*IN THE UNITED STATES DISTRICT COURT*
*FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA*

*CHARLESTON DIVISION*


IN RE:   AMERICAN MEDICAL SYSTEMS, INC., MDL NO. 2:12-MD-2325
IN RE:   BOSTON SCIENTIFIC CORP., MDL NO. 2:12-MD-2326
IN RE:   ETHICON, INC., MDL NO. 2:12-MD-2327

PELVIC REPAIR SYSTEMS
PRODUCTS LIABILITY LITIGATION

-----------------------------------------------------------------


*STATUS CONFERENCE*
*HELD ON MAY 24, 2012*
*BEFORE THE HONORABLE JOSEPH R. GOODWIN, CHIEF JUDGE*
*AND THE HONORABLE MARY E. STANLEY, MAGISTRATE JUDGE*


Court Reporter:        Teresa L. Harvey, RMR, RDR, CRR
                       Telephone: 304-254-8052


Proceedings recorded by mechanical stenography;
transcript produced by computer.

*APPEARANCES*

*(In alphabetical order by law firm)*

Daniel C. Hays
**ABOWITZ, TIMBERLAKE, DAHNKE & GISINGER, P.C.**
P. O. Box 1937
Oklahoma City, OK 73101

Benjamin H. Anderson
**ANDERSON LAW OFFICES, LLC**
1360 West 9th St., Suite 215
Cleveland, OH  44113

Aimee H. Wagstaff
**ANDRUS HOOD & WAGSTAFF**
199 Broadway, Suite 4150
Denver, CO  80202

Bryan F. Aylstock
D. Renée Baggett
**ALYSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC**
17 East Main St., Suite 200
Pensacola, FL  32502

Harry F. Bell, Jr.
**THE BELL LAW FIRM, PLLC**
P. O. Box 1723
Charleston, WV  25326-1723

Gary B. Blasingame
Henry G. Garrard, III
**BLASINGAME, BURCH, GARRARD, ASHLEY, P.C.**
P. O. Box 832
Athens, GA  30603

Christy D. Jones
**BUTLER SNOW**
P. O. Box 6010
Ridgeland, MS  39158

Clayton A. Clark
**CLARK, LOVE & HUTSON**
440 Louisianna, Suite 1600
Houston, TX  77002

*APPEARANCES*

(In alphabetical order by law firm)

Bret Stanley
**LAW OFFICES OF A. CRAIG EILAND**
Old Galveston Square
2211 The Strand, Suite 201
Galveston, TX 77550

Michael J. Farrell
Erik W. Legg
**FARRELL, WHITE & LEGG, PLLC**
P. O. Box 6457
Huntington, WV 25772-6457

Ryan R. Smith
**FELDSTEIN, GRINBERG, STEIN & McKEE**
428 Blvd. of the Allies
Pittsburgh, PA 15219-1352

Michael Bonasso
**FLAHERTY SENSABAUGH BONASSO, PLLC**
P. O. Box 3843
Charleston, WV 25338-3843

Carl N. Frankovitch
**FRANKOVITCH, ANETAKIS, COLANTONIO & SIMON**
337 Penco Road
Weirton, WV 26062-3828

David B. Thomas
Philip J. Combs
**GUTHRIE & THOMAS, PLLC**
P. O. Box 3394
Charleston, WV 25333-3394

Amy Eskin
**HERSH & HERSH**
2080 Opera Plaza
601 Van Ness Avenue
San Francisco, CA 94102-6388

Bryan A. Pfleeger
**MICHAEL HINGLE & ASSOCIATES, LLC**
220 Gause Blvd.
Slidell, LA 70458

*APPEARANCES*

*(In alphabetical order by law firm)*

James A. McKowen
**James F. Humphreys & Associates, L.C.**
United Center, Suite 800
500 Virginia Street, East
Charleston, WV  25301

Willard J. Moody, Jr.
**THE MOODY LAW FIRM**
500 Crawford St., Suite 300
Portsmouth, VA  23704

Fred Thompson, III
**MOTLEY RICE, LLC**
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

Fidelma Fitzpatrick
**MOTLEY RICE, LLC**
275 Seventh Ave., 2nd Floor
New York, NY 10001

Melissa Foster Bird
**NELSON MULLINS**
1035 Third Ave., Suite 300
Huntington, WV  25701

Taylor Tapley Daly
**NELSON MULLINS**
Atlantic Station, Ste. 1700
201 17th Street, NW
Atlanta, GA  30363

Derek H. Potts
Bret A. Clark
**THE POTTS LAW FIRM, LLC**
908 Broadway, 3rd Floor
Kansas City, MO  64105

Barbara R. Binis
Tracy G. Weiss
**REED SMITH, LLP**
2500 One Liberty Place
1650 Market Street
Philadelphia, PA  19103

*APPEARANCES*

*(In alphabetical order by law firm)*

Regis W. Stafford, Jr.
**REED SMITH, LLP**
Reed Smith Centre
225 Fifth Ave., Suite 1200
Pittsburgh, PA  15222

Robert T. Adams
Deborah A. Moeller
Bryan Pratt
Jon A. Strongman
**SHOOK, HARDY & BACON, LLP**
2555 Grand Blvd.
Kansas City, MO  64108-2613

Frederick Owen Ferrand
**SWIFT, CURRIE, McGHEE & HIERS, LLP**
The Peachtree
1355 Peachtree Street, NE, Ste. 300
Atlanta, GA  30309

William F. Bottoms
**VANANTWERP, MONGE, JONES, EDWARDS & McCANN, LLP**
1544 Winchester Avenue, 5th Floor
Ashland, KY  41101

Thomas P. Cartmell
**WAGSTAFF & CARTMELL, LLP**
4740 Grand Ave., Ste. 300
Kansas City, MO  64112

C. F. Jeb Wait, M.D., J.D.
**WAIT & ASSOCIATES**
205 Swede Creek
Boerne, TX  78006

Norwood S. Wilner
**THE WILNER FIRM**
444 E. Duval Street
Jacksonville, FL  32202

1    Proceedings had before the Honorable Joseph R. Goodwin,

2  Chief Judge, and the Honorable Mary E. Stanley, Magistrate

3  Judge, for the Southern District of West Virginia, in

4  Charleston, West Virginia, on May 24, 2012, as follows:

5         *CHIEF JUDGE GOODWIN:*  Well, good afternoon.  I would

6  like for somebody to volunteer to get out a calculator and

7  check everyone's hourly rate and add it up so I will know

8  exactly how much money I've spent this afternoon.  I'm

9  delighted that all of you are here, and the Marriott hotel and

10  Embassy Suites is delighted as well.

11    We talked a little bit about the scheduling for the Bard

12  MDLs, which is the five cases, which is the first item on the

13  agenda that I received.

14    Is there anything further on that, Mr. Garrard?

15         *MR. GARRARD:*  No, Your Honor.  I think with the

16  submission of the proposed order to the court and the

17  deposition protocol we're where we should be.

18         *CHIEF JUDGE GOODWIN:*  Anybody else?

19         *MS. DALY:*  No, Your Honor.  We agree with that.

20  Thank you very much.

21         *CHIEF JUDGE GOODWIN:*  All right.  Next I had the

22  issues common to MDL Nos. 2325, 2326, 2327 and 23 -- I guess

23  those three.  Let me, before I go through those items, give you

24  just a little spiel.  The Multidistrict Litigation Panel saw

25  fit to send all of those MDLs to this court.  Quite frankly, I

1   was consulted about whether they should be consolidated as sent

2   and I didn't know enough about it to say yes, so naturally, I

3   said no.  So we got all of them and they are separate MDLs, but

4   for those of you who spent most of your lives and nights

5   reading the Manual of Complex Litigation, you know that that

6   manual and every MDL judge that you've been before or judge

7   that you've practiced law before that has one of these big,

8   complex cases has encouraged counsel to look for commonalities

9   for development prior to the eventual down-and-out free-fall

10  fighting that will occur, because there are very significant

11  differences that I recognize, and each of you recognize, among

12  and between individual cases against manufacturers.   There are

13  different products involved; there are different experts

14  involved.   There are lots of differences.   Those I am not

15  looking for right now.   I know how to find differences.   I'm

16  looking for commonalities.   And in that regard, just let me go

17  through this, and I hope you won't take this in the wrong way.

