*IN THE UNITED STATES DISTRICT COURT*
*FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA*

*CHARLESTON DIVISION*


IN RE:   C. R. BARD, INC., MDL NO. 2:10-MD-02187
IN RE:   AMERICAN MEDICAL SYSTEMS, INC., MDL NO. 2:12-MD-02325
IN RE:   BOSTON SCIENTIFIC CORP., MDL NO. 2:12-MD-02326
IN RE:   ETHICON, INC., MDL NO. 2:12-MD-02327


PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION

-----------------------------------------------------------------



*STATUS CONFERENCE*
*HELD ON JULY 26, 2012*
*BEFORE THE HONORABLE JOSEPH R. GOODWIN, CHIEF JUDGE*
*AND THE HONORABLE MARY E. STANLEY, MAGISTRATE JUDGE*














Court Reporter:        Teresa L. Harvey, RDR, CRR
                       Telephone: 304-254-8052




Proceedings recorded by mechanical stenography;
transcript produced by computer.

*APPEARANCES*

*(IN ORDER ALPHABETICALLY BY LAW FIRM)*

Bryan F. Aylstock
**ALYSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC**
17 East Main St., Suite 200
Pensacola, FL  32502

Harry F. Bell, Jr.
**THE BELL LAW FIRM, PLLC**
P. O. Box 1723
Charleston, WV  25326-1723

Henry G. Garrard, III
**BLASINGAME, BURCH, GARRARD, ASHLEY, P.C.**
P. O. Box 832
Athens, GA  30603

Lisa Blue
**BARON & BLUE**
3811 Turtle Creek Blvd, Ste. 800
Dallas, TX  75219-4550

Christy D. Jones
Donna Brown Jacobs
**BUTLER SNOW**
P. O. Box 6010
Ridgeland, MS  39158

Martin Crump
**DAVIS & CRUMP**
1712 15th Place, Third Floor
Gulfport, MS  39501

Michael J. Farrell
Erik W. Legg
**FARRELL, WHITE & LEGG, PLLC**
P. O. Box 6457
Huntington, WV  25772-6457

Michael Bonasso
Elizabeth Taylor
**FLAHERTY SENSABAUGH BONASSO, PLLC**
P. O. Box 3843
Charleston, WV  25338-3843

*APPEARANCES*

*(IN ORDER ALPHABETICALLY BY LAW FIRM)*

Leaf D. McGregor
**FULBRIGHT & JAWORSKI**
2100 IDS Center
80 South Eighth Street
Minneapolis, MN  55402-2112

Fred Thompson, III
**MOTLEY RICE, LLC**
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

Fidelma Fitzpatrick
**MOTLEY RICE, LLC**
321 South Main Street
Providence, RI  02903

Melissa Foster Bird
**NELSON MULLINS**
1035 Third Ave., Suite 300
Huntington, WV  25701

Richard B. North, Jr.
**NELSON MULLINS RILEY & SCARBOROUGH**
201 17th St., NW, Suite 1700
Atlanta, GA  30363

Barbara R. Binis
Tracy G. Weiss
**REED SMITH, LLP**
2500 One Liberty Place
1650 Market Street
Philadelphia, PA  19103

J. R. Rogers
**LAW OFFICES OF J. ROBERT ROGERS**
3972 Teays Valley Road
Hurricane, WV  25526

*APPEARANCES*

*(IN ORDER ALPHABETICALLY BY LAW FIRM)*

Deborah A. Moeller
Bryan Pratt
Matthew D. Keenan
**SHOOK, HARDY & BACON, LLP**
2555 Grand Blvd.
Kansas City, MO  64108-2613

Frederick Owen Ferrand
**SWIFT, CURRIE, McGHEE & HIERS, LLP**
The Peachtree
1355 Peachtree Street, NE, Ste. 300
Atlanta, GA  30309

Douglas B. King
**WOODEN & McLAUGHLIN**
211 North Pennsylvania Street
One Indiana Square, Suite 1800
Indianapolis, IN  46204

1    Proceedings had before the Honorable Joseph R. Goodwin,

2  Chief Judge, and the Honorable Mary E. Stanley, Magistrate

3  Judge, for the Southern District of West Virginia, in

4  Charleston, West Virginia, on July 26, 2012, as follows:

5            *CHIEF JUDGE GOODWIN:*  First, on behalf of

6  Judge Stanley and myself and Kate, I want to express to all of

7  you our appreciation for the cooperative effort that is an

8  ongoing process in these MDLs, which apparently there may be

9  another one coming that I just read about in the newspaper.  In

10 any event, while I think we've done a good job of moving

11 forward in an orderly manner and planning where we're headed,

12 we have left a little debris behind us that we're going to need

13 to clean up, and we'd better do it now rather than later.

14 Lexicon has reared its ugly head when I just started thinking

15 about where we are and what we're doing in the context of the

16 master complaint, the short form complaint, and the direct

17 filing of cases in this district by many people.  Right now

18 we've got about 3,400 cases.  They're coming in at an

19 increasing rate.  I suppose all of you know that.  I think we

20 have time and I think it's essential that we take the time to

21 do some of the remedial work that I'm talking about, and this

22 is where I think liaison counsel should play a significant

23 role, as well as lead counsel, in the individual MDLs.  Not

24 three lawyers are meant in these MDLs to do all the work, so

25 I'm hopeful and expect leadership across-the-board from the

1    structure, particularly on the plaintiffs' side, that we set

2    up.

3        I reviewed the direct filing orders submitted in the three

4    newer MDLs and compared them with the existing direct filing

5    order that I entered in Bard.  Now, you have, I think, passed

6    out to you a definition-of-terms sheet.  It's a pitiful attempt

7    to differentiate the different kinds of situations with cases

8    that we have in the court, but I'm going to use these terms as

9    we go through the discussion.  And this discussion is meant to

10   lead to an effort by all of us to solve the problems that I'm

11   going to outline for you and not to a direction by me as to how

12   to solve them, except to say that they have to be solved.  The

13   problems have to be dealt with.

14       I said MDL defendants are those manufacturing or marketing

15   defendants like Bard, Sofradim, TSL, AMS, Boston Scientific,

16   Ethicon and J & J-related entities.  There are other defendants

17   in individual suits filed directly here, transferred here, like

18   medical providers, other pelvic mesh manufacturers, hospitals,

19   et cetera, and I'm going to refer to them, the ones that were

20   transferred here by the MDL Panel, as transferred non-MDL

21   defendants.  The MDL defendants, I'm kind of sticking with

22   manufacturers and so forth.  Other kinds of defendants that

23   were transferred here by the MDL Panel I'm calling transferred

24   non-MDL defendants.  And the final category are directly-filed

25   non-MDL defendants.  These are the other kinds of defendants,

1    medical providers, other pelvic mesh manufacturers, hospitals,

2    and so forth, named in lawsuits right now that are filed in the

3    Southern District.

4         In reviewing the proposed direct filing order and the

5    short form complaints, I've reflected on and considered issues

6    of fairness and efficiency and efficacy for all of us as we're

7    going through this litigation and thought about matters of

8    personal jurisdiction, venue, service of process, and that's

9    led me to conclude that entry of the direct filing order and

10   short form complaints in their current form is not feasible,

11   so we have to figure out how to make it feasible.  Nor is

12   continued direct filing as we permitted it up to this point,

13   specifically in Bard, appropriate in certain circumstances, as

14   I'll outline.  Currently plaintiffs have directly filed many

15   cases here in the Southern District naming only the MDL --

16   naming not only the MDL defendants but also a number of

17   directly-filed non-MDL defendants.  Refer to your definition

18   sheet.  In many cases, the naming of additional directly-filed

19   non-MDL defendants was done to avoid what I'm sure counsel

20   thought were statute of limitations issues.  These direct

21   filings are only -- are only appropriate in this court, in most

22   instances, if issues of personal jurisdiction and venue are

23   waived by the directly-filed non-MDL defendants or any

24   transferred non-MDL defendant that might be named.  Obviously,

25   the directly-filed non-MDL defendants have not been involved in

1   this litigation, for the most part.  They've not been before

2   the MDL Panel and they've not waived personal jurisdiction or

3   venue.  As a result, I don't see how we can -- and I'm willing

4   to listen -- how we can allow direct filing of complaints

5   against defendants other than the consenting MDL defendants

6   involved in each of the four MDLs.  The direct filing orders

7   and short form complaints will have to be somehow limited to

8   the MDL defendants.  The direct filing orders, I don't see how

9   they can contain language related to selection of venue;

10  rather, the MDL defendants must waive venue in order to direct

11  file.

