# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

----------------------------------------
IN RE:  C. R. BARD, INC., PELVIC REPAIR          MDL NO.
SYSTEM PRODUCTS LIABILITY LITIGATION             2:10-MD-2187

----------------------------------------

IN RE:   AMERICAN MEDICAL SYSTEMS, INC.,         MDL NO.
PELVIC REPAIR SYSTEM PRODUCTS                    2:12-MD-2325
LIABILITY LITIGATION

----------------------------------------

IN RE:   BOSTON SCIENTIFIC CORPORATION,          MDL NO.
PELVIC REPAIR SYSTEM PRODUCTS                    2:12-MD-2326
LIABILITY LITIGATION

----------------------------------------

IN RE:   ETHICON, INC., PELVIC REPAIR            MDL NO.
SYSTEM PRODUCTS LIABILITY LITIGATION             2:12-MD-2327

----------------------------------------


## STATUS CONFERENCE


### HELD ON FEBRUARY 7, 2013
BEFORE THE HONORABLE JOSEPH R. GOODWIN, DISTRICT JUDGE
AND THE HONORABLE MARY E. STANLEY, MAGISTRATE JUDGE

AND THE HONORABLE CHERYL A. EIFERT, MAGISTRATE JUDGE


Court Reporter:          Teresa L. Harvey, RDR, CRR
                         Telephone: 304-254-8052


Proceedings recorded by mechanical stenography;
transcript produced by computer.

*APPEARANCES*


<u>**For the Plaintiffs:**</u>

Henry G. Garrard, III
**BLASINGAME, BURCH, GARRARD, ASHLEY, P.C.**
P. O. Box 832
Athens, GA  30603

Bryan F. Aylstock
Renée D. Baggett
**ALYSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC**
17 East Main St., Suite 200
Pensacola, FL  32502

Fred Thompson, III
**MOTLEY RICE, LLC**
P. O. Box 1792
Mt. Pleasant, SC  29464

Clayton A. Clark
**CLARK LOVE & HUTSON, G.P.**
440 Louisiana St., Ste. 1600
Houston, TX  77002

Amy Eskin
**LEVIN SIMES**
353 Sacramento Street, Ste. 2000
San Francisco, CA  94111

Aimee H. Wagstaff
**ANDRUS, HOOD & WAGSTAFF, PC**
1999 Broadway, Suite 4150
Denver, CO  80202

Carl N. Frankovitch
**FRANKOVITCH, ANETAKIS, COLANTONIO & SIMON**
337 Penco Road
Weirton, WV  26062

Paul T. Farrell, Jr.
**GREENE, KETCHUM, BAILEY, WALKER, FARRELL & TWEEL**
P. O. Box 2389
Huntington, WV  25724-2389

*APPEARANCES (CONTINUES)*

Harry F. Bell, Jr.
**THE BELL LAW FIRM, PLLC**
P. O. Box 1723
Charleston, WV  25326-1723

Thomas P. Cartmell
**WAGSTAFF & CARTMELL**
4740 Grand Ave., Ste. 300
Kansas City, MO  64112

Fidelma Fitzpatrick
**MOTLEY RICE, LLC**
321 South Main Street
Providence, RI  02903

Derek H. Potts
**THE POTTS LAW FIRM**
908 Broadway, Third Floor
Kansas City, MO  64105

P. Leigh O'Dell
**BEASLEY ALLEN**
218 Commerce Street
Montgomery, AL  36104

Regina S. Johnson
**LOPEZ McHUGH LLP**
712 East Main Street
Suite 2A
Moorestown, NJ  08057

Bret Stanley
**LAW OFFICES OF A. CRAIG EILAND, P.C.**
1 Pennzoil Place
South Tower, Ste. 2150
711 Louisianna Street
Houston, TX  77002

David Kuttles
**THE LANIER LAW FIRM**
126 East 56th Street
Tower 56, 6th Floor
New York, NY  10022

*APPEARANCES (CONTINUES)*

James A. McKowen
**JAMES F. HUMPHREYS & ASSOCIATES, LC**
500 Virginia Street, East
Charleston, WV  25301

Victoria Maniatis
**THE SANDERS FIRM**
100 Herricks Road
Mineola, NY  11501

Sara Coopwood
**WATERS KRAUS & PAUL**
3219 McKinney Avenue
Dallas, TX  75204


**For the Defendants:**


Donna Brown Jacobs
**BUTLER SNOW**
P. O. Box 6010
Ridgeland, MS  39158

Barbara R. Binis
Tracy G. Weiss
Stephen J. McConnell
**REED SMITH, LLP**
2500 One Liberty Place
1650 Market Street
Philadelphia, PA  19103

Janet H. Kwuon
**REED SMITH**
355 South Grand Avenue
Suite 2900
Los Angeles, CA  90071

Deborah A. Moeller
Jon Strongman
**SHOOK, HARDY & BACON, LLP**
2555 Grand Blvd.
Kansas City, MO  64108-2613

*APPEARANCES (CONTINUES)*

Michael Bonasso
Elizabeth Taylor
**FLAHERTY SENSABAUGH BONASSO, PLLC**
P. O. Box 3843
Charleston, WV  25338-3843

Michael J. Farrell
Erik W. Legg
**FARRELL, WHITE & LEGG, PLLC**
P. O. Box 6457
Huntington, WV  25772-6457

Melissa Foster Bird
**NELSON MULLINS**
1035 Third Ave., Suite 300
Huntington, WV  25701

Richard B. North, Jr.
**NELSON MULLINS RILEY & SCARBOROUGH**
201 17th St., NW, Suite 1700
Atlanta, GA  30363

Lori G. Cohen
**GREENBERG TRAURIG, LLP**
Terminus 200
3333 Piedmont Road, NE
Suite 2500
Atlanta, GA 30305

Ronn B. Kreps
**FULBRIGHT & JAWORSKI**
2100 IDS Center
80 South Eighth St.
Minneapolis, MN  55402-2112

Paul J. Cosgrove
Jennifer Hageman
**ULMER BERNE LLP**
600 Vine St., Ste. 2800
Cincinnati, OH  45202-2409

David B. Thomas
**THOMAS COMBS & SPANN, PLLC**
P. O. Box 3824
Charleston, WV  25333-3394

*APPEARANCES (CONTINUES)*

Jacqueline Giordano-Hayes
**MORRISON MAHONEY LLP**
200 Summer Street
Boston, MA  02210

S. Deann Bomar
**SWIFT, CURRIE, McGHEE & HIERS, LLP**
1355 Peachtree Street, NE
Suite 300
Atlanta, GA  30309

1          PROCEEDINGS had before the Honorable Joseph R. Goodwin,

2    U.S. District Judge; and the Honorable Mary E. Stanley, U.S.

3    Magistrate Judge; and the Honorable Cheryl A. Eifert, U.S.

4    Magistrate Judge, for the Southern District of West Virginia,

5    in Charleston, West Virginia, on February 7, 2013, as follows:

6          *JUDGE GOODWIN:*   Well, good afternoon.

7          *COURTROOM DEPUTY CLERK:*   The matter before the Court

8    is In Re: C. R. Bard, Inc., MDL 2187; In Re: American Medical

9    Systems, Inc., MDL 2325; In Re: Boston Scientific Corporation,

10   MDL 2326; In Re: Ethicon, Inc., MDL 2327, Pelvic Repair Systems

11   Products Liability Litigation.

12         *JUDGE GOODWIN:*   Well, it's nice to see all of you

13   again.  I want to welcome and introduce Judge Eifert.  Judge

14   Eifert was appointed in 2010, and with Judge Stanley's

15   impending retirement and global-galavanting vacations, Judge

16   Eifert will be participating now and eventually handling the

17   discovery matters in this case.

18         I can tell you that her background is well suited to this.

19   She, for many years, did medical malpractice litigation.  She

20   was counsel to the largest health care provider, CAMC, in the

21   state, and she's interested in this.  She's actually read all

22   the stuff you-all have been filing and the disputes that we've

23   had so far.  I think it will be a pleasure for you to get to

24   know Judge Eifert.

25         While I'm at it, I'm going to introduce Dwane Tinsley,

1    who's seated over here in the jury box.   Dwane is a lawyer here

2    in town.   He was selected by the judges of this court to be

3    Judge Stanley's replacement as magistrate judge and right now,

4    absent some disappointment by the Federal Bureau of

5    Investigation, he should officially be a magistrate judge in

6    the very near future, and we're excited about that.

7        Today I excused Rob Adams from Boston Scientific and

8    Christy Jones from Ethicon.   If your name was not on that list

9    and you are lead or liaison counsel, you have not been excused.

10       I hope you-all know that the portion of today's status

11   conference that was to relate to Coloplast has been cancelled

12   for lack of interest.

13       There are a number of discovery issues on the agenda, so

14   I've changed the order of the agenda submitted by the parties.

15   I will address the general issues and then I will turn the

16   status conference over to Judges Stanley and Eifert to deal

17   with the discovery issues.

