IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON
TRANSCRIPT OF PROCEEDINGS

----------------------------------------

IN RE:  C.R. BARD, INC., PELVIC REPAIR        MDL NO.
SYSTEM PRODUCTS LIABILITY LITIGATION          2:10-MD-2187

----------------------------------------

IN RE:  AMERICAN MEDICAL SYSTEMS, INC.,       MDL NO.
PELVIC REPAIR SYSTEM PRODUCTS                 2:12-MD-2325
LIABILITY LITIGATION

----------------------------------------

IN RE:  BOSTON SCIENTIFIC CORPORATION         MDL NO.
PELVIC REPAIR SYSTEM PRODUCTS                 2:12-MD-2326
LIABILITY LITIGATION

----------------------------------------

IN RE:  ETHICON INC., PELVIC REPAIR           MDL NO.
SYSTEM PRODUCTS LIABILITY LITIGATION          2:12-MD-2327

----------------------------------------

IN RE:  COLOPLAST CORP. PELVIC SUPPORT        MDL NO.
SYSTEMS PRODUCTS LIABILITY LITIGATION         2:12-MD-2387

----------------------------------------

STATUS CONFERENCE

March 21, 2013


BEFORE THE HONORABLE **JOSEPH R. GOODWIN,** District Judge
AND
THE HONORABLE **MARY E. STANLEY,** Magistrate Judge
AND
THE HONORABLE **CHERYL A. EIFERT,** Magistrate Judge

1                                 **APPEARANCES**

2     **For the Plaintiffs:**

3

4     **MR. HENRY G. GARRARD, III**
      Blasingame, Burch, Garrard, Ashley, P.C.
5     P.O. Box 832
      Athens, GA  30603
6

7     **MR. CLAYTON A. CLARK**
      Clark, Love & Hutson
8     440 Louisiana, Suite 1600
      Houston, TX  77002
9

10    **MS. RENEE BAGGETT**
      Aylstock, Witkin, Kreis & Overholtz
11    Suite 200, 17 East Main Street
      Pensacola, FL  32502
12

13    **MR. THOMAS P. CARTMELL**
      Wagstaff & Cartmell, LLP
14    4740 Grand Avenue, Suite 300
      Kansas City, MO  64112
15

16    **MS. FIDELMA FITZPATRICK**
      Motley Rice, LLC
17    28 Bridgeside Blvd.
      Mt. Pleasant, SC  29464
18

19    **MS. AMY ESKIN**
      Levin Simes, LLP
20    353 Sacramento Street
      San Francisco, CA  94112
21

22    **MS. AIMEE H. WAGSTAFF**
      Andrus, Hood & Wagstaff, PC
23    1999 Broadway, Suite 4150
      Denver, CO  80202
24

25

1                            **APPEARANCES**

2                            **(Continued)**

3    **For the Plaintiffs:**

4

5    **MR. DEREK H. POTTS**
     The Potts Law Firm, LLP
6    908 Broadway, 3rd Floor
     Kansas City, MO  64105
7

8    **MR. ROBERT SALIM**
     Law Offices of Robert L. Salim
9    1901 Texas Street
     Natchitoches, LA  71457
10

11   **MR. RILEY BURNETT**
     Law Offices of Riley L. Burnett, Jr.
12   Suite 1600
     440 Louisiana
13   Houston, TX  77002

14

15   **MR. CARL N. FRANKOVITCH**
     Frankovitch, Anetakis, Colantonio & Simon
16   337 Penco Road
     Weirton, WV  26062
17

18   **MR. HARRY F. BELL, JR.**
     The Bell Law Firm, PLLC
19   P.O. Box 1723
     Charleston, WV  25326-1723
20

21

22

23

24

25

```
 1                      APPEARANCES

 2                      (Continued)

 3    FOR THE DEFENDANTS:

 4

 5    MS. BARBARA R. BINIS
      Reed Smith, LLP
 6    2500 One Liberty Place
      1650 Market Street
 7    Philadelphia, PA  19103

 8    MR. STEPHEN J. MCCONNELL
      Reed Smith, LLP
 9    355 South Grand Avenue
      Suite 2900
10    Los Angeles, CA  90071

11

12    MR. RICHARD B. NORTH, JR.
      Nelson, Mullins, Riley & Scarborough, LLP
13    201 17th Street, NW Suite 1700
      Atlanta, GA  30363
14

15    MS. LORI G. COHEN
      Greenberg Traurig, LLP
16    3333 Piedmont Road, N.E.
      Suite 2500
17    Atlanta, GA  30305

18    MS. DEBORAH A. MOELLER
      Shook, Hardy & Bacon, LLP
19    2555 Grand Boulevard
      Kansas City, MO  64108
20

21    MR. JON STRONGMAN
      Shook, Hardy & Bacon, LLP
22    2555 Grand Boulevard
      Kansas City, MO  64108
23

24

25
```

1                          **APPEARANCES**

2                          **(Continued)**

3    **For the Defendants:**

4    **MS. DONNA JACOBS**
     Butler Snow
5    P.O. Box 6010
     Ridgeland, MS  39158

6

7    **MS. CHRISTY D. JONES**
     Butler Snow
8    P.O. Box 6010
     Ridgeland, MS  39158

9

10   **MR. MICHAEL J. FARRELL**
     Farrell, White & Legg, PLLC
11   P.O. Box 6457
     Huntington, WV  25772-6457

12

13   **MR. MARC E. WILLIAMS**
     Nelson, Mullins, Riley & Scarborough, LLP
14   949 Third Avenue, Suite 200
     Huntington, WV  25701

15
     **MR. DAVID B. THOMAS**
16   Guthrie & Thomas, PLLC
     500 Lee Street, East
17   Suite 800, P.O. Box 3394
     Charleston, WV  25333-3394

18

19   **MR. DUSTIN B. RAWLIN**
     Tucker Ellis
20   925 Euclid Avenue
     Suite 1150
21   Cleveland, OH  44115

22

23   **MR. RONN B. KREPS**
     Fulbright & Jaworski, LLP
24   2100 IDS Center
     80 South Eighth Street
25   Minneapolis, MN  55402-2112

1                              **APPEARANCES**

2                              **(Continued)**

3    **For the Defendants:**

4

5    **MS. LANA K. VARNEY**
     Fulbright & Jaworski, LLP
6    98 San Jacinto Boulevard
     Suite 1100
7    Austin, TX  78701-4255

8

9    **MR. PAUL COSGROVE**
     Ulmer & Berne, LLP
10   600 Vine Street, Suite 2800
     Cincinnati, OH  45202

11

12   **MS. ELIZABETH L. TAYLOR**
     Flaherty, Sensabaugh, Bonasso, PLLC
13   P.O. Box 3843
     Charleston, WV  25338-3843

14

15

16

17

18

19

20

21   Court Reporter:              Lisa A. Cook, RPR-RMR-CRR-FCRR
                                  (304)347-3198
22                               lisa_cook@wvsd.uscourts.gov

23

24   Proceedings recorded by mechanical stenography; transcript
     produced by computer.

25

```
1                    P R O C E E D I N G S

2          JUDGE GOODWIN:  Well, good morning.  We have a

3   thinner crowd in the back than usual.  People are losing

4   interest.  What does that mean?

5          It's a pleasure to see all of you this morning.  As

6   they say, all good things must come to an end.  And today is

7   one of those days as, in this case, it is the last day with

8   Judge Stanley.

9          I know that each of you join me in wishing her well.  I

10  have resisted with all of my ability her retirement.  I even

11  threatened to tell people that she was a thief, used

12  extortion tactics as best I could, but she's persistent.

13         I am honored to have served with her and I am most

14  grateful for the hard work that she has rendered for this

15  court and the excellent job that she's done for all of us.

16  She's been a wonderful asset and we're going to miss her.

17         There are a number of excused attorneys today:  Mike

18  Bonasso, Bob Adams, Fred Thompson, Bryan Aylstock, Paul

19  Farrell, Jr.  If you're not on the list and you're absent

20  today, you've not been excused.

21         I want to make a point about the continued absence of

22  leadership counsel.  And I ask those of you who are here,

23  and this is particular -- well, it's pointed to the people

24  that aren't here.  Today there are attorneys with some very

25  good reasons for their absences, but I want everyone to
```

1    understand that their full attention to this case is

2    essential.

3         Cases in other jurisdictions must be put aside, and

4    your firms must make arrangements to take care of them and

5    find other lawyers to take care of those matters or we must

6    seek someone to substitute as counsel, lead counsel in the

7    case.

8         The coherence of progress in these cases depends upon

9    working together and getting to know one another and being

10   up-to-date on what's going on.

11        I recognize the burdens that it places on a firm when

12   an MDL case is undertaken.  And, of course, prepaid

13   vacations and family matters are important.  But this isn't

14   a single case or five cases.  This now is 14,000 cases and

15   growing by the day.

16        So, you are the leaders and you are the representatives

17   of 14,000 cases.  And while it's easier to excuse a single

18   lawyer in a single case, it's very difficult to excuse a

19   lawyer who's meant to be representative and have an

20   important role to play with regard to 14,000 cases.  I hope

21   everybody will take that seriously in the months ahead as

22   these MDLs heat up.

23        As we did last time, I'm going to address certain

24   general issues, and then I'll turn the status conference

25   over to Judge Stanley and Judge Eifert to do the heavy

1      lifting.

2          I ask in the future that you submit your joint agenda

3      in this format; that is, put the things I need to deal with

4      first and then the discovery issues afterwards.

5          The first topic that I have that I think I should

6      address is the wisdom, desirability, and status of tolling

7      agreements.

8          Would anybody like to address that?

9              MR. GARRARD:  Yes, Your Honor.

10             JUDGE GOODWIN:  Mr. Garrard.

11             MR. GARRARD:  First, I'd like to digress for just

12     one moment and say that on behalf of all the people that sit

13     on my side of the table, and I suspect I speak for the other

14     side of the table, we are appreciative of the efforts of

15     Judge Stanley and we will miss her.  But more than that, we

16     wish her the very best in whatever endeavors she undertakes

17     and happy travels.

