IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| **In re: C.R. Bard, Inc., Pelvic Repair System** <br> **Products Liability Litigation** <br> _____ | **MDL No. 2187** <br> **2:10-md-2187** |
| **In re: American Medical Systems, Inc., Pelvic Repair System** <br> **Products Liability Litigation** <br> _____ | **MDL No. 2325** <br> **2:12-md-2325** |
| **In re: Boston Scientific Corporation Pelvic Repair System** <br> **Products Liability Litigation** <br> _____ | **MDL No. 2326** <br> **2:12-md-2326** |
| **In re: Ethicon Inc., Pelvic Repair System** <br> **Products Liability Litigation** <br> _____ | **MDL No. 2327** <br> **2:12-md-2327** |

**THIS DOCUMENT RELATES TO ALL CASES**

**<u>PLAINTIFFS' POSITION STATEMENT ON THE ACCESS TO AND EXCHANGE OF
DOCUMENTS DISCOVERED IN OTHER PELVIC MESH MDLS PENDING BEFORE
THIS COURT</u>**

COME NOW Plaintiffs in the pending MDLs, and file their Position Statement on the

Access to and Exchange of Documents Discovered in Other Pelvic Mesh MDLs Pending Before

this Court and state as follows:

**I.      FACTUAL AND PROCEDURAL BACKGROUND**

**<u>Factual Information</u>**

The United States Judicial Panel on Multidistrict Litigation (JPML) entered an Order on

February 7, 2012 centralizing MDL No. 2325, MDL No. 2326, and MDL No. 2327 in the

Southern District of West Virginia where MDL No. 2187 is currently pending. The JPML

explained centralization of these cases will "eliminate duplicative discovery; prevent inconsistent

pretrial rulings; and conserve the resources of the parties, their counsel and the judiciary."[1]   The aforementioned MDLs involve factual issues arising from the implantation of pelvic surgical mesh products designed, marketed, and sold for implantation in the female pelvic floor region.[2] C.R. Bard, Inc. ("Bard"), American Medical Systems, Inc. ("AMS"), Ethicon, Inc. ("Ethicon"), and Boston Scientific, Corp. ("BS") manufactured products used to treat similar conditions (pelvic organ prolapse (POP) and stress urinary incontinence (SUI)).[3]   All MDL plaintiffs allege that they were implanted with defectively designed, manufactured, and marketed products.[4]  All plaintiffs claim that the manufacturer failed to provide appropriate warnings and instructions regarding the risks and dangers of these implantable devices.  The product liability claims include, but are not limited to: strict liability, negligence, and breach of warranty, as well as punitive damages claims.[5] The plaintiffs suffer from serious injuries, including among them recurrent and chronic pelvic pain, painful sexual intercourse, infections, nerve damage, organ injury, blood loss, pelvic floor damage and scarring. ((AMS Master Complaint at ¶50; Bard Master Complaint at ¶53; BS Master Complaint at ¶ 45; and Ethicon Master Complaint at ¶49).

The common characteristics of all the pelvic mesh devices, the common claims asserted by plaintiffs and the common injuries suffered are three reasons why cross-MDL utilization of documents is relevant.  Furthermore, use of documents produced across MDLs is valuable in

---

[1] In re: Am. Med. Sys., Inc., Pelvic Repair Sys. Products Liab. Litig., MDL 2325, 2012 WL 432533 (J.P.M.L, Feb. 7, 2012).
[2]  In re: Am. Med. Sys., Inc., Pelvic Repair Sys. Products Liab. Litig., MDL 2325, 2012 WL 432533 (J.P.M.L., Feb. 7, 2012) (Finding that "[t]he actions in each MDL share factual issues arising from allegations of defects in pelvic surgical mesh products manufactured by AMS, Boston Scientific, and Ethicon, respectively").
[3] In re: Am. Med. Sys., Inc., Pelvic Repair Sys. Products Liab. Litig., MDL 2325, 2012 WL 432533 (J.P.M.L., Feb. 7, 2012) (Finding, "[t]he pelvic surgical mesh products at issue in MDL Nos. 2325, 2326, and 2327 are used to treat similar conditions as those at issue in MDL No. 2187, and they have allegedly resulted in similar injuries.").
[4] Id.
[5] See AMS Master Complaint; Bard Master Complaint; BS Master Complaint; and Ethicon Master Complaint.

