## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

----------------------------------------
IN RE:  C. R. BARD, INC., PELVIC REPAIR          MDL NO.
SYSTEM PRODUCTS LIABILITY LITIGATION             2:10-MD-2187


----------------------------------------
IN RE:  AMERICAN MEDICAL SYSTEMS, INC.,          MDL NO.
PELVIC REPAIR SYSTEM PRODUCTS                    2:12-MD-2325
LIABILITY LITIGATION


----------------------------------------
IN RE:  BOSTON SCIENTIFIC CORPORATION,           MDL NO.
PELVIC REPAIR SYSTEM PRODUCTS                    2:12-MD-2326
LIABILITY LITIGATION


----------------------------------------
IN RE:  ETHICON, INC., PELVIC REPAIR             MDL NO.
SYSTEM PRODUCTS LIABILITY LITIGATION             2:12-MD-2327


----------------------------------------
IN RE:  COLOPLAST CORP. PELVIC SUPPORT           MDL NO.
SYSTEMS PRODUCTS LIABILITY LITIGATION            2:12-MD-2387




### STATUS CONFERENCE

### HELD ON MAY 23, 2013
### BEFORE THE HONORABLE JOSEPH R. GOODWIN, DISTRICT JUDGE
### AND THE HONORABLE CHERYL A. EIFERT, MAGISTRATE JUDGE



Court Reporter:          Teresa L. Harvey, RPR, RMR, RDR, CRR
                         Teresa_Harvey@wvsd.uscourts.gov
                         Telephone: 304-254-8052

Proceedings recorded by mechanical stenography;
transcript produced by computer.

*APPEARANCES*

**For the Plaintiffs:**

Henry G. Garrard, III
Josh B. Wages
**BLASINGAME, BURCH, GARRARD, ASHLEY, P.C.**
P. O. Box 832
Athens, GA  30603

Bryan F. Aylstock
Renée D. Baggett
**ALYSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC**
17 East Main St., Suite 200
Pensacola, FL  32502

Fred Thompson, III
**MOTLEY RICE, LLC**
P. O. Box 1792
Mt. Pleasant, SC  29464

Clayton A. Clark
Riley Burnett
**CLARK BURNETT LOVE & LEE**
440 Louisiana St., Ste. 1600
Houston, TX  77002

Amy Eskin
**LEVIN SIMES**
353 Sacramento Street, Ste. 2000
San Francisco, CA  94111

Aimee H. Wagstaff
**ANDRUS, HOOD & WAGSTAFF, PC**
1999 Broadway, Suite 4150
Denver, CO  80202

Carl N. Frankovitch
**FRANKOVITCH, ANETAKIS, COLANTONIO & SIMON**
337 Penco Road
Weirton, WV  26062

Paul T. Farrell, Jr.
**GREENE, KETCHUM, BAILEY, WALKER, FARRELL & TWEEL**
P. O. Box 2389
Huntington, WV  25724-2389

*APPEARANCES (CONTINUES)*

Harry F. Bell, Jr.
**THE BELL LAW FIRM, PLLC**
P. O. Box 1723
Charleston, WV  25326-1723

Thomas P. Cartmell
**WAGSTAFF & CARTMELL**
4740 Grand Ave., Ste. 300
Kansas City, MO  64112

Fidelma Fitzpatrick
**MOTLEY RICE, LLC**
321 South Main Street
Providence, RI  02903

Derek H. Potts
**THE POTTS LAW FIRM**
908 Broadway, Third Floor
Kansas City, MO  64105

Rayna E. Kessler
**LOPEZ McHUGH LLP**
712 East Main Street
Suite 2A
Moorestown, NJ  08057

Bret Stanley
**LAW OFFICES OF A. CRAIG EILAND, P.C.**
1 Pennzoil Place
South Tower, Ste. 2150
711 Louisianna Street
Houston, TX  77002

Martin D. Crump
Robert D. Cain, Jr.
**DAVIS & CRUMP, P.C.**
1712 15th St., Ste. 300
Gulfport, MS  39501

Alan S. Lazar
**MARLIN & SALTZMAN, LLP**
29229 Canwood St., Ste. 208
Agoura Hills, CA  91301

*APPEARANCES (CONTINUES)*

Mark Mueller
**MUELLER LAW**
404 W. 7th Street
Austin, TX 78701

Robert Salim
**Law Offices of Robert Salim**
1901 Texas Street
Natchitoches, LA 71457

**For the Defendants:**

Christy D. Jones
Donna Brown Jacobs
**BUTLER SNOW**
P. O. Box 6010
Ridgeland, MS 39158

Barbara R. Binis
Stephen J. McConnell
**REED SMITH, LLP**
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103

Janet H. Kwuon
**REED SMITH, LLP**
355 South Grand Avenue
Suite 2900
Los Angeles, CA 90071

Deborah A. Moeller
Jon Strongman
**SHOOK, HARDY & BACON, LLP**
2555 Grand Blvd.
Kansas City, MO 64108-2613

Michael Bonasso
**FLAHERTY SENSABAUGH BONASSO, PLLC**
P. O. Box 3843
Charleston, WV 25338-3843

*APPEARANCES (CONTINUES)*

Michael J. Farrell
Erik W. Legg
**FARRELL, WHITE & LEGG, PLLC**
P. O. Box 6457
Huntington, WV  25772-6457

Marc E. Williams
Melissa Foster Bird
**NELSON MULLINS**
1035 Third Ave., Suite 300
Huntington, WV  25701

Richard B. North, Jr.
**NELSON MULLINS RILEY & SCARBOROUGH**
201 17th St., NW, Suite 1700
Atlanta, GA  30363

Lori G. Cohen
**GREENBERG TRAURIG, LLP**
Terminus 200
3333 Piedmont Road, NE
Suite 2500
Atlanta, GA 30305

Ronn B. Kreps
**FULBRIGHT & JAWORSKI**
2100 IDS Center
80 South Eighth St.
Minneapolis, MN  55402-2112

Joshua A. Klarfeld
**ULMER BERNE LLP**
1660 West 2nd St., Ste. 1100
Cleveland, OH  44113-1448

Allison O. Van Laningham
**VAN LANINGHAM DUNCAN, PLLC**
300 N. Greene St., Suite 850
Greensboro, NC  27401

Jennifer L. Schuster
**WOODEN & McLAUGHLIN**
211 N. Pennsylvania Street
One Indiana Square, Ste. 1800
Indianapolis, IN  46204-4208

*APPEARANCES (CONTINUES)*

Thomas L. Craig
**BAILES, CRAIG & YON, PLLC**
401 10th St., Ste. 500
The St. James Building
Huntington, WV  25701

Lana K. Varney
**FULBRIGHT & JAWORSKI**
98 San Jacinto Blve., Ste. 1100
Austin, TX  78701

Matthew P. Moriarty
**TUCKER ELLIS, LLP**
925 Euclid Ave., STe. 1150
Cleveland, OH  44115

David B. Thomas
Philip J. Combs
**THOMAS COMBS & SPANN, PLLC**
P. O. Box 3824
Charleston, WV  25338

Proceedings had before the Honorable Joseph R. Goodwin, United States District Judge, and the Honorable Cheryl Eifert, United States Magistrate Judge, for the Southern District of West Virginia, in Charleston, West Virginia, on May 23, 2013:

*JUDGE GOODWIN:*   Good morning.

*COURTROOM DEPUTY CLERK:*   The matter before the Court is In Re: C. R. Bard, Inc., Civil Action No. 2:10-md-2187; In Re: American Medical Systems, Inc., Civil Action No. 2:12-md-2325; In Re: Boston Scientific Corp., Civil Action No. 2:12-md-2326; In Re: Ethicon, Inc., Civil Action No. 2:12-md-2327; In Re: Coloplast Corp., Civil Action No. 2:12-md-2387, Pelvic Repair Systems Products Liability Litigation.

*JUDGE GOODWIN:*   Well, it's nice to see all of you this morning.  The following attorneys are excused from today's conference:  Dustin Rawlin and Rob Adams.  If you are not one of those two people and you're not here, you're not excused.

As with last month's conference, I will address general issues and then turn the conference over to Judge Eifert to deal with important matters.

The first item on the agenda deals with the tolling agreement.  I want to express my appreciation to counsel, especially Mr. Garrard and Mr. North in taking the lead on getting this agreement worked out.  If somebody else took the lead, thank you.  As I've expressed to you before, this

agreement is significant from a court administration standpoint.  It will be entered upon receipt.

Is there anything further on that?

MR. GARRARD:  No, sir, Your Honor.  We will have the agreement to the Court no later than tomorrow.  There are two items --

JUDGE GOODWIN:  Correct.

MR. GARRARD:  -- that Ms. Fife notified us needed to be cleaned up, and Mr. North and I spoke earlier, and I think we have an agreement on that, so we should have it to the Court tomorrow.

JUDGE GOODWIN:  All right.  The next item deals with the case management and scheduling orders for 2014.  I note that the trial pool structure was to be comprised of sixteen total cases - eight from plaintiff, eight from defendants - from which I was to choose five bellwether cases, though I understand that in one of the MDLs, at least, there may be some modification of those numbers, by agreement.  At any rate, by e-mail in April, and pursuant to the request of the parties, I instructed that I would set two more rounds of trials in 2014.  This will be the third round of trials; right?  And they will be Bard, AMS, Ethicon, Boston Scientific, Bard, AMS, Ethicon, Boston Scientific.  Trials will begin in April and conclude in September of 2014.

Anybody want to address that topic?

