IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

AT CHARLESTON

IN RE:  ETHICON, INC.
        PELVIC REPAIR SYSTEM
        PRODUCTS LIABILITY LITIGATION

MDL No. 2:12-MD-2327

July 25, 2013
Charleston, West Virginia

TRANSCRIPT OF MDL BELLWETHER PRESENTATIONS
BEFORE THE HONORABLE JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE
and
THE HONORABLE CHERYL A. EIFERT
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiffs:            **BRYAN F. AYLSTOCK, ESQ.**
                              **D. RENEE BAGGETT, ESQ.**
                              AYLSTOCK WITKIN KREIS & OVERHOLTZ
                              Suite 200
                              17 East Main Street
                              Pensacola, FL  32502

                              **THOMAS P. CARTMELL, ESQ.**
                              **JEFFREY M. KUNTZ, ESQ.**
                              WAGSTAFF & CARTMELL, LLP
                              Suite 300
                              4740 Grand Avenue
                              Kansas City, MO  64112

```
(Appearances - Cont'd.)        BENJAMIN H. ANDERSON, ESQ.
                               ANDERSON LAW OFFICES, LLC
                               Suite 215
                               1360 West 9th Street
                               Cleveland, OH  44113


For the Defendant:             CHRISTY D. JONES, ESQ.
                               DONNA JACOBS, ESQ.
                               ANITA MODAK-TRURAN, ESQ.
                               BUTLER SNOW O'MARA STEVENS &
                               CANNADA, PLLC
                               P. O. Box 6010
                               Ridgeland, MS  39158-6010


                               DAVID B. THOMAS, ESQ.
                               THOMAS COMBS & SPANN, PLLC
                               P. O. Box 3824
                               Charleston, WV  25338-3824


Court Reporter:                TERESA M. RUFFNER, RPR
                               Sidney Christie Federal Building
                               845 Fifth Avenue, Room 101
                               Huntington, WV  25701
                               (304) 528-7583
```

Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription.

1    Thursday, July 25, 2013, at 10:00 a.m. in open court

2              THE CLERK:  The matter before the court is

3    In Re: Ethicon, Inc. Pelvic Repair Systems Products Liability

4    Litigation, Civil Action Number 2:12-MD-2327.

5              JUDGE GOODWIN:  Good morning.  We're here this

6    morning for the bellwether presentation in the In Re: Ethicon,

7    Inc. Pelvic Repair Systems, Inc. Products Liability

8    Litigation, MDL Number 2327.  I'm joined by Judge Eifert.

9         Have the parties noted their appearance for the record?

10             THE REPORTER:  Yes, they have.

11             JUDGE GOODWIN:  All right.  Thank you.  Pursuant to

12   PTO 33, the parties submitted eight cases per side originally

13   for consideration as bellwether cases.

14        I understand that you've reached agreement on two cases;

15   Carolyn Lewis, a TVT Classic case on plaintiffs' list, and

16   Peggy Froemming, a Prolift case that's on Ethicon's list.  Is

17   that correct?

18             MR. AYLSTOCK:  Judge, that's incorrect.

19             JUDGE GOODWIN:  All right.

20             MR. AYLSTOCK:  We were talking about an agreement,

21   but we were unable to reach an agreement on --

22             JUDGE GOODWIN:  Either of them?

23             MR. AYLSTOCK:  Either of them, Your Honor.

24             JUDGE GOODWIN:  All right.

25             MS. JONES:  I think, Your Honor, that we've -- we

1    did have a discussion and we've had multiple discussions about

2    whether or not we could reach an agreement on some.  In all

3    candor, I will tell you on behalf of the defendants --

4              JUDGE GOODWIN:  I'm sorry.  I couldn't --

5              MS. JONES:  What I would say on behalf of the

6    defendants is that as we begin our presentation, I think you

7    will find that we are willing to accept those two and will not

8    specifically argue those, but we want to put that in the

9    context, if you would, of the other cases that are to be

10   selected and --

11             JUDGE GOODWIN:  You're willing to accept them, but

12   they're not necessarily his favorites.  Is that what it boils

13   down to?

14             MS. JONES:  Well, no, I think the reality of it is

15   the -- we have accepted one that they selected and they've

16   accepted one that we selected, and we're willing to agree to

17   those, but we think that we need to agree to those in the

18   context of the other cases to be selected as representative of

19   the entire MDL population.

20             JUDGE GOODWIN:  All right.  I understand that

21   plaintiffs would like to know at the time I make the

22   bellwether selections which case will go first.

23             MR. AYLSTOCK:  Which product, Your Honor.  I believe

24   that Ms. Jones and I are in agreement that that would be a

25   good idea, and then we could stagger the reports for whatever

1    products come after the first product.

2            JUDGE GOODWIN:  As you recall, I will ask that you

3    have one case ready and a second ready as backup in case the

4    first case falls through for whatever reason.

5        Is there any opposition from Ethicon to my identifying,

6    in the same order from which I probably this afternoon will

7    select the cases, the first two cases?

8            MS. JONES:  No, Your Honor.  What I would suggest is

9    that what we will ask for, so that Your Honor is aware, is

10   we're going to ask that Your Honor select two TVT cases, two

11   TVT-O cases, and one of the Prolift cases.  And what we would

12   suggest, if Your Honor agrees that that's an appropriate

13   selection, is that when you select which ones of the cases

14   would be set, for example, in January, that it would be two

15   involving the same product, because I think that would be

16   easier for all sides that involve the same experts and the

17   same witnesses rather than having one involving one product

18   and one involving another.

19           JUDGE GOODWIN:  I've got it.

20           MR. AYLSTOCK:  And I'll get to this in my

21   presentation perhaps.  We agree on the concept.  We don't

22   agree which cases should go --

23           JUDGE GOODWIN:  Oh, I understand.  We wouldn't be

24   having this hearing.

25           MR. AYLSTOCK:  I don't think so, Your Honor.

1          JUDGE GOODWIN:  All right.  I think I've got it.  If

2     I mess it up, Kate will straighten me out.

3        I will identify the first case and the alternate in the

4     order selecting the five bellwethers.  The way I'm

5     understanding you, that necessarily means that I'm going to

6     select two of the five that are the same product instead of --

7     well, at least two of the five.  Does that make sense?

8          MS. JONES:  Yes, Your Honor.

9          MR. AYLSTOCK:  Yes, Your Honor.

10          JUDGE GOODWIN:  All right.  I'll select the five

11     cases and what I believe are the ones that are well-suited.

12     Each side has five minutes.  Try to keep to this time limit,

13     and plaintiffs can go first.  You have seven presentations.

14        Mr. Aylstock, are you going to do that or is somebody

15     else going to do it?

16          MR. AYLSTOCK:  If I could, Your Honor, I had a brief

17     presentation to kind of give the Court some context on the

18     different products in the Ethicon MDL because it is -- it's

19     certainly many more products than --

20          JUDGE GOODWIN:  That's fine, just so you take it off

21     of your five minutes for each of the seven.

22          MR. AYLSTOCK:  Yes, Your Honor.

23          JUDGE GOODWIN:  All right.  Thank you.

24          MR. AYLSTOCK:  May it please the Court.  Bryan

25     Aylstock for the plaintiffs.  I'm honored to be here this

1    morning.

2         I wanted to start, Your Honor, with explaining a little

3    bit about the different Ethicon products because there are

4    significantly more products in the Ethicon MDL than any of the

5    other MDLs.  There are five, really six different SUI

6    products, the stress urinary incontinence products.  There are

7    four pelvic organ prolapse cases.

8         What we have in this bellwether pool are TVT Classic

9    cases, TVT-O cases, TVT-S cases.  It looks like we may have

10   one TVT-AA, which is an abdominal approach which is --

11              THE REPORTER:  I'm sorry.  Could you use the

12   microphone?

13              MR. AYLSTOCK:  I'm sorry.  Yes.  And so we have a

14   wide range of the TVT products.  We have four different

15   products for pelvic organ prolapse.  The only one at issue --

16              JUDGE GOODWIN:  I'm having a hard time understanding

17   you, too.

18              MR. AYLSTOCK:  I'm sorry.  Let me try again.  Here

19   we go.  Maybe that's better.

20              JUDGE GOODWIN:  I think it will be.

21              MR. AYLSTOCK:  We have four different pelvic organ

22   prolapse cases, and the only one at issue in this bellwether

23   pool are the Prolift cases.  The Prolift+M is the exact same

24   product, just with a little bit different mesh.

25         When we talk about the SUI cases, there was an evolution

1    of the SUI cases over time.  And in particular, the Gynecare

2    TVT Classic was the first Gynecare Ethicon product to the

3    market.  It's -- oh, here it is.  Okay.

4        It came on the market in 1998.  It was a retropubic

5    device, which means it was implanted behind the pubic bone.

6    And that had the potential for causing some bladder

7    perforations.  And because of that problem, AMS developed the

8    Monarc product, which was an entirely different method of

9    implantation for the sling.

10       Shortly thereafter, to regain some market share, TVT-O

11   came on the market.  That's the transobturator approach.  When

12   you think "obturator," think "out."  The mesh comes out the

13   groin instead of up the abdomen for the woman.

14       And then, lastly, the single-incision market came to be

15   in the 2006 time frame with the TVT-S product.

16       We have, Your Honor, in our -- the plaintiffs pick one --

17   at least one of each of those major market segments.  This is

18   important, Your Honor, because the defendants have -- I

19   believe that they will advocate that a TVT-S product should

20   not be chosen as part of one of the five bellwethers.  We

21   strongly disagree with that assertion.

22       This is a Power Point slide from the Ethicon slide deck

23   on U. S. market share.  The market definition for slings can

24   be divided into three different categories.  You have your

25   retropubic, which is your TVT Classic, your transobturator,

1    which is your TVT-O, and your single-incision slings, which is

2    your TVT-Secur.  They're very different products, and I'll get

3    to that in a minute, but they're different products with

4    different regulatory histories, different design controls.

5    Everything about them when it comes to the implantation method

6    is different, as well as some of the tools that go along with

7    it.  And, again, this is Ethicon's own slide.

8         If we look at the market segment there, by 2010 the

9    obturator market was almost half of the sling market in this

10   country.  The retropubic followed with about a third, and then

11   about 20 -- somewhere between 16 and 20 percent by mid 2010

12   were these single-incision slings like the TVT.

13        So we believe that one of -- as Judge Fallon said, we

14   want to look at the predominant variables when we're picking

15   bellwethers.  A predominant variable in our judgment, Your

16   Honor, is the market definition of these slings, which fall

17   into the retropubic, transobturator, and single-incision.

18             JUDGE GOODWIN:  How does it divide up with the

19   number of cases currently filed?

20             MR. AYLSTOCK:  Well, that's an interesting point.

21   Let me get to that.  I think Ms. Jones will have some data on

22   that, but there's a problem that's unique to the Ethicon

23   litigation when it comes to plaintiffs' attorneys filing cases

24   with the product I.D.

25        The TVT product as first to the market kind of became

1    known universally.  When doctors talked about a sling, they

2    just talked about a TVT.  They don't necessarily talk to the

3    patient about a TVT-AA or TVT-S or TVT-O.  They just talked in

4    terms of, "I'm going to put a TVT in you."  And, in fact, when

5    they're writing in the medical records what they're putting

6    in, they simply write "TVT."  And that's -- we see this over

7    and over again in our inventory.

8        Now, it's compounded by the fact that the TVT label, the

9    TVT-O label doesn't say "TVT-O."  And that's in the bottom

10   left-hand corner of the screen.

