IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

```
_____x
                               :
IN RE: ETHICON, INC.           :          MDL No. 2:12-MD-2327
PELVIC REPAIR SYSTEM           :
PRODUCTS LIABILITY             :
LITIGATION                     :          DATE:  July 17, 2013
                               :
_____x
```

TRANSCRIPT OF MOTIONS HEARING HELD
BEFORE THE HONORABLE CHERYL A. EIFERT
UNITED STATES MAGISTRATE JUDGE
HUNTINGTON, WV

APPEARANCES:
(All counsel appearing by telephone.)


For the Plaintiffs:        BRYAN F. AYLSTOCK, ESQ.
                           D. RENEE BAGGETT, ESQ.
                           Aylstock Witkin Kreis & Overholtz
                           Suite 200
                           17 East Main Street
                           Pensacola, FL 32502

                           THOMAS P. CARTMELL, ESQ.
                           Wagstaff & Cartmell, LLP
                           Suite 300
                           4740 Grand Avenue
                           Kansas City, MO 64112




For the Defendants:        CHRISTY D. JONES, ESQ.
                           BENJAMIN M. WATSON, ESQ.
                           GARY RUBIN, ESQ.
                           Butler Snow O'Mara Stevens &
                           Cannada, PLLC
                           P. O. Box 6010
                           Ridgeland, MS 39158-6010

(Appearances continued:)

                        DAVID B. THOMAS, ESQ.
                        Thomas Combs & Spann, PLLC
                        P. O. Box 3824
                        Charleston, WV 25338-3824


*** Proceedings transcribed from Courtflow recording by:

                        AYME A. COCHRAN, RMR, CRR
                        Official Court Reporter
                        United States District Court
                        300 Virginia St., East
                        Room 6610
                        Charleston, WV  25301

1          PROCEEDINGS had before The Honorable Cheryl A. Eifert,

2     Magistrate Judge, United States District Court, Southern District

3     of West Virginia, in Huntington, West Virginia, on July 7, 2013,

4     at 1:23 p.m., as follows:

5               THE COURT:  We are here then in the case of In re:

6     Ethicon, Inc. Pelvic Repair System Product Liability Litigation,

7     case number 2:12-md-2327, and I understand we have on the line

8     for the plaintiffs Ms. Baggett, Mr. Aylstock and Mr. Cartmell; is

9     that correct?

10              MR. AYLSTOCK:  That's correct, Your Honor, Mr.

11    Aylstock.

12              THE COURT:  Mr. Aylstock, was that you?

13              MR. AYLSTOCK:  Yes, ma'am.

14              THE COURT:  All right.  For the defendants then, we

15    have Ms. Jones, Mr. Watson, Mr. Thomas, and Mr. Rubin; is that

16    correct?

17              MS. JONES:  That is correct, Judge.  This is Christy

18    Jones.

19              THE COURT:  All right.  Probably it will be helpful

20    when you go to speak, if you would identify yourself, because

21    this will be on a recording and it will be transcribed from a

22    recording.  So it would be more difficult for the court reporter

23    to figure out who is speaking.  Is that all right?

24              MR. AYLSTOCK:  Certainly, Your Honor.

25              MS. JONES:  Yes.

1           THE COURT:  Now I think we may be in for a long

2   afternoon, and hopefully, I'm wrong, but I think what I would

3   like to do to start off with, is to address what I think are some

4   broad issues that might have some impact on how the discovery is

5   handled from this point out.

6       The first question I have, I guess would be directed to Ms.

7   Jones, and that is what is the status of Johnson & Johnson in the

8   case and the requests that are directed to Johnson & Johnson?

9   Have the parties reached any agreement about that?

10          MS. JONES:  Your Honor, we have -- we have circulated a

11  stipulation that was similar; in fact, I think it's identical to

12  what was entered into the State of New Jersey at the recent file

13  and I will confess, Your Honor, that I think it has kind of been

14  held in abeyance and is -- has not been executed, but I think it

15  still at least is under consideration and in -- under those

16  circumstances, the stipulation provides, and I don't have it

17  exactly in front of me, Your Honor, but it provides that J&J and

18  Ethicon would be jointly listed on any verdict form as a

19  defendant and that corporate -- and that discovery related to the

20  corporate structure of J&J versus Ethicon would be unnecessary.

21          THE COURT:  Do the plaintiffs agree with that

22  representation?

23          MR. CARTMELL:  Your Honor, this is Tom Cartmell.  I can

24  respond to that because I have had a recent conversation with Ms.

25  Jones about that.  I think it is reasonable other -- that is an

1    accurate representation.  I will say, though, that the -- it's

2    asking for us to forego several depositions of Apex-type

3    witnesses.  It's also asking us to forego all of the organization

4    -- corporate structure organizational discovery.  I think we're

5    going to be okay with foregoing the corporate structure

6    organizational-type discovery.

7         There are a few more Apex-type depositions that they're

8    asking us to forego or agree not to call any of those people at

9    trial than we would like.  So the answer is I think we're really

10   close, but there are a few depositions that we might want to say,

11   look, we would need their deposition in this case.

12              THE COURT:  From --

13              MS. JONES:  And if I might respond, Your Honor, I

14   think, though we have not officially put this to bed, the initial

15   proposal that we had, we were asked to identify Apex witnesses

16   other than those who are initially subject to the New Jersey

17   list and we clearly gave the plaintiffs what we believe would

18   fall within the category of Apex witnesses and, in all candor,

19   they rejected some of those and my recollection is, without

20   looking back at it, that now every one ever those witnesses that

21   the plaintiffs have requested, we have agreed to produce without

22   -- and that those are, in fact, scheduled.

23        I know that those include Chuck Austin, Rodney Mileaux

24   (phonetic), whose deposition was yesterday, and some others.

25   Again, I don't have that list here, but I believe that I'm --

1    what I'm saying to Your Honor is I believe that those issues have

2    been resolved.

3         THE COURT:  The reason I ask is because early in some

4    of the responses filed by the defendants, the standard objection

5    was that there would be no information provided regarding Johnson

6    & Johnson because it was simply a holding company and I wanted to

7    know whether that -- as far as the written discovery, has that

8    been resolved?  Have you both agreed that, in fact, that's true,

9    the plaintiffs are not requesting written discovery re responses

10   from Johnson & Johnson?

11        MR. AYLSTOCK:  Your Honor, this is Bryan Aylstock.

12   It's a complicated question.  We certainly don't agree that

13   they're just a holding company and it's complicated because of

14   the very, I think admittedly, complicated corporate structure of

15   Johnson & Johnson.  There are multiple companies and divisions

16   and groups that work in concert, in particular, for these pelvic

17   mesh product and when we look -- for these pelvic mesh products

18   and when we look to depose certain witnesses for Johnson &

19   Johnson, for example, they have some involvement.

20       Now maybe they're directing some folks from other companies,

21   but there's -- certainly, we believe that the -- to the extent

22   that they exist within Johnson & Johnson or any of the Johnson &

23   Johnson companies involved in pelvic mesh, that those products

24   should be produced and I don't believe, Ms. Jones can correct me,

25   but I don't believe that any of those documents are being held

1    back on that basis, that they're with another Johnson & Johnson

2    company or something like that.

3            MS. JONES:  That is correct, to the best of my

4    knowledge.  I'm not aware of any of those and we certainly -- we

5    certainly represented to the Court early on, frankly, I think,

6    before you became involved, that in terms of -- of document

7    production, that we would not object to document production on

8    the sole basis that they were another J&J corporate entity.

9            THE COURT:  Fine.  Let me ask you this question, which

10   may sound like it's not related, but in my mind, it is, so bear

11   with me.

12           MS. JONES:  Sure.

13           THE COURT:  The second supplemental responses to

14   plaintiffs' first request for production of documents, I noticed

15   that the defendant, Ethicon, was the sole party that supplemented

16   and that the supplemental responses seemed to eliminate a good

17   bit of the general objections and so forth.

18     My question to you, Ms. Jones, is are these answers intended

19   to be used in place of your prior answers since many of the

20   substantive portions are just repetitive, or are these actually

21   in addition to, as I would consider the term supplemental to be?

22   I'm not sure whether these are supposed to be replacement

23   answers, where you have now eliminated a good portion of your

24   objections and you've restated the substantive answers, or

25   whether these are in addition to your two other responses.

 1          MR. WATSON:  Your Honor, this is Ben Watson.  I think I

 2    can probably speak to that.  Those are intended to replace the

 3    prior responses.

 4          THE COURT:  All right.  That's very helpful.  Thank

 5    you.

 6       The other question I have as an overall issue is what

 7    arrangements for agreements have you made regarding productions

 8    related to hernia mesh?  I saw that as a very broad objection

 9    that was made repeatedly in the answers.  It -- to some extent,

10    it appears there may have been some sort of agreements to limit

11    the requests as they pertain to hernia mesh, but I'm not certain

12    what those agreements are.

13          MR. AYLSTOCK:  Your Honor, this is Bryan Aylstock.  We

14    have, as the Court noted in our request for production, requested

15    hernia mesh documents and that request was never withdrawn.  As

16    with the XUS production , or foreign production, when it comes to

17    marketing-type documents, you know, that is a less important or

18    potentially less important category of documents than any

19    documents that would relate to safety claims, although I will say

20    that a lot of -- and we've seen this in the pelvic mesh.  The

21    marketing documents, when it comes to a next generation product,

22    often talked about the improvements to the safety profile over

23    and above the prior generation of product and that's particularly

24    important here because the pelvic mesh that -- the PROLENE mesh

25    that's used in all of the five different TVT products is the same

1    Polypropylene Mesh that's used in the original version of the

2    hernia products that Ethicon made, and at least that's my

3    understanding and, since then, there have been two subsequent

4    iterations of that mesh in changing the structure of it, the

5    weave of it, or the thickness of the strands, or the porosity,

6    and that's a very important issue to us.

7         And, in fact, Mr. Mahmoud, Dr. Mahmoud, who was just

8    recently deposed, he's the Chief Medical Officer for Ethicon,

9    testified that, in fact, when the assertions are made in various

10   materials and presumably at trial by Ms. Jones that the hernia

11   mesh experience provided long-term clinical data to support the

12   use of the TVT-S product, for example, he testified that, yes,

13   that -- those -- that information, including all of the safety

14   information and the testing would be directly relevant to and is

15   part of what they used in -- within Ethicon Women's Health to

16   evaluate whether or not this is the appropriate mesh for the --

17   in the human pelvis.

18        So we do -- just to be very clear, we do believe that that

19   information should be produced and we have consistently requested

20   it all the way back to our request last year, July of last year.

21             THE COURT:  So in these -- in these requests for

22   production of documents, for example, where you have asked for

23   information regarding pelvic mesh, your definition of pelvic mesh

24   is including hernia mesh products and you do expect to receive

25   information responsive to hernia mesh products; is that what I

1    hear you saying?

2           MR. AYLSTOCK:  Yes, and it's specifically defined, I

3    believe, as the PROLENE and PROLENE Soft hernia meshes, which are

4    the exact same mesh that's used in either the Prolift or the TVT

5    products used in the Women's Health.  So, to that extent, yes,

6    that's how we've defined it.

7           THE COURT:  Now, Ms. Jones, in your objection, you

8    object to any information regarding hernia mesh, other than

9    pelvic floor repair, meshes used in pelvic floor repair; is that

10   right?

11      I'm not -- I can't even get clear, to be honest with you,

12   after reading all of these briefs and e-mails and hundreds and

13   hundreds of pages, whether you've reached any agreement on

14   whether you're producing hernia mesh information or not.  So

15   where are we with that?

16          MR. AYLSTOCK:  Your Honor, this is Bryan Aylstock

17   again.  I believe the answer is we have not reached an agreement,

18   but Ms. Jones can correct me.

19          THE COURT:  Ms. Jones, has any hernia mesh information

20   been produced by Ethicon?

21          MS. JONES:  I do know that some hernia mesh information

22   has been produced, including some that relates to PROLENE Soft,

23   the PROLENE PS, which actually became then the Prolift product,

24   GYNEMESH PS.

25      In terms of -- I'm going to -- I'm going to ask Mr. Watson

1    to assist me with this a little bit.  We have consistently

2    objected to production of the hernia mesh because it does involve

3    a different product, although we have produced some of that and,

4    to my knowledge, and this is the reason I'm going to punt this to

5    Mr. Watson, with Your Honor's permission, to my knowledge, we've

6    never had a specific discussion with the plaintiff at all about

7    their knowledge -- about their request for these documents.

8             THE COURT:  Mr. Watson?

9             MR. WATSON:  Your Honor, this is Ben Watson.  We --

10   Bryan and I have had some conversations over the months about

11   this.  It's always been our position that hernia mesh goes to

12   different products and that the -- the extensive materials that

13   we have given them in this case, at this point totaling almost

14   9.5 million pages of documents, you know, is certainly sufficient

15   to give them the information that they need on the pelvic

16   products at issue and it's always been our position to have to go

17   out and, you know, do the extensive and expensive collection of

18   documents for products that are not at issue is simply

19   unreasonable.

20      Now what we have done in the production is that, to the

21   extent there are documents that are responsive, that relate to

22   hernia mesh, we have not excluded those documents.  So I think

23   it's not a tremendous amount, but I think you will see some

24   hernia documents in the production, but it's our objection to

25   going out and, you know, essentially, you know, providing them

1    with discovery on products that are not at issue with the -- you

2    know, having to go and collect all those materials for simply

3    products that we think are not pertinent to the litigation.

4              THE COURT:  Mr. Aylstock?

5              MR. AYLSTOCK:  Yes, Your Honor?

6              THE COURT:  So now you've heard that you may have

7    gotten some hernia mesh information, depending on what the

8    defendants felt was relevant or not.  You probably haven't gotten

9    all of the information related to PROLENE mesh and PROLENE Soft

10   mesh.  So where do we go with this issue?

11             MR. AYLSTOCK:  Well, Your Honor, I think what Mr.

12   Watson is saying and what we've found by looking through the

13   documents is that to the extent that there is a pelvic mesh -- a

14   document that's responsive to some request and is related to

15   pelvic mesh, and that document also refers to hernia mesh, they

16   have not excluded that from being produced and we appreciate

17   that, certainly.

18        For example, there was an issue with 510(k) clearance with

19   regard to one of their hernia meshes and the FDA came in and

20   said, hey, you should have gotten a 510(k) clearance and then

21   they were talking about that situation when the FDA came in with

22   the Prolift and said we need a 510(k) clearance.  You shouldn't

23   have been -- you marketed this, but you needed to get a 510(k)

24   clearance.

25        So they didn't exclude an otherwise responsive document

1    because of that, but they haven't produced the hernia mesh

2    documents, and those documents are critical because it is the

3    same mesh and it may be used in a different application, but it

4    is the exact same composition of the mesh that is being used in

5    the -- either the TVT products or the PROLENE products and the

6    testimony, and I've actually got it up for you, or for me to read

7    from the Chief Medical Officer at Ethicon was, "Did the data that

8    you became aware of in the hernia mesh or other mesh applications

9    for Ethicon inform your decision and thought process when it came

10   to deciding which mesh would be appropriate mesh for use in a

11   woman's pelvis?"  And, answer, "I think you are correctly

12   suggesting the data on the use of mesh in abdominal or other

13   hernia repair surgery could and should and was considered in the

14   context of use of that mesh in the pelvis."

15        Question, "So the experience the company would have and the

16   knowledge that it gained for its hernia mesh products would be

17   relevant to you, as its Chief Medical Officer, in making

18   assessments with regards to which mesh might be best for the

19   human pelvis as we've discussed before?"  Answer, "As we've

20   discussed before, human clinical data with a particular mesh is

21   relevant and has bearing on the considerations -- on the

22   considerations for use of that mesh in general."

23        So it is our position that that hernia mesh data, and we

24   know that in the case of Ethicon, they actually retained Dr.

25   Klosterhalfen and Dr. Klinge, two experts.  Klosterhalfen has

1    been retained and is set to testify, I believe, in the Bard

2    trial.  Dr. Klinge is our expert.  They retained them to do

3    testing on hernia meshes about inflammatory response and porosity

4    and so forth to inform the company on which mesh is best.  So,

5    yes, we absolutely believe that all of that needs to be produced.

6            THE COURT:  From my standpoint then, what I see in your

7    briefs and what I see in this outstanding discovery is that this

8    very important issue has really not been briefed very well.  It's

9    really not been raised adequately for the Court to have any idea

10   of how to rule on it because what I hear you saying is it's very

11   relevant.  I hear the defendants saying, well, it's too

12   burdensome.

13       I'm not sure that all of it would be relevant.  I'm not sure

14   that everything to do with hernia mesh would be relevant, but I

15   really don't have any basis with the documents in front of me to

16   make any sort of reasoned determination.

17       I think, Mr. Aylstock, if you want hernia mesh information,

18   then you need to file a brief specifying to that because I really

19   don't think it's been addressed.  All I've heard you say in your

20   briefs is that, well, they've waived everything.  They've waived

21   everything.

22       And I want to tell you up front that I'm not overly

23   impressed with these waiver arguments.  I think if -- I think

24   there are some circumstances where it's important to acknowledge

25   that somebody has waived an objection.  For example, I think if

1   you assert attorney-client privilege and you don't file a

2   privilege log, you have waived that, to that particular document

3   or documents that should have been on the log, but as a general

4   rule, I prefer to look more substantively at the -- at the

5   motions to compel and the objections so that the sides are

6   getting the documents that they need to either prosecute or

7   defend the case and that's where I want to go today.  That's why

8   I think it might take us some time.

9        I think the hernia mesh versus straight pelvic mesh issue

10  needs to be briefed in some way.  If you've already done that and

11  I'm overlooking it, then please tell me where that is, because

12  I'd be happy to re-read that.

13       MR. AYLSTOCK:  We -- Your Honor, this is Bryan

14  Aylstock.  It was in the -- only in the context of the waiver and

15  we can certainly brief that issue for Your Honor so that Your

16  Honor can understand where we're coming from better on that, but

17  if I could, and we did not bring this Motion to Compel lightly,

18  but if I could, perhaps if you'll indulge me a couple minutes to

19  give the Court a little background on why we think it's so

20  important to -- to consider the waiver issue and -- but and/or

21  order the documents to be produced, because there have been a

22  number of discovery issues and we would submit a pattern of

23  discovery issues that has really disadvantaged us and whether

24  it's in the form of an order or a certification from the

25  defendants of completeness or something, the facts on the ground,

1    if you will, really brought us to the point, because if the -- as

2    the Court probably is aware, this isn't -- these are now the

3    third responses to the discovery.

