IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

```
_____x
                               :
IN RE: ETHICON, INC.           :        MDL No. 2:12-MD-2327
PELVIC REPAIR SYSTEM           :
PRODUCTS LIABILITY             :
LITIGATION                     :        DATE:  August 9, 2013
                               :
_____x
```

TRANSCRIPT OF TELEPHONIC STATUS CONFERENCE HELD
BEFORE THE HONORABLE CHERYL A. EIFERT
UNITED STATES MAGISTRATE JUDGE
HUNTINGTON, WV

APPEARANCES:
(All counsel appearing by telephone.)


For the Plaintiffs:        BRYAN F. AYLSTOCK, ESQ.
                           D. RENEE BAGGETT, ESQ.
                           ERIC WALKER, ESQ.
                           BENJAMIN ANDERSON, ESQ.
                           Aylstock Witkin Kreis & Overholtz
                           Suite 200
                           17 East Main Street
                           Pensacola, FL 32502

                           THOMAS P. CARTMELL, ESQ.
                           Wagstaff & Cartmell, LLP
                           Suite 300
                           4740 Grand Avenue
                           Kansas City, MO 64112




For the Defendants:        BENJAMIN M. WATSON, ESQ.
                           GARY RUBIN, ESQ.
                           WILLIAM M. GAGE, ESQ.
                           DONNA B. JACOBS, ESQ.
                           Butler Snow O'Mara Stevens &
                           Cannada, PLLC
                           P. O. Box 6010
                           Ridgeland, MS 39158-6010

(Appearances continued:)

                    DAVID B. THOMAS, ESQ.
                    PHILIP J. COMBS, ESQ.
                    Thomas Combs & Spann, PLLC
                    P. O. Box 3824
                    Charleston, WV 25338-3824


*** Proceedings transcribed from Courtflow recording by:

                    AYME A. COCHRAN, RMR, CRR
                    Official Court Reporter
                    United States District Court
                    300 Virginia St., East
                    Room 6610
                    Charleston, WV  25301

```
 1          PROCEEDINGS had before The Honorable Cheryl A. Eifert,

 2    Magistrate Judge, United States District Court, Southern District

 3    of West Virginia, on August 9, 2013, at 1:55 p.m., as follows:

 4               JUDICIAL ASSISTANT:  Hello.  This is Laura Tatman,

 5    Judge Eifert's judicial assistant.

 6               MR. AYLSTOCK:  Hi, Laura.  This is Bryan Aylstock.

 7               JUDICIAL ASSISTANT:  Hi, everyone.

 8               MR. AYLSTOCK:  We've got a bunch of folks on the call.

 9               JUDICIAL ASSISTANT:  Okay, and I was going to ask you,

10    as this is on the record, if we could just start with plaintiffs'

11    counsel and each person announce their names slowly so the

12    courtroom deputy can pick that up, we'll do that first, and then

13    I will connect you with the judge.

14               MR. AYLSTOCK:  Okay.  This is Bryan Aylstock on behalf

15    of the plaintiffs.

16               MR. WALKER:  Eric Walker with the plaintiffs.

17               MR. CARTMELL:  Tom Cartmell with the plaintiffs.

18               MR. BAGGETT:  Renee' Baggett with the plaintiffs.

19               MR. ANDERSON:  Ben Anderson with the plaintiffs.

20               MR. THOMAS:  David Thomas and Phil Combs for

21    defendants.

22               COURTROOM DEPUTY CLERK:  Who was that again, I'm sorry?

23               MR. WATSON:  Ben Watson, Donna Jacobs and William Gage

24    for defendants.

25               MR. RUBIN:  Gary Rubin for the defendants.
```

```
1              JUDICIAL ASSISTANT:  Is that everyone?

2              MR. AYLSTOCK:  That's everyone from our side, Laura.

3    This is Bryan for the plaintiffs.

4              JUDICIAL ASSISTANT:  All right.

5              MR. WATSON:  And for the defendants as well.

6              JUDICIAL ASSISTANT:  All right.  Thank you.

7         If you'll hold one moment, I will connect you with Judge

8    Eifert.

9              MR. AYLSTOCK:  Thank you so much.

10             JUDICIAL ASSISTANT:  Thank you.

11        (Pause.)

12             THE COURT:  Good afternoon.

13             MR. AYLSTOCK:  Good afternoon, Your Honor.

14             MR. WATSON:  Good afternoon, Your Honor.

15             MR. THOMAS:  Good afternoon, Your Honor.

16             THE COURT:  I understand there's a number of people on

17   the telephone and I would just ask that when you are speaking, if

18   you would identify yourself so that that will be clear on any

19   transcript that's made.

20             MR. AYLSTOCK:  Sure will, Your Honor.  This is Bryan

21   Aylstock.

22             THE COURT:  All right.  So what I'd like to start doing

23   is having conferences like this once a week and I understand that

24   perhaps Friday afternoons are the most convenient time for

25   counsel; is that true?
```

```
1              MR. AYLSTOCK:  For was plaintiffs, Your Honor, this is
2    Bryan Aylstock.  It's as good as any, and we'll certainly make
3    sure to make ourselves avail and, just by wait of introduction,
4    Eric Walker is on the phone.  He's relatively new to the Ethicon
5    litigation, but he was heavily involved in a lot of briefing and
6    argument in some other MDL's.  So he may be involved in some of
7    the argument when -- either when we're out or just because he did
8    a lot of the briefing.
9              THE COURT:  Well, we welcome him to our little group
10   here.
11             MR. WALKER:  Thank you, Your Honor.
12             THE COURT:  Now let me hear from Mr. Thomas or Mr.
13   Combs or one of the defense counsel.  Would Fridays work well for
14   you all?
15             MR. THOMAS:  As well as any other, Judge.
16             THE COURT:  And -- all right.  And I think I understood
17   perhaps the afternoon is better than the morning; is that true?
18             MR. THOMAS:  As well as any other time.
19             THE COURT:  Okay.  All right.  Then I'm just going to
20   -- I'll just set them at my convenience.  It sounds like that
21   that will work for everybody.
22        Next Friday, we can either do it at 1:00 or 4:00 in the
23   afternoon, and I do -- I do want to make clear that what I'm
24   anticipating is to have a conference that lasts no more than one
25   hour.  So, tell me, what would you all prefer, 1:00 or 4:00 on
```

```
 1   the 16th?
 2          MR. AYLSTOCK:  For the plaintiffs, this is Bryan again.
 3   We're good with either.
 4          THE COURT:  All right.  Mr. Thomas, Mr. Combs, do you
 5   have any preference?
 6          MR. THOMAS:  Your Honor, if I may ask my counterparts,
 7   do you have a preference?
 8          MR. WATSON:  Yes.  This is Ben Watson.  I think, for
 9   next week, we would prefer the 4:00 slot, if possible.
10          THE COURT:  Certainly.  All right.  I will set it then
11   for Friday, the 16th, at 4:00 and then, after that, I'll just set
12   them sometime in the afternoon on Fridays and, what I'll do is
13   issue an order that just sets a few out in advance so everybody
14   knows what time and, as I think Laura may have told you, it's not
15   necessary for everyone to be in every conference, as long as
16   there is somebody representing each side that would have a
17   leadership role in the case, and I'll leave that up to you all,
18   as to who those people might be.
19      So let's talk about what's going on now.  Who would like to
20   go first?
21          MR. AYLSTOCK:  I'll start, Judge.  This is Bryan
22   Aylstock and, first, let me say thank you for -- for having these
23   calls.  We had actually discussed maybe having weekly calls with
24   the defense, but I think that it is very helpful having your
25   direct involvement just to keep us all on track and -- and moving
```

1    forward with the production and with the various issues and just

2    getting your thoughts.  So I'll start by saying thank you for

3    that.

4         We do have a number of issues that remain outstanding, Your

5    Honor, after our Motion to Compel.  In particular, you had

6    suggested that each side need to file some briefs on some issues.

7    The XUS brief was filed last Friday per the order.

8         We had had a conference call a week ago Thursday on some --

9    on the hernia mesh and sales rep issues, and Ms. Baggett can

10   speak to the sales rep issues, but the hernia mesh issues remain

11   outstanding and immediately, or at least a few hours after that

12   call, I did send a proposal to Mr. Watson on, you know, maybe

13   limiting those requests to certain of the RFP's that we would be

14   willing to do pursuant to his request and Mr. Gage's request that

15   we do that and I haven't heard anything at all.

16        And the hernia mesh issues are really becoming much -- you

17   know, I'd certainly want to stress the importance at our Motion

18   to Compel.  It's even more important to us given some recent

19   depositions in this case and some testimony and some documents

20   that -- that have been produced.  So we would urge that, although

21   that motion, I think, should have been filed Friday, we -- I

22   don't know what else to do, other than to tee up the issue, and

23   I'd like to tee it up as quickly as possible, if we could.

24             THE COURT:  Well, Mr. Watson or Mr. Gage, what has

25   happened with the suggestions from the plaintiff as to some

1    limitations?

