IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

AT CHARLESTON


IN RE:  ETHICON PELVIC REPAIR SYSTEM
         PRODUCTS LIABILITY LITIGATION          MDL No.
                                                2:12-MD-2327



                                          August 16, 2013
                                       Huntington, West Virginia



TRANSCRIPT OF TELEPHONIC STATUS CONFERENCE
BEFORE THE HONORABLE CHERYL A. EIFERT
UNITED STATES MAGISTRATE JUDGE


APPEARANCES (by telephone)

For the Plaintiffs:           **BRYAN F. AYLSTOCK, ESQ.**
                              **ERIK WALKER, ESQ.**
                              **BENJAMIN ANDERSON, ESQ.**
                              **PAIGE BOLT, ESQ.**
                              AYLSTOCK WITKIN KREIS & OVERHOLTZ
                              Suite 200
                              17 East Main Street
                              Pensacola, FL  32502

                              **THOMAS P. CARTMELL, ESQ.**
                              WAGSTAFF & CARTMELL, LLP
                              Suite 300
                              4740 Grand Avenue
                              Kansas City, MO  64112

```
For the Defendant:              WILLIAM M. GAGE, ESQ.
                                BENJAMIN M. WATSON, ESQ.
                                GARY RUBIN, ESQ.
                                DONNA B. JACOBS, ESQ.
                                MICHAEL BROWN, ESQ.
                                BUTLER SNOW O'MARA STEVENS &
                                CANNADA, PLLC
                                P. O. Box 6010
                                Ridgeland, MS  39158-6010

                                DAVID B. THOMAS, ESQ.
                                PHILIP J. COMBS, ESQ.
                                THOMAS COMBS & SPANN, PLLC
                                P. O. Box 3824
                                Charleston, WV  25338-3824

Court Reporter:                 TERESA M. RUFFNER, RPR
                                Sidney Christie Federal Building
                                845 Fifth Avenue, Room 101
                                Huntington, WV  25701
                                (304) 528-7583
```

Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription.

1    <u>Friday, August 16, 2013, at 4:02 p.m. in conference room</u>

2              THE COURT:  Now, I don't know if Laura told you, but

3    we are fortunate to have a court reporter here today, Terry

4    Ruffner.  So it is going to be very important that you not

5    speak quickly and that you identify yourselves when you

6    prepare to speak so that she can get everybody's name down and

7    we can keep a clean transcript.  Is that all right?

8              MR. WALKER:  Yes, Your Honor, of course.

9              THE COURT:  All right.

10             MR. WALKER:  This is Erik Walker.

11             THE COURT:  Wonderful.  Well, let's start off, then.

12   Have you all exchanged agendas?

13             MR. AYLSTOCK:  We have, Your Honor.  This is Bryan

14   Aylstock for plaintiffs.

15             THE COURT:  And as I said, I'd like to keep it to

16   one hour today.  So why don't we get started and just work

17   down the agenda.  Who would like to go first?

18             MR. AYLSTOCK:  Judge, this is Bryan Aylstock.  We

19   have -- most of our agenda items, I think, are the same.  So

20   if I could, I'll just maybe start to plow through them.

21             THE COURT:  Absolutely.

22             MR. AYLSTOCK:  The first one that we wanted to, on

23   our agenda, Judge, is the hernia mesh production.  As you may

24   recall, these documents were, separate and apart from the

25   Rule 26 obligations, were requested back in July of last year.

1    So we're now 13 months since we requested documents.  And the

2    hernia mesh documents contain PROLENE mesh and many of --

3    well, pretty much all polypropylene, the same exact material

4    in the TVT products.  And the Prolift products, there's also a

5    hernia mesh called Ultrapro that's the same exact mesh that's

6    in the Prolift+M product.  So we requested those back in July.

7         We've met and conferred extensively since then.  Of

8    course, it was the subject of our motion to compel that was

9    ultimately heard by Your Honor in July.  Since then, we've had

10   additional back and forths.  And as you recall, you had

11   ordered some briefing on it and that there was, I think, two

12   weeks ago from today.

13        All right.  We've exchanged some letters since then,

14   Mr. Gage and I.  I had narrowed the requests to exclude many

15   of our requests for production and then to limit the requests

16   for production on several others.  I sent that e-mail two

17   weeks ago yesterday, I believe, about that.

18        And my understanding -- and I just want to hopefully

19   confirm this, because, you know, it's important that we have

20   these documents -- is that the defendants are amenable to

21   answering fully and completely the RFPs that we had propounded

22   back in July or that -- to include the hernia mesh documents

23   that would be responsive to that.  And I had asked for a

24   stipulation so that we could just get an order from that, and

25   Mr. Gage then followed up with a letter yesterday, you know,

1    seeking some meet and confers as far as order and so forth,

2    because we do have expert reports due in four months.

3        So my understanding is that we do have an agreement

4    including for a stipulated order on that, and I hope that's

5    the case because we've been waiting a long time.

6                THE COURT:  Mr. Gage?

7                MR. GAGE:  Your Honor -- Your Honor, I sent a letter

8    to Mr. Aylstock yesterday.  I actually sent him one two days

9    ago and then I modified it to provide him some additional

10   information yesterday, and we have agreed to produce nine

11   privileged responsive documents for the requests that he --

12   that he pared down.  And those request numbers are -- well,

13   actually the letter that I sent him on August 15 or sent him

14   yesterday actually contains the request numbers to which we do

15   not have to respond.  Those are the ones that Mr. Aylstock has

16   agreed we just don't have to produce anything.  So I have

17   memorialized that in a letter.

18       I have also stated in the letter our position that

19   because we're in the early stages of the hernia mesh

20   litigation and we're still identifying and collecting

21   documents from the various hernia mesh simple sources and

22   custodians, there is still that we do not -- there is still a

23   lot that we don't know about volume, scope, or location of

24   some of these documents.

25               Your Honor may recall the hernia mesh product line is as

1      broad, if not broader in terms of just raw numbers, than the

2      pelvic mesh product line.  I want to say we're looking at, you

3      know, something in excess of eight to ten products.

4      Furthermore, the hernia mesh products have been -- some of

5      them have been on the market, I think it's safe to say, for

6      decades.  So we're talking about a different body and group of

7      documents than we are with regard to the pelvic mesh

8      documents.

9           So we're in the process of ascertaining what's out there.

10     And so in our letter with -- to Mr. Aylstock, we advised him

11     that we want to accommodate his requests as much as possible.

12     We do want to reserve the right to meet and confer with him

13     about specific document requests, sources or custodians if it

14     becomes apparent as we're proceeding with the collection that

15     the costs or burden of the collection may outweigh the

16     relevancy of the data.

17          We also communicated to Mr. Aylstock that we would need

18     his cooperation with regard to the timing of the productions.

19     Obviously, as I just indicated, we're talking about a large

20     number of documents and we're talking about, you know, a

21     significant number of products; and the productions will need

22     to occur in a rolling fashion, as they have occurred in the

23     pelvic mesh litigation.

