IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

AT CHARLESTON


IN RE:   ETHICON, INC. PELVIC REPAIR SYSTEM
         PRODUCTS LIABILITY LITIGATION          MDL No.
                                                2:12-MD-2327


                                       August 23, 2013
                                       Huntington, West Virginia


TRANSCRIPT OF TELEPHONIC STATUS CONFERENCE
BEFORE THE HONORABLE CHERYL A. EIFERT
UNITED STATES MAGISTRATE JUDGE


APPEARANCES (by telephone)

For the Plaintiffs:          **BRYAN F. AYLSTOCK, ESQ.**
                             **D. RENEE BAGGETT, ESQ.**
                             AYLSTOCK WITKIN KREIS & OVERHOLTZ
                             Suite 200
                             17 East Main Street
                             Pensacola, FL  32502

                             **THOMAS P. CARTMELL, ESQ.**
                             WAGSTAFF & CARTMELL, LLP
                             Suite 300
                             4740 Grand Avenue
                             Kansas City, MO  64112

```
For the Defendant:              WILLIAM M. GAGE, ESQ.
                                BENJAMIN M. WATSON, ESQ.
                                GARY RUBIN, ESQ.
                                DONNA B. JACOBS, ESQ.
                                MICHAEL BROWN, ESQ.
                                BUTLER SNOW O'MARA STEVENS &
                                CANNADA, PLLC
                                P. O. Box 6010
                                Ridgeland, MS  39158-6010

                                PHILIP J. COMBS, ESQ.
                                THOMAS COMBS & SPANN, PLLC
                                P. O. Box 3824
                                Charleston, WV  25338-3824

Court Reporter:                 TERESA M. RUFFNER, RPR
                                Sidney Christie Federal Building
                                845 Fifth Avenue, Room 101
                                Huntington, WV  25701
                                (304) 528-7583
```

```
Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription.
```

1 | Friday, August 23, 2013, at 3:00 p.m. in conference room

2 | THE COURT:  Hello, everyone.

3 | MR. GAGE:  Hi, Judge.

4 | THE COURT:  Well, I understand we still have a

5 | pretty sizeable crowd, which I'm happy to see on a Friday

6 | afternoon.

7 | Before we get started with your all's agenda, I wonder if

8 | I might cover a few little issues that I have on my own

9 | agenda.  The first has to do with briefing schedules.  I just

10 | want to make sure that I'm on top of the briefing schedules

11 | for the two motions that are outstanding.

12 | I currently on my list have two motions in this

13 | particular MDL that we are in the process of briefing.  The

14 | first would be the motion supporting entry of a protective

15 | order which has to do with the OUS documents.

16 | According to my schedule, the plaintiffs have their

17 | response due on August 27th and then Ethicon would have its

18 | reply due on September the 3rd.

19 | Is that what you have?

20 | MS. BAGGETT:  I believe that's true, Your Honor,

21 | yes.

22 | THE COURT:  Is this Renee Baggett?

23 | MS. BAGGETT:  Yes, Your Honor.

24 | THE COURT:  Okay.  I do want to ask you again --

25 | Miss Ruffner is present here with us -- if you wouldn't mind

```
 1      identifying yourself when you speak so she can get the

 2      transcript down.

 3                  MS. BAGGETT:  Yes.

 4                  THE COURT:  All right.  So -- and on the side of the

 5      defendants, does that sound like a correct briefing schedule?

 6                  MR. GAGE:  Yes, Your Honor.  That's August 27th --

 7      This is William Gage speaking.

 8                  THE COURT:  Okay.

 9                  MR. GAGE:  That's August 27th for the plaintiffs'

10      response and the defendant's response due September 3.

11                  THE COURT:  That's -- yes, that's what I have.

12                  MR. GAGE:  Okay.  And, Your Honor, I'm going to pull

13      the calendar up just to make sure.  Okay.  Yeah.  I was just

14      checking to make sure none of those dates fell on a weekend.

15      They don't.

16                  THE COURT:  No, I believe September the 3rd may be

17      the Tuesday after Labor Day.

18                  MR. GAGE:  Right.

19                  THE COURT:  Okay.  The other motion that I show as

20      being outstanding is docket number 730, which is plaintiffs'

21      motion to compel production of the sales rep files.  That was

22      filed on August the 15th, and I don't think we discussed the

23      need for an expedited briefing schedule.

24          So what I would have on my calendar right now is that the

25      Ethicon's response would be due on September the 3rd and the
```

 1   plaintiffs' reply would be due on September 13.

 2        Is that consistent with your expectations on the

 3   briefing?

 4             MS. BAGGETT:  Renee Baggett, Your Honor.  Yes, Your

 5   Honor, that's our understanding.

 6             MR. GAGE:  That's fine with us, Your Honor.  William

 7   Gage speaking.

 8             THE COURT:  Those are the only two motions that I

 9   show.  Are you aware of there being anything else still

10   pending?

11             MR. GAGE:  William Gage.  No, Your Honor.

12             THE COURT:  Thank you.

13             MS. BAGGETT:  Renee Baggett.  No, Your Honor.

14             THE COURT:  I understand now you have reached some

15   agreement regarding discovery of the hernia mesh and you

16   should be submitting a stipulation today on that.  Is that

17   correct?

18             MR. GAGE:  Your Honor, this is William Gage.

19   Mr. Aylstock and Miss Baggett and several of us on the defense

20   side have been working.  We have got a deal.  I think

21   Miss Baggett still is just double checking some -- there's

22   some appendices that are going to be attached to the

23   stipulation that we're going to present to Your Honor, and the

24   appendices have lots and lots of things like search terms, and

25   Miss Baggett has made some -- she's got some red-line changes,

1   and she sent them to us and we got -- sent some back to her

2   just to say, "What if we modify some of these a little bit?"

3   They're -- I think it's fair to say it's a very, very, very

4   small detail, but I think we're -- I mean I think we're

5   ready -- we are ready to announce to the Court we have a deal;

6   we've just got to get the appendices put together and attached

7   to the stipulation.

8              THE COURT:  When do you expect --

9              MS. BAGGETT:  And --

10             THE COURT:  I'm sorry.  Go ahead, Miss Baggett.

11             MS. BAGGETT:  I was just going to say that I agree

12  with what he said, that we have spoken and that that is our

13  understanding as well.

14             THE COURT:  When do you think you'll have the

15  finalized stipulation to the Court, then?

16             MR. GAGE:  Your Honor, we should have -- well, Your

17  Honor, if I could say this.  The red-line changes that

18  Miss Baggett proposed to the search terms, our people just

19  looked at them, and I got an e-mail saying that they looked

20  good, but we were going to propose some counter-proposals.  So

21  I'll send those to Renee as soon as we get off the call.  My

22  guess would be Monday or Tuesday at the latest.

23             THE COURT:  All right.  Does that sound accurate to

24  you, Miss Baggett, as far as a time frame?

25             MS. BAGGETT:  Yes.  Yes, Your Honor.

```
 1          THE COURT:  Great.  Then the German witness,
 2   Dr. Trzewik, was his custodial file produced?
 3          MR. GAGE:  Yes, Your Honor.
 4          THE COURT:  And Dr. Klosterhalfen, have we gotten
 5   any further on the explants?
 6          MR. GAGE:  Your Honor, I made a written proposal to
 7   Ben Anderson on -- this is William Gage again -- a written
 8   proposal to Ben Anderson on Wednesday where we proposed --
 9   well, we made a pretty lengthy proposition on how to handle
10   Dr. Klosterhalfen and the explants, and I've not yet heard
11   back from Ben.
12       I know Ben has been -- I think Ben has been traveling,
13   but I have -- we do now have a very specific offer out to
14   plaintiffs on that issue.
15          THE COURT:  Does anyone on the plaintiffs' side have
16   any information on this issue?
17          MS. BAGGETT:  Yes, Your Honor.  I wanted to ask if
18   Tom had joined the call -- I heard a beep come in -- because
19   he's been dealing with this, but we did have some issue with
20   the number of documents that were produced in the Trzewik
21   custodial file and the timeliness of that production.
22       Of course, this is a deposition that's taking place in
23   Germany, and we're going to have to take on the expense and
24   the time to travel there; and if we have not had appropriate
25   time to review those documents in preparation for the
```

1    deposition, it could cause us substantial difficulty.

