```
                 IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                          AT CHARLESTON


_____x
                               :
IN RE: ETHICON, INC.           :          MDL No. 2:12-MD-2327
PELVIC REPAIR SYSTEM           :
PRODUCTS LIABILITY             :
LITIGATION                     :          DATE:  August 30, 2013
                               :
_____x



                  TRANSCRIPT OF MOTIONS HEARING HELD
              BEFORE THE HONORABLE CHERYL A. EIFERT
                  UNITED STATES MAGISTRATE JUDGE
                         HUNTINGTON, WV


APPEARANCES:
(All counsel appearing by telephone.)


For the Plaintiffs:        BRYAN F. AYLSTOCK, ESQ.
                           D. RENEE BAGGETT, ESQ.
                           DANIEL J. THORNBURGH, ESQ.
                           Aylstock Witkin Kreis & Overholtz
                           Suite 200
                           17 East Main Street
                           Pensacola, FL 32502

                           THOMAS P. CARTMELL, ESQ.
                           Wagstaff & Cartmell, LLP
                           Suite 300
                           4740 Grand Avenue
                           Kansas City, MO 64112

                           JEFFREY FRIEDMAN, ESQ.
                           Law Office of Jeffrey Friedman
                           Suite 400
                           120 South State Street
                           Chicago, IL  60603

                           BENJAMIN H. ANDERSON, ESQ.
                           Anderson Law Offices
                           Suite 215
                           1360 West 9th Street
                           Cleveland, OH  44113
```

(Appearances continued:)


For the Defendants:        WILLIAM M. GAGE, ESQ.
                           BENJAMIN M. WATSON, ESQ.
                           GARY RUBIN, ESQ.
                           DONNA JACOBS, ESQ.
                           Butler Snow O'Mara Stevens &
                           Cannada, PLLC
                           P. O. Box 6010
                           Ridgeland, MS 39158-6010

                           DAVID B. THOMAS, ESQ.
                           PHILIP J. COMBS, ESQ.
                           DANIEL R. HIGGINBOTHAM, ESQ.
                           Thomas Combs & Spann, PLLC
                           P. O. Box 3824
                           Charleston, WV 25338-3824


Court Reporter:            Ayme Cochran, RPR, CRR

Proceedings recorded by mechanical stenography;
transcript produced by computer.

1          PROCEEDINGS had before The Honorable Cheryl A. Eifert,

2    Magistrate Judge, United States District Court, Southern District

3    of West Virginia, in Charleston, West Virginia, on August 30,

4    2013, at 2:00 p.m., as follows:

5               THE COURT:  Hello, everybody.  So are you all ready for

6    your long weekend?

7               MR. AYLSTOCK:  Yes, Your Honor.

8               THE COURT:   What do you have, about 40 depositions

9    scheduled over the holiday?  I'm glad it's you and not me.

10        Okay.  Let me just mention one preliminary thing before we

11   get started.  I just -- I had -- I guess Mr. Higginbotham had

12   contacted Laura about an extension for Ethicon to respond to the

13   plaintiffs' motion to compel production of sales representative

14   files and I wanted to put on the record that I have, of course,

15   agreed to that extension.

16        So the plaintiffs -- the defendants will have until -- or

17   wait.  Is this -- I have plaintiffs have granted a one-week

18   extension, okay.  So Ethicon has now until September the 10th to

19   file the response and then the plaintiffs would have their time

20   after the 10th.  So let's just get that on the record.  Everyone

21   agrees to that; is that correct?

22              MR. AYLSTOCK:  Yes, Your Honor.  This is Bryan Aylstock

23   for the plaintiffs.  They did request and we agreed to a one-week

24   extension on their response.

25              THE COURT:  All right.  Super.

```
 1        Okay.  That is all I have.  Who would like to go first?  And
 2   I don't know if anybody wants to update me on the depositions or
 3   if you have those all resolved at this point?
 4             MR. GAGE:  Your Honor, this is William Gage.  We do
 5   have some depo issues we need to discuss with Your Honor and,
 6   somewhat like last week, these are issues that, if we could get
 7   the Court's guidance, it will help us because they're kind of
 8   things that need to move.  You know, we need to really get them
 9   into place starting next week.
10             THE COURT:  Fine.  Why don't you go ahead then, Mr.
11   Gage, and tell me what the issues are.
12             MR. GAGE:  Well, Judge, I've got one thing just to kind
13   of update Your Honor and also to respond to Mr. Cartmell.  He and
14   I talked just shortly before this call.
15        Your Honor may remember, there's a big hearing with Judge
16   Goodwin on -- I think it's September 16th.  I'm sorry --
17             MR. AYLSTOCK:  18th.  18th -- or 19th, I mean.
18             MR. CARTMELL:  19th, I think.  This is Tom Cartmell.
19             MR. GAGE:  Okay.
20             THE COURT:  Yes.  There are things scheduled on the
21   19th.
22             MR. GAGE:  And we had previously agreed to take Dr.
23   Hinoul's deposition on that day and so Tom reached out to me
24   shortly before the call, Your Honor, and suggested that we go
25   look at alternative dates for Dr. Hinoul's deposition and I told
```

1    them that I would try to report back before the call -- or, I'm

2    sorry, at least by the call and what -- Your Honor, I just wanted

3    to report that we will attempt to find alternative dates so that

4    -- so that the lawyers who would otherwise be covering that

5    deposition can be available for that hearing.

6        There is -- but there is one issue that remains with regard

7    to Dr. Hinoul's deposition apart from maybe moving the dates and,

8    Tom, correct me if I'm wrong, but I believe the parties had

9    previously agreed to a two-day deposition and this, I think,

10   would be -- Dr. Hinoul has already been deposed for two days.  So

11   this would be actually days 3 and 4 of his deposition and, in

12   conjunction with a recent 30(b)(6) deposition notice that was

13   issued by the plaintiffs where we are required to identify

14   witnesses to respond to the various components of the notice, we

15   identified, I believe it was today, that Dr. Hinoul would be --

16   would be testifying about one of the topics in that deposition

17   notice.

18       There are a number of topics.  There are -- there are four

19   topics and he's going to testify about one of the topics, and

20   that topic is any reasons why a particular statement -- there's a

21   sentence in the TVT instructions for use, but it was changed in

22   2010 and the plaintiffs have asked for a 30(b)(6) deponent to

23   explain why the statement was changed.

24       So we've advised plaintiffs Dr. Hinoul will be the corporate

25   rep for that 30(b)(6) question and that we would like to wrap

 1     that into the two days we are now rescheduling for Dr. Hinoul's

 2     deposition and I --

 3          Tom, I don't know if that's acceptable to you, but that

 4     certainly would be our position, that we wrap that component into

 5     that two-day period.

 6          MR. CARTMELL:  Your Honor, this is Tom Cartmell.  Yeah,

 7     that was the first I'd heard of that today.  Dr. Hinoul's

 8     deposition is the conclusion of his fact witness deposition,

 9     which was originally started -- New Jersey, I think, took a

10     period of a day or so of deposition, and then we took a day or so

11     of deposition, and so we did not finish, and we had agreed --

12     Christy Jones and I agreed that we would come back to finish his

13     fact witness deposition.

14          They had also identified -- the defense had also identified

15     Dr. Hinoul as a 30(b)(6) witness way back related to our research

16     and development or our design, the 30(b)(6) notice.  Dan Smith

17     had several topics in that notice and Dr. Hinoul had several

18     other topics.  I think it's close to -- it's between ten and

19     fifteen topics Dr. Hinoul has been identified to discuss.  They

20     are clinical studies related to all products; in other words, all

21     the TVT products.  So it's covering an enormous amount of ground

22     and information.

