IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

AT CHARLESTON

IN RE:  ETHICON, INC. PELVIC REPAIR SYSTEM
        PRODUCTS LIABILITY LITIGATION           MDL No.
                                                2:12-MD-2327

Huntington, West Virginia
September 6, 2013

TRANSCRIPT OF TELEPHONIC STATUS CONFERENCE
BEFORE THE HONORABLE CHERYL A. EIFERT
UNITED STATES MAGISTRATE JUDGE

APPEARANCES (by telephone)

For the Plaintiffs:          **BRYAN F. AYLSTOCK, ESQ.**
                             **D. RENEE BAGGETT, ESQ.**
                             AYLSTOCK WITKIN KREIS & OVERHOLTZ
                             Suite 200
                             17 East Main Street
                             Pensacola, FL  32502

                             **THOMAS P. CARTMELL, ESQ.**
                             WAGSTAFF & CARTMELL, LLP
                             Suite 300
                             4740 Grand Avenue
                             Kansas City, MO  64112

                             **BENJAMIN H. ANDERSON, ESQ.**
                             Anderson Law Offices
                             Suite 215
                             1360 West 9th Street
                             Cleveland, OH  44113

```
For the Defendant:              WILLIAM M. GAGE, ESQ.
                                DONNA B. JACOBS, ESQ.
                                BUTLER SNOW O'MARA STEVENS &
                                CANNADA, PLLC
                                P. O. Box 6010
                                Ridgeland, MS  39158-6010

                                PHILIP J. COMBS, ESQ.
                                THOMAS COMBS & SPANN, PLLC
                                P. O. Box 3824
                                Charleston, WV  25338-3824

Court Reporter:                 TERESA M. RUFFNER, RPR
                                Sidney Christie Federal Building
                                845 Fifth Avenue, Room 101
                                Huntington, WV  25701
                                (304) 528-7583
```

```
Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription.
```

1    Friday, September 6, 2013, at 2:00 p.m. in conference room

2              THE COURT:  Well, we are lucky to have Terry Ruffner

3    here again with us today to act as our court reporter, so I'm

4    going to remind you to identify yourself before you speak so

5    that she can get the transcript correct in that manner, all

6    right?

7              MR. AYLSTOCK:  Yes, Your Honor.  This is Bryan

8    Aylstock.

9              THE COURT:  All right.  Thank you, Bryan.  Who would

10   like to go first?

11             MR. AYLSTOCK:  Your Honor, this is Bryan Aylstock.

12   I just wanted to update the Court and clarify something about

13   an issue for last week, and that is the deposition of James

14   Mittenthal, who was the 30(b)(6) designee on document

15   retention issues.  And as the Court is aware and Mr. Gage

16   pointed out, it was a brand new issue.  It wasn't on the

17   agenda.  And, frankly, I was blindsided by the -- what

18   happened to that.  And there was a representation made that

19   there were ten new witnesses that were identified in some

20   letter that I hadn't seen.

21        And I did go back to investigate that and just want the

22   Court to know that nine of those ten were identified at the

23   deposition, at the end of the deposition of Mittenthal.  There

24   was one additional witness, Allison London Brown.  Of course,

25   the deposition, we understand the Court's ruling and are not

1    intending to re-argue that, but the New Jersey counsel

2    couldn't be available on the 17th, so now it's been

3    rescheduled for the -- I believe the following week, so that

4    we can coordinate with New Jersey and hopefully knock it out

5    once and for all.  But I just wanted the Court to be aware of

6    those facts.

7            THE COURT:  Well, I appreciate that.  So you do have

8    it scheduled for the 17th; is that correct?

9            MR. AYLSTOCK:  Well, we had it for -- well, it works

10   for us, Judge, but New Jersey counsel is not available on that

11   date.  So to try to continue efforts at coordination and

12   let's -- I mean we're prepared to go forward on the 17th.

13   Their preference, of course, at Ethicon is let's do it once,

14   and, you know, that would be our preference too if we could

15   make it happen.

16       There is a date the following week that is available for

17   both the MDL and New Jersey counsel, and I believe we've

18   settled on that date.  Obviously we want it to be done as soon

19   as humanly possible because it's an important issue for us.

20           THE COURT:  Mr. Gage, does it -- does that agree

21   with your understanding, that there's perhaps a date after --

22   a date after September 17th when this witness can be

23   available and both New Jersey counsel and MDL counsel can be

24   available?

25           MR. GAGE:  This is William Gage.  Yes, Your Honor.

```
 1    I saw some e-mail tracks this morning that indicated the
 2    parties, including both MDL and New Jersey and Ethicon, had
 3    agreed to.  I think it's September 24.
 4            THE COURT:  Very good.  What other issues can we
 5    discuss today?
 6            MR. AYLSTOCK:  Your Honor, again, this is Bryan
 7    Aylstock.  There's an issue regarding some production, and I
 8    think Mr. Cartmell can speak to the specifics about it because
 9    it relates to some 30(b)(6) testimony that was provided and
10    then kind of dovetails into our requests for production
11    schedule or at least a sharing of the information, and we did
12    receive an e-mail from Mr. Gage with a chart of at least some
13    information about where the production is, but I think Tom can
14    get into the specifics of the documents related to this
15    MedScand that were just recently produced.
16            THE COURT:  Mr. Cartmell?
17            MR. CARTMELL:  Hi, Your Honor.  This is Tom
18    Cartmell.  I wanted to give you sort of an update about the
19    depositions and then tell you about the information we got
20    related to the custodial files.
21        We have been able to schedule, you know, depositions.  We
22    have the September 23rd expert cut-off.  And because of
23    timing, we've had to push some of those beyond the cut-off,
24    and I'm not -- we're not asking for, you know, a change in the
25    deadline, but it does turn out that some of the depositions
```

1    that we were hoping to originally take before then are going

2    to be scheduled in October, and we've been working

3    cooperatively to, I think, schedule those.  And I think all

4    but maybe the continuation of Mr. Smith's deposition has been

5    scheduled.

6        We did receive this week a chart from Mr. Gage related to

7    the custodial files.  You may recall that last week we talked

8    about, you know, providing us some idea of when the custodial

9    file productions would be complete, because we were having

10   difficulty with getting large volumes of documents after the

11   depositions.  And so Mr. Gage did send over a schedule related

12   to the depositions in September, and it does add to our

13   concern, honestly, because what we received was a chart that

14   has some information related to that.  I believe there's ten

15   or -- there's eleven depositions on here scheduled in

16   September, the first one being, I believe, the 11th, either

17   the 10th or the 11th.

18       At any rate, what we found was, for example, with two of

19   the custodians, the witnesses, Laura Angelini, who you may

20   recall is the one that has been called the godmother of the

21   actual TVT product, she is called -- described as

22   substantially complete, although there's a footnote that says

23   that they have found another hard drive for her recently.  The

24   hard drive will not be produced until mid October.  Well, her

25   deposition is September 16th and 17th, and we're looking for

1   another date.

2        The same is true with the Chief Medical Officer who is

3   being produced, I believe, on the 16th and 17th as well.

4   These are both depositions that we've asked for and they've

5   known about for, I think, greater than five months.  And

6   Angelini was actually scheduled once before in March.  We

7   asked for it in March.  It was scheduled in July.

8        So the same thing with James Hart.  He's substantially

9   complete, although he -- there's a hard drive that's been

10  located, I guess, and that won't be produced till mid October.

