IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

AT CHARLESTON


IN RE:  ETHICON, INC. PELVIC REPAIR SYSTEM
        PRODUCTS LIABILITY LITIGATION          MDL No.
                                               2:12-MD-2327



                                     September 13, 2013
                                     Huntington, West Virginia



TRANSCRIPT OF TELEPHONIC STATUS CONFERENCE
BEFORE THE HONORABLE CHERYL A. EIFERT
UNITED STATES MAGISTRATE JUDGE



APPEARANCES (by telephone)

For the Plaintiffs:          **BRYAN F. AYLSTOCK, ESQ.**
                             **D. RENEE BAGGETT, ESQ.**
                             AYLSTOCK WITKIN KREIS & OVERHOLTZ
                             Suite 200
                             17 East Main Street
                             Pensacola, FL  32502

                             **THOMAS P. CARTMELL, ESQ.**
                             WAGSTAFF & CARTMELL, LLP
                             Suite 300
                             4740 Grand Avenue
                             Kansas City, MO  64112

```
For the Defendant:              WILLIAM M. GAGE, ESQ.
                                BENJAMIN M. WATSON, ESQ.
                                GARY RUBIN, ESQ.
                                BUTLER SNOW O'MARA STEVENS &
                                CANNADA, PLLC
                                P. O. Box 6010
                                Ridgeland, MS  39158-6010

                                PHILIP J. COMBS, ESQ.
                                DAVID B. THOMAS, ESQ.
                                THOMAS COMBS & SPANN, PLLC
                                P. O. Box 3824
                                Charleston, WV  25338-3824

Court Reporter:                 TERESA M. RUFFNER, RPR
                                Sidney Christie Federal Building
                                845 Fifth Avenue, Room 101
                                Huntington, WV  25701
                                (304) 528-7583
```

```
Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription.
```

1    Friday, September 13, 2013, at 2:00 p.m. in conference room

2              THE COURT:  Hello, everyone.

3         MR. GAGE:  Hey, Judge.

4         MR. AYLSTOCK:  Hello.

5              THE COURT:  Well, I appreciate the fact that you are

6    willing to take up a few items I have on my agenda before we

7    get started on this status conference.  We do have Terry

8    Ruffner again as our court reporter.  So, once again, I'll

9    remind you to state your name before you speak so she can put

10   that in the transcript.

11        The first thing that I wanted to talk about a little bit

12   was the Ethicon motion for protective order, or I guess you

13   could also call it plaintiffs' motion to compel the OUS

14   documents.

15        I have read all of the briefing and I definitely

16   understand your positions, but I do have a few questions that

17   I want to ask you, and then I think I'll likely be prepared to

18   give you an oral ruling on it, which I will follow up with a

19   written order next week.

20        The first question that I have -- and I think this would

21   be directed to Ethicon; perhaps not.  But I'll let Ethicon

22   start.  What type of documents would you consider to be

23   regulatory documents?  I'm not sure I understand what is

24   normally found in a regulatory packet.  Can you describe the

25   documents for me?

1            MR. GAGE:  Your Honor, this is William Gage.  I

2   would refer the Court to the declaration of Pam Downs where

3   she describes the documents that we believe would be largely

4   duplicative, which, you know, is really the precise issue I

5   think that we've raised in the motion.  And the documents

6   would be -- and I'm looking at these -- I'm looking

7   principally at paragraphs 4 through paragraphs 14, including

8   the subparts.

9        These would be documents that would be submitted to the

10   various regulatory authorities in the countries in issue.  So

11   I think when we're talking about regulatory documents, it's

12   largely going to be submissions that would be headed to an

13   agency or a government that would be some sort of a required

14   and perhaps maybe even a voluntary filing.

15        I know that, for example, Judge, the briefing went back

16   and forth on documents like IFUs, brochures, design -- I mean

17   510(k) and/or other -- you know, in the U. S., it's 510(k)

18   documents, but it would be the functional equivalent of a

19   510(k), which would be whatever documentation that the company

20   would have to submit to whatever regulatory authority in order

21   to gain approval or clearance to market the product in that

22   country.

23            THE COURT:  Right.  I do understand the concept of

24   the regulatory submission, but what wasn't clear to me, as I

25   understand your briefing, there have been -- there have been

1    documents produced that perhaps would be in regulatory

2    submissions.  Then there are other documents that are part of

3    the regulatory submissions that you only produced for three

4    countries.  And I'm trying -- I'm struggling a little bit with

5    what has been produced and what it is out there that you think

6    is going to be duplicative.

7            MR. AYLSTOCK:  Your Honor, this is Bryan.  I may

8    have some thoughts on that.

9            THE COURT:  Will you speak up just a little bit,

10   Mr. Aylstock?

11           MR. AYLSTOCK:  Yeah.  I'll pick up.  I apologize.

12           THE COURT:  All right.

13           MR. AYLSTOCK:  This is Bryan Aylstock for the

14   plaintiffs.  Your Honor is correct; they have produced

15   regulatory files for three countries, and we have been through

16   them.  And as an example, in the Australian version of the

17   510(k) for the TVT Secur, there was mechanical testing, about

18   40-plus pages of mechanical testing on the mesh itself, but

19   there was bacterial testing and so forth that was not in the

20   510(k), the U. S. 510(k) for Secur that was, you know, in our

21   view pretty significant.

22       And, further, if you look at paragraph 7 of Ms. Downs'

23   declaration, she does indicate that some countries also have

24   independent and government-approved laboratory and clinical

25   testing that would be in it.

