IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

AT CHARLESTON


IN RE:  ETHICON, INC. PELVIC REPAIR SYSTEM
        PRODUCTS LIABILITY LITIGATION          MDL No.
                                               2:12-MD-2327



                                        September 20, 2013
                                        Huntington, West Virginia



TRANSCRIPT OF TELEPHONIC STATUS CONFERENCE
BEFORE THE HONORABLE CHERYL A. EIFERT
UNITED STATES MAGISTRATE JUDGE



APPEARANCES (by telephone)

For the Plaintiffs:          **BRYAN F. AYLSTOCK, ESQ.**
                             **D. RENEE BAGGETT, ESQ.**
                             AYLSTOCK WITKIN KREIS & OVERHOLTZ
                             Suite 200
                             17 East Main Street
                             Pensacola, FL  32502

                             **THOMAS P. CARTMELL, ESQ.**
                             WAGSTAFF & CARTMELL, LLP
                             Suite 300
                             4740 Grand Avenue
                             Kansas City, MO  64112

```
(Appearances - Cont'd.)          BENJAMIN H. ANDERSON, ESQ.
                                 ANDERSON LAW OFFICES
                                 Suite 215
                                 360 West 9th Street
                                 Cleveland, OH  44113

Also Present:                    CORINNE COOPMAN

For the Defendant:               WILLIAM M. GAGE, ESQ.
                                 BENJAMIN M. WATSON, ESQ.
                                 DONNA B. JACOBS, ESQ.
                                 BUTLER SNOW O'MARA STEVENS &
                                 CANNADA, PLLC
                                 P. O. Box 6010
                                 Ridgeland, MS  39158-6010

                                 DAVID B. THOMAS, ESQ.
                                 THOMAS COMBS & SPANN, PLLC
                                 P. O. Box 3824
                                 Charleston, WV  25338-3824

Court Reporter:                  TERESA M. RUFFNER, RPR
                                 Sidney Christie Federal Building
                                 845 Fifth Avenue, Room 101
                                 Huntington, WV  25701
                                 (304) 528-7583
```

Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription.

1  Friday, September 20, 2013, at 2:00 p.m. in conference room

2          THE COURT:  Hello, everyone.  Terry Ruffner is here

3  again for us, so I would like to remind you to identify

4  yourself on the record before you speak so she can note who is

5  the speaker.

6      All right.  Really the only thing I have to follow up on

7  is whether you have finished your discussions on the

8  supplemental sweeps of the custodial files.

9      What's happened with that?

10          MR. AYLSTOCK:  Your Honor, this is Bryan Aylstock.

11  We did provide a couple of additional terms to Mr. Gage

12  last -- this was late last week, and I don't think there was

13  an objection to them, at least not one I've heard, but other

14  than that, I think we're complete.

15      Is that your understanding, William?

16          MR. GAGE:  Your Honor, this is William Gage.  I

17  think what Bryan may have been referring to were the hernia

18  search terms.  And as I understand Your Honor, you are asking

19  about the custodial sweeps?

20          THE COURT:  Yes.

21          MR. GAGE:  Okay.  On the custodial sweeps, I sent

22  Mr. Aylstock a -- just kind of a description of how we do our

23  process on that, how that runs, and asked him to take a look

24  at it and then to get back with us and let us know if that was

25  agreeable.  But this would be a process that would be, you

1    know, if he agrees to it, we would apply it at future

2    depositions.  And I know that Bryan has had a busy week.  I

3    don't think he's had a chance to respond yet.

4              THE COURT:  Right.  I have --

5              MR. AYLSTOCK:  Your Honor --

6              THE COURT:  According to the transcript from last

7    week's hearing, I believe Mr. Gage had sent you, Mr. Aylstock,

8    a proposal on conducting these supplemental sweeps, and you

9    had not at that point had an opportunity to look at it.

10        So am I understanding that you still have not yet had an

11   opportunity to review it?

12             MR. AYLSTOCK:  I have reviewed it, Your Honor.  I

13   haven't had an opportunity to get back with Mr. Gage

14   specifically on it.  I had a couple of, I think, around-the-

15   edges suggestions on it.

16        I think one of the provisions was 21 days before the

17   deposition that the documents be provided.  Our original

18   understanding was that would be 30 days.  And given the volume

19   of some of these productions of late that we may be getting

20   to, you know, a little bit later in the call, I'd like to move

21   that to 30 days.  But other than that suggestion, I think we

22   are in agreement with the proposal that Mr. Gage put forward.

23             THE COURT:  Mr. Gage, what is -- what objection

24   would you have to making it 30 days instead of 21 days?

25             MR. GAGE:  I would -- I would love to talk to my

```
 1   documents people.  I don't think it would be a major issue,
 2   although I think the way that we had proposed it, Your Honor,
 3   was that they would give us 60 days heads-up on who they
 4   wanted to take a deposition of, and then we would then have
 5   about 38 days to go then collect and process and all that.
 6   But I can talk to my people and see, you know, what -- they
 7   gave me the proposal and said this is really what we would
 8   like to do, and I just would like to visit with them briefly
 9   on the 30-day proposal.
10           THE COURT:  Certainly.  Well, why don't you do that
11   and perhaps you'll be able to reach an agreement here in the
12   next couple of days on that.
13       That is all that I had on my agenda.  So who would like
14   to go first on your end?
15           MR. CARTMELL:  Your Honor, this is Tom Cartmell.
16   I'd like to talk about the depositions last week if that's
17   possible.
18           THE COURT:  Yes.  Oh, you know, on that point,
19   before I let you go forward, I did want to make one comment.
20   I don't want to ever discourage any of you from calling me if
21   you're having a problem during a deposition, but I did get a
22   call last week -- or I guess it was last week -- I don't know;
23   maybe it was earlier this week -- about the deposition being
24   taken in Hamburg, Germany.  And I did try to assist, but I
25   want you all to understand that I really have no authority
```

1  over a German citizen giving a deposition in Germany who's no

2  longer employed by the defendant.

3      I have no problem telling him what I think would be

4  appropriate under the rules, but you do realize I don't -- I

5  really have no jurisdiction over him.

6          MR. AYLSTOCK:  I understand, Your Honor.  This is

7  Bryan Aylstock for the plaintiffs.

8          THE COURT:  Right.  I mean I'm surprised his lawyer

9  didn't challenge me, but since he didn't, I kept talking.  But

10 anyway --

11         MR. AYLSTOCK:  I believe whatever you said, Your

12 Honor, had the desired effect.  I do appreciate that.

13         THE COURT:  Well, that's -- that's good news.  All

14 right.  Mr. Cartmell, I'm sorry to interrupt.

15         MR. CARTMELL:  Yeah, no problem at all.  We did have

16 a little more difficulty during the depositions this week than

17 we did the week before as we had discussed, and we had two

18 depositions you may recall this week that were on our list of

19 priority depositions that we wanted to make sure we completed

20 before the expert reports were due on the 23rd, and my

21 understanding is that they may be pushed a little bit from

22 that date now.  But at any rate, there's two depositions.

