1              IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
2                        AT HUNTINGTON
                 TRANSCRIPT OF PROCEEDINGS
3

4

5
   ---------------------------------------
6

7  IN RE:  ETHICON, INC.,  PELVIC REPAIR       MDL NO.
   SYSTEM PRODUCTS LIABILITY LITIGATION        2:12-MD-2327
8

9  ---------------------------------------

10

11

12              TELEPHONIC STATUS CONFERENCE

13                  September 30, 2013

14

15

16         **BEFORE THE HONORABLE CHERYL A. EIFERT**
                **UNITED STATES MAGISTRATE JUDGE**
17

18

19

20

21

22  Court Reporter:            Lisa A. Cook
                               RPR-RMR-CRR-FCRR
23                             (304)347-3198
                               lisa_cook@wvsd.uscourts.gov
24

25

```
 1                        APPEARANCES

 2                      (By Telephone)

 3   For the Plaintiffs:

 4   MR. BRYAN F. AYLSTOCK
     MS. D. RENEE BAGGETT
 5   Aylstock, Witkin, Kreis & Overholtz
     Suite 200
 6   17 East Main Street
     Pensacola, FL  32502

 7

 8   MR. THOMAS P. CARTMELL
     Wagstaff & Cartmell
 9   Suite 300
     4740 Grand Avenue
10   Kansas City, MO  64112

11

12   MR. BENJAMIN H. ANDERSON
     Anderson Law Offices
13   Suite 215
     360 West 9th Street
14   Cleveland, OH  44113

15

16   For the Defendant:

17   MR. WILLIAM M. GAGE
     MR. BENJAMIN M. WATSON
18   MS. DONNA B. JACOBS
     Butler, Snow, O'Mara, Stevens & Cannada
19   P.O. Box 6010
     Ridgeland, MS  39158-6010
20

21

22

23

24

25
```

1                        **APPEARANCES**

2                        **(Continued)**

3    For the Defendant:

4    **MR. PHILIP J. COMBS**
     Thomas, Combs & Spann
5    P.O. Box 3824
     Charleston, WV  25338-3824
6

