```
1              IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
2                        AT HUNTINGTON
                   TRANSCRIPT OF PROCEEDINGS
3

4

5
     ---------------------------------------
6

7    IN RE:  ETHICON, INC.,  PELVIC REPAIR       MDL NO.
     SYSTEM PRODUCTS LIABILITY LITIGATION       2:12-MD-2327
8

9    ---------------------------------------

10

11

12              TELEPHONIC STATUS CONFERENCE

13                   October 15, 2013

14

15

16         BEFORE THE HONORABLE CHERYL A. EIFERT
               UNITED STATES MAGISTRATE JUDGE
17

18

19

20

21

22   Court Reporter:          Lisa A. Cook
                              RPR-RMR-CRR-FCRR
23                            (304)347-3198
                              lisa_cook@wvsd.uscourts.gov
24

25
```

**APPEARANCES**

**(By Telephone)**

For the Plaintiffs:

**MR. BRYAN F. AYLSTOCK**
**MS. D. RENEE BAGGETT**
Aylstock, Witkin, Kreis & Overholtz
Suite 200
17 East Main Street
Pensacola, FL  32502


**MR. THOMAS P. CARTMELL**
Wagstaff & Cartmell
Suite 300
4740 Grand Avenue
Kansas City, MO  64112


**MR. BENJAMIN H. ANDERSON**
Anderson Law Offices
Suite 215
360 West 9th Street
Cleveland, OH  44113


**MR. ERIC WALKER**
Hissey Kientz
Arboretum Plaza One
9442 Capital of Texas Highway North
Suite 400
Austin, TX  78759

**MR. ANDREW N. FAES**
Wagstaff & Cartmell
Suite 300
4740 Grand Avenue
Kansas City, MO  64112

```
 1                        APPEARANCES

 2                        (Continued)

 3   For the Defendant:

 4   MR. WILLIAM M. GAGE
     MS. DONNA B. JACOBS
 5   Butler, Snow, O'Mara, Stevens & Cannada
     P.O. Box 6010
 6   Ridgeland, MS  39158-6010

 7

 8   MR. DAVID B. THOMAS
     Thomas, Combs & Spann
 9   P.O. Box 3824
     Charleston, WV  25338-3824
10

11   MR. GARY A. RUBIN
     Skadden, Arps, Slate, Meagher & Flom
12   1440 New York Avenue, N.W.
     Washington, D.C.  20005
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    P R O C E E D I N G S

2           THE CLERK:  Hi, everyone.  This is Laura, Judge

3    Eifert's assistant.  Lisa Cook will be the court reporter

4    today.  And, if you would, please identify plaintiffs'

5    counsel and then defense counsel for me.

6           MR. AYLSTOCK:  Laura, this is Bryan Aylstock on

7    behalf of the plaintiffs.

8           MS. BAGGETT:  Renee Baggett on behalf of the

9    plaintiffs.

10          MR. CARTMELL:  Tom Cartmell on behalf of the

11   plaintiffs.

12          MR. ANDERSON:  Ben Anderson on behalf of the

13   plaintiffs.

14          MR. WALKER:  Eric Walker on behalf of the

15   plaintiffs.

16          THE CLERK:  I'm sorry.  I didn't get the name

17   after Ben Anderson.

18          MR. WALKER:  Eric Walker.

19          THE CLERK:  Okay.  Thank you.

20          MR. WALKER:  Thank you.

21          MR. FAES:  Andy Faes on behalf of the plaintiffs.

22          THE CLERK:  I'm sorry.  Could you repeat that?

23          MR. FAES:  Andy Faes, F-a-e-s.

24          THE CLERK:  All right.  Thank you.  Anyone else

25   for the plaintiffs?

