## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF WEST VIRGINIA
## CHARLESTON DIVISION

| | | |
|---|---|---|
| In Re C. R. Bard, Inc., Pelvic Repair<br>System Products Liability Litigation | ) | MDL No. 2187 |
| | ) | |
| THIS DOCUMENT RELATES TO:  All Cases | ) | |
| _____ | ) | |
| | ) | |
| In Re American Medical Systems, Inc.,<br>Pelvic Repair System Products Liability Litigation | ) | MDL No. 2325 |
| | ) | |
| THIS DOCUMENT RELATES TO:  All Cases | ) | |
| _____ | ) | |
| | ) | |
| In Re Boston Scientific Corp. Pelvic Repair<br>System Products Liability Litigation | ) | MDL No. 2326 |
| | ) | |
| THIS DOCUMENT RELATES TO:  All Cases | ) | |
| _____ | ) | |
| | ) | |
| In Re Ethicon, Inc., Pelvic Repair<br>System Products Liability Litigation | ) | MDL No. 2327 |
| | ) | |
| THIS DOCUMENT RELATES TO:  All Cases | ) | |
| | ) | |

## PLAINTIFFS' BRIEF IN SUPPORT OF CONSOLIDATIONS AND RESOLUTION

On Monday, October 21, 2013, the Court requested the parties design and construct a plan that would lead to resolution or remand of transvaginal mesh cases in the four above styled MDLs.  This directive was based on the conclusion that single-plaintiff bellwether trials, while effective under most applications, have potentially become ineffective in transvaginal mesh litigation.  The following is our analysis:

## I.    SUMMARY OF BELLWETHER RESOLUTION PLAN

Transvaginal mesh is now the single largest consolidation of MDLs in the country.  Due to volume and complexity, single-plaintiff bellwether trials have become impractical.  Over the

course of the last three years, this Court has expended tremendous time and effort to develop a tailored trial plan that serves the goals of each MDL, judicial economy, and constitutional interests of the parties. As suggested by the Court, the next step must include consolidation of product specific trial-ready cases filed on behalf of West Virginia plaintiffs,[1] quickly followed by the implementation of a plan for consolidations of product specific trial-ready cases involving significant groups of appropriate cases through suggestions of remand and transfers of venue to several jurisdictions.

Your Honor should begin this necessary process with both SUI and POP groupings, selecting certain products where non-case specific discovery has been substantially completed in the MDL.[2] With the Court's publication of a more detailed and broader scaled roadmap implemented contemporaneously with the decision to consolidate certain West Virginia cases by product, the Court will have constructed a more complex and far-reaching structure more fitting of the challenge at hand.

Certainly, the parties recognize there are multiple paths to resolution. Based on history, we also recognize the smartest plan will be credited as successful only through the hindsight review of available efficiencies. The suggested path for progress here includes the carving out of specific cases from the general inventory (in addition to proposed consolidations in West Virginia) according to jurisdiction. Examples include Georgia, Texas, Florida, Illinois, and

---

[1] *See* Plaintiffs' Proposal for Consolidation for Trial, submitted by letter brief to the Court on September 18, 2013. Because the Court has already ordered the consolidation of certain cases involving residents of West Virginia, this submission will primarily focus on other jurisdictions.

[2] During the winter months of 2013 and through summer of 2014, coordinated discovery will continue to advance on additional devices from each defendant's two separate families of products, and the Court's various orders and rulings as to these products will be available to the parties, which should provide a framework for evaluation. It is assumed herein that substantially all coordinated non-case specific discovery is or will soon be complete for *at least* one POP and one SUI product from each major manufacturer defendant.

