```
1              IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
2                        AT HUNTINGTON
                   TRANSCRIPT OF PROCEEDINGS
3


4


5
      ----------------------------------------
6

7    IN RE:  ETHICON, INC.,  PELVIC REPAIR       MDL NO.
     SYSTEM PRODUCTS LIABILITY LITIGATION        2:12-MD-2327
8

9    ----------------------------------------

10


11


12


13                 TELEPHONIC MOTIONS HEARING

14                    November 6, 2013

15


16          BEFORE THE HONORABLE CHERYL A. EIFERT
                UNITED STATES MAGISTRATE JUDGE
17


18


19


20


21


22


23   Court Reporter:            Lisa A. Cook
                                RPR-RMR-CRR-FCRR
24                              (304)347-3198
                                lisa_cook@wvsd.uscourts.gov
25
```

1    **APPEARANCES**

2                                 **(By Telephone)**

3    For the Plaintiffs:

4    **MR. BRYAN F. AYLSTOCK**
     **MS. D. RENEE BAGGETT**
5    Aylstock, Witkin, Kreis & Overholtz
     Suite 200
6    17 East Main Street
     Pensacola, FL  32502

7

8

9    For the Defendant:

10   **MR. WILLIAM M. GAGE**
     **MR. BENJAMIN M. WATSON**
11   Butler, Snow, O'Mara, Stevens & Cannada
     P.O. Box 6010
12   Ridgeland, MS  39158-6010

13

14   **MR. RICHARD T. BERNARDO**
     Skadden, Arps, Slate, Meagher & Flom
15   1440 New York Avenue, N.W.
     Washington, D.C.  20005

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2            THE CLERK:  Hi, everyone.  This is Laura, Judge

 3   Eifert's assistant.  And I would appreciate it if

 4   plaintiffs' counsel could identify themselves first followed

 5   by defense counsel.

 6            MS. BAGGETT:  Hi.  This is Renee Baggett for the

 7   plaintiffs.

 8               THE CLERK:  Okay.

 9            MR. AYLSTOCK:  Bryan Aylstock for the plaintiffs.

10            THE CLERK:  Okay.

11            MR. GAGE:  William Gage for the defendant.

12            THE CLERK:  Thank you.

13            MR. GAGE:  Oh, and Ben Watson is also here for the

14   defendant.

15               THE CLERK:  All right.

16            MR. BERNARDO:  And Richard Bernardo is also here

17   for the defendant.

18               THE CLERK:  Okay.  Thank you.  Is that everyone?

19               MR. GAGE:  I believe so.

20            THE CLERK:  Thank you very much.  Hold one moment

21   for the Judge, please.

