# EXHIBIT 3

Confidential - Subject to Protective Order

Page 277

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

- - -

IN RE:  ETHICON, INC.        :  MDL NO. 2327
PELVIC REPAIR SYSTEM,        :
PRODUCTS LIABILITY           :
LITIGATION                   :

- - -

THIS DOCUMENT RELATES TO ALL CASES

- - -

June 6, 2013

VOLUME II

- - -

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

             Continued videotaped 30(b)(6)
deposition of PAUL PARISI taken pursuant to notice,
was held at the law offices of Riker Danzig Scherer
Hyland & Perretti LLP, Headquarters Plaza, One
Speedwell Avenue, Morristown, New Jersey, beginning
at 10:01 a.m., on the above date, before Ann Marie
Mitchell, a Federally Approved Certified Realtime
Reporter, Registered Diplomate Reporter and Notary
Public for the State of New Jersey.

- - -

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph|917.591.5672 fax
deps@golkow.com

Confidential - Subject to Protective Order

## Page 278

```
 1   APPEARANCES:
 2
 3       AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC
         BY:  BRYAN F. AYLSTOCK, ESQUIRE
 4       BY:  MARY LIU, ESQUIRE
         17 East Main Street
 5       Suite 200
         Pensacola, Florida 32502
 6       (850) 202-1010
         baylstock@awkolaw.com
 7       mliu@awkolaw.com
         Representing the Plaintiffs
 8
 9       MAZIE SLATER KATZ & FREEMAN, LLC
         BY:  ADAM M. SLATER, ESQUIRE
10       103 Eisenhower Parkway
         Second Floor
11       Roseland, New Jersey   07068
         (973) 228-9898
12       aslater@mskf.net
         Representing the Plaintiffs
13
14       BUTLER, SNOW, O'MARA, STEVENS & CANNADA,
         PLLC
15       BY:  MICHAEL L. BROWN, ESQUIRE
         1020 Highland Colony Parkway
16       Suite 1400
         Ridgeland, Mississippi 39157
17       (601) 948-5711
         michael.brown@butlersnow.com
18       Representing Johnson & Johnson and Ethicon
         and the Witness
19
20       RIKER DANZIG SCHERER HYLAND & PERRETTI LLP
         BY:  BRETT M. REINA, ESQUIRE
21       Headquarters Plaza
         One Speedwell Avenue
22       Morristown, New Jersey 07962
         (973) 538-0800
23       breina@riker.com
         Representing Johnson & Johnson and Ethicon
24       and the Witness
25
```

## Page 279

```
 1   APPEARANCES VIA TELEPHONE:
 2
 3       AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC
         BY:  D. RENEE BAGGETT, ESQUIRE
 4       17 East Main Street
         Suite 200
 5       Pensacola, Florida 32502
         (850) 202-1010
 6       rbaggett@awkolaw.com
         Representing the Plaintiffs
 7
 8       HEIDELL, PITTONI, MURPHY & BACH, LLP
         BY:  NANCY M. MARINI, ESQUIRE
 9       99 Park Avenue
         New York, New York 10016
10       (212) 286-8585
         nmarini@hpmb.com
11       Representing Representing Dr. Hines and the
         Urology Group
12
13       CASSIDAY SCHADE LLP
         BY:  ALEX CAMPOS, ESQUIRE
14       20 N. Wacker Drive
         Suite 1000
15       Chicago, Illinois 60606
         (312) 444-2470
16       acampos@cassiday.com
         Representing Dr. Dorothy Anoina and Women
17       for Women Health Care
18
19       PAM MAY LAW FIRM, P.S.C.
         BY:  NDIDI GBULIE, ESQUIRE
         P.O. Box 1439
20       Pikeville, Kentucky 41502
         (606) 432-0400
21       ngbulie@pammaylaw.com
         Representing Altman, McGuire, McClellan &
22       Crum, P.S.C. and Rick A. McClellan
23
24       VIDEOTAPE TECHNICIAN:
         CHRISTOPHER CAMPBELL
25                     - - -
```

## Page 280

```
 1                   - - -
 2                   I N D E X
 3                   - - -
 4
 5   Testimony of:  PAUL PARISI
 6       By Mr. Brown          285
 7       By Mr. Slater         305
 8       By Mr. Aylstock       361
 9
                     - - -
10
               E X H I B I T S
11
                     - - -
12
13   NO.        DESCRIPTION        PAGE
14   D          Letter to EWHU Field Sales      291
     Parisi-1   Force, October 23, 2006, Bates
15              stamped ETH.MESH.00461576
16   T-1054     Letter to EWHU Field Sales      306
                Force, October 23, 2006, Bates
17              stamped ETH.MESH.00461576
18   T-1055     Article entitled "Transvaginal      349
                repair of genital prolapse:
19              preliminary results of a new
                tension-free vaginal mesh
20              (Prolift technique) -- a case
                series multicentric study," by
21              B. Fatton, et al., Bates
                stamped ETH-02358 through
22              ETH-02367
23   T-1056     Gynecare TVT SECUR System      393
                Professional Education Program
24              Opportunities, Consider --
                Proper Targeting, Course
25              Effectiveness, & Costs, Bates
                stamped ETH.MESH.05795106
```

## Page 281

```
 1   T-1057     E-mail chain, top one dated 25      402
                May 2011, Bates stamped
 2              ETH.MESH.05164815 through
                ETH.MESH.05164820
 3
     T-1058     E-mail chain, top one dated 06      412
 4              Sep 2003, Bates stamped
                ETH.MESH.03738468 through
 5              ETH.MESH.03738470
 6   T-1059     PowerPoint, "Ethicon Women's      415
                Health & Urology," Bates
 7              stamped ETH.MESH.00235558
                through ETH.MESH.00235570
 8
 9   T-1060     E-mail chain, top one dated      423
                February 08, 2011, Bates
10              stamped ETH.MESH.05570260 and
                ETH.MESH.05570261
11   T-1061     TVT/SUI Professional Education      430
                Index and Production Bates
12              Range Chart, 4 pages
13   T-1062     TVT Professional Education      433
                Program, Bates stamped
14              ETH.MESH.00156909 through
                ETH.MESH.00156938
15
16   T-1063     E-mail chain, top one dated 16      445
                Sep 2004, Bates stamped
17              ETH.MESH.00864503 through
                ETH.MESH.00864507
18   T-1064     E-mail chain, top one dated 23      497
                Nov 2006, Bates stamped
19              ETH.MESH.03921637 through
                ETH.MESH.03921640
20
     T-1065     E-mail chain, top one dated      482
21              April 13, 2005, Bates stamped
                ETH.MESH.05795322 through
22              ETH.MESH.05795324
23   T-1066     KOL Interview: Carl G.      502
                Nilsson, Interview:
24              06.18.08(10-4pm), Bates stamped
                ETH.MESH.04048515 through
25              ETH.MESH.04048520
```

Confidential - Subject to Protective Order

| Page 282 | Page 284 |
|---|---|

**Page 282**

1  T-1067   Minutes TVT Secur resolution   516
       team, First meeting 1/22/07,
2      Bates stamped ETH.MESH.00528184
       and ETH.MESH.00528185
3
   T-1068   E-mail dated 30 Apr 2007, Bates   521
4      stamped ETH.MESH.00069114
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 284**

1        MS. MARINI:  I'm just continuing to
2  preserve the rights I indicated yesterday.  We have
3  a court order in the Ferrell vs. Hines matter, which
4  is pending in Connecticut.  This deposition is being
5  held open.  I'm just continuing to preserve my
6  rights under that court order, and I'm also
7  reserving all objections until the time of trial.
8  Thank you.
9            - - -
10       (A discussion off the record
11       occurred.)
12            - - -
13        MS. GBULIE:  So we'll continue our
14  objection about the cross-notices of the video
15  deposition, and we're awaiting a hearing on that
16  matter.  Thank you.
17            - - -
18       (A discussion off the record
19       occurred.)
20            - - -
21        THE VIDEOGRAPHER:  We are now on the
22  record.  My name is Christopher Campbell.  I'm a
23  videographer for Golkow Technologies.  Today's date
24  is June 6, 2013, and the time is 10:01.  This
25  deposition is being held in Morristown, New Jersey,

**Page 283**

1            - - -
2      DEPOSITION SUPPORT INDEX
3            - - -
4
5  Direction to Witness Not to Answer
6       Page Line
7
8
9
10  Request for Production of Documents
    Page Line
11
12
13
14
       Stipulations
15     Page Line
16
17
18
19
20   Question Marked
21     Page Line
22
23
24
25

**Page 285**

1  In Re:  Pelvic Repair System for the United States
2  District Court, Southern District of West Virginia,
3  Charleston Division.  The deponent is Paul Parisi.
4  Counsel will be noted on the stenographic record.
5  The court reporter is Ann Marie Mitchell.  The
6  witness has been previously sworn in, and we can now
7  proceed.
8            - - -
9        PAUL PARISI, after having been
10     previously duly sworn, continued to be
11     examined and testified as follows:
12            - - -
13       EXAMINATION
14            - - -
15  BY MR. BROWN:
16     Q.    Mr. Parisi, my name is Michael Brown.
17  I represent Ethicon.  I'm going to ask you a couple
18  questions now.  Okay?
19     A.    Yes.
20     Q.    Where were you raised?
21     A.    Here in New Jersey, Hackensack and
22  Mahwah, New Jersey.
23     Q.    Did you go to college?
24     A.    Yes, I did.
25     Q.    Where?

3 (Pages 282 to 285)

Confidential - Subject to Protective Order

Page 286

```
 1        A.    Here in New Jersey, Rutgers
 2   University.
 3        Q.    What's your degree in?
 4              MR. SLATER:  Objection.  It's
 5   irrelevant what his -- I'm just kidding.
 6   BY MR. BROWN:
 7        Q.    What's your degree in?
 8        A.    My degree is in mechanical
 9   engineering.
10        Q.    Are you a medical doctor?
11        A.    No, I'm not.
12        Q.    How long have you been at Ethicon?
13        A.    It will be 22 years this October.
14        Q.    Why did you come to Ethicon?
15        A.    I came to Ethicon because I thought I
16   could make a difference in healthcare and providing
17   better care for patients.
18        Q.    What is your current job at Ethicon?
19        A.    Regional manager of professional --
20   regional professional education manager.
21        Q.    What are your job responsibilities?
22        A.    I help to coordinate the education of
23   surgeons by coordinating surgeons to teach other
24   surgeons on our products.
25        Q.    What is the purpose of Ethicon's
```

Page 287

```
 1   professional education program?
 2        A.    The purpose of Ethicon's professional
 3   education program is to teach surgeons the use of
 4   our products and to provide training hands on and
 5   through presentations and lectures and other
 6   materials.
 7        Q.    Now, in your deposition, you were
 8   shown multiple professional education, what we call
 9   slide decks or PowerPoints.
10              Is that all that Ethicon provides the
11   doctors in professional education?
12        A.    No.
13        Q.    What else does Ethicon provide these
14   surgeons?
15        A.    In addition to the slide decks, we
16   provide the instructions for use, we provide
17   surgical technique documents, we provide procedure
18   DVDs that contain videos, procedure steps, some
19   other materials associated with the procedure.
20   The -- oftentimes, there are clinical articles also
21   provided.
22        Q.    If you would, explain the types of
23   professional education programs Ethicon provides.
24        A.    Ethicon provides a few different
25   types of professional education programs.  There are
```

Page 288

```
 1   hands-on lab programs.  There are what we call
 2   preceptorships, where a learning surgeon travels and
 3   attends multiple surgical procedures with the
 4   teaching surgeon.  Additionally, there are
 5   proctorships where the teaching surgeon goes and
 6   teaches the learning surgeon or observes the
 7   learning surgeon in their operating room.
 8        Q.    Was this type of training provided
 9   for the Prolift product?
10        A.    If I could amend that previous
11   answer?
12        Q.    Sure.
13        A.    There are also webcasts, there's
14   online training available as well.
15        Q.    Let me restate the question.
16              Was this type of training provided
17   for the Prolift product?
18        A.    Yes.
19        Q.    And the Prolift+M product?
20        A.    Yes.
21        Q.    Was this type of training provided
22   for the Prosima product?
23        A.    Yes.
24        Q.    And what about the TVT products?
25        A.    Yes, all of the TVT products.
```

Page 289

```
 1        Q.    Who trains the surgeons?
 2        A.    Surgeons train the surgeons.
 3        Q.    What is required before a surgeon can
 4   become a trainer for the Prolift products?
 5        A.    There's numerous requirements.  The
 6   surgeon has to be board certified in urology,
 7   urogynecology or gynecology.  They have to be one of
 8   the thought leaders or well respected in their
 9   field.  And they have to have experience in using
10   the product safely and effectively.
11        Q.    Is that the same requirements for
12   TVT?
13        A.    Yes.
14        Q.    Who answers the questions regarding
15   the procedure?
16        A.    Surgeons answer the questions
17   regarding the procedure.
18        Q.    Now, if a surgeon or a trainee
19   attends one of these training events and wants
20   additional training, does Ethicon provide that
21   additional training?
22        A.    Absolutely.
23        Q.    Can you give me an example of that?
24        A.    Yeah.  The surgeon who's teaching the
25   procedure would provide their e-mail address and
```

4 (Pages 286 to 289)

Confidential - Subject to Protective Order

Page 290

1  cell phone and invite the learning surgeons to reach
2  them back if they have any additional questions.  If
3  the learning surgeon misplaced that information,
4  they could get that through their representative or
5  through the professional education department.
6      Q.    If a training surgeon goes through a
7  preceptorship program where they watch the surgery
8  and they want to then have a trainer come and train
9  them, would Ethicon provide that additional
10 training?
11     A.    Absolutely.
12     Q.    Now, if there are complications or a
13 physician needs assistance, can he then go back to
14 that training surgeon and ask questions?
15     A.    Absolutely.
16     Q.    Is that part of the trainer's
17 responsibility?
18     A.    Yes, it is.
19     Q.    And tell me about that.
20     A.    The training surgeon would be under
21 an agreement with the company that they would not
22 only provide education during professional education
23 events, but they would be able to be open to
24 questions, discussion, be open to, as I said before,
25 travel to that doctor's operating room.  We made

Page 291

1  education available in a variety of different ways
2  so that the training surgeons had an opportunity to
3  access it however they felt it was best suited for
4  their needs.
5      Q.    Are there any educational
6  requirements for the surgeons who are being trained?
7      A.    Yes.
8      Q.    Did they go to medical school?
9      A.    Yes.
10     Q.    Did they have a specialty in any
11 area?
12     A.    Yes.  They had specialty with these
13 products in gynecology, urogynecology or urology.
14     Q.    Mr. Parisi, I'm showing you what's
15 been marked as Defense Exhibit 1.
16         - - -
17         (Deposition Exhibit No. D Parisi-1,
18         Letter to EWHU Field Sales Force, October
19         23, 2006, Bates stamped ETH.MESH.00461576,
20         was marked for identification.)
21         - - -
22 BY MR. BROWN:
23     Q.    Are you familiar with this document?
24     A.    Yes, I am.
25     Q.    What is it?

Page 292

1      A.    This is the criteria for learners of
2  the Prolift products.
3      Q.    Tell me a little bit about some of
4  these criteria.
5      A.    There's numerous things that, in
6  addition to, as I stated previously, the surgeon
7  would be certified, board certified in gynecologic,
8  urologic or urogynecologic surgery.  Additionally,
9  there are six requirements that were specific to
10 the Prolift procedure.
11         Would it be helpful if I read those?
12     Q.    Sure.
13     A.    The first requirement is that "at
14 least 30-50% of their practice is Pelvic Floor
15 Repair."  The second requirement is they "should be
16 doing at least 5 pelvic floor procedures per month
17 and treating stage 3 & stage 4 defects."  The third
18 is that they "use" either an "abdominal or vaginal
19 approach to treat pelvic organ prolapse."  The
20 fourth is that they use "obturator slings."  The
21 fifth is that they "perform or have performed
22 sacrospinous ligament fixations or
23 sacrocolpopexies."  And the last is that they
24 "utilize graft materials in the majority of POP
25 cases."  And graft materials would be comprehensive

Page 293

1  of all types of augments of repair like mesh
2  material.
3      Q.    Now, who develops these training
4  materials that we've talked about for these
5  surgeons?
6      A.    Surgeons develop the training
7  materials.
8      Q.    Why is that?
9      A.    Because we feel that it's important
10 that medical information be provided from surgeons
11 to be delivered by surgeons to surgeons.
12     Q.    And why do you, Mr. Parisi, not
13 actually develop the content for the professional
14 education?
15     A.    Because I'm not a medical doctor, and
16 surgeons have much more in-depth knowledge of
17 medical procedures.
18     Q.    Counsel asked you some very specific
19 language regarding complications used in these
20 professional education slide decks.  Do you remember
21 that?
22     A.    I do, yes.
23     Q.    When he asked you if those certain
24 words were in the slide decks, were you able to
25 answer those yes or no?

5 (Pages 290 to 293)

Confidential - Subject to Protective Order

Page 294

1    A.    Yes.
2    Q.    When he asked you words to that
3  effect or where complications of a certain severity
4  were disclosed, you sometimes deferred to medical
5  affairs. Do you remember that?
6    A.    I do, yes.
7    Q.    Why did you do that?
8    A.    Because I felt like I didn't have
9  direct knowledge and that those questions would be
10 better answered by a medical doctor.
11   Q.    Why is that? Why should surgeons
12 answer those questions?
13   A.    Because surgeons have years of
14 training and in-depth knowledge that comes from
15 their training and from their experience operating
16 on patients. It's most appropriate to get accurate
17 information directly from surgeons teaching other
18 surgeons. And that's why we do that.
19   Q.    Now, I'm showing you a professional
20 education slide deck or if you would -- it's
21 Exhibit 127.
22   A.    I have that, thank you.
23   Q.    Is this the 2005 professional
24 education slide deck?
25   A.    Yes, it is.

Page 295

1    Q.    And if you would, flip over to the
2  TVM retrospective study that discusses postoperative
3  complications. It's about halfway through the deck.
4    A.    Yes, I have that.
5    Q.    Do you remember counsel asking you
6  questions about the vaginal exposures with mesh
7  being 25 and that possibly being inconsistent with
8  what is in a study by Michel Cosson?
9    A.    I do remember that.
10   MR. SLATER: I object -- for the
11 record, I object to all these questions about, do
12 you remember counsel asking you this question. I
13 think what needs to happen is, because he is your
14 witness, you cannot ask any leading questions. And
15 I don't think you need to ask the questions in that
16 manner in order to elicit information. I think you
17 can ask him nonleading questions, and I object to
18 any -- I mean, I can object every time you do it or
19 you can grant me a standing objection for this
20 deposition. I object to any leading question,
21 including those where you suggest the entire context
22 of what you're getting at, which is I think leading,
23 because what you're doing is supplying information
24 as you go. I think it would be better if you just
25 asked nonleading questions where you asked him for

Page 296

1  information. So I object to that.
2    MR. BROWN: If you believe it's
3  leading, if you just put your objection on the
4  record.
5    MR. SLATER: So you want me to object
6  to every question?
7    MR. BROWN: If you believe it's
8  leading.
9    MR. SLATER: Okay. I object to that
10 question as a leading question and inappropriate for
11 you to ask the question in that manner of your own
12 witness in this context.
13   And also, I just want to place one
14 other thing on the record.
15   Well, actually, I'll save that for
16 when it happens.
17 BY MR. BROWN:
18   Q.    If you would look at Exhibit T-1047.
19   A.    I have that, thank you.
20   MR. SLATER: What is T-1047? Is that
21 the article?
22   MR. BROWN: It is.
23   MR. SLATER: That was being miscited?
24 BY MR. BROWN:
25   Q.    Mr. Parisi, if you would, I'm going

Page 297

1  to ask you to look, it's Bates number 2797. You'll
2  see that on the bottom right.
3    If you'll look on the right column,
4  the first paragraph, you'll see "Perioperative
5  complications." Do you see that?
6    A.    I do, yes.
7    Q.    If you will move down just a little
8  bit further to where it says, "The mesh exposure
9  complication." Do you see that?
10   A.    I do, yeah.
11   Q.    Would you read that sentence.
12   A.    "The mesh exposure complication was
13 observed in 34 patients (12...%)."
14   Q.    The next part, please.
15   A.    "However, only 25 patients warranted
16 surgery for partial removal of the mesh (9...%)."
17   Q.    Now, if you look at the slide that
18 I'm showing you, which has "TVM Retrospective
19 Study," this is on Exhibit 127, that says
20 "Postoperative Complications." Do you have that?
21   A.    Yes, I do. Thank you.
22   Q.    What does --
23   How many patients does it say vaginal
24 exposure with mesh had?
25   A.    It says 25 patients.

6 (Pages 294 to 297)

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Subject to Protective Order

Page 298

```
 1      Q.    And did those require surgical
 2 partial resection?
 3      A.    Yes.  It says very specifically, 25
 4 patients had vaginal exposure with mesh and required
 5 partial -- surgical partial resection.
 6      Q.    And, Mr. Parisi, is that consistent
 7 with the article and information you just read?
 8      A.    Yes, it is.
 9      Q.    Now, if you will, if you will go back
10 about three slides, it says, "Defect Type Impacts
11 Exposure Rates."  Do you see that?
12      A.    I do, yes.
13      Q.    How many exposures are identified in
14 this slide?
15      A.    34.
16      Q.    And is that consistent with article
17 T-1047?
18      A.    Yes, it is.
19            MR. SLATER:  Which page of the
20 PowerPoint are you on?
21            MR. BROWN:  "Defect Type Impacts
22 Exposure Rates," I think it's about three slides
23 after that, the one we were just on.  Postoperative
24 complications, uterine, technique.
25 BY MR. BROWN:
```

Page 299

```
 1      Q.    Mr. Parisi, I also want to talk to
 2 you about this slide deck and being fair and
 3 balanced.
 4            What does fair and balanced mean to
 5 you?
 6      A.    Fair and balanced means that the
 7 information is accurate and it's complete.
 8      Q.    Mr. Parisi, if you will, I'd like for
 9 you to flip back about three slides, might be four,
10 but it will say "TVM Retrospective Study."
11      A.    Yes.
12      Q.    Come back one more, please.  It says,
13 "Sites: Lille, France."  Do you see that?
14      A.    I do, yes.
15      Q.    Thank you.
16            Is this the retrospective study with
17 the 277 patients?
18      A.    Yes, it is.
19      Q.    And if you would, on the very next
20 slide, if you would flip over, please, what does
21 this slide indicate?
22      A.    "Intraoperative Complications."
23      Q.    And tell me the complications that
24 are listed there.
25      A.    Rectal injury, bladder injury,
```

Page 300

```
 1 hemorrhage or hematoma, surgical intervention.
 2      Q.    Go to the next slide, please.
 3            What does the next slide indicate to
 4 you?
 5      A.    "Complications."
 6      Q.    And what are the postoperative
 7 complications that are identified?
 8      A.    Vaginal adhesion, symptomatic tissue
 9 contraction, vaginal exposure with mesh and anatomic
10 failure.
11      Q.    Go to the next slide, Mr. Parisi.
12            What does that slide indicate?
13      A.    Another complication, which is the
14 exposure rate.
15      Q.    Go to the next slide, Mr. Parisi.
16            What does that slide indicate?
17      A.    Another complication, which is the
18 exposure rate.
19      Q.    Go to the next slide, Mr. Parisi.
20            What does that slide indicate?
21      A.    Another complication, which is the
22 exposure rate.
23      Q.    Mr. Parisi, I want to direct your
24 attention to Exhibit Number 128.
25            Mr. Parisi, if you would, I need you
```

Page 301

```
 1 to go to the slide, if you'll flip through to
 2 "Retrospective Study From the Original FRENCH
 3 Surgical Team."
 4      A.    Can you just tell me approximately --
 5      Q.    You're probably about a third of the
 6 way through the deck.
 7      A.    Okay, thank you.
 8            MR. SLATER:  What's the title of the
 9 page?
10            MR. BROWN:  It's that "Retrospective
11 Study From the Original French Surgical Team."
12            THE WITNESS:  Can I see the page?
13            Yes, I have that page.  Thank you.
14            MR. BROWN:  Adam, I'll wait till you
15 get there.  That's it.
16 BY MR. BROWN:
17      Q.    Mr. Parisi, what does this slide
18 indicate?  Or just strike that question.
19            Would you read the title from this
20 slide?
21      A.    "Retrospective Study From the
22 Original French Surgical Team."
23      Q.    Is this discussing a French study?
24      A.    Yes, it is.
25      Q.    If you go to the next page, what does
```

7 (Pages 298 to 301)

Confidential - Subject to Protective Order

Page 302

1  it indicate?
2      A.    Complications that were found in that
3  study, and it goes on to list a number of
4  perioperative, which is during the procedure, and
5  postoperative, which is after the procedure.
6      Q.    And if you'll go to the next slide,
7  what's the title of the next slide?
8      A.    "TVM Mesh Exposure."
9      Q.    What does this slide indicate?
10     A.    This indicates the exposure rate that
11  was found in the French study.
12     Q.    And if you look for the third bullet,
13  what does the third bullet say?
14     A.    Those that required intervention in
15  the OR, and it lists percentages across a variety of
16  different patients that were in the study.
17     Q.    If you'll go towards the end of the
18  slide deck, the title page will say "Complications."
19  Tell me when you're there.
20     A.    Yes.
21     Q.    Mr. Parisi, if you flip to the next
22  page, what does this slide indicate?
23     A.    "Healing Abnormalities" or exposure
24  rate, which is a type of complication.
25     Q.    If you will skip to the next page,

Page 303

1  two pages over, please. Tell me what this page
2  indicates.
3      A.    "Bleeding," which is a type of
4  complication.
5      Q.    The next page, and the title is
6  "Visceral Injury," what does that indicate?
7      A.    Visceral injury is injury to organs,
8  which is a type of complication.
9      Q.    Mr. Parisi, if you'll go to the next
10  page, please.
11          You received questions with regard to
12  pain or dyspareunia. Do you remember that?
13     A.    I do, yes.
14     Q.    What does this slide indicate?
15     A.    This indicates complications of pain
16  and dyspareunia and how to avoid those
17  complications.
18     Q.    Turn to the next page, please.
19          Can you read the title, please?
20     A.    "GYNECARE PROLIFT System: Early
21  Outcome Data."
22     Q.    Mr. Parisi, what is this slide
23  depicting?
24     A.    This depicts a detailed summary of
25  the clinical study which indicates the

Page 304

1  complications, exposures and the number of patients
2  and the percentages that those complications were
3  experienced in the study.
4      Q.    Do you remember being asked about
5  voiding dysfunction?
6      A.    I do, yes.
7      Q.    Is voiding dysfunction identified --
8          MR. BROWN: Objection to the form of
9  the question. He wasn't asked about voiding
10  dysfunction.
11  BY MR. BROWN:
12     Q.    Does this slide indicate voiding
13  dysfunction as a potential complication?
14          MR. SLATER: Objection, leading.
15          THE WITNESS: This slide does
16  indicate voiding dysfunction as a potential
17  complication.
18  BY MR. BROWN:
19     Q.    If you would as well, let me have you
20  on the -- do you see where it says "Complications,"
21  the top block?
22     A.    If I could amend that previous
23  answer?
24     Q.    Uh-huh.
25     A.    Voiding dysfunction is listed several

Page 305

1  times on this slide.
2      Q.    Let me ask you, if you would, do you
3  see the blocks and do you see the "Complications"
4  block?
5      A.    Yes, I do.
6          MR. SLATER: Objection.
7  BY MR. BROWN:
8      Q.    If you would look down two blocks
9  below that, read the three complications that are
10  indicated there.
11     A.    "Cystotomy."
12          MR. SLATER: Objection.
13          THE WITNESS: "Hematoma" and "voiding
14  dysfunction."
15          MR. BROWN: Thank you, Mr. Parisi.
16  No further questions.
17          MR. SLATER: That's your direct?
18          MR. BROWN: That's it.
19          MR. SLATER: Okay. I'm going to
20  follow up now if you want to take a second to get
21  situated.
22                  - - -
23          EXAMINATION
24                  - - -
25  BY MR. SLATER:

8 (Pages 302 to 305)

Confidential - Subject to Protective Order

Page 306

1    Q.    Mr. Parisi, let's start with Exhibit
2  D-1, which -- what I'd also like to do is put a date
3  on it --
4    A.    Yeah, this doesn't say D-1 on it.  It
5  says --
6    Q.    It says "D-Parisi."  What I'm going
7  to do is I'm going to mark this exhibit as Exhibit
8  T-1054, because we neglected to use it yesterday and
9  we really wanted to, so I want to thank counsel for
10  getting it in here for us.
11               - - -
12         (Deposition Exhibit No. T-1054,
13         Letter to EWHU Field Sales Force, October
14         23, 2006, Bates stamped ETH.MESH.00461576,
15         was marked for identification.)
16               - - -
17  BY MR. SLATER:
18    Q.    Let's spend a couple of minutes on
19  this document.
20         Okay.  You have before you Exhibit
21  T-1054?
22    A.    Yes.
23    Q.    This is an internal memorandum or
24  letter written by Price St. Hilaire, Product
25  Director Pelvic Floor Repair, dated October 23,

Page 307

1  2006.
2    A.    Yes.
3    Q.    Price St. Hilaire is a product
4  director in the pelvic floor repair area of
5  marketing?
6    A.    Yes.
7    Q.    So he's a marketing person.  Right?
8    A.    Yes.
9    Q.    As a product director, he's somebody
10  responsible to market the, in this case we're
11  talking about the Prolift.  Correct?
12    A.    I can't agree with that.  The product
13  director would have multiple responsibilities.
14    Q.    Well, he works in marketing.  Right?
15    A.    He does work in marketing.  Correct.
16    Q.    So his overall responsibility is to
17  market in this case the Prolift.  Right?
18    A.    His overall responsibility was to be
19  responsible for the pelvic floor repair products.
20    Q.    Now, does marketing within your
21  company -- well, I'll withdraw that.  Okay.
22         Let's look at the date of the letter
23  first is October 23, 2006.  Right?
24    A.    Yes.
25    Q.    So as of that point, the product

Page 308

1  director for the Prolift felt a need to send this
2  letter to the entire Ethicon Women's Health &
3  Urology field sales force to reaffirm the criteria
4  for any person who was invited to be trained on the
5  Prolift, any doctor.  Right?
6    A.    Yes.
7    Q.    And obviously this memo or letter was
8  written because there was obviously an issue at that
9  point with doctors being brought to the training who
10  didn't meet this criteria, so the field sales force
11  was being told, this is our criteria, make sure you
12  meet this criteria.  Correct?
13         MR. BROWN:  Objection.
14         THE WITNESS:  I can't agree to that.
15  BY MR. SLATER:
16    Q.    Well, then why would he write the
17  e-mail?  Let me rephrase it.
18         Why did Price St. Hilaire send this
19  letter, do you know?
20    A.    I don't know as I sit here -- well,
21  let me rephrase it, let me correct my answer.
22         My understanding is that he was
23  reiterating the same criteria that was in effect
24  from the time the Prolift product was launched
25  through present day.  This was always the criteria

Page 309

1  that was involved in the Prolift procedure, and he
2  was recommunicating it out to the sales -- to the
3  field sales organization.
4    Q.    The criteria set forth in this letter
5  was the criteria from day one, if a doctor didn't
6  meet this criteria, meaning all six of those
7  criteria, the doctor was precluded by that criteria
8  from being invited to be trained on the Prolift.
9  Correct?
10    A.    Yes, that was our intent.
11    Q.    If your company -- and -- rephrase.
12  Withdrawn.
13         And your company had set up a system
14  to make sure that if a sales representative invited
15  a doctor to be trained, that the doctor's
16  credentials and background would be double-checked
17  by the division manager and the professional
18  education development manager potentially also, to
19  make sure that the doctor met this criteria, a
20  system of checks and balances.  Correct?
21    A.    That's correct.
22    Q.    If a doctor who did not meet this
23  criteria was trained on the Prolift, then the system
24  of checks and balances within your company failed
25  with regard to that doctor.  Correct?

9 (Pages 306 to 309)

Confidential - Subject to Protective Order

Page 310

1    A.    I have no knowledge of a doctor not
2   meeting this criteria.
3        Q.    I didn't ask you if it happened, so
4   let's ask the question again.
5            If a doctor was brought to the
6   Prolift training and allowed to be trained but he or
7   she did not meet all six of these items of criteria,
8   then the system within your company failed in that
9   instance.  If it happened, that would be a failure
10  of the system.  Correct?
11           MR. BROWN:  Objection.
12           THE WITNESS:  I can't agree to that.
13  BY MR. SLATER:
14       Q.    Oh, really?
15           So you have a system in place that's
16  supposed to be a system of checks and balances to
17  make sure that a doctor who doesn't meet all six of
18  these criteria will be trained.  Right?  That's the
19  system.  Right?
20       A.    That's the intent of the system.
21  Correct.
22       Q.    And if a doctor were to be trained
23  who didn't meet this criteria, that would mean that
24  in that instance the system did not work, because a
25  doctor who shouldn't have been trained got trained

Page 311

1   on the Prolift.  That's a true statement by
2   definition.  Correct?
3        A.    I can't agree to that.
4        Q.    Fine.
5            If a doctor who didn't meet this
6   criteria was trained on the Prolift, that is
7   contrary to what your company wanted to happen.
8   Correct?
9        A.    The training on the Prolift --
10       Q.    It's a simple yes-or-no question.
11  Today we're going to actually stick to my questions.
12  You guys are going -- you're not going to do this.
13  So I'm going to ask the question again.
14           If a doctor who did not meet this
15  criteria got trained on the Prolift, that would be
16  contrary to what your company wanted to happen.
17  Correct?
18           MR. BROWN:  Objection.
19           Answer it the way that you feel --
20           MR. SLATER:  No.  He can answer --
21  no, no.  Hang on.  Mr. Brown --
22           MR. BROWN:  If you can answer with a
23  yes, answer with a yes.  If you can answer with a
24  no, answer with a no.  If you need to qualify yes or
25  no, you can do that.

Page 312

1            MR. SLATER:  No.  Here's what you'll
2   do.  You'll say yes, no or I can't answer with a yes
3   or no.
4            THE WITNESS:  I can't answer with a
5   yes or no.
6   BY MR. SLATER:
7        Q.    Let me ask it again so we can get
8   that clean so I can play it to the jury.  Okay?  And
9   then they'll see your face up on a 30-foot screen
10  saying you can't answer that simple question with a
11  yes or no.
12           MR. BROWN:  Objection to that.
13           Go ahead.
14  BY MR. SLATER:
15       Q.    You're telling this jury -- well,
16  rephrase.
17           Answer this question for the jury.
18           If a doctor who did not meet this
19  criteria, all six items, still got through and got
20  trained on the Prolift, if that happened, that would
21  be contrary to the intention of your company because
22  the criteria was set up to prevent that doctor from
23  getting trained on the Prolift.  That's a true
24  statement.  Right?
25           MR. BROWN:  Objection.

Page 313

1            THE WITNESS:  I can't answer that
2   with a yes or no.
3   BY MR. SLATER:
4        Q.    Fine.
5        A.    Because --
6        Q.    I didn't ask you for a because.  I
7   asked you yes, no or you can't answer with a yes or
8   no.  You've told the jury you can't answer that
9   question with a yes or no, so that's fine.  Okay?
10           Let's go to the next question.
11           Your doctor -- rephrase.
12           Ethicon set up this criteria, these
13  six items of criteria, with the intention that only
14  doctors who meet all of that criteria would be
15  trained on the Prolift because your company had made
16  a decision, a carefully thought-out decision, that
17  those are the doctors who would be able to safely
18  and effectively treat patients with the Prolift.
19  Right?
20       A.    I can't answer that question.
21       Q.    This criteria was set up for a
22  reason.  Right?
23       A.    I believe so, yes.
24       Q.    The reason was to make sure that
25  doctors of only a certain level of skill and

Confidential - Subject to Protective Order

Page 314

1  experience would be allowed to be trained on the
2  Prolift. Right?
3      A.    The intent of this criteria was to
4  provide criteria to the sales force who was
5  recruiting for these programs to invite doctors to
6  the training. This training was not the only
7  training that was made available to the doctors.
8  The doctors had experience in ob/gyn, urogynecology
9  or urology. They were board certified. Many of
10 them had fellowship training in addition in this
11 particular area. The company made every effort to
12 make sure the best doctors were trained to do this
13 procedure in order to provide the best possible
14 outcomes for patients.
15      MR. SLATER: Move to strike.
16 BY MR. SLATER:
17      Q.    The system -- rephrase.
18      The system of checks and balances was
19 set up so that doctors who don't meet this criteria
20 wouldn't slip through and get trained. That's why
21 you have several different people looking at the
22 doctor's credentials and background before he's
23 allowed or she's allowed to be trained. Right?
24 That's why you have checks and balances. Right?
25      A.    Yes.

Page 315

1      Q.    If a doctor who didn't meet this
2  criteria got through and got trained anyway, that
3  would be a failure of the system of checks and
4  balances. Correct?
5      A.    I have no knowledge of a doctor not
6  meeting this criteria being trained.
7      Q.    If it happened, that would be a
8  failure of the system of checks and balances.
9  Correct?
10     A.    I can't answer that with a yes or no.
11     Q.    One of the reasons why doctors would
12 need to meet this criteria from the perspective of
13 Ethicon professional education was because it was
14 determined within your company that those would be
15 the doctors who would have the best chance to safely
16 and effectively use the Prolift. Correct?
17     A.    I would defer that question to
18 medical affairs.
19     Q.    At the point when this letter was
20 written by Price St. Hilaire to the sales force,
21 there was some concern being voiced by preceptors
22 back to your company that they were seeing
23 physicians being brought to the training who didn't
24 meet this criteria. That's why this refresher
25 letter was sent to the sales force to say you really

Page 316

1  need to meet this criteria when you bring doctors
2  in. Correct?
3      A.    That's consistent with my
4  recollection as I sit here today.
5      Q.    And I showed you e-mails yesterday in
6  2007 showing that doctors were still complaining to
7  Ethicon, preceptors were complaining to Ethicon,
8  that the quality of the doctors coming to the
9  training was falling below the level of skill that
10 they -- that was supposed to be met. Remember we
11 showed you that e-mail yesterday?
12     MR. BROWN: Objection.
13     THE WITNESS: I remember one e-mail
14 that you showed me from yesterday.
15 BY MR. SLATER:
16     Q.    And do you recall -- well, rephrase.
17 Withdrawn.
18     This was Exhibit 1052, March 29,
19 2007. So it's about five months, six months after
20 Price St. Hilaire's letter where Andrew Meek is
21 reporting to several people, including yourself,
22 that Dr. Sarmini raised a concern that he is seeing
23 much lower skill levels from the preceptees at his
24 Prolift courses this year.
25     So the problem was continuing even

Page 317

1  five or six months later. Correct?
2      A.    I can't answer that with a yes or a
3  no. Dr. Sarmini is raising a concern. We did
4  address Dr. Sarmini's concern and we added
5  additional materials into the Prolift training, as
6  well as a hands-on training model and an electronic
7  simulator that were used. I don't agree as I sit
8  here today with the observation that Dr. Sarmini may
9  have been making in this e-mail from 2007. However,
10 we did take his input and, as always, tried to do
11 our best to make our education as robust as
12 possible.
13     MR. SLATER: Move to strike after "I
14 can't answer with a yes or no."
15 BY MR. SLATER:
16     Q.    Ethicon felt that it was its duty to
17 strictly enforce the criteria set forth in Price St.
18 Hilaire's letter from the first day the Prolift was
19 launched and the training began. Correct?
20     A.    This was one of the criteria that was
21 provided for the Prolift product from the time it
22 was launched, yes.
23     Q.    And Ethicon felt that it was its duty
24 to strictly enforce that criteria and that's why the
25 system of checks and balances was put into effect so

11 (Pages 314 to 317)

Confidential - Subject to Protective Order

Page 318

1  that doctors who don't meet this criteria wouldn't
2  slip through.  Correct?
3          MR. BROWN:  Objection.
4          THE WITNESS:  That's not correct.
5  BY MR. SLATER:
6      Q.   Fine.
7      A.   The system of checks and balances --
8      Q.   Well, you said just said it's not
9  correct.
10     A.   -- applies to all of our products --
11     Q.   Sir --
12     A.   -- and all of our training that we've
13  been doing since we started professional education
14  over 20 years ago.
15     Q.   Okay.
16          The system of checks and balances to
17  make sure that only those doctors who meet the
18  proper criteria per your company, there's always
19  been a system of checks and balances for all the
20  devices on which your company has trained
21  physicians.  Correct?
22          MR. BROWN:  Objection.
23          THE WITNESS:  To my knowledge, within
24  Ethicon, yes.
25  BY MR. SLATER:

Page 319

1      Q.   So across the board, every pelvic
2  mesh device Ethicon has sold, if a doctor was
3  trained and that doctor did not meet the criteria
4  that had been set by the company for doctors to be
5  brought to the training, in every one of those
6  instances, that would be a failure of the system of
7  checks and balances because that doctor was not
8  supposed to get through and get trained.
9          That's a true statement, yes or no?
10     A.   No.
11     Q.   So if the system of checks and
12  balances didn't cap -- didn't catch a doctor who
13  didn't meet the criteria, you think the
14  checks-and-balances system worked?
15     A.   There were other factors that went
16  into this.  At the end of the day, I feel like we
17  did everything we could to provide criteria and then
18  provided a robust system of checks and balances to
19  make sure it happened.
20     Q.   I didn't ask you that, though.
21  Strike your answer.  You keep telling me that you
22  think you guys did a wonderful job.  I'm not asking
23  you that.  I'm saying, in any instance --
24          Here's the question.
25          In any instance where a doctor was

Page 320

1  trained on any of the pelvic mesh devices sold by
2  Ethicon and that doctor didn't meet the training
3  criteria for that device's training, in that
4  instance, the system of checks and balances would
5  have not worked because the doctor got through and
6  was trained despite the fact that he or she was not
7  supposed to be.
8          That's a true statement, isn't it?
9          MR. BROWN:  Objection.
10          THE WITNESS:  I can't agree to that.
11  BY MR. SLATER:
12     Q.   So you think in that instance if the
13  doctor got through and got trained, that the system
14  of checks and balances -- that the system of checks
15  and balances worked?
16     A.   I can't answer that with a yes or no
17  because --
18     Q.   Fine.  That's all -- no.  There's no
19  because.  We don't have a because.  That's what your
20  attorney can ask you later if he wants to continue
21  on this line of questioning.  Okay, sir?
22          Counsel asked you about the types of
23  materials that are provided to physicians in
24  professional education, and one of the things that
25  you said is clinical articles are provided to

Page 321

1  doctors through professional education.  That's one
2  of the types of materials provided.  You said that.
3  Right?
4      A.   Yes.
5      Q.   Would those clinical articles
6  actually be handed to doctors at professional
7  education training sessions?
8      A.   Yes.
9      Q.   And your company certainly had an
10  obligation when deciding what articles to give, to
11  make sure that the decisions on what articles to
12  give would be fair and balanced, meaning you
13  wouldn't only want to give the articles that were
14  favorable to the device that the doctors were being
15  trained on but also articles that were critical of
16  it or may have raised serious concerns about the
17  safety or effectiveness of the device.  You want to
18  give both sides.  Right?
19     A.   Yes.
20     Q.   If your company failed to do that,
21  your company did not act in a fair and balanced way.
22  Correct?
23     A.   I can't answer that with a yes or no.
24     Q.   Fine.
25          You'd have to ask medical affairs on

12 (Pages 318 to 321)

Confidential - Subject to Protective Order

Page 322

1 that one?
2    A.    Is that a question?
3    Q.    Yeah.
4        Do you think you'd have to defer to
5 medical affairs on that one?
6    A.    As I sit here today, if you could
7 repeat the question, I'm not sure I understood the
8 second question.
9    Q.    Sure.
10       If your company in giving medical
11 literature to doctors at professional education
12 events failed to give articles on both sides of the
13 issue, those that are favorable and those that were
14 not favorable, then your company failed to provide
15 fair and balanced medical literature to doctors.
16 Correct?
17    A.    My understanding is that we did
18 provide fair and balanced --
19       MR. SLATER:  Move to strike.
20       THE WITNESS:  -- medical literature
21 on those products.
22 BY MR. SLATER:
23    Q.    I didn't ask you what you did.  I
24 didn't ask you what you actually did.  You keep
25 saying that.  We have a difference of opinion,

Page 323

1 because I don't think you did.  But I'm not asking
2 you that question.
3    A.    Okay.  I thought it mattered what
4 actually happened.
5    Q.    Oh, it does matter.
6       MR. BROWN:  No, no, no.  Wait.
7       MR. SLATER:  We'll get to that.
8       MR. BROWN:  Just listen.  He's asking
9 you a question --
10       THE WITNESS:  Sure.  I'm sorry.
11       MR. BROWN:  -- with regard to it
12 being -- listen to his question, answer his question
13 with regard to would that be fair and balanced or
14 not.
15       THE WITNESS:  Okay.
16 BY MR. SLATER:
17    Q.    If your company failed to give
18 medical literature to doctors on both sides of the
19 issue, meaning literature that would be favorable to
20 the device being trained on and that unfavorable,
21 for example, articles questioning the safety and
22 effectiveness of the device, if your company didn't
23 provide both sides, then it failed to provide fair
24 and balanced medical literature.  Correct?
25    A.    Since we're talking about medical

Page 324

1 literature, I would defer that question to medical
2 affairs.
3    Q.    Did your company in professional
4 education provide the Cheryl Iglesia article
5 published in August of 2010 to doctors through
6 professional education?
7    A.    We may have.
8    Q.    The one that said that it didn't
9 appear that the Prolift mesh was any more
10 efficacious than native tissue repair but showed
11 that it had much more complications and more serious
12 complications?
13       MR. BROWN:  Objection.
14       THE WITNESS:  We may have, I can't
15 recall as I sit --
16 BY MR. SLATER:
17    Q.    I'm going to withdraw the question
18 and rephrase it.
19       Did professional education for
20 Ethicon hand out the Iglesia, et al. article
21 published in 2010 as part of professional education?
22    A.    It's possible.  I can't recall as I
23 sit here today.
24    Q.    If your company acted in a fair and
25 balanced way, then that article should have been

Page 325

1 provided to doctors.  Right?
2       MR. BROWN:  Objection.
3       THE WITNESS:  I can't answer that
4 question.
5 BY MR. SLATER:
6    Q.    You can't as the director of
7 professional education and the corporate
8 representative, you can't answer that?
9    A.    I can't answer that question.
10    Q.    You know the Cheryl Iglesia article.
11 Right?
12    A.    As I sit here today, I can't recall
13 the specific article that you're referring to.
14    Q.    That's what you're telling this jury
15 under oath, that you're not familiar with the
16 article that was authored by the lead author, Cheryl
17 Iglesia, in August of 2010 published?
18    A.    I may have seen it over the years.  I
19 can't recall that specific article or what its
20 conclusions were or what its basis was as I sit here
21 today.
22    Q.    You testified that something else
23 that would be -- rephrase.
24       You testified that one form of
25 professional education that was used for devices

Confidential - Subject to Protective Order

Page 326

1  including the Prolift was webcasts. Remember you
2  said that?
3      A.    Yes.
4      Q.    List for me all the webcasts with
5  regard to the Prolift that ever existed, all the
6  ones that occurred.
7      A.    I can't list that as I sit here
8  today.
9      Q.    Why not?
10     A.    Because there were numerous ones.
11     Q.    How many?
12     A.    I can't tell you as I sit here today.
13     Q.    Give me an estimate. Give me a
14  range. Were there two? Were there 35? Give me a
15  range.
16     A.    Probably somewhere in between there.
17     Q.    Closer to what? Give me the best
18  estimate you can give me.
19     A.    The best estimate that I could give
20  would probably be somewhere around 15.
21     Q.    Were they all videotaped? Meaning
22  was the video feed recorded and saved for every
23  single one of those webcasts?
24     A.    I'm not certain. I believe so, but I
25  can't say that with certainty as I sit here today.

Page 327

1      Q.    Was a transcript of each webcast
2  created and maintained?
3      A.    I'm not certain.
4      Q.    You're the corporate rep. We're here
5  for your deposition. Counsel elicited this from
6  you.
7          Are you telling me you're not
8  prepared to answer these questions about
9  approximately 15 or potentially more webcasts that
10  were used for professional education on the Prolift?
11     MR. BROWN: Objection.
12     THE WITNESS: I can't recall as I sit
13  here today.
14  BY MR. SLATER:
15     Q.    And were webcasts used for the other
16  devices sold by your company?
17     MR. BROWN: Objection.
18     THE WITNESS: Sometimes, yes.
19  BY MR. SLATER:
20     Q.    Can you tell me all of the ones for
21  all of the other devices, all the TVT devices, the
22  Prosima, the Prolift+M, every one of those, can you
23  give me all the webcasts for those?
24     A.    I can't give them all to you as I sit
25  here today. However, I have --

Page 328

1      Q.    How about one?
2      A.    -- personal knowledge of webcasts
3  being used for the TVT products, telesurgeries,
4  which is a type of webcast, were also used for the
5  TVT, Prolift and Prosima products.
6      Q.    Just for the record, what is a
7  "webcast" as you're using the term?
8      A.    A webcast would be a video
9  transmission over the Internet of a presentation
10  with a surgeon speaking. Oftentimes, it would
11  include surgical video or -- yeah, or surgery of
12  other video content.
13     Q.    What is telesurgery?
14     A.    Telesurgery can also be transmitted
15  over the web. The only difference between the two
16  is that telesurgery requires special satellite
17  equipment versus transmitting the same type of
18  information over the Internet.
19     Q.    You also listed online training.
20         Is that something different from
21  webcasts and telesurgery or is it the same category?
22     A.    Online would be included in that same
23  category.
24     Q.    Tell me every single Prolift webcast
25  that you can remember right now.

Page 329

1      MR. BROWN: Objection.
2      MR. SLATER: What are you objecting
3  to? You opened the door on this.
4      MR. BROWN: What are you asking him?
5  Are you asking him for every bit of the content from
6  what was said? Are you asking him --
7      MR. SLATER: I got your objection.
8  BY MR. SLATER:
9      Q.    Let's start general.
10         Tell me as best you can each webcast
11  event, just tell me each time there was a webcast
12  for the Prolift that you actually can recall. Give
13  me whatever information you know about each one.
14         Let's start with the first one you
15  can recall.
16     MR. BROWN: Objection.
17     THE WITNESS: It's hard to remember.
18  BY MR. SLATER:
19     Q.    I didn't ask you if it's hard to
20  remember. So let's start over.
21         Just tell me the list. Okay? So
22  I'll ask the question now.
23         Please list for me each webcast that
24  you recall with regard to the Prolift. Just give me
25  whatever information you can remember about each

14 (Pages 326 to 329)

Confidential - Subject to Protective Order

Page 330

1  one. So start with one, you can tell me what you
2  know about that one, then you can tell me what you
3  recall about another one. As many as you can
4  recall. Let's start with this.
5       Tell me the first one, anything you
6  know about it.
7       A.    The first ones I can recall were in
8  the early 2005 and 2006 period where surgeries were
9  transmitted through the webcast or through the
10  telesurgery.
11      Q.    Who was involved in those surgeries?
12      A.    Likely -- and I can't remember as I
13  sit here today specifically. It would be likely one
14  of our surgeon preceptors who were teaching Prolift.
15      Q.    What are their names?
16      A.    Dr. Lucente, Dr. Miller,
17  Dr. Robinson. Those are some of the names that I
18  can recall that may have been involved in those.
19      Q.    And that would have been actual
20  Prolift procedures being shown on the Internet?
21      A.    To surgeons, yes.
22      Q.    What was the criteria for a doctor to
23  be allowed to participate in watching a webcast or a
24  telesurgery?
25      A.    The same -- similar criteria to what

Page 331

1  was listed here.
2       Q.    So in order to be able to participate
3  and watch this, you'd have to meet the six criteria
4  on that letter. Correct?
5       A.    Well, this letter is specific to
6  attending live training, face-to-face training.
7       Q.    It doesn't say that, though, does it?
8  Trained, integrity of the quality of physicians
9  trained for the Prolift. It doesn't say anything
10  about live versus the webcast, and the webcasts
11  constitute training. Right? Correct?
12      A.    The webcasts are a type of training.
13  I believe that this document specifically refers to
14  training in a lab setting, a preceptorship type of
15  setting.
16      Q.    But the same criteria would apply to
17  allow a doctor to participate in watching a webcast
18  or online training or telesurgery. Correct?
19      A.    The intent would be that, yes.
20      Q.    So you told me there was some surgery
21  webcasts in early 2005 into 2006 involving likely
22  Dr. Lucente, Dr. Miller and Dr. Robinson.
23      What else? Tell me other Prolift
24  webcasts you can recall.
25      A.    I believe there was a webcast, and I

Page 332

1  have to look at the -- some of the references that
2  we had to see if there was a date.
3       Is this everything that I had
4  yesterday?
5       This is from the three year time
6  period that I wasn't directly involved in the
7  business, but it's my understanding that this may
8  have been presented as a webcast or in other venues.
9       Q.    Just identify for the record what
10  you're holding in your hand.
11      A.    T-1045.
12      Q.    That's the Prolift+M Advanced User
13  Discussion?
14      A.    I believe so.
15      Q.    Who presented that?
16      A.    I wasn't with the company at the
17  time, so I don't know.
18      Q.    Sir, you keep saying you weren't with
19  the company. You are designated by the company as
20  the corporate rep. So please understand that under
21  the court -- the rules of law in New Jersey, that's
22  an irrelevant statement.
23      MR. BROWN: Do you know or not know?
24      THE WITNESS: I don't know. I'm
25  sure -- I don't know.

Page 333

1  BY MR. SLATER:
2       Q.    So we can bring you back at some
3  future date to get all the details on all the
4  webcasts and who was involved in teaching that
5  advanced user discussion. You could get that
6  information and be prepared to testify about it on a
7  future day. Correct?
8       MR. BROWN: Objection.
9       THE WITNESS: Certainly I'd be
10  willing to try to get that information.
11  BY MR. SLATER:
12      Q.    Any other webcasts regarding the
13  Prolift that you can tell me about? And just for
14  the record, by the way, T-1045 is Prolift+M?
15      A.    Yes. I agree with that.
16      Q.    But you are lumping Prolift and
17  Prolift+M together, basically?
18      A.    I'm not lumping them together. Now
19  that you've corrected me, I notice that that's
20  Prolift+M.
21      Q.    Any other Prolift webcasts, online
22  training, telesurgery, anything you can tell me you
23  recall as you sit here now?
24      A.    There may have been other
25  telesurgeries performed by other surgeons.

15 (Pages 330 to 333)

Confidential - Subject to Protective Order

Page 334

1    Q.    I just want to know what you can
2  recall.
3    A.    I'm trying to recall the best that I
4  can, as I sit here today, that the ones that I have
5  described already are the types of ones that I would
6  be aware of having happened.
7    Q.    With regard to the TVT devices, do
8  you recall any specific webcasts, online training or
9  telesurgeries that ever existed with any of the TVT
10 devices?
11   A.    Yes.
12   Q.    Tell us the list.
13   A.    I believe that there were televised
14 videos on televised surgery of the TVT-O in around
15 2004 and 2005.
16   Q.    And who was involved in providing
17 that teaching?  Who was the person who presented, or
18 people?
19   A.    It was probably multiple surgeons
20 presenting.
21   Q.    Who?
22   A.    And our medical affairs department.
23 At the time, Dr. Lucente may have been involved.
24 Dr. de Leval, who was the inventor, may have been
25 involved.  There may have been others as well that I

Page 335

1  can't recall from that -- from 2005.
2    Q.    Any other webcasts, online training,
3  telesurgery, with regard to any TVT devices that you
4  can recall other than what you just told me?
5    A.    I believe there were some webcasts on
6  TVT SECUR as well with -- transmitting video of
7  surgery as well.
8    Q.    Who was involved in that?
9    A.    Those I can't recall.  It would have
10 been one of our surgeon faculty or preceptors that
11 teach on behalf of TVT SECUR.
12   Q.    Any other that you recall?
13   A.    As I sit here today, I can't recall
14 if there were others.
15   Q.    Any of these webcasts, online
16 training or telesurgeries for any of the pelvic mesh
17 devices would need to be accurate and convey
18 accurate information.  Correct?
19   A.    Yes.
20   Q.    It would have to convey fair and
21 balanced information.  Correct?
22   A.    Yes.
23   Q.    It would have to convey the material
24 risk information.  Correct?
25   A.    Yes.

Page 336

1    Q.    It would have to convey, for example,
2  the known adverse events and risks as well.
3  Correct?
4    A.    Yes.
5    Q.    And the last device I want to ask you
6  about is the Prosima.
7         First of all, what you just said
8  would also apply to the Prosima.  I didn't have it
9  in the list, though.  Right?
10   A.    I'm sorry, can you --
11   Q.    The list of things that you just told
12 me about what the webcasts and online training would
13 have to convey, that would apply to the Prosima as
14 well.  Correct?
15   A.    Yes.
16   Q.    Was there any webcasts or online
17 training with regard to the Prosima that you can
18 recall?
19   A.    As I sit here today, I can't recall,
20 but there may have been.
21   Q.    The surgeons -- well, rephrase.
22         The doctors who provide the training
23 for Ethicon, meaning the outside doctors, they get
24 paid to do that.  Right?
25   A.    Yes.

Page 337

1    Q.    You said that if a doctor who had
2  been trained experienced problems or complications
3  with their patients, one aspect of professional
4  education is they could call the doctor that trained
5  him or her and get information about how to treat
6  those complications.  Right?
7    A.    They could ask questions of the
8  doctor that trained them, sure.
9    Q.    And your company would facilitate
10 that if asked.  Correct?
11   A.    Yes.
12   Q.    And that would happen fairly often.
13 Right?
14   A.    I can't say with what frequency it
15 happened.
16   Q.    Your company -- well, rephrase.
17 Withdrawn.
18         You said that you did not establish
19 the professional education content, the actual
20 content of the training materials.  Right?
21   A.    That's correct.
22   Q.    Certainly, it was not only created by
23 surgeons and doctors who didn't work for the company
24 or in medical affairs, other people participated
25 from other departments in the company.  Right?

16 (Pages 334 to 337)

Confidential - Subject to Protective Order

Page 338

1    A.    I believe there were cross-functional
2    people from different areas of the company.
3    Q.    The marketing department
4    participated.  Correct?
5    A.    Yes.
6    Q.    The professional education department
7    participated.  Correct?
8    A.    Yes.
9    Q.    Would regulatory have participated?
10   A.    They would have been on the copy
11   review board.
12   Q.    Who else?  What other department?
13   A.    Medical affairs, our surgeon
14   preceptors, regulatory, quality.  I'm trying to
15   think of all the different cross-functional members.
16   The legal department.  Those are the ones I can
17   recall as I sit here today.
18   Q.    You were asked some questions about
19   the language within the professional education
20   materials.  It certainly was important for you, as
21   director of professional education, and other people
22   within your department, to understand what the
23   content -- what the words stated on the page meant.
24   You needed to know what you were telling doctors.
25   Right?

Page 339

1    A.    I wasn't making the presentations,
2    nor were the people in my department.
3    Q.    Did your department -- the people --
4    rephrase.
5         Did the people working in your
6    department think it was important to understand what
7    was being conveyed in these professional education
8    materials?
9    A.    To the best of our ability as
10   nonmedical doctors, we made every attempt to
11   understand what information was in these slide
12   decks.  However, we were not the ones that were
13   presenting the materials.  It was surgeons
14   presenting to other surgeons.
15   Q.    With regard to all of the
16   professional education materials we've discussed,
17   they would all have to be copy reviewed.  Right?
18   A.    Yes.
19   Q.    And they would be signed off on by
20   multiple departments, including professional
21   education, marketing, medical affairs, regulatory,
22   quality.  Correct?
23   A.    Yes.
24   Q.    With regard to the webcasts, the
25   content of the webcasts, your company had input into

Page 340

1    what information would be provided in those webcasts
2    and online training.  Correct?
3    A.    Yes.
4    Q.    Was the content preapproved through
5    your company to make sure that your company approved
6    of what was going to be conveyed?
7    A.    Yes.
8    Q.    Would that be a copy review process?
9    A.    Yes.
10   Q.    Let's go to Exhibit 127, the first
11   Prolift professional education deck.  Go to the part
12   about the TVM retrospective study, the page that has
13   the postoperative complications that we've
14   discussed.
15   A.    Can I see the page that you're
16   referring to?
17   Q.    It's the one that says, "Vaginal
18   exposure with mesh: 25"?
19   A.    Great.  Thank you.
20   Q.    Are you with me?
21   A.    I am, yes, thanks.
22   Q.    In this professional education deck,
23   Exhibit 127, there's the page with the postoperative
24   complications listed from the TVM retrospective
25   study.  Do you see that?  You have that page in

Page 341

1    front of you.  Right?
2    A.    Yes.
3    Q.    On this page it says that the number
4    of patients who had vaginal exposure was 25 of the
5    patients.  Right?
6    A.    The number of patients that required
7    surgical partial resection of the mesh was 25 and
8    had vaginal exposure was 25 patients.
9    Q.    Let me start over.
10        The word on the page says, "Vaginal
11   exposure with mesh:  25" patients "(9.2%)."
12        That's what that line says.  Right?
13   A.    That's what that line says.  Correct.
14   Q.    The next line, there's a bullet point
15   that says, "Required surgical partial resection."
16   Right?
17   A.    Yes.  That's a subbullet of the
18   previous -- of the previous bullet.  Those two go
19   together.
20   Q.    Then on the next page, it says,
21   "Uterine Conservation Decreases Exposure Rate."  Do
22   you see that?
23   A.    I do, yes.
24   Q.    And it says that the patients who had
25   hysterectomies had 24 exposures and the patients who

17 (Pages 338 to 341)

Confidential - Subject to Protective Order

Page 342

1 had no hysterectomy or a previous hysterectomy had
2 one exposure. Do you see that?
3    A.    Yes.
4    Q.    That's telling the doctors there that
5 there is a total of 25 exposures. That's what it
6 says on that page. Right?
7    A.    It's referring to the previous page
8 and those 25 --
9        MR. SLATER: Move to strike.
10       THE WITNESS: -- exposures that
11 require --
12       MR. SLATER: Move to strike.
13       THE WITNESS: -- partial surgical
14 resection.
15 BY MR. SLATER:
16    Q.    Okay.
17       Now, stick with my question. I'm not
18 off this page yet.
19    A.    Sure. Sorry.
20    Q.    On this page, the total number of
21 exposures disclosed is 25. Right?
22    A.    On this page, yes.
23    Q.    Let's go to the next page, entitled
24 "Technique Impacts Exposure Rates." Do you see
25 that? Do you see that?

Page 343

1    A.    Yes.
2    Q.    And that at the bottom of the page is
3 21 exposures, 3 exposures and 1, for a total of 25
4 exposures disclosed on this page. Correct?
5    A.    Yes.
6    Q.    Let's go to the next page, the
7 page -- rephrase.
8       On the next page, it says, "Defect
9 Type Impacts Exposure Rates." And on that page,
10 there's anterior and posterior, and it's broken down
11 with 33 exposures for one and 1 exposure for the
12 other. Right?
13    A.    Yes.
14    Q.    So that's telling -- that says a
15 total of 34 exposures. Right?
16    A.    That's correct.
17    Q.    That's the only place in this entire
18 deck where one could add up the exposures in one
19 place and see 34 exposures. Right?
20    A.    It was part of the discussion
21 throughout the presentation of the entire deck --
22       MR. SLATER: Move to strike.
23 BY MR. SLATER:
24    Q.    Sir, first of all, I just want to let
25 you know, we looked at the notes. It doesn't

Page 344

1 disclose that. There aren't any notes on what you
2 just said. I want to let you know that. So let's
3 just stick with my question.
4       On this page --
5       MR. BROWN: Move to strike that
6 question.
7 BY MR. SLATER:
8    Q.    Rephrase.
9       On this page that says, "Defect Type
10 Impacts Exposure Rates," for anterior it says 33
11 exposures; for posterior, 1 exposure. It's the only
12 place in this deck where there's any information
13 that one could put together to say, oh, there were
14 34 exposures. It's the only page where that number
15 can appear. Right?
16    A.    It's possible, but it was a part of
17 the discussion.
18    Q.    Sir, it's not possible. Sir, it's
19 not possible. It's the only place where one could
20 add up the exposures to a 34 number. It's not
21 anywhere else in this deck. Right?
22    A.    I'm not certain. I haven't looked
23 through the entire deck.
24    Q.    Well, then look. It's only five
25 pages, sir.

Page 345

1    A.    Well, actually, the entire deck is --
2    Q.    The part about the TVM retrospective
3 study is only a small part of this. So you can look
4 at the few pages and you can confirm for me that
5 there's no indication of 34 exposures on any other
6 page.
7    A.    The prior page, if you go one page
8 prior to that.
9    Q.    The page that says "Technique Impacts
10 Exposure Rates"?
11    A.    Right. So I'm looking in
12 parentheses. And I can't -- I don't know exactly
13 what this means as I sit here today, I defer this to
14 medical affairs, but I do see the number 33 erosions
15 listed on this page. So I think what they were
16 trying to do is break down the different types of
17 erosions, what caused the different types of
18 erosions and then how a surgeon might be able to
19 prevent those different types of erosions.
20    Q.    But ultimately --
21       So you have 25 out of 33 erosions in
22 this parenthesis at the top. We know there's not 33
23 erosions reported in the article. Right? Because
24 that number is just wrong, because the article said
25 34. Correct?

18 (Pages 342 to 345)

Confidential - Subject to Protective Order

Page 346

1    A.    The article, I believe it said 34.
2  Correct.
3    Q.    Then at the bottom there's a total of
4  25 exposures called out specifically.  Right?
5    A.    Which is -- yes.
6    Q.    So this is fairly confusing, isn't
7  it?
8       MR. BROWN:  Objection.
9       THE WITNESS:  No.
10 BY MR. SLATER:
11   Q.    Of the 34 exposures seen in that
12 study, 25 required surgical repair.  That's
13 73 percent per the article.  Correct?
14   A.    The article that you showed me did
15 not just refer to Prolift, so that number quoted of
16 73 percent referred to a variety of different meshes
17 and --
18   Q.    Sir, you're on the wrong article.
19 You're getting confused.
20      I showed you the article for the 277
21 patient study.  Remember I showed you that article?
22   A.    Oh, I'm sorry.
23   Q.    And that article calculated that the
24 25 people who needed surgery of the 34 total
25 exposures totaled 73 percent; is that correct?

Page 347

1    A.    Could I -- I'd like to bring the
2  article in front of me --
3    Q.    You can look right in the abstract.
4    A.    -- to confirm what you're asking me.
5    Q.    Go right to the abstract on the first
6  page.
7    A.    I'm sorry.
8       I'd like to answer the question as
9  accurately as possible.
10   Q.    That's fine.  You can confirm as to
11 whether or not I'm right that they said 73 percent
12 of the exposures required surgery.
13      You see the 73 percent?
14   A.    I don't.  Can you show me?  I don't
15 see it in the abstract.  Can you show me where
16 you're looking in the abstract?
17   Q.    If you hand me the article so I don't
18 have to find it in my pile, I'll hand it to you.
19   A.    Sure.
20   Q.    It's actually in the "Results"
21 section and it's in a few other places, but you can
22 look right here halfway down, you'll see it's
23 73-point-something percent.
24   A.    In the first column or the second
25 column?

Page 348

1    Q.    Second column, sir, 25 out of 34 is
2  73 percent, isn't it?
3    A.    I do see where it says --
4    Q.    Your company was well aware that it
5  should never represent to doctors that most
6  exposures can be conservatively treated in a
7  successful way because your company knew that when
8  Dr. Cosson and his group reported their data, they
9  reported that 73 percent of the exposures required
10 surgery.  Correct?
11   A.    Can I have a moment to finish reading
12 this, because this is a different section than we
13 referred to previously?
14      MR. BROWN:  Go ahead and answer the
15 question he's got.  And if you need to relook at
16 something, you can.
17      THE WITNESS:  I'm having difficulty
18 answering the question, because I don't -- I do see
19 the 73 percent, but I don't -- I haven't -- I can't
20 understand what they're referring to as 73 percent.
21 BY MR. SLATER:
22   Q.    They're referring to 25 out of 34
23 equals 73 percent.  It's 34 total exposures, 25
24 needed surgery, that's 73 percent of the exposures
25 needing surgery.  But you can certainly look further

Page 349

1  if you want to confirm that.
2    A.    Thank you for letting me finish
3  reading the document.  I do see the 73 percent.
4    Q.    I'm going to hand you an article
5  marked as T-1055.  It's been marked as another
6  exhibit on previous occasions, but we're not going
7  to fish for that.
8       This is an article by --
9    A.    This one wasn't marked.
10      MR. BROWN:  Here.
11         - - -
12      (Deposition Exhibit No. T-1055,
13      Article entitled "Transvaginal repair of
14      genital prolapse:  preliminary results of
15      a new tension-free vaginal mesh (Prolift
16      technique) -- a case series multicentric
17      study," by B. Fatton, et al., Bates
18      stamped ETH-02358 through ETH-02367, was
19      marked for identification.)
20         - - -
21 BY MR. SLATER:
22   Q.    This is an article by Fatton,
23 F-A-T-T-O-N, et cetera, including Cosson, Amblard,
24 Debodinance and Jacquetin.  Do you see this?  Do you
25 see the article in front of you, 2006?

19 (Pages 346 to 349)

Confidential - Subject to Protective Order

Page 350

1      A.    Yes. I'm just taking a moment to
2  read the title. This -- I don't recall seeing this
3  yesterday.
4      Q.    What I'm going to do is I'm going to
5  draw your attention now to the page towards the end
6  of the 2007, as you've called it, professional ed
7  deck for the Prolift -- Gynecare Prolift system,
8  early outcome data.
9          Do me a favor, if you could, and turn
10 to that page also, because this article is being
11 quoted on that page. I want to ask you a couple of
12 questions.
13     A.    I'm sorry, where are you looking?
14     Q.    This is the slide -- the professional
15 ed slide deck, it's a page that you went through a
16 few minutes ago.
17     A.    From 2005?
18     Q.    2007. The page that says, "Early
19 Outcome Data" for the Prolift.
20     A.    And it's towards the back?
21     Q.    Towards the back. There's a list of
22 studies. Got it?
23     A.    I believe I'm looking at the same
24 slide that you are.
25     Q.    Okay.

Page 351

1          Looking at the second Prolift
2  professional education slide deck, I'm on the page
3  that says, Prolift "Early Outcome data." And if you
4  look, there's a list of studies.
5          And the second study listed is
6  Fatton, et al., 110 patients and then some
7  information is provided. Right? Do you see that?
8      A.    I do see that, yes.
9      Q.    And obviously it was required that
10 this information be accurate and complete and fair
11 and balanced in representing the significant
12 information in the article. Right?
13     A.    That's my understanding, yes.
14     Q.    And I've handed you the actual
15 article as Exhibit T-1055.
16         You have that to your left now.
17 Right?
18     A.    Yes.
19     Q.    What I'd like you to do now is turn
20 to the page that has the Bates number at the bottom
21 02364. In the bottom right is Table 6,
22 "Post-operative adverse events at 3 months."
23         You see the little table there that
24 lists some of the complications?
25     A.    I do, yes.

Page 352

1      Q.    One of them is "Granuloma." Right?
2      A.    "Granuloma (without exposure.)"
3      Q.    Right.
4          And is that listed on the list of
5  complications that were reported in this study on
6  the professional ed deck?
7      A.    I don't see that. However, the
8  information --
9      Q.    Sir --
10     A.    -- in the slide deck would be a
11 summary of this article as opposed to being --
12         MR. SLATER: Move to strike.
13         THE WITNESS: -- comprehensive of
14 everything that's in this entire article.
15         MR. SLATER: Move to strike.
16 BY MR. SLATER:
17     Q.    Is there -- well, rephrase.
18         In Table 6 the first complication
19 listed is "Granuloma (without exposure),"
20 2.8 percent.
21         Is that complication listed on the
22 table in the professional ed deck? Does that appear
23 there, yes or no?
24     A.    I don't see that, but the reference
25 is listed here if a surgeon wanted to get that

Page 353

1  document.
2          MR. SLATER: Move to strike from
3  "but" forward.
4          MR. BROWN: If he's asking you is it
5  the actual data on there, just yes or no.
6          THE WITNESS: Sure.
7  BY MR. SLATER:
8      Q.    And I'm going to ask it clean again,
9  because I don't feel like having to edit all my
10 questions and spend a lot of money on my tech guys,
11 so I'm going to ask it again.
12         In Table 6 it says "Granuloma
13 (without exposure)," 2.8 percent of the people in
14 the study.
15         Is that complication, "granuloma
16 (without exposure)," listed on the list of
17 complications on the prof ed deck for this article?
18 Does it appear there?
19     A.    I don't see it as I sit here today.
20     Q.    The next one says, "Mesh exposure,"
21 4.7 percent.
22         Is that listed on the list of
23 complications in the prof ed deck?
24     A.    Yes.
25     Q.    Well, I see cystotomy, hematoma and

20 (Pages 350 to 353)

Confidential - Subject to Protective Order

Page 354

1   voiding dysfunction. You're telling me you see mesh
2   exposure for the Fatton article?
3       A.   I do, yes. It's the next column to
4   the right.
5       Q.   Ah, okay. You're right. I stand
6   corrected. Okay.
7            On Table 6, the postoperative adverse
8   events for the Fatton study, "Shrinkage of mesh,"
9   which would also be mesh contraction. Correct?
10      A.   I defer that to medical affairs.
11      Q.   You don't know that shrinkage and
12  contraction are synonymous terms?
13      A.   I only know what I would have
14  heard --
15      Q.   You confirmed it yesterday.
16      A.   -- from medical doctors --
17      Q.   You confirmed it yesterday to me that
18  contraction, shrinkage and retraction are the same
19  thing.
20           Did you --
21           Have you lost track of that since
22  yesterday?
23      A.   I haven't lost track of it since
24  yesterday. I don't recall saying -- confirming that
25  yesterday.

Page 355

1       Q.   Do you know as you sit here right now that
2   contraction, retraction and shrinkage are
3   interchangeable synonymous terms?
4       A.   I would defer that to medical
5   affairs. I don't have --
6       Q.   What's your understanding?
7       A.   My understanding is that they
8   describe a similar type of situation that a medical
9   doctor would use to describe something.
10      Q.   On Table 6, postoperative adverse
11  events in the Fatton article, it lists "Shrinkage of
12  mesh," 18 patients, which was 17 percent of them.
13  Do you see that?
14      A.   Yes.
15      Q.   In the professional ed deck
16  summarizing the complications from that study, is
17  shrinkage of mesh listed?
18      A.   I don't see it on this slide.
19      Q.   Are the terms contraction or
20  retraction of mesh listed?
21      A.   I don't see it on this slide.
22      Q.   On Table 6, it's the list of
23  postoperative adverse events, "Vaginal synechia,"
24  S-Y-N-E-C-H-I-A, that one patient had that
25  condition.

Page 356

1            Is that listed as one of the
2   complications?
3       A.   I don't know what vaginal synechia
4   is.
5       Q.   Well, it's not listed, is it?
6       A.   I don't see those words listed on
7   this slide, but it could be -- I defer that to
8   medical affairs.
9       Q.   Shrinkage of mesh is a significant
10  issue with the Prolift. Correct?
11           MR. BROWN: Objection.
12           THE WITNESS: No.
13  BY MR. SLATER:
14      Q.   Rephrase.
15           Did you know, by the way -- rephrase.
16  Well, I'll ask the question clean.
17           Were you ever aware or was
18  professional education ever aware that medical
19  affairs had serious concerns about the erosion and
20  contraction/shrinkage rates with the mesh material,
21  the Gynemesh PS mesh material in the Prolift?
22      A.   I was not aware of that.
23      Q.   Was professional education at Ethicon
24  ever aware that starting almost two years before the
25  Prolift was even launched, that the French doctors

Page 357

1   who were in the TVM Group were asking your company
2   to come up with a safer, better mesh material
3   because they were concerned about the rates and
4   severity of erosion and contraction?
5           MR. BROWN: Objection.
6   BY MR. SLATER:
7       Q.   Were you --
8           Was your department aware of that?
9           MR. BROWN: Objection.
10          THE WITNESS: We wouldn't have been
11  aware of something that was --
12  BY MR. SLATER:
13      Q.   It's just a yes or no question.
14          Were you aware or not?
15      A.   No, we weren't aware two years before
16  the product was launched.
17      Q.   In fact, professional education was
18  never aware that medical affairs had been told by
19  the French doctors they needed to work to find a
20  better mesh material than Gynemesh PS because of the
21  issues with erosion and contraction. Your
22  department never knew that. Right?
23          MR. BROWN: Objection.
24          THE WITNESS: I can't agree to that.
25  I don't know what was told to my department in the

21 (Pages 354 to 357)

Confidential - Subject to Protective Order

Page 358

1  time that I wasn't --
2  BY MR. SLATER:
3      Q.    As far as you know, was that ever
4  told?
5      A.    As far as I know, I don't recall that
6  being discussed.  But it may very well have been
7  discussed with somebody else in professional
8  education.
9      Q.    Now, go to the very first page of the
10  article.
11         Not that, the article, the Fatton
12  article, the actual published article.
13         Very end of the abstract on the first
14  page, the last sentence says, "Anatomical and
15  functional results must be assessed with a long-term
16  follow-up to confirm the effectiveness and safety of
17  the procedure."
18         Is that information conveyed with
19  regard to the Fatton article that is summarized here
20  in this professional education deck, the second
21  deck, that those authors said that they needed to do
22  long-term studies to confirm that the Prolift
23  procedure is safe and effective?
24      A.    I think that that was something that
25  was conveyed.

Page 359

1      Q.    Show me where on the document.  I'm
2  not asking you in the stratosphere.  I'm asking you
3  here in the document, is that information conveyed
4  that those authors of that article had that
5  conclusion?
6      A.    That's a pretty typical conclusion
7  that appears in most clinical studies.
8         MR. SLATER:  Sir, I move to strike.
9  I move to strike.
10  BY MR. SLATER:
11      Q.    Did I ask you, with all due respect,
12  whether it's a typical conclusion?  Did I ask you
13  that?
14      A.    I'm not certain.
15      Q.    You're not certain if I just asked
16  you whether that's a typical conclusion?
17         MR. BROWN:  If he's asking you if
18  that language is in the slide deck, answer if that
19  language is in the slide deck or not in the slide
20  deck.
21         THE WITNESS:  Thank you.  That's
22  clear.
23         That language I don't see in the
24  slide deck as I sit here today.
25  BY MR. SLATER:

Page 360

1      Q.    The fact that 17 percent shrinkage
2  rate in the 110-patient study by Fatton, Cosson,
3  Jacquetin, et al., was not disclosed in this summary
4  that's provided in the professional ed deck renders
5  the summary of that article not fair and balanced.
6  Correct?
7         MR. BROWN:  Objection.
8         THE WITNESS:  No, I can't agree with
9  that.
10  BY MR. SLATER:
11      Q.    You can't agree or do you need to ask
12  medical affairs?
13      A.    I would defer the question to medical
14  affairs.
15         MR. SLATER:  Assuming that counsel is
16  not going to requestion you again, I would think I'm
17  done.
18         MR. BROWN:  Can we take --
19         MR. SLATER:  But I will say, just for
20  the record, that we're going to be making requests
21  for these webcasts, the telesurgeries, the videos,
22  the transcripts, everything, to make sure that we
23  have it all.  If we do, awesome.  If we don't, I'm
24  going to reserve my rights with regard to that issue
25  and the other questions I am -- the other issues

Page 361

1  we're going to write to you about.  I don't think
2  we're going to need to requestion this witness, but
3  I have to see what we get, if it's material we
4  didn't have.  Other than that, we're done.
5         MR. BROWN:  Are you going to follow
6  that with a letter?
7         MR. SLATER:  Absolutely.  You'll get
8  a detailed letter.
9         MR. BROWN:  Okay.  I don't have any
10  questions.  Can we take a break?
11         THE VIDEOGRAPHER:  The time is now
12  11:19.  This is the end of Disk Number 1.  We are
13  going off the record.
14                  - - -
15         (A recess was taken from 11:19 a.m.
16         to 11:34 a.m.)
17                  - - -
18         THE VIDEOGRAPHER:  The time is now
19  11:34.  This is the beginning of Disk Number 2.  We
20  are back on the record.
21                  - - -
22         EXAMINATION
23                  - - -
24  BY MR. AYLSTOCK:
25      Q.    Hello, Mr. Parisi.  My name is Brian

22 (Pages 358 to 361)

Confidential - Subject to Protective Order

Page 362

1 Aylstock.
2         We met yesterday; is that correct?
3   A.    Yes.
4   Q.    The rules --
5         The deposition is continuing, but do
6 you understand that you're still under oath?
7   A.    Yes.
8   Q.    And the same rules that Mr. Slater
9 went over you apply with me; is that right?
10  A.    Yes.
11  Q.    So let me show you what was
12 previously marked in your earlier deposition as
13 Exhibit 123.
14        Is that your CV?
15  A.    Yes, this looks like my CV. I don't
16 know that this is the most current version.
17  Q.    Well, you wrote this document; is
18 that right?
19  A.    I did, yes.
20  Q.    And it's important to you that a
21 curriculum vitae or CV is accurate; is that right?
22  A.    Yes.
23  Q.    Do you believe it to be accurate?
24  A.    I do, yes.
25  Q.    Let me ask you a few questions.

Page 363

1         I think you just testified that
2 you're now a regional PE manager or are you still
3 director of professional education worldwide?
4   A.    I'm a regional professional education
5 manager currently.
6   Q.    When did that change happen?
7   A.    About a year ago.
8   Q.    Now, in the hierarchy, a regional
9 professional education would be -- would report to
10 the director of professional education worldwide; is
11 that right?
12  A.    That's correct. Not to worldwide. I
13 report currently to the director of professional
14 education in the US.
15  Q.    And that director of professional
16 education in the US is who?
17  A.    Tom Affeld.
18  Q.    And Tom Affeld as director of
19 professional education US would report to director
20 of professional education worldwide; is that
21 correct?
22  A.    I believe so, yes.
23  Q.    So, but at one point, you held
24 director of professional education worldwide; is
25 that correct?

Page 364

1   A.    I held it for -- at one point in
2 time. It wasn't equivalent to the role that my
3 boss's boss currently holds.
4   Q.    When did that change take place, you
5 said about a year ago?
6   A.    Yes.
7   Q.    Why did that happen?
8   A.    The company went through some
9 restructuring, and my job was eliminated at the
10 time. And I interviewed for the job that I
11 currently have.
12  Q.    So in essence, you're now
13 reporting -- well, strike that.
14        You were demoted; is that right?
15  A.    No.
16  Q.    No.
17        Regional professional education
18 manager is equivalent to director of professional
19 education worldwide in the hierarchy of Ethicon?
20  A.    I wouldn't say it's equivalent, but I
21 wouldn't say I was demoted. I described the
22 situation of the company went through restructuring,
23 which is not uncommon in today's economy. My job at
24 the time of director of professional education
25 worldwide was eliminated, and I was able to

Page 365

1 interview and successfully gain the job that I
2 currently hold.
3   Q.    Well, somebody holds this position
4 now, director of professional education worldwide.
5 Who is that?
6   A.    Not for Ethicon Women's Health &
7 Urology. That division of -- is no longer a
8 division of Ethicon.
9   Q.    What is it a division of?
10  A.    It's no longer a company.
11  Q.    Well, I thought you said that your
12 boss reported to director of professional education
13 worldwide.
14        Is that with another Johnson &
15 Johnson company?
16  A.    With Ethicon.
17  Q.    With Ethicon.
18        Did you apply for that position
19 within Ethicon?
20  A.    Which position?
21  Q.    Director of professional education
22 worldwide, the same position you had for Ethicon's
23 Women's Health & Urology?
24  A.    I did, yes.
25  Q.    You didn't get that position?

23 (Pages 362 to 365)

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Subject to Protective Order

Page 366

1    A.    I didn't get that position.  Correct.
2    Q.    You didn't get the director of
3  professional education US either, did you?
4    A.    That's correct.
5    Q.    You applied for both of those
6  simultaneously, or was there a process?
7    A.    I believe it was both simultaneously.
8    Q.    What was the individual's name who
9  got the director of professional education US?
10   A.    Tom Affeld.
11   Q.    How do you spell that?
12   A.    A-F-F-E-L-D.
13   Q.    Does he have responsibility for the
14  TVT line of products for Ethicon?
15   A.    Yes.
16   Q.    Currently?
17   A.    Amongst other things, yes.
18   Q.    And you have regional responsibility
19  for those products currently?
20   A.    Yes.  For professional education.
21   Q.    And what is your region?
22   A.    My region is basically the states
23  between Maine and Minnesota down south on the
24  western border to Tennessee and on the eastern
25  border to New York state.

Page 367

1    Q.    Is there a number for your region or
2  nomenclature, region A, region 1?
3    A.    North Central Region.
4    Q.    How many regional managers are there
5  in the US?
6    A.    Three.
7    Q.    Who are the other two?
8    A.    Cathy Jarczynski.
9    Q.    How do you spell Jarczynski?
10   A.    J-A-R-C-Z-Y-N-S-K-I.
11   Q.    And the other one?
12   A.    Rick Lombardi.
13   Q.    How have your responsibilities
14  changed now that you're regional PE manager instead
15  of the director for professional education
16  worldwide?
17   A.    I'm responsible for regional
18  professional education for the Ethicon Surgical Care
19  division and the Ethicon Energy division within
20  those states that I previously described.
21   Q.    And the Ethicon Women's Care would
22  include the TVT portfolio of products?
23   A.    There is no longer Ethicon Women's
24  Care.  The companies that I currently support are
25  Ethicon Surgical Care and Ethicon Energy.  The TVT

Page 368

1  products are products under the Ethicon Surgical
2  Care division.
3    Q.    So you went to work for Johnson &
4  Johnson/Ethicon right out of college.  Right?
5    A.    Yes.
6    Q.    In fact, they paid for your
7  scholarship to Brazil, didn't they?
8    A.    That was well before I was involved.
9  I applied for a scholarship in, I believe it was
10  1985, before I even attended college.  And it was a
11  very competitive process, and I won a scholarship to
12  do a student exchange to Brazil for two months.
13  Subsequent to that, I went to college.  And upon
14  graduating college, I applied for a position within
15  the Ethicon division.  And I succeeded in getting
16  that position.
17   Q.    So J&J paid for part of your college.
18  Right?
19   A.    No.
20   Q.    They paid for the full scholarship to
21  Brazil, according to your resume; is that --
22   A.    They paid for the scholarship before
23  I went to college.  I was a high school student and
24  I applied for a scholarship because I wanted to do a
25  student exchange.  Johnson & Johnson had that

Page 369

1  scholarship available, and there was a competitive
2  process that I was able to win that scholarship.
3  And they paid for the expenses for me to do that
4  student exchange when I was in -- when I just
5  graduated from high school and before I started
6  college.  I've not received any other scholarships
7  or anything from Johnson & Johnson, nor did that
8  have any relationship to my later employment with
9  Johnson & Johnson.
10   Q.    Well, I guess my point is, you've
11  never worked for any other company other than
12  Johnson & Johnson/Ethicon?
13   A.    I worked for the Princeton Review
14  before I came to Johnson & Johnson.
15   Q.    Was that before college or during
16  college?
17   A.    That was during college.
18   Q.    So since you graduated from Rutgers
19  with a mechanical engineering degree, you have only
20  worked for Johnson & Johnson companies; is that
21  correct?
22   A.    That's correct.
23   Q.    Never had any other employment?
24   A.    That's correct.
25   Q.    And so that's been 23 years?

24 (Pages 366 to 369)

Confidential - Subject to Protective Order

Page 370

1    A.    It's 22, I believe, in October.
2    Q.    22 years?  Okay.
3          You started as a product development
4    engineer; is that right?
5    A.    Yes.
6    Q.    And then you ended up as a clinical
7    sales representative and a field sales trainer?
8    A.    Yes.
9    Q.    So you for a period of time at
10   Ethicon were a sales rep, meeting with doctors; is
11   that right?
12   A.    That's right.
13   Q.    And then you went into marketing.
14   Right?
15   A.    I did, yes.
16   Q.    And you became product director.
17   Correct?
18   A.    I was first in marketing, new product
19   strategic marketing manager between 2001 and 2003.
20   And then in 2003, I became product director.
21   Q.    So let's look at the new product
22   strategic -- strategic marketing manager, the CV
23   says from September '01 to January '03; is that
24   right?
25   A.    That's correct.

Page 371

1    Q.    Which products were involved?
2    Which -- were there pelvic mesh products involved in
3    that position?
4    A.    I believe the Gynemesh PS was
5    involved in that position.
6    Q.    And TVT-O?  TVT Classic?
7    A.    TVT-O may have also been involved in
8    that position as well.
9    Q.    That was a marketing position?
10   A.    I actually reported to research and
11   development, even though the title says marketing.
12   Q.    So your title was marketing, but you
13   were in the research and development side of things?
14   A.    That's correct.
15   Q.    And even in that position, it says
16   you partnered with thought leaders in urology,
17   urogynecology and gynecology to evaluate new ideas
18   and refine them into well-designed, successful new
19   procedures in incontinence and pelvic floor.
20         Can you tell me what that means?
21   A.    That just refers to the type of
22   projects that I worked on between 2001 and 2003.  I
23   worked with -- in this R&D function, I worked with
24   surgeons who were urologists, urogynecologists and
25   gynecologists, to gain their input and feedback in

Page 372

1    our research and development process for products
2    that were used in those specialties.
3    Q.    It says also, "Chartered new business
4    venture into pelvic floor repair including
5    multigenerational marketing model to succeed into
6    the pipeline for five-plus years."
7          What does that mean?
8    A.    That just describes one of the
9    projects that I worked on.  The pelvic floor repair
10   area was something that -- this job involved me
11   working on the Gynemesh PS project.  I may also have
12   had some involvement with the TVM project as well.
13   Q.    You point out the annual sales
14   revenue of those exceeded $100 million; is that
15   right?
16   A.    I believe so, yes.
17   Q.    So this is a marketing position.
18   Correct?
19   A.    I reported to R&D.  It was a liaison
20   position between R&D and marketing.
21   Q.    It was a marketing position.
22   Correct?
23   A.    I can't agree to that.  I reported to
24   R&D.  The title does include marketing in it.
25   Q.    Well, it doesn't say anything about

Page 373

1    R&D, does it?
2    A.    I don't see R&D listed here, but I am
3    telling you today that despite that information not
4    being here, this was an R&D position.  And that's
5    available in my personnel records as well.
6    Q.    You don't disagree that this position
7    involved the marketing of those products, do you?
8    A.    I don't disagree at all.  I said it
9    was a liaison between marketing and research and
10   development.
11   Q.    Then you became product director in
12   January of '03; is that right?
13   A.    Yes.
14   Q.    Product director is a marketing
15   position exclusively.  Correct?
16   A.    That is a marketing position.
17   Correct.
18   Q.    It looks like in this position you
19   managed the $50 million tension-free vaginal tape
20   TVT business during onset of highly competitive
21   market.  Do you see that?
22   A.    Yes.
23   Q.    What does that mean?
24   A.    That means I managed the TVT business
25   from a marketing perspective in that period between

25 (Pages 370 to 373)

Confidential - Subject to Protective Order

Page 374

1  2003 and February of 2005.
2      Q.    Now, TVT stands for tension-free
3  vaginal tape; is that right?
4      A.    That's correct.
5      Q.    And that's been what it stood for
6  since the very beginning, to your knowledge.
7  Correct?
8      A.    Yes.
9      Q.    And that's widely known within the
10  company?
11      A.    I believe so.  I can't attest to what
12  other people know or don't know, but I can tell you
13  that's my understanding of what TVT means.
14      Q.    And that was your understanding when
15  you were working as a product development engineer,
16  or do you recall?
17      A.    I had no involvement with TVT between
18  those years that I was a product development
19  engineer.
20      Q.    Well, the years you were product
21  director, the TVT was experiencing declining market
22  share; is that right?
23      A.    Yes.
24      Q.    And you helped to turn around that
25  declining market share; is that right?

Page 375

1      A.    Yes.
2      Q.    And there's also declining unit sales
3  and flat revenue.  Correct?
4      A.    Yes.
5      Q.    For the TVT product?
6      A.    Yes.  In that time period.
7      Q.    And it also, as product director,
8  marketing position at the bottom, says you launched
9  Ethicon's first direct-to-consumer patient education
10  PR campaign featuring Olympic speed skater Bonnie
11  Blair; is that right?
12      A.    That's correct.
13          MR. BROWN:  Bryan, let me just ask
14  you this.  When you just used the word "TVT," is
15  that just going to refer to the retropubic or
16  Classic?
17          MR. AYLSTOCK:  Well --
18          MR. BROWN:  And you did do that
19  there, but I just wanted to make sure.  I don't --
20  if that's our understanding, I'm not going to object
21  to different things, but...
22  BY MR. AYLSTOCK:
23      Q.    Well, how many TVT products are
24  there?
25      A.    There are I think about five

Page 376

1  different TVT products.
2      Q.    Is the original in your nomenclature
3  described as the TVT Classic?
4      A.    Yes.
5      Q.    And then there's TVT-O for the
6  transobturator; is that right?
7      A.    There's also TVT abdominal or TVT
8  with abdominal guides.
9      Q.    Is that TVT-AA?
10      A.    I'm not sure.  I haven't used the
11  term, but it -- what -- the product that from my
12  knowledge I termed is TVT with abdominal guides.
13      Q.    Okay.
14          And then there's TVT SECUR or TVT-S;
15  is that right?
16      A.    Yes.
17      Q.    And TVT EXACT?
18      A.    Yes.
19      Q.    And TVT ABBREVO?
20      A.    Yes.
21      Q.    Okay.
22          You were --
23          Were you product director over TVT-S
24  or was that after your time?
25      A.    That was after my time in marketing.

Page 377

1      Q.    Well, I think if it's okay with you,
2  when I refer to TVT, I'm asking you about TVT
3  Classic.  And if I ask a question about TVT-O, I'll
4  ask about that or TVT-S would be SECUR.  If I talk
5  about the TVT products, what I'm talking about is
6  the entire range of products.  Is that fair?
7      A.    The only question I would have is
8  where would you put the TVT with abdominal guides?
9      Q.    I would put them as one of the TVT
10  products.
11          Is that a fair characterization?
12      A.    Yes, that's fair.  As long as you use
13  those descriptions, I'll be able to answer your
14  questions as accurately as I can.
15      Q.    I appreciate that.
16          Bullet point number 4 talks about how
17  you launched Gynemesh PS and the TVT obturator
18  system.  Do you see that?
19      A.    Yes.
20      Q.    So what do you mean by launched those
21  two products?
22      A.    I was involved when the products were
23  launched.  There were other team members that were
24  also involved when those products were launched.
25  But during the time period that I held the position

26 (Pages 374 to 377)

Confidential - Subject to Protective Order

Page 378

1  of product director, the Gynemesh PS and the TVT
2  obturator system were launched, meaning that they
3  were released for sale by the company.
4      Q.    And it says, content development and
5  delivery of sales training and professional
6  education.  Do you see that?
7      A.    Yes, I do see that.
8      Q.    So you were involved in content
9  development for professional education as product
10  director, marketing.  Correct?
11     A.    I was amongst the team of people that
12  were involved, yes, as I've stated before.
13     Q.    So what was your involvement in
14  developing the content for the professional
15  education for the TVT-O system?
16     A.    In this particular position and this
17  particular time, I represented one of the marketing
18  functions on that team.  That team would have also
19  included medical affairs, our preceptors, our
20  surgeons that teach the product, regulatory, legal,
21  quality amongst other groups.  So it was a
22  cross-functional team that worked on the content
23  development that's described in that bullet.  And I
24  was a member of that team.
25     Q.    Yesterday you testified, and I wrote

Page 379

1  it down, that the intent of professional education
2  is to provide training in safe and effective use of
3  your products.  Do you recall that testimony?
4      A.    Yes.  I do recall that, yes.
5      Q.    Do you agree with --
6            Today you still agree that that's the
7  intent of professional education?
8      A.    I do agree that that's the intent of
9  professional education.
10     Q.    You would agree with me that
11  professional education shouldn't have anything to do
12  with sales.  Sales shouldn't drive professional
13  education, should it?
14     A.    Sales is involved in professional
15  education.  As a business, one of the outcomes of
16  sales is to drive revenue.  That revenue pays for
17  things that the company does in support of its
18  products and in support of research and development
19  and future innovation.  So I would say that sales
20  would be a part of professional education.
21     Q.    Okay.
22            So it's your testimony that
23  professional education should involve the sales of
24  the product?
25     A.    It does involve the salespeople, and

Page 380

1  they're one of the people that would nominate
2  surgeons for training and then continue to represent
3  and help the surgeons reach back out to the faculty
4  or the preceptors.
5      Q.    Do you agree with me that sales reps
6  shouldn't be the ones training physicians?
7      A.    In professional education, surgeons
8  were training physicians.
9            MR. AYLSTOCK:  Move to strike.
10  BY MR. AYLSTOCK:
11     Q.    I'm asking you -- and we can go round
12  and round like you did earlier today and yesterday.
13  I want you to listen to my question.
14     A.    Sure.
15     Q.    My question is, should sales reps be
16  training physicians in Ethicon on how to insert or
17  patient selection criteria for any of the TVT
18  products, yes or no?
19     A.    No.  Sales reps were not training
20  physicians.  Surgeons were training physicians.
21            MR. BROWN:  Do me a favor.  Give me
22  one second.
23            If he's asking you if sales reps
24  should be training them, just answer yes or no.
25  Don't add the next part, which is the doctors are

Page 381

1  doing the training.
2            THE WITNESS:  Sure, I'm sorry.
3            MR. BROWN:  Just yes or no on his
4  question.
5            THE WITNESS:  Okay.  I apologize.
6            MR. AYLSTOCK:  Move to strike the
7  answer and I'll ask it clean.
8            MR. BROWN:  Sure.
9  BY MR. AYLSTOCK:
10     Q.    Should sales reps be training
11  physicians on how to perform the TVT surgery of any
12  of the products or what patients should be selected?
13  Is that a sales rep function?
14     A.    I don't see that as a sales rep
15  function as I sit here today.
16     Q.    It would be improper if that
17  happened.  Correct?
18     A.    I can't say that it would be
19  improper.  I never was involved in the sales
20  department for TVT.
21     Q.    As a professional education director,
22  you can't tell this jury one way or the other
23  whether sales reps training physicians would be
24  improper?
25     A.    Sales reps -- I think I answered

27 (Pages 378 to 381)

Confidential - Subject to Protective Order

Page 382

1  that -- do not train physicians on use of the
2  product.
3           MR. AYLSTOCK:  No, no, no, you
4  didn't.  Move to strike.
5  BY MR. AYLSTOCK:
6      Q.   I'm asking you as the professional
7  education director for the TVT products whether you
8  believe that a sales rep training a physician is an
9  improper thing for that sales rep to do?
10     A.   It's my understanding in professional
11 education that the training in professional
12 education comes from a surgeon, not a sales
13 representative.
14     Q.   It would be wrong for a sales
15 representative to be out there training the
16 physician on how to perform the surgery because
17 sales reps aren't physicians.  Right?
18     A.   Sales reps are not physicians.
19 Correct.
20     Q.   So it would be wrong for a
21 nonphysician to be telling a physician how to
22 perform the surgery.  Correct?
23     A.   A sales rep may have some involvement
24 in guiding a physician or reminding them of the
25 information that they received in professional

Page 383

1  education.  They would not --
2           MR. AYLSTOCK:  Let me move to
3  strike --
4           THE WITNESS:  -- solely be the person
5  that was training the surgeon on the procedure.
6  BY MR. AYLSTOCK:
7      Q.   Listen to my question.
8      A.   Sure.
9           MR. AYLSTOCK:  Let me move to strike
10 your answer.
11 BY MR. AYLSTOCK:
12     Q.   And we'll get through this faster if
13 you listen to my question.
14     A.   Absolutely.  I'm trying my best to do
15 that.
16          MR. AYLSTOCK:  Ann Marie, can you
17 read the question back, please?
18                 - - -
19          (The court reporter read the
20          pertinent part of the record.)
21                 - - -
22          THE WITNESS:  I can't answer that
23 with a yes or no.
24 BY MR. AYLSTOCK:
25     Q.   So -- but you would agree that sales

Page 384

1  reps shouldn't, in --
2           According to Ethicon's policies and
3  procedures, sales reps are not supposed to be
4  training the doctors on how to perform this
5  procedure.  Correct?
6      A.   I would agree that professional
7  education is the function in which surgeons provide
8  the training on the procedure, yes.
9      Q.   Okay.  So let me ask it again clean.
10          Sales reps shouldn't be training
11 doctors or physicians, according to Ethicon's
12 policies and procedures.  Correct?
13     A.   As I sit here today, I don't know if
14 I can give a yes or no answer, because I don't know
15 what Ethicon's policies are as they pertain to sales
16 representatives.
17     Q.   As director of professional
18 education, your understanding is that it would be
19 improper for sales representatives to be in there,
20 telling the physicians how to perform the surgery.
21 Correct?
22          MR. BROWN:  Are you asking for
23 professional education?  I think that might be the
24 hiccup with him.
25 BY MR. AYLSTOCK:

Page 385

1      Q.   Does professional education -- well,
2  let me back up.
3           You said -- well, let me back way up.
4           What is the role of professional
5  education within Ethicon?
6      A.   Professional education provides the
7  training by surgeons to surgeons on our products.
8      Q.   And what was your role as director of
9  professional education in providing that training?
10     A.   Our role was to coordinate the
11 logistics around doctors traveling to visit other
12 doctors, doctors traveling to hands-on laboratories.
13 Our role was also to have been -- to engage with our
14 surgeon faculty who would be teaching the products
15 to the surgeon learners.
16     Q.   Is the role of professional education
17 to drive revenue for the company?
18     A.   No.
19     Q.   That would be improper.  Correct?
20     A.   I wouldn't say that it would be
21 improper.  It's not the primary goal.
22     Q.   It's one of the goals?
23     A.   I would say that as a business, it is
24 a possible goal of professional education to -- we
25 certainly would want surgeons that we trained to

Confidential - Subject to Protective Order

Page 386

1  utilize the products that they were trained on as
2  opposed to not utilizing the products.  It wouldn't
3  be an efficient use of the company's...
4       Q.    So is one of the goals of
5  professional education as well to market the
6  product?
7       A.    No.
8       Q.    That would be improper?
9            MR. BROWN:  Objection.
10           THE WITNESS:  I wouldn't say that
11  that would be improper.  That's not a goal of
12  professional education.
13  BY MR. AYLSTOCK:
14       Q.    And is the -- driving revenue a goal
15  of professional education?  Is that something
16  professional education should be concerned with,
17  driving revenue to the company?
18       A.    Professional education is not in
19  the -- is separated from the commercial aspect of
20  the business, so I would say that driving revenue is
21  not a goal of professional education.
22       Q.    And it shouldn't be a goal.  Correct?
23       A.    I wouldn't say that it shouldn't be.
24  It's important as a business for all functions
25  within the business to do their function and also

Page 387

1  contribute towards the viability of the company and
2  its ability to invest in research and training and
3  the production of safe and effective products.
4       Q.    As an individual who's never had
5  another job since college from -- other than at J&J,
6  you're familiar with the J&J credo?
7       A.    Yes, I am.
8       Q.    Let me show you what's previously
9  been marked as Exhibit T-15.
10           You probably don't even need to look
11  at it, do you?
12       A.    I'd like to look at it, if you'll
13  give me a moment.
14       Q.    You work in Somerville; is that
15  right?
16       A.    Yes.
17       Q.    They put this on the wall at
18  Somerville, don't they?
19       A.    I believe so, yes.
20       Q.    You walk by it every day when you
21  come in the office, don't you?
22       A.    I don't know that I walk by it every
23  day, but it's certainly in the hallway.
24       Q.    Okay.
25           And you're familiar with this credo?

Page 388

1       A.    I'm familiar with it, yes.
2       Q.    You've read it?
3       A.    I've read it, yes.
4       Q.    You believe in it?
5       A.    I do, yes.
6       Q.    You follow it?
7       A.    Yes.
8       Q.    Always?
9       A.    Yes.
10       Q.    Professional education should always
11  be following this, every individual within
12  professional education?
13       A.    Yes.
14       Q.    Correct?
15           And this is the Johnson & Johnson
16  credo.  Right?
17       A.    Yes.
18       Q.    It applies to all the companies owned
19  or operated by J&J, including Ethicon and all its
20  employees.  Correct?
21       A.    Yes.
22       Q.    So when we're talking about the J&J
23  credo, it's the same as saying the Ethicon credo.
24  Correct?
25       A.    I haven't heard to it referred to as

Page 389

1  the Ethicon credo.  It's the J&J credo.
2       Q.    You believe in it and apply -- and
3  believe it should be applied in everything every
4  employee does within the company.  Correct?
5       A.    Yes, I believe that.
6       Q.    The first responsibility, according
7  to the J&J credo, is what?
8       A.    The "first responsibility is to...
9  doctors, nurses...patients...mothers and fathers and
10  all others" that "use our products and services."
11       Q.    And it also says that mistakes must
12  be paid for.  Correct?
13       A.    Yes.
14       Q.    One of the things that this credo
15  stands for is --
16       A.    I'm sorry, could I just read to
17  where -- which section are you referring to?  I
18  don't want to misspeak as we're looking at a
19  specific document.
20           Okay.  "Research must be carried on,
21  innovative programs developed," yes, "and mistakes"
22  must be "paid for."  I do see that.  Thank you.
23       Q.    And you agree with that?
24       A.    I do agree with that, yes.
25       Q.    In essence, what this credo stands

29 (Pages 386 to 389)

Confidential - Subject to Protective Order

Page 390

1   for is that patient safety should come first.
2   Correct?
3       A.    Yes.
4       Q.    Should come before corporate profits?
5       A.    Yes.
6       Q.    And your company shouldn't expose
7   anyone, any woman using any of the products, to
8   needless danger for corporate profits.  Correct?
9       A.    Yes.
10      Q.    And in fact, your company should
11  never expose any of the patients that use the
12  products to needless danger, according to this.
13  Correct?
14      A.    I'm sorry, can you rephrase the
15  question?
16      Q.    Would you agree that the credo stands
17  for the proposition that your company, Ethicon/J&J,
18  should never expose a patient to a needless danger?
19      A.    Yes.
20      Q.    And that if the -- any --
21            And that's true for any medical
22  device manufacturer.  You believe that.  Right?
23      A.    I believe that this credo applies to
24  Johnson & Johnson, and that's my understanding of
25  where it's used.  I can't speak for another medical

Page 391

1   device manufacturer.
2       Q.    All right.
3             Well, you would agree that if there
4   were an instance where Johnson & Johnson or Ethicon
5   failed to put patient safety first and exposed a
6   patient to a needless danger, that it should be
7   accountable for all the harms and losses that result
8   from that.  Correct?
9             MR. BROWN:  Objection.
10  BY MR. AYLSTOCK:
11      Q.    According to this credo?
12      A.    Can you rephrase the question,
13  please?
14      Q.    If there were an instance where
15  Ethicon or J&J exposed a patient who used one of its
16  products to a needless danger, then it should be
17  held accountable for the harms and losses of the
18  patient that result from exposure of that needless
19  danger.
20            Do you agree with that or disagree
21  with that?
22            MR. BROWN:  Objection.
23            THE WITNESS:  I would agree that
24  that's what this document says, in my
25  interpretation.  There's many people, you know, that

Page 392

1   would have an interpretation of this as well.
2   BY MR. AYLSTOCK:
3       Q.    And as the director of professional
4   education, is that the type of standard that you
5   held yourself to and the employees within
6   professional education to?
7       A.    Yes.
8       Q.    So the role of professional education
9   in your mind is to train physicians.  Correct?
10      A.    Yes.
11      Q.    And that should be the focus of
12  professional education?
13      A.    That is -- yes.  That's probably the
14  focus of professional education.  Surgeons training
15  surgeons.
16      Q.    So let's talk -- you spoke about this
17  in the context of the Prolift and maybe some of the
18  TVT, but let's talk about some of the types of
19  professional education for the TVT line of products.
20      A.    Sure.
21      Q.    You mentioned hands-on training?
22      A.    Yes.
23      Q.    Describe that for the jury, please.
24      A.    Hands-on training would be the
25  teaching surgeon would demonstrate the proper steps

Page 393

1   in utilizing a product.  And the learning surgeon
2   would observe and then be able to perform the
3   training on a hands-on training model.
4       Q.    Okay.
5             Is that in the context of a cadaver
6   lab or something like that?
7       A.    It could be a cadaver lab or it could
8   be a surgical simulator as well.
9       Q.    While we're going through this, it
10  might be helpful just to kind of look at what I
11  marked as Exhibit T-1056.
12            - - -
13            (Deposition Exhibit No. T-1056,
14            Gynecare TVT SECUR System Professional
15            Education Program Opportunities, Consider
16            -- Proper Targeting, Course Effectiveness,
17            & Costs, Bates stamped ETH.MESH.05795106,
18            was marked for identification.)
19            - - -
20            THE WITNESS:  Okay, thank you.
21  BY MR. AYLSTOCK:
22      Q.    Is this a document you've seen
23  before?
24      A.    I believe I've seen it, yes.
25      Q.    And these --

30 (Pages 390 to 393)

Confidential - Subject to Protective Order

Page 394

1    Does this list all of the
2  professional education materials available for the
3  TVT SECUR, or are there others not on this list
4  available?
5    A.    As I sit here today, this seems to be
6  a good list of training that was available for TVT
7  SECUR.
8    Q.    In the context of the Prolift, your
9  counsel showed you a document with the requirements
10 that your company instituted for physicians to use
11 the Prolift product.
12    Are there similar requirements for
13 the TVT line of products?
14    A.    Yes.
15    Q.    What are those requirements?
16    A.    The TVT products were intended for
17 use by board certified gynecologists, urologists or
18 urogynecologists that treated women with
19 incontinence, stress urinary incontinence to be
20 specific.
21    Q.    Were there other requirements or was
22 that the only requirement?
23    A.    Those are the ones I can recall as I
24 sit here today.
25    Q.    So as you sit here today, that was --

Page 395

1  unlike the Prolift procedure which had a number of
2  requirements, the only requirement for using a TVT
3  product, according to Ethicon, for a physician using
4  it, was just to be board certified; is that correct?
5    A.    I mentioned also in having experience
6  treating patients with stress urinary incontinence.
7    Q.    Anything else?
8    A.    Without a document in front of me
9  like this, it would be hard for me to say.  There
10 may have been other things.
11    Q.    You're still in the role of
12 professional education on the TVT products today.
13 Correct?
14    A.    Yes, I am.
15    Q.    And your job is to know what criteria
16 are required to train physicians on the product.
17 Right?
18    A.    Yes.
19    Q.    Okay.
20    A.    Amongst other things.
21    Q.    Well, and that's, in essence, been
22 your job for many years.  Correct?
23    A.    It's been my job for -- I can go back
24 to my CV.  I can give you the years that it was my
25 job.

Page 396

1    Q.    Well, it's been multiple years.
2  Correct?
3    A.    Yes, it's been multiple years.
4  Correct.
5    Q.    And the only two things that you can
6  identify for me are board certified and experience
7  in treating patients with stress urinary
8  incontinence.  Anything else?
9    A.    I can't recall as I sit here today if
10 there was anything else or not.
11    Q.    If during a break or later on you
12 recall something, I'd appreciate you letting your
13 counsel know so I can know what your company other
14 requirements might have.
15    A.    Absolutely. I will.  Thank you.
16    Q.    So let's go through this.
17    We have the proctorships -- or
18 preceptorships.  Right?
19    A.    Yes.
20    Q.    And the target there is "All surgeons
21 who want to learn the procedure."  Do you see that?
22    A.    Yes, I do see that.
23    Q.    It's "the most effective training
24 course available" and it's "the primary option for
25 training physicians."  Right?

Page 397

1    A.    That's what this document describes,
2  yes.
3    Q.    So when it says "all surgeons," that
4  doesn't say board certified or not.  Right?
5    A.    That was understood.  This document
6  wouldn't stand alone.
7    Q.    What did you do as director of
8  professional education to make sure that was
9  understood within your company and the sales reps
10 that were out there recruiting doctors?
11    A.    We facilitated training for the sales
12 representatives.  And, you know, during that time,
13 it would be explained to them who the target
14 surgeons were for each of the different types of
15 products that we provided education for.
16    Q.    So what training did professional
17 education provide for the sales reps?
18    A.    We provided training during their
19 sales school.  We provided training during their
20 national training meeting.  There was individual
21 one-off training that professional education
22 managers would have provided to sales
23 representatives, either over the phone or in person.
24    Q.    Were there videos created for sales
25 reps on prof ed?

31 (Pages 394 to 397)

Confidential - Subject to Protective Order

Page 398

1    A.    There were videos created on the
2  procedures and sales reps had access to those videos
3  on procedures. The videos that prof ed provided
4  were those that were intended for surgeon training,
5  physician training.
6    Q.    So at these sales schools and
7  national training meetings, how were they trained by
8  prof ed? Was it stand up and do a PowerPoint? Was
9  it -- what was it?
10   A.    Yeah. Typically a PowerPoint would
11  be one of the ways that it would be done.
12   Q.    Did you yourself do any of these
13  training sessions?
14   A.    I may have.
15   Q.    And you would agree that when
16  training sales reps about the use of the TVT
17  products, that that training also needed to be fair
18  and balanced. Correct?
19   A.    Yes.
20   Q.    Because if the sales reps received
21  information that wasn't fair and balanced, they
22  might communicate that to physicians as well in an
23  unfair way. Correct?
24   A.    Yeah. I'd just like to clarify, my
25  department wasn't responsible for training sales

Page 399

1  representatives. My answer before referred to
2  training sales representatives specifically on
3  professional education.
4    Q.    But you agree that sales
5  representatives need to be trained in a fair and
6  balanced way so they can communicate information to
7  physicians in a fair and balanced way. Correct?
8    A.    I would agree with that, but I'm
9  not -- I would defer that to sales training as being
10  the experts in that area.
11   Q.    So let's --
12         We talked about preceptorships.
13  That's a live training of actual cases performed by
14  preceptors. Correct?
15   A.    Yes.
16   Q.    Cadaver labs, that's "the most
17  expensive training available;" is that right?
18   A.    According to this document for TVT
19  SECUR, yes.
20   Q.    And in those cadaver labs, a
21  physician who wanted to learn the procedure could do
22  the procedure on a cadaver and understand how to
23  perform it; is that right?
24   A.    They could do the procedure on a
25  cadaver and understand how to perform it, correct.

Page 400

1    Q.    And then you talked about the
2  proctorships. Right?
3    A.    Yes.
4    Q.    That's where a physician is in the
5  hospital overseeing the operation by one of the
6  trainees; is that right?
7    A.    Yes.
8    Q.    And that's the "last resort for large
9  targets that are unable to learn the procedure
10  through other courses." Is that what this says?
11   A.    That's what this document says, yes.
12   Q.    This document is TVT SECUR, but the
13  same principle would apply to any of the TVT
14  products; is that right?
15   A.    I'd have to see the documents for the
16  other TVT products.
17   Q.    Well, sir, you're the director of
18  professional education.
19         Do you know as we sit here today
20  whether that's true or not?
21   A.    I don't know.
22   Q.    And telesurgeries are those that were
23  performed over the Internet?
24   A.    Yes. Or through satellite
25  connection.

Page 401

1    Q.    And we have speaker events and
2  webcasts, we talked about those. Right?
3    A.    Yes.
4         THE WITNESS: I'd like to have a
5  bathroom break, if I could. Thank you.
6         MR. AYLSTOCK: Go off the record.
7         THE VIDEOGRAPHER: The time is now
8  12:17. This is the end of Disk Number 2. We're
9  going off the record.
10        - - -
11        (A recess was taken from 12:17 p.m.
12  to 12:25 p.m.)
13        - - -
14        THE VIDEOGRAPHER: The time is now
15  12:25. This is the beginning of Disk Number 3. We
16  are back on the record.
17  BY MR. AYLSTOCK:
18   Q.    We've -- what's the number of this
19  document?
20   A.    1056 with a T in front of it.
21   Q.    We've been going over the types of
22  professional education program opportunities in
23  Exhibit 1056.
24        Are there any others you can think of
25  for any of the TVT line of products that aren't on

32 (Pages 398 to 401)

Confidential - Subject to Protective Order

Page 402

1  this list?
2      A.    No.
3      Q.    Let me show you Exhibit 1057.
4                        - - -
5            (Deposition Exhibit No. T-1057,
6      E-mail chain, top one dated 25 May 2011,
7      Bates stamped ETH.MESH.05164815 through
8      ETH.MESH.05164820, was marked for
9      identification.)
10                       - - -
11 BY MR. AYLSTOCK:
12     Q.    It's an e-mail from Aaron Kirkemo
13 sent to you among others.  Do you see that?
14     A.    I do, yes.  Thank you.
15     Q.    Also to Scott Jones.
16           Is he marketing, sales?
17     A.    I believe at this time frame,
18 marketing.
19     Q.    The date on the e-mail is May 2011;
20 is that right?
21     A.    Yes.
22     Q.    You were director of professional
23 education for the TVT products at this time?
24     A.    Yes.
25     Q.    Do you remember receiving this?

Page 403

1      A.    I don't remember receiving this, but
2  my name was on the distribution, so I probably did.
3      Q.    Who is Jennifer Paradise?
4      A.    Jennifer Paradise is a person who
5  worked in professional education, I think, at the
6  time that this was written.  Yes.
7      Q.    If we turn back to the first e-mail
8  on the chain, Brian Luscombe, who is he?
9      A.    I believe at this point in time,
10 Brian Luscombe has been with the company for a
11 number of years, but I believe at this point in time
12 he was in marketing.
13     Q.    So Brian e-mails from the marketing
14 department to Piet Hinoul, Aaron Kirkemo in medical
15 affairs.  Right?
16     A.    I'm sorry, are you on the first
17 page or --
18     Q.    The very first e-mail on the chain
19 from May 12th at 1:24 p.m.
20     A.    Yes.
21     Q.    Then you're listed along with
22 Ms. Paradise and then some others?
23     A.    Yes.
24     Q.    And he's addressing it to medical
25 affairs, prof ed and marketing communications

Page 404

1  partners.  Right?
2      A.    Yes.
3      Q.    What he's talking about is the
4  institution of a newsletter to customers.  Right?
5      A.    I'm sorry, could I take a minute to
6  read that section?
7      Q.    Okay.
8      A.    Can you -- I'm sorry, I just after
9  reading it didn't remember your question.
10     Q.    Well, do you recall a time when the
11 marketing department engaged medical affairs, prof
12 ed, along with some marketing communications about
13 the institution of a quarterly newsletter from
14 J&J/Ethicon?
15     A.    It would appear that way from this
16 e-mail, yes.
17     Q.    And this newsletter is called "Female
18 Pelvic Medicine & Reconstructive Surgery."
19           Do you see that?
20     A.    I do see that, yes.  And this is a
21 draft of a newsletter.
22     Q.    That wasn't copy approved yet.
23 Right?
24     A.    That's what it says here, yes.
25     Q.    Now, any such newsletter that would

Page 405

1  go out from J&J/Ethicon would need to be copy
2  approved.  Right?
3      A.    Yes, it would.
4      Q.    By marketing.  Right?  Would they --
5      A.    By the copy review board, the
6  cross-functional team that we spoke about before.
7      Q.    That would include marketing.  Right?
8      A.    Marketing was not part of the copy
9  review approval.
10     Q.    For what?  For anything?
11     A.    I don't think so, no.
12     Q.    Because I think you testified earlier
13 today that they were.  Do you know?
14     A.    I don't know for sure.  I would defer
15 that to the marketing services department.
16     Q.    Prof ed would need to copy approve
17 it.  Right?
18     A.    Prof ed would need to copy approve
19 it, yes.
20     Q.    As this --
21           A quarterly newsletter to doctors
22 would be part of prof ed.  Right?
23     A.    This was something, from my
24 understanding of this e-mail, that Mr. Luscombe was
25 proposing.  What's attached here is a draft.  I

33 (Pages 402 to 405)

Confidential - Subject to Protective Order

Page 406

1  don't recall that this newsletter ever came to
2  fruition, so this was a concept that seems from this
3  e-mail that Mr. Luscombe is suggesting.
4      Q.   Is it your understanding that it was
5  never sent or you just have no idea?
6      A.   I don't have knowledge that this
7  newsletter was sent.
8      Q.   Do you know that it --
9           Do you know one way or the other?
10      A.   I don't know.  I would address that
11  to Mr. Luscombe.
12      Q.   Well, the idea of this --
13           You would agree, though, that if it
14  was sent, it would be part of professional
15  education's responsibility to make sure that it was
16  accurate.  Correct?
17      A.   I think he's consulting professional
18  education to get our input on this concept.
19      Q.   And the idea of this newsletter is to
20  penetrate teaching institutions throughout the
21  United States.  That's what he says.  Right?
22      A.   It does say that, yes.
23      Q.   You would agree that if it was
24  sent -- well, I'll strike that.
25           He's also talking about -- if we go

Page 407

1  to Jennifer Paradise, the second page of the e-mail.
2           She's in prof ed; is that right?
3      A.   At this time, yes.
4      Q.   And she really likes the idea and the
5  format.  Right?
6      A.   That's what she's saying in this
7  e-mail, yes.
8      Q.   Was she your -- under your management
9  at that time?
10      A.   Yes.
11      Q.   Okay.
12           And then Aaron Kirkemo weighs in.
13           He's director of medical affairs; is
14  that right?
15      A.   Yes.
16      Q.   And he agrees and thinks it looks
17  good.  Right?
18      A.   Yes.
19      Q.   And you have no knowledge about
20  whether this was implemented or not?
21      A.   I don't.  From this communication, it
22  looks like this was a concept that Brian was looking
23  to get input from various people, and they provided
24  their input to Mr. Luscombe.  I would defer to him
25  as to whether this did proceed to go to copy review

Page 408

1  and was issued as a newsletter.  But as I sit here
2  today, I can't recall that that occurred.
3      Q.   Do you know of any newsletters that
4  were ever instituted for any of the pelvic floor
5  products of J&J along these lines?
6      A.   I believe there were some newsletters
7  in the history of the pelvic floor and TVT products.
8      Q.   Tell me what you recall about those.
9      A.   I can recall probably around 2002 or
10  2003 some newsletters being issued to some of the
11  doctors that taught professional education for us.
12      Q.   Okay.
13           And those would have been part of
14  professional education.  Correct?
15      A.   Those would have been part of --
16  professional education would have been involved in
17  that, yes.
18      Q.   And they would have needed to have
19  been copy reviewed.  Correct?
20      A.   Yes.
21      Q.   And they would have needed to be
22  accurate and fair and balanced.  Correct?
23      A.   Yes, yes.
24      Q.   And they would have needed to
25  communicate any risk information in a fair and

Page 409

1  balanced way.  Correct?
2      A.   Yes.
3      Q.   Do you recall ever signing off on any
4  of those?
5      A.   I don't recall signing off on this.
6      Q.   Did you ever sign off on -- did you
7  personally ever sign off on any copy-reviewed prof
8  ed items?
9      A.   No.
10      Q.   Who would have done that in your
11  department?
12      A.   The copy review board would have
13  signed off on the use of documents that went through
14  copy review.
15      Q.   So we talked about all the items on
16  the list, Exhibit 156.  And then we talked about
17  some medical education newsletters that were sent
18  out.
19           Any other types of professional
20  education that you know about?
21      A.   No.  And just to clarify, from my
22  knowledge and memory, this newsletter was not sent
23  out.  But you're talking in general.
24      Q.   There were other newsletters that
25  were sent out?

34 (Pages 406 to 409)

Confidential - Subject to Protective Order

Page 410

1      A.    Yes, my apologies.  There was a
2  newsletter that I do recall at one point over the
3  years that these products were made available by the
4  company.
5      Q.    Was it stopped at some point in time?
6      A.    I don't think it was stopped at any
7  point in time.  It was --
8      Q.    So it's still going?
9      A.    I don't think it was intended to be
10 an ongoing thing.  There might have been a need to
11 or desire to communicate some information, and that
12 information was made available in the form of a
13 newsletter.
14     Q.    Now, other types of professional
15 education would include the IFU?
16     A.    No.  The IFU is not professional
17 education.  It's not a professional education-owned
18 document.  Regulatory affairs owns the IFU.
19     Q.    Does regulatory affairs own the
20 patient brochure as well?
21     A.    No.  Regulatory affairs doesn't own
22 the patient brochure.
23     Q.    That would be marketing, sales?
24     A.    Marketing.
25     Q.    Marketing owns the patient brochure.

Page 411

1        When it comes to training physicians
2  on the safe use of the product, you would agree that
3  Ethicon/J&J had a duty to properly train those
4  doctors.  Right?
5          MR. BROWN:  Objection.
6          THE WITNESS:  Ethicon did its best to
7  properly train the doctors on the use of our
8  products.
9  BY MR. AYLSTOCK:
10     Q.    Well, based upon the credo that we
11 just went under, you would agree that they had a
12 duty to do that, to provide adequate training on the
13 products, how to be safely and effectively used in
14 the right patient population.  Correct?
15         MR. BROWN:  Objection.
16         THE WITNESS:  I can't speak on behalf
17 of Ethicon.  My personal involvement in professional
18 education was to provide training by surgeons to
19 surgeons on the use of our product.
20 BY MR. AYLSTOCK:
21     Q.    Who was Marianne Kaminski?
22     A.    Marianne Kaminski worked in
23 professional education up until I think
24 approximately 2005, the end of 2005.
25     Q.    Was she your boss at one time?

Page 412

1      A.    She was my boss.
2      Q.    In professional education?
3      A.    Yes.
4      Q.    Let me show you Exhibit 1058.
5            - - -
6          (Deposition Exhibit No. T-1058,
7          E-mail chain, top one dated 06 Sep 2003,
8          Bates stamped ETH.MESH.03738468 through
9          ETH.MESH.03738470, was marked for
10         identification.)
11           - - -
12 BY MR. AYLSTOCK:
13     Q.    I direct your attention to the e-mail
14 from Marianne Kaminski to Zenobia Walji, the first
15 one in the chain, September 5, 2003.  Do you see
16 that?
17     A.    Yes, I do.
18     Q.    And the subject is "TVT Response for
19 Peggy Norton, M.D." do you see that?
20     A.    I do, yes.
21     Q.    And apparently what Peggy Norton,
22 Dr. Norton asked is, "Is there precedent for
23 industry being responsible for making certain that
24 surgeons are approved" and "certified to use new
25 devices" and "equipment?"  Do you see that question?

Page 413

1      A.    Yes.
2      Q.    And Marianne Kaminski answers that.
3  Do you see that?
4      A.    I see that, yes.
5      Q.    And what does she say, as director of
6  professional education at the time?
7      A.    Could I have a moment to read it?
8      Q.    Sure.
9      A.    Thank you.
10     Q.    Do you see where she says, "I can't
11 answer...for the whole industry, but there is a
12 precedent for Johnson & Johnson to be responsible
13 when introducing new technology, based on our
14 CREDO."  Do you see that?
15     A.    I do, yes.
16     Q.    And then she says, "Simply put, it is
17 the right thing for us to do so that we can be a
18 partner for life for all constituents (Physicians,
19 Patients, Payers, Sites of care)."  Do you see that?
20     A.    I do see that, yes.
21     Q.    And you agree with that.  Right?
22 It's the right thing to do to offer training so that
23 the correct patients will receive the product and
24 they'll be received in the safest manner possible.
25 Correct?

35 (Pages 410 to 413)

Confidential - Subject to Protective Order

Page 414

1      A.   Can you rephrase that as a single
2  question, please?
3           MR. BROWN:  Just --
4  BY MR. AYLSTOCK:
5      Q.   Well, do you agree that it's the
6  right thing to do that Johnson --
7           Well, do you agree that the correct
8  thing, consistent with the credo, when Johnson &
9  Johnson is going to introduce a new technology like
10 the TVT products, to provide training for that
11 product and to make sure that only responsible
12 surgeons that are approved and certified should use
13 the device?
14     A.   Yes.
15     Q.   Now, what does Ethicon do to ensure
16 that only properly trained physicians use the TVT
17 products?
18     A.   I'm not sure that I can answer that
19 question outside of professional education.
20     Q.   No.  I'm asking you as the former
21 director of professional education, training
22 physicians, what is done to ensure that only
23 properly trained physicians are putting in your
24 company's products?
25          MR. BROWN:  Objection.

Page 415

1           THE WITNESS:  There's a selection
2  criteria for physicians that's communicated.
3  There's a system of checks and balances that
4  surgeons that attend training meet our selection
5  criteria.  And once those surgeons attend training,
6  they come into a list that -- of surgeons that
7  attended training and the company will provide
8  product to.
9  BY MR. AYLSTOCK:
10     Q.   Let me show you Exhibit 1059.
11              - - -
12          (Deposition Exhibit No. T-1059,
13          PowerPoint, "Ethicon Women's Health &
14          Urology," Bates stamped ETH.MESH.00235558
15          through ETH.MESH.00235570, was marked for
16          identification.)
17              - - -
18 BY MR. AYLSTOCK:
19     Q.   You've seen this PowerPoint before,
20 haven't you?
21     A.   I have, yes.
22     Q.   In fact, this is your PowerPoint.
23 Right?
24     A.   I believe so.  From it looks like
25 around 2006.

Page 416

1      Q.   On the third page, it has you as the
2  director of professional education.  Right?
3      A.   That's correct.
4      Q.   And then under you are some of these
5  regional managers.  Right?
6      A.   Yes.
7      Q.   And then the next page has --
8      A.   Just to correct.  It's prof ed
9  development manager is the title of the people that
10 reported to me.
11     Q.   Which, in essence, is -- they're
12 divided by regions of the country.  Right?
13     A.   They are divided by regions of the
14 country.  Correct.
15     Q.   Now, if we look at page 6, "Prof Ed
16 Programs," do you see that?
17     A.   Yes.
18     Q.   We have the preceptorships, the
19 proctorships, the telesurgeries and the cadaver labs
20 and the PCP awareness programs.  Do you see that?
21     A.   Yes, I do.
22     Q.   Is that newsletter we were talking
23 about an example of a PCP awareness program?
24     A.   No.
25     Q.   What's a PCP awareness program then?

Page 417

1      A.   A PCP awareness program would be a
2  surgeon that performs the -- one of the procedures
3  providing education to physicians in their
4  community, primary care physicians in their
5  community, about the disease state of incontinence,
6  treatment options that were available.
7      Q.   So these are materials you provide to
8  surgeons that use your product to drive business,
9  drive people to ask for your product.  Right?
10     A.   No, I wouldn't say it that way.
11 These are materials that we provided to physicians
12 that use the product to educate other physicians
13 that work with them in their community about the
14 disease state of incontinence and treatment options.
15     Q.   And you did that so that your company
16 could sell more product.  Right?
17     A.   That might have been one outcome,
18 but the -- one intent -- the primary intent was to
19 educate primary care physicians on the disease state
20 of incontinence and treatment options that were
21 available.
22     Q.   Well, you're not training primary
23 care physicians how to do this surgery.  Right?
24     A.   No.
25     Q.   So you're --

36 (Pages 414 to 417)

Confidential - Subject to Protective Order

Page 418

1   The reason that you're trying to
2   raise awareness is so that they will refer cases to
3   physicians that do your surgery. Correct?
4       A.   No. The content that was used for
5   these programs discussed all different treatment
6   options, including nonsurgical treatment options.
7       Q.   You also had a program where you
8   would provide web content for physicians on the use
9   of the TVT product for their patients. Correct?
10      A.   That wasn't part of the professional
11  education, so I have no direct knowledge of that.
12      Q.   But you know that happened. Right?
13  You know that was part of what your company did.
14  Correct?
15      A.   I'm aware that that was something
16  that another function of the company did, and I
17  would defer to that.
18      Q.   That would have been part of the
19  marketing function?
20      A.   I believe so, yes.
21      Q.   You have a budget there, cost per
22  doctor, a couple pages in for the TVT and TVT-O
23  along with the Prolift?
24      A.   Yes.
25      Q.   And then you're tracking sales per

Page 419

1   doctor and costs per doctor for those products on
2   the next page?
3       A.   Yes.
4       Q.   And then you're -- on the next page
5   you're looking at return on investment. Right?
6       A.   Yes.
7       Q.   So you have the number of doctors
8   trained, the number of units sold and the units for
9   doctor trained all broken out?
10      A.   Yes.
11      Q.   "How Can You Optimize Your Prof Ed
12  Dollars?" Do you see that?
13      A.   Yes.
14      Q.   Who was this presentation given to
15  when you gave it?
16      A.   I believe this was given to the sales
17  department or sales representatives.
18      Q.   So --
19          And you personally gave this
20  presentation. Right?
21      A.   I believe so, yes.
22      Q.   So on the next page, you're telling
23  the sales reps to "Build Professional Education into
24  your business plan." Right?
25      A.   Yes.

Page 420

1       Q.   And "Target key accounts" and
2   "physicians." Right?
3       A.   Yes.
4       Q.   And on the next page, "Do's and
5   Don'ts," you're telling the physician -- the sales
6   reps to "use professional education as a tool."
7   Right?
8       A.   Yes.
9       Q.   A tool to sell the product. Correct?
10      A.   A tool to train doctors on the safe
11  and effective use of the product.
12          MR. AYLSTOCK: Move to strike.
13  BY MR. AYLSTOCK:
14      Q.   This is a presentation to sales reps.
15  Right?
16      A.   This is a presentation to sales reps,
17  correct.
18      Q.   And sales reps are there to sell the
19  product. Right?
20      A.   I think that's one of their
21  responsibilities. They're also representatives of
22  the product to doctors in their territory.
23          MR. AYLSTOCK: Move to strike after
24  "responsibilities."
25  BY MR. AYLSTOCK:

Page 421

1       Q.   Sales reps aren't a part of
2   professional education or they are a part of
3   professional education?
4       A.   They are not part of professional
5   education.
6       Q.   So you're telling these sales reps to
7   use professional education as a tool for them in
8   their sales. Correct?
9       A.   As a tool in their jobs.
10      Q.   Their job is to sell a product. It's
11  not surprising. Right?
12      A.   It's amongst their jobs, yes.
13      Q.   And then on the last page, you have
14  TVT-O adoption rates. Do you see that?
15      A.   Yes.
16      Q.   So you know how many surgeons went to
17  the telesurgery, how many went to the proctorship,
18  how many went to the preceptorship, how many went to
19  the cadaver. Right?
20      A.   Yes.
21      Q.   You track that, you know what program
22  surgeons went to what program. Correct?
23      A.   That's correct.
24      Q.   And how is that tracked within
25  professional education?

37 (Pages 418 to 421)

Confidential - Subject to Protective Order

Page 422

1      A.      There's a -- documents and a
2   registration system that's used in professional
3   education.
4      Q.      What's the name of that system?
5      A.      Professional education registration
6   system.
7      Q.      It's a database or a computer program
8   or what?
9      A.      It's a computer program, yes.
10     Q.      So whenever a doctor signs up for
11  telesurgery, you know on what date that doctor
12  attended.  Correct?
13     A.      I -- yes.
14     Q.      You know what hospital that doctor is
15  associated with.  Right?
16     A.      Yes.
17     Q.      And you know what presentation was
18  made to that doctor at that telesurgery.  You keep
19  track of that.  Right?
20     A.      I believe so, yes.
21     Q.      So if I have a physician who
22  implanted a TVT product in one of my clients, your
23  company should be able to tell me when that
24  physician went for training, whether they went for
25  training and what presentation they viewed.

Page 423

1   Correct?
2      A.      Yes.
3         MR. AYLSTOCK:  Let's break for lunch.
4         THE VIDEOGRAPHER:  The time is now
5   12:51.  We're going off the record.
6            - - -
7         (A luncheon recess was taken from
8      12:51 p.m. to 1:39 p.m.)
9            - - -
10        (Deposition Exhibit No. T-1060,
11     E-mail chain, top one dated February 08,
12     2011, Bates stamped ETH.MESH.05570260 and
13     ETH.MESH.05570261, was marked for
14     identification.)
15           - - -
16        THE VIDEOGRAPHER:  The time is now
17  1:39.  We are back on the record.
18  BY MR. AYLSTOCK:
19     Q.      Mr. Parisi, we are back after lunch
20  and I have a document that you've had a chance to
21  review, but I understand that you provided some
22  testimony before lunch that now you want to correct;
23  is that right?
24     A.      That's correct.
25     Q.      One item had to do with whether

Page 424

1   marketing signs off on prof ed copy review?
2      A.      Yes.
3      Q.      And they do, don't they?
4      A.      They do, yes.
5      Q.      And the other had to do with the
6   materials provided to doctors at individual training
7   sessions?
8      A.      That's correct.
9      Q.      And so your company knows which
10  training sessions were performed -- were attended by
11  every single doctor.  Right?  They keep track of
12  that?
13     A.      Yes.
14     Q.      And they keep track of what -- the
15  dates of that and what was copy reviewed at that
16  time?
17     A.      Yes.
18     Q.      And is there something else you
19  wanted to correct?
20     A.      I believe you asked me if
21  professional education was one of the approvers in
22  copy review, and I would like to clarify that
23  professional education is not one of the approvers
24  in copy review.
25     Q.      For any of the -- even the prof ed

Page 425

1   slide decks?
2      A.      The prof ed slide decks, they would
3   be involved in that cross-functional team, but as
4   far as the copy review committee, I want to be very
5   specific that the copy review committee includes the
6   functions that I had mentioned before, but it
7   doesn't include professional education as an
8   approver.
9      Q.      So let me get this straight.
10        For the professional education
11  materials, they have to be approved by marketing,
12  the copy review team includes marketing?
13     A.      Yes.
14     Q.      Includes medical?
15     A.      Yes.
16     Q.      Includes sales?
17     A.      No.
18     Q.      It includes regulatory?
19     A.      Yes.
20     Q.      And legal?
21     A.      Yes.
22     Q.      But not professional ed?
23     A.      They're not on the copy review board;
24  however, they would be involved in the team that
25  prepared the materials that was submitted for copy

38 (Pages 422 to 425)

Confidential - Subject to Protective Order

Page 426

1  review.  So they're involved in the process.
2      Q.     But then don't have to sign off on
3  whether this is consistent with their principles in
4  professional education?
5      A.     Just to clarify, they're not on the
6  copy review board, so there are records of who was
7  on the board when a particular document was
8  approved.  And in my recollection as I sit here
9  today, I don't recall professional education being
10  listed among those approvers.
11      Q.     Exhibit 1060 in front of you, do you
12  see that?
13      A.     Yes.
14      Q.     February 8, 2011?
15      A.     Yes.
16      Q.     You're sending an e-mail regarding an
17  FDA request for a copy of all surgical training
18  videos related to pelvic floor repair and SUI
19  products?
20      A.     I believe I'm responding to an e-mail
21  that was sent initially from Brian Kanerviko
22  forwarded to Alyson Wess.  And then I'm responding
23  to Alyson Wess's e-mail.
24      Q.     And it's also Lissette Caro-Rosado?
25      A.     Yes.

Page 427

1      Q.     Did she take your position as
2  worldwide director of professional education when
3  you went to Ethicon Biosurgery?
4      A.     Yes.
5      Q.     Is she still in Ethicon professional
6  education?
7      A.     No.
8      Q.     Where she's at?
9      A.     To my knowledge, she's no longer with
10  Ethicon.
11      Q.     Do you know where she went?
12      A.     I don't.
13      Q.     Do you know when she went?
14      A.     It was probably about a year ago.
15      Q.     Do you know why she left?
16      A.     She was displaced during the
17  restructuring.  To the best of my knowledge, her
18  position was eliminated.
19      Q.     So the FDA is requesting copies of
20  all the surgical training videos for all the TVT
21  products, among others.  Right?
22      A.     Yes.
23      Q.     Where are those housed within
24  Ethicon?  Is there a file cabinet or an electronic
25  database or -- as director of professional

Page 428

1  education, when you want to go see, I'd like to see
2  the TVT-S training video or what have you, how do
3  you do that?
4      A.     It would usually be in electronic
5  format, unless it was older, before electronic
6  records were keep -- were --
7      Q.     Start with the electronic.
8           What do you do to access it?
9      A.     The electronic records are kept on an
10  internal website.
11      Q.     Is that called the GGM Blue system?
12      A.     GGM Blue is one of the systems.
13      Q.     What does that stand for?
14      A.     Global graphics management system, I
15  believe, but I would defer that to somebody in
16  that -- the department that runs that system.
17      Q.     And then as far as a surgical
18  training video that was in use previously, how would
19  you go about finding those?
20      A.     There would be copies of the actual
21  video kept in archive with the copy review
22  department.
23      Q.     And so were you able to answer this
24  request from the FDA and provide the surgical
25  training videos that they requested?

Page 429

1      A.     Yes, I believe so.
2      Q.     Did you provide them all of the
3  surgical training videos historically or only those
4  that were in use at the time?
5      A.     I can't recall as I sit here today,
6  but we tried to understand the requests that they
7  were making and conform with that to the
8  satisfaction of the regulatory affairs department,
9  who was the requester of this.
10      Q.     Who is Nancy Leclair?
11      A.     Nancy Leclair was in charge of
12  marketing services.
13      Q.     And do you recall whether she handled
14  this for the FDA?
15      A.     I don't recall.
16      Q.     So Ethicon can tell the FDA and
17  anybody who asks what surgical training videos are
18  in effect at a certain period of time; is that
19  correct?
20      A.     Yes.
21      Q.     And historically, is it your
22  understanding that they keep records of what
23  surgical training videos were in effect at certain
24  periods of time?
25      A.     Yes.

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Subject to Protective Order

Page 430

1    Q.    And do you keep track of the in-use
2  dates for those surgical training videos?
3    A.    I believe the marketing services
4  department keeps track of those.
5    Q.    It's important if a surgical training
6  video is updated for some reason that the old
7  training video gets pulled from the sources in
8  professional education so stale information doesn't
9  get provided to physicians.  Right?
10    A.    That would be our intent.
11    Q.    So it's your understanding that you
12  can provide in-use dates for each training video so
13  that you know when a video kind of came offline and
14  when a new one came on?
15    A.    I believe so, but I would defer that
16  to the marketing services department that owns that
17  process.
18    Q.    Who in marketing services?  Would
19  that be Nancy Leclair?
20    A.    Currently it would be Eric Dunn, I
21  believe.
22    Q.    Let me mark for you Exhibit 1061.
23         - - -
24    (Deposition Exhibit No. T-1061,
25    TVT/SUI Professional Education Index and

Page 431

1    Production Bates Range Chart, 4 pages, was
2    marked for identification.)
3         - - -
4  BY MR. AYLSTOCK:
5    Q.    Have you ever seen that chart before?
6    A.    Yes, I think I've seen this.
7    Q.    Were you involved in the preparation
8  of the document?
9    A.    The document, I think, was prepared
10  by the marketing services department, but I do
11  recall seeing it.
12    Q.    And is that an accurate
13  representation of the surgical training videos and
14  other professional education materials for the TVT
15  products, to the best of your understanding?
16    A.    Yes.
17    MR. BROWN:  I'm just going to put on
18  the record that all of you might want to -- you
19  know, Bryan, you can decide how you want to handle
20  this.  That's a document that's prepared by counsel.
21  This is what we've provided to you, you didn't give
22  me another copy, so just to --
23    MR. AYLSTOCK:  That was provided to
24  me by Mr. Watson --
25    MR. BROWN:  Yes.

Page 432

1    MR. AYLSTOCK:  -- at 10:00 p.m.
2  before this deposition began.
3    MR. BROWN:  Right, yes.  So that was
4  prepared by counsel, so you can either -- and not
5  by Martin.
6    THE WITNESS:  Oh, my apologies.  I
7  don't know the origin of this document.  I can
8  clarify that I have seen this document before.  And
9  it's my understanding that this was prepared by
10  counsel.
11  BY MR. AYLSTOCK:
12    Q.    Did you see it in preparation for
13  your deposition?
14    A.    I see that it's in preparation for
15  the Pelvic Mesh/Gynecare litigation.
16    Q.    How recently have you seen the
17  document or how -- when did you see it, do you
18  recall?  A week ago, a month ago, last night?
19    A.    I would say it was probably within
20  the last week or so.  I can't recall as I sit here
21  today.
22    MR. BROWN:  I'm going to represent to
23  you that we have not provided that document to Paul,
24  so he is not -- he's not seen it in -- I mean, I
25  have not provided that document to you.

Page 433

1    THE WITNESS:  Yeah.  No, that counsel
2  did not provide it to me, so this -- if I have seen
3  it before, I mean, I see a lot of spreadsheets, it's
4  very difficult for me to say, you know, looking at
5  this if this was the exact same spreadsheet that
6  I've seen in the past.
7  BY MR. AYLSTOCK:
8    Q.    Your company has spreadsheets of the
9  in-use dates for the training materials on the TVT
10  products.  You've seen those.  Right?
11    A.    That's my understanding.
12    Q.    And where would those be kept?  Do
13  you have a file of them?  Are they in your e-mail
14  system or where would you have seen those?
15    A.    I believe that they would be in the
16  GGM Blue system that we had spoken of before.
17    Q.    Okay.
18    A.    Or in -- archived in the copy review
19  department.
20         - - -
21    (Deposition Exhibit No. T-1062, TVT
22    Professional Education Program, Bates
23    stamped ETH.MESH.00156909 through
24    ETH.MESH.00156938, was marked for
25    identification.)

Confidential - Subject to Protective Order

Page 434

1          - - -
2    BY MR. AYLSTOCK:
3         Q.    Let me show you Exhibit T-1062, which
4    is a TVT Professional Education Program.  It's one
5    of the documents that was listed on the grid.  I
6    think it was number 2 on the grid.
7              Do you recognize this as a type of
8    professional education used by Ethicon for the TVT?
9         A.    Yes.
10        Q.    And how would you describe this
11   document to the jury?  Is this a slide deck or what
12   is it exactly?  How is it used by your company?
13        A.    This was used in 1998 for
14   professional education.  I wasn't in the
15   professional education department in 1998.  It would
16   appear to be something that would be used within the
17   professional education programs discussing different
18   aspects of the TVT procedure.
19        Q.    Turn with me to 928.
20             You see the writing there at the top?
21        A.    Yes.
22        Q.    Would you agree with me that this is
23   not a final version of the TVT professional
24   education program?
25        A.    I don't -- well, I don't know.  This

Page 435

1    is from 1998.  I can't say that I have any
2    recollection of what the -- what this note might
3    have meant.
4         Q.    When you became director of
5    professional education, did you undertake to review
6    all of the current -- the materials that were in
7    effect at the time you became director?
8         A.    Yes.  When I started that job at the
9    end of 2005, I made every effort to be knowledgeable
10   about the materials that were current and currently
11   used within the department.
12        Q.    So you reviewed all of the videos
13   that were in effect?
14        A.    Yes.
15        Q.    You reviewed all the handouts and
16   other professional education slide decks?
17        A.    Yes.
18        Q.    Did you undertake any training on
19   medical principles involved in pelvic floor anatomy?
20        A.    Yes.  I probably had some training to
21   that effect.
22        Q.    Because your job is to help
23   communicate information to physicians and facilitate
24   the transfer of that information as director of
25   professional education.  Right?

Page 436

1         A.    My job is to facilitate the transfer
2    of information.  I was not personally involved in
3    teaching, as that was the role of our surgeon
4    faculty or preceptors.
5         Q.    Well, in doing your job, you had to
6    have some understanding about the medical principles
7    involved in the pelvic floor anatomy.  Correct?
8         A.    I had to have layperson's knowledge,
9    but I was not the person that would be doing the
10   teaching.  We left that up to surgeons who were
11   qualified to teach other surgeons.
12        Q.    Even when you were -- back in 2001
13   when you were a sales rep for Ethicon/J&J, you had
14   to have some basic understanding of those medical
15   principles when you were interacting with doctors
16   selling products.  Right?
17        A.    In 2001 I was a sales representative
18   for a different division of Johnson & Johnson.  I
19   had no involvement with the TVT products.
20        Q.    No.
21             But you were selling medical products
22   at that time.  Right?
23        A.    Yes.
24        Q.    And you know as a sales rep that one
25   of the things your company does is make sure the

Page 437

1    sales reps have an understanding of not only the
2    product but how the product is used so they can talk
3    to a doctor and sell the product.  Correct?
4         A.    Yes.
5         Q.    And when it comes to your role as
6    director of professional education, you became
7    familiar with some of the definitions of the medical
8    terms involved in the pelvic floor anatomy?
9         A.    Yes.
10        Q.    You attended medical conventions and
11   talked to doctors at those conventions?
12        A.    Yes.
13        Q.    And you did that as product director,
14   too, didn't you?
15        A.    I did, yes.
16        Q.    In fact, you went to the American
17   Urogynecological Society annual meeting and handed
18   out materials during that, didn't you?
19        A.    I may have.  I do -- I can say that I
20   definitely attended the American Urogynecologic
21   Society meeting.  Maybe not annually.
22        Q.    And the reason that you did that was,
23   in part, to help you learn about the pelvic floor
24   anatomy and how these products are used so that you
25   could do your job as director of professional

Confidential - Subject to Protective Order

Page 438

1 education or product director, whatever it was at
2 the time. Right?
3    A.    Yes, in part.
4    Q.    Now, when you were a sales rep for
5 Ethicon, were you told to train doctors on how to
6 use the product?
7    A.    No.
8    Q.    In fact, you were told not to train
9 doctors. Correct? You were told to leave that to
10 professional education. Right?
11    A.    Yes, that's my understanding.
12    Q.    And the reason is because sales
13 representatives aren't physicians, and they can't
14 practice medicine or they shouldn't be practicing
15 medicine. Right?
16    A.    That's correct.
17    Q.    So you understood that one of the
18 principles for any sales rep is your job is not to
19 train doctors on how to practice medicine and
20 perform the procedure, their job is to mainly sell
21 the product. Right?
22         MR. BROWN: Objection.
23         THE WITNESS: As I explained before,
24 the job of the sales representative is to represent
25 the products that they sell. In representing the

Page 439

1 products, they'd also have to be knowledgeable of
2 the professional education materials, the
3 instructions for use, other things that were
4 associated with the product.
5 BY MR. AYLSTOCK:
6    Q.    Is it your --
7         You would agree with me that a sales
8 representative should not be trying to clarify
9 instructions provided by a preceptor during surgery
10 for the doctor?
11    A.    A sales representative would be a
12 resource to the doctor to answer questions that they
13 had as it pertains to the instructions for use or
14 information that was previously presented to them
15 through professional education.
16    Q.    Well, they're told and you were told
17 as a sales rep that you shouldn't be conveying
18 information that's outside the instructions for use.
19 Correct?
20    A.    Yes.
21    Q.    In other words, if there's a question
22 that a doctor has about an issue that came up at the
23 training about -- with the preceptor -- strike that.
24 Let me start over.
25         If there was some question about

Page 440

1 whether -- how the procedure should be done and the
2 doctor had a question about the preceptor's training
3 and directed it to the sales rep, you would agree
4 that the sales rep should direct the doctor or the
5 preceptor to clarify any misunderstandings or
6 ambiguity in the training. Correct?
7    A.    Yes.
8    Q.    It wouldn't be appropriate for the
9 sales rep to communicate what the preceptor meant
10 and clarify something for the doctor. Correct?
11    A.    If it was in the IFU, I think it
12 would be appropriate for the sales rep to show the
13 doctor the IFU and help them -- they're a resource
14 to the doctor that they work with to help them have
15 the information they need to utilize our products.
16    Q.    And if that information wasn't in the
17 IFU, it's not up to the sales rep to clarify what
18 the preceptor meant during training. You would
19 agree with that?
20    A.    I would say that the IFU is not the
21 only education document but comprehensive of all
22 education documents that were provided to the
23 doctor, the sales rep could certainly provide
24 clarity as long as it was consistent with the
25 documents that were provided through professional

Page 441

1 education.
2    Q.    Well, if there was some question
3 about what the preceptor meant and it wasn't
4 otherwise in the professional education materials,
5 the IFU, sales reps shouldn't be telling the doc how
6 to perform the surgery. Correct?
7    A.    I would agree with that, if it wasn't
8 in the materials.
9    Q.    Would you agree that it's not up to
10 the sales rep to interpret what the preceptor meant
11 about certain ways to perform this procedure and
12 convey the sales rep's own interpretation of that to
13 the physician?
14    A.    Can you ask that question or rephrase
15 that question, please?
16    Q.    Would you agree with me that if the
17 sales rep is called upon to interpret what a
18 preceptor meant in part of the professional
19 education training, the sales rep should direct that
20 question to the doctor, to the preceptor, it's not
21 up to the sales rep to interpret what the preceptor
22 meant and convey that information to the doctor?
23    A.    That would be consistent with my
24 understanding, yes.
25    Q.    Would you agree that it's the

42 (Pages 438 to 441)

Confidential - Subject to Protective Order

Page 442

1   function of professional education, not the sales
2   reps, to show the doctor the proper implantation
3   techniques?
4       A.    Can I ask you to just repeat the
5   question?
6       Q.    Would you agree with me that when it
7   comes to the question of how to properly place the
8   mesh, the TVT mesh, for any of the TVT products,
9   that it's up to the professional education and
10  training materials and the preceptors and the
11  physicians to provide that information and the sales
12  reps shouldn't be conveying that information?
13      A.    I would believe -- I would agree that
14  the professional education materials, the videos,
15  the instructions for use, the CD-ROM, would be the
16  source of that type of information.  The sales rep
17  may also have copies of that information if the
18  doctor wanted to see that or misplaced it or wanted
19  to make sure they had the most recent version of
20  that information.
21      Q.    Can you describe to the jury what is
22  meant in the context of professional education by
23  the term "tension-free vaginal tape"?
24      A.    Tension-free vaginal tape was a
25  product that was sold by the company for the

Page 443

1   treatment of stress urinary incontinence.
2       Q.    What's meant by the term "tension
3   free"?
4       MR. BROWN:  Objection.
5       THE WITNESS:  It's my understanding
6   that tension free means that the mesh sling is
7   placed in a tension-free nature below the urethra.
8   BY MR. AYLSTOCK:
9       Q.    In other words, there shouldn't be
10  any tension on the tape?
11      MR. BROWN:  Objection.
12      THE WITNESS:  It's my understanding.
13  I would defer what degree of tension.  I can define
14  as I sit here today what tension free means.  I
15  would defer that to a medical doctor to elaborate on
16  what degree of tension is required for a particular
17  patient or a particular procedure.
18  BY MR. AYLSTOCK:
19      Q.    Have you ever heard it discussed that
20  individuals within your company shouldn't put any
21  credo-type issues in writing?
22      A.    No, I haven't heard that.
23      Q.    Would there be a reason not -- if
24  somebody had an issue that they thought was
25  inconsistent with the credo or some course of

Page 444

1   action, is there some reason why that shouldn't be
2   put in writing?
3       A.    My understanding is that there's a
4   credo hotline that any employee is welcome to call
5   should they have any questions about the credo.
6       Q.    Let me move to strike, because I'm
7   not asking about a hotline.
8       A.    Sure, I'm sorry.
9       Q.    I'm asking, is there any reason that
10  you can think of, as director of professional
11  education, why an individual within your company
12  would be told don't put credo issues in writing?
13      MR. BROWN:  Objection.
14      THE WITNESS:  I can't think of a
15  reason as I sit here today.
16  BY MR. AYLSTOCK:
17      Q.    You can't think of any good reason?
18      MR. BROWN:  Objection.
19      THE WITNESS:  I can't think of a
20  reason why that may or may not have been said.
21  BY MR. AYLSTOCK:
22      Q.    And were you ever part of any
23  conversations where that was discussed or --
24      A.    I don't recall.
25      Q.    I'll show you Exhibit T-1068 -- 1069

Page 445

1   rather.  1062.
2                    - - -
3       (Deposition Exhibit No. T-1063,
4       E-mail chain, top one dated 16 Sep 2004,
5       Bates stamped ETH.MESH.00864503 through
6       ETH.MESH.00864507, was marked for
7       identification.)
8                    - - -
9   BY MR. AYLSTOCK:
10      Q.    I'm just going to start from the very
11  back and just walk through it, so let me know when
12  you're ready.
13      A.    Okay.  Thank you.
14      Q.    Why don't we go through it.
15      MR. BROWN:  Why don't you see which
16  questions --
17      MR. AYLSTOCK:  I mean --
18      MR. BROWN:  Well, why don't you see
19  which questions you've got and if you need to
20  read --
21      MR. AYLSTOCK:  I don't want to take
22  up the time with reading it.
23      MR. BROWN:  Are you almost through or
24  do you --
25      THE WITNESS:  I'm almost through,

43 (Pages 442 to 445)

Confidential - Subject to Protective Order

Page 446

1  yeah.  It's just quite a long chain of e-mails
2  that --
3       MR. BROWN:  Are you asking about all
4  of them, Mr. Aylstock?
5       MR. AYLSTOCK:  I'm just going to walk
6  through it.  I'm not trying to play games with you
7  and ask you stuff where you don't have time to look
8  at it.  I just -- we've spent five minutes just
9  looking at this.
10      MR. BROWN:  Why don't you go ahead
11  and take questions on it.  If you need to look at
12  other things, you can.
13      THE WITNESS:  Sure.  Absolutely.
14  BY MR. AYLSTOCK:
15    Q.   So it starts September 2004.  Right?
16  And you're copied on an e-mail from Paul Capponi.
17      In fact, he sends it to you, among
18  others.  Correct?
19    A.   I believe I was copied on it, yes.
20    Q.   And that was in your position as
21  product director for the TVT-O.  Right?
22    A.   I believe so, yes.
23    Q.   In other words, you are the person in
24  charge of marketing for the TVT-O sling product made
25  by Ethicon and J&J.  Right?

Page 447

1    A.   I believe so at that point in time.
2    Q.   So there's some ongoing TVT-O action
3  items.
4      In your role as product director,
5  were you involved in handling action items involving
6  the TVT-O product?
7    A.   No, I don't remember being involved
8  in handling this particular action item.
9    Q.   No, that wasn't my question.
10    Were you generally involved as
11  product director in handling certain action items
12  for the TVT-O product generally?
13    A.   I guess that's a broad question.  I
14  would be involved in handling items as it pertained
15  to marketing of the TVT-O at this particular point
16  in time, because that was my function and
17  responsibility at this particular point in time.
18    Q.   Part of marketing is marketing
19  through sales representatives.  Correct?
20    A.   Yes.
21    Q.   Okay.
22    And you've had a chance to read the
23  e-mail responding to Mr. Capponi here by Shannon
24  Campbell.  Do you see that?
25    A.   Yes.

Page 448

1    Q.   Shannon Campbell is a sales rep?
2    A.   I believe so, yes.
3    Q.   So she then responds and copies you,
4  among others, about some certain action items
5  involving the TVT-O product.  Right?
6    A.   Yes.
7    Q.   And she talks about one thought
8  leader that she recently lost to Monarc,
9  Dr. Feagins.  Right?
10    A.   Yes.
11    Q.   And Monarc is a competitor sling
12  using the transobturator approach.  Correct?
13    A.   Yes.
14    Q.   And you know as product director that
15  Monarc was on the market before the TVT-O was on the
16  market.  Correct?
17    A.   Yes.
18    Q.   In fact, that was one of the primary
19  reasons why the TVT Classic was losing market share.
20  Correct?
21    A.   Yes, I believe so.
22    Q.   So to stop that loss of market share,
23  Ethicon developed the TVT-O product, correct, to
24  compete with the Monarc as a transobturator approach
25  to a sling.  Correct?

Page 449

1      MR. BROWN:  Objection.
2      THE WITNESS:  It's my understanding
3  in the role that I was in in marketing that the
4  TVT-O product was not developed in response to the
5  Monarc product.  It was developed in response to a
6  desire from surgeons to have an alternative approach
7  utilizing the transobturator method.
8  BY MR. AYLSTOCK:
9    Q.   Well, in your CV, one of the main
10  points that you make as product director is that you
11  turned around declining market share, declining unit
12  sales and a flat revenue to grow.  Do you see that?
13    A.   Yes.
14    Q.   And part of the reason and way that
15  you turned around that declining market share as
16  product director was the introduction of the TVT-O
17  transobturator product for Ethicon/J&J.  Correct?
18    A.   Yes, that was part of the way.
19    Q.   Now, the sales rep is talking about
20  Dr. Feagins being lost to a competitor.  Right?
21    A.   Yes.
22    Q.   He's talking about -- or she, rather,
23  is talking about her experience in the last few
24  weeks in talking to doctors about a modified TVT-O
25  trick.  Right?

44 (Pages 446 to 449)

Confidential - Subject to Protective Order

Page 450

1     A.     There is reference to the Babcock
2  technique.
3     Q.     Okay.
4            What's the Babcock technique?
5     A.     The Babcock technique was a method
6  used by the inventor of TVT-O to allow for space
7  between the TVT-O tape and the urethra.  It was
8  something that we provided through professional
9  education as a video.
10    Q.     Okay.
11           Is that in the IFU?
12           MR. BROWN:  Objection.
13           THE WITNESS:  I don't think the words
14  "the Babcock technique" are in the IFU, but its
15  intent is included in the IFU, which is to have
16  tension-free placement of the mesh below the
17  urethra.
18  BY MR. AYLSTOCK:
19    Q.     So the answer is no, it's not
20  described as such in the IFU?
21           MR. BROWN:  Objection.
22           THE WITNESS:  The words "Babcock
23  technique" are not in the IFU to my knowledge.
24  BY MR. AYLSTOCK:
25    Q.     All right.

Page 451

1            And what Ms. Campbell is saying as
2  the sales rep is, I've "modified the TVT O trick
3  with the babcock for his traditional approach.  I
4  had him take the TVT needle, and clamp the tape
5  around it with a babcock like we have talked about
6  with the TVT O."  Do you see that?
7     A.     Yes.
8     Q.     So she's showing this physician how
9  to modify the technique in the operating room.
10  Correct?
11    A.     I think this representative is
12  referring to a technique that we made available
13  through professional education.
14           MR. AYLSTOCK:  Let me move to strike.
15  That wasn't my question.
16  BY MR. AYLSTOCK:
17    Q.     According to this document, she -- it
18  says, "I had him take the TVT needle, and clamp the
19  tape around it."
20           She's directing the physician about
21  how to do the surgery with this TVT-O trick, the
22  Babcock.  Right?
23           MR. BROWN:  Objection.
24           THE WITNESS:  I don't know if that
25  was the intention.  I would defer that question to

Page 452

1  this particular representative.
2  BY MR. AYLSTOCK:
3     Q.     Well, you were copied on this as
4  product director.  Right?
5     A.     In 2004, I was copied on this, along
6  with it looks like about ten other people.
7     Q.     Well, and you knew as product
8  director that sales reps shouldn't be telling
9  doctors how to perform the surgery.  Correct?  We've
10  already went over that?
11    A.     Yes.
12    Q.     And what did you do in response to
13  this when you saw this e-mail about the sales rep
14  taking the doctor through the surgery and telling
15  him how to do it?  Did you do anything proactively
16  as product director?
17    A.     I can't recall as I sit here today.
18  It looks like the response came from Dan Smith, as I
19  read this e-mail.
20    Q.     We'll get to that.
21           But you didn't see it -- see fit to
22  respond in any way that you can recall?  Because
23  we've looked in your file for any response.  We
24  haven't seen it.
25    A.     I may have responded by telephone.  I

Page 453

1  may have responded in some other way than e-mail.
2     Q.     Do you have any recollection of
3  responding to this?
4     A.     I don't have recollection from 2004
5  of whether I responded to this or not.
6     Q.     So Mr. Dan Smith does respond.
7  Right?
8     A.     Yes.
9     Q.     Is Dan Smith a doctor?
10    A.     No.
11    Q.     He's an engineer.  Right?
12    A.     Yes.
13    Q.     So he thanks Shannon for the update
14  and says, I've "never heard of" this Babcock "being
15  placed around a" TVT-O "or TVTO needle!"  Right?
16    A.     Yes.
17    Q.     "Where did this come from?"  Right?
18  "It is NOT the deLeval technique."  Right?
19    A.     I agree with that's what it says in
20  this e-mail.
21    Q.     Well, and your --
22           Subsequent to this, you became
23  director of professional education, in charge of
24  ensuring that doctors are properly trained on the
25  TVT-O technique.  Right?

45 (Pages 450 to 453)

Confidential - Subject to Protective Order

Page 454

1   A.   Subsequent to this, yes.
2   Q.   So as we sit here today, you, in
3   fact, know that what Mr. Smith is saying is correct,
4   that it's not part of the de Leval technique and
5   it's not part of professional education or the IFU,
6   to use a Babcock around the needle?
7   A.   Yes. I don't think that that's
8   consistent with the professional education video on
9   the Babcock technique. And I think that's what Dan
10  is trying to do is correct that representative's
11  understanding of that professional education
12  material.
13  Q.   Because it would be wrong for a sales
14  rep to instruct the doctor on how to do the
15  technique, particularly if she's instructing the
16  doctor to do it in a manner that's inconsistent with
17  the IFU or the training provided by your company.
18  Correct?
19       MR. BROWN: Objection.
20       THE WITNESS: I can't say whether
21  this particular variation would be of relevance or
22  not.
23       MR. AYLSTOCK: Move to strike. I'm
24  not asking you if it's relevant.
25  BY MR. AYLSTOCK:

Page 455

1   Q.   You would agree that it would be
2   wrong for this sales rep to provide information to
3   the physician that's inconsistent with the IFU or
4   the professional education provided by your company.
5   Correct?
6   A.   The under -- my understanding is, and
7   again, this e-mail is ten years old. My
8   understanding is that the sales representative was
9   corrected in their interpretation of the
10  professional education materials --
11       MR. AYLSTOCK: That wasn't my
12  question. Let me move to strike.
13       Ann Marie, can you read back my
14  question.
15              - - -
16       (The court reporter read the
17       pertinent part of the record.)
18              - - -
19       THE WITNESS: Yes, the sales
20  representative shouldn't provide information that's
21  inconsistent with the IFU or the professional
22  education materials. However, this particular --
23  BY MR. AYLSTOCK:
24  Q.   No. I'm not asking for however.
25       MR. BROWN: Well, he does have a

Page 456

1   right to finish the question if he needs to.
2   BY MR. AYLSTOCK:
3   Q.   Well, is it -- I want -- you've
4   answered my question. So your counsel will have,
5   just like you did before, a chance to ask you a lot
6   of questions. And I'm trying to get through as much
7   as I can today, so I don't need a however unless
8   it's directly responsive to my question. And I
9   don't think my question was a correct, it's a yes or
10  no. And you've answered the question.
11  A.   I believe that my response is
12  directly responsive to your question. And in
13  reading this e-mail, it doesn't appear to me that
14  this variation would be of significance or
15  inconsistent with the professional education
16  materials.
17  Q.   So you believe that even though
18  Mr. Smith says that's not the de Leval technique
19  and he's never even heard of it being placed, that
20  this would come within the professional education
21  for how to perform a TVT-O? Is that your testimony?
22  A.   I can't testify one way or another.
23  This is a communication between a sales
24  representative and a member of our R&D department.
25  I would defer to them to clarify.

Page 457

1   Q.   You just told me because you thought
2   it was responsive that this wouldn't be inconsistent
3   with the professional education.
4        You don't know whether it is or it
5   isn't as we sit here today, do you? As director of
6   professional education, you don't know whether
7   placing this Babcock around the needle is consistent
8   or inconsistent with the IFU or professional
9   education?
10  A.   I already answered that I believe it
11  is consistent with the IFU. The Babcock technique
12  video was provided as one of the professional
13  education materials.
14  Q.   So around the needle?
15  A.   The variation of around the needle I
16  would defer to medical affairs or R&D.
17  Q.   So you don't know whether this
18  particular -- the manner in which this particular
19  doctor was instructed by this particular sales rep
20  is inconsistent or consistent with professional
21  education or the IFU, because you don't know whether
22  it's consistent to place it around the needle or
23  not, don't you?
24  A.   I don't believe that it --
25       MR. BROWN: Paul, just answer his

46 (Pages 454 to 457)

Confidential - Subject to Protective Order

Page 458

1    question.
2           THE WITNESS:  Sorry.
3           MR. BROWN:  Which is you either know
4    that or you don't know that.  That's his question.
5           THE WITNESS:  I don't know that as I
6    sit here today.
7    BY MR. AYLSTOCK:
8       Q.    Well, Mr. Smith certainly didn't
9    think it was consistent, did he?  Because he says
10   it's not the de Leval technique, and de Leval is who
11   invented the TVT-O procedure.  Right?
12      A.    It would appear that way.
13      Q.    So as we sit here today, you have no
14   reason to disagree with Mr. Smith and how he
15   responded.  Correct?
16      A.    I have no reason as I sit here today
17   to disagree with Mr. Smith.
18      Q.    Now, the sales rep, Ms. Campbell,
19   does respond to Mr. Smith.  Do you see that?
20      A.    Yes.
21      Q.    And she's "been thinking about where
22   I received the TVT O babcock idea," and it's from
23   several sources.  Right?
24      A.    Where are you reading that?
25      Q.    The top of the next e-mail in the

Page 459

1    chain.  "Dan, I have been thinking about where I
2    received the TVT O babcock idea from and I feel it
3    is from several sources."  Do you see that?
4       A.    Yes.
5       Q.    "I called several reps to see what
6    their physicians have been doing" and "I contacted
7    the product directors as well."  Right?
8       A.    Yes, I see that it says that.
9       Q.    And you're the product director at
10   this time.  Right?
11      A.    I was one of the product directors at
12   this time.
13      Q.    Okay.
14           So were there more than one product
15   directors for TVT-O?
16      A.    I believe so, yes.
17      Q.    How many were there?
18      A.    During different time frames, there
19   could have been two or three, possibly more.
20      Q.    Were they divided by region or how
21   were the responsibilities allocated?
22      A.    There was a product director and
23   group product director that would have had
24   responsibility.  There would have been a division in
25   responsibilities between the US and outside the US.

Page 460

1       Q.    She wouldn't be calling somebody from
2    outside the US?  You don't think that happened, do
3    you?
4       A.    I don't know.
5       Q.    And you were the US product director.
6    Right?
7       A.    I was one of the US product directors
8    at this point in time.
9       Q.    Who were the others --
10      A.    I don't recall getting a phone call
11   from this representative.
12      Q.    Who were the other product directors
13   at this time?
14      A.    I believe Brian Luscombe was in the
15   marketing department.
16      Q.    He was a product director?
17      A.    He was a product director.
18      Q.    Was he on equal par with you or was
19   he under you or was he your boss?
20      A.    There was a period of time that he
21   was my boss.  I don't know if this was that
22   particular period of time.
23      Q.    Who else was a product director
24   during this time?
25      A.    I believe Giselle Bonet was a product

Page 461

1    director.
2       Q.    Wasn't she foreign or was she US?
3       A.    She's US.
4       Q.    Any others you can think of?
5       A.    Again, this time frame, ten years
6    ago, it's hard for me to recall.
7       Q.    Well, in any event, she called you or
8    one of the other product directors according to this
9    e-mail and -- in an attempt to figure out where she
10   got this TVT-O Babcock idea.  Right?  That's what
11   the e-mail says?
12      A.    Yes.
13      Q.    And "some of the ideas were soaking
14   the mesh, injecting saline down the sheaths, using a
15   hemostat on both sides of the mesh sheath,
16   retracting in a lateral position as opposed to
17   towards the ceiling, and pulling off one side at a
18   time."  Do you see that?
19      A.    I see that, yes.
20      Q.    As we sit here today, do you know
21   whether those are consistent or inconsistent with
22   the IFU?
23      A.    I believe for the most part they're
24   consistent with the IFU.
25      Q.    Well, what's inconsistent with the

47  (Pages 458 to 461)

Confidential - Subject to Protective Order

Page 462

1  IFU?
2      A.    I don't recall seeing injecting
3  saline or soaking the mesh within the IFU.
4      Q.    Then she says, "I believe" --
5      A.    Just to clarify, when I say the IFU,
6  I'm talking about the professional education
7  materials in addition to the IFU.
8      Q.    So there's nothing in the
9  professional education materials or the IFU that
10 would suggest that doctors should soak the mesh
11 prior to implantation.  Correct?
12     A.    Not that I can recall.
13     Q.    And same for injecting saline down
14 the sheaths.  Right?
15     A.    Not that I can recall.
16     Q.    Then she says, "I believe it was one
17 of Domingo's physicians that was using the deLeval
18 technique of using a babcock.  This surgeon uses the
19 white TVT O needle to create the loop and clamps the
20 babcock over it."
21           And then she goes on to explain in
22 her mind that to her was the de Leval technique
23 since she never saw de Leval do it.  Right?
24           MR. BROWN:  Objection.
25           THE WITNESS:  That's what the e-mail

Page 463

1  says.
2  BY MR. AYLSTOCK:
3      Q.    "I just extended the same idea with
4  the retropubic approach needles" that "the surgeon
5  mentioned in" the "prior e-mail that was doing the
6  traditional approach."  Do you see that?
7      A.    Yes.
8      Q.    So she's taking it upon herself to
9  extend that idea and tell the doctor to do something
10 that's different from the de Leval technique.
11 Correct?
12     A.    It would appear that way for this
13 particular e-mail.
14     Q.    You would agree that would be wrong
15 for this rep to be doing that.  Right?
16     A.    As I've said before, the rep should
17 be sticking to things that were in the instructions
18 for use and the professional education materials.
19     Q.    And when you saw that she shouldn't
20 been, did you do anything to reprimand her?
21     A.    I may have.  I can't recall.  I may
22 have picked up the phone and called this individual.
23 I can't recall something from an e-mail from ten
24 years ago as I sit here today.
25     Q.    If you had, there would be a record

Page 464

1  of a reprimand.  Right?
2      A.    No, not necessarily, not from a phone
3  call.
4      Q.    You have a way to formally reprimand
5  an employee of yours.  Right?
6      A.    An employee of mine.  This
7  representative was not an employee of mine.
8      Q.    Well, you could have went to that
9  employee's boss and said, look, she's acting
10 inconsistent with the credo and telling this doctor
11 how to perform a surgery and I don't think that's
12 right and that person should be reprimanded.  Right?
13 Nothing prevented you from doing that as product
14 director?
15     A.    No, nothing would have permitted me
16 from doing that.  And I can't --
17     Q.    You didn't do that, did you?
18     A.    I can't recall.
19     Q.    How many people have you reprimanded
20 in your career?  Do you do that a lot?
21     A.    I wouldn't say I do it a lot, but I
22 would, if I saw incorrect information, I would do my
23 best to correct the information as I think this
24 e-mail from Dan Smith is trying to do.
25     Q.    Well, let's see what else she says in

Page 465

1  this e-mail back to Mr. Smith.
2      A.    I believe the individual's boss is
3  copied on this e-mail as well.
4      Q.    Who is Shannon's boss?  Kevin Mahar?
5      A.    I think it would have been Charles
6  Riedley, and Tom Lech is the -- is Charles
7  Riedley's -- was Charles Riedley's boss at the time,
8  as I can recall as I sit here today.
9      Q.    So then she goes on and talks about a
10 huge challenge.  "What is a huge challenge to a rep
11 trying to make this right, is that we really don't
12 know what the right amount is."
13           She's talking about the tension.
14 Right?
15           MR. BROWN:  Objection.
16           THE WITNESS:  It would appear that
17 way from this e-mail.
18 BY MR. AYLSTOCK:
19     Q.    "We know this is a quick fix to the
20 problem, but not a clinically backed solution."  Do
21 you see that?
22     A.    I do see that, yes.
23     Q.    "It's almost...trying to decide if a
24 8, 10 or 12 millimeter hagar dialator is best for
25 tensioning TVT with the patient under general.  We

48 (Pages 462 to 465)

Confidential - Subject to Protective Order

Page 466

1   learned the cough test, but relied on surgeons
2   experience with the tensioning under general.  The
3   package insert to" the "TVT O reads as follows:
4   'Ensure...the tape is placed with no tension under
5   the urethra.'"  Do you see that?
6       A.   Yes.
7       Q.   You would agree --
8            Well, when you became director of
9   professional education with responsibilities of the
10  TVT-O product, you became aware that there was
11  issues with how doctors were tensioning the tape.
12  Right?
13      A.   No, I don't recall being aware of
14  that.
15      Q.   You were aware of it back in
16  September 2004, because you were copied on this
17  e-mail.  Right?
18           MR. BROWN:  Objection.
19           THE WITNESS:  I was copied on this
20  e-mail, yes.
21  BY MR. AYLSTOCK:
22      Q.   And you brought that knowledge with
23  you when you became a director of professional
24  education.  Right?
25      A.   Yes.

Page 467

1       Q.   And what did you do -- well, strike
2   that.
3            She goes on to say, "My real question
4   is; How should we as reps be instructing our
5   physicians to tension the TVT O that aligns with the
6   IFU and fulfills our CREDO responsibility?"  Do you
7   see that?
8       A.   I do, yes.
9       Q.   So she's trying to get information
10  from you, Mr. Smith, her boss, Mr. Riedley, and
11  others on how best to instruct physicians for -- on
12  tensioning, because she's trying to fulfill her
13  credo responsibility of putting the patients first.
14  Right?
15           MR. BROWN:  Objection.
16           THE WITNESS:  I believe that this
17  representative was also talking about the wording
18  from Dr. de Leval's clinical study and referring to
19  the Babcock approach, which was made available
20  through professional education.
21           MR. AYLSTOCK:  Let me move to strike,
22  because I didn't --
23  BY MR. AYLSTOCK:
24      Q.   We'll get to all this stuff, but I'm
25  asking you about where she says, "My real question

Page 468

1   is; How should we as reps be instructing our
2   physicians to tension the TVT O that aligns with the
3   IFU and fulfills our CREDO responsibility."  Right?
4       A.   When I finish this question, would it
5   be possible to take a quick bathroom break?
6       Q.   Sure, that's fine.
7       A.   Thank you.
8       Q.   So she's trying to get information
9   out of you and your company and others about how
10  best to instruct physicians on tensioning.  Right?
11  That's what the e-mail says?
12      A.   Yes, that seems to be what the e-mail
13  says.
14      Q.   And to do it in a way that fulfills
15  the credo responsibility.  Right?
16      A.   Yes.
17           MR. AYLSTOCK:  Why don't we take a
18  quick break.
19           THE VIDEOGRAPHER:  The time is now
20  2:35.  This is the end of Disk Number 3.  We are
21  going off the record.
22                  - - -
23           (A recess was taken from 2:35 p.m. to
24       2:46 p.m.)
25                  - - -

Page 469

1            THE VIDEOGRAPHER:  The time is now
2   2:46.  This is the beginning of Disk Number 4.  We
3   are back on the record.
4   BY MR. AYLSTOCK:
5       Q.   We're back, Mr. Parisi.
6            Would you agree with me that nobody
7   in Ethicon should ever suggest to a physician to use
8   a surgical technique that differs from that in the
9   IFU surgical technique guide or other professional
10  education materials for any pelvic mesh device?
11           MR. BROWN:  Objection.
12           THE WITNESS:  I can't answer that
13  question with regard to nobody at Ethicon.  I can
14  say from my role in -- with my role in professional
15  education with the company that the information that
16  myself and my group would be responsible for
17  providing would be consistent with the IFU, the
18  surgical technique guide and the professional
19  education materials.
20           MR. AYLSTOCK:  Move to strike your
21  answer.
22  BY MR. AYLSTOCK:
23      Q.   I'm asking you whether -- and I'll
24  narrow it for you.
25      A.   Thank you.

49 (Pages 466 to 469)

Confidential - Subject to Protective Order

Page 470

1    Q.    Should anybody at Ethicon
2  professional education or in sales, as a sales rep,
3  ever suggest to a physician that he or she should
4  use a surgical technique that differs from that
5  that's in the IFU surgical technique guide or other
6  professional education materials for any of your
7  pelvic mesh devices?
8    A.    No.
9    Q.    Now, back to this e-mail.
10 Ms. Shannon is talking about the IFU. Right? Well,
11 let me start over.
12        We're at the top of page of 505,
13 864505, do you see that? Where she's asking, "How
14 should" the "reps be instructing our physicians to
15 tension the TVT O that aligns with the IFU and
16 fulfills our CREDO responsibility?" Are you with
17 me?
18    A.    Yes.
19    Q.    She then talks about that, "This has
20 been such a grey area and everyone seems to have
21 their own tensioning technique. With the
22 inconsistency of the sheaths, this has only" been
23 made -- let me start over.
24        She says, "This has been such a grey
25 area" that "everyone seems to have their own

Page 471

1  tensioning technique. With the inconsistency of the
2  sheaths, this has only made it tougher to provide a
3  more uniform response that parallel's the IFU." Do
4  you see that?
5    A.    I'm sorry, I've lost where you're at.
6    Q.    At the second full paragraph there.
7    A.    Okay. Thank you.
8    Q.    After they're talking about being --
9  she's talking about being consistent with the IFU on
10 tensioning. Right?
11    A.    Yes.
12    Q.    And she says that, "This has been
13 such a grey area" that "everyone seems to have their
14 own tensioning technique." Right?
15    A.    That's what it seems to say, yes.
16    Q.    You would agree with me that it's the
17 goal of professional education to provide
18 consistency in the implantation techniques for the
19 physicians. Right?
20    A.    Yes.
21    Q.    You don't want physicians, each
22 physician doing their own type of procedure; you
23 want the physicians to be consistent with the IFU
24 and the prof ed materials. Right?
25    A.    Yes.

Page 472

1    Q.    And --
2        But she says, "With the inconsistency
3  of the sheaths, this has only made it tougher to
4  provide a more uniform response that parallel's the
5  IFU." Do you see that?
6    A.    I do see that, yes.
7    Q.    And you're copied on this e-mail.
8  Right?
9    A.    Yes.
10    Q.    So going in as director of
11 professional education for the TVT-O product, you
12 knew that there had been some question about the
13 proper tensioning technique for the TVT-O. Correct?
14    A.    No.
15    Q.    Isn't that what you took from this
16 e-mail when you read it?
17    A.    As I read this e-mail, I understand
18 that this representative, Shannon Campbell, was
19 asking for clarification around the instructions for
20 use and the professional education materials.
21        As I further read through the
22 responses --
23    Q.    Well, we'll get to the responses.
24 Let's take this in stages.
25        She wants clarification because she

Page 473

1  believes there's a gray area in the tensioning
2  technique. Right?
3    A.    At that particular point in the
4  e-mail chain.
5    Q.    Right. Okay.
6        And so the response from Mr. Smith,
7  he has several different responses. Right? He
8  says, "Shannon, I am not sure what you're looking
9  for, but our mesh will never '...stretch' as
10 compared to the Monarc mesh." Right?
11    A.    I'm sorry, I need to --
12    Q.    I'm going to Mr. Smith's response to
13 Shannon Campbell's statements that there's some
14 question about how to tension the tape and it's a
15 gray area and she's looking for a little guidance
16 consistent with the credo. Right?
17        MR. BROWN: Objection.
18        THE WITNESS: Can you refer me to the
19 section that you're looking at this point?
20 BY MR. AYLSTOCK:
21    Q.    Well, we just went over Shannon's
22 e-mail back to Dan Smith copying you and others, her
23 boss and others, about the fact that where she
24 received the TVT-O Babcock idea and her belief that
25 there was some gray area in how to tension the TVT-O

50 (Pages 470 to 473)

Confidential - Subject to Protective Order

Page 474

1    mesh. Correct?
2        A.    Yes.
3        Q.    You see that in the e-mail?
4        A.    I do.
5        Q.    Mr. Smith responds to Shannon first
6    by saying that, "Our mesh will never '...stretch' as
7    compared to Monarc mesh." Right?
8        A.    I see that, yes.
9            MR. BROWN: Objection. Did you say
10   never stretch?
11           MR. AYLSTOCK: Well, I'm reading the
12   e-mail.
13           MR. BROWN: It says "will never 'not
14   stretch.'"
15   BY MR. AYLSTOCK:
16       Q.    "Will never 'not stretch' as compared
17   to the Monarc mesh." Correct? That's what he says.
18   Right?
19       A.    Yes.
20       Q.    Then he says, "As for the IFU, it
21   also" states "the surgeon needs to 'adjust the
22   tape...to avoid positioning the tape with tension.'"
23   Do you see that?
24       A.    Yes.
25       Q.    "Many surgeons have different

Page 475

1    techniques as you know and the babcock is just
2    another way they can use, if they so choose.  I
3    don't think" it's "a Credo issue, I would appreciate
4    if others would comment on this point."  Do you see
5    that?
6        A.    I do, yes.
7        Q.    Then he goes on and says, "Putting in
8    writing or suggesting that their may even be a Credo
9    issue is not a good idea!"  Right?
10       A.    I see that, yes.
11       Q.    And you're copied on this e-mail.
12   Right?  From Mr. Smith?
13       A.    From 2004, yes.
14       Q.    "We have discussed alternative
15   methods of sheath removal" in "both Regulatory and
16   Medical Affairs and have both said that suggesting
17   other methods used by" the "surgeons is not a
18   problem." Do you see that?
19       A.    Yes.
20       Q.    "This also includes other methods of
21   device delivery, since the surgeon ultimately owns
22   the responsibility of proper delivery and
23   placement." Right?
24       A.    Yes.
25       Q.    So Mr. Smith is telling the sales

Page 476

1    representative, Shannon Campbell, it's fine to
2    suggest to the physician alternative methods of
3    sheath removal and implantation. Correct?
4            MR. BROWN: Objection.
5            THE WITNESS: Yes, that's my
6    understanding, reading this. And that was
7    confirmed by regulatory and medical affairs at the
8    time.
9    BY MR. AYLSTOCK:
10       Q.    So regulatory and medical affairs
11   signed off on the idea of sales reps discussing
12   alternative methods of sheath removal and
13   implantation with physicians, according to this
14   document. Right?
15           MR. BROWN: Objection.
16           THE WITNESS: According to Dan Smith
17   in this document, yes.
18   BY MR. AYLSTOCK:
19       Q.    Ms. Campbell then responds to
20   Mr. Smith. Do you see this?
21       "As reps, we have quite a
22   responsibility and even a great deal of liability."
23   Do you see that?
24       A.    I do, yes.
25       Q.    As a former sales rep, you know that

Page 477

1    you indeed do have a great deal of responsibility
2    when it comes to interacting with the doctors.
3    Right?
4        A.    I believe so, yes.
5        Q.    And part of that responsibility is
6    providing fair and balanced information about the
7    risks of the products. Correct?
8        A.    Yes.
9        Q.    She then says, "I feel I got a little
10   grilled on my suggestion of tensioning, yet there is
11   no clear direction on tensioning." Right?
12       A.    I -- looks like that that's what it
13   says, yes.
14       Q.    "I'm not a rebel looking for my own
15   way of doing things. I'm a rep trying to figure out
16   what is best from my experiences with surgeons and
17   what I see the product doing in the operating room."
18   Do you see that?
19       A.    Yes.
20       Q.    "My goal is not to get the tape
21   changed, yet strive to place the mesh as designed
22   without altering it. The surgeon does own
23   responsibility for proper delivery and placement."
24   Then she says, "The fact is, they," the physicians,
25   "look to us as" reps "to show them the proper

51 (Pages 474 to 477)

Confidential - Subject to Protective Order

Page 478

1    placement techniques." Right?
2        A.    That's what it says, yes.
3        Q.    You know that as director of
4    professional education that doctors sometimes look
5    to sales reps to show them proper placement
6    techniques. Correct?
7            MR. BROWN: Objection.
8            THE WITNESS: I wouldn't agree -- I
9    can't agree with that.
10   BY MR. AYLSTOCK:
11       Q.    You don't agree with it?
12       A.    I don't agree with that.
13       Q.    In fact, it would be wrong for a rep
14   to show the doctor proper placement techniques.
15   Right?
16       A.    I would recommend that they utilize
17   the professional education materials.
18       Q.    Because it would be wrong for a sales
19   rep to be telling the physician proper placement
20   techniques. Correct?
21       A.    The professional education materials
22   would be the source of the correct information.
23       Q.    So in this instance, if Ms. Campbell
24   were, in fact, providing the doctor with placement
25   techniques, that would be inconsistent with your

Page 479

1    view of professional education. Correct?
2        A.    Yes.
3        Q.    And Ethicon's view, as you understand
4    it, of professional education. Correct?
5        A.    Yes.
6        Q.    Now, you had indicated that it's --
7    is it professional education's at Ethicon's desire
8    to train only the highly skilled physicians or is it
9    their intent to train any ob/gyn that would like to
10   do the TVT procedure?
11       A.    The requirements for the TVT
12   procedure would be to train gynecologists,
13   urologists or urogynecologists who are board
14   certified and are practicing the treatment of stress
15   urinary incontinence.
16       Q.    You would expect, in a procedure like
17   this, that physicians be highly skilled in their
18   field of practice as a board-certified obstetrician
19   or urogynecologist. Right?
20       A.    Yes.
21       Q.    And you know that this procedure is
22   not a simple procedure, is it?
23            MR. BROWN: Objection.
24            THE WITNESS: I can't say that I can
25   comment on what a physician would term it as simple

Page 480

1    or not simple. I would defer that to medical
2    affairs.
3    BY MR. AYLSTOCK:
4        Q.    Do you have a set time that's
5    required for a physician to sit through the training
6    that's -- the professional ed that's provided for
7    your company, by your company?
8        A.    The professional education programs
9    are typically a day to a day and a half for these
10   types of products in the TVT family.
11       Q.    I mean, when it comes to implanting a
12   medical device, a mesh inside a woman's pelvis
13   transvaginally, you would expect that a doctor would
14   need a day's worth of training on that before going
15   out and starting to operate on women with your
16   product; is that right?
17            MR. BROWN: Objection.
18            THE WITNESS: The doctor would
19   receive far more than a day's worth of training.
20   They would have completed a residency or a
21   fellowship in their specialty, taken the test to
22   become board certified. The training that the
23   company provides is specific to our product and the
24   use of it -- of our product, but certainly they
25   would have knowledge beyond the training that we

Page 481

1    provided.
2    BY MR. AYLSTOCK:
3        Q.    Of course.
4            Because you want them to be highly
5    skilled physicians in order to get the product,
6    they've got to be board certified and highly
7    skilled. Right?
8        A.    That would be our -- yes. That would
9    be our preference, sure.
10       Q.    Right.
11           And your desire is not for a
12   physician to spend 45 minutes with a sales rep and
13   then start implanting this permanent mesh inside of
14   a woman?
15       A.    If they were treating patients with
16   other sling procedures, then it would be possible
17   that they would be able to get the information they
18   needed to understand the nuances and the differences
19   between our product and the technique that they were
20   using previously. So that would be the
21   clarification of that answer.
22       Q.    So is there a requirement that in
23   order for a physician not to have to undergo the
24   full day's worth of training, they need to have been
25   proficient in other sling procedures? Is that an

52 (Pages 478 to 481)

Confidential - Subject to Protective Order

Page 482

1 actual requirement of Ethicon or are you just saying
2 that?
3          MR. BROWN: Objection.
4          THE WITNESS: That would be a
5 requirement of Ethicon, yes.
6 BY MR. AYLSTOCK:
7     Q.   Okay. Because -- okay. Strike that.
8          I'll show you Exhibit 1063.
9                    - - -
10         (Deposition Exhibit No. T-1065,
11         E-mail chain, top one dated April 13,
12         2005, Bates stamped ETH.MESH.05795322
13         through ETH.MESH.05795324, was marked for
14         identification.)
15                   - - -
16 BY MR. AYLSTOCK:
17    Q.   It's an e-mail from Marianne
18 Kaminski. We talked about her earlier. Right?
19    A.   Yes.
20    Q.   And she's in professional ed. Right?
21    A.   Yes.
22    Q.   She e-mails you and a whole bunch of
23 other folks?
24    A.   Yes.
25    Q.   And the e-mail's talking about "Q1,"

Page 483

1 I guess first quarter, "PE results - REVISED."
2          Was PE professional education
3 results?
4     A.   Yes.
5     Q.   She's talking about a couple of
6 errors in the spreadsheets about TVT costs being
7 overstated and some uterine health costs
8 understated. Do you see that?
9     A.   I don't see. Where are you referring
10 to?
11    Q.   Just at the very top there.
12    A.   At the top of the first page?
13    Q.   She's talking about a couple of
14 errors in the spreadsheet.
15    A.   Yes, thank you.
16    Q.   And then the impact on the national
17 budget. "TVT is now at 81% of annual budget, not
18 108%." Do you see that?
19    A.   Yes.
20    Q.   Okay. So --
21         And is it fair to say that Ethicon
22 has an annual budget for training doctors in
23 professional education programs?
24    A.   Yes.
25    Q.   And you're expected to stay within

Page 484

1 that budget for training doctors?
2     A.   That would be the intent of having
3 the budget, but it's possible that training may have
4 gone over the budget as this first bullet describes
5 here.
6     Q.   Now, I guess this is a follow-up to
7 an earlier e-mail that Marianne sent to you and a
8 whole bunch of other folks with this Q1 PE results.
9 Do you see that? The next e-mail down, April 13,
10 2005.
11    A.   Okay, thank you.
12         It's a little challenging because I
13 think we're reading it chronologically backwards,
14 but...
15    Q.   Yeah. Well, there's only two in this
16 chain, I think.
17    A.   There's a memo to Bruno on the last
18 page.
19    Q.   Memo from Bruno?
20    A.   Memo from Bruno.
21    Q.   Who's Bruno?
22    A.   I believe that was Bruno De Lacroix.
23    Q.   And what was his position?
24    A.   He was the regional sales director.
25    Q.   So let's start, then, from the back

Page 485

1 with this memo from the regional sales director.
2          And he says, "Dear all,
3 Congratulations for all the ProfEd activities you
4 have done and the ones you have in place." Do you
5 see that?
6     A.   Yes.
7     Q.   "Special thanks to Paul and Amy who
8 have been able to coordinate all that knowing that
9 our region suffered at the end of last year for lack
10 of" PD -- "PEDM." Did I read that correctly?
11    A.   I believe so, yes.
12    Q.   And he's talking about you, right,
13 Paul Parisi?
14    A.   Yes, I believe so.
15    Q.   Okay.
16         So what does that mean, "suffered at
17 the end of last year for lack of PEDM"?
18    A.   I think there was a vacancy in the
19 position that I assumed in February of 2005. So
20 there was a period that there was not a prof ed
21 manager in place. And it appears from this e-mail,
22 and I can't recall from 2005, that some -- that Amy
23 may have been covering that vacancy during that
24 time.
25    Q.   It looks like you were as well.

53 (Pages 482 to 485)

Confidential - Subject to Protective Order

Page 486

1  Right?  Paul and Amy?
2       A.    Well, I would have assumed
3  responsibility for it as of, I believe it was
4  February of 2005.
5       Q.    Okay.
6            It says you all -- "You know we are
7  all trying to get more funding, right now we do not
8  have anything."  Right?  So prof ed was trying to
9  get more funding to train doctors; is that right?
10      A.    Yes.
11      Q.    And Ethicon, someone up in the
12  corporate, didn't provide it at this point in time.
13  Right?
14      A.    It seems, as I read forward, the
15  response was is that there was still budget
16  remaining once the numbers were recalculated.  There
17  were some errors in the spreadsheet that led to the
18  previous assumption that there was -- that the
19  budget had been overspent, and now it looks like
20  Ms. Kaminski is correcting that there was budget
21  remaining for both TVT and uterine health.
22           MR. AYLSTOCK:  Let me move to strike.
23  That wasn't my question what happened after that.
24  BY MR. AYLSTOCK:
25      Q.    You know, Mr. Parisi, that

Page 487

1  professional ed tried to get more funding but it
2  wasn't provided to you.  Correct?
3       A.    I don't know that.  It seems like the
4  response was that it was provided.
5       Q.    No.  What they're talking about is
6  whether you're under or over budget.
7            There's nothing in here that says you
8  got more money, is there?
9       A.    I think by definition I read this to
10  understand that if we're at 81 percent of the annual
11  budget, that we still have roughly 20 percent
12  remaining to spend.
13           MR. AYLSTOCK:  Move to strike.
14  BY MR. AYLSTOCK:
15      Q.    My question is how -- whether you're
16  over or under budget.
17           My question is, you agreed with me
18  that prof ed was, including you, were trying to get
19  more funding for prof ed?  Right?  You just agreed
20  with me.  Are you going to change your testimony
21  again?
22           MR. BROWN:  Objection.
23           THE WITNESS:  There's not dates on
24  all of these e-mails, so it's difficult to follow --
25  BY MR. AYLSTOCK:

Page 488

1       Q.    Mr. Parisi, you know --
2       A.    -- the chain of communications.
3       Q.    Mr. Parisi, you know that at this
4  point in time, prof ed was looking for more funding
5  to train doctors on these procedures.  Correct?
6       A.    It seems that that's what Bruno was
7  trying to communicate.
8       Q.    I'm asking if you know.  You know
9  that.
10           You're going to sit here and tell the
11  jury you don't know that?
12      A.    I don't know --
13      Q.    You don't know that?
14      A.    There's no date on this
15  communication.
16      Q.    I'm not asking about the
17  communication.
18           MR. BROWN:  Answer if you know.
19           THE WITNESS:  I don't know.  I don't
20  know.
21  BY MR. AYLSTOCK:
22      Q.    You don't know.
23           Was there ever a point in time where
24  you tried to get more funding for professional
25  education?

Page 489

1       A.    It's possible.
2       Q.    You know it happened.  I know it's
3  possible, but you know it happened.
4            Sit here, look in the camera and tell
5  this jury whether you know that it happened or not,
6  please.
7            MR. BROWN:  Objection.
8            THE WITNESS:  To the degree that I
9  can recollect as I sit here today, I believe it was
10  possible that professional education would have been
11  seeking more funding if there was a need.
12  BY MR. AYLSTOCK:
13      Q.    That wasn't my question.
14      A.    I think that this --
15      Q.    Look in the camera and tell this
16  jury --
17      A.    -- e-mail goes on to respond --
18           MR. BROWN:  I haven't seen the
19  document, Bryan, so I can't even --
20           MR. AYLSTOCK:  I don't even care
21  about the document.
22           MR. BROWN:  -- I don't even know if I
23  need to object because I don't know if it's from
24  him, if it's not from him.  So I'd like to take 30
25  seconds.

54 (Pages 486 to 489)

Confidential - Subject to Protective Order

Page 490

1          MR. AYLSTOCK: Take a minute and look
2  at the document, but I'm not even asking about the
3  document right now.
4  BY MR. AYLSTOCK:
5     Q.    Mr. Parisi, under oath, tell this
6  jury whether you ever requested more funding, or
7  anyone in your department at professional education,
8  for professional education activities related to the
9  TVT or any other pelvic health product, yes or no?
10    A.    Yes, I believe that we did.
11    Q.    And in this instance, more funding
12  was not provided, but you were able to remain under
13  budget. Correct?
14    A.    No, I don't agree with that.
15    Q.    Is it your testimony that more
16  funding was provided in this instance, or do you
17  recall?
18    A.    I don't recall --
19    Q.    Okay.
20    A.    -- as I sit here today.
21    Q.    Thank you.
22        So let's look what Mr. Lacroix, Bruno
23  Lacroix, De Lacroix, had to say to all. He
24  referenced you and the funding. Right? "You know
25  we are all trying to get more funding, right now we

Page 491

1  do not have anything...it is important that we take
2  advantage of that to ask ourselves and our people to
3  improve our processes." Right? That's what he
4  says?
5    A.    Yes.
6    Q.    In other words, he's saying since we
7  don't have more funding, let's make sure that we're
8  maximizing the dollars that we do have to improve
9  our processes of professional education. Correct?
10    A.    Yes.
11    Q.    And then he says, if you turn to the
12  next page, "To me the biggest progress we can make
13  is to reinforce the reps in 'training' themselves on
14  TVT-Os." Do you see that?
15    A.    Yes.
16    Q.    Especially "the 'average' obgyns."
17  Do you that?
18    A.    Yes.
19    Q.    "They can sit down with them for 45
20  minutes, go through the procedure (cd rom and
21  leaflets), discuss the anatomy and use a sample" of
22  the "PF model." Do you see that?
23    A.    Yes.
24    Q.    What's the PF model?
25    A.    I believe that's a pelvic floor

Page 492

1  hands-on training model.
2    Q.    So what he's saying is that we can
3  save money, since we don't have any more funding
4  from the company, and reinforce -- in reinforcing to
5  the reps that they can sit down with these average
6  ob/gyns for 45 minutes and train them. Correct?
7       MR. BROWN: Objection.
8       THE WITNESS: It's my understanding,
9  now that I've had a chance to read the rest of his
10  statement, that he's suggesting that for doctors
11  that had prior experience using sling materials. He
12  goes on to say that if there's a need for an
13  official preceptorship after that, it would -- it
14  would be made available.
15  BY MR. AYLSTOCK:
16    Q.    Sir, where does it say that these
17  reps should be spending 45 minutes for those with
18  prior experience? It doesn't say that, does it?
19    A.    I don't see those words in the
20  document.
21    Q.    In fact, what it says is average.
22  They should train themselves on the TVT-Os,
23  especially the average ob/gyns. Right? That's what
24  it says?
25    A.    That is what it says.

Page 493

1    Q.    It doesn't say the highly skilled
2  ob/gyns who have already done other sling
3  procedures, does it? It doesn't say that?
4    A.    I don't see those words in here, but
5  I believe that was the intention and spirit of this
6  e-mail.
7    Q.    There's nothing in this e-mail that
8  supports your belief, does it? In fact, the e-mail
9  says "'average' obgyns." Correct?
10       MR. BROWN: If he's asking you what's
11  in the e-mail, just answer him yes or no if it's in
12  the e-mail.
13       THE WITNESS: Yes, I don't see that
14  in e-mail.
15  BY MR. AYLSTOCK:
16    Q.    In fact, he puts average in quotes.
17  Right?
18    A.    Yes.
19    Q.    And then he does say --
20       Well, you would agree with me that if
21  a rep is spending 45 minutes with a doctor and
22  providing them with CD-ROMs and leaflets, that's a
23  cheaper way of training a doctor than an official
24  preceptorship. Right? We looked at a document
25  earlier on those costs, we can pull it out if you

Confidential - Subject to Protective Order

Page 494

1  want, but you would agree with me on that. Right?
2      A.    I would agree with that, yes.
3      Q.    In fact, the official preceptorship
4  we saw in the other document is the most expensive
5  way to train doctors. Right?
6      A.    No, that's not correct.
7      Q.    The cadaver lab is the most expensive
8  way?
9      A.    I believe so, yes.
10     Q.    Well, the preceptorship is certainly
11 a lot more expensive than a rep sitting down with a
12 doctor for 45 minutes and giving them a CD and using
13 the model. Right?
14     A.    I don't know what it costs.
15     Q.    I didn't ask what you knew if it
16 would cost.
17           You would agree with me that it's a
18 lot more expensive to put a prospective physician
19 through a preceptorship than for the rep to sit down
20 with the doctor for 45 minutes and hand out a copy
21 of a CD and show him on a model how to do it.
22 Right?
23     A.    Yes, I would agree with that.
24     Q.    "In any case it would help the
25 Preceptorship to be more valuable and more

Page 495

1  importantly, it would create a stronger and deeper
2  relationship between the doc and the rep." Right?
3  Do you see that?
4      A.    I see that, yes.
5      Q.    "If the need is to have credential,
6  may be a dinner with presentation would be enough (I
7  do not know that for sure but...)" do you see that?
8      A.    Yes, I see that.
9      Q.    "Be creative!"
10           That's what Ms. Kaminski says.
11 Right?
12     A.    It seems to be that this was from
13 Mr. De Lacroix.
14     Q.    Right.
15           Ms. Kaminski's name is at the bottom,
16 because I guess she was forwarding this e-mail from
17 Bruno. Right?
18     A.    That would appear that way.
19     Q.    And Kaminski was your boss at the
20 time. Right?
21     A.    Yes.
22     Q.    It says, indeed she said -- strike
23 that.
24           Mr. De Lacroix says, "The more we
25 improve our ProfEd processes and ways of thinking,

Page 496

1  the more we will increase our ROI." Do you see
2  that?
3      A.    Yes.
4      Q.    That's return on investment. Right?
5      A.    Yes.
6      Q.    "The more money we will get." Right?
7      A.    Yes.
8      Q.    "Logic and discipline, right? Thanks
9  for your help." Do you see that?
10     A.    I do, yes.
11     Q.    And then your boss, Marianne
12 Kaminski, forwards this, along with her analysis of
13 the numbers about whether you're over or under
14 budget for physician training. Right?
15     A.    Yes.
16     Q.    And so you would agree with me that
17 in your organization, when it came to physician
18 training, there was a focus on return on investment
19 and getting more money. Right? According to this
20 document?
21           MR. BROWN: Objection.
22           THE WITNESS: Can you rephrase the
23 question, please?
24 BY MR. AYLSTOCK:
25     Q.    Well, you would agree with me that

Page 497

1  when it comes to professional education, one of the
2  things that was focused on by your company and your
3  department, including your boss, Ms. Kaminski, was
4  return on investment and making more money for the
5  company. Correct?
6           MR. BROWN: Objection.
7           THE WITNESS: It's my understanding
8  that according to this e-mail that there was
9  discussion between Mr. De Lacroix and Ms. Kaminski
10 or correspondence between the two of them that
11 referred to return on investment.
12 BY MR. AYLSTOCK:
13     Q.    And in fact, you know that
14 Mr. De Lacroix's thoughts here were implemented by
15 your company in allowing reps to train doctors with
16 the CD in order to save money. Correct?
17     A.    Yes, for doctors that had prior
18 experience with similar types of products.
19           MR. AYLSTOCK: Move to strike after
20 "yes."
21           - - -
22 (Deposition Exhibit No. T-1064,
23 E-mail chain, top one dated 23 Nov 2006,
24 Bates stamped ETH.MESH.03921637 through
25 ETH.MESH.03921640, was marked for

56 (Pages 494 to 497)

Confidential - Subject to Protective Order

Page 498

1        identification.)
2        - - -
3  BY MR. AYLSTOCK:
4      Q.    Let me show you Exhibit 1064.
5         Now, this e-mail chain is dated
6  November of 2006; is that right?
7      A.    Yes.
8      Q.    And you were director of professional
9  education during this time period for the TVT
10 products including the TVT SECUR and the TVT-O and
11 the TVT Classic.  Right?
12     A.    In the US, yes.
13     Q.    As director of professional
14 education, you knew it would be improper for the rep
15 to train the doctor on how to do the product -- how
16 to do the procedure, either TVT-O or TVT-S or TVT
17 Classic or any other one.  Right?
18     A.    That was my understanding, yes.
19 Unless the doctor had prior experience using another
20 sling material, another TVT-like product.
21     Q.    So is it your testimony that if they
22 had experience, the rep could train the doctor on
23 how to use a different TVT product.
24         That's not your testimony, is it?
25     A.    I'm a little confused with this

Page 499

1  document, so I'm having a little bit of difficulty
2  following your train of questions.  This appears to
3  be a document that I was not involved in, and it
4  appears to be with correspondence between the
5  members of the company outside of the United States.
6      Q.    Well, David Robinson is in this
7  country.  Right?  In fact, he was a medical
8  director?
9      A.    Yes.
10     Q.    He's someone you interacted with as
11 director of professional education.  Right?
12     A.    Yes.
13     Q.    Let me ask you this.
14        When it came to issues of training,
15 would it -- would you agree with me that if training
16 issues came up on a particular TVT product, in order
17 for you to do your job as director of professional
18 education, it's incumbent upon other members of the
19 team, including medical affairs, to inform you of
20 any training issues that need to be corrected.
21 You'd agree with that.  Right?
22     A.    Yes.
23     Q.    In other words, if issues were coming
24 up on the implantation of one of these devices that
25 could be corrected through training, you would

Page 500

1  expect to be notified of that as director of
2  professional education.  Correct?
3      A.    If the medical director felt that I
4  needed to be notified about it, yes, I would expect
5  that they would notify me.
6      Q.    Because professional education's job
7  is to make sure that the product is being used
8  safely and effectively.  You testified to that.
9  Right?  That was your job?
10     A.    Yes.
11     Q.    And if you don't know of issues that
12 are coming up with the training of physicians and
13 the safe and effective use of the product, you can't
14 effectively do your job as director of professional
15 education, can you?
16     A.    Can you rephrase the question,
17 please?
18     Q.    If issues come up in the training of
19 physicians on how to safely and effectively use the
20 TVT products and you're not made aware of those
21 issues, you can't effectively do your job as
22 director of professional education, can you?
23        MR. BROWN:  Objection.
24        THE WITNESS:  As it relates -- let me
25 start that over again.

Page 501

1         My understanding is that the company
2  medical director would inform me as professional
3  education of any information that they had as it
4  pertained to US professional education as for the
5  role that I was in at this particular point in time.
6  BY MR. AYLSTOCK:
7      Q.    Well, if there were issues in the
8  training of any of the TVT devices that needed to be
9  corrected, you would have expected to have been
10 brought into that discussion so that you could make
11 corrections to the professional education materials
12 and make sure the doctors are properly trained.
13 Correct?
14     A.    If there were issues in the training
15 that my group or team was providing, I would expect
16 that we would be alerted to that and be allowed to
17 make corrections to that.  And we did that with all
18 diligence.  I'm not aware of this particular chain
19 of e-mails from different countries outside of the
20 US as I sit here today.
21        MR. AYLSTOCK:  Motion to strike "and
22 we did that" forward.
23        THE WITNESS:  Could I take a short
24 break?
25        MR. AYLSTOCK:  Sure.

57 (Pages 498 to 501)

Confidential - Subject to Protective Order

Page 502

1      THE VIDEOGRAPHER: The time is now
2  3:24. We are going off the record.
3          - - -
4      (A recess was taken from 3:24 p.m. to
5  3:37 p.m.)
6          - - -
7      THE VIDEOGRAPHER: The time is now
8  3:37. We are back on the record.
9      MR. AYLSTOCK: I need to, for the
10  record, correct the last exhibit that was used, the
11  e-mail from Marianne Kaminski to Mr. Parisi and
12  others should have been Exhibit 1065. It was
13  mismarked 1064, so we had two 1064s. So we've
14  remarked it 1065. And it was 1063, but there were
15  two of them, so we corrected that.
16          - - -
17      (A discussion off the record
18  occurred.)
19          - - -
20      (Deposition Exhibit No. T-1066, KOL
21  Interview: Carl G. Nilsson, Interview:
22  06.18.08(10-4pm), Bates stamped
23  ETH.MESH.04048515 through
24  ETH.MESH.04048520, was marked for
25  identification.)

Page 504

1  experienced negative consequences from it?
2      A.    As it pertains to TVT SECUR, yes,
3  I've heard that. And hands-on training was
4  available in the United States for TVT SECUR.
5      Q.    At what point did it become required
6  by Ethicon?
7      A.    I can't say. I didn't use the word
8  "required."
9      Q.    So even though Ethicon knew that
10  hands-on training would be superior for the TVT
11  SECUR, it never instituted a requirement for
12  hands-on training, did it?
13      A.    Hands-on training models were
14  implemented in the United States for TVT SECUR prior
15  to the time frame in this e-mail.
16      Q.    Well, when you say they were
17  implemented, they were offered but they weren't
18  required by the company to implant the product.
19  Correct?
20      A.    The company would provide them at all
21  of its training programs.
22      Q.    Listen to my question.
23      MR. AYLSTOCK: Move to strike.
24  BY MR. AYLSTOCK:
25      Q.    Because my question was, did the

Page 503

1          - - -
2      THE VIDEOGRAPHER: The time is now
3  3:38. We're going off record.
4          - - -
5      (A discussion off the record
6  occurred.)
7          - - -
8      THE VIDEOGRAPHER: The time is now
9  3:39. We are back on the record.
10  BY MR. AYLSTOCK:
11      Q.    Before we took a short break,
12  Mr. Parisi, you had in front of you Exhibit 1064, an
13  e-mail from Harel Gadot from November 2006. Do you
14  see that?
15      A.    Yes.
16      Q.    And this e-mail chain talks about
17  that, at least according to Mr. Gadot, that the
18  "right training (hands-on) is the difference between
19  successful adoption of the product or having some
20  negative feedback on it." Do you see that?
21      A.    I do, yes.
22      Q.    Have you ever heard that, as director
23  of professional education, or in any other capacity
24  at Ethicon, that hands-on training would be better
25  training for physicians when it comes to a patient's

Page 505

1  company, did Ethicon or J&J ever require physicians
2  to undergo hands-on training for the TVT SECUR
3  product in order to sell the product for
4  implantation by that physician?
5      MR. BROWN: Objection.
6  BY MR. AYLSTOCK:
7      Q.    Yes or no?
8      A.    I don't recall that being a
9  requirement. However, the hands-on training models
10  were available if the physician --
11      Q.    See, I'm going to have to ask it
12  again, because I didn't ask about whether they were
13  available or not.
14      A.    Sure.
15      Q.    I asked whether Ethicon ever required
16  doctors to undergo hands-on training before they
17  were permitted to implant any of the TVT products?
18      MR. BROWN: Objection.
19  BY MR. AYLSTOCK:
20      Q.    Yes or no? Was it ever a
21  requirement?
22      A.    It's difficult for me to answer that
23  for any of the TVT products. As it relates to the
24  TVT SECUR, hands-on training was available. I can't
25  say today as I sit here whether that was made a

58 (Pages 502 to 505)

Confidential - Subject to Protective Order

Page 506

1    requirement or not.
2        Q.    You don't know?
3        A.    I don't know.
4        Q.    And as we sit here today, you're
5    still in charge of professional education for TVT
6    SECUR?  You don't know whether doctors were ever
7    required to undergo hands-on training before they
8    were allowed to implant it by your company?
9            MR. BROWN:  Objection.
10   BY MR. AYLSTOCK:
11       Q.    You don't know?
12       A.    I am currently -- TVT SECUR is no
13   longer marketed by our company, so I can't say
14   today.  I can say in this time period in 2006,
15   hands-on training was available for TVT SECUR.
16           MR. AYLSTOCK:  Move to strike.
17   That's not my question.
18   BY MR. AYLSTOCK:
19       Q.    My question is, as we sit here today,
20   you have no idea, you don't know whether your
21   company ever required hands-on training before it
22   would sell the TVT-S for implantation by a doctor.
23   Correct?
24           MR. BROWN:  Objection.
25   BY MR. AYLSTOCK:

Page 507

1        Q.    You don't know?
2            MR. BROWN:  Objection.
3            THE WITNESS:  Correct.
4    BY MR. AYLSTOCK:
5        Q.    When it came to any of the other TVT
6    devices, is that the same answer, you don't know
7    whether there was ever a requirement or not?
8        A.    As I sit here today --
9            MR. BROWN:  Objection.
10           THE WITNESS:  -- I would have to
11   refer to documents.  I can't answer that question.
12   BY MR. AYLSTOCK:
13       Q.    Okay.
14           And you're -- currently have a job as
15   regional manager for professional education
16   overseeing products, including the TVT Classic and
17   the TVT-O.  Correct?
18       A.    Yes.
19       Q.    Is there a requirement that those
20   physicians undergo hands-on training today?
21           MR. BROWN:  Objection.
22           THE WITNESS:  There's not a
23   requirement today, to my understanding.
24   BY MR. AYLSTOCK:
25       Q.    And you don't know --

Page 508

1            You don't believe there's ever been
2    such a requirement?
3        A.    I can't recall as I sit here today.
4            MR. BROWN:  Objection.
5    BY MR. AYLSTOCK:
6        Q.    You do recall discussions on the
7    TVT-S about the need to do hands-on training to
8    ensure doctors implant it correctly and safely for
9    the patient?
10       A.    I recall discussions on hands-on
11   training of the TVT-S, and it was something that my
12   group made available to physicians in the United
13   States.
14       Q.    But to your knowledge never made a
15   requirement?
16           MR. BROWN:  Objection.
17           THE WITNESS:  I don't recall it being
18   a requirement.
19   BY MR. AYLSTOCK:
20       Q.    Who did you have those discussions
21   with about the need for hands-on training?
22       A.    Medical affairs.
23       Q.    Who?  Do you remember the names?
24       A.    I can't recall from 2006 at this
25   point.

Page 509

1        Q.    You don't know who the -- who was in
2    medical affairs back then?  We know David Robinson
3    is on that e-mail.  Right?
4        A.    Yes, we know David Robinson is on
5    that e-mail.
6        Q.    And he was medical affairs.  Right?
7        A.    He was in medical affairs at that
8    point in time in 2006.
9        Q.    So does that refresh your
10   recollection as to whether Mr. Robinson ever came to
11   you and said, Mr. Parisi, we may need to institute
12   hands-on training for the TVT-S for the safety of
13   the patients?
14       A.    I don't recall.
15       Q.    I show you Exhibit T-1066.
16           You know who Dr. Nilsson is, don't
17   you?
18       A.    Yes.
19       Q.    Who is Dr. Nilsson?
20       A.    Dr. Nilsson is a gynecologist
21   practicing in Scandinavia.
22       Q.    Did you ever meet him?
23       A.    I believe I have, yes.
24       Q.    And he's a KOL, that's a key opinion
25   leader.  Right?

59 (Pages 506 to 509)

Confidential - Subject to Protective Order

Page 510

1     A.    Yes.
2     Q.    One of your jobs was interacting with
3  and developing key opinion leaders when it came to
4  the use of the TVT products.  Right?
5     A.    Can you repeat the question or
6  clarify the question?
7     Q.    Yeah.
8           One of your jobs in your CV talks
9  about how you managed 200-plus KOL faculty over the
10 past ten years.  That's on your CV.
11    A.    Yes.
12    Q.    And it also says one of your skills
13 is in multicompany experience, regulatory compliance
14 expertise and surgeon KOL partnership development.
15 That's in your CV.  Right?
16    A.    Yes.
17    Q.    And by partnership, Ethicon would
18 partner with these key opinion leaders to help it
19 market the product, the TVT products.  Correct?
20    A.    There's a variety of reasons that
21 Ethicon would have partnered with key opinion
22 leaders.
23    Q.    Well, one reason is to market the
24 product.  You'd agree with that.  Right?
25    A.    When I was in a marketing role, I may

Page 511

1  have interacted with key opinion leaders to market
2  the product, yes.
3     Q.    And you also interact with key
4  opinion leaders to be involved with the professional
5  education of the product.  Right?
6     A.    Yes.
7     Q.    You consider it a partnership with
8  these key opinion leaders who are in your CV.
9  Right?
10    A.    Yes.
11    Q.    So Dr. Nilsson is one of the key
12 opinion leaders that you partnered with for the TVT
13 products.  Correct?
14    A.    I don't recall personally partnering
15 with Dr. Nilsson.
16    Q.    Well, your company did.  Right?
17    A.    It would appear that way, yes.
18    Q.    And if you'll turn with me to the
19 third page, there's some -- there's a nomenclature
20 CN for Carl G. Nilsson.  Do you see that?  These are
21 comments by Dr. Nilsson during this KOL interview?
22    A.    Yes, I see that.
23    Q.    Is that fair?
24          And on the third page, the second
25 comment is "Criticality of Proper

Page 512

1  Assessment/Anesthesia Discussion."  Right?
2     A.    I'm sorry, where are you looking?
3     Q.    Where it says, it's the second CN --
4     A.    Oh, I see it, thank you.
5     Q.    Do you see that?
6     A.    "Criticality of Proper" -- that?
7     Q.    So according to this interview
8  transcript in 2008, Dr. Nilsson says that
9  learning -- his learning curve was 100 patients
10 before he was very good with dry results.  Do you
11 see that?
12          MR. BROWN:  Objection.
13          THE WITNESS:  I do see that -- those
14 words on this -- in this document.
15 BY MR. AYLSTOCK:
16    Q.    Well, this isn't the first time
17 you've heard that there's a learning curve when it
18 comes to physicians implanting the TVT devices.
19 Correct?  I mean, as director of professional
20 education, you know there's a learning curve when it
21 comes to doctors implanting your company's products.
22 Right?
23    A.    I would agree with that, yes.
24    Q.    And for this --
25          You would consider Dr. Nilsson a

Page 513

1  highly skilled surgeon?
2     A.    Yes.
3     Q.    He's one of the key opinion leaders
4  in the world on this.  Right?
5     A.    I believe so, yes.
6     Q.    And for him, it took him about 100
7  patients before he was very good with dry results,
8  according to this interview.  Right?
9          MR. BROWN:  Objection.
10         THE WITNESS:  According to -- I see
11 those words on this page, yes.
12 BY MR. AYLSTOCK:
13    Q.    And as director of professional
14 education, that's not surprising to you, that
15 there's a learning curve.  Right?  You know that to
16 be true?
17    A.    It's not surprising to me, no.
18    Q.    And it's not surprising that for even
19 highly skilled surgeons, it can take up to 100
20 surgeries before a surgeon's very good with them
21 with dry results?
22         MR. BROWN:  Objection.
23         THE WITNESS:  I would defer that to
24 medical affairs.  This is the first time I'm seeing
25 this document.

Confidential - Subject to Protective Order

Page 514

BY MR. AYLSTOCK:

Q.    Right.

But as director of professional education, you interact and partner with these KOLs on a regular basis. Right?

A.    During this time period, I was not working for this division of Johnson & Johnson.

Q.    Well, from --

In your resume, it says you managed over 200-plus KOL faculty over the past ten years. So I'm asking, in your experience at Ethicon for professional education, you know that it takes even highly skilled doctors up to 100 surgeries to be proficient at implanting the TVT devices. Correct?

A.    No, I can't agree with that.

Q.    This is the first time you've ever heard that it might take up to 100 surgeries?

A.    Yes.

Q.    That's all news to you?

A.    I have not heard that degree of number of patients.

Q.    And nobody took it upon themselves to share this information with you, the director of professional education, on the learning curve for the devices that you oversaw?

Page 515

MR. BROWN:  Objection.

THE WITNESS:  I was working for another division of Johnson & Johnson in June of 2008 when this document was produced, so I don't recall seeing this document previously.

BY MR. AYLSTOCK:

Q.    Right. And --

But if you set aside the document for a minute, when you came back as director of professional education in October of 2010, I take it you got back up to speed on what was happening with professional education and out in the field with these KOLs and other implanters with the TVT products. Right?

A.    I did my best to do that.

Q.    Okay.

A.    But I didn't discuss this particular case with Dr. Nilsson.

Q.    Well, you did discuss the fact that there was a --

A.    Two-and-a-half years prior.

Q.    Well, you know, in fact, there's -- I'll rephrase.

Let me show you this document, Exhibit 1067, from January 22, 2007.

Page 516

You were director of professional education at that point in time. Correct?

- - -

(Deposition Exhibit No. T-1067, Minutes TVT Secur resolution team, First meeting 1/22/07, Bates stamped ETH.MESH.00528184 and ETH.MESH.00528185, was marked for identification.)

- - -

BY MR. AYLSTOCK:

Q.    January 2007?

A.    Yes.

Q.    Director of professional education, you've been in that position since 2005. Right? So you've been in that position a couple of years at this point in time, approximately?

A.    Approximately.

Q.    And before that, you were professional education manager. Right?

A.    Yes.

Q.    So there's some attendees to this TVT SECUR resolution team.

Have you ever heard of that, that there was a resolution team for the TVT SECUR?

A.    Could I have a moment to read the

Page 517

document?

Q.    Sure.

Okay. Are you ready?

A.    Yes, I am. Thank you.

Q.    So David Robinson is an attendee.

And Kevin Mahar, is he in sales and marketing?

A.    I believe he was in marketing.

Q.    So we've got the medical affairs, the marketing folks.

Is there anybody on this from professional education?

A.    I don't see anyone listed here, no.

Q.    But there's this resolution team, and to set the context, it says, there's a "learning curve for Secur" that "appears more complex and longer than originally expected." Do you see that?

A.    I do, yes.

Q.    Now, as director of professional education, when did you become aware that the learning curve for SECUR was more complex and longer than originally expected?

A.    I believe -- my recollection of this is that they're describing some situations that were happening in Europe.

61 (Pages 514 to 517)

Confidential - Subject to Protective Order

Page 518

1    Q.   Yeah.
2    A.   And a team was put in place to take
3  corrective action against that.
4         MR. AYLSTOCK:  Move to strike.  It
5  wasn't my question.
6  BY MR. AYLSTOCK:
7    Q.   When did you become aware, as
8  director of professional education, that the
9  learning curve for SECUR was more complex and longer
10  than was originally expected?  Was that fact ever
11  brought to your attention?
12    A.   I may have -- yes, I may have heard
13  that.
14    Q.   And what did your company do to
15  remedy that?
16    A.   The steps that I can recall as I sit
17  here today is that a revised procedure document was
18  put together that described the surgical technique,
19  and that was made available through professional
20  education.
21    Q.   And when did that revised technique
22  guide go into effect?
23    A.   I don't have those dates as I sit
24  here today.
25    Q.   Was that the TVT SECUR procedural

Page 519

1  steps?
2    A.   I believe so, yes.
3    Q.   Would it surprise you that that went
4  into effect three years later in 2010?
5    A.   I'd have to see the documents, so I
6  can't comment as to --
7    Q.   Should it take three years or does it
8  take three years to implement a new procedure guide
9  when safety issues come up and women are getting
10  hurt from the poor implantation of the device?
11         MR. BROWN:  Objection.
12         THE WITNESS:  It's not my
13  understanding that that document was implemented in
14  2010.
15  BY MR. AYLSTOCK:
16    Q.   That would surprise you if that were
17  true?
18         MR. BROWN:  Objection.
19  BY MR. AYLSTOCK:
20    Q.   It would surprise you if it took
21  three years to do that, wouldn't it?
22         MR. BROWN:  Objection.
23         THE WITNESS:  There were documents to
24  my recollection that were implemented before that in
25  the US.

Page 520

1  BY MR. AYLSTOCK:
2    Q.   Well, it shouldn't have taken three
3  years, if it did take three years, to implement the
4  new procedure guide.  Correct?
5    A.   I can't say that it took three years,
6  because that's not my recollection of the situation.
7    Q.   Well, if it did, then something went
8  wrong at your company.  Right?
9         MR. BROWN:  Objection.
10  BY MR. AYLSTOCK:
11    Q.   Did you answer that question?
12    A.   I'm sorry, can you repeat the
13  question?
14    Q.   If it took you three years to change
15  it, based upon this knowledge, then something went
16  wrong with the professional education at your
17  company.  Correct?
18         MR. BROWN:  Objection to form.
19         THE WITNESS:  I can't answer that
20  with a yes or no.
21         My understanding is that there --
22  BY MR. AYLSTOCK:
23    Q.   If you can't answer it, that's fine.
24    A.   I can't answer it.  Thank you.
25    Q.   I'll show you the next exhibit.

Page 521

1                    - - -
2         (Deposition Exhibit No. T-1068,
3         E-mail dated 30 Apr 2007, Bates stamped
4         ETH.MESH.00069114, was marked for
5         identification.)
6                    - - -
7  BY MR. AYLSTOCK:
8    Q.   1068.  It's an e-mail from Robert De
9  Filippo to you, among others, dated April 2007.  Do
10  you see that?
11    A.   Yes.
12    Q.   And he's e-mailing Dr. Robinson.
13         Who is Robert De Filippo?
14    A.   He's a sales representative.
15    Q.   He says, "Hello Dr. Robinson, It was
16  a pleasure seeing you last week in Florida."  Do you
17  see that?
18    A.   Yes.
19    Q.   "As we discussed, Dr. Mokrzycki and
20  Dr. Hatangadi" --
21         MR. BROWN:  Hatangadi.
22         MR. AYLSTOCK:  Hatangadi.  Let me
23  start over.
24  BY MR. AYLSTOCK:
25    Q.   "As we discussed, Dr. Mokrzycki and

62 (Pages 518 to 521)

Confidential - Subject to Protective Order

Page 522

1    Hatangadi have not yet adopted TVT Secur as" a
2    "standard of care in treating SUI.  Due to some
3    early disappointments in their first 50 cases, they
4    have encountered some frustrations that" have
5    "caused them to back away from Secur."  Do you see
6    that?
7        A.    Yes.
8        Q.    So you were told in April of 2007
9    that these physicians, in their first 50 cases, had
10   some problems with the TVT SECUR.  Right?
11       A.    I see the word "disappointments"
12   used.
13       Q.    Okay.
14             Well, he then says, "I'd like to"
15   take "them out to dinner with you and Dan locally in
16   New Brunswick so that...both" of you "can share some
17   pearls and quite possibly observe...them" doing "3-5
18   cases.  Additionally, it appears if we...resolve
19   some internal issues with St. Peters Hospital which
20   will allow them both to begin preceptorships.  Since
21   I would like...to teach TVT Secur, I would need them
22   to have confidence in its efficacy in order to teach
23   other physicians."  Do you see that?
24       A.    Yes.
25       Q.    So this sales rep is telling the

Page 523

1    medical director for your company and you and others
2    that he would like to teach them the TVT SECUR
3    procedure.  Correct?
4        A.    No.
5        Q.    That's what he says?
6        A.    I don't see that.
7        Q.    Is that what it says?
8        A.    No.  The words that I'm reading on
9    here --
10       Q.    It says -- does it say, "Since I
11   would like...to teach" them -- let me strike that.
12             It says, "Since I would like them to
13   teach TVT Secur."  Right?
14       A.    Yes.
15       Q.    So even though they're having
16   disappointments in their first 50 cases, encountered
17   frustrations and are backing away from SECUR, this
18   sales rep is trying to get these same doctors to
19   teach TVT SECUR.  Correct?
20             MR. BROWN:  Objection.
21   BY MR. AYLSTOCK:
22       Q.    As a preceptorship.  Right?
23             MR. BROWN:  Objection.
24             THE WITNESS:  No, I don't believe
25   that's what this says.

Page 524

1    BY MR. AYLSTOCK:
2        Q.    All right.  Is it --
3             He doesn't say he would like them to
4    teach TVT SECUR?  He doesn't say that?
5        A.    My interpretation in reading this
6    e-mail is that he's asking our medical director to
7    come and spend time with two doctors that had some
8    early disappointment with TVT SECUR.  He's asking
9    them to come into their operating room and observe
10   them doing cases and provide any insight or feedback
11   that he could in order to give them a better
12   understanding of the use of the product.
13       Q.    And then he says, "if we will resolve
14   some internal issues with St. Peters Hospital which
15   will allow them both to begin preceptorships."
16   Right?  I guess, were you aware of some internal
17   issues that prohibited these two doctors from being
18   preceptors for your company?
19       A.    No, I wasn't aware of that.
20       Q.    Well, that's what this e-mail says.
21   Apparently there was.  Right?
22             MR. BROWN:  Objection.
23             THE WITNESS:  That's what
24   Mr. De Filippo is saying.
25   BY MR. AYLSTOCK:

Page 525

1        Q.    And he wants that resolved so that he
2    can get these two doctors to be preceptors to teach
3    TVT SECUR.  Right?
4             MR. BROWN:  Objection.
5             THE WITNESS:  I believe that that --
6    this is what -- that is the -- that's my
7    interpretation in reading this e-mail, yes.
8    BY MR. AYLSTOCK:
9        Q.    Because doctors that become
10   preceptors can make a lot of money.  Correct?
11             MR. BROWN:  Objection.
12             THE WITNESS:  No, I wouldn't agree to
13   that.
14   BY MR. AYLSTOCK:
15       Q.    How much has your company paid
16   Dr. Lucente, one of your top preceptors?  Over a
17   million dollars.  Right?  I mean, you know that?
18       A.    Yeah, I would agree with that over a
19   period of probably 17 years.
20       Q.    And you teach --
21             When a preceptor is hired, you pay
22   them per day.  Right?
23       A.    We pay them per hour, yes.
24       Q.    Okay.
25             So this sales rep is copying you,

63 (Pages 522 to 525)

Confidential - Subject to Protective Order

Page 526

1  among others, to say, even though these doctors are
2  having problems with SECUR and they haven't been
3  able to resolve them in their first 50 cases, we'd
4  like your help in working out this issue so that we
5  can make them preceptors teaching the procedure.
6  Right?
7      A.   I think the first thing that he's
8  asking for is for the medical director to come and
9  work with them in the operating room. And he goes
10 on to say, if they -- my understanding is that if
11 they were to resolve their issues and have a better
12 understanding of the product, Mr. De Filippo's
13 desire is that they would potentially become
14 preceptors, should there be a need for that to
15 happen.
16     Q.   At least for these --
17         You know these two doctors are highly
18 skilled surgeons. Right?
19     A.   Yes.
20     Q.   And in their first 50 cases, they
21 encountered some frustrations that caused them to
22 back away from SECUR. Right?
23     A.   Yes.
24     Q.   So for them, you knew that the
25 learning curve was apparently more than 50 cases,

Page 527

1  because they're still having problems. Right?
2         MR. BROWN: Objection.
3         THE WITNESS: I could interpret that
4  from this particular e-mail as I sit here today.
5  BY MR. AYLSTOCK:
6      Q.   And you were copied back in 2007, so
7  you knew that these two highly skilled doctors, at
8  least for them, the learning curve was somewhere in
9  excess of 50 cases. Right?
10         MR. BROWN: Objection.
11         THE WITNESS: I agree that that's
12 what this document says, and that was
13 Mr. De Filippo's opinion.
14 BY MR. AYLSTOCK:
15     Q.   And you knew that as director of
16 professional education back in 2007. Correct?
17         MR. BROWN: Objection.
18         THE WITNESS: Yes.
19         MR. AYLSTOCK: I think we'll be done
20 for the day.
21         THE VIDEOGRAPHER: The time is 4:05.
22 This is the end of Disk Number 4. We are adjourning
23 the deposition for the day. We are now off the
24 record.
25         MR. BROWN: You and I have talked

Page 528

1  about this, but our position is --
2             - - -
3         (A discussion off the record
4  occurred.)
5             - - -
6         MR. BROWN: I was saying, Bryan, you
7  and I had spoken about this earlier, but our
8  position is going to be that the deposition should
9  be closed after these two days.
10         MR. AYLSTOCK: We obviously disagree
11 with that. We haven't covered anywhere close to
12 what we need to cover with Mr. Parisi during his
13 time.
14         MR. SLATER: Just on behalf of New
15 Jersey, we haven't gotten to ask Mr. Parisi any
16 questioning, any substantive questioning as a
17 corporate rep on the TVT devices, other than a few
18 scattered questions. We obviously have a great deal
19 to ask him, too, we haven't had a chance yet. So we
20 obviously will be intending to question Mr. Parisi
21 as well on all the other devices that we haven't,
22 TVT devices, in fact, the Prosima device, which has
23 been neglected quite a bit, but we'll get some light
24 shined on it some day soon.
25         MR. BROWN: We formally object, but I

Page 529

1  understand your position.
2         (Deposition adjourned at
3  approximately 4:05 p.m.)

64 (Pages 526 to 529)

Confidential - Subject to Protective Order

Page 530

```
1
2                  CERTIFICATE
3
4          I HEREBY CERTIFY that the witness was
5   duly sworn by me and that the deposition is a true
6   record of the testimony given by the witness.
7
8
9          It was requested before completion of
10  the deposition that the witness, PAUL PARISI, have
11  the opportunity to read and sign the deposition
12  transcript.
13
14
15
16
17  _____
18     ANN MARIE MITCHELL, a Federally Approved
        Certified Realtime Reporter, Registered
19      Diplomate Reporter and Notary Public
20
21
22         (The foregoing certification of this
23  transcript does not apply to any reproduction of the
24  same by any means, unless under the direct control
25  and/or supervision of the certifying reporter.)
```

Page 532

```
1          - - - - - -
            E R R A T A
2          - - - - - -
3   PAGE LINE CHANGE
4   ___ ___ _____
5      REASON _____
6   ___ ___ _____
7      REASON _____
8   ___ ___ _____
9      REASON _____
10  ___ ___ _____
11     REASON _____
12  ___ ___ _____
13     REASON _____
14  ___ ___ _____
15     REASON _____
16  ___ ___ _____
17     REASON _____
18  ___ ___ _____
19     REASON _____
20  ___ ___ _____
21     REASON _____
22  ___ ___ _____
23     REASON _____
24  ___ ___ _____
25     REASON _____
```

Page 531

```
1          INSTRUCTIONS TO WITNESS
2
3          Please read your deposition over
4   carefully and make any necessary corrections.  You
5   should state the reason in the appropriate space on
6   the errata sheet for any corrections that are made.
7          After doing so, please sign the
8   errata sheet and date it.  It will be attached to
9   your deposition.
10         It is imperative that you return the
11  original errata sheet to the deposing attorney
12  within thirty (30) days of receipt of the deposition
13  transcript by you.  If you fail to do so, the
14  deposition transcript may be deemed to be accurate
15  and may be used in court.
16
17
18
19
20
21
22
23
24
25
```

Page 533

```
1
2          ACKNOWLEDGMENT OF DEPONENT
3
4          I,_____, do hereby
5   certify that I have read the foregoing pages, 277 -
6   534, and that the same is a correct transcription of
7   the answers given by me to the questions therein
8   propounded, except for the corrections or changes in
9   form or substance, if any, noted in the attached
10  Errata Sheet.
11
12
13  _____
14  PAUL PARISI               DATE
15
16
17  Subscribed and sworn
    to before me this
18  _____ day of _____, 20____.
19  My commission expires:_____
20
21  _____
    Notary Public
22
23
24
25
```

65  (Pages 530 to 533)

Confidential - Subject to Protective Order

Page 534

1          LAWYER'S NOTES
2    PAGE  LINE
3    ___  ___  _____
4    ___  ___  _____
5    ___  ___  _____
6    ___  ___  _____
7    ___  ___  _____
8    ___  ___  _____
9    ___  ___  _____
10   ___  ___  _____
11   ___  ___  _____
12   ___  ___  _____
13   ___  ___  _____
14   ___  ___  _____
15   ___  ___  _____
16   ___  ___  _____
17   ___  ___  _____
18   ___  ___  _____
19   ___  ___  _____
20   ___  ___  _____
21   ___  ___  _____
22   ___  ___  _____
23   ___  ___  _____
24   ___  ___  _____
25   ___  ___  _____

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Subject to Protective Order

## A

**Aaron** 402:12
403:14 407:12
**ABBREVO** 376:19
**abdominal** 292:18
376:7,8,12 377:8
**ability** 339:9 387:2
**able** 290:23 293:24
313:17 331:2
345:18 364:25
369:2 377:13
393:2 422:23
428:23 481:17
485:8 490:12
526:3
**Abnormalities**
302:23
**Absolutely** 289:22
290:11,15 361:7
383:14 396:15
446:13
**abstract** 347:3,5
347:15,16 358:13
**acampos@cassi...**
279:16
**access** 291:3 398:2
428:8
**accountable** 391:7
391:17
**accounts** 420:1
**accurate** 294:16
299:7 335:17,18
351:10 362:21,23
406:16 408:22
431:12 531:14
**accurately** 347:9
377:14
**ACKNOWLED...**
533:2
**act** 321:21
**acted** 324:24
**acting** 464:9
**action** 444:1 447:2
447:5,8,11 448:4
518:3
**activities** 485:3

490:8
**actual** 330:19
337:19 351:14
353:5 358:12
399:13 428:20
482:1
**Adam** 278:9
301:14
**add** 343:18 344:20
380:25
**added** 317:4
**addition** 287:15
292:6 314:10
462:7
**additional** 289:20
289:21 290:2,9
317:5
**Additionally** 288:4
292:8 522:18
**address** 289:25
317:4 406:10
**addressing** 403:24
**adequate** 411:12
**adhesion** 300:8
**adjourned** 529:2
**adjourning** 527:22
**adjust** 474:21
**adopted** 522:1
**adoption** 421:14
503:19
**advanced** 332:12
333:5
**advantage** 491:2
**adverse** 336:2
351:22 354:7
355:10,23
**affairs** 294:5
315:18 321:25
322:5 324:2
334:22 337:24
338:13 339:21
345:14 354:10
355:5 356:8,19
357:18 360:12,14
378:19 403:15,25
404:11 407:13

410:18,19,21
429:8 457:16
475:16 476:7,10
480:2 499:19
508:22 509:2,6,7
513:24 517:9
**Affeld** 363:17,18
366:10
**ago** 318:14 350:16
363:7 364:5
427:14 432:18,18
461:6 463:24
**agree** 307:12
308:14 310:12
311:3 317:7
320:10 333:15
357:24 360:8,11
372:23 379:5,6,8
379:10 380:5
383:25 384:6
389:23,24 390:16
391:3,20,23
398:15 399:4,8
406:13,23 411:2
411:11 413:21
414:5,7 434:22
439:7 440:3,19
441:7,9,16,25
442:6,13 453:19
455:1 463:14
466:7 469:6
471:16 478:8,9
478:11,12 490:14
493:20 494:1,2
494:17,23 496:16
496:25 499:15,21
510:24 512:23
514:15 525:12,18
527:11
**agreed** 487:17,19
**agreement** 290:21
**agrees** 407:16
**Ah** 354:5
**ahead** 312:13
348:14 446:10
**al** 280:20 324:20

349:17 351:6
360:3
**alerted** 501:16
**ALEX** 279:13
**aligns** 467:5 468:2
470:15
**allocated** 459:21
**allow** 331:17 450:6
522:20 524:15
**allowed** 310:6
314:1,23,23
330:23 501:16
506:8
**allowing** 497:15
**altering** 477:22
**alternative** 449:6
475:14 476:2,12
**Altman** 279:21
**Alyson** 426:22,23
**ambiguity** 440:6
**Amblard** 349:23
**amend** 288:10
304:22
**American** 437:16
437:20
**amount** 465:12
**Amy** 485:7,22
486:1
**analysis** 496:12
**anatomic** 300:9
**Anatomical**
358:14
**anatomy** 435:19
436:7 437:8,24
491:21
**Andrew** 316:20
**and/or** 530:25
**Ann** 277:17 285:5
383:16 455:13
530:18
**annual** 372:13
437:17 483:17,22
487:10
**annually** 437:21
**Anoina** 279:16
**answer** 283:5

288:11 289:16
293:25 294:12
304:23 308:21
311:19,20,22,23
311:23,24 312:2
312:4,10,17
313:1,7,8,20
315:10 317:2,14
319:21 320:16
321:23 323:12
325:3,8,9 327:8
347:8 348:14
359:18 377:13
380:24 381:7
383:10,22 384:14
399:1 413:11
414:18 428:23
439:12 450:19
457:25 469:12,21
481:21 488:18
493:11 505:22
507:6,11 520:11
520:19,23,24
**answered** 294:10
381:25 456:4,10
457:10
**answering** 348:18
**answers** 289:14
413:2 533:7
**anterior** 343:10
344:10
**anybody** 429:17
470:1 517:11
**anyway** 315:2
**apologies** 410:1
432:6
**apologize** 381:5
**apparently** 412:21
524:21 526:25
**appear** 324:9
344:15 352:22
353:18 404:15
434:16 456:13
458:12 463:12
465:16 495:18
511:17

Confidential - Subject to Protective Order

**APPEARANCES**
278:1 279:1
**appears** 359:7
485:21 499:2,4
517:16 522:18
**applied** 366:5
368:9,14,24
389:3
**applies** 318:10
388:18 390:23
**apply** 331:16 336:8
336:13 362:9
365:18 389:2
400:13 530:23
**appreciate** 377:15
396:12 475:3
**approach** 292:19
448:12,24 449:6
451:3 463:4,6
467:19
**appropriate**
294:16 440:8,12
531:5
**approval** 405:9
**approve** 405:16,18
**approved** 277:17
340:5 404:22
405:2 412:24
414:12 425:11
426:8 530:18
**approver** 425:8
**approvers** 424:21
424:23 426:10
**approximately**
301:4 327:9
411:24 516:16,17
529:3
**Apr** 282:3 521:3
**April** 281:21
482:11 484:9
521:9 522:8
**archive** 428:21
**archived** 433:18
**area** 291:11 307:4
314:11 372:10
399:10 470:20,25

471:13 473:1,15
473:25
**areas** 338:2
**article** 280:17
296:21 298:7,16
324:4,20,25
325:10,13,16,19
345:23,24 346:1
346:13,14,18,20
346:21,23 347:2
347:17 349:4,8
349:13,22,25
350:10 351:12,15
352:11,14 353:17
354:2 355:11
358:10,11,12,12
358:19 359:4
360:5
**articles** 287:20
320:25 321:5,10
321:11,13,15
322:12 323:21
**aside** 515:8
**asked** 293:18,23
294:2 295:25,25
304:4,9 313:7
320:22 337:10
338:18 359:15
412:22 424:20
505:15
**asking** 295:5,12
319:22 323:1,8
329:4,5,6 347:4
353:4 357:1
359:2,2,17 377:2
380:11,23 382:6
384:22 414:20
444:7,9 446:3
454:24 455:24
467:25 469:23
470:13 472:19
488:8,16 490:2
493:10 514:11
524:6,8 526:8
**asks** 429:17
**aslater@mskf.net**

278:12
**aspect** 337:3
386:19
**aspects** 434:18
**assessed** 358:15
**Assessment/Ane...**
512:1
**assistance** 290:13
**associated** 287:19
422:15 439:4
**assumed** 485:19
486:2
**Assuming** 360:15
**assumption** 486:18
**attached** 405:25
531:8 533:9
**attempt** 339:10
461:9
**attend** 415:4,5
**attended** 368:10
415:7 422:12
424:10 437:10,20
**attendee** 517:5
**attendees** 516:21
**attending** 331:6
**attends** 288:3
289:19
**attention** 300:24
350:5 412:13
518:11
**attest** 374:11
**attorney** 320:20
531:11
**augments** 293:1
**August** 324:5
325:17
**author** 325:16
**authored** 325:16
**authors** 358:21
359:4
**available** 288:14
291:1 314:7
369:1 373:5
394:2,4,6 396:24
399:17 410:3,12
417:6,21 451:12

467:19 492:14
504:4 505:10,13
505:24 506:15
508:12 518:19
**Avenue** 277:16
278:21 279:9
**average** 491:16
492:5,21,23
493:9,16
**avoid** 303:16
474:22
**awaiting** 284:15
**aware** 334:6 348:4
356:17,18,22,24
357:8,11,14,15
357:18 418:15
466:10,13,15
500:20 501:18
517:20 518:7
524:16,19
**awareness** 416:20
416:23,25 417:1
418:2
**awesome** 360:23
**Aylstock** 278:3,3
279:3 280:7
361:24 362:1
375:17,22 380:9
380:10 381:6,9
382:3,5 383:2,6,9
383:11,16,24
384:25 386:13
391:10 392:2
393:21 401:6,17
402:11 411:9,20
412:12 414:4
415:9,18 420:12
420:13,23,25
423:3,18 431:4
431:23 432:1,11
433:7 434:2
439:5 443:8,18
444:16,21 445:9
445:17,21 446:4
446:5,14 449:8
450:18,24 451:14

451:16 452:2
454:23,25 455:11
455:23 456:2
458:7 463:2
465:18 466:21
467:21,23 468:17
469:4,20,22
473:20 474:11,15
476:9,18 478:10
480:3 481:2
482:6,16 486:22
486:24 487:13,14
487:25 488:21
489:12,20 490:1
490:4 492:15
493:15 496:24
497:12,19 498:3
501:6,21,25
502:9 503:10
504:23,24 505:6
505:19 506:10,16
506:18,25 507:4
507:12,24 508:5
508:19 512:15
513:12 514:1
515:6 516:10
518:4,6 519:15
519:19 520:1,10
520:22 521:7,22
521:24 523:21
524:1,25 525:8
525:14 527:5,14
527:19 528:10
**A-F-F-E-L-D**
366:12
**a.m** 277:17 361:15
361:16

**B**

**B** 280:9,20 349:17
**babcock** 450:1,4,5
450:14,22 451:3
451:5,22 453:14
454:6,9 457:7,11
458:22 459:2
461:10 462:18,20
467:19 473:24

Confidential - Subject to Protective Order

475:1
**BACH** 279:8
**back** 290:2,13
298:9 299:9,12
315:22 333:2
350:20,21 361:20
380:3 383:17
385:2,3 395:23
401:16 403:7
423:17,19 436:12
445:11 455:13
465:1 466:15
469:3,5 470:9
473:22 484:25
502:8 503:9
509:2 515:9,11
522:5 526:22
527:6,16
**backed** 465:20
**background**
309:16 314:22
**backing** 523:17
**backwards** 484:13
**BAGGETT** 279:3
**balanced** 299:3,4,6
321:12,21 322:15
322:18 323:13,24
324:25 335:21
351:11 360:5
398:18,21 399:6
399:7 408:22
409:1 477:6
**balances** 309:20,24
310:16 314:18,24
315:4,8 317:25
318:7,16,19
319:7,12,18
320:4,14,15
415:3
**based** 411:10
413:13 520:15
**basic** 436:14
**basically** 333:17
366:22
**basis** 325:20 514:5
**Bates** 280:14,16,20

280:24 281:1,4,6
281:9,11,13,16
281:18,21,24
282:2,3 291:19
297:1 306:14
349:17 351:20
393:17 402:7
412:8 415:14
423:12 431:1
433:22 445:5
482:12 497:24
502:22 516:6
521:3
**bathroom** 401:5
468:5
**baylstock@awk...**
278:6
**began** 317:19
432:2
**beginning** 277:16
361:19 374:6
401:15 469:2
**behalf** 335:11
411:16 528:14
**belief** 473:24 493:8
**believe** 296:2,7
313:23 326:24
331:13,25 332:14
334:13 335:5
338:1 346:1
350:23 362:23
363:22 366:7
368:9 370:1
371:4 372:16
374:11 382:8
387:19 388:4
389:2,3,5 390:22
390:23 393:24
402:17 403:9,11
408:6 415:24
418:20 419:16,21
422:20 424:20
426:20 428:15
429:1 430:3,15
430:21 433:15
442:13 446:19,22

447:1 448:2,21
456:11,17 457:10
457:24 459:16
460:14,25 461:23
462:4,16 465:2
467:16 477:4
484:22 485:11,14
486:3 489:9
490:10 491:25
493:5 494:9
508:1 509:23
513:5 517:8,23
519:2 523:24
525:5
**believes** 473:1
**best** 291:3 314:12
314:13 315:15
317:11 326:17,19
329:10 334:3
339:9 383:14
411:6 427:17
431:15 464:23
465:24 467:11
468:10 477:16
515:15
**better** 286:17
294:10 295:24
357:2,20 503:24
524:11 526:11
**beyond** 480:25
**biggest** 491:12
**Biosurgery** 427:3
**bit** 292:3 297:8
329:5 499:1
528:23
**bladder** 299:25
**Blair** 375:11
**Bleeding** 303:3
**block** 304:21 305:4
**blocks** 305:3,8
**Blue** 428:11,12
433:16
**board** 289:6 292:7
314:9 319:1
338:11 394:17
395:4 396:6

397:4 405:5
409:12 425:23
426:6,7 479:13
480:22 481:6
**board-certified**
479:18
**Bonet** 460:25
**Bonnie** 375:10
**border** 366:24,25
**boss** 364:3 365:12
411:25 412:1
460:19,21 464:9
465:2,4,7 467:10
473:23 495:19
496:11 497:3
**boss's** 364:3
**bottom** 297:2
343:2 346:3
351:20,21 375:8
495:15
**Box** 279:19
**Brazil** 368:7,12,21
**break** 345:16
361:10 396:11
401:5 423:3
468:5,18 501:24
503:11
**breina@riker.co...**
278:23
**BRETT** 278:20
**Brian** 361:25
403:8,10,13
407:22 426:21
460:14
**bring** 316:1 333:2
347:1
**broad** 447:13
**brochure** 410:20
410:22,25
**broken** 343:10
419:9
**brought** 308:9
310:5 315:23
319:5 466:22
501:10 518:11
**Brown** 278:15

280:6 285:15,16
286:6 291:22
296:2,7,17,22,24
298:21,25 301:10
301:14,16 304:8
304:11,18 305:7
305:15,18 308:13
310:11 311:18,21
311:22 312:12,25
316:12 318:3,22
320:9 323:6,8,11
324:13 325:2
327:11,17 329:1
329:4,16 332:23
333:8 344:5
346:8 348:14
349:10 353:4
356:11 357:5,9
357:23 359:17
360:7,18 361:5,9
375:13,18 380:21
381:3,8 384:22
386:9 391:9,22
411:5,15 414:3
414:25 431:17,25
432:3,22 438:22
443:4,11 444:13
444:18 445:15,18
445:23 446:3,10
449:1 450:12,21
451:23 454:19
455:25 457:25
458:3 462:24
465:15 466:18
467:15 469:11
473:17 474:9,13
476:4,15 478:7
479:23 480:17
482:3 487:22
488:18 489:7,18
489:22 492:7
493:10 496:21
497:6 500:23
505:5,18 506:9
506:24 507:2,9
507:21 508:4,16

Confidential - Subject to Protective Order

512:12 513:9,22
515:1 519:11,18
519:22 520:9,18
521:21 523:20,23
524:22 525:4,11
527:2,10,17,25
528:6,25
**Bruno** 484:17,19
484:20,21,22
488:6 490:22
495:17
**Brunswick** 522:16
**Bryan** 278:3
375:13 431:19
489:19 528:6
**budget** 418:21
483:17,17,22
484:1,3,4 486:15
486:19,20 487:6
487:11,16 490:13
496:14
**Build** 419:23
**bullet** 302:12,13
341:14,18 377:16
378:23 484:4
**bunch** 482:22
484:8
**business** 332:7
372:3 373:20,24
379:15 385:23
386:20,24,25
417:8 419:24
**BUTLER** 278:14

**C**

**cabinet** 427:24
**cadaver** 393:5,7
399:16,20,22,25
416:19 421:19
494:7
**calculated** 346:23
**call** 287:8 288:1
337:4 444:4
460:10 464:3
**called** 346:4 350:6
404:17 428:11
441:17 459:5

**calling** 460:1
**camera** 489:4,15
**campaign** 375:10
**Campbell** 279:24
284:22 447:24
448:1 451:1
458:18 472:18
476:1,19 478:23
**Campbell's** 473:13
**CAMPOS** 279:13
**CANNADA**
278:14
**cap** 319:12
**capacity** 503:23
**Capponi** 446:16
447:23
**care** 279:17 286:17
367:18,21,24,25
368:2 413:19
417:4,19,23
489:20 522:2
**career** 464:20
**carefully** 313:16
531:4
**Carl** 281:23
502:21 511:20
**Caro-Rosado**
426:24
**carried** 389:20
**case** 280:19 307:10
307:17 349:16
494:24 515:18
**cases** 277:9 292:25
399:13 418:2
522:3,9,18
523:16 524:10
526:3,20,25
527:9
**CASSIDAY**
279:13
**catch** 319:12
**category** 328:21,23
**Cathy** 367:8
**caused** 345:17
522:5 526:21

**cd** 491:20 494:12
494:21 497:16
**CD-ROM** 442:15
**CD-ROMs** 493:22
**ceiling** 461:17
**cell** 290:1
**Central** 367:3
**certain** 293:23
294:3 313:25
326:24 327:3
344:22 359:14,15
412:23 429:18,23
441:11 447:11
448:4
**certainly** 321:9
333:9 337:22
338:20 348:25
385:25 387:23
440:23 458:8
480:24 494:10
**certainty** 326:25
**CERTIFICATE**
530:2
**certification**
530:22
**certified** 277:17
289:6 292:7,7
314:9 394:17
395:4 396:6
397:4 412:24
414:12 479:14
480:22 481:6
530:18
**certify** 530:5 533:5
**certifying** 530:25
**cetera** 349:23
**chain** 281:1,3,8,15
281:18,20 402:6
403:8,18 412:7
412:15 423:11
445:4 446:1
459:1 473:4
482:11 484:16
488:2 497:23
498:5 501:18
503:16

**challenge** 465:10
465:10
**challenging** 484:12
**chance** 315:15
423:20 447:22
456:5 492:9
528:19
**change** 363:6
364:4 487:20
520:14 532:3
**changed** 367:14
477:21
**changes** 533:8
**characterization**
377:11
**charge** 429:11
446:24 453:23
506:5
**Charles** 465:5,6,7
**Charleston** 277:3
285:3
**chart** 281:12 431:1
431:5
**Chartered** 372:3
**cheaper** 493:23
**checks** 309:20,24
310:16 314:18,24
315:3,8 317:25
318:7,16,19
319:7,11,18
320:4,14,14
415:3
**checks-and-bala...**
319:14
**Cheryl** 324:4
325:10,16
**Chicago** 279:15
**choose** 475:2
**Christopher**
279:24 284:22
**chronologically**
484:13
**clamp** 451:4,18
**clamps** 462:19
**clarification**
472:19,25 481:21

**clarify** 398:24
409:21 424:22
426:5 432:8
439:8 440:5,10
440:17 456:25
462:5 510:6
**clarity** 440:24
**Classic** 371:6
375:16 376:3
377:3 448:19
498:11,17 507:16
**clean** 312:8 353:8
356:16 381:7
384:9
**clear** 359:22
477:11
**clients** 422:22
**clinical** 287:20
303:25 320:25
321:5 359:7
370:6 467:18
**clinically** 465:20
**close** 528:11
**closed** 528:9
**Closer** 326:17
**CN** 511:20 512:3
**college** 285:23
368:4,10,13,14
368:17,23 369:6
369:15,16,17
387:5
**Colony** 278:15
**column** 297:3
347:24,25 348:1
354:3
**come** 286:14 290:8
299:12 357:2
387:21 390:1,4
415:6 453:17
456:20 500:18
519:9 524:7,9
526:8
**comes** 294:14
382:12 411:1
437:5 442:7
477:2 480:11

Confidential - Subject to Protective Order

497:1 503:25
512:18,21
**coming** 316:8
499:23 500:12
**comment** 475:4
479:25 511:25
519:6
**comments** 511:21
**commercial**
386:19
**commission**
533:19
**committee** 425:4,5
**communicate**
398:22 399:6
408:25 410:11
435:23 440:9
488:7
**communicated**
415:2
**communication**
407:21 456:23
488:15,17
**communications**
403:25 404:12
488:2
**community** 417:4
417:5,13
**companies** 367:24
369:20 388:18
**company** 290:21
307:21 309:11,13
309:24 310:8
311:7,16 312:21
313:15 314:11
315:14,22 318:18
318:20 319:4
321:9,20,21
322:10,14 323:17
323:22 324:3,24
327:16 332:16,19
332:19 337:9,16
337:23,25 338:2
339:25 340:5,5
348:4,7 357:1
364:8,22 365:10

365:15 369:11
374:10 378:3
379:17 385:17
386:17 387:1
389:4 390:6,10
390:17 394:10
396:13 397:9
403:10 410:4
415:7 417:15
418:13,16 422:23
424:9 433:8
434:12 436:25
442:25 443:20
444:11 454:17
455:4 468:9
469:15 480:7,7
480:23 492:4
497:2,5,15 499:5
501:1 504:18,20
505:1 506:8,13
506:21 511:16
518:14 520:8,17
523:1 524:18
525:15
**company's** 386:3
414:24 512:21
**compared** 473:10
474:7,16
**compete** 448:24
**competitive**
368:11 369:1
373:20
**competitor** 448:11
449:20
**complaining** 316:6
316:7
**complete** 299:7
351:10
**completed** 480:20
**completion** 530:9
**complex** 517:16,21
518:9
**compliance** 510:13
**complication**
297:9,12 300:13
300:17,21 302:24

303:4,8 304:13
304:17 352:18,21
353:15
**complications**
290:12 293:19
294:3 295:3
297:5,20 298:24
299:22,23 300:5
300:7 302:2,18
303:15,17 304:1
304:2,20 305:3,9
324:11,12 337:2
337:6 340:13,24
351:24 352:5
353:17,23 355:16
356:2
**comprehensive**
292:25 352:13
440:21
**computer** 422:7,9
**concept** 406:2,18
407:22
**concern** 315:21
316:22 317:3,4
**concerned** 357:3
386:16
**concerns** 321:16
356:19
**conclusion** 359:5,6
359:12,16
**conclusions** 325:20
**condition** 355:25
**confidence** 522:22
**CONFIDENTIAL**
277:13
**confirm** 345:4
347:4,10 349:1
358:16,22
**confirmed** 354:15
354:17 476:7
**confirming** 354:24
**conform** 429:7
**confused** 346:19
498:25
**confusing** 346:6
**Congratulations**

485:3
**Connecticut** 284:4
**connection** 400:25
**consequences**
504:1
**Conservation**
341:21
**conservatively**
348:6
**consider** 280:23
393:15 511:7
512:25
**consistency** 471:18
**consistent** 298:6
298:16 316:3
414:8 426:3
440:24 441:23
454:8 457:7,11
457:20,22 458:9
461:21,24 469:17
471:9,23 473:16
**constituents**
413:18
**constitute** 331:11
**consulting** 406:17
**contacted** 459:6
**contain** 287:18
**content** 293:13
328:12 329:5
337:19,20 338:23
339:25 340:4
378:4,8,14,22
418:4,8
**context** 295:21
296:12 392:17
393:5 394:8
442:22 517:15
**continue** 284:13
320:20 380:2
**continued** 277:14
285:10
**continuing** 284:1,5
316:25 362:5
**contraction** 300:9
354:9,12,18
355:2,19 357:4

357:21
**contraction/shri...**
356:20
**contrary** 311:7,16
312:21
**contribute** 387:1
**control** 530:24
**conventions**
437:10,11
**conversations**
444:23
**convey** 335:17,20
335:23 336:1,13
441:12,22
**conveyed** 339:7
340:6 358:18,25
359:3
**conveying** 439:17
442:12
**coordinate** 286:22
385:10 485:8
**coordinating**
286:23
**copied** 446:16,19
452:3,5 465:3
466:16,19 472:7
475:11 527:6
**copies** 427:19
428:20 442:17
448:3
**copy** 338:10
339:17 340:8
404:22 405:1,5,8
405:16,18 407:25
408:19 409:12,14
424:1,15,22,24
425:4,5,12,23,25
426:6,17 428:21
431:22 433:18
494:20
**copying** 473:22
525:25
**copy-reviewed**
409:7
**corporate** 325:7
327:4 332:20

390:4,8 486:12
528:17
**correct** 307:11,15
308:12,21 309:9
309:20,21,25
310:10,21 311:2
311:8,17 315:4,9
315:16 316:2
317:1,19 318:2,4
318:9,21 321:22
322:16 323:24
331:4,11,18
333:7 335:18,21
335:24 336:3,14
337:10,21 338:4
338:7 339:22
340:2 341:13
343:4,16 345:25
346:2,13,25
348:10 354:9
356:10 360:6
362:2 363:12,21
363:25 366:1,4
369:21,22,24
370:17,25 371:14
372:18,22 373:15
373:17 374:4,7
375:3,12 378:10
381:17 382:19,22
384:5,12,21
385:19 386:22
388:14,20,24
389:4,12 390:2,8
390:13 391:8
392:9 395:4,13
395:22 396:2,4
398:18,23 399:7
399:14,25 406:16
408:14,19,22
409:1 411:14
413:23,25 414:7
416:3,8,14 418:3
418:9,14 420:9
420:17 421:8,22
421:23 422:12
423:1,22,24

424:8,19 429:19
436:7 437:3
438:9,16 439:19
440:6,10 441:6
446:18 447:19
448:12,16,20,23
448:25 449:17
451:10 452:9
454:3,10,18
455:5 456:9
458:15 462:11
463:11 464:23
472:13 474:1,17
476:3 477:7
478:6,20,22
479:1,4 487:2
488:5 490:13
491:9 492:6
493:9 494:6
497:5,16 500:2
501:13 502:10
504:19 506:23
507:3,17 510:19
511:13 512:19
514:14 516:2
520:4,17 523:3
523:19 525:10
527:16 533:6
**corrected** 333:19
354:6 455:9
499:20,25 501:9
502:15
**correcting** 486:20
**corrections** 501:11
501:17 531:4,6
533:8
**corrective** 518:3
**correctly** 485:10
508:8
**correspondence**
497:10 499:4
**Cosson** 295:8
348:8 349:23
360:2
**cost** 418:21 494:16
**costs** 280:24

393:17 419:1
483:6,7 493:25
494:14
**cough** 466:1
**counsel** 285:4
293:18 295:5,12
306:9 320:22
327:5 360:15
394:9 396:13
431:20 432:4,10
433:1 456:4
**countries** 501:19
**country** 416:12,14
499:7
**couple** 285:17
306:18 350:11
418:22 483:5,13
516:15
**course** 280:24
393:16 396:24
443:25 481:3
**courses** 316:24
400:10
**court** 277:1 284:3
284:6 285:2,5
332:21 383:19
455:16 531:15
**cover** 528:12
**covered** 528:11
**covering** 485:23
**create** 462:19
495:1
**created** 327:2
337:22 397:24
398:1
**creative** 495:9
**credential** 495:5
**credentials** 309:16
314:22
**credo** 387:6,25
388:16,23,23
389:1,1,7,14,25
390:16,23 391:11
411:10 413:14
414:8 443:25
444:4,5,12

464:10 467:6,13
468:3,15 470:16
473:16 475:3,8
**credo-type** 443:21
**criteria** 292:1,4
308:3,10,11,12
308:23,25 309:4
309:5,6,7,7,19,23
310:2,7,18,23
311:6,15 312:19
312:22 313:12,13
313:14,21 314:3
314:4,19 315:2,6
315:12,24 316:1
317:17,20,24
318:1,18 319:3
319:13,17 320:3
330:22,25 331:3
331:16 380:17
395:15 415:2,5
**critical** 321:15
**Criticality** 511:25
512:6
**cross-functional**
338:1,15 378:22
405:6 425:3
**cross-notices**
284:14
**Crum** 279:22
**current** 286:18
362:16 435:6,10
**currently** 363:5,13
364:3,11 365:2
366:16,19 367:24
430:20 435:10
506:12 507:14
**curriculum** 362:21
**curve** 512:9,17,20
513:15 514:24
517:16,21 518:9
526:25 527:8
**customers** 404:4
**CV** 362:14,15,21
370:22 395:24
449:9 510:8,10
510:15 511:8

**cystotomy** 305:11
353:25

_____

**D**

**D** 279:3 280:2,13
291:17
**Dan** 452:18 453:6
453:9 454:9
459:1 464:24
473:22 476:16
522:15
**danger** 390:8,12
390:18 391:6,16
391:19
**Danzig** 277:15
278:20
**data** 303:21 348:8
350:8,19 351:3
353:5
**database** 422:7
427:25
**date** 277:17 284:23
306:2 307:22
332:2 333:3
402:19 422:11
488:14 531:8
533:14
**dated** 281:1,3,8,15
281:18,20 282:3
306:25 402:6
412:7 423:11
445:4 482:11
497:23 498:5
521:3,9
**dates** 424:15 430:2
430:12 433:9
487:23 518:23
**David** 499:6 509:2
509:4 517:5
**day** 308:25 309:5
317:18 319:16
333:7 387:20,23
480:9,9 525:22
527:20,23 528:24
533:18
**days** 528:9 531:12
**day's** 480:14,19

Confidential - Subject to Protective Order

481:24
de 334:24 454:4
    456:18 458:10,10
    462:22,23 463:10
    467:18 484:22
    490:23 495:13,24
    497:9,14 521:8
    521:13 524:24
    526:12 527:13
deal 476:22 477:1
    528:18
Dear 485:2
Debodinance
    349:24
decide 431:19
    465:23
deciding 321:10
decision 313:16,16
decisions 321:11
deck 294:20,24
    295:3 299:2
    301:6 302:18
    340:11,22 343:18
    343:21 344:12,21
    344:23 345:1
    350:7,15 351:2
    352:6,10,22
    353:17,23 355:15
    358:20,21 359:18
    359:19,20,24
    360:4 434:11
decks 287:9,15
    293:20,24 339:12
    425:1,2 435:16
declining 374:21
    374:25 375:2
    449:11,11,15
Decreases 341:21
deemed 531:14
deeper 495:1
Defect 298:10,21
    343:8 344:9
defects 292:17
Defense 291:15
defer 315:17 322:4
    324:1 345:13

354:10 355:4
356:7 360:13
399:9 405:14
407:24 418:17
428:15 430:15
443:13,15 451:25
456:25 457:16
480:1 513:23
deferred 294:4
define 443:13
definitely 437:20
definition 311:2
    487:9
definitions 437:7
degree 286:3,7,8
    369:19 443:13,16
    489:8 514:20
deLeval 453:18
    462:17
delivered 293:11
delivery 378:5
    475:21,22 477:23
demonstrate
    392:25
demoted 364:14,21
department 290:5
    334:22 338:3,6
    338:12,16,22
    339:2,3,6 357:8
    357:22,25 381:20
    398:25 403:14
    404:11 405:15
    409:11 419:17
    428:16,22 429:8
    430:4,16 431:10
    433:19 434:15
    435:11 456:24
    460:15 490:7
    497:3
departments
    337:25 339:20
depicting 303:23
depicts 303:24
deponent 285:3
    533:2
deposing 531:11

deposition 277:15
    283:2 284:4,15
    284:25 287:7
    291:17 295:20
    306:12 327:5
    349:12 362:5,12
    393:13 402:5
    412:6 415:12
    423:10 430:24
    432:2,13 433:21
    445:3 482:10
    497:22 502:20
    516:4 521:2
    527:23 528:8
    529:2 530:6,10
    530:11 531:3,9
    531:12,14
deps@golkow.co...
    277:22
describe 355:8,9
    392:23 434:10
    442:21
described 334:5
    364:21 367:20
    376:3 378:23
    450:20 518:18
describes 372:8
    397:1 484:4
describing 517:24
DESCRIPTION
    280:12
descriptions
    377:13
designated 332:19
designed 477:21
desire 410:11
    449:6 479:7
    481:11 526:13
despite 320:6
    373:3
detailed 303:24
    361:8
details 333:3
determined 315:14
develop 293:6,13
developed 389:21

448:23 449:4,5
developing 378:14
    510:3
development
    309:18 370:3
    371:11,13 372:1
    373:10 374:15,18
    378:4,9,23
    379:18 416:9
    510:14
develops 293:3
device 319:2
    321:14,17 323:20
    323:22 336:5
    390:22 391:1
    414:13 469:10
    475:21 480:12
    519:10 528:22
devices 318:20
    320:1 325:25
    327:16,21,21
    334:7,10 335:3
    335:17 412:25
    470:7 499:24
    501:8 507:6
    512:18 514:14,25
    528:17,21,22
device's 320:3
dialator 465:24
difference 286:16
    322:25 328:15
    503:18
differences 481:18
different 287:24
    291:1 302:16
    314:21 328:20
    338:2,15 345:16
    345:17,19 346:16
    348:12 375:21
    376:1 397:14
    418:5 434:17
    436:18 459:18
    463:10 473:7
    474:25 498:23
    501:19
differs 469:8 470:4

difficult 433:4
    487:24 505:22
difficulty 348:17
    499:1
diligence 501:18
dinner 495:6
    522:15
Diplomate 277:18
    530:19
direct 294:9
    300:23 305:17
    412:13 418:11
    440:4 441:19
    530:24
directed 440:3
directing 451:20
direction 283:5
    477:11
directly 294:17
    332:6 456:8,12
director 306:25
    307:4,9,13 308:1
    325:6 338:21
    363:3,10,13,15
    363:18,19,24
    364:18,24 365:4
    365:12,21 366:2
    366:9 367:15
    370:16,20 373:11
    373:14 374:21
    375:7 376:23
    378:1,10 381:21
    382:7 384:17
    385:8 392:3
    397:7 400:17
    402:22 407:13
    413:5 414:21
    416:2 427:2,25
    435:4,7,24 437:6
    437:13,25 438:1
    444:10 446:21
    447:4,11 448:14
    449:10,16 452:4
    452:8,16 453:23
    457:5 459:9,22
    459:23 460:5,16

Confidential - Subject to Protective Order

460:17,23 461:1
464:14 466:8,23
472:10 478:3
484:24 485:1
498:8,13 499:8
499:11,17 500:1
500:3,14,22
501:2 503:22
512:19 513:13
514:3,23 515:9
516:1,13 517:19
518:8 523:1
524:6 526:8
527:15
**directors** 459:7,11
459:15 460:7,12
461:8
**direct-to-consu...**
375:9
**disagree** 373:6,8
391:20 458:14,17
528:10
**disappointment**
524:8
**disappointments**
522:3,11 523:16
**discipline** 496:8
**disclose** 344:1
**disclosed** 294:4
342:21 343:4
360:3
**discuss** 491:21
515:17,19
**discussed** 339:16
340:14 358:6,7
418:5 443:19
444:23 475:14
521:19,25
**discusses** 295:2
**discussing** 301:23
434:17 476:11
**discussion** 284:10
284:18 290:24
332:13 333:5
343:20 344:17
497:9 501:10

502:17 503:5
512:1 528:3
**discussions** 508:6
508:10,20
**disease** 417:5,14
417:19
**Disk** 361:12,19
401:8,15 468:20
469:2 527:22
**displaced** 427:16
**distribution** 403:2
**District** 277:1,2
285:2,2
**divided** 416:12,13
459:20
**division** 277:3
285:3 309:17
365:7,8,9 367:19
367:19 368:2,15
436:18 459:24
514:7 515:3
**doc** 441:5 495:2
**doctor** 286:10
293:15 294:10
308:5 309:5,7,15
309:19,22,25
310:1,5,17,22,25
311:5,14 312:18
312:22 313:11
315:1,5 319:2,3,7
319:12,25 320:2
320:5,13 330:22
331:17 337:1,4,8
355:9 418:22
419:1,1,9 422:10
422:11,14,18
424:11 437:3
439:10,12,22
440:2,4,10,13,14
440:23 441:20,22
442:2,18 443:15
452:14 453:9
454:14,16 457:19
463:9 464:10
478:14,24 480:13
480:18 493:21,23

494:12,20 498:15
498:19,22 506:22
**doctors** 287:11
308:9 313:14,17
313:25 314:5,7,8
314:12,19 315:11
315:15 316:1,6,8
318:1,17 319:4
321:1,6,14
322:11,15 323:18
324:5 325:1
336:22,23 337:23
338:24 339:10
342:4 348:5
354:16 356:25
357:19 370:10
380:25 384:4,11
385:11,12,12
389:9 397:10
405:21 408:11
411:4,7 419:7
420:10,22 424:6
436:15 437:11
438:5,9,19
449:24 452:9
453:24 462:10
466:11 477:2
478:4 483:22
484:1 486:9
488:5 492:10
494:5 497:15,17
501:12 505:16
506:6 508:8
512:21 514:13
523:18 524:7,17
525:2,9 526:1,17
527:7
**doctor's** 290:25
309:15 314:22
**document** 277:9
291:23 306:19
331:13 349:3
353:1 359:1,3
362:17 389:19
391:24 393:22
394:9 395:8

397:1,5 399:18
400:11,12 401:19
410:18 423:20
426:7 431:8,9,20
432:7,8,17,23,25
434:11 440:21
451:17 476:14,17
489:19,21 490:2
490:3 492:20
493:24 494:4
496:20 499:1,3
512:14 513:25
515:4,5,8,24
517:1 518:17
519:13 527:12
**documents** 283:9
287:17 400:15
409:13 422:1
434:5 440:22,25
507:11 519:5,23
**doing** 292:16
295:23 318:13
381:1 436:5,9
459:6 463:5,15
464:13,16 471:22
477:15,17 522:17
524:10 531:7
**dollars** 419:12
491:8 525:17
**Domingo's** 462:17
**Don'ts** 420:5
**door** 329:3
**Dorothy** 279:16
**double-checked**
309:16
**Do's** 420:4
**Dr** 279:11,16
316:22 317:3,4,8
330:16,16,17
331:22,22,22
334:23,24 348:8
412:22 448:9
449:20 467:18
509:16,19,20
511:11,15,21
512:8,25 515:18

521:12,15,19,20
521:25 525:16
**draft** 404:21
405:25
**draw** 350:5
**drive** 279:14
379:12,16 385:17
417:8,9
**driving** 386:14,17
386:20
**dry** 512:10 513:7
513:21
**due** 359:11 522:2
**duly** 285:10 530:6
**Dunn** 430:20
**duty** 317:16,23
411:3,12
**DVDs** 287:18
**dysfunction** 304:5
304:7,10,13,16
304:25 305:14
354:1
**dyspareunia**
303:12,16
**D-Parisi** 306:6
**D-1** 306:2,4

_____
E
_____
**E** 280:2,9 532:1
**earlier** 362:12
380:12 405:12
482:18 484:7
493:25 528:7
**early** 303:20 330:8
331:21 350:8,18
351:3 522:3
524:8
**East** 278:4 279:4
**eastern** 366:24
**economy** 364:23
**ed** 350:6,15 352:6
352:22 353:17,23
355:15 360:4
397:25 398:3,8
403:25 404:12
405:16,18,22
407:2 409:8

416:8,15 419:11
424:1,25 425:2
425:22 471:24
480:6 482:20
485:20 486:8
487:1,18,19
488:4
**edit** 353:9
**educate** 417:12,19
**education** 280:23
281:11,13 286:20
286:22 287:1,3,8
287:11,23,25
290:5,22,22
291:1 293:14,20
294:20,24 309:18
315:13 317:11
318:13 320:24
321:1,7 322:11
324:4,6,19,21
325:7,25 327:10
337:4,19 338:6
338:19,21 339:7
339:16,21 340:11
340:22 351:2
356:18,23 357:17
358:8,20 363:3,4
363:9,10,14,16
363:19,20,24
364:17,19,24
365:4,12,21
366:3,9,20
367:15,18 375:9
378:6,9,15 379:1
379:7,9,11,13,15
379:20,23 380:7
381:21 382:7,11
382:12 383:1
384:7,18,23
385:1,5,6,9,16,24
386:5,12,15,16
386:18,21 388:10
388:12 392:4,6,8
392:12,14,19
393:15 394:2
395:12 397:8,15

397:17,21 399:3
400:18 401:22
402:23 403:5
406:18 408:11,14
408:16 409:17,20
410:15,17 411:18
411:23 412:2
413:6 414:19,21
416:2 417:3
418:11 419:23
420:6 421:2,3,5,7
421:25 422:3,5
424:21,23 425:7
425:10 426:4,9
427:2,6 428:1
430:8,25 431:14
433:22 434:4,8
434:14,15,17,24
435:5,16,25
437:6 438:1,10
439:2,15 440:21
440:22 441:1,4
441:19 442:1,9
442:14,22 444:11
450:9 451:13
453:23 454:5,8
454:11 455:4,10
455:22 456:15,20
457:3,6,9,13,21
462:6,9 463:18
466:9,24 467:20
469:10,15,19
470:2,6 471:17
472:11,20 478:4
478:17,21 479:1
479:4 480:8
483:2,23 488:25
489:10 490:7,8
491:9 497:1
498:9,14 499:11
499:18 500:2,15
500:22 501:3,4
501:11 503:23
506:5 507:15
511:5 512:20
513:14 514:4,12

514:24 515:10,12
516:2,13,19
517:12,20 518:8
518:20 520:16
527:16
**educational** 291:5
**education's** 406:15
479:7 500:6
**education-owned**
410:17
**effect** 294:3 308:23
317:25 429:18,23
435:7,13,21
518:22 519:4
**effective** 358:23
379:2 387:3
396:23 420:11
500:13
**effectively** 289:10
313:18 315:16
411:13 500:8,14
500:19,21
**effectiveness**
280:24 321:17
323:22 358:16
393:16
**efficacious** 324:10
**efficacy** 522:22
**efficient** 386:3
**effort** 314:11 435:9
**Eisenhower**
278:10
**either** 292:18
366:3 397:23
432:4 458:3
498:16
**elaborate** 443:15
**electronic** 317:6
427:24 428:4,5,7
428:9
**elicit** 295:16
**elicited** 327:5
**eliminated** 364:9
364:25 427:18
**employee** 389:4
444:4 464:5,6,7

**employees** 388:20
392:5
**employee's** 464:9
**employment** 369:8
369:23
**encountered** 522:4
523:16 526:21
**ended** 370:6
**Energy** 367:19,25
**enforce** 317:17,24
**engage** 385:13
**engaged** 404:11
**engineer** 370:4
374:15,19 453:11
**engineering** 286:9
369:19
**ensure** 414:15,22
466:4 508:8
**ensuring** 453:24
**entire** 295:21
308:2 343:17,21
344:23 345:1
352:14 377:6
**entitled** 280:17
342:23 349:13
**equal** 460:18
**equals** 348:23
**equipment** 328:17
412:25
**equivalent** 364:2
364:18,20
**Eric** 430:20
**erosion** 356:19
357:4,21
**erosions** 345:14,17
345:18,19,21,23
**errata** 531:6,8,11
533:10
**errors** 483:6,14
486:17
**especially** 491:16
492:23
**ESQUIRE** 278:3,4
278:9,15,20
279:3,8,13,19
**essence** 364:12

389:25 395:21
416:11
**establish** 337:18
**estimate** 326:13,18
326:19
**et** 280:20 324:20
349:17,23 351:6
360:3
**Ethicon** 277:5
278:18,23 281:6
285:17 286:12,14
286:15,18 287:10
287:13,23,24
289:20 290:9
308:2 313:12
315:13 316:7,7
317:16,23 318:24
319:2 320:2
324:20 336:23
356:23 364:19
365:6,8,16,17,19
366:14 367:18,19
367:21,23,25,25
368:1,15 370:10
380:16 385:5
388:19,23 389:1
391:4,15 395:3
411:6,17 414:15
415:13 427:3,5
427:10,24 429:16
434:8 438:5
446:25 448:23
469:7,13 470:1
482:1,5 483:21
486:11 503:24
504:6,9 505:1,15
510:17,21 514:11
**Ethicon's** 286:25
287:2 365:22
375:9 384:2,11
384:15 479:3,7
**Ethicon/J&J**
390:17 411:3
436:13 449:17
**ETH-02358**
280:21 349:18

**ETH-02367**
280:21 349:18
**ETH.MESH.000...**
282:4 521:4
**ETH.MESH.001...**
281:14 433:23
**ETH.MESH.001...**
281:14 433:24
**ETH.MESH.002...**
281:7 415:14
**ETH.MESH.002...**
281:7 415:15
**ETH.MESH.004...**
280:14,16 291:19
306:14
**ETH.MESH.005...**
282:2 516:7
**ETH.MESH.005...**
282:2 516:7
**ETH.MESH.008...**
281:16 445:5
**ETH.MESH.008...**
281:17 445:6
**ETH.MESH.037...**
281:4 412:8
**ETH.MESH.037...**
281:5 412:9
**ETH.MESH.039...**
281:19 497:24
**ETH.MESH.039...**
281:19 497:25
**ETH.MESH.040...**
281:24 502:23
**ETH.MESH.040...**
281:25 502:24
**ETH.MESH.051...**
281:2 402:7
**ETH.MESH.051...**
281:2 402:8
**ETH.MESH.055...**
281:9 423:12
**ETH.MESH.055...**
281:10 423:13
**ETH.MESH.057...**
280:25 393:17
**ETH.MESH.057...**

281:21 482:12
**ETH.MESH.057...**
281:22 482:13
**Europe** 517:25
**evaluate** 371:17
**event** 329:11 461:7
**events** 289:19
290:23 322:12
336:2 351:22
354:8 355:11,23
401:1
**EWHU** 280:13,15
291:18 306:13
**exact** 376:17 433:5
**exactly** 345:12
434:12
**EXAMINATION**
285:13 305:23
361:22
**examined** 285:11
**example** 289:23
323:21 336:1
416:23
**exceeded** 372:14
**excess** 527:9
**exchange** 368:12
368:25 369:4
**exclusively** 373:15
**exhibit** 291:15,17
294:21 296:18
297:19 300:24
306:1,7,7,12,20
316:18 340:10,23
349:6,12 351:15
362:13 387:9
393:11,13 401:23
402:3,5 409:16
412:4,6 415:10
415:12 423:10
426:11 430:22,24
433:21 434:3
444:25 445:3
482:8,10 497:22
498:4 502:10,12
502:20 503:12
509:15 515:25

516:4 520:25
521:2
**existed** 326:5
334:9
**expect** 479:16
480:13 500:1,4
501:15
**expected** 483:25
501:9 517:17,22
518:10
**expenses** 369:3
**expensive** 399:17
494:4,7,11,18
**experience** 289:9
294:15 314:1,8
395:5 396:6
449:23 466:2
492:11,18 497:18
498:19,22 510:13
514:11
**experienced** 304:3
337:2 504:1
**experiences**
477:16
**experiencing**
374:21
**expertise** 510:14
**experts** 399:10
**expires** 533:19
**explain** 287:22
462:21
**explained** 397:13
438:23
**expose** 390:6,11,18
**exposed** 391:5,15
**exposure** 297:8,12
297:24 298:4,11
298:22 300:9,14
300:18,22 302:8
302:10,23 340:18
341:4,8,11,21
342:2,24 343:9
343:11 344:10,11
345:10 352:2,19
353:13,16,20
354:2 391:18

**exposures** 295:6
298:13 304:1
341:25 342:5,10
342:21 343:3,3,4
343:11,15,18,19
344:11,14,20
345:5 346:4,11
346:25 347:12
348:6,9,23,24
**extend** 463:9
**extended** 463:3
**e-mail** 281:1,3,8,15
281:18,20 282:3
289:25 308:17
316:11,13 317:9
402:6,12,19
403:7,18 404:16
405:24 406:3
407:1,7 412:7,13
423:11 426:16,20
426:23 433:13
445:4 446:16
447:23 452:13,19
453:1,20 455:7
456:13 458:25
461:9,11 462:25
463:5,13,23
464:24 465:1,3
465:17 466:17,20
468:11,12 470:9
472:7,16,17
473:4,22 474:3
474:12 475:11
476:6 482:11,17
484:7,9 485:21
489:17 493:6,7,8
493:11,12,14
495:16 497:8,23
498:5 502:11
503:13,16 504:15
509:3,5 521:3,8
524:6,20 525:7
527:4
**e-mailing** 521:12
**e-mails** 316:5
403:13 446:1

482:22 487:24
501:19
**e-mail's** 482:25

---

**F**

**F** 278:3
**face** 312:9
**face-to-face** 331:6
**facilitate** 337:9
435:23 436:1
**facilitated** 397:11
**fact** 320:6 357:17
360:1 368:6
390:10 415:22
437:16 438:8
446:17 448:18
454:3 473:23
477:24 478:13,24
492:21 493:8,16
494:3 497:13
499:7 515:19,22
518:10 528:22
**factors** 319:15
**faculty** 335:10
380:3 385:14
436:4 510:9
514:10
**fail** 531:13
**failed** 309:24 310:8
321:20 322:12,14
323:17,23 391:5
**failure** 300:10
310:9 315:3,8
319:6
**fair** 299:2,4,6
321:12,21 322:15
322:18 323:13,23
324:24 335:20
351:10 360:5
377:6,11,12
398:17,21 399:5
399:7 408:22,25
477:6 483:21
511:23
**fairly** 337:12 346:6
**falling** 316:9
**familiar** 291:23

Confidential - Subject to Protective Order

325:15 387:6,25
388:1 437:7
**family** 480:10
**far** 358:3,5 425:4
428:17 480:19
**faster** 383:12
**fathers** 389:9
**Fatton** 280:20
349:17,22 351:6
354:2,8 355:11
358:11,19 360:2
**favor** 350:9 380:21
**favorable** 321:14
322:13,14 323:19
**fax** 277:22
**FDA** 426:17
427:19 428:24
429:14,16
**Feagins** 448:9
449:20
**featuring** 375:10
**February** 281:9
374:1 423:11
426:14 485:19
486:4
**Federally** 277:17
530:18
**feed** 326:22
**feedback** 371:25
503:20 524:10
**feel** 293:9 311:19
319:16 353:9
459:2 477:9
**fellowship** 314:10
480:21
**felt** 291:3 294:8
308:1 317:16,23
500:3
**Female** 404:17
**Ferrell** 284:3
**field** 280:13,15
289:9 291:18
306:13 308:3,10
309:3 370:7
479:18 515:12
**fifth** 292:21

**figure** 461:9
477:15
**file** 427:24 433:13
452:23
**Filippo** 521:9,13
524:24
**Filippo's** 526:12
527:13
**final** 434:23
**find** 347:18 357:19
**finding** 428:19
**fine** 311:4 313:4,9
318:6 320:18
321:24 347:10
468:6 476:1
520:23
**finish** 348:11 349:2
456:1 468:4
**FIRM** 279:18
**first** 282:1 292:13
297:4 307:23
317:18 329:14
330:5,7 336:7
340:10 343:24
347:5,24 352:18
358:9,13 370:18
375:9 389:6,8
390:1 391:5
403:7,16,18
412:14 467:13
474:5 483:1,12
484:4 512:16
513:24 514:16
516:5 522:3,9
523:16 526:3,7
526:20
**fish** 349:7
**fit** 452:21
**five** 316:19 317:1
344:24 375:25
446:8
**five-plus** 372:6
**fix** 465:19
**fixations** 292:22
**flat** 375:3 449:12
**flip** 295:1 299:9,20

301:1 302:21
**floor** 278:10
292:14,16 306:25
307:4,19 371:19
372:4,9 408:4,7
426:18 435:19
436:7 437:8,23
491:25
**Florida** 278:5
279:5 521:16
**focus** 392:11,14
496:18
**focused** 497:2
**folks** 482:23 484:8
517:10
**follow** 305:20
361:5 388:6
487:24
**following** 388:11
499:2
**follows** 285:11
466:3
**follow-up** 358:16
484:6
**force** 280:14,16
291:18 306:13
308:3,10 314:4
315:20,25
**foregoing** 530:22
533:5
**foreign** 461:2
**form** 304:8 325:24
410:12 520:18
533:9
**formally** 464:4
528:25
**format** 407:5
428:5
**former** 414:20
476:25
**forth** 309:4 317:17
**forward** 353:3
486:14 501:22
**forwarded** 426:22
**forwarding** 495:16
**forwards** 496:12

**found** 302:2,11
**four** 299:9
**fourth** 292:20
**frame** 402:17
461:5 504:15
**frames** 459:18
**France** 299:13
**free** 443:3,6,14
**FREEMAN** 278:9
**French** 301:2,11
301:22,23 302:11
356:25 357:19
**frequency** 337:14
**front** 341:1 347:2
349:25 395:8
401:20 426:11
503:12
**fruition** 406:2
**frustrations** 522:4
523:17 526:21
**fulfill** 467:12
**fulfills** 467:6 468:3
468:14 470:16
**full** 368:20 471:6
481:24
**function** 371:23
381:13,15 384:7
386:25 418:16,19
442:1 447:16
**functional** 358:15
**functions** 378:18
386:24 425:6
**funding** 486:7,9
487:1,19 488:4
488:24 489:11
490:6,11,16,24
490:25 491:7
492:3
**further** 297:8
305:16 348:25
472:21
**future** 333:3,7
379:19
**F-A-T-T-O-N**
349:23

_____

**G**

**G** 281:23 502:21
511:20
**Gadot** 503:13,17
**gain** 365:1 371:25
**games** 446:6
**GBULIE** 279:19
284:13
**general** 329:9
409:23 465:25
466:2
**generally** 447:10
447:12
**genital** 280:18
349:14
**getting** 295:22
306:10 312:23
346:19 368:15
460:10 496:19
519:9
**GGM** 428:11,12
433:16
**Giselle** 460:25
**give** 289:23 321:10
321:12,13,18
322:12 323:17
326:13,13,14,17
326:18,19 327:23
327:24 329:12,24
380:21 384:14
387:13 395:24
431:21 524:11
**given** 419:14,16
530:7 533:7
**giving** 322:10
494:12
**Global** 428:14
**go** 285:23 290:13
291:8 295:24
298:9 300:2,11
300:15,19 301:1
301:25 302:6,17
303:9 312:13
313:10 340:10,11
341:18 342:23
343:6 345:7
347:5 348:14

Confidential - Subject to Protective Order

358:9 380:11
395:23 396:16
401:6 405:1
406:25 407:25
428:1,19 445:14
446:10 491:20
518:22
**goal** 385:21,24
386:11,14,21,22
471:17 477:20
**goals** 385:22 386:4
**goes** 288:5 290:6
302:3 462:21
465:9 467:3
475:7 489:17
492:12 526:9
**going** 285:17
296:25 305:19
306:6,7 311:11
311:12,12,13
324:17 340:6
349:4,6 350:4,4
353:8,11 360:16
360:20,24 361:1
361:2,5,13
375:15,20 393:9
401:9,21 410:8
414:9 423:5
431:17 432:22
445:10 446:5
468:21 472:10
473:12 480:14
487:20 488:10
502:2 503:3
505:11 528:8
**Golkow** 277:21
284:23
**good** 394:6 407:17
444:17 475:9
512:10 513:7,20
**gotten** 528:15
**graduated** 369:5
369:18
**graduating** 368:14
**graft** 292:24,25
**grant** 295:19

**granuloma** 352:1,2
352:19 353:12,15
**graphics** 428:14
**gray** 473:1,15,25
**great** 340:19
476:22 477:1
528:18
**grey** 470:20,24
471:13
**grid** 434:5,6
**grilled** 477:10
**group** 279:11
348:8 357:1
459:23 469:16
501:15 508:12
**groups** 378:21
**grow** 449:12
**guess** 369:10
447:13 483:1
484:6 495:16
524:16
**guidance** 473:15
**guide** 469:9,18
470:5 518:22
519:8 520:4
**guides** 376:8,12
377:8
**guiding** 382:24
**guys** 311:12
319:22 353:10
**Gynecare** 280:22
303:20 350:7
393:14
**gynecologic** 292:7
**gynecologist**
509:20
**gynecologists**
371:25 394:17
479:12
**gynecology** 289:7
291:13 371:17
**Gynemesh** 356:21
357:20 371:4
372:11 377:17
378:1

**H**

**H** 280:9
**Hackensack**
285:21
**hagar** 465:24
**half** 480:9
**halfway** 295:3
347:22
**hallway** 387:23
**hand** 324:20
332:10 347:17,18
349:4 494:20
**handed** 321:6
351:14 437:17
**handle** 431:19
**handled** 429:13
**handling** 447:5,8
447:11,14
**handouts** 435:15
**hands** 287:4
**hands-on** 288:1
317:6 385:12
392:21,24 393:3
492:1 503:18,24
504:3,10,12,13
505:2,9,16,24
506:7,15,21
507:20 508:7,10
508:21 509:12
**Hang** 311:21
**happen** 295:13
311:7,16 337:12
363:6 364:7
526:15
**happened** 310:3,9
312:20 315:7
319:19 323:4
334:6 337:15
381:17 418:12
460:2 486:23
489:2,3,5
**happening** 515:11
517:25
**happens** 296:16
**hard** 329:17,19
395:9 461:6
**Harel** 503:13

**harms** 391:7,17
**Hatangadi** 521:20
521:21,22 522:1
**Headquarters**
277:16 278:21
**Healing** 302:23
**health** 279:17
281:6 308:2
365:6,23 415:13
483:7 486:21
490:9
**healthcare** 286:16
**heard** 354:14
388:25 443:19,22
453:14 456:19
503:22 504:3
512:17 514:17,20
516:23 518:12
**hearing** 284:15
**HEIDELL** 279:8
**held** 277:15 284:5
284:25 363:23
364:1 377:25
391:17 392:5
**Hello** 361:25
521:15
**help** 286:22 380:3
435:22 437:23
440:13,14 494:24
496:9 510:18
526:4
**helped** 374:24
**helpful** 292:11
393:10
**hematoma** 300:1
305:13 353:25
**hemorrhage** 300:1
**hemostat** 461:15
**hiccup** 384:24
**hierarchy** 363:8
364:19
**high** 368:23 369:5
**Highland** 278:15
**highly** 373:20
479:8,17 481:4,6
493:1 513:1,19

514:13 526:17
527:7
**Hilaire** 306:24
307:3 308:18
315:20
**Hilaire's** 316:20
317:18
**Hines** 279:11
284:3
**Hinoul** 403:14
**hired** 525:21
**historically** 429:3
429:21
**history** 408:7
**hold** 365:2
**holding** 332:10
**holds** 364:3 365:3
**hospital** 400:5
422:14 522:19
524:14
**hotline** 444:4,7
**hour** 525:23
**housed** 427:23
**huge** 465:10,10
**hurt** 519:10
**Hyland** 277:16
278:20
**hysterectomies**
341:25
**hysterectomy**
342:1,1

**I**

**idea** 406:5,12,19
407:4 458:22
459:2 461:10
463:3,9 473:24
475:9 476:11
506:20
**ideas** 371:17
461:13
**identification**
291:20 306:15
349:19 393:18
402:9 412:10
415:16 423:14
431:2 433:25

Confidential - Subject to Protective Order

445:7 482:14
498:1 502:25
516:8 521:5
**identified** 298:13
300:7 304:7
**identify** 332:9
396:6
**IFU** 410:15,16,18
440:11,13,17,20
441:5 450:11,14
450:15,20,23
454:5,17 455:3
455:21 457:8,11
457:21 461:22,24
462:1,3,5,7,9
467:6 468:3
469:9,17 470:5
470:10,15 471:3
471:9,23 472:5
474:20
**Iglesia** 324:4,20
325:10,17
**II** 277:12
**Illinois** 279:15
**impact** 483:16
**Impacts** 298:10,21
342:24 343:9
344:10 345:9
**imperative** 531:10
**implant** 504:18
505:17 506:8
508:8
**implantation**
442:2 462:11
471:18 476:3,13
499:24 505:4
506:22 519:10
**implanted** 422:22
**implanters** 515:13
**implanting** 480:11
481:13 512:18,21
514:14
**implement** 519:8
520:3
**implemented**
407:20 497:14

504:14,17 519:13
519:24
**important** 293:9
338:20 339:6
362:20 386:24
430:5 491:1
**importantly** 495:1
**improper** 381:16
381:19,24 382:9
384:19 385:19,21
386:8,11 498:14
**improve** 491:3,8
495:25
**inappropriate**
296:10
**include** 328:11
367:22 372:24
405:7 410:15
425:7
**included** 328:22
378:19 450:15
**includes** 425:5,12
425:14,16,18
475:20
**including** 295:21
316:21 326:1
339:20 349:23
372:4 388:19
418:6 487:18
497:3 498:10
499:19 507:16
**inconsistency**
470:22 471:1
472:2
**inconsistent** 295:7
443:25 454:16
455:3,21 456:15
457:2,8,20
461:21,25 464:10
478:25
**incontinence**
371:19 394:19,19
395:6 396:8
417:5,14,20
443:1 479:15
**incorrect** 464:22

**increase** 496:1
**incumbent** 499:18
**Index** 281:11
283:2 430:25
**indicate** 299:21
300:3,12,16,20
301:18 302:1,9
302:22 303:6,14
304:12,16
**indicated** 284:2
305:10 479:6
**indicates** 302:10
303:2,15,25
**indication** 345:5
**individual** 387:4
388:11 397:20
424:6 444:11
463:22
**individuals** 443:20
**individual's** 366:8
465:2
**industry** 412:23
413:11
**inform** 499:19
501:2
**information** 290:3
293:10 294:17
295:16,23 296:1
298:7 299:7
328:18 329:13,25
333:6,10 335:18
335:21,24 337:5
339:11 340:1
344:12 351:7,10
351:12 352:8
358:18 359:3
373:3 382:25
398:21 399:6
408:25 410:11,12
430:8 435:23,24
436:2 439:14,18
440:15,16 441:22
442:11,12,16,17
442:20 455:2,20
464:22,23 467:9
468:8 469:15

477:6 478:22
481:17 501:3
514:23
**initially** 426:21
**injecting** 461:14
462:2,13
**injury** 299:25,25
303:6,7,7
**innovation** 379:19
**innovative** 389:21
**input** 317:10
339:25 371:25
406:18 407:23,24
**insert** 380:16
466:3
**inside** 480:12
481:13
**insight** 524:10
**instance** 310:9,24
319:23,25 320:4
320:12 391:4,14
478:23 490:11,16
**instances** 319:6
**institute** 509:11
**instituted** 394:10
408:4 504:11
**institution** 404:4
404:13
**institutions** 406:20
**instruct** 454:14
467:11 468:10
**instructed** 457:19
**instructing** 454:15
467:4 468:1
470:14
**instructions**
287:16 439:3,9
439:13,18 442:15
463:17 472:19
531:1
**integrity** 331:8
**intended** 394:16
398:4 410:9
**intending** 528:20
**intent** 309:10
310:20 314:3

331:19 379:1,7,8
417:18,18 430:10
450:15 479:9
484:2
**intention** 312:21
313:13 451:25
493:5
**interact** 511:3
514:4
**interacted** 499:10
511:1
**interacting** 436:15
477:2 510:2
**interchangeable**
355:3
**internal** 306:23
428:10 522:19
524:14,16
**Internet** 328:9,18
330:20 400:23
**interpret** 441:10
441:17,21 527:3
**interpretation**
391:25 392:1
441:12 455:9
524:5 525:7
**intervention** 300:1
302:14
**interview** 281:23
281:23 365:1
502:21,21 511:21
512:7 513:8
**interviewed**
364:10
**Intraoperative**
299:22
**introduce** 414:9
**introducing**
413:13
**introduction**
449:16
**invented** 458:11
**inventor** 334:24
450:6
**invest** 387:2
**investment** 419:5

Confidential - Subject to Protective Order

Page 548

496:4,18 497:4
497:11
**invite** 290:1 314:5
**invited** 308:4
309:8,14
**involve** 379:23,25
**involved** 309:1
330:11,18 332:6
333:4 334:16,23
334:25 335:8
368:8 371:1,2,5,7
372:10 373:7
377:22,24 378:8
378:12 379:14
381:19 408:16
425:3,24 426:1
431:7 435:19
436:2,7 437:8
447:5,7,10,14
499:3 511:4
**involvement**
372:12 374:17
378:13 382:23
411:17 436:19
**involving** 331:21
447:5 448:5
**in-depth** 293:16
294:14
**in-use** 430:1,12
433:9
**irrelevant** 286:5
332:22
**issue** 308:8 322:13
323:19 356:10
360:24 439:22
443:24 475:3,9
526:4
**issued** 408:1,10
**issues** 357:21
360:25 443:21
444:12 466:11
499:14,16,20,23
500:11,18,21
501:7,14 519:9
522:19 524:14,17
526:11

**item** 423:25 447:8
**items** 310:7 312:19
313:13 409:8,15
447:3,5,11,14
448:4

———— **J** ————

**Jacquetin** 349:24
360:3
**January** 370:23
373:12 515:25
516:11
**Jarczynski** 367:8,9
**Jennifer** 403:3,4
407:1
**Jersey** 277:16,18
278:11,22 284:25
285:21,22 286:1
332:21 528:15
**job** 286:18,21
319:22 364:9,10
364:23 365:1
372:10 387:5
395:15,22,23,25
421:10 435:8,22
436:1,5 437:25
438:18,20,24
499:17 500:6,9
500:14,21 507:14
**jobs** 421:9,12
510:2,8
**Johnson** 278:18,18
278:23,23 365:14
365:15 368:3,25
368:25 369:7,7,9
369:9,12,14,14
369:20,20 388:15
388:15 390:24,24
391:4,4 413:12
413:12 414:6,8,9
436:18,18 514:7
514:7 515:3,3
**Johnson/Ethicon**
368:4 369:12
**Jones** 402:15
**June** 277:11
284:24 515:3

**jury** 312:8,15,17
313:8 325:14
381:22 392:23
434:11 442:21
488:11 489:5,16
490:6
**J&J** 368:17 387:5
387:6 388:19,22
389:1,7 391:15
408:5 446:25
505:1
**J&J/Ethicon**
404:14 405:1
**J-A-R-C-Z-Y-N-...**
367:10

———— **K** ————

**Kaminski** 411:21
411:22 412:14
413:2 482:18
486:20 495:10,19
496:12 497:3,9
502:11
**Kaminski's** 495:15
**Kanerviko** 426:21
**KATZ** 278:9
**keep** 319:21
322:24 332:18
422:18 424:11,14
428:6 429:22
430:1
**keeps** 430:4
**Kentucky** 279:20
**kept** 428:9,21
433:12
**Kevin** 465:4 517:6
**key** 420:1 509:24
510:3,18,21
511:1,3,8,11
513:3
**kidding** 286:5
**kind** 393:10
430:13
**Kirkemo** 402:12
403:14 407:12
**knew** 348:7 357:22
452:7 472:12

494:15 498:14
504:9 526:24
527:7,15
**know** 308:19,20
325:10 329:13
330:2,6 332:17
332:23,23,24,25
334:1 338:24
343:25 344:2
345:12,22 354:11
354:13 355:1
356:3,15 357:25
358:3,5 362:16
374:12,12 384:13
384:14 387:22
391:25 395:15
396:13,13 397:12
400:19,21 405:13
405:14 406:8,9
406:10 408:3
409:20 418:12,13
421:16,21 422:11
422:14,17 427:11
427:13,15 430:13
431:19 432:7
433:4 434:25
436:24 445:11
448:14 451:24
454:3 457:4,6,17
457:21 458:3,4,5
460:4,21 461:20
465:12,19 475:1
476:25 478:3
479:21 486:6,25
487:3 488:1,3,8,8
488:11,12,13,18
488:19,20,22
489:2,2,3,5,22,23
490:24 494:14
495:7 497:13
500:11 506:2,3,6
506:11,20 507:1
507:6,25 509:1,2
509:4,16 512:20
513:15 514:12
515:22 525:17

526:17
**knowing** 485:8
**knowledge** 293:16
294:9,14 310:1
315:5 318:23
328:2 374:6
376:12 406:6
407:19 409:22
418:11 427:9,17
436:8 450:23
466:22 480:25
508:14 520:15
**knowledgeable**
435:9 439:1
**known** 336:2 374:9
**knows** 424:9
**KOL** 281:23
502:20 509:24
510:9,14 511:21
514:10
**KOLs** 514:4
515:13
**KREIS** 278:3
279:3

———— **L** ————

**L** 278:15
**lab** 288:1 331:14
393:6,7 494:7
**laboratories**
385:12
**labs** 399:16,20
416:19
**lack** 485:9,17
**Lacroix** 484:22
490:22,23,23
495:13,24 497:9
**Lacroix's** 497:14
**language** 293:19
338:19 359:18,19
359:23
**large** 400:8
**lateral** 461:16
**launched** 308:24
317:19,22 356:25
357:16 375:8
377:17,20,23,24

Confidential - Subject to Protective Order

378:2
**law** 277:15 279:18
  332:21
**LAWYER'S** 534:1
**layperson's** 436:8
**lead** 325:16
**leader** 448:8
  509:25
**leaders** 289:8
  371:16 510:3,18
  510:22 511:1,4,8
  511:12 513:3
**leading** 295:14,20
  295:22 296:3,8
  296:10 304:14
**leaflets** 491:21
  493:22
**learn** 396:21
  399:21 400:9
  437:23
**learned** 466:1
**learners** 292:1
  385:15
**learning** 288:2,6,7
  290:1,3 393:1
  512:9,9,17,20
  513:15 514:24
  517:15,21 518:9
  526:25 527:8
**leave** 438:9
**Lech** 465:6
**Leclair** 429:10,11
  430:19
**lectures** 287:5
**led** 486:17
**left** 351:16 427:15
  436:10
**legal** 338:16
  378:20 425:20
**letter** 280:13,15
  291:18 306:13,24
  307:22 308:2,7
  308:19 309:4
  315:19,25 316:20
  317:18 331:4,5
  361:6,8

**letting** 349:2
  396:12
**let's** 306:1,18
  307:22 310:4
  313:10 329:9,14
  329:20 330:4
  340:10 342:23
  343:6 344:2
  370:21 392:16,18
  396:16 399:11
  423:3 464:25
  472:24 484:25
  490:22 491:7
**Leval** 334:24 454:4
  456:18 458:10,10
  462:22,23 463:10
**Leval's** 467:18
**level** 313:25 316:9
**levels** 316:23
**liability** 277:6
  476:22
**liaison** 372:19
  373:9
**life** 413:18
**ligament** 292:22
**light** 528:23
**likes** 407:4
**Lille** 299:13
**line** 283:6,10,15,21
  320:21 341:12,13
  341:14 366:14
  392:19 394:13
  401:25 532:3
  534:2
**lines** 408:5
**Lissette** 426:24
**list** 302:3 326:4,7
  329:21,23 334:12
  336:9,11 350:21
  351:4 352:4
  353:16,22 355:22
  394:1,3,6 402:1
  409:16 415:6
**listed** 299:24
  304:25 328:19
  331:1 340:24

345:15 351:5
352:4,19,21,25
353:16,22 355:17
355:20 356:1,5,6
373:2 403:21
426:10 434:5
517:13
**listen** 323:8,12
  380:13 383:7,13
  504:22
**lists** 302:15 351:24
  355:11
**literature** 322:11
  322:15,20 323:18
  323:19,24 324:1
**litigation** 277:7
  432:15
**little** 292:3 297:7
  351:23 473:15
  477:9 484:12
  498:25 499:1
**LIU** 278:4
**live** 331:6,10
  399:13
**LLC** 278:9
**LLP** 277:16
  278:20 279:8,13
**locally** 522:15
**Logic** 496:8
**logistics** 385:11
**Lombardi** 367:12
**long** 286:12 377:12
  440:24 446:1
**longer** 365:7,10
  367:23 427:9
  506:13 517:17,21
  518:9
**long-term** 358:15
  358:22
**look** 296:18 297:1
  297:3,17 302:12
  305:8 307:22
  332:1 344:24
  345:3 347:3,22
  348:25 351:4
  370:21 387:10,12

393:10 416:15
446:7,11 464:9
477:25 478:4
489:4,15 490:1
490:22
**looked** 343:25
  344:22 452:23
  493:24
**looking** 314:21
  345:11 347:16
  350:13,23 351:1
  389:18 407:22
  419:5 433:4
  446:9 473:8,15
  473:19 477:14
  488:4 512:2
**looks** 362:15
  373:18 407:16,22
  415:24 452:6,18
  477:12 485:25
  486:19
**loop** 462:19
**losing** 448:19
**loss** 448:22
**losses** 391:7,17
**lost** 354:21,23
  448:8 449:20
  471:5
**lot** 353:10 433:3
  456:5 464:20,21
  494:11,18 525:10
**lower** 316:23
**Lucente** 330:16
  331:22 334:23
  525:16
**lumping** 333:16,18
**lunch** 423:3,19,22
**luncheon** 423:7
**Luscombe** 403:3
  403:10 405:24
  406:3,11 407:24
  460:14

———————
**M**
———————
**M** 278:9,20 279:8
**Mahar** 465:4
  517:6

**Mahwah** 285:22
**main** 278:4 279:4
  449:9
**Maine** 366:23
**maintained** 327:2
**majority** 292:24
**making** 317:9
  339:1 360:20
  412:23 429:7
  497:4
**managed** 373:19
  373:24 510:9
  514:9
**management**
  407:8 428:14
**manager** 286:19
  286:20 309:17,18
  363:2,5 364:18
  367:14 370:19,22
  416:9 485:21
  507:15 516:19
**managers** 367:4
  397:22 416:5
**manner** 295:16
  296:11 413:24
  454:16 457:18
**manufacturer**
  390:22 391:1
**March** 316:18
**Marianne** 411:21
  411:22 412:14
  413:2 482:17
  484:7 496:11
  502:11
**Marie** 277:17
  285:5 383:16
  455:13 530:18
**MARINI** 279:8
  284:1
**mark** 306:7 430:22
**marked** 283:20
  291:15,20 306:15
  349:5,5,9,19
  362:12 387:9
  393:11,18 402:8
  412:9 415:15

Confidential - Subject to Protective Order

423:13 431:2
433:24 445:6
482:13 497:25
502:24 516:8
521:4
**market** 307:10,17
373:21 374:21,25
386:5 448:15,16
448:19,22 449:11
449:15 510:19,23
511:1
**marketed** 506:13
**marketing** 307:5,7
307:14,15,20
338:3 339:21
370:13,18,19,22
371:9,11,12
372:5,17,20,21
372:24 373:7,9
373:14,16,25
375:8 376:25
378:10,17 402:16
402:18 403:12,13
403:25 404:11,12
405:4,7,8,15
410:23,24,25
418:19 424:1
425:11,12 429:12
430:3,16,18
431:10 446:24
447:15,18,18
449:3 460:15
510:25 517:7,8
517:10
**Martin** 432:5
**MARY** 278:4
**material** 293:2
335:23 356:20,21
357:2,20 361:3
454:12 498:20
**materials** 287:6,19
292:24,25 293:4
293:7 317:5
320:23 321:2
337:20 338:20
339:8,13,16

394:2 417:7,11
424:6 425:11,25
431:14 433:9
435:6,10 437:18
439:2 441:4,8
442:10,14 455:10
455:22 456:16
457:13 462:7,9
463:18 469:10,19
470:6 471:24
472:20 478:17,21
492:11 501:11
**matter** 284:3,16
323:5
**mattered** 323:3
**maximizing** 491:8
**MAZIE** 278:9
**McClellan** 279:21
279:22
**McGuire** 279:21
**MDL** 277:5
**mean** 295:18 299:4
310:23 372:7
373:23 377:20
432:24 433:3
445:17 480:11
485:16 512:19
525:17
**meaning** 309:6
321:12 323:19
326:21 336:23
378:2
**means** 299:6
345:13 371:20
373:24 374:13
443:6,14 530:24
**meant** 338:23
435:3 440:9,18
441:3,10,18,22
442:22 443:2
**mechanical** 286:8
369:19
**medical** 286:10
291:8 293:10,15
293:17 294:4,10
315:18 321:25

322:5,10,15,20
323:18,24,25
324:1 334:22
337:24 338:13
339:21 345:14
354:10,16 355:4
355:8 356:8,18
357:18 360:12,13
378:19 390:21,25
403:14,24 404:11
407:13 409:17
425:14 435:19
436:6,14,21
437:7,10 443:15
457:16 475:16
476:7,10 480:1
480:12 499:7,19
500:3 501:2
508:22 509:2,6,7
513:24 517:9
523:1 524:6
526:8
**medicine** 404:18
438:14,15,19
**Meek** 316:20
**meet** 308:10,12
309:6,22 310:7
310:17,23 311:5
311:14 312:18
313:14 314:19
315:1,12,24
316:1 318:1,17
319:3,13 320:2
331:3 415:4
509:22
**meeting** 282:1
310:2 315:6
370:10 397:20
437:17,21 516:6
**meetings** 398:7
**member** 378:24
456:24
**members** 338:15
377:23 499:5,18
**memo** 308:7
484:17,19,20

485:1
**memorandum**
306:23
**memory** 409:22
**mentioned** 392:21
395:5 425:6
463:5
**mesh** 280:19 293:1
295:6 297:8,12
297:16,24 298:4
300:9 302:8
319:2 320:1
324:9 335:16
340:18 341:7,11
349:15 353:20
354:1,8,9 355:12
355:17,20 356:9
356:20,21 357:2
357:20 371:2
442:8,8 443:6
450:16 461:14,15
462:3,10 469:10
470:7 473:9,10
474:1,6,7,17
477:21 480:12
481:13
**meshes** 346:16
**Mesh/Gynecare**
432:15
**met** 309:19 316:10
362:2
**method** 449:7
450:5
**methods** 475:15,17
475:20 476:2,12
**Michael** 278:15
285:16
**michael.brown...**
278:17
**Michel** 295:8
**Miller** 330:16
331:22
**millimeter** 465:24
**million** 372:14
373:19 525:17
**mind** 392:9 462:22

**mine** 464:6,7
**Minnesota** 366:23
**minute** 404:5
490:1 515:9
**minutes** 282:1
306:18 350:16
446:8 481:12
491:20 492:6,17
493:21 494:12,20
516:5
**miscited** 296:23
**mismarked** 502:13
**misplaced** 290:3
442:18
**Mississippi** 278:16
**misspeak** 389:18
**mistakes** 389:11
389:21
**misunderstandi...**
440:5
**Mitchell** 277:17
285:5 530:18
**mliu@awkolaw....**
278:7
**model** 317:6 372:5
393:3 491:22,24
492:1 494:13,21
**models** 504:13
505:9
**modified** 449:24
451:2
**modify** 451:9
**Mokrzycki** 521:19
521:25
**moment** 348:11
350:1 387:13
413:7 516:25
**Monarc** 448:8,11
448:15,24 449:5
473:10 474:7,17
**money** 353:10
487:8 492:3
496:6,19 497:4
497:16 525:10
**month** 292:16
432:18

Confidential - Subject to Protective Order

**months** 316:19,19
317:1 351:22
368:12
**Morristown**
277:16 278:22
284:25
**mothers** 389:9
**Motion** 501:21
**move** 297:7 314:15
317:13 322:19
342:9,12 343:22
344:5 352:12,15
353:2 359:8,9
380:9 381:6
382:4 383:2,9
420:12,23 444:6
451:14 454:23
455:12 467:21
469:20 486:22
487:13 497:19
504:23 506:16
518:4
**multicentric**
280:20 349:16
**multicompany**
510:13
**multigenerational**
372:5
**multiple** 287:8
288:3 307:13
334:19 339:20
396:1,3
**MURPHY** 279:8
**M.D** 412:19

———————
**N**
———————
**N** 279:14 280:2
**name** 284:22
285:16 361:25
366:8 403:2
422:4 495:15
**names** 330:15,17
508:23
**Nancy** 279:8
429:10,11 430:19
**narrow** 469:24
**national** 397:20

398:7 483:16
**native** 324:10
**nature** 443:7
**NDIDI** 279:19
**necessarily** 464:2
**necessary** 531:4
**need** 295:15
300:25 308:1
311:24 315:12
316:1 335:17
348:15 360:11
361:2 387:10
399:5 405:1,16
405:18 410:10
440:15 445:19
446:11 456:7
473:11 480:14
481:24 489:11,23
492:12 495:5
499:20 502:9
508:7,21 509:11
522:21 526:14
528:12
**needed** 338:24
346:24 348:24
357:19 358:21
398:17 408:18,21
408:24 481:18
500:4 501:8
**needing** 348:25
**needle** 451:4,18
453:15 454:6
457:7,14,15,22
462:19
**needles** 463:4
**needless** 390:8,12
390:18 391:6,16
391:18
**needs** 290:13 291:4
295:13 456:1
474:21
**negative** 503:20
504:1
**neglected** 306:8
528:23
**never** 348:5 357:18

357:22 369:11,23
381:19 387:4
390:11,18 406:5
453:14 456:19
462:23 473:9
474:6,10,13,16
504:11 508:14
**new** 277:16,18
278:11,22 279:9
279:9 280:18
284:25 285:21,22
286:1 332:21
349:15 366:25
370:18,21 371:17
371:18 372:3
412:24 413:13
414:9 430:14
519:8 520:4
522:16 528:14
**news** 514:19
**newsletter** 404:4
404:13,17,21,25
405:21 406:1,7
406:19 408:1
409:22 410:2,13
416:22
**newsletters** 408:3
408:6,10 409:17
409:24
**ngbulie@pamm....**
279:21
**night** 432:18
**Nilsson** 281:23
502:21 509:16,19
509:20 511:11,15
511:20,21 512:8
512:25 515:18
**nmarini@hpmb....**
279:10
**nomenclature**
367:2 376:2
511:19
**nominate** 380:1
**nonleading** 295:17
295:25
**nonmedical**

339:10
**nonphysician**
382:21
**nonsurgical** 418:6
**North** 367:3
**Norton** 412:19,21
412:22
**Notary** 277:18
530:19 533:21
**note** 435:2
**noted** 285:4 533:9
**notes** 343:25 344:1
534:1
**notice** 277:15
333:19
**notified** 500:1,4
**notify** 500:5
**Nov** 281:18 497:23
**November** 498:6
503:13
**nuances** 481:18
**number** 297:1
300:24 302:3
304:1 341:3,6
342:20 344:14,20
345:14,24 346:15
351:20 361:12,19
367:1 377:16
395:1 401:8,15
401:18 403:11
419:7,8 434:6
468:20 469:2
514:21 527:22
**numbers** 486:16
496:13
**numerous** 289:5
292:5 326:10
**nurses** 389:9

———————
**O**
———————
**O** 451:2,6 458:22
459:2 462:19
466:3 467:5
468:2 470:15
**oath** 325:15 362:6
490:5
**obgyns** 491:16

493:9
**object** 295:10,11
295:17,18,20
296:1,5,9 375:20
489:23 528:25
**objecting** 329:2
**objection** 284:14
286:4 295:19
296:3 304:8,14
305:6,12 308:13
310:11 311:18
312:12,25 316:12
318:3,22 320:9
324:13 325:2
327:11,17 329:1
329:7,16 333:8
346:8 356:11
357:5,9,23 360:7
386:9 391:9,22
411:5,15 414:25
438:22 443:4,11
444:13,18 449:1
450:12,21 451:23
454:19 462:24
465:15 466:18
467:15 469:11
473:17 474:9
476:4,15 478:7
479:23 480:17
482:3 487:22
489:7 492:7
496:21 497:6
500:23 505:5,18
506:9,24 507:2,9
507:21 508:4,16
512:12 513:9,22
515:1 519:11,18
519:22 520:9,18
523:20,23 524:22
525:4,11 527:2
527:10,17
**objections** 284:7
**obligation** 321:10
**observation** 317:8
**observe** 393:2
522:17 524:9

Confidential - Subject to Protective Order

observed 297:13
observes 288:6
obstetrician
  479:18
obturator 292:20
  377:17 378:2
obviously 308:7,8
  351:9 528:10,18
  528:20
ob/gyn 314:8 479:9
ob/gyns 492:6,23
  493:2
occasions 349:6
occurred 284:11
  284:19 326:6
  408:2 502:18
  503:6 528:4
October 280:14,16
  286:13 291:18
  306:13,25 307:23
  370:1 515:10
offer 413:22
offered 504:17
office 387:21
offices 277:15
official 492:13
  493:23 494:3
offline 430:13
oftentimes 287:20
  328:10
oh 310:14 323:5
  344:13 346:22
  432:6 512:4
okay 285:18 296:9
  301:7 305:19
  306:20 307:21
  312:8 313:9
  318:15 320:21
  323:3,15 329:21
  342:16 350:25
  354:5,6 361:9
  370:2 376:13,21
  377:1 379:21
  381:5 384:9
  387:24 389:20
  393:4,20 395:19

404:7 407:11
408:12 433:17
445:13 447:21
450:3,10 459:13
471:7 473:5
482:7,7 483:20
484:11 485:15
486:5 490:19
507:13 515:16
517:3 522:13
525:24
old 430:6 455:7
older 428:5
Olympic 375:10
once 415:5 486:16
ones 326:6,10
  327:20 330:7
  334:4,5 338:16
  339:12 380:6
  394:23 485:4
one-off 397:21
ongoing 410:10
  447:2
online 288:14
  328:19,22 331:18
  333:21 334:8
  335:2,15 336:12
  336:16 340:2
onset 373:20
open 284:5 290:23
  290:24
opened 329:3
operate 480:15
operated 388:19
operating 288:7
  290:25 294:15
  451:9 477:17
  524:9 526:9
operation 400:5
opinion 322:25
  509:24 510:3,18
  510:21 511:1,4,8
  511:12 513:3
  527:13
opportunities
  280:23 393:15

401:22
opportunity 291:2
  530:11
opposed 352:11
  386:2 461:16
Optimize 419:11
option 396:24
options 417:6,14
  417:20 418:6,6
order 277:13 284:3
  284:6 295:16
  314:13 331:2
  481:5,23 497:16
  499:16 505:3
  522:22 524:11
organ 292:19
organization 309:3
  496:17
organs 303:7
origin 432:7
original 301:2,11
  301:22 376:2
  531:11
originally 517:17
  517:22 518:10
outcome 303:21
  350:8,19 351:3
  417:17
outcomes 314:14
  379:15
outside 336:23
  414:19 439:18
  459:25 460:2
  499:5 501:19
overall 307:16,18
OVERHOLTZ
  278:3 279:3
oversaw 514:25
overseeing 400:5
  507:16
overspent 486:19
overstated 483:7
owned 388:18
owns 410:18,25
  430:16 475:21
O'MARA 278:14

P
package 466:3
page 280:12 283:6
  283:10,15,21
  298:19 301:9,12
  301:13,25 302:18
  302:22,25 303:1
  303:5,10,18
  338:23 340:12,15
  340:23,25 341:3
  341:10,20 342:6
  342:7,18,20,22
  342:23 343:2,4,6
  343:7,8,9 344:4,9
  344:14 345:6,7,7
  345:9,15 347:6
  350:5,10,11,15
  350:18 351:2,20
  358:9,14 403:17
  407:1 416:1,7,15
  419:2,4,22 420:4
  421:13 470:12
  483:12 484:18
  491:12 511:19,24
  513:11 532:3
  534:2
pages 281:12 303:1
  344:25 345:4
  418:22 431:1
  533:5
paid 336:24 368:6
  368:17,20,22
  369:3 389:12,22
  525:15
pain 303:12,15
PAM 279:18
par 460:18
Paradise 403:3,4
  403:22 407:1
paragraph 297:4
  471:6
parallel's 471:3
  472:4
parentheses
  345:12,22
Parisi 277:15

280:5 285:3,9,16
291:14 293:12
296:25 298:6
299:1,8 300:11
300:15,19,23,25
301:17 302:21
303:9,22 305:15
306:1 361:25
423:19 469:5
485:13 486:25
488:1,3 490:5
502:11 503:12
509:11 528:12,15
528:20 530:10
533:14
Parisi-1 280:14
  291:17
Park 279:9
Parkway 278:10
  278:15
part 290:16 297:14
  324:21 340:11
  343:20 344:16
  345:2,3 368:17
  379:20 380:25
  383:20 405:8,22
  406:14 408:13,15
  418:10,13,18
  421:1,2,4 437:23
  438:3 441:18
  444:22 447:18
  449:14,18 454:4
  454:5 455:17
  461:23 477:5
partial 297:16
  298:2,5,5 341:7
  341:15 342:13
participate 330:23
  331:2,17
participated
  337:24 338:4,7,9
particular 314:11
  378:16,17 426:7
  443:16,17 447:8
  447:15,17 452:1
  454:21 455:22

457:18,18,19
460:22 463:13
473:3 499:16
501:5,18 515:17
527:4
**particularly**
454:15
**partner** 413:18
510:18 514:4
**partnered** 371:16
510:21 511:12
**partnering** 511:14
**partners** 404:1
**partnership**
510:14,17 511:7
**patient** 346:21
355:24 375:9
380:17 390:1,18
391:5,6,15,18
410:20,22,25
411:14 443:17
465:25 508:9
**patients** 286:17
294:16 297:13,15
297:23,25 298:4
299:17 302:16
304:1 313:18
314:14 337:3
341:4,5,6,8,11,24
341:25 351:6
355:12 381:12
389:9 390:11
395:6 396:7
413:19,23 418:9
467:13 481:15
509:13 512:9
513:7 514:21
**patient's** 503:25
**Paul** 277:15 280:5
285:3,9 432:23
446:16 457:25
485:7,13 486:1
530:10 533:14
**pay** 525:21,23
**Payers** 413:19
**pays** 379:16

**PCP** 416:20,23,25
417:1
**PD** 485:10
**PE** 363:2 367:14
483:1,2 484:8
**pearls** 522:17
**PEDM** 485:10,17
**Peggy** 412:19,21
**pelvic** 277:6 285:1
292:14,16,19
306:25 307:4,19
319:1 320:1
335:16 371:2,19
372:4,9 404:18
408:4,7 426:18
432:15 435:19
436:7 437:8,23
469:10 470:7
490:9 491:25
**pelvis** 480:12
**pending** 284:4
**penetrate** 406:20
**Pensacola** 278:5
279:5
**people** 314:21
316:21 334:18
337:24 338:2,21
339:2,3,5 346:24
353:13 374:12
378:11 380:1
391:25 407:23
416:9 417:9
452:6 464:19
491:2
**percent** 346:13,16
346:25 347:11,13
347:23 348:2,9
348:19,20,23,24
349:3 352:20
353:13,21 355:12
360:1 487:10,11
**percentages**
302:15 304:2
**perform** 292:21
381:11 382:16,22
384:4,20 393:2

399:23,25 438:20
441:6,11 452:9
456:21 464:11
**performed** 292:21
333:25 399:13
400:23 424:10
**performs** 417:2
**period** 330:8 332:6
370:9 373:25
375:6 377:25
429:18 460:20,22
485:20 498:9
506:14 514:6
525:19
**periods** 429:24
**perioperative**
297:4 302:4
**permanent** 481:13
**permitted** 464:15
505:17
**Perretti** 277:16
278:20
**person** 307:7 308:4
334:17 383:4
397:23 403:4
436:9 446:23
464:12
**personal** 328:2
411:17
**personally** 409:7
419:19 436:2
511:14
**personnel** 373:5
**perspective** 315:12
373:25
**pertain** 384:15
**pertained** 447:14
501:4
**pertains** 439:13
504:2
**pertinent** 383:20
455:17
**Peters** 522:19
524:14
**PF** 491:22,24
**phone** 290:1

397:23 460:10
463:22 464:2
**physician** 290:13
382:8,16,21,24
395:3 398:5
399:21 400:4
420:5 422:21,24
441:13 451:8,20
455:3 469:7
470:3 471:22
476:2 478:19
479:25 480:5
481:12,23 494:18
496:14,17 505:4
505:10
**physicians** 315:23
318:21 320:23
331:8 380:6,8,16
380:20,20 381:11
381:23 382:1,17
382:18 384:11,20
392:9 394:10
395:16 396:25
398:22 399:7
411:1 413:18
414:16,22,23
415:2 417:3,4,11
417:12,19,23
418:3,8 420:2
430:9 435:23
438:13 442:11
459:6 462:17
467:5,11 468:2
468:10 470:14
471:19,21,23
476:13 477:24
479:8,17 481:5
500:12,19 503:25
505:1 507:20
508:12 512:18
522:9,23
**ph|917.591.5672**
277:22
**picked** 463:22
**Piet** 403:14
**Pikeville** 279:20

**pile** 347:18
**pipeline** 372:6
**PITTONI** 279:8
**place** 296:13
310:15 343:17,19
344:12,19 364:4
442:7 457:22
477:21 485:4,21
518:2
**placed** 443:7
453:15 456:19
466:4
**placement** 450:16
475:23 477:23
478:1,5,14,19,24
**places** 347:21
**placing** 457:7
**Plaintiffs** 278:7,12
279:6
**plan** 419:24
**play** 312:8 446:6
**Plaza** 277:16
278:21
**please** 297:14
299:12,20 300:2
303:1,10,18,19
329:23 332:20
383:17 391:13
392:23 414:2
441:15 489:6
496:23 500:17
531:3,7
**pleasure** 521:16
**PLLC** 278:3,14
279:3
**point** 307:25 308:9
315:19 341:14
363:23 364:1
369:10 372:13
377:16 403:9,11
410:2,5,7 447:1
447:15,17 460:8
473:3,19 475:4
486:12 488:4,23
501:5 504:5
508:25 509:8

Confidential - Subject to Protective Order

516:2,16
**points** 449:10
**policies** 384:2,12
  384:15
**poor** 519:10
**POP** 292:24
**population** 411:14
**portfolio** 367:22
**position** 365:3,18
  365:20,22,25
  366:1 368:14,16
  371:3,5,8,9,15
  372:17,20,21
  373:4,6,15,16,18
  375:8 377:25
  378:16 427:1,18
  446:20 461:16
  484:23 485:19
  516:14,15 528:1
  528:8 529:1
**positioning** 474:22
**possible** 314:13
  317:12 324:22
  344:16,18,19
  347:9 385:24
  413:24 468:5
  481:16 484:3
  489:1,3,10
**possibly** 295:7
  459:19 522:17
**posterior** 343:10
  344:11
**postoperative**
  295:2 297:20
  298:23 300:6
  302:5 340:13,23
  354:7 355:10,23
**Post-operative**
  351:22
**potential** 304:13
  304:16
**potentially** 309:18
  327:9 526:13
**PowerPoint** 281:6
  298:20 398:8,10
  415:13,19,22

**PowerPoints** 287:9
**PR** 375:10
**practice** 292:14
  438:14,19 479:18
**practicing** 438:14
  479:14 509:21
**preapproved**
  340:4
**precedent** 412:22
  413:12
**preceptees** 316:23
**preceptor** 439:9,23
  440:5,9,18 441:3
  441:10,18,20,21
  525:21
**preceptors** 315:21
  316:7 330:14
  335:10 338:14
  378:19 380:4
  399:14 436:4
  442:10 524:18
  525:2,10,16
  526:5,14
**preceptorship**
  290:7 331:14
  421:18 492:13
  493:24 494:3,10
  494:19,25 523:22
**preceptorships**
  288:2 396:18
  399:12 416:18
  522:20 524:15
**preceptor's** 440:2
**precluded** 309:7
**preference** 481:9
**preliminary**
  280:18 349:14
**preparation** 431:7
  432:12,14
**prepared** 327:8
  333:6 425:25
  431:9,20 432:4,9
**present** 308:25
**presentation** 328:9
  343:21 419:14,20
  420:14,16 422:17

422:25 495:6
**presentations**
  287:5 339:1
**presented** 332:8,15
  334:17 439:14
**presenting** 334:20
  339:13,14
**preserve** 284:2,5
**pretty** 359:6
**prevent** 312:22
  345:19
**prevented** 464:13
**previous** 288:10
  304:22 341:18,18
  342:1,7 349:6
  486:18
**previously** 285:6
  285:10 292:6
  348:13 362:12
  367:20 387:8
  428:18 439:14
  481:20 515:5
**Price** 306:24 307:3
  308:18 315:20
  316:20 317:17
**primary** 385:21
  396:24 417:4,18
  417:19,22 448:18
**Princeton** 369:13
**principle** 400:13
**principles** 426:3
  435:19 436:6,15
  438:18
**prior** 345:7,8
  462:11 463:5
  492:11,18 497:17
  498:19 504:14
  515:21
**proactively** 452:15
**probably** 301:5
  326:16,20 334:19
  387:10 392:13
  403:2 408:9
  427:14 432:19
  435:20 525:19
**problem** 316:25

465:20 475:18
**problems** 337:2
  522:10 526:2
  527:1
**procedural** 518:25
**procedure** 287:17
  287:18,19 289:15
  289:17,25 292:10
  302:4,5 309:1
  314:13 358:17,23
  383:5 384:5,8
  395:1 396:21
  399:21,22,24
  400:9 434:18
  438:20 440:1
  441:11 443:17
  458:11 471:22
  479:10,12,16,21
  479:22 491:20
  498:16 518:17
  519:8 520:4
  523:3 526:5
**procedures** 288:3
  292:16 293:17
  330:20 371:19
  384:3,12 398:2,3
  417:2 481:16,25
  488:5 493:3
**proceed** 285:7
  407:25
**process** 340:8
  366:6 368:11
  369:2 372:1
  426:1 430:17
**processes** 491:3,9
  495:25
**proctorship**
  421:17
**proctorships** 288:5
  396:17 400:2
  416:19
**produced** 515:4
**product** 288:9,17
  288:19,22 289:10
  306:24 307:3,9
  307:12,25 308:24

317:21 357:16
  370:3,16,18,20
  370:21 373:11,14
  374:15,18,20
  375:5,7 376:11
  376:23 378:1,9
  378:20 379:24
  382:2 386:6
  393:1 394:11
  395:3,16 411:2
  411:19 413:23
  414:11 415:8
  417:8,9,12,16
  418:9 420:9,11
  420:19,22 421:10
  422:22 437:2,2,3
  437:13 438:1,6
  438:21 439:4
  442:25 446:21,24
  447:4,6,11,12
  448:5,14,23
  449:4,5,10,16,17
  452:4,7,16 459:7
  459:9,11,14,22
  459:23 460:5,7
  460:12,16,17,23
  460:25 461:8
  464:13 466:10
  472:11 477:17
  480:16,23,24
  481:5,19 490:9
  498:15,20,23
  499:16 500:7,13
  503:19 504:18
  505:3,3 510:19
  510:24 511:2,5
  524:12 526:12
**production** 281:11
  283:9 387:3
  431:1
**products** 277:6
  286:24 287:4
  288:24,25 289:4
  291:13 292:2
  307:19 318:10
  322:21 328:3,5

366:14,19 367:22
368:1,1 371:1,2
372:1 373:7
375:23 376:1
377:5,6,10,21,22
377:24 379:3,18
380:18 381:12
382:7 385:7,14
386:1,2 387:3
389:10 390:7,12
391:16 392:19
394:13,16 395:12
397:15 398:17
400:14,16 401:25
402:23 408:5,7
410:3 411:8,13
414:10,17,24
419:1 426:19
427:21 431:15
433:10 436:16,19
436:21 437:24
438:25 439:1
440:15 442:8
477:7 480:10
497:18 498:10
500:20 505:17,23
507:16 510:4,19
511:13 512:21
515:14
**prof** 353:17,23
397:25 398:3,8
403:25 404:11
405:16,18,22
407:2 409:7
416:8,15 419:11
424:1,25 425:2
471:24 485:20
486:8 487:18,19
488:4
**ProfEd** 485:3
495:25
**professional**
280:23 281:11,13
286:19,20 287:1
287:2,8,11,23,25
290:5,22 293:13

293:20 294:19,23
309:17 315:13
318:13 320:24
321:1,6 322:11
324:3,6,19,21
325:7,25 327:10
337:3,19 338:6
338:19,21 339:7
339:16,20 340:11
340:22 350:6,14
351:2 352:6,22
355:15 356:18,23
357:17 358:7,20
360:4 363:3,4,9
363:10,13,15,19
363:20,24 364:17
364:18,24 365:4
365:12,21 366:3
366:9,20 367:15
367:18 378:5,9
378:14 379:1,7,9
379:11,12,14,20
379:23 380:7
381:21 382:6,10
382:11,25 384:6
384:17,23 385:1
385:4,6,9,16,24
386:5,12,15,16
386:18,21 388:10
388:12 392:3,6,8
392:12,14,19
393:14 394:2
395:12 397:8,16
397:21 399:3
400:18 401:22
402:22 403:5
406:14,17 408:11
408:14,16 409:19
410:14,16,17
411:17,23 412:2
413:6 414:19,21
416:2 418:10
419:23 420:6
421:2,3,4,7,25
422:2,5 424:21
424:23 425:7,10

425:22 426:4,9
427:2,5,25 430:8
430:25 431:14
433:22 434:4,8
434:14,15,17,23
435:5,16,25
437:6,25 438:10
439:2,15 440:25
441:4,18 442:1,9
442:14,22 444:10
450:8 451:13
453:23 454:5,8
454:11 455:4,10
455:21 456:15,20
457:3,6,8,12,20
462:6,9 463:18
466:9,23 467:20
469:9,14,18
470:2,6 471:17
472:11,20 478:4
478:17,21 479:1
479:4,7 480:6,8
482:20 483:2,23
487:1 488:24
489:10 490:7,8
491:9 497:1
498:8,13 499:11
499:17 500:2,6
500:14,22 501:2
501:4,11 503:23
506:5 507:15
511:4 512:19
513:13 514:3,12
514:24 515:10,12
516:1,13,19
517:12,19 518:8
518:19 520:16
527:16
**proficient** 481:25
514:14
**profits** 390:4,8
**program** 280:23
281:13 287:1,3
290:7 393:15
401:22 416:23,25
417:1 418:7

421:22 422:7,9
433:22 434:4,24
**programs** 287:23
287:25 288:1
314:5 389:21
416:16,20 418:5
434:17 480:8
483:23 504:21
**progress** 491:12
**prohibited** 524:17
**project** 372:11,12
**projects** 371:22
372:9
**prolapse** 280:18
292:19 349:14
**Prolift** 280:19
288:9,17 289:4
292:2,10 303:20
307:11,17 308:1
308:5,24 309:1,8
309:23 310:6
311:1,6,9,15
312:20,23 313:15
313:18 314:2
315:16 316:24
317:5,18,21
324:9 326:1,5
327:10 328:5,24
329:12,24 330:14
330:20 331:9,23
333:13,16,21
340:11 346:15
349:15 350:7,7
350:19 351:1,3
356:10,21,25
358:22 392:17
394:8,11 395:1
418:23
**Prolift+M** 288:19
327:22 332:12
333:14,17,20
**proper** 280:24
318:18 392:25
393:16 442:2
472:13 475:22
477:23,25 478:5

478:14,19 511:25
512:6
**properly** 411:3,7
414:16,23 442:7
453:24 501:12
**proposing** 405:25
**proposition** 390:17
**propounded** 533:8
**Prosima** 288:22
327:22 328:5
336:6,8,13,17
528:22
**prospective** 494:18
**PROTECTIVE**
277:13
**provide** 287:4,13
287:16,16,17
289:20,25 290:9
290:22 314:4,13
319:17 322:14,18
323:23,23 324:4
336:22 379:2
384:7 397:17
411:12,18 414:10
415:7 417:7
418:8 428:24
429:2 430:12
433:2 440:23
442:11 455:2,20
471:2,17 472:4
486:12 504:20
524:10
**provided** 287:21
288:8,16,21
293:10 317:21
319:18 320:23,25
321:2 325:1
340:1 351:7
360:4 397:15,18
397:19,22 398:3
407:23 417:11
423:21 424:6
430:9 431:21,23
432:23,25 439:9
440:22,25 450:8
454:17 455:4

Confidential - Subject to Protective Order

457:12 480:6
481:1 487:2,4
490:12,16
**provides** 287:10,23
287:24 385:6
480:23
**providing** 286:16
334:16 385:9
417:3 469:17
477:6 478:24
493:22 501:15
**PS** 356:21 357:20
371:4 372:11
377:17 378:1
**Public** 277:18
530:19 533:21
**published** 324:5,21
325:17 358:12
**pull** 493:25
**pulled** 430:7
**pulling** 461:17
**purpose** 286:25
287:2
**pursuant** 277:15
**put** 279:3 306:2
317:25 344:13
377:8,9 387:17
391:5 413:16
431:17 443:20
444:2,12 494:18
518:2,18
**puts** 493:16
**putting** 414:23
467:13 475:7
**p.m** 401:11,12
403:19 423:8,8
432:1 468:23,24
502:4,5 529:3
**P.O** 279:19
**P.S.C** 279:18,22

**Q**

**qualified** 436:11
**qualify** 311:24
**quality** 316:8
331:8 338:14
339:22 378:21

**quarter** 483:1
**quarterly** 404:13
405:21
**question** 283:20
288:15 295:12,20
296:6,10,10,11
301:18 304:9
310:4 311:10,13
312:10,17 313:9
313:10,20 315:17
319:24 322:2,7,8
323:2,9,12,12
324:11,17 325:4,9
329:22 342:17
344:3,6 347:8
348:15,18 356:16
357:13 360:13
377:3,7 380:13
380:15 381:4
383:7,13,17
390:15 391:12
404:9 412:25
414:2,19 439:21
439:25 440:2
441:2,14,15,20
442:5,7 447:9,13
451:15,25 455:12
455:14 456:1,4,8
456:9,10,12
458:1,4 467:3,25
468:4 469:13
472:12 473:14
486:23 487:15,17
489:13 496:23
500:16 504:22,25
506:17,19 507:11
510:5,6 518:5
520:11,13 528:20
**questioning**
320:21 323:21
528:16,16
**questions** 285:18
289:14,16 290:2
290:14,24 294:9
294:12 295:6,11
295:14,15,17,25

303:11 305:16
311:11 327:8
337:7 338:18
350:12 353:10
360:25 361:10
362:25 377:14
439:12 444:5
445:16,19 446:11
456:6 499:2
528:18 533:7
**quick** 465:19 468:5
468:18
**quite** 446:1 476:21
522:17 528:23
**quoted** 346:15
350:11
**quotes** 493:16
**Q1** 482:25 484:8

**R**

**R** 532:1,1
**raise** 418:2
**raised** 285:20
316:22 321:16
**raising** 317:3
**range** 281:12
326:14,15 377:6
431:1
**rate** 300:14,18,22
302:10,24 341:21
360:2
**rates** 298:11,22
342:24 343:9
344:10 345:10
356:20 357:3
421:14
**rbaggett@awkol...**
279:6
**reach** 290:1 380:3
**read** 292:11
297:11 298:7
301:19 303:19
305:9 350:2
383:17,19 388:2
388:3 389:16
404:6 413:7
445:20 447:22

452:19 455:13,16
472:16,17,21
485:10 486:14
487:9 492:9
516:25 530:11
531:3 533:5
**reading** 348:11
349:3 404:9
445:22 456:13
458:24 474:11
476:6 484:13
523:8 524:5
525:7
**reads** 466:3
**ready** 445:12
517:3
**reaffirm** 308:3
**real** 467:3,25
**really** 306:9
310:14 315:25
407:4 465:11
**Realtime** 277:17
530:18
**reason** 313:22,24
418:1 430:6
437:22 438:12
443:23 444:1,9
444:15,17,20
449:14 458:14,16
510:23 531:5
532:5,7,9,11,13
532:15,17,19,21
532:23,25
**reasons** 315:11
448:19 510:20
**rebel** 477:14
**recalculated**
486:16
**recall** 316:16
324:15,22 325:12
325:19 327:12
329:12,15,24
330:3,4,7,18
331:24 333:23
334:2,3,8 335:1,4
335:9,12,13

336:18,19 338:17
350:2 354:24
358:5 374:16
379:3,4 394:23
396:9,12 404:10
406:1 408:2,8,9
409:3,5 410:2
426:9 429:5,13
429:15 431:11
432:18,20 444:24
452:17,22 460:10
461:6 462:2,12
462:15 463:21,23
464:18 465:8
466:13 485:22
490:17,18 505:8
508:3,6,10,17,24
509:14 511:14
515:5 518:16
**receipt** 531:12
**receive** 413:23
480:19
**received** 303:11
369:6 382:25
398:20 413:24
458:22 459:2
473:24
**receiving** 402:25
403:1
**recess** 361:15
401:11 423:7
468:23 502:4
**recognize** 434:7
**recollect** 489:9
**recollection** 316:4
426:8 435:2
453:2,4 509:10
517:23 519:24
520:6
**recommend**
478:16
**recommunicating**
309:2
**Reconstructive**
404:18
**record** 284:10,18

Confidential - Subject to Protective Order

284:22 285:4
295:11 296:4,14
328:6 332:9
333:14 360:20
361:13,20 383:20
401:6,9,16 423:5
423:17 431:18
455:17 463:25
468:21 469:3
502:2,8,10,17
503:3,5,9 527:24
528:3 530:7
**recorded** 326:22
**records** 373:5
426:6 428:6,9
429:22
**recruiting** 314:5
397:10
**Rectal** 299:25
**refer** 346:15
375:15 377:2
418:2 473:18
507:11
**reference** 352:24
450:1
**referenced** 490:24
**references** 332:1
**referred** 346:16
348:13 388:25
399:1 497:11
**referring** 325:13
340:16 342:7
348:20,22 389:17
451:12 467:18
483:9
**refers** 331:13
371:21
**refine** 371:18
**refresh** 509:9
**refresher** 315:24
**regard** 303:11
309:25 323:11,13
326:5 329:24
334:7 335:3
336:17 339:15,24
358:19 360:24

469:13
**regarding** 289:14
289:17 293:19
333:12 426:16
**region** 366:21,22
367:1,2,2,3
459:20 485:9
**regional** 286:19,20
363:2,4,8 364:17
366:18 367:4,14
367:17 416:5
484:24 485:1
507:15
**regions** 416:12,13
**Registered** 277:18
530:18
**registration** 422:2
422:5
**regular** 514:5
**regulatory** 338:9
338:14 339:21
378:20 410:18,19
410:21 425:18
429:8 475:15
476:7,10 510:13
**REINA** 278:20
**reinforce** 491:13
492:4
**reinforcing** 492:4
**reiterating** 308:23
**related** 426:18
490:8
**relates** 277:9
500:24 505:23
**relationship** 369:8
495:2
**released** 378:3
**relevance** 454:21
**relevant** 454:24
**relied** 466:1
**relook** 348:15
**remain** 490:12
**remaining** 486:16
486:21 487:12
**remarked** 502:14
**remedy** 518:15

**remember** 293:20
294:5 295:5,9,12
303:12 304:4
316:10,13 326:1
328:25 329:17,20
329:25 330:12
346:21 402:25
403:1 404:9
447:7 508:23
**reminding** 382:24
**removal** 297:16
475:15 476:3,12
**renders** 360:4
**RENEE** 279:3
**rep** 327:4 332:20
370:10 381:13,14
382:8,9,23
436:13,24 438:4
438:18 439:17
440:3,4,9,12,17
440:23 441:10,17
441:19,21 442:16
448:1 449:19
451:2 452:13
454:14 455:2
457:19 458:18
463:15,16 465:10
470:2 476:25
477:15 478:13,19
481:12 493:21
494:11,19 495:2
498:14,22 522:25
523:18 525:25
528:17
**repair** 277:6
280:18 285:1
292:15 293:1
306:25 307:4,19
324:10 346:12
349:13 372:4,9
426:18
**repeat** 322:7 442:4
510:5 520:12
**rephrase** 308:17
308:21 309:11
312:16 313:11

314:17 316:16
324:18 325:23
336:21 337:16
339:4 343:7
344:8 352:17
356:14,15 390:14
391:12 414:1
441:14 496:22
500:16 515:23
**report** 363:9,13,19
**reported** 345:23
348:8,9 352:5
365:12 371:10
372:19,23 416:10
**reporter** 277:18,18
285:5 383:19
455:16 530:18,19
530:25
**reporting** 316:21
364:13
**represent** 285:17
348:5 380:2
432:22 438:24
**representation**
431:13
**representative**
290:4 309:14
325:8 370:7
382:13,15 436:17
438:24 439:8,11
451:11 452:1
455:8,20 456:24
460:11 464:7
467:17 472:18
476:1 521:14
**representatives**
384:16,19 397:12
397:23 399:1,2,5
419:17 420:21
438:13 447:19
**representative's**
454:10
**represented**
378:17
**representing** 278:7
278:12,18,23

279:6,11,11,16
279:21 351:11
438:25
**reprimand** 463:20
464:1,4
**reprimanded**
464:12,19
**reproduction**
530:23
**reps** 380:5,15,19
380:23 381:10,23
381:25 382:17,18
384:1,3,10 397:9
397:17,25 398:2
398:16,20 419:23
420:6,14,16,18
421:1,6 437:1
441:5 442:2,12
452:8 459:5
467:4 468:1
470:14 476:11,21
477:25 478:5
491:13 492:5,17
497:15
**rep's** 441:12
**request** 283:9
426:17 428:24
**requested** 428:25
490:6 530:9
**requester** 429:9
**requesting** 427:19
**requestion** 360:16
361:2
**requests** 360:20
429:6
**require** 298:1
342:11 505:1
**required** 289:3
298:4 302:14
341:6,15 346:12
347:12 348:9
351:9 395:16
443:16 480:5
504:5,8,18
505:15 506:7,21
**requirement**

Confidential - Subject to Protective Order

292:13,15 394:22
395:2 481:22
482:1,5 504:11
505:9,21 506:1
507:7,19,23
508:2,15,18
**requirements**
289:5,11 291:6
292:9 394:9,12
394:15,21 395:2
396:14 479:11
**requires** 328:16
**research** 371:10,13
372:1 373:9
379:18 387:2
389:20
**resection** 298:2,5
341:7,15 342:14
**reserve** 360:24
**reserving** 284:7
**residency** 480:20
**resolution** 282:1
516:5,22,24
517:14
**resolve** 522:18
524:13 526:3,11
**resolved** 525:1
**resort** 400:8
**resource** 439:12
440:13
**respect** 359:11
**respected** 289:8
**respond** 452:22
453:6 458:19
489:17
**responded** 452:25
453:1,5 458:15
**responding** 426:20
426:22 447:23
453:3
**responds** 448:3
474:5 476:19
**response** 412:18
449:4,5 452:12
452:18,23 456:11
471:3 472:4

473:6,12 486:15
487:4
**responses** 472:22
472:23 473:7
**responsibilities**
286:21 307:13
367:13 420:21,24
459:21,25 466:9
**responsibility**
290:17 307:16,18
366:13,18 389:6
389:8 406:15
447:17 459:24
467:6,13 468:3
468:15 470:16
475:22 476:22
477:1,5,23 486:3
**responsible** 307:10
307:19 367:17
398:25 412:23
413:12 414:11
469:16
**responsive** 456:8
456:12 457:2
**rest** 492:9
**restate** 288:15
**restructuring**
364:9,22 427:17
**result** 391:7,18
**results** 280:18
347:20 349:14
358:15 483:1,3
484:8 512:10
513:7,21
**resume** 368:21
514:9
**retracting** 461:16
**retraction** 354:18
355:2,20
**retropubic** 375:15
463:4
**retrospective**
295:2 297:18
299:10,16 301:2
301:10,21 340:12
340:24 345:2

**return** 419:5 496:4
496:18 497:4,11
531:10
**revenue** 372:14
375:3 379:16,16
385:17 386:14,17
386:20 449:12
**review** 338:11
340:8 369:13
405:5,9 407:25
409:12,14 423:21
424:1,22,24
425:4,5,12,23
426:1,6 428:21
433:18 435:5
**reviewed** 339:17
408:19 424:15
435:12,15
**revised** 483:1
518:17,21
**Rick** 279:22
367:12
**Ridgeland** 278:16
**Riedley** 465:6
467:10
**Riedley's** 465:7,7
**right** 297:2,3 307:7
307:14,17,23
308:5 310:18,19
312:24 313:19,22
314:2,23,24
321:3,18 325:1
325:11 328:25
331:11 336:9,24
337:6,13,20,25
338:25 339:17
341:1,5,12,16
342:6,21 343:12
343:15,19 344:15
344:21 345:11,23
346:4 347:3,5,11
347:22 351:7,12
351:17,21 352:1
352:3 354:4,5
357:22 362:9,18
362:21 363:11

364:14 368:4,4
368:18 370:4,11
370:12,14,24
372:15 373:12
374:3,22,25
375:11 376:6,15
382:17 387:15
388:16 390:22
391:2 395:17
396:18,25 397:4
399:17,23 400:2
400:6,14 401:2
402:20 403:15
404:1,4,23 405:2
405:4,7,17,22
406:21 407:2,5
407:14,17 411:4
411:14 413:17,21
413:22 414:6
415:23 416:2,5
416:12 417:9,16
417:23 418:12
419:5,20,24
420:2,7,15,19
421:11,19 422:15
422:19 423:23
424:11 427:21
430:9 432:3
433:10 435:25
436:16,22 438:2
438:10,15,21
446:15,21,25
448:5,9 449:20
449:25 450:25
451:22 452:4
453:7,11,15,17
453:18,25 456:1
458:11,23 459:7
459:10 460:6
461:10 462:14,23
463:15 464:1,5
464:12,12 465:11
465:12,14 466:12
466:17,24 467:14
468:3,10,15
470:10 471:10,14

471:19,24 472:8
473:2,5,7,10,16
474:7,18 475:9
475:12,23 476:14
477:3,11 478:1
478:15 479:19
480:16 481:7,10
482:18,20 485:12
486:1,7,8,9,13
487:19 490:3,24
490:25 491:3
492:23 493:17,24
494:1,5,13,22
495:2,11,14,17
495:20 496:4,6,8
496:14,19 498:6
498:11,17 499:7
499:11,21 500:9
503:18 509:3,6
509:25 510:4,15
510:24 511:5,9
511:16 512:1,22
513:4,8,15 514:2
514:5 515:7,14
516:14,19 520:8
522:10 523:13,22
524:2,16,21
525:3,17,22
526:6,18,22
527:1,9
**rights** 284:2,6
360:24
**Riker** 277:15
278:20
**risk** 335:24 408:25
**risks** 336:2 477:7
**Robert** 521:8,13
**Robinson** 330:17
331:22 499:6
509:2,4,10 517:5
512:12,15
**robust** 317:11
319:18
**ROI** 496:1
**role** 364:2 385:4,8
385:10,13,16

Confidential - Subject to Protective Order

436:3 437:5
447:4 449:3
469:14,14 501:5
510:25
**rom** 491:20
**room** 288:7 290:25
451:9 477:17
524:9 526:9
**Roseland** 278:11
**roughly** 487:11
**round** 380:11,12
**rules** 332:21 362:4
362:8
**runs** 428:16
**Rutgers** 286:1
369:18
**R&D** 371:23
372:19,20,24
373:1,2,4 456:24
457:16

**S**

**S** 280:9
**sacrocolpopexies**
292:23
**sacrospinous**
292:22
**safe** 358:23 379:2
387:3 411:2
420:10 500:13
**safely** 289:10
313:17 315:15
411:13 500:8,19
508:8
**safer** 357:2
**safest** 413:24
**safety** 321:17
323:21 358:16
390:1 391:5
509:12 519:9
**sale** 378:3
**sales** 280:13,15
291:18 306:13
308:3,10 309:2,3
309:14 314:4
315:20,25 370:7
370:7,10 372:13

375:2 378:5
379:12,12,14,16
379:19,23 380:5
380:15,19,23
381:10,13,14,19
381:23,25 382:8
382:9,12,14,17
382:18,23 383:25
384:3,10,15,19
397:9,11,17,19
397:22,24 398:2
398:6,16,20,25
399:2,4,9 402:16
410:23 418:25
419:16,17,23
420:5,14,16,18
421:1,6,8 425:16
436:13,17,24
437:1 438:4,12
438:18,24 439:7
439:11,17 440:3
440:4,9,12,17,23
441:5,10,12,17
441:19,21 442:1
442:11,16 447:19
448:1 449:12,19
451:2 452:8,13
454:13 455:2,8
455:19 456:23
457:19 458:18
470:2,2 475:25
476:11,25 478:5
478:18 481:12
484:24 485:1
517:6 521:14
522:25 523:18
525:25
**salespeople** 379:25
**saline** 461:14
462:3,13
**sample** 491:21
**Sarmini** 316:22
317:3,8
**Sarmini's** 317:4
**satellite** 328:16
400:24

**satisfaction** 429:8
**save** 296:15 492:3
497:16
**saved** 326:22
**saw** 452:13 462:23
463:19 464:22
494:4
**saying** 312:10
319:23 322:25
332:18 354:24
388:23 407:6
451:1 454:3
474:6 482:1
491:6 492:2
524:24 528:6
**says** 297:8,19,25
298:3,10 299:12
304:20 306:5,6
340:17 341:3,10
341:12,13,15,20
341:24 342:6
343:8,14 344:9
344:10 345:9
348:3 350:18
351:3 353:12,20
358:14 370:23
371:11,15 372:3
375:8 378:4
389:11 391:24
397:3 400:10,11
404:24 406:21
413:10,16 451:18
453:14,19 456:18
458:9 459:8
461:11 462:4,16
463:1 464:25
467:25 468:11,13
470:24 471:12
472:2 473:8
474:13,17,20
477:24 478:2
485:2 486:6
487:7 491:4,11
492:21,24,25
493:9 495:10,22

495:24 510:12
512:3,8 514:9
517:15 521:15
522:14 523:5,7
523:10,12,25
524:13,20 527:12
**Scandinavia**
509:21
**scattered** 528:18
**SCHADE** 279:13
**Scherer** 277:15
278:20
**scholarship** 368:7
368:9,11,20,22
368:24 369:1,2
**scholarships** 369:6
**school** 291:8
368:23 369:5
397:19
**schools** 398:6
**Scott** 402:15
**screen** 312:9
**second** 278:10
292:15 305:20
322:8 347:24
348:1 351:1,5
358:20 380:22
407:1 471:6
511:24 512:3
**seconds** 489:25
**section** 347:21
348:12 389:17
404:6 473:19
**Secur** 280:22
282:1 335:6,11
376:14 377:4
393:14 394:3,7
399:19 400:12
498:10 504:2,4
504:11,14 505:2
505:24 506:6,12
506:15 516:5,22
516:24 517:16,21
518:9,25 522:1,5
522:10,21 523:2
523:13,17,19

524:4,8 525:3
526:2,22
**see** 297:2,4,5,9
298:11 299:13
301:12 304:20
305:3,3 312:9
332:2 340:15,25
341:22 342:2,24
342:25 343:19
345:14 347:13,15
347:22 348:3,18
349:3,24,25
351:7,8,23 352:7
352:24 353:19,25
354:1 355:13,18
355:21 356:6
359:23 361:3
373:2,21 377:18
378:6,7 381:14
389:22 396:21,22
400:15 402:13
404:19,20 412:15
412:19,25 413:3
413:4,10,14,19
413:20 416:16,20
419:12 421:14
426:12 428:1,1
432:12,14,17
433:3 434:20
442:18 445:15,18
447:24 449:12
451:6 452:21,21
458:19 459:3,5,8
461:18,19 463:6
464:25 465:21,22
466:5 467:7
470:13 471:4
472:5,6 474:3,8
474:23 475:4,10
475:18 476:20,23
477:17,18 483:8
483:9,18 484:9
485:5 491:14,17
491:22 492:19
493:4,13 495:3,4
495:7,8 496:1,9

Confidential - Subject to Protective Order

503:14,20 505:11
511:20,22 512:4
512:5,11,13
513:10 517:13,17
519:5 521:10,17
522:5,11,23
523:6
**seeing** 315:22
316:22 350:2
431:11 462:2
513:24 515:5
521:16
**seeking** 489:11
**seen** 325:18 346:11
393:22,24 415:19
431:5,6 432:8,16
432:24 433:2,6
433:10,14 452:24
489:18
**selected** 381:12
**selection** 380:17
415:1,4
**sell** 417:16 420:9
420:18 421:10
437:3 438:20,25
505:3 506:22
**selling** 436:16,21
**send** 308:1,18
**sending** 426:16
**sends** 446:17
**sent** 315:25 402:13
406:5,7,14,24
409:17,22,25
426:21 484:7
**sentence** 297:11
358:14
**Sep** 281:4,16 412:7
445:4
**separated** 386:19
**September** 370:23
412:15 446:15
466:16
**series** 280:20
349:16
**serious** 321:16
324:11 356:19

**services** 389:10
405:15 429:12
430:3,16,18
431:10
**sessions** 321:7
398:13 424:7,10
**set** 309:4,13
312:22 313:12,21
314:19 317:17
319:4 480:4
515:8 517:15
**setting** 331:14,15
**severity** 294:3
357:4
**Shannon** 447:23
448:1 453:13
470:10 472:18
473:8,13 474:5
476:1
**Shannon's** 465:4
473:21
**share** 374:22,25
448:19,22 449:11
449:15 514:23
522:16
**sheath** 461:15
475:15 476:3,12
**sheaths** 461:14
462:14 470:22
471:2 472:3
**sheet** 531:6,8,11
533:10
**shined** 528:24
**short** 501:23
503:11
**show** 347:14,15
359:1 362:11
387:8 402:3
412:4 415:10
434:3 440:12
442:2 444:25
477:25 478:5,14
482:8 494:21
498:4 509:15
515:24 520:25
**showed** 316:5,11

316:14 324:10
346:14,20,21
394:9
**showing** 291:14
294:19 297:18
316:6 451:8
**shown** 287:8
330:20
**shrinkage** 354:8
354:11,18 355:2
355:11,17 356:9
360:1
**side** 371:13 461:17
**sides** 321:18
322:12 323:18,23
461:15
**sign** 409:6,7 426:2
530:11 531:7
**signed** 339:19
409:13 476:11
**significance**
456:14
**significant** 351:11
356:9
**signing** 409:3,5
**signs** 422:10 424:1
**similar** 330:25
355:8 394:12
497:18
**simple** 311:10
312:10 479:22,25
480:1
**Simply** 413:16
**simulator** 317:7
393:8
**simultaneously**
366:6,7
**single** 326:23
328:24 414:1
424:11
**sir** 318:11 320:21
332:18 343:24
344:18,18,25
346:18 348:1
352:9 359:8
400:17 492:16

**sit** 308:20 316:4
317:7 322:6
324:15,23 325:12
325:20 326:7,12
326:25 327:12,24
330:13 333:23
334:4 335:13
336:19 338:17
345:13 353:19
355:1 359:24
381:15 384:13
394:5,24,25
396:9 400:19
408:1 426:8
429:5 432:20
443:14 444:15
452:17 454:2
457:5 458:6,13
458:16 461:20
463:24 465:8
480:5 488:10
489:4,9 490:20
491:19 492:5
494:19 501:20
505:25 506:4,19
507:8 508:3
518:16,23 527:4
**Sites** 299:13
413:19
**sitting** 494:11
**situated** 305:21
**situation** 355:8
364:22 520:6
**situations** 517:24
**six** 292:9 309:6
310:7,17 312:19
313:13 316:19
317:1 331:3
**skater** 375:10
**skill** 313:25 316:9
316:23
**skilled** 479:8,17
481:5,7 493:1
513:1,19 514:13
526:18 527:7
**skills** 510:12

**skip** 302:25
**Slater** 278:9,9
280:6 286:4
295:10 296:5,9
296:20,23 298:19
301:8 304:14
305:6,12,17,19
305:25 306:17
308:15 310:13
311:20 312:1,6
312:14 313:3
314:15,16 316:15
317:13,15 318:5
318:25 320:11
322:19,22 323:7
323:16 324:16
325:5 327:14,19
329:2,7,8,18
333:1,11 342:9
342:12,15 343:22
343:23 344:7
346:10 348:21
349:21 352:12,15
352:16 353:2,7
356:13 357:6,12
358:2 359:8,10
359:25 360:10,15
360:19 361:7
362:8 528:14
**slide** 287:9,15
293:20,24 294:20
294:24 297:17
298:14 299:2,20
299:21 300:2,3
300:11,12,15,16
300:19,20 301:1
301:17,20 302:6
302:7,9,18,22
303:14,22 304:12
304:15 305:1
339:11 350:14,15
350:24 351:2
352:10 355:18,21
356:7 359:18,19
359:19,24 425:1
425:2 434:11

Confidential - Subject to Protective Order

435:16
**slides** 298:10,22
299:9
**sling** 443:6 446:24
448:11,25 481:16
481:25 492:11
493:2 498:20
**slings** 292:20
**slip** 314:20 318:2
**small** 345:3
**Smith** 452:18
453:6,9 454:3
456:18 458:8,14
458:17,19 464:24
465:1 467:10
473:6,22 474:5
475:12,25 476:16
476:20
**Smith's** 473:12
**SNOW** 278:14
**soak** 462:10
**soaking** 461:13
462:3
**Society** 437:17,21
**sold** 319:2 320:1
327:16 419:8
442:25
**solely** 383:4
**solution** 465:20
**somebody** 307:9
358:7 365:3
428:15 443:24
460:1
**Somerville** 387:14
387:18
**soon** 528:24
**sorry** 323:10
336:10 342:19
346:22 347:7
350:13 381:2
389:16 390:14
403:16 404:5,8
444:8 458:2
471:5 473:11
512:2 520:12
**source** 442:16

478:22
**sources** 430:7
458:23 459:3
**south** 366:23
**Southern** 277:2
285:2
**space** 450:6 531:5
**speak** 390:25
411:16
**speaker** 401:1
**speaking** 328:10
**special** 328:16
485:7
**specialties** 372:2
**specialty** 291:10
291:12 480:21
**specific** 292:9
293:18 325:13,19
331:5 334:8
389:19 394:20
425:5 480:23
**specifically** 298:3
330:13 331:13
346:4 399:2
**speed** 375:10
515:11
**Speedwell** 277:16
278:21
**spell** 366:11 367:9
**spend** 306:18
353:10 481:12
487:12 524:7
**spending** 492:17
493:21
**spent** 446:8
**spirit** 493:5
**spoke** 392:16
405:6
**spoken** 433:16
528:7
**spreadsheet** 433:5
483:14 486:17
**spreadsheets**
433:3,8 483:6
**St** 306:24 307:3
308:18 315:20

316:20 317:17
522:19 524:14
**stage** 292:17,17
**stages** 472:24
**stale** 430:8
**stamped** 280:14,16
280:21,25 281:1
281:4,7,9,13,16
281:18,21,24
282:2,4 291:19
306:14 349:18
393:17 402:7
412:8 415:14
423:12 433:23
445:5 482:12
497:24 502:22
516:6 521:3
**stand** 354:5 397:6
398:8 428:13
**standard** 392:4
522:2
**standing** 295:19
**stands** 374:2
389:15,25 390:16
**start** 306:1 329:9
329:14,20 330:1
330:4 341:9
428:7 439:24
445:10 470:11,23
481:13 484:25
500:25 521:23
**started** 318:13
369:5 370:3
435:8
**starting** 356:24
480:15
**starts** 446:15
**state** 277:18
366:25 417:5,14
417:19 531:5
**stated** 292:6
338:23 378:12
**statement** 311:1
312:24 319:9
320:8 332:22
492:10

**statements** 473:13
**states** 277:1 285:1
366:22 367:20
406:21 474:21
499:5 504:4,14
508:13
**stay** 483:25
**stenographic**
285:4
**steps** 287:18
392:25 518:16
519:1
**STEVENS** 278:14
**stick** 311:11
342:17 344:3
**sticking** 463:17
**Stipulations**
283:14
**stood** 374:5
**stop** 448:22
**stopped** 410:5,6
**straight** 425:9
**strategic** 370:19,22
370:22
**stratosphere** 359:2
**Street** 278:4 279:4
**stress** 394:19 395:6
396:7 443:1
479:14
**stretch** 473:9
474:6,10,14,16
**strictly** 317:17,24
**strike** 301:18
314:15 317:13
319:21 322:19
342:9,12 343:22
344:5 352:12,15
353:2 359:8,9
364:13 380:9
381:6 382:4
383:3,9 406:24
420:12,23 439:23
444:6 451:14
454:23 455:12
467:1,21 469:20
482:7 486:22

487:13 495:22
497:19 501:21
504:23 506:16
518:4 523:11
**strive** 477:21
**stronger** 495:1
**student** 368:12,23
368:25 369:4
**studies** 350:22
351:4 358:22
359:7
**study** 280:20 295:2
295:8 297:19
299:10,16 301:2
301:11,21,23
302:3,11,16
303:25 304:3
340:12,25 345:3
346:12,21 349:17
351:5 352:5
353:14 354:8
355:16 360:2
467:18
**stuff** 446:7 467:24
**subbullet** 341:17
**subject** 277:13
412:18
**submitted** 425:25
**Subscribed** 533:17
**Subsequent**
368:13 453:22
454:1
**substance** 533:9
**substantive** 528:16
**succeed** 372:5
**succeeded** 368:15
**successful** 348:7
371:18 503:19
**successfully** 365:1
**suffered** 485:9,16
**suggest** 295:21
462:10 469:7
470:3 476:2
**suggesting** 406:3
475:8,16 492:10
**suggestion** 477:10

Confidential - Subject to Protective Order

**SUI** 426:18 522:2
**Suite** 278:5,16
  279:4,14
**suited** 291:3
**summarized**
  358:19
**summarizing**
  355:16
**summary** 303:24
  352:11 360:3,5
**superior** 504:10
**supervision** 530:25
**supplying** 295:23
**support** 283:2
  367:24 379:17,18
**supports** 493:8
**supposed** 310:16
  316:10 319:8
  320:7 384:3
**sure** 288:12 292:12
  308:11 309:14,19
  310:17 313:24
  314:12 318:17
  319:19 321:11
  322:7,9 323:10
  332:25 337:8
  340:5 342:19
  347:19 353:6
  360:22 375:19
  376:10 380:14
  381:2,8 383:8
  392:20 397:8
  405:14 406:15
  413:8 414:11,18
  436:25 442:19
  444:8 446:13
  468:6 473:8
  481:9 491:7
  495:7 500:7
  501:12,25 505:14
  517:2
**surgeon** 288:2,4,5
  288:6,7 289:3,6
  289:18,24 290:3
  290:6,14,20
  292:6 328:10

330:14 335:10
338:13 345:18
352:25 382:12
383:5 385:14,15
392:25 393:1
398:4 417:2
436:3 462:18
463:4 474:21
475:21 477:22
510:14 513:1
**surgeons** 286:23
  286:23,24 287:3
  287:14 289:1,2,2
  289:16 290:1
  291:2,6 293:5,6
  293:10,11,11,16
  294:11,13,17,18
  330:21 333:25
  334:19 336:21
  337:23 339:13,14
  371:24 378:20
  380:2,3,7,20
  384:7 385:7,7,25
  392:14,15 396:20
  397:3,14 411:18
  411:19 412:24
  414:12 415:4,5,6
  417:8 421:16,22
  436:10,11 449:6
  466:1 474:25
  475:17 477:16
  513:19 526:18
**surgeon's** 513:20
**surgeries** 330:8,11
  513:20 514:13,17
**surgery** 290:7
  292:8 297:16
  328:11 331:20
  334:14 335:7
  346:24 347:12
  348:10,24,25
  381:11 382:16,22
  384:20 404:18
  417:23 418:3
  439:9 441:6
  451:21 452:9,14

464:11
**surgical** 287:17
  288:3 298:1,5
  300:1 301:3,11
  301:22 328:11
  341:7,15 342:13
  346:12 367:18,25
  368:1 393:8
  426:17 427:20
  428:17,24 429:3
  429:17,23 430:2
  430:5 431:13
  469:8,9,18 470:4
  470:5 518:18
**surprise** 519:3,16
  519:20
**surprising** 421:11
  513:14,17,18
**sworn** 285:6,10
  530:6 533:17
**symptomatic**
  300:8
**synechia** 355:23
  356:3
**synonymous**
  354:12 355:3
**system** 277:6
  280:22 285:1
  303:20 309:13,20
  309:23 310:8,10
  310:15,16,19,20
  310:24 314:17,18
  315:3,8 317:25
  318:7,16,19
  319:6,11,14,18
  320:4,13,14
  350:7 377:18
  378:2,15 393:14
  415:3 422:2,4,6
  428:11,14,16
  433:14,16
**systems** 428:12
**S-Y-N-E-C-H-I-A**
  355:24

---

**T**
**T** 280:9 401:20

532:1
**table** 351:21,23
  352:18,22 353:12
  354:7 355:10,22
**take** 305:20 317:10
  360:18 361:10
  364:4 404:5
  427:1 445:21
  446:11 451:4,18
  468:5,17 472:24
  489:24 490:1
  491:1 501:23
  513:19 514:17
  515:10 518:2
  519:7,8 520:3
  522:15
**taken** 277:15
  361:15 401:11
  423:7 468:23
  480:21 502:4
  520:2
**takes** 514:12
**talk** 299:1 377:4
  392:16,18 437:2
**talked** 293:4
  399:12 400:1
  401:2 409:15,16
  437:11 451:5
  482:18 527:25
**talking** 307:11
  323:25 377:5
  388:22 404:3
  406:25 409:23
  416:22 449:19,22
  449:23,24 462:6
  465:13 467:17
  470:10 471:8,9
  482:25 483:5,13
  485:12 487:5
**talks** 377:16 448:7
  465:9 470:19
  503:16 510:8
**tape** 373:19 374:3
  442:23,24 443:10
  450:7 451:4,19
  466:4,11 473:14

474:22,22 477:20
**target** 396:20
  397:13 420:1
**Targeting** 280:24
  393:16
**targets** 400:9
**taught** 408:11
**teach** 286:23 287:3
  335:11 378:20
  436:11 522:21,22
  523:2,11,13,19
  524:4 525:2,20
**teaches** 288:6
**teaching** 288:4,5
  289:24 294:17
  330:14 333:4
  334:17 385:14
  392:25 406:20
  436:3,10 526:5
**team** 282:1 301:3
  301:11,22 377:23
  378:11,18,18,22
  378:24 405:6
  425:3,12,24
  499:19 501:15
  516:5,22,24
  517:14 518:2
**tech** 353:10
**TECHNICIAN**
  279:23
**technique** 280:19
  287:17 298:24
  342:24 345:9
  349:16 450:2,4,5
  450:14,23 451:9
  451:12 453:18,25
  454:4,9,15
  456:18 457:11
  458:10 462:18,22
  463:10 469:8,9
  469:18 470:4,5
  470:21 471:1,14
  472:13 473:2
  481:19 518:18,21
**techniques** 442:3
  471:18 475:1

478:1,6,14,20,25
**Technologies**
  277:21 284:23
**technology** 413:13
  414:9
**telephone** 279:1
  452:25
**telesurgeries** 328:3
  333:25 334:9
  335:16 360:21
  400:22 416:19
**telesurgery** 328:13
  328:14,16,21
  330:10,24 331:18
  333:22 335:3
  421:17 422:11,18
**televised** 334:13,14
**tell** 290:19 292:3
  299:23 301:4
  302:19 303:1
  326:12 327:20
  328:24 329:10,11
  329:21 330:1,2,5
  331:23 333:13,22
  334:12 371:20
  374:12 381:22
  408:8 422:23
  429:16 463:9
  488:10 489:4,15
  490:5
**telling** 312:15
  319:21 325:14
  327:7 338:24
  342:4 343:14
  354:1 373:3
  382:21 384:20
  419:22 420:5
  421:6 441:5
  452:8,14 464:10
  475:25 478:19
  522:25
**ten** 452:6 455:7
  461:5 463:23
  510:10 514:10
**Tennessee** 366:24
**tension** 443:2,6,10

443:13,14,16
  465:13 466:4
  467:5 468:2
  470:15 473:14,25
  474:22
**tensioning** 465:25
  466:2,11 467:12
  468:10 470:21
  471:1,10,14
  472:13 473:1
  477:10,11
**tension-free**
  280:19 349:15
  373:19 374:2
  442:23,24 443:7
  450:16
**term** 328:7 376:11
  442:23 443:2
  479:25
**termed** 376:12
**terms** 354:12
  355:3,19 437:8
**territory** 420:22
**test** 466:1 480:21
**testified** 285:11
  325:22,24 363:1
  378:25 405:12
  500:8
**testify** 333:6
  456:22
**testimony** 280:5
  379:3,22 423:22
  456:21 487:20
  490:15 498:21,24
  530:7
**thank** 284:8,16
  294:22 296:19
  297:21 299:15
  301:7,13 305:15
  306:9 340:19
  349:2 359:21
  389:22 393:20
  396:15 401:5
  402:14 413:9
  445:13 468:7
  469:25 471:7

483:15 484:11
  490:21 512:4
  517:4 520:24
**thanks** 340:21
  453:13 485:7
  496:8
**they'd** 439:1
**thing** 296:14
  354:19 382:9
  410:10 413:17,22
  414:6,8 526:7
**things** 292:5
  320:24 336:11
  366:17 371:13
  375:21 379:17
  389:14 395:10,20
  396:5 436:25
  439:3 446:12
  463:17 477:15
  497:2
**think** 295:13,15,16
  295:22,24 298:22
  319:13,22 320:12
  322:4 323:1
  338:15 339:6
  345:15 358:24
  360:16 361:1
  363:1 375:25
  377:1 381:25
  384:23 401:24
  403:5 405:11,12
  406:17 410:6,9
  411:23 420:20
  431:6,9 434:6
  440:11 444:10,14
  444:17,19 450:13
  451:11 454:7,9
  456:9 458:9
  460:2 461:4
  464:11,23 465:5
  475:3 484:13,16
  485:18 487:9
  489:14 526:7
  527:19
**thinking** 458:21
  459:1 495:25

**thinks** 407:16
**third** 292:17 301:5
  302:12,13 416:1
  511:19,24
**thirty** 531:12
**thought** 286:15
  289:8 323:3
  365:11 371:16
  443:24 448:7
  457:1
**thoughts** 497:14
**thought-out**
  313:16
**three** 298:10,22
  299:9 305:9
  332:5 367:6
  459:19 519:4,7,8
  519:21 520:2,3,5
  520:14
**till** 301:14
**time** 284:7,24
  295:18 308:24
  317:21 329:11
  332:5,17 334:23
  358:1 361:11,18
  364:2,10,24
  370:9 375:6
  376:24,25 377:25
  378:17 397:12
  401:7,14 402:17
  402:23 403:6,9
  403:11 404:10
  407:3,9 410:5,7
  411:25 413:6
  423:4,16 424:16
  429:4,18,24
  435:7 436:22
  438:2 445:22
  446:7 447:1,16
  447:17 459:10,12
  459:18 460:8,13
  460:20,22,24
  461:5,18 465:7
  468:19 469:1
  476:8 480:4
  485:24 486:12

488:4,23 495:20
  498:9 501:5
  502:1,7 503:2,8
  504:15 506:14
  509:8 512:16
  513:24 514:6,16
  516:2,16 524:7
  527:21 528:13
**times** 305:1
**tissue** 300:8 324:10
**title** 301:8,19
  302:7,18 303:5
  303:19 350:2
  371:11,12 372:24
  416:9
**today** 311:11 316:4
  317:8 322:6
  324:23 325:12,21
  326:8,12,25
  327:13,25 330:13
  334:4 335:13
  336:19 338:17
  345:13 353:19
  359:24 373:3
  379:6 380:12
  381:15 384:13
  394:5,24,25
  395:12 396:9
  400:19 405:13
  408:2 426:9
  429:5 432:21
  443:14 444:15
  452:17 454:2
  456:7 457:5
  458:6,13,16
  461:20 463:24
  465:8 489:9
  490:20 501:20
  505:25 506:4,14
  506:19 507:8,20
  507:23 508:3
  518:17,24 527:4
**today's** 284:23
  364:23
**told** 308:11 313:8
  331:20 335:4

Confidential - Subject to Protective Order

| | | | | |
|---|---|---|---|---|
| 336:11 357:18,25 | 315:2,6 318:20 | 413:22 414:10,21 | **transvaginally** | 357:1 372:12 |
| 358:4 438:5,8,9 | 319:3,8 320:1,6 | 415:4,5,7 417:22 | 480:13 | **TVT** 280:22 |
| 439:16,16 444:12 | 320:13 321:15 | 422:24,25 424:6 | **travel** 290:25 | 281:13 282:1 |
| 457:1 522:8 | 323:20 331:8,9 | 424:10 426:17 | **traveling** 385:11 | 288:24,25 289:12 |
| **Tom** 363:17,18 | 337:2,4,8 385:25 | 427:20 428:2,18 | 385:12 | 327:21 328:3,5 |
| 366:10 465:6 | 386:1 398:7 | 428:25 429:3,17 | **travels** 288:2 | 334:7,9 335:3,6 |
| **tool** 420:6,9,10 | 399:5 414:16,23 | 429:23 430:2,5,7 | **treat** 292:19 | 335:11 366:14 |
| 421:7,9 | 419:8,9 453:24 | 430:12 431:13 | 313:18 337:5 | 367:22,25 371:6 |
| **top** 281:1,3,8,15,18 | 501:12 | 433:9 435:18,20 | **treated** 348:6 | 373:20,24 374:2 |
| 281:20 304:21 | **trainee** 289:18 | 439:23 440:2,6 | 394:18 | 374:13,17,21 |
| 345:22 402:6 | **trainees** 400:6 | 440:18 441:19 | **treating** 292:17 | 375:5,14,23 |
| 412:7 423:11 | **trainer** 289:4 | 442:10 454:17 | 395:6 396:7 | 376:1,3,7,7,12,14 |
| 434:20 445:4 | 290:8 370:7 | 480:5,14,19,22 | 481:15 522:2 | 376:17,19 377:2 |
| 458:25 470:12 | **trainer's** 290:16 | 480:25 481:24 | **treatment** 417:6 | 377:2,5,8,9,17 |
| 482:11 483:11,12 | **training** 287:4 | 483:22 484:1,3 | 417:14,20 418:5 | 378:1 380:17 |
| 497:23 525:16 | 288:8,14,16,21 | 491:13 492:1 | 418:6 443:1 | 381:11,20 382:7 |
| **total** 342:5,20 | 289:19,20,21 | 493:23 496:14,18 | 479:14 | 392:18,19 393:14 |
| 343:3,15 346:3 | 290:6,10,14,20 | 499:14,15,20,25 | **trial** 284:7 | 394:3,6,13,16 |
| 346:24 348:23 | 291:2 293:3,6 | 500:12,18 501:8 | **trick** 449:25 451:2 | 395:2,12 398:16 |
| **totaled** 346:25 | 294:14,15 308:9 | 501:14 503:18,24 | 451:21 | 399:18 400:12,13 |
| **tougher** 471:2 | 310:6 311:9 | 503:25 504:3,10 | **tried** 317:10 429:6 | 400:16 401:25 |
| 472:3 | 314:6,6,7,10 | 504:12,13,21 | 487:1 488:24 | 402:23 408:7 |
| **track** 354:21,23 | 315:23 316:9 | 505:2,9,16,24 | **true** 311:1 312:23 | 412:18 414:10,16 |
| 421:21 422:19 | 317:5,6,19 | 506:7,15,21 | 319:9 320:8 | 418:9,22 422:22 |
| 424:11,14 430:1 | 318:12 319:5 | 507:20 508:7,11 | 390:21 400:20 | 427:20 431:14 |
| 430:4 | 320:2,3 321:7 | 508:21 509:12 | 513:16 519:17 | 433:9,21 434:4,8 |
| **tracked** 421:24 | 328:19 331:6,6 | **trains** 289:1 | 530:6 | 434:18,23 436:19 |
| **tracking** 418:25 | 331:11,12,14,18 | **transcript** 327:1 | **try** 333:10 | 442:8,8 448:19 |
| **traditional** 451:3 | 333:22 334:8 | 512:8 530:12,23 | **trying** 334:3 | 451:2,4,6,18 |
| 463:6 | 335:2,16 336:12 | 531:13,14 | 338:14 345:16 | 458:22 459:2 |
| **train** 289:2 290:8 | 336:17,22 337:20 | **transcription** | 383:14 418:1 | 462:19 465:25 |
| 382:1 392:9 | 340:2 378:5 | 533:6 | 439:8 446:6 | 466:3 467:5 |
| 395:16 411:3,7 | 379:2 380:2,6,8 | **transcripts** 360:22 | 454:10 456:6 | 468:2 470:15 |
| 420:10 438:5,8 | 380:16,19,20,24 | **transfer** 435:24 | 464:24 465:11,23 | 479:10,11 480:10 |
| 438:19 479:8,9 | 381:1,10,23 | 436:1 | 467:9,12 468:8 | 483:6,17 486:21 |
| 479:12 486:9 | 382:8,11,15 | **transmission** | 477:15 486:7,8 | 490:9 498:9,10 |
| 488:5 492:6,22 | 383:5 384:4,8,10 | 328:9 | 487:18 488:7 | 498:11,16,23 |
| 494:5 497:15 | 385:7,9 387:2 | **transmitted** | 490:25 523:18 | 499:16 500:20 |
| 498:15,22 499:2 | 392:14,21,24 | 328:14 330:9 | **turn** 303:18 350:9 | 501:8 504:2,4,10 |
| **trained** 291:6 | 393:3,3 394:6 | **transmitting** | 351:19 374:24 | 504:14 505:2,17 |
| 308:4 309:8,15 | 396:23,25 397:11 | 328:17 335:6 | 403:7 434:19 | 505:23,24 506:5 |
| 309:23 310:6,18 | 397:16,18,19,20 | **transobturator** | 491:11 511:18 | 506:12,15 507:5 |
| 310:22,25,25 | 397:21 398:4,5,7 | 376:6 448:12,24 | **turned** 449:11,15 | 507:16 510:4,19 |
| 311:6,15 312:20 | 398:13,16,17,25 | 449:7,17 | **TVM** 295:2 297:18 | 511:12 512:18 |
| 312:23 313:15 | 399:2,9,13,17 | **Transvaginal** | 299:10 302:8 | 514:14 515:13 |
| 314:1,12,20,23 | 411:1,12,18 | 280:17 349:13 | 340:12,24 345:2 | 516:5,21,24 |

518:25 522:1,10
522:21 523:2,13
523:19 524:4,8
525:3 528:17,22
**TVTO** 453:15
**TVT-AA** 376:9
**TVT-like** 498:20
**TVT-O** 334:14
371:6,7 376:5
377:3 378:15
418:22 421:14
446:21,24 447:2
447:6,12,15
448:5,15,23
449:4,16,24
450:6,7 451:21
453:15,25 456:21
458:11 459:15
461:10 466:10
472:11,13 473:24
473:25 498:10,16
507:17
**TVT-Os** 491:14
492:22
**TVT-S** 376:14,23
377:4 428:2
498:16 506:22
508:7,11 509:12
**TVT/SUI** 281:11
430:25
**two** 303:1 305:8
326:14 328:15
341:18 356:24
357:15 367:7
368:12 377:21
396:5 459:19
484:15 497:10
502:13,15 524:7
524:17 525:2
526:17 527:7
528:9
**Two-and-a-half**
515:21
**type** 288:8,16,21
298:10,21 302:24
303:3,8 328:4,17

331:12,14 343:9
344:9 355:8
371:21 392:4
434:7 442:16
471:22
**types** 287:22,25
293:1 320:22
321:2 334:5
345:16,17,19
392:18 397:14
401:21 409:19
410:14 480:10
497:18
**typical** 359:6,12,16
**typically** 398:10
480:9
**T-1045** 332:11
333:14
**T-1047** 296:18,20
298:17
**T-1054** 280:15
306:8,12,21
**T-1055** 280:17
349:5,12 351:15
**T-1056** 280:22
393:11,13
**T-1057** 281:1
402:5
**T-1058** 281:3
412:6
**T-1059** 281:6
415:12
**T-1060** 281:8
423:10
**T-1061** 281:11
430:24
**T-1062** 281:13
433:21 434:3
**T-1063** 281:15
445:3
**T-1064** 281:18
497:22
**T-1065** 281:20
482:10
**T-1066** 281:23
502:20 509:15

**T-1067** 282:1
516:4
**T-1068** 282:3
444:25 521:2
**T-15** 387:9

——————
**U**
——————
**Uh-huh** 304:24
**ultimately** 345:20
475:21
**unable** 400:9
**uncommon** 364:23
**undergo** 481:23
505:2,16 506:7
507:20
**understand** 332:20
338:22 339:6,11
348:20 362:6
399:22,25 423:21
429:6 472:17
479:3 481:18
487:10 529:1
**understanding**
308:22 322:17
332:7 351:13
355:6,7 374:13
374:14 375:20
382:10 384:18
390:24 405:24
406:4 429:22
430:11 431:15
432:9 433:11
436:6,14 437:1
438:11 441:24
443:5,12 444:3
449:2 454:11
455:6,8 476:6
492:8 497:7
498:18 501:1
507:23 519:13
520:21 524:12
526:10,12
**understated** 483:8
**understood** 322:7
397:5,9 438:17
**undertake** 435:5
435:18

**unfair** 398:23
**unfavorable**
323:20
**uniform** 471:3
472:4
**unit** 375:2 449:11
**United** 277:1 285:1
406:21 499:5
504:4,14 508:12
**units** 419:8,8
**University** 286:2
**update** 453:13
**updated** 430:6
**urethra** 443:7
450:7,17 466:5
**urinary** 394:19
395:6 396:7
443:1 479:15
**urogynecologic**
292:8 437:20
**Urogynecological**
437:17
**urogynecologist**
479:19
**urogynecologists**
371:24 394:18
479:13
**urogynecology**
289:7 291:13
314:8 371:17
**urologic** 292:8
**urologists** 371:24
394:17 479:13
**urology** 279:11
281:6 289:6
291:13 308:3
314:9 365:7,23
371:16 415:14
**use** 287:3,16
292:18,20 306:8
315:16 355:9
377:12 379:2
382:1 386:3
389:10 390:11
394:10,17 398:16
409:13 411:2,7

411:19 412:24
414:12,16 417:8
417:12 418:8
420:6,11 421:7
428:18 429:4
438:6 439:3,13
439:18 442:15
454:6 463:18
469:7 470:4
472:20 475:2
480:24 491:21
498:23 500:13,19
504:7 510:4
524:12
**user** 332:12 333:5
**uses** 462:18
**usually** 428:4
**uterine** 298:24
341:21 483:7
486:21
**utilize** 292:24
386:1 440:15
478:16
**utilizing** 386:2
393:1 449:7

——————
**V**
——————
**vacancy** 485:18,23
**vaginal** 280:19
292:18 295:6
297:23 298:4
300:8,9 340:17
341:4,8,10
349:15 355:23
356:3 373:19
374:3 442:23,24
**valuable** 494:25
**variation** 454:21
456:14 457:15
**variety** 291:1
302:15 346:16
510:20
**various** 407:23
**venture** 372:4
**venues** 332:8
**version** 362:16
434:23 442:19

Confidential - Subject to Protective Order

**versus** 328:17
331:10
**viability** 387:1
**video** 284:14
326:22 328:8,11
328:12 335:6
428:2,18,21
430:6,7,12,13
450:9 454:8
457:12
**videographer**
284:21,23 361:11
361:18 401:7,14
423:4,16 468:19
469:1 502:1,7
503:2,8 527:21
**videos** 287:18
334:14 360:21
397:24 398:1,2,3
426:18 427:20
428:25 429:3,17
429:23 430:2
431:13 435:12
442:14
**VIDEOTAPE**
279:23
**videotaped** 277:14
326:21
**view** 479:1,3
**viewed** 422:25
**Virginia** 277:2
285:2
**Visceral** 303:6,7
**visit** 385:11
**vitae** 362:21
**voiced** 315:21
**voiding** 304:5,7,9
304:12,16,25
305:13 354:1
**VOLUME** 277:12
**vs** 284:3

**W**

**Wacker** 279:14
**wait** 301:14 323:6
**Walji** 412:14
**walk** 387:20,22

445:11 446:5
**wall** 387:17
**want** 290:8 296:5
296:13 299:1
300:23 305:20
306:9 321:13,17
334:1 336:5
343:24 344:2
349:1 350:11
380:13 385:25
389:18 396:21
423:22 425:4
428:1 431:18,19
445:21 456:3
471:21,23 481:4
494:1
**wanted** 306:9
311:7,16 352:25
368:24 375:19
399:21 424:19
442:18,18
**wants** 289:19
320:20 472:25
525:1
**warranted** 297:15
**wasn't** 304:9 332:6
332:16 339:1
349:9 358:1
364:2 398:21,25
404:22 418:10
434:14 440:16
441:3,7 447:9
451:15 455:11
461:2 486:23
487:2 489:13
518:5 524:19
**watch** 290:7 331:3
**watching** 330:23
331:17
**Watson** 431:24
**way** 301:6 311:19
321:21 324:25
333:14 348:7
356:15 381:22
385:3 398:23
399:6,7 404:15

406:9 409:1
417:10 449:14,18
452:22 453:1
456:22 458:12
463:12 464:4
465:17 468:14
475:2 477:15
493:23 494:5,8
495:18 511:17
**ways** 291:1 398:11
441:11 495:25
**web** 328:15 418:8
**webcast** 327:1
328:4,7,8,24
329:10,11,23
330:9,23 331:10
331:17,25 332:8
**webcasts** 288:13
326:1,4,23 327:9
327:15,23 328:2
328:21 331:10,12
331:21,24 333:4
333:12,21 334:8
335:2,5,15
336:12,16 339:24
339:25 340:1
360:21 401:2
**website** 428:10
**week** 432:18,20
521:16
**weeks** 449:24
**weighs** 407:12
**welcome** 444:4
**well-designed**
371:18
**went** 319:15
350:15 362:9
364:8,22 368:3
368:13,23 370:13
409:13 411:11
421:16,17,18,18
421:22 422:24,24
427:3,11,13
437:16 452:10
464:8 473:21
519:3 520:7,15

**weren't** 332:18
357:15 504:17
**Wess** 426:22
**Wess's** 426:23
**West** 277:2 285:2
**western** 366:24
**we'll** 284:13 323:7
383:12 452:20
467:24 472:23
527:19 528:23
**we're** 284:15
307:10 311:11
323:25 327:4
349:6 360:20
361:1,2,4 388:22
389:18 393:9
401:8 423:5
469:5 470:12
484:13 487:10
491:7 503:3
**we've** 293:4 318:12
339:16 340:13
401:18,21 431:21
446:8 452:9,23
502:13 517:9
**white** 462:19
**widely** 374:9
**willing** 333:10
**win** 369:2
**withdraw** 307:21
324:17
**Withdrawn**
309:12 316:17
337:17
**WITKIN** 278:3
279:3
**witness** 278:18,24
283:5 285:6
295:14 296:12
301:12 304:15
305:13 308:14
310:12 312:4
313:1 316:13
318:4,23 320:10
322:20 323:10,15
324:14 325:3

327:12,18 329:17
332:24 333:9
342:10,13 346:9
348:17 352:13
353:6 356:12
357:10,24 359:21
360:8 361:2
381:2,5 383:4,22
386:10 391:23
393:20 401:4
411:6,16 415:1
432:6 433:1
438:23 443:5,12
444:14,19 445:25
446:13 449:2
450:13,22 451:24
454:20 455:19
458:2,5 462:25
465:16 466:19
467:16 469:12
473:18 476:5,16
478:8 479:24
480:18 482:4
487:23 488:19
489:8 492:8
493:13 496:22
497:7 500:24
501:23 507:3,10
507:22 508:17
512:13 513:10,23
515:2 519:12,23
520:19 523:24
524:23 525:5,12
527:3,11,18
530:5,7,10 531:1
**woman** 390:7
481:14
**woman's** 480:12
**women** 279:16,17
394:18 480:15
519:9
**Women's** 281:6
308:2 365:6,23
367:21,23 415:13
**won** 368:11
**wonderful** 319:22

**word** 341:10
375:14 504:7
522:11
**wording** 467:17
**words** 293:24
294:2 338:23
356:6 439:21
443:9 446:23
450:13,21 491:6
492:19 493:4
499:23 512:14
513:11 523:8
**work** 307:15
310:24 337:23
357:19 368:3
387:14 417:13
440:14 526:9
**worked** 319:14
320:5,15 369:11
369:13,20 371:22
371:23,23 372:9
378:22 403:5
411:22
**working** 339:5
372:11 374:15
514:7 515:2
526:4
**works** 307:14
**world** 513:4
**worldwide** 363:3
363:10,12,20,24
364:19,25 365:4
365:13,22 367:16
427:2
**worth** 480:14,19
481:24
**wouldn't** 314:20
318:1 321:13
357:10 364:20,21
385:20 386:2,10
386:23 397:6
417:10 440:8
457:2 460:1
464:21 478:8
519:21 525:12
**write** 308:16 361:1

**writing** 434:20
443:21 444:2,12
475:8
**written** 306:24
308:8 315:20
403:6
**wrong** 345:24
346:18 382:14,20
454:13 455:2
463:14 478:13,18
520:8,16
**wrote** 362:17
378:25

**X**

**X** 280:2,9

**Y**

**yeah** 289:24
297:10 306:4
322:3 328:11
398:10,24 433:1
446:1 484:15
510:7 518:1
525:18
**year** 316:24 332:5
363:7 364:5
427:14 485:9,17
**years** 286:13
294:13 318:14
325:18 356:24
357:15 369:25
370:2 372:6
374:18,20 395:22
395:24 396:1,3
403:11 410:3
455:7 461:5
463:24 510:10
514:10 515:21
516:15 519:4,7,8
519:21 520:3,3,5
520:14 525:19
**yesterday** 284:2
306:8 316:5,11
316:14 332:4
350:3 354:15,17
354:22,24,25

362:2 378:25
380:12
**yes-or-no** 311:10
**York** 279:9,9
366:25

**Z**

**Zenobia** 412:14

**$**

**$100** 372:14
**$50** 373:19

**0**

**01** 370:23
**02364** 351:21
**03** 370:23 373:12
**06** 281:3 412:7
**06.18.08(10-4pm)**
281:24 502:22
**07068** 278:11
**07962** 278:22
**08** 281:9 423:11

**1**

**1** 291:15 343:3,11
344:11 361:12
367:2
**1/22/07** 282:1
516:6
**1:24** 403:19
**1:39** 423:8,17
**10** 465:24
**10:00** 432:1
**10:01** 277:17
284:24
**100** 512:9 513:6,19
514:13,17
**1000** 279:14
**10016** 279:9
**1020** 278:15
**103** 278:10
**1052** 316:18
**1056** 401:20,23
**1057** 402:3
**1058** 412:4
**1059** 415:10

**1060** 426:11
**1061** 430:22
**1062** 445:1
**1063** 482:8 502:14
**1064** 498:4 502:13
503:12
**1064s** 502:13
**1065** 502:12,14
**1067** 515:25
**1068** 521:8
**1069** 444:25
**108%** 483:18
**11:19** 361:12,15
**11:34** 361:16,19
**110** 351:6
**110-patient** 360:2
**12** 297:13 465:24
**12th** 403:19
**12:17** 401:8,11
**12:25** 401:12,15
**12:51** 423:5,8
**123** 362:13
**127** 294:21 297:19
340:10,23
**128** 300:24
**13** 281:21 482:11
484:9
**1400** 278:16
**1439** 279:19
**15** 326:20 327:9
**156** 409:16
**16** 281:15 445:4
**17** 278:4 279:4
355:12 360:1
525:19
**18** 355:12
**1985** 368:10
**1998** 434:13,15
435:1

**2**

**2** 361:19 401:8
434:6
**2.8** 352:20 353:13
**2:35** 468:20,23
**2:46** 468:24 469:2
**20** 279:14 318:14

**487:11** 533:18
**200** 278:5 279:4
**200-plus** 510:9
514:10
**2001** 370:19
371:22 436:12,17
**2002** 408:9
**2003** 281:4 370:19
370:20 371:22
374:1 408:10
412:7,15
**2004** 281:16
334:15 445:4
446:15 452:5
453:4 466:16
475:13
**2005** 281:21
294:23 330:8
331:21 334:15
335:1 350:17
374:1 411:24,24
435:9 482:12
484:10 485:19,22
486:4 516:14
**2006** 280:14,16
281:18 291:19
306:14 307:1,23
330:8 331:21
349:25 415:25
497:23 498:6
503:13 506:14
508:24 509:8
**2007** 282:3 316:6
316:19 317:9
350:6,18 515:25
516:11 521:3,9
522:8 527:6,16
**2008** 512:8 515:4
**2010** 324:5,21
325:17 515:10
519:4,14
**2011** 281:1,9 402:6
402:19 423:12
426:14
**2013** 277:11
284:24

Confidential - Subject to Protective Order

**202-1010** 278:6
  279:5
**21** 343:3
**212** 279:10
**22** 286:13 370:1,2
  515:25
**228-9898** 278:11
**23** 280:14,16
  281:18 291:19
  306:14,25 307:23
  369:25 497:23
**2327** 277:5
**24** 341:25
**25** 281:1 295:7
  297:15,25 298:3
  340:18 341:4,7,8
  341:11 342:5,8
  342:21 343:3
  345:21 346:4,12
  346:24 348:1,22
  348:23 402:6
**277** 299:17 346:20
  533:5
**2797** 297:1
**285** 280:6
**286-8585** 279:10
**29** 316:18
**291** 280:13

**3**
**3** 292:17 343:3
  351:22 401:15
  468:20
**3-5** 522:17
**3:24** 502:2,4
**3:37** 502:5,8
**3:38** 503:3
**3:39** 503:9
**30** 282:3 489:24
  521:3 531:12
**30(b)(6)** 277:14
**30-foot** 312:9
**30-50** 292:14
**305** 280:6
**306** 280:15
**312** 279:15
**32502** 278:5 279:5

**33** 343:11 344:10
  345:14,21,22
**34** 297:13 298:15
  343:15,19 344:14
  344:20 345:5,25
  346:1,11,24
  348:1,22,23
**349** 280:17
**35** 326:14
**361** 280:7
**39157** 278:16
**393** 280:22

**4**
**4** 281:12 292:17
  377:16 431:1
  469:2 527:22
**4.7** 353:21
**4:05** 527:21 529:3
**402** 281:1
**412** 281:3
**415** 281:6
**41502** 279:20
**423** 281:8
**430** 281:11
**432-0400** 279:20
**433** 281:13
**444-2470** 279:15
**445** 281:15
**45** 481:12 491:19
  492:6,17 493:21
  494:12,20
**482** 281:20
**497** 281:18

**5**
**5** 292:16 412:15
**50** 522:3,9 523:16
  526:3,20,25
  527:9
**502** 281:23
**505** 470:12
**516** 282:1
**521** 282:3
**534** 533:6
**538-0800** 278:22

**6**
**6** 277:11 284:24
  351:21 352:18
  353:12 354:7
  355:10,22 416:15
**601** 278:17
**606** 279:20
**60606** 279:15

**7**
**73** 346:13,16,25
  347:11,13 348:2
  348:9,19,20,23
  348:24 349:3
**73-point-someth...**
  347:23

**8**
**8** 426:14 465:24
**81** 487:10
**81%** 483:17
**850** 278:6 279:5
**864505** 470:13
**877.370.3377**
  277:22

**9**
**9** 297:16
**9.2** 341:11
**928** 434:19
**948-5711** 278:17
**973** 278:11,22
**99** 279:9