EXHIBIT I

Confidential - Subject to Protective Order

```
 1              IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2                      CHARLESTON DIVISION
 3
 4   _____
 5   IN RE:  ETHICON, INC.
     PELVIC REPAIR SYSTEM,
 6   PRODUCTS LIABILITY LITIGATION       MDL NO. 2327
     _____
 7
                 THIS DOCUMENT RELATES TO ALL CASES
 8
 9                           *******
10       CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
11
12
13              VIDEOTAPED DEPOSITION OF
                    CHARLOTTE OWENS, M.D.
14
                           VOLUME 1
15
16
                       Atlanta, Georgia
17
18             Wednesday, June 19, 2013
19
20
21
22
23   Reported by:  MICHELLE M. BOUDREAUX, RPR
24   Golkow Job No. 66788
```

Confidential - Subject to Protective Order

 1    A    So at that time, the medical director was
 2    responsible for contributing to the development of the
 3    devices that we were going to bring to market.
 4    Q    In what way?
 5    A    Providing either direct or indirect medical
 6    support.  What I mean is either giving information back
 7    based on our own background experience or after working
 8    with consultants and key opinion leaders, who may be
 9    experts in the field.  We would also review product
10    complaints.
11         We would also work with the sales and
12    marketing team to develop information that would
13    educate them on the product and the use of the product.
14    We would contribute to the development of what we used
15    to call IFUs, instructions for use, patient brochures,
16    kind of like the in-house medical person to help with
17    issues that required an MD's attention.
18    Q    So you had to be copied on a lot of emails.
19    You were covering a lot of different facets within the
20    organization.
21    A    From time to time.  You know, sometimes they
22    would have a discussion prior to bringing you in,
23    depending on what the situation was.
24    Q    Look, I've seen your travel schedule.  Your

Confidential - Subject to Protective Order

1    contribute, but again, I don't want to give the
2    impression that all of this was on one person.
3         Q    No, but you were asked to contribute?
4         A    Correct.
5         Q    Okay.  So that would be professional -- when
6    you say "education," that's what you mean, professional
7    education?
8         A    But also to the sales force and, you know,
9    others within the company.
10        Q    So you helped with marketing?
11        A    Yes.
12        Q    Okay.  IFU product development is what I
13   wrote down.  Is that --
14        A    Yes.
15        Q    And marketing, which is the -- providing the
16   education to the sales force?
17        A    Yes.
18        Q    Anything else, or is that the big categories?
19        A    I think those are the big categories.
20        Q    All right.  So you also provided information
21   to the regulatory agencies or to the -- well, to the
22   regulatory agencies for new products that you were
23   bringing to the market, correct?
24        A    Yes.

 1   using the hammock style, and half are performing it in
 2   the U-style, the obturator style.  Do you follow me?
 3        A    I don't recall that at all.
 4        Q    All right.  That's just awful, awful.  I'll
 5   get back to the training question.
 6        A    Okay.
 7        Q    Now, did you validate -- did you participate
 8   in validating -- participating in validation studies
 9   for the IFU?
10             MR. BROWN:  Objection.
11        Q    (By Mr. Keith)  In regards to the TVT-Secur?
12        A    So for the IFU, the -- you know, the
13   instructions for use were based on a lot of different
14   things, not just a study, but pretty much the design of
15   the product, key ways to use the device that would
16   enable the practitioner to place it as it was, you
17   know, intended to.  So that may or may not be
18   associated with a validation study.
19        Q    All right.  So here's my understanding, you
20   have an IFU --
21        A    Yes.
22        Q    -- okay?  Did you participate in drafting
23   IFUs while at Gynecare?
24        A    Yes.

Confidential - Subject to Protective Order

```
 1      Q    What products?
 2      A    I remember Prolift.  I do not believe I was a
 3  part of the TVT-Secur, nor the TVT Obturator.
 4      Q    All right.  So we have a draft of an IFU,
 5  Gynecare has come up with this, and then my
 6  understanding is we've got to validate this IFU, this
 7  instruction for use, and that's what that stands for,
 8  that the doctors can actually read that and then
 9  complete the procedure based upon the reading of the
10  IFU.  Do I understand that correctly?
11      A    You do.
12      Q    Okay.  And the validation study, that's what
13  that's for?
14      A    Correct.
15      Q    Okay.  All right.  So your memory is you
16  don't believe you did any of that in regards the
17  TVT-Secur?
18      A    Or the TVT Obturator.
19      Q    Okay.  The only one that you may have
20  developed protocol for was the Prolift?
21      A    Correct.
22      Q    Okay.  What about clinical expert reports,
23  did you -- was that part of your responsibility?
24      A    Yes.
```

Confidential - Subject to Protective Order

```
 1   requirement around the world for you to submit your

 2   protocols to institutional review boards or ethics

 3   committees, whose primary focus is on the safety of the

 4   patient.

 5        Q    Was ethics something important to you?

 6        A    Absolutely.

 7        Q    Okay.  Was it important to you during your

 8   time at Gynecare?

 9        A    Absolutely.

10        Q    Still important to you?

11        A    Absolutely.

12        Q    Okay.  Was safety your first responsibility

13   as the medical affairs director?

14        A    Yes.

15        Q    Okay.  Did you -- as medical affairs

16   director, was your first priority to ensure the safety

17   of the patient and protect the patient?

18        A    Yes.

19        Q    Okay.  Now, you also, as part of your

20   responsibilities, if I understand correctly -- you

21   called it something else.  I call it defense of device.

22   I can't remember what you called it, review product

23   complaints.  Part of your responsibility was to defend

24   the devices or complaints against the device that were
```

Confidential - Subject to Protective Order

```
 1    lodged by patients or doctors, correct?
 2          MR. BROWN:  Objection.
 3          THE WITNESS:  I'm not sure I like the
 4    term "defend."
 5          MR. KEITH:  I didn't figure you would,
 6    but I -- but it is what it is.  But you were
 7    responsible --
 8          THE WITNESS:  For reviewing --
 9          MR. KEITH:  -- for responding to
10    accusations against the company that were
11    lodged by either patients or their doctors?
12          MR. BROWN:  Objection.
13          THE WITNESS:  My -- I wouldn't even say
14    people accused or made accusations.  What
15    would happen is we might hear of an -- of an
16    adverse event, we might be informed in
17    writing of an adverse event, we may see in
18    literature that there were adverse events,
19    and then we would evaluate whether or not
20    they were attributable to the device or some
21    other factor.
22       Q    (By Mr. Keith)  Dr. Owens, to be fair to
23    me --
24       A    Right.
```