EXHIBIT R

Confidential - Subject to Protective Order

```
1              IN THE UNITED STATES DISTRICT COURT

2        FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

3                    CHARLESTON DIVISION

4            Master File No. 2:12-MD-02327

5     * * * * * * * * * * * * * * *

6     IN RE:  ETHICON, INC. PELVIC * MDL 2327

7     PRODUCTS REPAIR SYSTEM       * Joseph R. Goodwin

                                    U.S. District

8     LIABILITY LITIGATION         * Judge

9     * * * * * * * * * * * * * * *

10          THIS DOCUMENT RELATES TO ALL CASES

11       AND VARIOUS OTHER CROSS-NOTICED ACTIONS

12

13     CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

14

15     VIDEOTAPED DEPOSITION OF CHERYL H. BOGARDUS

16     The Executive Center at Exchange Place, LLC

17                   21 W. Main Street

18                 Waterbury, Connecticut

19            August 30, 2013    10:13 a.m.

20

21

22       Reported by: Maryellen Coughlin, RPR/CRR

23

24          Golkow Technologies, Inc.

            877.370.3377 ph|917.591.5672 fax

25                 deps@golkow.com
```

Confidential - Subject to Protective Order

1    Q.      So you didn't look in any files

2    that you might have had at home or any office

3    relating to that subject?

4    A.      No.

5    Q.      Are you aware that in connection

6    with the discovery in this case that Ethicon was

7    unable to produce any custodial file for you?  In

8    other words, a file containing documents,

9    electronic or paper documents that you had had

10   when you were at the company, are you aware of

11   that?

12   A.      I was told that.

13   Q.      Okay.  And do you have any

14   understanding regarding why it is that the

15   company -- what is your understanding regarding

16   why it is that the company does not have any

17   files relating to you when you were at the

18   company, a custodial file for you?

19   A.      I have no idea.

20   Q.      No?

21   A.      Why they don't have records of my

22   e-mails?

23   Q.      Right.

24   A.      I don't know.

25   Q.      Okay.  When you left the employment

Confidential - Subject to Protective Order

1      of Ethicon, which I guess was in 2007 --

2           A.      Yes.

3           Q.      -- around May of 2007.

4                   When you left Ethicon, did you

5      delete, discard or destroy any paper or

6      electronic documents that you might have had in

7      your office or on your computer at that time?

8           A.      No.

9           Q.      So as far as you know, all of those

10     documents would have been still on your computer

11     or in the company's computers or in your files at

12     the time you left, right?

13          A.      Yes.

14          Q.      Did you take copies of -- either

15     originals or copies of any documents --

16          A.      No.

17          Q.      -- when you left the company?

18          A.      No, I did not.

19          Q.      Prior to the termination of your

20     employment, did you ever take any documents or

21     did you ever have any documents either on any

22     home computer or in any files that you maintained

23     at your home, that is to say Ethicon-related

24     documents?

25          A.      I don't remember anything

Confidential - Subject to Protective Order

1    specifically.  I kept records of the required

2    documents that I was required to sign, like the

3    secrecy agreement and things like that, but I did

4    not keep anything that was company related to my

5    job or would have been confidential.

6         Q.      Okay.  So I take it from that that

7    you may have at home a file that contains things

8    like an agreement between -- an employment

9    agreement or a confidentiality agreement that you

10   might have had with Ethicon, but you would not

11   have any files relating to let's say business

12   matters?

13        A.      No.

14        Q.      Okay.  And would the same be true

15   of your home computer?

16        A.      Yes.

17        Q.      Okay.  So as far as you know

18   sitting here today, the only documents that you

19   would be aware of that would relate to let's say

20   pelvic floor products at Ethicon, those, if they

21   existed at the time of your termination, they

22   would be on the company's computers or in the

23   company's files, and you don't have any copies;

24   is that fair?

25        A.      It is fair to say I don't have any

Confidential - Subject to Protective Order

```
1     copies.

2          Q.      Okay.

3          A.      I don't know -- I know the day I

4     left I hadn't touched anything --

5          Q.      Okay.

6          A.      -- and that's all I know.

7          Q.      Okay.  Do you have any reason to

8     believe before you left that any -- not

9     immediately before you left but at any time

10    before you left that any documents relating to

11    pelvic floor products had been deleted, discarded

12    or destroyed?

13         A.      No.  I mean, certainly not

14    intentionally and --

15         Q.      Okay.

16         A.      You normally delete things not to

17    fill up your e-mail, so I'm sure I deleted

18    something at some time.

19         Q.      So other than in the ordinary

20    course of business when an e-mail comes in and

21    you don't feel you need it anymore or it's a

22    trivial e-mail, other than that sort of routine

23    thing that we all do, you don't recall any

24    particular deleting, discarding or --

25         A.      No.
```

Confidential - Subject to Protective Order

1      Q.      -- disposal or destruction of

2   documents?

