EXHIBIT CC

Page 1

```
 1         IN THE UNITED STATES DISTRICT COURT
 2      FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 3                  CHARLESTON DIVISION
 4                      *   *   *
 5   IN RE:  ETHICON, INC.
 6          PELVIC REPAIR SYSTEMS         MDL NO. 2327
 7          PRODUCTS LIABILITY LITIGATION
 8                      *   *   *
 9   LISA SCHNEEBERGER INGRAM,
10              Plaintiff,
11        vs.                    CASE NO. 2:12-cv-9300
12   ETHICON, INC., et al.,
13              Defendants.
14                      *   *   *
15           Deposition of TROY MOHLER, Witness
16   herein, called by the Plaintiff for
17   cross-examination pursuant to the Rules of Civil
18   Procedure, taken before me, Kathleen W. Phillips,
19   a Notary Public in and for the State of Ohio, at
20   the offices of Tucker Ellis, 41 South High Street,
21   Suite 1225, Columbus, Ohio, on Friday, June 7,
22   2013, at 3:00 o'clock p.m.
23                      *   *   *
24
25      Job No. CS1678179
```

```
                                                     Page 17
 1            A.    No.
 2            Q.    I've taken a number of sales rep
 3   depositions throughout the years and it seems
 4   sort of consistently sales representatives
 5   usually have or maintain a storage locker.
 6                  Did you maintain a storage locker
 7   by any chance?
 8            A.    Yes, in my house.  That's what I'm
 9   referring to.
10            Q.    Okay.  What types of things would
11   you maintain related to the TVT products or
12   the -- or the POP or mesh products -- pelvic
13   mesh products in this storage cabinet in your
14   home?
15            A.    Samples.  Marketing materials.
16            Q.    Anything else?
17            A.    That's mainly it.  I mean, some
18   studies as well.
19            Q.    Anything else?
20            A.    No.
21            Q.    So, you -- you kept at your house
22   in a storage locker samples of the products?
23            A.    Yes.
24            Q.    Marketing materials.  What -- what
25   types of marketing materials would you have
```

...

1   kept in the storage locker?
2          A.   The company would give out
3   marketing materials, basically pamphlets, sales
4   aids.
5          Q.   Advertising promotional
6   educational material?
7          A.   Mainly, yes.
8          Q.   For physicians and for patients?
9          A.   Yes.
10         Q.   What about objection handlers or
11  information that you could look at but not
12  necessarily need to show the physician or the
13  patient?
14         A.   No.
15              MS. MAIMBOURG:  Objection.  You can
16  answer.
17  BY MR. THORNBURGH:
18         Q.   And let me -- let me ask a better
19  question.  What about training manuals?
20         A.   I didn't keep those in my locker.
21         Q.   Did you ever receive a training
22  manual?
23         A.   Yes.
24         Q.   Okay.  Where did you keep that?
25         A.   I kept that in my house.

1  Q.  What was your understanding of the
2  litigation hold letter?
3  A.  Not -- I mean --
4  MS. MAIMBOURG:  I'm going to object
5  to that.  If you want to show it to him, maybe
6  that would help.  I mean, he's not even a current
7  employee.
8  MR. THORNBURGH:  I'm just -- I
9  understand that, but I'm just -- I'm just trying
10  to find some background information.  That's all.
11  MS. MAIMBOURG:  You can answer.
12  THE WITNESS:  I just -- I mean, I
13  knew they were in some sort of -- sort of present
14  litigation against the company, but they didn't
15  give us a legal breakdown of what essentially it
16  meant.  I mean, if they did, I didn't really -- I
17  didn't pay attention, to be honest.  I don't know.
18  BY MR. THORNBURGH:
19  Q.  Did you ever have any meetings
20  with your managers or anybody else at Ethicon
21  or Johnson & Johnson regarding what your
22  obligations were in preserving documents that
23  you may have received from the company as a
24  result of a litigation hold letter?
25  A.  Yeah, we had annual -- annual

