```
 1              IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2                         AT HUNTINGTON
                   TRANSCRIPT OF PROCEEDINGS
 3


 4


 5
          ----------------------------------------
 6

 7    IN RE:  ETHICON, INC.,  PELVIC REPAIR       MDL NO.
      SYSTEM PRODUCTS LIABILITY LITIGATION        2:12-MD-2327
 8

 9        ----------------------------------------

10


11


12              TELEPHONIC STATUS CONFERENCE

13                    December 6, 2013

14


15


16         BEFORE THE HONORABLE CHERYL A. EIFERT
               UNITED STATES MAGISTRATE JUDGE
17


18


19


20


21


22    Court Reporter:         Lisa A. Cook
                              RPR-RMR-CRR-FCRR
23                            (304)347-3198
                              lisa_cook@wvsd.uscourts.gov
24


25
```

```
 1                        APPEARANCES

 2                      (By Telephone)

 3    For the Plaintiffs:

 4    MR. BRYAN F. AYLSTOCK
      Aylstock, Witkin, Kreis & Overholtz
 5    Suite 200
      17 East Main Street
 6    Pensacola, FL  32502

 7


 8    MR. THOMAS P. CARTMELL
      MR. ANDREW N. FAES
 9    Wagstaff & Cartmell
      Suite 300
10    4740 Grand Avenue
      Kansas City, MO  64112

11


12


13    For the Defendant:

14    MR. WILLIAM M. GAGE
      MR. BENJAMIN M. WATSON
15    Butler, Snow, O'Mara, Stevens & Cannada
      P.O. Box 6010
16    Ridgeland, MS  39158-6010

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2              THE CLERK:  Hello, everyone.  This is Laura, Judge
 3   Eifert's assistant.
 4         Counsel, first, if you could, let me know who's on the
 5   line.
 6              MR. AYLSTOCK:  Bryan Aylstock here for the
 7   plaintiffs.
 8              MR. CARTMELL:  Tom Cartmell for the plaintiffs.
 9   And Andy Faes is with me.
10              THE CLERK:  All right.  And for the defense?
11              MR. GAGE:  William Gage and Ben Watson.
12              THE CLERK:  All right.  Thank you very much.  Do
13   we expect anyone else as far as we know?
14              MR. GAGE:  Not to my knowledge.
15              THE CLERK:  Okay.  One moment for Judge Eifert,
16   please.
17         (Pause)
18              MAGISTRATE JUDGE EIFERT:  Hello, everybody.
19              MR. GAGE:  Good afternoon, Judge.
20              MR. AYLSTOCK:  Good afternoon, judge.
21              MAGISTRATE JUDGE EIFERT:  So, what do we all have
22   on the agenda for today?
23              MR. GAGE:  Not too much.
24              MAGISTRATE JUDGE EIFERT:  Well, that's music to my
25   ears.
```

1          MR. AYLSTOCK:  I don't think we'll have --

2    hopefully we won't be spending a whole hour together this

3    Friday afternoon, but we did have a few things we wanted to,

4    to address, Your Honor.

5          MR. GAGE:  Judge, this is William Gage.

6    And, Bryan, --

7    Your Honor, with, with everyone's permission, I can

8    probably knock out the first two real quick based on some

9    information that I've gotten fairly recently.  And, and then

10   we can kind of move through the agenda.

11         The first topic, Your Honor, is the plaintiffs asked

12   for -- the plaintiffs sent us a letter, I think it was

13   yesterday or day before yesterday, seeking information on

14   the completeness of certain custodial productions.

15         And I spoke to the team that's reviewing that letter

16   to, you know, determine the status of that and to provide a

17   response.  They have assured me that we ought to be in a

18   position to respond to that next week.

19         So, I feel, you know, pretty good that we're going to

20   get them a response on that next week.  And that was the

21   first item on the agenda.

22         The second item --

23         MR. AYLSTOCK:  Well, --

24         MR. GAGE:  Go ahead.

25         MR. AYLSTOCK:  I was just going to say, Judge --

1   this is Bryan Aylstock -- these were largely names that were

2   on a prior list where we had thought that maybe they were

3   complete.  But there are some important witnesses with a lot

4   of years service, some of them, with very few custodial

5   documents.

6       And with the exception, I think, of Allison London

7   Brown who we were able to confirm, you know, from her

8   deposition, these other folks haven't been deposed, but

9   appear to have real problems with their custodial files just

10  based on the number of documents and what we've seen.

11      And we didn't include them in the motion for spoliation

12  of evidence that I know is before Your Honor, but we wanted

13  to get that nailed down because we may be supplementing that

14  after -- if we can confirm that these are the complete

15  custodial files, that they don't appear to be -- we may have

16  issues there I guess is a better way to put it.

17          MAGISTRATE JUDGE EIFERT:  All right.  Well, let's

18  see what happens, then, when Mr. Gage gets back with you

19  next week.

20      What was number two, Mr. Gage?

21          MR. GAGE:  It's -- Your Honor may remember

22  Dr. Todd Heniford is, is a witness.  He's both an expert and

23  a fact witness, and he's supposed to be deposed next week --

24  maybe not next week, week after next.  And the plaintiffs

25  had made a request for his, shall we say, fact based

1   documents much like we had made a request for the fact

2   documents for Drs. Klinge and Klosterhalfen which seemed to

3   occupy so much of our time last month.

4        And there has been -- there's been a delay in getting

5   those documents from Dr. Heniford.  He's a surgeon and it's

6   just been tough tracking him down.

7        However, yesterday I was advised that the guy here who

8   is in contact with Dr. -- the attorney here who is in

9   contact with Dr. Heniford made contact with him.  And

10  Heniford is supposed to be Fed-Exing documents to us that

11  should arrive on Monday.  And we're going to do an ASAP

12  turnaround to get those into the hands of the plaintiffs.

13       So, I did -- when Bryan and I talked about this

14  yesterday, we had, despite many attempts, not been able to

15  get Dr. Heniford.  But we got him after I talked to Bryan

16  yesterday.  So, I'm, I'm feeling pretty good that we're

17  going to have those documents at least in our hands on

18  Monday.  And we're going to do an ASAP turnaround to get

19  them to plaintiffs.

20            MAGISTRATE JUDGE EIFERT:  All right.  Great.

21            MR. AYLSTOCK:  And the shoe's on the other foot a

22  little bit on this.  I was joking with William yesterday

23  about my need to hook up something to his witness's computer

24  to --

25            MR. GAGE:  And, Judge, I'm a little slow.  And I

1  thought for about, literally for like ten seconds that Bryan

2  was serious.  And I was reading him the riot act.  And then

3  --

4         MAGISTRATE JUDGE EIFERT:  You're losing your sense

5  of humor in this case, Mr. Gage.

6         MR. GAGE:  I know.  I know.

7         MR. AYLSTOCK:  He was a little slow on the uptake

8  on that one.

