IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

AT CHARLESTON


IN RE:  ETHICON, INC. PELVIC REPAIR SYSTEM
         PRODUCTS LIABILITY LITIGATION        MDL No.
                                              2:12-MD-2327



                                    December 20, 2013
                                    Huntington, West Virginia



TRANSCRIPT OF TELEPHONIC STATUS CONFERENCE
BEFORE THE HONORABLE CHERYL A. EIFERT
UNITED STATES MAGISTRATE JUDGE



APPEARANCES (by telephone)

For the Plaintiffs:         **BRYAN F. AYLSTOCK, ESQ.**
                            **D. RENEE BAGGETT, ESQ.**
                            AYLSTOCK WITKIN KREIS & OVERHOLTZ
                            Suite 200
                            17 East Main Street
                            Pensacola, FL  32502

For the Defendant:          **WILLIAM M. GAGE, ESQ.**
                            **BENJAMIN M. WATSON, ESQ.**
                            **GARY RUBIN, ESQ.**
                            BUTLER SNOW O'MARA STEVENS &
                            CANNADA, PLLC
                            P. O. Box 6010
                            Ridgeland, MS  39158-6010

Court Reporter:                    TERESA M. RUFFNER, RPR
                                   Sidney Christie Federal Building
                                   845 Fifth Avenue, Room 101
                                   Huntington, WV  25701
                                   (304) 528-7583

Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription.

1    Friday, December 20, 2013, at 2:00 p.m. in conference room

2              THE COURT:  Hello.

3              MR. GAGE:  Hi.  Good afternoon.

4              THE COURT:  Okay.

5              MR. GAGE:  Hi, Judge.

6              THE COURT:  Mr. Gage.

7              MR. AYLSTOCK:  Good afternoon, Your Honor.  Bryan

8    Aylstock here.

9              THE COURT:  Mr. Aylstock.

10             MS. BAGGETT:  Your Honor, Renee Baggett for the

11   plaintiffs.

12             THE COURT:  Miss Baggett.  All right.  Well, what do

13   we have going on today?

14             MR. AYLSTOCK:  Well, Your Honor, Bryan Aylstock for

15   the plaintiffs.  I guess a couple of things that are on the

16   front burner for us in light of some upcoming depositions

17   right after the holidays, and, in particular, there's a

18   deposition of a gentleman named Tom Barbolt, B-a-r-b-o-l-t,

19   and he is a -- one of the research scientists for Ethicon.

20      He's actually been deposed.  He was deposed in the

21   New Jersey litigation in advance of the *Gross* trial by

22   Mr. Anderson and then by my partner, Mr. Thornburg, in the MDL

23   several -- five or six months ago, I believe, and he has also

24   been designated as a non-retained expert witness by Ethicon,

25   and he is also designated on a number of 30(b)(6) topics

1    related to some of the testing done related to claims in the

2    instructions for use and specifically claims related to the --

3    the instructions for use say that the inflammation, if it

4    exists, is minimal to slight and transient, I think are the

5    operative words, and he relies on some studies for that and

6    also that the polypropylene doesn't -- is not subject to

7    degradation, which is another study.

8         But that deposition is set to take place on January 7th

9    and 8th, and we -- Mr. Watson and I had a call earlier, a

10   couple of days ago, about the need to get some additional

11   background information on those particular studies.

12        A little more background:  There's two studies, rat

13   studies.  One is a 91-day study and one is a 28-day study that

14   looked at the inflammatory response in the back of a rat of a

15   little piece of the TVT mesh when it was placed in there for

16   28 and 91 days, and the rats were sacrificed and so on and so

17   forth.

18        Well, we had asked for, as the Court is aware from our

19   motion to compel hearing back in July -- or June, I believe --

20   back in July 2012, we had asked for, you know, all underlying

21   data related to any studies that supported claims in the

22   instructions for use; and, in particular, we were very clear,

23   we asked for lab notebooks about those studies.

24        There's also a study related to degradation that is

25   relied on for the statement about the polypropylene does not

1    degrade, and it's a study about where some PROLENE was put in

2    dog hearts.  And so those three studies in particular are very

3    important to us because they supposedly or allegedly support

4    the claims made in the IFU that we and our experts say are

5    false and misleading and, you know, frankly are relied upon by

6    many physicians in deciding what product to use and whether a

7    mesh should be used at all, because what we've seen in

8    Miss Lewis and others is that the inflammation is, in fact,

9    severe and chronic and so forth, or at least moderate and

10   chronic, as opposed to minimal to slight and transient.

11       Well, we learned Wednesday that, in fact, in follow-up

12   for some of the back-ups, tissue and tissue slides to those

13   studies, that apparently Mr. Barbolt does have lab notebooks

14   for the two studies he was involved in, the rat studies, and I

15   believe -- and Mr. Watson can correct me -- they were either

16   at his house or there's some vault where they may be.

17       And given -- given that we really need that information

18   in very short order in order to conduct this deposition, which

19   given the timing of everything, we really have no interest in

20   moving the deposition.  We need to move forward with it.  But

21   what we need your help with, I think, is -- and maybe

22   Mr. Watson has some more information for us, but just need

23   that -- those lab notebooks and any of the underlying study

24   data related to those three studies in particular, the two rat

25   studies and the dog heart study, need it, you know, like next

1   week.   And I know it's Christmas, but we need it soon so we

2   can have our experts look at it before the deposition.

3           MR. GAGE:   Judge, this is William Gage.   May I

4   respond?

5           THE COURT:   Certainly.

6           MR. GAGE:   I'll be candid with you, Your Honor.   I'm

7   not the one defending Mr. Barbolt's deposition, so I don't

8   know the studies with the level of specificity that Bryan

9   knows them, but I had a call right before I got on this call,

10  and the long story short, Judge, is this:

11      I told my people, I said, "Look, I know that Ethicon

12  closes for a portion of this Christmas holiday," and I said,

13  "I'm getting ready to get on a call with the judge and I am

14  telling her that I am instructing you to call the person" --

15  there's a lady at the company who apparently, if there is

16  stuff that needs to be produced, she's the one that knows

17  where it is.

