IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT HUNTINGTON


TRANSCRIPT OF PROCEEDINGS




----------------------------------------

IN RE:  ETHICON, INC.,  PELVIC REPAIR         MDL NO.
SYSTEM PRODUCTS LIABILITY LITIGATION          2:12-MD-2327


----------------------------------------




TELEPHONIC MOTIONS HEARING

January 3, 2014




**BEFORE THE HONORABLE CHERYL A. EIFERT
UNITED STATES MAGISTRATE JUDGE**




Court Reporter:          Lisa A. Cook
                         RPR-RMR-CRR-FCRR
                         (304)347-3198
                         lisa_cook@wvsd.uscourts.gov

1                        **APPEARANCES**

2                      **(By Telephone)**

3    For the Plaintiffs:

4    **MR. BRYAN F. AYLSTOCK**
     **MS. D. RENEE BAGGETT**
5    Aylstock, Witkin, Kreis & Overholtz
     Suite 200
6    17 East Main Street
     Pensacola, FL  32502

7

8    **MR. RICHARD A. FREESE**
     Freese & Goss
9    2031 2nd Avenue North
     Birmingham, AL  35203

10

11

12

13   For the Defendant:

14   **MR. WILLIAM M. GAGE**
     **MR. BENJAMIN M. WATSON**
15   **MS. ANITA MODAK-TRURAN**
     Butler, Snow, O'Mara, Stevens & Cannada
16   P.O. Box 6010
     Ridgeland, MS  39158-6010

17

18   **MR. RICHARD BERNARDO**
     Skadden, Arps, Slate, Meagher & Flom
19   4 Times Square
     New York, NY  10036

20

21

22

23

24

25

```
 1                       P R O C E E D I N G S
 2              THE COURT:  Hello.  This is Judge Eifert.
 3              MR. AYLSTOCK:  Hi.  Good afternoon, Your Honor.
 4    This is Bryan Aylstock.
 5              THE COURT:  Hi, Mr. Aylstock.
 6              MS. BAGGETT:  Renee Baggett is also on.  How are
 7    you doing?
 8              THE COURT:  Fine.  How are you?
 9              MS. BAGGETT:  Very good.  Thank you.
10              THE COURT:  Who else do we have?
11              MR. GAGE:  Judge, I thought I would let the
12    plaintiffs finish before the defendants.
13              MR. FREESE:  Your Honor, Richard Freese on behalf
14    of Ms. Lewis.
15              THE COURT:  Anyone else on behalf of plaintiffs?
16         (No Response)
17              THE COURT:  All right.  Defendants?
18              MR. GAGE:  Judge, this is William Gage.  And I've
19    got Ben Watson of my office with me.  And I've also got
20    Anita Modak-Truran of my office with me.
21              MR. BERNARDO:  And you also have Rich Bernardo
22    from Skadden for defendants.  Good afternoon, Judge.
23              THE COURT:  Good afternoon.
24         Is there anyone else?
25         (No Response)
```

1          THE COURT:  Let me make sure, then, that the court

2     reporter, Ms. Cook, is on the line.

3          COURT REPORTER:  Yes, I'm here, Judge.

4          THE COURT:  All right.  Thank you.

5       Well, who would like to go first?

6          MR. AYLSTOCK:  I would, Your Honor.  This is Bryan

7     Aylstock again for the plaintiffs.  And I did want to

8     introduce the Court to Rich Freese.  Mr. Freese is counsel

9     of record and represents Ms. Lewis, Carolyn Lewis who is the

10    first bellwether Ethicon trial.

11       And we do have an issue that has arisen and

12    unfortunately couldn't be resolved with regard to the

13    completion of the deposition of Dr. Boreham, B-o-r-e-h-a-m.

14       Dr. Boreham is the implanting physician for Ms. Lewis.

15    And her deposition was taken back in July pursuant to the

16    order with regard to working up the pool of bellwether

17    cases.  Mr. Freese took the deposition.  It began late and

18    did not complete.  In fact, there were a couple hours left

19    on the seven hours under the Federal Rules.

20       And in addition to that, there's been documents that

21    have been produced since then that are directly relevant

22    and, in fact, contradict the testimony of Dr. Boreham in

23    there about contacts with sales reps and so forth.

24       And in the interest of moving things along in the

25    trial -- we know that the Judge is very interested in

1   keeping these trials to a minimum.  What we would like to do

2   is get some additional time with Dr. Boreham, complete the

3   discovery deposition, and have a short *de bene esse*

4   deposition so that we can present her testimony in the best

5   form possible and understandable way for the Court,

6   particularly in light of some of these, these documents that

7   were produced and, and I think need to be examined with,

8   with Dr. Boreham.

9        As I understand it, Ethicon has refused to allow the

10  completion of that without an order of this Court.  And we'd

11  ask that an order be entered allowing us to complete her

12  deposition.

13            THE COURT:  All right.  Who wants to speak on

14  behalf of the defendants?

15            MS. MODAK-TRURAN:  Your Honor, this is Anita

16  Modak-Truran.  I was at the deposition of Dr. Boreham and

17  I'm prepared to speak on that.

18       The deposition of Dr. Boreham lasted six hours and 22

19  minutes.  The deposition was completed.  None of the parties

20  ever asked to keep the deposition open.  That deposition

21  went from 3:25 to 9:47 with the majority of the time being

22  spent by plaintiff's counsel on all sorts of documents.

23       We do not agree, Your Honor, to an additional

24  deposition because, one, the Federal Rules do not make a

25  distinction between a discovery deposition and a *de bene*

1    *esse* deposition.  And in this case, Mr. Freese recognized

2    that during the deposition when he informed Dr. Boreham that

3    her deposition could possibly be used at trial.  So, we

4    don't think that argument makes any sense.

5        The other thing is that Dr. Boreham has not seen the

6    plaintiff since January of 2010.  All of the medical records

7    had been produced before her deposition.  We are not aware

8    of any new records concerning Dr. Boreham's treatment and

9    care of Mrs. Lewis.

10       Pursuant to the orders entered into this case, we filed

11   a dispositive motion on December 12th where we moved for

12   summary judgment based on the learned intermediary theory.

13       We've asked plaintiff's counsel what additional

14   documents they wanted to ask Dr. Boreham about, but they've

15   never been able to identify them to us.  We don't understand

16   why this request was not made before we filed our

17   dispositive motion.

18       And based on this Court's opinion in *Jones* vs. *Bard*, we

19   believe this Court, based on the same analysis, should deny

20   that request.

21       We also have Pre-Trial Order 38 which states that

22   absent exigent circumstances, there shall not be a repeat

23   deposition of a witness.  And, certainly, we have not seen

24   or heard any reason why the plaintiffs want to have a repeat

25   deposition of Dr. Boreham, particularly after we've already

1    filed the dispositive motion based on her testimony.

2           THE COURT:  Mr. Aylstock.

3           MR. AYLSTOCK:  I'll, I'll let Mr. Freese respond

4    to the particulars of the deposition, as well as the

5    documents that were received, and just remind the, the Court

6    that we -- I think it's been made clear when documents are

7    produced after the fact that, that they're on a deposition,

8    that that's an exigent circumstance.  But if I could

9    introduce Mr. Richard Freese to the Court.

10          THE COURT:  Right.  But let me clarify one thing

11   that you just said.  That's not what I've said.  I've said

12   that if you depose, for example, a corporate representative

13   or someone employed by the company or someone they've put up

14   as a fact witness and you've taken that deposition and then

15   they've produced, meaning the defendant has produced

16   documents that are pertinent to that witness and that should

17   have been produced before that could have been produced

18   before, then I can understand giving you a second chance at

19   a deposition.

20        Now, I understand Dr. Boreham is a treater.  Is that

21   right?

22          MS. MODAK-TRURAN:  That's correct, Your Honor.

23          MR. AYLSTOCK:  That's right.  And just to make

24   myself clear -- I'm sorry I was unclear -- these

25   depositions, or these documents certainly should have been

1    produced eons ago.  They were clearly within the request for

2    productions propounded last July.  But if I could just let

3    Mr. Freese speak to that.

4            THE COURT:  All right.  And, and we are going to

5    need to know what documents you're talking about because I

6    don't know what documents the defendant would have that

7    apply to a treating physician.

