# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

| | |
|---|---|
| IN RE:  ETHICON, INC. PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION<br><br>**This Document Relates to All Cases**<br><br>**And**<br><br>**Case No. 2:12-CV-04301** | **Master File No. 2:12-MD-02327**<br>**MDL No. 2327**<br><br>**JOSEPH R. GOODWIN**<br>**U.S. DISTRICT JUDGE** |

## DEFENDANTS' FIRST SET OF REQUESTS FOR ADMISSIONS TO PLAINTIFFS

Defendants Ethicon, Inc. and Johnson & Johnson (collectively, "Defendants"), pursuant to FED. R. CIV. P. 36, submit their first set of requests for admissions to Plaintiffs.

## REQUESTS FOR ADMISSIONS

### Notice of Claimed Investigational Exemption (IND #1688) - 1964

1.  Admit that a genuine copy of Ethicon's Notice of Claimed Investigational Exemption for a New Drug for polypropylene sutures (IND #1688), dated March 25, 1964, is located at Bates numbered pages ETH.MESH.09625989 through 09626241.

### Prolene Suture New Drug Application (NDA #16-374) – 1966-1969

2.  Admit that a genuine copy of Ethicon's initial New Drug Application for Prolene polypropylene monofilament sutures ("Prolene sutures") (NDA #16-374) dated

January 17, 1966, is located at Bates numbered pages ETH.MESH.09625817 through 09625947, 09625962 through 09625973, and 09626242 through 09629458.

3.     Admit that the document attached as Exhibit 1 and produced at Bates numbered pages ETH.MESH.09625731 through 09625737 is a genuine copy of the FDA's approval letter dated April 16, 1969, for NDA #16-374, Prolene sutures.

4.     Admit that on April 16, 1969, the FDA approved Prolene sutures as "safe and effective for use as recommended in the submitted labeling."

5.     Admit that the FDA approved the packaging, labels, and labeling submitted by Ethicon as part of NDA #16-374.

### Supplements to NDA #16-374 – 1970-1990

6.     For each of the supplements to NDA #16-374 listed in Exhibit 2, admit that a genuine copy of Ethicon's application for the supplement (and any amendments to it) is located at the Bates numbered pages listed under the "Application" column.

7.     For each of the supplements to NDA #16-374 listed in Exhibit 2, admit that the applications were submitted to the FDA on or about the date(s) identified in Exhibit 2 under the "Application Date(s)" column.

### 1970

8.     Admit that the document attached as Exhibit 3 and produced at Bates numbered page ETH.MESH.09629720 is a genuine copy of the FDA's approval letter dated May 8, 1970, for Supplemental NDA #16-374/S-001.

9.     Admit that the FDA approved Supplemental NDA #16-374/S-001 on May 8, 1970.

10. Admit that the document attached as Exhibit 4 and produced at Bates numbered page ETH.MESH.09629714 is a genuine copy of the FDA's amended approval letter dated June 29, 1970, for Supplemental NDA #16-374/S-001.

11. Admit that the FDA amended its approval of Supplemental NDA #16-374/S-001 on June 29, 1970.

**1972**

12. Admit that the document attached as Exhibit 5 and produced at Bates numbered page ETH.MESH.09630681 is a genuine copy of the FDA's approval letter dated August 17, 1972, for Supplemental NDA #16-374/S-002.

13. Admit that the FDA approved Supplemental NDA #16-374/S-002 as amended on August 17, 1972.

14. Admit that the document attached as Exhibit 6 and produced at Bates numbered page ETH.MESH. 09630683 is a genuine copy of the FDA's approval letter dated August 17, 1972, for Supplemental NDA #16-374/S-003.

15. Admit that the FDA approved Supplemental NDA #16-374/S-003 on August 17, 1972.

**1973**

16. Admit that the document attached as Exhibit 7 and produced at ETH.MESH.09630649 is a genuine copy of an April 26, 1973, letter from the FDA to Ethicon.

17. Admit that in Exhibit 7 the FDA recommended the addition of the following language to the IFU: "[I]n order to furnish adequate information for the safe use of the drug: transitory local inflammatory reactions have been reported."

3

18. Admit that the document attached as Exhibit 8 and produced at Bates numbered page ETH.MESH. 09630640 is a genuine copy of the FDA's approval letter dated June 26, 1973, for Supplemental NDA #16-374/S-005.

19. Admit that the FDA approved Supplemental NDA #16-374/S-005 as changed on June 26, 1973.

20. Admit that the document attached as Exhibit 9 and produced at Bates numbered page ETH.MESH. 09630742 is a genuine copy of the FDA's approval letter dated September 10, 1973, for Supplemental NDA #16-374/S-004.

21. Admit that the FDA approved Supplemental NDA #16-374/S-004 on September 10, 1973.

### 1974

22. Admit that the document attached as Exhibit 10 and produced at Bates numbered page ETH.MESH. 09630944 is a genuine copy of the FDA's approval letter dated March 1, 1974, for Supplemental NDA #16-374/S-006.

23. Admit that the FDA approved Supplemental NDA #16-374/S-006 on March 1, 1974.

24. Admit that the document attached as Exhibit 11 and produced at Bates numbered page ETH.MESH. 09630985 is a genuine copy of the FDA's approval letter dated November 18, 1974, for Supplemental NDA #16-374/S-007.

25. Admit that the FDA approved Supplemental NDA #16-374/S-007 on November 18, 1974.

### 1975

26.    Admit that the document attached as Exhibit 12 and produced at Bates numbered page ETH.MESH.09631401 is a genuine copy of the FDA's approval letter dated January 16, 1975, for Supplemental NDA #16-374/S-008.

27.    Admit that the FDA approved Supplemental NDA #16-374/S-008 on January 16, 1975.

28.    Admit that the document attached as Exhibit 13 and produced at Bates numbered page ETH.MESH.09631463 is a genuine copy of the FDA's approval letter dated June 4, 1975, for Supplemental NDA #16-374/S-010.

29.    Admit that the FDA approved Supplemental NDA #16-374/S-010 on June 4, 1975.

30.    Admit that the document attached as Exhibit 14 and produced at Bates numbered page ETH.MESH.09631174 is a genuine copy of the FDA's approval letter dated September 22, 1975, for Supplemental NDA #16-374/S-009.

31.    Admit that the FDA approved Supplemental NDA #16-374/S-009 as amended on September 22, 1975.

**1976**

32.    Admit that the document attached as Exhibit 15 and produced at Bates numbered page ETH.MESH.09631713 is a genuine copy of the FDA's approval letter dated October 22, 1976, for Supplemental NDA #16-374/S-011.

33.    Admit that the FDA approved Supplemental NDA #16-374/S-011 on October 22, 1976.

**1978**

34.    Admit that the document attached as Exhibit 16 and produced at Bates numbered page ETH.MESH.09632315 is a genuine copy of the FDA's approval letter dated May 12, 1978, for Supplemental NDA #16-374/S-014.

35.   Admit that the FDA approved Supplemental NDA #16-374/S-014 on May 12, 1978.

36.   Admit that the document attached as Exhibit 17 and produced at Bates numbered page ETH.MESH.09632331 is a genuine copy of the FDA's approval letter dated December 20, 1978, for Supplemental NDA #16-374/S-015.

37.   Admit that the FDA approved Supplemental NDA #16-374/S-015 on December 20, 1978.

**1979**

38.   Admit that the document attached as Exhibit 18 and produced at Bates numbered page ETH.MESH.09632606 is a genuine copy of the FDA's approval letter dated April 9, 1979, for Supplemental NDA #16-374/S-016.

39.   Admit that the FDA approved Supplemental NDA #16-374/S-016 as amended on April 9, 1979.

40.   Admit that the document attached as Exhibit 19 and produced at Bates numbered page ETH.MESH.09632774 is a genuine copy of the FDA's approval letter dated May 18, 1979, for Supplemental NDA #16-374/S-018.

41.   Admit that the FDA approved Supplemental NDA #16-374/S-018 on May 18, 1979.

42.   Admit that the document attached as Exhibit 20 and produced at Bates numbered page ETH.MESH.09632959 is a genuine copy of the FDA's approval letter dated December 6, 1979, for Supplemental NDA #16-374/S-019.

43.   Admit that the FDA approved Supplemental NDA #16-374/S-019 on December 6, 1979.

**1980**

44. Admit that the document attached as Exhibit 21 and produced at Bates numbered page ETH.MESH.09632673 is a genuine copy of the FDA's approval letter dated January 4, 1980, for Supplemental NDA #16-374/S-017.

45. Admit that the FDA approved Supplemental NDA #16-374/S-017 as amended on January 4, 1980.

46. Admit that the document attached as Exhibit 22 and produced at Bates numbered page ETH.MESH.09632861 is a genuine copy of the FDA's approval letter dated April 23, 1980, for Supplemental NDA #16-374/S-012.

47. Admit that the FDA approved Supplemental NDA #16-374/S-012 as amended on April 23, 1980.

48. Admit that the document attached as Exhibit 23 and produced at Bates numbered page ETH.MESH.09632899 is a genuine copy of the FDA's approval letter dated April 23, 1980, for Supplemental NDA #16-374/S-013.

49. Admit that the FDA approved Supplemental NDA #16-374/S-013 as amended on April 23, 1980.

50. Admit that the document attached as Exhibit 24 and produced at Bates numbered page ETH.MESH.09632978 is a genuine copy of the FDA's approval letter dated May 2, 1980, for Supplemental NDA #16-374/S-020.

51. Admit that the FDA approved Supplemental NDA #16-374/S-020 on May 2, 1980.

52. Admit that the document attached as Exhibit 25 and produced at Bates numbered page ETH.MESH.09633026 is a genuine copy of the FDA's approval letter dated December 17, 1980, for Supplemental NDA #16-374/S-1.

53.   Admit that the FDA approved Supplemental NDA #16-374/S-1 on December 17, 1980.

**1981**

54.   Admit that the document attached as Exhibit 26 and produced at Bates numbered pages ETH.MESH.09633003 through 09633004 is a genuine copy of the FDA's approval letter dated January 6, 1981, for Supplemental NDA #16-374/S-021.

55.   Admit that the FDA approved Supplemental NDA #16-374/S-021 on January 6, 1981.

56.   Admit that the document attached as Exhibit 27 and produced at Bates numbered page ETH.MESH.09633211 is a genuine copy of the FDA's approval letter dated January 14, 1981, for Supplemental NDA #16-374/S-2.

57.   Admit that the FDA approved Supplemental NDA #16-374/S-2 on January 14, 1981.

**1983**

58.   Admit that the document attached as Exhibit 28 and produced at Bates numbered pages ETH.MESH.09633361 through 09633362 is a genuine copy of the FDA's approval letter dated April 7, 1983, for Supplemental NDA #16-374/S26.

59.   Admit that the FDA approved Supplemental NDA #16-374/S26 on April 7, 1983.

**1984**

60.   Admit that the document attached as Exhibit 29 and produced at Bates numbered pages ETH.MESH.09633425 through 09633426 is a genuine copy of the FDA's approval letter dated March 12, 1984, for Supplemental NDA #16-374/S27.

61.   Admit that the FDA approved Supplemental NDA #16-374/S27 on March 12, 1984.

**1985**

62.  Admit that the document attached as Exhibit 30 and produced at Bates numbered pages ETH.MESH.09633444 through 09633446 is a genuine copy of the FDA's approval letter dated June 10, 1985, for Supplemental NDA #16-374/S28.

63.  Admit that the FDA approved Supplemental NDA #16-374/S28 as amended on June 10, 1985.

**1986**

64.  Admit that the document attached as Exhibit 31 and produced at Bates numbered pages ETH.MESH.09633998 through 09634005 is a genuine copy of the FDA's approval letter dated January 23, 1986, for Supplemental NDA #16-374/S29.

65.  Admit that the FDA approved Supplemental NDA #16-374/S29 on January 23, 1986.

66.  Admit that the document attached as Exhibit 32 and produced as Bates numbered pages ETH.MESH.09634080 through ETH.MESH.09634081 is a genuine copy of Section 6 of Ethicon's Annual Experience Report for PROLENE polypropylene suture covering the period from April 16, 1985 through April 15, 1986

67.  Admit that in 1986, Ethicon reported to the FDA that 1.58 million dozen sutures had been sold within the past 12 months, as stated in the document attached as Exhibit 32 and produced as ETH.MESH.09634081.

68.  Admit that the document attached as Exhibit 33 and produced at Bates numbered pages ETH.MESH.09634020 through 09634023 is a genuine copy of the FDA's approval letter dated May 23, 1986, for Supplemental NDA #16-374/S30.

69.  Admit that the FDA approved Supplemental NDA #16-374/S30 on May 23, 1986.

70.   Admit that the document attached as Exhibit 34 and produced at Bates numbered page ETH.MESH.09634106 is a genuine copy of the FDA's approval letter dated December 3, 1986, for Supplemental NDA #16-374/S31.

71.   Admit that the FDA approved Supplemental NDA #16-374/S31 on December 3, 1986.

**1987**

72.   Admit that the document attached as Exhibit 35 and produced at Bates numbered pages ETH.MESH.09634185 through 09634187 is a genuine copy of the FDA's approval letter dated August 28, 1987, for Supplemental NDA #16-374/S33.

73.   Admit that the FDA approved Supplemental NDA #16-374/S33 on August 28, 1987.

**1988**

74.   Admit that the document attached as Exhibit 36 and produced at Bates numbered pages ETH.MESH.09634299 through 09634303 is a genuine copy of the FDA's approval letter dated October 7, 1988, for Supplemental NDA #16-374/S34.

75.   Admit that the document attached as Exhibit 37 and produced at Bates numbered page ETH.MESH.09634318 is a genuine copy of proposed changes to the package insert for Prolene polypropylene sutures that Ethicon submitted to the FDA as part of NDA #16-374/S34.

76.   Admit that the proposed changes in NDA #16-374/S34 included labeling that warned of a "minimal, transient acute inflammatory reaction," and that it is not "subject to degradation or weakening by the action of tissue enzymes."

77.   Admit that the proposed changes in NDA #16-374/S34 included labeling that said the material "resists involvement in infection."

78.   Admit that the FDA approved Supplemental NDA #16-374/S34 on October 7, 1988.

**1990**

79.   Admit that the document attached as Exhibit 38 and produced at Bates numbered pages
ETH.MESH.09634354 through 09634356 is a genuine copy of the FDA's approval
letter dated March 20, 1990, for Supplemental NDA #16-374/S35.

80.   Admit that the FDA approved Supplemental NDA #16-374/S35 on March 20, 1990.

**Prolene Suture Studies**

81.   Admit that the document produced at Bates numbered pages ETH.MESH.09626038
through 09626039 is a genuine copy of part of Ethicon's IND #1688, containing Usher,
F.C., *Hernia Repair with Knitted Polypropylene Mesh*, Surgery, Gynecology &
Obstetrics, Vol. 117, No. 2 (1963), submitted to the FDA as part of IND #1688.

82.   Admit that the document produced at Bates numbered page ETH.MESH.09629996 is a
genuine copy of part of Ethicon's Fourth Quarterly Progress Report for NDA #16-374,
containing an abstract of Morgan, J.E., *A Sling Operation Using Marlex Polypropylene
Mesh for Treatment of Recurrent Stress Incontience*, Vol. 106, No. 3, pages 369–77
(1970), submitted to the FDA on April 24, 1970.

83.   Admit that the documents produced at Bates numbered pages ETH.MESH.09634276 and
ETH.MESH.09634282 through 09634283 are a genuine copy of part of Ethicon's 1988 to
1989 periodic report for NDA #16-374, containing an abstract of Kersey, J. et al., *A
Further Assessment of the Gauze Hammock Sling Operation in the Treatment of Stress
Incontinence*, British J. Obstet. Gynaecol., 95(4):382–385 (1988), submitted to the FDA
on June 28, 1989.

84. Admit that the document identified in Number 83 also contains an abstract of Gittes, R.F. & Foreman, R., *Transcutaneous Incorporation of Nonabsorbable Monofilament Sutures*, Surg. Gynecol.,Obstet., 166(6):545–548 (1988) submitted to the FDA on June 28, 1989.

**Reclassification Order**

85. Admit that from 1969 until the passage of the 1976 Medical Device Amendments, the FDA regulated Prolene polypropylene monofilament sutures as a drug.

86. Admit that, following the 1976 Medical Device Amendments enactment, the FDA regulated Prolene sutures as a Class III medical device.

87. Admit that the document attached as Exhibit 39 and produced at Bates numbered pages ETH.MESH.09634664 through 09634688 is a genuine copy of a July 5, 1990, FDA order.

88. Admit that according to Exhibit 39, the FDA reclassified nonabsorbable polypropylene surgical sutures from a Class III medical device to a Class II medical device with a low priority for the development of a performance standard.

89. Admit that the document attached as Exhibit 40 and produced at Bates numbered pages ETH.MESH.09634662 through 09634663 is a genuine copy of a letter from the FDA to Ethicon dated October 12, 1990, regarding the FDA's decision to reclassify polypropylene sutures as a Class II medical device.

90. Admit that on October 12, 1990, the FDA notified Ethicon that it reclassified PROLENE polypropylene sutures as a Class II medical device.

**510(k) Submissions**

**Modified PROLENE Mesh - 1996**

91. Admit that a genuine copy of Ethicon's 510(k) Premarket Notification dated June 25,
1996, for Modified PROLENE polypropylene mesh nonabsorbable synthetic surgical
mesh ("Modified PROLENE 510(k)") is located at Bates numbered pages
ETH.MESH.05217103 through 05217144.

92. Admit that a genuine copy of FDA's receipt letter to Ethicon concerning the Modified
PROLENE 510(k) (K962530) is located at Bates numbered pages ETH.MESH.05217101
through 05217102.

93. Admit that a genuine copy of Section I ("Modified Device and Description") of Ethicon's
Modified PROLENE 510(k) is attached as Exhibit 41 and located at Bates numbered
pages ETH.MESH.05217110 through 05217111.

94. Admit that Ethicon's Modified PROLENE 510(k) states, in part, at ETH.MESH.
05217111 that "Modified PROLENE mesh is constructed of knitted filaments of extruded
polypropylene identical in composition to that used in PROLENE* polypropylene suture
nonabsorbable surgical sutures, U.S.P."

95. Admit that Ethicon's Modified PROLENE 510(k) states, in part, at ETH.MESH.
05217110 that the predicate device for Modified PROLENE mesh is "a preamendment
device PROLENE polypropylene mesh nonabsorbable synthetic surgical mesh."

96. Admit that a genuine copy of the FDA's Clearance Letter for Ethicon's Modified
PROLENE 510(k) dated August 9, 1996, is attached as Exhibit 42 and located at Bates
numbered pages ETH.MESH.05217098 through 05217100.

97. Admit that the FDA cleared Ethicon's 510(k) submission for Modified PROLENE on
August 9, 1996.

**TVT - 1998**

98.     Admit that a genuine copy of Ethicon's 510(k) Premarket Notification dated October

        29, 1997, for the Tension Free Vaginal Tape (TVT) System (K974098) ("TVT

        510(k)") is located at Bates numbered pages ETH.MESH.08476210 through 08476342

        and ETH.MESH.10040062 through 10040065.

99.     Admit that a genuine copy of Section I ("New Device and Description") of Ethicon's

        TVT 510(k) is attached as Exhibit 43 and located at Bates numbered pages

        ETH.MESH.08476243 through 08476245.

100.    Admit that the TVT 510(k) states that polypropylene mesh used in the Tension Free

        Vaginal Tape (TVT) System (K974098) "is the same Polypropylene mesh that is used

        to fabricate PROLENE polypropylene mesh," as stated in ETH.MESH.08476244.

101.    Admit that the TVT 510(k) states that polypropylene strands used to fabricate

        PROLENE mesh are the "same strands used to fabricate PROLENE Polypropylene

        Nonabsorbable Surgical Suture (NDA/PMA #16-374)," as stated in

        ETH.MESH.08476244.

102.    Admit that the PROLENE polypropylene mesh is the only part of the TVT System's

        device intended to be left in a patient's body following a TVT surgical procedure.

103.    Admit that a genuine copy of the FDA's Clearance Letter for Ethicon's TVT 510(k)

        dated January 28, 1998, is attached as Exhibit 44 and located at Bates numbered pages

        ETH.MESH.08476211 through 08476213.

104.    Admit that the FDA cleared Ethicon's 510(k) submission for TVT on January 28,

        1998.

105. Admit that FDA has never rescinded its clearance of the 510(k) premarket notification for the Tension Free Vaginal Tape (TVT) System (K974098).

106. Admit that FDA has never rescinded the 510(k) premarket notification for the Tension Free Vaginal Tape (TVT) System (K974098).

107. Admit that the FDA has never issued a Warning Letter to Ethicon, Inc. regarding the Tension Free Vaginal Tape (TVT) System (K974098).

108. Admit that the FDA has never issued a Warning Letter to Johnson & Johnson regarding the Tension Free Vaginal Tape (TVT) System (K974098).

**TVT-AA/Blue - 2001**

109. Admit that a genuine copy of Ethicon's 510(k) Premarket Notification dated August 9, 2001, for the Modified TVT-Blue System, with Accessory TVT-AA (K012628) ("Modified TVT-Blue 510(k)") is located at Bates numbered pages ETH.MESH.10039072 through 10039200.

110. Admit that a genuine copy of Section I ("Modified Device and Description") of Ethicon's Modified TVT-Blue 510(k) is attached as Exhibit 45 and located at Bates numbered pages ETH.MESH.10039090 through 10039093.

111. Admit that, according to the Modified TVT-Blue 510(k), the Modified TVT-Blue System, with Accessory TVT-AA (K012628) ("TVT Blue") "is a modification of the currently marketed TVT device and accessories covered under 510(k) (K974098) cleared January 28, 1998" as stated in ETH.MESH.10039090.

112. Admit that, according to the Modified TVT-Blue 510(k), the TVT Blue "contains the same blue pigmented polypropylene monofilaments as the currently cleared

PROLENE* soft Polypropylene Mesh K001122 cleared on May 23, 2000" as stated in ETH.MESH.10039090.

113. Admit that, according to the Modified TVT-Blue 510(k), the TVT Blue  is distinguished, in part, from the TVT system "by the inclusion of blue pigmented polypropylene fibers (approximately 50%) interwoven in the same manner as the current unpigmented TVT device," and that the "blue pigmented monofilaments are made from the same unpigmented polypropylene fibers colored with blue pigment [Phthalocyaninato(2-)] copper," as stated in ETH.MESH.10039090.

114. Admit that, according to the Modified TVT-Blue 510(k), the TVT Blue "is a sterile single-use device that is composed of one piece of approximately 50% unpigmented and 50% pigmented blue [Phthalocyaninato(2-) copper], (Colour index Number 74160) polypropylene mesh," and that "this is the same Polypropylene Mesh that is used to fabricate PROLENE* Soft Polypropylene mesh (K001122) and PROLENE* Polypropylene Mesh (K962530)," as stated in ETH.MESH.10039092.

115. Admit that, according to the Modified TVT-Blue 510(k), the "PROLENE mesh is fabricated from polypropylene strands of clear and clear/blue pigmented polypropylene fiber," and that "these same strands are used to fabricate PROLENE* Polypropylene Nonabsorbable Surgical Suture, undyed of blue pigment, (NDA;PMA #16-374) manufactured and marketed by ETHICON, Inc." as stated in ETH.MESH.10039092.

116. Admit that a genuine copy of the FDA's Clearance Letter for Ethicon's Modified TVT-Blue 510(k) submission, dated October 26, 2001, is attached as Exhibit 46 and located at Bates numbered pages ETH.MESH.10039077 through 10039079.

117. Admit that the FDA cleared Ethicon's 510(k) submission for the Modified TVT-Blue System on October 26, 2001.

118. Admit that the PROLENE polypropylene mesh is the only part of the Modified TVT-Blue System intended to be left in a patient's body following a TVT surgical procedure.

119. Admit that FDA has never rescinded its clearance of the Modified TVT Blue 510(k) (K012628).

120. Admit that FDA has never rescinded the Modified TVT Blue 510(k) (K012628).

121. Admit that the FDA has never issued a Warning Letter to Ethicon, Inc. regarding the TVT Blue device (K012628).

122. Admit that the FDA has never issued a Warning Letter to Johnson & Johnson regarding the TVT Blue device (K012628).

### TVT-O - 2003

123. Admit that a genuine copy of Ethicon's 510(k) Premarket Notification dated December 8, 2003, for the GYNECARE TVT Obturator Device (K033568) ("TVT-O 510(k)") is located at Bates numbered pages ETH.MESH.07876926 through 07877006 and ETH.MESH.10039201 through 10039204.

124. Admit that a genuine copy of Section I ("Modified Device and Description") of Ethicon's TVT-O 510(k) is attached as Exhibit 47 and located at Bates numbered pages ETH.MESH.07876943 through 07876945.

125. Admit that, according to the TVT-O 510(k), the predicate device for the GYNECARE TVT Obturator Device "is a modification of the currently marketed GYNECARE TVT device covered under 510(k) K974098 cleared January 28, 1998" and "contains the

same blue pigmented polypropylene monofilaments as the currently cleared TVT Blue with Abdominal Guides K012628 cleared on October 26, 2001," as stated in ETH.MESH.07876943.

126. Admit that a genuine copy of the FDA's Clearance Letter for Ethicon's TVT-O 510(k) submission, dated December 8, 2003, is attached as Exhibit 48 and located at Bates numbered pages ETH.MESH.07876929 through 07876931.

127. Admit that the FDA cleared Ethicon's TVT-O 510(k) submission on December 8, 2003.

128. Admit that the PROLENE polypropylene mesh is the only part of the device intended to be left in a patient's body following a GYNECARE TVT Obturator surgical procedure.

129. Admit that FDA has never rescinded its clearance of the 510(k) premarket notification for the GYNECARE TVT Obturator Device (K033568).

130. Admit that FDA has never rescinded the 510(k) premarket notification for the GYNECARE TVT Obturator Device (K033568).

131. Admit that the FDA has never issued a Warning Letter to Ethicon, Inc. regarding the GYNECARE TVT Obturator Device (K033568).

132. Admit that the FDA has never issued a Warning Letter to Johnson & Johnson regarding the GYNECARE TVT Obturator Device (K033568).

### Updated Clearance - 2012

133. Admit that a genuine copy of the FDA's updated clearance letter for Ethicon's TVT 510(k) submission (K974098), dated September 28, 2012, is attached as Exhibit 49 and located at Bates numbered pages ETH.MESH. 10040062 through10040065.

134. Admit that the FDA issued an updated clearance letter for the TVT System on September 28, 2012.

135. Admit that a genuine copy of the FDA's updated clearance letter for Ethicon's Modified TVT-Blue 510(k) submission (K012628), dated September 28, 2012, is attached as Exhibit 50 and located at Bates numbered pages ETH.MESH. 10039072 through 10039074.

136. Admit that the FDA issued an updated clearance letter for the TVT-Blue System on September 28, 2012.

137. Admit that a genuine copy of the FDA's updated clearance letter for Ethicon's TVT-O 510(k) submission (K033568), dated September 28, 2012, is attached as Exhibit 51 and located at Bates numbered pages ETH.MESH. 10039201 through 10039204.

138. Admit that the FDA issued an updated clearance letter for the TVT-O Device on September 28, 2012.

Respectfully submitted,
ETHICON, INC. AND
JOHNSON & JOHNSON

*/s/ David B. Thomas*
David B. Thomas (W. Va. Bar No. 3731)
Thomas Combs & Spann, PLLC
300 Summers Street, Suite 1380
P.O. Box 3824
Charleston, WV 23558-3824
(304) 414-1800

*/s/ Christy D. Jones*
Christy D. Jones
Butler, Snow, O'Mara, Stevens & Cannada, PLLC
1020 Highland Colony Parkway
Suite 1400 (39157)

P.O. Box 6010
Ridgeland, MS  39158-6010
(601) 985-4523

## Exhibit Index

| Exhibit # | Description | RFA |
|---|---|---|
| 1 | FDA Approval Letter: NDA #16-374 | 3-5 |
| 2 | NDA Supplemental Chart | 6-7 |
| 3 | FDA Approval Letter: NDA #16-374/S-001 | 8-9 |
| 4 | FDA amended Approval Letter: NDA #16-374/S-001 | 10-11 |
| 5 | FDA Approval Letter: NDA #16-374/S-002 | 12-13 |
| 6 | FDA Approval Letter: NDA #16-374/S-003 | 14-15 |
| 7 | FDA Letter to Ethicon | 16 |
| 8 | FDA Approval Letter: NDA #16-374/S-005 | 18-19 |
| 9 | FDA Approval Letter: NDA #16-374/S-004 | 20-21 |
| 10 | FDA Approval Letter: NDA #16-374/S-006 | 22-23 |
| 11 | FDA Approval Letter: NDA #16-374/S-007 | 24-25 |
| 12 | FDA Approval Letter: NDA #16-374/S-008 | 26-27 |
| 13 | FDA Approval Letter: NDA #16-374/S-010 | 28-29 |
| 14 | FDA Approval Letter: NDA #16-374/S-009 | 30-31 |
| 15 | FDA Approval Letter: NDA #16-374/S-011 | 32-33 |
| 16 | FDA Approval Letter: NDA #16-374/S-014 | 34-35 |
| 17 | FDA Approval Letter: NDA #16-374/S-015 | 36-37 |
| 18 | FDA Approval Letter: NDA #16-374/S-016 | 38-39 |
| 19 | FDA Approval Letter: NDA #16-374/S-018 | 40-41 |
| 20 | FDA Approval Letter: NDA #16-374/S-019 | 42-43 |
| 21 | FDA Approval Letter: NDA #16-374/S-017 | 44-45 |
| 22 | FDA Approval Letter: NDA #16-374/S-012 | 46-47 |
| 23 | FDA Approval Letter: NDA #16-374/S-013 | 48-49 |
| 24 | FDA Approval Letter: NDA #16-374/S-020 | 50-51 |
| 25 | FDA Approval Letter: NDA #16-374/S-1 | 52-53 |
| 26 | FDA Approval Letter: NDA #16-374/S-021 | 54-55 |
| 27 | FDA Approval Letter: NDA #16-374/S-2 | 56-57 |
| 28 | FDA Approval Letter: NDA #16-374/S-026 | 58-59 |
| 29 | FDA Approval Letter: NDA #16-374/S27 | 60-61 |
| 30 | FDA Approval Letter: NDA #16-374/S28 | 62-63 |
| 31 | FDA Approval Letter: NDA #16-374/S29 | 64-65 |
| 32 | Section 6 of Annual Report 1985-1986 | 66-67 |
| 33 | FDA Approval Letter: NDA #16-374/S30 | 68-69 |
| 34 | FDA Approval Letter: NDA #16-374/S31 | 70-71 |
| 35 | FDA Approval Letter: NDA #16-374/S33 | 72-73 |
| 36 | FDA Approval Letter: NDA #16-374/S34 | 74, 78 |
| 37 | Package Insert Changes for NDA #16-374/S34 | 75-77 |
| 38 | FDA Approval Letter: NDA #16-374/S35 | 79-80 |
| 39 | FDA Order, July 5, 1990 | 87-88 |
| 40 | FDA Letter, October 12, 1990 | 89-90 |
| 41 | Section I of Modified PROLENE 510(k) | 93-95 |

| 42 | FDA Clearance Letter, Modified PROLENE | 96-97 |
| 43 | Section I of TVT 510(k) | 99-101 |
| 44 | FDA Clearance Letter, TVT | 103-104 |
| 45 | Section I of TVT-Blue 510(k) | 110-115 |
| 46 | FDA Clearance Letter, TVT-Blue | 116-17 |
| 47 | Section I of TVT-Obturator 510(k) | 124-125 |
| 48 | FDA Clearance Letter, TVT-Obturator | 126-127 |
| 49 | FDA Updated Clearance Letter – TVT | 133-134 |
| 50 | FDA Updated Clearance Letter – TVT-Blue | 135-136 |
| 51 | FDA Updated Clearance Letter – TVT-Obturator | 137-138 |

# Exhibit 1



DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE
PUBLIC HEALTH SERVICE
CONSUMER PROTECTION AND ENVIRONMENTAL HEALTH SERVICE
WASHINGTON, D.C. 20204

FOOD AND DRUG ADMINISTRATION

APR 16 1969

NDA 16-374

Xerox to:  Dr. C. Artandi
           Mr. A. J. Abbruzze
           Mr. D. Collins
           Mr. R. B. Sellars
           Mr. S. Smoyer
           Dr. A. W. Ulin

CERTIFIED AIR MAIL

Ethicon, Inc.
Attention: Mr. A. J. Bee
Somerville, New Jersey  08876

Gentlemen:

This acknowledges the receipt on February 6, 1969 of your communication
dated February 5, 1969 enclosing printed labeling pursuant to your
new drug application for "Prolene Polypropylene Suture (Nonabsorbable
Surgical Suture U.S.P., Type B)".

