**EXHIBIT #8**

*UNITED STATES DISTRICT COURT*
*SOUTHERN DISTRICT OF FLORIDA*
*MIAMI DIVISION*

LANA C. KEETON,
       Case No. 06-21116-Civ-UNGARO-BENAGES/O'SULLIVAN
          Plaintiff,

vs.                     **MIAMI, *FLORIDA***
                         July 9, 2007

GYNECARE WORLDWIDE, INC.,
a Division of ETHICON, INC.,
a Foreign Corporation, et al.,
          Defendants.
_____

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE JOHN J. O'SULLIVAN,
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

FOR THE PLAINTIFF:
                  BY: MS. LANA C. KEETON, Pro se
                  P.O. BOX 402494
                  Miami Beach, Florida 33140

FOR THE DEFENDANT:
                  *ARNSTEIN & LEHR, LLP*
                  BY: JEFFREY B. SHAPIRO, ESQ.
                  BY: NEVILLE M. LESLIE, ESQ.
                  200 S. Biscayne Boulevard
                  Miami, Florida 33131
BY TELEPHONE:     CATHERINE MARABEL, ESQ.
BY TELEPHONE:     PHILIP VINICK, ESQ.

REPORTED BY:      JERALD M. MEYERS, RPR-CM
                  J.M. Court Reporting, Inc.
                  1601 N.W. 109 Terrace
                  Tele: 954-431-4757
                  Pembroke Pines, Florida 33026-2717

(Call to order of the Court)

**THE COURT:** Good afternoon. Please be seated.

We are here today in the case of Lana Keeton versus Gynecare Worldwide and others, case number 06-Civil-21116 on a number of motions; the plaintiff's motion to compel compliance with the Federal Rules of Civil Procedure at deposition; the defendant's emergency motion to quash non-party subpoenas, and then the motions of Doctor Garely and Doctor Berger in regard to quashing non-party subpoenas.

Could I have appearances for the plaintiff first and then the defendant and then the doctors.

**MS. KEETON:** My name is Lana C. Keeton. I am here. I am the plaintiff pro se in this case.

**THE COURT:** Okay. Thank you, Ms. Keeton.

**MR. SHAPIRO:** Good afternoon, Your Honor. Jeffrey Shapiro and Neville Leslie for the defendants from Arnstein & Lehr.

**THE COURT:** Thank you, Mr. Shapiro.

**MR. SHAPIRO:** You are welcome, Judge.

**THE COURT:** And who is here on behalf of Doctor Garely?

**MS. MARABEL:** For Doctor Garely, my name is Catherine Marabel from the law firm of Hager & Ambler.

**THE COURT:** Okay.

**MR. VINICK:** Your Honor, Philip Vinick, V-i-n-i-c-k appearing on behalf of Doctor Berger & Neurology Associates.

**THE COURT:** Okay. All right. I guess we will address the motion to quash the non-party subpoenas first, and then the lawyers for the doctors can get off the line because I don't think they have anything to do with the other motion that was filed.

**MR. VINICK:** Thank you.

**MS. MARABEL:** Thank you, Your Honor.

**THE COURT:** Okay. I have reviewed the motions as well as the plaintiff's response to it. I think the first issue, Ms. Keeton, is whether or not the subpoenas were properly issued, and they were not.

Rule 45 clearly says, and I will quote it to you, I notice you quoted portions of Rule 45 to me in your response, but you didn't address the portion of Rule 45 that deals with the service of subpoenas, which is Federal Rule of Civil Procedure 45(a)(2) and 3 which state that a subpoena may be issued only by the court, the clerk of the court on attorney as an officer of the court."

You issued these subpoenas without having the clerk of the court up in New York or New Jersey, wherever they were issued out of, properly issuing the subpoena.

So what do you say about that, Ms. Keeton? You need to stand up.

**MS. KEETON:** I am sorry. I made phone calls to the court up there to the clerk, and they told me just to send them.

I asked them what the procedure was. What I need to do. I need like to, you know, what was the procedure? And they told he to send them. I should have brought my phone records to document that I called them and they told me that.

**THE COURT:** Okay.    **PAGE 1**

**MS. MARABEL:** Your Honor, if I may?

**THE COURT:** Well, no. Hold on a second. I mean, 45(a)(3) is clear.

"The clerk shall issue subpoenas signed, but otherwise in blank, to a party requesting it who shall complete it before service. An attorney, as also the court, may also issue and sign a subpoena on behalf of," and then it goes on and talks about when an attorney can issue it, but it is clear in these couple of cases that indicate that a pro se plaintiff does not have the authority to issue a subpoena.

