## SPILMAN THOMAS & BATTLE, PLLC
### ATTORNEYS AT LAW

Alexander Macia
Direct: 304.340.3835
Email: amacia@spilmanlaw.com

January 22, 2014

**_Via E-Mail & Regular U.S. Mail_**
Barbara R. Binis
Reed Smith LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103-7301

      In re:    *American Medical Systems, Inc. Pelvic Repair Systems Product Liability Cases,*
                MDL 2325, U.S. District Court (S.D.W.Va.)

Dear Ms. Binis:

     As you know, my firm represents MedStar Funding, LC ("MedStar") and Dan Christensen in connection with certain subpoenas issued by your firm on behalf of American Medical Systems ("AMS") in the above-captioned MDL. It has just recently come to my attention that AMS has also engaged the law firm of Cox Smith Matthews, Incorporated ("Cox Smith") in connection with similar actions pending in state courts in Texas. It has further come to my attention that Cox Smith has filed motions in those cases making the same factual allegations of wrongful conduct by MedStar and Mr. Christensen that you have made in our pending case. In fact, I understand that Cox Smith attorneys have even used the same affidavit from Dr. Cassidenti that you used to support your claims in our case. The links between Reed Smith and Smith Cox go much deeper than merely sharing AMS as a common client. Indeed, attorneys from Smith Cox and Reed Smith have even appeared together as co-counsel in state court actions in Texas. What you might not know, however, is that Cox Smith also represents MedStar Funding and has provided legal advice, opinions, and memoranda to Dan Christensen concerning a number of legal matters that are integral to his entire underlying business model. As such, Cox Smith has learned significant confidential information relating to MedStar and Mr. Christensen.

     Under these circumstances, it appears that the actions by Cox Smith constitute a significant breach of its duty of loyalty to MedStar and Mr. Christensen. As a result of this conduct, Mr. Christensen has retained Texas ethics and malpractice attorney, Chuck Herring of Herring & Irwin, LLP, to pursue this issue on his behalf before the appropriate authorities in Texas. Please see the attached letter.

Spilman Center  |  300 Kanawha Boulevard, East  |  Post Office Box 273  |  Charleston, West Virginia  25321-0273
www.spilmanlaw.com  |  304.340.3800  |  304.340.3801 fax

West Virginia     North Carolina     Pennsylvania     Virginia



**SPILMAN THOMAS & BATTLE** PLLC
ATTORNEYS AT LAW

Barbara R. Binis
January 22, 2014
Page 2

     Given the similarity of the allegations contained in the Cox Smith court filings to those raised by you in our pending case, not to mention the joint appearance in state court, it is reasonable to conclude that your firm has had communications with Cox Smith about MedStar and Mr. Christensen and, perhaps, has had access to and the benefit of confidential information obtained by Cox Smith. In any event, such an apparent relationship between Reed Smith and Cox Smith raises an appearance of impropriety that must be addressed immediately. If you believe that Cox Smith's conflict of interest does not extend to your firm, please provide a written explanation of this position.

     As you know, Mr. Christensen's deposition is currently scheduled for Tuesday, January 28. In light of this recent significant development, I cannot permit his deposition to go forward until this breach of professional responsibility is adequately addressed. If, however, you intend to proceed with this deposition, please inform me via email by no later than close of business on Thursday, January 23. If I do not hear from you, I will presume you do not intend to go forward with the deposition.

Very truly yours,

Alexander Macia

Enclosure

**HERRING & IRWIN, L.L.P.**
1411 WEST AVENUE, SUITE 100
AUSTIN, TEXAS 78701

_____

TEL: 512-320-0665                                          FAX: 512-519-7580

January 21, 2014

*Via facsimile 210-226-8395*
Cox Smith Matthews Incorporated
c/o Mr. James B. Smith
112 E. Pecan Street, Ste. 1800
San Antonio, Texas 78205

*Via facsimile 512-703-6399*
Ms. Kathy L. Poppitt
Cox Smith Matthews Incorporated
111 Congress, Suite 1800
Austin, Texas   78701

Dear Mr. Smith and Ms. Poppitt:

I represent MedStar Funding, L.C. ("MedStar") and Dan Christensen, President and owner of MedStar, in connection with potential legal claims against Cox Smith Matthews Incorporated (collectively, "Cox Smith") and individual Cox Smith lawyers. MedStar is a current Cox Smith client. Despite that fact, Cox Smith apparently has undertaken representation directly adverse to the interests of MedStar in a matter that is substantially related to Cox Smith's representation of MedStar. Specifically, I understand that Cox Smith, along with Reed Smith, L.L.P. ("Reed Smith"), is representing American Medical Systems ("AMS") in various state court actions in Texas. I also understand that Reed Smith is lead counsel for AMS for purposes of MDL 2325 currently pending in the Southern District of West Virginia, Charleston Division (the "MDL Case"). Cox Smith and Reed Smith have filed motions in state court cases and the MDL Case asserting that MedStar is involved in an improper scheme to falsify medical records and promote unnecessary surgeries. Cox Smith and Reed Smith have propounded discovery to MedStar and numerous medical providers associated with MedStar seeking information regarding those allegations. Thus, Cox Smith is pursuing litigation directly adverse to MedStar, its current client.

As you know, under Texas law an impermissible conflict of interest can result in disciplinary action, substantive damages claims for legal malpractice and breach of fiduciary duty, a fee forfeiture claim, and disqualification of counsel. Texas Disciplinary Rule of Professional Conduct 1.06(b) generally prohibits a lawyer and firm from undertaking or continuing representation of a person when the representation:

January 21, 2014
Page 2

(1) involves a substantially related matter in which that person's interests are materially and directly adverse to the interests of another client of the lawyer or the lawyer's firm; or

(2) reasonably appears to be or become adversely limited by the lawyer's or law firm's responsibilities to another client or to a third person or by the lawyer's or law firm's own interests.

Texas Disciplinary Rule of Professional Conduct 1.06(c) permits a lawyer to represent clients in certain conflict-of-interest settings, but not others. However, the present matter would be a nonconsentable conflict of interest under Rule 1.06(c)(1). Even if the present matter were a consentable conflict of interest under Rule 1.06(c)(1), Cox Smith has not sought or received informed consent required by Rule 1.06(c)(2), and thus an impermissible conflict of interest exists. Under Rule 1.06(f), when a lawyer in a firm has such a conflict of interest, no other lawyer in the firm may undertake representation. *See also* Tex. Disciplinary R. Prof'l Conduct 1.15(a)(1) (requiring that a lawyer withdraw from representation if the representation will violate any rule of professional conduct). Additionally, a disqualifying conflict also may be imputed to co-counsel and to counsel for other parties who are subject to a joint-defense agreement. *See, e.g., In re American Home Prods. Corp.*, 985 S.W.2d 68 (Tex. 1998) (imputation to co-counsel); *National Medical Enterprises, Inc. v. Godbey*, 924 S.W.2d 123 (Tex. 1996) (imputation to counsel subject to a joint-defense agreement). In terms of substantive claims, an impermissible conflict of interest constitutes a breach of fiduciary duty, permitting claims for both fee forfeiture and damages. *See, e.g., Burrow v. Arce*, 997 S.W.2d 229 (Tex. 1999); Restatement (Third) of the Law Governing Lawyers §§ 16(3), 37, 49.

If you have any reason to assert that Cox Smith does not have a serious, disqualifying conflict of interest in its representation of AMS against MedStar, please provide that information by 5:00 p.m. CST on Wednesday, January 22, 2014. If you do not provide such information, we will assume that such a conflict of interest exists. MedStar reserves its rights to pursue all available legal and equitable remedies against Cox Smith, Cox Smith's co-counsel, and any other person or entity that has participated in any breach of Cox Smith's fiduciary duties owed to MedStar. Those steps may include all available remedies for violations of the Texas Disciplinary of Professional Conduct; substantive claims for liability, damages, and fee forfeiture; and a motion to disqualify counsel.

On behalf of MedStar, I also request that you provide, within seven days of the date of this letter, all files and documents that you have concerning MedStar and all matters in which you have represented MedStar, including but not limited to:

- All documents involved in or concerning any transactional or other matter in which you have represented MedStar.

January 21, 2014
Page 3

- All pleadings, briefs, memorandums, discovery, affidavits, exhibits, correspondence, notes, drafts, emails, and all other documents, that you have that mention or refer to MedStar.

- All documents (including emails) that you have sent to or received from MedStar.

- All documents (including emails) that you have sent to or received from any person, entity, or counsel for any other party, in connection with the MDL Case that mention or refer to MedStar.

- All bills that you have sent to MedStar.

- All time records and calendar entries that mention or refer to MedStar.

Those documents and materials requested should include all electronic data, including but not limited to all attorney and staff notes and emails. *See generally* Tex. Comm. on Professional Ethics, Op. 570.

Additionally, I also request that you provide, within seven days of the date of this letter, all documents that you have prepared, filed, or participated in preparing or filing, concerning persons or entities whom AMS, Reed Smith, or you have alleged or identified as having a relationship or association with Medstar, including: Otto Fisher; One Point Orthopedic and Neurological Group, LLC; MedStar; Physician Surgical Group of Boca Raton, LLC; Dr. Amit Patel; Dr. Andrew Cassidenti; Dr. Sheldon Pike; Dr. Steven Siegel; Dr. Jon Marks; Dr. Aaron Katz; Dr. Tom Margolis; Dr. William Porter; Dr. Mark Leo; Dr. Amir Shariati; Dr. Earl Pescatore; Terry Lazar; Dr. Michael Hulse; Falany and Hulse Women's Center; North Georgia Medical Center; Sanctuary Surgical Anesthesia Center, LLC; Perimeter Surgery Group of Atlanta; and Marc Horowitz—collectively "Deponents"— and including but not limited to:

- All pleadings, briefs, memorandums, discovery, affidavits, exhibits, correspondence, notes, drafts, emails, text messages and all other documents, that you have that mention or refer to Medstar and any of the Deponents.

- All documents (including emails and text messages) that you have sent to or received from Reed Smith regarding the allegations against Medstar and any of the Deponents.

- All documents (including emails and text messages) that you have sent to or received from any person, entity, or counsel for any other party, in connection with the MDL Case that mention or refer to Medstar and any of the Deponents.

- All joint defense agreements that you have entered into with any other person, entity, or counsel for any other party, in connection with the MDL Case or any state court

January 21, 2014
Page 4

action in which you or co-counsel have propounded discovery or filed motions regarding Medstar and any of the Deponents.

If you have any questions concerning these matters, please do not hesitate to have your counsel contact me.

Sincerely,

Charles Herring, Jr.

cc:    Ms. Colleen Davies
Chair of Litigation Department
Reed Smith, LLP
101 Second Street, Ste. 1800
San Francisco, CA 94105
FAX: (415) 391-8269

# SPILMAN THOMAS & BATTLE, PLLC
### ATTORNEYS AT LAW

Alexander Macia
Direct: 304.340.3835
Email: amacia@spilmanlaw.com

January 22, 2014

*Via E-Mail (Laura.dixon@butlersnow.com)*
*& Regular U.S. Mail*
Laura Dixon
Butler Snow LLP
P.O. Box 6010
Ridgeland, MS 39158

*Via E-Mail (ahernandez@shb.com)*
*& Regular U.S. Mail*
Adrienne Hernandez
Shook, Hardy & Bacon L.L.P.
255 Grand Blvd.
Kansas City, Missouri 64108

*Via E-Mail (Dustin.rawlin@tuckerellis.com)*
*& Regular U.S. Mail*
Dustin B. Rawlin
Tucker Ellis | LLP
950 Main Avenue, Suite 1100
Cleveland, Ohio 44113

*Via E-Mail (Jonathan.feczko@tuckerellis.com)*
*& Regular U.S. Mail*
Jonathan Feczko
Tucker Ellis | LLP
950 Main Avenue, Suite 1100
Cleveland, Ohio 44113

*Via E-Mail*
Stephen.huffaker@nortonrosefulbright.com
*& Regular U.S. Mail*
Stephen Huffaker
Fulbright & Jaworski LLP
98 San Jacinto Boulevard, Suite 1100
Austin, Texas 78701-4255

*Via E-Mail (nugentj@gtlaw.com)*
*& Regular U.S. Mail*
Janna S. Nugent
Greenberg Traurig, LLP
Terminus 200
3333 Piedmont Road NE
Suite 2500
Atlanta, Georgia 30305

*Via E-Mail (merrellc@gtlaw.com)*
*& Regular U.S. Mail*
Cliff Merrell
Greenberg Traurig, LLP
Terminus 200
3333 Piedmont Road NE
Suite 2500
Atlanta, GA  30305

*Via E-Mail (jshill@shb.com)*
*& Regular U.S. Mail*
Jennifer Stonecipher Hill
Shook, Hardy & Bacon, L.L.P.
2555 Grand Boulevard
Kansas City, Missouri 64108

In re:   *American Medical Systems, Inc. Pelvic Repair Systems Product Liability Cases,*
MDL 2325, U.S. District Court (S.D.W.Va.)

