```
 1                IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2                          AT CHARLESTON

 3                     TRANSCRIPT OF PROCEEDINGS

 4

 5

 6       ----------------------------------------

 7

 8   IN RE:  ETHICON, INC., PELVIC REPAIR        MDL NO.
     SYSTEM PRODUCTS LIABILITY LITIGATION        2:12-MD-2327
 9

10       ----------------------------------------

11

12

13                       MOTIONS HEARING

14                      January 23, 2014

15

                 BEFORE THE HONORABLE CHERYL A. EIFERT
16                 UNITED STATES MAGISTRATE JUDGE

17

18

19

20   Court Reporter:           Lisa A. Cook
                               RPR-RMR-CRR-FCRR
21                             (304)347-3198
                               lisa_cook@wvsd.uscourts.gov
22

23   Proceedings recorded by mechanical stenography; transcript
     produced by computer.
24

25
```

1                              **APPEARANCES**

2  **For the Plaintiffs:**

3

4  **MR. EDWARD A. WALLACE**
   Wexler Wallace LLP
5  55 West Monroe Street
   Suite 3300
6  Chicago, IL  60603

7

8  **MR. THOMAS P. CARTMELL**
   Wagstaff & Cartmell, LLP
9  4740 Grand Avenue, Suite 300
   Kansas City, MO  64112
10

11 **MR. RICHARD A. FREESE**
   Freese & Goss
12 2031 2nd Avenue North
   Birmingham, AL  35203
13

14 **MR. BENJAMIN H. ANDERSON**
   Anderson Law Offices
15 1360 W 9th Street
   Suite 215
16 Cleveland, OH  44113

17

18

19

20

21

22

23

24

25

1    **For the Defendants:**

2

3    **MR. WILLIAM M. GAGE**
     **MS. CHRISTY D. JONES**
4    Butler, Snow, O'Mara, Stevens & Cannada
     P.O. Box 6010
5    Ridgeland, MS  39158-6010

6

7    **MR. RICHARD BERNARDO**
     Skadden, Arps, Slate, Meagher & Flom
8    4 Times Square
     New York, NY  10036
9

10

11   **MR. DAVID B. THOMAS**
     Thomas, Combs & Spann, PLLC
12   300 Summers Street
     Suite 1380
13   Charleston, WV  25301

14

15

16

17

18

19

20

21

22

23

24

25

1           P R O C E E D I N G S

2           THE CLERK:  The matter before the Court is *In Re:*

3  *Ethicon, Inc., Pelvic Repair System Products Liability*

4  *Litigation*, MDL 2:12-MD-2327, scheduled for motions hearing.

5           MAGISTRATE JUDGE EIFERT:  Good afternoon.

6      All right.  We are here on plaintiffs' motion for a

7  finding of spoliation and for sanctions.  Who would like to

8  proceed?

9           MR. WALLACE:  Your Honor, Ed Wallace on behalf of

10 the plaintiffs.

11          MAGISTRATE JUDGE EIFERT:  Go ahead, Mr. Wallace.

12          MR. GAGE:  Your Honor, if I may, William Gage on

13 behalf of Ethicon.  Could I ask the Court for a point of

14 procedure, please?

15          MAGISTRATE JUDGE EIFERT:  Certainly.

16          MR. GAGE:  We have reason to believe that -- this

17 is some of the materials that plaintiffs' counsel shared

18 with us just before the start of the hearing -- that

19 plaintiffs' counsel may bring to the Court's attention

20 certain materials that we don't believe are appropriate and

21 shouldn't be considered as part of this motion.

22      And I wanted to ask Your Honor, would Your Honor want

23 contemporaneous objections as those materials are referenced

24 or would Your Honor prefer that I raise those objections

25 when it comes my turn to speak?

1          MAGISTRATE JUDGE EIFERT:  Well, let's just deal

2    with it right now.  Why don't you tell me what the materials

3    are, Mr. Wallace.

4          MR. WALLACE:  Thank you, Your Honor.  Should I

5    approach or --

6          MAGISTRATE JUDGE EIFERT:  Just give me a general

7    description of what it is you have.

8          MR. WALLACE:  We actually spoke about Ms. Keeton

9    on the phone the other day when I had a hearing in front of

10   Your Honor on a different, a different matter.  And what I

11   received today were discovery requests that were issued by

12   Ms. Keeton in 2006.

13       And the way I intend to use these - I don't think it's

14   any, it's any big surprise - is that there is an affidavit

15   that's been submitted by the defendants that suggests that

16   the, the earlier litigation was very narrow in scope.

17       And one of the things that I wanted to do with Your

18   Honor -- I, I know that you've seen the hold notices, but

19   those hold notices are very broad and go exactly to

20   discovery that we seek.

21       The other thing with respect to Ms. Keeton's documents

22   that I'd like to tender to the Court -- and the Court, quite

23   frankly, can take it for what it, you know, what it believes

24   is relevant.  But the way we see it is that these discovery

25   requests that were issued by Ms. Keeton in 2006, as I

1    understand it, and I just received these, were quite broad

2    and go to some of the very requests and documents that we'd

3    be talking about today.

4        So, that's the only reason I want to use it.  I think

5    it's informative, and I've already provided a copy to Mr.

6    Gage.  And I was hoping to tender a copy to the Court.

7                MAGISTRATE JUDGE EIFERT:  And, Mr. Gage, tell me

8    what your objection is to that.

9                MR. GAGE:  Your Honor, you may recall -- I believe

10   it was on Friday, January 3, that we had a call with Your

11   Honor and Mr. Aylstock.  And we discussed the fact that

12   plaintiffs at that point in time were hoping to supplement

13   their motion with additional materials.

14       And I think the Court at that point said, you know, at

15   some point, the currently pending motion -- we have to stop

16   adding new material to it because every time new material is

17   added, we, the defendants, would like the opportunity to

18   look at the material and then put in a formal response.

19   Obviously, this is a very serious motion and we feel like we

20   need to have the opportunity to formally respond.

21       So, with respect to being handed these discovery

22   materials right at the beginning of the hearing, we don't

23   think it's appropriate for the Court for purposes of the

24   pending motion to be considering these, and certainly not

25   until we've had a chance to put in a formal response so that

1  we have a chance to perhaps counter or argue in response to

2  whatever plaintiffs' counsel may say on these materials.

3  So, it's really from that perspective that, that we object

4  to the use of these materials.

5      Furthermore, I think Your Honor may know -- we've

6  talked on the phone.  When Mr. Wallace and I talked with

7  Your Honor last week, Mr. Wallace said that Ms. Keeton's *pro*

8  *se* motion was something that Plaintiffs' Executive Committee

9  did not request.  They did not know that it was coming.

10      And I reached out to Mr. Aylstock to talk about how we

11  would deal with Ms. Keeton's materials.  And I know he's

12  sick and he has not gotten back to me.  But we just don't

13  think it's appropriate to add this issue to this hearing and

14  potentially be part of what the Court rules on in connection

15  with this motion.

16          MAGISTRATE JUDGE EIFERT:  Well, what I'm going to

17  do today is I'm not going to have you submit the documents

18  to me.  I have gotten all the documents that I think I need

19  to have in order to rule on your motion.

20      However, one of the questions that is predominant in my

21  mind is when the duty to preserve actually was triggered.

22  So, I'm going to entertain whatever argument you want to

23  make on that.

24      Mr. Wallace, if you believe that because broad

25  discovery requests were filed in 2007 or 2008 or 2006,

1    whenever this case was filed, you can go ahead and argue

2    that.  I don't want you, though, to submit the discovery

3    requests to me because I don't really need to see them.  All

4    right?

5              MR. WALLACE:  Thank you, Your Honor.

6              MAGISTRATE JUDGE EIFERT:  Why don't you proceed

7    then.

8              MR. WALLACE:  Thank you.

9        There are a few things that I may reference during the

10   few minutes that I have as far as my presentation goes.  One

11   was a PowerPoint technology that failed us today.  So, I

12   have a printed copy of that.  If it's okay with Your Honor,

13   I'd like to give it to you.

14             MAGISTRATE JUDGE EIFERT:  Do you have any

15   objection to that?

16             MR. GAGE:  No, Your Honor.  I would like a copy.

17             MR. WALLACE:  I believe we have one.

18             MAGISTRATE JUDGE EIFERT:  Yes.

19       And, Mr. Wallace, if you would, there are two issues

20   I'd really like you to spend some time on for me.

21       The first is when the duty was triggered.  I understand

22   the position of the plaintiffs that it was in 2003.  I can

23   tell you that I don't agree with that.  And I'd like to hear

24   from you why, first of all, you believe it is 2003.  And if

25   it's not 2003, when you do think it was triggered.  So,

1    that's the first issue.

2        The other one has to do with the importance of the

3    documents.  I want to understand going through these people

4    that you've given me the list of what it is you think these

5    people might have, what testimony you've received that makes

6    you think there are important documents missing so that I

7    understand where you're coming from with that aspect as

8    well.

9            MR. WALLACE:  Sure.

10           MAGISTRATE JUDGE EIFERT:  Okay.

11           MR. WALLACE:  And just one caveat on the second

12   issue, Your Honor.  I'm going to do the best I can.  Mr.

13   Aylstock was under the weather with the flu and couldn't

14   make it today.  So, we've -- Mr. Cartmell and Mr. Freese are

15   also here and may speak to that second issue.  So, if I

16   could just tender this to Your Honor.

17           MAGISTRATE JUDGE EIFERT:  Certainly.

18           MR. WALLACE:  And I'm not going to bore you by

19   going over our brief.  I'll get right into trying to address

20   the notice issue.

21       There, there are several reasons why we believe that

22   2003 is certainly a date that is very reasonable for the

23   Court to find that Ethicon was on notice.

24       First of all, something that I don't think the briefs

25   touch on, but I don't think is in dispute, is that the

1    standard is when there's the potential for litigation.

2         Well, what do we know about what Ethicon thought about

3    the potential for litigation?  Ethicon had a number of

4    adverse events early on.  There were a number of adverse

5    events that Ethicon was aware of, including bladder

6    perforation death cases from the TVT.  That's in the MAUDE

7    database and it's a matter of public record.  That was

8    something that Ethicon was aware of.

9         I can also tell you that, as an aside, Your Honor, from

10   doing all the work on the AMS litigation -- well, I'm sorry.

11   There's a protective order in place.  I realize we can't use

12   documents back and forth.  But what I can say is it's

13   undisputed that that's one issue.  They knew that there was

14   death cases.  There was litigation back in 2003.

15        There's also the testimony of James Mittenthal who said

16   over and over as the 30(b)(6) witness for the company that

17   the hold was in place in 2003 and remained unbroken.

18        So, it seems to me that as we pointed out in our reply

19   brief, it's a complete about-face that you have someone

20   under oath that's the company witness that they rely on so

21   much that they try to submit his affidavit in their response

22   brief, but says under oath, "These are when the hold notices

23   were issued.  Yes, it was an unbroken chain.  And, yes, they

24   existed."

25        If you look at the hold notices themselves -- I have

1    the 2003 hold notice right here.  I don't know if you've had

2    a chance to look at it, Your Honor.

3              MAGISTRATE JUDGE EIFERT:  Uh-huh.

4              MR. WALLACE:  But it -- if you look at the hold

5    notice, it doesn't say -- it doesn't provide for a very

6    narrow category of documents.  It was about the design of

7    the product.  And these cases had to do with the design.

