UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

| | |
|---|---|
| In re: C.R. Bard, Inc., Pelvic Repair System Products Liability Litigation | 2:10-md-2187 |
| In re: American Medical Systems, Inc., Pelvic Repair System Products Liability Litigation | 2:12-md-2325 |
| In re: Boston Scientific Corp, Pelvic Repair System Products Liability Litigation | 2:12-md-2326 |
| In re: Ethicon Inc., Pelvic Repair System Products Liability Litigation | 2:12-md-2327 |
| In re: Coloplast Corp., Pelvic Repair System Products Liability Litigation | 2:12-md-2387 |
| In re: Cook Medical Inc., Pelvic Repair System Products Liability Litigation | 2:12-md-2440 |

**THIS DOCUMENT RELATES TO ALL CASES**

**HUMANA INC.'S MOTION TO INTERVENE FOR THE LIMITED
PURPOSE OF OBJECTING TO PLAINTIFFS' COORDINATING
LEAD COUNSEL AND PLAINTIFFS' EXECUTIVE COMMITTEE'S
MOTION TO APPOINT LIEN RESOLUTION ADMINISTRATOR
<u>AND INCORPORATED MEMORANDUM OF LAW</u>**

Intervenors Humana Medical Plans, Inc. and Humana Insurance Co. (together, "Humana"), by and through their undersigned counsel, hereby moves to intervene in this case for the limited purpose of objecting to a particular provision contained in Plaintiffs' Coordinating

{2524 / MEMO / 00121180.DOC v1}

Lead Counsel and the Plaintiffs' Executive Committee's Motion to Appoint Lien Resolution Administrator (the "Garretson Motion"). In support thereof, Humana states:

1. Pursuant to Federal Rule of Civil Procedure 24(a), Humana moves to intervene as a matter of right. In the alternative, Humana moves to intervene permissively pursuant to Rule 24(b). Humana moves to protect its own interests as well as the interests of the sponsors of other Medicare Advantage Organizations ("MAOs"), which will not be adequately protected without Humana's involvement.

2. Humana requests that the Court:

   a. Grant its Motion to Intervene in these proceedings for the purposes of (i) representing its own interests; (ii) representing the interests of similarly-situated MAOs; and (iii) objecting to the Garretson Motion; and

   b. Deny the Garretson Motion or, in the alternative, include a provision in the proposed Order prohibiting any lien administrator from negotiating the waiver of MMSEA reporting requirements set forth in Section 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007, 42 U.S.C. § 1395y(b) ("MMSEA") for the defendants in MDL Nos. 2187, 2325, 2326, 2327, 2387, and 2440 (collectively, the "Pelvic Mesh MDLs").

3. Humana incorporates the following memorandum of law into its motion.

## MEMORANDUM OF LAW

Humana seeks to intervene for the limited purpose of objecting to the Garretson Motion.[1] With it, the Plaintiffs' Coordinating Co-Lead Counsel and Plaintiffs' Executive Committee

---

[1] Federal courts, including courts in this Circuit, allow non-parties to intervene for a limited purpose. *See Stone v. University of Maryland*, 855 F.2d 178, 180 (4th Cir. 1988) (permitting intervention for the limited purpose of challenging a sealing order); *Boone v. City of Suffolk, Virginia*, 79 F. Supp. 2d 603 (E.D. Va. 1999) (same); *Diagnostic Devices, Inc. v. Taidoc Technology Corp.*, 257 F.R.D. 96, 98 (W.D. N.C. 2009) (permitting intervention for the limited purpose of opposing a motion for temporary restraining order). Since Humana has moved to intervene for a limited purpose, which is clearly set forth in the present motion and memorandum, this Court need not require it to file a pleading under Rule 24(c). *See Diagnostic Devices*, 257 F.R.D. at 101.

