# EXHIBIT 3

Confidential - Subject to Protective Order

Page 1

1           IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
2                    CHARLESTON DIVISION
                        -   -   -
3    IN RE:  ETHICON, INC.       :  MDL NO. 2327
     PELVIC REPAIR SYSTEM        :
4    PRODUCTS LIABILITY          :
     LITIGATION                  :
5

         THIS DOCUMENTS RELATES TO ALL CASES
6                       -   -   -
7        AND VARIOUS OTHER CROSS-NOTICED ACTIONS
8                       -   -   -
9                Tuesday, August 13, 2013
10                      -   -   -
11       CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
12
13           Videotaped Deposition of JAMES P.
14   MITTENTHAL held at Riker Danzig Scherer Hyland
15   Perretti LLP, Headquarters Plaza, One Speedwell
16   Avenue, Morristown, New Jersey, on the above date,
17   beginning at 9:36 a.m., before Kimberly A. Overwise,
18   a Certified Realtime Reporter, Certified Court
19   Reporter, and Notary Public.
20                      -   -   -
21
22           GOLKOW TECHNOLOGIES, INC.
          877.370.3377 ph|917.591.5672 fax
23               deps@golkow.com
24
25

Confidential - Subject to Protective Order

Page 86

1  materials that were not expressly communications but
2  may be included with a product such as instructions
3  for use.
4      Q    In other words, those were
5  companies (sic) in 6 that are created by the company
6  that relate to the marketing of the product at
7  issue; right?
8      A    I'm sorry.  Documents created?  Well,
9  6 appears to include material beyond marketing
10  material to the outside world, but it encompasses
11  those types of materials.
12      Q    And 5 is a little different.  Let's go
13  back to 5 for a moment.  5 actually speaks to
14  documents that the company might not have only sent
15  to health care professionals but -- or patients, but
16  also communications or documents that the company
17  might have received from those third parties; right?
18      A    Well, it's not explicitly stated, but
19  I would -- I would assume that communications
20  embodies a -- both materials directed outward and
21  materials directed from the outside world to the
22  company.
23      Q    Okay.  Would that have covered
24  documents that should have been transferred from
25  Medscand to Ethicon?

Page 87

1          MR. WATSON:  Object as to form.
2          But you can answer if you can.
3          THE WITNESS:  Yeah, I don't know
4  specifically the context for those materials.
5  BY MR. WALLACE:
6      Q    Again, just for the record, you have
7  not seen any reminders that were ever sent out about
8  the hold notice that is referenced in this exhibit;
9  correct?
10          MR. WATSON:  Object to form.
11          But you can answer if you can.
12          THE WITNESS:  Well, other than the --
13  there was a Mersilene notice in 2008.
14  BY MR. WALLACE:
15      Q    And what are you looking at?
16      A    I'm looking at Exhibit T-2086.
17      Q    What's the Bates range on that just
18  for the record?
19      A    Of the -- the list of --
20      Q    It's Mittenthal 1273?
21      A    Yes.
22      Q    Okay.  And what's the Bates number for
23  the record?
24      A    Mittenthal 1273?
25      Q    I'm sorry.  The blue sticky.

Page 88

1      A    T-207 -- T-2086.
2      Q    Okay.  So in looking at T-2086, what
3  you're telling me is while you may not see a
4  reminder, you also see a 2008 hold notice relating
5  to Mersilene mesh; correct?
6      A    That's correct.
7      Q    Okay.  But the notice we just looked
8  at was sent in 2002; right?
9      A    That's correct.
10          (Exhibit No. T-2088 was marked for
11  identification.)
12          MR. WALLACE:  5.
13  BY MR. WALLACE:
14      Q    Okay.  You're going to be handed a
15  document marked as T-2088 dated 22 May 2003.  You've
16  seen this; correct?
17      A    I believe I have.
18      Q    And what is it?
19      A    It appears to be a May 22nd, 2003,
20  TVT-related hold notice.
21      Q    Now, the document that we looked at
22  right before that related to Mersilene mesh.  Do you
23  know what Mersilene mesh is?
24          MR. WATSON:  Objection; asked and
25  answered.

