1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

3                    AT HUNTINGTON

4              TRANSCRIPT OF PROCEEDINGS

5

6    _____

7

8    IN RE:  ETHICON, INC., PELVIC

9    REPAIR SYSTEM PRODUCTS LIABILITY    MDL NO.

10   LITIGATION                      2:12-md-2327

11

12   _____

13

14                    MOTION HEARING

15                    JUNE 13, 2014

16          BEFORE THE HONORABLE **CHERYL A. EIFERT,**

17            UNITED STATES MAGISTRATE JUDGE

18

19        Sidney L. Christie Federal Building

20          845 Fifth Avenue, Room 109

21        Huntington, West Virginia  25701

22

23

24

25

<u>**A P P E A R A N C E S**</u>

1

2

3  **FOR THE PLAINTIFFS:**

4

5  **MR. BENJAMIN H. ANDERSON**
   Anderson Law Offices, LLC
6  1360 West 9th Street, Suite 215
   Cleveland, OH  44113

7

8  **MR. ERIK WALKER**
   Hissey Kientz, LLP
   Arboretum Plaza One
9  9442 Capital of Texas Highway North, Suite 400
   Austin, TX  78759

10

11

12 **FOR THE DEFENDANTS:**

13

14 **MR. DAVID B. THOMAS**
   Thomas Combs & Spann, PLLC
   P.O. Box 3824
15 Charleston, WV  25338-3824

16

17

18

19

20

21

22 Court Reporter:          Carol Farrell, CRR, RMR, CCP, RPR
                            (304)347-3188
23                          carol_farrell@wvsd.uscourts.gov

24
   Proceedings recorded by Courtflow; transcript produced by
25 computer.

─────Motion Hearing─────

1       PROCEEDINGS had before The Honorable Cheryl A. Eifert,

2   Magistrate Judge, United States District Court, Southern

3   District of West Virginia, in Huntington, West Virginia, on

4   June 13, 2014, at 10:00 a.m., as follows:

5               THE COURT:  Good morning.

6               RESPONSE:  Good morning, Your Honor.

7               THE COURT:  In re:  Ethicon, Inc., Pelvic Repair

8   System Products Liability litigation, Case Number

9   2:12-md-2327.

10              Counsel, please note your appearance.

11              MR. ANDERSON:  Ben Anderson for the plaintiffs.

12              MR. WALKER:  Erik Walker for the plaintiffs.

13              MR. THOMAS:  David Thomas for defendants, Your Honor.

14              THE COURT:  Thank you.

15              Okay.  I have read all of the materials and let me

16  tell you what I'm thinking, and then I'll let you all say

17  whatever you want to say.

18              So, I think we all agree that any tissue that's

19  removed that might include the mesh is going to be evidence,

20  correct?

21              MR. ANDERSON:  Correct.

22              MR. THOMAS:  Yes.

23              THE COURT:  And most likely will be critical

24  evidence, maybe not always, but likely in some cases; we don't

25  know which.  Would you agree?

─Motion Hearing─

1            MR. ANDERSON:  Some cases, it may be --

2            THE COURT:  Yes.

3            MR. ANDERSON:  -- additional evidence of pathology.

4            MR. THOMAS:  We certainly believe it's critical

5    evidence, Your Honor.

6            THE COURT:  All right.  We don't agree, as I

7    understand it, that the plaintiffs have control over it.  I

8    think the defendant says that the plaintiffs do have control

9    over it; plaintiff says plaintiffs do not have control over

10   this evidence.  Right?

11           MR. ANDERSON:  Yes, Your Honor.

12           THE COURT:  I'm going to tell you that I looked at

13   your argument regarding the medical records and I don't agree

14   with that argument, and I'll tell you why I don't agree with

15   it.

16           I think that tissue is completely different from

17   medical records because my understanding of medical records is

18   that those records belong to the medical provider.  The

19   medical provider creates the records.  It's the thought

20   process of the medical provider.  And from the beginning of

21   time, those records have belonged to the medical provider.

22   The patient has had an interest in the record, since the

23   record is about the patient, but it's always been the work

24   product of the provider.  And so that makes records a little

25   different, in my mind, than, for example, my tissue taken out

1  of my body.  Even though the medical provider removes my

2  tissue, that was always my tissue.  It wasn't something a

3  physician created.  So I think they're different, and I don't

4  think that that argument on medical records is very

5  persuasive.

6        I understand, though, once the tissue is removed,

7  where the plaintiff is coming from as far as the control.

8  However, from my experience, when you have a foreign body

9  removed from a patient, generally, the medical provider, the

10  hospital or the surgical center, doesn't really, after a

11  certain period of time, want that foreign body, and they'll

12  toss it.  And they're more than happy to turn that over to the

13  patient or to anyone that the patient says can have it.  So,

14  for all intents and purposes, the patient does have the

15  ability to control that foreign body.  So, from that

16  standpoint, I do think in this case the patient would have the

17  best control over that, if you're looking at the control the

18  defendant would have versus the control that the patient would

19  have.  So, there's that issue.

20        Now, the duty to preserve it.  You know, obviously, I

21  think there is a duty on the person who has it to preserve it.

22  I don't think we can make the hospital or the surgical center

23  or the medical provider do that.  That's just too much to ask.

24  And I don't think they would otherwise have a duty to preserve

25  something like that.  It's not something that by federal or

—Motion Hearing—

1    state law they would normally have to retain for very long.

2    It's not like, for example, a slide or a cytology specimen.

3    It would be something they could normally toss.  So I do think

4    somebody has the duty to preserve it, and that's where I think

5    we're going to have probably the grayest area.

6            And I'll tell you, I'll tell you why I think that's a

7    gray area, because I thought about this for a long time.  And

8    the way I see it is the person who is going to know, first of

9    all, that the specimen even exists is the patient.  So I

10   think, from the very beginning, that the patient here in this

11   case, the plaintiff, has the duty to notify her attorney that

12   she's having a surgery that's going to involve the removal of

13   tissue that might include a foreign body or just have the

14   foreign body removed, but in some way, she's going to have to

15   notify her attorney that she's having this surgery and that

16   the mesh might come out as part of the surgery.  And I think

17   that there's just no way around that.  There's no way

18   Ethicon's going to know, out of these thousands of women, who

19   is going to have the surgery to have the mesh removed.  Right?

20           MR. ANDERSON:  Correct.

21           THE COURT:  There is no way you're going to know

22   that, Mr. Anderson.  You have no way of knowing that.  So

23   these -- these women are going to have to tell whoever they've

24   signed up with, whoever their contact is, that they're having

25   the surgery, right?

—Motion Hearing—

 1          MR. ANDERSON:  Correct.

 2          THE COURT:  Then somebody's going to have to notify

 3  the hospital laboratory or the surgical center.  I assume

 4  those are the primary places these procedures are being done.

 5  I doubt that anybody's doing these in an office, are they?

 6          MR. ANDERSON:  You are correct.

 7          THE COURT:  So somebody's going to have to notify the

 8  laboratory or the pathology department of one of these centers

 9  or hospitals that there is an interest in having this foreign

10  body, and I would think that probably needs to be the patient.

11  So who's that going to be, the patient or the patient's

12  attorney?  To me, it's probably going to need to be the

13  patient's attorney since if I were the patient's attorney, I

14  wouldn't want to rely on my client to do that.  That's big,

15  you know.  You know, I mean, you could, but you'd be running a

16  risk.  So that gets us to step number two.  Then where do we

17  go from there?

18          I don't think you can tell the hospital or the

19  surgical center how to handle the specimen.  Most of those

20  places have policies in place already.  And I can tell you

21  from having worked in a hospital, the last thing I would ever

22  do as an attorney for a hospital was have some attorney from

23  outside telling me how to tell my pathology department to

24  handle a specimen, because the policies were created within

25  the hospital after a lot of time and effort and research and

—Motion Hearing—

1    committees, and the policies were created so that there was

2    one way to do it that everyone followed, and we did it that

3    way because we didn't want a lot of deviation.  Every time you

4    deviate from a policy, that's where error gets introduced.  So

5    we wanted a -- we wanted some sort of process that everybody

6    followed every time, and we insisted on that so that we could

7    reduce error.  So I would not have allowed, for example, my

8    client to have accepted somebody else's policy on how to

9    preserve a specimen.  I would have said this is the way we do

10   it, this is the way we're going to do it.

