```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2                        AT HUNTINGTON

 3   _____x
                                    :
 4   IN RE:                         :  MDL NO.
     ETHICON, INC.,                 :  2:12-MD-02327
 5   PELVIC REPAIR SYSTEM PRODUCTS  :
     LIABILITY LITIGATION           :
 6                                  :
                                    :
 7
     _____x
 8
     THIS DOCUMENT RELATES TO ALL CASES :
 9   _____x

10

11              TELEPHONIC STATUS CONFERENCE
            BEFORE THE HONORABLE CHERYL A. EIFERT,
12             UNITED STATES MAGISTRATE JUDGE
                 WEDNESDAY, JULY 2, 2014
13

14

15

16

17

18            CATHERINE L. SCHUTTE-STANT, RPR, RMR
                 Federal Official Court Reporter
19                300 Virginia Avenue, East
                           Room 6009
20                 Charleston, WV 25301
                       (304) 347-3151
21

22

23

24

25
```

```
 1     APPEARANCES:

 2              (VIA TELEPHONE)

 3     FOR THE PLAINTIFFS:    BRYAN F. AYLSTOCK, ESQ.
                              D. RENEE BAGGETT, ESQ.
 4                            JOE ZONIES, ESQ.
                              Aylstock, Witkin, Kreis & Overholtz
 5                            Suite 200
                              17 East Main Street
 6                            Pensacola, FL  32502

 7
                              THOMAS P. CARTMELL, ESQ.
 8                            ANDREW N. FAES, ESQ.
                              Wagstaff & Cartmell LLP
 9                            4740 Grand Avenue, Suite 300
                              Kansas City, MO  64112
10

11              (VIA TELEPHONE)

12
       FOR THE DEFENDANTS:
13                            WILLIAM M. GAGE, ESQ.
                              BENJAMIN M. WATSON, ESQ.
14                            DONNA BROWN JACOBS, ESQ.
                              Butler, Snow, O'Mara, Stevens &
15                            Cannada, PLLC
                              P.O. Box 6010
16                            Ridgeland, MS  39158-6010

17
                              RICHARD BERNARDO, ESQ.
18                            Skadden, Arps, Slate, Meagher &
                              Flom
19                            4 Times Square
                              New York, NY  10036
20

21

22

23

24

25
```

1              P R O C E E D I N G S

2              Had before The Honorable Cheryl A. Eifert, United

3     States Magistrate Judge, United States District Court, for

4     the Southern District of West Virginia, at Huntington, via

5     teleconference, on July 2, 2014, as follows:

6              COURTROOM DEPUTY CLERK:  Good morning.

7              MR. GAGE:  Hello.

8              COURTROOM DEPUTY CLERK:  Good morning.  This is

9     Laura.  How is everyone today?

10             MR. GAGE:  Hey, Laura.  It's William Gage and Ben

11    Watson.  How are you?

12             COURTROOM DEPUTY CLERK:  I'm doing well, thank

13    you.  So I have the court reporter here.  This will be on

14    the record.  And if you all don't mind to just start with

15    plaintiffs' counsel and just let me know who's on the line.

16             MS. BAGGETT:  Renee Baggett.

17             COURTROOM DEPUTY CLERK:  Thank you.

18             MR. CARTMELL:  Tom Cartmell.

19             COURTROOM DEPUTY CLERK:  Tom Cartmell, yes.  Next?

20             MR. FAES:  Andrew Faes, F-A-E-S.

21             COURTROOM DEPUTY CLERK:  Thank you.

22             MR. ZONIES:  Joe Zonies, Z-O-N-I-E-S.

23             COURTROOM DEPUTY CLERK:  I'm sorry, I did not get

24    your first name?

25             MR. ZONIES:  Joe, J-O-E.

4

1          COURTROOM DEPUTY CLERK:  All right.  Thank you.

2      For defense counsel, please?

3          MR. GAGE:  William Gage and Ben Watson.

4          COURTROOM DEPUTY CLERK:  All right.  Anyone else?

5          MS. JACOBS:  Donna Jacobs.

6          COURTROOM DEPUTY CLERK:  Thank you.

7          MR. GAGE:  And, Laura, I know that Rich Bernardo

8   is joining the call.

9          COURTROOM DEPUTY CLERK:  All right.  Thank you.

10  It looks like we've got another minute.

11         MR. BERNARDO:  How's it going, William?

12         MR. GAGE:  Good.  Who is that?

13         COURTROOM DEPUTY CLERK:  Is that Mr. Bernardo that

14  just rang in?

15         MR. BERNARDO:  Yes, it is.  Good morning.

16         COURTROOM DEPUTY CLERK:  Good morning.  Is that

17  everyone as far as we know?

18         UNIDENTIFIED SPEAKER:  I think that Mr. Aylstock

19  is --

20         COURTROOM DEPUTY CLERK:  I'm sorry, I didn't get

21  that.

22         MR. AYLSTOCK:  I'm on.  Bryan Aylstock.

23         UNIDENTIFIED SPEAKER:  Yes, that's what I was

24  going to say, that's Bryan.  I thought he was joining.

25         COURTROOM DEPUTY CLERK:  All right.  If everyone

1    will hold one moment, I will get the Judge.

2          THE COURT:  Morning.

3       (Good morning, Your Honor.)

4          THE COURT:  All right, I think I know who all is

5    on the phone.  So tell me what's going on.

6          MR. BERNARDO:  Good morning, Your Honor.  This is

7    Rich Bernardo on behalf of Ethicon.  And thank you for

8    joining us.  The subject of this call are several 30(b)(6)

9    notices that plaintiffs served going back about a month or

10   so ago.  Two of them have -- (recording inaudible

11   interruption) -- are ripe for guidance from Your Honor, but

12   let me just describe the total package of them so you'll

13   have a little context.

14       So there are five total notices.  Three of them

15   essentially seek payments or information about payments or

16   contracts regarding a number of individuals, researchers,

17   authors, et cetera, and a number of entities.  A fourth one

18   seeks information regarding Ethicon's professional education

19   and training.  And that's a notice that had been served

20   earlier but had been -- (recording inaudible) -- in

21   connection with these other two notices.

22       And then the last one seeks information about Ethicon,

23   L.L.C., an entity that I understand was recently dismissed.

24       So those are the five notices by way of context.

25       Now, Ethicon has been meeting and conferring with

```
1    plaintiffs in an effort to try and narrow the areas of
2    dispute.  And we think we've completed our meet-and-confer
3    process with respect to two of the notices and, as I
4    mentioned, we have a couple of issues.  The other three we
5    have some agreements, but we're still in the process of
6    meeting and conferring to address any outstanding areas of
7    dispute, and due, I'll say, to no fault of either party, I
8    think, but it's been challenging trying to make sure the
9    right people are together to make sure we can penetrate
10   those and hopefully come to some agreement.  But if we don't
11   come to agreement, we were hoping that we might be able to
12   come back to Your Honor on any narrow areas of dispute on
13   those later next week, being mindful of the fact that you're
14   going to be away.  So if we have areas of dispute on those,
15   we were hoping we might visit with you again next Thursday,
16   if that's agreeable to you.
17        So, the two notices, the two notices at issue, one
18   notice pertains to payments made -- essentially payments
19   made and contracts with certain researchers, a Dr. de Leval
20   and Dr. Waltregny, going back well over a decade, an
21   organization called Medi-Line, in connection with some TVT-O
22   research that took place.
23        The other notice at issue pertains to payments and
24   contracts with approximately a dozen medical societies and
25   organizations.  And notably notices seek information
```

1    regarding -- and I'm quoting from some of them -- the

2    identity and terms and conditions of agreements; the amounts

3    paid; the services provided.

