```
 1            IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2                         AT HUNTINGTON

 3   _____x
                                   :
 4   IN RE:                        :  MDL NO.
     ETHICON, INC.,                :  2:12-MD-02327
 5   PELVIC REPAIR SYSTEM PRODUCTS  :
     LIABILITY LITIGATION          :
 6                                 :
                                   :
 7
 8   _____x

 9   THIS DOCUMENT RELATES TO ALL CASES :
     _____x
10

11            DEPOSITION DESIGNATION HEARING
         BEFORE THE HONORABLE CHERYL A. EIFERT,
12            UNITED STATES MAGISTRATE JUDGE
                THURSDAY AUGUST 21, 2014
13

14

15

16

17

18         CATHERINE L. SCHUTTE-STANT, RPR, RMR
                Federal Official Court Reporter
19              300 Virginia Street, East
                        Room 6009
20              Charleston, WV 25301
                    (304) 347-3151
21

22

23

24

25
```

1     **APPEARANCES:**

2     **FOR THE PLAINTIFFS:**
                                **JEFFREY M. KUNTZ, ESQ.**
3                               Wagstaff & Cartmell LLP
                                4740 Grand Avenue, Suite 300
4                               Kansas City, MO  64112

5

6

7     **FOR THE DEFENDANTS:**
                                **PHILIP J. COMBS, ESQ.**
8                               Thomas, Combs & Spann
                                P.O. Box 3824
9                               Charleston, WV  25338-3824

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              P R O C E E D I N G S

 2              Had before The Honorable Cheryl A. Eifert, United

 3     States Magistrate Judge, United States District Court, for

 4     the Southern District of West Virginia, at Huntington, on

 5     August 21, 2014, as follows:

 6              COURTROOM DEPUTY CLERK:  You may be seated and

 7     come to order.

 8              THE COURT:  Hello.

 9              UNIDENTIFIED SPEAKER:  Hi, Judge.

10              UNIDENTIFIED SPEAKER:  Good afternoon.

11              THE COURT:  I did not bring my stacks.  Do I need

12     them?  Should I go get them?

13              UNIDENTIFIED SPEAKER:  We've got a stack for you.

14              THE COURT:  Okay, all right.

15              UNIDENTIFIED SPEAKER:  Judge, respectfully, we're

16     only going to talk about one deposition today.

17              THE COURT:  Okay.

18              UNIDENTIFIED SPEAKER:  And if we came up or if we

19     all were at one table or something, because what we're

20     mostly going to fight about is cumulativeness, so we will

21     want to be comparing page and page.  Where would you like

22     us?

