# Exhibit 6



Copyright © 2013 Charleston School of Law. All Rights Reserved.
Charleston Law Review

Winter, 2013 - 2014

Charleston Law Review

*8 Charleston L. Rev. 319*

**LENGTH:** 17912 words

ARTICLE: WARNING: LAWYER ADVERTISING MAY BE HAZARDOUS TO YOUR HEALTH! A CALL TO FAIRLY BALANCE SOLICITATION OF CLIENTS IN PHARMACEUTICAL LITIGATION

**NAME:** Daniel M. Schaffzin*

**BIO:** * Assistant Professor of Law & Director of Experiential Learning, The University of Memphis Cecil C. Humphreys School of Law. J.D., 2000, Temple University Beasley School of Law; B.A., 1996, Temple University. Great thanks go to my wife, Professor Kate Traylor Schaffzin, for her ongoing support of my teaching and scholarship. Special thanks also go to my fine research assistant, Brandon White, for his many contributions to this article. Lastly, I offer my genuine thanks to Vinnie Carissimi and my former colleagues in the Health Effects Litigation Group at Pepper Hamilton LLP. It is a thrill to cite to Vinnie in this article and to express my appreciation for the seeds of inspiration that he and the Pepper team planted within me many years ago.

**LEXISNEXIS SUMMARY:**
 ... Because of this and other risks known to be associated with the drug, the warnings accompanying Pradaxa strongly advise patients not to stop taking the medication without first talking to medical personnel as doing so might increase the risk of having a stroke. ... Because of the manner in which lawyers are recruiting clients for mass tort litigation, the commercial outreach efforts they are undertaking present significant risks of misleading and confusing the already vulnerable consumers they are attempting to recruit. ... Among 301 patients surveyed, 86% asserted an awareness of advertisements promoting lawsuits against pharmaceutical companies over a specific drug, and one in five had seen an advertisement for litigation involving a drug they were taking. ... Shedding further light on the boundaries of permissible commercial speech when related to professional services, the Court explained: Truthful advertising related to lawful activities is entitled to the protections of the First Amendment. ... Although the law regulating drug promotion has never explicitly banned direct advertising to consumers, drug companies historically aimed their promotional efforts at the physicians who were prescribing their medications. ... In a television commercial, the lawyer should deliver the disclosures in the form of a major statement that is expressed in language understandable to the reasonable consumer and presented in a pace, tone, and form (oral or written) consistent with the claims made by the lawyer regarding the drug at issue.

**HIGHLIGHT:** COULD THIS HAPPEN TO SOMEONE YOU KNOW? John Jones is a sixty-eight-year-old man recently diagnosed with atrial fibrillation. n1 To counter the significantly increased risk of stroke associated with this

8 Charleston L. Rev. 319, *

condition, n2 John's doctor recently prescribed him the blood-thinning medication Pradaxa. n3 Like other blood thinners, Pradaxa can cause bleeding. n4 Because of this and other risks known to be associated with the drug, the warnings accompanying Pradaxa strongly advise patients not to stop taking the medication without first talking to medical personnel as doing so might increase the risk of having a stroke. n5 During the course of several discussions about Pradaxa and blood-thinning medications, John's prescribing physician has repeatedly advised John about the known risks and instructed him not to stop taking Pradaxa before first consulting him.

While watching reruns one weekday morning, John sees a commercial for the law firm Smith & Smith. As the words "PRADAXA," "FDA," and "WARNING" flash across the screen, a narrator reads the following in an urgent tone:

Pradaxa users: this is a warning for you. Did you take Pradaxa and experience kidney bleeding, internal bleeding, or a heart attack? Pradaxa, a blood-thinning drug, was supposed to be a safe anti-coagulant drug. However, reports from the FDA of Pradaxa side effects are showing a different picture. The FDA has announced new studies that indicate hundreds of cases of internal bleeding and even death. Originally, Pradaxa studies used by the company to gain FDA approval suggested only a small increase in the risk of heart attacks with the use of the drug compared to Warfarin. If you took Pradaxa and suffered from internal bleeding, heart attack, or other complications, then you may be entitled to financial compensation. So act now as time is limited. Find out if you qualify for compensation. Visit http://pradaxalawsuit information.com. n6 This website provides information about side effects of Pradaxa and compensation you may receive. Fill out the online case form now and start your free case evaluation now. Experienced Pradaxa lawyers will contact you if you qualify for compensation. n7

The commercial included no language advising users of Pradaxa not to stop the medication before consulting a physician.

John sees this commercial twice during the course of the half-hour television program. Panicked and confused, he immediately gets on his computer and searches the internet using the phrase "Pradaxa dangerous." n8 Among the first six search results John views are four links to websites maintained by lawyers or containing advertisements by lawyers for Pradaxa litigation. n9 Upon surveying several of these websites, John decides that he will stop taking his Pradaxa prescription and let his doctor know about the decision at his next appointment, scheduled for the next week. n10

**TEXT:**
 [*323]

I. INTRODUCTION

Like John, most Americans need not be anywhere near a doctor's office to face a deluge of information about pharmaceutical products. A source of significant debate, n11 [*324] pharmaceutical companies spend millions of dollars a year on direct-to-consumer advertising aimed at promoting drug products and the diseases they are approved to treat. n12 Just as prevalent, though seemingly less controversial, is a different sort of consumer-targeted advertising involving the delivery of commercial information about prescription drugs - advertising by law firms seeking clients in cases alleging the liability of those drug products. n13

While watching television, listening to the radio, and surfing the Internet, the average consumer must make a conscious effort to avoid the ongoing stream of legal advertisements. A great number of these advertisements caution and encourage users of prescription drugs to explore possible lawsuits against the companies that make and sell prescription drugs. n14 Designed to shock the conscience, they employ a common pattern: hurling urgently toned and prominently positioned sound bites across the media spectrum in a manner that touts the harmful side effects and

scientific data undisclosed by profit-hungry drug companies. [*325] The intended effect is to drive the consumer to contact the advertising lawyer about a potential claim arising from the prescription drug. As exemplified by the hypothetical case of John Jones, however, the impact of the authoritative - but unqualified - message of the lawyer can be much more: the consumer, already generally more susceptible by virtue of age or medical condition, loses confidence in, or simply stops taking, a medication prescribed by his or her physician.

Part II of this article contends that lawyer advertising intended to recruit prescription drug litigants poses a significant risk to the public's health and should therefore be regulated in a narrowly-tailored manner that protects both the consumer and the recognized right of attorneys to engage in commercial free speech. Part II fleshes out the asserted public health risk in three sections. First, in an effort to contextualize the commercial messaging at issue, Part II.A considers the prevalence of advertising by plaintiffs' lawyers and the inherently self-interested strategies employed by those lawyers who seek and are ultimately successful in efforts to recruit claimants for pharmaceutical litigation. Second, Part II.B scrutinizes examples of legal advertising for pharmaceutical claimants across several types of media. Among other points, the case is made that the content and tone of the messaging communicated by plaintiffs' pharmaceutical lawyers can frequently render it misleading or confusing when considered from the vantage point of the consumer. Third, Part II.C details study data and anecdotal evidence demonstrating the adverse impact of legal advertising for pharmaceutical liability cases on patient compliance and confidence.

In Part III, the article reviews the laws setting existing parameters on permissible legal advertising. Both Supreme Court jurisprudence impacting legal advertising and pertinent provisions of Model and state ethical rules are considered. Part IV then prescribes a narrowly tailored solution that honors the substantial governmental interest of protecting the consumer audience and the recognized commercial speech rights of the attorney advertiser. After a thorough exploration of federal law and guidance materials governing direct-to-consumer advertising by pharmaceutical companies, it is proposed that lawyer [*326] advertising for pharmaceutical mass tort claimants should be balanced in a manner akin to that required of pharmaceutical advertisers. Among other components, lawyers soliciting pharmaceutical litigants should make a series of clear and prominent disclosures regarding the nature of the commercial speech as advertising; should refer the consumer to neutral, third-party sources from which more information can be obtained; and should offer clear instruction to consult with a physician before making any decisions regarding the use of the subject medication after seeing the advertisement.

II. PREVALENCE OF AND PUBLIC HEALTH RISK ASSOCIATED WITH RECRUTING MASS TORT PHARMACEUTICAL LITIGANTS

Until the mid-1970s, absolute prohibitions prevented lawyers from advertising their services in any significant form to the general public. n15 In 1977, however, the Supreme Court struck down a state ban on attorney advertising in Bates v. State Bar of Arizona, n16 holding that promotion by lawyers was a protected form of commercial free speech. n17 The more than thirty years since Bates have seen a spectacular increase in attorney advertising across the media spectrum. n18 Among the most common targets of commercial solicitation by attorneys are tort victims, n19 in particular those who have been consumers of [*327] prescription medications that have faced the scrutiny of regulators or the scientific community. n20 Here, it is argued that many of the lawyers searching for plaintiffs willing to sue pharmaceutical companies use advertising tactics that can both mislead and compromise the well-being of the vulnerable consumers they are purporting to help.

A. Flood Gates Open: The Prevalence of Attorney Advertising Since Bates and Its Role in the Proliferation of Mass Tort Pharmaceutical Litigation

Attorneys acted swiftly and decisively on the promotional freedoms sanctioned by Bates and its progeny. n21 In the decade that followed the Bates decision, one-third of lawyers acknowledged having advertised, with 86% of those making solicitation through the Yellow Pages and 12% utilizing newspapers. n22 Within fifteen years of the ruling, attorneys were spending $ 419 million on Yellow Pages advertising, n23 and television advertising by lawyers had increased from less than $ 100,000 to more than $ 113 million. n24 In 1992 alone, thirteen law firms budgeted more

than $ 1 million per year for television promotion. n25

By the year 2000, attorney expenditures on television advertising had increased to approximately $ 236 million. n26 The start of the twenty-first century also saw lawyers expanding  [*328]  their promotional strategies to include use of internet outreach as a supplement to the more traditional forms of television, radio, and print advertising. n27 In 2009, attorneys spent just under $ 500 million on television advertising, approximately $ 102 million on magazine and newspaper solicitation, and roughly another $ 13 million on radio and internet promotion. n28 A 2012 report issued by the U.S. Chamber of Commerce's Institute for Legal Reform asserted that trial lawyers are spending more than $ 50 million on Google keyword advertising annually, n29 more than three times the total amount that the 2008 Obama presidential campaign spent for all online advertising and considerably more than the keyword advertising that Apple spent on the iPad and iPhone. n30  [*329]  In 2010, lawyers spent more than $ 844 million on advertising. n31

While commercial solicitation by lawyers immediately following the Bates decision sought out divorce cases and estates work, n32 it was not long before personal injury lawyers working on contingency-fee cases became the primary users of advertising channels. n33 For these practitioners, the freedom to advertise opened the door to the recruitment of a new category of clients: those who could claim injuries caused by similar exposure to a pharmaceutical product, medical device, or other product that had been demmed to cause injury. n34 The result was the proliferation of a refocused brand of mass tort litigation, one that targeted the "dispersed" or "toxic" tort rather than the group claims arising from a catastrophic accident. n35 By the early 1980s,  [*330]  mass toxic tort litigation dominated court dockets n36 and spawned a now well-understood business model that rewards attorneys who can recruit the most claimants in the most limited period of time. n37

Following the typical paradigm, it is common for lawyers to begin advertising for possible lawsuits within hours of a report that a marketed drug product has come to be associated with significant consumer injury or negative data. n38 On a rolling basis, the advertising lawyers will evaluate the prospective claims of responding consumers based on provability of drug exposure, medical records demonstrating related injury, and medical history generally. n39 After screening out cases deemed to be non-meritorious, the lawyers will then enter contingent-fee  [*331]  representation agreements with as many claimants as possible. n40

Once a mass grouping of clients are signed up, the lawyer or firm will likely proceed in one of several ways, all of which involve an aggregated claims strategy:

. Following what one commentator has called the "wholesaler" approach, the lawyer may hastily move forward with the filing of a putative class action. n41 Acting swiftly in this regard may create instant publicity that will help to attract more clients. n42 Being among the first to file a class action may also lead to the lawyer being named lead class counsel or appointed to a steering committee of plaintiffs' counsel in multi-district litigation situated in or around the forum where the class action was filed. n43

. Taking a "retailer" approach, the lawyer might alternatively choose to pursue the collected cases individually, but with an ultimate goal of "bundling" them together for leverage purposes. n44 Here, the strategy will most frequently involve pre-suit presentation of claims to the potential defendant with the threat of imminent litigation. Proceeding in this fashion, the lawyer will aim to generate early-term settlement discussions that will commonly join together the lawyer's stronger claims with those that  [*332]  might be weaker in terms of causation or damages. n45 If a favorable settlement is not obtained, the lawyer can then join the claims with a class, if one is certified, or file lawsuits in as many of the cases as is necessary. n46

. A third, and perhaps most provocative, approach involves the lawyer discontinuing the lawyering role after such time as the advertising has been placed and the potential claimants have been screened. At that point, the recruiting lawyer will take the often-significant numbers of claims and refer the same in bulk to lawyers who specialize in mass tort cases. n47 Usually, the lawyer will make the referral in exchange for some segment of the new lawyer's contingent fee, if any is recovered, and in reimbursement of other costs expended in pre-referral recruiting and screening of claims.

n48 To ensure compliance with ethical obligations, the referring lawyer will often remain involved as the primary client contact, while the lawyer to whom the cases are referred assumes responsibility for all substantive work. n49

[*333]  Regardless of the approach, the immediacy of the advertising and the referral networks tied to this effort are themselves problematic and raise troubling questions about the potential for harm to the otherwise unassuming consumer. To wit, in how many cases does the lawyer's drive to be "first to air" with commercials preclude a full and complete investigation of the negative study data or new warnings giving rise to the purported claims being shopped? n50 Do the hurried legal advertisers have a plan in place to process the responses they will receive in a manner that will honor, ethically and otherwise, the prospective clients who are providing those responses? n51 How effectively, if at all, do the various legal marketing messages communicate to the audience the reality that the sponsoring lawyer will almost certainly group individual cases together as part of a mass litigation or settlement strategy, or refer those cases to another law firm that may or may not be sufficiently equipped to handle the cases competently? n52 Is the advertiser a lawyer, or some other business entity being funded by a lawyer? n53

[*334]  Rather than addressing these concerning questions, it has become an expected aspect of mass toxic tort litigation that plaintiffs' lawyers will pursue aggressive marketing campaigns timed and designed to accumulate - rather than inform - potential clients. n54 Central to these ads is a theatrical, exaggerated brand of tone and content that further acts to render the ultimate consumer confused and vulnerable.

B. Dazing and Confusing: How Lawyers Advertise for Mass Tort Pharmaceutical Claims

Today, mass tort lawyers are using every form of media to search for clients. n55 Television campaigns crafted to make an instantaneous and jolting impact on audience members who see them have long been at the forefront of marketing efforts undertaken by mass tort lawyers. n56 More recently, the advent of online and social media advertising has allowed lawyers to increase their reach exponentially and enabled small and less established firms to be more active participants in mass tort litigation. n57 Because of the manner in which lawyers are  [*335]  recruiting clients for mass tort litigation, the commercial outreach efforts they are undertaking present significant risks of misleading and confusing the already vulnerable consumers they are attempting to recruit.

