# Exhibit 9



Copyright (c) 2012 University of Memphis Law Review
University of Memphis Law Review

Spring, 2012

University of Memphis Law Review

*42 U. Mem. L. Rev. 559*

**LENGTH:** 25033 words

ARTICLE: Specious Claims and Global Settlements

**NAME:** S. Todd Brown*

**BIO:** * Associate Professor of Law and Director of the Center for the Study of Business Transactions, University at Buffalo Law School.

**LEXISNEXIS SUMMARY:**
 ... Predictable settlement evidentiary targets generate opportunities and incentives for repeat players to develop and present intrinsically bad mass tort claims as good.  ... Although there may never be another mass tort that possesses all of the factors that have complicated asbestos personal injury litigation-including the long latency period between exposure and manifestation of an injury, unique association with a horrific disease, sheer volume of potential victims, shocking misconduct by key defendants and defendant elasticity-it nonetheless provides a useful study of the impact of judicial management and settlement expectations on private behavior.  ... In a 2010 study, the RAND Institute for Civil Justice reported that 86% of the claims paid by asbestos trusts in 2007 and 2008 were nonmalignant claims, which have largely been discredited elsewhere and subjected to considerable legislative and judicial restrictions.  ... Although many of the courts overseeing asbestos litigation routinely limited discovery into individual claims, Judge Jack approved increasingly aggressive inquiries into the screening practices that generated the claims before her.  ... As in the litigation screenings in the asbestos and silica litigations, fen-phen doctors who generated large volumes of qualifying claims could earn millions of dollars within a few months.  ... For example, although early oversubscription in the fen-phen global settlement might be explained by reference to the fact that compensation for unaudited claims was paid before the audited claims were reviewed, thus allowing repeat players to obtain large recoveries before their entire claim pools might be subjected to audit, several objectively specious claims were submitted after the court ordered audits of every claim submitted, criminal investigations were announced, and civil suits against some of those involved were initiated. ... In asbestos bankruptcies, where a select group of plaintiffs' firms largely dictate the terms of any trust distribution procedures and claim processors must rely upon repeat business from these same firms, evidentiary targets will vary little and tend to be far easier to satisfy than in the tort system and less likely to change unexpectedly than private inventory settlements.  ... In mandatory settlements, for example, incurring any costs beyond those required to satisfy the effective settlement criteria may not yield any additional benefits.  ... If the manner of selecting claims is predictable, those submitting claims may alter filing patterns to reduce the chances that their claims, or those within their inventories that may not withstand scrutiny, will be audited.  ... If the claims submitted are homogenous, random

sampling of an entire claim pool is the most straightforward and ostensibly fair method of both identifying offending claims and spreading the risk of audit equally among those advancing claims.

**TEXT:**
 [*560]

I. INTRODUCTION

Few problems are more disruptive to the efficient negotiation and operation of comprehensive mass tort settlements than oversubscription, which, at times, appears to be fueled primarily by specious claims. In settlements with opt-out rights, a flood of claims can generate a market for lemons, with the weakest claims submitted to the settlement and the strongest opting out and seeking recovery at trial or in private settlement. In binding settlements, oversubscription may result in a common problem, requiring dramatic reductions in payment that effectively transfer recoveries from those with intrinsically strong claims to those with weak claims.

Why are some comprehensive mass tort settlements overrun by specious claims? At first glance, the question suggests relatively straightforward answers: greed, the unethical schemes of a few plaintiffs that are "bad apples," and the inability or unwillingness of courts and defendants to challenge them. Thus, payment of specious claims is merely another cost of settlement, n1 and the "bad  [*561]  apples" who submit them clearly recognize that it will cost settlement administrators more to uncover than it will to simply pay the claims.

Without rejecting the bad apple explanation entirely, the available evidence suggests that specious claims within some mass torts are more complex than this explanation suggests. Specious filings have overwhelmed not only those settlements where advancing frivolous claims is rational, but also those where private self-interest should, in theory, discourage them. n2 In these cases, the vast majority of questionable claims were recruited, developed, and advanced by groups of repeat players following a streamlined and compartmentalized model of litigation. And, as in other group settings with comparable patterns of collective misconduct, n3 the fact that many participants are strikingly ordinary and otherwise ethical, law-abiding actors indicates that the bad apple rationale is, at best, incomplete. n4

In order to address this question in greater detail, Part II of this Article provides a descriptive account of the entrepreneurial  [*562]  claim markets n5 that generated specious claims in three high profile mass tort litigation contexts: asbestos litigation, silica litigation, and fen-phen litigation. Although frivolous claims appear in a wide variety of litigation and claim resolution settings, these cases were selected due to the volume of specious claims advanced and the availability of claim development and filing information that is not commonly accessible in mass tort litigation and settlement. The discussion not only identifies the specific practices that generated large volumes of dubious claims, but also places them in the context of the litigation and settlement environments in which they arose.

With the benefit of this experience, Part III identifies some distinguishing characteristics of the specious claim markets discussed in the case studies. Although commonly viewed by commentators as an adverse selection problem in which claim quality and value are fixed-but hidden-types, n6 this discussion evaluates the extent to which comprehensive "going forward" settlements n7  [*563]  may encourage practices that resemble claim manufacturing rather than fact development and yield circumstances in which rational ignorance prevails both at the group and individual level among repeat players. Even to the extent that some participants may have opportunities or obligations to identify and prevent specious claim development practices, compartmentalization of responsibility and cognitive justifications that tend to neutralize comparable concerns in other settings work in much the same way in entrepreneurial mass tort claim development. This presents not only problems for ethical enforcement, but also suggests that merely escalating the risk of discovery and severity of individual sanctions may not be as effective as conventional wisdom suggests.

With this basic framework in mind, Part IV evaluates the potential for future specious claim markets in modern aggregate litigation and advances proposals for controlling these markets in collective settlements. This Part

demonstrates that settlements susceptible to targeted development require more sophisticated provisions that address the opportunity, incentive, and neutralization patterns that fuel specious claim markets. Specifically, this Part emphasizes the need to ensure that deterrence messages reach the appropriate individuals and sub-groups, identify and target group incentives to advance specious claims, and manage their opportunities to do so. Although others have suggested the use of statistical methods to frame mass tort settlement values, this Part explains that these methods may be more valuable in controlling oversubscription and specious claim filings against claim resolution facilities post-settlement and outlines how these methods may be effectively employed in this context. To that end, this discussion provides a general framework for settlement criteria, proposes an adaptive audit approach to monitoring claims in going forward collective settlements, and suggests a more active role for courts in settlement planning.

II. Three Studies in Specious Claim Markets

The three cases analyzed below-regarding asbestos litigation, silica litigation, and fen-phen litigation-present distinct sce  [*564]  narios in which an overwhelming mass of specious claims flooded courts or comprehensive settlements. Although there may never be another mass tort that possesses all of the factors that have complicated asbestos personal injury litigation-including the long latency period between exposure and manifestation of an injury, unique association with a horrific disease, sheer volume of potential victims, shocking misconduct by key defendants and defendant elasticity-it nonetheless provides a useful study of the impact of judicial management and settlement expectations on private behavior. Likewise, the silica litigation provides a helpful point of comparison to asbestos litigation even though the specious claim market there never gained an effective foothold. The fen-phen case is perhaps most interesting because it challenges our expectations concerning the propensity for specious claims to arise where discovery seems likely and sanctions are potentially severe.

A. Specious Claim Markets in Asbestos Litigation and Settlement

Asbestos litigation has been aptly characterized as both the "mother of all mass torts" and the "mother of invention" due to the special problems it posed for courts. n8 Its history has been marked by a series of judicial experiments, both in substantive and procedural law, across individual states and in federal courts. This history also makes asbestos litigation an ideal starting point for this discussion.

1. The Historical Litigation and Settlement Environment in Asbestos Litigation

To appreciate the manner in which asbestos litigation evolved, it is helpful to understand the problems it created for courts. The long latency period between exposure to airborne asbestos fibers and the onset of asbestos-related disease made identifying the sources of the plaintiffs' asbestos exposure difficult. n9  [*565]  Though many who are exposed to asbestos and develop markers suggesting physiological damage from this exposure may not become impaired until years later, they might be barred from pursuing litigation if they wait until this impairment occurs. n10 In the interim, potential claimants would be forced to bear the financial burden of regular medical screening and the personal costs of living in the shadow of potentially developing debilitating or even terminal asbestos-related diseases.

Some courts sought to reduce the barriers to recovery, enable plaintiffs to preserve their rights, and shift costs from those exposed to asbestos to those responsible for the exposure through a variety of changes that have been characterized as "special asbestos law." n11 These modifications include recognizing physiological changes as compensable harms even where the plaintiff has no discernible impairment, relaxing evidentiary burdens to account for the long latency period of asbestos disease, and embracing plain  [*566]  tiff-friendly adjustments to the calculation of damages. n12 As a result, many claims that would not be compensable in typical personal injury cases-e.g., those lacking sufficient evidence to establish specific causation-could now go before a jury and be compensable. n13

Beyond the expansion of substantive law, the prevalence of "shotgun complaints" and relaxed venue and joinder rules in some jurisdictions generated amorphous consolidations of vague and indistinguishable claims. Plaintiffs with no connection to the forum state or only speculative, tangential ties to the forum were nonetheless allowed to join in cases

with in-state plaintiffs. n14 These complaints often provided notice of the basic facts of the plaintiffs' respective cases in name only. n15  [*567]

As a practical matter, consolidation, liberal pleading, and limited discovery n16 have had a substantial impact on pre-trial dispositive motions. It is simply not possible to establish that no reasonable jury could find for a specific plaintiff when the foundations of her claim are so vague and sweeping that they could be fairly read to assert any number of potential allegations. n17 Thus, even if the ability to survive summary judgment or a motion to dismiss might serve as a reasonable baseline for settlement purposes in theory, the number of claims that could do so under this framework could be far greater than expected in traditional tort litigation.

Faced with the administrative burden of managing this litigation, some courts became adept at encouraging the parties to settle. n18 In Madison County, Illinois, for example, defendants fre  [*568]  quently complained that the asbestos court implemented "a system that made a fair trial almost impossible" by, among other things: rejecting requests for more definitive statements or discovery defendants needed to prepare for trial effectively, limiting the defense case for trivial discovery oversights, and forcing defendants to prepare for multiple trials on the same day while allowing the plaintiff to choose which one would proceed when that day arrived. n19 Less extreme but comparable examples of settlement pressure have been noted in other states. n20 Regardless of the degree to which defendants' characterizations fairly capture the reality of the procedures employed, they reflect a common perception that the deck was stacked against non-settling defendants.

Within these jurisdictions, claims that survived early dispositive motions were most often settled, either individually or as  [*569]  part of inventory settlements. n21 In inventory settlements, firms generally conditioned the settlement of their strongest claims on the concurrent settlement of some or all of the other claims they represented. n22 Even claims that had not yet been subjected to discovery or, for that matter, placed on an active trial docket, could be settled and paid. n23 Although some of these inventory settlements may have conditioned payment on the production of nominal supporting evidence n24 -usually no more than sufficient to survive summary judgment-this was not always the case.

Under the circumstances, it is not surprising that both plaintiffs and defendants preferred private administration schemes for settling asbestos claims. For several years, most asbestos claims were filed in "plaintiff friendly" jurisdictions n25 where mass settlement was a given, n26 and administrative approaches allowed both sides to avoid some of the expense of litigation. Thus, some defendants agreed to forward-looking inventory settlement arrangements with specific firms, n27 while others adopted larger comprehensive settlement administration plans involving multiple firms n28  [*570]  and other defendants. n29 These settlements typically provided fixed grids and criteria similar to that used by the Manville Personal Injury Settlement Trust. n30 As a result, using a claim's prospects for surviving summary judgment as the nominal standard for compensation was transformed from a common practice into a fixed settlement target.

The problem with these private arrangements, however, was that they failed to provide lasting peace and, in fact, tended to encourage firms to recruit more claims and submit them for payment. n31 In short, it became apparent that any settlement that failed to resolve existing and future claims could generate more new claims than it resolved. n32

In the mid-1990s, the leading candidate for resolving all current and future mass tort claims appeared to be a class action suit under *Rule 23 of the Federal Rules of Civil Procedure.* n33 Under the proposed comprehensive class action settlements in Amchem Products, Inc. v. Windsor n34 and Ortiz v. Fibreboard Corp., n35 the settlement proponents settled inventory claims and  [*571]  attempted to limit future asbestos claimants' recoveries to a proposed distribution procedure that paid claims according to fixed categories upon the submission of sufficient evidence to satisfy the applicable criteria. n36 This approach promised the efficiency of the administrative model of private settlement plans and was intended to afford defendants lasting peace from future claims. n37

After the Supreme Court effectively foreclosed class action certification for asbestos claims in Amchem and Ortiz,

thus dooming the class action settlement approach, n38 litigants pursued the same basic settlement approach under *Section 524(g) of the Bankruptcy Code*. n39 In this system, the lawyers who control the largest asbestos claim inventories also control critical appointments in the bankruptcy case, n40 enjoy little resistance from most defendant-debtors and others in designing the terms of the resulting trusts, n41 and hold leadership positions in the trusts once they are established. n42 Not surprisingly, these terms and the manner in which the trusts operate largely reflect the interests of the firms that establish them. n43 Thus, much like asbestos litigation and settlement practice [*572] in state court, compensation from asbestos bankruptcy trusts is available at a standard that provides a rough approximation of whether the claims could survive summary judgment. n44 The result has been a system that neither resembles the traditional adversary process nor compensates for the policing functions of adversary litigation that have been stripped away. n45

2. Claim Recruiting and Development

To meet the demand for rising asbestos claims, enterprising lawyers drew inspiration from medical screening and monitoring programs. n46 Historically, these programs were used to evaluate at-risk populations for signs of disease, with the goal of identifying and treating these diseases early. n47 These firms often enlisted un [*573] ions and other organizations to nominally sponsor screenings of current and former workers in high-risk industries, n48 and they could easily present these screenings as a public service. n49 Moreover, the lawyers' presence could be seen as complementing this service; ensuring that victims would obtain the medical benefits of the screening, while providing ready access to lawyers who could help them preserve and pursue their legal rights. n50 [*574]

Over time, litigation screenings elevated claim-manufacturing efficiency over medical accuracy. Untrained employees assumed responsibility for taking medical histories, n51 which were often incomplete and inaccurate. n52 Similarly, some screening companies intentionally performed tests incorrectly to increase the likelihood of generating signs of impairment. n53 Many screening doctors did not see their work in this area as "medical work"; n54 they assumed their role was not to provide medical care, but to assist the lawyers in developing a colorable case for each prospective plaintiff.

As a result, firms that used litigation screening companies could generate claim volumes that far exceeded those achievable through traditional medical screenings. In a 2004 study, for exam [*575] ple, researchers found that an objective medical screening identified potential asbestos injuries in only 4.5% of the x-rays examined, while litigation screenings had produced ostensible diagnoses of asbestos personal injuries in an astounding 95.9% of cases from the same x-ray pool. n55 This recruiting system was remarkably skilled at maximizing the size of the lawyers' respective inventories because the enterprise could focus on building a mass of claims that satisfied a low nominal compensation standard with little care for whether or not those claims represented actual injuries recognized under applicable tort law. n56

3. The Impact of Specious Claims on Asbestos Settlements and Recoveries

A telling point of general reference for the impact of asbestos claim inflation generally is the Manville Personal Injury Settlement Trust. Prior to its bankruptcy in 1982, the Johns-Manville Corporation ("Manville") was the lead defendant in thousands of suits across the country because numerous asbestos personal injury victims could be linked to Manville products. n57 For much the same reason, a substantial number of asbestos claimants have since pursued claims against the Manville Trust. n58

Overwhelming claim volumes, including tens of thousands of claims that were generated through dubious litigation screenings, have dramatically curtailed payments from the Manville Trust to claimants for most of its existence. Although Manville's [*576] Disclosure Statement for its Chapter 11 Plan estimated that the trust would receive between 83,000 and 100,000 claims throughout its lifetime, 100,000 claims were filed within the first year alone. n59 In fact, more than 190,000 claimants were seeking compensation from the fund by January 1992. n60 The trust ultimately obtained authority to revise its payment scheme, the heart of which was the dramatic reduction of

payments to new claimants. n61 Still, by 2005, the trust had received over 690,000 claims-excluding withdrawn claims-and was paying 5% of the scheduled value to settling claimholders. n62

The Manville example unfortunately reflects the common reality across asbestos bankruptcy trusts. n63 In a 2010 study, the RAND Institute for Civil Justice reported that 86% of the claims paid by asbestos trusts in 2007 and 2008 were nonmalignant claims, n64 which have largely been discredited elsewhere and subjected to considerable legislative and judicial restrictions. n65 Given the volume of claims, "most trusts do not have sufficient funds to pay every claim in full and, thus, administrators set a payment percentage that is used to determine the actual payment a claimant will be offered." n66 Specifically, the median payment percentage of the trusts studied was 25% and fell as low as 1.1%. n67 [*577]

Notwithstanding this persistent pattern, courts continue to confirm asbestos bankruptcy plans that encourage oversubscription. In 2009, for example, Judge Gerber of the United States Bankruptcy Court for the Southern District of New York approved the 524(g) plan in the T H Agriculture & Nutrition ("T.H.A.N.") bankruptcy case based, in part, on representations that all current and future asbestos claimants would be paid in full. n68 Although only 14,024 claims were pending prior to the bankruptcy n69 and a mere 12,486 were qualified under the claim review process as of the effective date, 93,331 claimholders were allowed to vote on the plan. n70 By the time the T.H.A.N. trust began accepting post-petition claim filings in April 2011, the trust had already paid out nearly $ 400 million to claimants and raised its projected total liability from $ 900 million to roughly $ 2.5 billion, requiring the trust to reduce its payment percentage to 30% going forward. n71

The transformation of T.H.A.N. from a peripheral defendant, to targeted defendant, and, ultimately, to the source of yet an  [*578]  other asbestos trust plagued by oversubscription, is remarkable. During its first three decades as a peripheral asbestos defendant, T.H.A.N. paid approximately $ 2 million total to asbestos plaintiffs in the tort system. n72 Less than five years after it became a targeted defendant in 2003, T.H.A.N. was in bankruptcy. Moreover, a mere eight years after its defendant profile changed, T.H.A.N.'s aggregate liability had grown more than 1250-fold in connection with its global settlement. n73

Of course, oversubscription has had substantial consequences for otherwise viable companies and plaintiffs with intrinsically strong claims alike. In asbestos, specious claims have historically overwhelmed courts n74 and diverted compensation from strong claims to weak claims and the lawyers that bring them. n75 And though many defendants would have faced substantial liability for intrinsically strong asbestos claims alone, this surge of specious  [*579] claims forced dozens into bankruptcy n76 and transformed asbestos litigation into an "endless search for a solvent bystander." n77

B. Silica Personal Injury: A Failed Specious Claim Market

While asbestos mass tort litigation has experienced multiple peaks and valleys in its forty-year history, silica personal injury filings did not reach epic proportions until the early 2000s. n78 Given the ready comparisons between asbestosis and silicosis litigation, plaintiff-oriented litigation conferences and defense-side journals alike touted silica litigation as the "next asbestos." n79 Indeed, the Wall Street Journal reported that silica mass tort litigation appeared poised to rival asbestos litigation, both in terms of size and character. n80  [*580]

Notwithstanding its promising start, silica personal injury litigation as a mass tort was "essentially over" by the end of 2005. n81 In 2003, more than 10,000 of these claims were consolidated in Multidistrict Litigation 1553 ("the Silica MDL"), which was overseen by Judge Janis Jack in the United States District Court for the Southern District of Texas. n82 In 2005, following extensive discovery and a Daubert hearing, Judge Jack issued an opinion n83 that exposed numerous flaws in the litigation screening practices-largely borrowed from asbestos litigation practice n84 -that generated the vast majority of the underlying claims.

