# Exhibit 15

# An Analysis of Mass Torts for Judges

## Francis E. McGovern[*]

### I.   Introduction

Mass torts are different from normal torts.  The sheer number of cases—the quantitative difference—inevitably leads to qualitative differences.  The fundamental reasons for this qualitative shift can best be understood by examining the delicate tension among the policies underlying both substantive tort law and civil procedure.

There is a consensus that tort law supports both efficiency and corrective justice policies: compensation, deterrence, punishment, fairness, efficiency.[1]  These policies do not always dictate the same outcome in any given case, and the resulting tension among them creates the source of much of our tort law jurisprudence.  Should we, for example, require the manufacturer of a life-saving drug to warn of the risk of a small number of adverse reactions when the effect of such a warning will be to deter large numbers of people from using the drug and to create a net loss of life?  Efficiency and fairness goals are in conflict in this situation, and the just solution is unclear.

There is also a consensus that our standardized rules of civil procedure are driven by multiple policies: efficiency, fairness, and behavioral concerns.[2]  These policy goals are also not necessarily consistent in providing us with answers.  In the area of discovery, for example, there is a constant tension among efficiency, fairness, and behavioral interests in the use or limitation of interrogatories, depositions, and motions to produce.  The recent debate over Federal Rule of Civil Procedure 26(a)(1)(A) is an apt illustration.[3]

---

    * Francis H. Hare Professor of Torts, The University of Alabama School of Law.  Much appreciation goes to a host of readers from the bar (John Aldock, Fred Baron, Ralph Knowles, Gene Locks, Joe Rice, Steve Snyder), the judiciary (John Aisdorf, Ann Cochran, Sam Pointer), and the academy (Penny Gibson, Wythe Holt, Patty Lovelady Nelson, Susan Randall, Harold See).  Particular thanks go to Bill Christian, who turned a speech into a law review article.

    1. For a discussion of these values in the mass tort context, see David Rosenberg, *The Causal Connection in Mass Exposure Cases: A "Public Law" Vision of the Tort System*, 97 HARV. L. REV. 851, 861-87 (1984).

    2. For a discussion of these values in the mass tort context, see Francis E. McGovern, *Toward a Functional Approach for Managing Complex Litigation*, 53 U. CHI. L. REV. 440 (1986).

    3. *Compare* Gerald G. MacDonald, *Hesiod, Agesilaus and Rule 26: A Proposal for a More Effective Mandatory Initial Disclosure Procedure*, 28 WAKE FOREST L. REV. 819, 836-41 (1993) (argu-

When confronted by mass torts, many judges perceive an alluring commonality among cases that may lead them to make a critical shift in the balance of policies underlying tort law and civil procedure.[4] Faced with seemingly repetitive trials and an unending queue of mass tort plaintiffs, some judges have decided that efficiency concerns call for a more collective rather than individual treatment of claims.[5] More importantly, many of these same judges believe that fairness concerns—making sure that each individual receives some compensation in a reasonable period of time—also lead to a more collective approach.[6] Thus, the balance of policies—between efficiency and corrective justice—shifts in the context of mass torts and leads to more nontraditional aggregative solutions to mass tort issues.

This shift, however, creates a Catch-22 that has not become obvious until recently: The more successful judges become at dealing "fairly and efficiently" with mass torts, the more and larger the mass tort filings become. The creation of devices that speed the resolution of the case in front of the court also encourages more traditionally successful plaintiffs, more traditionally unsuccessful plaintiffs, and more plaintiffs who traditionally did not enter the tort system at all to take advantage of the new techniques. First, if a court creates substantive tort law that is applicable more generically—general causation, general exposure, market share liability, cancerphobia—more plaintiffs will be able to bring suit. Second, if a court develops more collective procedures—consolidations, common issue trials, extrapolation, class actions—more plaintiffs will be able to bring suit.

The purpose of this Paper is to describe these complexities in as nonnormative a manner as possible, not extolling nor condemning mass torts or the procedures used to resolve them, but attempting to explain the dynamics of this new phenomenon.

---

ing that Rule 26(a)(1)(A) undermines the purposes of notice pleading by requiring mandatory disclosure only to facts alleged with particularity in the pleadings) *with* William W Schwarzer, *Slaying the Monsters of Cost and Delay: Would Disclosure Be More Effective Than Discovery?*, 74 JUDICATURE 178, 180-81, 183 (recommending a mandatory disclosure procedure in order to reduce the cost and length of litigation).

4. For an older discussion of this trend, see Francis E. McGovern, *Management of Multiparty Toxic Tort Litigation: Case Law and Trends Affecting Case Management*, 19 FORUM 1, 5-9 (1983).

5. *See* Cimino v. Raymark Indus., Inc., 751 F. Supp. 649 (E.D. Tex. 1990) (justifying the court's asbestos litigation plan to expand the use of formal aggregative procedures in order to ensure court access for all plaintiffs within a reasonable period of time), *appeal filed*, No. 93-4452 (5th Cir. May 3, 1993).

6. *E.g.*, JACK B. WEINSTEIN, INDIVIDUAL JUSTICE IN MASS TORT LITIGATION: THE EFFECT OF CLASS ACTIONS, CONSOLIDATIONS, AND OTHER MULTIPARTY DEVICES 11 (1995) (describing the actions taken in the Agent Orange settlement to assist claimants in obtaining compensation quickly).

## A. From One Perspective, Most Torts Are Mass Torts

From the perspective of tort law's instrumentalist goal to promote compensation, most torts could be categorized as mass torts.[7] For example, medical malpractice can be considered a mass tort because doctors engage in risk-creating activities that injure large numbers of plaintiffs. The same could be said for insurance bad faith claims or automobile accident cases.

Our common use of the term "mass torts," however, is both more inclusive and less inclusive than this instrumentalist compensation view. The common usage of mass torts is more inclusive because a significantly higher percentage of potential plaintiffs involved in a given mass tort actually brings suit or files a claim than in normal torts. In most instances in which tortious activity causes harm, between ten percent and twenty percent of the potential plaintiffs actually file suit.[8] In mass torts, however, an estimated one hundred percent to two hundred percent of the potential plaintiffs seek recovery for their damages.[9] Thus, one

---

7. The multiple, and often conflicting, goals of tort law are discussed in virtually every tort casebook. *See, e.g.,* JAMES A. HENDERSON, JR. & RICHARD N. PEARSON, THE TORTS PROCESS 38-42, 327-33 (3d ed. 1988) (discussing the debates concerning the proper goals of tort law and the judiciary's role in achieving these objectives). For the instrumentalist perspective of tort law, see generally GUIDO CALABRESI, THE COSTS OF ACCIDENTS: A LEGAL AND ECONOMIC ANALYSIS 24-33 (1970); RICHARD A. POSNER, ECONOMIC ANALYSIS OF LAW 206-11 (4th ed. 1992); and Symposium, *Efficiency as a Legal Concern,* 8 HOFSTRA L. REV. 485 (1980). For the corrective justice perspective of tort law, see 2 ARISTOTLE, *Nichomachean Ethics, in* THE COMPLETE WORKS OF ARISTOTLE V.4.1131b25-.5.1134a13, at 1729, 1786-89 (Bollinger Series No. 71, Jonathan Barnes ed., 1984) (Revised Oxford Translation); Jules Coleman, *Corrective Justice and Wrongful Gain,* 11 J. LEGAL STUD. 421, 422-24 (1982); George P. Fletcher, *Fairness and Utility in Tort Theory,* 85 HARV. L. REV. 537, 537-39 (1972); and Symposium, *Corrective Justice and Formalism: The Care One Owes One's Neighbors,* 77 IOWA L. REV. 403 (1992).

8. DEBORAH HENSLER ET AL., COMPENSATION FOR ACCIDENTAL INJURIES IN THE UNITED STATES 110 (1991). For the other most frequently cited studies of claiming rates, see ALFRED F. CONARD ET AL., AUTOMOBILE ACCIDENT COSTS AND PAYMENTS: STUDIES IN THE ECONOMICS OF INJURY REPARA-TION 262-96 (1964) (outlining attitudes and opinions of plaintiffs and potential plaintiffs toward filing lawsuits); PATRICIA M. DANZON, MEDICAL MALPRACTICE: THEORY, EVIDENCE, AND PUBLIC POLICY 60 (1985) (noting that medical malpractice claims peaked in 1975 at one claim for every eight physicians); HARVARD MEDICAL PRACTICE STUDY, PATIENTS, DOCTORS AND LAWYERS: MEDICAL INJURY, MALPRACTICE LITIGATION AND PATIENT COMPENSATION IN NEW YORK, 7-1 to 7-35 (1990) (analyzing the potential plaintiffs that filed medical malpractice claims); ROGER B. HUNTING & GLORIA S. NEUWIRTH, WHO SUES IN NEW YORK CITY? A STUDY OF AUTOMOBILE ACCIDENT CLAIMS 5-8 (1962) (finding that 87% of individuals involved in automobile accidents attempted to recover damages); Hazel Glenn, *Who Claims Compensation: Factors Associated with Claiming and Obtaining Damages, in* COMPENSATION AND SUPPORT FOR ILLNESS AND INJURY 45-65 (Donald Harris et al. eds., 1984) (reporting the results of a study that showed only 12% of injured individuals obtained compensation through the legal system); Richard E. Miller & Austin Sarat, *Grievances, Claims and Disputes: Assessing the Adversary Culture,* 15 LAW & SOC. REV. 525, 544-45 (1980-81) (reporting the results of an empirical study that showed that only 3.8% of people with tort grievances actually filed suit).

