**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION**

| | |
|---|---|
| **IN RE:  ETHICON, INC. PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION** _____ **THIS DOCUMENT RELATES TO ALL CASES** | **Master File No. 2:12-MD-02327 MDL No. 2327** **JOSEPH R. GOODWIN U.S. DISTRICT JUDGE** |

**PLAINTIFFS' OPPOSITION TO**

**JOHNSON & JOHNSON'S AND ETHICON'S MOTION TO
REVISE CASE MANAGEMENT PROCEDURES AND FOR DISCOVERY
RELATED TO PLAINTIFF SOLICITATION**

Defendants have failed to establish that a single complaint out of 23,000-plus Ethicon cases is fraudulent. Not one. Indeed, independent random sampling – a survey governed by a protocol *defendants* developed – failed to reveal fraud in any filings. Notwithstanding such clear evidence, defendants inferentially leap from citing the unscrupulous acts of a call center which, by defendants' own admission, is likely unaffiliated with *any* of the plaintiff lawyers before this Court, to the shocking claim that fraudulent filings are pervasive. And the only corroboration defendants provide consists of self-serving statements that their products are safe. The fact that every jury has disagreed, defendants' own internal documents acknowledge the products' failures, defendants removed multiple mesh products from the U.S. market to avoid conducting comprehensive clinical trials on safety and at least one government has recommended a complete suspension of the use of defendants' products due to dangerous defects is apparently insufficient

1

motivation for women with debilitating vaginal pain to file suit, in defendants' eyes. Stripped of its anecdotal histrionics, defendants' motion lacks any substance at all.

This glaring lack of substance, together with the timing of the filing of the motion, suggest another motivation for filing the motion – to create a headline-grabbing story bigger than the multi-million dollar verdicts consistently rendered against mesh manufacturers. Defendants ramped up their media machine simultaneously with, if not before, they filed the motion in the wee hours of Wednesday, January 14th. The ink had barely dried on the page before the press was pressing plaintiff counsel to respond to allegations of fraud, and to comment on defendants' opprobrious request that every plaintiff attorney nationwide be placed under oath to deny impropriety, including barratry. (Motion ("Mot."), Ex. 4) Timed to the tee, this series of events led to a barrage of news stories throughout the national media. And all of this occurred in the midst of two trials involving these defendants' mesh products, and very shortly before the upcoming status conference. Defendants got free publicity, generated by nasty allegations against unknown call centers half a world away. But no one was directly defamed, since defendants did not (and cannot) identify a single purportedly fraudulent case that was ever filed as a result of the rogue call center's shenanigans.

What the media did not know last week is that Plaintiffs' counsel had already informed the Court of this scam operation some time ago. Plaintiffs' counsel came into possession of the letter by the call center that contains the FDA logo – and that is attached to defendants' motion -- over a year ago. (Mot., Ex. 1 at 48)  Concerned about this activity, coordinating co-lead counsel, Henry G. Garrard, III, after consulting with others in the MDL leadership, submitted the letter to this Court so the Court could have the origins investigated. Plaintiffs' counsel clearly wants nothing to do with a shady operation like this.

Secondary to the publicity boon it has already generated, defendants' motion seeks to (and would effectively) thwart plaintiffs' efforts to prosecute trial-set cases. Without citing anything other than the Court's authority to manage litigation, defendants have urged the Court to compel plaintiffs to (a) order their medical records, pre- and post- implant and (b) answer written discovery, dismissing cases when plaintiffs fail to do either. Defendants urge such relief despite the plethora of federal authority holding that plaintiffs have no obligation to obtain medical records for defendants beyond those in plaintiffs' possession (and those needed to file a lawsuit in good faith). Bard employed a similar tactic in its MDL proceeding, insisting, like defendants here, that more information would allow it to evaluate the litigation and thus facilitate resolution. Once the information was provided, though, nothing changed. In this litigation, requiring plaintiff counsel to order the full panoply of records for plaintiffs whose cases are not set for trial, while compelling client and counsel to answer written discovery, would consume finite time and financial resources that would have to be drawn from the prosecution of bellwether cases.

