# EXHIBIT B

SG030 ALI-ABA 61

American Law Institute - American Bar Association Continuing Legal Education
ALI-ABA Course of Study
July 26-27, 2001

Products Liability

**\*61** PRODUCTS LIABILITY CLASS ACTIONS: ESSENTIAL JURISPRUDENCE

Elizabeth J. Cabraser

Lieff, Cabraser, Heimann & Bernstein, LLP
San Francisco, California

Copyright (c) 2001 The American Law Institute; Elizabeth J. Cabraser

**\*63** <u>**TABLE OF CONTENTS**</u>

Introduction
Essential Jurisprudence: A Class Torts
    Supreme Court decisions
    Federal Appellate decisions
    Federal District Court decisions
    State Court decisions
*Amchem* and *Ortiz:* Challenges and Complications in the Certification and Settlement of Mass Tort Class Actions
*Amchem/Ortiz* Accelerate the Trend Toward State Court Product and Consumer Class Actions
*Phillips Petroleum v. Shutts* and Choice of Law in the Multistate Class Action Context
The *Copley*
*Simon v. Philip Morris:* Rule 23(c)(4)(A) and the Seventh Amendment *vs. Rhone-Poulenc*
*Jenkins* and *Cimino:* the Alpha and Omega of Asbestos Multi-Phase Trials
The *Telectronics* Litigation: 1995-2001
The Medical Monitoring Class and Its Subclasses
The Negligence Subclass Structure
Strict Liability Subclasses
Policy Considerations Articulated by the *Telectronics* Court
Summary Jury Trial and Settlement of the *Telectronics* Litigation
The Mandatory *Telectronics* Settlement Fails to Survive *Ortiz* on Appeal
The *Telectronics* Settlement is Re-Submitted And Approved On An Opt-Out Basis
The *Diet Drugs* Litigation: 1997-2001
The *Diet Drugs* MDL Court's Medical Monitoring Class Certification Decision
The *Diet Drugs* MDL Court Denies Approval to a Limited Fund Settlement
The MDL Court Approves a $4.75 Billion Multiple Opt-Out Class Settlement
Conclusion

**\*64** **YOUR PRODUCTS LIABILITY HIT PARADE: A CLASS TORTS TOP 20**

**<u>Introduction</u>**

In the quarter century during which American courts have addressed the application of the class action mechanism to product liability and other mass tort litigation, a rich and varied jurisdiction has developed. Because the class certification decision is both intensely fact-specific and uniquely discretionary, there is little true "precedent" in this field. The cases discussed in this

article span the range of judicial approaches to mass tort challenges, from restrictive/conservative to liberal/innovative, and the range of judicial reaction from antipathy to enthusiastic embrace.

The history of class tort jurisprudence is not one of straight line evolution, but of interweaving trends and concepts, in the application of the transsubstantive procedural rule to a wide variety of mass tort contexts, ranging from single incident disasters to the long-term toxic exposures, and to personal injury, property damage and consumer claims arising from the mass-marketed drugs and medical devices.

For example, Rule 23's most ingenious, and potentially most powerful provision, Rule 23(c)(4)(A) [FN1], has been historically underutilized, but is now coming to the fore as plaintiffs' lawyers and courts alike recognize its utility in separating common issues for classwide treatment, while reserving inherently individualized issues of specific causation and damages for personal jury trials.

### Essential Jurisprudence: A Class Torts "Top 20" (or so)

Acquaintance with this broad range of issues and approaches, and specific application of their lessons to products liability litigation, may be most efficiently achieved through a class torts crash course of essential reading. The following collection of oft-cited cases collectively provide an introduction into the application of Rule 23 criteria to a broad array of product liability/ mass tort circumstances.

**Supreme Court decisions:** *Phillips Petroleum v. Shutts,* 472 U.S. 797 (1985); *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 117 S. Ct. 2231 (1997); **\*65** *Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 119 S. Ct. 2295 (1999); *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.,* 532 U.S. 424, 121 S. Ct. 1678 (2001).

**Federal Appellate decisions:** *In re School Asbestos Litigation,* 789 F.2d 96 (3d Cir.), cert. denied, 479 U.S. 852 (1986); *In re Prudential Ins. Co. of America Sales Practices Litigation,* 148 F.3d 283 (3d Cir. 1998); *Hilao v. Estate of Marcos,* 103 F.3d 767 (9th Cir. 1996) affirming *In re Marcos Human Rights Litigation,* 910 F. Supp. 1460 (D. Hawai'i 1995); *Sterling v. Velsicol,* 835 F.2d 1188, 1200-01 (6th Cir. 1988); *Matter of Rhone-Poulenc Rorer, Inc.,* 51 F.3d 1293 (7th Cir. 1995); *Valentino v. Carter-Wallace,* 97 F.3d 1227 (9th Cir. 1996); *Castano v. American Tobacco Co.,* 84 F.3d 734 (5th Cir. 1996); *Jenkins v. Raymark Industries,* 782 F.2d 468 (5th Cir. 1986); and *Cimino v. Raymark Industries,* 151 F.3d 297 (5th Cir. 1998).

**Federal District Court decisions:** *In re Telectronics Pacing Systems, Inc., Accufix Atrial "J" Leads Products Liability Litigation,* 164 F.R.D. 222 (S.D. Ohio 1995); 164 F.R.D. 22 (S.D. Ohio 1995), and 172 F.R.D. 271 (S.D. Ohio 1997); *In Re: Copley Pharmaceutical, Inc., "Albuterol" Products Liability Litigation,* 158 F.R.D. 485 (D. Wyo. 1994), 161 F.R.D. 456 (D. Wyo. 1995), 1 F. Supp. 2d 1407 (D. Wyo. 1998), and 50 F. Supp. 2d 1141 (D. Wyo. 1999); *Coburn v. 4-R Corp.,* 77 F.R.D. 43 (E.D. Ky 1977), mand. dism. sub nom *Union Light, Heat & Power Co. v. U.S. District Court,* 588 F.2d 543 (6th Cir. 1978); *In re Agent Orange Product Liability Litig.,* 100 F.R.D. 718 (E.D.N.Y. 1983), [FN2] 597 F. Supp. 740 (E.D.N.Y. 1984); *Bowling v. Pfizer, Inc.,* 143 F.R.D. 141 (S.D. Ohio 1992); *In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Products Liability Litigation,* MDL No. 1203, 1999 WL 673066 (E.D. Pa.), 1999 WL 782560 (E.D. Pa.), 2000 WL 1222042 (E.D. Pa.); *Simon v. Philip Morris, Inc.,* 124 F. Supp. 2d 46 (E.D.N.Y. 2000) and 200 F.R.D. 21 (E.D.N.Y. 2001).

**State Court decisions:** *Vasquez v. Superior Court,* 4 Cal. 3d 800 (1971); *Washington Mutual Band v. Superior Court,* 24 Cal. 4th 906 (2001).

Not all of these decisions are products liability cases, and not all of them involve traditional personal injury torts. Nonetheless, these cases have shaped, and continue to shape, the strategies, options, and alternatives available to counsel seeking to deploy a class action mechanism to organize product liability litigation for the benefit of large numbers of similarly injured or damaged plaintiffs.

*Phillips Petroleum* involved oil leases and breach of contract; there was not a product claim in sight. Yet *Phillips Petroleum* is the mother of all modern multistate product liability class actions. Because *Phillips Petroleum* authorized state courts to exercise jurisdiction over nationwide classes, articulated the due process standards for class notice in Rule 23(b)(3) class actions, and acknowledged the propriety of the application of a single state's substantive **\*66** law to nationwide class claims pursuant to a constitutionally permissible conflict of law analysis, it enabled state-law based claims (such as strict liability, negligence, and breach of warranty) to be certified, on a nationwide basis, in state as well as federal courts.

*Amchem* and *Ortiz* rejected two comprehensive asbestos class action settlements, yet they articulated and restated the criteria for the certification of settlement-only classes, and the approval of class action settlements. *Amchem* emphasized the need for heightened scrutiny of the adequacy of representation in the class action settlement context, and the need for structural

assurances, such as subclasses, for the protection of any groups within the class whose rights and interests diverge materially from those of the class as a whole.

The Supreme Court's May 14, 2001 decision in *Cooperman Industries, Inc. v. Leatherman Tool Group, Inc.,* 121 S. Ct. 1678 (2000), involves neither product liability nor personal injury; nonetheless it will have a pervasive impact on the organization and trial of product liability claims in the mass tort context. *Leatherman* mandates *de novo* judicial review of jury awards of punitive damages, in every case, in every court. *Leatherman* removes Seventh Amendment due process considerations from the punitive damages determination, which is no longer a matter of fact, but one of law. *Leatherman* is the culmination of the Supreme Court's series of decisions that articulate due process limitations on the punitive damages that may be imposed against the defendant for a single course of conduct. [FN3] *Leatherman* holds that the Due Process Clause prohibits states from imposing "grossly excessive" punishments on tortfeasors. Punitive damages are not compensation for injury, but private fines levied by civil juries to punish reprehensible conduct, and to deter its future occurrence. To determine whether a given punitive damages award constitutes prohibited "grossly excessive" punishment, reviewing courts must focus on the degree of the defendant's reprehensibility or culpability, the relationship between the penalty and the harm to the victim caused by the defendant's actions, and, most notably, the sanctions imposed in other cases for comparable misconduct. This last factor is, according to *Leatherman,* the especial province of appellate courts.

The prospect of a multitude of appellate courts conducting independent, *de novo* reviews of multiple punitive damages awards made by different juries to prioritize and proportionalize the impacts of a defendant's product on multiple victims presents an institutional, jurisprudential, and equitable nightmare. A practical and strategic response to *Leatherman* is to gather the claims of the victims, and aggregate their punitive damages claims, for single determination by a single jury, and *de novo* review within a single jurisdiction. Unitary adjudication presents the best strategy both for maximizing the amount of punitive damages a reprehensible defendant actually pays and for assuring that this aggregate amount is sufficiently proportional to the harm to avoid the "grossly excessive" label, and may mean that punitive damages are actually paid, in a greater aggregate sum, far sooner than if multiple punitive **\*67** damages awards were consigned to multiple (and potentially mutually cancelling) appellate reviews. However, class adjudication of punitive damages, like any unitary adjudication, creates a situation in which it may be argued that some individuals would receive less from the distribution of a classwide punitive damages award than they would if they obtained an individual punitive damages verdict on their own. Unitary adjudication eliminates the "lottery" aspect of punitive damages, by allowing everyone to benefit from the award. There are more winners, but the prizes are smaller.

Plaintiffs' counsel will be under a special challenge, in the post-*Leatherman* era, to think and act strategically, and to cooperate and coordinate with each other, so that the quest to maximize the punitive damages a defendant pays does not degenerate into an endless battle among claimants to obtain and keep individual awards, with the defendant watching from the sidelines as large individual punitive damages awards are made by juries, only to be eliminated or reduced by trial and appellate courts on *de novo* review. Plaintiffs' counsel (as well as defendants' counsel) may also wish to consider whether, in a post-*Leatherman* world, the determination of punitive damages by the trial court, rather than a jury, is more likely to generate an appropriate punitive damages award that will withstand or, perhaps, (if the trial court's findings reflect full compliance and application of Supreme Court criteria) avoid the need for *de novo* appellate review.

The *Prudential* decision, a post-*Amchem* review of a nationwide insurance/consumer fraud class action settlement, have set a new jurisprudence standard for class action settlement approval and review. Prudential articulates detailed guidelines for settlement class certification and settlement approval that nonetheless apply in every context: the *Diet Drugs* products liability settlement approval decision by Judge Bechtle applies *Prudential,* along with *Amchem* and *Ortiz,* to its Rule 23(e) analysis. *Valentino,* while vacating the Felbatol pharmaceutical class before it for insufficient findings by the district court, reaffirmed the propriety of certification in pharmaceutical products liability cases. In *Valentino,* the Ninth Circuit refused to foreclose pharmaceutical classes, as defendants urged; rather, it confirmed that Rule 23 extends to personal injury/products liability claims, if sufficiently detailed findings are made at the trial court level.

The non-personal injury aspect of asbestos litigation is addressed in the *School Asbestos* decision, which illustrates the grouping of states' laws into several categories, with accompanying subclasses, to preserve the predominance of common legal issues in a nationwide 23(b)(3) class context. *Jenkins v. Raymark* and *Cimino v. Raymark* mark the alpha and omega of class treatment of personal injury/wrongful death asbestos product liability claimants in Texas federal court. *Jenkins* certifies the claimants as a class for common issues of punitive damages and defendants' conduct; *Cimino* leaves the *Jenkins* certification intact, but reverses later trial phases that attempted to establish individual damages and causation through classwide proof.

The *Marcos* litigation illustrates the successful trifurcation of a class action brought for the victims of atrocities committed by the Marcos regime: the trial court conducted the trial in three phases (liability, punitive damages, and compensatory damages, in that order)  **\*68**  and utilized sampling techniques to establish a quantum of compensatory damages to the victim class. The Ninth Circuit affirmed this trial-phasing and sampling technique.

The *Telectronics, Albuterol, Diet Drugs,* and *Pfizer* decisions illustrate the successful class certification, class treatment, trial and/or settlement of common liability-related issues in nationwide medical device and drug personal injury product liability litigation, and are classic examples of product liability class certification and settlement. *Sterling v. Velsicol* illustrates the severance of the causation issue into general causation (classwide issue) and specific causation (individual issue) in the context of a long-term toxic exposure mass tort, a "by product liability" mass tort. The concept of bifurcating causation (general/specific; class/individual) is controversial. It was upheld as Constitutional in *In re Bendectin Product Liability Litigation,* 857 F.2d 290 (6th Cir. 1988), *cert. denied sub nom, Hoffman v. Merrell Dow Pharmaceuticals, Inc.,* 488 U.S. 1006 (1989), affirming as verdict for defendant in a phase one general causation trial, after a mandatory limited fund class settlement of plaintiffs' claims had collapsed on appeal. *See In re Benedectin Products Liability Litigation,* 749 F.2d 300 (6th Cir. 1984).

*Coburn* and *Agent Orange* are early mass tort decisions that have retained a pervasive influence on modern mass tort jurisprudence. The *Coburn* case arose from a single incident disaster: the tragic fire at the Beverly Hills Supper Club, alleged to be caused by faulty electrical wiring, and illustrates an early use of Rule 23(b)(1)(B) "mandatory" class certification in a limited fund scenario, articulating, in compelling language, the policy reasons therefor. *Agent Orange* is an early products liability class decision, arising out of injuries claimed by veterans from exposure to the Agent Orange defoliant during the Viet Nam war. Judge Weinstein, who presided over the litigation and settlement of the case, developed the "substantial possibility" standard for mandatory certification of a 23(b)(1)(B) class with respect to punitive damages claims. The *Skywalk Cases* decisions illustrate the certification-to-settlement conduct of single incident mass tort litigation, arising out of a hotel skywalk collapse, and the interplay between parallel federal and state court class actions arising from the tragedy.

The *Simon v. Philip Morris* decisions, issued in 2000 and 2001 in tobacco tort litigation that remains ongoing, bring us full circle on many of the concepts and policies embedded in pre-*Amchem* mass tort decisions. The *Simon* decisions explore the utilization of modern choice of law doctrines to apply a single state's law to the fraud-based tort claims of a nationwide class, for purposes of adjudicating common issues, of defendants' liability; reserving the determination of individual causation and damages for later proceedings under the class members' home states' laws. The most recently reported *Simon* decision encapsulates the history and development of the debate over the utilization of the federal rules' severance and bifurcation provisions, in conjunction with Rule 23(c)(4)(A) to group common liability-related issues for class treatment and determination before a single jury, while reserving individual questions for later determination by separate juries. The *Simon* decision recounts a number of instances of trial court attempts, in tort contexts, both successful and not, to "carve at the joint" between common and individual issues, to preserve the benefits of class adjudication while protecting the due process rights of both plaintiffs and defendants.

**\*69**  Many of these cases are discussed in greater detail in the remainder of this article, and several serve as case studies. Each of these decisions features detailed discussions of the issues or procedures it addresses, and extensive citation to other cases. Among them, these decisions embody a great and ongoing debate as to the proper scope and role of the class action procedure in products liability litigation, and the potential for application of class procedures to the great variety of multi-claim, multi-injury cases we call "mass torts."

