# EXHIBIT 4

Confidential - Subject to Stipulation and Order of Confidentiality

```
 1                         - - -
 2                                   :SUPERIOR COURT OF
                                     :NEW JERSEY
 3    IN RE:                         :LAW DIVISION -
      PELVIC MESH/GYNECARE           :ATLANTIC COUNTY
 4    LITIGATION                     :
                                     :MASTER CASE 6341-10
 5                                   :
                                     :CASE NO. 291 CT
 6                         - - -
          CONFIDENTIAL-SUBJECT TO STIPULATION AND ORDER OF
 7                      CONFIDENTIALITY
                           - - -
 8
                       September 18, 2012
 9                         VOLUME III
10                         - - -
11             Transcript of the continued
12    deposition of PIET HINOUL, M.D., Ph.D., called for
13    Videotaped Examination in the above-captioned
14    matter, said deposition taken pursuant to Superior
15    Court Rules of Practice and Procedure by and before
16    Ann Marie Mitchell, a Federally Approved Certified
17    Realtime Reporter, Registered Diplomate Reporter,
18    Certified Court Reporter, and Notary Public for the
19    State of New Jersey, at the offices of Riker Danzig
20    Scherer Hyland & Perretti LLP, Headquarters Plaza,
21    One Speedwell Avenue, Morristown, New Jersey,
22    commencing at 10:16 a.m.
23                         - - -
                   GOLKOW TECHNOLOGIES, INC.
24           877.370.3377 ph|917.951.5672 fax
                     deps@golkow.com
25
```

Confidential - Subject to Stipulation and Order of Confidentiality

```
 1                  (Deposition Exhibit No.
 2             Plaintiff's-884, Article entitled
 3             "Transvaginal mesh repair of anterior and
 4             posterior vaginal wall prolapse: A
 5             clinical and ultrasonographic study," 7
 6             pages, was marked for identification.)
 7                            - - -
 8   BY MR. SLATER:
 9        Q.      -- an article that I think may have
10   been marked at a previous deposition as 759, but I
11   don't have the marked copy, so we're just going to
12   remark it 884.
13             The article we've now marked as
14   Exhibit 884 is an article you're certainly familiar
15   with.  Correct?
16        A.      Correct.
17        Q.      In fact, there's an acknowledgment at
18   the end of the article, "We are very grateful to Dr
19   Piet Hinoul for his contribution when reviewing this
20   paper."
21             Do you see that?
22        A.      Yep.
23        Q.      Wouldn't it have been nice if
24   Dr. Altman had had an acknowledgment in the article
25   he published in the New England Journal of Medicine
```

Confidential - Subject to Stipulation and Order of Confidentiality

```
 1   where he said, we are very grateful to Dr. Piet
 2   Hinoul, Dr. Aaron Kirkemo, Dr. David Robinson and
 3   Judith Gauld for their contribution when reviewing
 4   this paper?  Wouldn't that have been a good thing
 5   for him to say?
 6                    MR. SNELL:  Objection to form.
 7                    THE WITNESS:  My mother would have
 8   been proud of me in the New England Journal, but
 9   have you seen the revisions I've made to this paper
10   as opposed to a couple of suggestions I made freely
11   to Dr. Altman?
12   BY MR. SLATER:
13        Q.     Wouldn't it have been nice if
14   Dr. Altman had actually acknowledged you and the
15   others at Ethicon having made whatever contributions
16   you made to his article?
17                    MR. SNELL:  Objection to form.
18                    THE WITNESS:  I don't think it was
19   necessary.
20   BY MR. SLATER:
21        Q.     It would have been a better practice
22   if Dr. Altman had disclosed your involvement and the
23   involvement of the others in Ethicon.  That would
24   have been the better way to do things, right, rather
25   than affirmatively saying that nobody had any
```

Confidential - Subject to Stipulation and Order of Confidentiality

```
 1    involvement?
 2              MR. SNELL:  Objection, form.
 3              THE WITNESS:  No.  They disclose
 4    Ethicon, and I don't think we had a substantial
 5    impact on the paper.
 6    BY MR. SLATER:
 7         Q.   They disclosed that Ethicon gave
 8    money to help fund the study.  Correct?
 9         A.   Correct.
10         Q.   That tells nobody that anybody at
11    Ethicon looked at the manuscript when it was in
12    draft, made comments and edits to the manuscript.
13    Correct?
14              MR. SNELL:  Objection, form.
15              THE WITNESS:  We didn't make edits.
16    BY MR. SLATER:
17         Q.   You did make edits, though.  There
18    were deletions that were shown, and then it was up
19    to Altman and his co-authors whether they accepted
20    those.  Correct?
21         A.   Suggestions for editing, yes.  Much
22    different from this paper.  I don't know where
23    you've got my e-mail on this and how much red there
24    was on this paper.
25         Q.   Oh, I read it all.  It's sitting
```

