```
 1                  IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2                            AT CHARLESTON
                       TRANSCRIPT OF PROCEEDINGS
 3       _____
         IN RE:  C.R. BARD, INC., PELVIC
 4       REPAIR SYSTEM PRODUCTS LIABILITY     MDL NO.
         LITIGATION                           2:10-md-2187
 5       _____

 6       IN RE:  AMERICAN MEDICAL SYSTEMS,    MDL NO.
         INC., PELVIC REPAIR SYSTEM           2:12-md-2325
 7       PRODUCTS LIABILITY LITIGATION

 8       _____

         IN RE:  BOSTON SCIENTIFIC            MDL NO.
 9       CORPORATION, PELVIC REPAIR SYSTEM    2:12-md-2326
         PRODUCTS LIABILITY LITIGATION
10       _____

11       IN RE:  ETHICON, INC., PELVIC        MDL NO.
         REPAIR SYSTEM PRODUCTS LIABILITY     2:12-md-2327
12       LITIGATION

13       _____

         IN RE:  COLOPLAST CORP., PELVIC      MDL NO.
14       REPAIR SYSTEM PRODUCTS LIABILITY     2:12-md-2387
         LITIGATION
15       _____

16       IN RE:  COOK MEDICAL, INC.,          MDL NO.
         PELVIC REPAIR SYSTEM PRODUCTS        2:13-md-2440
17       LIABILITY LITIGATION

18       _____
                     TRANSCRIPT OF STATUS CONFERENCE
19                         FEBRUARY 05, 2015
                   BEFORE THE HONORABLE JOSEPH R. GOODWIN,
20                    UNITED STATES DISTRICT JUDGE,
                        AND CHERYL A. EIFERT,
21                   UNITED STATES MAGISTRATE JUDGE

22
         Court Reporter:        Carol Farrell, CRR, RMR, CCP, RPR
23                              (304)347-3188
                                carol_farrell@wvsd.uscourts.gov
24

25       Proceedings recorded by machine stenography; transcript
         produced by computer.
```

**A P P E A R A N C E S**
(Speaking Counsel Only)

**FOR THE PLAINTIFFS:**

**HENRY G. GARRARD, III, ESQUIRE**
BLASINGAME, BURCH, GARRARD & ASHLEY, P.C.
440 College Avenue, Suite 320
Athens, GA  30601

**CLAYTON A. CLARK, ESQUIRE**
CLARK, LOVE & HUTSON
440 Louisiana, Suite 1600
Houston, TX  77002

**BRYAN F. AYLSTOCK, ESQUIRE**
AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC
17 East Main Street, Suite 200
Pensacola, FL  32502

**BENJAMIN H. ANDERSON, ESQUIRE**
ANDERSON LAW OFFICES, LLC
1360 W. 9th Street, Suite 215
Cleveland, OH  44113

**FOR THE DEFENDANTS:**

**ROBERT T. ADAMS, ESQUIRE** (Boston Scientific)
SHOOK, HARDY & BACON
2555 Grand Boulevard
Kansas City, MO  64108

**LORI G. COHEN, ESQUIRE**  (C.R. Bard)
GREENBERG TRAURIG LLP
3333 Piedmont Road, Suite 2500
Atlanta, GA  30305

**CHRISTY D. JONES, ESQUIRE**  (Ethicon)
BUTLER, SNOW, O'MARA, STEVENS & CANNADA, PLLC
1020 Highland Colony Parkway, Suite 1400
Ridgeland, MS  39157

**DOUGLAS B. KING, ESQUIRE**  (Cook)
WOODEN & McLAUGHLIN, LLP
211 North Pennsylvania Street
One Indiana Square, Suite 1800
Indianapolis, IN  46204

MDL STATUS CONFERENCE

1           PROCEEDINGS had before The Honorable Joseph R. Goodwin,

2    District Judge, and Cheryl A. Eifert, Magistrate Judge, United

3    States District Court, Southern District of West Virginia, in

4    Charleston, West Virginia, on February 5, 2015, at 10:00 a.m.,

5    as follows:

6           THE COURT:  Good morning.

7           RESPONSE:  Good morning, Your Honor.

8           THE COURT:  Welcome back to Charleston.  It's nice to

9    see you all today.  My only concern is you're all starting to

10   look very familiar.

11          (Laughter.)

12          THE COURT:  As suggested earlier this morning, it

13   seems a little bit like a reunion and that should be

14   concerning to all of us.

15          I believe that our court reporter, Ms. Farrell, knows

16   most of you, but I ask that each of you identify yourselves

17   before you speak brilliantly on any subject.

18          I would like to cover the identified agenda items

19   first.  We have some issues common to MDLs 2187, 2325, 2326,

20   2327, 2387, and 2440.

21          The first topic on the agenda common to all the MDLs

22   is what has been characterized as establishing a case workup

23   for multi-product, multi-defendant cases.

24          Who wants to speak for the plaintiffs on this?  Mr.

25   Garrard?

─────── MDL STATUS CONFERENCE ───────

1          MR. GARRARD:  Your Honor, Henry Garrard.

2          Your Honor, during the course of this litigation, we

3    have had various waves of cases established for workup,

4    particularly in relation --

5          THE COURT:  Excuse me, Henry.  I'm going to have to

6    fix this chair.

