# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

AND

DISTRICT COURT
95TH JUDICIAL DISTRICT
DALLAS COUNTY, TEXAS

| | |
|---|---|
| IN RE:  ETHICON, INC., PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION | United States District Court, S.D. W. Va. Master File No. 2:12-MD-02327 MDL No. 2327 |
| THIS DOCUMENT RELATES TO ALL CASES | JOSEPH R. GOODWIN U.S. DISTRICT JUDGE |
| CAROL CAVNESS, Plaintiff<br><br>v.<br><br>TERESA KOWALCZYK, M.D., HUNT MEMORIAL HOSPITAL DISTRICT CHARITABLE HEALTH FOUNDATION d/b/a HUNT REGIONAL HEALTHCARE FOUNDATION and HUNT REGIONAL MEDICAL CENTER AT GREENVILLE, BAYLOR HEALTH CARE SYSTEM, JOHNSON & JOHNSON and ETHICON, INC. | District Court of Dallas County, Texas Cause No. DC-14-04220<br><br>KEN MOLBERG DISTRICT COURT JUDGE |

## AFFIDAVIT OF BENJAMIN M. WATSON

State of  Mississippi          )
                              )  ss:
County of Madison            )

1

BEFORE ME, the undersigned authority, on this day personally appeared Benjamin M. Watson, known to me personally, who was by me first duly sworn, and upon oath, stated to me as follows:

1.      My name is Benjamin Watson. I am over the age of 21, have never been convicted of a felony, and am of sound mind and fully competent to make this affidavit. I have personal knowledge of all the facts set forth in this Affidavit and affirm that they are true and correct based on my direct involvement or information I have personally reviewed.

2.      I am an attorney with Butler Snow LLP. Butler Snow LLP serves as defense counsel for Ethicon, Inc. and Johnson & Johnson ("defendants").

3.      I have personally reviewed the 47 documents identified on defendants' privilege log that are the subject of the current privilege dispute. Ms. Cavness originally challenged defendants' privilege claims with respect to 1,570 documents. A review of the documents revealed that the majority were exact – or near exact – duplicates of one another, leaving less than 400 distinct documents at issue. The parties subsequently resolved their dispute with respect to all but 47 of those documents through a combination of defendants withdrawing their privilege claims with respect to some of the documents and plaintiffs dropping their privilege challenges with respect to others. It is my good-faith belief, based on my review of the documents and the applicable law, that each of the 47 documents still at issue is protected by the attorney-client privilege and/or the work product doctrine.

4.      I have confirmed the identities of the individuals who created, sent or received the documents at issue by either speaking with them in person or by verifying their current or former employment status. I am also familiar with the identity of both in-house and outside attorneys for the defendants. Attached to this Affidavit as Exhibit A is a list of the individuals who are the

authors, recipients or senders of documents that have been challenged by plaintiffs – or whose legal advice is referenced therein. Exhibit A identifies which of these individuals are attorneys or legal personnel. With respect to non-attorneys, Exhibit A also states whether each individual is an employee of one of the defendants or its affiliates and provides the most-recent employment title for each individual based on a good-faith review of resources from Ethicon, Johnson & Johnson and reasonably available public databases and sources. I have confirmed that these individuals are – or were at the time they were employed by defendants or defendants' affiliates – authorized or empowered to seek and act upon legal advice.

5.       Defendants' headquarters are located in New Jersey and the majority of the in-house legal counsel and corporate employees identified in the communications at issue are based there. Accordingly, it is my understanding that nearly all of the communications in the documents at issue were sent to, or involved requests from, employees or attorneys in New Jersey.

6.       I have reviewed and am familiar with the definitions of "client" and "lawyer" as defined by New Jersey Rule of Evidence 504. I have also reviewed and am familiar with the definitions of "client," "representative of a client," "lawyer," "representative of a lawyer" and "confidential," as defined by Rule 503 of the Texas Rules of Evidence. Based on my review, the challenged documents associated with the reference "attorney-client privilege" involve a lawyer or lawyer representative engaging in confidential communications with a client or a representative of a client regarding professional legal services, or a lawyer or a representative of a lawyer rendering professional legal services or performing a requested task for a client or a representative of a client involving the rendering of professional legal services.

7.      Based on my review, the challenged documents associated with the reference "work product" involve emails or documents that were prepared by counsel, or at the direction of counsel, in response to pending litigation or in anticipation of expected litigation.

8.      I have provided further descriptions explaining why each of the contested documents is privileged in a table attached to this Affidavit as Exhibit B.[1]  Exhibit B sets forth: (1) the privilege log number for each of the documents at issue; (2) whether the document is being withheld in full or has been produced to plaintiffs in redacted form; (3) the privilege log entry for the document; (4) whether the document is being withheld/redacted based on the attorney-client privilege or as attorney work product; and (5) an explanation of the basis for defendants' privilege claim.

9.      Plaintiffs have challenged a number of documents prepared by APCO Worldwide ("APCO"). APCO is an international strategic communications firm specializing in litigation-related crisis management that was hired by Ethicon's outside counsel, Butler Snow LLP, to assist it in providing legal advice to Ethicon Women's Health & Urology, a division of Ethicon, Inc., in connection with litigation concerning vaginal mesh products.[2]  Butler Snow sought APCO's expertise to assist the firm on strategic communications issues related to its defense of Ethicon in pending and anticipated litigation involving vaginal mesh products.  Butler Snow did not retain APCO to provide ordinary public relations advice to it or Ethicon.

10.      The APCO documents at issue are all draft versions.  A later version of each of these documents that was no longer subject to the work-product doctrine has been produced to plaintiffs.  Specifically:

---

[1]      A more detailed version of Exhibit B that contains privileged descriptions of the documents at issue is being submitted *in camera* to the MDL court and will also be provided to the Texas State Court as an *in camera* submission if the Court agrees to accept such an *in camera* submission.

[2]      Defendants will provide the Court with a copy of the APCO engagement letter *in camera* upon request.

4

a.   A later version of document PL06609 was produced and is Bates-numbered ETH.MESH.13458065.

b.   A later version of document PL14831 was produced and is Bates-numbered ETH.MESH.07247733.

c.   A later version of document PL06691 was produced and is Bates-numbered ETH.MESH.07221339.

d.   A later version of document PL14559 was produced and is Bates-numbered ETH.MESH.05988002.

e.   A later version of documents PL15810, PL21909 and PL27471 was produced and is Bates-numbered ETH.MESH.13499979.

f.   A later version of document PL15819 was produced and is Bates-numbered ETH.MESH.05597789.

g.   A later version of document PL15849 was produced and is Bates-numbered ETH.MESH.07755959.

h.   A later version of documents PL21667 and PL21914 was produced and is Bates-numbered ETH.MESH.05597785.

11.    With respect to document PL20316, I have determined – based on communications with Ethicon counsel and Jennifer Haby – that Ms. Haby was acting as the functional equivalent of an Ethicon employee at the time the communication was made and that her receipt of the communication therefore does not vitiate the attorney-client privilege.

12.    In December 2008, Ethicon contracted with Ms. Haby – through her employer at the time, the brand-production company Schawk – to provide copy review support to Ethicon as a Senior Production Manager.  While serving in this role, Ms. Haby worked full time in her own

designated office space at Ethicon's facility in Somerville, New Jersey.  Ms. Haby was

responsible for facilitating review, comment and approval of drafts of documents and

submissions by various groups within Ethicon, including the legal department.  Accordingly, it

was essential that Ms. Haby communicate with Ethicon's in-house counsel to ensure that these

documents complied with regulatory and other legal requirements.  Pursuant to Schawk's

contract with Ethicon, Ms. Haby was required to protect confidential information she obtained as

a result of her work with Ethicon from disclosure to third parties.  A true and correct copy of that

contract is attached hereto as Exhibit C.  In 2012, Ethicon formally converted Ms. Haby's

position from that of a contractor to an Ethicon employee.  Ms. Haby remains employed by

Ethicon to this day.

     Further Affiant sayeth naught,

                                   Benjamin M. Watson

     SUBSCRIBED AND SWORN TO BEFORE ME, to witness my hand and seal of office
on this 23 day of February, 2015.

                                   Notary Public in and for the State of
                                   Mississippi

6

# EXHIBIT A

# Individuals Who Authored, Received Or Are Identified In Challenged Communications and Draft Documents

## I. Attorneys and Legal Personnel

| | Name | Position[1] |
|---|---|---|
| 1. | Benson, Marc | Attorney - WW VP LAW, SC&P |
| 2. | Blazer, Marci | Attorney - ASSISTANT GENERAL COUNSEL-TRADEMARKS |
| 3. | Brinckman, Dirk | Attorney - SR. VP - LAW, CHIEF REGULATORY COUNSEL |
| 4. | Chester, Michael | Attorney - Janssen Board Attorney |
| 5. | Clarke, Dorothy | Attorney - VP, HEALTH CARE COMPLIANCE, MD&D |
| 6. | De Camara, Jennifer | Attorney - ASSISTANT GENERAL COUNSEL |
| 7. | English, Timothy | Attorney - ASSISTANT GENERAL COUNSEL |
| 8. | Fletcher, Robert | Attorney - GENERAL COUNSEL MD&D |
| 9. | Forminard, Elizabeth | Attorney - GENERAL COUNSEL, CONSUMER GROUP |
| 10. | Freedman, Shane | Attorney - VICE PRESIDENT - LAW |
| 11. | Gaffe, Jaimi | Attorney - SENIOR COUNSEL |
| 12. | Geary, David | Attorney - ASSISTANT GENERAL COUNSEL |
| 13. | Gilson, Stephanie | Attorney - ASSIST GENERAL COUNSEL |
| 14. | Gottlieb, Jessica | Attorney - Regulatory |
| 15. | Guiton, Christopher | Attorney - ASSISTANT GENERAL COUNSEL |
| 16. | Hamill, Kathleen | Attorney - ASSISTANT GENERAL COUNSEL |
| 17. | Hueting, Debra | Attorney - Regulatory Legal Counsel |
| 18. | Janssens, Els | Attorney -- Regulatory |
| 19. | Jenkins, Lisa | Attorney - VICE PRESIDENT LAW TIBOTEC |
| 20. | Jimenez, Freddy | Attorney - ASST GENERAL COUNSEL |
| 21. | Johnson, Joy | Legal Assistant - LEGAL SECRETARY |
| 22. | Jones, Christy | Attorney (Butler Snow LLP) |
| 23. | Kennedy, Maria | Attorney - ASSISTANT GENERAL COUNSEL |
| 24. | Lukens, Patricia | Attorney - ASSIST GENERAL COUNSEL |

---

[1]    Except where otherwise indicated, the individuals identified are or have been employed by Ethicon, Johnson & Johnson, and/or a Johnson & Johnson affiliate and may have provided legal services to Ethicon or other J&J affiliates. This list provides the most recent employment title for each individual based on a good-faith review of resources from Ethicon, Johnson & Johnson and reasonably available public databases and sources.

| | Name | Position[1] |
|---|---|---|
| 25. | Main, Janet | Legal Assistant - EXECUTIVE ASSISTANT |
| 26. | McCulley, Michael | Attorney - Assistant General Counsel/Group Leader |
| 27. | Meehan, Deidre | Attorney - ASSISTANT GENERAL COUNSEL |
| 28. | Michalski, Richard | Attorney - SENIOR COUNSEL |
| 29. | Neill, Simon | Attorney - ASSISTANT GENERAL COUNSEL |
| 30. | Nixon, Randy | Attorney - VP LAW CNS |
| 31. | Olsen, Kenneth | Attorney - VP LAW JJ HCS ASST GENRL CNSL |
| 32. | Paterson, Clayton H. | Attorney - VICE PRESIDENT LAW |
| 33. | Petter-Lipstein, Daniel | Attorney - SENIOR COUNSEL |
| 34. | Plantz, Bernard | Attorney - CHIEF INTELLECTUAL PROPERTY COUNSEL |
| 35. | Reck, Francis | Attorney - Senior Counsel |
| 36. | Reilly, Anne | Attorney - Senior Counsel |
| 37. | Roberts, Lisa | Attorney - WW VP Law, J&J Diabetes Solutions |
| 38. | Scott, Elizabeth | Attorney - ASSISTANT GENERAL COUNSEL |
| 39. | Seferian, Sue | Attorney - HCCO, PHARM GLOBAL R&D |
| 40. | Sicari, Catherine | Attorney - ASSISTANT GENERAL COUNSEL |
| 41. | Sievers, Mark | Attorney - ASSISTANT GENERAL COUNSEL |
| 42. | Son, Rosa | Attorney - ASSISTANT GENERAL COUNSEL |
| 43. | Szanto, Melissa | Attorney - ASSISTANT GENERAL COUNSEL - PATENTS |
| 44. | Tandy, Marlene | Attorney - ASSISTANT GENERAL COUNSEL |
| 45. | ter Heerdt, Joyce | Attorney - ASSISTANT GENERAL COUNSEL |
| 46. | Torelli, Helen | Attorney - Associate General Counsel |
| 47. | Totin, Michael | Attorney - ASSISTANT GENERAL COUNSEL |
| 48. | Travers, Kristi | Attorney - ASSISTANT GENERAL COUNSEL |
| 49. | Van Passel, David | Attorney - ASSISTANT GENERAL COUNSEL |
| 50. | Vanbuggenhout, Willy | Attorney - Chief Privacy Officer |
| 51. | Vaughan, John | Attorney - Senior Counsel |
| 52. | Villani, Patricia | Attorney - ASSISTANT GENERAL COUNSEL |
| 53. | Warren, Lisbeth | Attorney - ASSISTANT GENERAL COUNSEL |
| 54. | Yap, Yuung Yuung | Attorney - ASSISTANT GENERAL COUNSEL |

## II. Non-Attorneys

| | Name | Position[2] |
|---|---|---|
| 55. | Acevedo, Michael | VP Sales & Marketing |
| 56. | Adams, Brad (James) | Planning Analyst |
| 57. | Affeld, Tom | DIR PROFESSIONAL EDUCATION ETHICON |
| 58. | Agnew, Theresa | VP Marketing McNeil Consumer Healthcare |
| 59. | Ahamed, Saleem | Contractor |
| 60. | Ahuja, Madhukar | Executive Director, Worldwide Healthcare Compliance |
| 61. | Aker, Brenda | DIR GLOBAL CLINICAL OPERATIONS |
| 62. | Akins, Tyrone | Director, Health Care Compliance |
| 63. | Alberti, Richard | ASP VP of Quality and Regulatory Compliance |
| 64. | Albright, Penny | VP Janssen Ortho |
| 65. | Allen, Cynthia | Quality Manager III |
| 66. | Allibone, Barbara | MANAGER GOVERNMENT CONTRACTS |
| 67. | Altman, Leslie | SPECIALIST HCC |
| 68. | Ames, David | Director of Medical and Strategic Affairs |
| 69. | Anderson, Elizabeth McKee | Worldwide Vice President, Global Strategic Marketing |
| 70. | Aravind, Suresh | VP STRATEGIC MED AFFAIRS |
| 71. | Armstrong, Jane | Staff Clinical Project Lead |
| 72. | Arnaud, Axel | SURGICAL RESEARCH DIRECTOR |
| 73. | Arslan, Levent | Sales and Stakeholder Relations Director |
| 74. | Asar, Vinit | VP Global Product Management |
| 75. | Asbury, Valerie | WW PRESIDENT, J&J DIABETES SOLUTIONS |
| 76. | Austin, Chuck | Corporate VP, Global Supply Chain |
| 77. | Bacci-Walsh, Diana | VP NA EDUC SOLUTIONS & MTG SVCS |
| 78. | Barham, Charman | Senior Administrative Assistant |
| 79. | Bariahtaris, Steven | VP GLOBAL FINANCE |
| 80. | Barnickel, Donna | C&G PAYMENT ANALYST |
| 81. | Barro, Jose | DIRECTOR, HCCO CORPORATE FUNCTIONS |

---

[2]       Except where otherwise indicated, the individuals identified are or have been employed by Ethicon, Johnson & Johnson, and/or a Johnson & Johnson affiliate and may have held positions in more than one department/subject area.  This list provides the most recent employment title for each individual based on a good-faith review of resources from Ethicon, Johnson & Johnson and reasonably available public databases and sources.

| | Name | Position[2] |
|---|---|---|
| 82. | Bartczak, Sergio | VP New Business Development Latin America |
| 83. | Baylor-Henry, Minnie | VP, STRATEGIC REGULATORY AFFAIRS |
| 84. | Bazemore, Robert | VP New Growth Platforms |
| 85. | Beach, Jim (James) | VP Ethicon Endo Surgery |
| 86. | Beath, Catherine | VP RA Global Surgery Group |
| 87. | Bellotti, Marc | Worldwide VP R&D |
| 88. | Bell-Powell, Linda | Privacy Compliance Manager |
| 89. | Benedetto, Laura | FINANCE DIRECTOR PHARMA CONTROLS & COMPL |
| 90. | Benson, Edward | DIRECTOR HCCO, BABY & BEAUTY GBU's |
| 91. | Bergmeyer, Lynn | CLINICAL SCIENCE MANAGER |
| 92. | Bernie, Bill (William) | Medical Director, Ethicon Endo Surgery |
| 93. | Bernstein, Nancy | MANAGER, PRIVACY COMPLIANCE |
| 94. | Beyers, Karen | Director, Clinical Project Scientist |
| 95. | Bhayani-Dada, Nazira | REGULATORY AFFAIRS MANAGER |
| 96. | Biggs, James | VP QUALITY & REGULATORY COMPLIANCE |
| 97. | Bloom, Leslie | DIRECTOR MEDAFF ADVOCACY & PARTNERSHIPS |
| 98. | Bohn, Don (Donald) | VP US GOVT AFFAIRS |
| 99. | Bookman, Deirdre | ASSOC DIRECTOR GCSO OPERATIONS |
| 100. | Bordley, Diana | DIR REGULATORY AFFAIRS |
| 101. | Borochaner, Meryle | Executive Assistant |
| 102. | Boscia, Jerome (Jerry) | VP Immunology, Janssen R&D |
| 103. | Bourassa, Betsy | Project Consultant (APCO Worldwide) |
| 104. | Bradley, Mary | HCCO, JGS |
| 105. | Braendle, Daniel | TRANSLATION PHASE |
| 106. | Braxton, Hilda | MANAGER REGULATORY AFFAIRS |
| 107. | Brennan, Anthony | SR DIRECTOR, MONITOR/REPORT/TRANSPARENCY |
| 108. | Broadhurst, Vanessa | President, Internal Medicine, Janssen |
| 109. | Brolick, Emily | Senior Analyst HCC |
| 110. | Bruno, Eric | Executive VP/General Manager, Ethicon Endo Surgery |
| 111. | Brusdeilins, Martin | VP, R&D, Ortho-Clinical Diagnostics |
| 112. | Buckley, Tracy | SOX COMPLIANCE MANAGER - SUPPLY CHAIN |
| 113. | Budden, Jeffrey | Director of Medical Communications, Cordis |
| 114. | Buerkle, Barbara | Sr. Analyst Contracting & Sys |

