**EXHIBIT 2**

In The Matter Of:
**In Re: Ethicon, Inc.**

---

**Mark Norvell, M.D.**
*05/31/2013*

---

Tiffany Alley Reporting & Video
3348 Peachtree Road
Tower Place 200, Suite 700
Atlanta, GA 30326

770.343.9696
www.tiffanyalley.com



IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION


IN RE: ETHICON, INC., PELVIC          MDL 2327
REPAIR SYSTEM PRODUCTS LIABILITY
LITIGATION


LILLIE HARRIET CREWS and WAIN         Civil Action File
CREWS,                                No. 2:12-cv-01549

          Plaintiffs,
vs.
ETHICON, INC., ETHICON, LLC, and
JOHNSON & JOHNSON,

          Defendants,


THE VIDEOTAPED DEPOSITION OF MARK K. NORVELL, M.D.

May 31, 2013

10:53 a.m.

Holiday Inn, 138 Glynco Parkway

Brunswick, Georgia

Maureen S. Kreimer, RPR, CCR-B-1379, LCR-061

Terry Wetz, Legal Video Specialist

```
 1    over a number of years, has it not?

 2         A.    It has.

 3         Q.    And prior to today, you have met with me,

 4    have you not?

 5         A.    Yes, I have.

 6         Q.    On two occasions?

 7         A.    True.  Well, three counting this morning.

 8         Q.    And they -- and you have -- I can't

 9    remember the third one, Doctor.

10         A.    Well, I'm sorry.  Two with you.  One with

11    your paralegal and --

12         Q.    Partner?

13         A.    Was the first time, right.

14               MS. DEMING:  I'm sorry.  What was the

15    last thing?

16         A.    Ann Parker.  I met with her on one

17    occasion and then Mr. Blassingale [sic] on this

18    morning and a previous occasion.

19               MS. DEMING:  And you understood

20    Ms. Parker to be with his firm?

21               THE WITNESS:  Exactly, mm-hmm.

22               MS. DEMING:  Okay.

23               MR. BLASINGAME:  Ms. Parker is a

24    paralegal at our law firm.

25    BY MR. BLASINGAME:
```

In Re: Ethicon, Inc.                    Mark Norvell, M.D.                    5/31/2013

```
 1        Q.     And then we met -- you and I met this
 2   morning, did we not?
 3        A.     That's correct.
 4        Q.     And we discussed your care and treatment
 5   of Mrs. Crews?
 6        A.     That's correct.
 7        Q.     And we discussed some Ethicon documents,
 8   did we not?
 9        A.     We did.
10        Q.     Those are documents that some parts of
11   which I shared with you, is that fair?
12        A.     That's correct.
13        Q.     We discussed what's known as
14   "instructions" for use for the product that she
15   received, did we not?
16        A.     We did.
17        Q.     Okay.  Have you met with anyone else
18   other than your lawyer about this matter?
19        A.     About this case, or --
20        Q.     Yes, sir.
21        A.     No, I haven't.
22        Q.     At the time you were in medical school,
23   had trans -- had the use of transvaginal mesh come
24   along?
25        A.     No, it had not; at least to my knowledge,
```

1    making notes.

2              MR. BLASINGAME:  She's making notes with

3    a shake of the head, so...

4    BY MR. BLASINGAME:

5         Q.    Doctor, would a better question be do you

6    expect the manufacturer to present a complete

7    picture of the risk and potential complications of a

8    medical device like Prolift to the extent that the

9    manufacturer has such knowledge?

10             MS. DEMING:  Object to the form.

11        A.    I would expect that, yes.

12   BY MR. BLASINGAME:

13        Q.    You're familiar with instructions for

14   use, the IFU?

15        **A.    Mm-hmm (affirmative).**

16        Q.    In fact, we have gone over that for this

17   product, have we not, sir?

18        **A.    We have.**

19        Q.    And what is your understanding, sir, of

20   what an IFU is?

21        **A.    Well, I guess it's documentation from the**

22   **manufacturer that's supposed to inform the physician**

23   **of the use of its product.**

24        Q.    And tell me, please, sir, how you have

25   related to IFUs, if any, during your practice; and

In Re: Ethicon, Inc.                    Mark Norvell, M.D.                    5/31/2013

1          THE VIDEOGRAPHER:  We are back on the

2    record.  The time is 12:00.  You may continue.

3    BY MR. BLASINGAME:

4          Q.    Doctor, am I correct that the

5    implantation of the Ethicon Prolift device into

6    Lillie Crews was on -- was in February of 2009?

7          **A.    I believe that's correct, yes.**

8          Q.    I'd like to call your attention to a

9    document that has been produced by Ethicon dated

10   February 23rd, 2007, which would be two years --

11         **A.    Okay.**

12         Q.    -- before Lillie was implanted.  And if

13   you don't --

14              MR. BLASINGAME:  Terry, if you'll pull

15   up --

16              MS. DEMING:  Which document?  Is it one

17   of the ones you gave me yesterday?  Which one is it?

18              MR. BLASINGAME:  Yes.

19              I'm going to give you a copy of it.

20              Terry, if you'll pull up Document 48,

21   and...

22              MS. DEMING:  Are you going to mark it

23   as --

24              (Plaintiff's Exhibit #1 marked)

25   BY MR. BLASINGAME:

In Re: Ethicon, Inc.                    Mark Norvell, M.D.                    5/31/2013

```
 1          Q.    Doctor, I'm going to show you this

 2    document, which is on the screen up there.

 3              MR. BLASINGAME:  And I'm going to ask the

 4    videographer to turn to Page 207155 of that

 5    document, which is about four pages in.

 6              MS. DEMING:  Okay.  And unless you -- I

 7    mean, I don't know how you're going about this, but

 8    there is no foundation to this document.  So showing

 9    it at this time to the doctor without establishing a

10    foundation, I object to.

11              MR. BLASINGAME:  It came from your files.

12              MS. DEMING:  What number did you say,

13    what page number?

14              THE WITNESS:  55.

15              MS. DEMING:  Okay.  Got it.

16              MR. BLASINGAME:  55.

17    BY MR. BLASINGAME:

18          Q.    Doctor, this document says on its face

19    that it is an Ethicon Expert Meeting:  Meshes for

20    Pelvic Floor Repair.

21              And if I look at Page 1 for a second, the

22    document shows the external participants as

23    Professor M Cosson; Professor BK Klosterhalfen;

24    Professor J Deprest; Professor B -- I can't

25    pronounce that.
```

In Re: Ethicon, Inc.                     Mark Norvell, M.D.                     5/31/2013

1          MS. DEMING:  Jacuetin.

2   BY MR. BLASINGAME:

3        Q.     Jacuetin.  And then Dr. Arit, Dr. D

4   Miller and Dr. K Lobodasch.

5          MS. DEMING:  Gary, before you go on, can

6   I just have a standing objection so I don't have to

7   object to the foundation and form throughout these

8   documents?

