# EXHIBIT 3

Richard Woodruff, M.D.

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION


IN RE: ETHICON, INC.
PELVIC REPAIR SYSTEMS
PRODUCTS LIABILITY
LITIGATION                    MDL NO. 2327


DARLA FLOWERS,

            Plaintiff,

vs.                          Case No.
                             2:13-cv-6764
ETHICON, INC., et al.,

            Defendants.
_ _ _ _ _ _ _ _ _ _ _ _ _ _ /
                   - - -
            December 13, 2013
                   - - -
            Videotaped deposition of
RICHARD WOODRUFF, MD, held at Safety
Harbor Resort & Spa, 105 North Bayshore
Drive, Safety Harbor, Florida, commencing
at 9:42 a.m., on the above date before
Rhonda Hall-Breuwet, RMR, CRR, FPR, CLR,
Realtime Systems Administrator
                   - - -
      GOLKOW TECHNOLOGIES, INC.
   877.370.3377 ph|917.591.5672 fax
          deps@golkow.com

Richard Woodruff, M.D.

Page 2

```
 1   APPEARANCES:
 2
         ROBERT E. PRICE, ESQUIRE
 3       Levin, Papantonio, Thomas, Mitchell,
         Rafferty & Proctor, P.A.
 4       316 South Baylen Street
         Suite 600
 5       Pensacola, Florida 32502
         (850) 435-7000
 6       rprice@levinlaw.com
                         Attorney for Plaintiff
 7
 8       KIMBERLY C. METZGER, ESQUIRE
         Ice Miller, LLP
 9       One American Square
         Suite 2900
10       Indianapolis, Indiana 46282
         (317) 236-2296
11       kimberly.metzger@icemiller.com
                         Attorney for Defendants
12
     VIDEOGRAPHER:
13           RON FLEMING
14
15
16
17
18
19
20
21
22
23
24
25
```

Richard Woodruff, M.D.

Page 11

1    Flowers, plaintiff, versus Ethicon,

2    defendants."

3              Do you see that?

4         A.    Yes.

5         Q.    Okay.  Do you understand

6    that Ethicon is the manufacturer of the

7    Prolift with device?

8         A.    Yes.

9         Q.    And do you understand that

10   the Prolift anterior device is the device

11   that you implanted into Darla Flowers in

12   2007?

13        A.    Yes.

14        Q.    And you may observe this

15   from the caption, but you understand that

16   Darla Flowers is not suing you or

17   bringing any sort of legal action against

18   you whatsoever?

19        A.    Yes, I understand that.

20        Q.    And do you understand that

21   Darla is not alleging that you did

22   anything wrong in this case?

23        A.    Yes.

24        Q.    Let's go to page 3, which is

25   Exhibit A.  I'm going to cover a couple

Richard Woodruff, M.D.

Page 53

```
1    that a risk might happen and the time
2    spent counseling with a patient?
3         A.    Yes.
4         Q.    With regard to the severity
5    of a risk and how severe the risk might
6    be, is there some correlation between the
7    amount of time spent counseling with a
8    patient?
9         A.    Yes.
10        Q.    And is it true to say that
11   the more severe the risks can be, the
12   more you'd want to spend time counseling
13   with a patient about the risks?
14             MS. METZGER:  Object to
15        form.
16             THE WITNESS:  Yes.
17   BY MR. PRICE:
18        Q.    Let me talk to you about the
19   FDA for just a minute.
20             In your experience as -- and
21   strike that.
22             First, you have some
23   experience -- I mean, this may be fairly
24   obvious, but just to get some background
25   here, you obviously have some experience
```

Richard Woodruff, M.D.

1    implanting medical devices into patients.

2         A.    Yes.

3         Q.    And when -- during your

4    practice, when you were implanting

5    medical devices into patients, did you

6    have some understanding that the medical

7    devices had been looked at by a

8    governmental agency?

9         A.    Yes.

10         Q.    Did you have some

11    understanding of the FDA and what the FDA

12    did?

13         A.    Yes.

14         Q.    And just generally speaking,

15    explain for the jury, what was your

16    understanding of what the FDA does with

17    regard to medical devices?

18         A.    Well, the FDA, to my

19    knowledge, looks at the data presented by

20    the manufacturers and approves or

21    disapproves the product.

22         Q.    And during your practice, if

23    a sales representative or otherwise some

24    other company representative presented a

25    medical device to you, what was your

Richard Woodruff, M.D.

Page 55

```
 1    presumption as it pertains to FDA

 2    clearance or approval?

 3                MS. METZGER:  Object to

 4         form.

 5                THE WITNESS:  My assumption

 6         was that it had been approved.

 7    BY MR. PRICE:

 8         Q.   And why would a doctor

 9    presume that if a medical device being

10    presented by a sales representative had

11    been -- I'm sorry.  I lost my train of

12    thought.

13                As a doctor, a sales

14    representative presents a medical device

15    to you, it may seem obvious, but why

16    would you presume that it's cleared by

17    the FDA?

18                MS. METZGER:  Object to

19         form.

20                THE WITNESS:  Well, I'm

21         going to elaborate on this.

22    BY MR. PRICE:

23         Q.   Sure.

24         A.   I can't answer it with a yes

25    or no.
```

Richard Woodruff, M.D.

1          Q.     Sure.

2          A.     We would have -- and this is

3     not a device, but medications, you know,

4     we would have pharmaceutical reps come in

5     and they would tell us, "We've got a new

6     product in the pipeline.  Can't talk

7     about it yet because it's not FDA

8     approved."  And they wouldn't tell us

9     anything -- they would say it's -- like a

10    new birth control pill.  "Can't talk

11    about it yet because's not FDA approved.

12    It's going to be exciting, but can't say

13    any more about it until we get FDA

14    approval."

15              So they wouldn't tell us

16    anything more than just "new birth

17    control pill; it's going to be exciting,

18    and we'll tell you about it as soon as we

19    get FDA approval."

20              So, you know, we were -- we

21    would assume that products that were

22    presented to us were FDA approved.

23          Q.     And to your knowledge, were

24    you ever presented a product or

25    medication that was not approved by the

Richard Woodruff, M.D.

 1   FDA that you then used in a patient?

 2          A.    Well, certainly not to my

 3   knowledge.

 4          Q.    And if the representative

 5   presented to you a product and told you

 6   that it had not been cleared by the FDA,

 7   what would your reaction be?

 8                MS. METZGER:  Object to

 9          form.

10                THE WITNESS:  Well, I don't

11          think I would use something that

12          hadn't been cleared by the FDA.

13   BY MR. PRICE:

14          Q.    Let's talk about your

15   experience with the Prolift device

16   specifically.

