# EXHIBIT 1

```
             IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                      AT CHARLESTON


_____x
                                   :
IN RE: C.R. BARD, INC.,            :
PELVIC REPAIR                      :        MDL NO.
SYSTEM PRODUCTS LIABILITY          :        2:10-MD-2187
LITIGATION                         :
                                   :
-----------------------------------:
                                   :
IN RE: AMERICAN MEDICAL            :
SYSTEMS, INC.,                     :        MDL NO.
PELVIC REPAIR SYSTEM PRODUCTS      :        2:12-MD-2325
LIABILITY LITIGATION               :
                                   :
-----------------------------------:
                                   :
IN RE: BOSTON SCIENTIFIC           :
CORPORATION PELVIC REPAIR          :        MDL NO.
SYSTEM PRODUCTS                    :        2:12-MD-2326
LIABILITY LITIGATION               :
                                   :
-----------------------------------:
                                   :
IN RE: ETHICON INC., PELVIC        :
REPAIR SYSTEM PRODUCTS             :        MDL NO.
PRODUCTS LIABILITY LITIGATION      :        2:12-MD-2327
                                   :
-----------------------------------:
                                   :
IN RE: COLOPLAST CORP. PELVIC      :
SUPPORT SYSTEMS PRODUCTS           :        MDL NO.
LIABILITY LITIGATION               :        2:12-MD-2387
_____x



             TRANSCRIPT OF MOTIONS HEARING HELD
     BEFORE THE HONORABLE MARY E. STANLEY, MAGISTRATE JUDGE
                UNITED STATES DISTRICT COURT
                 IN CHARLESTON, WEST VIRGINIA

                      AUGUST 2, 2012
```

```
APPEARANCES:

For the Plaintiffs:          MR. HENRY G. GARRARD, III, ESQ.
                             MR. GARY B. BLASINGAME, ESQ.
                             Blasingame, Burch, Garrard, Ashley, PC
                             P. O. Box 832
                             Athens, GA 30603

                             HARRY F. BELL, JR., ESQ.
                             The Bell Law Firm, PLLC
                             P. O. Box 1723
                             Charleston, WV  25326-1723


For the Defendant:           DEBORAH A. MOELLER, ESQ.
                             Shook, Hardy & Bacon, LLP
                             2555 Grand Blvd.
                             Kansas City, MO 64108-2613

                             RICHARD B. NORTH, JR., ESQ.
                             Nelson Mullins Riley & Scarborough
                             201 17th St., NW, Suite 1700
                             Atlanta, GA  30363



Court Reporter:              Ayme Cochran, RPR, CRR

Proceedings recorded by mechanical stenography;
transcript produced by computer.
```

```
 1        PROCEEDINGS had before The Honorable Mary E. Stanley,

 2   Magistrate Judge, United States District Court, Southern District

 3   of West Virginia, in Charleston, West Virginia, on August 2,

 4   2012, at 1:00 p.m., as follows:

 5             THE COURT:  Good afternoon.  I didn't expect to be

 6   graced with the presence of all of you so quickly after our

 7   status conference.

 8        This is in re:  C. R. Bard, Inc. Pelvic Repair Systems

 9   Products Liability Litigation, MDL-2187, and we have Henry

10   Garrard and Mr. Blasingame and Mr. Bell, all for the plaintiffs,

11   and Mr. North and Ms. Moeller for the defendants, and you have

12   been, I take it, engaged in taking a deposition today, as well as

13   in the past?

14             MR. NORTH:  I believe that got postponed after all

15   because everybody agreed that this was important.  It was

16   supposed to be in Huntington.

17             THE COURT:  Okay.

18             MR. NORTH:  But we decided -- I think they decided to

19   postpone it.

20             THE COURT:  All right.  First of all, being mindful of

21   the public record, is there any objection to my providing to the

22   clerk to docket the July 31 letter from Nelson Mullins, Mr.

23   North, and the August 2 letter from Mr. Garrard, just basically

24   giving them to the clerk to docket without exhibits?  I don't

25   think we need all the exhibits docketed and I would propose that
```

1    Bard's letter be docketed as a motion for protective order.

2              MR. NORTH:  That's fine, Your Honor.

3              THE COURT:  Okay.  And, Mr. Garrard, your letter will

4    be docketed as plaintiffs' response.

5              MR. GARRARD:  That's fine, Your Honor.

6              THE COURT:  Okay.  Well, I have read your letters, I've

7    read all the cases you cite, and I have read the depositions and,

8    if there's something further that you would like to relate, Mr.

9    North, I'll be glad to hear you now, or Ms. Moeller.

10             MR. NORTH:  Okay, Your Honor.  It's good to see you

11   again.  We did not expect to be here so soon either after last

12   week's conference, but last Thursday afternoon, while we were

13   actually here in Charleston, the first deposition of a treating

14   physician in one of the bellwether cases, the case of Queen, took

15   place and we, both defendants, Ms. Moeller and myself, and our

16   staff at our firms, became very concerned by what transpired at

17   that deposition.

18      As the Court knows from the record, we've provided you the

19   rough transcript.  The plaintiffs had met extensively with this

20   doctor on two separate occasions.  I think we misspoke and said

21   four attorneys.  It was actually three attorneys and a paralegal

22   from Mr. Garrard's firm and had shown her at least one company

23   document and talked about the contents of many other company

24   documents.

