# EXHIBIT 3

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2                        AT HUNTINGTON

 3   _____x
                                     :
 4   IN RE: C.R. BARD INC.,          :
     PELVIC REPAIR SYSTEM PRODUCTS    :  2:10-MD-2187
 5   LIABILITY LITIGATION            :
                                     :
 6                                    :
                                     :
 7   _____x

 8   THIS DOCUMENT RELATES TO ALL CASES :
     _____x
 9

10              TELEPHONIC STATUS CONFERENCE
           BEFORE THE HONORABLE CHERYL A. EIFERT,
11             UNITED STATES MAGISTRATE JUDGE
                 FRIDAY, AUGUST 15, 2014
12

13

14

15

16

17          CATHERINE L. SCHUTTE-STANT, RPR, RMR
                 Federal Official Court Reporter
18                300 Virginia Avenue, East
                          Room 6009
19                 Charleston, WV 25301
                      (304) 347-3151
20

21

22

23

24

25
```

```
 1    APPEARANCES:

 2              (VIA TELEPHONE)

 3    FOR THE PLAINTIFFS:

 4                        HENRY G. GARRARD, III, ESQ.
                          JOSH B. WAGES, ESQ.
 5                        Blasingame Burch Garrard & Ashley
                          P. O. Box 832
 6                        Athens, GA 30603

 7
                          DONALD A. MIGLIORI, ESQ.
 8                        Motley Rice
                          Suite 200
 9                        321 South Main Street
                          Providence, RI  02903

10

11              (VIA TELEPHONE)

12    FOR THE DEFENDANTS:

13
                          LORI G. COHEN, ESQ.
14                        CLIFF MERRELL, ESQ.
                          BETH K. TOBERMAN, ESQ.
15                        Greenberg Traurig
                          Suite 2500
16                        Terminus 200
                          3333 Piedmont Road
17                        Atlanta, GA  30327

