IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

IN RE: ETHICON, INC.

PELVIC REPAIR SYSTEMS
PRODUCTS LIABILITY LITIGATION
-----------------------------------------------------------

MDL NO. 2327

*This Document Relates To Ethicon Wave 1 Cases*

**PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION TO ENFORCE PRETRIAL ORDER # 17**

COME NOW, Plaintiffs in the above-captioned MDL and file this their Response in Opposition to Defendants' Motion to Enforce Pretrial Order # 17 and show the following:

**Argument and Citation of Authority**

Defendants' motion, which seeks to impose arbitrary and unfair limitations on Plaintiffs' rights to conduct discovery, has no basis in any rule or order and should be denied.

1. **PTO #17 is inapplicable by its terms to this wave process.**

Defendants' motion purports to seek to "enforce" a Pretrial Order (PTO #17) that was entered nearly three years ago (October 4, 2012) for purposes of the initial group of "bellwether" trial selection cases. By its express terms, PTO #17 has no applicability here in this trial wave process consisting of 200 cases. This Court has entered a detailed Docket Control Order dated August 19, 2015 (PTO #193 (as amended by PTO #195)) that expressly governs and controls for purposes of this wave process. Defendants' argument that the three-year-old PTO #17 entered for purposes of the initial bellwether process would control for purposes of this wave process flies in the face of the plain terms of both PTO #17 and PTO #193.

1

Defendants point to the introductory paragraph of PTO #17 for their contention that this three-year-old PTO should govern discovery in this wave process. Defendants conveniently ignore the language in PTO #17 that addresses the DFS process, specifically Paragraph 3 and its subparagraphs. Paragraph 3(a) of PTO #17 states unequivocally that "A Defendant Fact Sheet ('DFS')…shall be completed **only in those cases selected as a subgroup (not to exceed 20 cases) from which the final bellwether selection will be made**." (Emphasis added). If PTO #17 controlled here, as Defendants contend, then no DFS would be due in this wave process because these 200 wave cases are not part of the initial bellwether subgroup.[1]

Furthermore, Paragraph 3(b) of PTO #17 provides that "Defendants shall submit a substantially completed DFS for each case in the 'subgroup' identified in 3.a above **within 45 days after the entry of the Order establishing the 'subgroup' plaintiffs**." (Emphasis added). Thus, if Defendants were correct that PTO #17 is controlling here, then every DFS in this wave process would be due October 5, 2015, or 45 days from the entry of PTO #193. PTO #193 expressly provides that a DFS is due in these wave cases by November 19, 2015.

Even though PTO #17 only requires a DFS for the initial bellwether cases, Defendants certainly do not contend that no DFS is due in any of these wave cases. Likewise, even though PTO #17 makes the DFS due 45 days from the date of an order establishing the subgroup, Defendants would never take the position that the DFS's are due in these cases October 5, 2015 (45 days from the entry of PTO #193). For Defendants to maintain that certain language from Paragraph 3 of PTO #17 should control here, while other language in the very same paragraph makes it abundantly clear that PTO #17 has no applicability to this wave process, is logically indefensible. Defendants' motion should be denied.

---

[1] Similarly, no Plaintiff Fact Sheet would be required either as PTO #17 limits their submission to those within the Discovery Pool of the bellwether process.

**2. This wave process is governed by PTO #193 (as amended by PTO #195), which imposes no limitation on Plaintiffs' ability to conduct written discovery beyond an outside deadline and numerical limitations.**

