# Exhibit 2

Confidential - Subject to Protective Order

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

- - -

IN RE:  ETHICON, INC.        :  MDL NO. 2327
PELVIC REPAIR SYSTEM         :
PRODUCTS LIABILITY           :
LITIGATION                   :


- - -

THIS DOCUMENT RELATES TO ALL CASES

AND VARIOUS OTHER CROSS-NOTICED ACTIONS

- - -

Wednesday, August 15, 2013

VOLUME II

- - -

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER


         Videotaped Deposition of THOMAS A.
BARBOLT, Ph.D., held at Riker Danzig Scherer Hyland
Perretti LLP, Headquarters Plaza, One Speedwell Avenue,
Morristown, New Jersey, on the above date, beginning at
9:03 a.m., before Margaret M. Reihl, a Certified
Realtime Reporter, Certified Court Reporter, and Notary
Public.


- - -



GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph|917.591.5672 fax
deps@golkow.com

Confidential - Subject to Protective Order

Page 367

1    appropriate animal model, right?

2                        MR. THOMAS:  Object to the form of the

3    question.

4                        THE WITNESS:  The information gained

5    from the suture strand in the back of a rat gives a lot

6    of information about the potential for carcinogenicity

7    of any device.

8    BY MR. THORNBURGH:

9    Q.      Doesn't give you the same information?

10   A.      That's correct.

11                       MR. THORNBURGH:  Mary Ellen, were you

12   able to identify what document this came from?

13                       MS. SCALERA:  Ms. Stigman is trying to

14   look it up on the system.  I'll let you know as soon as

15   possible.

16   BY MR. THORNBURGH:

17   Q.      We talked yesterday somewhat about your

18   involvement with or your involvement with a discussion

19   at least that you had with David Robinson and the risk

20   of -- the risk in humans of particle loss or fraying.

21           Do you recall that discussion?

22   A.      I recall some e-mails.  I don't know that I

23   responded in that e-mail string.  I don't recall, but I

24   do recall generally what you're talking about.

25                       (Document marked for identification as

Confidential - Subject to Protective Order

Page 368

1          Deposition Exhibit No. T-2115.)

2                    MR. THOMAS:  Just for the record, you've

3   marked this as 2115?

4   BY MR. THORNBURGH:

5   Q.      Yeah, I'm sorry.  It's been marked -- the

6   exhibit has been marked 2115 ETH.MESH.00863391.

7           And you see this is an e-mail from Dan Smith on

8   February 27th, 2004, right?

9   A.      Yes.

10  Q.      And the subject line is "2 TVT complaints

11  concerning allegedly brittle mesh."

12          You see that?

13  A.      Yes.

14  Q.      And as we did yesterday, I'd would like to turn

15  to -- turn to the second page and we'll work backwards.

16          And the original e-mail is from Bernhard

17  Fischer to Janice Burns with that same subject line,

18  the importance is high, and Bernhard says or

19  Mr. Fischer says to Janice Burns or discusses with

20  Janice Burns two TVT complaints regarding mesh TVT Blue

21  and the TVT obturator system.

22          And if you look down at the paragraph after

23  that it says, "Dr. Mirna noticed that small blue

24  particles kept falling off the mesh, as if the mesh was

25  as he put it 'brittle'."

Confidential - Subject to Protective Order

Page 369

1          Do you see that?

2    A.    Yes.

3    Q.    And then below that it says, "since our mesh is

4    now blue, would it be possible that this was always the

5    case but now it is simply visible as opposed to before

6    the introduction of TVT Blue?"

7          Do you see that?

8    A.    Yes.

9    Q.    Okay.  So there's a discussion about complaints

10   that are coming in about the TVT losing particles,

11   right?

12   A.    Yes.

13   Q.    And you recall that being an issue when you

14   worked for Ethicon, don't you?

15   A.    Yeah, I recall some discussion of that.

16   Q.    Well, if you turn to the front page, Dan

17   Smith's response, he says, "this is not new, and was

18   exactly the original issue that stopped TVT Blue for

19   months.  The fix (I'm not sure how complete) is to cut

20   the mesh using ultrasonics, but it has not been

21   validated and I'm not sure where it sits on the

22   Operations priority list.  I recall it was scheduled

23   for mid to end of 2004."

24          He goes on to say, I believe that the board has

25   to set a directive that can be filtered down to the

Confidential - Subject to Protective Order

Page 370

1   reps, saying it's OK and it's not an issue, same as TVT

2   clear except you can see it.  By the way, you can also

3   see it in the packages of the pieces as the pieces fall

4   out of the sheath splits.

5          This is not going away any time soon and

6   competition will have a field day, major damage control

7   offensive needs to start to educate the reps and

8   surgeons up front that they will see blue shit and it

9   is okay.  This is why I wanted to launch TVTO in clear.

10         You see that?

11  A.      Yes, I see that.

12  Q.      Did you ever do any preclinical -- or did Dan

13  Smith or anybody ever ask you to do a preclinical study

14  of the blue shit that's falling off the mesh?

15  A.      No, I don't think so.

16  Q.      Instead Dan Smith -- you know Dan Smith, right?

17  A.      Yeah, I know Dan.

18  Q.      He's not a doctor, right?

19  A.      He's a project leader type.

20  Q.      Not a doctor, right?

21  A.      Not an MD.

22  Q.      He's in the research and development

23  department?

24  A.      Yes, I guess in the project management side of

25  things.

Confidential - Subject to Protective Order

Page 371

1    Q.      And Dan Smith rather than -- Dan Smith never

2    came to you and said, hey, Dr. Barbolt, why don't we

3    test these blue particles that are falling off of our

4    meshes to make sure that there's not an increased risk

5    to patients, right?

6    A.      I don't recall whether or not he did.

7    Q.      Well, you didn't do a test, right?

8                    MR. THOMAS:  Object to the form of the

9    question.

10                   THE WITNESS:  I did not.

11   BY MR. THORNBURGH:

12   Q.      That would have been something you could have

13   done?

14                   MR. THOMAS:  Object to the form of the

15   question.

16                   THE WITNESS:  As I read this memo,

17   frankly, I tend to agree that the small particles of

18   polypropylene may have always been there but were clear

19   and gone unnoticed.

20   BY MR. THORNBURGH:

21   Q.      That wasn't my question, Doctor.

22           My question to you was you could have tested it

23   preclinically in animals to see what the additional

24   risk of this -- these particles falling off of the

25   product is, right?

Confidential - Subject to Protective Order

Page 372

1   A.        TVT tape was tested in a one-month study.

2   Q.        My question was specifically looking at the

3   particles, you could have done that?

4   A.        Although it wasn't blue at that time, there

5   were no particles of clear observed in the tissue

6   sections either.

7   Q.        Because you couldn't see it.  Once they dyed it

8   blue, then all of a sudden, you can see it.  It becomes

9   obvious.  Dan Smith says it's been there all along, but

10  now you can see it because we dyed it blue.

11  A.        Well, you would see the clear in a tissue

12  section.

13  Q.        Dan Smith is saying this has been -- this is

14  not new and was exactly the original issue that stopped

15  TVT blue for months.

16            Do you think the blue pigmented dying of the

17  filaments somehow caused the mesh to start to lose

18  particles?

19  A.        No.

20  Q.        It's because now you could see it, right?

21  A.        I think so.

22  Q.        And so my question to you still remains, you

23  could have done a study preclinically to review what

24  the additional risk was associated with these particles

25  that are falling off, right?

Confidential – Subject to Protective Order

Page 373

1                    MR. THOMAS:  Object to the form of the

2     question.

3                    THE WITNESS:  Well, we did a one-month

4     intramuscular implantation study, and particles of

5     clear were not observed.

6     BY MR. THORNBURGH

7     Q.       Did you --

8     A.       That tells me that the risk would be very small

9     or nonexistent.

10    Q.       Did you ever take the particles, the blue shit

11    that Dan Smith is talking about, and cut open the back

12    end of a rat, put those particles inside the rat to see

13    what the inflammatory response would be?

14    A.       Such a study was done in the one-month

15    intramuscular study.  If there were particles present,

16    they would have been observed in the tissue section,

17    and we would have seen a very similar tissue reaction

18    to the particles as what we see to the filaments of the

19    mesh.

20    Q.       That wasn't my question.

21             My question was did you ever just take the

22    particles, cut open the back end I think you called it

23    the ass end of a rat, take that -- as Dan Smith calls

24    it the blue shit, put it in the rat and see if there is

25    an inflammatory response to the particles?

Confidential - Subject to Protective Order

Page 374

1    A.      No.

2                MR. THORNBURGH:  I'm going to go ahead

3    and mark a document internal Ethicon document as

4    Exhibit Number 2116, ETH.MESH.02180828.

5                (Document marked for identification as

6          Deposition Exhibit No. T-2116.)

7                MR. THORNBURGH:  And I'll go ahead and

8    also mark a document that goes with it, the ETH.MESH

9    number 02180828, and it's been marked as Exhibit Number

10   2117 -- sorry, that's not right.

11               I've marked the document with

12   ETH.MESH.02180833 as Exhibit 2117.

13               MR. THOMAS:  I need one more page,

14   please.

15               (Document marked for identification as

16         Deposition Exhibit No. T-2117.)

17   BY MR. THORNBURGH:

18   Q.      So if you turn to Exhibit 2116, it's a -- first

19   off, at the top of it is a letterhead -- it's a

20   letterhead telefax and it says "Johnson & Johnson

21   Medical Switzerland."

22               You see that?

23   A.      Yes.

24   Q.      And then the date is November 10th, 2004, and

25   it's to a David Menneret from a person named Sibylle

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Subject to Protective Order

Page 375

1   Basso or Basso, and subject is TVT Blue.

2          You see that?

3   A.     Yes.

4   Q.     It says, please see the attached letter of

5   Mister PD Dr. Eberhard.  (He is one of our most urgent

6   customers).  Hope you understand a little German.

7          You see that?

8   A.     Yes.

9   Q.     "Is there a process ongoing concerning the

10  production of TVT Blue tape?  Do you have received any

11  other comments like that one?  Is the problem

12  communicated to the organization (Steve Belle)?  If

13  not, what could we do?"

14         So if we turn now to the translated letter from

15  Dr. Eberhard, this says, Dear Emilie, please find

16  attached a TVT tape --

17  A.     Hang on.

18  Q.     Sorry.  It's on Exhibit 2117.

19  A.     Okay.

20  Q.     "Please find attached a TVT tape, which was

21  used as a demo unit for patients before they have their

22  operation.  Already at the operation it is embarrassing

23  to see how the tape is crumbling.  But it gets worse if

24  there is a stretch on the tape.  It is urgent that

25  Johnson & Johnson quickly produce a tape that is solid

Confidential – Subject to Protective Order

1    and weaved."

2            You see that?

3    A.      Yes.

4    Q.      Okay.  And this is one of the problems that

5    we've just discussed, and there's other complaints with

6    the tape appearing as it's crumbling or appearing as

7    it's brittle or the particles falling off of the

8    product, right?

9                MR. THOMAS:  Object to form of the

10   question.

11   BY MR. THORNBURGH:

12   Q.      Exhibit 2115?

13   A.      I was looking at Exhibit 2116, and I see a

14   picture of the tape at the bottom, and it looks more

15   than just some particles falling off.  It looks

16   different than I would have expected.

17   Q.      Why don't we go ahead and pull up the tape that

18   you're referring to.  Now, if you go to Exhibit 2116,

19   that's the picture that you're referring to, right?

20   A.      No, the one on the previous page.

21   Q.      Okay.  So if you go to the previous page --

22   A.      Yes.

23   Q.      -- you blow up that picture at the bottom.

24           So a picture was provided in the original

25   letter from Dr. Eberhard, correct?

Confidential - Subject to Protective Order

Page 377

```
 1                    MR. THOMAS:  Object to form of the
 2    question.
 3    BY MR. THORNBURGH:
 4    Q.       According to this exhibit, right?
 5    A.       As indicated in these documents.
 6    Q.       And look at that picture.  Did you ever test
 7    what that type of mesh with all the frayed edges -- I
 8    mean, it looks like a saw, right?
 9                    MR. THOMAS:  Object to the form of the
10    question.
11                    THE WITNESS:  As indicated in the German
12    -- I'm just reading these documents, I've never seen
13    these before.
14    BY MR. THORNBURGH:
15    Q.       Right, but --
16                    MR. THOMAS:  Let him finish.
17                    THE WITNESS:  I've never seen them
18    before.  I'm reading them, and as an scientist, I'm
19    offering up an interpretation, and I also note in the
20    German response that the TVT tape was used as a demo
21    unit.  So I'm not sure how much handling that tape has
22    had, to have that sort of appearance.
23    Q.       Did Dr. Eberhard's letter says -- let's keep
24    that picture up there, first off.  Let's talk about the
25    picture.
```

Confidential - Subject to Protective Order

Page 378

1          You see that tape?  You can look at the screen,

2    if you want, Doctor?

