# Exhibit 6

Confidential – Subject to Protective Order

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

- - -

IN RE:  ETHICON, INC.        :  MDL NO. 2327
PELVIC REPAIR SYSTEM,        :
PRODUCTS LIABILITY           :
LITIGATION                   :
THIS DOCUMENT RELATES TO ALL CASES

- - -

AND VARIOUS OTHER CROSS-NOTICED ACTIONS
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

- - -

August 20, 2013

- - -

Videotaped deposition of DANIEL J. SMITH taken pursuant to notice, was held at the law offices of Riker Danzig Scherer Hyland & Perretti LLP, Headquarters Plaza, One Speedwell Avenue, Morristown, New Jersey, beginning at 9:07 a.m., on the above date, before Ann Marie Mitchell, a Federally Approved Certified Realtime Reporter, Registered Diplomate Reporter and Notary Public for the State of New Jersey.

- - -

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph|917.951.5672 fax
deps@golkow.com

Confidential - Subject to Protective Order

Page 159

1          A.          I would imagine they were.

2          Q.          When was the first time you found out

3     that the mesh for -- used in TVT Classic frayed?

4          A.          Probably when I worked with the mesh

5     in the 2001 time frame.

6          Q.          So when you first started working on

7     mesh products used for stress urinary incontinence,

8     you learned and became aware that the mesh used in

9     the product would fray?

10         A.          I was aware of it.  I think it was --

11    when you cut fabric, it's typical that pieces would

12    come off and were put -- the pieces that would come

13    off that you're calling fraying are obviously much

14    smaller than the mesh itself that we're putting in.

15         Q.          Well, would you lose some portion of

16    the implant, it would essentially come apart,

17    wouldn't it?

18         A.          No, not necessarily, since the design

19    of the weave itself would not let that happen,

20    the -- it was just the fraying was on the outer

21    edges.

22         Q.          It would lose volume of particles,

23    wouldn't it?

24         A.          Minor, yes.

25         Q.          Minor?  Is that your word, minor?

Confidential - Subject to Protective Order

Page 160

1      A.      You just lose a few pieces of small

2   lengths of fiber.

3      Q.      When you found out this was happening

4   in 2001, did you go back and ask somebody who had

5   been there previously, did we intend for this to

6   happen?

7      A.      I don't recall that I had a general

8   conversation about that.  I know it was a known --

9   it was known to us.  It was known to our

10   competitors.

11      Q.      And that would sometimes result in

12   the product having sort of a jagged edge look,

13   wouldn't it?

14      A.      Whether it frayed or not, the

15   product -- the mesh had a jagged edge look primarily

16   as part of its fixation.  It was sometimes referred

17   to as the Velcro effect.

18      Q.      Now, when this really became an issue

19   with physicians is when you went to the TVT Blue,

20   isn't it?

21      A.      It became I think an issue maybe

22   prior to that or during that.  Blue made it more

23   visible.  But competitors would stretch our mesh

24   beyond the elastic limits of the mesh, or the usable

25   limits of the mesh, on black paper even when it was

Confidential - Subject to Protective Order

Page 161

1    clear.

2         Q.      Well, it didn't have to be stretched

3    beyond the usable limits for it to fray, did it?

4         A.      Typically, yes.

5         Q.      So it was only if it was misused that

6    it frayed?

7         A.      Yeah.  If you didn't -- if you didn't

8    stretch it, the pieces would have stayed in place.

9         Q.      Is the natural use of this product,

10   the ordinary course of using the product, it would

11   be stretched enough to have particle loss, wouldn't

12   it?

13        A.      Yes.

14        Q.      If you -- let me show you what I'm

15   going to mark as -- or what previously has been

16   marked as Exhibit Number 365.

17               Do you see that this is an e-mail

18   chain that starts with an e-mail from Richard Hu to

19   a number of individuals back in April of 2001?

20        A.      Yes.

21        Q.      And do you see where it says, in the

22   first e-mail, April 23, 2001 at 2:37 p.m., "Dr. Alex

23   Wang provided some valuable recommendation regarding

24   TVT when I met with him last week"?

25               And do you see where down at the

Confidential - Subject to Protective Order

1    bottom of the page it says, "The width of tape is

2    not consistent.  Some portion is wider than

3    1.1 centimeter and some narrower.  Dr. Wang

4    suggested we improve our manufacturing process to

5    make sure the wide is consistent.  Or, we have to

6    prove there is no clinical impact because of the

7    width variance"?  Do you see that?

8           A.     Yes.

9           Q.      If you go to the page before that,

10   actually, two pages -- yeah, one page before that,

11   do you see where there is an e-mail in the middle of

12   the document from Richard Hu to Laura Angelini

13   saying, "Hi Laura, Thank you for the help in

14   advance.  Below are picture files which show the

15   uneven width and serious fraying edge.  You might

16   want to show the pictures" of this -- "if this is

17   discussed."  Right?

18          A.      I'll take your word for it.  I'm just

19   trying to find it.  I'm sure it does.

20          Q.      It's the middle of the page that's

21   page 475.

22          A.     Yes.

23          Q.      And then Laura Angelini writes on the

24   bottom of page 474, "Dear All, I would like you to

25   read the correspondence here below.  Dr. Alex Wang

Confidential - Subject to Protective Order

Page 163

1    from Taiwan, one of the most experienced TVT users

2    in the world, has recently encountered some

3    difficulties because of inconsistent tape width of

4    our TVT.  I enclose here below the pictures he has

5    taken (important, product not used!  only opened!)

6    as well as the message containing his comments.  I

7    think this is not an acceptable tape configuration.

8    I discussed this with Dieter Engel and he suggested

9    to forward this to the TVT-L team for improving

10   during development of the blue tape."  Do you see

11   that?

12          A.      Yes.

13          Q.      And what was the TVL -- TVT-L team?

14          A.      I'm not sure who all was on the team,

15   but it was a team that was put together to create

16   the TVT mesh that's blue.

17          Q.      Okay.

18                  Then you see the next page or the

19   page 2 of the document, there's an e-mail from

20   Martin Weisberg in the middle of the page.

21          A.      Let me go back.  73?

22          Q.      Yes.

23                  Dated June 4, 2001, saying, "Dr.

24   Wang's suggestions are good and it is not the first

25   time we have heard them or thought about

Confidential - Subject to Protective Order

Page 164

1    implementing them.  I don't think we have any idea

2    whether the tape inconsistencies are clinically

3    significant or not, however the appearance of the

4    tape in the appended pictures certainly gives the

5    impression of inconsistent manufacturing and/or

6    quality control."  Do you see that?

