# Exhibit 7

Confidential - Subject to Protective Order

Page 311

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

- - -

IN RE:  ETHICON, INC.          :  MDL NO. 2327
PELVIC REPAIR SYSTEM,          :
PRODUCTS LIABILITY             :
LITIGATION                     :

- - -

AND VARIOUS OTHER CROSS-NOTICED ACTIONS
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

- - -

August 21, 2013

- - -

Continued videotaped deposition of
DANIEL J. SMITH taken pursuant to notice, was held
at the law offices of Riker Danzig Scherer Hyland &
Perretti LLP, Headquarters Plaza, One Speedwell
Avenue, Morristown, New Jersey, beginning at 9:12
a.m., on the above date, before Ann Marie Mitchell,
a Federally Approved Certified Realtime Reporter,
Registered Diplomate Reporter and Notary Public for
the State of New Jersey.

- - -

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph|917.951.5672 fax
deps@golkow.com

Confidential - Subject to Protective Order

Page 337

1          A.      Correct.

2          Q.      And laser cut mesh would be a new

3     process.  At this time in 2004 you didn't have any

4     laser cut mesh.  Right?

5          A.      That would be correct.

6          Q.      If you go to two pages forward,

7     another blue circle that has issues or concerns with

8     the product is "Particulate matter."  Do you see

9     that?

10          A.      Two pages forward.  I went backward,

11     sorry.

12                  Yes.

13          Q.      It says the "Mesh is poor quality,

14     falling apart.  Blue mesh particles" are "very

15     apparent.  Blue mesh is 'Different' - stiffer.

16     Sealed edges are better" and "safer."  And it's "All

17     part of" the "ROPE effect."  Do you see that?

18          A.      That's what someone has written, yes.

19          Q.      Then under "Mitigation Strategies," I

20     want to draw your attention to that, Mr. Smith.  It

21     states, "Risk/Benefits of sealing the edges -

22     greater risk of erosion."  Do you see that?

23          A.      Yes.

24          Q.      So sealing the edges of this product

25     that is described here as falling apart and having

Confidential – Subject to Protective Order

Page 338

1    blue mesh particles fall off it, that would mean

2    doing an ultrasound or a laser cut mesh.  Correct?

3         A.      It could, yes.

4         Q.      And so your company understood as of

5    2004 that if you were going to provide a laser cut

6    mesh in order to fix the mesh poor quality, as

7    described here, then that would increase the risk of

8    erosion.  Correct?

9              MR. HUTCHINSON:  Object to form.

10   Counsel, this is a fact witness deposition.

11             THE WITNESS:  I cannot answer that on

12   behalf of whoever wrote this document.

13   BY MR. CARTMELL:

14        Q.      Do you know if your company had that

15   knowledge as of this time, that if you actually

16   fixed the poor quality of the mesh that was falling

17   apart by sealing the edges with laser cut mesh, if

18   that would increase the risk of erosion?

19             MR. HUTCHINSON:  Object to form.

20             THE WITNESS:  It's my opinion this

21   may not be an accurate statement.

22   BY MR. CARTMELL:

23        Q.      You think the person who put this

24   together was inaccurate; is that right?

25        A.      No.  I'm saying that whoever wrote

Confidential - Subject to Protective Order

1   this said that might be a possible risk.  I couldn't

2   tell what they meant.

3        Q.      We talked yesterday about the risk

4   analysis process internally that your company was

5   required to do by law in order to determine if your

6   product was safe for patients' use.  Correct?

7        A.      Yes.

8        Q.      I want to hand you what's been marked

9   as Exhibits 261 and 262.

10           Let me hand you Exhibits 2161 and

11   2162, Mr. Smith.

12           MR. HUTCHINSON:  We got them.

13                - - -

14           (Deposition Exhibit No. T-2161, Risk

15           Management Report (Legacy) for TVT and

16           TVT-O, Document Name (#):  RMR-0000044,

17           Revision:  1, Bates stamped

18           ETH.MESH.01265223 through

19           ETH.MESH.01265239, and Deposition Exhibit

20           No. T-2162, Company Procedure for Medical

21           Device Risk Management Plan, Document Name

22           (#): PR602-003, Revision:  13, Bates

23           stamped ETH.MESH.00070187 through

24           ETH.MESH.00070211, were marked for

25           identification.)

Confidential - Subject to Protective Order

1    asking you questions about mesh fraying?

2           A.      Yes.

3           Q.      What is --

4                   What do you interpret the phrase

5    "mesh fraying" to mean?

6           A.      It's due to the initial mechanically

7    cutting of the gold standard TVT, small particles on

8    the edges of the mesh had the potential to fall off

9    of the mesh.

10          Q.      Is there any clinical significance to

11   mesh fraying?

12          A.      From the information I've seen from

13   our medical director, they do not feel that it's

14   clinically significant.

15          Q.      What did Ethicon do to address this

16   mesh fraying issue?

17          A.      There is an effort to laser cut the

18   mesh and identify with it.  However, both products,

19   since they're clinically effective, both products

20   are on the market today, both mechanically cut and

21   laser cut.

22          Q.      And, Mr. Smith, would you explain to

23   the jury what mechanically cut is and what laser

24   cutting is, please?

25          A.      Since the -- all mesh is -- comes

Confidential - Subject to Protective Order

Page 587

1    from a roll and the -- of mesh, much like a roll of

2    cloth, and it's then cut into strips the size for

3    the mesh which is used, which we call the tape

4    sometimes.  And if it is mechanically cut, it's cut

5    with something that would -- that may look like a

6    paper cutter, whereas if it's laser cut, it's cut

7    with a mechanical system using light from, like, a

8    laser.

9         Q.       And was laser cutting developed in

10   response to the voice of the customer?

11        A.       I would say yes.  It started to look

12   at ultrasonic cutting first, and we eventually

13   settled on laser cutting as the best from an

14   operational perspective.

15        Q.       What is ultrasonic cutting or

16   ultrasonic technology?

17        A.       Ultrasonics is vibration, with

18   vibration causing heat, and heat obviously used to

19   sever the mesh.

20        Q.       Are we on page 9?

21        A.       I am.

22        Q.       What is this?

23        A.       This was an elongation chart to

24   define the differences or similarities between laser

25   cut and mechanical cut.  And what this shows us is

Confidential – Subject to Protective Order

Page 588

1   that in the physiological range, which is the box,

2   which is circled around the .25 or quarter inch

3   elongation, that that physiological range, that the

4   meshes are virtually identical.  And the

5   physiological range was established using the gold

6   standard mechanically cut mesh, by taking that mesh

7   and understanding at what point in the elongation or

8   stretching of that mesh does the mesh no longer

9   return to its original length.  That's sometimes

10   called the -- beyond its elastic limit or into its

11   plastic limit.  And that limit is defined by a value

12   of about 164 grams.

13             And so what we have used at 164 as a

14   number, and then there's studies that also

15   represent -- the Lim study, which was a clinical

16   trial which said that the urethra did not exert more

17   than 50 grams of force on the mesh in laugh, cough

18   and sneeze with a full bladder.  So we kept the 164,

19   knowing that the lower limit was 50 grams.  And in

20   that lower limit, as you can see by this chart, at

21   50 grams, the lines are identical.  And at 164,

22   which is the other side of the box, the lines are

23   virtually on similar -- statistically similar.

24        Q.     Mr. Smith, what do you mean by

25   physiological range?  Explain that for us, please.

Confidential - Subject to Protective Order

Page 589

1          A.        The physiological range is a term

2    saying that what -- the load of which the urethra

3    physiologically in normal function, a woman's

4    function, laugh, cough and sneeze, the load that the

5    urethra would place on the mesh such that, you know,

6    causing the mesh to elongate or stretch or move.

7          Q.        Would that be another way of saying

8    the amount of pressure put on specific body parts?

9                    MR. CARTMELL:  Objection, leading.

10                   THE WITNESS:  It would be the amount

11   of pressure placed on the mesh if a mesh was placed

12   midurethra, yes.

13   BY MR. HUTCHINSON:

14         Q.        Did you prepare that document?

15         A.        I was one of a few individuals in

16   preparing this document.

17         Q.        Do you remember plaintiffs' counsel

18   asking you questions about Exhibit 2142?

19         A.        Yes.

20         Q.        Did he ask you any questions about

21   this particular page?

22         A.        I don't recall.

23         Q.        Let's look at the next page, page 10.

24                   It states, "Pull-out Force

25   Comparison," at the top, "Average force in a Human

Confidential - Subject to Protective Order

Page 590

1    Cadaver."  Do you see that?

2            A.      Yes.

3            Q.      What does this slide show us?

4            A.      It was, again, some of the safety and

5    efficacy data that we tried to put together, the

6    164, showing the physiological range.  And it was

7    looking at TVT SECUR in both the two positions, the

8    hammock as well as the U, comparing it against

9    Gynecare TVT and Gynecare TVT-O as controls.  And

10   what it indicated to us is that although there might

11   be some differences with some products, they were

12   all above, well above the 164 limit.

13           Q.      So at the physiological limits, what

14   is the difference, if any, between laser cut and

15   mechanically cut mesh?

16           A.      There is very -- there is none.

17           Q.      Is that significant?

18           A.      It's significant in the fact that the

19   gold standard clinical data from mechanically cut

20   mesh could be transferred over with the laser cut

21   mesh as well.

22           Q.      When you say transferred over, what

23   do you mean by that?

24           A.      I mean that the clinical studies

25   earlier than laser cut mesh are relevant to the

Confidential - Subject to Protective Order

Page 591

1    laser cut mesh since it's the same mesh, made the

2    same way, and the elongation properties of that mesh

3    are identical, if not similar.

4         Q.     Let's talk about clinical

5    significance.

6              Did Ethicon do any testing to

7    determine the clinical significance between

8    mechanically cut mesh and laser cut mesh?

9         A.     I'm not sure what all clinical

10   studies were done with that.  Postmarket, I know

11   there was clinical studies done -- I'm sorry,

12   premarket.  I know there was clinical studies done

13   postmarket.

14        Q.     If you'll turn with me now to

15   Exhibit 723.

16              Do you have that in front of you?

17        A.     I do.

18        Q.     And do you remember being asked

19   questions about this document?

20        A.     I do.

21        Q.     If you'll look at page 0655, it's the

22   third page of the document.

23        A.     Yes.

24        Q.     It states, "FDA Public Health

25   Notification" at the top.  Do you see that?

Confidential - Subject to Protective Order

Page 592

1          A.      Yes.

2          Q.      And to whom is this addressed?

3          A.      It's basically addressed to all

4   doctors or healthcare practitioners.

5          Q.      And to your knowledge, does this

6   public health notice sent by the FDA address mesh

7   made by every company that manufactures mesh

8   products?

9          A.      Absolutely.

10         Q.      So does it apply to the entire

11  industry?

12         A.      It does.

13         Q.      And what is the date of this

14  document?

15         A.      October 20, 2008.

16         Q.      In 2008, to your knowledge, how many

17  mesh competitors did Ethicon have?