18  I don't mean it to terrorize you, but I do mean it so that you

19  will not be surprised when I implement the knowledge which I

20  have gained from reading the rules and the cases.

21      First, let's just start with Rule 1 of the Federal Rules

22  of Civil Procedure, and it says I'm to construe all of them to

23  secure the speedy and the inexpensive determination of every

24  action and proceeding.   I want you to know that every action

25  that I and Judge Stanley take will be directed toward

1    accomplishing that task in these large and complex cases.   I
2    want to say to you what you well know, but I want to be sure
3    that you understand that I know that I have wide - with the
4    emphasis on wide - discretion to manage pretrial in complex
5    cases.   I have wide discretion to manage pretrial discovery.
6    The Federal Rules grant me flexibility to shape the type and
7    scope of information before and during the trials that will
8    surely come.

9        There are many tools within the Federal Rules that allow
10   me to do this, some that contemplate setting time limits,
11   restrictions on the quantity, the scope, or the sequencing of
12   discovery.   Let's just take Rule 26(a) -- or 26(b)(2)(A), which
13   states that the court may alter the limits in these rules on
14   the number of depositions or interrogatories or the lengths of
15   depositions under Rule 30.   By order, I can limit the number of
16   requests.   Rule 16(f) permits me to issue any just ruling,
17   including those authorized by Rule 37, if a party fails to
18   appear, substantially is unprepared, does not participate in
19   good faith, and so on and so forth.   Rule 26 gives me broad
20   authority by which I can manage, as I said, the scope of the
21   discovery, and 37 provides mandatory and discretionary
22   sanctions when the rules are not followed.

23       Now, I hope none of that is necessary.   In my dreams,
24   looking at all these fine lawyers, I would dream that
25   everything would just happen smoothly and we would never have

1  a disagreement, but because I recognize the inherent

2  intelligence shining from your bright eyes, I know there will

3  come times when we have substantial and real differences of

4  opinion and that we have solid legal arguments to make one with

5  the other and we will, I assure you, listen to you patiently

6  and do our very best to arrive at a fair and just conclusion as

7  to each issue.  I just don't want very many of them.

8       Just a word, it's not quite like the boy who cried wolf,

9  but there's a little bit of that.  All of you have experienced,

10 and I hope it's been more in state court - at least I'd like to

11 think that - than in federal court, the attitude of judges who

12 after a few years on the bench say in response to your

13 discovery problems, "A plague on both your houses," and you're

14 sitting there knowing that I'm following the rules and the

15 other side is wrong.  They're wrong on the law; they're

16 misrepresenting things to the court, but the judge won't take

17 time to read it, won't take time to examine it, and just wants

18 us both to go away.  We won't do that.  We won't do that.

19 Somebody's going to get blamed.  Now, that's not to say we're

20 not going to encourage you to agree, very strongly encourage

21 you to agree, as much as we can, but if we have to decide it,

22 it's going to be decided.  And I, fortunately, will only be

23 getting a second bite of the apple in the rare instance that

24 Judge Stanley does, for the first time in her life, something

25 with which I disagree.  But I have no tolerance -- I absolutely

1   have no tolerance for petty discovery disputes.  I'm handling a

2   bunch of them in Arizona and a bunch of them in California and

3   it's just driving me bananas.  I don't know what's happened to

4   lawyers.  In any event, Judge Stanley is very used to dealing

5   with discovery disputes and she'll deal with them as they come

6   along.

7        Let's go back to our agenda items, and the first item on

8   the agenda under the listing of "Common" is a direct filing

9   order.  How are we coming on that?

10       Mr. Garrard, you're standing up.  Go ahead.

11            MR. GARRARD:  Your Honor, we met with one of the

12  defendants yesterday, we met with all of the defendants today,

13  and I believe I can accurately report to the court that we

14  think we are reasonably close on direct filing order or orders.

15  We would ask the court to give us fourteen days, and it will

16  be our intention to have either agreed upon direct filing order

17  or orders, and I use plural because at least as to

18  Johnson & Johnson there is a little subtly that may need to be

19  appropriate for them different than AMS and Boston Scientific.

20  But we are hopeful as of this morning that within fourteen days

21  we can present to the court either agreed upon order or orders,

22  or alternatively, we will present to the court a document or

23  documents that will redline and show precisely what the issues

24  are that we cannot agree upon.

25       If you'd permit me, going on down, as to the master

1  complaint and short form complaint issues, item c; as to item

2  d, timing for short form complaints and responses to

3  plaintiffs' master complaint; and as to e, defendants' short

4  form complaint issues as to insufficiency or incompleteness, I

5  believe that after this morning we do not need to bring those

6  issues to the court and we believe we will have worked those

7  out.  I skipped over item b, which is protective order, and I

8  think that the common position of the plaintiffs and the

9  defendants is that we do not believe we can reach a mutual

10  agreement on protective order.  We have submitted to the court

11  the court's protective order.  The other side has submitted

12  various other versions, and we would seek, candidly, the

13  opportunity to have a meeting with Judge Stanley to see if

14  Judge Stanley can be of assistance to us in working through the

15  protective order issues.

16    *CHIEF JUDGE GOODWIN:*  All right.  I talked this over

17  with Judge Stanley yesterday.  I think you'll find she'll be

18  able to address that very quickly.

19    All right.  Going around the room, Ms. Binis --

20    *MS. BINIS:*  Yes, Your Honor.

21    *CHIEF JUDGE GOODWIN:*  -- do you essentially agree

22  with what Mr. Garrard has said?

23    *MS. BINIS:*  Yes, Your Honor.  The protective order

24  that AMS is working from is the Bard order that you have

25  already entered in the case, so that's the order that we're

 1   working from.

 2           *CHIEF JUDGE GOODWIN:*   Okay.   Ms. Moeller or Ms. Daly?

 3           *MS. MOELLER:*   We're already done, Your Honor.   We're

 4   not in this fight.

 5           *CHIEF JUDGE GOODWIN:*   All right.

 6           *MR. ADAMS:*   Rob Adams, Judge.

 7           *CHIEF JUDGE GOODWIN:*   Mr. Adams?

 8           *MR. ADAMS:*   Yes, and I represent Boston Scientific.

 9   We are in the same position as AMS.   We have submitted

10   essentially the Bard protective order that we have actually

11   used and modified in other litigation, so it's an order that

12   we're familiar with and the plaintiffs are familiar with.

13           *CHIEF JUDGE GOODWIN:*   Mr. Thomas or --

14           *MS. JONES:*   Christy Jones, Your Honor, on behalf of

15   Johnson & Johnson, and Mr. Garrard has accurately stated our

16   position.   Like the other co-defendant -- or not co-defendants,

17   but the other defendants, we have and are working from the Bard

18   order.   And I'd say to Your Honors that I think we all are

19   working in good faith.   We have -- we have, unfortunately, or

20   fortunately, on behalf of my client, already produced millions

21   of documents pursuant to another order that, frankly, we think

22   is more consistent with what the Bard order is; and it's for

23   that purpose that we're trying to work through those issues.

24   But I think, as Mr. Garrard has set forth, it's pretty much

25   that Your Honors are going to look at either what's on the

1    court's website or the Bard form of order and say one of these

2    applies, and we'll be able to move forward from that

3    thereafter.

4           *CHIEF JUDGE GOODWIN:*  Do you want to address it now?

5           *MAGISTRATE JUDGE STANLEY:*  If you wish.

6           *CHIEF JUDGE GOODWIN:*  All right.  Judge Stanley will

7    address this protective order issue now.

8           *MAGISTRATE JUDGE STANLEY:*  Well, let me ask this:  I

9    have the redlined protective order which was suggested by AMS,

10   and it's my understanding that the -- that the -- other than

11   changing the name of the party, or the name of the MDL, that

12   the significant differences are found on page 6 at 7(h),

13   page -- maybe I should wait for you-all to pull it out.

14       Okay.  Are you ready to go forward?  All right.  On

15   page 6, which is paragraph 7(h), I understand that that is the

16   paragraph that is materially different from the Bard protective

17   order.  Is that correct?

18          *MS. BINIS:*  That, and on page 10, paragraph 14, Your

19   Honor.

20          *MAGISTRATE JUDGE STANLEY:*  Well, hold on.  What about

21   paragraph 9 on page 7?