12      *Lexicon*.  *Lexicon v. Weiss* in 1998 was the thing that

13  drives MDL judges crazy.  We talk about it every single year at

14  the MDL conference about what a barrier the Supreme Court

15  created to dealing with these matters efficiently.  There the

16  Supreme Court found that a transferee judge cannot self

17  transfer an MDL action to his or her district under 1404 for

18  the purpose of conducting a trial, et cetera.

19      If additional defendants are to be named, it seems to me

20  the plaintiffs must follow the ordinary procedure.  There's two

21  things -- two ways to go.  Plaintiffs either have to follow the

22  ordinary procedure of filing the lawsuit in the district where

23  it's appropriately filed -- where it should be appropriately,

24  serving all of the defendants, and then the case must be

25  transferred, and will be readily, to this district by the MDL

1    Panel.  That's, of course, unless they can persuade the

2    directly-filed non-MDL defendants, and, of course, the MDL

3    defendants -- or the not transferred non-MDL defendants to

4    agree to a waiver of venue and personal jurisdiction.  If they

5    don't do that, the only other thing that we have to deal with

6    - and this is particularly true on the cases that are already

7    behind us and need to be cleaned up - is either we've got to

8    get the waivers or they've got to be transferred back to an

9    appropriate district under the transfer statutes.  Now, I can't

10   transfer a case I don't have jurisdiction over, but there is

11   Fourth Circuit precedent which allows me to transfer a case

12   where I have jurisdiction over one of the defendants but not

13   all of them, so that would cover most of the cases, not

14   necessarily all.

15       Have I sufficiently, even with all this garbled language,

16   conveyed to you what I see as a problem that we as the court

17   and the leadership of these MDLs need to straighten out as we

18   move forward?  I don't want to slow us down.  I'm very proud of

19   the work that's being done, but we'll just get in worse shape

20   fast if we don't solve this now.

21       Anybody have something you want to say?  Mr. Garrard?

22            *MR. GARRARD:*  Henry Garrard.  Can the Court tell us

23   the magnitude or the numbers of cases that this impacts where

24   there are non-MDL defendants that have been named and filed in

25   this case before the court?

1    *CHIEF JUDGE GOODWIN:*  As to the current problem,

2    yeah, I think I can identify that for you, and Kate may even

3    have a rough idea, I don't know.  It's not huge, but as to the

4    future, it can get big in a hurry, if we -- if we enter -- I

5    can't enter these orders the way they're written, so we have to

6    figure out how to solve the problem on a going-forward basis.

7    On the basis of the cases that are already here, I don't think

8    that's going to be a huge issue.  I think your liaison counsel

9    is going to be able to go back, figure out if transferring is

10   easier or no -- that doesn't require -- if there is a

11   jurisdiction, it doesn't require a new filing fee, it swings

12   back, goes through that clerk's office, back up through the MDL

13   and back here.

14          *MR. GARRARD:*  Obviously, we have --

15          *CHIEF JUDGE GOODWIN:*  Or we get waivers.

16          *MR. GARRARD:*  I suspect getting waivers may be quite

17   difficult.

18          *THE COURT:*  Very possibly.  If I were a doctor in

19   Nebraska I don't see why I would waive.

20          *MR. GARRARD:*  Frankly, I'm not sure why I would

21   either.  It would seem to me, and obviously we haven't

22   discussed this, that in terms of the MDLs that are here, my

23   thought process would be that the cases that belong here are

24   those of the MDL defendants, and that we probably would concur

25   with the court that those that have been filed should be

1  severed away in some fashion and we should work towards doing

2  that.   In the proposed orders, I think there has been

3  expression about, quote, other defendants, and I understand

4  where the court is in terms of --

5          CHIEF JUDGE GOODWIN:   And they are actually named

6  other defendants.

7          MR. GARRARD:   Yes, sir.

8          CHIEF JUDGE GOODWIN:   There are people who I think

9  thought the statute of limitations was running, and I'm not

10 going to accuse them of violating Rule 11, but they certainly

11 didn't give it a lot of thought.   They just threw the kitchen

12 sink at everybody they could think of.

13         MR. GARRARD:   I think we can go back and revisit that

14 and probably clean that up, having heard the Court's concern

15 about that.   I know that J & J -- the J & J Ethicon MDL had a

16 concern, and I think still has a concern, with some foreign

17 defendants that has to be dealt with in some way.

18         CHIEF JUDGE GOODWIN:   I have -- I don't mean to

19 interrupt you.

20         MR. GARRARD:   No, sir.

21         CHIEF JUDGE GOODWIN:   -- but with -- with those

22 defendants, or potential defendants, there is a lot more reason

23 for us to get our hands on them because of the very real

24 relationship they have to this litigation.   The only concern I

25 have about all of the other extran -- not extraneous, more

1    remote defendants, is that I expect the defendants -- the MDL

2    defendants, while not paying a great deal of attention to these

3    people right now, will, if we go to trial, be pointing their

4    finger at the doctors, so it will affect bellwether cases and

5    how we select bellwether cases.  It could affect a lot of

6    things.  But you think -- you think that -- from a plaintiffs'

7    standpoint, you think you-all can figure out a way?

8            *MR. GARRARD:*  I think we can.  I think the J & J

9    issue is different because our position will be there is a

10   connection there and that perhaps they can be added to the

11   complaint.  I think we just have to work through what works

12   with the court, and I don't know what J & J's position will be

13   in regard to that, but if the Court would remember, with

14   regard -- we had some foreign defendants initially.  We

15   negotiated a -- deal may not be the right word, but I think it

16   is.  We negotiated a deal in relation to that and dealt with

17   that problem.  Whether that can be done with J & J, I don't

18   know.

19           *MR. AYLSTOCK:*  Your Honor, Brian Aylstock.  Just to

20   clarify one thing.

21           *CHIEF JUDGE GOODWIN:*  Yes.

22           *MR. AYLSTOCK:*  In the master complaint we filed, and

23   has actually been answered by AMS and these related Ethicon

24   defendants, we did, in fact, name those foreign defendants; and

25   as Your Honor pointed out, there are -- there are issues with

1    blocking statutes and the Hague Convention that I think are

2    most appropriate in this court to deal with.  With regard to

3    the fundamental issue of the personal jurisdiction and waiver,

4    I think what Your Honors are referring to are medical providers

5    and doctors and hospitals.

6          *CHIEF JUDGE GOODWIN:*  And products manufacturers that

7    haven't been sued and transferred here.

8          *MR. AYLSTOCK:*  And just without totally conferring

9    with my colleagues, I think the best way to deal with that

10   would simply be to take those out of the master -- they're not

11   in the master complaint.  We only added them because there are

12   a number of combo cases and we wanted a mechanism so that those

13   combo cases could be dealt with, but I understand Your Honors'

14   concern.  I think the way to deal with it is on simply the

15   short form complaints to take all the non -- all the entities

16   that aren't named in the long form complaints of one of the

17   MDLs and only list those, and then those folks who have a combo

18   product involving a manufacturer that's not in the MDL, or who

19   choose to sue their physician or hospital, would do exactly

20   what you said, they would need to find the appropriate venue,

21   file it first, and then come here in the ordinary course of

22   that district filing.  So I think that would hopefully solve

23   problem one and problem two.