18       The first topic I want to address is one that I'm

19   interested in and one that will no doubt provoke some

20   discussion after this hearing, and down the road maybe some

21   creative, innovative solutions to problems we may run into.

22   And I want to ask Mr. Garrard, who brought the idea up, to

23   address the general topic of expediting the cases.

24            *MR. GARRARD:*   Thank you, Your Honor.   As a little bit

25   of background, Judge -- Judges, for a good portion of my career

 1   I've defended cases, and I defended mass tort cases, so I have

 2   a perspective that perhaps is unique that I have been on both

 3   sides.   I don't defend cases anymore; I do plaintiffs' work.

 4   But I had the experience of being before Judge Robert Parker

 5   in Beaumont a number of times, and he had an incredibly

 6   innovative mind.   I didn't necessarily always agree with him,

 7   and frequently didn't, because I was defending cases.   And I

 8   had experience here with Judge McQueen, who also had an

 9   innovative mind.   And I thought a lot about where we are and

10   the concern that everyone in this room shares as to numbers

11   of cases and how we can be more efficient.   And one of the

12   ideas - and I have other ideas that I won't bring to the court

13   at this point - but one of the ideas that I have comes from

14   experience of having done it; and that is that being mindful of

15   Your Honor's admonition that you don't want to hear the same

16   evidence five times, and frankly, we don't want to present the

17   same evidence five times, in relation to bellwethers that why

18   don't we consider bringing in three juries to the courtroom at

19   one time.   We can present liability evidence to all three.

20   Could there be some issues that might be a little bit different

21   for some?  Of course.   But that's easily managed in terms of

22   instructions to precise juries of precise issues.   And we

23   present the liability issues.   I know that as we have crafted

24   our presentation of experts to the other side, most of our

25   experts are going to testify as to all five bellwether cases,

1  so it's a matter of efficiency there.  And most of our experts

2  in terms of liability will be testifying as to each of the

3  Avaulta products.

4      As an example of how this could work, three of the

5  bellwether cases were filed in Georgia.  Now, they come from

6  different states, so there could be some little differences in

7  terms of state law, but that's easy to deal with.  And we could

8  present the liability evidence to those three juries as to

9  those plaintiffs, and then Your Honor and whatever other judges

10  you assign, where necessary, could preside over proceedings

11  that deal with specific damages to a plaintiff.  I've had that

12  done either that you separate the jury out and you present it

13  that way or you instruct the other juries that, now, this

14  particular witness is going to testify about Mrs. X, Mrs. Y and

15  Mrs. Z.  Jury A over here, you're to listen to what comes as to

16  Mrs. Z; and Jury B over here, you're to listen to what comes as

17  to Mrs. Y, et cetera.  That can be done in the same courtroom

18  or it can be done in separate courtrooms.  Those juries then

19  reach independent verdicts in terms of both liability and

20  damages.

21      I believe this could be done, and I have done it in an

22  efficient way.  I think and believe in the court's instructions

23  to juries that juries do pay attention to what courts tell them

24  in terms of what you should listen to or not listen to.  Your

25  individual jury verdict forms can be tailored to the precise

1   case and the precise law.  And I think we could try three cases

2   by this methodology in almost the same amount of time that it

3   will take to try one case.  And so what I'm coming with, and

4   the plaintiffs' side agrees with me, is a way that things can

5   be done efficiently and move cases forward.

6       I tell this somewhat jokingly, but really not.  I've spent

7   a lot of time in court in this county before Judge McQueen when

8   he was a judge, and Judge McQueen would bring us into court,

9   and I remember the last mass trial that I had he consolidated

10  2,000 cases and he put 10 exemplars up for trial.  And we

11  started trial and we went through trial for quite a while - a

12  couple months.  And I kept asking Judge McQueen, "Well, what

13  are you going to do with these other cases?"  Well, he never

14  would tell me what he was going to do with the cases.  But we

15  got partially through the trial, and the wisdom of his

16  methodology was that before it was over he had settled all

17  the cases - 2,000 cases.

18      And so innovative ways work, and I'm not suggesting that

19  as something this court would ever do, or perhaps I would even

20  want the court to do.  But trying exemplar cases -- and

21  frankly, I think one can try them to a single jury, but trying

22  exemplar cases to multiple juries at one time has been done; it

23  can be done; and it can be done efficiently and fairly, and

24  that would be the first proposition that we on behalf of the

25  plaintiffs would make to the Court.

1    And I don't expect to hear raving "We agrees" from the

2    left side over here, but I think that my challenge, and my

3    challenge to the defendants, is that for dealing with mutual

4    problems -- and we have mutual problems here.  We have a lot of

5    cases, and they have a lot of cases against them.  It is a

6    mutual problem, and it needs a resolution at some point, and I

7    don't think any court is going to tolerate a system by which

8    you just go one by one by one by one.  There's got to be

9    something innovative, and so I would challenge my brethren, who

10   are all suburb lawyers, to let's have some ideas that are

11   something besides, okay, we'll just try one case at a time.

12       And that would be my presentation, Your Honor.

13       *THE COURT:*  Thank you, Mr. Garrard.  I think I'm

14   right that the defendants probably wouldn't immediately sign

15   on to that idea.

16       *MR. GARRARD:*  I'm sure Your Honor's right.

17       *JUDGE GOODWIN:*  But I do appreciate the spirit of

18   innovation and thinking about these problems innovatively.  I

19   would encourage counsel for every party to think of ways that

20   we can expedite, handle fairly, this multitude of cases.

21       Where are we, Kate?  How many have we got now?

22       *LAW CLERK:*  Eleven thousand, four hundred-some.

23       *JUDGE GOODWIN:*  Eleven thousand, four hundred cases

24   now.  I am under no illusion -- having been in this business

25   for 45 years, I'm under no illusion that any of us are going to

try 11,500 cases, but I do believe that we may have to try several. But how we do it, and efficiencies that we can come up with, I would ask lead counsel for each of the defendants to think about that and have candid discussions with lead counsel for the plaintiffs about ideas such as the one that Mr. Garrard has put forth. I'm very willing to buy into creative solutions that both sides agree to. I am more reluctant to take one side's idea and impose it. That's not to say I am reluctant to come up with my own idea in the absence of joint ideas. This isn't too early to start thinking about those things. I realize it's too early for much, but I really appreciate that idea, and I think I'll just leave it at that and encourage the parties to discuss it with their clients and with their co-counsel and, frankly, with the counsel in the other MDLs, to the extent that you can, because the closer we get to a uniform process the easier it is for all the lawyers, and more importantly, for the judges. And I say "more importantly" because our attention spans are fading quickly.

*MAGISTRATE JUDGE STANLEY:* I have one question.

*JUDGE GOODWIN:* Yes, ma'am. Judge Stanley?

*MAGISTRATE JUDGE STANLEY:* Has there been any discussion or consideration of abbreviated advisory juries?

*MR. GARRARD:* Not at this point, Your Honor, but it's certainly worthy of discussion.

*MAGISTRATE JUDGE STANLEY:* Thank you.

1       *JUDGE GOODWIN:*  Along that line, I was talking with

2   Kate earlier.  We were talking about the parties no doubt will

3   do their own mock trials, but in a spirit of cooperation, you

4   might be able to do mock trials jointly instead of having to

5   have somebody in your own law firm pretend to be Mr. Garrard.

6   He could actually show up and do those abbreviated mock trials,

7   and instead of having somebody play the judge, I'll be glad to

8   show up.  So there are lots of things we could do, and I ask

9   you to consider it.

10      The next topic I have got is the state court dockets,

11  including hybrid cases with non-MDL defendants.  Who wants to

12  address that?

13      *MR. GARRARD:*  Mr. Clark, Your Honor, I believe, has

14  put some information together for the Court.

15      *JUDGE GOODWIN:*  Mr. Clark?

16      *MR. CLARK:*  Your Honor, Clayton Clark.  I have a

17  summary of the cases that we've been able to find so far, and I

18  think just kind of a general overview, there are approximately

19  3,500 to 4,000 state court cases on file right now, with the

20  overwhelming majority of those cases being those in the Jersey

21  court.  There are multiple one off cases in many, many

22  jurisdictions and, in fact, when I did deliver this information

23  to the defendants today that we have compiled, everyone said,

24  well, there's a few missing here and there; we need to get

25  together and make certain that it's correct.  Some of the

1   cases, in fact, that were in state court had moved -- had been

2   removed to federal court and are pending either transfer or

3   remand.   So I think that -- I spoke with Kate about this before

4   the hearing began, unless you would like to have a list right

5   now that is not complete and, in fact, probably needs some

6   attention, I've kind of gotten a loose agreement from the

7   defendants to work with them over the next month to get you

8   something more specific.   With that information, we have, of

9   course, the judges' phone numbers, the specific jurisdictions,

10  the type of case it is, and we're going to attempt to add more

11  information and populate that spreadsheet a little bit to give

12  you an idea of which products are involved.   I think that the

13  majority of the cases that we were able to find in the state

14  courts individually were multiple product cases.