18             MAGISTRATE JUDGE STANLEY:  Thank you.

19             MR. GARRARD:  Your Honor, we put the issue of

20     tolling agreements on the agenda because it's been visited

21     before and it's kind of been sitting over here somewhere.

22     We have watched the efforts of Coloplast and they have

23     entered into tolling agreements and it appears to be working

24     relatively well from that perspective.

25         The anticipation of a number of attorneys is that in

1 the coming months, the rate of filings may increase.  And

2 we're at a place where the defendants have a significant

3 number of cases actually filed in the court in which they

4 are achieving or will achieve significant improvement.

5   But we wanted to bring this back to the table because

6 from efficiency, from cost, from burdens on the Clerk's

7 Office, it seems to us that it's time to potentially

8 consider tolling agreements that are not prejudicial to the

9 defendants, but allow there to be an identification rapidly

10 of cases, case names, type of products, that sort of thing

11 that go into a tolling mechanism so that things can continue

12 to run smoothly and that no one or no process gets

13 overburdened.

14   So, we wanted to put it back on the table.  I recognize

15 that Your Honor cannot force anybody to enter into a tolling

16 agreement.  But we wanted to have some open discussion and

17 see if that's a possibility for us for the future,

18 particularly in light of what is anticipated to be a

19 significant number of filings over the next months.

20     JUDGE GOODWIN:  All right.

21   Who from the defense side first would like to address

22 this subject?  I know one can't speak for all, but does

23 anybody have something they'd like to say?

24   Ms. Jones, I know you haven't been doing anything for

25 the last couple months.

1    MS. JONES:  I've not, Your Honor, so I thought I'd

2    be the first one to jump up.

3    JUDGE GOODWIN:  Okay.

4    MS. JONES:  I, I confess to Your Honor that, that

5    there have been some earlier discussions in the past on

6    tolling agreements and that, to date, that my clients have

7    not entered into them.  And there are various reasons for

8    that; in, in part because it's important for us to know and

9    understand and appreciate the universe of what we're really

10   dealing with.

11   The other issue, frankly, has been if we were dealing

12   with one jurisdiction and we knew we were dealing with one

13   jurisdiction, it would be much easier to agree upon a

14   tolling agreement.  But we are being pulled in multiple

15   directions and I think, frankly, that that will have an

16   impact upon whether or not, you know, our client is really

17   interested in proceeding with a tolling agreement.

18   If there is a benefit to our clients to proceed with

19   one, it's certainly willing to consider it.  But in the

20   absence of there being a benefit to the client, then,

21   frankly, it's to our detriment not to know what the entire

22   universe is and go ahead and force the filings.

23   JUDGE GOODWIN:  Let me hear from anyone else and

24   then I have a comment.

25   MR. GARRARD:  Your Honor, let me make one comment

1   if I may.

2       The benefit to the defendants in a tolling arrangement,

3   if we could work out the proper language, is that Ms. Jones

4   can get exactly what she wants.  And, that is, she can know

5   the universe now quicker and more efficiently.

6       One of the things that I know bothers the defendants is

7   what they call the tail.  And I'm not wise enough to know

8   exactly what the tail is going to be.  But I think with a

9   tolling arrangement, they could know very quickly what the

10  current universe is with some definition of -- if Ms. Jones

11  is interested in whether it's a, a Prolift case or a

12  Prolift+M or whatever, there's no reason why that

13  information can't be provided along with the jurisdiction

14  where the case would ultimately end up, the name, and a few

15  other things.

16      So, I think that is a benefit to them.  And I think

17  it's an efficiency benefit to them as well because I have no

18  doubt that as cases come in through the filing process, that

19  generates significant work that has to be done within their

20  own shops and I understand that.  So, I think there is a

21  benefit.

22          JUDGE GOODWIN:  Mr. Garrard, let me ask you a

23  question.

24          MR. GARRARD:  Yes, sir.

25          JUDGE GOODWIN:  Am I correct that there is a date

1    in mid July of the 11th or something like that that is

2    significant?

3           MR. GARRARD:  Your Honor, there, there is a date

4    in July, July the 11th, the Court is correct, which is two

5    years post the time that the FDA came down with its warning

6    particularly about prolapse cases.

7       There are different thoughts as to what is the meaning

8    of that.  But I am sure that there are some people that

9    worry that that could potentially trigger a statute of

10   limitations.  I don't happen to believe that it does.  I

11   still believe it's a factual determination.

12      But that is a date, Your Honor, that people are

13   concerned about.  And, and I would predict to the Court that

14   you would see, and the Clerk's Office would see, a

15   substantial number of filings in the interim.  And we were

16   trying to find a way to perhaps make that more efficient.

17          JUDGE GOODWIN:  Anybody else for a defendant that

18   would like to give me their thoughts on tolling agreements?

19   I won't hold you to any representations.  I'm just curious.

20      Yes, ma'am.

21          MS. MOELLER:  Our client currently in this MDL is

22   not interested in tolling agreements for many of the same

23   reasons that Ms. Jones has already alluded to.

24          JUDGE GOODWIN:  Thank you, Ms. Moeller.

25      Let me, let me say why I am interested in a short

1    tolling agreement as opposed to an open-ended or lengthy

2    tolling agreement.  And that has to do with the

3    administration of these cases.  And I recognize it's not

4    your problem and we'll deal with it some way.

5         But we've had to borrow Clerk's Office staff from other

6    districts and had to hire people.  And what I am concerned

7    about is an influx of, in some cases, not very well thought

8    out complaints early -- late June, early July.  And I'm not

9    suggesting a particular length of time, but I can tell you

10   that 30, 60, 90 days would be helpful to the Court in that

11   regard.

12        And there's more than one reason for this.  This is all

13   inside baseball.  But our statistical year starts July 1.

14   The cases that are filed before July 1 count in with all the

15   cases that are filed now.  The amount of personnel that we

16   get with what they call the budget reset depends on that

17   year.  And then we get a new count that starts July 1.

18        So, then for next year and the year following, God

19   forbid, when we're still doing this, we might have a whole

20   lot less people able to do what we need done.

21        So, let's say a ninety-day tolling agreement gives time

22   within which cases can be filed in the next statistical

23   year.  I realize that's not a really solid reason, but it is

24   for us, and for us doing the work that we need to do to

25   provide the service that we want to provide for you all.

1    I hope you've found our Clerk's Office to be helpful

2  and cooperative.  And we've tried to be sure that that's the

3  case.  I want to be able to continue to have that sense of

4  assurance.

5    So, that's my pitch for a short term.  And my same

6  pitch would be to the plaintiffs.  Don't file junk.  Take

7  your time.  If the 90 days comes along to file -- 90 days is

8  long enough to think.  But that's, that's all I have to say

9  about it and whatever you do.

10    Judge Stanley.

11    MAGISTRATE JUDGE STANLEY:  There is another

12  statistical calendar which happens to be October 1 to

13  September 30, which is why I was thinking that 90 days would

14  actually be even a little bit more help to get us into

15  October, October the 11th, for example.  Now, it's not as

16  significant as the July 1 to June 30, but it would be

17  helpful.

18    The other thing is, Mr. Garrard, do you have any idea

19  how many may be heading our way, --

20    MR. GARRARD:  Your Honor, --

21    MAGISTRATE JUDGE STANLEY:  -- how many additional?

22    MR. GARRARD:  Your Honor, I can't give the Court

23  an accurate number, but I would be surprised if your numbers

24  over the next few months per month -- if I understand what

25  Kate has said to me, you're getting about 50 cases a month

1   currently.  I would be surprised if that number did not

2   double or triple.

3             MAGISTRATE JUDGE STANLEY:  All right.  Well,

4   here's another thought.  The clerk tells me that they are

5   obligated to file -- to assign a number and to process a

6   case the day it arrives.  And there's not an even flow of

7   cases in, so that they may have hundreds on Wednesday and

8   not so many on Monday or a Friday.  And -- which, of course,

9   it becomes really tough on the people who have the

10  responsibility of processing them.

11      If there is any way to even that out and to have some

12  cooperation, that would be so appreciated so that somebody

13  doesn't have to work until 10:00 at night, you know, without

14  really warning just because a whole bunch of lawyers decide

15  to file that day.

16            MR. GARRARD:  We, we will certainly send that

17  message, Your Honor.  What effect that sending of a message

18  will have, I don't know.  But we will certainly send that.

19      And I would make this offer having heard what Your

20  Honors have said.  If Ms. Jones or Ms. Binis or somebody

21  would be willing to at least work with us, we would see if

22  there is something we could come up with that might help

23  what the Court is talking about in the interim.

24            MS. JONES:  I had not understood, Your Honor, when

25  you initially said what you were talking about was a 60- or

1   90-day period or something like that.  And, and I am

2   confident that if that's what we're talking about, we could

3   probably figure out something to work around that.

4          JUDGE GOODWIN:  I would sure appreciate it.  And

5   Judge Stanley is right.  If you could make it over to like

6   the middle of October, that gives us another thing.  It's

7   just a pure statistical artificial deadline.

8          MS. JONES:  I anticipate that we can figure

9   something out on that.

10          MR. GARRARD:  We, we will endeavor to do that very

11   rapidly, Your Honor.

12          JUDGE GOODWIN:  I appreciate that very much.

13   Again, it's entirely voluntary.  I respect your clients'

14   decisions.  And, so, whatever, whatever you can do would be

15   well received.

16      We have -- currently have trials set through February,

17   2014:  AMS in December, Ethicon in January, and Boston

18   Scientific in February.  I plan to add Bard back into the

19   trial schedule and I'm willing to set a trial beginning in

20   March or April of 2014, depending upon whether Bard is set

21   behind Boston Scientific, cases from the trial pools which

22   were not chosen as bellwethers in December, 2013, and

23   January and February of 2014.

24          That is to say, as I mentioned when I met with the Bard

25   people this morning, it seems to me like those are the

1    cases, the ones that haven't been tried but that have been

2    prepared then go in rotation and we keep on going.