preparing for and taking expert witness depositions.   There are several physicians who proctor, consult, and/or help develop new products for many manufacturers at one time.  Several consultant-physicians have been identified as experts by defendants in this litigation.  For example, Dr. Vincent Lucente has been identified as a defense expert in the Bard MDL.  At one point he was a consultant for Ethicon, Bard and AMS.  He provided research support to Bard, Ethicon, and AMS and was a preceptor for Ethicon.  (See ETH.MESH.06538011 attached hereto as **"Exhibit 1"**).  There are many documents produced in the Ethicon MDL that are relevant and useful in preparing for and taking Dr. Lucente's deposition in the Bard MDL.  Piet Hinoul, an Ethicon employee, sent an email to various other Ethicon employees on January 16, 2009 explaining that he was just told that Dr. Lucente invented the Bard Adjust sling and that he was part of a DVD distributed by Bard.  (ETH.MESH.05133831-32 attached hereto as **"Exhibit 2"**). In another email dated June 10, 2012 Matt Henderson, an Ethicon employee, explains that Ethicon made a decision to minimize Dr. Lucente for many reasons including that he is a Prolift+ M user and a Bard preceptor. (ETH.MESH.04579677 attached hereto as **"Exhibit 3"**).    The documents highlighted above are just a few examples of how the MDL defendants are intertwined.  The discovery produced in the Ethicon MDL is useful and relevant to issues asserted in the Bard MDL.[6]

        As discussed at the status conference on 3/21/13, medical device manufacturers often highlight various "weaknesses" in other pelvic mesh manufacturer's products as a sales and

---

[6] Dr. Lucente is just one example of a physician-consultant employed by various manufacturers.  Other experts identified in this litigation have published peer review articles or completed studies on biocompatibility, degradation, pore size, surface area or density.  In many instances these scientists and physicians do not test one particular device developed by one manufacturer.  They are involved in analyzing and comparing various products, materials, instruments and devices at one time.  Use of documents produced in all the pelvic mesh MDLs will be extremely helpful in preparing for and taking these types of witnesses depositions as well.

marketing technique.[7]  This information is useful and relevant to all pelvic mesh MDLs.  For example, Danny Taut, an AMS employee created a PowerPoint presentation about the Apogee Tension Free Vault Suspension System. The presentation included fifteen (15) slides about selling against new competitors in the industry including IVS Tunneller, Prolift, and Avaulta. (MDL AMS D0030621-D0030627 attached hereto as **"Exhibit 4"**).  AMS produced an email dated August 10, 2008 wherein Senior Territory Manager, Carrie Belaski, allegedly attached a photo of an explanted Avaulta Solo mesh device.  Ms. Belaski indicated that the explanting physician had to remove several of his own Avaulta Solo implants. (MDL AMS D2303110-111 attached hereto as **"Exhibit 5"**).  Bard produced an email chain between Kyle Rice, a Bard sales representative, and others within the Bard Urological Division (BUD).  The parties to the email discuss the complications addressed in an AMS chart review including an erosion rate of 15%. Bard sales representatives seem to indicate that they planned to ask prospective customers if they find these erosion rates acceptable.  (AVA2E6507827-29 attached hereto as **"Exhibit 6"**). Boston Scientific produced a presentation on the Avaulta system which highlights physician perceived weaknesses of the Avaulta system, including tissue trauma, number of mesh arms, and abscesses.  (BSCM06300007071-78 attached hereto as **"Exhibit 7"**).  In 2006, Sofradim touted the superior quality of polyester over polypropylene and explained its product was better than Bard, J & J and Gore.   (AVAMDL2_00460431 attached hereto as **"Exhibit 8"**).  This type of information is not limited to one manufacturer or one product.  The common sales technique of "selling against the competitor" is prevalent in the documents and relevant to claims asserted by plaintiffs in all pelvic mesh MDLs.  The examples above highlight the importance of access to and exchange of documents across MDLs pending before this court.