MR. GARRARD:   Your Honor, Henry Garrard.  We have
been working on the potential scheduling orders for, in April,
the Bard/Sofradim trial, in which we already have an
understanding as to who the plaintiffs would be for that trial.
Ms. Moeller and I have talked and we are within just a little
bit of being able to submit an order to the Court.  We've got
an issue dealing with preservation of evidence that we're
trying to work out, and a couple other small issues.

But then we come to the issue of the next set of cases to
be tried, and I think this is true of all of the MDLs for the
sets of cases beyond those already scheduled and already having
scheduling orders that are setting trials for December,
January, February, and in that additional cases and makeups of
cases for further setting of cases, we from the plaintiffs'
side think that after the first set of bellwethers, which are
already scheduled, that there needs to be some addition to the
selection group and that we believe that the cases to be
considered need to include multiple products and an individual
plaintiff, and potentially multiple defendants, because we will
have gotten through sets of bellwethers already in each set of
cases.  And we would like to be able to add ten per side to the
trial group pools for each of those, and then be able to select
within the realities of the census here, and the census of
cases does include substantial multi-product plaintiffs, some
multi-defendant plaintiffs, and that is the issue that is

holding us up in terms of getting further scheduling orders in the hands of the Court, because we frankly don't have a concurrence of opinion with the other side.  You know, we --

JUDGE GOODWIN:  I think we've talked about this before, but I understand you're talking in a slightly different context than prior discussions.

MR. GARRARD:  Well, I am, Your Honor, because we will have had bellwether trials -- first sets of bellwether trials. And we're very mindful of the Court's ruling on that, and I'm not arguing about that at all, but it is for the next groups that we think, on our side, that we need some modification of that, and we wanted the Court to know that we think that.  And we think it needs to be not just a consideration of should it be an SUI case?  Should it be a prolapse case?  And we have divergence of views, and therein lies the reason -- most of the reasons of why we don't have proposed orders to the Court.  And we're trying to work through that, but any guidance from the Court might be helpful to us.

We understand, and we want this court as, to use your terms, the center of the universe, but we've got to, from our perspective, keep things moving that represent the totality of the cases.  And, quite frankly, if we don't have pressure from the plaintiffs' side on the defense side, we never come to the goal that MDLs are about, and that is resolution.  And so we're trying to do our part in regard to that.

*JUDGE GOODWIN:*  What's the case before Judge Molberg in Texas?  Is that a multi-product?  I think that's his name.

*MR. GARRARD:*  It is, yes, sir.

*JUDGE GOODWIN:*  And that's still set in June?

*MR. GARRARD:*  It's not June, is it?

*MR. CLARK:*  I think it got moved, Your Honor, but I'm not certain of that.

*MS. BINIS:*  Yes, Your Honor, it's been put off.

*JUDGE GOODWIN:*  All right.  Well, I have a call in to him as of yesterday, but I haven't heard back from him, so I'll probably learn from you what I need to know.

Well, somebody want to talk from the other side about this briefly?  Ms. Moeller?

*MS. MOELLER:*  Judge, I have even a more fundamental issue about the April trial date in MDL 2187.  We picked all those cases, as you'll recall, way back when, before we had the mass cases where we had trial after trial after trial.

*JUDGE GOODWIN:*  Scoot that microphone over in front of you, will you?

*MS. MOELLER:*  I'm a low talker.  Sorry about that, Judge.  We have -- from my perspective, I have two different clients that are in two different foreign countries in this group that's scheduled for April, and I'd like some guidance from the Court.  I'd like to just have one of my clients having to be worked up for this one trial date as opposed to spending

all that time and expense and only one case getting tried in April.  I'd like some guidance from you to see if there's a way that we can be more efficient in the use of our time.  The thought is we'll have a trial picked to you by August, and it seems a little bit wasteful and expensive to do all of that discovery for a case that -- we have three from one defendant and one from the second defendant.

JUDGE GOODWIN:  How many cases will we have tried by then?

MS. MOELLER:  There will be. . .seven?

MR. GARRARD:  Four.  Four of our cases, Your Honor, and presumably one AMS, one Ethicon, and one Boston Scientific. Then we rotate back around into the Bard/Sofradim MDL.

JUDGE GOODWIN:  Why don't I get back to you through Kate?  Let me think about this a little bit.

MS. MOELLER:  Okay.  Thank you, Judge.

JUDGE GOODWIN:  Ms. Binis?

MS. BINIS:  Your Honor, on the other issue with adding ten plaintiffs, it was our understanding from the beginning of this process that the five that you were going to choose next month would be the five cases that were tried one after the other.

JUDGE GOODWIN:  That's right.

MS. BINIS:  And that's our understanding of the process, and that's what we've been working towards in the

process.

   *JUDGE GOODWIN:* That's where it is. That's where it is.

   *MS. BINIS:* From my client, I don't think we see the need to expand the pool.

   *JUDGE GOODWIN:* That's where it is unless I change my mind, which as you can tell, I'm just all over the place. I change my mind all the time.

   *MR. THOMPSON:* Your Honor, this is Fred Thompson.

   *JUDGE GOODWIN:* Mr. Thompson.

   *MR. THOMPSON:* Certainly we understand the Bard first setting, the first five cases. I was here, and I think that the total census was 110 cases, and so it made perfect sense to do the Bard in the way that it was done and now to try those five cases.

   *JUDGE GOODWIN:* Uh-huh.

   *MR. THOMPSON:* But rotating these trials from one to the next to the next in essence means, if Ms. Binis' position is correct, then she's loaded up for three, plus three, plus three forever in this court with single-product SUI cases. And now that the MDL is 26,000 total cases, it seems to me as though it's a good idea that the Court have the ability to have multiple options to pick from as we go forward. I think that if you look at the rotation that's been set up, if in fact this initial trial pool is the trial pool, well, then, in essence

we're probably set through 2016, and we're going to have a host
of clients with different types of injuries that are simply not
going to get a hearing in this court.  And that has all sorts
of implications, but my biggest problem is that I think that it
limits your options to pick and choose as we go forward.  And
heaven knows the burden on working up initially some additional
cases pales in comparison to the burden that we're all
undergoing as a global sense.  And so I just recommend that we
at least consider expanding those pools so that you will have
more tools in your toolbox as the year goes on.  Thank you.

    *JUDGE GOODWIN:*  I always reserve the right to be
flexible and to change things as we go along.  We are talking
down the road apiece.  We really are.  Frankly, we got
ourselves in a bit of a problem because one side one time and
the other side the other time, if I remember my -- if I
remember the bidding correctly, tried to manipulate the trial
pool.  And I thought I was fairly clear in the beginning that
pick the cases that you think are fairly representative, each
side pick ones they think are fairly representative, and then
I'll pick five of them.  And in one instance somebody loads
them up this way, and in another instance they're loaded up
another way, and that didn't really help me much.

    And I recognize in the out months there is -- there has
been and continues to be substantial disagreement.  And based
on the very good work that counsel -- lead counsel for all the

parties have done so far, I'm loath not to attempt to resolve

agreements that they can't resolve.  I simply will tell you I

can't do it today.  I'll think about what you've told me and

I'll take a further look at it, and maybe I'll have to get a

few of you to jump on an airplane and come back and talk to me

a little bit about it, but I'm just not prepared to say

anything about it today.

Ethicon wanted me to remove the stipulation from the

agenda.  Is that right?

MR. AYLSTOCK:  Your Honor, Brian Aylstock.  I believe

that's so.  I'm happy to kind of discuss it, but we're still

working on it and there may have been some developments in New

Jersey yesterday that may affect it, but I haven't had a chance

to speak to Ms. Jones about it.

JUDGE GOODWIN:  I don't need to hear about it if

you-all don't need to tell me about it.

MS. JONES:  I only want Your Honor to be aware of the

fact that I reported last time we were here that I thought we

had a deal.  I still believe that we are -- I still hope we do.

I understand from Mr. Aylstock that we may not.  They were the

ones that wanted this off of the agenda, but I'm still hopeful

that that's not going to be an issue for Your Honor.

JUDGE GOODWIN:  All right.  Well, I'll just -- I'll

join you in the hope business and see how it works out.

Again, it may well be that -- our scheduled conference is

a ways off, the next conference.

When is it, Kate?

*LAW CLERK:*  August 1st.

*JUDGE GOODWIN:*  August 1st, and we've got the Bard trial starting the first week in July -- second week in July. So I may have to call some of you back for any number of issues before then.  I'll try not to.

I may be off message here.

Kate, is the next item the involvement of Plaintiffs' Executive Committee members in state court proceedings in coordination of discovery?

*LAW CLERK:*  Yes.

*JUDGE GOODWIN:*  Who will address that?

*MS. JONES:*  I will, Your Honor.

*JUDGE GOODWIN:*  All right.

*MS. JONES:*  Christy Jones for Ethicon.  And let me first clarify, and I think it's probably I was in error of it. It refers to Plaintiffs' Executive Committee members which it ought to more appropriately refer to members of the Steering Committee as opposed to the Executive, and I'm not really sure, Your Honor, that -- that -- I guess I'm asking for the assistance of the Court to the extent that it is appropriate.

As Your Honor is well aware, we have tried to schedule the discovery and the depositions to be efficient, to be taken one time, as best we can, in the state and the MDL.  The plaintiffs

have now asked for over 70 depositions in this litigation in addition to what's been done in New Jersey already.  All of those depositions the plaintiffs contemplate will take, although we disagree, more than one day.  And, frankly, we are having some difficulty and anticipate that it's going to get worse in that we have cases pending in Texas and New Jersey where we have people that are involved in this litigation who are also arbitrarily noticing depositions of key people, noticing them for a second time, demanding that they be made available for another day, and so forth.