11       What the label says -- let me see if I can get this to

12   work -- over here is Gynecare TVT System.  Now, we did not

13   know at the beginning of this litigation -- in fact, we've

14   only recently come to understand that this code 810081 is a

15   TVT-O product.  This is not a TVT product.

16       So when you look at statistics as far as how many cases

17   are TVT Classic versus how many are TVT-O versus how many are

18   TVT-S that are filed, they're going to be off because

19   plaintiffs' attorneys and even patients have a hard time

20   deciphering what's in the records when it comes to what

21   product was implanted.  And what you'll see, what you'll see

22   in the medical records --

23           JUDGE GOODWIN:  Let me get off on a tangent.  Let me

24   get on a tangent.

25           MR. AYLSTOCK:  Sure.

1        JUDGE GOODWIN:  Have you had your expert witnesses

2   look at each of these products already?

3        MR. AYLSTOCK:  We're in the process of doing that,

4   Your Honor, and I'll get to that.  Ms. Jones and I just had a

5   conversation about additional exemplars, to have them

6   evaluated, but they are very different products.

7        JUDGE GOODWIN:  All right.  Go ahead.

8        MR. AYLSTOCK:  And because of how the doctors use

9   the term "TVT," like a Kleenex, like you and I would say, "I

10  need a Kleenex," it's very difficult for a plaintiff's

11  attorney to know at filing what product it is, even if all the

12  medical records are collected, even if the sticker -- whenever

13  a doctor opens up the package and gets the tools out and the

14  mesh, there's a sticker, and the doctor will literally place

15  the sticker in the medical record, and that will identify what

16  that product is.

17      Well, the stickers for the TVT-O product just say "TVT."

18  And so it's very confusing.  And the only way we know this

19  is -- this another Johnson & Johnson Power Point -- the

20  ordering code for the TVT-O is the 810081.  And so that's

21  why -- that's how we figured it out.  And we figured it out

22  after a year and a half in this litigation.

23      So some of the cases we even filed we thought were

24  Classics but ended up being TVT-Os.  I think the better way to

25  look at it is what is the market share.  And what happened in

 1    the market -- and this is undisputed -- is that once the

 2    doctors realized there's a way that we can do this without

 3    having such a high risk of bladder perforations, they went to

 4    the transobturator method.  And that's what the market

 5    reflects, the sales of the various TVT products.

 6        So what we did is we tried to get a cross-section of all

 7    of the TVT, the major products, the S, which is the single-

 8    incision, the O, the obturator going out through the groin,

 9    through the pelvic bone, and the retropubic coming up through

10    the abdomen.  And this slide is on the top of the plaintiffs'

11    picks and on the bottom of the defendant's picks.

12        What's striking here, Your Honor, is that all of the

13    defendant's picks, save one, are in the 2010 time frame.  One

14    of them is the very, very end of 2009.  Why is that

15    significant?  Is that a coincidence?  I don't think it's a

16    coincidence, Judge, because there was a major change in the

17    instructions to the doctors about how to implant these

18    products.

19        So what we tried to do is not only pick on the SUI cases

20    and S, we picked four Os and we picked a Classic.  So we have

21    all three major products.  And as you can see, it ranges from

22    2005 all the way to 2011.  So we have a cross-section.  I

23    think we did exactly what bellwether -- the bellwether process

24    is intended to do, look at a cross-section, whereas the

25    defense looked at this narrow of a time frame.  And most of

1    these cases are Classic even though by 2010 the Classics had

2    decreased to one-third of the market share.

3        This is another significant point because when you look

4    at what the injuries are, on the defense side, except for one

5    case, which was an in-office mesh revision, which -- so the

6    Court understands, that's just simply a trimming of the

7    exposed mesh, usually a little estrogen cream on the inside of

8    the vaginal wall.  And for some women, they're fine for a

9    time.  Except for that one case, none of the others have had

10   any revisions at all.  And why is that important in the

11   context of the 2010 dates when all of these were picked?

12       Well, it's important because there's a significant

13   latency period for a lot of women after implantation to get

14   the mesh to erode to the vaginal wall and to the urethra.  Why

15   is that?  Well, as women age, as estrogen levels decrease, as

16   maybe they get diabetes or lupus or some other disease that

17   affects the tissue quality, they're going to be much more

18   likely to erode in the future.

19       So what we tried to do is pick some cases where the

20   latency was shorter, some where the latency was six years,

21   five months.  I think that's an important variable,

22   predominant variable, as Judge Fallon put it in his paper, for

23   how these cases should be evaluated.  And if you only pick the

24   2010 cases, well, okay, a lot of those haven't been revised

25   yet.  They may have some other problems.  They may not have

1    insurance.  They may have gone to their doctor and their

2    doctor said, "Well, there's risks to this.  Can you live with

3    it?"  And so they haven't been revised.  But they're not

4    representative because they're so short in time, less than

5    three years for some of these from today to when the

6    implantation was.  And so as we move forward, what we tried to

7    do is let's identify the problems common to all --

8              JUDGE GOODWIN:  So are the 2010 cases filed

9    prematurely, that is, by people that don't have any trouble

10   yet?

11             MR. AYLSTOCK:  Well, that's a very important point

12   because it doesn't take a revision surgery to have an injury

13   in this case.  The injuries can be pain.  It can be permanent,

14   debilitating, chronic pain without an erosion.  And if I could

15   just skip forward a little bit, I'll tell you why that is.

16       The TVT-O product here, here's -- I'll show a picture of

17   it.  These ice hook-looking things, these are going out, as

18   opposed to the TVT Classic, which goes up, where it goes up

19   through the abdomen.  Why is that important?

20       Well, when they changed the design to try to decrease the

21   risk of bladder perforation, the thing that they missed was

22   that when you go through over here, these obturator foramen

23   is how -- is how the mesh is fixated.  When you go through

24   that with these helical needles that go out like this, they're

25   very close to nerve branches, the obturator nerves and so

1    forth.

2        So the procedure itself, even without the mesh, can cause

3    permanent, lifelong debilitating pain.  And then you get the

4    mesh in there and it can entrap.  It can entrap nerves.  So

5    that's a long way of saying just because you have a procedure

6    doesn't mean -- or haven't had a procedure doesn't mean you

7    haven't been injured.

8        And the flip side is also true.  As we saw in the defense

9    picks, they picked one with a procedure that was an in-office

10   procedure.  The procedures are wide-ranging.  Some women can

11   have 23 procedures; some women can have a couple.  But you

12   shouldn't get too hung up on the procedures because some,

13   frankly, are pretty minor and then the women go on and are

14   okay for a time.  Others have transfusions.  It's major blood

15   loss.  It's under anesthesia.  It's in the hospital.  They try

16   to dig it out.  They can't get it.

17       So just by looking at, well, this is the number of

18   procedures, that's not really in my view the best way to look

19   at whether a case is representative or not.

20       So the Classic is this U-shaped hammock that comes

21   through the abdomen.  Here's another side picture of it.  The

22   O -- think side to side or out -- goes through the obturator

23   foramen.  And there's a membrane there where it actually pops

24   through.  Those ice hooks pop through.  And then the doctors

25   are told to pop and then stop and then drop and then pull it

1    through the groin area of the woman.

2        The S is completely different from either of those two.

3    It's a very small piece of mesh and it wedges up in there with

4    a single incision.  There's no trocar passes that go outside

5    the body.  So it's a very, very different procedure.  It has

6    fixation tips where it wedges between the bone and the muscle.

7    And we believe based upon our analysis, that there will be

8    thousands of cases, if they're not already here, of this TVT-S

9    product.  And it's a very important data point for what we

10   hope at some point we can sit down and talk about what the

11   resolution is.  And it would be a shame for the women who have

12   this very different product not to have that important data

13   point.  I think it would be important for the Court and the

14   parties to know what happens with that.

15       Now, I understand why they don't want to try one of those

16   cases.  It's off the market.  There was liability issues when

17   it was pulled off the market in Australia years earlier.

18   There's people talking back and forth about how unsafe it is,

19   and they even call it a failure.  I understand that, and I

20   accept that these cases are better perhaps than some of the

21   other ones because of the liability issues, but we owe it to

22   those women.  It's a market segment that was clear in TVT's

23   own -- or Ethicon's own documents that they occupied a big

24   segment of this market on this specific device.

25       So I'd urge the Court to put in this TVT, a TVT-S

1    bellwether.  Of course, you know the difference between SUI

2    and POP products.  The Prolift Total, completely different

3    than any of these.  It's a lot more mesh.  It's six trocar

4    passes blind through a woman's body, pelvis, the obturator, so

5    on and so forth.  And here's a picture of that.

6        I did want to briefly address the expert deadlines if I

7    could, and in particular when it comes to the TVT products,

8    because as Judge Eifert knows, we've been working very hard at

9    trying to get those products discovered.  A lot of discovery

10   was done before this MDL was even formed on the Prolift cases.

11   Some of us were involved in that.  The experts in those cases

12   translate to this MDL.  We expect to have a lot of the same

13   experts.

14       That's not necessarily the case in the TVT world.

15   There's five, six products in TVT.  And so we're, frankly,

16   behind the eight ball on the TVT discovery.  And Judge Eifert

17   issued an order yesterday.  There's more briefing that needs

18   to be done.  And right now our expert disclosures are due

19   August 22nd.

20       For AMS, which has a lot less products -- they only have

21   two.  They have the transobturator.  They have a -- one

22   transobturator and one retropubic device that are at issue,

23   the Monarc and a SPARC.  Their expert deadlines were pushed by

24   Your Honor on PTO 69 to August 26th and then simultaneous

25   disclosures ordered.  That's 99 days between disclosures and

1    trial.

2         We would ask -- in fact, we would beg, because in our

3    view, we're not going to be able to get experts ready.  It's

4    impossible for us to get the TVT experts ready in time because

5    of all of the issues in the discovery.  And I know this isn't

6    a discovery conference, but there are many that make it very

7    difficult for us to get a TVT case ready.  So we would ask, if

8    the Court is so inclined, to give us the same 99 days in

9    Ethicon and have the disclosures due, instead of August 22nd,

10   October 7th.

11             JUDGE GOODWIN:  And why is this, again?  It's

12   because --

13             MR. AYLSTOCK:  Well, it's a number of reasons.

14   First of all, there's many different products here that we're

15   all trying to discover simultaneously.

16             JUDGE GOODWIN:  But you said you had ex -- on one of

17   them --

18             MR. AYLSTOCK:  On Prolift we have the experts

19   because that discovery in New Jersey -- the New Jersey

20   discovery was directed.  Judge Higbee said do Prolift

21   discovery, and that's what we did, and then she tried that

22   case.  That particular case had 23 surgeries.  You know, I --

23             JUDGE GOODWIN:  You covered the field, so to speak,

24   on that.

25             MR. AYLSTOCK:  Correct.  And so we're ready to go.

1    We'd like -- I think if we did the Prolift, we could keep the

2    deadlines more in line and certainly keep the trial date, with

3    all the holidays and everything.   And we request

4    September 20th, something, a few extra weeks for the Prolift

5    just to make sure we -- you know, it's *Daubert*, and we

6    certainly owe it to these women to do the best job that we

7    can.   And since we're doing an AMS SUI case, I think it makes

8    sense to go ahead and look over to a POP case.

9        And Judge Fallon also in his paper when -- he said when

10   you look at bellwether cases, look at whether they're

11   trial-ready; are they trial-ready.

12       Well, Prolift, not quite there, but we're very close to

13   being trial-ready.   The discovery that we're doing in the MDL

14   and flying all around the country and everything is almost

15   exclusively directed at the TVT cases, the five, six different

16   products.   We're doing some cleanup here and there on the

17   Prolift cases, but that's what it is; it's cleanup.   It's not

18   discovery as an original matter.   And, frankly -- I'll give

19   you an example.

20       Just last week we had almost a million documents dropped

21   on us the day before -- or, I'm sorry -- it was right around

22   the time of the hearing before Judge Eifert.   We had another

23   million or so documents -- or million or so pages, I should

24   say, dropped on us.