4         We did not come in and, you know, waive the waiver argument

5    around after the first responses.  We met and conferred again and

6    said, look, we don't think these are appropriate and then after,

7    you know, a series of e-mails threatening another Motion to

8    Compel, we finally got some additional responses that really

9    didn't correct what we would submit under the law should be a

10   waiver.

11        So I'll stop there and --

12             THE COURT:  Okay.  Well --

13             MR. AYLSTOCK:  You might not want to hear that, but if

14   the Court is open to it, I'd like to address it a little bit.

15             THE COURT:  We might -- we might get to that point.

16   What I'm seeing in their second supplemental requests or

17   responses are -- are the fact that they have eliminated many of

18   the objections that were not appropriate and I think a lot of

19   your argument had to do with their boilerplate objections.  Your

20   arguments were correct, those are not proper objections, but it

21   appears to me that many of those at this point have now been

22   abandoned.

23        I think if you -- if you feel that you've been subjected to

24   discovery abuses, then the proper format to raise that would be

25   in a Motion for Sanctions.  What I want to look at today is what

1    information are you entitled to that you haven't received and

2    when can we get that to you because I believe there is

3    information you're entitled to receive that you haven't received.

4        I want to go through these, over these broad -- this broad

5    overview and then, if necessary, and it may be, we'll go through

6    every single one of these requests and we can talk about the

7    objections, whether they're waived, whether they're appropriate,

8    and what else is out there that needs to be produced, but the

9    first thing I'd like to do is set a briefing schedule for the

10   hernia mesh issue.

11       How long do you think it would take you, Mr. Aylstock, to do

12   a brief explaining why it's relevant for you to receive the

13   hernia mesh information and whether or not you have -- by just

14   identifying these two types of mesh, you have now sufficiently

15   narrowed your requests to make them reasonable?  How long do you

16   think you will need to do a brief on that?

17             MR. AYLSTOCK:  This is Bryan Aylstock, Your Honor.  Ten

18   days.

19             THE COURT:  Ten days?  All right.  And then I'm going

20   to give the defendants ten days to respond to that and, in the

21   response, Ms. Jones, if you're going to claim that it's

22   burdensome, that it's overly broad, that it's too expensive, then

23   I need to have support for that, not just the statement that, oh,

24   this is overly broad or it's too hard for us to go find all of

25   these documents.  I need something similar to the affidavit you

```
1    supplied about the Outside of the United States documents.  So

2    I'm going to need that sort of a response.  All right?

3              MS. JONES:  I understand, Your Honor.

4              THE COURT:  All right.  The next -- the next broad

5    issue I have has to do with the status of the OUS documents.

6    Tell me now, where are we?

7         I understand there's still some problems with producing it

8    because of the burdensomeness.  Where are we with the OUS

9    documents?

10             MR. WATSON:  Your Honor, this is Ben Watson.  I can

11   address that similar to the -- to the information we have put in

12   our brief.  You know, we've had -- we've had ongoing discussions

13   with Mr. Aylstock and his team about that for -- for sometime

14   now.

15        You know, it's never been our position that documents are

16   not discoverable simply because they're located outside of the

17   United States.  It's been our position that, you know, documents

18   that are core to the litigation certainly should be produced and

19   I think -- I think it's a fair representation that we have

20   certainly done that.

21        I mean, for example, I know Your Honor is probably aware

22   that these products are manufactured outside of the United States

23   and we have certainly, you know, given them documents from those

24   facilities.  We've never taken the position that, you know, we're

25   not going to give you documents because, you know, these things
```

were manufactured somewhere else.  We've certainly included that as part of our -- as part of our collection and as part of our production.

Also, we have -- we have provided to them worldwide adverse events.  We certainly have not limited that to adverse events in the United States.  We recognize, you know, that adverse events, wherever they may occur, you know, certainly provide information, but we have -- we have given them adverse events not for just the U. S., but also worldwide and, as part of our trying to come to an agreement on this issue, they have made several specific requests and we have honored those.  For example, they have requested the regulatory documents from three countries, from France, Japan and Australia, and we have collected and produced those for them.

In addition, they asked for marketing documents from what amounted to 32 separate countries and we have, you know, done -- I think Ms. Downs set forth in her declaration, we have done extensive work to track down any unique marketing documents for those countries and produced them.

The other thing that we have offered to do is to put up a witness, and Ms. Downs was going to be that witness, and we have, you know, gone to considerable time and expense to prepare her to be able to testify concerning the extent of documents outside the United States and what the -- what the cost and burden would be to get those documents.

1          Unfortunately, it's my understanding that that deposition is

2     no longer requested by the plaintiffs and they apparently don't

3     -- don't feel it's necessary, but the bottom line is, you know,

4     certainly, if you look at our -- at our papers, we have, I

5     believe, you know, 96 separate XUS custodians and simple forces

6     that we have produced.  We're obviously open to talking to them,

7     but if there are more specific things within reason that they

8     think that they want, we're certainly willing to talk with them

9     about it.  So that's where we stand on XUS.

10          THE COURT:  Now, Mr. Aylstock, do -- I think the

11    question that was going through my mind as I was reading through

12    all of this information is do you really want everything that's

13    -- everything that's overseas?  Do you really want all that

14    information?  How are you going to be able to digest and use it?

15    It sounds like it's a tremendous volume of information.

16          MR. AYLSTOCK:  Well, Your Honor, this is Bryan

17    Aylstock.  We did, as Mr. Watson alluded to, agreed to limit our

18    XUS discovery requests to certain matters that would relate

19    directly to the safety or the efficacy of the product.  So to the

20    extent that there are marketing documents, for example, all

21    around the world, we've -- I've told Mr. Watson, and he knows

22    this, that we don't need that information from all around the

23    world.

24          What we've told Mr. Watson is what we need are the documents

25    that would relate directly to testing, safety, regulatory,

because these regulatory bodies sometimes, and have, we know from other countries, raised safety issues and those were responded to or testing is requested and that's responded to.

So what we're ask -- what we limited it to was for the manufacturing documents, the testing documents, the design documents, and those -- those types of documents.  I

Think in Footnote 4 of our response, we set forth exactly what we were aiming for, Footnote 4 of our original Motion to Compel, if my memory serves, but those are the types and what we would not want to do is limit it simply to three specific countries.  We knew that there were issues in those three specific countries from the documents we had.  So those were the ones we asked, "Can you please front burner these?"

And so I appreciate Mr. Watson's efforts, and I told him as such, but we would like those types of information from anywhere in the world.  We're not talking about marketing brochures or sales figures and stuff like that from India or Africa, I agree with Your Honor.

But there is a more fundamental issue at this -- at play here and that is, from the plaintiffs' perspective, even when there is no objection or they have completely withdrawn their objection, and I appreciate that they did it, I would submit they should have done it without making us go through all this motion practice, but I appreciate that they did it, but we have no way of assuring ourselves that, in fact, the documents are truly

 1     being produced and that's been borne out in the discovery where

 2     we have a pattern where documents are not produced, or produced

 3     and we've had -- and we are able to identify, hey, this has not

 4     been produced, and then they're produced maybe the night before,

 5     the morning of or, in some cases, weeks after the deposition that

 6     underlies the request.

 7         So I think what we would like to come out of this, with an

 8     order, however the Court rules on these issues that, in fact, all

 9     of these documents must be produced.  In fact, we set forth a

10     couple of examples in our -- in our reply, but there are dozens

11     of examples where documents, core documents that were clearly

12     within the production that, you know, are clearly not

13     objectionable, I think there would be no assertion that they

14     would be covered under one of the -- would have been covered

15     under one of the objections simply are not produced and, for that

16     reason, I'm just concerned that by going this route, unless there

17     is an order, that we'll be right back here and the pattern that's

18     developed, that's put us at a huge disadvantage.

19         For example, 170,000 documents were produced last night.

20     Thousands of them -- that's 15 percent of the entire production.

21     Thousands of them are on deponents we've already -- we've already

22     deposed.  So I'm just raising it as an issue as to -- to have out

23     there when we're going through these issues, and I apologize for

24     digressing off the point, but that --

25             THE COURT:  No, I --

1          MR. WATSON:  But as to foreign production, is that's

2     the type of information and, even though they've produced certain

3     things, we know there are relevant documents within that XUS

4     production that should have been produced, that haven't been

5     produced, and I'll give you a couple of examples.

6          THE COURT:  All right.  Before you go on -- before you

7     go on, I'm sorry to interrupt, but I want to just -- I want to --

8     to look at these very broadly, to begin with, and I am going to

9     get to the issues you've raised, which I can tell you, I was very

10    concerned about the events as you described them because,

11    certainly, that is not the way discovery is supposed to occur and

12    so we will get to that.

13         On the foreign documents, however, and I think what I

14    perceive as part of the problem here is that you are trying to

15    work these things out, but I'm not sure you are speaking the same

16    language as the defendants.

17         I think, for example, you talk about wanting regulatory

18    documents.  I don't know myself what all would be out there, but

19    I can imagine that there's a tremendous amount of regulatory

20    documents that you would not want because they're not going to

21    have any sort of relevancy or -- or play any sort of important

22    role in this case and I don't know if perhaps the requests are a

23    little broad, but what's happening is you make these requests and

24    then the defendant is sort of picking and choosing what it thinks

25    is relevant and that certainly isn't -- is not the posture we

1    want the discovery to be in.

2        Perhaps there needs to be some more particular requests,

3    especially when you're talking about areas where there are huge

4    amounts of documents that will likely be irrelevant and then,

5    that way, we'll be on the same page and when I order something,

6    we'll all know what's being ordered and what has to be produced.

7        So I'm hearing you say, though, that there isn't any real

8    agreement about the Outside United States documents.  There have

9    been some things produced, there have been some things that

10   haven't been produced, and there's no bright line as to what's

11   supposed to be produced and what you're waiting for; is that

12   correct?

13          MR. AYLSTOCK:  Your Honor, this is Bryan Aylstock.  I

14   think that is correct, because our request, just to be clear, I

15   found the footnote.  What we would like Ethicon to do, and we

16   believe it's consistent with what -- what was ordered in the AMS

17   litigation, is for them to produce all foreign regulatory design,

18   testing and manufacturing documents, and I do agree with Your

19   Honor that there will be, I'm sure, a large number of irrelevant

20   documents in there, but how will we know that unless we look at

21   them?

22        And I think that those requests are likely to lead to the

23   discovery of admissible evidence.  In fact, I know that they are

24   because you've already seen some of them, but --

25          THE COURT:  Now --

1           MR. AYLSTOCK:  That -- that, to be clear, is our

2    request.  I don't believe that that's been agreed to by Mr.

3    Watson or Ms. Jones.

4           THE COURT:  All right.  Those are the requests and now,

5    counsel for Ethicon, you've heard what the requests are.  He's

6    stated what he wants as it pertains to Outside United States

7    documents.  You also have the benefit of Judge Stanley's order in

8    AMS and her reasoning as to why Outside U. S. Documents are

9    relevant.  So I think what you need to do is respond to those --

10   to these -- this request for these four categories of documents

11   and let both Mr. Aylstock and the Court know what it is you

12   intend to object to or whether you have, in fact, already

13   produced the relevant documents; whether you think it should be

14   limited to certain countries.  I've heard various ideas, but

15   nothing specific very specific?

16          MR. WATSON:  Yes, Your Honor, we can certainly respond

17   on those -- on those categories that he -- that he raised.

18          THE COURT:  All right.  And how long would you like to

19   respond?  And I can give you more than the ten days.  I don't

20   want to load a whole bunch of briefing on you, but if you've got

21   -- he's given you the four categories of OUS documents he wants.

22   You know what they are now and I think you need to specifically

23   say why you can or can't produce those things.  How long will it

24   take you to do that?

25          MR. WATSON:  Your Honor, I would -- I would think

```
 1    14 days would certainly -- certainly be fine.
 2              THE COURT:  All right.  Now since we are separating out
 3    the hernia mesh issue and the OUS issue for briefing, when we go
 4    through these other discovery requests, I'm not going to be
 5    ruling on them as they pertain to the hernia mesh or OUS at this
 6    point.  Those rulings will come later.  Is that clear to
 7    everyone?
 8              MS. JONES:  Yes, Your Honor.
 9              MR. AYLSTOCK:  Yes, Your Honor.
10              THE COURT:  All right.  Let's then talk about the
11    reference to business records because I did see that in many of
12    the responses.  I will tell you, Ms. Jones or Mr. Watson, that I
13    don't think it's appropriate to answer in the way that you
14    answered some of these, where you say something to the effect of,
15    "Some of the responsive documents can be found here", but you
16    don't say,"This is where the documents are."  You don't say what
17    databases can be searched.  You give them an example of where
18    some of the documents are.  I don't think that complies with the
19    discovery rules, but you tell me how I'm wrong about that.
20              MR. WATSON:  Your Honor, this is Ben Watson.  What we
21    would say about that is that, obviously, these documents are
22    produced pursuant to the ESI protocol that has about 31 or 32
23    separate parameters that allow this to be searched by, you know,
24    so many different things and it's our position that, you know,
25    with the documents in that searchable format, a format that was
```

1    negotiated and agreed to by the parties, we think that that gives

2    them the information that they need to find documents particular

3    to a -- you know, a certain topic, or a certain custodian, or a

4    certain issue, whatever, whatever it may be.  So that's the basis

5    for, you know, why we answered that way.

6            THE COURT:  Well, how is that different from the old

7    days where you just handed somebody seven banker's boxes full of

8    documents and said, "The answers are in here and you can look for

9    them as easily as I can"?

10           MR. WATSON:  Yes, Your Honor.  I certainly understand

11   that and I -- and I think the difference is, is the -- is the ESI

12   protocol and the extensive metadata and other information that's

13   provided and, you know, the fact that the documents are in

14   text-searchable format, you know, I think that's certainly

15   different than just, as you say, turning over a bunch of banker's

16   boxes of documents.  I think the way they are, you know -- you

17   know, indexed under the ESI protocol, I think, certainly make for

18   a different situation.

19           THE COURT:  Do you have these -- do you have your

20   records categorized by server, or document type, or something

21   that would identify a certain group of documents so that you

22   could then say, well, if you want documents that have to do with

23   clinical studies, you can go to this particular server, this

24   particular category of documents, and anything we have will be in

25   there, or are you just saying they need to search the entire

1    universe of documents that you've produced?

2          MR. WATSON:  Well, Your Honor, I think some of the

3    parameters that are in there, for example, the source file tabs

4    that tells them where the particular document came from, either

5    on a custodial level, or a database level or, you know, a -- you

6    know, a server level, whatever it may be, I think the source file

7    tab certainly, you know, allows them to do that.

8          THE COURT:  Let me --

9          MR. AYLSTOCK:  Your Honor --

10          THE COURT:  Yes, Mr. Aylstock, I'm going to let you

11    respond, but let me ask you this.  Is part of your concern with

12    their answers the fact that they seem to say, "Some of the

13    documents can be found here" and they don't really say, "These

14    are all the documents", or is it that you just don't want to have

15    to search the universe of documents yourself?

16          MR. AYLSTOCK:  It's the former, Your Honor, and -- and

17    this is Mr. Aylstock again.  Let me give you specific examples

18    because it was brought up, in fact, at one of the status

19    conferences about our need for the versions of the professional

20    education materials because the bellwether depositions were going

21    to take place, and actually have all taken place pretty much for

22    the implanting physicians, and it was brought up and Ms. Jones

23    indicated to the Court at that hearing that, yes, we'll do it

24    hopefully within ten days or whatever it was.

25      Well, that didn't happen, and then I went -- as the Court is

aware from the hearing, this happened during a deposition, I went

to depose Paul Parici, the worldwide vice president, or he was

the Head of Professional Education worldwide for Ethicon, and I

followed up with Mr. Watson multiple times with multiple e-mails

saying I need the finals so I can ask him some questions about

it, and not to mention the fact that the lawyers with the cases

in the bellwether pool are asking me what the files were.  I

couldn't even really respond to that.

     At 10:00 the night before the deposition -- well, let me

preface it by we had looked for all of the final versions and

there's no -- there are versions out there, but there's no

indication of which is final, which isn't final.  Some of them

have handwriting, so on and so forth.  So we did the latter.  We

did -- we did our best to piece it together.

     At 10:30 the night before the deposition, I get a grid of 34

Professional Education pieces with the Bates numbers from Mr.

Watson.  I appreciate it.  I would have liked it a little bit

earlier, but I went and looked at it and, in fact, and I made

this clear to Michael Brown at Butler Snow during the deposition,

these are not finals.  There's handwriting on them.  There's

edits on them.  What's going on with this?

     And -- and so I -- I couldn't be effective at the deposition

at all, and then I follow up actually during the deposition with

more requests.  Three weeks later, I get a new grid from Mr.

Watson having 50 percent more and new final, supposedly,

1    Professional Education materials.  Four of the 34 that were

2    previously produced on the grid by Mr. Watson were changed.  So

3    now things have changed on what's final and what's none final and

4    with the caveat that,"We're still looking.  We're not sure.  We

5    can't certify anything about what's final."

6         And then the same thing happened with Ms. Lin when it came

7    to the 510(k) submission for the TVT SECUR.  We had Mr. Cartmell,

8    gets into the deposition, asked him questions about it.  "Oh, I

9    have the 510(k), the complete one, right down the hall."

10        Well, in the middle of the deposition, more pages are

11   produced for the -- the core document to the FDA, the 510(k)

12   submission that should have been produced pursuant to our

13   requests back in July, but were not produced, and then produced

14   in the middle of the deposition, and there's -- there's many

15   examples like that.

16        But it just underscores the fact that when you answer with a

17   litany of, "Here's some, but not all," it puts us in an

18   impossible position of not knowing what "all" is and then, when

19   we go to look for all, their own lawyers, and I don't fault Mr.

20   Watson or Ms. Jones.  I know they're doing their best, but I

21   think it's a problem with the client.  Ethicon needs an order

22   saying you must do this so that it can be done once and for all

23   and now we don't have to go back and do more depositions and

24   we're at an enormous disadvantage with an expert deadline four

25   weeks away basically.

1           THE COURT:  Right.  Well, I do find that the -- (beep

2   detected on recording from telephone) -- that these instances

3   that you related in your brief are very disturbing, that it just

4   -- it sounded so improper to me to represent to the adverse

5   party, here is a final version of something and then, two weeks

6   after the deposition is over, say, oh, whoops.  Nope, that wasn't

7   the final version.  Here's the final version, and then that's not

8   even the final version.

9       So that's very -- that's very, very disturbing to me and I

10  do think that's something that should be the subject of a Motion

11  for Sanctions.  I think that -- that that is a real problem.