2          MR. WATSON:  Yes, Your Honor.  This is Ben Watson.  I

3    -- we did have an extensive call last week with Mr. Aylstock and

4    I think we do have close to an agreement in principle in terms of

5    what we will produce on the hernia side.  You know, we obviously

6    want to do a production that they're satisfied with on hernia

7    mesh, so we're in no way saying that we're not going to produce,

8    you know, the basic documents, I think, that they are looking

9    for.

10         Mr. Aylstock in his proposal basically cut out, I don't

11   know, I'd say about a third of the document requests saying, we

12   don't want hernia mesh related to these, but we do want hernia

13   mesh, you know, related to the other two-thirds and we had sent

14   that on to our team and our client and have been talking about it

15   and I think it generally is something that we can agree to.

16         What I -- what we are in the process of doing, and I had

17   hoped to have it out before the call today but, of course, I have

18   not, is to basically delineate what it is that we will be

19   producing.  We've got a list of about thirty-something custodians

20   because I don't know what -- they know what's there a lot better

21   than I know what's there.

22         So if they're producing -- if those represent and they can

23   certify, yes, these are the documents after a diligent search

24   that are responsive to the RFP's related to hernia, then great.

25   Then -- then it sounds like we have a resolution, but if they're

1    saying that we want to do this in lieu of responding to the RFP's

2    after a diligent search, then I don't think we can agree to that.

3    I -- I don't know.

4             THE COURT:  The thirty custodians, where did that come

5    from?  Were questions -- did you ask requests that were specific

6    to various custodians, or is this just a method by which they are

7    going to search for these documents?

8             MR. AYLSTOCK:  No, Your Honor, not for specific

9    custodians.  We asked for documents related to certain issues.

10            THE COURT:  All right.  So you have -- so where do the

11   -- where do the thirty custodians come from, Mr. Watson?

12            MR. WATSON:  Well, Your Honor, in terms of trying to

13   determine who is at the company that has responsive documents,

14   these are the people that seem to be the most likely to have it

15   and they have been put through an interview process to determine

16   what it is that they have and, based on that, you know, their

17   custodial collections are being made and that's, you know, from

18   our standpoint, at least on the custodial side, really the only

19   way to figure out who it is at the company that has the relevant

20   documents.

21            THE COURT:  Well, so as I -- what I hear you saying is

22   that you do intend to answer the requests and you believe the way

23   to do that is through these thirty custodians that you're

24   identifying and --

25            MR. AYLSTOCK:  Yes, Your Honor.  Yes, Your Honor.  Not

```
 1    just -- I mean that's just a piece of it.  You know, obviously,

 2    that's the central point to it as well, you know, because

 3    their -- you know, their discovery requests go to -- go to, you

 4    know, many different issues and, you know, whether it's adverse

 5    events, or design history files, or whatever.  Those are the

 6    things that -- that satisfy those as well.

 7            THE COURT:  All right.  Well, I think probably the best

 8    thing to do is for you to, as soon as possible, and certainly,

 9    you say Tuesday would be the latest, you need to let Mr. Aylstock

10    know what exactly it is you're going to respond to and whether

11    you are limiting the document productions in any way and then we

12    need to -- if you are and he disagrees with your limitations,

13    then the briefing needs to be done quickly, because he's right.

14    I mean that should have already been done at this point.

15            MR. WATSON:  Yes, Your Honor.

16            THE COURT:  So let's try to -- you know, let's -- no

17    later than Tuesday, but if you can do it sooner, then don't delay

18    because I think we'll have to be in a position next Friday to

19    have -- I want to specifically know what it is you're producing

20    and when you can produce it, how long it will take you to produce

21    it, and what specific limitations the plaintiff disagrees with

22    and maybe we won't have to do a whole lot of briefing on it.

23    Maybe we'll be able to just discuss it next Friday.

24            MR. WATSON:  Yes, Your Honor.

25            THE COURT:  All right.
```

```
1              MR. AYLSTOCK:  That would be my -- my hope, Your Honor.

2              THE COURT:  Okay.

3              MR. AYLSTOCK:  Would the Court permit me to inquire of

4     Mr. Watson, because he raised an issue that -- you know,

5     normally, we're not supposed to ask the opposing counsel a

6     question, but I wasn't sure how formal I could be.

7              THE COURT:  No.  Let's -- I'd prefer to be a little

8     informal.  I'd like to try to get these things resolved.

9          (Recording stops due to technical difficulties.)

10             THE COURT:  I do want you to know we're back on the

11    record.  So we are back on the record.

12         So go ahead and ask Mr. Watson what you'd like to ask him.

13             MR. AYLSTOCK:  I guess my concern with what you said,

14    Ben, was that, you know, with the custodial production, I

15    understand that that -- you know, that's part of our production,

16    but it sounded like for all of these requests, not just related

17    to hernia, the way that you responded to the request was through

18    this custodial and central source production, as opposed to doing

19    a sweep of the company, and that might feed into some of these

20    other issues that we're having with why documents seem to be

21    missing and then why we continually follow up and so it's --

22         Is that right on -- for all of the production?  Is this a

23    custodial-based production or did you produce, you know -- did

24    you -- did you produce all the documents or just all the

25    documents that were within the custodial file?
```

1          MR. WATSON:  No, Bryan.  These custodial sources are

2     just a piece of it.  We've produced now from 290 custodians and,

3     as of a couple of days ago, you all asked us to produce another

4     one, which we're going to do.  That's only one piece of it.

5          Obviously, the -- let's see, the 136 central sources that

6     we've produced from as well, certainly, you know, is a -- is a

7     robust production and I'm not sure I understand what your -- what

8     your issue is with it.

9          MR. AYLSTOCK:  Well, okay.  I guess -- I guess I'm --

10    when you produce with the custodial production, are you -- you're

11    just using search terms or how do you -- how do the documents get

12    produced when you find them?

13         MR. WATSON:  Well, their full environments are

14    selected.  That is every electronic and paper environment that

15    they have, whether it be their hard drive, their -- you know,

16    their shared space on a network drive or, you know, even the hard

17    copy documents that are saved in their office, the full

18    environment is collected and then the search terms that we all

19    agree to are applied against that data and then those documents

20    are reviewed and produced.

21         MR. AYLSTOCK:  Okay.  Well, I think this is a bigger

22    issue than I had thought, because I'll give the Court another

23    example.  We did the 30(b)(6) deposition of Dan Lamont, who is

24    the individual that was in charge of some risk -- you know, the

25    medical device reporting and there was this Corrective and

1    Preventive Action Plan, CAPA, related to some deficiencies in

2    their risk assessment related to these medical devices and -- and

3    I don't think that was ever produced and --

4            THE COURT:  Well --

5            MR. AYLSTOCK:  And so if we're just doing a search term

6    search, I'm not sure that that's --

7            THE COURT:  Well, did you --

8            MR. AYLSTOCK:  I mean that might be feeding into some

9    of these other issues that we can get to.

10           THE COURT:  Okay.

11           MR. AYLSTOCK:  But I just wanted to flag that.

12           THE COURT:  Well, I haven't gone back and looked at

13   your ESI protocol, but didn't you, in the protocol, address these

14   kinds of issues?

15           MR. AYLSTOCK:  Yes, Your Honor.

16           THE COURT:  So I guess what we'll need to do is go back

17   to the protocol and see whether that is being complied with

18   because --

19           MR. AYLSTOCK:  It's just --

20           THE COURT:  I don't --

21           MR. AYLSTOCK:  I'm sorry, Judge.

22           THE COURT:  Whenever you have a case with this much in

23   the way of documentation, I don't think it's feasible to expect a

24   defendant to review every single piece of documentation there is

25   across the world to find every -- I mean that's why you do

 1    representative searches and so forth.  So I'm not sure I'm

 2    understanding what your --

 3              MR. AYLSTOCK:  Yes.

 4              THE COURT:  What your problem is with that.

 5              MR. AYLSTOCK:  I guess I was just unclear whether they

 6    were searching everywhere in the company and -- or simply the

 7    custodians using it and it sounds like, other than the central

 8    source files, it's the central source or the -- the enumerated

 9    custodians, which might be enough.  I just wanted to understand

10    it better.

11              THE COURT:  Okay.

12              MR. AYLSTOCK:  Because I think it might be feeding into

13    some of these other issues.

14              THE COURT:  All right.  Well, so we'll go back and look

15    at the ESI protocol and make sure that the defendant is complying

16    with that, but if they are, then I'm not certain what else you

17    can expect out of them.

18              MR. AYLSTOCK:  Okay.

19              THE COURT:  What would be the next -- what's the next

20    issue we've got concerns with?