24          I have invited Mr. Aylstock to speak to us about his

25     specific priorities, and he has sent me an e-mail indicating a

1    relatively small group of documents he wants us to focus on,

2    and we've asked our document-collection people to do that.

3        We have also sent Mr. Aylstock -- I sent him a list of

4    the hernia mesh custodians from whom we think we need to

5    collect documents, some of which have already been collected,

6    some of which have not.  And we've also sent him just a

7    couple -- a few of the general source materials, and we've

8    asked him for his input as to whether he believes additional

9    custodians or additional general sources are some, you know,

10   things that he wants us to look at, because it may be that he

11   has some information from his review of the pelvic mesh

12   documents that causes him to want to go in certain directions.

13       I have also agreed to send -- or I have also offered to

14   send to Mr. Aylstock a list of search terms that we would

15   apply to the litigation.  Your Honor will remember that in the

16   pelvic mesh litigation, you have to have -- you know, you

17   run -- you do an agreed list of search terms, but the problem,

18   you can't use the pelvic mesh litigation search terms I am

19   told because they contain some terms that are unique to pelvic

20   mesh; and, furthermore, they don't contain some terms that are

21   unique to hernia mesh.

22       So we're going to have -- we're going to get him that

23   list; and, in fact, he should have that list -- I hope to get

24   it to him today, but if not today, he'll have it early next

25   week.  So we'll be working with Mr. Aylstock to go through

1    kind of all these nuts and bolts and details, but that's kind

2    of where the status of it is.

3              THE COURT:  It sounds --

4              MR. AYLSTOCK:  Here's -- here's --

5              THE COURT:  Yes --

6              MR. AYLSTOCK:  Go ahead.  I'm sorry.

7              THE COURT:  -- I was going to say it sounds as

8    though you've made a bit of progress.

9         One question I have, my memory was that there were only

10   two hernia mesh products that the request pertained to.  Is

11   that incorrect?

12             MR. AYLSTOCK:  Well, the request pertains to the

13   PROLENE and the Ultrapro.  The hernia mesh products that

14   Ethicon has, they're -- virtually all of their mesh products

15   contain Ultrapro or PROLENE.  Some of them -- you know,

16   Ultrapro is a partially dissolvable.  So it has the

17   polypropylene and then a partially dissolvable component.

18        The meshes that Ethicon makes, the hernia meshes, do

19   contain PROLENE.  There's a PROLENE hernia mesh system and a

20   PROLENE Soft hernia mesh system.  There's also a Proceed mesh

21   that we want to make clear needs to be included because that

22   also contains the PROLENE mesh.

23        And so the meshes that -- the hernia meshes that Ethicon

24   markets do contain the same components as the -- either the

25   Prolift+M or these TVT or Prolift products.  And there's

1   another one called Vicryl, and that's important because that

2   one had some -- and Mr. Anderson can probably speak with

3   greater specificity, but Vicryl also had some characteristics

4   that, you know, with the advances in the science were

5   translated over to the hernia meshes that weren't translated

6   over to the pelvic meshes.

7       So there's that issue, but there's also the issue of

8   timing that I'd really like to address.  And what concerns me

9   about what Mr. Gage said is we're at the beginning stage -- he

10  said we're at the beginning stages of looking at this.  And

11  these requests have been outstanding for 13 months and we've

12  been meeting and conferring on it for at least ten -- nine or

13  ten months.  And if they're just now looking at it on a

14  rolling basis, I don't see how that's going to work.

15      In my e-mail to Mr. Watson now two weeks ago, I indicated

16  that, look, we're happy to give some prioritization, but all

17  of these are priorities.  And what I've learned recently,

18  actually at the following of Mr. Mittenthal's deposition,

19  there was a discussion earlier this week.  Mr. Mittenthal was

20  a 30(b) designee on document retention.  We'll probably talk

21  about that later.  But what was indicated by one of Ethicon's

22  counsel, Mary Ellen Scalera, is that in regards to some of

23  these files, they are self-prioritizing some of what the

24  production is and particularly referring to these what are

25  called CAPA files, Corrective and Preventive Actions claim

1    files.  And what Miss Scalera indicated was that they didn't

2    view that as high priority, so the whole entire file wasn't

3    produced.  And they are high priority because these are some

4    of the most important pieces of -- these are the corrective

5    and preventative action plans when problems, product problems

6    or, in this case, document retention problems were brought to

7    the attention of Ethicon.

8         So this concept of a rolling production, I know the

9    practicality of that may require some roll-out, but what I

10   can't agree to is that we're going to be months and months and

11   months down the road before we get these documents.  They've

12   been requested now for over a year.  They're highly relevant

13   to the litigation, and they need to be produced in very short

14   order, and I do think this requires an order on the production

15   so that there's no confusion up the chain at Ethicon what

16   needs to be produced, because Mr. Gage and I get along well.

17   He's a very, you know, a very good guy.  I like him, but I

18   know he answers to people, and I think it's important that it

19   be in the form of a stipulated order that these things need to

20   be produced.

21        THE COURT:  Mr. Aylstock --

22        MR. AYLSTOCK:  Yes.

23        THE COURT:  -- let me interrupt here.  I understand

24   your rationale as to why the hernia mesh products are relevant

25   to the pelvic mesh, but from a practical standpoint, you're

1    essentially talking about fully discovering two different

2    kinds of mesh in one case, in one multi-district litigation

3    that already has compressed time frames.

4        I'm not certain how you are -- how you believe this can

5    be accomplished in the amount of time you're allowed to do

6    discovery.  I mean this is not -- these are not hernia mesh

7    cases.  These are pelvic mesh cases.  While there may be some

8    relevance in the hernia materials, there has to be some

9    limitations just because there's no other realistic way to get

10   it done on time.  I mean I'm concerned about how far afield

11   you're going with the hernia mesh.

12            MR. AYLSTOCK:  Two points there, Judge.  The first

13   is, I do recognize your -- first, the point, you know, there's

14   only so much time in the day, which is why I cut out -- we cut

15   out dozens of RFPs related to this and then limited some other

16   ones.  So I get that part.

17       But the second point is that these meshes are not

18   different from the pelvic meshes.  In fact, structurally, pore

19   size, the knitting, the weave, it's the same exact mesh; it's

20   just a different application.  And what the testimony has

21   been -- and Mr. Anderson can speak more to this, but what the

22   testimony has been is, we relied on the hernia mesh

23   experiences, because it is the same mesh, when we did -- when

24   we made both product claims and the instructions to the

25   doctors and the patient brochures and to the FDA submissions.

1    We just used whatever we learned in the hernia mesh, because

2    it's the same mesh.  And the claim -- I deposed the chief

3    medical officer, Ramy Mahmoud, and he said, "Oh, yes, those

4    are highly relevant, in fact, because that's exactly what we

5    used.  When we did the bench testing, when we did the animal

6    testing, when we did the clinical, you know, certain clinical

7    statements about how the mesh is absorbed or integrated in the

8    human body, that's based upon hernia experience, or at least

9    some of it is, or a lot of it is."