2              THE COURT:  How many pages were produced?

3              MS. BAGGETT:  Mr. Gage can correct me if I'm wrong,

4    but I think it was over 14,000 documents.

5              MR. GAGE:  Your Honor, it may be eleven or twelve

6    thousand, but it is a -- you know, it's a lot of documents.

7              THE COURT:  When is his deposition scheduled?

8              MS. BAGGETT:  I'm trying to confirm that for you,

9    Your Honor.  This is Renee Baggett.

10             MR. GAGE:  Your Honor, the September 4 is where it's

11   currently scheduled.

12             THE COURT:  All right.  I guess, then, what we'll do

13   is -- well, let's see.  There's only one more conference

14   before his deposition would take place, and that would be just

15   a few days before the deposition.

16        Let me know, then, if you have any issues that come up on

17   that, but I guess you'll need to let me know in the next few

18   business days.

19             MR. CARTMELL:  Your Honor, this is Tom Cartmell.  I

20   did join after you started, I guess.  I apologize for that.

21        I was just going to add that I do think that our lawyers

22   who are preparing for that would like to push that deposition

23   back a few days.

24        My understanding is that the reviewers have started

25   reviewing it.  And as far as the page numbers, it's much

1   greater than obviously the 14,000, or around that, documents.

2   And so we don't believe that we're going to be adequately

3   prepared before going over there.

4       Having said that, we don't want to push it back so far

5   that we wouldn't be able to take the deposition until after

6   our expert reports are due, or if we had to, we were hoping

7   that we could get an extension just for a supplement on that

8   if necessary, not an extension on the actual deadline date.

9           MR. GAGE:  Your Honor, as we were just about to get

10  on this call, about five minutes before we got on the call, I

11  just got an e-mail, and apparently Dr. Trzewik is willing to

12  move his deposition to September 18-19.  And this is just

13  breaking news.  Ordinarily I wouldn't want to be providing new

14  news in the presence of the Court like this, but we just got

15  the e-mail.

16      So, Tom, if you could look at that date and let us know.

17          MR. CARTMELL:  Sure will.  Thanks.

18          THE COURT:  Well, that's actually welcome news

19  because maybe that will resolve this issue, then.  That would

20  give you an extra couple of weeks to look at the documents,

21  which should be sufficient time, I would guess, although --

22          MR. CARTMELL:  I agree.

23          THE COURT:  -- quite honestly, I've never had to

24  review 14,000 pages.  So I don't know how long it takes.

25      What about Dr. Klosterhalfen?  You said, Mr. Gage, that

1    you had sent a proposal on how to handle his explants, and I

2    think where we left off was where are we on the plaintiffs'

3    side with that?  Does anyone on the phone know about that?

4              MR. CARTMELL:  Your Honor, I don't know if somebody

5    already said it, but Mr. Anderson was dropping off his

6    daughter at college today.  She's a freshman starting at

7    college, and so he was unable to attend, and I think he knows

8    more about that than anybody else.  I certainly -- I don't

9    know enough about it to comment.

10             THE COURT:  All right.  That was Mr. Cartmell,

11   correct?

12             MR. CARTMELL:  Yes.  I'm sorry.  Tom Cartmell.

13             MR. GAGE:  Your Honor, this is William Gage.  I

14   have -- I have not heard back from Ben on these issues

15   regarding Dr. Klosterhalfen.  My belief is he's going to want

16   to talk to me and he's going to want to probably propose some

17   different things.  So my request would be that Ben and I get

18   together early next week and talk through this.

19             THE COURT:  Okay.  Why don't we just pass

20   Dr. Klosterhalfen, then, to the next conference, and we can

21   check then and see where we are, because as I recall, you're

22   not going to Germany for a couple of weeks -- well,

23   probably -- what? -- in mid September?

24        So I guess you'd want to know something before then or by

25   then I would think.

```
 1              MR. GAGE:  Yes, Your Honor.  And there are -- there
 2    are additional issues related to Drs. Klosterhalfen and Klinge
 3    which we, again, raised in the proposal that we sent to
 4    Mr. Anderson.  So if Ben and I can't get it worked out next
 5    week, it's something that we're going to need Your Honor to
 6    break the tie on a week from today.
 7              THE COURT:  All right.  That sounds fine.
 8          That is all that I had on my little agenda.  So let me
 9    ask who would like to go first today.
10              MR. GAGE:  Your Honor, I don't necessarily ask that
11    we go first, but I would make one recommendation for us, and I
12    suspect Tom would join me in this.
13          Your Honor, probably the most pressing issue for today,
14    unlike the prior couple of weeks, really concern some
15    depositions, and there are a couple of depositions that we've
16    kind of hit an impasse on.  And as much as I hate to take the
17    Court through the back-and-forth in details of dates and such,
18    I think that's -- because these depositions are either going
19    to be taking place very soon or not, we probably need the
20    Court's help on those issues first off.
21              THE COURT:  All right.  Why doesn't -- why doesn't
22    somebody tell me what depositions we're talking about and what
23    the issues are.  I'm --
24              MR. GAGE:  Your Honor --
25              MR. CARTMELL:  Do you want to go?  Do you want to
```

1    go?

2              MR. GAGE:  Well, I will put -- I will put three

3    depositions down that I know we have issues on, and then the

4    plaintiffs may want to add more to that, but at a minimum it

5    would include Dave Robinson and Pete Hinoul -- and that's

6    H-i-n-o-u-l -- and Dan Lamont.

7         And then, Tom, do you want to add to that list?

8              MR. CARTMELL:  Yes.  I would probably add the

9    continuation of the -- this is Tom Cartmell -- continuation of

10   Dan Smith to that list.

11             THE COURT:  Let's start, then, with Mr. Robinson.

12   Tell me who he is and what the problems are with his

13   deposition.

14             MR. GAGE:  Your Honor, I'm going to yield the floor

15   to Michael Brown, who is a lawyer here with my firm.  Michael

16   has been working a lot with Dr. Robinson, and he kind of knows

17   the situation better than I do.

18             MR. BROWN:  This is Michael Brown.  Your Honor, we

19   had placed Dr. Robinson up for deposition in three days in

20   the New Jersey litigation and then offered him up as a fact

21   witness in the MDL as he was requested.

22        Now, Dr. Robinson, Your Honor, is a Medical Affairs

23   Director that came in the August time of 2005 and was involved

24   in the launch of one of the products, TVT Secur, and then came

25   out of the role as the primary Medical Affairs Director around

1    the time of 2009.  And so he was not involved in the launch of

2    TVT Retropubic, TVT Obturator, TVT Abbrevo, or TVT Exact.

3         And so he was placed for deposition on September 24th and

4    25th.  We agreed to two days of deposition, started at 9:00,

5    ended right around 6:53 p.m., went late, Your Honor, and then

6    started the next day at 9:00 and stopped around 4:16.  And,

7    Your Honor, it's the defendant's position that as a fact

8    witness, he's been offered up for two full days and that there

9    should not be additional time for his deposition.

10        THE COURT:  Did you say his deposition was taken

11   August 24th through the 25th?

12        MR. BROWN:  July 24th --

13        THE COURT:  Oh, July.

14        MR. BROWN:  -- through July 25th.  If I said that

15   wrong, then it's July, Your Honor.

16        THE COURT:  July 24th through the 25th.  And at the

17   time that he was offered as a witness, he was offered only as

18   a fact witness in the MDL, or was he also being offered in the

19   litigation in New Jersey?

20        MR. BROWN:  The deposition, Your Honor, was cross-

21   noticed in New Jersey, but New Jersey did not have an

22   opportunity to question the witness, Your Honor.

23        THE COURT:  So the two days that -- the two days he

24   testified in July, he testified solely as a fact witness in

25   the MDL.

1            MR. BROWN:  That is correct, Your Honor.

2            THE COURT:  Now, who wants to take his deposition

3    again?

4            MR. BROWN:  Your Honor, the MDL plaintiffs have

5    requested additional time with him.

6            THE COURT:  All right.  Mr. Cartmell, or someone on

7    the plaintiffs' side, why would you need more than two days to

8    depose him as a fact witness?