23          All of the -- or excuse me.  All of the clinical studies for

24     each of the TVT products and all of the prototypes as well, which

25     totals up to nine or ten products, he has been identified to

```
 1     discuss.  I agreed to do the 30(b)(6) in conjunction with that
 2     and try to get done.  Frankly, I don't think there's any possible
 3     way that we're going to get done with that 30(b)(6).
 4          We'll do the fact witness deposition, as we agreed.  We'll
 5     get done with that.  The 30(b)(6), we're only going to have, I
 6     think, probably a day or a little more than that for that.  I
 7     agreed to do that and then say, hey, you know, if we don't get it
 8     done, we may be asking for another day, and so our intent was to
 9     try to finish that, although I think it's extremely unlikely.
10          Then today, they obviously identified him to discuss another
11     topic, which Mr. Gage is right, it is one -- it is only one
12     paragraph that, I guess, they've identified him for, but the
13     topic is all studies and data and evidence that support a claim
14     in their -- in their label related to how this mesh in each of
15     the six products, or seven or eight, whatever it is, how the mesh
16     works in a live woman's body, and I suspect there's going to be a
17     ton of data that they are going to throw at us related to that
18     topic.
19          So, whereas, it may be one issue and topic, it's going to be
20     a situation where we are going to have to go through with him
21     data that supports the statement on a ton of products and
22     probably a ton of studies that support it.  So I just don't think
23     there's any way -- they're clearly trying to jam us up here.  I
24     don't think there's any way we can finish those together.
25               THE COURT:  Well, let me make sure I understand.  So
```

1    Dr. Hinoul has already been deposed for a couple of days and

2    that, perhaps, was in the New Jersey litigation?

3         MR. CARTMELL:  Your Honor, this is Tom again.  That was

4    in this case.  We -- it was noticed up and it was cross-noticed.

5    New Jersey's lawyer did some questioning on the Prolift, you

6    know, the products that have been in discovery in New Jersey, and

7    then we started on the TVT products, but we didn't finish.

8         THE COURT:  Then the two days that you now have set

9    aside, the additional two days, is that -- are those days

10    intended to be a continuation of a Rule 30(b)(6) deposition, or

11    are those two days of fact testimony, or is that a combination?

12         MR. CARTMELL:  It's a combination of both and it's not

13    a continuation of the 30(b)(6), Your Honor.  It is a -- it's the

14    first time we've ever had a chance to ask him questions about his

15    designation as a 30(b)(6) witness.

16         THE COURT:  But it's about the topics that you -- you

17    started on previously; is that correct?

18         MR. CARTMELL:  Well, no.  We didn't start on these

19    topics.  He was identified on different topics and nobody has

20    ever asked a question about these topics.

21         THE COURT:  So there have been two separate 30(b)(6)

22    notices of deposition to which Dr. Hinoul has been identified as

23    a corporate designee?

24         MR. CARTMELL:  That's correct, Your Honor.

25         THE COURT:  Questions have been asked on some of the

1    topics; on the second notice, the questions haven't been asked

2    yet, and that's what the two days is supposed to be, that

3    deposition, as well as a day of fact witness testimony, correct?

4         MR. CARTMELL:  Your Honor, this is Tom.  I apologize

5    I'm not clear.  He has been -- you're right that he has been

6    identified in two separate 30(b)(6) notices as their designee.

7    We have not asked a question of him on either of the topics in

8    either of the notices that he has been designated for.

9         THE COURT:  Oh, I thought I understood you to say that

10   you got started, but you didn't get finished.

11        MR. CARTMELL:  We got started with his fact witness

12   deposition.  We did not get started with the 30(b)(6) deposition,

13   but I agreed to go ahead and put the 30(b)(6) deposition after

14   the completion of the fact witness deposition.

15        THE COURT:  And the additional topic that he has been

16   -- I mean you -- based on the first notice of deposition, Rule

17   30(b)(6) deposition, you're okay?  You think you can finish that

18   in one day?

19        MR. CARTMELL:  No.  What I said was, and I told them

20   this honestly, I'm willing to take your two days and finish the

21   fact witness depositions and then start the 30(b)(6), but because

22   he's been identified on like fifteen different topics, and

23   there's -- the other thing to understand is he didn't even get

24   there until 2009.  So he's been identified on things.  Unless

25   he's -- I suspect he's not going to know about a lot of the

1    stuff, but I don't know that.  I don't think there is any way we

2    are going to finish that 30(b)(6), and I've told them that, but

3    I'm willing to go forward and, if we don't, then, of course, I

4    was -- we were going to come back and say we didn't finish that

5    30(b)(6).

6              THE COURT:  Okay.  Now one additional topic, as I

7    understand it, has to do with why language, why a sentence was

8    changed in a document; is that correct?

9              MR. CARTMELL:  This is Tom.  That's not really a

10   question -- it's not a sentence that was changed.  They have had

11   in their labeling the sentence that says, "The mesh has

12   bidirectional elasticity that allows it to withstand the forces

13   in a woman's body" essentially.  That's what the sentence says.

14        We've asked dozens of witnesses, you know, what is the

15   support and data for that?  None of them have an answer for that

16   and our -- except several have said there were studies done in

17   the 70s and 80s and 90s that support that, and we say, is it

18   hernia mesh studies that were done that provide the support for

19   this statement that is in a TVT that goes in a woman's pelvis and

20   they say, "Well, we don't know for sure."  So we did a 30(b)(6)

21   to nail down exactly what studies and data and evidence support

22   the claim that the mesh has those characteristics.

23             MR. GAGE:  Your Honor, if I -- this is William Gage.

24   If I could just respond briefly, and I hate that I got things

25   going off into the detail that it's gotten off into, but just at

1    kind of a 50,000-foot level, let me just kind of tell you how I

2    see the issue.

3        When -- based on the prior discussions, it is my

4    understanding that -- that we took a very hard line position and

5    said we are giving you two more days for Dr. Hinoul and that --

6    and that's it and -- and so, while I understand Mr. Cartmell is

7    saying that his position is, well, we would try to finish in two

8    days, I just wanted the record to be clear that that was not

9    necessarily the position that we agreed with.  Our position was,

10   no, we believe two days should be sufficient.  So I just wanted

11   to clarify that for the record.

12       The second thing I wanted to state was that, Judge, the

13   deposition notice that -- that we designated Dr. Hinoul to

14   respond to, one of the four topics to date, was topic number two.

15   Topic number one is the identity of all the studies and data and

16   other evidence that formed the basis of the statement in the IFU.

17   That's what Mr. Cartmell just told you is going to take a lot of

18   time and lots of data and they're going to shove a lot of data on

19   us and it's going to take forever to question, but Dr. Hinoul is

20   not the designated deponent for number one.  That's going to be

21   Tom Barbolt.

22       Question number two comes after question number one, and

23   question number two says, "Any and all reasons why the claim in

24   the IFU above was changed in 2010".  So it was that singular

25   issue that we designated Dr. Hinoul today to testify and so, at

1    50,000 feet, Judge, what basically I see is the parties had

2    agreed to two days, understanding we have a dispute as to whether

3    two days is sufficient, and then all we did today was add one

4    more question to that existing two days, and it was just our

5    position that that simple addition of that one question shouldn't

6    then be the tipping point or the straw that breaks the camel's

7    back that then automatically opens it up to a third day of

8    deposition and that was just really our position on that, Judge.

9         THE COURT:  Well, Mr. Cartmell, it doesn't sound like

10   that question would take that long to answer.  If -- if these

11   studies and whatnot are going to be described by some other

12   witness, then it seems to me that it would be probably pretty

13   simple for Dr. Hinoul to answer that -- that second question as

14   to the reasons, which would probably be because of the findings

15   in the studies, and somebody else is going to tell you about the

16   studies.  So I don't see why you wouldn't -- why you shouldn't be

17   able to do that in the day that you've got set aside for the Rule

18   30(b)(6) deposition.

19        MR. CARTMELL:  Your Honor, I was -- this is Tom

20   Cartmell.  I was just going to say, I -- you know what, I had not

21   seen that.  I just got the e-mail saying number two and I'm not

22   in my office.  So I do agree with that.  I didn't -- I thought he

23   was the one designated to discuss all the clinical trials like he

24   is in the other 30(b)(6).

25         So while I agree that it sounds like that may not take a lot

1    of time, you know, I -- again, I would like it to be clear to the

2    Court that there are topics on the other 30(b)(6) that we have to

3    get through; in other words, that are critical to each of these

4    cases, and I don't think there's any way that we're going to be

5    able to do it in a day and a half, and I'm going to -- we have

6    decided we're going to try to finish the fact witness deposition

7    in a half day or, you know, at that point.