11  With several others, the former employees are listed as

12  complete.  And three of the four or five, we've -- the

13  footnotes indicate that they have completed documents for

14  those.

15       But for a few other custodians, witnesses, Axel Arnaud,

16  who's a medical director who we deposed in July, he is listed

17  as complete, but they -- he's a current employee, and it's

18  listed as the last time there was an update done on a

19  supplement to look at whether or not there's supplemental

20  documents is in November of 2012.  So we deposed him in July,

21  but they haven't looked and supplemented his ongoing custodial

22  file since November of last year.

23       We have another day of his deposition coming up this

24  month, and it doesn't look like they're intending to do any

25  supplementation to his; and obviously it's within a week, I

1   think, now of his deposition.

2        The same is true with Dan Lamont.  He's a current

3   employee.  They list him as complete, but they have not

4   supplemented his file, being a current employee, since

5   November of 2012, and we have done his 30(b)(6) months ago,

6   and there's a continuation of that this month as well.

7        So there's just some concerns here, you know.  We

8   continue to get documents, large volumes, after the fact that

9   sort of dovetails into what Bryan was saying about the

10  MedScand documents.  We had a dump of MedScand documents I

11  believe this last Saturday.

12       Many of the documents we got Saturday are MedScand

13  documents that were related to topics in our 30(b)(6) Dan

14  Smith done months ago.  There are audits and there is a due

15  diligence file that's extensive.  And those were, you know,

16  topics that routinely during the depositions, Dan Smith, who,

17  of course, is not at the company at this time, was saying,

18  "Yes, the documents reflect they exist, but I don't know;

19  you'd have to ask somebody else because I haven't seen them."

20  And then it turns out now we have depositions on the Classic

21  case, which is the first filed in this litigation, a 30(b)(6)

22  on the Classic, which is filled with "I don't knows" related

23  to documents that we now have.

24       So, you know, I guess, again, we were hopeful that we

25  could get, you know, a ruling that they would complete these

```
1    productions of custodians.  And we understand with current
2    employees, they're going to have to continue to supplement
3    them, but we'd obviously like them to continue to supplement
4    them behind me so that, you know, especially right before we
5    take depositions, we can get the additional documents.
6              THE COURT:  Mr. Gage?
7              MR. GAGE:  Your Honor, this is William Gage.  Judge,
8    there was a lot said there, and I was trying to take notes,
9    and I think it might be better, rather than me trying to
10   respond to everything, maybe let me respond to a couple of
11   points and then we can discuss it, if Your Honor chooses, in
12   greater detail.
13        Let's take, for example, Judge -- well, to rewind, you'll
14   remember, Judge, we talked last week about the issues with
15   regard to custodial productions.  The plaintiffs wanted to
16   ensure that we were doing our best efforts to get those done
17   in advance of all these depos that are scheduled for
18   September.
19        So what we did was after that call, I asked for, you
20   know, kind of a status report from our documents people and
21   the documents lawyers, all the people that are devoted to
22   gathering, collecting, and organizing all this stuff.  And so
23   they put this chart together.  And this is -- for example,
24   Judge, the two witnesses that Mr. Cartmell spent a fair amount
25   of time discussing, Laura Angelini and James Hart, the chart
```

1    indicates for both of these witnesses the same information.

2    It indicates that the status of production is substantially

3    complete; and then there's a footnote, and the footnote

4    indicates that the hard drives were not available for

5    supplemental collection until recently.  Responsive documents,

6    if any, from these hard drive supplementations are expected to

7    be produced early to mid October.

8        And I asked the document teams, "Well, what's going on

9    with this?  Tell me why is this an issue."  And they said when

10   we go in and do a supplemental production for a particular

11   witness, when you do things like you go in and you get their

12   e-mail -- you know, that's the stuff that most people are

13   interested in.  When you go in and you get your e-mail, you

14   can apparently grab that information remotely or you can get

15   it from some other place other than physically going to the

16   witness and physically getting that information from the

17   witness.  That's how I understand it and how it was explained

18   to me.

19       However, when you're doing a supplemental production,

20   when you want to -- apparently, you know, there are a number

21   of different things that you do, and one of the things on the

22   checklist is to go to the witness and say, "Give me your

23   laptop or your whatever, your hard drive, and let me see if

24   you've dragged anything onto a hard drive that may need to go

25   into the supplemental production."

1      So, Judge, as it was described to me, you know, the vast,

2  vast, vast, vast majority of whatever witnesses typically keep

3  has been included and produced in the supplemental production.

4      What may still be out there are things that the witness

5  may have dragged to a hard drive.  And I said, "Well, when can

6  we get that?"  And they said, "Well, these witnesses are" -- I

7  think certainly -- I think it was Laura Angelini has either

8  been out of the country on an extended vacation or out of the

9  country for an extended period of time, and they're making

10  arrangements to get her laptop, to get -- and/or her hard

11  drive, to get this data, if there is any, and then include

12  that.

13      And they said once we get it, you know, it goes to the

14  vendor and has to get processed along with all of the other

15  requests that the plaintiffs have made.

16      So as they are telling me, Judge, the belief is that

17  there is a small chance that what has not yet been collected

18  is likely to be anything of significance.  It would apparently

19  have to be something that would have been on her hard drive in

20  the last six months or whatever it is; seven, six months.

21      Now, as I understand it, Miss Angelini is being deposed

22  largely about MedScand and/or her involvement with MedScand or

23  her knowledge about it, and she did make, I think, the

24  30(b)(6) on MedScand.  I'm not sure.  But as I understand it,

25  most of those transactions and activities occurred in 1999,

1    2000, 2001, around that time frame.

2         So, Judge, that's kind of how it's all shaking out.  I'm

3    not -- I mean I think -- I think we are doing what we should

4    be doing, and that is going to the nth degree to get all this

5    stuff, but it appears to me -- obviously, I can't make a

6    representation until we know what's on the hard drive, but it

7    appears to me that the chances of there being anything on the

8    hard drive that would be relevant to the subject matter of the

9    depo is pretty slim.  And the same would hold true with, I

10   think, James Hart, who falls into the same category as Laura

11   Angelini.

12        So what I wanted to do was to make sure that when we sent

13   the chart, we put the footnotes and we made the caveats so

14   that the plaintiffs would know that we feel like we've done a

15   very robust supplemental production, but there's still a

16   couple of -- you know, there's a closet or two that we hadn't

17   been able to get into and we wanted them to know it.

18             THE COURT:  Well, Mr. Cartmell, does that reassure

19   you some?

20             MR. CARTMELL:  Your Honor --

21             MR. AYLSTOCK:  Judge, this is Bryan Aylstock.  Would

22   you mind if I butted in real quick?

23             THE COURT:  No.

24             MR. AYLSTOCK:  A couple of things.  First -- well,

25   the chart that was provided was, I think, ten or eleven names

1    and referred that what we'd produced we've searched 200-and-

2    some custodians and produced documents.

3         Well, you know, I kind of was expecting us to know, well,

4    are the productions complete on those custodians or not.  And

5    then secondly, with regard to the completeness, you know, it

6    sounded like, from what Mr. Gage said, is that they kind of do

7    this electronic sweep when they do the custodial hard drive,

8    but they hadn't until recently asked Miss Angelini or Dr.

9    Hart, you know, "Do you have anything else?"  And that's when

10   they find these other things.

11        And what we're finding in the productions -- and the

12   Trzewik production is a really good example.  As you may

13   recall, Trzewik was the witness over in Germany who we got, I

14   think, 11,000 documents, something like that, you know, very

15   close to the deposition and they needed to push off.