1      We have looked at the three submissions, and we're

2  finding important information in it, in those, including

3  testing and back and forth with Japan about a label change

4  because of the -- the IFUs for these products are generally

5  standardized worldwide, but the Japanese, for example, said,

6  "Well, what about this, that, and the other?  Why -- these are

7  risks.  Why aren't they in your label?"  And, in fact, as far

8  as we can tell, they were changed in the Japanese label and

9  not any other labels.

10      So those are the type of things we're looking for.  We're

11  not interested in truly -- I don't want copies of the same

12  documents, of course.  I think we're -- but when they say it's

13  largely duplicative, you know, yes, there are certain things

14  that are the same, but what's not the same is what's highly

15  significant and from what we've seen from just the three files

16  that we have so far highly relevant.

17          THE COURT:  Are there any core regulatory documents

18  that Ethicon can tell me for a fact would be duplicative in

19  every one of these 67 countries?

20          MR. GAGE:  Judge, I would have to go back to Pam

21  Downs and go back to our regulatory people to give you a

22  specific list.  I do not have that specific data.  I don't

23  think we -- I don't think it was -- I just -- that's not part

24  of the affidavit or the motion and I just don't currently have

25  that data at my fingertips.

1          THE COURT:  Well, what I am struggling with is the

2   fact that I don't want to make Ethicon produce a lot of

3   duplicative materials, but I read the briefs, I read the

4   affidavit.  I've read them several times, and I was left not

5   really knowing the extent of what would be duplicative and

6   what types of documents would be duplicative.

7       My understanding is we're talking about somewhere between

8   11 to 14 products.  I couldn't even get an agreement out of

9   the briefs as to how many products you're talking about.

10  Someone said 14; someone said 11.  But they were products that

11  I understand were designed, manufactured, and distributed at

12  different times over a period of time.  There were likely

13  submissions made at different times, and I can't tell from

14  what I'm reading what percentage of those documents were

15  actually duplicative or not.  I think I'm struggling with

16  that, and --

17          MR. GAGE:  Your Honor --

18          THE COURT:  Yes?

19          MR. GAGE:  Oh, I'm sorry.

20          THE COURT:  Go ahead.

21          MR. GAGE:  This is William Gage.  And I apologize

22  for interrupting.  I thought I heard you take a pause.

23      Judge, that -- you know, when I was reading through the

24  briefing and getting prepared for today and looking at things,

25  one of the issues that I noted from the briefing -- and, of

1    course, I was familiar with this, somewhat familiar with it

2    back at the time it was occurring -- was the issue where I

3    think we had -- we, Ethicon, had offered to put up Ms. Downs

4    for a deposition in order to provide more information on that

5    issue, and that deposition never took place.  And that is, I

6    think, part of what may be the issue here, is we need a

7    tighter connection between what the plaintiffs are saying and

8    then what we're saying in terms of the duplicative nature.

9        You know, what's very concerning to us -- and Your Honor

10   saw this in our briefing and the affidavit -- Ms. Downs

11   conducts I think it was forty -- she interviewed regulatory

12   affairs employees representing forty-six of the ex U. S.

13   regulated markets, and it was her sense that the collection

14   and the production would be largely duplicative.

15       And so it's just very frightening to us to think that we

16   would have to go to so many different countries and then

17   gather, you know, what potentially could be a very large

18   amount of data and that a lot of could be in a foreign

19   language, which the affidavit mentioned.

20       And so now, you know, it's a conundrum where there's a

21   tremendous amount of work going forward to gather a lot of

22   documents.  The good faith belief of the company as expressed

23   in the affidavit is that a good bit of it would be

24   duplicative, some would be in foreign languages, and now you

25   are left -- we are left with an extraordinary dilemma in terms

1    of trying to weed out what's not duplicative and what is

2    duplicative.

3        So, you know, that's -- it is a -- it's a difficult

4    issue, Judge, and it's fearful -- we're fearful of the process

5    that we would have to go through to just get to that perhaps

6    small number of documents that are not duplicative.

7            THE COURT:  Well, here's the problem that I have,

8    though.  I think there's no doubt that this -- that these

9    documents are relevant.  There's no doubt in my mind that

10   they're relevant.  So we start with that.

11       The next question is, well, has the plaintiff already

12   received then all of the relevant documents.  It doesn't sound

13   like they have.

14       So then the next question is, well, what out there out of

15   100,000 or 250,000 pages, how much of that is going to

16   duplicate what they already have.  And you can't tell me that.

17       I'm left without any basis, then, to conclude that it

18   will be largely duplicative because I don't have any idea even

19   what core documents you might present to every country.  I

20   don't have any idea as to whether those core documents are

21   amended or modified.

22       We're talking about a large time frame.  We're talking

23   about 11 to 14 different products.  So I don't really have the

24   facts that I would need to conclude that what they're asking

25   for is highly duplicative, and I'm not hearing anything today

1     that provides that answer to me.  So I'm going to have to

2     assume that there may be some duplication, but perhaps not as

3     great as what you think there's going to be.  And that's the

4     other concern I have.  What you're telling me is largely

5     speculative, because the documents haven't been reviewed yet.

6          So, all right.  That was my first question.  I realize

7     there's a lot of countries out there, and 67 I think is what I

8     saw.  I don't know if what you might want to do is produce a

9     few more countries.