23 I'll briefly give you some background.

24      The first was Laura Angelini.  She was the witness who

25 some others have called the godmother or the grandmother of

1    the TVT.  And we had her scheduled for deposition in a

2    30(b)(6) setting on Monday for one day, and then the second

3    day was going to be the first of two days of fact deposition,

4    but we could not get a third day.  In other words, we couldn't

5    complete her fact deposition on a third day.  So we're still

6    waiting for another day on that.

7         We were all set to go on Monday; and as you may recall,

8    you had told defense counsel to make sure that they could get

9    us all the documents for the 30(b)(6) as soon as they possibly

10   could the week before.  And we did receive a production of

11   documents the Monday before the deposition.

12        As we started going through those documents, we started

13   noticing that there were no documents that would be -- no

14   documents that would be responsive to the 30(b)(6) topics

15   before the date of 2003.  And this is the deposition that was

16   going to deal with the payments made to the inventor of the

17   TVT, Professor Ulmsten, and several other paid consultants who

18   were involved in sort of the key studies that were -- that are

19   at issue related to the TVT and that the defense are primarily

20   relying on in this case.

21        So Friday, last Friday we got a call from William Gage

22   who said that it turned out -- well, he said there was good

23   news and bad news.  It turned out that the good news is that

24   Miss Angelini does have a lot of knowledge about that time

25   period about the consultants.  The bad news was that they had

 1    been unable to locate any documents related to payments to

 2    consultants or evidence related to that prior to 2003.

 3        He recommended that we go forward with the deposition

 4    because she did have a lot of information and then we could

 5    see how things go and consider, you know, additional time

 6    after that.  And I had told him at that time that I, you know,

 7    I think that makes sense, let's go forward, see how it goes,

 8    and if we need to have an additional day after, we'd take that

 9    up.

10        So we went to the deposition.  It was true that

11    Miss Angelini did have a lot of information from that time

12    period.  She's a critical, critical witness from the

13    perspective of marketing at that time period with the

14    consultants and also with the studies during that time period.

15        What was also apparent is when I started asking about the

16    documents from prior to 2003 and what had been done by the

17    corporation to try to locate those documents, it became clear

18    that she personally had really done nothing to try to figure

19    out where those documents are.  She didn't really know what

20    the company was doing, although she was told that the company

21    had been trying to locate these documents in the foreign

22    affiliate.  And she suspected that rather than the documents

23    all being within the United States at Johnson & Johnson

24    International, that they would likely be located in the actual

25    local affiliates in Sweden and France and Italy and Germany

1    and some of these places like this.

2         When I would ask the question about, you know, are these

3    documents -- you know, we've been told that these documents

4    are missing or cannot be found, multiple times defense counsel

5    made a record saying, "You know, Mr. Cartmell is calling these

6    documents missing.  I don't think that's an accurate

7    representation of them being missing.  They cannot be located,

8    but we are looking for them.  You know, we've started the

9    process of trying to find them, and they may be found

10   subsequently.  We just need some time."

11        So we did complete the 30(b)(6) deposition.  I did make

12   the record that, obviously, you know, we want these other

13   documents.

14        The other thing that happened that was a bit frustrating

15   was Miss Angelini gave topics on several -- or, excuse me --

16   testimony on several topics that really was sort of the first

17   time we had heard some of these things about the actual mesh

18   located in the TVT product.  And specifically, for example,

19   she testified that her belief and understanding was that the

20   mesh in the TVT product was changed at some time in 1998 right

21   before it was launched onto the market in the U. S.  And we

22   started talking about, you know, records and documents related

23   to that.  It was clear she didn't have any.  She had not seen

24   any.  She knows that they exist.  And if they do exist, we

25   know that they have not been produced to us at this point.

1        There were a few other topics related to those types of

2    things with the consultants that came out that if, in fact,

3    they are true, then clearly there have been foreign documents

4    and some we suspect within the United States that have not

5    been produced.

6        So, anyway, what happened was we completed it, but we

7    really didn't complete it; and, you know, we were hoping that

8    we would get further down the road.  I guess what we would

9    ask, because I know, Your Honor, you always like to know

10   exactly what we're asking, and I guess what we would like to

11   happen -- and, oh, there's one other thing I needed to throw

12   in; and that is, the day after the deposition, there were

13   documents produced to us that would have been responsive to

14   the payments to consultants.  In other words, on the Tuesday

15   after the Monday while we were doing the 30(b)(6) documents, I

16   received an e-mail I believe that day or maybe the next

17   saying, "We just got a bunch of documents that reflect

18   payments to consultants that would have been useful during the

19   30(b)(6) deposition related to some of the consultants."

20       Now, I don't have any idea obviously if they found those

21   overnight the night before, but obviously we didn't get a

22   chance to ask about those.

23       What we would specifically like, because of the deadlines

24   and these are key issues, is we'd like an order saying that

25   they, you know, will find and produce all of these documents

1   and certify that they have within two weeks; and then if we

2   could get another date for the 30(b)(6) within four weeks, I

3   think that now may be workable with respect to the expert

4   deadlines, unless I'm mistaken about that.

5        That's the first deposition.  Do you want me to pause

6   there and talk about that before we talk about the second one,

7   Your Honor?

8              THE COURT:  Yes, why don't we pause there.  And let

9   me say that my understanding, after we had our status

10  conference yesterday, my understanding is that Judge Goodwin

11  is going to continue some of these deadlines, and I think -- I

12  think Kate and Judge Goodwin thought that that was clear

13  during the hearing.  I didn't think it was all that clear that

14  they had made -- had made up their mind to continue the trial

15  date and some of these deadlines.

16       So if it wasn't clear to you, what I suggest you do, and

17  perhaps irrespective of whether it was clear or not, you ought

18  to contact Kate and talk to her about new deadlines because I

19  believe she has been looking at various different schedules

20  for you.

21       Has anyone talked to them, either one of them, either

22  Judge Goodwin or Kate since yesterday's hearing?

23             MR. AYLSTOCK:  Your Honor --

24             MR. GAGE:  Not -- go ahead.

25             MR. AYLSTOCK:  Your Honor, this is Bryan Aylstock

1    for the plaintiffs.  I did get a call from Kate after the

2    hearing and she did clarify that, yeah, in fact, we would be

3    pushed.  She was waiting to hear back on whether Bard would be

4    sliding into a particular time, I think April, and wanted to

5    know what Boston Scientific's position was about moving from

6    February to March, which I understood that they were okay with

7    that.

8        So she was double checking, but she did make clear it

9    looks like we'll be pushed into the February setting that was

10   the Boston Scientific, but she did make clear that the

11   deadlines associated with the other docket control orders

12   would be adjusted in line with the new trial date whenever we

13   get a new date.

14          THE COURT:  Great.  Well, Mr. Gage, why don't you

15   respond now to Mr. Cartmell's concerns about Laura Angelini's

16   deposition.

17          MR. GAGE:  Your Honor, this is William Gage.  I was

18   not at the deposition, so there's certain substantive issues

19   that perhaps were mentioned at the depo that I'm not perfectly

20   prepared to handle.  This is the first I've heard about issues

21   arising during the deposition that apparently were new pieces

22   of information to the plaintiff.