7    **MR. GARY A. RUBIN**
     Skadden, Arps, Slate, Meagher & Flom
8    1440 New York Avenue, N.W.
     Washington, D.C.  20005
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  P R O C E E D I N G S
 2              THE CLERK:  Could you identify plaintiffs' counsel
 3    first and then defense counsel, please.
 4              MR. AYLSTOCK:  Sure.  This is Bryan Aylstock on
 5    behalf of the plaintiffs.
 6              MS. BAGGETT:  Renee Baggett on behalf of the
 7    plaintiffs.
 8              MR. CARTMELL:  Tom Cartmell on behalf of the
 9    plaintiffs.
10              THE CLERK:  Anyone else for the plaintiffs?  Is
11    there anyone else on the line for plaintiffs' counsel?
12              MR. ANDERSON:  Ben Anderson.
13              THE CLERK:  All right.  Thank you.
14         What about defense counsel, please?
15              MR. GAGE:  For the defendants Donna Jacobs, Ben
16    Watson, and William Gage.
17              THE CLERK:  All right.  Thank you very much.  Hold
18    one moment.
19              MR. COMBS:  And Phil Combs for the defendant.
20              THE CLERK:  Oh, all right.  Thank you.
21              MR. RUBIN:  And Gary Rubin from Skadden Arps for
22    the defendant.
23              THE CLERK:  Gary Rubin did you say?
24              MR. RUBIN:  Yes, ma'am.
25              THE CLERK:  All right.  Thank you.  Is there
```

1    anyone else?

2        (No Response)

3            THE CLERK:  All right.  Hold one moment for Judge

4    Eifert, please.

5            THE COURT:  Hello.  How are you-all?

6        Lisa Cook is our court reporter today.  Once again,

7    I'll remind you to identify yourself when you speak so she

8    can get that correct, put it down correctly in the record.

9    All right?

10       Okay.  I have two things on my agenda today, and then

11   I'll turn it over to you-all.

12       The first has to do, once again, with the supplemental

13   sweeps of the custodial files.  The way we left it I think

14   last week, or a week from last Friday, was that there had

15   been a proposal made by the defendants that had been

16   provided to the plaintiffs.

17       The plaintiffs had reviewed it cursorily and felt that

18   perhaps the, the 21 -- they wanted 21 days instead of 30

19   days prior to depositions to have those produced.

20       Is that -- am I understanding correctly what was said

21   last time?

22           MR. GAGE:  Your Honor, this is William Gage.

23       Bryan and I ultimately talked and I think we came down

24   with what we agreed to was 65-25, meaning they would give us

25   65 days notice of the depo and we would provide the

1    documents within 25 days of the depo.

2         And I sent Bryan the revised stip just a few minutes

3    ago.  It's got a couple of other things in it that departed

4    from the original stip, but these were issues that were

5    discussed in several calls I had with Bryan and/or Tom this

6    past week.

7         So, I think on the 65-25 issue, I think we've got a

8    deal.

9              THE COURT:  Is that correct, Mr. Aylstock?

10             MR. AYLSTOCK:  Well, on that issue I think that's

11   correct with this caveat.  As, as Your Honor will recall,

12   there was a representation made to the Court that custodians

13   have been swept and produced, a couple hundred, in fact.

14   And where a deponent that we want is, you know, part of that

15   prior custodial production, unless there's some need to

16   supplement that production, you know, I, I -- we -- given

17   the time pressures we have and, and how long some of these

18   have been outstanding, I think that what I -- and I did

19   literally just get the stipulation a minute ago from, from

20   William.

21        What I would say is that if it's somebody on the

22   custodial production list, then we don't need 65 days.  We

23   don't need 21 days.  Certainly, we want a representation

24   that, that that file has been completely produced.  But I

25   don't want to get jammed up with the -- or hung up on the

1    65-day part of it because certain witnesses we've been, you

2    know, were already swept, I guess.  And then there's some

3    other things that are brand new to me in this stipulation

4    that William and I didn't discuss.

5        So, I guess sort of is, is -- it's a long way of saying

6    sort of, Your Honor.

7            THE COURT:  All right.

8            MR. GAGE:  Your Honor, this is, this is William

9    Gage.

10       I, I think what Bryan is referring to, he and I talked

11   this past week about the reality that, you know, some of

12   these people that they want to take the deposition of, their

13   custodial files would have been updated, swept, et cetera,

14   you know, sometime like in May of 2012 or maybe the end of

15   2012 or early 2013 such that there's been more than six

16   months pass since they were last swept.

17       But the reality is there, there may be instances where

18   the plaintiffs are willing to go forward with the depo

19   without having to do another supplemental custodial sweep.

20   And that's largely because some of the witnesses, you know,

21   it's really not that important what they may have about

22   e-mailing about or speaking about or working on in the year

23   2013 because some of these witnesses, the, the relevant time

24   frame may be years earlier.

25       So, I think that's where Bryan and I were trying to go,

1   that we would not try to have such a long depo notice period

2   in every instance.  We would try to work and hopefully have

3   some cases where, you know, we don't need to do a

4   supplemental sweep for a particular deponent.

5           MR. AYLSTOCK:  That's correct, Your Honor.  I just

6   don't, you know, I don't want the record to reflect that,

7   you know, we agreed that we're going to need, or, or give 65

8   days notice before every single deposition because there are

9   certain things we're learning even now that, okay, this

10  guy's a key person or this gal's a key person.  And with the

11  trial upon us, some of these very well may need a shorter

12  fuse.  So, that, that's my concern there.

13          THE COURT:  Well, I will let you both try to

14  address this further on your own.  It sounds to me that at

15  least the issue's been raised and that Mr. Gage is trying to

16  get these sweeps done prior to the deposition.  So, I think

17  that's maybe the best we can do on that today.

18      The other item I had was a follow-up on

19  Dr. Klosterhalfen's histological report and the production

20  of those reports.  Have we made any, any progress on that?

21          MR. ANDERSON:  Your Honor, this is Ben Anderson.

22      Pursuant to your, our discussion last week, we had

23  reached out to Dr. Klinge.  And then we had also reached out

24  to Dr. Klosterhalfen to say, "Please send me anything that

25  you have that's related to your consulting period with

1    Ethicon."

2          And, so, -- and I asked them to make reasonable

3    inquiries into their documents, realizing that some of this

4    work goes back more than 20 years that they did with

5    Ethicon.  And, so, I -- we have various changes of computers

6    since then.  I know I certainly have had a few different

7    laptops, and sometimes back then didn't have a computer at

8    all in the '90s.  And, so, they are making reasonable

9    inquiries into those documents.

10         I have, in fact, received a few documents from Dr.

11   Klinge already that -- as he is trying to look through and

12   see what is relevant.

13         And, so, from, from the plaintiffs' end, yes.  I don't

14   know what the defendants have done on their end to look for

15   some of the things that we discussed that they were going to

16   simultaneously be trying to find with regard to Drs. Klinge

17   and Klosterhalfen.

18         Since we spoke last Friday, I did get a stipulation, a

19   proposed stipulation from the defense.  And it was different

20   than what we had discussed in our previous phone calls.  And

21   it was asking for all of the documents to be collected by

22   Drs. Klinge and Klosterhalfen, and that they take this

23   plug-in device with a, with a drop-down kit, a witness

24   self-collection kit and plug it into their computers and

25   begin to take down electronically stored information.

1      Furthermore, they wanted it produced not to me, but

2   produced only to the defense so that they could, I guess,

3   vet it and run it through their channels before they decided

4   what they would produce to us.

5      And, of course, I was following the Court's instruction

6   and, and as, as Your Honor had said last week.  So, I think

7   if you can get the documents from Dr. Klosterhalfen that

8   pertain to Ethicon, Mr. Gage is telling you Ethicon doesn't

9   care.  Go ahead and get them.  I think you ought to try to

10  get them.

11     So, I did that for both he and Dr. Klinge.  I had

12  previously asked Dr. Klinge and made it more clear to him

13  what it was that I was asking because I don't think he quite

14  understood that this is documents that went between he and

15  Ethicon back in the day to, to and from.  And, so, I know

16  that Dr. Klosterhalfen is looking for anything that relates

17  to documents.

18     Also in this stipulation, despite the fact that I had

19  informed Your Honor and I had informed the defense that

20  Dr. Klosterhalfen, nor Klinge, per German law, introduce

21  medical records, patient information, they can't produce

22  actual explanted tissue.  That is not allowed for them to do

23  that.  This came up in the *Bard* litigation as well.  The

24  Judge did not make him produce those things.  Yet, they have

25  included it in their stipulation.

1         So, I responded at length to Mr. Gage and gave him all

2    of the reasons that I thought that the stipulation was not

3    appropriate and it was not in keeping with what we had

4    discussed with Your Honor, and went into that in some detail

5    and indicated that we would be -- we've made good faith

6    efforts to collect these.  And as we collect them, I even

7    offered if he wanted me to create a drop box folder, I could

8    put those in that, or I could send them to him as I receive

9    them, whatever he would like.

10        And, of course, we will treat them with the same

11   confidentiality that we would as with any document that's

12   been produced in this litigation.

13        So, I thought that I was, A, following the Court's,

14   Your Honor's instructions; B, doing what was reasonable and

15   necessary to comply, while at the same time not agreeing to

16   a stipulation which seems to be, at a minimum, overly

17   burdensome and causing these experts to try to, you know,

18   begin to put on their personal computers or other computers

19   some sort of kit that would download information and be sent

20   directly to Ethicon.  I don't believe that that's

21   reasonable, nor something that's warranted, nor something

22   that we should have to do.

23            THE COURT:  Mr. Gage, that's a little bit

24   different than what I understood you to say at the last

25   conference.  I thought your position was if the, if these

1    reports existed, that they should go ahead and get them from

2    Dr. Klosterhalfen since he had possession of them, and you

3    maybe did not have possession of them.  And, at the same

4    time, you were going to look for what Ethicon had from

5    Dr. Klosterhalfen.

6         So, it sounds like somehow we got a little off, off the

7    road there.

8              MR. GAGE:  Your Honor, this is William Gage.