```
 1        (No Response)
 2             THE CLERK:  That must be it.  I think that's it.
 3   Thank you.
 4        How about for defense counsel, please.
 5             MR. GAGE:  William Gage and Donna Jacobs.
 6             THE CLERK:  All right.  Anyone else for defense?
 7             MR. THOMAS:  David Thomas, Your Honor.
 8             THE CLERK:  All right.
 9             MR. RUBIN:  And Gary Rubin.
10             THE CLERK:  Okay.  Thank you, everyone.  If you'll
11   hold one moment for the Judge.
12             THE COURT:  Hello.
13        Hey, it sounds like somebody's a little bit close to
14   the speaker.  I'm getting some feedback, but I can't tell
15   where it's coming from.  So, could we all sit back just a,
16   just a smidgen.  Thank you.
17        All right.  Well, have you-all settled all these cases
18   in the last week?
19             MR. AYLSTOCK:  Well, -- Your Honor, this is Bryan
20   Aylstock.  Not exactly.  We, we did have a meet-and-confer
21   this morning and made some progress on certain issues, but
22   settlement might be a stretch.
23             THE COURT:  Okay.  Well, I don't have anything on
24   the agenda myself for today.  To be honest with you, I
25   didn't look at the last transcript yet to see if there was
```

1    anything left over.  But who would like to go first?

2              MR. AYLSTOCK:  I will, Your Honor.  This is Bryan

3    Aylstock.

4        One of the subjects of our meet-and-confer and a major

5    focus of our hearing last week was the -- I guess the week

6    before last was the Klinge/Klosterhalfen issue.

7              THE COURT:  Yes.

8              MR. AYLSTOCK:  And I have some news, I guess, to

9    report, some good news.  We do have a -- I'm sorry.  I'm out

10   of breath.  I'm up on a mountain.  But the good news is --

11   which, by the way, I may have to drop off and -- if

12   reception gets bad.

13       But the good news is that we have, we have made contact

14   with both those witnesses.  As the Court will recall,

15   Dr. Klosterhalfen is a non-retained fact witness.  But we

16   did make a disclosure yesterday, pursuant to the expert

17   report deadline, simply as a fact witness because he

18   obviously is one of the foremost experts in the world on

19   mesh.  So, I think that distinction is important.

20       But, in any event, both of these witnesses have agreed

21   to comply with the *duces tecum*.  When the depo notices were

22   issued by Ethicon on both these witnesses, they issued *duces*

23   *tecum* notices.  And although they're German and subject to

24   German law within the framework of that law and, in

25   particular, the privacy concerns, they're willing and have

1   actually collected, to the extent where they know where it

2   is on their computers, the documents that would be

3   responsive to that, again considering the privacy of, of the

4   patients and so forth under German law.  So, there is that

5   issue.

6       And there's also an issue, as the Court knows, with

7   regard to Ethicon's production of the Klinge/Klosterhalfen

8   documents.  And we -- I received a letter a couple of days

9   ago that William -- Mr. Gage forwarded to me from another

10  lawyer, another Ethicon lawyer that indicated that they have

11  located a number of Klinge and Klosterhalfen documents, some

12  of them related to hernia.  And their idea was to produce it

13  within the next 45 days.

14      That's problematic for us because we're traveling, at

15  least some of us -- Mr. Anderson and some of us on the call

16  are going to be traveling to do their depositions in the

17  next two to three weeks.

18      And, so, our thought was that both sides would, would

19  produce all the Klinge/Klosterhalfen documents in their

20  possession, and do it within the next ten days, so that both

21  sides with have an opportunity to review them and be ready

22  for their deposition, and, and basically certify

23  completeness of that production.

24      There is an issue outstanding, however, on the manner

25  of the production, not the documents themselves.  Again,

1   we're -- our -- these witnesses are willing to produce the

2   documents in hard copy format pursuant to the *subpoena duces*

3   *tecum*.  But the big issue right now is whether they should

4   be required to attach some sort of a, a collection kit

5   which, you know, what I consider to be spyware or some sort

6   of a -- something to go on their computer and collect

7   things.  And I don't think that's reasonable.

8        It's inconsistent with the ESI protocol in that the ESI

9   protocol applies to parties, not witnesses.  We have done

10  some third-party production.  But for the most part, except

11  for AdvaMed that's basically a trade coalition of pharma and

12  medical device companies, the metadata hasn't been produced

13  or, if it is, it's been very limited.

14       So, our thought was that we would produce, both sides

15  produce these documents within the next ten days, and then

16  we'd go over to Germany and hopefully complete these

17  depositions once and for all.

18       So, that, that's our position on the

19  Klinge/Klosterhalfen issue.  I think we're close, but the

20  idea of having a third-party witness attach something to his

21  or her computer and let it search for documents is, I think,

22  inconsistent with the law.

23       It's also very problematic given the German privacy

24  laws because there can be criminal penalties attached.  And

25  some of the metadata that might be produced or found, I

1    guess, with this software could contain patient names,

2    patient information.  Even the name of the file itself could

3    be a patient name.  And there would be really no way to deal

4    with that, no good way, certainly no timely way.

5         And what we thought we could do is with the

6    Klinge/Klosterhalfen documents have them produce, be

7    produced simultaneously to Ethicon and us.  To the extent

8    that there are any privilege issues, which I can't imagine

9    since these are third-party witnesses, there weren't any

10   attorneys present at any of these, that they could be

11   subject to some sort of extra clawback or something like

12   that.

13        But we'd like to get them at the same time that Ethicon

14   gets them, particularly given that these are consultants,

15   not, not corporate witnesses, and particularly given the

16   time frame that we're operating under here.

17             THE COURT:  All right.  It sounds like you're

18   scaling the Alps or something there, Mr. Aylstock.

19             UNIDENTIFIED SPEAKER:  He's going up three flights

20   of stairs.

21             MR. AYLSTOCK:  Yeah.  I've been found out.  I'm

22   sorry.

23             THE COURT:  Dr. Klinge, is that, is that doctor

24   also in Germany?  Both of them are in Germany?

25             MR. AYLSTOCK:  Yes, Your Honor, both are in

1   Germany.

2         THE COURT:  Well, I think fundamentally I couldn't

3   order them to attach anything to their computers in Germany.

4   I mean, I, I may think I have a lot of authority, but it's

5   actually limited when it comes to the borders of the United

6   States.  And -- but I don't, I don't see that as even being

7   a reasonable, a reasonable issue on the table because it's

8   not something I could order even if I really wanted to do

9   that.  So, I think we need to remove that.

10        So, if we take that off the table, what I hear you

11  saying the dispute is at this point is whether it will be 45

12  days or 10 days for the production and whether the

13  productions would be simultaneous.

14        MR. GAGE:  Your Honor, --

15        MR. AYLSTOCK:  That's correct, Your Honor.  And I

16  guess the only thing I would add is we've heard a lot about,

17  you know, "We're still looking."  And I get that.  I know

18  this is a big company and I know they're trying to turn over

19  every rock.

20        But what we can't have is a document dump the night

21  before the deposition that so often happens here, or three

22  weeks after the deposition when we've all spent the time and

23  money to go to Germany.

24        And, and for that reason, what we'd be looking for is

25  that, "Okay, we have done everything we reasonably know how

1    to do and this is what we found," not, "We're still looking.

2    There may be some other places down the road."

3         And, and, and certainly we would do that as well with

4    Klinge and Klosterhalfen.  Whatever they find, you know,

5    they've done, they've done the reasonable efforts in

6    compliance with the Federal Rules.

7              THE COURT:  All right.  Who from the defense wants

8    to respond?

9              MR. GAGE:  Your Honor, this is William Gage.  Just

10   a couple of, of things to, to talk about here.

11        First of all, I think we have to keep in mind that with

12   regard to the jurisdictional issue, these are witnesses who

13   are voluntarily choosing to come to the United States and

14   testify against their former, if you will, employer.  They

15   were consultants.  They weren't employees.

16        And the data that we're seeking to get is data that is

17   limited to their consulting engagements with Ethicon.  In

18   essence, Ethicon is seeking to reclaim what is, in essence,

19   its own documents.

20        In other words, -- and we're making the request of them

21   because they're coming to the United States to testify or

22   they're going to offer testimony in Germany to be offered in

23   the United States court against Ethicon.

24        So, at that level, Your Honor would clearly have

25   jurisdiction and authority to say that if they're going to

1   come into your courtroom, they have to comply with X, Y, and

2   Z with regard to the production of their data.

3       Secondly, with regard to the ESI protocol, Mr. Aylstock

4   made the comment that it doesn't apply to third parties.

5   The plaintiffs have issued -- the plaintiffs in the MDL

6   litigation have issued a number of subpoenas on third

7   parties, some as of very recently.

8       And in their definition of "document," which is a

9   defined term in their subpoenas, they very specifically say

10  that, "What we want from you, third party, is the entire

11  document in its electronic state, including metadata."

12      So, it, it seems, Judge, that it's difficult for them

13  to say it doesn't apply when, in fact, they are requesting

14  it from third parties.

15          THE COURT:  Before you go on, let's talk about the

16  first issue.

17      I am not going to require either of these physicians to

18  attach anything to their computer.  I think it's unfortunate

19  if Ethicon didn't retain the documents between itself and

20  its consultant.  But I'm certainly not going to ask these

21  physicians to attach anything, or these -- I don't know if

22  they're medical doctors or, or Ph.Ds.  But I'm not going to

23  ask them to attach anything to their computer.  In my

24  opinion, that's off the table.  So, I don't think we need to

25  go there any further.  All right?

```
 1              MR. GAGE:  Understood.

 2              THE COURT:  Okay.  So, your second issue is what

 3    then?

 4              MR. GAGE:  Well, the second issue would be -- and,

 5    Judge, just to clarify, is, is what Your Honor saying is

 6    that, that they will produce documents by printing them onto

 7    paper?  I mean, is that, is that what Your Honor is -- just,

 8    just to clarify.

 9              THE COURT:  Well, no.  What I understood Mr.

10    Aylstock to say was that you want some collection kit to be

11    attached to their computer that will essentially scan the

12    information on their computer and pull out the things that

13    the kit is set to find.  And if that's what you want to do,

14    then I'm telling you I'm never going to order that.

15         On the flip side, if you want documents from them, I

16    don't care if they put them all on a disk or if they print

17    them all out or they put them on a thumb drive or however

18    they want to -- if they e-mail them to you.  It doesn't

19    matter to me how, in what format they're produced.  What I'm

20    not going to allow is the collection kit.