California. These jurisdictions are chosen based on the Court's relationship with Judge Clay Land in Georgia (including Judge Land's experience with the Mentor ObTape mesh litigation), and the geographic diversity and sufficiency of numbers in the remaining five states. Subject to limitations imposed by Your Honor, counsel would be required to submit a fair cross section that includes 200 representative plaintiffs per MDL that would survive scrutiny related to a structured criteria mandated by the Court. The test for inclusion would be *whether the proposed claimants are representative of injuries as related to the general inventory*. In addition to being injury specific, any such cross section would also include cases based on a single state's law, including causes of action and theories of recovery. The Court could refine Plaintiffs' selections for a trial pool of up to 20 plaintiffs, ***effectively*** consolidate those cases, then begin ordering transfers of venue and/or suggestions of remand to the appropriate jurisdiction(s). Such prospective groupings are referred to herein as 'bellwether consolidations.'

Essentially, the Court should transition its primary role as an Article III jurist presiding over single-plaintiff bellwether trials toward a stepped-up process throughout other jurisdictions, allowing for at least one consolidated trial against each of the four primary defendants every other month beginning summer 2014 in either West Virginia or one of the five other proposed jurisdictions. Assuming such a plan is implemented involving both a POP and SUI, neither party could argue favor as to the Court's specific focus on any advocated or purported strength or weakness. This would undeniably provide real and important data about the value of Plaintiffs' various claims related to both SUI and POP products, perhaps leading to resolution.

Should 'bellwether consolidations' not encourage a particular defendant or set of plaintiffs to consider resolution by the fall of 2014, the Court could then consider the issuance of transfers and suggestions of remands, leading to consolidations of many more cases in dozens of

additional jurisdictions. Simultaneously, the remainder of the *200 selected cases* per defendant would have been worked up and ripe for transfer and remands under the direction and control of the Court. Having the above structure in place, the Court will effectively have crafted a much needed new guidepost for governance of complex litigation in the context of multi-district litigation.

Undoubtedly, many Plaintiffs and Defendants alike will be opposed to these suggestions. Defendants because it will force each manufacturer to actually evaluate financial exposure to both SUI, POP and dual product cases, rather than waiting for their respective 'turn in line' during the single bellwether trial process. Nor could either of the parties use the delay as an opportunity to wait out the MDL indefinitely. Similarly, attorneys for Plaintiffs nationwide will express dissatisfaction with the prospect of funding multiple trials, particularly where certain claims relate to medical devices touted as "the gold standard" or are perceived by the Defendants as more difficult for the Plaintiffs to win. As suggested at the September 19, 2013 status conference, it is mutual discomfort that will resolve this litigation. Defendants will no longer be allowed to use the slower moving single trial bellwether as a mathematical defense to resolution, while Plaintiffs will be forced to satisfy their burden of proof, or not.

## II. GUIDANCE ON LEGITIMATE CASE VALUES NECESSITATES A PROCESS ALLOWING FOR REPRESENTATIVE PLAINTIFFS, NOT PLAINTIFFS HAMPERED BY CASE-SPECIFIC DEFECTS OR DISPOSITIVE ISSUES

Any 'bellwether consolidations' should involve a fair cross section of representative plaintiffs with a spectrum of injuries. For example, a consolidation to one jury could consist of 4 high injury cases, 6 moderate injury cases, and 4 where there has been no surgical intervention under general anesthesia after implantation. That said, the practical reality is that Defendants have the ability and institutional knowledge to sabotage the process by trying to interject cases

that have one or more dispositive problems which make the cases ripe for either summary judgment or directed verdict after the plaintiff's case-in-chief (for example, a defendant's long-term financial relationship with an implanting surgeon who claims he would have still implanted the same product today, *even had he been advised of missing warnings*). Such a process would give no advice to the parties as to actual values on a spectrum of injuries. Consequently, Plaintiffs should be allowed to make bellwether selections that fall within certain criteria to be set by the Court that are applicable to a larger group of Plaintiffs as suggested earlier this paragraph. The goal of the Court here should be to assure **a representative consolidation**.