22            MAGISTRATE JUDGE EIFERT:  Good afternoon.

23      So, Mr. Aylstock, are congratulations in order?

24            MR. AYLSTOCK:  They are.  Thank you, Judge.  I

25   appreciate it.  I didn't, I didn't, frankly didn't expect to
```

1   be on here, but mom and baby are resting so I couldn't

2   resist.

3          MAGISTRATE JUDGE EIFERT:  Well, that's good news.

4   What did you have?  A little boy or a little girl?

5          MR. AYLSTOCK:  Yeah, a little boy, 8 pounds

6   13 ounces, big guy.

7          MAGISTRATE JUDGE EIFERT:  Yeah, a big boy.  That's

8   wonderful.  We're very happy for you.

9          MR. AYLSTOCK:  Thank you, Your Honor.  I

10  appreciate it.

11         MAGISTRATE JUDGE EIFERT:  Now, tell me what the

12  problem is today.

13         MS. BAGGETT:  Well, Your Honor, I'll get started

14  as I didn't expect Mr. Aylstock to be on.  But I do expect

15  him to fully get involved in this as he's just as

16  knowledgeable, if not more so, than I am.

17      But we hate to have to bring this to your attention

18  but, as you know, as of our hearing on Friday, one of the

19  things that we were, we were bringing to your attention was

20  the position we were put in with the Klosterhalfen and

21  Klinge depositions.

22      The deposition of Klosterhalfen, Dr. Klosterhalfen is

23  November the 9th and 10th which is this Saturday and Sunday.

24  And Dr. Klinge's deposition is the 14th and 15th which is

25  next Thursday and Friday in Germany.  And, you know, because

1    of the production of the, the documents in response to our

2    request for their, their custodial files, we've been put in

3    a very difficult position, if not impossible position, to

4    get prepared for these depositions.

5        We've been requesting documents specific to the

6    custodial files of Drs. Klinge and Klosterhalfen since the

7    beginning, for the most part, and we've been specifically

8    narrowing that down along the way.  And, more specifically,

9    we've been asking the defendants to tell us or provide to us

10   documents that are specific to the consulting arrangement or

11   agreement and relationship between Klinge and Klosterhalfen

12   and Ethicon/J&J.

13       To date, they have essentially produced over 107,000

14   documents which is over seven hundred -- almost 800,000

15   pages worth of documents that they claim are responsive

16   and -- but most of these documents that have been produced

17   are where Dr. Klinge and Klosterhalfen have been merely

18   referenced such as studies where they're, they're -- their

19   work has been cited in other studies and communications

20   between internal employees at Ethicon that may reference

21   their name.

22       So, a good majority of these documents really do not

23   even involve the custodial relationship or, excuse me, the

24   consulting relationship between Klinge and Klosterhalfen and

25   Ethicon/J&J.

1    And since we've had our hearing on Friday, you did

2    instruct us and we -- Mr. Aylstock, and he can speak to this

3    himself -- but we did contact Mr. Gage in an effort to

4    resolve the issue.  But we were basically told that we could

5    do these searches and come up with that information as

6    easily as the defendants.

7    And there's two reasons why that's flawed.  One of the

8    ways is, as we said, that these doctors are very, very

9    popular in this litigation.  They've been involved as

10   experts for a number of years.  Klosterhalfen himself is

11   considered the god of pelvic mesh, and he's referenced in

12   almost everything that's written.

13   And, so, the search terms will pull a lot of documents

14   that are making it difficult for us to get to the ones that

15   really matter.  And the specific search terms, if we do

16   not -- if we use just the e-mail addresses to, to, as was

17   suggested by the defendants, it fails to pull up other

18   documents like consulting agreements and, and PowerPoint

19   presentations potentially, and other things that the work

20   that may have been performed or, or produced by, by these,

21   between these, these, this, as a result of this

22   relationship.

23   And just as an example, since our hearing, over 60,000

24   pages have been produced to us since November the 1st that

25   actually most of these should have been produced to our

1    responses over a year ago because they're general references

2    to where they're just named in some of the documents.

3         And we still have not gotten what we needed and what

4    we've been asking for which is for them to identify exactly

5    which documents can be related only to the consulting

6    agreement between the two.

7              MAGISTRATE JUDGE EIFERT:  Mr. Gage.

8              MR. GAGE:  Judge, this is William Gage speaking.

9    I, I have Rich Bernardo on the phone us with, Judge.  He's a

10   lawyer with the Skadden Arps firm in New York, and he is

11   part of the team that represents Ethicon along with me.  And

12   I've asked him to be on the call today because he's kind of

13   an e-discovery person expert.  And to the -- there probably

14   will be questions and issues that I think he can help us

15   navigate through better than I can.

16        Your Honor, I got a call on Friday -- or, actually, I

17   first got an e-mail and then I followed it up with a call

18   from David Thomas.  He was on a hearing with Your Honor.

19   And the issue was that Bryan was having some problems

20   navigating through the, the recent productions that we had

21   just put through the pipeline on Klinge/Klosterhalfen.

22        And Your Honor may remember I sent you a letter and

23   told you we were producing some documents on

24   Klinge/Klosterhalfen.

25        So, I very quickly got on the phone with Bryan, and

1   then realized that kind of some of the scope of the

2   questions were, were ones that I would need to get Rich

3   involved.

4        So, I called Rich, and Rich and I got Bryan on the

5   line.  And, and then we got Crivella.  And, Judge, Crivella

6   is the documents vendor for the plaintiffs.  We got a guy

7   named Vince from Crivella on the line with us.

8        And the issue that, that I appreciated and the issue

9   that I understood was that we had -- we, Ethicon, had

10  produced a large amount of documents, but the K -- we refer

11  to them now, Judge, as -- Drs. Klinge and Klosterhalfen as

12  the K & K documents.  The K & K documents were a portion of

13  the larger production.

14       And Bryan needed help rightfully in, in identifying

15  where in this big mass of documents were the K & K documents

16  because what they wanted to do -- what the plaintiffs wanted

17  to do was elevate, put those in the front of the line so