3      A.      No, I don't.

4      Q.      Are you aware that Ethicon had a

5   practice of routinely getting rid of documents as

6   part of a formal document retention program?

7      A.      There was a document retention

8   program.  I don't remember the specifics of it.

9      Q.      Okay.  Do you remember that as part

10  of that document retention program there was an

11  annual purge of documents where people were

12  suppose to go through and get rid of stuff that

13  was not needed?

14     A.      I don't remember that it was

15  annual.

16     Q.      Okay.

17     A.      I don't remember the specifics of

18  it.

19     Q.      Do you recall ever having done it?

20     A.      I don't recall having done it, but

21  I would only guess that if it was a requirement I

22  would have done it.

23     Q.      Okay.  Do you recall having ever

24  received a memo or a note or something or some

25  kind of e-mail communication telling you, okay,

Confidential - Subject to Protective Order

1    it's time to comply with the document retention

2    program?

3         A.    Yes.  Vaguely, yes, because there

4    was a process in place, and part of that process

5    would have been getting some type of notification

6    at some time.

7         Q.    Okay.  And do you recall that as

8    part of that process you were also from time to

9    time told that certain documents should be held

10   on to because of litigation?

11        A.    I don't remember ever being told to

12   hold on to a document because of litigation.

13        Q.    Never?

14        A.    Never.

15        Q.    And you don't remember ever getting

16   either a e-mail or a written communication

17   telling you to hold on to documents?

18        A.    No, I don't remember that.  I mean,

19   specific to a legal matter?

20        Q.    Either specific to a legal matter

21   or in particular a --

22        A.    Or any time.  I don't remember ever

23   being asked to hold on to any documents.

24        Q.    Okay.  During the course of your

25   work at Ethicon, where did you -- if you kept

Confidential - Subject to Protective Order

1    paper or electronic documents, where did you keep

2    them?  And I take it -- by that I mean

3    physically, if it was paper, or electronically

4    where was it stored if it was electronic or if

5    there's some other place.

6         A.      Well, I obviously had files in my

7    workspace --

8         Q.      Okay.

9         A.      -- and on my computer.

10        Q.      Okay.  And other than files that --

11   now, in your workspace, I take it that would be

12   in -- you had an office?

13        A.      I had an office until the last six

14   months I was there.

15        Q.      Okay.  And I don't want to make

16   this more complicated than it needs to be but,

17   'cause you may have moved, but I'm trying to get

18   a sense of -- let's talk about in the last six

19   months when you were there.  Did you still have

20   the same files, maintain basically the same

21   collection of files that you had had the six

22   months prior to that, or was it like a new set of

23   files?

24        A.      I don't remember.

25        Q.      Okay.

Confidential - Subject to Protective Order

```
1          A.      I had five different positions in
2     six years --
3          Q.      Right.
4          A.      -- and I'm sure I passed files on
5     to other people.  I must have.  I'm guessing
6     again but.
7          Q.      At the time you left, paper
8     files --
9          A.      Mm-hmm.
10         Q.      -- where were they located and how
11    voluminous were they?
12         A.      Well, I had a small cubicle, so
13    they weren't that voluminous.
14         Q.      Okay.
15         A.      But they were in file drawings.
16         Q.      About how many file draws?
17         A.      I'm trying to remember.
18         Q.      Was it like a four- or five-draw
19    file cabinet or was it like a smaller file
20    cabinet next to your desk?
21         A.      There was a two-draw file cabinet
22    that was, you know, about three, four feet long.
23         Q.      Okay.  So, in other words, the draw
24    was about three or four feet deep?
25         A.      No, long.
```