Page 43

1  you -- did you have a file on your computer
2  called Ethicon studies or how did you --
3         A.   I don't know what it was called,
4  but something like that.
5         Q.   Separated by product maybe or --
6         A.   Yes.
7         Q.   And this would have been for both
8  computers?  So, you would have maintained the
9  same type of information in the computer that
10 you received in 2004 as you would on the
11 computer that was upgraded in approximately
12 2008?
13        A.   Yes.
14        Q.   Would you ever delete any Ethicon
15 related material or TVT related material or SUI
16 or pelvic organ prolapse related material from
17 your computer?
18        A.   No.  I was afraid to.
19        Q.   Why were you afraid to delete
20 stuff?
21        A.   I -- I never knew what I was truly
22 allowed to delete or not, so just to be safe --
23        Q.   So, you just kept it all?
24        A.   -- saved it all, yes.
25        Q.   I bet you had quite a bit by the

Page 44

```
 1  end of your tenure.
 2          A.   Yes.
 3          Q.   How many e-mails do you think you
 4  were receiving -- I mean, I don't know if
 5  you're like me, but I go -- some days a hundred
 6  and fifty and some days three hundred e-mails.
 7  Were you receiving about that many e-mails
 8  or --
 9          A.   No.
10               MS. MAIMBOURG:  Objection as to form.
11  BY MR. THORNBURGH:
12          Q.   About how many e-mails would you
13  receive on a daily basis?
14          A.   As a sales rep, maybe five to ten.
15          Q.   What e-mail addresses did you use?
16          A.   I think it was --
17               MS. MAIMBOURG:  Do you mean for
18  business?
19               MR. THORNBURGH:  Yeah.
20               THE WITNESS:  I think it was just my
21  name.  I remember T Mohler at I T S dot J and J
22  dot com.
23  BY MR. THORNBURGH:
24          Q.   I'm sorry?  T Mohler at I T S
25  dot --
```

Page 55

```
 1  had reviewed the -- the record retention policy
 2  and the legal -- J & J's legal department's
 3  preservation hold notice, right?
 4          A.   Yes.
 5          Q.   What was -- what was your
 6  recollection of the record retention policy at
 7  Ethicon and Johnson & Johnson?
 8          A.   Not much.  Not knowing -- no
 9  recollection.
10          Q.   Right.  I think you -- I think
11  your testimony was, you erred on the side of
12  caution, so you didn't destroy anything?
13          A.   That is correct.
14          Q.   You just kept it all on your
15  laptop or in your -- if you had paper
16  materials, you kept the paper materials in your
17  home or in the storage cabinet?
18          A.   Yes.
19          Q.   And returned all those to Johnson
20  & Johnson or Ethicon at the date of your
21  departure?
22          A.   Yes.
23          Q.   Do you remember having turned
24  over, for instance, marketing materials at the
25  time that you departed?
```

```
                                              Page 56
 1            A.    Yes.
 2            Q.    And you can say that definitively?
 3            A.    Yes.
 4            Q.    And that would have been things
 5    like brochures, patient brochures?
 6                  MS. MAIMBOURG:    Objection.
 7    BY MR. THORNBURGH:
 8            Q.    Or doctor promotional pieces?
 9            A.    Sales aids.
10            Q.    How about the IFU?  Did you keep
11    an IFU at your home?
12            A.    Yeah.  I mean, yes, if I would
13    have had that, I would have turned it over as
14    well.
15            Q.    And you didn't delete anything
16    from your computer or throw any of the hard
17    copy material away prior to handing it over to
18    Ethicon, correct?
19            A.    Yes.
20            Q.    It says -- number five says,
21    has the complete paper and electronic
22    records cleanout per PS-0000117 on site
23    paper/electronic records cleanout and
24    PR-0000018 company procedure for records
25    retention schedule been completed.
```

```
                                                 Page 62
 1           Q.   Okay.  What would you use the iPad
 2   for?
 3           A.   Just to show videos -- information
 4   out in the field.
 5           Q.   So, you would -- it would be the
 6   same situation where you would go to the
 7   Ethernet or intranet, download it, certain
 8   materials to your iPad, and then you would be
 9   able to play back for the doctors or nurses
10   certain videos or show them certain
11   information?
12           A.   Yes.
13           Q.   Okay.  What type of videos did you
14   have on your iPad?
15           A.   Procedural videos mainly.
16           Q.   For like the TVT-O procedure?
17           A.   THERMACHOICE.  TVT-O.  Trying to
18   think what else might have been on there.
19   VERSASCOPE.  VERSAPOINT.
20           Q.   Okay.  Did you delete anything
21   from your iPad prior to leaving Ethicon?
22           A.   Not that I recall.
23           Q.   Well, did you have a different
24   policy with your iPad than you had with your
25   computer?  Remember, you testified that you
```