9      We would like them seven days in advance.  If you get

10  them Monday, if you can turn them -- I mean, I don't know

11  what the volume is and maybe you know, can help us with

12  that.  But we just want to make sure we have enough time to

13  review them and digest them before his deposition.

14         MR. GAGE:  Yeah, absolutely.

15      And, Judge, I've got Ben Watson in here.  I'm going to

16  ask Ben --

17      Ben, I want that Fed Ex obtained, tracked, and if we

18  can get these things stamped and flipped around, let's do it

19  immediately.

20      Judge, the next item on the agenda, the, the plaintiffs

21  had requested additional depositions for two Ethicon

22  witnesses, Peter Cecchini and Paul Parisi.  And Your Honor

23  may remember this was a situation --

24      And, Bryan, you correct me if I misstate anything here.

25      But if I remember correctly, these were two depositions

1    that took place probably in October or November time

2    frame -- I guess probably more like October where some of

3    the documents -- some of their, I guess, custodial documents

4    didn't get produced until right before the depo.

5        And it's possible, Bryan, there may have been some

6    produced after the depo.  I just don't know the specifics.

7        But, in any event, Your Honor, you know, this falls

8    into one of the situations where, as Your Honor has said

9    previously, you know, "Ethicon, if you end up producing

10   documents after the depo that you know what you're opening

11   the door to, another potential depo."

12       So, Bryan had reached out to me --

13       And, Bryan, again, correct me if I'm wrong.

14       -- probably, maybe three weeks ago and said, "It looks

15   like we're going to need another depo on Cecchini and

16   Parisi."

17       And I responded at that time and said, "Bryan, if you

18   could tell us what in the new documents or the, the later

19   produced documents compels or mandates a need for another

20   deposition of these two, we'll be glad to consider it."

21       And I don't believe I've received a response from Bryan

22   on that.  And, so, our position would be, Your Honor, that

23   we would be glad to work with Bryan, but we do believe it's

24   appropriate for us to ask them to identify the later

25   produced documents that would in good faith, you know,

1    prompt or call for another deposition of those individuals.

2              MAGISTRATE JUDGE EIFERT:  What's your response to

3    that, Mr. Aylstock?

4              MR. AYLSTOCK:  Your Honor, Bryan Aylstock.  I'm

5    happy to work with, with Mr. Gage on this.

6         In the case of Parisi, for example, 16 -- nearly --

7    15,824 additional pages were produced by Mr. Parisi, or out

8    of his custodial file.  And they relate, just on a quick

9    review -- we haven't had time to go through all the pages --

10   but the TVT course development, cultivation and retention of

11   key opinion leaders, and using them as preceptors and

12   proctors, and also to, frankly, push the product, faculty

13   guidelines for professional education summits, surveys from

14   completed professional education summits, and it looks like

15   some newly produced profit slide decs from recently.

16        So, there is a lot, a lot there.  And, and as I've

17   expressed and I will say with renewed vigor, I'm not looking

18   to take anymore depositions that I don't have to take.  And

19   Parisi may be one that -- you know, probably would be one

20   that we could push until after the *Lewis* trial.

21        But it's not just a few documents.  And they're also

22   not just newly created documents.  These are documents that,

23   frankly, I don't understand why they weren't -- I mean,

24   Parisi in particular we went around and around about.

25        And, so, I'm not trying to throw stones, but we didn't

1    have this stuff to, to really digest it.  And Cecchini also

2    is a very key witness, and maybe not somebody we want right

3    around the corner.

4        But there continues to be additional documents

5    produced, not just by these two, but I just looked at

6    production in the last week.  And Susan Lynn, who you're

7    familiar with, a 30(b)(6) designee on regulatory, has

8    documents.

9        And, so, there's, there's an issue, and I'm happy to

10   work with Mr. Gage on it.  But we would like the opportunity

11   to, to take those depositions when we finally come up for

12   air and fully digest those documents.  I don't know if we

13   need an additional full seven hours for Mr. Parisi.  But,

14   you know, it's, it's just a problem that I wanted to

15   highlight.

16           MAGISTRATE JUDGE EIFERT:  Well, and let me say

17   this.  I think when you're talking about that amount of

18   documentation supplied after the deposition took place or

19   immediately prior to the deposition, I'm not going to

20   require the plaintiffs to be very specific about what it is

21   that they think justifies a second deposition or a third

22   deposition, whatever it might turn out to be, because that's

23   a lot of documents.

24       Now, what I, I will -- the limitation I will put on

25   them is that I don't expect them to be re-asking questions

1    that they've already asked.  If you get to a deposition

2    where they're asking the same questions, at that point I

3    would want to know what document they have in their

4    possession that they believe allows them to replow that old

5    ground.

6         Does that make sense?

7              MR. GAGE:  Judge, this is William Gage.  That,

8    that sounds fine.  And I, I will say, you know, one of the

9    concerns, not just about Cecchini and Parisi, but just kind

10   of in general is, you know, how much are we trying to fit in

11   before the *Lewis* trial.

12        And Bryan has just indicated that we may be able to,

13   you know, have those at the trial.  And that certainly helps

14   us.  And, so, I think, Judge, Bryan and I can just next week

15   kind of hammer this out and get this thing worked out on

16   Cecchini and Parisi.

17             MAGISTRATE JUDGE EIFERT:  Very good.  I just want

18   to make it clear I'm not going to require -- if, if you need

19   to consult with me, my position would be the plaintiffs

20   would not have to show much to justify another deposition

21   when you're talking about that volume of documents, of

22   document production.

23             MR. GAGE:  Absolutely.

24             MAGISTRATE JUDGE EIFERT:  All right.

25             MR. GAGE:  So, Judge --

```
1              MR. AYLSTOCK:  Your Honor, --

2              MR. GAGE:  -- the next item -- I'm sorry.

3              MR. AYLSTOCK:  Go ahead.

4              MR. GAGE:  The next item --

5              MR. AYLSTOCK:  We can shortcut some of these

6    because we do have -- one of the items was some designation

7    issues on some 30(b)(6).  But I think Ms. Jacobs's letter

8    clears up a lot of that.  I know Mr. Faes is on.

9         Are we good on that, Andy, or do we still have some

10   confusion about who's being designated on what?

11             MR. FAES:  I think there's still a confusion on a

12   couple areas on the mesh properties notice.  But I think

13   that's something that if we follow up with defendants'

14   counsel on we can work out something.  I don't know that

15   that's something we need to discuss right now.

16             MAGISTRATE JUDGE EIFERT:  All right.  Who's next?

17             MR. AYLSTOCK:  I didn't mean to cut you off,

18   William.

19             MR. GAGE:  Oh, that's fine.

20             MR. AYLSTOCK:  There may be some timing issues

21   and, in particular, some of the potential deal with regard

22   to giving more time on both sides for some of this upcoming

23   briefing.  But I, I --

24        Do you have any more on that, William?

25             MR. GAGE:  Judge, let me, let me kind of tell you
```

 1    what's going on.