18      And I said, "I want her called immediately, and I want

19  her, whatever it takes, even if we have to bring her in on our

20  own vacation, and even if the building is closed, to help us

21  locate whatever it is that Bryan is seeking in this regard."

22      So those are the instructions that I've issued to the

23  team, and my hope is we're going to make contact with her

24  today and get something moving quickly.

25      Obviously, Judge, we want this depo to go forward on

1    January 7; and if these documents exist, I want them to get

2    into Bryan's hands as soon as possible.

3             THE COURT:  Mr. Aylstock, do you have any idea how

4    voluminous the documents are?

5             MR. AYLSTOCK:  Well, we do know just from -- it's

6    called GLP, Good Laboratory Practices, standards, that for the

7    studies, you know -- and it just makes common sense.  You

8    don't need a GLP to tell a scientist this, but there's a

9    notebook with handwritten notes and there are consecutively

10   pre-numbered pages for, you know, basically the findings so

11   that, you know, if -- the pages can't be removed and so forth.

12   And I don't know, other than what I was told on Wednesday,

13   which is that not only are there -- does Mr. Barbolt

14   apparently have these, these -- some lab notebooks, but

15   there's an actual vault with notebooks with -- I believe it

16   was 91 separate notebooks of basically all of their -- the lab

17   notebooks from the studies.

18      And, you know, it was a shock to me, frankly, because it

19   was specifically requested in July of 2012, and we had a

20   hearing with Your Honor where this specific RFP was discussed.

21   And what we were told and you were told is that, "No, we're

22   not withholding anything," and then I learned, "Well, these

23   exist and they haven't been produced yet.  Would you like to

24   come to Somerville and enter the vault and look through the 91

25   pages and do that?"

1          And I said, "Well, what I'd like is for you to copy those

2     91 notebooks and give them to me immediately."  And, you know,

3     that's what I would like.  That's what I'm requesting.  They

4     should be consecutively numbered, pre-numbered pages, and I'd

5     like them all.

6          I don't know exactly what's in there, and, frankly, I

7     don't think they do either, but it's important that we have

8     this information.  It was clearly requested, and it is likely

9     to lead to the discovery of admissible evidence, but I really

10    need those three studies before the Barbolt, in advance, you

11    know, like next week, like I said.  So I guess I'd request all

12    of that to be copied, because that's what I was told existed,

13    and produced to us next week.

14         I don't know why Mr. Gage needs to talk to somebody about

15    those 91 notebooks because they're in a vault.  Just go send a

16    copy service to go copy.

17              MR. RUBIN:  This is Gary Rubin.  May I be heard on

18    the issue?

19              THE COURT:  Yes.

20              MR. RUBIN:  Thank you, Your Honor.  I think that we

21    are confusing two issues, and I don't mean that pejoratively,

22    because it's taking us a long time to get a handle on it.

23    It's possible that I'm not communicating it properly when I

24    talk to Mr. Aylstock.

25         The lab notebooks, the 91 that he's talking about -- and

1    I think the number is 90, but that's a separate issue from

2    Mr. Barbolt.  The lawyer who is dealing with Mr. Barbolt's

3    from our team, his name is David Thomas.  He has specifically

4    asked Mr. Barbolt, "Do you have any personal or company lab

5    notebooks for studies on which you worked other than what is

6    in the study database?"  That's the database that I talked

7    about with you, Bryan, when we were talking earlier this week.

8    And his unqualified answer was no.

9        So the notebooks that are in the vault, that is a

10   separate issue from what we need to deal with to get to

11   Mr. Barbolt's deposition.  For Mr. Barbolt, to the extent

12   there is any underlying data, that data would be saved in the

13   database of studies together with the study.

14       As to the first study that Mr. Aylstock mentioned, the 91

15   -- the 90-day rat study, we've produced I think it was just

16   under 500 pages out of the database relating to that study.

17   And so our understanding is we have fully produced all of the

18   underlying data there.

19       However, for the 28-day study, we are, as Mr. Gage said,

20   we have asked the client person who deals with this database

21   to go back and look in the database at this 28-day study to

22   see if there are any underlying data.  And at the same time we

23   have asked her to do that, we -- as long as she's going to be

24   doing that, we've asked her to take another run at the 90-day

25   rat study to see if there's anything other than these 497

1    pages that we've already produced.

2        Not to talk to you directly, Mr. Aylstock, but you

3    started talking about the 90-day and the 28-day.  Now you've

4    mentioned a third study.  And I know that you had mentioned a

5    third study, but if you could identify it to us.  As long as

6    we're asking this person to go back, we'll ask her to go look

7    for that study as well.  Just send us an e-mail and we'll put

8    her on that third study that you've mentioned.

9        MR. AYLSTOCK:  And, Your Honor, this is Bryan

10   Aylstock.  It's the Burkley degradation study involving

11   polypropylene and the dog heart.  It was discussed at length

12   with Mr. Burkley in his deposition.

13       THE COURT:  So you ought to be able to have this

14   woman look for that information by the end of next week.

15       MR. GAGE:  Absolutely, Judge.

16       THE COURT:  All right.  Well, whatever you find, get

17   to Mr. Aylstock by the end of next week.

18       Now, let's talk about the 90 or 91 lab notebooks.  As I

19   understand what Mr. Rubin has just said, these notebooks are

20   not related to Mr. Barbolt's deposition, but these are

21   documents apparently that have not been provided to the

22   plaintiffs.

23       MR. AYLSTOCK:  Well, Your Honor, this is Bryan

24   Aylstock again.  They may be.  I mean Mr. Barbolt's deposition

25   is a 30(b)(6) deposition and he's a non-retained expert; and,

1    you know, we don't know exactly what's in those lab notebooks,

2    but we would like to see those lab notebooks to -- as they do

3    relate to studies conducted by Ethicon on polypropylene.  So

4    we would like to have those, and we'd like to have them right

5    away since apparently they can just be copied.

6            MR. GAGE:  And, Judge, I think -- this is William

7    Gage.  I think -- and, Gary, you all correct me if I'm wrong

8    because I know you all have been somewhat closer to the issue.