8        So, Mr. Freese, first let's talk about the deposition.

9    When did this take place?

10            MR. FREESE:  Your Honor, it was in July of this,

11    of last year.  I'm sorry.

12            THE COURT:  July of 2013.  And did it, in fact,

13    last six hours and 22 minutes?

14            MR. FREESE:  I, I think Anita is correct on that,

15    yes, Your Honor.

16            THE COURT:  And was it essentially completed at

17    that time or did anyone request that it be left open?

18            MR. FREESE:  Well -- and, Your Honor, I'm, I'm

19    sorry.  I haven't studied Dr. Boreham's deposition.  But I'm

20    certain that off the record -- if it's not on the record, I

21    know off the record that Anita and I discussed that if any

22    documents were produced that pertained to Dr. Boreham that

23    were not yet produced, we would have to, you know, revisit

24    her deposition.

25        I'm not saying Anita agreed to or disagreed with me at

1    the time.  But I'm, I'm certain that, that the discussion

2    was had because I have that discussion in every deposition.

3            THE COURT:  Now, tell me what documents we're

4    talking about.

5            MR. FREESE:  Yes, yes, Your Honor.  So, in, in

6    September of this year, I guess four months or three, three

7    or four months after Dr. Boreham's deposition -- I'm sorry.

8    Let me give you some background first.

9        Dr. Boreham essentially said, "Listen, I haven't read a

10   TVT IFU in forever.  I don't know any sales reps.  I can't

11   even remember any sales reps.  I -- basically, this is what

12   I do and I have nothing to do with Ethicon.  I don't speak

13   to Ethicon.  I don't -- you know, I've looked at their

14   documents in the past but, but I, you know, I didn't, I

15   didn't read this IFU before I implanted Ms. Lewis."

16       All right.  Well, obviously, at that time, we took her

17   at face value.  And we had no documents to cross-examine her

18   with.  Yet, in September they produced documents that show

19   that Dr. Boreham not only was a, a key figure of every

20   implanting doctor in, in Texas but, in particular, at the

21   Baylor Medical Center.

22       She and her partner were a

23   five-hundred-thousand-dollar, half-a-million-dollar prospect

24   for TVT, and that they gave congratulatory letters to sales

25   reps for reining in Dr. Boreham and converting her from,

1   from a TVT product -- or her partner from a Bard product to

2   TVT and getting Dr. Boreham to buy more TVT products.

3        There's document after document after document showing

4   repeated discussions between Dr. Boreham and Ethicon.  And,

5   in fact, Your Honor, at this time, Ethicon was trying to

6   establish a world registry of, of TVT implanters.

7        And I won't argue what the purpose of that was.  But,

8   but, but Dr. Boreham never mentioned this.  And, in fact, we

9   now have internal e-mails showing that Dr. Boreham was

10  actively seeking out Ethicon employees, trying to volunteer

11  herself to be one of their recognized implanters so she

12  could participate in their worldwide registry.

13       She was making requests for 300, 300, just for herself,

14  brochures for the TVT product.  Yet, in her deposition she

15  said, "I don't ever use Ethicon stuff.  I don't know any

16  Ethicon people.  I don't use their documents."

17       Yet, the regional manager writes the local rep and

18  says, "Do you -- is this a mistake?  Do you really want 300

19  brochures?"  "Yeah, Dr. Boreham wants 300 brochures."

20       So, there, there is such a disconnect, Your Honor,

21  between what Dr. Boreham says that, that her contact was,

22  what she knew, what she was reading from, from Ethicon, and

23  what we now know from documents produced after her

24  deposition that were clearly called for earlier.

25       And let me give you a, a specific case of why this is

1   important today.

2       I just read today Ethicon's reply to Dr. Peggy Pence

3   who is our regulatory expert.  And they're -- they quote at

4   length Dr. Boreham in support of striking Dr. Pence saying,

5   "Listen, Dr. Boreham didn't rely on anything Ethicon did.

6   She didn't talk to anyone at Ethicon."  They, they go to

7   length to quote Dr. Boreham's July testimony saying that she

8   basically had no contact whatsoever with Ethicon.

9       Yet, we now know as we sit here that that, that that,

10  that the true picture is, is completely different, at least

11  with respect to the documents.  I don't know what she would

12  say, but I would say, Your Honor, that, that I've got a,

13  I've got a whole mess of questions I want to ask her about

14  how to reconcile her testimony in July with this, this --

15  obvious multiple contacts that both Ethicon and she had.

16  And they're congratulating their reps on having such a great

17  relationship and being the number one prospect and candidate

18  to implant TVT products.

19      So, I could go on and on, Your Honor.  But, I mean,

20  there, there is a dozen or more documents that we found in

21  September that clearly should have been produced before

22  that.  And Bryan can speak to the, to the number of

23  documents that were produced.

24      But, you know, if they got produced in September, the

25  fact that we found them just recently I don't guess is

1    unexpected.  We review, you know, thousands of -- tens of

2    thousands of documents all the time.  And after Dr.

3    Boreham's deposition had been taken, you know, there was an

4    emphasis on, "Hey, I'm still finding Dr. Boreham documents."

5    I mean, it was, it was quite by accident that we came across

6    them.

7         And as soon as we came across them, we alerted them

8    that, "Hey, we need to re-depose Dr. Boreham on this and on

9    the question of whether or not there's a difference in the

10   Federal Rules of discovery versus trial deposition."  I

11   mean, it's true.  I said that to Dr. Boreham.  I say that to

12   every witness.

13        But it doesn't mean that, that, you know, one takes a

14   deposition exactly the way you'd want the trial testimony

15   to, to be taken.  She's obviously outside the subpoena power

16   of, of the, of the District Court in West Virginia.  So, we

17   have to rely on her deposition.

18        And in light of these new documents, with no

19   explanation from the defendants why there's been such a late

20   production, you know, we didn't think we were being unfair

21   to them by, by asking for some additional time with Dr.

22   Boreham, particularly when we didn't even take -- neither

23   side got seven hours with Dr. Boreham.

24              THE COURT:  Okay.

25              MR. FREESE:  And I'll answer any question Your

1    Honor has.

2           THE COURT:  Yes.  Let me just stop everybody

3    because you're going to have to bear in mind that I am not

4    actively involved in the case.  So, I don't really know how

5    all of these various witnesses figure into the whole scheme

6    of things.  So, I need to start back at the beginning.

7        Dr. Boreham is a treating physician.  Is that right?

8           MR. FREESE:  Yes, Your Honor.

9           THE COURT:  And is she, what, an explanting

10   physician?  Exactly what --

11          MR. FREESE:  She's, she is the physician that

12   implanted the TVT sling into Ms. Lewis in 2009.

13          THE COURT:  Okay.  So, she did implant the TVT

14   product.  But you're saying at her deposition she said she

15   didn't use Ethicon products?

16          MR. FREESE:  No.  What she said is that, "I don't

17   normally read any of their things.  I don't talk to their

18   reps.  I don't rely on anything they tell me."

19       And this was all, this was all being set up by, by

20   Ethicon to do exactly what Anita just said.  And that was

21   to, to, to move forward on a summary judgment on learned

22   intermediary.

23       And now we find, now we find out not only was she

24   actively involved with Ethicon, she was actively involved in

25   soliciting to be in their trials, to get their, to get their

1    brochures on, on the TVT procedure.  And we know what the

2    brochures say.

3              THE COURT:  Okay.  Let, let -- take a breath.

4              MR. FREESE:  I'm sorry, Your Honor.

5              THE COURT:  Okay.  So, Dr. Boreham testifies in

6    July she's the implanting physician, last saw this woman in

7    2010.  She implants a TVT product, but she says that she

8    never reviewed the IFU.  She didn't read any of their

9    literature.  She really just kind of went on, on her own by

10   the seat of her pants and implanted this, this, this device.

11        And, and Ethicon got all of that testimony out of her

12   and used that as the basis of a, of a motion on, on the

13   learned intermediary.

14        You're saying that --

15             MR. FREESE:  That is correct.

16             THE COURT:  All right.  You're saying that after

17   her deposition in September, Ethicon produced documents that

18   essentially refutes what she says about her contacts and

19   relationship and knowledge of Ethicon products and IFUs and

20   so forth.

21             MR. FREESE:  That's correct, Your Honor.

22             MR. AYLSTOCK:  And if I -- I'm sorry, Your Honor.

23   This is Bryan Aylstock.  Just to add to that, these

24   documents weren't produced in the context of Ms. Lewis's

25   defense fact sheet at all.