We also acknowledge receipt of your additional communication dated
March 3, 1969.  Also those dated March 3 and March 14, 1969 enclosing
revised printed labeling.

The application was filed on March 17, 1969.

We have completed the review of this application as amended and have
concluded that the drug is safe and effective for use as recommended
in the submitted labeling.  Accordingly, the application is approved.

The enclosures summarize the conditions relating to the approval of this
application.

Please submit two market packages of the drug when available.

                    Sincerely yours,

                    B. H. Minchew, M.D.
                    Acting Director
                    Bureau of Medicine

Enclosures
     Records and Reports Requirement (Reg. 130.13)
     Conditions of Approval of NDA

RECEIVED

APR 1 8 1968

R. J. SEMPLE

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

ETH.MESH.09625731

- 2 -

With the approval of your new drug application the following information should be submitted concerning any continuing clinical investigations and the disposition of the drugs supplied for investigational use of this product as provided for in your IND(s):

(1) Whether each clinical investigator has been informed that a new drug application has been approved and whether he has been supplied copies of the approved labeling;

(2) A statement as to which of the clinical investigations are continuing, showing whether or not the study involves use of the drug under conditions other than those covered by the approved labeling;

(3) The disposition of any unused drugs supplied for investigational use that are not intended for continuing investigation or use under the conditions covered by the approved labeling.

Reports of any continuing studies should be submitted as progress reports to your Notice of Claimed Investigational Exemption. Data submitted to the new drug application under the records and reports requirement may be included in the progress report by reference.

In the event you initiate additional clinical studies involving use of the drug under conditions not covered by the approved labeling in the new drug application, it will be necessary, of course, that we be notified. This may be in the form of a separate Notice or an amendment to your IND(s). Information in the discontinued Notice may also be included by specific reference.

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY                    ETH.MESH.09625732

Records and Reports Requirement
(21 CFR 130.13)

130.13  Records and reports concerning experience on drugs for which
an approval is in effect.

(a)  On receiving notification that an application for a new drug is
approved, the applicant shall establish and maintain records and make
reports that are necessary to facilitate a determination whether there
may be grounds for invoking section 505(e) of the Act to suspend or
withdraw approval of the application, including adequately organized
and indexed files containing full reports or any of the following kinds
of information, pertinent to the safety or effectiveness of the drug or
the adequacy of the methods used in, or the facilities and controls used
for, the manufacture, processing, and packing of the drug to assure and
preserve its identity, strength, quality, and purity, that has not pre-
viously been submitted as part of his application for the drug and which
is received or otherwise obtained by him from any source:

(1)  Unpublished reports of clinical experience, studies, investigations,
and tests conducted by the applicant or reported to him by any person
involving the drug that is the subject of the application and related
drugs, and reports in the scientific literature involving the drug that
is the subject of the application.  An adequate summary and bibliography
of reports in the scientific literature will ordinarily suffice.  (The
applicant must identify at the time of each report submission each drug
he considers related to the subject drug.)

(2)  Unpublished reports of animal experience, studies, investigations,
and tests conducted by the applicant or reported to him by any person
involving the drug that is the subject of the application and related
drugs, and reports in the scientific literature involving the drug that
is the subject of the application.  An adequate summary and bibliography
of reports in the scientific literature will ordinarily suffice.  (The
applicant must identify at the time of each report submission each drug
he considers related to the subject drug.)

(3)  Experience, investigations, studies, or tests involving the chemical
or physical properties or any other properties of the drug; such as, its
behavior or properties in relation to microorganisms, including both the
effects of the drug on microorganisms and the effects of microorganisms
on the drug.

(4)  The information required by this section shall include, when known,
adequate identification of its source, including the name and post office
address of the person who furnished such information.

1-69

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY                    ETH.MESH.09625733

-2-

(5)  Copies of all mailing pieces and other labeling, and if it is a prescription drug all advertising, other than that contained in the application, used in promoting the drug; and copies of the currently used package labeling that gives full information for use of the drug, whether or not such labeling is contained in the application.

(6)  Information concerning the quantity of the drug distributed, in a manner and form that facilitates estimates of the incidence of any adverse effects reported to be associated with the use of the drug.  This does not require disclosure of financial or pricing data.

(7)  Information concerning any previously unreported changes from the conditions described in an application, including changes conforming to the conditions of § 130.9(a)(5).

(b)  The applicant shall submit to the Food and Drug Administration copies of the records and reports described in paragraph (a) of this section (except routine assay and control records) appropriately identified with the new-drug application(s) to which they relate, as follows.  Such copies, including form FD-1639, shall be submitted in duplicate, except that other individual patient case reports may be submitted in single copy.  Each report for human-use drugs that forwards an advertisement or promotional labeling pursuant to subparagraph (3) of this paragraph or a periodic report pursuant to subparagraph (4) of this paragraph shall be accompanied by a completed transmittal form FD 2253 (Transmittal of Advertisements and Promotional Labeling for Drugs for Human Use) or FD 2252 (Transmittal of Periodic Reports for Drugs for Human Use), respectively.  Forms are obtainable from the Food and Drug Administration, Department of Health, Education, and Welfare, 200 C Street NW, Washington, D.C. 20204.

(1)  Immediately upon receipt by the applicant, complete records or reports covering information of the following kinds:

(i)  Information concerning any mixup in the drug or its labeling with another article.

(ii)  Information concerning any bacteriological, or any significant chemical, physical, or other change or deterioration in the drug, or any failure of one or more distributed batches of the drug to meet the specifications established for it in the new-drug application.

(2)  As soon as possible, and in any event within 15 working days of its receipt by the applicant, complete records and reports concerning any information of the following kinds:

(i)  Information concerning any unexpected side effect, injury, toxicity, or sensitivity reaction or any unexpected incidence or severity thereof associated

1-69

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY                                    ETH.MESH.09625734

-3-

with clinical uses, studies, investigations, or tests, whether or not determined to be attributable to the drug, except that this requirement shall not apply to the submission of information described in a written communication to the applicant from the Food and Drug Administration as types of information that may be submitted at other designated intervals. "Unexpected" as used in this subdivision refers to conditions or developments not previously submitted as part of the new-drug application or not encountered during clinical trials of the drug, or conditions or developments occurring at a rate higher than shown by information previously submitted as part of the new-drug application, or than encountered during such clinical trials.

(ii)  Information concerning any unusual failure of the drug to exhibit its expected pharmacological activity.

(3)  When mailing pieces, any other labeling, and advertising are devised for promotion of the drug, specimens shall be submitted at the time of initial dissemination of such labeling and at the time of initial publication of any advertisement for a prescription drug.  Mailing pieces and labeling that are designed to contain samples of a drug shall be complete except for omission of the drug.

(4)  All the kinds of information described in paragraph (a) of this section, other than that submitted under the provisions of subparagraphs (1), (2), and (3) of this paragraph, shall be submitted at the following intervals, unless otherwise ordered in a written communication from the Commissioner:

(i)  If the drug is intended for administration to man, within intervals of 3 months beginning with the date of approval of the application during the first year following such date; within intervals of 6 months during the second year following such date; and at yearly intervals thereafter.

(ii)  If the drug is intended solely for administration to animals, at intervals within 6 months beginning with the date of approval of the application during the first year following such date, and at yearly intervals thereafter:  Provided, however, that such reports are not required from applicants to the extent that the reporting obligation is based on their manufacture of complete medicated feed.

(iii)  Whenever an applicant is required to submit reports under the provisions of subdivision (i) or (ii) of this subparagraph with respect to more than one approved application for preparations containing the same drug so that the same item(s) of information is (are) required to be reported for more than one application, he may elect to submit as part of the report for one such application all the information common to such applications in lieu of reporting separately and repetitively on each.  The applicant shall state when this is done and identify all the applications for which the reports are submitted.

(iv)  The submitted copies of records and reports shall include all the required information that was received or otherwise obtained by the applicant during the designated intervals.

1-69

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY                    ETH.MESH.09625735

-4-

(5)  On written order of the Commissioner, within the time stated in such order or agreed to by the applicant and the Commissioner, any designated records or reports containing the kinds of information described in this section.

(c)  The reports submitted under the provisions of this section are not required to furnish the names and addresses of individual patients unless the applicant is notified in writing by the Food and Drug Administration that individual patient identification is required with respect to designated reports in order to permit further investigation or because there is reason to believe that such reports do not represent actual results obtained.

(d)  The applicant shall upon request of any properly authorized officer or employee of the Department, at reasonable times, permit such officers to have access to and copy and verify any records and reports established and maintained under the provisions of this section.

(e)  If the Food and Drug Administration finds that the applicant has failed to establish a system for maintaining required records, or has repeatedly or deliberately failed to maintain such records or to make required reports, in accordance with the provisions of this section, or that the applicant has refused to permit access to, or copying or verification of such records or reports, the Commissioner shall give the applicant due notice and opportunity for a hearing on the question of whether to withdraw the approval of the application, as provided in section 130.14 and 130.27.

(f)  Upon written request of the applicant, stating reasonable grounds therefor, the Commissioner will make available any information in possession of the Food and Drug Administration of the kinds the applicant is required to maintain under the provisions of this section, except information readily available to the applicant from other sources or information which the Commissioner concludes must be considered confidential.

(g)  The "applicant" required to establish and maintain records and make reports required by this section and under the regulations in section 130.35 includes any person whose name appears on the labeling of the drug as its manufacturer, packer, or distributor under an approval or who is engaged in the manufacturing, processing, packing, or labeling of the drug under an approval of the application or any supplement to it; Provided, however, that in order to avoid unnecessary duplication in the submission of reports any such applicant's obligation to submit a report may be met by its submission on his behalf, designated as such, by another person responsible for reporting.

1-69

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

ETH.MESH.09625736

## Conditions of Approval of a New Drug Application

The signing of the new drug application form is regarded as a commitment on your part that:

All representations in the application apply to the drug produced until an approved supplement to the application provides for a change or a change is made in conformance with other provisions of § 130.9 of the new-drug regulations.

The labeling and advertising for the drug will prescribe, recommend, or suggest its use only under the conditions stated in the labeling which is part of this application; and if the article is a prescription drug, it is understood that any labeling which furnishes or purports to furnish information for use or which prescribes, recommends, or suggests a dosage for use of the drug will contain the same information for its use, including indications, effects, dosages, routes, methods, and frequency and duration of administration, any relevant warnings, hazards, contra-indications, side effects, and precautions, as that contained in the labeling which is part of this application in accord with § 1.106(b) (21 CFR 1.106(b)).

Section 505(e) of the Federal Food, Drug, and Cosmetic Act provides for approval of the application to be withdrawn if: clinical or other experience, tests, or other scientific data show that the drug is unsafe or not shown to be safe for use; further information indicates there is a lack of substantial evidence that the drug will have the effect it is represented to have; the application contains an untrue statement of material fact; the applicant fails to establish or maintain required records or make required reports; new information shows that the methods, facilities, or controls used in the manufacture, processing, and packing of the drug are inadequate to assure and preserve its identity, strength, quality, and purity; or the labeling of the drug is false and misleading.

The drug may not be labeled with another distributor's name, or repacked, or relabeled by another person unless provided for in the approved application or in conformance with § 130.9 of the new drug regulations.

Section 301(l) of the Act prohibits the use in the labeling, or in any advertising, of any representation or suggestion that an application with respect to the drug is approved under section 505, or that the drug complies with the provisions of that section.

The approval of this application under section 505 in no way relieves you of the responsibility for complying with all other provisions of the Act.

1-69

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY                    ETH.MESH.09625737

# Exhibit 2

Exhibit 2

| Suppl. # | Application Date(s) | Application (ETH.MESH.____) |
|---|---|---|
| S-001 | 10/30/1969 | 09629721–09629858 |
| S-002 | 6/14/1971<br>10/28/1971 (amendment) | 09630237–09630340<br>09630186–09630232 (amendment) |
| S-003 | 5/15/1972 | 09630724–09630739 |
| S-004 | 11/10/1972 | 09630676–09630678 |
| S-005 | 5/3/1973 (letter)<br>5/25/1973 (final labeling) | 09630648 (letter agreeing to changes)<br>09630641–09630647 (final labeling) |
| S-006 | 10/29/1973 | 09630955–09630982 |
| S-007 | 7/10/1974 (annual report) | 09630991–09631140 |
| S-008 | 12/19/1974 | 09631414–09631453 |
| S-009 | 2/26/1975 (original)<br>5/22/1975 (1st amend.)<br>8/8/1975 (2nd amend.) | 09631339–09631389 (original)<br>09631251–09631325 (1st amend.)<br>09631178–09631244 (2nd amend.) |
| S-010 | 3/25/1975 | 09631467– 09631500 |
| S-011 | 7/15/1976 (annual report) | 09631714–09631941 |
| S-012 | 11/16/1977 (orig.)<br>9/19/1978 (1st amend.)<br>8/14/1979 (2nd amend.)<br>2/15/1980 (3rd amend.) | 09632230–09632266 (orig.)<br>09632622–09632646 (1st amend.)<br>09632875–09632896 (2nd amend.)<br>09632870 (3rd amend.) |
| S-013 | 11/22/1977 (orig.)<br>9/19/1978 (amend.) | 09632272–09632311 (orig.)<br>09632653–09632671 (amend.) |
| S-014 | 2/10/1978 | 09632321–09632328 |
| S-015 | 6/30/1978 | 09632336–09632350 |
| S-016 | 8/18/1978 (orig.)<br>1/5/1979 (amend.) | 09632611–09632618 (orig.)<br>09632850–09632858 (amend.) |
| S-017 | 9/20/1978 (orig.)<br>5/22/1979 (amend.) | 09632678–09632757 (orig.)<br>09632935–09632957 (amend.) |
| S-018 | 11/22/1978 | 09632777–09632847 |
| S-019 | 7/9/1979 | 09632965–09632976 |
| S-020 | 12/28/1979 | 09632987–09633000 |

| Suppl. # | Application Date(s) | Application (ETH.MESH.____) |
|---|---|---|
| S-021 | 5/7/1980 | 09633015–09633023 |
| S-1 [1980] | 9/19/1980 | 09633031–09633062 |
| S-2 [1980] | 10/14/1980 | 09633216–09633241 |
| S26 | 2/24/1983 | 09633366–09633381 |
| S27 | 12/1/1983 | 09633429–09633436 |
| S28 | 2/29/1984 (orig.) 9/13/1984 (amend.) | 09633463–09633769 (orig.) 09633771–09633903 (amend.) |
| S29 | 11/22/1985 | 09634008–09634018 |
| S30 | 3/14/1986 | 09634024–09634048 |
| S31 | 10/24/1986 | 09634108–09634132 |
| S33 | 7/31/1987 | 09634190–09634206 |
| S34 | 9/8/1988 | 09634311–09634318 |
| S35 | 2/16/1990 | 09634358–09634369 |

# Exhibit 3



DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE
PUBLIC HEALTH SERVICE
FOOD AND DRUG ADMINISTRATION
ROCKVILLE, MARYLAND 20852

RECEIVED.

MAY 11 1970

P. V. BUDAY

NDA 16-374/S-001

MAY  8 1970

Ethicon, Incorporated
Attention:  Dr. Paul V. Buday
Somerville, New Jersey  08876

Gentlemen:

We acknowledge the receipt on November 3, 1969, of your supplemental
new drug application dated October 30, 1969, submitted pursuant to
section 505(b) of the Federal Food, Drug, and Cosmetic Act for
Prolene Polypropylene Suture (Nonabsorbable Surgical Suture, U.S.P.,
Type B).

The supplemental application provides for revision of the packaging
procedures and packaging materials employed exclusively for the blue
pigmented monofilament, sizes 00, 000, 4-0, and 5-0.

We have completed the review of this supplemental application and
it is approved.  Our letter of April 16, 1969, detailed the conditions
relating to the approval of this application.

Yours truly,

Marvin Seife, M.D.
Director
Office of Marketed Drugs
Bureau of Drugs

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

ETH.MESH.09629720

# Exhibit 4



DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE
PUBLIC HEALTH SERVICE
FOOD AND DRUG ADMINISTRATION
ROCKVILLE, MARYLAND 20852

NDA 16-374/S-001

JUN 29 1970

RECEIVED

JUL 1 1970

P. V. BUDAY

Ethicon, Incorporated
Attention:  Dr. Paul V. Buday
Somerville, New Jersey  08876

Gentlemen:

Reference is made to your supplemental new drug application of October 30, 1969, submitted pursuant to section 505(b) of the Federal Food, Drug, and Cosmetic Act for Prolene Polypropylene Suture (Nonabsorbable Surgical Suture, U.S.P., Type B).

This communication is intended to amend the letter issued May 8, 1970, from this Administration, as discussed by telephone on June 24, 1970, between your representative, Mr. Robert J. Semple, and Dr. Nathan R. Rosenthal of this Office.

The supplemental application provides for revision of the packaging procedures and packaging materials employed for the suture sizes 7/0 thru 2, with and without needles, clear or pigmented, including those articles provided for in the letter issued May 8, 1970.

It is understood that the action of this letter only broadens the scope of the provision paragraph of our approved letter issued May 8, 1970.

Yours truly,

Marvin Seife, M.D.
Director
Office of Marketed Drugs
Bureau of Drugs

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

ETH.MESH.09629714

# Exhibit 5



**DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE**
PUBLIC HEALTH SERVICE
FOOD AND DRUG ADMINISTRATION
ROCKVILLE, MARYLAND 20852

NDA 16-374/S-002

AUG 17 1972

**RECEIVED**

AUG 21 1972

P. V. BUDAY

Ethicon, Incorporated
Attention:  Dr. Paul V. Buday
Somerville, New Jersey  08876

Gentlemen:

We acknowledge the receipt on July 7, 1972 of your communication dated
July 5, 1972 enclosing printed labeling pursuant to your supplemental
new drug application dated June 14, 1971 for "Prolene Polypropylene
Suture (Nonabsorbable Surgical Suture, U.S.P.)".

We have completed the review of this supplemental application as amended
and it is approved.  Our letter of April 16, 1969, detailed the conditions
relating to the approval of this application.

Sincerely yours,

*Frederick J. Grigsby, M.D.*

Frederick J. Grigsby, M.D.
Deputy Director
Division of Surgical-Dental
Drug Products
Office of Scientific Evaluation
Bureau of Drugs

**CONFIDENTIAL**
**SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY**

**ETH.MESH.09630681**

# Exhibit 6



DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE
PUBLIC HEALTH SERVICE
FOOD AND DRUG ADMINISTRATION
ROCKVILLE, MARYLAND 20852

NDA 16-374/S-003

AUG 2 4 1972

RECEIVED

AUG 2 8 1972

FDA 5-1287

Ethicon, Incorporated
Attention: Dr. Paul V. Buday
Somerville, New Jersey 08876

Gentlemen:

We acknowledge the receipt on May 22, 1972 of your supplemental new drug application dated May 15, 1972 submitted pursuant to section 505(b) of the Federal Food, Drug, and Cosmetic Act for Prolene Polypropylene Suture (Nonabsorbable Surgical Suture, U.S.P.).

The supplemental application provides for the Chicopee Manufacturing Company, Lumite-Division, Cornelia, Georgia to be an alternate facility for the extrusion of monofilament from polypropylene pellets.

We have completed the review of this supplemental application and it is approved. Our letter of April 16, 1969 detailed the conditions relating to the approval of this application.

Sincerely yours,

Frederick J. Grigsby, M.D.
Frederick J. Grigsby, M.D.
Deputy Director
Division of Surgical-Dental
Drug Products
Office of Scientific Evaluation
Bureau of Drugs

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

ETH.MESH.09630683

# Exhibit 7



RECEIVED

APR 3 0 1973

P. V. BUDAY

DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE
PUBLIC HEALTH SERVICE
FOOD AND DRUG ADMINISTRATION
ROCKVILLE, MARYLAND 20852

NDA 16-374

APR 2 6 1973

Ethicon, Incorporated
Attention:  Dr. Paul V. Buday
Somerville, New Jersey  08876

Gentlemen:

We acknowledge the receipt on January 26, 1973 of your communication
dated January 25, 1973 pertaining to your new drug application for
"Prolene Polypropylene Suture (Nonabsorbable Surgical Suture, U.S.P.)."

Your communication is submitted in response to our conference of
November 29, 1972.

As you know, we have recently reviewed the package insert for Prolene
and recommend the following change be made in the ADVERSE REACTIONS
section in order to furnish adequate information for the safe use of
the drug:

    "Transitory local inflammatory reactions have been reported."

Please let us know promptly your proposal in regard to the above recom-
mendation.

                    Sincerely yours,

                    Margaret Clark, M.D. for

                    George F. Leong, Ph.D.
                    Acting Director
                    Division of Surgical-Dental
                    Drug Products
                    Office of Scientific Evaluation
                    Bureau of Drugs

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY                    ETH.MESH.09630649

# Exhibit 8



DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE
PUBLIC HEALTH SERVICE
FOOD AND DRUG ADMINISTRATION
ROCKVILLE, MARYLAND 20852

NDA 16-374/S-005

JUN 26 1973

RECEIVED
JUN 28 1973
P. V. BUDAY

Ethicon, Incorporated
Attention: Dr. Paul V. Buday
Somerville, New Jersey   08876

Gentlemen:

We acknowledge the receipt on May 29, 1973 of your supplemental new drug application dated May 25, 1973 submitted pursuant to section 505(b) of the Federal Food, Drug, and Cosmetic Act for Prolene Polypropylene Suture (Nonabsorbable Surgical Suture, U.S.P.).

The supplemental application provides for final printed labeling containing revised wording of the Adverse Reactions section as requested in our letter of April 26, 1973.

We have completed the review of this supplemental application and it is approved. Our letter of April 16, 1969 detailed the conditions relating to the approval of this application.

Sincerely yours,

Margaret Clark, M.D.

Margaret A. Clark, M.D.
Acting Director
Division of Surgical-Dental
Drug Products
Office of Scientific Evaluation
Bureau of Drugs

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

ETH.MESH.09630640

# Exhibit 9

RECEIVED

SEP 1 2 1973

P. V. BUDAY

DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE
PUBLIC HEALTH SERVICE
FOOD AND DRUG ADMINISTRATION
ROCKVILLE, MARYLAND 20852

NDA 16-374/S-004

SEP 10 1973

Ethicon, Incorporated
Attention:  Dr. Paul V. Buday
Somerville, New Jersey  08876

Gentlemen:

We acknowledge the receipt on August 15, 1973 of your communication
dated August 14, 1973 regarding your supplemental new drug application
of November 10, 1972 submitted pursuant to section 505(b) of the Federal
Food, Drug, and Cosmetic Act for Prolene Polypropylene Suture (Nonab-
sorbable Surgical Suture, U.S.P.).

The supplemental application provides for reinstating molecular weight
determination by intrinsic viscosity measurement as a raw material
specification for both pigmented and unpigmented pelletized polypropy-
lene resin (Novamont), and for changing the acceptable melt index range
for pigmented pelletized polypropylene resin (Novamont) from 3-5 to 4-7.
The raw material specification for melt index for unpigmented pelletized
polypropylene resin will remain as a range of 3-5.

We have completed the review of this supplemental application as amended
and it is approved.  Our letter of April 16, 1969 detailed the conditions
relating to the approval of this application.

Sincerely yours,

Margaret Clark, MD.

Margaret A. Clark, M.D.
Acting Director
Division of Surgical-Dental
Drug Products
Office of Scientific Evaluation
Bureau of Drugs

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY                    ETH.MESH.09630742

# Exhibit 10

 

RECEIVED   DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE
PUBLIC HEALTH SERVICE
MAR 6   1974   FOOD AND DRUG ADMINISTRATION
ROCKVILLE, MARYLAND 20852

P. V. BUDAY
NDA 16-374/S-006

MAR 0 1 1974

Ethicon, Incorporated
Attention:  Dr. Paul V. Buday
Somerville, New Jersey  08876

Gentlemen:

Reference is made to your supplemental new drug application of
October 29, 1973, submitted pursuant to section 505(b) of the Federal
Food, Drug, and Cosmetic Act for Prolene Polypropylene Suture
(Nonabsorbable Surgical Suture, U.S.P.).

The supplemental application provides for the manufacture, processing,
packaging, labeling, and sterilization of this drug in Ethicon's
facility located at U.S. 67, San Angelo, Texas 76901.

The approval of this supplemental application is based upon the proper
installation and validation before production of the sterilization
chamber and gas chromatographic equipment.

We have completed the review of this supplemental application, and it
is approved.  Our letter of April 16, 1969, detailed the conditions
relating to the approval of this application.

Sincerely yours,

Margaret Clark, M.D.

Margaret A. Clark, M.D.
Acting Director
Division of Surgical-Dental
Drug Products
Office of Scientific Evaluation
Bureau of Drugs

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

ETH.MESH.09630944

# Exhibit 11



**DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE**
PUBLIC HEALTH SERVICE
FOOD AND DRUG ADMINISTRATION
ROCKVILLE, MARYLAND 20852

RECEIVED

NDA 16-374/S-007

NOV 1 9 1974

P. V. BUDAY

Ethicon, Incorporated
Attention: Dr. Paul V. Buday
Somerville, New Jersey  08876

NOV 1 8 1974

Gentlemen:

We acknowledge the receipt on July 15, 1974, of your communication dated July 10, 1974, reporting experience, as required by the provisions of Title 21 CFR 310.300 and section 505(j) of the Federal Food, Drug, and Cosmetic Act for the preparation Prolene Polypropylene Suture (nonabsorbable surgical suture, U.S.P.).

The report contains information regarding the replacement of the Kodacel/ Surlyn 2.5 mil laminate as the top component of the overwrap or secondary protective package, with a polypropylene/Surlyn 2.0 mil laminate as supplied by the American Can Company (PZ-5516.51). A change of this nature falls under the provisions of 21 CFR 314.8(a)(2) and necessitates the submission and prior approval of a supplemental application.

It is understood from the discussion by telephone on October 15, 1974, between your representative Mr. Robert Semple and Mr. Stanley Koch of this Administration that the sterility stability studies using the polypropylene/ Surlyn 1601 overwrap, as reported in your July 10, 1974, periodic report, will be continued for a period of not less than 5 years, data submitted as available, and lots found to fall outside approved specifications for the drug, including product sterility, will be removed from the market.

We have completed the review of this supplemental application and it is approved. Our letter of April 16, 1969, detailed the conditions relating to the approval of this application.

Please submit two market packages of the drug, when available, incorporating the changes provided for by this supplemental application.

Sincerely yours,

Margaret Clark, MD

Margaret A. Clark, M.D.
Acting Director
Division of Surgical-Dental
   Drug Products
Office of Scientific Evaluation
Bureau of Drugs

**CONFIDENTIAL**
**SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY**                    **ETH.MESH.09630985**

# Exhibit 12



**DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE**
PUBLIC HEALTH SERVICE
FOOD AND DRUG ADMINISTRATION
ROCKVILLE, MARYLAND 20852

NDA 16-374/S-008

RECEIVED

JAN 1 7 1975

P. V. BUDAY

JAN 1 6 1975

Ethicon, Inc.
Attention:  Dr. Paul V. Buday
Somerville, New Jersey  08876

Gentlemen:

Reference is made to your supplemental new drug application of
December 19, 1974, submitted pursuant to section 505(b) of the
Federal, Food, Drug, and Cosmetic Act for Prolene Polypropylene Suture
(nonabsorbable surgical suture, U.S.P.).

The supplemental application provides for the marketing of monofilament
Prolene sutures in blue pigmented suture sizes 8/0, 9/0, and 10/0.

We have completed the review of this supplemental application and
it is approved.  Our letter of April 16, 1969, detailed the conditions
relating to the approval of this application.

Please submit one market package of a representative product of each
size of pigmented monofilament Prolene polypropylene sutures provided
for by this supplemental application.

Yours sincerely,

Margaret Clark, M.D.

Margaret A. Clark, M.D.
Acting Director
Division of Surgical-Dental
  Drug Products
Bureau of Drugs

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY                    ETH.MESH.09631401

# Exhibit 13



DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE
PUBLIC HEALTH SERVICE
FOOD AND DRUG ADMINISTRATION
ROCKVILLE, MARYLAND 20852

NDA 16-374/S-010

RECEIVED
JUN 5  1975

JUN 4  1975

P. V. BUDAY

Ethicon, Incorporated
Attention:  Paul V. Buday, Ph.D.
Somerville, New Jersey  08876

Gentlemen:

Reference is made to your ~~supplemental new drug application of March~~ 25,
1975 submitted pursuant to section 505(b) of the Federal, Food, Drug, and
Cosmetic Act for Prolene Polypropylene Suture (nonabsorbable surgical
suture, U.S.P.)

The supplemental application provides for a "see-through" package for
blue pigmented Prolene sutures, 8/0, 9/0, and 10/0 sizes, consisting of
two overwraps, each envelope of which corresponds to the currently approved
(S-007) polypropylene/Surlyn top laminate and paper/polyethylene/foil
bottom component overwrap.

It is understood from the discussion by telephone on May 29, 1975 between
your representative Dr. Paul V. Buday and Mr. Stanley Koch of this
Administration that the stability studies to be performed on this new
drug package, as described on p. 15 of your March 25, 1975 submission,
will be conducted on two production lots of size 8/0, and two production
lots of size 10/0, Prolene sutures at 25°C and at 37°C.