One of those cases is cited at 182 F.3d 934. No, I am sorry. It is an unpublished opinion out of the 10th Circuit, which is United States of America versus George Marideth and a second case, Burns versus Bank of America, which is at 2007 W.L. 1589437.

So, Ms. Keeton, where we are is the subpoenas that you issued are not viable subpoenas.

Now, you know, in the past I have warned you about following the rules of procedure. I know it is difficult for an unrepresented plaintiff to know all of the different rules, but when the emergency motion was filed, you were put on notice of the rule by the defendant. You haven't done anything to remedy the matter.

Now, the other issues are we are dealing with the parties who I had jurisdiction over, you know, Gynecare, Ethicon or Johnson & Johnson.

There are times that I have stretched the rules on your behalf, but here you are dealing with a non-party.

I don't have jurisdiction over those non-parties without proper service of the subpoena on them, and the subpoenas that you served simply were not properly served.

**MS. KEETON:** May I have the opportunity to cure that with re-sending it? If I remember -- I mean, I tried to remember everything that you said during the court, and on the docket it says, "Minutes of the hearing," but it is not available to me. I don't know how to get that, you know.

**THE COURT:** Well, we never had this issue come before us before. We did have Rule 45 issues, but not this particular issue. I am not here as your lawyer.

**MS. KEETON:** Yes. I understand.

**THE COURT:** You know, I am not here to give you legal advice. I am here to rule on issues when they come up.

In looking at this issue, in fact, beforehand if you had asked me, I wouldn't have known whether or not a pro se plaintiff could issue a subpoena or not because that's not something that happens very often, but it is clear, the rule is clear that you are not permitted to do that.

The Clerk of the Court has to issue the subpoena, and you didn't do that, and you haven't done it after you were notified, you know, in June. When was the emergency motion filed? It was back on --

**MS. KEETON:** The 22nd.

**THE COURT:** -- June 19th. At that time, that's 3 or 4 weeks ago, and it is clear that you are not permitted to serve the subpoena. You had the opportunity to cure it.

**PAGE 2**

The problem now is that discovery is finished in this case on July 20th --

**MS. KEETON:** I know.

**THE COURT:** -- you cannot conduct discovery after that date pursuant to Judge Ungaro's order. Did the doctors' lawyers want to be heard?

**MS. MARABEL:** Yes. If I may, Your Honor?

**THE COURT:** Yes.

**MS. MARABEL:** As far as this other procedural problem, also even at the time that we were served with the subpoena, as the subpoena was only served after the plaintiff had tried to contact my doctor again, even though I had asked her to contact me rather than the doctor, and I had said that he would not appear without an appropriate subpoena.

I also indicated to her that I didn't think that anything that he had would be relevant or that he had any documents, and there was also not enough time to object.

According to the subpoena, it looked like the depositions were supposed to be go in either 10 or 11 days. I was not available.

Doctor Garely was not available, and there certainly wasn't even enough time to object, Your Honor, let alone to prepare, even if the doctor did have relevant information to prepare for a very complicated case such as this.

If I might also add, back in April, I believe that's the first time the plaintiff was trying to get Doctor Garely to voluntarily appear for a non-party deposition.

Apparently there had been subpoenas served on him which were also improper, and I am not sure for all of the reasons, I am not sure that the subpoena also was not signed by the court at that time as well, but since April I believe my doctor got a letter from the plaintiff indicating that she would re-issue the subpoena, and that was around April 18th, and yet she waited until the middle of June to serve further subpoenas which didn't give us enough time to prepare for this.

If I may be heard on the substitute issue, I would like to if I may as well, Your Honor?

**THE COURT:** Okay. Well, let me ask you something: Does your client have any of the records that were requested by the subpoena?

**MS. MARABEL:** He has nothing. After I was contacted again, and the subpoena had been served, I asked him to make a search. He made a diligent search.

I also informed the plaintiff twice by letter, the last one I believe being on June 19th. I have my notes here. I advised her that he admitted a diligent search and he no longer as any records pertaining to any of the documents that she was asking about.

**THE COURT:** And he was only subpoenaed for records; is that correct?

**MS. MARABEL:** My doctor was subpoenaed for a deposition.

**THE COURT:** Okay. Is that correct? Hold on a second. Is that correct, Ms. Keeton?

**MS. KEETON:** On April the 1st I issued a deposition -- I mean a subpoena for documents, and Doctor Garely telephoned me back and offered

PAGE 3

information voluntarily. Based on your quash of the subpoena, I withdrew it on April the 18th.