Spilman Center · 300 Kanawha Boulevard, East · Post Office Box 273 · Charleston, West Virginia 25321-0273
www.spilmanlaw.com · 304.340.3800 · 304.340.3801 fax

West Virginia          North Carolina          Pennsylvania          Virginia



EXHIBIT
2

**SPILMAN THOMAS & BATTLE** pllc
ATTORNEYS AT LAW

January 22, 2014
Page 2

Dear Counsel:

As you know, my firm represents MedStar Funding, LC ("MedStar") and Dan Christensen in connection with certain subpoenas issued on behalf of your respective clients in the above-captioned MDL. A significant development has just recently come to my attention which implicates Defendant American Medical Systems ("AMS") and two of its law firms, Reed Smith, LLP ("Reed Smith") and Cox Smith Matthews, Incorporated ("Cox Smith"). For your reference, I have attached a letter to Ms. Binis of Reed Smith. Concisely stated, attorneys from Cox Smith have also represented MedStar and Dan Christensen and, through that relationship, have obtained confidential information relating to MedStar's business operations and arrangements. Now, Cox Smith and Reed Smith are apparently communicating and cooperating with state court actions in Texas wherein they are raising the same allegations against MedStar and Dan Christensen as have been raised in this case.

Under these circumstances, it appears that the actions by Cox Smith constitute a significant breach of its duty of loyalty to MedStar and Mr. Christensen. It is reasonable to believe that that law firm's coordinated relationship with Reed Smith now raises the appearance of impropriety by Reed Smith. Given the fact that your respective firms have coordinated with Reed Smith in obtaining documents from MedStar and the scheduling of the deposition of Mr. Christensen, it is also possible that you might have been provided confidential information about MedStar and Mr. Christensen, at a minimum.

The Reed Smith and Cox Smith relationship, as part of your joint defense coordination, now raises an appearance of impropriety that must be addressed immediately. If you believe that this conflict of interest does not extend to your firm, please provide a written explanation of this position.

As you know, Mr. Christensen's deposition is currently scheduled for Tuesday, January 28. In light of this recent significant development, I cannot permit his deposition to go forward until this breach of professional responsibility is adequately addressed. If, however, you intend to proceed with this deposition, please inform me via email by no later than close of business on Thursday, January 23. If I do not hear from you, I will presume you do not intend to go forward with the deposition.

Very truly yours,

Alexander Macia

Enclosure

cc:   Henry G. Garrard, III (via e-mail hgg@bbgbalaw.com and regular mail)
      Amy Eskin (via e-mail aeskin@levinsimes.com and regular mail)
      Fidelma L. Fitzpatrick (ffitzpatrick@motleyrice.com and regular mail)

**SPILMAN THOMAS & BATTLE**, PLLC

A T T O R N E Y S   A T   L A W

Alexander Macia
Direct: 304.340.3835
Email: amacia@spilmanlaw.com

January 22, 2014

***Via E-Mail & Regular U.S. Mail***
Barbara R. Binis
Reed Smith LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103-7301

     In re:  *American Medical Systems, Inc. Pelvic Repair Systems Product Liability Cases,*
          MDL 2325, U.S. District Court (S.D.W.Va.)

Dear Ms. Binis:

As you know, my firm represents MedStar Funding, LC ("MedStar") and Dan Christensen in connection with certain subpoenas issued by your firm on behalf of American Medical Systems ("AMS") in the above-captioned MDL. It has just recently come to my attention that AMS has also engaged the law firm of Cox Smith Matthews, Incorporated ("Cox Smith") in connection with similar actions pending in state courts in Texas. It has further come to my attention that Cox Smith has filed motions in those cases making the same factual allegations of wrongful conduct by MedStar and Mr. Christensen that you have made in our pending case. In fact, I understand that Cox Smith attorneys have even used the same affidavit from Dr. Cassidenti that you used to support your claims in our case. The links between Reed Smith and Smith Cox go much deeper than merely sharing AMS as a common client. Indeed, attorneys from Smith Cox and Reed Smith have even appeared together as co-counsel in state court actions in Texas. What you might not know, however, is that Cox Smith also represents MedStar Funding and has provided legal advice, opinions, and memoranda to Dan Christensen concerning a number of legal matters that are integral to his entire underlying business model. As such, Cox Smith has learned significant confidential information relating to MedStar and Mr. Christensen.

Under these circumstances, it appears that the actions by Cox Smith constitute a significant breach of its duty of loyalty to MedStar and Mr. Christensen. As a result of this conduct, Mr. Christensen has retained Texas ethics and malpractice attorney, Chuck Herring of Herring & Irwin, LLP, to pursue this issue on his behalf before the appropriate authorities in Texas. Please see the attached letter.

Spilman Center I 300 Kanawha Boulevard, East I Post Office Box 273 I Charleston, West Virginia 25321-0273
www.spilmanlaw.com I 304.340.3800 I 304.340.3801 fax

West Virginia    North Carolina    Pennsylvania    Virginia

**SPILMAN THOMAS & BATTLE,** PLLC
ATTORNEYS AT LAW

Barbara R. Binis
January 22, 2014
Page 2

　　　　Given the similarity of the allegations contained in the Cox Smith court filings to those raised by you in our pending case, not to mention the joint appearance in state court, it is reasonable to conclude that your firm has had communications with Cox Smith about MedStar and Mr. Christensen and, perhaps, has had access to and the benefit of confidential information obtained by Cox Smith. In any event, such an apparent relationship between Reed Smith and Cox Smith raises an appearance of impropriety that must be addressed immediately. If you believe that Cox Smith's conflict of interest does not extend to your firm, please provide a written explanation of this position.

　　　　As you know, Mr. Christensen's deposition is currently scheduled for Tuesday, January 28. In light of this recent significant development, I cannot permit his deposition to go forward until this breach of professional responsibility is adequately addressed. If, however, you intend to proceed with this deposition, please inform me via email by no later than close of business on Thursday, January 23. If I do not hear from you, I will presume you do not intend to go forward with the deposition.

　　　　　　　　　　　　　　　　Very truly yours,

　　　　　　　　　　　　　　　　Alexander Macia

Enclosure

HERRING & IRWIN, L.L.P.
1411 WEST AVENUE, SUITE 100
AUSTIN, TEXAS 78701

TEL: 512-320-0665                                              FAX: 512-519-7580

January 21, 2014

*Via facsimile 210-226-8395*
Cox Smith Matthews Incorporated
c/o Mr. James B. Smith
112 E. Pecan Street, Ste. 1800
San Antonio, Texas 78205

*Via facsimile 512-703-6399*
Ms. Kathy L. Poppitt
Cox Smith Matthews Incorporated
111 Congress, Suite 1800
Austin, Texas  78701

Dear Mr. Smith and Ms. Poppitt:

I represent MedStar Funding, L.C. ("MedStar") and Dan Christensen, President and owner of MedStar, in connection with potential legal claims against Cox Smith Matthews Incorporated (collectively, "Cox Smith") and individual Cox Smith lawyers. MedStar is a current Cox Smith client. Despite that fact, Cox Smith apparently has undertaken representation directly adverse to the interests of MedStar in a matter that is substantially related to Cox Smith's representation of MedStar. Specifically, I understand that Cox Smith, along with Reed Smith, L.L.P. ("Reed Smith"), is representing American Medical Systems ("AMS") in various state court actions in Texas. I also understand that Reed Smith is lead counsel for AMS for purposes of MDL 2325 currently pending in the Southern District of West Virginia, Charleston Division (the "MDL Case"). Cox Smith and Reed Smith have filed motions in state court cases and the MDL Case asserting that MedStar is involved in an improper scheme to falsify medical records and promote unnecessary surgeries. Cox Smith and Reed Smith have propounded discovery to MedStar and numerous medical providers associated with MedStar seeking information regarding those allegations. Thus, Cox Smith is pursuing litigation directly adverse to MedStar, its current client.

As you know, under Texas law an impermissible conflict of interest can result in disciplinary action, substantive damages claims for legal malpractice and breach of fiduciary duty, a fee forfeiture claim, and disqualification of counsel. Texas Disciplinary Rule of Professional Conduct 1.06(b) generally prohibits a lawyer and firm from undertaking or continuing representation of a person when the representation:

January 21, 2014
Page 2

> (1) involves a substantially related matter in which that person's interests are materially and directly adverse to the interests of another client of the lawyer or the lawyer's firm; or

> (2) reasonably appears to be or become adversely limited by the lawyer's or law firm's responsibilities to another client or to a third person or by the lawyer's or law firm's own interests.

Texas Disciplinary Rule of Professional Conduct 1.06(c) permits a lawyer to represent clients in certain conflict-of-interest settings, but not others. However, the present matter would be a nonconsentable conflict of interest under Rule 1.06(c)(1). Even if the present matter were a consentable conflict of interest under Rule 1.06(c)(1), Cox Smith has not sought or received informed consent required by Rule 1.06(c)(2), and thus an impermissible conflict of interest exists. Under Rule 1.06(f), when a lawyer in a firm has such a conflict of interest, no other lawyer in the firm may undertake representation. *See also* Tex. Disciplinary R. Prof'l Conduct 1.15(a)(1) (requiring that a lawyer withdraw from representation if the representation will violate any rule of professional conduct). Additionally, a disqualifying conflict also may be imputed to co-counsel and to counsel for other parties who are subject to a joint-defense agreement. *See, e.g.*, *In re American Home Prods. Corp.*, 985 S.W.2d 68 (Tex. 1998) (imputation to co-counsel); *National Medical Enterprises, Inc. v. Godbey*, 924 S.W.2d 123 (Tex. 1996) (imputation to counsel subject to a joint-defense agreement). In terms of substantive claims, an impermissible conflict of interest constitutes a breach of fiduciary duty, permitting claims for both fee forfeiture and damages. *See, e.g.*, *Burrow v. Arce*, 997 S.W.2d 229 (Tex. 1999); Restatement (Third) of the Law Governing Lawyers §§ 16(3), 37, 49.

If you have any reason to assert that Cox Smith does not have a serious, disqualifying conflict of interest in its representation of AMS against MedStar, please provide that information by 5:00 p.m. CST on Wednesday, January 22, 2014. If you do not provide such information, we will assume that such a conflict of interest exists. MedStar reserves its rights to pursue all available legal and equitable remedies against Cox Smith, Cox Smith's co-counsel, and any other person or entity that has participated in any breach of Cox Smith's fiduciary duties owed to MedStar. Those steps may include all available remedies for violations of the Texas Disciplinary of Professional Conduct; substantive claims for liability, damages, and fee forfeiture; and a motion to disqualify counsel.

On behalf of MedStar, I also request that you provide, within seven days of the date of this letter, all files and documents that you have concerning MedStar and all matters in which you have represented MedStar, including but not limited to:

- All documents involved in or concerning any transactional or other matter in which you have represented MedStar.

January 21, 2014
Page 3

- All pleadings, briefs, memorandums, discovery, affidavits, exhibits, correspondence, notes, drafts, emails, and all other documents, that you have that mention or refer to MedStar.

- All documents (including emails) that you have sent to or received from MedStar.

- All documents (including emails) that you have sent to or received from any person, entity, or counsel for any other party, in connection with the MDL Case that mention or refer to MedStar.

- All bills that you have sent to MedStar.

- All time records and calendar entries that mention or refer to MedStar.

Those documents and materials requested should include all electronic data, including but not limited to all attorney and staff notes and emails. *See generally* Tex. Comm. on Professional Ethics, Op. 570.