8         And we think that we've submitted more than enough case

9    law, Your Honor, that is instructive on that point that when

10   a company, especially like Ethicon, that is in the foreign

11   business that's highly regulated is on notice that there's

12   going to be litigation, the --

13             MAGISTRATE JUDGE EIFERT:  Let me ask you -- let me

14   stop you and ask you this question.

15        Obviously, Ethicon knew in 2003 that there was

16   litigation.  They obviously knew that.  And it involved a

17   TVT product.  That's, that's also clear.  But I think the

18   standard requires them to also know that the, that the

19   evidence is going to be something relevant to future

20   litigation.

21        And I think the concern I have here is you're, you're

22   suggesting to the Court that Ethicon should have known to do

23   a widespread preservation of all documents related to the

24   whole line of TVT products as early as 2003.  And that's

25   where I'm having some disconnect with you.

12

1          MR. WALLACE:  Sure.  Well, and I do that based

2    upon the plain reading of the document.  In every design

3    defect case, there's always the design history file.

4    There's always the slides in a case like this where there's

5    tissue at issue.

6       This hold notice itself spoke to TVT.  It didn't

7    delineate between products.  And we know from the, the

8    cycle, the history, the life cycle of the product that we

9    were talking about TVT back then.

10      The other thing that I'll point out, Your Honor, which

11   I think is incredibly instructive and something that

12   Ethicon, no matter what they do they can't walk away from in

13   this MDL, Ethicon in 2012 claimed work product privilege for

14   documents that directly correlate to the issues that are

15   raised by these hold notices.

16      So, they can't have their cake and eat it too.  On one

17   hand, they're claiming that there's a work product

18   privilege.  And the cases that we provided to Your Honor

19   are, are beyond dispute that when a company like Ethicon

20   claims that there is work product -- well, the answer to

21   your question, the law says if you're claiming work product,

22   you're on notice of litigation.

23      So, how can they submit privilege logs that go back to

24   2000, 2002, and to 2003 and claim that work product?  We've

25   provided Your Honor a lot of cases about that.

1    MAGISTRATE JUDGE EIFERT:  Let me ask you this.

2  Let's say that document had to do specifically with a case

3  that was pending in 2003.  How would that then trigger a

4  duty to preserve every document about that product and every

5  other product down the line?

6    MR. WALLACE:  The allegations go to the heart of

7  the design of the product.  And, so, just as in these cases,

8  we're relying on much of the same evidence.

9    And, again, we go back to the hold letter.  And, and

10 products liability law, when you're looking at the design of

11 a product, we're all generally looking at the same things.

12 The theories may be slightly different, but this was a TVT

13 product design that was at issue.

14    This hold letter was not limited.  And that's

15 something, again, that they cannot walk away from.  I mean,

16 this looks exactly like our discovery requests; the

17 labeling, adverse event reports, line listings.

18    Your Honor, we're only trying to hold them to their own

19 standards.  They issued these litigation holds.  They failed

20 to follow up on them.  We're only asking what the Court do

21 is not stretch itself to only do what they promised to do

22 and didn't.  So, that's where I think the question is

23 answered.  They answered it for us.

24    MAGISTRATE JUDGE EIFERT:  Well, the litigation

25 hold, as I understand it, was issued because of this one

1   case in 2003 which was then resolved in January of 2004.

2       So, is it your argument that unless they expressly took

3   back the litigation hold, it still remained in place for all

4   documents created in the future even though the case that

5   triggered it was no longer around?

6           MR. WALLACE:  Yes, Your Honor.  But I also have

7   another point to make on this.

8           MAGISTRATE JUDGE EIFERT:  Okay.

9           MR. WALLACE:  Mr. Mittenthal prepared this

10  document.  And I worked out with Mr. Gage in advance that

11  I'll only be referencing the exhibits.  But if I could just

12  pass this up for a moment because I think this answers your

13  question.

14      And that was a series of hold letters.  You just

15  mentioned 2004.  If you look at the second entry, you'll see

16  that there was another TVT hold letter issued in 2003.  I

17  have back at the table there every single one of those hold

18  notices.  They're all very similar all the way down to the

19  same typo for 10 years.  They all say the same thing.  So,

20  the chain is unbroken, Your Honor.  Those are the facts.

21          MAGISTRATE JUDGE EIFERT:  Let me ask you,

22  Mr. Wallace, if you don't -- and I know you believe it's in

23  2003 and I understand your argument.  But if it isn't 2003,

24  then when do you think it was triggered, an obligation to

25  preserve all documents about all products?

1          MR. WALLACE:  Well, I think the goal is between --

2    certainly, the defendants say at the earliest, it's 2008.

3    So, I think the goal is between 2003 and 2008.

4          I can tell you we referenced 22 individuals that their

5    custodial files are missing.  We referenced a number of

6    facts.  But I can tell you that we're still discovering the

7    state of destruction of data loss.

8          So -- but for purposes of this argument today, there

9    were discovery requests served it looks like in 2006.  And

10   there were orders entered in other cases that are exactly

11   like this case.

12         There were -- and in 2008 it's not as if the activity

13   by the FDA fell out of the sky.  The industry -- I, I --

14   and, again, you know, we can debate this, but the industry

15   was struggling with this issue regarding slings and their

16   response to it well before the FDA issued its announcements

17   in 2008.  So, it's definitely before 2008.  They knew that

18   this storm was coming.

19         And I'm sure that Mr. Cartmell might be able to talk

20   about some of the liability documents that go to the heart

21   of that very issue.

22         For example, if we were given the opportunity, one of

23   the ways in which to perhaps try to settle on a date before

24   2008 if you don't believe it starts in 2003 is what do some

25   of the witnesses say.  And that's something that Mr.

1   Cartmell might be able to address.

2       We referenced videos for example.  When were those

3   videos created?  When was heavyweight mesh a problem inside

4   the company?  The company was anticipating this happening.

5   They had been sued in 2003.  And there are contemporaneous

6   documents that exist from a liability perspective that

7   indicate that the company, not only from the documents but

8   the testimony, that, "We knew this was a problem."  That's

9   my characterization obviously.  But we believe that that

10  exists.

11          MAGISTRATE JUDGE EIFERT:  Okay.

12          MR. WALLACE:  And can I just make a point about

13  these hold notices for a moment, Your Honor?

14      What's troubling about it and why I, why I think we,

15  we've really got to stick to the 2003 date is because we've

16  provided Your Honor with a fair amount of case law that says

17  once you issue the litigation hold, you have an obligation

18  to follow up on that.

19      If we're to believe Mr. Mittenthal when he testified

20  under oath, he said it was an unbroken chain.  It applied to

21  the TVT without doubt.  So, in our view, it's beyond

22  dispute.

23      What's troubling about this is you have a 2002 audit

24  that says, "We've got a problem with documents."  Then you

25  have litigation holds that come out that are just forwarded

1    to district managers by legal or regulatory, and then

2    everybody is just left to monitor on their own.

3         And that's -- as one can imagine, exactly what happens

4    is data destruction and loss.  They failed to follow up on

5    these things.  Not only that, I do believe that this CAPA is

6    a major, major issue.

7         Again, we're only trying to hold Ethicon to their own

8    standards.  They say in this CAPA -- and we attached this as

9    an exhibit -- "Ethicon cannot appropriately provide all

10   relevant documents in case of litigation or inspection."

11   That's on January 16th, 2007.

12        So, this is certainly one of the dates before 2008 that

13   they know they have a problem.  So -- and they did nothing

14   about it.  We had to wait until April of 2013.  So, even if

15   you buy their 2008 story, which I suggest that we shouldn't,

16   they waited five or six years to tell us.

17        And what's more troubling about this CAPA is that

18   Mr. Mittenthal, their now expert, didn't even know about

19   this until I confronted it.  I confronted him with it the

20   month before, I believe in March of 2013.  I know it was

21   early 2013.

22        So, again, they knew that there was a problem and they

23   did nothing about it.  And I think that not only speaks to

24   the kind of sanctions that might be warranted here, Your

25   Honor, but also goes to the culpability issues that if Your

1  Honor wants to talk about we can do that.

2      To move on to the second issue, though, Your Honor,

3  we've talked about the hold notices.  On one hand, you've

4  got the hold notices.  You've got the CAPA.  You've got an

5  audit that says the situation is untenable.  And we know

6  that companies are very careful about what they say.

7      So, on one hand, we've got destroyed documents.  And

8  guess what we now have on the other hand about the documents

9  that we do have.  We've shown Your Honor, and it's in the

10  PowerPoint that I provided you, when they're talking about

11  an issue that is in this upcoming trial and probably every

12  single trial afterwards, they're looking at a polypropylene

13  degradation article and they're wanting opinions about SEM

14  images, issues like degradation, cracking, those sorts of

15  things that go to the heart of this case and probably every

16  other case.

17      And what do they do?  They say, "Please don't put this

18  in writing."  So, on one hand, we have destroyed documents.

19  So, they win there.  And then on the other hand, everything

20  we do have they get to stack the deck with their version of

21  the story because anything that's troubling, they've

22  instructed everybody, "Don't put it in writing."

23      So, now we've got both hands tied behind our back.  And

24  that's precisely the kind of uneven playing field that these

25  courts talk about, and we have to even the playing field.

1    You know, we're not even -- and we are here talking

2  about monetary sanctions, of course.  But at the end of the

3  day, this kind of conduct, it's not only about the money.

4  It's about getting an even playing field.

5    How can a company -- I mean, we're creating a real

6  incentive here for a company that on one hand gets to

7  destroy documents, then gets to present their own sanitized

8  version because now they've learned they shouldn't put it in

9  writing.

10    And if you look at their exposure here, and maybe why

11  they suggest on Page 34 of their response brief that maybe

12  we should only be talking about monetary sanctions -- I

13  don't want to say that they would be pleased to pay monetary

14  sanctions.  But what happens is it creates an incentive --

15  it's a win-win for them.  They pay some money and they move

16  on.  And then their exposure in 17,000 cases drops to the

17  tunes of hundreds of millions of dollars.

18    So, they are, they are -- it creates this incentive

19  almost for this to occur.

20    MAGISTRATE JUDGE EIFERT:  Tell me, Mr. Wallace,

21  what documents do you think are missing that are prohibiting

22  you from making your case?  Are there gaps in some aspect of

23  your case that you feel these documents would be able to

24  fill?  What are you actually missing?

25    MR. WALLACE:  Okay.  And, and part of this I'd

1    like to give Mr. Cartmell and Mr. Freese the opportunity to

2    talk.  But what I will say are two things about that.

3        Troy Mohler -- and his testimony is in the PowerPoint

4    if you want to look at that.  We know in these cases that

5    what is said to the doctor, for example, from a learned

6    intermediary is crucial.  It's, it's a design defect or a

7    warning claim.

8        So often we want to be able to confront the sales

9    representative with his or her own contemporaneous notes

10   that were taken.  Well, for example, in this case, Troy

11   Mohler was the sales rep that's at issue in the *Lewis* case.

12   His testimony is, "I kept everything in three-ring binders

13   and I gave everything to them and it's gone."

14       So, do I know what was on those hand-written notes?

15   Not precisely.  But I do know from other litigation it's,

16   it's often very, very important in product defect and

17   warning cases.

18       The other thing is Renee Selman's hard drive, the

19   president of the company.  We, we've given you a chart, Your

20   Honor, of each of these individuals, their roles within the

21   company in a couple of sentences.  And I think that answers

22   some of these questions.

23       But you've got the president of the company who

24   undoubtedly authored documents that are at issue in this

25   case.  And it's a little bit hard for me to stand up here

1    and say, "Well, I don't know what I don't know."  But

2    often -- I took the deposition of the CEO of AMS.  And I can

3    tell you it was very fruitful because we had his custodial

4    file.  And, so, I can speak from experience in a case that's

5    also before you that the CEO's file was very fruitful.