(collectively, the "PSC") ask the Court to give the Garretson Resolution Group, Inc. ("GRG") responsibility for overseeing a "Consolidated Lien Resolution Program" in the Pelvic Mesh MDLs. That program would purportedly resolve "liens"[2] arising under the Medicare Secondary Payer Act, 42 U.S.C. § 1395y(b) (the "MSP Act" or "Act") against certain Medicare beneficiaries who may settle claims in the Pelvic Mesh MDLs.

Humana does not object to this Court appointing any single lien resolution advisor in order to ensure the efficient satisfaction of reimbursement and subrogation claims (be they public or private) associated with future settlements in the Pelvic Mesh MDLs. Nor does Humana object to GRG's appointment to fulfill that role. However, to the extent that the Garretson Motion asks this Court to vest GRG with the authority to pursue the waiver of the Pelvic Mesh MDL defendants' reporting requirements under Section 111 of the MMSEA, Humana objects.

Facially, the Garretson Motion purports to limit GRG's role to <u>resolving</u> reimbursement obligations arising under Medicare Parts A and B—also known as "traditional" Medicare. *See generally* Proposed Order Appointing Lien Resolution Administrator [Docket 774-2], ¶ 4. As to MMSEA reporting requirements, the Proposed Order speaks merely in terms of GRG being authorized to "discuss the coordination of mandatory insurer requirements." *Id.* ¶ 4(b). If GRG's role was limited strictly to working with the Pelvic Mesh MDL defendants to coordinate the MMSEA reporting requirements, and ensuring that the defendants satisfied those reporting requirements, Humana would not take issue.

The PSC's Memorandum in Support of Motion to Appoint Lien Resolution Administrator [Docket 775] (the "PSC Memo"), however, makes clear that the parties have

---

[2] Strictly speaking, the obligation to reimburse the Medicare program imposed on primary plans by the Medicare Secondary Payer law does not create a "lien." *See U.S. Liab. Ins. Co. v. Sebelius*, 2012 U.S. Dist. LEXIS 65796 (C.D. Cal. May 10, 2012); *Zinman v. Shalala*, 835 F.Supp. 1163, 1170-71 (N.D. Cal. 1993), *aff'd* 67 F.3d 841 (9th Cir. 1995).

agreed to retain GRG with the ancillary goal of <u>impeding</u> Part C Medicare plan sponsors, like Humana, from adequately enforcing their rights as secondary payers under the MSP Act. Specifically, the PSC Memo discusses the purported "benefits" of authorizing GRG to pursue the waiver of Pelvic Mesh MDL defendants' reporting requirements under Section 111 of the MMSEA. *See, e.g.*, PSC Memo ¶ 2. Absent such reporting, it will be extremely difficult, if not impossible, for Humana and other MAO plan sponsors to identify settlements and pursue secondary payments from the Pelvic Mesh MDL defendants as they are obligated to do under federal law, harming the MAOs and, ultimately, the Medicare program. The Garretson Motion sets up an unseemly game of hide-and-seek, whereby settling Medicare patients obligations are honored or dishonored based solely on the fortuity of whether they received their Medicare benefits under Parts A and B directly from the government, or under Part C from an MAO.

Absent such reporting, further wasteful litigation will become necessary as MAOs will be forced to sue settling defendants to discover information that law and equity require they provide. Accordingly, Humana asks the Court to either deny the Garretson motion or include in any order appointing GRG as the administrator of Medicare-related reimbursement claims a prohibition on GRG pursuing such Part C waivers on behalf of the defendants.

## I. BACKGROUND

Because the interaction between Medicare, the MSP Act, and the MMSEA are complicated, and to Humana's knowledge have not been briefed for the Court, what follows is a brief description of the relevant statutory and regulatory language that are the source of Humana's interest in this matter.