Page 89

1          But you can answer if you can.
2          THE WITNESS:  I have a general
3  understanding that it's a mesh product created by
4  the company.
5  BY MR. WALLACE:
6      Q    You understand that TVT, that product,
7  is the subject of the litigation for which we are
8  here today; correct?
9      A    Yes.
10      Q    And so you would agree with me that --
11  as the company witness that J&J is stating at this
12  time in 2003 that it is on notice regarding
13  litigation regarding the TVT product; right?
14          MR. WATSON:  Object as to form.
15          Answer if you can.
16          THE WITNESS:  Yes.
17  BY MR. WALLACE:
18      Q    Okay.  Is this the earliest hold
19  notice that you are aware of regarding TVT?
20      A    Yes, it is.
21      Q    And the purpose of this litigation
22  hold notice regarding TVT in May of 2003 would have
23  been so that the company could preserve evidence
24  that might be relevant to legal proceedings; right?
25          MR. WATSON:  Object to form.

23 (Pages 86 to 89)

Confidential - Subject to Protective Order

Page 90

1     Answer if you can.
2          THE WITNESS:  Yes, it is instruction
3     directing people to comply with the preservation of
4     data as set forth in the notice.
5     BY MR. WALLACE:
6          Q     In other words, it was a notice that
7     was an effort by the company to comply with their
8     legal obligations to preserve evidence; correct?
9          MR. WATSON:  Same objection.
10         THE WITNESS:  Yes.
11    BY MR. WALLACE:
12         Q     Do you know whether or not this was a
13    new notice or a reminder?
14         A     My understanding is that this is a new
15    notice.
16         Q     Have you looked at the allegations in
17    Kandell versus Ethicon, et als.?
18         A     The circumstances of the actual case?
19         Q     Yes.
20         A     Not in detail, no.
21         Q     Were you told anything about the
22    allegations in the cases that are referenced in the
23    middle of the page where it says "RE: Hold Notice
24    for Kandell v. Ethicon, Inc., et als."?
25         A     As I mentioned, I was -- I was -- it

Page 91

1     was indicated to me that these were what were
2     described as one-off cases that had been
3     dispositioned.  That's the extent of my knowledge.
4          Q     Look at the top of the page where it
5     says Rita McIntyre, RN, RAC.
6          Do you know who that is?
7          A     No, I do not.
8          Q     Do you believe or have information to
9     suggest that Rita McIntyre was the individual that
10    sent this e-mail?
11         A     It would appear that the e-mail was
12    sent by Ethicon Interactive Communications.
13         Q     And what is that, if you know?
14         A     That would be a mailbox for whom the
15    dissemination of materials such as hold notices
16    would be issued from.
17         Q     What other sort of communications
18    would come from Ethicon Interactive Communications?
19         A     I don't know.
20         Q     Do you know whether it might have
21    included, for example, daily updates about the
22    company?
23         A     I don't know.
24         Q     Do you know who we would talk to to
25    find out what sort of communications the mailbox

Page 92

1     called Ethicon Interactive Communications would have
2     sent?
3          A     Yes.
4          Q     Who would we talk to?
5          A     The -- one of the individuals
6     responsible for dissemination of the materials,
7     which would include, depending on the time frame,
8     Linda McNelis or Wanda Patire-Singer.
9          Q     And you interviewed them in connection
10    with preparation for your testimony today; correct?
11         A     The -- Ms. Patire-Singer was
12    reinterviewed.  Ms. McNelis was interviewed at the
13    time of my last deposition.
14         Q     You would agree with me that this
15    notice was sent on 22 May 2003 at 20:07:19 GMT;
16    correct?
17         A     Yes.
18         Q     And let's look at the second page.
19    And you'll see that we see the same names again, do
20    we not, Taysen Van Itallie and Lisbeth A. Warren?
21         Q     This looks very familiar to the 2002
22    notice, does it not?
23         A     Yes.
24         Q     Let's look at 1 through 7.  Again, it