11           So all of these -- and when I've signed these orders

12   in the past in these other MDLs, I saw all that stuff and I

13   thought to myself, you know, I just don't think anybody's

14   going to follow that, any of these hospitals.  I mean, there

15   were these very long, complicated forms that you wanted

16   signed, and I thought, you know, but if both sides agreed to

17   it, I wasn't going to interject and say no, I'm not going to

18   let you do it that way.  I mean, if you had reached an

19   agreement, then perhaps you could find some hospital out there

20   who might be willing to follow it, then I wasn't going to tell

21   you you couldn't do it.  But I would be surprised if any large

22   facility would follow that, and I don't -- you know, I don't

23   know how you could make them, quite honestly.  So my guess

24   would be that most of these places are already going to have

25   policies in effect, don't you think?

1          MR. ANDERSON:  Yes, Your Honor, and that's been part

2    of the problem and one of the -- part of the genesis of us

3    coming to you -- is it okay if I sit with you today?

4          THE COURT:  Absolutely.

5          MR. ANDERSON:  Thank you.

6          We have hospitals that are saying wholesale rejection

7    of something that is akin to the letter that the defense put

8    as Exhibit B or A to their motion because they say we already

9    have policies in place.  My background is like your own.  I

10   represented the entire County of Los Angeles health system, 13

11   facilities.  We would never let attorneys dictate to us what

12   would happen, because of error, because of liability, because

13   of manpower, et cetera, et cetera.

14         THE COURT:  Right.

15         MR. ANDERSON:  So we have, in a number of instances,

16   in response to both the bar and the AMS orders, we have

17   hospitals that are saying, "We're not going to follow the

18   procedures," and we say, "It's a federal order."  They say,

19   "Too bad.  We have a procedure in place, you know, we will

20   have our lawyers contact you," et cetera.  So we have folks

21   who are just wholesale rejecting it, wholesale ignoring it.

22         And that's why, Your Honor, we brought you Kate

23   Grayson's affidavit because we did want you to see in terms of

24   boots on the ground when we had this question mark of -- that

25   you had, when you signed those orders thinking I just don't

────── Motion Hearing ──────

 1   see this happening, in fact, it's not, and it's created a huge

 2   problem, which is why we had proposed a protocol which was to

 3   say, when we reach out to ask that these be preserved, let's

 4   have something in place that says follow your own procedures

 5   but alert us so that we can then bring it and put it with a

 6   third-party facility who can then follow some of these steps

 7   that we can agree upon, as were laid out in Mr. Thomas's

 8   letter with the Tracey Law Firm.  But let's not put that onus

 9   on the hospital.

10           THE COURT:  I --

11           MR. ANDERSON:  Let's put that on an outside --

12           THE COURT:  I'll let you talk.

13           No, I agree.  I agree with that.  I think -- I don't

14   think that, now that it's brought in a motion form, that I

15   would ever enter an order telling a hospital or a surgical

16   center that they had to follow a certain protocol in

17   preserving a surgical specimen.  I don't think I have the

18   authority to do that, nor would I feel that I should do that

19   because they do have policies, they're supposed to have

20   policies, most of them, and I wouldn't -- I wouldn't ever try

21   to interject myself into that.

22           So, you know, I think that brings us then up to what

23   I consider step number three.  You've got the plaintiff

24   notifying her attorney that she's having a surgery, you've got

25   the plaintiff's attorney notifying the facility that they're

Motion Hearing

1   going to want this specimen whenever they can get it.  The

2   hospital's probably going to have to follow certain steps

3   before it can be released.  Generally, those specimens don't

4   have to be examined by a pathologist when they're just a

5   removed foreign body unless they're considered a defective

6   medical device, and I don't know that's the case with this

7   mesh or not.  There is different rules that apply.  If it's

8   just considered a foreign body like, you know, a tube that's

9   left in or something, then they don't even look at them half

10  the time.  But they do need to decontaminate them because it

11  would be considered a biohazard coming out of someone's body,

12  and that takes a certain amount of time, and then they, you

13  know, have just their own protocol that they would follow.

14  So, they're going to preserve it in whatever medium they

15  preserve it in.  Sometimes it's nothing.  They just stick it

16  in, you know, a dry container.  And I don't know that

17  anybody's going to have any control over that.  So that's step

18  number three.  So now we are at step number three.

19          Now, someone's going to get it, which is step number

20  four.  Either the defendant's going to get it or the

21  plaintiff's going to get it.  And I think it can be either

22  way.  The plaintiff can have the hospital release it to the

23  defendant or the plaintiff can get it.  So, you know, that, in

24  my mind, is an open question, and I think it can go either

25  way.

─────────────────────Motion Hearing─────────────────────

1           The problem that I see, and here's where I struggle a

2    little bit, I don't think it's fair for the defendant to say

3    we think the plaintiff should have to get it, store it,

4    maintain it, make sure it's safe, and just hang on to it for

5    as long as it takes until someday we might want our half.  And

6    if they do something with it, lose it, don't store it the way

7    we like it, then we're going to file a spoliation motion

8    against them.  And we're not going to tell them how we want

9    them to keep it, we're not going to tell them how long we want

10   them to keep it, we're not going to say anything, but it just

11   better be the way we want it five or 10 or 20 years from now

12   when we want it.  I don't think that's right.  That's not

13   fair.

14           I don't think it -- on the other hand, I don't think

15   it's fair for the plaintiff to say, "Well, we don't have any

16   duty to preserve this, you know.  They -- you know, they can

17   go get it if they want to."  I don't think that's right,

18   either, because you're the one who filed the suit and you're

19   the one who said the mesh is defective.  So the mesh is in

20   your client's body.  The mesh is coming out of your client's

21   body.  You're the one who says it's defective.  Yes, you do

22   have some obligation to preserve it.

23           So, you know, where do we go from here?  That's -- I

24   can get us up to the step where now it's the hospital's or the

25   surgery center's going to turn it over to one of you two.

———Motion Hearing———

 1   Where do we go from there?

 2           MR. ANDERSON:  Your Honor, if I may.

 3           THE COURT:  Yes.

 4           MR. ANDERSON:  Steelgate obviously is -- the reason

 5   that I got the affidavit from Kate Grayson is because

 6   Steelgate has done this in multiple of their MDLs and they've

 7   been doing this for a long time and they do their job very

 8   well.  And so, in our mind, the best entity to handle the

 9   interface between the litigation and the hospital is a

10   third-party company that's a biorepository just like Steelgate

11   is.

12           THE COURT:  All right.  Let me ask Mr. Thomas.

13           MR. ANDERSON:  Yes.

14           THE COURT:  What is your problem with having it go to

15   some third-party repository?

16           MR. THOMAS:  I have no problem with that at all, Your

17   Honor.

18           THE COURT:  Okay.

19           MR. THOMAS:  May I speak briefly about some of your

20   prior comments?

21           THE COURT:  Yes.

22           MR. THOMAS:  Important to Ethicon, and I think you

23   covered this, is that this issue apply to all cases and not

24   just trial candidate cases, as proposed in some of the orders.

25   Is that fair?

---Motion Hearing---

1           THE COURT:  It does have to apply to all cases, and
2    I'll tell you why, because we don't know what's going to
3    happen to these cases.
4           MR. THOMAS:  Thank you.
5           If our papers were read to suggest that we believe
6    the burden should be on the healthcare providers and that we
7    were imposing some burden on them beyond what they do every
8    day, that's not our intention at all.
9           The Grayson affidavit, when I read that, I agree with
10   everything that she said in terms of you cannot tell the
11   healthcare providers what to do.
12          The letter we attached in response to the motion was
13   because my name was included in that letter to contact, should
14   the healthcare provider have any questions about preservation
15   of the mesh.  I didn't want my name to be in any letter going
16   to a healthcare provider, having some plaintiff's -- some
17   healthcare provider call me about some other client's mesh
18   because, A, I don't think I have any business making any
19   comment about it, and, B, I think the plaintiff's counsel
20   would be reasonably upset if I had some say over disposition
21   of that mesh.  So that's the reason for the attachment of that
22   letter, that and that alone.
23          The big issue, Your Honor, we haven't discussed at
24   all, and it's the method of preservation of the mesh.  As you
25   are aware, the AMS order -- I have them all here if you'd like

──────Motion Hearing──────

1    to see them.  The AMS order requires the division of the mesh

2    and that each party instruct the healthcare provider about the

3    method of preservation for that mesh.  That's obviously not

4    workable for all kinds of reasons.  You're going to have two

5    people calling a hospital, one person saying preserve it this

6    way, another person saying preserve it this way.