4        And the two issues we wanted to raise with Your Honor

5    today are, first, whether in response to these notices,

6    Ethicon really needs to put up a witness to talk about the

7    specific amount paid or what the contract says, given the

8    nature of that subject matter and all that Ethicon has done

9    and is willing to do to otherwise provide plaintiffs with

10   meaningful and useable information with respect to those

11   notices.  That's one issue that we want to discuss with Your

12   Honor.

13       And then the second issue is if Your Honor is of the

14   view that a witness does need to be tendered to one or both

15   of those notices, there are a couple of subject matters, and

16   one, in particular, pertaining to what I would characterize

17   as foreign regulatory issues that Ethicon objects to on the

18   grounds of relevance.

19       So as a preliminary matter -- and I think this is

20   important for context -- I want to make it clear, Your

21   Honor, that Ethicon objects to these notices really in their

22   entirety, on the grounds that at some point discovery in

23   this proceeding has got to come to an end.  And we think

24   that we're at or very near that point.  I think you're well

25   aware there have been over 20 million pages of documents

1    produced.  We've been through several trials.  And I

2    understand on different products, but we've tendered dozens

3    and dozens of company witnesses, many of whom have testified

4    for several days each.

5         And these notices, they were either served for the

6    first time or kind of re-served on the eve of the trial for

7    Huskey, which is, as you know, scheduled to begin next

8    month.  And these requests are becoming more and more

9    detailed, more and more burdensome.  They're asking for

10   minutia that is extremely difficult and time-consuming for

11   the company to collect and put together.  It's particularly

12   complicated by the fact that it dates back many, many years.

13        But, despite its objection, rather than coming to you,

14   Ethicon has agreed to provide the discovery with certain

15   limitations; it's agreed to go back and undertake a

16   substantial re-review and collection of documents previously

17   collected that -- where these payments or the information

18   about them may not have come through the agreed upon

19   filtered terms with plaintiffs; it's agreed to go out and

20   make additional searchs for documents that have been

21   extremely time-consuming just given that this stuff is, I'll

22   say, it's sort of like a scavenger hunt, going all over

23   Europe, to try and find it; and it's also agreed to do all

24   of this on an expedited basis so it could get material to

25   plaintiffs by the end of this month, which may not sound to

1    Your Honor like expedited, but I will represent that, given

2    the types of efforts that we're going through to get this

3    information, I mean, that's been a very, very quick

4    turnaround.  So why are we here if we've agreed to do all of

5    this?

6        I think the reason we're here is that while we're

7    agreeable to get by our objections and produce documents,

8    Your Honor, Ethicon just simply doesn't believe that these

9    subject matters are appropriate for a deposition, in that

10   propelling a witness on them to be able to testify about

11   what the document says with respect to how much was paid to

12   somebody or what a contract says, and having a witness get

13   on top of all of that, particularly at this stage of the

14   litigation and this close to the Huskey trial, is very, very

15   burdensome, and it's also not the most efficient way of

16   addressing this.

17       I think history has shown in this case that after

18   documents are produced, there are a myriad of questions that

19   arise that many times the plaintiffs raise issues that

20   require further inquiries.  And that can't be addressed by a

21   witness, you know, on the spot, at a deposition.

22       So we proposed to plaintiffs, look, we'll produce the

23   documents; we'll work with you to either agree on

24   stipulations so that we -- we don't need to put a witness in

25   the chair, which is really what we think should be the

1    appropriate way, but worst case, if there's some narrow,

2    specific testimony that is needed after the parties work

3    together reviewing these materials, then we can

4    meet-and-confer on that.

5         Now, when we related that, plaintiffs said, well,

6    that's why you have this 10-day buffer period between the

7    time when you produce the documents and the deposition.  But

8    that's clearly insufficient time to allow plaintiffs to look

9    at the material, raise issues with us, and have us go back

10   and deal with them.  And I think we're all jammed up against

11   the Huskey trial, and we're trying to, again, do what we

12   think is reasonable and propose reasonable alternatives.

13        But, again, we're simply objecting to having to prepare

14   30(b)(6) witnesses on these subject matters at this stage.

15   So that's one issue.

16        And then the second issue is -- and I'll topline that

17   very much, because if the first issue is resolved favorably,

18   then we may not get to the second.  But the second issue is

19   three specific topics on what I'll call the de Leval notice,

20   the notice about this researcher.  And what plaintiffs

21   essentially want is discovery about this third-party's

22   potential regulatory violations a decade ago in connection

23   with that research.

24        Now, Mr. Gage, who is also on the call, can backfill

25   with any detail, if Your Honor desires, but essentially, as

1    I understand it, this researcher may not have complied with

2    full on regulatory rules in connection with that research.

3    And plaintiffs want Ethicon to put up a witness to testify,

4    I guess, as to whether or not that conduct violated

5    regulatory rules in Europe; and, if it did, whether Ethicon

6    decided to report it or do anything about it.

7        And it's Ethicon's view that that kind of testimony and

8    that subject matter is clearly not relevant, clearly not

9    admissible.  Given the types of rulings on foreign

10   regulatory or regulatory matters in the prior trials, it

11   clearly wouldn't be admissible at trial.  And, in any event,

12   we have agreed, notwithstanding our objection, to look for

13   documents, if any, pertaining to that.  We've not found

14   anything relevant yet, but we've agreed to produce the

15   documents and again work with plaintiffs.

16       So to sum up, and then I'll answer any questions or let

17   plaintiffs speak:  We object to putting up a witness with

18   respect to these two notices.  And if we do have to put up a

19   witness, we object to having the witness have to be prepared

20   to testify about a matter that is clearly, clearly not

21   relevant.

22       Thank you, Your Honor.

23          THE COURT:  All right.  Thank you.  Well, let's

24   hear then from the plaintiff.  And we'll start off with the

25   fact of having to put up 30(b)(6) witnesses.

1          MR. CARTMELL:  Good morning, Your Honor, this is

2     Tom Cartmell.  I'll respond to that.  Really, we have just a

3     little bit of background on this.  We have been talking

4     about these notices on multiple meet-and-confer calls for

5     two or three weeks.  And with respect to the society

6     payments Notice, primarily, we've -- they've told us from

7     the beginning that they did not want to put somebody up, but

8     they would rather put -- just give us documents that say,

9     you know, here's the amount that was paid to AUGS; here's

10    the amount that was paid to AUA, American Urology

11    Association, and things like that.

12         And we have had those discussions in the past related

13    to 30(b)(6) motions.  You may remember that, that our

14    notices -- we had a 30(b)(6) notice related to the amount --

15    the number of implants in women.  And the same argument was

16    made.  I can't -- I did not go back to look at the

17    transcripts, but I think maybe that was one that was in

18    front of you previously.  And we ended up -- they produced a

19    witness and we took the deposition with the documents.  Of

20    course, we explored beyond just the actual number, because I

21    Noticed extra things other than just the number.

22         And in this case, for instance, in our society payment

23    Notice, we do just -- we do ask for the amounts of payments

24    to multiple societies.  And the societies listed are all the

25    societies that the defense has referred to in the trials

1    that we've had.  Actually we've only had one-half trial in

2    the MDL, unfortunately.  I was the plaintiff's attorney that

3    was on that case and resulted in a half of a trial.