23              THE COURT:  What would be easier?  Let's see.

24     Sharon, what do you think would be best?

25              COURTROOM DEPUTY CLERK:  However they would like
```

```
 1    to be.
 2              THE COURT:  We need microphones is the problem.
 3              COURTROOM DEPUTY CLERK:  We have this, and we have
 4    a witness that's close to you.  You can use mine.
 5              THE COURT:  Let's see.
 6              UNIDENTIFIED SPEAKER:  I mean the main thing,
 7    we'll need some flat space for you to compare pages.
 8              THE COURT:  Right.  Oh, let's see, there's just
 9    that one microphone there.
10              COURTROOM DEPUTY CLERK:  The only other
11    microphone's -- you don't want them up there?
12              THE COURT:  Well, do you think we could do it
13    right here?  Would you be able to talk into that; you two
14    think you could speak into these two microphones here?
15              UNIDENTIFIED SPEAKER:  Judge, we'll be fine if
16    that's a good place for you.
17              THE COURT:  Yes, I'm just trying to think --
18    there's plenty of room up here to work.  I just don't know
19    if you guys can squeeze into that space here.  I could come
20    down there and sit.  Maybe that would be better.  What about
21    that?
22              UNIDENTIFIED SPEAKER:  Do these microphones all
23    work here?
24              THE COURT:  I think we could do that.
25              UNIDENTIFIED SPEAKER:  That table would be fine.
```

1          THE COURT:  Let's do that then.  All right.  This

2   would be a good place, but there's just that one microphone.

3          COURTROOM DEPUTY CLERK:  Yes.

4          UNIDENTIFIED SPEAKER:  Will this pick up all of us

5   sitting around?

6          THE COURT:  I hope so.  Okay.  Thank you.

7          UNIDENTIFIED SPEAKER:  We have a lot of cords.

8          THE COURT:  That will work, and then maybe you

9   could share.

10          COURTROOM DEPUTY CLERK:  You all could share.

11          THE COURT:  Yes.  What is that anyway?

12          COURTROOM DEPUTY CLERK:  That goes to the

13   computer.

14          THE COURT:  Oh, okay.  Yeah, there we go.

15          UNIDENTIFIED SPEAKER:  I think we're in good shape

16   now.

17          THE COURT:  You can speak into that one.  That

18   works.

19          COURTROOM DEPUTY CLERK:  And then you need to

20   identify yourselves for the record.

21          THE COURT:  Yes, don't forget to do that.  Before

22   you talk, put your name on the record.  Okay.

23          MR. KUNTZ:  Judge, this is Jeff Kuntz for

24   plaintiff.  And I'm just going to give some background.

25   Obviously, Phil and I were in front of you last week, I

1    guess, and we went through -- this is the Meng Chen

2    deposition.

3            THE COURT:  Right.

4            MR. KUNTZ:  And we went through several exhibits

5    that you ruled on, and then we had gone back to our

6    respective places and tried to cut some testimony out.  Mr.

7    Combs' objection is that some of the testimony is

8    cumulative.  We've met and conferred several times.  We on

9    our own cut a bunch of stuff out.  And then last night we

10   met again and went through several places where Mr. Combs

11   thinks things are cumulative.  And I agree probably to half

12   of them.  I think -- but then we have some that are still

13   unresolved.  So we have been trying.  But as far as the

14   exhibits, those have already been ruled on last week, so --

15           MR. COMBS:  Yes, it's been very productive.  Each

16   meeting has limited the issues for you.

17           THE COURT:  Very good.

18           MR. COMBS:  And again, I will not argue or belabor

19   this.  You know, to put this in context, we don't believe

20   that any of this is relevant, because we don't think there's

21   any logical relevancy.  I mean, this involves memoranda,

22   meetings, and E-mails of which one of the employees of

23   Ethicon raised the issue of should the IFU be updated with

24   two potential complications added.  And we don't think

25   there's any logical relevancy to it, because the record's

1    unrebutted that Mrs. Huskey's surgeon was aware of both

2    those complications.  And the record's unrebutted that she

3    -- (recording inaudible) -- the bias on those.  And so

4    everything we're talking about, it's our belief there's no

5    logical relevancy.  You know, we're past that now.

6              THE COURT:  Okay.

7              MR. COMBS:  So here's where we are.  We had tried

8    to identify all the areas that we think are cumulative.  And

9    I think what we need to do is just literally just walk

10   through the -- (recording inaudible.)

11             THE COURT:  All right.  Let's get started then.

12             MR. COMBS:  It's a slow process.  All right.  So

13   we'll start with the October 29th transfer.  And the section

14   of testimony that we're going to discuss is on Page 156.

15   And the page in which -- pages in which we say it would be

16   cumulative would be at 71 and 72 where it was originally

17   admitted.

18             MR. KUNTZ:  What was the original page?

19             MR. COMBS:  The page where it was originally

20   discussed --

21             THE COURT:  Page 156.

22             MR. COMBS:  Yes, Your Honor.  Page 71 and 72.

23             THE COURT:  All right.  Page 71.  I don't see

24   anything on Page 71 that -- oh, down at the bottom?

25             MR. COMBS:  Yes, ma'am.  At the bottom of the

1    page.

2            THE COURT:  "Dyspareunia is not warned about in

3    the Instructions For Use of the TVT products, correct?"

4            MR. COMBS:  And I think over into page 72 is the

5    answer.

6            THE COURT:  "No, the word 'dyspareunia' does not

7    appear in the IFU document."  All right.

8            MR. COMBS:  And at Page 156, this would be the

9    section that we would say has already been asked about.

10           THE COURT:  So lines 6 through 9; and what's the

11   other part?

12           MR. COMBS:  Lines -- the answer is at lines 14

13   through 18.

14           THE COURT:  Okay.  Okay, when you looked at the

15   TVT Instructions For Use, did you see in there that --

16   whether or not Ethicon was warning women about potential

17   dyspareunia following a TVT procedure?

18      "For the TVT IFUs I reviewed during the preparation for

19   the deposition, I do not recall that I saw that the

20   particular word in the warning caution or under that" --

21   well, yeah, that's cumulative.

22           MR. KUNTZ:  Well, but the difference is is she's

23   saying, did you warn about it -- or, no, the words don't

24   appear.  And she said, when the company released the TVT

25   products, was the company aware?  "I don't know."

1   And then this question on 156 is simply saying:  "Now

2 refreshing your recollection, you've looked at the IFU's in

3 preparation, is it in there?"

4   And she says, "I don't remember seeing it."

5   So in the first line of questions on 71 and 72, I think

6 it's different, Your Honor.

7     THE COURT:  We'll, let's see.  Let's look again.

8     MR. KUNTZ:  I mean, she's saying, "I don't know.

9 I don't know."

10   And then he is asking, well, did you actually look in

11 the IFU on 156?

12   And she says, Well, I did, and it's not in there.

13     THE COURT:  Well, on 71, the question is:

14 "Dyspareunia is not warned about in the Instructions For Use

15 of the TVT products, correct?"

16   And the answer is:  "No, the word 'dyspareunia' did not

17 appear in the IFU document."

18   That's --

19     MR. KUNTZ:  Okay.

20     THE COURT:  -- pretty much the same as, when you

21 looked at the instructions, did you see whether or not

22 Ethicon was warning women about dyspareunia?

23   And she says:  When I looked, I did not see that word.

24   I think it's the same -- it's the same information.

25 That word "dyspareunia" is not in the instruction.  I mean,

1       it's -- to me that says the same thing.

2               MR. KUNTZ:  Okay.  Well, we'll cut this one out.

3       But then the counter-designation needs to come out.

4               THE COURT:  What's the counter one?

5               MR. KUNTZ:  That's -- yours is not color-coded.  I

6       apologize.

7               THE COURT:  Is that this dark green one?

8               MR. KUNTZ:  Yes, the dark green one.

9               MR. COMBS:  Yes, ma'am.

10              THE COURT:  Yes, I'd say -- yeah.  I mean -- I

11      mean, I think this is pretty clear.  She's saying that that

12      word is not in the instructions.  Don't you think?

13              MR. KUNTZ:  Well, I thought she's asking, you know

14      -- when they released the TVT products, was the company

15      aware that dyspareunia was often -- (recording inaudible) --

16      use of product.  It says, I don't know.  And then he's

17      asking, well, did you go back and review them?  She said, I

18      did look at them in preparation, and they don't say it.  But

19      if it's close enough --

20              THE COURT:  Well, I think it's pretty -- I thought

21      this is even clearer.  It seems here like -- I mean, I guess

22      this is a question.  "Okay, let me give you an example

23      specific to TVT products.  Dyspareunia is not warned about

24      in the Instructions For Use of the TVT products, correct?"

25          And then the answer is:  "No, the word 'dyspareunia'

1    did not appear in the IFU document."

2        That's pretty clear.

3            MR. KUNTZ:  Okay.

4            THE COURT:  I mean that's a good question and a

5    good answer.  I think, in fact, that's even more clear than

6    this, where she's saying, IFUs are reviewed during the

7    preparation.  I do not recall that I saw that particular

8    word in the warning caution or under the potential AEs.

9    I like it -- if I were you, I'd say the other one is better.

10            MR. KUNTZ:  So leave the --

11            THE COURT:  The first one is very clear.

12            MR. KUNTZ:  Yeah, that's what we've done.

13            THE COURT:  Yeah.  I would do that.

14            MR. KUNTZ:  Just another one I was reading too

15    late at night, I guess.

16            THE COURT:  Yeah, because that one is just -- it's

17    not in there.

18            MR. KUNTZ:  And so 157 -- or --

19            MR. COMBS:  156:6 through 9.

20            THE COURT:  6 through 9.  And 14 through 18, and

21    then whatever the counter-designation was, which is -- which

22    ones did you look at?

23            MR. KUNTZ:  20 through 157:2.

24            THE COURT:  Through 25 -- okay.

25            MR. COMBS:  Judge, the next one we had is the

1    challenged section testimony is at page 166 and 167.

2              THE COURT:  Okay.

3              MR. COMBS:  And the page we will reference back to

4    is 121 and 122.

5              MR. KUNTZ:  167.

6              THE COURT:  121 and 122?

7              MR. COMBS:  Yes, ma'am.

8              THE COURT:  Okay.  So the testimony at 121 --

9    which lines?  All of this on 121?  Or starting at 16 or --

10             UNIDENTIFIED SPEAKER:  Yes, it's -- the corporate

11   challenging is at 166:21.  Now, in this situation, we know

12   that from looking at the documents, that dyspareunia is

13   showing up after TVT procedures, correct?

14        And she is talking about the complaint processes.  And

15   then we go --

16             THE COURT:  Okay.

17             UNIDENTIFIED SPEAKER:  And so that when we look

18   at -- on 121, she's being asked exactly those same

19   questions.  She's being asked, because of the frequency --

20   once you saw dyspareunia, you alerted some of your superiors

21   in the company.

22             THE COURT:  Well, that doesn't sound like the same

23   thing to me.

24        Now later on here, it says, you advised your boss about

25   it, right?