Perhaps the most recognizable means of recruitment are repetitive television commercials that utilize intimidating images, harsh phrases, and urgent tones that encourage the viewer to consider potential claims arising from ingestion of a drug product. n58 Following an all-too-predictable script, the usual commercial presents the plaintiffs' lawyer speaking authoritatively about new safety information, previously undisclosed by the drug-maker, impacting the warnings associated with the drug or causing its withdrawal from the market. n59 While the information is delivered, the name of the drug and the injuries it is being alleged to cause, along with words like "DEATH," "WARNING," and "DANGER," flash across the screen in bold, enlarged, and colorful fonts. n60 The lawyer,  [*336]  having delivered the sound bite that grabs the attention of the viewer, then altruistically invites the viewer to help "you or a loved one who may have been injured" by seeking out the services of the lawyer's law firm. n61 The viewer is encouraged to call the law firm immediately because "time may be running out" to preserve the viewer's rights against the drug company. n62

Beyond making use of imperative and sensationalized messaging, plaintiffs' mass tort lawyers also target television advertising to audiences more likely to be responsive to it. It is well accepted that television advertising soliciting clients appeals to the unsophisticated and less educated at a disproportionate rate. n63 To further seize on this vulnerable audience, drug lawyers place their ads to run during the day and late at night, n64 when they are more likely to reach individuals who are low-income, out of work, infirmed, and elderly. n65 Members of these more  [*337] susceptible target groups are generally not carriers of health and disability insurance or beneficiaries of paid work leave policies, which makes them more likely to be interested in the timely resolution of claims they perceive as being offered by the lawyer ads. n66

To expand potential outreach and limit the expense associated with television advertising, lawyers have increasingly used websites to solicit and screen potential mass tort claimants. n67 Utilizing carefully-planned keyword

advertising n68 and strategically-named web addresses (examples include TheActosLawFirm.com, n69 YazLawsuitLawyer.net, n70 and  [*338]  DangerousDrugs.com n71), lawyers direct the browsing party to legal advertising sites that purport to offer much more. Commonly, the websites present a dizzying mix of video and other content offering information about the "side effects" caused by the drug, "warnings" issued or other adverse action taken by the FDA related to the drug, and changes to the drug's labeling that are characterized as revealing negative data or drug-related complications previously withheld by the manufacturer. n72 That content is frequently intermingled with "results" information touting the outcomes obtained by the website sponsors on behalf of other clients. n73 By providing one-click access to online forms, the sites also invite the viewer to submit contact information necessary to initiate the screening process. n74 Facebook pages and  [*339]  Twitter feeds are used by advertising lawyers to drive viewers to the website. n75

While mass tort lawyers center their commercial messaging to potential clients and subsequent litigation claims around the allegedly misrepresentative nature of drug company promotional efforts, the marketing tactics they employ often toe the line between merely sensational and objectively misleading or confusing. In their thirty-second television spots and website headlines, lawyers authoritatively offer mere pieces of a bigger story, making broad claims about negative data, serious side effects, and adverse government action, without providing a proper context against which to weigh those claims. Although they are almost without exception not medically trained, legal advertisers seldom advise the target consumer to stay on the drug until they are able to talk to a doctor. n76 And rarely, if ever, do they couple their incomplete warnings with transparent information about the sources supporting their claims or guidance regarding how to access those sources or disinterested  [*340]  authorities like the FDA for more information about data, warnings, or withdrawals. n77

Still, given the prevalence of marketing by mass tort attorneys, today's patients are as (if not more) likely to gather information about a medication from a legal advertiser as they are from a healthcare professional. n78 Compounding this reality is the fact that legal advertisers regularly attempt to bury identifying or affiliation information in their promotional materials, designing materials to masquerade as unbiased news stories n79 or purely informational resources devoted to patient support. n80 In some cases, the advertising fails to tell the consumer who the lawyer is, if it is in fact a lawyer, doing the advertising. n81 Similarly, in the cases of lawyers who plan to refer  [*341]  some or all of the cases they successfully recruit, the messaging frequently omits any information about the prospect of referral or only does so in the fine print. n82

Although they are not healthcare professionals, mass tort plaintiffs' lawyers have, through their vast promotional undertakings, come to be a threatening part of the doctor-patient dialogue. Under the cover of commercial free speech, these lawyers speak convincingly to consumers about their serious illnesses and the sophisticated medications that have been prescribed to treat them. n83 The unfortunate result is that the average consumer is left to fend for himself in the search for a truth that a lawyer is now professing or promising to disclose. n84 Because that "truth" is often delivered only in part and generally without any disclosure of the inherently self-interested, ulterior business motives of the lawyer or law firm to gather as many clients as possible, the already vulnerable consumer is potentially being placed at even greater risk than that being hyped by the legal advertising at issue.

 [*342]

C. The Public Health Risk Posed by "Dangerous Drug" Ads: Assessing the Impact on Patient Decision-Making and Safety

Anecdotal evidence, in the form of both formal survey data and other first-hand reporting from medical professionals, supports the argument that widespread advertising for pharmaceutical litigation negatively impacts patient attitudes toward - and compliance with - physician-prescribed medica-tions. n85 In a 2003 poll commissioned by the U.S. Chamber Institute for Legal Reform, Harris Interactive interviewed people under medical care n86 about their awareness of product liability litigation involving specific drugs. n87 Among 301 patients surveyed, 86% asserted an awareness of advertisements promoting lawsuits against pharmaceutical companies over a specific drug, and one in five

had seen an advertisement for litigation involving a drug they were taking. n88 Perhaps more notably, nearly nine out of ten patients responded that they would be "concerned," with another half expressing that they would be "very concerned," if they "saw an advertisement [*343] regarding litigation over a drug they were taking." n89 Of those surveyed, 25% responded that seeing an advertisement making claims about a drug they were taking would cause them to "stop taking the drug immediately." Another 31% answered that they were "not sure" whether they would stop taking the drug. n90

In 2007, a similar survey funded by pharmaceutical manufacturer Eli Lilly and jointly sponsored by the National Council for Community Behavioral Healthcare asked 402 psychiatrists for opinions regarding the effect of lawsuit advertising on the compliance of patients taking antipsychotic medications. n91 Among respondents, nearly all (97%) reported having patients who had stopped taking or reduced their dosages of antipsychotic medications. n92 Of these psychiatrists, 52% attributed the reported medication stoppages or dosage reductions to law firm advertisements about antipsychotic drugs. n93 Additionally, half of the respondents reported that patient caregivers also asked for switches or stoppages of antipsychotic medications because of concerns generated by law firm advertisements, even if the loved one taking the medication was responding positively to treatment. n94

[*344] While survey data offer support for the broad premise that histrionic ads for pharmaceutical litigation can pose risks to patient safety, those risks become more tangible when considering exactly how individual patients are making medication-related decisions based on those ads alone. In a blog post entitled "Your Medication Can Kill You; Call Your Lawyer!," Evan Levine, a cardiologist and Clinical Assistant Professor of Medicine at the Montefiore Medical Center - Albert Einstein College of Medicine, detailed the nearly catastrophic impression that such an ad made on one of his patients:

I recently had an encounter with a patient who watched, in shock, a television ad portraying this new drug [Pradaxa,] as problematic and dangerous. He sat in my waiting room anxiously waiting to see me. He was concerned that I had prescribed a medication, to prevent a stroke, as a result of his irregular rhythm, that could cause him to hemorrhage to death. "It's all over the TV," he told me. "I saw it on the commercials. Pradaxa is causing people to bleed to death and I stopped it. I don't think I should be taking a drug that can make you bleed like that. People are suing too."

He had mistakenly placed himself at risk of a stroke by stopping the drug and spent his time and precious money (cost of a cab and the visit), to come to my office because he was convinced by a very convincing Madison Avenue ad that he was taking a dangerous drug. n95

Like many patients with atrial fibrillation, Dr. Levine's patient was elderly and thus likely to be more susceptible to a sensational ad touting the dangers of a medication treating his condition. n96 For this reason, and because the patient placed himself at increased danger of stroke and other bleeding-related events for the several weeks he was off Pradaxa, Dr. Levine lamented that "such ads represent a kind of public health risk." n97

In criticizing the legal advertisements at issue, Dr. Levine did not downplay the fact that Pradaxa, like other blood-thinning drugs used to treat atrial fibrillation, comes with its own set of [*345] significant risks and will cause some patients to suffer "horrible bleeds." n98 Still, he expressed his medical opinion that Pradaxa is for many patients a "better" and "safer" medication than its longer-marketed, historically prescribed alternatives: n99

But the free market is about making money, so there are firms out there putting millions into commercials, fishing for people who had a bleed while taking the drug (even though it is a known risk for any drug that thins the blood). It may

be that some of these people do deserve compensation, but what is clearly dangerous is that these ads seem to be causing some patients to stop taking critical medications! And if you stop Pradaxa, because you were frightened by some commercial, you will increase your risk of having a stroke.

Many of the ads would scare me, if I did not know the drug to be an important agent to reduce the risk of stroke. n100

Even within the mass tort plaintiffs' bar, debate exists about the appropriateness of and risk for adverse impact posed by ill-timed and sensationalized drug advertisements. Among the critics, one well-known mass tort lawyer described the perils of "exuberant advertising" as follows:

But there is another group who may be damaged ... who are not heard from, as they have no constituency: the people who see these ads. Having spoken extensively with people who respond to these solicitations (including our own), I know that there is a group who are frightened unnecessarily by the ads, perhaps stopping a drug that is good for them in their specific situation. There are also those who have false hopes raise that they will get money - but they never hear from the Website  [*346]  again. And there are those who have bona fide medical questions that their busy doctor doesn't have time to answer and are led by the ad to believe that they will get medical advice if they respond. n101

### III. EXISTING PARAMETERS OF PERMISSIBLE LEGAL ADVERTISING

For much of American history, broad ethical prohibitions precluded lawyers from engaging in any advertising or other commercial solicitation of clients. n102 In the mid-1970s, however, the United States Supreme Court began setting clearer boundaries around the restrictions that may be imposed on commercial free speech. n103 Among its early rulings in this area, the Court clarified in Bates v. State Bar of Arizona that blanket bans on legal advertising, as a category of such speech, are unconstitutional. n104 Although the Court extended constitutional shelter to legal advertising, it did not then pronounce, and has not subsequently deemed, legal advertising to be immune from regulation. n105 To the contrary, a survey of more recent Supreme Court jurisprudence on the issue of commercial speech generally, and legal advertising specifically, makes clear that when advertising by lawyers is false, misleading, or otherwise presents a threat to the public welfare, it may be limited in a manner that does not compromise constitutional free speech protections. n106

[*347]

### A. Overview of Supreme Court Jurisprudence Impacting Legal Advertising

The protections generally afforded to commercial speech extend from the Supreme Court's 1976 decision in Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc. n107 In that case, the Court considered the constitutionality of Virginia's outright ban on the advertising of prescription drug prices. n108 Among its other public policy implications, the Court noted that preventing disclosure of the banned price information prevented consumers from "the alleviation of physical pain or the enjoyment of basic necessities" n109 and encroached upon the public's capacity to make informed choices about economic policy. n110 Striking down the broad advertising prohibition at issue, the Court held that a state may not "completely suppress the dissemination of concededly truthful information about entirely lawful activity, fearful of that information's effect upon its disseminators and its recipients." n111 Again, however, the Court made explicit that the First Amendment does not shield commercial speech if the speech is false or misleading. n112 Moreover, the Court repeated the well-established doctrine that lawmakers may restrict the time, place, and manner of commercial speech "provided that they are justified without reference to the content of the regulated speech, that they serve a significant government[] interest, and that in so doing they leave open ample

alternative channels for communication of that information." n113

A year later, in Bates v. State Bar of Arizona, the Court established legal advertising as a category of protected free [*348] speech when it struck down an Arizona state ban on commercial solicitation by lawyers. n114 In Bates, the Arizona State Bar initiated disciplinary action against two lawyers who had advertised their legal services in a Phoenix newspaper. n115 Countering the arguments that the advertising ban at issue furthered the state's interests in mitigating a decrease in professional lawyering quality n116 and limiting consumer costs that would increase if advertising was permitted, n117 the Court explained that the legal services being advertised by the disciplined attorneys were routine ones that could be accurately priced before they were performed. n118 The Court further reasoned that permitting legal advertising would "be in accord with the bar's obligation to 'facilitate the process of intelligent selection of lawyers, and to assist in making legal services fully available.'" n119 The Court also explained that allowing attorney advertising would have the impact of facilitating consumer choice, potentially lowering the costs of legal services overall. n120 Rather than banning attorney advertising as a means of protecting the public, the Court offered, "the preferred remedy is more disclosure, rather than less. If the naivete of the public will cause advertising by attorneys to be misleading, then it is the bar's role to assure that the populace is sufficiently informed as to enable it to place advertising in its proper perspective." n121

Ultimately, the Bates Court narrowly held that the State Bar "may [not] prevent the publication in a newspaper of [] truthful advertising concerning the availability and terms of routine legal [*349] services." n122 Although it explained that "complete suppression" of attorney advertising was unconstitutional, the Court highlighted several restrictions on legal advertising that might be permitted, including false, deceptive, and misleading advertising, n123 advertising regarding the quality of legal services not susceptible to measurement or verification, n124 and in-person client solicitation. n125 The Court also called attention to "the special problems of advertising on the electronic broadcast media [that] will warrant special consideration." n126

Although not a legal advertising case, in Central Hudson Gas & Electric Corp. v. Public Service Commission of New York, the United State Supreme Court subsequently explained the test it would utilize moving forward in evaluating commercial speech restrictions. n127 In Central Hudson, the Court weighed the constitutionality of a state-wide prohibition against advertising by electric utility companies. n128 To assess the ban, the Court announced a "four-step analysis for commercial speech": (1) the speech must be neither misleading nor related to unlawful activity such that it falls within the parameters of First Amendment protections; (2) the state must assert a substantial interest to be advanced by the desired speech restrictions; (3) the desired restrictions must "directly advance" the asserted state interest; and (4) the asserted interest must not be attainable by a more limited speech restriction than that being proposed. n129 Applying these criteria, the Court found that, although Central Hudson held a monopoly over the sale of electrical service, the advertising fell within the category of protected First Amendment speech because Central Hudson did face competition from companies offering alternatives to its product and the advertising speech at issue was not otherwise false or [*350] misleading. n130 While the State was able to demonstrate both its substantial interests in energy conservation and in keeping electricity costs low for consumers, and that the advertising ban at issue would act to directly advance its conservation-related interest, the Court ultimately concluded that the State could not show that its conservation policy could not be protected adequately by more limited regulation than the ban. n131