Although many of the courts overseeing asbestos litigation routinely limited discovery into individual claims,

Judge Jack approved increasingly aggressive inquiries into the screening practices that generated the claims before her. As in other multidistrict litigation, n85 the court required the submission of plaintiff fact sheets that included relevant medical and diagnostic information, including the identity of the doctor diagnosing the plaintiff with a silica-related disease and copies of supporting documentation. n86 Moreover, notwithstanding plaintiffs' efforts to quash subpoenas directed to the diagnosing doctors due to their designation as consulting experts, the defendants were able to depose Dr. George Martindale. n87 Following some troubling revelations at this deposition, the court "proposed Daubert hearings/Court depositions for all of the remaining diagnosing doctors, as well as the screening companies (such as N&M) that hired most of them." n88  [*581]

The court's inquiry revealed a number of disturbing practices that mirrored those found in asbestos litigation. Among other things, those who took medical histories and performed complicated pulmonary function tests had no medical training, n89 doctors performed rushed examinations-if any physical exams occurred at all-and "simply ignored" differential diagnosis, n90 and screening companies "shopped" individual x-rays to different doctors until receiving a positive diagnosis. n91 One doctor even left pre-signed ILO forms n92 with the screening company. n93 Moreover, some law firms only paid the screening companies for positive diagnoses, n94 giving the screening companies and the doctors they employed a strong financial incentive to generate a high positive reading yield.

In sum, this inquiry revealed a practice that effectively ensured that the doctors and others involved could avoid accountability. Specifically, screening companies divided responsibility for several critical steps in the medical review process, n95 so nobody "assumed overall responsibility and oversight for the entire process." n96 Indeed, most of the silica screening doctors justified their involvement by marginalizing their own roles. They argued that most of the work was done by others, n97 that they were misled into believing they were merely verifying previous diagnoses, n98 that they were not really diagnosing anyone with anything or otherwise  [*582]  practicing medicine, n99 and that the misleading language in the reports they signed was merely legalese prepared by lawyers or screening company officials. n100

As a result of these practices, the rate of positive diagnoses was shockingly high. One of the screening companies, for example, "found 400 times more silicosis cases than the Mayo Clinic (which sees 250,000 patients a year) treated during the same period." n101 Moreover, although a dual diagnosis of asbestosis and silicosis is the medical equivalent of hitting a hole-in-one, the vast majority of the plaintiffs advancing silicosis claims in the Silica MDL had been involved in asbestos litigation and had submitted nominal diagnoses of asbestosis in support of their claims for payment from asbestos settlements. n102 On the stand, one of the doctors who rendered conflicting diagnoses for the same plaintiff in the Silica MDL and asbestos litigation said he "didn't know" if he could explain the discrepancy between the two diagnoses and subsequently asked for counsel, terminating his testimony. n103 As Judge Jack surmised:

These diagnoses were about litigation rather than health care. And yet this statement, while true, overestimates the motives of the people who engineered them. The word "litigation" implies (or should imply) the search for truth and the quest for justice. But it is apparent that truth and justice had very little to do with these diagnoses-otherwise more effort would have been devoted to ensuring they were accurate. Instead, these diagnoses were driven by neither health nor justice: they were manufactured for money. n104

Following the opinion, few of the silica claims were pursued in state court. In Texas, for example, of the approximately 5839 silica cases technically on the docket, only fifty-four plain  [*583]  tiffs attempted to satisfy the medical reporting law passed in 2005, and only twenty-two were active as of September 2010. n105

C. The Fen-Phen Settlement Specious Claim Market

Fen-Phen was a wildly popular anti-obesity treatment in the 1990s. The FDA requested its withdrawal in September 1997, after reports suggested a connection between use of the treatment and valvular heart disease and pulmonary hypertension, primarily in women. n106 The subsequent flood of personal injury claims against American

Home Products, the distributor of the drugs suspected in causing these injuries, ultimately led to the Nationwide Class Action Settlement Agreement. n107 At the time, this settlement was considered an impressive achievement; it appeared to overcome the legitimacy concerns that doomed Amchem and Ortiz, n108 and its claim qualification criteria appeared to limit the potential for over-claiming. This section highlights the conditions of the settlement and how, notwithstanding its strict parameters, a clear specious claim market arose and flooded the settlement with claims.

1. The Nationwide Class Action Settlement Agreement

Much like asbestos trusts and other comprehensive settlements, the Nationwide Class Action Settlement Agreement required claimants to submit medical evidence, including a physician's report, demonstrating a qualifying medical injury. n109 The  [*584]  assessment form submitted by board-certified cardiologists or cardiothoracic surgeons to classify claims required use of a specified formula in support of the doctor's determination that the claimed valvular leakage was mild, moderate, or severe. n110 In addition, the form required information concerning the claimant's medical history. n111

To verify the quality of the claim pool, the settlement agreement established a detailed audit process. Unlike most asbestos settlements and trusts, audits of 15% of the claims filed were mandatory rather than discretionary or conditioned on the consent of plaintiffs' counsel. n112 The settlement also provided for severe, albeit discretionary, penalties in the event the court concluded that there was no medical basis for an audited claim. n113 These penalties included audits of other claims involving the same attorneys or physicians, payment of certain costs and fees, and potential referral for criminal prosecution. n114

2. Oversubscription and Specious Claims

Although the fen-phen settlement was carefully structured to screen out weak claims, it was not infallible. Given the structure of the settlement, a claimant with a disqualifying history might otherwise qualify if the doctor omitted that history from the Green Form. Moreover, if the doctor exaggerated the measurements of a claimant's valvular leakage, the claimant might qualify for a substantially higher payment classification under the matrix established in the settlement than she was otherwise entitled. Thus,  [*585]  plaintiffs could readily advance claims that appeared to satisfy the settlement criteria where, in fact, their claims had little or no intrinsic merit.

Several plaintiffs' lawyers and screening service providers recruited dozens of doctors to review large volumes of echocardiograms, many of which had actually been taken by technologists in hotel rooms and other sites around the country. n115 As in the litigation screenings in the asbestos and silica litigations, fen-phen doctors who generated large volumes of qualifying claims could earn millions of dollars within a few months. n116

The manner in which these "echocardiogram mills" operated generated objectively specious claims. Among other things, some technologists systematically over-read and over-measured the echocardiograms to show that the patients had positive readings when they did not or qualified higher leakage requirements than the tests actually reflected. n117 Nonetheless, some of the doctors either signed off on the technologists' readings without any review or delegated their review obligations to other parties. n118 One doctor allegedly spent between sixteen seconds and no more than seven minutes per diagnosis and intentionally manipulated the equipment to capture misleading images to generate ostensible diagnoses. n119 In at least one case, the U.S. Attorney's office alleged that the measurements reported on the form "were not consistent with the measurements of hearts of human beings." n120

Notwithstanding the potential for audit, the settlement was besieged with far more nominally qualifying claims than statisti  [*586]  cally possible, leading the court to order an audit of the entire claim pool. n121 Early audit reports revealed that roughly 12.5% of the claims submitted were legitimate under the settlement criteria and that "high percentages of unfounded medical diagnoses correlated with particular physicians and particular plaintiffs' law firms." n122 In sum, the overwhelming majority of the claims were intrinsically weak but nominally qualifying due to manipulation of the evidence. Although the Nationwide Class Action Settlement was initially projected to largely

resolve the fen-phen litigation at a cost of $ 3.75 billion, n123 American Home Products Corporation and its successors n124 have paid roughly $ 21 billion to settle the suits to date. n125

III. Specious Claim Opportunities, Incentives, and Justifications

Speciousness is in the eye of the beholder. A claim advanced by a plaintiff who was never exposed to a defendant's product and lacks a verifiable injury is likely to be viewed as specious by most observers, while one with a lengthy history of exposure and extensive medical documentation of a resulting injury will be viewed as non-specious. Beyond these clear categories, however, whether a claim is specious or not tends to be murky. Are claims specious if they are unlikely to succeed at trial, or are they specious only if they are unlikely to get to a jury? Should we treat claims as specious merely because they are of unknown veracity, or should we accept the defendant's settlement in spite of this lack [*587] of knowledge as evidence that the claims are non-specious? In global settlement, should we consider claims specious because, contrary to the apparent assumptions of the settlement agreement, the manner in which they are developed reduces the likelihood that traditional plaintiff self-selection and attorney gate-keeping will occur, or should we limit this term to those cases in which supporting information is actively manufactured to create a knowingly deceptive perspective of claim merit?

If we accept that claim merit and value are fixed and known, we can distinguish specious and non-specious claims solely on merit. For example, if we characterize claims as having one of two fixed types, frivolous claims with zero value and non-frivolous claims with a value of D, it is possible to outline a basic framework for determining who should submit claims to a settlement grid. Plaintiffs with frivolous claims know their type and that they will face less scrutiny in a streamlined settlement, so they should be expected to subscribe to the settlement. Likewise, those holding non-frivolous claims should also submit claims for payment where they expect to receive compensation that exceeds D. Conversely, non-frivolous types with expected damages in excess of D should either seek to opt out (if possible) or find their claims undervalued in a binding settlement. In either case, adverse selection has negative consequences for either high-value non-frivolous claim holders-who are forced to accept a lower value than D in a binding settlement-or for defendants-who lose the peace they sought through settlement as increasing numbers of stronger claims opt out. In sum, this basic adverse selection framework promises to explain both why specious claims are filed and paid and how their presence undermines the objectives of global settlement.

Such a simplified framework, however, omits the largest pool of claims: those that are neither clearly frivolous nor clearly meritorious. Even if claims are intrinsically fixed types, the evidentiary support for claims in litigation and settlement tends to be malleable and subject to competing interpretations. Thus, if merit is based on satisfaction of the adopted standard, those who knowingly advance frivolous claims can do so because they are able to manufacture sufficient evidentiary support to satisfy the established criteria. If we limit "merit" under this standard to intrinsic merit, this malleability can yield sufficient internal uncertainty so that repeat players may submit frivolous claims they believe to be non-frivolous or, at least, do not have sufficient reasons to view as [*588] objectively frivolous. n126 In short, distinguishing specious and non-specious claims solely on the basis of known information about their merits is unlikely to capture the universe of claims we commonly view as specious.

Some claims are developed specifically in a manner that is intended to manufacture the appearance of merit without regard for whether the claims do, in fact, have merit. At least some of these manufactured claims may have intrinsic merit, but we are unable to distinguish them from manufactured claims that do not. In light of the ability of plaintiffs and their counsel to control how they develop claims and the degree to which development shortcuts reduce the capacity of streamlined settlement administration systems to distinguish good and bad claims, this Part treats all such manufactured claims as specious regardless of their unknown intrinsic merit. In these cases, the onus should be on the plaintiffs to devise more reliable mechanisms for producing support that is reliable.

Similarly, even claim development practices that may produce reliable evidentiary support under most circumstances may become unreliable when critical stages are outsourced to unreliable parties. Although some courts have concluded that lawyers are entitled to accept the work of medical and other legal professionals at face value for

ethical purposes, it may be just as difficult, if not impossible, to distinguish the good and bad claims that are generated as it is in the intentional claim manufacturing scenario. Here, too, this Part treats these claims as specious not because it speaks to their intrinsic merit but because the claims are ultimately presented as something they are not: premised upon reliable evidentiary support. As a whole, then, this Part focuses not only on claims that are specious inasmuch as the evidence known to the [*589] plaintiffs should preclude their submission, but also those claims that are based on development practices that, by design or manipulation by key participants, will generate evidence that frames bad claims as good.

Although some may take issue with this approach in light of the fact that it characterizes some innocent plaintiffs' intrinsically meritorious claims as specious, this is not a normative judgment as much as it is an assessment of the range of practices that plague global settlement. Given the critical role that repeat players have in collective litigation and settlement, n127 targeting their incentive framework with respect to unreliable practices and outsourcing should encourage self-selection and gate-keeping against advancing frivolous claims more effectively than merely targeting those individuals advancing claims that they know to be frivolous. n128 Indeed, the case studies demonstrate that the orthodox focus on the latter is unlikely to succeed across cases. For example, although early oversubscription in the fen-phen global settlement might be explained by reference to the fact that compensation for unaudited [*590] claims was paid before the audited claims were reviewed, n129 thus allowing repeat players to obtain large recoveries before their entire claim pools might be subjected to audit, several objectively specious claims were submitted after the court ordered audits of every claim submitted, n130 criminal investigations were announced, n131 and civil suits against some of those involved were initiated. n132

In addition, although the basic adverse selection framework may reflect the risk-reward assessment when there is one decision maker controlling the process from beginning to end, mass tort claims are mostly recruited and developed by discrete sub-groups, with individuals playing specific roles and performing routine, yet critical tasks in a larger group effort. This division of functions across sub-groups and individuals further limits the knowledge attributable to any one participant, thereby increasing the likelihood that participants will perceive objectively specious claims as sufficiently colorable to warrant submission in settlement. n133 Moreover, organizational dynamic research suggests that group socialization and institutional memory encourages the escalation and justification of dubious practices even where participants are otherwise ethical and upstanding citizens. n134

In sum, the origins for oversubscription are more complex and nuanced than those reflected in the basic adverse selection [*591] model. To account for these considerations, this Part incorporates claim uncertainty and organizational dynamics into a broader framework for analyzing and predicting oversubscription potential in global settlement. Specifically, this Part outlines how collective settlement alters claim recruiting and development opportunities, generates distinct incentives to pursue these opportunities, and reinforces common justifications for advancing specious claims.

A. Development Opportunities in Collective Settlement

Although most tort cases settle, these settlements tend to be framed by the parties' respective expected outcomes if a given case went to trial. n135 Predicting trial outcomes is far from a perfect science. For example, assume a case in which the plaintiff has strong objective evidence of exposure to a defective product and injury, but her evidence supporting a causal connection between the two hinges upon the credibility of a medical expert. One jury might not find the expert credible, while another might find the testimony compelling. A third jury could also discount the quality of the exposure evidence or injury even if the defense raised only a perfunctory challenge to it. This uncertainty carries the potential for under- or over-compensation at trial, with both sides adopting rough acceptable settlement ranges given their respective understandings of the risks given the available evidence and applicable law.

Collective settlements can reduce this uncertainty dramatically by supplanting tort law with a negotiated grid for compensation. In these cases, objective exposure and injury criteria replace the costly individualized assessment of exposure to a dangerous product or an accident plus injury, and the causal connection between the two, in a typical tort

claim. Thus, claims that might have substantially different values in tort litigation may nonetheless be pooled in the same injury or exposure categories for the purposes of settlement. The manner in which this pooling is framed can, in turn, alter recruiting and development opportunities for plaintiffs' firms.   [*592]

1. Predictability and Fixed Targets

In each of the markets reviewed, plaintiffs expected that their claims were compensable upon satisfaction of a predictable lower evidentiary standard than typically required at trial. This predictability is apparent in two distinct ways. First, the recurring pattern of obtaining "inventory" or "block" asbestos settlements for claims that survived early dispositive motions effectively reduced the nominal standard for asbestos claims to whether they had sufficient support to survive a motion to dismiss. n136 Again, plaintiffs could recruit and target claim development toward a fixed standard, but predictability may have been the product of substantial changes in substantive law and procedure, high defendant elasticity, and the presence of repeat players on both sides, n137 rather than any specific fixed settlement plan. As the judge overseeing asbestos litigation in New York City from 1987 to 2008 noted, this elasticity meant that the risk of non-recovery "all but disappeared" by the early 1990s. n138

Second, each of the comprehensive settlements qualified claims for payment upon satisfaction of clear, "check-the-box"  [*593]  criteria that were far more predictable and less difficult to satisfy than might be expected in tort. n139 Unlike traditional one-to-one case settlements, which tend to be agreed upon after the defendant has evaluated the specific facts of the claim, comprehensive settlements provided ample opportunity for firms to recruit new clients and develop their claims to the fixed nominal standard. In asbestos bankruptcies, where a select group of plaintiffs' firms largely dictate the terms of any trust distribution procedures n140 and claim processors must rely upon repeat business from these same firms, n141 evidentiary targets will vary little and tend to be far easier to satisfy than in the tort system and less likely to change unexpectedly than private inventory settlements.

Finally, although the plaintiffs in the Silica MDL could not rely on a similar track record in state silica personal injury litigation, many at the time saw the litigation as following the same track-including a substantial potential for high defendant elasticity n142 -and the litigation may have succeeded but for a "fortuitous combination of factors" that brought the unreliability of these screening practices front and center in the MDL. n143

2. Targeted Development and Claim Manufacturing

The ability to focus recruiting and development to a specific evidentiary target expands the claim pool to those that would  [*594]  stand little chance of success at trial. n144 For example, where a work history is sufficient evidence of a causal link under the criteria, the absence of credible evidence that the plaintiff was exposed long enough to cause the alleged injury under applicable tort law is no longer relevant to the recruiting decision. Likewise, although the persuasive value of the evidence supporting a specific client's heart valve or lung abnormalities may be limited at trial, that concern should not deter firms from accepting the case when it can be submitted for payment under a fixed standard that accepts the evidence as sufficient.

Beyond evidentiary gaps, targeted development generates opportunities for dubious evidentiary development practices. For example, a firm may have reservations about advancing a claim for which plaintiff-friendly doctors repeatedly fail to find evidence of physiological changes sufficient to warrant compensation in litigation, but it may continue shopping those x-rays to other doctors until they find one who is willing to make that representation when it only takes one such report to obtain compensation from an existing settlement. n145 At the extreme, fixed targets suggest an opportunity to manufacture claims by creating evidence that bears little resemblance to reality.