9. Francis E. McGovern, *Looking to the Future of Mass Torts: A Comment on Siliciano and Schuck,* 80 CORNELL L. REV. (forthcoming 1995) (manuscript at 2-3, on file with the *Texas Law Review*).

fundamental difference between ordinary torts and mass torts is the percentage of potential claims that are filed, typically over a short period of time in a limited number of locales,[10] thereby creating obvious externalities for the judicial system.

On the other hand, the common usage of mass torts is also less inclusive than the instrumentalist compensation view of tort law because this usage of mass torts envisions a high level of commonality among similarly situated torts—the number of claims may be great, but the variation among those claims and the number of parties involved are not.[11] Thus, medical malpractice claims come in all shapes and varieties, but Dalkon Shield cases look alluringly similar. It is, indeed, this allure of commonality that generates perceived opportunities, and their concomitant pitfalls, for the judicial system.

## B.  *From Other Perspectives, No Torts Are Mass Torts*

If tort law functions to further the instrumentalist goal of specific deterrence and to achieve various forms of corrective justice, no torts are mass torts. Under this perspective, the concept of mass torts is either irrelevant or unhelpful. The instrumentalist goal of tort law is to deter specific defendants from engaging in unacceptably risky activity and to remedy their wrongs by providing an individualized treatment for each plaintiff, thereby ensuring that the case resolution process provides dignity, autonomy, and empowerment. It is necessary, therefore, to identify and prove for each plaintiff and each defendant the precise tort that was committed and the precise remedy that is appropriate. To consolidate multiple defendants with variable culpability into the same case is just as counter-productive as joining multiple plaintiffs with different injuries. Instrumentalism rejects aggregative litigation; to consolidate cases for common treatment is to ignore tort law's fundamental tenet that defendants

---

10. *See* Deborah R. Hensler & Mark A. Peterson, *Understanding Mass Personal Injury Litigation: A Socio-Legal Analysis*, 59 BROOK. L. REV. 961, 965-66 (1993) (noting that mass torts involve a large number of plaintiffs represented by a small number of law firms with litigation concentrated in a few jurisdictions).

11. In this regard, note the Judicial Panel on Multidistrict Litigation's evolved analysis of the commonality requirement in asbestos litigation. *Compare In re* Asbestos & Asbestos Insulation Material Prods. Liab. Litig., 431 F. Supp. 906, 910 (J.P.M.L. 1977) (holding that the only common questions of fact in these cases related to the scientific and medical knowledge of the risk of exposure to asbestos) *with In re* Asbestos Prods. Liab. Litig. (No. VI), 771 F. Supp. 415, 419 (J.P.M.L. 1991) ("The heyday of individual adjudication of asbestos mass tort lawsuits has long passed."). Further, see Jenkins v. Raymark Indus., Inc., 109 F.R.D. 269, 271-72 (E.D. Tex. 1985) (remarking, upon certifying a class of asbestos plaintiffs, that commonality depends on whether a more economical outcome will result), *aff'd*, 782 F.2d 468, 472 (5th Cir. 1986) (affirming the district court's certification by holding that commonality requires only that common questions affect a substantial number of class members).

are responsible only when a specific plaintiff proves, after full due process of law, that a specific defendant is liable for specific damages.[12]  It is this inherent and long-standing conflict among tort rationales—compensation versus deterrence and efficiency versus fairness—that generates much of the ideological heat currently consuming mass tort discourse.

## C.  Reality: The Existence of Varied Mass Torts

One of the dangers in mass tort analysis is to treat all mass torts as fungible.   In reality, although basically one model of procedural rules applies to all torts, there are numerous models of acceptable procedures for mass torts.[13]  A number of taxonomies have been proposed to identify the characteristics driving the variation in mass torts.[14]   These taxonomies focus on whether: (1) the plaintiffs are known or unknown, and there is a large or small number of them;[15] (2) the defendants are known or unknown, and there is a large or small number of them;[16] (3) the event

---

12.  For a discussion of the concepts of "specific" and "general" deterrence, see CALABRESI, *supra* note 7, at 26-31.  For a discussion of individual deterrence in the context of mass torts, see the various cases on the issue of the consolidation of multiple tort cases into one trial: Malcolm v. National Gypsum Co., 995 F.2d 346, 351-52 (2d Cir. 1993); *In re* Repetitive Stress Injury Litig., 11 F.3d 368, 373 (2d Cir. 1993); and Cain v. Armstrong World Indus., 785 F. Supp. 1448, 1455 (S.D. Ala. 1992).  *See also* Sheila L. Birnbaum & Gary E. Crawford, *Consolidated Cases Raise Fairness Issues*, NAT'L L.J., July 12, 1993, at 18 (claiming that the consolidation of mass torts is problematic because the parties are treated categorically rather than individually).

13.  Probably the best example of procedural tailoring in this context is found in the MANUAL FOR COMPLEX LITIGATION (SECOND) § 10 (1985), and its successor, the MANUAL FOR COMPLEX LITIGATION (THIRD) (Tentative Draft No. 2, 1994).  *See* McGovern, *supra* note 2, at 448 (describing the different procedural approaches of the first and second editions of the *Manual for Complex Litigation*).

14.  *See* Commission on Mass Torts, Am. Bar Ass'n, *Revised Final Report and Recommendations of the Commission on Mass Torts*, *in* REPORT TO THE HOUSE OF DELEGATES 5-6 (1989) [hereinafter *Revised Final Report*] (proposing the classification of mass torts based on the nature of the tort: single event catastrophes, traditional products liability cases, and toxic tort cases); Hensler & Peterson, *supra* note 10, at 1031-50 (asserting that the variation in mass torts is due to factual and legal issues, special risk profiles, risk of future injury, and conflicting interests); Francis E. McGovern, *Models for Managing Mass Tort and Insurance Coverage Litigation, Introduction* to MANAGING COMPLEX LITIGATION 1, 5 (ABA Tort & Ins. Practice Section 1992) (suggesting that mass torts be classified on the basis of liability, specific causation, value, and funding); McGovern, *supra* note 4, at 3-4 (identifying the nature of the following factors as particularly influential in the case management of a mass tort: the plaintiffs, the defendants, the toxic substance involved, the environment, the damage, the location, and the law).

15.  Are the plaintiffs readily identified and relatively small in number, as in an aircraft crash, or are they diffuse and large in number, such as in exposure to asbestos; are they present claimants, claimants with long injury-latency periods, or future claimants; are they in between these extremes?  *See* WEINSTEIN, *supra* note 6, at 16 (recognizing that small- and medium-scale disasters with readily identifiable plaintiffs must be handled differently than massive disasters with long latency periods).

16.  Are the defendants readily identified and limited in number, such as the manufacturer of the Bork-Shiley heart valve, *see id.* at 88 (noting that there are few putative defendants in heart valve cases), or are they difficult to determine and large in number, as in DES?  *See, e.g.*, Sindell v. Abbott Labs., 607 P.2d 924, 925 (Cal.), *cert. denied*, 449 U.S. 912 (1980).  Are they a combination?

resulting in harm is single or multiple;[17] (4) the liability is known or unknown;[18] (5) the specific causation is known or unknown;[19] (6) the value of the case is known or unknown;[20] and (7) the funding for liability is known or unknown.[21]   Interspersed among all of these factors are the litigation strategies used by plaintiffs' lawyers, defendants, insurance carriers, and courts.

## II.   The Consensus Case Management Approach for Certain Mass Torts

The judicial system has handled, without major difficulty, mass torts involving discrete disasters, such as aircraft crashes, building collapses, and train wrecks.[22]   The process generally has involved consolidation for pretrial purposes, coordination of federal and state cases, the use of alternative dispute resolution (ADR) procedures for an individual or a global settlement, and if necessary, the trial of test cases.[23]

Mass torts involving traditional products liability scenarios—carburetor design defects, automobile tire defects, four-wheeler rollovers—have likewise presented few problems in resolution.[24]   Courts typically have used either the model described above for discrete disasters or have treated large numbers of traditional products liability cases like other torts, perhaps

---

17.   Was the event discrete in time and place, as in the Hyatt Skywalk case, *In re* Fed. Skywalk Case, 680 F.2d 1175 (8th Cir.), *cert. denied*, 459 U.S. 988 (1982), or were there many events at different times and places, such as the tobacco cases?   Was there a combination of the above?

18.   To what extent is liability clear, as in an aircraft crash, or hotly contested, as in the breast implant litigation?   *See* Shari Roan, *Women Caught in Middle of Breast Implant Debate*, L.A. TIMES, Mar. 8, 1994, at 1 (discussing the debate over liability in the breast implant cases).

19.   *See* WEINSTEIN, *supra* note 6, at 16-19 (grouping types of injuries on the basis of many criteria including whether causation is clear or unclear).   Is the actual cause of an individual plaintiff's harm known, as in a building-fire case, or contested, as in many Bendectin cases?   *See, e.g.*, Turpin v. Merrell Dow Pharmaceuticals, 959 F.2d 1349 (6th Cir. 1992) (addressing issues of causation in a Bendectin case).

20.   Are the value of cases generally established, as in already litigated cases such as the asbestos litigation, or disputed, as in relatively new cases such as the silicone gel breast implant cases?

21.   Is there sufficient money to pay all claims, as in the Swine Flu Vaccine case, *see* Malcolm Gladwell, *AIDS Vaccine Dilemma: Who Pays If There Are Lawsuits*, WASH. POST, Nov. 25, 1988, at C10 (noting that the federal government agreed to pay damages in all swine flu cases), or is there doubt as to the solvency of one or more defendants, as in the asbestos litigation?   *See Judge Clears Way for Suits Against Asbestos Companies*, MIAMI HERALD, Jan. 6, 1983, at 17A (reporting that Johns-Manville filed for protection from creditors under the Bankruptcy Code).   Is insurance coverage immediately available or is insurance coverage in dispute in parallel litigation of long duration?