The absence of any established link between the call center's actions and any plaintiff in this litigation means there is no basis for imposing any new discovery obligations on individual plaintiffs (much less on their lawyers). There is not a profession in the land that does not suffer from its share of unscrupulous practitioners – whether they are doctors running pain management clinics that prescribe narcotics to addicts, clergy using collection plates to line their own pockets or pharmaceutical companies concealing the harms of their products and paying large amounts of money in consulting fees to ensure continued use by AUGS members. But we do not react to such acts of wrongdoing by conducting an inquisition of the entire group. Moreover, defendants' request that every lawyer in this litigation be ordered to answer questions about unethical

3

conduct under oath based solely on falsehoods purportedly emanating from cubicles in New Delhi is arguably, itself, a sanctionable request. But plaintiffs decline to jump into that fray. Suffice it to say that if defendants had spent even a fraction of the time policing their products that they have spent trying to police this litigation, there would be no multi-million dollar verdicts and hence no call center.

1.      <u>**Defendants present no evidence of fraud in filings.**</u>

Defendants have proven nothing more than that an underhanded overseas group is soliciting inappropriately.[1] Defendants have presented no evidence that any lawyer in this litigation has (a) supported this group; (b) accepted referrals from this group; or (c) filed a case for anyone as a result of the improper solicitations cited by defendants, much less for a woman lying about mesh implantation. Lawyers extensively screen prospective clients provided by referral firms, including so-called "lead generators." (Memorandum in Support of Motion ("Memo") at 4) There is not a shred of evidence from the thousands of cases on file that this screening has failed even once, let alone pervasively.

In fact, extensive data proves otherwise. Defendants have previously raised precisely the arguments they make here in an effort to secure more information. Defendants claimed early last year that many plaintiff profile forms were inaccurate and medical records incomplete. Defendants therefore claimed that many filings were frivolous, or at least that the Defendants

---

[1]      Defendants' evidence suggests one or very few groups are behind these false solicitations. The several affiants have testified to calls of strikingly similar circumstances. The voices were Indian (though one affiant suggested Middle Eastern), unreturnable numbers, often international, appeared in caller ID, the voices appeared to be coming from a room with other solicitations in the background, the callers represented themselves as part of national medical organizations, the callers knew the plaintiffs' medical histories and multiple calls occurred in a short span of time. (Mot. at Ex. 1)

had insufficient information to develop a plan for resolution. To address this issue, the parties agreed to undertake a sampling of cases, selected purely at random, to ascertain the characteristics of the litigation overall. Defendants dictated the methodology used, thousands of sets of medical records were ordered for many hundreds of plaintiffs (at great expense) and independent statisticians analyzed the data and reached statistical conclusions. While the precise sampling methodology and statistical conclusions  are confidential, plaintiffs can report that all plaintiffs except three were implanted with one of defendants' products. The three remaining plaintiffs were implanted with different companies' mesh products (and presumably inadvertently filed their cases under the wrong cause number). *Not a single plaintiff's records showed no implantation*. In short, the only objective evidence available wholly belies defendants' claim of widespread fraud.

Not only are plaintiffs uninvolved in the improper solicitation cited by defendants, plaintiffs actually brought that solicitation to the Court's attention. Some time ago, plaintiffs' counsel discovered some of the material attached to defendants' motion. In particular, counsel discovered the letter improperly featuring the FDA logo. (Mot., Ex. 1 at 48) Coordinating co-lead counsel, Henry Garrard, in consultation with other plaintiffs' leadership, immediately transmitted the letter to the Court, indicating his belief that this was improper solicitation that plaintiffs felt compelled to bring to the Court's attention.