### *Amchem* and *Ortiz:* Challenges and Complications in the Certification and Settlement of Mass Tort Class Actions

On June 25, 1997, the United States Supreme Court issued its decision in *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 117 S. Ct. 2231 (1997), addressing the Third Circuit's decision in *Georgine v. Amchem Prods., Inc.,* 83 F.3d 610 (3rd Circuit 1996), which had reversed district court approval of a comprehensive class settlement of future asbestos injury claims. It has been oft-remarked that the Supreme Court's *Amchem* decision was driven by the majority's palpable disdain for the singular procedural posture, more than the substantive terms and conditions, of the nationwide asbestos future claims class settlement before it. The *Amchem* settlement featured a unique and unacceptable combination of absent (and unknown) future claimants with future claims, potentially inadequate funding, insufficient representation of theoretically divergent interests, potential intra-class conflicts; and perhaps most distastefully, a class perceived as receiving benefits inferior to those negotiated by the settling plaintiffs' counsel for their own "inventory" of individual clients. Moreover, while asbestos litigation asserting similar claims

had inundated the federal and state courts for many years, the *Amchem* class action itself was settled before it was filed, and the district court was presented, simultaneously, with a complaint that asserted the claims and the agreement that settled them, as a *fait accompli*.

Almost precisely two years later, the Supreme Court issued its decision in *Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 119 S. Ct. 2295 (1999) reversing the Fifth Circuit's decision affirming a "mandatory" (non-opt out) settlement that had shared many of the features condemned by the Supreme Court in *Amchem*. In fact, the *Ortiz* and *Amchem* settlements had been negotiated nearly concurrently, and had commenced their respective settlement approval processes not too far apart in time. [FN4] When the Supreme Court granted certiorari of the *Georgine* decision in **\*70** *Amchem*, it took the Fifth Circuit's first decision affirming the Fibreboard settlement as well, *In Re Asbestos Litigation,* 90 F.3d 963 (5th Cir. 1996). When the Supreme Court decided *Amchem*, it remanded the *Fibreboard* case to the Fifth Circuit for further proceedings. Again, the Fifth Circuit affirmed the settlement, in a decision reported as *In Re Asbestos Litigation,* 134 F.3d 668 (5th Cir. 1998). The Supreme Court subsequently granted certiorari, and on June 23, 1999, reversed the approval of the Rule 23(b)(1)(B) settlement.

*Amchem* and *Ortiz* shared many similarities: many of the same plaintiffs' counsel were involved as negotiators; both settlements featured side deals for individually represented plaintiffs, a provision that disturbed the Supreme Court; both attempted to settle unmanifested future injury claims arising from asbestos exposure; and both settlements featured allocation structures that the Supreme Court found troublesome. The fundamental distinction between the two settlements was, of course, that *Amchem* was a Rule 23(b)(3) "opt out" settlement, and *Ortiz* utilized a mandatory "limited fund" settlement class certified under Rule 23(b)(1)(B), from which no opt-outs were allowed.

While limited fund class action settlements are not new, the *Ortiz* settlement was unusual in that it was funded, not with the limited assets or insurance coverage of a financially troubled defendant, but with the compromise proceeds of a settlement of contested insurance coverage. It was, in effect, a settlement of a settlement. The settlement was funded with part, but not all, of the potentially available insurance, to the tune of a $1.525 billion contribution by the insurers, and a relatively insubstantial $500,000 contribution by Fibreboard itself. This "tripartite" agreement to resolve the insurance dispute and turn over proceeds to a mandatory class was intended to avoid the risks, potentially catastrophic to both claimants and company, that the coverage court would decide in favor of the insurers, leaving tort claimants with only the resources of Fibreboard itself as a source of recovery.

Many practitioners who awaited the *Ortiz* decision were concerned that it would unduly restrict the availability of limited fund certification under Rule 23(b)(1)(B), or depart from a jurisprudence that had been well developed in the appellate courts as to the requirements for such limited fund certification. [FN5] Instead of charting a radical departure from previous limited fund jurisprudence, the *Ortiz* court determined simply that the proposed Fibreboard settlement did not meet the historical and jurisprudential criteria for a classic limited fund, and thus could not be approved on the record before the courts. In doing so, the Supreme Court expressly discouraged innovation and experimentation in the Rule 23(b)(1)(B) arena, choosing instead to **\*71** prescribe a self-consciously conservative approach, and directing litigants and courts to use Rule 23(b)(3) instead as "the Rule's growing edge" for purposes of providing for class treatment of mass tort litigation. 527 U.S. at 862. As the *Ortiz* decision observes, "while we have not ruled out the possibility under the present Rule of a mandatory class to deal with mass tort litigation on a limited fund rationale, we are not free to dispense with the safeguards that have protected mandatory class members under that theory traditionally."

The settlement procedures utilized in *Amchem* and *Ortiz* attracted the attention and condemnation of numerous academics and practitioners, and contributed to the unprecedented high profile of these cases at the district and appellate court levels. No class action settlements have been dissected so assiduously, or with such single-minded condescension or condemnation, by the uninvolved. No class actions seminar or lecture since 1995 has been complete without a discussion of *Amchem* and *Ortiz,* often to the exclusion of all else.

Yet *Amchem* and *Ortiz* were procedural rarities, and their shared subject matter (the "future claims" of those exposed to and potentially injured by asbestos) was unique. In most cases involving classes certified for settlement, the actions are styled at the outset as class actions for purposes of litigation and trial. The cases present injury claims that are already manifest, or, at most, the potential claims of those who are aware they have been exposed to the product (drugs, cigarettes, medical devices) or substance (PCBs, nuclear radiation) at issue. Defendants typically object, rather than consent, to class treatment. With increasing frequency, defendants are resisting pre-certification settlement, often choosing to oppose trial-purposes class certification, and continuing, post-certification, to challenge class treatment and the structure of classwide trial, through motions to decertify,

a tactic designed to reveal the unmanageability of the case for trial and/or the plaintiffs' counsels' inability to try it. Fed. R. Civ. P. 23(c)(1), which essentially allows the court to re-visit class certification at any time prior to judgment, serves as the justification for such efforts. The new Rule 23(f) procedure, in effect since 1998, now provides for discretionary interlocutory appellate review of decisions granting or denying class certification. The availability of immediate appellate review under 23(f) will further encourage sustained and repeated changes to the district court's class orders.

The *Ortiz* decision focused on the availability of (b)(1)(B) mandatory class certification in a novel variation of the traditional "limited fund" scenario. Once again, the Supreme Court was confronted with a settlement of tens of thousands of compensatory and punitive damages claims for asbestos-related injuries. Three simple lessons emerge from the *Ortiz* rulings.

First, the Court held that the parties had "failed to demonstrate that the fund was limited except by the agreement of the parties ..." *Ortiz* at 2316. The Court observed that settling parties under (b)(1)(B) "must present not only their agreement, but evidence on which the district court may ascertain the limit and the insufficiency of the fund, with support in findings of fact following a proceeding in which the evidence is subject to challenge ..." In *Ortiz,* the proposed limited fund was the combination of Fibreboard's assets and certain Fibreboard insurance policies, with the company itself contributing only $500,00 to the **\*72** settlement fund. Although as to the sale value of Fibreboard the district court had heard evidence and made independent findings, "[t]he same, however, [could not] be said for the value of the disputed insurance." As to the insurance, the district court had simply assumed that the parties' proffered settlement value of the insurance claims was an appropriate valuation of the insurance itself.

Second, the Supreme Court held that the settlement's wholesale exclusions from the class, and the allocation of assets within the remaining class, were at odds with the traditional concept of the limited fund, and lacked the structural protections of Rule 23(a) that it had articulated in *Amchem.* Excluded from the mandatory class were tens of thousands of individual "inventory" claims, also represented by proposed class counsel, who had received separate settlements and especial treatment as a result of the negotiations by class counsel. In those unique circumstances, the Court concluded that "there can be no question that such a mandatory settlement class will not qualify when in the very negotiations aimed at a class settlement, class counsel agreed to exclude what could turn out to be as much as a third of the claimants that negotiators thought might eventually be involved, a substantial number of whom class counsel represent ...." *Ortiz* at 2318.

Third, in *Ortiz,* treatment within the class failed to provide the structural protections of *Amchem.* Indeed, even the most basic of class distinctions were not made. The Court observed that subclasses had not been established between present and future claims, nor between those class members who had claims that might be covered by substantial insurance and those who did not.

After *Ortiz,* to frame properly a (b)(1)(B) mandatory class under a "limited fund" theory, class counsel (i) must present a factual and legal record upon which a court may enter detailed findings establishing the existence of a limited fund, and (ii) must ensure that any subclasses receive separate representation to eliminate conflicting interests of class representatives and their counsel. These requirements may pose difficulties, but, in our view, they are manageable difficulties to be expected when attempting to resolve mass tort litigation comprehensively and fairly.

The *Ortiz* Court's majority expressly adopted a conservative overall philosophy to (b)(1)(B) certification, self-consciously posited the "traditional" limited fund as the presumptive ideal, and directed courts to look closely at "limited fund" cases that appear to stray far from their historical antecedents. However, the particular criticisms used by the Supreme Court to overturn the proposed certification and settlement place constraints upon the evidentiary record, and the structure of the class and subclasses, that courts should in the future be able to accept.

### \*73 *Amchem/Ortiz* Accelerate the Trend Toward State Court Product and Consumer Class Actions

The trend toward the litigation and settlement of nationwide personal and non-personal injury product claims in state, rather than in federal courts, was accelerated by the near confluence of three Supreme Court decisions: *Amchem, Ortiz* and the Supreme Court's earlier recognition of state courts' jurisdiction to enter binding judgments resolving nationwide class claims (including exclusively federal claims) in *Matsushita Elec. Indus. Co., LTD. v. Epstein,* 516 U.S. 357.

The rights of consumers to compensation for unfair business practices, false advertising, and dangerous, misrepresented, or overpriced products [FN6] has been accompanied by the growing judicial recognition that such rights were meaningless if economic barriers prevented litigants from pursuing their claims. To prevent mass producers and mass advertisers to cheat the many, a little at a time, the class action mechanism was invoked. The California Supreme Court landmark consumer fraud decision in *Vasquez v. Superior Court.,* 4 Cal. 3d 800 (1971) is illustrative of this movement.

Protection of unwary consumers from being duped by unscrupulous sellers is an exigency of the utmost priority in contemporary society .... The alternatives of multiple litigation (joinder, intervention, consolidation, the test case) do not sufficiently protect the consumer's rights because these devices 'presuppose a group of economically powerful parties who are obviously able and willing to take care of their own interests individually through individual suits or individual decisions about joinder or intervention.' [Citation omitted.]

Frequently numerous consumers are exposed to the same dubious **\*74** practice by the same seller so that proof of the prevalence of the practice as to one consumer would provide proof for all. Individual actions by each of the defrauded consumers is often impracticable because the amount of individual recovery would be insufficient to justify bringing a separate action; thus an unscrupulous seller retains the benefits of its wrongful conduct. A class action by consumers produces several salutary byproducts, including a therapeutic effect upon those sellers who indulge in fraudulent practices, aid to legitimate business enterprises by curtailing illegitimate competition, and avoidance to the judicial process of the burden of multiple litigation involving identical claims. The benefits to the parties and the courts would, in many circumstances, be substantial.

4 Cal. 3d at 808.

By contrast, lamented *Vasquez*, *"if each is left to assert his rights alone, if and when he can, there will at best be a random and fragmentary enforcement, if there is any at all. The end result is not only unfortunate in the particular case, but it will operate seriously to impair the deterrent effect of the sanctions which underline much contemporary law." Id.* at 807. *Vasquez* was followed by a series of California decisions that certified, or mandated the certification, of statewide and nationwide classes in cases of consumer fraud, unfair business practices and product liability. [FN7]

California was not alone. Other states demonstrated a sophisticated understanding of the historical underpinnings, equitable principles, and modern application of the class action mechanism. For example, in *Wood River Area Development Corp. v. Germania Federal Savings and Loan Association,* 198 Ill. App. 3d 445, 555 N.E. 2d (Ill. App. 1990), the Illinois Court of Appeals drew direct parallels between the original groups whose rights were adjudicated in English equity practice, "rural tenants and landlords, parishioners and parsons," and the masses of average Americans who depend on them today: "*No matter how refined, how revised, or how evolved this flashy import becomes, the goal of the class action remains the same -- justice for the lowly, the tenants, the parishioners, the multitudes.*" 198 Ill. App. 3d at 448.

Thus, state courts early recognized -- and have steadfastly remembered -- that modern society increasingly pits mortal **\*75** humans, of limited means, against large corporations of multi-national influence and perpetual existence. Unassisted by procedures that allow individuals to effectively aggregate their claims, and to try or resolve common issues in a unitary fashion, the battle remains fatally unequal. Justice cannot result from unequal access to the mechanisms of justice. Justice cannot result from procedures that are priced beyond the reach of individuals. Justice (including the right to an individual jury trial) is a cruel joke to those who will be worn down and worn out, in pocketbook and in spirit, by the endless pitched battles of a war of attrition funded by corporate defendants who can afford to expend millions for defense and not a penny for compensation. [FN8]

Perhaps it is most fitting that plaintiffs have increasingly resorted to state courts as *their* battlegrounds of choice for their claims against corporate defendants. Although the law recognizes corporations as persons, and makes no distinction between the human and the corporate, and although corporations enjoy perpetual existence, and an accumulation of capital unmatched by mere humans, it was not always so. Modern limited-liability corporations are creations of the mid-to-late nineteenth century. [FN9] They are creatures of state charter (not federal law) and exist at the state's sufferance. As a principle of law, the courts must make no distinction between the human and the corporate as equal persons before the law: so every jury is instructed in every trial involving a corporate defendant. [FN10]

However, *how* this equality is implemented so as to achieve justice as between these two very different categories of persons is the ambit of the equity jurisdiction employed by every court. That corporations dread the states who gave them life, and that corporations have fueled a massive outcry against the notion of nationwide classes in state courts, is the ultimate irony. State-chartered corporations act nationally and internationally. The courts of the states to whom they owe their existence should be free to certify nationwide classes of those with claims against them.

**\*76** The emerging leadership of state courts in effectuating nationwide settlements in the pre-*Amchem* era was exemplified by *Cox v. Shell Oil Co. (Polybutylene Pipe Litigation),* Case No. 18,844, a non-personal injury nationwide product defect action which culminated in a $950+ million settlement approved by the Chancery Court of Obion County, Tennessee in October 1995.

As the *Cox* Final Order describes, years of individual and group litigation in the federal and state courts were followed, in succession, by a failed federal class action settlement, the certification of overlapping nationwide classes by courts in two states, the intercession of a third state court to catalyze nationwide settlement discussions, and the ultimate approval of a $950 million settlement for a nationwide settlement class, not in a federal court (as would have been the most likely forum in the 1970s, 1980s, or even early 1990s), but in Tennessee Chancery Court. The settlement withstood appellate challenge and is six years into the claims process, which is providing replumbing, repairs and damage compensation to homeowners across the country.

A similar saga played out in the *Miracle Ear* litigation, a series of cases arising from allegations that the manufacturer misrepresented the abilities of its hearing aid to reduce "unwanted background noise" and sold it for inflated prices. [FN11] The safety of the device was not at issue. The first class action was brought in a California federal court, from which it was dismissed with a recommendation from the judge that the state law claims be pursued in state court. Two roughly parallel state court proceedings followed, in Minnesota and Alabama, respectively. Here again, the two courts certified overlapping nationwide classes for litigation purposes, and, although settlement discussions proceeded separately in the two cases, both courts ultimately granted preliminary and final approval in parallel proceedings, utilizing a dual-captioned class notice.

The pendency of related federal and state actions is not unusual, and the concept of federal court-state court coordination has been increasingly embraced by the courts, formally endorsed by the *Manual for Complex Litigation, Third*, §§ 31.3, *et seq.* (Federal Judicial Center 1995), and demonstrated effectively in such coordinated federal/state proceedings as the Alaska federal/state court *Exxon Valdez* litigation. While such federal/state litigation may be marked by divergent rulings (as was the *Exxon Valdez* litigation with respect to the initial class certification determinations, which the state court certified and the federal court denied), [FN12] it is now **\*77** acknowledged that joint or parallel pretrial orders, coordinated discovery, and settlement approval processes are not only permissible and proper, but advantageous in the definitive resolution of related litigation in multiple fora.