Confidential - Subject to Stipulation and Order of Confidentiality

```
 1    right here.
 2         A.     Okay.  So you know how different the
 3    input was.
 4         Q.     You may have had more input into this
 5    article than you did into Dr. Altman's study, his
 6    article --
 7         A.     Uh-huh.
 8         Q.     -- but the fact remains that you and
 9    others in Ethicon did have input into his article.
10    Correct?
11                MR. SNELL:  Objection, form.
12                THE WITNESS:  We made suggestions.
13    BY MR. SLATER:
14         Q.     Now, let's look at this article by
15    Velemir, Amblard, Fatton, Savary and Jacquetin.
16         A.     Uh-huh.
17         Q.     This is an article that you believed
18    to be reliable and to have valid conclusions.
19    Correct?
20         A.     As all literature or all studies,
21    they contribute to the total body of evidence on
22    this topic.  And they all bring something.
23         Q.     Let's look at the second page, which
24    is page 475.
25                Now, this study dealt with the
```

Confidential - Subject to Stipulation and Order of Confidentiality

1    Prolift®. Correct?
2    A.    Yes.
3    Q.    And it was a study of -- as titled,
4    "Transvaginal mesh repair of anterior and posterior
5    vaginal wall prolapse: a clinical and
6    ultrasonographic study." Correct?
7    A.    Correct.
8    Q.    Page 475, the first full paragraph in
9    the left column, the authors point out, "Between
10    2000 and 2005 our team participated in the
11    development of the tension-free vaginal mesh
12    technique. Over time it appeared that mesh
13    retraction was probably a contributing factor to
14    recurrence, postoperative pain and dyspareunia."
15    I read that correctly. Right?
16    A.    Yes.
17    Q.    And that was known to Ethicon before
18    the Prolift® was ever launched. Right?
19    A.    Correct.
20    Q.    This study, according to the methods
21    section just below there, involved the placement of
22    Prolifts® between 2005, March 2005 and August 2006.
23    Correct?
24    A.    Correct.
25    Q.    So this was from the launch of the

Confidential - Subject to Stipulation and Order of Confidentiality

```
 1     Prolift® through about a little over a year later.
 2     Right?
 3            A.      Yep.
 4            Q.      And these surgeons utilized the
 5     Prolift® technique to place these Prolifts®.
 6     Correct?  Right?
 7            A.      Yes.
 8            Q.      Now, look at the next page, please,
 9     page 476.
10                   In the right-hand column they give
11     some of their statistics, and they point out that
12     nine of the patients, which is 9.9 percent, had
13     vaginal mesh exposure.  Correct?
14                          MR. SNELL:  I'm sorry, where are you?
15                          MR. SLATER:  Right-hand column.
16                          THE WITNESS:  Here.
17     BY MR. SLATER:
18            Q.      Correct?
19            A.      Yes.
20            Q.      They point out that at the one-year
21     follow-up, which they call the greater or equal to
22     one-year follow-up, 12, which was 13 percent, of the
23     patients presented with recurrence of vaginal wall
24     prolapse.  Correct?
25            A.      Yes.
```

Confidential - Subject to Stipulation and Order of Confidentiality

```
 1        Q.      Now, if we go a little further down,
 2   the next paragraph, it talks about retraction of the
 3   anterior mesh, which, if you add together moderate
 4   and severe retraction, came to 89.3 percent.
 5   Correct?
 6        A.      Retraction -- right.  Uh-huh.
 7        Q.      And if you turn to the next page,
 8   they group together the posterior mesh retractions,
 9   and about 59 percent of the patients had retraction
10   of the posterior mesh.  Correct?
11        A.      How many did you say?
12        Q.      It's at the top of the page.  It's
13   48.4 percent plus 9.7 percent.  Correct?
14        A.      Yes.
15        Q.      I rounded that to 59 percent.
16                Pretty close.  Right?
17        A.      Fine.
18        Q.      So -- well, rephrase.
19                Those are extremely high rates of
20   retraction.  Correct?
21        A.      Yes.
22        Q.      And these extremely high rates of
23   retraction were found where you had some of the most
24   experienced surgeons in the world with the Prolift®
25   technique placing the Prolift® in these patients.
```

Confidential - Subject to Stipulation and Order of Confidentiality

```
 1   Correct?
 2        A.    That is correct.
 3        Q.    In the "Discussion," they talk
 4   about -- well, rephrase.
 5              In the "Discussion" they say in the
 6   second sentence, "This study shows that mesh
 7   retraction is associated with mesh thickening
 8   measured on ultrasound."  Okay.  I want to stop
 9   there.
10              That's something that Ethicon knew
11   even before the Prolift® was launched, that when
12   there's a mesh retraction, that the mesh is actually
13   thickened by the scar formation.  Correct?
14        A.    Right.  So it's the composite of the
15   mesh and the scar.  Yeah.
16        Q.    It becomes like a single solid
17   substance.  Correct?
18        A.    Correct.
19        Q.    And in this study, what the authors
20   did is they actually used ultrasounds to visualize
21   the mesh in vivo.  Correct?
22        A.    Uh-huh.  Correct.
23        Q.    And you certainly believe that is a
24   very valid technique to use where patients have
25   complications and you want to see what's happening
```