7          MR. GARRARD:  Yes.

8          THE COURT:  I just about disappeared.

9          MR. GARRARD:  I had one a moment ago suitable for a

10   midget so I swapped chairs so I could at least see over the

11   podium.

12         (Pause)

13         THE COURT:  All right, Mr. Garrard, I'm sorry.  Go

14   ahead.

15         MR. GARRARD:  Yes, sir.

16         During the course of the litigation, we have had

17   waves of cases established for workup both as bellwethers and

18   as larger waves of cases.  In those proceedings, the Court has

19   previously made the determination that we should not be

20   placing cases for workup in which more than one defendant's

21   products were actors, and by that I mean, where we claim as

22   plaintiffs that, for example, a Boston Scientific product and

23   an Ethicon product both caused injury to the plaintiff, or a

24   Bard product and an Ethicon product both caused injury to the

25   plaintiff.

1           We have now reached a point in this litigation that
2    we have a significant number of clients who have not been
3    processed through the system, established for case workup or
4    established for trials and, on behalf of the plaintiffs
5    collectively, we are asking the Court to allow us to come to
6    you with suggestions of workup of multi-product,
7    multi-defendant cases in which we believe we can prove that
8    two manufacturers' products were bad actors.  It's really that
9    simple in terms of what we're asking for.
10           I have gone through cases and I have a list of cases
11   that, if the Court wanted it, I could share with the Court.  I
12   need to put it in a different form than the way I have it.  I
13   know Mr. Clark has done the same thing.  He may have some
14   comments about this in addition to mine.  But we believe that
15   it is time, on behalf of those clients, that we move forward
16   trying to establish their cases, trying to prove their cases
17   and bring them to the trial position.
18           THE COURT:  Who would like to respond for the
19   defendants?
20           MR. ADAMS:  I will, Your Honor.  And I can do it from
21   here, Judge.
22           THE COURT:  That's fine.
23           MR. ADAMS:  Basically -- Robert Adams on behalf of
24   Boston Scientific.
25           Basically, there's two responses that I'd like to

—— MDL STATUS CONFERENCE ——

1    make to Mr. Garrard's proposal.

2         First, there is a good reason why the Court has

3    stayed away from these types of cases.  I think -- I

4    definitely know with respect to Boston Scientific, and I think

5    I could speak for the other defendants, that the

6    multi-product, multi-defendant cases represent an extremely

7    small percentage of the overall inventory of our cases.  With

8    respect to Boston Scientific, those types of cases, for all of

9    our cases, consist of basically 10 percent of the inventory.

10   We had made those arguments before in connection with other

11   hearings when the Court has dealt with this same issue.

12        The other point that I would like to make is is that

13   I think it is also important that if we are trying to

14   determine what are representative cases for trials, these

15   cases do not fit within that mold.  The most representative

16   cases for trials, to give us some benchmark, are single or

17   no-revision SUI cases.

18        On behalf of Boston Scientific, we have had trials of

19   11 plaintiffs and, so far, we have not tried a single case

20   involving an SUI product with a non-revision.

21        Our inventory is such that 66 percent of our cases

22   are SUI cases, and within that pie of SUI cases, 81 percent

23   are non-revision cases; therefore, those are the most

24   representative cases, and if there is anything that should be

25   worked up for trial, it is those cases.

—MDL STATUS CONFERENCE—

1          That's all I have, Your Honor.

2          THE COURT:  All right.  Mr. Clark?

3          MR. CLARK:  Your Honor, Clayton Clark.

4          First, Your Honor, with regard to the SUI cases that

5    Mr. Adams speaks of, on behalf of the plaintiffs, we would

6    offer to the Court and suggest that those cases do be set for

7    trial.  I'm not quite understanding specifically what he was

8    referring to, which cases they are, but we are ready to set

9    any numbers of cases in any groups that the Court deems

10   appropriate or capable of actually handling, with the size of

11   the docket that we have, so we agree.  Those cases should be

12   set in consolidation, in large numbers, in the appropriate

13   districts whenever the Court is ready.

14          With regard to the 10 percent that we're talking

15   about, two years ago we heard this basic identical argument

16   that we're supposed to not address the women that are most

17   hurt, the cases where we have the largest amount of damages.

18   And we see that more and more, as cases get picked, that when

19   a case has been in the system for two years or three years or

20   five years, the system being coming through us as well as

21   through Your Honor's court, that we see surgeries beginning to

22   mount up and multiple different defendants being involved in

23   those surgeries.  We're not asking for this to take over the

24   process.  We're just asking that the 10 percent be addressed

25   somehow, in some orderly fashion, and we also stand ready to

1    set as many of the individual SUI cases as the defendants will

2    agree to.

3              MR. GARRARD:  Your Honor, may I?

4              THE COURT:  Sure.

5              MR. GARRARD:  In the workup that was done in relation

6    to the Ethicon cases, where there was a survey of cases, my

7    understanding is 16 percent of those cases were multi-product,

8    multi-defendant cases, so it's not such a simple, small

9    number.