| | Name | Position[2] |
|---|---|---|
| 115. | Burgess, Ian | WW VP R&D TRAUMA & CMF |
| 116. | Burke, Cheryl | DIRECTOR OC PROFESSIONAL |
| 117. | Burrus, James | DIRECTOR REG AD & PROMO CNS |
| 118. | Cacciatore, Jeffrey | FINANCE MANAGER WW ORTHO REPORTING |
| 119. | Cadge, Don (Donald) | President, Patriot Pharmaceuticals, LLC |
| 120. | Cakolli, Laura | FINANCE DIRECTOR PHARMA CONTROLS & COMPL |
| 121. | Calantoni, Gail | Administrative Assistant, WW Office of Health Care Compliance & Privacy |
| 122. | Calderone, Susan | SPECIALIST MEDICAL AFFAIRS |
| 123. | Callegari, Peter | MD, VP, Medical Affairs (Janssen Products, LP (email = COBIUS Centocor Ortho Biotech Inc.) |
| 124. | Callen, George | SR EXECUTIVE ONCOLOGY SPECIALIST |
| 125. | Canady, John | MEDICAL DIRECTOR |
| 126. | Carino, Ettore | VP SALES & MKTG AMERICAS & WW TECH SRVC |
| 127. | Cariski, Alan | VP WW MEDICAL AFFAIRS |
| 128. | Carlson, John | VICE PRESIDENT INNOVATION PORTFOLIO |
| 129. | Carter, Anthony | VP DIVERSITY AND INCLUSION |
| 130. | Carter, Michael | VP & CQO WW QUALITY & REG COMPLIANCE |
| 131. | Carver, Judith | Sr. Clinical Project Manager, Medical Affairs |
| 132. | Case, Rob (Robert) | VP, US Sales, LifeScan |
| 133. | Casper, Andrea | VP, Worldwide Regulatory Affairs |
| 134. | Cassino, Rick (Ricchard) | Director, Health Care Compliance |
| 135. | Chambers, Charles (Rob) | VP SALES US SOUTH |
| 136. | Chang, Kristina | DIRECTOR COMMUNICATIONS |
| 137. | Chang, Paul | VICE PRESIDENT CHIEF SAFETY OFFICER |
| 138. | Charles, Chris (Christine) | DIRECTOR CLINICAL RESEARCH |
| 139. | Christianson, Bill (William) | WW VP Regulatory External Relations, DePuy |
| 140. | Cincotti, Kristen | Sr. Analyst HCC, DePuy |
| 141. | Clarke, Susan | GROUP LEADER HCCO GLOBAL SURGERY - WEST |
| 142. | Clarke, Wendy | Sr. Administrative Assistant, Health Care Compliance |
| 143. | Colfer, Jerry | VP of Information Technology, Patriot Pharmaceuticals |
| 144. | Collins, Greg | OPERATIONS |
| 145. | Colvin, Jhanita | Supply Chain Analyst |
| 146. | Connaire, Celia | GROUP LEADER HCCO GLOBAL SURGERY - EAST |
| 147. | Conticchio, Linda | Director, Audit Services Group, WW Health Care Compliance |

| | Name | Position[2] |
|---|---|---|
| 148. | Conway, Lea Ann | VP QUALITY & COMPLIANCE GLOBAL SURGERY |
| 149. | Coon, Michael | Senior Manager, Medical Affairs/Professional Relations, DePuy Orthopaedics |
| 150. | Copithorne, Mary | MONITORING MANAGER |
| 151. | Corkum, Nancy | WW VP, Office of Compliance |
| 152. | Corrigan, Kevin | Director, MD&D Regulatory Affairs, Advanced Sterilization Products |
| 153. | Corso, Chris (Christopher) | Director, Health Care Compliance, Consumer and Personal Care, McNeil Cons Health USA |
| 154. | Courtney, Richard | SR MGR REG AFFAIRS |
| 155. | Cronan, Juli | Sr. Manager Product Labeling |
| 156. | Crosby, Cindy | VP CLS Quality & Compliance |
| 157. | Crowley, Angela | MANAGER, EXTERNAL REPORTING |
| 158. | Cummings, Catherine | Contractor |
| 159. | Curry, Kris | Vice President of Health Care Compliance |
| 160. | Cutshall, Tony | VP MARKETING & PD |
| 161. | Dahlquist, Karl | Health Care Compliance Officer |
| 162. | D'Ambrosio, Diane | ASSOCIATE DIRECTOR ANALYTICS |
| 163. | Dang, Phil | LEAD ANALYST IT |
| 164. | Danielfy, Gabor | SENIOR DIRECTOR HCC EMEA |
| 165. | Danwalder, Lisa | LEAD ANALYST |
| 166. | DaRosa, Luciene | HCCO CODMAN |
| 167. | Dauria, Raina | VP, REGULATORY AFFAIRS, BIOSURGERY |
| 168. | Davis, Karen | COPY REVIEW AND COMPLIANCE MANAGER |
| 169. | de Freitas, Giselle | Project Coordinator WW Graphics & Labeling |
| 170. | De Ville, Rika | HEALTH CARE COMPLIANCE OFFICER BENELUX |
| 171. | DeCola, Dennis | Vice President of Compliance and Scientific Affairs |
| 172. | Deegan, Sarah | WW VP Qlty & Compliance Depuy Synthes FR |
| 173. | Del Prado, Michael | CGC ETHICON SURGICAL CARE |
| 174. | Delaney, Rich | Vice President of Marketing |
| 175. | Deloria, Diane | Director, Commercial Investigations |
| 176. | Demetriades, Joan | Strategy and Decision Support Leader |
| 177. | Denayer, Marc | VICE PRESIDENT, PHARMACOVIG. MEDICAL COMPLIANCE |
| 178. | Desai, Bhupesh | Manager of Health Care Compliance |
| 179. | Deveney, Rosina | Manager, Records & Info Management |

| | Name | Position[2] |
|---|---|---|
| 180. | DiBattiste, Peter | Global TA Head, Cardiovascular |
| 181. | Dillon, Sue (Susan) | Global TA Head Immunology |
| 182. | DiNardo, Robin | QUALITY DIRECTOR |
| 183. | Divilio, L. Thomas | Director of Medical Affairs |
| 184. | Dodd, Sheri | Vice President of Health Economics & Reimbursement |
| 185. | Dolginoff, Lori | SENIOR DIRECTOR, BRAND PUBLIC RELATIONS |
| 186. | Donato, William (Jr) | VP FRANCH ACCOUNT MGMT |
| 187. | Dorff, Gene (Eugene) | Vice President of Sales & Marketing |
| 188. | Dormier, Edward | VP RESEARCH & DEVELOPMENT |
| 189. | Doshi, Uday | DIRECTOR PROF & SCI AFFAIRS |
| 190. | Dover, Carl | Vice President, GRQP |
| 191. | Drinkwater, Sandhya | MANAGER HCC |
| 192. | Driscoll, Michael (Mike) | SR MANAGER, OVERSIGHT & MONITORING |
| 193. | Duke, John | NATIONAL SALES DIRECTOR |
| 194. | Dunbar, Fiona | VP GLOBAL MED AFFAIRS COMMERCIAL OPS |
| 195. | Duso, Brandy | Senior Accountant |
| 196. | Dwyer, Kevin | Contractor |
| 197. | Eichler-Huston, Susan | Director of Regulatory Affairs |
| 198. | Ekdahl, Andrew | ORTHOPAEDICS FRANCHISELEADER |
| 199. | Ells, Thomas (Tom) | VP Consumer Scientific Innovation |
| 200. | Engwall, David R. | Vice President of Customer Development |
| 201. | Erginel, Deniz | Neurology and Pain BUM |
| 202. | Evans, Eric | SR. EXECUTIVE IMMUNOLOGY SPECIALIST |
| 203. | Evanyo, Kimberly | Education Director, Medical Education |
| 204. | Faella, Sheila | SENIOR MANAGER ASSESSMENTS |
| 205. | Farley, Marc | Vice President of Business Practices & Compliance |
| 206. | Federici, Thomas (Tom) | Health Care Compliance Officer |
| 207. | Fehrman, Joanna | MGR FINANCE P/T |
| 208. | Fernandez, Judith | Health Care Compliance Officer |
| 209. | Ferradosa, Mario | RVP COMM EXCELLENCE AND STRAT AFFAIRS |
| 210. | Ferrari, Louis (Lou) | Vice President of Sales & Marketing |
| 211. | Ferraz, Jose Roberto | President |
| 212. | Finkelstein, Audrey | Contractor |

| | Name | Position[2] |
|---|---|---|
| 213. | Fiorino, Suzanne | SR DIR STRGT, ANALYTICS & SUSTAINABILITY |
| 214. | Firriolo, Chris (Christopher) | Director of Regulatory Affairs Advertising and Promotion |
| 215. | Flanigan, Andrea | POLICIES & PROCEDURES SR MGR |
| 216. | Focht, Kristina | FINANCE MANAGER OTC |
| 217. | Foltyn, Ted (Theodore) | Senior Director, Sales & Marketing, Ethicon Surgical Care |
| 218. | Fox, Walter | Independent Medical Education, Janssen Pharmaceuticals |
| 219. | Frias, Juan | Category Solutions Head |
| 220. | Fritz, Ingo | Process Engineer |
| 221. | Froelich, Lindsay | MANAGER, STRATEGIC COMMUNICATIONS |
| 222. | Frost, Kevin | SENIOR MANAGER MARKETING |
| 223. | Fruehauf, Fred  (Alfred) | FINANCE COMPLIANCE MANAGER |
| 224. | Fryer, Ibi (Violet) | LEAD CONTRACT SPECIALIST |
| 225. | Fuller, Dan (Daniel) | SR DIRECTOR STRATEGIC ACCOUNTS |
| 226. | Gadaleta, Sergio | Vice President, Regulatory Affairs & Product Vigilance |
| 227. | Garofalo, Victor | Specialty Marketing Manager |
| 228. | Gille, Dirk | Head of Pharmaceutical RD Quality Assurance |
| 229. | Gilmore, Karen | Research Optometrist |
| 230. | Giordano, Gina | DIRECTOR HCCO SGB & PATRIOT POC SBG SCG |
| 231. | Girgis, Violette | MANAGER PAYROLL, COMPLIANCE |
| 232. | Giroux, Kay | Specialist 4 Health Care Compliance |
| 233. | Giunta, Marie | LEAD ANALYST, EXTERNAL REPORTING |
| 234. | Glaser, Bill (William) | SR BIOTECHNICIAN |
| 235. | Glass, Terry | Health Care Compliance Officer, Vistakon |
| 236. | Godward, Donna | VP MD&D CQO |
| 237. | Goncalves, Michele | LEAD COMPLIANCE & FORENSICS SPECIALIST |
| 238. | Goode, Avis | MANAGER, CIA OPS |
| 239. | Goodridge, Michele | EXECUTIVE ASSISTANT |
| 240. | Gower, Michael | Course Co-Ordinator |
| 241. | Grab, Karl | Sales Representative |
| 242. | Graham, John | TruMatch |
| 243. | Gray, Carrie | HCC SR ANALYST |
| 244. | Greco, D. Daniel (II) (Dan) | Business Services Global Procurement |
| 245. | Green, Karen | LEADER GLOBAL THERAPEUTIC AREAS |

| | Name | Position[2] |
|---|---|---|
| 246. | Greenidge, Edmund | DIRECTOR |
| 247. | Grimes, Timothy (Tim) | HCCO NA Pharmaceuticals |
| 248. | Habig, Scott | VP, Sales & Marketing, Centocor |
| 249. | Haby, Jennifer | On-site Project Manager (Schawk) |
| 250. | Hahn, Dennis | DIR REG EXTERNAL ENVIRONMENT |
| 251. | Haines, Pamela | SR MANAGER US TRAINING |
| 252. | Hait, William | GLOBAL HEAD JANSSEN R&D |
| 253. | Hamalak, Teresa | LEAD COMPLIANCE & FORENSICS SPECIALIST |
| 254. | Hamilton, Amy | MANAGER LIFECYCLE LABELING PROJECT |
| 255. | Hammond, Jeffrey | Group Director, Medical Affairs, General Surgery, Johnson & Johnson Global Surgery Group |
| 256. | Hancock, Colleen | SR VP GLOBAL CHIEF OPERATING OFFICER |
| 257. | Hansen, Jerry | JNJ MERCK JV EE |
| 258. | Hanson, Temre | SENIOR SPECIALIST, EES |
| 259. | Harfe, Daniel | SR DIRECTOR, CLIN & REG AFFAIRS |
| 260. | Harlow, Hina | SENIOR DIRECTOR REGULATORY AFFAIRS |
| 261. | Hart, James | WW VP EBM and Chief Medical Officer |
| 262. | Hayes, Rebecca | General Operator 1 |
| 263. | Hemwall, Edwin | JNJ MERCK JV EE |
| 264. | Henderson, Matt | Director GTM Marketing Emerging Sites, Ethicon |
| 265. | Heremans, Annie | VP, R&D, Medical & Aesthetic Dermatology, OrthoNeutrogena division of Ortho-McNeil-Janssen Pharmaceuticals, Inc. |
| 266. | Hermansson, Paan | EMEA Marketing Manager |
| 267. | Hernandez, Renata | MANAGER |
| 268. | Hickson-Curran, Sheila B. | DIR GLO STRATEGIC MED AFF FOR CL PRODUCT |
| 269. | Hillberg, Holly | VP WW RESEARCH & DEVELOPMENT |
| 270. | Hinoul, Piet | VP MEDICAL AFFAIRS |
| 271. | Hiriak, Thomas | HCC OFFICER - BIO |
| 272. | Hitchye, Kellie D | FINANCE MANAGER |
| 273. | Hogenbirk, Patrick | Director , Training & Communication, J&J HHC & Privacy US |
| 274. | Holcroft, Steve | SR DIRECTOR REG COMPLIANCE FOR SYNTHES |
| 275. | Hood, Doug | IT AS SR MANAGER HCC DELIVERY MGMT |
| 276. | Hooda, Rohinish | Concractor - Zyrtec |
| 277. | Horwitz, David | Chief Medical Officer, Johnson & Johnson Diabetes Institute |

| | Name | Position[2] |
|---|---|---|
| 278. | Hulihan, Joseph F | VP, Medical Affairs, Janssen CNS |
| 279. | Humbles, Paul | DIRECTOR STRATEGIC INITIATIVES |
| 280. | Irizarry, Keila | MANAGER S2P PROCESS IMPROVEMENT |
| 281. | Jaakobs, James | GOVT CONTRACT COMPLIANCE AUDIT MANAGER |
| 282. | Jackson, Dawn | MANAGER LIFECYCLE LABELING PROJECT |
| 283. | Jarrell, Kent | Executive Director (APCO Worldwide) |
| 284. | Jerdonek, Ron | VP, WW R&D, LifeScan |
| 285. | Joffe, Jane | Senior Admin, Sales & Marketing, OrthoBiotech |
| 286. | Johnson, Denise | Sr Mgr - Privacy |
| 287. | Johnson, Diane | DIRECTOR, STRATEGIC REG AFFAIRS MD&D |
| 288. | Johnson, Janet | Sr. Manager Regulatory Affairs Depuy Orthopedics Inc. |
| 289. | Johnson, Larry | Director Preclinical Research, Ethicon |
| 290. | Johnson, Mark | SENIOR SCIENTIFIC DIRECTOR |
| 291. | Johnson, Matthew | DIR COMMUNICATIONS |
| 292. | Johnson, Rhonda | Contractor - Labor Relations Temp |
| 293. | Jones, Stella | VP, Immunology, Regulatory, J&J Biotechnology, Immunology, Oncology |
| 294. | Kafrissen, Michael | Chief Scientific Officer, Ortho-McNeil |
| 295. | Kalavendi, Ramakrishna | Contractor - eTMF |
| 296. | Kalin, Katherine | Vice President, New Business Development and Strategic Planning, OrthoClinicalDiagnostics |
| 297. | Kamin, Marc | VP Medical Affairs, OrthoBiotech & Centocor |
| 298. | Kanerviko, Brian | GROUP DIRECTOR REGULATORY AFFAIRS |
| 299. | Kawada, Eijiro | PROJECT MANAGER |
| 300. | Kawaguchi, Masato | EMP |
| 301. | Kebede, Mizanu | VP, Medical Devices and Diagnostics |
| 302. | Keen, Bobby | WW Vice President, Technical Service - ASP |
| 303. | Keen, Robin | VP, ENTERPRISE REG OPER EXCELLENCE |
| 304. | Kelly, Brian | SENIOR ENGINEER |
| 305. | Kelly, Joan | DIRECTOR STRATEGIC ANALYTICS & CUST MGT |
| 306. | Kelly, Mark | OPERATIONS TECHNICIAN |
| 307. | Keresty, Georgia | VP SCIENCE TECHNOLOGY & QUALITY |
| 308. | Kilburn, Randy | VP NA MKTG |
| 309. | Kingsberry, Michelle | NA REGION MGR |
| 310. | Kirberg, Gonzalo | COUNTRY MANAGER CHILE |

10

| | Name | Position[2] |
|---|---|---|
| 311. | Kiris, Gina | SR FINANCIAL ANALYST |
| 312. | Kirkemo, Aaron | Medical Director - Ethicon Gynecare |
| 313. | Kirkup, Ruby | VP, Research and Development - J&J Consumer Products US |
| 314. | Klein, Maren | MANAGER MARKET |
| 315. | Kling, Elaine | Sr. Director, Health Care Compliance |
| 316. | Kluesner, Stacy | MANAGER REGULATORY AFFAIRS |
| 317. | Koehler, Petra | MEDICAL DIRECTOR, TISSUE REINFORCEMENT, MEDICAL OPERATIONS |
| 318. | Konings, Frank | VICE PRESIDENT OTC R&D FRANCHISE |
| 319. | Kooij, Daap | Medical - Procurment Director<br><br>Proc. MD |
| 320. | Koritko, Chris | GCCO, DEPUY SYNTHES |
| 321. | Kramer, Paul | Director, Regulatory Advertising and Promotion, Pharmaceuticals Group Health Care Compliance - J&J |
| 322. | Krieser, Macil | VP QUALITY & REGULATORY COMPLIANCE |
| 323. | Kuijpers, Harold | Marketing Procurement Director MD&D EMEA |
| 324. | Kumar, Lori | VP R&D GLOBAL BEAUTY |
| 325. | Kumar, Rupali | MEDICAL INFO SPEC CPT |
| 326. | Kuntze, Erik (Carl) | SENIOR MEDICAL DIRECTOR - ETHICON PRODUCTS, MEDICAL AFFAIRS |
| 327. | Kurlander, David | SENIOR DIRECTOR -COMPLIANCE |
| 328. | Laas, Isabel | RCSL - Neuroscience & Pain |
| 329. | LaBerge, Rick | GM, J&J Global Walmart Business Unit |
| 330. | Lake, Deborah | DIRECTOR TECHNICAL & INFRASTRUCTURE |
| 331. | Lallier, Stacey | DIRECTOR, HCCO SUPPLY CHAIN, AMERICAS |
| 332. | Lamont, Kim | Sr. Manager, Marketing Services |
| 333. | Latyszonek, George | Manager, Health Care Compliance Officer |
| 334. | Lauwers, Ludo | SENIOR VICE PRESIDENT, SITE MANAGEMENT |
| 335. | Lavery, Tom | General Manager - DePuy UK & Ireland |
| 336. | Lawrance, Paul | VP, HCC -CORPORATE & GLOBAL SUPPLY CHAIN |
| 337. | Lazaro, Manny | EMMANUEL LAZARO |
| 338. | Lebeau, Guy | DIRECTEUR EXECUTIF EMEA |
| 339. | Lee, Sylvia | ASSOCIATE DIRECTOR |
| 340. | Leece, Barry | Senior Manager, Health Care Compliance - Ethicon |
| 341. | Leimkuhler, Marie | Senior Director, External Alliances |

| | Name | Position[2] |
|---|---|---|
| 342. | Levine, Howard | VP - Medical Affairs |
| 343. | Lewis, Amena | Manager, Health Care Compliance |
| 344. | Lilienfeld, Sean | CMO & VP STRAT MED AFFAIRS |
| 345. | Lin, Susan | MANAGER REGULATORY AFFAIRS |
| 346. | Lockwood Stacy | Director Policies Procedures, EMEA HCCP |
| 347. | Lowe, Mario | Director, Regulatory Affairs - LifeScan |
| 348. | Lum, Vanessa | VP, HCC & PRIVACY GLOBAL OPS |
| 349. | Luscombe, Brian | SENIOR MARKETING MANAGER |
| 350. | Lynch, Joseph | DIRECTOR MEDICAL AFFAIRS |
| 351. | Maestri, Jacqueline | VP QUALITY OPERATIONS |
| 352. | Mahar, Kevin | Director, Corporate Accounts, Ethicon |
| 353. | Mahmoud, Ramy | Chief Medical Officer |
| 354. | Maira, Christopher | Senior Financial Analyst |
| 355. | Malone, Jennifer | Contractor - Baldwin & Obenauf, US HQ-EPD GLOBAL GR |
| 356. | Manji, Husseini | Global TA Head Neuroscience |
| 357. | Marcello, Stephen | GROUP DIR MED AFFAIRS BIOSURG ENERGY |
| 358. | Maree, Aran | CHIEF MEDICAL OFFICER |
| 359. | Mark, Nancy | Director, Testing & Privacy Operations |
| 360. | Marotta, Christopher | MGR DEPUY SYNTHES GLOBAL ORTHO FRAN/R&D |
| 361. | Marran, Lynn | SR. MANAGER, US TESTING OPERATIONS |
| 362. | Marsh, Diane | Sr. Director, Global Strategic Analytics and Compliance - J&J |
| 363. | Martel, Donna | Med Info Svcs Cons |
| 364. | Martin, Anthony | VP R&D PRODUCTIVITY |
| 365. | Martinez, Clivetty | Vice President Health Care Compliance Latin America |
| 366. | Martinez, Debbi | MANAGER, DIGITAL & PRIVACY RA |
| 367. | Massey, Jill | Executive Director, Clinical Communications, Ortho-McNeil |
| 368. | Matteson, Chris | SR DIRECTOR, CIA IMPLEMENTATION |
| 369. | McArthur, Philomena | SR DIRECTOR, REGULATORY |
| 370. | McCarthy, Shawn | GM VP Global Marketing Cordis |
| 371. | McCormick, Vickie | VP, HCC and CIA CCO |
| 372. | McEvoy, Ashley | COMPANY GROUP CHAIRMAN, VISION CARE |
| 373. | McGregor-Beck, Roxanne | DIRECTOR REG AD & PROMO CV META PAIN |
| 374. | McIntyre, Michael | NATIONAL SALES DIRECTOR |