9          MR. BLASINGAME:  Absolutely.

10  BY MR. BLASINGAME:

11       Q.     And this document states that it is an

12  Introduction and Update of Project LIGHTning, which

13  I think if you read the entire document you would

14  see that that is another product they are intending

15  to put on the market.

16       **A.     For the vagina?**

17          MS. DEMING:  Object to the form.

18  BY MR. BLASINGAME:

19       Q.     Yes.

20       **A.     Yes.**

21       Q.     And if you will look on Page 7155 the

22  document says:  "The following summary of unmet

23  needs generated June the 2nd of 2006 was again

24  confirmed without any adding."

25          And one of the unmet clinical needs says

1    "no shrinkage/no long-term contraction."

2              If you look at the priority over there,

3    that's 10 points.

4         **A.    Mm-hmm (affirmative).**

5         Q.    The next one is "fibrosis reduction."

6    And the next one is:  Severe contraction, with an

7    arrow to dyspareunia, an arrow to sexual function.

8              And then the next block, an eight is "no

9    vaginal distortion, normal vaginal wall, maintain

10   sexual function, normal sexual function.

11             Doctor, if this document, which mentions

12   a previous document of June of '06, if this document

13   is -- shows the knowledge of Ethicon as of

14   February 23rd, 2007, if you had had this knowledge

15   before you implanted Lillie Crews with a Prolift

16   product, would you have been concerned about whether

17   or not to put this product in Lillie Crews?

18             MS. DEMING:  Object to the form.  You've

19   already noted that it's obviously not a complete

20   document because it references other documents, and

21   it's clearly the notes of somebody.  So it's

22   inappropriate to be questioning this -- or making

23   assumptions about this document when you haven't

24   even established foundation.

25             MR. BLASINGAME:  I think that all

| | |
|---|---|
| 1 | objections are reserved except as to the form of the |
| 2 | question. |
| 3 | MS. DEMING:  And I am objecting to the |
| 4 | form on an additional ground. |
| 5 | MR. BLASINGAME:  I think that was a |
| 6 | speaking objection. |
| 7 | BY MR. BLASINGAME: |
| 8 | Q.    But go ahead.  Doctor, can you answer the |
| 9 | question? |
| 10 | **A.    Had I had access to this information, I** |
| 11 | **would have been less likely to consider putting a** |
| 12 | **mesh in.** |
| 13 | Q.    Well, let's go back, Doctor, to a |
| 14 | December the 12th project, "Charter," they call it. |
| 15 | This will be Number 47 -- |
| 16 | **A.    December.** |
| 17 | Q.    -- December the 12th, 2006, which is a |
| 18 | previous document.  And if I look on Page 15 of that |
| 19 | document -- |
| 20 | MS. DEMING:  Can you -- so I can be |
| 21 | finding it, are you going through these records in |
| 22 | the order that you listed them in your letter |
| 23 | yesterday, or -- |
| 24 | MR. BLASINGAME:  No, not necessarily. |
| 25 | MS. DEMING:  So it's going to take me a |

1    THE VIDEOGRAPHER:  Stand by.  Just a

2    second, sir.  Get this going again.

3    And we are back on the record.  The time

4    is 12:12.

5    MR. BLASINGAME:  (To videographer) Would

6    you show us the first page of that document for just

7    a moment, please, 26733.

8    BY MR. BLASINGAME:

9    Q.    -- and, Doctor, you will see that the

10   first page of that document deals with -- the

11   identification of it is LIGHTning Project Charter,

12   December the 6th, 2012.

13   MS. DEMING:  Just to be certain, Gary,

14   any of these documents that are from -- purport to

15   be from Ethicon I have a standing objection to with

16   respect to foundation.  I don't need to be

17   interrupting you.

18   MR. BLASINGAME:  You do, and you do not.

19   MS. DEMING:  Okay.  Thank you very much.

20   BY MR. BLASINGAME:

21   Q.    Okay.  Doctor, if you will look at

22   Page -- and we will -- at Page 20 of this document.

23   A.    **Mm-hmm (affirmative).**

24   Q.    And if -- when you've had an opportunity

25   to look at it, I'd like to ask you a couple of

In Re: Ethicon, Inc.                    Mark Norvell, M.D.                    5/31/2013

```
1    questions about it.  But that's the only copy I
2    have.
3              MS. DEMING:  The Bates number, though, is
4    00267752.
5              MR. BLASINGAME:  That's right.
6              MS. DEMING:  You referred to it as Page
7    20.
8              MR. BLASINGAME:  Yes.
9              MS. DEMING:  Okay.
10   BY MR. BLASINGAME:
11       Q.    Now, may I -- I want to ask you a couple
12   of questions --
13       A.    Okay.
14       Q.    -- about that, Doctor.
15       A.    Okay.
16       Q.    Doctor, this says -- this is headed Value
17   Proposition.  And it says Benefit.  He's talking
18   about the LIGHTning document -- "Benefit.  May
19   reduce complications and side effects of mesh
20   repair.  May reduce incidents of recurrence.  Better
21   handling.  Improved confidence to use synthetic
22   graft."
23              And then -- that's for the clinician.
24              And for the payor, "may reduce procedures
25   for complications recurrence and associated costs."
```

1       Now, if you will keep that in mind, and

2  then look at what may -- what refers to the patient.

3  It says: "Potential better quality of life. May

4  reduce pain (nerve irritation to mesh implant). May

5  reduce risk of dyspareunia. Potentially less

6  exposure, subsequent re-operation. Potentially less

7  recurrence of prolapse."

8       Doctor, if you had had the information

9  on -- that is depicted on this document at the time

10  you implanted Lillie Crews, can you tell us whether

11  or not you would have had pause and recommended to

12  her the implantation of the Prolift?

13       MS. DEMING:  Object to the form.

14    A.   Let me understand.  If I understand this

15  document, they were working on a new mesh outside of

16  the Prolift?