17                When was the first time that

18   you can recall that you heard of this

19   Prolift device?

20          A.    Probably sometime during

21   the -- either the summer or fall of 2005.

22          Q.    Do you recall what method it

23   was presented to you?

24          A.    I think the sales rep

25   brought information around.

Richard Woodruff, M.D.

Page 109

1          Q.    And does Exhibit 9 look

2     familiar to you?

3          A.    Yes.

4          Q.    And describe what Exhibit 9

5     is.

6          A.    It's the -- you referred to

7     it as the IFU.  I'm not sure what that

8     stands for, but it's the product insert.

9          Q.    It's the documentation that

10    comes with the --

11         A.    With the kit.

12         Q.    -- with the Prolift kit?

13         A.    Yes.

14         Q.    And it would be your

15    practice to review the documentation

16    contained within the Prolift kit?

17         A.    Not every time because it's

18    redundant, but the first time, second

19    time.  After that, you know it.

20         Q.    Sure.  And occasionally if

21    you needed to refresh any of the

22    information contained within the

23    instructions for use of the product

24    insert, would you have the product insert

25    and review it in case you needed to

Richard Woodruff, M.D.

Page 110

```
 1    refresh your recollection on anything?
 2          A.    Yes.
 3          Q.    But, indeed, you have
 4    before --
 5          A.    Yes.
 6          Q.    -- read this and --
 7          A.    Yes.
 8          Q.    -- read it completely before
 9    using the Prolift --
10          A.    Yes.
11          Q.    -- device?
12                I want to point your
13    attention to a few specific things.
14    We're not going to sit and read the whole
15    thing today, but I want to point out to
16    you a few things and get some
17    clarification.
18                Let's go to the page after
19    the first page, which, for the record, is
20    ETH.MESH.02341523.
21                Are you on that page,
22    Doctor?
23          A.    Yes.
24          Q.    It says, "Please read all
25    information carefully."
```

Richard Woodruff, M.D.

1              Do you see that?

2         A.    Yes.

3         Q.    Did you indeed, at least

4    before you started implanting Prolift

5    devices, read the information in the IFU

6    correctly?

7         A.    Yes.

8         Q.    Carefully.  Excuse me.

9         A.    Yes.

10        Q.    And the third paragraph

11   says, "Training on the use of the

12   Gynecare Prolift."  Do you see where it

13   says that?

14        A.    Yes.

15        Q.    It says, "Training on the

16   use of the Gynecare Prolift pelvic floor

17   repair systems is recommended and

18   available.  Contact your company sales

19   representatives to arrange for this

20   training."

21              Did I read that correctly?

22        A.    Yes.

23        Q.    And did you indeed follow

24   through and receive training on the

25   Gynecare Prolift as is instructed here?

Richard Woodruff, M.D.

Page 112

```
 1              A.    Yes.
 2              Q.    Under "Indications," can you
 3     read the indications section where it
 4     says "The Gynecare Prolift total"?  Do
 5     you see where I'm reading?
 6              A.    Yes.
 7              Q.    Read with me.  "The Gynecare
 8     Prolift total anterior and posterior
 9     pelvic repair systems are indicated for
10     tissue reinforcement and long-lasting
11     stabilization of fascial structures of
12     the pelvic floor and vaginal wall
13     prolapse where surgical treatment is
14     intended either as mechanical support or
15     bridging material for the fascial
16     defect."
17              Do you see that?
18              A.    Yes.
19              Q.    And referring specifically
20     to Darla Flowers' case, did you use the
21     Prolift in Darla Flowers' case as is
22     indicated in this instruction for use?
23              A.    Yes.
24              Q.    And it talks about some
25     components here.  To be specific, in
```

Richard Woodruff, M.D.

Page 124

1    patients?

2              MS. METZGER:  Object to

3         form.

4              THE WITNESS:  We would have

5         spent more time on that.

6    BY MR. PRICE:

7         Q.    What about 10 percent?  Is

8    that high enough for you?  Would it have

9    altered the way you discuss the risk of

10   erosion or extrusion with your patients?

11        A.    I think we would have spent

12   a little more time talking about it, yes.

13        Q.    What about any risks of

14   sexual dysfunction or dyspareunia

15   associated with any of these risks?

16              MS. METZGER:  Object to

17        form.

18   BY MR. PRICE:

19        Q.    Is it fair to say that in

20   2007 you had no understanding of any

21   sexual dysfunction risk associated with

22   the Prolift device?

23        A.    That was an issue that

24   wasn't discussed in any of the training

25   that I went to, and at least in the

Richard Woodruff, M.D.

Page 125

```
 1      initial follow-up that I had with
 2      patients in the first two years, there
 3      was actually improvement in sexual
 4      function.  It was only when I started
 5      seeing erosions later that it became an
 6      issue.
 7              Q.    And the issue of the risk of
 8      sexual dysfunction and dyspareunia, if a
 9      company like Ethicon had the knowledge of
10      an increased risk of that, would you like
11      to know that as a physician?
12                  MS. METZGER:  Object to
13          form.
14                  THE WITNESS:  Yes.
15      BY MR. PRICE:
16              Q.    Would you then pass that
17      information on to your patients?
18              A.    Yes.
19                  MS. METZGER:  Object to
20          form.
21      BY MR. PRICE:
22              Q.    If there were any warnings
23      here in the adverse reactions section
24      that discussed sexual dysfunction,
25      including dyspareunia, would you have
```

Richard Woodruff, M.D.

```
 1    spent time talking to your patients about
 2    that risk?
 3                 MS. METZGER:  Object to
 4         form.
 5                 THE WITNESS:  Yes.
 6    BY MR. PRICE:
 7         Q.    Would you weigh the risk of
 8    sexual dysfunction, including
 9    dyspareunia, against any perceived
10    benefits of the Prolift device?
11                 MS. METZGER:  Object to
12         form.
13                 THE WITNESS:  Yes.
14    BY MR. PRICE:
15         Q.    The last -- after
16    erosion/exclusion, it discusses scarring
17    that results in implant contraction.  Do
18    you see that?
19         A.    Yes.
20         Q.    Did you have any
21    understanding as to the rate of implant
22    contraction that may occur after
23    implantation of the Prolift device?
24                 MS. METZGER:  Object to
25         form.
```

Richard Woodruff, M.D.

```
 1                    THE WITNESS:  Again, I don't
 2           think that was discussed.
 3    BY MR. PRICE:
 4           Q.    It's correct to say, you
 5    knew that you needed to implant the
 6    device with some correct tension?  Is
 7    that fair?
 8           A.    Yes.
 9           Q.    And the tension that you
10    placed in Darla Flowers' case was based
11    on your experience in implanting other
12    Prolift devices?
13           A.    Yes.
14           Q.    And before you started
15    implanting other Prolift devices, did you
16    learn how to implant Prolift devices from
17    training by Ethicon?
18           A.    Yes.  And, actually, it's
19    more proper to say "tension-free," not
20    "tension."
21           Q.    Let me ask you about any
22    risk of mesh degradation.  Were you ever
23    told by Ethicon that the Prolift mesh
24    posed a possibility of mesh degradation?
25                    MS. METZGER:  Object to
```