25      As the Court is aware and, as the authorities indicate, this

```
 1    issue of ex parte contact with treating physicians is a difficult
 2    one that many of the MDL Courts around the country have grappled
 3    with.  As the plaintiffs' submission itself points out,
 4    jurisdictions vary as to their rules.  Some jurisdictions permit
 5    the plaintiffs to have ex parte contacts, but not the defendants,
 6    with a treating physician.  Other jurisdictions allow both
 7    parties to.  For example, Georgia allows a defendant to have ex
 8    parte contacts with the attorneys (sic) subject to certain
 9    regulations.  I believe New Jersey is the same way.
10              THE COURT:  You said ex parte contacts with the
11    attorneys.  You mean --
12              MR. NORTH:  I mean, I'm sorry, with treating
13    physicians, thank you, and given that fact, the -- a number of
14    MDL judges in other proceedings have been grappling with, as the
15    cases point out, how do you handle this circumstance.  It appears
16    that most MDL Courts are moving towards a system where they
17    recognize that plaintiffs' attorneys may have the ex parte
18    contacts with the treating physicians, but they issue blanket
19    prohibitions about defendants having the contacts, but a couple
20    of Courts, as we have pointed out, have also said that to level
21    the playing field and the potential for prejudice, unfairness and
22    ambush that can result when the plaintiffs can have the ex parte
23    contacts with the treating physician, but the defendants cannot,
24    that there need to be ground rules, and we cited those cases.
25              The Ortho Evra Products case is the leading case on that
```

1    and, in that particular circumstance, the Court held that

2    plaintiffs' attorneys could have the ex parte contacts with the

3    treaters, but in return and to avoid any unfairness, they were

4    limited to discussing issues with the treating physicians about

5    their general care and treatment of the plaintiff in that case

6    and the Court issued a prohibition against the plaintiffs'

7    attorneys addressing liability issues, warnings, company

8    documents, things of that nature.  The Court in that particular

9    instance even said the violations of that prohibition could be

10   sanctionable if brought to the Court's attention.

11        There's also the *NuvaRing* case and, as the plaintiffs

12   correctly note, although the *NuvaRing* case adopts the same

13   limitation as the *Ortho Evra Products* case does, the plaintiffs

14   in that particular case agreed to the limitation.  However, the

15   judge in that particular MDL independently noted that he deemed

16   that limitation to be fair and appropriate under the

17   circumstances.

18        We've also cited the Court to a case from a state court in

19   New Jersey in a mass tort proceeding that takes an even more

20   stringent view.  In that case, even though New Jersey allows

21   defense counsel to have ex parte contacts in most circumstances

22   with treaters, the Court ruled it just wasn't feasible to do so

23   in a mass tort circumstance and, to ensure that the situation was

24   fair for all parties, the Court in that particular case ruled

25   that neither side could meet with the treaters.  Now we're not

1    asking the Court for something sort of that stringent because I

2    think that was particular to New Jersey's law which otherwise

3    would have allowed the defendants to meet.

4        Now, admittedly, as we cited in the brief and as the

5    plaintiffs rely on heavily, we have found two other MDL cases on

6    the other end of the spectrum.  That's the *Yasmin* case and the

7    *Kugel Patch* case.  In both of those instances, the plaintiff --

8    the Courts refused or declined to impose a limitation on the

9    scope of the plaintiffs' attorneys' contacts with the treater.

10       However, neither Court really discussed or delved into the

11   fairness issues that we're raising before the Court and that we

12   believe that the *Ortho Evra* case and the *NuvaRing* case rely on,

13   the fairness and even playing field for both parties, and even in

14   those two cases, I would note that the plaintiffs -- or the Court

15   imposed some restrictions on the plaintiffs' attorneys requiring

16   that if they were going to discuss company documents, and if they

17   were going to talk to these doctors about liability issues beyond

18   the scope of their treatment of the plaintiff, then they needed

19   to make certain disclosures to the defendants in advance of the

20   deposition of those treating physicians.

21       So all four Courts imposed some limitations, or

22   restrictions, or rules about how this process should occur to

23   prohibit the plaintiffs from discussing any of these

24   non-treatment liability issues and to impose disclosure

25   requirements.

1       The plaintiffs rely heavily on their brief on the notion

2    that they ought to be able to introduce or meet with the doctors

3    first and then prepare them for these lines of questioning based

4    on company documents because of the learned intermediary

5    doctrine.  We submit, Your Honor, that that really is sort of a

6    -- with all due respect, a subterfuge.  No one is preventing the

7    plaintiffs' attorneys from -- or suggesting they should be

8    prevented from going in and asking a treating physician,"If you

9    had been aware that Avaulta caused X, Y, or Z complication, would

10   it have impacted your treatment or the decisions you made?"

11   That's clearly fair game.

12       But to ask those questions under the guise, as you can see

13   in the transcript of Dr. Barbee, using company documents, taking

14   -- that they've shown her or discussed with her in ex parte

15   sessions before the deposition, taking snippets out of those

16   company documents and reading those to her and saying, "If you

17   were aware that employee A said in this e-mail," and blah, blah,

18   blah, "would that have changed?"

19       That's not necessary to get all the information they need

20   about the learned intermediary defense and all that is is, and

21   again, I'd suggest this respectfully, is subterfuge to allow them

22   to tell their version of bad corporate conduct through the guise

23   of what is supposed to be a fact witness talking about the

24   treatment of a plaintiff.

25       Again, they should be free to ask a doctor if she was aware

1    of this complication, erosion, or delayed healing, or whatever

2    the complication they're alleging may be, but to try to put that

3    information through her, through a company document that she has

4    no personal knowledge about and has not seen before until they

5    prepped her for these depositions in an ex parte session, we

6    believe transforms that witness far beyond what a treating

7    physician should be doing.