18

19

20

21

22

23

24

25
```

```
1                    P R O C E E D I N G S
2              Had before The Honorable Cheryl A. Eifert, United
3      States Magistrate Judge, United States District Court, for
4      the Southern District of West Virginia, at Huntington, via
5      teleconference, on August 15, 2014, as follows:
6              COURTROOM DEPUTY CLERK:  Good morning.
7          I'd like to confirm that our court reporter today is on
8      the line, Cathy Stant.
9              COURT REPORTER:  Yes, Laura.  This is Cathy.
10             COURTROOM DEPUTY CLERK:  Cathy is on the line.
11     May I ask who is on the line for plaintiffs?
12             MR. GARRARD:  Laura, Henry Garrard and Josh Wages
13     from my office.
14             MR. MIGLIORI:  Don Migliori from Motley Rice.
15             COURTROOM DEPUTY CLERK:  I'm sorry, I did not get
16     your name.
17             MR. MIGLIORI:  Donald Migliori from Motley Rice is
18     also here.
19             COURTROOM DEPUTY CLERK:  Okay.  If you don't mind,
20     would you please spell your last name for me?
21             MR. MIGLIORI:  M-I-G-L-I-O-R-I.
22             COURTROOM DEPUTY CLERK:  Thank you very much.
23     Anyone else on the line for plaintiffs?
24         All right, let's have defense counsel, please.
25             MS. COHEN:  Good afternoon.  This is Lori Cohen
```

1    with Greenberg Traurig.  And I am in my office with Cliff

2    Merrell and Beth Toberman.

3              COURTROOM DEPUTY CLERK:  Is that everyone for

4    defendants?

5              MS. COHEN:  I'm not certain.

6              COURTROOM DEPUTY CLERK:  Okay.  If everyone will

7    hold one moment, I will get Judge Eifert.

8              MS. COHEN:  Thank you.

9              THE COURT:  How is everyone?  Hello.

10             MS. COHEN:  Good morning, Judge.

11             THE COURT:  Hello.  And we do have Cathy on the

12   line?

13             COURT REPORTER:  Yes, Judge.  This is Cathy.

14             THE COURT:  Hi, Cathy.

15             COURT REPORTER:  Hi, Judge.

16             THE COURT:  All right.  I do have the agenda, and

17   we might as well just dive right in.  Let's see, I have as

18   the first issue the Weiland deposition documents.  Who would

19   like to start?

20             MS. COHEN:  Yes.  I'm sorry.  This is Lori Cohen

21   on behalf of the defendant, and I have my partner, Beth

22   Toberman, who has been dealing with these issues, and I

23   would love for her to be able to respond if Your Honor

24   agrees.

25             THE COURT:  Certainly.

1          MS. TOBERMAN:  Hi, Judge Eifert.  This is Beth

2     Toberman.  So just to give you a brief update.  Bard has

3     provided plaintiffs with a list of documents that were

4     previously produced that are responsive to the requests 6

5     through 21 of the ninth set of document requests.  We have

6     also provided a production yesterday of documents responsive

7     to requests 6 through 12.  We are working on review and

8     production of additional documents responsive to these

9     requests.

10          In addition, plaintiffs recently, I guess about a week

11     ago, sought -- or requested that we search Mr. Weiland's

12     data and some additional custodian's data for additional

13     search terms.  Over a thousand search terms were provided to

14     us.  And we are in the process of running those searchs and

15     reviewing those data and making productions consistent with

16     their request.

17          We anticipate that we will have all of these

18     productions completed over the weekend.  It may be Sunday,

19     but that is ten days prior to the deposition.  And we've

20     alerted plaintiffs to that, that timeline.

21          THE COURT:  Okay.  All right.  Who would like to

22     speak to this issue on the plaintiffs' behalf?

23          MR. GARRARD:  Your Honor, I'll let Josh Wages, who

24     has been dealing with Ms. Cohen's office, respond.

25          THE COURT:  All right.

1          MR. WAGES:  Thank you, Your Honor.  We, at this

2    point, are working and I believe that our attempts to work

3    this out without the Court's involvement have been

4    successful.  I don't have anything to bring to the Court's

5    attention in terms of issues to raise.  And, so I think

6    that, provided we stay on track for this weekend's

7    production, that will give us these documents within ten

8    days, I don't think that we're going to have any issues to

9    raise.  So I believe that issue has been addressed.

10          THE COURT:  Well, that is very good news.  I'm

11    happy.  I'm very happy with both of you -- all of you.

12          (Inaudible speaker.)

13          THE COURT:  Yes, that's good.  All right.

14      Well, let's move on to number 2 then, use of

15    confidential documents during treating physician's

16    deposition.  Who would like to speak to that?

17          MR. GARRARD:  Judge, part of that at least is an

18    issue we raised, and Josh Wages has been in communication

19    with various plaintiffs' lawyers about at least some issues

20    pertaining to that, and since he's had the direct

21    communications, I'd like him to explain to it the Court,

22    please.

23          MR. WAGES:  This is Josh Wages.  Your Honor,

24    approximately a week to a week and a half ago, I received a

25    call from a plaintiff's lawyer with one of the initial trial

1    pool cases, I call them the Bard 200.  Other folks refer to

2    them as Wave one and two.  But this lawyer was in a

3    deposition and had attempted to use -- to show the doctor

4    some documents produced by Bard in this litigation that had

5    been marked as confidential.  And believing that he needed

6    to have a protective order signed, he attempted to do that

7    on the record during the deposition.  And it was related to

8    me by this attorney that defense counsel representing Bard

9    during this deposition essentially told this doctor that

10   these are confidential documents; Bard objects to their use,

11   and he's not required to sign the protective order.  And at

12   that point there was disagreement between the lawyers.  And

13   my understanding is that the doctor declined to sign the

14   protective order.  And the plaintiffs' lawyer was unable to

15   use the confidential documents.

16       I advised that attorney that if he felt strongly enough

17   about the issue and wanted to open that deposition back up,

18   that he contact the Court and bring it to the Court's

19   attention.  And I believe, at least he told me that he had

20   contacted your office and gotten some direction.  And I kind

21   of felt that the issue would be addressed.

22       But then I got a call a couple nights ago from another

23   attorney actually in the exact same situation, same defense

24   lawyer, and he wanted to know what to do about the

25   situation, because it had now come up, you know, again, and

1    again the same thing had occurred.

2       The doctor didn't sign the confidentiality order at

3    first.  I think they ultimately had some acrimonious back

4    and forth off the record, and ultimately the doctor was

5    persuaded to sign the confidentiality order.

6       But to get to our point, from a global perspective --

7    and I have raised this issue with Ms. Cohen and Mr.

8    Merrell -- our position would be that in order that the --

9    the protective order addresses the use of confidential

10    documents during depositions.  And our position would be

11    there's no need to have a doctor during a deposition sign a

12    protective order, because there is a provision under the

13    protective order that allows the doctor -- or, excuse me --

14    allows a party to designate the deposition testimony as

15    confidential.

16       And as I've kind of raised a couple of times with

17    defense counsel, the vast majority of the documents that are

18    at issue have been used in various pleadings filed publicly,

19    as well as at trial, so it's our position that the vast,

20    vast majority of the documents that are being used with

21    doctors during depositions are no longer entitled to

22    confidentiality in any event.  And that's -- we just want to

23    get some guidance so that I can properly advise other

24    plaintiffs' lawyers, if they should have another issue, how

25    to address this going forward.

1            THE COURT:  Yes.  I do, I do recall somebody had

2       contacted the office about that, and I checked the Pretrial

3       Order.  I think it might have been Pretrial Order Number 7