PTO #193 expressly governs discovery in this wave process. Plaintiffs have a right to seek written discovery and requests for admission pursuant to Federal Rules 26, 33, 34 and 36, as well as under the plain terms of PTO #193, which expressly contemplates written discovery beyond the DFS. Defendants' attempt to limit Plaintiffs' ability to obtain written discovery until after the DFS responses are served simply has no basis in PTO #193. While PTO #193 provides numerical limitations and that any written discovery must be served by not later than January 4, 2016, it does not establish any ordering of discovery, and it does not otherwise purport to limit Plaintiffs' written discovery until after DFS responses are served. Plaintiffs' case-specific discovery is being sought, in part, for purposes of plaintiff and treating physician depositions that are currently being scheduled. If Plaintiffs are required to wait until after November 19th to serve individual discovery, as Defendants contend, then these depositions will almost assuredly have been taken before it could reasonably be anticipated that any response would be forthcoming to such written discovery. Therefore, to limit the Plaintiffs in the manner sought by this motion would effectively defeat the purpose of serving individual written discovery on the Defendants, and would defeat Plaintiffs' ability to conduct individual discovery in these cases. Such an inequitable result should not be allowed.

**3. Defendants' arguments to impose an unfair and arbitrary limitation on Plaintiffs' ability to conduct written discovery cannot survive scrutiny.**

Defendants argue that they need Plaintiffs' PFS responses before they should have to respond to DFS responses. (Dkt. No. 1717, p. 6 ("Until Defendants receive the completed PFS, they cannot collect and produce complete and accurate responses to the DFS, or for that matter, any other case-specific discovery sought by Plaintiffs.")). Such contention is demonstrably false.

The information required to be produced by Defendants by way of the DFS – information that is exclusively within the Defendants' possession – is in no way dependent upon whatever information may be contained in any Plaintiffs' PFS response.[2] Indeed, in the initial bellwether process in this MDL, the PFS and DFS were due simultaneously. (*See*, Dkt. No. 386 (both PFS and DFS due April 8, 2013)). However, the timing of PFS and DFS responses are simply not at issue in this motion. The sole issue presented in this motion is whether Plaintiffs are somehow limited by way of any rule or order in their ability to obtain written discovery from Defendants; the answer is clear that Plaintiffs are not so limited.

Defendants next argue that the information sought by way of Plaintiffs' written discovery is somehow duplicative or redundant of the same information that will be produced in their DFS. (Dkt. No. 1717, p. 6 ("…Plaintiffs' written discovery seeks precisely the types of information and documents that are covered by the DFS," and thus "effectively seek premature DFS responses….")). Contrary to such argument, however, the individual discovery served by Plaintiffs is aimed at facts, documents and admissions beyond what is covered in the DFS.[3] If

---

[2] The categories of documents and information required to be produced under the DFS are "Contacts With Treating and Evaluating Physicians" (referring, of course, to Defendants' contacts with those doctors); "Sales Representative Contacts" with plaintiffs' physicians; "Information Regarding the Plaintiff" (referring to information exclusively within the Defendants' possession, such as any communication by Defendants with the Plaintiff, if any, or MedWatch or Adverse Event Reports regarding Plaintiffs' injury); and, "Manufacturing Information" (information relating to the lot/batch of the plaintiff's implant). Plainly, none of this information would depend on what a Plaintiff happens to say in her PFS. Furthermore, Plaintiffs would obviously have no need for Defendants to provide them information that would be apparent from their PFS forms; Plaintiffs would necessarily already have that information.

[3] Merely by way of example, Plaintiffs have propounded written discovery relating to any surveillance or internet/social media investigation conducted relative to the Plaintiffs by the Defendants or their representatives. Plaintiffs have requested information about every implantation procedure conducted by Plaintiffs' physicians attended by any employee or representative of Defendants. While the DFS is arguably limited to contacts with treating physicians, Plaintiffs have served discovery for communications by Defendants with the medical facilities where the Plaintiffs were implanted. Plaintiffs have also served "contention interrogatories" (what evidence supports the defense's contentions, such as the plaintiff was an inappropriate candidate for mesh, the doctor was negligent or did not implant the device in accordance with instructions, or the plaintiff caused or contributed to her injuries) that are not within the DFS.

there were any information in the Plaintiffs' individual discovery requests that Defendants intend to produce in response to the DFS, then it would be a legitimate response for Defendants to simply say "this information will be produced with their DFS."