3    A.      Yes, I see it.

4    Q.      That's embarrassing, isn't it?

5               MR. THOMAS:  Object to the form of the

6    question.

7               THE WITNESS:  I'm not sure what was done

8    to this tape to make it look this way.

9    BY MR. THORNBURGH:

10   Q.      Dr. Eberhard says, already at the operation, it

11   is embarrassing to see how the tape is crumbling,

12   right?

13              MR. THOMAS:  Object to the form of the

14   question.

15              THE WITNESS:  I see the words.

16   BY MR. THORNBURGH:

17   Q.      And then he sends this picture of the tape that

18   he was referencing in his letter, which is all torn up

19   with all these frayed edges, and it looks like a saw at

20   the edges of that tape, doesn't it?

21              MR. THOMAS:  Object to the form of the

22   question.

23              THE WITNESS:  It looks broken down.

24   BY MR. THORNBURGH:

25   Q.      Is that the type of product Ethicon was

Confidential - Subject to Protective Order

Page 379

1   implanting permanently in the vaginas of women all

2   across the world?

3                    MR. THOMAS:  Object to the form of the

4   question.

5                    THE WITNESS:  It says that it's used as

6   a demo unit.  I'm not sure how much stretching and

7   handling it's had.

8   BY MR. THORNBURGH:

9   Q.       That's the tape -- according to Dr. Eberhard,

10  that's the TVT tape that he got from Ethicon and was

11  preparing for an operation, and it was all torn up,

12  broken down with all these frayed edges, frayed in such

13  a way that it looks like a saw, right?

14                   MR. THOMAS:  Object to the form of the

15  question.

16                   THE WITNESS:  I hear your description of

17  it.  I'm not sure how it was handled to make it look

18  that way.

19  BY MR. THORNBURGH:

20  Q.       Well, you can look at it, it's on the screen.

21  A.       I can see it in the documents.

22  Q.       Well, I got it blown up for you, Doctor, on the

23  screen, if you want to take a look at it?

24  A.       My eyes are pretty good for that size of

25  object.

Confidential - Subject to Protective Order

Page 380

1   Q.      That's pretty nasty looking mesh, isn't it?

2                   MR. THOMAS:  Object to form of the

3   question.

4                   THE WITNESS:  It is what it is.

5   BY MR. THORNBURGH:

6   Q.      And women are being implanted with Ethicon's

7   TVT tape all across the world, aren't they?

8                   MR. THOMAS:  Object to the form of the

9   question.

10                   THE WITNESS:  I don't think the tape

11  looks like that when it comes out of the package.

12  BY MR. THORNBURGH:

13  Q.      Women in New Jersey, women in Florida, women in

14  California, women in West Virginia are being implanted

15  with this stuff, this TVT mesh, right?

16                   MR. THOMAS:  Object to the form of the

17  question.

18                   THE WITNESS:  I don't think it looks

19  like that when it comes out of the package for

20  implantation.

21  BY MR. THORNBURGH:

22  Q.      Dr. Eberhard says it's embarrassing, the tape

23  is crumbling.  That's what Dr. Eberhard said.  He's a

24  doctor that's actually treating women, right?

25                   MR. THOMAS:  Object to form of the

Confidential - Subject to Protective Order

Page 381

1    question.

2                    THE WITNESS:  He also says it's used as

3    a demo unit.

4    BY MR. THORNBURGH:

5    Q.      He also says it's embarrassing, doesn't he?

6    A.      I see those words.

7    Q.      And you never tested in women what the risk of

8    particle loss or fraying was, you never tested --

9    strike that.  Let me ask a better question, because I

10   know it was poorly started.

11                   You never tested in animals what the additional

12   risk of the particle loss was, right?

13                   MR. THOMAS:  Object to form of the

14   question.

15                   THE WITNESS:  Other than the 28-day

16   study.

17   BY MR. THORNBURGH:

18   Q.      Right, but you didn't take the particles and

19   dump it into the back end of a rat and see what that

20   risk would be, correct?

21   A.      No, we did not.

22   Q.      You didn't look at what the risk of --

23   specifically what the risk of this nasty crumbling tape

24   is even in rats or guinea pigs or shoot(sic), did you?

25                   MR. THOMAS:  Object to the form of the

Confidential - Subject to Protective Order

Page 382

1    question.

2                    THE WITNESS:  I would say that a bunch

3    of particles are not implanted in patients.  The tape

4    is implanted in patients and any associated particles.

5    Those particles, although clear, would have been

6    observed in the tissue sections in the 28-day study.

7    BY MR. THORNBURGH:

8    Q.     8.5% particle loss, almost 10% of y'all's

9    meshes was falling apart into these little particles

10   and crumbling, as Dr. Eberhard says, right?

11                   MR. THOMAS:  Object to the form of the

12   question.

13                   THE WITNESS:  I see his words in this

14   memo.

15   BY MR. THORNBURGH:

16   Q.     Did you know that 8.5%, almost 10% of the mesh

17   was lost to particles?

18                   MR. THOMAS:  Object to form of the

19   question.

20                   THE WITNESS:  I didn't know that number.

21   BY MR. THORNBURGH:

22   Q.     Did you take 8.5% of the mesh, the blue shit

23   that Dan Smith was talking about, throw it in the back

24   end of a rat to see what the additional inflammatory

25   response would be to those particles?

Confidential - Subject to Protective Order

Page 383

1                    MR. THOMAS:  Object to form of the

2    question.

3                    THE WITNESS:  No, other than testing the

4    tape and any associated particles.

5    BY MR. THORNBURGH:

6    Q.    Exhibit 2117, Dr. Eberhard says, I can't

7    understand that no one will solve that problem for such

8    a long time.  At the latest, as the tape has becoming

9    blue, everyone has realized that the quality of tape

10   is, in Dr. Eberhard's words, terrible, right?

11                   MR. THOMAS:  Object to form of the

12   question.

13   BY MR. THORNBURGH:

14   Q.    That's what he writes?

15   A.    That's what he writes.

16   Q.    To Johnson & Johnson?

17                   MR. THOMAS:  Object to form of the

18   question.

19                   THE WITNESS:  That's what it looks like.

20   BY MR. THORNBURGH:

21   Q.    And it says, please see the picture of the

22   I-STOP tape of Hausmann.  A tape has to be weaved and

23   should not crumble.  Please try one and you will see

24   that the tape is crumbling.

25               That's what Eberhard says, right?

Confidential - Subject to Protective Order

Page 384

1                    MR. THOMAS:  Object to form of the

2    question.

3                    THE WITNESS:  Yes.

4    BY MR. THORNBURGH:

5    Q.     He's an important doctor in Germany, right?

6                    MR. THOMAS:  Object.

7                    THE WITNESS:  I don't know him.

8                    MR. THOMAS:  Object to the form of the

9    question.

10                   Are you finished with that exhibit?

11                   MR. THORNBURGH:  Yes.

12                   MR. THOMAS:  We went seven hours

13   yesterday.  We've gone another hour today, which is

14   more than the seven hours the MDL allows.

15                   MR. THORNBURGH:  I've got some more

16   questioning.

17                   MR. THOMAS:  Well, I understand that.

18   How much do you have?

19                   MR. THORNBURGH:  This is -- I'm going

20   through these exhibits pretty fast.

21                   MR. THOMAS:  I just ask you how much you

22   have?

23                   MR. THORNBURGH:  I don't know.  I can't

24   tell you.  Probably at least till noon.

25                   MR. THOMAS:  Is New Jersey counsel going

Confidential - Subject to Protective Order

Page 385

1    to ask questions today?

2                    MR. MUHLSTOCK:  I don't expect to.  This

3    is Todd Muhlstock of Sanders Viener Grossman for New

4    Jersey plaintiffs.

5                    MR. THORNBURGH:  It may take me all day.

6    It may take me all day to get through these documents.

7    I don't know.

8                    MS. SCALERA:  Can we hear what New

9    Jersey counsel has to say, please.

10                   MR. MUHLSTOCK:  The New Jersey

11   plaintiffs are not prepared to examine the witness

12   today.  It wasn't expected that there would be any time

13   available and until late yesterday did not know that

14   there would be time, and, apparently, there may or may

15   not be.  So at this point, we maintain our position

16   that we will review the transcript and determine

17   whether we need to continue the deposition at a later

18   date for the New Jersey plaintiffs.

19                   MR. THOMAS:  Let's take a break, please.

20                   THE VIDEOGRAPHER:  Going off the record.

21   The time is 10:01 a.m.

22                   (Brief recess.)

23                   (Deposition resumes at 10:15 a.m.)

24                   MR. THOMAS:  I'm sorry, I didn't catch

25   counsel for New Jersey's name.

Confidential - Subject to Protective Order

Page 386

1                    MR. MUHLSTOCK:  Todd Muhlstock,

2     M-u-h-l-s-t-o-c-k.

3                    MR. THOMAS:  Thank you.

4                    As the parties know, the MDL has been

5     trying to coordinate depositions of witnesses with New

6     Jersey.  Ethicon has been trying to cooperate with

7     counsel to provide adequate time for the depositions of

8     these witnesses.  I advised counsel in the MDL,

9     Mr. Anderson, earlier in the week that unless counsel

10    for New Jersey was going to participate in the

11    deposition so we could complete it in the time that was

12    provided, that we would hold the deposition time to the

13    seven hours that the federal rules permit and which has

14    been discussed with the magistrate now on a couple of

15    occasions.

16                   I asked Mr. Thornburgh last night at the

17    close of the first day when we did six hours 59 minutes

18    how much time he expected today and I was told about an

19    hour.  I was also told that somebody from New Jersey

20    would be here today, and I appreciate the fact that,

21    Mr. Muhlstock, you weren't part of that conversation,

22    and I appreciate your comments this morning that you

23    just learned about this and New Jersey is not prepared

24    to go forward today.  But I am concerned about

25    continuing the MDL deposition.

Confidential - Subject to Protective Order

Page 387

1              From what Mr. Thornburgh tells me, it
2    may be the rest of the day and then have to return for
3    a further deposition of Dr. Barbolt for a fact
4    deposition.  He's been deposed for two days already as
5    a 30(b)(6).  It's anticipated he'll be deposed again,
6    and Mr. Thornburgh tells me before the break that he
7    may go all day.
8              The reason why I went an extra hour
9    today was to try to accommodate you, and I would like
10   some commitment from you about what you expect for the
11   rest of the day so I can determine whether I have to
12   stop the deposition or whether we can reach an
13   accommodation.
14             MR. THORNBURGH:  Right.  Well, what I
15   told you was I want to get out of here just as much as
16   everybody else does, and what I told you was -- well,
17   yesterday I told you I don't know, it could be an hour,
18   it could be longer.  Today I told you hopefully by
19   noon, but it could be longer.
20             What I'm telling you is I want to get
21   out of here, and I'm going to try to get out of here by
22   noon.  What I don't know is how he's going to respond,
23   but if you want me to commit to noon, I can commit to
24   noon.  I can get done and out of here by noon, if
25   that's what you're asking for, but I don't know how

Confidential - Subject to Protective Order

1   he's going to respond to questions, and that's part of

2   an issue.

3                    I mean, the first part of this whole

4   morning the responses that I got were nonresponsive to

5   the questions I asked, and that can sometimes cause,

6   you know, a little bit of a delay, but I think we'll be

7   able to move through these documents rather quickly.

8                    MR. THOMAS:  Okay, we'll go to noon and

9   we'll stop at noon.

10                    MS. SCALERA:  I'd like to put something

11   on the record for New Jersey.  Pursuant to our last

12   telephonic case management conference with Judge

13   Higbee, the defendants were supposed to be made aware

14   of what counsel would be taking the deposition on

15   behalf of New Jersey counsel prior to the deposition

16   date, and we were never so told, nor were we ever told

17   that there would be a problem with New Jersey counsel

18   attending or completing the deposition today, so I just

19   want to note for the record that Judge Higbee's

20   instructions were not followed and that we have no

21   reason to believe that New Jersey counsel would not

22   finish the deposition also today.