7         A.      That's what he said.

8         Q.      Did you come to work on TVT products

9    shortly after that?

10        A.      It was after this, yes.

11        Q.      Look at what I'm going to hand you

12   next, which has previously been marked as

13   Exhibit Number 531.

14               Do you see where this is dated

15   November 18, 2003, and it's to the file from three

16   individuals.

17               How do you pronounce the first

18   individual's name?

19        A.      They were cc'd.  It's not from them.

20   But it's Mosaddeq Hossain, Gene Kammerer and Brian

21   Luscombe.

22        Q.      You're correct, they were cc'd on

23   this.  It was actually written by Marty Weisberg.

24   Correct?

25        A.      Correct.

Confidential - Subject to Protective Order

Page 165

1          Q.          And he says in this document, "This
2     note to file will address complaints of TVT
3     Tension-free Support for Incontinence mesh fraying
4     during placement.  Since introduction of the device
5     in 2000, there have been a total of 58 complaints of
6     fraying.  Fraying is inherent in the design and
7     construction of the product.  The application of
8     tension exacerbates this issue.  When the mesh
9     frays, several events occur:  the mesh elongates in
10    places; the mesh narrows in places; and small
11    particles of Prolene might break off."  Do you see
12    that?
13         A.          That's what he wrote.
14         Q.          So what Dr. Weisberg is saying here
15    is, it's just inherent in the design of this
16    product.  Right?
17         A.          He says that, as well as that fraying
18    does not affect the safety or effectiveness of the
19    device and they will not pursue it at this time.
20         Q.          Right.
21              We just saw an e-mail from him back a
22    few months before in which he said, I don't know
23    whether it has clinical significance or not.  Do you
24    remember that?
25              MR. HUTCHINSON:  Object to form.

Confidential - Subject to Protective Order

Page 166

1                        THE WITNESS:  Yes.  In 2001, I think.

2    BY MR. BLIZZARD:

3          Q.       And so here in 2003, he's saying,

4    well, I don't think it has clinical significance.

5    Right?

6                        MR. HUTCHINSON:  Object to form.

7                        THE WITNESS:  I'd have to read the

8    whole e-mail and we'd have to talk to Marty as to

9    what changed his position, but he did.

10   BY MR. BLIZZARD:

11         Q.       What studies are you aware of that

12   were ever done in animals or humans to determine the

13   clinical significance of this fraying?

14         A.       I am not aware.

15         Q.       Do you know, you know, when particles

16   break off of a medical implant, sometimes that's

17   call debris?  Have you heard of that before?

18         A.       Not in this case.

19         Q.       Well, I understand you may not have

20   heard it in this case, but when you've got --

21         A.       Let me rephrase it.  I've never heard

22   it called debris, but, I mean, I...

23         Q.       Do you know anything about

24   biomaterial science?

25         A.       A little bit.  There's another --

Confidential - Subject to Protective Order

1    other folks on the team that deal with that aspect

2    of it.

3          Q.       You know that implants are a foreign

4    body?

5          A.       Yes.

6          Q.       And they evoke foreign body

7    responses.  Correct?

8          A.       To a degree, yes.

9          Q.       So they're not inert, are they?

10         A.       They're tested for their inertness or

11   foreign body response to be acceptable or not

12   acceptable.

13         Q.       They have a foreign body response?

14         A.       Yes, they do.  Yes, they do.

15         Q.       The body produces cells in response

16   to an implant being put in the body.  Correct?

17         A.       Yes.

18         Q.       And if you have more particles

19   flaking off of the implant, you're going to have

20   typically more of a foreign body response, aren't

21   you?

22                  MR. HUTCHINSON:  Object to form.

23                  THE WITNESS:  I would say that would

24   be an incorrect statement, because if you lost

25   particles, then you would actually have less

Confidential - Subject to Protective Order

Page 168

1    material.  So, I mean, in this particular case, the

2    particles are a minute portion of the mesh that's

3    being implanted.  So the foreign body response of a

4    mesh that's half an inch wide, far greater mass than

5    a few particles on the edge.

6    BY MR. BLIZZARD:

7         Q.      Well, I mean, if those particles

8    flake off once they're in the body, those particles

9    create an additional potential for foreign body

10   response, don't they?

11        A.      No.  If they didn't break off, they

12   would have the same foreign body response if they

13   stayed attached.  So there is no difference whether

14   they're attached or not attached if there's a

15   foreign body response.

16        Q.      So what expert analysis do you rely

17   on for that statement?

18        A.      Just common sense.

19        Q.      So that your position is -- and I

20   guess, is it the company's position that if the

21   implant is intact and stays intact that there's

22   going to be a bigger foreign body response to that

23   than if parts of the implant come off of it --

24              MR. HUTCHINSON:  Object to form.

25   BY MR. BLIZZARD:

Confidential - Subject to Protective Order

Page 169

1      Q.      -- in the body?

2              MR. HUTCHINSON:  Object to form.

3      Counsel, I remind you, this is not a 30(b)(6)

4      deposition.  It is fact witness only.

5      BY MR. BLIZZARD:

6      Q.      Well, withdraw the company's

7      position.

8              Is it your position that if there's

9      going to be a bigger response, foreign body response

10     to an intact implant than an implant that's losing

11     particles after implantation?

12     A.      So let me try to explain my original

13     statement.

14              You were asking if you'd have greater

15     foreign body response if you lost a particle.  So my

16     answer was that if you have a mass of X and we know

17     that that mass of X has an acceptable foreign body

18     response in the body, because that's been tested, if

19     you have a particle that separates and is still in

20     the body, you still have that same mass.  And if a

21     particle or two fell off, then you would have

22     potentially slightly less, but the mass is so much

23     greater in terms of the mesh that's being implanted

24     than this small particle that perhaps fell off.