18         A.      Numerous.

19                 MR. CARTMELL:  Objection.  Object to

20  the form.

21  BY MR. HUTCHINSON:

22         Q.      If we look at the "Nature of the

23  Problem" paragraph.  Do you see that?

24         A.      Yes.

25         Q.      The first sentence, it reads, "Over

Confidential - Subject to Protective Order

Page 593

1    the past three years, FDA has received over 1,000

2    reports from nine surgical mesh manufacturers."

3         A.     It does.

4         Q.     Does that ring a bell?

5              MR. CARTMELL:  Object to the form.

6              THE WITNESS:  I would have to agree

7    with it.

8    BY MR. HUTCHINSON:

9         Q.     Let's look at the first paragraph of

10   this document.

11             What does the notification say about

12   complications?

13        A.     "This is to alert you" about "the

14   complications associated with transvaginal placement

15   of surgical mesh to treat Pelvic Organ Prolapse" as

16   well as -- or -- "and Stress Urinary Incontinence"

17   called SUI.

18        Q.     What does the second sentence say?

19        A.     "Although rare, these complications

20   can" be serious -- "have serious consequences."

21        Q.     And let's look at the second

22   paragraph under "Nature of the Problem."

23             Do you see that?

24        A.     Yes.

25        Q.     What is noted to be the most frequent

Confidential - Subject to Protective Order

Page 594

1    complications?

2         A.      "The most frequent complications

3    included erosion through the vaginal epithelium,

4    infection, pain, urinary problems, and recurrence of

5    prolapse and/or incontinence.  There were also

6    reports of bowel" and "bladder, and blood vessel

7    perforation during insertion."

8         Q.      And, Mr. Smith, are these risks that

9    are associated with any pelvic floor surgery?

10        A.      I would have to say yes.

11        Q.      And were you and Ethicon aware of

12   these risks from the first time you began working on

13   TVT products?

14        A.      I would say yes.

15        Q.      Let's look at Exhibit 406 for a

16   minute, please.

17        A.      I'm sorry, 4 --

18        Q.      406.  It's from yesterday.

19        A.      Uh-huh.

20        Q.      Do you remember being asked questions

21   about this document?

22        A.      I believe yes.

23        Q.      If you'll look at the bottom, and Mr.

24   Lawlor, if you can highlight this for me, please,

25   the sentence that starts with the word "but."  "But

Confidential - Subject to Protective Order

Page 595

1    the question keys and concerns."  Do you see that?

2                    It states, "But the key questions and

3    concerns were about the safety of Ulmsten procedure.

4    Indeed, it was broadly admitted that the use of any

5    mesh through the vaginal route was associated with a

6    high rate of complications, such as

7    rejection/infection and urethral erosion."  Do you

8    see that?

9         A.    Yes.

10        Q.    Do you recall being asked questions

11   by plaintiffs' counsel about that sentence?

12        A.    I believe so.

13        Q.    And does this document state the

14   words "any mesh"?

15        A.    Yes.

16        Q.    So would that be limited to Ethicon's

17   polypropylene mesh?

18        A.    No.

19        Q.    Did you author this document, Mr.

20   Smith?

21        A.    No.

22        Q.    Do you have any idea what Axel Arnaud

23   meant when he wrote the words "high rate of

24   complications"?

25        A.    I can only surmise that it was early

Page 596

1    in the time frame of putting a new procedure from

2    the Burch and there was some concerns.

3          Q.      Let's look at Exhibit 353 for a

4    minute, please.

5                  MR. CARTMELL:  I'm just going to

6    object for the record to that statement and ask that

7    it be stricken based on speculation.

8    BY MR. HUTCHINSON:

9          Q.      Do you have that document in front of

10   you?

11         A.      I do.

12         Q.      Do you remember being asked questions

13   about that document?

14         A.      I believe so, yes.

15         Q.      And it says at the top, this is an

16   e-mail from Axel Arnaud to Marty Weisberg, dated

17   October 13, 2002.  Do you see that?

18         A.      Yes.

19         Q.      And it's about soft Prolene.  Do you

20   see that?

21         A.      Yes.

22         Q.      And would you remind us again,

23   please, who Axel Arnaud and Marty Weisberg are?

24         A.      Axel Arnaud was a European medical

25   director.  And Marty Weisberg was also a US medical

Confidential - Subject to Protective Order

1    director.

2          Q.      Let's look at the sentence that

3    states, "I just had a concern about your statement

4    concerning Potential complications/Fistula &

5    Erosions.  This is a problem which arises rather

6    commonly in practice even with polypropylene and it

7    might be wise to be more elusive on this."  Do you

8    see that?

9          A.      Yes.

10          Q.      Do you remember being asked questions

11    about that specific sentence?

12          A.      Yes.

13          Q.      Let's look at the last sentence.  It

14    states, "Also, as you said, when this" happens, "it

15    is much less a problem with polypropylene meshes

16    since it usually resolves with a partial excision

17    and local care."  Do you see that?

18          A.      Yes.

19          Q.      Did plaintiffs' counsel ask you any

20    questions about that last sentence?

21          A.      No, they did not.

22          Q.      Let's look at Exhibit 2148, please.

23                  MR. CARTMELL:  I just object and move

24    to strike the statements of counsel referring back

25    to questions that plaintiffs' counsel asked you.  I

Confidential - Subject to Protective Order

Page 598

1    think it's improper.

2                    THE WITNESS:  I don't know if I have

3    that.  2148.

4    BY MR. HUTCHINSON:

5            Q.      2148?

6            A.      Got it.

7            Q.      And would you identify this document,

8    please?

9            A.      It's a clinical expert report signed

10   by Marty Weisberg, senior medical director of

11   Ethicon.

12           Q.      Do you remember being asked questions

13   about this document?

14           A.      Yes.

15           Q.      And for the benefit of the jury, what

16   is a clinical expert report?

17           A.      It's a document that's prepared by

18   the medical director that is placed in the file and

19   is a key document, primarily because the -- if there

20   was no clinical trial needed, the clinical expert

21   report serves as an expert opinion of the medical

22   director.

23           Q.      Did you sign off on this document?

24           A.      I don't believe I would sign off on

25   this document.

Confidential - Subject to Protective Order

Page 599

1      Q.      Okay.  And who did?

2      A.      Marty Weisberg.

3      Q.      Look with us, please, on page 241.

4              The second bullet point states,

5    "Transitory local irritation at the wound site and a

6    transitory foreign body response may occur.  This

7    response could result in extrusion, erosion, fistula

8    formation or inflammation."  Do you see that?

9      A.      Yes.

10     Q.      Do you remember being asked questions

11   about the language in this bullet point under

12   "Potential Complications"?

13     A.      Yes, I do.

14     Q.      Did you draft that language?

15     A.      No, I did not.

16     Q.      Would you be the appropriate person

17   to handle questions about this language?

18     A.      No, I would not.

19     Q.      Who would be?

20     A.      Medical director.

21     Q.      Let's look at Exhibit 2149.

22             Do you have that in front of you, Mr.

23   Smith?

24     A.      I do.

25                      -  -  -

Confidential – Subject to Protective Order

Page 600

1              (A discussion off the record

2          occurred.)

3                     -  -  -

4    BY MR. HUTCHINSON:

5          Q.      Mr. Smith, I've handed you what's

6    been marked previously as Exhibit 2149.

7                  Do you recall being asked questions

8    about this document?

9          A.      I do.

10         Q.      And this is an e-mail from Meng Chen

11   at the top to Bryan Lisa, dated January 29, 2009; is

12   that correct?

13         A.      Correct.

14         Q.      And if we look at the top of this

15   e-mail and the e-mail "from" and "to" information

16   below, did you send any of these e-mails?

17         A.      Absolutely not.

18         Q.      Did you receive any of these e-mails?

19         A.      Absolutely not.

20         Q.      Do you remember being asked questions

21   about this document?

22         A.      Yes, I do.

23         Q.      Let's look at the first sentence

24   under the original e-mail.  It states, "Bryan:  I

25   have re-checked all three IFUs (for TVT-A, TVT-O and

Confidential - Subject to Protective Order

1    TVT-S).  Everyone has the language 'Transitory local

2    irritation at the wound site and a transitory

3    foreign body response may occur.  This response

4    could result in extrusion, erosion, fistula

5    formation or inflammation.'"  Do you see that?

6         A.    Yes.

7         Q.    Do you remember being asked questions

8    about that sentence?

9         A.    Yes.

10        Q.    Would someone in medical affairs be

11   the more appropriate person to ask about the

12   inflammatory response language in the IFU?

13        A.    Yes.

14              MR. CARTMELL:  Object to the form.

15   BY MR. HUTCHINSON:

16        Q.    Would you turn to Exhibit 531 for me,

17   please.

18              Do you have that document in front of

19   you, Mr. Smith?

20        A.    I do.

21              MR. CARTMELL:  What's the exhibit

22   number?

23              MR. HUTCHINSON:  Exhibit 531, 531.

24              MR. CARTMELL:  Thank you.

25   BY MR. HUTCHINSON:

Confidential - Subject to Protective Order

Page 602

1        Q.        Would you identify this document, Mr.
2  Smith?
3        A.        It's a document that I was asked
4  to -- about, and it's authored by Marty Weisberg.
5        Q.        And what is the subject?
6        A.        "Mesh Fraying for TVT Devices."
7        Q.        Mr. Lawlor, could you highlight that
8  as we go, please?
9                  And the first few sentences of this
10  document states, "This note to file will address
11  complaints of TVT Tension-free Support for
12  Incontinence mesh fraying during placement.  Since
13  introduction of the device in 2000, there have been
14  a total of 58 complaints of fraying.  Fraying is
15  inherent in the design and construction of the
16  product."  Do you see that?
17        A.        Yes.
18        Q.        What does that --
19                  And do you remember being asked
20  questions about that?
21        A.        Yes.
22        Q.        What does it mean when this document
23  states, the "Fraying is inherent in the design and
24  construction of the" mesh?
25                  MR. CARTMELL:  Object to the form.

Confidential - Subject to Protective Order

Page 603

1              THE WITNESS:  In my opinion, it means

2     that when it's mechanically cut, there is pieces

3     that will come off.  And that is -- they've been

4     doing that from the first use of the product from

5     Prof. Ulmsten.

6     BY MR. HUTCHINSON:

7          Q.      You mentioned a Velcro effect during

8     the first day of your testimony.  Do you remember

9     that?

10         A.      Yes, I do.

11         Q.      Would you explain to the jury what

12    you mean by Velcro effect?

13         A.      The mesh, when it's cut, leaves the

14    edges of the mesh exposed.  And the mesh itself has

15    an inherent strength, in terms of its stiffness in

16    the width of the mesh, such that when it's pulled

17    into the tissue, the edges of the mesh bind into the

18    tissue and the mesh stays where placed.  And it's

19    like a -- it's been referred to by surgeons as a

20    Velcro effect.

21         Q.      Does that help with tissue ingrowth?

22         A.      It helps with the immediate tissue

23    fixation so that the woman immediately after surgery

24    is continent.