22          *MS. BINIS:*  Your Honor, we would be agreeable to not

23   worrying about that paragraph today.  The two paragraphs that I

24   think that we would be most concerned with are paragraph 8 and

25   paragraph --

1    *MAGISTRATE JUDGE STANLEY:*  Eight?  You mean 7(h)?

2    *MS. BINIS:*  7(h), correct, on page 6.

3    *MAGISTRATE JUDGE STANLEY:*  All right.

4    *MS. BINIS:*  And on page 10, paragraph 14, basically,

5    Your Honor, protecting some patent information and protecting

6    materials that were disclosed to a consultant to a competitor.

7    *MAGISTRATE JUDGE STANLEY:*  Now, and I understand

8    you're withdrawing the proposal in paragraph 9 on page 7?

9    *MS. BINIS:*  Yes, Your Honor.

10   *MAGISTRATE JUDGE STANLEY:*  And that's the sentence

11   beginning:  "The parties may also redact. . ." and finishing

12   ". . .to protected health information"?

13   *MS. BINIS:*  Yes, Your Honor.  And, frankly, Your

14   Honor, I think that's a little over broad.  If we need to

15   redact something and plaintiffs come back and say that

16   shouldn't have been redacted, I think we can deal with that on

17   a case-by-case basis.

18   *MAGISTRATE JUDGE STANLEY:*  Okay.  How do you justify

19   the essential nature of paragraph 7(h) on page 6 and

20   paragraph 14?  Why wouldn't Bard have the same requirements?

21   *MS. BINIS:*  I can't speak to that, Your Honor, but I

22   do know that my client highly negotiated these terms in the

23   Delaware litigation because it's really important to my client

24   on its patents.  Whether Bard has the same concerns on its

25   patents or not, I don't know, but I do know that -- and I can

1  give you to the person who really knows, who's sitting behind

2  me, but I do know that my client has been very firm on

3  protecting its patents and that's why they wanted this

4  information in there.

5           *MAGISTRATE JUDGE STANLEY:*   Does Bard wish to address

6  this?

7           *MS. DALY:*   No, Your Honor.

8           *MAGISTRATE JUDGE STANLEY:*   Does Boston Scientific

9  wish to?

10           *MR. ADAMS:*   No, Your Honor.

11           *MAGISTRATE JUDGE STANLEY:*   What about Ethicon?

12           *MS. JONES:*   No, Your Honor.

13           *MAGISTRATE JUDGE STANLEY:*   So, in other words, the

14  only entity that thinks that this is absolutely essential is

15  AMS?

16           *MS. BINIS:*   Apparently so.

17           *MAGISTRATE JUDGE STANLEY:*   Apparently.   Now,

18  Mr. Garrard, is there a position from the plaintiffs?

19           *MR. GARRARD:*   Your Honor, we don't see the need for

20  that.   Most patent information is public-type information and,

21  frankly, we moved away from the Bard protective order because

22  we have found that we think it's too extensive.   Every document

23  is designated confidential; and we have been mindful of the

24  court's admonition multiple times here we've got an open court.

25           There is an issue that Ms. Binis and I may engage in later

1  on today about discovery in another case that we are seeking

2  where the protective order is used to say we shouldn't have it.

3  So we think less is better, and more appropriate, and more

4  inclined with public policy, so we don't see the need for this.

5          *MS. BINIS:*  Your Honor, if I might just say, I tend

6  to agree that we tend to over mark as "confidential," and

7  that's a separate issue from what is allowed to be marked

8  confidential.  We do not intend, Your Honor, to mark half of

9  our documents as confidential, but there are certain materials

10 that we're going to be producing in this litigation about the

11 design and development of products that we do feel we don't

12 want our competitors to naturally see and which would be seen

13 in this litigation if not protected.

14         *MAGISTRATE JUDGE STANLEY:*  And your client is going

15 to be seeing -- be viewing documents produced by other

16 manufacturers.

17         *MS. BINIS:*  I understand that, Your Honor.

18         *MAGISTRATE JUDGE STANLEY:*  Well, I think it is far

19 more important that we have the same rules applying

20 across-the-board here.

21         *MS. BINIS:*  I understand.

22         *MAGISTRATE JUDGE STANLEY:*  And, accordingly, the

23 protective order which was entered into in the Bard MDL will be

24 the one that's used.

25         *CHIEF JUDGE GOODWIN:*  All right.  Let's go down to f,

1  the utilization of interim plaintiff profile information form

2  versus the defendants' proposal to utilize the fact sheets.

3       I don't find it appropriate to permit the plaintiffs to

4  complete the profile sheets rather than the full fact sheets.

5  You're going to have to do some persuading, Mr. Garrard.  I'll

6  give you a minute.

7       MR. GARRARD:  Thank you, Your Honor.  We're not

8  trying to avoid totally doing the full plaintiffs' fact sheet.

9  What we are trying to do is find an official vehicle by which

10  we can hone in on an initial pool of cases, then provide the

11  plaintiffs' fact sheets on that initial pool of cases from

12  which would then come, Your Honor, the cases that we do full

13  discovery on, then coming down to the bellwethers.  All we're

14  trying to do is have an efficient mechanism by which we can

15  have a realistic selection of the initial pool.  And if Your

16  Honor remembers what we did in Bard was Your Honor set this

17  date.  Well, we've got a whole lot more cases in these MDLs

18  than we had then, and just setting a date by which cases were

19  filed as your initial pool is not going to give them any

20  information; but what we are proposing is a methodology by

21  which we would do the plaintiff profile sheets.  We've had

22  discussions with the defendants today about that, and yesterday

23  about that, and while none of them have said, 'Yeah, we agree,"

24  we are very much in tune, we think, with, for example,

25  Johnson & Johnson, who in proposals to us has said they would

1    like to bifurcate the defendants' fact sheet and they would

2    like to give on the initial group of cases a defendants' fact

3    sheet that is generic about their products, and only when we

4    select down to a pool, Your Honor, then give us specific

5    information they may have about individual cases.  So what

6    we're trying to do -- and we didn't go over the idea because

7    of theirs, but it was interesting that theirs correlates with

8    ours pretty well.  What we're simply trying to do is have an

9    efficient way to give them some information now.  What happens

10   with the fact sheets, if we have to give fact sheets on every

11   case in inventory, we go away from what the MDL is all about

12   and that is in terms of an efficient movement of cases.

13        As courts have looked at these issues, what is important

14   is:  Was your product used?  We are saying, okay, let's give

15   that information.

16        Was there surgery to implant the product?  Yes, we give

17   that information:  The name of the doctor, the name of the

18   hospital, the date of that.

19        Was there repair surgery or revision surgery?  We say we

20   give that information now, the name of the doctor, the name of

21   the hospital.

22        What is the nature of the surgery?  We give that

23   information to them.

24        What is the nature of the injuries?  We give that

25   information to them.

1    The comment has been made to us, well, would you also give

2 us whatever medical you have now?  And our answer to that is

3 yes.

4    Would you work out a way that we can go ahead and get

5 medical releases, perhaps using them with Marker, whom we

6 already use in the Bard litigation?  The answer to that is yes.

7    And so that's where we are.  It's not to avoid in toto the

8 fact sheets.  It's a matter of staging and then doing fact

9 sheets on the cases that we've got to look at now.  What

10 happens --

11    *CHIEF JUDGE GOODWIN:*  I think I understand better --

12    *MR. GARRARD:*  Yes, sir.

13    *THE COURT:*

14    *CHIEF JUDGE GOODWIN:*  -- what you're driving at, and

15 to the extent that the parties can come together on a more

16 limited bit of information for the sole purpose of selecting

17 the pool, I'm not adverse to that.  But six years ago or so I

18 had a lot of trouble in the Serzone case with the plaintiffs'

19 fact sheets.  It's probably not unusual in the experiences of

20 the lawyers in this room that you may have from someplace a

21 case that you will have a very difficult time getting the fact

22 sheets filled out, getting the information you need, and so

23 forth.  I don't want to kick that can down the road so that

24 when the time comes you say, well, this is going to take ever

25 so much longer because, you know, we were --

1    *MR. GARRARD:*  What we know, though, Your Honor, is

2    that in large groups of cases the fact sheets on the cases down

3    the road are not truly relevant to what we're trying to do with

4    the initial cases.  And all we're trying to do is find a more

5    efficient way.  In Bard, for example, we spend a lot of time

6    updating fact sheets.  Well, for the case -- and what we have

7    proposed is that we take 150 cases in each of the three new

8    MDLs, that we do the plaintiffs' fact sheets on those once

9    we've honed in on that 150.  That each side get to select 75,

10   that we do that selection of the 150 based upon the profiles.