24         The cleanup problem I think largely would be solved by

25   Your Honor's analysis in the Fourth Circuit case, because I

1   would be surprised if anybody tried to direct file a case here

2   only involving a physician or a hospital without a manufacturer

3   that you clearly have jurisdiction over, so we could help the

4   court identify those, notify those counsel and get them

5   transferred back, and then they could -- so I think that would

6   be my off-the-cuff reaction.

7           *CHIEF JUDGE GOODWIN:*  Well, I think while the

8   laboring oar is going to be on the plaintiffs, defendants have

9   interest in this, too.  Let me hear from your side of the

10  table.

11          *MS. JONES:*  Well, I think we clearly have interest in

12  it, but -- but my impression from our side, Your Honor, is

13  that -- that based upon my memory, we're dealing with a handful

14  of cases, at least as to us, that that currently applies to

15  that we could probably reasonably look at, and I'm sure that we

16  can work it out in terms of what the best and easiest way is to

17  deal with those medical providers and others that have been in

18  those suits where they're named.  You know, obviously the

19  defendants generally prefer -- if we've got these lawsuits and

20  we've got an MDL, we'd rather have them all in the MDL, so I

21  will be candid with the court that we're going to try and

22  figure out a way to get them all right back here, even if we

23  have to do something there.

24          *THE COURT:*  Well, that's my preference, too.  I mean,

25  one of the main purposes of an MDL is to have it as the center

1  of gravity and, frankly, it works out better for the plaintiffs

2  as well as the defendants if you have it that way.  Now, I'm --

3  I didn't just fall off the turnip truck, but I recognize there

4  are some times that plaintiffs would like to take four or five

5  bites at the apple and for as many jurisdictions as they can,

6  but I've found in the past that I can discourage that, and I

7  will appropriately act to discourage it in this case -- in

8  these cases.  But in any event, I would appreciate you-all

9  working together to solve the cleanup and to modify the orders

10  you've presented to me to solve the problem with regard to

11  direct filing going forward, and also the venue language as it

12  appears.  I certainly don't think that anybody wants --

13  everybody wants to have cases that can go back to a forum

14  state, the original forum state, and they don't want to consent

15  that I should try every case, although I will warn you in

16  advance that I've been known to follow these cases simply by

17  asking to be assigned, and it helps a little bit.  I don't want

18  to get into the weeds on this, but if you-all can work together

19  on straightening out those orders, maybe I can go ahead, and

20  Judge Stanley can go ahead, and address some of our other

21  issues, keeping these issues in mind that we've got to clean

22  up first.

23            *MR. GARRARD:*  Your Honor, may I ask a clarification

24  point?

25            *CHIEF JUDGE GOODWIN:*  Sure.

1    *MR. GARRARD:*  As to existing venue issues, are the

2    existing venue issues on the Courts' minds, those are cases

3    that have already been direct filed that are not pursuant, for

4    example, to the Bard order?  But I know that there have been

5    many counsel who have directly filed in this court and in the

6    other three MDLs.

7        *CHIEF JUDGE GOODWIN:*  Yeah, and there may be some

8    Bard ones where we've got a problem too that just didn't occur

9    to me at the time I entered the order permitting the direct

10   filing.  It's also true that the minute we start with the

11   master complaint and the short form complaint, the problem is

12   going to grow exponentially, I think.

13      Did I answer your question?

14       *MR. GARRARD:*  I think you -- I perceive that the main

15   problem on venue would be those cases that have been direct

16   filed into this court where there is no apparent venue existent

17   now, and that while -- directly into this court absent a direct

18   filing order.

19       *THE COURT:*  Let me talk to Kate.

20      *(The Court and the law clerk confer off the record.)*

21       *CHIEF JUDGE GOODWIN:*  That's the main aspect of the

22   problem that needs to be cleaned up, but the proposed direct

23   filing order that I have been given also provides that these

24   people who direct filed here can, after it's over, just go

25   anywhere they want, even though they've never been anywhere

 1  before, and that won't work.

 2          MR. GARRARD:  I don't think that was the intent of

 3  the parties, so I think that is something that hopefully we can

 4  work together to clarify and resubmit to the court.

 5          CHIEF JUDGE GOODWIN:  You've been standing up a long

 6  time.

 7          MR. PRATT:  Judge, Bryan Pratt for Boston Scientific

 8  standing in for Bob Adams.  In Boston Scientific's short form

 9  proposed it named Proxy Company, and Proxy Limited, a foreign

10  company.  They are a supplier of ours, and I hear from you.

11  They called me.  They hired counsel this week and called me and

12  said -- I can't agree to support them in any case and I don't

13  represent them, but that's the concern that they have.  They

14  were concerned that plaintiffs could check a box and all of a

15  sudden they're here in West Virginia, so we're going to fix

16  that.  It's my goal to keep these cases here in West Virginia.

17  I think it's best for the administration of cases.  So I heard

18  what you said.  We'll work with Mr. Garrard and our team to get

19  that accomplished for you.

20          CHIEF JUDGE GOODWIN:  We just need to solve the

21  Ethicon problem.

22          MAGISTRATE JUDGE STANLEY:  Not the Ethicon.

23          CHIEF JUDGE GOODWIN:  Not the Ethicon problem.

24  Sorry, guys.

25          MR. GARRARD:  We want to solve that, too, Judge.

1    *MS. JONES:*  I think we've got it solved.  *(Laughter.)*

2         *CHIEF JUDGE GOODWIN:*   Let me just start down through

3    some of the orders you've submitted to me, and we'll keep in

4    mind the problems that you're going to work out, but there are

5    some other things.   AMS, we have PTO long form master

6    complaint, short form complaint, master responsive pleading.

7    Beyond the general issues and the ones I've talked about, as

8    far as I could tell, we have no issues specific to AMS as to

9    any of these pleadings.  Is that right?

10        *MS. BINIS:*   To the extent that the complaints named

11   Endo Pharmaceutical, Your Honor, they are not an MDL defendant.

12   There will be a motion filed next week to dismiss the Endo

13   defendants that you know is coming, so that issue will be

14   adjudicated then.

15        *THE COURT:*  Okay.  Yes, ma'am?

16        *MS. FITZPATRICK:*   That's correct; there are no other

17   issues beyond that.

18        *CHIEF JUDGE GOODWIN:*   Boston Scientific.  Do we have

19   a PTO, long form master complaint, a short form complaint?

20   Boston Scientific wants ninety days to file a master responsive

21   pleading.  How about I give you thirty?  Where are you?

22        *MR. PRATT:*  I'll take thirty.  The other defendants

23   have agreed to sixty; we agreed with the plaintiffs to do

24   ninety.  I'll take whatever you give me, Judge.  I'll get it

25   done in thirty.  We negotiated for this to be ninety, but I'll

1   do what you want me to do.

2          *CHIEF JUDGE GOODWIN:*  Well, I appreciate that, and I

3   just think the closer we can keep these things to running

4   parallel, the better off we are.  And if you can't get it done

5   in thirty, make a motion.

6          *MR. PRATT:*  And then now can we discuss the issue

7   also on my question about including injuries or damages, or did

8   you want to talk about that later on, Judge?

9          *CHIEF JUDGE GOODWIN:*  Well, let me just go through

10  what I've got for Boston Scientific.  You disagree with the

11  plaintiffs on paragraph 13, which asks the plaintiff to

12  identify the injuries and categories of damages claimed as a

13  result of your product.  Plaintiffs don't want that paragraph.

14  None of the other short form complaints contain this paragraph.

15         *MR. PRATT:*  That's true, Judge, and if you can give

16  me two minutes --

17         *CHIEF JUDGE GOODWIN:*  Absolutely.