15       And so with that, I have something I intended to leave

16  with Kate that I've given to the defense here now, but I think

17  that it would be more appropriate to maybe at the next status

18  conference to plan on something a little bit more detailed with

19  more information and more updated information, if that works

20  for you.

21       *JUDGE GOODWIN:*   That sounds fine, but I'm advised by

22  Kate, who is my advisor on all things, that she has the feeling

23  that there may be some of those cases that are hotter than

24  others, and if you could -- when you do submit it, after joint

25  discussion, if you could point out the defendants or

1   plaintiffs, what cases are causing heartburn on either side at

2   the present time, and where they are, and who the judge is, and

3   what stage the case is.

4           *MR. CLARK:*   And there are a number of those cases in

5   Texas and California specifically, one in New Mexico, and a

6   couple in other places.   And I will say that I think everybody

7   has been working together to attempt to either get involved

8   with those cases that involve non-MDL lawyers to where we can

9   have some influence there, or in those situations where we can,

10  move the cases outside of what this court is attempting to do

11  here.   We're working with that.   As you would expect, there are

12  state judges who have their own mind about when they want cases

13  to go, and so there may be need of some assistance in the

14  future with that.

15          *JUDGE GOODWIN:*   It's apparent, just based on the

16  number of cases filed and the rate at which they're being filed

17  in the MDLs, that this is clearly the center of gravity for

18  these cases.   Three to four thousand is a little bigger number

19  than I thought was out there in the hinterlands.   My experience

20  has been that the state judges fall into two categories:   One,

21  the larger category, is they'd just as soon I take care of it

22  and are happy to slow things down; and then there's a smaller

23  group, that you suggest, who have their own ideas about it and

24  they, quite rightly, proceed quickly.

25          I do know that there is a more formalized process now, or

1   at least a more consistent process now, of MDL judges being in

2   touch with and cooperating with state court judges, and

3   realizing that we don't talk about the cases.  The most we talk

4   about is our docket and where we are with our dockets and

5   theirs.  It turns out state courts are busier than federal

6   courts.  I didn't know if you knew that.  Federal judges don't

7   usually --

8            MR. CLARK:  With the filings here, I'm not sure

9   that's going to be the case here.

10           JUDGE GOODWIN:  Well, the MDLs are a much different

11  situation.

12           MR. CLARK:  We'll try to put a column in --

13           JUDGE GOODWIN:  Put the list together and point out,

14  as I say, the ones of interest, and we'll take it up again in

15  March, if that's all right with everybody.  Yes, ma'am?

16           MR. CLARK:  Thank you, Your Honor.

17           MS. BINIS:  Yes, Your Honor.

18           JUDGE GOODWIN:  Yes, ma'am?

19           MS. BINIS:  On this topic, we gave to Kate yesterday,

20  and to plaintiffs as well, a list of the cases that for AMS are

21  actually set for trial.  Now, we in every instance tried to

22  coordinate state cases with the MDL discovery, with the

23  depositions, and with documents.  In some of these cases that

24  hasn't worked, and in the eight that I have put on the list

25  that I gave you yesterday, we have not gotten agreement to do

1   that.   Now, obviously, that's a huge drain on our resources,

2   because at the same time that we're getting all our documents

3   together for this court, we have eight state cases that are

4   going to trial before this December MDL trial.   I understand

5   that that's the priority of the state judges.   In some

6   instances, though, it's lawyers here in this MDL who are not

7   agreeing to put their case off until after the December trial.

8   And so to the extent -- I'm actually throwing myself on your

9   mercy.   To the extent that I can get any help here from this

10  court, I would appreciate it.

11          *JUDGE GOODWIN:*   Well, I haven't seen the list that

12  you gave to Kate.   Nor have I -- do I know what -- if the

13  plaintiffs agree with the list of hot topics, but I can say

14  this, that because I've got so many of your cases, and so many

15  of their cases, I have some influence; and I will exercise the

16  influence to further the efficient disposition of the cases.

17  And, in that regard, I recognize the gamesmanship that goes on

18  in litigation, and I know that if I were a plaintiff sometimes

19  I'd want to whipsaw defendants if I could have.   And I know

20  sometimes if I were a plaintiff I'd like two bites at the

21  apple, and I'd like to cause you the kind of heartburn that

22  you're talking about.   But I am more inclined to try to urge

23  everybody to come, let us reason together, all in Charleston,

24  West Virginia.   So I'm aware of it; I know why they want to do

25  what they're doing; I know why you want me to intercede, and

1  I'm more inclined to your side of trying to pull things

2  together.

3           MS. BINIS:  Thank you, Your Honor.

4           JUDGE GOODWIN:  And I'll do what I can.

5           MR. NORTH:  Your Honor, if I may briefly, Richard

6  North on behalf of C. R. Bard.  I just wanted to note to Your

7  Honor that one of the cases on Ms. Binis' list in Texas is a

8  case where Bard is a codefendant, and that is set for trial in

9  June, so obviously given the MDL setting here, that's very

10  problematic for us.

11           JUDGE GOODWIN:  The sooner I have the information,

12  phone number, all that stuff, the sooner I might be able to

13  deal with it.

14           MR. CLARK:  Your Honor, I have that specific case

15  here.  I'll circle that case and give it to Kate at the close.

16           JUDGE GOODWIN:  Okay.  Mr. Garrard?  You seem like

17  you wanted to say something.

18           MR. GARRARD:  No, sir.

19           JUDGE GOODWIN:  All right.

20           MR. GARRARD:  I thought I had the next topic when it

21  came up.

22           JUDGE GOODWIN:  You probably do.  We're going to

23  briefly I guess revisit the issue of multiple product

24  restrictions.

25           MR. GARRARD:  Yes, sir.  The demographics of these

1   cases are such, Your Honor, that there are a significant number

2   of --

3        *JUDGE GOODWIN:*  I know where you're headed.  Do you

4   have the statistics on that?

5        *MR. GARRARD:*  I thought I was going to have it by

6   today, and I don't have it, but I will get it to the Court as

7   soon as I can get it from my fellow counsel and we'll provide

8   it to the Court.  And the discussion really revolves around as

9   we are trying to select bellwethers in the other MDLs, besides

10  the Bard-Sofradim one, getting cases that are solely a POP case

11  - prolapse case - or solely a stress urinary incontinence case

12  is leaving out significant numbers of women who have both an

13  SUI tape and prolapse mesh that come from the same defendant.

14       I'm not trying to revisit Your Honor's admonition to us

15  that you don't want to deal, at this point, with cases that

16  have, say, an SUI tape from Ms. Binis' client and a prolapse

17  from J & J.  I understand that at this point.  But we've got a

18  lot of cases that have both stress urinary incontinence tape

19  and a prolapse material in the same woman.

20       And, as an example, Your Honor, in the Bard bellwether

21  trials, of the five ladies who are going to have their cases

22  up, four of the five have both an SUI product and a prolapse

23  product.  Now, as we are prosecuting those cases, what we are

24  prosecuting in them is the prolapse material, but that's not

25  uncommon among the demographics, and we are just asking the

1   Court if you would rethink the admonition to us that we have

2   to select bellwethers that are purely one or the other.

3           *JUDGE GOODWIN:*   Bellwether cases, as you know - and I

4   won't bore you with the story about the sheep and all the

5   business about where bellwether came from - but the idea is

6   that they are cases that the parties put forward, and the court

7   helps, that are representative enough that their early trials

8   inform counsel sufficiently that if settlement is to be had the

9   results of those trials are instructive.  If, you know, out of

10  these 10,000, 12,000, 14,000 cases, 10,000 of them are multiple

11  product cases that you're relying on multiple products, then I

12  would think both sides would want to have a multiple product

13  case in the mix.

14          On the other hand, as I talked about the last time the

15  issue came up, anytime that you put multiple products before

16  the jury and multiple product testimony before the jury, you

17  learn less about what juries think of one product; you only

18  learn what they think of those products in combination.

19          So my inclination still is to take them as single

20  products, but I'm not ruling it out.  I just don't have your

21  numbers --

22          *MR. GARRARD:*   Yes, sir.

23          *JUDGE GOODWIN:*   -- I don't know how you're pursuing

24  it, and I don't know what the defendants think about it.  So

25  when you get those statistics together, why don't you get

1  together with Ms. Binis, and Ms. Moeller, and Ms. Cohen, and
2  some of these people and let's talk about it.

3  　　　　　*MR. GARRARD:*  We will do that, Your Honor.  We just
4  were desirous of asking the Court to revisit that in the
5  inclusion of bellwethers.  I hear what the Court is saying and
6  we will get the numbers and then we will have discussion with
7  Ms. Binis and others.

8  　　　　　*JUDGE GOODWIN:*  Consistency is the hobgoblin of small
9  minds, and while some people have said that my mind is small,
10  consistency is not one of my problems, or so says the Fourth
11  Circuit.