3         Trial settings for 2014.  Who wants to talk about that?

4         MR. GARRARD:  We simply, Your Honor, were

5    requesting the court to go ahead, if you will, and say, for

6    example, the next Bard/Sofradim cases will be in March, and

7    then starting back over with rotation of AMS, J&J, Boston

8    Scientific, and then back to Bard for the rest of the year

9    so that we could be planning forward.

10        Our, our expectation on the non-Bard MDLs, as the Court

11   knows, we've already agreed upon bellwethers for the next

12   set of Bard/Sofradim cases.  Our expectation from the

13   plaintiffs' side is exactly what Your Honor just said and,

14   that is, cases that are not reached, for example, with AMS

15   in December would then roll to the next setting.

16        JUDGE GOODWIN:  The way that the cases are set now

17   is meant to be humane.  That is to say, --

18        Which you won't recognize, Ms. Jones.

19        That is to say, I meant to set cases, try them, and

20   have a few days before we jump into the next one.  There

21   could come a time, even if we set these dates -- this is

22   just a caution.  There could come a time when it starts to

23   make sense to me just to keep rolling.

24        So, I'll set dates, but I'm not telling you that I

25   won't some day think it makes more sense just to stay in

1  trial until you've had enough, to be blunt.

2      But is his suggestion I just go ahead and set these

3  dates acceptable to this side of the room?

4          MS. BINIS:  Your Honor, --

5          JUDGE GOODWIN:  So agreeable.  You know, I

6  mentioned to Ms. Moeller in the Bard meeting that she was so

7  quiet.  And she remains that way.  I'm very concerned.

8          MS. BINIS:  Your Honor, --

9          JUDGE GOODWIN:  Yes.

10          MS. BINIS:  -- I'm afraid I can't remain so quiet.

11          JUDGE GOODWIN:  Ms. Binis, I didn't expect you to.

12          MS. BINIS:  I'm really trying, Your Honor.  I

13  really am.

14      If I could just jump ahead a little bit to what I was

15  going to say on the Minnesota and Delaware consolidations.

16          JUDGE GOODWIN:  Yes, uh-huh.

17          MS. BINIS:  Recently, within the last 30 days,

18  we've been in both, both of those courts.  And the

19  plaintiffs' lawyers in those courts have pushed very hard

20  for bellwether trial schedules in both those consolidations.

21      Now, those are the same plaintiffs' lawyers that are

22  here in the MDL.  And what, what we have got, Your Honor, is

23  six bellwether cases against AMS in the year 2014.

24      So, we have two cases in Minnesota in June.  We have

25  two cases in Minnesota in July.  We have one case in

1   Delaware in July.  And we have a case in Delaware in

2   September.  Those are all bellwether cases.  This is

3   completely separate from our individual trial calendar which

4   I've already shared with you for this year, but we have an

5   individual trial calendar for 2014 as well.

6        So, Your Honor, I'm, I'm simply saying this because

7   these are bellwether cases, because they are picked by the

8   same plaintiffs' lawyers that are in this litigation, and

9   because I just can't be in all those places at one time,

10  that this court take those cases into consideration.

11       JUDGE GOODWIN:  Ms. Binis, I'm going to say

12  something that will not fall softly upon you.

13       I, probably more than any federal judge you know, has,

14  have in the past and continues to reach out to state judges,

15  some of whom are responsive, some of whom are not.

16       I talked to one state judge just this week.

17       Which one was that?

18       LAW CLERK FIFE:  Judge Baca.

19       THE COURT:  Judge Baca.  I played phone tag with

20  another judge, and we'll get together in the next day or

21  two.

22       I'm reaching out to them and trying to work with them.

23  And, and in that sense, I am willing to try to accommodate

24  them.  But I say this with all due respect and deference to

25  my state colleagues.  It takes two to play.

1      Now, I've got 14,000 cases, and none of them have

2  14,000 cases.  And I'm going to set my docket, if we don't

3  work and play well together, and I am going to expect

4  lawyers to show up.

5          MS. BINIS:  I understand that, Your Honor.  And I

6  do appreciate the efforts that you've made, seriously.  I

7  guess what I'm suggesting here is it's more a matter of

8  coordination here among the parties than it is the court.

9          JUDGE GOODWIN:  I would think so because I'm --

10  you know, I don't have any of you followed.  None of you are

11  stalked.

12     On the other hand, I'm aware of which lawyers attend

13  most depositions and which lawyers are trying cases.  And I

14  know it's a fairly small group of you.  And eventually

15  you're all going to wear down to a little nub.

16     So, it seems to me that it would be wise to have

17  more -- have some further discussions about that.  I don't

18  want to be in a position -- I don't want to be in a position

19  to roll overtop of a State Court or your law firm or a

20  plaintiffs' law firm and say, "You will be here.  Your case

21  is going to trial on this date.  I don't care if you've got

22  four state cases."

23     But if I don't get the cooperation, I don't have a

24  choice.  That sounded meaner than I meant it to.  I didn't

25  mean it to.  I completely concur in your desire.  The

1    plaintiffs should work with you to avoid that problem.

2         It is always the case in the MDLs and in mass torts

3    generally that plaintiffs like to go to other jurisdictions

4    and get another bite at the apple and get a different judge

5    and get a different opinion and get a different verdict and,

6    thereby, think they're gaining leverage.  And sometimes they

7    do gain leverage because some of your clients get scared

8    off.  And we just live in a real world.

9         On the other hand, the real big enchilada is all these

10   cases, not the few dozen that are out there.

11        So, I would encourage strongly the plaintiffs to work

12   cooperatively with counsel for the defendants to avoid the

13   very problems you're concerned about.

14        Did I sound a little nicer at the end?

15             MS. BINIS:  You always sound nice, Your Honor.

16             JUDGE GOODWIN:  Thank you.

17        I think, Ms. Binis, you also wanted to talk again about

18   innovative trial ideas or --

19             MR. MCCONNELL:  Your Honor, I'm actually going to

20   address that.

21             THE COURT:  Okay.

22             MR. MCCONNELL:  We, we put that on the agenda as a

23   follow-up because I think Mr. Garrard --

24             THE COURT:  Yeah.

25             MR. MCCONNELL:  -- put that on the agenda the last

1    time.  And I think he also had it listed in the plural,

2    innovative trial ideas.  But I think the idea, singular,

3    that he mentioned at the time was this idea of multiple

4    juries.

5        I think Your Honor at the time of our last hearing

6    acknowledged the possibility, maybe even the probability,

7    that the defendants might not embrace that idea.

8        But we did have a conversation with Mr. Garrard, a very

9    pleasant conversation.  It always is with him.  And we

10   haven't been convinced about the merits of that.  I think

11   it's consolidation really in another form.  We dislike that

12   for all the obvious reasons.

13       But we didn't stop.  We talked about some other ideas.

14   And I think both you and Judge Stanley talked about some

15   notions of a mock trial.  It actually wasn't very mock

16   because I think you were talking about you doing it, --

17           THE COURT:  Right.

18           MR. MCCONNELL:  -- actually both sides and an

19   advisory jury.  So, we, we talked about that a little bit.

20       I got the sense from Mr. Garrard that he wasn't going

21   to embrace that idea.  And he can give you his own reasons

22   for that.  But there were a lot of other ideas too.  I just

23   wanted to bring you up-to-date on that.

24       We were going to talk a little bit about things to make

25   trials move faster.  I have to admit at the time I didn't

1   realize that you already had some things in place for the

2   trials, the idea of time trials.  But I think the very times

3   that we were thinking about I think are consistent with what

4   you've done.

5        We think judicious use, if I can talk about us being

6   judicious, judicious use of *Daubert* motions in these cases,

7   I think issues of biocompatibility.  There may be things

8   that we can separate the wheat from the chaff and make these

9   trials a little bit leaner.

10       And then we had some other ideas that we, we didn't get

11  too far on.  And they might not sound like things that make

12  cases go faster, but we talked about adding things like

13  juror questions or mini summaries after witnesses or at the

14  end of the day, although in my experience they actually can

15  make a case go faster because, you know, you're sort of more

16  confident that the jury is engaged and understands what's

17  going on and maybe -- we all know that these cases get

18  over-tried; too many witnesses, too many questions of the

19  witnesses.  And maybe there are things that can help us

20  avoid that, but I just wanted to bring you up-to-date.

21       So, we've talked about it.  I think we're going to

22  continue to talk about it.  It was a very good dialogue.

23  And if there are any other suggestions from the Court, we're

24  going to try to actually be innovative.

25            JUDGE GOODWIN:  Well, I've said this before, but

1    I'll repeat it for those of you who haven't been here.   In

2    my prior life, I was a trial lawyer for 25 years and I

3    tried -- I actually tried cases.   And I've been doing this

4    for 18 or 19 years.   And I know all the arguments.   I

5    mentioned one this morning.

6        When I say six days for each side, the plaintiffs say,

7    "Oh, my God, that's not fair.   We have, we have the burden

8    of proof.   We have to build the house.   All they have to do

9    is take potshots at us and tear it down."

10       And that's why in the order there is a little clause or

11   thing that says I'm the person that's going to apply these

12   rules in a flexible way.   I'm not going to let anybody take

13   advantage of anybody.

14       Ideas with regard to over-trying the cases, I'm not

15   Judge Ito.   And some of you are old enough to remember that.

16   I am.   Maybe we could have The Dancing Itos make a real

17   appearance.   We won't over-try it.

18       I notice I have -- or Kate notices that I have ten

19   motions on *Daubert* that came in today.   That's a lot.   So --

20   I haven't looked at them, so I won't make any further

21   comment.

22       But I compliment the lawyers in each of the cases.

23   There's been one or two cases where you've fought

24   unnecessarily.   But most of the, most of the cases I applaud

25   the cooperation I'm getting from lawyers.