---

[7] 3/21/13 Status Conference transcript, p. 43, lines 21-24 (Henry Garrard stated, "As an example of documents I'd be talking about, when you go through the databases, you'll find where Bard says negative things about J&J products or J&J says negative things about Bard products, and it is all intertwined.").

It is important to note that pelvic mesh manufacturers are held to the standard of an "expert" in the industry. They are required to stay abreast of "state-of-the-art" pelvic mesh developments and discoveries in their field.[8] Information produced across MDLs will help clarify what information was known or should have been known in the industry at any given time.

Finally, many women who undergo mesh surgery for treatment of POP or SUI are implanted with more than one product, and often with products manufactured and sold by different companies. The JPML explained, "[c]entralization of the three MDLs in one court will allow for coordination of any overlapping issues of fact in such multi-product, multi-defendant actions."[9] It will be imperative to use documents produced in several MDLs in this instance.

Common characteristics of all the pelvic mesh devices, the common injuries suffered by the plaintiffs, common experts, common manufacturers' sales techniques, requirements to stay apprised of "state-of-the-art" developments and multi-product plaintiffs are just a few examples of how cross-MDL utilization is relevant and useful in this litigation.

**The Stipulated Protective Orders**

Each pelvic mesh MDL at issue has an "umbrella order" in place to protect trade secrets or other confidential commercial information during the discovery phase and post-discovery phase of this litigation.[10] The Stipulated Protective Order (SPO) in place in each MDL currently

---

[8] See Borel v. Fibreboard Paper Products Corp., et al., 493 F.2d 1076 (1973). A detailed discussion of Borel is addressed in section II(E) below.

[9] In re: Am. Med. Sys., Inc., Pelvic Repair Sys. Products Liab. Litig., MDL 2325, 2012 WL 432533 (Feb. 7, 2012) (Ruling "finally, a number of these actions are brought by plaintiffs who were implanted with multiple products made by multiple manufacturers. Centralization of the three MDLs in one court will allow for coordination of any overlapping issues of fact in such multi-product, multi-defendant actions.").

[10] "Umbrella orders provide that all assertedly confidential material disclosed (and appropriately identified, usually by stamp) is presumptively protected unless challenged." *Manual for Complex*

reads: "Any document or other material which is marked CONFIDENTIAL or HIGHLY

CONFIDENTIAL or the contents thereof, may be used by a party, or a party's attorney, expert

witness, consultant, or other person to whom disclosure is made, only for the purpose of this

action."[11]  A majority of the attorneys involved in the pelvic mesh litigation have executed all

four SPOs and have access (or could easily get access) to all electronically stored information

produced in each MDL database.

## II.    LEGAL ARGUMENTS

### The Confidentiality Issue

The issue before the court is whether it should allow the access to and exchange of

documents discovered in one pelvic mesh MDL for use in another pelvic mesh MDL.  Currently,

the parties are limited to the use of "confidential" documents produced in one specific action.

It is difficult to fully discuss the cross-MDL utilization of documents without taking a step back

and looking at the reason why the parties are in this conundrum.  Pelvic mesh defendants have

produced hundreds of thousands of documents and designated almost every one as "confidential"

or "highly-confidential".  At the most recent status conference Magistrate Judge Stanley

explained:

> "Let me just say that my experience with over-designation of
> confidentiality that before people start trying to offer documents into evidence or
> support of motion, we judges don't really care much.  So long as the documents
> keep moving, you can designate them almost anything and it's not going to be a
> problem for us.
>
> The problem is if you're trying to withhold stuff from the public record or
> prevent a party from being an advocate from their client. At that point, you are
> going to run headlong into an extremely high wall that the district judge presiding
> over these cases sets by local rule, by 26, Rule 26 of the Federal Rules, that you
> have to meet a very high standard to keep your documents off the public record.

---

*Litigation,* § 11.432, at 64 (4th ed.2004)."  <u>Massey Coal Services, Inc. v. Victaulic Co. of Am.</u>, 249
F.R.D. 477, 479 (S.D.W. Va. 2008).
[11]Ethicon PTO #11 p. 4, ¶ 6; Bard PTO #7 p. 4, ¶ 6;  BS PTO #11, p. 3-4, ¶6; AMS PTO #13, pp. 3-4, ¶6.