I understand, Your Honor, that Your Honor can't necessarily control what goes on in the state court --

JUDGE GOODWIN:  Yeah, but I can control what -- who is on the Steering Committee.

MS. JONES:  And what we're asking, frankly, Your Honor, is that people that are involved in this litigation work with us and not arbitrarily notice or facilitate the separate noticing of other depositions.  People clearly have a right to take depositions, but we are working under some difficult circumstances in order to get ready for the trials that are out there; and to the extent that we could get some assistance from the Court, we would appreciate it.

JUDGE GOODWIN:  I try to work cooperatively with my state colleagues.  Sometimes it works better than it does other times, but I do expect the leadership of the plaintiffs' side

to realize that -- and I know I'm putting this on the record and you can wave it around in state court and to the disadvantage of the MDL, but I do believe this is the center of gravity now, just on sheer numbers.  There isn't anybody out there that's got anywhere near the cases that are in federal court; and we are the dog and we are going to wag the tail, and it's not going to get bobbed.  So I don't -- I am not -- without allowing plaintiffs to speak up and challenge what counsel's just said, I'm not siding with her on something I don't know all the facts, but I will say that I intend that nothing be done by members of the leadership to interfere with this litigation.

             MR. GARRARD:  Your Honor --

             MR. CLARK:  If I may --

             JUDGE GOODWIN:  Yes, sir?

             MR. GARRARD:  From plaintiffs' side, we're faced with a difficult problem, and that difficult problem is this: We are told that the defense can control the spigot.

             JUDGE GOODWIN:  Can control what?

             MR. GARRARD:  The spigot.

             JUDGE GOODWIN:  Uh-huh.

             MR. GARRARD:  They can keep the spigot dripping so slowly that, frankly, they think they can put us out of business.

             JUDGE GOODWIN:  Uh-huh.

*MR. GARRARD:*  And some of the dynamic that goes on outside of this court is in no way meant to take away from the center of gravity of this court, but is us being forced to try to make sure that they can't succeed with that.  I've told the Court once previously, and I won't name a defendant, and I don't want to name the defendant, but I've been told that -- and maybe it's my age, I don't know, but I've been told that --

*JUDGE GOODWIN:*  That's probably it.

*MR. GARRARD:*  -- you'll be dead before you can deal with enough cases in federal court to get us to do anything.

I know that's not what this Court's intention is, it's not our intention, but some of the demands on us are clients who are saying, "What are you doing?"  And I'll give you an example.  This morning, I couldn't sleep.  I know nobody cares about that except me, and maybe my wife, but she's not here.  I've got e-mail that comes in to me at 4:17 this morning.  I'm up.  It is from a client.  And this client says, "Mr. Garrard, you're not doing anything for me.  I'm destitute.  I'm about to lose my house.  I may lose my bladder.  And you're not getting my case moved."  So -- and I'm sure I'm not the only one who gets stuff like that.  And I'm not making this up, Your Honor, I got that e-mail this morning, and I'm sitting there saying: Whew, what do I do now?

So some of the problems that we have in terms of what happens in other courts is not meant to make it difficult for

Christy.  That's not -- from my perspective, that's not at all
it.  But some of it is because of the problem we have that
we've got to assist this court in moving cases.  That's one of
the reasons that we bring up the issue of different sorts of
cases being in the next wave, because we want to help keep this
the center of gravity.

        *JUDGE GOODWIN:*  Let me say this:  I have proceeded at
the pace we proceeded generally because that has been the
agreed-upon pace, and I like agreement.  But almost every
schedule that we've had has been one that the parties have had
input on and agreed to.  I'm aware, because I talk to
Judge Eifert, that in certain -- a certain MDL there's a
slowness in discovery, for whatever reason.  I try to keep up
with what's going on.  And I can tell you that just because
we've got things that we're now talking about, you know, way
into 2014, as I move up into my 70's, doesn't mean that that's
the way it's going to go down.  That's the way we're going --
that's the way we've planned, but should plans start to go
awry, should the spigot get turned off, to use your analogy --

        *MR. GARRARD:*  Yes, sir.

        *JUDGE GOODWIN:*  -- unnecessary discovery disputes
or slowness in discovery, difficulty in scheduling, all the
kinds of things which I think you're talking about occur,
Judge Eifert is the best plumber around.  *(Laughter.)*  And
she'll be able to deal with that.  All you have to do is ask

her.

   *MR. GARRARD:*  Thank you.

   *JUDGE GOODWIN:*  And I reserve the right -- as you no doubt guessed from the first time you appeared here, I can change these schedules fast.  I don't know what to say any more than that.  I'm going to keep control of this, and I'm going to make sure they go as fast -- if you want to go a lot faster than we're going right now, I'm in.  If you want to start a trial tomorrow morning -- I'm not kidding, if you want to start a trial tomorrow morning, I'm ready.  I don't know if I can get a jury here, but I could try.  That group out there doesn't look worthy.  *(Laughter.)*

   *MR. GARRARD:*  We'll take this side, Judge.
*(Laughter.)*

   *JUDGE GOODWIN:*  I do understand, and I appreciate the fact that you are dealing with complicated litigation on a massive scale with lots of players, lots of egos, lots of problems, lots of clients.  I really do understand.  And you're doing your own duty.  You've done a terrific job of it.  I just want to keep trying.  But you can go back and tell your clients we'll move as fast as we possibly can.  And if you want to go faster at any time, Mr. Garrard, you let me know.

   *MR. GARRARD:*  I will.

   *JUDGE GOODWIN:*  I'll move it up.

   *MR. GARRARD:*  Thank you.

*JUDGE GOODWIN:*   And I tell the defendants, I am not inclined to slow it down, except if you believe it's necessary. And I think we had something come up today between parties in one of the MDLs that will slow things down a little bit with a two-week extension on something, and we'll talk about that, but overall we'll just keep going.

Have you noticed I repeat myself?

*MR. GARRARD:*   No, sir.

*MR. THOMPSON:*   Judge, that's an Aristotelian oratorical method to drive a point home.   That's how we take it.

*JUDGE GOODWIN:*   Well, my wife -- I'm going to use that on my wife.   *(Laughter.)*

All right.   Bellwether presentations in Ethicon will be scheduled on July 18th.   That's during the Bard trial.   That will be at twelve noon.   Each side will have five minutes per proposed bellwether case, with the plaintiffs going first. Wait a minute.   We're going to move it from the 18th, which is during the Bard trial, to the 25th.   This is a change from last night.   We're going to move it to the 25th, which should be -- the trial should be to the jury, and we'll set it at 10:00.   Each side gets five minutes per pick.

On the Boston Scientific, the bellwether presentations will be on August 1st.   That coincides with the next status conference and will begin immediately following the status

conference and will follow the same rules, five minutes per pick per side.

    The next item I've got is Coloplast.  Anybody want to report on Coloplast?

        *MS. VARNEY:*  Your Honor, Lana Varney for Coloplast.

        *JUDGE GOODWIN:*  Yes, ma'am.

        *MS. VARNEY:*  I'd just like to report that we are making some very good progress in working with the PSC leadership and the uber-PSC leadership.  We've had --

        *JUDGE GOODWIN:*  I like that, the uber-PSC leadership.

        *MS. VARNEY:*  Yeah.  We've been able to recognize some common goals as we've met numerous times.  The common goals I like to call are the three E's, and we're trying to find the expeditious, effective and economical resolution to the litigation.  To move it forward we've been doing a number of things.  If I may share just the highlights we're doing, and only the highlights?

        *JUDGE GOODWIN:*  Yeah, that's good.

        *MS. VARNEY:*  There's plenty more.  We've developed a brief petition answer and short form.

    We've reached a stipulation on foreign entity service issues.

    We've been able to identify key medical records needed for early case assessment.

    We've created a process for receiving those medical

records, and indeed, the plaintiffs' counsel are providing us with the records.

We are evaluating those medical records for product ID, the nature of the adverse event, alternative causes, nature of the alleged injuries, prior conditions, and contributing causes, all things that we think are essential in assessing cases.

We have begun meeting with plaintiffs' counsel to discuss their claims and to exchange evaluations of our -- of the cases. As we engage in that process, they help us identify if there are additional records that will assist in the assessment, and we help them identify what we're missing and what further we need.

Then we are dialoguing regarding the nature of the alleged injuries that we are seeing. As you might imagine, that certainly takes up a lot of our time in trying to determine how do you assess the term "exposure and revision surgery." All of those terms are very broadly used, somewhat generically used, in medical records, and assessing them is essential and very unique to each individual claim.

We're also dialoguing on how best to structure an end-game resolution. And we have had numerous -- we've had numerous conversations with various plaintiffs' attorneys about their inventory of cases. We have additional meetings scheduled for June and July, and overall we believe the process is moving

along.

In order to continue the progress that we're making, we need three things.  We need, No. 1, more medical records.  And we've communicated that to the plaintiffs' counsel, particularly the ones that show us what the alleged injuries are and if there's been any treatment for those injuries.

Number two, we need additional time in order to assess those records.  We have quite a team of medical professionals reviewing the records, but it does take time.  Time to collect the records, time to assess the records.

The third thing that we think will be very helpful are the bellwether trials, because we will see some data points from those trials which will inform our discussions.

And so with that, I can say we're making some progress, and I'd like to also say thank you to the PSC and the uber-PSC for their continued willingness to cooperate.

JUDGE GOODWIN:  That sounded like an excellent presentation to a board of directors.  *(Laughter.)*

MS. VARNEY:  Thank you, Your Honor.

JUDGE GOODWIN:  I have appreciated that each of the reports -- yes, sir?