25       So we have to get that in our system.   We have to look at

1    them.  We have to get them to our experts.  And we've had some

2    expert -- we've had some deposition scheduling issues.

3            JUDGE GOODWIN:  If we did a POP case first, that

4    would solve your problem, right?

5            MR. AYLSTOCK:  Yes, Your Honor, it would.  And so

6    with that, if I may -- and he'll rush through it -- I'll

7    introduce Ben Anderson.

8            JUDGE GOODWIN:  You've taken up most of his time.

9    You have about three minutes of the case left.

10           MR. AYLSTOCK:  Mr. Anderson, Judge, speaks very

11   quickly.

12           MR. ANDERSON:  Not too fast.  Thank you, Your Honor.

13   We'll try to move through as quickly as I can.

14       What we tried to do is to choose a representative

15   sampling with a variety of women with a variety of backgrounds

16   and a variety of ages, a variety across all four products, as

17   well as some with no revision surgeries, some two, three

18   revision surgeries, and we tried to choose those over the time

19   line that Mr. Aylstock reflected.

20       We also tried to choose women that were representative of

21   the fact that we see a lot of women that have what we call

22   early onset injuries.  They will have the mesh placed; and

23   within a few months, they begin to have erosions or they begin

24   to have chronic pain issues or painful sexual relations.

25   However, due to the nature of the way the body responds to

1    this mesh and the way -- because of the woman's tissue,

2    because of the way the mesh is placed, etcetera, some have

3    late onset.

4        So we have women that -- and this is borne out in the

5    literature, as well as well-known by Ethicon.  And it's also

6    representative of the cases before Your Honor.  Some are five,

7    six, and seven years where the women think they're doing just

8    fine, and all of a sudden they begin to have chronic pain,

9    they begin to have multiple recurrent erosions and recurrent

10   infections.

11       So we tried to choose a representative sampling across

12   the board.  The first two cases I want to discuss with Your

13   Honor are both Prolift cases.  Prolift is for prolapse, and

14   that is Ethicon's product that came on the market in 2005.

15   And the first one is Ms. Lillie Crews.  And Ms. Crews is --

16   pardon me, Your Honor.

17       Ms. Crews was 57 at the time of her implant.  She is now

18   61.  She is married with two children, and her implant was in

19   2009.  It was two and a half years before she began to have

20   problems.  So this is more of a later onset type injury.  She

21   began experiencing bleeding, heavy cramping, chronic pain,

22   which we see in 80 to 90 percent of the cases.  The biggest

23   problem with these women is chronic pelvic, debilitating,

24   untreatable pain.  That is the biggest single most important

25   factor before this Court and across the board.  And all of

1    these women have it that we are presenting to Your Honor.

2         She has had dyspareunia, so painful sexual relations, and

3    recurrent kidney infections.  She had one revision two and a

4    half years after her implantation and then had to have another

5    one six months later due to the exposure of the mesh and the

6    erosion.  And, Your Honor, I'm sure after beginning the *Bard*

7    trial and hearing other -- erosions are no simple matter.

8    That is ulcerations of the vaginal tissue or other pelvic

9    floor tissue with the mesh being exposed either because of the

10   inflammatory response or due to an infection or due to

11   mechanical irritation.

12        So it's no small matter when we hear that a woman has

13   recurrent erosions.  Someone is having to go in there and

14   either cut that mesh and put estrogen cream on it or to try to

15   go in and, under general anesthesia, try to remove all of it,

16   which as Your Honor knows very well is impossible in most

17   cases.

18        So her injuries are representative because, A, she

19   doesn't have a lot of co-morbidities and other health

20   complications other than those for which the mesh was

21   implanted.  She's had two procedures, and she also has the

22   potential for future complications.

23        So we would move on to the second Prolift case.  And this

24   will be presented to Your Honor so that you have these things.

25   I'm just going to try to highlight a few things out of these

1      eight that I'm trying to present.

2           Ms. Pollard is also a Prolift -- had Prolift implanted in

3      her.  She was 43 at the time.  She's married and has five

4      children.  This would be, as opposed to Ms. Crews, this is

5      early onset.  So within four months, she had erosions into her

6      rectum, and it was repaired four months after the implant.

7      However, like many of the women, she continues to have chronic

8      debilitating pelvic pain as well as recurrent erosions.  And

9      she was implanted by an Ethicon-trained gynecologist.  And as

10     you'll review some of these things, we believe that that's

11     important in some of our selections.  And, of course, this was

12     prior -- her case was prior to any substantive IFU changes.

13     So we'd ask the Court to keep that in mind when trying to

14     decide as between one of these two Prolifts.

15          Now let's talk about some of the TVT-O cases if we could

16     quickly.  Ms. Staci Moreland.  She was 34 when this was

17     implanted in her body.  She had the TVT-O, which as

18     Mr. Aylstock explained, is Ethicon's sling placed

19     transobturator, so through the groin.  And she had early

20     onset.  So unlike some of the other TVT-O products that we'll

21     talk about briefly, she had early onset problems.  What were

22     those?  Early erosions.

23          She had to have two revision surgeries, and one was

24     approximately a month afterwards, after she had this

25     implanted, and then another one the week later.  And they

1    tried to remove some of the mesh.  Unfortunately, it remains

2    stuck in her thigh to this day.  She is married with three

3    kids and she is unable to have sexual relations with her

4    husband; unable to have sexual relations with her husband,

5    chronic pelvic pain, a burning sensation chronically, and

6    recurrent UTIs.

7         Recurrent UTIs, Your Honor, just to digress for one

8    moment, it's very, very important because these women who have

9    to keep coming back and being placed on antibiotics, a lot of

10   their doctors, they run out of options because they become

11   resistant.  And so they have to continue to go from -- after

12   they're on one for a year, then they go on another antibiotic

13   for a year.  And so it's a constant revolving problem, coupled

14   with all the other problems that they already have.  So it's

15   important to keep that in mind we feel.  And even after she

16   was treated, her problems continue to worsen to this day.

17             JUDGE GOODWIN:  Did you say two revisions or three?

18             MR. ANDERSON:  Two, Your Honor.  One was three --

19             JUDGE GOODWIN:  I think she said she had three,

20   didn't she?

21             MR. ANDERSON:  She had one -- oh, I'm so sorry.  She

22   did have one that was a week later.  They had to go back in

23   and do another repair.  I apologize, Your Honor.

24             JUDGE GOODWIN:  That's all right.

25             MR. ANDERSON:  Both of those were in March of 2009.

1          JUDGE GOODWIN:  Okay.

2          MR. ANDERSON:  Thank you.  And then we have Tonya

3     Edwards.  Tonya also was placed with a TVT-O when she was 33

4     years old.  She is a late onset, so --

5          JUDGE GOODWIN:  Now, what's her product?

6          MR. ANDERSON:  TVT-O, Your Honor.

7          JUDGE GOODWIN:  All right.

8          MR. ANDERSON:  So hers was a late onset.  Six and a

9     half years after it was placed, she began to have horrible

10    erosions, chronic pelvic pain, cramping, throbbing throughout

11    her pelvis, dyspareunia or painful sexual relations with her

12    husband.  And when they went in to do the revision, they found

13    what many doctors find when they're trying to treat sling- and

14    mesh-related complications.  They found the sling was bunched

15    and completely encapsulated with inflammatory scar tissue.

16        We believe that she's representative because she did not

17    have, like the other women, any significant other health

18    conditions.  So the jury can be very clear on what condition

19    we're here to hear about, why it was necessary in this

20    doctor's mind to use the sling, and whether those

21    complications are related to the sling and not some array of

22    other problems that she may have.

23        She also has had worsening stress urinary incontinence.

24    So the very thing that the sling was implanted for has gotten

25    much worse for her.  But that's just -- that's the least of

1    her problems compared to the pain, the vaginal bleeding, the

2    cramps, and difficulty with all of her bowel movements.  And

3    when she tries to have sex, it's exceedingly painful, which

4    has, like for most of these women that have dyspareunia,

5    caused great strain on her marriage.

6         We will then talk about Ms. Jo Huskey, also, Your Honor,

7    a TVT-O product implanted when she was 51.  She is also

8    married.  And she is representative because, A, she doesn't

9    have a lot of co-morbidities as we've discussed before, but,

10   B, a lot of these women do, as Mr. Aylstock --

11              JUDGE GOODWIN:  A lot of these people you're talking

12   about are very young.  How is that representative of the total

13   inventory of cases?

14              MR. ANDERSON:  Did you say they aren't or are --

15              JUDGE GOODWIN:  They are.

16              MR. ANDERSON:  Yes, Your Honor.  Well, obviously

17   there's an array and there's a mean average I think with

18   slings somewhere in the late 40s to early 50s to late 50s,

19   early 60s, so --

20              JUDGE GOODWIN:  Somewhere between the late 40s and

21   early 60s.

22              MR. ANDERSON:  Well, it depends on which study you

23   read.  Just like anything else, it depends on which of their

24   internal documents you read.

25              JUDGE GOODWIN:  I'll take that as an answer I don't

 1      understand.

 2              MR. ANDERSON:  Let's say we tried to make it

 3      representative within this, you know, 40s to 60s.

 4              JUDGE GOODWIN:  All right.

 5              MR. ANDERSON:  So, yes, Ms. Huskey had a TVT sling,

 6      the O.  And like a lot of the women, she tried to have

 7      conservative treatment at first, which did not work, and so

 8      with the conservative treatment first for the mesh erosions,

 9      and then she comes back.  And so they tried a partial

10      excision, you know, four months after the procedure.  It did

11      not work.  So she came back six months later, and she has

12      to -- they couldn't remove the mesh.  It's still stuck in her

13      thigh.

14          One of the problems that we see both with the Prolift

15      arms, which are very similar to the TVT Obturator, is that

16      mesh gets deeply embedded into the thigh and into the groin

17      area, and the doctors cannot -- they don't want to run the

18      risk of trying to dig and dig and create even more problems

19      with the nerves and the tissue and the muscle.  And even their

20      attempts have not -- have also left her with continued

21      physical therapy and chronic neuropathies of her pelvis.

22          Why is she representative?  She has suffered two

23      complications and she tried the conservative treatment and it

24      did not work, nor did the second.

25              I'll move on to our TVT-O case Schneeberger-Ingram.  And

1    she is married.  She is 44 years old.  And she had two

2    revisions.  She would be an early onset TVT-O.  Five months

3    after, she had to undergo her first revision treatment,

4    followed by as much of the sling as they could remove the

5    following year.  So she has early onset, but then a year later

6    they have to continue to go back to try to revise her

7    problems.  She has horrible permanent nerve entrapment, and

8    the sling is scarred in.  And she also cannot have sexual

9    relations, or when she does, it's almost impossible, with her

10   husband.

11        So she is representative again of someone without

12   significant co-morbidities, married with children, problems

13   with sexual relations, chronic pelvic pain, erosions, and the

14   need for having those revised.

15        We'll then move on to our TVT product.  This is Carolyn

16   Lewis.  This was originally picked by --

17             JUDGE GOODWIN:  TVT --

18             MR. ANDERSON:  Classic, Your Honor, the retropubic,

19   so the very first device, sometimes called retropubic,

20   sometimes called Classic.

21             MR. AYLSTOCK:  Judge, if it might be helpful, I do

22   have some notebooks I can pass out.

23             JUDGE GOODWIN:  What are those, copies of the

24   slides?

25             MR. AYLSTOCK:  Of the slides.

1              JUDGE GOODWIN:   Okay.   I'll take them.   They'll be

2     handy.