12      Separate and apart from that, however, I also find these

13  answers to be a problem where you are saying, some examples of

14  responsive documents are these and then you just go look in the

15  universe of the rest of the documents and maybe you'll find

16  something else.  That is not an adequate answer.

17      So every time I see an answer like that in this stack of

18  responses, I'm going to order Ethicon to make a more

19  particularized and specific response, either identifying where in

20  the universe of documents these things can be found, or what --

21  what word searches need to be used, or identifying the documents,

22  but this is not sufficient.

23      I think the plaintiff has the right to know where all of the

24  documents are, if they've already been given to the plaintiff,

25  and how to find them without having to just do a search and hope

1    they find something.  So I'm telling you that's how I'm going to

2    rule on all of those things.

3        The last -- the last broad issue that I have has to do with

4    the privilege log.  On the one hand, I hear the plaintiff saying

5    there is no privilege log.  On the other hand, the defendant is

6    saying, yes, there is a privilege log.  In fact, you had problems

7    with our privilege log.  So is there, or is there not, a

8    privilege log?

9            MR. WATSON:  Yes, Your Honor.  This is Ben Watson.  We

10   have produced an extensive privilege log.  Right now, it's up to

11   approximately 19,000 entries and we've produced that to them on a

12   rolling basis and, in fact, their designee, I guess, from the

13   Plaintiff's (inaudible) Committee, that they have designated

14   Anthony Irpino.  I have regular conversations and correspondence

15   with them and we talk about privilege issues and they ask us to

16   look at things and we look at it and we have a pretty meaningful

17   back-and-forth.

18       So, from our standpoint, you know, we certainly have a -- a

19   privilege log and we believe that it is robust and we -- at least

20   from what I know, we've never been told that they feel that the

21   log is insufficient in any way.

22       And, Your Honor, I don't know if it's appropriate at this

23   time, but at some point, I would like to address the Professional

24   Education and 510(k) issues with Mr. Aylstock.  I will be glad to

25   do it now, if that's okay.

```
1          THE COURT:  Well, I think we will get to those as we go
2    along here.  So I will give you an opportunity at that point,
3    definitely.
4          MR. WATSON:  Yes, Your Honor.
5          THE COURT:  Now, Mr. Aylstock, is there a problem with
6    the current privilege log?
7          MR. AYLSTOCK:  No, Your Honor.  I think Mr. Watson is
8    correct that there is a process that now is seemingly to work --
9    seeming to work and that issue, I would suggest, is off the table
10   at this time.
11      You know, there are meet-and-confers that take place and
12   certain documents and there's certain clawback issues and so
13   forth, but those are specific issues and really no longer related
14   to this Motion to Compel.  So I would agree with Mr. Watson.
15         THE COURT:  All right.  I think what we may do then, at
16   this point, is start going through the second supplemental
17   responses to plaintiffs' first request for production of
18   documents and we will address, as much as I hate to do this, each
19   one of these, to the extent that is necessary.  Does everyone
20   have that document in front of them?
21         MR. AYLSTOCK:  Yes, Your Honor.  This is Bryan
22   Aylstock.
23         MR. WATSON:  Ben Watson, I do.
24         THE COURT:  Request number one then is for the
25   corporate organization charts.  Do we have a problem yet with
```

1    that, Mr. Aylstock, with the response as it's written, and I

2    understand -- I understand the defendant to say this is actually

3    an amended response, not really a supplemental response, but an

4    amended response that now takes the place of their original

5    response; is that correct?

6          MR. WATSON:  Yes, Your Honor.  This is Ben Watson.

7    That's correct.

8          THE COURT:  All right.  So now we're looking at the

9    question and the answer.  Is there anything remaining that needs

10   to be produced in response to this from your position?

11         MR. AYLSTOCK:  Your Honor, this is Bryan Aylstock.

12   Request number one is sufficient with the caveat, of course, that

13   the hernia and XUS, and I know this is true for all of them, but

14   I just wanted to make that clear --

15         THE COURT:  Yes.

16         MR. AYLSTOCK:  -- are off the table.  That response is

17   sufficient in our view.

18         THE COURT:  And I'll make that again clear, that as far

19   as how these apply to the hernia mesh or to the OUS documents, we

20   -- these -- the rulings on these today will have nothing to do

21   with those.  Those rulings will come later.

22        And so the defendant may have to produce additional

23   documents, even when you've said something is sufficient.  If it

24   has to do, for example, with hernia mesh, they may still have to

25   produce it.  So I think we're all on the same page with that.

```
 1              MR. AYLSTOCK:  Thank you, Your Honor.

 2              THE COURT:  So number one is -- is sufficient.

 3         Number two?

 4              MR. AYLSTOCK:  Your Honor, Bryan Aylstock again, with

 5    the same caveat.  Number two appears sufficient to us.

 6              THE COURT:  Number three?

 7              MR. AYLSTOCK:  Number three, Your Honor, they have

 8    raised and -- the specific objection, number two, which is to

 9    scope and, in fact, this is another issue that we've been having.

10    The request, of course, says, "Any and all agreements between

11    defendants and other persons or entities relating to the

12    development of pelvic mesh."

13         We have -- of course, that would include the requests of the

14    consulting agreements for the inventors of the products and so

15    forth and that's another example where it was not produced.  We

16    asked for it.  Some of them were produced, but to our knowledge,

17    there are still agreements outstanding that haven't been produced

18    and I don't have a problem with their answer, except for the

19    scope.  I mean I'm not sure how that relates, but -- and whether

20    it relates, but these are consulting agreements and licensing

21    agreements from the inventors of the product, of the original TVT

22    product itself, I think it's Dr. Ulmsten and, to my knowledge, we

23    still -- we've asked and we still do not have those.

24         So I think there's an issue there.  I don't know that the

25    response is bad, it's just it hasn't happened.
```

1          THE COURT:  Defendant, what's your response?

2          MR. WATSON:  Your Honor, this is Ben Watson.  In terms

3     of our scope objection, I think this raises the -- you know, the

4     issue that, you know, when you ask for every single agreement

5     that may relate to these products, you know, you -- you know, to

6     the extent those are, you know, marketing agreements in India or

7     other things like that, that's our concern and that's why we

8     raised the scope issue.

9          Now, in terms of the specific contracts, you know, we can

10    certainly produce -- they do a large volume of contracts that we

11    have been able to -- you know, to find and collect.  We have had

12    some correspondence with Mr. Aylstock with the Ulmsten

13    agreements.  They were difficult for us to find.  You know,

14    after, you know, a lot of legwork, we ultimately found them.

15         I believe there are two still on the table that they have

16    asked about and, you know, despite our best efforts, we simply

17    have not been able to locate them in spite of all the -- you

18    know, with all of the places and most of the people we've talked

19    to.  So, you know, while we certainly continue our efforts on

20    those to -- you know, right now we just haven't been able to find

21    them.

22         THE COURT:  Let me make sure I understand, Mr. Watson.

23    As far as the scope, are there -- are there any agreements that

24    you are not producing based on a scope defense?

25         MR. WATSON:  No, Your Honor.  Certainly, there's not,

1    you know, a collection of agreements that we know about that

2    we're simply not producing because we think they're beyond the

3    scope.  It's just, you know, we have looked and everything that

4    we have been able to find, we have produced those.  So that's

5    correct, we are not withholding anything based on scope.

6          THE COURT:  Now, Mr. Aylstock, knowing -- knowing that,

7    having that representation by Mr. Watson, is this answer

8    sufficient or not?

9          MR. AYLSTOCK:  What I would suggest, Your Honor, with

10   that representation is that they withdraw objection number two,

11   the scope objection.  I think the answer itself is sufficient.

12   The compliance is another question.

13      And maybe we need to -- if they've certified that they've

14   done their best efforts, they just need to tell us that.  What we

15   can't have is, you know, at trial or after our experts are

16   deposed, oh, now we've found something, and it changes the game.

17   That's what we're concerned about.

18         THE COURT:  And, Mr. Watson, I understand how you feel

19   because I was a defense lawyer all of my career and you hate to

20   let go of what you think is a legitimate argument or a legitimate

21   objection, but if the objection actually has no teeth because, in

22   fact, you've turned everything over, then it hardly makes any

23   sense to continue to assert it and what happens if you continue

24   to assert it is that then the plaintiff does not know if, in

25   fact, there are other documents that you have withheld based on

1    this objection.  I think that is the biggest problem I hear the

2    plaintiff raising, is that with your objections, they're never

3    sure if you've, in fact, done your obligation, done your duty to

4    make a search, and have produced everything responsive and

5    relevant or whether you're holding things back based on some sort

6    of objection you've asserted, but you haven't really made clear.

7    Do you understand?

8              MR. WATSON:  Yes, Your Honor.  I certainly understand

9    that and, you know, we -- we -- the defense -- it certainly is

10   not our intent to, you know, hold things back based on this.  I

11   guess, from our standpoint, you know, it's so difficult to say,

12   yes, you know, we have every single contract that exists in the

13   company on this topic.  We certainly do our best efforts to -- to

14   make that happen, but being able to, you know, to assure yourself

15   one hundred percent, you know, is difficult from our perspective.

16             THE COURT:  Oh, I understand.

17             MR. WATSON:  With that understanding, and I'll

18   certainly let Ms. Jones overrule me if I'm wrong, but I think

19   with that understanding, you know, that may be an objection that

20   we're willing to withdraw.

21             THE COURT:  What I'm going to do at this point, is I'm

22   going to overrule that objection to scope for request number

23   three.  Should you find a contract that you believe should not be

24   produced because it is beyond the scope of what would be

25   legitimate requests in this case, then you can raise it at that

```
1     time with that --
2               MR. WATSON:  Yes, Your Honor.
3               THE COURT:  Raise it specific to that contract or
4     contracts.  All right?  And I would expect that to be done in a
5     supplemental response.
6         I would expect you to say we have located ten more
7     contracts.  However, these contracts are irrelevant, or they're
8     beyond the scope of the discovery request and so we're not
9     producing them, okay?
10              MR. WATSON:  Yes, Your Honor.
11              THE COURT:  Number four, where are we with answer
12    number four, Mr. Aylstock?
13              MR. AYLSTOCK:  Well, I think it has the same issue, the
14    scope issue, and we have -- frankly, have some issues with laying
15    our hands on copies of certain presentations and it may be that
16    part of this over -- of there is also an overarching issue, which
17    the Court should be aware of, that there are certain deponents or
18    company witnesses for which there simply is no custodial file or
19    there's, what I would submit, is clearly a deficient -- you know,
20    a hundred or less documents for the Chief Medical Officer is
21    there for three years or something like that.
22        An example I would give would be, again, Mr. Mahmoud, Dr.
23    Mahmoud, the Chief Medical Officer, he has some e-mails, you
24    know, a total of 23 e-mails for his three years as Chief Medical
25    Officer, and there's also some e-mails that are not in his
```

1    custodial file that we were able to locate where he was copied on

2    or he replied to somebody else.

3        The problem is, in one in particular, we were looking for

4    had the original e-mail that might attach and those documents may

5    not be there.  So, again, if they've complied -- and I understand

6    and, believe me, I'm very hesitant.  Motions for sanctions, I

7    really don't do that, but I'm hesitant to say anything bad about

8    these lawyers because I know they're doing their best, but we've

9    been told that the documents are being done by some other law

10   firm.

11       So what I -- what I would suggest, the same thing happen

12   here, is that if, in fact, the scope objection be overruled and

13   that if something is being withheld, that it be, you know, made

14   known to us that it's being withheld on the objections.  Absent

15   that, I think the -- the response, the written response, is okay,

16   as long as it's complied with.

17            THE COURT:  Mr. Watson, has anything been withheld

18   based on a scope objection?

19            MR. WATSON:  No, Your Honor, not -- not that I'm aware

20   of.  Again, I think -- I think it's the same issue.  There's not

21   a document that we're aware of that we're saying, hey, this is

22   beyond the scope.  We're holding this back.  That certainly is

23   not what we've done.

24       I think, you know, consistent with Your Honor's previous

25   ruling, you know, if something like that did come up, then, you

1    know, I think we could certainly identify that specific document

2    in -- you know, in a supplemental response --

3              THE COURT:  That's --

4              MR. WATSON:  -- and do it that way.

5              THE COURT:  That's what I'd like you to do.  I'm going

6    to overrule that objection as it stands today.  However, should

7    you find a document that you believe is outside the scope, then

8    you need to raise it in a supplemental response at that time and

9    specific to that document or documents, okay?

10             MR. WATSON:  Yes, Your Honor.

11             THE COURT:  All right.  Number five.  Now I know we

12   still have considerable problems with the policies and

13   procedures; is that true?

14             MR. AYLSTOCK:  Well, this is a little bit different,

15   Your Honor.  This relates to the storage solution and backup of

16   documents.  There is still some meeting and conferring going on

17   with the standard operating procedures and I think the suggestion

18   was made maybe -- I think it was by Your Honor, why don't we get

19   the technical people together.

20             THE COURT:  Uh-huh.

21             MR. AYLSTOCK:  And they've provided more information.

22   So I think that particular issue is being handled through the

23   meet-and-confer process and is still ongoing.

24        This particular request, though, relates to the policies and

25   procedures about storage and backup of documents and they have

1     asserted the Scope Objection Rule as well and we would submit

2     that that also needs to be overruled and, in particular, in light

3     of the fact that, you know, they have admittedly in some cases,

4     even in the case of the president of the company, that her hard

5     drive where she saved everything is lost, even though it was

6     supposed to be saved under the Document Retention Policy under

7     the preservation order.  So these are the very major issues to us

8     and we would submit that this also be overruled and that all of

9     these be produced or, if they're withheld, specifically

10    identified.

11          THE COURT:  Are you withholding anything at this point,

12    Mr. Watson?

13          MR. WATSON:  No, Your Honor, we're not withholding

14    anything and they have deposed, you know, a 30(b)(6) witness on

15    this twice now and he has spoken extensively, you know, on these

16    types of issues, the storage, deletion and backup and a number of

17    policies and procedures have been, you know, discussed in that

18    deposition and, you know, documents produced.

19       And I believe we have another similar deposition coming up

20    August 13, I believe, on these issues and I believe we will have

21    some additional documents produced, you know, based on the

22    retention issues that the plaintiffs have raised.  So I think

23    that can all be addressed in connection with that upcoming

24    deposition.

25          THE COURT:  All right.  I'm going to do the same thing

```
1    on this one, as far as scope then, overrule it.  You can raise it
2    later should some document come up that you feel needs to be
3    withheld on the basis of scope.
4         Request number six.
5              MR. AYLSTOCK:  It's the same issue, Your Honor.  I
6    don't know if they're withholding anything based on scope, but to
7    the extent they are, you know, we'd like to know where those
8    documents are and also how they're kept and it is an issue that
9    also has arisen in the context of discovery.
10        For example, the clinical trial company sponsors that we've
11   learned in the depositions that, hey, the witness, the Medical
12   Affairs Officer, said, well, they're all kept in a trial master
13   file in a file cabinet in one location in Somerville and I have
14   been looking for the typical plans and protocols and so forth
15   that had not been produced and then we were able to finally get
16   that.  So I just -- I think it's an important one and, if they're
17   not withholding anything, we would just suggest that objection
18   number two also be overruled.
19             THE COURT:  Anything being withheld, Mr. Watson?
20             MR. WATSON:  No, Your Honor, not that -- not that we're
21   aware of, and I just -- you know, I just want to make it clear
22   that, you know, there's always a possibility that we're going to
23   locate additional documents that may be, you know, in this index
24   or, you know, something that's -- or a log that's responsive to a
25   subject.  I just want to make it clear in my answer that, you
```

1    know, we're not aware of anything that we're holding back, but,

2    you know, obviously, there's a possibility that we could locate

3    something, you know, in -- in the future.

4          THE COURT:  I understand that and -- and I understand,

5    having worked for a large corporation, that there are documents

6    out there sometimes and, even with your best efforts, you don't

7    find them until later in the litigation.

8       However, having said that, the obligation of the defendant

9    is to perform a reasonable search for what may be out there,

10    sooner rather than later, because it is unfair to the plaintiff

11    to take a deposition believing that the plaintiff has all of the

12    relevant documents and then finding out after the deposition is

13    over that -- that the plaintiff didn't have the documents, or

14    that they have the wrong versions of the documents or the wrong

15    years of the documents and that, in fact, the correct document

16    was sitting in a file cabinet down the hallway that whole entire

17    time.  That -- that cannot happen because this case will never

18    get finished if that's what happens.

19       So I understand your concern, Mr. Watson.  I hear what Mr.

20    Aylstock says, that you and Ms. Jones are doing a good job.  It's

21    not your fault, but somebody has to be held accountable for those

22    kinds of errors.  Somebody needs to be making sure that the

23    search is being conducted properly, efficiently, and promptly.

24          MS. JONES:  And, Your Honor, this is Christy Jones.

25    Let -- I mean, you know, I know you appreciate how hard IT IS for

us to sit quietly back and not respond to some of the -- the
allegations, but I think that, at some point, I'm happy to
discuss with Your Honor the extent to which, and the number of
custodians, and how we've gone about this, and how we've
established the reasonableness of it, and I -- I can't represent
to Your Honor that it has been perfect under any circumstance,
but I can also represent to Your Honor that nothing has been
intentionally withheld.

I will represent to Your Honor that there has been specific
efforts to go out and collect information from any place we
thought was reasonably likely to reveal that information and I --
and I will also tell Your Honor that there have been times when
plaintiffs' counsel have said, we didn't get this information,
where is it, and we have been able to point them to exactly where
it has been and it has, in fact, been produced.

And, last but not least, there's no question that we have
had some documents and that, for example, with the sales reps
that we specifically went to plaintiffs' counsel and said, we
want you to know that there have been document retention issues.
We did that with the plaintiff, with the president of the
company, and we have done that on every occasion.

So I understand the concern about this.  I simply want to
represent to Your Honor that we have a process and a procedure in
place that we are happy to go through with Your Honor about what
we have done in terms of reasonableness and the millions of

1    documents that we have produced and the hundreds of custodians

2    that we have interviewed and collected documents from and what we

3    have tried to do in terms of the transparency when we knew there

4    was a problem going forward and advising plaintiffs' counsel of

5    that promptly.  So --

6              THE COURT:  And, Ms. Jones, and I don't believe that --

7    that you or Mr. Watson would be responsible for these issues.  I

8    am sure you are doing your utmost to make sure that the documents

9    are produced and I hear that from Mr. Aylstock.  So I have no

10   concerns about that sitting here today.