21              MR. AYLSTOCK:  Well, this one just happened today,

22    Judge.  We had been requesting exemplar products of, in

23    particular, the original TVT Retropubic product, as well as the

24    TVT-O and some other ones, the most urgent, of course, being the

25    TVT and TVT-O, given the expert deadline of September, and we've

1    requested them for many weeks.

2         I followed up with Ms. Jones -- I know she's out of the

3    country -- a couple of weeks ago, and then another one, and Ms.

4    Jones indicated to me yesterday that she thought it had been

5    done, but didn't get notice.  I guess they were in Butler Snow's

6    possession, but she didn't know about it.

7         Anyway, we get the box today and it does have exemplars, but

8    they're opened.  The boxes are literally opened.  In fact,

9    there's handwriting from somebody on them that says, "Open, but

10   complete."  I'm holding one in my hand, with handwriting, of an

11   open box with stuff rattling around in it and the way these come,

12   as hermetically sealed, then now -- I mean we're going to give

13   these to our experts for some testing, but the fact is, they're

14   not -- they're not -- they're not testable.

15        They could be skewered on cross examination, if they're

16   doing degradation testing or some other testing, that these

17   really weren't the products in pristine condition.  All the boxes

18   are opened and look like they've been sitting around and we've

19   been asking for six, eight weeks, and I need good product.  I

20   needed it six or eight weeks ago.  I certainly need it by today

21   to get to our experts to do some testing.

22             THE COURT:  Yeah.  That's --

23             MR. AYLSTOCK:  And these are products --

24             THE COURT:  That's a very legitimate request.  What's

25   the problem with that?

```
1              MR. GAGE:  Your Honor, this is William Gage.  I, in
2    Christy's absence, shipped those out yesterday at her request.
3    This is news to me.  This is the first I've heard of it.  I don't
4    know why the boxes were opened and I don't know if that's an
5    aberration or irregularity.
6         So I think what I would ask Bryan to do is to communicate
7    with me as soon as this call is over, help me understand what
8    they've got, and then we'll get about the business of getting it
9    replaced.
10        I would say -- I would say that it's my understanding that
11   they have -- the plaintiffs have had exemplars, three exemplars,
12   for a number of months.  So these were additional exemplars that
13   they had requested.
14             THE COURT:  Well, it ought not to be that difficult to
15   get a regularly packaged exemplar to provide to them.  I mean I
16   don't understand why this would be at all difficult.
17             MR. GAGE:  Judge I -- Judge, I'll be honest with you.
18   I have no idea.  I mean I true -- this is the first I have heard
19   of this.  I had no -- I have no idea why they would not have been
20   sealed in the way that they would be sealed when they come off
21   the assembly line.
22             THE COURT:  Well, let me --
23             MR. GAGE:  But I mean it --
24             THE COURT:  Mr. Aylstock --
25             MR. GAGE:  Now --
```

```
1                    THE COURT:  Mr. Aylstock?

2                    MR. AYLSTOCK:  Yes, Your Honor?  Yes, Your Honor?

3                    THE COURT:  So you've gotten some exemplars of TVTs and

4       TVT-Os and they're all opened?  The packages are all opened?

5                    MR. AYLSTOCK:  The packages are -- the boxes are open

6       and the seal is broken.  For some of them, the inner-seal is also

7       broken and there's stuff rattling around.  For other ones, you

8       know, the way that they -- and we -- Mr. Gage is right.  We did

9       get a couple of exemplars that we've been, you know, bringing to

10      court and so forth, but -- but the -- they usually come, you

11      know, in shrink wrap basically.

12                   THE COURT:  Uh-huh.

13                   MR. AYLSTOCK:  So there's no suggestion that anybody

14      has tampered with anything and, obviously, we want to be careful

15      with chain of custody and we want to do good -- good testing.

16                   THE COURT:  Right.

17                   MR. AYLSTOCK:  So I'm happy to get on the phone.  I

18      just wanted to highlight the issue because it's -- it's a -- I

19      think it's symptomatic of a larger problem and we've got expert

20      deadlines and I'm just concerned about meeting them and we may

21      need some time additionally.

22                   THE COURT:  Well, Mr. Watson -- or Mr. Gage, I don't

23      know what else there would be to talk about on the phone.  He got

24      the products.  They're opened.  Why can't you just arrange to

25      send him some new ones that are not opened?
```

```
1              MR. GAGE: That's -- that's exactly right, Judge.

2              THE COURT:  So let's -- let's get that done.

3              MR. GAGE:  We will, indeed.

4              THE COURT:  All right.  Thank you.  And let's get it

5    done as soon as possible.  That shouldn't be hard to do.

6              MR. GAGE:  I'm going to call the client as soon as we

7    get off this call, Judge.

8              THE COURT:  Great.

9         All right.  What's our next issue?

10             MR. AYLSTOCK:  The next issue, Judge, relates to this

11   professional education materials that we've been talking about.

12   In fact, I've got the transcript from the May 23rd hearing, where

13   Ms. Jones and I have exchange with you about these professional

14   education materials and she said that, you know, she's understood

15   that she gave us the -- you know, we have the list of the final

16   education materials.

17        Of course, I went through mand I won't belabor the point

18   about the deposition and getting another list right before the

19   deposition and discovering that list wasn't good and following up

20   and, three weeks later, getting another list and -- and it was

21   brought up at the Motion to Compel hearing, and I have that

22   transcript, where Mr. Watson indicates that we've given them

23   everything we're able to locate and we've given them the list

24   and, to our knowledge, it's -- it's right.

25        And so, you know, relying on that, we've been moving forward
```

1    and so forth and, the other day, we found some other what appear

2    to be final SKU numbers.  Those -- you know, the tracking numbers

3    for some more professional education materials and bring those to

4    Mr. Watson's attention and he indicates that, well, these --

5    these are additional media and, although he's, I guess, spent a

6    lot of time on it, and I know he's doing his best.  I'm not

7    personally attacking Mr. Watson, but I -- the e-mail indicates,

8    well, yeah, these should have been on, pretty much, but if you'll

9    give us some more examples, we'll go back and check and we just

10   can't operate like that when we're trying to -- their defense to

11   why the IFU or the label doesn't have certain things, one of

12   them, their corporate designee says, well, it's all in the

13   professional education.

14       Well, I've looked in the professional education, everything

15   I can find and, generally speaking, they don't talk about risks,

16   at least a lot of the ones that we've identified that they knew

17   about, and so we've got this impossible situation where we can

18   never be sure what the professional education materials are.

19       We had this exchange and one of the things that was

20   suggested, I -- was, well, since we have copy review forms for

21   each of these, they ought to be able to be matched up and I don't

22   have that.  I don't -- I have no confidence of what is complete

23   or not complete.

24       The only thing I have from the defendant is, well, if you'll

25   find more examples of final product, we'll confirm that those are

1    final product or final professional education pieces, and I don't

2    think that's appropriate and I think that they need to tell me

3    definitively what those professional education materials are.  We

4    asked for it specifically.  You know, not only our RFP's, but our

5    interrogatories, which I understand they need to answer today and

6    maybe we'll get an answer to that question that's complete today.

7    I hope so.  If so, then I can stop talking.

8         But I need a final answer about what the final professional

9    education pieces are from the defendant because this has been

10   like going on since May and depositions have been taken of not

11   only witnesses, but treating physicians and, of course, they

12   don't remember exactly what they got and -- and it's putting us

13   again in the -- and part of our experts' reports may be talking

14   about the failure to adequately train and how can they give a

15   report if they don't know what the final training materials are?

16              THE COURT:  Mr. Watson?

17              MR. WATSON:  Your Honor, this is -- yes.  This is Ben

18   Watson, Your Honor.  The copy review process applies to all

19   professional education materials.  The professional education

20   materials, before they can be used, have to go through the copy

21   review process and we have produced the copy review files for

22   these products, which include the professional education

23   materials.

24        We've produced the entire copy review index that has all of

25   the copy review materials, not just the professional education,

1    but all of the copy review materials and, Your Honor, I cannot

2    emphasize how many hours we have spent ourselves trying to

3    determine what the final versions are of the professional

4    education materials, primarily the slide decks that are used in

5    professional education and, as best we can do it, we have given

6    them several iterations of charts.

7         Mr. Aylstock is right that we've added things to it, you

8    know, as we find them and the problem is, Your Honor, that we're

9    in the same boat that they are.  We don't have a way,

10   particularly back before this was electronic, before 2009 and the

11   GPM Blue database.  We don't have a way ourself to do it, other

12   than to manually go through it and do the best we can, and that's

13   -- and that's what we have tried to do.

14        Now I think the important point here is that in Mr.

15   Aylstock's last request, he came up with several different pieces

16   of professional education material.  I believe -- I believe they

17   were -- one was corporate media and one was perhaps some

18   flashcards and they asked if they've been produced and, of

19   course, they been because the copy review materials have been

20   produced.