10        And so I see the point that, you know, it has the

11   potential to really open things up, but when it's the

12   defendants relying on those hernia studies to say this is a

13   safe product or this product integrates well or this product

14   has a minimal inflammatory response, we don't have a choice

15   but to go figure that out, because we don't -- well, number

16   one, we don't think that's true.  But, secondly, in opening

17   statement, Miss Cohen did this, I believe, in the Bard case;

18   there are decades of hernia mesh experience.  That's why this

19   is safe.  That's why we didn't have to do studies.  That's why

20   you should not find this is a defective product.

21        And, you know, it would mean that we could do nothing to

22   refute that very powerful statement, a statement, I think, in

23   the case, in particular, we'll have no problem refuting if we

24   get to the core documents.  And really that's what we're

25   looking for, the core documents, and that's why I limited the

 1    requests.  But --

 2              MR. ANDERSON:  Judge Eifert, this is --

 3              MR. AYLSTOCK:  -- if the defendants can -- can talk

 4    about the hernia mesh experience, we've got to talk about the

 5    hernia mesh experience because that is their defense to why

 6    they didn't do all these other steps.

 7              MR. ANDERSON:  Judge Eifert, this is Ben Anderson,

 8    and if I could real quickly.  The PROLENE mesh that's used in

 9    TVT is the same PROLENE mesh that was used in the hernia.  The

10    Gynemesh PF mesh that was used in the hernia application is

11    also the exact, exact same mesh as is used in the pelvic

12    floor.

13         And in the depositions -- and I've taken most of the

14    science depositions regarding material science, both in the

15    Prolift litigation for New Jersey as well as in the TVT

16    litigation here in the MDL.  Repeatedly the documents talk

17    about the hernia experience, the hernia testing.

18         And in opening statements, Miss Jones got up in our trial

19    in New Jersey and said, "We have 50 years of this.  We have

20    hernia mesh studies," and then they go and they list all the

21    hernia mesh studies.  They talk about all the hernia mesh

22    experience, and they say, "We've had all of these years of

23    experience with this.  It's safe.  It's not defective."

24         It is unfair to us and we have our hands tied behind our

25    back if we can't go and try to refute that.  And right now, we

1      only have limited documents, limited studies where we can go

2      back and trace back where they came up with these claims.  And

3      what we have found time and again is they will state, "We

4      don't need to do biocompatibility risk assessment, we don't

5      need to do this type of testing that's required by the FDA or

6      required by international standards on the pelvic floor meshes

7      because we already did it with the hernia meshes or we did it

8      with our PROLENE suture."

9          So if we are prevented from going back and looking at

10     those and determining, "Well, what testing did you do there,

11     was it appropriate and did it say what you said it does," then

12     we certainly are at a huge disadvantage and we are unfairly

13     prejudiced as a result of that.

14         So if we have these productions, we can at least go in

15     and do targeted searches so that we can try to look at these

16     various claims, because I can't stress enough that they did

17     not create new meshes for the pelvic floor.  They used their

18     hernia meshes.  And they, of course, want to rely on the

19     safety -- at least what they claim to be the safety data and

20     the efficacy data related to hernia.

21             THE COURT:  Okay.

22             MR. ANDERSON:  And they carried that forward into

23     the pelvic floor.

24             THE COURT:  Right.  I understand clearly what it is

25     you're saying.  Is there -- has there been no prior litigation

1   where any of this documentation -- I thought -- I vaguely

2   remember years ago there being hernia mesh litigation.

3            MR. ANDERSON:  The Kugel mesh litigation in Bard,

4   Your Honor.

5            THE COURT:  Oh, so it was just Bard.  There's not

6   been any --

7            MR. ANDERSON:  Yes, ma'am.

8            THE COURT:  -- Ethicon mesh litigation that --

9            MR. GAGE:  Judge, there's not been any consolidated

10   proceedings --

11            THE REPORTER:  Who is this?

12            THE COURT:  Wait.  Who is this?  Mr. Gage?

13            MR. GAGE:  I'm sorry.  This is William Gage.  I'm

14   sorry, Your Honor.

15            THE COURT:  Okay.  Thank you.

16            MR. GAGE:  There have been -- there have been some

17   cases against Ethicon in the hernia mesh states, but they were

18   never -- it was never like a consolidated proceeding.  As far

19   as I know, they didn't -- you know, the numbers were not

20   appreciable, you know, in terms of just the number of cases.

21       Now, there's some cases now that are pending.  I want to

22   say something in the neighborhood of 15 or 20.  And those

23   cases have mostly been filed in the last, you know, eight

24   months, six months, four months, that sort of thing.

25            THE COURT:  Do you have any discovery from these

 1    either concurrent litigation or prior litigation that would

 2    provide some of this documentation?

 3          MR. GAGE:  Judge, you know, we've made it -- we've

 4    made one, if not two productions in some of those other hernia

 5    cases, and that stuff is going to be queued up right off the

 6    bat and given to Mr. Aylstock in the MDL.  And there are

 7    additional ones that we're working on for those other cases

 8    that are likewise coming too.  So everything, you know, we've

 9    produced over there, we're going to produce here.

10          THE COURT:  All right.

11          MR. ANDERSON:  Your Honor, it's Ben Anderson again.

12    The reason that we asked for these at the outset of the MDL

13    was because those of us who had been involved in the New

14    Jersey litigation and we saw what the defense did there, and

15    so we knew that they were going to rely upon countless times

16    in the trial and with their experts the hernia mesh

17    litigation, which is why we began over 14 months ago saying we

18    want all of this, because we knew they were going to rely on

19    it.  And here we are, four weeks, five weeks before our expert

20    reports are due and we're still talking about, "Yes, we're

21    looking into it."  This is -- this is at a -- we're at a huge

22    disadvantage here.

23          THE COURT:  Well, this -- but this goes back to a

24    point that I've tried to make with you all I think for the

25    past three or four months.  I understand that you want to work

1    together, and I think that's wonderful because that reduces my

2    workload.   The problem is, you spend so much time meeting and

3    conferring and nothing seems to get resolved.   By the time you

4    bring it to me, you've got your back against the wall and

5    there's very little that I'm able to do about it because

6    there's only so fast you can produce millions of pages of

7    documents.

8         So, you know, I hear what you're saying.   What I want to

9    know is what is it I can do to help you now.   I understand

10   that you are -- I mean it sounded to me when we started off

11   this topic that you were very close to having everything

12   worked out.   And as we talked further, it sounds like you're

13   really not.   So what is it you want me to do?   How can I help

14   you all?

15        MR. AYLSTOCK:   Judge, this is Bryan Aylstock again.

16   I think we're in agreement that they're going -- that Ethicon

17   will respond to the RFPs as narrowed.   What we would request

18   is that they be ordered to do so so there's no confusion where

19   down the road, you know, "We didn't understand that this was a

20   requirement," number one.   And number two, we'd ask that there

21   be a substantial production of key things that we can

22   certainly identify within the next 30 days and a complete

23   production within the next 60 days such that we can

24   supplement, because it's not just expert reports.