9            MR. CARTMELL:  Your Honor, this is Tom Cartmell.  As

10   Mr. Brown said, Mr. Robinson was deposed in the New Jersey

11   litigation prior to the *Gross* trial.  He was deposed for three

12   full days in that case on one product, which was the Prolift

13   product.  He would be considered by the plaintiffs, if you

14   took all of the witnesses involved in the litigation,

15   definitely as one of the top three or four most important

16   witnesses in the case.

17        During the period of time that he was the medical

18   director, which was, I believe, 2005 until 2009, or late in

19   2009 I think it was, that is probably -- well, it definitely

20   is the most critical time in the case.  It's also the time

21   period when if you looked at the cases pending in the MDL,

22   that's where a huge percentage of the cases would fall.

23        He was, as medical director, the individual that signed

24   off on the clinical expert reports, the adverse event

25   reporting, all issues of pharmaco vigilance on all of the

1    brochures on the IFUs and basically all of the hazards and

2    harms, risk assessments, all the dFMEAs, all the aFMEAs, all

3    the pFMEAs, which are risk assessment tools, all of the

4    adverse reporting during that time.  And he did that for the

5    TVT Secur, the TVT-O, the TVT Classic, the TVT-AA, Laser Cut

6    TVT, TVT-D -- or, excuse me, not TVT-D.  TVT Exact and TVT

7    Abbrevo.

8         So he was deposed for three days in New Jersey on the

9    Prolift only.  In this litigation, which we're trying to

10   prepare trial packages on behalf of thousands of plaintiffs,

11   you know, nationwide, he is a critical witness on seven or

12   eight products, and therefore what we've tried to do is take

13   his deposition.  We did not take -- if a day is seven hours,

14   and I'm not saying -- I think the Federal Rules may say that

15   seven hours as a witness is a full day.  I think the

16   deposition time actually with him was just under -- it was

17   like 13 hours and 30 minutes.

18        The second day at 4:00 that defense counsel, Mr. Gage,

19   said that they needed to do a direct examination and we said,

20   you know, pursuant to your earlier ruling, that he could do

21   that based on what we had done so far, he did that.  I think

22   it was a little over an hour, and there was a brief redirect

23   on that.

24        We talked to Mr. Gage afterwards, and there was an

25   agreement we thought on behalf of the MDL that there would be

1    an additional day provided for him for the MDL.

2          New Jersey is also wanting time with Dr. Robinson.

3    Obviously Adam Slater, the lawyer there, wants additional time

4    as well.

5          We were then told that he will be offered for a day

6    additionally but that it needs to be split up between us and

7    New Jersey.  New Jersey is unwilling to do that, and we are

8    also unwilling to do that because we feel that we definitely

9    need additional time with Dr. Robinson on seven products when

10   he was deposed for three days on one product.

11         There were some issues with responsiveness, and I can

12   give you examples of that if you want, but we would be

13   satisfied for the MDL and say it is complete with one complete

14   seven-hour additional day with Dr. Robinson.

15         We believe that actually we will not likely be able to

16   adequately finish on Abbrevo and Exact and some of -- you

17   know, some of the other topics, but, again, we've told the

18   Court and the Court has, you know, mentioned a few times that

19   maybe that could be something that will be taken up later.

20              THE COURT:  Well, I'm not sure I'm clear on -- I

21   thought I heard the defendant say he only had testimony

22   relevant to the TVT Secur.  Then I hear you say no, he has

23   information on all of the products.  So which is it?

24              MR. BROWN:  Your Honor, this is Michael Brown.  He

25   was -- Dr. Robinson was -- got there in September, October of

1    2005.  So he would've not have been the Medical Affairs

2    Director at the time that TVT Classic was launched or at the

3    time that TVT Obturator would have been launched.

4        When he got there in the latter part of 2005, he would've

5    been involved with the launch of the TVT Secur device.  And

6    then as Mr. Cartmell stated, when he left in 2009, he would

7    have been involved in some of the sustainment of TVT Obturator

8    and TVT Retropubic.  By the time that the TVT Abbrevo and

9    TVT Exact were launched, he was no longer involved with the

10   products of TVT and Abbrevo.  That would've been a Dr. Hinoul

11   and a Dr. Kirkemo.

12       And so, Your Honor, our point is that they have had

13   adequate time to be able to go through and spend a day on TVT

14   Secur, which they did, and started, Your Honor, at 9:00 and we

15   stopped it at 6:53 p.m.  And then the next day, they go over

16   the sustainment of the TVT Obturator and the TVT Retropubic,

17   Your Honor.  And we had offered to start on July 25th, that

18   next day, at 8:00 to give additional time.  That offer was

19   denied.  We started promptly at 9:00, and we did not start our

20   direct until 4:16 p.m., Your Honor, to ensure that there was

21   the adequate time for the deposition.

22       MR. AYLSTOCK:  Your Honor, this is Bryan Aylstock.

23   I apologize for joining late.  I just landed back from

24   Pensacola.  So I just wanted to let you know I'm here, for the

25   record.

1           THE COURT:  Thank you.

2           MR. CARTMELL:  Your Honor, this is Tom Cartmell.  If

3    I could respond to that.

4           Your Honor, what isn't being stated is it's true that he

5    was not there during the time that TVT Classic was launched,

6    but when he was there during that period of time, he was the

7    medical director responsible for signing off on all TVT

8    Classic risk -- risk assessment tools that were done, and

9    there were several.

10          In fact, in 2005 when he got there, they did an entire

11   revamping of their policies and procedures related to risk

12   tool assessments, risk management reports.  And for the

13   products TVT, TVT-A, TVT Laser Cut Mesh, TVT-O, and TVT-S, he

14   was the medical director that signed off on every single one

15   of those.

16          So the fact that he wasn't there when it was launched is

17   true, but once he became the medical director, every time that

18   there was a new risk assessment done or every time that there

19   was a complaint to the company and a medical director needed

20   to sign off on it, regardless of whether it was TVT-O, TVT-S,

21   TVT Classic, TVT Laser Cut, TVT-AA, he was the medical

22   director responsible for signing off on all of those for the

23   company.

24          So he was very well involved or very much so involved in

25   all of those at the critical time period when things were

1  changing with these products.

2       As far as TVT Exact and TVT Abbrevo, he was also

3  intimately involved in the studies that were done in

4  development of those products that were not yet launched.  He

5  signed off on studies.  He also signed off on studies for TVT

6  Secur, TVT-O, TVT Classic and was critical in the clinical

7  studies that the company was doing during those periods of

8  time.

9            THE COURT:  What is it that the New Jersey lawyers

10 intend to cover?

11           MR. CARTMELL:  Well --

12           THE COURT:  I mean what products are they looking

13 at?  Are they looking at all seven products as well?

14           MR. CARTMELL:  Well, no, they -- I will tell you

15 this.

16           THE COURT:  Who is this?

17           MR. CARTMELL:  New Jersey has been -- I'm sorry.

18 Tom Cartmell.  New Jersey has been different in their

19 discovery.  In other words, Judge Higbee had told them that

20 originally that because the first trial was a Prolift, they

21 just needed to do discovery on that.

22      They've now moved into some TVT discovery, but as of yet

23 New Jersey has never done discovery on multiple TVT products

24 other than, I think, have done a few discovery depositions on

25 TVT-S.

1          My understanding is that they are phasing discovery and

2     that the New Jersey lawyer has said to Judge Higbee and has

3     certainly told Bryan and myself and Renee that he intends to

4     have his voice on all, you know, on his videos that he plays

5     in New Jersey and that they will -- you know, they intend to

6     do discovery at a different pace than us because they simply

7     don't have a trial or expert deadline coming up like we do;

8     and they don't have the resources, they've told us, to be

9     prepared to perform all these depositions at this point.

10          MR. AYLSTOCK:  Your Honor, Bryan Aylstock.  Just

11    real briefly.  I think Adam has also been asking -- New

12    Jersey's counsel, Adam Slater, has been asking Prolift+M

13    questions in some of these depositions, and that's a different

14    product than the Prolift that had been the subject of the

15    New Jersey discovery initially.

16          THE COURT:  All right.  Just so to make sure --

17          MR. GAGE:  Your Honor --

18          THE COURT:  Wait.  Wait.  Before you go on, we had

19    some trouble hearing what Mr. Aylstock was saying.  As I

20    understood it, Mr. Aylstock, you said that they're still

21    asking questions about a Prolift product; it's just a

22    different Prolift product than they've asked about in the

23    past.