8         But, you know, to get to those fifteen, ten to fifteen, and

9    then to get to this, I'm just not sure we can do that with this

10   witness and it's going to be really prejudicial to us if we have

11   to -- you know, if we can't get through the other stuff.  If we

12   get through the other stuff, yeah, it doesn't sound like, I don't

13   know, because we don't know exactly what he's going to say, but

14   it doesn't sound like this addition is going to take much longer.

15             MR. ANDERSON:  Your Honor, this is Dan Anderson.  If I

16   could add something, and that is that I took Thomas Barbolt's

17   deposition in the first round of depos and he was a 30(b)(6)

18   witness on things similar to this.  Part of the problem is that

19   he is not a clinician.  He is not a surgeon.  He's a

20   veterinarian.

21        And so, oftentimes, when I would ask about a study and he

22   would talk about it, I would say -- ask him the logical follow-up

23   question, at least it was logical to me, and that is, "And what

24   is that effect in a woman's pelvis", because he does animal

25   studies, and he would say, "You'd have to ask a clinician.  You'd

1    have to ask a clinician" on question after question.

2         And, therefore, if he's going to push those types of things

3    off to the clinician which, in this case, would be Pete Hinoul on

4    that topic, then we're going to have to re-plow the ground as

5    between what is shown in an animal versus what you would

6    anticipate that showing and what would be a logical step as to

7    whether or not that even is applicable after you tested it in the

8    tissue of a rat's back, they call it "rat dorsum", and they test

9    a small amount of tissue in the back of a rat and then,

10   constantly, I would ask him the question, "And how does that

11   relate to how it would react not from 30 days in a rat's back,

12   but for the life of a woman with a large piece of mesh in and

13   around her pelvic organs", and the answer would be, "You'll have

14   to ask a clinician.  I don't know".

15        So we could easily run into, and I anticipate that we will

16   run into that very same situation here.  So what seems like a

17   singular question on a singular topic actually is a very big

18   topic and they will oftentimes say, oh, we've had plenty of

19   studies on that and our goal in these 30(b)6s is to not allow

20   that to hang out out there.

21        Just like if anyone else was in our shoes doing their due

22   diligence in trying to prove our burden, we have to say what

23   studies are those and how do you -- how are you claiming to this

24   jury and to this Court that those would react in the same manner

25   in a woman's tissue for the rest of her life as they did in these

1    animal studies and Thomas Barbolt simply will not be able to make

2    that connection, as evidenced by past history and past deposition

3    testimony.  That's all I have to add.

4            THE COURT:  All right.  Well, I think we've really gone

5    about as far as we can on this particular issue.  I think it

6    sounds like we're going to have to wait and see.  You're all

7    concerned about something that hasn't happened yet.  I think that

8    the plaintiffs understand that they need to get these depositions

9    done.  They need to do it efficiently and as quickly as possible.

10       I'm going to suggest that they be prepared to ask Dr. Hinoul

11   about the additional topic at this two-day deposition and if, for

12   some reason, things get way off course and you can't get

13   something done, then we'll have to discuss it at that time, but

14   right now, it's all just -- it's all a lot of things that haven't

15   happened yet.  So let's move on to some -- something else.

16       What else do we have?

17           MR. AYLSTOCK:  Judge, this is Bryan Aylstock.  A

18   concrete issue that I'd like to bring up on a deposition topic is

19   Paul Parisi and Paul -- Mr. Gage and I have had numerous

20   back-and-forths, and we have asked repeatedly, and we're just at

21   impasse on whether the MDL gets any more time for Mr. Parisi.

22       By way of background, this was the deposition that you were

23   called at because Mr. Slater from New Jersey took the entirety of

24   the first day of the deposition and asked questions primarily on

25   the Prolift product.  He was following up.  He's New Jersey's --

1    he's Ethicon's 30(b)(6) designee on professional education for

2    New Jersey and so Mr. Slater asked a series of questions and

3    finished up his Prof deposition, his Prolift deposition, and then

4    you were called to weigh in on whether or not the redirect on

5    that, or the direct examination, should go forward or wait, and

6    what you ultimately said is, well, go ahead and finish the

7    Prolift direct examination and then you can start on the TVT

8    stuff.

9        So, ultimately, that's exactly what happened and, after a

10   back-and-forth, we got started shortly before lunch, and then

11   there was a lengthy lunch break, and then we got going, and

12   ultimately, the MDL got three hours, just a little hair over

13   three hours of deposition testimony of Paul Parisi.

14       And a little more background, and I've said this before, but

15   just to remind the Court, Paul Parisi, as the Worldwide Director

16   of Professional Education for -- from 2007 on, he changed jobs

17   just recently, but worldwide, was before that, I asked,"Can you

18   send me -- please tell me what the final Prof Ed materials are?

19   Can you please do that for me?"

20       We asked for it in open court.  Ms. Jones addressed it

21   before Judge Goodwin and Your Honor and, ultimately, after

22   asking, I got a grid at 10:00 the night before the deposition and

23   that was clearly and admittedly inaccurate, incomplete, and

24   totally, you know, useless certainly at 10:00 before the night of

25   the deposition.

1        Three weeks later, I got an updated grid that had 50 percent

2   more Prof Ed materials on it, an additional 17.  It went from 35,

3   I think, to 7 -- to 51, what were supposedly final Prof Ed

4   materials.  Since then, we've identified more and they've said,

5   yeah, these are more Prof Ed materials we didn't put on the other

6   grid.

7        So he was also -- before Worldwide Director of Professional

8   Education, he was the product -- Product Director for

9   Incontinence and Pelvic Floor Repair from 2003 to 2005.  He's

10  been an Ethicon employee since he got out of college.  He was New

11  Product Strategic Marketing Manager, Pipeline in 2001.  He is a

12  lifelong employee of this company and clearly a highly relevant

13  witness on a topic that is very difficult to be concise with

14  because these professional education materials, some of them are

15  two-hour long videos.

16       It's not just like you can show, you know, here's a few

17  pages of a Prof Ed material.  These are videos.  They're

18  webinars.  They're preceptorships.  They're proctors.  They're

19  cadaver labs.  There are, you know, 50-some-odd-plus materials

20  admittedly and we've had three hours with the guy and it's

21  Ethicon's firm position that we get no more time and we need his

22  deposition, and we're entitled to his deposition, and it's not

23  something that, frankly, I think I can complete in one additional

24  day.

25       I would like to request two additional days, given the

1    importance of this witness, but at a minimum, we've been given

2    three hours of time and what we're told by Ethicon is a pile of

3    sand and I just don't understand it and I'd really like the Court

4    to order him to be produced.  It doesn't necessarily have to be

5    immediately.  I would like it sometime in September or October,

6    but for two consecutive days so I can finish that deposition.

7              THE COURT:  Mr. Gage, that doesn't sound unreasonable

8    to me.  Three hours is not enough time.

9              MR. BROWN:  Your Honor, may -- this is Michael Brown.

10   May I speak?

11             THE COURT:  Yes.

12             MR. BROWN:  I think there's a couple of things that we

13   need to let you know, Your Honor, is that Paul Parisi was deposed

14   in a New Jersey deposition for three days previously and there

15   was an MDL fact deposition that took place and the -- and the MDL

16   plaintiffs allowed the New Jersey to take the whole first day of

17   the deposition instead of asking him about the TVT products.

18        We were present at 9:00.  The plaintiffs' counsel from New

19   Jersey wasn't available until 9:30.  We then, the next morning,

20   were available at 9:00 ready for the deposition, but MDL

21   plaintiffs did not want to go forward with the deposition until

22   New Jersey counsel got there.  We did not start until 10:01.  We

23   took a 40-minute lunch and then, Mr. Aylstock ended the

24   deposition at 4:05, when we were ready to continue.