16        Well, what we're seeing in that production as we're going

17   through the documents in preparation for that deposition is

18   multiple, multiple examples of documents from other witnesses,

19   witnesses we've already done, like Dan Smith, like Joerg

20   Holste, that are very important documents that we would have

21   questioned those witnesses about that weren't -- and we've

22   gone back and verified this -- weren't in their custodial

23   files and while these folks are current employees.  And so it

24   doesn't make a whole lot of sense what we're seeing, why these

25   documents are being produced, that are clear they're e-mails,

1    you know, to or from or copied to these folks during the

2    litigation hold period that simply are not in their file that

3    we didn't get until after their deposition.

4         So I guess that's a long way of saying no, I'm not -- it

5    doesn't alleviate my concern about it.  In fact, in some ways

6    it makes it even more concerning because we continue to get

7    documents after depositions but that, frankly, were relevant

8    and either should have been in the custodial file or clearly

9    relevant to what we -- the subject matter at hand.

10        The MedScand documents were, first of all, I would

11   submit, under a Rule 26 obligation of the civil litigation,

12   but were certainly requested 13, 14 months ago in the requests

13   for production.  And we've been on this trail for a very long

14   time and, you know, had months of back and forth about it;

15   And only, you know, I think within the last week do we get

16   certain key documents that we would have used for the

17   30(b)(6).

18        So what we'd like, frankly, Your Honor, is an order that

19   they need to complete their production -- first of all, tell

20   us, not just eleven witnesses, tell us for the custodians,

21   have you actually gone to them and asked them and are they

22   complete at least as of a certain date under your obligations,

23   and order that to be done within a time certain, hopefully

24   soon, and then have the supplementation of an Axel Arnaud,

25   these current employees, that clearly are still working on

1   these products, you know, a more seasonably date-certain

2   supplemental production so that we can know what's there and

3   what's not in advance of their depos.

4          MR. GAGE:  Your Honor, if I could -- this is William

5   Gage -- if I could just briefly respond to that.

6      The reason that -- the first issue I think that Bryan

7   mentioned was the custodians through September, and he pointed

8   out that that only included the people that were scheduled to

9   be deposed in September and didn't include the people that

10  are -- that they've asked us to depose in September -- I mean,

11  I'm sorry -- in October and November and then also people who

12  were deposed previously and that there is no pending depo

13  request.

14     My view and my belief from the call last Friday was that

15  I needed to focus on the most urgent task, which was the

16  people that were set for September.  I have asked our document

17  people to prepare a similar chart for the people that are

18  under discussion for deposition in October and then also to

19  prepare a chart for the people who had previously been deposed

20  and are no longer, you know, up for -- or on a depo schedule.

21     So that information is coming.  I just needed to focus my

22  people on that which was the hottest.  So I'm going to be --

23  we're going to be providing that information.

24          THE COURT:  And when will you be --

25          MR. GAGE:  Secondly, Judge --

1          THE COURT:  When will you be providing that

2     information?

3          MR. GAGE:  On the -- for the people on October,

4     easily we can -- we can do that next week.  I think I can

5     probably provide it for everybody next week.  If I -- if I

6     can't provide it for everybody next week, I will let Bryan

7     know early next week, like Monday, but my belief is that I can

8     definitely do those for the people for October next week and

9     probably for everybody by next week.

10         And, Judge, the reason -- one of the things -- one of the

11    reasons that we actually want to do that is because -- and

12    Bryan can attest to this.  He and I have been swapping e-mails

13    the last couple of days.  You may remember we talked last week

14    about I had recommended we have a face-to-face meet-and-confer

15    to talk about the priority of the remaining production and the

16    gaps in the remaining production, and Your Honor had suggested

17    that would be a good idea.

18         Well, Bryan and I look like we've settled on what we

19    think is going to be maybe around the last weekend of

20    September.  I mean not that we're going to meet on the

21    weekend, but we're going to meet on a day either before or

22    after that weekend.  And what we want to do, in addition to

23    these custodial collections, is be able to start working with

24    plaintiffs next week to formulate the agenda for that face-to-

25    face, because I believe that's where we're going to be able to

1    come out of a, you know, a sure-enough all-day face-to-face

2    meeting and we're going to know where the true differences

3    are.  But anyway I just wanted to remind you of that.

4        The other point I wanted to mention, Judge, was on this

5    issue of finding documents in custodial files for one witness

6    but not finding them in another, Judge, I will be candid with

7    you.  I'm not an e-discovery expert, but I've been around it

8    enough to know that that is apparently a feature that's not

9    uncommon in electronic discovery.  I can't give you the full

10   list of reasons why that occurs, but I do know that -- I've

11   seen that occur in other cases and I know that there's been

12   talk about it.  Those things do occur.

13       And as Bryan and others on the plaintiffs' side let us

14   know about these anomalies, what I do with those anomalies

15   is I send them back to our document people.  I'll forward

16   the e-mails or I'll have a phone call with them and I will

17   say, as we did with, for example, this Trzewik custodial

18   file that there has been concern, I've asked our document

19   people, "Okay.  Bryan makes a good point.  Why are certain

20   documents in there and why are certain documents

21   missing?"

22       And then they provide -- you know, they're looking into

23   that sort of stuff so that we can get a -- you know, try to

24   get our hands around it to get some understanding of what's

25   happening.  So those problems are problematic at times and

1    they are sometimes equally perplexing to us as well, so -- but

2    we're doing the best we can to try to meet those concerns.

3              THE COURT:  I think as far --

4              MR. AYLSTOCK:  Your Honor --

5              THE COURT:  Let me just step in here a second.  I

6    think as far as the update or the list of documentation from

7    the custodians, Mr. Gage, I do want you to have the October

8    people prepared by next week.  And then on Friday we'll see,

9    if you haven't gotten the November people and the rest of the

10   people updated by then or the list provided to the plaintiffs,

11   we can figure out how much longer it's going to take you to do

12   that.  But I do want you to have some information to the

13   plaintiffs as to where you are on the witnesses that are

14   scheduled for deposition in October.

15       The other point I want to raise here is I do understand

16   that for some reason sometimes documents don't appear in

17   custodial files that you would think should be there, but on

18   the flip side of that, if the plaintiffs have taken a witness'

19   deposition and after that deposition significant documents

20   turn up upon which that witness would have been questioned had

21   those documents been available at the deposition, I'm going to

22   be inclined to let the plaintiffs take another deposition of

23   that witness to ask about the newly discovered documents,

24   because I don't think it's fair when they're going in and

25   taking these depositions, they're going in with the belief

1    that they have the most significant and relevant documents and

2    they've had a chance to look through them and they've had an

3    opportunity to base their questioning on those documents, it's

4    not fair for you to come up with documents after the fact and

5    then expect them to be precluded from questioning the witness

6    about those documents.

7         Now, I hate the thought of having third- and fourth-round

8    depositions of these people, but that ultimately may be what

9    happens if this continues.  I don't know of any other way to

10   address it.

11        MR. CARTMELL:  Your Honor, this is Tom Cartmell.  If

12   I can just add one thing.  And on that -- on what you just

13   stated, to respond real quickly, we are looking at that

14   currently, for example, with the MedScand documents.  I mean

15   we don't want to go back, believe me, and take depositions

16   just because there's extra documents if it's not going to

17   change anything and it's not relevant and all that.  But what

18   we've got to look at is, you know, now we've got these videos

19   that are, you know -- because these people aren't going to

20   show up at trial, obviously -- can they be used and is it

21   really relevant information.