10               MR. GAGE:  Your Honor --

11               THE COURT:  For example, let's look at the European

12    Union.  Do they all essentially require the same sort of

13    submissions, and, if so, can you with any degree of accuracy

14    tell the plaintiffs, tell the Court, yes, they all require the

15    same thing, we have provided them with all the same things,

16    there have been no changes, no amendments, no modifications?

17         That would be one thing, but I don't hear that.

18               MR. GAGE:  Your Honor, I think what would -- what

19    might be -- one thing for Your Honor to contemplate would be

20    something that would give us the ability in a relatively short

21    time frame to identify that level of specificity to the

22    plaintiffs and say this is what we would categorize as being

23    duplicative, at least in terms of categories.

24         I mean obviously, Judge, you know, until you actually

25    physically have the documents, you can't make the perfect

1  determination that the document is exactly duplicative.

2  However, there would be categories of documents that the

3  company could identify and say, all right, this would be

4  duplicative.  And we could, in short order, provide them with

5  that data and then hopefully get their agreement that that's

6  not what they're looking for and then provide them with some

7  itemization, even if by broad category, of what may be

8  potentially non-duplicative.

9       I think it's a situation, Judge, where we're trying to

10 bring together a request for a small amount of documents

11 amidst a pool of what the company believes is a much larger

12 universe, and we're trying to come up with a way to not have

13 to, you know, go through every single bit of that in order to

14 find a small handful that might be non-duplicative of what has

15 already been submitted.

16            THE COURT:  Yes.  For example, Miss Downs says your

17 technical files are -- essentially all the technical files are

18 just duplicates or translations of official technical file.

19      So if that's the case, then perhaps you don't need to

20 produce the technical file that you submitted in every one of

21 the 67 countries.  It's just --

22            MR. GAGE:  Right.

23            THE COURT:  It's hard for me today -- you know, what

24 I'm concluding today is these regulatory documents are

25 relevant.  I don't want you to have to produce a lot of

 1    duplicate documents, nor does the plaintiff want you to do

 2    that -- the plaintiffs want you to do that.  However, it's

 3    incredibly difficult for us, not being part of Ethicon, to

 4    really know what is duplicate and what isn't, so -- and I

 5    don't think I got a good feel from Ms. Downs' affidavit as to

 6    what was and what wasn't.

 7         So here's what I'm going to propose on that; that you

 8    either, as you said, in very short order tell the plaintiffs

 9    what regulatory submissions will be the same in every country,

10    or, if there's groups of countries where the filings have been

11    exactly the same, identify that, or, if you can't do either

12    one of those things, maybe the plaintiffs can identify 10

13    countries they'd like to start with and have you produce

14    things from those 10 countries.  But you're going to have to

15    get started producing some of these things because I'm not

16    seeing anything in here that tells me that these are not

17    relevant documents, and I don't see anything definitive that

18    says they are largely duplicative.

19         So my ruling is going to be they're entitled to these

20    documents, these OUS documents.  I think it would be --

21    behoove both of you to try to work on how you want to start

22    that production and whether you need to produce every single

23    page from every single country, but -- so that's where I am on

24    that.

25              MR. AYLSTOCK:  This is Bryan Aylstock.  I appreciate

1    the Court's ruling, and you're absolutely correct; we're not

2    interested in identical documents, but we are interested in

3    things that are different, and we've seen differences, and

4    I'll work with Mr. Gage.  If in paragraph 9 Ms. Downs is

5    correct, that they are exact duplicates, I'm not interested in

6    exact duplicates.  But the things that aren't exact

7    duplicates, I am interested in.

8             THE COURT:  All right.

9             MR. GAGE:  And, Judge, I'll tell you, I think

10   your -- I think your proposal on starting with 10 countries of

11   the plaintiffs' choosing would be a great way for us to start,

12   because what that would allow us to do is focus in on those

13   countries, and with what we might learn from that exercise

14   might inform the extent to which we have to go beyond 10

15   countries, because it may be the plaintiffs say, "Okay, we get

16   you -- for the other -- for past, for beyond those 10, let's

17   do X instead of X, Y, and Z."

18            THE COURT:  Right.  I think that's what you ought to

19   aim to do.  So you two talk about that.  As I said, though,

20   there is going to be a production of some sort, and the extent

21   of that I guess is left to be seen after you've done some

22   discussion.

23       The next thing I want to talk about, though, on here --

24   because there was also an issue of cost shifting.  And one

25   thing that occurred to me, especially where the documents are

1    going to be -- are going to have to be translated, what have

2    you all been doing in the past on these translations?  Have

3    you been translating them, Mr. Gage, and then providing a

4    translated version to the plaintiffs, or have you been giving

5    them the foreign language version and you each are getting

6    your own translators?  How are you working that?

7                MR. GAGE:  Your Honor, it's my understanding that we

8    are in many instances providing translated documents.  And,

9    Bryan, I would invite you to correct me if I'm wrong on that.

10   I haven't asked that specific question.  But, Judge, I think

11   the reason that that's happening is I think in order to review

12   some of these things for privilege, we have to translate them

13   in order to make that ascertainment of privilege, and so we

14   then just pass along the translated document.

15       I believe that's how -- that's how Mr. Watson is telling

16   me that it's been happening in the past.

17                THE COURT:  Mr. Aylstock, is that your

18   understanding?