23       I do know -- and, Your Honor, this is very disjointed, so

24   let me give you my big picture thought and I can give you some

25   more detail.  My big picture thought is I think it would be

 1    very fruitful for Mr. Cartmell and, if not me, someone else on

 2    my team to have a call, certainly no later than Monday, to

 3    discuss Miss Angelini, because it is my understanding we have

 4    already agreed to make her available for another day for

 5    deposition; secondly, that we have also agreed to put up a

 6    30(b)(6) witness, a lady by the name of Pam Downs who is

 7    currently undergoing her own personal review of where

 8    potentially responsive MedScand documents may be.

 9        And it seems to me, Judge -- and this is the first that

10    we've heard about the extension of deadlines.  I just looked

11    over at Donna Jacobs, who was at the hearing yesterday, and

12    Donna believes we've not heard about that from Ethicon's

13    perspective yet.

14        But my point on Mrs. Angelini is this.  I know we are

15    already committed to giving the plaintiffs another day.  Now

16    that the deadlines have been laxed -- I mean I'm totally

17    committed to not only giving them the other day but giving

18    them another day for a deposition on a day after Pam Downs and

19    our own lawyers complete and are basically in a position to

20    say we've done everything we can to look for these documents,

21    because I agree with Tom; the last thing I want to do is put

22    up Miss Angelini at a time before these documents are

23    finally -- you know, we've exhausted our efforts to find them.

24        And, Judge, I will say this.  Your Honor probably is

25    sitting there thinking, well, William, or, Mr. Gage, what's

1    the root cause of this?  Why are you putting up people for

2    depositions before you've got the document production

3    finished?

4         And, Judge, I will have to tell you, I have been very

5    anxious to work with the plaintiffs, as Bryan and Tom I know

6    will support me on, and they know that I've been very, very

7    heavily engaged over the last four weeks, particularly since

8    Your Honor has been holding these calls, to make sure we're

9    doing what we need to be doing.  And I have, I think, to the

10   fault of my client, offered up depositions and allowed depo

11   dates to be offered in an effort to meet the plaintiffs'

12   request that these depos be done often before September 23 at

13   a time when I should have been checking with our documents

14   people to ensure that they had sufficient time to gather,

15   collect, and produce.  And I actually got ahead of myself on a

16   few cases.  I think Miss Angelini is one of them.  And if

17   there's fault to be laid, it is probably my fault, but at

18   least it came from an honest desire to meet the plaintiffs'

19   request that we put these people up before 9/23.

20        So it's my hope that if we can get on a phone call early

21   next week, we can agree on a date for Miss Angelini that will

22   let us -- and Pam Downs, who's going to be the 30(b)(6) on the

23   document collection issue -- to complete that work so we can

24   close this book out on Miss Angelini and the document

25   production.

1          The final thing I will say to Your Honor is, I think I

2     understood what Mr. Cartmell was saying about if the mesh

3     changed -- and I think Mr. Cartmell was suggesting that that

4     was news to him or that that was a new piece of information.

5     I will, just to be perfectly candid and upfront, that, I

6     think, may have surprised some lawyers on our side.  And so,

7     Your Honor, that's another reason I'm not prepared to -- we

8     don't have the facts yet for me to respond, but I do want Your

9     Honor to know that there's at least one aspect of her

10    testimony that we ourselves are making sure is factually

11    correct.  So if I could ask on Miss Angelini, if we could

12    discuss this with Mr. Cartmell next week, I am hopeful we can

13    reach a resolution on the entirety of her situation.

14          THE COURT:  Let me propose this.  You and

15    Mr. Cartmell talk about Miss Angelini.  And, Mr. Cartmell, if

16    you are not satisfied after speaking with Mr. Gage, then

17    provide to me a proposed order.  And, Mr. Gage, you can also

18    provide to me a proposed order on when her deposition would be

19    scheduled, when the documents -- the remaining documents would

20    be produced, and anything else that, Mr. Cartmell, you think

21    needs to be covered on Miss Angelini's deposition.

22          I think I've made it clear that if people are deposed and

23    then significant documents are produced afterwards, they're

24    going to be deposed again.  There's no other way around it.

25          MR. CARTMELL:  This is Tom Cartmell.  I appreciate

1   that, Your Honor, and I think that's a real good idea.  We

2   will do that.

3       I do want it to be clear for the record that these

4   documents that we're talking about are not MedScand documents.

5   These would be documents owned by Johnson & Johnson.  And, you

6   know, it just -- obviously you know my frustration because I

7   feel like we can never get ahead of the game or complete depos

8   as we storm towards trial, but we will definitely do that and

9   hopefully get you something, if we can't agree, early next

10  week, just so we can get everything back on the calendar fast.

11          MR. GAGE:  And I agree, Your Honor; your solution is

12  a good one.

13          THE COURT:  All right.  Let's talk about the next

14  deposition then, Mr. Cartmell.

15          MR. CARTMELL:  The other one is Carrie Brennan.  She

16  was another deponent we wanted to make sure we took.  She's

17  very involved in the post-marketing surveillance and adverse

18  event reporting.  And I don't know exactly how long before her

19  deposition we had noticed it, but it had been a while.  It had

20  not been one that we requested, you know, in July of last

21  year, but at any rate, we got Saturday -- the deposition was,

22  I believe, scheduled to be Wednesday or Thursday.  I think we

23  got Saturday a hundred thousand pages from her custodial file,

24  and then Tuesday we got another 25,000 from her custodial

25  file.

1     So obviously we told the defense counsel that we could

2  not go forward with that, knowing that.  We -- virtually very

3  little information prior to that time.  It's just a situation

4  of a late production.  Now we have to move it back.  I guess

5  we would just ask again that, you know, we make sure we get

6  all these documents and that we get that one back on the

7  calendar at a mutually agreeable date but before the expert

8  cut-off.

9         THE COURT:  Well, I think what will be important on

10  that is to find out what kind of extension you're going to

11  get, but since you do have -- well, we assume you have all of

12  the documents at this point, but I guess, Mr. Gage, that's one

13  of the issues.  They're very uncomfortable with the fact that

14  they don't seem to be getting all of the documents in a timely

15  fashion.

16         MR. GAGE:  Your Honor, this is William Gage.  With

17  respect to Carrie Brennan, let me provide Your Honor with some

18  of the facts surrounding that deposition.

19     The plaintiffs first requested the deposition on

20  August 9, according to what I've been able to determine, and

21  they wanted the deposition to occur before September 23.  And

22  under the PTO 38, you know, generally we're -- we try to get

23  about 45 days' notice of the deposition, but in this case, it

24  was slightly inside the 45 days, but we wanted to meet their

25  request to have it done before September 23, so we agreed to a

1    depo date of 9/19, September 19.

2         This was a new witness, meaning it was not a situation

3    where we were going to update an existing production.  It was

4    a first-time collection, first-time production.  So we went

5    out and we gathered those documents and then we produced them.

6         On September 5, about 12 days before Miss Brennan's

7    deposition, we sent plaintiffs a chart showing the status of

8    the custodial document production for our September deponents,

9    and we indicated in the chart that there was only one deponent

10   out of eleven for whom the production was neither complete or

11   substantially complete, and that was Miss Brennan.  And we

12   told plaintiffs in that chart that the production would be

13   complete on September 16, which would be about 38 days after

14   receiving the request for the depo.