9         There are two -- there are two issues here.

10        The first issue is, concerns a proposed stipulation

11   that we sent to Mr. Anderson regarding both

12   Dr. Klosterhalfen and Dr. Klinge.

13        Your Honor will recall that Dr. Klosterhalfen is a

14   non-retained expert designated by the plaintiffs.  And Dr.

15   Klinge is a retained expert designated by the plaintiffs.

16        The stipulation that we prepared and sent to the

17   plaintiffs last week is a stipulation that sets forth a

18   proposal for how the two witnesses, both of whom are Ethicon

19   consultants, would gather and produce to Ethicon the

20   documents, e-mails, and other related materials that arise

21   out of their former consulting relationship with Ethicon.

22        Your Honor may recall that on a prior call or two we

23   had pointed out to the Court that we would, we would want to

24   be taking these individuals' depositions both as a fact

25   witness in terms of their prior service as a consultant to

1    Ethicon and then, secondly, a, some time for their expert

2    depositions since they've both been scheduled as experts

3    against Ethicon.

4         So, the stipulation is a, is a document that proposes a

5    protocol for how we would go about getting those documents.

6         The second issue, Your Honor, relates to a very narrow

7    subset of documents that Mr. Anderson requested a few calls

8    ago, and certainly in an e-mail to us.  And those are the

9    Klosterhalfen explant reports.

10        Your Honor may remember when we discussed this last

11   week, we, we -- the parties agreed to do two things with

12   Your Honor's guidance.

13        One is Ethicon would continue to look internally to see

14   if they could find these reports.  And just to remind Your

15   Honor, this is when a patient would have a piece of mesh

16   taken out of their body.  The doctor would send the mesh to

17   Ethicon.  Ethicon would then send the mesh to

18   Dr. Klosterhalfen, who was then a consultant for the

19   company.  And Dr. Klosterhalfen would look at the mesh and

20   then send a report back to the company.

21        So, with regard to those explant reports, I received an

22   e-mail about two hours ago from our team in Germany.  We

23   dispatched, Your Honor, some lawyers to go to Germany to

24   look for this document, these documents among others.

25        And our team met early -- well, it would be early this

1    morning for us.  I guess it would be late afternoon for

2    them.  But our team met with a lady in Germany at the

3    Ethicon facility there.  Her name is Anke, A-n-k-e, Winter.

4         And she reported that -- she's the individual that --

5    when I indicated last week that we had a lead on somebody,

6    she's the individual that we had a lead on.  But she was out

7    last week on vacation.  So, we met with her early this

8    morning.  I was not part of the meeting.  Our team in

9    Germany was.

10        They, they believe that over the years,

11   Dr. Klosterhalfen may have provided about 50 such reports

12   following his review of mesh explants.  And she identified

13   several places where if the documents exist, they might be

14   located.  So, she's identified a Remetrex system, an Excel

15   file, and perhaps some hard copy files.

16        So, our team in Germany is now looking to go through

17   these sources to see if we can find those very specific

18   documents.

19        Now, Your Honor, the -- I think the place where in

20   terms of, of perhaps an action item for the Court, if we go

21   back to the stipulation -- and the stipulation would govern

22   not only these explant reports, but any other documents that

23   Drs. Klinge or Klosterhalfen would have created in

24   conjunction with their consultation agreement with Ethicon.

25        I believe that the stipulation or the proposal that we

1    put forward, the plaintiffs have raised a number of

2    objections to those, to our proposal.  And we can go through

3    the various objections and go through the various details

4    of, for example, the e-discovery self-collection kit which

5    we proposed.  If, if Your Honor wants to hear more about

6    that, Mr. Rubin is on the phone for Ethicon.  He can help

7    guide Your Honor through what that entails.

8         But at -- however Your Honor wishes to proceed, I

9    would, I would say this.  I think that probably the parties

10   are pretty far apart on the manner and process that should

11   be followed for retrieving these documents in the hands of

12   Drs. Klinge and Klosterhalfen which we believe are subject

13   to these consulting contracts.

14        And, so, I think at the end of the day, Your Honor may

15   end up just having to tell us to submit our various

16   proposals because at the end of the day, I think both sides

17   agree the need to get this document issue resolved is pretty

18   imminent if we're going to get the documents turned around

19   and produced prior to their depositions in November.

20        So, with that, I'll be quiet and just let Your Honor

21   tell me where you'd like to go.

22              MR. ANDERSON:  May I respond to that, Your Honor?

23              THE COURT:  Let me say first off, though, --

24              MR. ANDERSON:  Okay.

25              THE COURT:  -- I think when we were talking about

1    getting documents directly from Dr. Klosterhalfen, we were

2    talking about the histological reports of the explants only.

3    I think that's what we were talking about.

4          And I -- as I understood Mr. Gage, he didn't have a

5    problem with the plaintiffs getting copies of those reports

6    from Dr. Klosterhalfen.  And, at the same time, he was going

7    to be looking for them and whatever other quality assurance

8    documents went with those histological reports.

9          Now, is that, is that correct, my understanding?

10          MR. GAGE:  That is correct.

11          MR. ANDERSON:  Ben Anderson.

12          That was part of it, but they had also raised the issue

13    of, "We want, we want the documents that Dr. Klosterhalfen

14    has."  They weren't tailoring it to that.  Perhaps it was

15    perceived that way by Your Honor.  But certainly everything

16    that he does is histological in nature because he's the --

17    he was their pathologist.

18          So, everything he looked at, the documents that he

19    exchanged, the meetings that he was in over 20 years, those

20    related to material science and the histopathology as a

21    result of it.

22          THE COURT:  Well, that's not what I was talking

23    about, Mr. Anderson.

24          MR. ANDERSON:  Okay.

25          THE COURT:  We were talking about -- we were very

1    specifically talking about those reports.

2         Now, I'm understanding today that there's a whole

3    another set of documents involving Dr. Klosterhalfen and

4    maybe Dr. Klinge that the stipulation actually applies to.

5         Is that what you're telling me?

6              MR. GAGE:  Yes, Your Honor.

7         The, the -- I think the differential, where it breaks

8    down is what the plaintiffs are, are -- what, what got the

9    Klosterhalfen explant reports on Your Honor's agenda was the

10   plaintiffs' request for those documents.

11             THE COURT:  Right.

12             MR. GAGE:  But the defendants have a request for

13   the documents from Klinge, Drs. Klinge and Klosterhalfen

14   that are the subject of their, of their Ethicon consulting

15   agreement.

16             THE COURT:  I understand.

17        Now, I did not -- I don't think it ever sunk in before

18   that Dr. Klosterhalfen was a non-retained expert.  I thought

19   he had been retained in the New Jersey litigation, but

20   hadn't formally been retained in the MDL.

21             MR. ANDERSON:  No, ma'am.  This is Ben Anderson.

22        He was never, never in the New Jersey litigation in

23   terms of the Ethicon New Jersey litigation.  And he was not

24   a retained expert, nor non-retained expert by Ethicon until

25   such time -- in, in recent weeks he was designated as an

1    expert in State Court Ethicon action.  And thereafter he was

2    designated as a non-retained expert in our action.  And that

3    just happened within the week before we designated, which

4    was a week ago today I guess.

5           THE COURT:  So, you both have identified him as an

6    expert witness?

7           MR. GAGE:  Not Ethicon.

8           MR. ANDERSON:  You mean by -- by "you both," do

9    you mean Texas State Court as well as the MDL, Your Honor?

10          THE COURT:  First, tell me which party has

11   identified Dr. Klosterhalfen as an expert.  Is that just the

12   plaintiffs?

13          MR. ANDERSON:  This is Ben Anderson.  That's

14   correct, Your Honor.

15          THE COURT:  And he's never been retained by the

16   plaintiffs.  He's a non-retained, non-paid expert.  Is that

17   correct?

18          MR. ANDERSON:  In Ethicon, in Ethicon -- this is

19   Ben Anderson.  That is correct, Your Honor, in Ethicon.

20          THE COURT:  Okay.  So, is he a paid expert in some

21   other products -- in other product litigation?

22          MR. ANDERSON:  Yes, Your Honor, Ben Anderson

23   again.  In the *Bard* litigation --

24          THE COURT:  I see.  Okay.

25          MR. ANDERSON:  -- he was deposed and he was, and

1    he was also -- he went on trial at the *Cisson* case.

2                   THE COURT:  I see.

3                   MR. GAGE:  And, Your Honor, this is William Gage.

4         If, if I'm not mistaken, I believe Dr. Klosterhalfen

5    also appeared recently as an expert against Ethicon in a

6    State Court case.

7                   THE COURT:  All right.  So, so, now, Mr. Gage, --

8                   MR. GAGE:  Yes, ma'am.

9                   THE COURT:  -- have you -- you do not have the

10   documents that Dr. Klosterhalfen has in regards to the

11   consulting agreement with Ethicon?  You don't have any of

12   those documents?

13                  MR. GAGE:  Your Honor, we have very -- we have

14   been able to locate thus far very few Klinge and

15   Klosterhalfen like, for example, e-mails.

16                  THE COURT:  Uh-huh.

17                  MR. GAGE:  This is the subject that Mr. Anderson

18   raised with me several times.  "Why do you have so few?"

19                  THE COURT:  Right.

20                  MR. GAGE:  And we are -- as part of the hernia

21   stip, Your Honor may remember -- I think we're doing some

22   additional work to find some stuff there.  But --

23                  THE COURT:  I think I've got it now.  So, --

24                  MR. GAGE:  We were saying -- kind of like with the

25   explant reports, we need these documents.  And, so, now we

1    would like our former, our former consultants to give us

2    back our documents essentially.  And, so, that was the

3    purpose of the, of the stipulation was to propose a -- and

4    because they're the plaintiffs' experts, we wanted to do it,

5    you know, under this, this joint protocol where we would

6    make a joint contact and we would give them specific

7    instructions on how to produce the documents.

8        And knowing that they're in Germany, we would provide

9    them with this self-collection kit which is, again, some

10   e-discovery stuff that Mr. Rubin can explain to Your Honor

11   if you're interested in how it, how it works.

12       But the point was to put forth a proposal to allow our

13   former consultants who are now experts against us to produce