21              MR. GAGE:  I understand.

22         Your Honor, the, the issue is -- and I know this stuff

23    gets maddingly detailed -- is the metadata.  And, I mean, I

24    know -- you know, I'm not -- I don't pretend to be an ESI

25    expert.  I fortunately have Gary Rubin on the call with us
```

1   if we get into those issues.

2       But, Judge, the metadata is the information that's --

3   you know, it's information that's kind of behind the

4   document, so to speak.  So, for example, if you have an

5   e-mail, there may be a bunch of fields of data that don't

6   appear on the e-mail, but it indicates things like, you

7   know, date sent, date received, when it was last revised,

8   and things of that nature.

9            THE COURT:  Uh-huh, right.

10           MR. GAGE:  And apparently if you take -- for

11  example, if Dr. Klosterhalfen had, say, ten Word documents

12  or ten e-mails, if he just PDF-ed those or if he just

13  forwards them to, for example, Ben Anderson in their, in

14  their format that exists on their computer, and then Ben

15  just flips them over to us either exactly in the form in

16  which he received them from Dr. Klosterhalfen or perhaps as

17  a PDF, the metadata gets actually changed, actually -- some

18  courts call it spoliated.  The mechanics of moving the

19  document from Klosterhalfen to Ben Anderson actually

20  destroys the metadata.

21      So, what my people are telling me is if we want to get

22  the metadata, which as I understand what Ethicon produces

23  with regard to its production under the ESI protocol, if

24  we're going to preserve the metadata, then we've got to have

25  some way to have the, the documents moved over to a, a disk

1    or some other format that preserves the metadata.

2        Now, the reason for the collection kit is it's a, it's

3    a type of a, a stick that gets attached to the computer that

4    was used, for example, in -- I've been told in the hips,

5    the, the, the Pinnacle hips implant MDL to collect documents

6    from third parties.

7        So, the reason that we proposed it was it's been

8    something that's been used and agreed to, as I understand

9    it, in other litigations.  We just wanted Your Honor to know

10   where we're coming from.

11       But the -- but our particular collection system is not

12   really -- I mean, I'm not saying it's going to be a

13   collection system, and I understand Your Honor's ruling.

14   I'm just trying to find a way to get the data from the, from

15   these individuals without losing the metadata.

16            THE COURT:  Well, what other, what other options

17   are there?  Can they, can they download things on a disk and

18   preserve the metadata?

19            MR. GAGE:  Your Honor, if I may, I would ask

20   Mr. Rubin who's on the phone -- he's also one of Ethicon's

21   lawyers.  He's kind of our e-discovery expert and he could

22   probably answer that better than I could.

23            THE COURT:  Okay.

24            MR. RUBIN:  Good afternoon, Your Honor.

25       The short answer to Your Honor's question is "no."

1    Preserving the metadata by simply moving a document onto a

2    disk, as Your Honor mentioned, or e-mailing it, as William

3    mentioned, that, that's generally not something that happens

4    with an operating system that an ordinary person uses.  It

5    does require the technological tools of a vendor such as,

6    such as the vendor that we are using with our own custodians

7    and, and the vendor who is working with third parties in the

8    hips litigation, as, as Mr. Gage mentioned.

9         I'll just give Your Honor just, just a quick

10   hypothetical and then a quick, quick actual example.

11        Consider, Your Honor, that if Dr. -- either of the Drs.

12   K had an e-mail in his system, the metadata associated with

13   that e-mail would say the e-mail was sent on X date from so

14   and so at Ethicon to Dr. K.  If Dr. K then forwarded that

15   e-mail to plaintiffs' counsel, well, the new date of that

16   e-mail would be October 15th, 2013.

17        And it would then be from Dr. K to plaintiffs' counsel.

18   And it would no longer have the attributes of the original

19   e-mail.  And there would be less functionality from our end

20   or, frankly, even from plaintiffs' end for searching for

21   that e-mail in the database.

22        There is also -- I'll give you an actual example.  Dr.

23   Klinge sent plaintiffs' counsel a couple of weeks ago a

24   collection of documents, and plaintiffs' counsel turned them

25   over to us.

1    One of those documents appears to be a March, 2002, PDF

2    of a PowerPoint.  However, -- and I'm looking at the

3    document right now.  When I go to that document's

4    properties, it says that the author of the document is U.

5    Klinge and that the created date of the document is

6    September 30, 2013.

7    That just can't be right, Your Honor.  And either that

8    means that that was the date -- and this is likely -- that

9    was the date on which Dr. Klinge sent the document, copied

10   it to disk and sent it to plaintiffs' counsel.  But it could

11   also mean that that is the date on which a document that Dr.

12   Klinge had had on his hard drive, that is a date on which he

13   accessed and changed and altered that document.

14   Now, I'm not saying one way or the other.  But

15   obviously Your Honor can see that without the metadata,

16   without being able to trust what the document is telling us

17   about itself, then those are questions.  That then becomes

18   an area of exploration that we would have to, have to get

19   into at the actual deposition.

20   So, the short answer to Your Honor's question is "no,"

21   and I apologize for taking too much of your time.

22            MR. AYLSTOCK:  Your Honor, this is --

23            THE COURT:  How can this be done?  How can it be

24   done.

25            MR. AYLSTOCK:  I have a proposal, Your Honor.  I

 1    didn't mean to interrupt.

 2              THE COURT:  Go ahead.

 3              MR. AYLSTOCK:  My, my proposal is this.  My

 4    understanding is it's -- these, these physicians simply hit

 5    Control P and print out the documents.  The metadata isn't

 6    changed with the Control P.

 7         To the -- you know, the -- I guess it's important -- I

 8    think Your Honor already hit on it.  These aren't -- these

 9    are Ethicon documents.  These are documents Ethicon should

10    already have and know.  So, that's point one.

11         But point two is the volume of these is, is not a huge

12    volume.  And if we have the experts print them out, if

13    there's a question -- you know, in an e-mail it's going to

14    say what the date of the e-mail is.  It's going to say who

15    it's from, who it's to, who it's cc-ed.  That, that's what

16    matters.

17         We, we print it out.  If there's a question, we deal

18    with it.  I mean, we can -- we don't -- we're not opposed

19    necessarily to producing it.  It's just these are

20    third-party witnesses that are not subject to the ESI

21    protocol.  And that's not what the *duces tecum* normally

22    requires of these people.

23         If there's an issue, we'll deal with it on a case by

24    case basis or something like that.  But just printing out

25    the documents and then -- the documents are going to have

1    dates on them.  They're going to have the information on it.

2    And I don't think it -- I think we're -- it's kind of a

3    tempest in a teapot.

4              THE COURT:  So, Mr. Rubin, can they preserve the

5    metadata and can you see it if it's just printed out?

6              MR. RUBIN:  No, Your Honor.  The metadata is, is

7    in what I guess I would call fields surrounding an

8    electronic document.  There's no metadata in a, in a paper

9    document.

10             THE COURT:  Well, if the metadata includes -- if

11   it includes things like who, who is on, who e-mails are sent

12   to and who sent the e-mails and the date they were sent,

13   wouldn't that all show up when you printed out the e-mail?

14             MR. RUBIN:  It, it -- not necessarily.  Some of it

15   in an e-mail could show up.  There could be hidden users.

16   There could be attachments that drop out because of the way

17   they are printed.  There could be graphics that drop out.

18   Sometimes I'm sure Your Honor receives e-mails where

19   embedded graphics are, are rendered as, as separate

20   attachments.

21        And then with respect to documents like PDFs,

22   PowerPoints, and Word documents, no metadata that is

23   associated with those documents including, for example,

24   track changes, including, for example, different version

25   numbers, none of those types of data would be included with

1   a printout.

2        Now, we are not -- we, we offered the third-party

3   collection kit as a way to cut through this and try to be

4   easy.  Granite is one of Ethicon's vendors on this case and

5   has been a J&J vendor on other cases.  And they do this for

6   third parties.  It doesn't have to be Granite.  There are

7   other vendors, plenty of other vendors who can do something

8   like this.

9        And as Mr. Gage said, all we are asking is that the

10  documents be produced as plaintiffs are asking us to produce

11  documents, as plaintiffs are asking other third parties to

12  produce documents, and as I think we're entitled to the

13  documents under the Federal Rules.  That's all we're asking.

14       And if, and if plaintiffs would, would prefer to

15  contact the vendor, and I'd be more than happy to recommend

16  any of them who are not involved in this case, that would

17  be -- that, that would work equally well.

18            MR. ANDERSON:  Your Honor, this is Ben Anderson.

19  May I be heard?

20            THE COURT:  Sure.

21            MR. ANDERSON:  That's not, with all due respect,

22  all that they're asking.

23       What we have here is the difference between Ethicon

24  being a large corporation that has their own lawyers, that

25  have their own ESI vendors that can go through, collect

1    data, look at it for confidentiality reasons.  They do a

2    heavy amount of redaction on their end.  And they take 30 or

3    45 days before they ever produce things, if that.

4        These third-party vendors, the only one that produced

5    any level of metadata is a very large organization that has

6    lawyers and ESI departments and everything else.

7        What we are talking about here is asking two German

8    surgeons to hook up something on their computer.  They would

9    have to -- in order for them to -- of course, they have

10   great skepticism about having their former employers send

11   something to them saying, "Hook this up to your home, your

12   office, and your, your lap-top and then send it back to us

13   and trust us it's only going to be limited to things that

14   aren't going to get you in trouble under German law."