As an alternative, the Court could appoint a limited special master with an understanding of law, medicine, and representative statistics to analyze the cases proposed for each group of 'bellwether consolidations.' This limited special master could arrive at a recommendation as to the appropriate array of Plaintiffs that would represent a fair cross section of claimants, products, and injuries within the Court's inventory.[3]

In either event, and at this juncture, the initial selection of cases to be considered by the Court for 'bellwether consolidations' should consist of *a minimum of* 200 cases per defendant,

---

[3] General guidelines for criteria to consider in determining representative case criteria is found in the Manual for Complex Litigation Fourth § 22.317 at 360–61 (2004) (emphasis added), which provides:

> 22.316 Case Characteristics
>
> In litigation with numerous plaintiffs, the judge may direct the parties or a special master to identify relevant characteristics of the parties affecting pretrial organization, discovery, settlement, or trial. For example, in litigation involving allegedly harmful products or substances, the parties might be directed to organize information such as (1) the circumstances of exposure to the toxic product (e.g., the place, time span, and amount of exposure), (2) the types of diseases or injuries attributable to the exposure . . . (3) relevant and distinguishing characteristics of multiple products, including manufacturing and distribution information (e.g., prescription from a doctor or over-the-counter distribution through specific retailers) . . . Emerging patterns may assist the court in organizing and managing the litigation, whether by aggregated treatment or otherwise. Also relevant is whether the cases have the same counsel on one or both sides and whether the cases are at similar stages of pretrial development. **Cases having substantially similar evidence from the same expert or percipient witnesses sometimes benefit from some form of aggregation**.

involving at least one SUI device and one POP device[4] from each defendant's family of products as noted *infra* at **IV**, for a total of *at least* 800 cases.[5]  Within months, the Court could choose up to 20 similarly situated cases per consolidation from each group to serve as the Court's pool of cases to be consolidated for trial.[6]   Ultimately, this selection and subsequent 'bellwether consolidation' process will assist all parties in evaluating the strengths and weaknesses of their respective cases.  A potential jury verdict involving **a representative consolidation of Plaintiffs** will assuredly assist the parties in determining case values.[7]  Separately, and so as not to move the most severely injured (and needy) to the back of the line, the Court should also create a limited pool of extraordinary injury clients who could also be afforded special treatment, either

---

[4] As a further implementation of such a plan, where the Court has stated its intention to try consolidations of Uretex (SUI) cases in West Virginia followed immediately by Align (Bard only), the plan could be modified to make the second consolidation an Avaulta Biosynthetic (POP) (which would involve both Bard and Sofradim as defendants).

[5] This aggregate total number assumes 100 cases for at least 8 (a minimum of one POP and one SUI per defendant) of the 16 products would be prepared for trial in one of the four proposed jurisdictions, with an assumption of some attrition.  Your Honor would have the flexibility to determine how many jurisdictions and cases involving each defendant.

[6] Much like Your Honor is contemplating here, other federal courts across the country litigating asbestos cases ultimately navigated similar procedural waters in order to provide tens of thousands of plaintiffs and numerous defendants their day in court.  While consolidation became the norm in asbestos litigation, there remained certain trial procedures that were constitutionally prohibited.  *See Cimino v. Raymark Indus., Inc.,* 151 F.3d 297 (5th Cir. 1998).  In *Cimino,* the Fifth Circuit held that Judge Parker's trial plan in which causation and damages were determined for all 3000 consolidated plaintiffs based on extrapolation from the results of representative trials of small subsets of the consolidated claims, was violative of the Seventh Amendment and due process. 151 F.3d at 319–21. This decision cautions that plaintiffs and defendants must constitutionally be afforded the right to appear and contest those issues, even in consolidated actions within an MDL.  The Court has suggested a consolidation on design defect without litigating the issue of causation and absent exemplar plaintiffs.  Plaintiffs would respectfully submit that if the Court's current plan involved a trial of all elements of this strict liability cause of action, including the issue of causation *with* exemplar plaintiffs, the trial would be conducted in a much more efficient manner, and any judgment would be far more likely to withstand appellate scrutiny.

[7] Bellwether trials serve the purpose of facilitating resolution of the remaining cases by estimating the value of cases and determining the nature and strength of the claims.  *See* Herr, *Manual for Complex Litigation* (4th), § 22.315 at 590; § 22.56 at 623 (West 2010).  By providing the parties with a candid assessment of how a jury views liability and damages of a set of representative cases involving a spectrum of injuries related to homogenous products, the 'bellwether consolidations' can inform the parties as to a likely range of verdicts stemming from the amount and nature of treatment received by those plaintiffs tied specifically to a unique product.

by trials in this Court or to apply for expedited discovery and remand.