18  that they could be processed over the weekend so that they

19  could go out to the people that are going to be taking the

20  depositions.

21       And, so, Bryan and I agreed that Rich would call

22  Crivella and kind of discuss where in the pipeline that

23  material was and how to, how to elevate it.

24       So, Bryan and I didn't participate in those calls.  It

25  was one call later that afternoon.  It may have been more,

1    but I know there was at least one.

2         And somewhere -- I can't remember if it was Monday, but

3    there was a request by Renee and Bryan for Bates numbers.

4    And it may have actually been even on Friday a request for

5    Bates numbers.  And what we --

6                   MR. AYLSTOCK:  It was.  It was Friday afternoon.

7                   MR. GAGE:  It was Friday afternoon.  What we did,

8    Judge, was we sent Bryan an e-mail and said, "Here's the

9    search term that, that we agreed to use in the hernia mesh

10   stip; that if you use this search term, it will kick out the

11   documents that reference, you know, Drs. Klinge and

12   Klosterhalfen."  That's, that's how you kind of get into the

13   weeds and find the documents that reference the two, the two

14   people.

15        So, the -- I may be skipping over a few things here,

16   but bottom line is the issue kind of crystallized yesterday.

17   The plaintiffs said, "We need Bates numbers for the seven

18   explant reports," which Your Honor may remember we've

19   discussed on a number of calls, "plus we need Bates numbers

20   for, for anything else related to K & K."

21        And we discussed it internally and thought to

22   ourselves, well, you've got the search term.  The search

23   term gives you the Bates numbers.  And the search term is,

24   is a whole lot easier to navigate than given a list of Bates

25   numbers because if you give a list of Bates numbers, you

1    have to go into the system and open up one document at a

2    time typing in that Bates number, whereas if you give them a

3    search term, you get the computer to do it and you can do it

4    in, you know, whatever it is, a short amount of time, much

5    shorter than going in and individually opening up documents

6    from Bates numbers.  So, we couldn't really understand what

7    was going on.

8        Furthermore, Judge, let's think about the documents

9    that we're talking about.  The vast majority of the

10   documents regarding Drs. Klinge and Klosterhalfen have been

11   in plaintiffs' hands for more than 30 days.  And many of

12   them have been in plaintiffs' hands for months.

13       The only ones that are new are the ones that have come

14   through the pipeline very recently.  And we, Ethicon, are --

15   I mean, the outside counsel, we're getting the documents

16   at -- these newly produced ones, we're getting them at the

17   same time that the plaintiffs are getting them, meaning it's

18   -- in other words, if they wanted us to review the documents

19   to, for example, go find an even narrower pool like the,

20   just the ones that relate to consultancy, we wouldn't be

21   able to identify them because it would take -- I mean, we'd

22   have to go through all the documents one by one to try to

23   make a value judgment as to whether it relates to the

24   consultancy or not.  So, -- and that would take a while.  I

25   mean, it would take us a while, just as it would take the

1    plaintiffs a while.

2        So, you know, so, what we did, we talked about it late

3    last night, or e-mailed about it.  And then this morning we

4    talked about it and we provided the list of Bates numbers

5    that they've requested, but it's not the ones limited to

6    consultancy.  It's just the list of the documents that hit

7    on the terms K & K, Klinge and Klosterhalfen.

8        But, Judge, I don't really know how -- what else I can

9    do or what else we can do to close the gap.  The search term

10   is the most, is the quickest way to do that.

11       We gave that to them on Friday.  We gave them the Bates

12   numbers today.  But, frankly, I think the Bates numbers are

13   a much less efficient way to get the data.

14       And then when it comes to honing in on the ones that

15   relate specifically to the consultancy, I think we're on

16   equal footing with the plaintiffs.  I don't think we have

17   any superior knowledge or ability to identify those other

18   than individually reviewing all of them one by one which,

19   you know, I, it's just going to be difficult.

20           MR. AYLSTOCK:  Well, Judge, this is Bryan, if I

21   could just pipe up on a couple things.

22       One is, well, they've obviously reviewed them already

23   because they have confidentiality stamps.  They've been

24   reviewed for privilege.  And, so, I'm not sure what all

25   that's about.

1    But what they've given us is a giant haystack with over

2    a million pages of documents that have either the word

3    "Klinge" or "Klosterhalfen" in them.

4    And as Ms. Baggett said, Klinge and Klosterhalfen are,

5    are, by Ethicon's own admission, the foremost mesh experts

6    in the world.  They have been in Ethicon's consultancy since

7    the early 2000s or the late 1990s.

8    So, it's not surprising that there's a lot of documents

9    that simply have an article referenced about Dr. Klinge and

10   Dr. Klosterhalfen because they've published literally

11   hundreds and hundreds and hundreds of articles on mesh and

12   what happens with mesh and so forth.

13   What I thought that you had told us to do, both sides,

14   is, look, find the documents related to their consultancy.

15   Find the e-mails.  Find the agreements.  Find the documents

16   where Dr. Klinge or Dr. Klosterhalfen told you something and

17   you interacted with Ethicon.

18   And that's exactly what we did.  And we produced a few

19   boxes of information where they can go through and they can

20   simply look through the documents.  Here they are.  Here's

21   the e-mails, you know.  And they can question Dr. Klinge and

22   Klosterhalfen on everything, you know, obviously that we've

23   provided.

24   What -- the situation that we're in is now we have to

25   sort through literally in two days billions -- over a

1   million pages of documents and about 800,000 pages of

2   documents that have been produced within the last month,

3   60,000 of which have been produced within the last couple of

4   days, few days and aren't even uploaded.

5       So, this is what I had feared, as you may recall on a

6   couple of conferences ago, when you inquired about Mr. Gage,

7   "Well, Mr. Gage, can you get all of these documents to Mr.

8   Aylstock by the 31st?"  And he said, "Yes."  And then it

9   ended up being "no."

10      And, in fact, we got an e-mail from Mr. Gage today