Confidential - Subject to Protective Order

```
1          Q.      Oh, wide.  So it was like lateral
2     files?
3          A.      Wide, yes, wide.
4          Q.      Okay.  So two draws about three or
5     four feet long?
6          A.      (Witness nods.)
7          Q.      And were those two draws relatively
8     full of files?
9          A.      I don't remember.
10         Q.      Okay.  Were there files in both,
11    files in both draws?
12         A.      Yes.
13         Q.      Okay.  And it probably was not
14    completely jammed full of documents, right, or
15    was it?
16         A.      I don't remember.  That was a long
17    time ago, over six years ago.
18         Q.      Okay.  I appreciate that.  Now --
19    and for electronic documents, those would be on
20    your computer, right?
21         A.      (Witness nods.)
22         Q.      Did you have some kind of a system
23    of how you filed e-mails?  How did you do that?
24         A.      Probably a system in my own head,
25    but I filed typically by people and subject.
```

Confidential - Subject to Protective Order

```
 1           Q.       Actually, you're getting ahead of
 2    me.
 3                    Did you use like a program like
 4    Outlook or something like that to keep track of
 5    your e-mails?
 6           A.       Yes, Outlook.
 7           Q.       Okay.  And so you could set up your
 8    own little folders in Outlook?
 9           A.       Folders, right.
10                    MS. MAIMBOURG:  You know what,
11    Cheryl, wait until he finishes asking the
12    question 'cause you two are talking over each
13    other.
14                    THE WITNESS:  Sorry.
15                    MR. SHERIDAN:  Yeah, I was going to
16    say that.  I will try not to interrupt you --
17                    THE WITNESS:  Sorry.
18                    MR. SHERIDAN: -- but it will make
19    it more easy for the court reporter to get
20    everything.
21                    So you used Outlook and you set up
22    a system of folders to save e-mails, right?
23           A.       Yes.
24           Q.       And the folders were just folders
25    that you set up yourself based on what you
```

Confidential - Subject to Protective Order

1    thought was a good way to organize your e-mails,

2    right?

3         A.      Yes.

4         Q.      Okay.  And when you left the

5    company, that -- as far as you know, that e-mail

6    structure and folder structure was still in

7    place?

8         A.      Yes.

9         Q.      So e-mails that you had saved there

10   should still have been there, right?

11        A.      Yes.

12        Q.      Okay.  Now, you were with Ethicon

13   from approximately 2001 until I guess it was

14   about May of 2007, right?

15        A.      Right.

16        Q.      A period of about six and a half

17   years?

18        A.      A little less, yes.

19        Q.      Okay.  And during the course of

20   that period of time, would it be fair to say you

21   had a lot of communications that related to

22   pelvic floor products?

23        A.      During the time I was there, I

24   worked on the incontinence and pelvic floor area,

25   my first two years and four months, and then

Confidential - Subject to Protective Order

1    until the last about six months I was there I

2    didn't have -- my work didn't involve

3    commercialization of incontinence and pelvic

4    floor products.

5        Q.      Okay.  Well, during the period of

6    time when you were working on incontinence and

7    pelvic floor products, do you have any idea how

8    many e-mails you would have either sent -- that

9    you sent or received that would relate to those

10   issues?

11       A.      I have no idea.

12       Q.      Would it have been thousands?

13       A.      I have no way of quantifying my

14   work 12 years ago and how much -- and how many

15   e-mails I sent or received.

16       Q.      Okay.  Did you send or receive a

17   lot of e-mails during your work at Ethicon during

18   that period of time?

19       A.      What would a lot be?  I don't know

20   what you mean by this.

21       Q.      How about would you send or receive

22   let's say a hundred e-mails a day?

23       A.      Possibly.

24               MS. MAIMBOURG:  Could I just

25   clarify?  Are you talking about the early 2000

Confidential - Subject to Protective Order

1    period?  Remember, she said she only dealt with

2    incontinence the first two years and four

3    months --

4                    MR. SHERIDAN:  Okay.

5                    MS. MAIMBOURG:  -- and then her

6    last six months.  And certainly I think people's

7    e-mail habits changed over that decade, so I'm

8    just trying to seek some clarification as to what

9    you're asking her.

10        Q.     Okay.  During the period of time

11   that you had some involvement with incontinence

12   or pelvic floor products, would it be fair to say

13   you sent or received something on the range of a

14   hundred e-mails a day?

15        A.     Yes.

16        Q.     Okay.  During the course of your

17   work at Ethicon, did anyone ever ask you to

18   collect and save any documents relating to

19   incontinence or pelvic floor products?

20                    Let me amend that.  In connection

21   with any type of litigation.

22        A.     No, not that I remember.

23        Q.     Okay.  Could you please describe

24   for us your educational background after high

25   school?