Page 63

1  were -- that you erred on the side -- erred on
2  the side of caution by not deleting anything
3  from your -- from your computer.  Would you
4  have a different policy for your iPad?
5       A.  Well, with the iPad, they did
6  allow us to use it for more -- some personal
7  use if we wanted to in terms of apps and things
8  like that.  So, if I deleted anything, it was
9  personal apps.
10      Q.  Everything else would have been
11 saved on the iPad?
12      A.  Any company information would have
13 been saved.
14      Q.  It would have been turned over to
15 Ethicon at the time of your departure?
16      A.  Yes.
17      Q.  So, you would have had certain
18 procedural videos, correct?
19      A.  Yes.
20      Q.  Regarding at least the TVT-O.  Any
21 other TVT products?
22      A.  All the TVT products would have
23 had a video related to them.
24      Q.  Okay.  And you recall that
25 specifically having these videos on your

Page 64

1  laptop?
2       A.  Yes.
3       Q.  Or on your iPad, and did you use
4  those frequently with doctors?
5       A.  If it was a physician who I was
6  talking about with the product, yes.
7       Q.  Okay.  What other types of
8  information, data, materials would have been on
9  your iPad?
10      A.  E-mails mainly.
11      Q.  Was your e-mail, the e-mail that
12 you used the same on your iPad as it was on
13 your laptop?
14      A.  Yes.
15      Q.  So, if you sent an e-mail from
16 your iPad, it would show up in your sent items
17 on your laptop?
18      A.  Yes.
19      Q.  Would you keep patient brochures
20 or any marketing material on your iPad?
21      A.  I think there were electronic
22 sales aids on there as well.
23      Q.  But that was a new and interesting
24 technology for you as a salesperson to use your
25 iPad while showing promotional materials or

Page 236

1  you say that after 2008, you'd go to physicians
2  and you'd say, hey, Doc, you need to be handing
3  out this patient brochure to all of your
4  Plaintiffs -- or all -- sorry, strike that.
5              MS. MAIMBOURG:  No, let's not strike
6  that.
7  BY MR. THORNBURGH:
8        Q.    Doctor, you need to be handing out
9  the patient brochure to all of your patients.
10 Did you record those types of conversations
11 with doctors?
12       A.    No.
13       Q.    How did you know which doctors you
14 had a conversation with about what the next
15 time you saw that doctor?
16       A.    Notes.
17       Q.    What notes?
18       A.    My own notes in my -- in my
19 recordkeeping that I had.  You know, I had
20 basically a binder that kept notes on calls.
21       Q.    Okay.  And so that binder would
22 have been something that you would have kept
23 and maintained through your employment with
24 Ethicon until you left in 2012?
25       A.    Yes.

Page 237

1  Q. And that's something that you
2  would have provided to Ethicon when you left
3  the company, right?
4  A. Yes, so we had that continuum of
5  calls to figure out what was going on.
6  Q. So, there's probably a record of
7  the conversations that you were saying that you
8  had contained somewhere because you would have
9  given that file or that -- those notes to
10 Ethicon, and so if Ethicon didn't produce
11 those -- that -- those notes to me or to
12 Plaintiff's counsel, that's no fault of your
13 own because you handed those over to Ethicon
14 when you left the company, correct?
15 A. That's what I remember doing.
16 Q. And you did it because you
17 received the litigation hold letter in 2011 and
18 one in 2006. You probably don't remember the
19 2006 one. I can show it to you if you want,
20 but you recall receiving that litigation hold
21 letter regarding TVT-O in 2011, right?
22 A. I recall receiving those and
23 that's why I was very safe on everything I
24 kept.
25 Q. And so these notes that you would