 2        You know, the plaintiffs have filed the spoliation

 3    motion, and we saw the order from Judge Goodwin that has

 4    referred that motion to Your Honor.  And when we -- when you

 5    look at the deadline for responding to that motion, it falls

 6    on December 19th.  That's the current deadline.

 7        And that's, that's kind of a -- it's a pretty tough

 8    deadline for us because as Your Honor might expect, this is

 9    a very serious motion.  There are very serious remedies

10    requested.  And it's the kind of thing that, you know, it's

11    imperative that we do a lot of work to prepare for and put

12    our best foot forward.

13        And then I don't want to necessarily argue the

14    plaintiffs' case for them, but if, if we were to adhere to

15    the current deadline response on December 19th, then we

16    would have the plaintiffs working Christmas Eve, Christmas

17    day, New Year's Eve and New Year's day on their response.

18    And I know that's not -- I don't have standing to make that

19    argument, but I would just note it.

20        And, so, Bryan and I had talked Tuesday about, about

21    whether we could come to Your Honor and request an extension

22    such that our response would be due sometime the first --

23    kind of like that first week of January.

24        Now, when Bryan and I talked about this, Bryan being

25    the good lawyer that he is, said, "Well, William, I'm, I'd

1   be glad to work with you, but I need a little help on some

2   other deadlines, particularly some *Daubert* deadlines," which

3   I think fall within the purview of Judge Goodwin.

4       And I, I personally don't -- Christy Jones who, Judge,

5   you may have met and may know, she's my partner.  She's in

6   the air today.  And she's the one that kind of has to deal

7   with the *Daubert* deadlines because she's the one trying the

8   case in front of Judge Goodwin.  And I'm not -- I know that

9   there have been meetings with Judge Goodwin and discussions

10  about things like this and I've not been present.

11      So, we're going to try to talk to Christy later today

12  when she gets back to Mississippi.  And my hope, Judge, is

13  to have Christy call Bryan to work through the deadlines

14  that are of a concern to Bryan including but not limited to

15  those *Daubert* deadlines.

16      And, so, at the end of the day, we're trying to move

17  some deadlines around.  But the kind of a heads up that I

18  wanted to give to Your Honor is, you know, whether we end

19  up -- whether plaintiffs end up agreeing to an extension on

20  the spoliation motion or whether they just feel they have to

21  oppose an extension, I do know that we, Ethicon, will be

22  coming to Your Honor to ask for, you know, a little bit

23  extra time so that, so that we're not having to file a

24  response during the holidays and we can file it somewhere

25  like around January 7.  And, so, I just wanted to kind of

1    give you a heads up on that.

2            MAGISTRATE JUDGE EIFERT:  Well, let me say on that

3    I -- unless there's a good reason why there can't be an

4    extension, I, I almost always grant reasonable extensions.

5    I remember what it was like to be a lawyer and have a lot of

6    things due at the same time and try to work over the

7    holidays.  And as long as there's no impending deadline of

8    some sort or some event that's going to happen that makes an

9    extension unworkable, I'm always going to grant a reasonable

10   extension.  So, that lets you know where I stand on an

11   extension issue.

12       Mr. Aylstock, is there, is there any sort of -- for

13   example, I haven't looked at this motion at all, but

14   Mr. Gage says you're requesting some very serious remedies.

15   Are you requesting remedies that would have some impact on

16   your upcoming trial or are these separate and apart from

17   that?

18           MR. AYLSTOCK:  No, they would -- in fact, we asked

19   for remedies specific to the *Lewis* trial because there is,

20   there certainly are a lot of issues that play into that.

21   So, --

22           MAGISTRATE JUDGE EIFERT:  Now, when is that, when

23   is that set?

24           MR. AYLSTOCK:  That's February 10th.  And I

25   have -- just so the record's clear, I've never once denied

1    any request for them to extend deadlines.  And that wasn't

2    my intent here.

3        My only thought was -- certainly we are asking for

4    some, for some sanctions that are, you know, pretty severe.

5    But -- so, the *Daubert* motions are the same type thing.  If

6    our experts don't get to testify, then my clients can't be

7    in court.

8        And the way the schedule is set up now, I only get one

9    week to respond to potentially 14 different *Daubert* motions

10   where they already get two weeks under the rules to do a

11   spoliation.  And I told William yesterday, "Look, even if,

12   even if it doesn't work out with Judge Goodwin's schedule,

13   I'm not going to be inflexible."

14       I just -- you know, the request for basically more than

15   a month might therefore bleed into your schedule and

16   presumably, depending on the remedy, there may be some

17   appeal to Judge Goodwin.  And it could bump into the trial

18   of, of Ms. Lewis.  So, we certainly don't want that.  So, --

19           MAGISTRATE JUDGE EIFERT:  Well, I, I, of course,

20   cannot speak at all for Judge Goodwin on the *Daubert* motions

21   and that would be something you might want to take up with

22   Kate and just figure out what the wiggle room would be for

23   that.

24       But as far as the spoliation motion, I am going -- I'm

25   going to allow some reasonable extension.  Now, obviously if

1  you're asking for remedies that affect the *Lewis* trial and

2  it starts February the 10th, I'm going to have to have some

3  time prior to that to go through the motion and the response

4  and the reply and figure out whether there needs to be any

5  remedy that would affect that trial.

6      So, I'm going to need some time.  But I don't think

7  extending these dates after the end of this year would make

8  too much difference to me.

9      So, why don't you try to agree on some schedule that

10  gives me at least two weeks to look at these motions, or

11  this motion and all of the various memoranda.  But I -- if

12  you, if you --

13      What I'm saying, Mr. Gage, is if you want an extension,

14  you're going to get some sort of extension because I think

15  there's time to do that.  It's probably better if both sides

16  could figure out what that extension would be.  And I need

17  to have at least two weeks on my end to be able to look

18  through everything because I'm sure it is a serious motion.

19          MR. GAGE:  Thank you, Judge.  Bryan and I will do

20  that.  And we'll get you something here certainly by early

21  next week on that.  And we appreciate that.

22          MAGISTRATE JUDGE EIFERT:  And I would expect that

23  Judge Goodwin will be willing to work on the *Daubert* motions

24  as well.  I think the only thing he would be concerned about

25  would be, like me, having enough time to really review them

1    and rule on them prior to a trial.

2            MR. AYLSTOCK:  Right.  When Ms. Jones and I were,

3    and Tom were with, with His Honor and Kate, he indicated

4    that he's not so concerned about it because he's even ruled

5    on them in trial, and really thinks it's probably us that

6    would like the certainty before trial.

7        But it does kind of bleed into another issue which is

8    one of the defendants' experts, Dr. Feagins, who Tom's going

9    to, or slated to depose next week right before the *Daubert*

10   deadline and -- or the current *Daubert* deadline.  And I

11   guess he has some elective surgery or something he wants to

12   do.  And we're willing to move that, but not if it's going

13   to mean we can't file a *Daubert* motion.  So, one thing kind

14   of leads into another.