9        I think we've provided Bryan with a long list of studies.

10   There's just been, you know, tons of studies over time, and we

11   asked him to take a look at them and look at the list and let

12   us know which ones are the ones that they might be interested

13   in or which ones might be relevant to them.

14       So there's a lot of information on studies.  And, Bryan,

15   I don't know -- you know, Judge, I don't know if we've heard

16   back from Bryan on that, and I'm not sure we know -- and, Your

17   Honor, I would ask Ben or Gary to chime in.  I'm not sure that

18   the lab notebooks necessarily relate to any studies that Bryan

19   may or may not choose.

20       In other words, it may be that the studies that -- when

21   he hasn't told us, other than these three, which ones he's

22   interested in, but it may be that the lab notebooks don't have

23   any relevance to the one that he -- to the ones that he is

24   interested in.

25       Gary, have I gotten that correct?

1            MR. RUBIN:  Yes, William.  Your Honor, this is Gary

2     Rubin.  The lab notebooks are notebooks that -- they're not in

3     the study database.  They're not associated with any

4     particular studies.  They are notebooks by scientists.

5         And the problem that we have with them is that these are

6     handwritten notebooks in jargon, in shorthand, by scientists

7     dealing with a range of issues.  I cannot say that they are

8     relevant or that they should go to plaintiffs.  And I actually

9     can't agree on the phone that they deal with studies on

10    polypropylene, because I don't know that.

11        And so we have offered to Mr. Aylstock a protocol to

12    invite plaintiffs into the vault at Ethicon to flag pieces of

13    them that they would like, that they think they may be

14    interested in, but then we can use our normal procedures to

15    review and produce.

16        But it's almost as if we're dealing with -- in a sense,

17    these are foreign language documents to the reviewers because

18    of the handwriting and the scientific nature and the jargon.

19        What we talked about on the phone this week is that we

20    would immediately provide a list of who the individuals are

21    who had notebooks associated with them.  We will do that.  And

22    Mr. Aylstock has asked that we provide the first and last page

23    of these notebooks.  And we will also, if there are any, we

24    will endeavor to provide a contents or an index page if we

25    can, but those are items that will need to be -- we'll need

1    approval from the company, and those will need to be copied by

2    hand because these are not electronic documents.  These are

3    highly confidential paper documents that exist in a vault, and

4    that is the way that we deal with them.  And that's what I've

5    been able -- that's what I've been authorized thus far to

6    offer to Mr. Aylstock.

7              THE COURT:  When do you think you could get some

8    sort of an index to these 90 or 91 notebooks at least to the

9    extent that you identify who prepared the notebooks and what,

10   you know, the notebooks pertain to?

11       What I hear you saying, Mr. Rubin, is they might not even

12   pertain to mesh.  Is that right?

13             MR. RUBIN:  That is correct, Your Honor.

14             THE COURT:  So when can you have -- I mean it's only

15   91 notebooks.  I would think somebody could go in there and

16   look fairly quickly, maybe in a day, not even a day, to look

17   at -- just glance at them and figure out who prepared them and

18   what they're about.

19             MR. RUBIN:  We certainly know who prepared them, and

20   that's something that we'll send to Mr. Aylstock today.

21       The second part of your query, Your Honor, what are they

22   about, that's the difficulty that we're having, again because

23   they are written in handwriting and in jargon.  It would

24   require actually going through them with the owners.  It's not

25   something that just a member of the legal team or one of the

 1   outside counsel could go through.

 2        We do have notes about them that might be -- that might

 3   be useful.  But as I understand them, it's not like one

 4   notebook is on topic A, the next notebook is on topic B.

 5   These are just notebooks that are used until they are filled

 6   up and then the scientists move on to another one.

 7        But I hear what you're saying, Your Honor, and I'm going

 8   to go back and look for what information we have readily

 9   available that might help us and plaintiffs identify whether

10   there's anything in these notebooks that might be useful, and

11   we will give that to Mr. Aylstock.

12             THE COURT:  Are you able to tell by the name of the

13   scientist whether or not it would be someone involved or not

14   involved in transvaginal mesh or pelvic mesh?

15        (No response)

16             THE COURT:  Hello?

17             MR. GAGE:  Gary?

18             MR. RUBIN:  I apologize, Your Honor.  I'm struggling

19   with answering.  I cannot answer that because I don't know

20   what else these individuals might have been involved with.

21             THE COURT:  Well, surely there's someone --

22             MR. GAGE:  Judge --

23             THE COURT:  -- at the company who can tell you --

24   they can look at this list of scientists and they can say,

25   "Well, Dr. Smith never, never had anything to do with mesh."

1    That's not -- I mean Ethicon is a big company.  I'm sure they

2    have lots of products.  I would think you'd be able to tell

3    just by the names of some of these scientists whether there's

4    any likelihood they would have information in their notebooks

5    pertaining to pelvic mesh.

6         You might be able to eliminate half of the notebooks

7    doing that.

8              MR. GAGE:  Judge, if I was listening, that sounds to

9    me like probably the first step, because if you -- if you see

10   a notebook that's by a person that we've never heard of

11   before, the odds are, he or she is not a mesh scientist.  And

12   then, conversely, if you see something with a name that we,

13   you know, we all are familiar with in terms of a mesh

14   custodian, then that becomes one that you pull off the desk

15   and you -- you pull off the shelf and you take a closer look

16   at it.

17             THE COURT:  Well, somebody is going to need to do

18   that by the end of next week so we have some idea what we're

19   looking at as far as these 91 notebooks go, or 90 notebooks,

20   because that deposition is just right around the corner.  And

21   if any of those notebooks are relevant to that deposition,

22   Mr. Aylstock is going to have to have time to review them

23   before he takes the deposition.

24             MR. AYLSTOCK:  And, Your Honor, this is Bryan

25   Aylstock again.  Here's my issue with this whole thing.  I

1    learn about this two days ago.  In July of 2012, 17 months

2    ago, request for production number 56 asks for all documents,

3    including but not limited to notebooks and electronic

4    notebooks in your possession, custody, control that pertain to

5    clinical -- from -- provided to clinical investigators or

6    scientists that pertain to past, present, and future pre-

7    clinical studies of the pelvic mesh products.