1    As the Court will recall, the order on the defense fact

2  sheet requires the defendants to produce documents related

3  to physicians.  These were documents that were buried in the

4  millions of pages that we only discovered after the fact.

5    Some are back in September well after the deposition.

6  Some were before.  But none were produced along with the

7  defendant's fact sheet which is really our only -- in fact,

8  the order says we can't propound case specific

9  interrogatories related to that.  We have to rely on the

10  defendant's fact sheet.

11    So, we found these documents in the haystack.  Some

12  were produced after the fact.  Some we found after the fact.

13  But that's correct, Your Honor.

14    THE COURT:  All right.  And now you want to go

15  back and question her about, about her relationship with

16  Ethicon and her knowledge of Ethicon based on these new

17  documents.

18    MR. FREESE:  Yes, Your Honor, and including the

19  information contained in the brochures that she -- in her

20  deposition she claimed she doesn't read them.  And, yet, we

21  have e-mails showing that she was asking for 300.  And the

22  regional manager was like, "Who asked for 300 brochures from

23  us?"  And they go on to this long explanation of how

24  important Dr. Boreham is to them.  And they say, "Oh, great.

25  Well, here, you know, here it is."

1          THE COURT:  All right.  I understand all that.

2       So, the next question -- or the next issue that I heard

3    come up was Ethicon is saying, "Well, okay.  You got all of

4    these things or had all of these things in September, never

5    asked to re-depose her.  In December we then file a motion.

6    And now you've decided you want to re-depose her.  And, so,

7    isn't that unfair to Ethicon since you had between September

8    and December to take her deposition again."

9       Is that what you're saying, Ethicon?

10          MS. MODAK-TRURAN:  Yes, Your Honor.

11          THE COURT:  Okay.  How do you respond to that?

12          MR. FREESE:  Well, Your Honor, we had no reason

13    until we discovered these documents to ask to, to re-depose

14    her.  I mean, you know, --

15          THE COURT:  When did you discover them, sir?

16          MR. FREESE:  Bryan?

17          MR. AYLSTOCK:  It was within the last week or so,

18    Your Honor.  We were, frankly, prepping for this trial and

19    working on the summary judgment.

20       And, and I'd further respond that, again, the fact

21    sheet requires that the defendants provide this information

22    with the fact sheet.  And it, it has a document request and

23    that those sales call notes, all of the information related

24    be produced.

25       Now, Mr. Courts -- Paul Courts is the sales rep that

 1   called upon Dr. Boreham.  Mr. Courts's custodial file is

 2   largely incomplete and spoliated.  It's gone.  So, not only

 3   did we not have that file, we also did not have these

 4   documents produced with the defendant fact sheets.

 5       So, it's a little bit disingenuous --

 6           THE COURT:  I, I -- yeah, I understand what you're

 7   saying.  And I also think I heard you say that also in the

 8   context of replying to some other kind of motion, you sort

 9   of then saw this as being a bigger issue than you understood

10   it to be.

11           MR. FREESE:  Yes, Your Honor.  Well, today, today

12   they filed their reply to strike Dr. Peggy Pence, our

13   regulatory expert.  And the, the main thrust of their reply

14   today is, "Hey, look at what Dr. Boreham said in July.  She

15   said she didn't know anything about Ethicon, didn't talk to

16   anybody, didn't rely on anything.  The last IFU she saw was

17   2002."

18       Well, so, not only is it important to this learned

19   intermediary summary judgment, it also goes to the heart now

20   of what they're saying about what Dr. Pence should or should

21   not be entitled to testify about as a regulatory expert.

22           THE COURT:  All right.  I understand that.

23       Now, let me ask Ethicon, how do you respond to their,

24   their argument that you should have produced these things as

25   part of the fact sheet?

1    MS. MODAK-TRURAN:  Well, I went back and looked at

2    the defendant's fact sheet and we didn't -- one of the

3    questions asked:  Did this physician ever have any Ethicon

4    training?  And it is undisputed that Dr. Boreham has never

5    had any Ethicon training.

6        There's another question on the defense fact sheet that

7    asks about other contacts.  And we did identify documents

8    that show that we had sales reps who were interested in Dr.

9    Boreham as a TVT-Secur registry.  And those documents were

10   identified by Bates number.

11       And in the fact sheet we said, "There may be other

12   documents in the documents we produced, but this is what we

13   can do under this short timetable."

14       The second issue -- so, we did produce documents on

15   that.  And the fact that plaintiff chose not to bring those

16   documents to the deposition is not Ethicon's issue.

17       THE COURT:  Well, but were there, were there new

18   documents produced in September?

19       MS. MODAK-TRURAN:  There were additional documents

20   produced in September along the same vein.  But contrary to

21   the representations made by plaintiff's counsel, none of

22   these documents were communications between Dr. Boreham and

23   the sales rep.  These were communications between sales reps

24   in trying to have Dr. Boreham participate in a TVT-Secur

25   registry.  That is not the product at issue here.

1    Let me give you some background about Dr. Boreham so

2  you don't think that she's just using our product

3  willy-nilly.

4    Dr. Boreham is a well-trained urogynecologist.  She is

5  the head of her department at Baylor University.  Baylor's

6  policy is that while -- she did testify and she was asked

7  this by Rich extensively.  She did say that Ethicon sales

8  representatives came to see her.  She said her policy and

9  practice is that she does not rely on anything the sales

10  representative does.  And that's just like anything out of

11  the ordinary for doctors and academic institutions.

12    Dr. Boreham has extensively published on mesh.  She's a

13  researcher of mesh products.  She said that the reason why

14  she uses TVT-Secur is because, one, she was trained on it

15  during her fellowship and, second, because it is the most

16  widely studied mesh in the world and it has the best safety

17  profile.

18    She was specifically asked by Rich, who had extensive

19  periods of time with her, whether or not she relied on any

20  company literature.  And she said, "No," that her pattern

21  and practice as an academic doctor, as well as a clinician,

22  is to find -- is to look at the study.

23    In fact, she said that she did not go to meetings where

24  Ethicon or any other manufacturer was going because she

25  wants to keep that kind of neutrality.

1    Now, did Ethicon want her to participate in some

2 studies?  Those e-mails definitely show that.  She was asked

3 about that.  And she said, "I just don't remember," is what

4 she said at her deposition.

5    These e-mails, Your Honor, will not change the

6 substance of her testimony, which is that she, as an

7 academic, as a leader, a key opinion leader in her field,

8 she simply doesn't rely on manufactured data or, or the IFU,

9 or the patient brochure.

10    She was asked whether or not she had given Mrs. Lewis a

11 brochure.  And she said, "If I have brochures, I give them

12 to patients."  She had no documentation that she ever gave a

13 brochure to Mrs. Lewis.  Mrs. Lewis testified that she never

14 had a patient brochure.

15    So, patient brochures and IFUs are not in this case

16 because we have a doctor who does her own research and study

17 and has determined and said that she knew and understood all

18 of the risks of TVT based on her fellowship training, as

19 well as her own research, and that nothing would change her

20 opinion.

21    We can get you a copy of the transcript, but you'll see

22 that -- I'd say that three quarters of the time was spent by

23 Mr. -- by Rich asking her about internal company e-mails

24 about, "Did you know that Mr. Arnaud said this or that," and

25 showing her MSDS sheets and all of these other things that

1    she had never seen.  And she said none of those things

2    changed her opinion that TVT was the best product.

3         Now, if plaintiffs really thought, if they really

4    thought, Your Honor, that these documents they saw in

5    September were going to change their opinions, then they

6    should have brought that before we filed a motion for

7    summary judgment.

8         Texas law happens to be very specific on learned

9    intermediary, and this case fits within all fours within

10   *Porterfield* vs. *Ethicon*.  There is nothing that a second

11   deposition can do that's going to undermine what's in the

12   record.

13        So, I -- to be honest, Your Honor, I think the timing

14   of this motion is suspect.  It came after the fact, probably

15   after they read *Porterfield* and realized, "Oh, my God, we

16   don't have a case."

17             MR. FREESE:  Well, Your Honor, --

18             THE COURT:  If the, if the, if these documents are

19   nothing more than e-mails between employees of Ethicon and

20   they're not communications with the doctor, how would that

21   change anything that she's already had to say?