We have completed the review of this supplemental application and it is
approved.  Our letter of April 16, 1969 detailed the conditions relating
to the approval of this application.

Please submit two market packages of the drug, when available, incorporating
the changes provided for by this supplemental application.

Sincerely yours,

*Clarence C. Gilkes, D.D.S.*
for

Margaret A. Clark, M.D.
Acting Director
Division of Surgical-Dental
    Drug Products
Bureau of Drugs

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

ETH.MESH.09631463

# Exhibit 14



DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE
PUBLIC HEALTH SERVICE
FOOD AND DRUG ADMINISTRATION
ROCKVILLE, MARYLAND 20852

SEP 22 1975

NDA 16-374/S-009

RECEIVED

SEP 23 1975

P. V. BUDAY

Ethicon Inc.
Attention:  Paul V. Buday, Ph.D.
Route 22
Somerville, New Jersey 08876

Gentlemen:

(FPL SUBM. DATE)   Reference is made to your Supplemental New Drug Application of
August 8, 1975, submitted pursuant to Section 505(b) of the Federal,
Food, Drug, and Cosmetic Act for Prolene (Polypropylene) Suture, enclosing
final printed labeling.

The supplemental application provides for revisions of suture size,
needling, and labeling.

We have completed the review of this supplemental application and it
is approved.  Our letter of April 16, 1969, detailed the conditions
relating to the approval of this application.

In addition, please note that the product may not be legally marketed
until the Color Additive Regulation is amended to allow usage as provided
for in Supplement S-009 and the present restriction under 21 CFR 8.4026(c)
is removed.

Sincerely yours,

Margaret Clark, M.D.

Margaret A. Clark, M.D.
Acting Director
Division of Surgical-Dental
    Drug Products
Bureau of Drugs

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

# Exhibit 15



DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE
PUBLIC HEALTH SERVICE
FOOD AND DRUG ADMINISTRATION
ROCKVILLE, MARYLAND 20852

NDA 16-374/S-011

**RECEIVED**

OCT 26 1976

P. V. BUDAY

OCT 22 1976

Ethicon, Inc.
Attention: Paul V. Buday, Ph.D.
Somerville, New Jersey 08876

Gentlemen:

We acknowledge the receipt on July 19, 1976, of your communication dated July 15, 1976, reporting experience, as required by the provisions of Title 21 CFR 310.300 and section 505(j) of the Federal Food, Drug, and Cosmetic Act for the preparation Prolene Polypropylene Suture (nonabsorbable surgical suture, U.S.P.).

The report contains information regarding the replacement of the 0.5 mil polypropylene/1.5 mil Surlyn film laminate as the top component of the outerwrap or secondary protective package, with a 0.5 mil polypropylene/2.0 mil Surlyn film as supplied by the American Can Company. A change of this nature falls under the provisions of 21 CFR 314.8(a)(2) and necessitates the submission and prior approval of a supplemental application.

We have completed the review of this supplemental application and it is approved. Our letter of April 16, 1969 detailed the conditions relating to the approval of this application.

Please submit two market packages of the drug, when available, incorporating the changes provided by this supplemental application.

Sincerely yours,

Clarence C. Gilkes, D.D.S.
for
Margaret A. Clark, M.D.
Director
Division of Surgical-Dental
   Drug Products
Bureau of Drugs

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

ETH.MESH.09631713

# Exhibit 16



DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE
PUBLIC HEALTH SERVICE
FOOD AND DRUG ADMINISTRATION
ROCKVILLE, MARYLAND 20857

NDA 16-374/S014

RECEIVED

MAY 15 1978

J. C. KURJIAN

MAY 12 1978

Ethicon, Inc.
Attention:  Joan C. Kurjian
Somerville, NJ  08876

Gentlemen:

Please refer to your supplemental new drug application of February 10,
1978, submitted pursuant to section 505(b) of the Federal Food, Drug,
and Cosmetic Act for Prolene Polypropylene Suture (nonabsorbable surgical
suture, U.S.P.).

The supplemental application provides for revised labeling for Prolene
sutures with mechanically attached control release removable needles.

We have completed the review of this supplemental application and it is
approved.  Our letter of April 16, 1969, detailed the conditions relating
to the approval of this application.

Sincerely yours,

Philip G. Walters, M.D.
Acting Director
Division of Surgical-Dental
   Drug Products
Bureau of Drugs

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY                ETH.MESH.09632315

# Exhibit 17



DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE
PUBLIC HEALTH SERVICE
FOOD AND DRUG ADMINISTRATION
ROCKVILLE, MARYLAND 20857

NDA 16-374/S-015   **RECEIVED**

DEC 27 1978

J. C. KURJIAN

Ethicon, Inc.
Attention:  Joan C. Kurjian                    DEC 20 1978
Somerville, NJ  08876

Gentlemen:

We acknowledge the receipt on October 13, 1978, of your communication
dated October 12, 1978, enclosing printed labeling pursuant to your
supplemental new drug application dated June 30, 1978, for Prolene
Polypropylene Suture (nonabsorbable surgical suture, U.S.P.).

The supplemental application provides for revised labels.

We have completed the review of this supplemental application and it is
approved.  Our letter of April 16, 1969, detailed the conditions relating
to the approval of this application.

Sincerely yours,

Joseph K. Inscoe, Ph.D.
Acting Director
Division of SurgicalDental
  Drug Products
Bureau of Drugs

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY                    ETH.MESH.09632331

# Exhibit 18



DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE
PUBLIC HEALTH SERVICE
FOOD AND DRUG ADMINISTRATION
ROCKVILLE, MARYLAND 20857

NDA 16-374/S-016

RECEIVED

APR 1 6 1979

J. C. KURJIAN

AFR

Ethicon, Inc.
Attention:  Ms. J. C. Kurjian
Somerville, NJ  18876

Gentlemen:

We acknowledge the receipt on January 8, 1979, of your communication dated
January 5, 1979, enclosing printed labeling pursuant to your supplemental
new drug application dated August 18, 1978, for Prolene Polypropylene Suture
Nonabsorbable Surgical Suture, USP.

The supplemental application provides for labeling revision.

We have completed the review of this supplemental application and it is
approved.  Our letter of April 16, 1969, detailed the conditions relating
to the approval of this application.

Sincerely yours,

*James P. Mann*

James P. Mann, M.D.
Acting Director
Division of Surgical-Dental
  Drug Products
Bureau of Drugs

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

ETH.MESH.09632606

# Exhibit 19



DEPARTMENT OF HEALTH, EDUCATION  AND WELFARE
PUBLIC HEALTH SERVICE
FOOD AND DRUG ADMINISTRATION
ROCKVILLE, MARYLAND  20857

RECEIVED
MAY 2 1 1979
J. C. KURJIAN

NDA 16-374/S-018

Ethicon, Inc.
Attention:  Ms. J. C. Kurjian
Somerville, New Jersey  08876                    MAY 1 8 1979

Gentlemen:

Please refer to your supplemental new drug application of
November 22, 1978, submitted pursuant to section 505(b) of
the Federal Food, Drug and Cosmetic Act for Prolene Polypropylene
Suture, Nonabsorbable Surgical Suture, U.S.P.

The supplemental application provides for the addition of a
polyethylene suture retainer (needle park) to the currently
approved packaging of Prolene suture products.

We have completed the review of this supplemental application and
it is approved.  Our letter of December 20, 1978, detailed the
conditions relating to the approval of this application.

Sincerely yours,

James P. Mann, M.D.
Acting Director
Division of Surgical-Dental
  Drug Products
Bureau of Drugs

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY                    ETH.MESH.09632774

# Exhibit 20

FOOD AND DRUG ADMINISTRATION
ROCKVILLE, MARYLAND 20857

NDA 16-374/S-019

RECEIVED

Ethicon, Inc.
Attention:  Ms. Joan C. Kurjian
Sommerville, NJ 08876

DEC 1 3 1979

DEC 06 1979

J. C. KURJIAN

Dear Ms. Kurjian:

Please refer to your supplemental new drug application of July 9, 1979
submitted pursuant to section 505(b) of the Federal Food, Drug, and
Cosmetic Act for Prolene*Polypropylene Suture Clear and Pigmented
Nonabsorbable Surgical Suture, U.S.P.

The supplemental application provides for a revised package insert.

We have completed the review of this supplemental application and it is
approved.  Our letter of April 10, 1969 detailed the conditions relating
to the approval of this application.

Sincerely yours,

James P. Mann, M.D.
Director
Division of Surgical-Dental
   Drug Products
Bureau of Drugs

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

ETH.MESH.09632959

# Exhibit 21



DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE
PUBLIC HEALTH SERVICE
FOOD AND DRUG ADMINISTRATION
ROCKVILLE, MARYLAND  20857

NDA 16-374/S-017

RECEIVED

JAN  7  1980

J. C. KURJIAN                                          JAN 04 1980

Ethicon, Inc.
Attention:  Ms. Joan C. Kurjian
Somerville, NJ  08876

Gentlemen:

Please refer to your resubmitted supplemental new drug
application of May 22, 1979, submitted pursuant to section 505(b)
of the Federal Food, Drug, and Cosmetic Act for Prolene
Polypropylene Suture Nonabsorbable Surgical Suture, USP.

The supplemental application as amended provides for the use
of alternate secondary overwrap package components.

We have completed the review of this supplemental application
and it is approved.  Our letter of April 16, 1969, detailed the
conditions relating to the approval of this application.

Sincerely yours,

James P. Mann, M.D.
Director
Division of Surgical-Dental
    Drug Products
Bureau of Drugs

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY                    ETH.MESH.09632673

# Exhibit 22



DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE
PUBLIC HEALTH SERVICE
FOOD AND DRUG ADMINISTRATION
ROCKVILLE, MARYLAND 20857

RECEIVED

APR 2 8 1980

HOWARD L. SCHRAYER

NDA 16-374/S-012

Ethicon, Inc.
Attention:  Joan C. Kurjian
Somerville, New Jersey  08876

APR 23 1980

Gentlemen:

Please refer to your resubmitted new drug application of February 15, 1980
submitted pursuant to section 505(b) of the Federal Food, Drug,
and Cosmetic Act for Prolene $^{TM}$ (Polypropylene Suture Nonabsorbable
Surgical Suture, USP).

The supplemental application provides for the use of Sharpoint,
Inc., of Mohton, Pennsylvania, as a partial processor of Prolene
polypropylene suture.

We have completed the review of this supplemental application and it
is approved.  Our letter of April 10, 1969 detailed the conditions
relating to the approval of this application.

Sincerely yours,

James P. Mann, M.D.
Director
Division of Surgical-Dental
  Drug Products
Bureau of Drugs

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY                    ETH.MESH.09632861

# Exhibit 23



DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE
PUBLIC HEALTH SERVICE
FOOD AND DRUG ADMINISTRATION
ROCKVILLE, MARYLAND 20857

**RECEIVED**

APR 2 8 1980

HOWARD L. SCHRAYER

NDA 16-374/S-013

APR 23 1980

Ethicon, Inc.
Attention:  Joan C. Kurjian
Somerville, New Jersey  08876

Gentlemen:

Please refer to your resubmitted new drug application of February 15, 1980 submitted pursuant to section 505(b) of the Federal Food, Drug, and Cosmetic Act for Prolene $^{TM}$ (Polypropylene Suture Nonabsorbable Surgical Suture, USP).

The supplemental application provides for the use of Spingler and Tritt of Jestetten, West Germany, as a partial processor of Prolene polypropylene suture.

We have completed the review of this supplemental application and it is approved.  Our letter of April 10, 1969 detailed the conditions relating to the approval of this application.

Sincerely yours,


James P. Mann, M.D.
Director
Division of Surgical-Dental
  Drug Products
Bureau of Drugs

**CONFIDENTIAL**
**SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY**                    ETH.MESH.09632899

# Exhibit 24



DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE
PUBLIC HEALTH SERVICE
FOOD AND DRUG ADMINISTRATION
ROCKVILLE, MARYLAND 20857

**RECEIVED**

NDA 11-397, 12-815, 16-374
17-804, 17-809, 17-472
17-482, 18-175, 18-176

MAY 7 1980

HOWARD L. SCHRAYER

MAY 02 1980

Ethicon, Inc.
Attention: Ms. Joan C. Kurjian
Somerville, New Jersey 08876

Gentlemen:

Reference is made to your supplemental new drug application submitted
pursuant to section 505(b) of the Federal Food, Drug and Cosmetic Act
for the following products:

NDA 11-397 (S012) Silk Suture Nonabsorbable Surgical Suture, U.S.P.
NDA 12-815 (S010) Mersilene Polyester Suture Nonabsorbable Surgical
Suture, U.S.P. (Dyed and Undyed).
NDA 16-374 (S020) Prolene Polypropylene Suture Nonabsorbable Surgical
Suture, U.S.P. (Clear and Pigmented)
NDA 17-472 (S026) Vicryl (polyglactin 910) Suture Synthetic Absorbable
Suture, Dyed.
NDA 17-482 (S021) Vicryl (polyglactin 910) Suture Synthetic Absorbable
Suture, Undyed
NDA 17-804 (S020 ) Ethibond Polyester Suture Nonabsorbable Surgical
Suture, U.S.P., Dyed
NDA 17-809 (S013) Ethibond Polyester Suture Nonabsorbable Surgical
Suture, Undyed.
NDA 18-175 (S001) Coated Vicryl (Polyglactin 910) Suture Synthetic
Absorbable Suture, Dyed.
NDA 18-176 (S001) Coated Vicryl (Polyglactin 910) Suture Synthetic
Absorbable Suture, Undyed.

The supplemental applications provide for the use of the Cornelia, Georgia,
facility as a raw material testing site.

We have completed the review of these supplemental applications and they
are approved. Our previous letters detailed the conditions relating to the
approval of the original applications.

Sincerely yours,

*James P. Mann*

James P. Mann, M.D.
Director
Division of Surgical-Dental
Drug Products
Bureau of Drugs

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

ETH.MESH.09632978

# Exhibit 25



**DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE**
PUBLIC HEALTH SERVICE
FOOD AND DRUG ADMINISTRATION
SILVER SPRING, MARYLAND 20910

DEC 1 7 1980

RECEIVED

DEC 2 1980

HOWARD L. SCHRAYER

Mr. Howard L. Schrayer
Director, Regulatory Affairs
Ethicon, Inc.
Research and Development Division          Ref:  NDA 16-374
Somerville, New Jersey  08876

Dear Mr. Schrayer:

We have completed our review of your September 19, 1980 supplement to NDA
16-374 which requests approval for the use of alternate packaging material,
i.e., coated Tyvek, for PROLENE polypropylene nonabsorbable sutures.  Your
supplement is approved.

Sincerely,

Victor Zafra
Acting Director
Bureau of Medical Devices

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY          ETH.MESH.09633026

# Exhibit 26



DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE
PUBLIC HEALTH SERVICE
FOOD AND DRUG ADMINISTRATION
SILVER SPRING, MARYLAND 20910

JAN 6 1981

RECEIVED
JAN 1 2 1981
HOWARD L. SCHRAYER

Mr. Howard L. Schrayer
Director, Regulatory Affairs
Ethicon, Inc.
Somerville, New Jersey 08876

Ref: NDA's 8-536, 16-374, 10-389,
17-472, 11-397, 17-482,
12-815, 17-804

Dear Mr. Schrayer:

The Food and Drug Administration (FDA) has completed its review of the
following supplemental applications, dated May 7, 1980, to replace the
present control release needle/suture attachment requirement with the
specifications and procedure for testing described in the current USP for
removable needles.

NDA 8-536
Catgut Suture (Plain and Chromic)
Absorbable Surgical Suture, USP, S-008

NDA 10-389
Catgut Suture (Plain and Chromic)
Absorbable Surgical Suture, USP, S-010

NDA 11-397
Silk Suture
Nonabsorbable Surgical Suture, USP,
(Dyed and White Virgin), S-013

NDA 12-815
Mersilene* Polyester Suture,
Nonabsorbable Surgical Suture, USP
(Dyed and Undyed), S-011

NDA 16-374
Prolene* Polypropylene Suture,
Nonabsorbable Surgical Suture, USP
(Clear and Pigmented), S-021

NDA 17-472
Vicryl* (Polyglactin 910) Suture,
Synthetic Absorbable Suture, USP
(Dyed), S-028

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

ETH.MESH.09633003

Page 2 - Mr. Schrayer

        NDA 17-482
        Vicryl (Polyglactin 910) Suture,
        Synthetic Absorbable Suture,
        (Undyed), S-023

        NDA 17-804
        Ethibond* Polyester Suture Nonabsorbable
        Surgical Suture, USP
        (Dyed), S-023

Your supplements have been approved.

                        Sincerely,

                        Victor Zafra
                        Acting Director
                        Bureau of Medical Devices

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

# Exhibit 27



**DEPARTMENT OF HEALTH & HUMAN SERVICES**          Public Health Service

Food and Drug Administration
8757 Georgia Avenue
Silver Spring MD 20910

JAN 1 4 1981

**RECEIVED**

JAN 2 3 1981

**HOWARD L. SCHRAYER**

Mr. Howard L. Schrayer
Director, Regulatory Affairs
Ethicon, Inc.
Somerville, New Jersey  08876

Ref:   NDA 16-374/S-2
       PROLENE Polypropylene Suture

Dear Mr. Schrayer:

The Food and Drug Administration has completed its review of your
supplemental application, dated October 14, 1980, which requests approval
to market the PROLENE Polypropylene Suture, size 11-0.  Your supplement
is approved.

If you have any questions, please contact Carl A. Larson, Ph.D. at (301)
427-7156.

Sincerely,

Victor Zafra
Acting Director
Bureau of Medical Devices

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY          ETH.MESH.09633211

# Exhibit 28



**DEPARTMENT OF HEALTH & HUMAN SERVICES**     Public Health Service

---

RECEIVED

APR 1 1 1983

R. H. O'HOLLA

Food and Drug Administration
8757 Georgia Avenue
Silver Spring MD 20910

APR 7 1983

Mr. Robert H. O'Holla            Re:  N16374/S26
Department Manager                    PROLENE* Polypropylene Suture
Regulatory Affairs                    Nonabsorbable Surgical Suture,
Research and Development Division      USP (Clear and Pigmented)
Ethicon, Inc.                         Filed:  March 4, 1983
Route 22
Somerville, New Jersey  08876

Dear Mr. O'Holla:

The Food and Drug Administration (FDA) has completed its evaluation of
your premarket approval application (PMA) supplement which requested
approval for the use of polyethylene as an alternate material to be used
as a thermoformed suture organizer.  Based upon the information submitted,
the PMA supplement is approved subject to the conditions described in
the "Conditions of Approval for a PMA Supplement" (enclosed).

You may begin production and marketing of the device as modified by your
PMA supplement upon receipt of this letter.

If you have any questions concerning the approval of this supplemental
application, please contact Carl A. Larson, Ph.D., at (301) 427-7156.

Sincerely yours,

Robert G. Britain
Associate Director for
  Device Evaluation
Office of Medical Devices
National Center for Devices
  and Radiological Health

Enclosure

*Trademark

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY                    ETH.MESH.09633361

*Revised:  March 10, 1983*

CONDITIONS OF APPROVAL FOR A PMA SUPPLEMENT

Adverse Reaction and Device Defect Reporting.

*You shall submit a written report to the Food and Drug Administration (FDA), National Center for Devices and Radiological Health, Office of Medical Devices, Document Control Center (HFK-20), 8757 Georgia Avenue, Silver Spring, Maryland  20910 within 10 days after you receive or have knowledge of information about:*

> *(1)  a mixup of the device or its labeling with another article;*
>
> *(2)  any significant chemical, physical, or other change or deterioration in the device, or any failure of one or more of the devices to meet the specifications established in the application;*
>
> *(3)  any adverse reaction, side effect, injury, toxicity, or sensitivity reaction that is attributable to the device and has not been addressed by the device's labeling; and*
>
> *(4)  any adverse reaction, side effect, injury, toxicity, or sensitivity reaction that is attributable to the device and has been addressed by the device's labeling, but is occurring with unexpected severity or frequency.*

Note:  *All conditions of approval are subject to change upon publication of a final premarket approval regulation.*

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

ETH.MESH.09633362

# Exhibit 29



DEPARTMENT OF HEALTH & HUMAN SERVICES          Public Health Service

RECEIVED

MAR 1 5 1984                    Food and Drug Administration
                                8757 Georgia Avenue
R. H. O'HOLLA                   Silver Spring MD 20910

MAR 1 8 1984

Mr. Robert H. O'Holla          Re:  N16-374/S27
Department Manager                  PROLENE™ Polypropylene Suture
Regulatory Affairs                  Nonabsorbable Surgical Suture,
Research and Development Division    USP (Clear and Pigmented)
Ethicon, Inc.                       Filed:  December 9, 1983
Route 22
Somerville, New Jersey  08876

Dear Mr. O'Holla:

The Food and Drug Administration (FDA) has completed its evaluation of your
premarket approval application (PMA) supplement which requested approval for
the use of polypropylene as an alternate material to be used as a
thermoformed suture organizer.  Based upon the information submitted, the
PMA supplement is approved subject to the conditions described in the
"Conditions of Approval for a PMA Supplement" (enclosed).

You may begin production and marketing of the device as modified by your PMA
supplement upon receipt of this letter.

If you have any questions concerning the approval of this supplemental
application, please contact Thomas J. Callahan, Ph.D., at
(301) 427-7238.

                              Sincerely yours,

                              Robert G. Britain

                              Robert G. Britain
                              Acting Director
                              Office of Device Evaluation
                              National Center for Devices
                                and Radiological Health

Enclosure

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY                    ETH.MESH.09633425

I

Revised:  January 10, 1984

### CONDITIONS OF APPROVAL FOR A PMA SUPPLEMENT

Adverse Reaction and Device Defect Reporting.

You shall submit a written report to the Food and Drug Administration
(FDA), National Center for Devices and Radiological Health, Document Mail
Center (HFZ-401), 8757 Georgia Avenue, Silver Spring, Maryland  20910
within 10 days after you receive or have knowledge of information about:

(1)  a mixup of the device or its labeling with another article;

(2)  any significant chemical, physical, or other change or deterioration
     in the device, or any failure of one or more of the devices to
     meet the specifications established in the application;

(3)  any adverse reaction, side effect, injury, toxicity, or sensitivity
     reaction that is attributable to the device and has not been
     addressed by the device's labeling; and

(4)  any adverse reaction, side effect, injury, toxicity, or sensitivity
     reaction that is attributable to the device and has been addressed
     by the device's labeling, but is occurring with unexpected
     severity or frequency.

Note:  All conditions of approval are subject to change upon publication
of a final premarket approval regulation.

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

ETH.MESH.09633426

# Exhibit 30



**DEPARTMENT OF HEALTH & HUMAN SERVICES**　　　Public Health Service

Food and Drug Administration
8757 Georgia Avenue
Silver Spring MD 20910

**JUN 10 1985**

Mr. Robert H. O'Holla
Department Manager
Regulatory Affairs
Research and Development Division
Ethicon, Inc.
Route 22
Somerville, New Jersey　08876

Re:　N16-374/S28
PROLENE™ Polypropylene Suture
Nonabsorbable Surgical
Suture, USP (Clear and
Pigmented)
Filed:　March 5, 1984
Amended:　September 18, 1984; and
May 20, 1985

Dear Mr. O'Holla:

The Center for Devices and Radiological Health of the Food and Drug Administration has reviewed your premarket approval application (PMA) supplement, which requested approval for an alternate source of polypropylene resin raw material. Based upon the information submitted, the PMA supplement is approved subject to the conditions described in the "Conditions of Approval" (enclosed).

You may begin production and marketing of the device as modified by your PMA supplement upon receipt of this letter.

If you have any questions concerning the approval of this supplemental application, please contact Thomas Callahan, Ph.D., at (301) 427-7238.

Sincerely yours,

Carl A. Larson

Carl A. Larson, Ph.D.
Director
Division of Surgical
and Rehabilitation Devices
Center for Devices
and Radiological Health

Enclosure

RECEIVED

JUN 1 2 1985

R. H. O'HOLLA

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY　　　ETH.MESH.09633444

MAY 4 1985

I

## CONDITIONS OF APPROVAL

Approved Labeling. As soon as possible, and before commercial distribution of your device, submit two copies of an amendment to this PMA submission with copies of all approved labeling in final printed form to the Food and Drug Administration (FDA), Center for Devices and Radiological Health, PMA Document Mail Center (HFZ-401), 8757 Georgia Avenue, Silver Spring, Maryland 20910.

Premarket Approval Application (PMA) Supplement. Before making any change that could affect the safety or effectiveness of the device, submit a PMA supplement for review and approval by Center for Devices and Radiological Health (CDRH). Such changes may include, but are not limited to:

(1)   new indications for use;

(2)   labeling changes;

(3)   changes in existing manufacturing facilities, methods or quality control procedures;

(4)   the use of a different facility or establishment to manufacture, process, or package the device;

(5)   changes in sterilization procedures;

(6)   changes in packaging;

(7)   changes in the performance or design specification, circuits, parts, components, accessories, ingredients, or physical layout of the device; and

(8)   extension of the expiration date of the device based on data obtained under a new or revised testing protocol that has not been approved by CDRH. If the protocol has been approved, the change shall be submitted along with the supporting data in the next periodic report required in the PMA approval order. An approved protocol is one included in FDA guidelines applicable to the device or in a PMA submission for the device for which the approval order granted the expiration dating requested by you. Otherwise, you must submit and obtain CDRH approval of a PMA supplement for an expiration dating protocol.

Changes described below that enhance the safety of the device or safety in the use of the device may be placed into effect before your receipt of a written FDA order approving the PMA supplement provided that:

(1)   the PMA supplement and its mailing cover are plainly marked "Special PMA Supplement - Changes Being Effected";

(2)   the PMA supplement provides a full explanation of the basis for the changes;

(3)   the applicant has received acknowledgement of FDA receipt of the PMA supplement;

(4)   the PMA supplement specifically identifies the date that such changes are being effected; and

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

ETH.MESH.09633445

(5)   the changes are among the following:

(a)   labeling changes that add or strengthen a contraindication, warning, precaution, or adverse reaction or effect;

(b)   labeling changes that add or strengthen an instruction that is intended to enhance the safe use of the device;

(c)   labeling changes that delete misleading, false, or unsupported indications; or

(d)   changes in the manufacturing process or quality controls that add a new specification or test method, or otherwise provide additional assurance of purity, identity, strength or reliability of the device.

You need submit only three (3) copies of a PMA supplement and include only information relevant to the proposed or effected changes in the device. The submission shall include a separate section that identifies all changes for which approval is being requested.  You shall submit additional copies and additional information if requested by CDRH.

FDA may, as experience permits, issue guidelines listing specific types of changes that do not require FDA approval before implementation.

Post-Approval Reports.  Continued approval of your device is contingent upon the submission of 2 copies of post-approval reports to the Food and Drug Administration, Center for Devices and Radiological Health, PMA Document Mail Center (HFZ-401), 8757 Georgia Avenue, Silver Spring, Maryland 20910 at intervals of 1 year from the date of this letter.  The required contents of these reports will be described in the final order for the premarket approval procedural regulation which will be published in the FEDERAL REGISTER in the future.  Until this regulation is published in final form, each periodic report shall consist of information that previously has not been submitted as part of a PMA supplement and which you have obtained since the last post-approval report or since receipt of this letter, whichever is later;

(1)   a bibliography and summary of reports in the scientific literature involving the device and unpublished reports of in vitro, animal and clinical experience studies, investigations, and tests conducted by, reported to, or reasonably available to you involving the device or a related device--if, after reviewing the bibliography and summary, CDRH concludes that it needs a copy of the published and unpublished reports, CDRH will notify you that copies of such reports shall be submitted;

(2)   written promotional material; and

(3)   a description of changes made in the device not previously submitted in a PMA supplement.

Adverse Reaction and Device Defect Reporting.  You shall submit 3 copies of a written report to the Food and Drug Administraiton, Center for Devices and Radiological Health (CDRH), 8757 Georgia Avenue, Silver Spring, Maryland  20910 within 10 days after you receive or have knowledge of information about:

(1)   a mixup of the device or its labeling with another article;

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

ETH.MESH.09633446

# Exhibit 31



**DEPARTMENT OF HEALTH & HUMAN SERVICES**          Public Health Service

RECEIVED          Food and Drug Administration
                  8757 Georgia Avenue
JAN 27 1986       Silver Spring MD 20910

JAN 23 1986

R. H. O'HOLLA

Mr. Robert H. O'Holla          Re:  N16-374/S29
Director                            PROLENE™ Polypropylene
Regulatory Affairs                  Nonabsorbable Surgical
Research and Development Division    Suture, USP
Ethicon, Inc.                       Filed:  November 29, 1985
Somerville, New Jersey  08876

Dear Mr. O'Holla:

The Center for Devices and Radiological Health (CDRH) of the Food and Drug
Administration (FDA) has completed its evaluation of your premarket
approval application (PMA) supplement, which requested approval for the
addition of a thermoformed primary suture package as an alternate to the
currently approved package.  Based on data previously reviewed for this
packaging material for similar products and on the information submitted,
the PMA supplement is approved subject to the conditions described in the
"Conditions of Approval" (enclosed).

You may begin production and marketing of the device as modified by your
PMA supplement upon receipt of this letter.

If you have any questions concerning the approval of this supplemental
application, please contact Kenneth A. Palmer, Ph.D., at (301) 427-7238.

Sincerely yours,

Carl A. Larson

Carl A. Larson, Ph.D.
Director, Division of Surgical
  and Rehabilitation Devices
Office of Device Evaluation
Center for Devices
  and Radiological Health

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY          ETH.MESH.09633998

CONDITIONS OF APPROVAL

Approved Labeling. As soon as possible, and before commercial distribution of your device, submit two copies of an amendment to this PMA submission with copies of all approved labeling in final printed form to the Food and Drug Administration (FDA), Center for Devices and Radiological Health, PMA Document Mail Center (HFZ-401), 8757 Georgia Avenue, Silver Spring, Maryland 20910.

Advertisement. No advertisement for this device shall recommend or imply that the device may be used for any use that is not mentioned in the approved labeling for the device. All written promotional material shall include a brief statement of the intended uses of the device and relevent warnings, precautions, side effects, and contraindictions.

Premarket Approval Application (PMA) Supplement. Before making any change that could affect the safety or effectiveness of the device, submit a PMA supplement for review and approval by Center for Devices and Radiological Health (CDRH). Such changes may include, but are not limited to:

(1) new indications for use;

(2) labeling changes;

(3) changes in existing manufacturing facilities, methods or quality control procedures;

(4) the use of a different facility or establishment to manufacture, process, or package the device;

(5) changes in sterilization procedures;

(6) changes in packaging;

(7) changes in the performance or design specification, circuits, parts, components, accessories, ingredients, or physical layout of the device; and

(8) extension of the expiration date of the device based on data obtained under a new or revised testing protocol that has not been approved by CDRH. If the protocol has been approved, the change shall be submitted along with the supporting data in the next periodic report required in the PMA approval order. An approved protocol is one included in FDA guidelines applicable to the device or in a PMA submission for the device for which the approval order granted the expiration dating requested by you. Otherwise, you must submit and obtain CDRH approval of a PMA supplement for an expiration dating protocol.