    **THE COURT:** All right.

    **MS. MARABEL:** Could she stop? Ms. Keeton, I can't hear you.

    **THE COURT:** I am sorry. Ms. Keeton, would you move up to the podium, please, because she probably cannot hear you from there. We only have a telephone microphone on the podium.

    **MS. KEETON:** Well, first of all --

    **THE COURT:** Well, I am asking Ms. Keeton just one question. The subpoenas you most recently issued, are they only for documents or are they for documents and testimony?

    **MS. KEETON:** They are for documents and for testimony both that are critical to the case.

    **THE COURT:** Okay. All right. Go ahead, Ms. Marabel.

    **MS. MARABEL:** Thank you, Your Honor.

    **THE COURT:** All right.

    **MS. MARABEL:** The reason Doctor Garely first contacted me in April, mid-April of 2007 is that because when he received a response back from Ms. Keeton about the telephone call, he was somewhat confused because the letter indicated something absolutely the opposite.

    Apparently maybe she misconstrued what we were saying. On the contrary, he was trying to indicate that he really didn't have the information or there was nothing that he had that he could give to her or supply to her.

    I believe that what she is asking for is overbroad and irrelevant to the case.

    I asked her, when I telephoned her on the 19th of June, if she could tell me why she wanted Doctor Garely to give her anything relevant, and I was just met with, "It is relevant. It is relevant." Nothing that I could really understand. How could it be relevant? The doctor made a search and has no documents.

    **THE COURT:** Well, I mean she indicated in her response that Doctor Cantor who did the operation on her was trained by Doctor Garely.

    **MS. MARABEL:** That's interesting. That's interesting.

    **THE COURT:** And that Doctor Garely told her in a conversation that he was paid by Gynecare to train physicians.

    **MS. MARABEL:** Okay. What Doctor Garely did, he was not an employee. What he did was, the defendant never trained him to do anything. He went to Sweden and was shown, and I think there were about 15 or 20 doctors that went to Sweden, and the inventor of the device demonstrated how he did the operation from the device.

    Doctor Garely, along with about 15 or 20 other physicians, apparently did various talks. He had no idea who he was speaking to, and it wouldn't be just one physician.

    It wasn't just Doctor Garely. It would have been 3 or even 4 or maybe even 5 that they were talking about different aspects of this particular device.

    Also, some of the physicians were permitted to observe his doing procedures. He had no idea who they were. There was no direct training. There was no hands-on. **PAGE 4**

**THE COURT:** He was paid by Gynecare to do that?

**MS. MARABEL:** He was paid by Gynecare as a consultant, but he was not paid to do specific training for specific physicians, and it seems as though the plaintiff is trying to get expert testimony from this doctor to possibly further her medical malpractice case.

It is hard for me to figure out exactly what he would be able to give her that would in any way help the products liability case, but it seems to be more in the area of expert testimony.

Certainly Doctor Garely did not have any direct training experience with any of Ms. Keeton's physicians that he is aware of.

**THE COURT:** Well, I mean how can you say that? You just said he did training, but he doesn't know the names of the doctors.

**MS. MARABEL:** What he did was he would do lectures, but he does not even know what they may have been speaking about. Is it doctor Cantor who was the --

**THE COURT:** Yes.

**MS. MARABEL:** -- if Doctor Cantor happened to be present, Doctor Garely could not tell you whether he was just there to observe on a procedure at one time or another or whether he was there while the doctor was giving a talk to a room full of physicians on work-up procedures with respect to this device or the pretesting of this device, or anything to do with complications of this device; operative techniques of the device.

He doesn't even know from day-to-day which one he was doing and who he was speaking to. So as to what he would be able to give with respect to this lawsuit, I still don't know.

**THE COURT:** Okay.

**MS. MARABEL:** Certainly there is a lot of information. Even if the doctors did have any information, certainly the subpoena is asking for materials which are privileged by the attorney-client privilege, such as letters to and from attorneys and attorney's offices.

Any and all information regarding the relationship with the defendant, that certainly would encompass any correspondence that I would have or any correspondence that I have with the doctor, and also the doctor would assert the doctor-patient privilege under HIPPA and also the New York State law, Public Law 18 in asking for charts, MRI bills, X-rays, bills, reports, these are all sorts of things which are considered to be patient records.

**THE COURT:** Okay.

**MS. MARABEL:** So I have yet to find anything that has any relevance. Certainly the doctor does not have any problems with the product.

He just indicated to me he has used it, and that he had nothing but good things to say about the particular product.

So I think the plaintiff might say that maybe he is no longer associated with the defendants for some particular reason, but there is nothing like that at all.

He last had contact with them I think in 2001, 2002, but he did a diligent search of his house. He has no records.