Additionally, I also request that you provide, <u>within seven days</u> of the date of this letter, all documents that you have prepared, filed, or participated in preparing or filing, concerning persons or entities whom AMS, Reed Smith, or you have alleged or identified as having a relationship or association with Medstar, including: Otto Fisher; One Point Orthopedic and Neurological Group, LLC; MedStar; Physician Surgical Group of Boca Raton, LLC; Dr. Amit Patel; Dr. Andrew Cassidenti; Dr. Sheldon Pike; Dr. Steven Siegel; Dr. Jon Marks; Dr. Aaron Katz; Dr. Tom Margolis; Dr. William Porter; Dr. Mark Leo; Dr. Amir Shariati; Dr. Earl Pescatore; Terry Lazar; Dr. Michael Hulse; Falany and Hulse Women's Center; North Georgia Medical Center; Sanctuary Surgical Anesthesia Center, LLC; Perimeter Surgery Group of Atlanta; and Marc Horowitz— collectively "Deponents"— and including but not limited to:

- All pleadings, briefs, memorandums, discovery, affidavits, exhibits, correspondence, notes, drafts, emails, text messages and all other documents, that you have that mention or refer to Medstar and any of the Deponents.

- All documents (including emails and text messages) that you have sent to or received from Reed Smith regarding the allegations against Medstar and any of the Deponents.

- All documents (including emails and text messages) that you have sent to or received from any person, entity, or counsel for any other party, in connection with the MDL Case that mention or refer to Medstar and any of the Deponents.

- All joint defense agreements that you have entered into with any other person, entity, or counsel for any other party, in connection with the MDL Case or any state court

January 21, 2014
Page 4

action in which you or co-counsel have propounded discovery or filed motions regarding Medstar and any of the Deponents.

If you have any questions concerning these matters, please do not hesitate to have your counsel contact me.

Sincerely,

Charles Herring, Jr.

cc:   Ms. Colleen Davies
Chair of Litigation Department
Reed Smith, LLP
101 Second Street, Ste. 1800
San Francisco, CA 94105
FAX: (415) 391-8269

Cause No. C-0362-13-B

| | | |
|---|---|---|
| MARIA ROSALINDA GARZA and | § | IN THE DISTRICT COURT |
| SERGIO GARZA, ET AL | § | |
| | § | |
| | § | |
| v. | § | OF HIDALGO COUNTY, TEXAS |
| | § | |
| LUIS ALBERTO RAMIREZ, M.D., | § | |
| LUIS ALBERTO RAMIREZ, M.D., P.A. | § | |
| and AMERICAN MEDICAL | § | |
| SYSTEMS, INC. | § | 93rd JUDICIAL DISTRICT |

---

### MEDSTAR FUNDING, L.C.'S MOTION
### TO DISQUALIFY COUNSEL

---

TO THE HONORABLE JUDGE OF SAID COURT:

MedStar Funding, L.C. ("Medstar"), as Movant, intervenes in this case for the limited purpose of filing this Motion to Disqualify Cox Smith Matthews, Inc. ("Cox Smith") and Reed Smith LLP ("Reed Smith"), as counsel for defendants.

### I.

MedStar is a current client of Cox Smith, but in the present case Cox Smith has undertaken representation directly adverse to the interests of MedStar. Thus, Cox Smith has a dramatic, improper conflict of interest that requires disqualification of Cox Smith.

### II.

Cox Smith and Reed Smith, its co-counsel, represent defendant American Medical Systems ("AMS") in this case and various other actions in Texas. On behalf of AMS, Cox Smith has taken positions asserting that MedStar is involved in an improper scheme to falsify medical records and promote unnecessary surgeries. That is false, but obviously is directly adverse to

1


EXHIBIT
A

MedStar's position and interests. Thus, Cox Smith is pursuing litigation directly adverse to MedStar, its current client.

### III.

The Texas Supreme Court has repeatedly held that the Texas Disciplinary Rules of Professional Conduct provide "guidance" for trial courts in ruling on motions to disqualify. Texas Disciplinary Rule of Professional Conduct 1.06 is the general conflict of interest rule. In relevant part, it provides:

(a) A lawyer shall not represent opposing parties to the same litigation.

(b) In other situations and except to the extent permitted by paragraph (c), a lawyer shall not represent a person if the representation of that person:

(1) involves a substantially related matter in which that person's interests are materially and directly adverse to the interests of another client of the lawyer or the lawyer's firm; or

(2) reasonably appears to be or become adversely limited by the lawyer's or law firm's responsibilities to another client or to a third person or by the lawyer's or law firm's own interests.

(c) A lawyer may represent a client in the circumstances described in (b) if:

(1) the lawyer reasonably believes the representation of each client will not be materially affected; and

(2) each affected or potentially affected client consents to such representation after full disclosure of the existence, nature, implications, and possible adverse consequences of the common representation and the advantages involved, if any.

Texas Disciplinary Rule of Professional Conduct 1.06(c) permits a lawyer to represent clients in certain conflict-of-interest settings, but not others. However, the present matter would be a nonconsentable conflict of interest under Rule 1.06(c)(1). Even if the present matter were a consentable conflict of interest under Rule 1.06(c)(1), Cox Smith has not sought or received informed consent as required by Rule 1.06(c)(2), and thus an impermissible conflict of interest

2

exists. Under Rule 1.06(f), when a lawyer in a firm has such a conflict of interest, no other lawyer in the firm may undertake representation. *See also* Tex. Disciplinary R. Prof'l Conduct 1.15(a)(1) (requiring that a lawyer withdraw from representation if the representation will violate any rule of professional conduct).

## IV.

A disqualifying conflict also may be imputed to a disqualified firm's co-counsel and to counsel for other parties who are parties to a joint-defense agreement. *See, e.g., In re American Home Prods. Corp.*, 985 S.W.2d 68 (Tex. 1998) (imputation to co-counsel); *National Medical Enterprises, Inc. v. Godbey*, 924 S.W.2d 123 (Tex. 1996) (imputation to counsel subject to a joint-defense agreement). Reed Smith has worked as co-counsel with Cox Smith for AMS in this and other cases and because of the working relationship between Reed Smith and Cox Smith and the other relevant circumstances, Cox Smith's disqualifying conflict is imputed to Reed Smith. Accordingly, Reed Smith also must be disqualified from representing the defendants in this case.

## V.

## PRAYER

WHEREFORE, PREMISES CONSIDERED,  Medstar Funding, L.C. prays that this Honorable Court grant  this Motion to Disqualify Cox Smith Matthews, Inc. and Reed Smith L.L.P. from representing the defendants in this case, and that the Court grant Medstar Funding, L.C. such other and further relief, either at law or in equity, to which it  shows itself entitled.

3

Respectfully submitted,

## CERTIFICATE OF CONFERENCE

I hereby certify that counsel for Medstar Funding, L.C. made a good faith attempt to confer with counsel for defendants concerning the relief requested in this Motion to Disqualify. Defendants' counsel are opposed to the relief requested. The intervention of the Court is needed at this time.

_____

5

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was served on all counsel of record in accordance with the Texas Rules of Civil Procedure on _____.

_____

4840-5139-5864, v. 1

6

Case 2:12-md-02325   Document 1055   Filed 01/22/14   Page 1 of 3 PageID #: 14207

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## CHARLESTON DIVISION

IN RE: AMERICAN MEDICAL SYSTEMS, INC.   MDL NO. 2325
PELVIC REPAIR SYSTEM PRODUCTS
LIABILITY LITIGATION

THIS DOCUMENT RELATES TO ALL CASES

### SECOND AMENDED NOTICE OF VIDEOTAPED DEPOSITION

TO:

James Crockett, Jr.
Spilman Thomas & Battle
Spilman Center
300 Kanawha Boulevard, East
Charleston, WV 25301

    Attorney for Deponent

Amy Eskin, Esquire
Levin Simes LLP
353 Sacramento Street
20th Floor
San Francisco, CA 94111

Fidelma L. Fitzpatrick, Esquire
Motley Rice LLC
321 South Main Street
Providence, RI 02903-7109

    Attorneys for Plaintiff

    PLEASE TAKE NOTICE that pursuant to the Federal Rules of Civil Procedure,

Defendant will take the testimony of Daniel J. Christensen.

**DATE AND TIME:  January 28, 2014 at 9:00 AM**

**LOCATION:   701 Brazos Street**
**Suite 420**
**Austin, TX.**



EXHIBIT
B

The deposition will be taken before a person authorized by law to administer oaths, pursuant to Federal Rule of Civil Procedure 28, and will continue from day to day, excluding Sundays and court-recognized holidays, until the examination is completed.  The deposition will be recorded via stenographic means and videotaping.

Dated:  January 22, 2014

**REED SMITH LLP**

*/s/ Barbara Binis*
Barbara R. Binis, Esq.
1650 Market Street
25th Floor
Philadelphia, PA  19103
(215) 851-8100

*Attorneys for American Medical Systems, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on January 22, 2014, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the CM/ECF participants registered to receive service in this MDL.

The following individual will also be served by electronic mail:

James Crockett, Jr.
Spilman Thomas & Battle
Spilman Center
300 Kanawha Boulevard, East
Charleston, WV 25301

*Barbara Binis*
Barbara Binis

FILED
DALLAS COUNTY
1/16/2014 1:21:32 PM
GARY FITZSIMMONS
DISTRICT CLERK

CAUSE NO. DC-12-13371

| | | |
|---|---|---|
| JOANN WILLIAMS, | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| RUFUS GREEN, M.D., RUFUS GREEN, | § | DALLAS COUNTY, TEXAS |
| M.D., P.A. AND AMERICAN MEDICAL | § | |
| SYSTEMS, INC. | § | |
| | § | |
| Defendants. | § | 68th JUDICIAL DISTRICT |

**AMERICAN MEDICAL SYSTEMS, INC.'S AMENDED EMERGENCY MOTION TO COMPEL AN INDEPENDENT MEDICAL EXAMINATION OF PLAINTIFF AND A PRELIMINARY DEPOSITION OF TREATING PHYSICIAN**

Pursuant to Texas Rule of Civil Procedure 204, Defendant American Medical Systems, Inc. ("AMS") moves (i) to compel an independent medical examination of Plaintiff Joann Williams; (ii) to compel a preliminary deposition of plaintiff's treating physician before she undergoes surgery; and (iii) for an order establishing a protocol to preserve any pathology resulting from this or any other revision surgery.

## I. SUMMARY

Ms. Williams is about to have surgery that she claims is necessary because of a problem with AMS's medical device. None of her regular treating doctors have reported seeing this problem, however. Only one doctor -- to whom Ms. Williams was referred by her lawyers -- purports to see it, and he is the one proposing to operate on her. As a practical matter, once the surgery takes place, AMS will be unable to verify objectively whether the problem Ms. Williams claims to have actually exists or not. Accordingly, AMS requests a fair opportunity to assess for itself, *before the surgery*, whether there is a problem with the AMS device.

On June 10, 2011, Plaintiff Joann Williams was implanted with a SPARC sling (a pelvic mesh device) to treat her longstanding stress urinary incontinence. Since her surgery, not once

5042838.4



has she indicated to her regular treating physicians that she is experiencing pain or complications that her doctors or even she attribute to her pelvic mesh. Nonetheless, according to Ms. Williams' recent deposition testimony, she is on the brink of undergoing an operation – removal of her implanted pelvic mesh device – to be performed by a new doctor, who was recommended by her lawyers and who will be paid to operate on Ms. Williams by a litigation funding company. Were this procedure medically justified, AMS can only assume that it would be covered by Medicaid as part of Ms. William's federal disability support.[1] By filing this motion, AMS does not seek to interfere with Ms. Williams' right to proceed with her explant surgery. Rather, AMS respectfully requests that, among other relief, this Court grant AMS the opportunity to conduct an independent medical examination of Plaintiff Williams to preserve its ability to respond fully to Plaintiff's claims and to prevent the alteration, loss or spoliation of critical evidence that could reveal the true nature of Ms. William's injuries, if any.

That Ms. Williams plans to undergo explant surgery within a few weeks time is particularly troubling because:

1. Ms. Williams' medical records show that despite her numerous visits to doctors since her implant surgery, she has never complained of pain or discomfort related to the device.

2. None of Ms. Williams' independent treating physicians (seen both before and after this suit was filed) have diagnosed her with any medical problems or injuries related to her pelvic mesh implant, much less recommended that she have surgery to remove or revise it.

3. The only doctor who recommends that Ms. Williams undergo surgery to remove her pelvic mesh is Dr. Amit Patel, who Ms. Williams was encouraged to see by her lawyers. It is no coincidence that other plaintiffs represented by Ms. Williams' counsel are now seeing Dr. Patel as well.