6         And it's often fruitful in these design defect cases.

7    They're often intimately involved, much more so than a jury

8    might understand.  So, it's quite easy for Johnson &

9    Johnson/Ethicon to get up here and say, "Well, where are the

10   documents?" and you side against us.

11              MAGISTRATE JUDGE EIFERT:  When you deposed Ms.

12   Selman, what, what came out of that deposition?

13              MR. WALLACE:  Does anybody want to speak to that?

14              MAGISTRATE JUDGE EIFERT:  Let me first make sure,

15   does Ethicon have a problem if we have more than one speaker

16   on this motion?

17              MR. GAGE:  No, Your Honor.  That's fine.

18              MAGISTRATE JUDGE EIFERT:  All right.  So, what did

19   Ms. Selman have to say that might make you think that there

20   were documents in her custodial file or on her hard drive

21   that you did not get that would have been critical or

22   crucial to your case?

23              MR. CARTMELL:  Thank you, Your Honor.  Tom

24   Cartmell.

25         I did take Ms. Selman's deposition.  And most of Ms.

1   Selman's testimony was, "I don't remember."  In other words,

2   "I don't remember."  If she didn't have a document, it was

3   always, "I don't remember."  Typically, with the documents

4   we had, it was, "I don't remember," as well.

5       A lot of her deposition -- if you recall the time

6   period that she was involved was during the key time period

7   that is at issue in our failure to warn case only because at

8   that time, as Mr. Wallace said, the FDA got involved in the

9   story and there was a 2008 public health notice.

10      The trail stops as far as the response of the

11  company -- and I shouldn't say it stops, it never starts --

12  related to things about the public health notice, and

13  specifically the president of the company who was on the

14  boards that were involved making the decisions about a

15  response to the FDA or to the higher-ups in their company.

16      Mrs. Selman did testify that she would be involved in

17  all those discussions.  We don't have a single e-mail from

18  her and anybody else on those boards.  And, frankly, we

19  don't have them from others either.  So, I don't mean to say

20  that it's just Ms. Selman.  But that trail never starts.

21      And with respect to Ms. Selman, we, we -- she is, to

22  me, really obviously the most important person.  We don't

23  have anything from what the president of the company said

24  when all of this stuff was coming out.  And there's another

25  story that actually will be told in this upcoming trial that

1    is really relevant to this as well.

2         One of the witnesses who was the Associate Medical

3    Director, Dr. Meng Chen, who was, who was deposed at -- she

4    was at the company from 2006 until two thousand -- I think

5    she may still be there actually.  But the time period that

6    was at issue was starting in 2006.  And she became the

7    Associate Director of Safety Surveillance.

8         In other words, she was the one that when adverse

9    reactions were coming into the company or adverse events or

10   complications were being reported, she would be the one in

11   charge of making a determination of whether or not that was

12   caused by the device, the TVT device.  She would also be in

13   charge of contacting the physicians and contacting the

14   patients.

15        And she testified that she had multiple conversations

16   with patients.  They were telling her that they were having

17   life-changing debilitating pain and complications from the

18   device.

19        She went to her superiors.  She said, "I think we need

20   to change -- from my impression, we need to change the

21   label."  She said -- there's one meeting agenda without a

22   date on it that talks about that.  She -- the story stops.

23   It ends.

24        Renee Selman, we don't have anything.  She was the

25   number one person at that time.  She says, "I don't recall

1    what happened after that."  And the reason we don't know

2    what happened after that is because we don't have a single

3    document.

4         We know there would be e-mails surrounding that whole

5    period of time, 2006 to 2009 undoubtedly.  We don't have

6    one.  We don't have anything.

7         We know the president was involved because she was on

8    the board that was making the decisions.  She doesn't

9    remember a thing about it.  We don't have a single document

10   from her file that discusses it.

11        We know there were PowerPoints.  We know there were

12   other things.  There were presentations that were made by

13   her, by others to her.  We don't know what happened.

14        There's one other issue that is sort of similar that's

15   really pertinent to this case.  And it doesn't involve Ms.,

16   Mrs. Selman.  But the company made a change to the device,

17   mechanically cut mesh that was used in the TVT in 2006.

18   From 2003 to 2006, they worked on making that change.

19        2006 it comes out and they make a change to the device

20   that they say -- and we do have some PowerPoints that say,

21   "We made it more safe.  The edges aren't as sharp.  It

22   doesn't fray.  It doesn't lose particles.  It doesn't rope.

23   It doesn't curl.  It's safer for patients."

24        The story -- we say, "Did you continue to sell the old,

25   old construction mesh that was less safe?"  "Yes."  "Do you

1    remember any conversations about why?"  "No."

2        We don't have anything.  We don't have a single e-mail.

3    We don't have documents other than a few PowerPoints that

4    tell the story.  There's no marketing documents related to

5    what they were -- you know, there's very few.  Actually,

6    there are a few.

7        But we looked for launch plans - that's another thing -

8    starting at the time of TVT all the way.  We have some

9    European launch plans back from 1998 where they're going

10   around to doctors, and doctors are saying they're concerned

11   and doctors are telling them that dyspareunia and pain may

12   be a problem.  We've asked for the U.S. launch plans.  We've

13   asked for the laser-cut mesh launch plans, things like that.

14       The problem is when everything -- when we get to --

15   we're digging around in all these millions of documents that

16   they say they've produced, millions and millions of

17   documents.  Every time we get to something where, wow, this

18   is dramatic.  Something is happening here inside this

19   company.  And they know something's wrong with their

20   product.  There's got to be conversations about it.  We

21   don't have it.  We have nothing like that.

22       And I know it's just me saying, you know, this is what

23   I think because I don't know.  I mean, it is -- there has to

24   be some speculation to me saying this because, like Ed said,

25   we don't know what we don't know.

1        But common sense says that every time something starts

2   to happen, when Ms. Chen made complaints to her superiors,

3   everything goes silent.  And right now, as I said, we know

4   of 22 of these files.  When we get to those points, we ask

5   for more depositions.  And almost every time in the new

6   depositions we ask about, there's something missing.  And if

7   there's not something, just something missing, there's an

8   entire file missing.

9        After the first six months of this litigation -- and

10  Your Honor is very familiar with this because we had all our

11  calls -- we decided we cannot continue to do TVT-O and TVT-S

12  and TVT EXACT and TVT ABBREVO at every deposition.  These

13  depositions are too long anyway.  You were becoming

14  irritated.  Everybody was.

15       So, we didn't even continue going down that route.  But

16  what's going to happen is now as we go back and get the

17  witnesses that we decided not to take because we have a

18  TVT-O trial coming up, we have a TVT-S trial coming up,

19  there's more and more and more of this that we're going to

20  determine.

21           MAGISTRATE JUDGE EIFERT:  I think, again, here's

22  where I'm struggling because what, what we're trying to

23  figure out here is when the duty was triggered.  Once the

24  duty was triggered, was there a violation of that duty.  And

25  it appears that there was.  It appears that documents were

1    lost or destroyed or whatever, regardless of which date

2    you're using as your trigger point.  But then you get to the

3    prejudice.  And that, in a large part, will determine the

4    sanction.

5         I am struggling with the prejudice because what I hear

6    you saying is that you got some good things.  You got some

7    good stuff.  Now, you don't have the whole story.  You don't

8    have what everybody said about it or what everybody thought

9    about it.  But it sounds like you have some pretty good

10   things.  And they don't have any way to really respond to it

11   because they have no documents.

12        I don't know what you're actually missing.  I don't

13   know how this is really hurting you.  You know, if you said

14   to me, "Well, Ms. Selman testified that she prepared a

15   report that was 30 pages long and that outlined all of her

16   problems with this product and how she thought it could be

17   improved and that document is now gone," then I could see

18   where you're coming from.

19        But if it's just that you don't have everybody's

20   e-mails about the same subject, I'm struggling with how that

21   would justify a serious sanction such as a default judgment

22   or an adverse instruction.

23             MR. CARTMELL:  I guess the only way I can

24   respond -- because I, I totally understand that.  And we've

25   talked about it, you know.  The concern we can tell is --

1    and, and the response from them is no harm, no foul.  They

2    can tell you what, what prejudice they have.

3         When you go take Mrs. Selman's deposition and you say,

4    "Did you have meetings surrounding the public health

5    notice?"  "You know, I don't know.  I don't recall."  "Did

6    you prepare any presentations around the public health

7    notice?"  "You know, I really don't know.  I don't remember.

8    That's been five years."  There's really no way for us to

9    get to any answer.  And, and she's just an example of that.

10        When you take the lead engineer, Dan Smith, about

11   laser-cut mesh or mechanically cut mesh, "Weren't you

12   e-mailing about this?"  "I don't remember.  I don't recall."

13        I really, I really don't think the burden should be

14   ours because we -- there is no way we know what they haven't

15   produced.  We know that they've produced a million pages and

16   they say that.  But in the hundreds of thousands of pages

17   that's basically undisputed that they didn't produce, my

18   belief is the discovery after 40 some depositions now is

19   clear to us that we can't close the loop that we could

20   close.  We never have a document that gets you to that end

21   point.

22        You had knowledge that your warnings were inadequate.

23   You were at a meeting of the superiors of the company.  All

24   of the board members were there.  You guys made a decision

25   that it was inadequate or didn't make a decision.  We can't

1  ever get there.  And to try to get there, all we can do is

2  ask questions in a deposition.

3      And we could give you hundreds of examples of the

4  response every single time is, "I don't know.  I don't

5  remember," because the witnesses will not answer a single

6  question about a document unless there is a document in

7  front of them absolutely.  I mean, that's 100 percent of the

8  time.

9      So, I know we can't help you that -- it's frustrating

10 that we can't help you that much.  But, but there is always

11 an end to the story that we don't have we believe.

12         MAGISTRATE JUDGE EIFERT:  What you have to be

13 missing, though, is some sort of unique, critical, relevant

14 evidence that you're not getting.  And I'm saying to justify

15 a severe sanction, you've got to be able to show -- because

16 I don't -- from what I've read, I don't think that they

17 intentionally set out to destroy a bunch of documents.  You

18 know, I don't.  And, so, that might have gotten you there.

19 I don't think that I've seen that.

20     I do see where there are documents that perhaps were

21 destroyed unintentionally or negligently, however you want

22 to say it.  But then when you're going down your analysis,

23 you still have got to show to me that what's gone was

24 somehow unique or somehow really affects your case in some

25 negative way, prevents you from proving something you need

1  to prove.  And I'm not seeing that in your materials, nor am

2  I hearing that.

3      So, that's what I want to know.  What -- you know, they

4  tell you they had a meeting that they knew they were going

5  to talk about whether the warnings are, are good or not.

6  And you don't have any kind of document that tells you the

7  outcome of that meeting.  But what you do have is that

8  there's been no change in the instructions or in the

9  warnings.

10     Doesn't that tell you, then, that they took no action

11  and isn't that helpful to you because you're saying that

12  what they had out there was insufficient?  Why would not

13  having some document which you don't even know exists --

14  you're not even sure that -- maybe they got into the meeting

15  and they said, "Don't anybody write this down.  We don't

16  want anybody to see this," because you're telling me that

17  they did that as well.  Maybe they did that and that's why

18  there's no document.

19     My problem is how am I supposed to get there, you know,

20  on your motion if you're not giving me anything concrete to

21  work with?