A.   **Medicare Advantage, the Medicare Secondary Payer Act, and the MMSEA**

The federal Medicare program began with the 1965 enactment of Title XVIII of the Social Security Act. 42 U.S.C. § 1395, *et seq.* (the "Medicare Act"). Generally, Medicare pays medical treatment costs for individuals over 65 years of age and certain others. *See* 42 C.F.R. § 408.10, *et seq.* (2006). Today, Medicare benefits are divided into four parts:

(1) Medicare Part A, 42 U.S.C. § 1395c, *et seq.*, provides insurance for costs of inpatient hospital services and is available without payment of premiums to most persons who paid Medicare payroll taxes prior to becoming Medicare-eligible;

(2) Medicare Part B, 42 U.S.C. § 1395j, *et seq.*, funded through premiums and general tax revenue, is a voluntary program in which the beneficiary pays premiums to Medicare, and in return Medicare pays the costs of his or her medically-necessary outpatient services, such as doctors' office visits;

(3) Medicare Part C, 42 U.S.C. § 1395w-21(a)(1), permits individuals eligible for Medicare to elect to receive their Medicare benefits through enrollment in an MAO; and

(4) Medicare Part D, 42 USCS § 1395w-101 *et seq.*, provides voluntary prescription drug coverage to Medicare enrollees.

The Garretson Motion would appoint GRG to address claims for reimbursement arising only under Parts A and B. Secondary payer reimbursement claims of MAOs would go unresolved.

B.   **Medicare Part C: The Medicare Advantage Program**

The Balanced Budget Act of 1997, Pub. L. 105-33, established the "Medicare+Choice" program, later renamed "Medicare Advantage," by adopting a new "Part" to Medicare, Part C,[3] giving Medicare enrollees the option to receive their Medicare benefits from private health plans.[4] Congress adopted Part C to "enable the Medicare program to utilize innovations that have

---

[3] The governing provisions of Medicare Part C were incorporated into the Medicare Act at 42 U.S.C. §§ 1395w-21—1395w-28.
[4] Private health plans have been a part of Medicare since 1972, Pub. L. 92-603, Medicare Act at 42 U.S.C. § 1395mm.

helped the private market contain costs and expand health care delivery options." HOUSE CONF. REP NO. 105-217, at 585 (1997), *reprinted in* 1997 U.S.C.C.A.N. 205-06.

Under the Medicare Advantage program, CMS pays MAOs a fixed amount (*i.e.*, a capitation) for each enrollee and delegates to the MAOs the obligation to administer, pay, and assume all Medicare economic risk for, the Medicare benefits provided to Part C enrollees, pursuant to the requirements of Title XVIII and CMS Medicare regulations. *See* 42 U.S.C. § 1395w-23(a)(1)(A); 42 C.F.R. § 422.268.

By 2012, the Medicare Advantage program represented 28% of all Medicare enrollment,[5] covering over 12.6 million[6] Americans in more than 2,000 Medicare Advantage Plans offered nationally by more than 400 MAOs. Humana is one of the largest MAOs, with more than two million Medicare Advantage and more than three million Medicare Prescription Drug enrollees.

C.  **The Medicare Secondary Payer Act**

Before 1980, Medicare generally paid for its enrollees' medical services, regardless of whether another insurer or tortfeasor was legally responsible to do so. In 1980, Congress enacted the first in a series of amendments that shifted Medicare costs to other payers. Those provisions, along with their respective enforcement provisions, collectively comprise the MSP Act, 42 U.S.C. § 1395y(b). Summed up, the MSP Act

> makes Medicare the secondary payer for medical services provided to Medicare beneficiaries whenever payment is available from another primary payer . . . In order to accommodate its beneficiaries, however, Medicare does make conditional payments for covered services, even when another source may be obligated to pay. . . . The way the system is set up the beneficiary gets the health care she

---

[5] The Henvy J. Kaiser Family Foundation, State Health Facts, Medicare Advantage Enrollees as a Percent of Total Medicare Population, http://kff.org/medicare/state-indicator/enrollees-as-a-of-total-medicare-population.