Page 93

1     seeks information regarding labeling, but this time
2     around would you agree with me that the word "TVT"
3     is used in the hold notice?
4          A     Yes.
5          Q     And it says "Subject matters of
6     documents to be preserved:  TVT"; correct?
7          A     Yes.
8          Q     It doesn't delineate between any type
9     of TVT product, it says TVT; correct?
10         A     Correct.
11         Q     And you would agree with me that using
12    it in that form would broadly imply that it would
13    concern all TVT-type products; correct?
14         A     I would construe that to refer to a
15    range of TVT products.  I -- I don't -- I'm not a
16    product specialist.  I know there are other types of
17    TVT that have delineations after them.
18         Q     But this notice does not delineate
19    between the different products that might have been
20    on the market at the time; correct?
21         A     It simply says TVT.
22         Q     It again seeks the labeling
23    information for TVT?
24         A     Yes.
25         Q     And it seeks pharmacovigilance

24 (Pages 90 to 93)

Confidential - Subject to Protective Order

Page 94

1  information relating to TVT; correct?
2      A    Yes.
3      Q    It seeks -- again, it has the same
4  typo.  Do you see that?
5      A    Yes, I do.
6      Q    And so the Mersilene hold notice that
7  we looked at was from July 22, 2002.  So this is
8  almost a year later and it's got the same typo;
9  would you agree?
10     A    As I mentioned, I believe it's -- from
11 my read of it that it's a typo and, yes, it has the
12 same omission.
13     Q    And so -- and that's in Paragraph 3,
14 the regulatory, where it says:  "All final draft
15 communications with regulatory authorities regarding
16 the TVT..."
17         Do you see that?
18     A    Yes.
19     Q    Okay.  It also seeks discovery,
20 research and development material relating to the
21 TVT; correct?
22     A    Yes.
23     Q    And I have the same questions that I
24 had earlier regarding the Mersilene mesh and product
25 as it relates to the TVT.  If there were scientific

Page 95

1  products that were either analyzed or created for
2  the TVT, would you agree with me that those would be
3  sought here in this hold notice to be preserved even
4  though they weren't actual paper documents?
5         MR. WATSON:  Object to form.
6         But you can answer if you can.
7         THE WITNESS:  I would suggest that if
8  the information about the R&D was embodied in a form
9  by which it might be construed as a record and if it
10 is relevant to litigation, it would be covered under
11 Section 4.
12 BY MR. WALLACE:
13     Q    Thank you.  Again, Paragraph 5 seeks
14 product communications, not only internal
15 communications but also external communications;
16 correct?
17     A    Yes.
18     Q    And Paragraph 6 seeks, again,
19 marketing and sales material just like the 2002
20 notice did; correct?
21     A    Correct.
22     Q    And Paragraph 7 seeks manufacturing
23 documents just like the 2002 notice did; correct?
24     A    Yes.
25     Q    And it says with respect to

Page 96

1  manufacturing documents, it says:  "If product lot
2  batch is known, all TVT lot and batch records,
3  quality assurance and manufacturing controls and
4  product complaints."
5         Do you see that?
6      A    Yes, I do.
7      Q    And there's a Paragraph 8 that speaks
8  to distribution.  Do you see that?
9      A    Yes, I do.
10     Q    And what documents are sought to
11 preserve -- are sought to preserve under Paragraph 8
12 in May of 2003?
13     A    Within the context of the product
14 supply chain, the material related to its
15 distribution.
16     Q    And would the notice itself have
17 covered the documents that should have been
18 transferred from Medscand to Ethicon related to the
19 TVT products?
20         MR. WATSON:  Object as to form.
21         But you can answer if you can.
22         THE WITNESS:  As I previously
23 testified, I can't speak to the -- that particular
24 circumstance.
25

Page 97

1  BY MR. WALLACE:
2      Q    Why not?
3      A    I'm not familiar with the
4  circumstances surrounding that -- that incident.
5      Q    Okay.  So you would agree with me that
6  we've looked at a hold notice dated July 22 -- I'm
7  sorry -- July 2002 and we've also looked at this 22
8  May 2003 notice; correct?
9      A    Yes.
10     Q    And would you agree with me that the
11 new exhibit that you produced today -- let's go back
12 to that for a moment -- lists both of those?
13     A    Yes.
14     Q    Would you agree with me that you have
15 asked as a representative of the company, someone
16 that has been engaged by the company to testify here
17 today to hold notices, to have all hold notices and
18 documents thereto provided to you?
19     A    I'm sorry.  Hold notices and --
20     Q    I'm sorry.  Let me ask it differently.
21 You agree with me that you asked for all the hold
22 notices; correct?
23     A    Pertaining to mesh and tape
24 litigation; yes.
25     Q    And you asked for all reminders