7          The Bard order requires the healthcare provider to

8    store pathology as they usually do, but whatever explant they

9    retain to be stored in saline and refrigerated.  Again, that

10   is a whole different -- may be a whole different method of

11   preservation beyond what the hospital's doing on their own,

12   according to their policies.

13         The proposed procedure by the plaintiffs in the

14   Ethicon case requires that the explants be stored in formalin

15   which is a 10 percent formaldehyde solution.  And the issue

16   with that method in an order, as far as Ethicon's concerned,

17   is we're concerned that that blesses a method of preservation

18   of the mesh that we believe is inappropriate for certain of

19   the analytical tests that are being performed on the mesh.

20   Let me give you an example.

21         In the Lewis case -- we have had three cases so far.

22   The Lewis case, which the Court is very aware, we did

23   everything right as far as I'm concerned.  The mesh came in,

24   the mesh was -- our experts met, split the mesh, they took

25   theirs, we took ours.  It was in the state that it was in.

—————————————————Motion Hearing—————————————————

1        Dr. Jordi, who's plaintiffs' expert, conducted a

2   number of analytical tests on that mesh.  We got his report

3   and saw what he did, analyzed his methods.  We believe that

4   the formalin used in the preservation of that mesh is a

5   significant confounding factor to the results that he offered

6   at trial.  So, our position is that the formalin reacts with

7   proteins that are on the mesh after implantation and forms a

8   hard outer shell around the mesh so that when you're doing

9   analytical chemistry on the mesh, you have this hard outer

10  shell that is a confounder to the analytical chemistry.

11       Our experts cleaned the mesh.  They suggest that

12  cleaning is improper, didn't need to be done, done with the

13  wrong things, and I'm oversimplifying but that's basically it.

14       In the Huskey case, there is no mesh.

15       In the Edwards case, the mesh was, in our judgment,

16  mishandled by the plaintiffs' experts, the subject of

17  destructive testing, and we have affidavits, reports from our

18  experts, that say that the handling of the mesh compromised

19  our ability to do the analytical testing that we wanted to and

20  respond to the claims that the mesh is degraded.

21       I'm sorry for the long windup, but it's a necessary

22  predicate to understand that the method of preservation is all

23  important in the kinds of tests that are ultimately conducted

24  on the mesh, such that if the mesh is stored in saline, you

25  don't have this formalin outer shell that we've talked about.

—Motion Hearing—

1        There has been some suggestion that the mesh be flash

2   frozen.  That creates its own issues.

3        Storing in saline, as the Court's observed, may be a

4   biohazard and there are other issues there.

5        What Ethicon can't have -- at least our contention

6   is, excuse me -- we'll have whatever you tell us we have to

7   have -- is that we -- a Court-blessed method of preservation

8   for the mesh.

9        Plaintiffs are the ones in charge of what tests

10  they're going to conduct on this mesh, and it's changed across

11  MDLs.  Some plaintiffs' experts conduct certain tests.  Other

12  plaintiffs' experts conduct other tests.  We don't know

13  until -- what those tests are, whether the preservation

14  measure taken by the plaintiffs affects the results of those

15  tests.

16       THE COURT:  Well, here's what I'm proposing, though.

17  Step three is the healthcare provider -- healthcare provider

18  preserves this mesh when it's removed from the patient's body.

19  Healthcare provider preserves it any way the healthcare

20  provider wants to in compliance with its own policy.  Then

21  it's turned over to you two somehow.  Say it's sent to a

22  third-party repository, and, immediately upon receipt, it's

23  split in half.  You can take your half, you can put it in

24  anything you want to put it into.  They can take their half

25  and put it in anything they want to put it into.

---------Motion Hearing---------

1          MR. THOMAS:  The problem with -- I'm sorry.

2          THE COURT:  But the bottom line is no one is going to

3     tell the healthcare provider how to preserve it from the time

4     it's removed from the patient until the time it gets into your

5     hands.

6          MR. THOMAS:  Two things about that, Your Honor.

7          First of all, it's my understanding -- I don't have

8     the experience you do or Mr. Anderson -- it's my understanding

9     that the default is going to be to put this mesh in formalin

10    to preserve it, to fix it.  Once it goes into formalin, our

11    experts tell us, and we've submitted this information to the

12    Court, that compromises our ability to do the analytical

13    chemistry tests that we think are necessary to rebut the

14    claims of degradation.  Plaintiffs disagree with that.

15         The second point is if for some reason the healthcare

16    providers do not put it in formalin before they transfer it to

17    the third party and it's split at that time and plaintiffs

18    preserve one way and we preserve another way, then there is a

19    significant issue about whether we will be able to replicate

20    the same kinds of tests conducted by the plaintiffs because

21    there will not be tests on mesh preserved in the same manner.

22         THE COURT:  But I -- you know, I think what you're

23    talking about here is an issue that's never going to be

24    resolved.  You're going to be fighting about -- this is what

25    you'll be fighting about at trial.  I don't think that can be

---Motion Hearing---

1  fixed.  You're going to be arguing at trial over who has

2  tested this mesh the right way, who preserved it the right

3  way, whose tests are accurate and whose tests aren't.  I mean,

4  that's what you're going to be fighting about at trial, I'm

5  sure.  And I'm not sure that that can ever be removed from the

6  litigation.

7         MR. THOMAS:  And you see, that's basically my point

8  in our papers.  I tried to make it.  I want --

9         THE COURT:  So what's wrong with this plan?  Let the

10 hospital decide how to preserve it.  Send it to a third party.

11 It's immediately divided.  You do what you want with your

12 half.  They do what they want with their half.  You can say

13 what they did with their half is wrong, it doesn't allow for

14 the proper testing.  You can attack the way they've tested it.

15 They'll do the same with what you've done.  You bring your

16 experts in, they can fight.  You can take a fourth, one-half

17 of your half, and you can replicate their tests if you want so

18 that you can undermine their results.  You can do whatever you

19 want with your half.  But I don't know that there's going to

20 be any way -- I mean, how am I supposed to tell you -- I don't

21 know who's right.  I don't think I'd ever be able to decide.

22 I'm not a scientist.  I don't know whether it's formalin or

23 saline or whether they ought to just stick it into a container

24 with no kind of preservative or no kind of liquid.  So I can't

25 make a decision as to who's right about this.

Motion Hearing

1              MR. THOMAS:  If I may, Your Honor.

2              THE COURT:  Yes.

3              MR. THOMAS:  At the same time, by holding in an order

4     that whatever the hospital's method of preservation is is

5     adequate, prejudices perhaps our argument later that the

6     preservation method does not permit the proper analytical

7     chemistry analysis by either their expert or our expert.

8              THE COURT:  Why does it prejudice that argument?

9              MR. THOMAS:  Because plaintiffs, if they wanted to

10    test the mesh in a way that they believe can prove that mesh

11    degrades, I think it's their responsibility to have the mesh

12    preserved by the healthcare provider in the way that allows

13    those tests to be conducted.

14             THE COURT:  You show me one -- one case that says

15    that.

16             MR. THOMAS:  It's a matter of -- Your Honor, of --

17    the analogy I'll make is an automobile accident.  If you have

18    an automobile accident, which is a lot of cases on this, if

19    you're going to have a crashworthiness case, the plaintiff has

20    a duty to preserve the car as best they can.  It's not the car

21    altered.  It's not the car repaired.  It's not the car

22    preserved.  It's the car as it existed after the wreck.

23             THE COURT:  So, but wait a minute.  So, that means

24    that they have some kind of duty to notify, for example, all

25    of the tow-truck companies around the area that if they ever

---Motion Hearing---

 1  get into an accident, this is the way I want you to tow my car

 2  away from the scene.