4         But we did have a state court case, and in that case,

5    these are the societies -- or the Notice includes the

6    societies that were referred to routinely by defense counsel

7    in their defense of the case, saying that, you know, all of

8    these -- I think it's eight or ten societies -- support that

9    slings and mesh is safe and effective for women.  So we had

10   intended to do this discovery prior to those trials.

11        In January of this year, in New Jersey, Adam Slater had

12   served a Notice related to payments to societies.  We were

13   going to trial in Texas, I think in March, and we, frankly,

14   we talked to Adam about that and were intending to do that

15   discovery beforehand, or let him do it, because we were just

16   -- the MDL was tied up with that trial.  And so we didn't

17   get the Notice out until May 23rd of this year.  Although,

18   they have been on notice that -- in New Jersey, that that

19   was a topic that was going to be asked for.

20        On the issue of whether or not a witness should be put

21   forward on this, I will tell you, Diane Watkins, a lawyer

22   from my firm, has done research on that.  I suspected there

23   might be some sort of case law that was out there dealing

24   with whether or not a defendant can claim that the best form

25   of discovery would be in the form of, you know, a

1    stipulation, like they've asked us to do, or interrogatory

2    answers, those sorts of things.

3        There's nothing that we have found dealing with a

4    stipulation, but there is, there's case law -- lots of case

5    law, actually, where defendants have made this same sort of

6    request of a court.  They've said, look, it would be more

7    efficient to do it by an interrogatory answer is typically

8    the context in the cases.  And every single case that we

9    have found has -- the Court has said that that's not

10   appropriate; that a 30(b)(6) deposition is different than

11   the scope of an interrogatory answer.  And I would argue

12   that it's different than a stipulation; that the plaintiffs

13   can choose the form of discovery that they, they would like.

14   In some cases, it's an order.  They can choose the order, if

15   they want to do the deposition before the interrogatories.

16   And that it's -- the scope is greater, because it's intended

17   to bind with the testimony that can be used at trial, under

18   oath, and have a witness from the company designated who can

19   bind the corporation.

20       And the courts realize that, you know, it's not just

21   asking for one, single response, like a number for payments,

22   but that we're asking for testimony related to topics.  And

23   our Notice, our society Notice, for instance, and in the

24   de Leval Notice, as well, we have several topics, including,

25   you know, the location of the documents related to payments.

1    Because, the Court might remember, when we took in a TVT

2    case the deposition of a designee, Ms. Angelini, that it

3    became apparent to us when we got to the deposition that

4    there were lots of documents that they couldn't find; and

5    she told us when we got there, that from 2003 prior, they

6    could not find any -- they were unable to locate, I think is

7    what she said, any documents related to payments.  And the

8    reason for that was they had to go to different foreign

9    entities to look.  And the foreign entities had not kept any

10   of that material.

11        So we've asked, of course, in this one, if we can

12   have -- you know, if that's going to come up, we need to

13   know and discover where these documents are; what they did

14   to look for them.  And we're asking for more than just a

15   number.  In other words, we're asking for the terms and

16   conditions of the agreements; we're asking for what types of

17   activities they've done with these corporations -- or,

18   excuse me, these societies; we're asking for committees that

19   they have served on; we're asking for correspondence between

20   the companies related to the papers on slings and mesh that

21   they have, that they have between them.  And, and --

22             THE COURT:  Mr. Cartmell -- Mr. Cartmell --

23             MR. CARTMELL:  Yes.

24             THE COURT:  I hate to interrupt you, but I don't

25   want to let you go on too long before I interrupt, because I

1    want to make sure I understand.  Because you all know I have

2    absolutely no paperwork in front of me, so I'm just

3    listening to you, and trying to figure out what it is that

4    you've asked for and what it is that Ethicon doesn't want to

5    do.

6         So --

7              MR. CARTMELL:  Okay.

8              THE COURT:  So, as I understand it, you have

9    served them with some 30(b)(6) notices.  And at least some

10   of these notices are asking for contracts and payments

11   pertaining to various societies, or research entities, or

12   medical associations, in which Ethicon has some sort of

13   relationship.  And apparently at a trial, Ethicon has said

14   these various groups or organizations are supportive of the

15   mesh.  And so you want to know what the money exchange is

16   between the two.  Am I following you?

17             MR. CARTMELL:  Yes.  That's --

18             THE COURT:  So we're not talking about

19   individuals.  We're talking about societies or medical

20   associations or groups of some sort?

21             MR. CARTMELL:  Yeah.  We're talking about

22   societies, or medical organizations only, not specific

23   individuals.

24             THE COURT:  All right.

25             MR. GAGE:  And, Your Honor, this is William Gage.

1    This is a minor point, but I do think it's important to

2    clarify so that the record is correct.  Mr. Cartmell had

3    mentioned that in a prior trial the defense had referred to

4    these societies throughout the trial in support, in support

5    of the -- (recording inaudible) -- mesh.  And Tom is

6    referring to the Batiste trial, which was in Texas state

7    court, which Tom and I tried against each other.  And I

8    believe it's a fair statement to say that I tried mightily

9    to get that information into evidence, but the Court did not

10   let me put that into evidence, except there was one

11   particular society that the Court allowed us to put a

12   statement into evidence because of some relatively minor

13   issue.

14       But I think the record is clear from that case, that we

15   did try to put that information into evidence, but the Court

16   did not allow it.  So I just wanted --

17           MR. AYLSTOCK:  Judge, this is Bryan Aylstock.

18   Sorry to interrupt.  But we actually filed a Motion in

19   Limine on these societies and statements of societies in the

20   Lewis trial and Judge Goodwin denied it.  And we do firmly

21   believe -- and we're not looking to take willy-nilly

22   discovery -- but this is very likely to be an issue in the,

23   in the Huskey or Edwards case.  It's very likely to be an

24   issue, and in a lot of MDL cases.  And the Notice really

25   relates to payments and correspondence and agreements

1   between Ethicon and J&J, and these societies, because we

2   know that Ms. Jones or Mr. Gage is going to come up -- if

3   they are allowed to by Judge Goodwin or any other judge --

4   to say, this society, that society, all of these have made

5   statements in one way or another supportive of mesh.  And it

6   goes directly to the bias on that.

7        Now, the idea that a stipulation would, you know --

8   they said, well, why don't you just agree to a stipulation?

9   Well, we need the information, first of all.  You can't -- a

10  stipulation means by agreement.  We don't agree.

11       We'd simply like somebody in the chair to help us go

12  through -- we've got some documents, but they're confusing

13  and they don't make a lot of sense a lot of times.  So

14  putting someone in a chair on this very issue is going to,

15  we believe, directly affect the -- one of their main

16  defenses in this, because they're going to be running up

17  this society and that society.  So it's not -- it's not --

18  it's borne by what we believe and what we know the defense

19  is going to use to try to defend themselves in this case.

20            THE COURT:  All right.  So we have these notices

21  and they involve payments made by Ethicon or J&J to various

22  societies and medical associations that have allegedly made

23  statements supportive of the mesh.  And what you want to

24  know is -- or what you want is to have a 30(b)(6) witness

25  come and talk about the amount of the payments, any

1    contracts, I guess, that exist.  And what else?