```
 1        But still that -- I don't see that as being -- is that
 2   what you're talking about, where it says, and then you were
 3   looking at the database, and you yourself noticed
 4   dyspareunia and exposure -- (recording inaudible) -- and you
 5   advised your boss about it, right?
 6        UNIDENTIFIED SPEAKER:  Yes.
 7        THE COURT:  I don't -- I don't know.  I don't
 8   think that's so concerning.  I think -- I don't find that
 9   too cumulative.
10        UNIDENTIFIED SPEAKER:  Okay.  We'll withdraw it.
11        THE COURT:  Okay.
12        UNIDENTIFIED SPEAKER:  Judge, on 167, we have
13   three blocks here and the first is going to be at 9 through
14   14, the second is going to be at 15 through 20, and the
15   third is going to be at 21 through the first line at page
16   168 --
17        THE COURT:  Now, 9 through 14.  What was the
18   second one?
19        UNIDENTIFIED SPEAKER:  I thought we just did that
20   one.
21        THE COURT:  Yeah, I did, too.  But, okay.  15
22   through 20.  And what was the other one?
23        UNIDENTIFIED SPEAKER:  167:21 through 168.
24        THE COURT:  All right.  Okay.
25        UNIDENTIFIED SPEAKER:  So at 121:25, so the
```

1    question was:  "You were looking at the database.  You

2    recall yourself noticed dyspareunia exposure, correct, and

3    you advised your boss that?"

4         "Right."

5         And then at 121:25:  "Because of the frequency with

6    which you saw dyspareunia, you alerted some of your

7    superiors at the company to make them aware of that,

8    correct?"

9         "Yes."

10             THE COURT:  I don't, I don't think that's too --

11   I'm not too -- I don't see that as being that cumulative

12   really.  I mean, here you're talking about -- I mean, it

13   looks like here you're talking about a specific database.

14   And here you're just talking about -- I don't know what.

15   Talking about some adverse -- the issue that was being

16   looked at is should the adverse reaction section be updated?

17        The question is proposed by the medical affairs

18   regulatory affairs, so it's discussed as a group.

19        You noticed this, and because of the frequency, you

20   alerted some of your superiors; is that correct?

21        And she says, yes.

22        And then there's a meeting.  And they're talking about

23   meeting.

24        But on this other page, it's really talking more about

25   a database of some sort.  And I see that as sort of being

1    two different things.

2           UNIDENTIFIED SPEAKER:  Just respectfully, it's all

3    the same thing, because that's what she does is she receives

4    these complaints and she looks at them in the Remetrex

5    database.

6           THE COURT:  Yes, but I think here they -- it's

7    sort of two different conversations here.  This is more

8    about talking about meeting, and then the other is talking

9    about database.  And I don't think that they're directly

10   cumulative.  I mean, it doesn't sound to me like it's -- I'd

11   have to really read the whole thing probably to put it in

12   some context, but it's not as directly cumulative as what

13   you showed me the last time.

14          UNIDENTIFIED SPEAKER:  All right.  The next block

15   of testimony is at doc 15 through 20.  And so the question

16   is one of things you're looking -- (recording inaudible) --

17   Remetrex database is dyspareunia affect the quality of life

18   and people's daily routine -- to -- (recording inaudible) --

19   and then that question, we contend, is duplicative of 158.

20          THE COURT:  158.

21          UNIDENTIFIED SPEAKER:  15 through 23.

22          THE COURT:  158.  15 through 23.  158.  Okay.

23   Now, we can go back and we look at the patient's concerns

24   that you found from the Remetrex database.  The third one

25   that we look at is postoperative dyspareunia and pain affect

1    quality of life and daily -- does postoperative dyspareunia

2    and pain affect quality of life and affect daily routine.

3    The question doesn't really make a lot of sense.

4            UNIDENTIFIED SPEAKER:  For the record, I didn't

5    ask it.

6            UNIDENTIFIED SPEAKER:  That's true.

7            UNIDENTIFIED SPEAKER:  It might make a lot less

8    sense if I did.

9            THE COURT:  Postoperative long-term dyspareunia

10   can be a significant adverse event?  And let's see -- from

11   one of the things you found, was postoperative -- affect the

12   quality of life -- that is pretty, I'd say, cumulative here.

13   I think that's true.  Those are cumulative.  So I would say

14   that, you know, maybe you could choose one.

15           UNIDENTIFIED SPEAKER:  I'll try to think what's

16   going to make the depo flow better probably if it's in line

17   with these.

18           THE COURT:  I would pick which one.

19           UNIDENTIFIED SPEAKER:  I promise she's talking

20   about a specific exhibit here, her meeting notes, and then

21   ask again --

22           THE COURT:  I'd say whichever one seems more

23   extraneous there, I'd pitch, because you've got it in there

24   twice.

25           UNIDENTIFIED SPEAKER:  We'll pitch the first one,

```
1       just because it flows.  It's going to mess up --

2                    THE COURT:  The Page 158 one?

3                    UNIDENTIFIED SPEAKER:  Yes.

4                    THE COURT:  Okay.

5                    UNIDENTIFIED SPEAKER:  And, Judge, the next block

6       is 167 --

7                    UNIDENTIFIED SPEAKER:  Give me one second here.

8       Sorry.  Yeah, so we'll take out, and then your

9       counter-designation, then, too, it goes with that; I

10      assume's that's got to come out as well.

11                   UNIDENTIFIED SPEAKER:  Well, are you taking the

12      entire block of testimony out or 158:18 all the way down

13      to -- (recording inaudible.)

14                   UNIDENTIFIED SPEAKER:  I thought that's what she

15      just ruled.  Which question were you looking at?  One --

16      you're just taking out one, I got you, 18 through 23.

17                   UNIDENTIFIED SPEAKER:  That's all we took out.

18                   UNIDENTIFIED SPEAKER:  Okay.  We'll leave your

19      counter in.  Sorry about that.

20                   UNIDENTIFIED SPEAKER:  Judge, the next block that

21      we challenged was at 167:21, and so to know that -- "And so

22      to know that, you had to find a number of dyspareunia cases

23      in the Remetrex database, right?"

24          "Yes."