Going to the heart of the test it was articulating, the Central Hudson Court reminded that "the Constitution ... accords a lesser protection to commercial speech than to other constitutionally guaranteed expression. The protection available for particular commercial expression turns on the nature both of the expression and of the governmental interests served by its regulation." n132

In the first attorney advertising case to apply the standard in Central Hudson, the United States Supreme Court in In re R.M.J. considered a Missouri restriction that permitted attorneys to advertise in newspapers, periodicals, and the yellow pages information limited to ten identifiable categories. n133 The attorney challenged the Missouri rule after facing discipline for, among other violations, describing areas of practice in a manner not permitted under the rule. n134 Shedding further light on the boundaries of permissible commercial speech when related to professional services, the

Court explained:

Truthful advertising related to lawful activities is entitled to the protections of the First Amendment. But when the particular content or method of the advertising suggests that it is inherently misleading or when experience has proved that in fact such advertising is subject to abuse, the States may  [*351]  impose appropriate restrictions. Misleading advertising may be prohibited entirely. But the States may not place an absolute prohibition on certain types of potentially misleading information, e.g., a listing of areas of practice, if the information also may be presented in a way that is not deceptive. Thus, the Court in Bates suggested that the remedy in the first instance is not necessarily a prohibition but preferably a requirement of disclaimers or explanation. Although the potential for deception and confusion is particularly strong in the context of advertising professional services, restrictions upon such advertising may be no broader than reasonably necessary to prevent the deception. n135

 The Court reiterated that when the commercial speech at issue is not misleading, the State can regulate only where it can articulate a substantial interest in doing so and the restriction is in proportion to the interest being served. n136 Because the attorney's advertisement was not inaccurate or misleading and the state could demonstrate no substantial interest advanced by the rule at issue, the Court struck down the prohibition as violating the First and Fourteenth Amendments. n137

    In Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio, the United States Supreme Court weighed the challenge of a lawyer who faced sanctions for his use of a newspaper advertisement that included a picture of the Dalkon Shield contraceptive device and offered the services of the lawyer related to claims that the device was alleged to have caused serious injuries to some users. n138 In its complaint underlying the proceedings, the Ohio Office of Disciplinary Counsel asserted  [*352]  that the Dalkon Shield advertisement violated an Ohio rule that prohibited the use of illustrations in attorney advertising and required that the information in such advertising be both "dignified" and limited to a listing of twenty categories. n139 Again using the Central Hudson test, the Court first determined that information conveyed through the illustration of the IUD device was neither false nor misleading. n140 The Court then explained that the State's asserted substantial interest in ensuring that lawyers maintain dignity in their communications with the public was not sufficient "to justify the abridgment of their First Amendment rights." n141 Ultimately condemning the broad prohibition supporting it, the Court held that the lawyer's use of an accurate illustration of the IUD device could not support his reprimand. n142 The Court again emphasized that "because disclosure requirements trench much more narrowly on an advertiser's interests than do flat prohibitions on speech, "warnings or disclaimers might be appropriately required ... in order to dissipate the possibility of consumer confusion or deception.'" n143

    The Court most recently addressed legal advertising as commercial speech in Florida Bar v. Went for It, Inc. n144 At issue in Went for It was a rule that prohibited lawyers from sending targeted, direct-mail communications to victims and their relatives within thirty days of an accident or disaster or otherwise accepting referrals received through a violation of the rule. n145 Upholding the rule, the Court explained that the speech  [*353]  at issue was neither false nor misleading but found that the State had properly asserted a "substantial interest both in protecting injured Floridians from invasive conduct by lawyers and in preventing the erosion of confidence in the profession that such repeated invasions have engendered." n146 Importantly, the Court placed great weight on the results of a two-year study from which a 106-page report was generated "containing data - both statistical and anecdotal - supporting" the State's asserted substantial interest in preventing an erosion of public confidence in lawyers. n147 The Court also deemed the thirty-day restriction at issue, unlike an outright prohibition of interminable length, to be sufficiently "narrow both in scope and in duration." n148

    B. Model and State Rules of Professional Conduct

 Within the framework set forth by the Supreme Court, the ABA Model Rules of Professional Conduct permit lawyers to advertise. n149 Model Rule 7.2(a) states that "subject to the requirements of Rule 7.1 and 7.3, a lawyer may advertise

services through written, recorded or electronic communication, including public media." n150 Rule 7.1 specified that "[a] lawyer shall not make a false or misleading communication about the lawyer or the lawyer's services," and clarifies that "[a] communication is false or misleading if it contains a material misrepresentation of fact or law, or omits a fact necessary to make the statement considered as a whole not materially misleading." n151 With limited exception, Rule 7.3(a) restricts legal advertising "by in-person, live telephone or real-time electronic contact solicit ... when a significant motive for the lawyer's doing so is the lawyer's pecuniary gain ... ." n152 Generally, Rule [*354] 7.3(c) further requires an attorney to include the language "Advertising Material" on all packaging of print advertising and at the beginning and ending of any recorded or electronic communication. n153

Consistent with the Model Rules, every state has adopted ethical rules governing attorney advertising. n154 While all state rules generally prohibit attorneys from advertising in a manner that is false and misleading, a number of states now require attorney advertising to include explicit disclaimers and other disclosures designed to protect the consumer. In Alabama, for example, lawyer advertising must state that "no representation is made that the quality of the legal services to be performed is greater than the quality of legal services performed by other [*355] lawyers." n155 Likewise, in Missouri, lawyers must accompany advertising with a statement that "the choice of a lawyer is an important decision and should not be based solely upon advertisements." n156 In other states, rules require that advertising make clear the geographic location of the office that will provide the advertised services n157 or the identification of any attorney not affiliated with the advertising firm who has paid for any portion of the advertising costs. n158 In an effort to ensure compliance with and the intended impact of advertising disclosure requirements, [*356] many states have incorporated into ethical rules language requiring that all mandated disclosures be displayed with a prominence at least equivalent to the information about the legal services being advertised. n159

## IV. A PRESCRIPTION FOR CHANGE: REQUIRING FAIR BALANCE IN LAWYER ADVERTISING FOR PHARMACEUTICAL CASES AND CLIENTS

Like advertising for pharmaceutical litigation, promotion by pharmaceutical companies is pervasive. n160 Throughout the 1990s [*357] and into the first decade of the 21st century, expenditures in pharmaceutical advertising rose exponentially, increasing from $ 11.4 billion in 1996 to $ 29.9 billion in 2005 to $ 32 billion in 2008. n161 While patent expiration for certain major drugs appears to have curbed promotional spending in recent years, n162 pharmaceutical companies still spent more than $ 27 billion to promote their products in 2012. n163

Perhaps the most significant adjustment in pharmaceutical company promotion over the last several decades has been the shift in focus to direct-to-consumer marketing efforts (DTC). n164 Until the late 1990s, pharmaceutical companies used DTC advertising in relatively limited ways, relying almost exclusively on print advertisements in magazines and newspapers. n165 After the FDA issued draft guidelines in 1997 addressing permissible broadcast DTC advertising, spending on DTC promotion skyrocketed to $ 1.2 billion in 1998, representing a more than three-fold rise from DTC expenditures just three years before. n166 [*358] In the decade that followed, pharmaceutical company outlays on promotion to consumers via television and radio commercials, print advertising, and online messaging continued to swell, exceeding $ 5 billion in both 2006 and 2007 and remaining steady ever since. n167

The prevalence of consumer-directed promotion of pharmaceuticals has sparked an intense debate focused on the impact that pharmaceutical DTC advertising can and should be permitted to have on American public health and the doctor-patient relationship. n168 Like proponents of lawyer advertising for mass tort cases, advocates for DTC promotion tout the positive impact that the spread of information can have on patient education and empowerment, the relationship between patients and healthcare providers, and patient compliance with and access to medicines. n169 Opponents counter, arguing that pharmaceutical advertising to patients overemphasizes drug benefits, pushes new drugs before complete safety information is known, encourages inappropriate prescribing and overutilization, increases patient costs, and ultimately harms the healthcare [*359] provider-patient relationship. n170 While the same commercial free speech standards protect both DTC advertising by pharmaceutical companies and lawyer solicitation for pharmaceutical cases, n171 pharmaceutical companies face far greater scrutiny in the form of streamlined regulations requiring balanced disclosure of risk information in all promotional messaging to a consumer audience. n172 With many of the

considerations supporting regulation of DTC advertising, it is time for the implementation of similar restrictions as a means of mitigating the public health risk posed by direct solicitation of clients in pharmaceutical litigation. n173

A. Federal Regulation of Direct-to-Consumer Promotion by Pharmaceutical Companies

The Federal Food, Drug, and Cosmetic Act (FDCA), enacted in 1938, authorizes the Food and Drug Administration (FDA) to regulate the advertising of prescription drug products. n174 Section 502(n) of the FDCA, as clarified by the FDA's implementing regulations, n175 mandates that a prescription drug advertisement must include the established name of the prescription, the brand name (if any), the formula showing quantitatively each ingredient, and a "true statement of ... information in brief  [*360]  summary relating to side effects, contraindications, and effectiveness" of the product being advertised. n176 In addition to meeting this "brief summary" requirement, the FDCA and FDA regulations articulate that prescription drug advertisements must not be false and misleading, n177 must not omit material facts, including information "about the consequences" that can result from the promoted use, n178 and must present information about the risks and benefits of the drug in a fair and balanced way. n179 The "fair balance" requirement is met when the drug promotion presents the product's safety risk information in a manner comparable to the scope, depth, and detail of the information about its effectiveness. n180

Although the law regulating drug promotion has never explicitly banned direct advertising to consumers, drug companies historically aimed their promotional efforts at the physicians who were prescribing their medications. n181 In 1983, however, a small group of companies began campaigns that included more aggressive marketing to consumers. n182 In  [*361]  response to concerns about the appropriateness of marketing to an audience beyond medical providers, the FDA requested a voluntary moratorium to allow for the agency to consider the boundaries of permissible DTC advertising. n183 The moratorium concluded in 1985 upon the FDA's placement of a notice in the Federal Register. The notice confirmed the agency's regulatory jurisdiction over DTC promotion and clarified that the same "fair balance" and "brief summary" requirements that governed marketing to healthcare providers applied to direct marketing to consumers. n184

1. Requirements for Risk Disclosure in Print DTC Advertising

To satisfy the brief summary requirement, drug manufacturers using print advertisements in promotion to consumers historically included the entire section of the approved professional labeling, which included side-effect and warning information for the drug product. n185 Over time, however, the FDA became more sensitive to the consumer's ability to understand information that was both voluminous and technical in the full labeling accompanying the print ads. n186 As a result, the  [*362]  FDA issued draft guidance in 2004, entitled Brief Summary: Disclosing Risk Information in Consumer-Direct Print Advertisements, in which the agency clarified three alternative approaches by which pharmaceutical advertisers can satisfy the brief summary requirements for DTC print ads. n187 Each alternative requires the drug manufacturer to provide in its print advertisement information on the most serious and most common risks associated with the product. n188 The first option permits the print advertisement to be accompanied by FDA-approved patient labeling. n189 Alternatively, the manufacturer can include the approved portion of the patient labeling including the product risk information. n190 Under the third option, a manufacturer can include in the print advertisement a "highlights" section with the approved product (physician-intended) labeling rewritten in language understandable to consumers. n191

[*363]

2. Requirements for Risk Disclosure in Broadcast DTC Advertising

In 1997, the FDA issued a Draft Guidance for Industry: Consumer-Directed Broadcast Advertisements. n192 The draft, which became final in August 1999, instructs that DTC broadcast promotion for a pharmaceutical product must include a "thorough major statement" communicating details about the product's most important risks "in consumer-friendly language." n193 The broadcast advertisement must "not [be] false or misleading in any respect," and, among other

means of ensuring truth and clarify, must communicate "that the advertised product is available only by prescription and that only a prescribing healthcare professional can decide whether the product is appropriate" for the patient. n194 Information about the product's effectiveness and information about the product's safety must be presented in a balanced fashion. n195 The advertisement must also communicate information about the product's approved uses and limitations on its use in language understandable to the reasonable consumer. n196

In addition to information that must be explicitly included in the broadcast advertisement, the Guidance specified that ad sponsors "are also required to present a brief summary or, alternatively, may make "adequate provision ... for dissemination of the approved or permitted package labeling in connection with the broadcast presentation.'" n197 To satisfy this "adequate provision" requirement, broadcast advertisers must include reference in the commercial to four different sources through which the consumer can access complete labeling information for the drug product being promoted: a toll-free [*364] telephone number, a website address, a concurrently running print advertisement in a widely-circulated publication, and referral to a physician, pharmacist, or other healthcare provider. n198

3. FDA Guidance Regarding Presentation of Risk Information Generally

More recently, in its 2009 Draft Guidance for Industry, Presenting Risk Information in Prescription Drug and Medical Device Promotion, the FDA offered detailed insight into its expectations regarding the adequate disclosure of product risk information in advertisements for drug products. n199 Addressing promotion generally, the Draft Guidance offered "recommendations" on how to comply with FDA regulations requiring truthful and balanced information about product safety and efficacy. n200 The agency made clear that while its guidance documents are not legally binding, they together reflect its current position on how the content and format of a promotional piece contribute to the clear and accurate communication about product risk. n201

Articulating a broad concern about conveying information in a manner that minimizes product risk, n202 the agency explained [*365] that its assessment of risk information will focus on the "net impression ... communicated by all elements of the piece as a whole... . A promotional communication that conveys a deceptive net impression of the product could be misleading, even if specific individual claims or presentations are not misleading." n203 Notably, the FDA confirmed that it makes use of a "reasonable consumer standard," similar to that previously adopted by the Federal Trade Commission, in evaluating promotional materials. n204 Pursuant to this standard, the FDA examines advertising from the perspective of a reasonable consumer or particular group of consumers acting reasonably in the circumstances. n205 Moreover, the agency clarified, multiple interpretations of or reactions to a claim are possible if they are all reasonable, and a violation will be found if any one reasonable interpretation violates regulations because it is false or misleading. n206

In the Draft Guidance, the FDA elaborated upon and offered examples of several factors - categorized as "general considerations," "considerations of content," and "considerations of format" - the agency considers in its assessment of risk information presented in drug and device advertising. n207 Among the general characteristics the FDA considers in evaluating adequate balance of safety and benefit information are: (1) use of appropriate language for the target audience; n208 (2) appropriate use of signals (e.g., headlines, change of announcer); n209 [*366] (3) appropriate framing of risk information (e.g., severity, specificity); n210 and (4) hierarchy of risk information (i.e., most important risk information should come first). n211

Beyond these general considerations, the Draft Guidance noted the manner in which the FDA considers the quantity, materiality, and comprehensiveness of the risk information contained in the piece. n212 Regarding quantity, the FDA will assess the "comparability" of risk and benefit information in a promotional piece by looking to: (1) the number of statements about benefits and risk; (2) the completeness and depth of detail about benefits and risks; (3) the amount of time or space devoted to benefits and risks; and (4) the use of components that distract from the presentation of risk or benefit information. n213 In assessing materiality, the Guidance clarified that the FDA may consider a promotional piece that excludes material information about a product's risks to be misleading, even if the piece dedicates similar space or time to other risk and benefit presentations. n214 To evaluate comprehensiveness, the