Conceptually, the targeted development pattern will sound familiar to students of the collapse of the subprime mortgage market and the subsequent economic crisis. Once demand exceeded the available supply of high-grade mortgages, brokers and financial institutions identified gaps in credit rating assumptions that allowed them to obtain, package, and sell high-risk loans as low  [*595]  risk investment vehicles. n146 For example, credit score averaging

may have been intended to provide a rough measure of the creditworthiness of individual borrowers across a mortgage pool, but aggressive issuers soon realized they could satisfy the criteria by pooling mortgages that were likely to go into default with those supported by borrowers with artificially high credit scores. n147

3. Distinguishing True Positives and Positive Potential

To appreciate the degree to which this shift may alter claim opportunities, consider the following thought experiment involving a product used by one million people. In the absence of exposure, statistical evidence suggests that roughly 7% (70,000) of the population would contract lung cancer in their lifetimes. According to scientific studies, however, approximately 7.7% (77,000) of those exposed to the product will contract lung cancer. Thus, the number of true positives due to exposure to the product will be 7000. Assume that the damages suffered by all lung cancer victims in the exposure pool have a range of $ 200,000 to $ 20,000,000, with a mean of $ 1,500,000 and a median of $ 1,000,000.

If each case is litigated separately, we may expect considerable variability in verdicts. Only one in eleven lung cancer diagnoses among those exposed to the product may be attributable to product exposure, and different juries may reach dramatically different results in roughly comparable cases. Thus, the range of cases in which liability is found may be far higher or lower than the statistical evidence suggests. Moreover, verdict amounts could be substantially higher or lower in any given case than expected across the plaintiff pool due to differences in plaintiffs' education, age, and other factors influencing damages. In the aggregate, however, we may expect that some true positives will not be compensated in litigation while those that are not true positives will be compensated, including some that may involve substantial damages.  [*596]

To address the large volume of litigation in this hypothetical, current plaintiffs and the defendant agree to establish a comprehensive grid settlement that breaks claims into distinct pools and allocates roughly equivalent compensation to individual claims within each pool. In this settlement, the defendant agrees to pay an amount equal to the average cancer damages figure ($ 1,500,000) spread across the number of true positives (7000), or $ 10,500,000,000.

In the settlement, defining the evidentiary criteria for exposure, injury, and a causal connection between the two will be critical. If the settlement focuses exclusively on the first two elements, the absence of any need to advance a causal link will increase the potential number of qualifying claims under the settlement by compensating all users who ultimately contract lung cancer (77,000), rather than the much smaller number of true positives (7000). Thus, the per-claim compensation must be reduced to a level that reflects the actual likelihood of causation-one in eleven-or $ 136,363.64. This amount, of course, is a small fraction (.68%) of the highest damage claims ($ 20,000,000) and only 68% of even the lowest value damage claims ($ 200,000). At this level, the settlement is likely to suffer from considerable challenges prior to approval and, if possible, encourage substantial opt-outs by high value claims. Thus, if plaintiffs are unwilling to accept the substantial discount and defendants are unwilling or unable to increase the pool of funds dedicated to the settlement, the parties must narrow the compensation criteria toward the true positive or litigation positive pool.

Now assume that the scientific literature suggests the addition of two criteria: 1) exposure to the product for at least one year; and 2) compensation only to those with a specified form of lung cancer. This should limit the pool of qualifying claims to no more than 10,000 claimants without excluding any true positives. This substantial reduction in the potential claimant pool should, in theory, increase the potential compensation to each qualifying claimant dramatically ($ 1,050,000 per claim) without requiring additional settlement funding. Moreover, if we assume less than 100% subscription from qualifying claimants, the per-claim compensation for individual claims may be significantly higher. In sum, the aggregate payment should be sufficient for deterrence purposes, and the individual compensation levels should be sufficient to encourage substantial buy-in from the true positive pool.  [*597]

Both components, however, have limits. First, the one-year exposure condition may be difficult, if not impossible, to verify in the real world. In the absence of contemporaneous, objective records demonstrating exposure, plaintiffs with

qualifying injuries may nonetheless present claims based on claimed exposure periods that far exceed reality. On the other hand, requiring objective proof that may not be available-for example, shopping receipts or labels from products purchased years earlier-as a condition of qualification may preclude settlement approval.

Second, limiting compensation to a subset of cancer claims necessarily involves the inclusion of expert reports, which will serve a limiting function only to the extent that these claims are objectively distinguishable from others and that the settlement incorporates sufficient monitoring mechanisms to test the veracity of the reports submitted. As demonstrated in all three of the case studies above, some doctors have a propensity to over-read medical records and tests in favor of satisfying fixed criteria, particularly where their opinions are highly subjective. Even when provided with objectively verifiable standards, the fen-phen case study suggests that at least some doctors may manipulate the data or equipment in a manner that superficially satisfies the fixed criteria. n148

As a result, the practical potential volume of claims that may be shaped and advanced as qualifying may exceed settlement projections dramatically. This is true in spite of the parties' efforts to limit compensation, using largely objective criteria, to a pool that is only modestly larger than the pool of true positives. The question at this point is not whether the plaintiffs have incentives to do so or intend to do so fraudulently. Rather, the point of this thought experiment is merely to frame the potential opportunity to advance bad claims as good in aggregate settlement, even where the settlement terms appear to limit this potential. Of course, once the number of apparently compensable claims exceeds projections, this opportunity and the incentive to continue filing may become limited as courts reduce compensation or adopt more aggressive monitoring. In a case with extremely high true positive projections, however, large volumes of intrinsically weak claims may be compensated over an extended period of time without discovery. [*598]

B. Strategic and Targeted Development Incentives

If we view predictable evidentiary targets and permissive monitoring and enforcement systems as generating the opportunity to advance specious claims, the financial incentive to exploit this opportunity is obvious: those who advance weak claims stand to earn additional returns at little risk. Without discounting this argument as far as it goes, the direct economic advantage of advancing bad claims does not necessarily suggest that those responsible do so with knowledge of the specious nature of the claims. Indeed, if we accept the assertions of several doctors and lawyers involved in the case studies as true, ignorance of the most disturbing practices in those cases appears rampant. This is not to suggest that these self-serving assertions are true, but it does raise an interesting question as to whether the mass settlement approach encourages a systemic pattern of rational ignorance. To that end, this section focuses not only on the direct economic incentives to advance specious claims, but also the manner in which the process promotes rational ignorance in claim development.

1. Direct Economic Incentives

For all of their potential efficiencies, mass torts do not strip away all of the potentially substantial costs associated with establishing the merit of individual claims. Some costs may be shared by similar claims within a mass tort, including the costs of investigating the defendants' conduct, scientific evidence establishing a link between a product or event and certain types of injuries, and the transaction costs of litigating these and other issues. Other costs, however, are unique to each claim, including developing the factual or medical support for an alleged injury and the plaintiff's exposure to the defendant's product, or other causal link to the defendant's conduct. Discussions of the efficiencies of mass tort litigation focus on common expenses because cost-spreading is at the heart of the economies of scale that are promised by aggregation, but individual claim expenses can be substantial. n149  [*599]

Against this backdrop, economic incentives to adopt targeted development are twofold: they allow firms to generate additional claims that are compensable under the nominal criteria for compensation and avoid costs they would otherwise incur in preparing a case for trial. Thus, firms may increase the pool of claims across which common costs may be spread, thereby reducing the per-claim cost of development. At the same time, by avoiding certain

claim-specific costs ordinarily associated with litigation, firms may further reduce their up-front expenses.

The ability to target development to predictable criteria is significant because it may be far more efficient to increase the yield of claims within a pool of potential plaintiffs than it is to identify new prospective plaintiffs. Competition for new clients in many cases is intense and expensive, particularly after a comprehensive settlement is established. n150 This competition may not only limit the pool of potential plaintiffs available to any one firm but also increase the potential that plaintiffs with specious but superficially compensable claims under the predictable or fixed evidentiary standard will find representation with a competing firm.

2. Rational Ignorance and Development

The opportunity and potential cost savings associated with targeted development comes at the expense of potentially valuable information about the respective strengths and weaknesses of individual claims. The question, then, is whether collective settlement generates an environment in which the cost of developing this information is greater than the reasonably expected benefits of doing so. In short, does collective settlement promote rational ignorance?

In traditional litigation, aggressive fact development not only improves the evidentiary support required for any possible trial but also the firm's information advantage concerning the in  [*600]  trinsic merits of individual claims. Lawyers abhor nasty surprises in litigation, particularly those that they or their clients could or should have been aware of in advance. Positive and negative information can serve a valuable function in guiding litigation and settlement strategy as the case proceeds by allowing firms to periodically reassess the value of a case and determine acceptable exit strategies and settlement ranges as information improves. n151 Thus, a firm that develops cases only to the bare minimum required to survive summary judgment may dramatically weaken prospects for recovery by grossly over- or under-valuing their potential merits. n152

In aggregate litigation and settlement, however, ignorance with respect to these facts may be rational, depending on the nature of certain claims, the settlement structure, and the firm's general business model. In mandatory settlements, for example, incurring any costs beyond those required to satisfy the effective settlement criteria may not yield any additional benefits. Even where low value claims might be financially viable under a more reliable evidentiary development process, targeting recruiting and development to the evidentiary target alone may improve claim yield and aggregate recoveries to a level that more than offsets the nominal risk of doing so. In some circumstances, the expected per-claim recoveries may be so low that even the usual process of distinguishing good and bad claims in anticipation of potential litigation may be too expensive or yield too few claims for spreading common costs to a level that renders them positive net value claims. Likewise, as in traditional litigation, we may expect some firms to adopt a "settlement mill" approach even where it may be possible to generate greater returns by a more nuanced or tiered development strategy. n153

If we assume the firm is attempting to maximize its investment, targeted investment should occur only where a more traditional case development approach will not be expected to yield  [*601]  higher recoveries. Thus, the option to obtain recovery from a fixed global settlement should not encourage uniform targeted development where those holding strong claims can opt out and obtain significantly higher recoveries in the tort system.

Even the investment-maximizing firm, however, may adopt distinct development tracks for claims within the same case. Thus, the case evaluation process may put some claims on a litigation development track and preserve less promising claims in the firm's inventory but place them on a targeted development track. At different points in pre-settlement litigation or case-specific development, once promising claims may appear less promising and shift to a less thorough development approach going forward. Thus, a firm may limit its development costs by tiered development strategies without sacrificing its ability to advance the strongest claims at trial or its potential to leverage a larger volume of less developed, but potentially compensable, inventory claims.

To illustrate, assume a lawyer in the early 1990s has been screening out asbestos claims that he believes to be weak

and developing the cases he accepts as he would any other case. These costs include obtaining follow-up medical reports, developing documentary records supporting each client's work history, and interviewing potential witnesses who can support his clients' claims. He discovers that other plaintiffs file lower value claims that can survive motions to dismiss and obtain settlement without these additional costs. If he decides to forego these additional steps for any of his low value claims, he can save considerable time and expense to both his own and his clients' benefit. n154 He can also add claims to his inventory that his competitors are otherwise accruing. To the extent that some defendants refuse to settle or demand this additional evidence as a condition of settlement, he has the option of developing this additional evidence, dismissing these defendants and settling with the remaining defendants, or using the leverage from his stronger claims that are trial ready to obtain an inventory settlement covering all of his claims.   [*602]

C. Targeted Development and Manufactured Claim Practices

Predictability of compensation alters the playing field because it transforms the potential adverse selection problem in collective settlement into an opportunity to strategically tailor recruiting and development to the superficial satisfaction of the effective qualification criteria. The advocate's role of presenting claims in the light most favorable to the client tracks common practice in traditional civil litigation, n155 but the threat of adversarial testing of this one-sided evidence may be perceived as limited or non-existent for at least some of the firm's inventory. Claims presented with all of the zeal contemplated by the adversary process may run roughshod over settlement regimes that lack the capacity or will to challenge them. Also, systems that create opportunities to obtain recovery without meaningful claim review generate incentives for firms to take a relaxed approach to screening the claims that they bring. n156

Although firms can afford to be indifferent to intrinsic claim quality under the circumstances, opportunity and incentive alone do not make corruption of the recruiting and development process inevitable. Each of the case studies in Part II of this Article demonstrate how multiple participants worked together to generate specious claims in large volumes, but they also involved many more professionals who continued to approach recruiting and development without cutting corners or advancing volumes of claims that were impossible to build without the services of those [*603]  who did so. n157 Even within those plaintiff groups that advanced specious claims, the case studies do not clearly establish how many of the actual participants were aware of the corrupt practices involved, and those who were directly involved in the most questionable conduct arguably neutralized the corrupt nature of their actions.

The patterns and practices outlined in the case studies in Part II tend to track common themes found in research concerning other forms of group conduct that breaks from societal norms: opportunity, incentive, and justification. n158 In oversubscription resulting from dubious claim filings, predictable evidentiary targets create the opportunity, and targeted development promises considerable financial benefits. The distinguishing factor among those who embraced increasingly dubious recruiting and development practices is the degree to which sub-group rationalizations were sufficient to neutralize individual or firm concerns about their propriety.

1. The Targeted Development Spiral

At first glance, predictability is significant only inasmuch as it allows firms to avoid unnecessary costs. The ability to avoid claim-specific inquiries and costs that are not required to create a qualifying evidentiary record under the collective settlement is part of the presumptive value of collective settlements inasmuch as they replace expensive evidentiary support with less expensive alternatives. For example, as seen in the fen-phen global settlement, collective settlements may only require verified forms that include fill-in-the-blank responses in lieu of the expensive medical expert reports-and associated battles over those reports-that might be expected at trial.   [*604]

The danger in targeted development is that the most efficient mechanisms for generating the required evidence may also be among the least reliable measures of merit. For example, although it may be possible to employ traditional medical screenings to identify potential victims and subsequently develop their claims in a manner that is consistent with accepted medical practice, this approach is far more time-consuming and would yield far fewer clients than

litigation screenings.

With competition among doctors and screening companies focused on yield rather than quality, this disconnect suggests that the quality of diagnoses generated in the market for screening services will reach the lowest predictably compensable level over time. Any screening company that generated 5% positive diagnosis yields during the heyday of asbestos screening, for example, would quickly be out of business where other firms provided equally compensable diagnoses for 50 to 90% of the individuals they screened. n159

Targeted development can be particularly problematic where the volume of potential low or negative expected value claims is high. In these cases, the financial incentives to maximize volume and control costs encourage the use of doctors or service providers who generate the highest yields through the most financially expedient means possible. The result, as demonstrated in asbestos and silica litigation, is a virtual avalanche of newly generated claims that satisfy the evidentiary target but leave it virtually impossible for anyone-courts, defendants, or even the law firms advancing them-to distinguish the good claims on merit. The low sunk costs per claim may make it more rational to simply jettison any claims that are challenged n160 than to press forward with litigation, even if some of those claims might have merit. [*605]

As demonstrated by the asbestos and fen-phen case studies, systemic problems arise when these mechanisms expand the pool of compensable claims far beyond expectations. The key here is that it was not only possible to target real or perceived criteria but that doing so generated a volume of claims that could not be managed efficiently without (a) reducing payments to a level that denied legitimate claim holders their rightful share of any recovery, (b) demanding additional funding, thus denying defendants the peace they bargained for, or (c) embracing costly and time-consuming verification procedures that might offset much, if not all, of the transaction cost avoidance benefits expected from settlement.

2. Neutralizing Normative Concerns

Group corruption research suggests that one possible distinction between the different subgroups in these cases is the degree to which those who advanced specious claims embraced various neutralizing justifications and procedures for their specious claims. This research has long demonstrated that groups and subgroups "can develop norms that are far removed from generally accepted societal norms." n161

Specifically, although other justifications appear to be present, the neutralizing justifications prevalent in the case studies fall into two rough categories: denial of wrongfulness and denial of responsibility. n162 In this context, denial of wrongfulness refers to those justifications that deny the illegality, immorality, harmful nature, or victim of the conduct. Denial of responsibility captures those justifications that deflect personal responsibility for any particular conduct, including the belief that they were bound to take specific actions due to their role or the common rationalization that "everybody does it." n163 These justifications tend to have a cumula [*606] tive effect or work in concert to neutralize potential concerns about the participant's role. n164

a. Denial of Wrongfulness

As Professors Aguilera and Vadera note, "individuals who use rationalization justifications tend to argue that their behaviors are not criminal as laws and regulations codifying their behaviors as illegal may not exist, may be dated or not enforced, or their applicability may be questionable." n165 Commentators and courts acknowledged asbestos screenings and their perceived shortcomings for years before the Silica MDL. Yet, courts and defendants continued to allow the claims to proceed and settle, often without meaningful challenge. Similarly, the pattern of lax ethical enforcement against those who submitted dubious asbestos claims-and, subsequently, silica claims n166 -reinforced the perspective that mass torts were different. n167 In sum, the resulting claims could be perceived as non-frivolous because any claim that can be reasonably presented as warranting settlement is, by definition, a non-frivolous claim. n168

Even participants who suspected that some of the claims were weak or frivolous could easily reason that the defendants "deserved their fate" due to their own illegal or unethical conduct. n169 Asbestos, silica, and fen-phen litigation all involved products that were responsible for the premature deaths and life-altering injuries of thousands of victims, and the companies involved were easy targets for vilification. Indeed, after claim patterns are criticized or even entire cases are debunked as scientifically implausible, the [*607] presumption that the companies nevertheless "got what they deserved" may continue unabated.

b. Denial of Responsibility

In retrospect, it seems clear that judicial and academic perceptions of accepted practice in the mass torts discussed were not in line with the offending lawyers' and doctors' understandings. Lawyers do not simply switch hats from zealous advocates to diligent gatekeepers once a settlement is available, and few of the lawyers' actions in these cases conclusively demonstrate more than a willingness to take the information at their disposal at face value. At the same time, with a few notable exceptions, most of the doctors involved operated under a common, n170 but mistaken, view of their role in the process as "hired guns," rather than objective medical analysts.

Even if these perceptions of accepted practice were mistaken, they have been reinforced by a long history of accepting similar conduct in litigation. Doctors and other experts have been widely characterized as "hired guns" for one side or the other for as long as any of us alive today have been involved in civil litigation practice. n171 The practices that Judge Jack condemned in the Silica MDL were occasionally recognized, albeit rarely punished, during [*608] the fifteen years prior to her decision. n172 To be clear, this is not to say that all of these activities were ethical or even legal; it is merely recognition that the perception of what constitutes an accepted practice by lawyers tends to be shaped more by recognized patterns than by unspoken expectations and rules that are rarely enforced.

Denial of responsibility can be problematic in these cases because the specialization and division of responsibility that generate considerable efficiencies in mass tort litigation also yield a potential compartmentalization problem. n173 Compartmentalization of responsibility enables participants to rationalize and avoid consideration of broader issues with the process. n174 Even if participants [*609] harbor suspicions, stepping beyond their respective roles to examine the process diminishes the efficiency gained by the division of labor and may be viewed as bad form-an implicit suggestion that one's colleagues or superiors are unprofessional, unethical, incompetent, or worse-within the system. n175 Moreover, subgroups and individuals frequently believe that it is not in their best interests to ask questions or otherwise overstep their roles, particularly where they are fungible players in the process. n176

Compartmentalization presents significant problems for managing specious claims through ethical controls. Regardless of whether the systemic ignorance is inadvertent or by design, it may afford those involved a level of protection against liability and reinforce the perception that outside criticism is overblown. n177 Outside observers and others involved in the process may never know whether a participant is an ostrich-one who buried her head in the sand-or a fox-"a grand schemer who fully intended to follow the path of wrongdoing, and who contrived his ignorance only as a liability-screening precaution, like a good getaway car." n178 Put differently, even if courts and disciplinary authorities diligently pursue those that intentionally advance specious claims, they may be less comfortable doing so with respect to those who may be [*610] viewed as simply being zealous advocates, and the inability to clearly distinguish the two may provide cover for the foxes.