22.   *See Revised Final Report*, *supra* note 14, at 7 (noting that these mass torts have posed few problems for the judicial system).

23.   *See* William W Schwarzer et al., *Judicial Federalism in Action: Coordination of Litigation in State and Federal Courts*, 78 VA. L. REV. 1689, 1690-1704 (1992) (examining specific instances in which these techniques have been used).

24.   *See Revised Final Report*, *supra* note 14, at 7-9 (noting that traditional products liability litigation rarely raises difficult causation issues).

streamlining the pretrial process by using discovery from other cases or consolidating small numbers of cases for trial.[25]

## III. Mass Torts That Are Not Suitable for the Consensus Case Management Approach

To comprehend why some mass torts present substantial case management difficulties for the litigation system, it is necessary to refine our appreciation of mass torts beyond a mere taxonomy. What makes a tort evolve into a mass tort? Once it does, is there a distinction among mass torts that assists us in making appropriate case management decisions? Answers to these inquiries lie in two concepts: elasticity and maturity. Torts that are elastic[26] have the potential to become mass torts. Whether they will depends not only on their facts and social and legal environment, but also, in large part, on the strategies of plaintiffs' counsel, defendants, and judges. Once a mass tort emerges, it may reach a level of maturity—when the outcomes of cases are generally predictable—that warrants different judicial management.[27]

### A. Elasticity: The Emergence of Problematic Mass Torts

There has been limited discussion in the legal literature about what makes some torts emerge into mass torts. At a basic level, there are at least four phases to a potential plaintiff's transformation into a full-fledged tort plaintiff: (1) the perception of a harm, (2) the perceived knowledge of compensability for that harm, (3) a desire to participate in the tort system, and (4) access or an opportunity to participate in the tort system without major impediments.

Roughly ten to twenty percent of the persons who suffer actionable harms actually enter the tort litigation process.[28] Reasons for this low

---

25. *See* Richard A. Chesley & Kathleen W. Koldgy, Note, *Mass Exposure Torts: An Efficient Solution to a Complex Problem*, 54 U. CIN. L. REV. 467, 530-31 (1985) (discussing consolidated pretrial proceedings in products liability cases).

26. The term "elastic" is used both in its common usage and economic senses. A tort is elastic if it can be expanded to include more plaintiffs and more damages. Market share liability and damages for medical monitoring are examples of the expansion of a tort to include more plaintiffs and more damages. At the same time, a tort is elastic to the extent that the number of cases that are filed (demand) rises as the transaction costs associated with each case (price) are reduced and the number of judicial case resolutions increases (supply). An example of an inelastic mass tort includes an aircraft crash case, in which the number of plaintiffs is limited regardless of how rapidly or inexpensively cases are resolved. The asbestos litigation illustrates an elastic mass tort in which there appears to be larger numbers of filings when the velocity of case resolution is rapid and the transaction costs are low.

27. A mass tort reaches maturity when "there has been full and complete discovery, multiple jury verdicts, and a persistent vitality in the plaintiffs' intentions." Francis E. McGovern, *Resolving Mature Mass Tort Litigation*, 69 B.U. L. REV. 659, 659 (1989). For a discussion of maturity, see *infra* Part V. *See generally* McGovern, *supra*.

28. HENSLER ET AL., *supra* note 8, at 110.

percentage include the lack or cost of information, a risk aversion to engaging in litigation, the valuation of privacy more than remuneration, a lack of serious harm, the availability of alternative avenues of compensation, and other idiosyncratic and systematic reasons.[29]

Commentators have focused on the roles of the mass media, social networks, physician contacts, and plaintiff-oriented law firms in overcoming these inhibitions to entering the tort system.[30] The more opportunities someone has to learn about a tort, the greater the chances are that the person will sue, particularly when the information comes from an authoritative source such as the government, medical community, or trusted personal associations.[31] There is no doubt that advertising by plaintiffs' counsel also has had a major impact in informing potential plaintiffs of their opportunities for compensation.[32]

At the same time, the publicity and volume of claims can overcome individual inhibitions related to privacy and risk aversion. If it appears that a large number of similarly situated individuals are making claims, wronged parties may see no downside, and perhaps may see an obligation, to pursue a malefactor in court.[33]

Finally, there is the issue of access to the tort system. Before compensation is possible, a lawyer must accept the representation, and a legal forum must resolve the case. The strategic aspects of the concept of elasticity become critical in this regard, and the type of lawyer handling a case can often influence the resolution of the case. Plaintiffs' lawyers can be divided into four general categories: (1) boutique, (2) wholesale, (3) class action, and (4) new breed. Boutique lawyers generally follow the traditional paradigm for plaintiffs' lawyers. They select one case at a time, usually by referral from other lawyers; pursue only those cases that, through the potential for damages, can justify the expenditure of large transaction costs associated with individual discovery, trial, and appeal; and then move on to the next case. Under this model, a lawyer commonly takes only cases that have a potential value of over several hundred

---

29. *See* Glenn, *supra* note 8, at 70-76 (discussing the reasons that the injured fail to claim damages).

30. *See* HENSLER ET AL., *supra* note 8, at 164-72 (noting that in a study of people seeking damages, 70% claimed that the idea to seek compensation came from sources such as union leaders, employers, friends, relatives, neighbors, and other groups); Glenn, *supra* note 8, at 65-77 (finding societal forces such as family, physicians, and other groups to be a key factor in encouraging the initiation of a tort claim).

31. Glenn, *supra* note 8, at 67.

32. *See, e.g., In re* Application for the Discipline of Robert John Appert & Gerald Gordon Pyle, 315 N.W.2d 204, 206 (Minn. 1981) (discussing the distribution by 2 attorneys of 200 to 500 advertisement brochures resulting in at least 75 new Dalkon Shield cases for the attorneys).

33. *Cf.* Jack B. Weinstein, *Ethical Dilemmas in Mass Tort Litigation*, 88 NW. U. L. REV. 469, 547-49 (1994) (cautioning that a trial judge must carefully weigh the consequences of releasing information on mass torts to the public).

thousand dollars.[34]  Trial lawyers who are successful in achieving high awards for their clients generally find that both their inventory of cases and the rate of case resolution by settlement will increase in direct relation to their reputation.  The reaction of most boutique plaintiffs' lawyers to their success has not been to increase their case load, but rather to remain the same size by using more stringent case-selection criteria.[35]  Historically, plaintiffs' firms have not grown to accommodate an increased volume and flow of cases.

Wholesale plaintiffs' lawyers deal in volume litigation.  If larger numbers of similar cases can be found, then economies of scale will allow a lawyer to justify handling a larger inventory of cases.  Due to the high risk of no recovery at the beginning stages of any mass tort case, and the high chances of success needed to justify the investment to support a large volume of cases, these lawyers tend to be free riders on the boutique lawyers' development of litigation.[36]  Nevertheless, their fee arrangements with clients are typically identical to those of the boutique lawyers. Wholesalers vary substantially: Some are pioneers in advancing the litigation by extensive discovery and trial, whereas others are free riders.[37]  Generally, the free-riding wholesalers are willing to resolve their cases by settlement and at a substantially reduced value compared to those wholesalers who are able to succeed at trial.

The class action category of plaintiffs' lawyers finds it origins in securities litigation.[38]  Class action lawyers typically have few individual clients, but attempt to preempt all unrepresented plaintiffs by having a

---

34.  The overhead and incremental transaction costs for most plaintiffs' law firms that handle complex products liability cases are sufficiently high for low value cases to be uneconomical.

35.  *See* John C. Coffee, Jr., *Understanding the Plaintiff's Attorney: The Implications of Economic Theory for Private Enforcement of Law Through Class and Derivative Actions*, 86 COLUM. L. REV. 669, 706-12 (1986) (speculating on the factors that might contribute to the absence of large plaintiffs' firms).

36.  *See* John C. Coffee, Jr.,  *The Regulation of Entrepreneurial Litigation: Balancing Fairness and Efficiency in the Large Class Action*, 54 U. CHI. L. REV. 877, 911 (1987) (suggesting that it may be very profitable for an attorney to become a free rider on the plaintiff team's work in a class action).

37.  An examination of the trial and settlement histories of various law firms in the Dalkon Shield and asbestos litigation illustrates this point.  *See generally* PAUL BRODEUR, OUTRAGEOUS MISCONDUCT (1985); MORTON MINTZ, AT ANY COST: CORPORATE GREED, WOMEN, AND THE DALKON SHIELD (1985); RICHARD B. SOBOL, BENDING THE LAW: THE STORY OF THE DALKON SHIELD BANKRUPTCY (1991).  Prior to filing for bankruptcy in August of 1985, A.H. Robins tried approximately 50 cases and settled approximately 10,000.  McGovern, *supra* note 27, at 675-76.  The bulk of the plaintiffs' firms that settled over 100 cases tried none.  Prior to filing bankruptcy in 1982, Johns-Manville tried approximately 100 cases and settled approximately 3400 cases.  BRODEUR, *supra*, at 4.  Again, many firms that wholesaled cases engaged in no trials.  On the other hand, a review of the trial and settlement data from both mass torts reveals that only a relatively small number of plaintiffs' firms that settled volumes of cases also engaged in trials.

38.  The overlap in strategy and personalities is quite remarkable.  In my experience as special master in the silicone gel breast implant litigation, I have noticed that roughly half of the counsel on the plaintiffs' steering committee have a history of litigating securities cases.