Recognizing they have no evidence that the misrepresentations at issue have led anyone to file suit imprudently, defendants' fallback position is that evidence of the safety of their products proves that fraud in filings must be pervasive. In other words, defendants say, the evidence supporting product safety proves the lawsuits simply cannot have any basis. (Memo at

1, 12-13) This is bootstrapping at its utter worst. In essence, defendants' argument is that the claims must be fraudulent because defendants dispute the liability story.[2]

Defendants claim not only that their products are safe, but that women only think they have been injured by mesh because they've been duped by lawyer advertising to believe in fictitious injuries. (Motion at 13-14) Ignoring for a moment the cynicism of the sensibilities of American women inherent in such a view, this claim is nothing more than bald assertion. Attorney argument is not competent evidence (even when it makes a bar journal).

In reality, defendants' products have devastated the lives of countless American women, and the suits now on file are only the tip of the iceberg. *See* Christopher R. Chapple, *Mesh Sling in an Era of Uncertainty: Lessons Learned and the Way Forward*, EUROPEAN UROLOGY 2013; 64:528 (Ex. 1) (noting that mesh complications are underreported).[3] Surveys of women experiencing mesh complications reveal that these injuries are debilitating, physically and emotionally. Women's lives are never the same again, even after doctors attempt to remove the mesh. Brooke L. Hansen, et al, *Long-Term Follow-up of Treatment for Synthetic Mesh Complications*. FEMALE PELVIC MEDICINE & RECONSTRUCTIVE SURGERY 2014 May/June; 20(3):131, 133, 135 (Ex. 2).

---

[2]    Later in their brief, defendants seem to acknowledge the circular nature of such reasoning: "As in all litigated cases, the parties have an obvious disagreement over the merits of the plaintiffs' claims. Johnson & Johnson and Ethicon maintain that their pelvic products are safe and effective. Plaintiffs assert they are not." (Memo at 15)

[3]    The FDA recognizes on its own website that less than one percent of all device-related complications are reported to the FDA. *See*, http://www.fda.gov/MedicalDevices/Safety/ReportaProblem/default.htm ("A 1986 General Accounting Office (GAO) study showed that less than one percent of device problems occurring in hospitals are reported to FDA, and the more serious the problem with a device, the less likely it was to be reported."); *accord* Charles Steenburg, *The Food and Drug Administration's Use of Post-Marketing (Phase IV) Study Requirements: Exception to the Rule?*, 61 FOOD & DRUG LJ 295, 298 (2006).

Defendants' internal documents establish their products' dangers. For example, in discussing why defendants did not update the TVT SECUR to overcome its injury-causing propensity, defendants' own memoranda conceded that "TVT SECUR was considered a failure and didn't warrant line extensions." (ETH.MESH.01216820, Ex. 3) In comparing this product to earlier products, defendants acknowledged that regulators would likely find the device "more successful on the drawing board than in reality because the average practitioner finds it too complicated to insert correctly." (ETH.MESH.00642394, Ex. 4) In discussing the GYNEMESH product, one executive acknowledged that "the tight-knit arms would result in a rope effect….The effect of roping is increased inflammatory response, increased risk of infection and denser scar plate (not much fun for the patient)." (ETH.MESH.00034875, Ex. 5) Moreover, "GYNEMESH PS today has a 'swirling effect' causing what doctors have expressed as 'shrinkage or contraction of the mesh.' It isn't the mesh that's contracting, its [sic] the tissue that seems to be 'bunching up.'" (ETH.MESH.00681364, Ex. 6) By defendant's own admissions, the pain women experience is not "transitory at all," as the product label claims. (ETH.MESH.00071794, Ex. 7) It is long-term and often permanent pain. Defendants even acknowledged the case of a woman whose vagina was permanently destroyed by their product. (ETH.MESH.00005098, Ex. 8)

In discussing what was supposed to be the revolutionary PROLIFT-M, one executive recognized: "The erosion rate remains relatively high….mesh exposure is a difficult issue….decreasing the pore size further and the inflammatory reaction were not able to show an impact." (ETH.MESH.00827953, Ex. 9) Defendants promoted the PROLIFT as revolutionary because it involved a "specifically designed synthetic mesh." Except that it did not. As one executive wrote: "This mesh was not 'specifically designed' for PROLIFT application, we pulled

mesh out of our existing bag of tricks. This statement is unsupportable form [sic] a design history standpoint." (ETH.MESH.00318775, Ex. 10)[4]