### *Phillips Petroleum v. Shutts* **and Choice of Law in the Multistate Class Action Context**

Another major consideration determining the limits of a class action suit, and where a suit is filed -- in federal or state court and in what state or jurisdiction -- is choice of law. The choice of a correct jurisdiction for choice of law can sometimes make or break class certification. The issue comes up in any multi-state class action that involves state-created rights. In *Klaxon Co. v. Stentor Mfg. Co.,* 113 U.S. 847 (1941), the United States Supreme Court rejected the idea that there was a federal choice of law doctrine and required that "a federal court sitting in diversity must apply forum state conflict-of-law rules in determining what law to apply." As a result, choice of law rules vary state-by-state, and there is no uniform body of federal precedent.

In *Phillips Petroleum v. Shutts*, 472 U.S. 797 (1985), the Supreme Court held that any court (state or federal) may apply forum state law, or any other single state's law, to the claims of a nationwide class, in the absence of actual conflicts; or, in the event of a conflict of laws, pursuant to a constitutionally permissible (*i.e.,* most significant contacts) choice of law analysis. [FN13] The selection of a single state's law vastly simplifies the management of a nationwide class action, particularly for purposes of trial, since most states have pre-existing pattern jury instructions that can be applied (as modified, if necessary, to suit the factual circumstances of the case) and utilized in instructing the finder of fact.

Read together, *Klaxon, Shutts* and *Wortman* require, in a multi-state case, (1) a **\*78** determination whether there is a "true conflict" in laws between any relevant jurisdictions, and if true conflicts are shown, (2) a determination of which law or laws the forum state's choice of law rules require be applied; and (3) a final determination as to whether the resulting choice of law decision is violative of due process.

Despite the *Shutts* opinion's systematic explication of the step-by-step process to be followed in determining whether a conflict exists, what constitutes a conflict, and how to choose the appropriate state's law in the event of a conflict, many courts, faced with proposed nationwide classes assume, automatically, that the laws of all states will apply to the class claims, and that the courts must find a way to manage the presumed variations in multiple states' laws. [FN14] In some circumstances, of course, it may be necessary, or at least pragmatic, to revert to this "all states" approach. In such cases, courts may, and have, utilized subclassing and special interrogatories to address variations in state law without distorting this substantive law. *See, e.g.,* the *Telectronics* decisions discussed above.

The choice of law issue frequently arises in a class action under the requirement of Rule 23(b)(3) -- which is mirrored in most state jurisdictions' class action rules -- that common questions of law or fact must "predominate" and that a class action must be "superior" for a class to be certified. This results in the familiar arguments that -- to quote *Castano v. American Tobacco*

-- 84 F.3d 734, 741 (5th Cir. 1995), "variations in state law may swamp any common issues and defeat predominance," and that variations in law between jurisdictions make the case "unmanageable" and therefore class treatment is not "superior" if the choice of law decision requires application of multiple states' laws. [FN15]

A careful consideration of choice of law rules of various jurisdictions is useful prior to filing suit and may dictate a choice between state or federal court or of one particular jurisdiction over another. There are three questions that must be answered under a state's choice of law rules, and the answers to these questions will dictate the particular strategies that both **\*79** defense counsel and plaintiffs' counsel can adopt.

If there are in fact no conflicts between various state laws, then choice of law is not an issue in the certification of a suit. One question to ask about any particular jurisdiction is if there are specific burdens or presumptions that apply. Many, if not most, states have caselaw which state there is a presumption that home state law applies, and that it is the burden of defendant to show relevant "true" conflicts. Defendants will usually challenge the application of these presumptions in a class action, suggesting that to apply these presumptions switches the burden of proof under Rule 23 impermissibly, and that plaintiffs must affirmatively demonstrate that there are no true "conflicts" so that the action is manageable under Rule 23. Because cases are split both as to the existence of presumptions, and if those presumptions apply into a class action context, the knowledge of the choice of law rules of various jurisdictions is useful at a pre-filing stage.

Another key determination is the rule that any single jurisdiction has adopted. The traditional choice of law approaches are *lex loci delicti* and *lex loci contractus.* Both require the automatic application of the law of the place where an injury occurred or a contract had been signed. These place-based doctrines, still operative in 15 jurisdictions in one form or another, present immediate choice of law issues as they appear to require the use of multiple states' laws when a true conflict is shown. Similar problems are encountered in federal multi-district litigation proceedings transferred to a single federal forum under 28 U.S.C. §1407. Under *Ferens v. John Deere Co.,* 494 U.S. 516 (1990), an MDL transferee court must apply the choice of law rules of all transferor courts, a unique and often cumbersome rule requiring the transferee court to apply numerous states' choice of law rules. [FN16]

The alternative choice of law approach adopted by most jurisdictions allows more room for creative lawyering on the part of plaintiff and defense attorneys. This approach, which has been adopted in one form by the Restatement, is generally referred to as "interest analysis" and requires a court to consider the interests of the various jurisdictions which have an interest in the lawsuit, or particular sections of the lawsuit, in deciding which state's law, or which of several states' laws, must be applied to the class. Although defendants frequently argue that the law of 51 jurisdictions must be *automatically applied* in a nationwide class, such an argument in effect seeks to apply a rule of *lex loci delicti* and *lex loci contractus,* an approach that has been rejected by most states, which have adopted the interest analysis. *See generally Kuehn v. Children's Hosp.,* 119 F.3d 1296, 1301 (7th Cir. 1997) (Posner, C.J.) (noting that defendant was arguing in effect for *lex loci delicti* and that place of injury does not control in Wisconsin). Many states add another level of complexity by requiring the court to make a choice of law determination as to *each important issue* in the case separately. This concept, called *dépeçage,* helps to identify the major issues at stake in any case but complicates the analysis.

**\*80** Faced with interest analysis the approach of most defense counsel is to look for ways to argue for the application of multiple states' laws in an effort to defeat certification by demonstrating that the case will be unmanageable. A counter tactic frequently employed by plaintiffs is to argue that a particular state's choice of law rules can be applied either because there is no true conflict, or that a particular state, usually the defendants state of incorporation or principal place of business, has a sufficient interest (or the most significant contact as to the conduct involved) so that its laws can be applied to a nationwide class.

Both federal and state courts have recognized the propriety of applying the law of a defendant's home state's, or the state of its principal place of business to a nationwide class. In one leading case, *Martin v. Heinhold Commodities, Inc.,* 117 Ill. 2d 67 (1987), the Illinois Supreme Court applied the Illinois Consumer Fraud Act to a nationwide class which had allegedly been defrauded by an Illinois-based corporation, holding:

There can be no doubt that the claims of each member of the plaintiff class implicate the legitimate interests of Illinois in applying its law to adjudicate a dispute involving a business principally situated in its jurisdiction. *Id.* [FN17]

On April 5, 2001, the Appellate Court of Illinois issued its decision in *Avery v. State Farm,* 746 N.E.2d 1242 (Ill. App. 2001), essentially affirming a combined jury verdict/bench judgment in the approximate amount of $1 billion, and affirming the trial court's class certification order creating a nationwide class of State Farm policyholders to whose claims Illinois breach of contract and statutory consumer fraud law were applied. State Farm was headquartered in Illinois, and the evidence adduced

at trial, and reviewed on appeal, established that the policies and practices at issues were designed, conceived, and implemented in Illinois. *Id.* Without such choice of law determinations to facilitate the management and trial of nationwide classes in state court, consumers of financial and insurance services, and of many consumer products, would be denied access to the courts to enforce their consumer rights, since in most such cases, the individual values of these claims does not exceed $75,000, the federal diversity jurisdiction threshold. The alternative to nationwide certification through the application of one state's law, would be a pastiche of statewide classes, adding to the expense of litigation, the burden on the courts, and the likelihood of inconsistent and contradictory adjudications of the same facts and legal theories.

The combined lesson of *Phillips Petroleum* and its progeny, including *Martin* and **\*81** *State Farm,* is that both state and federal courts can facilitate the fair and efficient case management, and trial, of nationwide, state-law based product liability, breach of contract, breach of warranty, and consumer fraud claims (the cluster of claims that typically arises from product defects, failures, and dangers) by exercising nationwide jurisdiction through the class action procedure and by judicial application of choice of law doctrine.

Application of defendants' home state laws is not the only approach under the interest analysis that can result in the application of the laws of one or several jurisdictions. Numerous cases have recognized that a careful consideration of the interest of various jurisdictions does not require those states to apply their own laws, but rather to apply the law of a jurisdiction which will allow the suit to be adjudicated and a remedy provided to injured class members. As the court in *Randle v. Spectran,* 129 F.R.D. 386, 394 (D. Mass. 1988) noted the interest of any state in having "the injuries of its citizens litigated and compensated outweigh any interest in applying its own law."

A similar approach was adopted in *In re Pizza Time Theatre Securities Litigation,* 112 F.R.D. 15 (N.D. Cal. 1986), a securities and consumer law fraud class action in which the court analyzed the choice of law issues both under California choice of law principles and *Phillips Petroleum* and noted that no state had articulated an interest in protecting the defendants from liability for wrongdoing, or would insist on having its own law applied to the dispute if the result was that the class action mechanism could not be utilized and that the plaintiffs would be barred from court. As the court noted

> Each jurisdiction, including California, has laws prohibiting fraud that accommodate these somewhat competing concerns. It is evident that the similarities in these laws vastly outweigh any differences. It is also apparent that each jurisdiction would rather have the injuries of its citizens litigated and compensated under another state's laws than not litigate it or compensate it at all. 112 F.R.D. at 20.

Under interest analysis there are several areas where application of forum state law or one state's law is less controversial. For example, the statute of limitations of the forum state is almost always applied; according to *Sun Oil Co. v. Wortman,* the application of the forum's statute of limitation is historically accepted. Similarly, numerous courts have found that with regard to punitive damages the court should seek to apply one state's laws to a dispute, given the overriding interests of certain jurisdictions in preventing certain types of conduct. A good example of the choice of law analysis in the punitive damages context, and a lucid exhibition of principles of *dépeçage* is found in *In re Air Crash Near Chicago,* 644 F.2d 594 (7th Cir. 1981).

Defendants frequently seek to counter cases such as *Martin v. Heinhold Commodities* -- and the ability of courts to apply the law of the jurisdiction of the corporation's principal place of business or incorporation to the claims of a national class -- by citing to the **\*82** Supreme Court's recent decision in *BMW of North America v. Gore,* 517 U.S. 559 (1996). [FN18] Citing to *BMW,* and several other cases decided under the dormant commerce clause, defendants contend that application of one state's laws to a nationwide class interferes with the policy choices of other states and is therefore a violation of state sovereignty. The counter-argument is that the interest of a home jurisdiction is shown by its choice of law rules, decisions of its court, legislative statements, and contacts between the litigation, the parties, and the forum and that these interests are such that under *Shutts* that the choice of law determination does not interfere with any policy decisions of other states under *BMW v. Gore* to raise to the level of a constitutional violation.

Put simply -- in most circumstances -- if a state's choice of law rules involve interest analysis, and a sufficient showing has been made of the interest in the jurisdiction whose law is to be applied -- the constitutional "limitation" presents no real difficulties.

The final, and last resort if a court chooses to apply the law of multiple states to a nationwide class is to show that such an application of multiple state laws is manageable. This approach is perhaps best exemplified by the opinion of Judge Arthur Spiegel in *In re Telectronics Prod. Liab. Litig.,* 172 F.R.D. 271 (S.D. Ohio 1997), discussed in greater detail in below. In *Telectronics,* the plaintiffs' attorneys presented the court with comprehensive surveys categorizing the various "true" conflicts-in-laws, and then developed a trial plan which explained how the various subclasses created to reflect variations in law could

be presented to a jury at trial. This however is not an easy course, and one which helps to explain why choice of law issues are best considered in the pre-filing phase.

In the event of a true conflict necessitating completion of a choice of law analysis, it is likely that, under either of the prevailing analyses (significant contacts and comparative interest/comparative impairment) a single state will emerge, again simplifying class action management. In the class certification context, many courts place the initial burden on the opponent of class certification to demonstrate that some law(s) other than that of the forum state applies, by requiring that party to identify and demonstrate a true conflict. At that point, the burden reverts to the proponent of class certification to demonstrate why the forum state's (or any other state's) law ought to apply to the entire class, or, in the alternative, to demonstrate how the case may be fairly and efficiently managed in the context of the application of multiple states' laws. On January 25, 2001, in a unanimous opinion, the California Supreme Court, in *Washington Mutual Bank v. Superior Court of Orange County,* 24 Cal. 4th 906, 15 P.3d 1071 (2001), surveyed federal class action jurisprudence, explored and reaffirmed California's choice of law doctrine, and instructed trial courts on the procedures to follow to conduct a choice of law  **\*83**  analysis (should a conflict be identified), and the methodology to be used by class certification proponents to meet their burden on superiority/manageability should the outcome of such analysis result in the need to apply multiple states' laws.

The *Washington Mutual* decision did not change California substantive or procedural law, either as to choice of law doctrine or class certification procedure. However, it brought together, in a single opinion, 30 years of jurisprudence on the procedures and practices to be applied and followed by courts and litigants to correctly negotiate what could otherwise be a choice-of-law minefield, and to assure that, as of the time of class certification, choice-of-law issues have been raised and resolved. Some courts had, in the past, deferred the ultimate choice-of-law determination. To address it clearly at the class certification stage, as an aspect of demonstrating class action manageability/superiority, prevents the need for later re-examination of class certification decisions, and possible decertification, should submerged choice-of-law issues become case management hurdles later on.

The approach taken by Judge Weinstein to fraud/product defect claims by smokers and others against the tobacco companies in *Simon v. Philip Morris,* 124 F. Supp. 2d 46 (E.D.N.Y. 2000) -- the application of a single state's law nationwide -- is consistent with the alternatives set forth in *Washington Mutual.* Moreover, single state selection has become a focus of jurisprudential and academic analysis and advocacy, as the courts are faced repeatedly with mass wrongs involving a single product, service, or course of conduct that has been distributed nationwide. In such circumstances, the uniformity of the subject of the litigation, its design, manufacture, and marketing, and the strong interest in judicial economy (the desire to avoid burdening more courts than necessary to fairly adjudicate a dispute) lend weight to the single state approach. [FN19] *See, e.g.,* Phair, *Resolving the 'Choice-of-Law Problem' in Rule 23(b)(3) Nationwide Class Actions,* 67 U. Chi. L. Rev. 835 (Summer 2000); Kay, *Currie's Interest Analysis in the 21st Century: Losing the Battle, But Winning the War,* 37 Willamette L. Rev. 123 (Winter 2001).

It has become commonplace, and, under decisions such as *Washington Mutual,*  **\*84**  may be a prerequisite to certification once the choice-of-law issue is raised, to supply the court with sufficient data and analyses of the substantive laws at issue to enable the court to group the laws into readily discernable categories, and to create corresponding subclasses. At the very least, a survey of the state laws as to those points truly at issue in the litigation is required. Some courts may consider this task so daunting as to justify a denial of class certification by presuming a predominance of individual issues, or simply foreclosing the class certification process to avoid the task at hand. However, as Professor Kramer notes, "surveying state laws is not the problem that could make mass consolidation unmanageable. Determining the law in many states is not easy, to be sure. But every practicing lawyer has done a fifty-state search at some time in his or her career, and this is certainly manageable. Moreover, the time and expense required to ascertain the content of the laws, even in a fifty-state search, are a drop in the bucket compared to other costs of litigating a mass tort or contract action -- especially given easy access to computers and to research services like Lexis and Westlaw. The cost of doing such a search does not compare, for example, to the cost of preparing experts or compiling scientific evidence to establish or refute a claim." 71 NYU L. Rev. at 582.

Moreover, once this survey and analysis is completed, it may enable the court to select one state's law, rather than to continue under the laws of all states. Such a choice-of-law analysis may be theoretically complex, "but because variation in the legal rules is not great, once the state-by-state survey is completed, judges will find a relatively small number of conflicts and an equally small number of approaches to choice-of-law. At that point, claims can be grouped and the task of resolving the conflicts completed in a fairly efficient manner. It may not be fun, but it is far from impossible." *Id.*

Finally, as *Washington Mutual* clarifies, the hard work of multi-state survey and choice of law analysis must be placed upon the litigants, rather than the court. Class action proponents may not simply submit "densely worded articles, graphs, and charts

pertaining to each state's laws," leaving it to the court to craft manageable procedures from such materials. Litigants may, at the court's request, be required to submit proposed jury instructions and interrogatories to demonstrate that the case may be managed, at trial, under a multi-state regime without distortion of the underlying substantive laws. [FN20] Again, to quote Professor Kramer, the placement of the burden on the class action proponent to complete such an exercise "may not be fun, but it is far from impossible" and should not preclude cases truly involving a standard practice, service, or procedure from achieving class certification."