10             The second thing I would add is that in most

11   discussions that we have with regard to the cases, the

12   defendants always raise that there are multi-defendants

13   involved in this, therefore, my share should be much smaller.

14   So it's not an insignificant issue and it's not an

15   insignificant number of cases that we believe we need to be

16   able to bring forward.

17             THE COURT:  All right.

18             MS. COHEN:  Judge, if I may?

19             THE COURT:  Yes.

20             MS. COHEN:  Good morning.  Lori Cohen on behalf of

21   defendant Bard.

22             Just to join in with what Mr. Adams said, our numbers

23   are very similar as well.  We have about 10 percent that are

24   multi-manufacturer cases of this sort, and, again, like

25   Mr. Adams said, in our MDLs, we have not had any SUI case set

─── MDL STATUS CONFERENCE ───

1  for trial or go to trial, and we have about 70 percent, I

2  would say, statistically, of SUI cases.

3       THE COURT:  I think we had some set that didn't go.

4  I think we had one or two set, didn't we, an SUI case?  We did

5  not?

6       MS. COHEN:  I don't think so, respectfully, Your

7  Honor.

8       THE COURT:  That's okay.

9       MS. COHEN:  But, again, we have similar statistics.

10      And then, of course, as you know, with our recent

11 pretrial orders and the workups with Bard, 200, 300, that we

12 had specific provisions excluding these types of cases, and

13 now we have large batches of cases ready to be dealt with by

14 remand or trial, and so, having gone through all that, to now

15 talk about a new batch, which was specifically excluded from

16 those, we just think the timing is not appropriate at this

17 time, Your Honor.

18      THE COURT:  Yes?

19      MS. JONES:  Your Honor, I rise -- Christy Jones on

20 behalf of Ethicon.

21      I rise only because Ethicon has been mentioned on

22 multiple occasions.  We would join in Mr. Adams' remarks but,

23 more importantly, I hear Mr. Garrard referring to percentages

24 of cases, and I just want Your Honor to know that I do not

25 believe -- I'm not sure exactly what he's looking at, but

MDL STATUS CONFERENCE

1   those percentages do not comport with what our percentages

2   would represent at this time because I don't think we would

3   have any more than 10 percent.  I think it's less than 10

4   percent.  I just wanted the Court to be aware of that.

5            THE COURT:  Well, as you will hear at the end of this

6   morning's conference, I have quite a few ideas that I intend

7   to implement with regard to -- that apply to many of the MDLs,

8   some to all of them.  With some 70,000 cases, creativity has

9   not been difficult, and suggestions have not been sparse.  I

10  had plenty of suggestions from plaintiffs and defendants about

11  what we should do and when we should do it and getting more

12  and more as the days go by.

13           I have made decisions about what I'm going to do and

14  I'll be telling you about that in a little while.

15           The next thing we have is Ethicon.  The first topic

16  for that MDL is a general status update.  Who will do that?

17           MR. AYLSTOCK:  Your Honor, Bryan Aylstock.

18           THE COURT:  Mr. Aylstock.

19           MR. AYLSTOCK:  I can address that.

20           As this Court is aware, the Bellew case was set in

21  December and has now been reset to March 2nd, and we're

22  prepared to move forward with that case in this courtroom.

23           Also ongoing is the case -- the Perry case, which is

24  an SUI sling case.  Mr. Cartmell, one of the co-leads, isn't

25  here today because he's in court today on that case.  And --

──── MDL STATUS CONFERENCE ────

1          THE COURT:  Is that the California case?

2          MR. AYLSTOCK:  It is, Your Honor, Bakersfield,

3    California.

4          And, furthermore, in New Jersey today, Judge

5    Martinotti is holding a conference as well.  As of yet, he's

6    not set any cases for trial.

7          THE COURT:  But he will.

8          MR. AYLSTOCK:  He's still getting up to speed

9    after --

10          THE COURT:  Judge Martinotti and I are friends and

11    have been in contact a number of times, in this MDL as well as

12    previous ones.  You may have noticed that we've pretty much

13    decided that we are not going to try to see who can be the

14    most deferential to the other.  If there are conflicting

15    schedules, so be it.  We just have to find lawyers to attend

16    the proceedings in both places.  Go ahead.

17          MR. AYLSTOCK:  And, luckily for us, we have a lot of

18    lawyers so we can do that.

19          And, as far as that goes, there is no other trials in

20    Ethicon currently set before this Court which kind of bleeds

21    into the next couple of topics, so I don't know if Ms. Jones

22    has any response, but we can move on to the next topic, as the

23    Court would like.

24          THE COURT:  Ms. Jones?

25          MS. JONES:  I don't really have a whole lot to add,

--- MDL STATUS CONFERENCE ---

1   Your Honor, with respect to the status.  There are obviously

2   other cases set for trial outside of this MDL in various other

3   state court cases.

4        I think the issues that are listed on the agenda are

5   matters that we had previously obviously submitted to the

6   Court and briefed for Your Honor, and if Your Honor wants to

7   take those up individually and specifically, we would be happy

8   to do so.