| | Name | Position[2] |
|---|---|---|
| 375. | McKanry, Steve | FINANCE MANAGER T&E ASSESSMENTS |
| 376. | McKenzie, Bill | NA REG HCCO AND GRP LEADER |
| 377. | Mckenzie, Paul | VP R&D ETHICON |
| 378. | McKinley, Sherrie | Manager, Totality and Vendor Management |
| 379. | McMichael, Charles | COMPLIANCE MANAGER |
| 380. | McMonigle, Suzanne | VP Marketing Animas Corp |
| 381. | McShane, Gerry | INVESTIGATIONS AND OPEN PYMTS DIR |
| 382. | Mecka, Amy | MGR OF HLTH CARE COMP CREDIT |
| 383. | Medhekar, Neelu | DIRECTOR REGULATORY AFFAIRS |
| 384. | Meek, Jonathan | Director, WW EWHU Market Development |
| 385. | Melsheimer, Rich | Sr Director MA |
| 386. | Mendez, Edith | RECORDS MANAGEMENT LEAD |
| 387. | Mercado, Wendy | Temp Cordis Corp |
| 388. | Messmore, Renea | CIA PROGRAM MANAGER |
| 389. | Michaels, Pamela | Director HCC J&J |
| 390. | Miller, Steven | VICE PRESIDENT RA CVS AND METABOLISM |
| 391. | Mills, Roger | SR DIRECTOR CLINICAL LEADER |
| 392. | Mirza, Seemeen | Brand Integrity Manager LifeScan USA |
| 393. | Moccio, Lorraine | PHARM GCC OFFICER (GCCO), LEAD |
| 394. | Monaco, Madeline | SENIOR DIRECTOR REGULATORY AFFAIRS |
| 395. | Montalvo, Alexis | FINANCE MANAGER ASSESMENTS |
| 396. | Montandon, Carol | CONSUMER CQO, VP QUALITY & COMPLIANCE |
| 397. | Montes, Larry | VP health Care Compliance and Privacy |
| 398. | Mooney, Maureen | CONTRACT SPECIALIST |
| 399. | Moore, Brad | VP HEALTH SYSTEM INNOVATIONS |
| 400. | Moran, Maryellen | SOX FINANCE MANAGER |
| 401. | Mullarkey, Kimberly | WW Director, Consumer Communications |
| 402. | Muse, Robert | SR MANAGER COMPLIANCE |
| 403. | Nettesheim, Susan | VP of Toxicology and Product Stewardship |
| 404. | O'Connor, Bridget | MANAGER COPY APPROVAL |
| 405. | O'Donnell, Jim | STAFF FACILITIES ENGINEER |
| 406. | Oliver, Tracie | VP, Sales and Marketing |
| 407. | Ott, Matthew | SALES CONSULTANT |

| | Name | Position[2] |
|---|---|---|
| 408. | Ovington, Liza | DIRECTOR MEDICAL OPS |
| 409. | Paine, Jennifer | EXECUTIVE VICE PRESIDENT WW QUALITY REGULATORY AND |
| 410. | Pakstys, Gabia | Senior Manager |
| 411. | Papineau, Paula | DIRECTOR, HCCO - DEPUY SPINE |
| 412. | Parenti, Dennis | STRATEGIC LEAD, RHEUMATOLOGY TAS |
| 413. | Parisi, Paul | SR MANAGER HCC R&D GLOBAL SURGERY GROUP |
| 414. | Park, Kim | PARTNER, JANSSEN HEALTHCARE INNOVATION |
| 415. | Parsons, Erin | DIRECTOR HCCO SCI & MED |
| 416. | Patel, Amit | DIRECTOR HCCO CNS TIBOTEC |
| 417. | Patel, Kearal | TESTING LEAD |
| 418. | Patel, Parul | STAFF QUALITY ENGINEER, COMPLAINTS |
| 419. | Paterno, Michelle | SR MANAGER HCCO |
| 420. | Peebles, Rhonda | SENIOR MANAGER MARKETING |
| 421. | Peluso Nguyen, Roseann | DIRECTOR INSTITUTIONAL |
| 422. | Perez, Maria | SR MANAGER SYSTEMS & TECHNOLOGY |
| 423. | Petersen, Christine | DIRECTOR AMERICAS PRIVACY OFFICER -NORTH |
| 424. | Pfeifer, Michael | SENIOR DIRECTOR, CLINICAL DEVELOPMENT |
| 425. | Phillips, Sherry | NON QUALIFIED IC - PROFESSIONAL |
| 426. | Piech, Catherine | VP HECOR |
| 427. | Pike, Robert | Director - Strategic Marketing |
| 428. | Pinto, Sergio Alberto | REGIONAL SECTOR LEAD MD&D LATAM |
| 429. | Plouhar, Pam | WW VP CLIN RESEARCH |
| 430. | Plummer, Mary Ann | Process & Technology Leader |
| 431. | Porras, Elizabeth | PROOFER |
| 432. | Prange, Karen | VP & GM Neurovascular |
| 433. | Preston, Caroline | Manager HCC Visoncare |
| 434. | Price, David | Quality Assurance Engineer |
| 435. | Pruden, Gary | WORLDWIDE CHAIR, GLOBAL SURGERY GROUP |
| 436. | Prytherch, Lois | TECH LEAD IT |
| 437. | Quandt, Thorsten | Packaging & Labeling Process Lead |
| 438. | Quirk, Susan | DIRECTOR IT, STRATEGY & PLANNING |
| 439. | Ragland, Denise | DIRECTOR HCCO ANIMAS |
| 440. | Rasmussen, Debra | SENOR DIRECTOR |

14

|     | Name | Position[2] |
| --- | --- | --- |
| 441. | Ray, Amrit | CHIEF MEDICAL OFFICER & HEAD GMO |
| 442. | Reagan, Shelley | Director, Regulatory Compliance |
| 443. | Reardon, John | Director HCC |
| 444. | Rechtiene, Michael | President Animas Corp |
| 445. | Rector, Monika | ORTHO FRANCH GLBL R&D HCCO |
| 446. | Reid, Brian | IT MANAGER |
| 447. | Reinhardt, Max | WW PRESIDENT OF DEPUY SYNTHES SPINE |
| 448. | Reyes, Lilia | SR DIRECTOR ASPAC HCC&P OPERATIONS |
| 449. | Reynal, Jose | Janssen Transformation Support Leader |
| 450. | Reynolds, Thomas | DIRECTOR GLOBAL STRATEGY |
| 451. | Rielly-Gauvin, Katherine | Vice President Regenerative Medicine |
| 452. | Riley, Terri | Associate Director of Compliance |
| 453. | Roberts, Elizabeth | Director, Professional Affairs-Oral Care |
| 454. | Roberts, Kathryn | DIRECTOR REG AD & PROMO ONC NEPH |
| 455. | Robinson, David | Medical Affairs |
| 456. | Rodriguez, Bonnie | DIRECTOR JJHCS |
| 457. | Rodriguez, Frank | DIRECTOR HUMAN RESOURCES |
| 458. | Rogers, Campbell | Chief Scientific Officer |
| 459. | Roji, Adrian | Vice President US Sales & Marketing Ethicon Women's Health & Urology |
| 460. | Rosenthal, Norman R | VP, CDTL |
| 461. | Ross, Bridget | PRESIDENT AND CEO ACCLARENT |
| 462. | Ross, Stacey | DIRECTOR MEDICAL AFFAIRS |
| 463. | Rousseaux, Patrick | VP COM AFF AND BUSINESS DVT |
| 464. | Roy, Manisha | CATEGORY DIRECTOR |
| 465. | Rubincam, Michele | SR MGR GLOBAL TRAINING |
| 466. | Rudy, Sofia | MANAGER TESTING OPERATIONS |
| 467. | Rusticus, Christine | Associate Director, Regulatory Advertising and Promotion |
| 468. | Rybak, Dave | DIRECTOR HCCO - VISIONCARE |
| 469. | Salikuti, Satish C. | Senior Analyst |
| 470. | Sampson, Carmen S. | Compliance Manager |
| 471. | Sanford, Thomas | WW VP PUBLIC AFFAIRS & COMMUNICATIONS |
| 472. | Santangelo, Cathy | IT LEAD |
| 473. | Sarokhan, Brenda | SR DIR, ALLIANCE MANAGEMENT & TRAINING |

| | Name | Position[2] |
|---|---|---|
| 474. | Scalafani, Beth | Project Coordinator        WW Product Labeling-Global Surgery |
| 475. | Schaible, Thomas | MANAGER SOFTWARE DEVELOPMENT |
| 476. | Scheuble, Theresa | ASSOCIATE DIRECTOR BIOSURGERY R&D |
| 477. | Schleckser, Patty | DIRECTOR MEDICAL AFFAIRS |
| 478. | Schlinkmann, Ellen | Director FDA Clinical Trials |
| 479. | Schmid, Tim | PRESIDENT, ETHICON US |
| 480. | Schmidt, Calvin | President |
| 481. | Schnider, Cristina | SR DIRECTOR PROF COMMUNICATIONS |
| 482. | Schoeck, Michael | Director Healthcare Compliance |
| 483. | Schragal, Kelly | ADMIN ASSOC SR |
| 484. | Schroeer, Peter | Group Director EMEA Regulatory Affairs - Global Surgery Group |
| 485. | Schwartz, Barbara | Vice President and General Manager |
| 486. | Schwartz, Elizabeth | DIR, EXT & TRANS RPT REG HCC&P OPERATION |
| 487. | Schwartz, Lee | Director, Health Care Compliance, J&J Pharmaceutical Research and Development |
| 488. | Scott, Michele | DIRECTOR HCCO CVI & PR |
| 489. | Sedlatschek, Richard | VP QUALITY AND REGULATORY COMPLIANCE |
| 490. | Selley, Nicola | VP, Regulatory Affairs |
| 491. | Serbiak, Paul | Vice President, Research and Development |
| 492. | Sethi, Rohit | Contractor |
| 493. | Shana'a, May | Vice President Global Skincare |
| 494. | Shaw-Sarubbi, Christi | Vice President, WW Marketing, Ethicon Products |
| 495. | Shedden, Arthur | SR DIR MED AFFAIRS & SR SAFETY OFFICER |
| 496. | Shen, Jessica | VP CLINICAL DEVELOPMENT & REG AFFAIRS |
| 497. | Shields, Jade | Global Director, Commercial Compliance, J&J Consumer |
| 498. | Shortt, Colette | DIR SCIENTIFIC & REG AFFAIRS |
| 499. | Siegel, Jay | Chief Biotechnology Officer |
| 500. | Silber, Steven | SENIOR DIRECTOR, FLUBENDAZOLE |
| 501. | Sitarik, Denise | VP, Johnson & Johnson Patient Assistance Foundation, Inc. Sr. Director Patient Assistance |
| 502. | Smith, Amy | DIRECTOR, REGULATORY AFFAIRS |
| 503. | Smith, Eric | ENGR SR DEV |
| 504. | Smith-Gomez, Janis | VP MARKETING |
| 505. | Snyder, Elizabeth | CONTRACT MANAGER |

| | Name | Position[2] |
|---|---|---|
| 506. | Soblick, Adriana | SR MANAGER US REGIONAL T&M |
| 507. | Sokolowski, Dorothy | REGULATORY LEAD |
| 508. | Spurr, Bob | V.P. Strategic Business Group, Ortho-McNeil Janssen Pharmaceutical Services |
| 509. | St. Bernard, Carl | V.P. US Sales and Marketing, Depuy |
| 510. | Stancic, Ibis | SR MANAGER TESTING OPERATIONS |
| 511. | Staneruck, Debbie | DIR CONSUMER RECORDS & INFO MANAGEMENT |
| 512. | Starowicz, Sharon | DIR REG AFFAIRS EXTERNAL ENV FRANCH |
| 513. | Steele, Susan | COORDINATOR II |
| 514. | Stewart, Jeff | DIRECTOR, MARKET COMPLIANCE |
| 515. | Stoll, Hans-Peter | V.P. WW Clinical Research, Cordis |
| 516. | Stopa, Matt | Sr, Analyst, Health Care Compliance, DePuy Orthopaedics |
| 517. | Stoutenburgh, Daniel | DIR MEDICAL AFFAIRS SVCS |
| 518. | Straley, Mark | WW President Ortho Clinical Diagnostics Commercial |
| 519. | Suehnholz, Raymond | Vice President Global Strategic Marketing |
| 520. | Sumner, Kenneth | Vice President  Clinical Regulatory Affairs |
| 521. | Swearingen, David | Vice President, Corporate Communications |
| 522. | Szabo, Dave | TECHNOLOGY MANAGER |
| 523. | Taggart, Donna | NPD LEAD LABELING |
| 524. | Tanner, Heather MacFalls | Director, Regulatory and Clinical, Acclarent |
| 525. | Tanner, Pat | Director, Communications at Depuy Synthetics Companies |
| 526. | Taubert, Jennifer | Company Group Chairman, NA Pharm |
| 527. | Taylor, Daniela | MANAGER 1 - GOVERNMENT CONTRACTS |
| 528. | Tendler, Craig | VP LATE DVLP AND GLOBAL MED AFFRS |
| 529. | Tidwell, Bill | Senior Director, Medical Affairs |
| 530. | Toca, Luis | SR FINANCE MANAGER |
| 531. | Tompson, Chris | HCC OFFICER, CENTERS OF EXCELLENCE |
| 532. | Torres, Denice | PRESIDENT MCNEIL CONSUMER HEALTHCARE |
| 533. | Torres, Samantha | ANALYST PROF RELATIONS |
| 534. | Toselli, Richard | Vice President of Evidence Based Medicine |
| 535. | Treidel, Pat | ASSOCIATE DIRECTOR |
| 536. | Truyen, Luc | VP NEUROSCIENCE EXTERNAL AFFAIRS |
| 537. | Turek, Elizabeth | HEAD, GLOBAL LABELING MANAGEMENT |
| 538. | Turner, Wendy | GROUP DIRECTOR REGULATORY OPERATIONS |

| | Name | Position[2] |
|---|---|---|
| 539. | Tynan, Kevin | Sr. Director, PV Operations |
| 540. | Ucci, Patricia | IT DIRECTOR |
| 541. | Valenti, Marlene | Vice President Cordis |
| 542. | Van Aelst, Roeland | HCC Sector Lead, MDD EMEAC |
| 543. | Van Baelen, Karin | Head of Global Regulatory Affairs |
| 544. | Van Dessel, Ann | HEAD GLOBAL CLINICAL OPERATIONS |
| 545. | Van Hoof, Johan | Global Head IDV - Managing Director Crucell |
| 546. | Van Riet, Patrick | VP MANUFACTURING OPERATIONS IT |
| 547. | Vandenzavel, Sarah | PROFESSIONAL EDUCATION MANAGER |
| 548. | Varlotta, Michael | SENIOR DIRECTOR DOME |
| 549. | Vavala, Kim | SENIOR FINANCIAL ANALYST T&E |
| 550. | Vellucci, Laura | REGULATORY AFFAIRS FELLOW |
| 551. | Viana, Zeb | Ethicon Gynecare/Hernia Director EMEA |
| 552. | Vinci-Rainis, Melissa | Contractor - MVR Consulting, Marketing Communications |
| 553. | Wagner, Fred | VP SUPPLY CHAIN CUSTOMER CONNECTIVITY |
| 554. | Waldstreicher, Joanne | Chief Medical Officer |
| 555. | Waller, Michael | Vice President Clinical and Medical Affairs |
| 556. | Walls, Michelle | SR MGR HCCO COBI |
| 557. | Ward, Michael | WW Director, Clinical Research |
| 558. | Warner, Mechelle | SENIOR MANAGER, HCCO |
| 559. | Weigel, Alex | Contractor - Corporate Privacy Compliance |
| 560. | Weisberg, Martin | DIR MEDICAL |
| 561. | Werts, Ernest (Ray) | VP Sales, Ortho-McNeil Pharmaceuticals |
| 562. | Wesbecker, Donna | Senior Oversight & Monitoring Analyst |
| 563. | Wess, Alyson | SR. DIRECTOR, CUSTOMER STRATEGY |
| 564. | Whiteman, Joanne | MGR, INT'L REGISTRATION & RECORDS MGMT |
| 565. | Wichert, Cathy | Franchise Healthcare Compliance Officer, Vision Care |
| 566. | Widmer, Kathy | VP Marketing |
| 567. | Wildgust, Mark | GLOBAL MEDICAL AFFAIRS LEADER - ONCOLOGY |
| 568. | Williams, Carol Allison | MONOFILAMENT PROCESSOR |
| 569. | Williams, Crystal | Contractor |
| 570. | Williamson, Pauline | MICROBIOLOGIST |
| 571. | Willis, Joe | General Manager, Ortho Dermatologics |

|  | Name | Position[2] |
|---|---|---|
| 572. | Wilson, John | LEAD COMPLIANCE & FORENSICS SPECIALIST |
| 573. | Wisniewski, Mark | Director, Health Care Compliance |
| 574. | Wladika, Bill | Director, Inside Sales |
| 575. | Wolf, Lee | EXECUTIVE ADMIN |
| 576. | Wood, Jane | HEAD, J & J BIORESEARCH Q & C |
| 577. | Woodford, Phyllis | SR ANALYST EXTERNAL REPORTING |
| 578. | Woodruff, Sheri | VP, PUBLIC AFFAIRS & POLICY COMM |
| 579. | Woods, Kimberly | IT LEAD |
| 580. | Wright, Lucy | Senior Brand Manager |
| 581. | Wright, Sherri | SENIOR MANAGER ASSESSMENTS |
| 582. | Yang, Michael | PRESIDENT, Jannsen Pharmaceuticals |
| 583. | Yaross, Marcia | VP Clinical, Biosense Webster |
| 584. | Yee-Fong, Nigel | HEALTH CARE COMPLIANCE |
| 585. | Zaddem, Vincenza | STAFF ENGINEER QUALITY |
| 586. | Zalesky, Christopher | VP, GLOBAL POLICY GUIDANCE |
| 587. | Zelinger, David | Head, Medical Affairs Statistics |
| 588. | Zielke, Eberhard | Manager |
| 589. | Zoka, Ramineh | SR. DIRECTOR, CDTL |
| 590. | Zollo, Stephen | IT SOLUTIONS DESIGNER |