17  BY MR. BLASINGAME:

18    Q.   I believe, Doctor, that that's correct.

19  But that will have to be proven later.

20    **A.   Okay.  And are we speaking about Prolift**

21  **here, or are we talking about --**

22    Q.   We're talking about Prolift.

23    **A.   The benefits of LIGHTning over Prolift?**

24    Q.   Yes, sir.

25       MS. DEMING:  Objection to the form.

```
 1   Object to his characterization of what this is.

 2        A.    Okay.  Well, if I understand what I just

 3   clarified there, they recognized these problems with

 4   the Prolift, were coming out with a new product to

 5   fix those problems.  I was not aware of those being

 6   major problems in my position as a physician between

 7   2006 and 2009.

 8   BY MR. BLASINGAME:

 9        Q.    In that same document on Page 7839 --

10              MS. DEMING:  Can -- are you going to mark

11   that as an Exhibit?

12              MR. BLASINGAME:  I will.

13              MS. DEMING:  Okay.  If you'll do that, so

14   we know which documents we are referring to.

15              (Plaintiff's Exhibit #2 marked)

16              MR. BLASINGAME:  I think you have passed

17   it.  That's it, isn't it?  Is that Page 7839?

18              THE VIDEOGRAPHER:  Yes, sir.  Page 107?

19              MR. BLASINGAME:  Page 107.

20   BY MR. BLASINGAME:

21        Q.    Doctor, on Page 107 of this document

22   which is Bates number 00267839, it is captioned

23   Unmet Customer Needs.  And the unmet customer need

24   is to:  "Minimize shrinkage, vaginal stiffness,

25   dyspareunia and permanent pain"; to "lower the rate
```

1    of recurrence due to less tissue contraction"; and

2    to "minimize exposure."

3            If as early as 2006 Ethicon was concerned

4    with the unmet need to minimize shrinkage, vaginal

5    stiffness, dyspareunia, and permanent pain, is that

6    knowledge that you would like to have had in

7    determining whether or not to implant or recommend

8    implantation into Mrs. Crews?

9            MS. DEMING:  Object to the form.

10       A.   Yes, this would have been important

11   information to have had beforehand.

12            MR. BLASINGAME:  Okay.  We're going to

13   mark this as Exhibit 2.  If we could go off the

14   record just a moment.

15            MS. DEMING:  You just marked it as

16   Exhibit 2, didn't you?

17            MR. BLASINGAME:  Yes.

18            MS. DEMING:  Oh, okay.

19            THE VIDEOGRAPHER:  We're off the record.

20   The time is 12:19.

21            (Off the record 12:19-12:21 p.m.)

22            MR. BLASINGAME:  This will be No. 3.

23            (Plaintiffs' Exhibit #3 marked)

24            THE VIDEOGRAPHER:  We're back on the

25   record.  The time is 12:21.  You may continue.

1    comment on this page.

2    BY MR. BLASINGAME:

3         Q.    All right, sir.  Thank you.

4              MR. BLASINGAME:  Number 53.

5              MS. DEMING:  Number -- and it's what on

6    the list that you gave me, or rather the Bates

7    numbers?

8              MR. BLASINGAME:  02923305.

9              THE WITNESS:  Same document, different

10   page or different document?

11             MS. DEMING:  No, no.  It's different.

12   Say it again, Gary, please.  02923305?  That's the

13   first page of the document you're referring to?

14             MR. BLASINGAME:  02923305.

15             MS. DEMING:  Okay.  And are you going to

16   mark this as Exhibit No 4?

17             MR. BLASINGAME:  Yes.

18             (Plaintiff's Exhibit #4 marked)

19   BY MR. BLASINGAME:

20        Q.    Doctor, if you will assume that Anne

21   Doherty is a Professor of Urogynecology at King's

22   College Hospital in London.

23        A.    Okay.

24        Q.    That's not true.  I'm sorry.  If you will

25   assume that Linda Cardozo is a professor of

In Re: Ethicon, Inc.                    Mark Norvell, M.D.                        5/31/2013

 1   urogynecology at King's College Hospital in London.

 2        **A.      Okay.**

 3        Q.    If you -- and if you will assume, sir,

 4   for the purpose of this question that she's a

 5   well-known outstanding urogynecologist.

 6        **A.      Okay.**

 7        Q.    And if you will assume that she has

 8   written this letter to Ann Doherty and others at

 9   Ethicon, and that this letter regards -- is in

10   regards to a training session to be held in Lille, I

11   believe that would be France.

12             And assume that she's writing to the

13   group on August the 9th of 2005, that:  "I thought I

14   would just let you know that I find the safety

15   profile quite worrying, and hope that this will be

16   discussed in some detail, especially in view of the

17   fact that we have no efficacy data to date."  And

18   the subject is Prolift.

19        **A.      Right, right.**

20             MS. DEMING:  I'm objecting to your

21   characterization of these letters and these

22   assumptions that you've asked him to make about a

23   document that you haven't established even

24   foundation for.

25   BY MR. BLASINGAME:

1    Q.    And assume further, Doctor, that she

2    says:  "It is not that there were a lot of

3    complications, it's severity and type of

4    complications and these were just the perioperative

5    notes.  I still have major concerns regarding

6    erosion rate and possible problems with dyspareunia,

7    and none of these have been addressed in the data

8    which we have been given to date."

9            If you assume the facts that I have asked

10   you to assume, and assume that this well-known

11   urogynecologist is giving this information to

12   Ethicon, is this information that you would like to

13   have had before you implanted this device in Lillie

14   Crews?

15           MS. DEMING:  Object to the form.

16       A.    Yes.  It's information I would have like

17   to have had.

18   BY MR. BLASINGAME:

19       Q.    Is it something that you would -- is it

20   something that might very well have prevented you

21   from using this product in Lillie?

22           MS. DEMING:  Object to the form.

23       A.    It's quite possible it would have changed

24   my treatment of Lillie Crews.