Richard Woodruff, M.D.

```
 1          form.
 2                  THE WITNESS:  No.
 3     BY MR. PRICE:
 4          Q.    Were you ever told that the
 5     mesh could degrade in the Prolift to the
 6     point that the mesh loses structural
 7     integrity?
 8                  MS. METZGER:  Object to
 9          form.
10                  THE WITNESS:  No.
11     BY MR. PRICE:
12          Q.    What about mesh bunching in
13     the vagina?  Did you ever hear about the
14     risk of mesh bunching in the vagina from
15     Ethicon?
16                  MS. METZGER:  Object to
17          form.
18                  THE WITNESS:  No.
19     BY MR. PRICE:
20          Q.    What about mesh curling in
21     the vagina?  Did you ever hear any
22     warnings of mesh curling in the vagina
23     from Ethicon?
24                  MS. METZGER:  Same
25          objection.
```

Richard Woodruff, M.D.

Page 129

```
 1                  THE WITNESS:  No.
 2      BY MR. PRICE:
 3          Q.    What about mesh contraction?
 4      Did you ever hear about any risks of mesh
 5      contraction after implantation of the
 6      Prolift, from Ethicon?
 7                  MS. METZGER:  Object to
 8              form.  He just testified that that
 9              was in the IFU.
10                  MR. PRICE:  I'll strike
11              that.  Actually, we did cover mesh
12              contraction just a moment ago.  I
13              would dispute that he testified
14              that that was in the IFU, but I'll
15              strike that.  We did discuss
16              contraction.
17      BY MR. PRICE:
18          Q.    What about mesh banding?  Do
19      you have an idea of what mesh banding is?
20          A.    Yes.
21          Q.    And how do you have an idea
22      as to what mesh banding is?
23          A.    Well, that's when you can
24      feel one of the arms on pelvic exam.
25          Q.    Are you talking about after
```

Richard Woodruff, M.D.

```
 1    implantation?
 2          A.    After the implantation, yes.
 3    When you see a patient back for a routine
 4    exam, you can feel one of the arms.
 5          Q.    Was it ever discussed with
 6    you by Ethicon that there might be a
 7    banding effect of the arms after
 8    implantation of the Prolift mesh?
 9               MS. METZGER:  Object to
10          form.
11               THE WITNESS:  No.
12    BY MR. PRICE:
13          Q.    What about permanent nerve
14    pain?  Did Ethicon ever warn you that
15    there might be permanent nerve pain
16    associated with implantation of the
17    Prolift device?
18               MS. METZGER:  Same
19          objection.
20               THE WITNESS:  Not that I
21          recall.
22    BY MR. PRICE:
23          Q.    If you recall -- if Ethicon
24    were to tell you that there could be
25    permanent nerve pain associated with the
```

Richard Woodruff, M.D.

Page 131

1    Prolift device, do you think that would

2    stand out to you?

3              A.    I would think so, yes.

4              Q.    Let's talk about some of

5    Darla Flowers' medical charts.  I'm going

6    to -- do you mind if we go off the record

7    for just a moment?

8              A.    Sure.

9                    THE VIDEOGRAPHER:  The time

10              is 11:49 a.m.  Off the record.

11                    (Off the record from 11:49

12              a.m. to 11:59 a.m.)

13                    THE VIDEOGRAPHER:  The time

14              is 11:59 a.m.  On the record.

15                    (Document was marked as

16              Plaintiff's Exhibit Number 10 for

17              identification.)

18                    (Document was marked as

19              Plaintiff's Exhibit Number 11 for

20              identification.)

21    BY MR. PRICE:

22              Q.    Welcome back, Dr. Woodruff.

23    For the record, you have in front of you

24    Exhibit 10 and Exhibit 11.  Correct?

25              A.    Yes.

Richard Woodruff, M.D.

Page 154

```
 1          A.    13, yeah.
 2          Q.    Exhibit 13 is the FDA's
 3   July 2011 warning.  Have you ever seen
 4   Exhibit 13 before?
 5          A.    Yesterday.
 6          Q.    Okay.  So when I showed it
 7   to you yesterday when we sat down and
 8   met?
 9          A.    Yes.  There was after I
10   retired.
11          Q.    Yeah.  So you -- did you --
12   you didn't have an opportunity to read it
13   until yesterday because you -- you've
14   been retired?
15          A.    Correct.
16          Q.    So is it fair to say that
17   your review of literature has slowed down
18   since you've retired?
19          A.    Yes.
20          Q.    And after reading this --
21   after I showed it to you yesterday, did
22   you have any impressions regarding this
23   FDA 2011 announcement?
24          A.    No.  The important thing I
25   think is that the complications are not
```

Richard Woodruff, M.D.

1    that rare.

2          Q.    As a physician back in 2007,

3    if you would have read an announcement

4    that said complications associated with

5    transvaginal mesh repair of prolapse are

6    not rare, would that have affected the

7    way you counseled your patients?

8                MS. METZGER:  Object to

9          form.

10               THE WITNESS:  Yes.

11   BY MR. PRICE:

12         Q.    Would you have spent more

13   time talking about complications with

14   your patients?

15               MS. METZGER:  Object to

16         form.

17               THE WITNESS:  Yes.

18   BY MR. PRICE:

19         Q.    Would you have specifically

20   spent more time talking about the

21   complications of erosion?

22               MS. METZGER:  Object to

23         form.

24               THE WITNESS:  Yes.

25                     *   *   *

Richard Woodruff, M.D.

Page 156

```
 1   BY MR. PRICE:
 2        Q.    Would you have spent more
 3   time talking about the complications of
 4   sexual interference such as dyspareunia,
 5   painful intercourse?
 6             MS. METZGER:  Object to
 7        form.
 8             THE WITNESS:  Yes.
 9   BY MR. PRICE:
10             Q.    Dr. Woodruff, would you --
11   would you question the integrity of a
12   medical device that had not been approved
13   by the FDA?
14             MS. METZGER:  Object to
15        form.
16             THE WITNESS:  Yes.
17   BY MR. PRICE:
18        Q.    If you found out that a
19   medical device had not been approved by
20   the FDA, would you want the manufacturer
21   to do more research before you -- before
22   you used the product?
23             MS. METZGER:  Same
24        objection.
25             THE WITNESS:  Yes.
```

Richard Woodruff, M.D.