8         So, for that reason, Your Honor, we would ask that the Court

9    issue a limitation, such as the Court did in the *Ortho Evra*

10   products case, that allows the plaintiffs -- we recognize they

11   have the right to meet ex parte with these witnesses, but allow

12   -- restricts them and -- or suggests that they cannot discuss

13   company documents and issues like that beyond the knowledge of a

14   doctor and outside of the course of her treatment and care for a

15   particular patient.

16        We believe that the transcript we gave you shows that the

17   plaintiffs' attorneys are -- because they're very skilled

18   attorneys, are aggressively turning the treating physicians, who

19   are ostensibly fact witnesses, with factual testimony, into

20   advocates for their position.

21        They're discussing the company documents with them.  They

22   are asking them to be a mouthpiece for the plaintiffs' story of

23   corporate misconduct.  And we believe that this situation creates

24   a vastly uneven playing field, causes severe prejudice to the

25   defendants, and essentially, it results in am ambush every time

1    we walk into a deposition.

2        Now we've raised a second issue, Your Honor, that we've

3    disclosed -- I'm sorry.

4            THE COURT:  Let's just -- I'll get to the 26(a)(2)

5    issues --

6            MR. NORTH:  Right.

7            THE COURT:  -- afterwards.

8            MR. NORTH:  Okay.

9            THE COURT:  First, let me hear from the plaintiffs

10   concerning the ex parte communications.

11           MR. NORTH:  Okay.  Thank you, Your Honor.

12           THE COURT:  Thank you.

13           MR. GARRARD:  Thank you, Your Honor.  The decisions

14   that sit out there don't float in favor of the defendants'

15   position.  The most recent decisions in the *Kugel* case and in the

16   *Yaz* case clearly are well-reasoned decisions and what the Court

17   did in those two cases was to say, look, as a plaintiff,

18   essentially you've got the burden of proof to prove your case and

19   we're not going to tell you how to do that.  We are going to say

20   that if you show documents that are corporate documents to a

21   physician or treater or whatever, then if one of them says

22   48 hours ahead of the hearing, and one of them says 72 hours

23   ahead of the hearing, you've got to give the other side a list of

24   those documents.

25       The other three decisions that they talk about, one of them

1   the Court went off on Judge Fallon's reasoning that you can't

2   prohibit plaintiffs' lawyers from having conversations with

3   treating physicians.  One of them says you can have the

4   conversations with treating physicians, but we need to restrict

5   it to the doctors' records and other things related to the case.

6   I don't know what "other things related to the case" means, and

7   then the New Jersey decision out of State Court says you just

8   can't do anything.

9        But in analyzing this, Your Honor, part of what hasn't been

10  told to the Court is this.  Bard engages in conversations with

11  these doctors in the process of trying to get them to use their

12  products and in the process of sending them to cadaver courses

13  and didactic lectures and they have the doctors there and they

14  give them their spin in terms of what is the evidence, what isn't

15  the evidence; you need to use our product; you need to do this;

16  here's how you do it, et cetera.

17       The problem that exists for us is we don't know what those

18  conversations have truly been because we weren't there, but they

19  have already had a shot at most of the implanting physicians that

20  will come before this Court.  There's some exceptions, but most

21  of the time, those doctors have been to a Bard-sponsored event.

22       So it's not that there's a real unlevel playing field here.

23  All that we are doing is what we would do if this was an

24  automobile wreck case, if this was a typical malpractice case.

25  We would show to the witness documents that relate to the issues.

1           Now, one of the documents that I would like to show to the

2    Court, and I want to show it because defense counsel specifically

3    raised an issue in their -- if I may?

4           THE COURT:  Yes.

5           MR. GARRARD:  Okay, specifically raised an issue in

6    their letter to the Court and they said -- let me put my eyes on

7    -- in bullet point number 3, on the first page, they discuss

8    Bard's alleged trepidation about explanting the product if

9    something went wrong long-term.

10          If you look at this document, which is a Bard document, Your

11   Honor, and you go to the page entitled, "Kit's Weaknesses," it's

12   about the third page in, and you look at what Bard was saying to

13   its salespeople.  Now this is not a document given to the

14   doctors.  This is given to their salespeople and they describe

15   "Kits Weaknesses" and say, "Lack of substantial long-term outcome

16   and follow-up data prevents majority of gynecological surgeons

17   from adopting," and then underneath that, "trepidation

18   surrounding removal of kit system should something go wrong

19   long-term."

20          So to the extent counsel for Bard or Sofradim are taking

21   issue with that as an example, this is their document and this is

22   what they tell their salespeople, and then they go on and say,

23   "Complication rates perceived as still too high.  Sacrocolpopexy

24   is still viewed as gold standard for vault prolapse," and the

25   Court heard last Thursday some about sacrocolpopexy, and that

1    being a different approach from the transvaginal approach that

2    they were pushing in this product, these products.

3         So my point there is, these are not documents that are

4    anything other than the documents that the defendants have put

5    forward and that's just an example of a document that we believe

6    would be fair game to show a physician, "And had you known, for

7    example, Doctor So-and-So, that Bard says there's lack of

8    substantial long-term outcome and follow-up data pertaining to

9    these products, would you have used the product on this lady?

10   Would it have changed your course had you known there was

11   trepidation surrounding removal of the material should something

12   go wrong?"

13        I think these are things that we should be entitled to ask

14   the doctor about because we are going to have to face, in most of

15   the cases, the learned intermediary defense and I recognize under

16   West Virginia law that probably is not a recognizable defense in

17   this state, but it is in most states, and I can be assured, and I

18   know Mr. North is not going to get up here and say they're not

19   going to try to do that, because they are.  They're going to try

20   to take the position that it's the doctors' fault and they're

21   going to question these doctors about that.