4       -- I'm just going on my memory -- but I looked at the

5       Pretrial Order, it was very clear to me that -- and I think

6       it involved the treating physician, it was a witness, who

7       was not a party, not employed by a party, not retained by a

8       party -- it was very clear to me that a witness such as a

9       treating physician is not required to sign a protective

10      order.  So I do not believe that a treating physician would

11      ever have to sign the protective order.  And I don't believe

12      that would prevent a party from using a confidential

13      document at a deposition.

14         I think the Order is very clear that confidential

15      documents can be used in depositions.  And there are

16      guidelines in place and precautionary safeguards in place to

17      handle that.  And none of those include making the witness

18      sign onto a protective order.

19            MR. WAGES:  Thank you, Judge.

20            MR. MERRELL:  Your Honor, I'm here on behalf of

21      Bard.

22            THE COURT:  Yes.

23            MR. MERRELL:  Sounds like you're pretty clear in

24      your decision.  I just wanted to raise, the only concern we

25      had is -- you're right, it is absolutely correct that the

1   documents are protected under the confidentiality order in

2   terms of Bard being able to designate those confidential.

3   Your Honor, our only concern really is that the doctor

4   becomes aware of the documents, and then outside of the

5   context of depositions, he could disclose the information in

6   those, in those materials, and that would be a problem with

7   a protective order.  But, Your Honor, if you're set in terms

8   of your decision, we're happy to communicate that on to

9   everyone here.  But that was sort of our view or our

10  concern, just so you understand, that was our concern, and

11  that's why we believed that the physician needed to sign

12  that agreement, and in many of the depositions the

13  plaintiffs' counsel agreed; that's why they had brought it

14  with them for the physician to sign.  Just so you understand

15  our position, that that was our concern.

16          THE COURT:  Well, what I -- you know, what I did

17  is I looked at what the Order said.  And the Order did not

18  say that a witness, such as a treating physician, had to

19  sign onto the protective order.  So I'm telling you what the

20  Order says.  It really wasn't me making a particular

21  decision one way or the other.  I'm telling you what the

22  Order said.  And the Order does not require anyone, such as

23  a physician -- and, you know, quite frankly, it makes

24  absolutely -- I really don't know how a court could order a

25  witness to be bound by a protective order like that when

1    they're not a party; they're not employed by a party;

2    they're not retained by a party.  They're just a witness.

3    I mean, I don't think you can force people to sign

4    protective orders.  You know, I think that goes a little

5    beyond the authority logically of the Court.  I'm sure --

6    I'm sure you could -- I'm sure these treating physicians

7    would just as soon not be involved in these lawsuits at all.

8    So if you gave them the option, they'd probably say, "Hey, I

9    won't sign that protective order, and I also won't give a

10   deposition."

11            UNIDENTIFIED SPEAKER:  Right.  Although I'd say,

12   Your Honor, in the vast majority of the cases the physicians

13   have signed them.  And they've been willing to agree to be

14   bound by it.  But our just looking at the protective order,

15   it essentially says that you can't disclose the information,

16   you can't -- the parties and the attorneys can't disclose or

17   divulge the information, except in accordance with the

18   Order.  And the Order doesn't really say, okay, if you're in

19   a deposition you can show it to somebody.  It has a very

20   strict way in which you sign the agreement to be bound by

21   the protective order, and that's really the only way you

22   could disclose.

23       But I don't want to spend too much time.  I was just

24   trying to state our position.

25            THE COURT:  You know, I feel very comfortable with

1     the way I've interpreted that Order, and I do not think it

2     requires a treating physician or a witness to, to -- I do

3     not think it requires them to sign the protective order in

4     order to be given a confidential document during a

5     deposition.  So, you know, that's the way I feel about it.

6     And I don't think you can require them to sign onto it.  If

7     they're willing to do it, then, you know, then that's fine.

8     But if they're not willing to do it, I don't think that you

9     can make them do it.

10           UNIDENTIFIED SPEAKER:  Okay.

11           MS. COHEN:  Judge, the other thing that comes to

12     mind, sometimes, you know, you'll say that this deposition

13     and the documents are subject to the protective order.  I

14     suppose you could advise a physician that they are

15     confidential documents and that, I don't think that --

16     without making him or her sign the agreement.

17           THE COURT:  Right.  You know, I would be -- I

18     would really, quite frankly, doubt that the physician's

19     going to rush out and talk to a lot of people about these

20     documents.  I mean, I don't know what you're showing them,

21     but I doubt that they have very much interest once they

22     leave the deposition.  They're not taking the documents with

23     them, right?  You're not giving them to them to keep?

24     You're just showing them documents during their deposition;

25     is that right?

1    UNIDENTIFIED SPEAKER:  That's correct, Your Honor.

2    THE COURT:  I mean, I really can't imagine they're

3    so interested in Bard's documents that they're -- you know,

4    can't wait to rush out and share all that information with

5    the people in their neighborhood or whatever.

6    MS. COHEN:  Well, I would think that is true.  The

7    only thing that comes to mind is, you know, I guess, you

8    know, you could have a physician who was shown them and then

9    talks to his other fellow colleagues at the hospital about

10   it, or, you know, that -- or shared the information at a

11   conference or something like that.  Hey, did you know I was

12   deposed last week by a plaintiff's attorney or defense

13   attorney, he showed me something that said, X, have you seen

14   that?

15      That's the only, I guess that was the only -- and look,

16   neither Mr. Merrell nor I was present, so we're getting all

17   that second and thirdhand anyway.  And honestly, with your

18   ruling, Your Honor, we aren't trying to bicker with you.  We

19   will advise the troops of your ruling and make it clear,

20   so --

21   THE COURT:  Okay.  Okay.  But, yes, you can tell

22   them that these documents are marked confidential and

23   they're meant to be kept within the litigation.

24   MS. COHEN:  Yes, I think that's perfect.  I think

25   maybe we can make that instruction or give that direction

1    without having them sign it, and that should probably solve

2    everyone's problems.

3         MR. WAGES:  This is Josh Wages, Your Honor.  Just

4    regarding that point, I think that there needs to be some

5    clear understanding on behalf of the lawyers who are

6    defending the deposition as to exactly what is no longer

7    entitled to confidential designation, because there have

8    been a number of these documents.  And truthfully, I think

9    nearly every one of the documents that are being used for

10   purposes of the learned intermediary inquiry on depositions

11   have been disclosed publicly in this litigation.  So to

12   represent that those documents are confidential is not

13   accurate at this point.

14     Now, if there are other documents that are still

15   entitled to a confidential designation, that's fair game.

16   But the vast majority of these documents are no longer

17   confidential.

18        UNIDENTIFIED SPEAKER:  Your Honor, that is true,

19   that point, some of them are not confidential.  I don't know

20   if it's the vast majority.  I mean, certainly I view and

21   there could be some -- but I don't know if it's the vast

22   majority.  I think we can simply tell the doctor, some of

23   these documents are confidential and should not be

24   disclosed.  I don't know that we point out each and every

25   one, that might be belaboring it too much.