Although Defendants criticize the Plaintiffs for allegedly attempting to accelerate the case-specific discovery process, which is not the case, it should be noted that the Defendants have requested Plaintiffs to accelerate their case-specific PFS responses in cases where depositions have been scheduled on or before the PFS deadline.[4] In other words, Defendants seek accelerated discovery from the Plaintiffs, but Defendants do not want to answer Plaintiffs' case-specific discovery in a timely fashion. In light of Plaintiffs' prior experience with the Defendants' DFS responses (in the bellwether process and other trial selected cases), Plaintiffs anticipate that it may be necessary to seek the Court's involvement in order to obtain full and appropriate responses.[5] Plaintiffs do not want to delay depositions or other discovery while

---

Plaintiffs have also served requests for admission, which are expressly allowed under PTO #193, and which are not related to any DFS response. Finally, given Ethicon's admission that many, if not most, of the sales representative's records have been destroyed in violation of its own litigation hold letters (See Letters dated April 2, 2013, June 13, 2013, and January 8, 2015 attached hereto as Exhibits 1 through 3), Plaintiffs have sought full custodial files for these individuals as well as copies of any litigation hold letters that we sent to them by Ethicon.

[4] Plaintiffs' counsel has attempted to accommodate such requests by defense counsel for expedited PFS responses within reason. It should further be noted here that, with respect to the preliminary PPF process, Defendants have been aggressively policing alleged deficiencies, and have not hesitated to move for sanctions and/or dismissal based on PPF deficiencies.

[5] For example, the Defendants have consistently answered prior DFS requests regarding Defendants' communication with Plaintiffs' treating physicians with improper boilerplate such as "Ethicon does not maintain a database or any centralized records that track the contacts between physicians and sales representatives," and "Generally Ethicon does not maintain a 'call notes' database or any other centralized source that tracks contacts with physicians." If Defendants intend to maintain their consistent, boilerplate position that they do not have any of the documents or information that they are required to (and agreed to) produce in response to the DFS, then Plaintiffs will have no choice but to file motions to compel production of this information. Defendants necessarily maintain communications with the doctors who use their products; they just don't want to search for it or have to produce it.

undertaking whatever means may be necessary to get complete answers to this important written discovery.

Defendants' final complaint is that responding to any additional written discovery prior to the DFS deadline would be "unduly burdensome." (Dkt. No. 1717, pp. 6-7). In considering the Defendants' claimed "undue burden" in responding to discovery and/or DFS's in these cases, Plaintiffs would point out that PTO #193 imposes reasonable limitations on the numbers of interrogatories and requests for admissions, and Plaintiffs have served only limited requests for production beyond the few document requests in the DFS. Furthermore, Plaintiffs point out that the Defendants in these cases have engaged several of the nation's largest law firms, in addition to their primary defense firm, Butler Snow, to defend these wave cases. Respectfully, Defendants have ample resources to meet their discovery obligations in these cases. Plaintiffs would further point out the fact that the Plaintiffs in the Bard MDL wave cases and in the Boston Scientific MDL wave cases served individual case-specific discovery on the Defendants beyond the DFS. No argument was raised by either Bard or Boston Scientific that Plaintiffs' ability to conduct written discovery was in any way limited by the DFS in terms of timing or substance, like the Defendants argue here. By claiming an "undue burden," Defendants effectively seek to nullify the Plaintiffs' ability to conduct discovery beyond their DFS, at all, which would run directly counter to the express terms of PTO #193. Plaintiffs bear the burden of proof in these cases and certain of the evidence bearing directly on the issues in these cases is exclusively within Defendants' possession, and Defendants' claim of burdensomeness should not override Plaintiffs' rights to discovery under the Federal Rules and under PTO #193.