23                    MR. MUHLSTOCK:  This is Mr. Muhlstock.

24   I'm responding regarding the comment that it was

25   unknown whether we would attend or be able to complete

Confidential - Subject to Protective Order

Page 389

1    today.  I don't know what discussions were had with

2    other people directly on firsthand knowledge, but I was

3    told that everyone was aware of the situation.  I know

4    for sure that Adam Slater has been involved in this and

5    had this similar conversation regarding other

6    depositions, wherein the defendants in the MDL

7    expressed similar concerns, and he pointed out how it's

8    impossible for New Jersey attorneys to gauge in advance

9    how long a particular witness' deposition is going to

10   take and this one is a perfect example.  If we were

11   prepared to be there yesterday, we wouldn't have been

12   able to start yesterday.  Now we're here today, we

13   don't know if we would be able to even start today.  So

14   it's, you know, the same conversation has been had

15   before, and I don't know anything about violating a

16   specific directive of Judge Higbee.  I find it hard to

17   believe that that was done, but, again, I don't have

18   firsthand knowledge of it, but I'll look into it and

19   get back to counsel.

20             MS. SCALERA:  Okay.  But we expect that

21   New Jersey -- if New Jersey at all expects to question

22   this witness, that it be done today when the witness is

23   present, when MDL counsel finishes, which he has

24   represented will be at noon.  Thank you.

25             MR. MUHLSTOCK:  I'm sorry.  I didn't

Confidential - Subject to Protective Order

Page 390

1    hear that.  Can I have it repeated please or read back.

2                    MS. SCALERA:  It's going to be read

3    back.

4                    (The court reporter read back the record

5         as requested.)

6                    MR. MUHLSTOCK:  Well, I'll respond

7    further on the record, please.  As has been discussed

8    on the record between MDL plaintiff's counsel and

9    defendant's counsel, there's continuing dispute as to

10   how quickly this can be done, whether it should have

11   been done yesterday, whether the witness is answering

12   the questions asked, which I have to agree he has not

13   thus far, and that's probably one of the reasons this

14   is extended to a second day.  Whatever defense

15   counsel's expectations are, our position is what I've

16   stated our position is, so it appears the expectations

17   are inconsistent with that, and it is what it is, I

18   guess.

19                   MS. SCALERA:  We'll let the record stand

20   as it is.

21                   MR. MUHLSTOCK:  Thank you.

22                   THE VIDEOGRAPHER:  We're back on the

23   record.  Here marks the beginning of Volume 2, Tape

24   Number 2 in the deposition of Dr. Thomas Barbolt.  The

25   time is 10:22 a.m.

Confidential - Subject to Protective Order

Page 391

1    BY MR. THORNBURGH:

2    Q.       I have premarked as Exhibit Number 2118 a

3    letter dated October 12th, 2005 from Carol Holloway.

4    Bates number is ETH.MESH.03535750.

5               (Document marked for identification as

6               Deposition Exhibit No. T-2118.)

7    BY MR. THORNBURGH:

8    Q.       Okay.  You have this document in front of you,

9    Exhibit 2118?

10   A.       Yes.

11   Q.       And this -- in this letter Carol Holloway to

12   Herve Fournier says, thank you for telling us about

13   your customer's experience with a TVT device.  It was

14   reported that unraveling and tape became particles.

15   After implantation of the device the staff discovered

16   that there was remaining particles in the box.  Device

17   implanted without problems.  No consequence.  Our

18   physician -- or sorry -- our physical examination of

19   the product returned did confirm the fraying.  Fraying

20   is inherent in the product based on the mesh

21   construction.

22               Did I read that accurately?

23   A.       Yes.

24   Q.       She goes on to say, "when any amount of tension

25   is applied to the mesh, fraying occurs."  So this is

Confidential - Subject to Protective Order

Page 392

1    yet another complaint being reported to Ethicon or

2    Gynecare or Johnson & Johnson regarding the problem

3    that physicians were having in the field who were

4    implanting patients with Ethicon's device regarding

5    unraveling and particle loss.

6           That's what this letter would be appear to be,

7    correct?

8    A.     Yes.

9                  MR. THOMAS:  Object to form of the

10   question.

11   BY MR. THORNBURGH:

12   Q.     And, again, you were working with Gynecare

13   during this time period, right, with Ethicon?

14   A.     Yes, I was at Ethicon at this time.

15   Q.     And she goes on say, particles are made of

16   Prolene as the mesh and so are nonreactive.

17          That's not an accurate statement, is it?

18                 MR. THOMAS:  Object to form of the

19   question.

20                 THE WITNESS:  Reactivity is relative.

21   For clinicians, nonreactive I believe is appropriate.

22   For implant pathologists looking at particles in the

23   body, there may be a mild, chronic inflammatory

24   reaction, as you would see with the mesh itself.

25

Confidential - Subject to Protective Order

Page 393

1    BY MR. THORNBURGH:

2    Q.        Right.  So there is going to be a reaction.

3    There's going to be a foreign body reaction, as happens

4    with every foreign body implanted in the human body,

5    right?

6    A.        Yes.

7    Q.        So, in this case, with particles being lost

8    inside the human body during the implantation of the

9    mesh, you're going to have increased foreign body

10   reactions?

11                   MR. THOMAS:  Object to form of the

12   question.

13   BY MR. THORNBURGH:

14   Q.        Each of those particles that are loose inside

15   the woman's pelvis are going to trigger an inflammatory

16   response similar to a splinter in the finger, right?

17                   MR. THOMAS:  Objection.

18   BY MR. THORNBURGH:

19   Q.        There'll be an inflammatory response to that

20   splinter, right?

21   A.        Yes.

22   Q.        And there's going to be an inflammatory --

23                   MR. THOMAS:  Just note my objection to

24   the question.

25   BY MR. THORNBURGH:

Confidential - Subject to Protective Order

Page 394

1    Q.      There's going to be an inflammatory response to

2    the particles that are loose with inside the woman's

3    pelvis, right?

4                    MR. THOMAS:  Object to the form of the

5    question.

6                    THE WITNESS:  Yes.

7    BY MR. THORNBURGH:

8    Q.      And that inflammatory response can result in

9    granuloma formation around each one of these particles

10   contained within the woman's pelvis, right?

11                   MR. THOMAS:  Object to the form of the

12   question.

13                   THE WITNESS:  Yes.

14   BY MR. THORNBURGH:

15   Q.      So you're going to have -- essentially, you're

16   going to end up having little granuloma covered

17   particles, kind of like little BBs inside the pelvis of

18   a woman's vagina?

19                   MR. THOMAS:  Object to form of the

20   question.

21                   THE WITNESS:  No, not quite.

22   BY MR. THORNBURGH:

23   Q.      Well, they're certainly going to form

24   granulomas around each one of those particles?

25                   MR. THOMAS:  Object to form of the

Confidential – Subject to Protective Order

Page 395

1    question.

2                    THE WITNESS:  They will form the same

3    kinds of granuloma around the particles as they do

4    around each individual filament of the mesh.

5    BY MR. THORNBURGH:

6    Q.      Right.  So you're going to have additional

7    granuloma formation around those particles?

8    A.      Yes.

9    Q.      And the body is going to react or is reacting

10   to each one of those particles within the woman's

11   vagina?

12                   MR. THOMAS:  Object to the form of the

13   question.

14                   THE WITNESS:  They will be the particles

15   within the tissues around the mesh.

16   BY MR. THORNBURGH:

17   Q.      And, again, you were not asked to conduct a

18   study looking specifically at the inflammatory response

19   associated with those particles, correct?

20   A.      That's correct.

21   Q.      Handing you what's been premarked as Exhibit

22   2119 a series of e-mails regarding this particle loss

23   issue.

24                   (Document marked for identification as

25                   Deposition Exhibit No. T-2119.)

Confidential - Subject to Protective Order

Page 396

1   BY MR. THORNBURGH:

2   Q.      This is November 20 -- if you go down to the

3   bottom, it's a November 18th, 2005 e-mail from Sungyoon

4   Rah, right?

5   A.      The name sounds familiar.

6   Q.      Okay.  It's to Jacqueline Flatow, Jendly

7   Fabrice, Julian Gremion, Daniel Lamont, right?

8   A.      That's what it says.

9   Q.      With a CC to Chris Vailhe, right?

10  A.      Yes.

11  Q.      And Manuel Castro.

12          Any of those individuals within the preclinical

13  department?

14  A.      I think Jacqueline Flatow was in the surgical

15  functionality area.

16  Q.      And Sunny Rah, who is operations integration, a

17  division of Ethicon, Incorporated and Johnson & Johnson

18  company writes to this team of folks, "I have great

19  news," and the subject line is "great news for TVT

20  laser cut mesh."  The Bates number for this Exhibit is

21  00301741.

22          I have great news.  I met with Traci Gorky, Dan

23  Smith, Quentin Manley and made tremendous progress in

24  the last day.  Traci Gorky will be following up with

25  Gene Kammerer related to some additional testing

Confidential - Subject to Protective Order

1  requested to Jackie.  Based on several discussions with

2  Research & Technology Development and Product

3  Development organization, particle loss, elongation

4  curve and flexural rigidity data are, in capital

5  letters, not required for DVer work.  They have

6  specifically stated that these are not CTQs.  In

7  return, this means that will not require Design

8  Verification activities related to particle loss,

9  elongation curve, flexural rigidity!!!

10        So instead of going out and studying this

11  issue, particle loss issue, fraying issue, the

12  elongation curve, flexural rigidity issues, Sunny Rah

13  is celebrating the fact that it's been decided not to

14  undergo additional testing of the mesh, right?

15  A.    Well, I was not part of this e-mail string,

16  although I was at Ethicon at the time, I don't know

17  about this discussion.  It's really outside my area of

18  preclinical expertise.

19  Q.    Right.  But you could have -- you could have

20  been involved in this discussion.  You testified

21  earlier that you were involved in the discussion about

22  particle loss and fraying.

23        Do you remember that testimony?

24  A.    Yes.

25  Q.    And so this is a discussion about that issue

Confidential - Subject to Protective Order

Page 398

1   that you were involved with from a preclinical

2   standpoint, and they're celebrating the fact that

3   they're not going to conduct additional design

4   verification activities or testing of the product,

5   right?

6                    MR. THOMAS:  Object to the form of the

7   question.

8                    THE WITNESS:  I can read the e-mail.

9   BY MR. THORNBURGH:

10  Q.      And so that's what the e-mail would appear to

11  say, right?

12                   MR. THOMAS:  Object to the form of the

13  question.

14                   THE WITNESS:  Yes.

15  BY MR. THORNBURGH:

16  Q.      And then Chris Vailhe writes back, Sunny, I am

17  very surprised at this comment.  Particle loss,

18  elongation curve and flexural rigidity data are not

19  required for DVer, design verification, work because

20  they are not CTQs.  Particle loss is the reason why TVT

21  wants to use laser cut mesh, to eliminate particle loss

22  (which is critical to quality).

23          I agree on the approach of the team to limit

24  the testing in these area since the report on

25  ultrasonic cut mesh from Gene already provides a lot of

Confidential - Subject to Protective Order

Page 399

1   information that can be used for rationale not to test

2   the laser cut mesh.  I have the impression that

3   particle loss, elongation curve and flexural rigidity

4   are very important CTQs.  Right?  You understand what

5   CTQ means?

6   A.        Critical to quality.

7   Q.        Critical to quality.  And yet there is a

8   decision being made not to test it.  So let's forego

9   critical issues to quality so that we -- and not test a

10  product that's being permanently implanted in the

11  pelvis of women, right?

12                 MR. THOMAS:  Object to the form of the

13  question.

14                 THE WITNESS:  I don't know the context

15  of this e-mail string.

16  BY MR. THORNBURGH:

17  Q.        But that's what this e-mail string would

18  suggest, right?

19                 MR. THOMAS:  Object to the form of the

20  question.

21                 THE WITNESS:  I was not part of this

22  e-mail string.  I don't know the context of it, and it

23  would be inappropriate for me to comment on areas of

24  expertise outside my own area of expertise.

25  BY MR. THORNBURGH:

Confidential - Subject to Protective Order

Page 400

1    Q.        You're a preclinical person, right?

2    A.        That's a big bucket.

3    Q.        Well, you can test animals.  You can test

4    inflammatory response to particles within animals,

5    can't you?

6    A.        I could.

7    Q.        But you were never asked by anybody at Ethicon

8    to do that, right?