25     Q.      The foreign body response created to

Confidential - Subject to Protective Order

Page 170

1    a particular implant is not dependent solely on the
2    mass, is it?
3          A.      No.  But since we're speaking of TVT,
4    I was only referring to that.  If you changed the
5    material, you'd have a different foreign body
6    response.
7          Q.      Surface characteristics of the
8    implantable material affect the foreign body
9    response, don't they?
10          A.      They could have an effect.
11          Q.      And so this was intended originally
12   to be a single implant, one designed to be implanted
13   in the human body with certain surface
14   characteristics.  Correct?
15          A.      Like I indicated, it was before my
16   time, but the edges of the mesh have always been
17   designed to be sticking out of the mesh and have a
18   Velcro effect for fixation.
19          Q.      And was it part of the design to let
20   there be debris or fraying or particle loss of these
21   implants?  Was that part of the design?
22                  MR. HUTCHINSON:  Object to form.
23                  THE WITNESS:  Again, since I was not
24   part of that development years before I joined, and
25   I'm sure they knew that they had particle loss, that

Confidential - Subject to Protective Order

Page 171

1  was -- I would have to assume that would be part of

2  the design.

3  BY MR. BLIZZARD:

4      Q.      Well, let me just ask, are you aware

5  of any studies in humans, animals, on the pathology

6  of foreign body response to these frayed particles?

7      A.      No.  It's, again, not -- you know, it

8  wouldn't be something that I would have seen, and

9  I'm not sure if -- what was done on that.

10     Q.      Well, you were intimately involved in

11  this issue, weren't you?

12     A.      I was involved in some of the issues

13  with particle loss, yes.

14     Q.      You were concerned about the fact

15  that when they went to TVT Blue, that these blue

16  particles were visible to physicians.  You were

17  concerned about that, weren't you?

18     A.      Yes.

19     Q.      Let me just show you or hand you

20  what's been marked as Exhibit Number 366.

21              If you look at the e-mail at the top

22  of page 1, is this an e-mail written by you?

23     A.      Yes.

24     Q.      And this is dated February 27, 2004.

25  Correct?

Confidential - Subject to Protective Order

Page 172

1          A.      Yes.

2          Q.      You wrote it to Janice Burns; is that
3    right?

4          A.      Yes.

5          Q.      What was Janice Burns' position with
6    the company?

7          A.      Marketing.

8          Q.      And the subject is, it says,
9    "Important:  2 TVT Complaints concerning allegedly
10   brittle mesh."  Do you see that?

11         A.      Yes.

12         Q.      You write in the first sentence, "I
13   believe this MUST," and must is capitalized, all
14   caps.  Right?

15         A.      It is.

16         Q.      So you were emphatic about this.
17   Right?

18         A.      It was my position.

19         Q.      "I believe this MUST be discussed at
20   a Ronnie, Alan, Laura, Barbara" -- how do you
21   pronounce that next name?

22         A.      I couldn't tell you right now.  I'm
23   not sure what her role was at the time.

24         Q.      -- "Pryia level ASAP."

25                 What level would that be?

Confidential - Subject to Protective Order

1          A.      Most of those were vice presidents.

2     I'm not sure, Pryia, what her level was, but she

3     probably was a vice president.

4          Q.      So you're saying this must be

5     discussed at the vice president level immediately.

6     Right?

7          A.      That's what I said.

8          Q.      "This is not new, and was exactly the

9     original issue that stopped TVT blue for months.

10    The fix (I'm not sure how to complete) is to cut the

11    mesh using ultrasonics, but it has not been

12    validated and I'm not sure where it sits on the

13    Operations priority list.  I recall it was scheduled

14    for mid to end of 2004 (last year) and" -- how do

15    you pronounce that city in Germany?

16         A.      Neuchatel.

17         Q.      -- "will have to do this along with

18    TVT Next, D'Art, the sheath splitting, and TVTO

19    scale up.

20                 "I believe that the board has to set

21    a directive that can be filtered down to the reps,

22    saying its OK."

23                 So you're asking that the board

24    actually set a directive here indicating that it's

25    okay for these particles to be fraying.  Right?

Confidential - Subject to Protective Order

Page 174

1      A.      It was my opinion coming in that --

2  and what Ethicon gives us the authority to do is to

3  speak, you know, our concerns.  And I raised my

4  concern up to the vice president level and wanted

5  them to be aware of it.

6      Q.      Okay.

7              "Saying its OK and its not an issue,

8  same as TVT clear except you can see it."

9              So essentially you had the same issue

10  with TVT clear, but you couldn't see it until you

11  started making the implant in blue.  Correct?

12      A.      Not correct.  As I indicated, you

13  know, our competitors would stretch the clear over

14  black paper and you could see it as well.

15      Q.      It says, "By the way you can also see

16  it in the package as the pieces fall out of the

17  sheath splits!"

18              So actually, you can see these

19  particles coming off in the package.  Right?

20      A.      They're minor, as I indicated

21  earlier.

22      Q.      Now, what does the next sentence say?

23  Could you read that out loud for me?

24      A.      "This is not going" to go "away

25  anytime soon and" our "competition will have a field

Confidential - Subject to Protective Order

Page 175

1    day, major damage control...needs to start to

2    educate the reps and surgeons UPFRONT as they will

3    see" the "BLUE shit and it is OK.  This is why I

4    wanted to launch TVTO in clear!!!!!"

5           Q.      So basically you're saying they're

6    going to see this blue stuff and that it's okay, and

7    then you say, "This is why I wanted to launch TVTO

8    in clear!!!!!"

9                   So you wanted to make sure it was in

10   clear so it wouldn't be seen.  Right?

11                  MR. HUTCHINSON:  Object to form.

12                  THE WITNESS:  No.  Well, yes and no.

13   So TVT-O was being launched as -- originally as a

14   mechanically cut product, which is -- a mechanically

15   cut product has the fraying associated with it,

16   which had much clinical evidence with it.  And we

17   were working at the same time on putting in either

18   ultrasonics or laser cutting.  So it was my opinion,

19   and I, you know, felt that if we were going to do

20   that, we would eliminate the particle loss by

21   completing the activities that we're going to do

22   first.  Otherwise, we'd have to explain it.  And

23   perhaps it's a poor choice of words in some of it,

24   but it was my opinion.

25   BY MR. BLIZZARD:

Confidential - Subject to Protective Order

Page 176

1        Q.        So you didn't want to have to explain

2    it to the doctors?

3        A.        We will.  Again, it's Marty's e-mail

4    saying that it has no clinical relevance.

5        Q.        Well, you didn't want to have to

6    report it as a complaint even when doctors said,

7    hey, we're seeing this stuff coming off the implant,

8    you didn't even want to report it and log it as a

9    complaint, did you?

10                MR. HUTCHINSON:  Object to form.

11                THE WITNESS:  I don't believe I said

12    that here.

13    BY MR. BLIZZARD:

14        Q.        Let me show you what I'm going to

15    mark as Exhibit 2154.