25         Q.      When you said earlier about the

Confidential - Subject to Protective Order

Page 604

1  inherent strength of the mesh, what do you mean by

2  that?

3          A.      The inherent strength of the mesh in

4  terms of the mesh, if it's weaker, it will not exert

5  the force in order to stay in the mesh, in the

6  tissue, and can slip.  And if it slips, then the

7  woman is -- you know, before the ingrowth occurs,

8  which occurs over time, then the placement that the

9  mesh was done by the surgeon would move, and she

10  most likely would become incontinent.

11          Q.      Did plaintiffs' counsel ask you any

12  other questions about this document?

13                  MR. CARTMELL:  I just object to the

14  form.

15                  THE WITNESS:  I'm not sure.

16  BY MR. HUTCHINSON:

17          Q.      Well, let's look at the first

18  sentence in the second paragraph.

19                  Do you remember if plaintiffs'

20  counsel asked you any questions about that sentence

21  in the second -- in the first sentence in the second

22  paragraph?

23                  MR. CARTMELL:  Same objection.

24                  THE WITNESS:  No, there was no

25  questions about that.

Confidential - Subject to Protective Order

Page 605

1    BY MR. HUTCHINSON:

2         Q.      It states, "There is no reason to

3    expect that the fraying of the mesh or the particles

4    generated would create any safety risks."  Do you

5    see that?

6         A.      Yes.

7         Q.      Is that your opinion?

8         A.      I would say that it's --

9              MR. CARTMELL:  Object to the form.

10   Sorry.

11             THE WITNESS:  -- safe to agree with

12   that.

13   BY MR. HUTCHINSON:

14        Q.      Let's look at the third paragraph.

15   It states, "Regarding efficacy, I am not aware of

16   any studies comparing frayed and unfrayed tape.  I

17   am also not aware of any complaints that claim

18   changes in efficacy when tape is frayed.  No change

19   in efficacy would be expected."  Do you see that?

20        A.      Yes.

21        Q.      Did plaintiffs' counsel ask you any

22   questions about that sentence?

23             MR. CARTMELL:  Object to the form.

24             THE WITNESS:  Absolutely not.

25   BY MR. HUTCHINSON:

Confidential - Subject to Protective Order

Page 606

1          Q.      Let's look at the last page of this

2    document.

3                  And who is the author of this

4    document?

5          A.      It's Marty Weisberg, senior medical

6    director.

7          Q.      What does the last sentence of this

8    document state?

9                  Mr. Lawlor, can you highlight that

10   for the jury, please.

11         A.      "Since fraying does not affect the

12   safety and efficacy of the...device, it has been

13   determined not to pursue any corrective actions at

14   this time."

15         Q.      And does this document show that

16   Ethicon's medical director, Marty Weisberg,

17   evaluated the issues about fraying from a safety and

18   efficacy point of view?

19         A.      Yes, it does.

20         Q.      Let's look at Exhibit 2154.

21                 Do you have it in front of you?

22         A.      I do.

23         Q.      Do you remember being asked questions

24   about this document?

25         A.      Yes.

Confidential - Subject to Protective Order

Page 607

1          Q.      Let's look at the second page.  It's
2     Bates number 323.

3          A.      Yes.

4          Q.      And is this a marketing communication
5     about blue TVT mesh?

6          A.      Yes.  From Steve Bell.

7          Q.      And does it address small pieces
8     coming off the mesh?

9          A.      Yes.

10         Q.      All right.

11                 Let's look at key point number 3.
12    Mr. Lawlor, you can highlight that whole paragraph
13    for us, please.

14                 It states, "Reassure them that
15    PROLENE is proven to be inert and there are hundreds
16    of papers going back" to "25 years to reinforce this
17    point.  These particles will not cause any problem."
18    Do you see that?

19         A.      Yes.

20         Q.      First, for the jury, what is exactly
21    Prolene?

22         A.      Prolene is a proprietary version of
23    polypropylene, proprietary to Ethicon.  It's mainly
24    polypropylene with an additive which we call
25    Prolene.

Confidential – Subject to Protective Order

Page 608

1          Q.       And how long has Prolene been used in
2     the human body?

3          A.       I'm going to go back probably about
4     25 or plus years.  It's been used primarily as a
5     cardiovascular suture, and its unique properties of
6     Prolene giving it some stretch characteristics of
7     the fiber itself have been valued by the surgical
8     community.

9          Q.       Is Prolene a safe mesh to use in the
10    human body?

11         A.       Absolutely.

12         Q.       I'm sorry?

13         A.       Yes.

14         Q.       Why do you say that?

15         A.       It's been used for 25 years as a --
16    in the blood vessels in cardiovascular surgery.  So
17    it's proven, as well as all of the clinical trials
18    done with TVT for the last 16 years.

19         Q.       And did you author this document?

20         A.       No, I did not.

21         Q.       Who did?

22         A.       It was a medical -- I mean, a
23    marketing director, Steve Bell.

24         Q.       Do you know what Steve Bell meant
25    when he used the term "inert"?

Confidential - Subject to Protective Order

Page 609

1              MR. CARTMELL:  Object to the form.

2              THE WITNESS:  My assumption here is

3    that in -- that the mesh is considered inert, that

4    once the fibrotic response has cleared through the

5    body, the mesh can reside in the body and it's

6    considered inert.

7    BY MR. HUTCHINSON:

8         Q.      What do you mean by fibrotic

9    response?

10        A.      As with any foreign body, the tissue

11   reaction, there's minor tissue reaction called --

12   and then tissue response sometimes referred to as

13   fibrotic action.

14              MR. HUTCHINSON:  Just a second.

15   BY MR. HUTCHINSON:

16        Q.      Mr. Smith, would you get Exhibit 367

17   for me, please.

18                      -  -  -

19              (A discussion off the record

20          occurred.)

21                      -  -  -

22   BY MR. HUTCHINSON:

23        Q.      367?

24        A.      Yes.

25        Q.      Do you remember being asked questions

Confidential – Subject to Protective Order

1  about that document?

2          A.      Yes.

3          Q.      And look with me on page 1.  It

4  states, "Hello David, Please see the attached letter

5  from Mr....Dr. Eberhard."  Do you see that?

6          A.      Yes.

7          Q.      Who is Dr. Eberhard?

8          A.      I don't know.

9          Q.      Do you know where he's from?

10         A.      No.  I assume he's from Germany.

11         Q.      Why do you assume that?

12         A.      Because he says, I hope you can

13  understand a little bit of German.

14         Q.      Let's look at page 2.

15                 Is there --

16                 Do you see the photograph at the

17  bottom of the page?

18         A.      Yes, I do.

19         Q.      And do you recall being asked

20  questions about that?

21         A.      Yes, I do.

22         Q.      And based on your knowledge, Mr.

23  Smith, of the TVT products, is that photograph that

24  Dr. Eberhard sent representative of mesh that comes

25  out of a brand new box?

Confidential - Subject to Protective Order

Page 611

1          A.      No, it's not.

2          Q.      How do you know that?

3          A.      It would -- looks like this mesh has

4    been stretched is my opinion by -- or handling or

5    physical abuse.

6          Q.      And based on some of the documents

7    we've seen, was this a demo unit?

8          A.      There was another document

9    associated, which was a translation of the German,

10   and that translation of the German clearly stated

11   that that -- that this was a demo unit which had

12   been handled.

13         Q.      And when looking at the photograph of

14   this piece of mesh, does it appear to you that it's

15   been stretched?

16         A.      Absolutely.

17         Q.      How can you tell?

18                 MR. CARTMELL:  Object to the form.

19                 THE WITNESS:  It has been necked

20   down.  There's two areas that seem to be the same

21   width, and there's an area that particle loss has

22   happened in, which has made it narrower.

23   BY MR. HUTCHINSON:

24         Q.      Does it appear to be stretched beyond

25   the elastic properties?

Confidential - Subject to Protective Order

Page 612

1          A.          I would have to say in my opinion,

2    yes.

3          Q.          And based on your personal

4    experience, have you ever seen a mesh that was

5    actually used that's already been stretched beyond

6    its elastic properties?

7          A.          In clinical use?

8          Q.          Yes.

9          A.          Yes, I have.

10         Q.          Tell us about that.

11         A.          Prof. de Leval had placed a mesh in a

12   patient who had -- I'm going to assume maybe, I

13   think it was like four or five prior surgeries to

14   cure her incontinence.  And she was coming to Prof.

15   de Leval.  He placed a TVT-O.  And in order to get

16   her urethra in a position that he felt was

17   appropriate, he pulled extremely hard and the mesh

18   basically was roped and looked similar to this, if

19   not less than this.

20         Q.          And what was the clinical result?

21              MR. CARTMELL:  Object to the form.

22              THE WITNESS:  I -- she was dry

23   immediately after the surgery.  And I personally

24   followed up the following year and -- with Dr. de

25   Leval and asked if she was still incontinent, and he

Confidential - Subject to Protective Order

Page 613

1    said she was.

2    BY MR. HUTCHINSON:

3         Q.        You meant she was still incontinent?

4         A.        Incontinent.

5                   MR. CARTMELL:  Object to the form.

6                   THE WITNESS:  Sorry.

7                   MR. HUTCHINSON:  That's okay.

8    BY MR. HUTCHINSON:

9         Q.        Does this photograph at the bottom of

10   this exhibit appear to be an extreme case to you?

11                  MR. CARTMELL:  Object to the form.

12                  THE WITNESS:  I would say yes.

13   BY MR. HUTCHINSON:

14        Q.        But even in this extreme case, would

15   it still be acceptable to put this piece of mesh in

16   the human body, provided, of course, it was

17   appropriately sterilized?

18                  MR. CARTMELL:  Object to form.

19                  THE WITNESS:  I would say that it

20   would function, yes.

21   BY MR. HUTCHINSON:

22        Q.        Do you remember, Mr. Smith, about

23   testifying about how the mesh is constructed in

24   terms of course and wales?

25        A.        Yes.

Confidential - Subject to Protective Order

Page 614

1          Q.          What do you mean by that?

2          A.          Courses and wales define the porosity

3    of our mesh.  And the -- this particular mesh,

4    although it may lose particles on either side when

5    it's mechanically cut, as long as it has a

6    sufficient number of courses and wales, which is

7    defined by the width of the mesh of 1.1 centimeters

8    wide, the mesh may fray or look like that picture,

9    but it will not rip or tear in terms of completely

10   fall apart and separate.

11         Q.          Does it make the mesh stay intact

12   more or less from a clinical perspective?

13         A.          It makes it clinically functional.

14                 MR. CARTMELL:  Object to the form.

15   You're asking him all about clinical stuff.  And we

16   spent two days with him telling us that he can't

17   answer clinical questions.  I just want the record

18   to be clear.

19   BY MR. HUTCHINSON:

20         Q.          Mr. Smith, based on your personal

21   knowledge, does mesh fraying have any adverse effect

22   on patient safety?