11   When we've gotten that 150, then we give full fact sheets on

12   those, and it's from that point that we then select down to,

13   say, twenty cases that we want to do depositions and all

14   discovery, and then the bellwethers, but that we don't expend,

15   at this point, the time and the energy and the resources on the

16   plaintiffs' fact sheets beyond that initial pool.

17          *CHIEF JUDGE GOODWIN:*  Let me say one thing while it

18   occurs to me.  It is often lost in this process that the

19   individual lawyers who took in the cases remain responsible,

20   ethically and to the court, for representing their clients, and

21   there's no reason that they can't begin the process of working

22   on fact sheets.  But, having said that, if the parties can

23   arrive at a solution which is efficacious to everybody and

24   moves toward the selection of a group of cases faster than we

25   could do if we were doing all the fact sheets, I'm all for it;

1   I just don't -- and when I heard you start being what I

2   considered to be fairly flexible on what you were going to add

3   into this preliminary document, then I started seeing it might

4   be more acceptable to the defendants.  But why don't I let them

5   speak for themselves?

6         MR. GARRARD:  Let me just add this:  I believe that

7   this morning as we talked about this that we each said, let's

8   have thirty days to get through this idea of the profile and

9   then get to the issue of there are disputes between us in terms

10  of the actual plaintiffs' fact sheets.

11        CHIEF JUDGE GOODWIN:  Is that okay with everybody?

12  Thirty days?

13        MS. BINIS:  Yes, Your Honor.

14        CHIEF JUDGE GOODWIN:  That's what we'll do then.

15        MR. ADAMS:  Fine.

16        MR. GARRARD:  Thank you.

17        THE COURT:  Now, when we turn to g, the ESI protocol,

18  since I had to have Judge Stanley yesterday remind me what it

19  was, perhaps it would be better if she discussed it.

20        MAGISTRATE JUDGE STANLEY:  Okay.  Do you-all have it

21  out?

22        MR. THOMPSON:  Judge, I would like an opportunity to

23  be heard on this, if that's possible.

24        MAGISTRATE JUDGE STANLEY:  Let me ask a few questions

25  first, Mr. Thompson.

1          *MR. THOMPSON:*  Certainly.

2          *MAGISTRATE JUDGE STANLEY:*  First of all, I assume

3     there's a litigation hold in place, is that correct, for AMS?

4          *MS. BINIS:*  Yes, Your Honor.

5          *MAGISTRATE JUDGE STANLEY:*  And Boston?

6          *MR. ADAMS:*  Yes, Your Honor.

7          *MAGISTRATE JUDGE STANLEY:*  And Ethicon?

8          *MS. JONES:*  Yes, Your Honor.

9          *MAGISTRATE JUDGE STANLEY:*  All right.  So have you

10    been working on a preservation order?  Mr. Thompson?

11         *MR. THOMPSON:*  Your Honor, we have had an opportunity

12    to meet by telephone with each of the defendants.  We have

13    engaged our vendor to be the depository.  Let me give a little

14    bit of background.  And I speak as a philosophy major, but a

15    little bit of background.

16         *CHIEF JUDGE GOODWIN:*  This scares me when you say

17    that.

18         *MR. THOMPSON:*  It's a poly-variable.  The Bard

19    production has been ongoing for a year and a half, almost two

20    years.  Many millions of documents have been forwarded into the

21    vendor under the Bard ESI.  In AMS, a fair number of documents

22    have been submitted over the last year and a half in various

23    litigations throughout the country.  Johnson & Johnson, for

24    example, has I believe produced well over a million, maybe even

25    two million, documents in state court under a protocol.  And so

1   we are abiding very carefully by the Court's admonition of

2   efficiency.  We don't want to try to push the rock back up the

3   hill; we don't want to try to push anybody back to a moment of

4   singularity, but we do want an efficient addressing of the

5   issues, and we want to coordinate with ESI protocols that have

6   already been agreed to and entered in these state courts so

7   that they don't conflict with each other.

8       I'm optimistic and I believe that we are going to get an

9   agreed upon ESI to submit to the court.  Now, we have used the

10  Bard MDL protocol as our baseline, which, of course, if you

11  were going to enter into a negotiation, why in God's green

12  earth would you start with the order?  We should have asked for

13  a lot of stuff and been willing to give it up to get back to

14  the order, but what we've done is we've gone straight to the

15  Bard order.  And we view that as the core of the agreement and

16  we expect to have the cooperation and to have an agreement to

17  put before the court.  Certainly, we can use your help to make

18  sure that this doesn't drag on for any length of time, but we

19  do believe we're going to have some success in the next couple

20  weeks, and we would be happy to have you supervise us if we

21  can't play in the sandbox correctly.

22          *MAGISTRATE JUDGE STANLEY:*  Well, it sounds to me like

23  you were addressing the ESI protocol --

24          *MR. THOMPSON:*  Yes, ma'am.

25          *MAGISTRATE JUDGE STANLEY:*  -- and I had specifically

1    asked if you were going to submit a preservation order.

2              MR. THOMPSON:   We have submitted a preservation and

3    a protective order to the other side and that's part of our

4    discussions.  My intention is to submit it either with

5    agreement or as an adversarial document for you to consider.

6              MAGISTRATE JUDGE STANLEY:   Have the defendants made

7    specific inquiry with the IT folks who work for your clients to

8    ensure that the software that they are using for all various

9    functions, including email, doesn't have an auto delete

10   function?  Frequently you have to override those and I just

11   want to make sure that we don't have any of that lurking

12   somewhere.

13             MS. BINIS:   We have been working with our IT

14   department on that, Your Honor.

15             MR. ADAMS:   We have too, Your Honor.

16             MS. JONES:   As has Ethicon, Your Honor.

17             THE COURT:   All right.

18             MAGISTRATE JUDGE STANLEY:   When I looked at this

19   Exhibit A which AMS submitted, I take it that you started with

20   the Bard order --

21             MS. BINIS:   That's correct.

22             MAGISTRATE JUDGE STANLEY:   -- and then started adding

23   things to it?

24             MS. BINIS:   And, Your Honor, I understand that as of

25   the conversations yesterday and today we are very close to

1    agreement with plaintiffs on this.

2         *MAGISTRATE JUDGE STANLEY:*  Okay.  Well, then I won't

3    waste my time on it.  I did notice that there were some

4    provisions which were a bit of a surprise and -- or at least

5    one, but I assume that will go away.

6         *MS. BINIS:*  I'm not sure what you're referring to,

7    Your Honor.

8         *MAGISTRATE JUDGE STANLEY:*  I'm referring to the

9    privilege log.  You put a hole in that privilege log provision

10   that you could drive a coal train through.  And let's just say

11   you're going to have a hard time convincing me that that's an

12   appropriate provision.

13        I guess I'm done.

14        *CHIEF JUDGE GOODWIN:*  The next is the structure of

15   future case management conferences.  To me, that's a little

16   premature.  Let's get through what else we've got to do and

17   what you've promised to do.  The best thing that's happened so

18   far is what I hoped would happen is you-all came to town early

19   enough and had some meetings and we made some progress and

20   that, in the past, has proven to me that one of the best things

21    I can do about scheduling a meeting is just get you-all to

22   come and get together, not necessarily what we do in the court.

23        Now, as I mentioned early, I want to -- I mentioned the

24   discussion of common discovery issues and I think -- I think I

25   made myself clear, but let me just turn things over to

1   Judge Stanley just a minute to discuss in a global way how we

2   envision discovery proceeding.  And having said that, I want

3   you to understand that we want to work cooperatively with you.

4   You will rarely find it the case that if the parties are in

5   agreement about how to do something that we're going to stand

6   in your way unless the parties are -- well, never mind.