18         *MR. PRATT:*  Your Honor, in every complaint that I've

19  ever seen in the country, except the short form complaints we

20  have here, a plaintiff is always required to identify injuries

21  or damages.  Now, I get it, and I talked to the other -- my

22  co-defendants.  They've got great lawyers, and in the process

23  of their negotiations they say, hey, listen, we agreed not to

24  have this.  You know, we don't disagree with you, but in our

25  negotiations, they felt something else was different.  They're

1    in a different stage of the litigation than we are.  For us,

2    that was important, and we're not willing to waive what we

3    think is very clear law requiring that in every complaint.  We

4    think it's important.  We have AMS mass litigation and the

5    plaintiffs there, Judge, are doing it, so we don't think that

6    should change right here.  We think as part of any pre-suit

7    investigation, don't you think the plaintiff should have some

8    basic information on injuries or damages?  I think so, and I

9    think it ought to be included.  And that's going to define the

10   whole rest of the cases as to what's going to be set forth in

11   the pleadings.  And for us, we felt that's important, and we're

12   not willing to waive it.

13              *MR. GARRARD:*  Your Honor, we have a master complaint.

14   We refer to the master complaint in the short form complaint.

15   The master complaint sets out that the plaintiff -- as I

16   understand the law, it does not require us in a complaint -- or

17   a short form complaint to set out all the specifics of damages.

18   We have a second thing that we have worked out just today, and

19   that is we have reached an agreement between the AMS, the

20   Boston Scientific, and the J & J Ethicon MDLs to utilize a

21   Plaintiff Profile Sheet, which will set out the damages, and

22   we have reached an agreement that we would serve that upon the

23   other side within sixty days.

24              *THE COURT:*  Say that again.  Start at the beginning

25   of that sentence.

1    *MR. GARRARD:*  I can't say Plaintiff Profile Sheet

2    very quickly, but as the court will recall, we had some

3    discussion about this, I think at the last status conference,

4    and the court said, "If you folks can work it out, then the

5    court will entertain it."  Well, we have been working on it

6    diligently with both sides, and just this morning we have

7    reached an agreement, both on the form that will be used and on

8    an enabling order to present to the court for the court's

9    consideration.  In the context of that Plaintiff Profile Sheet

10   we are required to set out what we claim as the damages.  We

11   are required to say who the implanting physicians are, who the

12   explanting physicians are, attach whatever medical we have.

13   And while I understand Mr. Pratt's desire, we're going to have

14   it to him in sixty days anyway, so we think, number one, it's

15   not required under the law; and number two, he's going to have

16   the information anyway within sixty days.

17          *MR. PRATT:*  And, Judge, I know in every case I always

18   get injuries or damages in discovery.  It ought to be in

19   pleadings.  The rules are very clear on that.  I think I'm

20   entitled to it.

21          *THE COURT:*  Well, since this is your first time here

22   I hate to do this, but I think within the context of the MDL

23   the master complaint as proposed, and the short form complaint

24   as proposed, the absence of paragraph 13 would not make the

25   pleading inconsistent with *Twombly* or *Iqbal*, and I particularly

1   believe that all of the pleadings are to be construed in light

2   of the purpose of the rules, particularly Rule 1 of the Rules

3   of Civil Procedure, and I think in this case it's essential

4   that I have that sort of uniformity.   Now, here's what you get

5   for being the new guy that you can take back to your clients

6   and say, "I lost my first motion":   If they don't come through

7   with these profiles as promised, with the detail that they

8   promise, then I will sanction them.   Okay.

9        Turning to Ethicon, we have the direct filing order, the

10  long form master complaint, the short form complaint, and the

11  master responsive pleading, and that brings us to international

12  defendants.   The plaintiffs want to name international

13  defendants in their long and short form complaint.   Ethicon

14  Sarl, S-a-r-l, is a wholly-owned subsidiary of Johnson &

15  Johnson, or J & J, that's located in Switzerland.   If I

16  understand it, it's charged by J & J with manufacturing

17  Ethicon's pelvic floor repair products.   Is that right?

18            *MR. AYLSTOCK:*   That is correct, Your Honor.

19            *CHIEF JUDGE GOODWIN:*   Let me ask the other -- the

20  defendant --

21            *MS. JONES:*   It is correct, Your Honor, there are

22  other defendants that are also listed, which may be where Your

23  Honor is going.   I think I may be able -- well, I won't

24  anticipate.   I was going to short circuit things.

25            *CHIEF JUDGE GOODWIN:*   No, go ahead; I like shortcuts.

1       *MS. JONES:* Well, the issue is, and what we've

2 discussed with Mr. Aylstock and counsel primarily is that the

3 reason that they thought it was necessary to bring in the

4 non-U.S. defendants, I think, is to ensure that they would have

5 access to some discovery. The problem arose when we had some

6 depositions scheduled in France, and including depositions of

7 J & J subsidiary employees.

8       *THE COURT:* And there was some blocking --

9       *MS. JONES:* I learned about this blocking statute and

10 the fact that at least there was a risk that they would be --

11 that they were being exposed to criminal penalties, and so what

12 we went to the plaintiffs and said was we will do whatever --

13 we're not trying to avoid this discovery. We'll do whatever is

14 necessary to help you comply with the Hague Convention so that

15 these people are protected against the potential of criminal

16 sanctions. And, in fact, ultimately that's what Judge Higbee

17 has done with respect to that. The plaintiffs, I think,

18 thought that if they brought these foreign entities in that it

19 would remove that problem, and it does not remove that problem.

20 The only way that we are ever going to completely avoid having

21 those European entities subject to the European laws and

22 blocking statutes and whatever is essentially to go through the

23 Hague Convention. So what I have suggested and asked, and I'm

24 not sure which we're discussing, is that we at least discussed

25 the possibility of agreeing that we will do whatever we can to

1  facilitate them getting through the Hague Convention so that

2  we're not back here having to argue, one, about in the first

3  instance the jurisdiction, and other motions that will come as

4  a result of having to bring in the non-U.S. entities; but

5  secondly, so that we can get the discovery without them, or me,

6  or anybody else being subject to the potential for criminal

7  sanctions, either in Europe or in this court if I'm ordered to

8  produce something that somebody else has got.  So that's what

9  the issue is.  I don't know whether we can completely resolve

10  it, but I think that counsel -- I think we're closer to being

11  able to resolve it now than perhaps we were a week ago.

12          *CHIEF JUDGE GOODWIN:*  I know Mr. Aylstock wants to

13  say something, but let me just interpose something.  As of yet,

14  we don't have the plaintiff who's named one of these defendants

15  in a court that has then gone to the MDL and been transferred

16  here, so I've got right now the same problem with naming those

17  defendants as I do with naming the doctors and everybody else,

18  so should that issue be raised, you're blocked.  It generally

19  has been my experience, especially with the attitude that I've

20  seen so far in these cases, that it's at least worth a try to

21  work it out, and if you run into a roadblock, then we'll try to

22  figure it out at the time.  I'm not -- as some of the lawyers

23  that have appeared before me before well know, I'm not adverse

24  to making rulings.  I have no problem doing that; it's just

25  that I don't always understand everything that is a problem for

1    your business, your client, your legal team, so if you can

2    work it out on your own, chances are you'll work it out better

3    than I will.

4         So I just recommend you take her up on her offer and see

5    if before our next meeting this can all be smoothed out.

6              MR. AYLSTOCK:   And we have -- we've been going back

7    and forth with various issues.  I would say, Your Honor, that

8    although I understand the concern about complicating matters,

9    in Judge Katz' MDL, which is also another company, J & J

10   International or DePuy, that was a short form complaint and

11   that worked out, and now I think there is some waiver of

12   process.   But there is some unique things to Johnson & Johnson

13   in its interrelationship with all of these subsidiaries that

14   gives us a concern beyond just getting the depositions.   The

15   Hague is an exception to all of these blocking statutes, and

16   the blocking statutes generally cover the giving of evidence,

17   so while serving a witness under the Hague might actually

18   compel a witness to testify, getting the documents because of

19   potential evidence might require service under the Hague there,

20   and particularly given the facts of these cases where these

21   interrelated web of companies is manufacturing, developing,

22   designing.   We heard about the French scientist.   Well, that

23   was Ethicon France that developed the entire program --

24   product.