12  　　　　　*MR. GARRARD:*  I have seen a bellwether sheep, Your
13  Honor, and it's an interesting experience.

14  　　　　　*JUDGE GOODWIN:*  The next item is plaintiffs' fact
15  sheets in AMS, Boston Scientific, Ethicon.  They're due in AMS
16  for the discovery pool on March 18.

17  　　　How soon can the parties submit a plaintiff fact sheet
18  order, for AMS in particular, but also Boston Scientific and
19  Ethicon?

20  　　　　　*MR. GARRARD:*  Your Honor, within the last couple of
21  days the plaintiffs' side has agreed that it is willing to use
22  the Bard plaintiff profile form for each of those three MDLs.
23  That has been made known to the defendants.  I don't think they
24  have had the opportunity to respond yet, but I would hope --
25  and Barbara, you're more --

1      *JUDGE GOODWIN:*  I would like to have uniformity, so

2  I'm very -- I would encourage that.

3      *MR. GARRARD:*  I would presume that we can have some

4  mutual meeting of the minds on that within a week.

5      Is that fair, Barbara?

6      *MS. BINIS:*  Yes.

7      *JUDGE GOODWIN:*  Anything else on that topic?

8      The New Jersey trial involving Ethicon, who from

9  Ethicon -- the Ethicon MDL would like to report on this briefly

10  for the group?

11      *MS. JACOBS:*  Your Honor, I can do that --

12      *MR. AYLSTOCK:*  Your Honor, if I could --

13      *MS. JACOBS:*  -- if you would like for me to.

14      *JUDGE GOODWIN:*  All right.

15      *MS. JACOBS:*  Is it okay if I speak from the --

16      *JUDGE GOODWIN:*  Well, let's start from the defense

17  side, yes.  Plaintiffs have been doing all the talking.

18      *MS. JACOBS:*  You would just like to know where the

19  trial stands?

20      *JUDGE GOODWIN:*  I know it's in Day 18 and the

21  plaintiffs have rested.

22      *MS. JACOBS:*  Plaintiffs have rested; the defense is

23  into its case.  We have every reason to think it will be done

24  well before the end of February, but I can't be much more

25  specific than that.  There were a number of short court days

1  this week that will have some impact.

2      *JUDGE GOODWIN:*  Let me tell all of you, there won't

3  be a Day 17 of plaintiffs' case in any of the ones I try, just

4  for purposes -- I will follow the example of Judge Fallon in

5  the Vioxx cases, and when I am adequately informed to make a

6  decent judgment, I will limit the number of trial days.  It

7  just -- there's just no reason to take that long to try a case.

8  I'm not being critical.  There probably were reasons.  There

9  probably were reasons; I just haven't seen any myself.

10     So you expect maybe it will be -- look for a verdict

11  around the end of February?

12      *MS. JACOBS:*  I think it will be before the end of

13  February, Your Honor.  I really do.

14      *JUDGE GOODWIN:*  Do the plaintiffs agree with that

15  assessment?

16      *MR. AYLSTOCK:*  Your Honor, Brian Aylstock.  Myself

17  and Mr. Cartmell and Ms. Baggett have been there, one of us at

18  least, during the entire trial; and I think there have been

19  some issues, some sick jurors, even Judge Higbee was sick one

20  day, and some half days just that were part of the plan.  We

21  did have the opportunity to speak with Mr. Garrard and he had

22  conveyed, in fact, that we will not be in Day 18 in the

23  plaintiffs' case in this courtroom, and we understood that from

24  your comments at the last conference as well.

25     There have been a number of witnesses.  A lot, we

1    anticipate, of the expert witnesses that were qualified in that

2    court and so testified to that jury we think may, in fact, be

3    presented to Your Honor in this court.  And there was a

4    stipulation about Johnson & Johnson and Ethicon that we're

5    trying to work out, something similar for these MDLs, just

6    to -- Ethicon in particular -- or Johnson & Johnson has many

7    different companies all over the world, and it gets very

8    confusing, so we're hoping and we're talking about working out

9    a similar stipulation so that the jury is, one, not confused,

10   and that when it comes to -- if we get to punitive damages, if

11   we're so lucky, and that net worth becomes a relevant

12   consideration that we don't have to add up all these entities

13   all over the world.

14        *JUDGE GOODWIN:*  You'd just as soon add them all up,

15   wouldn't you?

16        *MR. AYLSTOCK:*  I would just as soon have Johnson &

17   John where they all flow and are controlled by one.

18        *MS. JACOBS:*  And we understand perfectly, Your Honor,

19   that that is the goal.

20        *JUDGE GOODWIN:*  All right.  Thank you both very much.

21        Turning to the next item, Proxy Biomedical, at the last

22   status conference on December 6, I gave the parties fifty days

23   to conduct jurisdictional discovery, with responsive briefs due

24   two weeks later, which is coming up in just a few days.

25        Mr. Cosgrove, would you like to report on this?

1       *MR. COSGROVE:*  Yes, Your Honor.  The plaintiffs

2 propounded extensive written discovery, including

3 interrogatories and document requests.  We responded to all of

4 that.  In fact, we had several meet-and-confer discussions.  We

5 made supplemental interrogatory responses.  As far as I know,

6 there's no issues with regard to the documents we produced.

7       The deposition of a representative from Proxy Limited on

8 these issues was noticed.  Several dates were provided; one was

9 decided upon.  It happened to be today.  A couple days ago, for

10 reasons that aren't clear to me, that deposition notice was

11 withdrawn and the deposition was terminated.

12       That's basically the rundown on discovery for jurisdiction

13 purposes.

14       *JUDGE GOODWIN:*  And briefs are due when?

15       *MR. COSGROVE:*  The supplemental briefs are due

16 tomorrow in the Holizna case, the case specific motion, as well

17 as the supplemental briefing on the global motion to amend.

18       *JUDGE GOODWIN:*  Okay.

19       *MR. COSGROVE:*  And Proxy Limited actually filed their

20 supplemental memorandum this morning.

21       *JUDGE GOODWIN:*  Yes, ma'am?

22       *MS. WAGSTAFF:*  Yes, Proxy Biomedical served

23 supplemental discovery responses this morning, and I haven't

24 had a chance to review them yet, but assuming that they are, in

25 fact, the discovery that we asked for, we'll be able to file

 1  our supplemental brief tomorrow.

 2        *JUDGE GOODWIN:*  All right.  Things are going

 3  swimmingly.  Anybody have anything to add on Proxy?  Okay.

 4        We had a brief meeting this morning with counsel in Bard.

 5  Is there anything else we have to take up on this issue?

 6        *MR. GARRARD:*  I don't think so, Your Honor.  I think

 7  we had a good discussion with the Court this morning.

 8        *JUDGE GOODWIN:*  Well, I know this will sadden you

 9  greatly, but thank you for your time today.  It's always a

10  pleasure to see all of you.  I'll now turn the status

11  conference over to Judge Stanley and Judge Eifert.  I'll see

12  you later.  Thank you.

13        *(Judge Goodwin exited from courtroom.)*

14        *MAGISTRATE JUDGE STANLEY:*  All right.  The first item

15  before us is deposition protocols and -- Mr. Garrard?

16        *MR. GARRARD:*  Yes, ma'am.  We have reached agreement

17  with all three defendants as to deposition protocols.  I have

18  actual presentations to make for AMS and Boston Scientific that

19  we can go ahead and present to the Court, hopefully with no

20  typos.  May I present?

21        *MAGISTRATE JUDGE STANLEY:*  Yes.

22        *MR. GARRARD:*  I'll give you two copies, if that

23  helps.  And we have as well the Boston Scientific, the same,

24  and Mr. Aylstock promises me that he will have one -- he and

25  Ms. Jacobs will have one to the Court for Johnson & Johnson

 1   Ethicon by. . .?

 2            MR. AYLSTOCK:   By tomorrow.

 3            MR. GARRARD:   By tomorrow.

 4            MAGISTRATE JUDGE STANLEY:   Great.   Are there any

 5   material differences between these and Bard?

 6            MR. GARRARD:   Not material differences, Your Honor.

 7   They are basically modeled off of that.   There are a few little

 8   things, but nothing that the parties felt were significant

 9   enough to be issues.

10            MAGISTRATE JUDGE STANLEY:   Okay.

11            MR. AYLSTOCK:   The Johnson & Johnson one, Your Honor,

12   will have a specific provision that kind of addresses the

13   depositions that were taken in the New Jersey litigation that

14   we fully intend to utilize in this court to the extent

15   possible.   As Your Honor recalls, we did have a conversation

16   with you at the last conference about that, and we've been able

17   to work through that and we'll be able to present that to you

18   tomorrow.

19            MAGISTRATE JUDGE STANLEY:   All right.   Are you going

20   to submit electronic versions through the clerk's office?

21            MR. AYLSTOCK:   Yes, Your Honor, we can.

22            MAGISTRATE JUDGE STANLEY:   Or just e-mail them to

23   Kate.

24            MR. AYLSTOCK:   Even better.

25            MAGISTRATE JUDGE STANLEY:   Both of these.   Anything

1   else on the deposition protocols?