1     While I think of it, on a different subject, I want to

2  encourage local counsel and liaison counsel and lead counsel

3  for the plaintiffs to keep liaison counsel up-to-date,

4  involved, and informed.  And I want to encourage them to

5  keep counsel in the individual cases informed.

6     There will come a time that it's very important that

7  that universe of lawyers out there, or at least some of them

8  that have an interest, will need to know.  And I feel like,

9  without any evidence, that the liaison counsel hasn't been

10  as involved in this case as they have in my previous MDLs.

11  And I would ask you to work a little harder to see that they

12  are.

13     As to innovative ideas, I'm open.  I'm open to

14  innovative ideas.  I'm open to focus groups.  I'm open to --

15  joint focus groups.  I'm open to focus groups with a judge

16  involved, Judge Eifert or me.  I'm open to most anything

17  that the parties seem to think might help.

18     I'm open to very creative things like, okay, we'll have

19  one just for fun and, and whatever happens, there's --

20  nothing said on that record may be used ever again, but it's

21  just for our information.  I'm open to all kinds of ideas.

22     All of you now, the big firms and the big plaintiffs'

23  firms, use mock trials a lot.  And all of you have seen that

24  you get disparate results from what you get when you

25  actually go to trial.  Sometimes you get a good prediction.

1       But it is very useful, at least from the defense side,

2   I think, in talking to your clients, especially if they

3   watch one of these juries talk about your case.  But,

4   anyway, I'm open.

5       And I, I didn't mean to confine it to Mr. Garrard's

6   idea of trying multiple cases at the same time.  I meant it

7   for many other things.  And all I -- I didn't mean to reject

8   Mr. Garrard's idea in that regard.  I just meant to put it

9   off.  So, --

10      MR. GARRARD:  Your Honor, we have had that

11  discussion.  And I applaud AMS for, frankly, reaching out to

12  further the discussions.  And we intend to have some more

13  discussions.  And, and I don't intend to respond to

14  suggestions.

15      But the one thing that we continually hear is that the

16  defendants need more information about the value of cases.

17  And there are multiple ways to do that.  And I don't think

18  from our side we would necessarily be adverse to some type

19  of procedure by which they could learn what juries would

20  think about ten cases or whatever, a mock jury.

21      But the problem from our side is that if we go down

22  that road, there's got to be some skin in the game from

23  their side.  There's got to be that this is leading us

24  somewhere.  There's got to be that if we get this kind of

25  information, then we are in a position to arrive at what

1  ultimately has to be a business solution for them and,

2  frankly, for us.

3       So, that's, that's the thing that's difficult to figure

4  out, how there is skin in the game from their side that

5  looks like if we go through these efforts of a mock trial or

6  advisory juries or whatever that it's going to lead us

7  somewhere.

8            JUDGE GOODWIN:  Uh-huh.  I understand.  But

9  there's no question in my mind that their obligation -- you

10  can sit down.  There is no, no doubt in my mind that their

11  obligation to inform their clients as to the progress of the

12  trial and the status of the trial means that those kinds of

13  things don't have an impact and don't lead somewhere.

14       They, of necessity, lead somewhere because they, in

15  performing their duties as counselors of law, have to tell

16  their clients and have to advise their clients.

17       So -- and I'll just wander off again.  And then I'll

18  get out of here and let Judge Stanley and Judge Eifert deal

19  with you.

20       But too many lawyers on both sides of the bar have

21  abandoned their role as counselors at law and have just

22  become combatants, advocates.  And your role to tell your

23  client, "You don't have a case," or, "You do have a case,"

24  or, "This is a good case," or, "This is a bad case," or all

25  of the stuff in between is a very important role that

1   lawyers play in society.

2       And I have a sixty-minute speech which I'll share with

3   all of you about the problem we have today with a legal

4   system that's more about "let's make a deal" than "let's

5   find the truth."

6       I like the legal system that is founded upon the common

7   law.  I like the common law that develops through trials and

8   through judgments rendered.  That doesn't mean that I don't

9   like settlements, but I like informed settlements.

10      If I keep going, it will get to be longer.  I -- to the

11  end of making informed judgments about what you tell your

12  clients and how you counsel your clients, I'll cooperate in

13  every way that I can and devote whatever effort you ask of

14  me to participate in those endeavors.

15      Now, the next topic is AMS's motion to strike

16  bellwether cases.  I've read the arguments presented by the

17  parties.

18      Does either party wish to add anything not presented in

19  the papers?

20      Yes, ma'am.

21          MS. FITZPATRICK:  Your Honor, Fidelma Fitzpatrick

22  for the plaintiffs.

23      The one thing that I would like to add, Your Honor,

24  that is not in the papers themselves is we had a hearing in

25  Delaware -- I think we're going to update you on this

1    later -- where we were looking for the composition of the

2    bellwether pool.  And we were also looking to put in a

3    scheduling order to get to trial, as Ms. Binis mentioned.

4         And what was very instructive about what happened in

5    that proceeding was that the position taken by AMS in

6    Delaware as to what constitutes a representative pool is

7    very different than the position that has been taken by AMS

8    in this particular court.

9         Here while they're arguing that it should be an SUI and

10   SUI only pool and that that is limited to two particular

11   products, the Monarch and the Spare, in Delaware the AMS

12   took a position that it wanted a much more extensive pool;

13   that in order to be properly representative of the entire

14   body of women who were before that court -- and before that

15   court is somewhere between 250 and 300 cases total, so a

16   very small fraction of what we have here -- that in order to

17   be properly representative, it had to include all of the

18   conditions and all of the products by AMS that were there.

19   And it's a very stark contrast and there are two points that

20   I wanted to make in comparison to that.

21        As Your Honor noted, this is where we have the bulk of

22   the cases.  At this juncture, to limit it to an SUI only

23   trial and certainly -- an SUI only bellwether grouping does

24   a disservice in two ways.

25        First of all, it excludes the approximately 40 percent

1   of women who are before this court who do have a POP

2   condition and whose cases cannot be resolved until we deal

3   with the POP cases and have a POP trial.

4        Secondly, it puts the, the MDL in a different position

5   certainly than the State Court in Delaware and the State

6   Court in Minnesota, both of which will be considering POP

7   trials and going forward for their bellwether pools.

8        And the third thing that it does, Your Honor, and this

9   follows up on what you were talking about this morning, is

10  we will be looping back into another AMS trial that's going

11  to come up, be it sometime in the spring of next year.

12       If we exclude these POP cases from this bellwether

13  pool, then we are essentially ensuring that no POP case is

14  going to be reached whatsoever until a very significant

15  period of time from now which, again, compromises the

16  ability of 40 percent of women to, to deal with their case.

17       The last point, Your Honor, that I want to bring up is

18  we had mentioned in our papers the issue of POP discovery

19  that's already been done, that that case is slightly farther

20  down the line.

21       Since we've put in our papers, and you'll be hearing

22  this a little bit later on in connection with the discovery

23  motions that are going to be heard, we have very serious

24  issues that have come up based on the 30(b)(6) deposition

25  that was taken a couple of days ago in this case and had

1   been ordered by Your Honor concerning the timing of

2   discovery that has been done, the scope of discovery that

3   has been done, the comprehensiveness of the discovery that's

4   been done, and our ability to get depositions.

5       And all of those issues and those discovery delays

6   compound our concerns about some of the SUI trials and some

7   of the issues that we're getting.

8       Now may not be the time to decide it, certainly, until

9   we see how things unfold in 30 or 60 days until we see what

10  happens with discovery.  But I think it's really important

11  for the purpose of keeping that December trial date that we

12  have the option of that POP trial, especially in light of

13  the discovery issues that we're going to be talking about

14  later and the possibility that while Your Honor may have

15  indicated an interest in doing an SUI trial, that the

16  particular circumstances of this case and the particular

17  circumstances of how this litigation has unfolded, it may

18  turn out later that Your Honor might decide that a POP case

19  might be more appropriate.  If we don't have any POP

20  bellwethers now, we have lost that ability to do that trial

21  date and move forward.

22      So, those are the only things that I wanted to add to

23  that, Your Honor.

24              JUDGE GOODWIN:  Anybody feel obligated to answer?

25              MS. BINIS:  Your Honor, as to Delaware, all I can

1    say about that is we have not decided on the Delaware trial

2    pool.  We have not even presented the judge with a proposal

3    for how to pick the trial pool.

4         And the only disagreement in Delaware was the

5    plaintiffs wanted eight bellwether picks and we wanted more

6    than that.  That was the issue of the Delaware pool.  It was

7    not an issue of which case would be tried.  And, certainly,

8    because there are more SUI cases there than anywhere, I

9    would argue that SUI should be tried there as well.

10        But, but what's most important here for our bellwether

11   cases is just what Your Honor was just talking about.  And,

12   that is, that we get to the truth of the matter.

13        I don't think it's any surprise to this Court that the

14   defendants view SUI cases very differently than they view

15   POP cases.  And that's for a lot of different reasons.

16        The FDA treats them differently.  Doctors treat them

17   differently.  Medical societies treat them differently.  And

18   even plaintiffs' experts treat them differently.

19        And we do, in our minds, value SUI cases, which are the

20   majority of the inventory in this court, very differently

21   than we view POP cases.  And for that reason, it was

22   important to us -- and we talked about this with Your Honor

23   before -- to try an SUI case first because we do believe

24   that that will best inform the defendants and the plaintiffs

25   about the value of the inventory.

1    Your Honor was very clear in your order as to how we

2    were to pick our bellwether cases.  Single product cases --

3    and there was, there was a good amount of discovery about

4    this and we went back to the transcript and looked at it.

5    It was single product cases.  And you said that an SUI case

6    would be tried first.  And that is how we approached our

7    bellwether picks.  We were, therefore, quite surprised to

8    see the plaintiffs had, in contradiction to that, picked

9    multi-product cases and POP cases.