And I believe that wall may be even higher in bellwether cases because it's not just simply the resolution of a private dispute.  This is truly an issue of national implication….."    (3/21/13 Status Conference transcript, p. 48 lines 22-25 and p. 49, lines 1-13).

It is clear that plaintiffs have been restrained in the ability to use relevant and pertinent documents, in expert depositions for example, because of defendants' over-designation of confidential documents.[12]  Plaintiffs in the Bard MDL recently negotiated an agreement for the preparers of one deposition to utilize documents from another MDL; however, that was a limited circumstance.   It has come to a point where the current system impedes plaintiffs' ability to fully prepare the case and be advocates for our clients.

The SPOs entered in the pelvic mesh MDLs allow the producing party to designate a document as "CONFIDENTIAL" if it "believes in good faith constitutes or discloses information that qualifies for protection pursuant to Fed. R. Civ. P. 26(c), specifically information that is a trade secret or other confidential research, development, or commercial information, and materials that are deemed confidential under Federal Drug Administration ("FDA") regulations and Health Insurance Portability and Accountability Act ("HIPPA") statute and/or regulations."[13]  Judge Stanley addressed what constitutes confidential information pursuant to Rule 26(c) in Massey Coal Services, Inc. et al. v. Victaulic Company of Am., et al., 249 F.R.D. 477 (2008), stating as follows:

"The word "confidential" modifies "research [information]," "development [information]," and "commercial information." The subsection, by its use of the word "other," equates "trade secret" with the three types of "confidential ... information." Thus the subsection treats equally "a trade secret or other confidential ... commercial information." Consistent therewith, in <u>United States v. International Bus. Mach. Corp.,</u> 67 F.R.D. 40, 46-47 (S.D.N.Y.1975), the court wrote that in determining whether documents contain confidential commercial information, the court will be guided by considerations commonly employed when determining if certain information rises to the level of a trade secret such as

---

[12] It goes without saying that but for the "confidential" designation these documents would be usable.
[13] Ethicon PTO #11 p. 2, ¶ 2; Bard PTO #7 p. 2, ¶ 2;  BS PTO #11, p. 2, ¶2, and AMS PTO # 13, p. 2, ¶ 2.

is embodied in Section 757 of the Restatement of Torts. There, [it] is suggested that factors of secrecy to be considered when determining if given information ought to be treated as a trade secret are: (1) the extent to which the information is known outside of [the] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of measures taken by [the business] to guard the secrecy of the information; (4) the value of the information to [the business] and to [its] competitors; (5) the amount of effort or money expended ... in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." Id. at 482.

Many of the thousands of documents designed as "confidential" by defendants do not meet the requirements set forth above. Plaintiffs address the confidential designation issue herein because it is imperative to acknowledge why we are at this juncture. However, this issue is extremely detailed and involves a review of thousands of documents. The issue will most likely have to be separately briefed unless the parties can come up with an agreement for a fast track de-designation process.

### Use of Documents Across MDLs

**A.  The documents will remain "confidential" and subject to a comprehensive SPO.**

What the plaintiffs in these MDLs are asking for is a plan that would allow all parties to immediately access and use documents produced in one MDL in another MDL for purposes of this litigation only.  Plaintiffs suggest that the current SPOs be amended to state that "confidential" documents may be used where relevant among the pelvic mesh MDLs pending before this court.   Plaintiffs propose that the documents designated as "highly confidential" should remain in a separate category wherein the parties agree to notify the affected producer of the intent to use the document prior to use in accordance with the existing SPOs. There is a comprehensive SPO in place in each MDL and the "confidential" documents produced in one MDL will be subject to the "confidential" designation in the other MDLs.