MR. SALIM:  Your Honor, Robert Salim on behalf of the plaintiffs.  Everything Ms. Varney says is correct.  We've had over five individual meetings.  Numerous members of the PSC have met on numerous times.  The dialogue is continuing on a

daily basis.  However, in the unlikely event that we're not
able to resolve these cases, which to date have not resulted in
any resolution, we believe that it's better -- we're going to
still have to go ahead and alternatively assume, if we don't
resolve these cases, when we don't show up in front of Your
Honor a year from then and say, "Your Honor, we tried, but it
didn't work" --

       *JUDGE GOODWIN:*  It won't be that long.

       *MR. SALIM:*  -- so we will propose that we'll get with
the defendants and propose a docket control order at the next
hearing and a discovery schedule in the event that by August
we don't have a resolution, or moving forward towards a
resolution, and then that way the matter won't get stagnant,
Your Honor.

       *JUDGE GOODWIN:*  You must have read my script.
*(Laughter.)*  Despite the good progress and the positive
statements from counsel for both sides, hundreds of cases
remain on the docket in this MDL and will have been pending for
a year at the end of August.  So I should -- I would expect by
Labor Day that if there's no firm settlement of these cases, or
no firm outline, let's say, for settlement of all these cases,
I will move toward requiring an expedited scheduling order.
Okay.

      Submission of the docket control order, I mentioned that.

      I've added a topic to the agenda on the show cause order

and the dismissal of certain Coloplast entities.  On

April 19th, 2013, I entered an order to show cause by

May 15th why I should not enter an order dismissing certain

Coloplast entities from the master complaint.  There have been

zero, that is, no responses to the deadline.  I will enter the

PTO dismissing the Coloplast entities referred to, and also

enter a PTO amending the short form and amended short form

complaints omitting not only those entities but also the Endo

entities.

Anybody have anything further for me before I make my exit

stage left?

MR. GARRARD:  Not from plaintiffs, Your Honor.

MS. JONES:  Not from Ethicon, Your Honor.

MS. BINIS:  No, Your Honor.

JUDGE GOODWIN:  I do want to remind you of some

upcoming deadlines.  There are bellwether presentations, we

mentioned, are on the 25th at 10.  The next status conference

and Boston Scientific bellwether presentations are on

August 1st at 10 a.m.  Well -- that's right, the conference is

at 10 and then the presentations follow.  And, as you-all know,

the Bard trials start at 8:30 on July 8th.  It may well be that

I have a couple of preliminary matters in the Bard trial as we

get closer that will require counsel to attend.

All right.  Judge Eifert, I'm going to turn it over to you

for the important stuff.

*(Judge Goodwin exited courtroom.)*

*MAGISTRATE JUDGE EIFERT:*  All right.  We will start, then, with Boston Scientific report on deposition and discovery progress.

*MR. STRONGMAN:*  Yes, Your Honor.  Just in terms of a quick status update, we are making good progress in terms of company witness discovery.  I think we're approaching a dozen witnesses have been deposed, another several in that big group are all on the calendar.

Our document production has been robust.  I think we are over six million pages, close to seven, so we're continuing to make good progress in regard to that.

There is one issue that I would seek some clarification from the Court on regarding the scheduling of bellwether treater depositions.  As a matter of context, both sides had agreed that the defendants would take priority and notice the treater depositions in our fifteen picks; the plaintiffs would do the same with theirs.  Commensurate with that, we informed plaintiffs that we would move forward getting dates, scheduling the treaters in our fifteen cases, assuming that they would do so in theirs.  The plaintiffs have informed us that they would object to us scheduling any treater depositions in any of the cases and that they plan to handle the scheduling in all thirty.  For a number of reasons, we feel like there's really no basis to prevent us from participating in that scheduling

process.   Certainly it's something that happens routinely.   We think for efficiency and logistics it just makes sense for each of us just to schedule the fifteen cases that we picked, the depositions that we will be noticing.   And so I want some guidance on that just to prevent both of us from plowing forward trying to both schedule the same sets of depositions.

MAGISTRATE JUDGE EIFERT:   Yes?

MS. WAGSTAFF:   Good morning, Your Honor.   Aimee Wagstaff.   Prior to your joining us in these MDLs, AMS was the first MDL that had noticed depositions for their treating physicians.   And what happened was plaintiffs rushed to file their notices for their picks, and defendants rushed to file notices for their picks, so what Boston Scientific and plaintiffs decided was:   Why do that rush?   Let's just agree that you can go first in defense picks and we can go first in plaintiffs' picks.   There was never any discussion on scheduling the depositions.   That's a separate and apart discussion that we've never had.   What we've asked is that they give us two to three weeks to try to schedule these depositions, and there's never been any communication that any plaintiffs' counsel have delayed or not provided dates to Boston scientific or Mr. Strongman.   In fact, the counsel for all thirty Boston Scientific bellwether picks have been very cooperative and have followed all deadlines, have gotten everything in on time, and so we've just asked that we be given

the opportunity for a couple of weeks to try to get those scheduled without Boston Scientific contacting our implanting physicians.  We feel that that's fertile ground for conversation that may not be appropriate, inadvertently if an administrator asks questions or whatnot, so we're just asking for a few weeks to try to get him dates.

   *MR. STRONGMAN:*  I would respond that there's a certain practicality that happens when one side schedules all of the depositions.  Those depositions inevitably get set around the preference of one side's schedule.  If the dates that are offered are the ones most convenient for one side, that just happens.  That's how it works.

  And so in that regard, I think in terms of what is fair, it makes sense for us both to then equally go about this process so that we both are working around each other's schedules instead of getting sets of dates in all thirty cases for all treaters that are pre-cleared and pre-scheduled around what works best for the plaintiffs.

   *MAGISTRATE JUDGE EIFERT:*  I tend to agree with Boston Scientific.  You could get the dates for your fifteen; they could get the dates for their fifteen.  I'm sure they're not going to have any *ex parte* communications about the treatment of the patient.

  You understand you'll just be getting dates to schedule the depositions?

*MR. STRONGMAN:*   Absolutely.   There will be no such *ex parte* communication.

*MAGISTRATE JUDGE EIFERT:*   So if that's your concern, I don't think that's really a legitimate concern.   But they'll be admonished that they're not to talk to the physician; they're just to get dates.   So I think that seems fair and it would probably be more practical to do it that way as well so you're both working at the same time.

*MS. WAGSTAFF:*   Okay.   Thank you, Your Honor.

*MR. STRONGMAN:*   Thank you, Your Honor.

*MAGISTRATE JUDGE EIFERT:*   Is there anything further?

*MR. STRONGMAN:*   Nothing further from Boston Scientific.

*MS. WAGSTAFF:*   No, Your Honor.

*MAGISTRATE JUDGE EIFERT:*   American Medical Systems. I understood that perhaps you wanted to remove some of these issues from the discussion today.   Is there anything that you do wish to cover?

*MS. BINIS:*   Your Honor, we have had some productive discussions over the last few days, and we would just like a little bit more time to see what we can work out before addressing any of these issues, so I'd like to put them all off if that's all right with Your Honor.

*MAGISTRATE JUDGE EIFERT:*   Yes?

*MS. FITZPATRICK:*   Your Honor, we have been having, as

Ms. Binis said, some very productive meet-and-confers.  As Your
Honor is aware, there are discovery issues that we have on both
sides, and at this point we're working on scheduling issues. We
are optimistic that we can resolve most of those issues,
recognizing we've been clear to the defendants that from the
plaintiffs' side we want to resolve these issues in a way that
preserves our December 3rd trial date.  We think that there's
ways that we can at least make a significant amount of progress
before addressing some issues to the Court, so if you would be
kind enough to give us a little bit of time to see what we can
do to narrow the issues, and hopefully resolve them if at all
possible, that would be very helpful.

     *MAGISTRATE JUDGE EIFERT:*  How would you feel about
scheduling another conference, either by phone or in person, in
maybe two weeks and that way I can make sure that we're still
on a moving forward --

     *MS. BINIS:*  I think that makes sense, Your Honor.

     *MAGISTRATE JUDGE EIFERT:*  All right.  And if you --
if you get everything resolved, of course, before that we'll
just cancel it, but I'll go ahead and issue an order.  Would
you prefer to do it in person, or would you prefer to do it by
telephone?

     *MS. FITZPATRICK:*  I think we should schedule it
initially as an in-person.  If we make a significant amount of
progress, Your Honor, that we only need you for ten minutes,

then of course we would prefer to do it by phone; or even
better, that we can tell you that we don't need you at all,
that we've reached an agreement.  But I think it's probably
best to at least schedule it for now in-person and then scratch
that if we can.

        *MS. BINIS:*  I agree.

        *MAGISTRATE JUDGE EIFERT:*  Would you two mind sending
Laura some dates in that time frame of about two weeks, ten
days to two weeks, that you would both be available?

        *MS. BINIS:*  Yes, Your Honor.

        *MAGISTRATE JUDGE EIFERT:*  Thank you.

        *MS. FITZPATRICK:*  Thank you, Your Honor.

        *MAGISTRATE JUDGE EIFERT:*  Is there anything else for
today, then?

        *MS. BINIS:*  Not on our calendar.

        *MAGISTRATE JUDGE EIFERT:*  All right.  Then the last
would be Ethicon.  We start off first with the pending motion
to compel.  There hasn't been a response yet to that, and I
think that's due --

        *MS. JONES:*  And, your Honor, I think that's true, so
I believe that response is not due until Tuesday of next
week --

        *MAGISTRATE JUDGE EIFERT:*  Yes.