3              MR. ANDERSON:   Tab 3 is the plaintiffs' bellwether

4     selections, and we are at about 12 pages back, Ms. Lewis.   So

5     a TVT product, originally a defense pick which did not end up

6     being one of their picks and ended up being one of our picks.

7              So Ms. Carolyn Lewis, 59 years old.   She's married.   She

8     was implanted in November of 2009.   She has not had a revision

9     surgery.   She has had chronic pelvic pain and horrible painful

10    sexual relations such that she and her husband have not had

11    sex in over two years.   She lives with and has chosen to live

12    with this chronic pelvic pain.   And, of course, she is

13    representative of those women out there who have chosen not to

14    have a revision, yet have to -- will suffer for the rest of

15    their lives with this permanent implant.

16             We'll move on quickly to the TVT-S product that we chose.

17    That is Ms. Edra Vazquez.   She was 35 when the TVT-S was

18    implanted.   She is now 40.   She is a late onset TVT-S

19    bellwether pick.   Four and a half years after her implant, she

20    had a partial removal because the mesh had eroded and

21    perforated into her urethra.   It was a very difficult revision

22    surgery.   Dr. Greibling was in there for over four hours

23    trying to remove this carefully away from the urethra.   And so

24    she has had worsened incontinence, urinary problems with both

25    urinary retention issues and urinary urgency problems, chronic

1    pelvic pain, and painful sex during intercourse.

2        So those are the representative plaintiffs.  I tried to

3    keep it short.  If you have any questions, I'll be happy to

4    answer them.  Thank you so much.

5            JUDGE GOODWIN:  Thank you.  All right.  I'll hear

6    from the defendant.

7            MS. JONES:  May I proceed, Your Honor?  If I could

8    have just a second, Your Honor, to switch computers.  I

9    apologize.

10           JUDGE GOODWIN:  That's all right.

11           MR. AYLSTOCK:  I apologize too, Your Honor.

12           MS. JONES:  I think it was Bryan's fault.

13           JUDGE GOODWIN:  Lawyers aren't good at technology,

14   or not very many of them are, okay?

15           MR. AYLSTOCK:  I certainly don't fall in that

16   category.

17           JUDGE GOODWIN:  Can you clear the screen?

18           THE CLERK:  No.

19           MR. AYLSTOCK:  There you go.

20           THE CLERK:  Thanks.

21           MR. AYLSTOCK:  Just keep hitting enough buttons.

22           MS. JONES:  All right.  I thought it would be up

23   there now.

24           JUDGE GOODWIN:  Turn those monitors on over there in

25   the jury box.  It could make the argument better downstairs.

```
 1              MS. JONES:  I don't know, Your Honor.  We had it
 2    operating earlier today.
 3              JUDGE GOODWIN:  Take your time, Ms. Jones.
 4              THE CLERK:  Is it showing presentation cart on your
 5    screen, because it does not on mine.  Does it show that the
 6    presentation cart has control at this point, because it's not
 7    showing that on mine, on the screen that Bryan is looking at.
 8              MR. AYLSTOCK:  Just trying to get laptop input.
 9              THE CLERK:  Right.  Presentation cart.
10         (Remarks off the record)
11              MS. JONES:  Your Honor --
12              JUDGE GOODWIN:  Yes?
13              MS. JONES:  -- I apologize for the best-laid plans.
14    We've got hard copies here if Your Honor --
15              JUDGE GOODWIN:  No, that's fine.
16              MS. JONES:  If you want us to go through that, I'm
17    happy to do that.
18              JUDGE GOODWIN:  It's fine.  Are the people on their
19    way up?
20              THE CLERK:  Yes, they are.
21              JUDGE GOODWIN:  Let's just take about five minutes
22    and wait for the tech people to come up from downstairs.
23              MR. AYLSTOCK:  We're going to try it on mine as
24    well, Your Honor.  Maybe it will work.
25              JUDGE GOODWIN:  All right.
```

1          MS. JONES:  It was working 30 minutes ago.  I think

2     I clearly jinxed it.

3          JUDGE GOODWIN:  I'm certain.  I'm certain.  Let's

4     just be at ease until the tech people come along.

5          (Recess from 10:50 a.m. to 10:55 a.m.)

6          JUDGE GOODWIN:  All right.  Ms. Jones?

7          MS. JONES:  May it please the Court.  I'll try my

8     best to not have any more technical interruptions here.

9          Your Honor, with the Court's permission, I'm going to

10    give an overview similar but very different from Mr. Aylstock

11    in terms of how we came to our selections and the features

12    that we think are important.  Mr. Thomas was then going to

13    respond to the plaintiffs' selection of claims, and then I'll

14    present our nominees.

15         I'll just start with the purpose of the bellwether

16    selection process, which I know Your Honor is more than well

17    aware of, but it occurred to us that what Judge Fallon says

18    here is very important; that is, in determining what the

19    bellwether selections are, it's very important to know what

20    types of cases actually comprise the MDL so that, in fact,

21    cases can be selected that will result in the ultimate

22    disposition of the MDL or the cases in the MDL.

23         And so to do that, we went about considering how to

24    define a representative claim, looking at the different

25    products, whether it was incontinence or prolapse, the age of

1    the plaintiffs, reasons for the implant and so forth.

2         As Mr. Aylstock has already mentioned, there are five TVT

3    products at issue in this multi-district litigation.   The

4    three that are of most interest are the TVT, the TVT

5    Obturator, the TVT Secur.   There are four prolapse products at

6    issue.   But as Mr. Aylstock mentioned, really only the Prolift

7    is at issue.   This is what I think is important, is when you

8    look at this chart, we currently as of earlier this week had

9    10,520 claims in the Ethicon MDL.

10        Now, Your Honor, some of those are those with which we

11   have been served but that have not yet been filed based upon

12   the tolling agreement that we entered into.

13             JUDGE GOODWIN:   Yeah.

14             MS. JONES:   Of those, some 5,200 have filed patient

15   profile forms and --

16             THE REPORTER:   I'm sorry?   "Have filed -- have

17   filed" --

18             MS. JONES:   Have filed patient profile forms.   And

19   so the information that I'm going to present to you is the

20   information gleaned from those patient profile forms, because

21   that, frankly, gives us, the defendants, the best information

22   that we have about what makes up the claims in the MDL in

23   general.

24        And what we did was we looked at those claims, those

25   5,200, believing that they would be the most representative

1    for a number of different reasons, not the least of which is

2    that in that roughly four to five thousand claims that are not

3    included here that have been filed in the last couple of

4    months, there are a number of those in which there's

5    absolutely no product identification.  In some cases, all of

6    the manufacturers have been sued.  So there's no way for us to

7    determine more precise information about that.

8         What we suspect, though, is that the figures that I'm

9    going to present to Your Honor are the most indicative that we

10   have, the most predictive that we have and, at best, will in

11   certain instances change in a way that I think will

12   demonstrate that perhaps there are claims here that may or may

13   not be as important to the case.

14        Once we look at this chart, you see the 2,778 claims

15   involving a single product only are stress urinary

16   incontinence claims.  Those are the TVT claims.  Seven hundred

17   and forty-two of those are prolapse products.

18        If we look then at the breakout, what you have is that

19   21 percent of the entire MDL are Prolift claims or prolapse

20   claims, and the other 79 percent are SUI claims, which clearly

21   indicates to us that four out of five of the plaintiffs are

22   SUI claims or TVT-related claims rather than the Prolift

23   claims, which, frankly, Your Honor, I know Your Honor is

24   aware -- and we'll come back to it -- that we argued early on,

25   I think at the first time we appeared before Your Honor, that

```
 1    an SUI case ought to be the first tried --

 2              JUDGE GOODWIN:  Right.

 3              MS. JONES:  -- for this very reason, and Your Honor

 4    is well aware that initially in our nominations, we didn't

 5    include any prolapse cases for that reason.

 6              JUDGE GOODWIN:  And I understand that.  I also note

 7    that your charts don't include multi-product --

 8              MS. JONES:  That's correct.

 9              JUDGE GOODWIN:  -- cases.  And that would change the

10    percentages considerably.

11              MS. JONES:  That would change the percentages on

12    some of these but certainly not on all of them, but we focused

13    only on that.

14              JUDGE GOODWIN:  And I asked Mr. Aylstock about doing

15    a pelvic organ prolapse case first because of his discovery

16    requests, but let me ask you about the progress of discovery

17    in that light.  I understand from Judge Eifert that in the SUI

18    product cases, we've been on a regular basis taking, like,

19    nine-day depositions of a witness because we're covering each

20    of the products.  And I can understand why it takes a long

21    time, but if every deposition is taking nine days, I don't --

22    I wondered the same thing I wondered when Ms. Cohen filled up

23    one side of my courtroom with notebooks.

24        How in the world are we going to try those cases in 12

25    days, which we are.  I didn't wonder if we were; I only
```

1    wondered how we were.

2        So in the context of your presentation -- and I know you

3    will -- explain to me the practicalities that you see of the

4    schedule that I have in place and how that relates to the

5    problems the parties are having in terms of getting discovery

6    done on the SUI products.

7            MS. JONES:  If I can just digress a little bit --

8            JUDGE GOODWIN:  Sure.

9            MS. JONES:  -- then to address that issue, Your

10   Honor.  All of the discovery, 90 percent of the discovery in

11   this case to date is related to the TVT products.

12           JUDGE GOODWIN:  Right.

13           MS. JONES:  There are five TVT products.  As you'll

14   see, the TVT Abbrevo and Exacto involve a very small

15   percentage.  Virtually no discovery has been devoted towards

16   those.  So we're really discovering three products, although

17   we have frankly said we want to discover -- we'd rather the

18   plaintiffs take those depositions in the hopes that we'll

19   never have to present these discovery again.

20       The depositions that have taken four, five, and six days

21   have been the depositions that have been 30(b)(6) designees.

22   The depositions that have been -- the others of the key

23   witnesses have been, frankly, longer than we thought they

24   should have been or needed to be, but I don't see that as --

25   I'm not going to address that as an issue here.

1          What I will say is that on each one of those depositions,

2     we have allocated at least two days for those depositions with

3     the hopes that we could simultaneously conclude any New Jersey

4     primarily depositions as well, and we've tried to work with

5     that, and there have been a number of scheduling issues that

6     have taken place.

7          I will say that there are additional depositions or

8     depositions that have not been completed that are now being

9     re-scheduled, in some cases at the plaintiffs' request and

10    some cases simply because they weren't completed, in late

11    August, early September, as late as that.

12         I will also tell Your Honor that the vast majority, if

13    not all of the key depositions have been taken in terms of the

14    key people that were involved in the issues.  And I will say

15    that there have been a total of -- I believe it's 71

16    depositions that have been requested in addition to the

17    30(b)(6) depositions.  The number of those that have been

18    scheduled and/or completed is in excess of 45.  The plaintiffs

19    have withdrawn the request of certain of the depositions.

20         So I don't think that discovery -- let me put it this

21    way.  If Your Honor says we're going to try a TVT case in

22    January, we'll try a TVT case in January, and discovery can be

23    completed.  The depositions that currently are being

24    re-scheduled are being re-scheduled at the plaintiffs'

25    request, and we're accommodating them, and I'm not pointing

1    fingers at them, but there is some delay.

2        We have agreed with them -- and the way the two-week

3    extension came about was that we were trying to work in

4    harmony with New Jersey on a matter that had to be

5    re-scheduled until later, and we said we'll agree to a

6    two-week extension of all of the deadlines down the line and

7    that you can, in fact, supplement any expert reports to the

8    extent that you need to.  We won't object to it because of

9    these depositions.