11       I think perhaps what he's asking implicitly is that whoever

12   is doing the actual document collection, maybe you need to make

13   it more clear or abundantly clear that they need to cross every

14   "T" and dot every "I", so that the documents are produced in a

15   reasonable time frame, so that the discovery can go forward and

16   the depositions can be taken, and things don't have to be

17   repeated, but I think as far as explaining what you've done, I

18   think that's probably something that would be more relevant to a

19   Motion for Sanctions and, if Mr. Aylstock isn't going to make

20   such a motion, you may never have to explain it.  I think what we

21   need to do today is figure out just how we can answer these --

22   these discovery requests to the extent they haven't been answered

23   and I think we're doing a pretty good job on that.

24             MS. JONES:  And I apologize for interfering.  I just

25   wanted Your Honor to be aware of that.

1          THE COURT:  No, I don't think you're interfering.  I

2    think you couldn't stand it any longer.  You're getting picked

3    on.  Your client was getting picked on and you did your job.  So

4    I appreciate that.

5          MR. CARTMELL:  Your Honor?  Your Honor, I apologize --

6    this is Tom Cartmell -- for interrupting.  I actually am catching

7    a flight to go take a deposition in this case and so I have to

8    get off.  I apologize.  But, obviously, everybody has this well

9    under hand.

10          THE COURT:  All right.

11          MR. CARTMELL:  So I just wanted to let you know.

12          THE COURT:  I appreciate that.  Thank you.

13          MR. CARTMELL:  Thank you very much.  Bye.  See you all.

14          THE COURT:  Bye.

15    Now on all of these issues that have to do with the scope

16    objection, I'm going to just rule the same way.  I'm going to

17    overrule the scope today.  If future documents are being withheld

18    on that basis, then you need to assert it at that point and I

19    won't consider it as a waiver of the objection in the future, but

20    what we will still have to do as we go through these, I think, is

21    find out whether there's anything being withheld at this point.

22    So if anyone can think of a way to expedite that, I'd be more

23    than happy to hear that.

24          MR. AYLSTOCK:  Well, Your Honor, this is Bryan Aylstock

25    again.  I think that brings us to request for production number

1    eight, which are the insurance policies and so forth that not

2    only, you know, are requested, but would have been required under

3    Rule 26 and I do think that, certainly, Ethicon has the right to

4    keep that confidential and so forth and it would be subject to a

5    protective order that we wouldn't challenge, but I think it is

6    important information that is typically produced and, in fact, in

7    Rule 26 disclosures.

8        So although they've suggested a meet-and-confer, and we're

9    happy to do that, I'd suggest that this is pretty basic and that

10   should likewise be produced and maybe even produced -- we have

11   come up with a procedure for basically kind of

12   for-attorneys-eyes-only and maybe there would be an exception if

13   it was a liability, you know, damage liability economist or

14   something, but for-attorneys'-eyes-only designation and I would

15   be fine with that for these type of insurance policies, but I

16   think they should be produced.

17             THE COURT:  Mr. Watson, what's your concern about

18   showing them your insurance policy?

19             MR. WATSON:  Your Honor, that's a -- that's a -- I

20   believe the same issue came up in New Jersey and I'm going to

21   defer to Ms. Jones on that one, if that's possible.

22             MS. JONES:  Your Honor, at the point -- you know,

23   frankly, we are dealing with companies that are clearly

24   financially unstable and what we did in New Jersey was to

25   represent that we had the appropriate coverage and the

1    appropriate financial information and that it was not, therefore,

2    necessary and it was confidential information that related to the

3    status and how the companies went about insuring and what was --

4    what portion of it was considered self-insured and so forth.

5        I -- that is an area that we inherited the company's

6    response on, Your Honor, and I will just be candid in the sense

7    that if we can defer that and give me three days to get back with

8    Mr. Aylstock to see if we can agree without any problem on an

9    attorneys'-eyes-only or whether the specific information or the

10   specific problems with that, I would appreciate it.

11            THE COURT:  What do you say about that, Mr. Aylstock?

12            MR. AYLSTOCK:  I -- I'm fine with that, Your Honor.

13            THE COURT:  All right.

14            MR. AYLSTOCK:  Certainly, I think Ms. Jones should be

15   able to consult with her attorney (sic) -- or with her client on

16   that one.

17            THE COURT:  With her client, and I mean what about just

18   a dec sheet, for example and not the entire policy?  Do you need

19   the entire policies for some reason?

20            MR. AYLSTOCK:  No, Your Honor.  I think the dec sheet

21   would probably be fine.

22            THE COURT:  All right.

23            MR. AYLSTOCK:  I mean it may raise a question that I

24   may follow up on, but initially, I think a dec sheet will be

25   fine.

1      THE COURT:  All right.  Well, why don't the two of you

2  meet and confer on that?  So, at this point, I'm going to rule

3  that this -- that your motion to compel this request is moot

4  because you're going to meet and confer and you can reassert it

5  at a later date should you not be able to agree?

6      MR. AYLSTOCK:  Thank you, Your Honor.

7      THE COURT:  Request number nine.  How are we on that

8  one?

9      MR. AYLSTOCK:  The supplemental response, certainly, we

10  have the New Jersey depositions and so forth and, you know,

11  that's what we say.  I don't know whether they're withholding any

12  documents and whether there even are any other depositions from

13  other litigations, but I know, for example, there was a pro se

14  case down in Florida involving a TVT product.  I don't know

15  specifically where that got (sic).  I know documents were

16  produced in that litigation, but I -- I would say that the answer

17  is not clear that it's inclusive of everything.  There's

18  certainly no objection.  So --

19      THE COURT:  Have you produced everything related to the

20  New Jersey litigation?

21      MS. JONES:  Yes, Your Honor.

22      THE COURT:  Are there other court or administrative

23  proceedings that would have responsive documents that you have

24  not produced?

25      MS. JONES:  Not that I know of, Your Honor, but I will

1    verify that.

2            THE COURT:  All right.  There's no objection to that.

3    So, if there is anything else, I would expect you to supplement

4    or, at that point, raise an objection to a particular document, a

5    particular deposition, or whatever it might be.

6            MS. JONES:  That's understood.  I just -- I would like

7    to say that nothing's been withheld, but, you know, I -- and I

8    know nothing has been intentionally withheld.  I just don't know

9    if perhaps there's an odd slip out there someplace that may have

10   been missed.  So I will go back and verify it.

11           THE COURT:  And I would assume that would be the same

12   for request number ten.

13           MR. WATSON:  That's correct, Your Honor.

14           THE COURT:  All right.  Number 11.  I see only the

15   objection related to the hernia mesh.  So it doesn't appear

16   there's any objection.

17        Is this a complete answer, to your knowledge, Ms. Jones?

18           MS. JONES:  To my knowledge, it is, Your Honor.

19           THE COURT:  Okay.

20           MS. JONES:  Other than with respect to the hernia.

21           THE COURT:  Right.  Number 12.  We've got scope and we

22   have hernia objections here and, of course, the hernia one, we'll

23   look at later.  What about scope, is there any document being

24   withheld based on scope?

25           MS. JONES:  I was waiting on Ben.  Not to my knowledge.

```
 1              THE COURT:  It will be the same --
 2              MR. WATSON:  Your Honor?
 3              THE COURT:  Yes?
 4              MR. WATSON:  I'm sorry.  I was just reading the
 5     request.  "Inquiries or investigations," that's one, honestly,
 6     that I will confess I don't have full knowledge of and that's one
 7     I would have to look at.  I honestly can't represent to the Court
 8     that everything has been received.  I'm just going to have to
 9     look at that, if that's okay.
10              THE COURT:  Yes.
11         Is that okay with you, Mr. Aylstock?
12              MR. AYLSTOCK:  It is, as long as it happens quickly.
13              THE COURT:  What kind of time frame do you want?
14              MR. AYLSTOCK:  With some thought that maybe there was
15     some regulatory action or investigation with regard to some of
16     the manufacturing, and we've looked in the Cruvella (phonetic),
17     or our own system, and haven't seen it.  So that's another one
18     where I'd appreciate a quick response because it might bear on
19     important issues and maybe some depositions upcoming or that have
20     already happened.
21              THE COURT:  How long will it take you, Mr. Watson, to
22     get an answer to this question?
23              MR. WATSON:  I would think first of next week.
24
25              THE COURT:  I'll give you seven days then.
```

```
 1              MR. WATSON:  Thank you, Your Honor.

 2              THE COURT:  Number 13.  All right.  That one looks like

 3    it's answered.

 4              MR. AYLSTOCK:  I would agree with that, Your Honor.

 5    This is Bryan Aylstock.

 6              THE COURT:  Number 14.

 7              MR. WATSON:  Your Honor, I think that would be the same

 8    as -- I think it's nine and ten.

 9              THE COURT:  Okay.  All right.  There's no documents

10    being withheld based on scope, to your knowledge?

11              MR. WATSON:  Correct.

12              THE COURT:  15?

13              MR. AYLSTOCK:  15, Your Honor -- this is Bryan

14    Aylstock.  I think it's fine, although I'm not sure if they had

15    intended to assert a scope objection there or not because it

16    looks like they started to and they might have hit delete on the

17    numbers one and -- and there's a blank.  So, other than the scope

18    objection, if that objection is overruled, we don't have a

19    problem with their response.

20              THE COURT:  Is there a scope objection?

21              MR. WATSON:  Your Honor, I don't believe there is.  I

22    think there was a typo and I apologize for that.

23              THE COURT:  Then 15 is okay.  16, we've got all three

24    of your specific objections.

25              MR. AYLSTOCK:  Right.
```

```
1              THE COURT:  Anything that you know you're withholding
2     on scope at this point?
3              MR. WATSON:  Your Honor, the only thing would be
4     potentially XUS.  I'm not aware of anything specifically, but I
5     know that when they ask for a foreign government agency, you
6     know, discussions about that, that would be the only thing that
7     would come to mind.
8              THE COURT:  All right.  And that, we will be taking up.
9         How about 17?
10             MR. AYLSTOCK:  Your Honor, Bryan Aylstock.  They did
11    produce a chart.  I appreciated that.  I just -- I'm not sure on
12    the number two objection again.  If there's no scope -- we may
13    have already disposed of the scope objection in toto, but
14    assuming that's the case, I think that's fine.
15             THE COURT:  Anything withheld on scope?
16             MR. WATSON:  Not that I'm aware of, Your Honor.  As Mr.
17    Aylstock said, we -- the company generated and we produced a
18    chart that showed the countries, but there's, you know, something
19    -- I'm not aware of anything else that would have a compilation
20    like that to show the products or the countries where the
21    products were sold.  If Mr. Aylstock has anything in mind, we
22    could certainly try to get it.
23             MR. AYLSTOCK:  As long as the chart is accurate and I
24    can rely on it, I'm fine with the answer.
25             THE COURT:  Number 18?  We've got all three objections.
```

```
 1   So we know we'll take care of hernia and OUS.  Is there anything
 2   being withheld on scope?
 3            MR. WATSON:  Not that I'm aware of, Your Honor.
 4            THE COURT:  Now remember, on all of these where you
 5   have said, "Here are some examples", that -- as I've said, that's
 6   not sufficient.  You're going to have to do a better job of
 7   pointing Mr. Aylstock into the direction of where he can find
 8   these documents and I don't know how --
 9            MR. WATSON:  Yes, Your Honor.
10            THE COURT:  I don't know how you plan to do that.  It
11   may just be there are certain categories of documents that he
12   needs to look in, but it has to be narrowed down from the entire
13   universe of documents that you've produced, okay?
14            MR. WATSON:  Yes, Your Honor.
15            THE COURT:  Number 19.  We've got scope again.
16   Anything you're withholding on scope?
17            MR. WATSON:  No, Your Honor.
18            THE COURT:  20.  You've got all three.  Anything on
19   scope?
20            MR. WATSON:  No, Your Honor.
21            THE COURT:  21, anything on scope with this?
22            MR. WATSON:  No, Your Honor.
23            THE COURT:  22, same issue, would be just the scope.
24            MR. WATSON:  Right and, again, not that I'm aware of,
25   Your Honor.
```

```
 1              THE COURT:  Mr. Aylstock, you feel free to jump in here
 2     if there's something other than scope that you're concerned
 3     about.
 4          23, we're talking scope again?
 5              MR. WATSON:  Right.  No, Your Honor.
 6              THE COURT:  24, any --
 7              MR. WATSON:  No, Your Honor.
 8              THE COURT:  Okay.  25.  It doesn't sound like you're --
 9              MR. WATSON:  Yes.  I'm looking at the response here.
10     Again, I don't believe we're aware of any such investigation, but
11     I'd like to verify that again.
12              THE COURT:  Okay.  So you'll verify that one?
13              MR. WATSON:  Yes.  Yes, Your Honor, in the same time
14     frame, if that's okay.
15              THE COURT:  Seven days?
16              MR. WATSON:  Yes, Your Honor.
17              THE COURT:  26, that's probably pretty -- let's see.
18              MR. WATSON:  Well, I think that's fundamentally the
19     same.
20              THE COURT:  Yes, okay.  So that one -- will you check
21     on that one as well within seven days?
22              MR. WATSON:  Yes, Your Honor.
23              THE COURT:  27.  So this looks like it's slightly
24     different.  What is the -- what is your objection about scope
25     here?  You say, "particularly as the request relates to patents."
```

Do you mean for hernia mesh or something else?

MR. WATSON:  Your Honor, I think it goes to their request for patents for pelvic mesh products and I think our position was that -- that patents just really aren't relevant or beyond the scope.  So I think that's why we asserted that particular objection.

THE COURT:  So you have not produced any of the patents?

MR. WATSON:  Your Honor, I don't think so, but I would -- I would have to check on that specifically, but I believe that is correct.

THE COURT:  You've produced the other documents that were requested; at least, you're not withholding anything except for the patents; is that correct?

MR. WATSON:  Correct.  Correct, Your Honor.

THE COURT:  All right.  Mr. Aylstock, what about the patents?  Are you moving to compel the patents?

MR. AYLSTOCK:  We are, Your Honor.  The patents on the product, and we've been able to find some of them independent from the production, absolutely are relevant because they talk about improvements and problems with prior designs and why this design is unique and how it alleviates or obviates the, in many cases, safety issues about the technique or the -- I mean all of this is -- a products issue, you know, Your Honor, are kits and everything is pretty much patented and there -- in those patents,

1    they talk about problems with other devices and how they think

2    this device will make it better.  So I think it's clearly

3    relevant and clearly likely to lead to the discovery of

4    admissible evidence and I am sure it's fairly easy just to go --

5    they have a patent file somewhere in Somerville.  They can pull

6    them out and copy them.

7            THE COURT:  Well let's do some briefing on this then.

8    How long do you need?  I guess -- I guess what we'll do is, I'll

9    have Ethicon file a brief as to why the patents would not be

10   relevant.  How long do you need to do that, will you need to

11   finish that brief?

12           MR. WATSON:  Your Honor, I think it was 14 days on the

13   other one.  What I would suggest maybe is, you know, a -- I guess

14   an omnibus filing on any issues like this that we need to brief.

15           THE COURT:  Do you want to do these together, these

16   hernia mesh?  So far, I've got three topics you have to brief,

17   the hernia mesh issue, the OUS documents, and the patents.  Do

18   you want to do them all on the same schedule or do you want some

19   staggered scheduling for these?

20           MR. AYLSTOCK:  Your Honor, I'll jump in.  This is Bryan

21   Aylstock.  I think it makes sense to just do it all in one, the

22   sooner we can get these all in.

23           THE COURT:  All right.  Why don't we do this then.

24   We'll -- whatever topics need to be briefed -- although, see,

25   we've got -- we've got them coming from different sides here.

1        I have -- with the hernia mesh, I have Mr. Aylstock filing

2   the first brief, but perhaps we'll just have the defendants start

3   off on all of these topics and then, Mr. Aylstock, you can

4   respond, and then the defendant can reply.

5        So do you want 14 days?  Is that enough time to do all of

6   these various topics or do you need longer than that for your

7   initial brief?

8             MR. WATSON:  Your Honor, this is Ben Watson.  You know,

9   I -- I think -- I think 14 days would probably be sufficient.

10  Obviously, if we add more and more topics to it, we may need to

11  re-visit that.

12            THE COURT:  All right.

13            MR. WATSON:  But I think, for now, it would be

14  sufficient.

15            THE COURT:  So 14 days for the defendant to address

16  hernia mesh, OUS documents, patents; 14 days for the plaintiffs

17  to respond to all of those; and seven days after that for the

18  defendant.  How does that sound?

19            MR. AYLSTOCK:  We'll do our best, Your Honor -- this is

20  Bryan again -- to shorten our 14 days.

21            THE COURT:  Okay.  All right.  That's where we'll go.

22  We'll start -- we'll do that right now.  So we'll move on to 28

23  then.  How are we with 28?  You've got a scope objection.  I

24  assume that you're not withholding anything based on scope at

25  this point?

1          MR. WATSON:  Correct, Your Honor.

2          THE COURT:  Okay.  29.  Same -- same thing for 29?

3          MR. WATSON:  Yes, Your Honor.

4          THE COURT:  30.

5          MR. WATSON:  Same thing, Your Honor, yes.

6          THE COURT:  31.

7          MR. WATSON:  Yes.  Correct, Your Honor nothing on

8     scope.

9          MR. AYLSTOCK:  Your Honor, I -- this is Bryan Aylstock

10    again.  If I could chime in, I think that -- I don't have quarrel

11    with the response itself with the instructions you give about

12    identifying things more specifically.  I guess one of the things

13    I'm concerned about in particular for these, because they are so

14    important for our experts, is the statement that Ethicon is

15    producing the documents and we -- we have requested and, for

16    example, there's a degradation study, one degradation study that

17    the company relies on, and Berkeley testified that there was, you

18    know, an entire study report, including slides and everything,

19    and that it's in tower 109.