21        So we are doing our best to -- to come up with what the

22   final versions are and, as I told Mr. Aylstock the other day in

23   an e-mail, you know, we -- we are adding to that chart,

24   particularly the portable media that has already been produced.

25        So, you know, we're -- we're kind of -- like I said, we're

1    in the same boat that they are, trying to put these pieces

2    together as well, which is -- which is unfortunate and it's

3    difficult, but we are doing our best on it.

4            THE COURT:  And, Mr. Aylstock, I think, as I recall

5    this issue, and we've addressed this many times, there is really

6    nothing that the Court can do to make someone produce something

7    that they don't have.  So if they don't have an index, or they

8    don't have a way of telling when these things were in use, I

9    can't compel them to produce that.  I think the best you might be

10   able to do is just under Rule 37(c), if they fail to supplement,

11   they fail to disclose something, then they won't be able to use

12   it if it's to their benefit.

13      You know, you may just -- you may have to get to a point

14   where you do a request for admissions and you've now supplied all

15   of the -- to me, all of your professional education materials.

16   You've supplied all of the in-use dates that you have available.

17   If you have none available, admit that, and then, if they try to

18   come up with something after that that helps them, you'll be able

19   to get it excluded, but I don't know -- I don't know what else I

20   can make them do.

21           MR. AYLSTOCK:  Well, Judge, what the witnesses have

22   testified is that the copy review forms are attached to the

23   documents or, you know, they're -- before this Blue system, they

24   were in a file cabinet, but they were all attached, and we had

25   this discussion at the Motion to Compel and, you know, if there

1    -- if they were attached and they're able to be tracked, which

2    they have to be able to be tracked because, in order to put

3    something out there, Legal signs off, Marketing signs off, Risk

4    Management signs.  All of these people have to sign off before

5    it's final.

6        Why can't they produce to us in the format that they clearly

7    have, or have an index for, these are the people that signed off

8    on these things and here's the forms and they're all in one

9    place?

10       To make us go find stuff and then wonder, because what we

11   found didn't have a copy review form attached to it, well, is

12   this final, is it not, and so I asked Mr. Watson, well, here's

13   some more stuff.  You gave me something you said was final and

14   then he's got to -- somehow, somebody in the company was able to

15   look at that and say, oh, yeah, that's final, and I'm sure they

16   did it by looking at some copy review form or something.  So give

17   us that, that your company clearly uses, to know what the final

18   professional education pieces are.

19              THE COURT:  So, Mr. Watson --

20              MR. WATSON:  And, Your Honor --

21              THE COURT:  Yes.  Tell me what's happened.  I think, if

22   I recall, didn't some of these copy review forms get disconnected

23   from other materials and so you've got these review forms, but

24   you don't know which materials they go to and things like that?

25              MR. WATSON:  That --

1    MR. AYLSTOCK:  And you had suggested, you know, Mr.

2    Watson put them together for us.

3    THE COURT:  Yes.  Why can't you?

4    MR. AYLSTOCK:  And we don't know.

5    THE COURT:  I mean is there no original anywhere or no

6    -- I don't know if these are hard copies, or these are electronic

7    documents, but is there no -- no place where they're together?

8    MR. WATSON:  Your Honor, for the hard copy, I guess we

9    need to divide it before 2009 and after 2009.  After 2009, it's

10   in -- it's electronic.  It's in the GGM Blue database and, as I

11   understand it, there is no actual copy accrual form.  It's, you

12   know, a field essentially that's in the -- in the database.  So I

13   don't think from '09 forward, it's a large problem.

14       I think where the problem comes up is prior to 2009, where

15   they are in hard copy, and for the -- for the copy review files,

16   as I understand it, when you go through each file, some of them

17   have copy review forms and some of them do not and, as you go

18   through each individual file, it's my understanding that just in

19   the way that they've been produced, it's very difficult and, in

20   some cases, can't be done to match them up.

21       So, again, it's a hugely time-intensive task that we have,

22   you know, tried to do our best to match up these copy review

23   forms or to tell them through a chart what the final -- what the

24   final version is.

25   THE COURT:  So if -- the way I picture it, there is

1     this big file cabinet somewhere with all of these various

2     education materials and they're all grouped together when they

3     were used together and with them is a copy review form and what

4     you're telling me is that somehow, these things have all become

5     separated, so they don't exist?  They no longer exist as they

6     used to in that now we don't know what copy review form goes with

7     which group of educational materials?

8              MR. WATSON:  Right.  I think you've got a file for a

9     particular job, whatever -- whatever the piece may be, you've got

10    a file for that and, in some cases, the copy review form is there

11    in that file, in some cases it's not, and it -- for whatever

12    reason, the way that those files are maintained, is essentially

13    how those are missed.

14             THE COURT:  Okay.  Well, I don't know, Mr. Aylstock,

15    what else I can make them do.

16             MS. BAGGETT:  One more point, Your Honor.  This is

17    Renee' Baggett, and Mr. Aylstock can probably elaborate on it,

18    but just because the documents -- these materials were copy

19    reviewed doesn't actually mean they were actually used either.

20    So we have no way to discern that either.

21             THE COURT:  But do the -- does the defendant have a way

22    to discern that?  I hear them saying they don't.

23             MR. WATSON:  Your Honor, that's -- this is Mr. Watson.

24    That's my understanding as well, that it would have to -- the

25    number of people at the company, how can we tell what was in use,

```
1    when it was in use, and what they tell us is we just don't have a
2    way to do that.  We have the copy review files, but beyond that,
3    that's -- that's not something that we can do.
4              MR. AYLSTOCK:  Your Honor, just -- I mean just to play
5    this out, I mean their witnesses, when we say, well, how come the
6    IFU doesn't talk about painful sex?  You know.  You knew back in
7    1998 that it caused painful sex and the regulations require you
8    to warn of everything that you know about or should know about
9    and so how come?  And they say, well, it's in the professional
10   education.
11       And so now we're -- we're in an impossible situation where,
12   one, you know, I've looked at them and they don't -- you know,
13   it's -- generally, they just have a slide with the risks in the
14   label, which are minimal, and then it's just doctors talking or
15   people talking.  So, but how do I -- how do I -- what am I
16   supposed to do to defend that and say, no, it's not in there or
17   this is what was used or what was not used?
18       So they had it and, bear in mind, there were litigation
19   holds in this back in 2004 and 2003.  So they have it in a file
20   cabinet in a way that it could be easily found, was Mr. Lisa's
21   testimony, up until 2009.  It's all in one cabinet file cabinet,
22   he says, and now they have a new database, this Blue database.
23       It's kind of like the SOP issue, where they have a database
24   to figure out all this stuff, that they can go to a terminal.  I
25   said, well, Mr. Lisa, can you -- you know, once the database
```

1    happened, can you go find it?  Oh, yeah, it's easy.  Well, if

2    it's easy, then give us the database and if you destroyed the

3    file cabinet or you put it in a way that now you can't find

4    what's used or not used, then you shouldn't get to make that

5    defense at trial, because it's just not fair.

6              THE COURT:  Well, and that -- and that may be true.

7    That -- that may be -- that may be a motion in limine that you'll

8    want to make or -- you know, I -- I think if you've got a witness

9    saying it's in the professional education information and you've

10   looked through all of it that's been produced and it's not there,

11   I don't see how they're going to claim it was in there.  I mean I

12   don't --

13             MR. AYLSTOCK:  But what they might do, Judge --

14             THE COURT:  It seems like that helps you.

15             MR. AYLSTOCK:  I didn't mean to interrupt.  Sorry.

16             THE COURT:  I mean you've got all the documents.  If

17   it's not in the documents, they've told you these are the

18   documents.  If you've got the documents and that particular risk

19   isn't in there, I mean I don't know why you would want to keep

20   pressing them to try to find something that has the risk in

21   there.  How does that really help you?

22             MR. AYLSTOCK:  Well, I don't think it does, but what I

23   don't want to have happen, Judge, is because they haven't given

24   me a final list and they claim that they can't, that they pull

25   some document out of the nine million pages that was marked

1    something without a copy review form and say, A-ha, it was

2    produced.  I didn't tell you about it and you could have found

3    the needle in the haystack.  I'm just trying to find the needle

4    in the haystack now, as opposed to being surprised at trial with,

5    well, it was in there somewhere.

6         THE COURT:  Well, I mean I -- I don't know what else to

7    do on this one.  I think perhaps if they haven't given you the

8    information, or they've somehow buried that information, that

9    that's going to require a motion later, perhaps a 37(c) motion or

10   something like that, but, you know, I hear them saying they don't

11   -- they've given you everything that they can give to you and

12   they have no other way to match anything up and it doesn't exist

13   anymore in a format where they could actually reconstruct it.

14   They just have to sit down and do the same thing you're doing.

15        I mean I understand your frustration, believe me, because it

16   is a little hard to believe that a corporation would not do a

17   better job of keeping its documents in an orderly fashion but,

18   you know, the reality is, a lot of corporations don't.