25        We're taking depositions over in Germany in the next few

1   weeks.  We've already taken quite a number of depositions; and

2   a lot of these folks, you know, have -- you know, these

3   documents may be very relevant to the folks we've already

4   deposed.

5       And I do understand that, you know, perhaps we met and

6   conferred and tried to work it out too long, but this was a

7   part of the motion to compel hearing way back when, and you

8   did order briefing on it.  And, you know, we just need to get

9   an order entered so that we all know what the ground rules are

10  with the production of this.

11      And we're happy and we've always worked well with

12  Mr. Gage.  I don't complain about him personally.  If he needs

13  more time on certain things, we've worked it out always.  But

14  without an order, my fear is we're going to hear at some

15  deposition, "Oh, well, we didn't understand that that was a

16  priority.  We just self-prioritized some of the documents so

17  that, you know, you get some of them, but" -- you know,

18  another example is in the New Jersey trial on Prolift, they

19  dumped a whole bunch of documents during the trial.  And we

20  don't want that.

21      We want some end to their searches and their production.

22  If they can't find stuff, they can tell us and then some

23  stipulation that they, you know, they looked and they couldn't

24  find it, but we can't have months and months and months while

25  we're trying to get ready for this first trial.

1          MR. ANDERSON:  Bryan, this is Ben.

2          MR. GAGE:  Your Honor --

3          MR. ANDERSON:  May I just suggest the following,

4    Your Honor:  Maybe -- maybe we could put together a list of

5    the things that we believe are the priorities for hernia mesh

6    and submit them to Your Honor for them to be included in an

7    order.

8          THE COURT:  Now, my understanding was that there

9    already had been a stipulated order of some sort drafted.  Is

10   that right?  I thought we started there.

11         MR. GAGE:  Not entirely.

12         THE COURT:  I thought we started --

13         MR. GAGE:  Not -- I'm sorry.  This is William Gage.

14   Not as to hernia mesh documents, Your Honor.

15         THE COURT:  All right.  So --

16         MR. AYLSTOCK:  I had asked for a stipulation and I

17   had thought that that was going to be okay, but I guess not.

18         THE COURT:  All right.  Well, here's my problem.  I

19   told you guys to brief this several weeks ago.  Nobody briefed

20   anything.  You told me that you had it close to being worked

21   out.  I hear you saying at the beginning of the conversation

22   you are close to working it out; in fact, you've essentially

23   worked it out, you just want to make sure everyone is on the

24   same page.  And now we're ending the conversation by you

25   saying you want me to issue an order based on apparently

1    nothing, because I haven't seen any briefing.  I don't

2    actually know the volume or scope of the production.  I don't

3    think Mr. Gage even knows that yet.

4        I don't know -- I don't have any basis upon which to

5    issue an order.  You know, you're going to have to give me

6    more than what you're giving me here.  I understand you want

7    documents.  I understand you've agreed to what documents are

8    being produced.

9        I heard Mr. Gage say you gave him a list of your

10   priorities and they were working on that.  So I'm not really

11   sure what this order is supposed to say.

12             MR. ANDERSON:  We need some deadlines, Your Honor.

13             THE REPORTER:  Who's that?  Who's speaking?

14             THE COURT:  Is that Mr. Anderson?

15             MR. ANDERSON:  Ben Anderson.  Sorry.  Sorry.

16             MR. AYLSTOCK:  Your Honor, this is Bryan Aylstock

17   again.  Mr. Gage can correct me, but in his letter he did say

18   that they would respond to the requests for production as

19   narrowed, and those are in the letter that we can provide Your

20   Honor that will -- that he will respond to.

21       So the order would simply say Ethicon is ordered to

22   respond to those -- their objection on the hernia mesh is

23   overruled as to those.  They are ordered to respond within "X"

24   days, and we can work -- you know, we can work toward having

25   some deadline in the future, but I don't want it to be, you

1    know, too far down the line.  And what Mr. Anderson said, let

2    me -- let me -- as I'm saying it, I think I have a solution.

3        If we could just have that, Mr. Gage and Mr. Anderson and

4    I should be able to work out a schedule of some key things

5    that could be produced within the next 15 to 30 days.

6            THE COURT:  All right.

7            MR. GAGE:  Your Honor --

8            THE COURT:  Why don't we do this:  Why don't we do

9    this:

10           MR. GAGE:  Your Honor, could I make just a quick

11   statement here?

12           THE COURT:  Is this Mr. Gage?  Mr. Gage?

13           MR. GAGE:  Your Honor -- yes.  I'm sorry.

14           THE COURT:  Okay.

15           MR. GAGE:  Yes, this is Mr. Gage.  Your Honor, you

16   have already correctly identified this particular issue that

17   I'm facing and our client is facing, and so I don't want to be

18   repetitive, but we are clearly -- we clearly want to work with

19   the plaintiffs to identify specific documents that they want

20   us to produce, and we will do our best to identify a time

21   frame in which we can produce them.  But the plaintiffs'

22   requests have to be mindful of the fact that, as we've

23   discussed earlier, for some of these products, we're talking

24   about decades and we're talking about a number of products.

25       And so while I think it would be good for them to give us

1    their prioritization and say here's what we need them to, you

2    know, have us focus on, if they want us to do it very quickly,

3    it's got to be relatively finite.  It can't be, quote, all

4    documents regarding hernia mesh, because it's just a massive

5    amount of stuff, Your Honor.

6              THE COURT:  All right.  Here's what I would like you

7    to do.  I want you to spend up until Tuesday afternoon trying

8    to come together with a stipulated order.  If you can't do it

9    by Tuesday afternoon, then by Wednesday afternoon I'd like you

10   each to submit a proposed order to me, and I will enter one.

11             MR. AYLSTOCK:  Thank you, Judge.

12             THE COURT:  All right.  Let's go on to the next

13   topic.

14             MR. ANDERSON:  There's a subset of that that -- this

15   is Ben Anderson.  I'm sorry.  I will handle sort of 1A as well

16   as 2 and 3, and I know that we're halfway into our allotted

17   time, so I'm going to try to prioritize and triage this as

18   best I can.

19        Part of that order is -- we discussed this last time on

20   the call, and Your Honor said, "Well, let's table it until we

21   discuss hernia a little bit further."

22        Something that came up in the deposition two weeks ago,

23   one of the German Ethicon witnesses, was the fact that

24   Ethicon's outside pathology consultant, Dr. Bernd

25   Klosterhalfen in Germany, had been sent from Ethicon explanted

1    hernia meshes for him to do pathological and histopathological

2    analysis of.

3        We have never seen the reports that he reported back to

4    them on.  And, of course, we would like to -- an opportunity

5    to see whatever slides were taken of the explanted hernia

6    meshes, as well as any tissue.

7        And so what we've proposed to them is we would like to

8    see the slides, and we would like to have one half of the

9    tissue pursuant to a protocol that Mr. Gage and I are working

10   on in a different part of the litigation.  And so I would just

11   ask that this be part of the thing that we're also going to be

12   trying to negotiate and see if we can come up with a

13   stipulated order by Tuesday p.m.  And if not, then we would

14   add that to our proposed order, would be either for us to

15   jointly or for Ethicon unilaterally go to Professor

16   Klosterhalfen and obtain these slides and pathology that they

17   sent to him.