24          MR. AYLSTOCK:  At least from my involvement when

25    I've been in depositions with New Jersey counsel.  A lot of

```
 1    the questions seem to be involved in the Prolift+M, which is a
 2    different product than the Prolift.  It's an entirely
 3    different mesh than the Prolift, but I just wanted to add that
 4    briefly, if I could.
 5              THE COURT:  All right.
 6              MR. GAGE:  And, Your Honor, there's another issue
 7    that I want to advise the Court of.  Tom Cartmell -- and this
 8    is William Gage.  Tom Cartmell and I talked yesterday about a
 9    number of these issues to see what we could work out.  And the
10    proposal with Tom was -- the proposal was on September -- that
11    we would be looking at September 4.  But the concern that I
12    did not realize until this morning was that that is a Jewish
13    holiday and that might impact Mr. Slater.  But he has not
14    specifically told us that, but he has told us, I think with
15    respect to other depositions, that the Jewish holidays, you
16    know, he would -- he asked that we not set depositions on
17    Jewish holidays.
18        And I just wanted to let Tom know, Your Honor, that I
19    just didn't even know about that until this morning.  And I'm
20    not saying that Adam has asked us for that, told us about
21    that, but he has told us he can't be available on September 4.
22              THE COURT:  As I'm -- as I'm listening to you, what
23    I am thinking is that the plaintiffs in the MDL are likely
24    going to need one more day to depose Dr. Robinson.  If he has,
25    in fact, had as much involvement in these products, whether it
```

1    was at the time they launched or later, it sounds like he has

2    had quite a bit of involvement and he would be an important

3    witness.  So I believe they're going to need another day to

4    get the information that they need.

5         Now, you know, the problem I have is I really don't have

6    any control over the New Jersey litigation, how or when they

7    do their discovery or what the judge in New Jersey is going to

8    do if the MDL has done a bunch of discovery and the New Jersey

9    lawyers don't want to accept that.

10        So I don't really know how to help Ethicon except to say

11   it sounds to me as though there is good cause for the

12   plaintiffs to have an additional day to depose Dr. Robinson.

13             MR. BROWN:  And, Your Honor, this is Michael Brown.

14   The other concern with Dr. Robinson that we had and I didn't

15   get to note earlier is Dr. Robinson is a former employee at

16   this time who is retired and so is not still currently an

17   employee.  So I just wanted to let Your Honor know that as

18   well.

19             MR. GAGE:  Your Honor, the only remaining issue on

20   Dr. Robinson now concerns the date; and as I said earlier,

21   Dr. Robinson has -- he's got September 11 available, which

22   would then accommodate Mr. Slater because I think that's not a

23   Jewish holiday, as I understand it, but the 4th is.  And so --

24   but I know -- but the 4th, the MDL lawyers don't want it.

25        So it's just been a real problem.  And so if we've got to

 1   give them another day, we'd sure like to do it on the 11th so
 2   that at least Mr. Slater can be present and we don't get in
 3   trouble up in New Jersey for not putting him up on a date when
 4   he can at least be present.
 5           THE COURT:  Well, that makes sense.  Are the
 6   plaintiffs, Mr. Aylstock or Cartmell, are you available on
 7   September 11th?  They could schedule Dr. Robinson.
 8       I'm going to grant your request for an additional day.
 9   It sounds to me as though you're going to need one additional
10   day.  I don't know how that's going to affect you, Ethicon,
11   though, as far as New Jersey goes, but I don't know that
12   there's anything I can do about that, especially if they want
13   to come in and ask questions about Prolift, which doesn't have
14   anything to do with the first few rounds of our MDL trials.
15           MR. GAGE:  Well, Your Honor, it would -- it would be
16   helpful if the depo in the MDL goes forward on the 11th
17   because, like I said, at least it would let us do our best to
18   accommodate plaintiffs' counsel's religious -- again --
19           THE COURT:  Right.
20           MR. GAGE:  -- he hasn't told us, but we now believe
21   it's his religious holiday, and it would be -- it's putting us
22   in a very difficult position to openly not honor what I
23   believe would be his request that it not be scheduled on a
24   major holiday for the state.
25           THE COURT:  Well, I think that might have to be the

1    trade-off, Mr. Cartmell.  You can have another day, but you'll

2    have to do it on the 11th.  And I don't know what you're

3    going to do.  Mr. Slater is in the New Jersey litigation; is

4    that correct?

5              MR. CARTMELL:  That's correct, Your Honor.  This is

6    Tom Cartmell.  I did not know this, but last night when we

7    talked, Mr. Gage had said, you know, "Would you just take the

8    4th?"  And actually I had said yes, we would take the 4th.  I

9    didn't know anything about that.  And he had said, "We'll just

10   go forward on the 4th.  I don't even know if Adam Slater is

11   going to attend, but would you do that?"  And I said yes.

12       The problem with the 11th is that they've offered three

13   other depositions that I think -- or two at least -- Axel

14   Arnaud's deposition that week, who is another one of the top

15   four most critical.

16       And, William, who's -- there's another one at least that

17   week that we've accepted, and we've told them, you know, we

18   are hopeful that because the same people are taking, you know,

19   the top four critical depositions, we were hopeful that we

20   could spread it out and not have them day after day during the

21   same week.

22             THE COURT:  Well, you may not have that -- you may

23   not have that luxury.

24             MR. CARTMELL:  Okay.

25             THE COURT:  There's a lot of lawyers working on

1    these cases, and I know that every lawyer thinks they're the

2    best lawyer and they can do it the best and they want to do

3    it, but that may not always be possible.

4         So what I'm saying today is you can have one more day for

5    the MDL, but you'll need to do it on September 11th to give

6    Ethicon some argument that Mr. Slater could have been present

7    and perhaps could have asked questions if he was there should

8    that issue come up in New Jersey because --

9              MR. CARTMELL:  Okay.

10             THE COURT:  Okay.

11             MR. CARTMELL:  Thank you.  Thanks, Judge.

12             THE COURT:  Now, the second one would be -- let's

13   see -- oh, Mr. Hinoul?

14             MR. GAGE:  Judge, it's actually pronounced

15   "Ha-newal."

16             THE COURT:  Hinoul.

17             MR. GAGE:  Yeah.  He's Dr. Pete Hinoul.  And this is

18   William Gage, Judge.  I will yield the floor to Mr. Brown, I

19   suppose, to tell us kind of more specifically what the issue

20   is there.

21        I think, Judge, the issue is we've offered two days next

22   week for his deposition, and the MDL plaintiffs have asked

23   that the deposition be held after a 30(b)(6) deponent

24   concerning consulting agreements.  And so the deal is

25   Dr. Hinoul is probably one of our -- he is -- is he still a

1    medical director?

2             MR. BROWN:  Yes.

3             MR. GAGE:  He's still a medical director at Ethicon.

4    He, Judge, is -- he's kind of like one of our chief people at

5    the company, and he was the chief person at the time of some

6    of these events, and he is one of the ones that we just have a

7    really difficult time with in terms of scheduling because he's

8    frequently traveling around the country for work, and

9    sometimes internationally.

10        And so on Dr. Hinoul, the plaintiffs wanted two

11   additional days for his depo, and so we offered those two

12   additional days -- how long ago? -- a week or two or three

13   ago?  Maybe two or so weeks ago.

14        And the problem now is -- and we got that depo set and

15   we're ready to go and Dr. Hinoul is set and ready to go.  The

16   problem now is that the plaintiffs have served a 30(b)(6)

17   notice on an issue related to consulting agreements and they

18   would like for us to put the 30(b)(6) consulting deponent up

19   for deposition first before Dr. Hinoul's deposition goes next

20   week.

21        And since we can't get the 30(b)(6) deponent -- her name

22   is Laura Angelini.  We can't put her up until, I think --

23   what, September 13? -- September 16.  Since we can't put her

24   up until September 16, we're just in a total logjam.

25             THE COURT:  All right.

1          MR. GAGE:  And so what we're asking for is relief on

2     the plaintiffs' request that we stagger the depositions in

3     that order.  We would ask that Hinoul's deposition go forward

4     next week as offered so that we can make all this work.

5          THE COURT:  Mr. Cartmell?

6          MR. CARTMELL:  Your Honor, we -- there's a

7     background that needs to be told about this a little bit.