25        So plaintiffs' counsel did have two days' worth of time to

1    do the deposition for this fact witness and chose to allow New

2    Jersey to ask questions with regard to Prolift products where

3    he'd been asked for three days and they had an opportunity to ask

4    this fact witness about those depositions and, Your Honor, our

5    position is that when we're going to put these witnesses forward

6    for two days in a fact deposition based upon MDL's notice that

7    they would ask questions about the TVT products that are at issue

8    and, also, that if they are going to allow New Jersey to ask

9    questions, that it would be applicable questions on these TVT

10   products and, when our witnesses are provided, that we would

11   begin at 9:00 when we're there, not at 9:30 on one day, and not

12   at 10:00 on the next day, and that the deposition wouldn't be

13   stopped at 4:00 and that the questions would continue to be

14   asked.

15        Your Honor, so those are a couple of major issues there, and

16   then from 2008 to 2010, he was not doing Gynecare's business.  He

17   was a marketing director.  There have been multiple marketing

18   witnesses.  There have been other professional education

19   witnesses.  And the professional education, as we've discussed,

20   primarily just looks at the logistics of bringing this

21   information together.  It's the medical affairs groups that are

22   responsible for the actual substance and content behind it, Your

23   Honor.

24             THE COURT:  Well, with all due respect to the counsel

25   from New Jersey, who I am not familiar with, it doesn't sound to

1    me as though anybody is able to control him or tell him what to

2    do or allow him to do things.  I think he does what he wants to

3    do.

4        I don't think that should prejudice the plaintiffs'

5    attorneys in this MDL.  They should have an opportunity to ask

6    questions.  So I'm going to give them more time to do that.

7        I think you're going to need to work out some time frame to

8    allow them to question Mr. Parisi because three hours just isn't

9    enough.  Now I understand you thought it should have gone longer

10   and this and that, but the bottom line is, they haven't had

11   enough time.  I don't think what they're asking is unreasonable.

12   So I suggest you try to figure out a time frame to continue his

13   deposition and this time it will only be for the MDL attorneys to

14   ask questions.  If they choose -- this time around, if they

15   choose to let the lawyer from New Jersey take control, then

16   they're just going to be out of luck.

17            MR. AYLSTOCK:  Thank you, Judge.  That won't happen

18   again, I can assure you.  We were trying to --

19            COURT REPORTER:  I'm sorry.  Who's speaking?

20            MR. AYLSTOCK:  I'm sorry.  This is Bryan Aylstock.  I

21   appreciate your comments and, just so the record is clear, there

22   was cross notice in New Jersey as part of it, but I hear what

23   you're saying and we'll be -- and I appreciate your ruling.

24            THE COURT:  All right.  What's the next issue then that

25   we can handle today?

1            MR. GAGE:  Judge, the next one concerns a Dr.

2      Aisenberg.

3            COURT REPORTER:  I'm sorry.  Who's speaking?

4            MR. GAGE:  Oh, I'm sorry.  This is William Gage.

5         The next issue concerns Dr. Aisenberg and the issue is

6      whether he should be offered up for one day or more than one day

7      and I will again yield the floor to Michael Brown, who knows Dr.

8      Aisenberg better than I do, and he can address, Your Honor, our

9      position as to why it should be a one-day depo and why we're

10     struggling to understand why it should be more than one day.

11           MR. BROWN:  Your Honor, Michael Brown.  Dr. Aisenberg

12     is a former employee who was at Ethicon from 1999 to September of

13     2002.  So he would arrive after the first product TVT was

14     launched in 1997 and he was gone before the TVT-O product was

15     launched and so he was a medical director for sustainment only of

16     TVT-O for one product and, based upon that, Your Honor, we

17     believe that there should only be one day of deposition.

18           THE COURT:  All right.  Who wants to respond to that

19     from the plaintiffs' side?

20           MR. CARTMELL:  Your Honor, this is Tom Cartmell.  We --

21     Dr. Aisenberg was the very first medical director at the company

22     when they started selling mesh for use in women's pelvises.  He

23     was not involved in only one product; in other words, we have

24     documents that show that he was involved in TVT; TVT-II, which

25     was a change not only to the needles, but also the mesh of the

product in 1999; TVT-AA, which is the abdominal approach;

TVT-Blue; Prolift; PROLENE Soft; the development of TVT-O, as

well.  It's multiple, multiple products.

    He was the key related to the transition from MedScand which

is the European company that originally manufactured the product,

and then it was purchased by Johnson & Johnson.  The transition

to Johnson & Johnson is a critical time period in this case and

what we found from multiple depositions is there are clearly

boxes and boxes of documents that are missing.  They're either

not produced because they're lost, or they're missing, and we're

getting -- we're getting different answers from different

witnesses and it's become a major source -- well, a major source

of questioning during the depositions and I know he's going to

have more information about that essentially than anybody other

than Ms. Angelini.

    He was involved in the initial labeling of the product,

which is critical because the first trial in this case is a TVT

Classic case.  He was the medical director that had to sign off

on all the labeling.  They told us that they are missing the

original labels from 1998-1999 up until the end of 2000 and have

been unable to explain where those labels are, although we have

information that those labels did not contain information related

to all practice of injuries to plaintiffs that we have, was

involved in the adverse event reporting during the key time for

-- actually, we -- my belief was it was '97 to 2002 when he was

1    there and adverse event reporting, the post-marketing

2    surveillance, he signed off on all the marketing materials for

3    all of these products.

4         And so he is, for this first trial, the marketing -- or,

5    excuse me, the physician that they all point to.  They say you

6    have to go to Medical Affairs.  They're the ones that are

7    responsible for warning.  In all of the medical aspects of our

8    defect case, he's the most important witness that we have.  There

9    is absolutely no way we can finish his deposition in one day.

10        Again, with all these products, it's unlikely we will in two

11   days, but we have agreed that we would do everything within our

12   power to do it within two days.  This is a date for deposition

13   we've been trying to get for months and months and months and

14   have just recently, in the last month or month and a half, been

15   given a date.  We thought that they may not be able to give us a

16   date.

17        So we know that he was a consultant prior to '99 as well, is

18   our understanding.  Anyway, we really feel strongly we need more

19   than one day.  Two days, we're hopeful we can finish with this

20   important witness.

21             THE COURT:  Mr. Brown, there -- clearly, there is a

22   very different perception as to the role that Dr. Aisenberg

23   played.  Did he play a role in more than one product?  They're

24   saying it was TVT, TVT-II, TVT-AA, PROLENE.  Can you answer that

25   for me?

1          MR. BROWN:  Yes, Your Honor.  I'm not familiar at all

2    with a product called TVT-II, nor am I aware on any short form

3    complaints that there is a product called TVT-II out there, nor

4    is there a TVT-Blue out there, as they he have indicated,

5    whatsoever.  So I'm not sure, Your Honor.

6          You know, Your Honor, there was a TVT-Retropubic or Classic,

7    which was the first product.  It was launched in Europe in '97,

8    and then the United States in 1998, and then you've got your TVT

9    Opturator case, Your Honor, that comes after that.

10          They did mention a TVT-AA, which is an abdominal approach

11    that the plaintiffs did not ask a question about to date, but,

12    Your Honor, he -- so he was within just that three-year time

13    frame and the labeling issue in this first case that they had

14    mentioned is a 2010 label and has nothing to do with the labeling

15    that would have taken place in 1997 or '98 because he wasn't

16    present at that time.

17          MR. CARTMELL:  Your Honor, this is Tom Cartmell.  Those

18    products -- again, if Mr. Brown had attended Dan Smith's

19    deposition, he would have heard about TVT.  It's come up in

20    multiple depositions.  It does exist.  It was a change to the

21    original TVT.

22          The other thing is, you know, they've told us he is one of

23    now, I think, fourteen or fifteen witnesses that they don't have

24    a custodial file for, but there are 42,000 documents that have

25    his name on them.  6,000 documents -- excuse me.  42,000 pages

1    that have his name on them.  It's one of the largest amounts of

2    pages that we have.  There is a total disconnect here between

3    what we think he's involved in and what they think he's involved

4    in.

5            THE COURT:  Well, based on -- based on what I've heard,

6    particularly the number of documents that are attributable to Dr.

7    Aisenberg or that he appears in, I don't think one day will be

8    enough either.  I think two days should be plenty.  So I'm going

9    to allow them two days to take Dr. Aisenberg's deposition, but

10   the two days will be it, unless something comes up at his

11   deposition that indicates that he had much greater involvement

12   than what Mr. Brown believes him to have had.