22        So we may be making some of those requests to you now.

23   We just -- with all that's going on and the expert report

24   deadline coming up and stuff, we're just not there yet on

25   that, and obviously we've missed the ability to probably do

1    that before the expert deadline, but we did that.

2        The one other thing I wanted to add, though, is one of

3    the things I mentioned was, for example, with Axel Arnaud and

4    Dan Lamont, these are current employees.  And when they tell

5    us on this chart that they have not done a new sweep since

6    November of 2012, which, frankly, was several months before

7    their depositions, more than -- I believe more than six months

8    before their depositions, and five months since we requested

9    their depositions, what we would like is for those situations

10   to be updated right away, because what we're finding -- I

11   understand Mr. Gage said, you know, these should all be new

12   documents.  But what we're finding in our supplements that are

13   coming in typically after the fact, these are not just new

14   documents.  These are old documents.  These go way back.

15   These are critical documents.

16       And even the new documents that we get are critical

17   because, for example, we've just recently learned that there

18   was going to be an update to the clinical expert report on the

19   TVT Classic, which is the first trial, and we kept seeing

20   documents saying that.  We kept looking for that.  And the

21   kind of information from those reports is that they have to,

22   in order to be able to sell those, that product, the Classic,

23   they have to update that report.  They have to have all the

24   risk information in there, all the warnings, the literature

25   searches and things like that.

1        And in the Profit litigation, they did that.  It wasn't

2   until recently.  And there was a whole new set of risk

3   information that showed up.  And, if so, we then sent an

4   e-mail and we said, "Hey, we have not seen this clinical

5   expert report that was supposedly updated in April 2012," and

6   just yesterday -- April of what?  Oh, I'm sorry.  April of

7   2013.  And just yesterday, I believe, we got an e-mail saying,

8   "We found it.  We'll send it over to you," which obviously

9   that would have been very useful during some of the prior

10  depositions.

11       So we would also like them to do these sweeps, you know,

12  for Axel Arnaud, for Dan Lamont and these people well in

13  advance of the depositions and well in advance of the trial so

14  we have the information.  In other words, don't just quit in

15  November of 2012.

16            THE COURT:  Does your --

17            MR. GAGE:  Your Honor, I think that --

18            THE COURT:  Does your ESI protocol say anything

19  about supplementation?

20            MR. GAGE:  Judge, that's exactly where I was headed.

21  I don't have a copy of it in front of me.  I know that when I

22  was having -- I'm just being very candid with the Court.  When

23  I was having discussions with the documents people, it was the

24  belief of at least one or two of them that there was no

25  definitive order or agreement with plaintiffs on the timing of

1    the -- you know, on when supplemental sweeps would be done.

2        I have not confirmed that or refuted it, but I know that

3    that was the belief of several people whose opinions I tend to

4    trust on these matters, and that is exactly one of the issues

5    that we wanted to put on the agenda with the plaintiffs, was

6    to establish a specific protocol and a timing mechanism for

7    how that gets done, because even -- because I mean if this

8    litigation goes on two years, three years, four years, however

9    long it goes on, we have to have a common understanding of how

10   that proceeds in the future, because otherwise we're going to

11   say, "Well, we did a supplemental review six months ago," and

12   Tom will say, "Well, no, you should have done it two months

13   ago or three months ago."  And I think we've just got to sit

14   down and, as we did with the hernia stip, work it out and work

15   it out soon.

16        THE COURT:  I agree with that.

17        MR. GAGE:  Because I don't -- I do not want to do

18   what Your Honor has indicated; and that is, I don't want to

19   have to keep putting people up for depositions.  And the best

20   way for my client to prevent that is to get an agreement on

21   this issue.

22        THE COURT:  I agree with you.  I think you're

23   absolutely right.  I don't -- I don't have the protocol in

24   front of me either, and I don't remember if or what it says

25   about supplementation.  I mean clearly under the Federal Rules

```
 1    there's a duty to supplement, but this is a little different

 2    because you're talking about going back and doing re-checks of

 3    people's computers.  So it's not your standard

 4    supplementation.

 5         I do think that's something that you all should talk

 6    about and perhaps have your computer people involved so that

 7    you know what you're talking about as far as time commitments

 8    to get these things done and how you want to prioritize these

 9    supplemental sweeps with the current reviews that you're doing

10    of custodial files.  You ought to put that on your agenda

11    definitely.

12              MR. GAGE:  We will do that.

13              MR. AYLSTOCK:  This is Bryan Aylstock.  I did -- I

14    was able to pull up the ESI protocol, and I think Mr. Gage is

15    correct; there's nothing stated one way or the other in that.

16    You know, frankly, we understood that we were complying with

17    the Federal Rules and the Federal Rules require seasonable

18    supplementation.  And when we have a witness being deposed and

19    they, you know, hadn't been swept for six, eight months, and

20    then another deposition, I expect that the rule of reason to

21    be -- then apply.

22         And, look, I'm happy to meet with William.  We get along

23    great, so on and so forth, but the problem is it's two weeks,

24    it's four weeks and then we -- and then we have these

25    depositions come up.  So we'd like, at least for those
```

1    depositions, that the sweeps to be made now, that they be

2    produced immediately.

3        These are -- the sweeps were -- you know, now we're going

4    on a year since the sweep on current employees with very

5    relevant information.  So, you know, I just expected the rules

6    to be followed, I guess.

7            THE COURT:  Well, I think I've made myself clear on

8    how I feel I would rule if you come back and ask for another

9    deposition on a witness because important documentation has

10   been found after that witness' deposition.  I don't think

11   anybody wants to do multiple rounds of depositions on the same

12   person because documents keep getting discovered that probably

13   should have been discovered earlier, but that ultimately will

14   be what happens.

15       So I think, you know, clearly, Mr. Gage, you're going to

16   want to try to do these sweeps and get documents before these

17   depositions reasonably in advance of the depositions.

18   Otherwise, you may find yourself having to put these people up

19   for deposition again.

20           MR. GAGE:  You're exactly right, Your Honor, and I

21   can assure you the plaintiffs will join me in saying there's

22   no one on this call who wants to prevent additional

23   depositions more than me.

24           THE COURT:  Right.

25           MR. GAGE:  I mean that is really my number one

1   desire, is I really want to bring the depos to a halt as soon

2   as I can just because, you know, it's very difficult for the

3   client and for the lawyers to get it all together.  So we have

4   a great incentive to do this, and so -- but I'm going to let

5   our team certainly know of Your Honor's viewpoint on this, and

6   we're going to do the best that we can in the time that

7   remains.

8            THE COURT:  All right.  I think that's probably all

9   that can be done today on that point.  I do think it's in all

10  of your benefit to put this topic on your agenda and come up

11  with some acceptable time frame for doing these sweeps, these

12  supplemental sweeps, so that at least everybody is on the same

13  page, because, you know, obviously Mr. Aylstock is thinking

14  that supplementation is going to be seasonable.  Of course, we

15  don't know what that means in the context of ESI or in a case

16  this large, a documentary case, you know, this large.  So it

17  seems to me you ought to sit down and talk about what you both

18  think seasonable means.

19           MR. AYLSTOCK:  This is Bryan Aylstock, Judge.  We'll

20  certainly do that and hopefully be able to work it out and

21  report back to you in next week's call.