19                MR. AYLSTOCK:  Well, I do know -- I guess, backing

20   up a little bit, there's a worldwide director, for example, of

21   regulatory affairs, and I know, you know, she --

22                THE COURT:  Wait.  Mr. Aylstock, we cannot hear you.

23   Can you speak up?  Can you start over and speak up, please?

24                MR. AYLSTOCK:  Yes.  I apologize, Your Honor.  Bryan

25   Aylstock for the plaintiffs.  I do know that we have a fair

1    number of untranslated documents in German and Japanese.  We

2    do have the benefit of a German fluent -- fluently

3    German-speaking lawyer in my office who has looked at a lot of

4    them, and, where necessary, we did an official document

5    translation if it's a document we want to use for a

6    deposition.

7         Some -- I don't have any reason to quarrel with what

8    Mr. Gage has said about some being translated and sent to us,

9    but a fair number are not translated.

10             THE COURT:  Well, you know, under the cases that I

11   looked at, the defendant, Ethicon, would not be obligated to

12   provide you with a translated version unless they had a

13   translated version at the time you made the request,

14   basically.

15        One thing I thought about as I was thinking through this

16   is have you -- have you ever considered, the both of you,

17   finding a translator that would be acceptable to each side and

18   share the cost of the translation?  Not only would that

19   perhaps save some money, but you then wouldn't have

20   disagreements as to what a document might say.

21             MR. AYLSTOCK:  Your Honor, this is Bryan Aylstock.

22   We have not had that specific discussion because in part we've

23   been dealing with it with our in-house processes, but I'm

24   happy to do that with Mr. Gage and, to the extent necessary,

25   do that.  There's a couple of different types of translations.

1    One is the official one where you want to use it in a

2    deposition or in trial, and then there are programs that will

3    actually translate documents, you know, kind of on the

4    shorthand.  They're not perfect, but you put them -- they're

5    OCR documents and you put them through and they spit out in

6    English.  So those have also been used.  So I'm happy to

7    discuss that further with Mr. Gage.

8              THE COURT:  I don't --

9              MR. GAGE:  Likewise, Your Honor, that's a good --

10   that's a good thing for us, for Bryan and me, to discuss.

11             THE COURT:  I don't -- I don't really -- I don't

12   know if that would be helpful or not, but it seems to me that

13   if any of these documents you plan to use in court, you might

14   as well share the expense of a translation, and then you can

15   also agree on the veracity of the document because you'll have

16   the same translation.  So anyway --

17             MR. GAGE:  Right.

18             THE COURT:  Now, the last issue on that is the

19   cost -- this further cost shifting.  The cases that I looked

20   at essentially state that costs of review, of course, aren't

21   going to be shifted, costs of translation, if you're doing

22   translations voluntarily, that won't be shifted.  But it

23   really comes down to, in most of these cases, these various

24   factors of how important is the material and how hard is it to

25   access it.  And I don't know anything about accessing it.

1    Are these documents -- these regulatory documents, are

2    they all electronic?  Are they hard copies?  You said

3    somewhere in your brief, Mr. Gage, that various custodians

4    have various pieces of these things.  What can you tell me

5    about how the documents are stored?

6         MR. GAGE:  Judge, it is my understanding that some

7    of these documents would be paper, some of them would be in

8    computer systems and that sort of thing.  I know that in the

9    Pam Downs affidavit there is a description of some of this

10   where she indicates that there would be both paper and

11   electronic form documents, and then she also references some

12   of the data Bates systems that are in place that would house

13   some of this material.

14        THE COURT:  Okay.  All right.  Well, she estimates

15   this cost to be up to a million dollars; and included in that,

16   she says the costs of interviewing employees, processing and

17   translating these documents.

18   I really don't know what she means by "processing" unless

19   she means giving them to your vendor and then your vendor

20   turning them over to the plaintiffs.

21   What's your understanding of her use of the term

22   "processing"?

23        MR. GAGE:  That is my understanding of -- and I'm

24   talking with Mr. Watson here, Judge, and Mr. Watson was part

25   of the team that helped put this affidavit together, and he's

1    worked with Pam Downs, and that is my -- he is nodding his

2    head affirmatively that your understanding of "processing" is

3    what our understanding of "processing" is; and that is, it's

4    the processing of getting the document to the vendors and, you

5    know, put through the gristmill of activity to make it a

6    producible document to the plaintiffs.

7            THE COURT:  Okay.  Well, I haven't -- I haven't made

8    up my mind on the cost shifting issue yet.  That will be in my

9    order next week.  I have made up my mind that some of these

10    documents, if not all of them, need to be produced.

11            MR. AYLSTOCK:  Could --

12            THE COURT:  Yes?  Who was that?

13            MR. AYLSTOCK:  Your Honor, this is Bryan Aylstock.

14    Could I just say a few words on the cost shifting?

15            THE COURT:  Yes.

16            MR. AYLSTOCK:  I'd refer Your Honor to the case of

17    *Rhone-Poulenc Rorer Inc. v. Home Indemnity Company*.  That's

18    1991, Westlaw 111040, an Eastern District of Pennsylvania

19    case.  And what it held was that an unwieldy recordkeeping

20    system which requires heavy expenditures in money and time to

21    produce relevant records is not an adequate excuse to

22    frustrate discovery.

23       I understand from Ms. Downs' affidavit or declaration

24    that maybe they didn't keep it all in some centralized file

25    somewhere, but this is one company, despite what Ethicon says

1    about J&J's involvement in this case, they are involved.   In

2    fact, there's a stipulation that they are to be held jointly

3    and severally liable on any verdict form.   They are a named

4    defendant in this case and have not been let out.