15        So it would be, you know -- we were trying to get it done

16   and stay within what the Court would want us to do.  And we

17   told the Court that -- I'm sorry.  We told the plaintiffs'

18   lawyers that Miss Brennan was updated, her file production had

19   been updated and complete through June of 2011.  So we had to

20   do a new collection for post-2011, for June 2011, but we had

21   already produced stuff through June 2011.  And we indicated in

22   the chart that the supplemental collection was conducted in

23   August 2013 shortly after plaintiffs identified her as a

24   deponent.

25        We actually beat our self-imposed deadline of 9/16,

1   meaning we said in the chart we would have it done on 9/16.

2   We were able to get it out the door on Friday, 9/13.  But

3   still, nonetheless, I called Bryan.  I tried to call.  I

4   couldn't get him.  So I called Bryan and I let him know late

5   Friday that, you know, that these additional documents were

6   coming and that we would get the disk into his vendor's hands

7   and give me the Saturday delivery date so I could get that to

8   him.

9        So when they got -- and I told him it was going to be a

10  lot of documents.  I didn't know precisely, but I knew it was

11  a lot.  And then, Judge, it's my understanding -- I could be

12  completely wrong about this.  It was my understanding that --

13  it sounds like a ton of pages, but it was my understanding

14  that a lot of these pages are like these long Excel

15  spreadsheets and that when you look at things like e-mails,

16  it's a vastly smaller number.  But, nonetheless, it's still a

17  lot of documents.

18       And so when the plaintiffs indicated that they were --

19  that this was just not -- you know, just too much for them to

20  review before the deposition, I said -- I told my guy who was

21  boots on the ground with that particular witness, "Immediately

22  offer them a choice.  If they want to go forward, they can,

23  but if they want to reschedule, we'd be glad to reschedule."

24  And so before anybody apparently got on planes or whatever, we

25  were able to agree that we would reschedule and we were

1    certainly going to provide them a new date for the depo.

2         So, Judge, this is an example again of, you know, we --

3    they made a request and we tried to get it in before the 9/23

4    deadline, which was a 43-day window.  We did tell them it was

5    not going to be complete until 9/16.  So, you know, those are

6    the facts that surround this particular depo.

7              MR. CARTMELL:  Your Honor --

8              THE COURT:  Well, I certainly -- I certainly cannot

9    fault you, Mr. Gage, for your effort, because I don't think

10   there's anything else you could have done based on what you've

11   just stated.  It sounds to me like it's one of those things

12   that occasionally happens and you just need to get a new date

13   for her deposition.  But it sounds like you've done everything

14   you can do as far as getting the records to them.

15        Mr. Cartmell, is there something else you wanted to say

16   on that one?

17             MR. CARTMELL:  I did.  You know, based on what

18   you've just said, I guess I disagree in a certain respect only

19   because Miss Brennan was the -- I think the -- for a huge

20   amount of time, the individual that was responsible for

21   adverse event reporting on the TVT products, and everything

22   went through her.  She wrote -- you know, when they would make

23   a determination regarding whether or not an adverse event was

24   related to the TVT products, she was responsible for sorting

25   that whole process through with the medical directors and

1    things like that.

2         So I guess my feeling very strongly is that those were

3    all documents that should have been produced way back when we

4    specifically asked requests for production of documents

5    related to adverse events, and the spreadsheets are related to

6    adverse events and so are other documents.  And then, you

7    know, that's not even taking into consideration the Rule 26

8    sort of duty that I think they have with all relevant

9    documents.  I mean these are documents that I would not

10   believe they need a request specifically for Miss Brennan's

11   deposition because she was the holder of all the post-

12   marketing surveillance documents.

13        So I understand and I anticipated that Mr. Gage would say

14   that.  What's frustrating is that we believe those documents

15   that came from her custodial file should have been produced

16   months ago, and they weren't.

17             THE COURT:  Well, it looks like you have them now.

18   So probably the next step here is just to get a new date for

19   her deposition.

20             MR. CARTMELL:  Okay.  And I'll work with Mr. Gage to

21   do that.

22             THE COURT:  You can update me next week.

23             MR. AYLSTOCK:  Your Honor, this --

24             THE COURT:  If you need to update me next week, you

25   know, remember to put that on the agenda.

 1               MR. CARTMELL:  Okay.  Thank you again, Your Honor.

 2               MR. AYLSTOCK:  Your Honor, this is Bryan Aylstock.

 3    I won't say anything more about Miss Brennan, but it does -- I

 4    did want the Court to be aware when it comes to this --

 5    whether it's 30 days or 21 days -- well, another thing just to

 6    point out is sometimes when they're produced, they're corrupt

 7    files, which happened here, and then we have to go back and

 8    forth.  But even beyond that, it takes time to upload these

 9    documents with our vendor, and in some cases it takes five

10    business days.

11        Now, we did everything we could and twisted arms to get

12    them uploaded sooner, but the volume of documents that are

13    coming in make it such that we -- 21 days really kind of turns

14    into 14 days, and there's just a lot to assimilate in a small

15    period of time.  So that's kind of why the 30 days is very

16    important to us.

17               THE COURT:  Well, that's something I want you and

18    Mr. Gage to talk about and try to reach some agreement on.  I

19    understand what you're saying.  I think it's difficult on both

20    sides.  But as far as Miss Brennan's deposition goes, it

21    appears we've done all we can do on that one.  You've got the

22    documents now.  You just need to get a new date.

23               MR. AYLSTOCK:  Yes, Your Honor.

24               THE COURT:  So what else do we have on the agenda?

25               MR. GAGE:  Your Honor, since we're talking about

1  depositions, there is -- there is one issue that we need to

2  raise, and that concerns Pete Hinoul.  Your Honor will

3  remember him.  He's the current -- I think he's the current

4  medical director, and he's obviously an important witness.

5      The current situation -- and I'm not -- I don't have the

6  full history in front of me, but I don't think the history is

7  relevant.  I think kind of where we are, is Your Honor may

8  remember from prior calls, Dr. Hinoul is one of our more

9  difficult witnesses to schedule because of his business

10 activities within the company.  He's obviously a very high-

11 ranking and very important witness.  And we have agreed to

12 provide him for -- is it two more days?

13     We've agreed to provide him for deposition for two more

14 days to the MDL plaintiffs and that those deposition dates are

15 currently scheduled for next week.

16         MS. JACOBS:  October 3rd and 4th.  October 3rd and

17 4th.

18         MR. GAGE:  Okay.  October 3rd and 4th is when

19 they're currently offered for.  And I believe that we've been

20 advised that the plaintiffs are not going to be able to accept

21 those dates.  And, Your Honor, that does create a hardship on

22 us.

23     Mr. Hinoul -- or Dr. Hinoul is not available at the same

24 time that Miss Jones can be available to defend that

25 deposition until probably early November, early to mid

1    November, and so we really need for that deposition to go

2    forward on those dates.  I think Your Honor may remember --

3    and I don't, again, don't have all the details, but I know

4    that these depo dates, we have been asked to move these depo

5    dates for him two, three, and maybe -- this may even be the

6    fourth time that we've been asked to move these depo dates.

7    And it's really creating a hardship for the witness, and we

8    would ask that the deposition be permitted to go forward on

9    the October 3 and 4 dates that are currently outstanding.