14   to us the documents that are the subject of their consulting

15   relationship.

16           MR. ANDERSON:  And, Your Honor, -- this is Ben

17   Anderson.

18       What I don't understand is we've had these document

19   requests for all documents between Ethicon and Klosterhalfen

20   and Klinge.  That was in our initial requests.  Why is it

21   that just now -- I ask Your Honor why is it that just now --

22   it has taken a year and a half for someone to go to where

23   they were the primary consulting, to go where they knew that

24   they were dealing the most, which is Norderstedt.  Why has

25   it taken this long to find out that now we find out there

1    have been 50 reports of mesh explant?

2         That is an extraordinary amount of information because

3    within those reports, there are things like the reason for

4    the explant, was there a failure, how long was the mesh

5    implanted, what type of mesh, and what the histology showed

6    in terms of fibrotic bridging, was there contraction of the

7    mesh.  There is an enormous amount of information on each of

8    those 50 patients.  And that's just the ones they've

9    identified so far.

10        So, I guess from our standpoint, I believe a reasonable

11   question would be why are we getting -- I don't -- we will

12   do what the Court instructs us to do.  But to ask us to

13   produce back to them now the things that we asked them to

14   produce a year and a half ago and we're just finding out

15   right now in this phone call that someone was finally sent

16   to Germany to get to the bottom of this, and I don't believe

17   that's an unreasonable request.

18            THE COURT:  We're talking again -- we're mixing up

19   these -- what I see in my mind are two sort of separate

20   categories of documents.  There are these histological

21   reports, which is one thing.

22        And those were the things that I understood Mr. Gage

23   really had no problem in you receiving from

24   Dr. Klosterhalfen if he had them and they don't have them.

25   But, at the same time, he was going to look for them.

1       So, that's the one category of documents.  And, you

2   know, perhaps they should have been produced earlier, but

3   that's really not an issue right now.  Right now is where

4   we're -- what we're going to do going forward.

5       Then there's this whole second set of documents which

6   are all the other documents that have to do with the

7   consulting relationship that Dr. Klosterhalfen and Klinge

8   had with Ethicon.  And that's what the stipulation is about.

9       Is that correct, Mr. Gage?

10          MR. GAGE:  Yes, Your Honor.

11          THE COURT:  All right.  So, the -- and I think

12  what, what I hear Ethicon saying is they don't have those

13  documents either.

14      So, you both want all of those other documents.  And

15  the point of the stipulation is trying to figure out a way

16  that the doctors can produce these that is fair and

17  efficient.  And that's what I think the stipulation is

18  supposed to address.

19          MR. ANDERSON:  Your Honor, this is Ben Anderson.

20      It addresses that, but it addresses some other

21  evidentiary matters that are of grave concern to us as well.

22      But certainly asking, first of all, a non-retained

23  expert who is a consultant to go plugging in something to

24  where he can pull down a bunch of data off of his personal

25  computer I think is far outside of reasonable requests, as

1    well as for Dr. Klinge.

2        They, they have -- they don't have a computer that is

3    labeled, you know, Ethicon work from blank to blank.  And I,

4    I don't believe that we should have to have our, our

5    experts' computers to have some sort of device that

6    downloads the data on to something to be given to the, to

7    the defense.

8        THE COURT:  Well, I think that is relevant

9    information that I would assume both sides would want.  And

10   I think by virtue of the fact that Dr. Klosterhalfen is in a

11   better position to know where those documents are on his

12   computer and to separate those from the things he's not

13   permitted to produce, I don't think it's unreasonable to ask

14   him to gather those things together, particularly if he's an

15   expert in this case.  I think everybody has a right to

16   those, to that information.

17       MR. ANDERSON:  Ben Anderson, Your Honor.  We've

18   asked for that, Your Honor.

19       THE COURT:  Well, they're asking for it too,

20   Mr. Anderson, because they don't have it either is what I'm

21   hearing.  I don't know why they don't have it.  You would

22   think they would, but they don't is what they're saying.

23       MR. AYLSTOCK:  Your Honor, this is Bryan Aylstock.

24       We -- it's not a matter of, you know, us not wanting

25   the information to come out.  Obviously, we do.  And I, I

1  may have misheard Mr. Gage, but what I heard him say is that

2  they've just now dispatched some people to Germany to look

3  for it and they're, they're still looking.

4       And that is very disturbing to me because this is

5  clearly within all of these requests, consulting agreements,

6  the correspondence back and forth.  Whatever is there is

7  absolutely within our request for production served last

8  July.

9            THE COURT:  All right.  But, Mr. Aylstock, Mr.

10  Aylstock, what I heard him say is they're looking for those

11  histological reports of the mesh explants, not all of these

12  other documents.  Maybe I'm wrong, but that's what I heard

13  him say.

14            MR. ANDERSON:  Your Honor, Ben Anderson.

15       I'd like to know that he's looking for all of it.  I

16  don't know why we don't have any -- out of 20 years of

17  consulting, why do we not have more information?  I just

18  don't understand.

19            THE COURT:  Well, Mr. Gage.

20            MR. GAGE:  Your Honor, this is Mr. Gage.

21       It is my understanding -- and I wasn't, I wasn't

22  planning on this being a particular subject of discussion.

23  I wasn't aware of this.  But, to my knowledge, this, this is

24  clearly not the first time people have been sent to Germany

25  to look for documents.  That's my understanding.

1      Number two, it's also my understanding that the hernia

2  stip is driving a large part of this.  Your Honor will

3  remember that about, I don't know, two or three weeks ago

4  Your Honor entered an order on the hernia side that required

5  us to go pull some documents.  So, that's part of what we're

6  looking at.

7      While we were over there, I asked the people to go get

8  to the bottom of this issue on, you know, talk to everybody

9  they could and figure out what's the best way -- if we can

10  find these Klosterhalfen explants, let's, let's get that

11  done.

12      So, as a by-product of the meeting, that -- of the

13  people being in Germany, that meeting got set up and I got

14  that information this morning which I just shared, Your

15  Honor.

16      So, --

17          THE COURT:  Okay.

18          MR. GAGE:  -- long story short is this is part of

19  a much larger effort.  And I think all the implications that

20  this is the first time we've ever lifted a finger to look

21  for something in Germany is, is incorrect.

22          MR. ANDERSON:  Your Honor, this is Ben Anderson.

23  Can I --

24          THE COURT:  Wait a second.  No, wait just one

25  second.

1        On this whole point, this is what I find to be very

2   unproductive are these conversations about how long it's

3   taken someone to collect something and when the first

4   request -- I mean, those are all subjects for a motion for

5   sanctions or a motion to compel or some other kind of

6   motion.  I think complaining about how long it's taken is

7   not productive.

8        What we're trying to do now is figure out going forward

9   how can we get the documents that both sides need, and how

10  can we do this as promptly and efficiently as possible?

11       So, I, I don't want to have a -- I don't anymore want

12  to have lots of conversations about, you know, how people

13  are dragging their feet and whatnot because it just doesn't

14  help.

15       Now, having said --

16            MR. ANDERSON:  Your Honor, --

17            THE COURT:  Yes.

18            MR. ANDERSON:  -- this is Ben Anderson.

19       We have done what Your Honor asked us to do.  We

20  reached out to Professor Klinge and Professor Klosterhalfen

21  and asked them to produce to us all of the documents,

22  whether it's histo reports or anything else, related to the

23  relationship with Ethicon so that we could get this stip

24  process moving and get it done as efficiently as possible,

25  which is if you find -- when you find documents on your

1    computer or in a hard file, whatever you have, send them to

2    us so that we can immediately make sure that the defense has

3    them.

4         They still, of course, retain their rights to designate

5    them as highly confidential P, or they can later say, "This

6    is not relevant," or, "it shouldn't be in."  But for right

7    now, given the time frame we have, we have these depositions

8    coming up in early November.  And, so, we are trying our

9    best the best way possible to get these to us and to them.

10        And if we start asking these experts, first of all --

11   first of all, the manner of collection, and that's the

12   manner of collection, and I think it's the fastest way to

13   get it done.  If we -- I don't believe that the manner of

14   collection in coercing our experts to start hooking up

15   things that Ethicon sends them to download information off

16   of a computer that then gets sent to Ethicon vetted by their

17   in-house counsel and their risk management and outside

18   counsel, and then all of a sudden we get it the night before

19   the deposition, I don't believe that's a fair and efficient

20   way to do it either, Your Honor.

21             THE COURT:  Well, and it may not be.  But I want

22   to make it clear that when I was speaking at the last status

23   conference, I was talking about these histological reports

24   only, the ones connected to the mesh explants.

25        I was not addressing any sort of protocol for

1   collecting the remainder of the documents pertaining to the
2   consulting relationship between Klosterhalfen, Klinge, and
3   Ethicon.  So, that's a whole different subject in my mind.
4   You're talking about a whole different universe of
5   documents.
6        So, that, that is, that is what needs to be -- that's
7   what needs to be addressed.  And you both -- you say that
8   you've been working on a stipulation.  But do I hear you say
9   that you've reached an impasse?
10        MR. ANDERSON:  Your Honor, I just got -- I didn't
11   have a stipulation.  They sent me one after the last
12   conference, and they sent it to me, I guess, on Friday.  And
13   I responded -- maybe they sent it on Thursday or Friday.
14   Yeah, Friday.  And I responded to them Friday at 5:27
15   saying, "I see these things, but I don't agree to a number
16   of them.  We can't agree to do this."
17        They asked about depositions.  I sent a very lengthy
18   response to try to address each and every one of their
19   concerns.  I, I offered some alternatives to the, what they
20   had proposed.  And then, and then I asked them to produce
21   the things that we still had that were outstanding through
22   them like the Klosterhalfen images from PA Consulting that
23   Your Honor has heard about, and any consulting agreements
24   and anything else that they find related to Klinge and