15       This Court can't guarantee that.  The defendants can't

16   guarantee that.  We can't guarantee that.

17       And when it comes to that, they don't -- they will have

18   to hire their own lawyers.  We have to have confidentiality

19   protections in place.  We're talking about a full-blown

20   thing.

21       And we have two German doctors who have patient

22   information and they're concerned about -- they can't

23   produce patient information, hospital information, surgeon

24   information.

25       And the problem with metadata is if they just begin to

1    download that, metadata also goes back and it looks like --

2    it looks at other versions.  So, if they have named a file

3    by a patient name in some earlier version, that wouldn't

4    show up for them on their computer.  They would have to

5    themselves go through and look at the metadata and determine

6    whether or not there may be patient information.

7         So, for, for two German doctors whose practices rely

8    upon them having confidentiality, and for Dr. Klosterhalfen

9    who runs one of the largest, if not the largest, pathology

10   institutes, his business reputation is completely on the

11   line if all the hospitals and surgeons that have been

12   sending him their explants and, and companies for 25 years

13   now hear that he is allowing a collection kit to go on his

14   computer to pull down what could be confidential patient

15   information.

16        The defendants know that this will have a chilling

17   effect not only on the experts testifying, but on these

18   guys' business practices.  This is an extraordinary relief

19   that they're asking for.

20             THE COURT:  Well, I've already, I've already told

21   them they're not going, they're not going to get a

22   collection kit.  I've already made that perfectly clear.

23   That's not going to happen.

24             MR. ANDERSON:  Okay.

25             THE COURT:  The, the question I have in my mind is

1    under Rule 45 when you talk about producing electronically

2    stored information, I'm not certain that it includes

3    metadata.

4            MR. ANDERSON:  Correct.

5            THE COURT:  I mean, that -- what it says is that

6    you produce it in the form that it is ordinarily maintained.

7        Now, I don't know what that means.  There's always

8    metadata somewhere there with any electronically stored

9    document.  But I don't know that this rule requires that to

10   be produced.

11       I mean, Mr. Gage, do you have case law that says that a

12   third party must produce the metadata along with whatever

13   the document is?

14           MR. GAGE:  Well, Your Honor, you know, again, if

15   we go back to the nature of the request, what we're trying

16   to do is recover essentially documents that, in a sense, are

17   in our custody or they're in our control.  They're our

18   former consultants' work product.

19       And I'm sure the plaintiffs would probably take the

20   position that we have, we have control over that in another

21   context.  It just happens to be here it's the plaintiffs'

22   experts.

23       So, I think we have to keep that in mind.  It's not

24   like some poor innocent third party who, you know, is just

25   incidentally wrapped up in the litigation.  These are the

1    plaintiffs' experts who also happen to be our prior

2    consultants.

3         And, Your Honor, if I may, Gary and I were talking --

4    Mr. Rubin and I were talking this morning about the

5    interplay between Rule 34 and Rule 45.

6         Gary, if you don't mind, if you could give the Judge

7    your thoughts on that.

8              MR. RUBIN:  And, and, Your Honor, it's exactly the

9    point you just made.  The documents need to be produced in

10   the, as they're kept in the ordinary course of business.

11   And, as Your Honor said, in the ordinary course of business,

12   documents are maintained with, with their metadata.

13        The metadata is an integral part of what's called the,

14   the native file, the file that exists, and is really -- you

15   know, when you think about it, it's really nothing more than

16   a series of electrons on, on magnetic tape.  That's really

17   all the file is.

18        So, what does that include?  It includes something that

19   can be by computer turned into language that we could read.

20   But then it also includes the data about the data, the data

21   that tells the computer this is a Word file, this is a PDF

22   file.  When you open this -- when, when the user clicks

23   this, open, open PDF or, or open Word.

24        And, Your Honor, as for case law, I don't have any, and

25   I apologize for not being prepared, on the tip of my tongue.

1    But I do believe that it is becoming more and more

2    understood in the ESI cases that metadata are to be

3    considered part of the, part of how a document is stored in

4    the ordinary course of business, particularly where one of

5    the parties requests it and, in this case, both parties are

6    requesting it of the other party.

7              MR. GAGE:  And, Your Honor, if I could -- this is

8    William Gage -- just address a couple of points that Mr.

9    Anderson made.

10        As Your Honor has already ruled, and, and I think as

11   Mr. Rubin kind of followed up on, if, if there's a concern

12   or a distrust in our vendor or our, you know, data

13   collection method, then we're, we're perfectly comfortable

14   with some other method of doing it, using some other company

15   that we don't even engage or talk to and we're not, there's

16   not, there's no way we can spy on them.  I mean, that's not

17   the intent is to spy on anybody.  We just want to preserve

18   the data.

19        It could become very important, Your Honor, as to, you

20   know, what these doctors were telling Ethicon at, at what

21   particular points along the way.  Those could be critical

22   moments in the relationship between Ethicon and these

23   doctors.  We have a very keen interest in finding these

24   documents and then making sure that, you mow, if we have to

25   look at the metadata, it's been preserved.

1    So, I mean, we're fine with -- I mean, we, frankly,

2    just offered it up as an accommodation because it's an easy

3    way to do it.  But if they're worried about it being spyware

4    or whatever, absolutely, they can do it in a -- or we would

5    ask that it be done using a vendor of their choice.  We're

6    not even physically in the room or touching the stuff.

7         THE COURT:  Well, what I'd like, what I'd like to

8    see is some case law that talks about whether electronically

9    stored information under Rule 45 includes metadata.  That

10   would be the first thing that I would like to see.

11   The other issue, I think, that bothers me a little bit

12   is we have -- I don't have any idea sitting here how

13   burdensome this is going to be, how expensive, how

14   time-consuming.  I get the impression that perhaps there's

15   not a lot of documents, so maybe it won't be a huge deal.

16   But I feel uncomfortable making decisions about what Dr.

17   Klinge and Dr. Klosterhalfen have to do without them really

18   having any input in this decision-making.

19   I don't know anything about German law.  I don't know

20   what they would be able to do and not be able to do.  And,

21   so, I just don't think there's enough information in front

22   of me today to figure out, first of all, how this could be

23   done, how burdensome and expensive it would be, and whether

24   the law even requires that that be produced by a third party

25   in their position.

1      I understand your arguments, Mr. Gage, that these are

2  former consultants and they've flipped on you.  And, so,

3  they're a little bit different than your average, completely

4  unrelated, third-party deponent or, or witness.  But I, I

5  still have some concerns that we've got to take into

6  consideration the burden on these doctors to produce this

7  information, and also the benefits that might be gleaned

8  from that information.

9      I mean, if these are contracts that you had with these

10  physicians, I can't imagine why it would be all that

11  important to have the metadata.  I mean, maybe it is.  I'm

12  not seeing it sitting here.

13      But, you know, I think, I think I need more information

14  on this particular topic.  I need to know what options there

15  would be for these doctors, how long it might take, how

16  burdensome it would be, how expensive it would be, and those

17  sorts of things, and whether, and whether they're even

18  required to produce that kind of information under Rule 45.

19          MR. GAGE:  All right.  Your Honor, let me, let me

20  suggest this.  It, it may be that we have to do it in a, in

21  a two-step process.  And, Your Honor, if I may, I would ask,

22  I would ask Mr. Rubin to basically keep me from putting my

23  foot in my mouth.  If I say something wrong, I would ask,

24  Your Honor, that he speak up and, and fix me on this because

25  he's kind of the expert here.

1      But, you know, we, we've also got the depos that we've

2  got to deal with.  And it may be that the best approach is

3  for -- Mr. Anderson said earlier today that -- when we were,

4  we were talking about some of these issues that Drs. Klinge

5  and Klosterhalfen, or at least maybe Dr. Klinge, had already

6  gathered some materials but had not yet produced it to Mr.

7  Anderson.

8      It may be that the next step is for, is for the experts

9  to produce whatever they've got in whatever format they've

10  got so that at least we can get whatever they have.  And

11  then we can brief the issue of getting the metadata, you

12  know, while we're at least getting the paper documents.

13      And, Your Honor, if I may, I just need to, I need to

14  ask Mr. Rubin, is there -- does that mess up, does that mess

15  anything up by even asking for that?

16              THE COURT:  You mean if they just print them out?

17              MR. GAGE:  Correct.

18              MR. RUBIN:  Right.

19              THE COURT:  So, it shouldn't, should it?

20              MR. AYLSTOCK:  That's my understanding, Your

21  Honor.  This is Bryan Aylstock.  I'm no ESI expert but, you

22  know, we, we certainly don't want to, you know, have any

23  claims of spoliation.  And we're willing to do it.  We're

24  willing to do exactly what Mr. Gage said.  We'd ask for it

25  to be reciprocal, that they also do it within the next ten

1    days so we can do this once and for all.  But we're willing

2    to do that.

3              THE COURT:  So, --

4              MR. GAGE:  Gary, can you comment?

5              THE COURT:  Yeah.  What happened to Mr. Rubin?

6              MR. RUBIN:  Sorry.  I was on mute.  I apologize.

7    This is Gary Rubin.

8         Accessing the documents does change the date on which

9    the document was last accessed.  And, so, printing it would.