## III. STANDARDS FOR TRANSFERS OF VENUE OR REMANDS TO TRANSFEROR COURTS FOR 'BELLWETHER CONSOLIDATIONS'[8]

It is settled the Court has the authority to group cases (whether by use of § 1407 remand or by way of § 1404 transfer) and require individualized discovery to ready said groupings for 'bellwether consolidations.'[9]   A suggestion of remand is appropriate where a case will not "benefit from further coordinated proceedings as part of the MDL . . . ," *McKinney v. Bridgestone/Firestone, Inc. (In re Bridgestone/Firestone, Inc., ATX, ATX II, & Wilderness Tires Prods. Liab. Litig.),* 128 F. Supp. 2d 1196, 1197 (S.D. Ind. 2001), and "when everything that remains to be done is case specific." *Bridgestone/Firestone*, 128 F. Supp. 2d at 1197 (quoting *In re Patenaude*, 210 F.3d 135, 145 (3d Cir. 2000)).[10]

---

[8] While a subtle distinction, a court receiving transferred cases under §1404(a) is technically a *transferee* court.  The factors to be considered under 28 U.S.C. § 1404(a) for a change of venue on direct-filed cases vary by circuit, and are obviously different than considerations involved in suggesting remand to the transferor court under 28 U.S.C. § 1407.  Since the vast majority of cases filed in the various MDLs were direct filed in this Court, 28 U.S.C. § 1404(a) would govern whether those cases could be tried in West Virginia or transferred to another appropriate jurisdiction for trial.  As a practical matter, once the Court determines remand of certain cases are appropriate, it can use the discretion afforded it under § 1404(a), and elect to transfer certain cases by product at the same time it suggests remand via the J.P.M.L.  The process is merely procedural.  The end result of remand or transfer is without distinction.

[9] The federal multidistrict litigation statute, 28 U.S.C. § 1407, mandates that each transferred action "shall be remanded by the panel at or before the conclusion of such pretrial proceedings to the district from which it was transferred unless it shall have been previously terminated." 28 U.S.C. § 1407(a); *see* J.P.M.L. Rule 7.6. ("Each action transferred only for coordinated or consolidated pretrial proceedings that have not been terminated in the transferee district court shall be remanded by the Panel to the transferor district for trial.").  Remand is mandatory if (1) the case has not been previously terminated and (2) coordinated or consolidated pretrial proceedings have concluded.  In all other cases, *it is discretionary*. *See US ex rel Hockett v. Columbia*, 498 F.Supp.2d 25, 37 (D.D.C 2007).

[10] The ultimate decision of whether to remand a case from a transferee court rests with the J.P.M.L.  *See* 28 U.S.C. § 1407.  Yet, "[i]n considering the question of remand, the Panel has consistently given great weight to the transferee judge's determination that remand of a particular action at a particular time is appropriate because the transferee judge, after all, supervises the day-to-day pretrial proceedings." *In re Data General Corp. Antitrust Litigation*, 510 F.Supp. 1220, 1226 (J.P.M.L. 1979) (quoting *In re Holiday Magic Sec. & Antitrust Litigation*, 433 F.Supp. 1125, 1126 (J.P.M.L. 1977)); *see also In re Zyprexa Prods. Liab. Litig.*, 314 F.Supp. 2d 1380, 1382 (J.P.M.L. 2004) ("[W]henever the transferee judge deems remand of any claims or actions appropriate, procedures are available whereby this may be accomplished with a minimum of delay."); *In re: Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 460 F.3d 1217, 1231

The initial phase of the MDL has appropriately involved (and will continue through spring of 2014 to involve) single bellwether trials. By the spring of 2014, the next phase of this MDL should move toward 'bellwether consolidations.'[11]  Then, if necessary, and only if necessary, the final phase at the end of 2014 could involve the remand and transfer of massive numbers of cases to district courts across the country. Wholesale remands and transfers of appropriate and worked up cases would only be needed if 'bellwether consolidations' fail to encourage resolution.[12]