11  saying, "There's more coming."  And we're now, because

12  Germany is six or eight hours ahead or whatever it is, less

13  than 36 hours away from a deposition where it's literally

14  impossible for us to properly prepare for that deposition.

15      And I harken back to the call on Friday where you

16  rightly said, "Mr. Aylstock, let's make these depositions

17  fruitful.  Let's streamline things.  Let's have Mr. Garrard

18  fill in some gaps."  And that's exactly what he tried to do

19  today.  I think Your Honor got a copy of that letter a

20  little while ago.

21      So, we're in an impossible situation where we're unable

22  to prepare for these depositions or prepare these witnesses.

23  And what we don't want to have happen, what I told Mr. Gage

24  on Friday afternoon following our call -- he did call and I

25  said, "Look, I don't want to be in a position where you put

1    a haystack out there.  You throw some needles in there.  You

2    tell us to go fish.  And we're -- one, it's not efficient

3    for the deposition.  Two, it's simply not fair.  These

4    documents have been requested for literally over a year, and

5    it's not fair for you to dump documents on us right

6    before -- hold them back or put them in a haystack so we

7    can't prepare and do our jobs as attorneys."

8        And it's part of a pattern where, you know, -- the

9    initial Parisi, for example, we just got documents after his

10   deposition, after the one that you ordered.  Now we get more

11   documents stating that's 2002.

12       So, it's a problem, and I have an idea for streamlining

13   the depositions if Your Honor would entertain it.  And that

14   would be if the defendant is -- if Mr. Thomas or some other

15   defense lawyer is going to use a document, please just tell

16   us what document you're going to use so the witness can have

17   read it and we don't waste time with the witness having to

18   read through every single page.

19       Give us some notice about it because that's the

20   position we're in because we -- simply, there is not enough

21   time between now and Dr. Klinge or Dr. Klosterhalfen to sort

22   through search terms that literally are, "Well, search the

23   data base for Klinge or Klosterhalfen."

24       That's not what we were after.  That's not what these

25   many hearings have been about.  They've been about the

1   consultancy between Ethicon and these witnesses.  And now

2   they've given us a haystack and told us to go fish.  And I

3   just don't think that's fair.

4            MR. BERNARDO:  Your Honor, if I may, this is Rich

5   Bernardo.  Since I feel particularly close to the production

6   and the significant efforts that my team has gone through to

7   turn things around in an extraordinarily quick time, I just

8   want to add a little bit of context and clarity.

9        First of all, the numbers that Ms. Baggett and Mr.

10  Aylstock are citing to you are grossly, grossly overstated.

11  I'm looking at a spreadsheet that we sent to them today that

12  in the entirety of this litigation going back all the way to

13  the beginning of time, we haven't even produced 100,000

14  documents or a million pages pertaining to Klinge and

15  Klosterhalfen.

16       In fact, over the entire course of the litigation,

17  they've only produced 17,000.  And that's not an

18  insignificant amount of material, but it's far, far less

19  than the volume that they're saying was even produced in the

20  last month.

21       In the last installments we've been producing volumes

22  of 100 documents here, 100 documents there.  And this has

23  been done because it's just taking a tremendously long

24  amount of time to get through documents that are in a

25  foreign language and to process them.  And I think our

1   vendor has actually performed extremely well in an effort to

2   do it.

3       So, the numbers are not overwhelming.  And most of

4   these documents have been in plaintiffs' hands for months

5   and, in some instances, years.  So, I just think that's very

6   important as far as context.

7       And, secondly, to make objective calls as to what

8   pertains to a consultancy is not something that we as

9   defendants should be doing because we're going to then get

10  accused of being limiting in what we're providing to them.

11      In fact, frequently we always find in these discussions

12  that plaintiffs don't want us to be making subjective calls.

13  And we thought it was reasonable to say, "There's not that

14  much of this stuff.  Here is the material that references

15  Drs. Klinge and Klosterhalfen.  You're equally well suited

16  to go through them like we are and identify the ones you

17  think that are relevant."

18      Perhaps the fact that there are lots of e-mails back

19  and forth about these doctors is relevant to the plaintiffs

20  and to their consultancy.  And you could be sure if we

21  didn't identify those documents, we'd all be here under a

22  different reason that there are other documents.

23      So, I just want to emphasize that the volume we're

24  talking about in terms of e-discovery is not significant.

25  And the material that has been produced at the end of the

1    process took a lot of effort to get out as quickly as they

2    did.

3         Your Honor may recall that we sent a letter last week

4    thinking we might not even be able to finish them due to

5    best efforts, but we were able to do that.  So, I think

6    there's a little bit of hyperbole and exaggeration over the

7    scope of the problem.  And, frankly, I'm not sure that the

8    problem is even a problem because I think what was done is

9    what is typically and appropriately done in e-discovery on

10   issues like this.

11        MS. BAGGETT:  Your Honor, if I could respond to

12   that just very briefly, the numbers that I quoted you

13   earlier are directly from our vendor who had gotten on the

14   phone with the defense's group on Friday.

15        And of those that we, we quoted to you that were

16   produced since November 1st -- we've had teams of people

17   going through them.  And of the three or four hundred

18   documents that they have already gone through, every single

19   one of them, minus maybe a handful, have been references to

20   studies where they have been copied on.  It has nothing to

21   do with a consulting agreement whatsoever.

22        The only, the only case specific, or specific

23   productions that we have received in that regard were seven

24   documents comprising 32 pages back in August, I believe it

25   was, that were the actual consulting agreements in the

1   contract.

2      So, they've known at least since August that we need

3   more particular, and they've been looking for and probably