15           MR. GAGE:  Yeah.

16           MAGISTRATE JUDGE EIFERT:  Well, --

17           MR. GAGE:  I'm sorry.

18           MAGISTRATE JUDGE EIFERT:  Mr. Gage, I would assume

19   that you're not going to ask to have that deposition delayed

20   and then tell them they can't file a *Daubert* motion.  That

21   would be unreasonable.

22           MR. GAGE:  Right, Judge.  And I have to be candid

23   with you.  This thing on Dr. Feagins, I haven't been fully

24   looped into it.  And, and this is one of the reasons why I'm

25   trying to -- I want to track Christy down this afternoon and

1    have a conversation with her and then get her to call Bryan

2    because there are a lot of different moving parts that I'm

3    not part of, and Feagins is one of them.  And, so, I really

4    want Christy to -- I'm going --

5         Bryan, are you going to be generally available today?

6              MR. AYLSTOCK:  I am, certainly.

7              MR. GAGE:  Good.  Well, I'm going to track her

8    down and see if we can't work through this Feagins issue; in

9    fact, work through all these issues.

10             MAGISTRATE JUDGE EIFERT:  She's always very

11   reasonable it seems to me.  So, I don't think there will be

12   a problem.

13             MR. GAGE:  I don't know, Judge.  How long have you

14   known her?

15             MAGISTRATE JUDGE EIFERT:  Maybe I just see the

16   good side of her.

17             MR. GAGE:  She's great.  No, I'm kidding.  She's

18   wonderful.

19             MAGISTRATE JUDGE EIFERT:  Is there anything else

20   today?

21             MR. CARTMELL:  Your Honor, this is Tom Cartmell.

22   Good afternoon.

23             MAGISTRATE JUDGE EIFERT:  How are you?

24             MR. CARTMELL:  Good.  Thank you.  One other issue

25   on a deposition.  And I want, if we can --

1          William, I'm bringing this up without talking to you

2     prior to it, but it has to do with Kammerer, Kammerer's

3     deposition.  And it just, just occurred yesterday.

4          And, so, because it is a time, timing issue that

5     we're -- where there's possibly another deposition, I

6     thought if we could bring it up today, that would be great.

7               MR. GAGE:  Yeah, that's fine.

8               MR. CARTMELL:  Okay.

9          You will recall, Your Honor, that Gene Kammerer is a

10    retired employee.  He was at the company for 42 years.  And

11    he is the one that we talked about previously, I think in

12    September.  He was claiming that he could not have his

13    deposition taken at all because of a -- he had already been

14    deposed in the *Gross* case.  And then he had had a three-hour

15    deposition in this case.  I think it was two and a half

16    hours on the record.  But he has that medical condition.

17    And we didn't find out what it was.

18         Do you remember that, Your Honor?

19              MAGISTRATE JUDGE EIFERT:  I do remember that.

20              MR. CARTMELL:  Okay.  So, anyway, we had agreed

21    that -- you had sort of given us your belief that we should

22    try to work it out, that you felt strongly.  I went back and

23    looked at the transcript and you said that unless he was on

24    his death bed, essentially, it would be hard to, to say that

25    he shouldn't give his deposition if he's a critical witness

1    like he is in this case.  He's actually the technical owner

2    of the TVT product from an engineering perspective.

3        And, so, so, we did talk after that.  We asked for

4    three hours on two days.  And they responded and said, "He

5    needs a day between so he can recover, and we'll only give

6    you two hours because he can't sit for longer than two

7    hours."

8        So, anyway, we, we said, "Well, we're not going to

9    agree that two hours on two days is going to, you know, be

10   enough time.  We'll go, we'll accommodate him, and we'll

11   see, and then we can talk about it later."

12       So, at any rate, I went Tuesday for the first two-hour

13   deposition.  My -- and I made it clear that that meant 120

14   minutes on the record.  And when I got there, unfortunately

15   there was traffic and one of the -- not the court reporter

16   but the video, the trial technician was 30 minutes late

17   because there had been a traffic issue.

18       And initially Mr. Hutchinson who was producing him

19   said, "Look, we're done at 12:00 and it's 10:30 now."  And I

20   said, "Wait a minute.  We get two hours, 120 minutes."

21       Anyway, we worked that out after arguing a little bit

22   like lawyers do.  And at the end of two hours, I said,

23   "Look, you know, I'm not sure we're going to be done in two

24   more hours.  But, you know, I get 120 minutes today.  I'm

25   not done.  I have to go to West Virginia for an Executive

1    Committee meeting and some other meetings with people there,

2    and I'm not going to be able to come back.  But I will have

3    another lawyer here.  I don't think they're going to be able

4    to do it in two hours."

5        I said, first of all, "I would like to finish right

6    now.  I'd love to do more time right now."  And they said,

7    "Sorry."  And the quote was, I'm looking at the transcript,

8    "In the afternoon his pain is much worse and, so, we can't

9    do it any longer.  He will be available in two days.

10   Somebody else can come for two hours.  But at noon, we'll be

11   done."  That's what Mr. Hutchinson said.

12       So, at any rate, Alex Barlow, another lawyer, went

13   yesterday to the deposition.  And he was told once again

14   that it would be two hours, 120 minutes, no longer.

15       But what happened was at the end of 120 minutes on the

16   record, and there had been some breaks just like with me the

17   two days before, they said, "Okay, we're ready for direct."

18       They took a 45-minute break.  They came back in 45

19   minutes and they did over an hour and a half direct of the

20   witness that didn't end until 3:30 in the afternoon.

21       And I was in meetings, but I was getting texts saying,

22   you know, "This seems inappropriate because they told us he

23   could not sit for longer than two hours, that he could not

24   do anything other than that."

25       And we -- I said -- Alex Barlow said at the end of the

1    depo, "I'm not done yet and I don't think it's appropriate

2    for you to do that right now."  Well, they have been doing,

3    as you know, these long directs during our case.

4        What I'm -- what's frustrating to me, you know, among

5    other things, is that I -- if I had known that he could go

6    to 3:30 in the afternoon that day, I would have done that.

7    I would have finished, you know, or come close to finishing

8    what I had at least.  And Alex Barlow may have been with me

9    and had some more on the TVT-O product.  But this is a

10   critical, critical witness for this trial.  He will be

11   played in a video at this trial, no question.

12       Unfortunately, we have not been able to get a very good

13   video.  This witness, to me, has been extremely

14   unresponsive.  And what we would ask for is the ability --

15   well, let me -- I'm getting ahead of myself.  So, they do

16   this direct.  We're not done.  And they did the direct on

17   things that we had not covered.

18       So, now at 3:30 I said to Alex Barlow, "You have to say

19   to them this is not fair.  We are going to call Judge

20   Eifert."

21       At that point, immediately Chad Hutchinson said, "You

22   know what, he can't go any longer," and ended the

23   deposition.