8        And from what I learned two days ago -- and it was

9    confirmed today -- they have not even asked those scientists

10   what's in those notebooks, which is -- there's a problem for

11   me.

12       I would just add that when it comes to the names,

13   sometimes there may be assistants that keep notebooks whose

14   names we may not know about, and a lot of the studies may

15   relate -- because the claims on the pelvic mesh sometimes

16   relate to hernia mesh testing, I'm not so sure that what we're

17   going to get is going to help us by the 8th.

18       And the only -- I would also add that these GLP standards

19   require there to be a notebook kept for these pre-clinical

20   studies.  So unless they violated good lab practices and

21   common sense, notebooks exist; they need to be produced.  I

22   don't know where they are, but maybe they're in this vault,

23   but apparently nobody has even talked to the scientists about

24   what's in the notebooks.

25       It's a real problem for me, and we need an answer, and I

1    think the easiest answer is just copy the notebooks and get

2    them to us and let us try to figure it out.

3          THE COURT:  Well, that may be the end result, but if

4    there are notebooks in there, I would think somebody at the

5    company is going to know what these people worked on.  There's

6    got to be somebody there who's going to know that, and I don't

7    see any point in giving you 50 notebooks that have nothing

8    whatsoever to do with mesh.

9       If there's some way that we can -- and when I say "we," I

10   mean Ethicon -- can look at these notebooks and figure out

11   what they might be about in some quick fashion and maybe

12   eliminate some of them, then they'll have to dig a little

13   deeper with what's left over.  But the bottom line is, Ethicon

14   needs to get started doing that ASAP.

15         MR. GAGE:  Judge, we're on it.

16         THE COURT:  All right.  All right.  What else do we

17   have?

18         MR. GAGE:  Judge, before I forget -- everybody is

19   going to get so mad at me if I forget, and I confess I

20   haven't -- well, I did.  I sent an e-mail to Bryan on this.

21      Your Honor, when the plaintiffs filed their spoliation

22   motion, they had requested a waiver of the page limits so that

23   they could, I believe, go to 25 pages.

24         THE COURT:  Uh-huh.

25         MR. GAGE:  And my briefing team has asked if we

1    could -- if we could ask for a waiver of the page limitation

2    such that we could have 30 pages, with the understanding that

3    in order for both sides to have an equal number, we would be

4    glad if plaintiffs -- or we'd be perfectly happy to let

5    plaintiffs have five more for their reply brief, so that each

6    side gets 30.

7            THE COURT:  I don't have a problem with that.

8            MR. GAGE:  And, Judge --

9            THE COURT:  I don't have a problem with that, but,

10   you know, I've told you before, I'm pretty nuts and bolts.  So

11   I like someone to get to the point.  If it takes you 30 pages

12   to get to the point, to get all the points covered, that's

13   fine.  But if it's 10 pages of points and 20 pages of flowery

14   argument, then don't do it, because I lose my attention span.

15           MR. AYLSTOCK:  Well, Your Honor, this is Bryan.

16   With our original draft, there was 48 pages, and so we worked

17   extremely hard to get it to 25 pages.  And, you know, I don't

18   have a problem with getting the -- providing the extra five,

19   because when we asked for the five pages, Ethicon or -- it was

20   okay with that.  They asked for, "Well, fine, but we'd like an

21   extra five for our response," and so we were fine with that,

22   of course.  And so if they'd like ten for their response, we'd

23   just like an extra five for our reply, and we will certainly

24   be filing a reply.

25           And also, just so everybody has a heads-up, we've finally

1    gotten some additional information about several more

2    custodians that apparently don't have a custodial file.  One

3    is a John -- Mr. John Clay, who was identified as, on their

4    30(b)(6) notices, the person in charge of the regulatory file

5    for all the TVT products for years, apparently doesn't have a

6    file.  Jill Schiaparelli apparently doesn't have a file.

7    Kendra Munchel doesn't have a file.  And these are important

8    witnesses.

9        So we'll be filing a supplement next week just to add

10   those individuals and perhaps some others that appear to have

11   severely deficient files to our motion.

12       One is Jill Schiaparelli.  She was the main contact

13   person with the Dr. Heniford.  The video that I think we've

14   provided in our spoliation was of a Dr. Heniford who Ethicon

15   had designated as a -- both a fact -- we had identified as a

16   fact witness and Ethicon has identified as an expert witness.

17   And I think on our last call, his file was brought up because

18   we still had not received documents we had requested.

19       He kind of falls in that very same category as Drs.

20   Klinge and Klosterhalfen.  He's a current consultant for

21   Ethicon, still does a ton of work for them, has a lot of

22   documentation that we know about mesh.  He's a mesh scientist

23   and researcher and has, you know, the video that -- he's

24   produced videos for Ethicon and so forth on that concept.  And

25   we still don't have that -- those documents.

1          Now, William -- Mr. Gage did pull down -- he's no longer

2    an expert for this case, the *Lewis* case.  He was pulled down

3    by Ethicon, but his fact witness deposition remains, and we

4    still would like to get his documents.  We lifted heaven and

5    earth to get Klinge's and Klosterhalfen's documents, and we'd

6    like to have those documents for that deposition, but I think

7    they're also probably very relevant to perhaps some of these

8    *Daubert* responses that we're working very hard on and are due

9    next Friday.

10              THE COURT:  Well, Mr. Aylstock --

11              MR. GAGE:  Judge --

12              THE COURT:  -- you've sort of lost me.  We were

13   talking about the page limits for these briefs, and all of a

14   sudden I have no idea what you're talking about.

15        So as far as the page limits go, that's fine.  You can

16   have your extra pages.

17        Now, was there another issue in there somewhere?

18              MR. GAGE:  Your Honor, this is William Gage.  With

19   regard to the page limitation and the briefing on the motion,

20   Mr. Aylstock just indicated that he would be supplementing

21   next week to, essentially, I guess, add additional items to

22   his motion.