22             MR. FREESE:  Well, Your Honor, they would change

23   it in a significant way because at first, it could help

24   refresh her recollection about who she was talking to and

25   what she was looking at for one.

1    Secondly, it may -- it becomes a credibility issue.

2         THE COURT:  Well, but if I understood it, the

3    documents that you're talking about aren't documents that

4    directly involve this doctor.  They're, they're sales reps

5    that are communicating with each other about the doctor, or

6    employees of Ethicon communicating about the doctor.  But

7    they're not, they're not e-mails to the doctor or from the

8    doctor.

9         So, you're going to have to tell me what the documents

10   are and, and whether or not Dr. Boreham is, is actually

11   directly involved in those documents, if those documents

12   show that she, she had an opinion about something or she

13   communicated directly with someone or -- so, explain to me

14   exactly what you've got.

15        MR. FREESE:  Your Honor, --

16        MR. AYLSTOCK:  Your Honor, this is Bryan Aylstock

17   if I could just jump in.

18        The order for the 600 TVT patient brochures, that's

19   critical to this case because their own, their own witnesses

20   testify that these, although they're called patient

21   brochures, are really intended for the doctor to have an

22   informed discussion with the patient, and intended to

23   communicate to the doctor the risk information so that

24   doctor can discuss it with the patient.

25        She testified unequivocally, "Look, I didn't -- I don't

1    know.  I, I never really use the brochures."

2        Well, that goes to her, her bias directly and what she

3    knew from those brochures and what she didn't know from

4    those brochures.

5        THE COURT:  So, you have, what, a letter from her

6    asking that some brochures be sent to her.  You have, what,

7    some written --

8        MR. AYLSTOCK:  The description of an order in --

9    for those brochures.  There's also a sales call description

10   describing a sales call with Dr. Boreham and how the sales

11   rep has such a great relationship with her.

12       Ms. Modak went on and on with Your Honor about how

13   unbiased and impartial and everything that Dr. Boreham is.

14   Well, that's what's going to come across in this deposition.

15       But what the documents, we would submit, show is, in

16   fact, she's making a lot, a lot of money on these products.

17   She may be a mesh advocate and there may be a good reason

18   for that, and that's her own bias for that.  She, she's

19   actively seeking work from Ethicon to be involved in their

20   TVT registry and has a financial motivation to do that.

21       And why these documents were not supplemented on the

22   defendant's fact sheet, why they weren't produced to begin

23   with, there is a duty of supplementation.  And, and what I'm

24   afraid of is that if we don't have a little bit more time

25   with Dr. Boreham, the jury is going to get the wrong

1   impression; in fact, a misleading, unjust impression of the

2   true nature of this.  And if, in fact, Ms. Modak's right,

3   then the jury will see that too.  But right now --

4          MR. FREESE:  Your Honor, --

5          THE COURT:  Yes.

6          MR. FREESE:  Your Honor, if I can just add this.

7   I think Anita just did a wonderful job of explaining to you

8   what they intend to do with Dr. Boreham.  And we know as

9   we're sitting here on the phone that the plaintiffs, if we

10  do our job, we can paint a very different picture of Dr.

11  Boreham and her incentives and her motives and her bias and

12  what she was doing and who she was talking to.

13         THE COURT:  Right.

14         MR. FREESE:  So, for, for Ethicon to be able to

15  put on this picture of Dr. Boreham as an unbiased

16  researcher, intellectual type who had no stake in the

17  outcome of Ethicon or its products is really -- and, and

18  then knowing that we actually have these documents in our

19  back pocket with the inability to cross-examine her with

20  them is really unfair to us.

21         THE COURT:  Right.  Now, let me ask you, how many

22  documents are you talking about?

23         MR. FREESE:  I'm aware of about a dozen.

24     Bryan, are there more than that?

25         MR. AYLSTOCK:  That's how many we've found so far

1   just from, you know, searching the haystack.

2           THE COURT:  Okay.  Well, what I'm going to be --

3       (Interference)

4           THE COURT:  I'm for some reason having some

5   trouble with this conference call.  Is anybody having

6   trouble hearing?

7           MR. AYLSTOCK:  I can hear you, Your Honor.

8           MR. FREESE:  No, Your Honor.  You're fine.

9           THE COURT:  All right.  What I am going to do is I

10  am going to allow you some additional time to depose the

11  doctor about these documents.

12      Now, I want to try to -- I want to try to set this for

13  a reasonable amount of time.  I'm not, I'm not thinking

14  another seven hours.

15      So, let me ask you, how long do you think you need to

16  depose Dr. Boreham about these documents?

17          MR. FREESE:  I think the plaintiffs could do it in

18  three hours easily, Your Honor.

19          THE COURT:  Three hours for 12 documents?

20          MR. FREESE:  Well, I'm, I'm -- I don't know what

21  she's going to say.  And I don't know whether or not Ethicon

22  is going to have anymore documents.  So, I, I certainly

23  think we could do it in that.  If Your Honor thinks we are

24  entitled to less than that, then obviously we'll go with

25  what Your Honor says.

1        THE COURT:  Right.  I will, I will allow you two

2    hours to depose her on these additional documents.  And that

3    I would be willing to extend if you find a whole lot more

4    than 12 documents.  But on these documents that you've found

5    so far, two hours is long enough.  And then I will also

6    allow the defendant some time to ask questions.

7        How long do you think you would need?  Should I give

8    you two hours as well?

9        MS. MODAK-TRURAN:  Just in case.  But, Your Honor,

10   what I don't want to happen -- and this is what I really

11   think this deposition is about is I'm afraid that

12   plaintiff's counsel will not stick to these documents; that

13   they're going to try and attack other areas that have been

14   creatively discussed at length and have nothing to do with

15   these documents.

16       So, if we could have something to protect us in that

17   regard.  I mean, if they want to ask about what internal

18   sales reps -- the thing about her -- you know, you said that

19   they can, they have that opportunity, but I don't want them

20   all of a sudden to say, "Oh, no, at your last deposition you

21   said that even knowing what this MSDS said, that it was

22   still a safe product for Mrs. Lewis."  I don't want them to

23   be able to go ahead and ask that.

24       MR. AYLSTOCK:  Your Honor, we're not intending to,

25   to go through an MSDS.  We have limited time.  I don't want

 1   to get into a bunch of fights in the deposition about what

 2   we can and can't ask.  We're professionals here and we know

 3   that.

 4             MS. MODAK-TRURAN:  I will tell you what --

 5             THE COURT:  What I think the deposition is

 6   supposed to be about is the additional documentation that

 7   the plaintiffs did not have before, and how that might

 8   affect her bias, her motives, or her prior testimony only,

 9   though, as it applies to whatever is on these various

10   documents and her -- I guess her role with Ethicon, if there

11   even is any real role.  I don't know.

12        So, you know, that's not an invitation to allow the

13   plaintiffs to rehash everything that's been, that's been

14   said before.  And I think everybody understands that to be

15   the case.

16        So, I will allow it with limitations.  It's to be about

17   the new information that you have.  And it's limited to two

18   hours for plaintiffs, no more than two hours for defendant,

19   those limitations.  And --

20             MS. MODAK-TRURAN:  Your Honor, could they

21   identify -- they have refused consistently to identify these

22   claimed documents.  Can they provide us with a set of those

23   documents by the end of the day?

24             THE COURT:  Well, I'm not, I'm not going to

25   require them to do that.  I think -- unless they agree.

1    And, you know, you may want to agree in order to make

2    everything speed up a little bit.

3        But I think they've told you what the documents

4    involve, and they've told you the general date that they

5    received them.  You're the ones that produced them.  You

6    ought to be able to figure out what documents you have that

7    apply to this doctor.

8              MS. MODAK-TRURAN:  Your Honor, the Pre-Trial Order

9    requires them to produce those documents within 48 hours.

10             THE COURT:  Well, if there's an order that already

11   says that, you know, then why are you asking me?

12             MS. MODAK-TRURAN:  I, I was asking --

13             THE COURT:  Whatever the rule -- whatever the

14   Pre-Trial rule says, or Pre-Trial Order says.  I haven't

15   memorized all of them in every case.  So, if there is, in

16   fact, an order that you have to produce documents 48 hours

17   before the deposition, then produce them 48 hours before the

18   deposition.