Changes described below that enhance the safety of the device or safety in the use of the device may be placed into effect before your receipt of a written FDA order approving the PMA supplement provided that:

(1) the PMA supplement and its mailing cover are plainly marked "Special PMA Supplement - Changes Being Effected";

(2) the PMA supplement provides a full explanation of the basis for the changes;

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

(3) the applicant has received acknowledgement of FDA receipt of the PMA supplement;

(4) the PMA supplement specifically identifies the date that such changes are being effected; and

(5) the changes are among the following:

(a) labeling changes that add or strengthen a contraindication, warning, precaution, or adverse reaction or effect;

(b) labeling changes that add or strengthen an instruction that is intended to enhance the safe use of the device;

(c) labeling changes that delete misleading, false, or unsupported indications; or

(d) changes in the manufacturing process or quality controls that add a new specification or test method, or otherwise provide additional assurance of purity, identity, strength or reliability of the device.

You need submit only three (3) copies of a PMA supplement and include only information relevant to the proposed or effected changes in the device. The submission shall include a separate section that identifies all changes for which approval is being requested. You shall submit additional copies and additional information if requested by CDRH.

FDA may, as experience permits, issue guidelines listing specific types of changes that do not require FDA approval before implementation.

Post-Approval Reports. Continued approval of your device is contingent upon the submission of 2 copies of post-approval reports to the Food and Drug Administration, Center for Devices and Radiological Health, PMA Document Mail Center (HFZ-401), 8757 Georgia Avenue, Silver Spring, Maryland 20910 at intervals of 1 year from the date of this letter. The required contents of these reports will be described in the final order for the premarket approval procedural regulation which will be published in the FEDERAL REGISTER in the future. Until this regulation is published in final form, each periodic report shall consist of information that previously has not been submitted as part of a PMA supplement and which you have obtained since the last post-approval report or since receipt of this letter, whichever is later;

(1) a bibliography and summary of reports in the scientific literature involving the device and unpublished reports of in vitro, animal and clinical experience studies, investigations, and tests conducted by, reported to, or reasonably available to you involving the device or a related device--if, after reviewing the bibliography and summary, CDRH concludes that it needs a copy of the published and unpublished reports, CDRH will notify you that copies of such reports shall be submitted;

(2) written promotional material; and

(3) a description of changes made in the device not previously submitted in a PMA supplement.

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

ETH.MESH.09634000

Adverse Reaction and Device Defect Reporting. You shall submit 3 copies of a written report to the Food and Drug Administraiton, Center for Devices and Radiological Health (CDRH), 8757 Georgia Avenue, Silver Spring, Maryland 20910 within 10 days after you receive or have knowledge of information about:

(1) a mixup of the device or its labeling with another article;

(2) any significant chemical, physical, or other change or deterioration in the device, or any failure of one or more of the the devices to meet the specifications established in the application;

(3) any adverse reaction, side effect, injury, toxicity, or sensitivity reaction that is attributable to the device; and

    (a) has not been addressed by the device's labeling or

    (b) has been addressed by the device's labeling, but is occurring with unexpected severity or frequency.

Reporting under the Medical Device Reporting (MDR) Regulation. The Medical Device Reporting (MDR) Regulation became effective on December 13, 1984, and requires that all manufacturers and importers of medical devices, including in vitro diagnostic devices, report to FDA whenever they receive or otherwise become aware of information that reasonably suggests that one of its marketed devices (1) may have caused or contributed to a death or serious injury or (2) has malfunctioned and that the device or any other device marketed by the manufacturer or importer would be likely to cause or contribute to a death or serious injury if the malfunction were to reoccur.

The conditions of approval accompanying PMA approval orders may require that the same events subject to reporting under the MDR Regulation must also be included in periodic reports to the PMA. FDA has determined that such duplicative reporting is unnecessary. Whenever an event involving a device is subject to reporting under both the MDR Regulation and the conditions of approval for this PMA, you shall submit the appropriate reports required by the MDR Regulation and identified with the PMA reference number to the following office:

                      Device Monitoring Branch (HFZ-343)
                      Center for Devices and Radiological Health
                      Food and Drug Administration
                      8757 Georgia Avenue
                      Silver Spring, Maryland 20910
                      Telephone (301) 427-7500

Copies of the MDR Regulation and a FDA publication entitled, "An Overview of the Medical Device Reporting Regulation", are available by written request to the above address or by telephoning (301) 427-8100.

Note: All conditions of approval are subject to change upon publication of the final order for the premarket approval procedural regulation.

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

ETH.MESH.09634001



**DEPARTMENT OF HEALTH & HUMAN SERVICES**                    Public Health Service

RECEIVED

JAN 2 3 1986

JAN 27 1986

R. H. O'HOLLA

Food and Drug Administration
8757 Georgia Avenue
Silver Spring MD 20910

Mr. Robert H. O'Holla
Director
Regulatory Affairs
Research and Development Division
Ethicon, Inc.
Somerville, New Jersey  08876

Re: N16-374/S29
     PROLENE™ Polypropylene
     Nonabsorbable Surgical
     Suture, USP
     Filed:  November 29, 1985

Dear Mr. O'Holla:

The Center for Devices and Radiological Health (CDRH) of the Food and Drug
Administration (FDA) has completed its evaluation of your premarket
approval application (PMA) supplement, which requested approval for the
addition of a thermoformed primary suture package as an alternate to the
currently approved package.  Based on data previously reviewed for this
packaging material for similar products and on the information submitted,
the PMA supplement is approved subject to the conditions described in the
"Conditions of Approval" (enclosed).

You may begin production and marketing of the device as modified by your
PMA supplement upon receipt of this letter.

If you have any questions concerning the approval of this supplemental
application, please contact Kenneth A. Palmer, Ph.D., at (301) 427-7238.

Sincerely yours,

Carl A. Larson, Ph.D.
Director, Division of Surgical
  and Rehabilitation Devices
Office of Device Evaluation
Center for Devices
  and Radiological Health

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY                    ETH.MESH.09634002

REVISED MAY 1, 198

II

CONDITIONS OF APPROVAL

Approved Labeling.  As soon as possible, and before commercial distribution of your device, submit two copies of an amendment to this PMA submission with copies of all approved labeling in final printed form to the Food and Drug Administration (FDA), Center for Devices and Radiological Health, PMA Document Mail Center (HFZ-401), 8757 Georgia Avenue, Silver Spring, Maryland 20910.

Advertisement.  No advertisement for this device shall recommend or imply that the device may be used for any use that is not mentioned in the approved labeling for the device.  All written promotional material shall include a brief statement of the intended uses of the device and relevent warnings, precautions, side effects, and contraindictions.

Premarket Approval Application (PMA) Supplement.  Before making any change that could affect the safety or effectiveness of the device, submit a PMA supplement for review and approval by Center for Devices and Radiological Health (CDRH).  Such changes may include, but are not limited to:

 (1)  new indications for use;

 (2)  labeling changes;

 (3)  changes in existing manufacturing facilities, methods or quality control procedures;

 (4)  the use of a different facility or establishment to manufacture, process, or package the device;

 (5)  changes in sterilization procedures;

 (6)  changes in packaging;

 (7)  changes in the performance or design specification, circuits, parts, components, accessories, ingredients, or physical layout of the device; and

 (8)  extension of the expiration date of the device based on data obtained under a new or revised testing protocol that has not been approved by CDRH.  If the protocol has been approved, the change shall be submitted along with the supporting data in the next periodic report required in the PMA approval order.  An approved protocol is one included in FDA guidelines applicable to the device or in a PMA submission for the device for which the approval order granted the expiration dating requested by you. Otherwise, you must submit and obtain CDRH approval of a PMA supplement for an expiration dating protocol.

Changes described below that enhance the safety of the device or safety in the use of the device may be placed into effect before your receipt of a written FDA order approving the PMA supplement provided that:

 (1)  the PMA supplement and its mailing cover are plainly marked "Special PMA Supplement - Changes Being Effected";

 (2)  the PMA supplement provides a full explanation of the basis for the changes;

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

(3)   the applicant has received acknowledgement of FDA receipt of the PMA supplement;

(4)   the PMA supplement specifically identifies the date that such changes are being effected; and

(5)   the changes are among the following:

    (a)   labeling changes that add or strengthen a contraindication, warning, precaution, or adverse reaction or effect;

    (b)   labeling changes that add or strengthen an instruction that is intended to enhance the safe use of the device;

    (c)   labeling changes that delete misleading, false, or unsupported indications; or

    (d)   changes in the manufacturing process or quality controls that add a new specification or test method, or otherwise provide additional assurance of purity, identity, strength or reliability of the device.

You need submit only three (3) copies of a PMA supplement and include only information relevant to the proposed or effected changes in the device. The submission shall include a separate section that identifies all changes for which approval is being requested. You shall submit additional copies and additional information if requested by CDRH.

FDA may, as experience permits, issue guidelines listing specific types of changes that do not require FDA approval before implementation.

Post-Approval Reports.  Continued approval of your device is contingent upon the submission of 2 copies of post-approval reports to the Food and Drug Administration, Center for Devices and Radiological Health, PMA Document Mail Center (HFZ-401), 8757 Georgia Avenue, Silver Spring, Maryland 20910 at intervals of 1 year from the date of this letter. The required contents of these reports will be described in the final order for the premarket approval procedural regulation which will be published in the FEDERAL REGISTER in the future. Until this regulation is published in final form, each periodic report shall consist of information that previously has not been submitted as part of a PMA supplement and which you have obtained since the last post-approval report or since receipt of this letter, whichever is later;

(1)   a bibliography and summary of reports in the scientific literature involving the device and unpublished reports of in vitro, animal and clinical experience studies, investigations, and tests conducted by, reported to, or reasonably available to you involving the device or a related device--if, after reviewing the bibliography and summary, CDRH concludes that it needs a copy of the published and unpublished reports, CDRH will notify you that copies of such reports shall be submitted;

(2)   written promotional material; and

(3)   a description of changes made in the device not previously submitted in a PMA supplement.

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

ETH.MESH.09634004

Adverse Reaction and Device Defect Reporting. You shall submit 3 copies of a written report to the Food and Drug Administraiton, Center for Devices and Radiological Health (CDRH), 8757 Georgia Avenue, Silver Spring, Maryland 20910 within 10 days after you receive or have knowledge of information about:

(1) a mixup of the device or its labeling with another article;

(2) any significant chemical, physical, or other change or deterioration in the device, or any failure of one or more of the the devices to meet the specifications established in the application;

(3) any adverse reaction, side effect, injury, toxicity, or sensitivity reaction that is attributable to the device; and

  (a) has not been addressed by the device's labeling or

  (b) has been addressed by the device's labeling, but is occurring with unexpected severity or frequency.

Reporting under the Medical Device Reporting (MDR) Regulation. The Medical Device Reporting (MDR) Regulation became effective on December 13, 1984, and requires that all manufacturers and importers of medical devices, including in vitro diagnostic devices, report to FDA whenever they receive or otherwise become aware of information that reasonably suggests that one of its marketed devices (1) may have caused or contributed to a death or serious injury or (2) has malfunctioned and that the device or any other device marketed by the manufacturer or importer would be likely to cause or contribute to a death or serious injury if the malfunction were to reoccur.

The conditions of approval accompanying PMA approval orders may require that the same events subject to reporting under the MDR Regulation must also be included in periodic reports to the PMA. FDA has determined that such duplicative reporting is unnecessary. Whenever an event involving a device is subject to reporting under both the MDR Regulation and the conditions of approval for this PMA, you shall submit the appropriate reports required by the MDR Regulation and identified with the PMA reference number to the following office:

                    Device Monitoring Branch (HFZ-343)
                    Center for Devices and Radiological Health
                    Food and Drug Administration
                    8757 Georgia Avenue
                    Silver Spring, Maryland 20910
                    Telephone (301) 427-7500

Copies of the MDR Regulation and a FDA publication entitled, "An Overview of the Medical Device Reporting Regulation", are available by written request to the above address or by telephoning (301) 427-8100.

Note: All conditions of approval are subject to change upon publication of the final order for the premarket approval procedural regulation.

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

ETH.MESH.09634005

# Exhibit 32

# TAB #

Section 6.

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

Section 6    <u>Information concerning the quantity of the drug distributed,</u>
<u>in a manner and form that facilitates estimates of the</u>
<u>incidence of any adverse effects reported to be associated</u>
<u>with the use of the drug.</u>

ETHICON, Inc. has marketed in excess of 1,580,000 dozens of
PROLENE sutures during this reporting period.

Three (3) patient associated experiences were reported to us
during this reporting period. Therefore, the incidence of
adverse effects reported to be associated with the use of
PROLENE suture is extremely low.

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

ETH.MESH.09634081

# Exhibit 33



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Public Health Service

RECEIVED

MAY 23 1986    R. H. O'HOLLA

Food and Drug Administration
8757 Georgia Avenue
Silver Spring MD 20910

Mr. Robert H. O'Holla
Director
Regulatory Affairs
Research and Development Division
Ethicon, Inc.
Somerville, New Jersey  08876

Re:  N16-374/S30
     PROLENE™ Polypropylene
     Nonabsorbable Surgical
     Suture, USP
     Filed:  March 21, 1986

Dear Mr. O'Holla:

The Center for Devices and Radiological Health (CDRH) of the Food and Drug
Administration (FDA) has completed its evaluation of your premarket
approval application (PMA) supplement, which requested approval for the
reduction in diameter of the suture tips to facilitate the swaging of finer
wire diameter needles.  Based on the information submitted, the PMA
supplement is approved subject to the conditions described in the
"Conditions of Approval" (enclosed).

You may begin production and marketing of the device as modified by your
PMA supplement upon receipt of this letter.

If you have any questions concerning the approval of this supplemental
application, please contact Kenneth A. Palmer, Ph.D., at (301) 427-7238.

Sincerely yours,

Carl A. Larson

Carl A. Larson, Ph.D.
Director
Division of Surgical
  and Rehabilitation Devices
Office of Device Evaluation
Center for Devices
  and Radiological Health

Enclosure

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY                    ETH.MESH.09634020

REVISED MAY 1, 1985

I

## CONDITIONS OF APPROVAL

Approved Labeling. As soon as possible, and before commercial distribution of your device, submit two copies of an amendment to this PMA submission with copies of all approved labeling in final printed form to the Food and Drug Administration (FDA), Center for Devices and Radiological Health, PMA Document Mail Center (HFZ-401), 8757 Georgia Avenue, Silver Spring, Maryland 20910.

Premarket Approval Application (PMA) Supplement. Before making any change that could affect the safety or effectiveness of the device, submit a PMA supplement for review and approval by Center for Devices and Radiological Health (CDRH). Such changes may include, but are not limited to:

(1)  new indications for use;

(2)  labeling changes;

(3)  changes in existing manufacturing facilities, methods or quality control procedures;

(4)  the use of a different facility or establishment to manufacture, process, or package the device;

(5)  changes in sterilization procedures;

(6)  changes in packaging;

(7)  changes in the performance or design specification, circuits, parts, components, accessories, ingredients, or physical layout of the device; and

(8)  extension of the expiration date of the device based on data obtained under a new or revised testing protocol that has not been approved by CDRH. If the protocol has been approved, the change shall be submitted along with the supporting data in the next periodic report required in the PMA approval order. An approved protocol is one included in FDA guidelines applicable to the device or in a PMA submission for the device for which the approval order granted the expiration dating requested by you. Otherwise, you must submit and obtain CDRH approval of a PMA supplement for an expiration dating protocol.

Changes described below that enhance the safety of the device or safety in the use of the device may be placed into effect before your receipt of a written FDA order approving the PMA supplement provided that:

(1)  the PMA supplement and its mailing cover are plainly marked "Special PMA Supplement - Changes Being Effected";

(2)  the PMA supplement provides a full explanation of the basis for the changes;

(3)  the applicant has received acknowledgement of FDA receipt of the PMA supplement;

(4)  the PMA supplement specifically identifies the date that such changes are being effected; and

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

(5) the changes are among the following:

(a) labeling changes that add or strengthen a contraindication, warning, precaution, or adverse reaction or effect;

(b) labeling changes that add or strengthen an instruction that is intended to enhance the safe use of the device;

(c) labeling changes that delete misleading, false, or unsupported indications; or

(d) changes in the manufacturing process or quality controls that add a new specification or test method, or otherwise provide additional assurance of purity, identity, strength or reliability of the device.

You need submit only three (3) copies of a PMA supplement and include only information relevant to the proposed or effected changes in the device. The submission shall include a separate section that identifies all changes for which approval is being requested. You shall submit additional copies and additional information if requested by CDRH.

FDA may, as experience permits, issue guidelines listing specific types of changes that do not require FDA approval before implementation.

Post-Approval Reports. Continued approval of your device is contingent upon the submission of 2 copies of post-approval reports to the Food and Drug Administration, Center for Devices and Radiological Health, PMA Document Mail Center (HFZ-401), 8757 Georgia Avenue, Silver Spring, Maryland 20910 at intervals of 1 year from the date of this letter. The required contents of these reports will be described in the final order for the premarket approval procedural regulation which will be published in the FEDERAL REGISTER in the future. Until this regulation is published in final form, each periodic report shall consist of information that previously has not been submitted as part of a PMA supplement and which you have obtained since the last post-approval report or since receipt of this letter, whichever is later;

(1) a bibliography and summary of reports in the scientific literature involving the device and unpublished reports of in vitro, animal and clinical experience studies, investigations, and tests conducted by, reported to, or reasonably available to you involving the device or a related device--if, after reviewing the bibliography and summary, CDRH concludes that it needs a copy of the published and unpublished reports, CDRH will notify you that copies of such reports shall be submitted;

(2) written promotional material; and

(3) a description of changes made in the device not previously submitted in a PMA supplement.

Adverse Reaction and Device Defect Reporting. You shall submit 3 copies of a written report to the Food and Drug Administraiton, Center for Devices and Radiological Health (CDRH), 8757 Georgia Avenue, Silver Spring, Maryland 20910 within 10 days after you receive or have knowledge of information about:

(1) a mixup of the device or its labeling with another article;

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

(2) any significant chemical, physical, or other change or deterioration in the device, or any failure of one or more of the the devices to meet the specifications established in the application;

(3) any adverse reaction, side effect, injury, toxicity, or sensitivity reaction that is attributable to the device; and

    (a) has not been addressed by the device's labeling or

    (b) has been addressed by the device's labeling, but is occurring with unexpected severity or frequency.

Reporting under the Medical Device Reporting (MDR) Regulation. The Medical Device Reporting (MDR) Regulation became effective on December 13, 1984, and requires that all manufacturers and importers of medical devices, including in vitro diagnostic devices, report to FDA whenever they receive or otherwise become aware of information that reasonably suggests that one of its marketed devices (1) may have caused or contributed to a death or serious injury or (2) has malfunctioned and that the device or any other device marketed by the manufacturer or importer would be likely to cause or contribute to a death or serious injury if the malfunction were to reoccur.

The conditions of approval accompanying PMA approval orders may require that the same events subject to reporting under the MDR Regulation must also be included in periodic reports to the PMA. FDA has determined that such duplicative reporting is unnecessary. Whenever an event involving a device is subject to reporting under both the MDR Regulation and the conditions of approval for this PMA, you shall submit the appropriate reports required by the MDR Regulation and identified with the PMA reference number to the following office:

                    Device Monitoring Branch (HFZ-343)
                    Center for Devices and Radiological Health
                    Food and Drug Administration
                    8757 Georgia Avenue
                    Silver Spring, Maryland  20910
                    Telephone (301) 427-7500

Copies of the MDR Regulation and a FDA publication entitled, "An Overview of the Medical Device Reporting Regulation", are available by written request to the above address or by telephoning (301) 427-8100.

Note: All conditions of approval are subject to change upon publication of the final order for the premarket approval procedural regulation.

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

ETH.MESH.09634023

# Exhibit 34



DEPARTMENT OF HEALTH & HUMAN SERVICES

Public Health Service

DEC - 3 1986

RECEIVED

1986

R. H. O'HOLLA

Food and Drug Administration
8757 Georgia Avenue
Silver Spring MD 20910

Mr. Robert H. O'Holla
Director, Regulatory Affairs
Ethicon, Inc.
A Johnson & Johnson Company
Somerville, New Jersey 08876-0151

Re: See Enclosed List
Filed: October 28, 1986

Dear Mr. O'Holla:

The Center for Devices and Radiological Health (CDRH) of the Food and Drug
Administration (FDA) has completed its evaluation of your premarket approval
application (PMA) supplements, which requested approval for an alternate
manufacturing site. Based upon the information submitted, the PMA supplements
are approved subject to the conditions described in the "Conditions of
Approval" (enclosed).

You may begin production and marketing of the devices as modified by your PMA
supplements upon receipt of this letter.

If you have any questions concerning the approval of these supplemental
applications, please contact Kenneth A. Palmer, Ph.D., at (301) 427-7238.

Sincerely yours,

Carl A. Larson

Carl A. Larson, Ph.D.
Director, Division of Surgical
    and Rehabilitation Devices
Office of Device Evaluation
Center for Devices and
    Radiological Health

Enclosures

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

ETH.MESH.09634106

# Exhibit 35



DEPARTMENT OF HEALTH & HUMAN SERVICES                    Public Health Service

                                                        Food and Drug Administration
                                                        8757 Georgia Avenue
                        AUG 28 1987              RECEIVED Silver Spring MD 20910

                                                        AUG 3 1 1987

                                                        R. H. O'HOLLA

Mr. Robert H. O'Holla
Director, Regulatory Affairs
Ethicon, Inc.
Somerville, New Jersey  08876-0151


Re:  See Enclosed List
     Filed:  August 12, 1987


Dear Mr. O'Holla:

The Center for Devices and Radiological Health (CDRH) of the Food and Drug
Administration (FDA) has completed its evaluation of your premarket approval
application (PMA) supplements, which requested approval for an alternate
sterilization process for secondary overwrap packaging.  Based upon the
information submitted, the PMA supplements are approved subject to the
conditions described below and in the "Conditions of Approval" (enclosed).
You may begin commercial distribution of the devices as modified by your PMA
supplements upon receipt of this letter.

The sale, distribution, and use of these devices are restricted to
prescription use in accordance with 21 CFR 801.109 within the meaning of
section 520(e) of the Federal Food, Drug, and Cosmetic Act (act) under
authority of section 515(d)(1)(B)(ii) of the act.

Failure to comply with the conditions of approval invalidates this approval
order.  Commercial distribution of devices that are not in compliance with
these conditions is a violation of the Federal Food, Drug, and Cosmetic Act.

All required documents must be submitted in triplicate, unless otherwise
specified, to the address below and shall reference the above PMA numbers to
expedite processing.

                    PMA Document Mail Center (HFZ-401)
                    Center for Devices and Radiological Health
                    Food and Drug Administration
                    8757 Georgia Avenue
                    Silver Spring, Maryland  20910

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY                    ETH.MESH.09634185

Page 2 - Mr. Robert H. O'Holla

If you have any questions concerning this approval order, please contact
Kenneth A. Palmer, Ph.D., at (301) 427-7238.

Sincerely yours,

Carl A. Larson, Ph.D.
Director, Division of Surgical
  and Rehabilitation Devices
Office of Device Evaluation
Center for Devices and
  Radiological Health

*Trademark

Enclosures

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

ETH.MESH.09634186

| Document Number | Device Name |
|---|---|
| N85316/S15 | ETHILON*/NUROLON* Nylon Sutures Nonabsorbable Surgical Suture, USP |
| N10389/S25 | Catgut Suture (Plain and Chromic) Absorbable Surgical Suture, USP |
| N11397/S26 | Silk Nonabsorbable Surgical Suture, USP |
| N12815/S22 | MERSILENE* Polyester Nonabsorbable Surgical Suture, USP |
| N14226/S8 | Collagen Suture Chromic Absorbable Surgical Suture, USP |
| N16374/S33 | PROLENE* Polypropylene Nonabsorbable Surgical Suture, USP |
| N17472/S42 | VICRYL* (polyglactin 910) Synthetic Absorbable Suture, Dyed |
| N17804/S37 | ETHIBOND* Polyester Nonabsorbable Surgical Suture, USP, Dyed |
| N18331/S19 | PDS* (polydioxanone) Synthetic Absorbable Suture (Dyed) |

*Trademark

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

ETH.MESH.09634187

# Exhibit 36



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Public Health Service

*file*
*56.1*

OCT - 7 1988

Food and Drug Administration
8757 Georgia Avenue
Silver Spring MD 20910

RECEIVED
OCT 1 3 1988
R. H. O'HOLLA

Mr. James P. O'Donnell
Manager, Regulatory Affairs & Statistics
Ethicon, Inc.
Somerville, New Jersey  08876-0151

RE: N16374/S34
    PROLENE* Polypropylene Suture
    Clear and Pigmented
    Nonabsorbable Surgical Suture, USP
    Filed:  September 13, 1988

Dear Mr. O'Donnell:

The Center for Devices and Radiological Health (CDRH) of the Food and Drug
Administration (FDA) has completed its evaluation of your premarket approval
application (PMA) supplement, which requested approval for updated labeling
changes for size 7-0 PROLENE* clear and pigmented sutures.  Based upon the
information submitted, the PMA supplement is approved subject to the
conditions described below and in the "Conditions of Approval" (enclosed).
You may begin commercial distribution of the device as modified by your PMA
supplement upon receipt of this letter.

The sale, distribution, and use of this device are restricted to prescription
use in accordance with 21 CFR 801.109 within the meaning of section 520(e) of
the Federal Food, Drug, and Cosmetic Act (act) under authority of section
515(d)(1)(B)(ii) of the act.

Failure to comply with the conditions of approval invalidates this approval
order.  Commercial distribution of a device that is not in compliance with
these conditions is a violation of the act.

All required documents must be submitted in triplicate, unless otherwise
specified, to the address below and shall reference the above PMA number to
expedite processing.

        PMA Document Mail Center (HFZ-401)
        Center for Devices and Radiological Health
        Food and Drug Administration
        8757 Georgia Avenue
        Silver Spring, Maryland  20910

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

ETH.MESH.09634299

Page 2 - Mr. James P. O'Donnell

If you have any questions concerning this approval order, please contact Mr. Kevin J. Crossen, at (301) 427-7238.

Sincerely yours,

Carl A. Larson, Ph.D.
Director, Division of Surgical
   and Rehabilitation Devices
Office of Device Evaluation
Center for Devices and
   Radiological Health

*Trademark
Enclosure

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

ETH.MESH.09634300

REVISED: November 19, 1986

CONDITIONS OF APPROVAL

Approved Labeling.  As soon as possible, and before commercial distribution of your device, submit two copies of an amendment to this PMA submission with copies of all approved labeling in final printed form to the PMA Document Mail Center (HFZ-401), Center for Devices and Radiological Health, Food and Drug Administration (FDA), 8757 Georgia Avenue, Silver Spring, Maryland  20910.

Advertisement.  No advertisement and other descriptive printed material issued by the applicant or private label distributor with respect to this device shall recommend or imply that the device may be used for any use that is not included in the FDA approved labeling for the device.  If FDA has restricted the sale, distribution and use of the device to prescription use in accordance with 21 CFR 801.109 within the meaning of section 520(e) of the act under the authority of section 515(d)(1)(B)(ii) of the act, all advertisements and other descriptive printed material issued by the applicant or distributor with respect to the device shall include a brief statement of the intended uses of the device and relevant warnings, precautions, side effects and contraindications.

Premarket Approval Application (PMA) Supplement.  Before making any change affecting the safety or effectiveness of the device, submit a PMA supplement for review and approval by FDA unless the change is of a type for which a "Special PMA Supplement—Changes Being Effected" is permitted under 21 CFR 814.39(d) or for which FDA has advised in an advisory opinion or in correspondence in accordance with 21 CFR 814.39(e) that an alternate submission is permitted.  A PMA supplement or alternate submission shall comply with applicable requirements under 21 CFR 814.39 of the final rule for Premarket Approval of Medical Devices (51 FR 26342) published in the Federal Register of July 22, 1986.

Postapproval Reports.  Continued approval of this PMA is contingent upon the submission of postapproval reports required under 21 CFR 814.84 at intervals of 1 year from the date of approval of the original PMA.  Postapproval reports for supplements approved under the original PMA, if applicable, are to be included in the next and subsequent annual reports for the original PMA unless specified otherwise in the approval order for the PMA supplement.  Two copies identified as "Annual Report" and bearing the applicable PMA reference number are to be submitted to the PMA Document Mail Center (HFZ-401), Center for Devices and Radiological Health, Food and Drug Administration, 8757 Georgia Avenue, Silver Spring, Maryland  20910.  The postapproval report shall indicate the beginning and ending date of the period covered by the report and shall include the following information required by 21 CFR 814.84:

(1) Identification of changes described in 21 CFR 814.39(a) and changes required to be reported to FDA under 21 CFR 814.39(b).

(2) Bibliography and summary of the following information not previously submitted as part of the PMA and that is known to or reasonably should be known to the applicant:

    (a) unpublished reports of data from any clinical investigations or nonclinical laboratory studies involving the device or related devices ("related" devices include devices which are the same or substantially similar to the applicant's device); and

    (b) reports in the scientific literature concerning the device.

-1-

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

-2-

If, after reviewing the bibliography and summary, FDA concludes that agency review of one or more of the above reports is required, the applicant shall submit two copies of each identified report when so notified by FDA.

Adverse Reaction and Device Defect Reporting. As provided by 21 CFR 814.82(a)(9), FDA has determined that in order to provide continued reasonable assurance of the safety and effectiveness of the device, the applicant shall submit 3 copies of a written report identified as an "Adverse Reaction Report" or "Device Defect Report", as applicable, to the PMA Document Mail Center (HFZ-401), Center for Devices and Radiological Health, Food and Drug Administration, 8757 Georgia Avenue, Silver Spring, Maryland 20910 within 10 days after the applicant receives or has knowledge of information concerning:

(1) A mixup of the device or its labeling with another article.

(2) Any adverse reaction, side effect, injury, toxicity, or sensitivity reaction that is attributable to the device and

(a) has not been addressed by the device's labeling or

(b) has been addressed by the device's labeling, but is occurring with unexpected severity or frequency.

(3) Any significant chemical, physical or other change or deterioration in the device or any failure of the device to meet the specifications established in the approved PMA that could not cause or contribute to death or serious injury but are not correctable by adjustments or other maintenance procedures described in the approved labeling. The report shall include a discussion of the applicant's assessment of the change, deterioration or failure and any proposed or implemented corrective action by the applicant. When such events are correctable by adjustments or other maintenance procedures described in the approved labeling, all such events known to the applicant shall be included in the Annual Report described under "Postapproval Reports" above unless specified otherwise in the conditions of approval to this PMA. This postapproval report shall appropriately categorize these events and include the number of reported and otherwise known instances of each category during the reporting period. Additional information regarding the events discussed above shall be submitted by the applicant when determined by FDA to be necessary to provide continued reasonable assurance of the safety and effectiveness of the device for its intended use.