He did indicate to the plaintiff from the get-go that he didn't think he has anything which would at all help her with this lawsuit.

**PAGE 5**

       **THE COURT:** Okay. Mr. Vinick, in regard to Doctor Berger?

       **MR. VINICK:** Yes. Thank you, Your Honor.

       **THE COURT:** Let me ask you a question: Has Doctor Berger researched his records to see if he has any documents that are responsive to the subpoena?

       **MR. VINICK:** He did, and he has no documents. Doctor Berger sold the patent to Gynecare whose intellectual property was a concept. It was not what he had or sold.

       It was not developed or used clinically that evolved into the device that apparently the plaintiff used or that was involved with the plaintiff in this action.

       He was a consultant with the company only, and along with others I am told was a consultant. He has no documents.

       I believe Your Honor has read the documents that have been produced, and at this time in that sense I echo what counsel has to say and join in her paperwork and the paperwork of the defendants insofar as reasons why some of this paperwork should not be produced.

       **THE COURT:** Well, why doesn't he have any documents if he held the patent on this thing?

       **MR. VINICK:** Well, he has the patent documents, but these patent documents were for a concept. This was for something that didn't evolve into the device that was developed here and apparently used in conjunction with the plaintiff.

       He sold the patent. He had those documents. Sure, he had an attorney who represented him in connection with that sale.

       **THE COURT:** Okay.

       **MR. VINICK:** Did he have his paperwork that led him to develop this concept? Yes, but that's not the product that was used here.

       **MR. SHAPIRO:** May I have just one minute?

       **THE COURT:** Hold on a second.

       **MR. VINICK:** In any event, Your Honor, that aside, I had a difficult time hearing the plaintiff before the microphone was moved, and I only received her papers today, but I should add that I personally called her in mid June after Doctor Berger gave me the papers before going on his trip abroad.

       I pointed out to her the procedural defects and told her, also, that there were no documents to be produced, and in spite of that, she basically said what counsel said, is that they are relevant. She wants them, and the judge will decide, but I don't want to get into a what he said, she said at this point.

       The main point is that there are no documents to be produced. There was no date set for the deposition. There was no location set for the deposition.

       There was just a demand for documents asking that they be sent out to her in Florida, and that she should be communicated with insofar as scheduling the depositions, by the way, in New York, not New Jersey where Doctor Berger lives and works.

       **THE COURT:** Okay.

**PAGE 6**

        **MS. KEETON:** But no deposition was subpoenaed.  There wasn't any --

        **THE COURT:** Hold on, Ms. Keeton.

        **MS. KEETON:** I am sorry.

        **THE COURT:** Mr. Shapiro, did you want to be heard in regards to this?

        **MR. SHAPIRO:** Yes.  Only two minor points of clarification of up to where we are now, Judge.

        **MS. MARABEL:** Your Honor, I cannot hear.

        **THE COURT:** Hold on, Ms. Marabel.  Mr. Shapiro, if you would come over to the podium.

        **MS. MARABEL:** Thank you, Your Honor.

        **MR. SHAPIRO:** Your Honor had inquired earlier as to Doctor Berger.  As to Doctor Berger, Your Honor, there was only a subpoena duces tecum and no deposition.

        **THE COURT:** Okay.

        **MR. SHAPIRO:** As to Doctor Garely, there was both.

        **THE COURT:** Right.  Okay.  That is where I was confused.  I thought it was vice versa.

        **MR. SHAPIRO:** Right.  And, second, Mr. Vinick was referring to a patent.  It is a patent for a surgical procedure that was applied for in 2001, long after the device was patented to the mid 1990's.  So we are talking about two different things.

        **THE COURT:** Okay.  All right.  Ms. Keeton.

        **MS. KEETON:** May I respond?

        **THE COURT:** Yes.

        **MS. KEETON:** Okay.  Well, first of all, in regard to both of Mr. Vinick and Ms. Marabel, my question is why don't they just respond that they have no documents?

        Even if it is procedurally wrong, they are speaking for their plaintiff -- I mean for their client.

        **THE COURT:** They have just responded and said that.

        **MS. KEETON:** Pardon?

        **THE COURT:** They have just responded and indicated that that they have no documents.

        **MS. KEETON:** But are they able to speak for the doctor without him swearing that he has no documents?  They can do that?

        **THE COURT:** Well, I mean you issued a subpoena saying, "If you have documents, send them to me by this date."

        They have indicated they don't have any documents.  I mean, if you subpoenaed the doctors for their testimony, and I find that it is relevant, then you would be able to ask them what did you do to search for these documents?