---

[1] Ms. Williams receives disability for a bipolar disorder. She began receiving disability in 2010, prior to her implantation surgery. Williams Dep. at 30.

- 2 -

4. Dr. Patel himself referred Ms. Williams to a lender that intends to take an interest in her claims against AMS in exchange for paying for the surgery.[2]

5. Given that Ms. Williams is a recipient of federal disability, if her surgery were medically necessary, she could rely on Medicaid – as opposed to a settlement funding company – to pay for her surgery.

Once the surgery is performed by Dr. Patel, vital evidence will be lost or altered and AMS's and the jury's ability to objectively verify whether, in fact, Ms. William's pelvic mesh ever injured her or whether the removal surgery was necessary will be forever compromised. Because AMS is justifiably concerned about preserving critical evidence in this case, AMS seeks an order from this Court: (i) compelling Ms. Williams to submit to a physical examination in the Dallas area by a board certified urologist retained by AMS; (ii) requiring that evidence from the surgery is properly preserved pursuant to a protocol; and (iii) permitting AMS to conduct a limited, preliminary deposition of Dr. Patel before the surgery (while preserving the right to depose him again at a later time).

## II.   FACTUAL BACKGROUND

On December 13, 2012, Ms. Williams filed suit against AMS alleging that a medical device manufactured by AMS, the SPARC sling system, was defective and has caused her personal injury.   In her deposition, Ms. Williams testified that she experienced aching, pain, pressure, and incontinence within a month after the SPARC device was implanted, and claimed the pain and incontinence have been continuous.   Williams Dep. at 238:9-21.[3]

---

[2] Dr. Patel's practice is unusual to say the least.   He describes his practice as "involving a novel clinic model," in which his "office is virtual and mobile" without any set place of business.   See A. Patel LinkedIn Resume, http://www.linkedin.com/in/aipatel (last visited 1/13/2014).   In any event, the address that he provided to AMS's counsel to obtain records was his condominium.   In addition, the practice address that Dr. Patel has listed with the Texas Medical Board (1441 N. Beckley) is Methodist Hospital, an institution with which he has not been affiliated for more than a year   TMB Public Verification/Physician Profile – A Patel, http://reg.tmb.state.tx.us/OnLineVerif/Phys_ReportVerif.asp?ID_NUM=519728&Type=LP&LicensePermit=M3682 , (last visited 1/14/2014).; A Patel LinkedIn Resume.

[3] Excerpts from the deposition of Joann Williams are attached as Exhibit A.

5042838.4

Yet, her complaints are effectively refuted by her contemporaneous medical records, as recorded by her treating gynecologist and countless other physicians she regularly sees – none of whom have ever documented a complaint of pain or other complication that they attribute to her SPARC sling.   Although Ms. Williams saw countless doctors and regularly complained of various aches and pains prior to filing suit, the *first* and *only* doctor to suggest that Ms. Williams has a SPARC related complaint or should have her sling removed is Dr. Amit Patel, the Dallas doctor who was hand-picked by her counsel.   AMS believes that at least one other plaintiff also represented by Ms. Williams' counsel is seeing Dr. Patel as well, although she does not live anywhere near Dr. Patel's practice in Dallas.  Williams Dep. at 12:21-14:20, 24:3-24:2.

Defendant Dr. Rufus Green treated Ms. Williams for stress urinary incontinence by implanting the SPARC on June 10, 2011.  Williams Dep. at 12:21-25.  After recovering from her surgery, Ms. Williams reported no pain from her SPARC device to any doctor, despite regular appointments to numerous physicians.[4]

- Dr. Andrew Burke, Dr. Daniel Leong and Dr. Cynthia McDonald regularly treated Ms. Williams for back pain, knee pain, hip pain and other issues both before and after she received the SPARC device.  Ms. Williams saw these doctors on at least 20 occasions between July 2011 (one month after surgery) and August 2013 (eight months after suit was filed).  Although she constantly complained of hip, knee and back pain, Ms. Williams never complained of the injuries set forth in her Petition, such as profound pelvic pain, constant bleeding or dyspareunia from the SPARC device. .

- In August 2011, Dr. Green performed a follow-up examination on Ms. Williams who reported that she was experiencing "no pain."

- In February 2012, Dr. William Dutton treated Ms. Williams for trichomonas(a vaginal infection), which resulted in her only complaints of dyspareunia (painful intercourse) prior to suit.  Her trichomonas infection was unrelated to her mesh device.

---

[4] A timeline of the treatment that Ms. Williams received after she was implanted with the SPARC device is attached as Exhibit B.

5042838.4

- From April 2012 through September 2012, Dr. Dutton treated Ms. Williams for uterine fibroids, irritable bladder syndrome and mixed urinary incontinence, none of which implicate her pelvic mesh device. She complained of increased menstrual bleeding, which Dr. Dutton diagnosed as uterine fibroids. Ms. Williams did not complain of dyspareunia or any other pain related to her SPARC device, and Dr. Dutton did not find any issues related to the device.

Despite any documented history of problems with her SPARC device, Ms. Williams filed suit against AMS claiming that the SPARC is defective and caused her injuries. Only after filing suit and only after two years passed without Ms. Williams making a single complaint to any of the physicians she chose for her healthcare was Ms. Williams recently examined by her counsel-selected physician, Dr. Amit Patel.

Alone among her many doctors, Dr. Patel (the only physician selected by her counsel, not by her) purportedly recommends that Ms. Williams undergo a surgical procedure to remove or revise her SPARC sling. Williams Dep. at 255:1-3. Even more peculiar, Dr. Patel himself suggested that Ms. Williams obtain a loan to pay for the surgery and referred her to a loan company he called "Injury Assist."[5] *Id.* at 24:21-22; 25:3-21. Plaintiff's regular insurer, Medicaid, has not been consulted about payment for the mesh removal surgery, and thus has not had occasion to evaluate the necessity of the procedure. *See id.* at 63:7-64:10. According to Ms. Williams, this surgery is scheduled to occur in late-January.

### III. ARGUMENT AND AUTHORITIES

AMS seeks an independent medical examination of Williams, observation by an independent board certified urologist at her scheduled surgery, an evidence preservation protocol, and the opportunity to depose Dr. Patel preliminarily regarding the basis for and plans

---

[5] This is especially troubling in light of the recent discovery that certain "litigation funding" companies have been recruiting doctors to perform mesh removal surgeries on plaintiffs and to prepare operative reports tailored to improve their positions in litigation. *See* Affidavit of Andrew Cassidenti, M.D., attached hereto as Exhibit C.

5042838.4

for the revision surgery.  These requests are made in accordance with Texas law and should be granted given the serious, unusual and pressing circumstances in this case.

**A.     AMS is entitled to a full, independent medical examination of Ms. Williams.**

Texas law provides for physical examination of a party upon a showing of good cause, where the party's physical condition is in controversy. TEX. R. CIV. P. 204(c).  This is a textbook case of good cause.  Ms. Williams has placed her physical condition at issue by filing this lawsuit and alleging that she has suffered injuries allegedly caused by defects in AMS's SPARC device, which AMS disputes.  Based solely on the opinion of Dr. Patel—the doctor selected by her lawyers—Ms. Williams claims that the SPARC device eroded around the wall of her "uterus" [sic], and the erosion is causing her to experience incontinence.  Williams Dep. at 22:5-23:4.  Dr. Patel's diagnosis is contradicted by her medical records both before and after suit was filed.  Moreover, the only way to determine if the SPARC device has, in fact, extruded or eroded is to physically examine Ms. Williams. *Once the surgery is completed, there will be no way for AMS or the jury to determine or verify whether Ms. Williams' claimed injury ever in fact existed -- the evidence will have been altered or destroyed.*  Under the peculiar circumstances here, where Plaintiff's lawyer-selected doctor plans to perform an operation none of her regular treating doctors have found warranted, AMS should not be forced to rely -- as the sole evidence of Ms. William's condition -- on Dr. Patel's after-the-fact characterization of what justified performing an arguably unnecessary surgery.

Interpreting an analogous Rule of Federal Civil Procedure, the United States Supreme Court observed, "A plaintiff in a negligence action who asserts mental or physical injury . . . places that mental or physical injury clearly in controversy and provides the defendant with good cause for an examination to determine the existence and extent of such asserted injury." *Schlagenhauf v. Holder*, 379 U.S. 104, 119 (1964) (citation omitted).  Texas courts agree.

- 6 -

Applying the prior version of Rule 204 (formerly Rule 167a), the Fourteenth Court of Appeals made an identical observation in a personal injury case arising from a boat accident: "By asserting a physical injury and by intending to use expert medical testimony to prove his alleged physical condition, the Real Party in Interest has placed his physical condition 'in controversy,' and has provided the Relators with 'good cause' to seek an independent medical examination." *Beamon v. O'Neill*, 865 S.W.2d 583, 586 (Tex. App.—Houston [14th Dist.] 1993).

In *Beamon*, the court held that "[g]ood cause for the examination existed because the Real Party in Interest had placed his own physical condition in controversy, and intended to call medical expert witnesses to establish his injuries." *Id.* "Further, Relators had filed an answer alleging that the injuries were the result of a pre-existing condition." *Id.*

Here, Plaintiff's physical condition is squarely in controversy, and good cause exists for an independent medical examination. TEX. R. CIV. P. 204(c)(1). Whether the SPARC device caused any injury at all is a matter of substantial debate. There is no documented history of problems with the device and none of Williams' treating doctors -- other than one recently selected by her counsel -- has diagnosed a problem with the device or recommended surgery. Once the surgery occurs, it will become impossible for AMS or any other objective party to observe or confirm the pre-surgery position of the SPARC device and whether it had eroded or extruded, as Plaintiff now alleges.

AMS proposes to use a qualified physician, R. Carrington Mason, D.O., to conduct the examination. Dr. Mason is a board-certified urologist who practices with Southwest Urology Associates in Dallas. He is experienced in the implantation and revision of pelvic mesh devices.

On this record, AMS is entitled to obtain an independent medical examination of Plaintiff prior to the removal of the SPARC device.

- 7 -

**B.      AMS is entitled to depose Dr. Patel.**

AMS also requests an opportunity to take a limited deposition of Dr. Patel before he performs any surgery on Ms. Williams, while retaining the right to depose him again later after the surgery.  This deposition is necessary because of the unusual circumstances of this case.  First, given the medical documentation, the surgery that Ms. Williams proposes to undergo may be unwarranted.  Moreover, unlike every other treatment that Ms. Williams has received in the last few years, this one will be paid for by a litigation funding company rather than by Medicaid, who paid for her original procedure and remains her source of health coverage.  Second, the surgery as described by Ms. Williams is not a typical revision surgery.   Williams has testified that Dr. Patel intends to remove the SPARC device and implant some other, permanent device that will dissolve and make its own mesh, something like that." Williams Dep. at 251:22-252:5.

Deposing Dr. Patel prior to the surgery will allow AMS to determine what complication Dr. Patel purportedly found with Ms. Williams' device, the basis for Dr. Patel's recommendation, and what the surgery will actually entail.  The deposition would be limited to the basis for the surgery, the proposed surgery itself, and to the financial arrangements for the surgery.  AMS should then be allowed to depose Dr. Patel again, after any surgery he performs, to learn what he found and the procedure he completed.

**C.      The Court should establish a protocol for the preservation of pathology resulting from this or any other revision surgery.**

AMS also requests that the Court enter an order detailing how pathology resulting from revision surgeries that Ms. Williams may undergo be preserved.  Counsel representing plaintiffs against AMS, including Ms. Williams' counsel, have requested that health care providers participating in revision surgeries for their clients prepare pathological specimens in accordance with their instructions and to send them to Steelgate, a biomedical storage company in Florida.

- 8 -

5042838.4

As a result, all pathology from revision surgeries is removed from the hospitals in contravention of normal practice, placed under the direct control of plaintiffs and shipped out of state.