22          MR. CARTMELL:  Yeah.  And I, I'm not sure I can go

23  any further other than I have.  I don't --

24          MAGISTRATE JUDGE EIFERT:  Well, in your materials

25  basically what you say is look at all the stuff that was

1    thrown away; there was tons and tons of stuff.  And that in

2    and of itself should say that there was unique, relevant

3    documents or information that we haven't gotten anywhere

4    else just by virtue of the size of the document.  But I

5    don't -- I'm not getting there that way.  I need to have

6    some idea of how this is affecting your ability to put on

7    your case.

8            MR. WALLACE:  Could I add one quick point about

9    that, Your Honor?

10           MAGISTRATE JUDGE EIFERT:  Yes.

11           MR. WALLACE:  Again, you focused on, you know, the

12   mass amount of data that was lost.  But who lost it?  I

13   mean, these aren't low-level people.  This is the bellwether

14   sales representative who testified, "I have no idea what

15   they did with it.  I gave it to them.  And I had every

16   single call note."

17       So, that goes directly to the learned intermediary.

18   Does it hurt our case?  Absolutely.

19           MAGISTRATE JUDGE EIFERT:  Now, is that an issue in

20   the *Lewis* case?

21           MR. WALLACE:  Well, not anymore, not anymore.  But

22   it certainly gave us no ammunition for which to present to

23   the doctor either before his deposition or afterwards.

24           MAGISTRATE JUDGE EIFERT:  So, it could be an issue

25   in an upcoming case.

```
 1            MR. WALLACE:  Absolutely.

 2       The other thing is if you look at who actually lost

 3  documents and how they lost them, you know, I mean, their --

 4  even buying their argument that 2008 was the trigger date,

 5  look at Renee Selman's hard drive and when it was lost.

 6  Just how -- I mean, and Jim Mittenthal's testimony on that

 7  is, "Well, they did what they were supposed to do,

 8  re-purpose the hard drive."

 9       The other thing is Mr. Mahmoud.  I mean, he was

10  involved in the quality of work discussions.  He handled

11  product complaints.  Adverse events are at issue here.  It's

12  without a doubt they go right to the heart of our case.

13       These are high-level people.  And, and putting aside

14  that we cannot perhaps point to the document that we are

15  missing as in the traditional case such that this is a fire

16  case or a car case and the car's destroyed.  In cases like

17  this, in pharmaceutical litigation you've got decades of

18  experience on that side.

19       And as Mr. Cartmell pointed out, maybe -- and we

20  submitted some case law on this, Your Honor.  The case law,

21  I believe, suggests that we should not be the ones that have

22  the burden to show that we've been prejudiced.  And we

23  submitted some cases to you on that that I think are

24  instructive.

25       And, so, I think at the end of the day, the case law
```

```
 1   says the burden is on them to say why these high-level
 2   people who in any other case -- they've defended lots of
 3   product liability cases and we've handled a lot of them too.
 4   And these people always have testimony and documents.
 5        And as the Court pointed out, in Zubulake and
 6   document-heavy cases, which these traditionally are, that's
 7   where the proof is without a doubt.  We can say that from
 8   experience.  I think that's undisputed.  Somebody that's
 9   handling adverse event reports and says, "I have no idea
10   what they did with this stuff.  I didn't destroy it."
11        So, we haven't even yet really been able to find out
12   how in the world that happened.
13             MAGISTRATE JUDGE EIFERT:  How what happened?
14             MR. WALLACE:  Well, how, how does someone's
15   documents like Mr. Mahmoud's documents who says that he
16   followed the rules, one of the few, that gets destroyed.
17   How does that happen?
18             MAGISTRATE JUDGE EIFERT:  Well, let me ask you
19   this.  And this is another issue that I'm a little confused
20   about.
21        So, we're talking here about custodial files that have
22   been lost or destroyed or whatever.  But I hear Ethicon
23   saying, "Well, but most of the documents that these
24   particular people would have would be documents that are
25   located on a server or they're in some generalized area that
```

1    is a multi-user area.  So, even though Dr. Mahmoud doesn't

2    have this on his hard drive or doesn't have it in his

3    e-mails, it is still, it is still there.  It still exists."

4            MR. WALLACE:  I take issue with that, Judge, and

5    here's why.

6        The, the testimony that we've uncovered is that there

7    was no -- even when they knew in 2007 that there was a

8    problem, in 2002 they knew there was a problem, they kept in

9    place the entire time all the way through this litigation a

10   policy that, where e-mails, for example, which are crucial

11   evidence typically in these cases are deleted.  They're gone

12   after 91 days.  So, there's nothing sitting on a central

13   file anywhere.

14       So, all the communications -- you know, we submitted

15   something where it says a "to-from."  There are no e-mails

16   to and from people.  And those are gone forever because --

17           MAGISTRATE JUDGE EIFERT:  There are no e-mails?

18   All the e-mails are gone?

19           MR. WALLACE:  In many cases, Your Honor.  There

20   are a lot of e-mails that are missing.  Now, now, Ethicon

21   points out in its response brief, "Well, we found, you know,

22   some over here and we found some over here."

23       But that, that's, that's -- to us, that's just an

24   excuse that falls flat because their system is designed in

25   such a way that documents are being -- you delete the

1    e-mail -- this is my understanding of Mr. Mittenthal's

2    testimony.  You delete the e-mail, it goes into your deleted

3    folder.  And then once it's -- the backup tapes, there's no

4    way that they can run a backup tape to restore something and

5    provide us what we really need.

6        And in cases like this where e-mails are so crucial,

7    they've never flipped the switch to shut off the destruction

8    of that data.  That's an intentional -- that's a -- put

9    aside whether we call it an intentional act.  It's a choice.

10   Right?  It's a choice that they made not to suspend that

11   system when they knew they had a problem.

12           MAGISTRATE JUDGE EIFERT:  All right.  Explain this

13   to me because this is the first I've heard of this.  So,

14   you're saying that in Ethicon, somebody has an e-mail on

15   their computer that they delete.  That e-mail is preserved,

16   I guess, in their delete box for 90 days and then it

17   disappears.  And there's no backup tape.  There's no way to

18   ever obtain that e-mail again.

19           MR. WALLACE:  Once a -- once an e-mail is, is

20   permanently deleted -- typically, these things go on a

21   backup tape, tapes in many cases.  That's how we're getting

22   backup tapes in the AMS litigation, for example.

23       Ethicon, in contrast, has had a policy in place that

24   has never changed, even after they found out that this was a

25   problem, that backup tapes are re-purposed or recycled.  And

1    they have a policy in place that they have not changed that

2    these backup tapes continue to get rotated and overwritten.

3         So, that some of these e-mails that are sitting there,

4    at least according to Mr. Mittenthal's testimony who should

5    be the one with the most knowledge since he was put up as a

6    30(b)(6) witness, when those e-mails are permanently

7    deleted, after 91 days they're gone.

8         And there's also an effort, and we've given Your Honor

9    documents on this, that there's a very robust program at

10   Ethicon to purge e-mails on an annual basis, purge all sorts

11   of documents on an annual basis.

12        So, you've got, on one hand, documents that are gone

13   forever.  And, again, any documents that might exist,

14   there's no fail-safe.  And that's -- I mean, if we want

15   to -- again, it may be unfair of me to -- I'm certainly not

16   going to sing AMS's praises, but that is an issue here.

17        Why didn't they do anything with the backup tapes?  And

18   that's actually in our reply in a footnote.  And I was

19   hoping I could remember the footnote, but it is in the, in

20   the reply brief.

21             MAGISTRATE JUDGE EIFERT:  Okay.  I did not see

22   that.

23             MR. CARTMELL:  Your Honor, if I could just

24   briefly -- I'll be very brief.  But these guys have told me

25   to say it and I forgot to and they'll be mad at me if I

1   don't.

2        On your point which is the issue of, you know, what

3   prejudice has there been to you, there were two other things

4   that I meant to mention.

5        And one is Paul Courts who was the sales rep in this

6   case who called on Dr. Boreham, the *Lewis* case I'm referring

7   to that is getting ready to be tried.  And the testimony's

8   been that, that he saw Dr. Boreham multiple times to, to

9   call on her related to the TVT and other products.  That's

10  gone.

11       He testified, "I actually took my files to the company

12  HR."  I believe -- they came to his house.  They picked up

13  everything.  They took it all.  He said, "I have no

14  explanation for it, for why it's gone."

15       You now know our failure to warn case has been

16  dismissed with, with, with prejudice.  It's gone.  And that

17  is a perfect example of something that, you know, has

18  prejudiced us.

19       We do know some of the materials that are marketing

20  materials that the sales reps took to doctors, although we

21  don't know what Mr. Courts took necessarily to this doctor

22  to give her knowledge.  And had we had that information at

23  Dr. Boreham's deposition from Mr. Courts, the detailing

24  pieces and the marketing materials that he was using, that

25  could have been information that would have shown what her

1   knowledge was or the absence of her knowledge.  But we could

2   not, we could not get into any of that because we don't have

3   any of that.

4        MAGISTRATE JUDGE EIFERT:  I thought she was the

5   one that testified, though, that she didn't listen to

6   anything that anybody told her, didn't read anything; that

7   she, you know, felt she knew herself just from her own

8   experience and education.  And, so, why or how would those

9   materials have made any difference?

10       MR. CARTMELL:  Well, her testimony was a little

11  different from that.  Her testimony was that when she was

12  going through her fellowship, she read the IFU before she

13  started doing the procedure in 2002.  She's done a ton of

14  procedures since then and thinks she hasn't looked back at

15  the IFU.

16      She also testified that she regularly gives sales

17  brochures or patient brochures to patients.  And she said,

18  "Occasionally I meet with sales reps."

19      It's one thing for her to say, you know, "I don't rely

20  on anything or do anything without any documents," okay, and

21  a very different thing that if we have documents that were

22  given to her, it's documented by Mr. Courts that he gave to

23  her that have different information and representations

24  about the product which we know were in these sales

25  materials about foreign body reaction, about inflammation,

1   and that they were given to her much after 2002.  It, it's

2   just a totally different situation.

3       We can't say that given that, if those materials were

4   in front of her at a deposition and we said, "Now, Doctor,

5   this is a sales piece that Mr. Courts provided to you in

6   2007 before Mrs. Lewis's surgery.  And you see here that

7   this is, it states that there's no foreign body reaction or

8   there's no inflammation or whatever.  There's no roping.

9   There's no curling.  There's no problem with this product.

10  That's information that was provided to you.  Do you read

11  it?"

12      Now, could she have said, "I didn't read any of that

13  stuff.  I didn't rely on it."  Maybe.  But she may not have

14  said that.  That's information if it was given to her.  My

15  point is, again, that's a situation where the burden should

16  not go back on us, I believe, from, from looking at it

17  because if the true reason for these types of, of -- well,

18  the spoliation or the inference, adverse inference is given

19  is because of it, we want to deter from them being able to

20  say, "Look, we didn't turn over hundreds of thousands of

21  pages of documents, but you didn't have any prejudice.  At

22  least, you can't tell us you have any prejudice."

23      And if we can't tell them because they decided that if

24  you don't give anything on that subject, they'll never know

25  about it, then of course we would never be able to say what

1    we don't have.  But there's no deterrence to them not to do

2    that over and over again.

3        And one other thing I want to say is that -- there's

4    another very important issue and it's -- the company hired a

5    consultant named Dr. Heniford who was a hernia surgeon who

6    was a paid consultant by them.  They said, "We want you to

7    do a video."  There's a video that was put together.  It

8    states, "Funded in part by Johnson & Johnson and Ethicon."