[6] The Henvy J. Kaiser Family Foundation, State Health Facts, Medicare Advantage: Total Enrollment, http://kff.org/medicare/state-indicator/total-enrollment-2/

needs, but Medicare is entitled to reimbursement if and when the primary payer pays her.

*Cochran v. U.S. Health Care Fin. Admin.,* 291 F.3d 775, 777 (11th Cir. 2002).

Under the MSP Act, payment for treatment of a Medicare beneficiary, whether covered under Part A, B, C, or D, is "conditional" or "secondary," whenever there is a "primary plan." A primary plan must either pay first for that treatment or else later reimburse the Medicare secondary payer for its conditional expenditure. 42 U.S.C. § 1395y(b)(2). A Tortfeasor that self-insures and "carries its own risk" for liability, is a "primary plan" under the MSP. 42 U.S.C. § 1395y(b)(2)(A). An MAO, like Humana, is a "secondary payer." 42 U.S.C. § 1395w-22(a)(4). A primary plan's reimbursement responsibility under the MSP is "demonstrated by . . . a payment conditioned upon the recipient's . . . release . . . of . . . a claim against the primary plan." 42 U.S.C. § 1395y(b)(2)(B)(ii). Thus, a tort settlement in favor of a Medicare enrollee (here, any defendants' payment to any settling claimant who is a Medicare enrollee) triggers the tortfeasor's (or its liability insurer's) MSP reimbursement obligation.

In 1997, when Congress established what is currently Medicare Part C, it also gave MAOs the right to charge primary plans to recover secondary payments, and specifically cross-referenced the MSP:

> (4) Organization as secondary payer
>
> Notwithstanding any other provision of law, a [Medicare Advantage] organization may (in the case of the provision of items and services to an individual under a [Medicare Advantage] plan under circumstances in which payment under this title is made secondary pursuant to section 1395y(b)(2)) of this title charge or authorize the provider of such services to charge, in accordance with the charges allowed under a law, plan, or policy described in such section--
>
> (A) the insurance carrier, employer, or other entity which under such law, plan, or policy is to pay for the provision of such services, or
>
> (B) such individual to the extent that the individual has been paid under such law, plan, or policy for such services.

42 U.S.C. § 1395w-22(a)(4).

Congress delegated interpretation of the Medicare Act to the Department of Health and Human Services ("HHS") and CMS. *See* 42 U.S.C § 1395kk. Pursuant to that delegation, in 2005, after a notice and public comment period, CMS issued a regulation providing that "[MAOs] will exercise the same rights to recover from a primary plan, entity, or individual that the Secretary exercises under the MSP regulations in subparts B through D of part 411 of this chapter." 42 C.F.R. § 422.108(f).

### D. The MMSEA and the Garretson Motion

In its Memorandum, the PSC refers to the reporting obligations of settling parties under Section 111 of the MMSEA. *See* PSC Memo at 3 [Docket 775]. This provision requires liability insurers, including self-insured plans like the Pelvic Mesh MDL defendants, to report to Medicare the details of settlements, judgments, awards, or other payments made to Medicare recipients, including Medicare Part C and D recipients. Congress enacted this provision in order to curtail widespread cheating that was costing the Medicare program, and MAO plans, hundreds of millions of dollars each year. During the implementation phase for MMSEA reporting, CMS made clear that it would pass on the settlement reports to the applicable Medicare Advantage plan, when the Medicare beneficiary obtained his or her Medicare benefits through a Medicare Advantage plan.

In regard to these reporting requirements, the PSC writes:

> GRG's global resolution programs provide significant benefits to claimants and defendants alike. . . . For defendants, GRG's global programs address the defendants' mandatory insurer reporting requirements under Section 111 [of the MMSEA]. In most consolidated resolution programs, GRG has obtained "exemptions" from MMSEA reporting for every defendant who settles claims. Here, GRG will coordinate such exemptions for all involved defendants.