Confidential - Subject to Protective Order

Page 98

1  relating to those hold notices; correct?
2      A    Yes.
3      Q    And would you agree with me that the
4  exhibit that we're looking at here, which is
5  Mittenthal 1273, between 7/22/2002 and 5/22/2003
6  that there are no reminders; correct?
7      A    I'm sorry.  Between -- what were the
8  dates you said?
9      Q    The first two documents --
10      A    Yes.
11      Q    -- there are no reminders; correct?
12      A    I'm sorry.  Between the -- between
13  Document 1 and Document 2?
14      Q    July 22, 2002 --
15      A    Yes.
16      Q    -- and May 22, 2003, there are no
17  reminders that are sent relating to mesh of any
18  kind; correct?
19      A    There are no formal reminders in
20  this -- in this format.
21      Q    Okay.  And you've asked for reminders;
22  correct?
23      A    Yes, I have.
24      Q    And whether formal or informal, you
25  haven't been provided with them unless they're shown

Page 99

1  on Mittenthal 1273; correct?
2      A    As I mentioned, reminders can come in
3  many forms.  I asked for formal reminders and I --
4  this is what I received.
5      Q    You asked for reminders that were in
6  writing?
7      A    Well, for instance, an e-mail sent by
8  a manager to a subordinate, I would not have
9  expected to have received that type of a reminder,
10  but the formal companywide reminders I asked for and
11  received.
12      Q    And the only reminders that are listed
13  on your entire document are an April 18, 2003, and
14  July -- I'm sorry -- 2013 and July 16, 2013;
15  correct?
16      A    I would disagree with that from the
17  standpoint that there are notices that are entitled
18  "Consolidated" or there is a reference made to
19  consolidated which also serve as reminders and that
20  the --
21      Q    And those are the -- that's the
22  consolidated notices that were sent in February of
23  2011; correct?
24      A    Yes.  And I would also suggest that
25  the notices surrounding some of these products

Page 100

1  served as reminders even if they were, in fact, in
2  connection with other litigation.
3      Q    In other words, if there was other
4  mesh litigation and it wasn't necessarily TVT
5  litigation, for example, it could help put an
6  individual at the company on notice that they need
7  to be preserving mesh-related information; correct?
8      A    Depending on the subject matter of the
9  notice, but yes.
10          (Exhibit No. T-2089 was marked for
11  identification.)
12  BY MR. WALLACE:
13      Q    Okay.  So let's look at the next
14  notice.  You've been handed a document that's been
15  marked as T-2089.  I'm going to ask you if you can
16  identify it for me.
17      A    It appears to be the April 27th, 2006,
18  TVT hold notice referenced in my list.
19      Q    And when you say your list, you're
20  talking about the Mittenthal 1273 which identifies
21  the dates of the holds and the product at issue;
22  right?
23      A    Yes.
24      Q    Okay.  Would you agree with me that
25  this is the second notice relating to TVT generally?

Page 101

1      A    Yes.
2      Q    Okay.  So, in other words, we have our
3  first TVT notice -- and, again, I'm asking you as a
4  witness for the company.  You are telling us that
5  the first notice relating to TVT was sent on May 22,
6  2003, and the second notice was sent on April 27,
7  2006; correct?
8          MR. WATSON:  Object as to form.
9          Answer if you can.
10          THE WITNESS:  Yes, I am.
11  BY MR. WALLACE:
12      Q    And do you know the circumstances of
13  the hold here?
14      A    No.  I have just a general
15  understanding that -- of the -- there was a specific
16  case that it is in reference to.
17      Q    Do you know who Lana Keeton is?
18      A    I do not.
19      Q    Did you -- were you told anything
20  about Lana Keeton?
21      A    As I mentioned, I may have been told
22  that this case was a -- what was described as a
23  one-off case that had been dispositioned.  That's
24  all I recall.
25      Q    Well, let's look at this April 27,