 3          MR. THOMAS:  But --

 4          THE COURT:  And this is how I want you to store my

 5  car on the lot until I can take possession of it.

 6          MR. THOMAS:  But to the extent that anybody has

 7  altered that vehicle as a part of the process, that's very

 8  much part of the case.

 9          THE COURT:  Well, getting it towed away from the

10  scene is going to alter it in some way.  I mean, I think that

11  when the patient is laying on an operating room table and the

12  hospital's removing the mesh from her body and putting it in

13  some sort of a jar to send it to the lab, I don't think she

14  does have control over what the hospital is doing at that

15  point.  And I don't think that the lawyer or me has any real

16  right to tell the hospital we have this lawsuit pending so we

17  expect you to vary from the policy that you follow in every

18  other case and we want you to do this because we're afraid, if

19  you don't do it this way, we may not be able to test the

20  specimen the way one of the parties wants to test it.  I just

21  don't think we can do that.

22          The hospital has a right to operate its business the

23  way that it believes it needs to be operated after it has

24  drafted these policies based on time, hours, research,

25  investigation, best practices, standards, government

─────Motion Hearing─────

1    regulations.  They've come up with these policies of how

2    they're supposed to handle the specimens.  And I don't -- I

3    don't feel that I or Mr. Anderson or you or anyone has the

4    right to go in there and say, "Now, I know you've got 25

5    surgeries you're going to do today, but I want you to

6    remember, in this one case, when you take that mesh out, make

7    sure you do this, this, this, and this for my lawsuit."  I

8    just -- I don't -- I can't buy that.  I think we're going to

9    have to let the hospital do what the hospital normally does.

10          Now, I'm not sure that the hospital does, in fact,

11   put all these things in formalin.  I'm looking at some

12   policies I printed off.  I see, for example, when they were --

13   for example, with bullets, when they remove bullets which is a

14   foreign body, they don't put it in anything.  They wrap it in

15   a piece of gauze and stick it in a jar.  That's what one

16   hospital does.  Another one puts it on a Telfa pad that's been

17   soaked in saline.  I mean, I don't know that every hospital

18   drops these things in formalin.  I don't know what they do.

19          You know, I don't know that you can't -- I don't know

20   that Mr. Anderson would have an objection if you said, "Well,

21   what about if we make a request in this particular case that

22   they put it in saline?"  Maybe he'd say, "Okay.  Well, we'll

23   let you do it in five cases" or "in these five cases, you can

24   do that."  I mean, maybe he would agree to do that in a few

25   cases.  I'm not sure the hospital's going to agree to do that

```
────────────────Motion Hearing────────────────
```

 1   but --

 2          MR. THOMAS:  The problem is, Your Honor, we don't

 3   know the proper method of preservation until after the tests

 4   are conducted.

 5          THE COURT:  Well then, I don't know what you're

 6   asking me to do.

 7          MR. THOMAS:  Only that it's plaintiffs' burden to

 8   preserve it in the way most appropriate for their testing so

 9   that we're not prejudiced when we come back --

10          THE COURT:  Well, that's just --

11          MR. THOMAS:  -- and I don't want -- in an order

12   blessing formalin preservation, for example, which is what

13   their proposed order requires.

14          THE COURT:  I'm not blessing anything.  I'm saying

15   what would happen is that it would be whatever the hospital

16   normally does.

17          MR. THOMAS:  Then if -- I understand that.  We'll

18   take that.

19          THE COURT:  I think what -- what I disagree with in

20   Ethicon's position is exactly what the plaintiff is saying,

21   this gotcha mentality.  "We don't want to tell you what to do,

22   we don't want to say anything, but it better be right when we

23   want it.  It better be the way we need to have it when we want

24   it.  And if it's not, it's your fault."  And you can't do

25   that.

─────Motion Hearing─────

```
 1          MR. THOMAS:  That was not the intention of the

 2  papers, Your Honor.

 3          THE COURT:  But it sounds like that even as you're

 4  speaking now.

 5          MR. THOMAS:  No, the intention of the papers, Your

 6  Honor, is -- is for the plaintiffs to determine what's the

 7  appropriate condition of the mesh for the tests that they want

 8  to run so that we get the appropriate condition of the mesh

 9  when we want to replicate their tests.  That's all that it is.

10  If down the road -- well --

11          THE COURT:  So you're going to get the mesh.  If this

12  is the way we do it, where now the healthcare provider has now

13  taken it out of the patient's body, put it in whatever they're

14  preserving it in, and now they're going to hand it over to

15  whom?  The plaintiff's attorney?

16          MR. ANDERSON:  Can I just address this, please, Your

17  Honor?

18          THE COURT:  Yes.

19          MR. ANDERSON:  I want to address your immediate

20  question and maybe some other things might be helpful in

21  coming to our conclusions here.

22          When we -- when we had tried to come up with a

23  protocol, we started about a year ago, and when we filed the

24  one on September 6 last year, it had to be withdrawn because

25  there was a problem with sample size.  But, in absence of the
```

─────────Motion Hearing─────────

1   protocol, what we have done now in three bellwethers with Burt

2   Snell, defense counsel at Butler Snow, is if there is a

3   surgery, the hospital does what they do.  Steelgate interfaces

4   with the hospital and says you have a surgery coming up or you

5   just had a surgery, whatever the case may be on timing.  We

6   want to retrieve it from you in whatever means you keep it.

7   The reason that formalin is there is because formalin is best

8   practices.  That's why hospitals all across this country do

9   it.  It's best practices under all of the pathology labs, all

10  the administrative codes, et cetera.  That's why they do it,

11  because it is the best preservative that's there.

12          Saline allows for bacteria.  Saline destroys not only

13  the tissue but also in this case the fibers, and refrigeration

14  does.  So that's why they use formalin in the first place.

15  It's a fixative.

16          So we receive it through Steelgate.  Steelgate

17  retrieves it in the bottle.  Steelgate then sends out a

18  photograph of it and says, "Mr. Anderson, we have received

19  Ms. So-and-so's mesh."  Then I immediately reach out to

20  defense counsel and say, "Steelgate has Ms. Lewis's or

21  Ms. Batiste's mesh.  Please let us know when your experts can

22  come to Jordi Labs for the dividing of the mesh."  They get

23  back with us and say, our guys, Dr. Ong and Dr. Thames, have

24  been sent every time, and they are invited to Dr. Jordi's lab,

25  and they all get there together.  Nothing has been opened.

Motion Hearing

1   They photograph the shipping box from Steelgate.  They open
2   that.  They photograph the bottle when it comes out.  Then
3   together they go into the lab, they pull it out with tweezers,
4   they divide it on a splitting machine, and they take the
5   formalin that's in the bottle, they create another bottle with
6   the same formalin, so that then their experts, Ethicon's
7   experts, take their bottle and they either ship it back to
8   their laboratory in a biohazard bag or they can take it with
9   them.  Typically, they ship it because of flights and going
10  through security.  And then they are welcome to do whatever
11  testing they want; we do whatever testing we want.
12          THE COURT:  So is it always formalin?
13          MR. ANDERSON:  It's almost always formalin.  There
14  have been a few rare instances where it's just dried mesh,
15  like you said, sometimes they put --
16          THE COURT:  Right, just put it in there.
17          MR. ANDERSON:  No one stores it in saline that we've
18  seen.  It's a preferred method, and it's not just in the
19  United States.  It's around the world.
20          And if I could just -- I need to correct something
21  for the record.  And it could be because Mr. Thomas is just
22  not aware of it.  But, as plaintiffs put in our papers, that
23  part of the Bard order about the saline, I became involved
24  with Mr. Wages on that, and they since changed that because we
25  had experts, both polymer scientists and pathologists, who

---Motion Hearing---

1  said please do not do that.  Saline will destroy the tissue,

2  and it will destroy it in the refrigerating, it will destroy

3  the mesh.  Then it's not usable for any of us.  So AMS agreed

4  because they didn't have any experts who came back with

5  anything other than that, and they said, okay, how about if we

6  at least ask the hospital if they're willing to put half of it

7  in saline and half of it in formaldehyde.  They agreed to

8  that, but I still think it creates more problems and you're

9  putting more burden on the hospital and delay and you're

10  getting two different requests.  But they did have to back off

11  of that position because the experts, which went unopposed,

12  said you can't store this in saline.  Saline allows bacteria;

13  formalin does not.  So that's why we had said, look, we don't

14  even want to put the impetus on the hospital to say it has to

15  be in formaldehyde.  We have to just say to them, "Follow your

16  normal operating procedures."