2         MR. CARTMELL:  There's also, Your Honor, questions

3    about memberships and positions within these societies.  In

4    other words, they are members of -- Ethicon has members of

5    these societies, and they have memberships designated.  They

6    pay money for that.  They do other things.  They provide

7    goods and services to these societies that we've asked

8    about.  They've also got positions on committees and in

9    leadership in these societies.  In other words, people from

10   Ethicon who are involved in that.

11        And then we've asked for communication between them, as

12   well.

13        THE COURT:  Okay.  And you want to go ahead and --

14   you don't want to look at the documents first to figure out

15   whether there really are any questions that you need to ask;

16   you want to just go ahead with a deposition?

17        UNIDENTIFIED SPEAKER:  Well, we --

18        UNIDENTIFIED SPEAKER:  Well, we looked at the

19   documents, Judge.  The ones that we could find.

20        THE COURT:  Have you received all the documents?

21        UNIDENTIFIED SPEAKER:  Judge --

22        UNIDENTIFIED SPEAKER:  Not pursuant to the notice,

23   no.  I'm sorry.

24        MR. BERNARDO:  Judge, this is Rich Bernardo.  Let

25   me clarify.  We've been trying to be as clear and

1    transparent with plaintiffs as we can as to what we've done,

2    where we're looking, and what the timetable is; and in the

3    last discussion I had with plaintiffs' counsel to let them

4    know that we've produced some of this stuff as of -- some of

5    the documents, excuse me, as of the end of June, but there's

6    still materials that are coming in that would be produced in

7    the middle of July.  And then we're still just having

8    difficulty even trying to figure out where some of these

9    materials would be and collect that.  But we've undertaken

10   to get them by the end of July.  So we've not yet produced

11   all the materials.

12       And we've also offered, once the materials are

13   produced, to meet-and-confer with plaintiffs' counsel and go

14   through them informally to try and address any questions or

15   issues, because we feel as if that probably will give them

16   more concrete or specific information, because if they have

17   questions, we can go back and try and fill them in.

18       And then if, after this process, this has all been

19   narrowed and there's some discrete area of testimony, then

20   maybe we can talk about that.  But we're talking about a

21   process to avoid the very kinds of things that happen where

22   we produce the documents, a witness who's generally familiar

23   with them is sitting in the chair, and then the plaintiffs

24   ask the question, and the witness is, well, I'm sorry, I

25   can't answer that; I'd have to go to X, Y, and Z.  And then

1    we're kind of back to square one again.

2         THE COURT:  Well, let me ask Ethicon a question.

3    Are you intending in the Huskey case to introduce evidence

4    about various medical associations and societies?  Is this

5    going to be an issue that you're presenting at the trial?

6         UNIDENTIFIED SPEAKER:  Judge, these societies have

7    published statements within the last several years where

8    they speak very favorably of the mesh.  So it is anticipated

9    that -- I mean, what these are, these are mostly like

10   organizations of doctors, and they speak through their

11   designated boards and that sort of thing.  And we would want

12   to reserve the right to be able to use those, because they

13   are -- they are representative of the physician groups that

14   use the devices throughout the country.  And actually, I

15   think some of them might be -- well, yeah, I mean they're

16   representative of large physician groups.

17        THE COURT:  Well, if you want to reserve your

18   right to introduce that sort of evidence, then clearly the

19   plaintiffs have a right to discover whether there's any sort

20   of bias that may underlie the opinions and support that

21   these associations are giving to your product.  So they're

22   going to have the right to discover that.  And I don't --

23        UNIDENTIFIED SPEAKER:  Actually, we agree with

24   that.

25        THE COURT:  Right.  And I don't know, then, that

1    just providing them with paperwork is going to be enough.

2    It may be that the paperwork is truly confusing or they

3    can't -- they can't put their chronology together or they

4    can't lay the trail; they don't understand how it works

5    within the society and they need some sort of testimony.  I

6    don't know that necessarily the Ethicon person is the place

7    to go.  Maybe the place to go is to the society or the

8    association and find out how it works.  But what I'm saying

9    is, you know, they may have a point that they need to get

10   some testimony on it.  It's hard for me to tell, because I

11   haven't seen any of the paperwork, so I'm not sure how

12   confusing these things really are.

13       I hear Mr. Aylstock saying that he's looked at some of

14   the paperwork and he finds it to be confusing.  If that's,

15   in fact, true, then he would be entitled to have someone

16   give him some explanation as to what it means, because I do

17   think bias would be a legitimate avenue for them to explore.

18              UNIDENTIFIED SPEAKER:  Your Honor, and just so

19   we're clear, I think -- and I agree with that.  It's not

20   that we're trying to deny them the right to do the

21   discovery.  I think what we're trying to request is the

22   process by which we get there.  And we just think that the

23   process would be better served for them to await the

24   production of documents, and then, then we can try to work

25   with them to, to offer stipulations to try to narrow the

1    issues.  And then if that doesn't work or if there's some

2    aspect that can't be narrowed, then if we have to, we put

3    somebody up, but -- so it's not really -- we don't want --

4    we're not trying to stop all the discovery, it's that --

5    it's really more the process of how we get there, Judge.

6            THE COURT:  Well, I think I hear them saying they

7    don't want to do it that way and they don't have to do it

8    that way; they have the right to select the way they want to

9    do it.  I don't necessarily agree that that's true.  I think

10   the Court does have some control over what would be the most

11   efficient way to go about it.  The concern that I have is if

12   this is going to be an issue in the Huskey trial, I'm not

13   sure that there's time to wait for you all to produce all of

14   your paperwork, and then go through it, and then try to

15   decide whether you can agree on certain stipulations, and

16   then try to take depositions, because -- when is this trial

17   supposed to begin?

18           UNIDENTIFIED SPEAKER:  Late August.

19           UNIDENTIFIED SPEAKER:  August.

20           THE COURT:  Late August.

21           MR. CARTMELL:  Your Honor, the way we've handled

22   this in the past, you may recall, is they have produced

23   documents ten days before our 30(b)(6) depositions.  That

24   gives us time to review those.  And then we had worked -- in

25   the past, you know, if there's issues that come up and we

1    get those documents and we think they're incomplete or we

2    have questions, that gives us the kind of time that, you

3    know, we need to go through that.  And, frankly, you know,

4    with Angelini and several others it's worked fine.

5         And so when Richard, you know, told me that, I said,

6    look, I'm fine with having meet-confers after you give us

7    the documents; we'll do that.  And if for some reason, you

8    know, things went crazy and we needed more time or you did,

9    after you give us the documents, and we can maybe push the

10   deposition back.  But the problem is, I didn't want to just

11   delay and say, no date has been set with this witness, who's

12   a 30(b)(6) designee, and give us the documents and then

13   later, you know, have a date.

14        I said, give us the date.  We'll have the person set up

15   for the deposition.  If something comes up, maybe we move it

16   back a few days or a week or whatever.  But ten days before,

17   give us the documents, we'll look at them, we'll chat with

18   you.  If we have issues, we'll take them up during that

19   period of time.

20             THE COURT:  I think that's the way you're going to

21   have to do it, simply because of the timeframes.  And having

22   said that, Mr. Cartmell, I certainly don't want to hear that

23   you went to a deposition and spent four hours asking

24   somebody to read how much they paid a various association.