25          "Following the TVT procedure, right?"
```

1      "Yes."

2      I had thought that was cumulative, again, on 121.  But

3    that's -- you've already looked at that.  So -- I looked at

4    it, the block of testimony.

5          THE COURT:  I don't see her talking about any

6    database on 121.  I don't see her saying anything about a

7    database.

8          UNIDENTIFIED SPEAKER:  And, Your Honor, I think

9    you're right.  There's two different things.  She's talking

10   about complaints she's getting.

11         THE COURT:  Right.

12         UNIDENTIFIED SPEAKER:  And then she's talking

13   about a separate act of looking at the database to see how

14   many are there.

15         THE COURT:  Right.  This just doesn't look to me

16   like she's talking about a database on 121.

17         UNIDENTIFIED SPEAKER:  Judge, I agree it's the

18   same issue as the block of testimony and not 214.

19         THE COURT:  I'm sorry.  I don't think she's

20   talking about a database on 121.  But she is talking about a

21   database on 167.

22         UNIDENTIFIED SPEAKER:  And I agree with the ruling

23   that you'd already made on the first section of testimony,

24   that it would be the same analysis.

25         THE COURT:  Yes.  Okay.  Okay.  All right.  So

1    where are we now?

2         UNIDENTIFIED SPEAKER:  We are at -- we're at

3    168:22.

4         THE COURT:  Okay.

5         UNIDENTIFIED SPEAKER:  And that goes through

6    169:15.  And we fully contend that it's cumulative of

7    122:22.  (Recording inaudible.)

8         THE COURT:  122:22 through 123 what?  22?

9         UNIDENTIFIED SPEAKER:  Yes.

10        THE COURT:  Okay.  So -- do you believe Ethicon to

11   have updated the IFU after this meeting and memorandum?

12        I do not have an opinion on the company.

13        Okay.  Now, let's look at the second page.

14        You have impressions from Remetrex issues?

15        What is Remetrex?

16        (Recording inaudible) -- database.

17        Now, she starts talking about the database.

18        UNIDENTIFIED SPEAKER:  Judge, where we're at is at

19   168:22, the challenge.

20        THE COURT:  All right.  Well, let me read this

21   first.  So what did you -- and so what you did to get --

22        UNIDENTIFIED SPEAKER:  I think she's talking about

23   updating it -- (recording inaudible) -- IFU in one place and

24   whether there was a need to warn about it or not warn about

25   it in another.  And she doesn't have opinions on either one.

1    THE COURT:  All right, so the first time they're

2  asking her, after this meeting, should you have put it in

3  the warning?

4    And now they're asking, should you -- do you think it

5  should be in there today?

6    Is that what you're saying?

7    UNIDENTIFIED SPEAKER:  Yeah.

8    THE COURT:  Okay.  So it's a different time frame

9  is what you're saying?

10    UNIDENTIFIED SPEAKER:  Exactly.  And I think one

11  is talking about updating IFU, and warn, yes, at two

12  different times.

13    THE COURT:  Yes, I think those are two different

14  times frames, so they wouldn't be cumulative.

15    UNIDENTIFIED SPEAKER:  Judge, the next block that

16  we challenge is at 196:8, and the testimony that we have

17  referred is at 191.

18    THE COURT:  Okay, 196:8 and 191.  All right.  This

19  11 through 21?

20    UNIDENTIFIED SPEAKER:  Yes, Your Honor.

21    THE COURT:  Okay.  (Recording inaudible) -- senior

22  management people point out who the -- look at it from

23  senior management perspective?  Telling them -- (recording

24  inaudible) -- postmarket knowledge of all of the TVT product

25  is a lot more comprehensive.  (Recording inaudible) -- so

1    why don't we update?

2        Okay.  So she's talking about an E-mail to senior

3    management.  All right.  And then what part of 196?

4            UNIDENTIFIED SPEAKER:  It's the block in 196:8

5    down to -- down to 21 -- I'm sorry -- down to 20 -- 196:8.

6        So again, she's being asked about -- it's the same

7    thing.  It's, I think, the same question, look into it from

8    a senior management perspective and facilitate the IFU --

9    (recording inaudible.)

10           THE COURT:  Yes, it does seem to be pretty much

11   the same thing.  She's talking I guess about the same memo.

12   Right?

13           UNIDENTIFIED SPEAKER:  Right.  You know, and

14   that's one issue we need to bring up.  We need to put this

15   memo -- this is one we didn't ask you to rule on.  You

16   actually looked at it when we were making our argument and

17   said that would come in, and now when I've gone back and

18   looked at -- there's a lot of cuts talking about it.  I

19   think it's something we need to admit in to make the cuts

20   make sense when the jury's seeing it.  So --

21           THE COURT:  I said it wouldn't come in, or --

22           UNIDENTIFIED SPEAKER:  You said it would.  It's

23   not one that we had talked about.  But going back and

24   reading the cuts now -- they're not going to make sense

25   without them looking at the documents.  The cuts we just

1       read about this 2008 document.  This is the one that you

2       kind of looked and said -- when we were making argument, and

3       said, well, that would definitely come in, if you remember.

4       So --

5               THE COURT:  Well, if I said it would come in, then

6       why isn't it coming in?

7               UNIDENTIFIED SPEAKER:  It hasn't been offered.

8               UNIDENTIFIED SPEAKER:  It hadn't been offered.

9       Originally we agreed to maybe not put it in.  But, honestly,

10      the more times you look at these and try and straighten out

11      the cuts, we've just missed a few things.

12              THE COURT:  Oh, that was one you hadn't offered

13      and --

14              UNIDENTIFIED SPEAKER:  Right.  And going back --

15              THE COURT:  Okay, all right.

16              UNIDENTIFIED SPEAKER:  -- going back through some

17      cuts now I've realized that there's a lot of testimony about

18      it that is not going to make sense to the jury -- you know,

19      unless they're actually seeing the document with the cut.

20              THE COURT:  Right.

21              UNIDENTIFIED SPEAKER:  So --

22              THE COURT:  Yeah.

23              UNIDENTIFIED SPEAKER:  Thank you.

24              UNIDENTIFIED SPEAKER:  Judge, it wasn't offered.

25      It would be disingenuous to try to stand on procedure on

1  that.  Because both sides have, you know, offered new cuts,

2  made new objections.  So I'm not going to try to say, well,

3  you know, Ollie, Ollie in free.

4          THE COURT:  No.

5          UNIDENTIFIED SPEAKER:  But it's the same thing.  I

6  mean, again, I wouldn't --

7          UNIDENTIFIED SPEAKER:  Which one is that?

8          UNIDENTIFIED SPEAKER:  3324.

9          UNIDENTIFIED SPEAKER:  Right.  We've redacted the

10  stuff out of it, too.

11          UNIDENTIFIED SPEAKER:  So what we're talking about

12  here, it's -- you know, it's all the same reason that this

13  line of testimony shouldn't come in.  What happens is a

14  layman can raise complaints that her consent in 2005 in the

15  United Kingdom was improper.  And all this -- all of it

16  doesn't make it all stem from complaints that are like this.

17  And so now we have a situation that we're talking about a

18  woman who has consented six years before this surgery for a

19  different physician -- (recording inaudible) -- system,

20  don't know what she was told, what she wasn't told.  But

21  here, we do know.

22          THE COURT:  Well, I know, but I think it goes to

23  the knowledge of the company about -- I mean, I think it

24  goes to their knowledge of complications and complaints and

25  issues.  That's really what it goes to.  Not whether that

1    woman's consent was good or not.

2              UNIDENTIFIED SPEAKER:  Your Honor -- right, and I

3    would direct you, for the record, to the last sentence, this

4    is one complaint of many, and she's saying, one of the past

5    for a better preoperative consent is to provide an updated

6    IFU to the operating physicians.

7              THE COURT:  Yeah.

8              UNIDENTIFIED SPEAKER:  And she's saying we need to

9    look into this.

10             THE COURT:  Right.

11             UNIDENTIFIED SPEAKER:  Patients aren't being

12   properly consented because our IFU's inadequate.

13             THE COURT:  Yeah.  I think it goes to what the

14   company knew as to how good their warnings were.  It's a

15   failure-to-warn case.  That's one of their claims.  And so

16   what's going to be important is what did the company know,

17   and what did they have in their warnings, and did their

18   warnings reflect their knowledge.  I mean, that's one of the

19   issues.

20        And I think you can argue that, you know, they didn't

21   have enough of a basis yet to put these things into their

22   warnings, whatever you want -- however you want to defend

23   it, but I don't think I could just say all that should be

24   excluded.  I mean, I would think you would have brought that

25   up in front of Judge Goodwin in a Motion in Limine if you

1   would have thought that they shouldn't be allowed to

2   introduce any evidence like that.

3           UNIDENTIFIED SPEAKER:  Well -- (recording

4   inaudible.)

5           THE COURT:  H-mm?

6           UNIDENTIFIED SPEAKER:  (Recording inaudible.)

7           THE COURT:  Well, I mean, it's still not too late

8   I guess to bring that up to Judge Goodwin, if you think it's

9   unfair, too late, or prejudicial or --

10          UNIDENTIFIED SPEAKER:  A Motion in Limine was

11  filed on all those issues.  Phil in the Remetrex case using

12  the complaints related to Meng Chen; he didn't rule on it.

13  He said, I got to see the evidence at trial.  And now we're

14  here with you doing that.

15          THE COURT:  Well, yeah.  I mean -- I may say, you

16  know, I'm not -- I'm ruling on what you can -- I'm not

17  ruling on, necessarily, that all of this will -- I mean, he

18  may still say -- you may still make a motion and say, you

19  know, based on the way the evidence is coming in, this

20  shouldn't come in.  And he can still exclude evidence.  I

21  mean, you know, because I'm not going to be there at the

22  trial.  Or they might -- they may open a door to something

23  or close a door to something, and you can -- things will

24  change.  I'm just going based on how it exists sitting here

25  today.  You know that old open the door thing, or close the