FDA  [*367]  assesses both the quality and quantity of the risk information in the advertisement at issue. n215 Specifically, the agency will look from the standpoint of the consumer as to whether the piece incorporates the most relevant risks, including all of the most serious risks. n216

The Draft Guidance also made clear the significance of formatting in the FDA's determination of whether promotional materials are false and misleading. n217 Importantly, the FDA explained "format" to include "the shape, size, and general layout of all portions of a print promotional piece, as well as the general plan of organization, arrangement, and theme in non-print promotional pieces such as videos and broadcast ads." n218 In reviewing print advertising, the FDA looks to whether risk information is included in the same parts of the piece as the benefit information. Placement of risk information is problematic if it compromises reader perceptions of the relative importance or utility of the information. n219 The FDA's evaluation of print promotion will also assess whether there are substantial differences in font size between risk and benefit information, and, regardless of the font used to display benefit information, whether the presentation of risk information is in a font that is difficult to read because of size or style. n220 Although the Draft Guidance recognized the difference in formatting print and non-print advertising, the FDA noted that in both the contrast between text and background should not highlight benefits more than risk information. n221 Specifying non-print advertising, the FDA explained that text that is superimposed on other images or visual components, such as graphics, should be reasonably visible  [*368]  and should appear on the screen long enough to be read and understood. n222 Further, visuals used in non-print promotions should not distract from statements of product risk, and, to this same end, any audio used should be consistent in pace, volume, and articulation for both risk and benefit information. n223

B. A "Fair & Balanced" Approach to Lawyer Advertising for Pharmaceutical Cases and Claims

 In the mad dash for pharmaceutical claimants, many mass tort lawyers have shown a penchant for resorting to any means necessary to advertise their services. n224 Even presuming for purposes of this analysis that the more questionable advertisements toe but do not cross the line of providing false and misleading information, the ads unquestionably and very intentionally bombard a highly-susceptible audience with information that is at best out of context. Left in a panic, with more questions than answers, the reasonable audience member cannot be faulted for reacting abruptly with a decision to stop or alter compliance with a medication that may be keeping her alive. Because of the advertisement, that reasonable audience member may also now have broader doubts about the discretion of her doctor, who decided to prescribe a "dangerous" medication to her in the first place.

Standing alone, the growing body of anecdotal evidence showing the adverse patient impact caused by advertising for pharmaceutical litigation gives rise to a substantial governmental interest necessary to enhance existing restrictions [*369]  on such advertising. n225 The need to address the generalized public contempt for lawyer advertising of this variety provides an additional substantial interest supporting enhanced regulations. n226 Regarding the latter justification, the United States Supreme Court has recognized that "the interest of the States in regulating lawyers is especially great since lawyers are essential to the primary governmental function of administering justice, and have historically been "officers of the courts."" n227

Taken together, federal law governing direct-to-consumer advertising by pharmaceutical companies and the FDA regulations and guidance materials informing it provide a framework for the regulation of mass tort legal advertising to consumers. At the heart of the requirements governing pharmaceutical DTC advertising is the expectation that promotional messaging will be fairly balanced in its reporting of the drug product's risk-benefit profile. n228 Whether a particular promotional piece - be it on television, online, or in print - is fair and balanced takes into account numerous variables, including the substantive content, the relative prominence and positioning of information about efficacy and safety, and what information might not be included in the piece. n229

 [*370]  Patterned accordingly, state ethical codes should require all legal advertising for mass tort pharmaceutical cases to include the following disclosures:

. Along the lines of the following, the advertisement should strongly encourage audience members to consult a healthcare professional with any questions or concerns about the drug product at issue: "You Should Not Stop Taking [Drug Product] Without Consulting Your Doctor. If You Have Questions About Your or a Loved One's Use of [Drug Product], Those Questions Should Be Directed to A Doctor."

. If the advertisement includes information about negative data from a study involving the drug, recent changes to the drug's label, or adverse governmental action related to the drug (e.g., a Department of Justice investigation of a manufacturer's improper promotion), then the advertisement must offer clear and prominent reference to the source of the information and direction to the audience about where to go for independent verification and more information. For example: "For More Information About the Recent Change to [Drug Product's] Label, Go to www.FDA.gov."

. If the advertising attorney or firm contemplates the referral of any solicited claims, then the advertisement should make the audience clearly aware of that possibility: "Your Case May Be Referred to Another Lawyer or Law Firm, Who May Perform Legal Services On Your Behalf. If Your Case Is Referred, You Will Be Contacted and Information About the Referral, Including Information About the Referral Attorney, Will Be Provided to You."

In a television commercial, the lawyer should deliver the disclosures in the form of a major statement that is expressed in language understandable to the reasonable consumer and presented in a pace, tone, and form (oral or written) consistent [*371] with the claims made by the lawyer regarding the drug at issue. n230 In print or online advertising, the lawyer should include the disclosures as part of a brief summary placed with a prominence and formatted in a style consistent with the drug-related claims. Regardless of the advertising medium, the lawyer should make explicitly clear, by way of an oral disclosure if in a TV commercial and a prominently displayed proviso if in print or on a website, that the material being viewed is "ATTORNEY ADVERTISING."

Short of an outright ban, which would almost certainly run afoul of the First Amendment, requiring more fairly balanced legal advertising by way of the above-described disclosures presents a narrowly-tailored means of affording both continued commercial speech protections to legal advertisers and enhanced consumer protections to the inherently more vulnerable audience members on the receiving end of that speech. Where mandating the disclosures will also likely have the effect of restoring some public trust in the legal profession, they appear to be well-positioned to withstand any constitutional scrutiny that might come their way under Central Hudson.

V. CONCLUSION

In his lament against the overzealous commercial messaging utilized by some plaintiffs' mass tort lawyers, cardiologist Evan Levine concluded with the following suggestion:

Perhaps the good lawyers out there should counter this commercial with their own:

If you or your loved one stopped taking Pradaxa, because of a commercial on TV, which inappropriately judged Pradaxa as a drug that is likely to harm someone, and then suffered a devastating stroke because of this, then call the law offices of XXX at 1 800 [... .] You may be entitled to compensation from [*372] the law firm who irresponsibly convinced your loved one to stop taking their medication. n231

Although tongue-in-cheek, Dr. Levine's proposal speaks to the substantial government interests driving the need to regulate attorney advertising for pharmaceutical mass tort claims more rigorously. It also contemplates the narrowly tailored manner in which to carry out that regulation.

8 Charleston L. Rev. 319, *372

Every day, thousands of people see, read, and hear lawyer advertisements seeking clients who have taken "dangerous" or "defective" drugs. In order to protect the public, those advertisements must be fairly balanced so as to remind the consumer that no decisions about use of a medication should be made without first consulting a healthcare professional. If requiring advertising for pharmaceutical claims to be fairly balanced will save even one life, then the restrictions suggested in this article should be implemented immediately.

**Legal Topics:**

For related research and practice materials, see the following legal topics:
Computer & Internet LawTrade Secret ProtectionFormer Employer's CustomersEnvironmental LawLitigation & Administrative ProceedingsToxic TortsLegal EthicsLegal Services MarketingAdvertising

**FOOTNOTES:**

n1. "Atrial fibrillation is an irregular and often rapid heart rate that commonly causes poor blood flow to the body. During atrial fibrillation, the heart's two upper chambers (the atria) beat chaotically and irregularly - out of coordination with the two lower chambers (the ventricles) ... . Atrial fibrillation symptoms include heart palpitations, shortness of breath[,] and weakness." Atrial Fibrillation, Mayo Clinic (Feb. 8, 2013), http://www.mayoclinic.com/health/atrial-fibrillation/DS00291. "Atrialfibrillation is increasingly prevalent among older adults." Margaret Fang et al., Atrial Fibrillation in the Elderly, 120 Am. J. Med. 481, 481 (2007), available at http://www.ncbi.nlm.nih.gov/pubmed/17524745. Moreover, atrial fibrillation "causes approximately 24% of strokes in patients aged 80 to 89 years." Id.

n2. Gina Shaw, AFib Treatment: Preventing Clots and Controlling Heart Rate and Rhythm, WebMD (June 21, 2013), http://www.webmd.com/heart/atrial-fibrillation-stroke-11/a-fib-treatments (stating that patients with atrial fibrillation "have a five times greater risk of suffering a stroke than someone without [the condition]").

n3. Pradaxa, marketed by Boehringer Ingelheim, "is a prescription blood-thinning medicine used to reduce the risk of stroke and blood clots in people with atrial fibrillation [(AFib)] not caused by a heart valve problem." Pradaxa, https://www.pradaxa.com (last visited Nov. 10, 2013). According to the American Heart Association,

Medications are often prescribed [to patients with atrial fibrillation] to prevent and treat blood clots[,] which can lead to a stroke. Additional drugs may be prescribed to control heart rate and rhythm in the [atrial fibrillation] patient. These medications may also be used in conjunction with other treatments. The heart rhythm can be more difficult to control. The longer [a patient has] untreated [atrial fibrillation], the less likely it is that normal rhythm can be reestablished.

Medication options may include blood thinners, rate controllers, and rhythm controllers.

Atrial Fibrillation Medications, Am. Heart Ass'n,

http://www.heart.org/HEARTORG/Conditions/Arrhythmia/AboutArrhythmia/Atrial-Fibrillation-Medications_UCM_423781_Ar (last updated Feb. 21, 2013).

n4. Pradaxa's package insert and warnings to consumers make clear that "Pradaxa can cause bleeding[,] which can be serious and sometimes lead to death." Pradaxa, https://www.pradaxa.com (last visited Nov. 10, 2013). According to the National Blood Clot Alliance, "Blood[-]thinning medications do save lives[] because they can treat or prevent dangerous blood clots. But, they also pose one possible and very serious side effect: Bleeding. Since blood thinners slow the clotting of blood, unwanted and sometimes dangerous bleeding can occur with the use of these medications." Living Your Best Life While Taking Blood Thinners, Nat'l Blood Clot Alliance, http://www.stoptheclot.org/documents/Nuisance%20Bleeding%20Flye r.NBCA.pdf (last visited Nov. 10, 2013). See also infra note 98.

n5. Pradaxa, supra note 3 (stating, in bold print, not to stop taking Pradaxa without first consulting the prescribing physician).

n6. While both the law firm and website address in this hypothetical are fictional, the website "www.pradaxalawsuitinfo.com" does exist as a promotional mechanism owned by the law firm of O'Hanlon, McCollom & Demerath, the self-proclaimed "Pradaxa Injury Lawyers." See About the Pradaxa Lawsuit, O'Hanlon, McCollom & Demerath, http://pradaxa lawsuitinfo.com (last visited Nov. 10, 2013).

n7. See Don't File a Pradaxa Lawsuit Until You Read This, Pradaxa Lawsuit, http://www.pradaxalawsuitsettlements.com (last visited Nov. 10, 2013) (warning Pradaxa patients via YouTube video using virtually identical language).

n8. See Google, http://www.google.com/#q=pradaxa+dangerous (last visited Nov. 10, 2013) (using Google's search engine, the author conducted a web search using the phrase "Pradaxa dangerous").

n9. See, e.g., What is Pradaxa, Doyle Raizner L.L.P., http://www.pradaxalitigation.com (last visited Nov. 10, 2013) (inviting reader, on behalf of Houston, Texas-based law firm Doyle Raizner LLP, to view sections regarding "why Pradaxa is a dangerous drug": "Pradaxa Timeline"; "Potential Claim?"; "Pradaxa Information"; "Why is Pradaxa a Dangerous Drug?"; "Pradaxa Adverse Effects"; and "Why Choose Doyle Raizner?").

n10. See Evan Levine, Your Medication Can Kill You; Call Your Lawyer!, Leftist Rev. (May 19, 2012),

8 Charleston L. Rev. 319, *372

http://www.leftistreview.com/2012/05/19/your-medication-can-kill-you-call-your-lawyer/evanlevine/ (noting patient who, after watching a television advertisement portraying Pradaxa as problematic and dangerous, was concerned that the author of the article, his doctor, had prescribed a medication that could cause the patient to hemorrhage to death); see also infra notes 95-100 and accompanying text.

n11. See U.S. Gov't. Accountability Office, GAO-07-54, Prescription Drugs: Improvements needed in FDA's Oversight of Direct-to-Consumer Advertising 8 (2006) (noting that "the practice of advertising prescription drugs to consumers has been controversial"). The United States is one of the two countries in the world (the other being New Zealand) to permit direct-to-consumer advertising by pharmaceutical companies. Id. Numerous articles have focused on the regulation of direct-to-consumer advertising and the long-standing debate surrounding its appropriateness. See, e.g., Julie M. Donohue et al., A Decade of Direct-to-Consumer Advertising of Prescription Drugs, *357 New. Eng. J. Med. 673, 674 (2007),* available at http://www.nejm.org/doi/full/10.1056/NEJMsa070502 ("[The article] examines recent trends in the [pharmaceutical] industry's use of direct-to-consumer advertising ... , assesses the timing of advertising campaigns relative to the introduction of drugs in order to shed light on safety issues, and examines trends in the FDA's regulation of drug advertising during the past decade."); Timothy McIntire, Note, Legal and Quality of Patient Care Issues Arising from Direct-to-Consumer Pharmaceutical Sales, *33 U. Mem. L. Rev. 105, 106 (2002)* (exploring "the courts' unique role in health care quality, specifically as it relates to legal issues surrounding direct-to-consumer pharmaceutical advertising"); Francis B. Palumbo & C. Daniel Mullins, The Development of Direct-to-Consumer Prescription Drug Advertising Regulation, *57 Food & Drug L.J. 423, 424 (2002)* (observing the "government agencies responsible for overseeing drug advertising, and presenting the history of drug advertising laws, regulations, and policies as these items relate specifically to [direct-to-consumer] advertising"); Victor E. Schwartz et al., Marketing Pharmaceutical Products in the Twenty-First Century: An Analysis of the Continued Viability of Traditional Principles in the Age of Direct-to-Consumer Advertising, *32 Harv. J.L. & Pub. Pol'y 333, 336 (2009)* (examining "rules of law that establish the legal landscape for warnings and advertising in the pharmaceutical context... . [and] concluding that, irrespective of the rise of [direct-to-consumer] advertising, traditional principles of law fully retain their viability in the post-[direct-to-consumer] world both as a matter of jurisprudence and sound public policy").

n12. See infra notes 160-67 and accompanying text. See also Levine, supra note 10 (commenting that the average citizen living in the United States "has surely been exposed to thousands of television and internet ads by big pharmaceutical companies promoting products that do everything from thinning blood to improving erections... . Those ads can make millions more for Big Pharma[,] since the result is often patients demanding the most expensive [brand-name] drugs.")

n13. Levine, supra note 10 ("Adding a counterpoint to the drug ads, and even more confusion for consumers, law firms troll the same airwaves for potential claimants in lawsuits against those same pharmaceutical companies. It is a strange phenomenon indeed and I see the results play out in my practice sometimes.").

n14. See Michael J. Miller, Pharmaceutical Direct-to-Consumer Advertising Regulations, For the Defense (DRI, Chicago, IL), Oct. 2011, at 12, 12-13, available at http://www.dritoday.org/ftd/2011-10f.pdf (citing Press Release, Kantar Media, Kantar Media Reports U.S. Advertising Expenditures Declined 12.3 Percent in 2009, (Mar. 17, 2010, 8:00 AM), available at http://www. businesswire.com/news/home/20100317005458/en/Kantar-Media-Reports-U.S.-Advertising-Expenditures-Declined)).

n15. See Ralph H. Brock, This Court Took a Wrong Turn with Bates: Why the Supreme Court Should Revisit Lawyer Advertising, *7 First Amend. L. Rev. 145, 149-50 (2009)* (quoting *Valentine v. Chrestensen, 316 U.S. 52 (1942))* (noting the Supreme Court's historical adherence to "the broad rule articulated in Valentine v. Chrestensen ... that while the First Amendment guards against government restriction of speech in most contexts, "the Constitution imposes no such restraint on government as respects purely commercial advertising."").

n16. *433 U.S. 350 (1977).*

n17. *Id. at 383.*

n18. Michael P. Stone & Thomas J. Miceli, Optimal Attorney Advertising, 32 Int'l Rev. L. & Econ. 329, 329 (2012).

n19. Nora Freeman Engstrom, Legal Access and Attorney Advertising, *19 Am. U. J. Gender Soc. Pol'y & L. 1083, 1089 (2011)* ("In the decades following the Bates decision, advertisements for legal services - and particularly personal injury legal services, which now make up the bulk of television advertising - have proliferated.").

n20. See Michael Freedman, New Techniques in Ambulance Chasing, Forbes (Nov. 12, 2001, 12:00 AM), http://www.forbes.com/forbes/2001/1112/ 056.html (overviewing "the surge" in lawyer advertising soliciting potential plaintiffs for "deep-pocket attacks on big corporations, especially pharmaceutical companies").

n21. For a more in-depth discussion of the cases that followed Bates and further elaborated upon the boundaries of attorney advertising, see infra Section III.A.