Against this backdrop, it should come as no surprise that compartmentalization has been an effective barrier to sanctions in the cases discussed. Although there may be compelling reasons to conclude that some of the attorneys involved in the Silica MDL intentionally manufactured specious claims, n179 the compartmentalization of responsibility has served as an effective "getaway car" to date. n180 Likewise, notwithstanding concerns about the high correlation between specious fen-phen claims and certain law firms, n181 the only criminal and civil litigation claims filed to date focus on the doctors and others whose actions are difficult to explain as anything other than intentional fraud or misrepresentation. n182 [*611]

IV. Managing Oversubscription in Aggregate Litigation and Settlement

Framing specious claim filings as merely the product of opportunistic plaintiffs or lawyers provides some bright lines and suggests relatively easy solutions. If we assume that claims are objectively fixed types, the incentive structure for advancing specious claims may be altered by enforcing ethical rules and otherwise penalizing those who advance them. At the same time, controlling the opportunity to advance dubious claims through largely objective evidentiary criteria and aggressive audit mechanisms may be viewed as sufficient to deter the rise of specious claim markets that threaten the stability of a settlement.

The foregoing analysis reinforces the view that targeting opportunities and incentives to advance dubious claims are important components of controlling oversubscription, but it also reveals their limits. Modern ethical and procedural rules tend to focus on bad apples who are either aware or should be aware of their misconduct, but this focus leaves substantial gaps in coverage. Likewise, the best opportunity-limiting controls employed to date have been plagued by practices that exploited blind spots that go undiscovered for months or years when verification mechanisms are static.

In short, an effective post-settlement verification system must not only account for intentional frivolous filings but also client recruiting and development practices that shield lead firms from knowing that any given claim is frivolous. This requires a more aggressive mechanism for identifying gaps between ex ante settlement claim expectations and the manner in which the qualification criteria are satisfied in practice, as well as the degree to which specific repeat players appear to advance colorable but manufactured evidentiary support. Against this backdrop, this Part evaluates modern aggregate litigation practice and proposes basic mechanisms for discouraging the emergence of specious claim markets through collective settlement design.   [*612]

A. Pre-Settlement Opportunism in Modern Practice

Tort reform and judicial recognition of the need to rein in certain practices have altered the mass tort landscape in recent years. Key state court decisions have established more restrictive joinder n183 and pleading n184 requirements. Moreover, many states have passed laws that require plaintiffs to demonstrate actual impairment in order to initiate certain types of suits, n185 and several courts have adopted inactive dockets for claims advanced by asymptomatic asbestos plaintiffs. n186 In addition, some well-publicized decisions have scaled back the substantive aspects of "special asbestos law." n187 As a result, filing rates in some of the former hotbeds of asbestos litigation have plummeted. n188 Like [*613]  wise, the Class Action Fairness Act n189 has effectively addressed concerns about the certification of nationwide class actions in state courts, n190 and the pleading standards announced by the Supreme Court in Bell Atlantic Corp. v. Twombly n191 and Ashcroft v. Iqbal n192 impose limits that should effectively limit shotgun-style complaints in federal court. n193

Moreover, individual judges continue to refine the process of managing aggregate litigation, including the use of staggered claim-specific discovery devices that generate far more information about not only the specific allegations underlying individual claims, but also the nature of the evidence supporting those allegations. In many mass tort cases, plaintiffs are required to file plaintiff fact sheets ("PFS") or comparable documentation that specifies basic information for each individual claim under pre-trial case management orders. n194 The required information will often include basic client identification information, information  [*614]  about the nature of the alleged injuries, the date of onset of the injuries, the identity of the person making the initial diagnosis, the products used or exposed to, and other relevant personal, work, or medical information. n195 A claimant's failure to submit this information by the deadline may result in dismissal of her claim or financial sanctions. n196

PFS requirements are a significant improvement over informal aggregation and bankruptcy practices that have effectively taken the mere presence of claims as proof that pre-litigation case  [*615]  investigations have taken place, but they may not reveal sufficient information to distinguish good and bad claims. PFS forms vary considerably from one case to the next, and they are not, of course, a substitute for traditional discovery. In most cases, they provide only limited opportunities for evaluating the relative merits of individual claims or their supporting evidence. n197

Similarly, more courts have embraced the use of Lone Pine n198 orders or comparable orders to mandate disclosure of key evidentiary support for individual claims. n199 Most often, these orders seek proof of specific causation; for example, expert medical reports demonstrating a causal relationship between a defendant's product and the plaintiff's injury. n200 The orders routinely afford plaintiffs a limited time frame to file the required information or reports and establish procedures for dismissing claims for which this information is not provided. n201 Although courts may issue  [*616]  Lone Pine orders at any stage of the proceedings, they typically avoid doing so where existing case management orders fill the same role or the disclosures sought by defendants are perceived as premature. n202 Moreover, Lone Pine orders may be issued shortly before or after a comprehensive settlement is reached, n203 and then be limited to non-settling claims, leading some firms that are the target of these orders to complain that they are punitive or designed to strong-arm plaintiffs into "lowball" settlements. n204

The emphasis on pretrial consolidation in multi-district litigation increases the potential for comprehensive settlement in that forum, and the manner in which these cases are litigated may place a greater emphasis on distinguishing claims based on merit. Collectively, the practices discussed suggest that diligent defendants may effectively control the asbestos and silica development model-targeting only an anticipated nominal standard without preserving a cost-effective means of distinguishing good and bad  [*617]  claims internally-by demanding higher evidentiary standards in any firm-specific or global settlement and seeking orders requiring Lone Pine submissions from those who attempt to hold out. Plaintiffs' firms that continue to marginalize development in this way or otherwise fail to verify the reliability of their experts' conclusions thus run the risk that their costs will be inflated rather than reduced, their cases dismissed, or both.

These changes reflect a larger shift in courts' and defendants' attention to rooting out specious claims that should encourage firms to avoid marginal claim development strategies prior to global settlement. By improving opportunities to gauge the quality of a firm's claims, these practices strengthen the value of individual merit in building repeat players' reputation in settlement negotiations. n205 Claim-specific inquiry options allow defense counsel, who also tend to be repeat players, to observe and distinguish the firms that advance primarily strong claims from others, and firms that effectively distinguish good and bad claims and develop them accordingly are better positioned to absorb the costs of advancing this information. n206 Thus, firms known as effective gatekeepers should enjoy an advantage in negotiating individual or inventory settlement terms, and firms with equally poor reputations may find future settlement values discounted, if settlement is forthcoming at all.

B. Settlement Terms and Administration

Continued use of fixed qualification criteria and limiting options for inquiry into the evidentiary support for claims submitted to a global settlement remain imperfect but frequently necessary realities of any system designed to resolve a large volume of claims effectively. Moreover, these settlements still occur before detailed claim-specific investigation, even when the available evidence suggests that the underlying claims are questionable. n207  [*618]  Standing alone, these facts suggest that future collective settlements will continue to have unanticipated blind spots that may be exploited, particularly given the substantial degree of creativity and flexibility of mass tort practice.

Notwithstanding its shortcomings, the fen-phen global settlement provides some evidence of the utility of controlling for evidentiary malleability. In its favor, the settlement was not content to rely on the mere fact that medical evidence was attested to by a doctor but provided objectively verifiable criteria to guide the doctor's assessment. n208 Once the audit began, this objective component was helpful not only in distinguishing good and bad claims, but also in distinguishing some would-be foxes from ostriches. The former has helped mitigate the damage of specious claim filings, while the latter has supported civil and criminal actions against the doctors responsible for generating large numbers of these claims.

One significant flaw in the fen-phen settlement is that the deterrence message did not reach its intended target: the doctors responsible for generating dubious medical reports. Neither the medical assessment form, nor the other documents provided to the doctors, suggests that the settlement is any different from any other proceeding in which the

doctor may be involved, and nowhere on these forms is it suggested that the claims will be subjected to a mandatory audit. Indeed, precisely because it is viewed as a settlement form, doctors may have reasonably believed that their work would be subjected to less scrutiny. To that end, the view that these doctors simply rolled the dice in manipulating the objective data overlooks the fact that the doctors who continued to sub  [*619]  mit specious claims failed to appreciate the risks they were taking in doing so.

Targeting the message to specific participants in collective settlement may not fully deter specious claim filings, but it should discourage ostriches from burying their heads in the sand and force foxes to take steps that objectively reveal their intent to engage in misconduct. In the fen-phen case, this would require little more than an acknowledgement from the medical professional that she understands that other medical professionals will review all submissions to ensure compliance with the objective criteria. In other settings, comparable acknowledgement of the likelihood of audit and potential sanctions for misleading or fraudulent submissions-beyond boilerplate language concerning the submissions being submitted on penalty of perjury-should serve the same purpose.

C. Audit Design and Flexibility

Audits are often viewed as being in conflict with the goal of streamlining administration and reducing transaction costs, and plaintiffs and settlement administrators frequently oppose settlement terms or motions seeking claim information that may impose significant costs. n209 Conversely, the absence of any mechanism to ensure that the claims submitted are, in fact, compliant with the terms and intent of the settlement invites rampant filing of specious or frivolous claims. Thus, an effective audit system must strike a balance between controlling costs and deterring and disallowing payment of specious claims.

There is no one-size-fits-all model for collective settlement design. The specific terms and structure of any particular settlement must take into account the nature of the claims, settlement objectives of the parties, and the likelihood that the terms will not obtain sufficient support from plaintiffs to be approved. Thus, procedures that impose greater risks or costs upon those submitting claims should generally demand higher claim payments or other concessions.

To that end, although this section consolidates a variety of research relevant to audit patterns and identifies the strengths and weaknesses of the different proposals, it does not attempt to frame a uniform model of global settlement. Nonetheless, this discussion  [*620]  suggests, at a minimum, that audits should be mandatory, include pool selection tied to repeat player claim pools rather than just claim type, provide for variable degrees of claim inquiry, and incorporate a range of sanctions and holdback options. Audits with substantial future claim submissions should incorporate provisions that allow administrators to adapt sampling and audit methods to address changes in filing patterns and discoveries quickly. Although others have suggested the use of comparable sampling mechanisms to aid in determining a defendant's aggregate liability prior to settlement, n210 this discussion highlights their potential benefits in discovering and deterring opportunistic claim development leading to oversubscription.

1. Mandatory Audit Pools

Audit terms tend to be negotiated prior to the establishment of a global settlement and largely reflect the parties' respective interests in the broader settlement. Thus, where defendants are concerned about the prospects that oversubscription will overwhelm the settlement, and thereby undermine the settlement, audit provisions tend to be mandatory and authorize detailed inquiry into the intrinsic merit of the claims reviewed. Conversely, when defendants are reasonably assured of peace notwithstanding any oversubscription, audit standards tend to be left to the discretion of the trust or the lawyers submitting claims to the claim facility. For example, as previously noted, the fen-phen global settlement initially contemplated a mandatory audit of one out of every twenty claims before the court required audits of every claim submitted. n211 By contrast, few of the existing asbestos settlement trusts have mandatory audit provisions, and most of the largest trusts require the consent of plaintiff-controlled trust advisory committees n212 before claim audits can occur. n213  [*621]

To provide an effective deterrent against specious filings, audits must present a credible threat of discovery. The absence of mandatory audits provide at least a partial explanation for the substantial oversubscription to asbestos trusts and the fact that the practices that flooded those settlements went largely unchallenged for several years prior to the Silica MDL. Indeed, in virtually every other context in which audits are employed to deter undesirable conduct, mandatory audits of at least some portion of the conduct to be monitored are the norm. Moreover, given that specious claim markets are driven by repeat players, the mandatory audit of a fraction of the total claims filed will both limit audit costs and provide a reasonable deterrent if coupled with other provisions designed to sanction those found to submit frivolous claims.

2. Random and Stratified Sampling

A common method of balancing the need to monitor the veracity of claims submitted against the costs associated with doing so is to limit audits to a portion of the claim pool. If the manner of [*622] selecting claims is predictable, those submitting claims may alter filing patterns to reduce the chances that their claims, or those within their inventories that may not withstand scrutiny, will be audited. To that end, any audit plan must be random and sufficiently spread across the relevant pool to maximize the ratio between limiting cost, on the one hand, and deterring and disallowing specious claim submissions on the other.

If the claims submitted are homogenous, random sampling of an entire claim pool is the most straightforward and ostensibly fair method of both identifying offending claims and spreading the risk of audit equally among those advancing claims. When the population is diverse, however, a random sample of the entire pool may not sufficiently investigate some sub-pools and excessively audit claims within others, so stratified sampling n214 may be preferable. This ensures that relatively proportionate samples within the sub-pool are represented and evaluated, which may improve the potential to discover discrepancies common to the sub-pool and spread the risk and costs of audit evenly among roughly comparable claims. If stratified sampling is appropriate, the critical question is identifying the appropriate subpopulations such that the selected samples reflect sufficiently homogenous sub-pools of the claims filed.

In stratified sampling, defining audit sub-pools according to not only claim type but also by professional should improve both deterrence and disallowance of specious claims. Even if claims within specific classes are comparable types, the manner in which the claims are developed and advanced by different claimants can vary wildly across the sub-pool. On the other hand, repeat players tend to follow identifiable patterns when developing and advancing claims, n215 yielding easily defined sub-pools that are largely homogenous and providing a basis for testing the veracity of their submissions in the aggregate by testing a small but representative sample.   [*623]

3. Audit Detail and Inquiry Levels

Balancing the costs and inquiry value of an audit not only takes place with respect to determining the sample size but also the degree to which individual claims selected for audit will be investigated. Thus, audits may vary from requiring modest additional information to searching investigations of the intrinsic merit of individual claims and the manner in which the claims were developed. The appropriate degree of inquiry should thus be guided, at least in part, by the potential malleability of supporting evidence and factors suggesting that the claims advanced may not be reliable.

As patterns are revealed over the life of the settlement, administrators may modify their audit patterns to account for discernable distinctions in filing patterns within certain exposure or injury types and geographic regions. These distinctions, whether they are inconsistent with actual filing patterns in other regions or categories or pre-settlement projections with respect to the relevant sub-pools, may warrant enhanced scrutiny within a portion of the claim pool long before oversubscription becomes obvious in the aggregate.

In addition, because key professionals tend to be repeat players not only within but also across mass tort cases, a repeat player's broader reputation for veracity in claim submissions is relevant to the degree to which their claims should be investigated. Tailoring audit severity to account for a known past offenders' propensity for employing dubious

practices not only enhances the potential to identify comparably unreliable practices early on but, over time and across cases, should discourage firms from taking shortcuts or employing experts who do. This will effectively place the burden of ensuring veracity on the parties best suited to do so: the repeat players who control claim development.

### 4. Sanctions and Repeat Players

Deterrence requires a credible threat of not only discovery but also sanction. Thus, in order to deter effectively, the costs associated with discovery of a pattern of specious filings may need to be far greater than mere rejection of the offending claims. Otherwise, repeat players may simply view rejection of frivolous claims as a no-risk proposition. After all, if they do not submit frivolous  [*624]  claims, they will certainly not obtain recovery for them. If they do, however, there is at least some chance that the claims will be paid. Thus, if the potential aggregate returns on the frivolous claims that slip through exceed the aggregate costs of submitting them, it is economically rational to advance the entire inventory of such claims.

The fact that lawyers and other professionals tend to be repeat players involved with multiple claims within a case provides substantial opportunities for employing meaningful audits. For example, the imposition of mandatory audits across all past and future submissions by specific offending law firms should encourage firms to take greater care in selecting and overseeing those responsible for generating claims. Moreover, similar provisions concerning claims supported by evidence generated by repeat offender doctors and screening companies may discourage firms from employing their services. In either case, the certain delays associated with mandatory audits alone will effectively reduce the financial returns of firms that advance unreliable claims and rely upon unreliable experts and should encourage greater care in claim and service provider selection.

### 5. Deferred and Suspended Compensation

A settlement plan that audits only a small fraction of the pool and pays other claims as they are processed raises the specter that claimants will dump large volumes of specious claims on the settlement up front. Those that are selected for audit may not be paid, but others may be paid before the settlement administrators identify any issues and adapt their procedures for more effectively screening weak claims. And once claims are paid, unwarranted payments tend to be difficult to recover.

In the aggregate, settlements may establish a mandatory suspended payment trigger if the number of claims submitted exceed the projected true positive estimates over a given timeframe. Thus, if the settlement projects X submissions during the initial claim submission period, this trigger would be automatic if the aggregate filings exceed X or some percentage above X. This could be applied to the entire settlement pool, discrete sub-pools within the settlement, or both. In the absence of deferred payment until the close of the submission period and suspended payment upon satisfaction of a trigger, the settlement administrator may be  [*625]  contractually obligated to pay claims, even after the data suggest that the settlement is oversubscribed. By expressly authorizing or requiring deferred payment until the window for submitting claims closes and suspension of payments if they exceed the relevant threshold, this provision would close any gap that might otherwise arise if administrators are required to seek supplemental authority before suspending payment.

In addition, suspending payment of submissions by a particular doctor or firm once they exceed a specific threshold or otherwise qualify for full inventory audits may discourage rampant oversubscription. Under this approach, payment of claims advanced by repeat players who submit more than a fixed number of claims or diagnoses in a submission period may be deferred until any random audits for the claim pool are completed. Thus, those who exceed the threshold by filing numerous dubious claims risk delayed payment, especially if those claims are subjected to a full mandatory audit, which should encourage those who submit large numbers of claims to avoid claims that are likely to fail the audit.

Although deferred or suspended payment may also delay payment for those submitting good claims as well, such

an approach could be tailored in a number of ways. The approach could streamline these audits, limit the holdback to a portion of the claims-for example, an amount no greater than a portion of the attorney's contingency fee-allow a staggered payment schedule to reduce the effect without undermining the deterrence value of the audit, or incorporate a bonding option for repeat players in which they obtain a bond to satisfy any settlement recovery demands for previously compensated specious claims. Repeat players who develop a reputation for filing specious claims across mass tort settlements may be priced out of the bonding option or otherwise suffer enterprise-level sanctions which, in turn, will reduce the degree to which ignorance of claim quality, either real or asserted, is rational. In sum, an up-front deferred payment or bonded submission system may improve the timing of compensation for the substantial majority of good and well-developed claims submitted by avoiding the need for more draconian measures down the road.