1830              **Texas Law Review**              [Vol. 73:1821

court certify a class action and appoint the lawyers to a leadership role.[39] Once a class is certified, many of these class action lawyers actively pursue discovery and prepare for trial, but the goal of most class action lawyers is to settle the case.[40]  The tremendous investments of time and money by class action lawyers generally require a consortium to fund the litigation.[41] If plaintiffs' counsel can obtain class action certification and thereby increase the amount in dispute, the defendant will be sufficiently averse to threats to its balance sheet and stock price that it will favor settlement.  At the same time, plaintiffs' counsel often seek an alliance with a judge by agreeing to resolve the entire litigation if the judge will pressure the defendants to provide the desired funding.  Class action lawyers are then compensated out of a settlement fund based on a court-determined formula.[42]  The major downside to the class action strategy is that if the case does not settle, lawyers without clients may receive little compensation.

In the last several years, a new breed of plaintiffs' firms has developed.  Unlike the boutique or wholesale categories, this category of plaintiffs' lawyers is more *prêt-à-porter*—"ready to wear"—to use the clothing industry analogy.  Generally, these firms followed the traditional paradigm until they confronted a mass tort.  Rather than becoming more restrictive in case selection, however, these firms decided to accommodate their larger numbers of clients by expanding their size, particularly paralegal personnel.  In addition to focusing on the values of individual cases, they concentrate on the flow rate of their cases, keeping the velocity of case resolution commensurate with their case intake.  Some of these firms have even expanded nationally, using referrals and branch offices to enhance their ability to maintain and process extremely large numbers of cases.  Their strategic model is eclectic.  They will try individual cases to maximize value, recognizing the impact of one successful trial on their

---

39. *See* Alison Frankel, *Et tu, Stan?*, AM. LAW., Jan.-Feb. 1994, at 68, 69 (recounting the myth among some mass torts lawyers about one class action attorney who "forces his way into cases in which other lawyers have been toiling for years, then manages to get himself appointed to a leadership position").

40. The prime example of a tried class action is the Bendectin litigation, in which a settlement had been reached by counsel and then reversed on appeal.  The ensuing trial resulted in a defense verdict. *See* Joseph Sanders, *The Bendectin Litigation: A Case Study in the Life Cycle of Mass Torts*, 43 HASTINGS L.J. 301, 362-72 (1992) (examining the procedural history of the Bendectin litigation as an example of how the judiciary rations adjudicatory resources in mass tort actions); David Lauter, *Bendectin Pact Creating Furor*, NAT'L L.J., July 30, 1984, at 1 (detailing the proposed $120 million settlement that attempted to cover both existing federal and state court cases and future claims).

41. *See* Paula B. Wilson, Note, *Attorney Investment in Class Action Litigation: The Agent Orange Example*, 45 CASE W. RES. L. REV. 291, 311-13 (1994) (noting the establishment of a consortium to finance the Agent Orange litigation and the resulting fee agreements).

42. *See* Jonathan R. Macey & Geoffrey P. Miller, *The Plaintiffs' Attorney's Role in Class Action and Derivative Litigation: Economic Analysis and Recommendations for Reform*, 58 U. CHI. L. REV. 1, 44-61 (1991) (discussing judicial review of class action settlements and attorney fee requests).

remaining inventory.[43]  They will use consolidations and class actions to increase the flow rate of their cases, and they will take advantage of their success in using all of these techniques to attract new clients and develop new mass tort cases.

This neat, conceptual division of types of plaintiffs' counsel often falls apart in the real world.  In multidistrict litigation (MDL), for example, there may be boutique, wholesale, class action, and new breed lawyers working together to pursue discovery.  The history of infighting among these types of lawyers, however, confirms the usefulness of these distinctions.[44]

New breed plaintiffs' lawyers interested in developing a mass tort case follow a completely different strategy than the boutique lawyers, and in doing so, they implicate the concept of elasticity.  What new breed lawyers care about is not just maximizing the value of each case individually, but maximizing the number of claimants they can aggregate and thereby increasing the total number and value of all of their cases.  They are looking for ways to make the tort more elastic by expanding the bounds of liability, causation, and damages; by simplifying and expediting procedures; and by increasing the number of claimants and thereby increasing the total value of the claims.  Although traditional plaintiffs' counsel also attempt to increase the value of each claim through a similar strategy, they do not focus on the aggregate number of claimants as a vehicle for increasing claim value.

Some aspects of this elasticity strategy are obvious.  First is the plaintiffs' lawyers attempt to expand legally actionable torts.  They try to expand duties by arguing for strict liability in tort,[45] a continuing duty to warn,[46] a duty to warn downstream consumers,[47] a duty as a successor corporation,[48] a duty as a component part manufacturer,[49] a duty as a

---

43. *See* Deborah R. Hensler & Mark A. Peterson, *Understanding Mass Personal Injury Litigation: A Socio-Legal Analysis*, 59 BROOK. L. REV. 961, 1043 (1993) (stating that a firm's portfolio of cases will gain value if the firm's lead cases in an area of law are successful).

44. *See* Alison Frankel, *supra* note 39, at 68 (describing the infighting among members of the plaintiffs' bar over the merits of resolving mass torts with class actions); W. John Moore, *"Master of Disaster" Builds Reputation for Mega-Settling*, LEGAL TIMES, Apr. 1, 1985, at 1, 7 (discussing the criticism by several plaintiffs' attorneys of another plaintiffs' attorney for his case management and settlement policies).

45. *See* Barker v. Lull Eng'g Co., 573 P.2d 443, 443, 457 (Cal. 1978) (imposing strict liability for a tort caused by a faulty high-lift loader).

46. *See* Bottignoli v. Ariens Co., 560 A.2d 1261, 1265 (N.J. Super. Ct. App. Div. 1989) (rejecting plaintiff's argument that a manufacturer had a continuing duty to warn).

47. *See* Sterling Drug, Inc. v. Yarrow, 408 F.2d 978, 992 (8th Cir. 1969) (holding that drug manufacturers have a duty to warn consumers of potential harm).

48. *See* Schumacher v. Richards Shear Co., 451 N.E.2d 195, 200 (N.Y. 1983) (observing that successor corporations may have a continuing duty to warn).

49. *See* Maake v. Ross Operating Valve Co., 717 P.2d 923, 926 (Ariz. Ct. App. 1985) (holding that a component part manufacturer has a duty to warn).

bulk supplier,[50] and an expanded duty as an insurer.[51]  They attempt to expand concepts of causation by arguing for market share liability,[52] proportional recovery,[53] presumed causation through exposure,[54] and emerging science.[55]  They also argue for expanded recovery of damages for fear,[56] for the risk of future harm,[57] for the cost of medical monitoring,[58] and for punitive damages.[59]  This attempted expansion occurs while plaintiffs' lawyers argue to minimize the scope of defenses, such as statutes of limitations,[60] statutes of repose,[61] and contributory negligence.[62]  The strategy, in other words, is to promote liability, causation, and damages that are not individually dependent, that apply to large numbers of people at the same time, and that can be proven by large numbers of people at the same time.

Second, according to this elasticity strategy, mass tort plaintiffs' counsel seek to develop facts that will support aggregation and apply to large numbers of claimants.  They do not want to focus on individual

---

50. *See In re* Breast Implant Cases, No. 2754-0000 (Cal. Super. Ct. Nov. 23, 1994) (order regarding Dow Corning's motion for summary judgment) (holding that a bulk supplier of silicone can be liable for the damage caused by the manufacture of breast implants).

51. *See* Keene Corp. v. Insurance Co. of N. Am., 667 F.2d 1034, 1052 (D.C. Cir. 1981) (denying a motion for a summary judgment against an insurance company for asbestos-related injuries coverage), *cert. denied*, 455 U.S. 1007 (1982).

52. *See* Sindell v. Abbott Labs., 607 P.2d 924 (Cal.) (imposing market share liability on a drug manufacturer), *cert. denied*, 449 U.S. 912 (1980).

53. *See In re* "Agent Orange" Prod. Liab. Litig., 597 F. Supp. 740, 862-64 (E.D.N.Y. 1984) (approving a settlement agreement for proportional recovery from multiple manufacturers of Agent Orange), *aff'd*, 818 F.2d 145 (2d Cir. 1987), *cert. denied*, 484 U.S. 1004 (1988).

54. *See* Borel v. Fibreboard Paper Prods. Corp., 493 F.2d 1076, 1094 (5th Cir. 1973) (holding that each of several defendants who exposed the plaintiff to asbestos could be held liable, despite the impossibility of determining which exposure caused the injury), *cert. denied*, 419 U.S. 869 (1974).

55. *See* Daubert v. Merrell Dow Pharmaceuticals, Inc., 113 S. Ct. 2786, 2791-92 (1993) (considering plaintiffs' attempt to introduce new scientific evidence regarding the causation of a birth defect).

56. *See In re* Moorenovich, 634 F. Supp. 634, 637 (D. Me. 1986) (observing that Maine allows recovery for the fear of future harm).

57. *See* Jackson v. Johns-Manville Sales Corp., 781 F.2d 394, 412 (5th Cir.) (allowing the plaintiff to recover for the possibility of developing cancer), *cert. denied*, 478 U.S. 1022 (1986).

58. *See In re* Paoli R.R. Yard PCB Litig., 916 F.2d 829, 852 (3d Cir. 1990) (allowing plaintiffs to recover the cost of medical monitoring), *cert. denied*, 499 U.S. 961 (1991).

59. *See* Wangen v. Ford Motor Co., 294 N.W.2d 437 (Wis. 1980) (allowing punitive damages for malicious, willful, or wanton conduct in reckless disregard of rights or interests).

60. *See* Wilson v. Johns-Manville Sales Corp., 684 F.2d 111, 112 (D.C. Cir. 1982) (holding that the development of one asbestos-related disease does not trigger the statute of limitations on other, subsequently developed asbestos-related diseases).