So unconfident were defendants in the safety of their products that they ultimately withdrew those for which additional study was required. As problems with transvaginal mesh mounted across the board, the FDA ultimately issued a 522 order, requiring all manufacturers of grandfathered mesh products to produce studies demonstrating the products' safety. The FDA found the studies that defendants submitted inadequate, ordering clinical trials. Rather than conduct such comprehensive study that would have revealed true risk-benefit profiles, defendants instead removed the PROLIFT, PROLIFT+M, PROSIMA, and TVT-SECUR products from the market altogether.

Defendants' suggestion that health care professionals and organizations universally favor their products is misleading, at best. (Memo at 12-13) Recently, some medical organizations have revised their positions on all mesh products, warning women that insufficient data supports the implantation of mesh. Among these organizations are the American College of Obstetrics and Gynecology (ACOG) and the Society of Gynecological Surgeons (SGS). *See* Lisa Rogo-Gupta & Shlomo Raz, *Pain Complications of Mesh Surgery*, in Howard B. Goldman, Complications of Female Incontinence and Pelvic Reconstruction Surgery (Springer Science+Business Media,

---

[4]     Defendants' admissions mirror those of Bard, another mesh defendant. Acknowledging that physicians feared there may be a "class action" lawsuit on mesh, Bard noted that lack of study was a problem. "We always release products with no data." (AVA2E1262455, Ex. 11) Indeed, not studying its mesh products was "par for the course" for Bard. (AVA2E1268173, Ex. 12)  Instead of studying, Bard simply educated its sales force "on how to potentially dispel the need for clinical data." (AVA2E8488368, Ex. 13) So averse was Bard to studying the dangers of its product that when the FDA gave manufacturers a choice between conducting a clinical trial or removing grandfathered mesh products, Bard chose to discontinue selling its Avaulta product. (AVA2E8502681, Ex. 14) But even though it lacked meaningful data, Bard "ha[d] an answer for everything. Ha, ha!" (AVA2E0101738, Ex. 15)

LLC, 2013) at 87 (Ex. 16) Pelvic mesh injuries are so severe and commonplace that there is now an officially named medical condition called "Chronic Mesh Pain Syndrome (CMPS)." *See* Rogo-Gupta, *supra*, at 93-94. Medicare recognizes the injury (Ex. 25).

Mesh complications are so pervasive that some of the most prominent medical institutions in the nation now advertise their treatment of mesh complications, including explant surgery. These include the Mayo Clinic, the Cleveland Clinic, UCLA, Duke University, the University of Colorado and the Methodist Hospital (Exs. 17 - 22).  One of the darlings of the TVM industry is Dr. Eric Rovner, a fellow of many organizations specializing in women's health. Dr. Rovner is the president of the Society of Urodynamics, Female Pelvic Medicine & Urogenital Reconstruction (SUFU). (Rovner Dep., Ex. 23 at 27:11-28:17). Dr. Rovner was on the task force that generated the position statement on TVM for the American Urogynecologic Society (AUGS) and the SUFU, which was later adopted by the American Urological Association (AUA). (*Id.* at 69:20-70:18; 72:2-7) Dr. Rovner has performed hundreds of mesh surgeries. In this litigation, though, he has now testified that most of those surgeries today are to remove mesh, not to implant it. (*Id.* at 46:6-13)

The hazards of transvaginal mesh are so acute – and complaints by European users so widespread -- that Scotland's Health Secretary asked all of that country's regional health boards to discontinue any implantation of TVM.[5]

In sum, the number of suits on file is no evidence of fraud. Given the pervasive problems with mesh – problems that have become such a global health issue that they have been declared a separate medical syndrome -- one would expect even more litigation. Defendants are thus left with nothing more than false solicitations made by an overseas call center. The suggestion that