### *85  The *Copley* "Albuterol" Product Liability Trial Plan

The product liability/personal injury claims coordinated as *In re Copley Pharmaceutical, Inc. "Albuterol" Products Liability Litigation,* MDL No. 1013 (D. Wyo.) originated around the country and implicated multiple states' laws. The claims involved the Copley product Albuterol, a prescription bronchodilator medication. Four batches of the drug became contaminated with one or more microorganisms which allegedly caused numerous injuries including bronchial infections, pneumonia, respiratory distress, and death. Copley ordered a nationwide recall of Albuterol in early 1994.

In 1994, the MDL transferee court granted partial class certification, under Rule 23(b)(3) and 23(c)(4)(A) on the issues of strict liability, negligence, negligence per se, breach of warranties, and requests for declaratory relief. *In re Copley Pharmaceutical, Inc.,* 158 F.R.D. 485, 493 (D. Wyo. 1994). The class certification decision was followed by the submissions of competing trial plan proposals. In the wake of the *Rhone-Poulenc* decision, defendant Copley also moved to decertify the class, contending that its Seventh Amendment rights would be infringed by a multiphase trial plan, and that the class was unmanageable because it included the claims of fifty-one jurisdictions. The decertification motion was denied, and a trial plan was approved. The published decision thereon, *In re Copley Pharmaceutical, Inc.,* 161 F.R.D. 456 (D. Wyo. 1995), includes a detailed discussion of the issues raised by *Rhone-Poulenc,* distinguishes the legal and factual issues involved in the *Copley* litigation and concludes that the constitutional concerns articulated in *Rhone-Poulenc* were unfounded. Citing, *inter alia,* the *School Asbestos, Jenkins,* and *Arthur Young* decisions, the *Copley* court determined that a multi-phase determination of common and individual issues comported with due process and constitutional requirements, and that the application of the different states' law could be managed within the class framework. *Id.* at 463-465.

In *Copley,* defendants argued that there had not been a single example of a class action trial conducted under the laws of all states. As the district court rejoined, "this court might indeed be the first to take such a class action to trial, but based on the policy reasons discussed below, the court is ready to take on that challenge." *Id.* at 466. The policy reasons that persuaded the *Copley* trial court to structure, and commence, such a nationwide class trial included the inability of many claimants to fund the daunting costs of individual litigation. The court saw no reason to replicate identical evidence and testimony relating to defendant's conduct and product, when counsel in the MDL proceedings had conducted discovery and were prepared to present the evidence in that forum. *Id.* at 466-467.

Despite its confident analysis and bold commitment to efficiency and economy through class trial, the *Copley* court did not certify all issues for common adjudication. The court's trial plan, set forth in the *Copley II* decision, 161 F.R.D. at 467-469, did *not* (unlike other class trial plans) include punitive damages. The *Copley* claims were before the MDL transferee judge pursuant to 28 U.S.C. § 1407, and were subject to remand to their districts of origin for trial. The *Copley* court contemplated that the class members' damages trials would indeed be  *86  conducted in these districts of origin. The *Copley* court determined that "punitive damages were inappropriate for class certification because they depend on an individual's injury and compensable damages." 161 F.R.D. at 467. Unlike the *Marcos* district and appellate decisions, the *Copley* trial court interpreted the Supreme Court's decision in *TXO* as requiring a determination, *inter alia,* of "how outrageous such punitive conduct is relative to a particular plaintiff." *Id.* This reasoning drove the court to group punitive conduct and punitive damages with compensatory damages for determination on an individual, rather than a class basis. *Id.* at 467-468.

The *Copley* court's trial plan provided for the determination of liability, punitive damages, and compensatory damages with respect to certain bellwether plaintiffs. The jury that determined these named plaintiffs' claims would also determine, on a classwide basis, the issue of generic causation -- "whether the contaminants proved to be in *Copley's* Albuterol can be harmful to human beings." *Id.* at 468. The trial plan set forth at 161 F.R.D. at 468-69 listed the following factual issues for classwide adjudication:

(1) To what extent was Copley's Albuterol contaminated?

(a) What batches were contaminated?

(b) What were the contaminates present?

(2) Using the class representatives as models, are those contaminants capable of causing damage to the human body?

(3) Was Copley's Albuterol defective?

(a) Was Copley's Albuterol defective in its design or manufacture?

(b) Did the contamination in Copley's Albuterol make it an "unreasonably dangerous" product?

(4) Was the defendant negligent in allowing the contaminants into its product?

(5) Did the defendant violate the Food, Drug & Cosmetic Act or the regulations promulgated thereunder?

(6) Did Copley breach express or implied warranties by its sale of contaminated Albuterol?

Concurrently, the court itself would consider evidence relevant to the plaintiffs' equitable medical monitoring claim: the medical monitoring issue would not be submitted to the jury. *Id.* Phase I would be followed, "if the plaintiffs prevail in any significant way" with the return of the class members' cases to their transfer or districts for trials. In such trials, individual plaintiffs would "have the burden of proving, under their local law, that they were in fact injured by the Defendant's product. Also with the trials, individual plaintiffs will present their claim for compensatory and punitive damages. While these trials will focus on issues of individual causation, plaintiffs will in fact be proving that they are members of the class because they, or **\*87** those they represent, suffered damages because of *Copley's* Albuterol." *Id.* at 469.

The *Copley* court's approach to the issue of potential variation in the state's tort law consisted of redefining the class, during trial and before judgment, to exclude the residents of any state whose law "appears to be idiosyncratic" 161 F.R.D. at 469. As the court reasoned, "even if such idiosyncrasies remove half the jurisdictions in the United States, which the court believes is highly unlikely, the application of common issues concerning the other 25 states should conserve judicial and litigation resources for all involved." *Id.* It was the court's hope, which proved ultimately to be well-founded, that the commencement of trial on common liability issues would provide the parties with both the information and incentive needed to settle the case on a classwide basis before the trial concluded, and judgment on the common liability issues was entered. The case settled on a classwide basis for $150 million after approximately 40 days of trial.

While the *Rhone-Poulenc* decision had suggested that a series of individual jury trials around the county were necessary, or at least desirable prior to class certification, the *Copley* court took advantage of its parallel jurisdictions as multidistrict transfer court and class action court to synergize the concepts of bellwether plaintiffs and a classwide trial. There was, arguably, no constitutional or due process prejudice to defendants, since they would reserve the right to challenge specific causation, injuries, and damages with respect to the remaining plaintiffs in individual jury trials, *if* plaintiffs prevailed on the common liability issues.

As had *Jenkins* before it, *Copley* pointed out the ultimate efficiency of the preclusive affect of the class judgment on liability, should defendants have prevailed. There would simply be no further proceedings. If, on the other hand, plaintiffs prevailed, then the necessity of relitigating and re-proving common issues that did not relate to the class members' personal characteristics or conditions would be eliminated, at substantial savings of time and expense.

### **\*88** *Simon v. Philip Morris:* Rule 23(c)(4)(A) **and the Seventh Amendment** *vs. Rhone-Poulenc*

On February 8, 2001, Judge Jack Weinstein of the Eastern District of New York issued the most recent in a series of major rulings in *Simon v. Philip Morris,* a consolidated class action asserting the punitive damages and general compensatory liability claims of injured smokers, exposed smokers, and health services providers. In *Simon v. Philip Morris,* 200 F.R.D. 21 (E.D.N.Y. 2001), Judge Weinstein addresses the trial structure of the case, which, as a practical matter, necessitates the determination of different issues by different juries because the *Simon* class action does not attempt to obtain the classwide determination of its individual members' compensatory damages: the right to seek compensatory damages, and the adjudication and calculation of these damages, are reserved for individual action. *Simon* is thus a quintessential Rule 23(c)(4)(A) action, seeking certification of specific claims and issues within the class, notably the general compensatory liability [FN21] of the tobacco company defendants to class members, and a determination of the constitutional limits of punitive damages owed by the tobacco company defendants for their alleged course of wrongdoing.

In *Simon,* the court takes on the challenge frequently raised by defendants that the severance of issues for trial before different juries violates defendants' jury trial rights. As *Simon* frames and responds to the issues, 200 F.R.D. at 21:

It is contended that the trial judge's authority in a class action to sever issues for trial before different juries is seriously circumscribed by the Seventh Amendment of the United States Constitution. It would be strange if that amendment,

designed to restrict appellate power, [FN22] were interpreted to eviscerate that of the trial judge and jury to effectively adjudicate complex cases ... there is no basis for such a perverse reading of the Constitution.

**\*89**  In rejecting the Seventh Amendment-based challenge to the severance of issues for trial before separate juries, the *Simon* decision invoked Anglo-American procedural history and the Seventh Amendment itself, the role of trial judges and juries vis-à-vis each other and the appellate courts; and "public policy favoring the efficient and fair determination of mass torts on the merits, utilizing flexible class actions where they are appropriate." The decision discusses and demonstrates the confluence of Fed. R. Civ. P. 1, 16, 23(c)(4)(A), [FN23] and 42(b) to provide trial courts with broad authority and essential flexibility in structuring polyfurcated trials, enabling common issues relating to liability questions and unitary damages issues, such as the limits of punitive damages, to be determined for the class as a whole, with the jury's special verdicts on those issues to be treated as determinative in the follow-on trials of the individual class members to establish the specific liability of defendants to them for compensatory damages based on their own injury claims.

In tracing the history of bifurcation, the courts' interpretation and application of the Seventh Amendment to bifurcated pleadings, and the recent, concerted Seventh Amendment attack by defendants on the application of bifurcation procedures to product liability class actions notwithstanding the clear intent of the drafters of Rule 23(c)(4)(A), [FN24] the *Simon* decision provides numerous instances of simple and complex bifurcation and polyfurcation in the non-class tort context. The implication is obvious: if the class action mechanism is purely procedural, and may not be applied to alter substantive law or the due process rights of the parties, how can bifurcation technique long-established and well-accepted in the non-class aggregate context be challenged or rejected upon the invocation of Rule 23? The *Simon* decision responds by utilizing Rule 23(c)(4)(A) in conjunction with the other federal rules relating to consolidation, severance, and trial structure: interpreting and applying the federal rules in a holistic fashion to promote the rules' own mandate: "These rules shall ... secure the just, speedy, and inexpensive determination of every action." Fed. R. Civ. P. 1.

**\*90**  The *Simon* decision recites specific instances of Rule 23(c)(4) instances of federal jurisprudential authorization of Rule 23(c)(4)(A) issue certification and multiple trial structures, observing that "Rule 23(c)(4)(A) has been particularly useful in the mass tort context." [FN25]

The *Simon* decision acknowledges contrary appellate decisions, such as *In re Rhone-Poulenc Rorer, Inc.,* 51 F.3d 1293 (7th Cir. 1995), and in the course of its analysis, characterizes them as "cases deviating from the norm" of Seventh Amendment doctrine. *Simon* makes the point that *Rhone-Poulenc,* in one commentator's words, is "void of any discussion of Rule 23" itself, *Id.,* and was a result-oriented, policy-inflected decision at odds with the undeniable existence of Rule 23(c)(4)(A), and its proper application in the partial certification of cases containing significant common liability issues. [FN26]

**\*91**  As *Simon* points out, the concern voiced in *Rhone-Poulenc* over the reexamination of the same fact issues by separate juries stemmed from that case's emphasis on negligence, and the challenge of severing negligence and comparative negligence issues. These concerns are not present where the tort at issue is fraud. As *Simon* observes, "in contrast, severing general compensatory liability based upon fraud from individuated issues such as specific reliance in *Simon II* establishes a clearer dividing line between the first jury's focus, which will be the defendant's conduct, and the second jury's focus, which will be the plaintiff's conduct, thereby minimizing the risk of re-examination." As the Third Circuit pointed out in *In re Paoli Railroad Yard PCB Litigation,* 113 F.3d 444, 452 n.5 (3rd Cir. 1997), "the Seventh Amendment prohibition is not against having two juries review the same evidence, but rather against having two juries decide the same essential issues." The *Simon* court proposes to preserve this distinction through the use of "procedural safeguards such as the special verdict and carefully crafted jury instructions," which the *Paoli* decision had observed may be used to present the severed issues to separate juries in a fashion that is neither "confusing" nor "uncertain." *Simon,* citing *Paoli,* 113 F.3d at 452 n.5.

In *Simon,* Judge Weinstein takes us full circle from the jury trial right preserved in the Seventh Amendment, through the development of the class action as an equitable procedural remedy, to the application of specific class action techniques to solve the problems raised by the mass proliferation of standardized consumer products and the barriers to the individual in confronting modern corporate power:

This court, in deciding how to structure *Simon II,* cannot ignore two fundamentals: (1) it is dealing with human institutions that, unlike the precise machinery of atomic physicists with variances approaching zero, must interpret the law reasonably, with some tolerance if it is to effectively serve its protective role; and (2) it is responding to a complex nationwide fraud allegedly created by defendants. The basic premise of law in this country remains that for every wrong there is a remedy, an effective and realistic  **\*92**  remedy. The class action is an outgrowth of history and equity that changed the procedural-

substantive balance of rights of those whose claims are aggregated. Both the supporters and critics of Rule 23 perceive this. The failure thus far to appreciably modify Rule 23 suggests that the present balance created by viable class actions is still approved by the rulemakers.... Trends in case law, the history of the Federal Rules of Civil Procedure and the United States Constitution, and current scholarship involving mass torts suggest that severing the issue of general compensatory liability from individual compensatory issues is appropriate in *Simon II.*

The parties have a wide range of possibilities with respect to certification, severance and other issues available for consideration by the court. The Seventh Amendment, while it needs to be considered, does not substantially inhibit them or the trial court.

### *Jenkins* and *Cimino:* the Alpha and Omega of Asbestos Multi-Phase Trials

Two appellate decisions endorsing the classwide trial of common issues in mass tort litigation have had a profound and continuing influence on the trial planning activities and class certification decisions of federal and state courts. Both of these, *Jenkins v. Raymark Industries, Inc.,* 109 F.R.D. 269 (Ed. Text 1985), affirmed, 782 F.2d 468, rehearing denied, 785 F.2d 1034 (5th Cir. 1986) and *In re School Asbestos Litigation,* 789 F.2d 996 (3d Cir. 1986) cert. denied, 479 US 852 (1986) arose from asbestos litigation. The *Jenkins* court certified a district-wide class of several thousand individual asbestos personal injury and wrongful death claims. The *School Asbestos* litigation involved a nationwide class of schools and educational institutions seeking to recover asbestos abatement costs. In both instances, class certification was affirmed insofar as it contemplated voluntary or "opt-out" certification under 23(b)(3) and 23(c)(4)(A).

The *Jenkins* trial plan included a "front to back" trial of the merits of the claims of the class representatives, and the jury's simultaneous determination of the following classwide issues: "(a) which products, if any, were asbestos-containing insulation products capable of producing dust that contained asbestos fibers sufficient to cause harm in its application, use, or removal; (b) which of the defendants' products, if any, were defective as marketed and unreasonably dangerous; (c) what date each defendant knew or should have know that insulators and their household members were at risk of contracting an asbestos related injury or disease from the application, use, or removal of asbestos-containing insulation products; (d) what amount of punitive damages, if any, should be awarded to the class as punishment for the defendants' conduct." 109 F.R.D. at 281-282. Any amount of punitive damages awarded in this initial phase was to be deposited in an interest-bearing account to constitute a "limited punitive fund" *Id.*

If the class representatives were successful in obtaining a plaintiffs' verdict on the **\*93** above-referenced generic defect, knowledge, conduct and causation issues, the class members were then to be grouped in "consolidated mini-trials of 4 to 10 plaintiffs on the issue of exposure to any products previously found to be defective; any damages legally caused by such exposure; and any comparative fault of each plaintiff in incurring such damages." *Id.* The Fifth Circuit affirmed the constitutionality of this approach, including the classwide determination of punitive damages. 782 F.2d at 470-471.