9        THE COURT:  Do you want to?

10        MS. JONES:  I think, Your Honor, in all candor, I

11   think that that is something that, at least as to the motion

12   to revise case management order that we have submitted to Your

13   Honor, the parties have briefed it, made suggestions.  We

14   would be happy to talk with them.  I think some of those are

15   perhaps things that we should talk out about how we can

16   address them.

17        As to -- the plaintiffs and the defendants have

18   presented different suggestions for how we move forward in

19   terms of setting additional cases for trial, and I think both

20   parties are prepared to move together to get cases ready for

21   trial.  We have a little bit of disagreement as to which cases

22   we ought to be focusing on, and I'm happy to discuss that.  To

23   the extent that the Court is inclined to consider specifically

24   the plaintiffs' recommendations made yesterday, we would like

25   to have a short hearing time to respond to the specific things

────── MDL STATUS CONFERENCE ──────

1   and suggestions that were made there.  And beyond that, I'm

2   happy to address that or to discuss those with the Court.

3           THE COURT:  I think I have sufficient information

4   based on the filings and the briefings to be able to address

5   it.  In fact, I have a draft of an order, which I should be

6   able to get out within a day or two.

7           As to the setting of cases, that's something I want

8   to -- I would be glad to have input from both sides as much as

9   you want, and we'll address that at a later time.

10          MS. JONES:  That's fine.  There are some areas that

11  we would like to address as to that specific issue but I'm

12  happy to -- to prepare that and to present that at the time

13  that the Court requests it.

14          THE COURT:  All right.  Let's turn to Boston

15  Scientific.  The first topic is a general status update.  Who

16  will report for the plaintiffs?

17          MR. CLARK:  Clayton Clark, Your Honor.

18          THE COURT:  Mr. Clark.

19          MR. CLARK:  Your Honor, I believe that the Court is

20  fairly aware of the recent progress with the Boston Scientific

21  MDL.  With the two different consolidations having been tried,

22  we are really in a position now where we're, I think, both

23  waiting for the Court to give us some direction on where we go

24  with regard to how many cases will be remanded, where they

25  will be remanded, how they will be tried.  I do envision that

1   process working, and I think that we have a good number of

2   cases being worked up in the waves.  We certainly believe that

3   more cases should be added, due to the number that have been

4   filed.

5          We agree that there are a number of non-revision SUI

6   cases that are being worked up.  We have no issue with there

7   being any particular groups added, so long as everything is

8   included.

9          And we're going to be urging the Court to, I think,

10  attempt to find a way where we can have large numbers of cases

11  tried, if not simultaneously, contemporaneously in different

12  courts so that we can manage the process and move the number

13  of cases toward trial in larger numbers, in hopes that that

14  will bring better resolution for both of us on the values of

15  the cases.

16         These -- the -- really, the issue for both of us is

17  what is the value of the cases.  If we focus exclusively on

18  the 40 or 45 percent of the SUI cases with no surgery, we're

19  talking about 10 percent of the value of the litigation.

20  There is a large number of lawyers and business people in this

21  courtroom that are focusing exclusively on the value.  If we

22  focus -- and the value is in the top 40 percent of the cases,

23  and that's where 80 percent of the value goes because of the

24  fact that these women are hurt the most.  We would ask that

25  the Court give some consideration to that fact, that if we are

MDL STATUS CONFERENCE

1   going to move the docket along, focusing on the 50 percent of

2   the cases or 45 percent of the cases that are worth less than

3   10 percent of the value, that that probably would not move the

4   litigation along at all but, rather, stall it further.

5          So, where we are in Boston Scientific, we're looking

6   forward to the Court's thoughts as to where we go next, now

7   that we've had our first two sets of bellwether

8   consolidations.

9          THE COURT:  All right.  The defendant?

10          MR. ADAMS:  Yes, Your Honor, just a couple of

11   comments to follow up on that.

12          As Mr. Clark said, we have been working our way

13   through the wave proceeding, and I think that that process has

14   been valuable in and of itself because, as Mr. Clark said,

15   people are here interested in the value of cases.  We started

16   with 189 cases.  We've already had 41 of those cases dismissed

17   with prejudice.  And that shows you a point that I believe all

18   of the defendants have made in previous hearings, that we

19   believe a substantial volume of the inventory of the cases in

20   these MDLs may turn out, when the focus of discovery is upon

21   them, they may get dismissed with prejudice.

22          We also have a number of other motions that the Court

23   is aware of that may be dispositive of other cases.  I think

24   approximately ten.

25          I have suggestions for the Court, possibly your

------MDL STATUS CONFERENCE------

1  clerk, about what would be an expedient way to work through

2  some of the motions that are currently on file in the wave

3  process.  I'm happy to go through that now or we could do this

4  at an individual meeting.

5        THE COURT:  Why don't we do it in an individual

6  meeting.

7        MR. ADAMS:  Okay.  Okay.

8        With respect to cases that should be set for trial,

9  Mr. Clark made the point that we ought to set cases that have

10  the more egregious injuries.  That is exactly the type of case

11  that Boston Scientific has been trying already.  As I said

12  before, we've tried cases involving 11 plaintiffs, and all of

13  them, except for one, which was the POP case that we tried

14  called *Albright*, all of them had multiple revisions.  And so I

15  think to the extent we're looking for benchmarks, we have

16  benchmarks in the top 10 percent of egregious cases.  We need

17  benchmarks for trial in the SUI cases with non-revisions or no

18  revisions.