# EXHIBIT B

# TABLE OF WITHHELD AND REDACTED DOCUMENTS

## I.   Communications To Or From In-House Counsel That Include Requests For Or The Provision Of Legal Advice

| Privilege log number | Withheld/Redacted | Priv Log Entry | Attorney-Client/Work-Product | Explanation |
|---|---|---|---|---|
| PL06220 | Redacted | Emails from client employees to client employees copying Deidre Meehan* and client employees seeking Deidre Meehan's* legal analysis and reflecting work product regarding Pelvic Mesh litigation | Attorney client | This document contains three emails concerning Ethicon's strategy and positioning in advance of an FDA advisory committee meeting regarding surgical mesh products.  Defendants have already produced in full two of the three emails.  The other, original email can only be produced in redacted form, however, because some of the communication contained therein is unquestionably protected by the attorney-client privilege.  The email is from Matthew Johnson to two Ethicon employees and copies Deidre Meehan, in-house counsel for Johnson & Johnson, and Minnie Baylor-Henry, another Johnson & Johnson employee.  The email reveals a request for legal advice that is protected from disclosure.  Moreover, the email seeks information that Meehan needs to provide legal advice.  (*See* Brief Section II.A.) |
| PL06294 | Redacted | Email between Deidre Meehan* and client employee and to client employees seeking Deidre Meehan's* legal analysis regarding mesh professional education | Attorney client | This document contains a chain of three emails between Ethicon employees Brian Kanerviko and Piet Hinoul, J&J employee Minnie Baylor-Henry and J&J counsel Deidre Meehan.  Defendants have produced the second and third emails on the chain.  However, defendants are withholding the first email in the chain because it is unquestionably privileged.  In that email, Mr. Kanerviko circulates a proposed addition to a guidance document to Mr. Hinoul, Ms. Baylor-Henry and Ms. Meehan and asks for feedback.  The email is privileged because it includes a request for legal advice by Mr. Kanerviko to Ms. Meehan, whom he addresses by name and from whom he requests feedback.  It is clear from the text of the email that the primary purpose of sending the email to Ms. Meehan is to solicit her legal advice on the proposed language to ensure that it is consistent with FDA regulatory standards.  (*See* Brief Section II.A.) |
| PL13057 | Redacted | Emails from Janet Main*, Freddy Jimenez* and client employee to client employees copying Bernard Plantz*, Helen Torelli*, Maria Kennedy*, Lisa Jenkins*, Mark Sievers*, Patricia Villani*, Marlene Tandy*, Jennifer De Camara*, Sue Seferian*, Elizabeth Forminard*, and client employees reflecting Janet Main's* legal analysis regarding FDA notice | Attorney client | This document contains two emails, beginning with a communication from in-house attorney Freddy Jimenez and his assistant Janet Main concerning an FDA notice.  Defendants have produced the second email in the chain, which is between two non-lawyer employees at Ethicon.  However, the first email is absolutely privileged because it reveals the provision and dissemination of legal advice by Jimenez with respect to the FDA notice.  (*See* Brief Section II.A.) |
| PL26558 | Redacted | Emails from Elizabeth Forminard* and client employees to Elizabeth Forminard* and client employees reflecting Elizabeth Forminard's* | Attorney client | This document contains a series of emails between Melissa Vinci-Rainis, a non-lawyer employee at Ethicon, and Elizabeth Forminard, an in-house attorney at Ethicon, regarding changes made to a draft of a standard operating procedure.  Defendants have produced the first email on the chain, which is between non- |

| Privilege log number | Withheld/Redacted | Priv Log Entry | Attorney-Client/Work-Product | Explanation |
|---|---|---|---|---|
| | | legal analysis regarding Prosima SOP changes | | lawyers. However, each of the other emails on the chain is unquestionably privileged. In each of these latter emails, the communication is either to a lawyer or from a lawyer and solicits or provides legal advice. The first email is from Vinci-Rainis to Forminard with an implicit request that counsel review the changes to the draft. The second email is from Forminard to Vinci-Rainis providing legal advice. The next email is from Vinci-Rainis to Forminard once again requesting counsel's legal opinion, albeit on a different topic. In the next email, Forminard responds with her legal opinion. Because all of these latter emails between Vinci-Rainis and Forminard involve the request for and provision of legal advice, they are privileged. (*See* Brief Section II.A.) |
| PL00595 | Withheld | Emails from client employees to Deidre Meehan* and client employee copying client employee summarizing Deidre Meehan's* legal analysis regarding the copy review for dyspenuria data | Attorney client | This document includes three emails. The first email is from Laura Vellucci, a non-lawyer regulatory employee, to Jonathan Meek, another non-lawyer employee, in which Vellucci highlights in-house attorney Deidre Meehan's concerns regarding the use of certain data. In the next email, from Meek to Vellucci, Meek specifies a disclaimer that was proposed by Meehan. The last email, which is from Vellucci to Meehan, copies Susan Lin, a non-lawyer employee, to apprise her that legal advice is being sought. All of these emails are privileged because they either mention Meehan's legal concerns or solicit her legal input. (*See* Brief Section II.A; II.C.) |
| PL03079 | Withheld | Email from client employee to Deidre Meehan* and client employee reflecting Deidre Meehan's* legal analysis regarding mesh professional education | Attorney client | This document begins with an email from a non-lawyer Ethicon employee to Deidre Meehan, counsel at Johnson & Johnson, and another non-lawyer Ethicon employee, regarding a training program. The initial email specifically requests the lawyer's feedback on a draft communication. Ms. Meehan responds by making several changes to the draft correspondence and asking for additional information necessary to provide her legal opinion. Ms. Meehan's revisions and her question, which seeks information necessary for the provision of legal advice, are privileged. (*See* Brief Section II.A.) |
| PL06554 | Withheld | Emails from David Geary* and client employee to David Geary* and client employee reflecting David Geary's* legal analysis regarding product recalls | Attorney client | This document includes two emails between David Geary, Senior Counsel at Johnson & Johnson, and a non-lawyer Ethicon employee regarding recall language. The initial email is a request for legal advice from Mr. Geary. Mr. Geary's response makes changes to the draft language which constitutes privileged legal advice. (*See* Brief Section II.A.) |
| PL11118 | Withheld | Email from David Geary* to client employee reflecting David Geary's* legal analysis regarding recall language | Attorney client | This document is an email from David Geary, Senior Counsel at Johnson & Johnson, to a non-lawyer Ethicon employee, regarding recall language. The email is privileged because it reveals Mr. Geary's legal analysis regarding the recall language. (*See* Brief Section II.A.) |
| PL11142 | Withheld | Emails between Deidre Meehan* and client employees reflecting Deidre Meehan's* legal analysis regarding response to FDA request | Attorney client | This document is a series of emails addressing revisions to an email communication being sent to the FDA. The original email is from Laura Vellucci, a regulatory affairs employee at Ethicon, to Catherine Beath, a regulatory affairs employee at Ethicon, and Deidre Meehan, in-house counsel for Johnson & Johnson, and copying Brian Kanerviko, another non-lawyer regulatory employee, to apprise him that legal advice is being sought. The email asks for review of the communication. While the request for review is sent to both a |

| Privilege log number | Withheld/Redacted | Priv Log Entry | Attorney-Client/Work-Product | Explanation |
|---|---|---|---|---|
| | | | | lawyer and non-lawyer, the primary purpose of the communication is to obtain legal advice, as the email specifically addresses Meehan and asks for her comments. (*See* Brief Section II.A.) In the next email, Beath provides information necessary for the provision of legal advice by Meehan. And in the final email, Meehan provides her legal analysis of the issue. This email chain is privileged because it contains the solicitation and receipt of legal advice concerning revisions and comments to communications with the FDA. (*See* Brief Section II.A). |
| PL11662 | Withheld | Emails between Dirk Brinckman* and client employees reflecting Dirk Brinckman's* legal analysis regarding Notified Bodies Board meeting minutes | Attorney client | This document contains a series of emails involving in-house counsel Dirk Brinckman and three Ethicon employees, Catherine Beath, Peter Schroeer and Richard Sedlatschek. The initial email is from Peter Schroeer, an Ethicon employee, apprising Brinckman and two others of a potential issue and asking for legal advice from Brinckman. In response, counsel Brinckman provides that advice. Finally, Catherine Beath, an Ethicon employee, provides additional information that will aid Brinckman in providing additional legal advice on the issue. These communications are privileged because they not only keep Brinckman apprised of business developments so that he can provide any necessary legal advice (*see* Brief Section II.A), but also seek his legal advice (*see* Brief Section II.A). |
| PL12301 | Withheld | Email from client employee to Deidre Meehan* and client employee seeking Deidre Meehan's* legal analysis regarding 522 update | Attorney client | This document is an email from Brian Kanerviko, an Ethicon employee, to Deidre Meehan, in-house counsel for Johnson & Johnson, and Minnie Baylor-Henry, a Johnson & Johnson employee, updating them on FDA issues. Because this is a communication intended to keep the attorney apprised of continuing business developments so that she can provide necessary legal advice, it is privileged. (*See* Brief Section II.A.) |
| PL13055 | Withheld | Emails from Freddy Jimenez*, Janet Main*, and client employee to Freddy Jimenez* and client employees copying Bernard Plantz*, Helen Torelli*, Maria Kennedy*, Lisa Jenkins*, Mark Sievers*, Patricia Villani*, Marlene Tandy*, Jennifer De Camara*, Sue Seferian*, Elizabeth Forminard*, and client employees reflecting Freddy Jimenez* and Janet Main's* legal analysis regarding FDA issues | Attorney client | This document is a series of emails, beginning with a communication from in-house attorney Freddy Jimenez and his assistant Janet Main concerning an FDA notice. The document also contains responses to the email by employees. This document is privileged because it reveals the provision of legal advice and responses to the same. (*See* Brief Section II.A.) |
| PL14558 | Withheld | Emails between client employees copying Lisbeth Warren* and client employee seeking Lisbeth Warren's* legal analysis regarding 522 response | Attorney client | This document includes two emails between non-lawyer Ethicon employees, copying Lisbeth Warren, Assistant General Counsel at Johnson & Johnson, seeking Ms. Warren's legal analysis regarding a regulatory filing. The initial email seeks clarification regarding the legal department's involvement in the response and implicitly requests legal review of a draft document. In response, a non-lawyer Ethicon employee confirms that Ms. Warren and the legal department are being asked for legal advice. (*See* Brief Section II.A.) |

| Privilege log number | Withheld/Redacted | Priv Log Entry | Attorney-Client/Work-Product | Explanation |
|---|---|---|---|---|
| PL15970 | Withheld | Emails between Lisbeth Warren*, Deidre Meehan* and client employee and to client employee reflecting Lisbeth Warren* and Deidre Meehan's* legal analysis regarding Prosima discontinuation | Attorney client | This document is a series of emails among Lisbeth Warren, Assistant General Counsel at Johnson & Johnson, Deidre Meehan, Senior Counsel at Johnson & Johnson, and two non-lawyer employees at Ethicon, regarding the discontinuation of a product. The initial email from a non-lawyer Ethicon employee asks two lawyers and one non-lawyer for legal advice about providing samples of the product. The fact that a non-lawyer employee is included on the communication does not defeat any claim of privilege because the advice was sought from two lawyers; thus, the primary purpose of the communications was to obtain legal advice. In the next email, Ms. Warren responds, stating her legal advice. Ms. Meehan's subsequent response requests more information and provides legal advice. This document is privileged because it includes an initial request for legal advice and multiple responses from two lawyers providing legal analysis regarding product discontinuation. These communications are classic attorney-client communications that are privileged. (*See* Brief Section II.A.) |
| PL19376 | Withheld | Emails between Lisbeth Warren*, Deidre Meehan* and client employee and to client employee reflecting Lisbeth Warren* and Deidre Meehan's* legal analysis regarding Prosima discontinuation | Attorney client | This document is a series of emails among Lisbeth Warren, in-house counsel at Johnson & Johnson, Deidre Meehan, Assistant General Counsel at Johnson & Johnson, and two non-lawyer employees at Ethicon, in which one of the non-lawyer employees seeks legal advice with respect to the discontinuation of a product. In the first email, the employee seeks legal advice from the attorneys. In the second email, Warren responds with her legal advice. Warren also asks for information necessary for the provision of further legal advice. In the third email, a non-lawyer employee provides the information requested to Warren. In the fourth email, Meehan weighs in on the issue and provides a legal opinion. The subsequent emails represent a "back and forth" between the lawyers and client, requesting and providing legal guidance on the issue. Therefore, all of these emails are privileged. (*See* Brief Section II.A.) |
| PL24593 | Redacted | Redacted portion of email from client employee to Deidre Meehan* copying client employees seeking Deidre Meehan's* legal analysis regarding Prolift adverse events | Attorney client | This document is a series of emails regarding Manufacturer and User Facility Device Experience ("MAUDE") database breakdown of mesh extrusions. Defendants have produced all of the emails with the exception of one, which is an email from Brian Luscombe, a marketing employee at Ethicon, to Deidre Meehan, an in-house attorney for Johnson & Johnson, asking for legal advice and copying various Ethicon employees to inform them that legal advice is being requested. Because this email is a communication that seeks legal advice, it is privileged. (*See* Brief Section II.A.) |
| PL28109 | Withheld | Emails from Simon Neill*, Dirk Brinckman* and client employees to Simon Neill* and client employees copying client employees reflecting Simon Neill* and Dirk Brinckman's* legal analysis regarding Gynecare product decommercialization | Attorney client | This document begins with an email from Dirk Brinckman, Vice President of the Law Division at Ethicon and Assistant General Counsel at Johnson & Johnson, to a non-lawyer Ethicon employee that provides Brinckman's legal analysis regarding Gynecare product decommercialization and other issues. In the email, Brinckman states that he is enclosing a note summarizing the decommercialization issue and providing a legal recommendation. The email also copies Elizabeth Forminard, General Counsel, Medical Devices & Diagnostics, and several non-lawyer employees to apprise them of Brinckman's legal analysis. The document also includes an email from Brinckman to Simon Neill, Assistant General Counsel at Johnson & Johnson, asking for an update regarding the discontinuation of the Gynecare product and its effect on the |

| Privilege log number | Withheld/Redacted | Priv Log Entry | Attorney-Client/Work-Product | Explanation |
|---|---|---|---|---|
| | | | | Company's contractual obligations. That same email also conveys Brinckman's legal advice. |
| | | | | The document also contains subsequent emails from Neill to non-lawyer employees requesting information sought by Brinckman, which is necessary for Brinckman to provide legal advice. In addition, Brinckman circulates an attached document that provides additional background related to his request for information and references litigation. An employee subsequently provides the requested information. These emails are privileged because they contain legal analysis from multiple counsel and/or involve communications seeking and providing information necessary for the provision of legal advice. (*See* Brief Section II.A.) |
| PL25343 | Withheld | Emails from Simon Neill*, Dirk Brinckman* and client employees to Simon Neill* and client employees copying Elizabeth Forminard* and client employees reflecting Simon Neill* and Dirk Brinckman's* legal analysis regarding Gynecare product decommercialization | Attorney client | This document contains several of the emails that are described as privileged in the entry for document PL28109 (immediately above), and were properly withheld for the same reasons set forth with respect to that document. The only additional email is from Paan Hermansson, a non-lawyer employee at Ethicon, to Simon Neill, an in-house attorney at Johnson & Johnson, and a non-lawyer employee at the company. This email is privileged because it provides information that was previously requested by attorney Dirk Brinkman and is necessary for Brinckman to provide legal advice. (*See* Brief Section II.A.) |
| PL28008 | Withheld | Emails between Simon Neill* and Dirk Brinckman* and from client employee and to client employee copying Christy Jones*, Elizabeth Forminard* and client employees reflecting Simon Neill* and Dirk Brinckman's* legal analysis regarding Gynecare product decommercialization | Attorney client | This document also includes two of the emails included in document PL28109, above, and those emails are privileged for the same reasons discussed with respect to that document. It also contains three additional emails, each of which is privileged, because it contains the provision of legal advice or a request for legal advice. The first of these additional emails is from Simon Neill, an in-house attorney at Johnson & Johnson, to Dirk Brinckman, another in-house attorney at the company, in which Neill provides an update. The email was sent in response to Brinckman's request for this information. In the next email, which is from Brinckman to Christy Jones, outside counsel at Butler Snow, Brinckman circulates the update for Jones' review. Brinckman also provides information necessary for Jones to adequately review the attached update. Lastly, the document includes a short follow-up email from a non-lawyer Ethicon employee to Brinckman and copying Jones in which the employee provides additional information necessary for the provision of legal advice. These communications are privileged because they seek legal advice and exchange information necessary for the provision of legal advice. (*See* Brief Section II.A.) |

| Privilege log number | Withheld/Redacted | Priv Log Entry | Attorney-Client/Work-Product | Explanation |
|---|---|---|---|---|
| PL28111 | Withheld | Emails from Simon Neill*, Dirk Brinckman* and client employee to Simon Neill* and client employees copying Elizabeth Forminard* and client employees reflecting Simon Neill* and Dirk Brinckman's* legal analysis regarding Gynecare product decommercialization | Attorney client | This document also includes several of the emails included in PL28109, above, and those emails are privileged for the same reasons set forth with respect to that document. The only additional email is from Paan Hermansson, a non-lawyer employee, to Simon Neill, a lawyer at Johnson & Johnson. This email is privileged because it reveals that Hermansson provided Neill with information that Neill sought at the request of Dirk Brinckman, Vice President of the Law Division at Ethicon and Assistant General Counsel at Johnson & Johnson. (*See* Brief Section II.A.) |
| PL28115 | Withheld | Emails from Simon Neill*, Dirk Brinckman* and client employee to Simon Neill* and client employees copying Elizabeth Forminard* and client employees reflecting Simon Neill* and Dirk Brinckman's* legal analysis regarding Gynecare product decommercialization | Attorney client | All but one of the emails in this document are the same as those described in document PL28109, above, and are privileged for the same reasons set forth with respect to that document. The only additional email is from Pann Hermansson, a non-lawyer, to Sarah Vandenzavel, another non-lawyer forwarding a document that had been sent to Hermansson in connection with a request for information by Dirk Brinckman, Vice President of the Law Division at Ethicon and Assistant General Counsel at Johnson & Johnson. Because this new email from one non-lawyer to another apprises the recipient of the email of the fact that legal advice has been requested and is being provided by Brinckman on a specific issue, it is also privileged. (*See* Brief Section II.A; II.C.) |
| PL28118 | Withheld | Emails from Simon Neill*, Dirk Brinckman* and client employees to Simon Neill* and client employees copying Elizabeth Forminard* and client employees reflecting Simon Neill* and Dirk Brinckman's* legal analysis regarding Gynecare product decommercialization | Attorney client | This document also contains many of the same emails that are included in document PL28109, above, and are privileged for the same reasons set forth with respect to that document. The document also contains two additional emails (the second-to-last and final emails in the chain), which are also privileged. The second-to-last email is sent from non-lawyer employee Zeb Viana to Simon Neill, an in-house attorney for Johnson & Johnson and another employee, Paan Hermansson, in which Viana follows up on a request for information from attorney Dirk Brinckman, Vice President of the Law Division at Ethicon and Assistant General Counsel at Johnson & Johnson. Hermansson responds by asking for clarification. Because these communications contain a request for information necessary for Brinckman to render legal advice, they are privileged. (*See* Brief Section II.A.) |
| PL05784 | Withheld | Memo reflecting Ethicon Legal Department's* legal analysis and work product regarding PFR/TVT Litigation | Attorney client | This document is a memorandum circulated at the request of counsel that summarizes litigation holds and provides legal instructions to employees. The document is attached to an email sent to all Regional Business Directors by a member of Ethicon management, informing them of the litigation holds and the retention of outside counsel. This document is privileged because it provides legal advice regarding hold notices and employees' interactions with outside law firms and describes requests by counsel for information necessary to provide legal advice. (*See* Brief Section II.A; II.C.) |

6

| Privilege log number | Withheld/Redacted | Priv Log Entry | Attorney-Client/Work-Product | Explanation |
|---|---|---|---|---|
| PL28065 | Withheld | Memorandum from Dirk Brinckman* and client employee to client employee copying Elizabeth Forminard* and client employees reflecting Dirk Brinckman's* legal analysis regarding decommercialization of pelvic floor repair products | Attorney client | This document is a memorandum from Dirk Brinckman, an in-house attorney for Johnson & Johnson, and a non-lawyer regulatory employee, to a high-ranking employee at Johnson & Johnson, copying two non-lawyers and one in-house lawyer to apprise them of legal advice.  It is marked as "privileged and confidential" and as Brinckman's work product.  The document contains legal analysis of the decision to globally discontinue certain products and is therefore privileged.  (*See* Brief Section II.A.)  The memo also qualifies at attorney work product because it addresses potential legal ramifications and government penalties that may stem from product discontinuation and therefore was drafted in anticipation of litigation.  (*See* Brief Section II.D.) |