25           MR. BLASINGAME:  Let's go off the record

In Re: Ethicon, Inc.                    Mark Norvell, M.D.                    5/31/2013

```
 1              MS. DEMING:  It is in there.

 2              MR. BLASINGAME:  It is in the records,

 3    but we'll make it --

 4              MS. DEMING:  Thank you.

 5              MR. BLASINGAME:  -- another copy.

 6              MS. DEMING:  His record just seemed to be

 7    a little unclear.

 8              THE WITNESS:  Because I don't need it.

 9              MR. BLASINGAME:  You don't need it.

10              MS. DEMING:  Thank you.

11              (Plaintiff's Exhibit #6 marked)

12              THE VIDEOGRAPHER:  Which one?

13              MR. BLASINGAME:  28.

14              THE WITNESS:  I'm sorry.  What was your

15    last question?

16              (The court reporter read back

17    the referred-to portion as follows:

18         Q.    And the product was a Prolift product;

19    right?")

20         A.    Yeah.  And that's correct.

21    BY MR. BLASINGAME:

22         Q.    And, Doctor, I'm going to show you, IFU

23    or instructions for use, on the Prolift, Total

24    Prolift floor repair, also the anterior and the

25    posterior.
```

1          MR. BLASINGAME:  Give you a copy of that.

2          MS. DEMING:  Yes, please.

3    BY MR. BLASINGAME:

4       Q.    And if you would mark that, please,

5    ma'am.

6          COURT REPORTER:  No. 7.

7          MR. BLASINGAME:  No. 7.

8          (Plaintiffs' Exhibit #7 marked)

9    BY MR. BLASINGAME:

10      Q.    You and I looked at this earlier, did we

11   not?

12      **A.    This is the one from 2008.**

13      Q.    Mm-hmm.  And I will ask you to turn to --

14      **A.    Okay.**

15      Q.    -- I'll ask you to turn to Page 2 of that

16   document.

17      **A.    Okay.**

18      Q.    And there are a list of contraindications

19   here.  Did Lillie Crews fit into any of the

20   contraindications there, Doctor?

21      **A.    No, she did not.**

22      Q.    And then there is a Adverse Reaction

23   section on Page 3 of that document.

24      **A.    Yes.**

25      Q.    And, in general, this is what you've

In Re: Ethicon, Inc.                    Mark Norvell, M.D.                    5/31/2013

1      Q.      I introduced myself earlier, I'm Kay

2    Deming.

3      **A.      Okay.**

4      Q.      I represent Ethicon in this action.

5      **A.      Okay.**

6      Q.      And I have got questions, obviously, in

7    response to some of the things that Mr. Blasingame

8    went over with you today.  So I'll try to make it as

9    quick as possible.

10     **A.      Okay.**

11     Q.      But some things will take longer than

12   others.

13     **A.      I understand.**

14     Q.      Have you ever met me before?

15     **A.      I don't recall if I've ever met you --**

16   **meeting you.**

17     Q.      Have you met anybody from my office

18   before?

19     **A.      I don't believe I have.**

20     Q.      Now, you met with the Plaintiffs'

21   attorney, Mr. Blasingame, you said twice?

22     **A.      Twice, mm-hmm.**

23     Q.      And once with his paralegal?

24     **A.      That's correct, mm-hmm.**

25     Q.      When was the meeting with the paralegal?

In Re: Ethicon, Inc.                Mark Norvell, M.D.                5/31/2013

1        A.      I don't remember the exact date.

2        Q.      How many months ago?  Was it recently,

3   or?

4        A.      Yeah, it was fairly recently.  I would

5   say four to five weeks ago.

6        Q.      Okay.  And what did you go over with her,

7   if anything?

8        A.      She gave me a copy of the IUF, is that

9   what that's called?

10       Q.      IFU?

11       A.      IFU.

12       Q.      Mm-hmm.  The same one that he went over

13   with you today?

14       A.      Mm-hmm (affirmative).

15       Q.      Okay.

16       A.      And she gave me a little bit of history

17   as to where this case was, and that this was one

18   case among many that was going to be eventually a

19   class action suit.

20       Q.      Well, that's -- the devil is in the

21   details?

22       A.      Right.

23       Q.      What history did she give you?

24       A.      History as to?

25       Q.      What did she tell you about this

In Re: Ethicon, Inc.                Mark Norvell, M.D.                5/31/2013

```
 1    litigation?
 2         A.    She mentioned that it had several cases,
 3    you know.  I am sure there is many law firms that
 4    has many cases, but they had many cases and that
 5    they had hoped to present this to a federal judge in
 6    West Virginia --
 7         Q.    Mm-hmm (affirmative).
 8         A.    -- sometime in July.
 9         Q.    Mm-hmm (affirmative).
10         A.    And I guess she mentioned that this, they
11    consider to be -- this particular case to be a
12    middle of the road case, no extreme where they have
13    to go back 20 times for surgery, yet it was more
14    than just your simple vaginal erosion.  So they felt
15    that this would maybe be a good test case for the
16    judge to look at.
17         Q.    All right.  How long did you meet with
18    her?
19         A.    Approximately an hour.
20         Q.    All right.  And did -- other than the
21    IFU, did she go over any other documents with you?
22         A.    I don't recall any other documents.
23         Q.    Okay.  Did she go over -- did you all go
24    over your medical record or chart with her?
25         A.    We went over the medical records briefly.
```

1   **Then I think we mentioned Dr. Nunnemann's op report**

2   **and his path report.  I don't recall if she asked me**

3   **why I referred this patient to Dr. Nunnemann.  But**

4   **you heard today why I did.  That's about the extent**

5   **of that meeting.**

6        Q.   All right.  You said you briefly went

7   over the record.  Out of this hour, how much time

8   did you spend actually on Mrs. Crews' medical

9   records?

10       **A.   20 to 30 minutes.**

11       Q.   Okay.  And the rest of the time was

12  talking about the litigation and the history and

13  whatnot?

14       **A.   Catching me up to date on what this part**

15  **of the case was positioned and things.**

16       Q.   Did you get the impression from her, or

17  did she tell you that the firm that they were --

18  that was representing Mrs. Crews had many other mesh

19  cases?

20       **A.   She mentioned that.**

21       Q.   Against many other mesh manufacturers?

22       **A.   She mentioned the Ethicon.  Obviously, I**

23  **didn't know about the AMS, but I think Bard was**

24  **mentioned.**

25       Q.   Okay.  Then when did you first meet with

In Re: Ethicon, Inc.               Mark Norvell, M.D.                5/31/2013

1    Mr. Blasingame?

2         A.    I'll say about two weeks ago.

3         Q.    How long did you meet with him?

4         A.    Seems like it was longer, two hours

5    maybe.

6         Q.    Was anybody else with his paralegal when

7    you met with her, or was it just the two of you?