Page 157

```
 1   BY MR. PRICE:
 2           Q.    Would you want the product
 3   to be FDA-approved before you used it?
 4           A.    Yes.
 5                 MS. METZGER:  Object to
 6           form.
 7   BY MR. PRICE:
 8           Q.    Do you have an understanding
 9   that the Prolift device was not actually
10   cleared by the FDA until after you
11   implanted it in Darla Flowers?
12                 MS. METZGER:  Object to
13           form.
14                 THE WITNESS:  I know that
15           now.
16   BY MR. PRICE:
17           Q.    You didn't know that back in
18   2007 when you implanted it?
19           A.    No.
20                 MS. METZGER:  Object to
21           form.
22   BY MR. PRICE:
23           Q.    Let me show you briefly
24   Exhibit 17 -- excuse me -- Exhibit 14.
25           A.    14.
```

Richard Woodruff, M.D.

Page 158

```
 1                (Document was marked as
 2            Plaintiff's Exhibit Number 14 for
 3            identification.)
 4   BY MR. PRICE:
 5            Q.    This is a public record.
 6   And I just want to point your attention
 7   to some of the dates in this record.
 8   It's a -- take a look and skim through
 9   that.  I presume you've not seen that
10   document before?
11                MS. METZGER:  I'm going to
12            object to the use of these at the
13            deposition because I know that
14            we've produced them in some form
15            to you.  Are you representing that
16            you got these through a Freedom of
17            Information Act request?
18                MR. PRICE:  I'm representing
19            that I got them through public
20            information sources.  This
21            particular copy that I'm showing
22            you is not -- I'm not saying that
23            that's an Ethicon document.
24                MS. METZGER:  Are you
25            willing to represent where it is
```

Richard Woodruff, M.D.

1           that you got the copy of the

2           document that you're showing the

3           doctor?

4                MR. PRICE:  Sure.  I got it

5           online.  If my recollection serves

6           me correctly, I got it from the

7           FDA Web site.  But --

8                MS. METZGER:  Okay.

9                MR. PRICE:  My

10          recollection's not necessarily

11          100 percent, but that's my best

12          recollection sitting here today.

13               MS. METZGER:  To the extent

14          that either of these two documents

15          are not publicly available -- and

16          I haven't checked your source, so

17          I don't know whether they're

18          obtainable from that source --

19          then I object to the use at the

20          deposition because they weren't

21          previously identified to us as

22          required by PTO 38, and move to

23          strike any testimony related to

24          these documents.

25               MR. PRICE:  And, Dr.

Richard Woodruff, M.D.

Page 160

```
1          Woodruff, you can go ahead -- the
2          source -- I mean, the PTO 38
3          provision that you're referencing,
4          is that the Ethicon production
5          provision?
6               MS. METZGER:  It's the 48
7          hours in advance of a treating
8          physician deposition, you need to
9          disclose to us the documents that
10         you're going to use at the
11         deposition.
12              MR. PRICE:  Right.  Right.
13         And for the record, this -- this
14         particular copy that I'm using is
15         not a Ethicon-produced document.
16         I got it through public sources.
17              MS. METZGER:  I will just
18         continue my objection.  If it
19         turns out to be an issue, we'll
20         deal with it.
21              MR. PRICE:  Sure.
22    BY MR. PRICE:
23         Q.   Have you had a chance to
24    look through that, Doctor?
25         A.   Yes.
```

Richard Woodruff, M.D.

Page 161

1          Q.    I'm directing your attention
2     to the third page, the Department of
3     Health and Human Services as the cover
4     page.  The recipients of this letter
5     appears to be Ethicon, Inc.; is that
6     correct?
7          A.    Yes.
8          Q.    And Ethicon, Inc., is the
9     manufacturer of the Prolift device?
10         A.    Yes.
11         Q.    And you see there's a date
12    stamp there, May 15th, 2008?
13         A.    Yes.
14         Q.    Do you see that?  And under
15    the "re" section, R-E, that gives
16    trade/device names.  Gynecare Prolift, do
17    you see that name there?
18         A.    Yes.
19         Q.    It says, "Gynecare Prolift
20    Total, Anterior, and Posterior Pelvic
21    Floor Repair Systems."
22              Do you see that?
23         A.    Yes.
24         Q.    Are these repair systems
25    repairs systems that you were using in

Richard Woodruff, M.D.

Page 165

1          Q.    Correct?

2          A.    Yes.

3          Q.    So it's fair to state that

4     under your standards as a doctor, you

5     would not use a device that was not

6     FDA-approved?

7               MS. METZGER:  Object to --

8     BY MR. PRICE:

9          Q.    Is that fair?

10              MS. METZGER:  Object to form

11              to the continued leading nature of

12              these questions.

13              THE WITNESS:  I would have

14              preferred that it would have been

15              FDA-approved.

16    BY MR. PRICE:

17         Q.    Do you understand that in

18    2012 the -- strike that.

19              Do you understand that after

20    the FDA's notification in 2011, that the

21    FDA approached Ethicon and asked them to

22    do further studies on the Prolift

23    product?

24              MS. METZGER:  Object to

25              form.

Richard Woodruff, M.D.

1          THE WITNESS:  Yes.

2     BY MR. PRICE:

3          Q.    How did you obtain that

4     understanding?

5          A.    You informed me of that

6     yesterday.

7          Q.    Did -- were you surprised to

8     hear that, that they were asked by the

9     FDA to do 522 studies?

10         A.    No.

11         Q.    And why does that not

12    surprise you?

13         A.    Well, the FDA is looking for

14    evidence that the risk-benefit ratio with

15    that product is reasonable.

16         Q.    Do you yourself question the

17    risk-benefit ratio of the Prolift

18    product?

19              MS. METZGER:  Object to

20         form.

21              THE WITNESS:  In general.

22         I'm not going to limit it to

23         Prolift.  I think that there still

24         is a place for mesh-enhanced

25         vaginal surgery.

Richard Woodruff, M.D.

Page 167

```
 1   BY MR. PRICE:
 2         Q.    But the indications for that
 3   surgery, the risks and benefits must
 4   be --
 5         A.    Balanced.
 6               MS. METZGER:  I'm going to
 7         object to form.
 8   BY MR. PRICE:
 9         Q.    The risks and benefits must
10   be balanced?
11               MS. METZGER:  Same
12         objection.
13               THE WITNESS:  Yes.
14   BY MR. PRICE:
15         Q.    I'm handing you what's been
16   marked as Exhibit 15.
17               (Document was marked as
18         Plaintiff's Exhibit Number 15 for
19         identification.)
20   BY MR. PRICE:
21         Q.    Take a look at Exhibit 15.
22   Have you seen that letter before?
23         A.    Yes.
24         Q.    Did I show you that letter
25   when we met?
```

Richard Woodruff, M.D.