22        Well, if there are things out there that the doctor doesn't

23   know about in terms of the products, and I will give you another

24   example, and I think this document, in fact, may have been

25   referred to in the deposition of Dr. Barbee, and this goes to an

1    issue of causation and an issue of what's the problem here.

2        Persistent delayed healing is an issue that Bard found out

3    about, knew about, and in the document I've just handed to the

4    Court, the document says, and I'm quoting Bard, "Simply by its

5    nature, collagen causes a greater inflammatory response than does

6    pure polypropylene."

7            THE COURT:  Do you know the date that this document

8    originated?

9            MR. GERRARD:  Your Honor, I do not, as I stand here.

10   Mr. North may be able to tell me.

11           MR. NORTH:  I do not, Your Honor.

12           MR. GARRARD:  I don't know the date of it, but the

13   document says, "Simply by its nature, collagen causes a greater

14   inflammatory response than does pure polypropylene.  We've shown

15   in the histology images of our animal data that this is a normal

16   organized inflammatory response consistent with good healing.

17       It does, nonetheless, contain a higher count of microphages

18   and other inflammatory cells, which again can potentially lead to

19   the patient's tissues taking a longer period of time to heal over

20   the vaginal incisions.  We will discuss the role of the closure

21   suture further contributing to the inflammation in a moment."

22       And then goes on to say, "By increasing the inflammatory

23   response at the suture line, we believe the collagen element of

24   the involved -- is the primary cause of persistent delayed

25   healing, as this is consistent with persisted delayed healing

1    seen previously in our Pelvicol and PelviSoft products."

2         Another matter that we should be able to ask the physician,

3    "Were you told this and did you know this?  If you had known

4    these sorts of things, would it have made a difference in your

5    care and treatment?"

6         And then, if you go to the third page of that document, Your

7    Honor, paragraph number 5, and this is -- this is a very

8    important paragraph.  "Finally, tensioning may also play a role

9    in persistent delayed healing.  Do not put the graft under any

10   tension.  The postoperative scarification process significantly

11   shrinks the tissues around the mesh, increasing the tension on

12   the graft," and I won't read the rest of it, but the whole

13   paragraph is pretty important.

14        Shouldn't a doctor know that and shouldn't we be entitled to

15   ask the doctor, "Had you known this, would it have made a

16   difference in your course of treatment of this lady?"  I've got a

17   number of documents that I could show to the Court, I won't take

18   the time to do that, but my point in showing these is these are

19   not documents we have created.  These are not documents that are

20   designed for inflammation.  That's a bad word.  We were just

21   talking about inflammation -- or designed to fan the flames, but

22   they are documents that are crucial to our ability to defend

23   against their claims that it's the doctor's fault and to defend

24   against the claims that the doctor is a learned intermediary.

25        There's a Mississippi case that got dismissed on a motion

1    and it got dismissed on a motion because the defendants were able

2    to examine the doctor and get the doctor to say, "I wouldn't have

3    changed anything, period.  I did what I did.  I'd do it again

4    tomorrow" in the courtroom.  Well, he's the learned intermediary.

5    Plaintiff is out.  We've got an obligation to our clients to

6    prepare the case and we've got an obligation to our clients to

7    figure out how to meet these issues.

8         The Court heard referred to in the session that we had in

9    chambers with Judge Goodwin on Thursday the *Scott* case and, in

10   the *Scott* case, if the Court will recall, there was a

11   $5.5 million verdict, but in that case, there was an assessment

12   of a 60 percent responsibility on manufacturing and 40 percent

13   responsibility on the doctor.

14        So it's not a pipe dream on our part that -- that the --

15   these are good defense counsel and they're going to try to blame

16   the doctor.  If I were in their shoes, I would try the same

17   thing, so -- but we've got an obligation to meet those issues

18   with our clients and we suggest to the Court that it is totally

19   appropriate for us to interview the doctors and I think Richard

20   is saying that he doesn't object to that and it is also totally

21   appropriate for us in preparation of the doctors to be able to

22   show them certain documents.

23        Now, should they be entitled to know ahead of time what

24   documents we showed them?  I don't know.  If the Court were to

25   say, "Henry, you tell them 72 hours ahead what documents you

```
1    showed the doctor," I wouldn't go out of here screaming and

2    saying, "Oh, gosh, the judge didn't do me right."

3        I mean fairness is fine, but fairness from our standpoint of

4    being able to properly prepare the cases for our clients requires

5    that we be able to show to doctors things that the company hadn't

6    shown them when they had the first shot at it.  It's not like

7    this is new to the doctors.  It's not like Bard hasn't dealt with

8    these doctors.

9        The Court will find in the bellwether cases, for example,

10   the Sisson case, the implanting doctor was a Dr. Rayburn, who was

11   a proctor for Bard, and there are other instances where that's

12   the same thing and Bard has had shots at these doctors.  They've

13   talked to these doctors.  We've got multiple e-mails where they

14   deal with various of these doctors.

15       We've got documents, Your Honor, where one of their

16   proctors, a Dr. Wyndham, and I won't bring it out, but I will be

17   glad to show it to the Court, if you like, where one of the

18   proctors, Dr. Wyndham, at Bard's suggestion, looked at a lady who

19   was having problems, who had been operated on by Dr. Sussler, and

20   in the records of that particular lady, Dr. Wyndham, their

21   proctor, Dr. Wyndham says, "I've quit using the product, the

22   Avaulta Plus products, because I've had this persistent delayed

23   healing that I was talking about and because I've had problems

24   with infections and the issue of rectal problems and just the

25   fatty tissue that this product goes through, infections and
```

```
1   fissures there and, in fact, in 40 percent, 40 percent of my

2   patients where I used the product, I've had the problem and I've

3   quit using it."

4        Shouldn't we be able to ask doctors, "Did you know this and,

5   if you did, and if you had known it, what difference would it

6   have made?"

7        And so that's our point, that we need to be able to prepare

8   the cases, because we have the burden of proof.  The case law

9   does not support limiting us in that regard.  The Yaz decision

10  and the recent Kugel decision and the decisions of Judge Fallon

11  all mitigate in favor of us being able to do what we've done.

12       And insofar as the tenure of the letter of the defendants

13  was as if we've done something wrong, we haven't done anything

14  wrong.  We have not violated any protective order.  We have not

15  violated any provision of the Federal Rules.  So we come into

16  this court with totally clean hands simply trying to prepare to

17  meet our burden of proof.

18            MR. NORTH:  Your Honor, if I could defer to my lawyer

19  here.

20            MS. MOELLER:  I just want to clarify a few issues,

21  Judge.  First of all, to say that the use of the learned

22  intermediary doctrine is somehow to be blaming the doctors is

23  just a misstatement of what the learned intermediary doctrine is.

24  It's simply a mechanism by which the manufacturers fulfill their

25  duty to warn by warning the manufacturer, not by warning directly
```