```
 1          UNIDENTIFIED SPEAKER:  We can handle it.

 2          THE COURT:  I think that, you know, the

 3    bottom-line is that you're not going to be able to do much

 4    to enforce it if the doctor goes to the next hospital

 5    meeting and says, I saw a document that was, you know, from

 6    my deposition with Bard.  But I think you can say, these

 7    documents are marked confidential in this litigation, so

 8    you're really not supposed to disclose them, and leave it at

 9    that, you know.

10          UNIDENTIFIED SPEAKER:  Okay.

11          MS. COHEN:  So we'll pass it on to our side, Your

12    Honor.

13          THE COURT:  Okay.  All right.  The next issue,

14    reports the parties have agreed to revise.  I did see your

15    revised pathology protocol and that looked to be an

16    acceptable protocol to me.  I think it did incorporate

17    everything we had discussed.  I think Kate has it.  I know

18    she has it.  She had sent it to me and showed it to me.  And

19    I think she was -- maybe she had circled a typo or something

20    and was -- so that, I think you're getting ready to enter

21    that, are you not?

22          MS. COHEN:  Didn't we already admit that?

23          UNIDENTIFIED SPEAKER:  We did.

24          MS. COHEN:  Yeah, I think we already submitted

25    that, but if there's a typo, we can always reach out to Kate
```

1    and figure that out.

2              THE COURT:  She has shown that to me.  So I think

3    they're getting ready to maybe enter that.  And then I

4    think, as far as the motion, I need to do something with

5    that.  I was sort of holding onto that before I left for

6    vacation; I was waiting for you to get your protocol done.

7    So at this point I'll have to just do something to get that

8    motion resolved.  But it will most likely refer to the fact

9    that you agreed on a revised protocol, and I'll reference

10   the new PTO number.  All right.

11             UNIDENTIFIED SPEAKER:  Okay.

12             THE COURT:  Okay.  All right.  Now, going down the

13   issues raised by Bard.  The first issue I have here is

14   additional corporate deposition resolving duplicative

15   testimony.  Who would like to discuss that?

16             MS. COHEN:  I think we've decided, Your Honor, to

17   table numbers one and two from the discussion.

18             THE COURT:  All right.

19             MS. COHEN:  Take those off today, unless Mr.

20   Garrard or Mr. Wages disagrees with that, but I think we'd

21   decided we'd continue to discuss.

22             UNIDENTIFIED SPEAKER:  That's fine.

23             THE COURT:  All right, inappropriate use of

24   documents produced in CK litigation.

25             MS. COHEN:  Yes.  And I can handle that one, Your

1    Honor.  This one that we had on the agenda I believe last

2    time, maybe the last two -- well, I guess the last time.

3    And there is a separate litigation that I'm sure you are

4    aware of involving a hernia mesh product, Composite Kugel,

5    and it's impending before an MDL in Rhode Island.  It's not

6    a pelvic mesh product.  And we would say that the issues in

7    that relate to a component of the device or ring that in

8    some circumstances would break.

9         There were numerous documents, as you can imagine,

10   produced in that litigation subject to a protective order.

11   They weren't produced en masse in this litigation.  Again

12   it's a different physician of Bard, a different device,

13   different issue.  It's a recall issue.  So it's a very

14   different situation.

15        In this litigation, from time to time, plaintiffs have

16   sent us certain of the documents in the other litigation and

17   said, hey, we'd like your permission to use these, or, we'd

18   like your consent to use these in deposition, or, we'd like

19   your consent to basically have them produced in this

20   litigation.  And we've had back and forth on that.

21        And as has been, you know, our typical fashion, most

22   often we've agreed to the ones they've presented to us.  In

23   some recent depositions, you know, unfortunately we were in

24   the deposition being handed documents that had not been

25   provided to us previously.  And Mr. Merrell and I were kind

1    of quickly fumbling through our iPads and information trying

2    to see if we'd seen them.

3         So basically, they were documents from the prior

4    litigation or the separate litigation, brought to the

5    deposition in this case; ones that we had not agreed to

6    before, and, you know, the plaintiffs' counsel had tried to

7    use them with the witnesses, and we objected.

8         So because of that experience, we decided to nip it in

9    the bud, so to speak, and sent a letter at the end of July

10   saying that we're not comfortable with this process; if

11   there is something that they plan to use, using documents

12   from another litigation not produced in this litigation, not

13   agreed to, that we would object to it, but certainly if

14   there were any documents they wanted us to review, then send

15   them to us and we could have a back on forth like we had in

16   the past.

17        We have not received any formal response from

18   plaintiffs' counsel.  Mr. Migliori, who I think has been

19   handling this issue, and I were going to speak this morning

20   but we haven't had a chance to, and maybe we'll be able to

21   work it out.  But we're not comfortable with the -- I think

22   there were another 15 or so corporate depositions coming up

23   in the next month or two, with just having these documents

24   in the other litigation presented to our witnesses without

25   us having agreed to them being used in this litigation.  And

1    that's the essence of our objection and argument.

2         Again, we're always willing to work with opposing

3    counsel and try to reach agreement as to any specific ones,

4    but in the course and midst of the deposition, to have our

5    witness be confronted with a document from another

6    litigation, even if not involving Bard, we just, we don't

7    think that's appropriate.

8         THE COURT:  Right.  That seems like a legitimate

9    concern to me.

10        MR. GARRARD:  Your Honor, this is Henry Garrard.

11   Don Migliori has been working with this and he's been

12   involved in both the Kugel litigation and the Bard, which is

13   against Bard and the transvaginal mesh litigation against

14   Bard, and I have asked him if he would address this with the

15   Court.

16        MR. MIGLIORI:  Good afternoon, Your Honor.  I

17   just wanted to give you a little context to it, because, as

18   I understand the issue raised, basically, there were several

19   documents in particular that were put on this agenda that at

20   no point was it intended to either to work outside of an

21   understanding or to, to ambush a witness with a document.  I

22   think this is more of a misunderstanding than it is anything

23   else.  I have been the lead counsel in the Kugel mesh

24   litigation.  I have a little different view about the

25   relevance of that litigation.  The product involved there

1   involves the exact same meshes that are at issue here.  And

2   a lot of the witnesses in this litigation, in fact, do talk

3   about giving all of their expertise in mesh from Davol, the

4   sister company of Bard.

5       These two divisions that are subject to two litigations

6   are both sister companies underneath Bard and both worked

7   together on developing the women's health products that are

8   the subject of the litigation in West Virginia.