Written discovery should be concluded *before* depositions are taken where possible.[6] Plaintiffs cannot fully prepare for the numerous Plaintiff and treating physician depositions that must be taken in these cases without first obtaining discovery of all relevant facts and documents in the Defendants' possession.[7] In both the Bard and the Boston Scientific MDLs, the Court's DCO for the wave processes expressly recognized the necessity of receiving written discovery responses prior to depositions, providing that "[i]f the deposition of an implanting physician is scheduled before the deadline to provide a DFS, [the defendant] shall provide a DFS in each such case at least 14 days prior to the implanting physician's deposition." (Case No. 2:12-md-2326, Dkt. No. 794 (PTO #100), ¶ C.9); *Accord*, Case No. 2:10-md-2187, Dkt. No. 841 (PTO #118), ¶ C.10)). Under the arbitrary deadlines urged by the Defendants in this motion, it would be impossible for Plaintiffs to conduct meaningful written discovery before the deposition and expert report deadlines imposed under PTO #193. Ideally, all Plaintiffs' and treating physicians' depositions would be completed prior to Plaintiffs' expert report deadline (December 17, 2015) so that their experts can review all of the relevant testimony and documents produced by the Defendants.[8] If Plaintiffs were not allowed to serve written discovery on Defendants until

---

[6] If depositions were taken in a given case, and then subsequent written discovery were to reveal information that would impact the deposition testimony, that could warrant a motion for leave to take another deposition and/or to reopen discovery in that case. Delaying discovery until after depositions are largely concluded – as suggested in Defendants' motion – would be costly and time-consuming for all parties, and would unduly burden the Court with dealing with such matters. Defendants merely seek an unfair litigation advantage.

[7] Defendants would certainly never agree to proceed with Plaintiffs' depositions without first obtaining all relevant discovery from Plaintiffs, including full PPF and PFS responses and all available medical records and other materials in Plaintiffs' possession.

[8] The DFS deadline here (November 19, 2015) allows less than one month before Plaintiffs' expert report deadline (December 17, 2015). In BSC, by comparison, the Plaintiffs' expert report deadline (October 29, 2014) was seven months from the DFS deadline in Wave 1 (March 21, 2014) and three months from the DFS deadline in Wave 2 (July 14, 2014). In Bard, the Plaintiffs' expert report deadline (October 6, 2014) was five months from the DFS deadline for Wave 1 (April 28, 2014) and four months from the

7

November 19, 2015, as Defendants urge here, then Defendants' responses would not even be due until after the Plaintiffs' expert report deadline. Allowing Defendants to arbitrarily create a deadline for written discovery that has no basis in any rule or order would effectively allow them to delay discovery to the point that it is useless in preparing expert reports and in conducting depositions, the only reasons that this discovery was sought in the first instance.

Dated: October 5, 2015.

          Respectfully submitted,

          /s/ Henry G. Garrard, III
          Henry G. Garrard, III, Esq.
          Georgia Bar No. 286300
          Blasingame, Burch, Garrard & Ashley, P.C.
          440 College Avenue
          P.O. Box 832
          Athens, GA 30603
          (706) 354-4000
          (706) 549-3545 (fax)
          hgg@bbgbalaw.com

          /s/ D. Renee Baggett
          Bryan F. Aylstock, Esq.
          Renee Baggett, Esq.
          Aylstock, Witkin, Kreis and Overholtz, PLC
          17 East Main Street, Suite 200
          Pensacola, Florida 32563
          (850) 202-1010
          (850) 916-7449 (fax)
          rbaggett@awkolaw.com

---

DFS deadline for Wave 2 (May 19, 2014). Given that Plaintiffs' deadlines are tighter and more demanding here, it is not unfair or "unduly burdensome" that Defendants similarly face tighter deadlines.

## CERTIFICATE OF SERVICE

I hereby certify that on October 5, 2015, I electronically filed the foregoing document with the Clerk of the court using CM/ECF system which will send notification of such filing to the CM/ECF participants registered to receive service in this MDL.

/s/ D. Renee Baggett
D.Renee Baggett, Esq.
Aylstock, Witkin, Kreis and Overholtz, PLC
17 E. Main Street, Suite 200
Pensacola, FL 32563
850-202-1010
850-916-7449
rbaggett@awkolaw.com