9              MR. THOMAS:  Object to the form of the

10   question.

11             THE WITNESS:  Not to my recollection.

12   BY MR. THORNBURGH:

13   Q.        And you've never volunteered, knowing that this

14   was an issue, you never personally volunteered to

15   undertake that task of doing a simple 21-day back end

16   or rat back study to determine the inflammatory

17   response from these particles, right?

18             MR. THOMAS:  Object to the form of the

19   question.

20             THE WITNESS:  I would have said that

21   it's not necessary and would have pointed to the 28-day

22   study where the TVT mesh and any associated particles

23   were implanted, and the tissue reaction was mild and

24   acceptable.

25   BY MR. THORNBURGH:

Confidential - Subject to Protective Order

Page 401

1    Q.       Another justification, right?

2                    MR. THOMAS:  Object to the form of the

3    question.

4                    THE WITNESS:  That's a result.  That

5    would be a result.

6    BY MR. THORNBURGH:

7    Q.       Another excuse not to conduct additional

8    testing, right?

9                    MR. THOMAS:  Objection.

10                   THE WITNESS:  I don't agree.

11   BY MR. THORNBURGH:

12   Q.       Daniel Lamont says, I am glad I was not the

13   only one that had a problem with this e-mail.  Perhaps

14   Sunny will actually sit down with the team and define

15   requirements instead of letting management do so.

16                   Was management getting in the way of doing this

17   critical to quality testing of the products that were

18   being implanted in women's vaginas all across the world

19   and all across the United States?

20                   MR. THOMAS:  Object to the form of the

21   question.

22                   THE WITNESS:  I can't comment on that.

23   I don't know the context of the e-mail stream or any of

24   the background information.

25   BY MR. THORNBURGH:

Confidential - Subject to Protective Order

Page 402

1    Q.     Again, you weren't asked to undergo -- to

2    undertake a task of making sure that the critical --

3    that the critical to quality testing was undertaken,

4    right?

5    A.     That was not my area of expertise.

6    Q.     Your area of expertise was preclinical, right?

7    A.     Yes.

8    Q.     You were kind of the person in preclinical that

9    would often issue justification memos about why testing

10   wasn't needed, right?

11              MR. THOMAS:  Object to the form of the

12   question.

13              THE WITNESS:  If they were appropriate,

14   yes.

15              (Document marked for identification as

16        Deposition Exhibit No. 2120.)

17   BY MR. THORNBURGH:

18   Q.     I'm going to hand you what's been marked

19   Exhibit 2120, another e-mail regarding particle loss

20   issue.

21              So in this e-mail dated February 15, 2006 --

22              MR. THOMAS:  May I have a copy, please?

23              MR. THORNBURGH:  I'm sorry, Dave.  I

24   didn't mean that.

25   BY MR. THORNBURGH:

Confidential - Subject to Protective Order

Page 403

1   Q.      In this e-mail dated February 15, 2006, Sunny
2   Rah says, hey Jackie, please provide me DVer, or design
3   verification, protocol for particle loss.  I'm
4   wondering if we may be able to perform particle loss on
5   only at the lower or low power setting runs rather than
6   for both low and high settings.

7           Remember yesterday when we talked about the
8   importance of looking at worst case scenario.

9           Do you remember that discussion?

10  A.      Yes.

11  Q.      And you agreed with me yesterday that it's
12  important to look at worst case scenario?

13  A.      Yes.

14  Q.      And in this case Sunny Rah is suggesting that
15  we do a low power setting test on particle loss rather
16  than the low and high, right?

17  A.      I see that, but I don't know what that means.
18  I don't know which one is worst case, the higher or the
19  lower.

20  Q.      "Of course, we will need to provide the
21  justification memo stating that lower settings will
22  create less besides and lower particles."

23          That's what she writes, right?

24              MR. THOMAS:  Object to form of the
25  question.

Confidential - Subject to Protective Order

Page 404

1    BY MR. THORNBURGH:

2    Q.      Or Sunny Rah writes, right?

3    A.      I can read this memo, yes.

4    Q.      And then Jacqueline Flatow or Flatow responds,

5    I'd like to repeat particle loss DVer, design

6    verification, on nominal parts - the fewer

7    justification memos we have, the better.  The fewer

8    evidence there is that we're not -- that we're electing

9    not to undergo testing of our product, the better?

10                   MR. THOMAS:  Is that a question?

11                   MR. THORNBURGH:  Yeah.

12                   MR. THOMAS:  Object to the form of the

13   question.

14   BY MR. THORNBURGH:

15   Q.      Here we go, you're the guy who is responsible

16   in part in drafting these justification letters, and

17   Jacqueline Flatow says, the fewer justification memos

18   we have, the better, right?  That's what she says?

19                   MR. THOMAS:  Object to the form of the

20   question.

21                   THE WITNESS:  That's what she says.

22   BY MR. THORNBURGH:

23   Q.      And we saw yesterday when we looked at the

24   10993 studies that you didn't conduct any of those

25   studies.  You wrote justification memos or

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Subject to Protective Order

Page 405

1    justification reasons for not undergoing the certain

2    10993 testing, correct?

3    A.      That's correct.

4                    MR. THOMAS:  Object to the form of the

5    question.

6    BY MR. THORNBURGH:

7    Q.      Going to hand you what's been marked as 2121,

8    ETH.MESH.01221055, the Pariente study.

9                    (Document marked for identification as

10                   Deposition Exhibit No. T-2121.)

11   BY MR. THORNBURGH:

12   Q.      Okay.  So, as you can see from this study, it's

13   called "An independent biomechanical evaluation of

14   commercially available suburethral slings," and the

15   author is J-L Pariente.

16           You see that?

17   A.      Yes.

18   Q.      And it's from the -- I'm going to try, I'm

19   going to butcher it, but it's from the Centre

20   d'Innovations Technologiques Biomatériaux, Hopital

21   Pellegrin and so forth, right?

22   A.      Yes.

23   Q.      You see that, in France?

24   A.      I see that.

25                   MR. THOMAS:  Counsel, do you have a date

Confidential - Subject to Protective Order

Page 406

1   for this study?

2              MR. THORNBURGH:  I do.  Well, I can tell

3   you, I can represent to you that it was July of 2005.

4   BY MR. THORNBURGH:

5   Q.      Okay.  So this is a study that looked at

6   particle loss in a number of different suburethral

7   slings, including TVT, right?

8   A.      I have not had a chance to read this paper.

9   This is really outside my area of expertise.  It's all

10  about biomechanical testing, and it looks like in a

11  clinical setting.

12  Q.      Right.  Well, let's look at this together, and

13  I'll walk you through it, okay.  Under "Abstract" it

14  says, many questions remain unanswered about the

15  physical properties of suburethral slings.  We report a

16  laboratory based study that compared in vitro

17  biomechanical characteristics of six slings used for

18  stress urinary incontinence:  TVT, which is

19  manufactured by Ethicon, IVS, Uretex, I-stop and

20  Uratape.

21              You see that?

22  A.      Yes.

23  Q.      It says, "each sling was found to have quite

24  different mechanical properties, varying from soft to

25  hard tapes, and elastic to very stiff tapes."

Confidential - Subject to Protective Order

1          So this is discussing a mechanical properties

2   test of a number of suburethral slings including TVT,

3   right?

4   A.      Yes.

5   Q.      And it goes on to say, "an assessment was made

6   of the amount of material shed by each tape during the

7   testing procedure.  This may have relevance to the

8   clinical situation, where particles shed during

9   surgical manipulation, may end up in the surrounding

10  soft tissue with unpredictable impact on future

11  success."

12          That's what Dr. Pariente writes, right?

13  A.      Yes.

14  Q.      So what do you think the percentage of particle

15  loss was with the TVT tape compared to the other tapes?

16  A.      I don't know.

17  Q.      Well, if you turn with me to -- turn with me to

18  the second page, it says -- see the section beginning

19  with to evaluate the shedding particles?

20  A.      Yes.

21  Q.      To evaluate the shedding of particles, each

22  sample was weighed before and after a soft procedure,

23  and the values range from 0 to 8.5 percent of initial

24  weight.  During surgical use, these particles were

25  released in soft tissue and is not possible to know

Confidential - Subject to Protective Order

Page 408

1   where they go.

2          And it reports that TVTs particle loss was the

3   highest on the next page with particle loss of -- which

4   would be the particle loss of 8.5, as you can see in

5   Table 2 on the last page, Bates Number 1058.

6          You see that?

7   A.     Yes.

8   Q.     TVT of all of the -- and if you can go ahead

9   and blow that up -- TVT, Ethicon's product, the product

10  that you were in charge of the bio -- the preclinical

11  compatibility testing for, this product had the highest

12  particle loss of 8.5%, correct?

13              MR. THOMAS:  Object to the form of the

14  question.

15              THE WITNESS:  I see that.

16  BY MR. THORNBURGH:

17  Q.     Okay.  And these doctors were saying this could

18  have an impact clinically on patient outcomes, right?

19              MR. THOMAS:  Object to the form of the

20  question.

21              THE WITNESS:  I don't see that written,

22  but if it is, then that's the case.

23  BY MR. THORNBURGH:

24  Q.     If you go back to Page 1 it says this may have

25  relevance to the clinical situation?

Confidential - Subject to Protective Order

Page 409

1    A.      I see it.

2    Q.      With particle loss being shed during surgical

3    manipulation of the slings, right?

4    A.      Yes.

5    Q.      And so the reported 8.5 particle loss for TVT,

6    which, according to the Pariente, could impact the

7    outcome for patients, right?

8                    MR. THOMAS:  Object to form of the

9    question.

10                   THE WITNESS:  That's what this person is

11   saying.

12   BY MR. THORNBURGH:

13   Q.      One of the ways to understand what that impact

14   to humans may be would be to look at it in animals,

15   right?

16   A.      Yes.

17   Q.      And what you could have done is you could have

18   cut open the back end of a rat, took 8.5% of the mesh

19   in particle form, put it in the back of the rat or

20   whatever animal model you choose to use and see what

21   the reaction would be both in terms of tissue reaction,

22   inflammatory response and migration of the particles,

23   right?

24                   MR. THOMAS:  Object to the form of the

25   question.

Confidential - Subject to Protective Order

Page 410

1               THE WITNESS:  That would not be relevant

2    to the final product.

3    BY MR. THORNBURGH:

4    Q.     The final product, as we saw from all these

5    complaints, had the same issue, had particle loss

6    occurring during the implantation in patients, right?

7               MR. THOMAS:  Object to the form of the

8    question.

9    BY MR. THORNBURGH:

10   Q.     We saw all the complaints, right.  You saw

11   Dr. Eberhard saying it's embarrassing, this tape is

12   terrible, particles are coming off of the tape, right?

13   A.     I recall his --

14              MR. THOMAS:  Object to form of the

15   question.

16              THE WITNESS:  I recall his memo.

17   BY MR. THORNBURGH:

18   Q.     He's one of the doctors in the field.  He's an

19   actual MD who is actually implanting these devices in

20   women, and he is saying, Ethicon, you got to change it,

21   right?

22              MR. THOMAS:  Object to the form of the

23   question.

24              THE WITNESS:  That's what he said.

25   BY MR. THORNBURGH:

Confidential - Subject to Protective Order

Page 411

1   Q.      And we saw other complaints from other doctors

2   in the field who are complaining about particle loss

3   and how it's an issue for them and that it's become

4   more obvious after the pigmented blue dyes were

5   incorporated into the mesh, right?

6                  MR. THOMAS:  Object to the form of the

7   question.

8                  THE WITNESS:  What was the question

9   there?

10  BY MR. THORNBURGH:

11  Q.      Yeah, we saw other complaints from other

12  physicians in the field about particle loss, right?

13                 MR. THOMAS:  Object to the form of the

14  question.

15                 THE WITNESS:  Yes.

16  BY MR. THORNBURGH:

17  Q.      And we looked at a discussion within Ethicon of

18  the potential to study the particle loss issue in their

19  design verification testing, you remember?

20  A.      I don't know the context of that discussion.

21  Q.      But you remember seeing that document, right?

22  A.      Yes.

23  Q.      And a decision was made not to test it.

24          Do you remember that?

25  A.      I don't know how that ultimately was resolved.

Confidential - Subject to Protective Order

Page 412

1   Q.      Well, I'm going to show you how it was

2   ultimately resolved, but you remember that discussion?

3   A.      Yes, we reviewed that e-mail string.

4   Q.      And those were issues that some of the folks

5   like Dan Lamont thought was important for criminal to

6   quality issues for the product, right?