16                        -   -   -

17                (Deposition Exhibit No. T-2154,

18                E-mail chain, top one dated 02 Mar 2004,

19                Bates stamped ETH.MESH.00865322 and

20                ETH.MESH.00865323, was marked for

21                identification.)

22                        -   -   -

23    BY MR. BLIZZARD:

24        Q.        Do you see where it says at the

25    bottom of page 1 -- actually, if you go over to the

Confidential - Subject to Protective Order

Page 177

1   next page, page 2, there's an e-mail, it says, "Dear
2   all."  Do you see that?
3        A.        Uh-huh.
4        Q.        It looks like it's authored by Steve
5   Bell; is that correct?
6        A.        He was the director of marketing for
7   Europe.
8        Q.        Do you see where it says, "Dear all,
9   As more and more customers now move to TVT Blue and
10  TVT-O with blue mesh you may sometimes hear.  'I can
11  see small blue pieces come off the mesh!  What's
12  wrong."  And then he writes, "KEY POINTS.  Gynecare
13  Blue TVT mesh and Gynecare Clear TVT mesh are
14  exactly the same."  Do you see that?
15       A.        Yes.
16       Q.        That's true, isn't it?
17       A.        Except for the color.
18       Q.        So it was easier to see the blue
19  particles than it was the clear particles.  Right?
20       A.        The reason for going to blue was so
21  that the surgeon could see it under the urethra.
22       Q.        Right.
23                 But they also could see the fraying
24  easier?
25       A.        Yes.

Confidential - Subject to Protective Order

Page 178

1          Q.        So as "The same number of particles

2    came off the clear mesh when it was stretched --

3    It's just that you see them against the tissues and

4    skin more when they are blue. -  This is no

5    different to what has happened for the past 7 years

6    with TVT."  Do you see that?

7          A.        Which is, again, supportive of

8    there's no safety or clinical issue.

9          Q.        So it says in item number 3,

10   "Reassure your doctors that this is part of the

11   success of TVT.  The way we have cut the mesh makes

12   the edges softer and we feel this has been a crucial

13   success factor in TVT.  Reassure them that PROLENE

14   is proven to be inert and there are hundreds of

15   papers going back 25 years to reinforce this point.

16   These particles will not cause any problem."  Do you

17   see that?

18         A.        That's what he wrote.

19         Q.        Okay.

20                   And these were representations made

21   by the company to physicians at Steve Bell's

22   recommendation.  Right?

23         A.        I would assume, yes.

24         Q.        You believed them to be true, didn't

25   you?

Confidential - Subject to Protective Order

Page 179

1          A.          I believe it, yes.

2          Q.          You have no problem making these

3    representations to physicians, do you?

4                      MR. HUTCHINSON:  Object to form.

5                      THE WITNESS:  I have no problem

6    discussing them, that Prolene has the

7    characteristics that are listed here, that it is --

8    you know, the body will accept Prolene.

9    BY MR. BLIZZARD:

10         Q.          You have no problem making the

11   representation that Prolene is inert?

12         A.          I think inert, in the word that is

13   being used here, I think I have stated that it will

14   not have any -- a negative tissue reaction that

15   would be bad.  I mean, Prolene -- this is the same

16   Prolene that's used in cardiovascular surgery and

17   blood vessels, heart surgeries.  It's been -- and

18   that's where the 25 years comes from.  So when you

19   take a suture and you take a -- and stitch a vessel

20   back together with small pieces of suture, you

21   basically have small pieces of polypropylene.  So,

22   in essence, that's been going on for years.

23         Q.          As an engineer who's worked for the

24   company for years, again, you believe and have

25   represented to customers of the company and to other

Confidential - Subject to Protective Order

1   people within the company that polypropylene, when

2   inserted in the human body, is inert?

3          A.      It will not have a negative foreign

4   body response.

5          Q.      Is that always the case?  There's no

6   tissue reaction that's negative ever?

7          A.      Negative in terms of the fact that

8   there's always a foreign body response, but the body

9   then heals itself.

10         Q.      On every occasion where it's

11  implanted in a human, it has that response?

12         A.      You're putting words in my mouth.

13         Q.      Well, I'm asking.

14         A.      If you have an infection, obviously,

15  that would be the case.

16         Q.      Well, it can cause --

17                 MR. HUTCHINSON:  Hold on just a

18  minute, Counsel.  Let the witness finish his answer,

19  please.

20                 THE WITNESS:  I am obviously trying

21  to explain, you know, polypropylene has been used.

22  Steve Bell, who wrote this e-mail, uses it as inert.

23  Inert can add the connotation that there will be no

24  response at all.  I don't believe that that's -- I

25  mean, I think everyone understands that when you put

Confidential - Subject to Protective Order

Page 181

1    anything in the body, there is some degree of

2    foreign body response.

3    BY MR. BLIZZARD:

4         Q.      So using inert in a technical sense,

5    this is false, isn't it?

6         A.      I probably would have used a

7    different word.

8         Q.      But this is what Steve Bell was

9    telling the salespeople to go out and tell doctors.

10   Right?

11        A.      It appears that way.

12        Q.      Now, by the way, when you put

13   polypropylene, mesh polypropylene from these

14   implants in the body, there is a foreign body

15   response.  Right?

16        A.      To an acceptable degree.

17        Q.      And it can become a chronic foreign

18   body response, can't it?

19        A.      I'm sure if there's conditions exist,

20   it could, yes.

21        Q.      It could involve macrophages and

22   giant cells.  And when that happens, we're actually

23   getting an immune response to the product, aren't

24   we?

25                MR. HUTCHINSON:  Object to form.

Confidential - Subject to Protective Order

Page 182

1          THE WITNESS:  You're -- you are

2    getting a little bit outside of my education in

3    terms of that, so if -- you know, you probably would

4    be best talking to other folks around the immune

5    responses and cell responses.

6    BY MR. BLIZZARD:

7          Q.      Let me show you what -- well, before

8    we get to that next exhibit, let me talk about this

9    one.

10         If you look at the -- below the

11   summary, do you see where Steve Bell says --

12         A.      Are we back on the document?  I put

13   it away.

14         Q.      Yes, I'm sorry.  I'm sorry.  I wasn't

15   quite finished with it.

16         Do you see where it says, "Be

17   proactive (the competition will try and target this!