23         A.          I have not heard of any.

24         Q.          Based on your personal knowledge,

25   does mesh fraying have any adverse effect on

Confidential - Subject to Protective Order

Page 615

1  efficacy?

2         A.      I have not heard of any.

3         Q.      Let's talk about the same questions

4  as it relates to particle loss.

5                 Based on your personal knowledge,

6  does particle loss have an adverse effect on patient

7  safety?

8                 MR. CARTMELL:  Object to the form.

9                 THE WITNESS:  I have never seen any

10 information that said -- would say that it did.

11 BY MR. HUTCHINSON:

12        Q.      Based on your personal knowledge,

13 does particle loss have any adverse effect on

14 whether or not the product works?

15                MR. CARTMELL:  Object to the form.

16                THE WITNESS:  Absolutely not.

17 BY MR. HUTCHINSON:

18        Q.      Let's look at Exhibit 2157.

19                MR. HUTCHINSON:  Dan, we got to take

20 a quick break, because we're running out of tape.

21                THE VIDEOGRAPHER:  The time is now

22 4:47.  This is the end of Disk Number 5.  We are

23 going off the record.

24                        -  -  -

25                (A recess was taken from 4:47 p.m. to

Confidential - Subject to Protective Order

Page 616

1         4:54 p.m.)

2                    -  -  -

3              THE VIDEOGRAPHER:  The time is now

4    4:54.  This is the beginning of Disk Number 6.  We

5    are back on the record.

6    BY MR. HUTCHINSON:

7         Q.      Mr. Smith, we are now back on the

8    record after we had to take a quick break to change

9    tapes.

10             Would you look at Exhibit 2143 with

11   me, please?

12        A.      I have it.

13        Q.      Do you remember being asked questions

14   about this document?

15        A.      Yes, I do.

16        Q.      And would you identify this document

17   for the jury, please?

18        A.      It's a risk document, sometimes

19   referred to as a DDSA or an FMEA.

20        Q.      And what is the purpose of a risk

21   document such as this?

22        A.      It identifies the known and/or

23   possible known conditions of harm or risk and

24   identifies the severity, the probability, of those

25   associated and identified risks.  And you collect

Confidential - Subject to Protective Order

Page 617

1    them in -- on here, and it becomes a living document
2    that gets revised and looked at as throughout the
3    life of the product.
4          Q.      And do you recall being asked
5    questions about whether or not the actual mesh of
6    the TVT product was associated with this risk
7    report?
8          A.      Yes.
9          Q.      And is this risk assessment
10   associated with the actual mesh of the TVT product?
11         A.      It is for the complete product, which
12   includes the mesh.
13         Q.      And how can you tell?
14         A.      Its various references within the
15   document that look at bleeding or damage to the
16   urethra or placement of the device itself.  It's
17   typically done on finished devices, so this is a
18   finished device.
19         Q.      Let's look at page 1 a little bit
20   more closely.  And, Mr. Lawlor, if you'll help us
21   with the highlighting.
22                 When was this document originally
23   prepared?
24         A.      It looks like in 1998.
25         Q.      Would that be September?

Confidential – Subject to Protective Order

Page 618

1          A.          September of '98.

2          Q.          Would that be shortly before the time

3     frame that TVT was launched in the United States?

4          A.          Yes.

5          Q.          And what is the revision date of

6     this?

7          A.          2000, in July 2000.

8          Q.          And how many revisions does it have?

9          A.          I believe it has eight revisions.

10    This is the eighth revision.

11         Q.          And let's look at page 2.

12                      On the left-hand side, there's some

13    language there.  Do you see that?

14         A.          Yes.

15         Q.          What does that tell us?

16         A.          It identifies the numerous revisions

17    that were done to this document over time.

18         Q.          And, Mr. Smith, do you remember being

19    asked questions about whether this document in total

20    addresses extrusion, erosion or exposure?

21         A.          Yes, I do.

22         Q.          Are those exact words in this

23    document?

24         A.          No.  If I recall, my testimony was

25    that they were referring in this document to tissue

Confidential - Subject to Protective Order

Page 619

1    damage.  Those exact words, however, are contained

2    in the IFUs of the -- for TVT.

3                    MR. CARTMELL:  Object and move to

4    strike the testimony that was nonresponsive.

5    BY MR. HUTCHINSON:

6            Q.      Let's be clear, Mr. Smith.

7                    When we talk about tissue damage,

8    does this document use the word "tissue damage"?

9            A.      I believe it does.

10           Q.      Turn with me, please, to 518.

11           A.      Yes.

12           Q.      Are you there?

13           A.      Yes.

14           Q.      All right.  I'm waiting on the IT.

15                   Tissue damage, fourth box down.

16                   Do you recall being asked questions

17   about that?

18           A.      Yes, I do.

19           Q.      And how does tissue damage relate to

20   extrusion, erosion or exposure?

21           A.      It could be similar in terms of, you

22   know, nature in terms of the exposure.  This

23   document here just speaks of it as tissue damage in

24   a general sense.

25           Q.      So my question, Mr. Smith, were the

Confidential - Subject to Protective Order

Page 620

```
 1    potential harms of extrusion, erosion or exposure
 2    excluded from this risk analysis?
 3             A.       In my opinion, I don't believe they
 4    were.
 5             Q.       And are erosion and extrusion listed
 6    in the IFU?
 7             A.       Yes, they are.
 8             Q.       Let's look at Exhibit 2147, please.
 9                      Do you recall being asked questions
10    about this document?  Oh, I'm sorry.  It should be
11    pretty close to the one --
12             A.       Yeah.
13             Q.       There you go.
14             A.       Trying to keep them in order here.
15    Got it.
16             Q.       You have Exhibit 2147 in front of
17    you?
18             A.       Yes.
19             Q.       And do you recall being asked
20    questions about this document?
21             A.       Yes, I do.
22             Q.       And for the jury's benefit, would you
23    identify this document, please?
24             A.       This is a biannual DDSA review of the
25    risk assessment that was just looked at called
```

Confidential - Subject to Protective Order

Page 621

1  TVT-2.  This was done by Sue Meltzer, external

2  quality, to review the complaint data and then

3  update if necessary the risk assessment.

4            MR. CARTMELL:  What's the exhibit

5  number, I'm sorry?

6            MR. HUTCHINSON:  2147.

7  BY MR. HUTCHINSON:

8       Q.     Is this the way that Ethicon is

9  proactive in evaluating the safety of its products?

10      A.     Absolutely.

11      Q.     Let's look at the third paragraph.

12      A.     Uh-huh.

13      Q.     It says, "Evaluate eleven (11)

14  potential new hazards for inclusion in the DDSA."

15  Do you see that?

16      A.     Yes.

17      Q.     And it lists several bullet points

18  there below.  Do you see that?

19      A.     Yes.

20      Q.     Are these new hazards that Ethicon

21  didn't know anything about?

22      A.     No.  They were listed in the IFU in

23  the same time frame.

24      Q.     Let's look at Exhibit 2160.

25      A.     I have 2159.

Confidential - Subject to Protective Order

Page 622

1      Q.      It looks --

2      A.      And I have 2161.

3      Q.      It looks like this.  Look on your far

4  left side.  Far left.  Is that it?  2160?

5      A.      I have 59 and I have 61.

6                      -   -   -

7              (A discussion off the record

8          occurred.)

9                      -   -   -

10             MR. HUTCHINSON:  We'll go off the

11  record for just a minute while we find it.

12             THE VIDEOGRAPHER:  The time is now

13  5:02.  We're going off the record.

14                      -   -   -

15             (A recess was taken from 5:02 p.m. to

16          5:03 p.m.)

17                      -   -   -

18             THE VIDEOGRAPHER:  The time is now

19  5:03.  We're back on the record.

20  BY MR. HUTCHINSON:

21      Q.      Mr. Smith, we're back on the record,

22  and you have in front of you Exhibit 2160.  Correct?

23      A.      Correct.

24      Q.      Do you remember being asked questions

25  about this document?

Confidential - Subject to Protective Order

Page 623

1          A.      I do.

2          Q.      And would you identify this document

3    for the jury, please?

4          A.      It is a risk assessment document,

5    FMEA.

6          Q.      And what is the purpose of this

7    document?

8          A.      This was done for the mesh, the laser

9    cut mesh project.

10         Q.      Why?

11         A.      To assess any potential risks that

12   the change of mechanically cut to laser cut might

13   have.  So it was a risk document done specifically

14   for the change from mechanical cut to laser cut

15   mesh.

16         Q.      And let's look at page 3 of 7.

17                 Could you blow that chart up for the

18   jury, please.

19                 Mr. Smith, why don't you describe for

20   the jury what this chart consists of?

21         A.      It can -- it looks at the component's

22   function, and we also, for any given activity going

23   to -- from left to right, it would look at the

24   potential hazard, the harm, as well as the

25   occurrence and a control method.  Based on the

Confidential - Subject to Protective Order

Page 624

1    procedure that's used with this document, you would

2    rank and rate the individual concerns of the

3    components, and you would get in a -- what was

4    called an RPN number at the end, which is a risk

5    number, risk potential number.

6         Q.      And if you can -- Mr. Lawlor, if you

7    zoom in on line 8, please.

8              Mr. Smith, do you remember being

9    asked questions about this particular line item?

10        A.      Yes, I do.

11        Q.      And under "Potential Failure Mode,"

12   what does it state?

13        A.      "Potential Failure Mode," it says,

14   "Mesh slips in tissue."

15        Q.      And then if we go over, what else do

16   you see?

17        A.      Potential "loss of device

18   functionality.  Mesh...provides partial repair."

19              Under the "Harm," it would be

20   "Erosion."

21              The "Potential Cause" would be the

22   mesh -- "Reduction in mesh width due to roping."

23              And then the "Control," which would

24   be "Ultrasonic Mesh study for pull-out," which was

25   used and there's an accession number there, which

Confidential - Subject to Protective Order

1   means it went through our corporate characterization

2   group.

3            And so basically -- and then it's

4   rated and ranked for the potential causes and harms.

5   But, in essence, the study would say that the use of

6   ultrasonic cut mesh, similar to laser cut mesh,

7   would mitigate some of the risk.

8            MR. CARTMELL:  Object and move to

9   strike the part that's nonresponsive.

10  BY MR. HUTCHINSON:

11       Q.    Mr. Smith, I remember you being asked

12  questions about the specific box that states erosion

13  here.

14       A.    Yes.

15       Q.    Do you remember that question?

16       A.    Yes, I do.

17       Q.    Would you need to evaluate that

18  specific box against some of the other boxes in this

19  document?

20       A.    Absolutely.

21       Q.    Like what?

22       A.    You would need to look across all the

23  lines, and that particular box, number 8, was

24  regarding to the assembly.  I believe there was

25  other boxes, such as I think 18, "Reduction

Confidential - Subject to Protective Order

Page 626

1    in...pore size," which would link to the mesh

2    changing shape.