7         Judge Stanley.

8         *MAGISTRATE JUDGE STANLEY:*  Well, once you have

9   reached agreement on preserving your evidence and how you're

10  going to -- and the ESI protocol, it would be my expectation

11  that the parties would be actively exchanging information.  Of

12  course, we've got these cases in different stages.  Ethicon's

13  turned over a lot of stuff, as have others and, of course, Bard

14  is heading toward trial, but it seems to me in order to have a

15  pretty efficient discovery process the plaintiffs need to have

16  a bunch of information in order to identify the custodians of

17  various computers and data, so they need organization charts

18  and historical information regarding who these individuals are

19  and what their roles were.

20        Obviously, there will be the need to work on developing

21  search terms.  Some of this material is obviously irrelevant

22  for those who have already reached those agreements, but the --

23  we'll then -- I'm assuming that since we've already started

24  talking about vendors that there will be a website, password

25  protected, or whatever?

1    *MR. THOMPSON:*   Your Honor, we were going to have

2    Harry Bell, who is our liaison, talk about the website that

3    we're preparing for -- first of all, for the general public

4    without passwords that will be, in essence, a bulletin board.

5    Any case lawyer who is admitted, certainly with a case filed in

6    this district or in the MDLs, will be able to enter the website

7    with the proper password and view the raw document production,

8    and then there will be higher levels of security for work

9    product type things which will not be accessible, but certainly

10   any case lawyer is going to have access to the document

11   production.   And also there will be a calendar, there will be a

12   bulletin board of appropriate orders, and also when from time

13   to time the court gives us the benefit of a tongue lashing

14   we'll use that as a forum to pass that along as well.   So I

15   think we're -- and, of course, the Bard site is up and active

16   and running at this moment.   The other sites are going to be up

17   in real-time as well.

18            *MAGISTRATE JUDGE STANLEY:*   In the Bard case we had a

19   bit of a dustup, or I guess it was just some extended

20   discussions, about whether the defense would be producing

21   documents with an index so that both the defense attorneys and

22   the plaintiffs' attorneys would be able to figure out where

23   documents came from, and who the custodian was, and where they

24   were made and maintained, and I certainly hope we don't have to

25   redo that fight or discussion.

1    I'm delighted to hear that you're moving forward on a

2   deposition protocol and -- I mean, what am I missing,

3   Mr. Garrard, Mr. Thompson?

4        MR. GARRARD:  I don't think the Court is missing

5   anything, but we would request on behalf of the plaintiffs that

6   the discovery stay as it currently exists pursuant to the

7   judge's initial CMO be lifted.  We are prepared and ready to

8   serve some initial discovery on the defendants.  We would like

9   permission to do that.  We have not done it because that stay

10  is in effect.  I think that would be the only thing that I

11  would suggest the Court might need to allow us to do.

12       CHIEF JUDGE GOODWIN:  What say the defendants?  We've

13  got a few housekeeping things you-all are going to agree on in

14  the next ten days or so.  Do you have any problem with lifting

15  the stay now?

16       MR. ADAMS:  I guess on behalf of Boston Scientific I

17  would say yes, that we do have a problem with doing it now.  I

18  think it's premature in this case.  I would like to see us work

19  through all of the basic filing issues before the stay is

20  lifted.  I think that's one of the purposes of the stay.

21       CHIEF JUDGE GOODWIN:  I am convinced that the good

22  order will be advanced by giving a little more time for

23  discussion before lifting the stay, so you've got -- you've got

24  a 10-day limit for some of this stuff, a 30-day limit for

25  others.  I'm going to split the difference and call it 20 days,

1   at which time I will lift the stay unless good cause is shown

2   why I should not do so.

3          MR. GARRARD:   Thank you, Your Honor.

4          MAGISTRATE JUDGE STANLEY:   Mr. Thompson, did I

5   address everything that you wanted to cover?

6          MR. THOMPSON:   Yes, Your Honor.

7          CHIEF JUDGE GOODWIN:   Let me move to motions to

8   dismiss and compliance with the court's pretrial order No. 1,

9   the parties' file lists containing pending motions, and I've

10  reviewed those and I find or think that the filing of master

11  complaints and short form complaints and plaintiffs' fact

12  sheets, or some abbreviated form thereof, may resolve some of

13  those motions.

14         MR. AYLSTOCK:   Yes, Your Honor.   Brian Aylstock.

15  That is what is contemplated.   We had a discussion yesterday

16  that was alluded to that would -- in the order that we're

17  contemplating for the master complaint and the master short

18  form and long form complaint would require anybody with a

19  pending case to adopt and incorporate the master long form

20  complaint or the short form complaint, so I think all of the

21  pending motions to dismiss for the individual cases should be

22  mooted, assuming we can work all of that out.

23         THE COURT:   Well, I would think that the defendants

24  are not going to be satisfied until you do do that, so can you

25  move fairly quickly to that end?

1    *MR. AYLSTOCK:*  Our hope is by the end of next week to

2    be able to present that.  In the direct filing order itself

3    we'll require those people who have not filed pursuant to the

4    master complaint and the master -- master long form and master

5    short form complaint to therefore adopt that.

6        *CHIEF JUDGE GOODWIN:*  And I recognize there may be --

7    there may be individual cases where you won't be able to solve

8    the problem.  And if there are, there are.  Ms. Binis?

9        *MS. BINIS:*  Your Honor, in the master complaint the

10   companies that we believe are not proper parties to this

11   litigation --

12       *CHIEF JUDGE GOODWIN:*  Yes.

13       *MS. BINIS:*  -- are still named.

14       *CHIEF JUDGE GOODWIN:*  Yes.

15       *MS. BINIS:*  So we would still need to bring a motion

16   to dismiss the Endo companies from the master complaint.

17       *CHIEF JUDGE GOODWIN:*  And you have motions to remand

18   filed as well.

19       *MS. BINIS:*  That's correct, Your Honor.

20       *CHIEF JUDGE GOODWIN:*  About 18 of them.

21       *MS. BINIS:*  That's correct.

22       *THE COURT:*  I'm well aware of those, and I understand

23   that there's been some briefing already on those in other

24   courts?

25       *MS. BINIS:*  There has been, Your Honor, so we can get

 1   a brief together for you very quickly.

 2        *CHIEF JUDGE GOODWIN:*  I think that's what you ought

 3   to do and let me take a look at that.

 4        *MS. BINIS:*  All right.

 5        *CHIEF JUDGE GOODWIN:*  First talk to one another and

 6   don't send me anything I don't have to decide.

 7        *MR. AYLSTOCK:*  Fair enough.

 8        *THE COURT:*  All right.  I've set four new conference

 9   dates.  This is going to be somebody's birthday or somebody's

10   problem, but I just have to pick dates.  We've got too many

11   lawyers for me to accommodate everybody, but I will accept

12   minority representation as long as I always have one of the

13   leads for each of the clients.  The dates are Thursday,

14   July 26; Thursday, September 13; Thursday, November 1; and

15   Thursday, December 6.  I'll enter an order on that.  As you can

16   tell, I tried to skip what looks like school and vacation

17   periods and so forth.  I'm sure I was unsuccessful in some

18   respects, but those are the dates.

19        Can we turn now to MDL 2325, which as of last count, but I

20   didn't look today, had 394 cases?  And you have a request for a

21   Science Day.

22        *(Judge Goodwin and Judge Stanley confer off the record.)*

23        *CHIEF JUDGE GOODWIN:*  All of the status conferences

24   will be at one.  It gives everybody the opportunity, I think.

25        Now, here's what I have in mind for the Science Day

1   request, and it's not going to meet all your objectives, but it

2   doesn't foreclose the fact that we're probably going to have

3   another or more Science Days that are more detailed and more

4   scientific.   What we've had up till now in the Bard cases are

5   more of a show-and-tell with products and a general outline of

6   theory of liability, theories of defense, very limited.   And we

7   found it helpful; that is to say, it was helpful just to see

8   the devices, although I can tell you that the pig skin model,

9   if you open it and put it back in the package it will mold very

10  quickly, and then smells really bad, so just in case anybody

11  wants to know.       *(Laughter.)*

12            *MR. GARRARD:*   There's a lot I could say to that, Your

13  Honor.

14            *CHIEF JUDGE GOODWIN:*   Yeah, it's probably best you

15  don't.     *(Laughter.)*

16            *MR. GARRARD:*   I won't right now.

17            *CHIEF JUDGE GOODWIN:*   So that's what I propose, and I

18  would like to do it on this July -- sooner rather than later,

19  and do it before our meeting on July 26th, like starting at

20  10:00 in the morning and give a couple of hours.