25              THE COURT:   Let me say this:   I can -- if I have to,

1    I can figure out a way to take the domestic part of J & J and

2    manipulate them and make them get the stuff you need.  So why

3    don't we just try to do it --

4            MR. AYLSTOCK:  I hear you loud and clear, Your Honor.

5            MS. JONES:  Then I would be subject to the criminal

6    prosecution.  *(Laughter.)*

7            CHIEF JUDGE GOODWIN:  I mean, I think we can work it

8    out.

9            MR. AYLSTOCK:  And we certainly have been trying, and

10   we will continue to try.

11           CHIEF JUDGE GOODWIN:  Okay.  And right now you don't

12   have a case upon which I could act.

13           MR. AYLSTOCK:  Well, under the Hague it requires

14   translation and a lot of money, so we were hoping to get this

15   finalized and the translation of the master complaint and short

16   form complaint --

17           CHIEF JUDGE GOODWIN:  You just use Google.

18           MR. AYLSTOCK:  The Hague doesn't allow Google.

19   *(Laughter.)*

20           MAGISTRATE JUDGE STANLEY:  Ms. Jones, in your

21   suggestion that you wish to cooperate on discovery and to

22   produce certain documents, and perhaps some witnesses, do I

23   understand that you would not be raising issues about whether

24   these documents were within the care, custody and control of

25   J & J?

1    *MS. JONES:*  I think that that is, for the most part,

2    correct, Your Honor.   The problem is -- and my partner here is

3    more of an expert than I am, but the problem is that the

4    European -- the French and the German, they are all a little

5    bit different, so I'm going to generalize, but it's the privacy

6    aspect of it that sometimes the witnesses, or even the

7    e-mails -- even the company e-mails are subject to the right --

8    you know, to their -- either you have to go through the Hague

9    Convention or whatever.   What I have said to Mr. Aylstock is

10   I'll facilitate the letters rogatory or whatever it needs to

11   do.   Now, that's not to say I might not object, just as I would

12   object if it were Ethicon in the U.S., because of a legitimate

13   objection to production for something.   But in terms of saying

14   that they're not under my control, no, I'm not.   It is a

15   separate entity, but I can facilitate that so long as I'm

16   not -- I don't want to be in a position where I expose my

17   client in Europe to criminal penalties for doing what I ask

18   them to do here; and all I'm trying to do is to facilitate the

19   procedures that would protect them against that.

20         *MAGISTRATE JUDGE STANLEY:*   Okay.

21         *MR. AYLSTOCK:*   And as we understand it, the Hague is

22   the exception, so we're going to have to serve under the Hague

23   anyway, so we might as well serve the complaint.

24         There is just one other issue I'd put on the table, and

25   maybe we can work this out some way, but that risk of jury

1  confusion if they see a bunch of Ethicon France or European

2  documents.   Some of them may not have Ethicon on them.

3           *THE COURT:*   We can take care of that.

4           *MR. AYLSTOCK:*   Okay.

5           *THE COURT:*   I've always kind of figured it was my

6  job, because lawyers, by the time they get to trial and they've

7  got their computer thumb drives full of all their stuff, and

8  they've talked about this stuff for two or three years, it's

9  going to be a hard job for me anyway to be sure you-all tell a

10 story to the jury that they can understand.   In the -- I'm

11 aware of in the Prempro cases, one that was tried here in front

12 of Judge Copenhaver, I don't have any idea how the jury

13 understood it from either side, but, you know, that's just

14 because I was listening.   Anyway --

15          *MR. AYLSTOCK:*   Thank you, Your Honor.

16          *THE COURT:*   -- we'll deal with that problem, if we

17 can.

18    Profile sheets.   I'm hearing that you've got that worked

19 out in a way that doesn't cause me the trouble I had in

20 Serzone?

21          *MR. GARRARD:*   Yes, sir.

22          *THE COURT:*   Okay.   All right.   Now, that's good,

23 because this leads me to Judge Stanley.

24          *MAGISTRATE JUDGE STANLEY:*   All right.   ESI protocols.

25 I have in front of me proposed stipulation, plaintiff version

1    and defense version; is that right?

2              *MR. AYLSTOCK:*   It is, Your Honor.   That's my poor

3    handwriting at the top.

4              *MAGISTRATE JUDGE STANLEY:*   So this is Ethicon.   And

5    so is this predictive coding sampling?

6              *MR. AYLSTOCK:*   Yes, Your Honor.   And as I understand

7    it, the ESI orders on the other defendants have been agreed to,

8    and they followed largely the Bard one, and I have heard you

9    loud and clear and I'll certainly sit down if you want me to

10   sit down now, but what we were thinking would be a good idea

11   specific to the Ethicon production, because there have been

12   four million pages or so already produced, would be to take

13   four, maybe three, custodians in medical affairs, regulatory,

14   what have you -- and I know Your Honors have been to the Sedona

15   conference and know more of what I'm talking about than I do,

16   but take a sample and procedure where we can run some

17   predictive coding across the unproduced custodial files and see

18   if -- compare that, because as I understand it, each document

19   has a unique identifier on the defendant's system, compare that

20   to what was actually produced with the lists on the search

21   terms and see if there were relevant documents that were

22   missed.   From that it would be a computer comparison of those

23   unique identifiers.   They would spit out, maybe it's a hundred

24   documents, and we can say, well, gosh, we did do a good job; or

25   maybe it's ten thousand documents and maybe we didn't do a good

1  job figuring out the search terms to produce all the documents

2  for both sides.  We could then take whatever pot that is and

3  cull it down and do one-tenth or one-fiftieth of the documents

4  just to see if, in fact, relevant documents are being missed

5  under the current system that's taking place.  And the reason

6  why Ethicon makes sense to maybe try this is because we do have

7  these documents and custodial files that have already been

8  produced and it would allow us to run this test and see if we

9  are, on a going-forward basis -- I'm not asking Ethicon to redo

10 what they have already done through the New Jersey litigation,

11 but maybe do it better or cheaper than a search term and then

12 a relevancy attorney review by their attorney.  And so that

13 was a thought I had.  There is certainly resistance - heavy

14 resistance - on the other side, and I think it can be done

15 cheaply, quickly, and with your supervision, just a way to

16 assure that both sides are getting relevant documents in this

17 case.

18        *MAGISTRATE JUDGE STANLEY:*  Ms. Jones?

19        *MS. JONES:*  May I respond?  As Mr. Aylstock noted,

20 this is not a provision in any of the other existing orders.

21 It's not appropriate in this order, I suggest to Your Honor,

22 because it ignores the purpose of predictive coding.

23 Predictive coding, which is, at least as I understand it,

24 pretty much a cutting edge issue, was developed initially so

25 that you could automate your review and attorney -- you know,

1   at the beginning of the litigation, and eliminate attorney

2   time, so that the hope was that the ESI document production

3   could be accomplished cheaper, more reasonably, and moving

4   forward.  It's not appropriate, I suggest, here because we have

5   already produced and are ready to hand to plaintiffs' counsel,

6   with this protective order having been entered, millions of

7   documents already.  We've already been through that process.

8   There have been no complaints about missing great categories of

9   documents.  And, in fact, I asked -- I said you know, "Is this

10  being prompted, frankly, by some legitimate concern that there

11  are batches of documents and all?"  And I think it's fair to

12  say that, like in every case, there have been some, you know,

13  an attachment that's not on this document or whatever, but

14  there have been no overriding concerns.  It certainly hasn't

15  been asked for in the context of the New Jersey litigation.