2             *MR. GARRARD:*   No, Your Honor.

3             *MAGISTRATE JUDGE STANLEY:*   Next has to do with using

4   documents which have been marked as confidential at the time of

5   production and what to do with them with respect to using them

6   with motions or responses to motions.  And does this have to do

7   with a particular defendant or all of them?

8             *MR. GARRARD:*   Your Honor, it came up as my lawyer

9   who is my brief writer and works on all these, Josh Wages, was

10  working on responses in relation to Boston Scientific, but

11  it's a problem that transcends Boston Scientific or any of the

12  defendants that as documents are produced to us by the

13  defendants, the vast, vast, vast majority of them are marked

14  confidential.  I suspect we could come into this court and we

15  could challenge the confidentiality markings on a great number

16  of them.  We haven't chosen to do that because of the time it

17  would involve, so we are placed in a difficult position that

18  if we need to use documents that have been produced to us,

19  either to make a motion or to respond to a motion, under the

20  protocol we work with now, we have to go to the other side and

21  say, "We want to use this document," to which they can object,

22  they can redact, or whatever they may deem they want to do.

23        There are two things that have happened with that.  One

24  is it's very time-consuming; secondly, we get into

25  meet-and-confers; and thirdly, it forces us to tell them

1  before we ever file a motion where we're going.  And we would

2  like to have some way that we can file motions that include

3  documents which have been marked confidential without having to

4  do that process, and we're seeking the wisdom of the Court,

5  quite frankly.

6       We had an issue earlier this week.  I think they were

7  going to invoke the Court, and then it was informed to me that

8  it got worked out, and I frankly don't know whether they ever

9  talked to Your Honor or not.

10      But that's what we're seeking is some help from the Court

11  in terms of how to deal with this in a fair way.

12           *MAGISTRATE JUDGE STANLEY:*  Well, you may think I

13  have wisdom, but I want you to know I've had absolutely no

14  effect on discouraging lawyers from marking documents as

15  confidential, even in the *Felman* case where every single one

16  was, and substantial monetary sanctions were imposed.  It

17  hasn't done any good.

18      I will say this:  As far as I can tell, every defense

19  attorney marks too many documents "confidential."  Ultimately,

20  it is always the burden of proof on the person marking the

21  document as confidential to justify that marking, and I would

22  expect that person with the burden of proof to be able to

23  substantially justify under Rule 26 why this particular

24  document is so critically important to be protected.  Keeping

25  in mind, of course, that you're disclosing these documents to

1    goodness knows how many attorneys, and with the understanding

2    that protective orders work pretty well at keeping the flow of

3    documents moving, which is why I think we all tolerate this

4    somewhat - this over marking.

5        I went back to the Protective Order and looked at it,

6    and the provisions of which you speak are really for post

7    discovery, so that as soon as I remembered that, I realized

8    that post discovery motions are motions for summary judgment,

9    whatever.  It's pretty obvious where people are going, there

10   shouldn't be that many documents, and so it wasn't intended to

11   be a particularly onerous burden to say, "Hey, can we now

12   remove this marking?"

13       And I'm assuming that you're now talking about the

14   difficulty of discovery motions.

15           *MR. GARRARD:*  Yes, ma'am.

16           *MAGISTRATE JUDGE STANLEY:*  Okay.  Well, and the

17   Protective Order is silent on discovery motions.  Having

18   thought about it overnight, it occurred to me that if it's

19   necessary to refer to particular documents which have been

20   marked as confidential, you could use the Bates number and

21   that would at least have the lawyers understanding what the

22   lawyer -- the opposing lawyer is talking about.  Now, it

23   leaves the judge in the dark, and so you could submit those

24   Bates-numbered documents that you have specifically referred

25   to *in camera*, hard copy, ship them in overnight.  That's one

1   way to do it.

2        But let me -- let me say this:  The judges in this

3   district hate having documents filed under seal.  All of the

4   judges in this district are acutely aware that the American

5   taxpayers pay our salaries, build these courthouses, and

6   provide the forum for all of you to settle your disputes.  And

7   they can walk into our courthouse at any time and look at what

8   we're doing and decide whether we're worth the money we're

9   paid.  They may not be able to do anything about that, but at

10  least they can inform their own opinion.

11       And the extent to which the pleadings that are filed in

12  important nationwide cases are impenetrable, incomprehensible,

13  then we're not serving the public.  And first and foremost,

14  while I believe it's my job to help the lawyers, I'm a public

15  servant.

16       So I think that -- I would hope that all of the attorneys

17  would very carefully consider the extent to which they actually

18  have to use examples, quote from, or otherwise refer to

19  documents which have been marked "confidential," because you

20  may be able to characterize documents without actually adding

21  the specifics.

22       I say to the defense attorneys that you can really tick

23  off a judge by over marking things.  And, of course, the *Felman*

24  case, which you may or may not have read, was egregious in that

25  they were marking, oh, the instruction manual for the printer,

1 and pictures of puppies, and calendars, and things like that.

2 I mean, it was ridiculous.

3    I'm assuming that hasn't been the case here, but I do

4 expect there to be a ready openness to removing documents.

5 So, for example, if the defense gets served with a motion to

6 compel, and all of a sudden you see these Bates numbers,

7 perhaps the first thing you ought to do is take those Bates

8 numbers and say, we'll take off the confidential marking on

9 those documents, so that it becomes more transparent to

10 everybody.

11    Do you think that is a proposal that, at least while we're

12 in the discovery phase, will get us through this?

13    Could somebody turn off their Blackberry or whatever it is

14 that's buzzing through the intercom?  Your electronic devices

15 should be off.

16    Go ahead.

17    *MR. GARRARD:*  Not mine.  I think that it can work,

18 Your Honor, if we refer to documents by Bates numbers and be

19 careful how we describe them, and if we can provide the

20 documents to Your Honors *in camera*, we can deal with that.

21 And hopefully we can engage in discussions with brethren across

22 the aisle to consider removing some of the confidentiality

23 markings.

24    *MAGISTRATE JUDGE STANLEY:*  Does anyone from the

25 defense have anything to say about that suggestion?  Okay.

1      Next has to do with document preservation issues,

2  apparently mostly with Ethicon.   Mr. Aylstock?

3           *MR. AYLSTOCK:*   Yes, Your Honor.   Just to report to

4  the Court, we have circulated and had at least one or two

5  meetings on our document proposal for document preservation as

6  it relates to Ethicon.   And it came up in Ethicon because we

7  learned that one of the facilities that manufactured some of

8  the mesh over in Germany was being shut down, so we sought and

9  have had some fruitful discussions I think with our

10  counterparts at Ethicon about a more formal order than the

11  federal rules for preservation of documents and the

12  notification about disposal of maybe some manufacturing

13  equipment and things like that.

14      And it relates, again - I alluded to this earlier - to the

15  fact that Ethicon and Johnson & Johnson has a lot of different

16  entities all over the world, and some of them aren't in this

17  court and necessarily subject to the federal rules.

18      We do appreciate and know that the hold orders are in

19  place at those foreign entities.   We've been informed of that,

20  but we thought it would be better for all involved that there

21  would be an actual order from the Court so that that could

22  then be circulated and we may not have translation issues and

23  so forth.   So we're working on that.   We hope that we'll be

24  able to come to a resolution on that in the next week or so and

25  present that to the Court.

1  And I understand from some of the other co-leads that

2  there may, in fact, be some similar proposals circulated.  I

3  don't know if they have or not, but we'd like to maybe kind of

4  set the ground rules for this MDL in a little more formal way.

5  *MAGISTRATE JUDGE STANLEY:*  Did Ethicon want to say

6  anything about this?

7  *MS. JACOBS:*  Your Honor, we had some concern about

8  the breadth of the order.  We have had one meet-and-confer.

9  The plaintiffs have sent back a proposal based on that

10  discussion, and we're looking at that now.

11  *MAGISTRATE JUDGE STANLEY:*  And did you want to go see

12  this place, Mr. Aylstock?

13  *MR. AYLSTOCK:*  Potentially.  I do not yet know

14  exactly what may be being disposed of, but we have made --

15  members of the MDL, and in New Jersey, have made several trips

16  over to Germany.  There's a very large mesh research facility

17  that Ethicon runs over in Germany.

18  So we just want to make sure everything is there, and I

19  know that they have the same interest in that.

20  *MS. JACOBS:*  And I can assure Your Honor nothing is

21  being disposed of at this time.

22  *MAGISTRATE JUDGE STANLEY:*  All right.  Thank you.

23  Next is treating and implanting physician scheduling and

24  order of examination issues, and apparently there is an

25  informal disagreement.

1   *MS. BINIS:*   Your Honor, I asked that this be put on

2   the calendar.   Mr. Garrard and I have had a few conversations

3   about it, but in discussing it with my team over the last few

4   days we've come up with some new ideas that I haven't had a

5   chance to discuss with him, so I suggest we table this and give

6   us a chance to talk about it more.