10    I really think that to get down to representative

11    cases, two of which could be tried in December, we need this

12    pool of 30 to channel down to that pool of five.  I do not

13    think that that's an outrageous number of cases.  I think

14    that that's what we're looking for is true representation,

15    and that if there is going to be a POP case tried later, we

16    can do another pool and we can narrow it down to a

17    representative POP case too.  I don't, I don't think that

18    those two things are inconsistent.

19    So, for those reasons, we feel that plaintiffs

20    basically ignored the direction Your Honor had given us.

21    And that is why we're asking to strike those POP cases.

22    JUDGE GOODWIN:  It is not news to me that both

23    sides -- I don't remember which defendants and which

24    plaintiffs -- have used the bellwether selection process to

25    try to manipulate things a little.  That doesn't come as a

1    great shock to me.

2        But I -- and I've considered the arguments that I've

3    heard from you and have read.  But I remain convinced that I

4    set up a fair process where the parties were to select cases

5    that each party filed was representative.

6        I indicated clearly and consistently what I intended to

7    pick.  I haven't changed my mind.  The motion to strike is

8    denied.  I haven't changed my mind.  This is -- to me, this

9    is like re-arguing something that you already know I'm going

10   to do, or putting things forward that ask me to re-litigate

11   something that I've already announced.  So, be that as it

12   may, the motion is denied.

13       Next is the update on PTO 37.  Who wants to report on

14   that?

15           MS. BINIS:  May I just ask -- I'm sorry, Your

16   Honor.  I didn't mean to interrupt you.

17           THE COURT:  Yeah, uh-huh.

18           MS. BINIS:  But may I ask for a clarification?

19           JUDGE GOODWIN:  Sure.

20           MS. BINIS:  Does that mean, Your Honor, that in

21   the five trial picks that we end up with, one of the

22   plaintiffs' POP cases may be in that five trial pick?

23           JUDGE GOODWIN:  It means whatever ones I pick will

24   be there because I gave everybody a fair chance and I'm

25   aware of everybody's arguments.  But I indicated what I was

1    going to do.

2              MS. BINIS:  Your Honor, we did not know that you

3    were going to allow multi-product cases.  So, I'm, I'm

4    wondering --

5              JUDGE GOODWIN:  I didn't say I was going to pick a

6    multi-product case.  Don't you understand that?

7              MS. BINIS:  Yes, Your Honor, I do.  Thank you.

8              JUDGE GOODWIN:  Okay.  I can't control what you

9    select.  I can control what I pick.

10       37, update on Delaware and Minnesota consolidated

11   cases.  I've heard part of that.  Who wants to fill me in on

12   the rest of it?

13             MS. BINIS:  Yes, Your Honor.

14       All I wanted to tell Your Honor was this was the week

15   in which the plaintiff fact sheet and the defendant fact

16   sheet forms were to be exchanged according to PTO 37.

17       Those forms have been exchanged short one.  There's one

18   plaintiff fact sheet that was not exchanged this week.  And

19   we talked to that plaintiff and we agreed with them to give

20   them a ten-day extension.  So, I'm expecting that we will

21   get it and I just wanted the Court to understand --

22             THE COURT:  Great.

23             MS. BINIS:  -- where we were in the process.

24             JUDGE GOODWIN:  Thank you very much.

25       Anything else to say about the Delaware and Minnesota

1  consolidated cases?

2       MS. BINIS:  No, Your Honor.  I wanted to tell

3  you -- explain the trial schedule.

4       JUDGE GOODWIN:  Boston Scientific, there's a

5  motion for leave to amend the complaint to add defendants.

6  I've reached a decision on this motion.  I will issue an

7  order within the next five days.  The motion is denied.

8       On MDL 2327, Ethicon, there's a stipulation dealing

9  with foreign entities, J&J, Ethicon, joint and several

10 liability.  Who's going to talk about that?

11      MR. CARTMELL:  Your Honor, Tom Cartmell on behalf

12 of the plaintiffs in the Ethicon case.

13      You may recall early on we were talking about naming

14 multiple defendants that were from foreign countries,

15 Ethicon Sarl and some other foreign defendants, because

16 they're listed as the legal manufacturer or they have some

17 involvement with the manufacture or marketing the products.

18      We agreed that we would not do that at that time.

19 We've been working together to try to come to an agreement.

20 We don't have an agreement yet, although Ms. Jones has been

21 very busy.  And we talked prior to today, and it looks like

22 she's going to be talking to her client.

23      There's really two issues.  The other issue has to do

24 with a stipulation related to Ethicon and J&J essentially

25 being one in the same for purposes of trial because our

1    concern is when we get to trial and there's multiple

2    manufacturers discussed, as we said, it will be confusing

3    for the jury and it, it will be a problem for us.

4        We need to know whether or not we need to do extensive

5    discovery to try to prove that J&J is responsible for the

6    acts of its subsidiaries or those types of things.  We know

7    that they agreed to stipulate to that in New Jersey, and

8    we're hopeful that they'll agree to stipulate to that here

9    as well.  And Ms. Jones said that she's going to be talking

10   to her client.  So, we're hopeful we don't have to --

11            THE COURT:  So, your forecast is for sunny

12   weather?

13            MR. CARTMELL:  My forecast is sunny weather, yes.

14            JUDGE GOODWIN:  Okay.

15            MS. JONES:  Your Honor, Mr. Cartmell is accurate

16   that I think that we will be able to resolve this issue

17   without problem.  It is a complicated issue --

18            THE COURT:  Right.

19            MS. JONES:  -- and it involves --

20            THE COURT:  Which you've dealt with before.

21            MS. JONES:  -- significant high people at the

22   client that we need a little bit of time, Your Honor.  I

23   think it will resolve itself.

24            JUDGE GOODWIN:  Sure.

25            MR. CARTMELL:  And, Your Honor, that, that

1   actually takes care of the second issue as well.  Those are

2   tied together.

3             JUDGE GOODWIN:  All right.  Did somebody want to

4   talk about amendments to the master complaint?  Is that what

5   you're talking about?

6             MR. CARTMELL:  Yeah.  We would -- if we couldn't

7   come to a stipulation, then we were talking about an

8   amendment.

9             JUDGE GOODWIN:  I understand.  Okay.

10        The final topic for Ethicon, I think, is New Jersey

11   update.  Anything to report on that?

12            MS. JONES:  No, sir, absolutely not.

13            JUDGE GOODWIN:  All right.

14            MS. JONES:  I will say, Your Honor, that there are

15   no current trial settings at this stage.

16            JUDGE GOODWIN:  Okay.

17            MS. JONES:  Would you like something else?

18            JUDGE GOODWIN:  No, no, no.  I, I just thought I

19   would mention Judge Higbee was invited to the Multi-District

20   Litigation Conference in Palm Beach and attended, and spoke

21   on federal-state cooperation.  Anyway --

22        All right, let's go to Coloplast.  It's nice to see

23   Coloplast again.

24        Who will report on the topic of agreed stipulation and

25   service of process, whatever?

 1          MR. SALIM:  Your Honor, Robert Salim for the

 2     plaintiffs.  We have agreed, of course, on a tolling

 3     agreement and we've agreed on a fact sheet.  It's working

 4     extremely well because the defendants have set up a web

 5     portal where the plaintiffs can send their medical records

 6     in.  And then we were doing well on identifying products.

 7     And a lot of the cases were not with the Coloplast

 8     defendants, and they're pointing that out.  That's working

 9     well.

10     We've talked about the stipulation on the foreign

11     defendants.  We have a draft that we have exchanged, and we

12     expect to agree on it by the end of today.

13          But the process itself, Your Honor, in line with why we

14     believe the tolling would be great on other defendants, it's

15     eliminating a lot of lawsuits once the defendants look at

16     it.  They're pointing out to the plaintiffs that either you

17     have the wrong product or you have multiple products.  And

18     then the plaintiffs are able to send the medical records

19     directly to the defendants.

20          And, so, we're getting a great early evaluation on the

21     significant number of cases without them even having to be

22     filed.  So, it's working very well.

23          JUDGE GOODWIN:  So, you, you were an advocate for

24     early case assessment.

25          MR. SALIM:  Yes, Your Honor, and it's actually

1    working.

2            JUDGE GOODWIN:  I met with the parties in Bard

3    this morning regarding pre-trial matters, and I think we've

4    dealt with everything.

5        Is there anything else that we need to do?

6            MR. GARRARD:  No, sir.

7            JUDGE GOODWIN:  I will conclude my part of this

8    conference and turn things over to Judge Stanley and Judge

9    Eifert.  But before I do, I invite you all to adjourn to the

10   lobby for lemonade and cookies in honor of Judge Stanley's

11   retirement at the conclusion of the status conference.

12   Judge Stanley and Judge Eifert will reconvene here this

13   afternoon at 1:00 for a hearing on AMS's discovery motions.

14       With that, I'll turn the bench over to them.  It's nice

15   to see all of you again.  On behalf of J.W. Marriott, I want

16   to thank you, and Embassy Suites and the Charleston Chamber

17   of Commerce.

18       I -- as I said, I've been in this business for a long

19   time.  I am very pleased to be the Judge in this case with

20   so many good lawyers.  I am very pleased about this.  I hope

21   it, hope it continues.

22       (Whereupon, District Judge Joseph R. Goodwin exited the

23   courtroom, after which the following occurred:)

24           MAGISTRATE JUDGE STANLEY:  Please be seated.

25       The first issue of general interest appears to be how

1    the defendants are designating documents as confidential.

2    And I guess the plaintiffs may think that too many are being

3    designated.  I'm not sure who offered this.

4         MR. GARRARD:  I offered it, Your Honor.  And I

5    don't have a solution, but we have a problem that some of

6    the defendants are designating virtually every document they

7    produce as confidential.

8         And I've raised it before and I guess what I'm really

9    asking is some approach whereby defendants re-look at what

10   they are designating and go back and designate or

11   un-designate in accordance with the Federal Rules.