While determining whether a settlement agreement and mediation documents from another litigation should be discoverable, The United States District Court for the Southern District of Florida explained that, "[t]he Defendants' argument that the settlement agreement in the *Day* matter [Day v. Procter & Gamble Distributing LLC, *Case No: 5:07–cv–00120–DF (E.D.Tex.2007)*] was confidential and thus not discoverable in this action, also fails. In *Jeld–Wen, Inc.,* the Court found that although the documents sought to be discovered were subject to a confidentiality agreement in a prior litigation, because the documents were subject to a confidentiality order in the case for which they were sought, the documents were not barred from discovery. *Id.* The undersigned concurs with the analysis in *Jeld–Wen* and concludes that the Confidentiality Agreement in the *Day* matter does not preclude discovery of the Settlement Agreement herein, particularly because there is a thorough and comprehensive Confidentiality and Protective Order in place in this case." In re Denture Cream Products Liab. Litig., 09-2051-MD, 2011 WL 1979666 (S.D. Fla. May 20, 2011) (citing Jeld–Wen, Inc. v. Nebula Glass Int'l, Inc., 2007 WL 1526649, *3 (S.D. Fla. May 22, 2007).  We have the same situation here. Plaintiffs are seeking cross-utilization of documents and the relevant information should not be barred from discovery.  The documents will be subject to a comprehensive SPO in all cases at issue and will remain "confidential" until challenged.  Plaintiffs respectfully request that the court consider the proposed amendment to the pelvic mesh SPOs.

**B.  Cross-MDL production conserves resources and promotes efficiency.**

The JPML centralized the pelvic mesh cases to "eliminate duplicative discovery, prevent inconsistent pretrial rulings and conserve the resources of the parties, their counsel and the judiciary."[14]  The overarching goal of 28 U.S.C § 1407(a) for selecting a transferee forum is to

---

[14] See, e.g. In re: Am. Med. Sys., Inc., Pelvic Repair Sys. Products Liab. Litig., MDL 2325, 2012 WL 432533 (J.P.M.L, Feb. 7, 2012).

find a court that will advance the "convenience of the parties and will promote the just and efficient conduct of the actions."  In order to eliminate duplicative discovery and conserve the resources of the parties, plaintiffs seek access to and the exchange of documents produced in one MDL for use in another.  The elimination of redundancy and wastefulness are two reasons these cases were centralized in the first place.

Courts from around the country regularly allow the sharing of information disclosed in discovery in one civil action with and between plaintiffs involved in similar litigation to promote efficiency and conserve resources.   See, e.g., Burlington City Bd. of Educ. v. U.S. Mineral Products Co., Inc., 115 F.R.D. 188, 190 (M.D.N.C. 1987).  ("The courts considering the matter have overwhelmingly and decisively endorsed the sharing of discovery information among different plaintiffs, in different cases, in different courts."); Cipollone v. Liggett Group, Inc., 113 F.R.D. 86, 91 (D.N.J. 1986) ("The court cannot ignore the might and power of the tobacco industry and its ability to resist the individual claims asserted against it and its individual members. There may be some claimants who do not have the resources or such able and dedicated counsel as in this case to pursue the thorough investigation which these cases require. To require that each and every plaintiff go through the identical long and expensive process would be ludicrous."); Nestle Foods Corp. v. Aetna Casualty & Sur. Co., 129 F.R.D. 483, 486 (D.N.J. 1990) ("Using fruits of discovery from one lawsuit in another litigation, and even in collaboration among various plaintiffs' attorneys, comes squarely within the purposes of the Federal Rules of Civil Procedure. United States v. Hooker Chemicals & Plastics Corp., 90 F.R.D. at 426."); Baker v. Liggett Group, Inc., et al., 132 F.R.D. 123 (1990) ("defendants have not shown good cause to preclude dissemination to litigants and lawyers in similar tobacco tort cases, subject to the protective order pertaining to the confidential information being issued in

this case………it is particularly appropriate that this principle be applied in tobacco tort cases in which individual plaintiffs must litigate against large corporate defendants.") .

All plaintiffs in these MDLs are similarly situated, asserted similar causes of actions, and have suffered similar damages.  The allowance of exchange of document across MDLs will conserve resources and promote efficiency.