        *MS. JONES:*  -- as I recall.  And frankly, Your Honor,
that's something I was hoping to work out.  I don't know if we

can or not.  It relates not to the production of additional
information; it relates only to certain objections that were
included within the discovery and whether or not those need to
be withdrawn specifically, and so what I'd hoped to do is I
would like to say that we can get it resolved.  If we can't get
it resolved, I think it's probably something that we can
address -- we'll file our response and can probably address
quickly in a telephonic hearing.

        *MAGISTRATE JUDGE EIFERT:*  Yes?

        *MR. CARTMELL:*  I guess our hope was that we could get
a date, sooner rather than later, if it's possible, to hear it
if we can't, just because this is sort of the issue we've
visited with Your Honor before about we have objections pending
to literally every single one of our requests, and we think
this is contributing to why we're having difficulty once we get
to the deposition point with each witness and figuring out that
certain things haven't been, you know, produced to us.  So we
were hoping if we could -- we could take this up, figure out if
objections are going to be, you know -- you know, still there
or not, we would be able to figure out and get final -- final
word on whether or not certain documents have been provided.
So I guess our only statement is we're all for talking.  I
think we have met and conferred a half a dozen times on this.
But if not, we'd just like to get a hearing date.

        *MS. JONES:*  So that Your Honor understands, the issue

is not that we're talking about production of documents or withholding of documents.

    *MAGISTRATE JUDGE EIFERT:* Right.

    *MS. JONES:* This is only an issue about whether or not it was appropriate to assert objections.  So the documents and all have been produced, so, to me, it's a legal technicality.  I understand it's premature at this point, given the fact that we've not responded, but I wanted Your Honor to understand that this is not -- this is not holding up discovery.

    *MAGISTRATE JUDGE EIFERT:* That's good to hear.  I don't see any problem in scheduling a hearing.  You have until the 27th, I think, to get your response in.

    *MS. JONES:* Right.

    *MAGISTRATE JUDGE EIFERT:* And then you would normally have ten days after that.  Do you need ten days?

    *MR. CARTMELL:* We don't.

    *MAGISTRATE JUDGE EIFERT:* Why don't you two try to get together and figure out a date to have a telephone conference, and then if you work it out before then, we'll just cancel it.

    *MS. JONES:* That's fine.

    *MAGISTRATE JUDGE EIFERT:* So can you do that and contact my assistant, Laura, give her the date -- give her a couple of dates and times that you would be available?

*MS. JONES:*  We'll be glad to, Your Honor.

*MR. CARTMELL:*  Yes, Your Honor.  Thank you.

*MAGISTRATE JUDGE EIFERT:*  Deposition scheduling issues.

*MR. CARTMELL:*  This is -- well, we actually have had phone calls, Donna Jacobs and I, recently.  We're making progress.  We're still having the difficulties in only getting one date.  Originally we were trying to get all of these knocked out by January 15 -- excuse me, July 15th in hopes that our experts would be able to get, you know, the transcripts and prepare reports and things like that.  We're moving along but -- and I just guess we want the Court to know for several witnesses we've not been able to get dates earlier than August, even though we started asking for those in January and some in last July.  So we are backed up.  We're doing five -- there's two weeks, I believe, there is five depositions going at once.  There's still some people we don't have dates for, you know, and we're at the point where now, as it was brought up previously, state courts are calling us with, you know, lawyers with trial dates coming up.  And the instance that Mrs. Jones is talking about is a lawyer in Texas who has a December trial date, and on a TVT-O case, and called to say, you know, "We need these depositions.  We can't wait for you guys," and us saying, we'll try to -- you know, we'll try to get them sooner.

We're jammed up into August.  We have August 22nd reports.
We're still getting one date for every witness.  We're never --
we've asked multiple times, just because of our scheduling
issues, if you could give us three or four dates that might
work for your witness, that will help us short of shuffle these
around.  We've never gotten more than one day for every
witness, and said, "Here's your date."

The problem is we take 90 percent of them, though if we
can't, then we don't get another date for several weeks.  So we
are doing better, but there is frustration and we still don't
have them all set.  And now we've got state courts who are
saying, "We've got to go different dates," or "We've got to go
sooner," and so we're dealing with that as well.

MAGISTRATE JUDGE EIFERT:  Ms. Jones, what do you say
about that?

MS. JONES:  What I'd like to say is that there are
two sides to every story, and if you've been asked for seventy
depositions -- over seventy depositions, plus 30(b)(6)
depositions, as I told you earlier -- told the Court earlier,
on each occasion they have demanded in excess of two days for
the depositions.  We have given them date after date.  On some
of the occasions, we've given them as many as four different
dates before a deposition date has been accepted by the
plaintiffs.  They're frustrated with us; I can tell you, we're
frustrated with them, Your Honor.  We are trying our best to

work with them, but the reality of it is at some point in time, if we're looking at a trial that's going to last -- and we have set six days to present our case, eighty depositions taking more than two days apiece, with 30(b)(6) depositions - there was one that lasted more than four days - is posing some problems.  And it may be at some point in time we'll come to Your Honor and simply say, we have to have a limitation on the number of depositions and on the time that they can go forward. We've tried to work with plaintiffs' counsel.  We've tried to work those things out.  There is frustration going both ways.

We have told them when we could not give them dates in terms of them being former employees or foreign witnesses, but we are doing our dead level best to give them dates.  Frankly, a little bit of a problem is -- I don't say this critically, because I think at least Mr. Cartmell has acknowledged, I mean, we have witnesses that we have told them we thought did not have pertinent knowledge and they didn't need to take.  One of those witnesses was scheduled for deposition this week or --

MR. CARTMELL:  Next.

MS. JONES:  Next week, and Mr. Cartmell withdrew the notice, you know, today.  So it's just that it's a massive amount of people that we're moving back and forth.  And we are trying to move to take care of it.  Whether we're going to need additional guidance from the Court in order to assist us or not remains to be seen.

MAGISTRATE JUDGE EIFERT: Well, you know, I've had some concern about the length of the depositions, but I understand that the reason for that is that you're dealing with seven products.

MS. JONES: Well, that is true, to some extent.

MAGISTRATE JUDGE EIFERT: Uh-huh.

MS. JONES: But there are witnesses who have already been deposed on a number of cases in New Jersey that have been asked for additional depositions. We have not brought it to the Court's attention, because I don't think it's appropriate to now at this stage, but we have rehashed some of the things that have previously been done. We're trying to work through it with them, but there is a limit in terms of, you know, the time limits. And I think, frankly, when Your Honor went through some of the transcripts, if it comes to that, that you will see that that time period is not necessary and that it could have been accomplished in a shorter period of time.

MAGISTRATE JUDGE EIFERT: Which will be difficult for me to determine --

MS. JONES: I understand.

MAGISTRATE JUDGE EIFERT: -- if I am not involved in the case actually, but what I would suggest you do is try to work on these things, but if you have had several conversations and you can't work them out, call my office and we'll have a conference on it, because I'd like to be as much of a help to

you as I can be.  And sometimes some of these issues can be resolved by just getting another person involved in the conversation.  So why don't -- why don't you aim to do that? I'm in Huntington nearly every day, and I usually am there with some key hearings scheduled here and there that don't take very long, so I'm generally available; and I would prefer that you do that rather than just go around and around and around.

Is that all right?

MS. JONES:  We'll be happy to do so.  I think in fairness, Your Honor, Mr. Cartmell or his office has been in touch with my office probably every day.  I mean, it's a constant --

MR. CARTMELL:  Right.

MS. JONES:  -- ongoing discussion.  And in fairness, I don't think anybody is trying to be difficult; it's just the frustration with the issues that we are dealing with and it is --

MR. CARTMELL:  Well, in fairness, we have 43 depositions, I think, scheduled; and we've never asked for 70 or 80, and --

MS. JONES:  Oh, we have -- we have 70.

MR. CARTMELL:  And the depositions in New Jersey, I will say, in fairness, have all been on the POP cases.  They were not on the seven TVM products, so that's the reason why they are -- the depositions are wholly new.  We told them we

won't duplicate any testimony.  I just want to make that clear.
And if we do ask about POP things, we told them that we would
tell you that in advance.

        *MS. JONES:*  That's certainly what the order provides.

        *MAGISTRATE JUDGE EIFERT:*  Well, contact me if you
need some help.

        *MS. JONES:*  Thank you.

        *MAGISTRATE JUDGE EIFERT:*  Third party protective
order.

        *MS. JONES:*  I think that is -- that issue, Your
Honor, relates to the third party subpoenas.

        *MAGISTRATE JUDGE EIFERT:*  Yes.

        *MS. JONES:*  And the only concern was whether or not
those third parties were going to produce documents that might
be confidential based upon the relationships with the client.
I think we've worked out a stipulation that will allow us to
identify confidential information so that not -- not that the
plaintiffs wouldn't get it, but that it would carry the
confidential stamp.  We don't know whether that's going to be
necessary or not, but that's out there.

     There has been an exchange and a redline agreement that
was exchanged last night, that I confess to Your Honor I have
not looked at, but I'm hoping is something that we can work
out.  We clearly had an agreement in principle.  The question
sometimes is reducing it to writing.

*MR. AYLSTOCK:*   Your Honor, Brian Aylstock.   I think
that's absolutely fair.   Our concern, we've -- we've -- we've
served a number of third parties with discovery requests.
We've gotten some documents.   We're getting some more.   Our
concern is simply that we don't want to slow anything down, and
certainly if something is confidential, they need stamped.   If
it's truly confidential, they can stamp it confidential.   We'll
talk about the order of designation perhaps another time, but
we don't have a problem with that as long as it doesn't slow us
down.