10        So practicality, it's going to be very difficult, but we

11   will get it done.  The other reason -- and let me just say

12   that it's important to us, as Your Honor is already aware, we

13   clearly have tried a Prolift case.  We have at least two

14   others likely to be tried this fall, state court cases.  So

15   from the standpoint --

16            JUDGE GOODWIN:  Where?  Where?

17            MS. JONES:  One in the State of Texas and one in the

18   State of Missouri.

19            JUDGE GOODWIN:  The New Jersey case has been moved.

20            MS. JONES:  I beg your pardon?

21            JUDGE GOODWIN:  The New Jersey case that was

22   scheduled --

23            MS. JONES:  The New Jersey case -- the next New

24   Jersey case is scheduled in March.  There is a Bard case

25   scheduled in September in New Jersey, as I understand it.

1              JUDGE GOODWIN:  Okay.

2              MS. JONES:  So I know you're going to be onto my

3      time in a minute, but that's a little bit of the story of

4      the --

5              JUDGE GOODWIN:  I'm not taking this off your time.

6      I'm trying --

7              MS. JONES:  I understand.

8              JUDGE GOODWIN:  -- to understand.  I don't mind --

9      and I want to help to adjust schedules that help the parties.

10     What I don't want to do is move trials.  And sometimes by

11     adjusting the schedule in the middle, you put it so that I

12     don't have any time to decide.  So that's what I'm concerned

13     about.

14             MS. JONES:  Well, my concern is not, Your Honor --

15     we'll work with an adjustment of the expert designations.

16         Now, the agreed-upon case management order that we have

17     provides for a staggered identification of expert witnesses,

18     and I would like to maintain that.  I understand Your Honor

19     can say no, but I would like to maintain that even if it's a

20     shorter period there because the plaintiffs' designation of

21     experts may or may not affect whether or not we need all of

22     the different categories of experts that we would otherwise

23     name.  But I don't have any objection to an extension of the

24     expert deadline if that's the issue.

25         One of the problems that we, frankly, looked at, Your

1    Honor -- and I'm not prepared without pulling out the order --

2    is that the *Daubert* deadline is, I think, scheduled before the

3    dispositive motion deadline.  And the concern was that as we

4    moved back the expert witness deadline, that we were going to

5    have to adjust the *Daubert* motion deadline accordingly.  And

6    there was some question as to whether or not Your Honor would

7    be agreeable to that.

8         JUDGE GOODWIN:  Well, I think I do need to adjust to

9    the extent that the *Daubert* motions are complete and have been

10   ruled on before you filed dispositive motions.  I'll have to

11   do something to do that.

12        MS. JONES:  So clearly we don't have any objection

13   to adjusting those schedules in that manner.  We do strongly

14   believe that we should not try a Prolift case in January.

15        JUDGE GOODWIN:  All right.  I'll let you go back to

16   what you wanted to tell me.

17        MS. JONES:  Well, one of the reasons that we believe

18   that we should not try a case in January is because we've got

19   79 percent of those cases in the MDL are TVT cases.  And if we

20   look at how they're broken out, 56 percent of those are TVT,

21   28 percent are TVT-O cases, and 12 percent are TVT-S cases.

22        Now, I want to call Your Honor's attention to the fact

23   that Mr. Aylstock suggested that the medical records and so

24   forth just refer to TVT and that this would be an aberration,

25   but the patient profile forms require the lot number to be

1    listed on the patient profile forms of the product.  And these

2    figures represent the identification of the product based upon

3    the lot numbers that are in the patient profile forms.

4        So out of that 5,200 cases that we currently have before

5    Your Honor, 56 percent of them are the original TVT Classic or

6    retropubic, and 28 percent of them are TVT-O, and 12 percent

7    of them are the TVT-S cases.

8        If we look at the time of implantation in terms of the

9    dates, what you will see is that the vast majority -- well, I

10   don't want to say the vast majority.  More claims were filed

11   involving implantation in the year of 2009 and 2010 with

12   respect to the TVT cases than any other year.  That's just

13   what the patient profile forms show.  If we look --

14       (Ms. Jones and Mr. Thomas conferred privately off the

15   record.)

16            MS. JONES:  Oh, I'm sorry.  I see.  We've got a typo

17   there.

18            JUDGE GOODWIN:  I see it there.

19            MS. JONES:  The white -- the white involves the

20   prolapse products and the red involves the TVT products.  I

21   don't know how many times we can look at this and not find

22   those, but it's just the reverse of what it says.

23       So that's the reason that when Mr. Anderson refers to the

24   dates more claims were filed, they were implanted during those

25   dates than any place else.

1          In terms of the injuries -- and we've got all these

2     plaintiffs' self-reported injuries because the injuries that

3     are identified for pain, urinary problems, dyspareunia, and

4     infection, infection is what I would represent to Your Honor

5     is that the science and the medical literature simply doesn't

6     bear out the fact that you would anticipate that number of

7     infections.  Infections associated with these products are

8     extraordinarily low.  So we don't know that that is, in fact,

9     representative, but it does show up on the patient profile

10    forms.

11         I know Your Honor has had questions in the past about the

12    revisions.  The plaintiffs talk about revisions.  This is what

13    the plaintiff profile forms show.  If you look at the SUI

14    products, 61 percent of those claims had no revisions,

15    29 percent had one revision.  So we have 90 percent of the

16    claims with one or no revision.

17         Those numbers vary a little bit whether it's a TVT, a

18    TVT-O, or a TVT-S, but it's between 59 and, like, 64 percent

19    it averages out.

20         If you look at the prolapse products, 42 percent have had

21    no revisions, 37 percent have had one revision.  So we end up

22    with 79 percent with one or no revisions.

23         And so if you look at what we've tried to do with looking

24    at the broad category of claims here, we named four TVTs,

25    which represent more than half of the products, three TVT-Os.

1    Because of our understanding about Your Honor's desire

2    concerning the -- at the AMS hearing about having a prolapse

3    product involved, we named one Prolift.  We accepted the

4    plaintiffs' designation of Ms. Froemming.  And, frankly, if

5    Your Honor is inclined to name a Prolift product, we would

6    hope that that would be it and that perhaps Your Honor would

7    consider; if not, that we have the same procedure that AMS has

8    in place and go back and look at two or three Prolift cases

9    when we actually have the opportunity to look at that.

10       So we believe that the representative claims -- that our

11   group of plaintiffs appropriately represent the makeup of the

12   MDL.  I point out that each -- at the beginning of the

13   selection process, each party selected 15.  We lost during the

14   course of discovery, through dismissals or requests for

15   withdrawal, five of those claims, so that -- so that our

16   selections were, in fact, reduced.  And therefore, you know,

17   here we are with what we have.

18       Mr. Thomas is going to address the plaintiffs'

19   selections, but what at the end of the day we're going to

20   suggest to Your Honor and that, you know, make us not perhaps

21   perfectly happy, but happier than some other alternatives,

22   would be we would accept the Lewis, which is the plaintiffs'

23   only TVT case that they named, which are over half of those

24   products.

25       Ms. Lewis is going to have a revision in September, so

1    she will have a revision, and we would suggest to Your Honor

2    that you select another TVT case but one of the TVT cases of

3    ours that has no revision, that you select two TVT-O cases,

4    one with a revision and one without a revision, and then

5    ideally it would be the -- if you're inclined to do a prolapse

6    product, to do the Froemming case.  And with that, I'll yield

7    to Mr. Thomas if it's okay.

8              JUDGE GOODWIN:  Okay.  Mr. Thomas.

9              MR. THOMAS:  Thank you, Your Honor.  Your Honor,

10   obviously the question now is whether the plaintiffs' nominees

11   accurately reflect the pool of cases from which you'll be

12   selecting cases.

13        I want to ground you again in some of the boards or

14   slides that you saw before about the distribution of these

15   cases.  The largest group is TVT Classic, then TVT-O.  That

16   makes up 84 percent of the cases.  Seventy-nine percent of the

17   cases are SUI cases.  Twenty-one percent are the prolapse.

18   That's the product mix that we're working with:  Eighty-four

19   percent TVT, TVT Classic and O, and then the four-to-one ratio

20   of SUI-prolapse.  And perhaps most importantly, compared to

21   what the plaintiffs have shown you, is the breakdown of

22   revisions.

23        Single-product SUI cases, 61 percent have no revisions,

24   29 percent have one revision.  That makes 90 percent of the

25   SUI inventory has one or fewer revisions.

1          The same is true with the pelvic organ prolapse cases.

2     Forty-two percent have no revisions.   Thirty-seven percent

3     have one revision.   Seventy-nine percent, one or fewer

4     revisions.

5          That's the approach that we took as we went through

6     plaintiffs' cases to figure out whether they were

7     representative.

8          I'm going to go through by product, because I think

9     product is an easy way to approach it.   TVT Classic, TVT

10    retropubic is the largest group of cases in the MDL.   It's

11    56 percent of the MDL.   Plaintiffs have only offered one

12    person from the largest group of cases in the MDL.   That's

13    Carolyn Lewis.

14         As you've heard, we've agreed to accept Carolyn Lewis

15    because that's theirs.   She doesn't have a revision now.

16    She's scheduled for revision in September.   And we'll accept

17    that one.   But in order to get at what is the largest group of

18    cases in the MDL, which would be the TVTs with no revisions,

19    Ethicon suggests to the Court that it's appropriate to have a

20    TVT case with no revisions as the second case with a January

21    trial.

22         Now, as you go through the next group of cases, we're

23    talking about the TVT-O cases or TVT Obturator cases.   TVT

24    Obturator has been on the market since 2003.   It's the second

25    largest group of cases in the MDL.   Again, it is 28 percent of

1    the SUI cases in the MDL.  Plaintiffs have given you four to

2    look at.  All four of these plaintiffs have mesh revision

3    surgeries.  And, remember, for these cases, 61 percent of this

4    group do not have any mesh revision surgeries.

5         So if we look at the first one, which is -- excuse me --

6    Tonya Edwards, Your Honor, she's too young.  She's 32 years

7    old.  She's the youngest person in this group of cases in

8    these proposed bellwethers.  Only 17 percent, 17 percent of

9    the people in this MDL are in the 30-to-40 age range.

10        The implant is too old, Your Honor.  It's in 2005.  You

11   saw the cases that we saw before.  The range of cases here,

12   the predominant number of cases is from 2009 and 2010.

13        She has a revision.  Only 29 percent have one revision.

14   Sixty-one percent have no revisions.  So the combination of

15   those three factors, that is, that she's too young,

16   17 percent, too old, not a predominant number either, and the

17   fact that she has one revision takes her out of the pool of

18   people that is a predictor or a bellwether for this MDL.

19        Likewise, Jo Beth Huskey, her age is okay, her implant is

20   okay -- date of implant is okay, but, Your Honor, she has two

21   revisions.  Only 10 percent of this population has more than

22   one revision.  That means that 90 percent don't have two or

23   more revisions.  So Jo Beth Huskey with multiple revisions is

24   not representative.

25        Likewise, we go to Staci Moreland.  She's too young.

1    She's 34 years old.  Your Honor, the plaintiffs have given you

2    three plaintiffs in their 30s when the demographics of this

3    MDL pool show that only 17 percent of the patient -- of the

4    plaintiff population is in this age range.

5        Ms. Moreland is not only too young, she's had three

6    revisions.  And remember that 10 percent have two or more.  We

7    don't have the breakdown of three or more, but it certainly

8    would be less than 10.  So you're over 90 percent of the

9    people that are more representative than Ms. Moreland on the

10   number of revisions.

11       Her complaint was filed more than three and a half years

12   after her mesh revision surgery.  We think that's a

13   significant statute of limitations issue.  And while I'm not

14   going to say we win that one, we're certainly going to argue

15   it when the time comes.  And we think that she's not an

16   appropriate candidate from the statute of limitations issues.