20        That deposition happened a couple of weeks ago and it's been

21    followed up and followed up and it's just another one of those

22    situations where I don't know why it wasn't produced before, but

23    this term "is producing", when we're really disadvantaged, doing

24    our best to get all of these experts worked up on all of these

25    different TVT products and, if maybe we can get a deadline, what

```
1    I would like -- what I'd like to see is, "Ethicon has produced
2    responsive documents", as opposed to "is producing", because I
3    don't know when, I don't know if anything is complete, and we
4    keep following up, and it's just very difficult.
5             THE COURT:  What do you say to that, Mr. Watson?  Have
6    you produced everything, other than this degradation study, to
7    your knowledge?
8             MR. WATSON:  Your Honor, I know we've certainly done
9    extensive searches for pre-clinical and clinical studies.  As far
10   as I'm aware, we have -- we have produced, you know, all of those
11   studies.  Now, again, there could be some out there that we're
12   just missing, we're not aware of, and we can certainly go back
13   and check to see if there is (inaudible).
14            THE COURT:  Okay.  Mr. Watson, are you walking or
15   anything with your phone, because you're breaking up a little
16   bit.  Just -- just started.
17            MR. WATSON:  I'm sorry, Your Honor.  No, I'm actually
18   on my speaker phone here at the desk.  I apologize.  I'll try to
19   talk a little closer into it.
20            THE COURT:  Okay.
21            MR. AYLSTOCK:  And just to be clear on that, Your Honor
22   -- this is Bryan again.  The study was produced, but none of the
23   backup, none of the data, none of the, you know, the slides, the
24   things that underlies the study, just a final report, as I
25   understand it.  So I didn't -- if I -- I hope I didn't overstate
```

 1    it, but I wanted to make the record clear that I'm not asserting

 2    that we didn't get the study.  I'm suggesting that all of the

 3    things that went along with the study needed to be produced and

 4    we followed up and our experts want to look at them and we're

 5    still waiting.

 6         MS. JONES:  And, Your Honor, Christy Jones.  If that's

 7    what the issue is, because I know that that issue has come up in

 8    New Jersey and there is an issue about whether or not -- and we

 9    have not produced, for example, pathology slides and that type of

10    actual data that is -- I'm not saying it's appropriate to call it

11    "data", but background data on some of the studies in terms of

12    pathology slides and some of that type of information and, in

13    fact, we have some significant concerns about producing those.

14         There are some documents -- and when I use the word

15    "documents", that's the wrong term, but pathology slides, for

16    example, that may be twenty years old kept and may or may not

17    still be in the same condition that they were in before and, if

18    that is the subject of the request, other than the report itself,

19    then I do think that that's an area that we need to at least have

20    a meet-and-confer on and possibly -- and possibly put aside for

21    some briefing, because that is something that the client does

22    have some concern about.

23         Again, this is not the documents, other than perhaps there

24    may be some -- some very specific patient data in some of the

25    underlying clinical studies, but if we're talking about pathology

1  slides and some of the scientific materials, then that may -- I

2  don't want to suggest to Your Honor that those have all been

3  produced because they certainly have not.

4  　　　　THE COURT:  Well, I do think that is -- that would be a

5  good topic to discuss at a meet-and-confer.  I don't --

6  　　　　MS. JONES:  I do, too.

7  　　　　THE COURT:  Yes.  And, Mr. Aylstock, I don't know if

8  your experts will want to examine the slides themselves, but if

9  that's the case, then I'm sure you're going to need to make

10  arrangements between both sides to do that under certain

11  circumstances, I suppose, where perhaps your expert can go to a

12  lab that Ethicon has, I don't know, but I do think that's --

13  that's something that you ought to talk about.

14  　　To the --

15  　　　　MR. AYLSTOCK:  Just to be clear, we have -- immediately

16  after the deposition of Mr. Berkeley, letters were sent, letters

17  were sent, and so, I mean, we'll -- we'll be happy to do it

18  again.  It's just we -- it needs to happen very quickly and it's

19  not -- I gave that as an example, but that's not the only thing.

20  　　The TVT-S Final Study Report for the one company study that

21  it did on a TVT-S, we've asked for that.  We don't have that.  So

22  it just underscores the point that we would like Ethicon to say

23  not it "is producing" or at some uncertain time, you'll get

24  something that -- that might be responsive, but these requests

25  have been outstanding for now a year.

We would like the response to say they have made reasonable efforts and done everything they -- correctly under the rules and they have produced the information and if it's -- we need a better meet-and-confer on the pre-clinical slides, we're happy to do that, but I didn't want to digress and have the Court think that's really the only issue here because it's not.

THE COURT: Right. What I'd like you to do, Ethicon, is within seven days, I want you to check and see if there are materials you have not produced responsive to this request that can be copied and provided to the plaintiff, the plaintiffs.

For items that cannot be reproduced; for example, pathology slides, then I think you need to outline what those are and then meet about how -- what -- what Mr. Aylstock needs and how arrangements can be made to do whatever needs to be done with these various things that cannot be reproduced because I'm not certain he even knows what all you have.

MS. JONES: Well, and, Your Honor, in all -- in all candor, the conversations of which I am aware with the plaintiffs have not been with Mr. Aylstock, but with other counsel about not producing those other underlying materials and slides. So we'll -- I will -- we will get the information that Your Honor has asked for and identify that. I don't believe that the clinical -- that there's anything in terms of the reports themselves, for example, that have been --

THE COURT: Withheld?

1          MS. JONES:  -- withheld, but I do -- I didn't want the

2     Court to be thinking that we had also produced some of this other

3     material, which we have not.

4          THE COURT:  All right.  Thank you.

5        Number 32.  It looks like your only objection is to the

6     hernia aspect of the question.  So have you produced everything

7     responsive at this point that you're aware of?

8          MR. WATSON:  Yes, Your Honor, that -- that we're aware.

9          THE COURT:  All right.  33.  We've got your scope

10    objection.  Anything on -- anything being withheld on scope?

11         MR. WATSON:  No, Your Honor, not to my knowledge.

12         THE COURT:  34.

13         MR. WATSON:  Your Honor, the only thing that I would

14    say is I think that this goes to the SOP issue.

15         THE COURT:  Uh-huh.

16         MR. WATSON:  That we continue, as Mr. Aylstock said

17    earlier, that we're meeting and conferring.  We've certainly, you

18    know, produced a good number of them as best we can and we're

19    still trying to work that issue out.

20         THE COURT:  All right.  35.  Is this an adequate

21    answer, Mr. Aylstock, except for the hernia mesh issue?

22         MR. AYLSTOCK:  It is, but it still suffers from the

23    issue about "Ethicon is producing", as opposed to "Ethicon has

24    produced".

25         THE COURT:  The way I'm reading that is that they are

1    -- what they're saying is they're producing the documents

2    pursuant to Rule 33(d), not that they're in the process of

3    producing, or do you intend it to mean that you're in the process

4    of producing and you haven't produced everything that you have?

5            MR. WATSON:  Your Honor, this is Ben Watson.  I think

6    it goes back to the -- you know, the same issue that I raised

7    before.  Obviously, we have done extensive searches and, you

8    know, made significant productions and, you know, just to the

9    extent that, you know, we locate additional things, you know, we

10   obviously continue to produce that.  So, you know, we just -- you

11   know, we didn't want to leave the impression that, you know,

12   absolutely everything has been produced and that's why we phrased

13   it that way, I believe.

14           THE COURT:  But you have -- you've produced everything

15   you have, that you have found at this point; is that correct?

16           MR. WATSON:  Correct, Your Honor.  We have produced the

17   adverse events database, the CHATS RimatriX system.  I believe

18   that that data goes through some point in 2012 and we have

19   produced that to the plaintiffs.

20           THE COURT:  And, of course, Mr. Aylstock is asking and

21   you are obligated to be reasonable and thorough in your search.

22   So, again, I think that goes back to the point of perhaps putting

23   a little fear of God into the attorneys that are actually looking

24   for the documents or the people that are employed by Ethicon and

25   making sure they understand that they need to be looking, and

```
 1    "looking" means really searching, not just picking up what's
 2    readily accessible, but actually searching for responsive
 3    documents.  I think that's --
 4              MR. WATSON:  Yes, Your Honor.
 5              THE COURT:  That's what he wants.
 6              MR. WATSON:  I certainly understand that.
 7              THE COURT:  36, anything with scope on -- anything
 8    you're holding on scope?
 9              MR. WATSON:  No, Your Honor.
10              THE COURT:  All right.  And then with all of these,
11    where it says, "Ethicon is producing", it's the same -- the same
12    issue about making sure that the search is being done
13    efficiently, thoroughly, et cetera.
14              MR. WATSON:  Yes, Your Honor.
15              THE COURT:  Request 37.  Anything at this point?  Now
16    you say -- you're objecting here on "unduly burdensome grounds".
17    Tell me what that's all about.
18              MR. WATSON:  Your Honor, I believe that had to do with
19    the patent applications.  I think it was the same --
20              THE COURT:  All right.
21              MR. WATSON:  -- issue --
22              THE COURT:  So you have -- I'm sorry.
23              MR. WATSON:  -- which is a "reference to" and I guess
24    we just did it that way instead of "referencing to".
25              THE COURT:  Okay, but as far as anything other than
```

```
 1    patent applications, you're not withholding anything based on

 2    scope at this point?

 3               MR. WATSON:  Correct, Your Honor.

 4               THE COURT:  38.  That's the standard operating

 5    procedures.  That would -- that would go back to what you're

 6    still meeting and conferring about, correct?

 7               MR. WATSON:  Yes, Your Honor.

 8               MR. AYLSTOCK:  Yes, Your Honor.

 9               THE COURT:  39.  We've got a scope objection.

10               MR. WATSON:  Nothing being withheld for scope, Your

11    Honor.

12               THE COURT:  40.  Looks like you don't have an

13    objection.  Have you produced everything then, other than you do

14    object to the hernia mesh issue, but anything that -- anything

15    out there you haven't produced?

16               MR. WATSON:  Not that I'm aware of, Your Honor.  Again,

17    we -- my understanding is that the MedWatch forms are stored in

18    the data -- the adverse events database and we had produced that

19    -- you know, that data, as I described.  So my understanding is

20    that that's been produced through that.

21               THE COURT:  41.  Looks pretty similar, Your Honor.

22               MR. WATSON:  I believe that's the same thing, Your

23    Honor.

24               THE COURT:  Yes.

25               MR. WATSON:  That it captured the adverse events
```

```
 1    database, so we're not withholding anything on scope.

 2                THE COURT:  42.

 3                MR. WATSON:  I believe that's the same thing.

 4                THE COURT:  43.  Again, it's adverse events,

 5    malfunctions.  This would be internal communications, though.

 6                MR. WATSON:  Right and, as far as I'm aware, we're not

 7    withholding anything based on scope.

 8                THE COURT:  44.

 9                MR. WATSON:  Your Honor, I believe what they're getting

10    at here are the source materials for the adverse events and,

11    again, it is my understanding that that's all stored in the

12    adverse events database, the RixatriX CHAT system, and that --

13    the source materials, as I understand it, have been produced and

14    so we're not withholding anything on scope.

15                THE COURT:  45.  To your knowledge, you've produced

16    everything that has do with complaints, adverse events --

17                MR. WATSON:  Yes, Your Honor.

18                THE COURT:  Regardless of who they've come from; is

19    that right?

20                MR. WATSON:  That's my understanding and, you know, my

21    understanding is that all goes -- because of the requirements

22    involved, that all goes into the database.  So, based on that, it

23    is my understanding everything has been produced.

24                THE COURT:  So that would be essentially the same for

25    46.
```

```
1          Now, 47, anything you have that you haven't produced at this

2    point?

3               MR. WATSON: Not -- not that I'm -- not that I'm aware

4    of, Your Honor.  You know, obviously, we have, you know, talked

5    to a large number of custodians and, you know, collected, you

6    know, many databases in the clinical area, so I'm not aware of

7    anything, and we're certainly not withholding anything on scope.

8               THE COURT:  48.

9               MR. WATSON:  I think 48, 49 and 50, 51, all have to do

10   with studies.  52, 53, those all have to do with various studies

11   or articles, abstracts, registries, research.  Have you produced

12   all of those things that you -- that you have in your -- or that

13   you're aware of at this point?

14              MR. WATSON:  Based on what I know, Your Honor, I

15   believe all the studies have been produced and I know we've

16   talked with Mr. Aylstock about registries and we've changed some

17   correspondence on that and, you know, from our standpoint, our

18   understanding is that the registry data we have has been

19   produced, but if there's something that he feels that we haven't,

20   you know, we're certainly glad to look for it.

21              THE COURT:  All right.  That really brings us up to

22   request number 55.  On all of those involving studies, I'm going

23   to overrule your scope objection and have you raise it at a later

24   date to specific documents or studies or whatever.  So we'll move

25   on to 55 then.  Where are we with this?
```

1          MR. WATSON:  Your Honor, to my knowledge, we're not

2     withholding anything based on scope.  Again, with the studies, as

3     far as I know, it's been produced, but again, as with everything

4     else, we're certainly glad to be sure of that and look and make

5     sure.

6          THE COURT:  And, you know, at some point, what you may

7     need to do, Ms. Jones offered to provide the Court with

8     information regarding the reasonableness of the search that had

9     been undertaken and the efforts that have been -- that have been

10    done by the various attorneys to find these documents.  She may

11    need to.  You may need to communicate that to Mr. Aylstock so he

12    gets some level of comfort that you've actually performed a

13    thorough and reasonable search.

14         I think his concern is, he's had too many instances as -- so

15    he says.  I'm not saying that he's -- he's relating those

16    accurately, but what he's representing is that he's had too many

17    instances where things have popped up either too late or in the

18    middle of depositions or right before depositions and that's left

19    him with some level of distrust as to the thoroughness of your

20    search.

21         So maybe what you need to do is meet with him and explain to

22    him what steps you've taken so he can feel as though you've

23    actually done what you are supposed to have done and I am going

24    to put in my order that you're required to do that, of course, as

25    far as conduct a search.

1          MR. WATSON:  Yes, Your Honor.

2          THE COURT:  Now 56.

3          MR. WATSON:  Your Honor, we have produced, certainly,

4   lab notebooks.  I know we became aware of some data just recently

5   and I believe it was in one of the recent productions, but this

6   is when -- this is one where we did recently locate some data and

7   I'd like to go back and look at that and make sure there's not

8   anything we're missing.

9          THE COURT:  I'll give you seven days to do that.

10         MR. WATSON:  Yes, Your Honor.

11         THE COURT:  57.  I would assume you have produced all

12  of this at this point, haven't you?

13         MR. WATSON:  As far as we're aware, Your Honor.

14         THE COURT:  You don't even sound like you have a lot of

15  faith in your own investigation.

16         MR. WATSON:  Well, Your Honor, the only reason I say it

17  that way is, you know, obviously, it's a huge company and, you

18  know, there may have been some, you know, random individuals

19  e-mailing back and forth that, you know, aren't even on the

20  custodians list that we didn't know about.  So it's those kinds

21  of things that I obviously, you know, can't speak to, but based

22  on, you know -- you know, the extensive number of players

23  involved and, yes, we certainly believe that we have.

24         THE COURT:  Have you been burned before, is that it?

25  I've had that happen, where you thought you had everything and --

1        MR. WATSON:  Well, it's not that, Your Honor.  It's

2    just --

3        THE COURT:  You think you have everything and you get

4    to a deposition and you're, in fact, the only person that doesn't

5    have a copy of the document in question.

6        MR. WATSON:  Right.  Absolutely.

7        THE COURT:  And it's your client.  So -- all right.  58

8    and I guess -- yes, 58 and 59 would be the SOP's again.  So those

9    you're conferring on; is that correct?

10       MR. WATSON:  Yes, Your Honor.

11       THE COURT:  60.  That's SOP again.  So I'll put

12   conferring on that.

13     61, how are we with that?

14       MR. WATSON:  As far as I know, Your Honor, everything

15   has been produced.  We're not withholding anything for scope.

16       THE COURT:  62.  Let's look at 62, 63, 64, those three.

17       MR. WATSON:  Your Honor, as far as I'm aware, those

18   have been produced.  You know, I'm just trying to look at all

19   three.  Not anything that we're aware of that we have and not

20   withholding anything on scope.

21       THE COURT:  On scope.  65, it looks like that's a

22   similar -- I don't -- I don't see anything in 65, 66, 67, other

23   than a scope objection.  68 would be the same.

24       MR. WATSON:  The only thing I would say on those, Your

25   Honor, and I -- and I'd have to verify, but I believe this is

1    correct.  I'm not sure that every single consulting or every

2    single physician has been produced and I think that was part of

3    the scope issue.  My understanding is, the way that has been done

4    is that, you know, from the physicians that issue anything as far

5    as the defendant fact sheet process, anything related to those

6    physicians have been produced, but I don't know if anything

7    broader than that has.

8              THE COURT:  So if the physician has been identified on

9    a fact sheet, then you've produced information related to that

10   physician, but you haven't produced the whole universe of

11   contracts or agreements or whatever relationships you might have

12   with these various physicians; is that what you're saying?

13             MR. WATSON:  Right.  I believe that's correct, Your

14   Honor.

15             THE COURT:  Mr. Aylstock, what --

16             MR. AYLSTOCK:  The problem with that, Your Honor, is

17   that the defendants' fact sheet, as you may recall, really only

18   applies to those in the bellwether process.  So what that leaves

19   us with is they've identified it and a total of 30 plaintiffs.

20   They have not, I don't believe, identified it for everyone who

21   has filed a plaintiff profile form or everybody involved in this

22   litigation who has filed suit and, you know, I think it's

23   relevant information.  It's certainly likely to lead to relevant

24   information and, beyond that, it's another one of those things

25   that if I ask the right witness, they're going to say, well,

1    they're all sitting in a file cabinet in Somerville.  You pull it

2    out and I have easy access to it.  So I think it should be

3    produced.

4         MS. JONES:  Your Honor, I'd like to be heard on that.

5    This is Christy Jones.  I mean there was a very specific

6    negotiation process about the defendants' fact sheets and about

7    defendant fact sheets having to be completed and the documents

8    all produced.  At the time that, you know, plaintiffs were

9    designated as bellwether plaintiff or they began that discovery

10   process, and part of the reason that we went to an abbreviated

11   fact sheet for the plaintiffs at the beginning was with the

12   understanding that the defendants would not have to go through

13   all of the search and production process on every sales

14   representative and every doctor related to every plaintiff until

15   such time as those plaintiffs became a part of the actual

16   discovery pool and I -- in all candor, I think that what Mr.

17   Aylstock is asking for now is something different from that.

18       We have produced those documents in the -- as the plaintiffs

19   became subject to discovery and I think that, frankly, is

20   consistent with the case management orders that were agreed upon.

21   If I'm wrong, I stand to be corrected, but just so Your Honor is

22   aware, I think that -- that's the way all this has come about.

23        THE COURT:  Well, Mr. Aylstock, tell me why it would be

24   important for you to know every -- information about every

25   compensation, grant, scholarship, gift or honoraria paid to an

1    individual or institution.