19        You know, I don't know what else -- tell me what -- tell me

20   what I could do that would help you, Mr. Aylstock.

21        MR. AYLSTOCK:  Is -- maybe I could ask Mr. Watson, can

22   you produce the entirety of the Blue database?

23        MR. WATSON:  Well, it has materials about many other

24   products, not just the products at issue here, and my

25   understanding is we've produced what's in the Blue database for

 1    these products.  So I'm not sure what else would be in there that

 2    -- that you would want.

 3              MR. AYLSTOCK:  Well, I think the database, the reason

 4    for a database is you can search for stuff because the guy, Mr.

 5    Lisa, said you just go to it, type something in and, you know,

 6    maybe -- maybe a site visit where we can go poke around in the

 7    Blue database or something, but I mean I guess maybe it's just an

 8    issue for a motion later, but I'm just trying to avoid that, if I

 9    can.

10              THE COURT:  Well, is the problem with what you've

11    gotten from the database or is it with what you've gotten that

12    pre-dates the database?  I thought the problem was with the

13    pre-2009 documentation.

14              MR. AYLSTOCK:  It's both because even -- yeah, they've

15    produced stuff out of the database, but it's still not the copy

16    review forms.  Even post-2009 aren't attached to anything.

17              THE COURT:  But he says there were no copy review

18    forms.

19              MR. WATSON:  That's correct, Your Honor.  2009 forward,

20    there are no copy review forms, is my understanding, and it's

21    just a -- you know, essentially a field in the database where the

22    approval is given.  It's done electronically instead of in paper

23    form.

24              THE COURT:  So when you produced the physician

25    education materials from the database, did you include that field

1    that shows when the approval was done or that the approval was

2    done?

3              MR. WATSON:  Your Honor, I have not personally looked

4    at that, but I can certainly verify that.

5              THE COURT:  Yes.  Why don't you check that, because I

6    don't know what the field shows, if it shows who approved it, the

7    date it was approved, just that it was approved, but it seems

8    like that would be information that Mr. Aylstock ought to be

9    given if it's available to you.

10             MR. AYLSTOCK:  If it has,

11             MR. WATSON:  Yes.

12             MR. AYLSTOCK:  -- then I haven't seen it and I've

13   looked.  That doesn't mean I'm perfect to search it, but I

14   certainly have looked, and I haven't seen it.

15             THE COURT:  Okay.

16             MR. WATSON:  There may just be a disconnect that either

17   side doesn't know perhaps what it's looking at.  So we can

18   certainly verify that and, if not, give it to them.

19             THE COURT:  All right.  Let's do that.

20        All right.  Are there any other issues?  We still have some

21   time.

22             MR. AYLSTOCK:  Yes, Your Honor.

23             THE COURT:  All right.

24             MR. AYLSTOCK:  On the sales rep, I think Ms. Baggett

25   was going to just briefly give the Court an update on a couple of

```
 1    issues.
 2              THE COURT:  Certainly.
 3              MS. BAGGETT:  Yes, Your Honor.  This is Renee' Baggett.
 4    We had a meeting, a meet-and-confer, last week with the defendant
 5    at the same time we discussed the hernia production issues and,
 6    at that time, we were -- that was last Thursday and our brief
 7    would have been done -- due on Friday.  So I called the Court and
 8    requested a week extension because we had -- based on our call,
 9    we had thought up a way of addressing the issues.  The parties
10    agreed that we might -- could do a stipulation as to certain
11    matters in lieu of doing the brief.
12        We sent down the stipulation this past Wednesday and
13    requested a telephone conference as well to discuss this so that
14    we could avoid having to file the brief to this date, but we have
15    not heard back from them on that.  So, I -- as I said, our brief
16    is due today, so I guess that's what we're going to be doing, is
17    filing the brief.
18              THE COURT:  Well, let's -- before you rush to file it
19    today, I'll give you some extra time, but let's find out what has
20    happened with the stipulation.
21              MR. WATSON:  Yes, Your Honor.  We received it Wednesday
22    afternoon and we have sent it on to our client to review, but
23    since Wednesday afternoon, we unfortunately just have not had a
24    chance to sit down and talk with them about that to make sure
25    that they are okay with it, but we can do that in short order
```

```
 1    and, if we do have any problems, we can certainly highlight them
 2    quickly.
 3              THE COURT:  All right.  We've got to get moving on some
 4    of these things.  You know, it seems to --
 5              MR. WALKER:  This is Eric Walker.  I hate to interrupt
 6    and I apologize.  Beyond what their client might object to, are
 7    there attorney objections to the stipulation, because I assume
 8    the attorneys have looked at it.  I'm just trying to figure out
 9    what I can do.
10        I'm the one who wrote the stipulation and will be handling
11    the motion, this is Eric Walker, and if there are attorney
12    problems with it beyond just the client saying, you know, we
13    can't do this for logistical reasons or something, I would like
14    to hear those, if we could.
15              MR. WATSON:  Well, I think one of my issues, Eric, was
16    the broad paragraph in there that says that essentially, once we
17    get past the bellwethers, we do a rolling production after we get
18    those, maybe a hundred at a time or something along those lines,
19    and I think we're concerned about the breadth on that.
20              MR. WALKER:  Well, I mean, you know, here's -- here are
21    my issues, if I can have just a few minutes, Judge.
22        To me, the sales representative documents are among the most
23    important in any of these litigations, just based on my
24    experience in these, and it's really not based on the sales rep
25    note that involve a particular bellwether doctor.  It's based on
```

what they reveal about what the company knew and what the company

did.

I mean I can tell you, having done a number of these, that

what happens is, if we come up with a document from a sales

representative who called on a doctor who said, you know, this

risk isn't great.  This benefit is wonderful and, of course, it's

all un-improved, it's inconsistent with the label, blah, blah,

blah, we hear the claim, well, that's a renegade sales rep.  It's

something that is way beyond what we authorized, but when you

actually look at the notes from the other sales representative,

you see that that's essentially a company policy.

So what we -- what is proposed is a very -- you know, I'm

happy to negotiate with them on a means of limiting the burden on

them, but we really do think that the rep notes from people other

than the doctors who are involved in the bellwether cases are

critical in this regard.

Plus, we can't seem to get notes and information from the

reps who called on the bellwether documents.  There seems to be

missing documents.  In some instances, you know, thousands of

pages of missing documents.  So that's kind of where we're at.

But in the end, this litigation largely boils down to what

the company's policy was.  Certainly, to prove punitive damages

claims and negligence, we have to show not just that some sales

rep said something, because they will claim that's not something

they authorized, but what the company did, and we need more than

1    just the notes that involved the bellwether doctors and I'm happy

2    to work with them on a way we can have a rolling production that

3    minimizes the burden to them, but the notion that the call notes

4    that are relevant are only those call notes related to the few

5    doctors involved in the bellwether cases, if we can even get

6    those which, so far, we haven't been able to, that's not the call

7    notes that are relevant.  It is the call notes of the doctors as

8    a whole.

9            THE COURT:  All right.  Well, let me ask, is it Mr.

10   Watson who is handling this one as well?

11           MR. WATSON:  I think so, Your Honor.

12           THE COURT:  All right.  Mr. Watson, when are you --

13   when will you be able to get a definitive answer from your client

14   as to the stipulation?

15           MR. WATSON:  I can give it to them on Monday.

16           THE COURT:  Monday?

17           MR. WATSON:  Monday, Your Honor.

18           THE COURT:  All right.  And let's do this.  When you

19   hear from your client, why don't you contact Mr. Walker and have

20   a telephone conversation about what needs to be tweaked or

21   changed or negotiated so you can get moving on it.

22           MR. WATSON:  Certainly.

23           THE COURT:  And then -- all right.  And then, Ms.

24   Baggett, let's assume you get a response from them, a definitive

25   response on Monday as to -- as to what they're willing to do and

1    you disagree with it and you want to file a brief.  How many days

2    after Monday will you need to get your brief finished?

3              MS. BAGGETT:  I'll defer back to Mr. Walker since he's

4    --

5              MR. WALKER:  Within two days, Your Honor.

6              THE COURT:  Two days?  All right.  So I'll just, at

7    this point, give you an extension until Wednesday to get your

8    brief done, assuming you hear what you need to hear on Monday.

9              MR. WALKER:  Thank you, Your Honor.

10             THE COURT:  No matter what --

11             MS. BAGGETT:  Thank you.

12             THE COURT:  Yes.  You can have two days to file a

13   brief.  That's not very long at all.  So --

14             MS. BAGGETT:  Thank you.

15             THE COURT:  Okay.  And, Mr. Watson, let's get some

16   response to them on Monday.