18       So I just wanted to make sure that that was teed up and

19   part of this process.

20           THE COURT:  Mr. Gage, are you the one to respond to

21   that for Ethicon?

22           MR. GAGE:  Judge, on this issue of the Klosterhalfen

23   images --

24           MR. ANDERSON:  I'm talking about the explants, just

25   talking about the explants.

```
 1              MR. GAGE:  I'm sorry.  I'm sorry.  The explants.

 2              MR. ANDERSON:  Yes.

 3              MR. GAGE:  On the issue of the explants, Your Honor,

 4    I think Ben and I talked about this maybe Monday night was

 5    when -- when I personally was aware, made aware of this issue,

 6    and Ben and I talked about it.  And I'm totally relying on

 7    what Ben is telling me.

 8         Ben is telling me that Ethicon apparently sent some

 9    samples to this Dr. Klosterhalfen, who at the time was, I

10    guess, a consultant of Ethicon, and he's now a plaintiff's

11    expert.  He's now a plaintiff's expert against Ethicon.

12         And so I asked Ben I guess Monday or Tuesday, I said,

13    "Well, if he's your expert, what is it that you want, assuming

14    we did send him slides?"

15         I think -- Ben, you correct me if I'm wrong -- you want

16    us to give you permission to let him look at or -- I mean what

17    exactly is it you want him to do with the slides?

18              MR. ANDERSON:  I corrected you that he's not our

19    expert.  Dr. Klinge is our expert.  But, secondly, I just said

20    if he has explanted tissue and slides of that and -- and I

21    also said to you, since he was a consultant and Dr. Klinge,

22    our expert, was a consultant -- both of them were your

23    consultants at Ethicon.  I would ask that all of the

24    communications between them, pathology, tissue samples or

25    whatever, that they be allowed to release those to us and that
```

1   Ethicon not force them into the confidentiality provisions

2   that they signed when they left the company.

3        And one of those things would, of course, be the Ethicon

4   explanted hernia mesh that your client sent to him.

5              MR. GAGE:  Judge, I think -- I think if Mr.

6   Anderson -- this is William Gage.  I think if Mr. Anderson

7   sends me a stipulation or a proposal, we ought to be able to

8   work something out.

9              THE COURT:  Okay.  Now, this is -- but this is where

10  we were last week too, talking about these slides.  And I know

11  these are a more specific category of slides.  So I'd like

12  to -- I'd like to talk about this for just a minute or two.

13       So Dr. Klosterhalfen was a consultant for Ethicon, but

14  he's not a witness in this particular multi-district

15  litigation; is that correct?

16             MR. ANDERSON:  Not in Ethicon as of yet, Your Honor.

17             THE COURT:  All right.

18             MR. ANDERSON:  Dr. Klinge, who was another Ethicon

19  consultant, is our expert.

20             THE COURT:  And Dr. -- Dr. --

21             MR. GAGE:  Dr. Klosterhalfen was named -- this is

22  William Gage.  Dr. Klosterhalfen was named as a plaintiff's

23  expert -- what? -- yesterday in a case that we have in Texas

24  state court; not in the MDL, but in Texas state court.

25             THE COURT:  All right.  So Dr. Klosterhalfen has in

1    his possession slides and tissue blocks pertaining to mesh

2    explants that were sent to him by Ethicon.

3            MR. ANDERSON:  In some instances sent by Ethicon and

4    in other instances sent to him by, you know, institutions,

5    hospitals, other surgeons, etcetera, because one of the things

6    that happened is Dr. Klosterhalfen would send interim analysis

7    of the pathology of Ethicon surgical explants for both the

8    pelvic floor and for hernia, and he did this for years and

9    years.  So what we have is some of the documentation of that,

10   and now what we'd like to get is the actual histopath slides

11   and things like that from him in order to have our experts

12   take a look at that.

13           THE COURT:  Right.  And I have already, I think,

14   made it clear that I believe the plaintiffs are entitled to

15   that, so --

16           MR. GAGE:  Your Honor, yes --

17           THE COURT:  So now -- so we've got all that behind

18   us.  So now the question is, where are you on working out some

19   sort of protocol to have these slides examined or exchanged or

20   to have re-cuts done of tissue blocks, or where are we on

21   that?  Is that what you're currently working on?

22           MR. ANDERSON:  Well --

23           MR. GAGE:  Your Honor -- Your Honor --

24           MR. ANDERSON:  Sorry.  Sorry.  Go ahead, Bill.

25           MR. GAGE:  Please let me respond.  Your Honor,

1    they're two different things.  Functionally they're the same,

2    but there's an important distinction.

3         Your Honor may recall that Mr. Anderson asked last week

4    for the -- for us to provide him with a list of the studies

5    that might have tissue slides or tissue blocks.  And we have

6    been contacting a number of people, and we've prepared that

7    list in accordance with Your Honor's directive, and we sent it

8    to Mr. Anderson a day or two ago.

9         Now, those are slides that are in -- slides and tissue

10   blocks that are in our custody and possession and control.  So

11   I just wanted Your Honor to understand that that -- that was

12   a -- that's a much larger task.  There's about 32 different

13   studies.  We have -- we have given all that information to

14   Mr. Anderson.

15        The issue about the slides or the explants that are in

16   the possession of Dr. Klosterhalfen, it still relates to

17   slides and explants, but these are slides and explants that

18   are not in our possession, custody, and, I suppose, not even

19   in our control.

20        And so what Mr. Anderson has asked us to do, he is saying

21   that he's concerned that Dr. Klosterhalfen would not be able

22   to release the explants that Ethicon sent him because of

23   perhaps some sort of a confidentiality agreement that would

24   prohibit him from doing that.

25        I assume he's had conversations with Dr. Klosterhalfen.

```
 1    Maybe he hasn't.  He's certainly --
 2              MR. ANDERSON:  I have not.
 3              MR. GAGE:  Okay.  He's certainly a plaintiff's
 4    expert, and so that issue was something that Ben and I had
 5    been e-mailing about a couple of times this week and I
 6    promised him that I would get on that and get moving on that,
 7    but -- so I just wanted Your Honor to understand the
 8    difference between the two and the activity that's taken place
 9    on those two issues.
10              THE COURT:  Right.
11              MR. ANDERSON:  So if I could respond -- this is Ben
12    Anderson -- to respond to your direct question, Your Honor,
13    you asked about the slides and the tissue blocks.  There's two
14    different sets, internal and external.  And the internal, yes,
15    he did submit a list of 32 studies.  And what I did was I
16    prioritized, based upon his request and our call last week,
17    which ones we wanted first and which ones could come second.
18    And I identified seven that we wanted the slides and the
19    tissue samples from.  And those happened to be seven that I've
20    been requesting since October of 2012.
21         And so hopefully there will be some very quick movement
22    on getting these things that I have been requesting for almost
23    a year.  And so I have identified those and, pursuant to
24    defendant's request, prioritized those.  So those are the
25    internal ones that hopefully we have an agreement on, and I
```

will find out by Tuesday when and whether they're going to
produce those things, those being pathology slides as well as
explanted mesh and tissue as they exist.