8     Where Angelini -- her deposition was scheduled long ago.  We

9     were -- we had accepted the deposition.  We were ready to take

10    the deposition.  It was offered for two days.  Our lawyers

11    were prepared and ready.  And we got a call from defense

12    counsel, I think it was four or five days before, saying she's

13    had an emergency come up and she's not going to be able to be

14    deposed at that time.  So that deposition was supposed to be

15    completed and it ended up being pushed back.

16         We then asked for, you know, immediately for dates for

17    Laura Angelini's deposition and literally heard nothing for

18    over a month.  And in the meantime, what happened was we had

19    been trying to be -- to get a contract that was in existence

20    between Dr. Ulmsten, the inventor of the TVT Classic product,

21    and MedScand or -- which ultimately became J&J; they purchased

22    MedScand -- for four or five or six months.

23         And there are multiple agreements between Dr. Ulmsten and

24    J&J.  And we were produced a couple, and then we said, "Well,

25    wait.  Where are the others?"  And then we were produced

1    another one.  And we said, "Well, this one, we need this one.

2    It's critical for Dr. Arnaud's deposition."  The night or day

3    before, actually, the deposition of  Dr. Arnaud, that

4    agreement, which we knew was going to be critical, finally

5    showed up after several months of that.  We didn't get the

6    actual cover page of that until the night before.  We got part

7    of the agreement but not the first page saying who the parties

8    to that were.

9         When we got it, sure enough it was the inventor, the

10   doctor.  And in that contract is a milestone provision that

11   states specifically that any clinical studies that were

12   performed by this doctor and provided favorable results -- in

13   other words, efficacy that was at a certain level; I think it

14   was 85 or 90 percent -- and low complication rates that were

15   below what had been published by Dr. Ulmsten before, they

16   would pay Dr. Ulmsten $400,000 per study that gave them that

17   result, so a payment for favorable results clause in this

18   agreement.  We got it the night before.  We questioned Dr.

19   Arnaud about it and we said, you know, "How many times did Dr.

20   Ulmsten do clinical studies where he was paid $400,000 for

21   those?"  And Dr. Arnaud said, "I have no idea.  Of course, you

22   know, I don't know.  He was a great guy.  We probably never

23   paid him."

24        So immediately we -- well, not immediately, but within a

25   week or two, I think -- I don't know the exact dates -- we

1    filed a 30(b)(6) saying we need somebody to testify.  We've

2    been asking for this information for months.  We originally

3    asked it during Dan Smith's deposition because he was the

4    30(b)(6) witness that was put forth to be the witness to talk

5    about consulting agreements with the company.  And that was

6    several months ago.  And we've been asking for Dan Smith for

7    all the consulting agreements but didn't get them.

8         So we completed that 30(b)(6) without having that

9    information.  When we sent out the consulting agreements or

10   payments -- the 30(b)(6) related to these clinical study

11   payments -- we had not heard anything back about dates for

12   Laura Angelini or dates for Pete Hinoul, and we had completed

13   Pete Hinoul's -- the first part of his fact witness

14   deposition.

15        They then named Laura Angelini as the 30(b)(6) witness on

16   that topic.  And we said, "Okay.  If you're going to make

17   Miss Angelini that witness, we would like a date for her as

18   soon as possible because we need to get this knocked out first

19   before we complete the medical directors because we know from

20   Dr. Arnaud's deposition that if we don't have that completed,

21   the medical directors will just say, 'We don't know how much

22   was made in payments related to clinical studies for the TVT

23   Classic.'"

24        So I asked -- as soon as I got the e-mail from

25   Miss Jacobs saying that they want to put Pete Hinoul up on the

 1    28th or 29th, my response was, "We need to do one day.  We'll

 2    limit the 30(b)(6) deposition of Miss Angelini to one day.

 3    We'll make that agreement with you.  But we need to do that

 4    before Dr. Hinoul's deposition."

 5        I never heard anything for several days.  I don't

 6    remember how long it was at all.  And another e-mail came and

 7    said, "Are you going to take Pete Hinoul's 28th to 29th date?"

 8    And my response immediately to that was, "I told you in a

 9    prior e-mail the week before that we need to have the 30(b)(6)

10    before that."  So --

11                THE COURT:  Now, Mr. Cartmell, before you go on --

12                MR. CARTMELL:  Yes.  Yes.

13                THE COURT:  I'm sorry --

14                MR. CARTMELL:  Okay.

15                THE COURT:  -- but I have to interrupt here --

16                MR. CARTMELL:  That's all right.

17                THE COURT:  -- because the one point that I'm

18    missing in all of this is why it is so critically important

19    that you find out how much these people were paid before you

20    take Dr. Hinoul's deposition.

21                MR. CARTMELL:  I apologize.  I've left that fact

22    out, and I apologize.  Pete Hinoul is a 30(b)(6) witness.

23    He's being taken as a 30(b)(6) on clinical studies.  And so he

24    is a 30(b)(6) deposition -- that's what I left out -- on

25    clinical studies related to the TVT product.

1          THE COURT:  Well, if you're going to get the

2     information about how much was paid from Miss Angelini, why

3     does the amount that was paid make any difference with what

4     you're going to ask Dr. Hinoul?

5          I'm still not understanding why that's such a critical

6     piece of information.

7          MR. CARTMELL:  Well, I mean there's multiple

8     clinical studies that obviously -- I mean it's a little bit of

9     strategy obviously, but it's related to which studies, you

10    know, what their results were and were payments made at that

11    time.

12         And what Dr. Hinoul is going to say is, obviously, you

13    know, "I don't know whether or not there was any payment made

14    for this study and this study and this study, multiple

15    Dr. Ulmsten studies."  And we wanted the company to speak, the

16    company representative, on behalf of the company about that

17    issue related to clinical studies.  And if he doesn't have the

18    information, he won't be able to.

19         THE COURT:  Is that one of the areas of inquiry that

20    you included in this 30(b)(6) notice?

21         MR. CARTMELL:  It was -- it was clinical studies for

22    the -- he was -- no, we didn't say payments from consultants

23    on clinical studies.  We had just said the clinical studies

24    related to the TVT product.

25         THE COURT:  But with Miss Angelini you did ask

```
 1    specifically as a topic of inquiry that she's to supply the
 2    payments.
 3              MR. CARTMELL:  Yeah, that's related to the
 4    agreement.
 5              THE COURT:  Well, I don't know.  You know, I still
 6    don't understand why it's so magical to know if a payment was
 7    made and how that would -- why that would have such a large
 8    impact on your examination of Dr. Hinoul.
 9        I think the problem that you're facing is that they're
10    telling you it's difficult to get him scheduled.  They've got
11    dates.  He's open and ready for those dates.  And you may put
12    yourself in a bind if you continue these again.
13              MR. CARTMELL:  Well, here's what we had talked
14    about, Your Honor.  This is Tom again.  We did talk last
15    night.  I wasn't certain that this was even going to be on the
16    list today from defense counsel because I think we visited
17    last night about my understanding was that we were going to go
18    ahead and take Miss Angelini's 30(b)(6) on September 16th, the
19    first day of her fact witness deposition on the 17th, and
20    Miss Jacobs was checking to see if she could do the second day
21    of her fact witness deposition on the 23rd.  And then we were
22    going to likely have to take Pete Hinoul's deposition a little
23    late -- in other words, after September 23rd -- and I had
24    asked if they could do it as -- you know, look for dates as
25    soon as possible.
```

1   Now, I think what they've told me is they said he is

2 going to be in trial.  There's a trial, a TVT trial in

3 Missouri starting September 23rd.  And I suspect they'll want

4 to do it before then because he's going to be preparing for

5 trial and maybe testify there.

6   I was hoping we could get a date, you know, as soon after

7 that that we could and then maybe if we needed to supplement

8 the expert reports.

9    THE COURT:  Well, I don't know what to tell you.

10 You've -- apparently you've been offered these dates of the

11 28th and the 29th.  He's prepared to go forward.  You've

12 asked for his deposition.  These are dates that you are

13 apparently free.

14    MR. CARTMELL:  Judge, I apologize for interrupting,

15 but, Your Honor, we have never accepted that date.  I have

16 never assigned a team to that deposition for that date because

17 we -- I told her immediately that we wanted the 30(b)(6)

18 first.