13           MR. CARTMELL:  Thank you, Your Honor.

14           MR. BROWN:  Thank you.

15           MR. GAGE:  Your Honor, the final deponent that -- well,

16   I owe -- I will say this.  I owe Mr. Cartmell some time for Dan

17   Smith and I just frankly totally forgot it.  I'm just dead level

18   honest with you and I -- and so I just want to apologize, but I

19   have to get back with him on a date for that and so, anyway, Tom

20   reminded me of that right before the call by e-mail and I just

21   went, wow.  I just forgot it.  So I do -- I do owe him some time

22   on that and I'll get that to him as quickly as I can, Judge, but

23   -- but so that's not a -- I hope we don't have a dispute on that.

24       But the last issue that I think just kind of hit us square

25   concerns a guy named Jim Mittenthal and Jim Mittenthal, Judge, is

1   the company's kind of outside guy that's been put up for these --

2   you know, the document retention issues and I think he's been

3   deposed once, maybe twice.  I haven't been personally involved

4   with the depositions, but let me tell you what the issue is.

5        Mr. Mittenthal was last deposed on August 13th and, after

6   that deposition, as I understand it, a conversation was held on

7   that day, immediately after the deposition.  The plaintiffs asked

8   for additional time with Mr. Mittenthal and they specifically

9   wanted Mr. Mittenthal to -- the agreement was reached that the

10  plaintiffs would give us the names of ten witnesses that -- that

11  he would then go investigate their files and be able to respond

12  at the next deposition as to the status of the document retention

13  for those ten individuals.  I guess it's like kind of a beta

14  test, you know, you just look at ten.

15       So we asked the plaintiffs to identify for us -- you know,

16  tell us who the ten are that you choose, and there have been

17  several -- and, in the meantime, while we were waiting for the

18  ten -- the list of the ten names, his deposition was scheduled

19  for September 10.  Now we received the names today.

20       And the problem, Judge, is that we are requesting of the

21  plaintiffs to move the deposition from the 10th to the 17th and

22  push it back a week for two reasons.  One is, because we have

23  just now gotten the list of the ten names, we believe it is going

24  to take more than between now and September 10 to get the

25  investigation done so that he can properly testify about those

1   ten witnesses;

2       And then, secondly, Mr. Mittenthal observes Rosh Hashanah

3   next Thursday and Friday and so that kind of knocks out two days

4   that would otherwise be available for him to conduct the

5   investigation into those ten witnesses.

6       Now I mentioned this very briefly to Mr. Cartmell when we

7   talked about it.  This issue didn't surface, I think, until

8   today, so it's kind of fresh, but I did mention it to Tom and Tom

9   said, William, I'm not personally involved with Mittenthal, but

10  he said, it's my understanding that it's the plaintiffs' desire

11  that that deposition go on the 10th, as opposed to the 17th and,

12  Judge, I -- I don't really -- I have not heard a reason why it is

13  so critical it go on the 10th versus the 17th, but I'm afraid I'm

14  setting myself up for failure because I'm going to have a witness

15  who is not going to be adequately prepared to respond to the list

16  of the ten names, which we just received today.

17          THE COURT:  All right.  Who would like to respond to

18  that?

19          MR. AYLSTOCK:  Your Honor -- this is Bryan Aylstock,

20  Your Honor.  I'll respond.  Just a little background on this,

21  Your Honor.  Mr. Mittenthal was the 30(b)(6) designee of Ethicon

22  on our document production 30(b)(6), and we've alluded to this

23  several times, but there are dozens of custodial files that are

24  gone, have gone missing, including all the way down from sales

25  reps on the cases that will be coming up for trial, all the way

1    up to the president of the company, and these were files,

2    custodial files that should have been preserved because there

3    were litigation holds in place, and that's been admitted to, and

4    there -- you know, so we have testimony of multiple witnesses.

5        When we looked at folks -- I deposed the Chief Science

6    Officer, Dr. Mahmoud, and he had very -- he had less than a

7    hundred documents in his entire file, and almost all were

8    personnel file documents.  Yet, I find other documents that

9    happened to be in the production with his name on them.  He says,

10   "No, I saved everything.  I meticulously saved everything.  I

11   would not have deleted it".  So it is a major, major issue, and

12   it is an issue that has been going on for a long time.

13       In fact, the deposition notice that this is -- that we're

14   talking about here with Mr. Mittenthal was served back in May.

15   It was served in May.  What happened was, procedurally, we had

16   the date.  Literally, the weekend before the deposition was

17   supposed to happen, I get an e-mail from Ms. Jones, "Please, will

18   you move this deposition for me?  It snuck up on me.  I didn't

19   realize", whatever.

20       I said, all right.  I'll move it, but we need a date

21   certain.  I'll move it if you agree to produce somebody who is

22   well -- and, you know, I need to know this, too.  I want to make

23   sure this person is prepared to address each and every topic in

24   the notice because it's a specific -- it's a very important issue

25   to us.  I'll agree to move it.  So we moved it and we moved it to

1    a date that Mr. Mittenthal was agreeable to.

2         Then, about a week before that deposition, they Prof Ed

3    noticed Mr. Mittenthal in New Jersey notice and said, well, let's

4    do it together, and I said, look, we're trying to coordinate.

5    Yes, we will agree to move it again at your request because we --

6    we think it's an important issue, but let's do it one time.  That

7    makes total -- total sense.

8         And so we get to the deposition.  I attended as well and so

9    I was -- I listened.  I didn't conduct the deposition personally,

10   but I certainly was there and heard the discussion afterward.

11   What was said is, look, we will give you -- it wasn't even really

12   a request.  The issue of why it didn't get completed was

13   two-fold.

14        One, there is a -- what's called a Corrective and Preventive

15   Action Plan, a CAPA.  It's an internal procedure for Ethicon, and

16   one of the CAPAs, when they identify a problem, they open a CAPA,

17   and this was a -- not a new issue at all.  In fact, it was an

18   issue I brought up in one of my very first depositions about two

19   years ago, I think, in this litigation in the New Jersey

20   deposition with Jennifer Payne, I brought it up.  So it's not a

21   new issue.

22        But if I can get to the point, the CAPA related to the

23   failure of Ethicon to maintain control on the litigation of

24   documents for litigation and regulatory purpose, that was part of

25   our notice.  They didn't produce the CAPA files before the

1    deposition, even though we asked and even though it was required,

2    and so what they did was they sent a partial file to one lawyer

3    the Friday before.  So they -- and, I think, admittedly didn't

4    have them for us when they needed to.  So we couldn't ask really

5    questions about that.

6        And then, secondly, Mr. Mittenthal had extensive notes about

7    all of his interviews with the people at Ethicon and their lack

8    of control or whatever for these documents or -- and did not

9    produce those notes.  So they agreed to produce the notes, they

10   agreed to produce the CAPA, and they agreed to produce Mr.

11   Mittenthal on the 10th of September so that we could get this

12   issue nailed down, so that then motion practice can happen, and

13   they -- they know that it's no secret we intend to file a Motion

14   for Spoliation because these are key documents that are missing.

15       And what this is, in my view, is an effort to further delay

16   this deposition that has been noticed since May and this issue

17   about the witnesses that, you know, they want us to identify the

18   witnesses with files that they can't find, well, that is -- they

19   know those witnesses.  They've known those witnesses since the

20   beginning and that was also part of our notice that was served

21   back in July.