22           THE COURT:  Great.

23           MR. AYLSTOCK:  And then there's one particular

24  time-sensitive issue I just wanted to flag; and that is, the

25  Trzewik and Hellhammer depositions -- they're the ones in

1    Germany -- Trzewik -- and I'm probably butchering his name --

2    this next week, and we had asked for --

3                THE REPORTER:  Wait.

4                THE COURT:  Mr. Aylstock, can you just slow down a

5    tiny bit?

6                MR. AYLSTOCK:  I'm sorry.

7                THE COURT:  Yeah.  We're having some trouble

8    hearing.

9                MR. AYLSTOCK:  And I was talking too fast, as I am

10   wont to do.  Mr. Trzewik's deposition is next week, and we had

11   asked for separation agreements and non-disparagement

12   agreements, to the extent they exist, to be produced.  And

13   given those two depositions and the length that we are going

14   to travel to them, I'd just like that to be done.

15       And I totally agree, we do not want to go back to Germany

16   or anywhere else and spend any more time away from our

17   families doing depositions that we could have completed

18   earlier.  So I just want to point those out.

19               THE COURT:  So, Mr. Aylstock, as I understand what

20   you're saying is you've got Mr. Trzewik's deposition scheduled

21   in Germany next week and --

22               MR. AYLSTOCK:  Yes, Your Honor.

23               THE COURT:  -- you have asked for separation

24   agreements, and what else?

25               MR. AYLSTOCK:  Non-disparagement agreements.  These

1    are former employees.  And we know for some former employees,

2    one of the things that they have to agree is, to get their

3    golden trophy or pension or whatever, is, "I'm not going to

4    say anything bad about the company when I leave."

5              THE COURT:  Right.

6              MR. AYLSTOCK:  So if those exist -- I don't know

7    whether they do -- we just don't want to go back to Germany

8    again.

9              THE COURT:  Mr. Gage, do those --

10             MR. GAGE:  Yes.

11             THE COURT:  -- exist with Mr. Trzewik?

12             MR. GAGE:  Your Honor, this is William Gage.  I

13   received -- we received an e-mail on Wednesday, September 4,

14   which was at 7:39 p.m., which would have been two days ago,

15   making the request for these two witnesses, Hellhammer and

16   Trzewik, for their separation agreements and the

17   non-disparagement agreement.

18       So we immediately flipped that to our documents people

19   and asked them to start immediately investigating, because I

20   wanted to be in a position to be able to say before today what

21   the situation is.

22       I received an e-mail 30 -- well, 90 minutes before this

23   conference call -- well, actually I may have gotten it a

24   little bit sooner than that.  Sometime this morning I got an

25   e-mail that indicated that our documents-review people had

1    reviewed these files, and we had to have someone who I -- from

2    my understanding of the e-mail, we had to have a native German

3    reviewer look at them.  Apparently they must be in the German

4    language.  And the information that I was supplied with just

5    before we got on the call was that neither of these files seem

6    to contain a specific agreement entitled Separation Agreement

7    or Non-Disparagement Agreement, but there are employment

8    contracts that contain confidentiality clauses that cover

9    business matters and business secrets learned while employed

10   by the company and then a subsequent contract with a broader

11   clause covering all confidential matters and activities.  And

12   that was for Mr. Trzewik.

13        For Mr. Hellhammer, there was one contract that contains

14   a broader confidentiality agreement -- I'm sorry -- her,

15   requiring her to keep secret all confidential matters and

16   activities learned while working for the company unless she's

17   legally required to share them.

18        So, Judge, you know, I got the request Wednesday night.

19   That's the best that I've got as of this time, but obviously,

20   Judge, again, if we have them, it is our intent and desire to

21   produce them because I don't want to -- I just want it all

22   done at one time.

23             THE COURT:  Well, let's have somebody on your end

24   look.  I'm getting the impression that what Mr. Aylstock is

25   looking for would be agreements signed at the time they're

1    leaving.  Is that correct, Mr. Aylstock?

2              MR. AYLSTOCK:  Yes, this --

3              THE COURT:  When they decided to leave the company,

4    these are agreements that they would sign in order to get

5    whatever benefits the company is willing to give to them in

6    exchange for signing these agreements, but these are things

7    done at the time they're leaving.  So it should be fairly easy

8    by date of termination to figure out if these agreements

9    exist.  I don't see why that would take very much time.

10             MR. AYLSTOCK:  That's correct, Judge.  That's what

11   we're looking for.  Obviously they're in our -- in our -- you

12   know, in some form or fashion in our document requests related

13   to the depo and that we just didn't see them.  So it's just

14   difficult for us to know what's not there.  And given, you

15   know, what's become sort of a pattern of finding things late

16   or missing things or missing, it's very -- it behooves us to

17   ask.  So that's what we did.

18             THE COURT:  Well, you can certainly ask the witness,

19   the witnesses when you depose them, whether they signed these

20   agreements.

21        But, Mr. Gage, I would think it would be very simple to

22   have someone look in their employment files and determine

23   whether or not agreements were signed on or about the time

24   they left the employment of the company.

25             MR. GAGE:  Well, Your Honor, the information I was

1  giving you was based upon a review of their employment files.

2         THE COURT:  But it didn't sound like you were

3  talking about agreements, though, that would have been

4  executed at or near the time of their termination.  It sounded

5  to me like just a standard employment agreement that somebody

6  signs at the time they become employed with the company.

7         MR. GAGE:  I think that's right, and I think the

8  reason for my communicating the information was upon a review

9  of the HR file, we did not find a non-disparagement --

10        THE COURT:  Okay.

11        MR. GAGE:  -- or separation agreement.  I was just

12  simply detailing what was in the file.

13        THE COURT:  All right.

14        MR. GAGE:  We were not able to -- we did review the

15  file, but we couldn't -- we could not find in the review of

16  the file a document that would be responsive to Mr.

17  Aylstock's request.

18        THE COURT:  Well, do me a favor and have your

19  document person, wherever these files are maintained, look for

20  any agreements in the files that would have been signed on or

21  about the time these people left the company just --

22        MR. GAGE:  I will certainly do that, Judge.

23        THE COURT:  -- just to make sure that there's not

24  something out there that goes by a completely different name

25  than Non-Disparagement Agreement or Separation Agreement.

1      MR. GAGE:  We will, Your Honor.

2      THE COURT:  And then, Mr. Aylstock, you'll just have

3  to ask the witnesses at their depositions whether they signed

4  anything when they left the company.

5      MR. AYLSTOCK:  Yes, Your Honor.  Thank you.

6      MR. GAGE:  Your Honor, I'll make that request as

7  soon as we get off the call.

8      THE COURT:  Great.  Do we have --

9      MR. GAGE:  Your Honor, I know -- I just wanted -- if

10  you don't mind, this is William Gage.  There are -- I've got

11  about five or six issues, and I know, you know, time is of the

12  essence on these calls.  I don't think any of them are

13  significant.  I think they're kind of housekeeping matters,

14  but I just wanted to let Your Honor know that I did have those

15  to discuss with Your Honor and the plaintiffs.

16      THE COURT:  Well, why don't you go ahead.

17      MR. GAGE:  Okay.  Your Honor, you may recall that

18  there's been discussion of a deposition and a document

19  production from two German doctors, a Dr. Klinge and a

20  Dr. Klosterhalfen.  And Mr. Aylstock has reached out to me.

21  You may remember, Your Honor, we had asked for their fact

22  witness deposition and also to get documents that they may

23  have concerning their relationships with Ethicon.