5        And so, first of all, it's J&J's worth that the Court

6    needs to look at.   And, secondly, simply by virtue of the fact

7    that for a worldwide regulatory head not to have some

8    centralized recordkeeping system of where these files are

9    located and have them all in Somerville or in Scotland or

10   wherever around the world the head sits at the particular time

11   should not impose a burden on our plaintiffs for the cost

12   shifting.

13       Even if you take at face value what Ms. Downs said about

14   500,000 to a million dollars and 150,000 to 200,000 documents,

15   what you're talking about per plaintiff is somewhere between

16   15 and 27 documents per plaintiff if, in fact, every one of

17   these has to be produced.

18       So those are the points I would make, and there's another

19   West Virginia federal -- it's a case I'd just direct Your

20   Honor to, and that's from the Northern District of West

21   Virginia, the *Automated Merchandising Systems v. Crane Company*

22   case.   It's coming out in the Federal Rules Decision, but it's

23   2011, Westlaw 5025907.   So I would urge the Court not to

24   impose cost shifting --

25                MR. GAGE:   Your Honor, if I could just very briefly

1    respond to that.

2              THE COURT:  Yes.

3              MR. GAGE:  Bryan cited a case dealing with an

4    unwieldy recordkeeping system.  I think it's -- I would submit

5    to Your Honor there's no evidence in this case whatsoever to

6    submit or to argue that simply because we do not have

7    centralized files across the globe, that that equates to an

8    unwieldy recordkeeping system that's designed to thwart the

9    litigation process.

10        I think it's probably, probably -- I'm assuming, Your

11   Honor -- but probably the standard of care, if you want to use

12   that term, for global companies to have separate systems

13   probably for a lot of different reasons, including security

14   and including the interplay between various privacy laws.  As

15   Your Honor knows, there's a very different and significant

16   layer of privacy laws that attend to some countries that

17   aren't present in others.

18        So I would just ask Your Honor to keep those points in

19   mind as you continue to consider the cost shifting issue.

20              THE COURT:  Yes, I will.  I have plenty of little

21   tests that I can apply to figure out whether or not to cost

22   shift.  I just haven't had a chance to do it.  But one thing

23   that's important to note is these factors aren't evenly

24   weighted.  So that's why it's going -- it's taking me a little

25   bit longer.  It's not just going down a list of four or five

1  or seven or eight criteria, because they're weighted

2  differently.  So the tests, you know, are going to take a

3  little while to do.

4      I do want to tell you, Mr. Gage, that I believe a million

5  dollars, while it sounds like an enormous amount of money,

6  when you're talking about the number of plaintiffs you're

7  talking about and the verdicts that have come in so far in

8  these mesh cases, it's not a tremendous amount of money.  So

9  that's one factor to look at.  But I don't think it's as

10 shocking as it might be in a regular old little case.  So,

11 anyway --

12         MR. GAGE:  Yeah, and I understand that, Your Honor.

13 I know -- I think just on that point, you know, obviously

14 clients, no matter how big or small they are, are always

15 concerned about costs of discovery.  And I think there's an

16 affidavit in front of Your Honor in another -- maybe perhaps

17 in the context of a sales rep motion, that indicates that the

18 company spent thus far something in the neighborhood of about

19 14.1 million on document production.

20         THE COURT:  Uh-huh.

21         MR. GAGE:  And I think that the issue of the million

22 dollars here is not so much a raw number as it is a contextual

23 number; and that is, you know, we're close to the -- we're at

24 the $14 million mark, and this potentially could, you know,

25 bump it up to 15 million.  But we just wanted Your Honor to

1    be -- you know, to have those facts.  They are what they are.

2            THE COURT:  I am more -- what I'm more interested in

3    factor-wise is what we can expect to recover from this

4    production, how much of it is actually duplicative, how much

5    of it would be new information.  That to me is the important

6    factor here as far as whether it justifies an expenditure of a

7    million dollars.  And so, you know, that's why I want you guys

8    to talk a little bit about that.  Maybe we can revisit that

9    subject next week.

10           MR. AYLSTOCK:  Yes, Your Honor.

11           MR. GAGE:  Yes, Your Honor.

12           MR. AYLSTOCK:  This is Bryan Aylstock.

13           THE COURT:  Okay.  Now, a couple of other items from

14   last week that I wanted just to get some follow-up on.

15       The first had to do with the list of custodians,

16   Mr. Gage.  You were looking at the October people and then you

17   were going to figure out the November people and the rest of

18   them.  Where are we on that?

19           MR. GAGE:  We have produced -- we have produced

20   three lists.  We have produced a list for the September

21   deponents and then a list for, we would say, the

22   post-September deponents, and then we produced today a list of

23   what I would refer to as everybody else; and that is,

24   custodians who I don't think are currently on the depo

25   schedule or calendar, but they have been previously identified

1    as custodians.

2        And as I understand it, if I'm remembering correctly, the

3    charts kind of indicate when the custodians last had their

4    custodial files updated.  And then we -- I also sent to Bryan

5    today -- and I didn't get it to him until a couple of hours

6    before the call.  I was out at a depo a day or two this week,

7    Judge, and just things have been piling up.  But I sent him a

8    proposal, a fairly specific proposal on how we -- I think we

9    talked about this last week -- about how we would go about

10   supplementations in the future in terms of timing and

11   priorities, etcetera.

12            THE COURT:  Yes.

13            MR. GAGE:  So Bryan has not really had a chance to

14   review that, but -- and I told him, I said, you know, we'll

15   talk about that next week, but I did get it to him.  So he's

16   at least got our proposal on that.