10            THE COURT:  Who wants to respond to this?  I do

11   remember Dr. Hinoul.  His name came up probably -- what? --

12   two months ago?  Several status conference -- several of these

13   conferences ago we were talking about Dr. Hinoul.

14       Was he the one that was supposed to testify in Missouri

15   or something and then that was canceled and he became

16   available?  Am I thinking of the same person?

17            MR. GAGE:  Judge, that's it.  You remembered it

18   well.

19            MR. AYLSTOCK:  Yes, Your Honor.

20            THE COURT:  So what is the problem, Mr. Aylstock?  I

21   mean I do recall these depositions have been scheduled and

22   canceled and scheduled again.

23       Why can you not take Dr. Hinoul's deposition as scheduled

24   on the 3rd and the 4th?

25            MR. CARTMELL:  Well, Your Honor --

1           MR. AYLSTOCK:  Mr. -- go ahead, Tom.

2           MR. CARTMELL:  This is Tom Cartmell.  If you don't

3    mind, I'll respond because I've been more involved in that.

4       If you'd go back to what we talked about originally was

5    that there was a need to get Dr. Hinoul's deposition before

6    September 23rd; and because Dr. Hinoul was not going to be

7    available for trial purposes, that was going to be difficult

8    to do.

9       The hearing came up on the 19th and 20th, and that was

10   the day when Dr. Hinoul was scheduled.  And because Kate --

11   and Judge Goodwin had made it clear through Kate that he

12   wanted to make sure everyone was there for the hearing.  The

13   other side was willing to reschedule.

14      That is the only time that Dr. Hinoul had been scheduled

15   for deposition following his original -- from his original

16   deposition.  And then I think there was some communication

17   about trying to do it after Angelini or before, but he was

18   going to be unavailable.  So that was canceled for that

19   reason.

20      They then -- it took a while, but they were willing to

21   give me additional dates when they figured out that he was not

22   going to be in trial, and the dates they gave me were the 3rd

23   and 4th of October.  I literally at that point, because

24   there's three of us that have spent literally 50 hours-plus

25   each related to the topics that Hinoul is going, you know, to

1    be deposed on, and all three of us cannot be available on that

2    date.

3         I cannot be available on that date, frankly, for a

4    personal reason.  I'm a municipal judge at night, and I have

5    put off an appeal in my -- on -- I do it every other week.

6    And I literally cannot do it again.  So I asked Kirk and the

7    other lawyer if they can cover it.  Kirk is in trial, a two-

8    week trial during that date, and the other lawyer is doing

9    another deposition on those dates and was unavailable as well.

10        So -- and, frankly, the feeling was once Kirk and I

11   couldn't be in it, there was no way we were going to be able

12   to do it anyway.  So I had asked them to give me dates the

13   second week of October, I think.  And I can't remember, Donna,

14   if I asked for the third week.  But the response -- we waited

15   for a period of time, and the response was he's not -- he

16   needs to go -- available any other time; he needs to go

17   forward on that date.

18        Now, I told these guys, look, if we can't do it until

19   later than that, it may be at our own peril, and I do

20   understand that.  But I promise you, Your Honor, there has

21   been -- you can count on one hand the number of times that we

22   have ever really turned down dates on key witnesses from them.

23        There have been multiple times when they have told us no

24   way, we cannot do depositions then.  We don't pass up dates if

25   we absolutely cannot pass them up.  And this is the first time

1    I'm hearing that Dr. Hinoul cannot be available till November.

2    I was hoping that we could get two dates, you know, in

3    October.

4        If we can't do it in November -- or, excuse me -- in

5    October, then, you know, I would think that we would do it the

6    first week.  I just cannot get the people there October 3rd

7    and 4th that need to do this deposition.

8            THE COURT:  Well, it sounds like -- I'm sure

9    Mr. Gage will try his best to find other dates in October, but

10   it sounds to me as though if you don't take them -- this

11   deposition on October 3rd and 4th, you're not going to be

12   able to take it until November, so --

13           MR. CARTMELL:  And I would appreciate it if they

14   could try to find October dates, but I do understand that.

15   And I will go back again and update with Kirk, you know, where

16   he is on that trial as well, but, you know, my belief is now

17   it's probably going to, I guess, be at our peril and it's

18   going to be hopefully the first week in November.

19           THE COURT:  All right.  Mr. Gage, Mr. Cartmell will

20   check with the other lawyer about his trial, and we all know

21   what happens with trials.  They hardly ever go forward when

22   they're scheduled.  So maybe the October 3rd and 4th date

23   will still work out.  But if not, if you would look for some

24   other dates later in October.  If that doesn't work, then

25   you'll just have to give him some dates in November, but let's

1    do it as soon as possible.

2              MR. GAGE:  Yes, Your Honor.  Thank you.

3              THE COURT:  All right.  Is there any --

4              MR. AYLSTOCK:  Your Honor, this is --

5              THE COURT:  Yes?

6              MR. AYLSTOCK:  This is Bryan Aylstock.  We had

7    served some 30(b)(6) notices on -- you know, we do want to

8    nail down these mesh characteristics.  It's sometimes a little

9    disheartening when you think you have something nailed down

10   and a witness, a key witness says, "Oh, no, the mesh is

11   completely different" when -- so -- but when we've been

12   operating and the documents reflect something different.

13        So there's some 30(b)(6) deposition notices that have

14   been outstanding on the mesh characteristics and the support

15   for certain statements in the IFU and so forth, and then

16   there's also some other deposition dates that have been

17   hanging out for an inordinately long time that we'd like to

18   try to nail down specific dates for so that we can move

19   forward and be ready for this trial.

20             THE COURT:  Well, when are you and Mr. -- when are

21   you and Mr. Gage going to talk?  Early next week, correct?

22             MR. GAGE:  Correct.

23             MR. AYLSTOCK:  That's correct, Your Honor.

24             THE COURT:  So let's -- why don't you have some

25   details prepared, Mr. Aylstock, as to precisely what it is

1    you -- the people you want to have done, the topics you want

2    to have done and a sort of estimated time frame of when you

3    would like to complete those things, and you two talk about

4    that at your conference on Monday or Tuesday.

5            MR. AYLSTOCK:  Yes, we can get that out to them

6    today.  We had done that before, and, you know, we'll update

7    that and get it right out to them.

8            THE COURT:  And if you want to add these things in

9    your proposed orders, by all means do so.  As many of these

10   things that we can get resolved, the better.

11           MR. AYLSTOCK:  Yes, Your Honor.

12           MR. ANDERSON:  Your Honor, this is Ben Anderson.  If

13   we could just add another agenda item for Mr. Aylstock and

14   Mr. Gage's meeting next week.

15       At the deposition of Joerg Holste -- that's one of their

16   German Ethicon employees that was taken at the end of July --

17   he had testified that when there was explant -- when explants

18   were received, both for hernia meshes and pelvic floor meshes,

19   when they were received at Ethicon, that Joerg Holste would be

20   the person who would fill out a form, they would go to quality

21   assurance, and that those forms would have patient name, type

22   of mesh, length of implant, and other identifying features;

23   and that when they wanted a histological analysis of those,

24   they would send it to their chief surgical outside pathology

25   consultant, Dr. Klosterhalfen.  And I asked him if that was

1    for both hernia and pelvic floor, and he says yes, and he said

2    it was per the consulting agreement between Dr. Klosterhalfen

3    and Ethicon.