25   Klosterhalfen.

1      So, I responded to them Friday at 5:27 and I haven't
2  seen a response to that.  But certainly the stipulation as,
3  as presented to me is, is not acceptable and I don't think
4  it's reasonable.  So, I'm happy to continue to work on this.
5          THE COURT:  All right.  So, it sounds to me like
6  you haven't reached yet an impasse.  You're still talking.
7      The question is how long do you two want to talk about
8  this before you want to just submit your proposals to me and
9  let me pick one?
10         MR. GAGE:  Today is Monday, Your Honor.  I would
11 say maybe close of business Wednesday.
12         THE COURT:  Mr. Anderson.
13         MR. ANDERSON:  Wednesday is -- the entire day is
14 bad for me.  I have another obligation that I have to be out
15 of town for.  So, I would say probably by Friday I could
16 maybe, would be more realistic for me.  We're already done
17 with Monday.  So, I'm happy to -- I'm happy to do this.  But
18 Friday would be more realistic.
19         THE COURT:  All right.  Why don't you work on it
20 and give it your best effort until Friday.  And if you
21 can't -- if by Friday at, say, noon you have reached impasse
22 about particular sections of the stipulation, send to me
23 what it is you want me to look at because it sounds to me if
24 the depositions are in November, you don't have that much
25 time to, to mess around.  You're going to have to get

1    something resolved.

2          MR. ANDERSON:  Your Honor, Ben Anderson again.

3        May I just ask your guidance on something?  I certainly

4    did not think that what we were discussing was only these

5    histopath reports, which I'm not really sure what category

6    that falls into because many of the things he did were

7    histopath reports.

8        But I'm not sure what to do now because I had requested

9    at both of them, thinking that I, I had my marching orders

10   pretty clear, to turn over the documents that were, that

11   they had between themselves and Ethicon.

12       So, I've already received some of those.  I'm happy to

13   send -- collect every one that I've gotten as of this

14   afternoon and send them to Mr. Gage and the defense.  But is

15   Your Honor indicating that you'd like for me to tell them

16   don't send any more?

17         THE COURT:  Well, I, I definitely want you to send

18   what you received to Mr. Gage.

19       Mr. Gage, what's your position on that?  Obviously, --

20         MR. GAGE:  Your Honor, --

21         THE COURT:  -- most of these documents are

22   obviously going to be producible.

23         MR. GAGE:  Yes, Your Honor.  I, I think probably

24   just to stick within the confines as much as we can of the

25   ESI protocol.  I believe it would be appropriate, and I

1    would request, that the witnesses continue to collect

2    whatever they may have or preserve whatever they may have.

3    But until we work out the protocol or the Court enters one,

4    I think it would probably be best for them not to send

5    materials directly to plaintiffs' counsel.

6         I just don't know what's in there.  There could be

7    something that, that my clients would say, you know, aren't

8    relevant to the litigation and, nonetheless, shouldn't be

9    given to the, to the plaintiffs' lawyers.

10        And with that fear in mind, I think it probably would

11   be best to ask them to, to continue to collect but not

12   produce to plaintiffs' counsel until we -- until Your Honor

13   enters something.

14             THE COURT:  Until, until Friday anyway.

15             MR. GAGE:  Yes, Your Honor.

16             THE COURT:  I'm going to try to get this resolved

17   as quickly as possible.

18        So, I think, Mr. Anderson, if you would give Mr. Gage

19   what you've gotten already, then ask the doctors if they

20   would continue to collect but hold.  And tell them it won't

21   be very long.  We're going to have something worked out here

22   very, very shortly.

23             MR. ANDERSON:  Yes, Your Honor, will do.

24             THE COURT:  I think, I think the chances are,

25   Mr. Gage, that most everything they collect that has

1   anything to do with Ethicon's pelvic mesh is going to be

2   producible.  So, you know, I don't know.  But, in any event,

3   --

4           MR. GAGE:  Likely so, Judge.  Some of the

5   things -- I mean, I'm not -- you know, I don't want to

6   create problems where there may be none, but I think, for

7   example, to the extent Drs. Klinge and Klosterhalfen got or

8   created documents that indicate patient names and things of

9   that nature, even providing that to Mr. Anderson without

10  redaction could, could theoretically present a problem.  So,

11  that's why I wouldn't, wouldn't -- that's one of the reasons

12  why I wouldn't want to do it.

13          THE COURT:  It sounds like they won't do that.

14          MR. ANDERSON:  Ben Anderson.  Right, exactly, Your

15  Honor.  They've already stated that they won't do that.

16          THE COURT:  Yeah.  They're not permitted by German

17  law apparently to do that.  So, in any event, we'll go with

18  that right now.  Just ask them to continue to collect, hold

19  it, and we'll get something worked out very, very shortly,

20  and then share what you already have.

21          MR. ANDERSON:  Thank you, Your Honor.

22      The only, the only correction I would make is that they

23  wouldn't just be documents related to pelvic floor meshes,

24  but also, since the pelvic floor mesh is used for hernia

25  mesh and the defendants used their, the studies and things

1   from the hernia mesh to relate to the pelvic floor in their

2   IFUs and in their brochures, et cetera, that it would be --

3   we, we would -- if the documents end up going to the defense

4   before us, we would argue that those would be absolutely

5   relevant.

6        THE COURT:  Well, I'm sure that your stipulation

7   covering the hernia mesh would address what's relevant and

8   what needs to be produced and whatnot.  So, -- but that's

9   understood.  It's not just the pelvic mesh.

10       Now, do -- who has, who has anything else they want to

11   raise for today's conference?

12       MR. AYLSTOCK:  Your Honor, this is -- just real

13   quick, Judge.  This is Bryan Aylstock on behalf of the

14   plaintiffs.

15       We did have on our agenda that we circulated to

16   Mr. Gage some issues with regard to deposition scheduling.

17   And I, I understood the Court to say, look, if you can't get

18   stuff worked out, then go ahead and notice some depositions

19   and then we'll deal with it.

20       There's been a few that -- of key folks that have been

21   outstanding for months, including Aaron Kirkemo, which we

22   requested in March, and Marianne Kaminski in, in May.  And

23   we don't have dates from them just yet.

24       And our, our intent was simply to, to notice them, you

25   know, with sufficient time, of course, to get everybody

1    ready.  Some of these are current employees, for example,

2    like Marianne Kaminski.  And just go ahead and get them on

3    the calendar because we do want to get them done before the

4    trial in February.

5              THE COURT:  Mr. Gage, that's, that's going to be

6    the end result.  If you can't get dates to them reasonably

7    after you've received a request, then, then they have every

8    right to go ahead and notice them.

9              MR. GAGE:  Yes, Your Honor.  This is Mr. Gage, or

10   William Gage.

11         Judge, if I may, I have a, a -- I have one issue that

12   is a global -- kind of a global issue on deposition

13   scheduling.  And if I may have Your Honor's permission, I'd

14   like to give Your Honor a series of facts about depositions.

15        And then at the conclusion of giving you those facts, I

16   have a proposal that, that we, we just kind of reached here

17   in the last day or two here internally.  And we just -- we

18   need the Court's instruction on a, on the proposal.

19             THE COURT:  All right.

20             MR. GAGE:  Your Honor, to turn the clock back to

21   late July, we, we had received a pretty significant number

22   of requests for depositions.  And we asked the plaintiffs'

23   lawyers -- and many of those requests were that the witness

24   be deposed before September 23 because that was then the

25   expert deadline.

1    And we asked in late July that the plaintiffs identify

2    their priority witness list and tell us which of the ones,

3    you know, needed to be deposed before 9-23 and which of the

4    ones could be deposed after 9-23.

5        So, on August 6th we received their priority list of 33

6    depositions.  Nineteen of those were, were to be produced

7    before the September 23 deadline, and 14 additional

8    depositions were to be completed in the fall.

9        We were able to offer dates before 9-23 for 17 of the

10   19 first priority witnesses.  We had, we had seven witnesses

11   scheduled to occur in the last week of July or the first two

12   weeks of August that were postponed at the plaintiffs'

13   request, and then showed up on that August 6th priority

14   list.

15       In other words, those depositions, those seven would

16   have been completed but for the plaintiffs' request to move

17   those depositions.  As it stands now, I think two have gone

18   forward and they want more time with one of the -- with,

19   with an additional one.

20       Now, Your Honor, the August 6th date is important

21   because we considered that to be, you know, "Tell us really

22   who you've got left and what you need to do before we march

23   off to trial."

24       After August 6th, we have received requests for a

25   witness named Margareta Eriksson, Wanda Patire-Singer, and

1    we also received three new 30(b)(6) deposition notices.

2           After September 1 we received requests for three new

3    witnesses and another full day with an existing witness,

4    Gene Kammerer.

5           After September 15, just a couple weeks ago, we

6    received requests for Cary Linsky.  And then we got a letter

7    last week for an additional nine or ten witnesses, new

8    witnesses.

9           So, Your Honor, where we are now is that there are

10   currently requests for 32 fact witness depositions that are

11   not continuations of existing depositions.  And there are

12   also -- we've got a lot of depositions that are already

13   scheduled.

14          And, Your Honor, we are at the point where it is, it's

15   almost impossible to continue to accommodate this very large

16   number of additional requests for depositions, particularly

17   as close as we are getting to trial.

18          And, Your Honor, we have struggled internally as to

19   what, what should we do.  And, and -- so, we -- after

20   thinking it through and talking it through, we, we came up

21   with a proposal.

22          And they have 32 -- they have requests for 32 fact

23   witness depositions.  And we would request that they take --

24   they pick their top ten and say, "These are the ten that

25   we've really got to have," and then we will get on -- you

1    know, we will get those ten done.  But facing 32 requests

2    right now is, is simply not possible between now and the end

3    of the year.

4         And, so, that's kind of where we find ourselves, Your

5    Honor.

6              THE COURT:  How many total depositions have been

7    taken so far in this case?

8              MR. GAGE:  Forty-one depositions have been taken.

9    And there are four more that are already hard sets, you