10        However, having said that, what I'm using in my own

11   mind in terms of gauging the reasonableness of what we're

12   talking about is the ESI protocol.

13        I recognize plaintiffs' position that it doesn't apply

14   to the doctors.  But why don't we just agree, then, that if

15   it's in the ESI protocol or if it's not, that will be our,

16   my definition of what's reasonable.

17        I think, William, our position is, then, printing will

18   be fine because it would not alter a type of metadata that,

19   that is called for in the ESI protocol.  And I'll let that

20   be our rule of reasonableness.

21             THE COURT:  All right.  Well, then, so, we'll have

22   the doctors print out responsive information.

23        Now, let's talk about the exchange and whether that

24   should be simultaneous and how many days to do that.

25             MR. ANDERSON:  Yes, Your Honor.  This is Ben

1    Anderson.   May I address that?

2              THE COURT:   Yes.

3              MR. ANDERSON:   One of the issues that we've had

4    is, as you recall, we had requested -- and I'm not, I'm not

5    trying to agitate Your Honor by saying things that have been

6    requested for a long time.  But I just want to historically

7    indicate that prior to the trial in New Jersey, we had asked

8    defense counsel for Ethicon for all of the Klinge and

9    Klosterhalfen documents, which was approximately November of

10   2012.

11       So, this issue has arisen again.  And a couple of weeks

12   ago, it was reported to Your Honor by Mr. Gage that they had

13   found a -- they had dispatched a team who was over in

14   Germany and they had found 50, at least 50, according to the

15   transcript, evidence of 50 reports on explants by

16   Dr. Klosterhalfen.

17       As William indicated, we were talking earlier in the

18   day, and he told me that now they have four.  And, so, I

19   asked what the difference -- why we lost 46 in the last week

20   and a half.  And I wasn't being flippant about that.  I

21   really wanted to understand it.

22       And, so, our concern is that -- or what we, what we'd

23   like to address is whatever this team that was dispatched a

24   few weeks ago to Germany has come up with, including these

25   50 reports, and any other documents that they have found or

1    that they believe are relevant to Drs. Klinge and

2    Klosterhalfen, we would ask that they be produced to us in

3    ten days, and anything that Dr. Klosterhalfen and Dr. Klinge

4    have be produced -- and we can do it either on a disk or in

5    hard paper format -- and they be produced both to Ethicon

6    and to us within ten days as well.

7              THE COURT:  Mr. Gage, why can't that be done?

8              MR. GAGE:  Your Honor, let me first address --

9    well, let me first address the 50 to seven because I do need

10   to clarify something there.

11       At the September 30 conference what I told the Court

12   was that, that we had somebody over in Germany talking to a

13   company employee named Anke, A-n-k-e, Winter.  And she was

14   the individual that we had a lead on.  And she was out on

15   vacation.  And, so, we were trying to meet with her when she

16   got back.

17       And based on that interview with Anke Winter, I

18   reported to the Court that they believed that -- this is a

19   quote.  They -- my quoting myself from the transcript.

20   "They believe that over the years Dr. Klosterhalfen may have

21   provided about 50 such reports following his review of mesh

22   explants."

23       Well, that didn't -- that number didn't really stick in

24   my mind much.  And then a couple of days ago, I get an

25   e-mail from some of our document people and I say, "What's

1    the update on producing those documents?"

2        And they say to me that they didn't locate any

3    reference, any references to explants and Dr. Klosterhalfen

4    within the pelvic mesh complaint files.  And then we

5    received a list, and there were seven that involved

6    Physiomesh and PROCEED.

7        And, Your Honor, Physiomesh is a hernia -- it's mostly

8    a hernia product.  It's a partially absorbable product

9    intended for abdominal hernia repair.  And then also for

10   PROCEED Ventral Patch.  And PROCEED is the name of another

11   Ethicon hernia product.

12       And, and I was told by the documents team that that

13   explains why we did not locate these things in the pelvic

14   mesh complaint files because apparently the reports we had

15   were from the hernia files.

16       Now, so, then I reported that this morning to Ben.  I

17   said, "Ben, it looks like we've got seven."  And Ben said,

18   "Wait a minute.  You said there were 50."  And I said, "When

19   did I say there were 50?"  He said, "You told the Judge that

20   on the phone."

21       So, I went back and pulled the transcript and I said,

22   "About 50."  So, I e-mailed my document people and I said,

23   "Why did -- where did I come up with the notion that it was

24   50 and now you-all are telling me seven?"

25       And, Your Honor, the deal was that when Ms. Winter was

1    first interviewed, the question that was posed to her was,

2    "How many of these reports are there?  Are there thousands

3    of them?  Are there hundreds of them?"  And her answer to

4    our documents people was, "Oh, no, much less, maybe 50."

5         So, at the time that, that I seized onto the 50 number,

6    it was, it was her, it was her responding to kind of

7    speculation about how many reports were we talking about, a

8    huge number, or were we talking about a small number?  So,

9    she threw out the number 50 and that's what I reported to

10   the Court.

11        What happened was -- what happened after that is then

12   once she started helping us to drill down and find the

13   reports, it turns out they can only find seven.  And they're

14   both regarding hernia products.

15        So, that -- I just wanted Your Honor to understand -- I

16   know that's fairly laborious, but I wanted Your Honor to

17   understand how I had those two different numbers.

18             THE COURT:  All right.  Well, if you have, if you

19   have a handful of explant reports, what other documents do

20   you have that you would need to produce to the plaintiffs

21   from Klinge and Klosterhalfen?

22             MR. GAGE:  Your Honor, --

23             THE COURT:  What other types of documents?

24             MR. GAGE:  Right.  In, in connection with, you

25   know, the hernia mesh stuff that we're -- the hernia mesh

1    documents that we're looking for, we came across some

2    additional ex-US custodians that reference Dr. Klinge and

3    Klosterhalfen in connection with the various Ethicon mesh

4    products.

5         And, so, those -- that data is being shipped to us to

6    one through -- you know, the way that it works, Your Honor,

7    is the first step is -- I mean, essentially, it's not like

8    physical pieces of paper from what I understand.  It is --

9    as Gary was saying earlier, it's like electrons on a

10   magnetic tape.

11        We've got to load them into a computer.  We have to

12   search through that, both using English and German language

13   terms because apparently when you're looking at the data

14   from these people overseas, you can't just run English

15   searches.  You've got to run English and German searches.

16        Then that then captures the documents that contain, you

17   know, the search terms that are in the ESI protocol, or part

18   of the protocol that we use to search for documents.

19        Then those are loaded into a review tool.  And the data

20   is then sent to a vendor to be converted into an image

21   that's kind of recognizable like a document, you know,

22   something that you could actually -- it turns into an image

23   there.  So, it -- because it's not, it's not a physical

24   piece of paper.  It's just data.

25        I asked our people, our documents people this morning,

1    I said, "Look, I really want to get this stuff produced well

2    in advance of this depo."  And they said they would check on

3    that and get me their absolute best.  And I said, "Look,

4    I've got to have it.  We've got to get it done before this

5    depo."

6        And, so, they're checking on that.  I don't have an

7    answer for Your Honor as to specifically how long it would

8    take.  But I can tell Your Honor it is clearly my intent and

9    in our best interest to get this done well in advance of the

10   depo because otherwise we're going to run into, you know,

11   we're going to run into problems.

12            THE COURT:  When is -- when are these -- when are

13   the depositions scheduled?

14            MR. AYLSTOCK:  The deposition of Professor

15   Klosterhalfen is Sunday, November 10.  The deposition of Dr.

16   Klinge is the following Thursday and Friday, November 14th

17   and 15th, 15th if necessary if they need more time.

18            THE COURT:  Well, that doesn't give you a lot of

19   time, Mr. Gage.

20            MR. GAGE:  I know, and I'm concerned about it.  In

21   fact, we were, we were -- there was some discussion this

22   morning, Your Honor, about is there any way that we can dig

23   through these files and exclude everything else so that

24   we're just focusing on the Klinge/Klosterhalfen stuff.

25       So -- and they said they would check on that.  So, you

1    know, Judge, it will probably be -- I am hopeful tomorrow I

2    should have some more, you know, information.

3         And, Judge, I mean, again, I'm not an ESI expert, but

4    apparently this stuff -- I mean, it just takes time, you

5    know.  It's pretty tough to push it through a system.

6         But, nonetheless, this is clearly my highest priority

7    in terms of document production.  So, if I could get with my

8    team, you know, and hopefully come up with something that we

9    can put together tomorrow that, that satisfies the timing

10   concerns.

11              MR. AYLSTOCK:  Your Honor, --

12              THE COURT:  Yes, go ahead, Mr. Aylstock.

13              MR. AYLSTOCK:  I'm sorry, Judge.  I didn't mean to

14   interrupt.  This is Bryan Aylstock.

15        My, my only comment is, you know, I understand it takes

16   time which is why we requested it back in July of last year.

17   And my fear is if we don't have an order, you know, we're

18   not going to -- it's not going to happen.  We all understand

19   what an order means.  And, and sometimes that helps clients

20   do what they need to do.

21              THE COURT:  Well, here's what I -- here's what I'd

22   like you to do, both of you.

23        First of all, Mr. Gage, you need to find out ASAP what,

24   what volume of documents we're talking about and how long

25   it's going to take to get these processed.  And that will

1    then determine how much time you're going to have, you're

2    going to have to get them produced because, you know, the