## IV.  APPROPRIATENESS OF SUGGESTION OF REMAND/TRANSFER

Fewer than 5% of these MDL cases were originally filed in, or removed from state court to, various federal courts around the country, and subsequently transferred to this Court by the

---

(9th Cir. 2006) (recognizing MDL judge's duty to "move [cases] in a diligent fashion toward resolution by motion, settlement, or trial"); *In re Commercial Money Ctr., Inc. Equip. Lease Litig.*, No. 1:02CV16000, MDL 1490, 2008 U.S. Dist. LEXIS 90470, at *12–*20 (N.D. Ohio Aug. 5, 2008) (rejecting argument for delay of remand until other cases in the MDL resolved); *cf. In re Silica Prods. Liab. Litig.*, 398 F. Supp. 2d 563, 578 (S.D. Tex. 2005) (declaring that while defendants' proposed "interminable" delay in resolution of the MDL cases "might guarantee lifetime employment for defense counsel, it also calls to mind the saying that 'justice delayed is justice denied.'").

[11] Relying on Rule 42, Judge Land of the Middle District of Georgia recently consolidated four MDL vaginal mesh plaintiffs' cases for trial, concluding that "[f]or the bellwether trial concept to be an effective gauge of other cases, it would appear that the more bellwether trials conducted, the more reliable the gauge," and that a consolidated bellwether trial "would provide the parties with an opportunity to obtain results for multiple claims without burdening the court or the parties with the substantial costs of multiple separate trials." *In re: Mentor Corp. ObTape Transobturator Sling Prods. Liab. Litig.*, 2010 WL 797273, *3 (M.D. Ga. 2010). Courts and commentators have recognized that the consolidation of cases for trial is an extremely useful procedural tool, particularly in product liability actions which typically involve multiple plaintiffs asserting similar claims arising out of the same allegedly defective product, thus involving common facts and evidence. "[A]ctions by different plaintiffs arising out of the same tort, such as a single accident or disaster or the use of a common product, frequently are ordered consolidated under Rule 42(a)." Wright & Miller, 9 Fed. Prac. & Proc. Civ. 2d. § 2384 (1971 & Supp. 1987). Accordingly, the Plaintiffs respectfully submit that any single plaintiff bellwether trials scheduled after the spring or early summer of 2014 be converted to consolidated bellwether trials on all issues.

[12] Controlled or wholesale remand is a particularly effective method for determining case values necessary for the accurate evaluation of mass tort claims. *See, e.g., In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.*, 288 F.3d 1012, 1020 (7th Cir. 2002). A decentralized process "of multiple trials, involving different juries, and different standards of liability, in different jurisdictions," may be the only mechanism for such evaluation. *Id.* Only after "a series of settlements has produced an accurate evaluation of a subset of claims," may others in that subset be settled or resolved at an established price. *Id.*

J.P.M.L.  The remaining lawsuits were filed in this Court pursuant to the direct filing stipulation contained in the various Pretrial Orders.  Presently, about 35,000 cases remain before this Court, with thousands more which have been served but not filed under the Delayed Filing Agreement.

That said, a significant amount of coordinated non-case specific discovery efforts have occurred to date under the purview of this Court, including hundreds of oral depositions involving Defendants' general liability witnesses and the production by Defendants of an estimated 46 million pages of documents.  By spring of 2014, general causation expert witnesses will have been designated for all parties for at least one product from each manufacturer's POP and SUI family of products, expert reports will have been generated, and experts' depositions will have been either taken or scheduled.  Case specific discovery can begin immediately following the Court's adoption of an appropriate grouping of Plaintiffs and the cases can be ready for staggered settings beginning summer of 2014.