4   have come across more documents that are responsive to what

5   we've requested.  Yet, they continue to pile on more and

6   more, even since November 1st, that have nothing to do with

7   this consulting relationship.

8            MR. AYLSTOCK:  And Mr. Gage had represented to

9   Your Honor that he had sent over a team of people to Germany

10  to go find this information.  They were able to find seven

11  of the explant reports.  But what else did they find?

12     Obviously, they were looking for things related to this

13  and, and, you know, we're entitled to know what this team of

14  people went over there and what they found, not, not a, a

15  statement, "Go fish," which is essentially what we've got.

16           MAGISTRATE JUDGE EIFERT:  Well, let, let me just

17  step in here a second.

18     First of all, let me understand the number of documents

19  because we are talking about two very different figures.

20  17,000 versus 107,000 is a huge difference.  So, where is

21  the disconnect with that?

22           MR. BERNARDO:  The 17,000, Your Honor, comes from

23  a spreadsheet that we put together for them, that our vendor

24  put together for them today running a search across every

25  document that has been produced to date for documents that

1    reference either Dr. Klinge or Klosterhalfen.

2         We, we had it put together and provided a list of Bates

3    numbers.  And it -- I'm looking at it as we speak.  It has

4    rows like an Excel spreadsheet, and the highest one is

5    17,000 -- I'm sorry.  I should have said 18,000.  It's

6    17,895.  I didn't see the other portion.  But that's every

7    document produced to date.  And you can tell from the

8    documents' Bates numbers when they were produced.

9         So, that's how we're able to determine when in the

10   process that these were produced.  And many of them, the

11   Bates numbers reflect that they were produced long, long

12   ago.

13        So, I'm not sure what Crivella did but, Your Honor,

14   that's how we came upon the numbers that I was citing to

15   you.

16             MAGISTRATE JUDGE EIFERT:  And you have -- you've

17   provided that spreadsheet to the plaintiffs?

18             MR. BERNARDO:  Yes, we provided --

19             MS. BAGGETT:  Today, Your Honor.

20             MR. AYLSTOCK:  Today.

21             MAGISTRATE JUDGE EIFERT:  Right.  But you did --

22   you do have it at this point.  Is that right?

23             MR. AYLSTOCK:  Well, it's 17,000 individual

24   documents, hundreds of thousands of pages, no doubt.  So, I

25   don't know where exactly the disconnect is.  I'm not a

1    technical guy.  Renee is not a technical gal.  But I know

2    what we were told.

3        But even if we take the 17,000 documents, hundreds of

4    thousands of pages today, you know, what do we do with that?

5    It's an impossible task to even do that.  But that's not

6    what we've been told by our vendor about what the numbers

7    are.

8        And as to this proposition a lot of them were produced,

9    well, yeah.  They were studies.  What we're looking for is

10   not references to studies.  We know Dr. Klinge and

11   Dr. Klosterhalfen consulted for them which is why we've been

12   on this hunt for the consultancy documents for months and

13   months and taken up way too much of the Court's valuable

14   time on it.

15            MAGISTRATE JUDGE EIFERT:  Well, I understand that

16   you have the consulting agreements.  Is that right?

17            MR. AYLSTOCK:  We have some.  I believe, I believe

18   it's complete.  But based upon history, you know, I'd like a

19   certification that that's all it is.

20            MAGISTRATE JUDGE EIFERT:  So -- well, you have

21   some -- you have what they've represented to be the

22   consulting agreements.  What other documents do you mean

23   when you say consultancy documents?  I think that's another

24   issue.

25        I hear Mr. Bernardo saying, "We don't really want to be

1    put in a position of having to sort through and define that

2    term for them because the first time we do that, they're

3    going to say that we underproduced.  So, we're giving them

4    everything with Klinge or Klosterhalfen's name on it and

5    they can then choose what they think is important out of

6    that pile of documents."

7              MR. AYLSTOCK:  Well, what we specifically asked

8    for a long time ago, Mr. Anderson, before Dr. Klinge even

9    testified in the Linda Gross trial in January of 2013 had

10   asked for, "Give us all the e-mails back and forth with you

11   and your folks and Dr. Klinge or Klosterhalfen.  Give us all

12   the notes of the meetings with your folks and Drs. Klinge or

13   Klosterhalfen.  Give us all the minutes of those meetings."

14        Those are the types of things that are important

15   because they go directly to the notice that we say these

16   witnesses gave to them.  And what we don't want to have

17   happen is at the deposition things pulled out that we

18   haven't had a fair opportunity to review that we've been

19   asking for for over a year.

20        So, those are the types of things.  I'm not

21   interested -- if they want to cite to Klinge or

22   Klosterhalfen, which they do all the time, I understand

23   that.  We, you know, we, we get it.  But what we want are

24   the interactions that they had with the Ethicon people, and

25   then the Ethicon people's notes and meeting minutes and

1  internal e-mails about what they did with that

2  information --

3        MAGISTRATE JUDGE EIFERT:  Well, I don't know.

4        MR. AYLSTOCK:  -- or didn't do with that

5  information.

6        MAGISTRATE JUDGE EIFERT:  Yeah, that's a, that's a

7  little bit -- I haven't really understood that that's what

8  you're looking for as far as the Klinge and Klosterhalfen

9  documents.  I mean, I don't know about what people may have

10  done with their information.  That doesn't seem to me to be

11  directly on point as to e-mails they may have been

12  participating in and that sort of thing.  So, --

13     Is somebody at the airport?

14        MR. AYLSTOCK:  Sorry.  I'm outside the hospital

15  and it's the Life Flight coming back.  I'm sorry.

16        MAGISTRATE JUDGE EIFERT:  Well, you know,

17  obviously, you have a lot of documents to go through and

18  you're concerned about that.

19     What I hear you saying is that in punishment of the

20  type of production Ethicon did, you want me to order them to

21  point to you every document they intend to use at Dr.

22  Klosterhalfen and Klinge's deposition.  Is that right?

23        MR. AYLSTOCK:  Well, I wouldn't use the term

24  "punishment."  I would say, like you did, Your Honor, with

25  the Dr. Klosterhalfen issue last Friday, let's streamline