24       We didn't get a chance to recross the witness.  So,

25   obviously we have to go back.  And basically what they've

1   done now since we were essentially in trial -- we know

2   they're not going to bring him to trial.  They've flipped

3   the, sort of the rules of playing evidence at trial.  And in

4   the middle of our cross-examination of the witness, they

5   have this hour-and-thirty-minute direct.

6        So, what I would ask, Your Honor, is -- what we are

7   asking for is the ability to go back and do an evidentiary

8   deposition of Mr. Kammerer.  At that time, when we are done

9   with that -- and we understand we've got to be quick and,

10  and it's got to be short because we have a six-day trial for

11  our part of the evidence.  Then they can do their direct.

12       And we would also ask -- and I know you don't like

13  this.  But if we need to file something, we would.  We would

14  ask that there be a special master there who would ask the

15  witness to respond to questions because what we get with

16  Mr. Kammerer is, and I'm not blaming defense counsel, is a

17  repeat of the question and then a long explanation,

18  occasionally a "yes" at the end, and then we go back and we

19  say, "We need the answer first, and then if you need to

20  explain."  And what we got was about, you know, 30 minutes

21  of real testimony.

22            MAGISTRATE JUDGE EIFERT:  Okay.  Well, that --

23  yes.  Let me just, let me just say something first.

24       I do think this is so difficult because all of these

25  depositions are turning out to be evidentiary depositions,

1    obviously, because none of these people are coming to trial.

2    And that makes it not only hard at the time you're taking a

3    deposition, but also at the time you're presenting the

4    witness at trial because you've got a lot in the deposition

5    that you don't really want and don't really need which

6    leaves you trying to piecemeal it together.  So, that's

7    problematic.

8        I -- as far as saying that you could have an

9    evidentiary deposition, I would have to see the transcript

10   to see how truly bad it is and whether it does justify.

11       But, now, Mr. Gage, what I'm a little concerned about,

12   and I do think this is very unfair, I do recall being told

13   that this man was so ill, he couldn't even sit for a

14   deposition; then being told that if he sat, he could only

15   sit for a few hours at a time -- sounds like that was even

16   reduced more -- and that the plaintiffs complied with all of

17   these various restrictions that you placed on them.  And

18   then you turn around and violate your own rules.  It doesn't

19   sound very good.

20       So, tell me what that was all about.

21            MR. GAGE:  Well, Judge, I have to, have to tell

22   you I don't, I don't know.  I mean, this is -- as, as Tom --

23   as Mr. Cartmell said, this is the first time he's raised it

24   with me.  And I just don't know.  I don't know anything

25   about this.

1    The only, the only bits and pieces that I'm aware of is

2    that I know the witness was in a lot of pain at some point

3    during the deposition.  I don't know whether that was put on

4    the record or not because I do remember Chad mentioning that

5    to me briefly.

6        But I just don't have any -- I'm not in a position to

7    be able to respond.  I mean, as I hear what Tom is saying,

8    Judge, I think my request would be for, for me to work with

9    Tom on a possible solution.  I mean, if the facts are as he

10   states, then I would agree that we need to make some sort of

11   effort to reach or bridge a gap here.

12        MAGISTRATE JUDGE EIFERT:  Yeah.

13        MR. GAGE:  But I think I need to -- and, Judge,

14   clearly, I mean, I, I know you, you know, stuff like this

15   it's all on the record.  Nobody is running and hiding.  I

16   mean, if, if there's some injustice or unfairness, I want to

17   fix that and I want to create it -- fix it so that we don't

18   have that problem.

19        So, I think if I could ask Your Honor's indulgence, I'd

20   like a shot at working this out with Tom next week and let's

21   see what we can do on it.

22        MAGISTRATE JUDGE EIFERT:  Why don't you do that.

23   If, if what Mr. Cartmell is saying is correct, then there's

24   been a real misrepresentation of this man's condition

25   because I don't see how he could go two hours and then

 1  another hour and a half if he's unable to even make it,

 2  barely make it through the two hours.  So, that's just not

 3  right.  We'll have to get to the bottom of that.

 4           MR. GAGE:  Okay.  We'll, we'll look at that.

 5           MR. CARTMELL:  It is a compliment that he's in

 6  pain when I'm questioning him and he's not when Chad is,

 7  though.

 8           MAGISTRATE JUDGE EIFERT:  Well, I'm glad you can

 9  see the bright side, the silver lining in that cloud.

10           MR. CARTMELL:  That's right.

11           MAGISTRATE JUDGE EIFERT:  I really do hate it for

12  you that you have to do most of your trial by evidentiary

13  deposition.  It's just horrible.  It's got to be torturous

14  for the jury to sit there and listen to these things being

15  played and -- oh, I just think it, it must be awful.  It's a

16  shame nobody seems to be able to come to trial.

17           MR. AYLSTOCK:  Tom and I did some of the depo cuts

18  for the Linda Gross trial in New Jersey.  And just sitting

19  there for hours and hours with the videographer trying to

20  make the cuts, and then for both sides trying to figure out

21  the objections and work that out, it is, it is the biggest

22  waste of time.  If there's any way -- and I had asked, you

23  know, some of these witnesses if they could come live, it

24  sure would be nice for both sides.

25           MR. GAGE:  Judge, I --

1          MAGISTRATE JUDGE EIFERT:  Then, you know, I know

2     you don't want to repeat depositions, but maybe one of the

3     things to think about in future MDLs -- maybe this is more

4     something for me -- is having some sort of time frame to do

5     evidentiary depositions.

6        It would certainly make the trial a lot smoother and a

7     lot -- and probably you would get better, a better or more

8     true result from the trial because I just can't -- I mean,

9     even, even in a good case, the jury gets bored.  I can't

10    imagine what it must be like sitting there ten or twelve

11    days and listening to one deposition after another,

12    horrible.

13         MR. GAGE:  You know, Judge, the way that Judge

14    Goodwin has those time restrictions on, on these cases, it's

15    going to be a huge step toward reducing the boredom, video

16    boredom factor because I know, for example, in New Jersey,

17    because I tried that case, we started somewhere around

18    January 6th or 7th and I think I came home March 1.

19         MAGISTRATE JUDGE EIFERT:  Well, I'll tell you

20    something about the time limitations too.  The further down

21    you are in the list as far as when your trial goes, I think

22    the shorter your trial is going to be because Judge Goodwin

23    has told me that he, he heard the same question at least

24    seven or eight times.  And he doesn't -- he thinks ten days

25    is even too long now for these cases.  And I think *Bard* had

1    12.  So, it's gradually shorter and shorter.

2         MR. CARTMELL:  That's interesting and, right, it's

3    probably best for both sides.  But it, it seems so

4    overwhelming right now.