23        And just so that Your Honor kind of understands what

24   we're doing, you know, we're obviously going through their

25   original motion; and for every alleged act of spoliation, what

1   we're doing is, you know, really marshaling a lot of forces

2   and gathering evidence and such in order to properly respond.

3       I'm concerned that if plaintiffs supplement next week,

4   and, you know, recognizing that Ethicon is -- and most of its

5   employees are gone during the Christmas week, I'm wondering

6   how -- I'm wondering what Your Honor would recommend we do if

7   we get to the response date of Monday, January 6th, on those

8   supplemental issues and we come to the Court and might have to

9   request a little bit of extra time.

10      At one level -- I mean I know Your Honor is very gracious

11  with extra time, and I'm not questioning that, but I wonder --

12  I hate to set Your Honor up for what is essentially two

13  motions, two responses, and two replies.

14          THE COURT:  Well, you know, I still haven't looked

15  at the original motion because what I like to do is look at

16  everything at one time so I don't have any kind of

17  preconceived notions that are marinating in my brain before I

18  get the rest of the documents.  So I haven't looked at the

19  motion.

20      The only concerns that I have at all about time frames is

21  that I understood Mr. Aylstock to say that some of the relief

22  that the plaintiffs are requesting affects this upcoming trial

23  date.  So that's --

24          MR. AYLSTOCK:  That's correct.

25          THE COURT:  You know, that's my only concern.  If it

1    were not -- if it were just the plaintiffs asking for money,

2    some kind of money sanction, it wouldn't be a big deal.  But

3    if they're asking for something that might affect a trial in

4    February, then, you know, we're not going to have a lot of

5    extra time for that.

6              MR. GAGE:  Well, Judge, what we may want to do is

7    just play it by ear if -- and I would just ask the Court's

8    indulgence and plaintiffs' indulgence, that depending on what

9    the -- the extent of the supplementation and the extent to

10   which we have to go try to, you know, dig up some facts and

11   have them ready on -- by January 6th, that we may have to come

12   back to Your Honor and ask for a brief extension on the

13   supplemental part.

14             THE COURT:  Sure.

15             MR. GAGE:  Okay.

16             THE COURT:  I think we can deal with that as it

17   comes up.

18        All right.  Now, Mr. Aylstock, was there some other issue

19   that you were raising?

20             MR. AYLSTOCK:  Yeah, and I apologize.  The other

21   issue related to our need to get the Heniford documents.

22   Dr. Heniford is a mesh scientist, a current consultant for

23   Ethicon.  He's been with them for many, many years, has been

24   paid I think over a million dollars by Ethicon, continuing to

25   be paid, and so he's not only a fact witness, he was a

1   retained expert for Ethicon.  And deposition was set and we

2   were in need of his documents.  There's that same issue

3   where -- the other side of the coin with Klinge and

4   Klosterhalfen.  We still don't have the documents.

5       Now, his expert deposition was withdrawn because he was

6   withdrawn as an expert, but he's still an important fact

7   witness, and we still want his documents.  And I'd like to get

8   them -- originally, as the Court may recall, they were

9   supposed to be produced a couple of weeks ago, and Mr. Gage

10  was doing everything he could to do that, and that didn't

11  happen, and now we're here before Christmas and we'd like to

12  get them before the end of the year so we can be ready for the

13  deposition.

14          THE COURT:  When is his deposition?

15          MR. GAGE:  Your Honor, this is William Gage.  What

16  happened was the depo was scheduled, I think, for December 17

17  and 18, and the way we had structured it was the same way that

18  Your Honor had asked that we do the Klinge and Klosterhalfen,

19  which was the fact witness depo for one day, followed by the

20  expert witness depo the next.

21      We are running into some of the same difficulties that

22  plaintiffs ran into when trying to obtain documents from

23  someone who is not your employee and someone who is a doctor

24  and has a hospital affiliation.  And it's been difficult.

25          We've gotten a small amount of documents from him, but

1     it's not a complete set.  It's not close to a complete set.

2     And so we have people today, including David Thomas, meeting

3     with Dr. Heniford, and that's face-to-face.  And the purpose,

4     among other things, is to emphasize the importance of ensuring

5     a complete collection and production of these documents.  So

6     that's what we're dealing with.

7          In terms of a depo date, we -- I just got an e-mail from

8     Michael Brown, who's also with David, and he said we are

9     getting a depo date today.  And so my hope, Your Honor, is

10    I'll be able to send Bryan a new depo date today.

11             THE COURT:  Now, is this a deposition you're trying

12    to take before the trial?

13             MR. GAGE:  Yes, Your Honor.

14             MR. AYLSTOCK:  Yes, Your Honor, absolutely.  And we

15    were hoping to take it before some of our *Daubert* responses

16    were due; but, frankly, you know, Dr. Heniford has made some

17    statements about, you know, the fact that the mesh needs to be

18    lightweight, large pore, and the TVT mesh is heavyweight,

19    small pore, and what that can do.  And so as a current

20    employee -- or a current consultant, I think it might be

21    helpful.  I'm not, frankly, too concerned about the *Daubert*

22    motions, but maybe I should be.  But I certainly would like

23    his deposition as humanly possible.  It was set on the 17th

24    and unilaterally withdrawn by Mr. Gage.

25             MR. GAGE:  And, Your Honor, this is William Gage.

1   The reason I unilaterally withdrew it was I knew the document

2   situation was not going to be to plaintiffs' liking and

3   certainly not to your liking, and I want the documents fixed

4   before the depo.

5           THE COURT:  All right.

6           MR. GAGE:  And as I said, Your Honor, we pulled him

7   down as an expert, and he is not -- you know, he's a third

8   party.  He's a fact witness.  And as you might expect, I don't

9   have the -- we don't have the same degree of control over him

10  as we would, for example, a company witness.

11          THE COURT:  All right.  Well, let's see what you can

12  get moving on that.  I guess you've got about a month to work

13  with as far as getting everything done before trial.  So

14  that's not a lot of time.

15          MR. AYLSTOCK:  No, Your Honor, not with everything

16  else we have to do.

17          THE COURT:  Right.  Well, work a little bit more on

18  this and try to get this resolved.  And if you can't and you

19  need to talk to me again or need definite deadlines, then just

20  call and I'll do that.