19             MR. AYLSTOCK:  Yes, Your Honor.  We'll certainly

20   abide by the rules.

21             MR. FREESE:  Yes, Your Honor.

22             THE COURT:  All right.  Now, the other issue has

23   to do with the evidentiary deposition.  And I'm not going

24   to -- I'm not going to allow you to take an evidentiary

25   deposition.  You know, I have problems with the whole way

1   these work in that everybody appears by deposition, but

2   that's the way it is.  And I don't see any reason to carve

3   out an exception for this particular doctor, not to mention

4   that once you do that, you're going to want to take

5   evidentiary depositions on everybody.  And, you know,

6   certainly none of the Docket Control Orders, none of the

7   prior rulings of the Court allow for that specifically.  And

8   nobody raised that as an issue at the outset of these cases.

9        So, I'm not going to grant that, that portion of your

10  motion.  You've got your two hours and that's what you get.

11       MR. AYLSTOCK:  With regard to that, Your Honor,

12  just so Your Honor is aware, I did raise that in one of

13  the -- actually, I think the first -- actually, the second

14  because I wasn't appointed at that time with Ms. Jones about

15  the potential nature of some *de bene esse* depositions.  And

16  she, I believe on the record -- I can cite it -- I can find

17  it I'm sure -- said that may be a possibility.

18       And, in fact, with regard to Dr. Klosterhalfen, I

19  believe at Ms. Jones's, or at least Ethicon's own request,

20  it was suggested that we do a *de bene esse* and that was

21  agreed to.

22       So, I, I would hate that this transcript be cited, you

23  know, as a hard and fast rule because I do think that, you

24  know, there may not be a distinction in the federal rules,

25  but this is a different animal.

1    And rule one, of course, says look for the just,

2    expedient, and inexpensive resolution.  And cutting up these

3    depositions, which is what we've been doing the past week,

4    it's becoming more and more apparent that, in fact, at least

5    in some limited cases, particularly given that these

6    witnesses are outside the subpoena power of the court, we

7    may be coming to you to ask for that.

8    And I don't think that was foreclosed by Ms. Jones at

9    the outset.  In fact, I think she said the opposite; that

10   depending on the situation, we may want to do that.  And, in

11   fact, for Dr. Klosterhalfen that was agreed.

12            THE COURT:  Okay.  Well, you know, I don't ever

13   have a problem if you want to agree to do something.  But

14   you're not presenting any agreement to me sitting here

15   today.  You're asking me to order that there be an

16   evidentiary deposition.  And I'm not going to order that.

17   I also want to make it clear that what I order in these

18   cases is specific to the circumstances that I am presented

19   with at the time I'm making a ruling.  So, there are no hard

20   and fast rules that should be coming out of my various

21   orders, these discovery orders because they're very specific

22   to the circumstances as they're presented to me at that

23   time.

24   Now, if you want to agree to take an evidentiary

25   deposition, that's fine.  There's nothing in the current

1  pre-trial orders that allows for that other than what you

2  might agree to do unless there's good cause shown.

3      I don't see good cause in this case.  To me, this is

4  like any other treating physician.  And I don't see any

5  reason why this particular doctor needs to be treated

6  differently than any of the other ones are.

7      So, you know, I'm not hearing any good cause for an

8  evidentiary deposition of this particular witness.  But I do

9  think you are entitled to ask her your two hours of

10 questions on these new documents that have been presented to

11 you after her deposition was completed.

12     All right?

13             MR. AYLSTOCK:  Thank you, Your Honor.

14             MR. FREESE:  Thank you, Your Honor.

15             MS. MODAK-TRURAN:  Thank you, Your Honor.

16             THE COURT:  Anything else that we need to address

17 today?  And do I need to do an order on this or are we all

18 on the same page?

19             MR. AYLSTOCK:  If there is an order, I think that

20 might be helpful just to make sure we get the cooperation we

21 need from Dr. Boreham.

22             THE COURT:  Do you have her deposition scheduled

23 yet?

24             MR. AYLSTOCK:  We have attempted to schedule it

25 and she's represented and, and both -- we have not received

```
 1   a date yet.
 2           THE COURT:  Okay, all right.  Well, I will get the
 3   order out next week because I think it's unlikely I'll be
 4   able to get it out today since the clerk usually doesn't
 5   want any orders filed after 3:00.  It's hard for them, I
 6   guess, to get everything docketed.  So, this will be coming
 7   out next week.  But that should still give you enough time
 8   to have it before you set the deposition.
 9       All right.  Thank you.  Good-bye.
10           MR. GAGE:  Judge, Judge, --
11           THE COURT:  Yes.
12           MR. GAGE:  This is William Gage.  Bryan and I have
13   a couple of remaining issues to discuss with Your Honor.
14           THE COURT:  Okay.
15           MR. GAGE:  But if I could excuse -- if I could let
16   Ms. Modak-Truran go, Judge, I'll let her go.
17           THE COURT:  Certainly.
18           MR. GAGE:  Okay.
19           MS. MODAK-TRURAN:  Thank you, Your Honor.
20           THE COURT:  Thank you.
21           MR. GAGE:  Bryan, are you still on?
22           MR. AYLSTOCK:  I am, William.
23           MR. GAGE:  Okay.  Good.
24       Judge, the other issue that we need to discuss with
25   you, you know, Your Honor will recall we've got the
```

1  spoliation motion --

2       THE COURT:  Right.

3       MR. GAGE:  -- and our briefing is currently due on

4  Monday.  Our response -- defendant's response is due on

5  Monday.  And on I think it's December 27th plaintiffs filed

6  a supplement to the motion.  I think it's about a six-page

7  supplement where they identified some additional issues

8  where they allege spoliation has occurred.

9     So, we reached out -- I reached out to Bryan and asked

10 whether he would be willing to agree on an extension.  It,

11 it made sense to us, Judge, that rather than filing a

12 response and then filing a response to the supplemental

13 motion, we would file one combined pleading which would be a

14 combined response to the original and the supplemental.

15    So, we reached out to Bryan and asked if he'd be

16 willing to let us file the combined response on Friday,

17 which would be a week from today, instead of on Monday so

18 that we could have time to gather the data and analyze the

19 issues with regard to these additional custodians and other

20 alleged spoliation issues.

21    So, he was cool with that.  So, I e-mailed Laura

22 yesterday and got a bounce-back.  And then there was a phone

23 number to call.  So, I called that number and I believe it

24 was Marianne.  So, I asked Marianne if I could just forward

25 my e-mail request to her.  So, I did that.  And then --

1   because I wanted -- obviously, Your Honor has to approve

2   that.

3            THE COURT:  Uh-huh.

4            MR. GAGE:  And then, and then Bryan in response,

5   when I copied him on the e-mail to Marianne, said, "Well,

6   we're going to need to have a call with the Judge.  We might

7   as well just talk about this while we're on the call."  And

8   I thought that was a good idea.

9            THE COURT:  Okay.

10           MR. GAGE:  So, that's' kind of where we are,

11  Judge.

12       The only other issue that we would need to wrap into

13  this, I think the supplemental motion was six pages.  And I

14  think we would just request an additional five in order to

15  respond to the supplemental motion.

16           THE COURT:  And how many pages, how many pages

17  will that bring you up to then?

18           MR. GAGE:  I would ask anybody to correct me if

19  I'm wrong, but I think it would now be 35.

20           THE COURT:  Okay.

21           MR. AYLSTOCK:  I think that's right, Your Honor.

22  This is Bryan.  I think we were at five not including the

23  signature block.  But I'm, I'm okay with that.  The only

24  issue I wanted to alert you is as we continue to dig into

25  this, there certainly seems to be more spoliation, at least

1  with regard to certain issues.

2  And I wasn't sure exactly how Your Honor wanted us to

3  deal with it.  Right now, we're struggling with these lab

4  notebooks from these key studies that we had talked with

5  Your Honor about before the break.

6  THE COURT:  Right.

7  MR. AYLSTOCK:  And we still don't have -- I don't

8  know whether they existed.  I can't really get a clear

9  answer on whether they existed, whether they don't exist,

10  whether they were in this other thing.

11  So, I think -- and, certainly, there's some more

12  custodians that are slated to be produced than even what

13  we've seen.  I expect this to be more of a recurring issue.

14  And I would just ask the Court's guidance for how maybe to

15  handle it.