Reporting under the Medical Device Reporting (MDR) Regulation. The Medical Device Reporting (MDR) Regulation became effective on December 13, 1984, and requires that all manufacturers and importers of medical devices, including in vitro diagnostic devices, report to FDA whenever they receive or otherwise become aware of information that reasonably suggests that one of its marketed devices (1) may have caused or contributed to a death or serious injury or (2) has malfunctioned and that the device or any other device marketed by the manufacturer or importer would be likely to cause or contribute to a death or serious injury if the malfunction were to reoccur.

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

ETH.MESH.09634302

-3-

The "Conditions of Approval" accompanying PMA approval orders may require that the same events subject to reporting under the MDR Regulation must also be included in periodic reports to the PMA.  FDA has determined that such duplicative reporting is unnecessary.  Whenever an event involving a device is subject to reporting under both the MDR Regulation and the "Conditions of Approval" for this PMA, you shall submit the appropriate reports required by the MDR Regulation and identified with the PMA reference number to the following office:

> Device Monitoring Branch (HFZ-343)
> Center for Devices and Radiological Health
> Food and Drug Administration
> 8757 Georgia Avenue
> Silver Spring, Maryland  20910
> Telephone (301) 427-7500

Events included in periodic reports to the PMA that have also been reported under the MDR Regulation must be so identified in the periodic report to the PMA to prevent duplicative entry into FDA information systems.

Copies of the MDR Regulation and an FDA publication entitled, "An Overview of the Medical Device Reporting Regulation", are available by written request to the above address or by telephoning (301) 427-8100.

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

ETH.MESH.09634303

# Exhibit 37

<u>PACKAGE INSERT</u>

SIDE # 1

SIDE # 2

DATE:

# PROLENE.

POLYPROPYLENE SUTURE
Nonabsorbable Surgical Suture, U.S.P.

## DESCRIPTION

PROLENE* Polypropylene Suture, U.S.P. (clear or pigmented) is an isotactic crystalline stereoisomer of a linear hydrocarbon polymer containing little or no unsaturation. The pigmented suture contains Copper Phthalocyanine Blue.

## ACTIONS

PROLENE Polypropylene Suture, U.S.P. causes a minimal, transient acute inflammatory reaction. This is followed by the formation of a microscopic layer of fibrous tissue around the suture. The suture is not absorbed nor is it subject to degradation or weakening by the action of tissue enzymes.

## INDICATIONS

PROLENE Polypropylene Suture, U.S.P. may be used wherever Nonabsorbable Surgical Suture, U.S.P. is recommended. Due to its relative biological inertness, it is recommended for use where the least possible suture reaction is desired. As a true monofilament, PROLENE Polypropylene Suture, U.S.P. resists involvement in infection and has been successfully employed in contaminated and infected wounds to eliminate or minimize later sinus formation and suture extrusion.

Because of its lack of adherence to tissue, PROLENE Polypropylene Suture, U.S.P. is efficacious as a pull-out suture.

## CONTRAINDICATIONS

There are no known contraindications.

## WARNINGS

Do not resterilize.

*Trademark

PROLENE size 7-0 sutures are U.S.P., except for diameter.

MAXIMUM SUTURE OVERSIZE IN DIAMETER (mm) FROM U.S.P.

| U.S.P. SUTURE SIZE DESIGNATION | MAXIMUM OVERSIZE (mm) |
|---|---|
| 7-0 | .007 |

## PRECAUTIONS

As with any suture, care should be taken to avoid damage when handling. Avoid the crushing or crimping application of surgical instruments, such as needleholders and forceps, to the strand except when grasping the free end of the suture during an instrument tie.

As with other synthetic sutures, knot security requires the standard surgical technique of flat and square ties with additional throws if indicated by surgical circumstance and the experience of the operator.

## ADVERSE REACTIONS

Transitory local inflammatory reactions have been reported.

## DOSAGE AND ADMINISTRATION

Use as required per surgical procedure.

## HOW SUPPLIED

PROLENE* Polypropylene Sutures, pigmented, are available as sterile strands in U.S.P. sizes 11-0 thru 6-0 (metric size 0.1—0.4) and 6-0 thru 2 (metric size 0.7—5.0).

PROLENE Polypropylene Sutures, clear, are available as sterile strands in U.S.P. sizes 6-0 thru 2 (metric size 0.7—5.0)

PROLENE size 7-0 sutures are U.S.P. except for diameter.

PROLENE Polypropylene Sutures, pigmented and clear, in U.S.P. sizes 4-0 thru 2 (metric size 1.5—5) are also available attached to CONTROL RELEASE* removable needles.

PROLENE Polypropylene Sutures, sizes 0 thru 5-0 are also available attached to Teflon† or Dacron† felt pledgets measuring 1/8" x 1/8" x 1/16" (3.0mm x 3.0mm x 1.5mm), 1/4" x 1/8" x 1/16" (7.0mm x 3.0mm x 1.5mm), or 3/8" x 3/16" x 1/16" (9.0mm x 4.0mm x 1.5mm). An additional size for the Dacron Pledget is also available measuring 1/16" x 1/4" x 1/4" (1.5mm x 6.0mm x 6.0mm).

CAUTION: Federal Law restricts this device to sale, distribution and use by or on the order of a physician or a veterinarian.

## ETHICON, INC.

a Johnson-Johnson company

Somerville, New Jersey 08876-0151

*Trademark            Made in U.S.A.
389xxx               ©ETHICON, INC. 1988

†TM E.I. DuPont de Nemours & Co.

All PROLENE polypropylene sutures are available in a variety of lengths with and without permanently attached needles.

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

ETH.MESH.09634318

# Exhibit 38



**DEPARTMENT OF HEALTH & HUMAN SERVICES**                    Public Health Service

MAR 20 1990

Food and Drug Administration
1390 Piccard Drive
Rockville, MD 20850

REGULATORY AFFAIRS
MAR 26 1990
RECEIVED

Mr. James P. O'Donnell
Manager
Regulatory Affairs and Statistics
Ethicon, Inc.
P.O. Box 151
Somerville, New Jersey  08876-0151

Re:  See Enclosed List
     Filed: February 23, 1990

Dear Mr. O'Donnell:

The Center for Devices and Radiological Health (CDRH) of the Food and
Drug Administration (FDA) has completed its evaluation of your
premarket approval application (PMA) supplements, which requested
approval for a change in the release criteria following ethylene oxide
secondary sterilization of overwrapped suture packages.  Based upon
the information submitted, the PMA supplements are approved subject to
the conditions described below and in the "Conditions of Approval"
(enclosed).  You may begin commercial distribution of the devices as
modified by your PMA supplements upon receipt of this letter.

The sale, distribution, and use of these devices is restricted to
prescription use in accordance with 21 CFR 801.109 within the meaning
of section 520(e) of the Federal Food, Drug, and Cosmetic Act (act)
under authority of section 515(d)(1)(B)(ii) of the act.

Failure to comply with the conditions of approval invalidates this
approval order.  Commercial distribution of devices that are not in
compliance with these conditions is a violation of the act.

All required documents must be submitted in triplicate, unless
otherwise specified, to the address below and shall reference the
above PMA numbers to expedite processing.

                PMA Document Mail Center (HFZ-401)
                Center for Devices and Radiological Health
                Food and Drug Administration
                1390 Piccard Drive
                Rockville, Maryland  20850

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY                    ETH.MESH.09634354

Page 2 - Mr. James P. O'Donnell

If you have any questions concerning this approval order, please
contact Ms. Diane Minear at (301) 427-1090.

Sincerely yours,

Carl A. Larson, Ph.D.
Director
Division of Surgical and
  Rehabilitation Devices
Office of Device Evaluation
Center for Devices and
  Radiological Health

Enclosures

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

ETH.MESH.09634355

N11397/S28                          Silk Suture, Nonabsorbable Surgical
                                    Suture, USP

N12815/S24                          MERSILENE™ Polyester Suture
                                    Nonabsorbable Surgical Suture, USP

N16374/S35                          PROLENE™ Polypropylene Suture,
                                    Nonabsorbable Surgical Suture, USP

N17804/S39                          ETHIBOND™ Polyester Suture
                                    Nonabsorbable Surgical Suture, USP

N18331/S22                          PDS II (Polydioxanone) Suture,
                                    Synthetic Absorbable Suture

N85316/S17                          ETHILON™/NUROLON Nylon Sutures
                                    Nonabsorbable Surgical Suture, USP

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY                    ETH.MESH.09634356

# Exhibit 39



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Public Health Service

Food and Drug Administration
1390 Piccard Drive
Rockville, MD 20850

JUL 5 1990

Mr. Walter S. Hennig
Vice President, Quality Functions
United States Surgical Corporation
150 Glover Avenue
Norwalk, Connecticut 06856

    Re: Reclassification of Nonabsorbable Polypropylene
        Surgical Suture, Docket Number 88P-0173

Dear Mr. Hennig:

<u>INTRODUCTION</u>

    The Center for Devices and Radiological Health (CDRH) for the Food and
Drug Administration (FDA) has completed its review of your reclassification
petition for the nonabsorbable polypropylene surgical suture. FDA concludes
that the generic type of device, nonabsorbable polypropylene surgical suture,
and all devices substantially equivalent to this generic type, should be
reclassified from class III into class II with a low priority for the
development of a performance standard. This order, therefore, reclassifies
nonabsorbable polypropylene surgical sutures into class II effective
immediately.

    FDA identifies the generic type of device the subject of this
reclassification, as follows:

        Nonabsorbable polypropylene surgical suture is a monofilament,
        nonabsorbable, sterile, flexible thread prepared from long-chain
        polyolefin polymer known as polypropylene and is indicated for use
        in soft tissue approximation. The polypropylene surgical suture
        meets USP requirements as described in the USP Monograph for
        Nonabsorbable Surgical Sutures; it may be undyed or dyed with an
        FDA approved color additive; and the suture may be provided with
        or without a standard needle attached.

    As you know, on May 4, 1988, FDA filed the reclassification petition
submitted by Advanced Biosearch Associates of Danville, California on your
behalf requesting reclassification of nonabsorbable polypropylene surgical
suture from class III into class II. The petition was submitted under section

**CONFIDENTIAL**
**SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY**              **ETH.MESH.09634664**

Page 2 - Mr. Walter S. Hennig

520(1) of the Federal Food, Drug and Cosmetic Act ("act"), 21 U.S.C. 360j(1), seeking reclassification under the procedures set forth in section 520(1)(2) of the act, 21 U.S.C. 360j(1)(2), and 21 CFR 860.136 of the agency's regulations.

Consistent with the act and the regulations, the agency consulted with the General and Plastic Surgery Devices Panel ("Panel") regarding the reclassification petition. The agency, by its September 28, 1988 letter and statements at the panel meeting, fully briefed the Panel about its obligations regarding the reclassification petition for nonabsorbable polypropylene surgical suture that was before it. The Panel, during an open public meeting on October 20, 1988, recommended that FDA reclassify nonabsorbable polypropylene surgical suture from class III into class II, and that FDA assign a high priority to the development of a performance standard for the generic type of device under section 514 of the act, although a performance standard need not be in place before reclassification is effective (Ref. 8 at page 55).

After reviewing all data in the petition and presented before the Panel, and after fully considering the Panel's recommendation and the views of the participants at the panel meeting, FDA, based on the information set forth in this letter, is ordering the reclassification of the generic type of device, identified on page 1, supra, from class III to class II.

RECLASSIFICATION PROCEDURE

Reclassification of nonabsorbable polypropylene surgical suture is governed by section 520(1) of the act, 21 U.S.C. 306j(1). The nonabsorbable polypropylene surgical suture is regulated as a class III device because prior to the Amendments it was subject to an approved "new drug" application submitted under section 505(b). See Section 520(1)(1)(A). Devices subject to "new drug" approvals prior to the Amendments are known as transitional devices and are automatically placed into class III to assure continuity of regulation.

Section 520(1)(1)(D), likewise, automatically classifies into class III a device that is "within a type of device described in subparagraph (A), (B), or (C) [of section 520(1)(1)] and is substantially equivalent to another device within that type." No time or other limitations narrow the scope of section 520(1)(1), nor is it suggested by the statute's text that anything other than all devices that fit within the scope of section 520(1)(1) are to be considered transitional, class III devices. Therefore, nonabsorbable polypropylene surgical sutures that are introduced well after the enactment date of the Amendments, which are substantially equivalent to a suture classified under section 520(1)(1)(A), are classified into class III under the authority of section 520(1)(1)(D).

Section 520(1)(2) of the act, which sets forth the procedures for reclassification of devices classified under section 520(1)(1), unambiguously applies to all devices classified under that section, and its scope is no more limited than that of section 520(1)(1). The statute's language is clear that section 520(1)(2) of the act is the exclusive means for reclassifying a device

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

Page 3 - Mr. Walter S. Hennig

classified under section 520(1)(1). Nothing in the act suggests that
transitional device reclassification should be initiated under any section of
the act other than section 520(1)(2).

    The act's premarket notification requirement demonstrates further that
this proceeding is authorized by the transitional device reclassification
provisions. If any person were to file a premarket notification under section
510(k) of the act, 21 U.S.C. 360(k), he would be required to identify:

> The class in which the device is classified under section 513 <u>or</u>
> <u>if such person determines that the device is not classified under</u>
> <u>such section, a statement of that determination and the basis for</u>
> <u>such person's determination that the device is or is not so</u>
> <u>classified (emphasis added)</u>. <u>Id</u>.

    Clearly, nonabsorbable polypropylene surgical suture was not classified
under section 513. Congress, as evidenced by the underlined portion of the
above-quoted language, recognized that classification could occur outside of
section 513. Section 520(1)(1) provides the only means of classifying a
device outside of section 513 available under the act, and nonabsorbable
polypropylene surgical suture was classified under the authority of that
section. Accordingly, any person now bringing nonabsorbable polypropylene
surgical suture to the market for the first time would be required to inform
the agency in the context of section 510(k) of whether his nonabsorbable
polypropylene surgical suture is substantially equivalent to a preamendment
suture, as classified under section 520(1)(1), or a unique and, therefore,
"new" suture as classified under section 513(f)(1).

    For the nonabsorbable polypropylene surgical suture the subject of this
reclassification proceeding, it is unchallenged that it was classified into
class III under section 520(1)(1). Accordingly, since neither sections
520(1)(1) nor 520(1)(2) express any time restraints or other limitations
regarding the acts of classification or reclassification of transitional
devices, and since the Amendments, through premarket notification, intend that
substantially equivalent devices, including transitional devices, be
classified the same, I must conclude that the agency's position, that section
520(1)(2) describes the reclassification procedures for devices originally
classified under section 520(1)(1), is reasonable and should be
followed.[1]

---

[1]  The agency's understanding of the transitional device provision is
consistent with the act and the agency's regulations, and is also supported by
legislative history, stating:

> [the] [o]pportunity to petition [under the transitional device
> provisions] for reclassification to class II or I is afforded
> the manufacturer or importer of any device classified into
> class III as a result of [section 520(1)(1).]

H.R. Rep. No. 853, 94th Cong., 2d Sess., February 29, 1976 at 38.

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

ETH.MESH.09634666

Page 4 - Mr. Walter S. Hennig

As the above discussion demonstrates, Congress intended to permit persons, who for the first time desire to manufacture or import transitional devices, the opportunity to seek reclassification under section 520(l)(2), notwithstanding the fact that reclassification was sought well after the passage of the Amendments. Moreover, U.S. Surgical, in our view and as the record shows, is an appropriate party to petition for reclassification under section 520(l)(2) in that the company intends to market nonabsorbable polypropylene surgical suture, and presently has received approval from FDA to export nonabsorbable polypropylene surgical suture to Italy, West Germany, France, The Netherlands and Switzerland (Ref. 150).  Under these circumstances, U.S. Surgical, like any person submitting a premarket notification under section 510(k) seeking classification under section 520(l)(1), has standing to pursue reclassification under section 520(l)(2) from an automatic class III placement.

DECISION

After reviewing the publicly available literature in the record, the Panel's deliberation, and FDA's past actions regarding nonabsorbable polypropylene surgical suture, it is apparent to FDA that a class III designation for nonabsorbable polypropylene surgical suture constitutes overregulation.

By limiting the generic class, the subject of this order, to nonabsorbable polypropylene surgical suture, as defined on page 1, FDA, according to the record evidence, has limited this reclassification to nonabsorbable polypropylene surgical suture with the same or similar health risks.  This approach is entirely consistent with FDA's definition of a generic type of device, see 21 CFR 860.3(i), and its view that "[t]he similarity of health risks is fundamental to the concept of classification by generic type of device," see 43 Fed. Reg. 32989, 32992 (July 28, 1978).

Additionally, U.S. Surgical has provided information in its petition to show that, despite variations in nonabsorbable polypropylene surgical suture materials and manufacturing processes, test methods exist to demonstrate whether any nonabsorbable polypropylene surgical suture is within the scope of the generic type of device identified in this order.  Therefore, we believe that the nonabsorbable polypropylene surgical suture is well characterized and an appropriate candidate for reclassification.

As you have demonstrated, class II controls are appropriate to regulate nonabsorbable polypropylene surgical suture.  Class II controls are indicated where class I controls alone are inadequate to reasonably assure a device's safety and effectiveness, and sufficient information exists to establish a performance standard to provide for such an assurance.  See section 513(a)(1)(B) of the act, 21 U.S.C. 360c(a)(1)(B).  As our discussion below demonstrates, the publicly available valid scientific evidence contained in the administrative record in this matter identifies the performance parameters and risks that define the safety and effectiveness of nonabsorbable polypropylene surgical suture.  Also, valid scientific evidence in the record demonstrates the basis of a performance standard to control these parameters and risks and, thus, "sufficient information to establish a performance

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

Page 5 - Mr. Walter S. Hennig

standard," (see section 513(a)(1)(B)), exists to classify nonabsorbable polypropylene surgical suture into class II.

A class II classification may occur with or without an actual standard being in place. Of importance is the fact that enough is known about the performance of nonabsorbable polypropylene surgical suture that the generic premarket clearance criteria of a performance standard constitute a more appropriate level of regulatory control than the agency's product by product premarket review, mandated by class III controls. Indeed, the data in the record show that when weighing benefits to the probable risk of illness or injury resulting from the use of nonabsorbable polypropylene surgical suture, class III controls are unnecessary to assure the device's safe and effective performance.

In granting your petition, FDA has relied on valid scientific evidence, as defined by 21 CFR 860.7(c)(2). The agency's regulations prescribe various types of evidence that may be valid scientific evidence, including, for example, well-controlled studies and reports of significant human experience with marketed devices. Although a well-controlled investigation is a component of valid scientific evidence, it is important to appreciate that such an investigation is but one type of evidence that can be relied upon by FDA to make classification and other regulatory decisions.

FDA firmly believes that end-product test methods are available to thoroughly evaluate nonabsorbable polypropylene surgical suture, and that publicly available valid scientific evidence supports this conclusion. The agency contrues section 514 of the act to sanction the use of end-product testing as a means of evaluating the properties and performance of a device. In that nonabsorbable polypropylene surgical suture is considered by the agency to be well characterized, and the record evidence supports this conclusion, and since valid scientific evidence shows the applicability of various end-product tests to the use of the suture in humans, we believe that class II controls provide a reasonable means, consistent with the act's purpose, to regulate nonabsorbable polypropylene surgical suture.

SCIENTIFIC BASIS

Suture Characterization

By definition, the nonabsorbable polypropylene surgical suture is well characterized. The suture is a monofilament, nonabsorbable, sterile, flexible thread prepared from long-chain polyolefin polymer known as polypropylene and is indicated for use in soft tissue approximation. The polypropylene surgical suture meets USP requirements as described in the USP Monograph for Nonabsorbable Surgical Sutures; it may be undyed or dyed with an FDA approved color additive; and the suture may be provided with or without a standard needle attached.

The nonabsorbable polypropylene surgical suture manufacturing process begins with production of the isotatic form of the polypropylene polymer wherein the attached methyl groups are arranged in a stereoregular

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

Page 6 - Mr. Walter S. Hennig

configuration along one side of the "plane" described by a zig-zag carbon chain.  It is produced in a solvent polymerization, using hydrocarbon solvent under pressure, at high temperatures and in the presence of a Ziegler-Natta catalyst which promotes the formation of the stereoregular isotatic form of the polypropylene polymer.  The resulting insoluble isotatic polymer resin is subsequently purified by filtration and extraction to remove the catalyst, and then dried.  Nonabsorbable polypropylene surgical suture may be left undyed (natural), or if desired, dyed with an FDA listed color additive in accordance with section 706 of the act.

The polypropylene resin is extruded at high temperature into polymer fibers of uniform diameter, and a specific multiple of their length are drawn or stretched to provide the necessary tensile properties.  Nonabsorbable polypropylene surgical suture is ordinarily monofilamentous, and depending upon the final suture size desired, fibers of appropriate diameter and characteristics are produced.  The processed thread is then cut to length, gauged to ensure uniform diameter and tensile strength in accordance with the requirements of United States Pharmacopeia (USP), appropriately packaged (with or without an attached needle), and sterilized to produce a finished suture (Refs. 7, 9, 29, 32, 65, 105, 133, 134 and 135).

Record data show that nonabsorbable polypropylene surgical suture's performance parameters and uses are well documented and understood, and that the generic type of device presents a reasonably uniform risk/benefit profile. Indeed the characteristics and composition of polypropylene are well-defined (Refs. 23, 24, 57, 58, 69, 72, 90, 91, 95, 113, 117, 120, 121, 126, 128-131, 134 and 135).  Moreover, the performance parameters of existing nonabsorbable polypropylene surgical suture are well established (Refs. 9, 24, 29, 45, 50, 64, 121, 133, 134, 135 and 137) and the record shows the reasonably safe and effective use of nonabsorbable polypropylene surgical suture in humans (Refs. 17, 21, 33, 41, 42, 87, 95, 120 and 138).

The end product, given its indications for use, must have certain tensile strength characteristics (Refs. 9, 23, 28, 30, 34, 64, 74, 85, 89, 90, 91, 95, 113, 117, 120, 121, 126, 128, 129, 130, 133, 137 and 142).  USP sutures, evaluated by uniform end-product testing, will perform successfully, notwithstanding different manufacturing processes (Refs. 7, 9, 64, 137, 24, 85, 133, 134 and 135), and will, among other things, have uniform tensile strengths.  Since record data show that all nonabsorbable polypropylene surgical sutures present similar risks and performance characteristics (Refs. 9, 24, 29, 45, 50, 64, 121, 133, 134, 135 and 137), end product testing, in conjunction with other controls, will provide an appropriate means of reasonably assuring safe and effective nonabsorbable polypropylene surgical sutures.

In sum, the principal materials used to produce nonabsorbable polypropylene surgical suture is isotatic polypropylene polymer, and the physical characteristics of these polypropylene polymers are well understood. The USP Standard (Ref. 133 a-1), the American Society for Testing and Materials (ASTM) standards (Ref. 9 a-t) and other state-of-the-art test methods exist to evaluate and analyze the manufacturing process, composition, and physical, mechanical and biological properties of any nonabsorbable

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

Page 7 - Mr. Walter S. Hennig

polypropylene surgical suture (Refs. 28, 30, 34, 88, 92, 110, 112, 113, 116-119, 130, 132 and 138). Nonabsorbable polypropylene surgical sutures present the same risks and performance parameters and can be standardized by end-product tests, and are regulable by the same or similar controls. Accordingly, the record shows that nonabsorbable polypropylene surgical suture constitutes a well characterized generic type of device.

### Control of Suture Performance

The parameters that need control to provide reasonable assurance of safety and effectiveness for nonabsorbable polypropylene surgical suture are suture breakage, tissue inflammatory response, infection, and suture-related calculogenesis. A discussion of each parameter and the appropriateness of a class II classification for nonabsorbable polypropylene surgical suture, as supported by valid scientific evidence, follows.

1. Suture Breakage

The most important function of a suture is to successfully hold tissue together until healing is sufficiently complete so as to negate the need of the suture. Failure of a suture prior to a wound regaining adequate strength may result in wound dehiscence: a disruption of apposed wound surfaces, interfering with the normal healing process. Suture breakage may occur where there is premature loss of tensile strength (Refs. 4, 23, 29, 32, 42, 43, 44, 64, 70, 83, 90, 95, 115, 117, 121, 126, 128, 129, 130 and 149), due to unfavorable physiological wound site conditions (Refs. 11, 17, 18, 22, 33, 48, 66, 68, 74, 79, 80, 87, 102, 121 and 137), poor surgical technique (Refs. 11, 21, 66, 74, 77, 80, 83, 102, 107, 108, 109, 115, 117, 121 and 137), or improper use of the suture (id.). Importantly, the cumulative risk of nonabsorbable polypropylene surgical suture breakage is small, and its ability to function properly is uncontested.

The data in the record reveal that the incidence of wound dehiscence varies according to a number of factors, not all of which relate to suture breakage (Refs. 11, 17, 18, 48, 54, 66, 68, 74, 80, 81, 87, 107, 108, 109, 121 and 137). Of those wounds that dehisce, only a small fraction are attributable to suture breakage (Refs. 11, 17, 22, 48, 66, 74, 79, 109 and 121). It has also been shown that the incidence of wound dehiscence due to suture breakage occurs infrequently with nonabsorbable polypropylene surgical suture (Refs. 11, 22, 66, 74, 79, 108 and 109), and that the overall incidence of wound dehiscence with nonabsorbable polypropylene surgical suture is low (Refs. 22, 41, 68, 74, 79, 87 and 109).

The loss of tensile strength leading to suture breakage is a potential cause of failure of nonabsorbable polypropylene surgical suture in certain applications (Refs. 4, 32, 42, 70, 115 and 149). Retention of the suture's tensile strength is critical to the function of nonabsorbable polypropylene surgical suture. The record data show that the loss of tensile strength in vivo is primarily related to the oxidative degradation of the polypropylene polymer (Refs. 4, 29, 32, 42, 43 and 44) and that the polymer's degradation proceeds slowly and is generally not considered clinically significant under most circumstances of use (Refs. 1, 4, 42, 121 and 149). The rate and extent

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

Page 8 - Mr. Walter S. Hennig

of oxidative degradation vary according to exposure to ultraviolet radiation, and may make the use of the suture in the eye questionable (Refs. 4, 32, 42, 70 and 149). Oxidative enzyme activity and the type of tissue at the wound site, e.g., actively metabolizing tissues, tissues with high oxygen concentration, and inflammation may also contraindicate the suture for certain applications (Refs. 4, 32, 42, 43, 44, 70 and 149).

The patient's health and response to the suture material may affect wound healing (Refs. 11, 17, 18, 48, 66, 74, 80, 81, 87, 107, 108, 109 and 121). Patients whose health has been compromised or weakened by poor nutrition, advanced age, obesity, uncontrolled diabetes, infection, anemia, or with certain forms of cancer, may exhibit delayed wound healing (Refs. 11, 17, 18, 48, 66, 74, 80, 81, 87, 107, 108, 109 and 121) which may increase the likelihood of suture failure. Although some of these factors have been shown experimentally to delay increases in wound strength, a nonabsorbable suture, such as nonabsorbable polypropylene surgical suture, may be preferred over absorbable sutures due to the suture's continuous support of tissues (Refs. 17, 48, 66, 74, 108, 121 and 137).

The appropriate use of nonabsorbable polypropylene surgical suture is important in defining its performance. The record shows that nonabsorbable polypropylene surgical suture has been successfully used in various wound sites and conditions in humans (Refs. 17, 21, 33, 41, 42, 87, 95, 120 and 138). Although, wound dehiscence is most significant in wound closures involving sites which can undergo expansion, stretching, or distention, such as the abdomen, chest, and joints, nonabsorbable polypropylene surgical suture may be the suture of choice due to its continued support of tissues (Refs. 11, 17, 18, 22, 33, 48, 66, 74, 79, 80, 81, 87, 102, 108, 121 and 137). Using nonabsorbable polypropylene surgical suture to close certain wounds has documented advantages related to the physical properties of the suture (Refs. 11, 22, 33, 66, 74, 79, 80, 81, 87, 108 and 121).

Surgical technique also affects the performance of sutures, including nonabsorbable polypropylene surgical suture. Improper closure technique can result in tissue separation and failure of the wound to heal. The factors relating to the wound closure technique that contribute to wound dehiscence include the tightness with which sutures are tied, suture knot security, the adequacy of tissue bites to allow for adequate wound expansion due to distention and damage to the suture during placement (Refs. 11, 17, 18, 21, 23, 48, 57, 58, 64, 66, 69, 74, 77, 79, 83, 87, 95, 102, 107, 108, 109, 115, 117, 120, 121, 129 and 130).

The critical parameter of tensile strength can be controlled by standard in vitro test methods and animal testing. The tensile strength of nonabsorbable polypropylene surgical suture before implantation and after explantation may be measured in a motor-driven tensile strength machine using equipment and procedures described in the USP (Refs. 133, 134 and 135). Moreover, various American Society for Testing and Material (ASTM) tests to evaluate suture strength exist and include, for example, yarn breaking load, breaking tenacity in loop/knot configuration, single textile fiber tensile strength, and in vitro strength loss and material degradation tests (Refs. 9, 134 and 135). Finally, to determine the effects of implantation of

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

Page 9 - Mr. Walter S. Hennig

nonabsorbable polypropylene surgical suture upon tensile strength, various _in vitro_ and _in vivo_ methods used by Salthouse (Refs. 116 and 117), Postlethwait (Ref. 110), and others (Refs. 30, 64, 128, 129 and 130), which compare the tensile strength of various absorbable and nonabsorbable sutures, show a suture's performance characteristics.

The various evaluative methods included in the above references are applicable to the safe and effective use of nonabsorbable polypropylene surgical suture in humans in that sutures that have been successfully used in humans are routinely evaluated with these evaluative methods (Refs. 17, 21, 33, 41, 42, 87, 95, 120 and 138). Importantly, the time necessary for wound healing in various sites in humans is known (Refs. 2, 3, 5, 6, 13, 14, 19, 20, 24, 25, 27, 38, 39, 49, 50, 52, 60, 61, 63, 74, 75, 76, 77, 78, 98, 101, 103, 107, 114, 116, 121, 124, 127, 137 and 143), and the above methods permit a determination of whether sufficient suture tensile strength will be present over time to assure a successful result at any given wound site.

Also, many of the above-identified performance parameters and risks can be adequately controlled by labeling disclosures which may be incorporated into a class II standard or required by the class I misbranding controls, which include, among other things, the requirement of adequate directions for use. Disclosures can be made which contain warnings against the use of nonabsorbable polypropylene surgical suture in certain conditions, such as intracamerally in the eye. Also, risks may be avoided by disclosing in labeling that users must be familiar with surgical procedures and techniques involving nonabsorbable polypropylene surgical suture before using it to close wounds.

2. Tissue Inflammatory Response

A tissue inflammatory response is an acute or chronic, localized reaction. Many factors may cause a tissue inflammatory response, including trauma attributed to the implantation of a suture, (Refs. 17, 29, 50, 66, 89, 110, 116, 117, 121, 125, 126 and 137), and foreign body reactions to the suture material (Ref. 74, 87, 107, 119, 121, and 123).