        **MS. KEETON:** Okay.

        **THE COURT:** But you issued them a subpoena that didn't even have any, at least one of them didn't have any date for an appearance.  It Just said, "Mail them to me."

        **MS. KEETON:** Which one was that?

        **MR. VINICK:** That was Doctor Berger.

**PAGE 7**

**THE COURT:** Doctor Berger.

**MS. KEETON:** Yes. This is the request for documents. There was never a subpoena issued for a deposition. Ever. The document does not exist.

I asked him for dates via fax. He did not respond. I did not schedule a deposition, and I sent a subpoena for documents.

**THE COURT:** Right.

**MS. KEETON:** I thought that would take care of it.

**THE COURT:** Doctor Berger has now told you or his attorney has told you he doesn't have documents.

**MS. KEETON:** Even in regard to clinical trials that he did in regard to the TVT device?

**THE COURT:** What I am telling you is he says he does not have documents.

**MS. KEETON:** Okay.

**THE COURT:** I am not going to go through it with him.

**MS. KEETON:** Okay. All right.

**THE COURT:** But if you don't believe that and you think it is relevant, because I am not going to rule on the relevance today.

I wanted the attorneys to tell you what it is that their witnesses would say if they were called, which apparently is not very much with regards to this, but I am going to have to quash the subpoenas because they were not properly served.

I don't see how you are going to get them served in time to take any kind of deposition between now and the 20th, but you are welcome to do that if you think that you can do that, but I know Judge Ungaro is strict on her orders.

She has already continued the discovery in this matter to July 20th, and I think you are just running out of time here, Ms. Keeton.

**MS. KEETON:** Well, I think that was the purpose of the motion to quash.

**THE COURT:** They are not subject to this court's jurisdiction without you serving the proper subpoena on them.

Regardless of what their motivation was for filing this, right now they are not under a valid subpoena, so they are not required to do anything.

**MS. KEETON:** Okay.

**THE COURT:** Do you understand?

**MS. KEETON:** Yes.

**THE COURT:** Okay. All right. Anything else in regard to this issue?

**MS. MARABEL:** Your Honor, if I may, Catherine Marabel again for Doctor Garely.

I did send a letter specifically to Ms. Keeton on June 14th and June 19th specifically saying that the doctor, I asked the doctor to make a diligent search, and that he has no records pertaining to this matter.

**THE COURT:** Okay.

**MS. MARABEL:** And I just want to re-emphasize and make it very clear that the defendant in this lawsuit did not train Doctor Garely for surgery.

PAGE 8

He had done some procedures way before this and way after this, and he as far I know, and the other surgeons that were involved, they were not being taught on how to do surgery. They know how to do surgery. They were never trained by any of the defendants in this lawsuit. They were trained in medical school and know as to their experience and knowledge how to do these procedures, not by the defendant.

**THE COURT:** Okay.

**MS. KEETON:** May I respond, please?

**THE COURT:** Okay.

**MS. KEETON:** There is deposition testimony by Doctor Bernard Cantor on June the 8th of 2005, and in that deposition testimony he stated that he went to New York to be trained by Doctor Alan Garely.

He said he was at the Long Island Jewish Hospital; that he saw three procedures performed in some classroom, and that he received a letter from Doctor Garely stating that he was qualified to do that procedure.

**THE COURT:** Well, I mean counsel just said that Doctor Garely was not trained by the defendant. She didn't say anything about him training your client. You need to listen to what she is saying.

**MS. KEETON:** I am sorry that I misunderstood you.

**THE COURT:** Okay. All right.

**MS. MARABEL:** Your Honor, Doctor Garely --

**THE COURT:** I have heard enough, Ms. Marabel.

**MS. MARABEL:** Thank you.

**THE COURT:** All right. So the defendant's emergency motion to quash the non-party subpoena served on the two doctors, Doctor Garely and Doctor Berger is granted, as well as non-party Alan Gurely's motion to quash a non-party's subpoena is granted and, well, Doctor Berger filed a notice of joinder in that, and so in regards to his subpoena, as well, it is quashed.

All right. Anything else I can do for the doctors?

**MR. VINICK:** No. Thank you very much, Your Honor.

**THE COURT:** All right. You all can get off the line if you would like.

**MR. VINICK:** Thank you.

**THE COURT:** Okay. Thanks a lot. All right.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**THE COURT:** All right.

**MS. KEETON:** I am sorry. I don't want to waste your time, but would you, please?

**THE COURT:** Sure. Go ahead.

**MS. KEETON:** Okay. I have not served a notice of noncompliance for -- you issued a ruling on April the 11th that they had to provide quality control reports for sterilization by the 24th of April. On May the 7th I received 4,300 pages. This is only 1,000 pages.