Plaintiff's seizure of control over the pathology before AMS has had a chance to examine it threatens AMS's ability to defend itself. First, counsel for plaintiffs have routinely asked for samples of mesh removed in surgeries be placed in a formalin solution. While formalin is a good preservative for tissue samples, it is not an appropriate preservative for polypropylene, and the exposure of explanted polypropylene mesh to formalin precludes accurate analysis of mesh specimens. Second, the handling of pathology outside of the normal course imposes significant risk of loss or damages to the specimens. In another case involving counsel for Ms. Williams, a tissue sample taken from a recent revision surgery was sent to Steelgate in accordance with counsel's instructions. When this sample was produced in discovery, AMS discovered that the tissue had not been properly preserved. The sample was provided to AMS's pathologist in a dry container (no preservative of any sort was present). The tissue sample itself was heavily damaged, perhaps destroyed, and showed signs of degradation. While the exact reasons for the damage to the sample in that case will be the subject of discovery in that case, that instance points out the risks inherent in allowing plaintiffs to retain unfettered control over pathology specimens and the need for a preservation protocol.

The protocol adopted by the Court should provide that all specimens be divided in half whenever possible, with one half to be preserved and stored in accordance with Plaintiff's instructions and the other half to be preserved and stored in accordance with Defendants' instructions. In this manner, each party can determine and utilize what it believes is the best manner in which to preserve pathology. In addition, the risk of loss or damage to a specimen is mitigated.

- 9 -

## IV. PRAYER

AMS respectfully requests (A) an order:   (1) compelling Plaintiff to submit to an independent medical examination by AMS' expert physician prior to the scheduled surgery; (2) compelling the limited deposition of Dr. Patel as set forth here; and (3) establishing an evidence preservation protocol, and (B) other relief to which AMS may be entitled.

- 10 -

5042838.4

Respectfully submitted,

*/s/ Jane Bockus*
Jane E. Bockus
State Bar No. 02541700
jbockus@coxsmith.com

Cox Smith Matthews Incorporated
Weston Centre
112 E. Pecan Street, Suite 1800
San Antonio, Texas  78205-1521
(210) 554-5500
(210) 226-8395 (Fax)

Michael D. Napoli
State Bar No. 14803400
mnapoli@coxsmith.com
Sandra C. Zamora
State Bar No. 22243950
szamora@coxsmith.com

Cox Smith Matthews Incorporated
1201 Elm Street, Suite 3300
Dallas, Texas 75270
(214) 698-7800
(214) 698-7899 (Fax)

ATTORNEYS FOR DEFENDANT
AMERICAN MEDICAL SYSTEMS, INC.

## CERTIFICATE OF CONFERENCE

I hereby certify that I have conferred with counsel for Plaintiff regarding the relief sought

in this motion.  Plaintiff's counsel Will Lundquist did not agree to the relief sought.

*/s/ Jane Bockus*
Jane Bockus

- 11 -

5042838.4

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been forwarded to all counsel of record listed below, by regular mail and electronic mail on this 16th day of January 2014.


William W. Lundquist
Clayton A. Clark
Scott A. Love
W. Michael Moreland
Clark, Love & Hutson, G.P.
440 Louisiana Street, Suite 1600
Houston, TX 77002
**COUNSEL FOR PLAINTIFF JOANN WILLIAMS**

Richard A. Capshaw
Capshaw & Associates
3031 Allen Street, Suite 201
Dallas, TX 75204
**COUNSEL FOR PLAINTIFF JOANN WILLIAMS**

Sam A. Houston
Shepherd, Scott, Clawater & Houston, LLP
2777 Allen Parkway, Suite 700
Houston, TX 77019
**COUNSEL FOR DEFENDANTS RUFUS GREEN, M.D., RUFUS GREEN, M.D., P.A.**


_____ /s/ Jane Bockus _____
Jane Bockus

- 12 -

5042838.4

# EXHIBIT "A"

CAUSE NO. DC-12-13371

| | |
|---|---|
| JOANN WILLIAMS, <br>     Plaintiff, | ) IN THE DISTRICT COURT <br> ) <br> ) |
| vs. | ) 68TH JUDICIAL DISTRICT <br> ) |
| RUFUS GREEN, M.D. and <br> RUFUS GREEN, M.D., P.A., <br> and AMERICAN MEDICAL <br> SYSTEMS, INC. <br>     Defendants. | ) <br> ) <br> ) <br> ) <br> ) DALLAS COUNTY, TEXAS |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF

JOANN WILLIAMS

DECEMBER 17, 2013

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF JOANN WILLIAMS,

produced as a witness at the instance of the Defendant

AMS, and duly sworn, was taken in the above-styled and

numbered cause on the 17th day of December, 2013, from

9:11 a.m. to 4:11 p.m., before Julie C. Brandt, RMR,

CRR, and CSR in and for the State of Texas, reported by

machine shorthand, at the offices of Capshaw &

Associates, 3031 Allen Street, Suite 201, Dallas, Texas,

pursuant to the Texas Rules of Civil Procedure and any

provisions stated on the record or attached hereto.

Job No.: 24-241520

JOANN WILLIAMS - 12/17/2013

Page 12

```
 1          A.    Maybe an hour and a half, two.

 2          Q.    Did you review any documents to refresh your

 3     recollection to prepare for your deposition?

 4          A.    Yes.

 5          Q.    Okay.  What did you review?

 6          A.    Well, just asked me my complications and

 7     stuff, so --

 8          Q.    Okay.  Did you look at any papers to help

 9     refresh your recollection?

10          A.    Well, no, I didn't look at none --

11          Q.    Okay.

12          A.    -- I don't think.

13          Q.    Are there some medical records that you may

14     have looked at to help you recall what your

15     complications are?

16          A.    Medical records, yes, I discussed them.

17          Q.    Okay.  But you didn't look at any?

18          A.    No.

19          Q.    Okay.  Have you seen any advertisements for

20     attorneys regarding the mesh litigation?

21          A.    Well, I've seen an advertisement maybe about

22     the mesh implant maybe in 2011.

23          Q.    Okay.  Is that the year that you got your

24     mesh?

25          A.    Let me see.  Yes, I think so.
```

Merrill LAD

JOANN WILLIAMS - 12/17/2013

Page 13

```
 1              Q.   Do you think you saw the advertisement before
 2      or after you got your mesh?
 3              A.   That was --
 4                   MR. CRADDOCK:   Objection.  Form.
 5              A.   -- after.
 6              Q.   (BY MS. BOCKUS)  Okay.  And what did the
 7      advertisement say?
 8              A.   Let me see.  Complication from the mesh
 9      implant.
10              Q.   Okay.  And then call a number?  Did it post a
11      phone number and say call this number?
12              A.   I can't recall.  I know it was complications.
13              Q.   Okay.  And when you saw the ad, did you call
14      the lawyer whose ad it was?
15              A.   No.
16              Q.   Okay.  How did you find your lawyer?
17              A.   Well, I end up calling one, but not then.
18              Q.   Oh, okay.
19              A.   Okay.
20              Q.   When you saw the commercial, the lawyer ad,
21      had you already had complications from your mesh?
22              A.   Yes.
23              Q.   Okay.  How soon after your mesh was implanted
24      did you experience complications?
25              A.   Really immediately.  Way before my six
```

JOANN WILLIAMS - 12/17/2013

Page 14

```
1      weeks --
2            Q.    Okay.
3            A.    -- checkup.
4            Q.    And so when you saw the ad, did you -- did it
5      cross your mind that might be me?
6            A.    Yes.  I experienced some of those symptoms.
7            Q.    Okay.  And that was before six weeks?
8            A.    Exactly.
9            Q.    Okay.  So going on, then at a later time did
10     you see another ad that led you to call a lawyer?
11           A.    Yes, I seen two or three ads --
12           Q.    Okay.
13           A.    -- over the time period.
14           Q.    How did you decide which number to call?
15           A.    I just looked at the advertising and decided
16     to just call one.
17           Q.    Okay.
18           A.    And I just choose that one.
19           Q.    And is that how you ended up with a lawyer?
20           A.    Yes.
21           Q.    Okay.  Did you talk to anyone before calling
22     the lawyer about the fact that you were thinking about
23     filing a lawsuit?
24           A.    No.
25           Q.    Okay.  You need to be sure and let me wait
```

JOANN WILLIAMS - 12/17/2013

Page 22

```
 1        leakage, and he's going to have to remove it.
 2             Q.   Okay.  So when did you last see Dr. Patel?
 3             A.   Let me see.  I think in probably the first,
 4        middle of October, I think.
 5             Q.   So in the middle of October you saw Dr. Patel
 6        and he told you you were having some erosion.  Is that
 7        correct?
 8             A.   Yes, when he examined me.
 9             Q.   And where did he say that the erosion was?
10             A.   Around my uterus wall.
11             Q.   Your uterus wall?
12             A.   Where there's a leakage.
13             Q.   So do you have -- do you believe that you have
14        a hole somewhere that's causing leakage?
15                      MR. CRADDOCK:  Objection.  Form.
16             A.   Yes, it's a leak -- leakage, excuse me, from
17        when I cough or sneeze it gets worse.
18             Q.   (BY MS. BOCKUS)  Okay.  So you're having some
19        leakage when you -- if you laugh unexpectedly or cough
20        or sneeze --
21             A.   Yes.
22             Q.   -- then some urine comes out?
23             A.   Correct.
24             Q.   But do you -- is it your understanding that
25        you have a hole somewhere that's causing this?
```

JOANN WILLIAMS - 12/17/2013

1        A.    Well, as far as I know, it's from the mesh,

2    caused damage where, you know, I have that incontinence.

3        Q.    And is this what Dr. Patel told you?

4        A.    Yes, it's going to have to be removed.

5        Q.    Have you scheduled your removal?

6        A.    Yes.

7        Q.    When is that going to happen?

8        A.    It's going to be the second or third week of

9    January.  I don't know the exact date, but he will

10    contact me before then, the second or third week.

11        Q.    And is it going to be paid for by Injury

12    Assist?

13        A.    Yes.

14        Q.    Okay.  And when Dr. Patel gave you the number,

15    did he --- is he the one who told you to ask for one of

16    those two women whose name appears on the card?

17        A.    Yes.

18        Q.    Okay.  You know, what I would like to do --

19    and at a break, I'm going to ask you to take the card

20    out, and I'm just going to make a copy of it and make it

21    an exhibit to the deposition.  Is that all right with

22    you?

23        A.    Yes.

24        Q.    Okay.  So other than the authorization that

25    you got to obtain your Detrol, have you received any

JOANN WILLIAMS -- 12/17/2013

1     other funding or money from settlement assist?

2         A.   No.

3         Q.   And how is it that you came to see Dr. Patel?

4     Who referred you to him?

5         A.   Well, I called the law firm and asked them do

6     they have -- do they know someone that I could see

7     because I started having more problems out of the

8     mesh --

9         Q.   Okay.

10        A.   -- so they referred me to that doctor.

11        Q.   Okay.  So do you remember a couple of minutes

12    ago when I asked you if your lawyers had referred you to

13    any healthcare providers and you said --

14        A.   Oh, I thought you said healthcare, not the

15    doctor.