9    And it's a video that apparently was going to go out to

10   surgeons to promote a new mesh that was going to be safer

11   for patients.

12       And Ethicon's paid consultant says in this produced

13   video that there's no reason ever to use small pore,

14   heavyweight mesh in the human body, literally a quote.

15       He -- it's an 11-minute, I believe, video.  He states

16   over and over that the problems are with inflammation and

17   foreign body response.  That is a heavyweight, small pore

18   mesh.  The TVT mesh is heavyweight and small pore.  We have

19   that in admissions from them.

20       But here's what we have.  We asked Mr. Cecchini during

21   the deposition, "Have you ever seen this video?"  "No, I

22   don't think so."  "Well, here's an e-mail that says the FDA

23   contacted you and heard that you have a very damaging video

24   that your company has produced and we want a copy of it."

25       And he testifies and, and from the one or two e-mails

1    we have, it makes it clear -- and we actually have another

2    witness independent of the company who's told us this --

3    that they searched for the video.  We think there's e-mail

4    traffic clearly saying, "Hey, the FDA wants this video.

5    What are we doing to do?"  Nothing, silence.

6        Peter Cecchini at his deposition says, "I've never seen

7    this."  We play it for him.  He says, "No, I've never seen

8    this."  We can't -- you know, we're trying to lay a

9    foundation for this video.  We know there's stuff there.

10   Nothing.

11       Then we say to him, "So, did you give it to the FDA?"

12   "Yeah, yeah, I think we did give it to the FDA."  "Well, was

13   there any conversations about that or anything like that?"

14   "I don't know."

15       It's another example of something that is absolutely,

16   absolutely the heart of our case almost, that internally

17   they have these videos they're producing that says this mesh

18   is not as safe.  It should never be used in the human body.

19       We're looking for documents.  We see nothing.  We think

20   they have to exist.  I can't tell you they do because you're

21   right.  They could have said, "Put nothing in writing."

22       But we know there was a search for it.  We know Mr.

23   Cecchini said, "Yes, we dug it up.  I know I sent it."  And

24   there is nothing there.  I think that's just another example

25   of an area where we think there has to be things there,

1    something.  But there's nothing.

2         And it's going to be a real problem for us -- we hope

3    not, we're hoping it shouldn't be -- but laying a foundation

4    and things like that because we think the things are, are --

5    were left out.  I just wanted to add that.

6              MAGISTRATE JUDGE EIFERT:  All right.  I think the

7    case law is, is helpful only to a certain extent because

8    it's not really dealing with MDLs.  But in most of these

9    cases when an adverse instruction is given, it's about a

10   specific set of evidence or a specific issue.

11        For example, if the employee in *Zubulake* says, "I know

12   there was this e-mail exchange and now that's gone," and we

13   know that's gone, then you can say whatever that subject

14   matter was of that e-mail exchange that's gone now, we're

15   going to presume that it was damaging to the defendant

16   because they lost it.

17        What you're asking for is an adverse instruction that

18   is just some universal thing that says, "They threw a bunch

19   of stuff away.  Therefore, you should find for us."  And,

20   you know, I'm struggling with that.  I don't think that's

21   what the intent of an adverse instruction is.

22        Now, if you said to me, for example, let's say you have

23   a case where the doctor testifies, the implanting physician

24   testifies and says, "Yes, I read all the materials they gave

25   me.  I relied on it 100 percent.  The salesman said this or

1    that."  And then the rep has no documents at all showing

2    anything.  I think you would be entitled to an instruction

3    that said whatever that rep had must have been damaging

4    because it's gone now.  You might be entitled to that.

5        But, but I don't know how to take what you're giving me

6    and try to say, well, yeah, there will be this adverse

7    instruction that will say what?  What?  What will it say?

8    That they threw stuff away and, therefore, their product was

9    bad?

10       It's -- you see where I'm kind of struggling with this?

11   I don't know what you're not able to prove.  I don't know

12   what it is that you think exists that's gone.  I understand

13   that you think a lot's gone, and a lot may be gone.  But it

14   still doesn't get me to the point of saying, well, yes, then

15   you should have an instruction that says what?

16              MR. WALLACE:  Your Honor, we actually submitted a

17   proposed instruction that is in the material that I gave you

18   and which also Mr. Gage has a copy of.  And it's consistent

19   with, we believe, Texas case law that would govern here.

20       And the interesting thing about Texas is that they

21   generally are against presumptions except in the case of

22   spoliation.  So, we actually crafted -- and it's something

23   that would be perhaps more specific to the evidence as it

24   came in.  But we actually crafted a proposed instruction

25   that is, that is based upon what we learned about Texas law.

1    And, again, it's, you know, it's allowed.

2         Just real quick, if I could just for clarification, and

3    I'll be brief.  It is Footnote 35 on Page 16 where we do

4    reference the backup tapes.  It's not in detail, Your Honor.

5    But the reason why I mentioned it, amongst other reasons, is

6    the way we've characterized the document destruction, both

7    sides.

8         I think you have to take into account under Rule 37,

9    given the amount of discretion that you have, the totality

10   of the circumstances.  And, and in my -- I would just submit

11   to the Court, Your Honor, that when you look at the totality

12   of the circumstances and the case law that says if you put a

13   litigation hold letter out there, you better follow it.  You

14   better monitor the employees.  You follow up on it.

15        Ethicon submits in their response brief, "Well, we're

16   doing that."  Well, the first time they started doing it was

17   in 2013.  So, even by their own admission, they ignored it

18   for five years if they say it's in 2008.  That's, that's

19   egregious.  That's beyond egregious, especially when you

20   have a 2002 -- you have a 2006 consult that says this is

21   untenable.

22        They open up a CAPA that remains open for years in 2007

23   before this is happening.  And then you fail to give your

24   own expert who's submitting affidavits to the Court that it

25   wants the Court to rely on that's just completely ignored

1  the CAPA, that I had to show it to them in 2013.  And the

2  first we were told about this five, six years later after

3  the litigation starts?  "Oh, we've got a problem." Amazing.

4  I'm shocked.

5      And there's -- I'm not being dramatic here.  I've never

6  seen anything like this.  I've scoured the cases, scoured

7  the cases.  A lot of us all have a lot of experience.  Has

8  there been any case anywhere where there's been such

9  widespread destruction?

10      Under the circumstances where the company is saying,

11  "Under our rules, we cannot produce relevant," relevant is

12  their words, "documents in the course of litigation," and

13  then come into the court and admit it.  And then say to us,

14  "Even though we believe the case law suggests otherwise, oh,

15  it's your burden to show us what we destroyed."

16      And, again, that's why I submit we, we would like the

17  focus not to really -- of course, there's a monetary

18  sanction that we would also ask for.  But there needs to be

19  a sanction here that levels the playing field.  And I, I

20  would turn it over unless Your Honor has any questions of

21  me.

22          MAGISTRATE JUDGE EIFERT:  Well, let's go ahead and

23  let the defendants say something.

24          MR. WALLACE:  Thank you, Judge.

25          MAGISTRATE JUDGE EIFERT:  Thank you.

46

1          MR. GAGE:  Good afternoon, Judge.

2          MAGISTRATE JUDGE EIFERT:  Good afternoon.

3          MR. GAGE:  Judge, I -- a lot of water has been

4    covered.  A lot of different issues have been covered.  I, I

5    think, I think we've got to start with some things that are

6    pretty clear.

7          First of all, there's no evidence anywhere that there

8    was intentional destruction.  I think the Court, Your Honor

9    noted that earlier.  And that's not really on the table.

10   There's nothing -- there's been no evidence, no affidavit,

11   no deposition testimony, no internal documents, nothing that

12   suggests there was ever any intent.  So, I think that's an

13   important point for us to keep in mind.

14         The plaintiffs mentioned -- Mr. Wallace mentioned

15   something about a robust purge policy.  And on that point, I

16   would direct Your Honor to Mr. Mittenthal's affidavit,

17   Paragraph 45.  There's a description of what I believe he's

18   referring to.  It was an annual systemic process for

19   reviewing paper and electronic company records.  And it

20   provides a records review checklist to determine each

21   document's disposition.

22         And Mr. Mittenthal's affidavit notes that the first

23   item on that checklist instructs employees to preserve the

24   document if it has been retained for litigation.

25         So, for Mr. Wallace to suggest that there were purge

1    days designed to destroy documents, that's simply not in

2    accord with the evidence that's in the record.

3         Your Honor, the other thing I think that you clearly

4    seized upon, which is obviously of key importance, is there

5    has been no loss of key documents here.  You know, this

6    lawsuit is about, in many respects, regulatory filings,

7    design history files, adverse event reports, marketing

8    materials, IFUs, and patient brochures.  And all of those

9    documents have been produced.

10        I mean, there may be occasionally something that we're

11   still looking for or some version here of some document.

12   And as we continue to look for documents, we may continue to

13   find certain things.  But the key documents, the essential

14   documents that are essential to the plaintiffs' claims have

15   been produced.

16        And then there have been thousands upon thousands of

17   documents from the individuals at issue that have been

18   produced, including documents from the people who appear on

19   the plaintiffs' list of 22.

20        So, when we, when we look at what's been produced, I

21   think we're somewhere in the neighborhood now of 10 to

22   12 million pages, or I should say -- yes, 10 to 12 million

23   pages, something around a million and a half, two million

24   documents.  It's been a very substantial production.

25        Now, Your Honor, there's been a lot of talk about the

1    22 custodians.  And I'd like to hand Your Honor a chart, if

2    I may.  Judge, this chart is entitled "Statistics Cited in

3    Ethicon's Opposition to Plaintiffs' Spoliation Motion."  And

4    all of the data that makes up this chart is already in the

5    record in various forms as attachments to our response.  So,

6    this is not something new that I'm springing on you.  We've

7    just taken existing data in the record and kind of organized

8    it for Your Honor's review.  And I think it's important to

9    spend just a few minutes going through this chart.

10       You see at the top we've got the individual.  And these

11   are the 22 individuals who have been identified by the

12   plaintiffs in their original motion or in the supplemental

13   motion as having files that were, that were destroyed.

14       You also see the separation date from Ethicon.  So, you

15   can get some perspective of when the person actually left

16   the company.  Then you have the department.  And then you

17   have number of documents in individual's custodial file per

18   the motion.

19       And what we've done there, Judge, is we've put the

20   number in that the plaintiffs allege were in that file.

21   That's taken from the plaintiffs' motion.

22       Now, what's very important, and I think Your Honor has

23   seized upon this and commented upon it earlier, the next

24   column is individual's e-mails and attachments found in

25   others' custodial files.

1          So, what you have here is -- for example, let's look at

2     individual number of files that's Sean O'Bryan.  Mr. O'Bryan

3     left the company in 2005.  He was in the regulatory group.

4     And there were 54 documents in his individual custodial

5     file.

6          But then what you find from, you know, where Sean

7     O'Bryan is involved from the other custodial files is 4,951

8     documents.  So -- and you understand what's going on, Your

9     Honor.  Sean O'Bryan may be sending an e-mail or receiving

10    an e-mail and a number of other people are copied on that

11    e-mail.

12         So, even if we weren't in some cases able to get

13    Mr. O'Bryan's e-mail out of Mr. O'Bryan's custodial file, we

14    were able to get Mr. O'Bryan's e-mail from another custodial

15    file because he sent that e-mail to them or copied them and

16    that sort of thing.  Does that make sense?