*Id.* In addition, the PSC's proposed Order stipulates that GRG will have "[t]he authority to meet and confer with any TVM defendant, at the defendant's request, to discuss the coordination of mandatory insurer reporting requirements with CMS under Section 111 of the [MMSEA]." Proposed Order ¶ 4(b).

In short, the PSC would have this Court authorize Garretson to convince CMS to waive the defendants' MMSEA reporting obligations. While the PSC presents this as another helpful service GRG will perform for its fees, its practical effect will be to create an unnecessary confrontation forcing MAOs to resort to litigation to enforce their rights under the MSP Act. Without reporting, MAOs cannot identify private settlements reached in cases such as these—settlements that are "primary payments" triggering their rights under the Act—making it impossible for Humana and other MAOs to resolve, absent litigation, their secondary payer claims with either the recipients of these primary payments (the Pelvic Mesh MDL plaintiffs) or the primary payers themselves (the Pelvic Mesh MDL defendants).

The United States Court of Appeals for the Third Circuit has ruled that MAOs may bring claims for double damages under the MSP Act against primary plans that fail to reimburse them. *See In re Avandia Marketing, Sales and Product Liability Litig.*, 685 F.3d 353 (3d Cir. 2012). These recovery rights, however, are worthless if MAOs are unable to identify primary payments when they happen. *Cf. United States v. Baxter Int'l., Inc.*, 345 F.3d 866 (11th Cir. 2003) (describing why traditional Medicare cannot more fully allege its MSP claims in a mass tort settlement, including that all of the information needed to assert claims is in the exclusive possession of the settling parties). In the Avandia case, for example, Humana was obligated to pursue the identity settling MAO plan members through lawsuits in federal and state court, extensive data mining, and the review of all relevant public filings—an extremely expensive,

burdensome, and time-consuming process. Section 111 of the MMSEA was designed to end that, and GRG should not be allowed to circumvent its protections by pursuing these waivers at Humana's and other MAOs' expense.

The PSC now tells us that GRG is in the business of pursuing these reporting waivers. The obvious and inequitable purpose of those waivers is to hide settlements with Medicare Advantage beneficiaries from MAOs.

## II. ARGUMENT

### A. Humana Is Entitled to Intervene as a Matter of Right

Under Federal Rule 24(a), a movant has a right to intervene in an action when that movant "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(2). As a general matter, this Circuit favors "liberal intervention" in order "to dispose of as much of a controversy involving as many apparently concerned persons as is compatible with efficiency and due process." *Feller*, 802 F.2d at 729 (internal quotations omitted).

To intervene as a matter of right, this Circuit requires a moving party to show that (1) it has an interest in the subject matter of the action, (2) the protection of this interest would be impaired because of the action, and (3) its interest is not adequately represented by the existing parties to the litigation. *See Feller v. Brock*, 802 F.2d 722, 729 (4th Cir. 1986); *Teague v. Bakker*, 931 F.2d 259, 260-61 (4th Cir. 1991). In addition, such a motion must be timely. *See Gould v. Alleco, Inc.*, 883 F.2d 281, 286 (4th Cir. 1989) (citations omitted). Humana meets each of these requirements.

### 1. Humana Has an Interest in the Subject Matter of the Action

To intervene as a matter of right, a party must have a "significantly protectable interest" in the outcome of the litigation. *Donaldson v. United States*, 400 U.S. 517, 531 (1971). The Fourth Circuit has recognized that a significantly protectable interest includes a contingent interest. *Cf. Teague v. Bakker*, 931 F.2d 259, 261 (4th Cir. 1991) (holding that a significantly protectable interest may include an interest contingent upon the outcome of other pending litigation.)