Confidential - Subject to Protective Order

Page 194

1  department would carry more weight.
2  BY MR. WALLACE:
3      Q    Can you look at the April 18 notice
4  that we were just looking at?  And look at Bates No.
5  29376, specifically at the bottom of the page where
6  it says: "CONSEQUENCES OF THE FAILURE TO COMPLY
7  WITH THIS NOTICE."
8          Would you agree with me that that
9  April 18, 2013, legal hold letter provides very
10  specific instructions about the failure to comply
11  with the notice?
12     A    Yes.
13     Q    And it mentions that the company could
14  be subject to severe sanctions and penalties and if
15  the employee doesn't follow it, of course, the
16  employee that is the subject of the notice could
17  have disciplinary action taken against that
18  employee; correct?
19     A    Yes.
20     Q    Now, you mentioned earlier today about
21  some informal information that you learned about
22  during some of your interviews where some managers
23  might have told employees about their obligations
24  under the legal holds.  Do you recall that?
25     A    Yes.

Page 195

1      Q    Do you have any evidence that any
2  directions like this warning here in 29376 were ever
3  sent outside of the exhibits we've looked at?
4      A    I don't have any evidence to indicate
5  that this precise form of communication was provided
6  by a manager.
7      Q    Well, let's take it a step further
8  then so we're making sure we're on the same page.
9  Do you have any evidence whatsoever that any warning
10  remotely like this was ever sent as a reminder to
11  anyone subject to these litigation hold notices that
12  we've talked about today?
13         MR. WATSON:  Object to form.
14         You should answer if you can.
15         THE WITNESS:  Well, the reminders
16  would have been -- and as I mentioned, as was my
17  testimony, I don't have the exact verbiage or
18  statements that would have been made, but I can
19  speak to the fact that the reminders were given in
20  the context of the -- the overall litigation hold
21  program, including the original and continuing
22  training material.  And those materials provide
23  similar indications of the importance of adhering to
24  the litigation hold.
25

Page 196

1  BY MR. WALLACE:
2      Q    But they didn't list TVTs or Prolifts,
3  did they?  They were just training materials that,
4  for example, new employees received?
5      A    New employees and current employees in
6  an ongoing fashion.  They were training materials.
7      Q    But you would agree with me that those
8  training materials did not reference TVT products?
9      A    I would agree.
10     Q    You would agree with me that those
11  training materials did not address Gynecare Prolift
12  products?
13     A    It -- no.  It would have been the role
14  of the manager to connect the specific product to
15  the training material.
16     Q    And, again, I want to make sure you
17  answer this question.  Do you have any evidence
18  whatsoever that there was anything remotely looking
19  like this document at 29376 where there is a
20  specific warning about what could happen to the
21  company that was ever sent as a reminder by anyone
22  to an employee at the company that was the subject
23  of the hold notices that we've talked about today?
24         MR. WATSON:  Object to form.
25         But you can answer if you can.

Page 197

1          THE WITNESS:  I don't have that
2  specific information.
3  BY MR. WALLACE:
4      Q    We -- you would also agree with me
5  that -- again, we talked about this up through 2011,
6  but I just want to make sure that the record's
7  clear.  Would you agree with me that you have no
8  evidence whatsoever as you sit here today as the
9  company witness that any of the litigation holds
10  that we've talked about were ever removed?
11         MR. WATSON:  Object to form.
12         You can answer if you can.
13         THE WITNESS:  No evidence they were
14  removed?  My understanding is that the holds are --
15  continue to be in effect.
16  BY MR. WALLACE:
17     Q    Right.  All the way from 2002 through
18  at least what we've looked at today, April 18, 2013;
19  correct?
20         MR. WATSON:  Object to form.
21         Answer if you can.
22         THE WITNESS:  Correct.
23  BY MR. WALLACE:
24     Q    And, furthermore, it's no longer
25  April, we're in August, but just to totally close