17          THE COURT:  Right.

18          MR. ANDERSON:  And then -- and we can have Steelgate

19  collect it.  Steelgate can then have it divided.

20          THE COURT:  So, it seems to me, Mr. Thomas, that if

21  at some point Ethicon decides that they would like to get a

22  specimen in some other kind of medium, some other sort of

23  preservative or medium, then the thing to do is to speak with

24  the plaintiffs' counsel and say, with this particular patient,

25  can we approach the facility and see if, in this case, we can

---Motion Hearing---

 1  have it put in formaldehyde or we can have it put in something

 2  other than formalin.  But at this point you don't -- there

 3  isn't anything that you really want it put in, that I'm

 4  hearing you articulate.

 5          MR. THOMAS:  I'm sorry.  I just don't think it's our

 6  burden to choose that.

 7          THE COURT:  Well --

 8          MR. THOMAS:  With the Court's orders today, the

 9  findings today, that applies to all cases.

10          THE COURT:  Um-hum.

11          MR. THOMAS:  And it does not bless formalin as a

12  preferred method of preservation, and we're just going to

13  follow whatever the hospitals do --

14          THE COURT:  Right.

15          MR. THOMAS:  -- absent any kind of agreement.  I

16  think that we can agree to the rest of it, Your Honor.  I

17  really think that's something that we can work out.

18          THE COURT:  Okay.

19          MR. THOMAS:  Those are the two issues that concerned

20  us the most, is our limitation on the cases to which the rule

21  applied and the method of preservation.  I understand the

22  Court's rulings.  With the Court's permission, I think that

23  Mr. Anderson and I can work out the details.

24          THE COURT:  All right.  So the rest of it, I would

25  think, would be pretty easy to work out.  I mean, you're not

‑‑‑‑‑‑‑‑‑‑‑‑Motion Hearing‑‑‑‑‑‑‑‑‑‑‑‑

1 arguing over the expense of preservation.  You're willing to

2 put it in a third-party repository.  You're willing to share

3 the expense of storing.  And you each want part of the

4 specimens, right?  You each want -- I mean, nobody wants --

5 nobody wants to just turn it all over to the other side,

6 correct?

7          MR. ANDERSON:  That's correct.

8          THE COURT:  So all the rest of it ought to be pretty

9 easy.  Yeah, I mean I'm thinking, unless and until there's a

10 specific request for a specimen to be put in something other

11 than what the healthcare provider normally does, I don't know

12 why -- I don't know what else you would do, other than to say

13 it just has to be done as the healthcare provider normally

14 does it.

15          You know, to me, that's just like picking up a car,

16 to use your analogy, after it's been towed to the junkyard.

17 You don't try to control how it's towed there and you don't

18 control how it's stored there.  You just go get it once it's

19 there and then you start preserving it the way you want it

20 preserved.  But, you know, up to that point, you don't really

21 have a lot of control over it, right?

22          MR. THOMAS:  I don't know the answer to that.  I

23 don't know the extent to which plaintiffs' counsel could

24 influence the method of storage of the implant after it's

25 removed from the body.  I understand the Court's findings in

—Motion Hearing—

1    that regard but I don't know the issue well enough to --

2           THE COURT:  Well, and I think they might be able to.

3           MR. THOMAS:  Exactly.

4           THE COURT:  If -- but only if -- why would they do

5    anything other than what the norm is, unless you said to them,

6    I specifically want this done this way?  Then they have

7    something to do other than what would normally be done.  But

8    there's no reason for them to start trying to change what the

9    hospital or the surgery center normally does unless there's a

10   specific request for that.  And I don't hear you making any

11   request.  You just -- all you're saying is, well, they're

12   just -- they just need to do it in the right way but you won't

13   tell them what that way is.  So it seems like then whatever

14   the hospital is doing is the way it has to be done.

15          MR. THOMAS:  And we've come a long way, as far as I'm

16   concerned today, in what the Court's decided, and the message

17   that I hear is that it applies to all cases --

18          THE COURT:  Yes.

19          MR. THOMAS:  It's whatever the hospital provides,

20   unless the parties agree otherwise.

21          THE COURT:  Right.

22          MR. THOMAS:  And to the extent in an upcoming case we

23   want the plaintiffs to request something different because of

24   the kind of testing we want to perform, we could make that

25   request.  Perhaps that's the best way --

Motion Hearing

1        THE COURT:  And try to --

2        MR. THOMAS:  -- to proceed before the Court again.

3        THE COURT:  Right.  And try to agree to something

4  before you would come back and ask for -- yeah.  And then, you

5  know, ultimately, even then, Mr. Thomas, it's still going to

6  rely upon the hospital to do it --

7        MR. THOMAS:  Absolutely, understand that.

8        THE COURT:  -- and I -- as I said, I don't really

9  feel comfortable trying to go in and tell a hospital that they

10  have to -- that they are commanded to deviate from their

11  normal procedure unless there's a real compelling reason to do

12  that.  So I would want to have, for example, some kind of hard

13  and fast scientific evidence telling me that the way this

14  hospital's doing it is really damaging the specimen so much

15  that it's not useful for this case.  Otherwise, I wouldn't

16  feel comfortable going to a hospital and saying, I order you

17  to deviate from your policy, your best practices, and do it

18  this way for this lawsuit.

19        MR. THOMAS:  And I understand that, Your Honor.  And

20  I don't think that we ever contemplate asking you to order a

21  hospital to change its procedures.

22        THE COURT:  Okay.

23        MR. THOMAS:  That's not what I was getting at.

24        THE COURT:  All right.

25        MR. THOMAS:  It would be an effort --

─────Motion Hearing─────

1           THE COURT:  A request to try to work with --

2           MR. THOMAS:  -- to ask plaintiffs to do certain

3    things.

4           THE COURT:  Okay.

5           MR. THOMAS:  And they would ask the hospital, and the

6    hospital would say --

7           THE COURT:  "Yes" or "no."

8           MR. THOMAS:  "Yes, we can do that" or "No, we can't."

9           THE COURT:  All right.

10           MR. THOMAS:  I don't think that we'd ever come back

11    and suggest to the Court that you tell the hospital what to

12    do.

13           THE COURT:  Okay.

14           MR. THOMAS:  That's not what I had in mind.

15           THE COURT:  All right.

16           MR. ANDERSON:  May I speak to that, please, Your

17    Honor?

18           THE COURT:  Yes.

19           MR. ANDERSON:  Because I do have a real concern.  And

20    Kate Grayson's affidavit spells some of this out, and just

21    through working with hospitals, practically speaking, there

22    are problems when you go to the hospital and you say please

23    divide this one-half into saline and one-half into formalin,

24    which is the way they normally do it, because then what

25    happens is a delay is put on that.  It then has to go to risk

──────Motion Hearing──────

1   management.  After it goes to risk management, it gets pushed

2   out sometimes to outside counsel.

3         Great case in point, the *Batiste*, *Lewis* cases.  We

4   put this extra request in there that they do these things, and

5   it took four months to get it back.

6         And, in some instances, we now have two things

7   happening:  Either after those months and months of waiting

8   for this to come in, the risk management or the outside

9   counsel says, "We're not following it."  That's number one.

10        Now we've had in two instances surgeons who are

11  saying, "I'm not going to perform the surgery if you're going

12  to make my hospital do this," and they have met with their

13  board and said, "We're not going to do the procedure."  So

14  this is -- it can be very draconian if we go in and start

15  saying, "Split this up."  Even this simple request, it sounds

16  like we're just going to come in and ask them if they'll do

17  it.  We're not ordering it.  That seems to be what I'm

18  hearing.  That simple request still has to be run through risk

19  management and they have to look at their liability, they have

20  to run it through their internal board and outside counsel,

21  and it is taking a very long time and is causing them to shy

22  away because they say, "Now we have got to put more people on

23  this," et cetera.