25   I mean that would be, you know, abusive I think.  If you've

1    got documents that are clear, there's no sense to go over

2    that sort of thing when something like that could be

3    stipulated.

4        And if it's stipulated, you can argue it; you can put

5    it before the jury.  There's no reason why you can't use it.

6    Something like that.  In fact, if anything, I think a jury

7    would appreciate it if you would just use it and argue it,

8    rather than make them sit there while you have somebody go

9    through page after page after page, reading to them how much

10   money they've received for something.

11       So -- but I do think what the plaintiffs are saying, I

12   think that's the way it's going to have to be done because

13   of the timeframe.  I think you need to get the documents to

14   them, but you probably need to set a date up some time,

15   perhaps, early in August of some witness who will be

16   prepared to go through these things.

17       And then you need to try -- the plaintiffs need to try

18   to really skinny down the true issues that they have some

19   confusion on, to ask this witness, so that this witness

20   isn't trying to -- because, you know, whoever Ethicon gets

21   is not going to know in advance, is not going to be able to

22   know the information that you want.  Because I doubt that

23   there's anyone in the organization who is familiar with all

24   of this information.

25       Is there anybody, Mr. Gage, or, Mr. Bernardo, who, who

1    really rode herd on all of the deals with all of the various

2    associations, over all of these years?

3            MR. BERNARDO:  No, there's not -- this is Rich

4    Bernardo, Your Honor.  No, there's not.  And that's one of

5    our difficulties.  And we understand Your Honor's ruling,

6    and we appreciate the guidance you give, because you've

7    addressed our precise issue.  As to timing, I just will say

8    for the record that, that part of our objection is that the

9    time crunch we're in is largely, if not completely, the

10   plaintiffs' making by raising these things now at this stage

11   of the discovery.  Had we been back six months or a year

12   ago, perhaps we wouldn't be here.

13       But part of our, our difficulty is that it is going to

14   be very time-consuming for us to get a witness educated on

15   the payments to each of these -- what the systems were used

16   to figure that out, where they are, where there were gaps;

17   where records might be.  I mean, it's not a centralized

18   system where you push a button and, you know, print out a

19   spreadsheet of each of these organizations.

20           THE COURT:  Right.  And let me clarify, too.  Let

21   me clarify my thought process here, as well.

22       I really do not think that the plaintiffs need

23   information that detailed.  I'll tell you, for one thing, if

24   that's -- if that's what you're trying to get, I don't know

25   why, because that is never going to be important to anybody

1    listening to this case.  I mean, I can understand wanting to

2    know how much money Ethicon has paid various organizations

3    over time, and what kind of a relationship Ethicon had with

4    these organizations, and what the give and take was; whether

5    Ethicon contributed to certain projects of these various

6    organizations, and sort of the big picture, but I think if

7    you're going to really dig for nitty-gritty, fine details, I

8    cannot expect that they're going to be able to produce that

9    to you, number one.  Number two, I wouldn't -- I wouldn't be

10   very upset with them if they couldn't.  And number three, I

11   don't think anybody is going to be prepared to testify about

12   that.  Again, I wouldn't be very upset if they couldn't get

13   someone prepared to testify about that.  And I don't think

14   it's going to be helpful to you.  It's just a waste of time.

15   And if you bring that sort of thing into this trial, Judge

16   Goodwin is going to kill you.

17        It's -- that is the kind of brutal -- that's the sort

18   of brutal evidence that nobody wants to hear.  They want to

19   hear the big picture.  They don't want to hear little,

20   nitty-gritty things that nobody cares about.

21             MR. CARTMELL:  Your Honor -- yeah, no, Your Honor,

22   you're exactly right.  And we get that.  I mean, I will tell

23   you that our intent is exactly as you say.  You know, I was

24   really talking about the Lewis trial previously, because Ms.

25   Jones in her opening statement put up a slide that had all

1    the logos for these societies that we're asking about and

2    said, look, every single one of them is supportive of mesh.

3        Our response to that, like you say, is very -- you

4    know, it's very simple.  And that is, look, here's all the

5    money they've paid to these societies and all of the

6    relationships they have with these societies.  That's it.

7    We're not going to dig into the nitty-gritty.

8        We do think they have that information, because a lot

9    of it -- you know, we found out during Angelini's deposition

10   related to payments to doctors is that the marketing people

11   are the ones that monitor this -- these sort of payments,

12   and there is a system that they use to, to track those.

13       So that's all we want.  And we will not go into the

14   weeds.  We understand that we won't be able to do that at

15   trial either.

16            THE COURT:  All right.  Well, don't do that.

17   Don't do that.  Don't do that in your notices; don't do that

18   at the deposition.  And don't expect them to have someone

19   prepared to do that.  And as I said, if, if they don't have

20   someone prepared to do that and you come back and you

21   complain about that, I am not going to be sympathetic.

22            MR. CARTMELL:  Okay, I understand.  For

23   clarification, I will say, what happened the first time was,

24   we got there and we said, okay, how much did you pay Doctor,

25   Dr. -- Dr. Nilsson (phonetic) or Ulmsten.  And we did get

1    there.  And they said, well, we paid them a lot of money in

2    2003 to 2010.  And we entered that into evidence, and we had

3    a little two-minute clip on that.

4         But then we found out that, you know, they hadn't even

5    looked in certain places and they couldn't find it.  I mean,

6    I would want for us to maybe ask about those types of

7    things, Your Honor, just -- because an answer, "We didn't

8    look," or, "We don't know," is equally as relevant to us.

9    But that's it as far as digging.

10             THE COURT:  Right.  I think the broad, the broad

11   issues, like how much money did you pay this organization in

12   this year, or, how much money did you pay them over this

13   five-year period, and what did you pay them for; did you pay

14   them to do research on pelvic mesh; did you pay them for

15   advertising; did you pay them for -- whatever; what is your

16   relationship with them; what committees do you serve on.

17   Those sorts of things are legitimate questions.  Some of the

18   finer -- like going through a contract in detail is just

19   ridiculous.  And that's what I don't want to see you doing.

20             MR. CARTMELL:  Okay.

21             THE COURT:  I do understand what Ethicon is

22   saying.  These are the kinds of things that should have been

23   done a year ago.  And I can understand why they're peeved to

24   have to be doing this a month before trial or two months

25   before a trial starts.  I understand that.  But, you know,

1     if you're going to go to trial, Mr. Gage, and, Mr. Bernardo,

2     and you're going to talk about these associations -- and I

3     heard you say, if I'm not mistaken, that some of these

4     publications are recent -- then the plaintiffs have a right

5     to explore your relationship with the people that are

6     publishing these articles.  And that's just the way it is.

7          So let's use some common sense in this discovery is all

8     I'm saying.  I am not going to prevent them from taking a

9     deposition if they truly need a deposition, but let's try to

10    work through this, and remember what the goal is, which is

11    to present a case to a jury that they can understand and

12    appreciate, and not one that's going to put them to sleep.

13                UNIDENTIFIED SPEAKER:  Okay.  And, Your Honor --

14                UNIDENTIFIED SPEAKER:  And, obviously, we're not

15    going to have a lot of time for them, given Judge Goodwin's

16    directive on how long these need to last.  So we totally get

17    that.