1    door thing; goose/gander rule -- all those things.

2         UNIDENTIFIED SPEAKER:  I'm pretty certain I'll

3    open and shut a lot of them within two weeks.

4         THE COURT:  But, you know, as I sit here today and

5    I hear what their claims are, that seems to me to be

6    relevant information as to what their knowledge is.

7         UNIDENTIFIED SPEAKER:  Well, if you're going to

8    designate on that, Judge, then, you know, obviously we'll

9    have to counter this with something on it.

10         UNIDENTIFIED SPEAKER:  Well, the testimony has

11    already been designated throughout.  That is -- my problem

12    is that is when this -- agreements are agreements, but when

13    you're reopening and stuff is taken out and cut and recut,

14    and there's testimony all over -- I mean, what we just

15    talked about is related to that document.  But the document

16    hasn't been offered.

17         UNIDENTIFIED SPEAKER:  Well, sure.  But there may

18    be other testimony that without this document that we could

19    designate that this document was not and that the

20    designation -- (recording inaudible.)

21         UNIDENTIFIED SPEAKER:  It was in your original --

22    it was absolutely in our original designation.

23         UNIDENTIFIED SPEAKER:  3324 is -- (recording

24    inaudible.)

25         UNIDENTIFIED SPEAKER:  Yeah, it's in our original

1    designate --

2              UNIDENTIFIED SPEAKER:  I don't think it is.  I

3    mean, do you have the designation?

4              UNIDENTIFIED SPEAKER:  Well, no, but we talk --

5    well, yeah, we talk about -- we talk about -- we were just

6    reading quotes about this document.  There's testimony all

7    over.

8              UNIDENTIFIED SPEAKER:  Okay, but that's very

9    different than offering the document into evidence.  Those

10   aren't -- that's not the same thing.

11             UNIDENTIFIED SPEAKER:  Right.  Well, that's why I

12   just brought it up in front of Your Honor to offer it, so --

13             UNIDENTIFIED SPEAKER:  I understand.  And my point

14   is that if you're going to add this into the elements, we

15   may add a counterproposal.

16             UNIDENTIFIED SPEAKER:  That's fine.  You can add

17   whatever you want.  That's fine.

18             THE COURT:  Yeah.  I mean, I would think that that

19   -- you know, that would certainly be an argument that you

20   could make, that if they're going to add something, you

21   should be able to add whatever you think is responsive to

22   that.

23             UNIDENTIFIED SPEAKER:  There's testimony all over

24   in these agreed-to cuts about that document already.  It's

25   -- it's -- if we're talking about it, the jury needs to see

1    the document we're talking about.  I mean, the testimony we

2    just brought up with her about notifying her superiors is

3    about that document.

4              UNIDENTIFIED SPEAKER:  Okay, but the plaintiffs

5    questioned it, on that document -- (recording inaudible) --

6    that's not all the testimony that exists on that document.

7    I'll redirect on that document.  I didn't designate that be

8    direct, because they didn't offer it.  They want to offer

9    it --

10             THE COURT:  He doesn't think any of that testimony

11   at all should come in.  He's only designating things now

12   because I've said that that testimony should come in is what

13   he's saying.  If I'm understanding you.  Mr. Combs doesn't

14   think any testimony or that document should come in.

15             UNIDENTIFIED SPEAKER:  You can put in whatever you

16   want on your redirect.  Absolutely fine.

17             THE COURT:  All right.  Yeah.  But I do, I do

18   believe that the testimony would be relevant to their

19   failure-to-warn claim.  I don't know how it wouldn't be

20   relevant.  Because I do think what the company knew, and she

21   would certainly be representative of the company's

22   knowledge, and on top of it, she's sitting here saying she

23   was telling senior management what she thought ought to be

24   in the IFU, and she was a medical person.  You know, I

25   mean --

1           UNIDENTIFIED SPEAKER:  (Recording inaudible) -- we

2     know in this consent what happened.  And we know that Dr.

3     Byrkit --

4           THE COURT:  Well, so that's your defense.  That's

5     your defense.

6           UNIDENTIFIED SPEAKER:  (Recording inaudible.)

7        And we know Byrkit -- (recording inaudible.)

8           THE COURT:  Your defense is it really wouldn't

9     have mattered what we wrote in that IFU, because we know in

10    this case that this woman got a perfectly wonderful,

11    thorough consent from this very talented physician.

12          UNIDENTIFIED SPEAKER:  And again, I don't want to

13    just say the same thing over and over again, but our

14    argument would be that having more than an hour of testimony

15    on complications that we know this woman -- we know Dr.

16    Byrkit knew these two complications.  (Recording inaudible)

17    -- the record's unrebutted.

18          UNIDENTIFIED SPEAKER:  But it's -- and I mean --

19          THE COURT:  But they have a right to put on their

20    case.

21          UNIDENTIFIED SPEAKER:  And it's not just about

22    two -- it's not just about two adverse events either.

23          THE COURT:  I mean, you can't -- you know, they've

24    got a different view of the case.  And they've got a right

25    to put their case on.  You may get up there and say, you

1    know, they're putting on a case, but it's not this case.

2    They're putting on somebody else's case.

3           UNIDENTIFIED SPEAKER:  Yes.

4           UNIDENTIFIED SPEAKER:  Judge, did you come to a

5    conclusion on that specific issue of what we had said 8:196

6    was cumulative or 191?

7           UNIDENTIFIED SPEAKER:  She said it was.

8           THE COURT:  I think it is cumulative, yes.

9           UNIDENTIFIED SPEAKER:  So we'll strike that.

10          THE COURT:  So you need to pick which one you want

11   to use.  But I think those are saying essentially the same

12   things.

13          UNIDENTIFIED SPEAKER:  Let me -- I can't remember

14   where the original one was at.  196 --

15          THE COURT:  191 was the original one.  191, lines

16   11 through 20.  And then he's asking -- it's being asked

17   again.

18          UNIDENTIFIED SPEAKER:  Okay.

19          THE COURT:  So I'd figure out which one you like

20   better.

21          UNIDENTIFIED SPEAKER:  I don't know.

22          UNIDENTIFIED SPEAKER:  They're all the same.

23          THE COURT:  It might be --

24          UNIDENTIFIED SPEAKER:  It's amazing how many times

25   you can read these and still not figure some things out, but

1    -- give me one second.  Trying to figure out which will make

2    the deposition flow a little bit better.

3                THE COURT:  That's what you need to try to do.

4                UNIDENTIFIED SPEAKER:  Which is going to be a

5    whole 'nother problem.  I mean, I'm just going to leave the

6    191 in.  This one kind of sits out by itself.

7                THE COURT:  Yes, okay.  All right.

8                UNIDENTIFIED SPEAKER:  Okay, so --

9                THE COURT:  He's leaving in 191; taking out 196.

10   So that would be 8 through 19 -- 8 through 19 is coming out

11   of 196, right?

12               UNIDENTIFIED SPEAKER:  I -- too eager --

13   (recording inaudible) --

14               THE COURT:  Well, then, I don't know what -- this

15   21 through 25 seems to be a carryon to what she seems to be

16   saying, and 16 through 19, so -- I don't know what you want

17   to do with that.

18               UNIDENTIFIED SPEAKER:  I didn't challenge that

19   one, Judge.

20               UNIDENTIFIED SPEAKER:  I just, I don't even know

21   if it makes sense.  I guess --

22               THE COURT:  I don't know if that makes any sense,

23   though.

24               UNIDENTIFIED SPEAKER:  Right.

25               THE COURT:  Well, you say here your postmarket

1    knowledge with these products are much more than what we

2    have in the IFUs of all three types of TVTs.  Yes.

3         You don't say what used to be.  You say what we have.

4         And then it would say, okay, there's a lag of

5    information --

6              UNIDENTIFIED SPEAKER:  I would take it out, 197:7,

7    it's not going to make --

8              THE COURT:  And it won't make any sense.

9              UNIDENTIFIED SPEAKER:  I don't know if it makes

10   sense even as it is.  But I think that's a lost-in-Meng-Chen

11   translation.

12             UNIDENTIFIED SPEAKER:  We're getting close, Judge.

13             UNIDENTIFIED SPEAKER:  Okay, the next one is at

14   page 201.

15             THE COURT:  Okay.

16             UNIDENTIFIED SPEAKER:  And we're challenging lines

17   20 --

18             THE COURT:  Okay.

19             UNIDENTIFIED SPEAKER:  And so where we would say

20   that it was asked was at 78:18 and 83.

21             THE COURT:  Now, what was that, you say it was

22   asked where?

23             UNIDENTIFIED SPEAKER:  On 78:18 and 83:12.

24             THE COURT:  78:18 and 83:12.

25             UNIDENTIFIED SPEAKER:  I just lost my place.  I'm

1    sorry.  I apologize.

2            UNIDENTIFIED SPEAKER:  That's fine.  It's on 201.

3            UNIDENTIFIED SPEAKER:  Okay.

4            UNIDENTIFIED SPEAKER:  And I think, and I think

5    it's 83:12:22.  I think it's -- (recording inaudible.)

6            THE COURT:  All right.  Now, why would a company

7    want to list known adverse events that could happen with its

8    products in the Instructions For Use?  What's the purpose of

9    doing that?

10       Okay.  Why is it important -- it might not be realtime,

11   but why would it be important to provide more current

12   information?  Why is that important?

13       And then, okay, I want you to tell me, tell the jury,

14   why is it important for the manufacturer to provide the

15   operating physician the current knowledge of the

16   manufacturer's potential adverse reaction.

17       Okay.  You know, I see where 83 and 201 do seem to be

18   the same.  But I don't really see 78 as being exactly the

19   same.  It's a little more generic.  It's not really asking

20   about the current.  It's just asking in general.  Why would

21   you want to list known adverse events.

22       And then 83 and 201 are asking for more, the more --

23   the more up-to-date --

24           UNIDENTIFIED SPEAKER:  (Recording inaudible.)

25           THE COURT:  Yeah.