8 Charleston L. Rev. 319, *372

n22. Peyton Paxson, Have You Been Injured? The Current State of Personal Injury Lawyers' Advertising, 36.2 J. Popular Culture 191, 191 (2002).

n23. Id.

n24. Stone & Miceli, supra note 18, at 331 (citing Bob D. Cutler, Chris Moberg, & Kurt Schimmel, Attorney Advertising: The Link Between Ad Cues and Consumer Search Criteria, 19 J. Prof'l Servs. Mktg., no. 1, 1999, at 1).

n25. Id.

n26. Id. (citing data provided by Kantar-TNS).

n27. Id.

n28. Id.

n29. See New Media Strategies, U.S. Chamber Inst. for Legal Reform, The Plaintiffs' Bar Goes Digital: An Analysis of the Digital Marketing Efforts of Plaintiffs' Attorneys & Litigation Firms 5 (2012), available at http://www.instituteforlegalreform.com/sites/default/files/The& uscore;Plaintiffs_Bar_Goes_Digital_2012_0.pdf [hereinafter Plaintiffs' Bar Goes Digital]. By its own account, the Institute for Legal Reform ("ILR") "is a national campaign, representing the nation's business community, with the critical mission of making America's legal system simpler, fairer and faster for everyone. Founded by the U.S. Chamber of Commerce in 1998 to address the country's litigation explosion, ILR is the only national legal reform advocate to approach reform comprehensively by not only working to change the laws, but also changing the legal climate." See About IRL, U.S. Chamber Inst. for Legal Reform, http://www.legalreformnow.com/about-ilr/ (last visited Nov. 10, 2013). Among its other stated aims, the ILR works to "neutralize plaintiff trial lawyers' excessive influence over the legal and political systems"; "create and maintain public support for legal reform, including building alliances with groups and organizations to advance the legal reform agenda"; "enact common sense reforms to ensure fairness in liability suits"; and "ensure damage awards are fair and equitable, eliminate frivolous lawsuits, and enforce legal ethics rules." Id.

n30. Plaintiffs' Bar Goes Digital, supra note 29, at 5; see also Alison Frankel, Plaintiffs' Lawyer Spend Millions in Online Ads. Should We Care?, Reuters (Mar. 1, 2012), http://blogs.reuters.com/alison-frankel/2012/03/01/ plaintiffs-lawyers-spend-millions-in-online-ads-should-we-care/; Brian Quigley, Trial Lawyers Stepping Up Online Advertising Spending, U.S. Chamber Inst. for Legal Reform (Feb. 26, 2012), http://www.instituteforlegalreform.com/blog/ commentary/trial-lawyers-stepping-up-online-advertising-spending (noting Institute for Legal Reform press release concerning study and observing that "the study also shows that lawyers are using the burgeoning world of social media, including Twitter, Facebook, and YouTube to find new clients. Per the study, "the litigation industry uses social communities to increase the reach of their own web content and online presence in an effort to encourage potential clients to share their personal contact information.'").

n31. See Kantar Media, U.S. Chamber Inst. for Legal Reform, Lawyers Mass Tort Solicitation Advertising 2 (2011), available at http://www.yumpu .com/en/document/view/9024025/lawyers-mass-tort-solicitation-advertising-institute-for-legal- reform.

n32. Freedman, supra note 20.

n33. See Engstrom, supra note 19, at 1089 ("In the decades following the Bates decision, advertisements for legal services - and particularly personal injury legal services, which now make up the bulk of television attorney advertising - have proliferated."); id. at 1090 n.33 (quoting Am. Bar Ass'n Comm'n on Advertising, Lawyer Advertising at the Crossroads: Professional Policy Considerations 130 (1995) [hereinafter ABA Comm'n on Advertising] ("Most television advertisements have been for personal injury or other contingency fee-based services.")); Paxson, supra note 22, at 192 (noting that "the leading specialization among advertisers is personal injury law, its practitioners representing victims of automobile accidents, medical malpractice, and "slip and fall' injuries; a calamity for the prospective client provides a business opportunity for the legal professional").

n34. This type of case is distinguished from a "mass accident" tort case, in which the potential plaintiffs have common claims of liability but potentially different measures of damages. See Task Force on Contingent Fees of the Am. Bar Ass'n Tort Trial & Ins. Prac. Section, Contingent Fees in Mass Tort Litigation, 42 Tort Trial & Ins. Prac. L.J. 105, 107 (2006) [hereinafter ABA Task Force on Contingency Fees]. By contrast, "in a dispersed mass tort, the issue of causation will have some common questions, such as whether the particular product involved has particular defects or causes particular types of injuries. There are also, however, issues that are different for each claimant." Id.

n35. Id. at 106 (quoting Manual for Complex Litigation (Fourth) 343-44 (2004)) (citations omitted).

"Mass torts litigation "emerges when an event or series of related events injure a large number of people or damage their property.' A mass tort is defined by both the nature and number of claims; the claims must arise out of an identifiable event or product, affecting a very large number of people and causing a large number of lawsuits asserting personal injury or property damage to be filed."

The Manual goes on to distinguish between mass torts that revolve around a single event, such as a hotel fire or other mass accident, and more "dispersed' mass torts involving the ingestion of a particular drug or the use of a particular product.

Id.; see also Deborah R. Hensler, Has the Fat Lady Sung? The Future of Mass Toxic Torts, *26 Rev. Litig. 883, 890 (2007)* (highlighting the differences between catastrophic and toxic mass torts litigations).

n36. See Karen A. Geduldig, Note, Casey at the Bat: Judicial Treatment of Mass Tort Litigation, *29 Hofstra L. Rev. 309, 310 (2000)* (footnote omitted) (noting that "by 1990, [mass tort claims] encompassed seventy-five percent of all new federal product liability filings"); Hensler, supra note 35, at 894 (noting that annual federal product liability filings increased 270% from 1976 to 1986, much of that growth attributable to mass tort claims in litigation focused on injuries alleged to have been caused by asbestos, the Dalkon Shield intra-uterine contraceptive device, and the anti-nausea drug Bendectin).

n37. See Mark Herrmann, From Saccharin to Breast Implants: Mass Torts, Then and Now, 26 Litig., Fall 1999, at 50, 51.

n38. See Paul D. Rheingold, Excess in Mass Tort Litigation, 7 Mealey's Emerging Drug and Devices Rep., no. 18, Sept. 19, 2002, at 37 (reporting that within a day of the July 2002 announcement that the Prempro hormone replacement therapy trials were being halted as a result of side effects, there were lawyer websites seeking Prempro cases and, "by Labor Day 2002, there were at least 38 sites, trolling for Prempro cases").

n39. ABA Task Force on Contingency Fees, supra note 34, at 108.

n40. Id. ("The claimants who appear to have viable cases will be signed up to contingent fee contracts that specify that the lawyer will receive a percentage, often 33 percent or 40 percent, of any recovery the client receives net of expenses. Hundreds or thousands of such clients might be signed up in this initial stage of the mass tort.").

8 Charleston L. Rev. 319, *372

n41. See Rheingold, supra note 38, at 38 (noting that within days of the report of the terminated Prempro study in 2002, "a number of class actions were filed, all attendant with the type of publicity that comes from alerting the press to the commencement of a class suit").

n42. Id.

n43. See Herrmann, supra note 37, at 51.

n44. Id. (detailing the "different but equally hasty response" from "the retailers" who instead choose to file individual cases); ABA Task Force on Contingency Fees, supra note 34, at 108-09 (describing the strategy of "bundling" cases for settlement purposes).

n45. ABA Task Force on Contingency Fees, supra note 34, at 108-09.

n46. See Herrmann, supra note 37, at 51.

n47. ABA Task Force on Contingency Fees, supra note 34, at 108; Nathan Koppel, Referrals Get Rough Around the Edges; Referral Fees Are Big Business for the Highest Bidder, But What About the Client?, Tex. Law., Mar. 29, 1999, at 1 ("The idea behind a freewheeling, free-market referral system is to channel cases, usually complex plaintiffs' cases, from the hands of lawyers too inexperienced or otherwise ill-equipped to handle them into the right hands ... That still happens, of course. But lawyers in the middle of the increasingly rough-and-tumble referral market say a new model has arisen. Many lawyers now use mass advertising to dredge in and sign up clients just to refer them out en masse - even shopping them to the highest bidder.").

n48. ABA Task Force on Contingency Fees, supra note 34, at 108; Freedman, supra note 20 (noting one such referral arrangement in which the recruiting firm paid to run the advertising, screen callers, and then refer potential plaintiffs to the other firm for "actual prosecution" of the cases).

n49. Howard M. Erichson, Beyond the Class Action: Lawyer Loyalty and Client Autonomy in Non-Class Collective Representation, *2003 U. Chi. Legal F. 519, 536 (2003).*

n50. Rheingold, supra note 38, at 37. (decrying the next-day lawyer advertising that followed the halting of the Prempro hormone replacement therapy trials: "It would be interesting to get some straight answers from the advertisers - lawyers and businesspeople - what their plans were. Did they do a sound, albeit rapid, analysis of what the prospects were for suit? Did they analyze the manufacturer's warnings as to whether they were adequate or not?").

n51. Id. ("One would also like to know what these advertisers intend to do with the many responses they received. Have they undertaken to get full information about the experiences of the women responding? How did they deal with the anguished question from responders about whether they should stay on [Prempro]? Did the women feel that there was some chance of making a financial recovery based upon the language in the Website or other ads?").

n52. Erichson, supra note 49, at 537 (quoting Interview with Alex H. MacDonald, Esq. (Apr. 26, 2002)) ("According to one lawyer who has represented a number of plaintiffs in the diet drugs mass tort litigation: "There are lawyers in diet pills ... who as a function of advertising and the really pernicious referral systems that exist among and between these people who advertise on television and funnel literally thousands of cases to some guy because the guy will split the fees 50/50, a referral fee that's totally unbelievable and of questionable ethics - they will send cases to people who never saw a document, have never in their lives tried a case to jury verdict, [and] were simply made powerful because they had a thousand cases.'") (alteration in orginal).

n53. Rheingold, supra note 38, at 37 ("A major contribution to the advertising problem is who facilitates the advertising. It was questionable enough when lawyers became merchants and had no intention of handling themselves (and had no ability to do so in any case). It is worse when non-lawyers promote the advertising. There are dozens of companies out there that - for a very sizeable fee - will design your ads and run them for you. They will sell you a territory (your zip code or region or they will get you national prominence by paying to come up high on a search engine).").

n54. Erichson, supra note 49, at 537; see also Herrmann, supra note 37, at 51 - 52 ("But regardless of whether the plaintiffs' lawyer is a wholesaler or a retailer, speed is of the essence. Class action complaints must be filed, or an inventory of clients gathered, promptly on the heels of [the event giving rise to the prospective mass toxic tort litigation].")