Whatever the form, audits and other monitoring schemes that limit opportunities to exploit collective settlements are a necessary cost that will yield the greatest benefit if they effectively discourage specious claim recruiting and submissions. Although  [*626]  many modern settlements include these measures, some-particularly asbestos bankruptcy trusts-fall far short of presenting a credible threat of discovery and sanction. And notwithstanding the fact that even well designed audits have failed to deter specious claim markets in all cases, their absence invites targeted development with little care for whether the claims have intrinsic merit.

6. Adaptable Sampling and Flexibility

Given the adaptability of claim recruiting and development markets, audit procedures that are fixed by settlement terms at the outset lend themselves to obsolescence once the settlement begins processing claims. If we assume that audits are merely reviewing claims that were developed pre-settlement, this potential may not be a significant problem. Where claim development can adapt in response to sampling or other audit rules, however, administrators may not be equipped to identify or react to these adaptations in a timely manner, particularly where the settlement may be read to require court approval before making any such changes. To that end, initial settlement design should not only incorporate learning about claims and practices derived pre-settlement but also mechanisms to continue this learning and adaptation during the life of the settlement.

D. The Judicial Role in Aggregate Settlement Administration

Judges play a critical role in establishing the legitimacy of an aggregate settlement. To bind class members, for example, Rule 23(e)(2) specifically requires a judicial finding that the settlement is "fair, reasonable, and adequate" following a fairness hearing. n216 Likewise, *section 524(g) of the Bankruptcy Code* conditions the entry of a channeling injunction-the centerpiece of an asbestos reorganization plan-on the court's finding that "the trust will operate through mechanisms . . . that provide reasonable assurance that the trust will value, and be in a financial position to pay, present claims and future demands that involve similar claims in substantially the same manner." n217 Even in the absence of an express rule or statutory requirement, judicial approval is desirable  [*627]  as a means of demonstrating that a settlement is the product of a fair and open process.

Nonetheless, hearings concerning the approval of global settlements tend to marginalize consideration of the practical elements of settlement administration generally and the likelihood that the settlement will be overrun by dubious claims specifically. This is not surprising inasmuch as potential objectors are frequently unhappy plaintiffs, who are concerned with their own compensation rather than the long-term risk of settlement depletion. Defendants have presumably negotiated monitoring terms as part of the larger settlement discussions, but the risk of oversubscription may be of little concern when the defendants' costs are fixed. Likewise, the plaintiffs' firms that support the settlement have little interest in creating more hoops for themselves or their referral firms to jump through. Finally, as seen in dozens of asbestos bankruptcies since the adoption of section 524(g), legal representatives for future claimants focus primarily on maximizing assets obtained from defendants and insurers rather than insisting upon strict monitoring of the claims submitted by the lawyers who effectively control their appointments. n218

This failure is particularly problematic in global settlements where absent tort victims' recoveries will be limited to

a fixed fund. Current plaintiffs and their counsel have no interest in embracing provisions that may delay or preclude their own recoveries, and defendants have no incentive to insist upon verification mechanisms when their own liability is fixed. Thus, even if the parties before the court agree that the settlement is "fair, reasonable, and adequate," a settlement plan that lacks sufficient verification mechanisms to deter rampant oversubscription will not be so for claimants who must proceed against an increasingly depleted settlement fund over time. In these situations, adequacy is not a snapshot as of the settlement; it is a question of whether the settlement plan as a whole is fair, reasonable, and adequate throughout its operation.  [*628]

V. Conclusion

Specious claim markets arise not only because some bad apples find it profitable to exploit gaps in settlement design but also because the focus on these bad apples overlooks group dynamics that weaken informal checks on specious claim submissions in traditional litigation. Predictable settlement evidentiary targets generate opportunities and incentives for repeat players to develop and present intrinsically bad mass tort claims as good. If we assume that bad apples are primarily responsible for these claims, limiting the opportunities to exploit settlement terms and elevating the sanctions associated with doing so should be sufficient to deter specious filings. This assumption, however, is inconsistent with what we know about similarly corrupt practices in virtually every other institutional or group context, and the absence of self-knowledge-that is, that the actor realizes that the action or practice is corrupt-limits the potential impact of common opportunity- and incentive-based controls alone.

Notwithstanding these limitations, understanding the potential issues in collective settlement also suggests more adaptable and targeted solutions. These include not only framing criteria to account for potential malleability and manipulation but also an adaptive monitoring system that targets the relevant groups, sub-groups, and individuals responsible for advancing claims. Specifically, sampling methods should focus not only on global claim patterns, but also the patterns employed by specific repeat players, incorporate mechanisms for refinement to identify and account for new techniques and strategies for generating claims, and afford settlement administrators with the tools necessary to avoid or recover payments on account of specious claims. At the same time, settlement forms and communications may be improved by ensuring that deterrence and compliance messages are effectively communicated to the appropriate sub-groups and individuals.

**Legal Topics:**

For related research and practice materials, see the following legal topics:
Environmental LawHazardous Wastes & Toxic SubstancesAsbestosGeneral OverviewEnvironmental LawLitigation & Administrative ProceedingsGeneral OverviewTortsProcedureSettlementsMultipartiesPartial Settlements

**FOOTNOTES:**

n1 See, e.g., Ian Ayres, Optimal Pooling in Claim Resolution Facilities, 53 LAW & CONTEMP. PROBS. 159, 160 (1990), available at http://digitalcommons.law.yale.edu/fsspapers/1541 ("The adverse selection of frivolous claimants represents an important transaction cost of claims facilities that non-frivolous claimants must bear.").

n2 See infra Part II.C.

n3 See JAMES WILLIAM COLEMAN, THE CRIMINAL ELITE: UNDERSTANDING WHITE-COLLAR CRIME 178 (4th Ed. 1998) ("Almost all of the studies have agreed on one point: White-collar offenders are psychologically 'normal' . . . ."); Blake E. Ashforth & Vikas Anand, The

Normalization of Corruption in Organizations, 25 RES. ORGANIZATIONAL BEHAV. 1, 5 (2003) (proposing a model that offers an explanation why "otherwise morally upright individuals . . . routinely engage in corruption without experiencing conflict"); Stelios C. Zyglidopoulos et al., Rationalization, Overcompensation and the Escalation of Corruption in Organizations, 84 J. BUS. ETHICS. 65, 65 (2009) ("While voracious ambition and greed certainly played a role in the corporate corruption noted, most of the perpetrators were otherwise law abiding and respectful citizens.").

n4 See Zyglidopoulos et al., supra note 3, at 65 (noting that, given the large number of otherwise law abiding citizens involved in corporate scandals, "the bad individual theory of corruption (enacted by evil characters) falls somewhat flat, indicating that self-deception and rationalization played a major role in justifying the practices"). See generally Niki A. Den Nieuwenboer & Muel Kaptein, Spiraling Down into Corruption: A Dynamic Analysis of the Social Identity Processes that Cause Corruption in Organizations to Grow, 83 J. BUS. ETH. 133 (2008) (discussing the process by which group corruption evolves notwithstanding low base rate for corruption in organizations).

n5 As used in this Article, the term "claim markets" refers to the markets for mass tort client recruiting and claim development services. Participants in these markets include law firms that primarily, if not exclusively, recruit new clients and refer them to larger firms for litigation and settlement, medical screening companies and doctors who generate the medical reports required to advance the claims, and outside litigation support organizations that assist lawyers in managing client information and preparing claim submissions. The term "specious claim markets" similarly refers to those claim markets in which the methods used to recruit and develop claims generate superficially plausible, but ultimately unreliable or intentionally misleading, evidentiary support.

n6 See, e.g., RICHARD A. NAGAREDA, MASS TORTS IN A WORLD OF SETTLEMENT 145 (2007) (discussing the classic adverse selection problem in settlement design); Francis E. McGovern, Resolving Mature Mass Tort Litigation, 69 B.U. L. REV. 659, 688 (1989) ("Unlike most torts where not every individual harmed seeks legal redress, mature mass torts generate an overabundance of plaintiffs through widespread publicity, including a substantial number of false positive claims.").

n7 Although we often envision settlements as covering claims that have already been advanced, some of the largest global settlements are established to process and pay both existing claims and any new claims that may arise going forward. These "going forward" settlements may have a limited window for accepting new claims, but others-including substantially all asbestos bankruptcy trusts-are designed to accept newly filed claims years or even decades after they are established. These settlements tend to establish a compensation grid, which categorizes current and future claims submitted by a range of factors-i.e., type and severity of injury, level of exposure to a harmful product or event, et cetera-and assigns settlement values to each category.

n8 See Alex J. Grant, Note, When Does the Clock Start Ticking?: Applying the Statute of Limitations in Asbestos Property Damage Actions, 80 CORNELL L. REV. 695, 696 (1995).

n9 See Peter H. Schuck, Some Reflections on the Future of Mass Torts, 12 CONN. INS. L.J. 505, 506 (2006) ("The unusually long latency periods associated with asbestos-related illnesses both multiplied the number of such claimants and increased the difficulty of product (and hence defendant) identification, necessitating some evidentiary innovations in order to facilitate the claims.").

n10 See *In re Asbestos Cases, 586 N.E.2d 521, 523 (Ill. App. Ct. 1991)* (noting many plaintiffs with little or no disability or impairment had filed asbestos lawsuits because they feared being barred by statute of limitations); Richard L. Marcus, They Can't Do That, Can They? Tort Reform via Rule 23, *80 CORNELL L. REV. 858, 871 n.72 (1995)* ("In the current tort system, an individual who has been exposed to asbestos and who exhibits even minor x-ray changes must generally file suit promptly or face the bar of the statute of limitations." (alteration in original) (quoting Memorandum in *Support of the Joint Motion of the Settling Parties for Approval of Notice to the Class at 50, Carlough v. Amchem Prods., Inc., 158 F.R.D. 314 (E.D. Pa. 1993)* (No. 93-CV-0215))).

n11 See Lester Brickman, Disparities Between Asbestosis and Silicosis Claims Generated by Litigation Screenings and Clinical Studies, *29 CARDOZO L. REV. 513, 515-518 (2007)* [hereinafter Brickman, Disparities]; Lester Brickman, On the Applicability of the Silica MDL Proceeding to Asbestos Litigation, *12 CONN. INS. L.J. 289, 292 (2006)* [hereinafter Brickman, Silica MDL]; Lester Brickman, On the Theory Class's Theories of Asbestos Litigation: The Disconnect Between Scholarship and Reality, *31 PEPP. L. REV. 33, 54-59 (2003)* [hereinafter Brickman, Disconnect]; Lester Brickman, The Asbestos Litigation Crisis: Is There a Need for an Administrative Alternative?, *13 CARDOZO L. REV. 1819, 1840-52 (1992);* Victor E. Schwartz & Rochelle M. Tedesco, The Law of Unintended Consequences in Asbestos Litigation: How Efforts to Streamline the Litigation Have Fueled More Claims, *71 MISS. L.J. 531, 536 (2001).*

n12 See Brickman, Disconnect, supra note 11, at 56-58; see also James A. Henderson, Jr. & Aaron D. Twerski, Asbestos Litigation Gone Mad: Exposure-Based Recovery for Increased Risk, Mental Distress, and Medical Monitoring, *53 S.C. L. REV. 815, 817-18 (2002)* (noting the "radical departures from longstanding norms of tort law" allowing pre-injury claims to obtain recovery).

n13 See Deborah R. Hensler & Mark A. Peterson, Understanding Mass Personal Injury Litigation: A Socio-Legal Analysis, *59 BROOK. L. REV. 961, 1046 (1993)* (noting substantial, yet highly subjective, damages have been awarded based on estimates of future medical expenses and plaintiffs' concern about their fate).

n14 See JENNIFER L. BIGGS ET AL., AM. ACAD. OF ACTUARIES, OVERVIEW OF ASBESTOS ISSUES AND TRENDS 15-16 (2007) available at http://www.actuary.org/pdf/casualty/asbestosaug07.pdf (noting broad discretion plaintiffs have enjoyed in filin in the forum of their choice).

n15 See generally Joe E. Basenberg & S. Leanna Bankester, Notice Pleading in the Mass Tort Arena: What Is Sufficient Notice?, *68 ALA. LAW. 74, 74-76 (2007)* (describing the use in mass tort actions of "shotgun complaints" that often evidence a lack of factual and legal inquiry by plaintiffs). As one court noted, quoting an attorney from a prominent plaintiffs' firm:

 It has been their practice over the many years of this consolidated litigation in New York Supreme Court, which has involved thousands of asbestos personal injury suits, to file a Standard Asbestos Complaint against a general list of numerous (currently approximately 100) defendants, which have been identified as making, selling, using, incorporating, installing, or providing premises with asbestos or asbestos products. The causes of action in the complaint are stated generally and jointly against all the defendants: "During the course of [plaintiff's] employment, plaintiff was exposed to the defendants' asbestos and asbestos containing materials to which exposure directly and proximately caused him to develop an asbestos related disease."

 *Arseneault v. Congoleum Corp., No. 01 Civ. 10657 (LMM), 2002 WL 472256,* at *1 (S.D.N.Y. Mar. 26, 2002)* (alterations in original). This approach to pleading has been acknowledged in other forms of aggregate

litigation as well. See *Canadian Nat'l/Ill. Cent. R.R. Co. v. Smith, 926 So. 2d 839, 840-41 (Miss. 2006)* (discussing FELA case asserting exposure to wide range of toxic substances); 3 *M Co. v. Glass, 917 So. 2d 90, 91 (Miss. 2005)* (discussing similar issue in state court silica litigation).

n16 See *Cimino v. Raymark Indus., Inc., 751 F. Supp. 649 (E.D. Tex. 1990)* (consolidating over two thousand claims in class action asbestos litigation), aff'd in part, vacated in part, *151 F.3d 297 (5th Cir. 1998);* Brent M. Rosenthal, Toxic Torts and Mass Torts, 55 *SMU L. REV. 1375, 1385-86 (2002)* (discussing disputes over individual claim discovery in Texas courts); Schwartz & Tedesco, supra note 11, at 536 (discussing the expediting of asbestos mass tort claims by way of consolidation and shortened discovery procedures).

n17 After more than a decade of implicit endorsement of these practices in Mississippi, for example, the state supreme court observed that the plaintiffs "don't appear to know when they were exposed, where they were exposed, by whom they were exposed, or even if they were exposed." *Harold's Auto Parts, Inc. v. Mangialardi, 889 So. 2d 493, 495 (Miss. 2004)* (characterizing pleading practices in the state as "a perversion of the judicial system unknown prior to the filing of mass-tort cases"). Prior to Mangialardi, these vagaries effectively increased the costs of litigation for defendants and likewise made it difficult, if not impossible, to effectively distinguish cases on their respective merits.

n18 See *Castano v. Am. Tobacco Co., 84 F.3d 734, 746 (5th Cir. 1996)* (referring to forced settlement approaches as "judicial blackmail"); JOHN H. BEISNER & JESSICA D. MILLER, LITIGATE THE TORTS, NOT THE MASS: A MODEST PROPOSAL FOR REFORMING HOW MASS TORTS ARE ADJUDICATED 7 (2009) (discussing judicial approaches designed to force settlement in mass tort cases); Brickman, Silica MDL, supra note 11, at 308 ("These aggregations effectively forced defendants to adopt mass settlement strategies even though many of the claimants had suffered no actual asbestos-related injury or could not show that any asbestos related disease was substantially caused by exposure to a defendant's products."); Keith N. Hylton, Asbestos and Mass Torts with Fraudulent Victims, 37 *SW. U. L. REV. 575, 587 (2008)* ("In addition to simply boosting the total damage award, the addition of a fraudulent claim also enhances the likelihood of settlement. If the defendant faces the risk of an enormous judgment representing the claims of thousands of plaintiffs, it will feel great pressure to settle in order to avoid a bankrupting damages judgment. Including fraudulent claims therefore not only enhances the aggregate award, it enhances the probability of a settlement." (footnote omitted)); Schwartz & Tedesco, supra note 11, at 544 (arguing that mass consolidation "does not promote efficiency; it merely forces defendants to settle").

n19 See Patrick M. Hanlon & Anne Smetak, Asbestos Changes, 62 *N.Y.U. ANN. SURV. AM. L. 525, 554-55 (2007)* (summarizing criticisms of the Madison County, Illinois, asbestos case management).

n20 See, e.g., Mark A. Behrens, Some Proposals for Courts Interested in Helping Sick Claimants and Solving Serious Problems in Asbestos Litigation, 54 *BAYLOR L. REV. 331, 350-51 (2002)* (noting "draconian" pressure placed on defendants in a Mississippi case and consolidation issues in West Virginia); Hanlon & Smetak, supra note 19, at 549-52, 574 n.193 (discussing Mississippi and Michigan). Michelle J. White, Asbestos Litigation: Procedural Innovations and Forum Shopping, 35 *J. LEGAL STUD. 365 (2006)* (discussing forum shopping and favorable venues for asbestos plaintiffs in various states).

n21 Inventory settlements generate obvious agency problems, but these issues are beyond the scope of this Article. For a discussion of these issues, see Howard M. Erichson, Beyond the Class Action: Lawyer Loyalty and Client Autonomy in Non-Class Collective Representation, 2003 *U. CHI. LEGAL F. 519, 569-75 (2003).*

n22 See NAGAREDA, supra note 6, at 25 (discussing grouping of weak claims with strong claims in block settlements).

n23 See, e.g., *Ill. Cent. R.R. Co. v. Byrd, 44 So. 3d 943, 947-49 (Miss. 2010)* (discussing inventory settlement plan).

n24 See *id. at 944-45* (noting low conditions for settlement documentation in agreement between firm and defendant).

n25 For a discussion of the impact of forum shopping in asbestos litigation, see White, supra note 20, at 365 (acknowledging plaintiffs' ability to forum shop in asbestos litigation and discussing the impact on trial outcomes between 1987 and 2003).

n26 See, e.g., Lester Brickman, Ethical Issues in Asbestos Litigation, *33 HOFSTRA L. REV. 833, 840 (2005)* (noting that asbestos claims had little or no risk of going unpaid and thus arguing that the contingency fees lawyers were charging were "unreasonable").

n27 See id. (arguing inventory settlements with going forward provisions effectively removed risk of non-recovery).

n28 A notable example is the Owens Corning National Settlement Program ("NSP"). See NAGAREDA, supra note 6, at 108-13 (discussing the operation of the NSP).

n29 Two notable examples of multi-plaintiff and multi-defendant arrangements are the Wellington Agreement and the settlement system administered by the Center for Claims Resolution. See Richard L. Marcus, Reassessing the Magnetic Pull of Megacases on Procedure, *51 DEPAUL L. REV. 457, 481 & n.116 (2001).*

n30 The Manville Personal Injury Settlement Trust was established under Johns-Manville Corporation's Chapter 11 Plan of Reorganization to process and pay qualifying asbestos claims against the company. Frank J. Macchiarola, The Manville Personal Injury Settlement Trust: Lessons for the Future, *17 CARDOZO L. REV. 583, 583 (1996).* The trust currently divides compensable injuries into eight categories-mesothelioma, two categories of lung cancer, "other" cancer, three categories of asbestosis (ranked according to severity) and "other" asbestos disease-and assigns a base settlement value to each category. See CLAIMS RESOLUTION MGMT. CORP., 2002 TRUST DISTRIBUTION PROCESS 1, http://www.claimsres.com/documents/MT/TDP02.pdf. Claimants must also provide basic information concerning their work histories and exposure to qualify for settlement. Id. at 13.