61. *See* Lankford v. Sullivan, Long & Hagerty, 416 So. 2d 996, 1004 (Ala. 1982) (striking down a statute that barred products liability claims involving products that had been used for more than ten years).

62. *See* Murray v. Fairbanks Morse, 610 F.2d 149 (3d Cir. 1979) (applying pure comparative fault in a strict liability suit).

differences, such as individual causation, but would rather focus on issues of defendant culpability and general causation.

Finally, the most fertile aspect of this elasticity strategy has been procedural. Plaintiffs have had significant success in lowering the financial and legal barriers to accessing courts. Some courts allow the multiple plaintiffs to have multiple cases brought with one filing fee.[63] Efficient pretrial discovery reduces the plaintiffs' counsel's transaction costs.[64] Liberal discovery rules allow the extended development of evidence,[65] and most importantly, aggregation of cases for discovery and trial greatly reduces transaction costs.[66]

---

63. *See* 28 U.S.C. § 1914 (1988) (requiring a $120 filing fee to institute a civil action, with no express limit on the number of plaintiffs that can be included in the action); CAL. GOV'T CODE § 26280.4 (West 1988 & Supp. 1995) ("The total fee for filing of the first paper in a civil action or proceeding in the superior court . . . shall be one hundred eighty-two dollars ($182)."). There are, however, examples of courts requiring larger fees in single actions that name numerous plaintiffs. *See* Abbey v. A.C. & S., Inc., No. C-93-2813, slip op. at 2 (N.D. Cal. 1993) (ordering the dismissal of an action involving approximately 1000 asbestos claimants and stating that plaintiffs could not "avoid the separate filing fees, venue and, perhaps, jurisdictional requirements by filing a single action that is really 1000 separate actions").

64. *See, e.g.*, General Order No. 29 at 6, *In re* Complex Asbestos Litig., No. 828684 (Cal. Super. Ct. June 21, 1981) [hereinafter General Order No. 29] (requiring defendants in asbestos litigation to answer a standard set of interrogatories without waiting for a plaintiff to propound or serve them). Mandatory disclosure reduces plaintiff costs by not requiring plaintiffs to incur the time and expense of serving interrogatories on the defendants in each case. The use of standard interrogatories also reduces costs for the defendants because the parties can settle into a "system" of answering the same questions—*i.e.*, word-processor, boilerplate answers—without worrying about an array of questions from case to case that would require the time and cost of investigating facts to support the answers. General orders also reduce costs by setting limits on the amount of discovery the parties can pursue—for example, limits on the number of interrogatories to be propounded and the length of depositions. *See* General Order No. 22, *In re* Los Angeles Asbestos Litig., No. C700000 (Cal. Super. Ct. Sept. 15, 1989) (requiring the use of a standard set of interrogatories established by a general court order); General Order No. 26, *In re* Los Angeles Asbestos Litig., No. C700000 (Cal. Super. Ct. Sept. 15, 1989) (limiting the initial deposition of any plaintiff to three hours, with an additional thirty minute examination by each represented defendant).

65. The standard interrogatories under San Francisco Superior Court General Order No. 29 requires defendants to provide information regarding all asbestos-containing products with which they are associated, regardless of whether the particular plaintiff in the case was exposed to those products. General Order No. 29, *supra* note 64, at 12, 16-18. These types of discovery rules have allowed plaintiffs' counsel to accumulate a library of general information regarding defendants and their asbestos-containing products that can be used in future litigation.

66. *See, e.g.*, *In re* Asbestos Prods. Liab. Litig. (No. VI), 771 F. Supp. 415 (J.P.M.L. 1991) (transferring 26,639 actions involving asbestos personal injury and wrongful death claims to the Eastern District of Pennsylvania in an attempt to reduce the expenses and transaction costs of litigation). For examples of cases consolidated for trial, see Cimino v. Raymark Indus., Inc., 751 F. Supp. 649, 649, 651-54 (E.D. Tex. 1990), *appeal filed*, No. 93-4452 (5th Cir. May 3, 1993); Abate v. A.C. & S., Inc. (*In re* Baltimore City Personal Injury & Wrongful Death Asbestos Cases), No. 89236705, slip op. at 29-31 (Md. Cir. Ct. June 3, 1993); Abrams v. GAF Corp., No. 88-5422(1) (Miss. Cir. Ct. Dec. 20, 1990); and Turley v. Owens Corning Fiberglas Corp., CV-84-C-3321 slip op. (W. Va. Cir. Ct. Feb. 15, 1989). For an example of class certification of a mass tort, see Jenkins v. Raymark Indus., Inc., 782 F.2d 468 (5th Cir. 1986).

Other aspects of an elasticity strategy are not obvious. One such aspect arises in the trial strategy of plaintiffs and defendants. A fundamental difference between a tort and a mass tort is the existence of repetitive trials. Defendants generally have an advantage during the first trial regarding a particular product because of their superior knowledge of the product.[67] Data suggests, however, that the advantage belongs to plaintiffs if a product is the subject of multiple trials.[68] The reason is that defendants must be consistent regardless of the number of times a case is tried, whereas the plaintiffs can change their approach each time.[69] The defendant is always the same and is, therefore, limited by inelastic constraints of internal and longitudinal consistency. The plaintiffs are different people and therefore, have the advantage of elasticity in their stories. If one trial story does not work, mass tort plaintiffs' lawyers can use another story that may be more successful. Defendants, on the other hand, cannot afford to be caught making inconsistent arguments. Thus, the elasticity of trial strategy inherent in multiple trials gives another advantage to plaintiffs.

## B. *Containment: Defendant's Response to Elasticity*

Defendants traditionally have had two strategies in tort litigation. First, there is the stonewall, scorched-earth, war-of-attrition strategy that demands that each and every plaintiff must prove at trial each and every aspect of his respective case.[70] If there is more than one case filed by different plaintiffs, then the strategy is to divide and conquer. The defendant's goal is to raise transaction costs by making each plaintiff's case as expensive and difficult as possible and by forcing each plaintiff to undergo the full rigors of the tort litigation system, thus deterring the filing of new cases and preventing a tort from evolving into a mass tort.

This strategy works well unless a critical mass of plaintiffs' counsel file cases. If a sufficient number of plaintiffs can spread the costs and share the fruits of discovery, then the defendant can be hoisted on its own petard. The combination of multiple plaintiffs' efforts increases the possibility of developing evidence adverse to the defendant and dramatically

---

67. *See* Francis E. McGovern, The Cycle of Mass Tort Litigation (May 1990) (unpublished manuscript, on file with the *Texas Law Review*) (discussing the defendant's many advantages at the initial stage of mass tort litigation, including a monopoly over information).

68. *Id.* at 3.

69. *Id.* at 11. Rules of evidence and the doctrine of issue preclusion serve to lock a defendant into a consistent position for subsequent litigation. *See, e.g.*, CAL. EVID. CODE §§ 1222, 1290-1292 (West 1966) (allowing the admission of former testimony); 18 CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 4416, at 137-38 (1991) (discussing the elements of issue preclusion).

70. Robert L. Rabin, *A Sociolegal History of the Tobacco Tort Litigation*, 44 STAN. L. REV. 853, 858 (1992) (explaining that the tobacco litigation was ideal for a stonewall defense).

decreases the plaintiffs' transaction costs. Plaintiffs' counsel who share information and spread their costs ultimately will have an advantage over this defense strategy.[71]

The second traditional strategy for defendants in tort litigation has been settlement—either case-by-case or globally. If it is possible to settle cases, particularly if a defendant can obtain a confidentiality order protecting the amount of the settlement and the fruits of discovery or obtain an assurance by plaintiffs' counsel to cease bringing additional cases, then the visibility of the tort and the chances for a mass tort arising are reduced.[72] Unless a defendant achieves a global settlement, however, a substantial chance exists that settlements will encourage other plaintiffs to file suit, particularly if the tort is elastic and if plaintiffs think that they can receive compensation without the hassle and cost of trial.[73] In effect, a defendant pursuing this strategy may be buying more litigation. If the potential number of claimants becomes too large, the cost may render this strategy impossible.

The modern defense strategy in mass torts can best be described as containment. Recognizing that elasticity is the key to mass torts, defendants have begun to utilize multiple strategies—settle with key plaintiffs' counsel, litigate trials in favorable jurisdictions, conduct single-shot discovery in MDL, propose global settlements, and delay to buy time for legislative, judicial, or social-climate change.[74] The key to the containment strategy is timing—a recognition that the goal is to cut off an expansion of the mass tort at every avenue, to eliminate or reduce elasticity, and thus to utilize multiple tactics and techniques depending upon what works in each particular set of circumstances. The containment strategy has multiple facets that can be used simultaneously depending upon their respective efficiency.[75]

---

71. *See Baltimore Jury Renders $152M Verdict Against Celotex*, ASBESTOS LITIG. REP., Mar. 17, 1989, at 18662, 18662-63 (Andrews Publications, Edgemont, Pa.) (describing a $152 million verdict won by two asbestos plaintiffs in Maryland).

72. *See* Seaman v. Pfizer, 9 Cal. Rptr. 2d 474, 479 (Ct. App. 1992) (noting that a manufacturer of heart valves paid millions to heart valve recipients and insisted on confidentiality agreements and protective orders in every settlement).

73. *See* Francis E. McGovern, *The Alabama DDT Settlement Fund*, LAW & CONTEMP. PROBS., Autumn 1990, at 61, 62 (noting that 10,000 new cases were filed against a DDT manufacturer after its first settlement).