---

[5]      http://www.bbc.com/news/uk-scotland-scotland-politics-27884794

the existence of such a group somehow translates into widespread fraud in MDL filings finds no support in law or logic.[6]

**2.      Plaintiffs are under no duty to acquire medical records they do not already possess.**

Plaintiffs are fully cognizant that the Court has concluded that plaintiffs' pre-suit investigative duty under Rule 11 requires the securing of medical records establishing mesh implantation. However, defendants' suggestion that a foreign call center's solicitations somehow mean many plaintiffs were never implanted is belied by the random sampling process designed by defendants' themselves, which has thus far found that every plaintiff whose full medical records were ordered and then reviewed had been surgically implanted with mesh. Nevertheless, if defendants will identify those plaintiffs whom it claims have not yet provided proof of implantation, plaintiff leadership will contact the lawyers involved and urge them to provide such proof.   Indeed, this Court already has procedures in place to allow the Defendants to file motions to dismiss for those plaintiffs who fail to timely file a completed Plaintiff Profile Form, including those medical records in the plaintiff's possession.

But for multiple reasons, defendants are not entitled to an order compelling plaintiffs to order all the medical records *on damages* for defendants. For one thing, plaintiffs have produced materials as required by this Court's practice and procedure orders and the rules. Plaintiffs have produced all medical records in their possession, fully identified all injuries they suffered a result of transvaginal mesh in their plaintiff profile sheets and provided signed authorization forms to allow defendants to obtain additional records, if they choose. When particular plaintiffs are

---

[6]      Defendants also complain about lawyer advertising for the better part of five pages of their brief. (Memo at 10-14) But defendants concede that lawyers have the right to advertise. (Memo at 10) And defendants do not claim that any existing advertising is illegal or unethical. Finally, defendants do not advocate any relief that seeks to limit or restrict advertising. The advertising issue is a red herring.

designated for bellwether status, the parties work together to ensure both sides have all records well in advance of trial, and even in advance of expert depositions. Defendants' claim that they need more records now is belied by their failure to use authorization forms to obtain records for any plaintiffs beyond those designated for case-specific discovery.

As significantly, defendants' current request exceeds the scope of discovery prescribed by the Federal Rules. The Federal Rules require litigants to produce only those documents in their possession, custody and control. *See* FED. R. CIV. P. 34(a); *Patrick v. Teays  Valley Trustees, LLC*, 297 F.R.D. 248, 262 (N.D. W. Va. 2013), *aff'd*, 298 F.R.D. 333 (N.D.W. Va. 2014).

A litigant does not "control" her medical records. In *Clark v. Vega Wholesale Inc.*, 181 F.R.D. 470 (D. Nev. 1998), the court noted that the essence of "control," for discovery purposes, is a party's legal right of access to materials. The court held that a plaintiff has no legal right to medical records held by a third party, despite the fact that the plaintiff could obtain the records with a valid authorization. Indeed, "medical care providers maintain custody or control of medical records." *Id.* at 472 (citation omitted). In a subsequent decision, the same court referred to a line of cases holding that "a patient does not have control of medical records that are in the possession, custody or control of his medical providers." *Powell v. Texvana, Inc.*, No. 2:09-cv-01079-LDG-GWF, 2010 WL 4791507, at *1 (D. Nev. Nov. 18, 2010). Moreover, "the party seeking the records can obtain them by serving a subpoena on the medical provider." *Id.*[7]

Numerous other courts concur. *See, e.g., Neal v. Boulder*, 142 F.R.D. 325, 327 (D. Colo. 1992) ("Plaintiffs do not have custody of the medical records being sought."); *Zavala-Basquez v. Allstate Indem. Co.*, No. C8-5673BHS, 2009 WL 3063078, at *2 (W.D. Wash. Sept. 21, 2009)

---

[7]     Defendants have made no claim that any plaintiffs have failed to provide a sufficient signed authorization form to facilitate defendants' obtaining of records.