The *School Asbestos* class certification decision was affirmed prior to the development of a full-fledged trial plan. On remand, the district court determined that the trial would be bifurcated, with Phase I to include the following issues:

A. The level at which various kinds of friable asbestos, in various forms, is hazardous in school buildings.

B. Defendants' knowledge of the health hazards of asbestos.

C. Defendants' failure to properly warn or test.

D. Defendants' fraudulent concealment of knowledge of the dangers of asbestos.

E. Defendants' conspiracy to suppress knowledge of the dangers of asbestos.

F. Punitive damages.

G. Common defenses.

(*In re Asbestos School Litigation,* Pretrial Order No. 235, 5/17/90). With respect to subsequent proceedings, the court stated simply that "determination of the conduct of any additional phase(s) in this action shall be deferred until the completion of phase I." *Id.* It has anticipated the litigation would be resolved through settlement.

*Jenkins* did not settle, however, and Judge Parker, who had crafted the trial plan affirmed by the Fifth Circuit, subsequently determined that it was not sufficiently efficient to address expeditiously the thousands of claims that continue to be filed in his court. Accordingly, Judge Parker crafted a more radical plan that depended upon sampling of the class members and statistical extrapolation in order to determine an award of compensatory damages to all class members without the necessity of adjudicating the individual claims. *Cimino v. Raymark Industries, Inc.,* 751 F. Supp. 649 (E.D. Tex. 1990).

In the Fifth Circuit's *Cimino v. Raymark Industries,* 151 F.3d 297 (5th Cir. 1998), asbestos injuries were at issue. The class certification of asbestos injury claims had reached its high water mark over a decade earlier, in *Jenkins v. Raymark Industries,* 782 F.2d 468 (5th Cir. 1986). *Jenkins* affirmed the class treatment, for purposes of a multi-phase trial, of several thousand asbestos claims pending in the Eastern District of Texas. Phase I would decide: (1) which, if any, of each of the multiple defendants' products were defective as marketed and unreasonably dangerous; (2) when each defendant knew or should have known plaintiffs were at risk; (3) whether each defendant was guilty of gross negligence in marketing its products; and (4) as to each defendant so liable, the imposition of a punitive damages multiplier prior to the determination of compensatory damages for the individual class members. *See Cimino,* 151 F.3d at 301. The *Jenkins* approach had been affirmed by the Fifth Circuit over the years, but attempts **\*94** to streamline the post-Phase I determinations of exposure, injury, and damages has failed to withstand appellate scrutiny. *See In re Fibreboard,* 893 F.2d 706 (5th Cir. 1990).

While *Cimino* itself accepted the propriety of the *Jenkins* Phase I trial, all subsequent proceedings of the trial were reversed. The *Cimino* trial plan, implemented after the 1990 *Fibreboard* decision, provided for representative, rather than individual, trials of Phase II damages and injuries issues. In its 1998 *Cimino* decision the Firth Circuit concluded, after a thorough and detailed recitation, review, and analysis of trial phases II and III as implemented, that these aspects of the classwide trial structure violated the Seventh Amendment. 151 F.3d at 311-321. In dissecting the multi-phase trial, *Cimino* noted, with approval, the utilization of class certification to determine classwide issues relating to defendants' knowledge, conduct, or duty, and to such issues as "generic causation," that is, the propensity or ability of a product to cause harm. 151 F.3d at 316-317. However, *Cimino* disapproved of any leap from these issues to damages, without the individualized adjudication of specific causation and individual exposure. In short, causation as an individual issue cannot be avoided, and must be determined through some form of individualized adjudication. Causation and exposure cannot be proved by substitution or extrapolation where, as in *Cimino,* multiple defendants' products were potentially present, and causation not only involved linking a generic product (asbestos) to an illness of a class of persons exposed, by definition, to the generic product; but a determination as to which defendant's product, and which defendant, was responsible at law for each class member's disease. 151 F.3d at 314-15.

Thus, *Cimino* provides for jury adjudication of all phases of a bifurcated or multi-phase personal injury class action, with class treatment itself reserved, potentially, to common issues relating to the defendant and its product, rather than to the injuries and characteristics of the class members. While this increased reliance on Rule 23(c)(4)(A) to distinguish class from individual issues may result in a loss of efficiency, it serves to protect the legitimate rights and interests of both sides in a trial that, preserves some class characteristics, while adhering to the requirement of proof of all elements of the substantive claims at issue, and preserving the appropriate burden of proof. One risk of the *Cimino* decision is that subsequent courts may abandon the classwide treatment of Phase I trials, which *Cimino* upheld, determining that, once individualized jury adjudication of injuries and damages is necessitated, little or no efficiency can be gained from the classwide treatment of liability issues. However, the superiority and manageability criteria for class certification, whether under *Amchem* or *Cimino,* do not either force or encourage an "all or nothing" approach to class certification. If a substantial portion of each individual trial would be taken up with evidence of defendants' conduct, knowledge, and duty to establish liability, and such evidence would not vary substantially from case to case, the single classwide trial of such issues still conserves judicial resources and promotes consistency of adjudication. It may also prevent multiple trials if the initial classwide trial of liability is determined in defendants' favor. The necessity, graphically demonstrated in *Cimino,* to discriminate carefully between common and individual issues should not discourage courts from undertaking the exercise.

Indeed, the Fifth Circuit itself later did so in **\*95** *Mullen v. Treasure Chest Casino,* 186 F.3d 620 (5th Cir. 1999), which upheld the district court's decision to certify a plaintiff class, under Fed. R. Civ. Proc. 23(b)(3), on behalf of floating casino workers with respiratory illness caused by defective ventilation on the vessel. *Mullen* additionally approved the district court's decision to bifurcate proceedings into a phase one liability trial and phase two causation/damages proceeding.

### The *Telectronics* Litigation: 1995-2001

The *Telectronics* litigation exemplifies the commitment of a federal MDL Transferee Court to utilize Rule 23 mechanisms to manage the cases transferred to it, and illustrates the impact of recent trends on the certification, *de*certification, *re*certification, trial, and settlement of a nationwide personal injury product liability class.

In April 1997, shortly before the issuance of *Amchem* (and for the fourth time in a little over a year), Judge S. Arthur Spiegel, the MDL Transferee Judge in *In re Telectronics Pacing Systems, Inc., Accufix Atrial "J" Leads Products Liability Litigation,*

No. MDL-1057 (S.D. Ohio) addressed class certification issues in the case. In previous rulings, the court had granted plaintiffs' initial motion to certify the litigation as a class action, reconsidered that initial order (decertifying the foreign class and retaining the nationwide class), and subsequently decertified the class in light of the Sixth Circuit's ruling in *In re American Medical Systems, Inc.,* 75 F.3d 1069 (6th Cir. 1996). In an Order dated April 2, 1997, published at 172 F.R.D. 271 (S.D. Ohio 1997), Judge Spiegel recertified a nationwide class, with subclasses, on plaintiffs' medical monitoring, negligence, and strict liability claims. The class structure approved by the *Telectronics* court features a structure of nine subclasses to address variations in state law. Most recently, a fifth decision, issued on December 1, 1997, six months into the post-*Amchem* era, denied defendants' second decertification effort and confirmed the viability of medical monitoring claims under the laws of all states. The court's previous rulings are published at 164 F.R.D. 222 (11/17/95 initial certification order); 1996 U.S. Dist. LEXIS 11088 (2/22/96 order decertifying foreign class); and 168 F.R.D. 203 (7/16/96 order decertifying nationwide class). The 12/1/97 *Order Denying Defendants' Motion for Reconsideration* is unpublished, but is available from the author.

The *Telectronics* court's post-*American Medical Systems* decertification decision, 168 F.R.D. 203, was based upon the conclusion that plaintiffs had not, at that time, carried their burden of demonstrating that nationwide class treatment was superior and manageable, under the requirements of Rule 23(b)(3), given the perceived or potential variation in states' laws. The *Telectronics* court's subsequent recertification ruling, at 172 F.R.D. 271, addresses the state law issues in detail, and concludes, as to those claims that it certifies, that common legal and factual issues predominate over individual issues.

Approximately 25,000 pacemakers with "J" leads were implanted in the hearts of United States residents. Between December 1988 and February 1993, TPLC received reports of at least seven fractures of the wires. [FN27] TPLC notified the FDA, and TPLC recalled the unsold **\*96** leads. TPLC disseminated a "Dear Doctor" letter on November 3, 1994 notifying them of the voluntary recall. The *Telectronics* decision notes that at least 30-32 injuries due to fractures (including six deaths) have been reported, and eight other implantees have died during the lead extraction procedure. The incidence or fracture rate is a matter of dispute: TPLC has estimated the incidence at 12%; the court observed that other TPLC documents indicate "that the fracture rate may be as high as 20%." 172 F.R.D. at 277. TPLC now recommends periodic fluoroscopic screening of all patients implanted with the "J" lead to monitor for fractures. Plaintiffs contend that the voluntary recall and monitoring procedures instituted by TPLC are inadequate. *Id.*

### The Medical Monitoring Class and Its Subclasses

The medical monitoring class is defined as "all persons who have had the Accufix Atrial 'J' pacemaker leads, Model 330-801 and Model 329-701 placed in their bodies whose leads have not been explanted and who seek the establishment of a medical monitoring and research program." The court certified the medical monitoring class under Rules 23(b)(1)(A), (b)(1)(B), and (b)(3), divided it into two subclasses: "(1) implantees from states that do not require present physical injury to recover for medical monitoring and (2) implantees from states that require present physical injury in order to recover for medical monitoring." 172 F.R.D. at 285-87.

With respect to class certification of the medical monitoring claim under Rule 23(b)(1)(B), the *Telectronics* court found that separate adjudications on medical monitoring issues may adversely affect other implantees' ability to recover. The court noted that defendant TPLC, the only defendant against whom class certification had been sought, was a subsidiary that had recently sold all of its assets to another corporation. TPLC is no longer an operating corporation, possesses a $25 million diminishing liability policy, received approximately $105 million for the sale of its assets, and depleted approximately $9 million of their insurance coverage to cover legal fees and medical monitoring expenses. Under these circumstances, Judge Spiegel acknowledged the "possibility of the existence of a limited fund." 172 F.R.D. at 286.

While the court noted that the parties had not submitted formal evidence regarding the potential costs of the medical monitoring program, the simple arithmetic of dividing TPLC's remaining $120 million in assets and insurance by the estimated 25,000 **\*97** implantees would yield approximately $4800 to spend on each implantee for medical monitoring and any potential damage awards. It was apparent to the court that, under such economic circumstances, the ability of class members to "opt out" of the medical monitoring class to pursue their own claims could create inequity and prejudice. *Id.*

The *Telectronics* court additionally certified the medical monitoring claim under Rule 23(b)(3), pursuant to its specific predominance, superiority, and manageability findings. Among these findings were that the proposed class members had small monetary claims that would be difficult to pursue in individual actions, coupled with the observation that "the superiority prong of Rule 23(b)(3) is satisfied if aggregation of small monetary claims is required to ensure vindication of legal rights." 172 F.R.D.

at 287. The court disagreed with defendants' contention that class certification of medical monitoring would be unmanageable in light of claimed variations in state law on medical monitoring. As the court articulated them, "the critical questions are whether the present monitoring program is adequate and whether Telectronics will be required to continue it. Thus, most variations in state law regarding medical monitoring are immaterial." *Id.* As noted above, the court did recognize one major distinction in the law of medical monitoring that was relevant to the particular circumstances of the *Telectronics* litigation: whether or not the plaintiff must show physical injury to qualify for a medical monitoring claim. *Id.*

**The Negligence Subclass Structure**

The plaintiffs' negligence claims were certified under Rule 23(b)(3). The court found, under the analysis mandated by *American Medical Systems,* 75 F.3d at 1084, that common issues predominated with respect to the determination of defendant's negligence liability, because liability issues arose from a single product design, manufactured by a single defendant, and liability (or lack thereof) dependent upon jury evaluation of a single course of conduct. The *Telectronics* court's predominance analysis was a detailed one, which included a comparison with, and distinction from, *In re American Medical Systems; Georgine v. Amchem Prods.,* 83 F.3d 610 (3d Cir. 1996) (the decision affirmed in *Amchem*); and *Castano v. American Tobacco Co.,* 84 F.3d 734 (5th Cir. 1996), in which multiple manufacturers, products, models, and longer class periods were involved. The *Telectronics* court stressed the particular circumstances of the "J" lead implantees' claims, which involve fracture of the "J" lead component and resulting physical injury, injuries which are readily detectable upon examination, and for which explantation procedures are available. Unlike some other personal injury mass torts, the *Telectronics* case does not involve complex or exotic issues of disease causation, a lengthy class period, multiple manufacturers, or multiple product design or manufacturing variations.

The *Telectronics* court similarly focused upon the particular circumstances of the litigation in finding class treatment superior to other available methods for adjudication of negligence liability issues. Manageability challenges arising from variations in the states' negligence laws were addressed by the designation of two negligence subclasses. One subclass includes the 46 jurisdictions that permit introduction of state-of-the-art evidence by defendants; **\*98** the other subclass includes those two jurisdictions (Hawaii and Pennsylvania) that do not allow the introduction of state-of-the-art evidence. 172 F.R.D. at 291.

As the *Telectronics* court recognized, the essential elements of negligence law are uniform; such variations as do exist, such as recognition of the state-of-the-art defense, tend to be readily recognizable and easily accommodated within a class structure. With respect to the basic elements of negligence, the *Telectronics* court found that all states apply the same elements to determine liability: duty, breach, causation, injury and damage. 172 F.R.D. at 291. The court noted that while the parties might differ in their contentions regarding the application of these elements to the facts presented, and certainly were in dispute regarding the facts themselves, there could be no substantial dispute between them as to the principles of law applicable to the negligence claim. The *Telectronics* court found that "the predominant issue to be decided in this case is whether TPLC is legally responsible for the 'J' Lead fractures." 172 F.R.D. at 293.

The court recognized that "a major element of that question is whether state law provides a defense because the product was designed, inspected, tested, labeled or produced with the best knowledge and technology reasonably available at the time." 172 F.R.D. at 291. Acknowledging that the majority of the states recognize the state-of-the-art negligence defense, the court placed claimants from these states in a separate subclass. Judge Spiegel rejected defendants' other arguments regarding the "nuances" of the states' laws, finding that these nuances would not preclude class treatment and trial, and could be addressed through care in the crafting of jury instructions. 172 F.R.D. at 293.

Of particular interest is the *Telectronics* court's analysis of the "proximate cause" issue raised by defendants, who argued that the states had adopted different terminologies and definitions of causation (some courts, for example, had eliminated the term "proximate cause" from their jury instructions, preferring to utilize the term "direct cause" as being less confusing to jurors). *Id.* The *Telectronics* court's discussion of this issue points out that these differences in terminologies are attempts by the state to *avoid* confusion regarding the basic concept of causation, that causation is always an element of negligence, and that these states were attempting to adopt more modern terminology in order to retain the essential (and universal) meaning of "legal cause." *Id.*

The *Telectronics* court's treatment of the "proximate cause" nuance issue is instructive, since the adoption of different terminology or phraseology by courts and jury instruction drafters in different states may mask an essential identity of legal concept, as the courts struggle to simplify legal language and to make the meaning of the law clearer for the fact finder. In this respect, courts addressing the issue of nationwide class certification, and the claimed variations in states' laws, may promote

greater clarity and understanding by assisting in the movement toward plain language in judicial caselaw and jury instructions. In so doing, they are neither dishonoring nor disregarding the "nuances" of state law, creating a federal common law, nor abrogating state common law. They are simply assisting in enabling juries to apply the law, as it exists, to the facts presented them at trial.

### *99 Strict Liability Subclasses

The court certified three strict liability subclasses under Rule 23(b)(3). Thirty-two jurisdictions were included in a subclass of jurisdictions following the version of strict liability outlined in the Restatement (2d) of Torts § 402A. Eleven states were included in a subclass of those applying a modified version of § 402A (which incorporates some elements of negligence into the strict liability formulation), and three jurisdictions were included in the subclass following the formulation of strict product liability articulated in *Greenman v. Yuba Power Products,* 377 P.2d 897, 900 (Cal. 1963) 172 F.R.D. at 293. The § 402A subclass was further subdivided, on the basis of whether the state allows introduction of state-of-the-art evidence in defense, and the 402A (modified) subclass was subdivided as to whether the jurisdiction requires proof that the product was either defective, unreasonably dangerous or both. 172 F.R.D. at 279.