19        THE COURT:  Well, again, I'm going to address in a

20  more -- in a very specific but in general comments where I'm

21  headed in almost every MDL at the end.

22        But as to Boston Scientific, let's turn to *Sanchez*

23  and *Hall* and let me tell you where I am on that.

24        The *Sanchez* case is ready for transfer to the

25  appropriate Federal Court in California.  All the pending

1  motions have been completed, although not filed.  *Sanchez*, the

2  plaintiff's short-form complaint identified the United States

3  District Court for the Central District of California, Western

4  Division, as the appropriate court for remand.  I need to know

5  from defendants if you're in agreement with that?

6         MR. ADAMS:  Yes, Your Honor, I believe that's

7  correct.

8         THE COURT:  That's where it will be going.

9         I'm also in the process of considering the *Hall* case,

10  the other former bellwether.  I need to know if there is

11  agreement among the parties that the District of Minnesota is

12  the appropriate jurisdiction.  The plaintiff is a Wisconsin

13  resident.

14         MR. ADAMS:  Yes.  We believe that it should be in the

15  District Court in Wisconsin, Your Honor.

16         THE COURT:  In Wisconsin?

17         MR. ADAMS:  Yes.

18         THE COURT:  What says the plaintiff?  Do you want to

19  get to me later?

20         MR. CLARK:  I think we're going to have to get with

21  that case later, Your Honor.

22         THE COURT:  I can tell from the look on

23  Ms. Wagstaff's face.

24         (Laughter.)

25         MR. ADAMS:  Your Honor, I did have one point about

—MDL STATUS CONFERENCE—

1  *Sanchez.*

2          THE COURT:  All right.

3          MR. ADAMS:  *Sanchez*, there is a significant amount of

4  work that needs to be done in that case to update it.  The

5  plaintiff was --

6          THE COURT:  Well, I am going to disagree, and you're

7  going to have to try to persuade a judge who I'm going to tell

8  that the case is ready for trial and please not to let you do

9  any more work, please not to let you do any more discovery,

10  please not to allow any motion practice, but to set it for

11  trial within 30 to 60 days.  So you might -- you're just going

12  to have to convince whatever judge gets it.

13          MR. ADAMS:  Understood.

14          THE COURT:  It's something that I don't buy.

15          All right.  That's all on *Sanchez* and *Hall*.

16          Are we ready to go to Bard?

17          The first topic is a general status update.

18          MR. GARRARD:  Yes, Your Honor.  Henry Garrard.

19          THE COURT:  Mr. Garrard.

20          MR. GARRARD:  As Your Honor knows, we have a trial

21  set February 18th in the Wise case.  We have a pretrial then

22  on Monday.  We expect that case to go to trial.  The Court has

23  given us six trial days, and we are working as hard as we can

24  work to meet that directive from Your Honor.

25          We have Wave 1 and 2 cases that we have all been

─ MDL STATUS CONFERENCE ─

1   working diligently on, with the exception of a couple of

2   experts who it has been difficult to get the dates for.  Most

3   cases, discovery has been completed.  Motions, as Your Honor

4   is aware, have been filed and refiled.  We have designated --

5   will be designating, I think by Friday, experts in specific

6   cases, as Your Honor has directed.  And those cases will

7   shortly be ready to be moved, remanded, consolidated, whatever

8   Your Honor decides to do.

9          We have another wave of 300 cases.  We have worked

10   with the Court and carved out 60 of those cases to have

11   discovery finishing first.  We are working on that.

12          We have worked together in terms of being able to do

13   short depositions of treating physicians, and that is working

14   out as well as one could expect it to work out.

15          We will then have to start on the next portion of

16   Wave 3.  There have been some dismissals of cases from Waves 1

17   and 2 and Wave 3 for various reasons, which I won't go into

18   here, some were very personal to the client, that have caused

19   the cases to be dismissed.  There were other reasons that

20   cases have been dismissed.  I don't think one can construe

21   from dismissals any particular reason in all of the cases.

22          In New Jersey, I attended the session with Judge

23   Martinotti a couple weeks ago.  Judge Martinotti is very

24   vested in the Bard cases, very much wants to see what he can

25   do in terms of moving forward, frankly, the resolution

─── MDL STATUS CONFERENCE ───

1   process.  I don't know where that's going.  But he is

2   interested in that and wants to explore that I believe before

3   he explores setting trials in the Bard MDL.

4         I think that's basically the report at this moment,

5   Judge.

6         THE COURT:  All right.  Defendant?

7         MS. COHEN:  Thank you, Your Honor.

8         THE COURT:  Ms. Cohen?

9         MS. COHEN:  Just a few additional comments.  I think

10  Mr. Garrard covered most of it.

11        Judge Martinotti is visiting with the attorneys this

12  morning in New Jersey, as you know.

13        In the Pretrial Order 118, Bard 200 set of cases,

14  just to give the Court an update and consistent with

15  Mr. Adams' comments, there are 155 left of those, so 45 of

16  those have been dismissed, for one reason or another.  And, as

17  you know, those cases with the motions pending and once ruled

18  upon will be at the end of the schedule and ready for remand

19  or trial, and I know Your Honor will address that later.