## II.  Draft Documents That Include Attorney Comments

| Privilege log number | Withheld/Redacted | Priv Log Entry | Attorney-Client/Work-Product | Explanation |
|---|---|---|---|---|
| PL06463 | Redacted | Draft docket reflecting Deidre Meehan's* legal analysis and maintaining common defense regarding FDA panel meeting | Attorney client | This document is a draft docket submission on Pelvic Organ Prolapse Repair ("POP") to be submitted to an FDA panel meeting.  The document was circulated with comments from American Medical Systems ("AMS"), another manufacturer of mesh devices.  However, the document contains some comments from Deidre Meehan, an in-house attorney at Johnson & Johnson, that were added after AMS sent the draft.  The comments from Meehan were circulated only internally within Ethicon and Johnson & Johnson.  Meehan's comments are unquestionably privileged, and must therefore be redacted, because they contain legal advice.  (*See* Brief Section II.B.) |
| PL14194 | Redacted | Draft Docket Submission reflecting Deidre Meehan's* legal analysis regarding Advisory Committee Meeting on Pelvic Organ Prolapse Repair | Attorney client | This document is a literature review section of a memorandum to be submitted at an upcoming FDA Advisory Committee meeting on Pelvic Organ Prolapse ("POP") Repair.  The document reviews the same literature that the FDA referenced in a 2011 White Paper.  The document agrees with the FDA that the literature has identified adverse events associated with the treatment of POP with mesh.  However, it also urges the FDA to consider the adverse events relative to the benefits the procedures provide.  Defendants have produced this document, but have redacted passages by Deidre Meehan, an in-house attorney at Johnson & Johnson, that constitute legal analysis.  (*See* Brief Section II.B.) |
| PL14460 | Withheld | Draft package insert reflecting Deidre Meehan's* legal analysis regarding Prosima Physician ISI | Attorney client | This document is a redlined draft of the Prosima Physician Important Safety Information.  The document is attached to an email from Deidre Meehan, an in-house attorney at Johnson & Johnson, to non-lawyer employees, which makes clear that the comments are from legal.  Because the document contains counsel's revisions and comments on legal issues, including the information that should be included in a product safety insert, it is privileged.  (*See* Brief Section II.B.) |
| PL14461 | Withheld | Draft package insert reflecting Deidre Meehan's* legal analysis regarding Prosima Physician Important Safety Information | Attorney client | This document is a redlined draft of the Prosima Physician Important Safety Information, including comments by in-house counsel Deidre Meehan.  The document is attached to an email from Deidre Meehan, an in-house attorney at Johnson & Johnson, to non-lawyer employees, which make clear that the changes were made by Meehan.  The revisions are legal in nature and reveal Meehan's legal opinions as to Ethicon's obligations under FDA regulations, making them privileged.  (*See* Brief Section II.B.) |
| PL25353 | Withheld | PowerPoint presentation reflecting Dirk Brinckman's* legal analysis regarding pelvic floor repair and TVT Secur product discontinuation | Attorney client | This document is a table addressing the discontinuation of the PFR/TVT Secur product.  The table is attached to a memorandum authored by Dirk Brinckman, an in-house attorney at Johnson & Johnson, and Laura Vellucci, a non-attorney employee who works on regulatory matters providing legal advice on the issue of discontinuation.  Accordingly, the table is included within, and is a necessary part of, counsel's legal advice and is therefore privileged.  (*See* Brief Section II.B.) |

8

| Privilege log number | Withheld/Redacted | Priv Log Entry | Attorney-Client/Work-Product | Explanation |
|---|---|---|---|---|
| PL28500 | Withheld | Draft communication reflecting Jaimi Gaffe's* legal analysis regarding 522 Post Market Surveillance Plans | Attorney client | This document is a redlined version of a draft letter to the Australian Therapeutic Goods Administration.  The draft letter was attached to an email from Jaimi Gaffe, an in-house attorney at Johnson & Johnson, which makes clear that Gaffe is the author of the redline revisions and comments.<br><br>Gaffe's comments reveal her legal opinions regarding Ethicon's obligations under Australian law and is therefore privileged.  (*See* Brief Section II.B.) |

### III. Emails And Communications Between Non-Lawyers Within Ethicon Or J&J Discussing Legal Advice From Counsel

| Privilege log number | Withheld/Redacted | Priv Log Entry | Attorney-Client/Work-Product | Explanation |
|---|---|---|---|---|
| PL08740 | Redacted | Emails from client employee to Dirk Brinckman*, and client employees copying Deidre Meehan* and client employees and from client employee to client employee copying Lisbeth Warren* and Elizabeth Forminard* seeking Dirk Brinckman*, Deidre Meehan*, Lisbeth Warren*, and Elizabeth Forminard's* legal analysis regarding FDA 522 response | Attorney client | This document includes three emails regarding a draft response by Ethicon to a post-market surveillance request by the FDA with respect to pelvic mesh devices. Defendants have produced the first and second emails. The first email is from Brian Kanerviko, a non-lawyer regulatory affairs employee at Johnson & Johnson, to multiple non-lawyer employees, as well as in-house attorneys. The second email is from Chuck Austin, another Ethicon employee to unlisted recipients. The final email in the chain is from Gary Pruden, a non-lawyer employee from Johnson & Johnson, to Chuck Austin and copies Lisbeth Warren and Elizabeth Forminard, both of whom are in-house attorneys at Johnson & Johnson. This email is privileged because it reveals counsel's legal opinion with respect to Ethicon's position on a regulatory filing submitted to the FDA. (*See* Brief Section II.C.) |
| PL13102 | Redacted | Emails between client employees summarizing Ethicon Legal Department's* legal analysis regarding FDA panel meeting | Attorney client | This document contains two emails regarding a field update to sales colleagues on an upcoming FDA panel meeting on transvaginal mesh products. Defendants have produced the email at the top of the chain. However, the initial email is unquestionably privileged because it reveals the provision of legal advice. Although this email is from Matthew Johnson, a non-lawyer employee at Ethicon, to Paul Parisi and Kevin Frost, two other non-lawyer employees at the Company, it specifically references a request for and the provision of legal advice by the "legal" department and is therefore privileged. (*See* Brief Section II.C.) |

| Privilege log number | Withheld/Redacted | Priv Log Entry | Attorney-Client/Work-Product | Explanation |
|---|---|---|---|---|
| PL13077 | Withheld | Emails from Joy Johnson* and client employees to Marc Benson*, Dorothy Clarke*, Rob Fletcher*, Elizabeth Forminard*, Kathleen Hamil*, Patricia Lukens*, Randy Nixon*, Clayton Paterson*, Sue Seferian*, Freddy Jimenez*, Dirk Brinckman*, Joyce ter Heerdt*, Yuung Yuung Yap*, Willy Vanbuggenhout*, Timothy English*, David Geary*, Richard Michalski*, Kenneth Olsen*, Daniel Petter-Lipstein*, Francis Reck*, Anne Reilly*, Lisa Roberts*, Catherine Sicari*, Michael Totin*, Michael Chester*, Jennifer De Camara*, Shane Freedman*, Stephanie Gilson*, Jessica Gottlieb*, Christopher Guiton*, Maria Kennedy*, Michael McCulley*, Deidre Meehan*, Elizabeth Scott*, Mark Sievers*, Rosa Son*, Marlene Tandy*, Helen Torelli*, Kristi Travers*, John Vaughan*, Patricia Villani* and client employees copying Jennifer De Camara* summarizing Jennifer De Camara's legal analysis regarding guidance document on educational support | Attorney client | This document is a series of emails starting with an email from Johnson & Johnson legal secretary Joy Johnson "on behalf of Johnson & Johnson Law Department," providing a guidance document that addresses legal limitations on certain programs.  The emails that follow disseminate the legal guidance to employees within the Company and are therefore also privileged.  (*See* Brief Section II.C.) |
| PL24616 | Redacted | Redacted portions of emails from client employee to client employees copying client employees summarizing Marci Blazer's* legal analysis regarding deletion of text for NEO and Prosima+M | Attorney client | This document is a series of six emails addressing whether certain text should be included on the carton for NEO and Prosima+M. Defendants have produced four of these emails, which are between non-lawyers and do not reflect legal analysis. However, the first email and the fifth email are privileged because they discuss legal opinions by Marci Blazer, an in-house attorney for Johnson & Johnson, on certain text to be used on the carton.  The first email is from Jennifer Malone, a graphics and labeling employee at Ethicon, to various non-lawyer Ethicon employees.  The email relays legal advice by Marci Blazer, an attorney, about the text.  Because this email includes legal analysis by counsel, it is privileged.  (*See* Brief Section II.C.)  Similarly, in the fifth email, which is between Malone and a number of non-lawyer Ethicon employees, Malone states Blazer's legal position on the text at issue.  Because this email also reveals counsel's legal analysis regarding text for the carton, it is privileged.  (*See* Brief Section II.C.) |

| Privilege log number | Withheld/Redacted | Priv Log Entry | Attorney-Client/Work-Product | Explanation |
|---|---|---|---|---|
| PL27398 | Withheld | Email from client employee to client employee copying Melissa Szanto* summarizing Melissa Szanto's* legal analysis regarding de Leval discussion | Attorney client | This document is an email from Theresa Scheuble (Ethicon employee) to Rhonda Peebles (Ethicon employee) and copying Melissa Szanto (an attorney at Johnson & Johnson), summarizing Szanto's legal advice to hold off on discussing an issue until Szanto gets more information and can provide a legal opinion. This communication is privileged because its purpose is to convey privileged legal advice to those within the corporate structure who need the advice in order to fulfill their corporate responsibilities. (*See* Brief Section II.C.) |

## IV. Work-Product Materials Created By APCO Worldwide

| Privilege log number | Withheld/Redacted | Priv Log Entry | Attorney-Client/Work-Product | Explanation |
|---|---|---|---|---|
| PL06609 | Withheld | Draft communication reflecting work product regarding Pelvic Mesh litigation | Work product | This document is a draft letter to surgeons regarding the decision to discontinue certain pelvic mesh devices.  The draft was authored by Betsy Bourassa, a consultant at APCO Worldwide, a strategic communications firm that specializes in litigation-related crisis management and was retained by the company's outside counsel to address litigation-related communications issues.  It is therefore protected by the work product doctrine.  (*See* Brief Section II.D.)  A later version this document that is not subject to the work-product doctrine has been produced to plaintiffs. |
| PL06691 | Withheld | Draft communication reflecting work product regarding Pelvic Mesh litigation | Work product | This document is a draft letter regarding the decision to discontinue certain pelvic mesh devices.  The draft was authored by Betsy Bourassa, a consultant at APCO Worldwide, a strategic communications firm that specializes in litigation-related crisis management and was retained by the company's outside counsel to address litigation-related communications issues.  As such, it is protected work product.  (*See* Brief Section II.D.)  A later version this document that is not subject to the work-product doctrine has been produced to plaintiffs. |
| PL14559 | Withheld | Draft communication reflecting work product regarding Pelvic Mesh litigation | Work product | This is a draft document outlining Ethicon's response to questions concerning the Company's discontinuation of some of its mesh products.  The document was drafted by Kent Jarrell of APCO Worldwide, who was retained by Ethicon's outside counsel and worked at counsel's direction. The draft document provides litigation-related advice in that it outlines the Company's position with respect to events that are the subject of ongoing and threatened product-liability lawsuits.  (*See* Brief Section II.D.)  A later version this document that is not subject to the work-product doctrine has been produced to plaintiffs. |
| PL15810 | Withheld | Draft document summarizing Ethicon Legal Department's* legal analysis regarding 522 response to FDA | Work product | This is a draft document outlining Ethicon's response to questions concerning its discontinuation of certain mesh products.  It was drafted by Kent Jarrell of APCO Worldwide, a strategic communications firm that specializes in litigation-related crisis management and was retained by the company's outside counsel to address litigation-related communications issues.  Because this draft document was created by a litigation consultant retained by outside counsel in anticipation of litigation, it qualifies as attorney work product.  (*See* Brief Section II.D.)  A later version this document that is not subject to the work-product doctrine has been produced to plaintiffs. |
| PL15819 | Withheld | Draft communication reflecting work product regarding Pelvic Mesh litigation | Work product | This is a draft letter to surgeons to inform them of the decision to discontinue certain pelvic mesh devices.  The draft was authored by Betsy Bourassa of APCO Worldwide and is drafted to avoid inadvertently suggesting any potential bases for product liability suits.  Because this document was created by a litigation consultant retained by outside counsel in connection with the defense of litigation, it qualifies as attorney work product.  (*See* Brief Section II.D.)  A later version this document that is not subject to the work-product doctrine has been produced to plaintiffs. |

| Privilege log number | Withheld/Redacted | Priv Log Entry | Attorney-Client/Work-Product | Explanation |
|---|---|---|---|---|
| PL15849 | Withheld | Draft communication reflecting work product regarding Pelvic Mesh litigation | Work product | This document is a draft of a letter to be sent to distributors to inform them of the decision to discontinue certain pelvic mesh devices. The draft was authored by APCO Worldwide, a strategic communications firm that specializes in litigation-related crisis management and was retained by the company's outside counsel to address litigation-related communications issues. Because this document was created by a litigation consultant retained by outside counsel in anticipation of litigation, it qualifies as attorney work product. (*See* Brief Section II.D.) A later version this document that is not subject to the work-product doctrine has been produced to plaintiffs. |
| PL21667 | Withheld | Draft communication reflecting work product regarding Pelvic Mesh litigation | Work product | This is a draft document outlining responses to questions concerning its discontinuation of some mesh products. The draft states that it is confidential and not for distribution. Because this draft document was created by APCO Worldwide, a strategic communications firm that specializes in litigation-related crisis management and was retained by the company's outside counsel to address litigation-related communications issues, it qualifies as work product. (*See* Brief Section II.D.) A later version this document that is not subject to the work-product doctrine has been produced to plaintiffs. |
| PL21909 | Withheld | Draft document summarizing Ethicon Legal Department's* legal analysis regarding 522 response to FDA | Work product | This is a draft document outlining Ethicon's position with respect to its discontinuation of some of its mesh products. The draft states that it is confidential and not for distribution. Because this draft document was created by Kent Jarrell of APCO Worldwide, a strategic communications firm that specializes in litigation-related crisis management and was retained by the company's outside counsel to address litigation-related communications issues, it qualifies as work product. (*See* Brief Section II.D.) A later version this document that is not subject to the work-product doctrine has been produced to plaintiffs. |
| PL21914 | Withheld | Draft communication reflecting work product regarding Pelvic Mesh litigation | Work product | This is a draft document outlining Ethicon's position with respect to its discontinuation of some of its mesh products. The draft states that it is confidential and not for distribution. Because this draft document was created by Kent Jarrell of APCO Worldwide, a strategic communications firm that specializes in litigation-related crisis management and was retained by the company's outside counsel to address litigation-related communications issues, it qualifies as work product. (*See* Brief Section II.D.) A later version this document that is not subject to the work-product doctrine has been produced to plaintiffs. |
| PL14831 | Withheld | Draft communication reflecting work product regarding Pelvic Mesh litigation | Work product | This document is a draft letter to be sent to surgeons to inform them of the decision to discontinue certain pelvic mesh devices. The draft was authored by APCO Worldwide, a strategic communications firm that specializes in litigation-related crisis management and was retained by the company's outside counsel to address litigation-related communications issues. It is therefore protected by the work product doctrine. (*See* Brief Section II.D.) A later version this document that is not subject to the work-product doctrine has been produced to plaintiffs. |

| Privilege log number | Withheld/Redacted | Priv Log Entry | Attorney-Client/Work-Product | Explanation |
|---|---|---|---|---|
| PL06690 | Withheld | Email from client consultant to client employee copying Lisbeth Warren* and client consultants seeking Lisbeth Warren's* legal analysis and reflecting work product regarding Pelvic Mesh litigation | Attorney client | This document is an email from an employee of APCO Worldwide to a non-lawyer Ethicon employee, copying two other APCO employees and Lisbeth Warren, an in-house attorney for Johnson & Johnson.  The email is a privileged communication that was made for the purpose of providing advice at the behest of Ethicon's outside counsel regarding issues related to ongoing and threatened future litigation involving the Company's products.  (*See* Brief Section II.D.) |

## V.  Communication Between In-House Counsel And Consultant Acting As "Functional Employee" Of The Company

| Privilege log number | Withheld/Redacted | Priv Log Entry | Attorney-Client/Work-Product | Explanation |
|---|---|---|---|---|
| PL20316 | Withheld | Emails between Deidre Meehan* and client employee copying client consultant and client employees reflecting Deidre Meehan's* legal analysis regarding Prosima Apical Support learning guide | Attorney client | This document contains four emails that communicate legal advice by Deidre Meehan, an in-house attorney for Johnson & Johnson, regarding a Prosima Apical Support Learning Guide.  The first email is from Kevin Frost, a non-lawyer employee at Ethicon, to Meehan.  The email also copies Aaron Kirkemo and Melissa Vinci-Rainis, two non-lawyer employees, as well as Jennifer Haby, a contractor who was hired by Ethicon to manage its copy-review process (including the facilitation of legal review) and who functioned as a de facto employee of Ethicon, to apprise these individuals that legal advice is being requested.  This email notes that Meehan provided legal advice and includes additional information necessary for the provision of legal advice.  It is therefore subject to the attorney-client privilege.  (*See* Brief Section II.A.)  The next three emails are also privileged, as they involve a follow-up email by Frost reminding Meehan of his earlier comments, a response by Meehan providing her legal opinion on the changes, and a final email from Frost asking Ms. Haby to implement the agreed-upon changes.  All of these emails are privileged because they reveal a request for and the provision of legal advice.  (*See id.*)  The fact that Ms. Haby, a non-employee contractor, is included on the email chain does not defeat the privilege because, as explained in defendants' brief and the accompanying declaration of Ben Watson, Ms. Haby was acting as a functional employee of Ethicon and needed Ms. Meehan's confidential legal advice to perform her role at the company.  Accordingly, her communications with Ethicon's counsel are privileged.  (*See id.* Section II.E.) |

# EXHIBIT C

Schawk 

## MASTER AGREEMENT

This Master Agreement (this "Agreement") effective as of January 1, 2008 (the "Effective Date") by and between JOHNSON & JOHNSON SERVICES, INC., a New Jersey corporation with offices at 410 George Street, New Brunswick, New Jersey 08901 ("JJSI"), and Schawk USA Inc., a Delaware corporation with offices at 1695 River Road, Des Plaines, IL 60018 ("Seller").

WHEREAS, Seller is in the business of providing graphics imaging and related supplies and services (collectively, "Services"), and JJSI and/or certain affiliates of JJSI, including, without limitation, the affiliates listed on Exhibit A attached hereto, may purchase such Services from Seller from time to time;

NOW, THEREFORE, in consideration of the foregoing and the mutual promises, covenants and agreements set forth below, and for other good and valuable consideration, the receipt and sufficiency of which the parties hereby acknowledge, the parties agree as follows:

1. SUPPLY OF SERVICES

(a) During the term of this Agreement, JJSI or an affiliate of JJSI (as applicable, "Buyer") may from time to time enter into an agreement with Seller specific for Buyer, such as the agreement attached to this Agreement as Exhibit B or other similar document (in each case, an "Affiliate Agreement" for services in connection with the Product Categories listed in the Affiliate Agreement) and in accordance with this Services Agreement. Seller agrees to perform such Services for Buyer, and such Buyer shall pay for, the Services as set forth in such Affiliate Agreement (including any Work Order as defined below) and this Agreement with respect thereto.

(b) The parties agree that there are no minimum purchase requirements under this Agreement and that the relationship between Seller and JJSI and its affiliates is not one of exclusivity.

(c) Buyer may issue to Seller a design work request, statement of work or other similar document (collectively, a "Work Order") describing the Services to be provided by Seller pursuant to the applicable Affiliate Agreement.  Such Work Order shall be considered a part of the applicable Affiliate Agreement.

2. TERM

(a) This Agreement shall be effective from the Effective Date through February 28, 2010 (the "Initial Term"), unless sooner terminated as provided herein. Prior to the expiration of the Initial Term, JJSI shall have the option of extending this Agreement, including the pricing contained herein, for up to one (1) additional year upon written notice to Seller.

(b) Seller or Buyer, or JJSI on behalf of Buyer(s), may terminate an outstanding Affiliate Agreement at any time upon thirty (30) days written notice to the other party if the other party is materially in default of its obligations under such Affiliate Agreement, including this Agreement with respect thereto, and such default is not cured within such thirty (30) day period; provided however, there shall be no cure period for a breach by Seller of its obligations to supply the Services on a timely basis in accordance with the applicable Affiliate Agreement on more than one occasion, either to the same Buyer or different Buyers. In the event of any termination of a Affiliate Agreement by Buyer, if a default of Seller with respect to such Affiliate Agreement would also affect Seller's ability to perform its obligations under any other outstanding Affiliate Agreements in the reasonable discretion of JJSI on behalf of its affiliates, JJSI may also terminate any or all other such Affiliate Agreements.