8         A.    It was just her.  And then she was

9    present during Mr. Blasingale's [sic] first meeting.

10        Q.    So in this longer meeting, what did y'all

11   do, what did y'all talk about?

12        A.    Again, I think we talked a little bit

13   more about her medical records.  We talked -- again,

14   there was two IFUs, 2008, 2011.  He showed me those,

15   had me sign a confidentiality statement so they

16   could discuss those things that we brought up today.

17   Talked a little bit about flying as he was going

18   back home, he flew home.

19        Q.    Okay.  Anything else?

20        A.    That's about the extent of what I

21   remember.

22        Q.    Okay.  Well, in this two-hour period how

23   much time did you spend talking about Mrs. Crews'

24   actual medical records?

25        A.    Maybe 30 minutes.

```
 1        Q.     Okay.  So most of the time was really

 2   these other documents --

 3        A.     Right.

 4        Q.     -- that you were talking about?

 5        A.     Mm-hmm, yeah.

 6        Q.     Did he show you all of the documents that

 7   you saw here today?

 8        A.     I think he did.  One document, the one

 9   you couldn't find that was embedded, I don't

10   remember talking about that one.

11        Q.     But there were a whole lot other more

12   documents that he showed you that you didn't go over

13   today; is that right?

14        A.     There may have been a few that we didn't

15   go over; again, it's hard to recall all that.

16        Q.     Did he put -- he made -- and we're going

17   to go over these today.  There are a lot of

18   documents that have been produced, as you would

19   imagine, in litigation like this?

20        A.     Mm-hmm (affirmative).

21        Q.     Did he ask you to take these documents

22   home and read them so you could get a little context

23   or what?

24        A.     Yeah.  I think that they provided me with

25   the hospital records; of course, I had my own office
```

In Re: Ethicon, Inc.                    Mark Norvell, M.D.                    5/31/2013

```
 1    records.
 2         Q.    Sure.
 3         A.    But I had the hospital records and the
 4    records of Mayo.  So they provided me those, asked
 5    me to read those.
 6         Q.    What about these company documents that
 7    he went over with you?
 8         A.    They didn't hand me any of those --
 9         Q.    Okay.
10         A.    -- so they were just discussed.  And he
11    may have shown them to me, but I didn't take
12    anything home.
13         Q.    But in these types of e-mails and in
14    these meeting notes or minutes or whatever they
15    were, and we'll talk about them in a minute --
16         A.    Mm-hmm (affirmative).
17         Q.    -- did he show you any documents that
18    surrounded those that may have put those documents
19    into context?
20         A.    Don't recall that.
21         Q.    Okay.
22         A.    Just the highlighted areas that he had.
23         Q.    All right.  Did he provide you with
24    copies of anything else?
25         A.    No, I believe that's it.
```

In Re: Ethicon, Inc.                Mark Norvell, M.D.                5/31/2013

 1        Q.    Okay.  And when was the next time that
 2   you met with Mr. Blasingame this morning?
 3        A.    **This morning.**
 4        Q.    And what time did y'all meet this
 5   morning?
 6        A.    **We started meeting a little bit after**
 7   **9:00, I believe --**
 8        Q.    Okay.
 9        A.    **-- a few minutes after 9:00.**
10        Q.    Okay.
11        A.    **We finished up about 10:30 or something**
12   **like that.**
13        Q.    And your attorney was present?
14        A.    **She was.**
15        Q.    Mr. Blasingame was present?
16        A.    **Can I refer the rest of the questions to**
17   **her?**
18        Q.    No, absolutely not.
19              I was not present; correct?
20        A.    **That's correct.**
21        Q.    All right.  What did you talk about this
22   morning?
23        A.    **Again, I think he just refreshed my**
24   **memory on the IFUs.  The -- I think he may have gone**
25   **over the -- some of the things he went over this --**

In Re: Ethicon, Inc.                   Mark Norvell, M.D.                   5/31/2013

```
 1    you know, during his --

 2         Q.    You're pretty sure he did, didn't you?

 3         A.    -- deposition.  Sorry?

 4         Q.    Didn't you go over all these things that

 5    you --

 6         A.    Don't know that he went over all of them,

 7    went over a few of them.

 8         Q.    Did he tell you what kind of questions he

 9    was going to be asking you?

10         A.    Yes.  I guess in reference to that, he

11    asked me how I would answer that just to, I guess,

12    anticipate what my answer would be.

13         Q.    Did he provide you with a hypothetical,

14    for example, and say "how would you answer this one

15    if I give this hypothetical?"

16         A.    He did ask me a few hypotheticals.  I

17    don't know that I can remember the contents of the

18    hypotheticals.

19         Q.    All right.  Was there anything that you

20    can remember that you said, "no, I can't testify to

21    that"?

22         A.    Don't recall anything along that line.

23              (Defendant's Exhibit #1 marked)

24    BY MS. DEMING:

25         Q.    Doctor, we served a subpoena on you.  I
```

1    provided you an IFU; is that right?

2        **A.    Yes.**

3        Q.    And that was marked, I believe, as

4    Exhibit 7 this morning or earlier today.

5        **A.    Okay.**

6        Q.    Do you remember that testimony?

7        **A.    I do.**

8        Q.    Do you remember specifically ever having

9    read an IFU for the Prolift device?

10        **A.    Can't say I remember specifically.**

11        Q.    Okay.

12        **A.    I may or may not have read one, so...**

13        Q.    In your previous testimony did you say

14    that you typically didn't read instructions that

15    came from the manufacturer?

16        **A.    You know, I guess in some things like,**

17    **you know, IUDs went off the market for a while and**

18    **then they came back on the market, you know, I**

19    **typically read those to refamiliarize.  After you've**

20    **done several of them, then you don't really need to**

21    **go back and refer to them again.**

22        Q.    And before you ever did a Prolift

23    procedure, you'd already done some Apogee and

24    Perigee procedures; right?

25        **A.    I had assisted on a lot of those with**

1    **Dr. Dohn and Dr. Johnston.**

2        Q.    So would it, in fact, be the case then

3    that you didn't typically read IFUs like this

4    Prolift IFU?

5        **A.    Well, like I say, I honestly can't**

6    **remember if I did or didn't.**

7        Q.    When you gave that testimony before, was

8    it truthful?

9        **A.    What testimony did I give?  That I**

10   **typically didn't --**

11       Q.    Do you remember giving any testimony

12   about whether you typically reviewed IFUs or not

13   before, or instructions from manufacturers?