Page 168

```
 1            A.    Yes.
 2            Q.    It was the first time you
 3     had seen that letter, right?
 4            A.    Yes.
 5            Q.    Did you have a chance to
 6     take a look at it and read through it?
 7            A.    Yes.
 8            Q.    I want to ask you a couple
 9     questions about it.
10                  On the second page of the
11     letter -- well, actually, let me back up.
12                  The first page of the letter
13     begins a section that says, "Accordingly,
14     under Section 522 of the act, we are
15     ordering you to conduct a postmarket
16     surveillance study of your device to
17     address our questions below."
18                  Do you see that?
19            A.    Yes.
20            Q.    Now, these appear to be
21     questions asked by the Department of
22     Health and Human Services to Ethicon; is
23     that correct?
24            A.    Yes.
25                  MS. METZGER:  Object to
```

Richard Woodruff, M.D.

1        form.

2    BY MR. PRICE:

3        Q.    The second one says, "What

4    are the rates associated with each of the

5    following adverse events through 36

6    months post-implant:  mesh exposure in

7    the vagina, mesh erosion into another

8    organ, pelvic pain, infection, de novo

9    dyspareunia, vaginal shortening, vaginal

10   scarring, de novo vaginal bleeding,

11   atypical vaginal discharge, fistula

12   formation, de novo voiding dysfunction

13   (including de novo incontinence),

14   neuromuscular problems (including groin

15   and leg pain), revision surgery,

16   recurrent prolapse."

17           Do you see that?

18       A.    Yes.

19       Q.    And the FDA appears to be

20   asking, "What are the rates associated

21   with these complications?" right?

22           MS. METZGER:  Object to

23       form.

24           THE WITNESS:  Yes.

25                   *   *   *

Richard Woodruff, M.D.

```
 1    BY MR. PRICE:
 2            Q.    And as a practicing doctor,
 3    would it be important for you to
 4    understand what are the rates of these
 5    complications of the devices that you're
 6    implanting into your patients?
 7                  MS. METZGER:  Object to
 8            form.
 9                  THE WITNESS:  Yes.
10    BY MR. PRICE:
11            Q.    And if Ethicon had the
12    ability to obtain that information before
13    marketing the Prolift device, would you
14    have liked to know that information when
15    you were discussing the risks and
16    benefits with your patients?
17                  MS. METZGER:  Object to
18            form.
19                  THE WITNESS:  Yes.
20    BY MR. PRICE:
21            Q.    The third question is, "What
22    is the quality of life (including sexual
23    function) for women who have received
24    this device at 6 months, 12 months, 18
25    months, 24 months, and 36 months
```

Richard Woodruff, M.D.

Page 171

```
 1   post-surgery?"
 2                Do you see that?
 3        A.    Yes.
 4        Q.    Is that the type of question
 5   that you would like to -- strike that.
 6                If Ethicon had the ability
 7   to find that information, would you like
 8   to know that information before you
 9   implanted the Prolift into your patients?
10                MS. METZGER:  Object to
11        form.
12                THE WITNESS:  Yes.
13   BY MR. PRICE:
14        Q.    Is the quality of life,
15   including sexual function, the type of
16   information that you would consider in a
17   risk-benefit analysis for your patients?
18                MS. METZGER:  Object to
19        form.
20                THE WITNESS:  Yes.
21   BY MR. PRICE:
22        Q.    Number 5, "Among patients
23   with resurgery within 36 months after
24   transvaginal pelvic organ prolapse" --
25   strike that.  Reading problems today.
```

Richard Woodruff, M.D.

1              "Among patients with

2     resurgery within 36 months after initial

3     transvaginal pelvic prolapse surgery with

4     the mesh:

5              "a.  what are the rates of

6     adverse events and what is the quality of

7     life during the . . . following

8     resurgery?"

9              Do you see that?

10         A.    Yes.

11         Q.    And if resurgery was a

12    common occurrence after implantation of

13    the Prolift device, would you like to

14    know that, as a doctor?

15              MS. METZGER:  Object to

16         form.

17              THE WITNESS:  Yes.

18    BY MR. PRICE:

19         Q.    Would you like to know the

20    rates of adverse events as it pertains to

21    any resurgeries that had occurred with

22    the Prolift device?

23              MS. METZGER:  Object to

24         form.

25              THE WITNESS:  Could you

Richard Woodruff, M.D.

Page 173

1              rephrase that?

2    BY MR. PRICE:

3         Q.    Sure.  In 2007, if Ethicon

4    was in a position to know how many

5    resurgeries had occurred with the Prolift

6    device, would you like to know that

7    before implanting the Prolift into Darla

8    Flowers?

9              MS. METZGER:  Object to

10        form.

11             THE WITNESS:  Yes.

12   BY MR. PRICE:

13        Q.    You would take into

14   consideration whether or not Darla would

15   need subsequent resurgeries for the

16   Prolift device, wouldn't you?

17        A.    Yes.

18             MS. METZGER:  Object to

19        form.

20   BY MR. PRICE:

21        Q.    If after being asked this

22   information by the FDA, if Ethicon then

23   decided to withdraw the Prolift product

24   instead of following through with the

25   FDA's 522 studies, would that cause you

Richard Woodruff, M.D.

Page 177

```
 1              intended to use at the deposition.
 2                   In the e-mail, I said I
 3              didn't guarantee I was going to
 4              use all these documents, but this
 5              was on the list of those
 6              documents.  So that's just -- I
 7              wanted to put that on the record.
 8    BY MR. PRICE:
 9              Q.   So you have Exhibit 16 in
10    front of you?
11              A.   I do.
12              Q.   Okay.  And when we left off,
13    we were talking about the 522 studies of
14    Ethicon.  So let's flip to the e-mail.
15    It starts on page ETH.MESH.05603796.
16                   Are you there?
17              A.   Yes.
18              Q.   There's an e-mail among two
19    people among -- well, actually among
20    several people.  I want to point your
21    attention to the verbiage "As I read
22    Section 10 of this guidance."  Are you
23    with me?
24              A.   Yes.
25              Q.   It says, "As I read Section
```