1    to the plaintiff -- to the patient.  It doesn't have anything to

2    do with claiming that the doctor did anything wrong.

3         From the -- from the manufacturer's perspective, you only

4    examine what the manufacturer has told the learned intermediary.

5    You don't care really from a legal perspective what he has passed

6    on because you look at what they've done to fulfill it and what

7    other sources of information that physician had if he knew

8    something independent of what the manufacturer had said.  So it's

9    not a blame assessment on that physician.

10        Similarly, I think it is grossly unfair and premature for

11   Mr. Garrard to tell the physicians that the defendants are going

12   to point the finger at the doctors, as I personally, and I don't

13   know that Richard has either, made that determination for our

14   clients what our strategy will be in each of these individual

15   bellwether cases and that is clearly unfair and going to be

16   prejudicial to those physicians prior to us coming in and trying

17   to get factual information from them in the deposition because we

18   have not made that strategy determination yet and I think it's

19   grossly unfair for him to go to the physicians with some sort of

20   statement that, "You know the defendants are going to point the

21   finger at you."  There's no -- that's inherently prejudicial and

22   a bias against the defendants.

23        I wanted to address briefly the sales rep conversations with

24   the physicians and the fact that Bard has conversations with them

25   and that's clearly not in the litigation setting.  It's clearly

1    not with lawyers.  It's prior to there ever having been any

2    thought of litigation and it's not the same type of discussion

3    that they're having with these physicians.

4         And, from my client's perspective, we didn't market this

5    product in the United States.  We have had no conversations with

6    any of these physicians at any time.  We have no sales force in

7    the United States at all for these products.  So that clearly

8    doesn't pertain to us.  We don't have direct access to these

9    doctors for these products.

10        The use of -- I beg to differ a little bit with Mr. Garrard

11   in the necessity of using these internal company documents to

12   find out the information that they need to know.  It is one thing

13   to ask a physician whether or not delayed healing would have an

14   impact on whether or not the physician would use a product.  It's

15   something else to take a document taken out of context, the date

16   of which he doesn't even know.  It could have been after this

17   woman was implanted with the product.

18        If you don't know the date of the document, it may or may

19   not have bearing on what the company knew at a relevant time for

20   that specific plaintiff and so all of these factors, I think,

21   show that this is not the kind of conduct that should be taking

22   place in the MDL segment.

23        Mr. Garrard talked about, in a typical case, he would do

24   this and he would do that.  This isn't a typical case.  This is a

25   case of -- I think that's a gross understatement probably.  These

1    are cases that are bellwether.  They have impact on other cases.

2    They have impact on other manufacturers.  They have impact on the

3    plaintiffs, and what they're doing, clearly, they have access to

4    the physicians under -- they can have ex parte contact with them.

5    That's not the squabble, obviously.

6        It's when they go beyond their care and treatment and try to

7    influence the doctors' positions on things that we have a problem

8    with and that's -- that's really what the crux of it is, is how

9    far are they allowed to go, and the use of documents and talking

10   about defendant strategies and things like that, we think goes

11   over the line, and that's -- that's our position on that.

12            THE COURT:  Thank you.  I have read through Dr.

13   Barbee's deposition and I think all agree that there is no

14   provision in the Federal Rules of Civil Procedure, Federal Rules

15   of Evidence, or the local rules, which has anything to say about

16   this and, in fact, from my own trial preparation experience, my

17   experience on the bench, lawyers would be derelict if they did

18   not interview their witnesses before they took their testimony

19   and if they did not show them relevant documents.

20       I find what the plaintiffs have done, particularly and

21   specifically as set forth in the Barbee deposition, to have been

22   entirely proper.  It appears to have been a very professional

23   deposition.

24       It was interesting.  It moved along.  I mean there was a

25   huge amount of material covered and I -- I find the cases which

1    have suggested that it's appropriate to put in limitations to

2    have offered less than substantial reasons in support of them.

3    There's certainly no provision of the rules, as I've already

4    said.

5         Now I've also been a lawyer sitting down there and had a

6    cross examination from opposing counsel of the witnesses who I've

7    put on the stand and they've went on at great length about how I

8    woodshedded the witnesses, or I did this and I did that, and the

9    government is so unfair, or whatever it was, and there is ample

10   room for cross examination.

11        So, for example, if this document on persistent delayed

12   healing was, in fact a -- shall we say a scholarly or, at least,

13   it's obviously scientific and technical to some degree, which was

14   several years after the fact, then that is appropriate game for

15   cross examination and I think any doctor would want to know what

16   did Bard know and when did they know it and how did that -- how

17   did that work itself into the timeline of when the doctor

18   implanted the mesh?  What was Bard telling me when I was relying

19   on their statements and what did Bard learn later or perhaps

20   before?