9       The protective order in Rhode Island actually

10  specifically allows attorneys from Motley Rice to use

11  documents in that litigation with parties to that

12  litigation.

13      So I just wanted to be clear, the protective order that

14  Ms. Cohen is speaking about actually is the cloak and

15  protection over everybody that was in the room and virtually

16  in this deposition that just took place last month where

17  this miscommunication arose.

18      Also, there were three other litigations before

19  Greenberg Traurig and Ms. Cohen got involved in this

20  litigation where Davol witnesses were deposed in the women's

21  health product MDL, but for, for their knowledge of Davol

22  mesh.  And counsel then was a counsel named Richard North

23  who had agreed that we could use documents that are relevant

24  to the witnesses from the Kugel mesh litigation; use the

25  documents from that litigation in the depositions that were

1    being taken pursuant to these notices of subpoena before

2    your court.

3        So there is a history of using these documents.  I have

4    no problem with the procedure of identifying the documents

5    intended to be used.  I don't think going through the

6    formality of requesting the documents from one litigation to

7    the other is one that needs to be employed.  Certainly, an

8    option, but I do think that meeting and conferring on the

9    documents is not unreasonable.  It wasn't done because it

10   hadn't -- it had been an understanding, again, before Ms.

11   Cohen got involved, that it wasn't necessary to do that if

12   they were in fact relevant and related.

13       So the seven documents that are referenced in this

14   agenda were documents that I presented to Mr. LeFever

15   (phonetic) last month.  I'm still under the protective order

16   by both courts, and the documents were inquired upon; the

17   witness answered the questions appropriately.  And the

18   documents share the same protections in this Court as they

19   did in the other court.

20       So I don't think there's a lot of -- I don't think

21   there's certainly any prejudice from the process.  There may

22   have been a misunderstanding because of a change of counsel,

23   about whether there was a need to go through a prior

24   meet-and-confer on them.  We would have strong objections if

25   there were problems with in the meet-and-confer using a

1    document from a litigation that related to the mesh, because

2    it's highly relevant, but I guess we can approach that as we

3    get -- go forward on these further corporate depositions.

4        I just didn't want there to be a record here that, that

5    there was any deviation from prior deposition procedures or

6    protocols, that there's anybody that saw documents that

7    weren't subject to both protective orders or that there was

8    any attempt to try to circumvent any of the orders.

9            MS. COHEN:  Your Honor, if I may just respond

10   briefly?

11           THE COURT:  Yes.

12           MS. COHEN:  I'm certainly not trying to cast any

13   aspersions on character or any mal intent.  I just think

14   that we were concerned in some of these depositions and

15   certainly going forward with documents from other

16   litigation, you know, this particular one or any other one

17   being used with our company witnesses.  And we have

18   produced, as I know you've heard us say many times, many

19   millions of pages, over 11 million, and I can't be

20   responsible for knowing every document in other litigation

21   as well.  I don't even think I am subject to the protective

22   order in the other MDL.  So I think that's a separate issue.

23       As to the agreement with prior counsel, Mr. North, we

24   specifically asked him about this issue.  And he said he

25   only agreed to a handful of documents in a December 2012

1    deposition of one witness, in particular, and that's

2    specific to that witness.  So he didn't give any kind of a

3    broad-brush agreement, at least that's what we were told,

4    and that's what we put in our letter to Mr. Migliori.

5        And, again, you know, we certainly worked it out in the

6    past.  When Mr. Wages sent us several batches of documents,

7    and we agreed to these, and we looked at them carefully and

8    said, okay, we could see some of the relevance.  But there

9    may be situations where we don't agree with the relevance.

10    And I think there are at least several of the documents

11    where we said, no, we don't see any relevance here.

12        Mr. Migliori mentioned that the witnesses said they got

13    all of their expertise.  I don't think that is accurate.

14    There has been testimony they got some aspects of expertise

15    from Davol.  And that's what we would look for in terms of

16    assessing individual documents.

17        So again, there haven't been a lot of battling over

18    this.  I think that most often we've been able to reach

19    agreements.  But what we're seeking from the Court is

20    guidance, and hopefully a, you know, a ruling or an

21    instruction that, going forward, if there are additional

22    documents other than the ones that we've already agreed

23    could be used, that we're given them in advance, and that we

24    have a chance to talk about them and meet and confer over

25    them.

1          THE COURT:  What, what sort of process as far as

2     how, how far in advance do you think you would need to have

3     the documents to give you sufficient time to review them and

4     meet and confer on whether they're relevant?

5          MS. COHEN:  Well, we know how busy everyone, you

6     know, is right now.  And probably if we had them a week in

7     advance.  Mainly Mr. Wages has been sending them to Mr.

8     Merrell.  And, in the past, and in large part, we agreed to

9     some of them, and some we didn't agree to.  So if there are

10    further documents like that, if they're provided to us a

11    week ahead of time, that would -- we'd be happy to work on

12    that expedited basis.

13         THE COURT:  So is there any disagreement with, on

14    the plaintiffs' side with sending the documents that you're

15    going to use that aren't from the transvaginal mesh

16    litigation in advance?

17         MR. GARRARD:  This is Henry Garrard.

18         COURT REPORTER:  I'm sorry, could you repeat your

19    name, please?

20         MR. GARRARD:  Mr. Migliori is going to say

21    something, and then I want to say something.  Go ahead, Don.

22         MR. MIGLIORI:  Thank you.  And I just -- I don't

23    have a problem with that, Your Honor.  As the Court knows,

24    from time to time there are -- you know, work that is done

25    on these depositions right up to the time of the deposition,

1    sometimes until the morning of the deposition.  I'd just

2    like it to be somewhat flexible.  And Ms. Cohen has been --

3    I don't want to suggest otherwise -- somewhat flexible that

4    if there is a document or two that come to the attention of

5    the person preparing for these depositions -- again, because

6    we're all going on so many directions at the same time in

7    this case -- that there be an open-mindedness about

8    reviewing the document there.  These generally are one-page

9    E-mails and things like that.  And some of them, in fact,

10   even have been publically disclosed as exhibits so they

11   don't have the protections anymore.

12        So as long as there's some kind of an understanding and

13   good faith ability to add to, to supplement that kind of

14   exchange, I don't have a problem with early disclosure of