7   A.      Whatever is in those memos.

8   Q.      You remember reading that; that's what those

9   memos said, right?

10  A.      Yes.

11  Q.      So now we've got Pariente defining the amount

12  of particle loss, and for TVT it's 8.5%, according to

13  this study, right?

14  A.      Yes.

15  Q.      Going to hand you what's been premarked as

16  Exhibit 2122, an e-mail string regarding the particle

17  loss issue and standardization under AFNOR.

18          (Document marked for identification as

19          Deposition Exhibit No. T-2122.)

20  BY MR. THORNBURGH:

21  Q.      Do you know what AFNOR is?

22  A.      AFNOR, no.

23  Q.      Do you understand that France had a

24  standardization committee that would standardize

25  testing and materials which would later be adopted by

Confidential - Subject to Protective Order

Page 413

1    European countries?

2    A.        I don't think I -- I don't recall that.

3    Q.        Well, let's look at this, so you get some

4    background, okay.  So, again, I'm going to have you

5    turn -- the Bates number is 03358217, and the subject

6    is, as you can see on Page 1 on this May 1st, 2006

7    e-mail, French standard on TVT and meshes.

8             And so if you turn with me to

9    ETH.MESH.003358222, it's an e-mail from Scott Ciarrocca

10   to a number of individuals directed to Xavier and

11   Pascale.  It says, looking into finding a way to give

12   you specifics.  It is unfortunately not straightforward

13   to obtain all this.  To be clear, we're talking about

14   Prolene Gynemesh® Soft, the implantable materials, not

15   the TVT or Prolift® devices.

16            Actually, let me -- if you go ahead to the very

17   last page, sorry about that, 8224, the subject is AFNOR

18   (ISO) Organization - Request.

19            You see that?

20   A.        Yes.

21   Q.        And it says -- it's an e-mail from Xavier at

22   Gynecare France saying, over the last few months in our

23   country we are -- we can observe a clear awareness from

24   the KOLs and other surgeons in regard to what is or not

25   a good prosthesis, both for SUI slings and prolapse

Confidential - Subject to Protective Order

Page 414

1    repair.

2          Under the initiative of Gynecare France, we

3    succeed in convincing our local standards organization

4    (AFNOR) to set up a commission.  Her goal will be to

5    try to standardize that market in those both areas.

6    First step will be a local standard and then a European

7    one.

8          The two co-presidents for that commission will

9    be Professor Jacquetin.

10         You know who that is, right?

11   A.    I've heard of that person.

12   Q.    And Professor Haab.  Further to our last

13   meeting with AFNOR guys, we have been requested as

14   others competitors to provide the following for TVT and

15   TVT-O as well as TVM Prolift®, initial testing

16   completed before releasing the product on the market

17   (material characterization, et cetera), applicable

18   standards for previous point (clinicals, materials,

19   test methods), the way we as manufacturer did evaluate

20   the products for preclinical side as well as clinical

21   side (literature analysis, animal trials, human

22   investigations).

23         So this is talking about a need -- talking

24   about a group called AFNOR, which is a French

25   standardization organization, which is requesting

Confidential - Subject to Protective Order

Page 415

1    information from manufacturers, right?

2    A.       Yes.

3    Q.       And one of the things being requested is

4    preclinical information, right?

5    A.       Yes.

6    Q.       If you go to Bates Number 8219, Dr. Fournier or

7    Herve Fournier says, as you probably know, AFNOR

8    (French standardization organization) prepares a

9    standard on SUI tapes and prolapse repair meshes

10   implanted by vaginal ways.  Manufacturers, surgeons,

11   KOLs and AFSSAPS are gathered in a TF S92B, which is

12   split in two working groups to write the draft of the

13   standard which is scheduled to be to CEN in the next

14   forthcoming years.

15           You see that?

16   A.       Yes.

17   Q.       Kind of similar to the work you did, the

18   working group that you did for ISO, there is a French

19   standardization organization that does similar

20   standardization of testing, right?

21   A.       That's correct.

22   Q.       Then if you turn the page, so there's some

23   information about the people that will be involved in

24   these working groups, couple of those folks as you can

25   see are from Ethicon, and if you go to Bates Number

Confidential - Subject to Protective Order

Page 416

1    8221 it says, I received the homework from our

2    colleagues of the WG1 last March 21st in French.

3    Please find those ones in the zip file attached, and

4    there's a zip file that is attached.  It says which one

5    includes as follows, suggestions on Paragraph 4 of the

6    standard, and it goes on to say below that suggestions

7    on Paragraph 5.1, 5.2 of the standard on fraying.

8           You see that?

9    A.     Yes.

10   Q.     Okay.  So one of the issues that is being

11   identified as part of the standardization processes of

12   AFNOR is the fraying potentiation of SUI slings, right?

13                  MR. THOMAS:  Object to the form of the

14   question.

15                  THE WITNESS:  Yes.

16   BY MR. THORNBURGH:

17   Q.     And if you go to page -- the first page, it's

18   got 5.2.2 particle release fraying section defined.  It

19   says, describes a method of measuring of particles

20   which may be released from the implant while implanted

21   in the body.  Generally, when we talk about fraying as

22   associated with urethral slings and pelvic floor

23   support materials made from meshes, we are describing

24   loss of pieces of the device as it is manipulated

25   during insertion.  Our tests are done on weight loss

Confidential - Subject to Protective Order

1    basis.  We do not count particles or observe particle

2    size.  Briefly, the mesh is weighed, then stretched to

3    a specific tension or percentage elongation then

4    weighed again, and the difference in weight is reported

5    as percentage of particle loss.

6            That makes sense, doesn't it?

7    A.      Yes.

8    Q.      It says, and this looks like to be the comments

9    from Gene Kammerer regarding this particle loss

10   standardization that's being discussed at AFNOR, right?

11           MR. THOMAS:  Object to the form of the

12   question.

13           THE WITNESS:  I can read the e-mail.

14   I'm not part of this stream.  This is outside my area

15   of expertise.  I can simply read it as a scientist and

16   offer up whether or not what you're reading is what's

17   in the text.

18   BY MR. THORNBURGH:

19   Q.      Right.  What I'm reading is what's in the text,

20   right?

21   A.      It looks that way.

22   Q.      And I'm going to show you how you're tied to

23   this.  We're going to go further and further as we get

24   through today, and you're going to see your connection,

25   but you certainly were a part of this discussion while

Confidential - Subject to Protective Order

Page 418

1    you were at Ethicon.

2            You recalled that previously, right?

3    A.      Not part of this discussion.

4    Q.      You were a part of the particle loss

5    discussion, the fraying discussion?

6    A.      I was part of some of the discussion around

7    particle loss.

8    Q.      Right, right.  And let me guess, you came up

9    for justification not to do testing?

10           MR. THOMAS:  Object to the form of the

11   question.

12           THE WITNESS:  No, I did not.

13   BY MR. THORNBURGH:

14   Q.      We'll see what the record shows later on, but

15   it goes on, we have no specific specification or

16   limitation.  The data is collected for information

17   purposes only.  It would not be proper to add a

18   specification about -- it would not be proper to add a

19   specification amount of acceptable loss.  For example,

20   a mesh weighing 2 grams is inserted into the body.  It

21   is determined that during insertion 0.4% of the mesh is

22   dislodged.  So 0.008 grams of the mesh is in the body

23   but not attached to the main structure.

24           Well, we know from the Pariente study that what

25   Pariente found was 8.5% of TVT mesh is lost during the

Confidential - Subject to Protective Order

Page 419

1   implantation process?

2                MR. THOMAS:  Objection.

3   BY MR. THORNBURGH:

4   Q.      Based on the study that was done by Pariente?

5                MR. THOMAS:  Object to form of the

6   question.

7   BY MR. THORNBURGH

8   Q.      Right?

9   A.      That's correct.

10  Q.      And so it goes on to say I think it means

11  nothing from safety, clinical or functional aspect of

12  the product.

13          They didn't even ask you to test it, right?

14               MR. THOMAS:  Object to the form of the

15  question.

16               THE WITNESS:  Again, I don't know the

17  context of this discussion.  I was not part of it.

18  This is project team related work that was done

19  outside.  I was not on the project team.

20  BY MR. THORNBURGH:

21  Q.      You know who Gene Kammerer is, right?

22  A.      Yes.

23  Q.      He's not an MD, right?

24  A.      No.

25  Q.      In fact, the highest level of education that

Confidential - Subject to Protective Order

Page 420

1    Gene Kammerer has is an Associate's degree, correct?

2    A.       I don't know that.

3    Q.       I'll represent to you that during his

4    deposition, he informed me that the highest level of

5    education was an Associate's degree, okay?

6    A.       Okay.

7    Q.       All right.  So you would expect people that

8    were part of the clinical physicians, MDs to be calling

9    the shots on what it means clinically to the safety of

10   patients this particle loss and fraying issue, right?

11                  MR. THOMAS:  Object to the form of the

12   question.

13                  THE WITNESS:  The best I can tell is

14   Gene is making reference to the fact that if you

15   present a particle loss in percentage, it doesn't mean

16   much, if you don't know what the weight of the starting

17   device is.  I think that's what he's talking about,

18   but, again, I don't know of a context.  It's out of my

19   area.  I can simply read this as a scientist and offer

20   a comment.

21   BY MR. THORNBURGH:

22   Q.       But that wasn't my question.  Here we've got

23   Gene Kammerer, who is in the research and design

24   department at Ethicon, who has a Associate's degree

25   saying, I don't think it means anything about safety,

Confidential - Subject to Protective Order

Page 421

1    right?

2    A.      They say in the percentage representation means

3    nothing.  It means nothing in a number of different

4    ways.

5    Q.      He says I think it means nothing from a safety,

6    clinical or functional aspect of the product.

7            What do you think he means by safety?

8                    MR. THOMAS:  Object to the form of the

9    question.

10                   THE WITNESS:  He's talking about the use

11   of percentage, and using percentage loss doesn't mean

12   anything, unless you know the weight of the initial

13   product.

14   BY MR. THORNBURGH:

15   Q.      But as you testified earlier, you're a Ph.D.

16   who you are responsible or were responsible to Ethicon

17   for testing products on animals, that each one of those

18   particles will be a foreign body that the body will

19   react to, and there will be an inflammatory response,

20   right?

21                   MR. THOMAS:  Object to the form of the

22   question.

23                   THE WITNESS:  I can't add anything to

24   what I've already spoke.

25   BY MR. THORNBURGH:

Confidential - Subject to Protective Order

Page 422

1    Q.        Preclinically in animals, you can -- I

2    understand you've said it before, I'm asking you to say

3    it again, in animals when you have this foreign body

4    and you have additional foreign bodies from the

5    particles that are lost during implantation of the

6    device, each one of those particles as well as the

7    actual full product mesh inserted in the patient or in

8    an animal is going to trigger a foreign body response,

9    right?

10              MR. THOMAS:  Object to the form of the

11   question.

12              THE WITNESS:  Yes.

13   BY MR. THORNBURGH:

14   Q.        An inflammatory response, correct?

15   A.        Yes.

16   Q.        Which will result in granuloma formation over

17   each one of those particles and over the mesh?

18              MR. THOMAS:  Object to the form of the

19   question.

20              THE WITNESS:  The inflammatory reaction

21   is a granulomatous reaction.

22   BY MR. THORNBURGH:

23   Q.        Right.  So but Gene Kammerer says, well,

24   therefore, the particle loss test is not relevant,

25   unless it can be identified that the material which

Confidential - Subject to Protective Order

Page 423

1    frays has some impact on the safety, clinical outcome

2    or functionality of the product.

3            A good place to start would have been with you?

4                    MR. THOMAS:  Is that a question?

5                    MR. THORNBURGH:  Yeah.

6                    MR. THOMAS:  Object to the form of the

7    question.

8                    THE WITNESS:  I can't -- I can't speak

9    for Gene.  Whatever he says is what he said.

10   BY MR. THORNBURGH:

11   Q.    I'm not asking you to speak for Gene.  I'm

12   asking you to speak for yourself.

13   A.    And the question is?

14   Q.    A good place to start to look at safety from a

15   preclinical standpoint to look at the risk that could

16   be associated with the particle loss or fraying issue

17   would have been to go to you and say test this, test

18   this issue?

19                   MR. THOMAS:  Object to the form of the

20   question.

21   BY MR. THORNBURGH:

22   Q.    That would have been a good place to start,

23   you, right?