18   Especially BARD as they have a sealed edge tape) and

19   remind your customers it is the same as clear.  It

20   is a proven safe implant (in the blue format over

21   100,000 have been implanted world wide).  Remind

22   them of the benefits of blue mesh.  Remind them it

23   is inert PROLENE with over 25 years of use.  Remind

24   them of our wealth of clinical data with ultra low

25   complication rates."  Do you see that?

Confidential - Subject to Protective Order

Page 183

1       A.      That's what he wrote.

2       Q.      These were all suggestions that were

3   made for salespeople to communicate.  Right?

4       A.      I don't understand where the -- and

5   don't see the "here all," so I'm not sure where all

6   this went to.  But being Steve is in marketing, I'm

7   sure he was communicating it to marketing.

8       Q.      You would expect these

9   representations -- these recommendations by Steve to

10  be carried out, wouldn't you?

11      A.      I would say yes.

12      Q.      If you look at an e-mail on the

13  bottom of the first page, do you see it's from you

14  to Charlotte Owens, who is a medical director for

15  the company at the time?

16      A.      Uh-huh, yes.

17      Q.      And it says, "Subject:  Reminder on

18  BLUE mesh!"  The "Importance" is indicated as

19  "High."  Right?

20      A.      Yes.

21      Q.      It says, "Charlotte, With regard to

22  our discussion yesterday around logging customer

23  complaints, I just wanted to keep you up to date and

24  informed.  I do not know how these questions are

25  being logged or if they need to be?  You may want to

Confidential - Subject to Protective Order

Page 184

1   discuss this with Janice to better understand the

2   customer situation.

3               "This is a marketing communication

4   regarding 'BLUE' TVT mesh.  There has been some

5   customer questions raised about the blue" package --

6   "the blue particles again (the same as when it was

7   released in the states)."  Do you see that?

8        A.      Yes.

9        Q.      Then Charlotte Owens responds to your

10  e-mail saying, "If a patient is affected then it

11  constitutes a complaint.  If it is just physicians

12  feeling a certain way about it then we don't log it

13  as a complaint."  Do you see that?

14       A.      Oh, I'm sorry, I went down and not

15  up.  Yes.

16       Q.      So Charlotte Owens is saying, look,

17  if it's just a physician reporting that this blue

18  stuff is coming off, we don't log that as a

19  complaint?

20       A.      That's what she said.

21       Q.      Okay.

22       A.      But we do know that they were logged

23  as complaints in some cases.  Depending how they

24  came in, they get logged, depending on the category

25  they come in.

Confidential - Subject to Protective Order

1          Q.        Let me show you what I'm going to

2    mark as Exhibit Number 2155 to your deposition.

3                         -   -   -

4                   (Deposition Exhibit No. T-2155,

5               E-mail chain, top one dated 09 Mar 2004,

6               Bates stamped ETH.MESH.00863405 through

7               ETH.MESH.00863407, was marked for

8               identification.)

9                         -   -   -

10   BY MR. BLIZZARD:

11         Q.        You see this is an e-mail at the

12   bottom of the page from you dated March 9, 2004?

13         A.        On the second page?

14         Q.        It starts at the bottom of the first

15   page.

16         A.        Yes.

17         Q.        Do you see it's dated March 9th and

18   it's "Importance:  High," "Complaint TVTO"?  Do you

19   see that?

20         A.        Yes.

21         Q.        And the body of the e-mail starts

22   over on the next page.

23                   Do you see where it says, "There are

24   seven complaints and 6 are for the BLUE mesh

25   fraying, the seventh will be reviewed to understand

Confidential - Subject to Protective Order

1    what happened.  Steve Bell has issued an information

2    sheet (below) to the sales force last week however I

3    believe there may be a need for additional damage

4    control if we do not want to impact TVT-O sales!"

5              So there was concern about this blue

6    stuff impacting sales.  Correct?

7         A.      Yes.  From an R&D person.

8         Q.      It says, "What was done, when the USA

9    converted to BLUE mesh?  Will BLUE mesh fraying

10   complaints be a measure of success (in a negative

11   way) for TVTO?  Should this be addressed on a GLOBAL

12   basis?  What should" -- and I don't know why I can't

13   remember how to pronounce that.

14        A.      Neuchatel.

15        Q.      -- "Neuchatel's standard complaint

16   reply look like and how will this stock answer be

17   perceived by the surgeons?"

18              These were all questions that you

19   had.  Right?

20        A.      I did.

21        Q.      And then if you look over on the next

22   page, do you see where Brian Luscombe responds to

23   your e-mail and sends it to a bunch of other people

24   on the same day?

25        A.      Are you talking about the first page?

Confidential - Subject to Protective Order

Page 187

1    I'm not seeing where you're looking at.

2           Q.      Go to the first page of the document.

3    There's an e-mail from Brian Luscombe, March 9, 2004

4    to you and others.  Do you see that?

5           A.      Oh, the original one.  I'm sorry.

6    Yes.

7           Q.      It says, "Subject:  Complaint TVTO.

8    All, In the US, we proactively discussed the mesh

9    construction with the physicians to make them aware

10   that our clear mesh also frays, but that this

11   fraying is inherent in the construction of our

12   mesh...we then also reinforce that the open weave

13   construction of our mesh is likely one of the

14   critical success factors that has allowed

15   GYNECARE...to be so successful - having such low

16   erosion and exposure rates."  Do you see that?

17          A.      Yes.

18          Q.      So basically what Luscombe is saying

19   is that the physicians were told that this fraying

20   was actually a benefit to the patient because it was

21   one of the reasons for low erosion/exposure rates.

22   Correct?

23                  MR. HUTCHINSON:  Object to form.

24                  THE WITNESS:  That would be an

25   incorrect assumption.  When I read this, the saying

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Subject to Protective Order

Page 188

1   is that he was saying that the mesh frays, we know

2   that.  But the mesh is the mesh and is -- the mesh

3   is what's doing -- solving the SUI.  So it's the

4   mesh itself and the expansion and the elasticity of

5   that mesh is what's giving us the low exposure and

6   erosion rates.  He's not saying that the particle

7   loss is low erosion or exposure rates.

8   BY MR. BLIZZARD:

9        Q.      Well, you know that a lot of

10  physicians were not happy with this particle loss,

11  were they?

12                   MR. HUTCHINSON:  Object to form.

13                   THE WITNESS:  I can't answer that.  I

14  know that there was some that complained about it.

15  There was others and probably more than the ones

16  that complained about it that didn't complain at

17  all.