3          Q.      And let's actually look on page 4.  I

4    think you're already there with me.

5                 Do you recall being asked questions

6    about line 17 and line 19?

7          A.      I do.

8          Q.      And if we look there under "Potential

9    Failure Mode," both of them state, "Tissue in-growth

10   does not occur."  Do you see that?

11         A.      That's correct.

12         Q.      What else does this chart tell us

13   about that potential harm?

14         A.      It tells us that the occurrence is

15   extremely low, it was rated a 1.  And it tells us

16   that it's -- the mitigation would be using the

17   existing mesh that's on TVT-Base devices, Classic

18   and TVT-O, which is the gold standard.  So what it's

19   saying is that there's very little chance of that

20   happening because of the mesh being used.

21                MR. CARTMELL:  You trailed off, I'm

22   sorry.  Little chance of it happening because of?

23                THE WITNESS:  Because of the

24   mitigation column, "Control Method," of the use of

25   TVT mesh.

Confidential – Subject to Protective Order

Page 627

1    BY MR. HUTCHINSON:

2         Q.      Mr. Smith, turn to some of the

3    exhibits that you were asked about today.

4                If you'll look at Exhibit 2161 for

5    me, please.

6                And specifically I want you to turn

7    your attention --

8                Or actually, before we do that, do

9    you recall being asked questions about this

10   document?

11        A.      Yes, I do.

12        Q.      And would you identify to the jury,

13   please, what this document is?

14        A.      It's a risk management report

15   prepared by the risk group or -- this is part of the

16   Quality group.

17        Q.      And if you'll turn, please, with me

18   to page 228.

19                Do you remember being asked questions

20   about this particular page?

21        A.      Yes, I do.

22        Q.      And who makes the final decision on

23   which harms are included in this harms/hazards

24   summary table?

25        A.      The responsibility of this document

Confidential - Subject to Protective Order

Page 628

1   is the medical director mainly, as well as quality.

2          Q.      And do you remember being asked

3   questions during your deposition about what input

4   that you gave?

5          A.      Yes, I do.

6          Q.      And if I recall, you testified that

7   you gave technical input if needed?

8          A.      That's correct.

9                  MR. CARTMELL:  Object to the -- and

10  misstates -- objection to the form.

11                 THE WITNESS:  That's correct.

12  BY MR. HUTCHINSON:

13         Q.      What do you mean by giving technical

14  input if needed?

15                 MR. CARTMELL:  Same objection.

16                 THE WITNESS:  Depending on the

17  questions and the discussion at the time of the

18  group, that's going on in the group, I would make

19  sure that the -- the discussion was relevant to the

20  design of the device, not relevant to whether or

21  not, you know, I pick the category or whether or not

22  I assigned a severity or harm as in -- that would be

23  the medical director's position.

24  BY MR. HUTCHINSON:

25         Q.      And if we look on this page, I see

Confidential - Subject to Protective Order

Page 629

1    the second column, it states, "Severity of Harm,"

2    and there's different numbers given down for harms;

3    is that correct?

4            A.      That's correct.

5            Q.      Who makes the final decision about

6    which numbers these harms get?

7            A.      Medical director.

8            Q.      And if we look on there on the fourth

9    column, it states, "Estimated Frequency of Harm."

10   Do you see that?

11           A.      Yes.

12           Q.      Who makes the final decision about

13   which numbers are inputted there?

14           MR. CARTMELL:  Objection, asked and

15   answered.

16           THE WITNESS:  It would be medical

17   director and quality.

18   BY MR. HUTCHINSON:

19           Q.      And where --

20           And who was the medical director?

21           A.      David Robinson.

22           Q.      Do you know where Dr. Robinson got

23   that information?

24           MR. CARTMELL:  Objection, calls for

25   speculation.

Confidential - Subject to Protective Order

Page 630

1              THE WITNESS:  No, I don't.

2    BY MR. HUTCHINSON:

3         Q.      Would Dr. Robinson be the better

4    person to answer these questions?

5         A.      Yes.

6         Q.      About the -- excuse me.

7                 About this document?

8         A.      Yes.

9         Q.      And if we look on the harms/hazards

10   summary table, do you see those harms that are

11   included on the left side?

12        A.      Yes.

13        Q.      And are these risks included within

14   the IFU?

15              MR. CARTMELL:  Object to the form.

16              THE WITNESS:  Yes.

17   BY MR. HUTCHINSON:

18        Q.      Mr. Smith, let's look at

19   Exhibit 2126, please.

20              THE COURT REPORTER:  There is no

21   2126.

22              THE WITNESS:  2138 is the first one.

23              MR. HUTCHINSON:  Well, I have what

24   Mr. Cartmell gave me as Exhibit 2126.

25              MR. CARTMELL:  Is this the timeline?

Confidential - Subject to Protective Order

Page 631

1                    MR. HUTCHINSON:  This is the

2     timeline.  That's what I have it as.

3                    MR. CARTMELL:  2166.

4                    MR. HUTCHINSON:  All right.  My bad.

5                    THE WITNESS:  There is a 2166.

6     BY MR. HUTCHINSON:

7          Q.     Why don't you get 2166 out there.

8          A.     Wrong pile.

9                 I have it.

10         Q.     Have you seen this document before

11    today?

12         A.     No.

13         Q.     Let's look at the second page where

14    you have the chart.

15                 What is the mesh used in TVT, Mr.

16    Smith?

17                    MR. CARTMELL:  Object to the form.

18                    THE WITNESS:  It's -- TVT has a 6 mil

19    polypropylene fibers which construct the TVT mesh.

20    BY MR. HUTCHINSON:

21         Q.     Is this what we've seen or what was

22    defined as "old mesh" in some of the documents we've

23    seen?

24         A.     Yes.  Or old mesh or TVT.

25         Q.     And was this the same mesh that Dr.

Confidential - Subject to Protective Order

Page 632

1  Ulmsten started with in the very beginning when he

2  developed TVT?

3              MR. CARTMELL:  Object to the form.

4              THE WITNESS:  Yes.

5  BY MR. HUTCHINSON:

6       Q.      Is the mesh any different than the

7  mesh Dr. Ulmsten started with to your -- in your --

8  to your knowledge?

9              MR. CARTMELL:  Object to the form.

10             THE WITNESS:  Not in design or

11 construction.  However, it -- he started, it was a

12 clear mesh.  We now have clear and blue mesh.

13 BY MR. HUTCHINSON:

14      Q.      And the mesh that Dr. Ulmsten used,

15 does it have any clinical data supporting it?

16             MR. CARTMELL:  Object to the form.

17             THE WITNESS:  Yes.

18 BY MR. HUTCHINSON:

19      Q.      What?

20             MR. CARTMELL:  Object to the form.

21             THE WITNESS:  It was clinical studies

22 that were attached to the 510(k) which was

23 submitted.

24             MR. CARTMELL:  Do you want to restate

25 that?  Because I was in the middle of his answer.

Confidential - Subject to Protective Order

Page 633

1          MR. HUTCHINSON:  Okay.  My question

2   was, what, and you objected to the form on that.

3          MR. CARTMELL:  What was it in it?

4   Yeah, I'm objecting to all of this, because he has

5   no foundation.  He has no idea.  He wasn't even at

6   the company, and he told me that, at the time.

7          MR. HUTCHINSON:  All right.  You can

8   cease from making speaking objections.

9   BY MR. HUTCHINSON:

10       Q.     Mr. Smith, to your knowledge, did Dr.

11  Ulmsten have any clinical data to support the TVT

12  mesh?

13         MR. CARTMELL:  Object to the form.

14         THE WITNESS:  The files that I

15  reviewed for this deposition were from the Medscand

16  files as well as the 510(k)s, which were submitted

17  by Ethicon which included Dr. Ulmsten's clinical

18  trials.

19  BY MR. HUTCHINSON:

20       Q.     Let's look at exhibit --

21       A.     If I could be correct.  They include

22  his clinical trial outcomes, to my knowledge.

23       Q.     Thank you.

24         MR. CARTMELL:  I object and ask that

25  the entire line of testimony be stricken based on

Confidential - Subject to Protective Order

Page 634

1   his testimony already to me that he never saw a

2   clinical trial, all he saw was a few pieces of paper

3   that referred to a clinical trial.  He never saw a

4   protocol, he never saw data, he never saw any of

5   that.

6              MR. HUTCHINSON:  Counsel, in all due

7   respect, I did not make any speaking objections when

8   you were asking questions.  And I'll ask that you

9   refrain.

10  BY MR. HUTCHINSON:

11          Q.      Mr. Smith, would you get Exhibit 2169

12  out in front of you, please.

13              Do you remember being asked questions

14  about this document?

15          A.      I do.

16          Q.      And what is this document?

17          A.      It was a page from another PowerPoint

18  presentation, if I recall.  And it lists some meshes

19  that are sold by Ethicon as well as some meshes that

20  aren't.  And it lists their weights.

21          Q.      And which meshes are sold by Ethicon?

22          A.      Gynemesh, Gynemesh PS or Prolene,

23  TVT, Vypro and Mersilene.

24          Q.      And which are not sold by Ethicon?

25          A.      Marlex, IVS and Surgipro, off of this

Confidential - Subject to Protective Order

1   chart.

2          Q.      And do you recall being asked

3   questions about which TVT or which actual mesh,

4   rather, has a great -- the greater weight

5   numerically?

6          A.      Yes.

7          Q.      And which mesh is that?

8          A.      It's the TVT, which has a 94.

9          Q.      And what is significant about that,

10   if anything?

11              MR. CARTMELL:  Object to the form.

12              THE WITNESS:  It was stated to be

13   more weight than the other meshes that Gynecare

14   sells.  In my opinion, the significance of that is

15   limited prior -- because TVT is such a small piece

16   of mesh relative to pelvic floor meshes, which the

17   other meshes listed here are pelvic floor meshes.

18   BY MR. HUTCHINSON:

19          Q.      That's the distinction then that I

20   want to ask you about.

21              Which of these meshes are actual

22   pelvic floor meshes?

23          A.      Gynemesh or Gynemesh PS.

24          Q.      If you could slow down just a minute,

25   because I want to be precise on this.

Confidential - Subject to Protective Order

Page 636

1                    Which of these are pelvic floor

2     meshes?

3          A.        Gynemesh PS, for instance.

4          Q.        Okay.

5          A.        It's -- I did not create this chart,

6     so Gynemesh is generic, Prolene is generic.  The

7     only one that's on this list that's used in SUI is

8     TVT.

9          Q.        And other than TVT, would it be

10    appropriate for using any of these other meshes in

11    SUI surgery?

12         A.        In my opinion, no.

13         Q.        Why not?

14                   MR. CARTMELL:  Objection.

15                   THE WITNESS:  TVT, obviously the only

16    mesh that's been used in SUI surgery from a Gynecare

17    perspective for the 15 or 16 years.  The Prolene --

18    the Gynemesh PS mesh, PS mesh listed on this page

19    here, is a very light mesh, has very limited stretch

20    characteristics.  TVT has a defined elongation

21    property for it.