21       Now, I'd ask you to review the previous show-and-tell and

22  you don't need to repeat the female anatomy lessons that we had

23  in that, and to limit what we learned there or repetition of

24  that, insofar as you can, but you will want to present your

25  product specific issues for us.   I'm going to give AMS, Ethicon

1  and Boston Scientific just an arbitrary thirty minutes to begin

2  with, each, and you can coordinate with that, and plaintiffs

3  will get thirty minutes.  And I realize that's not equal

4  either, but that's the way it goes.  And we'll do more of this

5  in the future.  Your consumers are right here and we're going

6  -- there is going to be a lot we're going to want to learn from

7  you and from your experts and from your case development as

8  time goes on, but there is, you know, an evaporation of storage

9  that occurs, so I want to take it in pieces, in digestible

10  chunks, and this is the first chunk we'll do.

11         *MR. GARRARD:*  May I inquire of the Court?

12         *CHIEF JUDGE GOODWIN:*  Yes.

13         *MR. GARRARD:*  My recollection is when we did this

14  previously it was off the record and there's not a transcript

15  of it.

16         *CHIEF JUDGE GOODWIN:*  That's what we did, and I think

17  it's a good idea.  And we also had some prohibitions about

18  usage of anything that was said not being an admission by any

19  defendant or the plaintiff.  Just basically it's an

20  off-the-record thing, and if anybody messes up, it's no-harm,

21  no-foul.

22         *MR. GARRARD:*  A question I wanted to raise with the

23  Court is in that presentation there was a great deal of anatomy

24  and how the surgery was done, repair surgeries, et cetera.  We

25  certainly can do that again.  I would think the Court doesn't

 1  care for us to do that again, so some guidance from the Court

 2  in terms of what you would like from this side of the table

 3  would be helpful.

 4        CHIEF JUDGE GOODWIN:  Well, I can tell you that just

 5  from reading the papers, which I occasionally do, that you

 6  file, that the defendants obviously think that there is a

 7  substantial emphasis that ought to be placed on the surgeries

 8  and how they're performed and the other pieces of equipment

 9  involved other than the mesh product.  And because they think

10  that, they're going to want to talk about it a little bit, and

11  so I'm going to let them, and you can respond.

12        MR. GARRARD:  Okay.  I understand.  Thank you.

13        MR. ADAMS:  Your Honor.

14        CHIEF JUDGE GOODWIN:  Yes.

15        MR. ADAMS:  On the scheduling issue, I'd like to ask

16  the Court's indulgence on this point:  On the 26th I already

17  know that I am not going to be able to be here.  Mr. Bonasso

18  will be able to be here, but what I wanted to see is if it

19  would be at all possible if we would listen and learn and make

20  sure there is no duplication, and then on behalf of Boston

21  Scientific at the next scheduled hearing, which would be

22  September 13th, we would be given a half-hour, and hopefully

23  it would take less time than that, because we're not going to

24  be repetitive, and then I'd be able to appear to do that.

25        CHIEF JUDGE GOODWIN:  Do you know how deep in my debt

1    you would go if I give you that?  I mean, you would -- you

2    would -- from there on out, everything I did you'd just have to

3    be so agreeable.

4              *MR. CLARK:*  Your Honor.

5              *CHIEF JUDGE GOODWIN:*  Yes?

6              *MR. CLARK:*  From the plaintiffs' perspective, and

7    Boston Scientific, I'm not going to be able to be here on that

8    date as well.  I have a situation I'm aware of, plans with my

9    daughters for a year now, so we completely agree from the

10   plaintiffs side as well.

11             *MR. ADAMS:*  Well, I think that wipes out your debt,

12   Your Honor.

13             *CHIEF JUDGE GOODWIN:*  You know, ever since we went to

14   CM/ECF and the law clerks have my signature, I've been really

15   worried about it showing up on promissory notes.  Then I had

16   another thought, "I don't have any money anyway, so it doesn't

17   really matter.     *(Laughter.)*

18        No, we can do that, although it may well be that I don't

19   need to hear anything specifically from you.  You may, after

20   you've read and heard what everybody else does, not find

21   anything, and if you do, we'll keep it short, but we'll be

22   flexible.

23             *MR. ADAMS:*  Very good.

24             *MAGISTRATE JUDGE STANLEY:*  You could submit your

25   products through Mr. Bonasso.

1    *MR. ADAMS:*  We'd like to do that, and then if I could

2    just have time, you know, 20 minutes, 25 minutes, on the

3    13th, and believe me, I'm not going to be repetitive, but if

4    there are significant points that we need to make, I'd like to

5    make them.

6         *THE COURT:*  You've been so humble and appropriate

7    that we'll do that.  I'm just -- I'm very leery of being

8    flexible in the beginning of these cases, so understand that my

9    flexibility is not a sign of weakness.

10        *MR. ADAMS:*  Understood.

11        *CHIEF JUDGE GOODWIN:*  I understand, and have made it

12   my business to understand, when I got all of these MDLs that

13   they were going to be different, and they are in different

14   stages of development, and there are different issues that will

15   arise, and by putting the emphasis on the common discovery and

16   the common issues and so forth, I don't want you to think that

17   I don't appreciate those very substantial differences.  Some of

18   it is what I was talking about with regard to the products

19   other than the mesh.  I understand there's a difference between

20   the SUI products and the POP products, but I'll continue to

21   learn, and you will continue to have the opportunity to educate

22   me.

23        If you as a group continue to operate as you have thus far

24   in this case, this is going to be almost like it was when

25   people considered law a profession.  This has been very

1    pleasant and very professional and I admire the lawyers here

2    for the way they are and have conducted themselves thus far in

3    this litigation.  So if we can just continue down that path I

4    will work very hard to be sure that everybody is treated with

5    the kind of respect and every client gets the kind of fair

6    treatment that they certainly are entitled to.  Just because

7    you're in an MDL, and just because these cases are all

8    amalgamated, I recognize that there is an individual defendant

9    in every case and an individual plaintiff in every case, and

10   I'm not going to forget that at any point.  I cannot in any

11   reasonable way get everybody caught up completely and on the

12   same page at the same time.  There will be some of that.

13   That's going to happen just because of the similarities.

14   You're going to get closer together.  The defendants and

15   products and the litigation is going to come closer together as

16   time wears on, but some of the cases are so far behind in

17   development, because they haven't been developed at all in any

18   other court, that they're never going to be up -- certainly not

19   with Bard and maybe not one with the other.  I haven't lost the

20   sense that that is the case.

21        As usual, I am going to take the coward's way out on the

22   discovery issues where this is likely to be more of a problem

23   and it will be up to Judge Stanley to reconcile your

24   differences on that.

25        Now, I've got these two AMS cases with the protective

1   order issue.  I am loath to -- I am loath to get into a fight

2   with a judge that I've been talking to on the phone who seems

3   very nice and who's doing as good as she can.  On the other

4   hand, I'm not going to agree with her just to be agreeing with

5   her, so I'm going to have to decide this issue in this federal

6   court under the standards that I have that are applicable.

7       *(Judge Goodwin and Judge Stanley confer off the record.)*

8           *MAGISTRATE JUDGE STANLEY:*  On *Ambroff* and

9   *Boatman-Morse*, we have no information about those.  We don't

10  know --

11          *MS. BINIS:*  Yes, Your Honor.

12          *MAGISTRATE JUDGE STANLEY:*  -- what state court they

13  were or which judge.

14          *MS. BINIS:*  In *Boatman-Morse* it was Arizona, and it

15  was Tucson, and the name of the judge escapes me, but I can

16  come by it easily.  In *Ambroff*, it was the Northern District of

17  California, and it was Magistrate Judge Cousins, Nathaneal

18  Cousins.  Now, we would like an opportunity to brief this and

19  argue it for Your Honors.  I didn't intend to make you --

20  present all that for you today.

21          *MAGISTRATE JUDGE STANLEY:*  My understanding is that

22  certain witnesses were deposed --

23          *MS. BINIS:*  Yes, Your Honor.

24          *MAGISTRATE JUDGE STANLEY:*  -- and you have a

25  protective order that says the plaintiffs can't use the

1  depositions of those witnesses in any other case.