16  We think it is exposing us to an additional expense that's an

17  inappropriate use of predictive coding and it's just not

18  warranted at this point.

19          *MAGISTRATE JUDGE STANLEY:*  Mr. Aylstock, is there any

20  provision in the rules that suggests that this is something

21  that I should order?

22          *MR. AYLSTOCK:*  Well, there is the case that's cited

23  in the order for proposed stipulation.  This is cutting edge

24  technology, and I recognize that, and I think that the

25  overarching purpose of the rules would certainly support you

1   doing this, as other courts have done, but given the

2   cutting-edge nature of it, I can't point you to a specific rule

3   that says predictive coding would be allowed.  I would say

4   while certainly there have been some issues in the New Jersey

5   production, us finding the documents that we think we need --

6   and I'm not trying to cast any stones, but it's very difficult

7   when you're going through all these documents to know -- you

8   don't know what you don't know, and so if we could do this

9   little experiment on a very limited basis I think it would be

10  instructive to the court and to the parties to see if we're on

11  the right track on a going-forward basis, because I do

12  anticipate millions and millions of more pages.  In most MDLs

13  that I've been involved with it's up to 12, 13 million pages.

14  We might be able to do it cheaper and more efficiently going

15  forward, and that was my only thought.

16           *MAGISTRATE JUDGE STANLEY:*  But basically what you're

17  saying is that Ethicon should have another server and run all

18  the previously-produced documents through it again?

19           *MR. AYLSTOCK:*  Only selected custodial files.

20  Certainly not foreign documents.  Certainly some of the

21  custodian files, I think there have been thirty or forty

22  thousand pages for some of the key ones.  And only do it on

23  those.

24           *MAGISTRATE JUDGE STANLEY:*  But just -- but basically

25  do it again, because they've already done it once.

1          *MR. AYLSTOCK:*  Well, they've done it once, not with

2     predictive coding but with their own search terms, and there

3     have been some problems.

4          *MAGISTRATE JUDGE STANLEY:*  Well, now, didn't -- part

5     of the problem is that it's hard to know what was done in New

6     Jersey and what's being done here and, I mean, surely the

7     plaintiffs in New Jersey must have cooperated in developing the

8     search terms --

9          *MR. AYLSTOCK:*  They did --

10          *MAGISTRATE JUDGE STANLEY:*  -- for that litigation.

11          *MS. JONES:*  That's correct.

12          *MR. AYLSTOCK:*  And certainly that's how it's

13     typically done.

14          *MAGISTRATE JUDGE STANLEY:*  Right.

15          *MR. AYLSTOCK:*  Certainly the search terms, there is

16     cooperation, but I think as we move forward this predictive

17     coding -- in the Actose MDL, for example, it's my understanding

18     predictive coding is going to be used.  I think it's something

19     we will see more and more.  And I'm not suggesting that they

20     run it over four million pages; I'm suggesting we do a limited

21     sampling on those limited custodial files and see what we find.

22     That's all.

23          *MAGISTRATE JUDGE STANLEY:*  Anything further,

24     Ms. Jones?

25          *MS. JONES:*  I can't think of any other arguments.

1          *MAGISTRATE JUDGE STANLEY:*  I'm sorry?

2          *MS. JONES:*  No, Your Honor.

3          *MAGISTRATE JUDGE STANLEY:*  I'm not at this point

4   inclined to require that.  I'll take a double look at this and

5   see what I can find, but at this point I think no production is

6   going to be perfect, and they're pretty far down the line; I'm

7   not going to make them back up at this point.

8          *MR. AYLSTOCK:*  Thank you, Your Honor.

9          *MAGISTRATE JUDGE STANLEY:*  So that's Ethicon.

10          *MS. JONES:*  Your Honor, I think that that's the

11   only --

12          *MR. AYLSTOCK:*  Yes, we were going to say the same

13   thing, that's the only disagreement we have.

14          *MAGISTRATE JUDGE STANLEY:*  That was my understanding.

15          *MR. AYLSTOCK:*  I presented two orders, one the

16   defense version.  The defense version is the exact same, except

17   it doesn't have the predictive coding, so that would be the one

18   we're using.

19          *THE COURT:*  I'll read them carefully and make sure

20   everything else is satisfactory.

21          *MS. JONES:*  Thank you, Your Honor.

22          *MAGISTRATE JUDGE STANLEY:*  On AMS, the indication is

23   that you've worked out most of it, but not absolutely

24   everything.

25          *MS. BINIS:*  There is just one issue that's

1  outstanding as to AMS, Your Honor, and that is the number of

2  custodians to which plaintiffs want us to commit at this point.

3  They want us to commit to this number of thirty, and when I

4  heard that number I said, "I don't know that there are thirty

5  people.  I think that's a high number.  Can you tell me who

6  you're thinking about so that we can talk about whether that is

7  the right list of people or not?"

8       And they said, "We don't want to tell you who the thirty

9  are; we just want you to commit to thirty.  Every other

10 manufacturer defendant has committed to thirty."  Which I don't

11 know, that might be true, but the fact is that AMS is much

12 smaller a company than any of these defendants.  We have only

13 a tenth of the employees that the next largest company here

14 has, so I'm just not willing to commit in the abstract to a

15 number that I'm just not sure later won't come back to bite me

16 because it wouldn't be appropriate.  I suggested twenty.  I

17 suggested we pick ten, they pick ten, but they're firm on the

18 thirty number.

19          *MAGISTRATE JUDGE STANLEY:*  Who is going to respond

20 to this?  Mr. Thompson?

21          *MR. THOMPSON:*  I am the coordinating co-lead for the

22 litigation.  Ms. Fitzpatrick and Ms. Eskin have negotiated

23 that.  I guess this is the first time I've heard that Ms. Binis

24 has agreed to go to twenty, because my understanding was that

25 she had indicated that she wanted to commit to ten or only if

1   we would actually tell her the names of thirty.

2        This reminds me of a major league arbitration, a high-low

3   arbitration, and it certainly -- as we all know, Bard has

4   agreed to 22.  I think we can see where the resolution of this

5   should be and --

6        *MAGISTRATE JUDGE STANLEY:*  Why are you not doing it

7   on the basis of the organizational chart and the identity of

8   the people?  I don't understand why you don't want to list your

9   names or why they would be hung up on a particular number.  I

10  mean, it seems to me that what you want is figuring out who the

11  custodians are of the best documents.  What am I missing?

12       *MR. THOMPSON:*  Well, AMS -- and here again, I don't

13  want to -- matter of fact, I see one of my cohorts standing,

14  but the 30(b)(6) organizational information is all going to be

15  made manifest.  This is actually just the ES protocol, which

16  contemplates that we're going to go through a negotiation

17  period.

18       *MAGISTRATE JUDGE STANLEY:*  Right.

19       *MR. THOMPSON:*  Certainly since nobody else has any

20  trouble just assigning a certain number of depositions, if

21  Ms. Binis is correct and there are only like four people over

22  there who do anything, then four will be all it is.  But

23  certainly some number between ten and thirty seems to me to be

24  the easy response.

25       *MAGISTRATE JUDGE STANLEY:*  Ms. Fitzpatrick?

1    *MS. FITZPATRICK:*  I was actually going to echo

2    Mr. Thompson's issues.  We have just actually started to

3    receive documents from AMS, and in addition to a corporate

4    structure deposition, which we have agreed will happen before

5    the end of September, but we don't have a definite date, and my

6    concern, what Ms. Binis proposed to me was I can't plant my

7    flag today and say these are the thirty that I want, because I

8    don't know who else is out there, but I have a good idea from

9    previous litigation who we might want, and we don't -- but I

10   couldn't be constrained by these thirty only to discover maybe

11   six months from now, gee, there are seven other people that I

12   wish I had asked for instead.