7                *MR. GARRARD:*   That's fine.

8                *MAGISTRATE JUDGE STANLEY:*   Now, with respect to AMS,

9   three motions have been filed lately.   AMS has not had an

10  opportunity to file a response.

11       I thought my order with respect to, first, the outside

12  U.S. production and compliance was pretty clear.   It's evident

13  that we have thousands of plaintiffs who have experienced

14  adverse consequences which they allege have to do with these

15  devices manufactured and marketed by various defendants.   So

16  you go back to the old Watergate issues.   What did the defense

17  know?   When did they know it?   And then you can add to that:

18  What did they tell physicians and sales reps about their

19  product?   And what did they expect those physicians to then

20  tell their patients?

21       I see absolutely no difference whether the material is

22  written in English, or Spanish, or Vietnamese, or Arabic as to

23  what the product's for, what the rate of adverse consequences

24  is understood to be, and what could those adverse consequences

25  be.

1     Now, Judge Eifert has been very conscientious in reading a
2   lot of materials, but we also -- I understand that I -- there's
3   no way that I can keep up with the facts as you are developing
4   them.   And I was -- according to the most recent testimony,
5   perhaps in New Jersey, do the plaintiffs now say that you-all
6   think that there is a particular rate of potential adverse
7   consequences to a given patient?

8         *MR. GARRARD:*   Your Honor, when you look at the
9   scientific literature, there are various rates reported.   When
10   you look at certain documents that come from various
11   defendants, there are rates reported.   I'm not sure anyone
12   from our side can stand up and say that 15 percent is the rate,
13   but we've got documents and we've got literature that shows
14   substantial percentages of complications.

15         I'm not sure I've answered your question.

16         *MAGISTRATE JUDGE STANLEY:*   Well, what I'm trying to
17   determine, both as an assist to myself and Judge Eifert, is
18   whether there is some body of testimony that's being developed
19   now in the depositions to which we have no access, in the
20   public testimony that we're not following, so that we have
21   context for the discovery disputes that are now coming before
22   us?   I mean, the problem we always have is that you-all file
23   certificates of service and we never have a clue what you're
24   saying to each other about the answers to interrogatories or
25   whatever.   So I think, for both of us, it would help us if we

1  were getting some context for the positions of the parties.

2      So I hear from the plaintiffs that you say that there is

3  a range of percentages of patients who experience problems.

4          *MR. GARRARD:*   When one goes to the literature, that

5  is correct, Your Honor, you know, and I've seen documents

6  where they say, well, the average is such and such.   But when

7  you look at the literature, there is a range -- that's not me.

8          *MAGISTRATE JUDGE STANLEY:*   We usually have the CSOs

9  shoot whoever's phone is going off, because they are all armed.

10 Usually that takes care of it.

11     Go ahead.

12         *MR. GARRARD:*   I think we could give the Court a short

13 paper, if that's what you want.

14         *MAGISTRATE JUDGE STANLEY:*   No, I --

15         *MR. GARRARD:*   But in terms of precise numbers, I'm

16 not sure that we've got a single number.

17         *MAGISTRATE JUDGE STANLEY:*   I'm not asking for that.

18         *MR. GARRARD:*   Okay.

19         *MR. AYLSTOCK:*   Your Honor, Brian Aylstock.   From

20 the testimony that's been developed and is now public from the

21 New Jersey trial, in the internal TVM study that supported the

22 Prolift launch, there was -- of any adverse event in that, it

23 was two-thirds of the individuals in that - there was 175

24 patients - experienced some adverse event.

25     The erosion rate varied depending on whether it was six

1 | months, one year, three years, five years, but it has ranged

2 | anywhere from fifteen to twenty percent as far as the mesh

3 | eroding either into the bladder or through the vaginal wall.

4 |     *MAGISTRATE JUDGE STANLEY:*  Okay.  Now, I would also

5 | like to hear from the defense what you believe is a fair

6 | characterization of what is likely to be the rate at which

7 | there are some complications or adverse consequences.  Or you

8 | can just say what your expert just testified in New Jersey, or

9 | what you've already disclosed, if anything.

10 |     I'm not asking -- you're not under oath; this isn't going

11 | to be shoved down your neck.  I'm trying to figure out where

12 | we're going in this case.

13 |     *MS. JACOBS:*  Your Honor, I'll just be honest, I'm

14 | not prepared to give those sorts of statistics.  I certainly

15 | would have been if I had appreciated that's where we were going

16 | today.

17 |     *MAGISTRATE JUDGE STANLEY:*  All right.  Now, so the --

18 | yeah, Mr. Bard -- Mr. North?

19 |     *MR. NORTH:*  Your Honor, this is just one piece of

20 | literature that I thought I could share with the Court, but I

21 | think we addressed this in the early days in the Bard MDL, in

22 | fact, on the record.  For example, with our client's product,

23 | there is a study by a Dr. Patrick Culligan that focused on the

24 | product and focused on the erosion question, and he found

25 | eleven percent erosion with the product, but all but one of

1   the cases were treated in his facility without a subsequent

2   surgery.   So that's one study that's been done.

3              *MAGISTRATE JUDGE STANLEY:*   I think I recall that

4   study --

5              *MR. NORTH:*   Right.

6              *MAGISTRATE JUDGE STANLEY:*   -- being cited and also

7   published by the FDA or something.

8              *MR. NORTH:*   Exactly.

9              *MAGISTRATE JUDGE STANLEY:*   Thank you.

10             *MR. GARRARD:*   They also have studies, Your Honor,

11  showing about fourteen percent also, that was sponsored by

12  them.

13             *MAGISTRATE JUDGE STANLEY:*   I know you're not going to

14  let him have the last word, Mr. Garrard.

15             *MR. GARRARD:*   I try not to.

16             *MAGISTRATE JUDGE STANLEY:*   Okay.   So that's the basic

17  context of what we have.

18       Now, I am not pleased to hear that there has been such

19  delay in producing documents with respect to those which are

20  outside the United States, but one of the facts that I don't

21  know is whether the products that were used and sold outside

22  the United States are the exact same products that were sold

23  inside the United States.   Nobody ever told me that.

24       Ms. Eskin?

25             *MS. ESKIN:*   Yes, Your Honor, Amy Eskin.   The SPARC

1   and Monarc, Apogee and Perigee products --

2         *COURT REPORTER:*  I'm sorry.  I'm sorry.  Could you

3   start over?  I didn't hear you.

4         *MS. ESKIN:*  Sure, and I'll slow down.  The SPARC and

5   Monarc products -- the SUI products that were sold overseas,

6   and they are the same as the products that were sold here in

7   the United States, and there is a wealth of information we

8   believe that exists outside the United States regarding adverse

9   events related to those SUI products and registries and their

10  locations.  And there are many other sources of information

11  overseas, including with overseas sales forces and other

12  sources that we talked about in our brief and in our original

13  motion.  And the same would be true for Apogee and Perigee.

14      So we're looking to find out what was known or knowable

15  by the defendant from sources outside the United States,

16  because it does provide the context that Your Honor is talking

17  about, not just in the published literature in terms of the

18  reporting of erosion rates, but what was internally known to

19  the company, either through registries, reports from

20  physicians, and other sources, so that we can demonstrate what

21  the adverse event rate is, what it should have been reported

22  as by them.

23        *MAGISTRATE JUDGE STANLEY:*  All right.  Ms. Binis,

24  your response is due no later that February 21?

25        *MS. BINIS:*  Yes, Your Honor.

1          *MAGISTRATE JUDGE STANLEY:*  Any chance you can do it

2    faster than that?

3          *MS. BINIS:*  Your Honor, let me introduce my partner,

4    Janet Kwuon.

5          *MAGISTRATE JUDGE STANLEY:*  You have your face

6    pointing toward the back of the courtroom; I couldn't

7    understand a word you said when you introduced her.

8          *MS. BINIS:*  I apologize.  Let me introduce my

9    partner, Janet Kwuon.  She's in charge of that.

10          *MAGISTRATE JUDGE STANLEY:*   Hello, Ms. Kwuon.

11          *MS. KWUON:*   Good afternoon, Your Honor.  I'm from

12   the Los Angeles office and I am managing this OUSP.  In terms

13   of the briefing, I believe we can probably get the brief to the

14   Court a little bit in advance of February 21.  I need to just

15   doublecheck a couple things, because there are many pieces we

16   want to put together to provide the Court a full picture.