12        I know in my office we are getting ready to respond to

13   whatever the *Daubert* motions are and whatever substantive

14   motions may come in relation to the Bard cases.  But as we

15   are preparing that, we keep looking and knowing that we need

16   to utilize documents that have been produced.

17        And I have talked to my briefers and said, "Well, Judge

18   Stanley advised last time paraphrase, cite to the Bates

19   number, and then provide the documents to the court."  And

20   we're going to attempt to do that as best we can, although

21   they come back at me and say, "Henry, when we do that, some

22   of the import of what we're trying to say gets lost."

23        And we just have a practical problem here that there

24   is, in fact, a gross over-designation of documents as

25   confidential.

1      There's a second problem which is arising.  And back

2   when the formation of the other MDLs was coming about, we

3   had some discussion about why that would be good to put it

4   all in this court.  And that is this:

5      As we are doing depositions in certain of the cases --

6   and I'll use Bard as an example right now.  When we are

7   doing depositions of some of the deponents, it becomes clear

8   as we study how to do the deposition that there are

9   documents that have been produced in the other MDLs that

10   would be appropriate or relevant to use in the Bard MDL.

11      Now, I had that problem a week or so ago and I

12   communicated with Ms. Jacobs and Ms. Jones and we worked out

13   a temporary way that we could utilize some documents if we

14   wanted to.

15      But I think we need some directive from the court,

16   perhaps an order from the court that allows us to use

17   documents across MDLs because the way the protective orders

18   read right now is that you are limited to the utilization of

19   Ethicon-produced documents in the Ethicon MDL or

20   Bard-produced documents in the Bard MDL.

21      As an example of documents I'd be talking about, when

22   you go through the databases, you'll find where Bard says

23   negative things about J&J products or J&J says negative

24   things about Bard products, and it's all intertwined.

25      And, so, we are requesting that the court allow us to

1   potentially submit an order or the court verbally issue an

2   order that says that we can use documents across the MDLs so

3   long as we keep them confidential within the MDLs.

4       I think the exception would be within the protective

5   orders there is a category of "highly confidential" or -- I

6   can't remember exactly what the description is.  That

7   perhaps should, should be excepted such that if you need to

8   use "highly confidential," or think you do, you need to

9   notify the affected producer.

10      And I don't have a problem with that.  But the general,

11  generally designated confidential documents, we need to be

12  able to use them across the MDLs.  And then we also need

13  some vehicle by which the confidentiality designations get

14  de-designated.

15      I know this court does not want us to file motions that

16  say, "Judge Stanley or Judge Eifert, look at eleven million

17  documents that have been over-designated."  We don't want to

18  do that either.  But we do have that problem and we need, we

19  need some, some help from the court.

20              MAGISTRATE JUDGE STANLEY:  All right.

21              MR. NORTH:  Your Honor, --

22              MAGISTRATE JUDGE STANLEY:  Mr. North.

23              MR. NORTH:  -- if I could address that briefly, as

24  far as confidentiality goes, I think the Court will remember

25  that at the beginning of this litigation, we produced an

1   enormous amount of documents on behalf of Bard, what I hope

2   was fairly expeditiously.  And in doing so, to be able to do

3   it that quickly, yes, there was some over-designation, I'm

4   sure, by our vendors.

5       We've continued to work with Mr. Garrard's firm on any

6   challenges they have.  Two of my partners have spent several

7   days talking and in-person meetings with Mr. Garrard's

8   partners to work that out.  And we are willing to continue

9   to do that.

10      As far as the use of the documents in other MDLs, I

11  believe this is something the parties all together need to

12  spend some time and maybe prepare an order for the Court's

13  consideration.

14      What we're most concerned about is notice.  For

15  example, -- and I, I couldn't speak for Ms. Jones or Ms.

16  Jacobs.  But one of our urogynecology experts, Dr. Vincent

17  Lucente, was deposed by the plaintiffs, not Mr. Garrard, on

18  Friday.  It was an eight-hour -- seven- to eight-hour

19  deposition and it's not concluded.

20      Dr. Lucente had done a lot of consulting work in the

21  development of the Prolift product for Johnson & Johnson.

22  My understanding is -- I wasn't there.  My colleague,

23  Ms. Cohen was -- that 80 percent of the questioning was

24  concerning his work for Johnson & Johnson.

25      I can't speak, again, for Ms. Jones and Ms. Jacobs, but

1    if the reverse had been true, I would have wanted notice and

2    an opportunity to be there because, otherwise, we're not all

3    going to each other's depositions in the individuals MDLs.

4         So, my suggestion would be that all the parties get

5    together, see if we can come up with some sort of order that

6    would give us protection against those sorts of events from

7    happening.

8              MAGISTRATE JUDGE STANLEY:  All right.

9         Yes, Ms. Jones.

10             MS. JONES:  I would simply second what counsel for

11   Bard is saying.  I mean, we, we got a call and tried to work

12   things out.  And we basically, not knowing what the

13   documents were at the time, said, you know, "We'll agree to

14   this if we limit this to attorneys' eyes only until we have

15   some idea of what documents that are being used," because

16   clearly there are -- we are all competitors and there are,

17   in fact, some documents that are -- have the potential to be

18   very sensitive.

19        And while I think we can probably work things out, this

20   is -- I mean, we, we did get a report that we -- that the

21   deposition did not go as we had been led to believe in terms

22   of what we thought, how we thought the documents were going

23   to be used.

24        And I don't have any problem with sitting down and

25   trying to work something out or an order that is agreeable

1   to all of the defendants.  But I do think we need a little

2   bit of time to, to see if we can work the terms out.

3              MAGISTRATE JUDGE STANLEY:  All right.

4        Does Boston want to chime in here?

5              MR. STRONGMAN:  I would just simply echo that I'm

6   more than willing to sit down and try to figure out a

7   solution.  I'm certainly -- we're in the same position.  We

8   had a deposition happen where a document was used that was

9   an Ethicon-produced document in one of our depositions

10  recently.  It wasn't a big issue.

11       But in terms of -- certainly, we don't have access to

12  those documents before the deposition.  There's certainly no

13  foundation, not a document involved with our witness in any

14  regard.  But, of course, as with everything, we're more than

15  happy to sit down and try to see if there's a solution.

16             MAGISTRATE JUDGE STANLEY:  Does AMS wish to

17  respond?

18             MR. MCCONNELL:  No.  We're in accord with the

19  defendants.  We agree.

20             MAGISTRATE JUDGE STANLEY:  And Coloplast?

21             MR. KREPS:  Same, Your Honor.  We are certainly

22  willing to work that out.  Of course, we're not yet in the

23  stage of producing documents.

24             MAGISTRATE JUDGE STANLEY:  Before I hear from Mr.

25  Garrard, as Ms. Jones pointed out, you are competitors.

1    And, so, therefore your clients may believe that there are

2    aspects of their particular documents that they don't want

3    the competitors to see.  And, yet, of course the nature of

4    competition is that your sales reps are telling the

5    surgeons, "Oh, you don't want another product.  You want my

6    product and this is why."

7         And, so, there's, there's really two different sides to

8    that particular coin.  Correct?  I mean, is that a fair

9    assessment?

10             MR. NORTH:  Yes.

11             MAGISTRATE JUDGE STANLEY:  Okay.  Now, with

12   respect to, for example, Ethicon's documents, I'm sure that

13   there was a vast body of documents which were admitted into

14   evidence.  And what if -- New Jersey State Court and, of

15   course, anybody has access to those.  And they are no longer

16   confidential to anybody.  And the same thing is going to

17   happen with our trials.  Bard's documents are going to be

18   admitted into evidence.

19        So, as you -- of course, we encourage you to work out

20   the problem.  That is obviously going to pose some tricky

21   issues with your clients and with opposing counsel.

22        Let me just say that in my experience with

23   over-designation of confidentiality that before people start

24   trying to offer documents into evidence or in support of a

25   motion, we judges don't really care very much.  So long as

1    the documents keep moving, you can designate them almost

2    anything and it's not going to be any problem for us.

3         The problem is if you're trying to withhold stuff from

4    the public record or prevent a party from being an advocate

5    for their client.  And at that point, you are going to run

6    headlong into an extremely high wall that the district judge

7    presiding over these cases sets by local rule, by 26, Rule

8    26 of the Federal Rules, that you have to meet a very high

9    standard to keep your documents off the public record.

10        And I believe that that wall may be even higher in

11   bellwether cases because it's not just simply the resolution

12   of a private dispute.  This is truly an issue of national

13   implication.  So, that will just give you a few items to

14   think about.

15        Mr. Garrard, now do you wish to reply?

16        MR. GARRARD:  The only comment I want to make,

17   Your Honor, is what Mr. North is suggesting that we

18   essentially tell them our strategy in the deposition before

19   we're taking the deposition certainly invades our

20   lawyer/client work product, et cetera, and is not something

21   that is doable.

22        MAGISTRATE JUDGE STANLEY:  How is this different

23   from the prior hearing that we had when you offered to

24   provide documents to a witness 48 hours in advance?

25        MR. GARRARD:  What Your Honor ruled was that for

1    treating physicians that we had to notify the other side of

2    documents that we were going to -- I can't remember whether

3    it was had produced to the doctor or were utilized by the

4    treating doctor.

5             MAGISTRATE JUDGE STANLEY:  So, that's just

6    treating physicians.

7             MR. GARRARD:  Yes, ma'am.

8             MAGISTRATE JUDGE STANLEY:  That was just your

9    offer.  It wasn't --

10            MR. GARRARD:  It wasn't across the board.

11            MAGISTRATE JUDGE STANLEY:  And it wasn't --

12            MR. GARRARD:  It was just that.  The, the doctor

13   that Ms. Jones is referring to, or Richard is referring to

14   was a designated expert for the defendants.

15        And my recollection, Christy, is that we didn't use any

16   of your documents in the deposition.  And there's no doubt

17   that there was examination about what he had done with, with

18   Johnson & Johnson, but I don't think any documents were

19   utilized in the deposition.