### C.  The documents plaintiffs seek to use are relevant to the claims asserted against the MDL defendants.

As detailed above, there are many instances where a document produced in one MDL is relevant to a claim asserted in another MDL. Federal Rule of Civil Procedure 26(b)(1) provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense--including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter. For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence. All discovery is subject to the limitations imposed by Rule 26(b)(2)(C)."  The United States District Court for the Northern District of Indiana explained, "For discovery purposes, relevancy is construed broadly to encompass "any matter that bears on, or that reasonably could lead to other matter[s] that could bear on, any issue that is or may be in the case. Chavez v. DaimlerChrysler Corp., 206 F.R.D. 615, 619 (S.D.Ind.2002) (*quoting* Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351, 98 S.Ct. 2380, 2389, 57 L.Ed.2d 253 (1978))." Coleman v. Am. Family Mut. Ins. Co., 274 F.R.D. 641, 643 (N.D. Ind. 2011).

Plaintiffs provided several examples of how documents produced in one MDL are relevant to the claims, defenses and issues asserted in another MDL pending before this court.

Common characteristics of all the pelvic mesh devices, the common injuries suffered by the plaintiffs, common experts, common sales techniques, requirements to stay apprised of "state-of-the-art" developments and multi-product plaintiffs are just a few examples of the types of claims and issues where cross-MDL discovery will be useful and relevant.

### D.  The proposed amendment to the SPOs is limited in scope.

Plaintiffs are requesting that the amendment to the SPOs be limited in scope, specifically allowing "confidential" documents to be used where relevant among the pelvic mesh MDLs pending before this court.  Plaintiffs are not requesting an unfettered "sharing protective order" that would "enable other litigants, not involved in this case, to obtain the [confidential] information without taking further action."  Gil v. Ford Motor Co., CIV A 1:06CV122, 2007 WL 2580792 (N.D.W. Va. Sept. 4, 2007).  In Gil, Plaintiff Intervenor, Elmer U. Currence, filed an Opposition to Ford Motor Company's Motion for a Protective Order.  The issue before The United States District Court for the Northern District of West Virginia was "whether the Court should enter a protective order covering 183 pages of documents and if so, should the protective order be non-sharing."[15]  Id. at 1.  Gil is distinguishable from the issues addressed herein for many reasons.  First, there are already SPOs in place designating hundreds of thousands of documents as "confidential" until challenged.[16]  In Gil the court was deciding whether a "non-

---

[15] Ford already sought, and was granted a "sharing protective order" for other "confidential" documents produced in the litigation.  See Gil v. Ford Motor Co., CIV A 1:06CV122, 2007 WL 2580792 (N.D.W. Va. Sept. 4, 2007).

[16] As addressed above, many documents marked "confidential" do not meet the requirements addressed by Judge Stanley in Massey Coal Services, Inc. et al. v. Victaulic Company of Am., et al., 249 F.R.D. 477 (2008).  The court in Menendez ex rel. Menendez v. Wal-Mart Stores E. LP, 1:10-CV-53, 2012 WL 90140 (N.D. Ind. Jan. 11, 2012) explained, "[T]his is not a case where Defendants are attempting to seal *all* of their discovery documents based only on a general concern that Plaintiffs might share them with others-a basis which clearly falls short of establishing good cause. *See, e.g., Ward,* 93 F.R.D. at 579–80 (declining to enter a non-sharing protective order where plaintiffs voluntarily agreed not to disclose any trade secrets and the only remaining basis for the protective order was defendant's fear that plaintiffs would disclose discovery to certain "fly-by-night" non-lawyer experts); *Hooker,* 90 F.R.D. at 425–36 (finding that a non-sharing protective order was not warranted where defendants did not show that trade

sharing" protective order should be entered covering 183 documents.  Second, plaintiffs herein are requesting an amendment to the SPOs to allow cross-MDL utilization of documents for the pelvic mesh cases centralized before the Southern District of West Virginia only. In Gil the plaintiff was seeking to share "confidential" documents with any plaintiff known or unknown to the parties.   Finally, as addressed in sections (A), (B) and (C) above, plaintiffs have established relevance and usefulness of the documents to the issues in this litigation, as well as shown that without use of the documents plaintiffs will be unable to fully prepare the case or be advocates for our clients.