   I do know there was a motion filed.   We had not had a
chance to talk about it before it was filed.   If you could
maybe just give us another week or two to work it out before we
file a response?

       *MAGISTRATE JUDGE EIFERT:*   That should be something
that's very easy to work out.   I don't see that as being a
complicated task.

           *MR. AYLSTOCK:*   It's not, and hopefully --

           *MAGISTRATE JUDGE EIFERT:*   No, I would not think so.

           *MS. JONES:*   I don't think it is, Your Honor.

           *MAGISTRATE JUDGE EIFERT:*   Sales representative
production issues.

       *MR. AYLSTOCK:*   Your Honor, Ms. Jones was kind enough
a month or so back -- this was before the defense factsheets
were due, and as Your Honor's probably aware, the order

provides that in addition to the information provided certain custodial files from sales reps, call notes, information, sales ads, so on and so forth, that the sales reps used with the implanting physicians be provided as well, so that we can have the benefit of that discovery before we do any plaintiff depositions, implanter depositions, so forth.

Apparently, and Ms. Jones can add to this or disagree with me, there was some sales rep custodial files where the litigation hold letters went out but were not complied with, and so there are no materials whatsoever for certain sales reps.  Other sales reps have some materials, but things are missing.  And certainly we need to get to the bottom of that, from the plaintiffs' perspective, particularly given the learned intermediary issue and the failure-to-warn claims that we do have.  But all we'd ask there is that, at this point, maybe we have a date certain where we know this is the end of the production, here's what -- here's what we think might be missing, and then we can figure out what, if any, remedy needs to be --

MAGISTRATE JUDGE EIFERT:  And what sort of deadline are you proposing?

MR. AYLSTOCK:  I think that -- I think they're almost done, and I want to be reasonable with them.  The problem is, Judge, we're now getting to the case specific bellwether discovery, and these lawyers that have these cases are saying,

"When do we get our materials so we can take this depositions?"
So hopefully within the next week perhaps they could have that.
I'm flexible as long as it doesn't interfere with our
deposition schedule.

          *MS. JONES:*   Your Honor, if I might, we advised
counsel as soon as we -- the litigation hold or the problem
with that all relates to former employees who left the company
at some point in time and those materials were not preserved as
they should have been or whatever.  As soon as we identified
that, we did advise Mr. Aylstock, and that was about six weeks
ago, whatever.  We have produced all of the materials that we
have on all of the sales reps, except one, at this point and
that one is scheduled for production next week.  We have also
produced for Mr. Aylstock a chart that identifies those sales
representatives for whom we have no information, no custodial
files, at this point in time.

     We have -- we learned yesterday, one of my partners, that
there is one additional database that they've identified that
may have some of that information that we have thus far been
able -- unable to find.  They are looking at that now just to
see if there's any chance that anything else is in there.
Other than that, we're done as to those sales rep productions
as of the -- I think it's the 31st that the one outstanding
one is to be produced.  So I don't mind representing to the
Court that by the 1st of June or whatever that we anticipate

being able to answer any questions.

The one thing I did tell Mr. Aylstock I wasn't sure, he asked us to tell us what was missing from those files that perhaps seemed to have less than a full production.  And I have told him I will work with him.  I'm just not sure I can -- I can tell him what's missing.

MAGISTRATE JUDGE EIFERT:  How could she tell you what's missing?

MR. AYLSTOCK:  Well, during the initial discussion, she'd indicated that certain things that she expected to be there -- I mean, she didn't elaborate, but I'm assuming e-mails about calls, visits, or sales ads or so forth, simply weren't, there and that's what alerted her to the fact that maybe there's an issue.  So there are certain categories of documents we believe should be in any sales rep custodial file.  When they go and they -- of course, a lot of them are in the surgeries themselves, and they take notes of those surgeries, or have e-mails or some record of the visit with the doctor, because that's their job.  They have bosses that they have to report to, "I went with this doctor; he likes the product; he doesn't like the product."  So those things and why is very important as well, and what I did to convince him to use the product.  Those are the things that are extremely important when it comes to the implanter depositions, because what they were told -- it's not just the IFU, or the patient brochure or

whatever, it's, you know, the hand-to-hand combat so to speak with these reps telling doctors:  "Here's why our product is better; here's why you don't need to worry about erosion; here's why. . ."  And some of that information should be obviously in there.  And so I'm not asking her to do the impossible; and we had a conversation out in the hallway, you know, where I said that.  But certain categories, I think, are obvious should be in there that I don't think are.

MAGISTRATE JUDGE EIFERT:  I still am not understanding, though, what you expect her to tell you.  That she would have expected those things to be in the file?  That you would expect those things to be there?  I don't understand how she's going to tell you what's missing from these files other than to say, "Well, I would speculate that these things would be in the file, and they're not."  She can't tell you what they said or any detail about them, so I'm not really sure I understand what it is you want from her.

MR. AYLSTOCK:  The categories of items.  And I think for some of the sales reps we do have full production, and those would have categories:  Here's sales; here's your welcome packet; here's -- here's what we see in a full production file. And if we just have that list, we can make the comparison.  But at this point I'm in the dark as far as what exactly systems were used, what the welcome packet was, or here's your intro. So that's what we've been talking about.

  *MAGISTRATE JUDGE EIFERT:* Were there certain standard things that are to be found in every sales representative's file?

  *MS. JONES:* If there are, I would be happy to give that to him.  I mean, to be honest with you, I don't know that there is a protocol specifically that's there.  What we -- when we identified and realized some of the documents were missing early on, we told them specifically that we would be willing to, if necessary, produce someone for deposition to talk about the litigation holds.  And what we've done and whether or not that's an option here or not, I don't know.

  And this is one of these cases where I'm -- I'm certainly willing, to the extent that I can, to give Mr. Aylstock this -- this material.  And I don't mind giving him -- if it doesn't -- if a protocol exists somewhere that says this is what ought to be in there, I would certainly give that to him.  I tell the Court today, I don't know if that exists.  And beyond that, if it doesn't exist, all I can do is give him an informal analysis based upon what's in the other sales representative files.

  *MAGISTRATE JUDGE EIFERT:* Why don't you look and see if there is a protocol so that --

  *MS. JONES:* Be glad to.

  *MAGISTRATE JUDGE EIFERT:* But even if there is a protocol, about all you're still going to get, at best, is a guess that it would have been in a particular person's file.

I think you should look for a protocol.

MS. JONES:  I'll be happy to do that.  I'm just not sure I can -- I'll work with Mr. Aylstock.

MAGISTRATE JUDGE EIFERT:  And you may want to take a deposition, as she suggested, of someone who can tell you what -- what kinds of materials would have been in those files that weren't held.

MR. AYLSTOCK:  I think that makes sense, because ultimately if there is a spoilage claim I think we need to identify what's not there and why -- why it may be relevant information.

MAGISTRATE JUDGE EIFERT:  Right.

MR. AYLSTOCK:  But we can talk further about that.

MAGISTRATE JUDGE EIFERT:  But it's best to do that by deposition than to just ask her to try to tell you what she thinks might be in those files.

MR. AYLSTOCK:  Fair enough.

MAGISTRATE JUDGE EIFERT:  Identification of final version of revision and training materials.  I know this has been an issue for a little while, hasn't it?

MR. AYLSTOCK:  It has, Your Honor.  We did receive a letter late last evening from Ms. Jones' colleague which did identify, for the first time, the copy review, all of the -- I believe all of the advertisements with the copy review date. What I don't -- and I haven't had time to research all of this,

but what I don't believe it tells us is what particular journals, under what time frame, or what -- there's a radio ad; there's a TV ad.

What we need, and what we've been asked for by those with bellwether plaintiffs who have talked to their lawyers and told their lawyers things like, "Well, I remember seeing an ad.  I think it was in *Woman's Day*."

Well, they would like to say, "Well, here's the ad.  Do you remember -- is this the one you remember?"  Because a lot of those ads go directly to the direct consumer advertising failure to warn.

So what I'd request, to the extent it's not in there, and I don't think it is, is that the defendants also provide information as to the in-use stage for those advertisements so that we can be on the same page as far as where it was, when it was, and the circulation.

The sales training materials, I don't believe yet we have the final -- we may have the final versions, but not in a way that we know that they're final versions.  I think there's copy review that happens with those, is my understanding.  And we just want to make sure before we go off and take implanter depositions, where training is clearly an issue in these cases, that we know exactly what the final versions were, and then further, to the extent possible, to the extent Ethicon knows, we need to know, well, this person went to this training and at

that point in time here was the video that would have been shown, or here is the training manual, here is the outline of what you do in a cadaver lab.

And so we're working with them, and I appreciate the letter last night.  I think we have an agreement that they're willing to do that; I just again request that, since we are into the bellwether discovery, we have a reasonable date so that we can have that.

It's also important, Your Honor, for our experts - this training is an issue - to be able to say what was told to the doctors in the training, or what was not told to the doctors in the training.

MAGISTRATE JUDGE EIFERT:  Do you have that material that is in some department?

MS. JONES:  Your Honor, my understanding is that we have, in fact, produced to them all of the information that establishes what the final -- let me separate these out first. The professional education programs, that we have, in fact, identified the final programs and identified in terms of the copy review.  There are one or two out there that are unidentified.  I will follow up, but my understanding is that that's been done.

The problem is, and what I think Mr. Aylstock is asking, is what he'd like to know is what professional education materials were used to train each individual physician?  And I

think our issue is we can say these are the materials that were
available for use, and this is the training program that he
went to, but it's not necessarily that we can specifically say
that Dr. So-and-so saw X particular training program.  Most of
the time we assume that it happens to be the one that bears the
most current date, but we're not in a position, I don't think,
to certify that a particular doctor saw a particular procedure
or particular training without going to the doctor himself.