17       Lisa Scheenberger-Ingram.  The age is okay, the date of

18   implant is okay -- the date was okay, but this is another two-

19   revision plaintiff, Your Honor.  Again, you're talking about

20   10 percent of the pool of plaintiffs.  It's not the 90 percent

21   of people that have one or less.

22       So what you have from the TVT-O cases of which plaintiffs

23   give you four, which is the second largest group of cases, you

24   would think that the demographic should be age 40 to 65,

25   surgery in 2009 and 2010, with no revisions or one revision.

1      Your Honor, none of these cases are representative of

2   that demographic, and this is the second largest cases, block

3   of cases in the MDL.  And when Ms. Jones talks to you in a

4   minute, we're going to ask you to do the same thing with

5   TVT -- TVT-O as we asked you to do with TVT Classic, and that

6   is, identify one with one revision, one with no revisions, and

7   that way you get the biggest number of cases in the second

8   biggest block of cases that you have.

9      TVT-S.  We've heard an awful lot about TVT-S and

10  inability to identify and the fact that there are going to be

11  more of these.  Well, they're only 323 TVT cases, Your Honor,

12  in the MDL.  And to put that in perspective, there are five

13  TVT cases for every one TVT-S case there is; five to one.

14  Three hundred -- and they're only 12 percent.  Twelve percent

15  of the MDL is TVT-S.  So it is an outlier by itself in

16  connection with the entire MDL.

17      And you only have one TVT-S person to look at, Your

18  Honor.  You don't have a choice.  You only have but one from

19  the plaintiffs.  And I would suggest to you that even as an

20  outlier by itself, Ms. Vazquez is also an outlier and not

21  representative.

22      Ms. Vazquez is another 35-year-old.  She is a

23  17 percenter, if you will, in the group of MDL plaintiffs.  So

24  not only do you have a small category of cases, but you had an

25  unrepresentative age group within that product group.  And so

1    Ms. Vazquez is 35, in a small group, and she has one revision.

2    So that takes you again out of the 61 percent that have no

3    revisions and puts you in a minority of cases, the 39

4    percent -- excuse me -- the 29 percent that have one revision.

5        I would suggest to the Court if you're inclined to choose

6    a TVT, it should be a no-revision case, which we don't have to

7    choose from here.  And so that's the only one that you have.

8        For the Prolift cases, you've heard our position on the

9    Prolift cases.  We didn't realize we were supposed to submit

10   Prolift cases at the beginning, so we didn't.  We proposed

11   Froemming, which is a plaintiff discovery pick, and we'll try

12   that late next summer if the Court is so inclined.  And we'd

13   like to have the opportunity to offer our own candidate should

14   that be appropriate later down the road.  But the ones the

15   plaintiffs have --

16           JUDGE GOODWIN:  You know, just as a sidelight -- and

17   this is true across all the mesh MDLs -- I would ask all of

18   you to quit reading things into what I say.  I just say

19   things, and whatever I say means that.

20       I have said that I will try an AMS, an SUI case first.

21   That's what I said, I believe.

22           MR. THOMAS:  Thank you.

23           JUDGE GOODWIN:  Go ahead.

24           MR. THOMAS:  The Lillie Crews case, a pelvic organ

25   prolapse case, Your Honor, we don't believe that's

1   representative.  Her Total Prolift implant was in 2009.  She's

2   had two revisions, one in August of 2011 and one in March of

3   2012.

4       Your Honor, 80 percent of all Prolift cases have one

5   revision or less.  Forty-two percent of all Prolift cases have

6   no revisions.  So what you're dealing with is a case in the

7   21 percent of the pelvic organ prolapse cases that takes it

8   out of the demographic which makes this a bellwether or

9   representative case.

10      Ms. Crews also has a TVT-O implant.  It's not clear from

11  the record developed to date what impact that might have on

12  this litigation or this case, but the Court has recognized the

13  difficulty in having a multiple-product case, and you learn

14  more from a single-product case and any injuries that might be

15  claimed as a result of that single product than you do from a

16  confounder that has a second product.

17      So we suggest to the Court that Lillie Crews is not a

18  representative or bellwether plaintiff.

19      Finally, you have Theresa Pollard.  We believe her claim

20  is barred by the statute of limitations.  Her surgery occurred

21  on January 2008.  She had mesh revision surgery some two

22  months later, and the record that has been developed to date

23  suggests that there's a bunching of the mesh just two months

24  later.

25      Ohio has the two-year statute of limitations.  The

1    complaint was filed more than four and a half years after her

2    revision surgery, and we believe that that's a case that is

3    not appropriate because of her significant statute of

4    limitation issues.

5         So, Your Honor, just in sum, again going back to where we

6    started with the board, TVT is the biggest block of cases.

7    Plaintiffs gave you one.  TVT-O is the second biggest block of

8    cases, with no or one revision.  Plaintiffs give you four with

9    multiple revisions.  And Ms. Jones is going to tell you right

10   now why our representative picks are better than what the

11   plaintiffs have offered to you.  Thank you.

12        JUDGE GOODWIN:  Ms. Jones.

13        MS. JONES:  Your Honor, I'm going to quickly go

14   through these because I understand we're running a little bit

15   short on time.

16        What we have done, as I mentioned to Your Honor earlier,

17   is we have identified four TVT cases, three TVT-O cases, and

18   one Prolift case.  And I'd like to address those by product as

19   Mr. Thomas did with respect to the TVT cases, the four cases.

20   Your Honor has copies of the Power Point that, frankly, has as

21   much of the information about the plaintiffs as I think is

22   appropriate.

23        Brown is from -- is from Alabama and is a TVT case.  She

24   had her implant inserted in 2010 at the same time that she had

25   a vaginal hysterectomy and a uterine wall suspension with

1    sacrospinal ligament fixation.  She has not had a revision,

2    which we believe is appropriate.  She's from the State of

3    Alabama.  I mention that only because we went back and looked

4    at the percentages of claims coming from each individual

5    state, and there was a total of about -- a little over three

6    percent, three and a third percent represented by the State of

7    Alabama.

8         So we believe that based upon the fact that it's an SUI

9    product, the date of the implant is 2010 when more of the

10   implants occurred, there's no revision, which is consistent

11   with the statistics and the representative injuries, that she

12   is an appropriate candidate.

13        The second TVT case that we identified was Ms. Galarza,

14   who is a divorced, 52-year-old woman, at least at the time of

15   her implantation.  She has had four children, multiple

16   miscarriages.  She's had symptomatic SUI.  She had a TVT

17   inserted in 2010.  She has not had any revisions.  She

18   complains of the same injuries that we saw at the top of the

19   percentage list in terms of pain, infection, urinary issues,

20   and dyspareunia.

21        She's from Illinois.  Illinois has a percentage of claims

22   in the MDL comparable to Alabama, at a little over three

23   percent.

24        The third candidate here is Annette Lughas.  She had a

25   TVT.  She was age 47 at the time of implant.  And I know

1    Mr. Thomas mentioned this.  Our statistics show that

2    75 percent of the claims fall within the 40-to-69 age group

3    across the -- across the board based upon what we have to

4    date.

5        Ms. Lughas, again, has had no revision.  We believe that

6    her age, the product, the date of implantation all make that

7    representative.  She's from the State of Georgia.  The State

8    of Georgia has over five percent, nearly six percent of the

9    claims involved in the MDL and that her claimed injuries are

10   consistent with those across the board.

11       If we look at the next TVT case, it's Tracey Ryan Smith

12   from the State of Missouri.  She was 45 at the time that she

13   received her implant.  At that time, she had numerous other

14   procedures, including a hysterectomy and salpingo

15   oophorectomy, uterovaginal vault suspension.  She has not had

16   a revision, although she claims that she has had pain,

17   infection, dyspareunia, and a recurrence.  I mean one of the

18   things that she's suggesting that's a little bit different

19   here is that she's had a recurrence of her stress urinary

20   incontinence.  But her age and claims are all representative

21   of what we see across the board.

22       The next group of plaintiffs that we have are the TVT-O

23   cases.  We have three TVT-O cases that we named.  The first is

24   Mary Abadie from Louisiana.  Ms. Abadie is a 64-year-old

25   housewife from Louisiana.  Louisiana comprises about seven

1    percent of the cases.  It has one of the highest number of

2    cases in the entire MDL.

3         She had had a past hysterectomy.  She had symptomatic

4    stress urinary incontinence.  She had a TVT-O inserted at the

5    same time that she had a posterior colporrhaphy with sutures,

6    which I'll remind Your Honor is a treatment for prolapse that

7    does not involve one of the mesh products.

8         Her implantation date was, again, 2010.  Her alleged

9    injuries are consistent with those that we see across the

10   board.  And she's had no revision.

11        The second TVT-O case that we named is Cora Mae Brush,

12   who has had a revision.  She had an in-office mesh revision,

13   which is consistent with what a number of patients that have

14   to have some type of -- or have some type of exposure have

15   actually in the office.  She was 47 years old at the time of

16   implantation.  She is divorced.  She has two children.

17        We believe that her -- both the date of implantation, her

18   age, the claims that she has set forth are consistent with

19   those across the MDL.

20        Saundra Landes is from Virginia.  Virginia has, I will

21   tell you, Your Honor, 2.81 percent of the claims, a little bit

22   less that than.  She was age 65 at the time that she received

23   her TVT.  She has had five children.  She had symptomatic

24   stress urinary incontinence before.  And she had multiple

25   sutures at the time that her TVT sling was implanted.  It was

1    actually implanted in two thousand and -- I think it was

2    implanted in 2010.  I don't have that on there.

3         She had her revision surgery in 2012, the procedure to

4    correct it.  Her alleged injuries include pain, infection,

5    dyspareunia, with recurrent urinary tract infections.  And we

6    believe for the reasons stated and that are on the slide that

7    she is a representative plaintiff.

8         The one issue with respect to Ms. Landes that I should

9    advise Your Honor of, even though we have named her, at the

10   time there was an attempt during her surgery -- they were

11   going to correct the prolapse as well as the stress urinary

12   incontinence.  There was an attempt to use a Prolift.  They

13   intended to put that in.  Her bladder was perforated.  The

14   surgeon abandoned that attempt and performed a native tissue

15   surgery rather than using the Prolift.

16        So I bring that to Your Honor's attention because even

17   though we named her, it does arguably involve multiple

18   products, not that -- it's just the use of them in the course

19   of the surgery.

20        That takes us then to the Prolift case that was one of

21   plaintiffs' actual selections.  Ms. Froemming is from Florida,

22   and Florida --

23             JUDGE GOODWIN:  Did Ms. Landes have a revision?

24             MS. JONES:  I beg your pardon?

25             JUDGE GOODWIN:  Did Ms. Landes have a revision?

1          MS. JONES:  She did not.

2          JUDGE GOODWIN:  The sheet indicates she does.  So

3    she did not?

4          MS. JONES:  She did --

5          JUDGE GOODWIN:  Not?

6          MS. JONES:  -- not have a revision.

7          JUDGE GOODWIN:  Okay.

8          MS. JONES:  She had a -- no, no.  I think what the

9    confusion is, Your Honor, she had a subsequent procedure to

10   correct the prolapse.  So she has had a subsequent procedure,

11   but it's not a procedure that's related to the TVT and the --

12         JUDGE GOODWIN:  I'm not indicating I've made up my

13   mind on any of this, but she sounds pretty confusing to me.

14         MS. JONES:  She is -- I will confess to you that she

15   would not be at the top of our list of choices for that

16   reason.

17       If we look then to Ms. Froemming, Ms. Froemming is

18   from -- I'm sorry -- is from Florida.  Florida has almost six

19   percent of the cases in the MDL based upon what we have seen.