2         MR. AYLSTOCK:  Well, for example, there is an

3    organization called "ACOG", American Congress of Obstetricians

4    and Gynecologists; one called "AUGS", American Urogynecologic

5    Society.  We know that they came out with physician papers on

6    various things and, at one point, ACOG called the use of pelvic

7    mesh experimental.  Well, that presented a big problem from a

8    working standpoint and healthcare reimbursement standpoint for

9    Ethicon and they did everything they could to reverse that and

10   potentially -- and some of the people on the board, we believe

11   that they have paid, maybe as consultants, or so on and so forth,

12   and ultimately, that statement about the use of mesh being

13   experimental was retracted and those are the types of things that

14   are likely to be discovered by having the information provided.

15        Another specific example with regard to the bellwether

16   cases, while, in fact, they would produce the agreements with a

17   particular plaintiff's physicians, there may be physicians in his

18   or her group that also were paid, they may have had

19   conversations.  Their group may have been paid, or a prior group,

20   and I just think that it's not something that should be difficult

21   for a company like this to keep track of who they're paying.  In

22   fact, I think the law now requires them to keep track and, in

23   some cases, disclose the doctors that they're paying money to and

24   those doctors are influencing other doctors, influencing medical

25   societies, and maybe even publishing studies that -- that are not

1   properly disclosed in the -- that may be used at trial that

2   aren't properly disclosed in the conflict of interest statements.

3       There was a specific example in this litigation with Dr.

4   Altman, who published one of the studies related to the Prolift

5   product.  Well, he put in his study, actually published in the

6   New England Journal of Medicine, that Ethicon had no involvement

7   in the drafting of the manuscript.  Well, they did have

8   involvement.  So those types of things raised the issue that

9   there's a concerted effort by Ethicon to contaminate the medical

10  community with information that it -- it is biased and it helps

11  us uncover that bias.

12          THE COURT:  Well, I think your request is a bit broad.

13  The way it's written, they would have to list, for example, all

14  of the employees at Ethicon that were paid a salary for work they

15  did on pelvic mesh products, which is, you know, ludicrous and

16  not helpful.

17      Why don't you do this, Mr. Aylstock.  Why don't you rewrite

18  that request in some format that really gets to what it is you're

19  looking for.

20          MR. AYLSTOCK:  Okay.

21          THE COURT:  I think this is so broad, and I know they

22  haven't raised that objection, but I'm going to raise it for them

23  so we can move along here.

24      Well, I'm going to order you to rewrite that question and

25  make it a little bit more specific, focused on what it is you're

1     looking for, and I'll give you seven days to file it -- or serve

2     it.  Don't file it.

3             MR. AYLSTOCK:  Yes, Your Honor

4             THE COURT:  66, where are we with that one?

5             MR. WATSON:  Correct, Your Honor.  We're not

6     withholding anything based on scope.

7             THE COURT:  67.

8             MR. Watson:  Same thing.

9             THE COURT:  68.

10            MR. WATSON:  Again, not withholding anything based on

11     scope.

12            THE COURT:  69.

13            MR. WATSON:  Same thing.  Correct, same thing.

14            THE COURT:  All right.  How about 70?  Was there -- was

15     there any kind of an issue with that?  The design history files,

16     I note that there's -- there's some maybe still outstanding

17     issue.  Is that -- is there an outstanding issue, Mr. Aylstock?

18            MR. AYLSTOCK:  Mr. Cartmell could speak to it with

19     greater accuracy because he was dealing with that directly, but I

20     believe that that design history file issue has been resolved.

21             THE COURT:  Great.

22            MR. AYLSTOCK:  Or, at the very least, they are still in

23     a meet-and-confer process regarding the SOP's.

24             THE COURT:  71.  It looks like that -- it looks like

25     you're saying this is duplicative.  So you have already answered

```
1    it, I take it?

2              MR. WATSON:  Right.  Correct, Your Honor.

3              THE COURT:  72.  You say duplicative.  And if you -- if

4    you think this is not correct, Mr. Aylstock, then you jump in

5    there, but 71, 72, 73, 74, 5, 6, are all duplicative.

6              MR. AYLSTOCK:  One thing I would say about this, Your

7    Honor, is I would expect the design history files to contain

8    documents that would be a subset of those requested, but the

9    reason for the request was that there may be other documents

10   outside of the design history file, but in all documents relating

11   to the design --

12             THE COURT:  Yes.  We've got 70 --

13             MR. AYLSTOCK:  So I think that would -- I see what

14   they're saying.  So I think -- I think they're duplicative.

15             THE COURT:  All right.  And that goes to 76 as well.

16        Now we're on 77.  Anything being withheld on scope?

17             MR. WATSON:  No, Your Honor.

18             THE COURT:  78.  This is where you're having -- you're

19   having some issues, aren't you, with the package inserts,

20   instructions, product labels, Mr. Aylstock?

21             MR. AYLSTOCK:  We are, Your Honor, and specifically

22   with regard to the package inserts, the very first label or IFU

23   or the TVT Classic product, it hasn't been produced.  It -- as

24   Ethicon points out, I'm sure Mr. Watson would, at that point in

25   time, it was another company called MedScan, but we did find the
```

1    document indicating that all the MedScan documents, because they

2    bought the entire -- either the company, or at least this part of

3    the company that had this product were, in fact, transferred over

4    and, you know, there's regulatory requirements and so forth with

5    that.  So there is an issue there.

6        With regard to the inserts, they have produced a chart,

7    which we've been using and relying on, which are the in-use dates

8    for those IFU's for the various products, and there were some

9    changes to that along the way, and I think and I hope that that's

10   now the final chart and, if that's the case, that's great.

11       The -- the patient brochures, and maybe it's incorporated in

12   another one, are a little bit different issue, in that in-use

13   dates, we've been told, are not available at this time and so we

14   have very little way of knowing which patient brochures were

15   applicable to which bellwether planters, for example, or

16   bellwether planters may have been in the doctor's bellwether

17   implanters.

18       The reason for that is, while they do have copy review

19   dates, which I suppose are instructive, but there was never an

20   effort, to my knowledge, to take any of the old brochures out or

21   any information as to when the new brochures were printed and

22   sent to the doctors or, I don't believe, any information or

23   recordation of when those brochures were delivered to the

24   doctor's office or, if they have, we certainly haven't seen them,

25   and so it puts us in a very difficult position, vis-a-vis

1    bellwether plaintiffs, to know, oh, this was the one that, you

2    know, was in use at this point in time.

3         And Ms. Jones can correct me, because she was involved in

4    the trial much more directly, but I believe the way that Judge

5    Higbee handled it in New Jersey was -- was simply to say, well,

6    if Ethicon couldn't provide in-use dates for whatever it was, the

7    IFU or the patient brochures, then they can't very well come in

8    and say this wasn't the right one or whichever one the plaintiff

9    identifies kind of --

10        THE COURT:  So she just let you pick the one that was

11   best for your case and they --

12        MR. AYLSTOCK:  (Inaudible) testified under oath --

13        MS. JONES:  I think -- I think Mr. Aylstock would like

14   to retract that.

15        THE COURT:  Well --

16        MR. AYLSTOCK:  As I said, I wasn't directly involved,

17   but it is an issue that is important and I -- what I -- I guess

18   what I'd like is an order saying, you know, if, in fact, you

19   can't do that, we'd like a certification that you can't, that you

20   don't know what patient brochures were available at particular

21   points in time, and then at least we can rely on that, as opposed

22   to, you know, we come -- you know, get close to trial or after a

23   plaintiff is deposed, there's a big "Aha moment", where now we've

24   found the document where this "Dr. So-and-So", it was delivered,

25   the new ones, and the old once were taken off.  I mean I don't

1    know that that's ever going to come out.  It doesn't -- certainly

2    hasn't been produced yet, but that's, frankly, what I'm concerned

3    about.

4              MS. JONES:  Your Honor, and I will address this.  We

5    have -- we have given Mr. Aylstock and plaintiffs all of the

6    information that we have about this.  Unfortunately, we can't

7    produce specifically what we don't have.

8         What we have produced and what we've told them is we do have

9    copy review dates, so we know that a certain brochure wasn't

10   available until after that.  There clearly will be occasions when

11   an individual doctor may or may not have received a particular

12   brochure.

13        We know that there's dates on the brochures, so we know they

14   weren't used before then and, in general, they began to be used

15   in the same time period, you know, shortly after that, but in

16   terms of being able to say, "This particular brochure was in use

17   between January 1, 2005, and January 31, 2006", we have looked

18   and we don't have specifically that information.

19        And, clearly, you know, part of the problem is, Your Honor,

20   that -- that, as a product is produced, you know, they -- it's

21   like a pharmaceutical.  It's produced, to some extent, with an

22   expiration date, if you would, and those products may be out

23   there and in hospitals for a period of time after it first went

24   out.

25        So I -- I'm not sure what we could do beyond giving them

1    what we have and the best information that we have.  That's been

2    exactly the same situation that, frankly, we've been operating

3    under for -- since before the trial in January in terms of

4    production of all of these documents.

5         It's clearly not something that's being withheld because,

6    clearly, it's not in our best interest to withhold it.  We would

7    like to have it.  It simply does not exist more definitively than

8    is out there.

9              THE COURT:  Right.  Well, and I recall at the hearing,

10   one of the status conferences, this came up, and I said then, as

11   I'll say now, I can't order a defendant to produce something it

12   doesn't have.

13        I think, Mr. Aylstock, if you want to pin down, if you want

14   a statement from the defendant saying, "We do not have dates for

15   these brochures, in-use dates", then that's best done by a

16   Request for Admission or a Rule 30(b)(6) deposition.  I don't see

17   how I can order something like that in -- in a Motion to Compel a

18   Request For Production of Documents.

19        So I'm not going to order them to say they don't have the

20   dates.  I think you can get that information some other way.  I

21   don't think it's appropriate in a Motion to Compel a Request For

22   Production of Documents and the brochures, by the way, was

23   Request For Production number 81, so we'll assume we've already

24   taken care of that one.

25        We'll go back to 78, which is the package inserts, product

1    labels, instructions for use.

2       My understanding, Mr. Aylstock, is what you don't have, that

3    you're aware of, is a package insert and an IFU for the TVT

4    Classic; is that right?

5         MR. AYLSTOCK:  That's correct, the very first version

6    of it, and I think we do have something in writing from them

7    saying "unavailable", but it's with the caveat, "We're continuing

8    to look", so on and so forth.  So I think that, you know, if

9    they've made diligent effort and they can't find it, then that --

10    they need some other motion, but we would just like them to state

11    that, you know, in the form of an answer to the request so that

12    then we can use it and rely on it, as opposed to, "We currently

13    can't find it, but we'll keep looking."

14         THE COURT:  Is it too late to do Request For

15    Admissions?

16         MR. AYLSTOCK:  No, Your Honor.  We still --

17         THE COURT:  I still think -- I just -- in my mind, it

18    doesn't make logical sense for me to order them to say they don't

19    have this particular package insert and IFU when your motion is

20    to compel them to provide all of these various things, but not to

21    represent what they don't have.

22       You're asking them to produce what they do have and you're

23    asking me to compel them to produce what they do have, not make

24    them state what they don't have.  So I think there's another way

25    to go about that, either a Rule 30(b)(6) or a Request For

```
1    Admission.
2              MR. AYLSTOCK:  And we're happy to do that, Your Honor.
3    I was just thinking, perhaps, of some alternatives to simply have
4    them certify as an answer to the request that the plaintiffs do
5    not -- or the defendants do not have documents specific to the
6    requests on the TVT Classic label, the very first TVT Classic
7    label, but I'm happy to do it however the Court would see fit.
8              THE COURT:  I think it would probably -- from the
9    standpoint of compelling them, I think the best thing is for you
10   to place it in a different request.
11       (Beep detected on recording from telephone.)
12             THE COURT:  Is everyone still there?
13             MR. AYLSTOCK:  Yes, Your Honor.
14             THE COURT:  I heard -- I heard some beeps.  I didn't
15   know if we lost somebody or --
16             MS. JONES:  Yes, Your Honor.
17             MR. WATSON:  Still here, Your Honor.
18             THE COURT:  Okay.  All right.  Core data sheets, I
19   understand there's been some disagreement as to whether these
20   apply or not to medical device cases or medical products cases.
21   So where are we on that?  That's 79.
22             MR. WATSON:  Yes, Your Honor.  This is Ben Watson.  It
23   is our understanding that core data sheets are used in more the
24   pharmaceutical realm and not in the medical device realm.  So,
25   you know, we have -- we have searched and we have not come up
```

1   with any.  So I'm not sure what else to tell the Court.

2          THE COURT:  Mr. Aylstock?

3      I think we lost him.

4      (Beep detected on recording from telephone.)

5          MR. WATSON:  I guess that was the beep.

6          MR. AYLSTOCK:  Your Honor, Bryan Aylstock.  I'm back

7   again.  I apologize.

8          THE COURT:  So you were so angry with my last ruling,

9   you hung up.

10     All right.  We are on number 79.  Mr. Watson has just said

11  that he's unaware of core data sheets being used for devices.  He

12  thinks that's a pharmaceutical product term.

13         MR. AYLSTOCK:  And we -- we'll accept that

14  representation, Your Honor.

15         THE COURT:  All right.  79 is taken care of.

16     Number 80.  It looks like you've produced what you have and

17  the only objection is based on the hernia issue, correct?

18         MR. WATSON:  Correct, Your Honor.

19         THE COURT:  81, we've just covered.

20     82, where are we on that?  Have you produced everything you

21  have?

22         MR. WATSON:  Yes, Your Honor.  We have produced

23  everything that we are aware of.  All of these materials have to

24  go through the copy review process and we have produced, you

25  know, all of the copy review files for these products.  As far as

1     we are aware, we have produced all of this.

2              THE COURT:  Mr. Aylstock, is there any information you

3     have to the contrary?

4              MR. AYLSTOCK:  Not -- well, here's -- here's the issue

5     with the copy review, Your Honor.  Apparently, from the

6     testimony, I think, from Mr. Lisa, in one of the depositions I

7     took, he testified that, look, we used to have  in a file, filing

8     cabinet in the copy room.  These copy review forms are signed off

9     by different areas of the company, regulatory, medical, legal,

10    risk management, what have you, and so all of these people sign

11    on and they've looked at it.  They think it's fine or whatever,

12    and then, most of the time when these products are on the market,

13    they would be attached to whatever piece it is and then put in a

14    filing cabinet.

15        Later on, it was switched over to a database, which makes a

16    lot of sense, and that way, whenever anybody has an issue with an

17    IFU, or a patient brochure, or a product insert, a "lens view",

18    sometimes they called it, well, let's go see who signed off on it

19    and what notes they made, and then they just pull it out and it

20    makes it extremely easy.

21        What -- the way that these have been produced and, in

22    preparation for the depositions, in trying to find all the forms,

23    it's really hodgepodge.  It's, yes, there's apparently a final

24    IFU, or a patient brochure, or a marketing piece, but the copy

25    review forms are -- might be in a different area of production

1    and unattached and not produced in a way that allows us to match

2    up the copy review forms to the piece that the copy reviews and I

3    made the request that, at least with regard to the filing

4    cabinet, as I did with the trial master files following another

5    deposition, just produce them in that order because it all makes

6    sense.  It catalogues and the witness says it's all easy and it's

7    all there.

8         With regard to the database, I think it's -- if it's -- you

9    know, if it's in the database, it also can be reproduced in a way

10   that does not require literally tens of dozens of hours trying to

11   match things up when they -- the company has made clear, look,

12   it's not hard.  In fact, I can go down the hall.  It doesn't take

13   me any time at all and I can match them up.  So that's how we'd

14   like these produced, because these are important documents, along

15   with the copy review forms are very important.

16             THE COURT:  Mr. Watson?

17             MR. WATSON:  Yes, Your Honor.  I think Mr. Aylstock is

18   right about the evolution of the copy review process.  Up until

19   2009, it was a paper process and there are literally copy review

20   files for, you know, the various, you know, pieces of

21   information, whether it's a brochure or anything else, and my

22   understanding is that those were all moved -- those boxes were

23   all moved off-site in storage and our team collected the copy

24   review -- copy review files from those boxes.

25        Now I know Mr. Aylstock talks about Bryan Lisa's testimony

1    and a good bit about these file cabinets, but, you know, the only

2    thing we know is that he's talking about how they were kept at

3    one time and, in fact, we talked with Mr. Lisa and, you know, his

4    position was that, no, they're not in any file cabinets that I'm

5    aware of, other than what would have held the copy review files.

6    So, as far as we know, you know, we have gone back, gotten the

7    copy review files that existed in hard copy format and, in terms

8    of the copy approval form, my understanding is that's what we

9    have.  That's the way they are in the copy review files.

10        Now Mr. Aylstock recently sent us some correspondence on

11   this and we -- we did some more digging and, it's our

12   understanding that recently, the company tried to aggregate the

13   copy review forms.  I don't think they're going to be any

14   different than what they are -- what we already have.  They're

15   just in one place.

16        So we're in the process of getting that collected and, you

17   know, we'll do so.  I think they're going to be duplicative of

18   what they already have, but if having them in one place may help,

19   we're certainly agreeable to producing that.

20        And then, you know, post-2009, it all went into the GGM Blue

21   (phonetic) database, you know, and we've produced the copy review

22   materials from that database.  So, you know, I -- I think on

23   this, we've certainly done what we can and, you know, finding out

24   about, you know, this compilation of the copy review forms that

25   are done, maybe that will be helpful, and we're certainly going

1    to get that to use.

2              THE COURT:  All right.  Because what I hear him saying

3    is, he's got these forms, these sign-off forms or whatever, but

4    he can't -- he can't figure out what particular information sheet

5    or brochure or marketing material it goes with.

6         Is that what you're saying, Mr. Aylstock?

7              MR. AYLSTOCK:  It is, and we know from the testimony

8    and common sense, that certainly, the database and, before that,

9    the files would have matched them up.  They're not going to --

10   the company isn't going to take the time to do all those copy

11   reviews signed off on by every department and not have a way to

12   match it up with what's being copy reviewed.

13        And so either it needs to be produced consecutively so that

14   we have a piece with all of that or, if that's not doable,

15   there's no doubt in my mind that the company has a way, via the

16   database or some cataloging system, that they could produce a

17   chart.  Here are the lists of the Prof-Ed materials, for example,

18   or the patient brochures, and here are the copy review forms and

19   then, you know, I can say, all right.  Here's the Bates number

20   for every copy review form of everybody who's signed off on this

21   piece, because we're also taking these depositions and these

22   people may not remember or they may say, "I don't recall whether

23   I did that or not."

24        Well, if I have the form that is signed off on by -- that

25   says it's signed off by

1    Brian Lisa, then I can ask questions of Mr. Lisa, as opposed to

2    him saying, "Well, I don't know.  You know, it could have been

3    me, it could have been anybody."  It just puts me in an

4    impossible situation and I know the company has to do that

5    because that's what a good company would do.