17             MR. WATSON:  Yes, Your Honor.

18             THE COURT:  All right.  What else do we have?

19             MS. BAGGETT:  Well, real quick, before we move on to

20   the other topic, I just also wanted to give you a heads up that

21   probably today or -- or on Monday, at the latest, we're going to

22   be filing a motion regarding some privilege issues.  Certainly,

23   we have some issues with some of the documents that have been

24   determined to be privileged, but that's coming next, either today

25   or Monday.

```
1              THE COURT:  Okay.

2              MR. WATSON:  The same day.

3              THE COURT:  All right.  Well, I'll look for that.

4              MR. WATSON:  Yes, Your Honor.  We've met and conferred

5    extensively on that.  I think there are five or so documents that

6    were on each challenge.

7              THE COURT:  Okay.  Well, that should be fairly easy

8    then.  Five is a lot better than 500.

9         Okay, what else?

10             MR. AYLSTOCK:  Your Honor, this is -- this is Bryan

11   again.  If I could introduce Ben Anderson, I think you probably

12   know him from the many hearings, but he's handling a lot of the

13   case -- or the experts related to degradation and defective

14   product.  So he had some issues and follow-up to some of those

15   other slides and study materials we brought up in the Motion to

16   Compel a few weeks back.

17             THE COURT:  All right.

18             MR. ANDERSON:  Yes.  Hello, Your Honor.  I took the

19   deposition of Dan Berkeley back in May and he was the one who had

20   conducted a seven-year degradation study and it was the only

21   study that had ever been conducted by Ethicon per his testimony

22   and, as you know, whether or not the polypropylene degrades in a

23   woman's pelvis is a huge point of contention in all of these

24   cases and so, being the only one that had ever done a study, and

25   the only degradation study, we had extensive deposition testimony
```

1    over that.

2         And I asked him about the study itself, which was just a

3    report, and in doing the report, he -- they did FBM, or high

4    magnification photographs of the materials, and I asked him if he

5    still had those and he said yes.  And I said, "Where are they",

6    and he said, "Tower 109."  And I said, "Is that somewhere you go

7    every day", and he said, "Virtually every day."

8         I asked him where the back-up was for the testing that was

9    done in order to determine that there was, in fact, degradation

10   and he said, "It's in the same place", and so I told counsel, Mr.

11   Paul Davis, I said, "I'm not -- I don't believe this has been

12   produced and I would ask that all of these things be produced."

13        And, at one of the breaks, he said, "I've already, you know,

14   contacted my client and we should be able to tell you where those

15   are and whichever ones have not been produced, we'll be able to,

16   you know, get those produced to you."  I said, "That sounds

17   great."

18        I followed up with him with an e-mail in May and listed the

19   parts of the testimony and everything that we had requested and

20   said, "We need this."  I got nothing.

21        I sent him another e-mail.  He sent it up past the powers

22   that be.

23        July rolls around.  On July 2nd, I sent another e-mail to

24   whom I believe might be the powers that be, that being Christy,

25   Donna, William, and I -- I believe Dave Thomas as well, and said,

1    "Guys, you know, time's a wastin'.  I'd really like these

2    materials."  He identified them and he said where they were.  I

3    have gotten nothing back from that.

4         It was the point of -- some of the meet-and-confer and

5    Motion to Compel items that were addressed with Your Honor, I

6    sent another follow-up e-mail after that and I've gotten nothing

7    in that regard.  So I would ask that the defendants do what I

8    asked them do at the deposition that day back in May, and that is

9    to go to the tower where he says they are or have Mr. Berkeley do

10   it and provide us with copies of the FEM photographs, as well as

11   the backup data that I asked for specifically to support their

12   study.

13        They claim that their -- that their polypropylene doesn't

14   degrade in the human body and they used this study, this one

15   study, as their -- as their back-up for that and we should be

16   allowed to look at that and have our experts look at it and we're

17   going on, you know, two, three months now and we have nothing.

18             THE COURT:  Yes.  So I agree.  Where are those

19   materials?

20             MR. WATSON:  Your Honor, this is Ben Watson.  I think I

21   can short circuit most of this.  Mr. Aylstock and I exchanged

22   some e-mails on this earlier this week and I believe Mr. Anderson

23   was copied.  Part of those materials were produced last week, I

24   believe on July 31st, and we have again gone to Mr. Berkeley and

25   he has located, you know, what we think is the rest of the

1    materials and those will be produced today.  So they'll be going

2    out today.

3            THE COURT:  Okay, but, you know, and while that's

4    wonderful that you're getting these things produced, it does seem

5    like it took you a terribly long time to do it.  Why would it

6    take that long, if this man knew exactly where the information

7    was?  It's been, what, two and a half months.

8            MR. WATSON:  Yes, Your Honor.  I agree with that.

9    Unfortunately, I think it was a -- it's not an excuse, but I

10   think it was an internal breakdown on our team and I apologize

11   for that.

12           THE COURT:  Well, we've got to stop with the internal

13   breakdowns because we're not -- we're not moving if there's

14   breakdowns.  It sounds like you guys have a lot of

15   meet-and-confers, so I can't imagine that there's all of --

16   always these huge communication breakdowns.  It just sounds to me

17   like things aren't getting done, for some reason or another.

18   Maybe you're just overwhelmed, I don't know, but that -- that

19   kind of thing, it's just too long.

20           MR. WATSON:  Yes, Your Honor.  I --

21           THE COURT:  I don't want to have to award sanctions.

22   You know, I tend to be a little less inclined to award sanctions,

23   but Judge Stanley trained me that I'm supposed to be awarding

24   these sanctions and she had no fear in doing that and I'm going

25   to have to follow her lead because she was the original

1    magistrate on this case and so that's the -- these cases, and so

2    that's the only fair thing to do.

3         MR. ANDERSON:  And the next issue, Your Honor, and

4    hopefully, those will be produced today and it will be in

5    conformance.  I did not see an e-mail on July 31st, so I was not

6    copied on that and perhaps -- perhaps some of the things have

7    been produced thus far.  I certainly have not seen the issues.

8    So, hopefully, that will remove the issue.  If not, I guess we'll

9    take it up again next week with Your Honor.

10        THE COURT:  Okay.

11        MR. ANDERSON:  The next issue in that regard is also

12   under this area of degradation, is there was an outside company

13   that Johnson & Johnson hired called PA Consulting, who came in in

14   November of 2010 and looked at the issue of erosion with

15   Ethicon's meshes, and they did a very lengthy report that ended

16   up being compiled in June of 2011 and, in that report, their

17   outside consultant, Professor Klosterhalfen, looked at the issue

18   of degradation and it is mentioned in the report and they talked

19   about how the "images on file", that's a quote, "images on file

20   by -- show that there is degradation of fiber."

21        So I asked another witness about that back in June, a Chris

22   Vailhe, about those images and where they were and he said he had

23   seen those images at one point in time and he took something that

24   he believed was in a report over to a lab and showed them to

25   "Bob" in the lab, last name unknown, and he showed them to Bob

1    and Bob said, "No, I don't think that shows degradation."

2         I said, okay, where are those?  I would like to see those.

3    We had asked for these repeatedly in New Jersey and never gotten

4    them and now, in this litigation, we're asking for them and have

5    not gotten them.

6         Now, Mr. Thomas had told me at the bellwether hearing that

7    he was looking into it and then after the Bacca and Holtz

8    (phonetic) depositions last week, he would come back to me on it.

9    I have not yet heard from him, but I know he's been on the road

10   and so I assume it's something he is looking into and hopefully

11   is about to resolve, but again, it's something we need our

12   experts to look at and time's a wastin'.  So, hopefully, Mr.

13   Thomas has got a response for us and can report on that now.

14        THE COURT:  Yes.  Mr. Thomas, you've been way too quiet

15   today anyway.

16        MR. THOMAS:  Well, that's because Mr. Anderson just put

17   me on the spot.  Just to be fair, this was a request that came up

18   at the end of July.  Mr. Anderson and I were in New York for --

19   well, I was in New York for eight days for depositions.  He

20   attended part of them.  I asked for additional time to deal with

21   it while we were in New York.

22        I got back the first of the week and I have made inquiry,

23   made some connections.  I don't have an answer yet.  I hope to

24   have one soon.

25        THE COURT:  All right.  Well, that sounds like a pretty

1    prompt effort on Mr. Thomas's part.  So, hopefully, he'll have

2    something to share with you soon.  If he hasn't gotten back with

3    you by next Friday, then make sure you put that on the list of

4    things we need to talk about.

5              MR. ANDERSON:  Thank you, Your Honor.  I'll do that.

6         The next item on my matter is animal studies and

7    pre-clinical testing, both pathology slides, as well as any

8    tissue blocks or explanted tissue and this came up the first time

9    at a deposition in October of 2012 by their 30(b)(6) and their

10   pre-clinical person, Dr. Thomas Barbolt, and we began asking

11   Ethicon back in October of that year, last year for those.

12        It continued in through December and it continued in through

13   this year, such that we were guided by that when we did our

14   discovery in the MDL to be sure to include it in that, so that

15   anything that would be produced in New Jersey, would also be

16   produced in the MDL and vice versa because we are asking for the

17   exact same thing.