The external, there's also the same type of information
that had -- that is housed by Dr. Klosterhalfen.  And so we
believe that we should be entitled to look at those things as
well.  Both he and Dr. Klinge had internal communications with
Ethicon regarding their surgical meshes, regarding pathology,
animal studies, etcetera.  We believe we should be entitled to
that and that they should lift any sort of confidentiality or
non-disclosure so that we could obtain those.

Those are the two issues.  Hopefully we can get those
resolved by Tuesday.  If not, we will bring that to Your
Honor.

THE COURT:  Yes.  And, you know, what concerns me a
little bit with Dr. Klosterhalfen is the sort of chain of
custody issue, because if he's gotten some of these things
from Ethicon, some from outside sources, a consultant on the
one hand for Ethicon and now he's testifying against Ethicon
in another case, I think you really, when you're working this
out, need to figure out the best way to handle cataloging and
controlling what he has, because otherwise you're going to
have a mess as far as, you know, what he's got and where it
came from and how useful it will be.

MR. ANDERSON:  Yes.

1          MR. GAGE:  And, Your Honor --

2          MR. ANDERSON:  This is Ben Anderson, and I'll just

3    tell you he has the largest pathology center in Germany.  He

4    has been doing this for 30 years, and he was their consultant,

5    keeping up with all of the various explanted materials as they

6    would go back and forth.  We have some of his interim analyses

7    that he sent in.  So he, in fact, did it.  He is a pathologist

8    that they relied upon for a long time.  And if there were any

9    chain of custody issues, we, of course, would have to deal

10   with those as they came along.  But first we'd like to just

11   have access to them and have them produced.

12         THE COURT:  Did you say you're going to Germany next

13   week?

14         MR. AYLSTOCK:  The third week -- three weeks --

15         MR. ANDERSON:  Some of our friends are going over

16   there.

17         THE COURT:  Well, you know, that might not be a bad

18   time to -- I don't know; that may be too late -- but to get

19   the slides or get whatever it is you're going to get from him,

20   and, you know, maybe you can each send somebody to his

21   laboratory and pick some of these things up, because I don't

22   know.  It just -- well, that's all beside the point.  But that

23   sort of -- that sort of concerns me as to what you're actually

24   going to get and how you're going to get it, but --

25         MR. ANDERSON:  So, William, you and I should talk

1    about that.  That's a great idea.

2              THE COURT:  Yeah, you --

3              MR. GAGE:  And, Your Honor, this is -- this is

4    William Gage.  I'm also very concerned about what I don't know

5    and what I can't find out; i.e. --

6              THE COURT:  Right.

7              MR. GAGE:  -- now that he's a plaintiff's expert, I

8    can't talk to him, I can't work with him.  I don't know what

9    it is we sent him.  I'm totally relying on -- well, I

10   shouldn't say I'm totally relying on Ben.  I trust Ben.  Ben

11   wouldn't make a statement unless it was a true statement, but

12   I don't have the independent -- you know, I can't just pick up

13   a phone and call a person and say, "Hey, give me the list of

14   everything we gave Klosterhalfen," etcetera.

15        It is a very, very difficult situation for us to manage,

16   both because of the lapse of time and just the difficulties

17   associated with guys over in Germany and such who are no

18   longer our consultants and are now -- you know, if you want to

19   call them enemies of a sort, they are in terms of being an

20   expert.

21        So I just -- I would ask for Your Honor's indulgence as I

22   try to work with Ben.  The bottom line is, we want to try to

23   find a solution, but as a lawyer who's trying to protect the

24   interests of my clint, on this one I feel like I've got one

25   and a half hands tied behind my back because I really don't

1    know what to do.  But I will pledge to Your Honor cooperation

2    with Ben.  Ben and I work well together, and we will try to

3    come to some solution as quickly as we can.

4            THE COURT:  Yes.  Okay.  Well, you know, that may be

5    one that you want to make a joint trip to Dr. Klosterhalfen's

6    laboratory and both be there and both see what he has and sort

7    of catalog it and figure out how you're going to share it, but

8    that's up to you.

9            MR. ANDERSON:  Okay.

10           THE COURT:  So I will rely on you two to try to work

11   that out.  We are on the same page, that the plaintiffs have a

12   right to see these slides, these tissue blocks, whatever.  So

13   I'm going to rely on you to figure out the best way to share

14   this.

15           MR. ANDERSON:  Thank you, Your Honor.  The next

16   order, just to keep everything on our agenda, is something we

17   talked about last week.  At the deposition of Dan Berkeley, an

18   Ethicon material scientist, in May we started talking about

19   their one and only seven-year degradation study of their

20   sutures.  We had asked in May, July and again in August for

21   the follow-up to that.

22       Mr. Watson produced two separate things in an effort to

23   give us all of that data that we've been requesting.  It came

24   in, and it's only partially there.  I have listed out the

25   three major things that are still not included in that, and I

1  put that in my e-mail to all the defense counsel.  And if --

2  we need to get some agreement on this because it is a very,

3  very important study, and there are some very important things

4  that are either missing, or if they can direct me to some

5  other place in the database where it exists, I'm happy to go

6  look there, if they'll show -- show me those documents.  But

7  we have looked for them.  We don't see them.  And so I would

8  just say that that's another thing that if we can't get some

9  movement on by Tuesday -- we've been asking for this for

10  months, and our experts need to see it, and we want to include

11  that in a stipulated order as well.

12       That's the seven-year dog degradation study.

13         THE COURT:  Mr. Gage or Mr. Watson, anyone want to

14  comment on that?

15         MR. GAGE:  Your Honor, I asked -- when Ben and I had

16  a conversation this past Monday night, I told -- I told him to

17  send me a single e-mail with every single thing that he wants,

18  everything, and he obliged.  He sent it to me Thursday,

19  just -- well, no, I guess it was before Thursday.  Maybe it

20  was Wednesday.  But he sent me the full e-mail, and we got

21  everything here, and there are probably something in the

22  neighborhood of about 15 or 20 requests, and we are -- we've

23  got a team of people who are devoting attention to every one

24  of them.

25       So we're just -- I'm doing everything in my power to get

1    this done as quickly as possible.

2              MR. ANDERSON:  There's actually three categories.

3    This is Ben again.  There's three categories.  One was the

4    tissue and mesh specimens.  We just talked about that.  The

5    next one was the dog degradation study.  We talked about that.

6         The next was the Klosterhalfen information.  We talked

7    about that.  And the last thing is the PA Consulting

8    Klosterhalfen images, and we're about to talk about that.  So

9    it's not 15 or 20 or 30.  It's four major areas, and we've

10   just covered three of them.

11             THE COURT:  What I would suggest, Mr. Gage, is that

12   as you're working to respond to these things, to keep

13   Mr. Anderson up to date on where you are so that he realizes

14   and appreciates that you are actually moving forward.