19    THE COURT:  So is your problem that you wouldn't be

20 ready by the 28th?

21    MR. CARTMELL:  Yes, we will not be prepared for the

22 clinical study 30(b)(6) on the 28th and 29th.

23    THE COURT:  Well, you know, I can't -- obviously I

24 can't make them take a deposition on two days that they've

25 never noticed the deposition to be taken on.  I can't force

1  them to accept the dates.  You know, I don't know what to tell

2  you.

3      It sounds to me as though if it's not been noticed, the

4  only problem you're going to run into, Mr. Cartmell, is he may

5  not be available in the future when you want to depose him,

6  but I don't know what else to do on that one.

7      I don't see any magical reason why this Laura Angelini's

8  deposition needs to be taken before Dr. Hinoul's.  But what I

9  hear Mr. Cartmell saying, Mr. Gage, is that he's not prepared

10  to take Dr. Hinoul's deposition on the 28th and 29th, he

11  never asked for them on those two dates, and he never agreed

12  to those two dates.  And it's not been noticed, right?

13         MR. GAGE:  That's correct, Your Honor.  I mean, you

14  know, if you think about the process, the plaintiffs say, "We

15  need the deposition of Pete Hinoul."  We then offered

16  August 22, we offered August 23, we offered August 29, and we

17  offered August 30.

18      So, you know, in terms of the way that things work, we've

19  done -- you know, we've done what is expected of us, and

20  that's to provide a good number of dates when they ask for the

21  deponent's deposition.

22      The place that we're headed toward now, or potentially,

23  is going to be a situation where if Pete doesn't get deposed

24  next week, then the plaintiffs next week will be making

25  demands on us to produce him, you know, after September 23

1   while he's either in trial or getting ready for trial in this

2   case up in Missouri, and then they're going to ask to

3   supplement their expert reports.  I mean I don't know really

4   why they would need to do that, but nonetheless they've made

5   that request.  And all of this comes in the context of our

6   saying here are four dates we're ready, willing and available.

7            THE COURT:  Well, I understand that.

8            MR. GAGE:  So I mean --

9            THE COURT:  No, I understand that, and I agree with

10   you.

11        They're telling you right now, Mr. Cartmell, that he is

12   not going to be available when that trial starts in Missouri,

13   which is a very understandable reason for him to be

14   unavailable.  They have dates available now that you can take

15   the man.

16        I haven't heard any argument from you that convinces me

17   that there needs to be a delay in his deposition.  And I'm

18   certain that if it -- if you don't take these dates and he's

19   not available and you try to use that to extend an expert's

20   supplementation, that Judge Goodwin isn't going to let you do

21   that because I'm going to tell Judge Goodwin that you had an

22   opportunity to take his deposition in sufficient time for your

23   expert reports.

24        So I don't know what you want to do.

25            MR. CARTMELL:  Well --

```
 1              THE COURT:  I certainly can't make you take it on
 2    those dates, but today --
 3              MR. CARTMELL:  I guess --
 4              THE COURT:  Today is the 23th.  That gives you quite
 5    a bit of day -- quite a bit of time to get prepared for his
 6    deposition.
 7              MR. CARTMELL:  Okay.  I mean I will -- if I can -- I
 8    need to talk about -- talk to the people that were going to
 9    assist in this deposition.
10         I just -- Your Honor, I apologize that we didn't accept
11    the date, but we never heard anything back for weeks.  I never
12    considered that this deposition would be on the 28th and
13    29th because we were looking -- the first time I heard about
14    him being in trial was last night.
15         I considered -- our team considered that in a month and a
16    half, they would be able to come up with one date in September
17    or two dates in September.  I just -- I didn't think that was
18    unreasonable based on the process we had been going through.
19    And, you know, we've never really -- there's been multiple
20    times when we have said, "We need this deposition before this
21    one," because there is some strategy involved in taking these
22    depositions, especially when you're dealing with six different
23    products and different, you know, things like this.
24         So we've never complained, though, because we've said,
25    "Let's work it out."  This was one, because of the experience
```

1   we've gone through time and time again at these depositions

2   when they say, "I don't know" and we're sort of chasing our

3   tail, that we thought, look, we need to nail this issue down,

4   get it from the company so they can tell us; surely they're

5   going to be able to give us a day or two in September.

6        Now, the day before, last night, was the first time I had

7   heard them ever say, "Look, we thought we were going forward

8   on the 28th and 29th."  In the meantime, I've got people

9   working to prepare for, you know, a dozen other depositions

10  that are already scheduled during that time period.

11            THE COURT:  But I'm afraid that's going to be the

12  nature of it.  I understand that there's strategy involved,

13  but you don't always get to set them up the way you want to,

14  because sometimes you're just driven by the availability of

15  the witness.

16       So, you know, what I'm telling you is I'm not saying that

17  you can't take the deposition some day in September.  Maybe

18  there are some days prior to the 20th when Dr. Hinoul could

19  be available.  But what I'm telling you is, if you wait until

20  after he's involved in the trial in Missouri, then I'm not --

21  I'm not going to recommend to Dr. Goodwin -- or to Judge

22  Goodwin that that would be a valid basis for having any

23  extensions or supplementations of expert reports.  I don't

24  think that would be a sufficient basis, because you have an

25  opportunity here to depose him.

1        MR. CARTMELL:  Yeah, they told me last night there's

2   not another -- there's not a single day in September that he

3   can be produced.

4        THE COURT:  Well, you know, I would ask Mr. Gage to

5   check on that and make sure that's truly the case.  But, you

6   know, I don't otherwise know what else to tell you.

7      There's a lot of people to depose.  You're going to have

8   to take some of these out of the order that you most prefer to

9   take them.

10       MR. CARTMELL:  I understand, Your Honor.  I

11  appreciate that.  I will tell you there have been at least a

12  dozen times we have tried to give priority to them.  We have

13  never once been given the priority.  It has never been the

14  case that when we have asked for priority, we have been given

15  the priority that we wanted to take them in; never.

16       THE COURT:  Well, maybe you should -- maybe you need

17  to start noticing them on dates that you want to notice them

18  on, because, you know, I really don't know what to do when

19  what you're talking about is there's no agreement, there's no

20  notice, there's nothing for me to enforce, there's nothing for

21  me to really do except to say to you all you're not going to

22  get everything you want in scheduling these depositions.

23       MR. GAGE:  Your Honor, if I might.

24       MR. AYLSTOCK:  This is Bryan Aylstock.  I'm sorry,

25  Judge, to interrupt.  You know, it's a little curious to me

1    it -- Pete Hinoul versus the medical affairs director at

2    clinical affairs, in the Prolift in the New Jersey litigation,

3    the deponent, the 30(b)(6) witness for the clinical studies

4    was Judi Gauld, and it was my understanding she was going to

5    be a clinical designee here as well.

6         So, you know, perhaps one way out of this is, you know,

7    to help them designate who they want, and obviously Judi Gauld

8    as the clinical affairs director is an appropriate designee

9    and she was able to do it in the Prolift and she was involved

10   in all those trials.  So that's a potential way out that I

11   just want to throw out.

12              MS. BAGGETT:  Your Honor -- and this is Renee

13   Baggett.  I just wanted to interrupt also.  One of the

14   concerns with doing the depositions out of order that may not

15   be as obvious as we wanted to make it, but the fact that a lot

16   of times in these depositions and during the preparation for

17   these depositions, we discover documents and testimony that

18   was not provided prior to the deposition and it could put us

19   in a position that we have to ask again to have Dr. Hinoul

20   come back as a result of the information that we learn during

21   the deposition of the 30(b)(6), Miss Angelini.

22              THE COURT:  Well, I do understand what you're saying

23   and I'm not unsympathetic to your position, but what I am

24   saying to you is that as far as the authority that I have,

25   there's really not a lot that I can do in these kinds of

1    situations except to say if there are dates available and

2    you've been given a series of dates, then, you know, you need

3    to -- you need to get them scheduled and pick those dates

4    because there is a chance down the road you're not going to

5    get more dates when you want them.

6        But, you know, the other option for you as plaintiffs is

7    to quit -- quit waiting, quit asking them to give you dates;

8    just go ahead and notice things.  I don't -- it just depends

9    on how much you want to work together, I suppose.