22       So it's not like -- look, we're happy to cooperate.  We

23   don't want to surprise the guy, but this isn't really a new

24   issue.  They know the whole deposition is about all these

25   witnesses, corporate witnesses, without custodial files.

```
1              THE COURT:  All right.  Mr. -- Mr. Aylstock, did -- did

2    you -- did the plaintiffs give to Ethicon today a list of ten

3    witnesses that they expect this particular deponent to

4    investigate?  Is that correct?  Is that true?

5              MR. AYLSTOCK:  I don't -- I don't know that.  If it

6    happened, I wasn't copied on the e-mail.  I don't know.

7              THE COURT:  Well, I can tell you this.  You can go

8    ahead and take your deposition on September the 10th, but you're

9    not going to ask any questions about those ten witnesses whose

10   names you just gave to Ethicon.  So if that, in fact, occurred,

11   you're not going to be able to ask anything about them.

12        On the other hand, your other option is to delay it to

13   September 17th, and then you can ask about the ten names that you

14   gave to the defendants.  It otherwise makes no sense.

15        Why do you want to insist on taking his deposition on a day

16   when he can't be ready, when you've waited and waited and waited,

17   and this is such critical information and all you have to do is

18   wait one more week?  I mean I think those are your two options.

19        If you just gave them names today, they don't have time to

20   do the investigation they would need to do between now and

21   September the 10th, with a holiday -- a holiday involved and plus

22   two Jewish holidays, days that they will be taking off.  It just

23   can't be done.

24        So what's your pleasure?  Do you want to ask them questions

25   about these ten people or not?
```

1          MR. AYLSTOCK:  I -- Judge, my preference would be,

2    unfortunately, to delay the deposition.  Just so the record is

3    clear, they just asked for these names.  I'm not trying to hide

4    any balls.  These are names that -- they know which custodial

5    files are missing and it's not a secret, but I accept your ruling

6    and we'll go forward on the 17th.

7          THE COURT:  All right.  What's the next issue?

8          MR. CARTMELL:  Can I real quick, Your Honor -- this is

9    Tom Cartmell -- clarify something, because I know Hinoul can be

10   put behind this, but I want to make sure on something.  My

11   request on Dr. Hinoul related to the hearing being on the 19th

12   and it becoming sort of a big deal hearing, I know every hearing

13   is, but this one has some new wrinkles to it that make it

14   extremely important for both sides, was -- was a request that we

15   push that back.

16      If, in fact -- this is for you really, William.  If you were

17   going to give me earlier dates, then I'll just go -- I will miss

18   that hearing and I will just take the deposition on the 19th and

19   20th, because I am not -- I cannot be available and ready for

20   that deposition, as you know, because you have -- we have so many

21   depositions prior to that.

22         MR. GAGE:  All right.  So, Your Honor, we will look for

23   a date, as I understand that, after the current -- the currently

24   scheduled dates to accommodate Mr. Cartmell in that regard.

25         THE COURT:  Is that what you want, Mr. Cartmell,

```
1    something after the 19th of September?

2              MR. CARTMELL:  Yes, 19th and 20th, I would appreciate

3    it, or else, if we have to, then we'll just go forward on those

4    dates.  Thank you.

5              THE COURT:  Now, was Dr. Hinoul the one that has to be

6    in Missouri to testify?

7              MR. GAGE:  Judge, I am pleased to report that that

8    trial --

9              COURT REPORTER:  I'm sorry.  Who's speaking?

10             MR. GAGE:  Oh, I'm sorry.  This is William Gage.

11             THE COURT:  Yes.

12             MR. GAGE:  I am pleased to report, Judge, that that

13   trial was continued by the judge in that case and I think the

14   continuance occurred on Wednesday --

15             THE COURT:  Okay.  Well, good.

16             MR. GAGE:  -- this past week.  Yes.  That kind of helps

17   out.

18             THE COURT:  All right.  Good.

19             MR. GAGE:  Judge, the last -- the last thing I wanted

20   to mention on kind of the scheduling issues and, Judge, you know,

21   I haven't been involved in discovery-specific issues up until the

22   last three or four weeks with Your Honor, so sometimes my body of

23   knowledge and my history is not as deep as you probably would

24   expect someone who is talking on this call to have, but I would

25   -- you know, there has been a fair amount of e-mail traffic
```

1    between the parties and usually it's not happy e-mail traffic

2    about -- about the production of custodian and human resource

3    files.  Those are two different files.  There's custodial files

4    and then there are human resource files and, you know, human

5    resource files are just like the -- you know, employment files of

6    people.

7                    THE COURT:  Sure.

8                    MR. GAGE:  Or of the deponents.  Well, the curious

9    thing that I think I am correct on is it that the parties have

10   operated not pursuant to a court order, but have operated

11   pursuant to an understanding or an agreement that the custodial

12   files -- we would endeavor to produce the custodial files 21 days

13   in advance of the deposition, so that that gives the plaintiffs

14   time to review the documents before they go take the depositions.

15       And then with regard to the human resource files, we have

16   endeavored -- we kind of operate to endeavor to produce those

17   seven days in advance of the depositions and I'm not sure if

18   there's documentation to that effect, but I know that that's what

19   we -- that's kind of the benchmark that we each hold ourselves

20   to.

21       Judge, the one thing I wanted to just mention, because it's

22   now coming up a lot in the e-mail traffic between us and Mr.

23   Aylstock and Mr. Cartmell, is because there are so many

24   depositions that are -- that are -- that are being scheduled in

25   the month of September and there are still a fair number that Mr.

1    Cartmell has requested for which we still haven't yet given a

2    date; in other words, there are more depositions being scheduled,

3    I think we've got two -- perhaps, I think, two 30(b)(6)

4    depositions, additional new deposition notices last night, I am

5    concerned that I'm setting up my document production people for

6    failure because, in some instances, I'm worried that the

7    depositions may -- you know, because we're so -- we're trying to

8    be accommodative on the dates, I sometimes agree to dates or

9    offer dates and I don't even think about the 21-day deadline for

10   the custodial productions and I'm just asking for the plaintiffs'

11   indulgence and Your Honor's patience with us.  I'm predicting

12   that we may breach the agreement between the parties on a few

13   instances, but I just ask in advance for some consideration on

14   that.

15              MR. CARTMELL:  Your Honor?

16              THE COURT:  Yes?

17              MR. CARTMELL:  Your Honor, this is Tom Cartmell.  I was

18   going to respond.  We have been having considerable problems.  I

19   do believe that there's only two witnesses that we have requested

20   out, that the requests are out for right now, that are new.  All

21   of these depositions that we have requested, essentially that we

22   don't have dates on yet, have been requested for months and

23   months and months.

24       I mean I will say that, you know, they have had this list.

25   What they asked us to do, and it was primarily pursuant to your

 1     advice, Your Honor, was to get them a priority list of

 2     depositions and so, hearing you loud and clear, we did that.  I

 3     gave them an e-mail saying these are the ones we would like

 4     before the expert deadlines.  We can push all of these back, but

 5     all of those that were pushed back, other than truly only a few,

 6     they have had those names for months and months.

 7             THE COURT:  Mr. Gage, when you're getting -- when

 8     you've gotten the list of prospective witnesses from the

 9     plaintiffs, are you having your production people begin

10     collecting the documents at that point instead of waiting until

11     there's actually been a request for a definite date for a

12     particular witness?

13             MR. GAGE:  Yes, Your Honor.  I think -- I think the way

14     the process works is we actually send -- we put a list together

15     of all the deposition requests and then we send that to the

16     documents people so they know to start pulling those files.

17             THE COURT:  Well, it sounds, from what Mr. Cartmell is

18     saying, this list was given to you back months ago.  So why

19     wouldn't you be able to have those custodial files and HR files

20     already available to you?

21             MR. GAGE:  Well, Judge, maybe my concern is premature.

22     I think my concern comes out of the following.  There is just

23     such an enormous amount of e-mail traffic going back and forth on

24     depo scheduling and -- and I know I've seen one or two or three

25     new witnesses pop up over the last few weeks that I just get

1    worried and maybe there's -- maybe I'm worried about something

2    that's not really going to be a problem, but I just wanted to let

3    everybody know, you know, we're doing our best on these custodial

4    and document -- and the HR productions and it -- and it grieves

5    me to see.  We've done it in a few instances, Judge.  We've not

6    met -- sometimes we've gotten inside the 21 and the 14 days and

7    with just all that's going on, I'm fearful that I'm going to do

8    it, that it's going to happen again, and I just want Your Honor

9    and the parties to know we -- we are doing our best to make sure

10   that that doesn't become a problem and that's really all I wanted

11   to say, Judge.

12       We are pulling the ones from the lists that we've had for

13   quite awhile.  I'm less concerned about those than I am about

14   maybe some of the more newer ones.