24      Dr. Klinge is a plaintiff's expert and then

25  Dr. Klosterhalfen is a plaintiff's expert, although he may

1    not end up being an MDL plaintiff's expert.

2        I just wanted to update Your Honor on the status of that.

3    Mr. Aylstock represented to us that he agrees that we can take

4    the fact witness deposition, that they will work with us to

5    help us get a fact witness deposition of Dr. Klinge, that they

6    may not have as much control over Dr. Klosterhalfen, but they

7    will likewise work to help us get that established.

8        And so, Your Honor, I'm hopeful that by next Friday, we

9    will be able to report a date for those depositions and also a

10   protocol for how we're going to handle getting their documents

11   produced.

12            THE COURT:  Great.

13            MR. AYLSTOCK:  Your Honor, just to add to that, we

14   did have that conversation.  And as I told Mr. Gage, you know,

15   Dr. Klinge will be an MDL expert when the disclosures come

16   out.  I don't think that's a big secret.  And, of course,

17   he'll be put up for deposition, and we're not going to object

18   if fact questions are asked of Dr. Klinge in that deposition.

19       We did learn since -- or I learned personally since the

20   call that a lot of fact witness questions were asked of him.

21   They had an opportunity in the New Jersey litigation where he

22   was also designated as an expert on the same issues.  So I've

23   committed to Mr. Gage to meet and confer on that.

24       And with regard to Dr. Klinge, I think there may be an

25   issue whether this should be a separate fact witness

1    deposition, an additional day or two or something, as opposed

2    to kind of rolling it into the expert deposition and knocking

3    it out all at one time, but we haven't discussed it any

4    further than that.

5              MR. ANDERSON:  Your Honor, this is Ben Anderson.  I

6    presented Dr. Klinge for his deposition in Germany last

7    November, and they -- the defense took his deposition over the

8    course of two very long days.  And Mr. Gage's partner,

9    Mr. Brown, asked a lot of fact witness deposition questions at

10   that time, and we certainly -- and we certainly didn't object

11   to that.  And so they've had one bite at the apple, and we're

12   certainly not saying that they can't have yet another bite at

13   the apple, but that is what it is.  And so the last time it

14   was handled in an efficient manner and it was done at the same

15   time as his expert deposition.

16        So he has undergone, you know, 16-plus hours of

17   deposition, or two days' worth certainly.  And so we would

18   just ask that we follow similar suit this time, that they ask

19   their expert questions and they ask their fact witness

20   questions at the same time since he is a German witness.

21             MR. GAGE:  Your Honor, if I may --

22             THE COURT:  Is that not the idea, that you're going

23   to try to do them essentially at the same time?

24             MR. GAGE:  Your Honor, I think -- this is William

25   Gage.  Judge, one of the things that we didn't have then and

1    we don't have now are the documents and the e-mails that we

2    had requested from Drs. Klinge and Klosterhalfen with regard

3    to their consulting activities.  We don't know what volume

4    that may be, but it is our -- it's our preference at this

5    point to perhaps have his fact witness deposition the day

6    before his expert depo, but we do need to see what the

7    document production looks like in order to get a sense of how

8    much there is.

9        He was apparently a consultant for a number of years to

10   Ethicon.

11            THE COURT:  Well, that doesn't sound unreasonable to

12   me.  I think your deposition protocol, if I'm not mistaken,

13   also states that to the extent that you have depositions from

14   New Jersey litigation, you are to use those and not re-ask the

15   same questions or re-plow the same ground.  So I'm sure you'll

16   try to not be repetitive or cumulative in your questioning.

17   But that doesn't sound unreasonable to me, to do a day of fact

18   witness and then move on to the expert issues.

19            MR. GAGE:  Your Honor, we'll put a proposal

20   together; and if we can't iron everything out by next Friday,

21   we'll let Your Honor know.

22            THE COURT:  All right.

23            MR. GAGE:  Another just quick kind of a housekeeping

24   matter, the plaintiffs filed two 30(b)(6) -- two new 30(b)(6)

25   notices last week, and one relates to MedScand documents.

1    Basically they want to take a 30(b)(6) on where the documents

2    are located and that sort of thing.

3        And then there's another 30(b)(6) notice that they filed,

4    and it relates to hernia mesh testing and TVT testing and

5    PROLENE testing.  And Bryan and I have agreed to talk on

6    Monday.  He and I -- Bryan and I are going to talk about

7    meeting and conferring on the hernia aspect of it.  And then

8    two guys from my office, Michael Brown and Chad Hutchinson,

9    are going to talk with, hopefully, Ben Anderson on Monday on

10   the TVT/PROLENE side of that 30(b)(6).  We've got a few

11   issues; and my hope is, Judge, we can work out some resolution

12   next week.

13       My only request is I would just ask for the plaintiffs'

14   and the Court's indulgence that if we can't reach an agreement

15   by Friday of next week, then Bryan and I will advise the Court

16   next week of the date by which I would file a motion for a

17   protective order.

18            THE COURT:  Let me ask you something, Mr. Gage.  I

19   recall in the back of my mind receiving some sort of draft

20   stipulation that I thought applied to the hernia --

21            MR. GAGE:  That's on my -- that's coming up next on

22   my agenda.

23            THE COURT:  Okay.  So wouldn't these two issues

24   overlap?

25            MR. GAGE:  Well, interestingly, Your Honor, one of

1    the reasons why I wanted to meet and confer with Bryan on the

2    hernia aspect of it was to talk about his request in light of

3    the stipulation that has been sent to Your Honor for

4    signature.

5              THE COURT:  Now, wait --

6              MR. GAGE:  So there is some overlap on that.

7              THE COURT:  Wait a second with that, though.  I

8    don't believe I ever got a stipulation for signature.  What I

9    received was a partial stipulation with some kind of comments

10   that you expected some additional exhibits or appendices to be

11   forwarded to me.

12       So I haven't even looked at that stipulation closely.  I

13   did not understand that to be a final agreement.

14             MR. AYLSTOCK:  Your Honor, this is Bryan Aylstock.

15   We -- you know, the appendices -- the issue with the

16   appendices were some additional search terms that we had

17   requested.  And I think I'm stating this fairly -- William can

18   correct me -- they didn't object to those terms.  They just

19   wanted it per se -- they wanted to run some checks with their

20   IT folks to see whether -- you know, what that was turning up

21   and whether they could be -- might need to be narrowed or

22   changed or so forth.  And that's where it sat, and I haven't

23   heard back from them on that testing to see, you know, kind of

24   where that is.

25       But, you know, the problem again -- and I'm very glad

1    this came up, because that stipulation has deadlines and

2    figures upon ordering of a stipulation.  And, you know, we've

3    been asking for the documents.  So we need to get that

4    resolved.  And if we need to amend perhaps the search terms

5    later on, we can do that, but --

6              THE COURT:  Well --

7              MR. GAGE:  Your Honor, this is William Gage.

8              THE COURT:  -- so am I to --

9              MR. GAGE:  When we -- when we sent the stipulation

10   to Your Honor -- I'm having a hard time remembering who

11   actually sent the e-mail to your assistant, but it was the

12   intention of both Bryan and me that it was ready to be signed,

13   that there are three appendices and the appendices made by

14   agreement of the parties be changed from time to time because

15   things like list of custodians and Bryan may say, "Hey,

16   William, I want to add a couple," and we'd say, "Sure, go

17   ahead and add a couple," or he may want to say, "I want to

18   change a search term."  And we would not expect the Court to

19   have to enter a new hernia stipulation every time we change

20   one of the items on appendices A, B or C.