17            THE COURT:  Mr. Aylstock, have you had a chance to

18   look at the proposal on the supplemental sweeps?

19            MR. AYLSTOCK:  No, Your Honor.  I received it

20   about -- less than an hour before the call.  There are a lot

21   of custodians.  I do have a couple of questions on it.  And we

22   did have a -- before Your Honor got on this call, Mr. Gage and

23   Mr. Cartmell and Ms. Baggett and I discussed trying to get

24   together next week to hash that out.

25        I guess one question I had about the list, William, that

1    I just got on the larger custodial list is for those folks on

2    that list, there's not a column as to whether the custodial

3    production is complete or still ongoing for those folks.  And

4    that would be, you know, my big question on that.

5                 THE COURT:  Right.  I thought that was one of the

6    things that you were going to put on the list, Mr. Gage, was

7    where they were in collecting the custodial files.

8                 MR. GAGE:  Judge, I mean I may be wrong about this,

9    but I thought that the information when it means -- when it

10   says last, last collection date, would be that it was complete

11   as of that date.  I mean I'll go back to my people and

12   confirm, but that was my understanding of what that

13   information on the chart is.

14                THE COURT:  Do you see that, then, Mr. Aylstock?

15                MR. AYLSTOCK:  If, in fact, what Mr. Gage -- if it's

16   on the chart, if these are complete productions, that's great.

17   There are some -- you know, some of the folks on the September

18   list, for example, Miss Angelini had a hard drive she found

19   and so forth.  I don't know if that type of thing exists for

20   these folks or not.  So maybe if Mr. Gage could put a column

21   in there saying completed if, in fact, that's true, then at

22   least we'd have it in writing that, okay, these folks have

23   been completed and they've been asked if they have hard drives

24   or flash drives or whatever happened with Ms. Angelini where

25   she came up with more documents.  I just don't want to be

1    blindsided with more documents from these people that I have

2    been told have complete custodial file production.

3              MR. GAGE:  I've got you.  Your Honor, I will -- I

4    will go back to our people.  I mean it was my understanding

5    that that's what the information conveys, but I now am hearing

6    from Bryan.  So I think we can come up with something that

7    gives him the data that he needs --

8              THE COURT:  Very good.

9              MR. GAGE:  -- that he believes might be missing

10   here.

11             THE COURT:  Very good.  Well, the last thing, then,

12   that I had had to do with the deposition of -- is it Dr.

13   Klinge, Klinge?

14             MR. GAGE:  Klinge.

15             THE COURT:  Klinge.  Something about you were going

16   to put together a proposal about how to take his deposition,

17   fact portion first, expert portion next.  And I think we left

18   it that you were going to try to put something together and

19   try to work it out by today.

20             MR. GAGE:  Two lawyers who are not on this call, Ben

21   Anderson for the plaintiff and David Thomas for the defendant,

22   are going to be the two lawyers who are actually going to take

23   that deposition or engage in those depositions.

24        David and Ben -- I have seen a number of e-mails go back

25   and forth between the two of them.  They are trying to set a

 1   time to talk, and --

 2           MR. THOMAS:  William, I'm on the phone.

 3           MR. GAGE:  Oh, are you, David?  I didn't realize you

 4   were on.

 5           MR. THOMAS:  I came in late.  Your Honor, David

 6   Thomas.  I have been in contact with Mr. Anderson about dates

 7   for the depositions.  He gave me a date which I thought was

 8   too late.  I offered him a time second week in October where

 9   we can take the depositions of Dr. Klinge and Dr.

10   Klosterhalfen before the expert deposition, along with the

11   production of the confidential documents well enough in

12   advance so we can have an efficient fact deposition, and then

13   take a day off before we do the expert deposition.  And I'm

14   waiting to hear back from Mr. Anderson on that proposal.

15       So we have made, in fact, made a proposal and haven't

16   heard back, and I'm sure we'll work something out or come back

17   to you if we can't work it out.

18           THE COURT:  Great.  Well, that is all that I had on

19   my list.  So who would like to -- who would like to go next?

20           MR. GAGE:  Judge, I've got just a couple of

21   relatively -- I'd say relatively minor things.  First of all,

22   Your Honor, I just wanted to report to you, you may remember

23   last week that I mentioned to the Court that there had been a

24   30(b)(6) notice that if you kind of boil it down, it relates

25   to the testing regarding hernia and TVT and PROLENE material.

 1    And I told Your Honor that -- or I asked the parties and Your

 2    Honor that Bryan and I would try to get together this week to

 3    meet and confer about that issue.

 4        I don't want to burden everybody with a long recitation

 5    of the back and forth, but the long story short is -- and,

 6    Bryan, you correct me if I'm wrong -- we've pretty much

 7    resolved our differences.  There weren't that many differences

 8    to begin with, but I think we've resolved it.  Bryan has still

 9    got to get back to me on one aspect of that depo notice about

10    our request to exempt the hernia tests from the scope of the

11    depo notice.

12        But, Bryan, other than waiting to hear back from you on

13    that particular issue, I think -- I think I've correctly

14    recited our current state of affairs on that depo notice.

15              THE COURT:  Do you agree, Mr. Aylstock?

16              MR. AYLSTOCK:  Your Honor, Bryan Aylstock.  Yeah, I

17    do agree.  Just a little bit more on the hernia issue, I

18    received, I think it was late yesterday, some modifications,

19    suggested modifications to certain of our terms.  I've

20    circulated it to our team, and I think we're going to be okay

21    with those modifications with another couple of tweaks.