4        And he testified -- and this is a quote -- "We always

5    received a report when we sent meshes to Dr. Klosterhalfen,

6    and it was entered in an electronic system where it was known

7    what the mesh was, the application, how long it had been

8    inside the patient and which problems they had with it."

9        So we requested -- we looked -- I had all of our people

10   go and try to find anything like this.  Of course, we believe

11   that pursuant to the original RFPs, we should've received all

12   such quality assurance information because it is an adverse

13   event report, and we should've certainly gotten all of the

14   reports back from Dr. Klosterhalfen.

15       And so we didn't find anything, and so Mr. Aylstock did

16   send an e-mail back on September 11th to defense counsel

17   asking for that.  And then last night, Mr. Gage sent an e-mail

18   that said that, "We have a lead on this and our team is

19   actively pursuing it.  We'll update you as soon as we get more

20   information."

21       So I just want to make sure that this is an issue

22   that's -- that's out there, that's being discussed, because as

23   we are getting -- narrowing the new -- getting closer to the

24   new expert deadline, these are the types of things, especially

25   with histological analysis -- these are not just straight-up

1    documents.  These are things that we are hoping that we're

2    going to be getting some -- some explants to look at.

3        We're also hoping that, short of that, that we get these

4    documents so that we can have our experts take a look at these

5    things.  And I realize that we're all busy and that there is

6    probably good reasons why it took eight days to get back to

7    us, but as we -- but now that this is teed up, I would just

8    ask that we push on this, because if there's an electronic

9    system and it's in quality assurance and it has to do with

10   meshes that were sent to Dr. Klosterhalfen and he reported

11   back, we would like to have all those documents, and it's just

12   not clear why we wouldn't have gotten them in the first place.

13       So I do appreciate the fact that William said that

14   they're looking into it, but I just hope that we can get some

15   quick movement on it.

16            THE COURT:  Mr. Gage?

17            MR. GAGE:  Your Honor --

18            THE COURT:  Yes?

19            MR. GAGE:  Your Honor, this is William Gage.  Your

20   Honor, we did interview some people inside the company.  One

21   of them had an idea as to what was being described or where

22   this information might be located.  So we've dispatched some

23   people to go dig and see what they could find.  So I'm

24   hopeful -- I am hopeful that next week we're going to at least

25   be able to say we found it or we didn't find it.

1        And just so Your Honor understands, you know, we probably

2   get, I'm guessing, two or three, sometimes four requests a day

3   from plaintiffs on issues like this.  And so what we do, just

4   so Your Honor knows and just so the plaintiffs know, we track

5   these.  We put them on a chart.  We make sure that -- and then

6   we have calls sometimes as often as every two or three days to

7   go through the chart of the pending requests that the

8   plaintiffs have sent us by e-mail so that we can make sure

9   that we are promptly and properly investigating these sorts of

10  e-mail requests.

11       And so I just wanted to assure the Court and the

12  plaintiffs that we have a -- we do have a structure here.

13  When they do send us e-mails, we try our best to respond.

14  Sometimes all we can say is we've got a lead or we're

15  looking into it.  But trust me, Your Honor and plaintiffs'

16  counsel, we are actively charting, analyzing, and then

17  methodically going through these requests, because it is our

18  desire to, you know, get these things and get them out if we

19  can find them.

20       Sometimes it's very difficult to find them, but if we can

21  find them, I want to find them and get them out the door.

22            THE COURT:  Well, we'll put --

23            MR. GAGE:  Oh, Your Honor, if I could -- I'm sorry.

24            THE COURT:  We'll put Dr. Klosterhalfen's

25  histological reports on our agenda for next Friday and you can

1  update me as to where we are with those reports and whether

2  they've been found and produced.

3          MR. ANDERSON:  Thank you, Your Honor.

4          MR. GAGE:  Thank you, Your Honor.  And, Your Honor,

5  if I could, I think it probably would help us also on this

6  particular issue, Dr. Klosterhalfen, as we've discussed in the

7  past, is the plaintiffs' expert.  I'm not sure if he was -- I

8  think he was designated as a non-retained expert against

9  Ethicon last Monday, but if Mr. Anderson could reach out to

10 Dr. Klosterhalfen and ask him to produce his report -- in

11 other words, they are Dr. Klosterhalfen's reports.  They were

12 sent to Ethicon.  So presumably Dr. Klosterhalfen would have

13 kept a copy of his report.  And since he is a plaintiff's

14 expert, he could help us resolve this discovery issue by also

15 going to Dr. Klosterhalfen and producing those reports to us

16 as well.  That will -- that's another way we can bridge the

17 gap here, Your Honor.

18         THE COURT:  Has anybody --

19         MR. ANDERSON:  Your Honor, this is Ben -- sorry.

20         THE COURT:  Has anybody gone to Dr. Klosterhalfen's

21 laboratory yet to see what he has?  Because it sounds to me --

22 this subject matter has come up numerous times -- that Dr.

23 Klosterhalfen has actual tissue, actual explants, he has

24 reports, and I thought there was going to be some effort, some

25 joint effort to go and catalog what he does have in his

1   possession.  Has that not been done?

2            MR. ANDERSON:  Your Honor, this is -- I'm sorry.

3            THE COURT:  Go ahead.

4            MR. ANDERSON:  I thought you were through.

5            THE COURT:  I'm finished.

6            MR. ANDERSON:  This is Ben Anderson.  This is Ben

7   Anderson.  Your Honor, this issue came up in the Bard trial;

8   and when Mr. Gage had requested this, I had gotten a -- we

9   responded that we would need to meet and confer on all of the

10  documents that he was requesting and the information that he

11  was requesting because we felt that it was overly broad and at

12  the time he was not our expert and since has become non-

13  retained expert.

14       And the problem is that he works at the Düren Institute

15  at the hospital, and so these explants and things that come

16  in, come in from all sorts of different -- they don't just

17  come from Ethicon.  They come from -- directly from patients

18  and surgeons and other hospitals and things like that.

19       He is not at liberty to allow lawyers from the United

20  States to come into a German hospital and just come in and

21  start looking at patients' information in the form of

22  explanted tissue and medical records and things.  And so Judge

23  Goodwin had ruled on this in the Bard trial that that was not

24  something that needed to be produced because he couldn't do

25  that pursuant to German law.  He could not just hand over

1   people's explants or pathology reports concerning his review

2   of those.

3       So we had never agreed -- and, quite frankly, we were not

4   going to bring it up in this call because I'd gotten an e-mail

5   from David Thomas saying, "Let's discuss this, short of

6   bringing it to the Court's attention," and I had agreed to do

7   that to see if we could come to some agreement without putting

8   this aspect of what documents they believe he should produce

9   versus what documents we believe he can and those which he may

10  have and may not have.

11      So we have not reached out to him yet in terms of what he

12  has, but I do know that this particular issue, which is

13  somewhat separate and distinct from what we're discussing

14  here, they asked for -- he has literally thousands of mesh

15  explants over the course of 20 years and then tens of

16  thousands of histopathology slides.  It's the largest

17  institute for pathology in Western Europe.  And so to say that

18  he's just going to open up his laboratory because of this

19  litigation, he cannot do that.  The hospital will not allow

20  it.  German law won't allow it.