10   know, in terms of being scheduled.  So, that would be a

11   total of 45.

12             THE COURT:  Is that just fact witness depos or is

13   that 30(b)(6) and fact witness?

14             MR. GAGE:  That's fact witnesses only.

15             THE COURT:  Okay.

16             MR. CARTMELL:  Well, my numbers are a little

17   different than that.  I think the number is actually --

18             THE COURT:  Who, who is this speaking?

19             MR. CARTMELL:  Oh, I'm sorry.  I apologize.  This

20   is Tom Cartmell.

21             THE COURT:  Thank you.

22             MR. CARTMELL:  Your Honor, my, my numbers, I

23   think, are accurate.  And our numbers that we have are 42

24   depositions total.  In two of those depositions, the MDL has

25   not asked a question.  And, so, there's been requests for

1   additional days, or additional day in those for MDL.

2        And those include, those include actually the 30(b)(6)

3   depositions of Ms. Lynn (phonetic), Mr. Smith, Dan Lamont,

4   and I think -- oh, and Ms. Angelini.  That's true.  And if,

5   if I could respond, you know, briefly, and I think maybe --

6           THE COURT:  Well, before you go on, let's, let me

7   try to figure this out.

8        So, Mr. Cartmell, you say 42 depositions have been

9   taken.  And that includes both fact witnesses and 30(b)(6)

10  depositions?

11          MR. CARTMELL:  Yes, Your Honor.

12          THE COURT:  And Mr. Gage says 41 depositions have

13  been taken, and that only includes the fact witnesses.  So,

14  --

15          MR. GAGE:  Your Honor, I think the, the confusion

16  may be resulting from the fact that some of the fact

17  witnesses have also been deposed as 30(b)(6) witnesses.

18          THE COURT:  So, the 41 includes fact witnesses and

19  30(b)(6) depositions.

20          MR. GAGE:  Only if it -- only to the extent that

21  it's the same person who has later been deposed as a

22  30(b)(6).  In other words, 41 people have been put up as a

23  fact witness.

24          THE COURT:  How many additional depositions have

25  been taken of 30(b)(6) witnesses separate and apart from

1   these ones that are both?

2           MR. CARTMELL:  This is Tom Cartmell.  None, Your

3   Honor.  There's no confusion.

4           THE COURT:  Okay.  So, --

5           MR. GAGE:  But, Your Honor, they're not different

6   people, but they are different depositions.

7           THE COURT:  But there's been 41 of them total.

8           MR. GAGE:  No.  If we were, if we were to add in

9   the 30(b)(6)s, the total would be higher than 41.  And I've

10  got Donna Jacobs here, Your Honor, who helps us on, kind of

11  handles all the depo scheduling.

12      Donna, I don't know if we have an exact count, but --

13          MS. JACOBS:  I did not make an exact count.  I

14  just counted the people who have been deposed in their

15  individual capacities.  At least four of those were also

16  deposed as 30(b)(6) designees under notices that were served

17  on the defendant.

18          THE COURT:  Well, you can see why I have a problem

19  sometimes because I can't even get some of these basic facts

20  down.  You disagree about some really simple things like the

21  number of people who have been deposed.

22      So, in any event, in addition to whether it's been 41,

23  45, or 42, you're telling me, Mr. Gage, that they have now

24  told you they want another 32 fact witnesses.

25          MR. GAGE:  Yes, Your Honor, that's -- the numbers

1    that we tabulated, that's apparently what it looks like.

2              THE COURT:  And do you agree with that,

3    Mr. Cartmell?

4              MR. CARTMELL:  Your Honor, I have not looked, so I

5    couldn't agree.

6              MR. AYLSTOCK:  Your Honor, this is Bryan Aylstock.

7         I'm looking at a couple of different letters here, but

8    a lot of these folks have been requested a long time ago

9    like, you know, what I just brought up, Mr. Kirkemo in

10   March, Ms. Kaminski in May.

11        These aren't -- there were certainly some new folks in

12   light of the new documents that were just produced in light

13   of the new testimony.  And I would, I would say the new

14   folks, you know, were probably in the order of 15 or

15   something like that in addition to the old folks.

16        Then there are some folks like, for example, Joel

17   Lippman.  Joel Lippman was the Chief Medical Officer for J&J

18   from July, 2000, to May of 2006.

19        Well, we haven't asked for his -- we may have asked for

20   his deposition now, but we had asked for his personnel file

21   and his custodial file months ago.  And we still don't have

22   it.

23        So, for some of these, we're trying to get the file

24   before we ask for the deposition.  For some of them, we

25   learn things about their involvement in one of the 11 or 13

1    different products, depending on how you look at laser cut

2    and mechanical cut.

3         And, so, there are certainly some more folks as we've

4    gone through the deposition process that we've identified

5    that we believe that we need for the 11 products that we

6    have to work up.  And we're certainly prioritizing them.

7         We have limited resources, much more limited than

8    Johnson & Johnson.  And we're not in any hurry to be away

9    from our families and be on the road doing depositions.  But

10   certain things need to be done in particular.

11        And we're looking at the ones that are for the TVT

12   Retropubic case coming up.  Some can be pushed into next

13   year.  And we're willing to do that and work with that.  But

14   the suggestion that somehow we're taking depositions

15   willy-nilly of people we don't need I vehemently disagree

16   with because I'd much rather be doing something else than

17   doing depositions.  I know everybody feels that way.

18            MR. GAGE:  Your Honor, --

19            MR. AYLSTOCK:  This is the first time I've heard

20   any of this back and forth.  Mr. Gage certainly didn't share

21   any of those numbers with us.  And this is the first time

22   I've heard such a proposal out of his mouth.  So, it's all

23   kind of new to me.

24            MR. GAGE:  Your Honor, this is William Gage.

25        If I may respond just briefly, I think, you know,

1    really the straw that kind of broke the camel's back was the

2    letter that we got this past week where I think it was a

3    list of nine or ten new witnesses.

4          And, Judge, I'm not suggesting either implicitly or

5    explicitly that the plaintiffs are taking depositions they

6    don't rightfully believe they need to take.  That's not my,

7    my point.

8          My point is that just given the limited time that

9    remains and the number of new requests that are coming in

10   and the, and the personnel resourcing issue, not to mention

11   the very complicated process of scheduling these depositions

12   and getting all the file productions in order, it's, it's

13   more than what can reasonably be accomplished given the time

14   remaining.

15         So, Your Honor, that's the spirit in which I make this,

16   make this proposal.  It's, it's really just so many in such

17   a short period of time.  And, and when we look at the

18   August 6th e-mail, you know, we thought we were saying,

19   "Guys, tell us who you really need for the fall and, and

20   let's get cracking on that."

21         And, and they sent us the e-mail.  They gave us that

22   prioritization.  But what's happened since then is so many

23   additional people have been added that by virtue of a timing

24   perspective, it's almost impossible to get it done.

25               THE COURT:  Well, and I think one issue that comes

1   to mind again is your first trial will be just a TVT Classic

2   product.  Correct?

3              MR. AYLSTOCK:  Yes, Your Honor.  This is Bryan

4   Aylstock.

5              THE COURT:  And then the second round is going to

6   be a TVT-O?

7              MR. AYLSTOCK:  Yes, that's correct, Your Honor.

8              THE COURT:  So, looking at just those two

9   products, and bearing in mind that Ethicon is the one that

10  doesn't want to separate out the products, but, Mr. Gage,

11  you may need to do that in order to get the depositions

12  done, why don't you look at which of these witnesses you

13  need to depose for those products.

14      Now, maybe there aren't any that you can just separate

15  out for those products.  I don't know.  But if there are,

16  certainly those would go to the top of the list.  If

17  there's -- if there are witnesses that are only on products

18  that aren't going to be set for trial for another year, I

19  don't understand why you can't put those at the very end of

20  your list.

21             MR. CARTMELL:  Your Honor, this is Tom Cartmell.

22  I'll try to answer some of those questions.

23      Part of the reason that there has been some, you know,

24  changing around and in some respects, as Mr. Gage said,

25  requests by us to move the depositions from priority to

1    non-priority and moving them further into the fall in

2    November and December and things like that was if you

3    recall, we were originally on the fast track of not knowing

4    which case would go to trial first.

5         So, we were trying to complete TVT, TVT-O, TVT-S and

6    all the other product depositions in a period of time that

7    would allow our experts to give reports on each product.

8         As we progressed and we figured out -- or the Judge was

9    actually kind enough to tell us that we would have a TVT

10   product first, and then separated by some time and a

11   different Docket Control Order for TVT-O and TVT-S, we then

12   were willing to push back some depositions and change some

13   depositions over time.

14        And that's why some of these depositions that have been

15   originally marked as priority became non-priority at that

16   point.

17        So, we have already decided that for some TVT-O fact

18   witnesses, for some TVT-S fact witnesses, TVT laser cut,

19   and, and L and Blue and all these people, to take those

20   people off priority and not do them before an expert cutoff.

21        We also, though, -- and I have had multiple

22   conversations with Donna Jacobs and William Gage about this

23   as well as Christy.  We talked about early on there not

24   being a deadline, a cutoff for discovery depositions at the

25   time of the experts.

1   So, I told them, "Look, I'm hoping and, and it sounds

2   like you guys understand, we are going to continue to take

3   depositions after the expert cutoff deadline because we have

4   to knock these out."  And TVT-O will be following, you know,

5   shortly on the heels.  We have expert reports that will be

6   due shortly after that.

7   So, although we won't make those necessarily priority,

8   we're still going to ask to take those depositions.  And

9   those depositions, I believe -- I think it's hard to

10  believe, first of all, that there's 32.  But some of those

11  may be TVT-O and TVT-S.  And that's why we've asked for

12  those not in October, but in maybe November and December

13  and, frankly, you know, potentially having to go off also

14  maybe into the new year.

15  We, we are not -- I mean -- and the other thing I would

16  say, Your Honor, and -- in the last 60 days, I can get you

17  the number, but they have dumped an amazing amount of new

18  documents on us, mostly from people who have either been,

19  already deposed or for people that are new witnesses or new

20  documents that we're just discovering.