3    more documents there are, the sooner they're going to need

4    them.

5         And we're not talking about a whole lot of time.  We're

6    talking about less than a month at this point.  So, you

7    know, 45 days is ridiculous, of course.  I don't know if ten

8    days is doable.  Maybe there's something in between there.

9         And while you're at it, why don't you both look for

10   cases that talk about Rule 45 and metadata.  And you don't

11   have to do a brief at this point.  If you find a case that

12   you think is relevant, then just e-mail the case cite to

13   Laura and I'll, I'll start looking that over so that we can

14   speed up that aspect of it too because, you know, if we find

15   out that that's not really part of what Rule 45 envisions,

16   then we don't have to worry anymore about that and you can

17   go forward with your depositions and not have to worry about

18   the metadata.  So, --

19             MR. AYLSTOCK:  Yes, Your Honor.

20             MR. GAGE:  That sounds good.

21             THE COURT:  Now, today is Tuesday.  So, by

22   Thursday at noon, Mr. Gage, I want the answers to those

23   questions.

24             MR. GAGE:  Yes, Your Honor.

25             THE COURT:  And then, of course, I assume you'll

1   share those immediately even if it's before Thursday at

2   noon.  But you'll share that information with the

3   plaintiffs' lawyers.  And then you, you can both e-mail me

4   your suggestions on what the time frame ought to be.

5        But I, you know, I think we've got to be realistic

6   here.  There's not a lot of time.  So, you're going to have

7   to really crank these things out, Mr. Gage.

8             MR. GAGE:  Understood, Your Honor.

9             THE COURT:  These, this Klosterhalfen stuff, I

10  mean, I've just been hearing about this now for six months

11  it seems like.  And it doesn't seem like we're a whole lot

12  closer to getting anything finished with him.  I understand

13  he's a very important witness, he and Klinge.  But still

14  we've got to move on these things.

15       All right.  So, let's, let's do that on this issue.

16            MR. AYLSTOCK:  Thank you, Your Honor.

17            THE COURT:  Anything --

18            MR. THOMAS:  Your Honor, this is David Thomas.

19  I'd like to address one more issue with Klinge and

20  Klosterhalfen if I may.

21            THE COURT:  Certainly.

22            MR. THOMAS:  I'm the one that's going to make the

23  trip to take the depositions of these folks.  Plaintiffs

24  have agreed to make Dr. Klinge available for two days if

25  necessary in order to do his fact deposition and his expert

1    deposition.  However, they've only offered Dr. Klosterhalfen

2    for a single day.

3        I thought we had this resolved six weeks ago when we

4    discussed with them before about having a fact witness

5    before and an expert deposition the second day.  Now they,

6    they suggest that we can do them both in a single day, which

7    would be Sunday, November the 10th.

8        Dr. Klosterhalfen, Your Honor, as you probably well

9    know by now, was a consultant for Ethicon for about 13

10   years.  Mr. Aylstock described him as one of the foremost

11   experts in the world on mesh, as far as they're concerned, a

12   very prolific author on the subject matter of the

13   litigation.

14       And we received last night an expert report from Dr.

15   Klinge which is 89 pages long.  And while I haven't had a

16   chance to read it yet, he relies upon studies where he works

17   with Dr. Klosterhalfen in support of his opinions.

18       Your Honor, it's just critical that we have a full day

19   to explore the factual relationship between

20   Dr. Klosterhalfen and Ethicon over that 13-year period, and

21   then have a second day to explore his expert witness

22   opinions which are contained in a 26(a)(2)(C) expert

23   disclosure we also received last night.

24       I think the rules contemplate that we get a full day

25   for his expert deposition.  The Court has already recognized

1    the need of a factual deposition because of this peculiar

2    relationship with Ethicon.  I just ask the Court to require

3    the plaintiffs to make Dr. Klosterhalfen available for two

4    days.

5         And, of course, if I get it finished in one, I'll be

6    thrilled.  I'll be able to spend some time in Germany.  But

7    if I need two, I'd like to have two instead of coming back

8    after it's over and asking the Court for another day and

9    having to go over there and get a second day.

10         THE COURT:  You know, I'm a little astonished that

11   this is even an issue.  I cannot understand which

12   plaintiffs' lawyer would have said that the defendant can

13   only have one day to take this deposition.

14        I mean, we have talked about this sort of thing so many

15   times.  And how many times have we agreed that a fact

16   deposition is different than an expert deposition or a Rule

17   30(b)(6) deposition?  I don't understand.  I mean, who said

18   they could only have one day?

19         MR. ANDERSON:  Your Honor, this is Ben Anderson.

20   And it's a little bit different than Mr. Thomas described.

21        A few weeks ago we talked about this.  And I indicated

22   that he was a non-retained expert and he was going to submit

23   an (a)(2)(C) report, and that he had one day that he had

24   available which was November 10th.

25        And they said, "We want to do all of the depositions at

1   once in Germany."  And I said, "Well, given that he's not a

2   retained expert, he's not going to have a 95-page report

3   like Klinge.  He's going to have a very short report of

4   opinions.  And I believe he should be able to cover the

5   facts and the experts in one day.  He's got one day."

6       And, so, we set it up for one day, and we talked about

7   this a couple of weeks ago.  And then Mr. Thomas raised it

8   with me a few days ago, and I said, "I haven't talked to him

9   about an extra day."

10      And, so, I am more than willing to talk to him about

11  another day.  The problem is they wanted to get him done in

12  one week.  And, so, we set Klosterhalfen on a Sunday.  We

13  set Muehl on a, on a Monday.  And then Klinge was available

14  on the Thursday and the Friday.

15      And one of the things that they had sent to me and

16  said, "Well, perhaps if he can't do it on that day, we might

17  be able to do it while we're over there."

18      And, so, if there's a chance to do that, quote/unquote,

19  while we're over there, and it can be done in between or it

20  can be done before, based upon his schedule, then we're more

21  than willing to try to do that.  But it's a little bit

22  different than the way it was framed, Your Honor.

23      And, so, I'm more than happy to try to do that.  But he

24  could not do anything during the week because of his

25  schedule.  So, we planned it for a weekend.

1       And, so, I am happy to try to see if we can do it while

2   we're over there.  The problem was they were restricting us

3   to one week.  They said, "We've got to get this done in one

4   week."  And that could not be possible.

5       So, I'm happy to try to see if there's a day after

6   Klinge or -- yeah, it would have to be after Dr. Klinge and

7   probably on a weekend if we can get him that following

8   weekend.

9           MR. AYLSTOCK:  Your Honor, --

10          THE COURT:  Well, you need to make it so.  I have

11  bent over backwards giving you the time you need to take

12  your depositions.  And I am astonished that you would expect

13  them to take this man's deposition in one day.  That's just

14  not even reasonable.

15      I also think it's very reasonable of Ethicon to want to

16  do the German depositions at the same time since they have

17  to go to Germany to do them.

18      So, this is -- this whole subject -- I can't even

19  understand why this is a subject that has to be brought up

20  to the Court.  I mean, anybody with any common sense would

21  know you can't limit that deposition to one day, and that

22  they should be done close together in time while they're

23  over there.

24          MR. ANDERSON:  And we're trying to do just that,

25  Your Honor.

43

1      THE COURT:  Well, let's, let's do our very, very
2  best because I just -- that just is really astonishing to me
3  that it's even a subject.  So, I think you need to do what
4  you can with Dr. Klosterhalfen to get that worked out.
5      MR. ANDERSON:  Part of the problem is, Your Honor,
6  that I do not have direct contact with him.  And, as you
7  know, Henry Garrard from the litigation -- and Henry has
8  been working with him for a number of years.  And, so, I
9  have -- I will go back to Mr. Garrard and we will see if
10 there is something we can do.  I do not have direct contact
11 with him.  And, so, apologies to this Court, and I will do
12 whatever I can to make sure that this happens.
13     THE COURT:  All right, fine.  Is there anything
14 else on Klosterhalfen or Klinge?
15   (No Response)
16     THE COURT:  All right.  Is there anything else?
17 We've got about six minutes left today that we can talk
18 about some other topic.  Is there anything that needs to be
19 covered today?
20     MR. GAGE:  Judge, I've got just a couple of quick
21 ones.  And they're not -- these are not going to be
22 contentious or big problems, but I do need to raise them.
23     THE COURT:  All right.
24     MR. GAGE:  This is William Gage.
25   Your Honor, -- and, and I -- this came to my attention

1    after the call with Bryan this morning.  And I would have

2    raised it with Bryan on the call, but it just came to my

3    attention thereafter and it's not a big deal.

4         Judge, the Federal Rules of Civil Procedure technically

5    require the document requests to non-parties, including

6    experts, be made through subpoenas, *subpoena duces tecum*.

7         But in the interest of time and efficiency, Ethicon is

8    proposing to plaintiffs that we would agree that document

9    requests of experts in the *Lewis*, which is the first MDL

10   case, and the other MDL cases can be made via the notices of

11   depositions rather than through formal subpoenas.  And,

12   obviously, we would reciprocate.  Both sides would do that.

13        And we're -- because we're about to have to issue

14   notices or subpoenas and I wanted to just see if that was

15   okay with, with Bryan and the plaintiffs.

16             THE COURT:  Mr. Aylstock.

17             UNIDENTIFIED SPEAKER:  I'm sorry, Your Honor.  Mr.

18   Aylstock dropped off.  I'm trying to get him back on the

19   line.  Mr. Cartmell, if he's prepared to talk about it, he

20   can do it until we get him back.

21             MR. CARTMELL:  I'm really -- this is Tom Cartmell,

22   Your Honor.  I guess I'm really not prepared.  But I

23   would -- I'm just thinking about it as I heard Mr. Gage talk

24   about it.

25        And, and my only concern would be that, you know, these