In sum, the Court and parties will have substantially completed all non-case specific discovery for certain products over the next six months.  With due process as our guide during these developments, Plaintiffs give assurances to the Court herein that pursuant to the Plaintiffs' burden of proof, the below SUI and POP products *will be discovered to the extent that the Plaintiffs will be ready and prepared for trial*, beginning with Ethicon and Bard, on a staggered basis for the following devices:

**Ethicon by June 2014**

| GYNECARE PROLIFT® Pelvic Floor Repair System (POP) | GYNECARE PROLIFT +M™ (POP) | GYNECARE TVT SECUR™ System (SUI) | GYNECARE TVT™ Retropubic (SUI) | GYNECARE TVT™ Obturator System Tension-Free Support for Incontinence (SUI) |
|---|---|---|---|---|

**Bard and Sofradim by August 2014**

| Avaulta™ Biosynthetic Classic Support System (POP) | Uretex® Self-Anchoring Urethral Support System (SUI) |
|---|---|

**AMS by September 2014**

| Apogee™ Vaginal Vault Prolapse Repair System (POP) | Perigee™ Transobturator Anterior Prolapse Repair System (POP) | Monarc Subfascial Hammock (SUI) | SPARC Sling System (SUI) |
|---|---|---|---|

**Boston Scientific Corporation by October 2014**

| Pinnacle® Pelvic Floor Repair Kit (POP) | Uphold™ Vaginal Support System (POP) | Solyx™ SIS System (SUI) | Obtryx® Transobturator Mid-Urethral Sling System (SUI) | Prefyx® PPS System (SUI) |
|---|---|---|---|---|

The above chart of products represents a significant portion of currently filed and delay filed cases.

The Court's plan for 'bellwether consolidations' through transfers and suggestions of remand would not be complete absent consideration of statewide jurisdictions that contain a suitable number of Plaintiffs chosen by injury and product. For the above products, such jurisdictions include (i) Central District of California, (ii) Southern District of Texas, (iii) Middle District of Georgia, (iv) Southern District of Florida, and (v) Southern District of Illinois. Your Honor also has several procedural options which allow 'bellwether consolidations' to go forward

before this Court in West Virginia.[13]   In short, the Court can accomplish 'bellwether consolidations' in any number of the proposed jurisdictions it chooses; it will simply require the Court to perform additional procedural tasks if a party (either a plaintiff or a defendant) is unwilling to work with the Court.

A representative cross section involving the above Bard/Sofradim and Ethicon products

---

[13] This Court has the authority to try cases involving both resident and non-West Virginia plaintiffs, whether direct filed in this Court or transferred from other district courts. If direct filed, per the various Pretrial Orders, a "federal district court of proper venue as defined in 28 U.S.C. § 1391" has yet to be determined in any of the direct filed cases. The Charleston Federal Court is, in fact, a "federal district court of proper venue as defined in 28 U.S.C. § 1391" with respect to each of the MDL defendants. Under 28 U.S.C. § 1391(c), "venue for a corporation is proper in any district 'in which it is incorporated or licensed to do business or is doing business....'" *Goad v. Celotex Corp.*, 831 F.2d 508, 509 (4th Cir. 1987). Additionally, in states with multiple districts, if venue is deemed proper for a corporation defendant in one of its districts, then any of the districts within the state are proper. 28 U.S.C. § 1391(d); *see, e.g., Fanning v. United Fruit Co.*, 355 F.2d 147, 149 (4th Cir. 1966) (finding company doing business in judicial district subject to venue in that district). As the venue statute provides, personal jurisdiction must also be present, but that is not an issue here as Defendants are all multi-national corporations doing business throughout the world, and all are doing business, continuously and systematically, in West Virginia. If transferred from other districts, there would need to be a waiver of remand by the plaintiffs. *Lexecon* recognizes that the plaintiff's choice of venue cannot be overridden, but it can be waived. *See e.g., In re: Carbon Dioxide Indus. Antitrust Litig.*, 229 F.3d 1321, 1325 (11th Cir. 2000) (upholding MDL court's denial of plaintiff's suggestion of remand to JPML after agreement to try case in MDL court, and noting "[t]he locality of the lawsuit—the place where judicial authority may be exercised—though defined by legislation relates to the convenience of the litigants and as such is subject to their disposition."). As explained in *Solis v. Lincoln Elec. Co.*, 2006 WL 266530, *4 (N.D. Ohio 2006) (emphasis in original):