```
 1    this.  Let's get to the heart of the matter.  Even though

 2    you found that the Rule 26(a)(c) report, or whatever it is,

 3    was sufficient, let's make this efficient.  Let's make this

 4    efficient.  Let's do it in a way where both sides can know

 5    what's coming, and, and order that they give us a heads up

 6    about the documents they intend to use so we can focus on

 7    those instead of 17,000 documents that there's simply no way

 8    we can get through.

 9              MAGISTRATE JUDGE EIFERT:  Well, I am all for

10    streamlining these depositions.

11         Let me ask the Ethicon attorneys, do they have a

12    problem with sharing the documents they intend to use during

13    these depositions?

14              MR. GAGE:  Judge, it would seem to me that if it's

15    a two-way street, it's not that big of a deal.  I mean, I --

16    you know, Bryan had not put that offer on the table before

17    this call.  And, so, you know, -- but, you know, as I sit

18    here, if it goes both ways, you know, --

19              MAGISTRATE JUDGE EIFERT:  That seems, that seems

20    very reasonable.

21              MR. GAGE:  I mean, I suppose we could do it.

22              MAGISTRATE JUDGE EIFERT:  What about that, Mr.

23    Aylstock?  You both -- you give them the documents you

24    intend to use during the depositions and they'll give you

25    the documents that they intend to use.
```

1          Now, that doesn't mean that if you get there and

2     there's some other document that you want to use that you

3     can't use it.  But the idea is to exchange sitting here

4     today or tomorrow what you know you're going to be asking

5     the witness about, exchanging those documents.

6          MR. AYLSTOCK:  For these witnesses, Your Honor, I

7     think we would certainly agree to that because -- well, one,

8     we've given them three boxes or so of stuff.  It's pretty

9     easy to get through.

10         So, I think ours are going to most likely come from

11    that because we haven't had an opportunity to get through

12    most of the other stuff.  But on these witnesses, I think

13    that's a good solution.

14         MAGISTRATE JUDGE EIFERT:  All right.

15         MR. GAGE:  And, Judge, -- this is William.  Well,

16    I guess it doesn't really matter.  I was just going to say

17    that, that I know that we're -- I mean, we on our end are

18    reviewing the documents as well.  And, and I don't know when

19    that process is going to be complete.

20         And all I was going to say is I think, I think we

21    probably need to do this in a way that lets both sides

22    continue their respective review of the documents up until,

23    you know, pretty close in time to the depo because I know

24    Bryan is going to keep reviewing.  I know we're going to

25    keep reviewing.

1      And, in other words, if we exchanged tomorrow, it may

2   be a little premature.  We may want to do it the night

3   before the depo or something like that or, or, or a day

4   before the depo or something like that.

5           MAGISTRATE JUDGE EIFERT:  Well, what I would

6   suggest you do is if you already know there are certain

7   documents that you're going to use, exchange those.  As each

8   day passes, if there's more documents you know you're going

9   to use, exchange those up until the point of, you know, an

10  hour before the deposition if need be.

11          MR. GAGE:  Okay.

12          MAGISTRATE JUDGE EIFERT:  And, you know, I'm going

13  to trust that both, both sides will be open and forthcoming

14  with the documents and not try to spring something on the

15  witness or on the other side at the deposition because that

16  would be so fruitless, it wouldn't be worth it.

17          MR. AYLSTOCK:  I understand, Your Honor.  We're at

18  a little bit of a disadvantage because we go second.  So, a

19  lot of what we ask will probably depend on what's asked

20  initially.  But we'll certainly follow Your Honor's

21  directive.

22          MR. GAGE:  And, Judge, --

23          MAGISTRATE JUDGE EIFERT:  All right.

24          MR. GAGE:  Judge, David Thomas who's going to be

25  taking these depositions is, I think, on a plane headed over

1    there right now.

2              MAGISTRATE JUDGE EIFERT:  Right.

3              MR. GAGE:  I think he, I think he just got on the

4    plane or he's getting close to getting on the plane.  So,

5    he's going to be out-of-pocket for -- I don't know how long

6    that flight is.  I think it's going from Detroit.  My guess

7    is it's probably, what, about an eight-hour flight to

8    Germany?

9              MAGISTRATE JUDGE EIFERT:  I would say.

10             MR. GAGE:  Yeah.  And, so, --

11             MAGISTRATE JUDGE EIFERT:  Seven maybe.

12             MR. GAGE:  Yeah.  And I can send him an e-mail

13   which I assume he can get.  But, you know, it may be

14   tomorrow before he can make a -- he's the only guy making a

15   decision as to what's going to be used during the depo.