5         But, you know, one thing I will say that's going to be

6    interesting -- and I've never had to go through it, but this

7    may, may fall in your lap, Judge, I'm just not sure, is when

8    we get to the point where we're talking about these

9    deposition cuts, you know, I'm so, I guess, maybe hyper or,

10   or freaked out about the idea of, you know, playing the cuts

11   so they can be understanding and getting an answer.  Some

12   lawyers don't, don't move to strike things.

13        But in these, you know, I have had to, you know, move

14   to strike answers.  I've never had a situation where -- I've

15   never looked at the law on that.  There's going to be a huge

16   number of those where, you know, what you end up with is a

17   "yes" and then a long, you know, paragraph that we move to

18   strike.

19        And I'm just -- I'm really nervous about how we're

20   going to be able to take all of those up and whether or not

21   the long explanations come in because they literally double

22   or triple the time of our video cuts.

23        MR. GAGE:  This is William Gage.  You know, one

24   thing, Judge, that, as I listened to Tom's concern on that,

25   because Judge Goodwin has limited the number of days for

1   each side -- I think, what is it, it's either five or six --

2   you know, the reality is when the parties both do their depo

3   designations and once you allocate the time that you know

4   you have to give to your live witnesses, the reality is the

5   depo designation cuts are going to be, are going to have to

6   be pretty concise.

7        In other words, it seems to me it's going to be tough

8   for the parties to designate, for example, 300 hours of depo

9   testimony per side realizing they can only play, what, ten

10  hours per side?

11       You know, the amount of designation may dramatically

12  over-strip the amount that can actually be played.  And we

13  may need to give some thought as to how we deal with that

14  because I can see it working, you know, doing all these huge

15  designations.  But at the end of the day, we all recognize

16  that only a tiny portion can actually get played.

17            MAGISTRATE JUDGE EIFERT:  Right.  Well, that's a

18  good thing for the jury.

19            MR. GAGE:  Yeah.

20            MAGISTRATE JUDGE EIFERT:  I think it's tough when

21  you're trying to work up the case and you're doing what you

22  know is going to be an evidentiary deposition at the same

23  time.

24       When I practiced in Kentucky and did medical

25  malpractice defense work, you could not subpoena a physician

1    to trial.  You just couldn't do that in Kentucky.  So, I

2    knew when I was deposing the treating physician that that

3    was going to be my evidentiary deposition.

4         And it was, it was difficult because at that point, I

5    was just collecting information.  I really hadn't honed in

6    on what I wanted to emphasize in my case and what I didn't

7    want to emphasize.  And I know how, how problematic that is.

8    I just can't imagine.  I think it must be very, very

9    difficult to do that effectively in this MDL.

10        I'm not sure there's any way around it, though, unless

11   everybody agrees that they'll allow evidentiary depositions

12   toward the end of the case.  But right now, that's not

13   permitted in any of the orders and things that we have in

14   place.  So, --

15             MR. CARTMELL:  Right.

16             MAGISTRATE JUDGE EIFERT:  But, you know, I think

17   we had this issue come up - I think it was in *Bard* - where

18   the plaintiffs wanted a deposition just a couple of weeks

19   before trial.  And the real -- the main reason I wouldn't

20   let them do it was because it was so close to the trial

21   date.  That was the big driving force for me.

22        But, you know, I, I -- at that time, I thought, well,

23   gee, this is really difficult because they can't -- they,

24   they took this guy's deposition a year and a half ago.  And

25   in between, they've gained all this additional knowledge.

1    And now they're not really going to be able to present it.

2         But, you know, based on what was available in the, in

3    the docket control orders and the deposition protocol and

4    stuff, I had to rule the way I ruled.

5              MR. AYLSTOCK:  Right.

6              MAGISTRATE JUDGE EIFERT:  It's unfortunate, yeah.

7              MR. AYLSTOCK:  There is one more issue, Your

8    Honor.  This is Bryan Aylstock again.  Tom will probably

9    jump in here.

10        But there were some individuals that Ethicon has

11   designated as non-retained experts.  And they have been --

12   they were deposed before these designations.  But

13   Dr. Arnaud, Dr. Robinson, and Dr. Hinoul have all been

14   designated as non-retained experts.

15        And we asked for their depositions because, obviously,

16   we didn't have the benefit of their disclosures at that

17   time, the Rule 26 disclosures and what it was they were

18   supposed to talk about.  And, you know, obviously we don't

19   know whether these people are going to be called live or

20   not.  And apparently they are.  They're listed as

21   non-retained experts.

22        And what we've been told by Ms. Jones is, "No, you

23   can't, you can't ask them questions about their non-retained

24   expert opinion designations that were provided."

25        So, we would like an opportunity to depose them about

1    any opinions they intend to offer, expert opinions in the

2    *Lewis* trial.  And apparently I guess we're going to need you

3    to, to rule on that and determine whether we get that.

4            MAGISTRATE JUDGE EIFERT:  Well, I think one thing

5    that will be important to me is that if the designations are

6    really nothing more than rewording of what they've already

7    testified to, then I don't see a reason to take another

8    deposition.

9        If there are new -- if there's new opinions or there's

10   supplementation that wasn't stated in the deposition that

11   would need the further questioning, that's a different

12   story.

13       But if what Ms. Jones did was merely go read their

14   deposition and then prepare a designation that was

15   essentially a reiteration and in a summary form, then I

16   don't see any need to re-depose the person.  It's going to

17   depend on what they said, not what the designation says.

18           MR. CARTMELL:  This is Tom Cartmell.  And that is

19   exactly what Christy's response was.  She said, "They've

20   already testified to it, so you don't -- we're not going to

21   produce them again."

22       You know, when I saw that and looked at the

23   disclosures, I mean, an example is like this.  You know,

24   Axel Arnaud is going to testify that the TVT product is safe

25   and effective and that -- and it goes into a little detail

1  about that.

2      Now, we never asked, you know, Axel Arnaud, "Do you

3  think the TVT product is safe and effective?" because, as

4  you say, we know we're at trial and we were trying to do

5  trial cuts and things like that.  We were trying to show

6  with documents and evidence that it's not safe and

7  effective.

8      But we didn't get a chance to, for example, ask

9  Dr. Arnaud, "What are, you know, all the bases for your

10  opinion, or is this a basis for your opinion, or what are

11  you relying on for that opinion?" or things like that.  It

12  just obviously was not something -- we weren't, we weren't

13  asking him expert type questions that we would have asked.

14  We were really in cross-examination mode or discovery mode,

15  as you say.

16      It's hard to, it's hard to -- like if we went to the

17  deposition -- and I haven't done it, Your Honor, yet.  So,

18  maybe this is something we need to.  But it's hard to

19  believe that if we went to the deposition and we, we looked

20  for the question on, for example, that, then that question

21  would never be in there.

22      Now, clearly we know that Axel Arnaud is going to say

23  that.  But we don't know -- we can't -- we haven't had a

24  chance to explore everything related to that opinion.