21          MR. AYLSTOCK:  Your Honor, another issue that I'd

22  like to bring up and I have discussed with Mr. Gage by e-mail

23  and followed up last night and was hoping to get an answer

24  from him and maybe have it and we can shortcut this, we

25  continue to have issues of documents -- you know, historical

 1    documents, not brand new newly created documents, being

 2    produced after the witnesses.  And then it also goes into this

 3    idea that there were lab notebooks in a vault and so on and so

 4    forth.

 5         And I sent Mr. Gage some orders from other MDLs,

 6    including the Pradaxa MDL.  And the lawyers defending,

 7    Boehringer Ingelheim, there have the same document, I guess --

 8              THE REPORTER:  I'm sorry.  I'm not --

 9              MR. AYLSTOCK:  -- production company that Mr. Gage

10    is using here.  And what that judge did was said, "Look, I'm

11    not -- I'm going to ask you to, you know, have somebody at

12    that document production company say that they've undertaken a

13    good faith effort to do everything and to find the documents

14    so that we don't continually have this issue."

15         I got yesterday -- I think Mr. Watson sent me another

16    production with some more documents which -- so what we'd like

17    and what I proposed to William is can we maybe do that?  And

18    if the answer is no, that's fine, we'll brief it for Your

19    Honor so Your Honor can see those orders.

20         I'm not trying to surprise Mr. Gage or say I'm arguing it

21    right now, but that's an issue that we'd like to get briefed

22    and to Your Honor if there isn't some agreement on it.

23              MR. GAGE:  Your Honor, this is William Gage.  Can I

24    respond?

25              THE COURT:  Certainly.

1           MR. GAGE:  Your Honor, you know, this business of

2      producing custodial documents is, I have learned, it's a very

3      complicated business.  And I have learned stuff in the last

4      five months of doing this that have made me realize that

5      nothing is ever easy when it comes to document production.

6      And in particular on this issue of custodial productions, you

7      know, it's very easy to say, for example, "You have

8      produced -- you know, you've produced this document to me or

9      you produced this witness's custodial documents to me a year

10     ago and then you six months later do a supplemental

11     production.  Why is it that you give me a document in the

12     supplemental production that pre-dates the original

13     production?"

14          And at one level, Judge, that's just a -- that's a very

15     good question, and I asked the question recently to my team,

16     "Why does this happen?  What's going on?"  And they said,

17     "Well, there are a number of reasons that you may see things

18     like that.  One would be, for example, privilege downgrades."

19     And Your Honor knows, you know, we review the documents for

20     privilege and sometimes they're marked as privileged and then

21     later they're -- somebody goes back in and reconsiders it or

22     the plaintiffs may contest them and then they end up getting

23     produced because they're no longer -- or the privilege claim

24     is no longer dealt with, or, I was told, that sometimes it's

25     resolution of technical files, meaning there's some, you know,

1    technical issue that has to be worked through.

2        And then another reason that you end up getting

3    documents, maybe not on the post-dating issue, but that you

4    continue to get documents on a particular custodian is because

5    of supplementations.  You know, you go -- and some of these

6    people still -- a lot of the people that we've produced for

7    still work for the company, and we've got some schedule -- and

8    I know we've discussed it with Bryan; I think we've shared

9    some data with him -- as to how often we do these supplemental

10    productions.

11        So the long story short is on the custodial productions,

12    there are a lot of different moving parts; and at any one

13    time, any one of those moving parts may give you the sense

14    that the production is not complete.  So I understand where

15    Bryan is coming from, but what I think we need to do is if

16    Bryan is really concerned about the completeness, I think we

17    need to deal with it first on a document basis so that we can

18    say -- so that Bryan can say, "These are the documents that

19    create my concern."  And then we can go investigate those

20    documents and come back to him and give him our response as to

21    what the deal is.  That way we know what we're dealing with,

22    we know what the issues are.

23        And in any event, I share all this with you, Judge,

24    because it's just a -- these custodial productions are

25    relatively complicated things and it's difficult to ever say,

1    boom, this one is forever done and complete, because you've

2    got all these other things happening, like privilege

3    downgrades, technical file issues, and supplementation, which

4    I don't know how -- you know, I don't know how you get around

5    them.

6              MR. AYLSTOCK:  Yeah.  And, Your Honor, this is Bryan

7    Aylstock.  I'm not asking for this as the end-all be-all, but

8    the -- what was done in Pradaxa and ordered by Pradaxa,

9    LeClairRyan, as I understand it, is the document company for

10   both Boehringer Ingelheim and J&J in this litigation.  And

11   it's simply an affidavit, and it doesn't say this is the

12   end-all be-all, but it just says, "I've made this affidavit

13   after reasonable inquiry as required under Rule 26; and based

14   on the information that I've been supplied, you know, this is

15   a complete file as best as I know."

16        And I appreciate and commend Mr. Watson, Mr. Gage, you

17   know.  When we make an inquiry, you know, typically we can do

18   that, but it just -- it has -- it hasn't been an isolated

19   inquiry.  We've been making these inquiries for a year, and

20   it's very difficult for us to know what's there and not there.

21   And when, you know, I hear about a vault with lab notebooks

22   and nobody has even asked the laboratory folks whether there's

23   mesh stuff in there, or I have Tom Barbolt being deposed and

24   I -- there's got to be lab notebooks for this.  It's a problem

25   that I think needs to be addressed.  And we're prepared to

1    file a motion on it if there's not agreement, and we'll put

2    that in papers.

3         MR. GAGE:  Well, Your Honor, if I could just make a

4    couple of comments.  First of all, what the -- it's UnitedLex

5    is the name of the group that's working with us, not

6    LeClairRyan.  LeClair did it for a while, but it's now

7    UnitedLex.  I just wanted the record to be clear on that.

8         But, secondly, Your Honor, I would just say, to kind of

9    close out the issue, I would invite Bryan, with Your Honor's

10   indulgence, to, you know, to meet-and-confer with us on a

11   specific -- a more specific basis, because at 50,000 feet,

12   it's hard to deal with the issue.  But when you deal with it

13   in the context of specifics, I think we could provide them

14   with assurances that are -- become much more difficult, you

15   know, at a 50,000-foot level.