16  THE COURT:  You know, I think this is very

17  problematic if you really want to have some meaningful

18  decision prior to your trial.  I think if what you are

19  seeking is money damages or some other sort of sanction that

20  won't affect the Lewis trial, then we have plenty of time

21  and I can, you know, let you figure out some sort of

22  schedule that you want to go on as far as supplementing.

23  But I'm, you know, I'm trying to figure out what your

24  needs really are as far as getting a ruling on this motion.

25  MR. AYLSTOCK:  Well, maybe if I could get Your

1    Honor to ask Mr. Gage to give me an answer on whether, in

2    fact, lab notebooks ever existed or whether they, for some

3    reason, didn't keep lab notebooks on those three key studies

4    that support -- that we've talked about, the 28-day and the

5    91-day studies, --

6              THE COURT:  Right.

7              MR. AYLSTOCK:  -- then we could supplement in very

8    short order.  I mean, you probably haven't seen our

9    supplementation.  All we're doing is saying after we get

10   confirmation that these files don't exist, telling the Court

11   when those people were there and what their importance was

12   because the -- a lot of this isn't in dispute as far as

13   whether they exist or when the litigation hold went into

14   effect.  So, --

15             THE COURT:  Okay, all right.

16        Well, Mr. Gage, can you answer that question?

17             MR. GAGE:  Well, yes, Judge.  And let me, let me

18   just kind of backtrack.

19        I assume -- because I want to kind of follow up, Your

20   Honor, if I may, on a question you kind of asked Bryan.

21   And, that is, what is it he's seeking.  And I'm not sure if

22   he's -- maybe I didn't hear it.  But I wasn't sure he was

23   crystal clear.

24        It's my understanding, Judge, that the original motion

25   certainly seeks sanctions that would impact the trial.  In

1   other words, he is seeking sanctions that like, you know,

2   adverse inference instruction, et cetera, or striking of

3   defenses that would, that would absolutely have an impact on

4   the Lewis trial.

5       So, to that extent, I just wanted to kind of clarify

6   that for Your Honor and say that, you know, at some point,

7   the supplementation has to stop, at least insofar as he

8   needs a ruling prior to the trial.  But, certainly, to

9   continue to supplement and maybe seek sanctions for a future

10  trial, that's certainly within, I guess, plaintiff's

11  prerogative.  So, I just wanted to kind of make that point.

12          THE COURT:  Well, and you have to bear in mind

13  that I will look at the motions.  I haven't looked at

14  anything yet.  As I told you, I wait until everything is in

15  or until the time frames have expired for everything to be

16  in before I look at anything because I like to have a fresh

17  view and not have read part of somebody's argument and --

18  but you have to bear in mind with this type of a motion when

19  you're asking for sanctions that are going to affect

20  evidence at the trial or defenses at the trial, I'm going to

21  have to be able to communicate with Judge Goodwin.  And I'm

22  going to have to take some lead from him on what he thinks

23  would be appropriate in that regard because I really don't

24  have anything to do with the trial.

25      So, there's going to have to be enough time for that to

1    occur as well.  I just want to warn you.  That's why I said

2    I think we're talking about at least a couple of weeks.

3              MR. AYLSTOCK:  Your Honor, that was my concern

4    with -- I mean, I'm, I'm a reasonable guy.  If they need --

5    the supplementation simply said, "Here, here's some more

6    names and here's what they do."  I understand that may need

7    more time and may need a few more pages.  But I don't know

8    that, you know, how much more time.

9        And I am seeking, you know, some relief in the Lewis

10   trial.  So, I really am looking for your guidance on that.

11   And we can kind of end it maybe with the lab notebooks and

12   then continue to supplement for the next trials or what have

13   you.  But --

14             THE COURT:  Right.  So, tell me again when is

15   Lewis actually set to start?

16             MR. AYLSTOCK:   February 10th, Your Honor.

17             THE COURT:  February 10th.

18             MR. AYLSTOCK:  That's when the jury selection

19   begins.

20             THE COURT:  I think realistically I'm going to

21   have to have your materials by the 17th or the 20th of

22   January.  Let's see.  Yeah, because, I mean, I'm certain

23   that that -- I would think the latest, the latest that I

24   would want to have your things would be --

25        (Interference)

```
1           THE COURT:  What is all the noise on this line?

2           MR. AYLSTOCK:  I don't know, Your Honor.

3           THE COURT:  Is anybody else hearing it or is it

4    just me?

5           MR. AYLSTOCK:  I'm hearing it.  It sounds like a

6    buzzing noise.

7           THE COURT:  Buzzing and the high-pitch noises.

8        I'm thinking -- let's see.  Realistically, I'm going to

9    have to have everybody's things no later than January the

10   20th.  And that's going to give me, then, just about two

11   weeks.

12       (Interference)

13          THE COURT:  Okay.  I have no idea what that is.

14       Because, you know, if, in fact, there, there is some

15   impact on the trial, then you're going to need to have a few

16   days before the trial to accommodate whatever that might be.

17   Correct?

18          MR. AYLSTOCK:  That's, that's correct, Your Honor.

19   Maybe if we could get the response on the 8th, on Wednesday,

20   and then have our reply be due on the 20th, maybe that would

21   be realistic.

22          MR. GAGE:  You know, Judge, here's my -- here's

23   our situation, Judge.  I think I had indicated to you

24   earlier, you know, we have had a -- we have been working all

25   Christmas and all New Year's to try to get a lot of stuff
```

1   done.  And it's been very difficult because a lot of our

2   employees are gone.  I mean, I say a lot.  I think virtually

3   all of them are on vacation.  And they all come back on

4   Monday.

5       And for every event of spoliation that plaintiffs have

6   alleged in both their original and in their supplemental

7   motion, we obviously have a series of very detailed and, in

8   some cases, laborious steps that we're taking to try to, as

9   you might expect, disprove the, the claim.

10      And, so, it's putting us under a very difficult

11  situation for them to supplement on January 27th -- I'm

12  sorry -- December 27th and then for us to have to respond on

13  the 8th.

14      So, we felt like if we could just get, you know, five

15  business days, the 6th through the 10th, that would give us

16  hopefully enough time to deal with those new issues.

17          MR. BERNARDO:  If I may add -- this is Rich

18  Bernardo -- Judge, the, the difficult and particularly

19  frustrating aspect of all of this is the supplemental

20  materials that were filed at the close of business on the

21  27th were based upon information that we provided to

22  plaintiffs even as per their supplement back in October.

23  So, this is not new information.

24      This is information that was provided in very detailed

25  charts and letters sent to the plaintiff that they actually

1    annexed to their supplement.  So, it's, it's very

2    frustrating that we're being put in a very short time frame

3    to address these issues, particularly when plaintiffs have

4    sat on the information.

5              THE COURT:  Well, --

6              MR. AYLSTOCK:  Well, --

7              THE COURT:  Let me ask you, Mr. Aylstock, --

8              MR. AYLSTOCK:  Yes, Your Honor.

9              THE COURT:  -- if they have until Friday, the

10   10th, do you think that you can have your reply by the 20th

11   of January?

12             MR. AYLSTOCK:  The issue with it is simply

13   everything else going on in our lives with this trial and

14   the, *the Daubert* responses and summary judgment responses

15   and replies.

16      I mean, if you order it, Judge, of course I'll do it.

17   I just want to produce the best work product possible.  And

18   they've had -- frankly, they will have had six full weeks to

19   reply to a motion they normally get two weeks for.  And I've

20   been okay with all of that.  I understand this is serious

21   business.  But I'm just asking for, you know, another couple

22   of days given everything else going on.  I don't think it's

23   unreasonable, but I'll do what you say.

24             THE COURT:  All right.  Well, you know, you

25   already had a deadline for your first response.  And my

1   understanding was that the only reason you were extending

2   that was just so you could do it all in one shot because now

3   you have to supplement.  And, so, there are six more pages

4   you have to respond to, and you don't want to have to file

5   two separate documents.  You'd just like to do it all at one

6   time.

7         Is that correct, Mr. Gage?

8               MR. GAGE:  Yes, Your Honor.

9               THE COURT:  And, and when were you supposed to

10  have your first response completed?

11              MR. GAGE:  Monday, the 6th.

12              THE COURT:  Monday, the 6th.  And the six pages,

13  is it -- how many employees are we talking about?