Various studies have documented that an early tissue inflammatory reaction results from the trauma of inserting sutures and does not occur as a result of a reaction to suture material (Refs. 82, 84 and 144). When the suture is placed within tissue with little or no trauma, no inflammatory cell response results, suggesting the conclusion that the body's nonspecific response to tissue injury induces the appearance of inflammatory cells usually seen immediately after suturing (Refs. 31, 87, 107, 119, 146 and 147). The initial reaction of tissues after suturing reflects the amount of injury inherent in the process, and that injury typically is the same for all sutures 5 to 7 days after suturing (Refs. 17, 111, 121, 126, 127 and 137).

The inflammatory response observed beyond 5 to 7 days postoperatively is dependent upon the nature of the specific suture material employed. Specifically, synthetic materials elicit a lesser response than sutures of natural origin (Refs. 29, 110, 116, 117, 119, 121 and 136), and nonabsorbable polypropylene surgical sutures elicit a milder response than absorbable

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

Page 10 -  Mr. Walter S. Hennig

sutures (Refs. 37, 89, 119, 126, 127 and 137).  Additionally, fine gauge sutures provoke a lesser response than large diameter sutures because of their lesser mass and therefore lesser amount of implanted foreign material (Refs. 50 and 136).

Record data show that nonabsorbable polypropylene surgical suture elicits a very mild chronic inflammatory response (Refs. 29, 89, 110, 116, 117, 119, 121, 126, 127 and 137), and because it is ordinarily monofilmentous, this response is among the most benign elicited by any suture material (Ref. 110).  Following the initial inflammatory phase, a mild chronic tissue response to nonabsorbable polypropylene surgical suture is seen which is typically characterized by gradual formation of a fibrous encapsulation of the suture with little or no persistent cellular response (Refs. 87, 107, 119, 146 and 147).  The chronic tissue inflammatory response to nonabsorbable polypropylene surgical suture is observed to be mild, and less than that elicited by certain other sutures (Refs. 87, 107, 119, 146 and 147) even though the chronic inflammatory response to nonabsorbable polypropylene surgical suture may be associated with granuloma formation in certain circumstances and wound sites (Refs. 74, 87, 107, 119, 121 and 123).

Because of the biocompatability of the synthetic polypropylene material, nonabsorbable polypropylene surgical suture has not been associated with allergic and antigenic reactions.  Although the manufacturing process may introduce impurities and residues that can cause tissue inflammatory response, numerous well-established biocompatibility tests provide methods to evaluate a suture's inflammatory potential, including USP tests for impurities and residues, or other state-of-the-art analytical methods (Refs. 8, 9, 10, 12, 51, 53, 62, 65, 72, 86, 93, 96, 97, 104, 106, 112, 132, 133, 134, 145 and 148).

In summary, the risk of early tissue inflammation resulting from trauma is related to the user technique and is no greater for nonabsorbable polypropylene surgical suture than for other suture material.  Further, the foreign body response to nonabsorbable polypropylene surgical suture is mild in nature and, therefore, the suture in some circumstances may be preferred to other nonabsorbable sutures.  Appropriate labeling disclosures related to tissue inflammation may indicate that all nonabsorbable sutures present an inflammatory response and that nonabsorbable polypropylene surgical suture is less pronounced than that of other nonabsorbable sutures.  Moreover, to the extent the manufacturing process may cause residues that introduce a potential for allergic or antigenic reaction, which otherwise is not present with the nonabsorbable polypropylene surgical suture, well-established biocompatibility tests, as part of a standard, exist to evaluate the suture's inflammatory potential.

3.  Infection

Although polypropylene surgical suture is manufactured and marketed as a sterile device in accordance with voluntary standards for sterility (Refs. 7, 9, 133 and 134), it, nonetheless, may exacerbate the effects of an existing wound infection, because of its composition, physical configuration, and duration of contact with tissue (Refs. 15, 16, 29, 31, 35, 36, 40, 45, 48, 50,

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

ETH.MESH.09634673

Page 11 -  Mr. Walter S. Hennig

55, 56, 66, 73, 122, 123, 125, 127 and 141).  It has been established that the presence of suture material in a wound increases the wound's susceptibility to infection where the suture serves as a conduit for the mechanical transport of bacteria (Refs. 15, 29, 31, 36, 40, 50, 55, 66, 73, 108, 123, 125, 127, 136 and 139).  Also, materials which permit the adherence of the largest amount of bacteria cause the greatest degree of post-surgical infection (Refs. 31, 36, 56, 73 and 125).  Indeed, a comparative study of 10 sutures demonstrates that the physical configuration and chemical nature of various suture materials, their coating mechanisms, and the duration of contact between the sutures and bacteria, contribute to the bacterial adherence of the suture.(Ref. 31).  The physical configuration of suture material is found to correlate positively with the degree to which sutures aggravate infected wounds (id.), and the use of suture coatings do not appear to reduce the suture-related infection rate (Refs. 36, 45, 50, 55, 123 and 127).

In the presence of infection or contamination, all sutures appear to potentiate the wound infection (Refs. 29, 45, 48, 50, 123 and 127).  While nonabsorbable polypropylene surgical suture is not unique in its potential to exacerbate infection, it does appear to carry a somewhat lesser risk than other sutures in this regard (Refs. 16, 32, 40, 55, 95, 121, 123, 126, 138 and 170).  The choice of suture material may, therefore, be critical when closing a wound in the presence of infection or potential infection.  Because the nonabsorbable polypropylene surgical suture presents somewhat of a lesser risk than other sutures to potential infection, it is a suture of choice for infected wounds or contaminated wounds that present a substantial risk of infection (Refs. 16, 29, 32, 35, 40, 45, 48, 55, 73, 95, 123, 126, 138, 139, 140 and 141).

In summary, since suture selection may be a critical factor in avoiding the exacerbation of an infection, adequate labeling for the nonabsorbable polypropylene surgical suture, as part of a standard, could state that it is a suture of choice in closing infected or contaminated wounds.

4.  Calculogenesis

Nonabsorbable polypropylene surgical suture, like other suture material, has been shown to be a nidus for calculogenesis when in contact with salt solutions of the bladder and biliary tract (Refs. 47, 66, 107 and 137).  Calculi formation occurs on other natural and synthetic sutures in the bladder, and calculi formation appears to be dependant on the length of time the suture is in contact with urine in the bladder (Refs. 18, 47, 107, 117, and 137).  Studies also report that nonabsorbable polypropylene surgical suture, and other sutures, when exposed to salt solutions in the common bile duct have been associated with stone formation (Refs. 18, 60 and 137).

The risk of calculogenesis resulting from implantation of nonabsorbable polypropylene surgical suture in either the urinary or biliary tract is related to the length of time the suture is in contact with a salt solution in those tracts.  The risk of calculogenesis with nonabsorbable polypropylene surgical suture is typical of that associated with all nonabsorbable sutures. Thus, adequate labeling as part of a standard, can control this risk by stating that it is inadvisable to place nonabsorbable polypropylene surgical

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

Page 12 - Mr. Walter S. Hennig

suture, or for that matter, any suture, in contact with salt solutions in the body's urinary and biliary tracts.

Based on the information presented above, it can be concluded that nonabsorbable polypropylene surgical suture is well characterized and that there is sufficient publicly available valid scientific evidence to demonstrate that a performance standard can be established and used, in combination with the general controls, to provide reasonable assurance of the safety and effectiveness of nonabsorbable polypropylene surgical suture. For control of suture breakage, in particular, for control of suture tensile strength, a standard can assure device safety and effectiveness. See pages 8-9. Likewise, suture-related tissue inflammatory response can be controlled by a performance standard. See page 10.

The act's general controls also make a substantial contribution to the regulation of nonabsorbable polypropylene surgical suture. Manufacturing processes for nonabsorbable polypropylene surgical suture are and will be subject to FDA's Good Manufacturing Practice regulations, and the act's adulteration provisions. Moreover, labeling warnings and disclosures identified throughout this order will provide sufficient control of various nonabsorbable polypropylene surgical suture-related performance parameters or risks to reasonably assure the suture's safe and effective use.

## PRIORITY FOR THE DEVELOPMENT OF A STANDARD

While valid scientific evidence demonstrates that a performance standard may be written to control the material, composition, and physical characteristic of this generic type of device in order to reasonably assure its safety and effectiveness, one is not immediately needed. Existing devices, within the generic type covered by this order, typically conform to voluntary standards, including USP standards for nonabsorbable surgical suture. Moreover, nonabsorbable polypropylene surgical suture, as currently manufactured, has established a reasonable record of safe and effective use. The basic properties, principles of manufacture, and appropriate indications and contra-indications for use of nonabsorbable polypropylene surgical suture are well-established, both scientifically and clinically, as documented in publicly available information contained in the petition (Refs. 28, 39, 63, 64, 75, 76, 90, 98, 107, 121, 126 and 134).

In this matter, significant publicly available information indicates that existing nonabsorbable polypropylene surgical sutures are generally safe and effective (Refs. 24, 29, 39, 63, 75, 76, 80, 85, 98, 107, 110, 117, 121 and 127). Thus, FDA concludes that development of a mandatory performance standard is not immediately necessary to protect the public health.

State-of-the-art test methods are well-established to evaluate and analyze the structure, composition, physical, chemical, mechanical, physicochemical and biological properties of any nonabsorbable polypropylene surgical suture to allow a precise determination to be made of the relative safety and effectiveness of marketed nonabsorbable polypropylene surgical sutures and those intended for commercial distribution. Thus, the determination of

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

ETH.MESH.09634675

Page 13 - Mr. Walter S. Hennig

comparable safety and effectiveness of future nonabsorbable polypropylene surgical suture and marketed sutures can be made in the context of a premarket notification under section 510(k) of the act, 21 USC 360(k).

FDA, therefore, respectfully disagrees with Panel's recommendation that the promulgation of a mandatory performance standard be a high priority. FDA concludes that development of a mandatory performance standard should be a low priority because the establishment of a regulatory standard is not immediately necessary to protect the public health.

CONCLUSION

Based on the information provided in the petition and presented at the panel meeting, and the information submitted to the administrative record, FDA concludes that the generic type of device, nonabsorbable polypropylene surgical suture, should be reclassified from class III to class II with a low priority for the development of a performance standard.

Sincerely yours,

Robert L. Sheridan
Director
Office of Device Evaluation
Center for Devices
    and Radiological Health

Enclosure: References

cc:  Howard R. Asher
     President
     Advanced Biosearch Associates
     3880 Blackhawk Road
     Danville, California  94526-4617

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

Enclosure

REFERENCES FOR NONABSORBABLE POLYPROPYLENE SURGICAL SUTURE

1.  Allen MV, Jones Ed, Snow R, et al: Long-term study of iris sutures in rabbits.  Ophthalmic Surg 13(9):733-6, Sep 1982

2.  Amshel AL: The use of vicryl (Polyglactin 910) sutures in colonic and rectal surgery. Dis Colon Rectum 20(7):636-8, Oct 1977

3.  Andersen JR, et al.:  Polyglycolic acid, silk, and topital ampicillin. Arch Surg 115:293-5, Mar 1980

4.  Apple DJ, Mamalis N, Brady SE, et al: Biocompatibility of implant materials: A review of scanning electron microscopic study. Am Intra-Ocular Implant Soc J 10:53-65, 1984

5.  Apt L, Gaffney WL, Dora AF: Experimental suture studies in strabismus surgery.  II.  Comparison of tensile strength of plain catgut with polyglycolic acid (Dexon) sutures after extraocular muscle surgery. Albrecht von Graefes. Klin Arch Ophthalmol 201:19-27, 1976

6.  Assimos DG, et al.:  Efficacy of polyglycolic acid (PGA) tubing stents in ureteroureterostomies. Urol Res 12:291-3, 1984

7.  Association for the Advancement of Medical Instrumentation: Guideline for industrial ethylene oxide sterilization for medical devices.  AAMI ST27-P-11/87, pp 1-76, Nov 1987

8.  General Plastic Surgery Device Panel's Meeting Transcript, Thursday, October 20, 1988.

9.  American Society for Testing and Materials Standards:

| | | | |
|---|---|---|---|
| a. | #D | 204-82 | Standard Methods of Testing Sewing Threads |
| b. | #D | 1423-82 | Standard Method of Testing for Twist in Yarns by the Direct-Counting Method |
| c. | #D | 1774-79 | Standard Test Methods for Elastic Properties of Textile Fibers |
| d. | #D | 2101-82 | Standard Test Methods for Tensile Properties of Single Man-Made Textile Fibers Taken From Yarns and Tows |
| e. | #D | 2256-80 | Standard Test Method for Breaking Load (Strength) and Elongation of Yarn by the Single Strand Method |
| f. | #D | 2257-80 | Standard Test Method for Extractable Matter in Yarns |
| g. | #D | 2259-85 | Standard Test Methods for Shrinkage of Yarns in Boiling Water or Dry Heat |
| h. | #D | 3217-79 | Standard Test Methods for Breaking Tenacity of Man-Made Textile Fibers in Loop or Knot |

1

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY                    ETH.MESH.09634677

| | | | Configurations |
|---|---|---|---|
| i. | #D | 3412-86 | Standard Test Methods for Coefficient of Friction, Yarn to Yarn |
| j. | #D | 3822-82 | Standard Test Method for Tensile Properties of Single Textile Fibers |
| k. | #F | 469-78 | Standard Practice for Assessment of Compatibility of Nonporous Polymeric Materials for Surgical Implants With Regard to Effect of Materials on Tissue |
| l. | #F | 719-81 | Standard Practice for Testing Biomaterials in Rabbits for Primary Skin Irritation |
| m. | #F | 720-81 | Standard Practice for Testing Guinea Pigs for Contact Allergens: Guinea Pig Maximization Test |
| n. | #F | 748-82 | Standard Practice for Selecting Generic Biological Test Methods for Materials an Devices |
| o. | #F | 749-82 | Standard Practice for Evaluating Material Extracts by Intracutaneous Injection the Rabbit |
| p. | #F | 750-82 | Standard Practice for Evaluating Material Extracts by Systematic Injection in the Mouse |
| q. | #F | 756-82 | Standard Practice for Assessment of Hemolytic Properties of Materials |
| r. | #F | 763-82 | Standard Practice for Short-Term Screening of Implant Materials |
| s. | #F | 813-83 | Standard Practices for Direct Contact Cell Culture Evaluation of Materials for Medical Devices |
| t. | #F | 895-84 | Standard Test Method for Agar Diffusion Cell Culture Screening for Cytotoxicity |

10.  Autian J: Testing for toxicity. In von Recum AS (ed): Handbook of biomaterials evaluation. New York, Macmillan Co (15):167-178, 1986.

11.  Baggish MS, Lee WK: Abdominal wound disruption. Obstet Gynecol 46(5):530-4, Nov 1975

12.  Barenberg SA, et al.: Structural and chemical characterization of polymers. In Techniques of biocompatibility testing.  Williams DF (ed): Boca Raton, CRC Press 2(1):1-47, 1986

13.  Bartone FF, Gardner PJ, Hutson JC: Polyglactin 910 suture in urinary tract. Urology 9(5):521-5, May 1977

14.  Bartone FF, Shires TK: The reaction of kidney and bladder tissue to catgut and reconstituted collagen sutures.  Surg Gynecol Obstet, Jun 1969, pp 1221-5

2

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

ETH.MESH.09634678

15. Blomstedt B, Osterberg B: Fluid absorption and capillarity of suture materials. Acta Chir Scand 143(2):67-70, 1977

16. Bridgens NK: A comparative study of surgical suture materials and closure techniques. J AOA 82(9):715/37-718/40, May 1983

17. Bucknall TE: Factors affecting healing. In Wound healing for surgeons. Bucknall TE, Ellis H (eds). Philadelphia, Bailliere Tindall (3):42-74, 1984

18. Bucknall TE: Wound healing in abdominal operations. Surg Ann 17:1-22, 1985

19. Burcharth F, et al.: Inguinal hernia repair with silk or polyglycolic acid sutures. A controlled trial with 5 years follow up. World J Surg 7(3):446-8, May 1983

20. Cabaud HE, Feagin JA, Rodkey WG: Acute anterior cruciate ligament injury and repair reinforced with a biodegradable intraarticular ligament. Am J Sports Med 10(5):259-65, 1982

21. Calhoun TR, Kitten CM: Polypropylene suture - Is it safe? J Vasc Surg 4(1):98-100, July 1986

22. Cameron AEP, Gray RCF, Talbot RW, et al: Abdominal wound closure: a trial of Prolene and Dexon. Br J Surg 67:487-8, 1980

23. Campbell JR, Marks A: Suture materials and suturing techniques. In Pract 7(3):72-5, May 1985

24. Capperauld I, Bucknall TE: Sutures and Dressings. In wound healing for surgeons. Bucknall TE, Ellis H (eds). Philadelphia, Bailliere Tindall pp 75-93, 1984

25. Case CD, Glenn JF, Postlethwait RW: Comparison of absorbable sutures in urinary bladder. Urology 7(2):165-8, Feb 1976

26. Casey DJ, Lewis OG: Absorbable and Nonabsorbable Suture. In Handbook of Biomaterials Evaluation: Scientific, Technical, and Clinical Testing of Implant Materials. vonRecum AF: New York, Macmillan Publishing Company, ch 7 pp 86-94, 1986

27. Cassie AB: Suture materials and the healing of surgical wounds. In Operative surgery and management. Keen G (ed): Wright PSG, Bristol pp 1-8, 1981

28. Chu CC: Mechanical properties of suture materials. An important characterization. Ann Surg 193(3):365-71, Mar 1981

29. Chu CC: The degradation and biocompatibility of suture materials. In CRC Critical Review in Biocompatibility. Williams DR (ed): ed 3, CRC Press, Boca Raton, FL, vol 1, issue 3, p 261-322, 1985

3

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

ETH.MESH.09634679

30. Chu CC, Moncrief G: An in vitro evaluation of the stability of mechanical properties of surgical suture materials in various pH conditions. Ann Surg 198(2):223-8, Aug 1983

31. Chu CC, Williams DF: Effects of physical configuration and chemical structure of suture materials on bacterial adhesion. A possible link to wound infection. Am J Surg 147:197-204, Feb 1984

32. Clayman HM: Polypropylene. Ophthalmology 88(9):959-64, Sep 1981

33. Corman ML, Veidenheimer MC, Coller JA: Controlled clinical trial of three suture materials for abdominal wall closure after bowel operations. Am J Surg 141:510-3, Apr 1981

34. Dahlke H, Dociu N, Thurau K: Thrombogenicity of different suture materials as revealed by scanning electron microscopy. J Biomed Mater Res 14:251-68, 1980

35. Dardik H, Dardik I, Laufman H: Clinical use of polyglycolic acid polymer as a new absorbable synthetic suture. Am J Surg 121:656-60, Jun 1971

36. de Holl D, Rodeheaver G, Edgerton MT, et al: Potentiation of infection by suture closure of dead space. Am J Surg 127:716-20, Jun 1974

37. Delbeke LO, Gomel V, McComb PF, et al: Histologic reaction to four synthetic microsutures in the rabbit. Fertil Steril 40(2):248-52, Aug 1983

38. Deveney KE, Way LW: Effect of different absorbable sutures on healing of intestinal anastomoses. Am J Surg 133:86-93, Jan 1977

39. Deveney and Dunphy: Wound healing in the gastrointestinal tract. In Fundamentals of wound management. Hunt TK, Dunphy JE (eds): Appleton-Century-Crofts, New York, pp 569-593, 1979

40. Dineen P: The effect of suture material in the development of vascular infection. From the Surgical Bacteriology Research Laboratory, Department of Surgery, The New York Hospital-Cornell Medical Center

41. Donaldson DR, Zoltowski JA, Guillou PJ, et al: Does the type of suture material contribute to the strength of the lateral paramedian incision? Br J Surg 69:163-5, 1982

42. Drews RC: Polypropylene in the human eye. Am Intra-Ocular Implant Soc J 9:137-42, Spring 1983

43. Drews RC: Lens implantation: Lessons learned from the first million. Trans Ophthalmol Soc UK 102:505-9, 1982

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

ETH.MESH.09634680

44. Drews RC: Quality control, and changing indications for lens implantation. Am Acad Ophthalmol 90(4):301-10, Apr 1983

45. Edlich RF, Panek PH, Rodeheaver GT, et al: Physical and chemical configuration of sutures in the development of surgical infection. Ann Surg 177(6):679-88, Jun 1973

46. Edlich RF, Panek PH, Rodeheaver GT, et al: Surgical sutures and infection: A biomaterial evaluation. J Biomed Mater Res Symposium 5:115-26, 1974

47. Edlich RF, Rodeheaver GT, Thacker JG: Considerations in the choice of sutures for wound closure of the genitourinary tract. J Urol 137:373-9, Mar 1987

48. Ellis H: The abdominal wall. In Wound healing for surgeons. Bucknall TE, Ellis H (eds). Philadelphia, Balliere Tindall (7):124-142, 1984

49. Ethicon Inc.: Wound closure manual, 1985

50. Forrester JC: Sutures and sepsis. In Controversies in Surgical Sepsis. Karran S (ed): Praeger, ch 5, pp 43-52, 1980

51. Forster R: Mutagenicity testing and biomaterials. In Techniques of biocompatibility testing.Williams DF (ed): Boca Raton, CRC Press 2(7):137-149, 1986

52. Francois J, Verbraeken J: Polyglycolic acid suture in retinal detachment surgery. Ophthalmologica 174:277-9, 1977

53. Freeman WJ: Characterization of Polymers. In Encyclopedia of Polymer Science & Engineering. Mark HF, et al. (eds). J Wiley & Sons, New York, pp 290-327, 1985

54. Gallitano AL, Kondi ES: The superiority of polyglycolic acid sutures for closure of abdominal incisions. Surg Gynecol Obstet 137:794-6, Nov 1973

55. Georgiade GS: Wound contamination. Postgrad Med 73(3):247-54, Mar 1983

56. Gristina AG, Price JL, Hobgood CD, et al: Bacterial colonization of percutaneous sutures. Surgery 98(1):12-9, Jul 1985

57. Gupta BS, Wolf KW, Postlethwait RW: Effect of suture material and construction on frictional properties of sutures. Surg Gynecol Obstet 161:12-6, Jul 1985

58. Gupta BS, Wolf KW, Postlethwait RW: Effect of lubrication on frictional properties of sutures. Surg Gynecol Obstet 161:416-8, Nov 1985

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

ETH.MESH.09634681

59. Hastings JC, Van Winkle W, Barker E, et al: Effect of suture materials on healing wounds of the stomach and colon. Surg Gynecol Obstet 140:701-7, May 1975

60. Hastings JC, Van Winkle W, Barker E, et al: The effect of suture materials on healing wounds of the bladder. Surg Gynecol Obstet 140:933-7, Jun 1975

61. Hastings JC, et al.: The effect of suture materials on healing wounds of the bladder.  Surg Gynecol Obstet 140:933-7, June 1975

62. Henry TJ (ed): Guidelines for the preclinical safety evaluation of materials used in medical devices. HIMA Report 85(1), 1985

63. Heppenstall: Fracture and Cartilage.  In  Fundamentals of wound management. Hunt TK, Dunhy JE (eds): Appleton-Century-Crofts, New York, pp 524-551, 1979

64. Herrmann JB: Tensile strength and knot security of surgical suture materials. Am Surg pp. 209-17, Apr 1971

65. HIMA guidelines for the analysis of ethylene oxide residues in medical devices, 1980

66. Hunt TK: Wound complications. In Management of Surgical Complications, Artz CP, Hardy JD (eds): ed 3, Philadelphia, W.B. Saunders Co, ch 2, pp 21-32, 1975

67. IMS America Ltd: Total polypropylene suture sales in the United States for 1986 and 1987

68. Irvin TT, Koffman CT, Duthie HL: Layer closure of laparotomy wounds with absorbable and nonabsorbable suture materials. Br J Surg 63:793-6, 1976

69. Johnson CD: Two alternative methods for tying the surgeon's knot with one hand. Surg Gynecol Obstet 164:375-6, Apr 1987

70. Jongebloed WL, Figueras MJ, Humalda D, et al: Mechanical and biochemical effects of man-made fibres and metals in the human eye, a SEM-study. Doc Ophthalmol 61:303-12, 1986

71. Kaminski JM, Katz AR, Woodward SC: Urinary bladder calculus formation on sutures in rabbits, cats and dogs. Surg Gynecol Obstet 146:353-7, Mar 1978

72. Kampf G: Characterization of plastics by physical methods. Experimental techniques and practical application. Hanser Publishers, New York, 1986

73. Katz S, Izbar M, Mirelman D: Bacterial adherence to surgical sutures. A possible factor in suture induced infection. Ann Surg 194(1):35-41, Jul 1981

6

74. Kenady DE: Management of abdominal wounds. Surg Clin North Am 64(4):803-7, Aug 1984

75. Ketchum: Peripheral nerve repair. In Fundamentals of wound management. Hunt TK, Dunphy JE (eds): Appleton-Century-Crofts, New York, pp 450-475, 1979

76. Ketchum: Tendon healing. In Fundamentals of wound management. Hunt TK, Dunphy JE (eds): Appleton-Century-Crofts, New York, pp 500-523, 1979

77. Ketchum LD: Suture materials and suture techniques used in tendon repair. Hand Clin 1(1):43-53, Feb 1985

78. Kleener J: Filtration blebs in corneoscleral wounds sutured with Dexon 7-0 and Dexon 8-0. Acta Ophthalmol 58:957-62, 1980

79. Knight CD, Griffen FD: Abdominal wound closure with a continuous monofilament polypropylene suture. Experience with 1,000 consecutive cases. Arch Surg 118:1305-8, Nov 1983

80. Kon ND, Meredith JW, Poole GV, et al: Abdominal wound closure. A comparison of polydioxanone, polypropylene, and Teflon -coated braided Dacron sutures. Am Surg 50(10):549-51, Oct 1984

81. Konigsberg HA, Presto AJ, Marshall VF: Wound dehiscence in urological patients. J Urol 114:578-80, Oct 1975

82. Kraissl CJ, Kesten BM, Cimiotti JG: The relation of catgut sensitivity to wound healing. Surg Gynecol Obstet 66:628-636, 1938

83. Landymore RW, Marble AE, Cameron CA: Effect of force on anastomotic suture line disruption after carotid arteriotomy. Am J Surg 154:309-12, Sep 1987

84. Langston HT: The problem of catgut sensitivity and its relation to wound healing. Ann Surg 115:141, 1942

85. Lee S, Hailey DM, Lea AR: Tensile strength requirements for sutures. J Pharm Pharmacol 35:65-9, 1983

86. Lifshin E, Williams EA: Analytical methods. In Encyclopedia of Chemical Technology. Mark HF, et al. (eds) J Wiley & Sons, New York, pp 586-683, 1978

87. LoCicero J III, Robbins JA, Webb WR: Complications following abdominal fascial closures using various nonabsorbable sutures. Surg Gynecol Obstet 157(1):25-7, Jul 1983

7

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

ETH.MESH.09634683

88. Magnusson B, Kligman AM: The identification of contact allergans by animal assay: The guinea pig maximization test. J Invest Dermat 52(3):268-276, 1969

89. Macht SD, Krizek TJ: Sutures and suturing - current concepts. J Oral Surg 36:710-2, Sep 1978

90. Marchant LH: Effect of elongation rate on tensile strength of surgical suture materials. Surg Gynecol Obstet 138(2):231-3, 1974

91. Marchant LH, Knapp S, Braun H, et al: Effect of elongation rate on the percentage elongation of surgical suture material. Surg Gynecol Obstet 139:389-91, Sep 1974

92. Marzulli F, Maguire HC: Usefulness and limitations of various guinea-pig tests for skin hypersensitivity. Food Chem Toxicol 20:67-74, 1982

93. Merritt K: Hypersensitivity induction. In Handbook of biomaterials evaluation. von Recum AS (ed): New York, Macmillan Co. (16):179-187, 1986

94. Merritt K: Immunological testing of biomaterials. In Techniques of biocompatibility testing. Williams DF (ed). CRC Press, Boca Raton, Fl., 2(6):123-136, 1986

95. Miller JM, Kimmel LE: Clinical evaluation of monofilament polypropylene suture. Am Surg 33(8):666-70, Aug 1967

96. Mitchell J Jr (ed): Applied polymer analysis and characterization. Hanser Publishers, New York, 1987

97. Mitchell J Jr: Chemical Analysis. In Encyclopedia of Polymer Science & Engineering. Mark HF, et al. (eds). J Wiley & Sons, New York, pp 381-420, 1985

98. Moore and Malone: Vascular repair. In Fundamentals of wound management. Hunt TK, Dunphy JE (eds): Appleton-Century-Crofts, New York, pp. 476-499, 1979

99. Morris MC, Baquero A, eEdovan, et al: Urolithiasis on absorbable and non-absorbable suture materials in the rabbit bladder. J Urol 135:602-3, 1986

100. Mowbray SL, Chang SH, Casella JF: Estimation of the useful lifetime of polypropylene fiber in the anterior chamber. Am Intra-Ocular Implant Soc J 9:143-7, Spring 1983

101. Munton CGF, et al.: Vicryl (Polyglactin 910): A new synthetic absorbable suture in ophthalmic surgery. A preliminary study. Br J Ophthalmol 58:941-7, 1974

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

ETH.MESH.09634684

102. Myhre OA: Correspondence. Breakage of prolene suture. [Letter to the editor.] Am Thorac Surg ____:121, _____

103. Nachemson A, Nordwall A: Wound strength in a clinical material. Scand J Plast Reconstr Surg 9:93-7, 1975

104. Northrup SJ: Mammalian cell culture models. In Handbook of biomaterials evaluation. von Recum AS (ed). New York, Macmillan Co. (19)209-225, 1988

105. Official Monograph for Nonabsorbable Surgical Sutures. In The United States Pharmacopeia, XXI, 21st Revision, pp 1007-1009, 1156-1160 and 1274-1275, 1985 and Fourth Supplement, pp 2225-2226, November 1986

106. Paynter RW: Surface analytical techniques in biomaterials development. In Techniques of biocompatibility testing. Williams DF (ed): Bocat Raton, CRC Press 2(2):49-80, 1986

107. Peacock EE Jr (ed): Wound Repair. ed 3, Philadelphia, W.B. Saunders Company, 1984

108. Pellegrini CA: Postoperative complications. In Current Surgical Diagnosis & Treatment.Way LW (ed): ed 7, Los Altos, CA, Lange Medical Publications, ch 4, pp 23-5, 1985

109. Poole GV, Meredith JW, Kon ND, et al: Suture technique and wound-bursting strength. Am Surg 50(10):569-72, Oct 1984

110. Postlethwait RW: Long-term comparative study of nonabsorbable sutures. Ann Surg 171(6):892-8, 1970

111. Postlethwait RW: Principals of operative surgery: Antisepsis, technique, sutures, and drains. In Davis-Christopher textbook of surgery. The biological basis of modern surgical practice, 12th ed. Sabiston DC (ed), W.D. Saunders Co., Philadelphia, pp 317-332, 1981