**THE COURT:** Okay.                                    PAGE 9

**MS. KEETON:** I haven't had time to go through the other 4,000. I looked at every page in here. This is not sterilization reports. They manufactured the product at Ethicon in Switzerland.

They then shipped it to Ethicon in Scotland and sterilized it, and then they ship it back to Ethicon in Sweden -- no, in Switzerland. So that is on their protocol and shows how they do it.

All of these reports are manufacturing reports. They are written in French, and they are from Switzerland.

At the end of each report there is a line that says "sterilization." You know, it lists, "Okay, we have got this many devices, this many needles, this many and this many" and what they use. It is a quality control.

It shows, "We had 198 were good. Two were bad," and that's what it shows. The very last line on them is "sterilization," and there is nothing on it.

There is a cover page, and the cover page shows a control number for those things to be shipped to Scotland.

So after I got it, you know, I wrote them that it was unresponsive to, number 1, my interrogatory, number 2, your order, and they said -- they wrote me back, and I have it here, that that's all the documents that they had.

Then they sent me a bill for $1,117.50 for copying over 4,000 pages that is unresponsive to the request for production. There are some things in here that say -- I have to look at it. I don't remember.

**THE COURT:** All right.
**MR. SHAPIRO:** I note, Judge --
**THE COURT:** Hold on.
**MR. SHAPIRO:** I am waiting.
**MS. KEETON:** It is a one page document, and it is the return document, like when Scotland sends it back to Switzerland and they say this was done.

You know, quality control should say, they do it by ethylene oxide gas, or something like that, and they have to have the proper amount of gas and the proper amount of -- you know, it is really important that it actually be sterilized.

There is one page in here, and it talks about, you know, it was an e-mail. It was a bad batch, you know, that says that that was a problem, and it was from England.

Well, I have got necrotizing feshitice, and to me it is really important if the device, you know, what their sterilization process is, and if it was accurate and if it was done properly.

So, you know, the reason I brought up the situation about going to Summerville, New Jersey, they repeatedly told me there were thousands of pages -- I am sorry I don't look at you, but I have to remember this, you know.

Okay. They repeatedly told me that there were thousands of pages of documents at Summerville to go through.

Then when you finally ruled that they had to give me dates on the 20th and the 21st of February, they sent me an e-mail they were going to make them available at their office.

PAGE 10

I said, "I really want to go and see all of their documents. I want to see the whole thing," and they wrote me back. Well, it will fit in a manila folder.

I said, "Well, why didn't you just mail it to me 3 months ago instead of all of these motions back and forth?"

Then, whenever you made that ruling, they sent me over 4,000 pages and a bill for $1,000. I mean, I think, you know, they should have given me an opportunity to inspect it, or something like.

They wrote back and said, "You required, copies." What I required was the quality control reports for their sterilization process which is done in England, and I have the pieces of paper with me here.

The reason I know that information, it is in confidential documents that they provided to me in discovery. It is on 3 pages. You know, they have a protocol for what they do with the product that it is established.

**THE COURT:** So you are saying you never received the documents regarding the sterilization in England?

**MS. KEETON:** Yes. That is what I am saying.

**THE COURT:** All right. What do you say, Mr. Shapiro?

**MR. SHAPIRO:** Judge, quite frankly, I can't understand what she is saying. I really mean that, Judge.

**THE COURT:** Well, she is indicating she wanted sterilization documents regarding the sterilization process that occurred in England, and she got documents that really don't relate to that, but relate to Switzerland.

**MR. SHAPIRO:** Judge, this is territory we have plowed. We have gone through this. We have produced what we have. This is not part of today's hearing. I have not seen anything she is talking about.

I mean, I have seen the documents. I don't know what she is referencing. She walks in with a stack of documents about 7 or 8 inches thick. It is not scheduled for today's hearing, and we have given her what we have.

**THE COURT:** Are you aware of this problem that she has where she indicates that there should be documents?

**MR. SHAPIRO:** No, Judge. This is the first I have heard of it.

**THE COURT:** Have you discussed it with him, Ms. Keeton?

**MS. KEETON:** I have the e-mails from Mr. Leslie here in regard to this. I have them here with me, and I also have the documents, the pages -- the permanent pages taken from the protocol. I have a copy for you and for them, if you would like me to give it to you.

**THE COURT:** Hold on.

**MR. LESLIE:** Your Honor, the sterilization procedure was produced to her 6 months ago. She filed a motion. We said there may be some more documents in Switzerland.

You said, "Could you, please, go back and have the company double check if there were more." If there were quality control reports, which those are, and sterilization records, she asked for both.