16        Q.   Oh, okay.  You misunderstood?

17        A.   Yes.

18        Q.   Okay.  So your law firm referred you to

19    Dr. Patel?

20        A.   Yes, for one.

21        Q.   And then he referred you to Injury Assist?

22        A.   Yes.

23        Q.   Okay.  And all of this happened in late

24    September, early October.  Is that correct?

25        A.   Yes.

JOANN WILLIAMS - 12/17/2013

Page 25

```
 1          Q.    Of this year?

 2          A.    Yes.

 3          Q.    Okay.  And is Injury Assist going to fund your

 4    surgery with Dr. Patel?

 5          A.    Yes.

 6          Q.    Okay.  And is that -- have you gotten some

 7    written confirmation of that?

 8          A.    No.

 9          Q.    Have you received anything in writing from

10    Injury Assist?

11          A.    No.  Well, when they paid for my medication

12    and stuff, yeah.

13          Q.    Tell me what you received from them.

14          A.    I received a Wells Fargo card to pay for my

15    pelvic ultrasound and for my urinalysis.  That's to pay

16    for the -- to pay for my treatment when I had went.

17          Q.    When was that?

18          A.    It was about three and a half months ago.

19          Q.    So August, September?

20          A.    No.  No, about three weeks, three and a half

21    weeks ago.

22          Q.    Oh, okay.  Where did you have your pelvic

23    ultrasound?

24          A.    At -- one of them I had done at Presbyterian

25    and one -- the ultrasound, I had on Walnut Hill Lane, at
```

```
 1          A.   Take in donations.

 2          Q.   Have you ever filed for workers' compensation?

 3          A.   No.

 4          Q.   Have you ever filed for Social Security

 5     disability?

 6          A.   Yes.

 7          Q.   When did you do that?

 8          A.   2010.

 9          Q.   What was the basis of your disability?

10          A.   Back then it was bipolar.

11          Q.   Who was your doctor who was taking care of you

12     for your bipolar?

13          A.   I was going to -- what's that called?  I was

14     going to different doctors.  Well, at the MHMR, they

15     gave me medication for it.

16          Q.   Do you know what medication you took?

17          A.   Well, I've been on several different ones,

18     Seroquel, Zoloft, Citalopram.  It's C-I-T-A-L-O-P-R-A-M.

19     And some different other medication I don't take

20     anymore.

21          Q.   So are you receiving any treatment today for

22     your bipolar disease?

23          A.   No.  Just take my medication.

24          Q.   What medication?

25          A.   I'm just on Citalopram right now.
```

JOANN WILLIAMS — 12/17/2013

Page 63

```
 1          A.   On the bus or family or friend.
 2          Q.   Okay.  Are you currently on Medicare or any
 3     other --
 4          A.   Medicaid.
 5          Q.   Medicaid?
 6          A.   Uh-huh.
 7          Q.   How long have you been on Medicaid?
 8          A.   Since 2010.
 9          Q.   Okay.  And you file claims with Medicaid every
10     time you go to a doctor?
11          A.   Do I use my Medicaid, yes.
12          Q.   And did you use your Medicaid when you went to
13     see Dr. Patel?
14          A.   No, because Medicaid wouldn't cover that
15     medication.
16          Q.   They wouldn't cover that medication?
17          A.   I don't think so, no.  It's too expensive.
18          Q.   Have you asked Medicaid to cover the surgery
19     that you've got planned?
20          A.   No.
21          Q.   Why not?
22          A.   Because it already had covered -- Medicaid
23     covered that -- the first surgery.
24          Q.   Have you asked them to cover the removal
25     surgery?
```

Merrill LAD

JOANN WILLIAMS - 12/17/2013

Page 64

1          A.   No.

2          Q.   Why have you not asked them to cover that?

3          A.   I just have not.

4          Q.   Okay.  Do you intend to file a claim with

5     Medicaid for your removal surgery?

6          A.   Yes, probably so.

7          Q.   Have you -- has Medicaid paid Dr. Patel's

8     bills up until now?

9                    MR. CRADDOCK:  Objection.  Form.

10         A.   No.

11         Q.   (BY MS. BOCKUS)  Have you submitted

12    Dr. Patel's bills to Medicaid?

13         A.   No, I haven't received a bill.

14         Q.   Okay.  So when you -- when you first went to

15    Dr. Patel's office, did you fill out any paperwork?

16         A.   Yes.

17         Q.   And did they ask you to present proof of

18    insurance or some way of paying for his bill?

19         A.   I'm trying to think.  I think so.  I think I

20    showed them my card.  I have a little Medicaid ID card.

21         Q.   And is that what you -- you use your Medicaid

22    card any time you need to get a prescription filled or

23    seek medical care?

24         A.   Yes, besides that Pharmacom card.

25         Q.   How do you spell that?

1      A.   No.

2      Q.   And this was Dr. Dutton?

3      A.   Yes.  I thought it was.  I got scared and

4   thought the fibroids was probably causing it.

5      Q.   Okay.

6      A.   And Dr. Dutton told me it wasn't.  He said,

7   I'm not doing surgery or nothing for those fibroids.

8   It's not nothing to have surgery about.

9      Q.   After your mesh was implanted, describe for me

10  the problems that you had during the first month after

11  your mesh was implanted.

12     A.   Aching.  Aching.  Pain.  Feel like my pelvic

13  was -- I don't know.  It was just aching.  And pressure

14  on my bladder.  And still was having problems urinating

15  and the leakage back then, that month.

16     Q.   Okay.  And then how did that change over the

17  next year?  Did all of those aches and pains continue,

18  or did they improve?

19     A.   They continued.

20     Q.   And the little leakage, did it continue?

21     A.   Yes, I still have leakage.

22     Q.   Okay.  And then did you develop any other

23  problems over the year after your mesh was first

24  implanted?

25     A.   Well, when I was having my period from time to

JOANN WILLIAMS - 12/17/2013

Page 251

1        Q.   And that's when they thought you had fibroids?

2        A.   Yes, I think so.

3        Q.   Okay.  Did any doctors at the -- at

4   Presbyterian tell you that the problems -- the pain you

5   were having was caused by your mesh?

6        A.   No, they didn't even know what a mesh was,

7   that doctor didn't.  It was a lady that had examined me.

8   She didn't even know what that implant was.

9        Q.   Did you tell her you had had an implant?

10       A.   Yes.  She said she heard of it, but --

11       Q.   She didn't know what it was?

12       A.   I don't know what I told her.

13               MR. CRADDOCK:  Objection.  Form.

14       A.   I thought it was a sling, bladder sling or

15   something.  I don't know what kind of mesh I told her I

16   had.

17       Q.   (BY MS. BOCKUS)  And you think she didn't know

18   what that --

19       A.   She act like she didn't know --

20       Q.   Okay.

21       A.   -- in my opinion.

22       Q.   Has Dr. Patel told you what kind of surgery

23   he's going to do?

24       A.   Yes, pretty much he did.

25       Q.   And what did he tell you?

JOANN WILLIAMS — 12/17/2013

Page 252

1    A.    Well, it's a surgery where he could do some

2    kind of device.  It will dissolve and make its own mesh,

3    something like that.  But he have to remove this one and

4    do another one that stay in me permanent.  It's a lot

5    better.  It will dissolve with me, make my own mesh.

6    Q.    What risks has he told you about that are

7    associated with this surgical procedure?

8    A.    None.  He said that he haven't had a problem

9    out of none of his patients.  All of them have been

10   successful, as far as he know.

11   Q.    Okay.  Has he told you that there are any

12   potential problems with the removal of your mesh?

13   A.    No.  No.  He just say he's going to have to

14   remove it, he said, because it's --- he told me I would

15   have a complication when he examined me.  He see the

16   leakage where it's leaking, you know, causing me

17   problems when he examined me.  But then he said it was

18   no problem removing it, I don't guess.

19   Q.    Okay.  So has he told you what the risks are

20   that are associated with the surgery that he's

21   recommended?

22   A.    No, not yet.

23   Q.    Okay.

24   A.    He just told me that he's going to probably do

25   surgery second or third week in January.  And I'm going

JOANN WILLIAMS - 12/17/2013

1     Q.   Has any doctor other than Dr. Patel told you

2     that you ought to have your mesh removed?

3     A.   No.

4     Q.   Has any doctor other than Dr. Patel suggested

5     that the problems you're having with intercourse is

6     related to your mesh?

7     A.   No.  Dr. Dutton didn't really know.  He told

8     me to go back to doctor -- excuse me -- go back to

9     Dr. Green.  He said he believed it did.  He didn't know

10    for sure, you know, because he didn't specialize in it.

11    Q.   So how are you doing today?

12    A.   Well, I'm having abdominal pain down in the

13    lower part of my stomach now, a little aching, a little

14    aching in my pelvic area, but not substantial like it's

15    been in some days.  But it's uncomfortable right now.

16    Q.   When you have these pains, do you ever take

17    the hydrocodone that's been prescribed for your back

18    pain?

19    A.   Well, I have, but I mostly take Tramadol, take

20    the Naproxen or something like that.

21    Q.   And do any of those drugs help?

22    A.   Yeah, it subside later.  It don't just help

23    sometimes right away.  It depend.

24    Q.   Yeah.  Has any doctor told you you need to

25    restrict your activities because of your mesh?

TREATMENT TIMELINE

| 06/10/11 | Dallas Medical Center | **Implant of Mesh: Plaintiff's name at time of implant was Joann Denise Gray** Procedures performed: Transvaginal sling bladder/urethral suspension; cystocele repair; suprapubic cystostomy tube placement; cystoscopy. | Williams0001675-1677 Williams0001095-1097 |
|---|---|---|---|
| 06/13/11 | Rufus Green, MD | **Office visit:** Here for a postoperative visit. She has not had incisional drainage. She has not had pain in her incision. She does not have swelling around her incision. | GREEN 28-30 Williams0001682-1684 |
| 06/17/11 | Daniel Leong, DO | **Office visit:** **Complains of pain from surgery.** Had bladder surgery still complains of pain | Williams0001067 |
| 07/15/11 | Daniel Leong, DO | Complains of **knee pain** | Williams0001066 |
| 07/28/11 | Daniel Leong, DO | Complains of **pain in back** – radiates to leg over 1 year | Williams0001065 |
| 08/05/11 | Presbyterian Dallas | **ER visit:** Complains of **back pain** | Williams0001418-1421 |
| 08/17/11 | Rufus Green, MD | Follow up on surgery. **"patient is doing well. No pain.** No problem with urinary incontinence." | GREEN 31-33 Williams0001679-1681 |
| 08/24/11 | Daniel Leong, DO | Complains of **hip pain** and swollen ankles. | Williams0001064 |
| 11/11/11 | Presbyterian Dallas | **ER visit:** Complains of **low right abdominal pain** onset a couple of days. Diagnosis: Fibroids | Williams0001447-1451 |
| 11/18/11 | William Dutton, MD | Complains of **gum infection** in mouth, and **pain due to fibroid** | Williams0001655 |
| 12/11/11 | Andrew Burke, DO | Complains of **left hip pain**, also continues with **left knee pain.** Severe cramping, severe sharp, severe shooting pain. Assessment: peripheral neuropathy, hip joint pain, depression, obesity, uterine leiomyoma (fibroid of uterus). | Williams0000953-956 |
| 01/12/12 | Andrew Burke, DO | **Lower Extremity Neurodiagnostic** | Williams0000957- |

**Exhibit B**

|  |  | **Test:** History: radiating low back pain, burning in feet | 959 |
|---|---|---|---|
| 02/05/12 | Presbyterian Dallas | **ER visit:** complaining of lower abdominal pain onset 4 days ago. Also reports pain in her lower back and hips, increased urgency and chills. States that her symptoms feel similar to previous Urinary Tract Infection symptoms. Treated with an antibiotic (Macrobid). | Williams0001484-1488 |
| 02/20/12 | William Dutton, MD | Only complaint of pain with intercourse; diagnosed with a trichomonas infection; treated with an antibiotic (Metronidazole). Stress incontinence: rarely leaks | Williams0001660-1661 |
| 02/28/12 | Andrew Burke, DO | EMG results, pain management referral related to **back pain** | Williams0000960-964 |
| 04/23/12 | Andrew Burke, DO | Chief complaint: B  Reported as sharp pain for 3 weeks to 2 months. | Williams0000965-969 |
| 04/25/12 | William Dutton, MD | **Ultrasound non OB Pelvic/transvaginal:** Multiple uterine fibroids.  Otherwise a sonographically unremarkable pelvis. | Williams0001672 |
| 05/01/12 | Andrew Burke, DO | **Office visit:** Chief complaint: Here for abnormal results. Diagnosis: hyperlipidemia (elevated cholesterol); leiomyoma (fibroid); lumbar radiculitis; left knee joint pain; Vit D deficiency; tobacco dependency; sickle cell without crisis; asthma; lumbalgia (back pain) Patient is requesting medical records to look for her own pain doctor. Counseled on smoking cessation. Counseled on diet and exercise. | Williams0000970-975 |
| 05/03/12 | William Dutton, MD | **Office visit:** Has had no further bleeding, but not her main concern.  What can you do about my bladder:  Options:  1) Oxybutynin XL 5 mg at bedtime.  2) Increase dose to 30 mg over time 4 ____. 3) return to Dr. Rufus Green for follow-up.  4)  Explained the | Williams0001664 |