17              MAGISTRATE JUDGE EIFERT:  Yes.

18              MR. GAGE:  Okay.  Then you see, Judge, the next

19    column says "Approximate Number of Documents Produced in

20    Custodial Files of Other Individuals Working in Same

21    Department."

22         So, again, if we're looking at Sean O'Bryan, what you

23    see is we collected from approximately 15 other custodians

24    in the regulatory group who generated about 47,000

25    documents.

1      Again -- so, if, if Mr. O'Bryan is having conversations

2    about some regulatory matter with others in his group,

3    there's been a significant number of, of documents produced,

4    you know, tens of thousands of documents produced from that

5    department that would serve as the basis for plaintiffs to

6    question him about, you know.

7      The point, is, Judge, I think if you just simply look

8    at purely the data around the custodial files, you're

9    potentially missing the larger picture.

10      And then, finally, the final column is "Relevant

11   Documents Produced from Central Sources."  And, Your Honor,

12   we've talked on some of our Friday calls about the

13   differences between custodial files and central sources.

14   Your Honor alluded to it earlier.

15      Because the medical device industry is so very heavily

16   regulated and the companies are under obligations to keep

17   certain central sources, a lot of the work that's done by

18   these individuals at the company winds up in these central

19   source files which are distinct from custodial files.

20      So, for example, Sean O'Bryan would spend a lot of his

21   time dealing with 510(k) applications or complaint files.

22   And those central sources have been collected and produced.

23      So, I think this chart gives you, you know, a much

24   better perspective on the concept of prejudice.  You know,

25   the law is clear, Your Honor, that the plaintiffs have the

1    burden of coming in and demonstrating that they have been --

2    the presentation of their claim has been substantially

3    prejudiced by their inability to get information from the

4    opposing party.  And they simply haven't done it.

5         You know, notably, Judge, we've been through the entire

6    process of all the expert designations.  And I think most,

7    if not all, of the experts have been deposed.  To my

8    knowledge -- and I had somebody look at this and maybe I

9    missed it.  I never -- I'm sure the plaintiffs would have

10   raised it.  I never saw anywhere where a plaintiffs' expert

11   said, "I can't give an opinion about this product," or, "My

12   opinion is wishy-washy because I don't have particular

13   information or materials."  It, it simply doesn't exist.

14        And I think, Your Honor, at least my perspective of

15   what we just saw transpire a few minutes ago, was that

16   plaintiffs' counsel can only give you "what ifs."  They

17   can't point to specific portions of their claim that they

18   have, where they have been substantially prejudiced.

19        I know Your Honor has already looked at some of the

20   case law on this issue.  You alluded to it earlier.  When

21   you go back and you look at the Fourth Circuit case law on

22   substantial prejudice, you see case after case after case

23   repeating the same theme.

24        And I've got kind of a list of them here, Judge.  And

25   I'm not going to -- they're all in somebody's brief.  In

1  fact, many of these cases are found in the plaintiffs'

2  brief.

3       But what you find in the cases where the courts are

4  considering sanctions of the type that the plaintiffs are

5  seeking here, these adverse inferences, default judgments,

6  monetary sanctions, what you see are, for example, the

7  *Telectron* case.  The corporate counsel ordered the immediate

8  destruction of documents directly pertaining to plaintiffs'

9  complaint.

10      You see cases where the -- this is the *King* case which

11 is cited in the briefing.  The plaintiffs' insurance company

12 destroyed the power source unit that plaintiffs alleged had

13 a manufacturing defect.

14      The *Silvestri* case.  Plaintiff destroyed the automobile

15 that was the basis of the case.

16      *Taylor* vs. *Mitre*.  Plaintiff intentionally destroyed

17 his desktop and installed a program called Evidence

18 Eliminator."

19      You see cases like the *Stanley* case where the

20 defendant's president told colleagues to destroy evidence.

21      Over and over and over again the common theme in the

22 case is some level of intentionality or where the item or

23 thing that has been destroyed is central to the plaintiffs'

24 case.

25      And here, Judge, if we go back and look at this chart

1    and we see the tens of thousands of documents that have been

2    produced both by the individuals, by, by the custodians with

3    whom they were working, and then the productions through the

4    central source files, it, it, they can't, they can't stand

5    up here and say, "Let me show you how my case has been

6    materially prejudiced."

7           MAGISTRATE JUDGE EIFERT:  Well, Mr. Gage, what

8    about the plaintiffs' contention that, for example, their

9    punitive damages claim may be affected by the fact that now

10   they no longer have these e-mails where the employees of

11   Ethicon are basically admitting that they have a bad, unsafe

12   product and those now have all been wiped clean because, for

13   example, you've taken the president of the company's hard

14   drive and wiped it entirely clean clearly after there was a

15   duty to preserve?

16          MR. GAGE:  Your Honor, let me speak to, to that.

17       Mr. Cartmell gave you his understanding of Ms. Selman's

18   testimony.  I've got a page or two of her deposition

19   testimony.  She was asked a question during that deposition.

20       Question:  "Any other big categories of documents that

21   you can think of that we might not have because we don't

22   have your hard drive?"

23       And her answer was:  "I think you would be missing very

24   few documents because I wasn't the document originator for

25   much of anything.  So, if it's not in my file, it would

1    be -- a marketing presentation would be in Lesley Fronio's

2    file.  If it was financial related, my finance person would

3    have it.  I didn't originate a lot of e-mails or documents.

4    I didn't create my own PowerPoints.  Somebody has it."

5         So, Judge, when everybody brings all the focus,

6    admittedly, on the president of the company, Renee Selman --

7    who, by the way, is very disturbed by the fact that these

8    documents weren't maintained.  She's personally very

9    disturbed by that, as we are.

10        The reality is we still have to go back to the material

11   prejudice -- certainly, no intent.  But we have to go back

12   to the material prejudice basis, whether it's a compensatory

13   claim or a punitive claim, whatever the nature of the claim,

14   the plaintiffs have to come in and say, "Let me show you how

15   the essential elements of my case can no longer be

16   presented, or can only be presented in a way that has been

17   substantially prejudiced because of the destruction of this

18   material."

19        And there's a good reason for that, Judge.  The law

20   doesn't want any speculation in this area.  The parties have

21   to come forward and really tightly make their case.

22             MAGISTRATE JUDGE EIFERT:  Okay.

23             MR. GAGE:  Your Honor, I, I think it's also

24   important -- there's been a fair amount of discussion about

25   the sales reps.  And I want to remind the Court -- if I may

1    approach, Judge.  You may remember PTO 70, a copy of which
2    I've just handed Your Honor.  You may remember back in the
3    middle part of 2013, there was -- plaintiffs had filed a
4    motion seeking, or compelling production of a number of
5    sales rep files beyond those that were tied to the
6    bellwether plaintiffs.  And Your Honor issued an opinion in
7    September, September 26th, 2013, on this issue.

8        And I remembered this opinion as we were going back and
9    thinking about the sales reps because I think this opinion
10   and the evidence that was submitted there really
11   crystallizes the issue.

12       You'll remember that there was an affidavit that was,
13   that was tendered in connection with that motion from
14   Mr. Matt Henderson.  And he pointed out to the Court, and
15   the Court found, because this was obviously uncontested,
16   that medical device representatives are not required to keep
17   detailed records of their contacts with customers for the
18   simple reason that medical devices are not sold to doctors,
19   but to the facilities at which surgeries take place.

20       And the Court also noted, based on the affidavit, that
21   medical sales device representatives primarily provide
22   product support to surgical facilities, which is in contrast
23   to the way that it happens in the pharmaceutical side.

24       And in connection with the motion, and as the Court
25   noted in its opinion, the sales reps do not create their own

1  marketing or promotion materials.  Instead, Ethicon supplies

2  its representatives with a uniform set of materials

3  developed by Ethicon for distribution.

4      So, we had some conversations here about Paul Courts

5  and Troy Mohler, a couple of the sales reps in question.

6  You know, the reality is, Judge, there shouldn't be anything

7  significant that is unique in those files.

8      Furthermore, Judge, I think it's important to point out

9  that with respect to Paul Courts, you know, there were 556

10 documents produced out of his files.  And most of what is --

11 most of what was contained in those documents were things

12 that you would normally expect to find on a sales rep file.

13     So, again, Judge, once we penetrate just the surface

14 allegation that, well, the sales rep materials are gone, if

15 we go back in time and we think about what sales reps do in

16 the medical device arena at Ethicon, and if we go back and

17 we look at the Court's ruling in September of 2013 and the

18 evidence that we were all addressing there, I think we begin

19 to see a very clear picture that even if those files are

20 gone, it doesn't lead to a finding of substantial prejudice.

21 It just -- those two simply don't hook up.

22     Judge, I want to reference the CAPA issue simply

23 because it was referenced earlier.  I, I think the CAPA

24 issue is a red herring.  And I would ask, Your Honor, as you

25 work through the issue to, to look very carefully on that.

1      A CAPA is essentially kind of a corrective action or a

2   preventative action that the company undertakes with regard

3   to a whole lot of different things.  Whenever the company

4   has any particular issue sometimes related to health or

5   safety or internal documentation or internal issues, they

6   may do what's called open a CAPA which is basically open an

7   investigation into the issue.

8      The 2002 internal audit that's referenced in the motion

9   papers that the plaintiffs have been harping on talks about

10   Ethicon did not have a formal records management program.

11   And that was pertaining to a time period before the pelvic

12   mesh litigation was instituted.

13      The hold notices -- the hold notice that we've been

14   discussing, the first one was issued in 2003.  And those

15   overrode all regular record retention procedures and

16   instructed the employees to preserve the documents.

17      And that -- and then you see that you've got the CAPA

18   and additional audits working through 2006 and 2007.  And

19   finally the CAPA is closed in 2009.

20      Essentially, Judge, the point that I wanted to make is

21   this.  The company is internally working to improve their

22   document management system all throughout that time period.

23   That's a good thing.  That's what we want our companies

24   doing.

25      And interestingly, notably, if Your Honor goes back and

1    looks at the amendments to the Federal Rules of Civil

2    Procedure that dealt with electronic discovery, those begin

3    to come in in 2006.  And then I think there's another

4    version in 2008.  And then I think, as Your Honor may know,

5    Congress is expected to get yet another series of changes to

6    our electronic discovery rules.  I think it's in 2015, and

7    likely will take effect December 1 of 2015.

8        But the point is this, Judge.  At the same time the

9    Federal Courts of this country were grappling with document

10   management issues and preservation hold issues, so was

11   Ethicon.  Ethicon was responding to the environment and

12   looking to makes changes and improve and better themselves.

13       So, I just wanted to point out that the CAPA issue, in

14   my view, is a red herring and is not designed to be what I

15   think the plaintiffs want to portray it as, some admission

16   of fault or admission of guilt.  And the details, Your

17   Honor, are fully set forth in our brief and in supporting

18   affidavits.

19           MAGISTRATE JUDGE EIFERT:  Mr. Gage, you did just

20   remind me of something I wanted to ask you.  What about the

21   plaintiffs' argument that the duty to preserve was triggered

22   in 2003 based on your own litigation hold letter?

23           MR. GAGE:  Right.  Judge, I -- you know, I think

24   it's, I think it's very clear that, that a litigation hold

25   notice, both those sent by Ethicon and those sent by other

1    clients that I've worked for, those that I see at all the

2    various seminars that I go to on e-discovery, litigation

3    hold notices are extraordinarily broad.  In many cases,

4    they're sent to entire companies.  And they say, "Hold

5    anything you got related to this particular product or this

6    particular issue or this particular former employee,"

7    whatever the case may be.