MAO plans provide healthcare coverage to nearly one quarter of all Medicare enrollees. Humana itself insures more than one million enrollees. The Garretson Motion would appoint GRG to resolve reimbursement obligations arising from Pelvic Mesh MDL settlements for precisely none of these enrollees while simultaneously eliminating the main tool that Humana would use to identify those obligations. This Court is currently adjudicating the claims of more than 40,000 pelvic mesh claimants, and thousands of other plaintiffs have sued in New Jersey, Massachusetts, Delaware, Pennsylvania, and California state courts. It is simply inconceivable that none of these plaintiffs have healthcare coverage through Humana or any other MAO plan sponsor.

Humana has already identified individual litigants in the Pelvic Mesh MDLs who receive healthcare coverage through Humana.[7] On information and belief, Humana covered many more settling litigants and non-litigants with tolling agreements.

### 2. Humana's Interest Would Be Impaired Because of the Action

A decision by this Court to deny Humana's Motion to Intervene would bar Humana from arguing against the grant of the Garretson Motion, effectively denying Humana its primary opportunity to protect its rights under the MSP Act. If the Court ultimately grants the Garretson

---

[7] In the interests of privacy, we have not identified them in this Motion, but could do so, if necessary, in camera.

Motion, and Garretson is allowed to seek MMSEA Part C waivers on behalf of the defendants in the Pelvic Mesh MDLs, then Humana and other MAO plan sponsors will be left with extremely limited options—essentially, litigation against settling manufacturers—in identifying potential reimbursement obligations owed by the Pelvic Mesh MDL defendants.

### 3. Humana's Interest Is Inadequately Represented by the Parties

None of the parties in the Pelvic Mesh MDLs represents Humana's interests. If they did, then the Garretson Motion would have named GRG to resolve <u>all</u> Medicare reimbursement obligations, not just those arising under Medicare Parts A and B.

### 4. Humana's Motion is Timely

The PSC filed its motion on February 14, 2014. Prior to that date, there was no indication in any of the Pelvic Mesh MDL dockets that any of the defendants were contemplating appointing GRG to serve as lien administrator or that one of GRG's functions would be to negotiate MMSEA waivers on behalf of defendants. Little more than a week has passed since then. Accordingly, Humana's motion is timely.

### B. Alternatively, Humana Should Be Granted Permission to Intervene

Permissive intervention confers discretion upon the court to allow intervention "on timely motion" when the petitioner "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1). In deciding such a motion, "the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3).

For the reasons discussed above, Humana's motion is timely.

In addition, Humana's claims share common questions of law and fact with these proceedings, at least insofar as they pertain to the Garretson Motion, which purports to create a

framework for Medicare reimbursement while simultaneously ignoring MAO plan sponsors' rights under the MSP Act and eliminating the central method that those plans would use to identify primary payments.

Finally, allowing Humana to intervene for the limited purpose of contesting the Garretson Motion will not unduly delay or prejudice the adjudication of the rights of the original parties to the action. Humana's intervention would not expand the scope of the Pelvic Mesh MDLs and would not delay their progress in this Court.

### III.  CONCLUSION

For the foregoing reasons, this Court should grant Humana's Motion to Intervene and either deny the Garretson motion or require inclusion of a provision in the PSC's proposed Order prohibiting any lien administrator from negotiating a Part C waiver of MMSEA reporting requirements for the Pelvic Mesh MDL defendants.

Dated: February 24, 2014

LOWEY DANNENBERG COHEN & HART, P.C.

By: /s/ Gerald Lawrence
Richard W. Cohen
Peter D. St. Phillip
Gerald Lawrence
Uriel Rabinowitz
One North Broadway, Suite 509
White Plains, New York  10601
Telephone:    (914) 997-0500
Facsimile:    (914) 997-0035

RAWLINGS & ASSOCIATES, PLLC
Mark D. Fischer
Jeffrey C. Swann
Robert Griffith
1700 Waterfront Plaza
325 West Main Street
Louisville, Kentucky 40201-7427

Telephone: (502) 587-1279
Facsimile: (502) 584-8580
*Attorneys for Plaintiff Humana, Inc.*