24        So the larger facilities, especially UCLA, University

25  of Texas Southwest, these facilities are now saying, "You know

─────Motion Hearing─────

 1  what?  We're going to have our own protocol for you, and it is

 2  going to delay us getting mesh back to you."

 3        So I have real concerns because I know that just

 4  hearing what's going on today, I know what's going to happen.

 5  I'm going to get a request from Mr. Thomas, "Would you please

 6  reach out to these hospitals and tell them that we would like

 7  our half to go into saline?"  And it is going to be a real

 8  problem, Your Honor, because that's not best practices.

 9  That's number one.

10        Number two is, okay, now if we start to say, "Could

11  you put part of it in saline, part of it in formalin," we are

12  going to say at trial saline is not even the way that

13  pathologists preserve the material.  And, in fact, the

14  hospital's normal routine is to put it in formalin.  However,

15  in order to say that, we're going to have to go in and depose

16  someone at the hospital and that's, as you know, when inhouse

17  counsel starts to get their backs reared up and they say, "You

18  know what?  You're not going to come in and start deposing all

19  of our people" --

20        THE COURT:  Wouldn't your expert be able to say that?

21        MR. ANDERSON:  What's that?

22        THE COURT:  Wouldn't your expert be able to say that,

23  I mean, that's how they do it at hospitals?  I mean --

24        MR. THOMAS:  Can I speak to that, Your Honor?

25        THE COURT:  Yeah, but we're getting -- we're getting

Motion Hearing

```
 1   off --
 2            MR. THOMAS:  Because we're borrowing trouble now.
 3            THE COURT:  Yeah, really.
 4            MR. THOMAS:  This is not something that's even ripe
 5   before the Court.
 6            THE COURT:  No, I know.
 7            MR. THOMAS:  That's a long ways down the road, if it
 8   ever comes.
 9            THE COURT:  I wouldn't worry about that yet.  I mean,
10   and I can tell you, you know, that was one of the advantages
11   to have inhouse counsel because it would have taken me about
12   probably an hour to say no, we're not doing that.  Because,
13   you know, I mean, as inhouse counsel to a hospital, there was
14   never a good reason to deviate from a standard policy just to
15   help somebody out in a lawsuit that we had no -- no
16   involvement in because all it ever did was come back to bite
17   us.  Because then if we didn't do it right, which happened,
18   you know, because people were busy, and so they'd forget that
19   this was the case we were supposed to do something special on,
20   and then it was just nothing but aggravation after that.  So I
21   wouldn't be surprised if people didn't want to cooperate.  You
22   know, maybe you would have better luck in a surgery center, a
23   smaller facility, you know.
24            But, as Mr. Thomas says, that's not in front of us
25   right now, and we don't need to worry about it at this point,
```

---Motion Hearing---

1   and maybe he'll find out, as you've said they found out in

2   Bard, that saline is no use, either.  And I don't know that

3   formaldehyde is going to be any different or any better than

4   formalin, so we won't --

5           MR. ANDERSON:  Basically the same.

6           THE COURT:  Yeah.  We won't worry about that at this

7   point then.

8           MR. ANDERSON:  I guess my point was, Your Honor,

9   there's going to be a spillover effect if we start to go to

10  these hospitals asking them for special treatment because it's

11  the exact same --

12          THE COURT:  Well, and the answers are they're not

13  going to do it anyway.  I mean, really, you know?  Once they

14  go to their lawyers, I mean, you know lawyers won't do

15  anything.  They won't do anything.

16          MR. ANDERSON:  That's my fear, though, is that

17  nothing happens and it gets delayed, delayed, delayed.

18          THE COURT:  Right.  And that's a risk that you take.

19  And I don't think that Ethicon is going to want to do that.

20          And, you know, Mr. Thomas, you're going to have all

21  your arguments that even though that is a standard way that

22  they're preserved, that doesn't mean that it doesn't have

23  negative effects on the mesh and it doesn't mean that the

24  results then of the testing aren't skewed.  I mean, you still

25  have that argument, that these tests are not accurate because

———Motion Hearing———

 1   of the formalin.  I mean that, to me, is still a valid

 2   argument that you have.   Right?

 3           MR. THOMAS:  I would agree --

 4           THE COURT:  Maybe you don't want to put them in a

 5   medium that would allow you to have what you would consider to

 6   be untainted test results.  Maybe it's better to be able to

 7   say that all the test results are tainted, right?

 8           MR. THOMAS:  Just trying to keep all my options open,

 9   Your Honor.

10           THE COURT:  Leave your options open.

11           Hey, as long as I have you all here, there are a

12   couple of other things I want to talk to you about.

13           One thing has to do with, and I may have forgotten

14   all my folders now.  They're more -- these are more sort of

15   administrative issues for me than anything else.

16           These motions that Ethicon has been filing lately,

17   these things about meet and confer or, in the alternative,

18   motions for protective order.  Do you know what I'm speaking

19   about, Mr. Thomas?

20           MR. THOMAS:  I don't, Your Honor.  I'm sorry.

21           THE COURT:  There's, I think, four or five of them

22   pending right now.  And they're entitled --

23           (Discussion held off the record between the Court and

24   the Deputy Clerk.)

25           THE COURT:  In any event, they are called things like

---Motion Hearing---

```
 1   Ethicon's request to meet and confer or motion for protective
 2   order -- in the alternative, motion for protective order.
 3         MR. THOMAS:  I'm going to make a guess.  Is it with
 4   respect to a couple of witness depositions or 30(b)(6) --
 5         THE COURT:  There is, yes, several.  Response request
 6   for meet and confer, in the alternative, motion for protective
 7   order regarding notice for oral deposition, yeah, for
 8   designated witnesses.  Okay.
 9         What I want to bring up about that, Mr. Thomas, is
10   that when these are styled this way, they are put into my
11   report as a motion for protective order.  And we have a report
12   that's generated every six months, and there are certain
13   things that I have to do within that six-month period, and
14   then the motions are placed on that report and so now they
15   are -- they are in my window, and something has to be done
16   with them.  And these are -- this is a national report.
17         MR. THOMAS:  I understand.
18         THE COURT:  So every time the word "motion" is in a
19   style of anything, it now comes up onto my little report.
20         MR. THOMAS:  Can I -- I've not read those precise
21   motions, but my guess is that that is to protect the record
22   for a 30(b)(6) deposition on the scope of the notice and
23   having a witness without any kind of pending protective order
24   motion pending.
25         THE COURT:  Um-hum.
```

-Motion Hearing-

1            MR. THOMAS:  Binding testimony comes from that
2    witness, without the protective order.
3            THE COURT:  Right.
4            MR. THOMAS:  That's my -- that's my guess.
5            THE COURT:  That was my guess as well when I saw it.
6            MR. THOMAS:  And how would you suggest that we do
7    that to protect the record in advance of the deposition in
8    adequate time?
9            THE COURT:  Yes.  That's what I want to talk about
10   today.  So if we can come up with something.  I mean,
11   technically, you can't file a motion for protective order
12   until you've had your meet and confer.  So, just by virtue of
13   the title, clearly, this shouldn't be filed as motions because
14   you haven't had the meet and confer because you're asking for
15   a meet and confer at the same time you're filing the motion
16   for protective order.  So we've got to somehow be restyling
17   these so that the word "motion" isn't showing up in them.  But
18   I understand what you're trying to do because under the rules,
19   if you have a pending motion for protective order, then the
20   deposition transcript can't be used at a trial until that had
21   been resolved.  So I see what you're trying to do with that.
22   And I don't know.
23            Is -- are these -- is the reason that this is
24   happening because these are being scheduled in too short of a
25   time frame to get them resolved?  Because this has just

—Motion Hearing—

1   started.  And I know you used to file just objections.

2          MR. THOMAS:  And we decided, I think, or the Court

3   told us that the objections were not appropriate.

4          THE COURT:  There is really no such thing as

5   objections, yeah.  I knew, I knew that was my fault.  I knew

6   that when I saw this.

7          MR. THOMAS:  I'm really dealing kind of in the

8   abstract here because I don't have any idea what those motions

9   actually say.