18                THE COURT:  I'm telling you, they're getting

19    shorter every case -- every trial, too.  Every time he sits

20    through one, I think I hear him cut a few hours off the next

21    one.  So, I'm warning you, they're going to get shorter and

22    they're going to get shorter.

23         Now, the second issue was this particular researcher.

24    Plaintiffs, tell me, what is the deal with the researcher.

25    Why do you want to know what he did wrong?

1              MR. AYLSTOCK:  If I could, Your Honor, this is

2     Bryan Aylstock again.  Joe Zonies is on the phone, and I

3     wanted to introduce him to you.  He's a member of our PFC,

4     and he's been doing a lot of the TVT-O specific discovery

5     and has a lot of knowledge about Dr. de Leval.  So if I

6     could just introduce Joe.

7              THE COURT:  All right.

8              MR. ZONIES:  Good morning, Judge.

9              THE COURT:  Good morning.

10             MR. ZONIES:  Joe Zonies here.  It is a pleasure

11    being in front of you.  This is my first time.

12        Judge, this is about -- the trial coming up is about

13    the TVT-O device, obturator approach.  And Dr. de Leval is a

14    Belgian scientist and doctor who developed the device.  In

15    2003, at the end of the -- 2003, Ethicon went in and entered

16    into an agreement with Dr. de Leval to have exclusive --

17    essentially exclusive rights to sell the TVT-O device.  And

18    within a year, by the end of, I think it's 2004, at -- maybe

19    -- yeah, 2004, Ethicon rolled TVT-O out into the market.

20        And the primary focus is what happened between the time

21    of 2003, during the development and the time that it rolled

22    out to market, in that one-year period.  And the reason that

23    Dr. de Leval is important is because he had exclusive access

24    to all of the trial information.  He was the only scientist

25    -- or he and his associate, Waltregny, were the only two

1    doctors who ever utilized this device before it went to

2    market.  So they were the sole owners of all of the

3    information about the device.

4         And part of what happened is, is during the

5    development, in the first part of 2004, Ethicon continued to

6    ask Dr. de Leval for his data and his clinical data showing

7    that the device was safe and effective.  And he continued to

8    not be able to provide it to them.

9         So, ultimately, Ethicon hired a company called

10   Med-Alliance to go in and take a look at what was going on

11   in the lab in Belgium.

12        And that scientist wrote a very long report back to

13   Ethicon, saying, there's a problem; Dr. de Leval has

14   essentially been experimenting on women without the proper

15   authority to do so from the authorities, and he's been doing

16   it without the proper consents, and he's been doing it

17   without -- we don't have true paperwork showing that the

18   device is safe and effective.  And I believe he may have

19   subjected himself and Ethicon potentially to criminal

20   liability because he's taking TVT devices -- Ethicon knows

21   he's taking these devices; he's manipulating them, changing

22   them, putting them together, in violation of both European

23   and U.S. regulations, and then putting them into women who

24   don't know that he's doing an experiment on them, because

25   they haven't consented to an experiment.

1    We have -- we've pieced together that sort of testimony

2   and story through multiple depositions.  And in those

3   depositions, we've asked the question, what was the

4   company's position, once it knew he had done this, what did

5   the company do about it.

6    And the most that we've gotten is -- it was actually a

7   document that says, in 2004, oh, my gosh, we want nothing to

8   do with this study that this guy has done.  He denied it,

9   even though he's paid for it, and our contract says with him

10   that we can back out of it completely.  But that comes from

11   the people in the field.

12    And we are seeking in this case, in deposition,

13   Ethicon's position on why and what they did about the fact

14   that Dr. de Leval had essentially violated the law in his

15   initial clinical trials, and why Ethicon denied that it had

16   any involvement in those clinical trials, when it did; and

17   that, ultimately, what did Ethicon do to try to ensure the

18   device was safe and effective before they started selling it

19   to thousands of women, when it was the same scientist that

20   they used before they -- the only scientist whoever used it

21   before they started to sell it on the market.

22    And so the questions are really what is the

23   corporation's -- what was the corporation's thinking and

24   position on these very serious issues before it started

25   marketing this device, when it used only the person who had

1    created the data supporting the device illegally.

2             THE COURT:  Well, I don't see -- I'm not seeing

3    how that's relevant.  I really -- I'm not.  Are you saying

4    that some of the women in the MDL were experimented on by

5    this Dr. de Leval?

6             MR. ZONIES:  No, no, not at all, Your Honor.  I

7    don't mean to imply that at all.

8             THE COURT:  So he didn't have anything to do -- he

9    didn't have anything to do with any of the women in the MDL?

10            MR. ZONIES:  Well, he created the device, and the

11   only data that Ethicon had when it started marketing the

12   device was his data.  So any woman who got the device in the

13   United States did so based upon this data that Ethicon knew

14   was not accurate data.

15            THE COURT:  Well, I didn't hear you say -- I

16   didn't hear you say anything about the accuracy of the data.

17   I heard you say that he didn't follow foreign laws as to how

18   he was accumulating the data.  That he was not --

19            MR. ZONIES:  No.

20            THE COURT:  Okay.

21            MR. ZONIES:  Your Honor, I apologize.  It is also

22   the accuracy of the data.  It's important to point out that

23   the investigator that Ethicon sent over -- Ethicon hired him

24   to go in and see what happened.  He reported back that the

25   data was incomplete, that the data was not captured

1    correctly, and that there wasn't, frankly, sufficient data

2    that was done in a correct way.  Not even -- I'm not even

3    talking about the regulatory aspects, but literally that the

4    data was not collected correctly.  We've asked for the data

5    itself and have not been able to get that.

6              MR. BERNARDO:  Your Honor, this is Rich Bernardo.

7    I think the record is getting very clouded by this

8    discussion, because, back to Your Honor's point about

9    relevance.  If I may, let me just for clarity read the three

10   subject matters at issue, because they have nothing to do

11   with the accuracy of the data.  They're purely about whether

12   or not he violated -- and, if I may, I'll just read the

13   three.  They're very short.

14        One topic is:  Any conclusion reached by defendants as

15   to whether or to what extent conduct by Dr. Jean de Leval or

16   Dr. David Walregny violated any Government or regulatory

17   rules, laws, or regulations in connection with this study of

18   any TVT product, component or prototype.

19        The next one was:  Any decision reached by defendants

20   as to whether to report violation of any applicable

21   regulations or laws by Dr. Jean de Leval or Dr. David

22   Waltregny to any Government regulatory authority.

23        And finally:  All reports or communications made by

24   defendants regarding violation of any rules, regulations, or

25   laws by Dr. Jean de Leval or David Waltregny to any

1    Government or regulatory authority.

2        Those are the three subjects we're objecting to.  And

3    we're objecting to them on the grounds of relevance, for

4    many of the reasons Your Honor's already stated.

5            THE COURT:  Well, I agree.  I don't think any of

6    those things are relevant to the issues in this case.  I

7    don't see it.  It sounds to me like what you're trying to do

8    is explore how bad Ethicon is.  You want to show that it's a

9    bad company, a mean, criminal company.  And so you want to

10   explore how they had this little, evil scientist, this mad

11   scientist there overseas doing these experiments on women.

12   And I'm just -- I'm not going there.  That's not what the

13   case is about.