```
 1              UNIDENTIFIED SPEAKER:  I'll take the 83:12 through

 2      22 out.

 3              THE COURT:  Okay.

 4              UNIDENTIFIED SPEAKER:  If we think they're all

 5      three close.

 6              THE COURT:  I'd say 78 is different from 83 and

 7      201.  So you're going to take 83 out?

 8              UNIDENTIFIED SPEAKER:  Yes.  83, just 12 through

 9      22.

10              THE COURT:  Okay.

11              UNIDENTIFIED SPEAKER:  All right.  That was all

12      the challenges for that volume.  Luckily, there are less

13      than in the next -- (recording inaudible.)

14              UNIDENTIFIED SPEAKER:  Because I took so much out

15      on my own.

16              THE COURT:  Okay.

17              UNIDENTIFIED SPEAKER:  It's hard not to get

18      repetitive on the second day of deposition.

19              THE COURT:  Yeah.  Okay.

20              UNIDENTIFIED SPEAKER:  And, Judge, this one, it's

21      at 224, it would be, the witness is questioned about

22      persistent pain.  And -- (recording inaudible) -- ongoing

23      for months and months.  And the same questions on, for

24      example, 222:20 are said -- in -- (recording inaudible.)

25              THE COURT:  222.
```

1          UNIDENTIFIED SPEAKER:  So basically, it's on

2     222:20 down to 223:7.  And as compared to 224:2 through 21.

3          THE COURT:  Okay.  The patient's -- (recording

4     inaudible) -- never been free from pain; is that true?

5     Okay.

6        Yeah, those are, those are, you know, essentially the

7     same thing, I agree.  And they're so close together, that --

8     yeah.  I think that's -- those are the same.

9          MR. KUNTZ:  So you're saying 222 -- what is it

10    again, Phil?  I'm so sorry.

11         MR. COMBS:  That's okay.  It's really -- 222:20 --

12         MR. KUNTZ:  It's confusing.

13         MR. COMBS:  I should maybe in the future, I'll

14    bring photocopies of each page to put together or something.

15    222:20 through 223:7 was the first.

16         MR. KUNTZ:  Okay.

17         MR. COMBS:  And then the other block was 224:15

18    through 21.

19          I've never done a cumulative, working on it like

20    this, so I think in the future what I'll do is I'll bring --

21    I'll just photocopy two pages for each one.

22         THE COURT:  Let's see.  Which one flows better?

23    When you have the opportunity to learn erosions can become

24    symptomatic -- yes.

25       If you left that out.  Yes.  And you've had

1    conversations with a patient where that is, that is the

2    patient's experience, correct?  Mostly patients?

3        You've had conversations with patients or -- (recording

4    inaudible) -- occurred -- actually injured.

5            UNIDENTIFIED SPEAKER:  Your Honor, I think it --

6    probably the bottom one, the 224:15 through 21 is the one

7    that needs to come out.  This all goes together.

8            THE COURT:  Yeah.  Probably you're right.

9            UNIDENTIFIED SPEAKER:  Okay, so I'll take out

10   224:15 through 21.

11           UNIDENTIFIED SPEAKER:  Judge, the next one is at

12   231, and it starts at 20, and it's just the same thing.

13           UNIDENTIFIED SPEAKER:  231:20 through -- 232:14.

14           THE COURT:  The same thing as what?

15           UNIDENTIFIED SPEAKER:  Part of this I already

16   agreed to remove.  I agreed to remove 232:7 through 14.  But

17   I think that the rest of it is talking about, again, a year

18   or two down not being properly formed.  And then third --

19   second and third and fourth surgeries after erosions, and I

20   think -- I don't remember anywhere else that that's been

21   talked about multiple surgeries being needed that she was

22   receiving those complaints.  I cut out the middle.

23           UNIDENTIFIED SPEAKER:  So the first section was

24   231:20 through 232:6.  I had that it was cumulative of 128

25   -- (recording inaudible) --