8 Charleston L. Rev. 319, *372

n55. Rheingold, supra note 38, at 38 ("A manufacturer can be sure today that if it recalls a product or puts out a new warning that there will be ads the next day seeking victims who used its product. And it is not just the Net, it is TV and newspaper ads.").

n56. See Simon Dumenco, Ambulance Chasers Offer Lessons in Digital Marketing: Marketing Do's and Don'ts - Especially Don'ts! - from a Surprising Source, Adver. Age (Feb. 29, 2012), http://adage.com/print/232934 ("If you've ever been anywhere near daytime or late-night TV, you already know that personal-injury lawyers are big TV-marketing spenders.").

n57. Erichson, supra note 49, at 535 ("For lawyers hoping to attract a sufficient number of similar clients to achieve the critical mass needed for mass representation, earlier forms of lawyer advertising would have been inefficient and prohibitively expensive. Internet advertising, especially web-based consortium advertising services that attract potential clients with particular types of injuries or claims and connect those potential clients with lawyers in their homes states, enables small and less established firms to seek entry into mass litigation practice.") (footnote omitted).

n58. Freedman, supra note 20 (noting that the "ads use scare phrases like "FDA Investigation,' and feature hospital patients hooked to IV units").

n59. See, e.g., Law Firm of Elk & Elk, Mirena IUD Users Having Medical Problems, YouTube (Nov. 14, 2012), http://www.youtube.com/watch?v=Eizn3z STeqA (warning that "Women with a Mirena IUD are having medical problems," including "perforating the uterine wall" and "the IUD migrating to the abdomen, requiring surgery, causing sepsis, and other complications"; the commercial also loosely describes an FDA Warning Letter to Bayer, the IUD manufacturer, cautioning about "false or misleading presentations regarding Mirena"); Craig Swapp & Associates, Avandia Diabetes Drug Side Effects Lawyer, YouTube (Nov. 10, 2010), http://www.youtube.com/watch?v=HACY WLY_bSc (warning diabetics who "have been treated with the popular diabetes drug Avandia, you should be aware that the FDA has issued a warning on the possible increased risk of heart attack or other heart ailments. Avandia is the subject of a federal Senate investigation.").

n60. See, e.g., Charles E. Boyk Law Offices, LLC, Yaz Warning Commercial Launched by Ohio Yaz Injury Lawyer, YouTube (Mar. 12, 2009), http://www.youtube.com/watch?v=qskyilp5Q_8 (warning women who have taken or are currently taking Yazmin, Yaz, or Ocella birth control, as the word "Warning!!" flashes across the screen in large, red, bold font).

n61. See, e.g., Law Offices of Robert J. Fenstersheib & Associates, P.A., Dialysis Attorney: GranuFlo

Lawyer, YouTube (Feb. 28, 2013), http://www.youtube.com/watch?v=0WdkLLC1_9Q (seeking plaintiffs for litigation focused on Granuflo and Naturalyte hemiodialysis treatment; commercial includes no speaking, but rather sharp beeping sounds of hospital machine accompanying the flashing words, "If you or a loved one has undergone hemodialysis treatment and suffered from a heart attack, We Want to Help" and "Go to GranufloLawSuitHelp.com" on the screen).

n62. See, e.g., The U.S. Drug Watchdog Now Warns Time May be Running Out to Get Women Yaz or Yasmin Birth Control Pill Users Identified if they Suffered a Heart Attack[,] Stroke[,] or a Embolism, PR Web (May 14, 2012), http://www.prweb.com/releases/2012/5/prweb9500724.htm (warning that time is running out to file a lawsuit); Kay Van Wey, Yaz Lawyers Warn: Time is Running Out to File a Yaz Side Effects Lawsuit, Van Wey Law, http://www.vanweylaw.com/practice_areas/female-yaz-lawyers-can-file-a-yaz-side-effects-lawsuit-for-you.cfm (last visited Nov. 22, 2013) (same).

n63. Nora Freeman Engstrom, Run-of-the-Mill Justice, *22 Geo. J. Legal Ethics 1485, 1524 (2009)* [hereinafter Run-of-the-Mill Justice] (citing ABA Comm'n on Advertising, supra note 33, at 97).

n64. Kantar Media, supra note 31, at 15 (stating, as part of an analysis summary, that "advertising is geared toward Daytime TV viewers - a significant portion of whom are elderly and/or retired.").

n65. Freedman, supra note 20 (reporting on one mass tort lawyer's knowledge that "ads running during the day attract the poor, the disabled, the unemployed and others who may not know where or how to look for a lawyer. Real-life judge shows like Judge Mills Lane and Judge Judy are jackpots. Talk shows like Montel Williams are effective, too. Jerry Springer's audience was a fertile source of clients until, strangely enough, producers toned down the scratching and hair-pulling. And never run ads on Fridays or during Christmas week. The audience isn't in a litigious mood, he says.").

n66. Run-of-the-Mill Justice, supra note 63, at 1524.

n67. See First-of-Its-Kind Study Finds Plaintiffs' Lawyers' Online Marketing Tactics Among Most Sophisticated, Expensive, U.S. Chamber of Commerce (Feb. 29, 2012), http://www.uschamber.com/press/releases/2012/february/first-its-kind-study-finds-plaintiffs'-lawyers'-online-marketing-tactic ("The study details how many plaintiffs' firms create and dispatch a wide variety of websites and use social media tools such as Twitter and Facebook to create a complex web of information presented in a broad variety of ways, all designed to attract and vet potential clients for lawsuits.").

8 Charleston L. Rev. 319, *372

n68. See id. Google offers the following explanation of keyword advertising on its network:

Keywords are words or phrases you choose to match your ads with corresponding user search terms and relevant web content on the Google Network. Selecting high quality, relevant keywords for your advertising campaign can help you reach the customers you want, when you want.

Imagine you're craving a hamburger. You head to a restaurant, and see that the items on the menu are "Food" and "Meat in between bread." Even if this restaurant served the best burger in town, you might leave without ordering anything. They'd lose your business - simply because the words they used weren't the same words you had in mind.

To get your ads to appear when people search for your product or service, the keywords you choose need to match the words or phrases that people use, or should be related to the content of the websites your customers visit.

How Keywords Work, Google, https://support.google.com/adwords/answer/ 1704371?hl=en (last visited Nov. 10, 2013).

n69. Actos Bladder Cancer Lawsuit Information, Jackson Allen & Williams, LLP, http://www.theactoslawfirm.com (last visited Nov. 10, 2013) (advertising legal services under the guise of providing "Actos Bladder Cancer Lawsuit Information" and "Information and help for victims of Actos").

n70. Yaz Lawsuit: A Patient Advocacy Group, McEwen Law Firm, Ltd. & Crumley Roberts, Attorneys at Law, http://www.yazlawsuitlawyer.net/ (last visited Nov. 10, 2013) (providing at the top of the webpage the phrase "Yaz Lawsuit: A Patient Advocacy Group," which appears next to the logos for McEwen Law Firm, Ltd., and Crumley Roberts, Attorneys at Law, the two apparent sponsors of the site).

n71. Jacoby & Meyers, LLP, http://www.dangerousdrugs.com (last visited Nov. 10, 2013) (soliciting claimants in cases involving antidepressants; anti-seizure drugs; arthritis drugs; birth control drugs; cough, cold, and flu medications; diabetes drugs; heart, cholesterol, and hypertension medications; painkillers; sleeping pills; statins; weight loss drugs; and dietary supplements; website video offers lawyers who "can provide you with aggressive representation that will give you the greatest chance of a favorable settlement outcome").

8 Charleston L. Rev. 319, *372

n72. See supra notes 58-62, 68-71 and accompanying text.

n73. See, e.g., Proven Results, Kershaw, Cutter, & Ratinoff, LLP, http://www.kcrlegal.com/proven-results.aspx (last visited Nov. 10, 2013) (providing a list of multi-million dollar lawsuit settlements the law firm obtained); Yaz Lawsuit, supra note 70 (providing a "results" category on website's homepage, wherein viewers may observe statistics about how much money the law firms supporting the websites have gleaned as a result of Yaz litigation).

n74. See, e.g., Drug Injury Case Evaluation Forms, Law Offices of Thomas J. Lamb, P.A., http://www.druginjurylaw.com/Evaluation-menu.html (last visited Nov. 10, 2013) (providing a list of drug injury case evaluation forms applicable to numerous pharmaceutical drugs awaiting potential litigation by the sponsor); Morgan & Morgan, http://www.forthepeople.com/?gclid=CPnfls T8uboCFcxaMgodPnwAKQ (last visited Nov. 10, 2013) (providing, on website's homepage, a form for a "FREE, Immediate, Case Evaluation," as well as a 24/7 live chat feature and 24/7 toll-free phone number).

n75. See, e.g., Girard Gibbs LLP, Actos Lawyers, Twitter, https://twitter.com/ActosLawyers (last visited Nov. 10, 2013) (Twitter account tied to Girard Gibbs law firm; twitter profile touts that Gibbs firm is a "national litigation firm committed to protecting the rights of individuals who suffered injuries after taking the diabetes drug Actos"); Jacoby & Meyers, LLP, Dangerous Drugs, Facebook, https://www.facebook.com/pages/Dangerous-Drugs/370769239670713 (last visited Nov. 10, 2013) (Jacoby & Meyers's Facebook page containing links throughout to content on the firm's DangerousDrugs.com website); Jacoby & Meyers, LLP, Twitter, http://twitter.com/DrugsDangerous (last visited Nov. 10, 2013) (Jacoby & Meyers's Twitter feed); Twitter, http://twitter.com/PradaxaLawsuit (last visited Nov. 10, 2013) (Twitter account tied to legal website filepradaxalawsuit.com).

n76. See, e.g., Edward M. Bernstein & Associates, Zocor Lawsuit - Zocor Lawyer: Ed Bernstein, YouTube (June 13, 2011), http://www.youtube.com/ watch?v=RupSJt7k2JU (advising viewer, "If you have taken the cholesterol drug Zocor or the generic equivalent and have been diagnosed with Rhabdomyolysis, Myopathy, or Kidney Failure, you may be entitled to compensation ... ."; in tiny, white print, the words "Never stop taking any medication before asking your doctor" flash instantaneously onto screen but are drowned out by the words "Zocor Alert: You May be Entitled to Compensation" in large, red font); Gerard Gibbs, Actos Bladder Cancer Injury Lawsuit, YouTube (Oct. 24, 2011), http://www.youtube.com/watch?v=PXSGBjrOw6I (seeking claims against Actos, a drug indicated to treat Type II diabetes; advertisement warns of Actos link to bladder cancer but contains no warning that viewer should not stop taking medication without first consulting doctor).

n77. Although most legal advertisements offer no source or reference information, those that do tend to bury the presentation of that information. An example is a commercial by Norris Injury Lawyers soliciting users of Chantix, a medication indicated to assist patients with smoking cessation. See Norris Injury Lawyers, Chantix

Lawsuits, YouTube (Mar. 11, 2010), http://www.youtube.com/watch?v=VUcz9tu_nLQ. In the one-minute ad, the voiceover describes FDA reports about patients taking Chantix who have experienced suicidal thoughts, aggressive behavior, and serious emotional changes. Id. While the phrases "Chantix Suicide Dangers," "suicidal thoughts," "aggressive behavior," and "serious emotional changes" remain on the screen in large, color-contrasted fonts, source data, noting retrieval from the FDA.gov website, appears on the screen in tiny font for only seconds. Id.

n78. See supra note 8 and accompanying text.

n79. See, e.g., Felicia L. Stern, Pradaxa Lawsuits Being Investigated by Bernstein Liebhard, LLP, as Next Conference in Federal Pradaxa Litigation Set for January 10th, PR Web (Dec. 29, 2012), http://www.prweb.com/releases/Pradaxa-Lawsuit/Pradaxa-Bleeding/prweb10278400.htm (article on file with author; originally appeared in S.F. Chron.). Crafted as a press release, the author retrieved this piece during a search for new stories about Pradaxa-related litigation. The headline and story body gave the impression that a third-party is reporting on lawsuits, newly-filed by the Bernstein Liebhard, LLP law firm, on behalf of patients who experienced severe side effects such as bleeding as a result of ingesting Pradaxa. Id.

n80. See, e.g., Climaco, Wilcox, Peca, Tarantino & Garofoli Co., L.P.A., Ohio Class Action and Mass Tort Alerts, Ohio Consumer Alert, http://www. ohioconsumeralert.com (last visited Nov. 10, 2013) (purporting to offer "class action and mass tort alerts" to Ohio consumers).

n81. A case in point is the website www.ZyprexaSideEffectsLawyer.com. On its main page, the site offers content about "Zyprexa Side Effects," the FDA's issuance of "limited Zyprexa warning information," and "Zyprexa and Diabetes Link." Zyprexa Side Effects, Zyprexa Side Effects Lawyer, http://www.zyprexasideeffectslawyer.com (last visited Nov. 10, 2013). Although the page alludes to information about "lawyers and attorneys" and offers the reader the opportunity to "learn about your legal rights," no individual lawyers or law firms are named anywhere on the site. Moreover, although Zyprexa is still a marketed product, the website appears to be outdated, evidenced by the August 6, 2008 article as the headlining source on the website. Id.

n82. Glen Lerner, Glen Lerner Dangerous Drug Pradaxa Wrongful Death Lawyer Attorney, YouTube (Mar. 9, 2012), http://www.youtube.com/watch?v=EyerBMDfTbM (disclosing in small print, for a fleeting second at commercial's conclusion, that "some work may be performed by, or referred to, other attorneys").

n83. Over the last 15 years, significant mass tort litigations have focused on patients taking drugs indicated

to treat significant illnesses, including type II diabetes (Avandia, Actos, Januvia, Byetta); severe mental illnesses, such as schizophrenia and bipolar disorder (Zyprexa, Seroquel, Risperdal); stroke prevention (Pradaxa); and pain (Vioxx, Celebrex), among others.

n84. See, e.g., The Carlson Law Firm & Komie & Morrow, LLP, Help for Pradaxa Patients, http://pradaxadruglawyer.com (last visited Nov. 10, 2013) (identifying The Carlson Law Firm and Komie & Morrow LLP as sponsors and containing banner headlines offering "Help for Pradaxa Patients" and "Help for Pradaxa Bleeding Injury").

n85. Steven Garber, Inst. for Civil Justice, Economic Effects of Product Liability and Other Litigation Involving the Safety and Effectiveness of Pharmaceuticals 80-81 (2013), available at http://www.rand.org/pubs/monographs/MG1259.html (overviewing survey data addressing the impact of litigation on consumer compliance with prescribed therapies); Levine, supra note 10 ("Adding a counterpoint to the drug ads, and even more confusion for consumers, law firms troll the same airwaves for potential claimants in lawsuits against those same pharmaceutical companies. It is a strange phenomenon indeed and I see the results play out in my practice sometimes.").

n86. The interviewees were selected from lists of patients with at least one of eight diagnosed medical conditions: high cholesterol, hypertension, arthritis, depression, obesity, diabetes, heart disease, or stomach ulcers. Harris Interactive, U.S. Chamber Inst. for Legal Reform, Pharmaceutical Liability Study: Report on Findings 54 (2003), available at http://www.us chamber.com/sites/default/files/press/rx_pharmaceuti cal_liability_study_report.pdf. See also supra note 29.

n87. Id. at 3 (identifying as two primary research objectives the "measure[ment of] patient awareness of advertisements for product liability litigation, and what actions they might take as a result of seeing such an advertisement" and the "investigat[ion of] patient concern toward the effect of product liability litigation on new product development and availability").

n88. Id. at 39-40.

n89. Id. at 41.

n90. Id. at 42; see also Judyth Pendell, AEI-Brookings Joint Center for Regulatory Studies, The Adverse

8 Charleston L. Rev. 319, *372

Side Effects of Pharmaceutical Litigation 13 (2003), available at http://regulation2point0.org/wp-content/uploads/downloads/2010/04/phpgM.pdf ("Using a Harris poll of doctors, pharmacists, and patients to inquire about the impact of liability on pharmaceutical prescribing, warning, and compliance adds force to the existing evidence that the tort liability system creates over[-]deterrent effects... . Patients may learn of litigation involving the drug and not begin the medication or stop taking medication they are currently on ... ."). Corroborating the patient responses, about two in five physicians and pharmacists surveyed reported cases of patients who stopped taking properly prescribed medication upon becoming aware of litigation surrounding the medication. Id. at 9; Harris Interactive, supra note 86, at 26, 33.

n91. New Survey Shows Product Liability Litigation May Jeopardize Treatment Outcomes for People with Severe Mental Illnesses, Eli Lilly & Co. (June 13, 2007), https://investor.lilly.com/releasedetail.cfm?releaseid=248836.

n92. Id.; see also Garber, supra note 85, at 81.

n93. Eli Lilly & Co., supra note 91; see also Garber, supra note 85, at 81.

n94. Eli Lilly & Co., supra note 91.

n95. Levine, supra note 10.

n96. Id.

n97. Id.