n31 See Marcus, supra note 29, at 481-82.

n32 NAGAREDA, supra note 6, at 111.

n33 See Francis E. McGovern, The Defensive Use of Federal Class Actions in Mass Torts, *39 ARIZ. L. REV. 595, 606 (1997)* (noting that class actions were the "preferred procedural device" at the time).

n34 *521 U.S. 591 (1997).*

n35 *527 U.S. 815 (1999).*

n36 NAGAREDA, supra note 6, at 78.

n37 See id. at 79.

n38 See id. at 159-60 (noting that the "modern class action is an institution ill-suited for . . . a redistributive program").

n39 See id. at 21-22 (discussing use of bankruptcy to fashion mass tort resolution across different mass torts); see also Georgene Vairo, Mass Torts Bankruptcies: The Who, the Why and the How, *78 AM. BANKR. L.J. 93, 128 (2004)* ("Given the failure of the Amchem and Ortiz class action settlements and the failure of Congress to act on a general level, bankruptcy may well be the only option available to defendants seeking peace in an intractable litigation.").

n40 See generally S. Todd Brown, Section 524(g) Without Compromise: Voting Rights and the Asbestos Bankruptcy Paradox, *2008 COLUM. BUS. L. REV. 841, 861-62* (discussing strategic and competitive dominance of the small number of firms controlling the largest inventories in asbestos bankruptcies).

n41 See *id. at 860-62;* see also William P. Shelley et al., The Need for Transparency Between the Tort System and Section 524(g) Asbestos Trusts, 17 NORTON J. BANKR. L. & PRAC. 257, 261 (2008) ("The dynamics of the bankruptcy process tend to lead to trust agreements . . . that are largely written by counsel for the asbestos claimants themselves.").

n42 See *Brown, supra* note 40, at 862-63.

n43 See id. at 893-94 (outlining issues with the oversight of asbestos bankruptcy plans and settlement administration); see also Yair Listokin & Kenneth Ayotte, Protecting Future Claimants in Mass Tort Bankruptcies, *98 NW. U. L. REV. 1435, 1481 (2004)* (discussing obstacles to ensuring fairness in mass tort bankruptcies); Linda S. Mullenix, Commentary, Back to the Futures: Privatizing Future Claims Resolution, *148 U. PA. L. REV. 1919, 1926 (2000)* (noting limits of information provided to courts approving mass tort settlements).

n44 See Charles E. Bates et al., The Naming Game, MEALEY'S LITIG. REP.: ASBESTOS, Sept. 2, 2009, at 1, 7, available at http://www.bateswhite.com/media/pnc/9/media.229.pdf (noting the higher propensity to file claims against trusts because, among other reasons, their standards "are typically less strict than the burden of proof in the Tort System"); see generally Shelley et al., supra note 41.

n45 See NAGAREDA, supra note 6, at 150 ("The problem of overclaiming inheres in any move from a tort system predicated on individualized proof toward a streamlined administrative regime. Efficient application of a compensation grid necessarily involves cutting corners by comparison to the detailed proof that might be

demanded in tort litigation."); Deborah R. Hensler, Revisiting the Monster: New Myths and Realities of Class Action and Other Large Scale Litigation, *11 DUKE J. COMP. & INT'L L. 179, 188 (2001)* ("Thousands of lesser-value claims may be resolved en masse according to negotiated schedules of damages that pay little attention to individual claim differences and involve little adversarial litigation.").

n46 See Lester Brickman, The Use of Litigation Screenings in Mass Torts: A Formula for Fraud?, *61 SMU L. REV. 1221, 1226-27 (2008)* [hereinafter Brickman, Litigation Screenings] (discussing the creation of asbestos litigation screening practices).

n47 See Brickman, Disconnect, supra note 11, at 63; David Maron & Walker W. (Bill) Jones, Taming an Elephant: A Closer Look at Mass Tort Screening and the Impact of Mississippi Tort Reforms, *26 MISS. C. L. REV. 253, 264 (2006)*. For example, following the terrorist attacks of September 11, 2001, a variety of screening programs were established to test and track the physical and mental injuries suffered by first responders and other high-risk populations. See generally John Howard, The World Trade Center Disaster: Health Effects and Compensation Mechanisms, *16 J.L. & POL'Y 69 (2007)*.

n48 See Brickman, Disconnect, supra note 11, at 76 (noting the role of unions in mass screenings); Charles Silver & Lynn A. Baker, Mass Lawsuits and the Aggregate Settlement Rule, *32 WAKE FOREST L. REV. 733, 741 (1997)* ("Unions, churches, homeowners and renters associations, and other voluntary membership groups are also potential sources of clients.").

n49 The late Fred Baron's remarks at the National Press Club in 2002 provide a vivid example of how this "public service" argument has been used to deflect criticism of litigation screenings:

Myth 1: Plaintiffs' lawyers notoriously go out with x-ray vans, find people who work in factories, and develop large numbers of clients. Quite honestly, I am offended when somebody criticizes me for providing free medical services to a person who is working in a factory and who has been exposed to asbestos. . . . Hundreds and hundreds of people who have developed cancer have first learned that they had cancer, hopefully early enough to save their life, as a result of x-ray screenings that were provided either by their union or by plaintiff's counsel. I am offended when people tell me that, "it's terrible that you are giving free medical treatment to working people who end up filing suits." I do not buy that argument. When a victim is diagnosed with a disease and somebody is legally responsible under state law, there should be no barrier to that individual filing a suit to reclaim their rights.

Fred Baron, Address at the Nat'l Press Club (June 18, 2002), in CIV. JUST. F., Apr. 2003, at 11, 12, available at http://heartland.org/sites/all/modules/custom/heartlandmigration/files/pdfs/12337.pdf; see also Roger C. Cramton, Lawyer Ethics on the Lunar Landscape of Asbestos Litigation, *31 PEPP. L. REV. 175, 182-83 (2003)* ("Even though the medical benefits of screening are dubious and the quality of the testing provided is subject to question . . ., Baron's argument has a large popular appeal. A grievance body that examines and possibly punished the recruitment methods would be subject to much public criticism and hostility."(footnote omitted)).

n50 See Joseph F. Rice & Nancy Worth Davis, Judicial Innovation in Asbestos Mass Tort Litigation, *33 TORT & INS. L.J. 127, 140 n.74 (1997)* (noting that while screenings may be perceived as a public service, they serve as a "double-edged sword" for plaintiffs' attorneys who must make prompt filings upon discovery of signs of exposure to avoid tolling of statutes of limitation).

n51 See Brickman, Disconnect, supra note 11, at 67 ("While the recording of patient information such as medications, age, race, medical history, and exposure history are crucial to prevent errors in interpretation, the persons hired by screening enterprises to gather that information typically lack any qualifications for the taking of exposure and medical histories and usually receive no training."(footnote omitted) (internal quotation marks omitted)).

n52 See id. at 80 (discussing manipulation of medical histories).

n53 See id. at 67-68 ("Screening enterprises administer pulmonary function tests in a manner that generates far higher numbers of lung-impaired persons than would be the case if the standards established by the American Thoracic Society were observed."); id. at 90 ("Both the X-ray equipment used and the process of administering the X-rays leave much to be desired. However, the resultant poor quality of X-rays may actually improve B-readers' ability, if not propensity, to misread the X-ray." (footnote omitted)).

n54 See ABA COMM'N. ON ASBESTOS LITIG., REPORT TO THE HOUSE OF DELEGATES RECOMMENDATION 8 (2003), http://www.cdc.gov/niosh/docket/archive/pdfs/NIOSH-015/020103-Exhibit12.pdf ("The x-rays are generally read by doctors who are not on site and who may not even be licensed to practice medicine in the state where the x-rays are taken or have malpractice insurance for these activities. According to these doctors, no doctor/patient relationship is formed with the screened workers and no medical diagnoses are provided. Rather, the doctor purports only to be acting as a litigation consultant and only to be looking for x-ray evidence that is 'consistent with' asbestos-related disease."). At least one doctor has successfully defended a medical malpractice complaint based on his screening activities by insisting that he was not involved in a doctor-patient relationship with those he screened. *Adams v. Harron, No. 97-2547, 1999 WL 710326,* at *2 (4th Cir. Sept. 13, 1999) (per curiam).

n55 See Joseph N. Gitlin et al., Comparison of "B" Readers' Interpretations of Chest Radiographs for Asbestos Related Changes, 11 ACAD. RADIOLOGY 843, 855 (2004).

n56 One plaintiffs' lawyer acknowledged this fact, explaining, "The sole purpose for . . . asbestos screening programs is in anticipation of future litigation against. sic asbestos manufacturers" and the process is "geared toward collecting evidence for future asbestos litigation." *Brief of Appellants at 19, In re Asbestos Prods. Liab. Litig., Nos. 98-1166, 98-1165, 1998 WL 34085715 (3d Cir. 1998).*

n57 See *Brown, supra* note 40, at 846-47.

n58 Recent Developments in Assessing Future Asbestos Claims Under the FAIR Act: Hearing on S. 852 Before the S. Comm. on the Judiciary, 109th Cong. 190-92 (2005) [hereinafter Lederer Testimony] (testimony of Mark E. Lederer, Chief Financial Officer, Manville Personal Injury Settlement Trust), http://www.access.gpo.gov/congress/senate/pdf/109hrg/25947.pdf.

n59 Id. at 198.

n60 See MANVILLE PERSONAL INJURY SETTLEMENT TRUST: HISTORY, http://www.mantrust.org/history.htm (last visited May 5, 2012).

n61 See id.

n62 See Lederer Testimony, supra note 58, at 193.

n63 See *Mauger v. A.W. Chesterton, Inc., No. 2154, No. 1631, 2007 Phila. Ct. Com. Pl. LEXIS 193,* at *25 (Phila. Ct. Com. Pl. June 25, 2007) (discussing other trusts that have received several hundred thousand claims).

n64 LLOYD DIXON ET AL., RAND INST. FOR CIV. JUST., ASBESTOS BANKRUPTCY TRUSTS: AN OVERVIEW OF TRUST STRUCTURE AND ACTIVITY WITH DETAILED REPORTS ON THE LARGEST TRUSTS xiv (2010) [hereinafter RAND 2010 REPORT], available at http://www.rand.org/content/dam/rand/pubs/technicalreports/2010/RANDTR872.pdf. The nonmalignant designation, however, may be over-inclusive given the limits of the data available to RAND. Id. at xiii-xiv.

n65 See Mark A. Behrens, Asbestos Litigation Screening Challenges: An Update, *26 T.M. COOLEY L. REV. 721, 755 (2009).* See infra Part IV.A for a more detailed discussion.

n66 RAND 2010 REPORT, supra note 64, at xv.

n67 Id.

n68 *In re T H Agric. & Nutrition, L.L.C., No. 08-14692 (REG), 2009 WL 7193573* (Bankr. S.D.N.Y. May 28, 2009); see also Declaration of Francine F. Rabinovitz in *Support of Confirmation of the First Amended Prepackaged Plan of Reorganization of T H Agriculture & Nutrition, L.L.C. Under Chapter 11 of the Bankruptcy Code at P 35, In re T H Agric. & Nutrition, L.L.C., No. 08-14692 (REG), 2009 WL 6679826* (Bankr. S.D.N.Y. May 15, 2009) ("The anticipated Asbestos PI Trust funding will allow the Asbestos PI Trust to pay 100% of the value of each Asbestos PI Claim for the life of the Asbestos PI Trust."); Kirk T. Hartley et al., Commentary, Pre-packaged Plan of Inequity: The Financial Abuse of Future Claimants in the T H Agriculture & Nutrition 524(g) Asbestos Bankruptcy, MEALEY'S ASBESTOS BANKR. REP., Nov. 2011, at 1, 3-4, available at http://www.bateswhite.com/media/pnc/2/media.492.pdf.

n69 Disclosure Statement with Respect to a Prepackaged Plan of Reorganization of T H Agriculture & Nutrition, L.L.C. Under Chapter 11 of the Bankruptcy Code at 4, In re T H Agric. & Nutrition, L.L.C., No. 1:08 BK14692, 2008 WL 7947215 (Bankr. S.D.N.Y. Oct. 10, 2008) [hereinafter THAN Disclosure Statement].

n70 *Declaration of James Sean McGuire Certifying Tabulation of Ballots Regarding Vote on Debtor's Prepackaged Plan of Reorganization at 6, In re T H Agric. & Nutrition, LLC, No. 08-14692 (REG), 2009 WL 7193573* (Bank. S.D.N.Y. Nov. 24, 2008).

n71 Notice Regarding Commencement of Claim Filing on April 1, 2011, THAN Asbestos Personal Injury Trust (Mar. 14, 2011), http://www.thanasbestostrust.com/Files/20110321THANCommencementNotice.PDF.

n72 THAN Disclosure Statement, supra note 69, at 4.

n73 Id. at 4-5.

n74 *Brown, supra* note 40, at 890-91 (discussing how specious claim filings overwhelm efficiencies in asbestos bankruptcies); see also Frederick T. Smith, Commentary, Class Actions' Uncertain Future: Lessons from Ortiz v. Fibreboard, reprinted in ANDREWS TOXIC CHEMICALS LITIG. REP., Nov. 15, 1999, at 1, 10-11 ("In some parts of the country, mass tort claims have threatened to overwhelm the civil justice system, accounting for more than one-quarter of the entire civil caseload in certain courts.").

n75 See Asbestos Litigation: Hearing Before S. Comm. on the Judiciary, 107th Cong. 8-9 (2002), available at http://www.gpo.gov/fdsys/pkg/CHRG-107shrg88289/pdf/CHRG-107shrg88289.pdf (noting how unimpaired asbestos claims diminish recoveries for the sick); Brickman, Litigation Screenings, supra note 46, at 1228 ("I estimate that lawyers have spent at least $ 500 million, and perhaps as much as $ 1 billion, to conduct litigation screenings that have generated over 1,000,000 claimants, most of whose claims are specious, and contingency fees well in excess of thirteen billion dollars." (footnote omitted)); Matthew Bergman & Jackson Schmidt, Editorial, Change Rules on Asbestos Lawsuits, SEATTLE POST-INTELLIGENCER, May 30, 2002, at B7 (noting that "the genuinely sick and dying are often deprived of adequate compensation as more and more funds are diverted into settlements of the non-impaired claims"); Quenna Sook Kim, Asbestos Trust Says Assets Are Reduced as the Medically Unimpaired File Claims, WALL ST. J., Dec. 14, 2001, at B6 (noting that "a 'disproportionate amount of Trust settlement dollars have gone to the least injured claimants-many with no discernible asbestos-related physical impairment whatsoever'").

n76 See Charles Bates & Charlie Mullin, Commentary, The Bankruptcy Wave of 2000-Companies Sunk By an Ocean of Recruited Asbestos Claims, MEALEY'S LITIG. REP.: ASBESTOS, Jan. 24, 2007, at 39, 39, available at www.bateswhite.com/media/pnc/6/media.286.pdf ("Mass recruited claims caused the bankruptcy wave of asbestos defendants that began in 2000 and eventually resulted in the bankruptcy of more than 40 companies."). The authors conclude that "the cost to defendants, their insurers, and seriously injured asbestos claimants from the mass recruiting of over 600,000 unimpaired asbestos claimants may eventually total $ 50 billion." Id. at 44.

n77 'Medical Monitoring and Asbestos Litigation'-A Discussion with Richard Scruggs and Victor Schwartz, MEALEY'S LITIG. REP.: ASBESTOS, Mar. 1, 2002, at 1, 5, available at http://www.shb.com/attorneys/SchwartzVictor/MedicalMonitoringandAsbestosLitigation2002.pdf (recounting the experiences of former asbestos plaintiffs' lawyer Dickie Scruggs).

n78 See STEPHEN J. CARROLL ET AL., RAND INST. FOR CIV. JUST., THE ABUSE OF MEDICAL DIAGNOSTIC PRACTICES IN MASS LITIGATION: THE CASE OF SILICA ix (2009) [hereinafter RAND SILICA REPORT], http://www.rand.org/pubs/technicalreports/2009/RANDTR774.pdf.

n79 See Martha Sharp, Silica: The Next Asbestos?, 3 ENFORCE: INS. POL'Y ENFORCEMENT J., no. 3, 2004 at 5, 6, available at http://www.docstoc.com/docs/34386057/The-Next-Asbestos (noting sharp rise in silica litigation claims and suggesting that each claim would be worth "six figures"). Aside from the similarities in the resulting injuries-asbestosis and silicosis are both incurable lung diseases with long latency periods-many Americans have been exposed to silica dust at home and in the workplace. See id.; see also *RAND SILICA REPORT, supra* note 78, at 37 (discussing wide range of industries with workplace exposure to silica dust).

n80 Susan Warren, Silicosis Suits Rise Like Dust: Lawyers in Asbestos Cases Target Many of the Same

Companies, WALL ST. J., Sept. 4, 2003, at B5.

n81 *RAND SILICA REPORT, supra* note 78, at ix.

n82 Id. at 3-4.

n83 *In re Silica Prods. Liab. Litig., 398 F. Supp. 2d 563, 567 (S.D. Tex. 2005).*

n84 See Brickman, Disparities, supra note 11, at 577-78.

n85 See discussion infra Part III.A.

n86 *In re Silica Prods. Liab. Litig., 398 F. Supp. 2d at 576.*

n87 *Id. at 579-81.* Although plaintiffs' counsel represented that Martindale was a consulting expert in their motion to quash his deposition, "Dr. Martindale testified that he was not Plaintiffs' expert and had specifically refused Plaintiffs' lawyers' requests to serve as their expert." *Id. at 581.* More significantly, Dr. Martindale testified that he had not intended to diagnose anyone with silicosis and withdrew the ostensible "diagnoses" bearing his signature for 3617 plaintiffs in the litigation. *Id. at 581-84.*

n88 *Id. at 584.*

n89 *Id. at 598-99.*

n90 *Id. at 600, 629.*

n91 See *id. at 601.*

n92 An ILO form is frequently used to document findings of lung abnormalities and will often be sufficient medical documentation to establish such findings in asbestos settlements.

n93 *In re Silica Prods. Liab. Litig., 398 F. Supp. 2d at 600-01.*

n94 See *id. at 601.*

n95 *Id. at 633* ("In many cases, a different person performed each of the following steps: taking the occupational history, performing the physical exam, reading the x-ray, analyzing the pulmonary function tests, taking the medical history, and finally, making a diagnosis. The people performing the steps were so compartmentalized that often they did not know the others' identities, let alone whether they were qualified and were performing their assigned tasks correctly.").