74. Probably the best example of the use of multiple strategies is in the *Exxon Valdez* case. *See* Andrew Blum, *Threat of Punies Is Sword Over Exxon*, NAT'L L.J., June 27, 1994, at A6; Don J. DeBenedictis, *Oil-Spill Settlement Okayed*, ABA J., Dec. 1991, at 31; Donald C. Dilworth, *Verdicts, Settlements Mop Up Exxon Valdez Litigation*, TRIAL, Oct. 1994, at 101 (all discussing Exxon's litigation strategies).

75. *See* Michael D. Tomatz, Note, *Prozac: Is It the Next Rising Giant in Products Liability?*, 12 REV. LITIG. 705, 714, 710-14 (1993) (noting that by indemnifying doctors, maintaining product safety, and providing aid to prosecutors facing the Prozac defense, "Eli Lilly has aggressively defended itself against what otherwise would have been become an overwhelming wave of litigation"); Andrew Blum,

There are two other important considerations in the implementation of a defense strategy. First, when there are multiple defendants, there may not be a united strategic front.[76] It may be impossible to pursue a stonewall approach when a similarly situated defendant is funding the plaintiffs' attorneys through settlements. Defendants simply may not be able to pursue an optimal and coherent strategy. Second, insurance issues may also hamper a defendant's ability to pursue an optimal defense strategy.[77] Insurance carriers may, for example, inhibit a global settlement strategy by denying the necessary funds until an extended coverage dispute has been resolved. The carriers themselves may have so many unresolved disputes over coverage issues that they may demand individual proof or may free ride on another carrier's duty-to-defend responsibilities.[78]

## C.   The "Mega" Mass Tort Dilemma

On occasion, a mass tort—such as the asbestos litigation—can become gigantic. This phenomenon occurs because of a confluence of factors that culminate in the recognition by the tort system that hundreds of thousands of persons have suffered compensable harms. Selectivity by plaintiffs' counsel is no longer a critical issue; virtually all cases are compensable under our tort law. Notwithstanding the unusual nature of this type of mass tort, its lessons tend to be used quite erroneously in other contexts. These torts are unique and need not taint our understanding of other mass

---

*Effort to Shore Up Prozac: Drug Maker Mounts an Attack*, NAT'L L.J., June 17, 1991, at 3 (focusing on Eli Lilly's untraditional defense strategy of attacking plaintiffs' lawyers for criticizing Prozac and supporting government attorneys attacking the Prozac defense in criminal trials); LeRoy Hersh, *Prozac: Jumping on the Lilly Pad*, LEGAL TIMES, Sept. 2, 1991, at 25 (attacking as a marketing ploy Eli Lilly's offer to provide legal representation to any doctor sued for prescribing Prozac); *see also* Milo Geyelin, *Judge Weighs Sanctions in DuPont Case*, WALL ST. J., Jan. 19, 1995, at B8 (reporting that DuPont faces sanctions for its strategy of withholding evidence and resisting discovery in the Hawaii Benlate litigation); James P. Miller & Milo Geyelin, *DuPont's Defense in Benlate Litigation May Be Weakened by Case in Hawaii*, WALL ST. J., Jan. 30 1995, at B8 (recounting plaintiffs' attorneys' belief that DuPont faces more litigation and higher damage awards as a result of its behavior in the Hawaii Benlate litigation).

76. The history of the asbestos litigation provides multiple examples of this phenomenon. *See* BRODEUR, *supra* note 37, at 90-91 (describing the divide-and-conquer tactics of plaintiffs against asbestos defendants in the 1970s). An example of cooperation is illustrated by the so-called Wellington Facility described in Harry H. Wellington, *Asbestos: The Private Management of a Public Problem*, 33 CLEV. ST. L. REV. 375, 385-90 (1984-85) (proposing an "Asbestos Claims Facility" to consolidate the interests of asbestos producers and insurers and to provide an efficient alternative to litigation for injured parties).

77. *See* Global Settlement Agreement & Trust Agreement at 18-27, Ahearn v. Fibreboard Corp., Civil No. 6:93cv526 (E.D. Tex. Aug. 27, 1993) (describing the dispute between Fibreboard and its insurers that preceded the global settlement agreement).

78. *See id.* at 24-25 (explaining that two of Fibreboard's insurers came to an agreement to avoid the free-rider problem).

torts.[79]  Nevertheless, the question remains: How shall we accommodate such a large number of cases?

The strategies of plaintiffs' lawyers and defendants understandably become extreme, particularly if bankruptcies are imminent and the end-game has begun.[80]  Plaintiffs' firms generally feel obliged to accommodate plaintiffs who have suffered compensable harms.[81]  If a plaintiffs' firm was extremely selective in choosing its cases, another plaintiffs' firm would take those that remained.  The queue of plaintiffs at the courthouse is inevitable.  Some plaintiffs' firms have reacted by filing cases in diverse geographical areas, spreading the judicial case load.  Others have concentrated their cases in a small number of jurisdictions to move thousands of cases at a time through consolidated trials.[82]  Still others have tried class actions to resolve entire categories of cases at a time.[83]  When a tort is extremely elastic, the fundamental dilemma for plaintiffs' firms is: how can they (1) maximize the value of each claim, (2) maximize the value of all of their clients' claims, and (3) prevent other plaintiffs' firms from taking over their present and future cases?  The lessons of sociobiology for surviving in a competitive environment are probably more helpful in guiding attorneys than the lessons of substantive tort law.[84]

Litigators have adopted short- and long-term strategies to cope with this dilemma.  Plaintiffs' firms generally have worked well with the judiciary to develop efficient mechanisms for resolving large numbers of cases for their litigation value.[85]  Defendants have been as concerned about the rate of case resolution as about case value.  Companies that, if

---

79.  *See* John A. Siliciano, *Mass Torts: The Case Against the Special Case*, 80 CORNELL L. REV. (forthcoming 1995) (suggesting that the problem with asbestos claims is that courts have failed to follow the ground rules of the traditional tort system, due to the vast number of claimants).

80.  *See* David Rosenberg, Comment, *Of End Games and Openings in Mass Tort Cases: Lessons from a Special Master*, 69 B.U. L. REV. 695, 706-07 (1989) (describing the problems caused by limited or exhausted assets available to compensate plaintiffs).

81.  Although there is limited money available, the larger number of cases a plaintiffs' lawyer has, the larger a percentage of the pie that lawyer will still get.  Also, as in the asbestos litigation, not *all* defendants go bankrupt—there were still some viable asbestos defendants, so the larger the number of plaintiffs, the more money a plaintiffs' lawyer gets.

82.  *E.g.*, Cimino v. Raymark Indus., Inc., 751 F. Supp. 649, 652 (E.D. Tex. 1989), *appeal filed*, No. 93-4452 (5th Cir. May 3, 1993); Abate v. A.C. & S., Inc. (*In re* Baltimore City Personal Injury & Wrongful Death Asbestos Cases), No. 89236705, slip op. at 29-32 (Md. Cir. Ct. June 3, 1993); Abrams v. GAF Corp., No. 88-5422(1), slip op. at 5 (Miss. Cir. Ct. Dec. 20, 1990); Turley v. Owens Corning Fiberglas Corp., CV-84-C-3321, slip op. at 1-2 (W. Va. Cir. Ct. Feb. 15, 1989).

83.  *See, e.g.*, Lindsey v. Dow Corning Corp. (*In re* Silicone Gel Breast Implant Prods. Liab. Litig.), No. CV 94-P-11558-S, 1994 WL 578353, at *2 (N.D. Ala. Sept. 1, 1994) (addressing a breast implant products liability case in which over 380,000 settlement packages were mailed); Georgine v. Amchem Prods., Inc., 157 F.R.D. 246, 261 (E.D. Pa. Aug. 16, 1994) (resolving an asbestos class action with "many tens of thousands of class members").

84.  *See generally* J.H. BECKSTROM, EVOLUTIONARY JURISPRUDENCE 20-22 (1989) (discussing how the empirical research of sociobiology helps to overcome the practical limitations of the law).

85.  *Abate*, slip op. at 17.

provided sufficient time, might be able to accommodate the resolution of a certain number of claims may not be able to withstand the pressures of rapid resolution.

The class action device has epitomized the longer-term approach. When a tort is elastic, there is an incentive for one or more plaintiffs' firms to file a preemptive class action that will provide global peace.[86] There is also an incentive for defendants to find plaintiffs who will agree to such a "global peace" class action. This type of class action serves multiple purposes. Aside from affording predictability, it changes control of the litigation from multiple plaintiffs' firms to the class action leadership and provides an opportunity to devise an alternative mechanism for resolving the cases in the litigation queue—it also impacts the due process rights of the participants.[87] The current status of the asbestos litigation reflects the short- and long-term dilemmas associated with the mega mass tort.[88]

## IV. The Judicial Transition: From Umpire to Manager to Player

What should the appropriate role for the judge be in confronting mass torts? The traditional model of the judge as an umpire, ruling on the issues as they are served by the adversaries, has been criticized as too limited.[89] An alternative approach—the judge as a manager—has been suggested as superior.[90] In this latter role, the judge should actively learn the details of the litigation and channel the efforts of the court and counsel to resolve the litigation more efficiently.

---

86. *See* John C. Coffee, Jr., *Class Wars: The Corruption of the Class Action and What Can Be Done About It*, 80 CORNELL L. REV. (forthcoming 1995) (examining the incentives of plaintiffs' attorneys to file a class action in a mass tort case).

87. *See* Francis E. McGovern, *Foreword* to Symposium, *Claims Resolution Facilities and the Mass Settlement of Mass Torts*, LAW & CONTEMP. PROBS., Autumn 1990, at 1, 1 (addressing the "mechanisms . . . developed to dispense funds to resolve mass tort litigation").