("Plaintiffs' DSHS records are not within their control and Defendant has other means of obtaining the information."); *Greene v. Sears, Roebuck & Co.*, 40 F.R.D. 14, 16 (N.D. Ohio 1966) ("It must be borne in mind that Rule 34 extends only to documents which an adverse party has 'in his possession custody or control.' From the record, it does not appear, and it seems quite unlikely, that any of the [treating physician notes] are now in the possession or custody of the plaintiff or her counsel."); *Dobbey v. Randle*, No. 10 C 3965, 2014 WL 1364428, at \*2 (N.D. Ill. Apr. 7, 2014) ("Plaintiff's [unproduced] medical records are in [the Illinois Department of Corrections'] possession, custody, and control."); *U.S. v. Sarras*, 575 F.3d 1191, 1215 (11th Cir. 2009) (a plaintiff's medical records are in the control of the facility holding them).[8]

Magistrate Judge Eifert has recognized in this litigation that health care providers control medical records, not the patient. In distinguishing between a patient's control of tissue explants and the provider's control of medical records, Judge Eifert stated:

> [M]y understanding of medical records is that those records belong to the medical provider. The medical provider creates the records. It's the thought process of the medical provider. And from the beginning of time, those records have belonged to the medical provider.

(Transcript, Hearing, June 13, 2014 at 4:17-21, Ex. 24)

Any claim that a plaintiff's case may not proceed without medical records of injury would be without merit. A plaintiff is injured if she feels pain, even if medical records cannot confirm the existence of a that pain. Indeed, there are entire medical fields that focus on "soft

---

[8]    The plaintiff's ability to obtain records via an authorization form does not change this legal principle, particularly given that defendant can subpoena records with authorization as well. *Ayers v. Continental Casualty Co.*, Civ. Act. No. 5:05-CV-95, 2007 WL 1960613, at \*7 (N.D.W. Va. July 2, 2007); *see also Pham v. Wal-Mart Stores, Inc.*, No. 2:11-cv-01148-KJD-GWF, 2012 WL 3730565, at \*2 (D. Nev. Aug. 28, 2012); *Candelaria v. Erickson*, No. 01 Civ. 8594 LTS RLE, 2006 WL 1636817, at \*2 (S.D.N.Y. June 8, 2006); *Clark*, 181 F.R.D. at 672.

tissue" injuries that cannot be confirmed by tests or examinations. Moreover, in some jurisdictions, women may recover damages for emotional distress caused by a defendant's misdeeds, even without a present physical injury. *See, e.g., Faya v. Almaraz*, 620 A.2d 327, 336-37 (Md. App. 1993) (upholding damage claim for fear of contracting AIDS from HIV-surgeon despite no evidence plaintiffs were HIV-positive); *Wetherill v. Univ. of Chicago*, 565 F. Supp. 1553, 1559-60 (N.D. Ill. 1983) (upholding claim for emotional distress due to fear of developing cancer from ingesting DES despite no evidence of physical injury).

**3.      Defendants' requested discovery of individual plaintiffs *and their counsel* is without any basis in law, fact or good faith.**

The inferential leap that defendants have made is far too great to warrant the extensive written discovery – including document requests – they seek to serve on every individual plaintiff AND her attorneys. If defendants had evidence that a particular plaintiff or attorney was involved in fraud, such individualized discovery might be appropriate. But there is no such evidence. Thus, if defendants are entitled to any relief at all (which they are not), it is an order instructing plaintiff counsel to inquire of their clients whether any have been exposed to telephone solicitations and, if any were, to have them answer the written discovery requests *relating to solicitation only* that is contained in Exhibit 3 to defendants' motion.

Even for plaintiffs exposed to solicitation, there is no basis for defendant's proposed interrogatories about lawyer advertising or the plaintiff's first meeting with trial counsel (the first two questions in that Exhibit 3). Those questions are unrelated to solicitation or fraud and are clearly designed to explore other issues, such as a statute of limitations defense. That is especially true because defendants do not contend that any lawyer advertising to date has been

illegal or unethical. The questions about advertising and first contact with trial counsel are thus are not designed to ferret out fraud.