### Policy Considerations Articulated by the *Telectronics* Court

The *Telectronics* re-certification decision reaffirms the vitality of Rule 23 in the context of mass tort claims. Cognizant of recent appellate decisions decertifying other nationwide classes, the *Telectronics* court engaged in the legal and factual analyses articulated by these courts as judicially-created prerequisites to class treatment, and concluded that, under the specific circumstances presented by the *Telectronics* litigation, such criteria supported, rather than precluded, the class certification of common issues and claims. Moreover, the *Telectronics* court also took the opportunity to restate the policy considerations inherent in Rule 23, and to announce its departure from any "trend" that based decertification or denial of certification on a disagreement with the ramifications of Rule 23 in its present form. The *Telectronics* court's language, 172 F.R.D. at 275-76, is clear and unequivocal:

In deciding this question, the court is mindful of the applicable law and rules, the procedural and substantive legal rights of the parties and the ethical concerns raised by adjudication of mass tort claims. Recently, several Circuit Courts have been highly critical of the use of class actions in mass tort and product liability cases. While we recognize the difficulties inherent in diversity based-class actions as outlined by the Circuit Courts, we continue to believe that class action provides the fairest, most efficient and economical means of dealing with these types of cases. We believe courts must play an important role in the efficient resolution of mass tort action. This is especially so where, as here, there is a danger that the expense of litigation and potential for large damage awards threaten to bankrupt the defendant and leave some class members without a remedy. *See* Marc Z. Edell, *Resolution of Mass Tort Litigation: Practitioner's Guide to Existing Methods and Emerging Trends,* C949 ALI-ABA 37 (1994) (noting that class **\*100** actions have value in conserving resources of plaintiffs, defendants and the courts).

We also strongly disagree with those Circuit Courts which have allowed their apparent economic biases to influence their interpretation of the requirements of Rule 23. For example, in *Castano v. American Tobacco Co.,* 84 F.3d 734 (5th Cir. 1996), the Fifth Circuit found that class certification of all nicotine dependent individuals was not superior under Rule 23(b)(3) because of the strategic effect class certification has upon the defendants' chances.

In the context of mass tort class actions, certification dramatically affects the stakes for defendants. Class certification magnifies and strengthens the number of unmeritorious claims. Aggregation of claims also makes it more likely that a defendant will be found liable and results in significantly higher damage awards.

*Id.* at 746 (citations omitted); *see also Matter of Rhone-Poulenc Rohrer Inc.,* 51 F.3d 1293 (7th Cir. 1995). To credit the Fifth Circuit's reasoning is to also state that its converse -- denying class certification makes it less likely defendants will be found liable or responsible for lower damage awards -- is true. Plaintiffs in individual actions will have to bear a greater share of the cost and risk for maintaining their action as compared to plaintiffs in a class action. Often an individual action pits a single plaintiff relying on his or her own resources to fund the litigation against the vast resources of a large manufacturer and the large law firms which represents it.

Obviously, the procedural rules affect the outcome of litigation. These Circuit Courts seemed to ignore the essence of Rule 23 because of their philosophical disagreement with the effects of Rule 23.

The *Telectronics* decisions demonstrate that, even in the wake of recent appellate decisions and the *Amchem* Supreme Court decision, trial courts may properly certify common claims and issues in mass tort personal injury/wrongful death cases and non-personal injury product liability cases on a nationwide basis, if plaintiffs meet their burden of presenting a viable trial structure that appropriately addresses variations in states' law and enables the court to conduct a meaningful trial of such issues. Factual circumstances that facilitate the plaintiffs' ability to make a credible demonstration, and the court's ability to discern a manageable structure, may include a highly-defined common course of conduct, a relatively short class period, an essentially uniform product, and a single manufacturer or manufacturing process. All  **\*101**  of these circumstances may not coincide in a single case, as they did in *Telectronics,* and such confluence may not be necessary to support class treatment.

## Summary Jury Trial and Settlement of the *Telectronics* Litigation

In February 1998, the court conducted a one-week summary jury trial [FN28] of the classes' claims against defendants Telectronics and (parent corporation) Pacific Dunlop, utilizing several named plaintiffs as exemplar plaintiffs. The jury heard evidence and argument from witnesses and counsel, and considered liability issues on the part of the class and the damages claims of the exemplar plaintiffs. The court utilized jury instructions and interrogatories designed to be compatible with the laws of all states. The jury returned liability and compensatory damages verdicts for the plaintiffs, while declining to hold the manufacturer's parent company liable on plaintiffs' veil-piercing theory.

As the court had predicted, the summary jury trial experience, and its outcomes, facilitated constructive settlement discussions. In July 1998, the parties reached a proposed settlement which provided for payment, to the class, of the insurance available to the manufacturer defendant. On July 22, 1998, the court granted preliminary approval to the settlement, and certified the plaintiff class under Rule 23(b)(1)(B) for settlement purposes, with final certification of the class and final settlement approval conditioned upon the parties' ability to demonstrate satisfaction of mandatory class certification criteria and the fairness, adequacy, and reasonableness of the settlement. The settlement was granted final approval by decision issued on March 5, 1999, reported at 186 F.R.D. 459 (S.D. Ohio 1999).

## The Mandatory *Telectronics* Settlement Fails to Survive *Ortiz* on Appeal

There appeared to be no question, in *Telectronics,* that the primary defendant, Telectronics ("TPLC") itself, had assets and available insurance so limited as to justify a 23(b)(1)(B) class for settlement purposes. [FN29] As chronicled above, the *Telectronics* court had  **\*102**  previously certified the class, for litigation and trial purposes, under various subsections of Rule 23. [FN30] By the time the litigation had progressed to the point of settlement, however, it appeared obvious that the insurance potentially available to pay the claims that were the subject of the *Telectronics* litigation was inadequate to fully pay all claims, thereby justifying limited fund class certification. As the *Telectronics* court concluded: "TPLC's funds are so limited that there is a substantial probability, almost a certainty, that if damages are awarded in individual litigation against TPLC, the claims of earlier litigants would exhaust TPLC's assets with the result that later litigants would not be able to recover on their claims. The settlement, on the other hand, immediately makes available the entire value of the company."

The more controversial aspect of the settlement involved the release given to Telectronics' parent companies, whose assets and insurance did not constitute a limited fund. However, the parents had various defenses available to them, and holding them liable for the conduct of its subsidiary would have required a successful "veil piercing" exercise. In fact, plaintiffs had a prior opportunity to test the strength of their veil piercing theory in the course of the summary jury trial conducted in February, 1998 in the multidistrict proceedings. Claims against both Telectronics and parent Pacific Dunlop were tried to a jury, which returned a liability verdict against Telectronics only. It thus seemed appropriate to the District Court to grant a release to Pacific Dunlop in return for its contribution toward the Telectronics limited fund settlement, despite the fact that Pacific Dunlop was not itself a limited fund. As the *Telectronics* court noted, Rule 23(b)(1)(B) is not restricted solely to instances of a limited fund; the language of the rule itself contains no reference to a limited fund, and observed that the loss of a settlement (which would occur in the absence of a release for the parent company) "can constitute a risk within the meaning of Rule 23(b)(1)(B)." *Id.* at 414. [FN31]

**\*103**  In the absence of a settlement with Telectronics, it was clear to the court that Telectronics' available assets and insurance would have been exhausted in the defense of the litigation, leaving nothing for any successful litigants. *Id.* at 38-40. This must be

contrasted with the *Ortiz* scenario, in which the limited fund defendant, Fibreboard Corp., itself contributed a mere $500,000 of the $1.525 billion settlement, in which the limited fund settlement itself was funded by the compromise of contested insurance coverage litigation, and in which the *Ortiz* court found the evidentiary record on the existence of an underlying limited fund to be lacking.

Despite these arguable distinctions, the Sixth Circuit, on review, did not determine the *Telectronics* settlement to be survivably different from *Ortiz*. In *In Re: Telectronics Pacing Systems, Inc., Accufix Atrial "J" Leads Products Liability Litigation, 221 F.3d 870, (6th Cir. 2000),* the court applied *Ortiz* strictly finding that the settlement was an abuse of discretion for straying too far from "the historical model" dictated by *Ortiz*. 221 F.2d at 877. The fatal flaw, as found by the Sixth Circuit, was settling parent defendant Pacific Dunlop's voluntary agreement to contribute $10 million to the settlement in return for a mandatory release. There had been no finding that Pacific Dunlop itself met limited fund criteria: indeed, the point of the settlement had been that Pacific Dunlop would contribute only on condition that it would obtain a mandatory release, to resolve the litigation in its entirety.

The Sixth Circuit was critical of the district court's inconsistent (in its view) holdings with respect to Pacific Dunlop, contrasting the district court's finding of personal jurisdiction over the parent company early in the case, with its approval, at the end, of a settlement releasing it in a mandatory class context. The Sixth Circuit agreed with settlement objectors "that the Australian parent company should not be totally released from liability based solely on agreement of the parties and for that reason alone the settlement cannot be approved." *Id.* at 880.

Presumably, the Sixth Circuit would not have obliterated a settlement that, as to the parent companies at least, preserved the general due process requirement of providing an opt-out opportunity to class members. *Id.* at 881. Of course, the record reflected that Pacific Dunlop's position was that it would not settle, nor contribute to a settlement with the primary defendant, under opt-out conditions. The settlement proponents had argued that the structure of the settlement was necessary to ensure maximum contributions, and to preserve the primary defendant's assets for the claimants, to avoid bankruptcy. The Sixth Circuit, however, took a sanguine view of the prospects and ramifications of a bankruptcy: "Our holding here does not end the matter or foreclose injured plaintiffs from recovery. If TPLC is or becomes insolvent, then, as discussed above, bankruptcy is a partial solution. This would leave open for adjudication the liability of the parent companies, which all parties recognize to be the defendants with the deepest pockets. [FN32] Our decision here, therefore, should not adversely affect **\*104** the members of the class who have real injuries to be redressed and compensated." *Id.* at 882.

In *Ortiz* itself, the Supreme Court had declined to hold that bankruptcy trumps mandatory settlement class certification, and had, at least implicitly, preserved mandatory settlement as a viable *alternative* to bankruptcy, given its costs, delays, and uncertainties. Many have argued that bankruptcy is particularly ill-suited to address unliquidated personal injury tort claims. The Sixth Circuit, in *Telectronics,* appeared singularly untroubled by such considerations, and took the step that *Ortiz* itself had not: suggestion of bankruptcy as the preferred "solution" to the concerns of tort claimants facing a potentially insolvent tortfeasor.

**The *Telectronics* Settlement is Re-Submitted And Approved On An Opt-Out Basis**

In the wake of Sixth Circuit reversal, the parties re-negotiated the proposed settlement, this time providing for opt-outs. The new settlement was recently submitted to Judge Spiegel for final approval, which was granted on March 8, 2001. *In re Telectronics, Inc., Products Liability Litigation, 137 F. Supp. 2d 985 (S.D. Ohio 2001).* The companion decision approving attorneys fees is published at 137 F. Supp. 1029. The *Telectronics* settlement has thus won ultimate approval as a "traditional" opt-out 23(b)(3) settlement. [FN33] More to the point for other cases, the question is whether the Sixth Circuit's draconian application of *Ortiz* has completely chilled the creativity that *Ortiz* cautioned, but did not foreclose.

**\*105 The *Diet Drugs* Litigation: 1997-2001**

By September 15, 1997, when the diet drugs Pondimin (fenfluramine) and Redux (dexfenfluramine) were withdrawn from the market pursuant to FDA request, approximately six million Americans had taken one or both, either alone or in combination with phentermine, an older drug not withdrawn from the market. In the wake of this withdrawal, thousands of civil actions were filed in state and federal courts nationwide on behalf of these "Diet Drugs" users. These included individual and class actions for personal injury and medical monitoring or surveillance. Most injury claims alleged heart valve damage or primary pulmonary hypertension (an otherwise rare, and almost invariably fatal disease), the two medical conditions most frequently associated in

the medical literature with Diet Drug use, and conditions as to which plaintiffs allege they had not been adequately warned. On December 12, 1997, the Judicial Panel on Multidistrict Litigation transferred the federal actions to the Eastern District of Pennsylvania for consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407, and appointed Chief Judge Emeritus Louis C. Bechtle, a member of the Judicial Panel, as Transferee Judge for the multidistrict proceedings, styled *In re: Diet Drugs (phentermine, fenfluramine, dexfenfluramine) Products Liability Litigation,* MDL Docket No. 1203.

During the same period, the thousands of suits filed in state courts were similarly coordinated, notably in Pennsylvania, New York, New Jersey and California. The result was a network of coordinated proceedings and individual actions, proceeding concurrently in the federal and state courts. Through formal sharing agreements approved by the MDL court, plaintiffs in most of these actions have access to the coordinated discovery conducted in MDL 1203 and its coordinated state court counterparts. Several individual actions have gone to trial, a $23 million verdict was reported in August, 1999, and there have been a number of large individual settlements.

### The *Diet Drugs* MDL Court's Medical Monitoring Class Certification Decision

Against the backdrop of statewide class certification orders in six state courts, on August 26, 1999, Judge Bechtle issued *Memorandum and Pretrial Order No. 865* in the MDL Docket No. 1203 proceedings, certifying an essentially nationwide medical monitoring plaintiff class, and excluding from the class those plaintiffs protected by the state court certification orders, and residents of those states in which present injury is required for entitlement to medical monitoring. The decision is published as *Diet Drugs (Jeffers v. American Home Products, Inc.),* 1999 WL 673066 (E.D. Pa.).

In the federal court system, medical monitoring was apparently first recognized and ordered as a form of pretrial relief in *Friends For All Children, Inc. v. Lockheed Aircraft Corp.,* 587 F. Supp. 180, 184-88 (D.D.C. 1984), aff'd, 746 F.2d 816 ("*FOAC*"). In that case, brought on behalf of 70 Vietnamese orphans against Lockheed, the plaintiffs sought diagnostic medical examinations to evaluate the presence of brain injuries in children who had survived the crash of a plane in the course of their evacuation. *Id.* The diagnostic exams were necessary to **\*106** determine if injury had occurred, and if treatment was required, as a result of the sudden cabin decompression that accompanied the crash. *Id.* The United States Court of Appeals for the District of Columbia affirmed the imposition of medical monitoring liability on the defendant tortfeasor, in a decision widely cited by subsequent medical monitoring cases across the country. This landmark decision explicated the fundamental distinction between a medical monitoring claim based on increased risk to determine *if* an injury exists, and a conventional personal injury claim based on the fact of damage flowing from an injury that *does* exist.

The personal injury/medical monitoring distinction may have a dispositive influence on the issue of class certification. The District of Columbia Circuit in *FOAC,* the Third Circuit in *Paoli,* 916 F.2d at 850, the Sixth Circuit in *Sterling v. Velsicol,* 835 F.2d 1188, 1200-01 (6th Cir. 1988) and the Fifth Circuit in *Cimino v. Raymark Indus.,* 151 F.3d 297 (5th Cir. 1998) have all acknowledged the clear line that divides general causation issues (*i.e.,* a product or substances' characteristics and epidemiological proof of its ability to cause harm -- exposure places the victim at an increased risk of harm), which are at issue in medical monitoring claims and which are subject to class-wide adjudication, from issues of individual causation (did exposure to a substance or product cause injury to a specific individual), which are not at issue in medical monitoring cases, and may in some cases be more appropriate for separate, individualized adjudication in personal injury suits.

In crafting the definition and scope of the federal medical monitoring class, Judge Bechtle invoked the federal-state coordination admonition of § 30.15 of the *Manual for Complex Litigation, Third* (Federal Judicial Center 1995), stating as follows:

> The civil actions in MDL No. 1203 are before the court on diversity jurisdiction and so there is overlapping jurisdiction over the [state court] Diet Drug Litigation. Furthermore, the court has in the past and will in the future conduct MDL No. 1203 in a manner that encourages coordination between state and federal courts, rather than in a manner which results in conflicting deadlines and discovery requirements for parties. In this light, the court will exclude from the conditional class those persons who are, on the date of this Order, class members of a certified class action in a state court for medical monitoring and they shall remain excluded for as long as they are members of such class. *See, e.g.,* Manual for Complex Litigation 3d § 30.15, at 221 (1995) (stating that "to the extent a state court class action has progressed further than the federal action, the court may want to consider an appropriate definition to exclude the members of the class").

1999 WL 623066 (E.D. Pa.).

The moving plaintiffs in MDL 1203 had argued for the application of Pennsylvania state law to the entire nationwide class under Pennsylvania choice of law doctrines. **\*107** Judge Bechtle disagreed that this approach obviated the need to explore the laws of all states involved in his class certification order, and directed the parties to brief variances in state law and propose appropriate subclasses. Notably, the Court did not deny class certification on grounds that state law variances would overwhelm common issues; to the contrary, Judge Bechtle's analysis observes the primacy of common issues over state law variations, and recognizes the creation of a limited number of subclasses as a response to the manageability challenge posed by a unitary trial on the medical monitoring claims of the residents of as many as 44 states. Judge Bechtle also excluded, from the class definition, residents of those few states (such as Louisiana) which, by legislative or jurisprudential fiat, had limited the medical monitoring claim to plaintiffs with existing injuries.