20        On the Pretrial Order 163 and the subsequent pretrial

21  orders that modify those with the Bard 300, there are 246

22  cases of those that remain, so some 54, again, for one reason

23  or another, have been dismissed of those, and, as Mr. Garrard

24  accurately reported, we are finishing the treating physician

25  phase which, as the Court again knows, there was a lot of

——— MDL STATUS CONFERENCE ———

1   discussion about that, but we are finally going to be finished

2   with those and then we will be moving into the expert witness

3   phase of those.

4        The only other thing I would say is that there is a

5   motion, a consolidation motion pending, and I know Your Honor

6   is going to address that.  We had asked for a hearing on that.

7   We think that that should be addressed in a separate hearing,

8   and we have made that request, so I'll reiterate that again.

9        And then, finally, I think I was having trouble

10  hearing earlier when I stood up.  We have had not had any SUI

11  cases either scheduled for trial or set for trial, and even

12  though some of the defendants have tried some of them, we have

13  had none of them in this setting or anywhere else, so, again,

14  with 70 percent of the inventory, we are very interested in

15  those as hallmarks for value.

16       And that's I think all I would add to what

17  Mr. Garrard said.

18       THE COURT:  Thank you.  I'm keenly aware of that and

19  I intend to take care of it.

20       MS. COHEN:  Thank you, Your Honor.

21       THE COURT:  The next is American Medical Systems, and

22  I'm going to go off the record because they're going to talk

23  about a tentative settlement.  I think what they have to say

24  is valuable to everyone here.

25       (Discussion held off the record.)

———— MDL STATUS CONFERENCE ————

1          THE COURT:  I would like to commend Endo's management

2    and counsel, particularly Jen Dubas, Ellen Reisman, and Ethan

3    Greene, for their commitment to achieving resolution of these

4    cases.  I recognize that it was not easy, but the company

5    persevered and had dedicated, experienced settlement counsel

6    working full time.  As a result, AMS was able to achieve

7    settlements that were in the best interests of the company and

8    its shareholders, as well as the women who suffered injuries.

9    Obviously, this conserved judicial resources and is of benefit

10   to the taxpayers.

11         I also want to commend the hard work of plaintiffs'

12   leadership and others, and I'm not going to try to do this in

13   any order.  But I'm very familiar with the work of Harris

14   Junnell, and I want to commend him and his firm.  I want to

15   commend Joe Rice, Henry Garrard, Bryan Aylstock, and others,

16   not to mention the over 200 law firms that worked hard to get

17   to this settlement.  I was hesitant to do that because I knew

18   I was going to leave everybody out and somebody like Clayton

19   might get mad at me but --

20         (Laughter.)

21         THE COURT:  -- I'll just have to stop there and say

22   that I'm very proud that there was a calm, rational, reasoned

23   global attempt.  I'll talk more about that at the end.  My

24   remarks at the end may not be eloquent, but they have been

25   thought out.  So I'm not going to ask you to take notes

——— MDL STATUS CONFERENCE ———

1   because there will be a transcript and I'll be afraid to read

2   it after I finish but I'll do the best I can.

3         I'm pleased that the mesh litigation is largely over

4   as to AMS.  I know that there is still a few firms that

5   haven't joined the settlement, and given that virtually all of

6   the leadership and the plaintiffs' bar have reached resolution

7   with AMS, I'm confident the remaining firms will be able to do

8   so.  I encourage them to do so, acting in the best interests

9   of their clients.

10        The work that AMS and its counsel have done can

11  benefit, and the plaintiffs' counsel, can benefit other cases.

12  I believe there is much to the structuring -- well, let me say

13  methodology, methodology, that can be used in other cases.

14        And I think we'll try to have an opportunity somehow

15  to get that information to you a little later.

16        Let me turn to Coloplast, another featured player

17  today.  For the plaintiffs?  We are still off the record.

18        (Discussion held off the record.)

19        THE COURT:  I want to thank Lana Varney, Ronn Kreps,

20  Skeeter Salim -- Robert Salim, Riley Burnette for their

21  progress and work in Coloplast.  While it's a much smaller MDL

22  than AMS, there is much to take away from these settlements as

23  well, the methodologies that they have used, and there are

24  many similarities with the AMS packet.  So I think there are

25  things to be learned from both of these groups.

1          Let's turn next to Cook.  We are still on the record

2     now.  Who will begin a general status update for that MDL?

3          MR. ANDERSON:  Good morning, Your Honor.  Ben

4     Anderson on behalf of the Cook plaintiffs.

5          THE COURT:  Mr. Anderson.

6          MR. ANDERSON:  Just a quick update.  As Your Honor

7     knows, you have recently selected four bellwether plaintiffs

8     for three upcoming bellwether trials, one being an optional in

9     case certain issues pan out from the first trial.  Those are

10    to begin in April.  And, given that I will be trying the

11    Bellew case with you in March, Your Honor, that means we will

12    be seeing a lot of each other in March, April, May, June, and

13    July.  And I would ask for an order that you and I be allowed

14    to go on holiday after that, please.