(c) Notwithstanding any termination of any or all Affiliate Agreements as a result of a breach by the other party, the terminating party shall be entitled to recover all damages provided for in this agreement as a result of the other party's breach. Any termination or expiration of this Agreement or any or all Affiliate Agreements shall not release any party from any liability which at such time had already accrued nor affect the survival of any right, duty or obligation of any party that is stated to survive termination or expiration or by its nature survives termination or expiration.

(d) JJSI may terminate this Agreement at any time and for any reason upon thirty (30) days written notice to Seller if there is no outstanding Affiliate Agreement. Buyer may terminate any outstanding Affiliate Agreement at any time and for any reason upon thirty (30) days written notice to Seller. In the event of such termination, Seller shall comply with any directions given by Buyer in such notice with respect to the Services and cease all other Services and work with respect to such Affiliate Agreement. Within 30 days from the effective date of such termination, Seller shall submit an invoice to Buyer for all goods delivered by Seller in accordance with such Affiliate Agreement prior to termination. Buyer agrees to pay all undisputed amounts in accordance with this Agreement. In no event shall Buyer be responsible for any amounts in the aggregate greater than (i) the total that would have been due under such Affiliate Agreement or (ii) the value of all Services performed by Seller in accordance with such Affiliate Agreement prior to termination, whichever is less.

**CONFIDENTIAL**
**SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY**

(e) This Agreement shall survive for outstanding Affiliate Agreements entered into by the parties prior to the expiration of this Agreement, and such Affiliate Agreements shall continue to be subject to this Agreement, until such Affiliate Agreements expire or are terminated in accordance with its terms or this Agreement with respect thereto.

(f) The following Sections of this Agreement shall survive any termination or expiration of any or all Affiliate Agreements and termination or expiration of this Agreement: Section 2(f), Sections 9-14, Sections 16 and 17 and Sections 22-29

## 3. SERVICES

(a) The performance of the Services and the design, construction, quantity, quality, delivery date and description of any deliverables related to the Services shall be in accordance with the applicable Affiliate Agreement (including, without limitation, the Service Level Requirements attached thereto and the applicable Work Order(s)) (collectively, to the extent included in such Affiliate Agreement as may be amended from time to time in accordance with this Agreement, the "Ordered Specifications") and in accordance with all current design, construction and quality specifications, and any other descriptions, that were provided by Seller to Buyer prior to the time the Affiliate Agreement was issued (collectively, including the Ordered Specifications, the "Design Requirements").

(b) Seller shall be entitled to introduce changes to the Design Requirements of the Services provided that:

      i. any such changes do not adversely affect quality, price, function (including without limitation performance, inter-changeability and interface where applicable), delivery, reliability, durability, safety, maintenance of the Services; and

      ii. Seller keeps Buyer informed of and obtains the written approval from Buyer for all such changes prior to implementing any such changes.

(c) Notwithstanding subsection (b) above, Buyer shall have the right, in its sole discretion, to reject any changes proposed by Seller and insist on performance of the Services in accordance with the Design Requirements in effect at such time.

(d) Buyer shall be entitled to change any aspect of the Design Requirements in a Work Order at any time by providing written notice of such changes to Seller prior to performance by Seller of the Services in such Work Order. If any such changes are rejected by Seller, Buyer shall have the option to revert to the Design Requirements in effect at such time or seek any changes that are mutually acceptable to both parties.

(e) Seller shall prepare a change order for any changes to the Design Requirements pursuant to the above sections and shall send to Buyer such change order for written approval by Buyer prior to Seller implementing any such changes. Such change order shall set forth in detail the effect (if any) of the changes on the Services with respect to the following, as applicable:

      i. price;
      ii. function (including without limitation performance, interchangeability and interface);
      iii. scheduled performance/delivery;
      iv. quality.

## 4. PRICE, SERVICE LEVELS, AND PAYMENT

(a) Unless Seller and Buyer mutually agree otherwise in the Affiliate Agreement, pricing for Services for each Affiliate Agreement shall be in accordance with Exhibit C attached to this Agreement for the duration of this Agreement.

(b) Seller shall not issue any invoices before the Services are performed for Buyer. Unless Buyer otherwise informs Seller, Seller shall issue a separate invoice for each project completed by Seller. Seller shall include on all invoices the description of Services to which the invoice relates and the correct price. Seller will use its best efforts to provide Buyer with invoices in an electronic manner as instructed by Buyer. Buyer shall pay all undisputed invoices within 45 days after receipt of such invoices.

(c) Except for charges expressly set forth in a Affiliate Agreement and Exhibit C, Buyer shall not be responsible for any (i) other charges, including charges for delivery, parts or services and (ii) expenses of Seller or any markups on any expenses of Seller.

(d) Any provision for performance of Services or payment by Buyer in installments shall not be construed as making the obligations of Seller severable. Other than as a result of a breach by Buyer, in the event that Seller does not fulfill all its obligations set forth in a Affiliate Agreement for any reason, including discontinuation of Seller's business for any reason, Seller shall promptly return all amounts paid to Seller in connection with such Affiliate Agreement. In such event, Buyer also

**CONFIDENTIAL**
**SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY**

reserves the right to cancel the Affiliate Agreement and seek any other remedy in accordance with applicable law.

## 5. DELIVERY

(a) Seller shall perform all Services strictly in accordance with the applicable Affiliate Agreement. Except as otherwise set forth in an Affiliate Agreement and Exhibit C, delivery of all deliverables related to the Services shall be F.O.B. Buyer's location and the pricing of the Services include all amounts for any delivery charges thereto. Seller shall provide a packing list to Buyer for all shipments.

(b) Seller shall securely pack all deliverables related to the Services in a manner suitable for shipment and sufficient to enable the deliverables to withstand the effects of shipping, including handling during loading and unloading.

(c) Unless otherwise agreed by both parties, Seller shall provide Buyer with weekly informal written or oral progress reports concerning the schedule for the Services ordered by Buyer. Seller shall immediately notify Buyer any change that may affect any delivery date set forth in the Affiliate Agreement, including reasons for, and the estimated duration of, any delay.

(d) Time is of the essence for each Affiliate Agreement. If requested by Buyer, Seller shall ship any delayed deliverables related to the Services by means to avoid or minimize delay to the maximum extent possible, including rerouting any shipment if appropriate and the use of a dedicated motor carrier or air freight, and any added costs shall be borne by Seller.

(e) Notwithstanding the foregoing, if Seller has not delivered Services as set forth in the applicable Affiliate Agreement (other than as a result of any action taken by Buyer or a Force Majeure Event), Buyer shall be permitted to terminate the applicable Affiliate Agreement and/or seek other remedies as may be available in accordance with applicable law. Buyer reserves the right to return early deliveries or excess or short shipments at Seller's expense.

## 6. ACCEPTANCE

If any Services or related deliverables do not meet any Design Requirements, Buyer may reject the Services and/or deliverables, Seller shall return to Buyer all amounts paid by Buyer pursuant to such Affiliate Agreement and Buyer may seek any remedy that may be available in accordance with this Agreement and applicable law.

## 7. BUYER'S PREMISES

(a) If Seller needs access to Buyer's premises, Seller shall give Buyer reasonable prior written notice. While on Buyer's premises at any time, Seller shall comply with all rules and regulations of such Buyer and those applicable to such Buyer's premises. Seller shall be responsible for its employees and agents while on Buyer's premises whether or not any actions fall outside the scope and course of employment or engagement by Seller. Seller shall ensure that its employees and agents proceed directly to the site of the work and do not enter any other part of Buyer's premises.

(b) Seller agrees that Buyer may search Seller's employees and agents and their vehicles while on, leaving or entering Buyer's premises. Buyer may also search any toolboxes or other packages of Seller's employees and agents at any time while on, leaving or entering Buyer's premises.

## 8. SELLER'S PERSONNEL

Buyer reserves the right to reject for any lawful reason whatsoever any of Seller's personnel assigned by Seller to work on Buyer's account in connection with this Agreement or any Affiliate Agreement. Seller shall as soon as possible thereafter provide a replacement satisfactory to Buyer. Seller shall not, however, leave the position without acceptable staffing during the replacement assessment period.

## 9. WARRANTIES

(a) Seller represents and warrants the following:
(i)-The Services and all deliverables related thereto shall conform to this Agreement and the applicable Affiliate Agreement, including the Design Requirements, and any applicable industry standards and practices

(ii) Seller shall have no responsibility for any text and copy that are part of the Services provided by Seller under any Work Order ("Text and Copy"), provided that Seller submits a digital copy, digital proof, press proof or other press sheet (the "Proof") containing Text and Copy to Buyer for Buyer's approval, and Text and Copy in its production form conforms to the

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

Proof as it has been approved by Buyer. Buyer shall be responsible for reviewing each Proof submitted to it by Seller and clearly communicating to Seller in writing Buyer's approval or disapproval of the Proof and any changes Buyer requires to the Proof before any further action regarding the Proof, such as a press run or other further process involving the Proof. Seller shall also have no responsibility for Text and Copy if Buyer fails to approve or disapprove any submitted Proof within the time period agreed by Buyer and Seller, or if Buyer instructs Seller to proceed without Buyer's review and approval of a Proof for any reason, including but not limited to timing issues.

(iii) Compliance with any and all applicable federal, state and local laws, rules and regulations (including but not limited to the Department of Transportation, the Federal Trade Commission, the Food and Drug Cosmetic Act, the Fair Packaging and Labeling Act) related to Buyer's products and packaging is the sole responsibility of Buyer, and Seller shall have no liability whatsoever in connection therewith.

(iv) Seller, the Services and deliverables and the use thereof by Buyer shall not infringe on any party's intellectual property rights, including any party's confidential information, trade secrets, copyrights or patents;

(v) Seller shall comply with, and the Services and deliverables shall be in compliance with, all present and future federal, state and municipal statutes, laws, ordinances and regulations, including those relating to the environment, occupational safety and health administration (OSHA), labor standards, United States Food and Drug Administration (the "FDA") (including compliance with good manufacturing practices), International Standards Organization Rules 9,000 et seq. and any permits, licenses and certifications Seller is required to have;

(vi) Seller shall comply with JJSI's policy of Employment of Young People attached to this Agreement as Exhibit D; and

(vii) Seller has not been debarred by the FDA, nor have debarment proceedings against Seller been commenced. Seller agrees to immediately notify Buyer if any such proceedings commence or if Seller is debarred by the FDA.

(b) All third party warranties and representations obtained by or applicable to Seller in connection with the Services are hereby deemed provided, in addition, for the benefit of Buyer, its affiliates and their users and customers in connection with the Services. Nothing in this clause shall be construed as limiting in any way Seller's other warranties.

(c) Seller will use its best efforts to respond to any warranty issues in a timely fashion to meet Buyer's needs.

(d) Seller's warranties are equally applicable to any replaced or repaired deliverables or part thereof.

(e) The warranties contained herein shall survive any inspection, acceptance and payment by Buyer and shall survive any termination or expiration of this Agreement and any or all Affiliate Agreements.

THE WARRANTIES SET FORTH IN THIS SECTION ARE EXCLUSIVE AND IN LIEU OF ALL OTHER REPRESENTATIONS AND WARRANTIES, EXPRESS OR IMPLIED, ARISING BY LAW OR OTHERWISE, INCLUDING BUT NOT LIMITED TO ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR ANY IMPLIED WARRANTIES ARISING FROM TRADE USAGE, COURSE OF DEALING OR COURSE OF PERFORMANCE. Buyer's sole and exclusive remedy for any breach of such warranties relating to any non-conforming Product is to have Seller correct and replace the Product, if Seller is unable to correct and replace the Product, Seller shall refund to Buyer the fees paid by Buyer to Seller for the non-conforming Product.

10. CONFIDENTIAL INFORMATION; INTELLECTUAL PROPERTY RIGHTS

(a) As used herein, "Confidential Information" shall include all information given to Seller by Buyer or any of its affiliates, or otherwise acquired by Seller, relating to Buyer or its business or any of Buyer's affiliates or their businesses, including (i) information regarding any of the products of Buyer or any of its Affiliates, the design or manufacture of such products or the packaging thereof, (ii) information regarding advertising, distribution, marketing or strategic plans, (iii) information regarding costs, productivity or technological advances and (iv) this Agreement, any Affiliate Agreement and the Ordered Specifications and any other information in connection therewith.

(b) Notwithstanding the foregoing, "Confidential Information" does not include the following information:

i. information that is or was independently developed by Seller without use of the Confidential Information;

ii. information that is or was received from a third party that did not have, to Seller's knowledge, any confidentiality or other similar obligation to Buyer or its affiliates with respect to such information; or

iii. information that becomes or was a part of the public domain.

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

(c) Seller shall not (i) use the Confidential Information for any purpose other than in connection with this Agreement and the applicable Affiliate Agreement, (ii) reproduce the Confidential Information for any purpose other than to the extent necessary in connection with this Agreement and the applicable Affiliate Agreement or (iii) disclose the Confidential Information to any third party, including any affiliates, without the prior written approval of Buyer. Notwithstanding the foregoing, Seller may disclose Confidential Information to the extent required by laws or regulations or as ordered by a court or regulatory body having competent jurisdiction; provided Seller promptly provides notice of such requirement to Buyer prior to any disclosure to allow Buyer to seek a protective order or similar relief in Buyer's sole and absolute discretion.

(d) Seller shall (i) use at least the same degree of care that Seller uses to protect its own proprietary information of a similar nature, but no less than reasonable care, to protect and maintain the Confidential Information, (ii) restrict disclosure of the Confidential Information to its employees who have a need to know such information in connection with this Agreement and shall advise such employees of the confidentiality of such information, (iii) return or destroy, as requested by Buyer, all Confidential Information upon Buyer's request.

(e) No right, title, interest or license to Seller is either granted or implied under any trademark, patent, copyright or any other intellectual property right by the disclosure of the Confidential Information hereunder. Seller acknowledges that Buyer is the exclusive owner of and has all rights to the Confidential Information, including all intellectual property rights therein, such as patents, copyrights, trade secrets, trademarks, moral rights, and similar rights of any type under the laws of any governmental authority (collectively, "Intellectual Property Rights").

(f) All preexisting technology and know-how possessed by Seller as of the date hereof and any specifications, ideas, concepts, inventions, techniques, data, designs and information, whether or not protected by patents, of Seller as of the date hereof shall remain the property of Seller. In addition, and notwithstanding anything to the contrary in this agreement, Buyer acknowledges that all of the following shall remain the exclusive intellectual property of Seller: business and/or technical information relating to Schawk digital color imaging products and technology including hardware, software, and media, ideas, concepts, methods, techniques, processes and skills, and adaptations thereof in conducting Schawk's business and also relating to Schawk's PaRTS systems, Blue™systems and related services, software, and/or technology and future development of all such products and technology whether any of the foregoing information is disclosed orally, visually, or recorded, written, or in any other medium of expression  ("Seller Proprietary Information"); provided however, Seller grants Buyer a nonexclusive, perpetual, royalty free, transferable right to such Seller Proprietary Information only to the extent required by Buyer for the Services and all related deliverables provided however, Seller grants Buyer a nonexclusive, perpetual, royalty free, transferable right to such Seller Proprietary Information only to the extent required by Buyer for the Products and all related deliverables (the foregoing shall not apply to Schawk software which is available to Buyer only through separate license agreement).  Any drawings Seller provides to Buyer shall not affect Seller's rights in Seller Proprietary Information, which shall remain the property of Seller.

(g) Subject to subsection (f) above, Buyer will be the exclusive owner of all deliverables created by Seller in connection with the performance of the Work Order, any improvements or works based on or derived from such deliverables ("Derivatives"), and any ideas, concepts, inventions, techniques, data, designs, information and technology, whether or not protected by patents, that Seller may conceive or first reduce to practice in connection with the performance of the Work Order ("Deliverable Concepts") and all Intellectual Property Rights however conceived, generated, made, or reduced to practice, as the case may be, by Seller, either alone or jointly with others, which arise out of or relate to this Agreement or any Product developed or Work Order issued hereunder (the deliverables, Derivatives, Deliverable Concepts and the Intellectual Property Rights with respect thereto are collectively referred to as, "Buyer Materials"). Buyer's Materials do not include Seller's Proprietary Information.

(h) All copyrightable Buyer Materials created by Seller and formally submitted to Buyer for Buyer's exclusive use in connection with or during the performance of the Work Order shall be considered a "work made for hire" for Buyer to the fullest extent permitted by law. Buyer shall be considered the author of the Buyer Materials for purposes of copyright and all worldwide right, title and interest therein, shall be the property of Buyer as the party specially commissioning said work.

(i) To the extent that the Buyer does not acquire or retain ownership of any copyrights as a work made for hire in accordance with the foregoing, and with respect to all other Intellectual Property Rights, Seller assigns to Buyer all right, title and interest in and to the Buyer Materials, including the worldwide copyrights and patents, any applicable extensions and renewals thereof, and further including all rights to reproduce such work, to prepare derivative works, to distribute copies of the work and to perform and/or display the work without royalty or any other consideration. To the extent such assignment of rights and ownership is invalid or any of the foregoing rights, including so called "moral rights" or rights of "droit moral," may be inalienable, Seller waives and agrees not to exercise such rights, and if such waiver and agreement are deemed invalid, Seller hereby grants to Buyer and its designees the exclusive, transferable, perpetual, irrevocable, worldwide and royalty free right to make, use, market, modify, distribute, transmit, copy, sell, practice, and offer for sale and import the Buyer Materials and any process, technology, software, article, equipment, system, unit, product or component part covered by the Deliverable Concepts or a claim of any patent in any part of the Deliverable Concepts. At Buyer's request, Seller will execute any instrument, or obtain the execution of any instrument, including from any employee or contractor, that may be appropriate, and shall provide Buyer all design drawings, source code and other documents detailing the design and operation of the

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

Services and Buyer Materials, in whatever format Buyer may reasonably require, to assign the rights to Buyer in accordance with this section or perfect such rights in Buyer's name. Seller shall assist Buyer, at Buyer's expense and as Buyer may request, in any proceeding or litigation involving the Buyer Materials.

(j) Upon Buyer's request at any time, Seller shall provide to Buyer all material, drawings, data and work in progress in connection with the Buyer Materials. Except as set forth in this Agreement to supply the Services to Buyer, Seller shall not use the Buyer Materials in any manner or for any reason during or after the term of this Agreement.

(k) Without limiting the foregoing, Seller agrees that neither Seller nor any of its affiliates shall sell or distribute, or authorize the sale or distribution by any third party of, any goods using Buyer Materials or any Confidential Information, including the Design Requirements to any party other than Buyer.

(l) This Section shall survive any termination or expiration of this Agreement and any or all Affiliate Agreements.


11. INDEMNIFICATION

(a) Material Furnished to Buyer by Seller

Seller agrees to assume sole legal responsibility for, and to hold harmless Buyer from any liability, expense, and damage claims (including attorneys' fees) asserted against Buyer resulting from claims of copyright infringement, violations of personal rights of privacy, misappropriation of ideas or rights, and literary piracy or plagiarism, excepting (i) claims for which Seller is indemnified pursuant to Section 11 (b) and (ii) claims arising from matters with respect to which Seller has advised Buyer in writing (or via electronic mail) of the legal risks involved and Buyer, by its specific written approval (or via electronic mail), has assumed the risks thereof.

Buyer agrees to give Seller prompt notice of such claims and to permit Seller to control the defense or settlement thereof. However, Buyer reserves the right to participate in the defense of any such claim through its own counsel and at its own expense.

(b) Material Furnished to Seller by Buyer

Buyer agrees to assume sole legal responsibility for, and to similarly indemnify and hold harmless Seller with respect to, any advertising or promotion materials, or commercial data or material, including product claims, furnished to Seller by Buyer, as a result of which claims of copyright infringement, violations of personal rights of privacy, misappropriation of ideas or rights, and literary piracy or plagiarism, or suits involving deceptive advertising, unfair competition or product disparagement which may be made against Seller. Buyer further agrees to indemnify and hold Seller harmless with respect to claims which are from the use or consumption of Buyer's products in market testing or general public usage.


(c) This Section shall survive any termination or expiration of this Agreement and any or all Affiliate Agreements.


12. INSURANCE Seller agrees to maintain in full force and effect during the term of this Agreement and any Affiliate Agreement valid and collectible insurance policies in connection with its activities as contemplated hereby, which policies shall be in compliance with Exhibit E attached to this Agreement.