14           MS.  HOWANITZ:  Do you want to show him

15   what you're referring to?

16           MS. DEMING:  I can, and we can do it

17   later, so I don't --

18   BY MS. DEMING:

19       Q.    But do you remember that testimony?

20       **A.    No.  And like I say, I may not have**

21   **read -- may or may not have read that.  But I**

22   **don't -- I know that I have read things for like**

23   **IUDs.**

24       Q.    For Apogees?

25       **A.    Yeah, for IUDs and those type of things.**

In Re: Ethicon, Inc.                    Mark Norvell, M.D.                    5/31/2013

1      Q.      Did you read the IFUs for the Apogee?

2      **A.      I don't recall --**

3      Q.      Okay.

4      **A.      -- to be honest.**

5      Q.      Okay.  Going back to then your treatment

6  of Mrs. Crews when you did the TVT procedure, given

7  that you can't recall what IFUs you may have

8  reviewed or not reviewed, would it be a fair

9  inference that you certainly didn't rely on IFUs for

10  manufacturers to teach you how to use mesh products

11  and to do mesh procedures?

12      **A.      You're asking me if I relied on those, or**

13  **to --**

14      Q.      To treat your patients?

15      **A.      To treat the patient, no.**

16      Q.      Okay.  When you did this TVT procedure

17  she came in for postop visit just like the one

18  postop for the Prolift procedure; right?

19      **A.      Mm-hmm (affirmative).**

20      Q.      Let me ask you to look at -- well, before

21  we do that, at Page 71 of your -- of the record

22  that -- your record, your chart, there is what's

23  called a Bladder Health Questionnaire at Pages 71.

24      **A.      Mm-hmm (affirmative).**

25      Q.      And then 73, I think, picks up with the

In Re: Ethicon, Inc.                    Mark Norvell, M.D.                    5/31/2013

1       **A.      I can't say that I have, no.**

2       Q.      Did Mr. Blasingame show you any of the

3    studies that are now three years and five years out

4    comparing the Prolift to other types of products?

5       **A.      He mentioned this morning that there's**

6    **been some new evidence that says that the mesh is**

7    **not any better than the conventional traditional**

8    **method as far as recurrence rate.**

9       Q.      Did he tell you that there is literature

10   out there showing that it's not any worse?

11      **A.      I am sure that's true.**

12      Q.      Okay.  Did you read any of the studies

13   that he told you about?

14      **A.      He didn't reference as to which studies**

15   **he was speaking of, so...**

16      Q.      So you know any time you read a study,

17   it's got its good points, it's got its bad points;

18   right?

19      **A.      Kind of like the Bendectin case?**

20      Q.      Kind of like that.  And at the end of

21   those published articles, there is usually a

22   reference to what the limitations of the study are,

23   what really you can infer or conclude from these

24   studies; right?

25      **A.      And the weaknesses of the strengths of**

1    the studies; right.

2         Q.    Did he point any of that out to you when

3    he was talking about it?

4         A.    Not that I recall, no.

5         Q.    He went over a whole bunch of risks of

6    mesh products.  Did he show you any evidence that

7    suggested the risks that we talked about most of the

8    morning were confined to the Prolift as opposed to

9    being common to all mesh products?

10        A.    I don't think it was specifically for any

11   particular product as being true of all mesh

12   products.

13        Q.    Let me ask you to look at these Exhibits

14   that Mr. -- just have those before you, if you will.

15        A.    Okay.  Are we finished with Exhibit 5?

16   Can I hand it back or hold on to it?

17        Q.    Yes, I think so.  I think so.

18        A.    It would give me a little bit more space

19   down here.

20        Q.    Okay.  Look at Exhibit 1.

21        A.    Okay.

22        Q.    All right.  And this is a multipage

23   document that purports to be notes that somebody

24   took at a meeting of experts; is that right?

25        A.    That's what it appears to be, yes.

1        Q.     Okay.  And you'd never seen this document

2    before Mr. Blasingame showed it to you, did you?

3        **A.     That's correct.**

4        Q.     All right.  And you don't know any of

5    these people, do you?

6        **A.     I thought I knew the Dennis Miller, but I**

7    **think it's another person I'm thinking of.  No, I**

8    **don't know any of these people.**

9        Q.     Well, we all know Dennis Miller is a

10   great comedian.

11       **A.     Right.**

12              MR. BLASINGAME:  He's also a

13   urogynecologist out there in Minnesota, I think.

14   BY MS. DEMING:

15       Q.     You don't know a urogynecologist from

16   Minnesota, do you?

17       **A.     No.**

18              MR. BLASINGAME:  Have we got that?

19   Excuse me.  Have you got your copy of that Exhibit?

20              MS. DEMING:  I do have my copy.

21              MR. BLASINGAME:  Okay.  I was just -- I

22   don't put my hand -- may I see that?  Yes.

23       A.     Yeah, this is Exhibit 1.  That might be

24   your copy.

25              MR. BLASINGAME:  Okay.  Yeah, it may be.

 1                MS. DEMING:   I'm sorry.   These were your

 2      documents so I thought you had retained copies.   I

 3      mean documents that you had showed him during your

 4      examination of him.

 5      BY MS. DEMING:

 6           Q.     Doctor, do you know the context in which

 7      that meeting was held?

 8           **A.     No, except for what's written here, you**

 9      **know, it just says Expert Meeting, Meshes for Pelvic**

10      **Floor Repair.**

11           Q.     Okay.   Did you -- do you agree it's a

12      good thing for companies to meet with key opinion

13      leaders and thought leaders and experts in the

14      field?

15           **A.     I think it's an excellent thing to look**

16      **at ways of improving their products.**

17           Q.     And that's a very good thing to always be

18      striving to make the product better; correct?

19           **A.     That's correct.**

20           Q.     And that's the way medicine works, isn't

21      it, Doctor?

22           **A.     That's correct.**

23           Q.     And just because more is learned about a

24      product that allows a better product to be developed

25      doesn't mean that first product was defective;

1   right?

2      **A.    That's correct.**

3      Q.    Did you read this whole document that he

4   took selections -- took selected portions of --

5      **A.    No.**

6      Q.    -- from Exhibit 1?

7      **A.    Just the areas that he had gone over in**

8   **the previous deposition.**

9      Q.    All right, Doctor.  When you go to

10  meetings and you take notes, do those notes always

11  have everything that was covered in those meetings?