Richard Woodruff, M.D.

```
 1     10 of this guidance, a company may not

 2     have to perform the 522 study if the

 3     product is withdrawn from the market.

 4     I'm not sure if the product can be

 5     withdrawn after the 522 order is received

 6     or if the option not to conduct the study

 7     only applies to products that were

 8     withdrawn before the issuance of the 522

 9     order.

10               "We will need to get further

11     clarity on our options going forward."

12               Do you see that?

13          A.    Yes.

14          Q.    Now, if one of the

15     considerations of Ethicon was to opt to

16     not going forward with the 522 study

17     instead of following through with the

18     FDA's request, would it raise a concern

19     with you as to the integrity of the

20     product that you had used before?

21               MS. METZGER:  Object to

22          form.  And over my previous

23          objection that if indeed this

24          document had not been previously

25          produced to us, I object to its
```

```
 1              use and move to strike any
 2              testimony regarding it.
 3                   But over those objections,
 4              Doctor, please answer if you can.
 5                   MR. PRICE:  Okay.  And Kim,
 6              if you wouldn't mind, I can -- for
 7              the rest of the questions on this
 8              document, we can do a running
 9              objection --
10                   MS. METZGER:  Running
11              objection?
12                   MR. PRICE:  -- for that.
13                   MS. METZGER:  That's fine.
14              Thank you.
15                   I'll also object to the form
16              of the question.
17         BY MR. PRICE:
18              Q.   Do you need me to repeat the
19         question after that?
20              A.   Please.
21              Q.   Okay.  And this may not be
22         the exact rephrasing, but basically the
23         question is:  If Ethicon, after being
24         asked by the FDA to perform 522 studies,
25         considered not going forward with the 522
```

Richard Woodruff, M.D.

Page 180

```
 1    studies and the information asked with

 2    regard to patient safety, would you have

 3    some concerns about the Prolift product's

 4    integrity?

 5                 MS. METZGER:  Object to

 6          form.

 7                 THE WITNESS:  Well, it would

 8          raise a question, yes.

 9    BY MR. PRICE:

10          Q.    Dr. Woodruff, we've talked

11    about some of the complications and risks

12    of the Prolift procedure in 2007 versus

13    what you know today.

14                 Do you recall our general

15    discussion of that?

16          A.    Yes.

17          Q.    And you also recall we

18    discussed that you heightened some of

19    your discussions with patients with

20    regard to risk and benefits even after

21    the FDA's 2008 warning; is that accurate?

22          A.    Yes.

23          Q.    And assuming you were

24    practicing today, after reading the

25    July 2011 warning, would you likely
```

Richard Woodruff, M.D.

Page 181

```
 1    heighten your risk-benefit discussion
 2    even more after reading that?
 3              MS. METZGER:  Object to
 4         form.
 5              THE WITNESS:  Yes.
 6    BY MR. PRICE:
 7         Q.    So knowing what we know
 8    today, going back in 2007, if you would
 9    have had that information with regard to
10    risks of erosion, risks of sexual
11    complications, and any other risks that
12    you were not aware of, would you go back
13    and have a heightened discussion with
14    Darla Flowers about the risks and
15    benefits of the Prolift device?
16              MS. METZGER:  Object to
17         form.
18              THE WITNESS:  Yes.
19    BY MR. PRICE:
20         Q.    And is there a possibility
21    that that heightened discussion would
22    lead to a different decision as to
23    whether or not to implant the Prolift
24    device in Darla Flowers?
25              MS. METZGER:  Object to
```

Richard Woodruff, M.D.

Page 182

```
1            form.  Calls for speculation as to
2            what Ms. Flowers would have
3            decided.
4                 THE WITNESS:  I think it's
5            hard to say what she would have
6            decided.  I would have to agree
7            that I have no idea what she would
8            have decided.  It's possible that
9            she may have been willing to
10           accept the risk.  I don't know.
11  BY MR. PRICE:
12           Q.   Fair enough.  But you can
13  say that you know today that you would
14  have spent more time talking about the
15  risk of complication?
16           A.   Yes.
17                MS. METZGER:  Object to
18           form.
19                THE WITNESS:  Yes.
20  BY MR. PRICE:
21           Q.   And it's also fair to say
22  that you would have spent much more time
23  discussing the degree of problems
24  associated with her prolapse decisions so
25  that you could weigh those against those
```

Richard Woodruff, M.D.

```
 1    heightened risks that we've discussed
 2    about today?
 3              MS. METZGER:  Object to
 4         form.
 5              THE WITNESS:  Yes.
 6              MR. PRICE:  That's all I
 7         have.  Thank you, Doctor.  I may
 8         have some more questions after
 9         defense finishes, but it's now her
10         turn.
11              CROSS-EXAMINATION
12    BY MS. METZGER:
13         Q.   Good afternoon, Doctor.
14         A.   Good afternoon.
15         Q.   My name is Kim Metzger.  I
16    represent Johnson & Johnson and Ethicon
17    in this lawsuit, and we met for the first
18    time today; is that correct?
19         A.   Yes.
20         Q.   You did not meet Mr. Price
21    for the first time today, though, right?
22         A.   Correct.
23         Q.   When did you first meet with
24    Mr. Price?
25         A.   Yesterday.
```

Richard Woodruff, M.D.

```
 1          Q.    Can you tell me about that
 2    meeting, please.
 3          A.    He wanted to meet with me
 4    yesterday just to familiarize me with
 5    what this was going to be like and -- you
 6    know, I had not seen the chart for six
 7    years -- so I could review the chart.
 8          Q.    How long did you meet with
 9    Mr. Price yesterday?
10          A.    An hour maybe.
11          Q.    And had you spoken with him
12    or anybody from his office on the
13    telephone before meeting with him
14    yesterday?
15          A.    Yes.
16          Q.    And how many times did you
17    speak with Mr. Price on the phone or
18    someone from his office?
19          A.    I think I initially talked
20    with his paralegal to set up a date.  I
21    think her name is Brandi.
22                THE WITNESS:  Is that right?
23                MR. PRICE:  Yeah.  Actually,
24          that's right.
25                THE WITNESS:  And I think I
```

Richard Woodruff, M.D.

Page 187

```
 1              MR. PRICE:  Object to form.
 2         Sorry.
 3              THE WITNESS:  Yes.
 4    BY MS. METZGER:
 5         Q.    You met with Mr. Price for
 6    an hour, and did he do more than show you
 7    the charts and the medical records?
 8         A.    He asked me some of the same
 9    questions that he asked me today.
10         Q.    Did he ask you how you were
11    going to answer those questions?
12         A.    No.
13         Q.    What questions do you recall
14    that he asked you today that he also
15    asked you yesterday?  You can do it in
16    terms of general subject matter, that
17    sort of thing first, and we'll see if we
18    need to go deeper.
19         A.    I mean, basically, he kind
20    of went through the whole outline of what
21    he was going to ask me.
22         Q.    So he took your deposition
23    in advance of the deposition?
24              MR. PRICE:  Object to form.
25              THE WITNESS:  Not in as much
```

Richard Woodruff, M.D.