21        So I will deny that motion for a protective order with

22   respect to setting forth limitations on the plaintiffs in their

23   ex parte discussions with plaintiffs' treating physicians.

24        I hasten to say that from -- from this particular deposition,

25   I felt that it was a very professional job and, from what I've

1    seen of the attorneys all along, that's what I expect, that

2    you're both outstanding counsel on both sides, and I expect the

3    courtesies to continue, and I'm quite confident they will.

4        Now let's go on to the expert report issue and my first

5    question is totally irrelevant.  I would like to know what one of

6    these kits costs.

7            MR. GARRARD:  Your Honor, it's my understanding that

8    these kits sell for between $1,600.00 and $1,700.00.

9            THE COURT:  All right.

10           MR. NORTH:  I was going to say $1,600.00.

11           MR. GARRARD:  The medical records and, frankly, the

12   documents from the companies indicate between $1,600.00 and

13   $1,700.00.

14           THE COURT:  Thank you.  See, you just -- every once in

15   awhile, you think about these things and you all know the answer

16   and I don't.

17       Now the -- I will -- again, I've read your materials.  I've

18   read the cases.  If you want to argue more about it, I'll be

19   happy to hear it.

20       I want to know what the financial arrangement with these

21   treating physicians is.

22           MR. GARRARD:  We have no financial arrangement with

23   these treating physicians other than they always send us a bill.

24   If we spend two hours with them, they send us a bill for time,

25   but we have not retained the treating physicians, Your Honor, as

1    retained experts.

2              THE COURT:  Doesn't that answer the issue?

3              MR. NORTH:  No, Your Honor.  Respectfully, I would

4    suggest that it's not a matter of whether they're retained or

5    not; it's whether they are giving testimony that's not based on

6    their personal knowledge, that's not based in their role of -- as

7    a treating physician; and we submit that this is going far beyond

8    her role as a treating physician in eliciting opinions, and I

9    think that's consistent with the cases that we've cited.

10             THE COURT:  Well, I found that the cases that you cited

11   did not stand for the propositions as you stated them to be.

12   Rule 26(a)(2)(b) says -- has -- and I read this as the condition

13   precedes, that the witness has to be retained or especially

14   employed to provide expert testimony in the case or, of course,

15   if you're an employee of a party whose job it is to give expert

16   testimony.

17        So that -- so, number one, what I hear is that we do not

18   have a witness who is retained or specially employed to provide

19   expert testimony.  Now I completely agree with you that treating

20   physicians are educated, have enormous --

21             MR. NORTH:  Right.

22             THE COURT:  -- expertise and, under the Federal Rules

23   of Evidence, have technical abilities which will inform the jury

24   that lay people don't have, but what -- what I read these cases

25   to say is that the -- in the *Goodman v. Staples* case, they were

```
1   talking about a witness who was hired to render expert opinions.

2   So that, in fact, they say, "We hold today that when a treating

3   physician morphed into a witness hired to render expert opinions

4   that go beyond the usual scope of a treating doctor's testimony,

5   the proponent of the testimony must comply with Rule 26(a)(2)."

6       I guess it's not all that unusual for a treating physician

7   to become -- to later be hired as an expert or to be offered as

8   an expert.

9               MR. NORTH:  Right.

10              THE COURT:  But the question, isn't it, is the doctor

11  testifying about what happened in the past with this patient or

12  is the doctor offering testimony that is overarching and not with

13  respect to a particular patient?

14              MR. NORTH:  Well, and this may be -- we may have a

15  differing view on what being retained is.  To me, if you are

16  paying a doctor to meet with you on two separate occasions and

17  you are paying that doctor by the hour to meet with you in

18  preparation for a deposition and you are going over documents,

19  company documents that the doctor has never seen, and you are

20  asking for her to opine with her expertise about the influence of

21  these company documents that she has no personal knowledge of in

22  the course of her treatment, I believe that is the key point of

23  that case, that sort of work-up of someone, and then asking these

24  questions that go beyond her simple treatment of Mrs. Queen, and

25  the course and care of Mrs. Queen morphs -- and I think that's
```

1    the key language in that case -- morphs the person from the fact

2    witness/treating physician into an expert.

3        So it may just be a difference of opinion on what

4    constitutes "retaining". To me, the two meetings that they're

5    paying this witness by the hour to discuss matters beyond her

6    treatment and then soliciting testimony about complications that

7    she has sustained with other products that aren't even involved,

8    there's a lengthy question -- set of questions to her about her

9    experience and her views on Avaulta Plus and the porcine layer.

10       This is an Avaulta solo case without the porcine layer.

11   They were eliciting all sorts of information from her and

12   opinions from her using her knowledge, background, and experience

13   that have nothing to do with the facts of this case and are far

14   beyond her treatment of this plaintiff and that's why we submit

15   that, consistent with those cases, the conduct of the plaintiffs

16   here have morphed her into an expert witness.

17             THE COURT:  Well, to the extent that she testified

18   about product -- a product that was not implanted in Ms. Queen,

19   then that simply is not admissible; is that correct, in the

20   bellwether case?

21             MR. NORTH:  We would take that position, certainly, at

22   the appropriate time, but I think that's just one indication of

23   them exploring with her a number of issues and getting opinions

24   on a number of issues that aren't based on her own knowledge from

25   the treatment of Mrs. Queen, the factual background of that

1    treatment.  It's her opinions as to medical issues in general

2    impacting this litigation, we would submit.