15   documents.

16             THE COURT:  Yeah.

17             MS. COHEN:  Your Honor, I don't know if Mr.

18   Garrard wants to say anything.  I was just going to say, we

19   are flexible and I think we all work very well together.

20   And hopefully the Court can see that.  And if there are --

21   you know, I think we can say a week as an aspirational goal

22   and if there are some that come up at the last minute, we'll

23   be happy to work with plaintiffs' counsel on that.

24             MR. GARRARD:  Your Honor, this is Henry Garrard.

25   What I wanted to add to the mix was this:  I would like us

1    to have the ability from either side to come to Your Honor

2    if there is a document that one side or the other feels

3    strongly about that we can't agree upon, to bring that to

4    Your Honor's attention and get some ruling from Your Honor

5    in regard to a particular document, should that occur.

6              THE COURT:  Certainly.  Let me tell you, too,

7    today and yesterday, I ruled on some deposition designations

8    in the Ethicon case that is going to go to trial here

9    shortly.  And what I have noticed is there were a lot of

10   documents used that really didn't have anything to do with

11   the product that is at issue in the upcoming trial.  And, of

12   course, a lot of that had to do with the fact that, you

13   know, these were discovery depositions, and so there were,

14   there were questions being asked about all kinds of

15   products, and there were questions being asked about hernia

16   mesh and whatnot.  And, of course, the discovery is so much

17   broader than what would be admissible at trial.  But the

18   problem with doing that, when we get to the point of trying

19   to use these depositions at trial is, a lot of the questions

20   are getting excluded because the admissibility question is

21   different than the discovery question as far as the

22   relevancy and as far as what's prejudicial and what's

23   misleading, and what is -- so, you know, bear that in mind

24   when you're taking your depositions and you're using

25   documents that don't really have to do with the product.

1     I mean, I think -- because as I was going through these

2     depositions and I'm looking at what they're ultimately

3     designating and what the jury is going to hear, they're

4     losing a lot out of their depositions, because of the fact

5     that when they took the depositions, they put way too much

6     in that didn't have anything to do with, you know, the

7     product that's at issue.

8         I just make that point for you to, to bear that in mind

9     as you're taking depositions.

10         MR. GARRARD:  Your Honor, this is Henry Garrard.

11    I understand that, but in the things that we're talking

12    about here, there was a close communication between Bard

13    Urological and Davol in terms of the mesh, and there are

14    aspects of the mesh that relates to Davol products that go

15    hand in glove with the mesh in the transvaginal products.

16    So it's a case-by-case basis, and a document-by-document,

17    and witness-by-witness.  But there are many things that

18    would be certainly relevant, even though they don't talk

19    about, for example, the Avaulta product.

20         THE COURT:  Well, I understand.  I understand what

21    you're saying.  But the point I'm trying to make is that

22    you use a much sharper knife when you get closer to trial,

23    and I just think maybe you need to bear that in mind when

24    you're taking these depositions, because you sometimes wind

25    up then with a really choppy deposition that isn't nearly as

1    helpful.

2            MR. GARRARD:  We certainly had that experience in

3    the Bard system trial, Judge, and I understand it.

4            THE COURT:  Yeah.

5            MR. GARRARD:  And in Bard, this is not an

6    argument, but part of the practical problem is that many of

7    the depositions wind up having to -- application to

8    different products.

9            THE COURT:  No.  I understand.  And it's tough.  I

10   do, I understand that, yes.

11           MR. GARRARD:  Okay.  Yes, it is.

12           THE COURT:  I just thought I'd throw that in for

13   what it's worth.  But it sounds to me like you've reached

14   some sort of agreement on the fact that you can give some

15   advance notice on these documents.  So I think that's what

16   you need to do.  And a week doesn't sound unreasonable at

17   all.

18           MR. GARRARD:  We can generally do that, Judge.

19           THE COURT:  Okay.

20           MS. COHEN:  Thank you, Your Honor, we appreciate

21   it.

22           THE COURT:  Ex parte contact with physicians.

23           MS. COHEN:  Yes.  So this is an issue I think I

24   raised just briefly when we spoke two weeks ago at our last

25   telephonic conference, that looking ahead to the Pretrial

1    Order 131 and the parameters for the physician's written

2    question depositions and that, and how the ex parte, you

3    know, rules would apply.  I think I raised that just as a,

4    you know, as a preliminary matter.  And giving that, some

5    more thought about that, and we believe that the ex parte

6    ruling should be revisited.

7           THE COURT:  I'm sorry, Ms. Cohen.  I'm sorry.

8    Would you, would you restate again?

9           MS. COHEN:  Yes.  No problem.  So in light of the

10   Pretrial Order 131, the written question approach to

11   treating physician depositions.

12          THE COURT:  Yes.

13          MS. COHEN:  We believe in that light of that,

14   that, you know, we respectfully would request that the

15   ex parte ruling that was instituted a while back in the

16   litigation should be revisited in light of that new approach

17   to depositions of treating physicians via written questions.

18       And I think I raised that two weeks ago when we had our

19   telephonic hearing.  I realize it's not briefed yet or fully

20   presented.  So I thought today that I would propose that we

21   perhaps put together a briefing schedule on this issue, in

22   light of the Pretrial Order 131 schedule.  I think the

23   treating physicians likely would take place in October, so

24   we do have a little bit of time, but, you know, now that the

25   cases have been determined, the 300 cases, we would ask that

1    plaintiffs' counsel not reach out or have any contact or

2    have ex parte communication with the treating physicians

3    until this issue is resolved and until we can get it decided

4    by Your Honor.

5         MR. GARRARD:  Judge, this is Henry Garrard.  We

6    have an order that was entered by Judge Stanley.  It's

7    Pretrial Order Number 48, where we are allowed to have

8    ex parte contact, which the law allows us to have.  And,

9    frankly, we don't think that there is anything that changes

10   what the Judge did, or should change it.  We are under a

11   tremendous time crunch here.  We can't wait until October to

12   do justice to our clients in terms of speaking with treating

13   physicians.  And if it's got to be briefed, obviously, we'll

14   do it.  But this is an issue that, frankly, is already the

15   law of the case, Pretrial Order Number 48, and I don't see

16   that there's anything that's changed that should justify

17   changing what Judge Stanley's already ordered.

18        THE COURT:  Well, I'm not sure I'm clear on what

19   the -- what would the change be?  What is it you're

20   proposing, Ms. Cohen?

21        MS. COHEN:  Well, because under Pretrial Order

22   131, basically, you know, there would be the 30 written