24   A.    They could have done that.

25   Q.    They didn't, right?

Confidential - Subject to Protective Order

Page 424

1    A.        I don't recall that we didn't have verbal

2    discussions about that.

3    Q.        But they could have asked you to go do a little

4    test, to take a rat, cut open its back or cut open the

5    back end of it, take this, as Dan Smith described, this

6    blue shit that's falling off of the mesh, and put it in

7    the animal model to see what the reaction might be,

8    right?

9                  MR. THOMAS:  Object to the form of the

10   question.

11                 THE WITNESS:  We did such a relevance

12   study implanting TVT mesh and any associated particles

13   in the 28-day rat study.

14   BY MR. THORNBURGH:

15   Q.        Twenty-eight day rat study.

16            My question to you is did you actually take the

17   mesh and do this -- have the people like Gene Kammerer

18   run a test and get the particles to fall off and take

19   those particles, the blue particles, put it in the back

20   end of a rat to see what the inflammatory response will

21   be to the particles?

22                 MR. THOMAS:  Object to the form of the

23   question.  You are continuing to argue with the

24   witness, just ask him questions.

25                 MR. THORNBURGH:  I'm not arguing with

Confidential - Subject to Protective Order

Page 425

1    him.

2                    MR. THOMAS:  Yes, you are.

3                    MR. THORNBURGH:  No, I'm not.

4    BY MR. THORNBURGH:

5    Q.      Did you ever do that study?

6    A.      I think I've answered that a half a dozen

7    times, and the answer was no.

8                    (Document marked for identification as

9                    Deposition Exhibit No. T-2123.)

10   BY MR. THORNBURGH:

11   Q.      Handing you what's been premarked as Exhibit

12   2123, an e-mail from Gene Kammerer regarding slings and

13   as you'll see, it has to do with particle loss, and the

14   AFNOR standards as well as the Pariente study?

15                    MR. THOMAS:  May I have one, please.

16                    MR. THORNBURGH:  Of course you may,

17   Dave.

18   BY MR. THORNBURGH:

19   Q.      As you'll see in here, as we get through the

20   discussion, AFNOR was considering setting a limit for

21   particle loss at -- I'm sorry at 5%, okay.  So that

22   would obviously be a problem for Ethicon if the

23   particle loss for TVT was 8.5%, right?

24                    MR. THOMAS:  Object to the form of the

25   question.

Confidential - Subject to Protective Order

Page 426

1           THE WITNESS:  Yes.

2   BY MR. THORNBURGH:

3   Q.     So let's see what Gene Kammerer recommends.

4   Why don't you just take a moment, look at that

5   document, because I'm going to talk to you about it at

6   length.  ETH.MESH Number 01221024.

7           MR. THOMAS:  Could we go off the record

8   briefly.

9           MR. THORNBURGH:  Yeah.

10          THE VIDEOGRAPHER:  Going off the record.

11  The time is 11:06 a.m.

12          (Brief recess.)

13          THE VIDEOGRAPHER:  Back on the record,

14  the time is 11:10 a.m.

15          THE WITNESS:  Shall I continue to read

16  through?

17  BY MR. THORNBURGH:

18  Q.     I'm going to just -- I'm not going to spend

19  that much time on this, actually, just to try to save

20  us some time.

21  A.     Good.

22  Q.     So I'll try to point out for you -- you know,

23  try to walk you through this document.

24  A.     Okay.

25  Q.     So, again, it's Gene Kammerer, May 4th, 2006,

Confidential - Subject to Protective Order

Page 427

1    and it's a discussion of the Pariente findings as well

2    as the standards being set by AFNOR of 5% particle loss

3    is the sort of cutoff limit for meshes, okay?

4    A.      Okay.

5    Q.      And it talks about the study that was done and

6    says that during the study, you look with me, you'll

7    see on the -- six lines down from the top where it

8    starts with in the test.

9    A.      Yes.

10   Q.      It says, in this test the strips are pulled ten

11   times up to a load of 25 Newtons, 5.6 pounds.  The

12   difference in weight before and after is determined.

13   The recommended limit for acceptance is less than 5% of

14   the sample weight should fall off.

15           That's what we were talking about, and I'll

16   show you later on how 5% is the cutoff that AFNOR was

17   considering for particle loss.  It says, here are a few

18   objections, so Kammerer is saying I've got objections

19   to this test.

20           You see that, right?

21   A.      Yes.

22   Q.      And he lays those out, the load cell on the

23   Instron test is a maximum of 500 Newtons, and the test

24   is done at 25 Newtons.  He says it should be at 100 to

25   150 Newtons.

Confidential - Subject to Protective Order

Page 428

1          You see that?

2     A.    Yes.

3     Q.    So he is saying the test is too rigorous.  It

4     should be -- we should test it at less Newtons, right?

5               MR. THOMAS:  Object to the form of the

6     question.

7               THE WITNESS:  No.  Again, I'm not a

8     biomechanical engineer.  What the sentence is saying is

9     that he's saying that he is trying to test or set the

10    load cell at 500 Newtons is insufficiently sensitive to

11    get good resolution and accuracy at just 25 Newtons.

12    He is saying you ought to make the test more sensitive

13    by decreasing the load cell to something more in the

14    range of 25 Newtons.

15    BY MR. THORNBURGH:

16    Q.    Okay.  Well, we'll see what he goes on to say,

17    okay, because he goes to say, the sample is stretched

18    ten times, this is way too many times to stretch.  One

19    time should be sufficient.  One time.  So remember how

20    we talked about earlier how the worst case scenario for

21    a patient is important testing to do.

22               Do you remember that discussion?

23               MR. THOMAS:  Objection.

24               THE WITNESS:  Yes.

25    BY MR. THORNBURGH:

Confidential - Subject to Protective Order

1   Q.      So here they're talking about the test pull it

2   ten times and Kammerer is saying, no, let's just pull

3   it one time.

4           You see that?

5                   MR. THOMAS:  Object to the form of the

6   question.  I think you're arguing with the witness

7   again.

8                   MR. THORNBURGH:  Dave, I'm not arguing

9   with the witness.  I do get excited, but I'm not trying

10  to argue with the witness.

11                  THE WITNESS:  I see what he's saying.  I

12  can't speak to his rationale or understanding of the

13  details of his thinking.  I just see these sentences

14  and they're as you state them.

15  BY MR. THORNBURGH:

16  Q.      So what he's saying is let's not pull it ten

17  times, let's pull it one time, right?

18                  MR. THOMAS:  Object to the form of the

19  question.

20  BY MR. THORNBURGH

21  Q.      Right?

22  A.      He says one time should be sufficient.

23  Q.      Because, remember, if the particle loss is 8.5,

24  it doesn't meet the AFNOR standards at 5%, right?

25                  MR. THOMAS:  Object to form of the

Confidential - Subject to Protective Order

Page 430

1    question.

2                      THE WITNESS:  I don't know that the 8.5%

3    from this Pariente study was done under these load cell

4    conditions.

5    BY MR. THORNBURGH:

6    Q.       But assuming with me that AFNOR standard is 5%

7    for the maximum amount of particle loss, if it's 8.5%

8    or anywhere greater than 5%, that's a problem for

9    Ethicon?

10                     MR. THOMAS:  Object to the form of the

11   question.

12                     THE WITNESS:  It would not.

13   BY MR. THORNBURGH:

14   Q.       It would not meet the standard?

15   A.       If this standard was ever finalized.  I mean,

16   the discussion about how to do a standard takes a great

17   deal of time.  It looks at input from a wide range of

18   people, and there's many times this is very standard.

19   I don't know if this is where they landed with the

20   standard or not.  I don't know that.

21                     MR. THOMAS:  Note my objection to this.

22   You continue to ask Dr. Barbolt about documents he's

23   never seen before and asking him to give his opinions

24   on things he had no involvement with.

25                     MR. THORNBURGH:  He did have

Confidential - Subject to Protective Order

Page 431

1    involvement.

2               MR. THOMAS:  I think it's a waste of

3    time.

4               MR. THORNBURGH:  He did have

5    involvement, and we'll get to additional documents that

6    showed his involvement.  He's already testified that he

7    was involved in discussions.

8               MR. THOMAS:  I don't want to argue with

9    you about it.  I just want to state my objection for

10   the record.

11   BY MR. THORNBURGH:

12   Q.    So let's move on.

13         The maximum number force is pulled to 25

14   Newtons.

15         You see that?

16   A.    Yes.

17   Q.    So the maximum force it is pulled to is 25

18   Newtons for the TVT tape at 1.1 centimeters wide, this

19   equals about 30% stretch.

20         So I don't have an issue with the percent

21   stretch, but to do it ten times is unreasonable.

22         You see that?  That's what he writes?

23   A.    Yes, that's his view.  That's what he writes.

24   Q.    Instead he's saying it should be done one time,

25   right?

Confidential - Subject to Protective Order

Page 432

1    A.        That's what he suggests.

2    Q.        When the tape is in place and is stretched by

3    the patient during everyday movement, Dr. Lin in his

4    study published in the Journal of Urology, March 2005

5    found that the force applied by the downward movement

6    of the bladder and urethra would be a maximum of

7    100 grams or one Newton.  That's what it says --

8    A.        Again, I'm not a biomechanical engineer.  These

9    numbers really don't mean a lot to me.

10   Q.        I understand, but I'm walking you through it,

11   and you're going to see why it matters.  The reason why

12   it -- and, as we've already looked at, the reason why

13   it matters is if there's particle loss, there's going

14   to be an inflammatory response with inside an animal

15   and with inside a human?

16   A.        I think we've already established that.

17   Q.        Right.  So instead of looking at the worst case

18   scenario, as you will see, which was often the case at

19   Ethicon, what we see here is protocol for testing that

20   would create less particle loss.

21                  MR. THOMAS:  Object to the form of the

22   question.

23                  THE WITNESS:  I can't comment on their

24   motives.  That was not part of this discussion or this

25   e-mail stream.  This was an area outside of my

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Subject to Protective Order

Page 433

1  preclinical area of expertise.

2  BY MR. THORNBURGH:

3  Q.      If you go down to in the report by

4  Dr. Pariente, the TVT tape lost 85% of its weight under

5  these test conditions.

6          Did I read that accurate?

7              MR. THOMAS:  No, you didn't.

8              THE WITNESS:  No.

9  BY MR. THORNBURGH:

10  Q.      "In the report by Dr. Pariente the TVT tape

11  lost 8.5% of its weight under these test conditions."

12  A.      That's correct.

13  Q.      "The maximum limit for weight loss is arbitrary

14  at 5%.  No proven rationale is provided for that

15  limit."

16          In his study only TVT would fail, in the

17  Pariente study.  Remember when we looked at it, TVT had

18  the highest particle loss percentage at 8.5%, remember

19  that?

20              MR. THOMAS:  Object to the form of the

21  question.

22              THE WITNESS:  Yes, I remember it.

23  BY MR. THORNBURGH:

24  Q.      So and the other ones were less than 5%, so all

25  of the other TVT or all of the other midurethral slings

Confidential - Subject to Protective Order

Page 434

1    on the market, according to that study, would have

2    passed with the exception of Ethicon's TVT?

3    A.     No, that's not --

4                MR. THOMAS:  Object to the form of the

5    question.

6                THE WITNESS:  That's not correct.  The

7    Pariente study shows the SPARC device losing 5.4%.

8    BY MR. THORNBURGH:

9    Q.     So the SPARC may fail at 5.4%, and so would the

10   TVT, right?

11   A.     Yes.

12   Q.     So, anyway, he goes on to say in summary the

13   test is far too violent or forceful to provide accurate

14   information.  The limit is arbitrary.  The test does

15   not reflect true operation -- operative conditions,

16   right?  That's what his summary was in this document,

17   right?

18                MR. THOMAS:  Object to the form of the

19   question.

20                THE WITNESS:  That's what it looks like.

21   BY MR. THORNBURGH:

22   Q.     Hand you what's been marked as 2124, an e-mail

23   dated May 9th, 2006.

24                (Document marked for identification as

25                Deposition Exhibit No. T-2124.)

Confidential - Subject to Protective Order

Page 435

1   BY MR. THORNBURGH

2   Q.      And if you go down to the bottom of the

3   first -- the front page it says, Jackie, I need some --

4   this is, again, from Gene Kammerer May 9th, 2006, "I

5   need some clarification on the particle loss test.