18  BY MR. BLIZZARD:

19       Q.      Let me just show you what I've marked

20  as Exhibit Number 367.

21                   You see this is also in the same time

22  frame, November 10, 2004, from a David Menneret --

23  I'm sorry, from Sibylle Basso to David Menneret.

24  "Hello David, Please see the attached letter of

25  Mister PD Dr. Eberhard (he is one of our most urgent

Confidential - Subject to Protective Order

Page 189

1   customers!!!)  Hope you understand a little bit" of

2   "German.

3                   "Is there a process on going

4   concerning the production of the TVT blue tape?  Do

5   you have received any other comments like that one?

6   Is the problem communicated to the organization...

7   If not, what could we do?"

8                   If you look over at the next page of

9   this document, you could see there's a letter in

10  German?

11          A.      Yes.

12          Q.      Do you read German?

13          A.      No, I do not read German.

14          Q.      Look down at the below the German --

15  do you see there's a little picture there of mesh?

16          A.      Yes.

17          Q.      Does that look like some particle

18  loss there?

19          A.      There has been particle loss on the

20  edges, yes.

21          Q.      And that's not minor particle loss,

22  is it?

23                  MR. HUTCHINSON:  Object to form.

24                  THE WITNESS:  As I indicated, if the

25  mesh is stretched beyond its elastic limit, you will

Confidential - Subject to Protective Order

Page 190

1   get fraying and particle loss more severe.

2   BY MR. BLIZZARD:

3        Q.      Well, this e-mail or telefax

4   communication on page 1 does not indicate that this

5   doctor is some bozo who stretched this beyond the

6   limits.  This indicates that this guy is one of your

7   most urgent customers, doesn't it?

8                MR. HUTCHINSON:  Object to form,

9   argumentative.

10               THE WITNESS:  I can only look at

11  what's here.  Perhaps he wanted to make a point.

12  BY MR. BLIZZARD:

13       Q.      Well, do you expect -- is this

14  something --

15               This photo of this mesh, this kind of

16  particle loss, as one of the design engineers for

17  TVT, is this acceptable?

18       A.      Actually, this would be an extreme

19  case, but the design of the weave for TVT will stay

20  together if has three wales, and that indicates that

21  the mesh fraying stops.  And it's only the edges

22  that were cut that actually fray.  So the mesh stays

23  intact in terms of the use of the mesh clinically,

24  although it perhaps has fraying.

25       Q.      So your view is that this mesh, from

Confidential - Subject to Protective Order

Page 191

1    a clinical standpoint, is acceptable to put in the

2    human body?

3                    MR. HUTCHINSON:  Object to form.

4                    THE WITNESS:  It's only going to be

5    my opinion that the mesh, you know, if -- when used,

6    if stretched to this degree would still work if the

7    surgeon needed to stretch a mesh in order to make

8    the woman continent.  I have seen Dr. de Leval

9    stretch mesh perhaps even further than this.  And

10   she was perfectly continent four years later, so...

11   BY MR. BLIZZARD:

12        Q.     So you would not have a problem, I

13   take it, having a mesh product like this, this

14   product, inserted into someone you knew?

15        A.     No.

16        Q.     A photograph like this?

17        A.     Well, you wouldn't insert this

18   particular mesh.  You would -- you know, this is a

19   picture of a mesh that someone stretched.

20        Q.     It's a picture of mesh that's lost a

21   lot of particles, isn't it?

22        A.     It has narrowed.

23                    MR. HUTCHINSON:  Object to form of

24   the last question.

25   BY MR. BLIZZARD:

Confidential - Subject to Protective Order

Page 192

1    Q.    Let me show you what I'm marking as

2  Exhibit Number 369 to your deposition.

3            Do you see that this is a translation

4  of Dr. Eberhard's letter of October 18, 2004?  Do

5  you see it says it's a translation of his letter?

6    A.    Yes.

7    Q.    The title says, "TVT tape.  Dear

8  Emilie, Please find attached a TVT tape, which was

9  used as a demo unit for patients before they have

10 their operation."  Do you see that?

11   A.    Yes.

12   Q.    "Already at the operation it is

13 embarrassing to see how the tape is crumbling" --

14            MR. HUTCHINSON:  Counsel -- no, we

15 need to stay on the record.

16            Is that -- is New Jersey counsel

17 still participating in this deposition by telephone?

18            Somebody obviously put us on hold.

19            Hello?  Hello?

20            I mean, that's obviously distracting,

21 so we need to fix that.  So why don't we go off the

22 record.

23            THE VIDEOGRAPHER:  The time is now

24 2:06.  This is the end of Disk Number 3.  We are

25 going off the record.

Confidential - Subject to Protective Order

Page 193

```
 1                        -  -  -
 2              (A recess was taken from 2:06 p.m. to
 3          2:31 p.m.)
 4                        -  -  -
 5              THE VIDEOGRAPHER:  The time is now
 6   2:31.  This is the beginning of Disk Number 4.  We
 7   are back on the record.
 8   BY MR. BLIZZARD:
 9         Q.       Mr. Smith, when we went off the
10   record, we were short on tape, we had some disco
11   music playing and it was hot in here.  So I think
12   all that has been corrected.  And so are you ready
13   to proceed again?
14         A.       I am, thank you.
15         Q.       I think we were talking about
16   Exhibit 369, which is the "Translation of PD Doctor
17   Eberhard's letter of" October 18th of 2004?
18         A.       That's correct.
19         Q.       I think the first paragraph indicates
20   that he had been using the unit as a demo model for
21   patients when they were having -- before they had
22   their operation.  And he says in paragraph 2,
23   "Already at the operation it is embarrassing to see
24   how the tape is crumbling.  But it gets worse if
25   there is...stretch on the tape."  And he then says,
```

Confidential - Subject to Protective Order

Page 194

1    "It is urgent that Johnson & Johnson quickly produce

2    a" -- I think he means tape -- "that is" sold "and

3    weaved" -- "solid and weaved.  If not I have the

4    convenience that the doctors will change the" tapes

5    "and will get others (from other suppliers)."  And

6    then he says, "I can't understand that no one will

7    solve" the "problem for such a long time.  At the

8    latest, as the tape has becoming blue, everyone has

9    realized, that the quality of the tape is terrible.

10   Please see the pictures of the I-STOP tape of

11   Hausmann.  A tape has to be weaved and should not"

12   crumble.  "Please try one and you will see that the

13   tape is crumbling."  Do you see that?