22    BY MR. HUTCHINSON:

23         Q.        Mr. Smith, based on your experience,

24    what do you mean by Gynemesh PS having a limited

25    stretch?

Confidential - Subject to Protective Order

Page 637

1        A.       The weave of Gynemesh PS is very

2   different from the TVT construction, such that it

3   does not have elongation properties anywhere near

4   the TVT mesh, of which Prof. Ulmsten specifically

5   wanted TVT to have the unique stretch properties

6   that was created back in 1997.

7        Q.       How is the weave of TVT mesh

8   different than Gynemesh PS?

9        A.       It's not similar at all.

10       Q.       How are they different?

11       A.       It would be almost difficult to even

12   describe without looking at them.  It's not --

13   they're not even close to the same.

14       Q.       Would it be appropriate in your

15   opinion, based on your experience, to use Gynemesh

16   PS in any type of SUI product?

17       A.       In my opinion, no.  And there is no

18   SUI products on the market that use any mesh similar

19   to that of Gynemesh PS in SUI surgery.

20              MR. CARTMELL:  Object.  I apologize.

21   Object and move to strike after the answer.

22   BY MR. HUTCHINSON:

23       Q.       What about Ultrapro?

24              MR. CARTMELL:  Same objection.  Or

25   objection to the form.

Confidential - Subject to Protective Order

Page 638

1             THE WITNESS:  Ultrapro mesh is also a

2     POP mesh, or a pelvic floor repair mesh.

3     BY MR. HUTCHINSON:

4             Q.      Okay.

5             A.      Its characteristics in my opinion

6     also would not be suitable, and primarily because of

7     the very stretchable characteristics that that

8     particular mesh has relative to TVT, meaning that it

9     has greater elongation properties and also a

10    property sometimes referred to as roping.  So as it

11    is stretched, it narrows and could cause roping or

12    retention.

13            Q.      Mr. Smith, let me clear the record.

14    Would Ultrapro -- actually, let me back up.

15                    What is Ultrapro?

16            A.      Ultrapro is a mesh, a partially

17    absorbable mesh used in pelvic floor surgery.  It

18    has yet even a different construction and weave.

19            Q.      Based on your experience, would

20    Ultrapro be suitable for an SUI product?

21            A.      No, it would not.

22            Q.      Why not?

23            A.      As I was indicating, the elongation

24    properties of Ultrapro would cause it to neck and

25    narrow and stretch greatly, even during implantation

Confidential - Subject to Protective Order

Page 639

1    or after implantation.

2          Q.      What do you mean by "elongation

3    properties"?

4          A.      Much like an elastic band.  It

5    behaves more like an elastic band than TVT does.

6    Where TVT has resistance, it has some elastic

7    properties if stretched, whereas Ultrapro would

8    stretch many times or multiple time more.  It's just

9    hard to define, but...

10          Q.      If you will look, please, with me at

11    Exhibit 2172.

12                  Do you have that in front of you?

13          A.      Yes, I do.

14          Q.      Do you remember being asked questions

15    about this document?

16          A.      Yes, I do.

17          Q.      Does this apply to hernia repair or

18    POP surgery?

19          A.      Yes.

20          Q.      Does it apply to SUI surgery?

21          A.      No.

22          Q.      Did you author this document?

23          A.      No.

24          Q.      Do you hold yourself out to be an

25    expert in histology?

Confidential – Subject to Protective Order

Page 640

1          A.        No.

2          Q.        For the benefit of the jury, what is

3   histology?

4          A.        It's the evaluations of tissue

5   ingrowth or tissue, cell and tissue in general.

6          Q.        If we look at this document that you

7   have in front of you, 2172, do you remember being

8   asked questions about the benefits of large pores?

9          A.        Yes.

10         Q.        And do you remember being asked

11  questions about the conclusions of this evaluation?

12         A.        I believe so, yes.

13         Q.        And were the conclusions for pelvic

14  floor repair products instead of stress urinary

15  incontinence products?

16                   MR. CARTMELL:  Object to the form.

17                   THE WITNESS:  It's what the intent of

18  this document was.

19  BY MR. HUTCHINSON:

20         Q.        Mr. Smith, would you turn with me,

21  please, to Exhibit 2168.

22                   Before we go there, though, I want to

23  ask you a question.

24                   Do you remember being asked about --

25  questions by plaintiffs' counsel about heavyweight

Confidential - Subject to Protective Order

Page 641

1    mesh versus lightweight mesh?

2         A.      Yes.

3         Q.      And what did you mean when you

4    testified that you cannot agree that it is a

5    heavyweight mesh?  What did you mean by that?

6         A.      In my opinion, TVT has -- isn't

7    defined as a heavyweight mesh, so there's

8    characterization and people define meshes in

9    heavyweights and lightweights.  In my experience,

10   it's been called TVT.  It has a 6 mil fiber and it's

11   not necessarily, in my mind -- it may be considered

12   a heavyweight mesh.  I don't consider it a

13   heavyweight mesh.  That's all.

14        Q.      Let's look at Exhibit 2168, please.

15               Do you have that in front of you?

16        A.      Yes, I do.

17        Q.      And do you recall being asked

18   questions about pore sizes?

19        A.      I do.

20        Q.      Let's look at --

21               Actually, do you recall being asked

22   questions about large pores and small pores?

23        A.      Yes, I do.

24        Q.      Let's look at page 16 for a minute.

25               Are you there?

Confidential - Subject to Protective Order

Page 642

1         A.      Yes.

2         Q.      It states at the top, "Pores must be

3    greater than 75 microns."  Did I read that

4    correctly?

5         A.      Yes.

6         Q.      What does that mean?

7         A.      The Amid study, which has held up

8    pretty much in respect to pore size, it was defined

9    that anything greater than 75 microns would be

10   considered a large macroporous mesh.  75 microns is

11   three-thousandths of an inch, which is roughly the

12   size of your hair.  The pores in TVT mesh are

13   roughly a millimeter, which is a thousand microns.

14   So we're talking about 75 microns versus a thousand

15   microns, which is what a TVT mesh is.  So we're

16   obviously a larger pore size than what's considered

17   a macroporous mesh.

18                MR. CARTMELL:  Object to the form --

19   or excuse me.  Object to the testimony as

20   nonresponsive.  Move to strike.

21   BY MR. HUTCHINSON:

22        Q.      Down at the bottom, the first

23   paragraph, it says, "Searchers have shown through

24   histological studies that a good incorporation

25   requires pores greater than 75 microns."  Did I read

Confidential - Subject to Protective Order

1      that correctly?

2           A.      Yes, I believe so.

3           Q.      And, Mr. Smith, are the pores in the

4      TVT mesh greater than 75 microns?

5           A.      Yes.  They are -- pores in TVT mesh

6      are approximately 1,000 microns.

7           Q.      Let's look at page 24.

8                   Do you recall being asked

9      questions -- actually, strike that.

10                  Are you with me on page 24?

11          A.      Yes.

12          Q.      It states at the bottom -- I mean,

13     I'm sorry, at the top, "The chemical nature of the

14     material.  Select an inert material:  No scientific

15     evidence suggesting to use something else than

16     POLYPROPYLENE."  Do you see that?

17          A.      Yes.

18          Q.      What does that mean?

19          A.      It's written by the medical directors

20     here, this document.  It's saying that after the

21     initial inflammatory response, the material is

22     inert.

23          Q.      And it states down at the bottom, a

24     paragraph that I don't believe you were asked about,

25     where it says "Select an inert material."  Do you

Confidential - Subject to Protective Order

Page 644

1    see that?

2                    MR. CARTMELL:  Object to the form.

3                    THE WITNESS:  Yes.

4    BY MR. HUTCHINSON:

5            Q.      Were you asked about this paragraph?

6            A.      I don't believe so.

7            Q.      What does it state?

8            A.      "Polypropylene has been used for

9    years in surgery and its perfect tolerance in the

10   human body has been established.  It is the number

11   one suture used in cardiovascular surgery.  It is by

12   far the most widely used mesh...both" in "hernia

13   repair" as well to "cure...SUI.  To date, there is

14   currently no scientific evidence suggesting" any

15   other "material would have a better effect in

16   minimizing the inflammatory reaction of the host

17   tissues."

18           Q.      All right.

19                   And if you'll turn with me to page

20   40, please.  It's the very last page.  You can blow

21   up that paragraph at the bottom that starts, "As far

22   as slings are concerned."

23                   Mr. Smith, this is the last page of

24   this document.  Correct?

25           A.      Yes.

Confidential – Subject to Protective Order

Page 645

1          Q.      And it states "Conclusions" at the

2    top?

3          A.      Yes.

4          Q.      Did plaintiffs' counsel ask you any

5    questions about this particular page of the

6    document?

7                  MR. CARTMELL:  Object to the form.

8                  THE WITNESS:  Not at all.  Not at

9    all.

10   BY MR. HUTCHINSON:

11         Q.      Down there at the bottom it has two

12   bullet points.  Do you see those?

13         A.      Yes.

14         Q.      What does the first bullet point

15   state?

16         A.      "As far as slings are concerned, the

17   huge and long term experience with the Gynecare TVT

18   is the best guarantee for the pelvic floor surgeon

19   that he will very seldomly have to face vaginal

20   complications."

21         Q.      Okay.

22                 Let me ask you to switch gears for a

23   minute and ask you a few questions about the Scion

24   project and the Matrix project.  Okay?

25         A.      Okay.

Confidential – Subject to Protective Order

Page 646

1        Q.      Let's talk about the Scion project

2    first.

3                What was the purpose of that project?

4        A.      The Scion project was initiated as a

5    next-generation product potential after TVT SECUR.

6    It was initially stated to try to improve the

7    product on some of the things that we had seen with

8    TVT SECUR post-launch, such as having a longer mesh,

9    single placement device, rather than both retropubic

10   and obturator, absorbable ends and the like.

11       Q.      Did you get any voice of the customer

12   feedback?

13       A.      Since the project went on for

14   numerous years, we had a lot of VOC or voice of

15   customer.  Almost all surgeons who we showed it to

16   were very pleased with the device and anticipated us

17   in launching the device.

18       Q.      Was it your job as an engineer within

19   the R&D department to bring new ideas to the table?

20       A.      Yes.

21       Q.      And is that what you were doing with

22   the Scion project?

23       A.      Yes.

24       Q.      Did a finished product ever come out

25   of this project?

Confidential - Subject to Protective Order

Page 647

1      A.      No, it did not.

2      Q.      Why not?

3      A.      The company --

4              MR. CARTMELL:  Objection, asked and

5      answered.

6              THE WITNESS:  The company determined

7      that it was a business decision to no longer pursue

8      that as a product.

9      BY MR. HUTCHINSON:

10      Q.      Let's talk about the Matrix project

11      for a minute.

12              What was the purpose of the Matrix

13      project?