2  　　　　MS. BINIS:  Yes, Your Honor.

3  　　　　MAGISTRATE JUDGE STANLEY:  Now, the plaintiffs are

4  saying, hey, it's the sworn testimony of a witness --

5  　　　　MS. BINIS:  Yes.

6  　　　　MAGISTRATE JUDGE STANLEY:  -- I should have access to

7  that.  And you say, no, you can't, because we've got this

8  protective order.

9  　　　　MS. BINIS:  Yes.

10 　　　　MAGISTRATE JUDGE STANLEY:  Well, we can't enter an

11 order vacating somebody else's protective order.

12 　　　　MS. BINIS:  Yes, Your Honor.

13 　　　　MAGISTRATE JUDGE STANLEY:  And so it would seem to me

14 that you'd have to go to that judge and say, "will you please

15 give us leave to disclose this?"

16 　　　　MS. BINIS:  And we have been saying that all the way

17 through.  Plaintiffs have been asking us for these documents in

18 every jurisdiction that we're in.  We've been arguing it in

19 every jurisdiction that we're in.  In Delaware the judge said

20 just what you said, "I can't undo an agreed-upon, voluntarily

21 entered stipulation in -- that was entered in another court."

22 　　　　MAGISTRATE JUDGE STANLEY:  Yeah.  So you go back to

23 that court and you get it changed; right?

24 　　　　MS. BINIS:  I agree, Your Honor.

25 　　　　MAGISTRATE JUDGE STANLEY:  So why don't you do that?

1          *MR. GARRARD:*  One of the cases is in this court.  The

2     *Ambroff* case --

3          *CHIEF JUDGE GOODWIN:*  Then you've got a really good

4     chance.

5          *MR. GARRARD:*  -- is Nathaniel Cousins.  So we will go

6     to this judge and get it changed, and this judge being you,

7     Your Honor.

8          *CHIEF JUDGE GOODWIN:*  I would say the chances of

9     success are very high, because sworn statements are, I would

10    think, of necessity, and I just -- I just have to hear from you

11    on it.  I don't want to rule on something that I don't know

12    what the parties are fighting about, so get me papers on it and

13    tell me how long you need to do it.

14         *MS. BINIS:*  We could have a motion filed within the

15    next thirty days, Your Honor.

16         *MAGISTRATE JUDGE STANLEY:*  Is this on admissibility

17    or discovery?

18         *MR. GARRARD:*  I would think that the motion is ours

19    to file asking this court to modify the stay in *Ambroff* to give

20    us the information, and we can file a motion seeking this

21    court's involvement in that within fourteen days, Judge.

22         *CHIEF JUDGE GOODWIN:*  Is 14 days to reply all right?

23         *MS. BINIS:*  Yes, Your Honor, and then we could

24    respond.  That's fine.

25         *MR. GARRARD:*  Or I'm prepared to argue it now, if the

 1 | Court would like.

 2 | *THE COURT:*  I don't want to do that because, as you

 3 | could tell, I had Judge Higbee messed up in this other issue,

 4 | so you better give me a little bit of time if I can't get those

 5 | two straight.

 6 | *MR. GARRARD:*  We'll have it to you in 14 days, Your

 7 | Honor.

 8 | *THE COURT:*  All right.

 9 | *MS. BINIS:*  And, Your Honor, just to be clear, this

10 | does not deal with *Boatman-Morse*, which is the Arizona case.

11 | This only deals with *Ambroff*.

12 | *CHIEF JUDGE GOODWIN:*  But Judge Stanley's suggestion

13 | is you need to go to the courts and ask them.  Otherwise, you

14 | put us in a terrible position; and you're going to get yourself

15 | in a terrible position, because we might order the production

16 | of something and you've got another order that says you can't

17 | turn it over and you're going to either be in contempt of one

18 | court or the other.

19 | *MS. BINIS:*  Well, your Honor, if I could just give

20 | you a little bit of a flavor for this, these were protective

21 | orders that were entered before there was a mass tort.  These

22 | were cases that were filed very early when there weren't that

23 | many cases.  They were voluntarily entered, agreed to by the

24 | parties, and entered by the court.  The depositions were then

25 | taken.  This was before the company had hired counsel, before

1  there was a mass tort.  Admittedly, and I'm embarrassed to have

2  to say this to as many judges as I have to say it, but it's

3  true, not all the documents that were requested in those cases

4  had been produced at the time of deposition.  In fact, a very

5  limited document production had occurred.  When I came on the

6  scene and I realized that, I went to the plaintiffs and I said,

7  "Do you understand we have not given you all the documents we

8  need to give to you?"

9      And they said, "Actually, yeah, we were wondering about

10  that.  We were wondering where all those documents were."

11      And I said, "Well, now we're going to do that.  We're

12  going to give you all the documents."

13      And they said, "Now we have to redepose all your

14  witnesses," which, frankly, I didn't think was all that

15  unreasonable, given all the circumstances, so we were working

16  towards that.  We were working towards giving them the

17  documents; we were working towards the redeposition of the

18  plaintiffs.  We then settled the case, and as a term of the

19  settlement -- and I settled the case with Ms. Eskin and

20  Ms. Fitzpatrick, who are the leads on our litigation.  I said,

21  "You have to make it -- we have to have as a term of the

22  settlement that you will abide by the terms of those protective

23  orders, because we now have these depositions out there and we

24  now have a mass tort, and we have these depositions that were

25  taken on a limited number of documents and where witnesses said

1   things like, 'I don't know the answers,' that now they have all
2   the documents, they are not going to say that, so you have to
3   agree as a term of this settlement agreement, and we will pay
4   you for that, that you will abide by the terms of the
5   protective order."

6        And they agreed, and I got it in writing, and I got it
7   from both of them.  So immediately -- we settled that case in
8   December.  Immediately in January we get a request for those
9   depositions, and I'm sitting there going:  We just settled
10  this; we just settled the case.

11       Of course, that's what a protective order means.  When you
12  enter into a protective order and you have that as a specific
13  term of the protective order, this happens all the time --
14  excuse me, I'm getting sick -- but it happens all the time that
15  you take these depositions and they're not usable in cases down
16  the road.  And that's all that this entails is an agreed-upon
17  order and a bargained-for order.

18            MR. GARRARD:  May I briefly respond, Your Honor?
19            CHIEF JUDGE GOODWIN:  Sure.
20            MR. GARRARD:  The protective order that AMS wants to
21  rely upon at paragraph 14 says:
22            "Notwithstanding the provisions hereof, each
23            party is free to disclose information furnished by
24            that party, including confidential information,
25            and such shall not be deemed a waiver of

1    protections hereof, including confidentiality."

2        The protective order itself allows the dissemination of

3    the information.

4        *CHIEF JUDGE GOODWIN:*  I'm going to make you-all brief

5    this.  I don't want to decide it today.  I don't understand

6    enough about it.  I'm not going to start down this road on an

7    issue that -- one of the few issues where you-all have fallen

8    into disagreement without being able to be fully informed as I

9    decide it.  So on that issue as well do you think you should be

10   the moving party?

11       *MR. GARRARD:*  I think we should, because we're asking

12   this court, which has the *Ambroff* case transferred to it --

13       *CHIEF JUDGE GOODWIN:*  How about the other cases?

14       *MR. GARRARD:*  The other case is a state court case.

15   Candidly, I don't think Your Honor can necessarily change that

16   order.  We could go to that court, but --

17       *CHIEF JUDGE GOODWIN:*  I can assure you I can't.

18       *MR. GARRARD:*  But this court can deal with the issue

19   that we have, the documents and the depositions that we are

20   seeking, most of which were 30(b)(6) depositions, so we will

21   brief it to the --

22       *CHIEF JUDGE GOODWIN:*  Whatever it is you want me to

23   do, you put it in a brief in 14 days.