13       And so Ms. Binis, one of her colleagues had suggested at

14   one point tell us ten and we can renegotiate if we need to go

15   beyond ten, if we should agree to it.  We didn't want to get

16   into a process whereby we were agreeing to ten and then we'd

17   have to jump through additional hoops, which would mean perhaps

18   coming back to the court if we're going beyond that, and so we

19   had asked for the same amount that others were getting.  Now,

20   certainly if Ms. Binis says there aren't thirty people over

21   there that could possibly have information, then we're not

22   going to ask for it, but we needed to have the flexibility to

23   know that we could keep working on this as it goes forward.

24       *MAGISTRATE JUDGE STANLEY:*  And so Boston has thirty

25   and Bard had twenty-two?

1      *MR. GARRARD:*  They had twenty-two, Your Honor, but we

2      have had some add-ons that we have worked together with.   We

3      haven't really had a problem with Bard.   Bard we have expanded

4      beyond that number, but in negotiations with the plaintiffs.

5             *MAGISTRATE JUDGE STANLEY:*   And Ethicon is thirty or

6      so?

7             *MS. JONES:*   We have way too many, Your Honor.

8      *(Laughter.)*

9             *MR. AYLSTOCK:*   Ethicon is a huge corporation.

10            *THE COURT:*   You-all are making me glad I don't

11     practice law.

12            *MAGISTRATE JUDGE STANLEY:*   Ms. Jones, you are always

13     funny, and the poor reporter can't figure out what's being said

14     because everybody is laughing.   Yes, Ms. Binis?

15            *MS. BINIS:*   I'm not saying -- I don't know what

16     number we're going to get to.   We're going to be reasonable; I

17     just don't want to agree in the abstract to a number.

18            *THE COURT:*   Well, too bad.   Why don't we just say up

19     to thirty and after that you have to do it by motion.   I mean,

20     let's face it, if it's up to thirty, it might be six and that

21     will be it.

22            *MS. BINIS:*   Up to thirty is fine with us, Your Honor.

23            *MS. FITZPATRICK:*   Thank you, Your Honor.

24            *MR. PRATT:*   Judge Stanley, I apologize for

25     interrupting.   I'm not sure -- I'm going back through -- we

1    negotiated ours with the plaintiffs, and I didn't do that so I

2    don't want to stand up and say we agreed to thirty.  I think

3    it's going to be much smaller than that for my company, but I

4    don't want to stand up and say it's thirty when I don't know

5    the exact number.

6              *MAGISTRATE JUDGE STANLEY:*  Okay.  I can't imagine

7    that they want a whole bunch of stuff from a whole bunch of

8    irrelevant people, but I may be wrong.

9         All right.  Protective orders.  Is that our next item?

10   All right.  I understand AMS --

11             *MR. GARRARD:*  Your Honor, I think we've agreed

12   across-the-board on protective orders.

13             *MAGISTRATE JUDGE STANLEY:*  We're all done?

14             *MR. GARRARD:*  Yes, ma'am.

15             *MAGISTRATE JUDGE STANLEY:*  Excellent.  Preservation

16   orders.  Where are we on preservation orders?

17             *MR. THOMPSON:*  With regard to the privilege order and

18   the preservation order that we had indicated to the court that

19   we were going to seek, we have been instructed by your e-mail

20   of last week that gave us instructions and gave us some insight

21   into how you were viewing things, and it appears to us that the

22   better course here is to wait until we have a concrete dispute

23   over those issues to bring before you, and so we -- our

24   suggestion would be that we simply hold those issues in

25   abeyance until we have a co-auctorial dispute so that you can

1    have something in front of you to rule on.

2           *MAGISTRATE JUDGE STANLEY:*  As I reviewed these, it's

3    fine to put it off for a while.  And one thing the parties may

4    want to consider is that I think when you have a roadmap and

5    specific rules or guidelines, it's somewhat easier for junior

6    lawyers and others who are involved in this, and non-lawyers,

7    to follow more specific guidelines so that, for example, in the

8    preservation order it listed a whole lot of things whereas --

9    of things to be done, whereas in Pretrial Order Number One, it

10   was just a general obligation to preserve.  And I'm not saying

11   that I think it's the right thing to do, but I thought that it

12   certainly was one way to provide a roadmap to non-lawyers who

13   may not understand the depth and the significance of a

14   preservation order.  So I just kind of float that out there

15   that whether or not you get into a fight about it, the defense

16   may want to say, well, here are samples of what you really need

17   to do to your non-lawyer clients so that they have a better

18   understanding, rather than just handing them the one paragraph

19   from Pretrial Order Number One.

20        And on the privilege matter, I didn't see anything wrong

21   with the recitation of the law.  And it occurred to me that

22   young lawyers who are doing privilege review may find the law

23   as stated in that proposed order to be helpful, so I didn't see

24   anything wrong that you did there; it's just that I certainly

25   don't want to have disputes over things that you're not arguing

1  about.

2  *CHIEF JUDGE GOODWIN:*  Okay.  No, this is still you.

3  *MAGISTRATE JUDGE STANLEY:*  I've lost track.

4  *CHIEF JUDGE GOODWIN:*  ES protocol for Ethicon.  Have

5  you done that?

6  *MS. JONES:*  We just did that.

7  *THE COURT:*  Okay.  The motions to dismiss and remand.

8  *MAGISTRATE JUDGE STANLEY:*  Did you want to ask about

9  30(b)(6) depositions on Ethicon?

10  *CHIEF JUDGE GOODWIN:*  You go ahead.

11  *MAGISTRATE JUDGE STANLEY:*  Is there any issue about

12  the 30(b)(6) depositions in Ethicon?

13  *MS. JONES:*  I don't think so, Your Honor.

14  *MR. AYLSTOCK:*  No, Your Honor.  We just wanted --

15  there was an agenda item, we wanted to report that notice had

16  been served.  We're working cooperatively to schedule those

17  depositions and moving forward with discovery generally.

18  *CHIEF JUDGE GOODWIN:*  Anything you want to tell us

19  about what's going on in New Jersey?

20  *MAGISTRATE JUDGE STANLEY:*  Do you have a trial date?

21  *MS. JONES:*  We will have an official trial date

22  tomorrow.  I think I can represent to the court that it looks

23  like that we have jury selection on January the 4th and start

24  on the 7th, if my dates are right.

25  *CHIEF JUDGE GOODWIN:*  And when do I start the

 1    February trial?

 2              *MR. GARRARD:*  February 5th, Your Honor.

 3              *MS. JONES:*   There have been discussions about

 4    November.   I think we've now pretty much gotten an agreement.

 5    We're waiting for a call tomorrow from Judge Higbee that will

 6    officially set that date.

 7              *MAGISTRATE JUDGE STANLEY:*   Is that an SUI or POP or

 8    both?

 9              *MS. JONES:*   It's a POP.   Well, it will be POP with a

10    Prolift case only.   There are two plaintiffs that are still in

11    the mix, one of whom will be chosen for the trial plaintiff.

12    And that decision may be made tomorrow, but I think that's

13    likely to be postponed for a while, but it will be a Prolift

14    case.

15              *MR. AYLSTOCK:*   That's my understanding, Your Honor.

16    It's down to two cases, and I believe Judge Higbee left it up

17    to the defense as to whether November 4th or January 7th,

18    and we're fine with either one, in New Jersey.

19              *MS. JONES:*   The only thing I'd advise Mr. Aylstock

20    and I'd like to advise the court, we have been ordered in New

21    Jersey to produce the CEO and basically some Apex depositions.

22    They will take place between now and September the 15th.

23    Those depositions are of -- one may be the general counsel of

24    Johnson & Johnson.   Obviously, this is the set of depositions

25    we'd like to do one time, because they aren't people that have

1   direct day-to-day responsibility of things.  I talked to

2   Mr. Aylstock.  We are going to file notice of those

3   depositions.  We probably -- we're going to try to work it out,

4   and see if we can work it out between us and New Jersey and see

5   if we can come together on some kind of deposition protocol,

6   but we may be coming back to the court and asking for some

7   assistance there.  Mr. Aylstock and I can work things out, I

8   think.  It's occasionally the other people want to have a say

9   in it, and so. . . .