17          We very hurriedly tried to address one of the primary

18   issues, which was the scope of the collection that's being

19   done.  And prior to our hearing today Ms. Eskin and I sat down

20   and talked, and we agreed that there may have been a

21   miscommunication about how broadly and comprehensively AMS is

22   collecting documents related to women's health products

23   worldwide.  And so I think that issue actually is not really

24   the issue that we have a little bit of disagreement about; it

25   has to do with the timing and the perception of delays.  We

1   definitely want to squarely address that in this briefing,

2   because even the letter that we submitted to the Court very

3   late this morning - so we're just trying to get some additional

4   information to you and the court - did not focus on the issue

5   of timing so much as to clarify that in terms of the scope of

6   what we're collecting, as we are collecting everything related

7   to the women's health products in the foreign OUS offices, and

8   I think that's maybe where Ms. Eskin and I had a miss.

9        But in terms of briefing, I believe that we can get the

10  brief to the Court earlier, and I need to just doublecheck sort

11  of the date, and what day of the week even the 21st is, to see

12  if we can do something a little sooner.

13          *MS. ESKIN:*  Your Honor?

14          *MAGISTRATE JUDGE STANLEY:*  Ms. Eskin?

15          *MS. ESKIN:*  I agree our major issue now is timing in

16  terms of the speed and amount of the production and the way

17  it's being rolled out.  I think we have a couple of issues

18  that we posed in our brief that we have also met and conferred

19  about having to do with how quickly after we identify

20  custodians we can get those custodial files for the outside

21  U.S. custodians.  We have suggested fifteen days after that

22  request is made to the defense.  Ms. Kwuon is going to get back

23  to me on that.

24       We're also looking at reducing the notice period for OUS

25  depositions to enable us to be able to get that discovery

1  rolling.   And then, of course, the timing rollout as proposed

2  and as being followed by AMS right now puts us really in an

3  impossible position in terms of getting our case prepared,

4  getting our depositions noticed and taken, getting our experts

5  ready.   We just feel like it needs to happen much faster,

6  particularly in the context we have here where the document

7  request went out in June of last year.

8          *MAGISTRATE JUDGE STANLEY:*   How many lawyers do you

9  have on this MDL, AMS?

10          *MS. KWUON:*  It's a combination, so for the OUSPs

11 we've had to add to the team in terms of obtaining local

12 counsel in some of the OUS markets.   And then we have the U.S.

13 team, and then we have local counsel both in the U.S. in terms

14 of, you know, there is a primary local counsel that's assisting

15 with the documents and discovery in a very large way, and then

16 there are individual counsel who have, you know, different

17 roles depending on the particular matters.

18      You know, the complication with the OUSPs is, you know,

19 not just our having to send somebody to conduct the interviews

20 and to collect the documents and do similar to what we do in

21 the U.S. on the same scale, but we are also running into, for

22 many of the EU markets and Australia as well, the extra loop

23 that you have to work in in terms of privacy, and then, you

24 know, the retention of vendors, and, you know, that -- it has

25 to go through that loop before it comes then to -- we can even

1    receive the documents here.

2        And so, I mean, rest assured from the minute we received

3    the order at the end of October to today, we have been working

4    like crazy to get our hands on those documents.  And by the

5    March 31 date, which was the first milestone that we have in

6    place for the OUS countries that we have identified in our

7    proposed schedule, plus what we have already provided to date,

8    we think that we're going to be at like 75, 80 percent of sort

9    of worldwide coverage.  And then we needed that extra month to

10   scoop in whatever is left.

11       And so from, you know, the beginning of November and

12   December, we've been reaching out to the EMEA, which is our

13   European-Middle Eastern market, the APLAC market, which is

14   Asia, Pacific Latin America, and tapping each one of the key

15   locations, the key people, to then, you know, retain local

16   counsel, get a privacy review, determine what kind of

17   logistical hoops we have to do.

18       And then we've been going out and scooping -- collecting

19   not just electronic data, but hard copy data.  In many of the

20   locations, because we are OUS, they have very small space.

21   It's not -- they're not the main office; so then they point us

22   to a storage unit somewhere where they have boxes of documents.

23   And we are sending lawyers out there and going through the

24   boxes of documents, and having the copy service come out and

25   scan and collect all of those materials.

1   So I think that's the part on the comprehensiveness.  You

2   know, I feel as though we are being extremely comprehensive,

3   and there isn't any unilateral limitation or some threshold

4   we're asking the plaintiffs to establish, because we understand

5   what the order is, and we are doing everything we can.  You

6   know, it's the timing.  And I think that while I understand the

7   plaintiffs want the documents yesterday, and frankly I wished

8   we could have provided the documents yesterday, we're off by

9   thirty days for most of them, and then really another thirty

10  days to kind of clean up the end of it.

11              *MAGISTRATE JUDGE STANLEY:*  Thank you, Ms. Kwuon.

12      Ms. Eskin, after AMS files its response, can you file your

13  reply in less than a week?

14              *MS. ESKIN:*  Yes.

15              *MAGISTRATE JUDGE STANLEY:*  Okay.  Anything further on

16  the OUS production?  Okay.

17      Moving on to document production in relation to

18  depositions scheduled and custodial production, and again,

19  this is AMS and the motion is not ripe, but there appears to

20  be a disagreement, as I understand it, on whether or not the

21  plaintiffs can designate more than thirty custodians.

22              *MS. BINIS:*  Your Honor, we have worked with

23  plaintiffs over the last few days and agreed to produce the

24  custodial files for the extra -- well, the ESI protocol order

25  said up to thirty and then ask the Court for intervention.  Now

1    we're up to forty five -- a request for forty five custodial

2    files.  So we've agreed to do that, but they want it yesterday,

3    and the problem is that they gave us a list in August, which

4    we've been working on and which is produced now.  Then they

5    gave us another list in October, which we are almost complete

6    with.  And then less than thirty days ago, they gave us a

7    completely new list where there is only five people who overlap

8    the August and October lists and the completely new list that

9    we got in the beginning of January.  And now they want us to

10   do what we've been doing since October and November -- I mean,

11   I'm sorry, August and October; they now want us to do

12   everything that we've done then, for more people, in thirty

13   days.  And it's impossible for us to do.  We're not saying we

14   won't do it; we're saying to them we need to prioritize.

15        And of this brand new list of brand new custodians, the

16   vast majority of them are ex-employees, which means that the

17   files for all those ex-employees aren't within our usual

18   databases.  We go to archive databases to get those, so that

19   takes a little bit longer as well.

20        So we're not saying, "We're not going to give it to you."

21   All we're saying is, "Here is what we can do, and this is the

22   schedule we can do it on."  And they're saying, "That's just

23   not acceptable; we need it tomorrow."

24        Now, we have given them deposition dates for the five

25   current employees that we have that they have asked for.  Even

1    though some of those were not on the original lists, we're

2    going to do everything in our power to get those five -- the

3    documents for those five produced, and those five depositions.

4    But for the brand new people that we just heard about less than

5    thirty days ago, it's impossible for us to get an entire

6    custodial file together within the next twenty to thirty days,

7    which is what we're being asked for.

8         We've gone to them and said, "Is there some compromise?

9    Is there a way that we can get less than the entire custodial

10   file?  Can we limit it by time, or by product, or give you

11   information?"  Because some of the people, frankly, on their

12   list -- one of them is a shipping and receiving clerk.  Now,

13   today they've told us, "Okay, we're not going to ask for the

14   shipping and receiving clerk."  Some of them have never worked

15   on women's health products.  So we have to have that discussion

16   as well.

17        So again, this is a timing issue and not a scope issue.

18   We are going to produce the custodial files, but the question

19   is when.  And we have laid out -- we have laid out a schedule

20   for them, and I can't tell you what the schedule is, but

21   Ms. Kwuon can, and we're willing to do everything in our power,

22   and we're working with plaintiffs to see if we can limit this

23   in a way that will make it faster, but we're working as fast

24   as we can.  We have tripled the number of people that are

25   working on this, because we have to get this done, and we

1   understand that, but there's a limit to what can get done.

2              *MAGISTRATE JUDGE STANLEY:*   Yes, Ms. Fitzpatrick?

3              *MS. FITZPATRICK:*   Your Honor, we did have a

4   meet-and-confer.  The issue that has come up is that we have

5   been receiving documents, we have been scheduling discovery.

6   We've got some custodial files, and we are now in a better

7   position to identify people who we would like to depose who can

8   give relevant information to the case.

9        This is something that was I think previewed back when we

10  started talking about the ESI protocol and our concerns about

11  identifying custodians at the front end before we even had a

12  chance to do discovery.  So we have been able to identify -- at

13  this stage, we have noticed 23 particular depositions, across a

14  broad range of topics, of people that we want to depose based

15  on our review of the documents and our discovery.

16       And what our concern is at this juncture is it wasn't

17  actually till this morning that we understood that AMS was

18  willing to produce some custodial files, because the position

19  had originally been that they weren't, and we do appreciate

20  that, but it is a timing issue for us.  We need to take these

21  depositions.  We have a deposition protocol that's been

22  submitted that permits for 45 days -- we have to wait 45 days

23  before taking depositions.  It's a great concern for us if

24  we're now hearing that it's going to be 80, or 90, or 100 days

25  between noticing a deposition and actually getting to take that

1    deposition.  Obviously, with a trial date, with expert

2    disclosures that need to be done in July, we are concerned

3    about having to wait that length of time.