20        But the thing we can't do is tell Christy or Richard or

21   Barbara or any of them that, "Here's our strategy of taking

22   a deposition."  And, so, that we will resist.  If there's

23   some way that there's language that we can work out so that

24   cross utilization of documents can be done, that's fine.

25        But it is a significant issue and it's going to be a

1   bigger issue as we go forward because Your Honor is correct

2   that in marketing, for example, Bard says, "You need to use

3   our multi-product because Ethicon's prolapse product has too

4   much mesh or the pores are too small or whatever else."

5   There's truly nothing confidential about that.  But it's

6   matters that we need to be able to cross utilize.

7          MAGISTRATE JUDGE EIFERT:  I'm just -- you know, I

8   think you go back to the primary issue, which is the

9   over-designation of these things as confidential because if

10  you didn't have that confidential marking on them, you could

11  use them at the depositions.

12      So, I don't know if the answer is to make motions to

13  de-designate.  I understand what you're saying.  That might

14  be eleven million documents.  And I don't really want to

15  look at eleven million documents.

16      But I think maybe there needs to be some cooperation

17  and some work on getting some of these now that you know you

18  may want to use voluntarily de-designated as confidential

19  without -- I understand your point about not wanting to give

20  your strategy over in advance of the deposition, but I don't

21  know how you're going to get a very good deposition if

22  you're using documents that this expert's not looked at in

23  years and years and years.  So, I mean, I think there's got

24  to be some give and take there probably.

25          MR. GARRARD:  Yes, Your Honor.

1          MAGISTRATE JUDGE STANLEY:  To the extent that

2   you-all negotiate a procedure for using confidential

3   documents either in a different MDL or using confidential

4   documents in a particular MDL that you want to use in court,

5   I think it would be a good idea if you negotiate this as an

6   amendment to the existing protective order and/or an

7   amendment to the existing deposition protocol so that the

8   changes are in one document rather than some supplemental

9   document which would make it more difficult for people who

10  are trying to follow it.

11      All right.  I'm assuming that the parties have not

12  resolved the AMS discovery disputes that are set for 1:00.

13          MR. MCCONNELL:  I think we have resolved some to

14  some extent.  Maybe we could talk about that for a second,

15  the deposition issues.

16          MS. FITZPATRICK:  We, we are working on that, Your

17  Honor.  And I think that there may be some things that we

18  might be able to present to you that we would like to have

19  either reduced to an agreed-to order or court order.  But

20  there will be other issues that are still in dispute,

21  especially, as I mentioned, given the deposition that

22  happened this week.

23          MAGISTRATE JUDGE STANLEY:  Okay.  Well, of course,

24  anybody who wants to attend that hearing at 1:00, you're

25  more than welcome.  We'll be here.

1          Now, there are some agenda issues from Ethicon on

2    narrowing of products discovery and production of outside

3    U.S. documents.

4          MR. CARTMELL:  Your Honor's last -- at the last,

5    the last hearing we mentioned that we were going to discuss

6    with Ethicon the idea of maybe narrowing the product

7    discovery to a certain number of products as we go forward

8    under this DCO and prepare for trial.

9          We have done that and, and we're at an impasse.

10   They're unwilling to do that.  And I'll let Ms. Jones tell

11   you the reasons for that.

12         But essentially I think it has to do with they don't

13   want to produce witnesses more than once.  And if we come

14   back later with other products, because of the witnesses --

15   many of them have to do with the same products -- we may

16   have to do that.

17         But -- and I hesitated about bringing this up today

18   without a written motion, but our concern has been that we

19   have about four months to do 50 or 60 depositions.  We're on

20   a fast track.  And if we filed a formal motion, we might be

21   a month down the line.

22         So, I was hoping to get some guidance from the Court

23   today, or you may say that you want us to file something

24   specifically and that's okay.  But if you don't mind, I'd

25   like to give a little more background about the issue and

1    how it's sort of affecting the discovery at this point.

2        The issue is in the Ethicon case there are seven TVT

3    sling products that are at issue.  And, really, six of them

4    are going to be discovered heavily.  One is not so important

5    because it has to do with tools and it's likely not going to

6    affect many cases.

7        There are also three POP, or pelvic organ prolapse,

8    products that have been discovered, some in New Jersey;

9    really, the Prolift product.  And then there's two others,

10   the Prosima product and the Prolift+M product, that really

11   have not been discovered much in New Jersey.

12       We are, you know, satisfied --

13           MAGISTRATE JUDGE STANLEY:  No, wait.  I was -- I

14   got a little confused.

15           MR. CARTMELL:  Okay.

16           MAGISTRATE JUDGE STANLEY:  You had three POP

17   products.

18           MR. CARTMELL:  That's right.

19           MAGISTRATE JUDGE STANLEY:  And then you said there

20   were two more.  Or is that -- were you speaking of two that

21   were within the three?

22           MR. CARTMELL:  Within the three, I'm sorry.  Yeah,

23   the Prolift and the -- excuse me.  The Prolift+M and the

24   Prosima are POP products that really haven't been discovered

25   a whole lot in New Jersey because the first bellwether in

1    New Jersey was a Prolift, was a Prolift case.

2              MAGISTRATE JUDGE STANLEY:  Right.

3              MR. CARTMELL:  So, so, a lot of the, the Prolift

4    discovery's been done in New Jersey.  We have debated about

5    how much needs to be done now given the, the Court's

6    discussion about what the likely first bellwether is.

7         However, we feel -- still feel like we need to do

8    Prolift discovery just in case it is a Prolift and for the

9    future of all those products.

10        So, essentially what we're talking about doing right

11   now is discovering ten or nine products before the January

12   trial date.

13        We approached them about maybe reducing the number of

14   TVT cases or slings being discovered right now to three:

15   The TVT, the TVT-O, and the TVT-S.  And those three sling

16   products probably make up I think greater than 90 percent of

17   the sling cases that are currently pending in, in the MDL.

18        The other two or three, the Abbrevo, the Exact, and the

19   AA, are a very small percentage of the cases.

20        So, that's really the issue.  The effect that it's had

21   so far on us is essentially we're, we're behind.  We started

22   asking for depositions in July of last year.  I think we

23   asked for 21 or 22 at that time.  And we just got dates for

24   those depositions in the last two weeks or three weeks.

25        We also have asked since then for another 30

1    depositions of individuals.  And, so, we're over 50 people

2    that we've asked for depositions for.  And now we do have

3    approximately 30 days, although when we were given dates, we

4    were given one day, one single day for each witness, and

5    told that these depositions should only last one day.

6        So, as a practical matter, we've been arguing about

7    what these depositions have looked like and who should be

8    involved in the depositions; for instance, the 30(b)(6)

9    depositions.

10       We sent, back in July, a 30(b)(6) notice that was sort

11   of overarching on regulatory, marketing, and several

12   different topics.  And this is not intended to say this is

13   their fault at all.  We have fault in this as well.  We went

14   back and forth for a long period of time trying to

15   negotiate, you know, what the topics would be and who would

16   be able to, to talk about them.

17       And we've had tremendous problems deciding:  Is there a

18   witness that can talk about seven products?  And they've

19   told us multiple times that it would be impossible on some

20   of the products for one individual to learn everything about

21   seven products.  And, so, it may be multiple witnesses.

22       The long and short of that is we've had one

23   deposition -- actually, we've had one and a half of a

24   30(b)(6) which occurred last week.  I took the deposition of

25   one of the regulatory designees.  And we were able -- in two

1    full days, we were able to get through essentially two and a

2    half of the products, and not all the topics even on those,

3    those products.

4         Now, at the end of the two days, there was discussion

5    about, "Are we done?"  They say, you know, "You're done."

6    And we say, "Well, we're not done.  We've got to do

7    discovery on the other ones."

8         And there's the issue of they say, "You have to do your

9    fact witness deposition of this witness who's also a fact

10   witness right now.  And we're not going to bring this

11   witness back later because you had your opportunity to do

12   that now."

13        So, it, it's a very complicated thing and my concern

14   is -- that, that's the effect.  The concern that we have is

15   that we get way down the line -- and we have talked about,

16   you know, just taking a few depositions and seeing if we can

17   get this worked out.  And, in fact, we talked -- Ms. Jones

18   and I talked about that before today.  And I'm okay with

19   doing that.

20        But my concern is that we get down the line and we have

21   a bunch of uncompleted depositions.  And I think in Federal

22   Court there's a good argument that if you don't complete a

23   deposition, you can't play it at trial.

24        And this case is a little different than the New Jersey

25   case where their witnesses were within the subpoena power

1  because they're not going to be within the subpoena power

2  here if we have the trials here.  And we may be, you know,

3  having to take or use a lot of these video depositions in

4  this courtroom and not able to, to have live witnesses here.

5      So, I believe that if we could -- the other concern I

6  have is that we get way down the line and, honestly, we

7  figure out the first bellwether, you know, trial is a TVT-O,

8  for instance, and we don't have much discovery done.  And

9  Your Honors are saying, "Hey, you know, here we are a month

10  from trial.  You guys didn't really discover that product in

11  full."  And, you know, we didn't mention it to you.

12      And that's part of the reason I wanted to bring it up

13  at this time.  I believe that if we were able to, you know,

14  narrow the discovery to certain products, it would be

15  beneficial to both sides.  Some on my side would say, "Hey,

16  you're letting off the pedal.  You need to drive them as

17  hard as you can to settlement."

18      But I believe -- we believe that we should, instead of

19  that, be very concerned about having our cases ready to be

20  tried in the best format they can in front of Your Honors so

21  that you don't have a crummy trial.  You have one bellwether

22  that really tells you something.  And I'm concerned that if

23  we don't narrow it at this point that we're not going to get

24  there by the January date.

25          MAGISTRATE JUDGE STANLEY:  Ms. Jones.

1          MS. JONES:  May I respond, Your Honor?

2      We have been trying to work with Mr. Cartmell and I,

3  I'm a little bit surprised to hear him say some of the

4  things that he has said this morning.