### E.  **Manufacturers are held to the standard of an expert.**

Manufacturers in the pelvic mesh industry are held to a high standard of knowledge. They are required to keep abreast of "state-of-the-art" products and new discoveries in their field.  In fact, The United States Court of Appeals, Fifth Circuit in Borel v. Fibreboard Paper Products Corporation, et al., 493 F.2d 1076 (1973) explained, "Manufacturers are held to the knowledge and skill of an expert.  This is relevant in determining (1) whether the manufacturer knew or should have known the danger and (2) whether the manufacturer was negligent in failing to communicate this superior knowledge to the user or consumer of its product. (citing Wright v. Carter Products, Inc. 2 Cir. 1957, 244 F.2d. 53)."  Documents produced across MDLs will help shed light on what the pelvic mesh manufacturers knew or should have known about these implantable devices at any given time.  Moreover, the documents will help determine

---

secrets or other proprietary information would be disclosed and instead merely argued that disclosure of discovery would be "detrimental to its position in parallel lawsuits"); *Patterson,* 85 F.R.D. at 153) (denying defendant's motion for a non-sharing protective order where defendant did not show that discovery involved trade secrets or confidential proprietary information, but instead simply expressed concern that plaintiff wanted to develop additional litigation against defendant). As a result, Plaintiffs' objection that 'Defendants' proposed Protective Order is too restrictive, and that a "sharing order" is more appropriate, is overruled."

whether the pelvic mesh companies were negligent in failing to communicate the information known by the industry as a whole.  The court explained, "The manufacturer's status as an expert means that at a minimum he must keep abreast of scientific knowledge, discoveries, and advances and is presumed to know what is imparted thereby." Borel, 493 F.2d at 1089 (1973). Access to and exchange of documents produced in one MDL for use in another MDL will be relevant and pertinent in addressing what type of scientific information, discoveries and advances were known by the pelvic mesh industry.

## CONCLUSION

For the foregoing reasons, plaintiffs respectfully request that the SPOs be amended to state that "confidential" documents may be used where relevant among the MDLs pending before this court.

This 12th day of April, 2013.

By:     /s/ Henry G. Garrard, III
        Henry G. Garrard, III
        hgg@bbgbalaw.com
        Plaintiffs' Coordinating
        Co-Lead Counsel
        Georgia Bar No. 286300

Blasingame, Burch, Garrard & Ashley, P.C.
P.O. Box 832
Athens, GA  30603
706-354-4000

By:     /s/ Fred Thompson, III
        Fred Thompson, III
        fthompson@motleyrice.com
        Plaintiffs' Coordinating
        Co-Lead Counsel
        Motley Rice LLC
        South Carolina Bar No. 5548

28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
843- 216-9118

                                        By:     /s/ Bryan F. Aylstock
                                                Bryan F. Aylstock
                                                BAylstock@awkolaw.com
                                                Plaintiffs' Coordinating
                                                Co-Lead Counsel
                                                Florida Bar No. 078263

Aylstock, Witkin, Kreis & Overholtz
17 E. Main Street, Suite 200
Pensacola, Florida 32502
877-810-4808

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION**

| | |
|---|---|
| **In re: C.R. Bard, Inc., Pelvic Repair System** | **MDL No. 2187** |
| **Products Liability Litigation** | **2:10-md-2187** |
| _____ | |
| **In re: American Medical Systems, Inc., Pelvic Repair System** | **MDL No. 2325** |
| **Products Liability Litigation** | **2:12-md-2325** |
| _____ | |
| **In re: Boston Scientific Corporation Pelvic Repair System** | **MDL No. 2326** |
| **Products Liability Litigation** | **2:12-md-2326** |
| _____ | |
| **In re: Ethicon Inc., Pelvic Repair System** | **MDL No. 2327** |
| **Products Liability Litigation** | **2:12-md-2327** |
| _____ | |

**THIS DOCUMENT RELATES TO ALL CASES**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on April 12, 2013, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the CM/ECF participants registered to receive service in this MDL.

By:     _/s/ Henry G. Garrard, III_
        Henry G. Garrard, III
        hgg@bbgbalaw.com
        Georgia Bar No. 286300
        Plaintiffs' Lead Counsel and
        Member of Plaintiffs' Steering Committee

Blasingame, Burch, Garrard & Ashley, P.C.
P.O. Box 832
Athens, GA  30603
(706) 354-4000