MAGISTRATE JUDGE EIFERT:  So you did not -- your
department did not keep, for example, an entire presentation
that was presented on such-and-such a date with the names of
the attendees?

MS. JONES:  That's right; but what we do know is we
know who -- we know who the teacher was that presented.  We can
tell what kind of general program it was and who attended.  But
in terms of being able to go to the specific slideshow, you
assume that it's the most current, but I can't certify
necessarily that it is.

MAGISTRATE JUDGE EIFERT:  But that was not -- you did
not keep track of that is what I'm asking?

MS. JONES:  That's right.  My understanding is that
that's not clear.  We're going back trying to look at that to
confirm that, but if we know what materials were made
available, but in terms of what actually was used in each or
what each individual physician received, we don't have any

tracking mechanism for that.  I told Mr. Aylstock to the extent
that we find that there's anything there, we'll certainly give
it to him.  But at this point, in terms of we're going back
trying to look at manually to see if there's any way that we
can be more specific on that information; but right now we've
not been able to do it in a way that we can certify that this
doctor saw this particular slide presentation.

          *MR. AYLSTOCK:*  It's a little more complicated than
that, and it's sort of like the issue we're facing with patient
brochures.  Ethicon, as I understand it, has copy review dates
for patient brochures, and presumably, sales training
materials.  What we've been told -- and this issue came up in
the Linda Gross case that was tried in New Jersey - or maybe it
was Pam Wicker; I'm not sure - but that they have -- Ethicon
doesn't keep track of the in-use dates for patient brochures.
And if, to the extent that these are in use during this time
period, that's really what we need.  It certainly is important
for the plaintiffs to know, well, this is a patient brochure
that was in use during this time frame and was pulled off of
the shelves here.

          My understanding is the patient brochures just sat on the
shelves.  There was never a recall or, you know, these are no
longer valid because we updated them.  So it puts us in a very
difficult position with our plaintiffs to -- when they know
they saw a patient brochure, well, this was the one that would

have been in use.  Obviously, it would have to be after the copy review date.

I believe the way it was resolved in New Jersey is that kind of the copy review dates became important for that, but maybe we can discuss something along those lines so that we don't get to trial and we have a motion, well, you didn't prove that the doctor saw this one, even though we all -- the reasonable expectation is that these were in use.

So that's the problem we're facing.  I'm really just throwing that out as background.  And I know Ms. Jones is working with us, and we'd just like it done so that we can proceed with bellwethers, because it is hampering our ability to get our experts up to speed as well as go forward with these bellwether implanter depositions, because we really can't do that until we know what they were trained with.

MAGISTRATE JUDGE EIFERT:  All right.

MS. JONES:  And what I'm representing to the Court is it's my understanding it's been done.

MAGISTRATE JUDGE EIFERT:  It's done?

MS. JONES:  It's done.

MAGISTRATE JUDGE EIFERT:  You've given him now as much as you can give to him?

MS. JONES:  It's my understanding that we have. There are some things on the present education programs that we're trying to see if we can give them any additional

information about what doctors saw what, but the remaining
portions of that have been done.

The only thing I told Mr. Aylstock about this morning, and
I don't know the answer to the question, is whether or not we
have, in fact, produced the advertisements in terms of the
dates that they were run and where.  And I will follow up on
that today.  I just don't know the answer to the question.

MAGISTRATE JUDGE EIFERT:  And I think you're asking
that whatever else might be out there you want it by a certain
date?

MR. AYLSTOCK:  We -- we -- as you know, I can throw
out the June 1st date for the other, but I'm reasonable.  Just
understand that it's affecting our ability to move forward with
depositions.

MAGISTRATE JUDGE EIFERT:  June 1st?

MS. JONES:  In the abstract, Your Honor, I would say
that June 1st is fine.  And what I would ask the Court to do
is to let me follow up on this advertisement issue.

MAGISTRATE JUDGE EIFERT:  Sure.

MS. JONES:  I just -- in all candor, I thought we had
done everything that they had asked for us to do until this
morning.  And when he raised that issue, I don't know whether,
frankly, that's been produced or not.  And I'm assuming if it
hasn't been produced it's readily collectible, but I need to
make a phone call for that.

*MAGISTRATE JUDGE EIFERT:*  It sounds like there's no disagreement that you're entitled to this information if they have it.

*MS. JONES:*  That is correct.

*MAGISTRATE JUDGE EIFERT:*  And I think Ms. Jones is going to do everything she can to get it for you.  If you feel that she's not moving quickly enough, then bring that to my attention and we'll see what we can work out on that.

*MR. AYLSTOCK:*  Thank you, Your Honor.

*MAGISTRATE JUDGE EIFERT:*  Anything else on that issue?

*MS. JONES:*  I'll move as quickly as I can.

*JUDGE GOODWIN:*  All right.  Rule 30(b)(6) deposition status.  I had that one put on the agenda after the conversation that we had last week or so.

*MR. CARTMELL:*  Right.

*MAGISTRATE JUDGE EIFERT:*  What can you tell me?

*MR. CARTMELL:*  Your Honor, we had two days of the deposition for the design -- development and design 30(b)(6) witness, and we can report that the Court's order was followed as far as the witness being prepared to answer the questions that you said the witness should be prepared to answer.  We did not finish the deposition, and there's certain things that you've asked us to meet-and-confer about that we have not yet had a chance to do that.  And, in other words, the standard

operating procedures, but we're going to do that if we can work that out, and I'm hopeful that we can.

One issue that I was hoping that we could bring to your attention today for guidance, because we won't be back here possibly until August 1st, and maybe you want us to brief this and come back before then, and tell us if that's the case, we've talked briefly about it, and that is the issue related to whether or not we have to do the fact witness deposition at the same time as the 30(b)(6) deposition.

And a little background on that is we noticed up, as you know, regulatory and design and development and marketing 30(b)(6)'s on various topics to try to handle those first, hoping that that would make things more efficient down the road, we'd be able to narrow the scope of where all the documents are, what they are, what they consist of, things like that.  They're very -- admittedly, they're very long depositions, because for each one they're covering, you know, TVT, TVT-O, TVT-S, Abbrevo, Exact, Prolift, Prolift+M, so we have divided them up among lawyers who are willing to learn that product and go take the depositions.  And, for instance, you know from Ms. Lin's deposition as the regulatory designee, she was designated in every single topic -- not every single topic, about thirty topics.  We had thought that there would be different designees for each product.  She was only involved in the Abbrevo product and maybe one other, but yet she was, I

guess, taught all the other topics.  We're about to get that finished.

We've asked for fact witness dates for her deposition. She's on a few items, early Classic information, in the Abbrevo, she's a fact witness.  In other words, she has e-mails; she has a production -- Prosima POP production that's pretty extensive.  And so what we wanted to do is make sure that we finish the 30(b)(6), turn the camera off, and do a separate fact witness deposition, because my experience is when you try to mix and mingle them, it's -- it's -- there's a difference between having a witness bind your company as a 30(b)(6) designee versus a fact witness.  And so what we asked to do is complete the 30(b)(6) and come back and do a fact witness deposition.

We've asked the same thing for Dan Smith, who is two days in, and we have two more days that are set for him, but we would like dates separate and apart for that for Dan Smith's fact witness deposition, who we think Dan Smith is involved in virtually every single product from all periods of time.

The response thus far has been:  You've got these days, complete it.  Just get it done.

We have separate lawyers who would be assigned to that, for lots of reasons, including resources and scheduling and things like that.  So I guess what we would like is guidance from the Court on -- and we have exchanged -- we sent case law

supporting our position.  We'd like guidance on whether or not
we would be able to get separate dates for the fact witness
depositions.

          MS. JONES:  I'm going to respond, and then Mr. Combs
has been specifically working on this 30(b)(6), but I'd like to
respond to the issue of the separate fact witness depositions
generically, not dealing with any particular one.  What we have
said to Mr. Cartmell and the plaintiffs is, I don't generally
have a problem with you doing a separate fact witness
deposition.  What I do have a problem with is you not doing it
at the time that you do the 30(b)(6) deposition.  And by that
I'm saying, you know, we ought to be doing it -- if we've taken
the 30(b)(6) deposition on Monday and Tuesday, then the fact
witness deposition ought to be on Wednesday, just for purposes
of efficiency and so forth.  And that's what we have asked.
Some of the 30(b)(6) witnesses, I've questioned whether or not
they need a separate fact witness deposition, but I think that
has to be taken up on an individual basis.

     But, in general, what we have said is:  If you want a
separate fact witness deposition, we understand that, and we
understand you may be entitled to that, but do it at the same
time so that we don't have to bring back the witness, you know,
altogether.  We can turn the camera off and do it the next day,
but when we're trying to accomplish all we're trying to
accomplish, it makes much more sense to get it done at that

point.

And having said that, Your Honor, if you don't mind, Mr. Combs can tell you about the report on further 30(b)(6) --

*MAGISTRATE JUDGE EIFERT:*  Certainly.

*MR. COMBS:*  Judge, I agree with Mr. Cartmell's representations in regards to the deposition we had the hearing on on May the 14th.  The witness was prepared and was asked and answered questions on the topics that you have directed we be prepared on.  We've scheduled the resumption of that deposition for June 4th and 5th.

We're already in the process of doing a meet-and-confer on three topics that you directed the parties to conduct additional met-and-confers to narrow those issues.  Obviously, if we can't get it done, we'll come back to you, but at this point we're in the process of trying to get that done without additional court intervention.