20   She is a married woman with two children.  She had her mesh --

21   she had the Prolift actually inserted in 2006.  She had her

22   mesh removed in 2012.  I say that in large part, Your Honor,

23   because I think, in all candor, this is one that there may be

24   some statute of limitations issues on.  Based upon the

25   testimony, let me simply say it's certainly something that

1   will probably be discussed, and I think it's appropriate to

2   advise the Court in selecting these that that's certainly a

3   potential.

4        She's also an early implant, in 2006.

5             JUDGE GOODWIN:  Well, let's assume there is a

6   statute of limitations problem.  I don't want to -- I don't

7   want to -- I don't want to wait all the way through until I

8   get to summary judgment motions on these cases we're

9   scheduling for bellwether trials to find out that there's a

10  bar.

11       What suggestions do you have?

12            MS. JONES:  Your Honor, here would be my suggestion:

13  I'm perfectly happy to have an early date for filing any

14  motion that we believe would be barred by the statute of

15  limitations.  I raise this for Your Honor because I think

16  there's going to be a question.

17       The reason that we have the issue here, just so Your

18  Honor knows, is she actually had a mesh exposure in 2008.  So

19  the delay in filing certainly would appear to raise that

20  issue.

21       I'm happy to agree upon some early date to have those

22  brought forward.  There may be one or two claims where there's

23  some additional discovery that needs to be done before that's

24  finalized or resolved, but that would be my off-the-cuff

25  suggestion.

```
 1              JUDGE GOODWIN:  I don't mean to panic either side by
 2     bringing this up, but I'm just going to ask it.  How bad would
 3     it be for you all to put off your bellwether case, your first
 4     bellwether case?
 5              MS. JONES:  How bad would it be to put it off?
 6              JUDGE GOODWIN:  Yes.
 7              MS. JONES:  I think we would -- it would be easy for
 8     us to put it off and we would accommodate the Court, and it
 9     would certainly in some respects make life a little bit easier
10     for us in terms of what we're trying to do.  So I don't know
11     that we would object to it.
12              JUDGE GOODWIN:  Let's see if I panic Mr. Aylstock.
13              MR. AYLSTOCK:  A little bit, Your Honor, in this
14     respect:  We believe on our side we're going to need to try
15     each of these cases before we can sit down and have meaningful
16     resolution.  Certainly that's been the history of Ms. Jones'
17     client, Johnson & Johnson.  It's not some company that's -- so
18     we're expecting that.
19          So we'd like to get that going.  We don't want to lose
20     the trial date, but, candidly, if it came to try a TVT case in
21     January, one of the products, or nothing, or move the trial, I
22     don't think that trying a TVT case with half a loaf is in --
23     half the discovery done and in a very hectic, hurried fashion
24     is going to be representative of anything, and --
25              JUDGE GOODWIN:  So let me understand you, because
```

1       that's why I brought it up, is you were telling me about your

2       discovery problems and your prep problems for an SUI case.

3                   MR. AYLSTOCK:  Yes, Your Honor.

4                   JUDGE GOODWIN:  So you are saying you'd rather put

5       it off than try an SUI case in January.

6                   MR. AYLSTOCK:  Unless Your Honor could see it clear

7       to give us the same allowance you gave AMS with the 99 days.

8       And it's more difficult, I understand, for the Court with the

9       holidays and the scheduling.

10          We're anxious to get going.  We're not running from these

11      trials.  We want the trials.  But from a practical matter, I

12      understand the holidays.  If we can't have that same allowance

13      that was given to AMS with the simultaneous disclosures --

14                  JUDGE GOODWIN:  It's hard for me to predict how hard

15      these cases are going to be for me.  I just don't know until I

16      get your papers.

17          Among all you lawyers from all over the country now with

18      28,000 cases, you're keeping me and Judge Eifert fairly busy,

19      and I'm going to think about it.

20          I'm going to pick the cases today, and I'm going to set a

21      schedule today, but I need to -- I just needed to get your

22      reaction and your thoughts before I did.  I've got them.

23          Go ahead, Ms. Jones.

24                  MS. JONES:  Well, Your Honor, I'm pretty much at the

25      end where, you know, we have the cases that we suggest that

```
 1    are out there that ought to be considered.  We've been through

 2    all of that.  We suggest that our -- that the ultimate

 3    grouping ought to be the TVT cases, the TVT-O cases, and the

 4    single Prolift case that we've talked about.  And frankly,

 5    Your Honor, if you -- if I got to design the world, we would

 6    start with two TVT cases, then we would go to TVT-O, and the

 7    third case would be the Prolift case in large part because it

 8    is true that most of the Prolift discovery has been done, but

 9    it's also true that we tried Prolift cases and we are not

10    going to be in a position to resolve anything in this MDL

11    until we get to the point that we can deal with the TVT cases

12    that represent the vast majority of the claims.

13         And, frankly, Your Honor, I think that what we're going

14    to see when we are able to analyze all of these recent filings

15    is that those numbers are not going to change and that we will

16    see fewer and fewer revisions involved in the numbers and

17    probably a significant number that but for concerns about

18    statutes of limitations might not have been filed at all.

19         That's purely prediction based upon what we know from

20    other MDLs in general.

21              MR. AYLSTOCK:  Your Honor, may we respond to the

22    defense selections?

23              JUDGE GOODWIN:  Well, she's then going to want to

24    respond to yours.  So go ahead and take a minute and then I'll

25    give them a minute.
```

```
 1              MR. AYLSTOCK:  Mr. Cartmell will.

 2              MR. CARTMELL:  Your Honor, first of all --

 3              JUDGE GOODWIN:  I know I've told this story before,

 4    but I just can't resist every time this happens.  There was a

 5    district judge when I practiced law by the name of Dennis

 6    Knapp, and he was the most successful federal judge in the

 7    history of the world at settling cases.  And his methodology,

 8    which I abhorred and which I've avoided, was he would just let

 9    everybody talk until nobody had anything else left to say, you

10    know, and he would go back and forth and back and forth until

11    everybody was just exhausted.  And then he would say, because

12    there were very few women practicing law back then, he would

13    say -- he'd look up at the ceiling and he'd say, "Can't you

14    boys work this out?"  And then that would start a new round of

15    talk, and he'd listen to that go back and forth until nobody

16    could say a thing.

17         I'm not going to resort to that.  Go ahead.

18              MR. CARTMELL:  Well, I will try to be brief, but I

19    want to make one thing clear.  Mr. Aylstock just said that we

20    need to try every one of these cases before we talk

21    resolution.  I totally disagree with that.  I do not want to

22    try all of our cases, but I do agree with the point that we

23    need to try a few of these cases, and we are prepared to do

24    that.

25         I want to just, if I could, respond to one -- to the
```

1    practicality question that you brought up, Your Honor, real

2    briefly with your permission if that's okay.

3              JUDGE GOODWIN:  Go ahead.

4              MR. CARTMELL:  As far as it being practical for us

5    to try a TVT Classic or a TVT case in January, I think it is

6    very difficult for us to do that, and the reason is, is

7    because of the discovery right now.  And right now I will tell

8    you, one thing is we've not had any nine-day depositions.  The

9    longest we've had is four for one deposition, but we've had

10   two more days with that same witness on a fact witness, but we

11   are having extreme difficulty --

12             JUDGE GOODWIN:  Is that four with two more?

13             MR. CARTMELL:  We had four on a 30(b)(6) deposition

14   of a witness, and then they produced that -- because they

15   designated that witness as a 30(b)(6) witness, and then we did

16   take a fact witness of that person who was in the role of a

17   medical director --

18             JUDGE GOODWIN:  So six days all together.

19             MR. CARTMELL:  Six days all together, yeah.  And so

20   where we are, Your Honor, an example that I could give you is

21   the deposition that I came from yesterday and got here last

22   night at midnight from, is we are given two days for

23   depositions and we're told that during the deposition we

24   should handle TVT-S, TVT-O, TVT Classic, Abbrevo, and Exact.

25        I will tell you in the 30 or 20 depositions we've taken

1    so far, we have only handled and talked about Abbrevo and

2    Exact in one or two depositions.  And I'm very concerned about

3    that because I know at the end of this case, if there's an

4    Abbrevo or an Exact case, they're going to say, "Sorry,

5    Charley, you guys didn't take any discovery," and we're going

6    to have no discovery.

7              JUDGE GOODWIN:  Well, we may have something to say

8    about that.

9              MR. CARTMELL:  Okay.

10             JUDGE GOODWIN:  But you should follow Judge Eifert's

11   orders to the letter.

12             MR. CARTMELL:  Yes, that's right.  And so yesterday

13   is a good example only in this:  Yesterday we took a

14   deposition of the medical director in charge of the TVT Secur

15   and -- for five years and involved in the Classic and the

16   TVT-O as well.  I took the deposition yesterday.  And the way

17   we've been doing it among our deposition teams is dividing it

18   by product.  And so I was assigned to take the TVT Secur

19   deposition.  Mr. Zonies was assigned to take TVT-O and then

20   there's a Classic representative.  And then the New Jersey

21   lawyer is there as well because it's been cross-noticed.

22       I took all day yesterday on the TVT Secur product and I

23   finished.  We finished a little late, at 7:00, and I

24   appreciated them going longer with me.  Today is going to be O

25   and Classic, and the New Jersey lawyer has said he needs a

1    substantial amount of time to take New Jersey's portion.

2         And at the end of the deposition, what's going to happen

3    is the same thing almost that's happened at every one.   We

4    will say we're not done yet.   We still need to handle some of

5    these products.   New Jersey will likely not have gone or will

6    have gone and said they're not done yet.   And so we'll say to

7    the defense we need another day with this witness.   And that

8    has happened multiple times.

9         And nothing that I am saying is intended to be critical

10   of Ms. Jones or any of the defense, because they're not the

11   problem at all.   It's just as a practical matter, now we have

12   this witness who is going to need to be produced -- we're

13   asking to be produced again, and the dates we get for them are

14   in September, you know, or late August or September.   It's

15   after our deadlines.   So that has already happened about a

16   dozen times.   And these are the key people that we need.

17        I will say --

18             JUDGE GOODWIN:   I'll let you deal with that later.

19             MR. CARTMELL:   Okay.   Okay.   As far as our TVT

20   Classic and our TVT-S and our TVT-O discovery has gone so far,

21   there's still a whole lot of depositions before we get to the

22   point where we'll be trial-ready.

23             JUDGE GOODWIN:   Now, tell me, you all have heard

24   from Judge Higbee on your scheduled -- the first scheduled

25   trial, right?

```
 1                   MR. CARTMELL:  Yes.

 2                   JUDGE GOODWIN:  And she's moved it?

 3                   MR. CARTMELL:  She moved -- well, she -- you mean

 4     the first scheduled Prolift trial -- or the second scheduled

 5     Prolift trial?

 6                   JUDGE GOODWIN:  Yes.

 7                   MR. CARTMELL:  No, it is still set.

 8                   JUDGE GOODWIN:  But she had a trial schedule that

 9     conflicted with one of my trials.

10                   MR. CARTMELL:  Well, that could have been the Bard

11     case that was set in September --

12                   THE CLERK:  Bard.

13                   MR. CARTMELL:  I'm sorry.  Judge Higbee -- you're

14     right.  Judge Higbee did move from January to March the

15     Prolift trial.

16                   JUDGE GOODWIN:  And so that trial was the one that

17     was going to conflict with this trial.

18                   MR. CARTMELL:  That's right.

19                   JUDGE GOODWIN:  Okay.

20                   MR. CARTMELL:  And now it's in March.

21                   JUDGE GOODWIN:  That's what I thought.

22                   MR. CARTMELL:  And it's another Prolift.  It's the

23     same lawyer who tried the first case, Adam Slater.  So,

24     anyway, that gives you some type of flavor for this.

25                Now, with respect to the Prolift cases, Mr. Aylstock said
```

1    we are ready essentially to try that case because we have

2    agreed with them that we will not duplicate the discovery.