6              THE COURT:  Right.  I can't imagine that these things

7    are floating around separately.  They would -- we would

8    absolutely -- there would be no reason to even keep them if

9    you're not going to have them in any logical order.

10       Why don't you -- why don't you two try to figure out how the

11   company has these and how, perhaps, you can work to get the

12   review forms tied to the various sheets, brochures and materials?

13   Can do you that?

14             MR. WATSON:  Yes, Your Honor, we would be glad to do

15   that.

16             THE COURT:  All right.

17             MR. AYLSTOCK:  Thank you, Your Honor, and I have been

18   -- I have followed up with Mr. Watson specifically on the Prof-Ed

19   and asked, you know, where are the copy review forms and I have

20   continued to do so.

21             THE COURT:  Well, let's do that and let's try to speed

22   that up and, if you can't get anything resolved here soon, then

23   bring it back.  Do another motion specific to that or just call

24   me and we'll see what we can do to work it out.

25        83, they say, is duplicative.  Do you agree with that?

```
1              MR. AYLSTOCK:  Yes, Your Honor.

2              THE COURT:  84, is there anything being withheld?  Mr.

3    Watson?

4              MR. WATSON:  No, Your Honor, not to my knowledge.

5    Nothing is being withheld.  I can tell the Court we've gone to

6    extensive efforts to identify and, you know, give Mr. Aylstock

7    charts of the professional education materials.  I realize we're

8    -- if he needs to discuss that, we're glad to do so with him,

9    but, you know, we had -- you know, we have given him everything

10   that we're able to locate on that and, you know, we're certainly

11   glad to work with him to try to -- to try to pin down, as best we

12   can, a final version.

13             THE COURT:  All right.  That's another one of those

14   things that we need to get -- we need to have some kind of a time

15   frame on for you all to meet and confer.  Can you meet and confer

16   about these issues that you're supposed to talk about within the

17   next 14 days?

18             MR. AYLSTOCK:  I can do it before that, Your Honor.

19             MR. WATSON:  Yes, Your Honor.

20             MR. AYLSTOCK:  And they are critical.  I'll make myself

21   available certainly in the next couple of days, if we can, but

22   certainly, the next 14 days.

23             THE COURT:  Okay.  All right.  85.  I think -- how are

24   you doing on this one?  It looks like they say it's duplicative.

25   Do you agree it's duplicative?
```

1          MR. Aylstock:  You know, now we're asking for an index

2     or catalog of -- (inaudible) -- what I'm talking about and so the

3     other ones were, you know, provide them, and now I'm asking them

4     to provide a way for me to see a catalog or an index so I know

5     where they're all at.  You know, I don't think it's entirely

6     duplicative.  It might be encompassed within those other ones,

7     but --

8          THE COURT:  They say they've given you a spreadsheet.

9     Does that cover it?

10          MR. AYLSTOCK:  Yes, Your Honor.  They have -- they

11     have, Your Honor, and I believe it covers it.  It just has the

12     caveat that "We're still looking and we're not sure."

13          THE COURT:  Okay.  Well, we're going to address those.

14          86.  Is there anything being withheld, Mr. Watson?

15          MR. WATSON:  No, Your Honor.

16          THE COURT:  How about 87?

17          MR. WATSON:  Your Honor, Mr. Aylstock and I have had

18     some correspondence on Global Launch Plans and, you know, we've

19     looked into this.  We've provided an index to him of the

20     documents that we have been able to locate, you know, that --

21     that constitute the launch plan.  As we understand it, there's

22     no, you know, specific document or -- or, you know, presentation

23     that anyone creates as a Global Launch Plan.

24          It's more of a -- you know, as products come on the market,

25     you know, whoever is in charge of it, you know, pretty much puts

together any compilation they feel necessary and we have followed

up with the company and we're not aware of any, you know, central

location where things such as Global Launch Plans are, but to the

extent we've been able to, you know, find them from the other

people we've talked to, we've produced them.  So that's where we

are on that.

MR. AYLSTOCK:  Your Honor, this is Bryan Aylstock

again.  I do have a concern on this and it relates back to

another deposition I took of Cynovia Walghee (phonetic), who as I

understand it, now is no longer with the company since I took her

deposition, but one of the documents in her -- in her file and

it's not just a piece of paper.  This is a lengthy document

prepared by the marketing folks and, in this case, it was a draft

of a Prolift and the title of the document, "Global Launch Plan,

Draft III", and we looked and we -- you know, we couldn't find

the draft.  We couldn't find the final draft.  We couldn't find

the prior drafts.

And it was -- it's like an official document and it goes

through the details about why this product is out there, what the

marketing of the product will do and, in particular, this

document went on and on about how the speed to market is critical

and we can't get behind these other products and we have to do

everything we can to meet timelines and, of course, that's very

important in the Prolift case because they didn't -- they didn't

bother to do the FDA clearance process, which was on the

1    timeline, but the document itself is an official document.  I

2    have a draft of it.  I have Draft II or III, I can't recall

3    exactly.  I don't have the final.

4        And maybe it's produced somewhere, but I've looked and my

5    people have looked because I'm not all that great at looking.  We

6    can't find it and it just would make no sense to me that they

7    would have that on the Prolift, but not on the TVT -- or the

8    other -- the TVT SECUR was launched around that same time and I

9    think they -- (inaudible) -- so it's just another one of these

10   situations where I can't prove the negative.  I know there's a

11   giant haystack out there and I'm looking around for all of these

12   needles and now I've got to figure out -- it's not there and I

13   just don't -- it doesn't make any sense to me that they wouldn't

14   have, one, a final version of this and even if it is in the

15   production somewhere, the Global Launch Plan, you know, they have

16   a launch plan for every one of their products.  They're going to

17   market worldwide.  It's a big deal.

18           THE COURT:  What do you say to that, Mr. Watson?

19           MR. WATSON:  Your Honor, that -- really, I don't have

20   any more information other than that.  You know, we've been told,

21   you know, that -- that there is no formal Global Launch Plan.

22   That doesn't mean that, you know, from time to time one is not

23   put together and, you know, we have -- we had followed up with

24   the marketing people to ask them and we're certainly glad to keep

25   asking to see if we can find anything else, but so far, we have

1     not come up with anything.

2              THE COURT:  Mr. Aylstock, have you taken a 30(b)6

3     deposition of a marketing representative?

4              MR. AYLSTOCK:  In the context of Prolift only, I

5     believe that that may have been taken through New Jersey.  I

6     personally didn't.

7              THE COURT:  So did anyone ask this witness whether or

8     not there are these Global Launch Plans for all the products or

9     --

10             MR. AYLSTOCK:  That deposition I took was Prolift only

11    because it was a New Jersey deposition, I -- I think before the

12    MDL really got off the ground.  So, no, I don't recall that.

13             THE COURT:  Well, I guess, you know, where I'm coming

14    down on this one is I'm hearing the defendants say there aren't

15    routinely prepared Global Launch Plans for the products.  We have

16    to rely on him to have actually asked someone to make sure that

17    information is correct and that there, in fact, are not Global

18    Launch Plans, but if he tells us that he's done this search and

19    he's done it diligently and he's coming up empty handed, I don't

20    know what there would be to compel him to produce.

21             MR. WATSON:  And, Your Honor --

22             THE COURT:  I think, Mr. Watson, it would be worth your

23    while to double check.

24             MR. WATSON:  We will, Your Honor.

25             THE COURT:  And quickly.

```
 1              MR. WATSON:  Yes, Your Honor.

 2              THE COURT:  All right.  On 88, it says they do not have

 3    any information responsive.  So I don't know that there's

 4    anything to compel on that.

 5              MR. AYLSTOCK:  I guess, you know, they -- Mr. Watson,

 6    in response to my request on advertising, did produce a chart

 7    after -- and I know he went to a lot of effort to do it, but it

 8    had TV ads, it had radio.  You know, Bonnie Blair was their big

 9    spokesperson and so forth and so, if that's their response,

10    that's their response, but it just is another one of those where

11    it -- I find it hard to believe that they would have done that

12    without saving a copy somewhere and maybe -- maybe it's in the

13    million, or almost a million pages that were produced last night,

14    I don't know, but --

15              THE COURT:  Have any of these been produced, Mr.

16    Watson?

17              MR. WATSON:  Your Honor, I know certain promotional

18    DVD's have been produced and, I apologize, I don't have the

19    spreadsheet in front of me, but I know we have produced DVD's.

20        As far as radio advisements, I know scrubs have been

21    provided.  No one has been able to point us to any audio files

22    for that, so, you know, to the extent -- I guess these requests

23    get into direct consumer advertising and, you know, what we're

24    aware of, we have -- we have -- and that's on the spreadsheet

25    that I supplied.  So we're certainly not withholding anything.
```

1          THE COURT:  I really -- I understand the concerns that

2     Mr. Aylstock is raising because some of these things just don't

3     make sense.  Why would you have one draft of a Global Launch Plan

4     and not have the other drafts or have the final version?  Why

5     would you have a spreadsheet that lists certain DVD's but not

6     have any of the DVD's?  And I think these issues he's raising are

7     legitimate.

8        I'm not implying that you haven't -- that what you're

9     telling me is untrue, but I do -- I do think you really need to

10    check with your company because I'm not sure that it fully

11    understands the kind of ramifications that could go along with it

12    withholding information or just failing to do what it's supposed

13    to do to find the information.  So I hope you will check with

14    them on some of these things.

15          MR. WATSON:  Yes, Your Honor.

16          THE COURT:  90, request number 90.  Let's see.  It

17    looks like they've produced the documents that they're aware of.

18    Nothing on scope.

19        So is there anything else, Mr. Aylstock, on this one?

20          MR. AYLSTOCK:  No, Your Honor.

21          THE COURT:  How about 91?  There is a scope objection,

22    but I don't -- are you withholding anything, Mr. Watson?

23          MR. WATSON:  No, Your Honor.

24          THE COURT:  92.  This would -- this, again, involves

25    your direct to consumer marketing, right?

```
1                    MR. WATSON:   Right.  So same answer.

2                    THE COURT:  Same answer.  93, duplicative, and do you

3       have any reason to disagree with that representation that this is

4       duplicative?

5                    MR. AYLSTOCK:  No, Your Honor.

6                    THE COURT:  94.  It looks like it's the same scope

7       issue and nothing being withheld, though, okay.

8                    MR. WATSON:  No, we're not.

9                    THE COURT:  Okay.  95.

10                   MR. WATSON:  Same thing.

11                   THE COURT:  96.

12                   MR. WATSON:  Same -- same thing, Your Honor, with

13      (inaudible.)  They've asked us to give the websites and we've

14      produced those to them.

15                   THE COURT:  97.  You've produced what you have,

16      internet based advertisements?  Okay.

17                   MR. WATSON:  That's correct.

18                   THE COURT:  98.

19                   MR. AYLSTOCK:  Your Honor, what I would say about sales

20      representatives, you know, that was obviously part of the

21      bellwether process and we had, you know, certainly identified

22      those sales representatives and, obviously, to the extent that we

23      have it, have produced their documents and their custodial files.

24                   THE COURT:  Mr. Aylstock, are you asking for all sales

25      representatives?
```

1            MR. AYLSTOCK:  Well, these are documents that we're

2     asking in 98 particularly is documents that identify those

3     representatives in their regions, territories and so forth.

4            THE COURT:  Have you given them that, Mr. Watson?

5            MR. WATSON:  Your Honor, I don't know what it would be

6     that would identify them.  You know, obviously, they are -- you

7     know, if we went to every employment file of every sales rep, I

8     guess that would  identify them all, but, you know, I don't guess

9     we've given them anything in the chart that has here's every

10    sales representative who's ever, you know, been with the company.

11           MS. JONES:  Your Honor, I just want to reiterate what

12    Mr. Watson said.  Again, this is part of a very carefully

13    negotiated CMC and an agreement that this would be produced, this

14    information as I understand it they're asking for, would be

15    produced in the context of, once they identify a plaintiff who

16    saw an individual doctor, that we would then identify and produce

17    the documents relative to the sales representatives -- the sales

18    representatives there and the reason that that was important is,

19    Your Honor, that there is -- just the way the company is

20    organized and because these sales representatives call, not

21    exclusively, but primarily on, you know, hospitals and so forth,

22    that those change and there's sometimes maybe three or four sales

23    representatives that ultimately, when you go back and look at it,

24    are responsible for a particular area.

25           So what we have found is just identifying those sales reps,

1    even for particular doctors, is a burdensome process, although we

2    have taken it on as to individual plaintiffs as they come along,

3    but that's -- I mean that's what's been produced with respect to

4    those and, when we didn't have materials, it's been -- we've

5    advised counsel about that.

6         THE COURT:  So, Mr. Aylstock, why do you want to know

7    who all the sales representatives are?  Isn't it -- I mean what I

8    hear Ms. Jones saying is they've given you the names of the sales

9    representatives for all the bellwether cases.  Why would you need

10   anything else right now?

11        MR. AYLSTOCK:  Here's the issue, Your Honor.  They have

12   given us the names and they've also, pursuant to the defendants'

13   fact sheets, were obligated to give us all of the documents from

14   the sales reps.

15      What -- and Ms. Jones is absolutely correct.  She called us

16   up and let us know, look, there's an issue.  We looked at

17   custodial files on these and, in fact, the document retention

18   policy wasn't followed.  We've taken the depositions of some of

19   these sales reps who testified, one in particular, who said, "I

20   took notes of every sales rep -- or every business I had with the

21   doctors.  They were in spiral notebooks.  I gave every -- I kept

22   everything.  I had a warehouse.  I kept everything.  I gave it to

23   the company when I left."  None of that was produced.

24        So what -- it underscores what we were actually getting to

25   at these -- in these to begin with, in how the documents -- how

1    these sales reps are trained is they're going to have some

2    consistency in the training, they're going to have some

3    consistencies in the messaging to the doctors.

4         There is a territorial structure, as we understand it, for

5    the sales reps.  They have district managers in other litigation.

6    I've seen -- you know, charts.  Here's your little territory,

7    because you're not going to have sales reps in Florida flying to

8    California.  They all have some geographic territory usually and

9    now, with this issue of document obstruction, it's even more

10   important for us to know and understand these territories because

11   we may need to take the district managers and identify those and

12   we can figure out whether the training was consistent.

13        And, frankly, we've also seen documents where the sales reps

14   are told, you know, "Don't share this with the doctors."  For

15   example, the FDA safety alerts, the sales reps were told, I

16   presume nationwide, but I'd like to -- you know, "Don't

17   proactively bring this up.  If they bring this up, you bring that

18   up and you deflect" and so on and so forth.  We've seen a lot of

19   these.

20        So it certainly could lead to the discovery of admissible

21   evidence in a vacuum, but where we have specific instances of

22   documents that were not retained, admittedly pursuant to the

23   document retention policies and the litigation letters, I think

24   it makes it more important that we get right now, and make sure

25   it's collected, all of these documents for all of these sales

1  reps nationwide, because when you add up all of the plaintiffs,

2  you know, already, I think, Ethicon MDL has 6 or 7,000 clients

3  and I think it's going to be -- for the plaintiff.  It's going to

4  be more we're going to need, unless something happens or

5  something changes, or maybe we can call -- you know, have a

6  conversation at some point to make this go away.

7      We're going to need that information and I'm very concerned

8  that it's not being retained and I'm also asserting that it would

9  lead to discovery of admissible evidence because it shows the

10  pattern of what the sales reps were talking about, what they were

11  talking about with doctors, maybe doctors told the sales rep.

12  I'm having this problem and, you know, it was noted for the

13  company and so forth.

14      THE COURT:  All right.  I'm looking -- I'm looking at

15  request number 98, 99, 100, 101, 102, 103, 104.  Okay, so 98

16  through 104, they all have to do with training of sales reps,

17  documents prepared by sales reps, communications with sales reps,

18  identities of sales reps.

19      So I'm looking at all of those and I think what I need, a

20  little bit more information on before I can rule on these is,

21  because what I hear Ms. Jones saying is that, look, you know,

22  it's not that we wouldn't give them this information, it's that

23  right now, it's not relevant in the midst of the millions of

24  documents that we are producing to make us go collect all of this

25  information about sales reps that don't have anything to do with

1    the bellwether cases is just burdensome and unnecessary.

2        I hear Mr. Aylstock saying, no, even though these aren't the

3    reps in the bellwether cases, it -- what they've been taught and

4    what they've written down and what they've been told may all be

5    relevant and, plus, we need to collect all of these things

6    because we're afraid they're going to get thrown away if we don't

7    collect them right now.

8        I think I need you to add that to your briefing list.  I --

9    my gut -- my gut feeling is that I don't see the point in

10   collecting information about every one of these sales reps at

11   this point in time and I wasn't privy to the negotiations for the

12   defendants' fact sheets.

13       I don't know what the discussions were.  I don't know

14   whether there were any sort of agreements that related to the

15   scope of investigation of sales reps.  I don't know how sincere

16   the problems are, as far as maintaining documents.

17       So I don't think you need to do a long brief on this.  I

18   don't think it's going to be one where there will be a whole lot

19   of law, but what I'd like to have more information about are just

20   sort of the factual underpinnings of why we need to do this right

21   now, because I don't really see it sitting here today.  So --

22           MS. JONES:  Your Honor, let me, if I may, clear up

23   some of this.  When you start looking at all of the requests from

24   98 to 104, clearly, some of the information relating to, for

25   example, sales training and communications to the sales force in

1   general and so forth have been produced, it's -- it's the stuff

2   that were linked, if you will, to the individual sales

3   representatives and having to go back and pull correspondence

4   with individual sales representatives and so forth that I think

5   is the subject of most concern here.

6           THE COURT:  Right.  I --

7           MS. JONES:  We can clarify that in the briefing.  I

8   just didn't want you to think that we objected to producing any

9   of this documentation because, clearly, some of it has been

10  produced.

11          THE COURT:  Right.

12          MS. JONES:  Some of it outside of individual

13  plaintiffs.

14          THE COURT:  Right, and I think as I was looking at

15  these, I was thinking in terms of producing this kind of

16  information as it related to every single sales rep who has ever

17  worked at Ethicon because there's really no -- that's had

18  anything to do with a pelvic mesh product, which I think would

19  probably be a fairly long span of time and probably a lot of

20  people.

21      I would assume that you've produced the items that are

22  relevant to the sales reps that are in the bellwether cases,

23  correct?