18        As you might anticipate or may already know, Ethicon used

19   their, quote-unquote, "animal studies", or pre-clinical studies,

20   as the basis for making certain claims like, "Bidirectional

21   elasticity incorporates well into the surrounding tissues,

22   doesn't show an intensive inflammatory response, has adequate

23   pore size to allow for tissue ingrowth," and the list goes on.  I

24   won't bore you with them, but they're very important to this

25   litigation because they make certain claims that we have a right

1    to go and verify.

2        So when I put deponents in the chair and I ask them

3    questions about it, it would be awfully nice if we had discovery

4    we've been asking for so that we could have our experts look at

5    the actual pathology slides and look at the mesh with the tissue

6    in it to see if what they are claiming is there, is actually

7    there.

8        And so this has been an ongoing thing and I would like to be

9    able to come to some resolution of it because, even if we have

10    to, say, cut off half of the tissue blocks and then preserve --

11    preserve them and send them through with a chain of custody form,

12    that's fine, but pathology slides should be able to be put into a

13    tube and sent to us.  It's not -- we are not, you know,

14    reinventing the wheel and breaking new ground.  It happens in

15    every litigation and so here we are butting up against, you know,

16    six weeks away from our expert reports or five weeks and I still

17    don't have anything in this regard.

18            THE COURT:  Who can -- who can speak to that?

19            MR. WATSON:  Your Honor, this is Ben Watson.  I think

20    this goes back to the issue we talked about at the hearing a

21    couple of weeks ago.  You know, it's our position that tissue

22    slides just are not something that should be produced.  You know,

23    in many cases, they're many years old.  You know, there are some

24    newer ones and there are some older ones.

25        But at least in our experience, this is something that

1    generally we haven't been asked to do before and, you know, the

2    -- you know, the data says what it says.  The report says what it

3    says, but, you know, to go and actually get the tissue slides and

4    figure out, you know, how they're going to be divided, chain of

5    custody, all of that sort of thing, we think that it's just

6    something that's not necessary.

7              THE COURT:  Well, I --

8              MR. ANDERSON:  But with all due respect, Your Honor --

9              THE COURT:  Yes.

10             MR. ANDERSON:  I've been involved in these litigations

11   for a quarter century and we've been producing slides when I was

12   on the defense end and have received them on the plaintiff's

13   side.

14             THE COURT:  Yes.

15             MR. ANDERSON:  And the whole idea behind pathologists

16   doing the slides is because they don't degrade over time.  They

17   are what they are.  It's a way of taking something and making it

18   stand still in time and they know full well that there's things

19   that we learn from those going back as far as twenty, thirty,

20   fifty years and, certainly, within the last 15 years, H&E

21   staining is H&E staining.  It is what it is.

22             THE COURT:  Right.  Now I hate to interrupt you, but I

23   do, I agree with you.  I think that if you -- if defendant has

24   slides that form the basis of a study, or of a representation, or

25   of marketing, whatever it would be, that the plaintiff has a

1    right to view those slides.

2         I think, as I recall when we discussed this last time, the

3    whole question was about preservation, whether there were, for

4    example, blocks, sufficient blocks that you could make re-cuts,

5    whether there -- there was a way to handle the exchange of this

6    information without it being destroyed or lost or in some way

7    tainted and I thought that's where we left it, was there were

8    going to be some discussions about how this could take place.

9         I mean even if you have to agree on a laboratory somewhere

10   and bring your experts in to look at it all at the same time,

11   there's got to be a way to do this.

12        I did not understand that the defendants had an objection to

13   sharing this information and I don't really -- I don't understand

14   how you could have an objection.  It seems to me that this is a

15   valid -- this is valid information for the plaintiff to be able

16   to discover.

17             MR. WATSON:  Your Honor, this is Ben Watson.  I

18   understand your point and, you know, to move this along, if

19   they'll identify the specific slides or blocks for -- that they

20   -- that they're interested in, then I think we'll be able to work

21   together to find a way to make that happen.

22             MR. ANDERSON:  And we have done that repeatedly and

23   we're happy to send it, the exact same thing again with the exact

24   study that we're asking for, and we will ask for them again, but

25   certainly, we don't want to be in a position, Your Honor, to

1    where they come in at trial and they say, no, we have -- we've

2    done studies and here are the slides, or here's what we saw from

3    those studies, and we don't have a chance to verify those.

4              THE COURT:  Right.

5              MR. ANDERSON:  And so we will identify as many as we

6    see, but also, it's also in the nature of you claim in your -- in

7    this particular warning, or in this particular brochure, animal

8    studies have shown blank.

9         Okay, where are those animal studies and where's the tissue

10   blocks or the samples that support that claim so that we can go

11   out and verify it.  We have that burden and so we would ask that

12   -- I will -- I will send again to Mr. Watson the things that

13   we've been requesting and see if whatever issues they have, that

14   we can tee those up by Monday or Tuesday and, if we don't have

15   resolution, then that will be something that we put also on the

16   agenda for next week.

17        And a related issue is we found out in the deposition just

18   last week that there's actually ex-planted hernia mesh that was

19   sent in to Ethicon and then was sent out to Professor

20   Klosterhalfen for him to review.  The importance of that, of

21   course, Your Honor, is that the same PROLENE hernia mesh that

22   Ethicon made for their hernia repair is the exact same PROLENE

23   hernia mesh that is used in all of the TVT devices.

24        Therefore, if it's doing something untoward in the tissue

25   and it's being sent out to look at because of erosions, or

1    chronic inflammation, or chronic pain, then that's obviously

2    something that we need to discover and determine the relevance of

3    and, when we found out that, that was in complete contrast to

4    other depositions that we had taken, other Quality Affairs people

5    who said, "We never receive explanted mesh at Ethicon.  Never."

6    And so it was a bit eye-popping when I heard that, and so my

7    question then was, counsel, will you agree to produce that,

8    because the witness has said, well, it's not our -- it's not our

9    -- it's not our proffer.  It goes directly to Professor

10   Klosterhalfen and he reports it to us, and I said, yes, but this

11   came to your company first.  You agree that that's just as much

12   your proffer as his, and the witness said, well, of course.

13   So we would ask that included in this would be that any of

14   the hernia mesh -- or hernia mesh explants and any reporting on

15   that that was done by Professor Klosterhalfen, that he, or we, be

16   allowed to access those as well.  So I'm going to put that as

17   part of my request to Mr. Watson.

18   MR. THOMAS:  Your Honor, this is David Thomas.  I was

19   at the deposition last week when that happened.  Those issues

20   were identified.  This is the first time that Mr. Anderson has

21   made a request for any of those samples and just make that clear.

22   This is the first time that that request has been made on the

23   record here today.

24   THE COURT:  Okay.

25   MR. AYLSTOCK:  Judge, this is Bryan Aylstock again.

I'm looking at the transcript from the Motion to Compel hearing and what the Court said is, "What I'd like to do, Ethicon, is within seven days, I want you to check and see if there are materials you have not produced responsive to this request and be copied to the plaintiffs. For items that can't be reproduced, you need to outline what those are and then meet about how to do it," and we still don't have that list.

And the fact that we're learning stuff at a deposition on a list that you ordered to be produced within seven days, it -- we'd like a list of all the pathology materials that -- that you ordered to be produced so then we can figure out what we need and how soon we can get it.

THE COURT: Yes. I think it --

MR. AYLSTOCK: So we did make the request.

THE COURT: I do think that if you have testing and you've got materials from that testing and you made representations based on that testing about these particular products, that you need to figure out what you've got and how that can be shared with the plaintiffs and, apparently, I already said that. So I don't disagree with myself this week. I think you ought to -- you ought to be doing that.

You know, as far as the hernia mesh, I'm not, at this point, prepared to address that because I still am not clear on what we're agreeing to and not agreeing to about the hernia mesh. So I'd like to put that sort of on the back burner, that piece of

1    hernia mesh.

2         Let's talk about and let's get something done on these

3    pathology slides, or tissue blocks, or whatever you have on these

4    pre-clinical studies that Ethicon performed.  So, yeah, we need

5    to get moving on that.

6              MR. AYLSTOCK:  I agree.

7              THE COURT:  I mean they have a right to discover that.

8    It may turn out that it's not admissible.  It may turn out that

9    they can't use it, but I mean discovery is so broad that I don't

10   see how you can think that you wouldn't have to share that.  So

11   let's get it worked out.

12             MR. ANDERSON:  The last topic is very quick, and that

13   is, Your Honor, that our expert, Professor Klinge as well as the

14   expert in Bard and who I just mentioned, Professor Klosterhalfen,

15   they were both consultants to Ethicon on their hernia mesh, as

16   well as on their surgical meshes and looking at things like

17   animal testing and other things.