15        It might require you to have more contact with him, maybe

16   every other day, and not that you necessarily have to have

17   something to hand to him, but I think he might feel a greater

18   sense of security if he knows that you're actually working on

19   it.

20             MR. GAGE:  That's a great idea, Judge.  And just so

21   you know, Ben and I, I think, have talked every day since last

22   Friday, and I believe -- and certainly we've been e-mailing

23   each other constantly.  So, you know --

24             MR. ANDERSON:  I talk to him more than I talk to my

25   wife.

```
 1              MR. GAGE:  He and I have been working very closely
 2    together on this, Judge.  I think -- I think --
 3              MR. ANDERSON:  Hopefully by Tuesday we'll have some
 4    good movement on these fronts.
 5              THE COURT:  Yes, I want you --
 6              MR. GAGE:  And, Your Honor --
 7              THE COURT:  I want you to talk to each other more
 8    than you talk to your wives.  So let's keep on with that.
 9              UNIDENTIFIED SPEAKER:  Is that on the record?
10              THE COURT:  Let me -- everything is on the record.
11              UNIDENTIFIED SPEAKER:  Would it not be in an order?
12              THE COURT:  Let me say this.  We're 48 minutes into
13    the conference and the defendants haven't been permitted to
14    say anything that's on their agenda.  So I think in the
15    future, we might alternate.  We'll let the plaintiffs start
16    with one and then we'll alternate to the defendant.  But at
17    this point, let me ask -- I understand, Mr. Anderson, you
18    still have one last issue.  I think I know what it is.  It
19    sounds like you're moving on this.
20        Let me ask the defendants what do they have on their
21    agenda?  Because they only have about 12 minutes left to talk.
22              MR. GAGE:  Judge, the primary things that we've put
23    on our agenda were simply to just advise the Court of the
24    status of progress in the last week on certain issues, and
25    we've touched on a number of these things.
```

1          THE COURT:  Okay.

2          MR. GAGE:  In other words, we have some things that,

3     in terms of documents, that we think we need from the

4     plaintiffs, but we're -- in the meet -- we want to exhaust the

5     meet-and-confer route before we put them on this agenda and

6     bring them to Your Honor's attention.

7          THE COURT:  So we're going to go back, then, to

8     Dr. Klosterhalfen; is that right?  Mr. Anderson?

9          MR. ANDERSON:  Well, I think that in the interest of

10    time, Bryan, why don't you -- why don't you jump in and either

11    cover, you know, something -- 4 through 6 or something?

12         MR. AYLSTOCK:  Yeah, and I'll probably have Tom talk

13    about that we have had some custodial file production issues,

14    and in particular to the German trip that's coming up in the

15    next three weeks, there's a Dr. Trzewik that we're waiting to

16    see if there's a custodial file.

17         And just so you know, Judge, I think we've taken 31

18    depositions so far, and about a third of them we either don't

19    have -- the custodial file is gone, missing, destroyed, at

20    least confirmed destroyed in some cases and/or there's about a

21    hundred documents or less.

22         And we did take a deposition on Tuesday of a

23    Mr. Mittenthal, who's a 30(b)(6), on document production

24    issues and custodian -- you know, what's going on with these

25    custodial files that are missing and gone, because there's

1    been litigation, hold letters in place since 2002, and we're

2    hoping to get in that deposition.  Unfortunately, it did not

3    finish because we had requested some files related to this

4    CAPA, the Corrective and Preventive Actions plan, as well as

5    some notes, and so we're waiting on a date so that we can

6    finish that, but -- and I know my time is short, so maybe I'll

7    just sum it up like this.

8         We are hoping to have a deposition and complete that

9    deposition that's in coordination with New Jersey within the

10   next three weeks.  We asked for it and sent a notice back in

11   May and it was moved twice at the defendant's request since

12   then.  And we'd like to finish that deposition.  But in

13   advance of that, it would be helpful to us if the defendants

14   could tell us which of the remaining witnesses don't have

15   custodial files or have custodial file spoliation or missing

16   file issues so that we can go ahead and have Mr. Mittenthal

17   talk to us about all of those, because, you know, we're going

18   to be filing a motion for spoliation of these documents.  So

19   we want to do it all in one motion.

20             MR. GAGE:  Your Honor, this is William Gage.  I was

21   just talking to Ben, with Ben Watson here on my scene.  And,

22   Ben, am I correct that you just told me that we have provided

23   such a list?

24             MR. WATSON:  Yeah, at Mr. Mittenthal's deposition

25   we provided a list of the custodians and the document count

1    for each custodian.  You know, obviously somehow it's more

2    than others.  Sometimes none.  So I think that list is

3    certainly a starting point for the conversation that

4    Mr. Aylstock is talking about.  And, you know, we can

5    certainly go down that list and talk with him about any

6    concerns that he has.

7            THE REPORTER:  I'm having a hard time hearing you,

8    Mr. Watson.

9            MR. GAGE:  I apologize, Your Honor.  I'll get close

10   to the phone.  We've provided a list in connection with

11   Mr. Mittenthal's deposition earlier this week that lists all

12   of the 200-and-something custodians, I believe, that -- and it

13   gives a document count for each custodian; in other words, how

14   many responsive documents were produced for each custodian.

15   And, obviously, some of them were zero.

16      So I think what Mr. Aylstock -- what it sounds like

17   Mr. Aylstock is talking about, he wants to essentially note

18   for the universe, and I think that document gives what he is

19   asking for and would be glad to have a conversation with him

20   over that or anybody if he has any concerns about and wants to

21   talk about it.

22           MR. ANDERSON:  This is Ben Anderson.  Really

23   quickly.  Not the universe.  I just want to talk about one

24   planet, and that is we have a critical deposition in three

25   weeks in Hamburg, Germany of Dr. Juergen, J-u-e-r-g-e-n,

1    Trzewik.  The last name is spelled T-r-z-e-w-i-k.  He is a

2    critical science witness.  We're three weeks away, and we

3    don't have a custodial file for him.

4         So we need to have an answer on that, please, yesterday

5    as to what's going on.  He is a very, very important witness

6    in this litigation, and I can't believe we don't have a

7    custodial file.

8              MR. GAGE:  And let me just mention one thing.  I

9    think the custodial files are to be produced -- what? -- we

10   agreed 14 days in advance of the depo?

11             MR. CARTMELL:  I think that's the employment files,

12   not the -- this is Mr. Cartmell.  This is Tom Cartmell.

13   William, I think that is the employee files, not the custodial

14   files.  That's my understanding.

15             MR. ANDERSON:  Correct.  That's correct.  This is

16   Ben.  You're right, Tom.

17             MR. AYLSTOCK:  And I think this may be getting back

18   to my concern -- again, this is Bryan Aylstock -- from the

19   last call, that the documents continue to roll in way after

20   the fact.  And when we had our motion to compel hearing way

21   back when, we went through, you know, in painstaking detail,

22   as Your Honor knows, all of the requests for production.  And

23   you asked Mr. Watson, "Are you holding anything back?  Are

24   you -- you know, based upon the scope objection?"