10       MR. CARTMELL:  Well, that's the issue, Your Honor.

11   Tom Cartmell.  You know, we -- both sides have bent over

12   backwards to work with each other.  You know, we've decided --

13   we've made informed decisions that rather than file motions

14   and do that kind of stuff, it pays to work together.  And, you

15   know, what?  It's biting us in the you-know-what now.

16       And maybe we shouldn't have, but I can understand the

17   idea that, you know, they're giving us dates, but there's

18   never been a time when they have given us dates when we wanted

19   to do the deposition and we could've accepted them.

20       And, you know, what we would ask for, if we had filed

21   motions, is to order them to give us dates for somebody like

22   this so important and not say, "We have the entire month of

23   September and we cannot give you one day.  We cannot give you

24   two days."

25       MR. GAGE:  Your Honor --

1            THE COURT:  Yes.

2            MR. GAGE:  Your Honor, this is Mr. William Gage.  If

3    I could just lend just a tad bit of perspective.  You know, I

4    think we're probably close to 35, maybe 40 depositions in this

5    litigation.  And I join Mr. Cartmell's statement where he said

6    we've bent over backwards to work with each other.  We have.

7    This is -- I think, if I'm correct, this is the first time

8    we've had to ask the Court for any assistance on scheduling

9    issues.  And so I think, you know, this is like less than

10   maybe 10 or 5 percent of the overall number of depos.  It's

11   gotten to the point where we've had to ask Your Honor for

12   input.

13       So I do believe that the parties have been working very

14   well together.  We're both under a tremendous amount of

15   pressure.  So I just wanted Your Honor and also plaintiffs'

16   counsel to understand I think it's not as big of an issue in

17   terms of overall numbers as you might -- as it might be

18   portrayed.

19            THE COURT:  No, I think you --

20            MR. GAGE:  Oh, and, Your Honor --

21            THE COURT:  I do think you've gotten along quite

22   well, but what I'm saying is when you're asking -- when you're

23   asking for my assistance, if there's no paper that's been

24   filed, I mean like a notice of deposition, there's really not

25   much I can do except encourage you to pick dates that you can

1    both be available for.

2        What I'm -- one thing I can tell you, though, is if you

3    haven't taken depositions that you could have taken and just

4    didn't take them because you didn't like the order that they

5    were in, I guarantee you that is not going to be a sufficient

6    basis for Judge Goodwin to extend deadlines.  He's not going

7    to find that persuasive.  I don't find it persuasive.  That's

8    what I'm trying to tell you.

9        As far as whether this occurs on September the 4th or

10   August the 30th, there's really nothing I can do about that.

11   You can either notice it on a date you want to notice it on or

12   you can get a date from the defendants and take it.

13            MR. CARTMELL:  Understood.  This is Tom Cartmell.

14            MR. GAGE:  Your Honor -- Your Honor, this is William

15   Gage.  If we may, Your Honor, ask the plaintiffs to let us

16   know by, you know, close of business today or maybe by noon on

17   Saturday as to whether they're going to accept the dates

18   offered for Pete Hinoul next week.  That would be helpful to

19   us for travel purposes, planning, etcetera.

20            THE COURT:  And those dates are -- what are the

21   dates?  The 29th and 30th?

22            MR. GAGE:  Yes, Your Honor.

23            MR. AYLSTOCK:  Judge, this is Bryan Aylstock.

24        William, if you could please -- I mean we will work on a

25   Saturday or a Sunday, and both, and a Jewish holiday for the

1    MDL.  It doesn't matter.  We need to get this done, but we

2    simply will not be ready with the volume of material by next

3    week.  So I would ask that some date be provided in September,

4    and we will make it happen, other than next week.  It's just

5    too close in time, so --

6              MR. CARTMELL:  This is Mr. Cartmell.  This is Tom

7    Cartmell.  And we'll pick one of the days, you know, if you

8    can do that.  We don't have to necessarily finish it.

9              MR. GAGE:  And, Your Honor, if I may ask, I assume

10   this will be a date that you will insist be before Laura

11   Angelini's deposition.

12             THE COURT:  No, I don't care if it -- I'm not going

13   to insist when they take it.  All I said was --

14             MR. GAGE:  Okay.

15             THE COURT:  -- I didn't see any magic in taking her

16   deposition before his, because I don't really know why it

17   matters how much somebody was paid to perform a particular

18   study or not, but then I'm not a lawyer in the case.  Maybe

19   that's a really important fact, but I'm not going to say what

20   order it has to be taken in.  I'm just saying you need to --

21   they either need to notice it on dates that they want to

22   notice it on and your witness will have to be there, unless

23   there's a very good reason for him not to be, or they need to

24   work with you and take dates you can offer.

25             I do find it hard to believe there's not a single day in

1    the month of September that this man who is your current

2    employee can be available.   I just -- I find that hard to

3    believe.

4              MR. AYLSTOCK:   And, Judge, this is Bryan again.

5    Just to clarify your last point, it's not the fact that he was

6    paid for doing the study.   It's the fact he was paid if and

7    only if the results were favorable for the TVT.   So if the

8    study came out bad for the TVT, he got no payment.

9         And, you know, our experts -- and you just look at

10   anything, that in and of itself is a very bad thing, and we

11   want to establish how many studies that was part of and so

12   forth, but I get your point.   I just wanted to clarify that.

13             THE COURT:   No, I do understand that that might be

14   important.   I just don't know why that's an important

15   precursor to Dr. Hinoul's deposition.   But in any event, I'm

16   not going to tell you what order to take them in.

17        I would urge you, Mr. Gage, to try to find a date or two

18   in September when Dr. Hinoul could be available.   Otherwise,

19   the options left are accepting the dates you have or the

20   plaintiffs noticing the deposition.

21             MR. GAGE:   Thank you, Your Honor.   We'll do that.

22             THE COURT:   All right.   All right.   Dan Lamont.   We

23   have Dan Lamont.   We're running out of time.   We're at one

24   hour right now, but we'll try to cover these last two.

25        What are the issues with Dan Lamont and Dan Smith?

1        MR. COMBS:  Judge, this is Phil Combs.  I'll speak

2    to Dan Lamont and I'll try to keep it very quick.  The only

3    issue here is whether the plaintiffs will get one additional

4    day with Mr. Lamont or two additional days.  We've offered one

5    additional day; they've demanded two.

6        Mr. Lamont was deposed for two days in the New Jersey

7    litigation.  He was deposed on April 4th, 2012 and May 24th,

8    2012.  And he was deposed for two days in the MDL litigation,

9    April 3rd, 2013 and April 4th, 2013.  He was a corporate

10   representative on various topics for the regulatory affairs

11   notice.

12       Judge, this man has been deposed for four days.  The

13   deposition transcripts of his deposition totaled 1,220 pages.

14   The New Jersey lawyers were present for the two days that he

15   was deposed in the MDL, and we've said, "Listen, under the --

16   under PTO 38 and under Federal Rule 30(d)(1), you get one more

17   day with him."  And we've offered that they could have that

18   one additional day -- I may not have the exact -- I believe we

19   offered either September 10 or September 11.

20       So that's our position on that.  We think that they've

21   had adequate time to depose Mr. Lamont.  We do not think they

22   are entitled to two additional days with Mr. Lamont.

23       THE COURT:  Mr. Cartmell?  Mr. Aylstock?

24       MR. CARTMELL:  This is Tom Cartmell, Your Honor.  He

25   was deposed for two days on one product.  We're trying to

1    complete the deposition of Mr. Lamont 30(b)(6) in one

2    additional day.  He will be talking about six -- six or seven

3    products.  There's virtually -- there's absolutely, I should

4    say, no way we could finish his deposition on all products if

5    we are not given another full day, seven hours; and we still

6    won't finish it, incidentally, on the 30(b)(6).  And then we

7    have agreed that we would take one day of fact deposition

8    testimony from him.

9        You know, I've looked back at the New Jersey litigation

10   and the number of depositions.  There were 57 depositions

11   taken in New Jersey on one product, and 26 of those

12   depositions, the deposition lasted two days or longer.  There

13   were multiple -- on one product -- multiple times seven, I

14   believe, depositions were three, as many as four, and those

15   were all fact witness depositions.  And we're not trying to be

16   unreasonable.  We're just trying to make sure, on behalf of

17   thousands of cases, women across America and lawyers

18   everywhere who expect us to be their fiduciary and prepare a

19   trial package for them, that we've done our duty.