15            THE COURT:  Well, and I think what will be considered a

16   reasonable effort on your part will depend a lot upon when you

17   were first asked about that witness and how many documents are

18   attributable or in the custodial file of that particular witness.

19   So I don't -- I understand that you're trying and I think that's,

20   you know, what you need to do.

21       I guess if some issue comes up in the future, we'll have to

22   look at that individual witness and when you were first requested

23   to present that witness and what sort of efforts were made to

24   collect the file and how big the files are.

25       So, you know, I think -- I think we don't need to worry

1    about that probably today.  It doesn't sound like there's

2    anything coming up that you are aware of sitting here today where

3    you're not going to have the file to them in a reasonable amount

4    of time.

5           MR. GAGE:  That's correct, Your Honor.  As I sit here,

6    I don't think we're aware of any problems where we know we're

7    going to have a problem.

8           THE COURT:  Okay.  Well, that's -- you know, if

9    something comes up, we can address it at the time.  I think, as

10   long as you're turning the names over to whoever it is that

11   collects the documents, as long as you're turning those names

12   over shortly after you receive them, then I don't -- you know, I

13   don't know what else you can do, really.

14          MR. AYLSTOCK:  Judge, this is Bryan Aylstock.  Can I

15   weigh in briefly?

16          THE COURT:  Sure.

17          MR. AYLSTOCK:  I've actually had some discussion on

18   this because it came up at Mittenthal because, following his

19   deposition, what one of the lawyers for Ethicon said is, "Well,

20   we didn't realize that the CAPA files were high priority", or

21   something like that, and I asked following that, "Well, I didn't

22   know that you didn't think that they were high priority.

23   Certainly, I did, but can you give us, please, the production

24   schedule?  Tell us who you're working on, which files are

25   complete, which files are not complete?  Can you share that

 1    information with us, because we might have a very different view

 2    from you about what's important and what's not important".  We

 3    probably do, being plaintiffs' lawyers and they're defense

 4    lawyers.

 5         And it's really brought to a head with the situation with

 6    Mr. Trzewik.  He was subject, as you may recall, a couple of

 7    hearings ago, and we didn't have his file and we were within the

 8    21 days.  Frankly, I don't recall the 21-day agreement.  I don't

 9    quarrel with Mr. Gage because I believe that a lot of these

10    documents are clearly relevant and within the RFP requests and

11    what I was told is that we're producing those.  We've produced

12    those.  We're holding nothing back.

13         Well, Mr. Trzewik's file came in after we had raised it and,

14    in looking at that, it's clear that a vast -- or there are dozens

15    and dozens and hundreds of examples where documents from that

16    file are really custodial productions for another file that are

17    not in those files.  For example, Dan Smith, who you know a lot

18    about, or Joerg Holste.  There are very critical documents, and

19    Mr. Holste's deposition has already been taken.

20         And so now I'm -- I've lost confidence in the ability to

21    know, first of all, what's been produced when and whether these

22    productions are ever complete and so if they can share, here's

23    the ones, the custodians we know that are complete, and certify

24    that, and here's the ones that are in process and here's the

25    central sources that are in process, then I think we can all be

1    playing from the same sheet of music, instead of wondering what's

2    there because, frankly, we may now need to go back and say we

3    need more time with Joerg Holste again.  It's a waste of

4    resources to do it again, but I don't know that we have any other

5    choice.

6              MR. GAGE:  Your Honor, I have a -- I have a response to

7    that.  I sent an e-mail.  I -- like Mr. Aylstock, I share his

8    views almost precisely on this issue in the sense that I think it

9    is time for us to have a face-to-face meeting where we can talk

10   about a number of issues with regard to documents and, Your

11   Honor, including prioritization of what it is that's important to

12   the plaintiffs and so I sent an e-mail to Bryan on Wednesday and

13   asked him to let us know when we can come down to his place in

14   Pensacola and have that face-to-face meeting because I think -- I

15   think trying to do it over the phone just doesn't work.  I think

16   a face-to-face would be helpful.

17        And Your Honor may recall, you had asked -- you had ordered

18   up the parties to meet and confer about some of these RFP's and

19   so the plan is, and we're waiting to hear back from Mr. Aylstock

20   on this, but the plan is, when he gives us a date for a

21   face-to-face meet and confer, we're going to meet and confer on

22   the RFP's that you've ordered us to do and then, also, on other

23   document issues, including the scheduling -- the prioritization

24   issue.

25             THE COURT:  Yes.  I think that's a great idea.  I also

1    -- I like Mr. Aylstock's idea about there being a more frequent

2    communication with them as to where you are in document

3    collection because I think a lot of the distrust issues arise

4    from the fact that they send out a name and it goes out into

5    space and then they don't know what's going on with it.  They're

6    trying to schedule depositions, but they don't have the documents

7    and they're trying to juggle these things.

8         You know you have the information that they don't have,

9    which is, has the request been made to the document collectors?

10   Have they started to collect it?  How far are they?  What else is

11   out there?  How much longer do they think it's going to take?

12        And I think it would be very helpful to resolving a lot of

13   these issues if, Mr. Gage, you would share that information with

14   Mr. Aylstock to say, well, yes, we've made the requests.  Yes,

15   they've started to collect.  It looks like they're half done.  We

16   still have to do this portion of document review and so that --

17   so that they have some idea of where you are with these things.

18             MR. GAGE:  I agree, Judge.  I think it's a great idea

19   and, hopefully, we can structure it -- and I think Bryan would

20   love to find a way to do this.  We can structure it so that,

21   frankly, maybe the -- you know, the lawyers on this call aren't

22   the ones having to do that; in other words, we can maybe have

23   some dedicated individuals in the various firms having those

24   communications so that we're able to, you know, keep the ball --

25   keep the eye on the other balls that we've got in the air.  I

1    mean, I think it may even be good to kind of almost make a little

2    protocol out of it.

3            THE COURT:  That's a great idea.  I think going to the

4    source is going to be where you get the best information and, by

5    the time you have somebody at another office tell somebody at

6    your office to tell you --

7            MR. GAGE:  Exactly.  Exactly.

8            THE COURT:  Yes.  I think that's a very good idea, too,

9    Mr. Gage.  I think you all should talk about that and come up

10   with some sort of procedure and then identify the people that are

11   going to keep everyone updated on how the document production is

12   coming.

13           MR. GAGE:  Well, Judge, that's a good idea and I would

14   recommend that we -- that, you know, as soon as we hear back from

15   Bryan on the dates of the meet and confer, you know, let's get

16   that scheduled and let's get an agenda for that meeting.  I think

17   -- I think that that would be good for us to put an agenda

18   together for that meeting, which includes this issue.

19           MR. AYLSTOCK:  And it may need to be over the phone.

20   This is Bryan, I'm sorry.  It may need to be over the phone,

21   given our schedules but, you know, if I could get that list in

22   advance of the meeting, it would certainly be more productive.

23       I know we're at our hour.  A couple of just quick things

24   because I don't want the record to be unclear.

25       On the custodial file production, I believe it was a 30-day

1   agreement, as opposed to a 21-day agreement, just so the record

2   isn't -- I can't guarantee that, but I believe that was what it

3   was.

4       And then the other thing, and this could potentially go to

5   next week because I know we're out of time.  We'd like, and we

6   brought this up at the very end, unfortunately, at the last one,

7   the Court to consider perhaps for some of these depositions, or

8   all of them, at least initially, a special master that could help

9   us wade through the responsiveness, or lack of responsiveness of

10  these witnesses, because there are just dozens and dozens of

11  examples we can show, but I think it would help both sides.

12      You know, and frankly, there's been complaints here and

13  there, hey, one of our lawyers gets a little too excited or

14  something, but if we had a special master to be able to sit

15  through some of them and -- they've been appointed in Pinnacle.

16  They've been appointed in the Actos MDL and so, you know, I just

17  wanted to put that on the table.  We're happy to brief it, if the

18  Court should so desire, but that's the other thing that we really

19  wanted to bring up today.

20          THE COURT:  Well, let's think about that.  I -- I have

21  a feeling that that proposal is not going to be well received in

22  this Court, in this district, but certainly, that's something we

23  can -- we can talk about.