21       So from our perspective -- I mean I think from

22   everybody's perspective, plaintiffs' and defendant's, the

23   hernia stipulation is ready to be entered by Your Honor and,

24   with the understanding that Bryan and I have already had and

25   we've already discussed, those appendices will change from

1   time to time, but I don't think either one of us expects that

2   Your Honor is going to have to keep entering new amended

3   orders.

4           THE COURT:  Okay.  Was that sent -- let me ask you,

5   was that sent to Laura in Word form?  Because what I would

6   have to do is take your stipulation and enter it as a pretrial

7   order.  Most likely what I would do would be to incorporate it

8   into a pretrial order and just say the parties have agreed and

9   stipulated to the following and the Court hereby adopts and

10  orders it as such.  And then I would then just put your

11  stipulation into the pretrial order.

12          MR. GAGE:  Judge, I actually think we put it

13  together in that fashion.  In other words, I think when you

14  look at it, it's got like a heading and a style and it starts

15  off with something like, you know, it is so ordered by

16  agreement of the parties --

17          THE COURT:  Okay.

18          MR. GAGE:  -- and then has a signature blank for the

19  Court.  I believe that's the way we structured it.

20          THE COURT:  All right.  Well, then, I'll go ahead

21  and enter that today.  I was really under the impression that

22  that was a draft stipulation that you had agreed to 90 percent

23  of but that there was still some tweaking that needed to be

24  done.  So I hadn't really looked it over very closely or tried

25  to enter it.  I was waiting for something final to come to me.

1          MR. GAGE:  Well, I'm sorry, and I should have been

2     clearer in the way that we communicated.  And I know that

3     Bryan and I got cleared on it.  I just failed to communicate

4     our level of clarity to Your Honor.

5          THE COURT:  Well, no harm done if you've been

6     following it.  I'll just go ahead and order it -- or enter it

7     today when we get off the phone.

8          MR. AYLSTOCK:  Thank you, Judge.  And, William, if

9     you could just let me know on those additional search terms --

10         MR. GAGE:  Yep.

11         MR. AYLSTOCK:  -- because the sooner, the better.

12         MR. GAGE:  Yep.  Yep.

13         THE COURT:  All right.  Well -- and then the

14    MedScand documents, so you don't have any problem with --

15    you're not -- you're just advising me that there's been a

16    Rule 30(b)(6) notice filed on that; is that correct?

17         MR. GAGE:  Yes, Your Honor.  I'm not -- I don't --

18    as I'm sitting here, I can't remember any big issue about

19    that.

20         THE COURT:  Okay.

21         MR. GAGE:  But my point on the hernia and the TVT

22    and the PROLENE 30(b)(6) notice, I just didn't want to run

23    across and trip across a deadline to file a motion for a

24    protective order.  You know, sometimes it's hard to figure out

25    what is a deadline for a motion for a protective order on a

1   subpoena that contains document requests and that sort of

2   thing.  And I just thought it would be good if I could ask

3   Your Honor's indulgence and that of the plaintiffs to give us

4   until next Friday to announce to the Court whether we need to

5   do any further arguing or whether we have reached an

6   agreement; and if we have gotten to Friday and we don't have

7   an agreement, then Your Honor could set a date perhaps the

8   following week when we would be filing something.

9           THE COURT:  That sounds fun.

10          MR. ANDERSON:  Your Honor, Ben Anderson.  I'm sorry.

11  This is Ben Anderson again.  And that's the way we were

12  looking at the Klinge and Klosterhalfen subpoena as well.  So

13  that we aren't feeling like we are tripping up over a date or

14  something, we are going to try to meet and confer on this.

15  But if for some reason we can't, then we're going to bring the

16  Klinge and Klosterhalfen, both requests for the deposition and

17  as well as an array of documents that they've asked us to

18  produce.

19      First of all, you know, we don't control Dr.

20  Klosterhalfen.  But even with regard to him and Klinge,

21  there's some significant issues that are hanging out out

22  there, not just the fact witness deposition.  And so even

23  though they've served the notices, that's something that we

24  consider that we're still meeting and conferring on.  So that

25  we don't get tripped up in any guidelines or deadlines as

1    well, that's something we'll bring back to Your Honor.   Thank

2    you.

3              THE COURT:   That's fine.

4              MR. GAGE:   And, Your Honor, this is William Gage,

5    and I fully agree with that sentiment.   All of us have enough

6    on us that we don't need to be tripping each other over

7    deadlines, but we obviously need to keep Your Honor apprised.

8              THE COURT:   I appreciate that.

9              MR. CARTMELL:   Your Honor, this is Tom Cartmell.   I

10   had one sort of time-sensitive issue I was going to try to

11   bring up if we have a few minutes.

12             THE COURT:   Yes.

13             MR. CARTMELL:   We have Miss Angelini's deposition on

14   the 16th.   That's the 30(b)(6) depositions day.   It's a one-

15   day 30(b)(6), and it's the one we talked about last week that

16   has to do with payments to consultants and things like that.

17        I have sent an e-mail to William, I believe just the

18   other day, and had asked that we get a copy of the responsive

19   documents that are -- the ones that are responsive to our

20   requests for documents that accompanied our subpoena, our

21   notice that we filed.   It's over 30 days ago or about 30 days

22   -- 35?   Oh, on August 5th.   August 5th we filed it.   And

23   asking if we could get a copy of the responsive depo documents

24   or an indication of the ETH mesh bates numbers for the

25   documents that are responsive.

1      This was an issue that came up, you may recall, with Dan

2    Smith beforehand, and I think -- I don't want to misstate what

3    you said, and I didn't -- I don't think there was a transcript

4    on this one hearing, but I think what you had said is that

5    they should, at the very least, give us the date ranges.  And

6    the only reason is we want to make sure we have enough time

7    before the deposition to get the responsive documents, review

8    them, get them organized so that we can be efficient and get

9    things done on the day of the deposition.

10           THE COURT:  Mr. Gage?

11           MR. GAGE:  Your Honor, this is William Gage.  Your

12    Honor, I will tell you that because I'm not personally the

13    person wrapped up in Laura Angelini and all the documents and

14    the MedScand issues and Tom knows a lot more than I would,

15    what I would request is that we have a call no later than

16    Monday morning with Mr. Cartmell to -- so that my people that

17    are doing Laura Angelini, and me if necessary, are on that

18    call.

19      I want to make sure there are -- I want to know -- I want

20    to hear from Tom himself exactly what he needs, and I want to

21    make sure my people are focused on getting exactly what he

22    needs, because I agree with Tom; I do not want a problem.  And

23    I suspect that there could be one because there are a lot of

24    people involved on Angelini.  And I want to make sure we don't

25    have a problem.

1    So, Your Honor, if I could ask that Tom and I get on the

2    phone no later than Monday morning to get really squared away

3    on this.  I want to make sure I give him what he's entitled

4    to.

5              THE COURT:  Well, obviously --

6              MR. CARTMELL:  This --

7              THE COURT:  Yes, go ahead.

8              MR. CARTMELL:  I apologize, Your Honor.  This is Tom

9    Cartmell again.  I'm willing to do that.  I guess a couple

10   weeks before the deposition -- and I had -- in my e-mail I was

11   hoping to get the documents a week in advance, especially

12   because I have two depositions, two other depositions next

13   week, and we can talk about it, but essentially the document

14   request is very specific to what we're asking for.  It's a

15   very limited 30(b)(6) notice.  It's the documents that reflect

16   payments to the consultants.