22        But on the hernia issue, obviously given the timing of

23    the production of those documents, certain of our 30(b)(6)'s

24    covered both pelvic mesh and hernia mesh topics; and because

25    they're essentially the same mesh, although there are

1    different tests done on the same mesh for the hernia as

2    opposed to the pelvic mesh, so what we've agreed to do is

3    let's get that production rolling as quickly as possible on

4    the hernia, kind of split that 30(b)(6) notice into two and

5    proceed with the pelvic mesh part of that, or at least certain

6    aspects of the pelvic mesh part of it.

7         Certain aspects of the hernia mesh like their IFUs and

8    certain things can be produced much more timely.  So we'll

9    probably go forward with that part of it.

10             THE COURT:  All right.  Mr. Gage, do you have

11    anything further?

12             MR. GAGE:  Judge, one issue I wanted to circle back

13    with Your Honor on.  I mentioned to Your Honor last week the

14    situation we were facing with the fact that one -- that the

15    trial plaintiff might potentially have some surgery either --

16    I don't know if it's occurred or it's going to occur soon, but

17    we talked about the fact that there may be a piece of

18    tissue/mesh that gets removed from her body that might need,

19    first, testing and/or analysis by the plaintiffs and then that

20    material being provided to defendants.  And I mentioned to

21    Your Honor that given where the expert deadlines are, we might

22    have to seek a little extra time, either the plaintiffs or the

23    defendants, or both.  And Your Honor I think indicated you

24    might mention something to Kate about that.

25             THE COURT:  I did.  I did mention it to her.  I

```
 1    didn't get anything in response.

 2              MR. GAGE:  Well, then you've paved the road for us.

 3    And, no, you did tell us it would be ultimately --

 4              THE COURT:  Judge Goodwin's.

 5              MR. GAGE:  -- Judge Goodwin's decision, but we do

 6    appreciate any help that the magistrate can give us on that

 7    issue.

 8         So if an issue is not really ripe -- and I don't want to

 9    bother the Court, either the magistrate or the judge, the

10    federal -- the Article III judge with an issue until it is

11    ripe, but the flip side is, Your Honor, if you think I need

12    to -- Bryan and I need to begin a dialogue with Kate directly

13    on that, we will be glad to do so, but I just kind of wanted

14    your input on what you think we should do on that.

15              THE COURT:  I do think that that would be what you

16    ought to do, is you ought to go ahead and talk to Kate.  I

17    told Kate about the issue with the mesh and that it would need

18    to be tested and that might create some time considerations

19    with the deadlines.

20         I also told her at the same time, since I was going to be

21    the bearer of bad news for the first item, that the second

22    plaintiff was having some emotional issues and might have

23    issues being able to attend the trial.  So I've laid both of

24    those on Kate at this point, and I told her that I expected

25    that you would be contacting her.  Now, you know --
```

```
 1              MR. GAGE:  Okay.

 2              THE COURT:  -- we've got this -- the hearing on

 3    September 19th, as I understand it, Judge Goodwin may be

 4    taking up some other avenues of how to address these cases and

 5    the best way to go forward.  So I'm not really -- I'm not

 6    entirely sure what it is at this point that he's going to be

 7    raising, but, you know, it may be that you ought to get with

 8    her before the 19th and at least let her know that these

 9    issues are out there.  I mean I've told her, but I think you'd

10    better do it too.

11              MR. GAGE:  No, I think we should do that.  And so,

12    Your Honor, I'll reach out to Bryan early next week so that we

13    can jointly call --

14              THE COURT:  Call Kate.

15              MR. GAGE:  -- Kate.  Thank you for paving the way

16    for us.

17              THE COURT:  No problem.  I'm not in Charleston, so I

18    can do it by e-mail.

19         Okay.  Is that all you have, Mr. Gage?

20              MR. GAGE:  Your Honor, I think that's all that was

21    on my list.

22              THE COURT:  Mr. Aylstock, do you have anything

23    today?

24              MR. AYLSTOCK:  There is a depo scheduling issue, and

25    I'm not as up to speed on it as Mr. Cartmell, so maybe I can
```

1    toss it to -- get him to talk about Allison London Brown's,

2    who was taken earlier in the week.

3              THE COURT:  Certainly.

4              MR. CARTMELL:  Hi, Your Honor.  This is Tom

5    Cartmell.  I will report, first of all, though, that we did

6    have a deposition this week, Dr. Robinson, and that was one of

7    the depositions that you had rescheduled, and Mr. Gage

8    presented Dr. Robinson, and he -- everything ran pretty dang

9    smoothly.  It was a good deposition, and it was -- I just

10   wanted to report that things went very well.  And Mr. Gage

11   clearly shared your clarification of the -- of your previous

12   order with others as well I'm told.  So that's definitely a

13   positive.

14        And then one issue we have is Allison London Brown.  We

15   didn't have the deposition go forward.  New Jersey took I

16   think a day and a half of the deposition because my

17   understanding is it was noticed by New Jersey, we were

18   cross -- cross-noticed in and agreed to attend.

19        The witness had to leave at 2:30 the second day.  I

20   believe -- but, William, correct me if I'm wrong -- I think

21   maybe there was a direct done for a period of time before

22   that, or maybe there wasn't.  At any rate, we did not get the

23   deposition completed, and there was some long discussion and

24   record made at the time about whether or not Miss London Brown

25   I think will be presented again.  But the MDL has not had a

1    chance yet to ask any questions, and the New Jersey lawyer's

2    questions were primarily related to POP products, the Prolift

3    products, I'm told.