21      Now, a separate and more discrete issue here is -- and I

22  appreciate where Mr. Gage is coming from with regard to, well,

23  why can't Professor Klosterhalfen just produce it and that

24  would help us out.

25      The point is that they are a party defendant here.  I

1    don't disagree that we will certainly ask him for anything

2    that he has.  Okay.  We will do that.  But he's not a party

3    defendant, and they have quality assurance files, and we would

4    like to know for purposes of when they were produced, what the

5    system was that was in place, whether or not they accurately

6    recorded it, what they recorded and when.  We have a right to

7    those type of documents.  And so maybe what Professor

8    Klosterhalfen has may supplement that, but certainly it

9    shouldn't be in substitution for their requirement and

10   obligation to go and find these, or at least try to find them,

11   and to produce them to us for an assortment of reasons.

12       So they are discrete issues, but what Professor

13   Klosterhalfen can and cannot produce is something that we were

14   going to have a call on next week, because certainly he can't

15   open up his lab because of the litigation here.

16            THE COURT:  Well, that's fine, and I don't think

17   Mr. Gage is suggesting that Dr. Klosterhalfen become their

18   document producer.  I think what he's saying is, if you want

19   to see these things and Dr. Klosterhalfen has them, then why

20   don't you just ask him to give them to you while they're

21   trying to find them.

22       I mean I hear what you're saying, but there also has to

23   be a little bit of common sense in here.  If these are

24   documents that he prepared for Ethicon, I don't see how he can

25   claim that he can't give them to Ethicon.  You're asking for

1   them from Ethicon.  If you can get them directly from him,

2   what difference does it make?

3        I'm not saying that Mr. Gage does not have to answer your

4   requests.  Of course he does.  But, you know, to me this is a

5   tug of war that just makes no logical sense.  So I think if

6   you can get -- if you can get documents from Dr. Klosterhalfen

7   that pertain to Ethicon -- Mr. Gage is telling you Ethicon

8   doesn't care; go ahead and get them -- I think you ought to

9   try to get them.

10        And in the meantime, Mr. Gage, you still need to look for

11   them on your end because I hear Mr. Anderson saying that it's

12   more than just the histological report, that you have other

13   documents pertinent to these histological reports.  So you

14   both need to look at that.  But I also think --

15             MR. ANDERSON:  Thank you, Your Honor.  This is Ben.

16             THE COURT:  I also think --

17             MR. ANDERSON:  Oh, I'm sorry.

18             THE COURT:  -- that this Dr. Klosterhalfen issue

19   comes up over and over and over and over again.  You know, I

20   don't understand why no one to this point, why there hasn't

21   been some discussion already about what is he allowed to turn

22   over, what would pertain to the plaintiffs in this case, what

23   might be Ethicon's property.  I don't understand why that

24   hasn't happened already since he appears to be a very

25   important witness in the case, but --

1                MR. GAGE:  Your Honor --

2                THE COURT:  Yes?

3                MR. GAGE:  -- this is William Gage.  I have a letter

4       dated August 21, 2013, addressed to Mr. Anderson that David

5       Thomas and I put together, and it contains our very specific

6       requests of what we are requesting from Dr. Klosterhalfen and,

7       more importantly, what we're not.  And just so that everyone

8       understands, our requests -- because you'll remember, Your

9       Honor, that he was a former consultant for Ethicon.  What we

10      are requesting, what we requested that Ben go to Dr.

11      Klosterhalfen and have produced to us are the documents that

12      pertain to his work for Ethicon.

13             Similarly, with regard to any pathology or mesh samples,

14      that sort of thing, we are asking that he produce to us only

15      those mesh samples that pertain to Ethicon.  In other words,

16      Mr. Anderson talked about Judge Goodwin's prior ruling and the

17      scope of, you know, his data base with all these meshes from

18      other manufacturers.  We're not asking for that.  We're asking

19      only for materials that relate to his former work as an

20      Ethicon consultant, but we've been very sensitive to that, and

21      that's spelled out very, very specifically in our letter to

22      Mr. Anderson of August 21.

23             So I just wanted Your Honor to understand the scope of

24      what we are requesting we believe is very narrow and would not

25      violate Judge Goodwin's ruling.

1          THE COURT:  Well --

2          MR. ANDERSON:  Your Honor, Ben Anderson again.  I

3    want to, first of all, respond to what Your Honor had asked

4    before as to why.

5          After one round of Bard trial that got mistried and

6    Professor Klosterhalfen was already in the state and then they

7    retried it, he and his wife had a planned holiday that they

8    were going to take, and they had to postpone it in order for

9    him to appear at the second Bard trial.

10         So when I wanted to contact him, they were on holiday and

11   could not be contacted, and they did not come back until just

12   this past week.  And so I have been unable to forward any type

13   of requests to him because he had made it very clear he was

14   having -- and, more importantly, his wife was going to have

15   nothing to do with mesh while they were finally on their

16   holiday.  So that was a practical issue that was in the way of

17   me trying to request things.  That's number one.

18         Number two.  What counsel is discussing here are two

19   different categories.  One, we have no problem speaking with

20   him and asking him to produce documents pertaining to his work

21   for Ethicon.  And I don't think that he will have a problem

22   with producing those.

23         The second request is the more important one, and it has

24   been asked not only for Ethicon but also other manufacturers.

25   But let's just talk about the Ethicon.  Not all of the samples

1    that he received that were Ethicon meshes came from Ethicon.

2    In fact, most of them did not come from Ethicon, as I

3    understand it.  And he is under an obligation not to and a

4    prohibition not to produce samples from that hospital of

5    explanted meshes.

6         It is -- it was -- this is exactly what was ruled upon

7    because that was what Judge -- the judge ruled upon with

8    regard to Bard, is he could not produce medical records and

9    actual mesh samples but rather histopathological analysis.

10   And so he cannot do that.  And we're happy to look for the

11   documents, but in terms of mesh samples themselves, it cannot

12   be done.

13        THE COURT:  Well, that's fine, Mr. Anderson.  I

14   don't think anybody expects Dr. Klosterhalfen to do anything

15   he's not legally permitted to do.

16        The problem that I'm trying to raise here is that Dr.

17   Klosterhalfen has been a figure in this litigation for quite a

18   while now and yet nobody seems to know exactly what it is he

19   does have, what he can turn over, what he can't turn over.  It

20   seems like nobody really knows.  And what I'm questioning is,

21   why not?  Why hasn't somebody by now done that?

22        I hear you saying, well, he just hasn't been available.

23   Okay.  Fine.  But now maybe perhaps is the time to get that

24   figured out before you have your expert deadlines come up.

25        So I guess that's all we can really say about Dr.

1    Klosterhalfen, but it did remind me of one thing.  What

2    happened with Mrs. Lewis's -- is it Lewis? -- her mesh?  I

3    thought everything was worked out with the hospital to get

4    that mesh.