21  We've also had a half a dozen depositions, including

22  Dan Smith's multiple day, Angelini's, and some others, where

23  we have been told new issues, new things about the mesh, new

24  things about where the documents reside.

25  And, in fact, last week we had a conference call for

1    over an hour with Ms. Jacobs and Mr. Gage discussing how

2    they were searching around in the local entities in, in

3    Europe to try to find all these documents, talking to

4    certain witnesses.

5         And, in fact, during the deposition of Laura Angelini,

6    I got certain names of people.  They were trying to find all

7    this information about the mesh and the agreements between

8    MedScand and things like that.

9         So, some of the new names come from in the last 30 days

10   of depositions and their witnesses specifically saying --

11   you know, Susanne Landgrebe, in fact, was the co-director of

12   this.  So, she would have more information on that.  So, we

13   sent out something saying, "We need to take Susanne

14   Landgrebe."

15        Now, I have given up -- I'm the scheduler.  I'm the

16   depo scheduling guy.  I feel like that's all I do.  And I'm

17   sure Ms. Jacobs feels the same way.  I've given up on the

18   idea of being able to get this stuff to our experts in time.

19   So, we are now into November and December depositions.

20        But this is information almost entirely that should

21   have been in our hands, again, months ago.  I know you don't

22   want us to talk about that, and that's fine.  But to say

23   that we get ten more depositions because, you know, somehow

24   we have delayed or somehow we have not done what we're

25   supposed to do is simply not fair.

1        And, so, we need this extra time to get these

2   witnesses' testimony, get these documents, the foundation

3   laid, and things like that that, frankly, we didn't get for

4   the last 60 days.

5             THE COURT:  All right.  Well, here's, here's what

6   I can say on this.

7        First of all, I think both sides need to put together a

8   list of the people that have already been deposed.  And if

9   the same person has been deposed as a fact witness and as a

10  30(b)(6) witness, those, that's two separate depositions.

11       So, let's, let's put a list together so that we're all

12  working off the same list as to who's already been deposed.

13       Then let's see how many depositions are left to be done

14  and whether some of those need to be pushed to the front of

15  the list and some can be pushed to the end of the list.

16  That's something I think needs to be done.

17       I think probably one of the problems that's happening

18  here is that these lists of names are being sent out and

19  there's not really any prioritization that's happening with

20  these witnesses because the fact of the matter is there is

21  only a limited amount of time left.  And I think it's -- it

22  behooves everyone to get the people deposed who really need

23  to be deposed before your first trial takes place.  So,

24  let's do that.

25       After you've made these lists and you've talked a

1   little bit about the order of these, of these deponents, if

2   you can't agree, then, then give the information to me and

3   I'll, I'll, I will make a decision as to how many

4   depositions can be taken, when, what time frame they need to

5   be taken in, and how many days you can take them.

6        Right now, you don't have any agreement one way or the

7   other.  And when I listen to you-all talk, I can't make

8   heads or tails of who's been done, who hasn't been done.

9   It's so -- it's impossible for me sitting here to be at all

10  helpful to you.

11       I suggest you do that.  Make some lists.  I mean,

12  you're not even agreeing on the number of people that have

13  been deposed.  You're not even agreeing on the number of

14  products in dispute.  I've seen -- I've heard seven.  I've

15  heard 11.  I've seen 14.  I've seen 15.  I have no idea, to

16  be honest with you, how many products are in dispute and

17  what you're discovering on, on what number of products.

18       So, I think there needs to be, you know, a little bit

19  of organization on some of these simple matters.  And then I

20  would be able to help you more.

21       There's going to be a limit to the number of

22  depositions you can take, though.  You can't take 100

23  depositions.  You just can't.  So, you need to pick the

24  people you really need to depose.

25       And I understand what you're saying on the plaintiffs'

1   side.  You're not wanting to just run around and take

2   depositions for fun.  It's expensive.  It's time-consuming.

3   It's, it's difficult, draining.  So, I understand that.

4        But, you know, sometimes I think maybe in the whirlwind

5   of trying to get everything done, nobody is stepping back

6   and really looking at the whole picture and saying, you

7   know:  "What do we really need to do to get ready for

8   trial?"

9        And you're about at the point now where you need to do

10  that because -- when is your trial?  January or February?

11       MR. AYLSTOCK:   February 10th, Your Honor.   This

12  is Bryan Aylstock.  And I --

13       THE COURT:  We're talking about holidays coming

14  up.  I mean, it's going to get tougher and tougher between

15  the end of November and the middle of December, the end of

16  December to get things done.

17       MR. AYLSTOCK:  We hear you, Judge.  This is Bryan

18  Aylstock.

19       And, and certainly there's a limit to, to our stamina

20  as well.  It is -- this is a little different than, than the

21  other MDLs even in, in, before Judge Goodwin just with the

22  number of products and the, the span.  But, but we hear you

23  on that.

24       THE COURT:  Maybe some day someone will tell me

25  what the number of products is because I still don't know.

1          MR. AYLSTOCK:  I think I might be able to clear

2     that up real quick, Judge.  There are seven, seven TVT

3     products by name.  That would be the TVT Classic, the TVT-S,

4     the TVT-A -- I'm sorry -- the TVT-O.  Those are the three

5     main ones.  Then there's a TVT-AA, a TVT EXACT, a TVT

6     ABBREVO, and a TVT-D.

7          What makes it a little -- and then there's four POP

8     products.  There's Gynemesh PS, the Prolift, the Prolift+M,

9     and the Prosima.

10          What makes it complicated and why there's some

11     uncertainty is there was a switch, but not really a switch,

12     where certain of the TVT products went from a mechanical cut

13     or machine cut to a laser cut because they were losing

14     particles.  And that's one of the issues in the case.

15          But they, they continued selling both products even to

16     this day.  So, it depends on, you know, I guess what glasses

17     you have or how you want to look at it.  But where --

18     mechanical cut versus laser cut certainly affects not only

19     the particle loss but the stretchability and other things.

20          So, I, I apologize for making it unclear.

21          THE COURT:  No, that helps.  That actually helps

22     me some.

23          Let me ask you-all, tell me what your needs are as far

24     as the conference calls we've been having.  We're at the end

25     of the, of the calls that have been scheduled by the order.

1   Do you feel that you need more calls?  And, if so, how

2   frequently do you want to have them?

3       I'm totally at your disposal.  So, you just let me

4   know.  If you don't think they're helpful, we, you know, it

5   won't offend me.  We can stop having them.  If you think

6   they're helpful, then we can have some more.  Just tell me

7   how frequently you think we need to do them.

8       So, who, who would like to go first on that?

9           MR. AYLSTOCK:  I could, Your Honor.  This is Bryan

10  Aylstock.  I, I -- they're very helpful and I apologize for

11  some of the back and forth we have on them if for no other

12  reason, there's a flurry of e-mails and proposals that

13  happens because neither of us want to come to Your Honor and

14  not have done our homework.  So, just by virtue of that, I

15  think it's very important.

16      But your instruction and your availability is very

17  helpful to us.  And I don't know that we necessarily need

18  them like another one this week.  Maybe next Friday, a week

19  from Friday, and maybe go to a two-week rotation would be my

20  suggestion.

21          THE COURT:  Mr. Gage, or someone on the defense.

22          MR. GAGE:  Your Honor, this is William Gage.  And

23  I concur with, with Bryan's comments.  It has been very

24  helpful to have Your Honor available to us on a weekly

25  basis.

1          One of the things that we just literally kicked around

2    the last day or two, which we haven't even had a chance to

3    propose to Bryan yet, is that we start holding a one-hour

4    call with Bryan or his, or Tom or, or their delegees to

5    discuss discovery issues, kind of a standing one-hour call

6    every week.

7               THE COURT:  Uh-huh.

8               MR. GAGE:  And the plan would be, I think,

9    hopefully, Judge, that that call would then maybe give Your

10   Honor the ability to instead of having to meet with us every

11   week, maybe every other week or something like that.

12              THE COURT:  That sounds like a great idea.

13              MR. GAGE:  Okay.  So, I think we're going to head

14   in that direction.

15         And the other thing, Your Honor, we're -- we -- you

16   know, we're still trying to get a face-to-face with, with

17   Mr. Aylstock.  And he's been kind.  He offered a date and

18   Tom couldn't and we just keep going around and around.  But

19   we really hope that -- we think that's also a very important

20   part of the, of the puzzle because we've got a lot of things

21   we need to sit down with Bryan and Tom and talk about.

22         So, we're going to continue to press for a face-to-face

23   meeting.  And I think that hopefully will help us on some of

24   the document issues.

25              THE COURT:  I think that is very important.  If

1    you could find some time -- I realize you're all very, very

2    busy.  But if you could find some time to meet in person and

3    take a dedicated few hours, you might be able to work a lot

4    of these things out.

5              MR. GAGE:  Your Honor, I have two -- I have a

6    couple of housekeeping matters that I just needed to provide

7    to Your Honor, and also perhaps to plaintiff, and to

8    plaintiffs' counsel.

9              THE COURT:  All right.

10             MR. GAGE:  First of all, it was mentioned

11   earlier -- and it may have been Bryan that mentioned it.

12       We were talking about Marianne Kaminski, and he

13   indicated that she was an Ethicon employee.  I just didn't

14   want the hearing to close without noting for the record that

15   we were informed I think it was last week or maybe this -- I

16   guess last week that apparently she is no longer still with

17   the company.  So, I just wanted the record to be clear on

18   that.

19             THE COURT:  So, did Mr. Cartmell make her quit?

20             MR. CARTMELL:  I haven't even had the chance to

21   talk to her yet, Your Honor.

22             UNIDENTIFIED SPEAKER:  It's just a threat.

23             MR. GAGE:  I have to tell you, Your Honor, the

24   other, the other issue that I wanted to mention to you was

25   some of the scheduling problems we've had with regards to

1    some of the witnesses.  And it includes three of them,