```
 1    experts, we're not representing them.  We have retained
 2    them.  I'm not exactly sure what these document requests are
 3    going to be.
 4        But to the extent that they are taxes, you know, and
 5    things like that, I guess I'm a little hesitant without
 6    knowing what the requests are going to be to agree to that
 7    or be able to agree that these people that we don't
 8    necessarily, obviously, represent have to turn over a bunch
 9    of stuff that we don't know what it would be and whether
10    it's personal nature or whether they have any rights to say
11    "no."
12              THE COURT:  Mr. Gage, were you talking again about
13    Klinge and Klosterhalfen or are you just talking about other
14    witnesses?
15              MR. GAGE:  I just was referring to experts in
16    general, Judge.
17              THE COURT:  Experts in general.  Because I --
18              MR. GAGE:  Yes.
19              THE COURT:  -- thought I understood you already
20    served a subpoena on Klosterhalfen and Klinge.
21              MR. GAGE:  That's correct, Your Honor.  That was
22    in connection with like their fact depo because at the time,
23    they hadn't been designated as experts.
24        And what happened was we got the expert witness
25    designations last night from the plaintiffs.  And, I mean,
```

1    to be perfectly honest with you, Judge, you know, it's just

2    kind of a surface level thought that we just had here.  We

3    just said, hey, it would be a whole lot easier for both

4    sides to agree to do this.

5              THE COURT:  You're just agreeing, you're just

6    agreeing -- what, what you want to agree to is that the

7    document can be served along with the notice and doesn't

8    have to be served as a subpoena.  But you're not suggesting

9    that they have to -- they can have no objections to the

10   documents.

11             MR. GAGE:  Oh, of course not, Judge.  All I'm

12   saying is the parties would agree that we don't have to go

13   physically get a third party issue subpoenaed and then

14   physically delivered to their expert witness that, to get,

15   you know, the documents that you normally request with

16   regard to an expert witness.

17        But, instead, we would just include the document

18   requests in the -- either as an attachment to the depo

19   notice or in the body of the depo notice.  And then both

20   sides would fully preserve all objections, including the

21   expert would preserve all objections.  The, the change in

22   service would affect nothing other than the fact that you

23   would physically serve a subpoena.

24             MR. CARTMELL:  I'm sorry.  This is Tom.  That was

25   dumb.  I apologize.  We have no problem with that.