> A critical qualifier to the *Lexecon* analysis, however, is that § 1407(a) is not a *jurisdictional* limitation, but simply "a venue statute that...limits the authority of courts (and special panels) to override a plaintiff's choice." [*Lexecon*] at 42; *see In re: Carbon Dioxide*, 229 F.3d at 1326. This qualifier is critical because "venue is personal and waivable." *Catz v. Chalker*, 142 F.3d 279, 284-85 (6th Cir.1998), *amended*, 243 F.3d 234 (6th Cir.2001). Thus, a plaintiff may decide not to raise an otherwise-valid objection to venue and "consent to remain in the transferee district for trial." *Manual for Complex Litig. Fourth*, § 21.132 at 224.

Hence, there is no impediment to trying cases in the MDL so long as the plaintiff waives the right to remand under § 1407. *Solis, supra; Mann v. Lincoln Elec. Co.*, 2011 WL 3205549 (N.D. Ohio 2011); *Baxter v. Lincoln Elec. Co.*, 2012 WL 112526 (N.D. Ohio 2012) (recognizing that where plaintiffs agreed to try case in MDL court, MDL court had authority to try cases); *In re: Carbon Dioxide, supra; Armstrong v. LaSalle Bank Nat'l Ass'n*, 552 F.3d 613 (7th Cir. 2009) (recognizing that while plaintiffs could agree to trial in MDL court, no waiver was intended under the facts); *In re Western States Wholesale Natural Gas Antritrust Litig.*, 2010 WL 2539728 (D.Nev. 2010) ("after *Lexecon*, some courts have concluded that a plaintiff may waive the right to a § 1407 remand.").

could be submitted by the Plaintiffs to the Court by the end of this December, 2013.  The Court would then select up to 20 suitable cases for trial per consolidation to create multiple groups of similarly situated products including the complete spectrum of injuries.  After determining the jurisdiction(s) in which 'bellwether consolidations' would take place, the Court would begin to issue both suggestions of remand AND §1404(a) transfer orders as early as summer 2014.[14]  It is also assumed herein Your Honor would receive necessary appointments and consent to preside over handpicked specific consolidations in the multiple jurisdictions addressed herein.

For 'bellwether consolidations' of Plaintiffs who reside in states other than West Virginia, the first trials stemming from the Court's 'bellwether consolidations' related to products manufactured by Bard/Sofradim and Ethicon should begin in summer of 2014.  This process could continue with a grouping of cases proposed to the Court by Plaintiffs for consolidation related to the AMS and Boston Scientific products noted above, with the Court selecting up to 20 as representative for additional trials in September and October 2014.  The process would repeat itself monthly for a cross section of plaintiffs, manufacturers and products.

---

[14] Certainly, the cases involving these products are not located in the same judicial district in each state. However, Your Honor has numerous options available to him when suggesting remand.  Following remand, each district court would have the ability under 28 U.S.C. § 1404(b) to transfer its cases within its division to a district court in the same division indicating willingness to participate.  If required, the Chief Judge from each district could sign a 'tag-along' order for any future remands from this Court by product to ensure the cases land before a district court willing to accommodate the Court's plan, as well as in a position to set trials for products which have already been substantially worked up before the Court (and, by the spring of 2014, each manufacturer's POP and SUI family of products will likely have already been through the bellwether trial process).  Transferor courts could additionally grant § 1404(a) motions once a case is remanded to them and transfer such cases to a district court which the Court expressly recommends in either its Suggestion of Remand to the J.P.M.L. or in its Final Pretrial Order.  *See In re Brand-Name Prescription Drugs Antitrust Litigation*, 264 F. Supp. 2d 1372 (J.P.M.L. 2003).  The transferor court could choose to consolidate any or all of these cases by product and either try the cases or transfer the now-consolidated group of cases back to this Court.  *See In re Air Crash at Dubrovnik, Croatia on Apr. 3, 1996*, MDL No. 1180 (Letter from Chief Judge Covello, U.S. District Court, D. Conn., to Michael J. Beck, Clerk of the JPML, suggesting that four remanded cases be transferred back to his court and consolidated for trial (Jan. 4, 2002)).  Of course, the parties could agree to these transfers following remands from the J.P.M.L.  The transfer of direct-filed cases under §1404(a) is much simpler: the Court may use its discretion to select an individual district court within each state for transfer.