16             MAGISTRATE JUDGE EIFERT:  Right.

17             MR. GAGE:  You know, we've got people reviewing --

18             MAGISTRATE JUDGE EIFERT:  That -- it's 4:30 now.

19   I don't think it's going to matter much if it's tomorrow

20   before he can get the documents.  I can't imagine --

21             MR. GAGE:  Okay.

22             MAGISTRATE JUDGE EIFERT:  I can't imagine that any

23   of you are going to use hundreds of pages of documents

24   because there's no way you'll ever get the deposition done

25   if you do that.

1          MR. GAGE:  And, Judge, I guess to clarify one

2     other thing just so that we don't have any

3     misunderstandings, you know, the way that I think it's going

4     to work is we've got a fact deposition for one, for one day

5     of seven hours followed by an expert deposition.  And I'm

6     assuming that -- I'm just trying to get in my mind, does the

7     Court's ruling apply to just the fact witness depo or to

8     both or is there any real reason for us to distinguish

9     between the two?

10          MAGISTRATE JUDGE EIFERT:  I see no reason to

11     distinguish between the two.  I mean, either way what you're

12     talking about doing is sharing work product.  So, if you're

13     going to share it for the fact witness portion, why not

14     share it for the expert witness portion?

15          MR. GAGE:  I suppose I would say this, Your Honor.

16     If, for example, on the expert deposition we were going to,

17     for example, ask the witness about a document that appeared

18     on his reliance list -- in other words, it's a document that

19     maybe is even cited in the plaintiffs' expert report.  I

20     don't believe Your Honor -- I don't believe it's the intent

21     of Your Honor's ruling to require us to disclose those.

22          I think the intent is to require us to disclose

23     documents that emanate from the Ethicon production that the

24     plaintiffs themselves -- I --

25          MAGISTRATE JUDGE EIFERT:  Yes.

1      MR. GAGE:  Am I making sense, Judge?

2      MAGISTRATE JUDGE EIFERT:  Absolutely.  What I,

3  what I would expect you to do are from the documents that

4  Ethicon produced to identify those which you intend to use

5  because the problem that I understand the plaintiffs are

6  having is that they're having trouble going through your

7  production.

8      And, on the flip side, the documents that the

9  plaintiffs produce to Ethicon, out of those documents they

10  should pull out the ones they think they'll be asking Drs.

11  Klinge and Klosterhalfen about.  But not -- you know, if, if

12  you know that the plaintiff has a document, you don't have

13  to tell the plaintiff you're going to use a document that's

14  the plaintiffs' document.  I mean, they should already be

15  familiar with their own documents.  This is just a way to

16  streamline the productions.

17      MS. BAGGETT:  And, Your Honor, in addition to

18  that -- this is Renee Baggett, Your Honor.  One thing, one,

19  one thing that concerns me is, like we've experienced in the

20  past, is the last-minute document dump.

21      I think it might be prudent to also limit the defense

22  from being able to use a document if it's not identified in

23  enough time for the, the, our fellows that are taking the

24  deposition to have a chance to review it and, and, and plan

25  on preparing the witness or doing what they need to do to

1    prepare to defend that document.

2            MAGISTRATE JUDGE EIFERT:  I'm not, I'm not -- no,

3    I'm not going to go that far.  I think that the documents on

4    both sides have been produced pretty late in the game for

5    these witnesses.  You've known about these witnesses for

6    months.  We've talked about them for months.  I, I'm not

7    going to go that far.  I, I'm going to rely on both sides

8    to, in good faith, turn over everything they anticipate

9    they're going to use.

10       But if something should come up at the deposition that

11   requires them to use another document or a different

12   document, I'm not going to preclude the use of that

13   document.  I mean, those things happen.  What I'm trying to

14   do is --

15           MR. AYLSTOCK:  But I would, I would just expect

16   that they would at least be on that list of 18,000 documents

17   that have been specifically identified so that we're not --

18   we can at least go through them.  I think that's what Ms.

19   Baggett was getting at.

20           MAGISTRATE JUDGE EIFERT:  Well, if it's a document

21   you've given to them, I'm not going to make them tell you

22   they're going to use that document, just like I don't, I'm

23   not going to tell you that you have to tell them which of

24   their documents you're going to use.  I'm saying --

25           MR. AYLSTOCK:  Understood, Your Honor.

1          MAGISTRATE JUDGE EIFERT:  Yeah.  So, --

2          MS. BAGGETT:  And that's not really what I was

3    intending, Your Honor.  I apologize if I was confusing.  I

4    meant of the documents that the defendants have in their