25          MAGISTRATE JUDGE EIFERT:  But I, I think if, if it

1   doesn't -- if it wasn't covered in the deposition and the

2   designation is that generic, then you will probably be able

3   to take another deposition.

4       If, however, he said in his deposition, for example, "I

5   think that the mesh was the perfect shape, it had the

6   perfect pore size, this was perfect, that was perfect," and

7   then they say he's going to say it's safe and effective

8   based on the fact of pore size, shape, et cetera, then I

9   think you basically got the opinion.

10      And I would have thought at the deposition you would

11  have said, "Well, you know, why do you think that?" if he

12  made those kind of comments.  But I guess I'll have to see

13  what the designation is compared to the transcript.  And you

14  can point out to me where you think you need to ask more

15  questions.

16      I think, I think the sides ought to be able to figure

17  this out because you're going to know what, you know, what's

18  reasonable and fair and what's not.  You can't come after

19  the fact and make new opinions or supplement opinions and

20  then not allow them to explore those in deposition.  That's,

21  that's not going to be fair.  So, --

22          MR. AYLSTOCK:  Judge, this is Bryan.  In

23  particular, what I'm -- just what I'm thinking about is, you

24  know, methodology type opinions, *Daubert* type questions

25  about, "You say this.  All right.  Give me your methodology.

1   What do you base that on?"

2       And as Tom said, when I looked at it, I'm like -- you

3   know, I was at or helped with a lot of those depositions.

4   Certainly in a trial or cross-examination mode, we're not

5   necessarily thinking about *Daubert* and, you know, attacking

6   the methodology back then.

7           MAGISTRATE JUDGE EIFERT:  Right.  Well, you, you

8   point out to me what, where it is that you think further

9   questioning would be necessary, and then I'll hear from the

10  defendants as to why they don't think it is necessary.

11      And I'm sure we can work out which ones you get to redo

12  and which you don't.  If -- you know, how that, whatever,

13  whatever we need to do on that, we can do I'm sure.  But get

14  it to me sooner rather than later.

15          MR. AYLSTOCK:  Yes, Your Honor.

16          MAGISTRATE JUDGE EIFERT:  Especially with the

17  spoliation motion.  I do want to devote some time to that.

18  So, don't file all those motions the last two weeks of

19  January.

20          MR. CARTMELL:  Okay.

21          MR. GAGE:  Judge, this is William Gage.  I'll just

22  mention we -- and this is really kind of like my only, I

23  guess, thing to mention to you.

24      The, the -- you'll remember that I think it was mid

25  September we had asked plaintiffs, and Your Honor kind of

1    had agreed on this, that plaintiffs would give us a list of

2    all the depos that they wanted to take before the trial.

3              MAGISTRATE JUDGE EIFERT:  Yes.

4              MR. GAGE:  And we got that list.  And I think

5    we've done -- you know, I think we're closing in on

6    finishing it up, or at least we've got everything pretty

7    much on schedule.  I'm sure there's an outlier somewhere.

8         But a few weeks back, we got a prof. ed., professional

9    education, 30(b)(6) deposition notice.  It's a pretty hefty

10   notice.  It's got lots of subparts and, I don't know, seven

11   or eight document requests.

12        And I'm working -- we're working with Bryan.  I am, I

13   am just -- and it's not that I don't want to give discovery.

14   It's I'm really running out of bodies and dates between now

15   and the beginning of trial.  We just have, as Your Honor

16   might expect, and the plaintiffs have it too, mountains of

17   work to do between now and the end of, or I guess the

18   beginning of the trial.

19        And, so, Bryan let me know that they feel pretty

20   strongly, the plaintiffs do, that they need to have that

21   depo taken before the *Lewis* trial.  And I'm, I'm not saying

22   I hereby move for protective order and ask you to quash it.

23   I want to try to work with Bryan.  I want to see if maybe we

24   can't go through the notice and, you know, see if we can't

25   hone in on what they really need before the *Lewis* trial.

1    But I just wanted to kind of give you a heads up that

2    this is possibly one thing that I may want to just reach out

3    to you with Bryan and, if I feel like I have to, just ask

4    for some, not necessarily a formal ruling but just somekind

5    of informal guidance on how Your Honor thinks we ought to

6    handle that.

7    Like I said, I want to help and I want to cooperate,

8    but it wasn't on the early list.  It was served just a few

9    weeks ago.  And I'm just running out of bodies and dates.

10    MAGISTRATE JUDGE EIFERT:  Well, maybe one thing

11    you could do is look at that list, Mr. Cartmell and Mr.

12    Aylstock, and figure out what you really need to question a

13    witness about prior to this *Lewis* trial and delay the rest

14    of it until after which, you know, if nothing else, would

15    shorten the depositions significantly I would think.

16    MR. CARTMELL:  I think -- this is Tom Cartmell.  I

17    think that's a really good idea.

18    And I think on that, William, I think that may be the

19    best way to handle that is -- that came up because of a

20    deposition of Dr. Eisenberg where during the direct, another

21    two-hour direct Maimbourg did which was, by the way

22    excellent, she did a great job, but it had a new sort of

23    defense related on prof. ed. that, that came up during that

24    direct.

25    And, so, when the witness was then asked by me on

1 recross whether or not they knew whether any of these prof.
2 ed. materials had been given to any doctors, he said, "I
3 have no idea.  You'd have to, you'd have to ask somebody in
4 prof. ed. about that."

5     So, it was prof. ed. materials that the defense was,
6 "Look, all the doctors knew about it because they got it in
7 these prof. ed. materials."  Then I followed up and they
8 said, "I can't tell you whether or not any of those things
9 actually went to doctors."  That's why -- at least one
10 reason why that notice was generated after that.  But we
11 could, we could limit that, you know, way down.

12         MR. GAGE:  And, Judge, if we -- you know, we were
13 talking earlier about Paul Parisi.  If it turns out, if it
14 turns out that we end up putting up Paul again, you know, it
15 may be that -- because he does prof. ed., Judge.  It may be
16 that we could put him up and he could handle some of these
17 topics that, you know, relate to *Lewis*.

18     And, and -- but, look, one of the great things I love
19 about working with Bryan and Tom is we both kind of have an
20 agreement that, you know, we kind of work through things and
21 we generally get there.  There's times we get there.  And,
22 so, I'm confident we'll work something out.  But if not, I
23 may need a little -- you know, we'll ask for a call.  But I
24 hope that won't be necessary.