16        THE COURT:  Well, why don't you see what you can

17   work out together on that.

18        MR. AYLSTOCK:  We will, Your Honor.

19        THE COURT:  I think Mr. Aylstock's -- the -- sort of

20   the bee in his bonnet is that there's this vault full of these

21   lab notebooks that he's just learned about, and so now he's

22   having doubts that he's been told what really is out there,

23   and his doubts are going to continue until he feels that he

24   gets some sort of reassurance.

25        It may be justified for him to feel that way.  Maybe he's

1    overacting a little bit.  I don't know.  But why don't you

2    talk about it and see what you can work out.

3              MR. GAGE:  Yes, Your Honor.

4              MR. AYLSTOCK:  I've been accused of overreacting

5    before, but -- okay -- it is more than the lab notebooks.

6    It's -- Ben, we'll try to work it out, and if not, we'll bring

7    it to Your Honor.  We certainly -- that's why I provided, I

8    think it was Monday, to William this proposed order, and it

9    wouldn't be groundbreaking for something like that to happen,

10   but we'll see what we can do.

11             THE COURT:  Right.  I agree.  If there are real

12   problems with the extent of the search that's being done by

13   Ethicon, then those kinds of reassurances in writing are a

14   good thing to do.

15             MR. AYLSTOCK:  And in particular, given the

16   impending trial, you know, in the *Linda Gross* trial in

17   New Jersey that we had some involvement in, there were

18   thousands and thousands of documents that were produced right

19   on the eve or right during trial.  And, you know, I don't know

20   why that happened, but it happened, and I don't want to have

21   that here, because there were some very important documents

22   that didn't get used in that trial because they hadn't been

23   produced.

24             THE COURT:  All right.  Well, is there anything

25   else?

1          MR. AYLSTOCK:   This one should be an easy one, Your

2     Honor.   Again, this is Bryan.   There's an issue I think in --

3     and maybe Mr. Watson has an answer to it.   We were in -- we've

4     been produced a lot of materials that are -- almost everything

5     is in black and white.   And the way that the ESI order is

6     drafted, that, you know, if we request something in color, we

7     can get it.

8        But it's become apparent that the defendants' lawyers,

9     because this happened in some of their depositions, they

10    have -- must have a color -- a database or something of color

11    copies, and I'm not sure that we're getting what the ESI

12    requires, that is, some designation that a color copy exists,

13    and if we want it, we can have it.

14       So to the extent that they have all of these marketing

15    brochures and so forth in color, you know, we certainly want

16    them, because they're sometimes illegible literally in black

17    and white.   And I'm not throwing stones, because when we ask

18    for them, Mr. Watson is very good to give them to us.   But

19    what we'd like is, you know, basically what the defense

20    lawyers have.   If they have color copies, we'd like to have

21    the color copies too.

22          THE COURT:   Mr. Gage?

23          MR. WATSON:   Your Honor -- Your Honor, this is Ben

24    Watson.   Mr. Aylstock is correct.   It's my recollection -- I

25    don't have it in front of me.   My recollection of the ESI

1    protocol is that, you know, if a document has color contents

2    to it, there's a, I guess, a seal, there's a meta data seal

3    that it's locked in.  It's my understanding that, you know,

4    that that is certainly there.  I'll certainly double check on

5    that.  But, yes, any -- you know, any document that he, you

6    know, requests in color, we're certainly glad to give it to

7    him.

8        And, you know, Bryan, if you and I want to talk about

9    that, I'd be glad to work out a way to figure out exactly what

10   it is that you need and we'll get it to you.

11              THE COURT:  I think I hear him saying he doesn't

12   always know there is a color copy until later, and so --

13              MR. WATSON:  Well, Your Honor --

14              THE COURT:  He wants you to give him what you have

15   if it's in color.

16              MR. AYLSTOCK:  That's right.

17              MR. WATSON:  And I think we're certainly, you know,

18   glad to do that.  It's just defining, you know, what it is.

19   If it's marketing brochures, you know, if it's something

20   discrete in the universe, I think that's easy to find and get

21   them out.  I just want to make sure I understand what it is

22   that he's interested in.

23              THE COURT:  He wants anything you have that's in

24   color.  That's what I hear him saying.  If you have it in

25   color, he wants a color copy.

1          MR. WATSON:  Right.  And, Your Honor, I think that,

2     again, I think that everything that we have in color, I think

3     that goes, you know, against the ESI protocol because as I

4     understand it, what it says is that, you know, if there is a

5     color version, we'll mark it in the meta data and then they

6     can make reasonable requests for color copies.

7          So if it's just a blanket request for everything that

8     exists in color, we want it in color, I think Mr. Aylstock and

9     I need to talk about that.

10          THE COURT:  Right.  I'll order you to do whatever

11     the ESI protocol says.

12          MR. WATSON:  Yes, Your Honor.

13          THE COURT:  So whatever it says -- and if you

14     don't -- if you can't agree on what it says, then we can take

15     that up.  But whatever it says is what you need to do.

16          MR. AYLSTOCK:  Your Honor, my point -- and, you

17     know, I don't disagree with what Mr. Watson says about that.

18     What I'm asking -- what I'm suggesting is I -- it seems to me,

19     because we see it at these depositions where multiple color

20     copies are pulled out, not Ethicon, but the Butler Snow

21     lawyers or the defense lawyers have some -- you know, they

22     have some database on their own.  I suppose they have an index

23     of copied versions.  And to the extent that those lawyers have

24     it, you know, we'd like to be on equal footing with them

25     without having to pick and choose and figure out meta data, if

1     it's there and so forth.

2             THE COURT:  Mr. Aylstock, they're going to have to

3     do what the ESI protocol says.  Unless the ESI protocol -- if

4     they want to put something in color themselves and it's not --

5     it's not in color from Ethicon or it's not noted to be in

6     color in the meta data, then I don't guess you have a right to

7     have them give you their color versions.  You know, they'll

8     have to do whatever the ESI protocol says.