14              MR. AYLSTOCK:  I think, Your Honor, it's eight or

15  so.  It's really five pages.

16              THE COURT:  All right, five pages.  And how many,

17  how many additional employees are you talking about?

18              MR. BERNARDO:  It raises seven additional

19  employees, Your Honor.

20              THE COURT:  All right, seven additional employees.

21  Well, I'm going to go ahead and give Ethicon until the 10th

22  to get their response in.

23        And I'm going to give you, Mr. Aylstock, until the

24  20th.  If the 20th rolls around and you really can't get it

25  done, I'll be -- I would be willing to give you an extra day

1  or two to get it in to me because really by that point, I'll

2  be starting to go through everything.  And, so, you know,

3  your reply would be the last thing I would probably look at

4  anyway.

5      But I don't want it much past the 20th because -- and,

6  I mean, unless you, you know, unless you don't care about

7  how long it takes to get things figured out.  I can probably

8  look at it pretty quickly.  I'm, I'm planning on doing that.

9  But I'm also going to have to have an opportunity to discuss

10  the sanctions with Judge Goodwin.

11      And, so, I want to build in some time to do that and

12  also give you-all, you know, five days or so before your

13  trial starts to see, if sanctions are awarded, how you're

14  going to modify your case to address that.

15          MR. AYLSTOCK:  Thank you, Your Honor.

16          THE COURT:  Okay.

17          MR. BERNARDO:  Judge, may we also request that

18  there's an end to these supplemental opening briefs?  The

19  reason I raise this is we've received a number of e-mails

20  from Mr. Aylstock that immediately seize upon a statement

21  that we haven't located documents pursuant to an additional

22  issue, so I'm going to add this as a supplement.

23      We're at a point now where when we say we haven't

24  located something, that doesn't mean that it existed and has

25  been destroyed.  That simply means it may never have

1   existed.  It takes some time to pin all of that down.

2      And I feel like we're at a stage where all of this is

3   being, sort of hanging over us saying, "Well, if you don't

4   respond immediately, I'm going to file another supplemental

5   brief."

6      And there have been two issues that have already been

7   raised.  One is these lab notebooks that have been mentioned

8   to plaintiffs for many months.  And another is these XUS

9   productions where we've produced material and said, "We've

10  not identified materials for this country or this country."

11  That doesn't mean that they've been destroyed.  That just

12  means that there may have been no filings.  And it's

13  prejudicing us to have to keep adding to our motion.

14     So, I would request that we could leave the state of

15  the opening brief the way it is in response to that.  And if

16  there's something supplemental that comes in later on, we

17  can deal with that.

18         MR. AYLSTOCK:  And that's --

19         THE COURT:  I think I've made it pretty clear what

20  the time frames are.  And there just -- if you want

21  something decided in time for the Lewis trial, then I'm

22  going to have to have everything by the 20th.  And by

23  everything, I mean the motion, the response, and the reply.

24     So, I don't -- I'm not talking about filing new things.

25  If you want to file some new motions later on new documents,

1   that's fine.  But I'm not going to be able to really rule on

2   those before the Lewis case.

3           MR. AYLSTOCK:  I understand, Your Honor.  And

4   that's why I brought up the logistics of it because,

5   frankly, the problem is I can't get a straight answer.  I

6   feel like I'm boxing shadows because I know, for example,

7   that they -- from other documents, that they corresponded,

8   they had issues with the South African regulatory agencies.

9       Well, they tell me they can't locate them.  Well, does

10  that mean they're not there?  The lab notebooks that we've

11  talked about for these key studies, good lab practices

12  require it.  You know, I think they're there somewhere or

13  they were.  But I can't, I can't get them to say they're

14  either gone or they never existed.  So, I'm kind of left in

15  a quandary.

16      So, I mean, on those two things I would like for them

17  to tell me or maybe I'll just do a 30(b)(6) and they can

18  answer it under oath.  But it would be a lot easier for them

19  just to tell me whether they exist or not.  That's all I'm

20  trying to get at.

21          MR. GAGE:  Judge, let me make just a very quick

22  point here.  And you know Bryan and I get along pretty well

23  considering our relative positions here.

24      But, for example, on this South African deal, I think

25  we sent them a letter or an e-mail, I don't know, what, 48

1    hours ago, 72 hours ago and, and notified them that under

2    the OUS order that Your Honor entered, you know, that we

3    didn't find anything for South Africa.

4        Well, 24 hours go by.  We get an e-mail from Bryan that

5    says, "All right.  Does this mean that they're destroyed,"

6    or whatever it was that he specifically requested.

7        Now, it takes us a little time to respond because we

8    don't respond to Bryan's inquiries without making sure -- I

9    mean, we don't -- we rarely give Bryan any sort of a

10   substantive response without making sure that a group of us

11   has a phone call, that we double-check everything because we

12   don't want to make an erroneous representation on something

13   like this.

14       So, when Bryan says he, he makes these requests and we

15   don't get back to him, I mean, Judge, we're talking about 72

16   hours at the most --

17            THE COURT:  Right.

18            MR. GAGE:  -- since he's made the request.

19       And, so, I would just ask Bryan -- I know the trial's

20   coming up, but it's getting really tough to take a request

21   on a Thursday and provide a full-natured, substantive

22   response on a Friday.

23            MR. AYLSTOCK:  Judge, really what I'm talking

24   about is the lab notebooks.  That has been an issue since

25   July.  And we brought up at the last hearing:  Why can't you

1   tell me whether these lab notebooks exist or not?  That's

2   not a hard thing.  I've been asking for -- literally, Mr.

3   Anderson has asked for over a year I think.

4          MR. GAGE:  Well, Judge, Rich can, can respond to

5   that particular inquiry.

6          MR. BERNARDO:  Yeah.  On the lab notebooks, I

7   think we have, Judge, gone well beyond what you had ordered

8   before the holiday, and not only thought to provide

9   plaintiffs with a Table of Contents, but we actually had

10  somebody come back over the holiday, retrieve as many of the

11  90 notebooks that we know exist or existed, and actually

12  make copies of them, put somebody on a plane, have all of

13  the lab notebooks that we were able to obtain brought to

14  offices so they could take a look at them.

15      There were 30 of them that we weren't able to obtain.

16  We had folks calling people all over the world during the

17  holidays to try and get those back.  We got another batch of

18  those.  Those are going to be sent by overnight mail so they

19  can look at them on Monday.

20      And all of this is so that we can give them the

21  notebooks that we understand exist for these individuals.

22  If there are other notebooks that they have a basis to

23  believe exist, they need to provide us information about

24  that and we can talk about that and try and find those.

25          THE COURT:  I think he's asking for the notebooks

1    that would apply to the three specific studies that he

2    identified.

3            MR. BERNARDO:  No, I understand that, Judge.  And

4    those would be, if they exist, among the notebooks that we

5    have been providing.  We've been trying to work with the

6    people to go through the notebooks because they're very

7    difficult to understand and it's a time-consuming process.

8        So, we're, we're still trying to look into this.  We're

9    trying to get them all the information that we have

10   available to us in the time that we have it available.

11           THE COURT:  So, you're saying if, if lab notebooks

12   exist for these three studies, they would be in that vault

13   of lab notebooks that we discussed prior to the holidays.

14   Is that right?

15           MR. BERNARDO:  That is our understanding, Judge.

16   And what we're trying to do now is to take those notebooks

17   and go back with these specific questions and talk to the

18   people who own the notebooks now that they're back and see

19   if there's anything that we're missing.

20       In other words, this isn't something where we're just

21   not trying to answer the question.  It's just something that

22   because of the circumstances it is taking a lot of time to

23   answer.

24       And it could very well be that this material is in

25   these notebooks that we're all looking at, but we just don't

1  collectively have a sophisticated enough understanding of

2  what's in them to appreciate that. That's what we're trying

3  to pin down.

4          THE COURT: Okay. Well, I, you know, I doubt, Mr.

5  Aylstock, that you're going to have an answer to that

6  question in time for that to be part of your spoliation

7  motion for the Lewis trial. But certainly that is something

8  you can make a motion on later.

9          MR. AYLSTOCK: I mean, that -- I'm looking at the

10 deposition notice from August. And this is the deposition

11 on mesh properties. This is -- Mr. Barbolt is the designee

12 and my partner is taking his deposition later this week.