112. Rae T: Tissue culture techniques in biocompatibility testing. In Techniques of biocompatibility testing. Williams DF (ed): Boca Raton, CRC Press 2(3):81-93, 1986

113. Rodeheaver GT, Borzelleca DC, Thacker JG, et al: Unique performance characteristics of Novafil . Surg Gynecol Obstet 164:230-6, Mar 1987

114. Ross G, Pavlides C, Long F, et al: Absorbable suture materials for vascular anastomoses. Tensile strength and axial pressure studies using polyglycolic acid sutures. Am Surg 47(12):541-7, Dec 1981

115. Roy J, Guidoin R, Cardou A, et al: Cardiovascular sutures as assessed by scanning electron microscopy. Scanning Electron Microscopy 3:203-10, 1980

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

ETH.MESH.09634685

116.   Salthouse TN: Biologic response to sutures. Otolaryngol Head Neck Surg 88:658-64, Nov-Dec 1980

117.   Salthouse TN: Tissue response to sutures. In Biomaterials in Reconstructive Surgery. Rubin LR (ed): ch 13, pp 131-41, 1983

118.   Salthouse TN, Matlaga BF: An approach to the numerical quantitation of acute tissue response to biomaterials. Biomat Med Dev Art Org 3(1):47-56, 1975

119.   Salthouse TN, Matlaga BF, Wykoff MH: Comparative tissue response to six suture materials in rabbit cornea, sclera, and ocular muscle. Am J Ophthalmol 84(2):224-33, Aug 1977

120.   Sanders RJ: A new monofilament polypropylene suture. Exp Med Surg 28:224-7, 1970

121.   Sanz L, Smith S: Mechanisms of wound healing, suture material, and wound closure. In Strategies in Gynecological Surgery. Buchsbaum HJ, Walton LA (eds): New York, Springer-Verlag, ch 5, pp 53-75, 1986

122.   Scher KS, Bernstein JM, Jones CW: Infectivity of vascular sutures. Am Surg 51(10):577-79, Oct 1985

123.   Sharp WV, Belden TA, King PH, et al: Suture resistance to infection. Surgery 91(1):61-3, Jan 1982

124.   Stephenson KL: Suturing. Surg Clin North Am 57(5):863-73, Oct 1977

125.   Sugarman B, Musher D: In vitro adherence of bacteria to suture materials. Clin Res 28(5):832A, 1981

126.   Swanson NA, Tromovitch TA: Suture materials, 1980s: Properties, uses, and abuses. Int J Dermatol 21(7):373-8, Sep 1982

127.   Taylor TL: Suture material: A comprehensive review of the literature. J Am Podiatry Assoc 65(7):649-61, Jul 1975

128.   Tera H, Aberg C: Tensile strengths of twelve types of knot employed in surgery, using different suture materials. Acta Chir Scand 142:1-7, 1976

129.   Tera H, Aberg C: The strength of suture knots after one week in vivo. Acta Chir Scand 142:301-7, 1976

130.   Tera H, Aberg C: Strength of knots in surgery in relation to type of knot, type of suture material and dimension of suture thread. Acta Chir Scand 143:75-83, 1977

131.   Trimbos JB, Van Rijssel EJC, Klopper PJ: Performance of sliding knots in monofilament and multifilament suture material. Obstet Gynecol 68(3):425, Sep 1986

10

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY                    ETH.MESH.09634686

132.   Tripartite biocompatibility guidance for medical devices, 1986

133.   United States Pharmacopeia, Revision XXI, 1985:

   a.      Physical Tests, <621> Chromatography
   b.      Physical Tests, <761> Nuclear Magnetic Resonance
   c.      Physical Tests, <851> Spectrophotometry and Light-Scattering
   d.      Physical Tests, <861> Sutures - Diameter
   e.      Physical Tests, <871> Sutures - Needle Attachment
   f.      Physical Tests, <881> Tensile Strength
   g.      Physical Tests, <661> Containers, Biological Tests -Plastics
   h.      Biological Tests, <85> Bacterial Endotoxins Test
   i.      Biological Tests, <71> Sterility

134.   United States Surgical Corporation's Reclassification Petition. Docket No. 88P-0173

135.   United States Surgical Corporation's letter dated May 15, 1989

136.   Valcke H, Marquet JFE: Suture materials. Acta Otorhinolaryngol Belg 37(3):457-70, 1983

137.   Van Winkle W Jr, Hastings JC: Considerations in the choice of suture material for various tissues. Surg Gynecol Obstet 135:113-26, July 1972

138.   Van Winkle W Jr, Hastings JC, Barker E, et al: Effect of suture materials on healing skin wounds. Surg Gynecol Obstet 140:7-12, Jan 1975

139.   Varma S, Ferguson HL, Breen H, et al: Comparison of seven suture materials in infected wounds - an experimental study. J Surg Res 17(3):165-70, Sep 1974

140.   Varma S, Johnson LW, Ferguson HL, et al: Tissue reaction to suture materials in infected surgical wounds - a histopathologic evaluation. Am J Vet Res 42(4):563-70 Apr 1981

141.   Varma S, Lumb WV, Johnson LW, et al: Further studies with polyglycolic acid (Dexon) and other sutures in infected experimental wounds. Am J Vet Res 42(4):571-4, Apr 1981

142.   von Fraunhofer JA, Storey RS, Stone IK, et al.: Tensile strength of suture materials.  J Biomed Mat Res 19:595-600, 1985

143.   Watts DR, Carr SH, Hohf Rp: Poly(Glycolic Acid) sutures in canine vascular anastomoses.  J Biomed Mater Res 10:867-77, 1976

144.   Whipple AO, Elliott RE: The repair of abdominal incisions. Ann Surg 108:741, 1938

11

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY                    ETH.MESH.09634687

145. Wilson RS, Lelah MD, Cooper SL: Blood-material interactions. An assessment of in vitro and in vivo test methods. In Techniques of biocompatibility testing.Williams DF (ed): Boca Raton, CRC Press 2(8):151-181, 1986

146. White RA, Kopchok G, Donayre C, et al: Comparison of laser-welded and sutured arteriotomies. Arch Surg 121:1133-5, Oct 1986

147. White RA, Abergel RP, Lyons R, et al: Laser welding: An alternative method of venous repair. J Surg Res 41:260-63, 1986

148. Woodward SC, Salthouse TN: The tissue response to implants and its evaluation by light microscopy. In Handbook of biomaterials evaluation.von Recum AS (ed): New York, Macmillan Co. (30):364-378, 1986

149. Yamanaka A, Nakamae K, Takeuchi M, et al: Scanning electron microscope study on the biodegradation of IOL and suturing materials. Trans Ophthalmol Soc UK 104:517-21, 1985

150. Letters from FDA to United States Surgical Corporation granting export rights of nonabsorbable polypropylene surgical suture to The Netherlands, Italy, France, Switzerland and West Germany.

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

ETH.MESH.09634688

# Exhibit 40



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Public Health Service

Food and Drug Administration
1390 Piccard Drive
Rockville, MD 20850

OCT 12 1990

Mr. James P. O'Donnell
Manager
Regulatory Affairs
Ethicon, Inc.
P.O. Box 151
Somerville, New Jersey 08876-0151

REGULATORY AFFAIRS

OCT 15 1990

RECEIVED

Re: N16374
    PROLENE™, Polypropylene Nonabsorbable Suture

Dear Mr. O'Donnell:

The Center for Devices and Radiological Health (CDRH) of the Food and Drug
Administration (FDA) reclassified the nonabsorbable poypropylene surgical
suture on July 5, 1990, effective on that date, from Class III into Class
II (order enclosed). Notice of this reclassification will be announced in
a future Federal Register notice. This letter constitutes notification
that devices approved for commercial distribution under your PMA, N16374
and supplements 1 through 35, of your PMA, have also been reclassified into
Class II.

FDA identified nonabsorbable polypropylene surgical suture as follows:

> Nonabsorbable polypropylene surgical suture is a monofilament,
> nonabsorbable, sterile, flexible thread prepared from long-chain
> polyolefin polymer known as polypropylene and is intended for
> use in soft tissue approximation. The polypropylene surgical
> suture meets USP requirments as described in the USP Monograph
> for Nonabsorbable Surgical Sutures; it may be undyed or dyed
> with an FDA approved color additive; and the suture may be
> provided with or without a standard needle attached.

Accordingly, FDA has determined that your devices, as approved for
marketing under your PMA and PMA supplements, are included in this generic
type of device and are, therefore, reclassified into Class II. Although
your devices were originally approved under an NDA/PMA application for
commercial distribution, you may continue to market your devices subject to
the general controls provisions of the Federal Food, Drug, and Cosmetic Act
(act) and any performance standards promulgated under section 514 of the
act. As such, any new device or any modification to your existing
device(s) is subject to the premarket notification provisions of 21 CFR
807.81, and may require a determination of substantial equivalence in order
to be marketed.

**CONFIDENTIAL**
**SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY**

ETH.MESH.09634662

Page 2 - Mr. James O'Donnell

If you have any questions, please contact Kenneth A. Palmer, Ph.D., at (301) 427-1090.

Sincerely yours,

Robert L. Sheridan
Director
Office of Device Evaluation
Center for Devices and
  Radiological Health

Enclosure

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

ETH.MESH.09634663

# Exhibit 41

SECTION 1

## MODIFIED DEVICE AND DESCRIPTION

**Name of the Device**    Modified PROLENE polypropylene mesh

| CLASSIFICATION | COMMON NAME | TRADE NAME/ PROPRIETARY NAME |
|---|---|---|
| Class II Medical Device, 21 CFR§878.3300 | PROLENE polypropylene mesh | PROLENE polypropylene mesh nonabsorbable synthetic surgical mesh |

**Establishment Registration Number**

The ETHICON, Inc. establishment registration number is 2210968.

**Device Classification**

The FDA has classified PROLENE mesh as a Class II Medical Device under the Division of General and plastic surgery devices (21 CFR§878.3300).

**Change or Modification to an Existing Device**

Modified PROLENE mesh is a change to an existing preamendment device PROLENE polypropylene mesh nonabsorbable synthetic surgical mesh (see Appendix I for documentation of preamendment status). The modification is to supply additional sizes and a precut key hole shape (see Appendix II). Surgeons routinely cut current product to optimal shapes and prepare a keyhole to accommodate the spermatic cord during the repair of inguinal hernias. Therefore, these changes are intended to provide more convenient shapes and sizes for the same surgical uses.

This is not a Notification for a new device.

**Performance Standards**

No special controls in the form of performance standards, postmarket surveillance requirements, patient registry requirements have been established for this device. ETHICON, Inc. will comply when any such controls are promulgated.

Continued on next page

Modified PROLENE polypropylene mesh nonabsorbable synthetic surgical mesh
ETHICON, Inc.

1

ETH.MESH.05217110

MODIFIED DEVICE AND DESCRIPTION, Continued

**Physical Description**

Modified PROLENE mesh  is constructed of knitted filaments of extruded polypropylene identical in composition to that used in PROLENE* polypropylene suture nonabsorbable surgical sutures, U.S.P. (ETHICON, Inc.)  The mesh is approximately 0.027 inches thick. This material, when used as a suture, has been reported to be nonreactive and to retain its strength indefinitely in clinical use. The preamendment device, PROLENE  mesh, is constructed of the same knitted filaments.

**This Notification is to request clearance for labeling changes to add additional sizes and a precut key hole shape .**

Modified PROLENE  mesh is knitted by a process which interlinks each fiber junction and which provides for elasticity in both directions. This construction permits the mesh to be cut into any shape or size without unraveling. The precut key hole shape is being provided as a convenience to the surgeon. The preamendment predicate device, PROLENE mesh, is made from the same knitting process.

Modified PROLENE mesh is available in single packets as sterile undyed (clear ) sheets in seven sizes. The sizes available are 2.5 x 10 cm (1 x 4 inches), 6 x 11cm (2.5 x 4.5 inches), 7.6 x 12.7 cm (3 x 5 inches), 4.5 x 10 cm (1.8 x 4 inches), 6 x 13.7 cm (2.4 x 5.4 inches), 15 x 15 cm (6 x 6 inches), 30 x 30 cm (12 x 12 inches).  Each sheet is 0.7 mm (0.027 inch) thick.

---

ETH.MESH.05217111

# Exhibit 42



**DEPARTMENT OF HEALTH & HUMAN SERVICES**                    Public Health Service

AUG - 9 1996

Food and Drug Administration
9200 Corporate Boulevard
Rockville MD 20850

John D. Paulson, Ph.D.
Vice President, Regulatory Affairs
Ethicon, Inc.
P.O. Box 151
Somerville, New Jersey  08876-0151

RECEIVED
AUG 16 1996
JOHN D. PAULSON

Re:  K962530
     PROLENE Polypropylene Mesh Nonabsorbable Synthetic
       Surgical Mesh
     Regulatory Class:  II
     Product Code:  FTL
     Dated:  June 25, 1996
     Received:  June 28, 1996

Dear Dr. Paulson:

We have reviewed your Section 510(k) notification of intent to
market the device referenced above and we have determined the
device is substantially equivalent (for the indications for
use stated in the enclosure) to devices marketed in interstate
commerce prior to May 28, 1976, the enactment date of the
Medical Device Amendments, or to devices that have been
reclassified in accordance with the provisions of the Federal
Food, Drug, and Cosmetic Act (Act).  You may, therefore,
market the device, subject to the general controls provisions
of the Act.  The general controls provisions of the Act
include requirements for annual registration, listing of
devices, good manufacturing practice, labeling, and
prohibitions against misbranding and adulteration.

If your device is classified (see above) into either class II
(Special Controls) or class III (Premarket Approval), it may
be subject to such additional controls.  Existing major
regulations affecting your device can be found in the Code of
Federal Regulations, Title 21, Parts 800 to 895.  A
substantially equivalent determination assumes compliance with
the Good Manufacturing Practice for Medical Devices:  General
(GMP) regulation (21 CFR Part 820) and that, through periodic
GMP inspections, the Food and Drug Administration (FDA) will
verify such assumptions.  Failure to comply with the GMP
regulation may result in regulatory action.  In addition, FDA
may publish further announcements concerning your device in
the Federal Register.  Please note:  this response to your
premarket notification submission does not affect any
obligation you might have under sections 531 through 542 of
the Act for devices under the Electronic Product Radiation
Control provisions, or other Federal laws or regulations.

ETH.MESH.05217098

Page 2 - Dr. John D. Paulson

This letter will allow you to begin marketing your device as described in your 510(k) premarket notification.  The FDA finding of substantial equivalence of your device to a legally marketed predicate device results in a classification for your device and thus, permits your device to proceed to the market.

If you desire specific advice for your device on our labeling regulation (21 CFR Part 801 and additionally 809.10 for in vitro diagnostic devices), please contact the Office of Compliance at (301) 594-4595.  Additionally, for questions on the promotion and advertising of your device, please contact the Office of Compliance at (301) 594-4639.  Also, please note the regulation entitled, "Misbranding by reference to premarket notification" (21 CFR 807.97).  Other general information on your responsibilities under the Act may be obtained from the Division of Small Manufacturers Assistance at its toll-free number (800) 638-2041 or at (301) 443-6597.

Sincerely yours,

Celia M. Witten, Ph.D., M.D.
Director
Division of General and
    Restorative Devices
Office of Device Evaluation
Center for Devices and
    Radiological Health

Enclosure

## INDICATION FOR USE

510(k) Number (if known): _____K 96 2530_____

Device Name:         Modified PROLENE polypropylene mesh nonabsorbable
                     synthetic surgical mesh

Indications for Use:  Modified PROLENE polypropylene mesh is indicated for the
                     repair of hernia and other fascial deficiencies that require the
                     addition of a reinforcing or bridging material to obtain the
                     desired surgical result.

## (PLEASE DO NOT WRITE BELOW THIS LINE - CONTINUE ON
## ANOTHER PAGE IF NEEDED)

_____   _____   _____
              Concurrence of CDRH, Office of Device Evaluation (ODE)

                                          (Division Sign-Off)
                                          Division of General Restorative Devices
                                          510(k) Number _____ K 96 2530

Prescription Use _____√_____          OR          Over-The Counter Use _____
(Per 21 CFR 801.109)

                                          (Optional Format 1-2-9G)

_____
Modified PROLENE polypropylene mesh nonabsorbable synthetic surgical mesh
ETHICON, Inc.                                                        iii

ETH.MESH.05217100

# Exhibit 43

# SECTION 1

## NEW DEVICE AND DESCRIPTION

**Name of the Device**

| CLASSIFICATION NAME | COMMON NAME | TRADE NAME/ PROPRIETARY NAME |
|---|---|---|
| Mesh, Surgical, Polymeric (21CFR, §878.3300) | Pubourethral Sling | To be determined |

**Establishment Registration Number**

The ETHICON, Inc. establishment registration number is #2210968

**Manufacturer**

This device is distributed by ETHICON, Inc. The device is manufactured by MedScand Medical, P.O. Box 20047, S200 74, Malmo, Sweden.

**Device Classification**

Surgical mesh is classified by the FDA as a Class II Medical Device, General and Plastic Surgery Devices (21CFR, §878.3300, Product Code 79FTL).

**Change or Modification to an Existing Device**

The Tension Free Vaginal Tape (TVT) System is a new device, not a modification to an existing device.

Continued on next page

Tension Free Vaginal Tape (TVT) System
ETHICON, Inc.

1

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY          ETH.MESH.08476243

NEW DEVICE AND DESCRIPTION, Continued

**Performance Standards**

Mandatory Standards:  No special controls in the form of performance standards, postmarket surveillance requirements or patient registry requirements have been established for this device.  ETHICON, Inc. will comply with any such controls when promulgated.

**Physical Description**

The Tension Free Vaginal Tape (TVT) System includes the device and its accessories.  The device and accessories are sold separately or as a set.  The system consists of the following:

Device:
      TVT Device (Sterile, Single-Use)

Accessories (used in conjunction with the device):
      TVT Introducer (Non-Sterile, Reusable)
      TVT Rigid Catheter Guide (Non-Sterile, Reusable)

**TVT Device Description:**

The TVT Device is a sterile, single-use device that is composed of polypropylene mesh (also referred here-in as a tape) with approximate dimensions of 0.5 x 16 inches (1.1 x 40cm).  This is the same Polypropylene Mesh that is used to fabricate PROLENE polypropylene mesh (K962530).  The PROLENE mesh is fabricated from polypropylene strands.  These same strands are used to fabricate PROLENE polypropylene Nonabsorbable Surgical Suture (NDA/PMA #16-374) manufactured and marketed by ETHICON, Inc.  The mesh is covered with a polyethylene sheath that is cut in the middle across the width (separating the sheath into two pieces).  Both the mesh (tape) and sheath are attached at each end to two stainless steel needles by a plastic shrink tubing (collar).  The device is used with its dedicated accessories which are described below.

Continued on next page

Tension Free Vaginal Tape (TVT) System
ETHICON, Inc.

2

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

ETH.MESH.08476244

NEW DEVICE AND DESCRIPTION, Continued

**Physical Description (continued)**

### Accessories Description:

The TVT Introducer (Accessory) is provided non-sterile for sterilization before surgical use. It is reusable. The introducer is made of stainless steel. It is composed of three (3) parts; 1) handle; 2) threaded staft and 3) rubber O-ring (extra O-rings are provided in the packaged accessory). The metal staft is threaded on one end and notched on the other end for location of the O-ring. The metal staft is contained (inserted) within the handle of the introducer. The introducer functions to facilitate passage of the TVT device from the vagina to abdominal skin.

The TVT Rigid Catheter Guide (Accessory) is provided non-sterile for sterilization before surgical use. It is reusable. The guide is made of stainless steel. The guide is used to add rigidity to the Foley Catheter.

Tension Free Vaginal Tape (TVT) System
ETHICON, Inc.

3

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY                    ETH.MESH.08476245

# Exhibit 44

**DEPARTMENT OF HEALTH & HUMAN SERVICES**                    Public Health Service

                                                            Food and Drug Administration
                                                            9200 Corporate Boulevard
                                                            Rockville MD 20850

                                                            JAN 28 1998

Mr. Gregory R. Jones
·Director, Regulatory Affairs
Ethicon, Inc.
P.O. Box 151
Somerville, New Jersey  08876-0151


Re:  K974098
     Tension Free Vaginal Tape (TVT) System
     Regulatory Class:  II
     Product Code:  FTL
     Dated:  October 29, 1997
     Received:  October 30, 1997


·Dear Mr. Jones:

We have reviewed your Section 510(k) notification of intent to
market the device referenced above and we have determined the
device is substantially equivalent (for the indications for
use stated in the enclosure) to devices marketed in interstate
commerce prior to May 28, 1976, the enactment date of the
Medical Device Amendments, or to devices that have been
reclassified in accordance with the provisions of the Federal
Food, Drug, and Cosmetic Act (Act).  You may, therefore,
market the device, subject to the general controls provisions
of the Act.  The general controls provisions of the Act
include requirements for annual registration, listing of
devices, good manufacturing practice, labeling, and
prohibitions against misbranding and adulteration.

If your device is classified (see above) into either class II
(Special Controls) or class III (Premarket Approval), it may
be subject to such additional controls.  Existing major
regulations affecting your device can be found in the Code of
Federal Regulations, Title 21, Parts 800 to 895.  A
substantially equivalent determination assumes compliance with
the current Good Manufacturing Practice requirement, as set
forth in the Quality System Regulation (QS) for Medical
Devices:  General regulation (21 CFR Part 820) and that,
through periodic (QS) inspections, the Food and Drug
Administration (FDA) will verify such assumptions.  Failure to
comply with the GMP regulation may result in regulatory
action.  In addition, FDA may publish further announcements
concerning your device in the Federal Register.  Please note:
this response to your premarket notification submission does
not affect any obligation you might have under sections 531
through 542 of the Act for devices under the Electronic
Product Radiation Control provisions, or other Federal laws or
regulations.

**CONFIDENTIAL**
**SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY**                    ETH.MESH.08476211

Page 2 - Mr. Gregory R. Jones

This letter will allow you to begin marketing your device as described in your 510(k) premarket notification.  The FDA finding of substantial equivalence of your device to a legally marketed predicate device results in a classification for your device and thus, permits your device to proceed to the market.

If you desire specific advice for your device on our labeling regulation (21 CFR Part 801 and additionally 809.10 for in vitro diagnostic devices), please contact the Office of Compliance at (301) 594-4595.  Additionally, for questions on the promotion and advertising of your device, please contact the Office of Compliance at (301) 594-4639.  Also, please note the regulation entitled, "Misbranding by reference to premarket notification" (21 CFR 807.97).  Other general information on your responsibilities under the Act may be obtained from the Division of Small Manufacturers Assistance at its toll-free number (800) 638-2041 or (301) 443-6597 or at its internet address "http://www.fda.gov/cdrh/dsmamain.html".

Sincerely yours,

Celia M. Witten, Ph.D., M.D.
Director
Division of General and
   Restorative Devices
Office of Device Evaluation
Center for Devices and
   Radiological Health

Enclosure

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

## INDICATION FOR USE

510(k) Number (if known): _____

Device Name:            Tension Free Vaginal Tape (TVT) System

Indications for Use:    The TVT device is a sterile, single-use device intended to be
                        used as a pubourethral sling indicated for treatment of stress
                        urinary incontinence (SUI), for female urinary incontinence
                        resulting from urethral hypermobility and/or intrinsic sphincter
                        deficiency.  The TVT Introducer and Rigid Catheter Guide
                        accessories are intended to facilitate placement of the TVT
                        device.  The accessories, available separately, are provided non-
                        sterile and are reusable.

## (PLEASE DO NOT WRITE BELOW THIS LINE - CONTINUE ON ANOTHER PAGE IF NEEDED)

_____

Concurrence of CDRH, Office of Device Evaluation (ODE)

Prescription Use ___×___          OR          Over-The Counter Use _____
(Per 21 CFR 801.109)
                              _Dccece_____ (Optional Format 1-2-9G)
                              (Division Sign Off)
                              [    ...al Re    ]
                              510(k) Number _____  _K974070_

_____

Tension Free Vaginal Tape (TVT) System
ETHICON, Inc.

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY                    ETH.MESH.08476213

# Exhibit 45

SECTION 1

## MODIFIED DEVICE AND DESCRIPTION

**Name of the Device**

| CLASSIFICATION NAME | COMMON NAME | TRADE NAME/ PROPRIETARY NAME |
|---|---|---|
| Mesh, Surgical, Polymeric (21CFR, §878.3300) | Pubourethral Sling | GYNECARE Tension-Free Vaginal Tape System |

**Establishment Registration Number**

GYNECARE is a Division of ETHICON, Inc a *Johnson and Johnson* Company. The establishment registration number for GYNECARE, a Division of ETHICON, Inc. is #2210968.

**Manufacturer**

This device is distributed by GYNECARE a Division of ETHICON, Inc., P.O. Box 151, Somerville, NJ 08876-0151. The modified TVT Blue device is manufactured in Neuchatel, Switzerland by ETHICON SarL. The TVT-AA Abdominal Guides and Couplers are manufactured in the USA by GYNEACRE a Division of ETHICON, Inc., Somerville, NJ.

**Device Classification**

Surgical mesh is classified by the FDA as a Class II Medical Device, General and Plastic Surgery Devices (21CFR, §878.3300, Product Code 79FTL).

**Predicate Device(s)**

TVT-blue is a modification of the currently marketed TVT device and accessories covered under 510(k) K974098 cleared January 28, 1998. It contains the same blue pigmented polypropylene monofilaments as the currently cleared PROLENE* SOFT Polypropylene Mesh K001122 cleared on May 23, 2000.

Continued on next page

\* Trademark

Modified TVT Blue and TVT-AA
GYNECARE a Division of ETHICON

1

ETH.MESH.10039090

MODIFIED DEVICE AND DESCRIPTION, Continued

**Predicate Device Continued**

The predicate device for the accessory TVT-AA abdominal guides is the Stamey Needle manufactured by COOK OB/GYN, K884553, cleared November 14, 1988. Other similar predicate devices include various Stamey Needles manufactured by Cook OB/GYN as well as the Raz and Pereyra.

**Change or Modification to an Existing Device**

The modified TVT Blue System is a modification to the existing Tension Free Vaginal System (TVT) system herein referred to as the TVT System. TVT-Blue is distinguished by the inclusion of blue pigmented polypropylene fibers (approximately 50%) interwoven in the same manner as the current unpigmented TVT device. The blue pigmented monofilaments are made from the same unpigmented polypropylene fibers colored with blue pigment [Phthalocyaninato(2-)] copper. The Color Index Number is 74160 as referenced in 21CFR § 74.3045. This is the same color additive used in PROLENE* Polypropylene Suture. The purpose of the blue monofilaments is to offer greater visibility of the TVT mesh as it is placed along the midurethra.

TVT-AA is an accessory to the TVT system. TVT-AA will be available as an accessory to the unpigmented predicate TVT device and to the modified TVT blue device. TVT-AA consists of two disposable abdominal guides and two disposable couplers to facilitate the placement of the TVT mesh using an abdominal approach. TVT is currently placed transvaginally. The abdominal guides and couplers allow Urologists, who are more comfortable with an abdominal approach as a result of their training, to apply TVT mesh using an abdominal approach versus a transvaginal approach. The placement of the TVT mesh is unchanged as it is placed on the midurethra. This is not a new device only an alternative approach to accessing the vagina for placement of TVT mesh.

Continued on next page

Modified TVT Blue and TVT-AA
GYNECARE a Division of ETHICON

2.

ETH.MESH.10039091

MODIFIED DEVICE AND DESCRIPTION, Continued

**Performance Standards**

No special controls in the form of performance standards, postmarket surveillance requirements or patient registry requirements have been established for this device. GYNECARE a Division of ETHICON, Inc. will comply with any such controls when promulgated.

**Physical Description**

The current Tension Free Vaginal Tape (TVT) System currently includes the device and its accessories. The device and accessories are sold separately or as a set. The system consists of the following:

Device:  TVT Device (Sterile, Single-Use)
Accessories (used in conjunction with the device):
      TVT Introducer (Non-Sterile, Reusable)
      TVT Rigid Catheter Guide (Non-Sterile, Reusable)
      **TVT Abdominal Guides and Couplers provided sterile (packaged with TVT Single-Use Device)**

**TVT- Blue System Description:**

The TVT blue device is a sterile, single-use device that is composed of one piece of approximately 50% unpigmented and 50% pigmented blue [(Phthalocyaninato(2-) copper], Colour index. Number 74160) polypropylene mesh (referred here-in as a tape) with approximate dimensions of 0.5 x 16 inches (1.1 x 40cm). This is the same Polypropylene Mesh that is used to fabricate PROLENE* Soft Polypropylene mesh (K001122) and PROLENE* Polypropylene Mesh (K962530). The PROLENE mesh is fabricated from polypropylene strands of clear and clear/blue pigmented polypropylene fiber. The blue pigmented polypropylene monofilaments comprise approximately 50% of the mesh. These same strands are used to fabricate PROLENE* Polypropylene Nonabsorbable Surgical Suture, undyed of blue pigment, (NDA/PMA #16-374) manufactured and marketed by ETHICON, Inc. The mesh is covered with a polyethylene sheath that is cut in

Continued on next page

Modified TVT Blue and TVT-AA
GYNECARE a Division of ETHICON

3

ETH.MESH.10039092

MODIFIED DEVICE AND DESCRIPTION, Continued

**Physical Description
Continued**

the middle across the width (separating the sheath into two pieces). Both the mesh (tape) and sheath are attached at each end to two stainless steel needles by a plastic shrink tubing (collar). The device is used with its dedicated accessories, TVT Introducer and Rigid Catheter Guide, and may be used with the TVT-AA accessory to facilitate an abdominal approach as described below.

**TVT-AA Accessory Description:**

The TVT-AA consists of two disposable stainless steel abdominal guides and two disposable polypropylene couplers. It is provided sterile. The tip of the abdominal guide is designed to accept the smaller, tapered end of the coupler with a press fit, while the distal, or wider end is designed to accept the current TVT needle with a press fit. The abdominal guides allow Urologists, who are already more familiar with an abdominal approach, to pass the guides from an abdominal insertion out through the vagina. The couplers are attached to the TVT needle and then attached to the abdominal guide. The TVT needle, and tape are then passed back up the vagina toward the abdomen (current procedure) following the path of the guide. The TVT needle is pushed from below, per the current instructions for use and the guide is used to simply "guide the interlocked unit out through the abdomen. The abdominal approach does not change the intended use of the TVT, unpigmented or blue mesh, but simply offers a choice of an abdominal approach or a transvaginal approach to TVT, sling repair.