Then we went back. The company went to the headquarters -- well, not the headquarters, but to where this product was originally manufactured in Switzerland, and we followed the Court's order

PAGE 11

We double checked, and that's where we discovered these 4,000 pages that were produced in accordance with your court order from about 90 days ago.

Sterilization procedures were produced prior to that, but that was not sufficient. We objected, and so forth.

We went backwards and forwards, and as a result of the hearing that we had before Your Honor, the client engaged in another check, and that's when we discovered these documents and produced them to the plaintiff.

THE COURT: Okay. Are you familiar with her complaint that she believes these documents are located in your England office?

MR. LESLIE: No. I am not familiar with that, Your Honor, but all I can add, Your Honor, is we have now triple checked, and we have given her everything that the company has.

THE COURT: All right.

MR. LESLIE: At one point she made a reference to me that there may be something in Ethicon in the U.K., which was part of our triple checking procedure, and this is everything that is in the company's possession.

THE COURT: Okay.

MS. KEETON: May I give you this piece of paper?

THE COURT: Okay.

MS. KEETON: These are the e-mails and other documents.

THE COURT: All right. I am trying to see if I have a copy of the order that we are talking about.

MS. KEETON: Oh. I have that.

THE COURT: Okay. Can you hand it up?

MS. KEETON: Yes. Just give me a moment.

THE COURT: Okay. I have it here.

MS. KEETON: Is it this?

THE COURT: Is this where it says, "The defendant shall provide the quality control reports for the sterilization of the Gynecare TVT device and proline mesh tape in their possession, custody and control?"

MS. KEETON: Yes.

MR. LESLIE: Yes, Your Honor.

THE COURT: Okay. All right. Now, what are you showing me on this, Ms. Keeton? I think it is an e-mail or a fax.

MS. KEETON: Well, it is a real specific document about the fact that what they sent me and why it was wrong, and I noted their Bates stamp document numbers to look at to tell them what the problem was.

THE COURT: Okay. Have you seen this document?

MR. LESLIE: Yes, Your Honor. I don't know what specifically she has given you, but from my recollection, I recall she said, "Here is a document." There are additional records; something to that effect.

THE COURT: Well, she said, "Based on other discovery you provided, the sterilization is done at Ethicon Limited in Scotland.

MR. LESLIE: Yes. I understand that. Judge, like I said, the company has triple checked, and this is it. This is everything that there is responsive to these requests. We have given everything.

THE COURT: Okay.

PAGE 12

      MR. LESLIE:  We cannot do anymore.

      THE COURT:  Okay.  Counsel indicates there are no other records.  You can use that at trial or however you would like to.  You can use that to show the jury that they don't keep their records of their sterilization, if that is what happened.

      MS. KEETON:  Well, what is really important at this moment is, I mean to me --

      THE COURT:  Okay.

      MS. KEETON:  -- okay.  These are all in French.  They all came from Ethicon in Sweden.

      THE COURT:  Right.

      MS. KEETON:  And they are all regarding the manufacturing of the product.  They sent me a bill for $1,117.50 for copies that are unresponsive.  Am I supposed to take that?  I mean --

      THE COURT:  Okay.  I see what you are saying.

      MS. KEETON:  -- why would I do that?

      THE COURT:  Why do you think these documents are responsive?  Why does the defendant believe the documents are responsive to my order that said that the defendant shall provide the quality control reports for the sterilization of the Gynecare TVT device and proline mesh tape in their possession?

      MR. LESLIE:  Your Honor, in addition to that, there were some other requests that are not spelled out that specifically asks for quality control reports for specific time frames, and that's exactly what they are.

      They are for all of products; the subject product that was manufactured in that specific time frame, and we have gone ahead and produced every quality control report for those products in that window.  I believe it was for 2000 and 2001.

      They are completely responsive to plaintiff's request and the court's order.

      Further, we are under no obligation, Your Honor, to have them translated.  They have been produced.  They are kept in the ordinary course of business and over 4,000 pages and a $1,000 copy bill which equates to 25 cents a copy is more than reasonable.

      THE COURT:  Well, I agree with that, assuming that it was in response to a request.  If you just have given her 4,000 documents that have nothing to do with her request, then she shouldn't have to pay for that.

      MR. LESLIE:  They are quality control reports, Your Honor, and that was asked for and that was ordered by Your Honor.

      THE COURT:  Well, it was not ordered by me.  What was ordered by me was to provide quality control reports for the sterilization of the Gynecare TVT device and proline mesh.

      MR. LESLIE:  Your Honor, there were other requests that are not spelled out in the order, and I don't have them in front of me, where you

go further on and you are like in response to request number 7, the defendants will check and respond.