**Exhibit B**

| | | hysterectomy would by no means guarantee any improvement in bladder function. | |
|---|---|---|---|
| 05/03/12 | William Dutton, MD | **Fax to Dr. Andrew Burke**<br>Diagnosis: Mixed urinary incontinence; uterine fibroid; ____<br>Treatment: Oxybutynin XL 5 mg at bedtime.<br>Rufus Green performed an effective anterior colporrhaphy (vaginal wall repair) and mid urethral sling procedure but Ms. Gray has positive mixed incontinence/___ bladder syndrome. I have explained to Mrs. Gray that hysterectomy would relieve her menstrual problems but by no means could guarantee improvement in her bladder symptoms. For the present she is willing to try an anti-cholinergic (type of drug to decrease amount of urination) (increasing the dosage gradually if necessary) and return here for follow up in 1 month. [Allan Dutton, MD] | Williams0001662 |
| 06/06/12 | Andrew Burke, DO | **Office visit:**<br>Here for results from MRI.<br>Tenderness upon palpation of L-S spine region, decreased flexion at L-S spine …<br>Diagnosis: Spinal stenosis; lumbar radiculitis; degeneration lumbar discs; COPD; lumbalgia; hyperlipidemia; tobacco dependency; Vit D deficiency; Obesity<br>Discussed LS spine MRI showing spinal stenosis. L5-S1 herniated disc. Referral stat to Ortho for spinal stenosis. Increased narco to 7.5 mg. Will not prescribe hydrocodone 10 mg. Will need chronic pain management for back pain. Discontinue smoking – importance stressed to patient. Follow up 2 weeks. | Williams0000976-979 |
| 06/20/12 | Andrew Burke, DO | **Office visit:**<br>Here for follow up from last office | Williams0000980-985 |

**Exhibit B**

| | | visit. States she continues with pain, knee pain ...<br>Tenderness on palpation to L4-L5 disc space with restricted flexion ...<br>Diagnosis: spinal stenosis; lumbar radiculitis; degeneration lumbar discs; COPD; lumbalgia; hyperlipidemia; tobacco dependency; Vitamin D deficiency; obesity ... | |
|---|---|---|---|
| 06/27/12 | Andrew Burke, DO | **Office visit:**<br>Complains of knee pain. Diffuse pain both sides.<br>Tenderness and crepitus present in both knees upon active and passive range of motion. No swelling or erythema noted ...<br>Diagnosis: Crepitus knee, arthralgia knee, internal derangement knee, irritable bladder, leiomyoma, obesity<br>...<br>Left knee with arthritic changes. Left knee intraarticular injection today. Return in 2 weeks for right knee x-ray and intraart injection. Saw Dr. Dutton ob/gyn for irritable bladder and uterine fibroid. Patient to follow up. Awaiting referral to ortho coverage by insurance for LS spine herniated discs. Follow up in 2 weeks. | Williams0000986-989 |
| 07/11/12 | Andrew Burke, DO | **Office visit:**<br>Complains of **right knee pain x 3 weeks.**<br>Pain both sides diffuse.<br>Tenderness and crepitus present in both knees upon active and passive range of motion. No swelling or erythema noted ...<br>Diagnosis: Crepitus knee; arthralgia knee; internal derangement knee; irritable bladder; leiomyoma; obesity<br>Saw Dr. Dutton for irritable bladder and uterine fibroid to follow up. Prescription written to increase hours of home health. Medical supply form | Williams0000990-995 |

**Exhibit B**

| | | | |
|---|---|---|---|
| | | filled out for quad cane. | |
| 07/12/12 | Claudia McDonald, MD | **Consultation:** HPI: Been asked to see by Dr. Burke this 51 year old who has a **long term complaint of lower back pain.** Also apparently has problems with her knees. Describes back pain but no clear evidence of radicular pain. | Williams0000230-231 WILLIAMS_J-588009-2CJM-000008-9 |
| 08/09/12 | Presbyterian Dallas | **ER visit:** 52 year old complaining of back pain, hip pain and knee pain onset 1 year ago and gradually worsening. Denies injury and trauma but states she "lifts stuff" that she shouldn't. | Williams0001519-1522 |
| 08/23/12 | William Dutton, MD | **Work in Office visit:** Complains nocturia x 3 (urinating during night), wears pad at night. Sometimes leaks with coughing, laughing, sneezing. Felt improved when she was on Vesicare for one month only. Doesn't want to go back to Dr. Green. | Williams0001665 |
| 09/13/12 | Medical Center of McKinney | **Physical therapy discharge summary:** Received 9 physical therapy visits between 7/23/12 and 9/13/12 for degenerative joint disease of lumbar spine. Discharged as plateaued and had no further improvement. | Williams0000070 |
| 09/21/12 | Claudia McDonald, MD | **Office visit:** 66"; weight 250 **Some improvement with PT for back pain** Patient requesting pain medications. Referred her back to her primary physician. | WILLIAMS_J-588009-2CJM-000002 |
| 09/26/12 | Presbyterian Dallas | **ER visit:** 52 year old complains of **neck and back pain** s/p MVA which occurred today. Also with right knee pain and bilateral shoulder pain. | Williams0001545-1548 |

5

Exhibit B

| 09/27/12 | Andrew Burke, DO | In with complaint of **back pain – lower region.** States she has been going to physical therapy but it makes her pain worse. Pain in back on both sides equally, the upper back area also, the mid-back area also, the neck area also, paresthesia of the legs. Sharp pain for more than a year. | Williams0000996-1001 |
| 09/28/12 | William Dutton, MD | Not improved on present dosage of Vesicare. Will try Vesicare at 10 mg at bedtime. | Williams0001665 |
| 10/23/12 | Presbyterian Dallas | **ER visit:** 52 year old with history of asthma presents with complaint of **intermittent sharp chest pain** onset 2 days ago. Reports chest pain worsened tonight. | Williams00015777-1581 |
| 10/30/12 | Andrew Burke, DO | In with complaint of **osteoarthritis – has back pain and bilateral knee pain.** Refilled pain medications. Was given information to Parkland pain clinic at last office visit. Instructed patient will no longer prescribe narcotic pain meds for her. Treated muscle cramps. | Williams0001002-1007 |
| 11/16/12 | Presbyterian Dallas | **ER visit:** Patient reports she was restrained passenger in MVC at 1630 today. Patient **complains of neck and low back discomfort.** | Williams0001618-1622 |
| 03/07/13 | Andrew Burke, DO | In with complaint of **back pain – lower region and knees coming down to legs and hips x 3 weeks, knee pain x comes and goes.** Patient says she may need steroid shot … Long conversation with patient discussing significant lifestyle changes to improve overall health … | Williams0001008-1012 |
| 05/14/13 | Parkland Memorial Hospital | States having pain very bad, makes you just want to get a gun and shoot yourself. Wants appointment before | Williams0000249 |

6

**Exhibit B**

| | | August. | |
|---|---|---|---|
| 05/15/13 | Andrew Burke, DO | Chief complaint: back pain – lower region x years; hip pain both sides x years<br>History of present illness: back pain lower region x years.   Both sides equally.   Reported as sharp pain. Occurring at night …. | Williams0000945-951 |
| 05/08/13 | Daniel Leong, DO | Patient to return to recheck COPD still not better<br>Diagnosis: chest pain , COPD | Williams0001070 |
| 08/22/13 | Andrew Burke, DO | **Office visit:**<br>Complains of single growth on throat x 4 days …<br>Weight 257<br>Throat is moist,   tongue   midline, pharynx is without exudates. Tonsils not enlarged.  There is a mass located at cervical vertebra 3 on the right side …<br>Diagnosis   mass/swell   head/neck; crepitus knee, arthralgia knee, internal derangement knee, irritable bladder, obesity,  lumbalgia,  spinal  stenosis, osteoarthrosis, tobacco dependence. | 10ABU-000082-89 |
| 8/22/13 | | **Visit with Dr. Burke is the last medical record we have on Ms. Williams** | |

**Exhibit B**

EXHIBIT "C"

### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

IN RE: AMERICAN MEDICAL SYSTEMS, INC.
PELVIC REPAIR SYSTEMS PRODUCTS LIABILITY
LITIGATION

MDL No. 2325

THIS DOCUMENT RELATES TO ALL CASES

### AFFIDAVIT OF ANDREW CASSIDENTI, M.D.

Andrew Cassidenti, M.D., being first duly sworn upon oath, deposes and states as
follows:

1.  I have personal knowledge of the facts stated herein, and could and would
    competently testify thereto if called as a witness.

2.  I am a urogynecologist practicing at St. Joseph Hospital in Orange, CA. I am
    board certified in obstetrics and gynecology, three year fellowship trained in
    urogynecology and pelvic reconstructive surgery and board certified in female
    pelvic medicine and reconstructive surgery. I have been practicing medicine for
    over 25 years.

3.  On or around July 15, 2013 I received an email from info@Doc-Net.org with the
    "Subject: Vaginal mesh removal cases." The email was from a group looking for
    surgeons experienced and interested in vaginal mesh removal cases. I was curious
    and responded by email July 15, 2013 that "I am a fellowship trained
    Urogynecologist in Orange County CA very experienced in the management of

vaginal mesh exposure removal and the management of all vaginal mesh complications. Please send me further information about your program. Thank you."

4. Later that day I received an email back from Otto Fisher with Matt Lister copied, stating "Hi Doc   Please call me when you can to discuss this opportunity   otto fisher 732 501-0000." Emails are attached.

5. I was on vacation with my family that week and waited until I returned home to call Otto Fisher.

6. On August 5, 2013 I had a phone call with Otto Fisher. I started the conversation asking him if he was a doctor or an attorney and he told me " I am neither, I am an entrepreneur." I asked him what was he looking for. He told me that he needed a doctor in my area in southern California as well as in Las Vegas to do mesh removal cases. He told me he pays $2500 per surgery "whether it took 5 minutes or 2 hours" and that they were done at outpatient surgery centers. He stated that office consultation, cystoscopy and urodynamics if needed were paid at a set rate. I asked him what outpatient surgery centers were being used and he said he contracts with certain centers. I told him I work at and am a partner at La Veta surgery center very close to my office which would be very convenient for me and if I agreed to do surgeries, could they be done there? He said he would be happy to contact them to discuss this and I gave him the name and phone number of the contact person there.

7. He told me that "some of the patients are crazy but most are reasonable." He told me I would get paid whether I removed mesh or not. He stated that  he has paid a

doctor who operated on a women who found no mesh at surgery and he paid him anyway.

8. He told me "there is a federal judge in West Virginia that needs to see key phrases in the operative report like defective mesh, bunched up mesh and mesh erosions." I immediately asked Otto that " you are not telling surgeons what to dictate in an operative report, are you?" He said "no, but it's just a game and we have to play the game." I told him I do a lot of medical legal work for both defense and plaintiffs in malpractice cases and he responded "so then you know it's just a game." He told me that he has many "reputable surgeons" working with him whose names he would share with me later.

9. I told him that I do not think that vaginal mesh used for urinary stress incontinence (USI) and pelvic organ prolapse (POP) is defective

10. He told me there is "a simple one page contract" with him in that phone call and at a later date told me there is no contract.

11. He told me Dan Christensen, his funding arm attorney would be calling me and to take his phone call.

12. Otto Fisher asked me to email him my CV and I did. At this time, I became concerned and suspicious that Otto Fisher and his associates were engaged in a scheme that could be harmful to women. I decided to continue my correspondence with him to gather further information about his business plan.

13. He asked me if I knew any experienced mesh surgeons in Las Vegas because he

- 3 -

had a back load of cases in Las Vegas and "the lawyers were getting on him." I told him I would speak with a colleague Dr Geoff Hsieh I knew in Las Vegas and get back to him. I did speak with Dr Geoff Hsieh, board certified in Female pelvic medicine and reconstructive surgery, who is a colleague and friend of mine about Otto and he told me Otto had contacted him previously and spoke with his partner and practice attorney and they decided they did not want to work with Otto.

14. At the end of my conversation with Otto he told me "welcome aboard" and I told him I was not on board and needed to speak with Dan Christensen first and my practice attorney.

15. Otto immediately started pressuring me to sign on with him. He texted me after our phone call at 940 am PST on August 6, 2013 his contact information and the message "Great to speak to you! Welcome to the team!" At 1014 am PST he texted "Just remember to Email me ur CV Ottofisher@gmail.com. And Contact Jeff Shay for me Pls." At 1049 am PST I texted back "Let me look into getting a Nevada medical license. It may make sense for me to fly to Vegas to do a full day of surgeries as needed." He responded "True."

16. Same day 406 pm PST text from Otto "Did you email me ur cv yet." I responded "Not yet. Still seeing patients. Will do later tonite when I get home." Otto responded "I forgot I'm est time."

17. He texted me August 12, 2013 at 747 am PST " Drew Make sure you speak to Dan from my office He left u a message last week. He runs my funding arm and is my attorney point man Thanks Otto." I replied "Will do."