8        But the scope of the hold notice, which is often very

9    broad, does not create the -- it, it is not the functional

10   equivalent of the legal duty to preserve.  Hold notices are

11   broad.  The legal duty to preserve is, is something that is

12   narrower than that and must be looked at in the context of

13   the particular lawsuit at hand.

14       So -- and the thing that I am most troubled about,

15   about the plaintiffs today going back to 2003 is this.

16   They're asking the Court to look in retrospect through a

17   prism in 2014 where we have -- I don't know what the number

18   is -- thousands upon thousands of plaintiffs in this

19   litigation.  And they want to go back to 2003 and say,

20   "Based on what we know today in 2014, given all the number

21   of plaintiffs on the docket here, you should have acted in

22   2003 before the Federal Rules of Civil Procedure even had

23   any substantive provisions regarding e-discovery and acted

24   as though a mass tort was imminent."  And that's simply not

25   fair.

1    So, Your Honor, obviously it is something the Court

2  struggles with.  It's something that I personally struggle

3  with as a lawyer because it's difficult to -- I mean, it's

4  very hard for me to turn the clock back and say, "Let me

5  tell you precisely what the scope and obligation should have

6  been in 2003."  It's very difficult to do that.

7    But what I can tell you is isolated cases in 2003,

8  2004, 2005, whatever the relatively few number of cases were

9  that occurred during that time period, those cases can't

10  give rise to the obligation to preserve and collect for

11  hundreds and hundreds and hundreds of custodians, which is

12  what essentially the company is now having to do in terms of

13  production and going out and finding lots of people.  You

14  can't look at 2014.

15    You can't look at the technology in 2014.  You can't

16  look at the general level of awareness in 2014.  You can't

17  look at 20,000 lawsuits versus a tiny handful and say what,

18  what we see today is the measuring stick for what happened

19  in 2003.

20    MAGISTRATE JUDGE EIFERT:  So, tell me when you

21  believe the duty was triggered and why you believe it was

22  triggered at that time.

23    MR. GAGE:  Judge, I think, I think, you know,

24  the -- you have -- Your Honor has the chart that I handed

25  you earlier.

```
 1              MAGISTRATE JUDGE EIFERT:  Uh-huh.
 2              MR. GAGE:  You see how I've got it in three -- you
 3    see how I've got a darker gray.
 4              MAGISTRATE JUDGE EIFERT:  Uh-huh.
 5              MR. GAGE:  And then I've got a lighter gray.  And
 6    then the bottom is, is just kind of pure white.  Do you see
 7    that?
 8              MAGISTRATE JUDGE EIFERT:  Yes.
 9              MR. GAGE:  Judge, the beginning of the -- the
10    transition from the darker gray to the lighter gray is the
11    2007-2008 period.  Do you see that?
12              MAGISTRATE JUDGE EIFERT:  Yes.
13              MR. GAGE:  All right.  The first case -- and Your
14    Honor basically remembers what happened in terms of facts.
15    You've got a relatively small number of isolated cases.  And
16    then you get this first case in New Jersey.  And I believe
17    that is in -- and the brief's got the exact dates, but the
18    first case in New Jersey is I believe --
19              MAGISTRATE JUDGE EIFERT:  April of 2008.
20              MR. GAGE:  Okay, April of 2008.  So -- and then
21    when you get to the transition on the chart from where it
22    goes to lighter gray to white, that's when the New Jersey
23    Supreme Court orders consolidation of the pending State
24    Court cases.
25         And, so, Judge, it's, it's very difficult for me, and I
```

1    certainly think it's difficult both for the plaintiffs and

2    certainly for Your Honor, to try to nail into a specific

3    date.  But it would have to be somewhere in that time period

4    when the cases began to gain sufficient numbers, and then

5    the Supreme Court in New Jersey orders consolidation.  And

6    now you've got, you know, a pretty substantial number of

7    cases pending.  That, that is a circumstance where now it's

8    gone far beyond just an isolated case.

9         Your Honor, just a couple more points.

10        Dr. Heniford.  Judge, the issue with Dr. Heniford is he

11   par -- he helped put together an Ethicon-sponsored video

12   which, if I'm correct, the title of is basically "The

13   Benefits of Lightweight Mesh Versus Heavyweight Mesh."  It's

14   got something to do with the differences between lightweight

15   mesh and heavyweight mesh.  And that video has been produced

16   to the plaintiffs.

17        The question on the table, I think, is the plaintiffs

18   are wanting to know are there additional videos on that

19   subject.  And, so, you know, Judge, I'm not going to tell

20   you how many phone calls and e-mails our team has sent

21   internally to try to get to the bottom of that.  As we stand

22   here today, I am not aware of any other video that addresses

23   that particular issue.

24        And I think for the purposes of this hearing, what I'm

25   saying on that issue is, Judge, you can't claim spoliation

63

1    about something that you've not yet proven exists or doesn't

2    exist.  Now, we've, we -- several of our lawyers met with

3    Dr. Heniford to get him ready for his deposition.  And in

4    the course of that, Dr. Heniford produced some documents

5    which have been produced to the plaintiffs.  And it's my

6    understanding that there are, there are a couple of other

7    videos that may be part of that production.  But it's my

8    understanding those are not videos that directly go to this

9    issue of lightweight versus heavyweight mesh.

10       And we indicated to the Court in a footnote in our

11   brief that the Heniford production was going to basically

12   take place while we were in the middle of the briefing on

13   this.  So, Judge, we're still looking at what Dr. Heniford

14   may or may not have that may or may not relate to the

15   subject matter.

16       Long story short is this.  If we can find it, if it

17   exists, we're going to produce it.  But for purposes of

18   spoliation, in my humble opinion, we can't be punished for

19   something that nobody has concretely said exists and there's

20   no longer a copy of it.

21       And further, Judge, I have to say their, their concerns

22   about Dr. Heniford somewhat ring hollow to me because

23   yesterday morning after we busted our tails for weeks and

24   weeks and weeks to get him to agree to give a deposition and

25   we got his documents and produced documents, we get an

1  e-mail yesterday and they say they don't want to take his

2  deposition and cancelled his deposition.  So, he's not even

3  going to be deposed tomorrow.

4       MAGISTRATE JUDGE EIFERT:  Does he not know if he

5  made more than one?

6       MR. GAGE:  As I understand it, Judge, his

7  recollection is that he doesn't remember any other videos on

8  lightweight versus heavyweight other than the one that he --

9  I think that's what he would have testified to.  And

10 Mr. Thomas has been working with him more than I have.

11      And, Mr. Thomas, if I'm misstating that, I certainly

12 want you to correct me.

13      So, Your Honor, I think at the end of the day, where I

14 am and where I believe Ethicon is, yes, there was material

15 that was lost.  We detailed in our brief the, the additional

16 efforts that the company is now undertaking to ensure that

17 this doesn't happen again.

18      It may happen again like we are human and we make

19 mistakes.  But the company has taken the fact of the filing

20 of this motion -- the fact that the plaintiffs have been

21 after us has been taken very seriously.  The affidavit and

22 the evidence in the record shows what we have done to

23 respond to that.

24      We want the Court to be very mindful of the fact that

25 the fact that I am standing up here and urging the Court not

1   to award sanctions does not mean that we don't take this

2   very seriously and are not engaged in efforts to ensure that

3   it doesn't happen again.

4       But where we are under the law is they have to prove

5   intentionality.  There's absolutely no evidence of it.  They

6   have to prove that the presentation of their claims has been

7   substantially prejudiced.  They can't do it, Judge.  They

8   simply can't do it.

9       None of their experts said it.  And the plaintiffs'

10  lawyers can't put their fingers on where the claims -- where

11  the elements of their claims can't be proven.

12      So, Your Honor, at the end of the day, we would urge

13  the Court not to award sanctions and to deny this motion.

14      Thank you.

15          MAGISTRATE JUDGE EIFERT:  Thank you.

16      Mr. Wallace, do you have anything else you wish to add?

17          MR. WALLACE:  Yes, Your Honor, briefly.

18      I'll try to work backwards.  Let's first talk about the

19  videos real quickly.  We know that there are other videos

20  that exist.  We also, as Mr. --

21          MAGISTRATE JUDGE EIFERT:  How do you know that?

22          MR. CARTMELL:  Pardon me?

23          MAGISTRATE JUDGE EIFERT:  How do you know that,

24  that there's other videos that exist?

25          MR. CARTMELL:  We're asking for the documents.

1   But we also know that there are videos, the other videos do

2   exist.  And we've been talking to you about that for a

3   period of time.  I mean, we don't have them yet.  I don't

4   understand.  He's saying, I think, that they're coming.

5           MR. GAGE:  Judge, just to be clear, when, when we

6   met with Dr. Heniford to get him ready for the depo that was

7   supposed to take place tomorrow, we advised him of the need

8   to produce his documents pursuant to several subpoenas.

9       In the course of collecting that material, I believe we

10  came into possession of a video or two or three including

11  some videos of just like surgical cuts where he's in an

12  operating room and there's some camera showing him working

13  on a mesh.

14      But then there are -- I think there was maybe one or

15  perhaps two produced videos, you know, presentations.  It's

16  my understanding that those videos were produced to the

17  plaintiffs by Dr. Heniford through David Thomas about a week

18  and a half, maybe two weeks ago.  So, those videos have been

19  produced.

20      And what we're doing internally, Your Honor, is we,

21  Ethicon, are going through the documents that Dr. Heniford

22  produced.  And we are looking to see are they going to give

23  us any clue to help us look further inside of Ethicon to see

24  are there other videos that his documents reference that we

25  previously didn't know about.  So, if we have them, we want

1    to find them and produce them.

2           MR. CARTMELL:  My point is we knew months and

3    months ago that there were videos because there were other

4    documents referring to them.  And we said, "We want those

5    videos, we want those videos," months and months ago.

6        Three weeks before trial, now we find out they found

7    those videos.  But we want the documents related to the

8    Heniford video because we believe there is documents

9    surrounding it going to the FDA and back and all the

10   interactions and things like that.

11          MAGISTRATE JUDGE EIFERT:  Okay.

12          MR. WALLACE:  Exactly.  I'll move on.  I'll try to

13   work backwards and I'll talk about the CAPA for a second.

14       The words that Mr. Gage used were we're trying to

15   characterize the CAPA.  And he gave you some information

16   about what was happening in the electronic world and

17   everything else.  That's not evidence.  Here's the evidence,

18   Your Honor.  This is a summary report if I could tender it

19   to you.

20          MAGISTRATE JUDGE EIFERT:  Is that the report?  I

21   think I already have it in my materials.

22          MR. WALLACE:  It says what it says.  It says

23   Ethicon cannot appropriately provide all relevant documents

24   in case of litigation or inspection.  That's exactly what

25   happened here.

1    So, the point I want to make about that is when you

2  look at the totality of the circumstances -- and that's what

3  I think you get, Your Honor, to look at -- and you're

4  selecting when this duty arose, I think we also don't want

5  to miss the point about these hold notices and the CAPA and

6  the audit where they talk about how things are untenable.

7  It's the choices.

8    And I'm not trying to disparage Ethicon or say that

9  this was intentional.  But I think under the case law and

10  under Rule 37, you get to look at their choices.  They

11  didn't trigger a backup process.  They had documents --

12  putting aside how they characterize how meaningless the CAPA

13  was, those are their rules that apparently now they take

14  very seriously.  Yet, they didn't do anything until 2013.

15    So, when you're thinking about the sanctions, Judge, to

16  use one of their words, it has to be proportional to the

17  conduct.

18    The other thing is there was a lot of discussion about

19  when the duty arose.  The other thing about those hold

20  letters, Judge, is that there is an unbroken chain.  And

21  that's under oath.