10         THE COURT:  Right.

11         MR. THOMAS:  But is there a way -- well, perhaps the

12  way to do it is to talk with the plaintiffs' counsel to see if

13  we can work out something because that's going to be a

14  recurring issue because I know there are a number of

15  depositions they want to continue to take through the summer,

16  and I certainly don't want your -- your list to be too long

17  with motions.

18         MR. ANDERSON:  May I propose this, Your Honor?  That

19  we -- now that we know that this is an issue for Your Honor,

20  we will meet and confer on this, and then if we can't come to

21  something, we'll just do another call with you, like we have

22  so many times in the past, and see if we can't hammer it out

23  in a phone call.

24         THE COURT:  We will try to figure out a way to

25  preserve this issue for you because I understand -- you know,

—————Motion Hearing—————

1    I mean, I think it is something that we may need to discuss

2    because, on the flip side, I'm sure it will be problematic for

3    the plaintiffs if they take the deposition and then not be

4    able to use it at all because you've got this pending motion

5    for protective order.  So I would think in most of these

6    cases, the big issues you're going to want to have resolved

7    before you take the deposition.  I mean, I don't think anybody

8    wants to go take these depositions and not be able to use the

9    transcript at all.  But, you know, yes, why don't you talk

10   about this.

11           I mean, number one, meet and confers have to take

12   place before you file a motion, right?  I understand why

13   you're doing it.  I understand that I instigated this.  And,

14   you know, I realize what I said was correct but I said it

15   before I understood how the MDLs really work.  Because you

16   know these things are so crazy that filing objections in these

17   MDLs might be the best way sometimes to approach the problems

18   you have with these depositions, although there is no such

19   thing as objections to notices of deposition in the rules.

20   And in a normal case, that wouldn't work.  I see why you do

21   them in these MDLs, but right now I've got four -- I think

22   four of those pending, and at some point, if they aren't going

23   to actually develop into a full-fledged motion for protective

24   order, they'll have to be withdrawn or I will just have to

25   deny them at some point but, you know, that requires a long

—Motion Hearing—

1  written opinion and I'd prefer not to have to do that if

2  there's really no -- I mean, I could probably deny them all

3  now, just because you haven't met and conferred, but I'd like

4  not to have -- I'd like to give you a chance to sort of figure

5  these out and if there is any issues, deal with them.

6          MR. THOMAS:  Yes.

7          THE COURT:  So if you wouldn't mind looking into that

8  for me, I'd appreciate that, Mr. Thomas.

9          MR. THOMAS:  I will.

10          THE COURT:  The other thing is we've got a few older

11  things also here that are pending.  For some reason, these two

12  really old ones haven't showed -- are not showing up on my

13  report, and they should have already showed up.  They should

14  have been on my last report.  And I'm not going to bring this

15  to anyone's attention because I don't want them on there,

16  but -- and that's these -- the ones that we sort of had

17  following along with the spoliation, clarification motion, and

18  that hasn't showed up because that was titled a request for

19  clarification, so that really hasn't been spotted as a motion.

20          But there's this motion to deem requests or compel

21  that was filed by Ethicon, and then plaintiffs had filed a

22  similar motion to determine sufficiency of discovery, and

23  these were filed, I think, gosh, back in like January.  And

24  those have sort of been grouped with that spoliation motion,

25  and I was going to have a hearing on all of those things at

--------Motion Hearing--------

1   the same time.  Where are we with that?  Does anyone here

2   know?

3          MR. ANDERSON:  No, I don't, Your Honor.

4          MR. THOMAS:  I don't either, Your Honor, but I will

5   find out.

6          THE COURT:  All right.  I know that we had pushed

7   back the spoliation issue because that letter had been found

8   by Ethicon where one of the -- the document retention letters

9   had been withdrawn and so they were looking into that, and

10  then it just sort of disappeared off the face of the earth

11  but -- doesn't disappoint me, but I do need to get the things

12  resolved that are on here so -- all right.

13         And then the last thing that I have pending is the

14  Keeton motion, which is something I do have on my six-month

15  report and I will be getting an order out on soon.

16         But those other ones, if you don't mind looking into

17  those things for me, I'd appreciate it.  Maybe it's about time

18  to have a status telephone call or something just to see where

19  we're at because you guys have a trial, what, in August?

20         MR. ANDERSON:  Correct.

21         MR. THOMAS:  August 22nd.

22         THE COURT:  Right.  So you may want -- I don't know

23  where you are with the spoliation and the requests and the

24  sufficiency of discovery which I think were requests for

25  admissions, I believe that that's what you were trying to

———Motion Hearing———

 1   figure out the sufficiency of.  I don't know if you're going

 2   to need those for your August case or not.  But if you do, you

 3   better get on it because I've got two weeks I'll be gone in

 4   July.

 5          So, all right.  So if you don't mind looking into

 6   those things.  If you need the numbers of the motions and

 7   whatnot, Laura has those.

 8          MR. THOMAS:  What two weeks are you gone in July,

 9   Your Honor?

10          THE COURT:  I will be leaving on the 11th.

11          MR. THOMAS:  Okay.

12          THE COURT:  And I will be back the twenty- -- let's

13   see -- the 26th, so the 27th would be my first day back.  No,

14   28th.  Yes, so I will be gone from Friday, the 11th, and I'll

15   be back on Monday, the 28th.

16          MR. THOMAS:  I expect you would like to work these

17   out before you go, these issues.

18          THE COURT:  Yes.  That would be better, definitely.

19          Yes.

20          MR. ANDERSON:  A couple of points of clarification,

21   if I could, Your Honor, just with going back to the pathology

22   protocol.

23          So, you know, there is 20-some-thousand filed Ethicon

24   cases.

25          THE COURT:  Um-hum.

---Motion Hearing---

1           MR. ANDERSON:  So we're talking about thousands and

2    thousands of women and lawyers and things like that --

3           THE COURT:  Um-hum.

4           MR. ANDERSON:  -- that are going to somehow get

5    notice that if you are going to have another revision surgery

6    or your first revision surgery, that you need to then, after

7    you've recovered from the surgery -- because a lot of times

8    it's a short time period between a doctor saying we're going

9    to take you in because you're in so much pain, sometimes it's

10   a longer period of time, but it's variable.  And so a lot of

11   times we will be, as their counsel, relying upon them to tell

12   us that they've had a procedure.  And many of them are in the

13   hospital for a few days and then they have six weeks of

14   recovery, et cetera.  So there's going to be a lag in here

15   between us trying to get the protocol in the right form and

16   then get the notice out and then try to push that out to

17   thousands and thousands of clients.  It is going to be a

18   logistical nightmare but we'll do it, per the Court's order.

19   So there's going to be a lag between -- because women are

20   having these done every day, right?

21          THE COURT:  Um-hum.

22          MR. ANDERSON:  So we have to try to figure out what

23   is a reasonable amount of time for us to expect that we'll be

24   able to comply with something if it's in the order of within

25   five days of your procedure.  If we do that today, there's no

────────Motion Hearing────────

1    way that -- there's going to be a huge gap of compliance, if

2    you would, with such an order.  So we need to consider how

3    that -- when this is going to go into effect and to whom it

4    applies because I assume that this is a prospective order for

5    women in the future who are going to have mesh removed.

6            THE COURT:  All right.  Well --

7            MR. THOMAS:  Your Honor, could I speak to that very

8    quickly?

9            THE COURT:  Yes.

10           MR. THOMAS:  This is not the creation of a new duty

11   today.  This is a recognition of an existing duty that these

12   women have had since they've been involved in this litigation.

13   So Ethicon strongly believes that anything that's gone on

14   before today, case law explicitly provides that these people

15   have a duty to preserve whatever evidence might be

16   appropriate.  We're just agreeing on a protocol or hoping to

17   agree on a protocol how to handle that issue going forward.

18           THE COURT:  Um-hum.

19           MR. THOMAS:  Not going back.

20           THE COURT:  No, I do agree with that.  I think -- I

21   think every one of these women who filed a case over the

22   transvaginal mesh should have known that if they had a surgery

23   related to transvaginal mesh, that they should have kept a

24   specimen, alerted their physician, if there was a specimen

25   removed related to that, that that might be evidence.  I think

─Motion Hearing─

1   they should have known that.  I think their attorney should

2   have told them that.  To me, that is simple, basic, basic

3   personal injury law.  So, I don't -- I do not think that is

4   anything new.  I really don't.  I agree with Mr. Thomas 100

5   percent.  I mean, that, to me, is just simple basic law.