14           MR. ZONIES:  Well, and -- and I understand what

15   you're saying, Your Honor, and I appreciate that.  I think

16   what we're trying to do is, through a discovery mechanism --

17   again, whether or not this gets admitted at trial I think is

18   a whole separate issue -- but through a discovery mechanism,

19   try to determine whether or not Ethicon, frankly, the

20   corporation, knew of these things or whether or not it was,

21   you know, perhaps, somebody in France or, you know, making

22   decisions without the corporation knowing and understanding

23   how this data was developed.  And if the corporation itself

24   did not understand that, I think it's something that's

25   relevant for when the corporation then started selling the

1   devices.  The corporation -- I'm sorry, go ahead.

2       THE COURT:  The three topics that Mr. Bernardo

3   just read to me are not relevant to this case.  They're not

4   relevant.  And I'm not going to allow you to do discovery on

5   those three topics.  I don't think those topics have

6   anything to do with the issues in this case.

7       MR. ZONIES:  And to be -- I just want to

8   understand the scope of that, Your Honor, and that's the

9   extent that it's, whether or not those three topics, any

10  conclusions reached by Ethicon about whether or not there

11  was a violation of any rules or regulations.

12      THE COURT:  I don't think whether this, this

13  scientist violated the laws of a foreign Government is

14  relevant to this case.  And that's what these three topics

15  really have to do with is whether Ethicon knew he was

16  violating rules or regulations or laws, whether they wanted

17  to report it, whether they did report it; what they did with

18  it.  I don't think any of that is relevant to this case.

19      Whether his data was accurate or not, whether they

20  relied on his data, that would be relevant to the case.  But

21  that's not what you're asking about in these three topics.

22      And, apparently, that information you've already

23  discovered, because you're telling me that you've gotten

24  information from Med Alliance that none of his data was

25  really accurate.  So it sounds like you've discovered what

```
 1    is probably the accurate portion of this particular person's

 2    information.

 3              UNIDENTIFIED SPEAKER:  Just for clarification,

 4    Your Honor, you mentioned that -- whether or not this

 5    scientist violated the law, but is it relevant -- I guess

 6    our position is that it would be relevant if Ethicon

 7    violated the law.  In other words, if Ethicon knew of these

 8    violations and as manufacturing a medical device have a duty

 9    or responsibility to report things, or make sure that the

10    accuracy of the data was, in fact, accurate, but they failed

11    to do that, I guess that's where we think there's, at least,

12    a discoverable issue.

13              THE COURT:  But you're talking about the laws of a

14    foreign government, right?  I don't know how that's

15    relevant.  I don't understand how you think that's relevant

16    to this case.

17              MR. ZONIES:  Well, I may not have explained it

18    clearly.  And because what Tom said is correct, it's not

19    really whether or not he violated the law, what it is is, by

20    -- Ethicon knew -- it's our position that we need to

21    demonstrate -- but Ethicon knew that he was taking TVT

22    devices and manipulating and altering those devices and then

23    implanting them into women.  And from Ethicon's standpoint,

24    and under the U.S. laws, potentially, that is a violation of

25    U.S. regulations, U.S. laws, as well.
```

1        So the issue really is not about whether or not what

2    Waltregny and de Leval did as much as what did Ethicon do,

3    the company, when given this information, or did they even,

4    frankly, know the information.

5        We have the Med Alliance report, saying that his data

6    was inaccurate and discussing these issues about altering

7    devices, but what we don't have is the company's position on

8    what it did when it received that report.  We only have,

9    essentially, the report itself, and the people on the ground

10   who got it that didn't ultimately make the decisions or have

11   the knowledge about what to do in response to it.  That's

12   what we're looking for.

13       It's not so much about the violations themselves, but

14   the company -- what were the actions and decisions based

15   upon, and whether or not it knew that.

16           MR. BERNARDO:  And, Your Honor, this is Rich

17   Bernardo again.  And I read the subject matters into the

18   record precisely for the reason that that's -- that is not

19   what the subject matters are, number one.

20       Number two, exploring the conduct of somebody well over

21   a decade ago in a foreign country with respect to research

22   he did prior to any relationship, contractural relationship

23   with the company is so far astray from relevant information,

24   it clearly would not be admissible.

25       I'm not even sure, Your Honor, we could figure that

1   out, because now what we're talking about is not objective,

2   like the payments or anything like that, but it's now what

3   is borne out by any of the documents.  And we agreed to look

4   for anything that might discuss this and provide them to

5   plaintiffs.  And to date, we've not found anything that

6   would discuss this.  So it's almost -- it's almost

7   impossible even to address.

8        And, again, for the reasons you said, it's completely

9   far astray from any of the issues or individuals in this

10  case.  And it's, again, trying to pin Ethicon as a bad

11  company for not taking action on some conduct that's not

12  even clear as to what it was.  We have one person's opinion

13  in this report.

14       THE COURT:  Well, and I thought I heard you read

15  in those topics that the questions have to do with did

16  Ethicon report the violations.  The violations would have

17  been violations of some foreign Government's laws and

18  regulations.  So the report --

19       MR. BERNARDO:  That's correct.

20       THE COURT:  -- would have to be to that foreign

21  entity.  You wouldn't report -- I wouldn't report to the

22  United States Government that somebody violated Sweden's

23  laws, because the United States Government wouldn't care.

24  Right?  So I don't -- I'm just not seeing how this is at all

25  relevant to this particular case.

1        What Ethicon did about the doctor who was -- where was

2    he doing these -- where was he?  What country was he?

3              UNIDENTIFIED SPEAKER:  Primarily in Belgium, Your

4    Honor.

5              THE COURT:  So he's in Belgium?

6              UNIDENTIFIED SPEAKER:  At the University of the

7    Liege, yes.

8              THE COURT:  So I don't -- I really cannot follow

9    how it makes any difference what Ethicon did about what they

10   were told regarding what this scientist did in Belgium.

11             MR. GAGE:  Your Honor, this is William Gage.  I

12   would note, when this issue -- this issue was addressed in

13   the Batiste case back in March, in Texas state court, and

14   our Motion in Limine to exclude any reference to this issue

15   was granted.

16             THE COURT:  Well, I can understand why.  I think

17   that it is a very inflammatory issue that really doesn't

18   have anything to do with the merits of the case.  I think

19   there may be some issues in there that are meritorious, like

20   did Ethicon use data that was inaccurate.  I think that's a

21   very fair area to explore.

22        I don't think it's fair to explore whether Ethicon

23   reported to Belgium that a scientist, perhaps, didn't follow

24   the rules in Belgium.  And if they didn't, that makes them

25   look like they're a bad company, with a crazy scientist

1    doing experiments on his own.  I think that is -- is just

2    beyond the pale as far as kind of a character assassination

3    tactic that I don't think is fair in a trial.  It's just

4    not.

5         And I'm not going to let you at this point run down

6    that road and do that kind of discovery.  I mean it's -- I

7    don't think it's relevant.  So, no, I'm not going to allow

8    you to do that.  And I'm not going to make Ethicon put up a

9    person to testify about that.

10             UNIDENTIFIED SPEAKER:  Okay, that's understood,

11   Your Honor.  There are multiple other topics on that.  I

12   think those are the three that are at issue.  But we have

13   your ruling and we will definitely abide by it.

14             THE COURT:  Now, while I have you on the phone,

15   let's talk about Dr. Gretchen -- is it Byrkit?  Is that how

16   you pronounce--

17             UNIDENTIFIED SPEAKER:  You know, this may not be

18   -- we may not be the right people to talk about this.  But

19   is Dr. Byrkit -- she's a treating physician in the Huskey

20   case?