```
 1              THE COURT:  Of where?
 2              UNIDENTIFIED SPEAKER:  128 -- (recording
 3    inaudible.)
 4              THE COURT:  You mean in the first volume?
 5              UNIDENTIFIED SPEAKER:  Yes.  Basically, he just
 6    re-asked the same question -- (recording inaudible.)
 7              THE COURT:  Okay.
 8              UNIDENTIFIED SPEAKER:  Just got a bigger picture.
 9    I mean, it's exactly the same.
10              UNIDENTIFIED SPEAKER:  What are you looking at
11    again, 231?
12              UNIDENTIFIED SPEAKER:  231:20 through 232:6.
13              THE COURT:  The next one mentioned -- okay,
14    (recording inaudible) -- pre-op --
15              UNIDENTIFIED SPEAKER:  The problem I have with
16    this is that on 128 he's asking about a specific exhibit and
17    her notes.  Let me see.  You're saying it's the same as 128.
18    You're talking about the database and --
19              UNIDENTIFIED SPEAKER:  I mean, that's -- that's
20    where the complaints come from is Remetrex.  That's the
21    complaint -- (recording inaudible.)
22              UNIDENTIFIED SPEAKER:  No, that's where they store
23    them all.  She's talking about actual calls she's getting
24    from people and talking to them.  That's the difference.
25    She's not talking about the database.  She stores those in
```

1    the database, and then she went back to review them to see

2    if there was a trend or frequency.  It's two different

3    events.  She's talking about taking the complaints, taking

4    the calls; what I'm learning; whereas, when she talks about

5    Remetrex, she's saying, I'm going back to look at all the

6    complaints we've got to see if there's a trend or a signal

7    or how frequent they are.

8              UNIDENTIFIED SPEAKER:  It's the same events.

9    (Recording inaudible) --

10             UNIDENTIFIED SPEAKER:  But it's two totally

11   separate actions by her is what she's doing.

12             THE COURT:  Next what's mentioned is, patients

13   don't further -- (recording inaudible) -- preop -- yes --

14   how are you able to look at the Remetrex database and

15   determine patient -- (recording inaudible) -- again it's

16   during my processing of individual cases.  It must have been

17   repeated a few times that the patient sharing complaints in

18   their reporting.  The patients -- (recording inaudible) --

19   in other words, saying that these patients didn't understand

20   -- what I was saying and what I was trying to say at the

21   time is that from those complaints -- (recording inaudible)

22   -- indicated they either couldn't recall , and while they

23   couldn't recall the doctor provided a risk/benefit

24   assessment.

25             Yeah, okay.  It seems like it is a little bit

1   cumulative.  Now, tell me why -- what are you -- how are

2   these different?

3            UNIDENTIFIED SPEAKER:  I think they're two

4   different.  One, she's talking about complaints that she's

5   actually receiving; whereas, in Remetrex, she's saying, I'm

6   getting complaints, I'm going back to our database to see

7   how many there are, and is there a trend, is there a signal,

8   how frequent are they.  I mean, Remetrex just stores all

9   these complaints; whereas, in 231, she's actually talking

10  about specifics.  Do you remember, you had -- you know, you

11  were getting complaints.

12       And then on down, 232, where she's talking about

13  people's complaints, second, third, fourth surgeries for

14  erosions, that's not been talked about anywhere of anything

15  we've -- (recording inaudible.)

16            THE COURT:  Yes, that hadn't been.

17            UNIDENTIFIED SPEAKER:  We had a challenge.

18            UNIDENTIFIED SPEAKER:  Oh, okay, my bad.

19            UNIDENTIFIED SPEAKER:  The challenge was for --

20  231:20 --

21            UNIDENTIFIED SPEAKER:  To back to --

22            THE COURT:  Yeah, he was talking about just this,

23  do you remember at some point you had been an associate, you

24  started to notice you were getting complaints from patients,

25  where patients were saying they weren't properly informed of

1    the risks associated.

2              UNIDENTIFIED SPEAKER:  Right.

3              THE COURT:  And that was what I think she was

4    talking about here, wasn't it?

5              UNIDENTIFIED SPEAKER:  On 128?

6              THE COURT:  Mm-hmm.  It does seem like it was the

7    same thing.  And it goes on through 6, so -- that, that does

8    seem to be the same thing.  231:20 through 232:6.

9              UNIDENTIFIED SPEAKER:  And it was 128.

10             THE COURT:  128, that whole part here where she's

11   talking about -- it started -- it starts at 1.  Patients,

12   next one mentions patients did not feel they were adequately

13   pre-op consent risk/benefit assessment.  Do you see that?

14             UNIDENTIFIED SPEAKER:  Yes, we already agreed to

15   cut that.

16             THE COURT:  What are you cutting?

17             UNIDENTIFIED SPEAKER:  The remaining testimony,

18   Your Honor -- (recording inaudible.)

19             UNIDENTIFIED SPEAKER:  We agreed to take out 1

20   through 5 as being cumulative, but not when she starts

21   talking about going -- and then looking at the database.

22             THE COURT:  Okay.

23             UNIDENTIFIED SPEAKER:  That's the distinction I'm

24   drawing.  I cut out 1 through 5, because I agreed that was

25   cumulative.  But --

1    UNIDENTIFIED SPEAKER:  And if you just keep going,

2    on, for example, on 128:6, so she looks at the database, and

3    then below that, so 128:14, and when you say -- (recording

4    inaudible.)

5    THE COURT:  Yeah.  I mean it's pretty much the

6    same thing, mm-hmm.  Yeah, see, then it goes on -- where she

7    says -- and is this still in on 129, to accurately reflect

8    what I saw in these complaint reports?

9    UNIDENTIFIED SPEAKER:  No.  See, I cut 1 through 5

10   on 128.  And then I cut 8 through 2; I agreed that was

11   cumulative.  I've already -- I agreed with him.

12   UNIDENTIFIED SPEAKER:  That's what's left.

13   UNIDENTIFIED SPEAKER:  But the Remetrex part,

14   that's where I draw the distinction.  I mean, I agreed with

15   him on the front end and back end of that.

16   THE COURT:  Well, then it's really not that

17   cumulative if you've cut all the rest of it out.

18   UNIDENTIFIED SPEAKER:  Right, it's just this

19   middle part on Remetrex.

20   THE COURT:  Yes.

21   UNIDENTIFIED SPEAKER:  This is just -- I had 14 --

22   talking about complaints -- (recording inaudible) -- and the

23   complaints were that they weren't properly informed of the

24   risks.  That's exactly where the question is in 230 --

25   (recording inaudible.)

1        THE COURT:  Yeah.  I mean, it's -- it's -- yeah,

2    it's essentially it's the same thing.  But --

3        UNIDENTIFIED SPEAKER:  My problem with it is is

4    that she has two different tasks to take complaints and talk

5    about it, and then go back and say, we have all these other

6    complaints.  Is there a problem here?

7        UNIDENTIFIED SPEAKER:  But it's -- (recording

8    inaudible) --

9        THE COURT:  So here you're saying here she's

10   getting complaints from patients, and here's she's looking

11   in a database?

12       UNIDENTIFIED SPEAKER:  Exactly.  And then I agreed

13   the front end and back end were cumulative of 186.  I agreed

14   to take it out.  But I don't -- in my mind, I see the

15   distinction of two different activities.

16       THE COURT:  Yeah.  I'm going to leave this in.

17   Because I do think he's cut all of that out of the back end.

18   And it could be that these are different.  Because here it's

19   saying she's getting complaints, and there she was looking

20   at a database.  So I'm going to believe what he's saying,

21   that those are two different --

22       UNIDENTIFIED SPEAKER:  The database would include

23   the complaints.

24       THE COURT:  Yeah, but she is saying two slightly

25   different things here.  And he has cut all that other out.