n98. Id. ("The fact is that Pradaxa does reduce the blood from clotting (some might say it does thin the blood) and like any blood thinner, whether it is Coumadin, or even Aspirin, or Pradaxa, it can increase the risk of bleeding. This is something that will happen anytime you take any blood thinner. Fall down and bang yourself while taking Coumadin or Pradaxa and you will bleed more than if you weren't taking it.").

n99. Id. Dr. Levine noted that he had, after spending "an entire visit to educate him, again, about the risks and benefits of Pradaxa compared to Coumadin," restarted Pradaxa therapy for the patient who had stopped the drug after watching the Pradaxa litigation ad. Id.

n100. Id.

n101. Rheingold, supra note 38, at 38.

n102. See 3 James B. Astrachan et al., The Law of Advertising § 46.02[1] (2013) (providing a detailed historical background of the jurisprudence and debate surrounding the prohibitions on legal advertising until the Bates case).

n103. See *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 770 (1976)* (overturning state prohibition against advertisement of prescription drug prices as unconstitutional).

n104. *Bates v. State Bar of Ariz., 433 U.S. 350 (1977)* (overturning as unconstitutional an Arizona ban on attorney advertising).

n105. See generally Brock, supra note 15, at 151-61 (surveying Supreme Court decisions dealing with lawyer advertising).

n106. For a concise overview of the Supreme Court cases impacting legal advertising, and an outline of other areas of law implicated by attorney advertising for mass tort pharmaceutical cases, see Vincent V. Carissimi, Lawyer Advertising in Pharmaceutical Litigation, Address to the Pennsylvania Bar Institute (Feb. 1, 2006), in Pharmaceutical Litigation 39, 39-46 (2006).

n107. *425 U.S. 748 (1976).* For a more recent discussion of Virginia State Board of Pharmacy and its progeny, see Nat Stern & Mark Joseph Stern, Advancing an Adaptive Standard of Strict Scrutiny for Content-Based Commercial Speech Regulation, *47 U. Rich. L. Rev. 1171 (2013).*

8 Charleston L. Rev. 319, *372

n108. *Va. State Bd. of Pharmacy, 425 U.S. at 749-50.*

n109. *Id. at 764.*

n110. *Id. at 765 & n.19;* see also Stern & Stern, supra note 107, at 1173.

n111. *Va. State Bd. of Pharmacy, 425 U.S. at 773.*

n112. *Id. at 771* (citing *Gertz v. Robert Welch, Inc., 418 U.S. 323, 340 (1974); Konigsberg v. State Bar, 366 U.S. 36, 49 & n.10 (1961)).*

n113. Id.

n114. *Bates v. State Bar of Arizona, 433 U.S. 350, 384 (1977).*

n115. *Id. at 354-56.*

n116. *Id. at 368.*

n117. *Id. at 377.*

n118. See *id. at 372.*

8 Charleston L. Rev. 319, *372

n119. *Id. at 376-77* (quoting Model Code of Prof'l Responsibility EC 2-1 (1976)).

n120. *Id. at 377* ("Although it is true that the effect of advertising on the price of services has not been demonstrated, there is revealing evidence with regard to products; where consumers have the benefit of price advertising, retail prices often are dramatically lower than they would be without advertising. It is entirely possible that advertising will serve to reduce, not advance, the cost of legal services to the consumer.") (footnote omitted).

n121. *Id. at 374-75.*

n122. *Id. at 384.*

n123. *Id. at 383.*

n124. *Id. at 383-84.*

n125. *Id. at 384.*

n126. Id.

n127. *447 U.S. 557 (1980).*

n128. *Id. at 558-59.*

n129. *Id. at 564, 566.*

8 Charleston L. Rev. 319, *372

n130. *Id. at 566-68.*

n131. *Id. at 570-71.*

n132. *Id. at 562-63* (citing *Ohralik v. Ohio State Bar Ass'n, 436 U.S. 447, 455-56 (1978)).*

n133. *In re R.M.J., 455 U.S. 191, 194 (1982).* The permitted advertising could include only the lawyer's name, address and telephone number, areas of practice, date and place of birth, schools attended, foreign language ability, office hours, fee for an initial consultation, availability of a schedule of fees, credit arrangements, and the fixed fee for "routine' legal services. Id.

n134. *Id. at 196-97.*

n135. *Id. at 203* (citing *Bates v. State Bar of Ariz., 433 U.S. 350, 375 (1977))* (citation omitted).

n136. Id.

n137. Id. at 206-07.

n138. *471 U.S. 626, 630-31 (1985).* The advertisement specified that the IUD device was "alleged to have caused serious pelvic infections resulting in hospitalizations, tubal damage, infertility, and hysterectomies. It is also alleged to have caused unplanned pregnancies ending in abortions, miscarriages, septic abortions, tubal or ectopic pregnancies, and full-term deliveries." *Id. at 631.* It also noted that the attorney was currently handling lawsuits involving the device, that readers should "not assume it is too late to take legal action," that cases would be handled on a contingent fee basis, and that no fees would be owed by clients if the case resulted in no recovery. Id.

8 Charleston L. Rev. 319, *372

n139. *Id. at 632.*

n140. *Id. at 639-40.* Here, the Court noted that "the advertisement's information and advice concerning the Dalkon Shield ... were entirely accurate" in that the advertisement did not promise successful lawsuits, did not suggest that the advertising lawyer had special expertise other than his work on other litigation involving the product, "reported the indisputable fact that the Dalkon Shield had spawned an impressive number of lawsuits," and advised readers that the attorney was willing to represent other women asserting similar claims. Id.

n141. *Id. at 648.*

n142. *Id. at 655-56.*

n143. *Id. at 651* (quoting *In re R.M.J., 455 U.S. 191, 201 (1982)).*

n144. *515 U.S. 618 (1995).*

n145. *Id. at 620, 621;* see also Brock, supra note 15, at 163.

n146. Id. at 635.

n147. Id. at 626-28.

n148. Id. at 629, 635. Among "the anecdotal record mustered by the Bar," the Court pointed to newspaper editorial pages criticizing Florida lawyers using targeted, direct mail after accidents, as well as scathing excerpts from complaints of direct-mail recipients. Id. at 627-28.

8 Charleston L. Rev. 319, *372

n149. See Model Rules of Prof'l Conduct R. 7.1-7.3.

n150. Id. at R. 7.2(a).

n151. Id. at R. 7.1.

n152. Id. at R. 7.3(a).

n153. Id. at R. 7.3(c).

n154. See Ala. Rules of Prof'l Conduct R. 7.1-7.6; Alaska Rules of Prof'l Conduct R. 7.1-7.5; Ariz. Rules of Prof'l Conduct R. 7.1-7.5; Ark. Rules of Prof'l Conduct R. 7.1-7.5; Cal. Rules of Prof'l Conduct R. 1-400; Colo. Rules of Prof'l Conduct R. 7.1-7.6; Conn. Rules of Prof'l Conduct R. 7.1-7.5; Del. Rules of Prof'l Conduct R. 7.1-7.6; Fla. Rules of Prof'l Conduct R. 4-7.1-4-7.11; Ga. Rules of Prof'l Conduct R. 7.1-7.5; Haw. Rules of Prof'l Conduct R. 7.1-7.5; Idaho Rules of Prof'l Conduct R. 7.1-7.6; Ill. Rules of Prof'l Conduct R. 7.1-7.6; Ind. Rules of Prof'l Conduct R. 7.1-7.5; Iowa Rules of Prof'l Conduct R. 32:7.1-32:7.8; Kan. Rules of Prof'l Conduct R. 7.1-7.5; Ky. Rules of Prof'l Conduct S. Ct. R. 3.130(7.01)-3.130(7.60); La. Rules of Prof'l Conduct R. 7.1-7.10; Me. Rules of Prof'l Conduct R. 7.1-7.6; Md. Rules of Prof'l Conduct R. 7.1-7.5; Mass. Rules of Prof'l Conduct R. 7.1-7.5; Mich. Rules of Prof'l Conduct R. 7.1-7.5; Minn. Rules of Prof'l Conduct R. 7.1-7.5; Miss. Rules of Prof'l Conduct R. 7.1-7.7; Mo. Rules of Prof'l Conduct R. 4-7.1-4-7.6; Mont. Rules of Prof'l Conduct R. 7.1-7.5; Neb. Rules of Prof'l Conduct R. 3-507.1-3-507.5; Nev. Rules of Prof'l Conduct R. 7.1-7.6; N.H. Rules of Prof'l Conduct R. 7.1-7.5; N.J. Rules of Prof'l Conduct R. 7.1-7.5; N.M. Rules of Prof'l Conduct R. 16-701-16-705; N.Y. Rules of Prof'l Conduct R. 7.1-7.5; N.C. Rules of Prof'l Conduct R. 7.1-7.5; N.D. Rules of Prof'l Conduct R. 7.1-7.5; Ohio Rules of Prof'l Conduct R. 7.1-7.6; Okla. Rules of Prof'l Conduct R. 7.1-7.5; Or. Rules of Prof'l Conduct R. 7.1-7.5; Pa. Rules of Prof'l Conduct R. 7.1-7.7; R.I. Rules of Prof'l Conduct R. 7.1-7.5; S.C. Rules of Prof'l Conduct R. 7.1-7.5; S.D. Rules of Prof'l Conduct R. 7.1-7.5; Tenn. Rules of Prof'l Conduct R. 7.1-7.6; Tex. Rules of Prof'l Conduct R. 7.01-7.07; Utah Rules of Prof'l Conduct R. 7.1-7.5; Vt. Rules of Prof'l Conduct R. 7.1-7.5; Va. Rules of Prof'l Conduct R. 7.1-7.5; Wash. Rules of Prof'l Conduct R. 7.1-7.6; W. Va. Rules of Prof'l Conduct R. 7.1-7.5; Wis. Rules of Prof'l Conduct R. 7.1-7.6; Wyo. Rules of Prof'l Conduct R. 7.1-7.4.

n155. Ala. Rules of Prof'l Conduct R. 7.2(e); see also Colo. Rules of Prof'l Conduct R.7.1 (a)(2) (stating that, "A communication is false or misleading if it compares the lawyer's services with other lawyers' services, unless the comparison can be factually substantiated."); Ky. Rules of Prof'l Conduct S. Ct. R. 3.130(7.15)(1)(c) (stating that, "A communication is false, deceptive or misleading if it compares the lawyer's services with other

lawyers' services, unless the comparison can be factually substantiated."); Tenn. Rules of Prof'l Conduct R. 7.1(c) (stating that, "A communication is false or misleading if it compares the lawyer's services or fees with other lawyers' services or fees, unless the comparison can be factually substantiated.").


n156. Mo. Rules of Prof'l Conduct R. 4-7.2(f); see also Fla. Rules of Prof'l Conduct R. 4-7.3(b) ("Except as otherwise provided in this subdivision, all advertisements other than lawyer referral service advertisements shall contain the following disclosure: "The hiring of a lawyer is an important decision that should not be based solely upon advertisements. Before you decide, ask us to send you free written information about our qualifications and experience."').


n157. See, e.g., Ark. Rules of Prof'l Conduct R. 7.2(d) ("Any communication made pursuant to this Rule shall ... disclose the geographic location or offices of the attorney or the firm in which the lawyer or lawyers who actually perform the services advertised principally practice law."); Pa. Rules of Prof'l Conduct R. 7.2(i) ("All advertisements and written communications shall disclose the geographic location, by city or town, of the office in which the lawyer or lawyers who will actually perform the services advertised principally practice law. If the office location is outside the city or town, the county in which the office is located must be disclosed.").


n158. Fla. Rules of Prof'l Conduct R. 4-7.2(c)(7) ("No lawyer shall, directly or indirectly, pay all or a part of the cost of an advertisement by a lawyer not in the same firm."); Pa. Rules of Prof'l Conduct R. 7.2(j) ("A lawyer shall not, directly or indirectly (whether through an advertising cooperative or otherwise), pay all or any part of the costs of an advertisement by a lawyer not in the same firm or by any for-profit entity other than the lawyer's firm, unless the advertisement discloses the name and principal office address of each lawyer or law firm involved in paying for the advertisement and, if any lawyer or law firm will receive referrals from the advertisement, the circumstances under which referrals will be made and the basis and criteria on which the referral system operates.").


n159. See, e.g., Fla. Rules of Prof'l Conduct R. 4-7.12(c) ("Any words or statements required by this subchapter to appear in an advertisement must appear in the same language in which the advertisement appears. If more than [one] language is used in an advertisement, any words or statements required by this subchapter must appear in each language used in the advertisement."); Ky. Rules of Prof'l Conduct S. Ct. R. 3.130(7.25) ("All advertisements must include the words "THIS IS AN ADVERTISEMENT,' unless excepted by SCR 3.130(7.09). In recorded telephone, electronic, video, or digital communications, other than television, the speaker must first state "THE FOLLOWING IS AN ADVERTISEMENT' and must further state at the end of the communication "THIS MESSAGE HAS BEEN AN ADVERTISEMENT.' All television communication, video recording or digital recording must prominently display the words "THIS IS AN ADVERTISEMENT' on the screen for as long as the lawyer's or firm's name appears on the screen. If a television communication video recording, or digital recording is longer than 60 seconds, the words "THIS IS AN ADVERTISEMENT' must be displayed throughout the entire communication. The words "THIS IS AN ADVERTISEMENT' must be prominently displayed on every page of any advertisement in writing, and displayed without scrolling on the first screen of every page of a website."); Mo. Rules of Prof'l Conduct R. 4-7.2(f) (""Conspicuous' means that

the required disclosure must be of such size, color, contrast, location, duration, cadence, or audibility that an ordinary person can readily notice, read, hear, or understand it."); N.Y. Rules of Prof'l Conduct R. 7.1(f) ("Every advertisement other than those appearing in a radio, television or billboard advertisement, in a directory, newspaper, magazine or other periodical (and any web sites related thereto), or made in person pursuant to Rule 7.3(a)(1), shall be labeled "Attorney Advertising' on the first page, or on the home page in the case of a web site. If the communication is in the form of a self-mailing brochure or postcard, the words "Attorney Advertising' shall appear therein. In the case of electronic mail, the subject line shall contain the notation "ATTORNEY ADVERTISING."").

n160. See Palumbo & Mullins, supra note 11, at 423 ("Direct-to-consumer (DTC) prescription drug advertising is now well known to practically all American households. One needs only to watch virtually any commercial television program or to browse through any consumer-directed magazine to view advertisements for a variety of prescription drugs."). In 2007, it was reported that in one year the average American watches sixteen hours of pharmaceutical advertisements. See Lia Mulligan, You Can't Say That on Television: Constitutional Analysis of a Direct-to Consumer Pharmaceutical Advertising Ban, *37 Am. J.L. & Med. 444, 444 (2011)* (citing Dominick L. Frosch et al., Creating Demand for Prescription Drugs: A Content Analysis of Television Direct-to-Consumer Advertising, 5 Annals Fam. Med. 6, 6 (2007)); see also Congressional Budget Office, Promotional Spending for Prescription Drugs 1 (2009), available at http://www.cbo.gov/sites/default/files/cbofiles/ ftpdocs/105xx/doc10522/12-02-drugpromo_brief.pdf (overviewing recent trends and the effects of pharmaceutical promotion).

n161. Dhaval M. Dave, Effects of Pharmaceutical Promotion: A Review and Assessment 3 (Nat'l Bureau of Econ. Research, Working Paper No. 18830, 2013), available at http://www.nber.org/papers/w18830.

n162. Id.

n163. Id.

n164. See C. Lee Ventola, Direct-to-Consumer Pharmaceutical Advertising: Therapeutic or Toxic, 36 Pharmacy & Therapeutics 669, 669, 670 (2011), available at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3278148/pdf/ ptj3610669.pdf (highlighting the rapid growth of DTC advertising over the last several decades and that such promotion "is now the most prominent type of health communication that the public encounters").

n165. Congressional Budget Office, supra note 160, at 2.