n96 Id.

n97 *Id. at 583-84, 605-06, 609-11, 617, 619, 639 n.121.*

n98 *Id. at 582.*

n99 See *id. at 584, 603-04, 618-19, 634-35, 640.*

n100 *Id. at 583, 604, 617.*

n101 *Id. at 603.*

n102 Id.

n103 *Id. at 607.*

n104 *Id. at 635.*

n105 HON. JOSEPH HALBACH, JR., CAUSE NO. 2004-70000 STATEWIDE SILICA MDL, 333D DISTRICT COURT OF HARRIS COUNTY,TEXAS, *TEXAS CIVIL PRACTICE & REMEDIES CODE SECTION 90.010(k)* REPORT (Sept. 1, 2010), http://www.justex.net/JustexDocuments/24/Section 90.010(k) Report.pdf.

n106 David J. Morrow, Fen-Phen Maker to Pay Billions in Settlement of Diet-Injury Cases, N.Y. TIMES, Oct. 8, 1999, at A1, available at http://www.nytimes.com/1999/10/08/business/fen-phen-maker-to-pay-billions-in-settlement-of-diet-injury-cases.html?pagewante

n107 Nationwide Class Action Settlement Agreement with American Home Products Corp. (As Amended), MDL No. 1203, Civ. No. 99-20593 (E.D. Pa. Nov. 18, 1999), [hereinafter Diet Drugs 1999 Settlement], http://www.settlementdietdrugs.com/pdfs/AmendedSettlement%20Agreement%20.pdf.

n108 NAGAREDA, supra note 6, at 136-43.

n109 See *Diet Drugs 1999 Settlement, supra* note 107, at § VI.C.

n110 See Appendix to GREEN FORM, Settlement Matrix Compensation Benefits Guide for Physicians, Attorneys and Class Members (on file with author).

n111 Id.

n112 See *Diet Drugs 1999 Settlement, supra* note 107, at § VI.E.1 (providing for audit of 15% of the claim pool). All other nominally qualifying claims were to be paid without audit, but payments for the audited claims were withheld pending the results of the audit. Id. at § VI.E.2; see *Brown v. Am. Home Prods. Corp. (In re Diet Drugs Prods. Liab. Litig.), MDL No. 1203, Civ. No. 99-20593, 2002 U.S. Dist. LEXIS 23595,* at *12 (E.D. Pa. Nov. 26, 2002) ("As of now, 85% of the claims must be paid without any real check on their legitimacy.").

n113 *Diet Drugs 1999 Settlement, supra* note 107, at § VI.E.8.

n114 Id.

n115 See Brickman, Litigation Screenings, supra note 46, at 1259-60 (discussing recruiting and screening practices).

n116 See Indictment at 11-12, United States v. Tai, No. 2:10-cr-00769-JS (E.D. Pa. Nov. 30, 2010) [hereinafter Tai Indictment] (outlining more than $ 2 million in billings for mass produced diagnoses); Complaint at 10-11, AHP Settlement Trust v. Crouse, No. 03-5252 (E.D. Pa. Sept. 19, 2003) [hereinafter Crouse Complaint], http://www.settlementdietdrugs.com/pdfs/ComplaintAgainstLindaCrouse091803.pdf (noting over $ 3.2 million earned in eleven months).

n117 See Tai Indictment, supra note 116, at 9.

n118 See id.

n119 See Crouse Complaint, supra note 116, at 10-11 (noting that one doctor earned more than $ 3.2 million in eleven months from just two of the roughly twenty-five law firms using her services).

n120 Tai Indictment, supra note 116, at 10.

n121 See *In re Diet Drugs Prods. Liab. Litig., 553 F. Supp. 2d 442, 476 (E.D. Pa. 2008)* ("Numerous attorneys, some with nefarious intentions, operated echocardiogram mills to develop a vast inventory of claimants . . . . This flood of claims was unexpected and out of step with the learned projections based on epidemiologic and demographic evidence.").

n122 NAGAREDA, supra note 6, at 145.

n123 Morrow, supra note 106.

n124 American Home Products Corporation, subsequently known as Wyeth, was acquired by Pfizer Inc. on October 15, 2009. Wyeth Transaction, PFIZER, http://www.pfizer.com/investors/shareholderservices/wyethtransaction.jsp (last visited May 6, 2012).

n125 Alex Berenson, Analysts See Merck Victory in Vioxx Settlement, N.Y. TIMES, Nov. 10, 2007, at A1,

available at http://www.nytimes.com/2007/11/10/business/10merck.html?pagewanted=all.

n126 See, e.g., George Loewenstein et al., Self-Serving Assessments of Fairness and Pretrial Bargaining, *22 J. LEGAL STUD. 135, 138-39 (1993)* ("Plaintiffs are likely to systematically overestimate the value of their claims, and defendants are likely to underestimate the value of claims brought against them."); Deborah L. Rhode, Moral Counseling, *75 FORDHAM L. REV. 1317, 1325 (2006)* ("Even with the best of intentions, attorneys, like any decision makers, are subject to cognitive biases, peer pressures, and information barriers that compromise counseling responsibilities."); Jean R. Sternlight & Jennifer Robbennolt, Good Lawyers Should Be Good Psychologists: Insights for Interviewing and Counseling Clients, 23 OHIO ST. J. ON DISP. RESOL. 437, 543 (2008) (noting clients report facts as they cognitively perceive them).

n127 There is general agreement that plaintiffs' lawyers are the driving force behind mass tort claim recruiting and filing patterns. See Brickman, Litigation Screenings, supra note 46, at 1232-33 (criticizing the entrepreneurial model of asbestos litigation and its role in expanding the volume of asbestos claims); Richard A. Nagareda, Autonomy, Peace, and Put Options in the Mass Tort Class Action, *115 HARV. L. REV. 747, 808 (2002)* (noting the "driving force" in selecting certain cases is entrepreneurship); Richard A. Nagareda, In the Aftermath of the Mass Tort Class Action, *85 GEO. L.J. 295, 319 (1996)* (analyzing the role of entrepreneurial mass tort attorneys in mass tort filing patterns); David Rosenberg, Response, Mandatory-Litigation Class Action: The Only Option for Mass Tort Cases, *115 HARV. L. REV. 831, 848-49 (2002)* (analyzing claim investment considerations in mass tort); Jack B. Weinstein, Ethical Dilemmas in Mass Tort Litigation, *88 NW. U. L. REV. 469, 480 (1994)* ("The speed with which the number of breast implant cases exploded on the scene is attributable in part to a well-organized plaintiffs' bar, which now has the capital, organizational skills, and advertising techniques to seek clientele.").

n128 Cf. McGovern, supra note 33, at 606 (noting the impact of timing on potential returns and the manner in which it may influence client recruiting). For example, even before the Silica MDL, asymptomatic asbestos client recruiting dropped significantly due to the growth of deferred dockets, tort reform, and restrictions on consolidation. See TOWERS WATSON, A SYNTHESIS OF ASBESTOS DISCLOSURES FROM FORM 10-KS: INSIGHTS 1 (2010), http://www.towerswatson.com/assets/pdf/1492/AsbestosDisclosuresInsights4-15-10.pdf.

n129 NAGAREDA, supra note 6, at 241-42.

n130 See, e.g., Tai Indictment, supra note 116, at 7-12 (detailing criminal action against doctor involved in fen-phen specious claims diagnoses after full audits were ordered).

n131 See, e.g., Jeremy Hudson, Woman Sentenced in Fen-Phen Scam, THE CLARION-LEDGER, Dec. 22, 2004, at 1B (recounting how a sixty-three year-old woman was sentenced to ten months in prison for taking $ 250,000 in a fake settlement); Robert Lenzner & Michael Maiello, The $ 22 Billion Gold Rush, FORBES (Apr. 10, 2006), http://www.forbes.com/forbes/2006/0410/086.html (questioning how much of $ 22 billion in settlement payments went to individuals with specious claims).

n132 See Reed Abelson & Jonathan D. Glater, Tough Questions Are Raised on Fen-Phen Compensation, N.Y. TIMES, Oct. 7, 2003, at C1 (discussing RICO case against fen-phen echo-mill doctor).

n133 See Ashforth & Anand, supra note 3, at 12 ("Specialization not only fosters a diffusion of responsibility, it makes it difficult for any individual to comprehend (and easy to deny) the 'big picture.'").

n134 See supra notes 3-4 and accompanying text.

n135 See, e.g., LLOYD DIXON & GEOFFREY MCGOVERN, ASBESTOS BANKRUPTCY TRUSTS AND TORT COMPENSATION 8-9 (2011), available at http://www.rand.org/content/dam/rand/pubs/monographs/2011/RANDMG1104.pdf.

n136 As a group of prominent plaintiffs' firms argued in the W.R. Grace bankruptcy, the only relevant question was whether the claimant could produce some form of evidence in support of her claim, not whether the evidence was questionable. Response to and Opposition to Debtor's Motion to Compel Asbestos Personal Injury Claimants Represented by Edward O. Moody, P.A., Foster & Sear L.L.P., Motley Rice LLC, and Williams Bailey Law Firm, LLP to Respond to the W.R. Grace Asbestos Personal Injury Questionnaire and Motley Rice LLC's Joinder in the Responses of Various Law Firms Representing Asbestos Personal Injury Claimants in Opposition to Debtor's Motion Compel, In re W.R. Grace & Co., No. 01-01139355 (Bankr. D. Del. 2006). Similarly, the court in the Armstrong bankruptcy rejected an estimation analysis that assumed plaintiffs in the tort system must identify a debtor's product to be compensated because it was not "the reality in asbestos litigation," where limits on product identification records would "preclude summary judgment on this issue." In re Armstrong World Indus., Inc., 348 B.R. 111, 130 (D. Del. 2006).

n137 Repeat players in litigation tend to adopt recognized settlement patterns. Moreover, RAND reports that some defense attorneys actively encouraged plaintiffs to file additional suits against their clients, apparently as a means of generating fees during the inevitable march toward settlement. RAND SILICA REPORT, supra note 78, at xiv.

n138 See Hon. Helen E. Freedman, Selected Ethical Issues in Asbestos Litigation, 37 SW. U. L. REV. 511, 525 (2008).

n139 See supra notes 44-45 and accompanying text.

n140 See generally Brown, supra note 40 (discussing strategic and competitive dominance of the small number of firms controlling the largest inventories in asbestos bankruptcies).

n141 See id. at 843.

n142 In fact, the plaintiffs in that case adopted an aggressive, high-dollar settlement approach premised on the assumption that the defendants would follow the asbestos litigation settlement model. See Roger Parloff, Diagnosing for Dollars, FORTUNE (June 13, 2005), http://money.cnn.com/magazines/fortune/fortunearchive/2005/06/13/8262537/index.htm ("In April 2004 the plaintiffs' lead counsel presented the defendants with a letter demanding $ 1 billion to settle the cases. He suggested that the price was a bargain, because 'litigating the Silica MDL will collectively cost the defendants more than $ 1,500,000,000' in pretrial expenses alone.").

n143 *RAND SILICA REPORT, supra* note 78, at 27.

n144 Although some may find this expansion beyond colorable litigation claims problematic standing alone, this normative view is not without controversy. The focus of this Article is not, however, to determine the appropriate evidentiary standard for collective settlement but to identify the manner in which the standard selected may be distorted beyond one or more of the settlement proponents' expectations.

n145 See David Egilman, Letter to the Editor, Asbestos Screenings, 42 AM. J. INDUS. MED. 163 (2002), available at http://www.egilman.com/Documents/publications/screenings.pdf ("I was amazed to discover, that in some of the screenings, the worker's X-ray had been 'shopped around' to as many as six radiologists until a slightly positive reading was reported by the last one of them.").

n146 See, e.g., FIN. CRISIS INQUIRY COMM'N, FINANCIAL CRISIS INQUIRY REPORT xviii-xxii (2011), available at http://www.gpo.gov/fdsys/pkg/GPO-FCIC/pdf/GPO-FCIC.pdf.

n147 Although others have discussed this pattern in more technical terms, an excellent layman's account may be found in Michael Lewis, THE BIG SHORT: INSIDE THE DOOMSDAY MACHINE (2010).

n148 See supra Part II.C.

n149 To illustrate, one firm noted that the cost of producing case-specific expert medical reports was "unduly burdensome and time-consuming." Memorandum of Law in Support of Plaintiffs' Motion for Extension of Time to Comply with Pretrial Order No. 29 Requiring Case-Specific Expert Reports for Only the Plaintiffs Represented by Weitz & Luxenberg, P.C., or Alternatively to Amend Order to Certify for Interlocutory Appeal Under *28 U.S.C.  § 1292*(b), at 7, In re Bextra & Celebrex Marketing Sales Practices & Prod. Liab. Litig., MDL No. 1699, No. M:05-CV-01699-CRB (N.D. Cal. Aug. 29, 2008) [hereinafter Weitz & Luxenberg Memorandum].

n150 See, e.g., John C. Coffee, Jr., Class Wars: The Dilemma of the Mass Tort Class Action, *95 COLUM. L. REV. 1343, 1374 (1995).*

n151 See Joseph A. Grundfest & Peter H. Huang, The Unexpected Value of Litigation: A Real Options Perspective, *58 STAN. L. REV. 1267, 1279 (2006).*

n152 See id.

n153 See generally Nora Freeman Engstrom, Run-of-the-Mill Justice, *22 GEO. J. LEGAL ETHICS 1485 (2009)* (discussing settlement mills in traditional litigation).

n154 This assumes that the financial expenses may be deducted from the clients' recovery in addition to the lawyer's fee.

n155 See, e.g., T. Leigh Anenson, Absolute Immunity from Civil Liability: Lessons for Litigation Lawyers,

*31 PEPP. L. REV. 915, 923 (2004)* (discussing attorneys' "freedom to err" on the side of their clients in the adversary system); Gerald Walpin, America's Adversarial and Jury Systems: More Likely to Do Justice, *26 HARV. J.L. & PUB. POL'Y 175, 177 (2003)* ("Zealous, faithful advocacy means the obligation to search out all favorable evidence, to seek, neutralize or destroy all unfavorable evidence, and to press the most favorable interpretation of the law for his client.").

n156 Cf. Janet Cooper Alexander, Do the Merits Matter? A Study of Settlements in Securities Class Actions, *43 STAN. L. REV. 497, 547-48 (1991)* ("Having established a system in which all cases that survive a motion to dismiss are settled for a certain percentage of the stakes, plaintiffs' attorneys have less incentive to screen cases carefully. Thus, the existence of a 'going rate' encourages the filing of more, and weaker, suits than attorneys would bring under the conventional economic model.").

n157 Indeed, some high-profile plaintiffs' lawyers and doctors actively lobbied against some of the practices discussed in this Article. See Asbestos Litigation: Hearing Before S. Comm. on the Judiciary, supra note 75, at 24-26 (prepared statement of Steven Kazan) (criticizing recruiting practices of entrepreneurial mass tort firms); Egilman, supra note 145, at 163.

n158 See generally Ruth V. Aguilera & Abhijeet K. Vadera, The Dark Side of Authority: Antecedents, Mechanisms, and Outcomes of Organizational Corruption, 77 J. BUS. ETH. 431 (2008) (drawing upon the Opportunity-Motivation-Justification model of crime to explain corporate corruption).

n159 See Brickman, Disparities, supra note 11, at 526-30 (noting screening doctor positive yields of 50-90%).

n160 Given this cost consideration, it may not be surprising that so many silica and asbestos claimants accepted dismissal rather than attempting to build sufficient evidentiary support to satisfy the higher standards adopted in some states and courts following the Silica MDL. See Aricka Flowers, Judge Robreno: Cleaning Up Clogged Asbestos MDL, SOUTHEAST TEXAS RECORD (Aug. 5, 2009, 11:56 AM), http://www.setexasrecord.com/news/220412-judge-robreno-cleaning-up-clogged-asbestos-mdl (noting dismissal of thousands of asbestos claims); supra note 105 and accompanying text.

n161 See Nieuwenboer & Kaptein, supra note 4, at 137.

n162 This framework collapses elements of those advanced by Aguilera & Vadera, supra note 158, at 431-37, and Ashforth & Anand, supra note 3, at 16-22.

n163 See Aguilera & Vadera, supra note 158, at 436; Ashforth & Anand, supra note 3, at 18.

n164 See Zyglidopoulos et al., supra note 3, at 70.

n165 See Aguilera & Vadera, supra note 158, at 436.

n166 See Ashforth & Anand, supra note 3, at 18 (discussing the influence of "slippage between behavior

and rules" in enforcement on perceptions of legality and propriety).

n167 See generally Carrie Menkel-Meadow, Ethics and the Settlements of Mass Torts: When the Rules Meet the Road, *80 CORNELL L. REV. 1159 (1995)* (discussing ambiguities of ethical issues in mass tort litigation).

n168 See *Choctaw, Inc. v. Campbell-Cherry-Harrison-Davis & Dove, 965 So. 2d 1041, 1045-47 (Miss. 2007)* (agreeing with firm's assertion that claims that targeted settlement criteria were historically paid and, accordingly, not "frivolous" by definition).

n169 See Ashforth & Anand, supra note 3, at 18-20.

n170 Michael A. Silverstein, Letter to the Editor, WALL ST. J., Dec. 13, 2005, at A13 (defending organization's decision to honor screening doctor criticized by Judge Jack in the Silica MDL because he was merely acting as an expert witness in that case).

n171 See generally David E. Bernstein, Keeping Junk Science out of Asbestos Litigation, *31 PEPP. L. REV. 11, 13 (2003)* (arguing that "hired gun" physicians misdiagnose lung abnormalities and misidentify causation in asbestos litigation); Lee Mickus, Discovery of Work Product Disclosed to a Testifying Expert Under the 1993 Amendments to the *Federal Rules of Civil Procedure, 27* CREIGHTON L. REV. 773, 792 n.85 (1994) ("An expert witness eager to please his employer may sometimes form his opinion solely on the basis of incomplete information disclosed to him by counsel."); Joseph Sanders, The Bendectin Litigation: A Case Study in the Life Cycle of Mass Torts, *43 HASTINGS L.J. 301, 348-86 (1992)* (discussing use of expert testimony on both sides in Bendectin litigation); Jeffrey J. Parker, Note, Contingent Expert Witness Fees: Access and Legitimacy, *64 S. CAL. L. REV. 1363 (1991)* (discussing hired gun experts and expert bias).

n172 For example, one court noted significant concerns with comparable practices in 1990. See Raymark Indus., Inc. v. Stemple, No. 88-1014- *K, 1990 U.S. Dist. LEXIS 6710,* at *6 (D. Kan. May 30, 1990) ("For all purposes, Raymark and this court reasonably assumed, given the defendant attorneys' professional responsibilities and Rule 11 compliance, that they would only submit claims of at least some merit, but surely would not recklessly acquiesce in the filing of a constant, steady flow of faulty claims. As this opinion will demonstrate, such is apparently the case. As stated at the time of hearing on the motions, this claim process appears to be a 'professional farce!' The process makes a mockery of the practices of law and medicine! Indeed, if this court were now to acquiesce in any of them it would make a 'laughingstock' of the court!").

n173 See *In re Silica Prods. Liab. Litig., 398 F. Supp. 2d 563, 633 (S.D. Tex. 2005)* (noting how the compartmentalization of screening duties allowed one silica screening doctor to "reconcile his acquiescence in false diagnosing language"). The court continued:

Repeatedly, the diagnosing doctors testified as to their blind (and, as it happens, unfounded) faith that other physicians had taken the necessary steps to legitimize their diagnoses. By dividing the diagnosing process among multiple people, most of whom had no medical training and none of whom had full knowledge of the entire process, no one was able to take full responsibility over the accuracy of the process. This is assembly line diagnosing. And it is an ingenious method of grossly inflating the number of positive diagnoses.