88. As previously indicated, however, asbestos appears to be an aberration, although the potential exists for other mass torts, such as tobacco and silicone gel breast implant litigation, to become mega mass torts. If this does happen, the pressure on the tort system will become even more intense. McGovern, *supra* note 9 (questioning whether the tort system will be able to handle more mass torts).

89. *See* Robert F. Peckham, *The Federal Judge as a Case Manager: The New Role in Guiding a Case from Filing to Disposition*, 69 CAL. L. REV. 770, 770 (1981) (arguing that judges can increase judicial efficiency through effective pretrial management); Alvin B. Rubin, *The Managed Calendar: Some Pragmatic Suggestions About Achieving the Just, Speedy, and Inexpensive Determination of Civil Cases in Federal Courts*, 4 JUST. SYS. J. 135, 138 (1978) (suggesting that "there *are* advantages to judicial assumption of responsibility for case control" (emphasis in original)); William W Schwarzer, *Managing Civil Litigation: The Trial Judge's Role*, 61 JUDICATURE 400, 402 (1978) (urging judges to "intervene in civil litigation and take an appropriately active part in its management from the beginning"). *But see* Judith Resnik, *Managerial Judges*, 96 HARV. L. REV. 374 (1982) (criticizing the phenomenon of managerial judging).

90. *See, e.g.*, Peckham, *supra* note 89, at 770 (asserting that there is a correlation between a court's efficiency and active judicial management); Rubin, *supra* note 89, at 138-40 (discussing the benefits of judicial management); Schwarzer, *supra* note 89, at 408 ("Judicial intervention will help ensure that controversies will be litigated . . . as justly, speedily and inexpensively as possible.").

In the context of mass torts, however, some judges have become more than managers and are, indeed, players. They have done so not because of any explicit decision on the judge's part, but by necessity, because any decision or nondecision by the judge has external ramifications on the issue of elasticity.[91] To make the situation even more complex, judges are often not aware of the effects of their decisions on the elasticity of mass torts. They simply do not have mechanisms for knowing what is happening in the larger context of a given mass tort.

Some judges, in fact, are conditioned not to look beyond the issue before them and not to think at all about the next series of issues that may arise. Indeed, some of the effects of judicial decisions in mass torts are counterintuitive. For example, in traditional torts, setting a case for trial is generally accepted as the surest way to encourage the parties to settle and to resolve that case. In the context of the silicone gel breast implant cases, that judicial strategy arguably backfired. There was a global opt-out class action settlement negotiated under the auspices of the MDL.[92] Plaintiffs who decided to participate in the settlement resolved their cases by agreeing to payments based on a standardized grid to be paid out of a common fund.[93] Plaintiffs who decided to opt out, however, agreed to proceed through the normal tort system, predominantly in state court.[94] A review of the silicone gel class action reveals a high correlation between a judge's history of setting cases for trial while the proposed settlement was being negotiated and the number of parties who opted out. Jurisdictions that had trials or cases set for trial were the ones in which most of the opt-outs occurred.[95] In retrospect, this outcome seems obvious. Plaintiffs' lawyers who thought they could resolve cases more quickly in a given court tended to stay in that court. The net effect of a court's "efficiency" in setting early trial dates was to generate more cases and a longer docket for that court.

Baltimore's experience with the asbestos litigation provides an example of this phenomenon. Until 1980, Maryland devoted a small amount of

---

91. These ramifications play themselves out in any number of contexts. A decision on a substantive or procedural legal decision in one court will inevitably impact another court's decision-making process. On a more subtle level, a series of decisions that result in a large settlement may affect the ability of other judges to settle their cases if the settlement exhausts available financial resources.

92. See Lindsey v. Dow Corning Corp. (In re Silicone Gel Breast Implant Prods. Liab. Litig.), No. CV 92-P-11558-S, 1994 WL 578353, at *2 (N.D. Ala. Sept. 1, 1994) (approving the settlement).

93. See id. at 7-8 (reviewing the compensation program for settling plaintiffs).

94. See id. at 11 (considering the opt-out rights provided in the settling agreement).

95. See, e.g., Letter from Francis E. McGovern, Special Master, National Center for State Courts, to Hon. Peter M. Lowry, Texas District Court for the 261st District (Mar. 16, 1995) (on file with the *Texas Law Review*) (listing the plaintiffs with cases in Texas state court who opted out of the federal silicone gel breast implant settlement).

judicial resources to asbestos litigation, resulting in a backlog of over 2000 cases.[96]   The trial court then decided to adopt an innovative, common-issue trial so that individual cases could be streamlined.[97]   This decision encouraged plaintiffs' counsel to file an additional 6500 cases,[98] most of which probably would not have been filed absent the common-issue trial, and it raised the stakes for the defendants—an adverse verdict in 8 cases is one thing, but an adverse verdict in 8500 cases creates a risk that is hard to accept, even if the verdict is eventually reversed on appeal.   Thus, by attempting to accommodate the cases that had been filed, the trial court created an elastic procedure that invited massive additional filings.   If you build a super-highway, there will be a traffic jam.

There is no way for a court to avoid being a player in an elastic mass tort.   By accommodating cases, a judge increases the elasticity of the mass tort.   By being more rigid, the court decreases elasticity.   In either event, the judge is a player.   In Dallas, the faster the courts resolved their asbestos cases, the more cases were filed.   When the courts indicated that they would process a fixed level of cases, the filings stabilized to meet that level, and filings increased in other parts of Texas.[99]   In Philadelphia, filings increased steadily until the courts provided disincentives for filing through rulings on statutes of limitations and the disability requirement.[100]

Judges use two predominant approaches to deal with mass torts.   The first and more traditional approach is to view each case discretely, thus ignoring the effects of cases on one another.[101]   The second approach, the management approach, is to learn all aspects of the litigation and develop a comprehensive management plan to resolve the cases in an orderly manner.[102]

Both approaches have strengths and weaknesses.   The traditional approach promotes the tort-law value of individual treatment.   Regardless of the judge's intention, however, isolated judicial decisions inevitably have effects on the other cases addressing the mass tort.[103]   Thus, a judge can easily exacerbate the problem by ignoring the realities of the mass tort

---

96. Abate v. A.C. & S., Inc. (*In re* Baltimore City Personal Injury & Wrongful Death Asbestos Cases), No. 89236705, slip op. at 9 (Md. Cir. Ct. June 3, 1993).

97. *Id.* at 17-19.

98. *Id.* at 13.

99. I base this information on several conversations I have had with state judges, plaintiffs' lawyers, and defense lawyers in Texas.

100. *E.g.,* Giffear v. Johns-Manville Corp., 632 A.2d 880, 887-88 (Pa. Super. Ct. 1993), *appeal granted,* 651 A.2d 539 (Pa. 1994).

101. *See* Resnik, *supra* note 89, at 383-86 (describing a judge's traditional role as involving little initiative or participation by the judge prior to trial).

102. *See id.* at 378 (describing the new role assumed by judges during the pretrial phase).

103. *See supra* note 91.

world.   In addition, counsel for plaintiffs and defendants typically encourage those judges who are favorable to their particular strategic position to make even more extreme decisions.   In this manner, judge-shopping has developed into a fine art, and the incentives for judges to be viewed as gurus of mass torts have become strong.

Both federal and state judges have gone to great lengths to fulfill their roles under the judicial management approach.   The MDL judges have established ad hoc information-sharing mechanisms with state judges, and state judges have created institutions to enable them to communicate among themselves.[104]   In addition, federal and state judges have sought to expand their information-gathering techniques in other ways to appreciate the realities of pending mass torts.[105]

The management model, however, also has problems in its implementation.   The litigation paradigm of information-gathering and decisionmaking is generally viewed as inconducive to gross policy-making.[106]   Attempting to resolve a complex social problem with courts rather than with legislatures is viewed as counterproductive.[107]   Judges who take it upon themselves to control a mass tort and achieve a global solution, at least outside of bankruptcy, have been subject to substantial criticisms.[108]   The rules of civil procedure were arguably not designed to contemplate this type of litigation resolution.   Numerous proposals have been made to empower judges to mandate global solutions,[109] but these proposals have been successfully opposed by both plaintiffs and defendants.

## V.  Maturity: A Judicial Solution to Problematic Mass Torts

A third emerging judicial strategy focuses on the concept of maturity. This approach assumes that a life cycle exists for mass torts—mass torts go through various stages in their evolution—and that different judicial strategies should be used at different stages of the life cycle.[110]   At the early

---

104.  Schwarzer et al., *supra* note 23, at 1689-90.

105.  For example, I have been appointed as a special master in the silicone gel breast implant litigation to coordinate between the MDL transferee judge and the state trial judges.

106.  For a discussion of this thesis, see Kenneth C. Davis, *Facts in Lawmaking*, 80 COLUM. L. REV. 931, 942 (1980) (arguing against the litigation model for major policymaking tasks).

107.  WEINSTEIN, *supra* note 6, at 120-21.

108.  *See In re* Joint E. & S. Dist. Asbestos Litig., 14 F.3d 726, 733 (2d Cir. 1993) (vacating the district court's class certification order).

109.  *See, e.g., Revised Final Report, supra* note 14, at 25-26 (urging Congress to authorize a judicial panel to direct that some or all individual actions arising in mass tort litigation be consolidated before a federal court empowered to resolve all issues); AMERICAN LAW INSTITUTE, COMPLEX LITIGATION PROJECT § 6, at 292-93 (1992) (proposing that transferee courts have "full power to manage and organize the consolidated proceeding so as to promote its just, efficient, and fair resolution").

110.  *See* McGovern, *supra* note 67, at 2-4 (reviewing the stages of the cycle of mass tort litigation).

stages of the litigation, judges should take a more traditional approach; at the later stages, once the full dimensions of the tort are recognized, a more activist model is appropriate.