Plaintiffs certainly should not be required to produce any of the documents requested. If any plaintiffs were actually solicited, and if the soliciting call center is actually affiliated with an attorney, any disclosures the client made to the personnel involved would be protected by attorney-client privilege, regardless of the call center's culpability. Only if the complaint that the client filed was determined fraudulent would there be any basis to pierce the privilege. The crime-fraud exception to privilege applies when the client (not the attorney) seeks to perpetuate a fraud, using the attorney's services to do so. *See U.S. v. Zolin*, 491 U.S. 554, 563 (1989) (crime-fraud exception exists to prevent client from "getting advice for the commission of a fraud or crime"); *Chaudhry v. Gallerizo*, 174 F.3d 394, 403 (4th Cir.), *cert. denied*, 528 U.S. 891 (1999). Moreover, a preliminary showing of a reason to suspect that a particular plaintiff has engaged in fraud is required before the Court may undertake an *in camera* review of privileged material. *Zolin*, 491 U.S. at 572; *Sterling v. Tenet*, 417 F.3d 338, 344 (4th Cir. 2005), *cert. denied*, 546 U.S. 1093 (2006). In short, the plaintiff should not be forced to disclose confidential information, even for *in camera* review, absent a showing that she perpetuated a fraud.

Defendants are not entitled to interrogate plaintiff counsel at all, thus the Court should reject defendants' proposed discovery to litigation lawyers. (Mot. at Ex. 4) Every attorney is charged with knowledge of the rules of professional conduct and all are presumed to have complied with those rules until a showing is made otherwise. Defendants have made no such showing regarding any attorney in this litigation. If defendants were entitled to any relief from the lawyers (which they are not), it would be a one-sentence filing by each attorney, indicating that neither the lawyer nor anyone affiliated with the lawyer, to the attorney's knowledge, has

engaged in improper direct solicitation of clients. As officers of the court, counsel would be bound by such a statement just as if it had been made under oath. And if any attorney were unwilling to make such an affirmation, the Court would undoubtedly have far more strongly worded questions for that lawyer than defendants do.

**4.      Plaintiffs have no objection to additional trials that involve consolidation.**

Defendants propose that 200 cases be selected for discovery and trial. (Memo at 5) Plaintiffs have no objection, so long as (a) this designation supplements, rather than supplants, the trials already in the works, (b) cases involving discontinued devices are included in the mix[9] and (c) cases are consolidated for trial. Individual trials would consume too much of the parties' and the Court's time and resources while providing limited benefit to global resolution. With the number of cases on file, trial of each individual woman's claims in isolation would too inefficient.

**CONCLUSION**

The solicitations upon which defendants' motion is based were inappropriate and quite simply wrong. They have no place in litigation. Plaintiffs' counsel are confident they are not a moving force in this litigation, and independent, random sampling bears that out. This much is certain: defendants have provided no evidence that any of the lawsuits currently on file (much less a substantial number of them) are the product of these acts. Defendants have therefore not justified the onerous relief they propose – relief that would grind this litigation to a screeching halt.

---

[9]      There is no reason that women implanted with devices that Ethicon has withdrawn from the market should go to the back of the line.

Dated:  January 22, 2015.

Respectfully submitted,

/s/Bryan F. Aylstock
Bryan F. Aylstock, Esq.
Renee Baggett, Esq.
Aylstock, Witkin, Kreis and Overholtz, PLC
17 East Main Street, Suite 200
Pensacola, Florida  32563
(850) 202-1010
(850) 916-7449 (fax)
E-mail:  baylstock@awkolaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on January 22, 2015, I electronically filed the foregoing document

with the Clerk of the court using CM/ECF system which will send notification of such filing to

the CM/ECF participants registered to receive service in this MDL.

/s/ Bryan F. Aylstock
Bryan F. Aylstock
Aylstock, Witkin, Kreis and Overholtz, PLC
17 E. Main Street, Suite 200
Pensacola, FL 32563
850-202-1010
850-916-7449
baylstock@awkolaw.com