Judge Bechtle's medical monitoring class certification decision was guided by the self-conscious, and eloquently expressed, effort to do equity by providing a meaningful forum and procedure for the pursuit of the medical monitoring claim. As the Court summarizes its class certification analysis:

> The class members' claims are such that individual ligation would not result in achieving the appropriate relief for the class members. Absent class treatment, the class members will be unable to obtain the benefit of collection and research of medical data and thereby better understand issues such as latency periods and techniques of diagnosis of the diseases which the class believes are caused by the ingestion of the drugs. While Plaintiffs will ultimately have to prove that they and the class are, in fact, at a risk of contracting these diseases, the court notes that there is sufficient medical study and research at this time to warrant conditional certification. There exist individual issues which will be a challenge to the court and the parties in resolving the class claims, including individual factual issues and variance of applicable state law. Rather than turn its back on these challenges, the court will conditionally certify the class as outlined above and will continue to review the class and redefine it as necessary until it can be said with some certainty that class treatment is unacceptable under *Barnes,* Rule 23 or the parties' constitutional rights.

> As the accompanying Order directs, the court will expect the parties to further brief and present to the court their views on issues of developing scientific studies, potential class structures to address variance of state law and individual issues. However, the court finds that certification is appropriate at this juncture as it has found the requirements of Rule 23(a) and (b) are met under Plaintiffs' theory that the class members are entitled to uniform, equitable relief. That theory is founded on such scientific studies and findings which would at least present a triable issue of fact for **\*108** a factfinder. Thus, in the interests of granting the equitable relief requested and noting that the class itself is unable to perform those equitable tasks on an individual basis, the court certifies a conditional medical monitoring class as outlined above.

*Id.*

### The *Diet Drugs* MDL Court Denies Approval to a Limited Fund Settlement

Prior to the *Diet Drugs* MDL court's certification of the comprehensive *Jeffers* medical monitoring class for litigation purposes, the court had been asked to certify a "limited fund" mandatory class for settlement purposes, and to approve a proposed partial settlement with defendant, Interneuron Pharmaceuticals, Inc. The resulting decision, issued on September 27, 1999, and published as *Wish v. Interneuron Pharmaceuticals, Inc.,* 1999 WL 782560 (E.D. Pa.) contains a succinct yet detailed summary of the events leading to the federal and state litigation, and the coordination of the federal cases as MDL proceedings. The partial settlement at issue was framed as a non-opt out, limited fund class settlement, and was negotiated, documented, and briefed for final approval before the Supreme Court's June 1999 issuance of its *Ortiz* decision. As the *Wish* decision recounts, the court conducted a six day evidentiary hearing in connection with final approval, including detailed financial information to justify the terms of the settlement: $1.5 million cash; what remained of Interneuron's self-consuming insurance policies (an estimated $28 million); and $55 million in future payments from Interneuron's royalty income, to be secured by Interneuron stock. Interneuron, a secondary manufacturing defendant, claimed impending insolvency when faced with thousands of diet drug injury claims. After the settlement hearing, but before the trial court's decision, the *Ortiz* decision was issued, essentially sealing the settlement's fate.

In a thorough and analytical comparison of the Interneuron settlement with the settlement rejected in *Ortiz,* Judge Bechtle concluded that "A comparative analysis of the *Wish* settlement against the traditional model as articulated in *Ortiz* leads to the conclusion that the court is far afield from the traditional notions of limited fund class structure as contemplated by the drafters of Federal Rule of Civil Procedure 23(b)(1)(B). These significant departures deprive the class of the traditional protections as

articulated in *Ortiz*. The court further finds that the settlement fails to provide alternative means of protecting those interests. Even when Rule 23(b)(1)(B) is read with sufficient flexibility to permit its application to mass tort cases generally, such flexibility would be stretched beyond the breaking point in applying it to the proposed *Wish* limited fund settlement." *Id.* at *10.

### *109  The MDL Court Approves a $4.75 Billion Multiple Opt-Out Class Settlement

The failure of the Interneuron settlement to survive *Ortiz* did not spell the end of settlement efforts in the *Diet Drugs* litigation. Many months of intensive negotiations culminated in a proposed Rule 23(b)(3) opt-out class action settlement with primary defendant American Home Products ("AHP"), which was presented to the court for preliminary approval in December 1999. Pursuant to a comprehensive, multi-media nationwide notice program, several weeks of evidentiary hearings on final settlement approval were held in May and June, 2000, with additional sessions in August, 2000. The court heard medical, public health, scientific, financial, and marketing expert testimony on the terms and benefits of the settlement, the sufficiency of the notice program, and the ability of the settlement to provide benefits addressing the specific disease at issue in the case, heart valve damage attributed to sustained diet drug usage.

The AHP settlement had two main components: a medical monitoring program, designed in cooperation with the state courts that had previously certified such claims, to be administered by independent trustees under the supervision of the court; and a detailed matrix of cash benefits to be paid, in the present and future, to injured claimants who wish to remain in the class. The settlement benefits have a total nominal value of $4.75 billion and a net present value of approximately $3.75 billion. Payments to individual claimants range from approximately $7,000 to $1.5 million, depending upon claimant age, severity of injury, and other circumstances. In a lengthy decision, the MDL court approved the proposed settlement on August 28, 2000 in a decision published as *In Re: Diet Drugs Liability Litigation (Brown v. American Home Products Corporation),* 2000 WL 1222042 (E.D. Pa.).

Judge Bechtle's decision granting final approval to the settlement details the medical issues in the case, the terms and conditions of the settlement, the "multiple" or "back end" opt out system, the class certification requirements for the opt-out settlement class, and the structure of the class and subclasses, the nature of the settlement negotiations, the terms of the settlement, and the rights of class members under both prevailing Third Circuit settlement approval factors, and the requirements of *Amchem* and *Ortiz.*

The *Diet Drugs* decision takes pains to contrast the integrity of the negotiations, and the protections afforded to class members by the class/subclass structure in the *Diet Drugs* litigation, with those aspects of the *Amchem* and *Ortiz* settlements that were criticized by the Supreme Court. For example, the *Diet Drugs* court found that "during the negotiations, [settling defendant] AHP never offered, and the plaintiffs never requested, payment of a lump sum to resolve the claims of class members," and "To the contrary, the negotiations were devoted to working out a structure that would appropriately resolve the claims of all individuals who took [the drugs]. Only when that structure was agreed upon did the parties determine the amount of money that would be necessary to fund the structure."

In findings that drew sharp contrasts between the *Diet Drugs* settlement and the  *110  negotiations that produced the *Amchem* deal, the court observed: "There was no intra-class trading off of benefits. That is, one benefit of the settlement did not have to be reduced in exchange for the creation or exchange of another benefit." Additionally, the court found that the parties' litigating posture provided them with leverage to extract a favorable settlement; unlike the situation in *Amchem,* the *Diet Drugs* litigation was proceeding, in an active litigation posture, toward class trial of the medical monitoring claim, and individual trials of other claims.

The *Diet Drugs* settlement is innovative with respect to its multiple opt-out opportunities: features necessary to afford choice to claimants with potentially valuable personal injury claims, who might elect to proceed to trial against AHP instead of registering for the class action settlement benefits. While the order reflects approximately 44,000 opt outs, the settlement option itself also proved popular: approximately 120,000 class members have registered for accelerated benefits, and approximately 100,000 members had registered for long-term benefits. A unique Accelerated Implementation Option ("AIO") was created to enable class members to accept settlement benefits without awaiting final court approval of the settlement "presents a unique opportunity and the class members may accept the benefits of the settlement without having to await court approval of the class," the court found. That nearly 120,000 class members chose the AIO, which is essentially a separate agreement with AHP to accept the settlement benefits in return for a release, indicates that the terms are considered reasonable by the class members themselves.

In its settlement approval decision, the *Diet Drugs* court also drew a distinction between the divergent and amorphous nature of the *Amchem* class with the "cohesive" nature of the *Diet Drugs* settlement class. The *Diet Drugs* class "is more cohesive than the classes sought to be certified in the asbestos and tobacco litigation arenas," the court observed. "Where *Amchem* involved class members exposed to asbestos in differing ways and through a wide range of different asbestos-containing products, the instant class was exposed to only two diet drugs, which are chemically related, and through a single method of exposure -- oral ingestion of drugs." Moreover, noted the court, *Amchem* dealt with a variety of injuries including pleural scarring, lung cancer, asbestosis and mesothelioma. However, the *Diet Drugs* class settlement was confined to a single distinct injury: heart valve damage. The other serious disease attributed to diet drug ingestion, primary pulmonary hypertension ("PPH"), was excluded from the settlement benefits and releases so that sufferers could achieve individual adjudications that fully reflected their personal circumstances and the strength of their claims. Ironically, several objectors opposed the exclusion of PPH from the class action settlement, arguing that it should be included. Inclusion would, in turn, have led to objections by, it is estimated, the majority of PPH sufferers themselves, and possibly from heart valve disease sufferers as well.

Finally, the *Diet Drugs* court rejected the contention that the settlement had a "futures" problem similar to that observed by the Supreme Court in *Amchem,* because heart valve disease involves latency and progression. The Supreme Court found a conflict between the presently injured asbestos plaintiffs, and those who had been exposed but had as yet manifested no symptoms of asbestos disease, in the *Amchem* settlement. However, in the case of *Diet Drugs,* the court found that the objectors had "presented no evidence from any study to support **\*111** the contrary view that ... valvulopathy is either latent or that it progresses in most former patients." In short, the medical evidence presented in connection with hearing showed a short latency period, and the settlement matrix itself addressed the issue of progression by providing for increased payments if claimants' conditions worsened.

Structurally, the *Diet Drugs* class included five discrete subclasses, each of which was represented by its own subclass representatives, and by subclass counsel who participated in the negotiations. With respect to the issue of leverage," the *Diet Drugs* decision observes:

> Neither were Class Counsel disarmed by a lack of leverage in their negotiations. In *Amchem,* the Supreme Court rejected the notion that in a settlement class context, a fairness inquiry under Rule 23(e) could eclipse the certification requirements under Rules 23(a) & (b). *Amchem,* 521 U.S. at 621. The court held that such an approach would disarm both Class Counsel and the court. *Id.* The Court, stated that "class counsel confined to settlement negotiations could not use the threat of individual litigation to press for a better offer, ... and the court would face a bargain proffered for its approval without the benefit of adversarial investigation." *Id.* (citations omitted). Here, Class Counsel were armed with leverage in their negotiations, including the threat of imminent and ongoing litigation. By the time settlement negotiations were underway, thousands of individual personal injury and medical monitoring suits were proceeding through discovery and toward trial. Several other class actions were certified in the states and before this MDL No. 1203 transferee court. Also, the class action medical monitoring trial in New Jersey was underway. Thus, throughout the negotiations, Class Counsel were able to use the threat of present and continuing litigation as a bargaining chip in reaching the best possible deal they could achieve for the class." *Id.* at \*45.

The *Diet Drugs* settlement was appealed by various objectors to the Third Circuit; as to most, appeals have been withdrawn and dismissed. As of this writing, two appeals remain; oral argument was conducted on May 30, 2001, and it appears likely the settlement will receive final judicial approval.

### Conclusion

The greatest hits of 21st century products liability litigation have yet to emerge. Rule 23 itself is in flux, with radical proposed additions to the Rule now under consideration by the Federal Rules Advisory committee. Dissemination for public comment is expected shortly. State courts become ever more sophisticated and proactive in the management of complex tort litigation. Lawyers themselves have learned to form information sharing networks, and more **\*112** formal consortia, to amass and deploy the resources necessary to prosecute litigations involving thousands, or millions, of injured claimants. Yet the resources of our civil justice system--the number of judges and courtrooms--remains relatively static. The class action has a vital role yet to play in ensuring access to courts for claimants, and empowering courts themselves to handle mass claims effectively. Under these conditions, products liability class actions will evolve and mature as mainstays of mass tort procedures.

[FN1]. Fed. R. Civ. P. 23(c)(4) provides:

"When appropriate (A) an action may be brought or maintained as a class action with respect to particular issues, or (B) a class may be divided into subclasses and each subclass treated as a class, and the provisions of this rule shall then be construed and applied accordingly."

[FN2]. *Mandamus denied sub nom In re Diamond Shamrock Chemical Co.,* 725 F.2d 858 (3d Cir.), cert. denied, 465 U.S. 1007 (1984).

[FN3]. *See BMW of North America, Inc. v Gore,* 517 U.S. 559 (1996); *TXO Production Corp. v. Alliance Resources Corp.,* 509 U.S. 443 (1993); *Pacific Mutual Life Insurance Co. v. Haslip,* 499 U.S. 1 (1991).

[FN4]. The Amchem settlement was granted final approval by the district court *sub nom. Georgine v. Amchem,* 157 F.R.D. 246 (E.D. Pa. 1994) on August 16, 1994. The Third Circuit reversed settlement class certification and final settlement approval in *Georgine v. Amchem Products, Inc.,* 83 F.3d 610 (3d Cir. 1996) ("Georgine") on June 27, 1996. The *Ortiz* settlement was granted final approval by the district court *sub nom. Ahearn v. Fibreboard Corp.,* 162 F.R.D. 505 (E.D. Tex. 1995) on July 27, 1995. The Fifth Circuit affirmed settlement-purposes rule 23(b)(1)(B) mandatory class certification and final settlement approval on July 26, 1996, 90 F.3d at 963, one month after the Third Circuit's reversal of the *Amchem* settlement in *Georgine,* 83 F.3d at 612.

[FN5]. *See, e.g., In Re Bendectin Products Liability Litigation,* 749 F.2d 300 (6th Cir. 1984); *In Re Temple,* 851 F.2d 1269 (11th Cir. 1988); *In Re Dennis Greenman Securities Litigation,* 829 F.2d 1539 (11th Cir. 1987); *In Re "Agent Orange" Product Liability Litigation,* 100 F.R.D. 718 (E.D.N.Y. 1983), affirmed 818 F.2d 145 (2d Cir. 1987), cert. denied *sub nom Fraticelli, et al. v. Dow Chemical Co., et al.,* 484 U.S. 1004 (1988). In fact, the *Ortiz* decision cites these cases approvingly as setting forth the appropriate evidentiary and financial standards and criteria for limited fund class certification and settlement approval.

[FN6]. As observed in Note, *Harnessing Madison Avenue: Advertising and Products Liability Theory,* 107 Harv. L. Rev. 895 (February 1994), "the classic [[state] cases of products liability law that propelled the law toward tort and away from contract ... were grounded, in part, on the courts' keen awareness of advertising's growing power over consumer decision-making." These cases, including *Greenman v. Yuba Power Products, Inc.,* 377 P.2d 897 (Cal. 1962), and *Escola v. Coca-Cola Bottling Co.,* 150 P.2d 436 (Cal. 1944), and *Henningsen v. Bloomfield Motors, Inc.,* 161 A.2d 69 (N.J. 1960), observed that consumers of mass produced and mass marketed goods and services must rely on the representations made and impressions created by modern advertising. Consumers have been "lulled" by manufacturer-provided advertising and marketing devices; "under modern conditions, the ordinary layman, on responding to the importuning of colorful advertising, has neither the opportunity nor the capacity to inspect or determine the fitness of [a product] for use ...." *Henningsen,* 161 A.2d at 83.

[FN7]. *See, e.g., Clothesrigger, Inc. v. GTE Corp.,* 191 Cal. App. 3d 605 (1987) (seeking damages and injunctive relief for fraud, negligent misrepresentation and unfair business practices in long distance telephone overcharges); *Anthony v. General Motors Corp.,* 33 Cal. App. 3d 699 (1973) (product liability; injunctive relief); *Sindell v. Abbott Labs,* 26 Cal. 3d 588 (1980), *cert. denied,* 449 U.S. 912 (1980) (doctrine of market share liability established in DES tort claimants' class action).

[FN8]. The federal courts were far from silent on this topic, over 55 years ago, the Seventh Circuit held "to permit the defendant to contest liability with each claimant in a single, separate suit would, in many cases, give defendants an advantage which would almost be equivalent to closing the door of justice to small claimants. This is what we think the class suit practice was to prevent. *Weeks v. Baroco Oil Co.,* 125 F.2d 84, 90 (7th Cir. 1941).