15         (Laughter.)

16         THE COURT:  I confessed to somebody yesterday that I

17    would much rather sit here than I would back there.  I

18    actually enjoy trials.  I think there are an awful lot of

19    judges on the bench anymore that can't, by any legitimate

20    measure, call themselves a trial judge.  I would also suggest

21    there are a lot of lawyers that say they're trial lawyers that

22    haven't tried any cases, either.  But I look forward to it.  I

23    look forward to seeing you.

24         Anybody want to speak for the other side?

25         MR. KING:  Your Honor, Doug King for Cook.

———— MDL STATUS CONFERENCE ————

1    Nothing really to add.  We're preparing the cases for

2  trial, as you know.

3    THE COURT:  Yes, sir.

4    MR. KING:  We're ready to go.

5    THE COURT:  All right.

6    MR. KING:  Thank you, sir.

7    THE COURT:  I ask you to listen now to what I have to

8  say.  You can feel free to ignore anything that's corny or

9  purple prose and recognize that these particular remarks have

10  not had the benefit of a law clerk to take out the language

11  that they would normally remove from my efforts.

12    Resident today in this very nice courthouse are a

13  bunch of black boxes or servers containing digital files, each

14  of which has many complaints against one or more of the

15  medical-device manufacturers represented here today.  There

16  are more than 70,000 individual lawsuits against these

17  corporate entities.  Each of these lawsuits embodies a

18  conflict which the legal system of the United States is

19  obligated to resolve.

20    My role with regard to each of these conflicts is to

21  apply appropriate procedures in the law to the end that I do

22  justice to my part of each case.  My very passing familiarity

23  with John Rawls tells me that any rational person inhabiting

24  the original position behind the veil of ignorance can deliver

25  justice.  Of course, that person must not only be rational but

─ MDL STATUS CONFERENCE ─

 1    also impartial and inexperienced, or, as he puts it, ignorant.

 2            As one with more than 25 years' experience as a

 3    litigator and 20 years as a federal judge, I am well

 4    acquainted with the requirements for a good justice hunt in an

 5    individual case.  But this is no ordinary hunt.  I view the

 6    more than 70,000 cases through the lens of my experience and

 7    those procedures and laws that I mentioned before.  I see

 8    disputes that must each be addressed and resolved.  Each case

 9    assigned to me is assigned for full pretrial development, but

10    the Congress of the United States has only allowed 678 Article

11    III Federal District Judges.  We have a few more because of

12    our senior judge system, but, all in all, a paltry few are

13    available.  The entire federal judiciary cannot individually

14    develop and try 70,000 cases within the professional lifetime

15    of anyone in this courtroom.

16            So, we're faced with a conundrum.  Conundrums arising

17    from multiple conflicts usually drive those so confronted to

18    travel down one of two paths:

19            The first path is cyclical and often downwardly

20    spiralling in adversity.  Most try to avoid this, if they can

21    at all, by procrastination and inactivity.  Others pretend

22    that they're preparing to travel down a different path but

23    they fail to take any meaningful step to begin the journey.

24    Those who choose the first path usually find that each step

25    along it becomes more radical.  In our present circumstance,

—— MDL STATUS CONFERENCE ——

1    the first path will never lead to complete resolution.

2            Those of you who were or are to this day involved in

3    the world of asbestos have some knowledge of the obstacles on

4    such a path.

5            Success on the second path begins with a recasting of

6    these enormous numbers of conflicts in a form that can be

7    dealt with, and then the path leads to a pretty steep climb to

8    mutual trust and a cooperative endeavor.

9            Some of you, like AMS, Coloplast, have already done

10   this.  The rest of you will hear more presentations which

11   describe ways to go which fall within my definition of the

12   second path.

13           I hope to end on a hopeful note but, first, I feel

14   compelled to describe what lays ahead for those of you who are

15   either doing nothing or who have taken steps down the first

16   path.

17           One of the advantages of our long acquaintance is you

18   know that I say what I mean and I mean what I say.

19           Ahead of you lies more individual trials this year.

20   Ahead of you lies preparation for and trial of consolidated

21   cases this calendar year.  Ahead of you lies joinder of cases

22   on issues to be decided.  Ahead lie mass remands and trials in

23   several jurisdictions within the next few months.  Ahead, we

24   will have more accelerated discovery.

25           If you genuinely feel like you need more information

1  before beginning to travel a path to resolution, then that

2  information is forthcoming in spades this year.  Please

3  believe me that each side will lose cases at trial.  And the

4  verdict in any trial will ask louder than before whether more

5  was lost or gained by going to trial.

6        With the approval of the Fourth Circuit Court of

7  Appeals, I'm staffing up for a crush of business.  I'm adding

8  three law clerks on the 1st of March to my current staff of

9  able law clerks and paralegals.  I will be able to keep up

10  with you.  Deadlines from here on out will be firm, and you

11  should arrange to cover what will be many conflicts in

12  schedules.  That's the description of the immediate steps that

13  lie ahead on path one.

14        I said I wanted to be hopeful.  I want to emphasize

15  that there is and always will be, always will be, a choice to

16  pursue an alternate path, focused on resolution by settlement.