13. GOVERNING LAW; DISPUTE RESOLUTION
All claims, disputes, and other matters in question arising out of or relating to this Agreement or the breach thereof shall be decided by arbitration to be held in New Brunswick, NJ, in accordance with the Rules of the American Arbitration Association then in effect unless the parties mutually agree otherwise. This Agreement to arbitrate shall be specifically enforceable under the prevailing arbitration law. The award rendered by the Arbitrator shall be final and judgment may be entered thereon in accordance with applicable law in any court having jurisdiction thereof. Notice of the demand for arbitration shall be filed in writing with the other party to the Agreement and with the American Arbitration Association. The demand for arbitration shall be made within two (2) years after the claim, dispute or other matter in question arises.

14. LIMIT OF LIABILITY

Except in connection with claims subject to indemnification pursuant to Section 11(a) or Section 11(b) and for breaches of Section 10 of the Agreement, for which liability shall not be limited, in no event will Seller's aggregate liability for all claims arising in connection with this Agreement exceed the total fees actually paid by Buyer to Seller pursuant to this Agreement during the six month period immediately preceding the date such claim arose. Under no circumstances shall either Buyer or Seller be liable to the other for any indirect, consequential, punitive, exemplary, or incidental damages (including without limitation lost sales or profits, interruption in the use or availability of data, or loss of goodwill) in connection with this

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

Agreement, even if it has been advised of the possibility of such damages.

15. FORCE MAJEURE

If any party is prevented from performing any of its obligations hereunder due to any cause which is beyond the nonperforming party's reasonable control, including fire, explosion, flood, or other acts of God; acts, regulations, or laws of any government; war, terrorist acts or civil commotion; strike, lockout or labor disturbances; or failure of public utilities or common carriers (a "Force Majeure Event"), such nonperforming party shall not be liable for breach of this Agreement or the affected Affiliate Agreement to the extent due to such Force Majeure Event. Such nonperformance will be excused for three months or as long as such event shall be continuing (whichever occurs sooner), provided that the nonperforming party gives immediate written notice to the other party (the "NonForce Majeure Party") of the Force Majeure Event and that such nonperforming party exercises all reasonable efforts to eliminate the Force Majeure Event to resume performance of its affected obligations as soon as practicable. If the Force Majeure event continues for more than three months, the NonForce Majeure Party may terminate the affected Affiliate Agreement by written notice to the nonperforming party.

16. RELATIONSHIP OF THE PARTIES

(a) The relationship of the parties established by this Agreement is that of independent contractors, and nothing contained herein shall be construed to (i) give either party any right or authority to create or assume any obligation of any kind on behalf of the other or (ii) constitute the parties as partners, joint ventures, coowners or otherwise as participants in a joint or common undertaking.

(b) Both parties agrees that each Buyer acts on its own behalf only and that no Buyer shall be liable for any of its affiliates, including any other Buyer, under any circumstances.

17. PUBLICITY In no event shall either party use the other party's name, trademarks or logos, or any names, trademarks or logos of any affiliate of the other party, for any purpose. Without limiting the foregoing, neither party shall originate any publicity, news release, or other announcement, written or oral, whether to the public press, the trade, any of the other party's customers, suppliers or otherwise, relating to this Agreement or any Affiliate Agreement, or to the existence of an arrangement between the parties without the prior written approval of the other party.

18. MOST FAVORED CUSTOMER; BENCHMARKING

(a) Seller warrants and represents that all terms, including prices, charges, benefits and warranties, in this Agreement and any Affiliate Agreement are at least as or more favorable than any terms that Seller has offered to any other person or entity, including any affiliates of Buyer, for products and services offering substantially the same as the types of Services and Services offered in this Agreement. If at any time during this Agreement or any Affiliate Agreement Seller shall contract with any other person or entity, including any affiliates of Buyer, for terms more favorable, Seller shall promptly notify JJSI of such more favorable terms, and if such more favorable terms were offered by Seller to another person or entity other than any affiliate of Buyer or Seller fails to notify JJSI in any event, JJSI and every affiliate of it shall immediately receive the benefit of the more favorable terms for the remainder of this Agreement, including any renewals thereof, as well as retroactively to the effective date such more favorable terms were offered by Seller. Upon JJSI's request, Seller shall advise JJSI in writing, executed by an officer of Seller, that this Section has not been contradicted by any transaction entered into by Seller since the later of (i) the date of this Agreement or (ii) the date of the most recent notice provided by Seller pursuant to this Section.

(b) Seller agrees that JJSI and any Buyer have the right to benchmark any or all portions of the Services during this Agreement, whether formally or informally, at the expense of JJSI and/or Buyer.

19. SUBCONTRACTORS

Pursuant to Public Law 95507, the provision at 48 Code of Federal Regulations 52.2199 ("Utilization of Small Business Concerns") is incorporated into any Affiliate Agreement in excess of $500,000. This clause is aimed at maximizing opportunities for small, disadvantaged and women owned businesses where appropriate and is intended for suppliers who offer further subcontracting opportunities. When these conditions exist, Seller agrees to use its best efforts to carry out this policy in the award of subcontracts to the fullest extent consistent with its efficient performance of the such Affiliate Agreement. Notwithstanding the foregoing, Seller shall not subcontract any of its obligations hereunder or any Affiliate Agreement without the prior written consent of Buyer.

20. ASSIGNMENT Neither party may assign this Agreement or any Affiliate Agreement without the prior written consent of the other party and any attempt to do so shall be void. Subject to the foregoing sentence, this Agreement shall bind and inure

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

to the benefit of the parties hereto and their respective successors and permitted assigns.

21. SALE OF AFFILIATE

This Agreement and any outstanding Affiliate Agreement shall not be affected if a Buyer ceases be an affiliate of JJSI for any reason. If any party that is an affiliate of JJSI at any time during this Agreement ceases to be an affiliate of JJSI, such party shall be entitled to this Agreement's benefits for a period of twelve months after such party ceased being an affiliate of JJSI.

22. AUDIT

During the term of this Agreement and any outstanding Affiliate Agreement, and for the later of a period of (1) year following any termination or expiration of this Agreement and any or all Affiliate Agreements or resolution of any disputes hereunder, Seller agrees to make, keep and maintain, in accordance with generally accepted accounting principles and practices, consistently applied from year to year. invoices, records of payments, correspondence, instructions, specifications, plans, drawings, receipts, manuals, contracts, purchase orders. memoranda and other records relating to the contract, including the Services and/or goods provided hereunder. Buyer shall have the right to audit and/or examine billing records related to the billing of Buyer, either directly or through its authorized representative or agents, during regular business hours and upon reasonable prior notice. If any audit or examination reveals that Seller collected more from Buyer than it was entitled to collect under any Affiliate Agreement, Seller shall promptly reimburse such Buyer for the amount of any overcharges. Seller shall also pay Buyer interest at the rate of one percent (1%) per month on such amount, but in no event to exceed the highest lawful rate of interest, calculated from the date the amount was paid to the Seller until the date of actual reimbursement to Buyer. In the event that any such audit or examination reveals that Seller collected more than five percent (5%) than what it was entitled to collect under any Affiliate Agreement, Seller shall also reimburse Buyer for the cost of such audit in addition to the other amount owed pursuant to this Section.

23. HEADINGS

The headings used herein have been inserted for convenience only and shall not affect the interpretation of this Agreement.

24. WAIVER

The failure of either party to enforce at any time for any period any provision hereof shall not be construed to be a waiver of such provision or of the right of such party thereafter to enforce each such provision, nor shall any single or partial exercise of any right or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right or remedy.

25. SEVERABILITY

Any term or provision of this Agreement or a Affiliate Agreement which is invalid or unenforceable in any jurisdiction shall, to the extent the economic benefits conferred by such to both parties remain substantially unimpaired, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions or affecting the validity or enforceability of any of such terms or provisions in any other jurisdiction.

26. THIRD PARTY BENEFICIARIES

Seller agrees that all affiliates of JJSI are third party beneficiaries of this Agreement and shall be entitled to its benefits. Subject to the foregoing, this Agreement and any Affiliate Agreement are intended solely for the benefit of the parties hereto and the parties subject to the applicable Affiliate Agreement and their respective successors and permitted assigns, and it is not the intention of the parties to confer third party beneficiary rights upon any other party.

27. NOTICES

To be effective, all notices and other communications hereunder shall be in writing and delivered personally or mailed by overnight U.S. mail, postage prepaid, or by certified or registered U.S. mail, return receipt requested, postage prepaid, or sent by Federal Express or another nationally recognized courier service (billed to sender), to the parties at the following addresses:

If to Seller:

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

Schawk USA Inc.

Attn: Executive Vice President

1695 River Road Des Plaines, IL 60018

With Copy To:

Schawk USA Inc.

Attn: Legal Department

1695 River Road

Des Plaines, IL 60018

If to JJSI or a Buyer:

Johnson & Johnson Services, Inc.
Attn: Andrew J. Mowery
199 Grandview Road
Skillman, NJ 08558

with a copy to the applicable Buyer at the address set forth in the applicable Affiliate
Agreement,

or to such other place as a party may designate by written notice to the other.

28. ENTIRE AGREEMENT; AMENDMENT; CONFLICTS

(a) It is the mutual desire and intent of the parties to provide certainty as to their respective future rights and remedies against
each other by defining the extent of their mutual undertakings as provided herein. Accordingly, this Agreement
(i) supersedes all previous understandings, agreements and representations between the parties, written or oral and (ii)
constitutes the entire agreement and understanding between the parties with respect to the subject matter hereof and
incorporates all representations, warranties, covenants, commitments and understandings on which they have relied in entering
into this Agreement, and, except as provided for herein, neither party makes any covenant or other commitment concerning its
future action nor does either party make any promises, representations, conditions, provisions or terms related thereto.

(b) No modification, change or amendment to this Agreement shall be effective unless in writing signed by each of the parties.
No term included in any invoice, estimate, confirmation, acceptance or any other similar document in connection with this
Agreement shall be effective unless expressly stated otherwise in a writing signed by each of the parties. Any additional
term(s) in accordance with the foregoing, including any terms in an Affiliate Agreement, shall expressly be subject to each
term of this Agreement, and to the extent of any conflict or inconsistency between this Agreement and such term, the terms of
this Agreement shall govern, unless such writing includes the section number(s) of this Agreement that the parties agree no
longer governs for the matter(s) covered thereby.

29. MISCELLANEOUS

(a) Any provisions, representations or agreements required by law to be included in this Agreement are hereby incorporated by
reference, including those prohibiting discrimination against any employee or applicant for employment because of race,
color, religion, sex or national origin, or physical or mental handicap and those providing for the employment of disabled
veterans and veterans of the Vietnam era.

(b) Subject to Sections 13 and 14, any remedies provided herein are cumulative and not exclusive of any remedies provided by

**CONFIDENTIAL**
**SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY**

law or equity.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives.

Johnson & Johnson Services, Inc.

By: _Andrew J. Mowery_

Name: Andrew J. Mowery
Title: VP Packaging / Category Leader
Date: 6/3/2008

Schawk USA Inc.

By: _____

Name: RONALD J. VITTORINI,
Title: V.P. + GENERAL COUNSEL
Date: 6-18-2008

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

EXHIBIT A

AFFILIATES OF JOHNSON & JOHNSON SERVICES, INC. (PARTIAL LIST)

Advanced Sterilization Products
ALZA Corporation
BabyCenter, L.L.C.
Biosense Webster, Inc.
Centocor, Inc.
Codman & Shurtleff, Inc.
Cordis Corporation
DePuy, Inc.
DePuy Orthopaedics, Inc.
DePuy Spine, Inc.
Diabetes Diagnostics, Inc.
Egea Biosciences, Inc.
eJNJ, L.L.C.
Ethicon, INC.
Ethicon EndoSurgery, Inc.
Gynecare
Independence Technology, L.L.C.
Janssen Pharmaceutica Products, L.P.
Johnson & Johnson Consumer Companies, Inc.
Johnson & Johnson Development Corporation
Johnson & Johnson Gateway, L.L.C.
Johnson & Johnson Health Care Systems Inc.
Johnson & Johnson Medical
Johnson & Johnson • Merck Consumer Pharmaceuticals Co.
Johnson & Johnson Pediatric Institute, L.L.C.
Johnson & Johnson Pharmaceutical Research & Development, L.L.C.
Johnson & Johnson Sales and Logistics Company
Johnson & Johnson Vision Care, Inc.
LifeScan, Inc.
McNEILPPC, Inc.
Neutrogena Corporation
Noramco, Inc.
Noramco of Delaware, Inc.
OraPharma, Inc.
Ortho Biotech Products, L.P.
OrthoClinical Diagnostics, Inc.
OrthoMcNeil Pharmaceutical, Inc.
Personal Products Company
Scios Inc.
Spectacle Lens Group of Johnson & Johnson Vision Care, Inc.
Splenda, Inc.
THERAKOS, Inc.

Other affiliates of JJSI can be found at the following website:
http://www.jnj.com/our_company/family_of_companies/index.htm

**CONFIDENTIAL**
**SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY**

EXHIBIT B FORM OF AFFILIATE AGREEMENT

AFFILIATE AGREEMENT

This Affiliate Agreement dated as of June 10, 2008 (this "Affiliate Agreement") between

Johnson & Johnson Consumer Products Company Division of Johnson & Johnson Consumer Companies, Inc.
Johnson & Johnson Healthcare Products Division of McNEIL-PPC, Inc,

("Affiliate"), and Schawk USA Inc., a Delaware corporation with offices at 1695 River Road, Des Plaines, IL 60018 ("Seller"), relates to that certain Master Agreement made as of the 1st day of January, 2008 by and between Johnson and Johnson Services, Inc. and Seller (the "Agreement"). All terms not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

In furtherance of the Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      All services and/or deliverables (collectively, "Services") provided by Seller to Affiliate shall be subject to and in accordance with the terms of the Agreement while the Agreement is in full force and effect except as set forth below:

[list exceptions or attach separate agreement]

2.      Other than set forth in Section 1 above, Seller shall include the following reference on all work orders, statements of work, estimates and any other similar documents for Services provided by Seller to Affiliate:

"The Services set forth herein shall be subject to, and are provided in accordance with, the Master Services Agreement between Johnson & Johnson Services, Inc. and Schawk USA Inc. dated as of January, 2008.

3.      To the extent Affiliate or Seller discovers at any time that any Services provided by Seller, other than as set forth above, did not reflect the pricing or other terms set forth in the Agreement, Affiliate and Seller shall cooperate with each other and promptly take all necessary actions to apply the terms set forth in the Agreement to such Services, including reimbursements of any amounts that may be due.

4.      All of the terms and conditions of the Agreement, to the extent not expressly modified herein, are hereby incorporated into the terms and conditions of this Affiliate Agreement by this reference as if set out in full herein. This Affiliate Agreement shall be governed by and shall be construed in accordance with the laws of the State of New Jersey.

IN WITNESS WHEREOF, the parties have caused this Addendum to be executed by their duly authorized representatives.

Schawk USA Inc

By: _____

Title: V. P. GEN COUNSEL

Attest: _____

Date: JUNE 18, 2008

Affiliate: Johnson & Johnson Consumer Products Company Division of Johnson & Johnson Consumer Companies, Inc.

Johnson & Johnson Healthcare Products Division of McNEIL-PPC, Inc

By:      Michael Maggio

Title:   VP Global Strategic Design Operations

Attest: _____

Date:   June 11, 2008

## PRODUCT CATEGORIES

Consumer Health Care Global Business Unit

Oral Health
    Reach
    Listerine
    Rembrandt
    Plax
    Efferdent

Wound Care
    Band Aid
    Neosporin
    Cortaid
    Polysporin
    Purell
    Caladryl
    Bengay
    Tucks

Women's Health
    Monistat
    KY
    Compeed
    Savlon
    Ortho Options
    Rogaine
    Visine
    EPT

**CONFIDENTIAL**
**SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY**

**CONFIDENTIAL**
**SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY**

## SERVICE LEVEL REQUIREMENTS

The following are the "Requirements" that must be met in order to provide Buyer the level of service necessary to support their business plan. The "Services" that Seller will provide to meet these "Requirements" are noted below. The "Requirements" are divided into three major areas:

### Local Requirements

The Seller must provide support to the Buyer's CHC Business as it relates to the Skillman, Morris Plains and NYC Locations. The goal is to effectively manage graphic projects from conception to successful production.

The Seller must keep current with all business practices related to Pre Press and be able to effectively run the Buyers business unit. This is up to and including equipment, staff and technology.

### Corporate Requirements

To provide overall support and insure the contents of the contract are being met. This requirement must consist of:

• Management representation in place to ensure requirements are established and maintained.

• Ensure proper resources are maintained, evaluated and developed to meet the Buyers current requirements and continuous improvement programs.

• Sales and services support to insure that the graphics and prepress process is consistently executed, and that issues requiring corrective action are brought to the attention of management.

• Systems overview and management to insure that the most cost effective speed to market methodology is being allocated to the buyer.

• New technologies, processes and materials are brought to the attention of the Buyer.

• Ensure technology, process, quality and cost improvement initiatives are on track.

• Alerts the Buyer of any changes within Seller that can or may affect service.

## SERVICES

The following categories make up the services that Seller will provide Buyer in order to meet the specifications for the design, planning and execution of Services.

**CONFIDENTIAL**
**SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY**

**Graphic/Account Services**

This will consist primarily of a Seller's Technical Graphics Coordinator, who will coordinate with the Skillman, MOPS, NYC complex executing the requirements. The specific services to be provided are:

• Manage projects from receipt of artwork through to release to Buyers Print Vendor or choice.

• When directed by design production manager, attend pre-production meetings with project manager, design agency and printer to provide expert advise on artwork development, preproduction and printing.

• Ensures appropriate representation from Seller on projects.

• Establish costs and timelines for facilitating multiple jobs.

• Reviews proofs against the approved Buyers Design/Regulatory Approved Artwork

• Send available materials (transparencies, files, etc) to the appropriate printers or Seller plant as required.

• Responsible for maintaining job-tracking system, including measurements of performance attributes.

• Communicate with project team and Design Production Managers on all issues involved in the execution of projects.


In addition, the Seller will also provide the following:

• Digital Proofer — Capable of use for copy review, color break, and other mechanical review processes.

• Personal Computer — Capable of handling the preflighting of files, communications and data transfer.


**Plant Services**

This will consist of the multitude of services that will be performed by the Seller's manufacturing plants. The services to be provided as required and priced according to Exhibit C:


**Customer Service**

• Customer Service Representative to input into the electronic order entry system (Schawklink) all information necessary for the plant to properly execute Buyer's projects. This information includes, but is not restricted to specifications, marks information, trap specifications, color rotation, color specifications, delivery data, output requirements (color keys, cromalins, digital proofs, final films or files, etc.) printer requirements, etc.

• Preflighting of all digital files.

• Coordinate with printers to get technical requirements

• Provide Feedback to Production Manager on condition of files received from Global Design or other suppliers if not properly formatted and their impact on delivery or cost performance.

**Preproduction**

• All production activities including, but not limited to, those individual services noted in Exhibit C necessary to execute the electronic production, proofing and quality of Buyer's projects.

• Output on Buyer's project consisting of film, electronic files or image carriers per the specifications required for the selected printer, and per the pricing and specifications noted in Exhibit C.

**Technical Support**

• Work with Design Production Managers to establish print requirements (color targets, materials, print technology)

**CONFIDENTIAL**
**SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY**

• Seller will conduct review meetings (in person or via teleconference) with the selected printer, when necessary.

• Seller will relay any printer concerns regarding press reproduction to the Design Production Manager and guide the team to insure the integrity of the design is maintained.

**Corporate Services**

This will consist of the support services provided by the Seller's Plants, Corporate Administration, Technical Sales/Services and the Seller's Business Unit Manager assigned to the Buyer. The support provided by these groups is as follows:

• Corporate Administrative Services will insure that the invoicing and account administrative services are provided in a timely and accurate manner. The Corporate Administrative Services will maintain the appropriate accounting, accounts receivable, and payment schedules and records related to Buyer's project activity. The Seller's pricing department will insure that the proper charges are applied to all invoicing consistent with Exhibit C.

• Monitor, track and report quality, technology, process and cost improvement initiatives monthly.

• The Seller's Business Unit Manager assigned to the Buyer is to insure that the systems deployed against the Buyer's account are sufficient to meet the Buyer's requirements. This includes confirmation of adequate production personnel and resources to meet the timelines needed on all Buyer projects and to provide plant services.