12      **A.    No.**

13      Q.    Okay.  Do you have any idea who was even

14  taking the notes that are reflected here?

15      **A.    Don't believe that's reflected.**

16      Q.    Okay.  You certainly had never seen it

17  before Mr. Blasingame showed it to you; right?

18      **A.    No.**

19      Q.    Did he show you any other documents that

20  put that document into context?

21      **A.    I can't really say that he did.  I know**

22  **that this is confidential information because I**

23  **signed a confidentiality statement.**

24      Q.    All right.  Look at Exhibit 2.  What was

25  Exhibit 2?  Do we -- is that one there?  It's the

```
 1   next one.  It is.
 2              MS.  HOWANITZ:  PowerPoint presentation.
 3              MS. DEMING:  Oh, it's the PowerPoint.
 4   Okay.
 5   BY MS. DEMING:
 6       Q.    Mr. Blasingame only asked you two
 7   questions -- or strike that.  He asked several
 8   questions.  But he referred to page --
 9              MR. BLASINGAME:  May I see that one just
10   a second?
11              THE WITNESS:  Sure.
12              MS. DEMING:  That's the real thick one.
13              MR. BLASINGAME:  Oh, okay.  That's the
14   only copy I had, I think.
15   BY MS. DEMING:
16       Q.    Well, this is -- you referred to -- or
17   strike that.
18              Mr. Blasingame referred to Page 20 of
19   that document, and Page 107 of that document; right?
20   You don't need to interpret it.  I'm just asking
21   trying to refresh your memory.  There were only two
22   pages out of there that he referred to.
23       A.    This is not a trick question?
24       Q.    Not a trick question.  Have you ever seen
25   that document before?
```

In Re: Ethicon, Inc.                    Mark Norvell, M.D.                    5/31/2013

```
 1        A.      No, I have never seen it before.

 2        Q.      It's 140 pages; right?

 3        A.      Mm-hmm (affirmative).

 4        Q.      And if you look at the last number, it's

 5   got 140 pages in it.  Did you read every single page

 6   of that?

 7        A.      No.

 8        Q.      Of course not.

 9               MR. BLASINGAME:  What was that comment

10   you made?

11               MS. DEMING:  I'll withdraw that comment.

12   I said:  "Of course not."

13   BY MS. DEMING:

14        Q.      Do you know the context in which this

15   PowerPoint was even put together?

16        A.      Not entirely, no.

17        Q.      Have you ever used a PowerPoint in making

18   any presentations?

19        A.      I have.

20        Q.      And how do -- strike that.

21               Do your PowerPoint references just kind

22   of summarize a point that you might make, but it

23   certainly doesn't include everything you say about

24   that point, does it?

25        A.      Usually that's the case, yes.
```

1     Q.     So it's more of a prompt to talk about

2  other things; right?

3        **A.     Keep you on task, right.**

4     Q.     Do you know what was discussed in the

5  context of these individual PowerPoint slides?

6        **A.     I don't.   I don't.**

7     Q.     We talked about this a little bit earlier

8  that doctors have different preferences for things;

9  right?   Do you remember that testimony?

10       **A.     That's correct.   That's correct, mm-hmm.**

11    Q.     And some feel like, well, this product

12 doesn't meet this need I have.   Do you agree that

13 happens?

14       **A.     Yes; different doctors have different**

15 **opinions.**

16    Q.     Just like you tended to use Apogee and

17 Perigee because you were experienced and familiar

18 with that, that was your preference; right?

19       **A.     That's correct.**

20    Q.     Do you think it's a bad thing for a

21 company like Ethicon to try to develop a product

22 that meets some of these unmet needs?

23       **A.     I think that's a thing they should be**

24 **striving for, yes.**

25    Q.     And just because a salesperson giving a

```
 1    PowerPoint presentation talks about unmet needs, you

 2    don't think that's synonymous with defects in the

 3    product, do you?

 4            MR. BLASINGAME:  Object to the form of

 5    question.

 6        A.    No, I think a company that's striving for

 7    improvements should look at their weaknesses and try

 8    to improve upon them.

 9    BY MS. DEMING:

10        Q.    All right.  With respect to adverse

11    events, I asked you if you had reported this event

12    to the FDA, and Mr. Blasingame asked you a lot of

13    questions about what you would have done and what

14    you wouldn't have done.  You certainly didn't --

15            MR. BLASINGAME:  Object to the form of

16    that question.

17            MS. DEMING:  Okay.

18    BY MS. DEMING:

19        Q.    You certainly didn't expect --

20            MR. BLASINGAME:  Excuse me.  I object to

21    the comment.  It wasn't a question.

22            MS. DEMING:  Oh, well, whatever.

23            MR. BLASINGAME:  Whatever.

24    BY MS. DEMING:

25        Q.    Doctor, did you expect -- well, strike
```

1    that.

2         You understand that adverse events can be

3    reported for any number of things to a drug company;

4    right?

5         A.    That's correct.

6         Q.    And they don't necessarily mean that

7    product caused that problem, it's just a report that

8    somebody gives to the company about some malady they

9    have.  Is that your understanding?

10        A.    That's my understanding.

11        Q.    And do you think it's a good thing for

12   companies to evaluate reports and see if there is

13   any merit and assess the validity of reports of

14   adverse events before they start disseminating

15   information about that?

16        A.    Yes.  I think that, you know, they want

17   to verify the accuracy of those reports before

18   disseminating information.

19        Q.    And that can take some time, you agree?

20        A.    It certainly can take some time.

21        Q.    Misinformation would be worse than no

22   information at all, don't you think, Doctor?

23        A.    In most cases I would have to say that's

24   true.

25        Q.    So when Mr. Blasingame asked you

1    questions about whether you would want to know

2    everything that a drug company knows about the

3    product, you don't want to know everything, do you,

4    Doctor?

5         **A.    It's hard to fairly answer that.  I would**

6    **like to know known potential risks, you know, before**

7    **so I can make an informed decision for the patient.**

8         Q.    I don't disagree with that, Doctor.

9              MR. BLASINGAME:  Excuse me.  I object to

10   your comment.

11             MS. DEMING:  I will withdraw the comment.

12   BY MS. DEMING:

13        Q.    Doctor, you expect the company, though,

14   to evaluate those reports so that they can provide

15   you accurate and up to date information; correct?

16        **A.    That's correct.**

17        Q.    Exhibit 3, Doctor, if you'll look at

18   that.

19        **A.    Okay.**

20        Q.    Just as we discussed with Exhibit 1, you

21   understand this to be notes again from somebody that

22   attended a meeting in 2006; right?

23        **A.    That's correct.**

24        Q.    Do you know anything about the context of

25   this meeting?

```
 1          A.      No, except they are talking about meshes
 2   for pelvic floor repair.
 3          Q.      Okay.  Well, and that's based on what you
 4   read there; right?
 5          A.      Exactly.
 6          Q.      And what Mr. Blasingame told you about
 7   that document; right?
 8          A.      He has referred to this document, yes.
 9          Q.      Okay.  Did you read the whole thing?
10          A.      I have not read the whole thing.
11          Q.      Did he go over this with you before your
12   testimony began today?
13          A.      He mentioned elements of this document
14   that he questioned whether or not I was aware of
15   them --
16          Q.      Okay.
17          A.      -- the information therein.
18          Q.      And, again, you don't know what was
19   discussed that may not have appeared in this
20   person's notes; right?
21          A.      I don't know -- can you rephrase?
22          Q.      You don't know if there was other stuff
23   discussed --
24          A.      No, no.
25          Q.      -- that just didn't appear in the
```

```
 1   notes --
 2        A.    Right.
 3        Q.    -- isn't that right?
 4        A.    No, I'm not privy to all the information
 5   that was at that meeting.
 6        Q.    Do you know anything or did
 7   Mr. Blasingame show you any documents to put this
 8   one into context?
 9        A.    No, no other documentation.
10        Q.    Once again, you agree it's good for
11   companies to meet with thought leaders and experts?
12        A.    I would expect them to, yes.
13        Q.    If you'll look at Exhibit 4, Doctor.
14        A.    Okay.
15        Q.    Okay.  This was an e-mail that
16   Mr. Blasingame talked to you about earlier today?
17        A.    That's correct.
18        Q.    Strike that.  I apologize.  I was getting
19   in a hurry.
20              Do you know Anne Doherty?
21        A.    I don't.
22        Q.    Have you ever talked to Anne Doherty?
23        A.    I don't believe I have.
24        Q.    Do you know Kim Hunsicker?
25        A.    I don't believe I do.
```

1    Q.      Had you ever seen this document before

2  Mr. Blasingame showed it to you?

3    **A.      No, I had not.**

4    Q.      Did he show you any of the documents or

5  the context of these e-mails, any other documents to

6  put it into context?

7    **A.      Not that I recall.**

8    Q.      Did you read the whole string of e-mails

9  that go along with this?

10   **A.      I have not.**

11   Q.      Wouldn't you want to know the context of

12  these documents and the context of these selective

13  quotes that Mr. Blasingame told you before you make

14  a decision as to whether these would even have had

15  any effect on what you told Mrs. Crews?

16   **A.      Can you -- can you rephrase that**

17  **question?**

18   Q.      Well, Doctor, I have gone through these

19  documents with you.  You don't know what they are?

20   **A.      No.**

21   Q.      You'd never seen them before?

22   **A.      That's correct.**

23   Q.      You haven't seen documents to put them

24  into context?

25   **A.      That's correct.**

1      Q.      You haven't even read the documents.

2   You've just listened to Mr. Blasingame's rendition

3   and selective portions of those documents; right?

4      **A.      That's correct.**

5      Q.      Just like you talked about in what you

6   would do and what you would rely on to treat your

7   patients --

8      **A.      Mm-hmm (affirmative).**

9      Q.      -- you would want to know the context of

10   the statements Mr. Blasingame read to you from these

11   documents before deciding, or before telling this

12   jury that we're going to be before, whether these

13   documents or this information would have made any

14   difference to you; right?

15      **A.      That's correct.**

16      Q.      Doctor, when you met with any of the

17   folks from Mr. Blasingame's office, did they say to

18   you at the outset something to the effect of "now,

19   we don't criticize your treatment, we don't have any

20   problem with you whatsoever."  Was that statement

21   made to you or implied to you?

22      **A.      Maybe implied.  They did tell me that**

23   **they are representing Mrs. Crews, not me.  I think**

24   **just the nature of my records and the length of time**

25   **before she had a problem, they kind of reassured me**

In Re: Ethicon, Inc.                  Mark Norvell, M.D.                  5/31/2013

1      Q.      You haven't even read the documents.

2   You've just listened to Mr. Blasingame's rendition

3   and selective portions of those documents; right?

4      **A.      That's correct.**

5      Q.      Just like you talked about in what you

6   would do and what you would rely on to treat your

7   patients --

8      **A.      Mm-hmm (affirmative).**

9      Q.      -- you would want to know the context of

10  the statements Mr. Blasingame read to you from these

11  documents before deciding, or before telling this

12  jury that we're going to be before, whether these

13  documents or this information would have made any

14  difference to you; right?

15     **A.      That's correct.**

16     Q.      Doctor, when you met with any of the

17  folks from Mr. Blasingame's office, did they say to

18  you at the outset something to the effect of "now,

19  we don't criticize your treatment, we don't have any

20  problem with you whatsoever." Was that statement

21  made to you or implied to you?

22     **A.      Maybe implied.  They did tell me that**

23  **they are representing Mrs. Crews, not me.  I think**

24  **just the nature of my records and the length of time**

25  **before she had a problem, they kind of reassured me**

1    that they don't feel like anything was done

2    inappropriately by me.

3         Q.    Okay.  Did any remark -- strike that.

4               Was any remark made or implied by --

5    strike that.

6               Was there any remark that was made, or

7    did you draw an inference from the remarks that were

8    made that somehow Ethicon was going to point the

9    finger at you, or throw you under the bus, or

10   something to that effect?

11        A.    I do recall I guess it was Ann Parker,

12   she said in terms of law -- she made it easy for me.

13   She says we talk about three Ps:  Patient, product

14   and physician.  And she says we represent -- not

15   blaming the product, obviously, so you're either

16   going to point the finger at the physician or the

17   patient.

18        Q.    Okay.  And that was in this first meeting

19   you had with her?

20        A.    That was in this first meeting.

21        Q.    Why do you think she told you that,

22   Doctor?

23        A.    I think it was just to kind of give me

24   where you might be coming from.

25        Q.    Okay.  Maybe poison the well?