Page 189

1          Q.     -- but not --

2          A.     No, I did not see the office

3    chart yesterday.  I just saw the -- it

4    was actually from the surgery center.  It

5    wasn't from the hospital.

6          Q.     Okay.  So he showed you the

7    surgery center records --

8          A.     Right.

9          Q.     -- but not your chart?

10         A.     Correct.

11         Q.     Okay.  Did he show you any

12   other documents yesterday?

13         A.     Let's see.  He showed me a

14   study from -- I don't remember the

15   author.  You know, the study from the

16   "Green Journal."

17              MR. PRICE:  The Iglesia?

18              THE WITNESS:  The Iglesia

19         study, yeah.

20   BY MS. METZGER:

21         Q.     Was that the -- do you

22   remember what year?  There were a couple

23   studies.

24         A.     2010.

25         Q.     Did you see the follow-up

Richard Woodruff, M.D.

Page 190

1    study by Sokol as well?

2              A.    That's the only one he

3    showed me.

4              Q.    Okay.  So he showed you the

5    Iglesia study and what else?

6              A.    I'm trying to remember what

7    all else there was.  Let's see.  I think

8    I saw the -- the information about my

9    training for the first time today.

10                   He said he had a copy of my

11   certificate, but I didn't see it.

12                   THE WITNESS:  I went through

13        my CME file and I couldn't find my

14        copy of it, so if you have a

15        chance, if you could mail me a

16        copy, I'd appreciate it, and I

17        could put it in my CME file.

18                   MR. PRICE:  I'd have to see

19        if the defense is agreeable to

20        doing it.

21                   THE WITNESS:  Yeah.

22                   MR. PRICE:  It's really more

23        theirs than it is mine.

24                   MS. METZGER:  It's your

25        certificate.  It's fine with me if

Richard Woodruff, M.D.

Page 193

1          A.     It didn't make me go
2     (indicating).
3          Q.     Did it change your -- did it
4     change your prescribing practices or your
5     consenting practices at all?
6          A.     I talked a little bit more
7     about erosion rates.
8          Q.     About erosion?
9          A.     But I had been ever since
10    that 2008 FDA bulletin came out, so I
11    don't think that it changed it as much as
12    the FDA bulletin did.
13         Q.     Any other documents that
14    Mr. Price showed you when he met with you
15    yesterday?  Did he show you any company
16    documents from Johnson & Johnson or
17    Ethicon?
18         A.     Well, he had me sign the
19    confidentiality agreement.  I'm trying to
20    remember what all.
21         Q.     Well, let me ask you a
22    different question.  Did he show you any
23    documents yesterday that we didn't look
24    at here at the deposition today?
25         A.     No.

Richard Woodruff, M.D.

Page 194

1        Q.    Did he leave any of those

2   documents with you?

3        A.    The only thing he left with

4   me was the Iglesia study.

5        Q.    Did you look at any other

6   medical literature, discuss any other

7   medical literature, with Mr. Price

8   yesterday?

9        A.    No.

10        Q.    There were some comments

11   that were made in the first part of the

12   deposition about things that you had

13   heard for the first time when you spoke

14   with Mr. Price yesterday.

15             Can you refresh me about

16   what some of those things that you heard

17   for the first time from Mr. Price

18   yesterday were?

19        A.    We've gone through an awful

20   lot of things.  Would you like to refresh

21   me about what you are --

22        Q.    Okay.  Sure.

23        A.    -- discussing?

24        Q.    We can go back through that.

25   I remember, for example, I believe you

Richard Woodruff, M.D.

Page 195

```
 1    testified that you heard for the first
 2    time yesterday that -- something about
 3    the FDA regulatory process and the letter
 4    from Bryan Lisa or to Bryan Lisa from the
 5    FDA.  You had seen that for the first
 6    time yesterday and heard about that for
 7    the first time yesterday; is that
 8    correct?
 9         A.    The one asking for the 522
10    studies?
11         Q.    No.  About the 510(k)
12    application.
13         A.    Oh, okay.  That was the
14    first time I had seen that, yes.
15         Q.    Was it your opinion that
16    your discussion with Mr. Price yesterday
17    was intended to skew you one way or
18    another about the integrity of the
19    product?
20              MR. PRICE:  Object to form.
21    BY MS. METZGER:
22         Q.    And by that, I mean the
23    Prolift product.
24         A.    Well, I'm sure that you know
25    that doctors are always nervous around
```

Richard Woodruff, M.D.

Page 197

1         A.    I know how that works.

2         Q.    But I didn't get to meet

3    with you alone yesterday.

4         A.    I understand that.

5         Q.    That's the difference.

6              MR. PRICE:  Object to form.

7    BY MS. METZGER:

8         Q.    Anything else about the

9    meeting with Mr. Price yesterday?  You

10   didn't keep any notes or records of that?

11        A.    No.

12        Q.    Was anybody else present?

13        A.    My wife was in the house,

14   but she went in the bedroom, so she

15   wasn't privy to the discussion.

16        Q.    That was my next question.

17   Did he meet with you in your home?

18        A.    Yes.

19        Q.    Okay.  What time of day was

20   that?

21        A.    He got there right around

22   3:00 and I think you left at, what, 4:15

23   or something like that?

24        Q.    Okay.  Anything else about

25   the conversation that you had with

Richard Woodruff, M.D.

Page 196

```
 1    lawyers.  You've heard that before, I'm
 2    sure.
 3            Q.    And lawyers around doctors.
 4    That white-coat hypertension.
 5            A.    You know, I understand the
 6    way this works, and I know that
 7    everybody's always looking out for their
 8    client's own best interest.  I try to be
 9    objective.
10            Q.    Was it your impression that
11    there was any sort of a deliberate
12    attempt on Mr. Price's part yesterday to
13    skew you toward testimony one way or
14    another today?
15            MR. PRICE:  Object to form.
16            THE WITNESS:  I understood
17        priorities.
18    BY MS. METZGER:
19            Q.    What do you mean by that?
20            A.    I -- I know who he's working
21    for.
22            Q.    All right.  Anything else --
23            A.    As well as I know who you're
24    working for.
25            Q.    Okay.
```

Richard Woodruff, M.D.

Page 208

1    getting the medical device approved for

2    marketing in the United States?

3           A.    No.

4           Q.    Do you know what the 510(k)

5    process is?

6           A.    Well, just from what I've

7    learned here in the past two days --

8           Q.    But you --

9           A.    -- which isn't much.

10          Q.    So you don't claim any

11   particular expertise --

12          A.    No.

13          Q.    -- on how the Prolift may or

14   may not have been approved at any point

15   in its regulatory history, correct?

16          A.    Well, I'm gathering from the

17   letter in 2008, it was approved by its

18   similarity to just flat pieces of mesh.

19          Q.    But apart from -- apart from

20   that, do you have any specialized --

21          A.    No.

22          Q.    -- knowledge of the approval

23   process --

24          A.    No.

25          Q.    -- for --

Richard Woodruff, M.D.

Page 209

```
 1                    I need to get a clean
 2    question out.
 3                    Do you have any specialized
 4    knowledge or any particular personal
 5    knowledge of how the Prolift device
 6    proceeded through the regulatory process
 7    with the FDA?
 8            A.     Not previous knowledge, no.
 9            Q.     Okay.  So just what you've
10    learned in the past couple days?
11            A.     Yes.
12            Q.     And you're aware -- I
13    believe when we looked at the IFU, we
14    looked at the component parts for the
15    Prolift device, correct?
16            A.     Yes.
17            Q.     And you're aware that the
18    Prolift kit contains a precut piece of
19    Gynemesh PS, polypropylene mesh; is that
20    correct?
21            A.     Yes.
22            Q.     And together with a set of
23    surgical instruments; is that right?
24            A.     Yes.
25            Q.     The Gynemesh PS
```

Richard Woodruff, M.D.

Page 229

1          A.    She told me she was a

2    half-a-pack-a-day smoker.  It was

3    recorded in my notes.

4          Q.    That was the source of the

5    information, was --

6          A.    Yes.

7          Q.    -- from Mrs. Flowers --

8          A.    Yes.

9          Q.    -- is that correct?

10         A.    Yes.

11         Q.    And you knew at the time

12   that you performed the Prolift surgery on

13   Mrs. Flowers in July of 2007 that smoking

14   was a factor -- potential factor in poor

15   wound healing; is that correct?

16         A.    Yes.

17         Q.    I assume you would have

18   imparted that information to

19   Mrs. Flowers?

20         A.    I don't know that we

21   discussed it in particular, no.

22         Q.    Going back, just to close

23   the loop on this FDA issue, this is

24   Exhibit Number -- Plaintiff's Exhibit

25   Number 14, and I'm looking at the --

Richard Woodruff, M.D.

Page 230

```
 1    looks like the third page of that
 2    exhibit.  It's the May 15th letter from
 3    the FDA to Bryan Lisa at Ethicon, Inc.
 4              Is this one of the document
 5    that Mr. Price showed you when he met
 6    with you yesterday?
 7         A.    I think so, yes.
 8         Q.    Did Mr. Price show you any
 9    of the documents that may have preceded
10    that particular letter from FDA to
11    Mr. Lisa?
12         A.    I think this is the only
13    one.  I don't remember any others.
14         Q.    Do you know what, if any,
15    were the status of the negotiations or
16    the discussions about Prolift between FDA
17    and Ethicon as of the date you performed
18    Mrs. Flowers' surgery?
19         A.    No.
20         Q.    You don't have any context
21    in which to place this letter from
22    Mr. Lisa -- or to Mr. Lisa from FDA; is
23    that correct?
24              MR. PRICE:  Object to form.
25              THE WITNESS:  No.
```

Richard Woodruff, M.D.

Page 231

```
 1    BY MS. METZGER:
 2         Q.    Let me ask you a different
 3    way.  Do you have any context for this
 4    letter dated May 15th, 2008, from the FDA
 5    to Mr. Lisa, apart from the letter
 6    itself?
 7              MR. PRICE:  Object to form.
 8              THE WITNESS:  No.
 9    BY MS. METZGER:
10         Q.    So you don't know what was
11    going on before and what happened
12    afterward?
13         A.    No.
14         Q.    Doctor, do you think it's
15    fair to show you a single letter and a
16    snapshot in time as to what was going on,
17    on May 15th of 2008, and not give you any
18    information about what may or may not
19    have been going on beforehand and ask you
20    to make a judgment about the integrity of
21    this product?
22              MR. PRICE:  Object to form.
23              THE WITNESS:  It's always
24         good to have context.
25                   *   *   *
```

Richard Woodruff, M.D.

Page 232

1    BY MS. METZGER:

2         Q.    Okay.  You weren't given

3    that context, were you?

4              MR. PRICE:  Object to form.

5              THE WITNESS:  No.

6    BY MS. METZGER:

7         Q.    The FDA doesn't regulate the

8    practice of medicine, does it?

9              MR. PRICE:  Object to form.

10             THE WITNESS:  It doesn't

11             regulate the practice of medicine,

12             no.

13   BY MS. METZGER:

14        Q.    So, for example, if you have

15   Gynemesh PS soft mesh that's available to

16   you, we've already established that that

17   was approved for use.  That's a product

18   that was available to you, and you could

19   use it as you wished for the indications

20   for pelvic organ prolapse treatment; is

21   that correct?

22             MR. PRICE:  Object to form.

23             THE WITNESS:  Yes.

24   BY MS. METZGER:

25        Q.    And when you performed the

Richard Woodruff, M.D.

Page 304

```
 1   BY MR. PRICE:
 2        Q.    Including -- another
 3   difference is the tools that come with
 4   the Prolift kit as well, correct?
 5              MS. METZGER:  Object to
 6        form.
 7              THE WITNESS:  Yes.
 8   BY MR. PRICE:
 9        Q.    Now, let's back up a moment
10   to what you said about the -- the
11   Gynemesh being the same mesh.
12              Because the Gynemesh had
13   been on the market since 2002, if Ethicon
14   was in the position to have some data on
15   the erosion rates of the Gynemesh, would
16   you have liked to know about those in
17   2007?
18              MS. METZGER:  Object to
19        form.
20              THE WITNESS:  Yes.
21   BY MR. PRICE:
22        Q.    And if Ethicon had some data
23   on the severity and rate of the
24   complications that they had seen from the
25   Gynemesh material, would you have liked
```

Richard Woodruff, M.D.

Page 305

```
 1    to have seen that in the instructions for
 2    use --
 3                  MS. METZGER:  Object.
 4    BY MR. PRICE:
 5          Q.    -- with the Prolift kit?
 6                  MS. METZGER:  Object to
 7          form.
 8                  THE WITNESS:  Yes.
 9    BY MR. PRICE:
10          Q.    And if Ethicon had reports
11    from the field of life-altering
12    complications in patients, is that
13    something you'd like to know in 2007?
14                  MS. METZGER:  Object to
15          form.
16                  THE WITNESS:  Yes.
17    BY MR. PRICE:
18          Q.    Is it fair to say that any
19    data that Ethicon had received, based on
20    the usage of the Gynemesh mesh in the
21    field, you would have considered that
22    data when you were implanting a Prolift?
23                  MS. METZGER:  Object to
24          form.
25                  THE WITNESS:  Yes.
```