3              THE COURT:  How can a treating physician testify about

4    the treatment to a particular patient without taking into

5    consideration all the other patients who had similar symptoms?  I

6    mean let's -- let's talk an ear infection.  I mean if a doctor is

7    treating a little kid with an ear infection, that doctor is

8    bringing to bear the thousands of little kids with infections,

9    including all three of mine, and what antibiotic is going to

10   work?  What procedure to put tubes in the ear is going to work?

11   Do the adenoids have to be removed?

12        However, now if Dr. Barbee were to be presenting testimony

13   concerning her opinion as to the impact of microphages on the

14   ability of an incision to heal correctly and having written up --

15   and having written -- and having authored these scientific

16   opinions in the abstract, that would be quite a different

17   situation, it seems to me.

18             MR. NORTH:  I certainly agree with Your Honor that

19   every doctor brings their past treatment and experience to the

20   table in talking about their treatment of the patient at issue at

21   that time, but I think that what happened here, I would

22   respectfully submit, far transcends that example in cases.

23        A discussion of various attributes and her experience with

24   porcine dermis on Avaulta Plus.  Absolutely, her opinions on that

25   are not based on her treatment of Ms. Queen; have no relevance,

1    you're right, and it would be an admissibility issue at a later

2    time, also, but we believe it's an indication that they're going

3    beyond the treatment so that we're ambushed when we get there.

4         We don't know what these people are going to be talking

5    about if they're foraying into all of these topics beyond their

6    actual care of the plaintiff and we -- you mentioned earlier the

7    need for vigorous cross examination on the first argument and,

8    going back to that, if I could, we would respectfully request,

9    given the Court's ruling, that the Court at least follow the

10   other two cases relied upon by the plaintiff and require 72-hour

11   disclosure of us about the documents they have shown to that

12   doctor.  Otherwise, we can't go in there.

13        I mean we've produced several million pages of documents and

14   we don't know which ones they're going to pull out and show to a

15   doctor until we get there without a disclosure.  So we don't have

16   the opportunity to figure out what the date is or do any sort of

17   ample cross examination.

18        It's the same problem with these doctors coming in and

19   giving opinion testimony about issues beyond their treatment of a

20   specific plaintiff.  We're ambushed, I submit, every time because

21   we cannot prepare to cross them.

22        We don't have a report.  We don't have a report.  We don't

23   have disclosure of the documents.  We're walking in blind.

24        My partner, Jane Davis, called me right after I landed in

25   Atlanta Thursday night.  She had taken the deposition of Dr.

1    Barbee.  She is a -- has got more experience with scientific

2    issues than anyone I know in this profession.  She is a former

3    pharmacist before she went to law school and she just was

4    ambushed at Dr. Barbee's deposition because there had been no

5    disclosures, no information, about all these topics.

6         She was prepared to depose the expert, or the doctor, on the

7    treatment of Ms. Queen and this became a far-ranging deposition

8    and we submit that there needs to be expert reports if they're

9    going to go far afield from the treatment under the cases we

10   cited.  We believe she was effectively retained with their prior

11   meetings and we'd also submit that, regardless, there needs to be

12   some prior disclosure before we go into these depositions as to

13   what the documents were.

14            THE COURT:  Who wishes to respond from the plaintiffs?

15   Mr. Garrard?

16            MR. GERRARD:  I want to say something and then Mr.

17   Blasingame would like to comment to the Court, if he may.

18        The defendants are not surprised by the issues in these

19   cases.  They know what the issues are in these cases.  To say

20   that they are ambushed, they're not ambushed.

21        But what I would be willing to do, if the Court wants me to,

22   is if they want to know 72 hours ahead what are the documents

23   we've shown to a witness, I'm willing to do that.  We're not

24   trying to disadvantage anybody.  We're simply trying to prepare

25   our cases appropriately and, if that's something that the Court

```
 1    believes we ought to do, I'm certainly willing to do that.

 2            MR. BLASINGAME:  Your Honor, may I interrupt Mr.

 3    Garrard for just a moment?  I don't -- I don't mind the -- I just

 4    don't want -- I prepared a lot of these depositions, plaintiffs'

 5    depositions, and sometimes we're about 48 hours out before we

 6    know all the documents.

 7            THE COURT:  So you just wanted to reign him in a little

 8    bit?

 9            MR. BLASINGAME:  Yes.

10            MR. GERRARD:  I'm just too liberal, Judge.

11            THE COURT:  Next time, he'll put a choke collar on you

12    and just jerk on the leash.

13            MR. BLASINGAME:  I've been practicing law with him a

14    long time, Your Honor.

15            MR. GARRARD:  Another point, though, that I want to

16    make, Your Honor, is this.  In terms of a treating physician, he

17    or she brings to the table whatever their experience is across

18    the board, as Your Honor knows.

19        Dr. Barbee, I believe, and Mr. Blasingame or Mr. North can

20    correct me if I'm incorrect on this, Dr. Barbee, I believe, had

21    used or considered the Avaulta Plus product with the porcine and

22    had determined to go with the Solo product without any porcine

23    because of thoughts about that product.  So the doctor brings --

24    in arriving at a differential -- and that's what they're doing.

25    They're arriving at a differential in terms of what happened to
```

1    this patient?  Why did it happen?  They bring their whole breadth

2    of experience to it.

3            THE COURT:  Well, I'm going to accept Mr. Garrard's

4    offer to give notice to Bard.  I'm going to keep it to 24 --

5    excuse me -- 48 hours.

6            MR. NORTH:  Okay.

7            THE COURT:  And, however, at this point, I am not

8    persuaded that these treating physicians/surgeons are expert

9    witnesses.  My guess is, if they were willing and the plaintiffs

10   were willing for you to have an ex parte sit-down with you, Mr.

11   North, or Ms. Moeller, they would charge you by the hour, too,

12   and that wouldn't make them your expert witness.  I haven't seen

13   a doctor yet who is going to sit down with anybody without

14   charging them by the hour.

15           MR. NORTH:  My neighbor.

16           THE COURT:  Maybe when you're having cocktails.

17           MR. NORTH:  Right.

18           THE COURT:  But, at this point, under these

19   circumstances, I am not persuaded that these treating physicians

20   are expert witnesses, even though my guess is, because they are

21   performing delicate and technical surgery, that they are highly

22   experienced and do have their own medical opinions and scientific

23   opinions about various products, but that's what -- who they are

24   and so I have a couple of other -- or at least one other matter.

25       During the reading of this deposition, I saw that counsel

1    had agreed that objections would be noted simply, "Objection as

2    to form", that that phrase would be used to interpose an

3    objection, and so it was done repeatedly and I understand that

4    attorneys are concerned about preserving their objections at

5    depositions.

6         It's not clear to me whether in a bellwether case someone

7    like Dr. Barbee would actually appear and testify in person or

8    whether the videotape would be provided.  I mean do you all have

9    a sense for that, whether it's going to be live or not?

10            MR. GERRARD:  Your Honor, it's just going to vary.

11   Sometimes you get a doctor to come live, sometimes you can't.

12   And, frankly, a lot of it will depend upon the circumstances of

13   the doctor at the time of trial, and that works for both sides.

14            THE COURT:  Okay.

15            MR. NORTH:  That's my impression.  It would rarely

16   happen, though, I would think, that the doctor would come live,

17   which is why the disclosure for us to do appropriate cross

18   examination is so vital.

19            THE COURT:  All right.  Well, Tabitha, if you would

20   give them each a copy of this.

21            COURTROOM DEPUTY CLERK:  Yes, ma'am.

22            THE COURT:  I think you all are aware that I presided

23   over the discovery in this case known as *Feldman Production*.

24   During the course of that case, which also involved -- let me

25   just give you a little bit of background before you start reading

1    the order.

2              MR. NORTH:  I'm sorry.

3              THE COURT:  *Feldman Production* was owned by some

4    Ukrainians.  There were all kinds of international issues

5    involved, plus many of the issues that we have here of documents

6    being produced in a foreign language, the need for translation,

7    depositions to be taken of non-English speakers, the need for

8    complying with Hague Convention and other treaties, plus

9    substantial suspicion that the interpreters wouldn't accurately

10   interpret the question, so that not only did we have

11   interpreters, but we had checkers.

12        And seeing that on the horizon kept me up, awake one night,

13   and so I just told the lawyers in that case, unless somebody is

14   treading on your absolute privileged communication, don't make

15   any objections at all and nothing will be held against you.  In

16   other words, you can come in later, a certain amount of time

17   after a deposition is taken, after you have read it in peace and

18   quiet with no interruptions and, if you see that you should have

19   made a particular objection that's material and important, that

20   you can then interpose it, and I say this -- I'm just suggesting

21   that you all think about this technique and discuss it among

22   yourselves, seeing that depositions are full of utterly worthless

23   objections.  They're never really litigated.  They're never

24   really adjudicated prior to trial.  They just -- it's just kind

25   of yammering in the background.

1          And so I suggest to you, particularly for non-English

2     speakers, that you reach some kind of agreement along the lines

3     that I set forth in this order so as to make the job for

4     interpreters, and the witnesses, and the lawyers easier.  So

5     that's all I have to say.

6          MR. GARRARD:  Thank you for doing that, Your Honor.  I

7     can tell you, we have had instances, even with foreign witnesses,

8     not in this case, where you go back and you try to edit, and you

9     try to edit out many of the objections that, frankly, should

10    never have been made.  So the point of the Court is very well

11    taken and we will try to work together to see if we can do

12    something.

13         THE COURT:  I think -- I think that the amendments to

14    some of the rules, including -- is it 502 or whatever having to

15    do with clawbacks and -- is to take some pressure off lawyers and

16    not raise the issue of waiver which, of course, can just drive

17    people crazy.

18         MR. BLASINGAME:  Your Honor, there have been many times

19    in my career and in taking depositions that I have offered to the

20    other side, "You may reserve every objection known to man."  I've

21    never been taken up on that.

22         THE COURT:  That's right, because they want to

23    interrupt your questioning because you're too good, Mr.

24    Blasingame.  I understand that.

25         All right.  Well, I will be entering an order in this and

```
1    filing your letters, and it's always a pleasure to see you, and

2    let me know if I can be of any assistance.

3                MR. NORTH:  Thank you, Your Honor.

4                MR. GARRARD:  Thank you very much, Your Honor.

5                MR. BLASINGAME:  Thank you, Your Honor.

6                MR. BELL:  Thank you, Your Honor.

7                MR. GARRARD:  Thank you very much.

8           (Proceedings concluded at 2:00 p.m., August 2, 2012.)

9

10   CERTIFICATION:

11       I, Ayme A. Cochran, Official Court Reporter, certify that

12   the foregoing is a correct transcript from the record of

13   proceedings in the matter of In Re C. R. Bard, Inc.,

14   MDL NO. 2:10-MD-02187, In Re American Medical Systems, Inc.,

15   13 MDL No. 2325; In Re Boston Scientific Corp., MDL No. 2326; and

16   In Re Ethicon, Inc., MDL No. 2327, as reported on August 2, 2012.

17

18   s/Ayme A. Cochran, RPR, CRR                     April 2, 2013

19   Ayme A. Cochran, RPR, CRR                       DATE

20

21

22

23

24

25
```