23   questions per physician.  And the ex parte access will be

24   particularly prejudicial to the defense, if the plaintiffs,

25   you know, can basically put together their questions, talk

1     to the treating physicians, and then we wouldn't have the

2     ability to do the same.  So we think that that -- in light

3     of the unique aspects of Pretrial Order 131, that the

4     plaintiffs' can basically tailor their questions

5     specifically, and especially given the limited questions

6     that we're allowed, and the fact that they will only be in

7     writing, without any give and take, I think that just

8     changes the waterfront.  And, at least, we would ask in this

9     context, with this somewhat unique -- I've never experienced

10    an Order exactly like this in terms of treating physicians,

11    but in this context with this -- (inaudible) -- we be

12    allowed to -- either the plaintiffs not have ex parte

13    communications about the questions, about the depositions or

14    the restrictions; they not be able to basically preempt our

15    questions or see what the questions will be or give them the

16    answers ahead of time.

17         So we would just like an opportunity to brief that.

18    And while the briefing takes place, that for this 300 set of

19    cases, that plaintiffs' attorneys not be allowed to reach

20    out to them about this issue until we iron this out, which

21    should not take very long.

22              MR. GARRARD:  Judge, this is Henry Garrard.  And

23    nothing's changed.  They didn't have the right to go to

24    doctors when they were taking seven-hour depositions, and

25    they don't have the right now.  So, frankly, there is

1    nothing that has changed.

2        Now, I would say to Your Honor that when we responded

3    to Ms. Cohen's objections to Judge Goodwin's Pretrial Order

4    131, he had what objections she filed in Court.  And we

5    responded to those.  And, frankly, we're supportive of what

6    the Judge had done.  We did make one suggestion to the

7    Court, and that was that for the treating physician

8    depositions, that the Order be slightly modified, and that

9    would be that the defendant provide their 30 questions; we

10   then have those, and we do our 20 questions the Judge has

11   given us.  That those then both go to a court reporter, and

12   the court reporter sits down with the doctor to propound the

13   questions.  And that we have the right to be on the

14   telephone, each side, at that time, and that each side gets

15   a 15-minute follow-up.  If the Judge were to do that, that

16   would seemingly alleviate any problems Ms. Cohen has.

17       But the truth of the matter is, whether she had a

18   seven-hour deposition or whether she's got a deposition by

19   written questions, it doesn't change the fact that we had

20   the right to talk to the treating physicians.  In fact,

21   Judge Stanley mused in the hearing we had about that, that I

22   would be derelict if I didn't do that.

23       So I don't think there's any change that justifies any

24   modification of Judge Stanley's order.  And under the time

25   frame that we're having to work under from the plaintiffs'

1    side, who have the burden of proof, we have to move as fast

2    as we can move.  And we're trying to do that.

3        And the other aspect of it is, it's not like the

4    defendant hasn't had access to many of these doctors,

5    because they had them in training, they talked to them, they

6    wined them, they dined them.  So it's not like they've never

7    talked to the vast majority of these in planning positions.

8        THE COURT:  All right.  Well, number one, if,

9    Ms. Cohen, you're asking me to give permission for the

10   defense attorneys to talk to the treating physicians, that

11   is not something I can do, because I know in some states I

12   just absolutely cannot do that.  That would be against the

13   state law.  So I can't do that.

14       MS. COHEN:  Right.

15       THE COURT:  If you're asking me not to allow the

16   plaintiffs' attorneys to speak with the physicians prior to

17   the deposition, then Judge Stanley's already ruled on that.

18   And I'm not going to change her ruling on that.  And so if

19   you're asking me to enter an order that says that the

20   plaintiffs' lawyers cannot answer the deposition questions

21   for the doctors -- I mean, they would not surely do that,

22   because would that not be unethical for them to answer the

23   questions for the doctors?  I mean, these are deposition

24   questions.

25       Is that what you're asking me, to enter an order to

1    tell them they're not permitted to answer the questions for

2    the doctors?

3           MS. COHEN:  Well, no.  It's not -- and I agree it

4    would be unethical.

5           THE COURT:  Yes.  That would be unethical.

6           MS. COHEN:  But to, you know, to guide them in how

7    to answer the questions, I think that's a concern.  And,

8    again, we're really just asking that, in light of this

9    change of circumstance and new Pretrial Order, that we be

10    allowed to readdress the issue.  And as an example, there

11    is -- part of the order of Judge Stanley says that 48 hours

12    prior to the deposition of a treating physician or surgeon,

13    that copies of the documents that are going to be used in

14    the deposition will be produced to the defense.

15        And so, you know, it's hard to imagine how that's going

16    to work in the context of the written questions.  And Mr.

17    Garrard, I guess his proposal in response to the objection

18    is not something that we're willing to agree to, the way

19    that that's presented, but we can address that separately,

20    since we just received that I think yesterday.

21        But I think there were parts of the Pretrial Order 48

22    and Pretrial Order 131 which don't, for lack of a better

23    word, don't mesh very well together.  And, you know, I think

24    there are changed circumstances that require to take another

25    look at the issue.  And that's all we're seeking permission

 1     to do.

 2               THE COURT:  Well, you know -- I think as far as

 3     speaking to -- as far as ex parte contact with the

 4     physician, the traditional ex parte contact, I don't think

 5     that there's anything I would do to change that.  As I said,

 6     I don't think that I can give the defense attorneys

 7     permission to speak with the physicians.  Because, as I

 8     said, you know, the law varies, and in some states you just

 9     can't do it.  That's just the way it is.  And I couldn't

10     give you authority to do that.  And I don't think that I can

11     change Judge Stanley's ruling.  I mean, that is -- there

12     would be no reason to do that.

13         I mean, I think that is the law of the case as it

14     stands right now.  But I do -- I do think that maybe there

15     would be some reason to look at how this process should be

16     handled as far as the actual written questions themselves

17     and how that deposition in writing will take place.  But I'm

18     not sure -- you know, I'm not sure how we go about doing

19     that.  I don't think it needs to be briefed.  Maybe, maybe

20     there should be some discussion on how that can be carried

21     out in a way that makes the most sense.  Certainly neither

22     side ought to be telling the doctor how to answer the

23     question.

24               MS. COHEN:  Exactly.  And again I --

25               THE COURT:  Right, Mr. Garrard; you agree to that?

```
 1              MR. GARRARD:  Well, I can't tell a doctor how to

 2    answer anything under oath, Your Honor.

 3              THE COURT:  Right.

 4              MR. GARRARD:  I think I can say to a doctor:  You

 5    might be asked this question.  What would your answer be?

 6        I don't think there's anything wrong with that.  But I

 7    don't intend and don't think I could sit down and write out

 8    an answer for a doctor to a question that is going to be

 9    propounded to him through this process.  To me, what ought

10    to occur is this:  This is in the hands of Judge Goodwin

11    right now.

12              THE COURT:  Okay.

13              MR. GARRARD:  We responded to Ms. Cohen's

14    objections to the Judge's order.  And the only thing we

15    suggested in that related to exactly this.  And I just -- I

16    told the Court a moment ago, and I don't think you want me

17    to repeat it, the modification that we suggested, it's

18    before the Judge.  And Judge Goodwin will do whatever he

19    intends to do with it.  And I would think that's where it

20    probably should stay.  And if there's something that occurs

21    there that the parties think is a problem, then certainly we

22    can come back to either him or to you.

23              THE COURT:  Right.  I think the way to address it,

24    the way to address your concerns, Ms. Cohen, would be to try

25    to figure out how to handle this process so that -- I mean,
```

1    as Mr. Garrard says, maybe the way to do it is to submit the

2    questions to the physician at one time with a court reporter

3    present or something so that you would have some sense that

4    there isn't any back-dooring going on when the questions are

5    being answered.  I would certainly hope that no attorney

6    would sit down with a doctor and tell him how to answer

7    these questions under oath, because I just think that would

8    be absolutely improper.

9         MS. COHEN:  Right.

10        THE COURT:  You know, that just certainly is not

11   the way it should be done.  And I would think -- I would not

12   think that Judge Goodwin would have had that in mind when he

13   set this up.  So, you know, maybe that should be -- maybe we

14   ought to ask Kate about how that ought to be addressed

15   and --

16        MS. COHEN:  And we can certainly respond to that,

17   to what the plaintiffs filed and fill out our objection or

18   our further thoughts on what they proposed.

19        THE COURT:  Right.

20        MS. COHEN:  We basically told Ms. Fife that, while

21   we were filing that, that, -- what did we tell her?

22        UNIDENTIFIED SPEAKER:  For purposes of preserving

23   the record.

24        MS. COHEN:  For purposes of preserving the record,

25   that, you know, we weren't seeking any relief.  And if you

1   read our objection, we didn't seek any relief.  And we told

2   that to Ms. Fife ahead of time.  But now that the plaintiffs

3   have responded, I guess we may have to respond further.  And

4   again I don't want anyone to take my comments on this call

5   as an agenda to think I have any lack of respect for the

6   plaintiffs' attorneys, because I know that this is an

7   ethical group.  But I think there's a gray zone.  I don't

8   think Mr. Garrard or his team is going to -- or any of the

9   plaintiffs' attorneys are going to sit down and say, this is

10  how you must answer this, and let me hand you a sheet of

11  paper that dictates what you should say.  But even in the

12  way Mr. Garrard just made his comment gives me some

13  heartburn, because he said, you know:  You may be asked the

14  following question, and what would you say about it.

15       And of course as these written questions are delivered

16  to -- in a sequence of days, to a sequence of doctors,

17  obviously everybody will start to see the questions that

18  each side are asking.  And there's not much we can do to

19  change them completely.  And so they will have a preview.

20  And that's the part that gives me some heartburn, not

21  because I think anyone is intentionally trying to act

22  unethically, but, as I said, there is a gray zone.  Even in

23  the way Mr. Garrard said that:  You may be asked the

24  following question.

25       You know, it's what comes after that that concerns me.

1    Again, it's not about Mr. Garrard, but there are a lot of

2    people out there.

3              MR. GARRARD:  Your Honor -- I'm sorry.

4              THE COURT:  Of course that's what happens in those

5    ex parte conferences.  I mean, you know, that's what

6    happens.  The lawyer goes in and says to the doctor, you

7    know, I expect that -- I expect that the lawyer's probably

8    going to ask you this, that, and the other.  And if you're

9    asked that question, what are you going to say?

10      I mean, that's what happens at those conferences.

11   Whether the deposition is taken, you know, under oath, in

12   front of a court reporter orally, or whether it's done in

13   writing, that's what those conference are all about.  We all

14   know that.  So that's not anything different than the norm.

15      But I think there's maybe some way that the process

16   here could be shored up some so that, you know, that there's

17   no -- there's no participation of the lawyer in the actual

18   answering of the written questions.  And maybe that's what

19   needs to take place.  And I would say a way to do that is

20   figure that out maybe through Kate or something.

21             MR. GARRARD:  Your Honor, I would offer to Ms.

22   Cohen that if she wants to have a discussion with me and my

23   team about that, I'm happy to have that with her.

24             THE COURT:  Yes, you can figure out something, I'm

25   sure.

1          MR. GARRARD:  If she's got some idea that causes

2     her not to have a need for Rolaids, I'd be glad to talk to

3     her.

4          MS. COHEN:  Okay.

5          THE COURT:  Okay, all right.  The last issue here

6     is discovery under PTO 131, various deadlines and

7     coordination and depositions.

8          MS. COHEN:  We put this on the list, and I don't

9     think we have anything specific I guess until we get the

10    rest of it ironed out through -- (inaudible) -- flagging

11    this issue is something we will probably continue to talk

12    about, I would imagine.

13         The -- I guess a couple of things that I would just

14    alert the Court to is that we did speak with Mr. Garrard or

15    E-mail with him, you know, last week.  And he said that

16    because of the very, very expedited schedule and time frame,

17    that they recognize how quickly everyone needed to mobilize

18    and respond.  And so he said he was getting the word out to

19    his troops, and that hopefully they were going to get us

20    dates and proposed locations for the plaintiffs and spouses

21    that was in a manner sufficient for both sides.

22         And so we received some of those, I don't have the

23    exact counts, like Monday and Tuesday of this week, but

24    there are many of the 300 that we have not received any

25    communication, any -- no date, any -- anything at all.  So

1    we have concerns about that.  And probably we will need -- I

2    think you said two weeks ago that we may need to start

3    Noticing, if we haven't heard from anybody.  So we're

4    probably going to have to do that next week.

5            MR. GARRARD:  Lori, if you would send to Josh and

6    get Cliff to send to Josh the names of the firms who had not

7    propounded dates to you.

8            MS. COHEN:  Okay.

9            MR. GARRARD:  I would be more than happy for Josh

10   to reach out to them.  I think for all of the cases that my

11   firm has, I believe we have already given you dates for all

12   of them, but if you've got people that haven't and you would

13   like us to reach out to them, I will.

14       I will tell you and tell Judge Eifert that I have had

15   two lengthy phone conference calls with all of these people

16   and have told all of them that they needed to get deposition

17   dates to you immediately.  And I don't mind reaching out

18   again, because I'd like to see this move as expeditiously as

19   possible as well, but I don't know who has not given you

20   dates.  But if you want to give that to us, we'll reach out

21   again.

22           MS. COHEN:  Okay.  Yes, we will do that.

23           THE COURT:  Because, really, I mean, it's been two

24   weeks now.  Really, I mean, they should have had dates for

25   everybody by now.

1        MR. GARRARD:  Well, they got all mine, Judge.

2        THE COURT:  Okay.  Well, they need all the rest.

3        MR. GARRARD:  Well, if she'll tell me -- if she'll

4    tell Josh -- we all know who does the work -- if she'll tell

5    Josh, he'll reach out to them immediately.  And if they --

6    and then if they don't do it, then they're on their own.

7        THE COURT:  All right.  What you can do after

8    that, Ms. Cohen, is just start Noticing depositions.

9        MS. COHEN:  Right.  And we had communication with

10   Mr. Garrard where I think we were in agreement to try and do

11   everything in a coordinated way, maybe at centralized

12   locations, to try and make it as efficient as we could, from

13   both sides.

14       THE COURT:  Right.

15       MS. COHEN:  Hopefully, that's going to work.  But

16   we'll -- I guess we'll report back at our next call.

17       THE COURT:  Okay.  Sounds great.  All right.

18   Well, that looks like we've gone through what was on the

19   agenda then.

20     Is there anything else?  We have a couple of minutes

21   left.

22       MR. GARRARD:  Not from the plaintiffs' side,

23   Judge.  Thank you very much.

24       THE COURT:  Thank you.  Ms. Cohen?

25       MR. GARRARD:  Have a good weekend.

1          THE COURT:  You, too.

2          MS. COHEN:  No, we're good.  Hope your vacation

3    was good.

4          THE COURT:  It was very nice.  It was great.  I

5    got to see some of my friends from high school, a couple

6    that I hadn't seen in 37 years.

7          MS. COHEN:  Wow.

8          THE COURT:  It was great.  I know it was really

9    fun.  So, just girls, so that was fun.

10          MS. COHEN:  That would be great.

11          THE COURT:  It was.

12          MR. GARRARD:  I have to tell you a little story on

13    that.  I went to my 50th high school reunion recently.  And

14    as I start walking in, I overheard the conversation of

15    several of them, and the first conversation was:  How many

16    bypasses have you had?  And the second --

17          THE COURT:  That's depressing.

18          MR. GARRARD:  How long have you been on that

19    walker?  And of course my wife went with me.  I haven't had

20    bypasses, and I don't need a walker.  And I said, I think

21    it's time for us to leave.  This just doesn't have a good

22    flavor to it.

23          MS. COHEN:  I'm sure Judge Eifert friends didn't

24    have any of those issues.

25          THE COURT:  No, no, no.  We're all young girls

1    yet.

2            MR. GARRARD:  You all are young people.  Have a

3    good weekend, Judge.

4            THE COURT:  You, too.  Thank you.

5            MR. GARRARD:  Thank you.  Bye-bye.

6            MS. COHEN:  Thank you very much.

7            THE COURT:  Bye-bye.

8        (Proceedings concluded at 3:58 p.m.)

9                    REPORTER'S CERTIFICATE

10        I, Catherine L. Schutte-Stant, Official Court

11    Reporter of the United States District Court, for the

12    Southern District of West Virginia, do hereby certify that

13    the foregoing proceedings were transcribed by me to the best

14    of my ability, and said proceedings are a true and accurate

15    transcript from my stenographic notes.  I further certify

16    that I am neither related to any of the parties by blood or

17    marriage, nor do I have any interest in the outcome of the

18    above matter.

19

20    NOVEMBER 10, 2014     s/CATHERINE L. SCHUTTE-STANT, RPR, RMR

21                         _____

22

23

24

25