6   France is trying to set new standards for the TVT like

7   products.  Particle loss is one of the standards.  They

8   have a test method which shows 8.5% loss for TVT.  I am

9   challenging their methods as too vigorous."

10          You see that?

11  A.      Yes.

12  Q.      They have since backed off of the roughness of

13  the test, but TVT still has very high percentage.  It

14  will fail the test if the test is expected as stands

15  and we will not be able to sell in France next year.

16          I read that correctly, right?

17              MR. THOMAS:  Object to the form of the

18  question.

19              THE WITNESS:  Yeah, that's what it says.

20  BY MR. THORNBURGH:

21  Q.      Is there any discussion here from Gene Kammerer

22  saying, you know what, we ought to take this particle

23  loss issue seriously, because what we care about is not

24  selling the product in France, what we care about is

25  patient safety.  So what we should do is send over a

Confidential - Subject to Protective Order

Page 436

1    request to Dr. Barbolt and say, Dr. Barbolt, what does

2    this mean clinically, at least preclinically in

3    animals, as it relates to the safety.

4              MR. THOMAS:  Object to the form of the

5    question.  You're arguing with him.  You're being very

6    disrespectful of the witness.

7              MR. THORNBURGH:  I'm not arguing with

8    him.

9              MR. THOMAS:  I think you are, and the

10   transcript will bear it out.  We'll figure that out

11   some day.

12             THE WITNESS:  I can't speak for what

13   Gene should have or shouldn't have done.

14   BY MR. THORNBURGH:

15   Q.     That wasn't my question.  My question was Bates

16   number is 01219629.  So my question was is there any

17   discussion here from Gene Kammerer saying, you know

18   what, we ought to take this particle loss issue

19   seriously because what we care about is not selling the

20   product in France, what we care about is patient

21   safety, so what we should do is send over a request to

22   Dr. Barbolt and say, Dr. Barbolt, what does this mean

23   clinically, at least preclinically in animals as it

24   relates to safety?

25             MR. THOMAS:  Object to the form of the

Confidential - Subject to Protective Order

Page 437

1    question.

2    BY MR. THORNBURGH:

3    Q.      That discussion isn't in here, right?

4    A.      That's correct.

5    Q.      Kammerer is not saying let's look out for

6    patient safety, let's do a preclinical study of

7    particle loss in patients, let's get Dr. Barbolt

8    involved and see what this means clinically or pre

9    clinically to the safety of patients, right?

10              MR. THOMAS:  Object to the form of the

11   question.

12              THE WITNESS:  Could we take those one at

13   a time.  It seems like there are three or four

14   questions there.

15   BY MR. THORNBURGH:

16   Q.      Well, Kammerer is not saying in this document,

17   let's look out for patient safety, that was number one,

18   he's not saying that, right?

19   A.      Can I respond?  He's not saying that either.

20   Q.      Right.  What he's saying is, and if you look

21   with me at the last section we were at -- you have that

22   document, 01219629.  So if you can pull up the

23   paragraph that says, Jackie, we need some

24   clarification, what he's saying here is under the

25   standards that are being set, because TVT still has

Confidential - Subject to Protective Order

Page 438

1    very high percentage of particle loss, TVT will fail

2    under the test, and he goes on to say, as it stands, we

3    will not be able to sell in France next year, right?

4                    MR. THOMAS:  Object to the form of the

5    question.

6                    THE WITNESS:  That's what he says in

7    this memo.

8    BY MR. THORNBURGH:

9    Q.      Right.  So he's concerned about whether or not

10   TVT is going to be able to be sold in France because of

11   the particle loss issue, right?

12                   MR. THOMAS:  Objection.

13                   THE WITNESS:  I think that's one of his

14   concerns.

15                   (Document marked for identification as

16         Deposition Exhibit No. T-2125.)

17   BY MR. THORNBURGH:

18   Q.      Hand you what's been premarked as Exhibit 2125.

19   This is a series of e-mails, and if you turn with me to

20   Bates number ending 4493, you see at the bottom Herve

21   Fournier sends to Gene Kammerer and a number of other

22   folks a English PDF that was -- it says, here is a

23   French version from which the English PDF text sent

24   yesterday by AFNOR.

25                   You see that?

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Subject to Protective Order

Page 439

1    A.       Yes.

2    Q.       And then Herve Fournier says in the document,

3    it is stated that one soft elongation of 0.01 kN, which

4    equals ten Newtons.

5            You see that?

6    A.       No.

7    Q.       So on the same page, 4493.

8    A.       Okay.  Coming up, okay, I see it.

9    Q.       It says, in the document, it is stated that a

10   one soft elongation of 0.01 kN or which equals, I

11   guess, 10 Newtons, right, is applied instead of 10

12   elongation of 25 Newtons as proposed by CL Medical!

13   Even in this case 8.5% loss of particles is noted for

14   TVT, right?

15           You see that?

16              MR. THOMAS:  Object to the form of the

17   question.

18   BY MR. THORNBURGH:

19   Q.       So even in the case of one soft elongation pull

20   at 10 Newtons -- sorry -- one soft elongation is

21   applied instead of 10 elongation of 25 Newtons as

22   proposed -- I'm sorry.

23           Basically, what it's saying is the standards

24   are being relaxed here based on the other documents we

25   have looked at what they're proposing is a one soft

Confidential - Subject to Protective Order

Page 440

1   elongation of 10 Newton pull, right?

2                    MR. THOMAS:  Object to the form of the

3   question.

4                    THE WITNESS:  I see that it's written

5   here.

6   BY MR. THORNBURGH:

7   Q.      Instead of what they were proposing before,

8   which was 10 elongation of 25 Newtons, right?

9   A.      So that was the draft, that version, I guess,

10  this is the final.

11  Q.      By then even in this case were 10 Newtons of

12  pull, only one soft pull would apply, 8.5% of particle

13  loss is still noted for TVT?

14                   MR. THOMAS:  Object to the form of the

15  question.

16                   THE WITNESS:  That's what it says.

17  BY MR. THORNBURGH:

18  Q.      So Gene Kammerer says, as you see above, this

19  data at 10 Newton times one and 8.5% particle loss does

20  not sound correct to me.  Our testing has consistently

21  shown about 1% loss of weight.  As I mentioned

22  previously we use different parameters to define the

23  test.  That is, we pull to a specific distance, rather

24  than a force.  But we also measure by loss of weight

25  and only do one pull.

Confidential - Subject to Protective Order

Page 441

1          So he is still concerned saying, wait, this

2     doesn't sound right to me, we still can't be seeing

3     8.5% particle loss at one pull at 10 Newtons, right?

4                    MR. THOMAS:  Object to the form of the

5     question.

6                    THE WITNESS:  He's saying that the

7     procedure used in-house is a different one than what is

8     recommended by the AFNOR guidance.

9     BY MR. THORNBURGH:

10    Q.      So if you go up to next Page 4492, see where it

11    says concerning fraying?

12            You see where I'm at?

13    A.      Yes.

14    Q.      Concerning fraying (to be typed by AFNOR) the

15    CL Medical/Pariente project is as follows, it have not

16    been possible to have one Newton.

17            So what Gene Kammerer was saying, no, we'll

18    just do one Newton because that's what that Lin article

19    showed, so let's just do one Newton, and this person is

20    writing to Gene and saying we can't do one Newton.

21    It's not going to be allowed.

22            To have been unfortunately decided for the time

23    being despite our efforts one elongation of 10 Newtons

24    on the slings and no excluding limit of 5% weight loss.

25    Is this fine with you?

Confidential - Subject to Protective Order

Page 442

1          And if you turn the page -- I read that
2   correctly, right?
3               MR. THOMAS:  Object to the form of the
4   question.
5   BY MR. THORNBURGH:
6   Q.     That's what that paragraph --
7   A.     You did read it correct.  I'm stumbling on the
8   no excluding limit of 5% weight loss.  What does that
9   mean?  That it's not a hard requirement but --
10  Q.     Yeah, it looks like maybe all the industry
11  pushed by Ethicon may have worked at AFNOR?
12              MR. THOMAS:  Object to the form of the
13  question.  Quit arguing and being disrespectful.
14              MR. THORNBURGH:  I'm not arguing or
15  being disrespectful.
16              MR. THOMAS:  Sure you are.
17              THE WITNESS:  This is a cold document to
18  me.  I'm not part of this e-mail stream.  This is an
19  area outside of my area of expertise.  Right now trying
20  to read through it and understand and get into the
21  context of this discussion, what happened, I'm really
22  not that kind of person that you ought to be asking
23  questions about this document about.
24  BY MR. THORNBURGH:
25  Q.     Right, but, I mean, my point is here is that,

Confidential - Subject to Protective Order

Page 443

1   you know, it's like there's 8.5% particle loss, and you

2   were a person at preclinical who had a discussion and

3   was involved about this particle loss issue, and

4   instead of just accepting the fact that there's

5   particle loss at 8.5% and having you work up a

6   preclinical study on that issue, what we see here is

7   excuses and objections about why we shouldn't follow

8   the protocols that have been set forth.  What we should

9   do is we should try to reduce or get rid of the 5%

10  standard at AFNOR, and we should say that the study

11  that's being done isn't good.  We should lower the

12  number of pulls, and we should lower the Newtons of the

13  pull, right?

14            MR. THOMAS:  Object to the form of the

15  question or object to the closing argument.

16  BY MR. THORNBURGH:

17  Q.     That's what we see here, right?  I mean, as

18  you've seen from all these e-mails we looked at, there

19  was a decision not to have you get involved in doing

20  preclinical studies on particle loss, right?

21            MR. THOMAS:  Object to the form of the

22  question.

23  BY MR. THORNBURGH:

24  Q.     We didn't see any of that discussion in the

25  exhibits we looked at, right?

Confidential - Subject to Protective Order

Page 444

1          MR. THOMAS:  Object to form of the
2   question.
3          THE WITNESS:  That's why I'm wondering
4   why you're asking me all these questions about
5   something that I was only peripherally involved with,
6   maybe even just verbally and never in any kind of
7   document where I would weigh in with my opinion.
8   BY MR. THORNBURGH:
9   Q.     Right.  Well, the point is, though, like you
10  doing all the justification memos about why testing
11  shouldn't be done and you testified earlier that you
12  should look at the worst case scenario, instead of
13  doing that, what we see is objections to standards that
14  are being proposed by AFNOR, and instead of accepting
15  the study protocol that had been done by Pariente and
16  its findings, trying to come up with a way to show that
17  there's less particle loss with the TVT slings, right?
18          MR. THOMAS:  Object to form of the
19  question.
20  BY MR. THORNBURGH:
21  Q.     That's what we're seeing here, right?
22          MR. THOMAS:  Object to the form of the
23  question.
24          THE WITNESS:  I don't see it that way.
25  BY MR. THORNBURGH:

Confidential - Subject to Protective Order

Page 445

1    Q.      Okay, well, you did see instead of accepting

2    the protocol -- the study protocol, Gene Kammerer tried

3    to come up with a less rigid study, which would show

4    less particle loss, right?

5                    MR. THOMAS:  Object to the form of the

6    question.

7                    THE WITNESS:  I don't know the context.

8    It sounds like he was providing input based on his own

9    biomechanical engineering experience.  I can only

10   surmise.

11   BY MR. THORNBURGH:

12   Q.      He proposed one pull instead of ten pulls,

13   right?

14                   MR. THOMAS:  Object to form of the

15   question.

16                   THE WITNESS:  I can only surmise that he

17   thought that that was the relevant conditions for the

18   test.

19   BY MR. THORNBURGH:

20   Q.      And instead of 25 Newtons, he proposed one

21   Newton, right?

22                   MR. THOMAS:  Object to the form of the

23   question.

24                   THE WITNESS:  Same answer.

25   BY MR. THORNBURGH:

Confidential - Subject to Protective Order

Page 446

1   Q.      That's what we've seen in these records, right?

2                   MR. THOMAS:  Object to the form of the

3   question.

4                   THE WITNESS:  You can read in these

5   e-mails.

6                   (Document marked for identification as

7                   Deposition Exhibit No. T-2126.)

8   BY MR. THORNBURGH:

9   Q.      Handing you what's been premarked as Exhibit

10  2126.  I'm going to turn your attention to the last

11  page.  It's Bates Number 00844331.  It says it's from

12  Yukie Yamano, who appears to be, as you can see,

13  from -- well, as you'll see, it's an Ethicon employee

14  from Japan.  It says, Joe, do you have time to talk on

15  this today?  Any time in the afternoon is fine for me.

16  This is a little complicated and urgent matter.  One of

17  our customers reported WHLW (government) as TVT

18  complication after making a bladder calculus.  Because

19  the surgeon think end of strand of TVT is frayed, gets

20  into the bladder and made bladder calculus.

21          You see that?

22  A.      Yes.

23  Q.      MHLW asked us if we received this kind of

24  report or not worldwide basis.  We would like to talk

25  more to explain.

Confidential - Subject to Protective Order

1          And then Joseph Megan responds, sends an e-mail
2   to Dave Robinson, who's in clinical affairs, right?
3   A.      I think Dave was the medical affairs officer
4   for Gynecare.
5   Q.      So he sends it to the medical affairs officer,
6   a clinician, right?
7   A.      Yes.
8   Q.      And he says, hi Dave, quick question (I think)
9   for Japan.  A surgeon there has filed a complaint
10  saying that the fraying of the TVT has caused a bladder
11  calculus.  (I'm not sure if the terminology is 100%
12  right with translation.)  Based on my discussion with
13  Yamano-san, it seems that maybe there was a technique
14  problem here or something, and maybe a bladder injury
15  was not recognized right away.  But we have to check
16  out the fraying issue as the surgeon filed a complaint.
17          So we're gonna -- we think it's something else,
18  but we got it -- now that a surgeon has filed a
19  complaint, now we've got to check out this fraying
20  issue, right?
21                  MR. THOMAS:  Object to the form of the
22  question.
23  BY MR. THORNBURGH:
24  Q.      That's what this appear to say?
25                  MR. THOMAS:  Object to the form of the

Confidential - Subject to Protective Order

Page 448

1    question.

2                         THE WITNESS:  Well, so the question

3    again?

4    BY MR. THORNBURGH:

5    Q.        Yeah, well, the question here is, you know,

6    what we see here is this Japanese employee of Ethicon

7    is sending an e-mail saying there's a doctor that's

8    complained that as a result of fraying of the mesh,

9    there's been an injury, a bladder calculus to a

10   patient, right?

11   A.        It's a product complaint, yes, I see that.

12   Q.        And we see Joseph Megan saying, oh, it's

13   probably physician related, but now that the surgeon

14   has filed a complaint, now we've got to check out the

15   fraying issue, right?

16                        MR. THOMAS:  Object to the form of the

17   question.

18                        THE WITNESS:  I see that.

19   BY MR. THORNBURGH:

20   Q.        And it says has the fraying been linked to any

21   complications?  Bladder related?  My understanding is

22   no.  Please let me know, and he gives his voice mail.

23             You see that?

24   A.        Yes.

25   Q.        If you go up, Dave Robinson says, the fraying

Confidential - Subject to Protective Order

Page 449

1    of the original tape has proven to be of no consequence

2    and cannot cause a calculus unless the tape is in the

3    bladder or urethra.  Three scenarios often account for

4    this finding.  Tape truly in bladder at time of TVT but

5    not recognized with cysto.  Tape in a bladder wall and

6    therefore difficult to recognize with cysto.  The tape

7    or at least the edge of the tape later erode into the

8    bladder and a calculus forms.  Tape is placed properly

9    but later erodes into the bladder and a calculus forms.

10           You see that?

11   A.      Yes, I see that.

12   Q.      These scenarios can happen with tape from any

13   manufacturer and none of them have anything to do with

14   the fraying that occurs with our original tape, right?

15           You see that?

16   A.      Yeah, I would agree with that, not as a

17   clinician but this makes -- it's logical.  It's a

18   logical conclusion.

19   Q.      Dear Dave, thank you very much for the answer

20   to our question.  I shared your comment with our

21   colleagues and we have another question.  According to

22   your e-mail, the fraying of the original tape has

23   proven to be of no consequence and cannot cause a

24   calculus unless the tape is in the bladder or urethra.

25   Does Gynecare have any clinical paper or data for this?

Confidential - Subject to Protective Order

Page 450

1    If yes, could you please provide it to us.  Regards,

2    Yukie.

3            You see that?

4    A.     Yes.

5    Q.     So then Dave Robinson responds, do you mean

6    papers regarding no calculus formation without tape in

7    the bladder (no papers to support) or that the fraying

8    is of no consequence --

9    A.     Hang on.

10   Q.     Okay.  See David Robinson's response to --

11   A.     Okay.  Which page?

12   Q.     On 4332.

13           MR. THOMAS:  When you read would you

14   please read in a monotone, as opposed to giving

15   intonations to the statement as if you're talking like

16   the person is.  That's the way all of your questions

17   have been, and I think it's more appropriate to read

18   cold monotone as opposed to any intonations.

19   BY MR. THORNBURGH:

20   Q.     You see where I'm at, the e-mail from David

21   Robinson on August 30th, 2007?

22   A.     Yes.

23   Q.     And it says, "do you mean papers regarding no

24   calculus formation without tape in the bladder (no

25   papers to support) or that the fraying is of no

Confidential - Subject to Protective Order

Page 451

1    consequence (there may be internal data on file but
2    there will be no published information).  The internal
3    data will probably only support the fact that the
4    frayed pieces remain biocompatible."
5            That's where you come in right?
6                    MR. THOMAS:  Object to the form of the
7    question.
8                    THE WITNESS:  That's his clinical
9    judgment.  Yeah, okay.
10   BY MR. THORNBURGH:
11   Q.      So Yukie Yamano writes back, Dear Dave, thank
12   you very much for your response.  I mean whether there
13   is data which the frayed piece is not consequence and
14   no possibility of causing of calculus formation.  If
15   the internal data may only support the fact that frayed
16   pieces remain biocompatible, we may not get the answer
17   we are looking for.  Our QA, that's quality assurance,
18   right?  On the next page, our QA and safety department.
19   You see where I'm at, on Bates Number 43332?
20   A.      Okay.
21   Q.      Our QA and safety department is asking the
22   following questions also.  We would appreciate if you
23   provide comments from clinical standpoint.  We are also
24   trying to get the comments from several incontinence
25   experts in Japan.  Is there any possibility of frayed

Confidential - Subject to Protective Order

Page 452

1    pieces of TVT floats (moves) into the bladder without

2    any bladder injury?  If the above question is yes and

3    the frayed pieces go into the bladder, is there any

4    possibility the frayed piece can be the core (cause) of

5    calculus formulation.  We would highly appreciate and

6    your help on this.  Thank you and best regards Yukie,

7    right?

8            So Yukie is asking too many questions.  He's

9    saying --

10                   MR. THOMAS:  Oh, please, Dan.  Come on.

11   Would you ask a straight question, please.

12                   MR. THORNBURGH:  I'm asking a straight

13   question.

14                   MR. THOMAS:  No, you're not.  You're

15   laughing when you say it.

16   BY MR. THORNBURGH:

17   Q.      Yukie has asked additional questions, hasn't

18   he?

19                   MR. THOMAS:  Object to form of the

20   question.

21                   THE WITNESS:  It looks like there's some

22   follow-up questions.

23   BY MR. THORNBURGH:

24   Q.      Okay.  And so now he's trying to get more

25   specific and trying to get additional explanation for

Confidential - Subject to Protective Order

Page 453

1   what the possible safety issues are to patients if the

2   TVT frays float or migrate into the bladder, right?

3   A.      Yes, that's his question.

4   Q.      So you Dave writes, dear Yukie, the answer to

5   your first question is no.  I will forward your

6   question to Tom Barbolt for further input.

7           You see that?

8   A.      Yes.

9   Q.      Do you remember this discussion?

10  A.      No, I -- so what he's forwarding to me then is

11  the question, if the phrase --

12             MR. THOMAS:  He hasn't showed you

13  anything yet that he forwarded to you.

14  BY MR. THORNBURGH:

15  Q.      Yeah, my question to you is do you recall this

16  discussion?  I've got your responses.

17  A.      I don't recall this specifically discussion,

18  not even copied on the e-mail.

19  Q.      Well, let's see if that ever happened.

20  A.      Okay.

21  Q.      So what I have done is I've marked 2127.

22             (Document marked for identification as

23             Deposition Exhibit No. T-2127.)

24  BY MR. THORNBURGH:

25  Q.      Which is a additional e-mail about this

Confidential - Subject to Protective Order

Page 454

1    discussion.  Can you look at -- if you look through

2    this document on page 4342, 4343 and 4344, you'll see

3    that that's the string of e-mails that we just

4    discussed which were questions and attempts at

5    answering Yukie Yamano questions, right?

6    A.      Yes.

7    Q.      And then it looks like on 4342, it says, David

8    Robinson is the person sending -- forwarding you the

9    e-mail, e-mails that we've just discussed on Friday,

10   August 31st, 2007 to you and to Yukie Yamano.  "Asking

11   TVT Complication? - Fraying" is the subject line,

12   right?

13           Dear Tom, can you help with any info regarding

14   the lack of impact regarding frayed edges.  Thank you

15   for your help.

16           And then you write on the next page, 4341, I

17   think your three scenarios are correct, Dave.  It is

18   not biologic plausible -- sorry -- it is not

19   biologically possible -- I think you meant not

20   biologically possible, right?

21                   MR. THOMAS:  Object to the form of the

22   question.

23                   THE WITNESS:  It is not biologically

24   possible.

25   BY MR. THORNBURGH:

Confidential - Subject to Protective Order

1   Q.      Biologically possible for the filaments of the

2   TVT tape to cause urinary calculi unless they are in

3   contact with the urine in either the bladder or the

4   urethra.  I know of no preclinical (or clinical)

5   studies examining the question as it is well accepted.

6           Number one, that doesn't completely answer

7   Yukie's questions.  One of his questions was if the

8   frayed piece is loose can it migrate into the bladder

9   causing a bladder calculi, right?

10                  MR. THOMAS:  Object to form of the

11  question.

12                  THE WITNESS:  I don't see that in this

13  e-mail string.

14  BY MR. THORNBURGH:

15  Q.      Did David Robinson not forward to you the full

16  question from Yukie?

17  A.      I don't know.  I don't recall that.

18  Q.      So you never did a pre -- you never did a

19  preclinical study that looked at the potentiation of a

20  frayed, loose, migrating piece of the tape going into

21  the bladder and causing a bladder calculi, correct?

22  A.      Yeah, I know I'm not -- I know of no such

23  preclinical study.

24  Q.      I mean, it's possible if you've got these loose

25  particles or loose, frayed pieces of the tape, it's

Confidential - Subject to Protective Order

Page 456

1   possible that the body will try to push that particle

2   or that loose, frayed piece out of the body, and it

3   could come into contact with the bladder causing a

4   bladder calculi, right?

5                    MR. THOMAS:  Object to the form of the

6   question.

7                    THE WITNESS:  I'm not a clinician;

8   however, I do agree with the three scenarios that Dave

9   had proposed.  I think he was correct.

10  BY MR. THORNBURGH:

11  Q.     I don't know that answered my question, sir.

12  My question to you was you never studied whether or not

13  it was possible for these loose particles or for loose,

14  frayed pieces of the mesh to migrate into the bladder

15  causing a bladder calculi, right?

16                   MR. THOMAS:  Object to the form of the

17  question.

18                   THE WITNESS:  I think it's highly

19  unlikely, given the thickness of the muscular wall of

20  the bladder.

21  BY MR. THORNBURGH:

22  Q.     That wasn't my question.

23         My question was you never studied that issue

24  specifically?

25  A.     That's correct.

Confidential - Subject to Protective Order

Page 457

1  Q.       I mean, it's like if I get a splinter in my

2  finger, and sometimes it can go down deep, my body

3  usually either tries to gobble it up and sometimes it

4  just disappears.  Oftentimes, though, it gets pushed,

5  it gets migrated out of my finger, out of my body as

6  part of the inflammatory foreign body response, right?

7                MR. THOMAS:  Object to the form of the

8  question.

9                THE WITNESS:  Well, a foreign body in

10  the vicinity of the surface of the skin and a foreign

11  body embedded in the pelvic fascia is really a

12  different location.

13  BY MR. THORNBURGH:

14  Q.       Right.  But my question is in that example that

15  I gave you about the splinter, the body can move it,

16  can migrate that splinter outside of my body, right?

17  A.       What the body does is create an inflammatory

18  reaction to the splinter, it heals underneath the

19  splinter, and then the splinter comes to the surface as

20  the skin exfoliates it.

21                MR. THORNBURGH:  We've got to go off the

22  record.

23                THE VIDEOGRAPHER:  We're going off the

24  record.  The time is 11:50 a.m.

25                (Brief recess.)