14        A.      This is obviously -- yes, I see it.

15   It's his opinion, but as I think I indicated that we

16   didn't know where that mesh came from, but it was

17   obviously a sample.  So somebody was stretching the

18   mesh.

19        Q.      Right.

20                But it --

21                According to him, it was crumbling,

22   and it looks like it was crumbling, wasn't it?

23        A.      Yeah.  I mean, people would say that

24   the particles falling off, that it was crumbling.

25                God bless you.

Confidential - Subject to Protective Order

1    Q.    If you look at what I'm going to mark

2  or what's been previously marked as Exhibit Number

3  974, do you see that this is another document that

4  has to do with fraying?

5         If you look over on page 2 of this

6  document, do you see there's an e-mail from Paul

7  Parisi dated December 9th of 2004 to a number of

8  people, including yourself?

9    A.    Yes.

10   Q.    And do you see it says, "To all,

11 Allison will try to gain...VOC" -- which is voice of

12 customer, isn't it?

13   A.    Correct.

14   Q.    -- "on Laser Cut Mesh during this

15 weekend's PROLIFT cadaver lab.  Please provide

16 feedback on the questionnaire below directly to

17 her."  Do you see that?

18   A.    Yes.

19   Q.    So now, over on the first page, you

20 say -- there's an e-mail from you.  Right?

21   A.    There is.

22   Q.    And it says --

23        This is to Kevin Mahar, who was VP of

24 sales, wasn't he?

25   A.    Yes, I believe he was.

Confidential - Subject to Protective Order

1          Q.          And it's December 10, 2004.  You say,

2     "Just a thought with regard to us collecting

3     information.

4                    "Paul, what was the ruling from our

5     compliance group regarding us asking

6     questions/collecting data?  Did we have to log

7     issues as complaints???????"  And then you've got a

8     whole bunch of question marks after that.  Right?

9          A.          I do.

10         Q.          It says, "If so, we should do this in

11    a manner that avoids this issue."  Do you see that?

12         A.          Right.

13         Q.          So you were trying to do it in a

14    manner that avoided logging these issues as

15    complaints.  Right?

16         A.          Incorrect.  So you're -- if I could

17    put this in context.  So typically if we -- whenever

18    we get information, if we were to do a

19    questionnaire, we should -- and I was questioning

20    whether we should -- put them in as complaints, even

21    though they're not complaints, because we're asking

22    questions.  So the question here was to make sure

23    that we didn't fall into that from a asking

24    questions perspective that aren't necessarily

25    complaints that we would then have to put into the

Confidential - Subject to Protective Order

Page 197

1    complaint system.  It was to ask them in a manner

2    that, you know, would be appropriate to get the

3    information and proactively so that we could work on

4    this issue that people are saying is the fraying

5    issue and complete the -- you know, move forward.

6              Q.      Right.

7                      You're saying that we should do this

8    in a way where we don't have to log it as a

9    complaint.  Right?

10                     MR. HUTCHINSON:  Object to form.

11   It's been asked and answered, Counsel.

12   BY MR. BLIZZARD:

13             Q.      Isn't that what this is?

14             A.      Because a question is not a

15   complaint.  A complaint is when a doctor calls up

16   and logs a complaint.  It's not something that we

17   say, what are your thoughts on this and now we have

18   to log it as a complaint because we got their

19   thoughts.

20             Q.      Well, I mean, if you ask the

21   question, Doctor, do you have any problems with our

22   implant and they say, well, look, I don't like the

23   fact that there's blue stuff that comes off this

24   implant every time I use it, that's a complaint,

25   isn't it?

Confidential - Subject to Protective Order

Page 198

1          A.       It's an opinion.  And the complaints

2   in the complaint system, which is why I'm asking the

3   question, are those that the doctor picks up the

4   phone and calls the hotline and puts the complaint

5   in.

6          Q.       Well, regardless, you reference the

7   compliance group here.  Right?

8          A.       They would make the call as to how we

9   would -- how we should structure our questionnaire.

10         Q.       Right.

11                  The compliance group is -- that's the

12  group within the company that keeps you out of

13  trouble with the FDA.  Right?

14                  MR. HUTCHINSON:  Object to form.

15                  THE WITNESS:  No.

16  BY MR. BLIZZARD:

17         Q.       They make sure you dot your Is and

18  cross your Ts, don't they?

19                  MR. HUTCHINSON:  Same objections.

20                  THE WITNESS:  No.  They're just one

21  of the groups.  Just the compliance group I'm

22  speaking of would be the worldwide quality group

23  that collects the complaint data.

24  BY MR. BLIZZARD:

25         Q.       That's the quality group.  Right?

Confidential - Subject to Protective Order

Page 199

1          A.          It's a division of the quality group.

2          Q.          So what's the compliance division's

3    role?

4          A.          When I use compliance here, it was

5    just a general term, because I was speaking --

6    worldwide quality is the only one -- I mean, within

7    the company, people would know what I was talking

8    about.  Worldwide quality, which is part of

9    compliance, are the ones that collect the data.

10         Q.          Okay.  So let's not spend any more

11   time on that.

12                     If you look up at the top, it looks

13   like Steve Bell answers your question for you.

14                     Your question was, how do -- if we

15   should do this in a manner that avoids this issue.

16   Correct?  And he says, "Ask generally about all

17   meshes.  Don't specify our brand."

18         A.          I believe it was a reasonable

19   question, and I still believe it's a reasonable

20   question.

21         Q.          Okay.

22                     And that's his answer.  Right?  The

23   way we avoid having to log it as a complaint is to

24   ask it about all meshes rather than specifying the

25   brand?

Confidential - Subject to Protective Order

Page 200

1          A.       He's suggesting that that's what we

2   do.

3          Q.       Now, at one point, there was a test

4   that was developed to determine acceptable particle

5   loss, wasn't there?

6          A.       No.   There was a test developed to

7   determine the differences in particle loss between

8   laser cut and mechanical cut.

9          Q.       Well, there was a test to look at

10  implants and the acceptable level of particle loss

11  that was developed in France, wasn't there?

12         A.       Then I'm speaking of a different one.

13         Q.       Let me show you what's been marked as

14  Exhibit Number 371.

15                  MR. HUTCHINSON:  Counsel, when we say

16  these are exhibits that have previously been marked,

17  are we talking about the four days that Dan has

18  already been deposed; is that correct?

19                  MR. BLIZZARD:  I have no idea.

20                  MR. HUTCHINSON:  Do you know where

21  this document came from?

22                  MR. BLIZZARD:  It came from the

23  exhibits.  That's all I know.  People pull these

24  exhibits for me and put them in folders and I look

25  at them.

Confidential - Subject to Protective Order

1            THE WITNESS:  I'm not sure I've seen

2  this in my prior deposition.

3            MR. BLIZZARD:  There you go.  The

4  witness knows more about it than I do.

5  BY MR. BLIZZARD:

6       Q.      So it looks like this is an e-mail

7  that was written by Gene Kammerer to Jacqueline

8  Flatow.  Right?

9       A.      Yes.

10      Q.      Dated May 9, 2006.  Right?

11      A.      That's what it says.

12      Q.      It says, "Particle loss on TVT."

13              And this is the same issue we've been

14  talking about, isn't it?

15      A.      By a different individual, but yes.

16      Q.      Is Gene Kammerer, he's somebody who

17  works as an engineer in the company?

18      A.      He was.  And he was looking at a

19  project for ultrasonic cutting.

20      Q.      The cutting, you mean the laser cut?

21      A.      No.  Ultrasonic is vibration, sound.

22  A laser is heat and light.

23      Q.      So which one was he working on?

24      A.      The ultrasonic.

25      Q.      It says, "Jackie, I need some

Confidential - Subject to Protective Order

Page 202

1   clarification on the particle loss test.  France is

2   trying to set new standards for the TVT like

3   products.  Particle loss is one of the standards.

4   They have a test method which shows 8.5% loss for

5   TVT."  Do you see that?

6          A.      I see it.  I have no idea what the

7   test method is.

8          Q.      But it says 8.5 percent, that's a

9   pretty big loss of particles, isn't it?

10                 MR. HUTCHINSON:  Object to form.

11                 THE WITNESS:  Since it doesn't have a

12   relative base, it's -- I don't know what the -- what

13   to tell you.

14   BY MR. BLIZZARD:

15         Q.      Okay.

16                 "I am challenging their method as too

17   vigorous.  They have since backed off on the

18   roughness of the test, but TVT still has very high

19   %.  It will fail the test if the test is excepted as

20   stands and we will not be able to sell in France

21   next year."  Do you see that?

22         A.      That's what it says.

23         Q.      Did you ever become aware of this

24   issue?

25         A.      Not to my knowledge, no.

Confidential - Subject to Protective Order

1          Q.      Let me show --

2          A.      I mean, any test method -- I mean,

3   you can create a test method.  It may not be an

4   appropriate test method, but if -- and that's why

5   you would need to see the test method, to understand

6   what they were trying to do.

7          Q.      Well, he says that TVT has a very

8   high percentage.  That's what Gene Kammerer says.

9   Right?

10         A.      It was his choice of words here.

11         Q.      Then it's Exhibit 372.

12                 Do you see this is another e-mail

13  from Gene Kammerer dated June 12, 2006?

14         A.      Yes.

15         Q.      This is written to Sungyoon Rha.  Do

16  you see that?

17         A.      Yeah, Sunny.

18         Q.      Sunny.

19                 What --

20                 Where does Sunny work?

21         A.      Sunny was in operations, to my

22  knowledge.

23         Q.      In the same group you were in?

24         A.      She was in Ethicon as well as in

25  Neuchatel at some point, but her role was different.

Confidential - Subject to Protective Order

Page 204

1    It was not development, it was operations.

2            Q.      Do you --

3            A.      She would have been on a team.

4    Sorry.

5            Q.      Okay.

6                    Do you see where it says, "Sunny, In

7    the test method from the new French standards for

8    particle loss the difference between TVT and the

9    competitors is significant.  Approximately 10 fold

10   more for TVT at 8% of the strip falling off.  They

11   do nothing special to the mesh and the test is very

12   similar to our test, except for the preparation

13   step."  Do you see that?

14           A.      That's what he writes.

15           Q.      So essentially he's saying in this

16   e-mail that when you run this test on particle loss

17   that they've developed in France, which is very

18   similar to the company's test, there's ten times

19   more particle loss in the TVT product than the

20   competitor's product.  Right?

21           A.      I'd have to read it again in terms of

22   the company's test.  We don't have a test for it, so

23   I think we're just referring to the French test.

24           Q.      It says, "They do nothing special to

25   the mesh and the test is very similar to our test."

Confidential - Subject to Protective Order

Page 205

1  Do you see that?

2       A.     I mean, that's what he writes, but

3  I'm not familiar with what test he was working on

4  either.

5       Q.     Well, regardless, ten times more than

6  the competitors, that's a huge difference, isn't it?

7            MR. HUTCHINSON:  Object to form.

8            THE WITNESS:  It's a relative number.

9  If your mesh is constructed differently or has a

10 different weave, a lot of the competitors' meshes

11 don't stretch at all, so that would explain why this

12 is.

13 BY MR. BLIZZARD:

14      Q.     Well, this suggests it's ten times

15 higher than any competitor.  Right?

16           MR. HUTCHINSON:  Same objection.

17           THE WITNESS:  If it's not clinically

18 relevant, it doesn't matter if it's 20 times.

19 BY MR. BLIZZARD:

20      Q.     So you're back to it doesn't matter.

21 Right?

22           MR. HUTCHINSON:  Same objections,

23 Counsel, mischaracterization of the witness's

24 testimony.

25 BY MR. BLIZZARD:

Confidential - Subject to Protective Order

Page 206

1          Q.     Well, I mean, didn't you just say it

2     doesn't matter?

3          A.     I would -- making a statement about

4     the tenfold.  If it's a message from -- it was Marty

5     Weisberg saying that particle loss was not

6     clinically relevant.

7          Q.     Well, it seemed like it was, at one

8     point, going to matter to the French, didn't it?

9     The French were developing this test, and they said

10    if you didn't pass the test, you couldn't sell the

11    product.  Right?

12              MR. HUTCHINSON:  Objection, calls for

13    speculation.

14              THE WITNESS:  Again, I wasn't

15    involved in those conversations, but apparently they

16    were looking at that, yes.

17    BY MR. BLIZZARD:

18         Q.     So it mattered to them, didn't it?

19              MR. HUTCHINSON:  Same objections.

20              THE WITNESS:  Apparently.

21    BY MR. BLIZZARD:

22         Q.     And if you couldn't sell it in

23    France, that would matter to the company too,

24    wouldn't it?

25         A.     It could.