14              MR. CARTMELL:  Asked and answered.

15              THE WITNESS:  Matrix was a research

16      project that myself and another individual from

17      Germany undertook to evaluate different materials.

18      In this case, it was a material that -- not a mesh,

19      but we were -- the material would have a minimal

20      amount of polypropylene in it.  The goal was to

21      understand how low or how little polypropylene we

22      could actually put in a material and have it

23      functionally -- and function.  And we looked at

24      whether or not it would have application both in SUI

25      or pelvic organ prolapse.

Confidential - Subject to Protective Order

Page 648

1    BY MR. HUTCHINSON:

2            Q.      What was the result?

3                    MR. CARTMELL:  Objection, asked and

4    answered.

5                    THE WITNESS:  We studied it for

6    numerous years, numerous animal studies, and there

7    was no conclusive result that came out of it to --

8    that that material would serve as a good material

9    for replacements at this point.

10   BY MR. HUTCHINSON:

11           Q.      Is this an example of you as a fellow

12   engineer trying to bring new ideas to the table?

13           A.      It's an example of, not only myself,

14   but Ethicon looking for better materials or better

15   solutions.

16                   MR. CARTMELL:  Move to strike as

17   nonresponsive.

18   BY MR. HUTCHINSON:

19           Q.      Let's talk about TVT-O PA.

20                   What was that?

21           A.      TVT-O PA was a project.  It came

22   after TVT -- or after, excuse me, Scion.  Scion

23   originally started as a polypropylene mesh, went

24   to -- eventually went to a PA mesh.  When we created

25   the mesh, which could -- a partially absorbable

Confidential - Subject to Protective Order

Page 649

1    mesh, it was then determined that we wanted to put

2    it onto a different product with TVT-O and test it

3    clinically.  And so we created a project called

4    TVT-O PA.

5          Q.      What was the ultimate result of the

6    TVT-O PA?

7                  MR. CARTMELL:  Objection, asked and

8    answered.

9                  THE WITNESS:  The TVT-O PA product

10   was created, clinical samples were developed.  And

11   prior to the clinical actually being executed, it

12   was determined that the product did not function

13   effectively in some human cadaver studies that were

14   done and that it had too much elongation or stretch.

15   So it was -- the project was canceled.

16   BY MR. HUTCHINSON:

17         Q.      Let me ask you this.

18                 Out of all the projects that we've

19   talked about, what material have you found that

20   would have the characteristics needed to replace

21   Prolene as the mesh used in the gold standard TVT?

22                 MR. CARTMELL:  Objection, asked and

23   answered.

24                 THE WITNESS:  I have not found

25   anything that's close.  We -- the PA mesh was

Confidential - Subject to Protective Order

Page 650

1   attempted to be designed to be as close to or

2   identical to the TVT mesh having an absorbable

3   component to it.  But as we said, it was not

4   successful.

5   BY MR. HUTCHINSON:

6       Q.      Why has Ethicon continued to use

7   Prolene in its mesh for TVT products?

8       A.      Prolene, I would say, as a material

9   is the most proven mesh.  It's the gold -- it's

10  considered the gold standard.

11      Q.      I want to clear something up.

12              If I recall, when you were deposed,

13  you testified that you've never done a study --

14  there's never been a study done by the company to

15  test a PA mesh for SUI.

16              MR. CARTMELL:  Objection, move to

17  strike the statement of counsel.

18  BY MR. HUTCHINSON:

19      Q.      What do you mean by that?

20              MR. CARTMELL:  Same objection.

21              THE WITNESS:  There was a study

22  planned to be done, but it was not carried out due

23  to experiencing the product before use that it would

24  not behave properly due to its stretch

25  characteristics prior to being placed in the body.

Confidential - Subject to Protective Order

Page 651

1    BY MR. HUTCHINSON:

2         Q.       And what project are we talking

3    about?

4         A.       That was the TVT-O PA project.

5         Q.       Mr. Smith, do you or Ethicon -- or

6    strike that.

7                  Do you know of a mesh that is safer

8    and more effective than the Prolene mesh already

9    used in the TVT products?

10                 MR. CARTMELL:  Object to the form.

11                 THE WITNESS:  No.

12   BY MR. HUTCHINSON:

13        Q.       Do you remember being asked questions

14   about information that would be reasonable for a

15   woman to know about having a TVT device implanted in

16   their body?

17        A.       Yes.

18        Q.       Based on your experience, Mr. Smith,

19   do all surgeries carry risks?

20        A.       Absolutely.

21        Q.       And whose responsibility is it to

22   warn the patients of those known risks?

23                 MR. CARTMELL:  Object to the form.

24                 THE WITNESS:  It's the surgeon's

25   responsibility.

Confidential - Subject to Protective Order

Page 652

1    BY MR. HUTCHINSON:

2         Q.      And do you remember plaintiffs'

3    counsel asking you questions about what you'd want

4    your wife or daughter to know about the risks?

5         A.      That's correct.

6         Q.      And, Mr. Smith, if your wife or

7    daughter suffered from stress urinary incontinence

8    and wanted to improve the quality of their life,

9    what would you recommend?

10              MR. CARTMELL:  Object to the form.

11              THE WITNESS:  I would recommend one

12   of the TVT family of products, either TVT SECUR,

13   TVT-O, TVT, but the surgeon would have to make that

14   determination as to which one of those products

15   would be best.

16              MR. HUTCHINSON:  Thank you.  No

17   further questions.

18              We'll go off the record.

19              MR. CARTMELL:  Go off the record for

20   just a second.

21              THE VIDEOGRAPHER:  The time is now

22   5:39.  We are going off the record.

23                    -  -  -

24              (A recess was taken from 5:39 p.m. to

25         6:03 p.m.)

Confidential - Subject to Protective Order

Page 653

1                         -   -   -

2                         THE VIDEOGRAPHER:  The time is now

3      6:03.  We are back on the record.  This is the

4      beginning of Disk Number 7.

5                         MR. HUTCHINSON:  Tom, real quick

6      before we go into your line of questioning, it's

7      6:00.  How long do you anticipate?  Because we do

8      have some flights to catch, but I do want you to

9      have the opportunity to do a redirect or recross,

10     rather, limited to our redirect.

11                        Can you give me an approximation of

12     how long?  Because, in all honesty, the witness's

13     back is hurting and it's now 6:00.

14                        MR. CARTMELL:  I don't know.  You

15     just did a two hour approximate direct.  You brought

16     up a lot of stuff, a lot of new issues, frankly, and

17     I feel like we need to respond to those.

18                        MR. HUTCHINSON:  All right.  Go on.

19                        I can't agree to give you a whole

20     hour, in the interest of time.

21                        MR. CARTMELL:  Pardon me?

22                        MR. HUTCHINSON:  I can't agree to

23     give you a whole hour, in the interest of time.

24                        MR. GOZA:  Let's just start and see.

25                        MR. HUTCHINSON:  Just go on.

Confidential - Subject to Protective Order

Page 654

1                      -  -  -

2                   EXAMINATION

3                      -  -  -

4   BY MR. CARTMELL:

5          Q.      Mr. Smith, you just testified, I

6   believe, that your company does training for

7   physicians.  Correct?

8          A.      In the form of an IFU.

9          Q.      Right.

10                 And what you mean by that is you

11  specifically train physicians by using or through

12  the IFU.  Correct?

13         A.      Yes.

14         Q.      And so it's clear that if the IFU is

15  not correct, then the training will be defective.

16  Correct?

17         A.      Hypothetically.

18         Q.      And it's also true that if the IFU is

19  not correct, then the product of that, the training,

20  and the IFU and the product as a whole will be

21  defective.  Correct?

22                 MR. HUTCHINSON:  Object to form.

23                 THE WITNESS:  I can't answer that as

24  a yes or no the way it's stated.

25  BY MR. CARTMELL:

Confidential – Subject to Protective Order

Page 655

1          Q.       If you assume that the IFU is

2    incorrect, then we know that the IFU is a part of

3    the product.  Correct?

4          A.       Correct.

5          Q.       If the IFU is incorrect, then the

6    product will be defective.  Correct?

7          A.       The IFU would need to be changed.

8          Q.       Well, and the product would be

9    defective if it was incorrect?

10         A.       The product would need to be

11   changed -- I mean, the IFU would need to be changed

12   if you're speaking of the IFU.  The product may have

13   nothing wrong with it.

14         Q.       The IFU is part of the product.

15   Right?  We've already established that.  Correct?

16         A.       So the product would need to be

17   altered.

18         Q.       Right.

19                  Because there may be a defect as a

20   result of the incorrect IFU.  Right?

21                  MR. HUTCHINSON:  Object to form.

22                  THE WITNESS:  Hypothetically

23   speaking, yes.

24   BY MR. CARTMELL:

25         Q.       Now, you just testified, I think,

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Subject to Protective Order

Page 656

1    that you believe the TVT products are safe?

2          A.      I do.

3          Q.      Now, you, as we know, spent years and

4    years of your life, approximately nine or ten years,

5    in the development and the design and in handling

6    the technical aspects of those products.  Correct?

7          A.      Fair enough to say.

8          Q.      I take it -- and I think you said,

9    you testified that you're very proud of those

10   products.  Correct?

11         A.      I am.

12         Q.      I take it that if in fact those

13   products were found to be unsafe or defective or to

14   cause risks that outweighed the benefits, you'd feel

15   some responsibility for those -- for that; is that

16   right?

17         A.      Hypothetically, if that was the case,

18   they would need to be changed.

19         Q.      Right.

20                 And you would feel some

21   responsibility for that, because you personally were

22   involved in designing and developing those products.

23   Right?

24                 MR. HUTCHINSON:  Object to form.

25                 THE WITNESS:  Yes.

Confidential - Subject to Protective Order

Page 657

1    BY MR. CARTMELL:

2         Q.      You talked about recommending the use

3    of the TVT SECUR, but the TVT SECUR is no longer

4    being sold by your company.  That's right?

5         A.      That's right.

6         Q.      And the reason for that is because

7    the FDA said that your company needed to do further

8    clinical studies related to that to determine

9    whether or not the product was safe or effective.

10   Correct?

11                MR. HUTCHINSON:  Object to form.

12                THE WITNESS:  They -- the FDA

13   indicated that additional 522s would need to be done

14   for numerous mesh products.

15   BY MR. CARTMELL:

16        Q.      The FDA --

17        A.      That was one of them.

18        Q.      I'm sorry.

19        A.      And that was one of them, yeah.

20        Q.      The FDA said, for the TVT SECUR

21   product that you designed and developed, longer term

22   clinical studies about safety of the product needed

23   to be performed by the company.  Correct?

24        A.      That's correct.

25        Q.      And your company chose as a business

Confidential - Subject to Protective Order

Page 658

1    decision, I think is what we've been told, not to

2    pursue those studies.  Right?

3            A.        That was their choice, yes.

4            Q.        I want to talk to you about

5    Exhibit 2160, if you'll refer back to that.

6                      Mr. Lawlor.

7                      2160, as you recall, is the risk

8    assessment related to the laser cut mesh that you

9    were just asked again about?

10           A.        Correct.

11           Q.        And we went through this, and you

12   testified that failure modes included in this were

13   that the laser cut mesh could decrease in pore size,

14   not integrate into the tissue and cause erosions.

15   Correct?

16           A.        That was your words that you were

17   reading, yes.

18           Q.        That's what it says on the document.

19   Correct?

20           A.        Right.

21           Q.        And it also talks about how the mesh

22   can slip and it can cause erosions.  Right?

23                     MR. HUTCHINSON:  Object to form.

24                     THE WITNESS:  That was indicated by

25   the people who put this together, yes.

Confidential - Subject to Protective Order

Page 659

1    BY MR. CARTMELL:

2         Q.      And this involved engineers from your

3    company, a medical director from your company and a

4    team of people.  Correct?

5         A.      Yes.  I was not part of that, but

6    yes.

7         Q.      And you mentioned that, I think what

8    you said was, we did some controls that made this

9    unlikely, or I think you said "rare" was your word.

10   Right?

11        A.      I think -- I believe I indicated that

12   the control method was to use the TVT mesh.

13        Q.      Well, yeah.  What you're -- I just

14   want to be clear.

15               What you're telling the jury is the

16   control method was, we're using a TVT-O mesh or a

17   TVT mesh that has been on the market for several

18   years.  That's what you're saying.  Right?

19        A.      Right.  Relative to your statement of

20   that pore size being smaller than the TVT mesh, that

21   that would be rare, because the mesh pore size would

22   stay above the 75 microns.

23        Q.      Well, but what you're saying is the

24   control there is because it's been on the market for

25   several years, and because we say there hasn't been

Confidential - Subject to Protective Order

Page 660

1   any problems with it that we've seen in our

2   reporting of complaints, that's one control?

3          A.      That's right.

4                  MR. HUTCHINSON:  Object to form.

5   BY MR. CARTMELL:

6          Q.      And the other thing that's listed as

7   a control is a study.  Right?

8          A.      I believe so, yes.

9          Q.      And the study that is listed we've

10  talked about in this deposition, haven't we?

11         A.      If you could give me reference, are

12  we speaking of the same study?

13         Q.      Well, that study that's listed there,

14  if you go to -- let's go to 18 that we were talking

15  about, or what you talked about a minute ago with

16  defense counsel.  Actually, I think it's 19, I

17  apologize.

18                 When you go to the control method

19  related to the reduction in pore size causing

20  erosion, it states, "Ultrasonic Mesh study for

21  tissue in-growth, PSE accession number 02-0579"?

22         A.      That's correct.

23         Q.      That's the rabbit study that we

24  talked about, isn't it?

25         A.      I believe it is.

Confidential - Subject to Protective Order

Page 661

1          Q.       That's the study that is ten rabbits

2    for 14 days?

3          A.       As an endpoint.

4          Q.       Right.

5                   So what happened in that study we've

6    discussed is five of the rabbits got a little piece

7    of mesh that was the TVT laser cut mesh, I take it?

8          A.       I could look at the study.  It was

9    not my study, but --

10         Q.       Well, the truth is that it wasn't the

11   laser cut mesh, because that study, as we discussed,

12   talked in -- or took place in 2003.  Right?

13         A.       That's correct.

14         Q.       So this is a laser cut mesh FMEA, or

15   risk analysis, that is referring to the control of

16   the problem being erosion from small pores, being a

17   rabbit study that was done in 2003 and not with

18   laser cut mesh.  Correct?

19                  MR. HUTCHINSON:  Object to form.

20   BY MR. CARTMELL:

21         Q.       Is that true?

22         A.       It was -- used ultrasonically-cut

23   mesh.

24         Q.       Right.

25                  It did not use the laser cut mesh

Confidential - Subject to Protective Order

Page 662

1    that is being analyzed in this risk analysis.

2    Correct?

3         A.       There's reasons for that, but yes.

4         Q.       Well, the reason for that and the

5    reason laser cut mesh wasn't used in the rabbit

6    study was because it wasn't even in existence at

7    that time.  Isn't that true?

8         A.       It was being put in as part of this

9    program.

10        Q.       Right.

11                 So it didn't exist at that time.

12                 And so in the rabbit study, they did

13   not put laser cut mesh that was sold to women in the

14   rabbits' pelvis.  Correct?

15                 MR. HUTCHINSON:  Object to form.

16                 THE WITNESS:  No.  They put

17   ultrasonically-cut mesh, which effectively does the

18   same job by welding the ends together, whether it's

19   welded by heat, a light heat or sound heat.

20   BY MR. CARTMELL:

21        Q.       It's different, though --

22        A.       It is.

23        Q.       -- than the laser cut mesh, isn't it?

24        A.       It is a different method of cutting

25   it.

Confidential - Subject to Protective Order

Page 663

1          Q.          Now, if you also look further at

2    column 29, and if you look at the "Failure Mode" on

3    column 29 related to the laser cut mesh, you'll see

4    that it says, "Mesh is too stiff."  Do you see that?

5          A.          Yes.

6          Q.          So your company knew that as of this

7    time, the TVT mesh that was laser cut could possibly

8    come -- become too stiff and it could lead to damage

9    to the urethra in a woman.  Correct?

10                     MR. HUTCHINSON:  Object to form.

11                     THE WITNESS:  That is what they

12   listed, yes.

13   BY MR. CARTMELL:

14         Q.          Because if you go over to the "Harm"

15   listed, let's go over to that, specifically it

16   states, "Damage to Urethra."  Right?

17         A.          Yes.

18         Q.          Now, again, you use that same rabbit

19   study that didn't even use laser cut mesh to be the

20   control for that, the way you mitigated that harm.

21   Correct?

22                     MR. HUTCHINSON:  Object to form.

23                     THE WITNESS:  It's the study that the

24   team used when they did this form, yes.

25   BY MR. CARTMELL:

Confidential - Subject to Protective Order

Page 664

1          Q.        And you knew that, in fact, the laser

2    cut mesh was actually stiffer than the TVT mesh.

3    Right?

4          A.        Not in the physiological range.

5          Q.        Well, for example, for you, when you

6    held it in your hand, you felt that it was stiffer?

7          A.        Not in the physiological range.

8          Q.        My question is specifically when you

9    held the mesh in your hand, did you feel it was

10   stiffer?

11         A.        You'd have to define "stiffer,"

12   but --

13         Q.        It felt more stiff?

14                   MR. HUTCHINSON:  Stop, hey, stop,

15   Tom.  The witness is trying to answer your question.

16                   THE WITNESS:  You would have to

17   define "stiffness."  It's -- but I personally feel

18   that it's -- within the physiological range, it was

19   the same.

20                   MR. CARTMELL:  Object and move to

21   strike after the answer.

22                        -   -   -

23                   (Deposition Exhibit No. T-2183,

24             E-mail chain, top one dated 11/1/2004,

25             Bates stamped ETH.MESH.05548122 and

Confidential - Subject to Protective Order

Page 665

1              ETH.MESH.05548123, was marked for

2              identification.)

3                      -  -  -

4    BY MR. CARTMELL:

5         Q.      I'm going to hand you what has been

6    marked as 2183.  It's an e-mail from you to doctors

7    that you are consulting with related to the laser

8    cut mesh.

9              And before I ask you about this

10   specifically, it's true, Mr. Smith, that if a mesh

11   is too stiff, then that can cause erosions and pain

12   for women.  Correct?

13        A.      It could.

14        Q.      And this was specifically your

15   statement, if you look at the -- I believe it's the

16   fourth paragraph down, we've got it outlined here,

17   you state to these doctors who you are asking to

18   consult related to the mesh, "You will also be

19   evaluating our current TVT mesh (mechanically cut)

20   and a new laser cut mesh that does not fray and has

21   a stiffer feel."

22              Okay.  So you personally felt like

23   the laser cut mesh had a stiffer feel.  Correct?

24        A.      Beyond the physiological range, yes.

25        Q.      The truth is that your company did

Confidential - Subject to Protective Order

Page 666

1    testing on the mesh and actually found that the

2    elongation, what, was more or less with the laser

3    cut mesh?

4         A.       Beyond the physiological range, it

5    was less, given a certain load.

6         Q.       If the elongation of a mesh is less,

7    then it will actually be stiffer.  Correct?

8         A.       Not necessarily stiffer, as typically

9    defined in the other direction.

10                         -  -  -

11                   (Deposition Exhibit No. T-2184, Memo

12                   dated December 14, 2004, Bates stamped

13                   ETH.MESH.01809080 and ETH.MESH.01809081,

14                   was marked for identification.)

15                         -  -  -

16   BY MR. CARTMELL:

17        Q.       Let me hand you what's been marked as

18   2184.

19                   MR. HUTCHINSON:  Counsel, do you have

20   a copy?

21                   MR. CARTMELL:  I just gave them to

22   you.

23   BY MR. CARTMELL:

24        Q.       Doctor, this is a memo to you and

25   Paul Parisi.

Confidential – Subject to Protective Order

Page 667

1              Who is Paul Parisi?

2      A.      I'm sorry, you just called me

3   "doctor."

4      Q.      I'm sorry.  Strike that.  Sorry,

5   strike that.  You're not a doctor.  Sorry.  I'll

6   start over.

7              Mr. Smith, this is a memo to you and

8   Paul Parisi.

9              Who is Paul Parisi?

10     A.      Paul Parisi was in marketing at the

11   time, I believe.

12     Q.      And it's from Becky Leibowitz.

13             Who is she?

14     A.      She was part of the CPC or product

15   characterization group.

16     Q.      It's regarding a "Comparison of

17   Laser-Cut" Mesh "and Machine-Cut TVT Mesh to Meshes

18   from Competitive Devices."  Right?

19     A.      Yes, I believe it is.

20     Q.      So it sounds like you looked at your

21   TVT mesh that was machine cut.

22             And is it true that that is the mesh

23   that had particles that would be lost or come off

24   the product and it would fray?

25     A.      If we could recall -- call it

Confidential - Subject to Protective Order

1  mechanically cut rather than machine cut, I would

2  agree, yes.

3          Q.      I'm sorry, okay.

4                  Then you compared that with laser cut

5  mesh that your risk analysis said could be stiffer.

6  Correct?

7          A.      The risk analysis said that if it was

8  too stiff, it might be a problem.

9          Q.      And this was actually the results of

10 a study, if you look at the results down there.  It

11 states, "The average load at one-fourth inch

12 intervals of elongation, up to 1 inch (20%) of

13 elongation was calculated for both groups of TVT

14 mesh and is plotted below in the Figure along with

15 several meshes from competitor devices.  At 1 inch

16 of stretch, the laser-cut TVT mesh was about three

17 times stiffer than the machine-cut TVT mesh."

18 Right?

19         A.      That was beyond the physiological

20 range.

21                 MR. CARTMELL:  Object and move to

22 strike the answer.  And I'll ask you to answer the

23 question yes or no.

24 BY MR. CARTMELL:

25         Q.      The laser cut mesh that was measured