24       And you answer it in 14 more, and I'll do the best I can.

25       *MS. BINIS:*  Thank you, Your Honor.

| | |
|---|---|
| 1 | *MR. GARRARD:*  All right. |
| 2 | *CHIEF JUDGE GOODWIN:*  Now I'm on to the Judge Higbee |
| 3 | issue about the contact with the doctors.  I'm going to ask the |
| 4 | parties in Ethicon to provide me with a copy of Judge Higbee's |
| 5 | order, as well as the briefs filed with the appellate division. |
| 6 | *MAGISTRATE JUDGE STANLEY:*  Do you know when or how |
| 7 | long the appellate division typically takes to render an |
| 8 | opinion? |
| 9 | *MS. JONES:*  No, Your Honor.  I mean, we have -- we |
| 10 | would have thought we would have had an order before now, and |
| 11 | I am told that sometimes it is as prompt as thirty days and |
| 12 | sometimes it's as long as a couple of years, so we're just -- |
| 13 | we are in limbo.  And, frankly, I've talked with the |
| 14 | plaintiffs' counsel, and the issue is a little bit different |
| 15 | from what we've presented by Mr. Garrard in his letter in the |
| 16 | sense that what happened was we had retained and begun working |
| 17 | with experts, and then they subsequently showed up as treating |
| 18 | physicians, and we promptly disclosed it, which then brought on |
| 19 | the issue that's currently before the court.  And the only |
| 20 | reason that we have it up here - we'll certainly be glad to |
| 21 | furnish you with the briefs and orders and all - is that at |
| 22 | some point it may end up being moot.  If we get the right |
| 23 | decision out of the appellate court, it may end up being moot. |
| 24 | But under any circumstances we have to -- we will eventually |
| 25 | have to know to what extent we are bound by that order in this |

1  court so that we don't inadvertently do something

2  inappropriately.  So we will be happy to send that to you and

3  I'm happy to advise the court of any developments as they

4  occur.  But if we don't get a decision within a reasonable

5  period of time, we're going to have to ask for guidance from

6  this court.  And that's really all we wanted to do was to put

7  that on the radar screen to say if we don't get a decision out

8  of the appellate court we're going to need some guidance.

9           *CHIEF JUDGE GOODWIN:*  I was going to have you brief

10  it in 30 days.  You don't see that much urgency?

11          *MS. JONES:*  I would hope we would have one, but I

12  can't represent that to the court.  We have been waiting now

13  since March.

14          *CHIEF JUDGE GOODWIN:*  I'm going to kick the can down

15  the road to the next status conference and then we'll talk

16  about it.

17          *MS. JONES:*  That's fine.

18          *MAGISTRATE JUDGE STANLEY:*  Can you tell me whether

19  the briefs tended to argue some peculiarlies within New Jersey

20  law, or was it more broadly focused than that?

21          *MS. JONES:*  It ended up being more broadly focused.

22  It was certainly initially, and Judge Higbee certainly relied

23  upon some peculiar New Jersey law.  There were amicus briefs

24  filed as well, so it ended up in a broader -- a broader issue,

25  but I'll be happy to -- as I was saying, Your Honor, would you

1  like for us to go ahead and submit to you her order and the

2  briefing that was submitted to the appellate court?

3           *MAGISTRATE JUDGE STANLEY:*   Including the amicus

4  briefs.

5           *MS. JONES:*   We'll be happy to do that.

6           *MR. AYLSTOCK:*   And I believe, Your Honor, in

7  Mr. Garrard's letter to the court that was -- Judge Higbee's

8  order, anyway, was one of the attachments, so you have that,

9  and we'll certainly work with Ms. Jones to make sure you have a

10 complete record.   I will say, from what I know about it, the

11 argument was in late March, and it was an interlocutory appeal,

12 so I agree with Ms. Jones, I think it could be any day and it

13 might well be mooted by the next status conference.   We'll see.

14          *CHIEF JUDGE GOODWIN:*   Moving to the Ethicon and

15 Johnson & Johnson cases, I think we've talked about a bunch of

16 it.   We had about 316 cases at my last count.   There have been

17 a lot of documents produced.   Again, am I right that you-all

18 are working together on this?

19          *MR. AYLSTOCK:*   You are correct, Your Honor.

20 Ms. Jones and I spoke at length yesterday, and again this

21 morning, and we have carefully considered the Court's comments

22 at the last hearing about apple munching and not having second

23 bites at the apple.   And I've also reviewed Judge Higbee's

24 comments about your conversation with her, and we agree with

25 both Your Honors that speed and lack of duplication should be

1  our goal, and that's what we're working toward.  There are and

2  there will be some differences that will need to be addressed

3  here.  For example, in the New Jersey litigation all the

4  depositions have been focused on the Prolift product.  Expert

5  reports for a trial in November are going in next Friday, so

6  the case on the Prolift is very far advanced on that.  The

7  depositions were taken with the thought in mind that the

8  witnesses are within the subpoena power of Judge Higbee's

9  court.  That is not necessarily the case here, so depending on

10  whether maybe we could work out an agreement to bring some

11  witnesses live in an assay deposition or something like that,

12  we can hopefully shortcut as much of the need to redepose some

13  of these witnesses on the Prolift as possible.

14        *CHIEF JUDGE GOODWIN:*  I assured Judge Higbee on a

15  related matter that I have a travel budget.  She does not.

16        *MR. AYLSTOCK:*  She mentioned that.

17        *CHIEF JUDGE GOODWIN:*  If necessary, I can travel up

18  there.  I don't foresee it until we get to *Daubert*, but I can.

19        But does this mean anything that would prevent me from

20  having to go to the south of France?  *(Laughter.)*

21        *MS. JONES:*  Your Honor, we might have -- we might

22  have a deal we can work out.

23        *MR. GARRARD:*  Actually, Judge, we're going to have

24  some depositions in France this summer and we thought that

25  either you or Judge Stanley might be good to go and moderate.

1      MR. THOMPSON:   And they may be very contentious, so

2  we'll need judicial supervision.

3      MR. GARRARD:   We may need both of you.   (Laughter.)

4      CHIEF JUDGE GOODWIN:   Judge Stanley spends most of

5  her time over there, so she'd be good.

6      MAGISTRATE JUDGE STANLEY:   I wish.   Ms. Jones?

7      MS. JONES:   I apologize.   I thought you were going,

8  really, to the French depositions, and we are working with

9  plaintiffs' counsel, but because we do have ongoing discovery

10  and depositions, including some that are going to be in France

11  the end of next month, we are trying to work out some provision

12  so that they could be taken one time in both New Jersey and in

13  this proceeding, and I'm hopeful that we're going to be able to

14  work it out.   I'm confident that Mr. Aylstock and I can work it

15  out, but we've got another court, another counsel, involved

16  here and so we're going to try and work it out.   If we run into

17  a problem we may actually come jointly to you and say we need

18  a -- we need some guidance and some resolution right now in

19  terms of helping us agree upon a procedure, but I think we all

20  hope to get to the same place, but because this is the first

21  time we're having to work with the two different jurisdictions,

22  we may need Your Honors' help.   And the other thing that we

23  would like to be able to do is to be able to begin to start

24  cross-noticing some of those depositions promptly.

25      CHIEF JUDGE GOODWIN:   I encourage you to continue on

1  the path you are on and I will help you at any way along that
2  path that you find expedient.
3          *MS. JONES:*  Thank you, Your Honor.  I mean, I'm
4  confident that we're going to be able to work it out.  It's
5  just we may need some additional assistance.
6          *THE COURT:*  And if it's a really difficult problem,
7  Judge Stanley will step in.
8          *MS. JONES:*  Okay.  Thank you, Your Honor.
9          *CHIEF JUDGE GOODWIN:*  What else do we have to take up
10  this afternoon?
11          *MR. GARRARD:*  Your Honor, from the plaintiffs' side,
12  I don't think we have anything else to take up at the moment.
13          *CHIEF JUDGE GOODWIN:*  Got anything else?
14          *MR. ADAMS:*  No, Your Honor.
15          *CHIEF JUDGE GOODWIN:*  Who's got an afternoon
16  airplane?  Well, the rest of you spend the time you've got in
17  Charleston in an enjoyable way and continue your productive
18  meetings.  I'm glad to see all of you.  Court stands adjourned.
19          *(Proceeding concluded at 2:25 p.m., May 24, 2012.)*
20  *CERTIFICATION:*
21      I, Teresa L. Harvey, Registered Diplomate Reporter, hereby
   certify that the foregoing is a correct transcript from the
22  record of proceedings in the matters of In re American Medical
   Systems, Inc., MDL No. 2325; In re Boston Scientific Corp.,
23  MDL No. 2326; and in re Ethicon, Inc., MDL No. 2327, as
   reported on May 24, 2012.
24
25  s/Teresa L. Harvey, RDR, CRR              June 19, 2012