10            *MR. AYLSTOCK:*  It's John and Jacobs.  *(Laughter.)*

11            *MS. JONES:*  I think that's the extent of the update.

12            *MR. AYLSTOCK:*  That's correct, Your Honor.  And with

13   regard to that, I'm confident we'll be able to work that out.

14   The only thing I might say, lest the record be unclear, the

15   discovery that's gone forth in New Jersey has been directed at

16   those Prolift cases and so to the -- I don't -- we have not

17   been focusing in New Jersey at all on the TVT cases and, in

18   fact, Judge Higbee said discovery will start in the fall.  I

19   have no idea whether these individuals have involvement with

20   TVT that would require some additional coming back, but I just

21   don't want to waive -- well, while in total agreement we want

22   to do it one time, and maybe Judge Higbee ordered it for

23   everything - and I wasn't at the hearing - I just wanted to

24   make that point to the court.

25            *MS. JONES:*  I don't think it's specifically ordered

1  as to these people, but I think there is a general

2  understanding, and we'll work it out.

3          MR. AYLSTOCK:   Thank you, Judge.

4          MR. THOMPSON:   Judge, the Bard state cases in New

5  Jersey, the CMO was ordered -- that set a first trial date, I

6  believe, in the first of April, which is firmly in a trial

7  position.

8          MR. GARRARD:   April 15th, Your Honor.

9          CHIEF JUDGE GOODWIN:   Pending motions.   Apparently

10  there is about a baker's dozen motions to dismiss, motion to

11  reconsider, a motion to remand.   Just write this down:   If I

12  grant a motion to reconsider, it's the first time I've ever

13  done it, so. . ..   But I'll take a careful look at it.

14      There haven't been timely responses filed to some of the

15  motions.   On the Notice of Pending Motions list that I got on

16  April 6, Ethicon identified five motions to dismiss and counsel

17  indicated by e-mail that the filing of the master complaint

18  would probably moot those motions.

19          MS. JONES:   I think that's correct.

20          MR. AYLSTOCK:   And they may also moot some motions to

21  remand as well.

22          THE COURT:   All right.   And there's also five motions

23  to dismiss Caldera, Boston Scientific and AMS.   And Regional

24  Health Systems filed a motion to dismiss, but it's not ripe

25  yet.   Just put those on your radar and let me know if you want

1   to respond to them, you want a ruling on them, or you're going

2   to get rid of them.  We have so few rules that anybody in the

3   hierarchy of the federal judiciary seems to care about, but one

4   of them is if you have motions pending for more than six months

5   or you have cases pending for more than three years, and that's

6   the only reason I really care, so if you take a look at it to

7   keep me off of the bad list.  *(Laughter.)*

8        There are 21 remand motions pending in Boston Scientific.

9   There is about 600 cases.  I don't think there is going to be

10  many remaining after the master complaint.  Is that right?

11            *MR. PRATT:*  That's my understanding, Judge.

12            *CHIEF JUDGE GOODWIN:*  Again, just take a look, and

13  whether these motions are moot or they're going to get me a

14  piece of paper that takes care of it --

15            *MR. PRATT:*  We'll do that.

16            *CHIEF JUDGE GOODWIN:*  If I don't hear from you on any

17  pending motion in the near future by filing a motion to dismiss

18  as moot or whatever, then I'll set a briefing schedule.

19            *CHIEF JUDGE GOODWIN:*  Did you want to talk any more

20  about the *Ambroff* and *Boatman*?

21            *MAGISTRATE JUDGE STANLEY:*  I did not set a deadline

22  for production of the *Ambroff* documents and the *Ambroff* and

23  *Boatman* depositions.

24            *MS. BINIS:*  Your Honor, the *Ambroff* documents were

25  delivered already.  The *Boatman* are going to be delivered next

1    week.  We've worked that out with the plaintiffs.

2              *MAGISTRATE JUDGE STANLEY:*  Well, good.

3              *CHIEF JUDGE GOODWIN:*  There are 41 motions to dismiss

4    in AMS, 18 motions to remand.

5              *MS. BINIS:*  We will get a list together, Your Honor,

6    and let you know which ones of those are going to be moot by

7    the master complaint and which ones are still pending.

8              *CHIEF JUDGE GOODWIN:*  Thank you.

9              *MAGISTRATE JUDGE STANLEY:*  You said you were going to

10   file a motion the dismiss about Endo next week?

11             *MS. BINIS:*  Yeah, we're going to file it next week,

12   Your Honor.  And that will be pursuant to the master complaint,

13   so that will be a motion that may moot some of those other

14   motions.

15             *CHIEF JUDGE GOODWIN:*  Let me remind everybody, and

16   pass the word through the liaison counsel and lead counsel, not

17   to file cases with unrelated plaintiffs in one action, and I

18   need to enter a severance order to address this issue after we

19   get around to entering the direct filing order.  We had that

20   problem before in Digitek.

21             *MAGISTRATE JUDGE STANLEY:*  And Serzone.

22             *CHIEF JUDGE GOODWIN:*  And Serzone.  What else do I

23   need, except to do the Bard stuff?

24        *(The Court and the law clerk confer off the record.)*

25             *CHIEF JUDGE GOODWIN:*  All right.  Bard and TSL have

1  entered orders waiving service.  I would encourage the

2  remaining manufacturer defendants to consider submitting such

3  orders.  Just take a look.  And Sandra Bresnick hadn't entered

4  a motion to withdraw yet.  Will whoever --

5              *MS. MOELLER:*  We'll take care of that, Judge.

6              *CHIEF JUDGE GOODWIN:*  All right.  Thank you.

7  September 13th at 1 p.m. -- September 13th at 1 p.m., the

8  Boston Scientific show-and-tell and the extra 15 minutes for

9  the others.

10     And now I need -- what else do we have besides Bard?

11  Anybody have anything else?  Mr. Garrard?

12             *MR. GARRARD:*  Yes, sir.  The plaintiffs have worked

13  together in terms of certain administrative matters pertaining

14  to counsel and we would seek permission to meet with the court

15  about that.  It's nothing about that that pertains to the

16  defendants or any merits or anything in relationship to the

17  defendants.  It's purely an administrative issue.

18             *CHIEF JUDGE GOODWIN:*  I'll be glad to do so, unless

19  the defendants don't object to me doing it.

20             *MS. JONES:*  I have already advised Mr. Aylstock that

21  I didn't have any objection to it.

22             *THE COURT:*  I didn't figure --

23             *MS. JONES:*  We may want our own one of these days.

24  *(Laughter.)*

25             *THE COURT:*  That's been my experience.  So we'll do

1    that.   And it will be handled properly.   I've been in this

2    business too long to start playing games, so. . ..   Okay.   So

3    let's go -- let's take the Bard people and go to the conference

4    room.   And I'll see all of you on the -- and Ms. Eskin.

5              *MAGISTRATE JUDGE STANLEY:*   Would you join us in the

6    Bard meeting?

7          *(Proceeding adjourned at 1:55 p.m., July 26, 2012.)*

8

9

10   CERTIFICATION:

11        I, Teresa L. Harvey, Registered Diplomate Reporter, hereby
     certify that the foregoing is a correct transcript from the
12   record of proceedings in the matters of In Re C. R. Bard, Inc.,
     MDL NO. 2:10-MD-02187, In Re American Medical Systems, Inc.,
13   MDL No. 2325; In Re Boston Scientific Corp.,  MDL No. 2326; and
     In Re Ethicon, Inc., MDL No. 2327, as reported on July 26,
14   2012.

15
     s/Teresa L. Harvey, RDR, CRR              August 11, 2012
16

17

18

19

20

21

22

23

24

25