4         We have agreed with AMS that what we will do, I think by

5    Tuesday of next week, is present them with a priority.  We

6    will tell them which ones, which deponents we would like to go

7    first, and go down the line so we can work on it that way.

8    And we have also agreed to consider a somewhat reduced

9    custodial file and are waiting for proposals that I believe we

10   are going to get from them by next Tuesday.

11        And I would certainly hope that that process could allow

12   us to get through and to move this along a little bit faster

13   than AMS has been proposing.  It's not quite as fast as we

14   would like, but I think at this juncture we should go through

15   that process next week and we should, hopefully by the end of

16   next week, be able to see whether we can make progress on this

17   again or we are going to be at an impasse and have to come back

18   to Your Honor for a resolution.

19        *MAGISTRATE JUDGE STANLEY:*  Is it -- are we at a

20   situation where it would be acceptable for AMS not to file a

21   response to this motion, and while you keep working on it?

22        *MS. FITZPATRICK:*  Your Honor, what I would suggest is

23   perhaps we have a date calendar for the response to the motion,

24   maybe about two weeks out, in the hopes that over the next week

25   we can resolve the situation, but if it doesn't get resolved we

1   would like to get it going quickly.  We don't want to have to

2   wait then for another two weeks to get a response, and then

3   give a reply, and be out maybe about a month before we would

4   get something from Your Honor on what we are looking for here.

5            *MAGISTRATE JUDGE STANLEY:*  At the moment the response

6   is due on the 21st.

7            *MS. FITZPATRICK:*  And I think we can certainly work

8   over the next week to see whether that's going to be necessary.

9            *MAGISTRATE JUDGE STANLEY:*  All right.  I went back --

10  because I remembered that we had had a conversation at the

11  July status conference on the 26th, I went back and looked at

12  that transcript.  And basically what it said was -- there was

13  back and forth, just as we're doing right now.  I think

14  Ms. Binis, you were at ten or twenty, and the plaintiffs didn't

15  want to set a number, and finally I said, well, how about

16  thirty and beyond that by motion.  And I appreciate the fact

17  that we haven't had to have one motion after another about

18  additional people, and so if you can't work it out, your

19  response will be due on the 21st.

20           *MS. BINIS:*  Thank you, Your Honor.

21           *MAGISTRATE JUDGE STANLEY:*  Okay.  All right.  Now,

22  there is an issue on document redaction.  Go ahead.

23           *MS. FITZPATRICK:*  Your Honor, we have worked that

24  issue out.  We have reached an agreement on how we're going to

25  deal with that.

1       *MAGISTRATE JUDGE STANLEY:*  Great.   Thank you.

2          Is the same true with the scope of document searches?

3          *MS. FITZPATRICK:*  We have not completely resolved the

4   issue, but we had a very productive meet-and-confer again this

5   morning on that particular issue, and we plaintiffs are going

6   to get back to the defendants with some additional information

7   they want.  I think that's an issue, Your Honor, we probably do

8   not need to set forth briefing right now.

9          *MAGISTRATE JUDGE STANLEY:*  Okay.   And how about

10  production of product exemplars?

11         *MS. FITZPATRICK:*  We have -- we have reached somewhat

12  of an agreement on that, and AMS has proposed a document

13  preservation -- a document chain of command -- chain of custody

14  issue.   We just received that yesterday.   We're going to be

15  taking a look at that and getting that redlined back to them,

16  but I'm optimistic that that's one that we are going to be

17  able to resolve.

18         *MAGISTRATE JUDGE STANLEY:*  All right.

19         *MS. FITZPATRICK:*  And the privilege logs issue, Your

20  Honor, we've also reached a date -- an agreement on how those

21  are going to be redone, and a date for getting those completed.

22         *MAGISTRATE JUDGE STANLEY:*  Well, I'm delighted to

23  hear that.   There are few things in this world that I hate

24  more than reviewing documents *in camera*.   And I'm feeling

25  grumpy about it, because in a completely different case I have

 1   to look at several hundred documents.  Okay.

 2        Moving on to Ethicon, apparently there has been some

 3   dispute about foreign document production, but you're close to

 4   an understanding?

 5        *MS. JACOBS:*  We are working through that, Your Honor.

 6   The plaintiffs have been kind enough to prioritize what it is

 7   they're really interested in, both by type of document and by

 8   country, and we have folks working on those priority documents

 9   right now.

10        And then we are providing a chart for them about the

11   various products, the countries in which they're sold, when

12   they were first approved for sale there, so that if they want

13   to further prioritize they have some additional information to

14   use to do that.

15        *MAGISTRATE JUDGE STANLEY:*  Okay.  Mr. Aylstock?

16        *MR. AYLSTOCK:*  Yes, Your Honor.  I think you were

17   about to move on to the trial pool discovery here in a minute,

18   and I'm prepared to speak on that.

19        *MAGISTRATE JUDGE STANLEY:*  Okay.  I'll hear you now.

20        *MR. AYLSTOCK:*  Really, it's just an update like our

21   counterparts at AMS.  We've had some productive discussions,

22   including over a very nice dinner last night with Ms. Jacobs

23   and Mr. Thomas.  What we had discussed, in fact, at the

24   invitation of defense counsel is perhaps narrowing the pool of

25   cases that would be selected in bellwether to some of the more

1  representative cases.  And what I mean by that is in the

2  Ethicon situation, and I think more so than any of the other

3  MDLs, there is actually eleven different products at issue in

4  this MDL, four pelvic organ prolapse products, seven sling

5  products.  And some of the sling products don't have the market

6  share of others, and they certainly do have some similarities,

7  but they all have different design history files; they have

8  different regulatory predicate products; they have different

9  folks involved.  And so we're hopeful that maybe we can

10 continue talking about that.

11      But if we were to reach an agreement for just this first

12 selection, it might help us with the number of depositions that

13 we're facing, too, and experts to workup on each individual

14 product.  It might help us be able to get further down the road

15 and ready for those trials, if the Court would entertain such a

16 limitation.

17      Now, we do understand that it's our responsibility to work

18 up all the cases, and we owe it to all of our clients with all

19 of those products to do so, but we're continuing to discuss

20 that, but thought we would introduce that to the Court as a

21 potential option as we move down the road toward the bellwether

22 trials.

23      *MAGISTRATE JUDGE STANLEY:*  It certainly seems to make

24 sense to focus on products that have the most cases.

25      *MS. JACOBS:*  We are certainly interested, Your Honor,

1  in working out some limitation with respect to the plaintiffs

2  that would be into the trial pool.  Our primary concern is

3  that we don't open up our employees to serial depositions.

4  We would like for the discovery to continue, to the greatest

5  extent possible, on everything with the understanding that, as

6  Mr. Aylstock said, some of the products just don't have the

7  extensive use and history of the others.

8        *MAGISTRATE JUDGE STANLEY:*  Thank you.  There was a

9  request to put on the agenda something about the status of

10  search term modifications?

11        *MR. AYLSTOCK:*  Yes, Your Honor.  Similar to the other

12  agenda items, we think we'll be able to work that out.  We have

13  provided, based upon additional discovery in this case, a list

14  of additional search terms that we would request that they,

15  when they're doing their custodial productions, determine

16  whether documents might have these.  And I think there were

17  only seven on our list that they had questions about, and we're

18  just awaiting another meet-and-confer on that, but I think

19  we'll be able to work that out successfully without any court

20  intervention.

21        *MAGISTRATE JUDGE STANLEY:*  Okay.  And the last item

22  is deposition scheduling.  Mr. Garrard, or you, Mr. Aylstock?

23        *MR. AYLSTOCK:*  Same thing, Your Honor.  We're working

24  through it, and we now have -- Ms. Jacobs was kind enough to

25  provide us a number of different depositions.  Some of the

1  folks are ex-U.S. that might be subject to blocking statutes,

2  and we have a commitment to work that out and a notification

3  process if they're not willing to appear voluntarily, perhaps

4  in this country, giving us enough time so we can go through the

5  Hague and go through the hoops that might be necessary in time

6  for trial.

7          *MAGISTRATE JUDGE STANLEY:*   That finishes my list.

8  How about you-all?

9          *MR. GARRARD:*   Thank you, Your Honor.

10         *MAGISTRATE JUDGE STANLEY:*   Thank you, all.   Next

11 status conference, March 21st.

12      *(Court adjourned at 2:28 p.m., February 7, 2013.)*

13

14 CERTIFICATION:

15     I, Teresa L. Harvey, Registered Diplomate Reporter, hereby
   certify that the foregoing is a correct transcript from the
16 record of proceedings in the matters of In re: C. R. Bard,
   Inc., MDL No. 2187; In re: American Medical Systems, Inc.,
17 MDL No. 2325; In re: Boston Scientific Corp., MDL No. 2326; and
   In re: Ethicon, Inc., MDL No. 2327, as reported on February 7,
18 2013.

19

   s/ Teresa L. Harvey, RDR, CRR          February 13, 2013
20

21

22

23

24

25