5      Your Honor will remember that we have already produced

6  about 50 witnesses from Prolift depositions in the State of

7  New Jersey.  And we have an agreement that those will be

8  used and there will be not duplicative depositions.

9      And, in fact, some of those that are on the list that

10  they've asked for are people who have previously been

11  discovered, albeit on Prolift as opposed to some of the TVT

12  issues.

13      The -- I would like to address this in two different

14  ways first because the request is to limit the discovery

15  primarily on the TVT products.  And the TVT products --

16  there are six products there.  And, frankly, and I will be

17  candid with Your Honor, three of those products, the TVT,

18  the TVT-O, and the TVT-Secur, which are the products that

19  plaintiffs have asked that the discovery be narrowed to, do

20  amount to roughly 85 to 90 percent of the TVT cases, the SUI

21  cases.

22      We, we would be happy to limit the discovery to those

23  cases because it would make life much easier today.  The

24  problem with that -- and this is what we've tried to work

25  out with plaintiffs' counsel -- is that to do that would

1   arguably leave us in a position of having to bring back all

2   of those people -- not all of them, but a significant number

3   of people to come back later on on the remaining TVT cases,

4   the other TVT product cases.

5        So, what we were trying to do was to figure out a way

6   that plaintiffs' counsel -- in fact, we went to them and we

7   said, "Okay, we're willing to limit the discovery here

8   provided you agree to limit the depositions on these other

9   cases, should it become an issue in the future, to one or

10  two per product," because they will have discovered

11  basically the main, the main TVT employees and so forth in

12  other discovery.

13       And they are, frankly, unwilling to agree to limit the

14  discovery should it become important on the other two cases.

15  And I understand -- I mean, I understand their position.

16  And I think both of us have a reasonable position that I'd

17  like to produce my folks one time even if it means you

18  produce them one time for two days or three days, but do it

19  at one time for efficiency sake and that's, that's all we

20  have to do so it's not a matter of bringing the same witness

21  back repetitively.

22       And I think that's more the issue that we have in terms

23  of limiting the discovery than anything else.  And what we

24  have said to Mr. Cartmell is, "We're trying to work things

25  out," you know.  We've given them -- for some of these

1    witnesses, one day is probably ample time.  For some of the

2    witnesses, it may take two or three days.  We're trying to

3    work with them.  We have said, "We'll work with you and work

4    through some of the depositions."

5         We have asked, frankly, Your Honor, that they take the

6    fact witness portion of the 30(b)(6) at the same time -- the

7    fact witness deposition of the witness at the same time that

8    they do the 30(b)(6) deposition even if it's the next day so

9    it's done at one time just for efficiency purposes.  And I

10   think we're trying to work things, work things through with

11   that.  But I think the main issue is whether or not we limit

12   discovery to the product.

13        MAGISTRATE JUDGE STANLEY:  You say that these

14   three TVT types are 90 percent of the SUI cases.  Of all of

15   the cases that have been brought against J&J and Ethicon,

16   what percentage are SUI cases?

17        MS. JONES:  My recollection, and don't hold me to

18   the exact number, is between 30 and 40 -- between 60 and

19   70 percent of all of the cases involve SUI products.

20        MAGISTRATE JUDGE STANLEY:  But they may be both

21   SUI and POP?

22        MS. JONES:  Some.  There, there is a category that

23   involves both products, yes, Your Honor.

24        MAGISTRATE JUDGE STANLEY:  Is that in addition to

25   the 60 or 70 percent?

1    MS. JONES:  No, no, no.  That's part of the 60 to

2    70 percent.

3    MAGISTRATE JUDGE STANLEY:  Okay.

4    MS. JONES:  The vast majority of our cases involve

5    an SUI product.  My recollection is the last numbers I saw

6    were about 70 percent of our cases involve an SUI product.

7    MAGISTRATE JUDGE STANLEY:  Mr. Cartmell, do you

8    agree with those numbers?

9    MR. CARTMELL:  I do, Your Honor.  I think that's

10   accurate.  I don't know what percentage is SUI plus POP.  I

11   think it's a fairly large percentage.  So, some of those

12   will have both.

13   MAGISTRATE JUDGE EIFERT:  I think what's difficult

14   for us is we really don't have any access to the discovery

15   and it's hard to make a decision or even a suggestion when

16   you don't know what you're talking about.

17   But of your -- of these employees, how many are there

18   that have information about all the products?  Is that a

19   vast number of people?

20   MS. JONES:  My recollection is that the plaintiffs

21   have asked for 44 depositions of the TVT plaintiffs that

22   include present and former employees.  It's hard to answer

23   the question without going back, frankly, Your Honor, and

24   looking at each one of the individuals because some of those

25   are former employees.  And, obviously, the former employees

1    have a limited number of products that they're familiar

2    with.  They had new products coming on the market at the

3    same time.

4        My guess, without sitting down and looking at all of

5    it, is that 25 to 30 percent of them probably cover the

6    majority, if not all, of the products.  But I haven't looked

7    at that.  I'd have to go back.

8        MR. CARTMELL:  Just from our review of the

9    documents, I would say it's quite a bit higher than that

10   because what you have is you have what's called the TVT line

11   of products.

12       And, so, a lot of the same scientists all the way from

13   the development period of time and the design period of time

14   through the regulatory 510(k) submissions all the way to

15   the, to the marketing of the products, they overlap with a

16   lot of these people.

17       So, you get the same -- the project teams are not

18   exactly the same.  There's additional people on each one.

19   But you get sort of a core group who are involved in several

20   of the products.

21       MAGISTRATE JUDGE EIFERT:  And that's a fairly

22   large group.

23       MR. CARTMELL:  I think it's greater than

24   50 percent for sure.

25       MAGISTRATE JUDGE EIFERT:  Okay.  That's one of

1    those things you should try to work out, but I would think

2    there would have to be a motion made, you know, if you can't

3    work it out.  It's just too hard to sit up here and try to

4    put that together.

5              MR. CARTMELL:  Okay.

6              MS. JONES:  What I would suggest -- I know that

7    Mr. Cartmell -- part of his problem was -- his concern was,

8    and rightly so, that, that we don't want to be criticized by

9    the court for not bringing the issue to the attention early

10   on.

11        We've got depositions scheduled.  We're going to try to

12   work things out.  If we just come back, you know, in April

13   or something if we -- you know, we'll see if we can work

14   something out that's more definitive, something there for

15   the court if need be.

16        This is not a problem, Your Honor, of lack of

17   cooperation on this issue.  It is not a -- it's not a

18   problem in terms of us trying to figure out what's the most

19   efficient way for all of us to have them.

20             MAGISTRATE JUDGE STANLEY:  It seems worth

21   mentioning that the whole idea of a bellwether trial is to

22   prevent having to try 14,000 cases.  And, so, that the

23   likelihood of trials as to, as to products that were not

24   used very much just plummets.  And, so, you wonder what's

25   the best use of time here.

1          MS. JONES:  You know, we've, we've had that very

2     discussion.  But that was the reason that we suggested,

3     well, let's do an agreement that, that will take those off

4     the table.  But, but you'll agree there will be a limited

5     number of depositions taken should this, these other

6     products become at issue later on.

7          MR. CARTMELL:  In a way --

8          MS. JONES:  That's what we were trying to get to

9     is to avoid having to do another 50 depositions.

10          MAGISTRATE JUDGE STANLEY:  Well, you can always

11     throw in a clause such as "except as otherwise ordered by

12     the Court."

13          MS. JONES:  All right.

14          MAGISTRATE JUDGE STANLEY:  And, you know, that

15     solves a lot of problems.

16          MR. CARTMELL:  I think that's right.  And we would

17     be willing to -- I think what was offered was actually one

18     deposition entirely for each of those other two products.

19     And we can't do that as fiduciaries representing all those

20     other attorneys out there that have those cases.  Obviously,

21     we can't agree to one deposition.

22          But I think maybe there are some limitations that could

23     be made.  And, of course, we wouldn't duplicate the

24     questioning that we did before.

25          MAGISTRATE JUDGE STANLEY:  Okay.  Do you want to

1   move on to production of outside U.S. documents?

2          MS. JONES:  I think, I think we can quickly deal

3   with that in that we have agreed upon the priorities.  And,

4   that is, there's not anything in dispute at all with respect

5   to that.  And those documents are -- some of them have been

6   produced and are in the process of a rolling production that

7   we've agreed upon in terms of -- the plaintiffs have

8   prioritized which documents they've asked us to produce on a

9   timely basis.

10          MAGISTRATE JUDGE STANLEY:  All right.

11      Boston Scientific.

12          MR. STRONGMAN:  The only thing I would add simply

13   just to update the Court, we are in the middle of company

14   witness depositions.  I think we have somewhere in the range

15   of 20 scheduled over the next couple months.  We're well

16   into our document production and, and we're all making good

17   progress and working cooperatively together with Mr. Clark

18   and Ms. Wagstaff.

19          MS. WAGSTAFF:  I agree with that, Your Honor.

20          MAGISTRATE JUDGE STANLEY:  Okay.  The next status

21   conference is April 18th at 1:00 p.m.  I'll be packing my

22   suitcase for Spain.

23          MR. GARRARD:  Your Honor, the next hearing will be

24   here or in your chambers?

25          MAGISTRATE JUDGE STANLEY:  I think it will be here

1    because we've got the chairs here.  So, we're in good shape.

2         (Proceedings concluded at 11:45 a.m.)

3                          *  *  *  *  *

4

5

6

7

8         I, Lisa A. Cook, Official Reporter of the United

9    States District Court for the Southern District of West

10   Virginia, do hereby certify that the foregoing is a true and

11   correct transcript, to the best of my ability, from the

12   record of proceedings in the above-entitled matter.

13

14

15       s\Lisa A. Cook                    March 25, 2031

16           Reporter                          Date

17

18

19

20

21

22

23

24

25