*MAGISTRATE JUDGE EIFERT:*  It seems to me this issue came up once before.  Was that in AMS?  And I don't believe that I ever had to rule on it, because it was resolved in some manner.  How was that resolved in your MDL?

*MS. BINIS:*  Your Honor, those 30(b)(6) depositions were organizational only.  They were not substantive.  And we made an agreement that three of those would be taken simultaneously with the fact depositions and that two of them were taken separately, but it's really not the same thing as a

substantive 30(b)(6).  And certainly the plaintiffs in our litigation have told us that they're going to want substantive 30(b)(6)s, as well as these organizational 30(b)(6)s, as well as fact witnesses.  So this whole conversation will be equally applicable to us when it comes to the substantive 30(b)(6), because we don't want to produce a witness three times.

        *MAGISTRATE JUDGE EIFERT:*  Yes.  Do you have anything to add?

        *MS. FITZPATRICK:*  Your Honor, it is correct that this will come up in AMS.  We have been discussing, as you know, depositions and deposition scheduling, and certainly 30(b)(6) witnesses.  This is something that we have in our meet-and-confer as just the order in which we want the 30(b)(6) witnesses.  We would like them towards the end of the fact discovery so we can know exactly what it is that we want to go in on the 30(b)(6) and get as opposed to that fact witness.  So I'm not sure this is going to directly translate to what we're doing, but it is certainly an issue that is on the table that we've been discussing in the meet-and-confer and may have to come back to Your Honor on.

        *MAGISTRATE JUDGE EIFERT:*  Yes?

        *MR. CARTMELL:*  Just real quick to clarify one thing. We had not been told -- well, we have been told, I agree with Ms. Jones that, yeah, "If you're going to do the fact witness, do it then."  But what we've been told here is, "Here is your

two days."  And we've said in response to that, "We're going to try to finish the 30(b)(6) deposition in two days, but we cannot finish the fact witness deposition at that time.  Do you want to produce the person for a third day or a fourth day?"

And on fact witness depositions, it's been very clear and they have agreed:  We'll give you two days; you better knock it out.

And now we have people who they're obviously cross noticing depositions and people are coming from other jurisdictions who are saying, "Hold on.  I want a chance to ask questions as well."

But on fact witness depositions, we have not had a problem yet.  We finished one in three days, I believe, and the others all in two days.  The point is we've asked for dates for the fact witness deposition and they say, "It's these two days. Finish the 30(b)(6) and knock out the fact witness at the same time."

MS. JONES:  We've obviously had a major miscommunication, because I think I had told Mr. Cartmell very clearly on at least a couple of occasions that he can take the deposition of the fact witness the following day.  Now, that's at issue.  I need to -- I don't want to get into this at this stage, but we do have -- apparently we've got a discovery dispute going on now that I may need to bring to Your Honor's attention that relates to this very issue.  But my issue, Your

Honor, again, is not producing for a fact witness deposition.
Part of it does do -- it relates to timing, but -- but my
recollection is that, at least in the generic conversations in
which I was involved with Mr. Cartmell, that we said, "We just
want them taken at the same time," so. . . .

      *MAGISTRATE JUDGE EIFERT:*  Well, I think what we'll
need to do with this, because it does sound to me *. . .(Bell*
*sounding.)*  I have no idea what that is.

      *COURTROOM DEPUTY CLERK:*  I've never heard that in the
building before.

      *MAGISTRATE JUDGE EIFERT:*  Time to end, I think.
*(Laughter.)*  It sounds to me like this is going to be an issue
that involves more than one MDL.  I don't think it's going to
involve Bard.

      *MR. GARRARD:*  I think we have already dealt with it
in Bard.

      *MAGISTRATE JUDGE EIFERT:*  I think you've dealt with
it.  It doesn't sound, at this point, as though Coloplast is
interested in this issue, but in the other three MDLs, why
don't we brief it?  As far as the plaintiffs, the plaintiffs
what I think need to do is make -- well, I don't know, maybe
the defendant is the one that needs to make the motion to have
the time frame -- the fact witness deposition done immediately
after the 30(b)(6).  I don't know who actually wants to make
the motion.  Who would like to make the motion?

*MR. CARTMELL:*  We can, if you like.

*MS. JONES:*  We'd be happy to.  *(Laughter.)*

*MS. JONES:*  It doesn't matter to us, Your Honor.  I mean, we'll be happy to make the motion --

*MAGISTRATE JUDGE EIFERT:*  I think your client is the one that's trying to control the schedule, so perhaps you should make the motion.

*MS. JONES:*  Fine, Your Honor.  Be happy to.

*MAGISTRATE JUDGE EIFERT:*  All right.  So why don't the defendants in the three MDLs, Boston Scientific, Ethicon and AMS, file a motion -- yeah, I think that would be the way to do it.

When do you-all think you could get your motion filed?

*MS. JONES:*  Given the fact that we have Memorial Day, could we get until the week after Memorial Day, that Monday or Tuesday afterward?

*MAGISTRATE JUDGE EIFERT:*  What would that date be? Does anyone have a calendar?

*MS. JACOBS:*  That Monday is the 3rd.

*MAGISTRATE JUDGE EIFERT:*  The 3rd of June?

*COURTROOM DEPUTY CLERK:*  It is.

*MAGISTRATE JUDGE EIFERT:*  Defendants then file your motion by the 3rd of June.  Do we need an expedited schedule, or do you want your 14 -- 17 days, actually?

*MR. CARTMELL:*  Actually, expedited would be great,

just so we can get them scheduled if, in fact, we're going to be allowed to.

             *MAGISTRATE JUDGE EIFERT:*   Is ten days quickly enough for you?

             *MR. CARTMELL:*   Yes.

             *MAGISTRATE JUDGE EIFERT:*   Ten days after, then, the plaintiffs will need to file their response.

     And how many days will you need to reply?  Three?

             *MS. JONES:*   That's fine.

             *MAGISTRATE JUDGE EIFERT:*   Three days after that the replies will be due.

             *MR. NORTH:*   Your Honor?

             *MAGISTRATE JUDGE EIFERT:*   Yes?

             *MR. NORTH:*   I guess I have a question.  Does Bard need to participate in that briefing, Your Honor, since I believe that's already been handled?

             *MAGISTRATE JUDGE EIFERT:*   Yeah, you know, I thought I had already --

             *MR. NORTH:*   Exactly.

             *MAGISTRATE JUDGE EIFERT:*   No Bard and no Coloplast, unless you just feel like writing.  All right.

     So June 3rd for the motion, June 13th for the response, and June 16th.  Are those all weekdays?

             *COURTROOM DEPUTY CLERK:*   The 16th is a Sunday.

             *UNIDENTIFIED SPEAKER:*   The 16th is a Sunday.

*MAGISTRATE JUDGE EIFERT:*  All right.  Make it
June 17th, then, for the reply.  And then I will try to get
something to you as quickly as possible.  If we need argument,
I'll notify you and we can set up -- we may need to have some
other kind of discovery conference before the August 1st
status conference, because it sounds like there are a lot of
issues brewing out there that we don't want to let go too long,
so that may become necessary, and we'll talk about that if it
needs to be done.

　　　　Is there anything else, then, we need to cover today?

　　　　　　　*MR. GARRARD:*  No, Your Honor.

　　　　　　　*MAGISTRATE JUDGE EIFERT:*  Thank you, Mr. Garrard.
Yes?

　　　　　　　*MS. JONES:*  I apologize, Your Honor.  I have just
while we've been sitting here -- there is a deposition going on
today, I've not talked to any of the plaintiffs' lawyers here,
of Dan Berkeley.  He's being deposed; he's in the second day of
his deposition in the MDL here.  I am told that there is a
dispute about whether or not they're going to complete that
deposition today.  Direct examination is going to be done,
whether they're entitled to come back.  I anticipate, I guess
what I'm raising with the Court, is it may very well be that
they need Your Honor's assistance this afternoon in terms of
whether or not that deposition must be concluded.  I've told
you everything I know about the deposition, except that this is

actually the third day of this man's deposition, and clearly

it's going to be our position that the deposition is not a

30(b)(6) deponent, just a fact witness.  But I don't know

what's going on at the deposition; I just know that that

dispute is ongoing at this point in time, so I guess what I'm

suggesting to Your Honor is that I may be suggesting that the

parties then contact Your Honor this afternoon, if that will be

acceptable.

       *MAGISTRATE JUDGE EIFERT:*  Certainly.  If you need to

do that, contact Laura in my office.

       *MS. JONES:*  Okay.

       *MAGISTRATE JUDGE EIFERT:*  And she will track me down.

       *MS. JONES:*  Thank you, Your Honor.

       *MAGISTRATE JUDGE EIFERT:*  Anything else?

       *MR. GARRARD:*  No, Your Honor.

       *MR. AYLSTOCK:*  No, Your Honor.

       *MAGISTRATE JUDGE EIFERT:*  Anything from the

defendants?  All right.  Well, then court is in recess.

    *(Proceeding concluded at 11:37 a.m., May 23, 2013.)*

CERTIFICATION:

    I, Teresa L. Harvey, Registered Diplomate Reporter, hereby
certify that the foregoing is a correct transcript from the
record of proceedings in the matters of In Re: C. R. Bard,
Inc., MDL No. 2187; In re: American Medical Systems, Inc., MDL
No. 2325; In re: Boston Scientific Corp.,  MDL No. 2326; In Re:
Ethicon, Inc., MDL No. 2327; and In Re: Coloplast Corp., MDL
No. 2387, as reported on May 23, 2013.

<u>s/Teresa L. Harvey, RDR, CRR</u>          <u>May 30, 2013</u>