3    Therefore -- and, again, frankly, this sort of freaks me out.

4    We are relying on all of the depositions that were taken in

5    New Jersey primarily by a lawyer named Adam Slater, who is a

6    very good lawyer, but on every video in this courtroom,

7    essentially when the videos are played, it's going to be Adam

8    Slater's voice in the Prolift trials.

9         Look, you know, we're living with that.  We're trying to

10   cover some of the things in the depositions that we need to,

11   and we do think that if you say in January is our trial date,

12   which we think it should be, we can be ready with very good

13   evidence and testimony and expert support in a Prolift trial.

14   But on the other cases, I'm very concerned that we will just

15   not present to you at that time, you know, our best case if

16   it's a sling case.

17             JUDGE GOODWIN:  Well, this is July.  It's a long way

18   between now and January.  It's only a matter of how time is

19   allocated.  You could prepare almost any case between now and

20   January.  It's a matter of what else you're doing.

21        I'm going to need to go back and meet with Judge Eifert

22   and we're going to need to talk about this, but I'm going to

23   come out with -- I'm going to come out with a schedule for you

24   and with the selections for you.

25             MR. CARTMELL:  Okay.  Appreciate it, really do

1    appreciate that, Your Honor.  And another thing, just so you

2    know, as far as the sling cases, some are easier to discover

3    than the other.  And the TVT-S, it just is easier to discover.

4    We will be more ready on a TVT-S case.  And the reason is, it

5    came to market much later.  It started in 2006, where the

6    Classic started back in 1998, the TVT-O started in 2003.  It

7    came off the market in 2012, but essentially --

8              JUDGE GOODWIN:  But it's just a sliver according to

9    Ms. Jones.

10             MS. JONES:  (Nods head up and down)

11             MR. CARTMELL:  It is -- yeah, we think, like they

12   say, it's a sliver.  We think it's 20 percent of the cases.

13   That's consistent with, you know, I believe Mr. Aylstock's

14   numbers, and we think it's representative.  So it should just

15   be one in the top five.  But as far as being ready, that

16   one --

17             JUDGE GOODWIN:  I'm going to talk to Judge Fallon

18   about this.

19             MR. CARTMELL:  Okay.  Okay.

20             JUDGE GOODWIN:  He told me one of the most important

21   things about bellwether trials is how much it costs to get

22   them ready.

23             MR. CARTMELL:  Yeah.  Well, it won't -- yeah.  It

24   will not cost us as much on the Prolift because it has been

25   done.  But if you don't mind, I'll respond briefly to what --

1          JUDGE GOODWIN:   Sure.

2          MR. CARTMELL:   -- Ms. Jones said.   And a few things

3   that I'd like to say is Mr. Aylstock's point was of the TVT

4   cases and the big numbers, I think his point was we do believe

5   that a large number of those cases are going to turn out to be

6   TVT-Os.

7          I mean we went through our bellwether pick selection.   We

8   asked lawyers from all over America to send us medical records

9   and give us data on cases so we could determine whether they

10  should be in the 15.   And time and time again, we had

11  situations where they'd send it to us as a TVT case.   We did

12  the digging and it became a TVT-O Classic.   So I'm confused by

13  the numbers, but I will tell you I think that 79 percent is a

14  lot smaller than that.   I can't tell you how much, though, at

15  all.

16         The other thing I wanted to say is -- and you touched on

17  this.   Obviously you were thinking about this.   A single

18  prolapse case will be predictive of a large number of cases

19  that are not in those numbers that have a prolapse and a

20  sling.   It just will, because the case is obviously going to

21  focus, when you have a combination, on the prolapse,

22  undoubtedly, because that's the one with all the mesh and all

23  the wings and things like that.   So the numbers of prolapse

24  cases are actually much bigger than that.

25         I had slides to go through each one, but I can just

1    mention my goal is just to give you a little tidbit of each

2    case that makes in our mind the case not representative, the

3    ones that they have identified.

4           JUDGE GOODWIN:  Quickly.

5           MR. CARTMELL:  Tab 4.  That's tab 4.  And just a

6    disclaimer upfront, we don't have as much information as them.

7    What we did was, because we don't have the medical records for

8    all these people, we called counsel across America.  We had

9    conversations.  We said, "Send your medical records."  And we

10   tried to go through them, but some of the things I say are

11   based on what lawyers told me and the records we had, but we

12   don't have them all.

13       So for Ms. Abadie, I think the name is --

14          JUDGE GOODWIN:  Say that again.

15          MR. CARTMELL:  Abadie, A-b-a-d-i-e.  The information

16   we have is that she's in extremely poor health.  She has

17   severe COPD that makes it difficult for her to travel.  And

18   the question of the lawyer who represents this client is can

19   she actually travel to come to a trial.  That's the

20   information that we got.

21       She is a no-revision case with no followup.  So it's a

22   low-damage case, obviously, and that's the reasons why we

23   think it's not representative.

24       With respect to Judy Brown, Judy Brown, based on what

25   we've been told -- and we've not seen these records, but it

1    came out in the deposition, she's had two prior suicide

2    attempts, she has extreme mental issues and problems to the

3    extent that the lawyer has told us he worries about her

4    ability to travel and maintain during an entire trial.  That's

5    the reason why we don't think that that is a representative

6    case.

7         Cora Mae Brush.  Cora Mae Brush has had extensive drug

8    and alcohol --

9              JUDGE GOODWIN:  Does her lawyer not want to try her

10   case?  Does her lawyer not want her case tried?

11             MR. CARTMELL:  Ms. Brush or Ms. Brown?

12             JUDGE GOODWIN:  Brown.

13             MR. CARTMELL:  Ms. Brown's lawyer, he did not say

14   that.  He said, "I worry about her being able to go through an

15   entire trial and whether or not she's going to be willing to

16   do that because of her mental issues."

17        Cora Mae Brush.  It came out in her deposition that she's

18   been removed from a jury panel because she's fidgety.  She's

19   had drug and alcohol abuse that has been severe in the past.

20   She was questioned extensively about that.  And so we don't

21   think in the end that that would be a representative case

22   because likely that's going to be a huge portion of the

23   evidence presented or the defenses presented in that case.

24        Ms. Galarza.  Now, Ms. Galarza, as Ms. Jones mentioned,

25   has had eleven pregnancies with four births.  This is a

1   defense that is used in these lawsuits extensively.  She's got

2   major co-morbidities, including that she is a diabetic and she

3   has significant longstanding depression preexisting the actual

4   time of the implant here.

5       These are all issues that I think would be tried heavily;

6   and in the end of the case, regardless of the verdict, it may

7   be the reason, you know, for the verdict, and we don't think

8   that's representative.  She's also had fraud crimes.

9           JUDGE GOODWIN:  I realize everybody wants -- you

10  want to try cases that are good for you, and they want to try

11  cases that are good for them.

12          MR. CARTMELL:  That's right.

13          JUDGE GOODWIN:  So their good cases are your bad

14  cases.

15          MR. CARTMELL:  Right.  No --

16          JUDGE GOODWIN:  I kind of got that.

17          MR. CARTMELL:  Okay.  Okay.  The other thing on

18  Saundra Landes -- and you picked up -- I won't spend any time,

19  but that is the failed Prolift case, obviously.  And then it

20  was -- there was a perforation.  It was converted to a sling.

21  So we don't think that's representative.

22      Ms. Lughas, Annette Lughas, this was a TVT-AA approach,

23  an abdominal approach.  It's a product actually that I don't

24  think has been on anybody's charts, including ours,

25  admittedly.  It's a TVT Classic but a different approach.

1    They offered that for sale, and it was not a winner on the

2    market.   In other words, there are very few TVT abdominal

3    approach cases out there.   And the Annette Lughas case we

4    believe is not representative for that.

5         The other reason is she's had preexisting cancer

6    surgeries and complications.   And there's a severe question

7    about whether or not she was a candidate for stress urinary

8    incontinence.   It came out extensively in her deposition.   So

9    the question is, is it the doctor's fault, you know, for

10   placing this, rather than truly the manufacturer's.

11              JUDGE GOODWIN:   You're doing a good job here --

12              MR. CARTMELL:   Okay.

13              JUDGE GOODWIN:   -- but could you move faster?

14              MR. CARTMELL:   Yes.   Sorry.   The last thing is the

15   Froemming case.   The Froemming case is the one that originally

16   is a Prolift case and we had designated that as one of our

17   picks.

18        After we designated the Prolift case, we then did

19   discovery.   We had depositions, and it came out during the

20   deposition of the doctor, who would not talk to us before the

21   deposition, that he modified the actual Prolift by cutting the

22   wings of the Prolift.   So we have not a Prolift as designed

23   implant.   It's a modified Prolift; cut the wings and it's

24   actually sutured in the body, which the other Prolifts are

25   not.

 1          So he used it off-label, the doctor did, and we believe

 2     that that case will become all about off-label use rather than

 3     the issues related to our claims.  Admittedly, that is our

 4     case.  We did -- we signed it up.  We said -- but we did not

 5     add it to the list in the final group because we found that

 6     out afterwards.  For that reason, we don't think it's

 7     representative.

 8          JUDGE GOODWIN:  Ms. Jones, according to them, all

 9     your cases are bizarre.  Do you have a response?

10          I'm being -- I hope you understand.  I --

11          MS. JONES:  I do understand, Your Honor.  It is very

12     clear to me, as I'm sure it is to the Court, that we have very

13     different objectives here.

14          We have tried to identify those cases that we believe

15     actually represent the pool of the MDL plaintiffs.  I don't

16     know that there's anything else I can say.  If we haven't

17     persuaded you about that right now, we're not likely to

18     persuade you about it in the next five minutes.  So I'm happy

19     to answer any questions you have.

20          JUDGE GOODWIN:  All right.  What I want to do -- and

21     I'll do the best I can from what I've got; I have to.  Our

22     process is set up -- I don't mean this disrespectfully, but do

23     you remember the old IT phrase "garbage in, garbage out"?

24          I am going to pick the cases from the cases that I've

25     got.  They might not be the cases that I would ideally pick

1    had I had the opportunity to look at all of them.  But I'm

2    going to do it.  But I'll remind counsel for both sides that

3    the purpose here is to be helpful to you and to your clients

4    in assessing these claims.  Are these -- at the end of this

5    process, am I going to go to my plan B, which after I get

6    through the first round of bellwether trials, I have two or

7    three plan Bs in mind.

8         So I'll just do the best I can, and we'll try them, and

9    I'm not going to tell you yet how many days that are going to

10   be allocated to trial.  I've got to get through *Bard* first and

11   see how much of the 12 days is needed, but we'll see.

12        This is an unnecessary addition to my comments.  I doubt

13   very seriously if either of you are going to be really happy

14   with my list and my scheduling.  I'll do the best I can.  I'm

15   not really happy with my scheduling in December.  It's not my

16   ideal way to spend the holiday season, but we're going to do

17   our work and we'll get it done.

18        Judge Eifert and I both practiced law for a long time

19   before we started these gigs, and we haven't forgotten what

20   it's like to be a practicing lawyer.  I did it for 25 years.

21   She did it for about --

22             MAGISTRATE JUDGE EIFERT:  About the same.

23             JUDGE GOODWIN:  -- about that.  So we haven't

24   forgotten.

25        I've got *Bard* starting Monday.  I'm going to go back now

1   and work out a schedule and make these picks.  You should have

2   an order today or tomorrow, and we'll go from there.

3        All right.  Thank you very much.

4        (Hearing concluded at 12:00 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21        I, Teresa M. Ruffner, certify that the foregoing is a

22   correct transcript from the record of proceedings in the

23   above-entitled matter.

24

25        /s/Teresa M. Ruffner              July 30, 2013

   _____       _____