24          MS. JONES:  That's correct, Your Honor.

25          THE COURT:  To the extent you have it.

```
1              MS. JONES:  That's correct.

2              THE COURT:  So what I want to know and, Mr. Aylstock,

3      you'll -- you'll have the burden in this -- on this particular

4      issue, is why would it be relevant to collect all of that

5      information?  When you use the proportionality rule in Rule 26,

6      why would you want to collect all of that right now when there

7      are so many other things that need to be done before this goes to

8      trial and you're talking about a tremendous number of people,

9      documents, a long time span?

10         It may be that you're entirely justified.  I just don't feel

11     like I have enough information sitting here today.  So I'd like

12     to hear from you on that.  And why don't you do this as a

13     separate brief and, Mr. Aylstock, you go first.

14             MR. AYLSTOCK:  Sure, Your Honor.

15             THE COURT:  That will give you something to do in the

16     next 14 days.

17             MR. AYLSTOCK:  I'm so happy to have that.

18             THE COURT:  I knew you would be.  I like to share the

19     pain.

20         Okay, that brings us up then to 105.  Where are we on that?

21     It looks like --

22             MR. WATSON:  Yes, Your Honor, we --

23             THE COURT:  You've produced everything you have?

24             MR. WATSON:  As far as we are aware, Your Honor, we

25     have produced the gold mine database, which is the -- I guess the
```

1    -- the detailed note database that talks about the interactions

2    between sales reps and physicians.  So, yes, Your Honor.

3            THE COURT:  Anything else you're aware of, Mr.

4    Aylstock, on that one?

5            MR. AYLSTOCK:  No, Your Honor.

6            THE COURT:  I think 106 would probably go back to this

7    whole issue of 98 through 104.  So we can add 106 to that list as

8    part of the briefing.

9        So that brings us to 107.  Have you -- you've -- oh, you say

10   it's duplicative.

11       Do you disagree with that, Mr. Aylstock?  It does sound like

12   you've asked for that frequently.

13           MR. AYLSTOCK:  I think it's duplicative, Your Honor.

14           THE COURT:  108.  That's another salesperson issue.  So

15   we'll throw that in the pot with 98 through 104, 106, and we'll

16   add 108.  109, we can add to that, and 110.

17       So that brings us to 111.  Where are we on that one?  Have

18   you -- you've produced everything?

19           MR. WATSON:  Your Honor, yes, we're certainly not

20   holding anything back and, you know, honestly, I don't know.  To

21   the extent this goes to the discussion we had previously on

22   honoraria of other doctors, but I think it goes to the same

23   issue.

24           THE COURT:  Right.  Okay.  All right.  112, it looks

25   like you've produced everything, but you do have a scope

```
1    objection.  Anything you're withholding based on scope?

2              MR. WATSON:  Not withholding anything based on scope.

3              THE COURT:  112.  Oh, that's the one we just did.

4         113.  113.  We don't want to repeat any of these, do we?

5              MR. AYLSTOCK:  No, Your Honor.

6              MR. WATSON:  No, Your Honor.

7              THE COURT:  I've never seen such a big set of requests.

8    Okay, 113, where are we on that?  It looks like you've produced

9    everything subject to these objections we've already discussed;

10   is that correct?

11             MR. WATSON:  Correct.  Correct.  Nothing being withheld

12   on scope.

13             THE COURT:  And then 114, you've got the SOP's that

14   you're meeting and conferring on.

15        115 is SOP's.

16        116, SOP's.

17        117, let's see.  So that -- you have produced what you have?

18             MR. WATSON:  Correct.  That goes to the copy review

19   issue.  All of that has to go through the copy review process.

20             THE COURT:  Okay.  118, they say, is duplicative.

21   What's your position on that, Mr. Aylstock?

22             MR. AYLSTOCK:  I would agree with them, Your Honor.

23             THE COURT:  All right.  119.

24             MR. AYLSTOCK:  This one is one I think we need to talk

25   about.
```

```
1              THE COURT:  All right.  And you want to have their

2    annual sales revenue for what purpose?

3              MR. AYLSTOCK:  I think in many states, Your Honor,

4    maybe not all states, but it is relevant to the punitive damage

5    issue that we believe that's at issue in this case, as well as

6    when it comes to nationwide, it's certainly relevant to their

7    motive and why they may have taken shortcuts and put speed to

8    market above patient safety and why they made certain decisions.

9         There were a lot of decisions made by the company on what to

10   do from a regulatory stand point, what to do from a clinical

11   standpoint, whether to have clinical evidence or putting on a --

12   a product on the market.  It seems to us, or we intend to prove

13   anyway, Your Honor, that those decisions were driven by marketing

14   and sales and revenue, as opposed to patient safety.

15             THE COURT:  I think this is probably going to include

16   120 as well, so 119 and 120 is the financial information.

17             MR. AYLSTOCK:  And I would add for some of the state

18   laws, certainly, to support this, you know, profits, net worth,

19   so forth, as directly relevant to punitive damages.

20             THE COURT:  Yes.  I know that we just had a -- we just

21   had a case here in this district and Judge Chambers found that

22   there had to be a prima fascia case made to support production, a

23   prima fascia case of -- supporting punitive damages before

24   production of financial information would be required.

25        This is probably one that's going to have to be briefed.
```

```
1    It's a big issue.  I don't know how long you want on this or when

2    you want to do it.  I wouldn't think you'd want to do this as

3    part of your -- your other briefing, but you tell me.

4              MR. AYLSTOCK:  Your Honor, I agree with the timing of

5    it.  We have a lot to do --

6              THE COURT:  Right.

7              MR. AYLSTOCK:  -- to get our expert reports and so

8    forth and this wouldn't necessarily bear on those other issues,

9    so if we could have maybe 30 days on this.

10             THE COURT:  All right.  And you will take -- you will

11   file the first brief, Mr. Aylstock?

12             MR. AYLSTOCK:  Yes, Your Honor.

13             THE COURT:  All right.  Mr. Aylstock will file the

14   brief in 30 days.  The defendants will have -- how long do you

15   think you'll need after that, two weeks or three weeks?

16             MR. WATSON:  Your Honor, I would think two weeks would

17   be fine.

18             THE COURT:  Okay.

19             MR. AYLSTOCK:  Your Honor, on this issue, you had

20   referenced a recent case.  Was it -- I'd certainly like to read

21   that case.

22             THE COURT:  It was *Robinson v. Quicken Loans*, but I

23   don't recall what the case number would be.

24             MR. AYLSTOCK:  Okay.

25             THE COURT:  It's fairly recent.  It was -- it was
```

1     within the -- and it was Judge Chambers here in the Southern

2     District of West Virginia, so you ought to be able to find it

3     fairly easily.

4             MR. AYLSTOCK:  Great.  Thank you, Judge.

5             THE COURT:  All right.  121.  It looks like -- have you

6     produced everything you have, Mr. Watson?

7             MR. WATSON:  Yes.  As far as we are aware, Your Honor,

8     we are not withholding anything.

9             THE COURT:  122, they say, is duplicative.  Do you

10    agree with that?  122, 1323 and 124 are all duplicative.  Do you

11    agree with that, Mr. Aylstock?

12           MR. AYLSTOCK:  We do, Your Honor.

13           THE COURT:  All right.  Okay.  124, it was -- did I say

14    that?  122, 123, 124, okay.  So that takes care of the Request

15    For the Production of Documents and, hopefully, I will be able to

16    put together an order that is fairly accurate.  I tried to keep

17    notes here.

18      Now we still have the -- we still have the interrogatories,

19    so where are we on those?

20           MR. AYLSTOCK:  Your Honor, this is Mr. Aylstock again.

21    The -- you know, with the Court's rulings up until this point

22    and, in particular, the issue with regard to specifically

23    identifying documents, I think that what we've found generally in

24    speaking with -- instead of answering, they would -- Ethicon's

25    responses would refer to a whole bunch of documents.  I think

```
 1    we've briefed that and I don't think that's really the proper way
 2    to do it, but --
 3              THE COURT:  I agree.  From the cases that I've
 4    reviewed, I think that you have to -- you can refer to documents.
 5    If, for example, the information's contained in the specific
 6    documents and it would be just as easy for one side as the other
 7    to get the answer from reviewing those documents, but I don't
 8    believe it's appropriate to just list a bunch of documents and
 9    say the answer is somewhere in there.
10         The cases that I read that talk about using Rule 33(d), and
11    I can -- if that's your main issue, I can just address that in an
12    order, but the cases I've reviewed that talk about Rule 33(d)
13    talk about the fact -- for example, I think the best  -- the best
14    example I read with was where the question was how long -- what's
15    the average amount of time it takes for your company to rule on
16    or to grant or deny a request for family medical leave and the
17    company produced the -- all of the requests for medical leave and
18    all of the responses to the requests and said, here they are.
19    You average them out.  So the ability to do that was the same for
20    both sides and so they were able to produce the documents instead
21    of actually responding.
22         I don't know that that's what I'm seeing here.  It seems to
23    me here, what you're saying is, well, if you look at these
24    various documents, then somewhere in there will be an answer.  Am
25    I misunderstanding?
```

1           Mr. Watson?

2               MR. WATSON:  Your Honor, I -- I think when they ask for

3       particular pieces of information and, you know, the -- the

4       documents that we have presented are so extensive, you know, I

5       think that telling them, look, you know, look at these, you know,

6       particular documents that we have given you, you know, we

7       certainly think that that's the appropriate way to do it, rather

8       than having to, you know, take the documents ourselves and, you

9       know, try to, you know, come up with the same information.

10              THE COURT:  I think it depends on what the question is.

11          Is that your primary issue, Mr. Aylstock, is the use of the

12      documents in place of just answering the question?

13              MR. AYLSTOCK:  Yes, I think so.  I think there are --

14      you know, a lot of them do have some boilerplate language, even

15      in the second supplemental response that we would assert is still

16      not appropriate under -- I believe it's the *Mills* case from the

17      Southern District of West Virginia, but that's our -- that's our

18      main issue.  I would agree with that.

19              THE COURT:  All right.  What I can do is go through

20      this pleading with that primarily in mind, this response, and I

21      can issue an order.  You were the ones that asked for the

22      hearing, so I don't know if there's anything you really want to

23      argue about today in regards to these answers to interrogatories,

24      but if you don't want to, I'll just go ahead and look through

25      them and rule myself.

```
 1              MR. AYLSTOCK:  I think that's fine, Your Honor.

 2              THE COURT:  All right.  I will work on this tomorrow

 3    then.

 4        Is there anything else that we -- I know everybody is

 5    probably tired.  I know I'm tired.

 6        Is there anything else we want to do today, any -- somebody

 7    -- I think Laura had mentioned there was maybe a problem with a

 8    deposition.  Is that something that needs to be addressed?

 9              MR. AYLSTOCK:  No.  I think that, unless something

10    happened I don't know about, I think everything has been --

11              UNIDENTIFIED SPEAKER:  (Inaudible.)

12              MR. AYLSTOCK:  Oh, no, that -- that was resolved.

13              THE COURT:  Was that resolved?

14              MR. AYLSTOCK:  Yes, Your Honor.

15              THE COURT:  All right.

16              MS. JONES:  Is that the deposition from last night?

17    I'm sorry, I misunderstood what the --

18              THE COURT:  There was a problem --

19              MR. AYLSTOCK:  Determining whether or not, if the

20    problem couldn't be solved by reasonable counsel, which it was --

21              MS. JONES:  Oh.

22              MR. AYLSTOCK:  -- the Court was available.

23              MS. JONES:  Okay.  I don't think there's anything else,

24    Your Honor, and I -- and I don't think that there -- I know that

25    there are some issues about the length of certain depositions
```

1    that I think, for the most part we have resolved, although, in

2    all candor, I think that Mr. Cartmell had one or two issues that

3    he wanted to bring up and I -- but I don't think it's appropriate

4    to do him -- to do this without him on the telephone and I think

5    that we have worked through the vast majority of the issues with

6    respect to the depositions.  At least -- at least, I think we

7    have.

8         I mean we have been, as Mr. Aylstock notes, coordinating --

9    trying to coordinate with both state counsel and the MDL and get

10   all of this done once, at one time, and I think we've got most of

11   those issues resolved, but it may very well be, Your Honor, that

12   we we'll be calling to ask for your advice on some issues in the

13   next week or so.

14              THE COURT:  That would be fine and, certainly, I would

15   almost appreciate it if you would contact me as issues arise so

16   that we don't have to have three and four-hour hearings.  I think

17   it's just too tiring for everyone and, pretty soon, you start

18   giving up because you're too tired to make your argument any

19   more.  So it might be better if we can do these in smaller

20   batches instead of great big issues all at the same time.

21        But that brings up one last point or one last thought in my

22   mind and, as I recall, one of the problems with the length of the

23   depositions was the need to cover fifteen different devices.  Has

24   there been any further consideration given to reducing the number

25   of devices that are at issue, at least for these -- these first

1    round of trials and maybe picking them up again later, or any --

2    any thought about that?

3              MR. AYLSTOCK:  Your Honor, this is Bryan Aylstock

4    again.  We have discussed with Ms. Jones the idea that maybe for

5    these depositions and some of these TVT that are of relatively

6    small market shares or were late comers to the market when, you

7    know, maybe they don't have the number of plaintiffs, that the

8    depositions could be limited, you know, on the TVT side to three

9    products, the TVT-S, the TVT-O, and the Classic.

10             You know, I think the argument against that is, well, we

11   want to do it once and for all, and I understand that, and we're

12   doing everything we can to accommodate that and it's complicated

13   by New Jersey and those lawyers' desire to be involved and be

14   included in communications and so forth.  That's been the subject

15   of some discussions with Judge Higbee, but I think it's a very

16   good idea and, frankly, it's the only way that we're going to be

17   able to get whatever cases are picked on July 25th ready for

18   trial.

19             And another thing that -- that -- and because we're moving

20   depositions, we've already been talking about, I think you should

21   know, Your Honor, you know, or maybe a joint request or an

22   unopposed request for an extension of time to cover these expert

23   reports, which I don't know if that will be addressed by Your

24   Honor.

25             THE COURT:  It would be Judge Goodwin.

1          MR. AYLSTOCK:  Okay, but I think it's a good idea.

2     Another potential -- I think we'll -- both sides will probably

3     have more clarity after the 25th, when Judge Goodwin makes his

4     determinations as to which cases, because there may be certain

5     cases that at least we won't have to do expert reports on and

6     that might drive which deponents that we need to do before expert

7     reports and so on and so forth.

8        But I think that the only way we're going to be ready for a

9     trial and have the experts and the *Daubert,* all the hearings and

10    so forth is if we do, in fact, narrow our focus significantly

11    because I'm very tired.  I'm very tired, Your Honor.

12         THE COURT:  Yes, I agree.  I mean it just -- I can

13    understand Ethicon's position that they don't want to have the

14    same people deposed seven times, but it almost becomes impossible

15    to get everything done in time and to present a decent case when

16    you are taking nine and ten-day depositions.  So --

17         MS. JONES:  And that's what happened with respect to

18    the 30(b)(6), but frankly, Your Honor, I think that most of that

19    is gone and done with.

20       It is correct that we've got a couple of products that we

21    have very few cases on.  They had very little market share, but

22    the expense and the disruption to the client and, frankly, us

23    having to go out and find former employees to produce them is

24    extraordinary and having to do it on multiple occasions is going

25    to make it almost impossible.

1          I mean we're -- we are dealing with a time period that

2     covers over fifteen years with various products and, you know,

3     frankly, the parties have been cooperative, I think, for the most

4     part, and I don't think that the fact that TVT-Exact and Abbrevo

5     were still kind of being left in the -- in the mix is unduly

6     affecting these things.

7          I understand your concern, but frankly, that's not the

8     reason that the depositions are being stretched out and taking so

9     long, because no time has really been spent with respect to those

10    -- to those products and, as to the further PBT products, Mr.

11    Aylstock is right, it may change based upon Judge Goodwin's

12    ruling, but we have some of those other TVT products, each one of

13    those other TVT products, listed among the plaintiff and defense

14    nominations for the bellwether cases.  So we're going to have to

15    address those issues.

16         But I -- all of that being said, I can assure Your Honor

17    that we are all anxious to curtail discovery as much as we can,

18    just so as it doesn't end up costing us more in the long run in

19    terms of additional time and effort.

20              THE COURT:  Well, that's true.  Well, I think you all

21    have worked well together.  I don't hear anybody being criticized

22    or slandered.  So that's good.  I think you're working well

23    together.

24         Hopefully, you'll be able to get this worked out.  It just

25    -- you know, I just think it seems -- not being at any of the

1    depositions, so it's hard for me to tell, but it just seems as

2    though those things are taking a tremendous amount of time and

3    almost will be unusable, they'll be so long, because I do think

4    Judge Goodwin is going to be pretty strict about the time that

5    you have to try the case.

6         Yeah, I don't -- I don't think he's going to be too -- he's

7    going to be willing to be flexible on that.  I think he'll be

8    pretty strict on that.

9         You know, you also -- I don't know if you have access to the

10   transcripts in the other MDL's, but you might want to look at the

11   bellwether selections in AMS and, if you have that transcript,

12   just to get the idea from Judge Goodwin that he really wants to

13   hear representative cases, not cases that you necessarily have

14   put up there because you think that's your best case to win.  He

15   wants cases that truly represent the issues.  So you might bear

16   that in mind so he doesn't yell at you, so he doesn't get

17   impatient with you.

18            MR. AYLSTOCK:  From the plaintiffs' perspective, that

19   was our goal.

20            THE COURT:  Well, good.  Good.  I think he'll be --

21   he'll appreciate that.  So --

22        All right.  Well, thank you all for the time you've spent.

23   I will get an order out.  Hopefully, it will be in the next day

24   or two and we'll go from there.

25            MR. AYLSTOCK:  Thank you, Your Honor.

```
 1              MS. JONES:  Thank you very much.

 2              MR. WATSON:  Thank you, Your Honor.

 3              THE COURT:  Thank you.  Bye-bye.

 4          (Proceedings concluded at 4:41 p.m., July 17, 2013.)

 5

 6   CERTIFICATION:

 7       I, Ayme A. Cochran, Official Court Reporter, certify that

 8   the foregoing is a correct transcript from the record of

 9   proceedings in the matter of In re:  Ethicon, Inc. Pelvic Repair

10   Systems Product Liability Litigation, MDL Case No. 2:12-MD-2327,

11   as recorded on July 17, 2013 and subsequently transcribed by me.

12

13   s/Ayme A. Cochran, RPR, CRR              August 7, 2013

14   Ayme A. Cochran, RPR, CRR                        DATE

15

16

17

18

19

20

21

22

23

24

25
```