18        There was a tremendous amount of back-and-forth information

19   that went between the two of them.  In working with Professor

20   Klinge and being a former Ethicon consultant, he has said, "I had

21   lots of -- lots of e-mails that went back and forth and reporting

22   that went back and forth between myself and Professor

23   Klosterhalfen and Ethicon."

24        We have searched the databases.  We find very, very little

25   in terms of communication going back and forth.  And for

1    Professor Klinge, it was over ten years of work and for Professor

2    Klosterhalfen, almost twenty.

3         And so if -- I'm going to make a renewed request that

4    anything between the two of them be produced and/or that they

5    allow whatever confidentiality agreement existed, and there was

6    confidentiality agreements that were signed, that related to any

7    developing products and things like that, that they be allowed to

8    produce them themselves.

9         One way or another, we should be able to get our hands on

10   the information that was flowing between these two world-renowned

11   scientists and Ethicon regarding surgical mesh, not just hernia

12   mesh, but their meshes in tissue that they used to validate a

13   number of things and the claims that they make.  So I just wanted

14   to let Your Honor know that that one was going to be on the table

15   as well.

16             THE COURT:  Well, all right.  We'll have to address

17   that.  I don't -- you know, I don't have the background

18   information on the professor and this other gentleman and what --

19   what kind of connection they had with Ethicon, if there were

20   written contracts, if they were just out there.

21        I mean I don't know that Ethicon even has the e-mails that

22   would have been changed between these two people.  So I

23   definitely would need to have some more background information to

24   know, you know, whether that's something they would have and what

25   right they would have to it.  I don't have that in front of me at

1    this point.  So you may want to --

2              MR. ANDERSON:  Right.

3              THE COURT:  You may want to flush that out some and, I

4    don't know, does anyone on the defendants' side have anything

5    they wish to say about that topic?  It's awfully quiet.  No

6    comments?

7              MR. GAGE:  Your Honor, I -- the only thing I -- this is

8    William Gage.  The only thing that I would say is I didn't -- I

9    wasn't quite sure I understood what Mr. Anderson was saying and I

10   just kind of wanted to get some clarification, if I could, just

11   so that when we look into this issue, we'll know better what he

12   was saying.

13      Was Mr. Anderson saying that based on the MDL document

14   production, and/or New Jersey document production, there's

15   nothing or virtually nothing that constitutes -- are we talking

16   about e-mails from Dr. Klinge and/or Klosterhalfen to an employee

17   of Ethicon?  Is that what you were saying, Ben, was what you were

18   concerned was not present?

19             MR. ANDERSON:  Yeah, William, there are some, but --

20   but they are very limited.  A couple of examples would be the

21   2008 and 2009 Klosterhalfen explant studies, but also, there's

22   e-mail changes or studies that they worked on dating back to the

23   -- back to the 90s in Russia and other places, and I'm not

24   finding a lot of those things in the database and, as you know,

25   I've been at this a pretty long time, for two and a half years,

1     and so we continue to look for things, hoping that they will come

2     up in other production.  They haven't.

3         And so given that you've spoken up, perhaps you and I could

4     talk about this further and see what we could come up with and if

5     we -- if it's not being produced for some reason or you feel it

6     has been produced, then maybe we can figure out a way to address

7     the issue and then, if we can't come to terms on it, then we'll

8     see if we can get some help from Judge Eifert.  How does that

9     sound?

10            MR. GAGE:  I agree.  Let's try to do that on Monday

11    and, certainly, if Dr. Klinge and Klosterhalfen are your experts,

12    then we're going to want to get their computers as well, so we

13    can ourselves get the e-mail tracking with Ethicon.

14            THE COURT:  Yes, that sounds like a good idea because,

15    really, I don't even -- as I said, I mean I'm not sure if Ethicon

16    even was -- had access to this e-mail exchange or these e-mails

17    you're talking about.  So why don't you all talk and then, if you

18    want to raise it next week, just put that on your agendas and

19    we'll talk about it.

20            MR. ANDERSON:  That would be fine.

21            MR. GAGE:  Your Honor, this is William Gage again.

22    Just one final thought that I would have for Your Honor's

23    consideration.  As these calls go forward weekly, and I really

24    like this, because it just -- it gets down to the lick log and

25    let's get this stuff done.

1          Could we request that the parties -- or would Your Honor

2     consider asking the parties to exchange an agenda of just the

3     issues they wish to -- wish to discussing with Your Honor on the

4     Friday call maybe by Wednesday at noon or close of business on

5     Wednesday so that we can ensure that we have a day to go find the

6     appropriate person on our team to be able to respond to whatever

7     that agenda item is?

8          For example, if Mr. Thomas had not been on the call today,

9     we would not have been able to respond to a particular issue.

10    You know, and the composition of who attends the call may change

11    from week to week, but -- but we should, if we can get the agenda

12    just 24 hours or 36 hours in advance, that would let us try to

13    track down more information on that item for the call.

14              THE COURT:  That makes a lot of sense to me.  Why don't

15    you do that.  Why don't we say noon on Wednesday to exchange your

16    agenda items and you don't -- you don't need to send them to me.

17    Just exchange them with each other and that's a good idea.  That

18    will give you a chance to have a little preparation and maybe we

19    can even get more done.

20              MR. GAGE:  Thank you, Your Honor.

21              MR. AYLSTOCK:  That sounds good, Your Honor.

22              MR. WATSON:  Yes, Your Honor.

23              THE COURT:   All right.  Well, I think that we've done

24    a good bit of work today, which is good, and I'm going to just

25    issue an order that talks only about scheduling.  I'm not going

1    to do an order that confirms anything we've discussed here today.

2        I think, if you want orders like that in the future, that we

3    ought to -- you ought to tell me at the time we're having the

4    conference because what I -- what I really plan with these are

5    they're not so much motions and arguments and so forth.  It's

6    just all of us trying to work out these issues and so I was

7    considering these to be a little less formal.

8        Now you will have transcripts, of course, so is that -- does

9    that sound acceptable to everyone?  No orders, really, no formal

10   orders, just discussion and transcripts or --

11            MR. AYLSTOCK:  Yes.

12            THE COURT:  Is that all right for everyone?

13            MR. AYLSTOCK:  Yes, Your Honor.  Bryan Aylstock.

14            THE COURT:  Okay.

15            MR. AYLSTOCK:  I mean, I think in some circumstances,

16   we might ask for one and I think, you know, we'll certainly put

17   that on the record.

18            THE COURT:  All right.  If you do want an order about

19   something specific, let me know, and -- I'm sorry.

20            MR. WALKER:  Your Honor, this is Eric Walker.  I just

21   wanted to add that while I -- you know, on the agenda issue, just

22   in case there is some issue that comes up, you know, where --

23   something comes up where there was an agreement that something

24   would be reached by Wednesday at noon and it hadn't been, maybe

25   there would be an exception to that, just so there's not an

```
 1    absolute rule on that, but generally speaking, everything would
 2    be on an agenda by noon.
 3            THE COURT:  Right.  As I said, my point is to keep
 4    these somewhat informal.
 5            MR. WALKER:  Yes.
 6            THE COURT:  So that we can talk through these things
 7    and try to move forward.  So, yes, if something -- if something
 8    happens Thursday morning that's important and it's not on your
 9    agenda, but you really feel like you need to bring it up, I'm not
10    going to say you can't do that because it wasn't on your agenda.
11    Now you may not get much of an answer from the other side, but at
12    least we can raise the issue and maybe decide where to go with
13    it.
14            MR. WALKER:  Thank you, Your Honor.
15            THE COURT:  All right.  Thank you all.  I appreciate --
16    I really do appreciate all of your cooperation and the fact that
17    you're really trying to work together and I know this is tough.
18    I know there's a lot of material.  You're on a tight schedule.  I
19    understand all that.  So I appreciate the time that you're giving
20    to me and I will talk to you then next week, if not before.
21            MR. AYLSTOCK:  Thank you, Your Honor.
22            THE COURT:  Thank you.
23            MS. BAGGETT:  Thank you.
24            THE COURT:  Bye-bye.
25            MR. WATSON:  Thank you.  Bye.
```

1          (Proceedings concluded at 3:18 p.m., August 8, 2013.)

2

3

4     CERTIFICATION:

5          I, Ayme A. Cochran, Official Court Reporter, certify that

6     the foregoing is a correct transcript from the record of

7     proceedings in the matter of In re:  Ethicon, Inc. Pelvic Repair

8     Systems Product Liability Litigation, MDL Case No. 2:12-MD-2327,

9     as recorded on July 17, 2013 and subsequently transcribed by me.

10

11     s/Ayme A. Cochran, RPR, CRR                August 13, 2013

12     Ayme A. Cochran, RPR, CRR                         DATE

13

14

15

16

17

18

19

20

21

22

23

24

25