25        "No, Judge, we're producing it all."  And if, in fact, we

1    have to request -- it's just a lot of this stuff does relate

2    to more than one witness, even though it's in a custodial

3    file.  So it really -- particularly when a third of them, of

4    the depos we've taken, don't have custodial files or there's

5    serious spoliation issues, so --

6            MR. WALKER:  Judge, this is Erik Walker.  How about

7    resolving this issue on the German doctor real quick?

8            MR. ANDERSON:  Yes.  Yes.

9            THE COURT:  Who is speaking?

10           MR. WALKER:  I'm sorry.  Erik Walker.  You know, I

11   know that these issues all dovetail together, but it sounds

12   like there's some urgency on the German doctor.  And, again,

13   Your Honor, I'm new.  I was on the first call last week.  But

14   it sounds like there's some urgency on this German doctor, and

15   that really needs to be taken care of right away.

16       And so in addition to, you know, maybe talking some more

17   about what is going on generally in discovery, we need to get

18   this German doctor taken care of right away.

19           MR. GAGE:  Your Honor, this is William Gage.  If I

20   may make one statement, I have spent virtually the entire week

21   in constant e-mail communication with the plaintiffs, and I

22   have said every single day, "I'm doing everything in my power.

23   Please identify for me all of your issues."  And I have been

24   sent tons of e-mails.  "I want this document.  I want a signed

25   copy of this," etcetera.  No one has raised this particular

1    issue with me.

2        Now, I'm not saying we're not at fault.  If there's a

3    deadline and we've missed it, then I apologize and we'll

4    correct it, but I can't respond -- if it's that important, if

5    it's so critical, why didn't either one of you send me an

6    e-mail today?

7            MR. ANDERSON:  There was an e-mail sent to you.

8    This is Ben Anderson.  There was an e-mail sent.  And not

9    everything flows through you, William, because Ben Watson has

10   handled a number of things, and Andy Faes on our side handles

11   things.  Just like you have a dozen, 15, 20 people on your

12   side, we do on our side as well, and different people wear

13   different hats.

14       And when we noticed that there was no custodial file for

15   Juergen Trzewik, we went through the channels that we've been

16   going through for months and months; and that was, "Please let

17   us know why there's not been a custodial file.  And if there

18   was, please tell us where it is."

19           THE COURT:  Wait.  Mr. Anderson, let me interrupt

20   here.  These conferences are not opportunities for you people

21   to bicker at each other, and I'm not going to waste an hour of

22   my time listening to you bicker and complain about the other

23   party.  What we're --

24           MR. ANDERSON:  I apologize, Your Honor.

25           THE COURT:  What we're here to do is try to resolve

1    problems, not argue and exacerbate them.

2        So, Mr. Gage, now you know they need this German guy's

3    file.  When can you get it to them?

4            MR. GAGE:  Ben, did you -- do we already have it?

5        (Counsel conferred privately off the record.)

6            MR. GAGE:  Your Honor -- let me assure you of this,

7    Your Honor.  As soon as I get off this phone call, I'm making

8    calls and demanding that it be done ASAP --

9            THE COURT:  That's wonderful.

10           MR. GAGE:  -- even if it requires people working

11   over the weekend.

12           THE COURT:  That's the best that he can do,

13   Mr. Anderson.

14           MR. ANDERSON:  Thank you.

15           THE COURT:  So he's going to do that.

16           MR. ANDERSON:  Thank you.

17           THE COURT:  All right.  Is there anything else you

18   think we can do today?  We have two minutes left.

19           MR. AYLSTOCK:  Your Honor, Bryan Aylstock.  I

20   appreciate all your time.  I don't think we can cover anything

21   remaining in two minutes, and I apologize for the bickering.

22   It's -- but I really do appreciate the call because it does

23   focus our attention like a laser beam, and your input is

24   invaluable.

25           THE COURT:  Well, I appreciate --

1           MR. GAGE:   And, Your Honor -- this is William

2    Gage -- I would also say that the statements that both Bryan

3    and Ben made early on are -- hold true notwithstanding the

4    fact that we like to bicker from time to time; and that is, we

5    do have a very good working relationship as compared to many

6    other pieces of litigation that I've seen.

7        So I don't want you to get discouraged.   We do fight.   We

8    do have -- you know, protect our clients' interests, but we

9    are, I think, making a lot of progress, although I think -- I

10   think what we have to really -- both sides have to focus on,

11   Your Honor, is keeping the information flow alive, because I

12   think if we do it like that, then it lets me have a chance to

13   quickly respond to these issues.

14          THE COURT:   Well, and I think this is very helpful

15   to me as well because then when you file your motions, I have

16   some history that I can rely on when I'm trying to rule on

17   these things, instead of trying to go back and re-create

18   things through odd e-mails and so forth.

19       So I'm glad we're doing this too.   I just don't like

20   bickering.   I hear enough of it at home between my two

21   children, and I don't want to hear it on a Friday afternoon.

22   So -- but I do -- as I've said before, I appreciate the fact

23   that you all are working together.   I appreciate the fact that

24   you participate in these telephone conferences.   And I do

25   think we are moving forward.   So keep up the good work.

1          MR. WALKER:  Judge, this is Erik Walker again.  Can

2    I ask one other question?  At the risk of encouraging even

3    more bickering, which certainly I don't want to do, if we

4    haven't heard back on the German deposition by Tuesday, is

5    there a particular time that would be best to call the Court,

6    or if we could call the Court, to find out, you know, the

7    situation on that?

8          THE COURT:  It would have to be in the afternoon

9    because I believe that Tuesday I'm happy to say is my petty

10   offense day.  So I have all sorts of petty offenses that are

11   scheduled in the morning, so --

12         MR. WALKER:  Well, it could even be Wednesday.  I

13   just think -- it sounds to me like this German custodial file

14   issue really is critical and that we may need your help on it.

15         THE COURT:  All right.  Why don't we -- we can do --

16   you can call me Tuesday afternoon.  I think I'm probably

17   pretty clear Tuesday afternoon.  And if you call and I happen

18   to have an arraignment or something, they don't take very

19   long, so I can get right back with you in the afternoon.

20       Why don't we -- why don't we aim for that and see where

21   we are with the German witness's custodial file.

22         MR. WALKER:  Thank you.

23         MR. ANDERSON:  Ben Anderson.  Thank you so much,

24   Your Honor.  Again, apologies if there was bickering.  William

25   and I spent eight weeks in trial together, so we go at it like

1    brothers sometimes, but we don't need to belabor you with

2    that, so apologies.

3            THE COURT:  You're starting to sound like an old

4    married couple, see?

5            MR. ANDERSON:  We feel like it sometimes.

6            MR. GAGE:  At least that's how we look at it.

7            THE COURT:  Well, you all have a nice weekend.

8        (Conference call concluded at 5:01 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21    I, Teresa M. Ruffner, certify that the foregoing is a

22    correct transcript from the record of proceedings in the

23    above-entitled matter.

24

25        /s/Teresa M. Ruffner                August 19, 2013
     _____     _____