20       We're also trying to make sure that we can finish these.

21   We're fielding calls from lawyers all over America who are

22   saying, "Do you have these handled or do we need to be there

23   or file" -- and some of them are in state courts -- and

24   saying, you know, "Are we going to ask questions as well?  Do

25   we need to?"

1    Frankly, we've been telling these people, other than Adam

2    Slater in New Jersey -- because he insists otherwise -- that

3    we have it, you know, handled so that they don't necessarily

4    need to extend these depositions unnecessarily.  So we can

5    complete these depositions not, you know, in a lot of respects

6    for all products adequately, but we're trying to be

7    reasonable.  We don't think we're being unreasonable.

8    We've only had 35 depositions right now.  In, you know,

9    Vioxx and Avandia, it was 60 to 70 depositions.  In heart --

10   in others, it's been, you know, hundreds of depositions.  And

11   we're doing it in six months on seven or eight products, and

12   we just need the time to make sure we do an adequate job.

13            MR. COMBS:  And, Judge, just very briefly.  I mean

14   let's not lose sight of the fact the guy has already given

15   1,220 pages of deposition transcript.

16   I -- you know, the fact that depositions took multi days

17   in New Jersey I don't think has any bearing on this.  He's

18   been deposed for two days in New Jersey, two days in the MDL.

19   We've offered him for another day at the -- I defended the

20   30(b) deposition that he was at, Chad Hutchinson and I.  And

21   at the end of that deposition, what the plaintiffs' counsel

22   said at page 536 of that transcript was, "I'm just ceding my

23   last 30 to 45 minutes here to Mr. Hutchinson so he can do his

24   direct."

25            So the plaintiffs have already said on the record that

1    they only had 30 to 45 minutes more for the man's 30(b)

2    deposition.  And I just think that five days is enough.

3              THE COURT:  Have all the products been covered in

4    the 30(b)(6) deposition?

5              MR. COMBS:  Judge, it's a little hard for me to

6    answer.  He is -- he is a post-marketing surveillance witness.

7    So the procedures that apply would apply across the board.

8    Like, for example, there wouldn't be a different procedure for

9    TVT, you know, for a certain TVT as opposed to a different

10   TVT.

11             MR. CARTMELL:  Your Honor, this is Tom Cartmell.

12   I'll answer that, and the answer is no, they have not all been

13   covered.

14       And to take that statement by counsel that he's turning

15   over 45 minutes and that's all he had is an absolute untruth,

16   because there have been multiple conversations with defense

17   counsel saying, "We need another day."  And he knows that.

18       And to say that, you know, one product gets two days and

19   you guys are fine with that, but all of a sudden now you're

20   using it against us in the MDL who's supposed to have their

21   own opportunity to take depositions and we're trying to do

22   seven products, it's just not fair, frankly.

23             THE COURT:  All right.  Well, here's what I'm going

24   to do on that.  I am going to grant the plaintiffs an

25   additional day for the Rule 30(b)(6) deposition, and I'm also

1    going to give them seven hours to take a fact deposition, all

2    right?

3              MR. COMBS:  Okay.

4              MS. BAGGETT:  Thank you, Your Honor.

5              MR. GAGE:  Yes, Your Honor.

6              THE COURT:  Dan Smith.  Where are we with Dan Smith?

7              MR. CARTMELL:  Dan Smith's deposition, Your Honor,

8    was completed two days as a fact witness.  Now, this is the

9    deposition that you've been told it was a 30(b)(6) for four

10   days, and he was designated in the 30(b)(6) to cover all

11   issues of design and development, all design history files for

12   each of the eight products, actually, because Laser Cut Mesh

13   and TVT-AA were covered with them.

14       He is the individual who's responsible for finding on

15   behalf of the company a new mesh or material that would

16   replace the TVT mesh for safety reasons.  He was the inventor,

17   developer, designer of the TVT-S, the TVT-O.  TVT Scion,

18   TVT-PA were both in development.  TVT Abbrevo and Exact he

19   worked extensively on.  TVT Classic he was in charge of from a

20   research and development and engineering standpoint, and the

21   Laser Cut Mesh, signing off on all risk management tools.

22       He is, even ahead of David Robinson, the most important

23   witness in the TVT cases there is.  He was their designee for

24   30 topics in the 30(b)(6) deposition.  That deposition we

25   agreed to complete.  His fact witness deposition went forward

1    for two days this week.  And the total time on the record was

2    10 hours, I believe, and 17 minutes.  We were not given a full

3    14 hours.  And even if we were given 14 hours, we would not

4    have finished his deposition.

5        He -- we have major, major problems with responses during

6    the deposition, and this is an issue you've said that maybe we

7    should file a motion on.  And if you'd rather me not give

8    examples here and file our motion on, we will do that,

9    although I would like to give examples to the Court if they

10   would allow me, if the Court --

11              THE COURT:  Well, let me ask you, what --

12              MR. GAGE:  Your Honor --

13              THE COURT:  -- is it that you want?  What are you

14   asking for?

15              MR. CARTMELL:  What we would like is an additional

16   day with Dan Smith as a fact witness deposition.  We've agreed

17   to try to complete that in one day.

18              MR. GAGE:  Your Honor, this is William Gage.  I

19   would like -- Tom, you and I may have discussed this briefly

20   yesterday, but, Your Honor, I really haven't had -- because

21   it's so new, this pending request for an additional day of Dan

22   Smith, if I could ask Your Honor's leave, we can take a look

23   at this situation and get with the people that defended his

24   deposition.  I can get Mr. Cartmell a response by close of

25   business Monday.

1            THE COURT:  That's fine.  I think if you can work

2    that out, that's fine.  You know, I will tell you that I think

3    two days is a long time for a fact witness deposition.

4        Now, understandably you didn't get two full days.  You

5    apparently got a day and a half, but --

6            MR. CARTMELL:  Yeah.  They insisted -- counsel

7    insisted -- this is Tom Cartmell.  Counsel insisted at 3:30

8    that they start their direct.  They performed a two-hour

9    direct, and then we did a 45-minute, I think, 50-minute

10   recross.  That's a whole nother issue that maybe next week we

11   can talk to you about because it is creating really major

12   issues I think.

13       The other issue we'd like to talk about is the potential

14   to have somebody at these depositions, a special master, to at

15   least see the responsiveness of these witnesses, but I

16   understand we're running out of time.  And if you want to talk

17   about that next week, then we can push it to then.

18           THE COURT:  Why don't we have you two try to work

19   something out with Dan Smith.  I do think that, you know, a

20   three-hour examination of your own fact witness is a little

21   unusual, so --

22           MR. CARTMELL:  It was two hours.  I apologize if I

23   said three.  It was two.

24           THE COURT:  Okay.

25           MR. CARTMELL:  This is Tom Cartmell.

1          THE COURT:  In any event, you know, most of the time

2     you don't ask very many questions of your fact witnesses.  So

3     I could see where that might be a legitimate reason for having

4     a little bit longer with Mr. Smith.  But why don't you try to

5     work it out.

6          MR. GAGE:  We will, Your Honor.  Hopefully we can

7     get something done.

8          THE COURT:  All right.  Well, I think that's about

9     all we're going to be able to accomplish today.  So I guess at

10    least we got that done.

11         MR. GAGE:  It's been very helpful and we appreciate

12    your spending your Friday afternoons with us.

13         THE COURT:  Well, I'm beginning to look forward to

14    these little meetings.  I like to be -- I really like to be

15    the one in charge.  In any event, I do appreciate it, and you

16    guys try to get what you can done before our next -- I guess

17    the biggest point maybe by next Friday will be you're going to

18    work on Dr. Klosterhalfen.  And also if there's any additional

19    fall-out with Dr. Hinoul, we can talk about that then as well

20    and whatever else comes to mind.

21         MR. CARTMELL:  Sounds good.  Thank you.

22         MR. GAGE:  Thank you, Judge.

23         THE COURT:  All right.  Enjoy your weekend.

24    Bye-bye.

25         (Telephonic conference concluded at 4:11 p.m.)

1      I, Teresa M. Ruffner, certify that the foregoing is a

2    correct transcript from the record of proceedings in the

3    above-entitled matter.

4

5         /s/Teresa M. Ruffner                    August 26, 2013

6    _____       _____

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25