24      I think one of the things that I would want to know is how

25  would we select a special master, and who would pay the special

1    master, and would this special master have to attend all of your

2    depositions or are you just talking about perhaps selecting a few

3    until you get an idea of how the special master would rule on

4    these certain issues.

5        You know, I've never done the kind of work that you've done.

6    I've done litigation on a much smaller scale, but I can't

7    remember anytime in my 27-year litigation career having to have a

8    special master sit in at a deposition to tell a witness to answer

9    a question.  That is something the witness's lawyer ought to be

10   doing, whoever is there for that witness.

11       If the witness is non-responsive, that witness's lawyer

12   should take them out into the hallway and say, "You have got to

13   answer the questions".  That's the job of the lawyer whose

14   witness that is.

15       So I don't understand the concept really of needing a

16   special master for that particular purpose, but I'm open to

17   hearing what you say and, you know, I haven't seen any of these

18   deposition transcripts.  Maybe these are all really horrendous

19   witnesses that won't answer a single question, but I would think

20   with lawyers of your caliber and your years of experience, this

21   would be something you could fix on your own without having to

22   have another person sitting there in a deposition telling people

23   how to answer questions.  It seems a little insane to me.

24           MR. GAGE:  Your Honor --

25           MR. AYLSTOCK:  I agree, but this is a little different

```
1    in that none of these witnesses, or at least we don't believe any
2    of them are within the subpoena power of the Court.  If these
3    were truly discovery depositions where we -- you know, and then
4    we could bring them live and either they would answer the
5    question or Judge Goodwin or yourself or the jury would see the
6    ridiculousness of some of the responses, that would be one thing,
7    but given that four days or six days, or however long we're going
8    to have to present our case, this filibuster is just out of
9    control.
10               MR. GAGE:  Your Honor?
11               THE COURT:  Yes?
12               MR. GAGE:  This is William Gage.  If I may respond to
13   that.  When Mr. Cartmell raised this issue with me a week or so
14   ago on the phone and I went back and looked at some -- some stuff
15   that he had, some transcript -- or a transcript that he wanted me
16   to look at, and I looked at it and, Judge, I'm not going to come
17   in here and tell you I'm batting a hundred percent with every
18   witness doing exactly what they ought to do.
19        So when I saw that, I went -- I was provided with Your
20   Honor's prior instructions on how witnesses should handle, you
21   know, responses, how they should be responsive.  Sometimes they
22   get concerned.  They don't fully understand this yes/no stuff and
23   -- but Your Honor had laid out some pretty clear instructions in
24   a prior -- I wouldn't call it -- I mean it was a ruling of the
25   Court, yes, but I think maybe you had been asked to provide some
```

1    guidance to a witness on the record.

2         So I took that and I have sent that back out to my entire

3    team and it said this is, you know, Judge Eifert's instructions

4    on these issues.  It is my hope -- and I was pretty clear on it.

5    I mean I didn't just attach the attachment.  I -- I let people

6    know what is expected of them.

7         So I am hopeful that to the extent these issues come up in

8    the future, I'm going to be looking to my team of lawyers to --

9    to prepare the witnesses and work with the witnesses in

10   accordance with Your Honor's prior statements on at least this --

11   you know, the concept of how to handle a yes/no question and that

12   sort of thing.

13         THE COURT:  That would be much appreciated because I

14   know that Judge Goodwin has a real problem with witnesses that

15   won't -- that are not responsive to the question asked.  If these

16   depositions are going to be used at trial, he's going to be

17   concerned, I think, if he hears a lot of rambling from these

18   witnesses.

19         Plus, that doesn't do anybody any good.  I mean you're

20   trying to get the information discovered and get it done so you

21   can go to trial, but I do believe that if these are your

22   witnesses, Mr. Gage, which it sounds like they are, then it's

23   your responsibility to make sure that they're answering questions

24   in an appropriate fashion.  It shouldn't require a judge or a

25   special master to be there.  It's the lawyer's job to do that.

```
 1              MR. GAGE:  Well, okay.

 2              THE COURT:  So I appreciate you trying to do that and,

 3    hopefully, we won't continue to have problems, if there are, in

 4    fact, problems.  I really haven't seen any of the transcripts to

 5    know if there's serious problems or not.

 6         I mean, you know, on the flip side, witnesses are sometimes

 7    going to ramble a little bit and that -- that can't be helped

 8    because they're nervous and they're under a lot of stress and you

 9    have to give them a little bit of leeway, but if you've got --

10    and we've all had that witness that just rambles on and on and

11    on.  It's the lawyer's job to prevent that from happening.

12         So I'm glad to hear we're all on the same page with that and

13    I'll let you guys work on this a little bit and, if it's not

14    getting any better, then we can re-visit this special master

15    concept, but --

16              MR. CARTMELL:  Your Honor?

17              THE COURT:  Yes?

18              MR. CARTMELL:  Tom Cartmell.  And your ruling has

19    been, as I told you before, I think, cited multiple, multiple

20    times at all these depositions, and I am just concerned because

21    when it is cited, the belief by the attorney is that if they

22    answer yes, for instance, to a question like, "Did your company

23    do a" -- you know, or, "No, did your company do a study on that

24    in live human beings", that they can then say, "The FDA doesn't

25    require us to and we did a study in cadavers and in people and
```

1    blah, blah, blah, blah, blah, blah, blah".

2         And that is the interpretation of your ruling I'm concerned

3    that they have, and that is that, as long as they say yes or no,

4    they can then say whatever they want and the problem is,

5    obviously, that just runs out the clock on us like crazy and then

6    we have to move to strike it and not be concerned that the judge

7    at the time of trial may not think that actually striking

8    questions is a true rule, federal rule.  So that -- that's my

9    concern.

10        THE COURT:  Well, and yes, and I think we've talked

11   about this before.  My ruling was that they have to answer the

12   question.  They are then allowed to explain their answer, if they

13   need to, if they need to explain it, but the explanation still

14   needs to be responsive to the original question.

15        Saying yes does not give them the leeway to then talk about

16   anything else they want to talk about that might somehow be

17   tangentially connected to the original question.  I mean they --

18   they have a right to explain their answer, if it needs to be

19   explained, but that's -- I agree with you, Mr. Cartmell.  That's

20   not an open door for them to just say whatever they want to say

21   about any issue in the case and I think everybody understands

22   that.  I would assume every lawyer understands that.

23        So I think we're going -- Mr. Gage has told all of us he's

24   making an effort to educate his witnesses and his team of

25   lawyers.  So I think we're going to have to put some faith in him

1    and hope that, if this is a problem, that it won't be a problem

2    in the future.  If it continues as a problem, then we'll

3    re-address it.

4            MR. GAGE:  And, Your Honor, I'm going to ask -- I'm

5    going to take this transcript and make sure that this portion of

6    it is delivered to every lawyer on our team taking depos.

7            THE COURT:  Great.  All right.  I think we've gotten a

8    lot done again today.

9            MR. GAGE:  We have.

10            MR. AYLSTOCK:  We have.

11            MR. CARTMELL:  We have.

12            THE COURT:  So I wish you all a nice holiday weekend.

13    I hope you do have an opportunity to take a little bit of time

14    off because I know you've been working at a frenetic pace.  So

15    good luck over the weekend.  Take a little time off and I'll talk

16    to you all, I guess, next Friday.

17            MR. CARTMELL:  Thank you, Judge.

18            MR. GAGE:  Thank you, Your Honor.

19            MR. AYLSTOCK:  Thank you, Your Honor.

20        (Proceedings concluded at 3:15 p.m., August 30, 2013.)

21

22    CERTIFICATION:

23        I, Ayme A. Cochran, Official Court Reporter, certify that

24    the foregoing is a correct transcript from the record of

25    proceedings in the matter of In Re:  Ethicon, Inc. Pelvic Repair

1    System Products Liability Litigation, Case No. 2:12-md-2327, as

2    reported on August 30, 2013.

3

4    s/Ayme A. Cochran, RPR, CRR                September 5, 2013

5    Ayme A. Cochran, RPR, CRR                              DATE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25