17        So, you know, I was hoping to get as much information

18   maybe by then that I could get, but I'm also willing to --

19             MR. GAGE:  Well, I'll tell you what.  I'll tell you

20   what, Tom.

21             MR. CARTMELL:  And --

22             MR. GAGE:  I'm sorry.  I apologize for interrupting,

23   Your Honor.  Your Honor, I will -- now that I know a little

24   more precisely what the issues on -- on this payment of

25   consultant issue, I will call, as soon as we get off this

1   phone call, my documents people and tell them that that's what

2   we need to be able to discuss with Tom and provide to him,

3   hopefully on Monday, if we have it.  And then, Judge, that

4   gives me a head start.

5          THE COURT:  Great.  Obviously he's going to need --

6   if you want -- if you want the deposition to be efficient and

7   fast, he's going to need the documents in advance.  And

8   certainly the number of pages of documents will make a

9   difference in how much -- how well he'll be able to review

10  them.  But the more there are, the sooner he needs them

11  obviously.

12      So I do think, perhaps maybe even this afternoon,

13  somebody in your office, Mr. Gage, can figure out if there's

14  any Bates number ranges that they could send him to so he

15  could start looking at those over the weekend if he wishes to

16  do so.

17         MR. GAGE:  Yep, I will certainly endeavor to do

18  that, Your Honor.

19         THE COURT:  Let's try to do -- let's try to get as

20  much to him.  I have a feeling he won't be happy unless he has

21  something to do this weekend related to this MDL.  So let's

22  try to --

23         MR. CARTMELL:  Your Honor --

24         THE COURT:  -- make sure you put as many documents

25  on him as you can so he can spend all weekend reading those.

1          MR. GAGE:  Thank you, Judge.  This is William Gage.

2    I just have just two more issues and then I'm done and they're

3    both -- they should be both very quick.

4        This is just a matter of apprising Your Honor of one of

5    the two plaintiffs whose case is scheduled to be tried in

6    January may be undergoing a surgery, I think this upcoming

7    week, which could result in some explanted mesh being

8    available for testing and inspection.

9        And Mr. Anderson and I have been talking about this.

10   We've actually put together a protocol on how we're going to

11   handle the testing of that explant if, in fact, one is

12   produced from the surgery.  And I just wanted to let Your

13   Honor know that Ben and I both also talked about the fact that

14   we -- he's got an expert deadline coming up and I've got an

15   expert deadline coming up; that depending on when the surgery

16   is and, you know, how quick the doctor gets it from point A to

17   point B, etcetera, there may be a need for Mr. Anderson and I

18   to approach Your Honor next week or the week after with some

19   agreement on slight modifications of deadlines regarding that

20   specific issue on expert designations.

21         THE COURT:  Well, you can approach me, but

22   ultimately that's going to be Judge Goodwin's decision to

23   make.  When it comes to extending deadlines in the scheduling

24   order, that is completely up to him, and I really don't have

25   any authority to extend anything, but obviously, you know,

1    you'll want to -- I'll make Kate aware that there's this

2    issue.

3         You know, one thing also I might suggest is that you have

4    some conversation with the hospital to make sure that you can

5    get the mesh as soon as possible, because I know from having

6    worked at a hospital, that that sometimes is difficult to do

7    unless there have been arrangements made in advance.

8              MR. ANDERSON:  This is Ben Anderson, Your Honor, and

9    we've done exactly that, and we tried to put as many ducks in

10   a row as possible to ensure that they understand fully at the

11   hospital -- at the hospital what we want, what we need, and

12   that we need it expedited.

13        And so fingers crossed and looking upwards, we hope to be

14   able to get that and to move on it as soon as we can.  And

15   then if it looks like we have an issue, then it sounds like we

16   need to take that up through Kate and to Judge Goodwin, and we

17   appreciate you.

18             THE COURT:  I will definitely.  I'll let her know in

19   advance.  Now, which particular plaintiff is this?

20             MR. ANDERSON:  This is Miss Lewis.

21             THE COURT:  Miss Lewis.  Okay.  You know, it was so

22   hard to get the plaintiffs selected for this first round of

23   trials that I'm sure he won't be happy to hear that one of

24   them is having surgery at this point, but, you know, that

25   can't be helped.

1           MR. ANDERSON:  Yes, Your Honor.  It's Ben Anderson.

2     We had mentioned that during -- I presented on the bellwether

3     stuff in front of His Honor, and that was known, and it was

4     known through the deposition process as well.  So it's not a

5     surprise, if you will, but I can appreciate what you're

6     saying.

7           THE COURT:  Okay.

8           MR. AYLSTOCK:  Your Honor, this is Bryan.  On that

9     note -- and I don't know if, William, you've heard from the

10    Davis & Crump firm.  The backup case, I did hear from them

11    that there may be some issue with her ability to sit through a

12    trial.  She was the one who had had a couple of previous

13    suicide attempts.  And that was also discussed.  But I don't

14    know if they've reached out to you, William, but I wanted to

15    make sure that they had, if they haven't.  And I guess I

16    wanted you to be aware of that as well, Judge, so that it's

17    known as soon as I knew.

18          THE COURT:  You're not going to make Judge Goodwin

19    very happy.

20          MR. AYLSTOCK:  No --

21          THE COURT:  He wasn't happy -- he was not happy with

22    the bellwether selections, nor was I.  I just couldn't believe

23    in thousands and thousands of cases that there -- that you

24    couldn't find some people who really fell into a mainstream.

25    Obviously you made that decision.  Hopefully this won't all

1    explode on you, but he's not going to be very happy.  I can

2    tell you that.

3              MR. AYLSTOCK:  I'll wear my flak jacket, Your Honor.

4              THE COURT:  Yes, I would if I were you.

5              MR. GAGE:  And, Judge, I'm glad I'm not coming up

6    there on September 19.

7              THE COURT:  It might be best to avoid it if you can,

8    so --

9              MR. ANDERSON:  William, can we schedule Hinoul's

10   deposition for that day, please?

11             THE COURT:  Get as far away as you can.  Maybe

12   that's a day you should go to Germany.

13             MR. GAGE:  I agree.

14             THE COURT:  All right.  Is there anything else,

15   Mr. Gage?

16             MR. GAGE:  No, Your Honor.  Thank you.

17             THE COURT:  I think that's about our time for today.

18   So I know we have a couple of things we're going to follow up

19   on next Friday.  And I will, as I said, go right now and get

20   that stipulation entered so that we can get that on the books.

21   But I guess since you've agreed to it, you know you should be

22   following it, whatever it says.

23             MR. GAGE:  Correct.

24             THE COURT:  All righty.

25             MR. AYLSTOCK:  Thank you, Judge.  Appreciate all

1    your time on another Friday afternoon.

2              THE COURT:  Thank you.

3              MR. GAGE:  Have a great weekend.

4              THE COURT:  You all too.  Bye-bye.

5         (Hearing concluded at 3:05 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21       I, Teresa M. Ruffner, certify that the foregoing is a

22    correct transcript from the record of proceedings in the

23    above-entitled matter.

24

25       /s/Teresa M. Ruffner              September 9, 2013
      _____     _____