4         So we just wanted to make sure that we could get our

5    days.  We've asked for two days back on the schedule.

6    Miss London Brown is one of the, you know, two or three most

7    critical marketing witnesses, but we obviously understand

8    we're not going to be able to do it before the 23rd.

9              THE COURT:  Mr. Gage?

10             MR. GAGE:  Your Honor, I will -- I will -- I haven't

11   been tracking with what happened on Allison London Brown.  I

12   know I've seen a couple of e-mails, but I just don't -- I

13   didn't really focus on them, but I will get with -- we will

14   get with Mr. Cartmell early next week on this request for two

15   additional days for MDL to take Allison London Brown's depo.

16   If the facts are as Mr. Cartmell stated, then I suspect we're

17   going to be working this problem out.

18             THE COURT:  Great.  Well, all right.  That's good.

19   I don't know, though.  Mr. Cartmell sounded too happy about

20   that deposition.  Maybe --

21             MR. GAGE:  Your Honor --

22             THE COURT:  Maybe I went too far.

23             MR. CARTMELL:  I really -- I really even -- I

24   struggled with even bringing that up, but I was being serious.

25   Honestly it has nothing to do with substance or whether I

1    think it went well for our side.  We did -- William and I

2    talked, and I also talked to the lawyers at the other one, and

3    I just think they went better.  I just think things went

4    smoother.

5              THE COURT:  Very good.

6              MR. CARTMELL:  So I just wanted to report that.

7              THE COURT:  I appreciate that.

8              MR. GAGE:  Well, Your Honor, the one thing I would

9    ask is for you to personally print off that page of the

10   transcript to save for the future where I need to say, "Your

11   Honor, you remember Mr. Cartmell being a good guy?"

12             THE COURT:  We'll have Terry highlight that section

13   there.

14             MR. GAGE:  Please do.

15             THE COURT:  So, Mr. Cartmell or Mr. Aylstock, do you

16   have anything else today?

17             MR. AYLSTOCK:  Nothing on my list, Judge.

18             THE COURT:  Very good.

19             MR. CARTMELL:  Yeah, that's all I have.  Thanks.

20             THE COURT:  Super.

21             MR. AYLSTOCK:  We're ending early.

22             THE COURT:  We're ending early.  And actually the

23   first half hour I took up on the motion for protective order.

24        So if we get to a point where you don't think these are

25   helpful anymore, just let me know and we can start doing them

1    less frequently and eventually perhaps not at all.  I'm more

2    than happy to continue doing them as long as you need them,

3    but I don't want to take time out of your day if you don't

4    need them.  So just let me know how you feel about that.

5              MR. GAGE:  Judge, I've got to tell you something

6    just very, very briefly.  I've got a 14-year-old son who is

7    just a huge Ole Miss Rebel football fan, as I am, and we play

8    at Texas this weekend and it's a huge game.  I mean it's just

9    huge for our school.  And he said, "Dad, are you going to take

10   me to the game?"  And Austin, Texas is about nine hours away

11   from where I live.  And I said, "No, I can't do that."  I

12   said, "On Friday afternoons I have a standing call with a

13   federal judge and we go through some very high-level issues

14   and important issues and I have to be thoroughly and

15   adequately prepared."  And he said, "Well, I don't fully

16   understand that.  I don't like it."  But he said, "Is the

17   judge a college football fan?"  And I said, "Well, I'll ask

18   her at the next hearing if she has an inclination to watch

19   college football."  So, Judge, if I may inquire.

20             THE COURT:  I hate to tell you this, but I went to

21   Ohio State for law school and I only went to one game the

22   entire three years I was there.

23             UNIDENTIFIED SPEAKER:  Oh, you never should have

24   said that out loud.

25             THE COURT:  That was only because the tickets were

1   free.  Otherwise, I don't think I would have gone.  So -- but

2   you know what, Mr. Gage, if something like that comes up, I

3   mean, honestly, I don't mind to move these occasionally or

4   to -- you know, you can get someone else to cover for you,

5   because you don't have that much time to spend with your

6   children when they're young.  So I would hate to have you miss

7   those kinds of things.

8          MR. GAGE:  Well, you're kind to say that, Judge, and

9   I certainly -- trust me, there are plenty of other reasons why

10  I couldn't go to Texas, but I thought it was funny that he

11  said, you know, "If she's a college football fan, maybe I can

12  live with it."  I thought it was funny.

13         THE COURT:  I thought he was hoping you could

14  explain to me why it would be important to miss the meeting

15  then, see?  He was giving you an argument.  He's a natural-

16  born lawyer it sounds like.

17         MR. GAGE:  He seems to think that's what he wants to

18  do in life.

19         THE COURT:  Good for him.  Don't discourage him.

20         MR. GAGE:  I'm not.  I'm not.  It's the greatest

21  profession.

22         THE COURT:  I think being a judge is even better; it

23  really is.

24      Well, if there's nothing else, then, once again, I

25  appreciate your attendance and we'll talk next week.

1       (Conference concluded at 2:50 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21     I, Teresa M. Ruffner, certify that the foregoing is a

22  correct transcript from the record of proceedings in the

23  above-entitled matter.

24

25     /s/Teresa M. Ruffner         September 16, 2013

     _____    _____