5              MR. ANDERSON:  Yes, Your Honor, Ben Anderson again.

6    Part of the problem is that where she had her explant, which

7    is UT Southwest, changed their in-house protocol because their

8    pathology department was being overwhelmed with requests and

9    it was taking critical time away, as I understand it, from

10   their actual performing their day-to-day duties of being

11   pathologists and having their staff be able to process samples

12   and have a quick enough return for their surgeons, not to

13   mention outside requests.  And so they changed their system

14   such that now it goes through a risk management process where

15   the request has to go through risk management.  Then risk

16   management makes the request of pathology.  Then pathology

17   gets back and tells risk management.  Then risk management

18   then reaches back out to the outside requester, which would be

19   yours truly.

20         And so it has become a little bit of red tape, and we

21   still do not have any of the explant material.  That's the

22   first problem, has been one of yet new layers of trying to get

23   this from the pathology department.  But the second issue

24   that's pressing is that we had -- we worked hard to try to

25   come up with a pathology protocol.  That would be myself and

1    Mr. Gage and Mr. Snell.  And after we had agreed upon it and

2    thought that it looked good and we submitted it and we were

3    going to have it entered as a pretrial order, I realized and

4    sent an e-mail to William -- to Mr. Gage and Mr. Snell two

5    weeks ago saying, "Guys, hold the phone.  I need to put the

6    brakes on the PTO.  I realize that there is a mistake in the

7    amount of sample which will be considered too small to be able

8    to be divided."  And I was off by -- it was a difference

9    between grams and milligrams and 120 milligrams needed to

10   actually be left than 12 milligrams.

11       And so Mr. Gage couldn't address the issue because he was

12   getting on a plane I think to go to Chicago to do a

13   deposition.  So he turned that over to Mr. Snell.

14       Mr. Snell and I spoke a few days later, and that was, I

15   think, two weeks ago yesterday.  And I explained the problem

16   to him, that it was a *mea culpa*, that when I went back and was

17   discussing with my experts what we were going to do with the

18   sample when it came out and I started discussing values, that

19   they chuckled at me and said, you know, that's the wrong

20   value.  That is way too high.

21       And so I said -- you know, I explained to them that it

22   was a mistake on my part with regard to how much sample we

23   actually needed, that we needed miniscule amounts compared to

24   what had been in the protocol.  And so I did give that to

25   Mr. Snell two weeks ago.  He said he would check with his

1    people and get back to me.  And I have not heard back from

2    him.  And so I would -- I'd not planned on teeing that up

3    today, but since Your Honor asked, that's where we are.  And

4    so I would just ask that if Mr. Gage could follow up with

5    Mr. Snell and find out if someone is going to get back to me

6    so that we could address that ASAP, because as soon as we get

7    the word and that sample comes out, we need to immediately get

8    that reviewed by experts.  We need to have pathology slides

9    done, etcetera, and that is not a quick process.  So I'm still

10   waiting to hear back from the defense.

11           THE COURT:  Yes, Mr. Gage, that's -- I think that's

12   an important issue.  What's the status of getting the

13   pathology protocol worked out?

14           MR. GAGE:  Judge, I know that Mr. Snell had to go

15   call our -- he -- I know part of the reason was trying to get

16   up with our pathologist, to have the pathologist look at the

17   proposed recommendation from Mr. Anderson.  I'll have to

18   follow back up with him.

19       To be honest with you, Judge, I don't -- I mean Ben may

20   have communicated this to Mr. Snell, but I don't think I even

21   knew for certain that there was an explant until just now.

22   But, nonetheless, I agree with you; we need to get it knocked

23   out now that I -- I mean certainly now that I know that

24   there's an explant.

25           THE COURT:  Well, I think we all knew about the

1    explant coming from Miss Lewis --

2              MR. ANDERSON:  Yes.

3              THE COURT:  -- because we talked about that --

4              MR. GAGE:  Well --

5              THE COURT:  -- last week or two weeks ago perhaps.

6              MR. GAGE:  But I --

7              MR. ANDERSON:  That's correct.  It's Ben Anderson.

8    That's correct, Your Honor.  We have said that her surgery was

9    coming up, and that's why the pathology protocol was critical.

10             THE COURT:  Right.

11             MR. GAGE:  Agreed, but it was my understanding that

12   we were not -- that there was uncertainty as to whether or not

13   the surgery would generate an explant.  That's what I'm

14   referring to.

15             MR. ANDERSON:  Well, that's -- Ben Anderson again.

16   That's a good point, Your Honor, is that as of right now, we

17   don't know how much -- we know that there was an explant,

18   so -- or at least that was the -- the surgery was to go in and

19   remove part of the mesh.  That was the anticipated surgery.

20        Now, I guess there's a chance that nothing was removed,

21   but my sense is that the idea was that he was going to go in

22   there and remove some mesh.  How much and whether it was

23   tissue and mesh, we still don't know because we haven't heard

24   from the risk management office.

25             THE COURT:  Okay.  Well, why don't you follow up on

1    that.  You know, I'm surprised that they had a different

2    procedure in the past because seven or eight years ago when I

3    was at CAMC, we wouldn't -- we didn't let anything go out for

4    litigation unless there was a lawyer involved.  So I'm not

5    surprised that you're having to go through those channels, but

6    I would expect they ought to have that issue resolved fairly

7    shortly here.  So you're going to need a protocol in place.

8    So I urge you to move on that one.  That sounds like it needs

9    to be done ASAP.

10          MR. GAGE:  And, Judge, we have a protocol in place.

11   The only thing that I think Mr. Anderson was recommending --

12   and it's been entered by Judge Goodwin.  I think he's just

13   recommending a modification to a phrase found in the protocol.

14          THE COURT:  So there's already been a protocol in

15   place.

16          MR. ANDERSON:  I didn't think it was entered, Your

17   Honor.  Maybe I'm wrong.

18          MR. GAGE:  I thought Judge Goodwin signed it.

19          THE COURT:  He may have.  I'm not aware if he did,

20   but then it's really hard to keep up on everything that gets

21   filed in these cases --

22          MR. ANDERSON:  Amen.  This is Ben Anderson.  Sorry.

23          THE COURT:  -- when they're not right in front of

24   me.

25          Well, we're at our hour mark.  Unless there's something

1   really critical that needs to be discussed right now, if

2   there's anything left over, we can pass it to next Friday.

3            MR. AYLSTOCK:  Your Honor, this is Bryan Aylstock.

4   I did have a couple of other things, but Mr. Gage and I can

5   speak on Monday and hopefully resolve them.

6            THE COURT:  Great.

7            MR. AYLSTOCK:  Or at least we'll have them on the

8   agenda.

9            THE COURT:  Sounds wonderful.  Anything from the

10   defendant?

11            MR. ANDERSON:  Thank you, Your Honor.

12            THE COURT:  Anything from the defendants?

13            MR. GAGE:  No, Your Honor.

14            THE COURT:  All right.  Thank you all again, and I

15   will talk with you next Friday.

16            MR. ANDERSON:  Thank you.

17            THE COURT:  Send me proposed orders if you can't

18   agree on your depositions and whatnot.

19            MR. GAGE:  Okay.

20            THE COURT:  Thank you.  Have a good weekend.

21     (Conference concluded at 3:05 p.m.)

22    I, Teresa M. Ruffner, certify that the foregoing is a

23   correct transcript from the record of proceedings in the

24   above-entitled matter.

25     /s/Teresa M. Ruffner          September 23, 2013

_____    _____