2    Allison London Brown, Cheryl Bogardus, and Marianne

3    Kaminski.  They have, they have each in their own way

4    reported to us, let's just say, problems with their prior

5    depositions.  And that affected their willingness to provide

6    additional dates for more deposition dates.

7         And, so, it's been very difficult.  We're going to pull

8    the transcripts of those three individuals and take a look

9    and see what happened, if anything.  But that, that is an

10   issue that concerned my client a good bit.  And it's one

11   that we're going to look into.  And we'll get back with

12   Bryan if we see anything that we believe needs to be

13   addressed on a more formal basis.

14        MR. CARTMELL:  Your Honor, this is Tom Cartmell.

15   Just for the record, I was not at any of those depositions.

16   And, in fact, for Ms. Brown I don't think the MDL had an

17   opportunity to ask a question.

18        MR. GAGE:  I think that's correct.

19        THE COURT:  And, you know, they need to understand

20   that if, if they don't work with you to get another date

21   that what's going to happen is they'll just be noticed and

22   subpoenaed, and they're not going to have the opportunity to

23   select a date that might be more convenient for them.

24        MR. GAGE:  That's correct, Your Honor.  We have

25   advised them of that.

1     The other couple things I need to -- well, just

2  relatively small issues, Judge.  There are two issues, and I

3  don't believe Your Honor -- I'm not sure if Your Honor is

4  the appropriate person to handle these or not.  I just would

5  request guidance from the Court.

6     The, the parties have been discussing some deadlines in

7  the Docket Control Order with regard to the new dates for

8  expert reports.  Is that something that Your Honor would

9  refer us to Judge Goodwin on?

10         THE COURT:  Yes.  I would, I would definitely

11  start with Kate on that.  Judge Goodwin would be the one who

12  would amend any scheduling order.  So, that's just the way

13  it is in the Southern District of West Virginia.  The

14  District Judges do manage their own scheduling orders.  So,

15  you would need to contact Kate, and then she could talk to

16  Judge Goodwin for you I'm sure.

17         MR. GAGE:  And, Your Honor, the other issue that I

18  needed some input on -- and I have not had a chance to raise

19  this with Bryan and I apologize for that.  It just -- there

20  have been so many things people have been wanting me to put

21  on the agenda that it's hard to play traffic cop on all this

22  stuff.

23     But, but Your Honor may remember we've got this case

24  set for trial in February.  It's the *Brown* case.

25         THE COURT:  Right.

1            MR. GAGE:  I'm sorry, the *Lewis* case.

2            THE COURT:  The *Lewis* case.

3            MR. GAGE:  The law firm that is involved in that

4    case is the, the Freese & Goss firm.  And they're the ones

5    that -- I think that's their case.  And we've had a

6    situation in, in one of Mr. Freese & Goss's State Court

7    cases in Texas where they have, they have issued deposition

8    notices for Ethicon employees on dates other than those

9    which have been accepted by, or -- well, they've already

10   been deposed in some cases, and they're wanting additional

11   dates that are different from the ones that MDL counsel are,

12   are giving us.

13       And the problem is Mr. Goss is on the Plaintiffs'

14   Steering Committee, and it's created a problem for us.  And

15   I don't know whether that is an issue that we need to

16   raise -- I mean, I've got to get with Bryan on it.  If we

17   can't get immediate assistance with Bryan on that, the

18   question for Your Honor is, is that something that's

19   supposed to come to Your Honor or is that something we

20   should take up with Judge Goodwin?

21            THE COURT:  I guess it depends on what kind of

22   assistance you need.  If it just has to do with the date,

23   then you would come to me.  If it has to do with somebody

24   attending to the underlying problem, then that would

25   probably be Judge Goodwin.

1          MR. GAGE:  Okay.

2          MR. AYLSTOCK:  And, Your Honor, this is Bryan

3    Aylstock.  I'm happy to reach out to them.  This is the

4    first I've heard of any of this, you know.  So, I understand

5    that.

6        And there is one -- and I know we're way over -- one

7    quick issue about one deposition if I could bring up to Your

8    Honor before we get off the phone.

9          THE COURT:  Sure, sure.  Go ahead.

10          MR. AYLSTOCK:  It's about Gene Kammerer.  He has

11   been an employee of J&J for decades, left in 2001.  And he

12   was the individual who had indicated that he could be

13   deposed for three hours at a time.  So, we did his

14   deposition.  And ultimately I think on the record it was

15   probably two and a half hours because he took a break and

16   left and so forth.

17       He is critical to the material science part of the

18   case.  He's a senior scientist.  When he left, he was

19   engineering fellow.  He's very critical with this particle

20   loss issue that I discussed, the pore size, the design

21   defect.  He actually owns some of the patents on some of

22   these products.  So, it's a very -- he's a very important

23   witness.

24       I understood prior to his deposition that he had some

25   medical condition that would only allow him to sit for three

1    hours at a time.  So, we said, "Absolutely, we understand.

2    That's fine."  We're not trying to put anybody, you know,

3    into discomfort.

4         But what ended up happening is we got two and a half

5    hours and now it's been -- we understood from, I think, a

6    conversation that happened off the record perhaps with the,

7    with somebody that he's got some degenerative disk disease.

8    And we understand that.  And if he needs to stand up or take

9    breaks, we can bite off two hours at a time if we need to.

10        But we need more time with Mr. Kammerer.  He's

11   indicated that he's, he's got some letter from a doctor that

12   says he, you know, is hurting or something.  I don't know.

13   I haven't seen the letter.  But we're going to notice his

14   deposition because he is so critical.

15        And I wanted to bring it to Your Honor's attention that

16   we've only had two and a half hours with, with this very

17   critical witness.  And we need -- or we would like his

18   deposition in the very near future, and particularly in

19   light of the design defect aspects and how it might affect

20   the trial upcoming.

21             THE COURT:  Now, Mr., Mr. Gage, what's the

22   situation with Mr. Kammerer?  Is he -- or is it Kammerer?

23   What's his name?

24             MR. GAGE:  It's Kammerer.  His last name is

25   spelled K-a-m-m-e-r-e-r.

1           THE COURT:  Oh, Kammerer.  Okay.  And is he a

2    former employee did I hear you say?

3           MR. AYLSTOCK:  He is now, Your Honor.  He left in

4    2011.

5           THE COURT:  So, Mr. Gage, what kind of control do

6    you have over Mr. Kammerer?  Can you work something out so

7    that they don't have to just notice him for some date that's

8    convenient for them?

9           MR. GAGE:  Your Honor, I believe I reported last

10   week or the week before Mr. Kammerer in our conversations

11   with him has been very concerned about making himself

12   available for additional deposition time because of his

13   condition.

14       We obviously told Mr. Kammerer that these sorts of

15   things generally require some input from a physician,

16   sometimes a letter, sometimes, you know, other, other

17   methods.

18       And he obtained a letter from his physician.  I

19   received that letter -- another lawyer in my firm received

20   it Saturday afternoon.  I received it last night at

21   9:34 p.m.  And I didn't check e-mails until this morning.

22       And the question in my mind was whether the letter was

23   something that I could send to plaintiffs' counsel or to the

24   Court because the letter did, in fact, discuss his medical

25   condition with some, some level of specificity.

1          So, my lawyer, Chad Hutchinson, here at the firm called

2     Mr. Kammerer to get his position as to whether or not I

3     could give that letter to both the Court and to plaintiffs'

4     counsel.  And Mr. Kammerer advised Mr. Hutchinson that he

5     believes his health conditions are private.  And he, he gave

6     us limited authority to disclose the letter to the Court

7     only.  So, Your Honor, --

8          THE COURT:  Well, I think the problem here is if

9     you look at the case law, unless somebody is on their death

10    bed or has severe dementia or Alzheimer's, they generally

11    are not excused from a deposition even if they have some

12    sort of medical problem.

13         What, what will happen is that accommodations will be

14    made so that he isn't, his health isn't jeopardized.  But

15    the likelihood that he's not going to have to testify

16    anymore, it's not great.

17         I suggest that perhaps you talk to him about the fact

18    that, you know, the plaintiffs are willing to work with him

19    as far as spreading this out over several days, a few hours

20    a day, but he's, he's not going to be able to avoid it

21    unless he has a very, very serious medical problem.

22         And you know what will also happen is if they subpoena

23    him and he makes a motion to quash the subpoena, he's going

24    to have to produce the medical evidence because no court is

25    going to excuse him from anything unless they've seen the

1    medical evidence.

2         So, you might want to talk to him, Mr. Gage.

3              MR. GAGE:  We will, Your Honor.

4              THE COURT:  Nobody wants to be deposed.  But the,

5    but the reality is he's likely to be deposed more than he's

6    already been.  So, he ought to try to do it on his own, you

7    know, on his own terms if he can.  But one of those terms

8    can't be that there won't be any more depositions because

9    there's clearly going to be.

10             MR. GAGE:  Understood, Your Honor.  Thank you.

11             MR. AYLSTOCK:  Thank you, Judge.  I appreciate all

12   the time you gave us today.

13             THE COURT:  Certainly.  I appreciate you-all too.

14   And I'll, I'll issue a new schedule for some additional

15   status conferences starting on October 11th setting them two

16   weeks apart.  And I'll still aim for 2:00 unless somebody

17   finds that to be not a convenient time.

18        Would you prefer mornings or do you, do you think

19   afternoons work just as well?

20             MR. AYLSTOCK:  I think afternoons are fine, Judge.

21             THE COURT:  All right, okay.  Well, thank you

22   then.  I will get an order out in the next day or two.  And

23   I will talk to you in a week and a half or so.

24             MR. AYLSTOCK:  Thank you so much.

25             THE COURT:  Thank you.  Bye-bye.

1     (Proceedings concluded)

2                          * * * * *

3

4

5

6

7

8          I, Lisa A. Cook, Official Reporter of the United

9     States District Court for the Southern District of West

10    Virginia, do hereby certify that the foregoing is a true and

11    correct transcript, to the best of my ability, from the

12    record of proceedings in the above-entitled matter.

13

14

15        s\Lisa A. Cook                    October 2, 2013

16           Reporter                            Date

17

18

19

20

21

22

23

24

25