```
 1              MR. GAGE:  Okay.

 2              THE COURT:  All right.

 3              MR. GAGE:  And then, Judge, the last thing I had

 4    which is kind of ending on a good note is -- because I do

 5    want you to know that although you always catch us at our

 6    bad moment, we do, we do have things where we can agree and

 7    we do make progress.  And there was one quick thing I wanted

 8    to report on.

 9        The -- we've been kind of going back and forth on some

10    de-designation of confidential documents.  You know, we

11    designate a lot of stuff confidential, and sometimes the

12    plaintiffs ask us to de-designate.  And lately there's been

13    a fair amount of e-mail traffic on that.  And, so, it kind

14    of got a lot, to be a lot of e-mail traffic.

15        And, so, what we had basically agreed to was a process

16    to address confidentiality challenges on a rolling basis so

17    that, you know, for the documents where the plaintiffs had

18    specifically identified, we're going to give the plaintiffs

19    kind of a "yes/no" answer on whether we're going to agree to

20    de-designate during some weekly calls that we're going to

21    have.

22        And then in cases where, for example, the plaintiffs

23    may challenge the entirety of the depo testimony or exhibits

24    without further specificity, the plaintiffs are going to

25    give us the testimony and the documents that they're
```

1    specifically challenging.  And then we're going to give them

2    a "yes/no" answer that will be scheduled no later than two

3    weeks from the date.  And then we'll continue to respond as

4    each new request comes in on a rolling basis like that.

5         So, I, I was pleased to see that we got that knocked

6    out, and I just wanted you to know that we were able to

7    knock it out.

8              THE COURT:  Well, --

9              MS. BAGGETT:  Well, Your Honor, this is Renee

10   Baggett.  I was in on the call regarding the confidentiality

11   designations.  And, and one thing I did want to point out

12   was that we did ask both the defense counsel, specifically

13   the person in charge of designating them -- they're in a

14   better position, for the most part, to know whether or not

15   they're over-designating.  And we've asked them to have her

16   go back also in addition to us going through them and see

17   where she can remove some of them without us having to

18   specifically request it.

19             THE COURT:  Well, and I do want to remind you all

20   that Judge Goodwin, as I've, as I've stated before, finds

21   very few things to warrant protection.  So, I think that

22   probably what's going to happen is many of the things that

23   you may still think should be designated as confidential

24   he's going to say are not confidential.

25        With that in mind, you probably ought to look at the

1    documents.  And if there's something that is really not

2    clearly confidential, go ahead and de-designate them instead

3    of waiting for the plaintiffs to point it out.

4         But I do think it's great that you've come up with this

5    process and that you're doing this ahead of, of getting to

6    the point of the schedule and whatnot.  I think that's very,

7    very good.  So, I'm proud of you all.

8         You know, I, I don't -- I know that you guys work very

9    hard to work a lot of these things out.  And, so, all that I

10   ever see are the things that you can't agree on.  I'm sure

11   there's many, many more things you do agree on.  And it

12   seems like things are moving forward pretty well.  But it

13   does help, I think, to have these conversations every now

14   and then.

15             MR. GAGE:  It does.

16             THE COURT:  So, that brings us to a close today

17   unless there's something that really can't wait for two

18   weeks.  And I guess it's a little less than two weeks.  It

19   would be a week from Friday when we would next talk.

20             MR. AYLSTOCK:  Right.

21             MR. GAGE:  That's right, Judge.

22             THE COURT:  If there isn't anything else, then I

23   will just look by Thursday before noon to see what you can

24   give me on the metadata and on the, the amount of time and

25   the volume of documents that Ethicon will be producing in

1    relation to Klosterhalfen and Klinge.  All right.

2            MR. GAGE:  Sounds good, Your Honor.  Thank you.

3            MR. AYLSTOCK:  Thank you, Your Honor.

4            THE COURT:  Thank you all.  Bye-bye.

5        (Proceedings concluded at 4:00 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          I, Lisa A. Cook, Official Reporter of the United

2    States District Court for the Southern District of West

3    Virginia, do hereby certify that the foregoing is a true and

4    correct transcript, to the best of my ability, from the

5    record of proceedings in the above-entitled matter.

6

7

8          s\Lisa A. Cook                    October 16, 2013

9             Reporter                            Date

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25