## CONCLUSION

By summer of 2014, this Court will have effectively fulfilled the duties of comprehensively readying cases for trial based on at least one of each manufacturer's POP and SUI family of products.  The next step must move forward into 'bellwether consolidations' through the use of available and willing Article III courts to facilitate resolution of remaining cases with this Court remaining in charge.   Specific circumstances here require consolidations including SUI, POP and dual product cases for each manufacturer.  When the Court's plan is implemented , Your Honor will then possess the tools necessary to accelerate the process or slow the flow of trial settings, depending on the reasonableness and compliance of the parties.

By:     /s/ Clayton A. Clark
        Clayton A. Clark
        Texas Bar No. 04275750
        Clark, Love & Hutson, G.P.
        440 Louisiana Street, Suite 1600
        Houston, TX 77002
        (713) 757-1400
        (713) 759-1217 (fax)
        CClark@TrialLawFirm.com
        *Plaintiffs' Coordinating Co-Lead Counsel*

        /s/ Henry G. Garrard, III
        Henry G. Garrard, III
        Georgia Bar No. 286300
        Blasingame, Burch, Garrard & Ashley, P.C.
        P.O. Box 832
        Athens, GA  30603
        Phone:  (706) 354-4000
        hgg@bbgbalaw.com
        *Plaintiffs' Coordinating Co-Lead Counsel*

        /s/ Fred Thompson, III
        Fred Thompson, III
        South Carolina Bar No. 5548
        Motley Rice LLC
        28 Bridgeside Blvd.
        Mt. Pleasant, SC 29464
        Phone:  (843) 216-9118

13

fthompson@motleyrice.com
*Plaintiffs' Coordinating Co-Lead Counsel*

/s/ Bryan F. Aylstock
Bryan F. Aylstock
Florida Bar No. 078263
Aylstock, Witkin, Kreis & Overholtz
17 E. Main Street, Suite 200
Pensacola, Florida 32502
Phone:  (877) 810-4808
BAylstock@awkolaw.com
*Plaintiffs' Coordinating Co-Lead Counsel*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF WEST VIRGINIA
## CHARLESTON DIVISION

| | | |
|---|---|---|
| In Re C. R. Bard, Inc., Pelvic Repair System Products Liability Litigation | ) ) ) | MDL No. 2187 |
| THIS DOCUMENT RELATES TO: All Cases | ) ) ) | |
| In Re American Medical Systems, Inc., Pelvic Repair System Products Liability Litigation | ) ) ) | MDL No. 2325 |
| THIS DOCUMENT RELATES TO: All Cases | ) ) ) | |
| In Re Boston Scientific Corp. Pelvic Repair System Products Liability Litigation | ) ) ) | MDL No. 2326 |
| THIS DOCUMENT RELATES TO: All Cases | ) ) ) | |
| In Re Ethicon, Inc., Pelvic Repair System Products Liability Litigation | ) ) ) | MDL No. 2327 |
| THIS DOCUMENT RELATES TO: All Cases | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on October 25, 2013, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notifications of such filing to the CM/ECF participants registered to receive service in this MDL.

By:    /s/ Clayton A. Clark
       Clayton A. Clark
       Texas Bar No. 04275750
       Clark, Love & Hutson, G.P.
       440 Louisiana Street, Suite 1600
       Houston, TX 77002
       (713) 757-1400
       (713) 759-1217 (fax)
       CClark@TrialLawFirm.com
       *Plaintiffs' Coordinating Co-Lead Counsel*