5    possession that plaintiffs would not be expected to have if

6    we have not been provided, you know -- at least that

7    document has not been identified, that we have that, you

8    know, the benefit of them not being able to use the document

9    that neither our, our counsel or the witness has ever seen

10   before.

11         MAGISTRATE JUDGE EIFERT:  Well, I'm not prepared

12   to make that ruling.  I think if that should occur at the

13   deposition and you believe that it was prejudicial to you,

14   then you need to make a motion at that point to strike the

15   document, strike the testimony pertaining to the document.

16   And then that issue can be addressed at that time.

17       But a deposition is not always that well planned.  And

18   things do come up in depositions that might require you to

19   use documents you weren't intending to use or ask questions

20   you didn't intend to ask.  And I'm not going to make those

21   hard and fast limitations at this point.

22         MS. BAGGETT:  Thank you, Your Honor.

23         MAGISTRATE JUDGE EIFERT:  But I've told you what I

24   expect.  I know you're all very honorable lawyers.  I'm sure

25   you will exercise the best of intentions in exchanging these

1  documents.  And I think that's a very good solution if

2  you're both willing to do it.

3          MR. AYLSTOCK:  Yes, Your Honor.  Thank you very

4  much.

5          MAGISTRATE JUDGE EIFERT:  Thank you.

6          MR. GAGE:  Thank you, Judge.

7          MAGISTRATE JUDGE EIFERT:  All right.  Good luck on

8  your depositions then.

9          MR. GAGE:  Thank you.  Judge, I think we're on for

10 Friday at, at the regular time.

11      But, Bryan, I mean, I don't know if, if you've got

12 anything that we need to -- I mean, if there are -- do we,

13 do we have an agenda for Friday that we need to bother the

14 Judge with or are we clear for Friday?

15         MR. AYLSTOCK:  Well, I think the main thing -- and

16 I have been out-of-pocket, so I'm shooting from the hip

17 here.  But the main thing related to the late production of

18 the Dr. Cecchini and Parisi documents and, you know, our

19 request for more time given that late production.

20      But maybe we can split the baby on that, William.  And,

21 so, I'm happy to talk further about that.  I'm not prepared

22 to say whether there's anything else or not.  So, if you're

23 suggesting there's something to talk about there, maybe we

24 can put off Friday.  I don't know.

25         MR. GAGE:  Yeah.  Your Honor, I mean, if Your

1    Honor is okay with this, I mean, I don't want to, I don't

2    want to impose upon the Court, but my sense of it is we do

3    have one deposition issue that Bryan and I need to talk

4    about.  But it, it's -- he and I really kind of need to meet

5    and confer before I think we bring it to Your Honor's

6    attention because I have a position, but I'm certainly

7    willing to change my position once Bryan and I can talk

8    through the facts.

9         My thought would be if Your Honor is okay with us maybe

10   approaching you on an as-needed basis as opposed to having

11   the standing call on Friday, that may be a better solution

12   if Your Honor and Bryan are willing to do that.

13            MAGISTRATE JUDGE EIFERT:  It makes no difference

14   to me.  I'm really just -- I just want to be available to

15   help you move your discovery along.  So, I don't have a

16   preference one way or the other.  The only, the only caveat

17   is that I may not always be available.

18            MR. AYLSTOCK:  If Your Honor would indulge me to

19   confer with Renee and Tom on that because I am certainly out

20   of the loop on a lot of things at present before, --

21            MAGISTRATE JUDGE EIFERT:  Sure.

22            MR. AYLSTOCK:  -- before putting off that hearing.

23   We'll notify the Court promptly if, if we don't have

24   anything to say or fight about.

25            MAGISTRATE JUDGE EIFERT:  That's fine.

1       MR. GAGE:  That's fine.

2       MAGISTRATE JUDGE EIFERT:  Okay, all right.

3       MR. GAGE:  Thank you, Judge.

4       MAGISTRATE JUDGE EIFERT:  I appreciate you guys

5   trying to work this out.  I think this is a good, workable

6   solution, and hopefully it will help make the depositions go

7   a little faster and a little more smoothly.  So, good luck

8   with everything.

9       MR. GAGE:  Right.  Thank you, Judge Honor.

10      MR. AYLSTOCK:  Thank you, Your Honor.

11      MS. BAGGETT:  Thank you.

12      MAGISTRATE JUDGE EIFERT:  Bye.

13   (Proceedings concluded)

14                    * * * * *

15

16

17       I, Lisa A. Cook, Official Reporter of the United

18   States District Court for the Southern District of West

19   Virginia, do hereby certify that the foregoing is a true and

20   correct transcript, to the best of my ability, from the

21   record of proceedings in the above-entitled matter.

22

23

24       s\Lisa A. Cook                    November 7, 2013

25          Reporter                              Date