25         MAGISTRATE JUDGE EIFERT:  All right.  So, if you

```
 1   need me, call me.

 2              MR. AYLSTOCK:  Thank you, Judge.

 3              MR. GAGE:  You-all have a great weekend.

 4              MR. AYLSTOCK:  Off topic question, Judge?

 5              MAGISTRATE JUDGE EIFERT:  Yes.

 6              MR. AYLSTOCK:  I noted that you set an in-person

 7   hearing for next Thursday in Huntington on Mr. Phipps's,

 8   whoever that is, motion to do something.  And I went and

 9   looked at it and I, frankly, didn't understand what it was

10   about or what he was doing.  And I don't know if it -- Laura

11   had copied me on it.  I'm happy to attend.  I'm at the

12   Court's pleasure, obviously, but I wondered if I could

13   either attend by phone or --

14              MAGISTRATE JUDGE EIFERT:  Well, you know, that's

15   the problem that we have right now.  With my courtroom under

16   construction, we're in that grand jury room.  And we

17   can't -- our hearings either have to be all by telephone or

18   all attending in person.  We can't split it.  Don't ask me

19   why, but apparently it can't be done.

20       This Phipps -- and I haven't looked at his motion yet,

21   but I know it has something to do with MedStar and the

22   records from MedStar which, you know, I thought we had

23   resolved two months ago.

24       Apparently, some of his clients are some of the people

25   that had surgeries done that were paid for by MedStar.  And
```

1   he wants to reopen that issue about whether the records

2   should be produced or not.  That's my understanding of what

3   this is all about.

4       I think he's insisted on it being in person.  I told

5   Laura to send -- I was in Charleston yesterday.  I told her

6   to send out an e-mail to everyone in whose MDL he had filed

7   a motion, which may be why you got it, Mr. Aylstock, and ask

8   them to figure out -- you know, I didn't care if it was done

9   in person or by phone, but I needed consensus among all of

10  the parties and Mr. Phipps as to how it would be done.

11      And I was just told by Laura this morning that it's

12  going to be done in person next Thursday.  I mean, I

13  don't -- if you don't have anything that you want to say, if

14  you want to have somebody who is planning on coming for the

15  plaintiff speak on your behalf, that's fine with me.  I

16  don't, I don't necessarily want to make all of you people

17  travel here.

18      It would be my preference to do it by phone just for

19  your convenience.  But apparently whoever this Mr. Phipps

20  is, that's not, that's not good enough for him.

21      So, I, I suggest you get together with the people that

22  you think may be coming and just have them speak for you.  I

23  think the --

24          MR. AYLSTOCK:  That's fine.

25          MAGISTRATE JUDGE EIFERT:  Yeah.  I don't think --

```
 1              MR. AYLSTOCK:  I don't have any, any clients on

 2   any list that I know about.  So, I may have Mr. Frankovitch

 3   or Mr. Bell or Mr. Farrell there just --

 4              MAGISTRATE JUDGE EIFERT:  Right.  I, I think that

 5   would be -- you know, it's up to you who you have come.  But

 6   I've already ruled on this issue once.  I haven't looked at

 7   his motion to see what might be new and persuasive to the

 8   contrary, but I, I don't think the plaintiffs even had a

 9   position the first time around.  I think they just said,

10   "Whatever."  They didn't really care.  So, I certainly am

11   not going to tell you it's that important for you to be

12   here.

13              MR. AYLSTOCK:  Okay.  Fair enough, Judge.  I just

14   was looking at my calendar freaking out.

15              MAGISTRATE JUDGE EIFERT:  Yeah.

16              MR. GAGE:  Judge, this is William Gage.  Just FYI,

17   I learned this trick recently.  If somebody -- assuming you

18   have Wi-Fi in the courthouse, if you -- if somebody on your

19   staff or somebody with the court has an iPad, you could turn

20   your iPad on.  And if Bryan has an iPad, he could turn his

21   iPad on, and you both do a FaceTime.  It's an app called

22   FaceTime.

23              MAGISTRATE JUDGE EIFERT:  Uh-huh.

24              MR. GAGE:  And he could put, he could put that

25   iPad -- you could put your iPad like, for example, on your
```

1    bench, you know, up where you're sitting.  And you would be

2    looking at Bryan's face and he could hear you and you could

3    hear -- it's just like -- it's the coolest thing in the

4    world.  It's just like talking to a computer screen except

5    it's a live shot of the person.

6              MAGISTRATE JUDGE EIFERT:  Right.

7              MR. GAGE:  We're actually now doing that.

8              MAGISTRATE JUDGE EIFERT:  Right.  I, I -- but the

9    problem is really with the way the transcript is done

10   because it's put on Courtflow.  There's not a court reporter

11   present.  So, that's the problem is Courtflow doesn't work

12   if like a phone is turned on or a device like that is turned

13   on.  For some reason, you can -- what we can do is if

14   somebody just wants to listen in, we can put the phone on

15   and they can listen to the best of their ability, but they

16   can't participate at all.

17        So, if people want to participate, they all either need

18   to attend by phone or they need to attend in person.  We

19   can't split it at this point.

20             MR. AYLSTOCK:  Got it.

21             MAGISTRATE JUDGE EIFERT:  Yeah.  So, that's,

22   that's the issue.

23        But, as I said, Mr. Aylstock, I would look -- I -- you

24   might want to talk to -- I think Ms. Baggett was pretty

25   involved the last time, or at least she was -- or Ms.

1    Eskins.  One of them was in the background and they kind of

2    said, "We don't really have a position on this one way or

3    the other."  So, --

4            MR. AYLSTOCK:  And I think that -- so, okay.  I

5    got it.  I appreciate it, Judge.

6            MAGISTRATE JUDGE EIFERT:  Sure.  Is there anything

7    else?

8            MR. AYLSTOCK:  Not from the plaintiffs, Judge.

9            MR. GAGE:  Not from the defendants, Judge.

10           MAGISTRATE JUDGE EIFERT:  All right, great.  Well,

11   thank you again.  And I suppose I will be talking with some

12   of you next week at the *Secant* hearing.

13           MR. GAGE:  Judge, is that by phone?

14           MAGISTRATE JUDGE EIFERT:  I believe that -- I

15   think that one is by phone, yeah, yeah.

16           MR. AYLSTOCK:  It's by phone.  It's the same

17   number.

18           MR. GAGE:  Judge, I don't think it matters to you,

19   but just to the extent it would, I believe somebody else

20   from our office will be participating on Ethicon's behalf

21   and I probably won't.  But I just wanted you to be aware of

22   that.

23           MAGISTRATE JUDGE EIFERT:  That's fine.  As long as

24   whoever is on the phone is up to, up to snuff as to what the

25   issues are and they're prepared, I, I don't care who it

1    would be.

2          MR. GAGE:  All right.  Well, thank you.  Have a

3    good weekend everybody.

4          MAGISTRATE JUDGE EIFERT:  You too.  Thank you.

5    Bye-bye.

6       (Proceedings concluded at 2:55 p.m.)

7                        *  *  *  *  *

8

9

10

11          I, Lisa A. Cook, Official Reporter of the United

12    States District Court for the Southern District of West

13    Virginia, do hereby certify that the foregoing is a true and

14    correct transcript, to the best of my ability, from the

15    record of proceedings in the above-entitled matter.

16

17

18       s\Lisa A. Cook                    December 12, 2013

19          Reporter                          Date

20

21

22

23

24

25