9             MR. AYLSTOCK:  Okay.  Fair enough, Judge.

10            THE COURT:  All right.  Okay.

11            MR. AYLSTOCK:  And then just a quick follow-up.  I

12    had requested some exemplars of the Prolift products looking

13    forward, looking down the road, and I'm not sure where we are

14    on that and some hernia exemplars that Mr. Anderson had

15    requested Miss Jones back in July.  And, you know, I just

16    wanted to follow up, put that on the Court's radar, because we

17    still are waiting on that.

18            THE COURT:  Does anyone --

19            MR. GAGE:  Yeah, Judge, this is William -- this is

20    William Gage.  On the exemplars, Judge, we've got -- we've got

21    very few, and we have advised Mr. Aylstock of this.  We have

22    very few of some kinds, like, for example, Prolifts, very few

23    of them.

24            When I say very few, if my memory is correct, it's less

25    than ten, but I'm operating off memory, so don't hold me to

1      that number.  But it's a very small number.

2          Now, if -- if, for example, they, the plaintiffs, are

3      interested in testing like the mesh as opposed to like testing

4      the full configuration of the Prolift device, I've got a lot

5      more -- I think it's called Gynemesh PS, which are just kind

6      of flat square squares of that type of mesh, so -- but I had

7      very few, like TV -- well, not very -- I've got very few TVT

8      Secur and very few Prolift devices, which are two of the

9      discontinued devices.

10         So one of the things that -- and we've advised Bryan

11     as -- I think it was going back as far as April of this year.

12     One of our concerns is with so few devices remaining, we have

13     to be very careful not to hand all these out and then have

14     them all evaporate or disappear, because we've got other

15     courts that might get on us.  And we have to be very careful

16     to make sure we keep some and not let anything happen to them

17     just because of the fact we've got a lot of courts that --

18     other than the MDL, that, you know, we might have to be

19     answerable to.

20         So we've got to be careful with the ones that we have a

21     very small number.  And we've already given the plaintiffs

22     some of these.  It's not like we've stiffed them on this.  As

23     I understand it, they made a request earlier, months and

24     months ago.  We produced a number of them to them, and now

25     they're coming back and want more.  So it's not a deal where

 1   we just told them no.

 2        MR. AYLSTOCK:  Well, we don't have any Prolifts.

 3   You've never given us Prolifts.

 4        MR. GAGE:  Well, I'll have to go back and check, but

 5   in any event, Judge, we have very few.  And my take is if I

 6   could get Bryan to send me an e-mail that says, "I need this

 7   device," and it needs to be very specific as to what he wants

 8   and the number, then I will respond and tell him how many we

 9   can give him.  And then if there's a dispute over the number,

10   then we can come back to Your Honor and I'll say, "Judge, I've

11   got, whatever it is, ten.  He wants eight of my ten."  And I'm

12   going to say, "Judge, I feel like I can't do that with other

13   Prolift cases pending around the country and give them all to

14   the MDL counsel."

15      So I kind of think that's where we are.  It's not that we

16   don't want to cooperate.  It's we have to be careful with the

17   ones that we have very few product on.

18        MR. WATSON:  Judge, this is Ben Watson.  I hate to

19   interrupt.  Bryan, you did send me an e-mail, and I think it

20   was broken out by products.  And I just want to make sure my

21   memory of that is right.  So I think we do have that.

22        MR. GAGE:  Okay.

23        MR. AYLSTOCK:  I sent that December 2nd after a

24   meet-and-confer with Mr. Watson about that.

25        MR. GAGE:  Do you have the hernia products listed in

 1   there as well?

 2           MR. AYLSTOCK:  Yes.  PROLENE old construction,

 3   PROLENE revision 2, and PROLENE 5 mil to revision 3.

 4       So you were copied on that.  It was December 2nd at

 5   11:08 a.m.

 6           MR. GAGE:  Judge, you see what happens.  I get so

 7   many e-mails from Bryan, I can't keep up with them all.

 8           THE COURT:  Well, why don't you -- you know, why

 9   don't you read the e-mail that he sent and then figure out,

10   you know, what you have and what you can supply to him.

11       I understand your concern about handing them all out, and

12   obviously you don't want to do that and I don't want to make

13   you do that, so let's figure out what we can do with what

14   you've got left.

15           MR. GAGE:  All right.  Thank you, Judge.

16           THE COURT:  Do we have anything else?

17           MR. AYLSTOCK:  That's all I have right now, Your

18   Honor, for this.

19           MR. GAGE:  Judge, I will note for the record that

20   Bryan and I agreed in retrospect at the fact that we did not

21   send each other any e-mails over Thanksgiving was an absolute

22   blessing for both of us.  So I'm almost inclined to file a

23   motion asking for no e-mails on Christmas Eve or Christmas

24   Day, but I think Bryan will agree on the record we're not

25   going to do that to each other.

1          MR. AYLSTOCK:  We're going to do our best, although

2     all of our *Daubert* responses to all of the *Daubert* motions

3     Mr. Gage's firm filed are due on the 27th, so I don't know if

4     I can do that, but I'll certainly try.

5          THE COURT:  Mr. Aylstock is the scrooge in this

6     group I think.

7          UNIDENTIFIED SPEAKER:  Very much.

8          THE COURT:  Well, you all enjoy your vacation if you

9     get to take any days off next week, and I guess I will talk to

10    you again in a couple of weeks unless something comes up in

11    between.

12         MR. AYLSTOCK:  That sounds great, Your Honor.  We'll

13    be on the phone in a couple of weeks.

14         THE COURT:  All right.  Thank you.

15         MR. GAGE:  Thank you, Judge.

16         THE COURT:  Goodbye.

17         MR. GAGE:  Bye-bye.

18         MR. AYLSTOCK:  Merry Christmas, everybody.

19         THE COURT:  You too.

20       (Conference concluded at 2:55 p.m.)

21     I, Teresa M. Ruffner, certify that the foregoing is a

22    correct transcript from the record of proceedings in the

23    above-entitled matter.

24

25       /s/Teresa M. Ruffner                    December 23, 2013