13 And it asks for all of this information. There's a document

14 request.

15     So, it's not like I haven't been asking. It's not like

16 I haven't been following up. And now we're on the eve of

17 this deposition. We even had a conference with Your Honor

18 about it, about the specific underlying data for this.

19     So, I appreciate -- and I don't -- I'm not here to

20 throw stones at Rich or William specifically because I know

21 that it's hard during the holidays. But this was done in

22 August and we're just looking for an answer. Do those lab

23 notebooks exist? Because they are key -- these, these are

24 the, these studies that support key statements in the

25 Instructions For Use that we say are false and misleading

1   and our experts say are false and misleading.

2        So, if they don't exist, they should know, okay, they

3   don't exist, not look through 90 notebooks and see what you

4   find.  And that's, that's the position we're left in.

5        So, I mean, I just -- I would like, if Your Honor

6   would, to tell them to get me an answer to that at least

7   before Barbolt's deposition next week.

8             THE COURT:  Well, I hear them saying that if that

9   information exists, it's in that vault of notebooks and

10  they're currently looking through the notebooks.  So, you

11  need to look through the notebooks as quickly as you can so

12  that you can give an answer to Mr. Aylstock to that

13  question.

14            MR. BERNARDO:  And we are doing what we can.

15            THE COURT:  All right.

16            MR. AYLSTOCK:  On a related note, Your Honor, -- I

17  know this has gone long, so I'll be real quick if Your Honor

18  would indulge me because this does relate to this deposition

19  next week.

20            THE COURT:  Okay.

21            MR. AYLSTOCK:  Mr. Barbolt is a veterinary -- he's

22  a veterinary pathologist.  But he's the designee for a

23  30(b)(6) on these mesh properties, certain of those issues.

24  He's also been named as a non-retained expert for Ethicon

25  and, and designated as such.

1          What, what I don't want to have happen, I guess, is in

2     some of the back and forth related to all of this, I've

3     received e-mails saying, "Well, Dr. Barbolt is going to be

4     prepared to discuss these certain studies, but he may not be

5     prepared to discuss other things related to your notice."

6          And our notice has been outstanding since August.  I

7     just wanted -- and I think, Your Honor, we brought this up

8     with some other 30(b)(6) designees.  So, I just would like

9     some clarification or maybe -- the notice that, that we have

10    served has, is out there and we'd like Mr. Barbolt to be

11    prepared to answer the topics on that notice that's been

12    outstanding since August, and prepared to answer questions

13    that may be related to his expert testimony, his expert

14    designation in the Lewis case.

15               MR. GAGE:  Your Honor, --

16               THE COURT:  He's a 30(b)(6) witness?

17               MR. AYLSTOCK:  Yes, Your Honor.

18               THE COURT:  Well, then, I think the law is pretty

19    clear on the duty to prepare and the duty to produce

20    witnesses that can respond to the topics unless there's some

21    sort of motion for protective order filed or, or something

22    that you've agreed to.  I mean, the law is clear.

23               MR. AYLSTOCK:  Thank you, Your Honor.

24               MR. GAGE:  Your Honor, this is William Gage.

25    David Thomas who you know is -- he's on vacation this week,

1    but he's --

2         (Interference)

3              THE COURT:  I don't know what is happening.

4              MR. AYLSTOCK:  I don't know, Your Honor.

5              MR. GAGE:  Well, he's the one that prepared

6    (recording inaudible) and I have a very high degree of

7    confidence that David is keenly aware of the

8    responsibilities under the law.  And I know personally that

9    he has worked extraordinarily hard to make sure the witness

10   is prepared.  So, you know, if, if there's some disconnect

11   that manifests at the depo, we'll have to deal with it.

12        The, the one thing that I do want to mention that, now

13   that Bryan raises it is, you know, he was designated as a

14   non-retained expert, but the depo that is taking place on

15   Tuesday -- and I'm not sure if it's a two-day depo or if

16   it's a one-day depo -- that's his 30(b)(6) depo.

17        And in keeping with Your Honor's -- your ruling, or the

18   discussion that we had on December 6th, we're not making him

19   available for an expert deposition because Your Honor may

20   remember on December 6th we kind of went through Your

21   Honor's parameters as to when a non-retained expert should

22   be put up for additional deposition.

23        And, so, that's been a bit of a bone of contention.

24   But we've been clear with the plaintiffs that, you know, his

25   fact -- his 30(b)(6) depo is what's going forward next week.

1    And, as I said, he should be prepared to do what we

2    understand he's supposed to do in that regard.  And they

3    have certainly prepped, you know, a tremendous amount.

4           THE COURT:  Okay, all right.  Well, you'll

5    probably have to get into the deposition and see if problems

6    arise.  But if the deposition that's been noticed is a

7    30(b)(6) deposition, that would be different than a

8    deposition of a witness who's a non-retained expert.  To me,

9    that's two different types of depositions.

10       So, if they're not both noticed, then the one you're

11   taking is the one you've noticed.

12          MR. AYLSTOCK:  We've noticed them both, Your

13   Honor.  And, you know, the, the problem, I guess -- and I

14   don't -- I'm trying to maybe avoid some issues -- is the

15   30(b)(6) designation is exactly pretty much what his expert

16   designation is.  There's some differences, of course.  But I

17   don't want to -- and we have noticed both.  I don't want to

18   get in there and have a big fight over what answer he can

19   provide or not.  But we're just trying to get this done.

20          THE COURT:  Well, I think if there's that much

21   overlap, it should be fairly easy for you two to resolve it

22   at the deposition.

23          MR. AYLSTOCK:  I would hope so.

24          MR. GAGE:  Judge, that, in fact -- that, that

25   was -- I think David even corresponded with plaintiffs and

1   even noticed that there was a bunch of overlap.  But -- so,

2   I think, you know, as lawyers tend to be, we're all

3   hyper-technical at times and we're all worried about stuff.

4       But my guess is once the depo is complete, if the

5   plaintiffs feel like, you know, there was something that

6   wasn't appropriate on the 30(b)(6) side, I'm sure they'll

7   raise it.

8       And if, if they then want to commence with an expert

9   deposition, then I would -- you know, we would ask that they

10  follow what Your Honor set forth on December 6th, which was

11  essentially the, the plaintiffs would need to show why or

12  how the expert designation exceeds the scope of the previous

13  deposition of the witness.

14          THE COURT:  Okay, because we really don't have

15  time to be taking multiple depositions of the same people if

16  it can be avoided.  And I would think you would all want to

17  try to limit that.

18      So, why don't you get into the deposition and do the

19  best you can.  I don't know what day you're taking it.  But,

20  you know, it's likely that I will be here.  So, if something

21  comes up that you think is crucially important and requires

22  some input from me, just call and I'll do what I can.

23          MR. AYLSTOCK:  Thank you, Your Honor, --

24          MR. GAGE:  Thank you.

25          MR. AYLSTOCK:  -- for indulging us so long on a

1    Friday afternoon.

2              MR. GAGE:  We do appreciate it, Judge.

3              THE COURT:  You're wearing me out today.

4              MR. AYLSTOCK:  I'm going to bed.

5              THE COURT:  I know.  And you don't sound like

6    you're very well, Mr. Aylstock.  You sound like --

7              MR. AYLSTOCK:  I'm not.  I'm not well at all.

8              THE COURT:  Well, stay away from all your kids.

9    They don't need to get sick, do they.

10             MR. AYLSTOCK:  No, no, they don't.

11             THE COURT:  All right.  Well, you-all have a nice

12   weekend and let me know if you need something next week.  I

13   will go ahead and do the order on the first part of our

14   discussion.  I'm not going to do an order on anything else

15   unless you believe there's some need to do that.

16             MR. AYLSTOCK:  No, Judge, we don't.

17             MR. GAGE:  Thank you, Judge.  We appreciate your

18   time.

19             THE COURT:  Thank you.  Good-bye.

20        (Proceedings concluded)

21

22

23

24

25

56

1          I, Lisa A. Cook, Official Reporter of the United

2    States District Court for the Southern District of West

3    Virginia, do hereby certify that the foregoing is a true and

4    correct transcript, to the best of my ability, from the

5    record of proceedings in the above-entitled matter.

6

7

8          s\Lisa A. Cook                    January 7, 2014

9             Reporter                          Date

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25