Modified TVT Blue and TVT-AA
GYNECARE a Division of ETHICON

4

ETH.MESH.10039093

# Exhibit 46



**DEPARTMENT OF HEALTH & HUMAN SERVICES**                    Public Health Service

OCT 2 6 2001

Food and Drug Administration
9200 Corporate Boulevard
Rockville MD 20850

Gregory R. Jones
Director of Regulatory Affairs
 and Quality Assurance
Gynecare
Division of Ethicon , Inc.
P.O. Box 151
Somerville, New Jersey 08876

Re: K012628
    Trade/Device Name: GYNECARE Tension-Free Vaginal Tape (TVT) Blue System
    Regulation Number: 878.3300
    Regulation Name: Surgical Mesh
    Regulatory Class: II
    Product Code: FTL
    Dated: August 9, 2001
    Received: August 13, 2001

Dear Mr. Jones:

We have reviewed your Section 510(k) premarket notification of intent to market the device
referenced above and have determined the device is substantially equivalent (for the indications
for use stated in the enclosure) to legally marketed predicate devices marketed in interstate
commerce prior to May 28, 1976, the enactment date of the Medical Device Amendments, or to
devices that have been reclassified in accordance with the provisions of the Federal Food, Drug,
and Cosmetic Act (Act) that do not require approval of a premarket approval application (PMA).
You may, therefore, market the device, subject to the general controls provisions of the Act. The
general controls provisions of the Act include requirements for annual registration, listing of
devices, good manufacturing practice, labeling, and prohibitions against misbranding and
adulteration.

If your device is classified (see above) into either class II (Special Controls) or class III (PMA), it
may be subject to such additional controls. Existing major regulations affecting your device can
be found in the Code of Federal Regulations, Title 21, Parts 800 to 898. In addition, FDA may
publish further announcements concerning your device in the Federal Register.

Please be advised that FDA's issuance of a substantial equivalence determination does not mean
that FDA has made a determination that your device complies with other requirements of the Act
or any Federal statutes and regulations administered by other Federal agencies. You must
comply with all the Act's requirements, including, but not limited to: registration and listing (21
CFR Part 807); labeling (21 CFR Part 801); good manufacturing practice requirements as set

ETH.MESH.10039077

Page 2 – Mr. Gregory R. Jones

forth in the quality systems (QS) regulation (21 CFR Part 820); and if applicable, the electronic product radiation control provisions (Sections 531-542 of the Act); 21 CFR 1000-1050.

This letter will allow you to begin marketing your device as described in your Section 510(k) premarket notification. The FDA finding of substantial equivalence of your device to a legally marketed predicate device results in a classification for your device and thus, permits your device to proceed to the market.

If you desire specific advice for your device on our labeling regulation (21 CFR Part 801 and additionally 21 CFR Part 809.10 for in vitro diagnostic devices), please contact the Office of Compliance at (301) 594-4659. Additionally, for questions on the promotion and advertising of your device, please contact the Office of Compliance at (301) 594-4639. Also, please note the regulation entitled, "Misbranding by reference to premarket notification" (21 CFR Part 807.97). Other general information on your responsibilities under the Act may be obtained from the Division of Small Manufacturers, International and Consumer Assistance at its toll-free number (800) 638-2041 or (301) 443-6597 or at its Internet address http://www.fda.gov/cdrh/dsma/dsmamain.html

Sincerely yours,

Celia M. Witten, Ph.D., M.D.
Director
Division of General, Restorative
and Neurological Devices
Office of Device Evaluation
Center for Devices and
Radiological Health

Enclosure

**INDICATION FOR USE**        *K 012628*

510(k) Number (if known): _____

Device Name:            <u>Tension Free Vaginal Tape (TVT) Blue System</u>

Indications for Use:    The TVT device is intended to be used as a pubourethral sling
                        indicated for treatment of stress urinary incontinence (SUI) for
                        female urinary incontinence resulting from urethral hypermobility
                        and/or intrinsic sphincter deficiency.  The TVT Introducer, Rigid
                        Catheter Guide and TVT Abdominal Guides and Couplers are
                        accessories intended to facilitate placement of the TVT device.

(PLEASE DO NOT WRITE BELOW THIS LINE - CONTINUE ON
ANOTHER PAGE IF NEEDED)

Concurrence of CDRH, Office of Device Evaluation (ODE)

Prescription Use _____        OR _____ Over-The Counter Use _____
(Per 21 CFR 801.109)

                        **(Division Sign-Off)**        (Optional Format 1-2-9G)
                        **Division of General, Restorative**
                        **and Neurological Devices**

Modified TVT Blue and TVT-AA  **510(k) Number** *K012628*

ETH.MESH.10039079

# Exhibit 47

## SECTION 1

### MODIFIED DEVICE AND DESCRIPTION

**Name of the Device**

| CLASSIFICATION NAME | COMMON NAME | TRADE NAME/ PROPRIETARY NAME |
|---|---|---|
| Mesh, Surgical, Polymeric (21CFR, §878.3300) | Pubo-urethral Sling | GYNECARE TVT Obturator System |

**Establishment Registration Number**

GYNECARE is a Division of ETHICON, Inc a *Johnson and Johnson* Company. The establishment registration number for GYNECARE, a Division of ETHICON, Inc. is #2210968.

**Device Classification**

Surgical mesh is classified by the FDA as a Class II Medical Device, General and Plastic Surgery Devices (21CFR, §878.3300, Product Code 79FTL).

**Predicate Device(s)**

The fundamental scientific technology of the GYNECARE TVT Obturator device is unchanged from the predicate device. GYNECARE TVT Obturator device is a modification of the currently marketed GYNECARE TVT device covered under 510(k) K974098 cleared January 28, 1998. It contains the same blue pigmented polypropylene monofilaments as the currently cleared TVT Blue with Abdominal Guides K012628 cleared on October 26, 2001.

The predicate device for the accessories; Helical Passers and Winged Guide is the GYNECARE TVT AA Abdominal Guides covered under 510(k) K012628 cleared on October 26, 2001. Another similar predicate device is the American Medical Systems' MONARC[TM] Subfacial Hammock Helical Needles covered under 510(k) K02356 cleared on November 19, 2002.

GYNECARE TVT Obturator System
GYNECARE a Division of ETHICON, Inc.

000001

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY                    ETH.MESH.07876943

| | |
|---|---|
| **Change or Modification to an Existing Device** | GYNECARE TVT Obturator System maintains the same fundamental scientific technology as the predicate device. The primary change to the device is the replacement of the needles with plastic tube receptacles to accommodate the accessory; Helical Passer (provided assembled for convenience). The PROLENE mesh implant and plastic sheath remain unchanged.

Two accessories are provided with the GYNECARE TVT Obturator device; 1) GYNECARE Helical Passer, 2) GYNECARE Winged Guide. The Helical Passer and Winged guide are provided to facilitate placement of the TVT Obturator device.

For comparison, photos of the modified and predicate device are included in Attachment III.

The GYNECARE TVT Obturator device will be primary packaged together with Helical Passers and Winged Guide in a plastic tray (workstation) placed within a plastic 'tub' with a tyvek label that serves as the sterility barrier, and placed in a labeled carton. |
| **Physical Description** | GYNECARE TVT Obturator System includes the device and its accessories. The device and accessories are sold as a set. The system consists of the following:

Device:
GYNECARE TVT Obturator device (Sterile, Single-Use)

Accessories (used in conjunction with the device):
GYNECARE TVT Helical Passers (Sterile, Single Use)
GYNECARE TVT Winged Guide (Sterile, Single Use) |

*Physical Description Continued on Next Page*

GYNECARE TVT Obturator System
GYNECARE a Division of ETHICON, Inc.

000002

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY                ETH.MESH.07876944

**GYNECARE TVT Obturator device:**

The GYNECARE TVT *Obturator* device is a sterile, single patient use device, consisting of one piece of undyed or blue (Phtalocyanine blue, Color index Number 74160) PROLENE* polypropylene mesh (tape) covered by a plastic sheath overlapping in the middle. Medical grade plastic tube receptacles are attached at each end of the mesh to accommodate the Helical Passers. The Helical Passers come assembled to the GYNECARE TVT Obturator device and are used to deliver of the mesh implant via the trans-obturator "inside-out" approach. The "inside-out" approach delivers the mesh trans-vaginally, along the posterior ischiopubic ramus and through the obturator membrane.

**GYNECARE TVT Helical Passers:**

The GYNECARE TVT Helical Passers are two stainless steel, curved wire passers with plastic handles and are designed to deliver the GYNECARE TVT *Obturator* device. Helical Passers are provided as left and right units, pre-assembled to the GYNECARE TVT Obturator device.

**GYNECARE TVT Winged Guide**

The GYNECARE TVT Winged Guide is a stainless steel accessory instrument, which facilitates the passage of the GYNECARE TVT Helical Passers through the dissection tract. This accessory is offered as an adjunct to the device.

GYNECARE TVT Obturator System
GYNECARE a Division of ETHICON, Inc.

000003

**CONFIDENTIAL**
**SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY**                    **ETH.MESH.07876945**

# Exhibit 48



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Public Health Service

DEC - 8 2003

Food and Drug Administration
9200 Corporate Boulevard
Rockville MD 20850

Mr. Sean O'Bryan
Senior Project Manager, Regulatory Affairs
Ethicon, Inc.
Route 22 West
Somerville, New Jersey 08876

Re: K033568
    Trade/Device Name: GYNECARE TVT Obturator Device
    Regulation Number: 21 CFR 878.3300
    Regulation Name: Surgical mesh
    Regulatory Class: II
    Product Code: FTL
    Dated: November 10, 2003
    Received: November 13, 2003

Dear Mr. O'Bryan:

We have reviewed your Section 510(k) premarket notification of intent to market the device referenced above and have determined the device is substantially equivalent (for the indications for use stated in the enclosure) to legally marketed predicate devices marketed in interstate commerce prior to May 28, 1976, the enactment date of the Medical Device Amendments, or to devices that have been reclassified in accordance with the provisions of the Federal Food, Drug, and Cosmetic Act (Act) that do not require approval of a premarket approval application (PMA). You may, therefore, market the device, subject to the general controls provisions of the Act. The general controls provisions of the Act include requirements for annual registration, listing of devices, good manufacturing practice, labeling, and prohibitions against misbranding and adulteration.

If your device is classified (see above) into either class II (Special Controls) or class III (PMA), it may be subject to such additional controls. Existing major regulations affecting your device can be found in the Code of Federal Regulations, Title 21, Parts 800 to 898. In addition, FDA may publish further announcements concerning your device in the <u>Federal Register</u>.

Please be advised that FDA's issuance of a substantial equivalence determination does not mean that FDA has made a determination that your device complies with other requirements of the Act or any Federal statutes and regulations administered by other Federal agencies. You must comply with all the Act's requirements, including, but not limited to: registration and listing (21 CFR Part 807); labeling (21 CFR Part 801); good manufacturing practice requirements as set forth in the quality systems (QS) regulation (21 CFR Part 820); and if applicable, the electronic product radiation control provisions (Sections 531-542 of the Act); 21 CFR 1000-1050.

**CONFIDENTIAL**
**SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY**
ETH.MESH.07876929

Page 2 - Mr. Sean O'Bryan

This letter will allow you to begin marketing your device as described in your Section 510(k) premarket notification. The FDA finding of substantial equivalence of your device to a legally marketed predicate device results in a classification for your device and thus, permits your device to proceed to the market.

If you desire specific advice for your device on our labeling regulation (21 CFR Part 801), please contact the Office of Compliance at (301) 594-4659. Also, please note the regulation entitled, "Misbranding by reference to premarket notification" (21CFR Part 807.97). You may obtain other general information on your responsibilities under the Act from the Division of Small Manufacturers, International and Consumer Assistance at its toll-free number (800) 638-2041 or (301) 443-6597 or at its Internet address http://www.fda.gov/cdrh/dsma/dsmamain.html

Sincerely yours,

*Miriam C. Provost*

for Celia M. Witten, Ph.D., M.D.
Director
Division of General, Restorative
and Neurological Devices
Office of Device Evaluation
Center for Devices and Radiological Health

Enclosure

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

ETH.MESH.07876930

INDICATION FOR USE

**510(k) Number (if known):** _K033568_

**Device Name:** <u>**GYNECARE TVT Obturator device**</u>

**Indications for Use:** The GYNECARE TVT *Obturator* device is intended for use in women as a sub-urethral sling for the treatment of stress urinary incontinence (SUI) resulting from urethral hypermobility and/or intrinsic sphincter deficiency.

_Miriam C. Provost_

(Division Sign-Off)
Division of General, Restorative
and Neurological Devices

510(k) Number _K 633568_

(PLEASE DO NOT WRITE BELOW THIS LINE - CONTINUE ON
ANOTHER PAGE IF NEEDED)

Concurrence of CDRH, Office of Device Evaluation (ODE)

Prescription Use _____     OR     Over-The Counter Use _____
(Per 21 CFR 801.109)

(Optional Format 1-2-9G)

GYNECARE TVT Obturator System
GYNECARE a Division of ETHICON

iii

**CONFIDENTIAL**
**SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY**                    **ETH.MESH.07876931**

# Exhibit 49



**DEPARTMENT OF HEALTH & HUMAN SERVICES**                    Public Health Service

Food and Drug Administration
10903 New Hampshire Avenue
Document Control Room –WO66-G609
Silver Spring, MD 20993-0002

Mr. Gregory R. Jones
Director, Regulatory Affairs            SEP 2 8 2012
Ethicon, Inc.
P.O. Box 151
SOMERVILLE NJ 08876

Re:   K974098
       Trade/Device Name:  Tension Free Vaginal Tape (TVT) System
       Regulation Number:  21 CFR 878.3300
       Regulation Name:  Surgical mesh
       Regulatory Class:  II
       Product Code:  OTN
       Dated:  October 29, 1997
       Received:  October 30, 1997

Dear Mr. Jones:

This letter corrects our substantially equivalent letter of January 28, 1998.

We have reviewed your Section 510(k) premarket notification of intent to market the device
referenced above and have determined the device is substantially equivalent (for the indications
for use stated in the enclosure) to legally marketed predicate devices marketed in interstate
commerce prior to May 28, 1976, the enactment date of the Medical Device Amendments or to
devices that have been reclassified in accordance with the provisions of the Federal Food, Drug,
and Cosmetic Act (Act) that do not require approval of a premarket approval (PMA).  You may,
therefore, market the device, subject to the general controls provisions of the Act.  The general
controls provisions of the Act include requirements for annual registration, listing of devices,
good manufacturing practice, labeling, and prohibitions against misbranding and adulteration.

If your device is classified (see above) into either class II (Special Controls) or class III (PMA), it
may be subject to additional controls.  Existing major regulations affecting your device can be
found in the Code of Federal Regulations, Title 21, Parts 800 to 898.  In addition, FDA may
publish further announcements concerning your device in the <u>Federal Register.</u>

Please be advised that FDA's issuance of a substantial equivalence determination does not mean
that FDA has made a determination that your device complies with other requirements of the Act
or any Federal statutes and regulations administered by other Federal agencies.  You must

ETH.MESH.10040062

Page 2 -

comply with all the Act's requirements, including, but not limited to: registration and listing (21 CFR Part 807); labeling (21 CFR Part 801); medical device reporting (reporting of medical device-related adverse events) (21 CFR 803); good manufacturing practice requirements as set forth in the quality systems (QS) regulation (21 CFR Part 820); and if applicable, the electronic product radiation control provisions (Sections 531-542 of the Act); 21 CFR 1000-1050.

If you desire specific advice for your device on our labeling regulation (21 CFR Part 801), please go to http://www.fda.gov/AboutFDA/CentersOffices/CDRH/CDRHOffices/ucm115809.htm for the Center for Devices and Radiological Health's (CDRH's) Office of Compliance. Also, please note the regulation entitled, "Misbranding by reference to premarket notification" (21 CFR Part 807.97). For questions regarding the reporting of adverse events under the MDR regulation (21 CFR Part 803), please go to http://www.fda.gov/MedicalDevices/Safety/ReportaProblem/default.htm for the CDRH's Office of Surveillance and Biometrics/Division of Postmarket Surveillance.

You may obtain other general information on your responsibilities under the Act from the Division of Small Manufacturers, International and Consumer Assistance at its toll-free number (800) 638-2041 or (301) 796-7100 or at its Internet address http://www.fda.gov/MedicalDevices/ResourcesforYou/Industry/default.htm.

Sincerely yours,

Benjamin R. Fisher, Ph.D.
Director
Division of Reproductive, Gastro-Renal,
and Urological Devices
Office of Device Evaluation
Center for Devices and Radiological Health

Enclosure

ETH.MESH.10040063

## INDICATION FOR USE

**510(k) Number (if known):** _____

**Device Name:**          <u>Tension Free Vaginal Tape (TVT) System</u>

**Indications for Use:**    The TVT device is a sterile, single-use device intended to be
                          used as a pubourethral sling indicated for treatment of stress
                          urinary incontinence (SUI), for female urinary incontinence
                          resulting from urethral hypermobility and/or intrinsic sphincter
                          deficiency.  The TVT Introducer and Rigid Catheter Guide
                          accessories are intended to facilitate placement of the TVT
                          device.  The accessories, available separately, are provided non-
                          sterile and are reusable.

### (PLEASE DO NOT WRITE BELOW THIS LINE - CONTINUE ON
### ANOTHER PAGE IF NEEDED)

_____   _____   _____

Concurrence of CDRH, Office of Device Evaluation (ODE)

Prescription Use ____/X_____     OR   /\   Over-The Counter Use _____
(Per 21 CFR 801.109)                          (Optional Format 1-2-9G)

(Division Sign Off)
r         ~l           al Re
510(k) Number _____ K974010

_____
Tension Free Vaginal Tape (TVT) System
ETHICON, Inc.



**DEPARTMENT OF HEALTH & HUMAN SERVICES**   Public Health Service

Food and Drug Administration
10903 New Hampshire Avenue
Document Control Center – WO66-G609
Silver Spring, MD  20993-002

September 28, 2012

Dear Manufacturer:

In 2010, the Division of Reproductive, Gastro-Renal, and Urological Devices (DRGUD) in the Office of Device Evaluation (ODE) in the Center for Devices and Radiological Health (CDRH) took over lead review responsibility of surgical mesh indicated pelvic organ prolapse and stress urinary incontinence from the Division of Surgical, Orthopedic, and Restorative Devices (DSORD).

DRGUD has developed new product codes for surgical mesh indicated for pelvic organ prolapse and stress urinary incontinence and is issuing corrected substantial equivalence letters to manufacturers of these devices to reflect the new product codes.  The following table lists the new product codes and their respective descriptions.

| Product Code | Product Code Description |
|---|---|
| OTM | mesh, surgical, for stress urinary incontinence, male |
| OTN | mesh, surgical, **synthetic**, urogynecologic, for stress urinary incontinence, female, **multi-incision** |
| PAG | mesh, surgical, **non-synthetic**, urogynecologic, for stress urinary incontinence, female, **multi-incision** |
| PAH | mesh, surgical, **synthetic**, urogynecologic, for stress urinary incontinence, female, **single-incision mini-sling** |
| OTO | mesh, surgical, **synthetic**, urogynecologic, for apical vaginal and uterine prolapse, **transabdominally placed** |
| PAJ | mesh, surgical, **non-synthetic**, urogynecologic, for apical vaginal and uterine prolapse, **transabdominally placed** |
| OTP | mesh, surgical, **synthetic**, urogynecologic, for pelvic organ prolapse, **transvaginally placed** |
| PAI | mesh, surgical, **non-synthetic**, urogynecologic, for pelvic organ prolapse, **transvaginally placed** |

Please note that the regulatory class (Class II) and the regulation number (21 CFR 878.3300) for surgical mesh indicated for pelvic organ prolapse and stress urinary incontinence remains unchanged at this time.

If you have any questions regarding the contents of this letter, please contact Sharon Andrews at (301) 796-6529 or Rebecca Robinson, Ph.D., at (301) 796-6532.

Sincerely yours,

Benjamin R. Fisher, Ph.D.
Director
Division of Reproductive, Gastro-Renal,
  and Urological Devices
Office of Device Evaluation
Center for Devices and Radiological Health

ETH.MESH.10040065

# Exhibit 50



**DEPARTMENT OF HEALTH & HUMAN SERVICES**                     Public Health Service

Food and Drug Administration
10903 New Hampshire Avenue
Document Control Room – WO66-G609
Silver Spring, MD 20993-0002

Mr. Gregory R. Jones
Director of Regulatory Affairs and Quality Assurance
Gynecare
Division of Ethicon                               SEP 28 2012
P.O. Box 151
SOMERVILLE NJ 08876

Re:   K012628
      Trade/Device Name:  GYNECARE Tension-Free Vaginal Tape (TVT) Blue System
      Regulation Number:  21 CFR 878.3300
      Regulation Name:  Surgical mesh
      Regulatory Class:  II
      Product Code:  OTN
      Dated:  August 9, 2001
      Received:  August 13, 2001

Dear Mr. Jones:

This letter corrects our substantially equivalent letter of October 26, 2001.

We have reviewed your Section 510(k) premarket notification of intent to market the device
referenced above and have determined the device is substantially equivalent (for the indications
for use stated in the enclosure) to legally marketed predicate devices marketed in interstate
commerce prior to May 28, 1976, the enactment date of the Medical Device Amendments or to
devices that have been reclassified in accordance with the provisions of the Federal Food, Drug,
and Cosmetic Act (Act) that do not require approval of a premarket approval (PMA).  You may,
therefore, market the device, subject to the general controls provisions of the Act.  The general
controls provisions of the Act include requirements for annual registration, listing of devices,
good manufacturing practice, labeling, and prohibitions against misbranding and adulteration.

If your device is classified (see above) into either class II (Special Controls) or class III (PMA), it
may be subject to additional controls.  Existing major regulations affecting your device can be
found in the Code of Federal Regulations, Title 21, Parts 800 to 898.  In addition, FDA may
publish further announcements concerning your device in the Federal Register.

Please be advised that FDA's issuance of a substantial equivalence determination does not mean
that FDA has made a determination that your device complies with other requirements of the Act
or any Federal statutes and regulations administered by other Federal agencies.  You must

ETH.MESH.10039072

Page 2 -

comply with all the Act's requirements, including, but not limited to: registration and listing (21 CFR Part 807); labeling (21 CFR Part 801); medical device reporting (reporting of medical device-related adverse events) (21 CFR 803); good manufacturing practice requirements as set forth in the quality systems (QS) regulation (21 CFR Part 820); and if applicable, the electronic product radiation control provisions (Sections 531-542 of the Act); 21 CFR 1000-1050.

If you desire specific advice for your device on our labeling regulation (21 CFR Part 801), please go to http://www.fda.gov/AboutFDA/CentersOffices/CDRH/CDRHOffices/ucm115809.htm for the Center for Devices and Radiological Health's (CDRH's) Office of Compliance. Also, please note the regulation entitled, "Misbranding by reference to premarket notification" (21 CFR Part 807.97). For questions regarding the reporting of adverse events under the MDR regulation (21 CFR Part 803), please go to http://www.fda.gov/MedicalDevices/Safety/ReportaProblem/default.htm for the CDRH's Office of Surveillance and Biometrics/Division of Postmarket Surveillance.

You may obtain other general information on your responsibilities under the Act from the Division of Small Manufacturers, International and Consumer Assistance at its toll-free number (800) 638-2041 or (301) 796-7100 or at its Internet address http://www.fda.gov/MedicalDevices/ResourcesforYou/Industry/default.htm.

Sincerely yours,

Benjamin R. Fisher, Ph.D.
Director
Division of Reproductive, Gastro-Renal,
  and Urological Devices
Office of Device Evaluation
Center for Devices and Radiological Health

Enclosure

ETH.MESH.10039073

**INDICATION FOR USE**  K012628

510(k) Number (if known): _____

Device Name:  Tension Free Vaginal Tape (TVT) Blue System

Indications for Use:  The TVT device is intended to be used as a pubourethral sling indicated for treatment of stress urinary incontinence (SUI) for female urinary incontinence resulting from urethral hypermobility and/or intrinsic sphincter deficiency.  The TVT Introducer, Rigid Catheter Guide and TVT Abdominal Guides and Couplers are accessories intended to facilitate placement of the TVT device.

(PLEASE DO NOT WRITE BELOW THIS LINE - CONTINUE ON ANOTHER PAGE IF NEEDED)

Concurrence of CDRH, Office of Device Evaluation (ODE)

Prescription Use _____        OR        Over-The Counter Use _____
(Per 21 CFR 801.109)

(Division Sign-Off)                (Optional Format 1-2-9G)
Division of General, Restorative
and Neurological Devices

Modified TVT Blue and TVT-AA  **510(k) Number** K012628

GYNECARE, Division of ETHICON

ETH.MESH.10039074

# Exhibit 51



**DEPARTMENT OF HEALTH & HUMAN SERVICES**                    Public Health Service

Food and Drug Administration
10903 New Hampshire Avenue
Document Control Room – WO66-G609
Silver Spring, MD 20993-0002

SEP 2 8 2012

Mr. Sean O'Bryan
Senior Project Manager, Regulatory Affairs
Ethicon, Inc.
Route 22 West
SOMERVILLE NJ  08876

Re:   K033568
       Trade/Device Name: GYNECARE TVT Obturator Device
       Regulation Number:  21 CFR 878.3300
       Regulation Name:  Surgical mesh
       Regulatory Class:  II
       Product Code:  OTN
       Dated: November 10, 2003
       Received: November 13, 2003

Dear Mr. O'Bryan:

This letter corrects our substantially equivalent letter of December 8, 2003.

We have reviewed your Section 510(k) premarket notification of intent to market the device
referenced above and have determined the device is substantially equivalent (for the indications
for use stated in the enclosure) to legally marketed predicate devices marketed in interstate
commerce prior to May 28, 1976, the enactment date of the Medical Device Amendments or to
devices that have been reclassified in accordance with the provisions of the Federal Food, Drug,
and Cosmetic Act (Act) that do not require approval of a premarket approval (PMA). You may,
therefore, market the device, subject to the general controls provisions of the Act. The general
controls provisions of the Act include requirements for annual registration, listing of devices,
good manufacturing practice, labeling, and prohibitions against misbranding and adulteration.

If your device is classified (see above) into either class II (Special Controls) or class III (PMA),
it may be subject to additional controls. Existing major regulations affecting your device can be
found in the Code of Federal Regulations, Title 21, Parts 800 to 898. In addition, FDA may
publish further announcements concerning your device in the Federal Register.

Please be advised that FDA's issuance of a substantial equivalence determination does not mean
that FDA has made a determination that your device complies with other requirements of the Act
or any Federal statutes and regulations administered by other Federal agencies. You must

ETH.MESH.10039201

Page 2 -

comply with all the Act's requirements, including, but not limited to: registration and listing (21 CFR Part 807); labeling (21 CFR Part 801); medical device reporting (reporting of medical device-related adverse events) (21 CFR 803); good manufacturing practice requirements as set forth in the quality systems (QS) regulation (21 CFR Part 820); and if applicable, the electronic product radiation control provisions (Sections 531-542 of the Act); 21 CFR 1000-1050.

If you desire specific advice for your device on our labeling regulation (21 CFR Part 801), please go to http://www.fda.gov/AboutFDA/CentersOffices/CDRH/CDRHOffices/ucm115809.htm for the Center for Devices and Radiological Health's (CDRH's) Office of Compliance. Also, please note the regulation entitled, "Misbranding by reference to premarket notification" (21 CFR Part 807.97. For questions regarding the reporting of adverse events under the MDR regulation (21 CFR Part 803), please go to http://www.fda.gov/MedicalDevices/Safety/ReportaProblem/default.htm for the CDRH's Office of Surveillance and Biometrics/Division of Postmarket Surveillance.

You may obtain other general information on your responsibilities under the Act from the Division of Small Manufacturers, International and Consumer Assistance at its toll-free number (800) 638-2041 or (301) 796-7100 or at its Internet address http://www.fda.gov/MedicalDevices/ResourcesforYou/Industry/default.htm.

Sincerely yours,

Benjamin R. Fisher, Ph.D.
Director
Division of Reproductive, Gastro-Renal,
  and Urological Devices
Office of Device Evaluation
Center for Devices and Radiological Health

Enclosure

**INDICATION FOR USE**

510(k) Number (if known): _K033568_

| | |
|---|---|
| **Device Name:** | **GYNECARE TVT Obturator device** |
| **Indications for Use:** | The GYNECARE TVT *Obturator* device is intended for use in women as a sub-urethral sling for the treatment of stress urinary incontinence (SUI) resulting from urethral hypermobility and/or intrinsic sphincter deficiency. |

*Miriam C. Provost*

(Division Sign-Off)
Division of General, Restorative
and Neurological Devices

510(k) Number _K033568_ .

**(PLEASE DO NOT WRITE BELOW THIS LINE - CONTINUE ON
ANOTHER PAGE IF NEEDED)**

Concurrence of CDRH, Office of Device Evaluation (ODE)

Prescription Use _____✕_____        OR        Over-The Counter Use _____
(Per 21 CFR 801.109)

(Optional Format 1-2-9G)

GYNECARE TVT Obturator System
GYNECARE a Division of ETHICON

iii

ETH.MESH.10039203



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Public Health Service

Food and Drug Administration
10903 New Hampshire Avenue
Document Control Center – WO66-G609
Silver Spring, MD 20993-002

September 28, 2012

Dear Manufacturer:

In 2010, the Division of Reproductive, Gastro-Renal, and Urological Devices (DRGUD) in the Office of Device Evaluation (ODE) in the Center for Devices and Radiological Health (CDRH) took over lead review responsibility of surgical mesh indicated for pelvic organ prolapse and stress urinary incontinence from the Division of Surgical, Orthopedic, and Restorative Devices (DSORD).

DRGUD has developed new product codes for surgical mesh indicated for pelvic organ prolapse and stress urinary incontinence and is issuing corrected substantial equivalence letters to manufacturers of these devices to reflect the new product codes. The following table lists the new product codes and their respective descriptions.

| Product Code | Product Code Description |
|---|---|
| OTM | mesh, surgical, for stress urinary incontinence, male |
| OTN | mesh, surgical, synthetic, urogynecologic, for stress urinary incontinence, female, **multi-incision** |
| PAG | mesh, surgical, **non-synthetic**, urogynecologic, for stress urinary incontinence, female, **multi-incision** |
| PAH | mesh, surgical, **synthetic**, urogynecologic, for stress urinary incontinence, female, **single-incision mini-sling** |
| OTO | mesh, surgical, **synthetic**, urogynecologic, for apical vaginal and uterine prolapse, **transabdominally placed** |
| PAJ | mesh, surgical, **non-synthetic**, urogynecologic, for apical vaginal and uterine prolapse, **transabdominally placed** |
| OTP | mesh, surgical, **synthetic**, urogynecologic, for pelvic organ prolapse, **transvaginally placed** |
| PAI | mesh, surgical, **non-synthetic**, urogynecologic, for pelvic organ prolapse, **transvaginally placed** |

Please note that the regulatory class (Class II) and the regulation number (21 CFR 878.3300) for surgical mesh indicated for pelvic organ prolapse and stress urinary incontinence remains unchanged at this time.

If you have any questions regarding the contents of this letter, please contact Sharon Andrews at (301) 796-6529 or Rebecca Robinson, Ph.D., at (301) 796-6532.

Sincerely yours,

Benjamin R. Fisher, Ph.D.
Director
Division of Reproductive, Gastro-Renal,
   and Urological Devices
Office of Device Evaluation
Center for Devices and Radiological Health

ETH.MESH.10039204