THE COURT: Right.

MR. LESLIE: And I believe that one of those specifically encompassed quality control reports, but I do not have the request in front of me.

THE COURT: Okay.

MS. KEETON: Well, first of all, I can't read it because, you know, these are reports that are just little -- they are just words, you know.

THE COURT: Well, that is what all reports are. They are not under any obligation to translate them for you.

If you want them translated, you can do that or find someone who speaks French to look at it.

MS. KEETON: No.

THE COURT: The issue I am trying to determine right now is whether or not you should have to pay for these.

Based upon what I have in front of me, I can't tell because, as counsel said, some of my orders say, "Provide what is asked for in number 10."

So I don't know whether or not this is responsive. It doesn't appear to me to be responsive to the portion that says, "You shall provide the quality control reports for the sterilization of the Gynecare TVT device," but it may very well be responsive to other requests for production that I ordered them to comply with.

MS. KEETON: I only asked for 10 requests for production.

THE COURT: All right.

MS. KEETON: Your Honor --

THE COURT: Well, here is what you can do, Ms. Keeton: If you want to pursue this, then you can file a motion indicating that they provided you documents that were not responsive to my orders.

You can lay out what I ordered and what the requests were and which ones of those I enforced, and then counsel can respond and indicate why they are responsive to those documents, and then I will make a decision --

MS. KEETON: Okay.

THE COURT: -- as to whether or not to require you to reimburse them for the copying. Okay?

MS. KEETON: May I ask you one other question?

THE COURT: Yes. We have got to get going here because I have another hearing.

MS. KEETON: All of these documents say, "confidential," all of these reports, and I need to be able to provide you with some of these for you to make a determination.

THE COURT: If you are going to provide them to me, you better have them translated because I don't read French.

MS. KEETON: Okay.

THE COURT: Why do you need to provide them to me?

MS. KEETON: Because you need to be able to see that they are manufacturing and not sterilization. One of them.

PAGE 14

**THE COURT:** Let's look at the issue here. I don't think counsel is saying that it relates to sterilization. He is agreeing it does not relate to sterilization.

**MS. KEETON:** Oh.

**THE COURT:** The question is if both parties are in agreement that it is some kind of quality control report, it is just an issue.

You are telling me that it doesn't relate to sterilization so they shouldn't have given them to you.

They are saying, well, you asked for all quality control, so they gave it to you. I don't need to get the documents translated.

**MS. KEETON:** I see.

**THE COURT:** If you want to provide it to me, then you need to file it under seal and you need to have a certified translation of the document, unless you have an agreement from counsel that you can file it not under seal, but if it is confidential under your agreed protective order, then it has got to be sealed with the court. All right. Anything else?

**MR. LESLIE:** If I can just add, Your Honor, that we would require it be filed under sealed if plaintiff so chooses.

**THE COURT:** All right. So if you file it, you need to file it under seal. Don't file it without a translation because I am not going to consider it in French. I just simply don't have the ability to have it translated for you. Okay?

**MS. KEETON:** Certainly.

**THE COURT:** Anything else?

**MR. SHAPIRO:** No. Thank you, Your Honor.

**THE COURT:** Okay.

**MR. SHAPIRO:** Yes. Your Honor, is there a ruling on the pending motion?

**THE COURT:** Yes. I am sorry. You are correct.

**MR. SHAPIRO:** Okay.

**THE COURT:** On the plaintiff Lana King's motion to compel compliance with Federal Rules of Civil Procedure, the deposition is denied.

I have reviewed the deposition. It does not appear to me that the attorneys were disparaging or threatening you in any fashion.

I am also denying the request, I think the substantive request, which is the last which is to strike the answers on pages 224 to 245. I am going to deny that request as well.

I reviewed that portion of the deposition. It mostly relates I think to you signing some kind of document that indicates that you are agreeing to the procedures that are going to be performed on you.

It does not appear to me that you are being harassed there or being badgered, and you responded to the questions after apparently looking at the documents, and I am not going to strike that from the record. All right. Thank you very much.

**MS. KEETON:** Thank you.

**MR. SHAPIRO:** Thank you, Judge.

**MS. KEETON:** Thank you so much for your time.

**THE COURT:** All right. Good luck.

**MS. KEETON:** Thank you.

(Whereupon the proceedings were concluded)    PAGE 15

C E R T I F I C A T E

    I hereby certify that the foregoing is an accurate transcription of proceedings in the above-entitled matter.

_____    _____

DATE                    **JERALD M. MEYERS, RPR-CM**
                          Miami, FL  33128-7797

**PAGE 16**