- 4 -

18.    August 14, 2013 8:34 am PST Otto texts me "Drew I also need a specific contact person within ur office to work with the patient scheduler at my office whom has been assigned to send u new patients  Send me her name Phone email And tell her Amanda will be her contact person  Thanks."

19.    I responded at 9:02 am PST " Let me speak with your attorney first, see a contract and run it by my practice attorney as well before we have Amanda start working with my staff. Thanks." Otto immediately responded " There r no contracts as I said  Feel free to speak to my lawyers  I'm holding on to these Vegas patients by a thread  Don't delay too long ;))  It's $50,000 to u just waiting there ready."

20.    On August 15, 2013, I was contacted by phone  by a man who introduced himself at Daniel Christiansen of MedStar Funding in Austin, TX.  My contemporaneous notes of this conversation are attached. He informed me that he was an attorney from Austin, Texas and that he was working in conjunction with Otto Fisher. He told me that MedStar Funding was in the business of funding mesh lawsuits and he used the term "factoring" to describe this process.

21.    I asked him that I did not understand why the patients were not going back to the doctors who put in the mesh to have them manage the mesh complications. He told me that there are thousands of women with mesh complications who don't have insurance to get care now. He stated that many providers don't want to take managed care rates. He stated that even if the patients do have insurance, they act as a facilitator to have them see a provider. He stated they provide travel to the doctors qualified to do the surgeries.

22.    He stated that patients tell him "I don't have confidence in my doc" and that their

"Doc says they are fine, just live with this."

23.   I told him that I was trying to understand his business model. I asked him if it was
the case that patients were being referred to him by the plaintiff attorneys in the
mesh lawsuits. He said yes. I asked him if his business plan is that he was going at
risk funding the patients mesh removal surgery and travel in advance assuming he
would get paid back a premium on his investment if and when the mesh lawsuits
were won. He said yes "it's called factoring." He told me the lawsuits were against
the manufacturers of the mesh products, not the doctors.

24.   I told him I was troubled when Otto Fisher told me of the needed language in my
operative report that the federal judge in West Virginia needs to see and that "it's
just a game." . He told me that " Otto must have misspoke or you misinterpreted
him." I told him that Otto was very clear and that I did not misinterpret him. He
also told me that he was a practicing attorney and would not want to be involved in
anything that could threaten his law license.

25.   In the course of this conversation, I told Mr. Christiansen that I do not hold the
opinion that mesh used to treat urinary stress incontinence or pelvic organ prolapse
is defective. I also told him that I was not comfortable with having lawyers tell me
the language to be included in my operative notes.  I repeated that I would never
dictate anything in my operative report that was not truthful, that I believed the
mesh is not defective. He told me that "you would not be helping the patient if you
fix them but you don't help them win their mesh lawsuits cases." He told me I "
needed to get my head around what the patient wants which is to win the lawsuit."

26.   He stated that I likely "was not a good fit" for his team.

27. I told him he was probably right.

28. I have had no contact with Otto or Dan since that conversation.

29. Copies of my email correspondence are attached.

30. I found out the afternoon of September 17, 2013 that my name and office address are listed on a website Surgicalassistance.com which I had never heard of before nor would ever agree to work with. I looked at the website and discovered it advertised surgeons who agreed to do the mesh removal surgery without compensation unless a mesh lawsuit is won. I called the phone number listed on the website and spoke with a Mr. Blake Barber the next day. I told him I was very upset that my name was placed on this website without my knowledge or permission and he asked me if I knew Otto Fisher. I said I did and he told me he works with Otto Fisher and that Otto told him to put my name up. I told him I never gave Otto permission to do this nor am I going to work with Otto in any way. Mr Blake asked me if I did not want to work with Otto, would I still be willing to work with him. I said no and asked him to immediately remove my name from the website or my personal attorney would be contacting him. He said he would remove my name.

31. I am sharing this information with the attorneys representing pelvic mesh manufacturers and this Court because I believe that the scheme described above wrongfully promises to allow certain "entrepreneurs" and the surgeons they employ to profit for performing unnecessary surgeries on women. I fear plaintiff attorneys may be using this scheme to get what they feel is needed testimony from surgeons to win their mesh lawsuits. I do not believe that pelvic mesh devices for

the treatment of stress urinary incontinence or pelvic organ prolapse are defective and I strongly support their continued use. The above-described actions do not fairly and honestly represent women who have had these devices implanted and certainly threaten to cause unnecessary harm.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on the 26th day of September 2013, in the County of Orange, CA.

Andrew Cassidenti, M.D.

State of California          County of  ORANGE
Subscribed and sworn to (or affirmed) before me on this
___26___ day of ___Sept___, 20_13_ by
ANDREW     CASSIDENTI
proved to me on the basis of satisfactory evidence
to be the person(s) who appeared before me.
Signature _____

YOUNG YEI HONG
Commission # 1915116
Notary Public - California
Orange County
My Comm. Expires Dec 29, 2014

- 8 -

# Exhibit 1

Sep 18 13 11:06a    Cassidenti                              9494965834              p.2
          Re: Vaginal mesh removal cases                                      Page 1 of 1

---

**From:** otto fisher <ottofisher@gmail.com>
   **To:** Matt Lister <aeea1031@aol.com>; Andrew Cassidenti <abruin4ev@aol.com>
**Subject:** Re: Vaginal mesh removal cases
   **Date:** Mon, Jul 15, 2013 11:27 am

---

Hi Doc

Please call me when you can to discuss this
opportunity

otto fisher
732-501-0000

On Mon, Jul 15, 2013 at 12:08 PM, Matt Lister <aeea1031@aol.com> wrote:
   This is what I have from the doctor.  I guess you gonna have to email him first to get a phone number

   Sent from my iPhone

   Begin forwarded message:

      **From:** Andrew Cassidenti <abruin4ev@aol.com>
      **Date:** July 15, 2013, 1:45:25 AM EDT
      **To:** "info@Doc-Net.org" <info@Doc-Net.org>
      **Subject: Vaginal mesh removal cases**

      I am a fellowship trained Urogynecologist in Orange County CA very experienced in the
      management of vaginal mesh exposure removal and the management of all vaginal mesh
      complications. Please send me further information about your program.
      Thank you.

      Andrew Cassidenti,MD
      Director, Female Pelvic Medicine and Reconstructive Surgery
      St Joseph's Hospital, Orange, CA
      Clinical Professor OB/GYN
      Keck/USC School of Medicine, Los Angeles, CA

      Sent from my iPad

--
**OTTO FISHER**
*ONE POINT ORTHOPEDICS*
*AND NEUROSURGICAL GROUP*
**732-501-0000  MOBILE**

Sep 18 13 11:08a          Cassidenti                                    9494965834                    p.3

Re: Cassidenti CV attached                                                              Page 1 of 1

From: otto fisher <ottofisher@gmail.com>
To: Drew Cassidenti <abruin4ev@aol.com>
Subject: Re: Cassidenti CV attached
Date: Mon, Aug 12, 2013 8:58 am

Drew

Ive reached out to Dr Ruhland at the sx ctr.

My attorney liaison Dan Christensen will be contacting
you also to introduce himself

Dan.s cell number is 512-695-6677

pls accept his call when you can

I will also need from you a specific contact
person within your practice to handle the
booking of each patient. Send me that persons
contact and make her aware that Amanda from
my office will be contacting
her as well.

and Welcome to our group as our California surgeon !!!!!!!!

otto

On Tue, Aug 6, 2013 at 11:14 PM, Drew Cassidenti <abruin4ev@aol.com> wrote:
Otto,

My CV attached.

Thanks,
Andrew Cassidenti, MD
abruin4ev@aol.com

---
OTTO FISHER
ONE POINT ORTHOPEDICS
AND NEUROSURGICAL GROUP
732-501-0000  MOBILE

Sep 18 13 11:08a        Cassidenti                                                9494565834                    p.4
Re: Cassidenti CV attached                                                                        Page 1 of 2

> From: otto fisher <ottofisher@gmail.com>
> To: Andrew Cassidenti <abruin4ev@aol.com>
> Subject: Re: Cassidenti CV attached
> Date: Mon, Aug 12, 2013 10:01 am

sure thing Drew

our company name is
Physicians Surgical Group

our attorneys name is

Jeff Cohen
Board Certified by the Florida Bar in Health Law

Florida Healthcare Law Firm
The Gulfstream Bank Building
909 S.E. 5th Avenue, Suite 200
Delray Beach, FL 33483
(561) 455-7700 (office)
(561) 455-7701 (fax)
(888) 455-7702 (toll free)

jcohen@floridahealthcarelawfirm.com
www.floridahealthcarelawfirm.com
Twitter: @FLHealthLawFirm
feel free to ask him any thing

otto

On Mon, Aug 12, 2013 at 12:43 PM, Andrew Cassidenti <abruin4ev@aol.com> wrote:
> Let me speak with your attorney first, see a contract and run it by my practice attorney as well before we
> have Amanda start working with my office staff.
> Thanks.

> Best,

> Drew Cassidenti, MD
> Director, Female Pelvic Medicine and Reconstructive Surgery
> St. Josephs Hospital, Orange, CA
> Clinical Professor OB/GYN
> Keck/University of Southern California School of Medicine, Los Angeles, CA

> On Aug 12, 2013, at 8:58 AM, otto fisher <ottofisher@gmail.com> wrote:

>     Drew

Sep 18 13 11:08a        Cassidenti                        9494966834                p.5
Re: Cassidenti CV attached                                            Page 2 of 2

Ive reached out to Dr Ruhland at the sx ctr.

My attorney liaison Dan Christensen will be contacting
you also to introduce himself

Dan.s cell number is 512-695-6677

pls accept his call when you can

I will also need from you a specific contact
person within your practice to hanlde the
booking of each patient. Send me that persons
contact and make her aware that Amanda from
my office will be contacting
her as well.

and Welcome to our group as our California surgeon  !!!!!!!!

otto

On Tue, Aug 6, 2013 at 11:14 PM, Drew Cassidenti <abruin4ev@aol.com> wrote:
Otto,

My CV attached.

Thanks,
Andrew Cassidenti, MD
abruin4ev@aol.com

--
OTTO FISHER
ONE POINT ORTHOPEDICS
AND NEUROSURGICAL GROUP
732-501-0000  MOBILE

--
OTTO FISHER
ONE POINT ORTHOPEDICS
AND NEUROSURGICAL GROUP
732-501-0000  MOBILE

Sep 18 13 11:07a          Cassidenti                    9494965634              p.6

Mesh cases                                                              Page 1 of 1

**From:** Dan Christensen <Dan@medstarfunding.com>
  **To:** abruin4ev <abruin4ev@aol.com>
  **Cc:** ottofisher <ottofisher@gmail.com>; Lisa Christensen <Lisa@medstarfunding.com>
**Subject:** Mesh cases
  **Date:** Tue, Aug 13, 2013 5:07 pm

Dr. Cassidenti:

I left a message on your phone last week. I am working with Otto Fischer as part of this network of providers servicing mesh cases. We are the funding arm to the network. I would like to speak to you soon about how to get you some patient flow. When is good for you?

Dan Christensen, Esq.

Founder and President

MedStar Funding

7301 RR 620 N, Ste. 155-334

Austin, Texas 78726

(512) 266-0097 (o)

(866) 468-5043 (f)

(512) 695-6677 (c)

www.medstarfunding.com

dan@medstarfunding.com

 Description: MedStar Final Logo RGB

CONFIDENTIALITY NOTICE: This transmission may be subject to Federal and state privacy laws, HIPAA regulations and/or may contain proprietary and privileged information. If you are not the intended recipient of this message, you may not disclose, print, copy or disseminate this information. If you have received this in error, please reply and notify only the sender and delete the message. Unauthorized interception of this e-mail is a violation of Federal criminal law.

# Exhibit 2

Sep 18 13 11:07a        Cassidentl                          9494965834                    p.7

8 - 15 -19   Dan Christensen
        PC:

1. How does it work, why does
   not pt. see her own doctor
   to repair her complications at
   her local hospital using
   her own award?

2. Contract

1,000s of f med care
mous
~~~~~ don't have consumer
        to get care now

mon providers don't want
        to take managed care
        rate

even if they do have
        insurance, they
        n't as a practice
        to see a provider. —

they predic friend to me
        doctos grateful & c

As ing
        I don't have confidence
                in my docs
        a times Doc says they
        are fine, just live
        c this a