22    So, putting aside the duty issue which you're going to

23  decide, keep in mind, again, there was a choice by Ethicon

24  year after year, well before that first case was dismissed

25  in 2004, that came out with another hold letter and another

1    hold letter and another hold letter that was broad.

2         And, again, I'm not characterizing the hold letters.

3    You have copies of them.  They say what they say.  And it's

4    undisputed they didn't follow them for years apparently

5    until 2012-2013.

6         The first time they started following up on those hold

7    letters from the evidence that we've uncovered thus far, and

8    I want to emphasize "thus far" because there's witnesses yet

9    to be deposed and, unfortunately, this may have to be

10   revisited down the road, that there is an on-going problem

11   that even under their scenario they ignored for, if you buy

12   the 2008 story, six years.  That has to be taken into

13   account.

14        With respect to the sales representatives' documents

15   and this idea that the sales representatives don't really

16   keep files, I recognize that that issue has been before Your

17   Honor.  It's different in this case, in the *Lewis* case.

18        You have testimony that I've given you in the

19   PowerPoint about what Mr. Mohler did.  What did he do?  He

20   had a three-ring binder with his notes.  The only thing we

21   have are the reviews.

22        Right, Tom?

23        So, his notes, which we could have used and we can't --

24   so, you've asked for some specific examples.  We've given

25   them to you.

1      The other thing, I want to ask some quick -- I'll do it

2   in the form of questions.  The IFU that was in use for the

3   first two years in the TVT, where are they?

4      The Ulmsten data from the studies that they say are the

5   cornerstone, in their words, of their marketing of the TVT

6   device that are missing, where are they?

7      The launch plans, where are they?

8           MAGISTRATE JUDGE EIFERT:  What years are we

9   talking about for these things?

10          MR. WALLACE:  Well, these arguably would have been

11  in the very early years of the development of the TVT.

12          MAGISTRATE JUDGE EIFERT:  Which is what?  In the

13  '90s?

14          MR. WALLACE:  It could have been in the '90s.

15  However, we don't have to worry about TVT hold letters.  I

16  don't want us to seize so much on that point that we lose

17  sight of the fact that the regulatory requirements and a

18  company that is engaged in product liability litigation all

19  the time knows that these sorts of design files, you have to

20  have them.

21     It isn't a question of whether or not you put a hold in

22  place.  You better have them to support what the design of

23  the product is.  So, let's forget about hold notices for a

24  second.  Where is that?

25          MAGISTRATE JUDGE EIFERT:  Well, I think that's a

1   completely different topic.  What we're dealing with today

2   is spoliation of evidence after someone knew they had a duty

3   to preserve it.  And that's what I want to focus on.

4           MR. WALLACE:  Fair enough, Your Honor.

5       The -- I just want to point out just a couple more

6   things.  I want to talk about the remedies for a second

7   because, obviously, there are some choices you're going to

8   have to make.

9       One is I want to point out it's not over.  There are

10  some things that I thought of in just a few minutes.  Your

11  Honor knows we want an adverse instruction.  We've requested

12  it.  We've given you a sample instruction.  I assume that if

13  that's allowed, we'd work with Judge Goodwin and you to

14  craft an appropriate instruction based upon the evidence

15  that comes in.

16      And if Your Honor does not grant the motion for an

17  adverse instruction now, at a minimum a fail-safe should be

18  that if you rule against us now on the adverse instruction,

19  it should be without prejudice to our right to demonstrate

20  during trial that that sort of instruction is warranted.

21  And we'd want the opportunity to present evidence on it at

22  trial.

23      The other thing is this, this is going to go on because

24  we are -- if there's an order entered like *Bard* where

25  there's 200 cases released, and if the statistics remain the

1  same, a hundred or more of those sales representatives will

2  not have files.  And, so, the deck once more is going to be

3  stacked against us.

4      So, one of the things that you can consider, Your

5  Honor, is that you can let us pick the bellwether cases.

6  And in those cases where those documents are missing, don't

7  let them profit from it.  Let us have the opportunity to

8  pick our bellwether cases.  They don't get to pick.  And

9  when you look at the choices that they made, I think that's

10  a simple, a simple decision.

11      And I'd just add as an aside that there is no deterrent

12  if you can come into a courtroom and say, "I get to destroy

13  100,000 documents, 200,000 documents, 300,000 documents and

14  I'll pay a fine and walk away."  That's, in our view, while

15  certainly we accept it, Your Honor, we think that the case

16  law makes very clear that the Court has to consider the

17  deterrent power of its decision.

18      And I say that as an officer of the court knowing that

19  sanctions are not something that we should all be seeking

20  all the time and they're rarely rewarded.  But if there was

21  ever a case for it, it's this one.

22      Thank you.

23          MAGISTRATE JUDGE EIFERT:  Thank you.

24          MR. GAGE:  Your Honor, if I may, I don't have -- I

25  don't ask for leave to respond to the substance.  I have

1   several procedural issues if I -- before Your Honor

2   dismisses us, I would like to raise them.

3            MAGISTRATE JUDGE EIFERT:  All right.  Why don't

4   you go ahead.

5            MR. GAGE:  All right.  Your Honor, in plaintiffs'

6   reply brief -- they submitted about a 27-page reply brief.

7   And there are several issues that were raised for the first

8   time in the reply brief, including they provided some

9   statistics about the number of custodians whose files were

10  allegedly destroyed that -- the statistics cover individuals

11  who were not the subject of the original or the supplemental

12  motion.

13      And, so, we would, we would ask leave, Your Honor, to

14  submit a short sur-reply to address new issues raised for

15  the first time in plaintiffs' reply brief.  That would

16  include the statistics issues.

17      And then also, Judge, they've essentially moved in

18  their reply papers to strike the Jim Mittenthal affidavit on

19  the basis that it is formulated largely on hearsay.  And we

20  have cases directly on point that show that a 30(b)(6)

21  witness may, indeed, rely and is oftentimes expected to rely

22  on hearsay.  And that would be very important for us to

23  submit.

24      And then, finally, Judge, -- so -- and there's some new

25  allegations regarding Medscand that we think we'd like to

1    respond so.  So, if we could, we would ask for that.

2        And then, secondly, the other housekeeping matter was

3    on the Lana Keeton materials, Your Honor.  If Your Honor is

4    at all inclined to consider those, then we would also ask

5    for leave to submit something in response.

6        MAGISTRATE JUDGE EIFERT:  Let me ask you a

7    question about Ms. Keeton's materials.  I -- she mentioned

8    in her materials that she had filed this case.  And that's

9    when I made the connection that she was the Keeton from the

10   2007 case.

11       And I looked on paper and saw that she was, her case

12   was dismissed on summary judgment; that she started to

13   appeal it, and then she apparently abandoned the appeal.

14       So, I'm not even sure why Ms. Keeton is a party in this

15   action to be honest with you.  And if she shouldn't be a

16   party in this action, I'm not going to consider any of her

17   material.

18       MR. GAGE:  Your Honor, we are currently working on

19   a motion to dismiss her MDL complaint based in part on *res*

20   *judicata* as Your Honor has already clued in on.

21       So -- and we also believe that it is improper for her

22   to be submitting a memorandum for that reason, and also

23   because it is generally not proper for individual plaintiffs

24   to submit briefing on an issue of common interest that the

25   Plaintiffs' Steering Committee should be in charge of.  In

1   fact, they more or less admitted that on the call with you

2   last week.

3        So, we have several bases to object.  But we do have

4   this memo outstanding.  It would be, you know, frankly, our

5   preference not to respond to her spoliation briefing unless

6   Your Honor intends to consider it, in which case we would

7   want to respond.  If Your Honor is not going to consider it,

8   then we are going to move separately to dismiss her case

9   based on *res judicata*.

10        MAGISTRATE JUDGE EIFERT:  I have reviewed it, but

11  I'm not going to rely on anything that she said because I

12  don't believe she has a valid case even.  I mean, I think

13  she's already been dismissed out.  So, I'm not going to

14  consider it.  And I don't need any sort of reply to that or

15  response to that, that motion.

16        MR. GAGE:  Thank you, Your Honor.

17        MAGISTRATE JUDGE EIFERT:  As far as the other

18  housekeeping matters, if you have cases about reliance by a

19  30(b)(6) witness, you can go ahead and e-mail those to

20  Laura.  I will look at those.

21        The statistics I did see and I do find them troubling.

22  I couldn't put them in any real context, though.  So, I

23  wasn't really sure how to use them.

24        I, I don't want to delay my ruling too long on this

25  because however I rule, if somebody disagrees with me, they

1   have the right to go to Judge Goodwin and ask him to, you

2   know, overrule me.  So, I want to give him time to do that.

3       So, I just as soon not have a lot of additional

4   filings.  If there is something short, very, very short that

5   you want to say about the statistics, then that's fine.  You

6   can submit something.

7           MR. GAGE:  Well, Your Honor, if it -- again, I

8   almost would think it's Your Honor's choice.  If -- we

9   believe the statistics do not paint a truthful picture.  If

10  Your Honor intends to consider them -- and I hear Your Honor

11  saying they are troubling, which is primarily the reason we

12  need to address them.  If Your Honor is going to consider

13  them, then we would ask for leave to present something

14  relatively short and quick to address it.

15      If Your Honor chooses to not consider them for this

16  round of briefing, you know, Your Honor has told plaintiffs

17  there was a cutoff on new material they could submit, then

18  we could handle it that way; i.e. Your Honor would not

19  consider it and it wouldn't be part of the record on the

20  ruling on this motion.  It's really up to Your Honor.

21          MAGISTRATE JUDGE EIFERT:  Well, and, you know, the

22  way I see this, I see this motion as a motion that would

23  apply to all cases.  And that's the way it was filed.  And

24  the fact that this motion may be denied doesn't mean that

25  the plaintiffs couldn't file another spoliation motion in a

1   specific case if they had evidence to support that or -- and

2   I'm not saying that it's going to be denied.  I have not

3   made my mind up yet to be honest with you.

4       But I think for the purposes of this motion, what I'm

5   looking at are those 22 custodians that had insufficient

6   productions or no productions.  And that's what I tend to

7   focus on because I need to try to decide if there was

8   prejudice based on documents in those files.

9       So, I don't think at this point, although I do find the

10  statistic troubling, it's not going to figure largely in my,

11  my decision because I just don't have any frame of reference

12  for it.  It's just numbers.

13          MR. GAGE:  Well, and, Your Honor, we will then not

14  submit something specific on that issue, although I will

15  tell you we have a lot to say about that.  So, please don't

16  let it influence you because we truly have a lot to say

17  about that.

18          MAGISTRATE JUDGE EIFERT:  All right.

19      Mr. Wallace, is there anything you wish to add or are

20  we --

21          MR. WALLACE:  I'm sure the second I walk out of

22  here, Judge, there's going to be a lot more I wish I could

23  add, but I think I need to be quiet now.

24          MAGISTRATE JUDGE EIFERT:  All right.  Well, thank

25  you.  I appreciate it.  Court is in recess.

1          (Proceedings concluded at 3:25 p.m.)

2                          * * * * *

3

4

5

6

7

8          I, Lisa A. Cook, Official Reporter of the United

9     States District Court for the Southern District of West

10    Virginia, do hereby certify that the foregoing is a true and

11    correct transcript, to the best of my ability, from the

12    record of proceedings in the above-entitled matter.

13

14

15         s\Lisa A. Cook                    January 27, 2014

16            Reporter                              Date

17

18

19

20

21

22

23

24

25