6           So my thought of what you're saying here is I think

7   that there must be some way that you communicate with the

8   attorneys, the plaintiffs' attorneys.  I think you need to

9   tell them that they need to tell their clients that if any of

10  them have a surgery scheduled or have had a surgery, they need

11  to notify the attorney, then the attorney needs to notify the

12  surgeon or the hospital or both, or the surgery center,

13  whatever, that they want the specimen.  And just -- that's the

14  first step.

15          Then, as to picking up the specimen and getting it to

16  the third party, I think that you can take a little bit of

17  time to do, and I don't think that's going to be that big of a

18  deal.  Because I think the hospital or the surgery center,

19  once you notify them that you want that specimen and that

20  you'll be coming to get it, they'll hold it for you.  They

21  won't throw it away if they know you're going to come and get

22  it, as long as it's not a year from now, you know.  They

23  just -- they'll throw it away if nobody says they want it, you

24  know.

25          MR. ANDERSON:  So, in terms of an order or a protocol

———Motion Hearing———

```
 1   that ends up being a PTO, is the Court looking to the party --
 2   I'm trying to get clarification on that.  Are you --
 3           THE COURT:  What I'm going to do, I'm going to do an
 4   order that says that I've ruled that this applies to all the
 5   plaintiffs, that the plaintiffs have the obligation to notify
 6   their attorney, and the attorney will have the obligation, the
 7   plaintiff's attorney will have the obligation to notify the
 8   defendants that there has been or will be a surgery in which
 9   there will be a specimen or anticipates there to be a
10   specimen, that the specimen is going to be preserved by the
11   hospital according to its normal protocol, that the -- and
12   then that the parties are going to meet and confer and
13   determine how that specimen will be retrieved from the
14   hospital laboratory or surgery center and to whom it will be
15   sent, and then how it will be managed from that point forward.
16   So that's kind of what my -- and that you will then be
17   submitting to me your protocol to manage retrieval from the
18   facility to the third-party repository and how it's going to
19   be handled from that point after.
20           MR. ANDERSON:  Okay.  And just back to what you
21   said -- were saying a minute ago about that it was fundamental
22   that all these women know, many of these women had mesh that
23   was revised --
24           THE COURT:  Um-hum.
25           MR. ANDERSON:  -- or removed long before they
```

---Motion Hearing---

```
 1  retained an attorney.

 2          THE COURT:  Well, that's different.  That's

 3  different.

 4          MR. ANDERSON:  And there are other times when women

 5  go in for a procedure and they had no idea that -- they went

 6  in and the doctor did a clip, sometimes they'll take a little

 7  piece, sometimes they won't.  They don't know to immediately

 8  notify us and say, "I think the doctor may have taken

 9  something out of me," but -- and we -- I'm just trying to

10  explain to the Court from our position what we've heard time

11  and again from a lot of the women that do not know that

12  anything was removed because sometimes --

13          THE COURT:  Well, but you know what spoliation -- you

14  know what the requirement is.  It's when you know that there's

15  evidence that's material to a claim that's pending or that's

16  anticipated.  If you don't know that you have evidence or you

17  don't know that you're going to file a claim yet, then you

18  don't have to retain it.  But at this point people know that

19  there's -- you know, from the time they filed the claim or saw

20  a lawyer or, you know, I think, clearly, they had an

21  obligation to have retained or have made some effort to retain

22  the evidence.

23          And we don't have any spoliation motions in front of

24  us.  They're not accusing anybody at this point of

25  intentionally trying to destroy evidence.
```

—Motion Hearing—

1          All I'm saying, though, is that I would have thought

2     the very first time one of these plaintiffs went into a

3     lawyer's office, the lawyer would have said, you know, "Now,

4     if you have any kind of surgery related to this, make sure

5     that you tell your doctor to keep the specimen."  I would have

6     thought that would be something that would have been part of

7     the normal spiel, you know, the first visit with the attorney.

8     I mean, I just can't imagine that it wouldn't be.

9          MR. ANDERSON:  And part of the problem that we've run

10    into, Your Honor, is exactly that.  We will get notice maybe

11    30 days after the surgery or two weeks after the surgery, and

12    all of the hospitals have different requirements.  And then,

13    depending on which employees are there at the time, they may

14    have a procedure in place, but certain employees immediately

15    throw -- have tossed the mesh, even if they've had a policy

16    that they're supposed to retain it for a few days --

17          THE COURT:  Well, then that's not going to be --

18          MR. ANDERSON:  -- and so we've gotten --

19          THE COURT:  That's not going to be your client's

20    fault.  And you've got to figure too, Mr. Anderson, that, you

21    know, how many times are you actually going to have to produce

22    it?  We don't know how many cases are going to go to trial.

23    It could be five.  It could be 500.  It could be 5,000.  I

24    mean, we don't know sitting here today.  That's why you've got

25    to keep it.  That's why the order has to be that it's got to

---Motion Hearing---

1   be kept in all of them because we don't know, sitting here

2   today, how many will go to trial.  We don't know who they will

3   be.

4          Judge Goodwin could remand all these cases, for all I

5   know.  He could consolidate 500 cases.  He could do what he's

6   doing in some of the other MDLs and have these waves of a

7   thousand cases, and we don't know which ones those will be.

8          So I can't very well say, "Well, you only have to

9   keep it in the current bellwethers."  I mean, that would be a

10  very ineffectual order because we don't know what's going to

11  come six months down the road.

12         MR. ANDERSON:  And I wasn't suggesting that by my

13  last comments.

14         THE COURT:  No, I know.  What I'm saying, though, is

15  I wouldn't worry.  You're a big worrier.  You worry too much.

16  You worry, worry, worry.  You worry about all these things

17  that haven't even happened yet.  You're going to die very

18  young if you don't stop that.

19         MR. ANDERSON:  I only -- if we could trade "worry"

20  for "concern" because I'm the one who receives -- just like we

21  worry about our children because we hear what happens to other

22  children.  We worry about them because we've seen what they've

23  done in the past.  I worry and I bring these concerns to the

24  Court because they're not hypothetical; they are real.  And

25  we -- and those of us who run these things have to hear this

---Motion Hearing---

```
 1   all the time from the field, e-mails, calls, concerns, and so
 2   we bring it to the Court because of those real concerns, not
 3   worrying about something that may happen, but trying to adjust
 4   now for things that have already happened to try to deal with
 5   them better in the future.
 6            THE COURT:  Well, I think you know from my spoliation
 7   order in this case that I'm pretty -- pretty down to earth.  I
 8   understand that things happen and people don't necessarily
 9   intend to lose evidence.  I mean, sometimes people just aren't
10   very smart about how they do things.
11            So, you know, I think, though, that they need to
12   be -- you need to get the word out.  They should already be
13   doing this.  And if it comes up that they haven't, we'll
14   figure out why and go from there.
15            MR. ANDERSON:  Okay.
16            THE COURT:  Okay?
17            MR. ANDERSON:  Yes, ma'am.
18            THE COURT:  Anything else?
19            MR. THOMAS:  Not here, Your Honor.
20            MR. ANDERSON:  Not from us, Your Honor.
21            THE COURT:  All right.  Thank you.
22            MR. ANDERSON:  Have a great weekend.
23            THE COURT:  You, too.
24            MR. ANDERSON:  Thank you.
25            THE COURT:  Thank you.  Court is in recess.
```

───────Motion Hearing───────

1                (The proceedings concluded at 11:10 a.m.)

2

3

4                              *   *   *

5

6

7                        CERTIFICATE OF REPORTER

8

9    I certify that the foregoing is a correct transcript of the

10   record of proceedings in the above-entitled matter.

11

14   _____

15   Carol Farrell, CRR, RMR, CCP, RPR
     Realtime Systems Administrator
16   United States Court Reporter

17

18

19

20

21

22

23

24

25

*United States District Court*
*Southern District of West Virginia*