21             THE COURT:  Yes.

22             UNIDENTIFIED SPEAKER:  Okay.  I got to tell you, I

23   probably know more than anybody on this phone from

24   plaintiffs' perspective about it, but I know very little

25   about it.

1              THE COURT:  All right.  Well, there's been a

2      motion for a protective order filed on it, and I realize

3      plaintiffs have not had an opportunity to respond yet, but

4      it has to do with her deposition that's been scheduled on

5      July 21st.  And, as you know, I'm getting ready to leave.  I

6      will be out beginning on the 11th of July.  So something has

7      to be done on this before I go.  And what strikes me about

8      this is it appears to me that I have already ruled on this

9      issue once before.  It also appears to me that this issue

10     has -- is dealt with in the deposition protocol.  And so I'm

11     somewhat confused as to why this issue has arisen.

12         What it is is that the plaintiffs, apparently, are --

13     have subpoenaed Dr. Byrkit to give a second deposition on

14     the same subject matter.  They want to do it as an

15     evidentiary deposition for trial.  And she does not want to

16     give a second deposition.

17         Ethicon doesn't want to go to a second deposition.

18     They've made a motion for protective order, and they've

19     argued that, of course, the deposition protocol doesn't

20     allow for a second deposition, number one.

21         Number two, we'd previously discussed the fact that

22     there's nothing in the protocol that really allows for

23     evidentiary depositions.  And previously I had not allowed

24     an evidentiary deposition, because, I mean, honestly, I

25     don't think that that was something that the parties agreed

1    to do.  And I don't think it can logically or practically be

2    done in these cases.  It just can't be done.

3        And so, unless there's some good cause reason for

4    taking a second deposition, which I haven't heard yet -- and

5    maybe that's what the plaintiffs are going to put in their

6    response to this -- I'm not, I'm not going to allow a second

7    deposition of this physician.  But this issue needs to be

8    resolved pretty quickly.  I think --

9        UNIDENTIFIED SPEAKER:  Okay, I --

10       THE COURT:  I think Laura sent out an E-mail

11   yesterday asking for when we could do a telephone conference

12   on this.  And I was hoping that I might have you people on

13   the phone today, and we could just resolve it today, but it

14   doesn't sound like I have the right people on the phone --

15       UNIDENTIFIED SPEAKER:  Yeah --

16       THE COURT:  -- I'm kind of telling you what I'm

17   thinking.  Go ahead, I'm sorry.

18       UNIDENTIFIED SPEAKER:  Yeah.  I'm sorry.  I

19   interrupted you three times straight.  But, I will pass that

20   on.  And Ed Wallace, I think, is primarily responsible for

21   that issue.  I do know, actually, and Andy just told me that

22   the argument is that there's new documents or new

23   information since the last depo.  But I will pass on what

24   you have said, and, you know, obviously with -- they're

25   going to need to do something right away.  And tell them --

1    would you like me to tell them that, in lieu of a written

2    response, if they're willing to, that you would get back on

3    the phone quick and decide it that way, if necessary?

4              THE COURT:  Yes.

5              UNIDENTIFIED SPEAKER:  Or would you rather them

6    file?

7              THE COURT:  No.  You know, they don't really need

8    to do a written response.  What I would be looking for from

9    them is what is required under the protocol, and that is, a

10   good cause reason for doing a second deposition.  In her

11   case, she doesn't want to do a second deposition, which will

12   weigh against a second deposition.  It says in the motion

13   for protective order that there are no new documents; there

14   has been no activity since her deposition was given a year

15   ago.  It was a six-hour deposition.  Everything was

16   apparently covered.

17        You know, I sympathize with all of you.  I think it's

18   terrible that you have to present your whole case through

19   these long, unwieldy depositions, and I hate that for you,

20   but that's the way, unfortunately, it is.  And I don't -- I

21   really don't see any way around that.

22        I don't think that -- I don't think there's any fair

23   way to allow an evidentiary deposition here and one here,

24   but not here.  And I don't think it's manageable, with the

25   number of trials that we're going to start having in these

1    MDLs, I just don't think it's manageable to be taking

2    evidentiary depositions.

3         So, good cause to me is not that you'd rather have a

4    better deposition for trial.  Good cause is going to have to

5    be something more than that.  So if you would pass that

6    along; tell them they don't need to do a written response.

7    We can just get back on the phone and we can talk it out.

8    But my inclination is not to allow someone to do an

9    evidentiary deposition simply because they want a better

10   deposition to use at trial.

11             UNIDENTIFIED SPEAKER:  Okay.  I'll pass that on

12   today.  And somebody will get back to you today.

13             THE COURT:  I would appreciate that.  Thank you.

14             UNIDENTIFIED SPEAKER:  We do have three other

15   notices, Your Honor, just like Rich said, we've kind of been

16   working through those.  You know, there may be some things

17   we can't agree on, like this.  But I think we'll get back to

18   you on those right away, too, because you're leaving town.

19   One of them we've agreed we'll push till after the Huskey

20   trial -- at least one, maybe two -- two of them?

21        Yeah, two of them.  Two of the three we've agreed we'd

22   push until after the Huskey trial, although we are still

23   reserving our right to get the discovery.  One of them deals

24   with payments to foreign authors.

25        We did the payments to Nilsson (phonetic) and Ulmsten.

1    That one deals with foreign authors that we're going to take

2    up later.

3        So, we're trying to limit the amount of time and

4    issues, the number of issues that we'd bring to you, and

5    hopefully there won't be too many more.

6            THE COURT:  Well, let me ask you while I have you

7    on the phone, do you think you need an order, or do you feel

8    that you can go from here without me generating an order on

9    what we've talked about today?

10           UNIDENTIFIED SPEAKER:  I think that we can go

11   without an order from the plaintiffs' perspective.

12           UNIDENTIFIED SPEAKER:  Your Honor, as I understand

13   it, this hearing's been transcribed, and assuming that's

14   correct, we'll just order a copy of the transcript and let

15   that kind of serve as Your Honor's order, if that's okay

16   with you?

17           THE COURT:  That is music to my ears, actually.

18   You are all my favorite people today.

19       Yes, it has been recorded.  So, yes, you can request

20   the transcript and then you'll have it all.  So I appreciate

21   that.  Thank you.

22           UNIDENTIFIED SPEAKER:  Well, thank you, Your

23   Honor.

24           UNIDENTIFIED SPEAKER:  Judge, we appreciate your

25   time.

1          UNIDENTIFIED SPEAKER:  Thanks.

2          THE COURT:  All right, thank you.  Bye-bye.

3      (Proceedings concluded.)

4

5                  REPORTER'S CERTIFICATE

6          I, Catherine L. Schutte-Stant, Official Court
   Reporter of the United States District Court, for the
7   Southern District of West Virginia, do hereby certify that
   the foregoing proceedings, which were taken out of my
8   presence, were transcribed by me from an audio recording to
   the best of my ability, and said proceedings are a true and
9   accurate transcript from my stenographic notes.  I further
   certify that I am neither related to any of the parties by
10  blood or marriage, nor do I have any interest in the outcome
   of the above matter.

11

   JULY 3, 2014          s/CATHERINE L. SCHUTTE-STANT, RPR, RMR
12                        _____

13

14

15

16

17

18

19

20

21

22

23

24

25