```
 1    So I don't find it so cumulative that it makes that much

 2    difference, so --

 3            UNIDENTIFIED SPEAKER:  Judge, those are all the

 4    cumulative objections.

 5            UNIDENTIFIED SPEAKER:  I have one.

 6            THE COURT:  Okay.

 7            UNIDENTIFIED SPEAKER:  On page -- of your

 8    counter-designation, 229 is cumulative of -- 229:30.

 9            THE COURT:  229, okay.

10            UNIDENTIFIED SPEAKER:  And, you know, she -- I

11    think it's cumulative of Page 80:11 through --

12            THE COURT:  29, what line?

13            UNIDENTIFIED SPEAKER:  I'm sorry, Your Honor.

14    229, line 9 through 230:15.

15            THE COURT:  Through 230:15, okay.

16            UNIDENTIFIED SPEAKER:  It happens at 280 --

17    (recording inaudible) -- and then again --

18            THE COURT:  And where do you say it's cumulative

19    of what?

20            UNIDENTIFIED SPEAKER:  80:11 through 81:2.

21            UNIDENTIFIED SPEAKER:  You can cut -- cut out --

22    (recording inaudible) -- 22 -- you already cut out 229:9

23    through 14.

24            UNIDENTIFIED SPEAKER:  Well, that's your --

25    (recording inaudible) --
```

```
 1            UNIDENTIFIED SPEAKER:  Well, I know, but you cut

 2    it out of the counter and then you want to say I'm

 3    cutting --

 4            UNIDENTIFIED SPEAKER:  Well, then it was a

 5    mistake.

 6            THE COURT:  Right.  Cut it for you.

 7        (Recording inaudible.)

 8            THE COURT:  All right, so you say it's cumulative

 9    of what now?

10            UNIDENTIFIED SPEAKER:  Page 80:11 through 81:2.  I

11    mean, they're just --

12            THE COURT:  80:11 through 81:2.

13            UNIDENTIFIED SPEAKER:  Another designation that's

14    cumulative.

15            THE COURT:  Might be that patient --

16            UNIDENTIFIED SPEAKER:  Well, at least I told you

17    it was your designation.

18            UNIDENTIFIED SPEAKER:  You told me it was my

19    designation.

20            UNIDENTIFIED SPEAKER:  I meant to say I'm

21    objecting to that.  And just cut your designation.

22        (Recording inaudible.)

23            UNIDENTIFIED SPEAKER:  One place is 80.  You know,

24    it's several times in here.  It's just one thing a physician

25    looks at, and it's part of the risk/benefit.
```

```
1              UNIDENTIFIED SPEAKER:  What page is the original

2   on?

3              UNIDENTIFIED SPEAKER:  80, page 80.

4              THE COURT:  Okay.

5              MR. KUNTZ:  So it would be the first volume, Phil.

6              MR. COMBS:  Yes, I just -- I'm -- I'm just

7   struggling, Jeff, because I don't have it designated.  I

8   mean, it may be that it was designated and got removed.

9              MR. KUNTZ:  I don't know.

10             THE COURT:  On 80, you mean?

11             MR. COMBS:  Yes.

12             MR. KUNTZ:  Then it's definitely not cumulative if

13  you don't have it designated.

14             MR. COMBS:  And, Judge, Jeff and I, once we get --

15  once he gets the run sheet cut, what we'll do is -- he'll

16  send us his, and we'll compare it to ours and we'll get back

17  together with him.  And if there is anything -- one thing I

18  promise you, I think it's really unlikely that Jeff and I

19  will be back down here to bug you on this deposition --

20             THE COURT:  Okay.

21             MR. KUNTZ:  So 80, you don't have designated?  It

22  could just be a mistake?

23             MR. COMBS:  It could be a mistake.  We'll go back

24  and look at it.  But on the transcript I have, it is not --

25  (recording inaudible.)
```

1            MR. KUNTZ:  Okay.

2            THE COURT:  That takes care of that one then.

3            MR. COMBS:  Judge, we really appreciate it.

4            MR. KUNTZ:  Yes, thank you very much.

5            THE COURT:  Sure.

6            MR. COMBS:  I know it's very tedious.  We

7    appreciate it.

8            THE COURT:  No problem.

9            MR. KUNTZ:  We actually agree a lot more than

10   you --

11           THE COURT:  No.  I think you guys have done a good

12   job really.  It looks pretty good.

13           UNIDENTIFIED SPEAKER:  It's a lot of depo cuts.

14           UNIDENTIFIED SPEAKER:  Oh, my gosh, this is the

15   14th one.

16           THE COURT:  Well, you know, it's terrible that you

17   have to do your whole trial by depositions, on the one hand,

18   but, on the other hand, it's kind of nice that you can sort

19   of go back and pretty all these things up and you're not

20   stuck with any real surprises at trial.

21           UNIDENTIFIED SPEAKER:  That's true.

22           THE COURT:  Although, that's boring, because the

23   best part of trial is the surprises, I think.  At least I

24   always thought the best part was the surprises.  The best

25   and the worst.

```
 1              UNIDENTIFIED SPEAKER:  Yeah, right.  It just
 2    depends  --
 3              THE COURT:  Which end of the surprise you're on.
 4              UNIDENTIFIED SPEAKER:  Yes.
 5              UNIDENTIFIED SPEAKER:  Oddly happens that you'll
 6    be on both ends.
 7              THE COURT:  Yeah.  I learned early on to get that
 8    stony face so you didn't have the bad reaction when you got
 9    surprised.
10              UNIDENTIFIED SPEAKER:  When I was taking my trial
11    advocacy class in law school, the professor, he said -- he
12    said, this is called the spear in the chest.  And when
13    you're in law school, you don't know what he's talking
14    about.  But the first couple times you're in deposition or
15    trial and you ask that bad question and you just get blown
16    up, you're just like, oh, now I know what he was talking
17    about.
18              THE COURT:  It's really bad when it's your own
19    witness who does it to you.
20              UNIDENTIFIED SPEAKER:  Yes.  Judge, thank you very
21    much.
22              THE COURT:  You're welcome.
23              UNIDENTIFIED SPEAKER:  Was there an issue on
24    Owens?
25              UNIDENTIFIED SPEAKER:  Paul and Andy worked it
```

1    out.  It is done.  Everything -- no, everything is done.

2    Everything --

3              UNIDENTIFIED SPEAKER:  This is what I got, and

4    they said, can you handle it.  I have no idea.

5              UNIDENTIFIED SPEAKER:  It's done.  The only

6    deposition that's still to be negotiated --

7              THE COURT:  We're off the record?

8              UNIDENTIFIED SPEAKER:  Yes.

9         (Proceedings concluded.)

10

11                    REPORTER'S CERTIFICATE

12        I, Catherine L. Schutte-Stant, Official Court

13   Reporter of the United States District Court, for the

14   Southern District of West Virginia, do hereby certify that

15   the foregoing proceedings, which were taken out of my

16   presence, were transcribed by me from an audio recording to

17   the best of my ability, and said proceedings are a true and

18   accurate transcript from my stenographic notes.  I further

19   certify that I am neither related to any of the parties by

20   blood or marriage, nor do I have any interest in the outcome

21   of the above matter.

22

23   AUGUST 25, 2014     s/CATHERINE L. SCHUTTE-STANT, RPR, RMR

24                      _____

25