8 Charleston L. Rev. 319, *372

n166. Ventola, supra note 164, at 670. While many commentators point to the 1997 issuance of the FDA draft guidance as the trigger for the explosive growth in DTC advertising, Ventola notes that "there is evidence that this trend began much earlier. For example, in 1980, total spending on DTCPA was $ 12 million; in 1990, it was $ 47 million; and in 1995, it was $ 340 million, representing a nearly 3,000% increase in expenditures during a 15-year period before broadcast ad regulations had even been relaxed." Id. (footnotes omitted).

n167. Id.; see also Congressional Budget Office, supra note 160, at 3 (providing graphic chart). While DTC spending in 2008 decreased for the first time in well over a decade as a result of a nationwide financial crisis and subsequent economic downturn, the $ 4.8 billion spent on DTC promotion still represented nearly a quarter of pharmaceutical manufacturers' expenditures for all promotional activities. Congressional Budget Office, supra note 160, at 3; Ventola, supra note 164, at 670.

n168. See Jeremy A. Greene & David Herzberg, Hidden in Plain Sight: Marketing Prescription Drugs to Consumers in the Twentieth Century, 100 Am. J. Public Health 793, 793 (2010) available at http://www.ncbi.nlm.nih.gov/pmc/ articles/PMC2853635/pdf/793.pdf ("Considerable controversy persists, however, about the impact of DTC advertising on American public health and the doctor-patient relationship. Whereas some argue that advertising has indeed democratized access to important new medications, others decry the coarsening of medical discourse, the diminution of physicians' authority, and the risks of overprescription and inappropriate prescription by the manipulation of consumer awareness and consequent pressure on prescribers.") (footnotes omitted).

n169. Ventola, supra note 164, at 672-73 (discussing in some detail the arguments in support of DTC drug ads).

n170. Id. at 673-82.

n171. See supra Sections III.A & B.

n172. See infra Section IV.A.

n173. See Miller, supra note 14, at 13 ("Many of the same concerns activating regulation of DTC advertising apply with equal force to lawyer advertising."). Along very similar lines to what is posited in this article, Miller asserts that lawyer advertising should be regulated to require "warnings" to potential clients about the "risks" of pursuing contingent fee claims. Id. "Specifically, lawyer advertisements should include a warning that not all claimants will prevail and that significant or easily obtained results - which are frequently touted by lawyer advertisements - are not necessarily typical. Now is the time for a renewed effort to examine and better monitor lawyer advertising to ensure that it is not false or misleading and that it adequately warns consumers of the actual risks and benefits associated with legal services." Id.

n174. *21 U.S.C. §§301*-399f (2006); see generally Palumbo & Mullins, supra note 11, at 424-31 (providing an overview of the historical and legislative evolution of prescription drug advertising).

n175. See 21 C.F.R. § 202.1(e)(1) (2011).

n176. *21 U.S.C. § 352*(n), (3) (2006).

n177. See U.S. Food & Drug Admin., Guidance for Industry: Presenting Risk Information in Prescription Drug and Medical Device Promotion, at 3 n.10 (Draft May 2009) [hereinafter Presenting Risk Information] (citing *21 U.S.C. § 352*(n), (q)(1); 21 C.F.R. § 202.1(e)(5)(i)), available at http://www.fda. gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation /Guidances/UCM155480.pdf ("Prescription drugs and restricted devices are misbranded if their advertising is false or misleading in any particular [way].").

n178. Id. (citing *21 U.S.C. § 352*(n); 21 C.F.R.§§1.21, 202.1(e)(5)(iii)).

n179. Id. (citing 21 C.F.R. § 202.1(e)(5)(ii)).

n180. 21 C.F.R. § 202.1(e)(5)(ii) (2011). Regarding the fair balance doctrine, the regulations specify that drug manufacturers must "present a fair balance between information relating to side effects and contraindications and information relating to effectiveness of the drug in that the information relating to effectiveness is presented in greater scope, depth, or detail than is required by section 502(n) of the act and this information is not fairly balanced by a presentation of a summary of true information relating to side effects and contraindications of the drug ... ." Id.

8 Charleston L. Rev. 319, *372

n181. See Palumbo & Mullins, supra note 11, at 424.

n182. See Amy Shaw, Direct-to-Consumer Advertising (DTC) of Pharmaceuticals, CSA ProQuest Discovery Guides, 1, 4 (Mar. 2008) (quoting Julie M. Donahue et al., A Decade of Direct-to-Consumer Advertising of Prescription Drugs, *357 New Eng. J. Med. 673-81 (2007)),* available at http://www.csa.com/discoveryguides/direct/review.pdf (describing "the first DTC television advertisement" by Boots Pharmaceuticals and a DTC marketing effort by Merck and Dohme, both in the early 1980s, as "two drug-marketing campaigns [that] "broke with tradition and pursued a marketing strategy that depended on consumers' taking a more active role in prescribing decisions"").

n183. Direct-to-Consumer Advertising: Hearing Before the Subcomm. on Consumer Affairs, Foreign Commerce, & Tourism of the S. Comm. on Commerce, Sci., & Transp., 107th Cong. 6 (2001) (statement of Nancy M. Ostrove, Deputy Director, Division of Drug Marketing, Advertising, and Communications of FDA), available at http://www.fda.gov/NewsEvents/testi mony/ucm115206.htm (noting that among the steps taken during the moratorium to assess the impact of DTC advertising, the FDA conducted research and sponsored a series of public meetings, and the University of Illinois and Stanford Research Institute jointly sponsored a symposium to evaluate DTC advertising "from a broad research and policy perspective").

n184. Direct-to-Consumer Advertising of Prescription Drugs; Withdrawal of Moratorium, *50 Fed. Reg. 36677, 36678* (Sept. 9, 1985) (concluding that "current regulations governing prescription drug advertising provide sufficient safeguards to protect consumers"); see also Ventola, supra note 162, at 670.

n185. See Donna U. Vogt, Cong. Research Serv., RL32853, Direct-to-Consumer Advertising of Prescription Drugs 18 (2005), available at http://www.law.umaryland.edu/marshall/crsreports/crsdocume nts/RL3285303252005.pdf.

n186. Id.

n187. U.S. Food & Drug Admin., Guidance for Industry: Brief Summary: Disclosing Risk Information in Consumer-Directed Print Advertisements at 3-6 (Draft Jan. 2004) [hereinafter FDA Brief Summary], available at http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatory Information/Guidances/UCM069984.pdf.

n188. Id. at 6; see also Vogt, supra note 185, at 18 (noting that each approach would still require the disclosure of "all contraindications; all warnings; the major precautions, including any that describe serious adverse drug experiences or steps to be taken to avoid such experiences; and the three to five most common nonserious adverse reactions most likely to affect the patient's quality of life or compliance with drug therapy").

n189. FDA Brief Summary, supra note 187, at 4. According to the FDA website's description of "Patient Labeling," "for some prescription medicines, FDA approves special patient materials to instruct patients about the safe use of the product. These materials may be given to patients by their health care provider or pharmacist, and are considered part of FDA-regulated product labeling." Patient Labeling and Risk Communication, FDA, http://www.fda.gov/ AboutFDA/CentersOffices/OfficeofMedicalProductsandTobacco/C DER/ucm169617.htm (last visited Nov. 10, 2013).

n190. FDA Brief Summary, supra note 187, at 5.

n191. Id. at 5-6.

n192. U.S. Food & Drug Admin., Guidance for Industry: Consumer-Directed Broadcast Advertisements (1999) [hereinafter Consumer-Directed Broadcast Advertising], available at http://www.fda.gov/downloads/Drugs/ GuidanceComplianceRegulatoryInformation/Guidances/UCM070065.pdf.

n193. Id. at 2.

n194. Id.

n195. Id.

n196. Id.

8 Charleston L. Rev. 319, *372

n197. Id. at 1. (alteration in original) (quoting 21 C.F.R. § 202.1(e)(1)).

n198. Id. at 2-3.

n199. See Presenting Risk Information, supra note 177.

n200. Id.

n201. Id. at 2 ("FDA's guidance documents, including this draft guidance, do not establish legally enforceable responsibilities. Instead, guidelines describe FDA's current thinking on a topic and should be viewed only as recommendations, unless specific regulatory or statutory requirements are cited.").

n202. Id. at 3. The Guidance noted that "omission or minimization of risk information is the most frequent violation of the regulations cited in advertising and promotion enforcement letters sent to sponsors ... ." Id. In further support of this concern, the Guidance pointed to research indicating, among other points, that "60 percent of patients believe ads directed at them do not provide enough information about risks, 60 percent of physicians believe that patients have little or no understanding from these ads about what the possible risks and negative effects of the products are, and 72 percent of physicians believe that patients have little or no understanding from these ads about who should not use the product." Id. (citing Kathryn J. Aikin, John L. Swasy, & Amie C. Braman, Patient and Physician Attitudes and Behaviors Associated with DTC Promotion of Prescription Drugs - Summary of FDA Survey Research Results 4-5, 7-8 (Nov. 19, 2004), available at http://www.fda.gov/downloads/ Drugs/ScienceResearch/ResearchAreas/DrugMarketingAdvertisin gandCommunicationsResearch/UCM152890.pdf).

n203. Presenting Risk Information, supra note 177, at 4.

n204. Id. at 5 (citing Federal Trade Commission, FTC Policy Statement on Deception, (Oct. 14. 1983), appended to *FTC v. Cliffdale Assocs., Inc., et al., 103 F.T.C. 110, 170 (1984)* [hereinafter FTC Policy Statement on Deception]).

8 Charleston L. Rev. 319, *372

n205. Id. at 6.

n206. Id.

n207. Id. at 6-20.

n208. Id. at 7. Here, the FDA elaborated that appropriate DTC language is that which presents "both benefit and risk information in clear, understandable, and non-technical language for consumer audiences." Id.

n209. Id. at 7-8. Quoting the FTC Policy Statement on Deception, the Draft Guidance explained that ""accurate information ... may not remedy a false headline [or signal] because reasonable consumers may only glance at the headline' and skip the remainder of the text." Id. (alteration in original) (quoting FTC Policy Statement on Deception at 182).

n210. Id. at 8-9. The Draft Guidance defined "framing" as "how a particular piece of information is stated or conveyed, such as by emphasizing either the positive or negative aspects of the information or by presenting the information in vague versus specific terms." Id. at 8. To preempt the possibility that framing risk information differently might alter the manner in which audience members might respond to that information, the Draft Guidance clarified that "risk information should be presented in the same terms or with the same degree of specificity as benefit information." Id. at 9.

n211. Id. at 9-10.

n212. Id. at 10-14.

n213. Id. at 11. Citing to social science research, the Draft Guidance elaborated that "the quantity of information presented can affect the net impression of the piece. The amount of information presented is one component that, together with choice of words, color, graphics, voiceover, and other aspects of the piece, can affect cognitive load, the mental effort required to understand the various components of information in the piece." Id. at 10-11.

8 Charleston L. Rev. 319, *372

n214. Id. at 11. The Draft Guidance defined "material facts" as "those that would influence reasonable consumers ... about a product." Id. at 12. Among the factors that FDA will use to determine if a fact is material is the promotional piece's target audience and the nature of the benefit claims it is making. Id. at 12-13.

n215. Id. at 14.

n216. Id. at 11-14.

n217. Id. at 14-20.

n218. Id. at 14-15. In speaking generally to formatting, the Draft Guidance explains that "manufacturers should note that any [of the] formatting factors could make a piece false or misleading and that each factor could interact with others to increase this problem or to create a false or misleading impression when there might not be one if a factor were considered in isolation." Id. at 15.

n219. Id. at 15-16.

n220. Id. at 16-17.

n221. Id. at 17-18.

n222. Id. at 18-19.

n223. Id. at 19-20.

8 Charleston L. Rev. 319, *372

n224. See Krysten Crawford, New Worry for Vioxx Victims - Scams, Cnn Money (Dec. 1, 2004, 6:28 PM), http://money.cnn.com/2004/12/01/news/ fortune500/vioxx_ads/ ("Lawyers have used pop-up ads, spam, customized Web sites and paid ad searches to find Vioxx users... . So Vioxx lawyers are being aggressive, but does that mean they're crossing the line? Tort reform advocates think so. "You can't tell me that some of these lawyers aren't motivated purely by greed,' said Gretchen Schaefer, a spokeswoman for the American Tort Reform Association. She claims lawyers are promising huge rewards to Vioxx users, even those who aren't injured, so they can file more lawsuits.").

n225. Regarding the demonstration of a substantial governmental interest, the United States Supreme Court has said that the second prong of the Central Hudson test does not require "empirical data come ... accompanied by a surfeit of background information... . We have permitted litigants to justify speech restrictions by reference to studies and anecdotes pertaining to different locales altogether, or even, in a case applying strict scrutiny, to justify restrictions based solely on history, consensus, and "simple common sense.'" *Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 555 (2001)* (alteration in original) (quoting *Florida Bar v. Went for It, Inc., 515 U.S. 618, 628 (1995)).*

n226. See Miller, supra note 14, at 80 (offering survey data in support of the point that "the public concern and disdain for lawyer advertising coupled with the high price of litigation creates a substantial government interest to do more to regulate overzealous and potentially misleading lawyer advertising").

n227. *Ohralik v. Ohio State Bar Ass'n, 436 U.S. 447, 460 (1978)* (quoting *Goldfarb v. Va. State Bar, 421 U.S. 773, 792 (1975));* see also Brock, supra note 15, at 156 (noting that "in a lawyer advertising case, the [substantial government interest] prong of the Central Hudson test is easily met").

n228. See supra notes 178-79 and accompanying text.

n229. See Presenting Risk Information, supra note 177, at 21 ("It is important to re-emphasize that, in addition, to specific risk-related claims, FDA also considers the net impression conveyed by all elements of a piece. For this reason, manufacturers should focus not just on individual claims or presentations, but on messages conveyed by the promotional piece as a whole.").

n230. See Miller, supra note 14, at 80 ("With a television ad, for instance, a lawyer could deliver the disclosure orally. When an attorney discusses the risks orally during the ad, the lawyer would voice the disclosure as equally emphatically or prominently as voicing the other claims.").

n231. Levine, supra note 10.