*Id. at 633-34.*

n174 Donald Palmer, Extending the Process Model of Collective Corruption, 28 RES. ORGANIZATIONAL BEHAV. 107, 115 (2008) (noting that division of labor and requiring participants to focus on their specific tasks "substitute for more time consuming mindful and rational cost benefit or normative analysis that might lead organizational participants to eschew wrongful courses of action").

n175 See id. ("The division of labor also diffuses responsibility, such that participants in one part of an organization sometimes do not feel obligated to (in fact, might even be forbidden from) point(ing) out the wrongful character of the behavior of employees in another part of the organization.").

n176 See Ashforth & Anand, supra note 3, at 25-34 (discussing socialization of corruption across groups).

n177 See DAVID LUBAN, LEGAL ETHICS AND HUMAN DIGNITY 220 (2007) (discussing "willful" ignorance and its potential for liability avoidance); Stephen Fraidin & Laura B. Mutterperl, Advice for Lawyers: Navigating the New Realm of Federal Regulation of Legal Ethics, *72 U. CIN. L. REV. 609, 638 (2003)* ("Attorneys might avoid knowledge of certain information because they believe that ignorance permits them better to defend the client or to circumvent ethical obligations."); Robert Rubinson, Attorney Fact-Finding, Ethical Decision-Making and the Methodology of Law, *45 ST. LOUIS L.J. 1185, 1204 (2001)* ("Since every ethical rule requires a factual predicate and lawyers themselves determine whether such a factual predicate exists, attorneys can control the process of ethical decision-making through fact-finding. This deceptively simple point-rarely acknowledged in ethics discourse-demonstrates the extraordinary impact of fact-finding on ethical decision-making.").

n178 See LUBAN, supra note 177, at 220-21.

n179 As Judge Jack concluded:

 The record does not reveal who originally devised this scheme, but it is clear that the lawyers, doctors and screening companies were all willing participants. And if the lawyers turned a blind eye to the mechanics of the scheme, each lawyer had to know that Mississippi was not experiencing the worst outbreak of silicosis in recorded history. Each lawyer had to know that he or she was filing at least some claims that falsely alleged silicosis. The fact that some claims are likely legitimate, and the fact that the lawyers could not precisely identify which claims were false, cannot absolve them of responsibility for these mass misdiagnoses which they have dumped into the judicial system.

 *In re Silica Prods. Liab. Litig., 398 F. Supp. 2d 563, 635-36 (S.D. Tex. 2005).*

n180 Id. at 679 (noting that sanctions ordered in that case were "substantially less than the total amount of damages" caused by the specious filings); see also *RAND SILICA REPORT, supra* note 78, at 18 ("In the end, only one of the plaintiffs' firms involved in the silica litigation ended up paying a penalty for their practices during the silica litigation. And the sanction levied against that firm was small."); David J. Kahne, Curbing the Abuser, Not the Abuse: A Call for Greater Professional Accountability and Stricter Ethical Guidelines for Class Action Lawyers, *19 GEO. J. LEGAL ETHICS 741, 741 (2006)* ("However, while Judge Jack's proclamation and the new legislation have sought to eliminate frivolous claims and compensate those truly harmed, nothing has been done to penalize the clearly unethical conduct prevalent amongst lawyers in mass tort adjudication.").

n181 See NAGAREDA, supra note 6, at 145.

n182 See, e.g., Tai Indictment, supra note 116 (criminal action against doctor involve in fen-phen specious claim diagnoses); Crouse Complaint, supra note 116 (RICO action against doctor filed by fen-phen settlement trust); see also Mark A. Behrens & Cary Silverman, Now Open for Business: The Transformation of Mississippi's Legal Climate, *24 MISS. C. L. REV. 393, 400-01 (2005)* (discussing prosecution of those involved in fabricating evidence submitted to separate fen-phen settlement plans).

n183 See, e.g., Brickman, Litigation Screenings, supra note 46, at 1291 (discussing Mississippi's approach); Victor E. Schwartz et al., West Virginia as a Judicial Hellhole: Why Businesses Fear Litigating in State Courts, *111 W. VA. L. REV. 757, 768 (2009)* (comparing Mississippi's reforms to those of West Virginia).

n184 See, e.g., Maron & Jones, supra note 47, at 280-81; Basenberg & Bankester, supra note 15, at 74 (discussing change to "shotgun-style complaint" practice in Mississippi).

n185 See Mark A. Behrens & Phil Goldberg, The Asbestos Litigation Crisis: The Tide Appears to Be Turning, *12 CONN. INS. L.J. 477, 492 (2006)* (noting that Ohio, Georgia, Texas, Florida, Kansas, and South Carolina have adopted medical criteria laws).

n186 See *id. at 489-91* ("Inactive dockets were first adopted in the late 1980s and early 1990s in jurisdictions that were experiencing large numbers of filings by the unimpaired-Massachusetts (September 1986), Chicago (March 1991), and Baltimore City (December 1992). Since 2002, the list of jurisdictions with inactive asbestos dockets has grown to include Cleveland, Ohio (March 2006); Minnesota (coordinated litigation) (June 2005); St. Clair County, Illinois (February 2005); Portsmouth, Virginia (August 2004); Madison County, Illinois (January 2004); Syracuse, New York (January 2003); New York City (December 2002); and Seattle, Washington (December 2002)." (footnote omitted)).

n187 For example, Texas embraced a more restrictive exposure standard for asbestos personal injury suits in 2007. See *Borg-Warner Corp. v. Flores, 232 S.W.3d 765, 773 (Tex. 2007).*

n188 See, e.g., Bates & Mullin, supra note 76, at 40-42 (discussing Mississippi and Texas and concluding that "less than 10 percent, and more likely less than five percent of the historical non-malignant claims would have been filed if the current tort environment had prevailed over the last two decades").

n189 Class Action Fairness Act of 2005, Pub. L. No. 109-2, *119 Stat. 4* (codified at *28 U.S.C.  § § 1453,* 1711-15 (2006 & Supp. IV 2010)).

n190 See, e.g., John C. Coffee, Jr., New World of Class Actions: CAFA, Exxon, and Open Issues, N.Y. L.J., July 21, 2005, at 25.

n191 *550 U.S. 544 (2007).*

n192 *556 U.S. 662 (2009).*

n193 Recent Supreme Court opinions have been interpreted to require far more than the boilerplate

allegations that dominated mass tort pleadings previously. See, e.g., *Limestone Dev. Corp. v. Vill. of Lemont, Illinois, 520 F.3d 797, 802-03 (7th Cir. 2008)* ("Twombly teaches that a defendant should not be forced to undergo costly discovery unless the complaint contains enough detail, factual or argumentative, to indicate that the plaintiff has a substantial case."); David Marcus, The Past, Present, and Future of Trans-Substantivity in Federal Civil Procedure, *59 DEPAUL L. REV. 371, 415-26 (2010).*

n194 A typical PFS process was outlined by the Ninth Circuit:

CMO 19 ordered plaintiffs to complete a Plaintiff's Fact Sheet in all respects and serve it within 45 days after transmission of the blank PFS. For cases where no PFS was returned, Defendants' Liaison Counsel were to send a letter warning that the case was subject to dismissal, after which the plaintiff would have an additional 15 days to comply. If a PFS were received on time but was not completed in all respects, a deficiency letter was to be sent allowing an additional 15 days to serve a completed PFS and warning that the case was subject to dismissal if one were not received.

*In re Phenylpropanolamine (PPA) Prods. Liab. Litig., 460 F.3d 1217, 1225 (9th Cir. 2006).*

n195 For example, Administrative Order No. 12 in the Asbestos MDL requires "a report identifying each plaintiff by full name, date of birth, last four digits of plaintiffs sic SSN, and a statement indicating the status of the plaintiff in the case before the Court." Amended Administrative Order No. 12A at 1, In re Asbestos Prods. Liab. Litig. (No. VI), No. MDL 875 (E.D. Pa. Aug. 27, 2009), http://www.paed.uscourts.gov/documents/MDL/MDL875/adord12.pdf. It also requires the identification of "each and every prior or pending court or administrative action" brought on account of the alleged injuries. Id. In addition, plaintiffs must "submit to the court a copy of the medical diagnosing report or opinion upon which the plaintiff now relies for prosecution of the claims as if to withstand a dispositive motion," and the objective and subjective data that support them "shall be identified and descriptively set out within the report or opinion." Id. at 2.

n196 See, e.g., *In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig., 496 F.3d 863, 867 (8th Cir. 2007)* (upholding dismissal based on failure to submit compliant PFS by the deadline); *In re Phenylpropanolamine, 460 F.3d at 1234, 1237-38, 1240* (same); Bacher v. Actavis Totowa, LLC, No. 2:09-CV-00665, *2009 U.S. Dist. LEXIS 119305* (S.D. W. Va. Dec. 18, 2009) (sanctioning counsel for failing to comply with PFS order); Case Management Order No. 1, In re Oral Sodium Phosphate Solution-Based Prods. Liab. Litig., No. 1:09-SP-80000 (N.D. Ohio Nov. 24, 2009), http://www.ohnd.uscourts.gov/assets/Clerks OfficeandCourtRecords/MDL/2066/CMO1.pdf (establishing procedures for compliance with PFS requirement, including provision for dismissing claims for noncompliance); In re Prempro Prods. Liab. Litig., No. 4:03-CV-1507-WRW, *2009 U.S. Dist. LEXIS 18773* (E.D. Ark. Feb. 27, 2009) (order noting potential sanctions, including attorneys fees, and dismissal of cases with prejudice if PFS deadline was not met); In re Fosamax Prods. Liab. Litig., MDL No. 1789, No. 1:08- *CV-04901, 2009 U.S. Dist. LEXIS 59690* (S.D.N.Y. Jan. 12, 2009) (dismissing claim with prejudice for failing to submit PFS by deadline); In re Bextra & Celebrex Mktg., Sales Practices & Prods. Liab. Litig., MDL No. 1699, No. 05- *CV-01699 CRB, 2007 U.S. Dist. LEXIS 7807* (N.D. Cal. Jan. 12, 2007) (same); In re Rezulin Prods. Liab. Litig., 223 F.R.D.109, 118 (S.D.N.Y. 2004) (same), vacated in part *MDL No. 1348, No. 03 Civ. 1756, 2004 WL 1700618* (S.D.N.Y. Jul. 27, 2004).

n197 See BEISNER & MILLER, supra note 18, at 17 ("Fact sheets help provide an early, bird's eye view of the nature of the litigation, but they do not provide all of the information necessary to evaluate the merits of plaintiffs' claims. Some claimants provide false or incomplete answers, reasoning that among thousands of pending cases, their answers will never be scrutinized. Other claimants may simply decline to devote the time

and effort needed to completely answer the questions.").

n198 So-called "Lone Pine Orders" take their name from a case management order entered in a New Jersey state court order that required submission of basic information about individual claims. *Lore v. Lone Pine Corp., No. L-33606-85, 1986 WL 637507* (N.J. Super. Ct. Law Div. Nov. 18, 1986).

n199 See James P. Muehlberger & Boyd S. Hoekel, An Overview of Lone Pine Orders in Toxic Tort Litigation, *71 DEF. COUNS. J. 366, 370-73 (2004)* (identifying and discussing use of Lone Pine orders in different state and federal courts). Courts may also adopt comparable orders requiring expedited discovery from defendants. See, e.g., *Abbatiello v. Monsanto Co., 569 F. Supp. 2d 351, 354 (S.D.N.Y. 2008)* (discussing the application of Lone Pine orders).

n200 See generally Muehlberger & Hoekel, supra note 199, at 366-67.

n201 See *In re Vioxx Prods. Liab. Litig., 388 Fed. App'x. 391, 397-98 (5th Cir. 2010)* (finding trial judge did not abuse discretion by dismissing claims that did not satisfy medical report requirement in pre-trial order); *Acuna v. Brown & Root Inc., 200 F.3d 335, 340 (5th Cir. 2000)* (affirming dismissal of claims). But see *McManaway v. KBR, Inc., 265 F.R.D. 384, 388-89 (S.D. Ind. 2009)* (approving Lone Pine order without procedure for automatic dismissal but noting potential defense cost assessments to plaintiffs if claims were subsequently dismissed on summary judgment). Courts have been willing to extend time frames where justified, but these extensions are increasingly limited and are frequently referenced in support of orders dismissing non-compliant claims with prejudice.

n202 See *In re Digitek Prod. Liab. Litig., 264 F.R.D. 249, 258-59 (S.D. W. Va. 2010)* (rejecting request for Lone Pine order due to relatively early stage in the case and the "number of measures" adopted to advance the litigation previously); *In re Vioxx Prods. Liab. Litig., 557 F. Supp. 2d 741, 744 (E.D. La. 2008)* ("In crafting a Lone Pine order, a court should strive to strike a balance between efficiency and equity. Lone Pine orders may not be appropriate in every case and, even when appropriate, they may not be suitable at every stage of the litigation. For example, in the present case, a Lone Pine order may not have been appropriate at an earlier stage before any discovery had taken place since little was known about the structure, nature and effect of Vioxx by anyone other than perhaps the manufacturer of the drug."); *Morgan v. Ford Motor Co., No. 06-1080 (JAP), 2007 U.S. Dist. LEXIS 36515*, at *42-43 (D.N.J. May 17, 2007) (rejecting motion for Lone Pine style order that "would require over 700 Plaintiffs to produce affidavits from qualified environmental experts and licensed physicians, while Defendants were required to produce no discovery" and requiring plaintiffs to "submit a Rule 26(a)(1) simple statement including the 'nature and extent of injuries suffered,' their treating physicians, and medical authorizations").

n203 See Pretrial Orders Nos. 29, 30, and 31, In re Bextra and Celebrex Mktg. Sales Practices and Prod. Liab. Litig., MDL. No. 1699, No. M:05-cv-01699 (N.D. Cal. 2008). For a similar approach, see Pretrial Order No. 121, In re Avandia Mktg., Sales Practices and Prods. Liab. Litig., No. 2007- *MD-1871, 2010 WL 4720335* (E.D. Pa. Nov. 15, 2010).

n204 See Weitz & Luxenberg Memorandum, supra note 149, at 7.

n205 See, e.g., Robert H. Mnookin, Negotiation, Settlement and the Contingent Fee, *47 DEPAUL L. REV.*

*363, 365 (1998)* ("Concerns about reputation operate to constrain opportunism, at least somewhat.").

n206 See, e.g., Brian L. Connelly, et al., Signaling Theory: A Review and Assessment, 37 J. MGMT. 39, 41-45 (2011) (discussing signaling theory and its various applications).

n207 For example, in the four years during which the World Trade Center litigation was pending, fewer than sixty of the roughly nine thousand claims had been investigated through the adversary process to a significant degree, and the first public signs of potentially specious claim filings in that case came from an independent Associated Press investigation into a limited subset of claims. See David B. Caruso, Credibility in Question for Some 9/11 Health Damage Suits, BOSTON.COM (Feb. 8, 2010), http://articles.boston.com/2010-02-08/news/293264301ground-zero-workers-trials. A comprehensive settlement was reached shortly after this report and before the planned bellwether trials were to begin. See Mireya Navarro, Deal Is Reached on Health Costs of 9/11 Workers, N.Y. TIMES, Mar. 12, 2010, at A1 ("The first 12 cases were scheduled to come to trial on May 16 in Manhattan, and those trials will now not take place.").

n208 See supra Part II.C.1.

n209 See, e.g., DIXON & MCGOVERN, supra note 135, at 25-26.

n210 See Alexandra D. Lahav, Rough Justice, (Sept. 23, 2010) (unpublished manuscript), available at http://papers.ssrn.com/sol3/papers.cfm?abstractid?=1562677.

n211 See supra Part II.C.

n212 Trust advisory committees play a significant role in setting policy and overseeing the operation of asbestos bankruptcy trusts. See RAND 2010 REPORT, supra note 64, at xvi ("Trustees are required to obtain the consent of the trust advisory committee (TAC) (representing current claimants) and the future claimants' representative (FCR) (representing future claimants) before major actions by the trust can be taken (such as revising trust distribution procedures, or TDPs)."). As one prominent attorney recently noted, "The selection of the trustees and members of the trust advisory committees (TACs) that oversee the operation of the trusts is heavily influenced, if not controlled outright, by counsel for the asbestos claimants." See Shelley et al., supra note 41, at 261. Not surprisingly, lawyers from these same firms dominate trust advisory committee positions, particularly at the largest trusts. See RAND 2010 REPORT, supra note 64, at 14 & App. B.

n213 At least twenty-one trusts (AC&S, Armstrong, ASARCO, AWI, Babcock & Wilcox, Burns and Roe, C.E. Thurston & Sons, Combustion Engineering, DII, Federal-Mogul, G-I Holdings, H.K. Porter, J.T Thorpe, Kaiser Aluminum, Leslie Controls, Owens-Corning, Plibricio, Porter-Hayden, Shook and Fletcher, THAN, USG, and Western Asbestos), which include the largest trusts established since 2000, require consent from the trust advisory committee. For example, section 5.8 of the USG Trust Distribution Procedures provides, in relevant part, "The PI Trust, with the consent of the TAC and the Futures Representative, may develop methods for auditing the reliability of medical evidence." QUIGLEY CO. INC., UNITED STATES GYPSUM: ASBESTOS PERSONAL INJURY TRUST DISTRIBUTION PROCEDURES 42, http://www.quigleyreorg.com/ch11pdfs/1451-1500/1488Exa.pdf. At least eight others (A-Best, A&I, API, ARTRA, Keene, Manville, Raytech, and UNR) authorize, but do not require, claim audits.

42 U. Mem. L. Rev. 559, *628

n214 Under stratified sampling, claims are broken into discrete strata, within which claims are subjected to random audits.

n215 See *Brown, supra* note 40, at 921 (discussing identifiable common filing practices across cases among repeat players).

n216 *FED. R. CIV. P. 23(e)(2).*

n217 *11 U.S.C. § 524*(g)(2)(B)(ii)(V) (2006).

n218 *Brown, supra* note 40, at 190.