By adopting this third strategy, judges may help alleviate many of the pressures that mass torts place on the judicial system. If a judge can identify the life-cycle pattern of a mass tort, then he can develop alternative methods for standardizing the disposition of large numbers of cases. These alternative methods would avoid problems associated with a long queue of personal injury disputes displacing other cases in the judicial system.

The cyclical theory of mass tort litigation contemplates an initial stage in the litigation during which there are inherent advantages for the defendant in available resources, information, law, strategy, and public opinion. Plaintiffs' attorneys attempting to establish liability for a mass-produced product face substantial difficulties in locating the documents, expertise, and information necessary to present a cogent and compelling case of liability to a jury. At the same time, there are often legal barriers to establishing liability; the law may not be receptive to the particular circumstances of a newly alleged tort. The defendant, on the other hand, has a virtual monopoly on information and expertise, has a major incentive to devote sufficient resources to defending the product, and can develop a superior strategy to present its story to a factfinder. During this initial stage of the cycle, the defendant tends to win the cases it chooses to try and is often able to settle lawsuits quietly with little impact on other cases.[111] Plaintiffs have to be particularly tenacious to overcome these barriers and establish the vitality of their claims.

If, however, the plaintiffs are able to achieve success, either by jury verdicts or major settlements, the cycle proceeds into a second phase. Here, the plaintiffs have the advantage. Their success suggests that they have discovered sufficient information and expertise to present a credible case on liability, causation, and damages; have surmounted legal obstacles or made new, more favorable law; and have developed a second-generation offensive strategy to counter the previously successful approach of the defense.[112] This shift in momentum drives all parties to excess. Once there is a popular consensus that a particular series of outcomes is inevitable, a herd instinct generates an overabundance of support for those outcomes. The pendulum eventually swings much further than is warranted by the rational circumstances. The most significant ramification of

---

111. *See* Rosenberg, *supra* note 80, at 711 (noting that defendants may attempt to expedite weaker claims and delay the stronger ones in an effort to construct a string of precedent-setting favorable verdicts).

112. *See* David Rosenberg, *The Dusting of America: A Story of Asbestos—Carnage, Cover-Up, and Litigation*, 99 HARV. L. REV. 1693, 1696-98 (1986) (analyzing the strategies used by plaintiffs' attorneys in the asbestos litigation).

this second phase is the creation of a heightened demand for litigation: filings of new cases increase dramatically.[113]  Although the newly created backlog of litigation does not affect the outcomes of the second-phase litigation, it creates substantial pressures on the defendant during subsequent phases in the litigation process.

Typically, a third phase in the cycle develops as the plaintiffs' attorneys push the envelope of viability of existing cases and select new, marginal cases to litigate.[114]  At the same time, the defendant develops its second-generation defensive strategy to overcome its earlier lack of success and launches a counterattack on unfavorable law, evidence, and public opinion.[115]  As a result, the defendant has proportionately more success in the third phase than in the second.  Even if a liability finding seems preordained by the plaintiffs' previous success, plaintiffs may receive lower verdict amounts.[116]

The theory suggests that although subsequent cycles do occur, depending on the idiosyncracies of the particular litigation, eventually a rough equilibrium of case values ensues as the cases become more routinized and the parties' contentions become more defined.[117]  As the law, procedure, evidence, strategy, and public perception stabilize, the case outcomes and values proceed more asymptotically.  Eventually, the litigation becomes a mature mass tort.  A mass tort reaches maturity when

> there has been full and complete discovery, multiple jury verdicts, and a persistent vitality in the plaintiffs' intentions.  Typically at the mature stage, little or no new evidence will be developed, significant appellate review of any novel legal issues has been concluded, and at least one full cycle of trial strategies has been exhausted.[118]

Once a mass tort has matured, the second judicial strategy of case management has a substantially greater chance of acceptability and success.[119]  Sufficient information is available, even in the litigation process, to make informed decisions, and a greater chance exists that the affected public will receive global resolutions more favorably.

---

113.  THOMAS E. WILLGING, TRENDS IN ASBESTOS LITIGATION 118-19 (1987) (stating that the asbestos cases filed in all federal district courts jumped from 272 in 1978 to 1450 in 1980).

114.  *See Asbestos Coalition Falling Apart,* NAT'L L.J., Apr. 25, 1988, at 3 (discussing the difficulties that arose when plaintiffs whose disability or cause of action was more unclear or questionable than past plaintiffs began to file claims).

115.  *See, e.g.,* SUSAN PERRY & JIM DAWSON, NIGHTMARE: WOMEN AND THE DALKON SHIELD 194 (1985).

116.  *See* Rosenberg, *supra* note 1, at 897-98 (noting that the potential recovery from both settlements and verdicts in mass tort cases diminishes with time).

117.  *See* Rosenberg, *supra* note 80, at 697.

118.  McGovern, *supra* note 27, at 659.

119.  *See id.* at 688-94 (listing the advantages of using alternative steps to resolving mature mass torts).

The suggestion here is that judges adopt multiple strategies for coping with mass torts as a temporal phenomenon, letting the marketplace of litigation play out in the early stages and using more comprehensive case management techniques as the mass tort matures. As is the case with any blanket recommendation, there are interstices that need attention. The Judicial Panel on Multidistrict Litigation and analogous state entities locate potential mass torts early in their life cycle in order to consolidate pretrial discovery.[120] Generally, judges who have been assigned as transferee courts have felt the obligation to resolve the entire litigation quickly by themselves in a one-riot, one-Ranger mode.[121] If the theory of the life cycle of mass torts is correct, early resolution may perpetuate a distorted version of a mass tort. The original concept of trying single cases even under the rubric of the MDL is still current among some judges. They appear to feel that more information concerning the nature of the litigation is necessary before any global solution can be proposed. At the same time, some judges feel that class action aggregation may fundamentally change the nature of the tort.[122]

On the other hand, the desire of some plaintiffs' counsel and defendants to obtain early closure to a mass tort or a potential mass tort can lead to successfully negotiated settlements.[123] This is also consistent with the approach of MDL, interstate coordination, and intrastate management. The marketplace of negotiation has a role parallel to that of the marketplace of litigation in the life of a lawsuit. However, premature global resolutions can be problematic. First, there is the "control freak" phenomenon. If, in an effort to bring peace to a mass tort conflict, politically and legally unacceptable pressure is put on the participants, there is the potential of a prolonged and volatile tail to the tort.[124] Second, there is the problem of unrealistic expectations. If large numbers of persons have expectations that are radically different from the reality of the litigation, there is also the potential for longer-term dislocation.[125] Third,

---

120. MANUAL FOR COMPLEX LITIGATION (THIRD) § 31 (Tentative Draft No. 2, 1994).

121. See, e.g., Peter H. Schuck, The Role of Judges in Settling Complex Cases: The Agent Orange Example, 53 U. CHI. L. REV. 337, 351 (1986) (describing Judge Jack Weinstein's aggressive approach to the Agent Orange litigation, which he "propelled . . . toward trial [and] self-consciously reshaped").

122. See, e.g., In re Rhone-Poulenc Rorer Inc., No. 94-3912, 1995 WL 116310, at *5 (7th Cir. Mar. 16, 1995) (granting mandamus to decertify a class action by hemophiliacs against blood supply companies because of "the sheer magnitude of the risk to which the class action, in contrast to the individual actions pending or likely" would expose the defendants).

123. See Claudia MacLachlan, Fernald Pact Reached for a Price, NAT'L L.J., Aug. 8, 1994, at A12 (reviewing a settlement involving the Fernald nuclear power plant); Julie G. Shoop, Breast Implant Settlement Gains Approval, TRIAL, Nov. 1994, at 112 (reporting the approval of the settlement of the silicone gel breast implant litigation).

124. See SOBOL, supra note 37, at 327-42 (reviewing the lingering problems in the aftermath of the Dalkon Shield litigation).

125. See id. at 340 (noting that although the Dalkon Shield case "undoubtedly seemed endless to women waiting for relief, judged by the standards of major reorganization cases, the case was handled

the mere existence of a settlement fund may generate claims that would otherwise have remained dormant. It can turn a tort into a mass tort if the settlement does not withstand attack.[126]

It has been suggested elsewhere that the dynamics for resolving mass torts go far beyond the traditional tort litigation process.[127] Until, however, there are exogenous interventions, judges are all we have. It has also been suggested that the messiness of the common-law torts process is not necessarily bad, given the alternatives.[128] Necessity is the mother of lots of inventions.

---

relatively expeditiously"). Another example is the recent filing for bankruptcy by Dow Corning Corp., which has undermined many expectations that the silicone gel breast implant litigation could be resolved quickly. *See* Milo Geyelin & Timothy D. Schellhardt, *Dow Corning Seeks Chapter 11 Shield, Clouding Status of Breast-Implant Pact*, WALL ST. J., May 16, 1995, *available in* WESTLAW, WSJ database (reporting that the filing disrupts the $4.23 billion global settlement fund).

126. The proposed silicone gel breast implant settlement will provide substantial insight into these phenomena as the claims are processed and if a ratchet in the fund payments triggers a second opt-out opportunity.

127. *See* WEINSTEIN, *supra* note 6, at 3 (observing that mass torts "require us to treat a wide variety of problems—jurisdictional, scientific, substantive, and administrative, as well as philosophical and ethical—differently from the way we have met them in the traditional one-plaintiff-one-defendant case.").

128. *See* Peter H. Schuck, *Mass Tort Litigation: An Institutional Evolutionist Perspective*, 80 CORNELL L. REV. (forthcoming 1995) (arguing that the common-law torts process is more adaptable and responsive than fixed statutory solutions).