[FN9]. *See, e.g.,* Handlin & Handlin, *Origins of the American Business Corporation,* 5 J. Econ. Hist. 1, 10 (1945); Presser, *Piercing the Corporate Veil* (Clark Boardman Callaghan 1994, 1997) § 1.02.

[FN10]. *See, e.g.,* Johnson, Civil Jury Instructions, Louisiana Civil Law Treatise, § 2.01. "*You must deliberate on this case without regard to sympathy, prejudice, or passion for or against any party to the suit. This means that the case should be considered and decided as an action between persons of equal standing in the community. A corporation or an insurance*

*company is entitled to the same fair trial at your hands as a private individual. All persons stand equal before the law, and are to be dealt with as equals in a court of justice.*"

[FN11]. The *Miracle Ear* litigation involved consumer fraud actions arising from marketing claims. Similar claims on behalf of similarly (but not identically) defined nationwide purchaser classes were asserted, and later settled, in parallel state court actions: *In re Miracle Ear Consumer Litigation,* Case No. CT-94-001696 (Hennepin Co., Minnesota) and *Wilson v. Dahlberg, Inc.,* Civil Action No. CV-94-031 (Barbour Co., Alabama).

[FN12]. An excellent overview of the issues involved in coordinating federal and state litigation, with specific examples of successful coordination, is contained in Schwarzer, Weiss, and Hirsch, *Judicial Federalism in Action: Coordination of Litigation in State and Federal Courts,* 78 Virginia Law Review 1689 (1992).

[FN13]. In *Shutts,* the United States Supreme Court reviewed the application of the law of the forum state, Kansas, to a multistate class by a Kansas court. The Supreme Court held that the forum state could apply its own laws consistent with due process when there were shown to be "true conflicts" only if the forum had a "significant contact or significant aggregation of contacts" to the claims asserted by the class members so that those connections created state interests "which made application of that forum state's laws neither arbitrary nor unfair." Finding that the Kansas courts had incorrectly applied Kansas law to claims essentially unconnected to Kansas, the Supreme Court reversed and remanded. The further progress of the underlying case is instructive. After remand, the trial court considered the various state laws at issue and made findings of fact that none presented true conflicts, and therefore it once again applied Kansas law to all claims as there were no "true conflicts" requiring that another state's laws be applied. The Supreme Court of Kansas again affirmed, and the case returned to the United States Supreme Court for the second time, styled as *Sun Oil Co. v. Wortman,* 486 U.S. 717 (1988). On the substantive choice of law issue, the Supreme Court affirmed the decision of the Kansas Supreme Court that all other states' pertinent substantive legal rules were consistent with those of Kansas and therefore allowed application of Kansas law to all of the claims from other states.

[FN14]. Many courts neglect to consider that they need not face a fifty state management challenge in most cases. As Judge Posner noted in *Barron v. Ford Motor Co. of Canada, Ltd.,* 965 F.2d 195, 197 (7th Cir. 1992), "before entangling itself in messy conflict of laws analysis a court ought to satisfy itself that there actually is a difference between the relevant laws of the different states." Similarly, in *In re Complaint of Bankers Trust Co.,* 752 F.2d 874 (3d Cir. 1984), the Third Circuit observed that, unless a material conflict exists creating a significant possible effect on the outcome of the trial, choice of law rules are inapplicable. In such cases, the court may confidently apply forum state law.

[FN15]. Other courts, including the Third Circuit in *In re Prudential Securities Lit.,* 148 F.3d 208 (3d Cir. 1998), have found that claimed variations in law were minor and did not raise issues preventing class certification. *See also In re Diamond Shamrock Chem. Co.,* 725 F.2d 858, 861 (2d Cir. 1994) (upholding certification of a nationwide class by Judge Weinstein, who found any divergence in product liability rules nationwide to be "insignificant.").

[FN16]. This complication may be avoided by the filing of a master complaint or consolidated complaint in the MDL Transferee Court as the court of original jurisdiction.

[FN17]. Other courts have similarly applied the law of a defendant's principal place of business to conduct occurring nationwide. For example, in *W.R. Grace & Co. v. Continental Cas. Co.,* 896 F.2d 865, 872 (5th Cir. 1990) the court recognized "the strong and overriding interest" of the state of principal place of business in misconduct occurring in that state. Similarly, in *In re Bendectin Lit.,* 858 F.2d 290, 305 (6th Cir. 1986) the Sixth Circuit applied the law of the defendants' principal place of business to all class members under Ohio's choice of law doctrine.

[FN18]. *BMW* was not itself a class action, but an individual claim by an Alabama resident. Punitive damages calculated by reference to the defendant's nationwide activities were held excessive by the Supreme Court. In a class action, where the members of a nationwide class are before the court and the nationwide activities of the defendant are relevant to class claims, there is no issue of judicial overreach, as there might be in attempting to match the activities of defendant in all states with the claims and damages of a single plaintiff in one state.

[FN19]. Other commentators decline to surrender to the single-state approach as the only, or best, management alternative. As Larry Kramer points out in *Choice-of-Law in Complex Litigation,* 71 NYU L. Rev. 547, 582 (1996), while conducting a choice-of-law analysis as to every claim and issue raised in a 50-state class action may seem burdensome, "there will never be 50 different substantive rules, or even fifteen or ten. States tend to copy their laws from each other, and many use identical or virtually identical rules. In practice, the court will seldom have to deal with more than three or four formulations, and the choice will often be between two alternatives. Hence, the number of actual conflicts may not be great. Nor are there all that many approaches to choice of law: nearly three-fourths of the states use either the First or Second Restatement, and only a few states use such exotic approaches as *lex fori* or the better law approach. Hence, the court should be able first to reduce the number of conflicts to a relatively manageable number and then to group states for purposes of conflicts analysis." *Id.*

[FN20]. As the *Washington Mutual* decision holds "while we recognize that the submission of proposed instructions and special verdict forms would be extremely helpful in ascertaining whether a trial on nationwide class claims will be manageable, we decline to require such submissions in each and every case. Instead, we conclude the individual trial court should retain discretion in the matter and should exercise that discretion to meet the needs of the particular circumstances before them." *Washington Mutual,* 24 Cal. 4th 906 at n.12.

[FN21]. The *Simon* decision describes the trial structure as an opt-out compensatory class with subclasses with: (a) some test cases tried in full in this court before a single jury, and general fraud and related compensatory liability decided as to the rest of the class by the same jury; (b) individual issues such as statutes of limitations, reliance and individual damages referred to appropriate district courts to resolve individual compensatory claims and defenses; and (c) a non-opt-out punitive damage class certified covering all Tobacco claims for punitive damages with the same jury that decided the issues in (a) determining punitive damages, if any.

[FN22]. *Simon* contains a fascinating discussion of bifurcation under English and early American practice and an analysis of the original intent of the Seventh Amendment, to prevent *de novo* review of juries' factual findings by courts of appeal. Since *Simon,* the Supreme Court in *Leatherman* has ruled that juries' punitive damages awards are not findings of fact and are not protected from *de novo* review by the Seventh Amendment; findings of liability and compensatory damages remain protected.

[FN23]. Among the recent Law Review articles cited in *Simon* in support of issue certification and trial polyfurcation are Rule 23(c)(4)(A) are: Susan E. Abitanta, *Bifurcation of Liability and Damages in Rule 23(b) Class Actions: History, Policy, Problems and a Solution,* 36 SW. L. J. 743 (1982); Patrick Woolley, *Mass Tort Litigation and the Seventh Amendment Reexamination Clause,* 83 Iowa L. Rev. 499 (1998); David Rosenberg, *Mass Tort Class Actions: What Defendants Have and Plaintiffs Don't,* 37 Harv. J. on Legis. 393 (2000); Mary J. Davis, *Toward the Proper Role for Mass Tort Class Actions,* 77 Or. L. Rev. 157 (1998); and Robert G. Bone, *Rule 23 Redux: Empowering the Federal Class Action,* 14 Rev. Litig. 79 (1994).

[FN24]. As *Simon* notes, the Advisory Committee's Notes (1966) for Rule 23(c)(4)(A) provide: "For example, in a fraud or similar case the action may retain its class character only through the adjudication of liability to the class [accomplished through bifurcation under R. 23(c)(4)(A)]; the members of the class may thereafter be required to come in individually and prove the amounts of their respective claims." *The Manual for Complex Litigation, Third,* § 30.17, n.703 (Federal Judicial Center 1995), similarly suggests that the separation of common liability issues from individual issues "appears to have been the intention of the drafters" of Rule 23(c)(4)(A).

[FN25]. *See Valentino v. Carter-Wallace, Inc.,* 97 F.3d 1227, 1234 (9th Cir. 1996) (in products liability action against manufacturers of epilepsy drug Rule 23 authorizes the district court in appropriate cases to isolate the common issues under Rule 23(c)(4)(A) and proceed with class treatment of those particular issues); *Jenkins v. Raymark Industries, Inc.,* 782 F.2d 468, 473-74 (5th Cir. 1986) (affirming trial judge's bifurcation of punitive and actual damages pursuant to Rule 23(c)(4)(A) in asbestos class action and noting that "necessity requires us to change and invent"); *In re Copley Pharmaceutical, Inc.,* 161 F.R.D. 456, 461 (D. Wyo. 1995) (partial certification in class action brought by consumers against manufacturers of a bronchodilator prescription pharmaceutical, finding that "Fed. R. Civ. P. 23(c)(4)(A) [is] a highly efficient way to preserve both judicial economy and the rights of the parties in the case"); *In re Beverly Hills Fire Litig.,* 695 F.2d 207, 216-17 (6th Cir. 1982)

(confirming severance of liability from causation issues in mass tort class lawsuit); *Sanford v. Johns-Manville Sales Corp., 923 F.2d 1142, 1145 (5th Cir. 1991)* (trying liability and punitive damages before one jury and compensatory damages before another in asbestos litigation); *In re Benedectin Litigation, 857 F.2d 290, 309 (6th Cir. 1988)* (affirming district court's trifurcation into liability, causation and damages in products liability suits brought against pharmaceutical company for manufacturing an anti-nausea medication for expectant mothers that allegedly caused birth defects); *Central Wesleyan College v. Kaiser Gypsum Co., Inc., 6 F.3d 177, 189 (4th Cir. 1993)* ("Rule 23(c)(4) make[s] plain that district courts may separate and certify certain issues for class treatment" in approving partial conditional certification of class of asbestos victims as to eight common issues); *In re Telectronics Pacing Systems, Inc., 168 F.R.D. 203, 211 (S.D. Ohio 1996)* (certifying class action for determination of common issue of defendant's liability in manufacturing allegedly defective pacemakers, and reserving for separate adjudication individual questions of compensatory damages).

[FN26]. *See Valentino v. Carter-Wallace, 97 F.3d 1227, 1232 (9th Cir. 1996)* ("This constitutional [Seventh Amendment] concern of the *Rhone-Poulenc* court may not be fully in line with the law of this circuit."). *Simon* cites *In re Copley Pharmaceutical, Inc., 161 F.R.D. 456, 461 (D. Wyo. 1995)* ("[The] analysis [in *Rhone-Poulenc*] effectively eviscerates *Fed. R. Civ. P. 23(c)(4)(A)* ... taking away one of the sharpest instruments available to trial courts managing mass tort litigation"); *In re Tetracycline Cases, 107 F.R.D. 719, 727 (W.D. Mo. 1985)* ("The court should always consider the possibility of determining particular issues on a representative basis as permitted by *Rule 23(c)(4)(A)* ... to make the common issues in the class predominate for purposes of *Rule 23(b)(3)*"); Stephen R. Bough & Andrea G. Bough, *Conflict of Laws and Multi-State Class Actions: How Variations in State Law Affect the Predominance Requirement of Rule 23(b)(3), 68 UMKC L. Rev. 1, 20 (1999)* ("The entire opinion [in *Rhone-Poulenc*] is void of any discussion of *Rule 23*"); Steven S. Gensler, *Bifurcation Unbound, 75 Wash. L. Rev. 705, 733 (2000)* ( "The risk of re-examination presented when separate juries hear bifurcated issues calls for sound case management, not avoidance of the procedure."); John C. Coffee, Jr., *Class Wars: The Dilemma of the Mass Tort Class Action, 95 Colum. L. Rev. 1343, 1440 (1995)* ("This Seventh Amendment objection seems a weak argument" and suggesting that, if a limited class were certified after a finding that plaintiffs had a probability of success, "it seems doubtful that even the Seventh Circuit would find a Seventh Amendment violation.").

[FN27]. The heart pacing system at issue in the *Telectronics* litigation consists of three main parts: a pulse generator, leads, and a programmer. The lead's retention wire is a filament of one of two metal alloys, is encased in polyurethane insulation, and is designed to bend back and forth within the system. The bending can cause the retention wire to break, to protrude through the polyurethane insulation, and to cause potential or actual injury to the tissues adjacent to the wire. As the court pointed out, the retention wire itself is not electrically active within the pacing circuit, and does not affect the conduction of the electrical signal or the operation of the pacing system. A fracture, however, can cause serious injury to the heart or blood vessels if the metal wire protrudes through the polyurethane sheath. 172 F.R.D. at 277.

[FN28]. The term "summary jury trial" refers to a streamlined, non-binding trial presentation designed to replicate, insofar as is practicable, the dynamics of an actual trial. Judge Spiegel has been a pioneer in the development and utilization of the summary jury trial as a technique to educate the court and counsel as to whether a complex case can be managed in the context of a classwide or unitary trial, and how such a trial should be structured. The experience of designing and conducting the trial in turn promotes a fuller and more realistic understanding of the merits of the claims and defenses in the "real world" of the courtroom and jury room, which in turn can narrow the issues the parties elect to try, can refine their presentation at trial, and can promote informed settlements short of actual trial. The summary jury trial or "mini-trial," and the utilization of less formalized variations on this theme, has become a recognized settlement technique.

[FN29]. The prevailing test of limited fund status is whether there is a substantial probability, which is less than a preponderance, but more than a mere possibility, that if damages were awarded the claims of earlier litigants would exhaust the defendant's assets. *In re Granada Partnership Sec. Litig., 803 F. Supp. 1236, 1244 (S.D. Tex. 1992)*; *In re First Commodity Corp. of Boston Customer Accounts Litig., 119 F.R.D. 301, 312 (D. Mass. 1987)*; *In re Jackson Lockdown/MCO Cases, 107 F.R.D. 703, 713 (E.D. Mich. 1985)*; *In re "Agent Orange" Prod. Liability Litig., 100 F.R.D. 718, 726 (E.D.N.Y. 1983)* *Ortiz* does not appear to change this standard.

[FN30]. As *Amchem* did before it, and *Ortiz* did subsequently, the *Telectronics* final settlement approval opinion traces the history and development of Federal Rule 23, from its roots in English chancery practice, through various iterations of the federal equity rules and federal rules of civil procedure, to demonstrate the survival of equity powers and principles in the operative Rule 23. 186 F.R.D. 459, 470-471. *Telectronics* uses this discussion to make the point that "historically only 23(b)(3) provided a litigant the right to opt out, not 23(b)(1) or (b)(2)." *Id.* at *35.

[FN31]. In concluding that Rule 23(b)(1)(B) may extend beyond a limited fund defendant, the *Telectronics* court paraphrased the language of the subsection, stating, "we believe that certification under 23(b)(1)(B) may be appropriate if there is a substantial risk to the other parties now before the court that their interests or claims will be impaired or impeded by allowing individual claims to proceed against the defendant, not that there necessarily would be a limited fund in the technical sense." *Id.* at 473.

[FN32]. Of course, at the pre-settlement February 1998 summary jury trial, the jury had declined to hold the parent companies liable, providing both sides with some insight on the ultimate prospects of these claims, and the advisability of settlement.

[FN33]. By contrast, and to underscore the broad discretion enjoyed by trial and reviewing courts in the products liability class certification context, *see Zinser v. Accufix Research Inst., Inc.,* _____ F.3d ____ (9th Cir. 2001), a Rule 23(f) decision issued by the Ninth Circuit on June 15, 2001. *Zinser* affirmed the trial court's denial of plaintiffs' class certification motion in a case involving the same defendants, and same type "J" lead wire design, as was certified and settled in *Telectronics*. A petition for rehearing has been filed.

SG030 ALI-ABA 61

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

---