17  I want to appeal to your better and more reasonable angels.  I

18  ask you today to consider putting aside your present

19  intentions to tread the first described path.  It is going to

20  be much rockier and more difficult than it has been over the

21  past few years.

22        I ask you, please, to forsake procrastination.  It's

23  simply a thief of time and money.  No one on the plaintiffs'

24  side can believe that delay is in their best interests.  I'm

25  sure that the calls from your clients are becoming more

––––––––––– MDL STATUS CONFERENCE –––––––––––

1   strident, and that stridency is justified.  No one on the

2   defense side can believe that delay is in their best

3   interests.  You've read the studies.  Your managers have read

4   the studies.  Litigation costs, without consideration of

5   settlements or judgments, are growing at a rate in excess of

6   10 percent a year, and have been for 15 years or more.

7           Accountants or auditors are becoming more

8   inquisitive.  The market is becoming more concerned about

9   possible exposure in cases like these.  Global resolution,

10   without thousands of trials, will occur.  The law requires

11   that filed lawsuits be resolved.  When that occurs will depend

12   upon how difficult it is for the decision makers on each side

13   to stop procrastinating or pretending that the problem doesn't

14   exist.

15           These cases will not evaporate simply by the passage

16   of time, and we cannot try them all one by one by one by one.

17   I ask you to start by facing reality.  Realize that you have

18   the information.  You now have the information that you need

19   to begin mapping a path to settlement.  Start by recasting, as

20   AMS did, the conflicts as one problem, not as this thousands

21   of cases.  You can do that without much distortion, based on

22   what you now know.  Agree on steps that each side can verify.

23           As I suggested earlier, the first part of the path is

24   a very steep climb to mutual trust.  A lot of the motion

25   practice lately has not been helpful in leading up that path.

—— MDL STATUS CONFERENCE ——

1   But once we are to get there, to a position of mutual trust,

2   you can find the path, you can see the path to find a

3   resolution.

4          What I said earlier when I was not being hopeful, as

5   I am now, was not meant, and those of you who know me know it

6   was not meant as a threat.  It's a statement of present

7   intention of what we're going to do.  And I have geared up in

8   my own way and planned in my own way to do things the best way

9   I know how.  I know that it places substantial burdens on

10  everybody.  I'm not enthusiastic about some of it myself.

11         People say, "Well, Judge, you just got to go to

12  Miami, Florida, spend two weeks trying cases in beautiful

13  Miami."  You know, so the Chamber of Commerce in Florida

14  doesn't get too angry, it does seem like a pretty town and I

15  did have some good meals, but the inside of one hotel room and

16  the inside of one courtroom, as you trial lawyers know, looks

17  pretty much like any other.  So my road show, while necessary

18  because of the failure of the parties to waive Lexecon, may

19  well continue, but I don't take any great joy in it.  I don't

20  have anywhere I really want to go.

21         Before I conclude, I want to turn to my learned

22  colleague, Judge Eifert.  As many of you know, she is as good

23  at resolving discovery disputes as any judge you've ever

24  appeared before.  She has the experience as a trial lawyer on

25  both sides of cases to be practical, and she doesn't put up

————— MDL STATUS CONFERENCE —————

1   with a lot of nonsense.

2           I have to tell you a secret.  I said at one of our

3   meetings, you may remember, that there is no excuse for a

4   judge to be mean.  As we left the courtroom, she said, "I

5   disagree with that."

6           (Laughter.)

7           THE COURT:  Judge Eifert?

8           MAGISTRATE JUDGE EIFERT:  I have nothing to add to

9   that.

10          (Laughter.)

11          MAGISTRATE JUDGE EIFERT:  I'm not looking forward to

12  it either, believe me, but, clearly, there is a lot to be

13  done.  So we're all in this together.

14          THE COURT:  We are.  As I look at it, it's

15  schizophrenic for me.  I like all of you all.  I've had a good

16  time.  I've gotten to know some really good lawyers and I'm

17  going to get to know some of you a lot better, it seems.  But

18  it doesn't -- that very familiarity, and the length of time

19  that we've known each other, nags in the back of my head as a

20  failure to do my job in an expedient way.  So I'm going to

21  kick it into high gear and ask you to do the same, and we'll

22  do the very best we can.

23          Thanks for coming.  That concludes our status

24  conference.  Let's go off the record, please.

25          (Discussion held off the record.)

MDL STATUS CONFERENCE

1          (The proceedings concluded at 11:22 a.m.)

2                -   -   -   -   -

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           **REPORTER'S CERTIFICATE**

2

3        I, **Carol Farrell, CRR, RMR, CCP, RSA, RPR,** Official Court

4   Reporter of the United States District Court for the Southern

5   District of West Virginia, do hereby certify that the

6   foregoing is a true and accurate transcript, to the best of my

7   ability, of the proceedings as taken stenographically by and

8   before me at the time, place, and on the date hereinbefore set

9   forth.

10

11

12  **/S/ Carol Farrell, CRR, RMR, CCP, RPR**              **02/05/15**

13  _____    _____
                **Court Reporter**                         **Date**

14

15

16

17

18

19

20

21

22

23

24

25

*United States District Court*
*Southern District of West Virginia*