• The Seller's General Managers will confirm that their plants' processes are consistent, providing a quality product, as well as providing corrective action in the instance of an error.

## ADDITIONAL SELLER OBLIGATIONS

The following are additional services to be provided to Buyer in consideration of the payments made by.

• The Seller's Business Unit Manager is to provide a written report and presentation to the Buyer's Management on the following:

    1. Status of continuous improvement initiatives (Annual, 1QTR).

    2. New Technology and its potential impact on quality, cost and/or speed to market reductions (Annual 1QTR).

    3. Major accomplishments in streamlining or process revisions to the Buyer's workflow (Annual 1QTR).

    4. Industry trends (ie: processes, materials, sourcing, resources competitive activity, etc.) (Annual 1QTR).

    5. KPI report QTRLY.

## Requirements

The following are the additional requirements that must be met in order to provide Buyer the level of service necessary to support their business plan.

## Services

The following categories make up the services that Seller will provide Buyer in order to meet the requirements.

**Account Services**

This will consist of the Seller's Graphic Designers. The specific services to be provided are:

• Executing design/revision requirements in a timely and efficient manner.

**CONFIDENTIAL**
**SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY**

• Providing estimates when required, tracking and reporting costs to the appropriate CG Manager. Alerting the CG Manager when costs will exceed estimate.

• Managing the project from conception through to final marketing approval of creative. Reviewing with the appropriate Design Production Manager throughout the process.

• Working with Design Production Manager, Package Engineering and Tech Services to ensure all technical requirements are met i.e. Dielines, print process.

• Providing proper PDF files consistent with the J&J format for implementation into GSS.

• Providing D2L system with revised/new copy cleared packaging artwork in a timely manner for upload.

• Providing all artwork consistent with J&J guidelines and procedures.

### Preproduction

• When directed, participation in preproduction meetings with the Design Production Manager, Printer, Design Agency and Marketing prior to final artwork development. Providing guidance on production and printability issues and timing.

• Communicate with Design Production Managers, Design Agencies, Project Managers, Marketing, printers and Sellers suppliers on all issues involved in the execution of projects.

• Reviews and approves/rejects, proofs, color keys after receipt: from Seller's plants and reviews with Design Production Managers.

• Work with Design Production Managers to establish priorities and timelines to facilitate workflow and ensure all timelines are met.

• Maintain job-tracking system, including measurements of performance attributes.

• Provide monthly report to Director, Design Production Managers containing measurements on job tracking system, feedback on the quality of files received, opportunities for improvement on both Buyer and Seller's process/procedures.

### Plant Services

This will consist of the multitude of services that will be performed by the Seller's plants in accordance with priced according to Exhibit C.

• Customer Service Representatives to perform the necessary tasks for the plant to properly execute Buyer's projects. i.e. order entry, preproduction meeting notes, specifications, marks information, trap specifications, color rotation, color specification, delivery dates, output requirements or other necessary pertinent printer requirements.

• Customer Service Representatives that will inform the Buyer of any changes in scheduling, cost or timing that will effect delivery of materials to the printer, printers scheduled print date or delivery to Buyer's manufacturing facility.

• Customer Service Representatives that will work and meet with Seller's Plant staff to determine the optimum approach to production.

• All production activities including, but not limited to, those individual services noted in Exhibit C necessary to execute the electronic production, proofing and quality of Buyer's projects.

• Output of Buyer's projects consisting of film, electronic files or image carriers per the specifications required for the selected printer, and per the pricing and specifications noted in Exhibit C.

### Corporate Services

This will consist of the support services provided by the Seller's General Managers, Corporate Administration, Technical Sales/Service, TM Group and Seller's Business Unit Manager assigned to the Buyer. The support provided by these groups is as follows:

**CONFIDENTIAL**
**SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY**

EXHIBIT E INSURANCE REQUIREMENTS

Seller shall maintain at its own expense, the types of insurance(s) specified below. For product liability/completed operations, Seller will maintain insurance coverage in effect for at least five (5) years after termination of the Agreement.

A. Commercial General Liability and Umbrella Liability

Seller shall maintain coverage on a Commercial General Liability Occurrence Coverage Form (or equivalent) including coverage for product liability/completed operations and contractual liability with limits of not less than $2,000,000 each occurrence. Seller shall separately maintain Umbrella Liability including liability coverage with a limit of liability no less than $5,000,000 annually.

Each of the above coverages shall include worldwide coverage including coverage for USA jurisdiction claims and occurrences. Seller's policy shall include JJSI and its affiliates, and their directors, officers and employees, as Additional Named Insureds.

B. Workers' Compensation

Seller shall maintain coverage on a Workers' Compensation Form (or equivalent) in accordance with applicable law, covering all employees who are to provide service under this Agreement. Seller shall also maintain Employers' Liability coverage with limits of not less than the following:

Bodily Injury by Accident................................$1,000,000 Each Accident
Bodily Injury by Disease.................................$1,000,000 Each Employee
Bodily Injury by Disease.................................$1,000,000 Policy Limit

C. Miscellaneous

1.    1. Seller's policies for each of the coverages set forth above shall specifically waive any rights of subrogation against JJSI and its affiliates, and their directors, officers and employees.
2.    2. Seller shall supply JJSI and/or Buyer with the above proof of insurance and forms, including any endorsements, as required upon the signing of this Agreement and any Affiliate Agreement, but JJSI and/or Buyer's failure to demand such proof or forms shall not waive JJSI and/or Buyer's rights to such coverage as specified herein.
3.    3. All insurance companies for each of the coverages set forth above must be rated A or better with a financial rating of VII or better in the most recent A. M. Best's Rating Guide.
4.    4. All insurance policies for each of the coverages set forth above shall provide for thirty days (30) days' prior written notice to JJSI and each Buyer of any cancellation, nonrenewal or material change of coverage.

**CONFIDENTIAL**
**SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY**

**CONFIDENTIAL**
**SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY**

• Corporate Administrative Services will insure that the invoicing and account administration services are provided in a timely and accurate manner. The Corporate Administrative Services will maintain the appropriate accounting, accounts receivable, and payment schedules and records related to buyers project activity. The Seller's pricing department will ensure that the proper charges are applied to all invoicing consistent with Exhibit C.

• Upon receipt of new artwork, and when necessary, the Seller's Technical Sales/Service Representative will meet with the Design Production Manager and the appropriate Buyer's CG Manager to review art for mechanicals as it relates to print production.

• The Technical Sales/Service Representative will relay any printer concerns regarding press reproduction to the Technical Graphics Coordinator and guide the group as to whether alterations can be made to make the design more "Print Friendly", without jeopardizing the design intent.

• Seller will also provide additional technical support for the Buyer's account in the form of printer profiling and fingerprinting.

• The Seller's Business Unit Manager is responsible to insure that the systems deployed against the Buyer's account are sufficient to meet the requirements. This includes confirmation of adequate production personnel and resources to meet the timelines needed on all Buyer projects and to provide plant services as noted above.

• The Seller's Business Unit Manager will confirm that their plants' processes are providing a quality product, continuous improvement, as well as corrective action in the rare instance of an error.

• The Seller's Business Unit Manager, assigned to the Buyer, is to provide a written report and presentation to Buyer's Director Consumer Graphics on the following:

    o Status of continuous improvement initiatives

    o New technology and its potential impact on cost and speed to market reductions

    o Major accomplishments in streamlining or process revisions to the Buyer's workflow

    o New print materials and processes for potential product improvements

• Training sessions on graphics, prepress orientation and printability to be offered by Seller to appropriate Buyer Personnel at no cost.

• Plant tours will be available for appropriate Buyer personnel, of the Seller's facilities, which supply prepress services to Buyer. Travel and accommodation expenses to be provided by Buyer.

**CONFIDENTIAL**
**SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY**

## EXHIBIT C PRICING

| Line Item | Category | Unit of Measure | Services Description | Contract Price (per U of M) |
|---|---|---|---|---|
| 1 | Job Entry/Planning | Each | | $ 50.00 |
| | **Artwork Creative / Revisions** | | | |
| 2 | Mechanical Artwork Creative (includes two rounds of revisions) | Each | Includes Simple/Medium/Complex Artwork | $ 220.00 |
| 3 | Artwork Revisions | per Hour | revisions per hour after included 2 rounds | $ 85.00 |
| 5 | Creative development | per Hour | Developing creative ideas for existing items, new package or promotional package | $ 175.00 |
| 6 | Illustration | per Hour | | |
| 7 | Scanning | Each | Transparency of reflective art | $ 175.00 |
| | | | | $ 75.00 |
| 8 | High-end color work | per Hour | Color retouching, creation of vignettes, resizing | $ 150.00 |
| | **Processing Charges** | | | |
| 9 | Design file preflight and transfer | per Hour | | $ 80.00 |
| 10 | Trapping and assembly | per Hour | | $ 110.00 |
| 11 | PostScript file RIP create DCS | per Hour | | $ 110.00 |
| 12 | Chromalin (small 11X14) | Color | | $ 18.00 |
| 13 | (med 16X20) | Color | | $ 28.00 |
| 14 | (lg over 16X20) | Color | | $ 40.00 |
| 15 | Color key (small 11X14) | Color | | $ 10.00 |
| 16 | (med 16X20) | Color | | $ 18.00 |
| 17 | (lg over 16X20) | Color | | $ 25.00 |
| 18 | Thermal (small 8.5X11) | Each | | $ 5.00 |
| 19 | (med 13X19) | Each | | $ 10.00 |
| 20 | (lg over 16.5x23.4) | Each | | $ 20.00 |
| 21 | Kodak Digital channeled proof (small 10x12.5) | Each | | $ 90.00 |
| 22 | (med 20x12.5) | Each | | $ 150.00 |
| 23 | (lg over 20x25) | Each | | $ 200.00 |
| 24 | Analog proof (small 10x12.5) | Each | | $ 90.00 |
| 25 | (med 20x12.5) | Each | | $ 150.00 |
| 26 | (lg over 20x25) | Each | | $ 200.00 |
| 27 | Final film (small 11x14) | Color | | $ 20.00 |
| 28 | (med 16x20) | Color | | $ 38.00 |
| 29 | (lg over 16x20) | Color | | $ 50.00 |
| 30 | Rotogravure line cylinder | Color | | $ 825.00 |
| 31 | Rotogravure process cylinder | Color | | $ 900.00 |
| 32 | Step & repeat film | Color | | $ 50.00 |
| | **Inkjet output** | | | |
| 33 | (low quality) | Each | | $ 10.00 |
| 34 | (medium quality) | Each | | $ 15.00 |
| 35 | (premium quality) | Each | | $ 20.00 |
| | **Transfer Requests** | | | |
| 36 | Output file to CD | Each | | $ 25.00 |
| 37 | FTP or Mass Transit | Each | | $ 25.00 |

**CONFIDENTIAL**
**SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY**

| Line Item | Category | Unit of Measure | Services Description | Contract Price (per U of M) |
|---|---|---|---|---|
| | **Specific Packaging Requests** | | | |
| 38 | | | | |
| 39 | UPC | Each | | $ 24.00 |
| 40 | 128 Code | Each | | $ 24.00 |
| 41 | 2D Code | Each | | $ 24.00 |
| | Press attendance | Each | | $ 500.00 |
| | **Pack Images/Photography** | | | |
| 42 | | | | |
| 43 | Digital Photo 300dpi | Each | | $ 75.00 |
| 44 | Pack (front).jpeg | Each | | $ 50.00 |
| | 3D pack image (wireframe) | Each | | $ 650.00 |
| | **Comps** | | | |
| 45 | | | | |
| 46 | Low | Each | Laser output and assembly | $ 60.00 |
| 47 | Medium | Each | Digital output and assembly | $ 125.00 |
| | Premium Quality | Each | Color accurate and assembly | $ 250.00 |
| | **Large Format Prints** | | | |
| 48 | | | | |
| 49 | 20x24 | Each | | $ 25.00 |
| 50 | 30x40 | Each | | $ 80.00 |
| | 48x... | Each | | $ 80.00 |
| | **Inkjet Prints** | | | |
| 51 | | | | |
| 52 | Low res 8.5x11 | Each | | $ 10.00 |
| 53 | Low res 11x17 | Each | | $ 12.00 |
| 54 | Low res 12x18 | Each | | $ 14.00 |
| 55 | Low res 16x20 | Each | | $ 18.00 |
| 56 | Med res 8.5x11 | Each | | $ 12.00 |
| 57 | Med res 11x17 | Each | | $ 14.00 |
| 58 | Med res 12x18 | Each | | $ 16.00 |
| 59 | Med res 16x20 | Each | | $ 20.00 |
| 60 | High res 8.5x11 | Each | | $ 14.00 |
| 61 | High res 11x17 | Each | | $ 16.00 |
| 62 | High res 12x18 | Each | | $ 18.00 |
| | High res 16x20 | Each | | $ 22.00 |
| | **Asset Mangement System/Library** | | | |
| 63 | Uploading of Images | per Hour | Is there a charge by file size? (if there is, please elaborate below) | $ 75.00 |
| 63.1 | | | | |
| 63.2 | | | | |
| 63.3 | | | | |
| 63.4 | | | | |
| 63.5 | | | | |
| | **Handling Fees** | | | |
| 64 | File size > 5mb | Each | | $ 25.00 |
| 65 | File size > 15mb | Each | | $ 25.00 |
| 66 | File size > 50 mb | Each | | $ 50.00 |
| 67 | File size > 150 mb | Each | | $ 50.00 |
| 68 | File size >250 mb | Each | | $ 75.00 |
| | **Shipping Costs** | | | |
| 69 | Overnite | Each | | $ 13.00 |
| 70 | Next Day | Each | | $ 15.00 |
| 71 | 2 Days | Each | | $ 8.00 |
| 72 | Ground | Each | | $ 6.00 |
| 73 | Others | Each | | $ |

**CONFIDENTIAL**
**SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY**

02/06/2009   09:01   5008741126

# S C H A W K

3-10-2008

Pricing

Approved, 2 sheets

Steven D. Gray

Director, Engineer

| Category | Unit of Measure | Service Description | Contract Pricing per U of M |
|---|---|---|---|
| Job Entry/Planning | Each | | |
| **Artwork Creative / Revisions** | | | |
| Minor - Modify existing artwork | Each | Copy changes to existing art, adding legend and information, changes created in 1 language | $ 185.00 |
| Medium-Modify existing artwork | Each | Copy changes, dieline change or artwork repositioning for existing artwork, changes created in 2 languages | $ 280.00 |
| Major-New artwork | Each | Create new size of existing art, line extensions, promotional item, changes created in 3 languages | $ 445.00 |
| Creative development | per Hour | Developing creative ideas for existing items, new package or promotional package | $ 175.00 |
| Illustration | per Hour | | $ 170.00 |
| Scanning | Each | Transparency of reflective art | $ 75.00 |
| High-end color work | per Hour | Color retouching, creation of vignettes, masking | $ 150.00 |
| **Processing Charges** | | | |
| Design file complete and transfer | per Hour | | $ 90.00 |
| Trapping and assembly | per Hour | | $ 110.00 |
| PostScript file RIP create (PCS) | per Hour | | $ 110.00 |
| Chromalin (small 11X14) | Color | | $ 18.00 |
| (med 16X20) | Color | | $ 24.00 |
| (lg over 16X20) | Color | | $ 40.00 |
| Color key (small 11X14) | Color | | $ 10.00 |
| (med 16X20) | Color | | $ 15.00 |
| (lg over 16X20) | Color | | $ 25.00 |
| Thermal (small 8.5X11) | Each | | $ 5.00 |
| (med 13X19) | Each | | $ 10.00 |
| (lg over 18.5X23.4) | Each | | $ 20.00 |
| Iris Digital chromated proof (small 10x12.5) | Each | | $ 60.00 |
| (med 20x12.5) | Each | | $ 120.00 |
| (lg over 20x25) | Each | | $ 200.00 |
| Analog proof (small 10x12.5) | Each | | $ 90.00 |
| (med 20x12.5) | Each | | $ 150.00 |
| (lg over 20x25) | Each | | $ 200.00 |
| Float film (small 11x14) | Color | | $ 20.00 |
| (med 16x20) | Color | | $ 30.00 |
| (lg over 16x20) | Color | | $ 90.00 |
| Rotogravure litho cylinder | Color | | $ 625.00 |
| Rotogravure process cylinder | Color | | $ 900.00 |
| Slam & mount film | Color | | $ 55.00 |
| **Inkjet output** | | | |
| (low quality) | Each | | $ 10.00 |
| (medium quality) | Each | | $ 15.00 |
| (premium quality) | Each | | $ 30.00 |
| **Transfer Requests** | | | |
| Output file to CD | Each | | $ 25.00 |
| FTP or Mass Transit | Each | | $ 25.00 |
| **Specialty Packaging Requests** | | | |
| UPC | Each | | $ 24.00 |
| 128 Code | Each | | $ 24.00 |
| 2D Code | Each | | $ 24.00 |
| Prop. Alignment | Each | | $ 500.00 |
| **Pack Images/Photography** | | | |
| Digital Photo product | Each | | $ 75.00 |
| Pack steel item | Each | | $ 50.00 |
| 3D pack image (wireframe) | Each | | $ 550.00 |
| **Comps** | | | |
| Low | Each | Laser output and assembly | $ 60.00 |
| Medium | Each | Digital output and assembly | $ 120.00 |
| Premium Quality | Each | Color accurate and assembly | $ 260.00 |
| **Large Format Prints** | | | |
| 20x24 | Each | | $ 25.00 |
| 30x40 | Each | | $ 60.00 |
| 40x... | Each | | $ 80.00 |

Page 1 of 2

CONFIDENTIAL
SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

# S C H A W K

| Inkjet Prints | | | | |
|---|---|---|---|---|
| Low res 8.5x11 | Each | | $ | 10.00 |
| Low res 11x17 | Each | | $ | 12.00 |
| Low res 12x18 | Each | | $ | 14.00 |
| Low res 18x20 | Each | | $ | 18.00 |
| Med res 8.5x11 | Each | | $ | 12.00 |
| Med res 11x17 | Each | | $ | 14.00 |
| Med res 12x18 | Each | | $ | 16.00 |
| Med res 18x20 | Each | | $ | 20.00 |
| High res 8.5x11 | Each | | $ | 16.00 |
| High res 11x17 | Each | | $ | 16.00 |
| High res 12x18 | Each | | $ | 18.00 |
| High res 18x20 | Each | | $ | 22.00 |

| Asset Management System/Library | | | | |
|---|---|---|---|---|
| Uploading of images | per Hour | Is there a charge by file size? (if there is, please elaborate below) | $ | 75.00 |

| Handling Fees | | | | |
|---|---|---|---|---|
| File size > 5mb | Each | | $ | 25.00 |
| File size > 15mb | Each | | $ | 25.00 |
| File size > 50 mb | Each | | $ | 50.00 |
| File size > 150 mb | Each | | $ | 50.00 |
| File size >250 mb | Each | | $ | 75.00 |

| Shipping Costs | | | | |
|---|---|---|---|---|
| Overnite | Each | | $ | 13.00 |
| Next Day | Each | | $ | 18.00 |
| 2 Days | Each | | $ | 8.00 |
| Ground | Each | | $ | 8.00 |
| Other | Each | | $ | |

Approved Pricing

SDG

**CONFIDENTIAL**
**SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY**

EXHIBIT D JJSI'S POLICY OF EMPLOYMENT OF YOUNG PEOPLE

This policy applies to the employment by Seller of persons under the age of 18 ("Young Persons") in the manufacture of any product, or any component of any product, or any services provided to JJSI or an affiliate of JJSI worldwide.

A. Age, Health & Safety -- No person under the age of 16 shall be employed. No person between the ages of 16 and 18 shall be employed unless such employment is in compliance with the health, safety and morals provisions of the International Labour Organization Convention 138 Concerning Minimum Age.

B. Hours -- No Young Person shall be required to work more than 48 hours of regularly scheduled time and 12 hours of overtime per week, nor more than six days per week.

C. Law & Regulations -- No Young Person shall be employed unless such employment is in compliance with all applicable laws and regulations concerning age, hours, compensation, health and safety.

Seller agrees to submit to periodic compliance inspections by JJSI and/or its affiliates and representatives, maintain the records necessary to demonstrate compliance and provide annual certifications of compliance.

**CONFIDENTIAL**
**SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY**