# Exhibit 9

Confidential - Subject to Protective Order

Page 850

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

- - -

IN RE:  ETHICON, INC.          :    MDL NO. 2327
PELVIC REPAIR SYSTEM,          :
PRODUCTS LIABILITY             :    VOLUME VI
LITIGATION                     :


- - -


THIS DOCUMENT RELATES TO ALL CASES AND
VARIOUS OTHER CROSS-NOTICED ACTIONS
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
- - -
February 4, 2014
- - -

Continued videotaped realtime
30(b)(6) deposition of JOHNSON & JOHNSON and
ETHICON, taken through it representative DANIEL J.
SMITH, was taken pursuant to notice and held at the
law offices of RIKER DANZIG SCHERER HYLAND PERRETTI
LLP, Headquarters Plaza, One Speedwell Avenue,
Morristown, New Jersey, beginning at 8:53 a.m. on
the above date, before Kimberly A. Cahill, a
Federally Approved Registered Merit Reporter and
Notary Public for the State of New Jersey.


- - -


GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph|917.591.5672 fax
deps@golkow.com

Confidential - Subject to Protective Order

Page 861

1          Q.          In or about 2004-2005, Ethicon
2    started to explore more vigorously the concept of
3    cutting the TVT meshes using a laser; is that right?
4          A.          In what timeframe?
5          Q.          2004-2005?
6          A.          They may have.  I believe they were
7    experimenting with ultrasonic cutting in that
8    timeframe.
9          Q.          And part of the reason for that was
10   that there were complaints and perceptions in the
11   marketplace from the physicians that the
12   mechanically cut mesh was -- had some problems; is
13   that right?
14                     MR. HUTCHINSON:  Object to form.
15                     THE WITNESS:  I wouldn't necessarily
16   characterize it as a problem.  Competitors would use
17   it -- it was -- against, from a selling perspective,
18   of the particle loss, but it was not ever deemed to
19   be clinically relevant.
20   BY MR. ZONIES:
21         Q.          Well, there were complaints coming
22   from the field and it was known at Ethicon that
23   mechanically cut mesh frayed; is that right?
24                     MR. HUTCHINSON:  Object to form.
25                     THE WITNESS:  That is a term that was

Confidential - Subject to Protective Order

Page 862

1  used, yeah.

2  BY MR. ZONIES:

3        Q.      And that mechanically cut mesh had

4  particle loss or particles coming off of the mesh;

5  correct?

6        A.      Or fraying.

7        Q.      Also that mechanically cut mesh roped

8  or deformed and curled; correct?

9                MR. HUTCHINSON:  Object to form.

10               THE WITNESS:  It -- if stretched

11  beyond its elastic limit, yes.

12  BY MR. ZONIES:

13       Q.      And laser cut mesh used -- strike

14  that.

15               Using a laser to cut the TVT mesh was

16  one of Ethicon's approaches to cut down on fraying

17  and particle loss; correct?

18       A.      Yes, I would say that's...

19       Q.      And also using the laser to cut the

20  mesh was one of Ethicon's ways to address the roping

21  and curling that could happen with mechanically cut

22  mesh; correct?

23       A.      It was primarily done to my knowledge

24  for the particle loss.

25       Q.      You say it was primarily for the

Confidential - Subject to Protective Order

1    particle loss.  You do understand that was also to

2    address the roping, because the laser cut mesh would

3    not rope as much as mechanically cut; correct?

4                   MR. HUTCHINSON:  Object to form.

5                   THE WITNESS:  It's subjective to "as

6    much"; but if anything is stretched more than its

7    elastic limit, it will perform -- it'll rope.

8    BY MR. ZONIES:

9         Q.     And the mechanically cut mesh would

10   reach that limit more quickly than laser cut;

11   correct?

12        A.     Yes.

13        Q.     It would rope more quickly than --

14   strike that.

15                   Mechanically cut mesh would rope

16   under less force than laser cut; correct?

17        A.     That would be correct; however, from

18   a -- you would have to, from an explanation

19   perspective, understand that those forces that you

20   are speaking about are far greater than the

21   physiological range and not normally seen in -- from

22   a clinical perspective.

23                   MR. ZONIES:  Move to strike after

24   "that would be correct."

25   BY MR. ZONIES:

Confidential - Subject to Protective Order

Page 864

1          Q.      Now, Mr. Smith, the laser cut mesh

2    would not rope as much as the mechanically cut mesh

3    because of the difference in its mechanical

4    properties due to the fashion in which it was cut;

5    correct?

6          A.      Could you rephrase --

7          Q.      Yeah, that was --

8          A.      -- rephrase that; otherwise, I'm not

9    sure I can answer that --

10         Q.      I'll rephrase.

11         A.      -- or how to answer it, I should say.

12         Q.      Sure.  The laser cut mesh was stiffer

13   than the mechanically cut mesh and that's why it

14   wouldn't rope as quickly as mechanically cut

15   correct?

16                 MR. HUTCHINSON:  Object to form.

17                 THE WITNESS:  I would not be able to

18   agree with that as stated, no.

19   BY MR. ZONIES:

20         Q.      Now, if a mesh ropes or when a mesh

21   is under stress, the pore size of the mesh can

22   change; correct?

23         A.      Providing there's sufficient load.

24         Q.      And the effective diameter of the

25   pores could change; correct?

Confidential - Subject to Protective Order

Page 865

1          MR. HUTCHINSON:  Object to form.

2          THE WITNESS:  I couldn't agree with

3     that as stated.  The word "diameter" makes no sense

4     in that context.

5                    - - -

6          (Deposition Exhibit No. T-3587,

7          10-11/04 E-Mail Chain Among Lancos,

8          Castro, Smith, et al, ETH.MESH.01813975

9          through ETH.MESH.01813978, was marked for

10         identification.)

11                    - - -

12    BY MR. ZONIES:

13         Q.     Mr. Smith, I'm going to hand you

14    what's been marked as Exhibit 3587.  It was

15    previously marked as 3160.

16         (Pause.)

17    BY MR. ZONIES:

18         Q.     Have you reviewed -- Mr. Smith, you

19    have in front of you Exhibit 3587?

20         A.     Yes, I do.

21         Q.     Now --

22         MR. HUTCHINSON:  I'm sorry.  I'm

23    having -- I have 3160.

24         MR. ZONIES:  It was previously marked

25    as 3160.  I've re-marked it.

Confidential - Subject to Protective Order

1              MR. HUTCHINSON:  All right.

2              MR. ZONIES:  Do you want to keep the

3   old one instead?

4              MR. COMBS:  No, no, that's fine.

5   Just tell me again --

6              THE WITNESS:  3587.

7   BY MR. ZONIES:

8         Q.     Mr. Smith, you have in front of you

9   Exhibit 3587; it was previously marked as Exhibit

10  3160?

11        A.     Yes, I do.

12        Q.     And you can see that this is -- on

13  the top there, ends up being an e-mail that was

14  forwarded to you in 2004; is that right?

15        A.     Yes.

16        Q.     And the discussion in this e-mail is

17  about the top three complaints that Ethicon is

18  receiving about its TVT mesh; correct?

19        A.     It appears to be, yes.

20        Q.     And one of the top three complaints

21  is that the mesh is fraying; is that right?

22        A.     Yes.

23        Q.     So if you look down in the e-mail

24  from Laurent, you can see that the top three

25  complaints, mesh frayed, is on the top; is that

Confidential - Subject to Protective Order

1    right?

2           A.      It's listed there, yes.  I'm not sure

3    if it's the first or -- but it is listed there.

4           Q.      And then it goes on to discuss that

5    and it says, "For Mesh frayed, so far there is no

6    official corrective action set up at Neuchatel" --

7    and Neuchatel's the manufacturing facility?

8           A.      Of the finished product, not of the

9    mesh.

10          Q.      -- and "This kind of complaint is

11   tracked," "knew by all people involved in TVT

12   business and especially technical people like Dan

13   SMITH."  That's you.  Right?

14          A.      Yes, that's me.

15          Q.      And that's true, isn't it, that this

16   was something that Ethicon knew about, that the mesh

17   that it used in the TVT frayed; correct?

18          A.      If I could explain, it says tracked.

19   I do not track them.  I did know about it, so just

20   clarifying --

21          Q.      Sure.

22          A.      -- the tracking piece versus the

23   knowing piece.

24          Q.      And it's -- I don't know what's going

25   on today.  Hang on -- Dave, I'm just going to pull

Confidential - Subject to Protective Order

Page 868

1    this a little bit more.  That's all.  It keeps

2    catching.

3                  Mr. Smith, that was true, correct,

4    that you and others, Ethicon, knew that one of the

5    characteristics of its TVT mesh was that the mesh

6    would fray; correct?

7          A.      Yes.

8          Q.      And this e-mail from Laurent goes on

9    to say, on the next page, that "the mesh frayed is

10   the reverse defect of the mesh features (elasticity

11   of the mesh is one of the commercial" arguments "to

12   market the TVT)."

13                 And that's true, right, that the mesh

14   fraying was part of the elasticity; when the mesh

15   would get pulled under strain, it would fray;

16   correct?

17                 MR. HUTCHINSON:  Object to form.

18                 THE WITNESS:  I would not agree the

19   way that was stated, nor who wrote this.  Does --

20   did the mesh lose particles?  Yes.  It -- I don't

21   think you could equate them back to the elasticity

22   as stated here.

23   BY MR. ZONIES:

24         Q.      Okay.

25                 So Laurent may have that part wrong.

Confidential - Subject to Protective Order

Page 869

1          A.          I'd have to -- you know, I'm not

2    quite sure what he's trying to get at.  He's a

3    French-speaking individual.  It might be English.

4    Don't know.

5          Q.          And in any case, Laurent writes that

6    "the mesh frayed is the reverse defect of the mesh

7    features (elasticity of the mesh is one of the

8    commercial" arguments "to market the TVT)."  That's

9    what he wrote; correct?

10         A.          That's what's written.

11         Q.          And --

12         A.          From my understanding of that would

13   be when de Leval chose TVT, it was because of its

14   elastic properties.  That may be what he's speaking

15   of there.

16         Q.          Then he goes on to say, "However, the

17   root cause of the phenomenon are known; the way to

18   cut the mesh (blade cutting)" -- that means

19   mechanically cut, right, using a blade?

20         A.          Yes.

21         Q.          And that is indeed -- was known as

22   the cause of the fraying and particle loss; correct?

23         A.          No.  If I could explain, it was --

24   it's due to the construction of the mesh, not the

25   cutting of the mesh.

Confidential - Subject to Protective Order

Page 870

1          Q.        Mr. Smith, Laurent writes that "the

2    root cause of the phenomenon is known:  the way to

3    cut the mesh (blade cutting).  If we change the way

4    to cut the mesh (ultrasonic cutting or laser

5    cutting) it seems we can limit the mesh frayed

6    defect significantly."

7                    Is that what he wrote there?

8          A.        Yes.

9          Q.        "Yes."  And that was true, correct,

10   that if you changed -- if Ethicon changed the way of

11   cutting the mesh from blade cutting to laser

12   cutting, it could limit the fraying of the mesh;

13   correct?

14                   MR. HUTCHINSON:  Object to form.

15                   THE WITNESS:  Yes.

16   BY MR. ZONIES:

17         Q.        Mr. Smith, I'm going to hand you

18   what's been previously marked as Exhibit 3161.

19                   (Pause.)

20   BY MR. ZONIES:

21         Q.        Mr. Smith, have you had a chance to

22   look at Exhibit 3161?

23         A.        Yes.

24         Q.        3161's a Power Point entitled "LCM

25   Project" -- that's laser cut mesh project; correct?

Confidential - Subject to Protective Order

1          A.      I would agree with that.

2          Q.      Yeah -- and it says that it's

3    photographs comparing the laser cut mesh to

4    mechanically cut mesh.  That's the title of it;

5    correct?

6          A.      Yes.  Sorry.

7          Q.      If you turn to the first slide --

8    it's called "Side by Side," the first slide with a

9    picture on it -- do you see that?

10         A.      Yes.

11         Q.      Hang on just a second.

12                 (Pause.)

13                 MR. HUTCHINSON:  Joe, we can go off

14    the record if you want to.

15                 MR. ZONIES:  Yeah, we can go off the

16    record.

17                 THE VIDEO TECHNICIAN:  We're going

18    off the record.  The time is 9:15 a.m.

19                     -  -  -

20                 (A discussion off the record

21          occurred.)

22                     -  -  -

23                 THE VIDEO TECHNICIAN:  Back on the

24    record.  Time is 9:21 a.m.

25    BY MR. ZONIES:

Confidential - Subject to Protective Order

1          Q.       Mr. Smith, you have Exhibit 3161 in

2    front of you?

3          A.       I do.

4          Q.       And that's a Power Point

5    presentation; and on the title page, it's the "LCM

6    Project" or laser cut mesh project; correct?

7          A.       It appears so --

8          Q.       And --

9          A.       -- done by whoever ran the laser cut

10   program, yes.

11         Q.       And it talks about the photographs

12   comparing laser cut mesh versus mechanically cut

13   mesh; is that right?

14         A.       Yeah, that's what's shown here.

15         Q.       If you turn to the first -- it's

16   actually the third slide of the Power Point

17   presentation, the first picture, it's called "Side

18   by Side."

19                  Do you see that?

20         A.       Yes.

21         Q.       And on the left-hand side, it has

22   "MCM" standing for mechanically cut mesh; and on the

23   right-hand side, it says "LCM" for laser cut mesh;

24   is that right?

25         A.       Yes.

Confidential - Subject to Protective Order

Page 873

1          Q.       And one of the things that the laser
2     cut mesh -- strike that.
3                   One of the reasons that Ethicon
4     created the laser cut mesh and changed the way it
5     was cutting its mesh was to address what is seen on
6     the left-hand side where the arrow is pointing at
7     "Particles"; is that right?
8          A.       Yes, but from an explanation
9     perspective, we were addressing particles.  That is
10    a mesh that has been stretched, as it's stated, 50
11    percent, which is far beyond the clinical stretching
12    or what would be stretched in clinical use.
13                   MR. ZONIES:  Move to strike after "we
14    were addressing particles."
15    BY MR. ZONIES:
16         Q.       So if we zoom in on the particles,
17    that is what is described in the earlier e-mails as
18    particle loss, which is a function of the fraying of
19    the mesh, is that right, the mechanically cut mesh?
20         A.       Yes, providing that it would be
21    stretched in a normal manner.  This was stretched
22    well beyond that, so you're seeing more particles.
23                   MR. ZONIES:  Move to strike after
24    "normal manner."
25    BY MR. ZONIES:

Confidential - Subject to Protective Order

1          Q.      And the fraying is seen in this

2    photograph where on the edges of the mechanically

3    cut mesh, it's sort of lost its structure and it has

4    pieces of plastic sticking out and fraying; is that

5    right?

6                        MR. HUTCHINSON:  Object to form.

7                        THE WITNESS:  As I indicated, this

8    was stretched well beyond its elastic limit and not

9    clinically relevant stretching.

10                       MR. ZONIES:  Move to strike as

11   nonresponsive.

12   BY MR. ZONIES:

13         Q.      Mr. Smith, my question is, is -- Mr.

14   Smith, the fraying that was described in the earlier

15   e-mail is, as we zoom in on this mechanically cut

16   mesh, it's what those edges of the mesh look like

17   where it's lost its structure and degraded; is that

18   right?

19                       MR. HUTCHINSON:  Object to form.

20                       THE WITNESS:  No, that is not

21   correct.

22   BY MR. ZONIES:

23         Q.      And you can see on the slide above

24   where it says "Degradation" -- do you see that, Mr.

25   Smith?

Confidential - Subject to Protective Order

Page 875

1           A.      Yes.

2           Q.      -- and it's pointing at, indeed, the

3    edges fraying of the mechanically cut mesh; is that

4    right?

5                   MR. HUTCHINSON:  Object to form.

6                   THE WITNESS:  That's what the

7    photograph shows, but not linked to the prior e-mail

8    that you just referred to.

9                   MR. ZONIES:  Move to strike after

10   "That's what the photograph shows."

11   BY MR. ZONIES:

12          Q.      And if you turn to two slides later,

13   you see a slide entitled "Mesh Degradation"?  Do you

14   have that in front of you, Mr. Smith?

15          A.      Yes.

16          Q.      And if you -- on the left-hand side

17   again is mechanically cut mesh, and on the

18   right-hand side is laser cut mesh; correct?

19          A.      That's what they're labeled.

20          Q.      And mechanically cut mesh has a label

21   saying "Loss of structure" and it has that frayed

22   look; is that right?

23          A.      That's what the label says.

24          Q.      And then on the right-hand side, it

25   says, for laser cut mesh, "Stretched, but" the

Confidential - Subject to Protective Order

Page 876

1    "structure remains"; is that right?

2         A.      At, I believe, the 50 percent

3    elongation, yes.

4         Q.      And, Mr. Smith, that was, in fact,

5    one of the reasons that Ethicon created laser cut

6    mesh, was to ensure that the mesh didn't fray and

7    have particle loss when it was put under strain;

8    correct?

9              MR. HUTCHINSON:  Object to form.

10             THE WITNESS:  In the contents of this

11   e-mail, I would say, no.  Particle loss, yes.  But

12   this e-mail is not representative of why we were

13   doing that project.

14   BY MR. ZONIES:

15        Q.      Mr. Smith, one of the -- if you turn

16   two slides later, there's a series of photos

17   entitled "Pre & Post Elongation."  Do you see that?

18        A.      Yes.

19        Q.      And, again, on the left-hand side,

20   the first two photos are mechanically cut mesh and

21   the last two are laser cut mesh; is that right?

22        A.      It appears to be that, right.

23        Q.      And the post-elongation mechanically

24   cut mesh, what that's reflecting is what Ethicon

25   calls roping; is that right?

Confidential - Subject to Protective Order

Page 877

1          A.      I would not be able to agree with
2     that.
3          Q.      Well, let's take a look.  If you look
4     at the next page, it's a description of those
5     photographs.  That's what it's entitled.  Right?
6          A.      Yes --
7          Q.      And --
8          A.      -- it's entitled that.  Sorry.
9          Q.      That's okay.  And in the description,
10    it says, in the comparison between the
11    pre-elongation and post-elongation samples for the
12    mechanically cut mesh, it is seen that sometimes the
13    edges are slightly rough in the pre-elongation
14    samples -- so that means even before it's stretched,
15    the edges are rough from mechanically cut mesh.
16    Right?
17         A.      By design.
18         Q.      That's how it was designed; is that
19    right?
20         A.      Yes, it was.
21         Q.      And that's how Ethicon designed it,
22    to have rough edges for the mechanically cut mesh.
23    Right?
24                 MR. HUTCHINSON:  Object to form.
25                 THE WITNESS:  That's the construction

Confidential - Subject to Protective Order

Page 878

1     of the mesh and what Professor Ulmsten actually

2     liked about the mesh, because it had its ability to

3     stick into tissue nicely when it was actually

4     implanted.

5     BY MR. ZONIES:

6          Q.        This description goes on to say, in

7     the post-elongation sample of the mechanically cut

8     mesh, "the mesh has narrowed, roped prior to

9     relaxation and some of the knit has fallen apart."

10              That's what was written there; is

11    that right?

12         A.        Whoever wrote it used that

13    terminology, yes.

14         Q.        So if we turn back and look at what

15    was roped and lost its structure with fraying, that

16    would be the description of the second photo from

17    the left, the MCM post; is that right?

18         A.        No, that would be an opinion of

19    whoever wrote this.

20         Q.        And discussing that photograph of the

21    mechanically cut mesh; correct?

22         A.        Stretched at 50 percent, yes.

23         Q.        So laser cut mesh was designed in

24    part to deal with the roping and particle loss;

25    correct, Mr. Smith?

Confidential - Subject to Protective Order

Page 879

1          A.          I would say, no, it was really

2    designed -- because the mesh is identical, it was

3    really designed to address particle loss.

4          Q.          Well, let's take a look at exhibit --

5    what's been previously marked as Exhibit 3162.

6                      Exhibit 3162 is an e-mail in 2005

7    from Allison London Brown, is that right, discussing

8    laser cut mesh?

9          A.          It appears to be, yeah --

10         Q.          And --

11         A.          I'm not in cc, so I'm not sure what's

12   in this e-mail.

13         Q.          And she writes about laser cut mesh.

14   Do you see the paragraph that starts with "The basic

15   story"?

16         A.          If you don't mind, let me just take a

17   quick second to read it since I've not seen this.

18                      (Pause.)

19                      THE WITNESS:   I'm back.

20                      (Pause.)

21                          -   -   -

22                      (A discussion off the record

23         occurred.)

24                          -   -   -

25   BY MR. ZONIES:

Confidential - Subject to Protective Order

Page 880

1        Q.        Mr. Smith, have you had a chance to

2    review Exhibit 3162?

3        A.        Yes, I have.

4        Q.        Mr. Smith, Exhibit 3162 is an e-mail

5    from Allison London Brown in May of 2005 discussing,

6    the subject is, laser cut mesh; correct?

7        A.        Yes.

8        Q.        And you see the paragraph that begins

9    with "The basic story"?

10       A.        Yes.

11       Q.        She says that "The basic story here

12   is the current mesh (MCM)," mechanically cut mesh,

13   "is perceived by some physicians as inferior and we

14   do get a high number of complaints on linting and

15   roping (mesh particles falling off and the material

16   stretching to the point of being a string)."

17                 That's what she wrote; correct?

18       A.        That's what she wrote.

19       Q.        And she says that "the new material,"

20   meaning laser cut -- right?

21       A.        I believe so.

22       Q.        -- "the new material will

23   dramatically reduce the incident of linting and

24   should all but eliminate the roping as it stays nice

25   and flat."

Confidential - Subject to Protective Order

Page 881

1                        Right?  That's what she wrote?

2          A.        That's what she wrote, yeah.

3          Q.        And that's, indeed, Mr. Smith, what

4   you wrote in your e-mail if you look at what we

5   looked at yesterday -- it was 3162 -- you got that

6   in front of you?

7          A.        Probably.

8          Q.        I think it's the second one, actually

9   --

10         A.        As in --

11         Q.        From the top.  Is that it there,

12  3162?

13         A.        That's 3163.

14         Q.        Oh, I'm sorry.  Yeah.  We were just

15  looking at --

16         A.        Is that the one you want, 3163?

17         Q.        3163, right.

18                   You have Exhibit 3163, Mr. Smith?

19         A.        Yes.

20         Q.        And what you wrote in Exhibit 3163 is

21  consistent with what Ms. London Brown wrote about

22  the laser cut mesh; correct?

23         A.        Within the -- within reason, yes, in

24  terms of using those words, and from an R & D

25  perspective, what we would -- you know, if you

Confidential - Subject to Protective Order

Page 889

1             THE WITNESS:  So I would have to say

2    no, because it is a mischaracterization for that --

3    what this document is and the fact that -- that the

4    TVT has been known to have what we call a Velcro

5    effect, so even if it narrowed, it still holds in

6    tissue.

7             So you would have to go back to

8    actual studies to see if that would happen.  This is

9    a -- it's a possibility and you would have to follow

10   that up with, does it really happen.

11   BY MR. ZONIES:

12        Q.      What this describes is a possibility

13   or a potential, as that's entitled; correct?

14        A.      Yes.

15        Q.      And the potential that this describes

16   is -- a potential cause, in the right-hand column,

17   is, if there's roping, that potentially could cause

18   the mesh to slip; correct?

19        A.      Theoretically.  It's all theory.

20        Q.      Potential; correct?

21        A.      Potential that are rated and ranked

22   and weighed, yes.

23        Q.      Right.  So if the mesh roped, it has

24   the potential to cause the mesh to slip; and then

25   the harm that potentially results is, in that row at

Confidential - Subject to Protective Order

Page 890

1    least, recurrence; correct?

2         A.      If it was to happen.

3         Q.      And that continues down, for example,

4    to the next row down, which says, "Reduction in mesh

5    width due to roping" is a potential cause of the

6    mesh slipping, in the first column; correct?

7         A.      Yes.

8         Q.      And if that occurs, that potentially

9    could cause erosion; correct?

10        A.      If not placed correctly, yes.

11        Q.      And, again -- if you go down to the

12   bottom one, it says --

13        A.      The bottom one or the next one?

14        Q.      I'm sorry.  Two down from that, it

15   says, "Edge quality."  Do you see that?

16        A.      Not yet.  Where are you?  Oh, you're

17   in the other column over.  Yes.

18        Q.      Again, here in the potential cause of

19   the problem is the edge quality and that, if that

20   happens, could potentially cause the harm of pain;

21   correct?

22        A.      I believe it's talking about the

23   sheath, though, isn't it?  You're in a sheath

24   column.  You've moved from -- from mesh to sheath.

25   So, again, that would not be a proper way to read

Confidential - Subject to Protective Order

Page 891

1    this -- this chart.

2         Q.     So, Mr. Smith, if you look down a few

3    rows, you see -- if you look down two rows, you can

4    see "Edge quality" as a potential cause of a

5    problem.  It says "Edge quality (roughness, large

6    bead size)"; is that right, is that what that says?

7         A.     It says that in the column under the

8    sheath.

9         Q.     And if that potential cause occurs,

10   it can potentially cause mesh damage in the sheath

11   and, in turn, pain as the harm; correct?

12                MR. HUTCHINSON:  Object to form.

13                THE WITNESS:  I can't agree the way

14   you're looking at this chart.  You're

15   misrepresenting this -- what this chart says.

16   BY MR. ZONIES:

17        Q.     So let's go to the next page, Mr.

18   Smith, the same columns, rows 2, 3, and 4.

19        A.     Rows 2, 3, and 4.

20        Q.     And, again, reading the chart from

21   the right-hand side, it says "Potential Cause" and

22   the second row down says, "Reduction in mesh pore

23   size."  Do you see that?

24        A.     Yes.

25        Q.     And if there's a reduction in mesh

Confidential - Subject to Protective Order

1  pore size, that could potentially cause a failure by

2  -- of the tissue ingrowth not occurring; correct?

3      A.      Depending on the weighting and the

4  rating, yes.

5      Q.      And the harm that could be caused to

6  the patient from that is that there could be a

7  foreign tissue reaction, a foreign body reaction;

8  correct?

9              MR. HUTCHINSON:  Object to form.

10             THE WITNESS:  No, with an explanation

11  that you have to -- in order to use this chart

12  correctly, you look at the severity.  You look at

13  the rating and the occurrence.

14             And in those three categories, we're

15  looking at an RPN number of 7's and 8's, which is

16  extremely low.  So, yes, it says that, but what it's

17  saying is that because we're using the Prolene mesh,

18  the chances of that happening are slim to none,

19  because the numbers are low.

20             So, yes, the words are there, but

21  this chart has to be used in conjunction with the

22  RPN number.

23             MR. ZONIES:  Move to strike as

24  nonresponsive.

25  BY MR. ZONIES:

Confidential - Subject to Protective Order

Page 893

1       Q.    Mr. Smith, on the right-hand side for

2  rows 2, 3, and 4, they all say the same thing,

3  "Reduction in mesh pore size" as the potential

4  cause; correct?

5       A.    Has the potential.

6       Q.    And we've discussed before that pore

7  size reduction can happen when mesh is put under

8  strain; correct?

9       A.    Correct.

10      Q.    It might also happen, for example, if

11  mesh roped.  When mesh ropes, like we saw in those

12  pictures, the pore size is collapsed completely;

13  correct?

14      A.    Depending on how far it's stretched,

15  yes.

16      Q.    And so if -- if that happens in this

17  -- according to this chart, if that happens, the

18  harm that can occur that's two columns over to the

19  left -- the harm that can occur potentially to a

20  patient if that happens includes tissue reaction,

21  recurrence of their stress urinary incontinence,

22  meaning it comes back, and erosion; is that right?

23      A.    That's what it says, at a -- at a low

24  level, yes.

25          MR. ZONIES:  Move to strike after

Confidential - Subject to Protective Order

Page 894

1    "That's what it says."

2  BY MR. ZONIES:

3         Q.      And the laser cut mesh, Mr. Smith,

4  was designed -- this is the design FMEA, right, it's

5  talking about the design of laser cut mesh?

6         A.      Yes.

7         Q.      The laser cut mesh was designed in

8  part to -- the laser cut mesh, Mr. Smith -- what

9  we're looking at is the design FMEA for laser cut

10  mesh; correct?

11         A.      Yes.

12         Q.      And it's demonstrating that part of

13  the reason to design the laser cut mesh was to

14  address these issues; correct?

15         A.      No, I couldn't agree with that.  It's

16  part of the -- the format for all the things that

17  would be looked at in the design of anything, we

18  look at all of the characteristics, so it is here,

19  but it's not the main -- it's not the reason why it

20  was being done.  It's one of them.  It's one of many

21  things we look at.

22                 MR. ZONIES:  So move to strike as

23  nonresponsive.

24  BY MR. ZONIES:

25         Q.      What this shows, Mr. Smith, is that

Confidential - Subject to Protective Order

Page 895

1    one of the reasons that laser cut mesh was being

2    developed was to address these issues; correct?

3                    MR. HUTCHINSON:  Object to form.

4                    THE WITNESS:  Yes, it's one of the

5    reasons.

6    BY MR. ZONIES:

7         Q.     Now, eventually laser cut mesh was

8    actually put into Ethicon's devices; correct?

9         A.     Yes.

10        Q.     And --

11        A.     Some of them.  Sorry.

12        Q.     The TVT Retropubic product is

13   available in laser cut; correct?

14        A.     As well as mechanical.

15        Q.     The TVT-O is available in laser cut;

16   correct?

17        A.     As well as mechanical.

18        Q.     And Ethicon chose, Mr. Smith, to

19   continue to sell mechanically cut mesh; correct?

20        A.     That's correct; however, the reason

21   for that is because there is very good clinical

22   evidence that mechanical cut and laser cut have the

23   same clinical efficacy.

24                    MR. ZONIES:  Move to strike after

25   "That's correct."

Confidential - Subject to Protective Order

Page 896

1   BY MR. ZONIES:

2           Q.      So, Mr. Smith, I'm going to hand you

3   what's being marked as Exhibit 3588.

4                        -   -   -

5                   (Deposition Exhibit No. T-3588, Power

6               Point "Product Overview: Laser Cut Mesh,"

7               ETH.MESH.01730932, was marked for

8               identification.)

9                        -   -   -

10                  (Pause.)

11                  MR. ZONIES:  And the ETH.MESH. on

12  3588 is 01730932.

13                  (Pause.)

14  BY MR. ZONIES:

15          Q.      Mr. Smith, have you had a chance to

16  review 3588?

17          A.      Yes.

18          Q.      Mr. Smith, you have in front of you

19  Exhibit 3588 and it's entitled "Product Overview:

20  Laser Cut Mesh."  Do you see that?

21          A.      Yes.

22          Q.      And this is a Power Point

23  presentation discussing some of the reasons to

24  create laser cut mesh; correct?

25          A.      It's discussing the outcome of

Confidential - Subject to Protective Order

Page 897

1    creating it, but, yes.

2         Q.        Okay.  Better put, this is a Power

3    Point presentation discussing the outcome of

4    creating laser cut mesh; correct?

5         A.        Uh-hum.  Yes.  Sorry.

6         Q.        So if you look, it says it's a new

7    processing technique; correct?

8         A.        Yes.

9         Q.        And it involves cutting the strips

10   with a laser instead of the current mechanical

11   method.

12               Then the fourth bullet point down

13   says, "the fraying of the edges and the loss of some

14   of the particles is reduced with the laser cut mesh

15   as compared to the mechanical cut mesh."  The mesh

16   integrity is retained; correct?

17        A.        That is one of the things it says,

18   yes.

19        Q.        And that was, indeed, one of the

20   reasons to do laser cut mesh; correct?

21        A.        That was one of them.

22        Q.        If you turn to the next page of the

23   presentation, again, you see some photographs

24   comparing laser cut mesh before stretching and then,

25   on the right-hand side, laser cut and mechanically

Confidential - Subject to Protective Order

Page 898

1    cut mesh after stretching; correct?

2         A.      That's what's shown.

3         Q.      And it says at the top with the

4    quotes "'Fray' & 'Stray' No More...Laser Cut Mesh";

5    is that right?

6         A.      It sounds like a marketing cliche.

7         Q.      That was the marketing term, right,

8    if you use laser cut mesh, you're not going to fray

9    and your mesh isn't going to stray; is that right?

10        A.      You'd have to ask --

11               MR. HUTCHINSON:  Object to form.

12               THE WITNESS:  -- someone from

13    marketing.

14               MR. ZONIES:  I'm sorry?

15               THE WITNESS:  You'd have to ask

16    someone from marketing who created this document.

17    BY MR. ZONIES:

18        Q.      And it discusses the benefits of

19    laser cut mesh, which includes, first, duller edges;

20    is that right?

21        A.      Actually, that's what it says;

22    however, that was actually one of the, I think,

23    issues with laser cut mesh, that we weren't sure

24    that it was actually going to hold, because the

25    function of the mechanically cut mesh was actually,

Confidential - Subject to Protective Order

Page 899

1    from a Velcro effect, to hold into tissue; and when

2    the laser cut mesh had duller edges, it may not have

3    stayed, so that testing had to be done.

4                 MR. ZONIES:  Move to strike after

5    "that's what it says."

6    BY MR. ZONIES:

7          Q.      The other -- the -- one of the

8    benefits that's listed is decreased, quote, roping

9    effect; is that right?

10         A.      That's what's listed here.

11         Q.      And, indeed, that was one of the

12   reasons to create laser cut mesh; correct?

13         A.      I couldn't -- my understanding, it

14   was primarily for the particle loss.

15         Q.      Well, that was a big concern of

16   yours, the particle loss; correct?

17                 MR. HUTCHINSON:  Object to form.

18                 THE WITNESS:  Well, as I was

19   explaining, they both rope regardless -- I mean,

20   this document here does not say what the loads were

21   that these were put under, so it's -- it's a picture

22   trying to show an effect.

23   BY MR. ZONIES:

24         Q.      They both rope.

25         A.      They both have -- they both rope.

Confidential - Subject to Protective Order

1        Q.      So, Mr. Smith, if we zoom in on the

2    "After Stretching" picture, on the left-hand side is

3    the laser cut, on the right-hand side is the

4    mechanically cut; is that right?

5        A.      It's -- I believe, yes.

6        Q.      I'm sorry.  On the right hand

7    picture, the "After Stretching"?

8               Mr. Smith, if you look at the "After

9    Stretching," you can see a difference between these

10   two meshes, the laser cut on the left-hand side

11   after stretching versus the mechanically cut mesh on

12   the right-hand side, where the mechanically cut mesh

13   has lost its structure and certainly the pores have

14   collapsed; is that right?

15              MR. HUTCHINSON:  Object to form.

16              THE WITNESS:  I would not agree with

17   that as stated.  They both have narrowed, I think,

18   fairly equally.  The mechanically cut has lost the

19   edge quality, which actually may not affect it from

20   a holding perspective, but in the picture, it is --

21   the edges are different.

22   BY MR. ZONIES:

23       Q.      As you said, the mechanically cut has

24   lost its edge quality; correct?

25       A.      From where it started, yes.

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Subject to Protective Order

Page 901

1          Q.       And both of them, when put under
2    strain, the pour sizes seem to have collapsed
3    somewhat; correct?
4                   MR. HUTCHINSON:  Object to form.
5                   THE WITNESS:  In this picture, yes.
6                   MR. ZONIES:  Mr. Smith, I'm going to
7    hand you what's being marked as Exhibit 3589.
8                        -  -  -
9                   (Deposition Exhibit No. T-3589, Memo
10                  from Allison London Brown to Dan Smith Re:
11                  Mechanical Cut vs. Laser Cut Mesh
12                  Rationale, ETH.MESH.00858252 and
13                  ETH.MESH.00858253, was marked for
14                  identification.)
15                       -  -  -
16                  MR. ZONIES:  Just take a minute and
17   review that.  ETH.MESH. number is 00858252.
18                  (Pause.)
19   BY MR. ZONIES:
20          Q.       Mr. Smith, you have in front of you
21   Exhibit 3589?
22          A.       Yes.
23          Q.       And it's a memorandum from Allison
24   London Brown to you, Dan Smith, regarding mechanical
25   cut versus laser cut mesh rationale; is that right?

Confidential - Subject to Protective Order

Page 902

1        A.      Yes, among some other things, yes.

2        Q.      And she writes -- Ms. London Brown

3   writes to you, Dan Smith, that "In the fall of 2004,

4   work was re-initiated to approve a change in the

5   processing of PROLENE mesh used in the GYNECARE TVT

6   systems"; is that right?

7        A.      I believe she was referring to the

8   ultrasonic cutting that might have come before that

9   and the reinitiation of it, yes.

10       Q.      In other words, there was -- much

11  earlier, before 2004, Ethicon was looking at whether

12  or not it should cut its meshes differently than

13  with mechanically cut mesh; correct?

14       A.      I believe they were.

15       Q.      And she writes that the rationale for

16  the TVT base business was a customer need to fix a

17  problem; is that right?

18       A.      That's what she has written here.

19  Again, particle loss.

20       Q.      Right.  She says two things, two

21  reasons, under "Customer Need:  FIX A PROBLEM" --

22  number 1, "Customer Need:  FIX A PROBLEM.  The

23  Market place (Europe specifically) was experiencing

24  some challenges from surgeons who were using stiffer

25  meshes with different construction, which had less

Confidential - Subject to Protective Order

Page 903

1    particle loss" -- that's what you were pointing out,

2    the particle loss.  Right?

3         A.      It's in numerous places in here.

4         Q.      -- less particle loss than

5    mechanically cut mesh and less mesh distortion

6    during implantation than mechanically cut mesh;

7    correct?

8         A.      That's what it says.  I believe she's

9    referring to many other comparative meshes that are

10   on the market that are stiffer.

11        Q.      And she says the -- in the next

12   paragraph, "The particulate loss in question was

13   attributed to the stretching of the mesh" --

14   mechanically cut mesh -- "during implantation and,

15   at times, difficult removal of the sheaths, causing

16   loops created during the knitting process, but cut

17   during processing to fall off"; correct?

18        A.      That's what's stated.

19        Q.      In other words, pieces of mesh from

20   the mechanically cut mesh were falling off during

21   implantation and also when there was difficult

22   removal of sheaths; correct?

23        A.      It's the particle loss.

24        Q.      Of mechanically cut mesh.  Right?

25        A.      Yes.

Confidential - Subject to Protective Order

Page 904

1          Q.        And then she goes on to say,

2     "Additionally, the mechanically cut (MC)" -- the

3     mechanically cut mesh "can be stretched to

4     deformation, creating a rope," in quotes, "if not

5     placed properly."  That's what she wrote.  Right?

6          A.        That's what she wrote.

7          Q.        Some physicians, she continues,

8     perceived this could irritate or damage the urethra.

9     Right?

10          A.        It was a perception of those.

11          Q.        And, again, those were the -- two of

12     the reasons that Ethicon was creating -- strike

13     that.

14                    And, again, those are two of the

15     reasons why Ethicon was changing the cutting method

16     to laser cut from mechanically cut; correct?

17          A.        It was one of the reasons why we were

18     doing that, change the manufacturing process,

19     perhaps, you know, improve on the particle loss.

20     There was no evidence that it would -- as stated

21     here, would irritate or damage the urethra.  It was

22     perceived.

23          Q.        It was perceived and if you recall,

24     the laser cut, we looked at the design FMEA and it

25     was talking about part of the reason to create laser

Confidential - Subject to Protective Order

Page 905

1   cut mesh was to address the potential for pore size

2   change, for fraying that might cause erosion or

3   pain; is that right?

4                    MR. HUTCHINSON:  Object to form.

5                    THE WITNESS:  No, I believe I

6   disagreed with the way that was being looked at from

7   that chart.

8   BY MR. ZONIES:

9         Q.      And that chart, however, described

10  erosion and pain as some of the reasons that Ethicon

11  was developing the laser cut mesh instead of the

12  mechanically cut mesh; correct?

13                   MR. HUTCHINSON:  Object to form;

14  mischaracterizes his testimony.

15                   THE WITNESS:  No, again, it was, as

16  we develop things, we always list all of the

17  possible -- possibilities and then rank and rate

18  them.  And they're on the chart because we look at

19  everything -- everything.

20  BY MR. ZONIES:

21        Q.      Right, and Mr. Smith, if you look at

22  Exhibit 3585 -- it was from yesterday.  You may have

23  that in front of you -- Mr. Smith, if you look at

24  Exhibit 3585, this is a memorandum from 1999; is

25  that right?

Confidential - Subject to Protective Order

1          A.        I believe if we're looking at the

2     same one it's regarding hernia meshes, right, from

3     Bob Rousseau?  Yes.

4          Q.        Yes, Exhibit 3585 is a memorandum --

5     the initial memorandum's August 18th, 1999; is that

6     right?

7          A.        Yes.  I was looking at the top is

8     September.

9          Q.        And this is discussing, "As we had

10    discussed, there are three generations of mesh."

11    Right?

12         A.        Hernia meshes, yes.

13         Q.        And the first generation, called old,

14    old mesh is utilized currently in the TVT product;

15    is that right?

16         A.        Yes.

17         Q.        And this is in 1999; correct?

18         A.        It's when the memo was created, yes.

19         Q.        And then it talks about a second

20    generation old mesh, which is currently utilized in

21    Scotland for normal Prolene, flat mesh.  Right?

22         A.        For hernias.

23         Q.        Then it talks about a third

24    generation (new or 5-mil) mesh, which is currently

25    in production in San Lorenzo.  Right?

Confidential – Subject to Protective Order

Page 907

1          A.         For hernia mesh, yes.

2          Q.         And there, if you look at that, Mr.

3     Smith, it's discussing how way back in 1999, when

4     the TVT was first on the market, they were laser

5     cutting the mesh; is that right?

6                     MR. HUTCHINSON:  Object to form.

7     BY MR. ZONIES:

8          Q.         Do you see where it says laser

9     cutting in that paragraph?

10         A.         No.  Which paragraph are you looking

11    at, third paragraph?

12         Q.         Third paragraph, the third generation

13    or new mesh, way back in 1999, and they're

14    performing some laser cutting.  Do you see that?

15         A.         That's what it says, I guess.  I

16    haven't found it on here, but -- oh, yes, here we

17    go.

18         Q.         And as a matter of fact, if you look

19    up in the first paragraph, that's what this memo is

20    about.  It says, "I am forwarding this message to

21    you regarding your request for mesh samples to

22    perform laser cutting experimentation in Scotland."

23    Right?

24         A.         That's what Bob Rousseau wrote, yes.

25         Q.         In 1999.  And yet, from 1999 until

Confidential - Subject to Protective Order

Page 908

1   2006, Ethicon never used laser cutting to cut its

2   TVT mesh; correct?

3          A.      There was no reason to.  I mean, this

4   is -- we're still -- we're still not using -- we're

5   still using mechanical cut because there is clinical

6   evidence that says mechanical -- there's nothing

7   wrong with mechanical cut.

8          Q.      Mr. Smith, that's -- to this day --

9   can we pull up the picture, please, of the laser cut

10  mesh next to mechanically cut mesh?  Exhibit 3161?

11               As a matter of fact, Mr. Smith, if

12  you have in front of you Exhibit 3161, to this day,

13  Ethicon continues to sell this mesh on the left-hand

14  side of this picture; correct?

15         A.      Absolutely incorrect.  That mesh in

16  that picture is a mischaracterization for

17  demonstration purposes at 50 percent elongation.  50

18  percent elongation is ten times more than what you

19  would use clinically.

20               MR. ZONIES:  Move to --

21               THE WITNESS:  The physiological range

22  is between 5 and maybe 10 percent elongation.  This

23  was done by someone -- probably Gene Kammerer given

24  the date and the time for laser cut -- for

25  demonstration purposes.

Confidential - Subject to Protective Order

Page 909

1                     MR. ZONIES:  Move to strike as

2    nonresponsive.

3    BY MR. ZONIES:

4         Q.     Mr. Smith, it's true, isn't it, that

5    to this day and since 1999 -- move -- strike that.

6                     Mr. Smith, it's true, isn't it, that

7    in 1999, Ethicon had the capabilities to create the

8    laser cut mesh that's seen on the right side of this

9    photograph; correct?

10                    MR. HUTCHINSON:  Object to form.

11                    THE WITNESS:  It may be true;

12   however, from an explanation perspective, just

13   because technology exists, the clinical evidence of

14   TVT being mechanically cut from Professor Ulmsten

15   initially was the clinical evidence for TVT and it

16   was mechanically cut and it still is today.

17                    MR. ZONIES:  Move to strike after "It

18   may be true."

19   BY MR. ZONIES:

20        Q.     And yet, from 1999 until today,

21   Ethicon still sells mechanically cut mesh; is that

22   correct?

23        A.     Mechanically cut mesh is sold today,

24   yes.

25        Q.     Despite the fact that Ethicon knows

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Subject to Protective Order

Page 910

1    it has particle loss and fraying; correct?

2                    MR. HUTCHINSON:  Object to form.

3                    THE WITNESS:  Particle loss and

4    fraying is not clinically relevant.

5    BY MR. ZONIES:

6        Q.      Mr. Smith, Ethicon knows, as shown in

7    this picture, that mechanically cut mesh has

8    particle loss; is that right?

9        A.      Mechanically cut mesh has particle

10   loss which has been deemed by our medical officials

11   to be nonclinically relevant, yes.

12       Q.      Particle loss was very important to

13   you personally, wasn't it, Mr. Smith?

14       A.      I -- as an R & D engineer, I dealt

15   with it, yes.

16       Q.      I mean, let's take a look at Exhibit

17   366.  You wrote this memo, this e-mail, in February

18   of 2004, didn't you?

19       A.      I believe I did, yes.  I believe

20   we've looked at it already.

21       Q.      About what you've described as

22   brittle mesh.  Right?

23       A.      I would have to read it to -- if I

24   did, I did.

25       Q.      If you look at the one, two, three,

Confidential - Subject to Protective Order

Page 911

1   fourth paragraph down, "This is not going away
2   anytime soon and competition will have a field day,
3   major damage control offensive needs to start to
4   educate the reps and surgeons UPFRONT that they will
5   see BLUE shit and it is OK."
6              That's what you wrote about the
7   particle loss.  Right?
8        A.      Yes, because we were changing the
9   process -- process going to blue and we always have
10  had particle loss.  As a clear mesh, particle loss
11  has been part of the TVT from its inception; and
12  without going to laser cut mesh, you would see more
13  particle loss.
14             Obviously, I could have used a better
15  choice of words, but it is okay, is what it says,
16  because our medical directors have said particle
17  loss was not clinically relevant.
18       Q.      The roping that laser cut mesh was
19  intended to address was, however, clinically
20  relevant and the laser cut mesh actually did address
21  the roping; correct?
22       A.      If someone was to stretch it beyond
23  its elastic limit on purpose, yes.
24       Q.      And if there was, indeed, less
25  roping, then there would be, as the chart showed,

Confidential - Subject to Protective Order

Page 912

1  less erosion, less pain, less recurrence, and less

2  retention; correct?

3        A.      No, I can't agree to that.  Again,

4  that chart is being mischaracterized.

5        Q.      That's what was on the chart, though,

6  correct, that if there's roping, there's a potential

7  to cause erosion; correct?

8        A.      No, there's -- it's on the chart

9  because if a surgeon did not put it properly and you

10  had roping, that could happen clinically.  So,

11  again, the chart needs to be looked at holistically.

12        Q.      If there was roping, it could cause

13  erosion; correct?

14        A.      If the surgeon didn't put it in

15  correctly.

16        Q.      If -- move to strike as

17  nonresponsive.

18                Mr. Smith, if there was roping --

19  that's what the chart says -- if there was roping,

20  for whatever reason, it could cause erosion;

21  correct?

22        A.      No, that's --

23                MR. HUTCHINSON:  Object to form.

24                THE WITNESS:  -- not what the chart

25  says.

Confidential - Subject to Protective Order

Page 913

1    BY MR. ZONIES:

2         Q.      To this day, Mr. Smith, it's true,

3    isn't it, that Ethicon still sells the mechanically

4    cut mesh that you're discussing in this e-mail, and

5    that Ethicon still sells this mesh where physicians

6    may see blue shit all over the place.  Right?

7                 MR. HUTCHINSON:  Object to form;

8    argumentative.

9                 THE WITNESS:  I think I've answered

10   we sell both blue and clear mesh in mechanically cut

11   form.

12                MR. ZONIES:  Why don't we take a

13   break.

14                THE VIDEO TECHNICIAN:  We're going

15   off the record.  The time is 10:27 a.m.

16                (A recess was taken from 10:27 a.m.

17          to 10:57 a.m.)

18                THE VIDEO TECHNICIAN:  We're back on

19   the record.  This is the beginning of disc number 2.

20   The time is 10:57 a.m.

21   BY MR. ZONIES:

22        Q.      Mr. Smith, we're back from break.

23   Are you ready to go?

24        A.      Yes.

25                MR. ZONIES:  Mr. Smith, I'm handing

pilot header

Confidential - Subject to Protective Order

1          Q.      Okay.

2                  And then what did you say about the

3    elongation?

4          A.      So the elongation as indicated in the

5    back of here at 800 grams would be at the top of the

6    chart or at the far right-hand side of this chart,

7    so well beyond the physiological range.

8          Q.      Mr. Smith, let's look at Exhibit

9    3589, if we can, please.  Do you remember being

10   asked questions about this document?

11         A.      Yes, I do.

12         Q.      And is this a memo to you from

13   Allison London Brown about mechanically cut versus

14   laser cut mesh?

15         A.      Yes.

16         Q.      And Mr. Smith, if we look at the

17   second paragraph under "Customer Need," it begins

18   with "The particulate loss in question" -- do you

19   see that?

20         A.      Yes.

21         Q.      -- and do you recall the plaintiffs'

22   lawyer asking you questions about that paragraph?

23                 MR. ZONIES:  Object to the form.

24                 THE WITNESS:  I don't -- I was asked

25   from many things, so not -- I mean...

Confidential - Subject to Protective Order

1    BY MR. HUTCHINSON:

2         Q.      Let's look at the last sentence of

3    that paragraph that begins with "Particle lost."

4    What does it state?

5         A.      "Particle lost is not clinically

6    significant and has always been present with the

7    Gynecare TVT mesh," which would be the mechanical

8    cut mesh.

9         Q.      What does that mean?

10        A.      It means that it's not an issue.

11   It's been determined by medical and clinical that it

12   is not significant, it's not -- does not have a

13   clinical impact.

14              MR. ZONIES:  Move to strike as beyond

15   the scope.

16   BY MR. HUTCHINSON:

17        Q.      And Mr. Smith, the particle loss

18   that's referenced in this exhibit, would that be the

19   same particle loss that we looked at in the

20   photograph that compared mechanically cut versus

21   laser cut mesh where they both were relaxed after 50

22   percent elongation?

23              MR. ZONIES:  Object to the form.

24              THE WITNESS:  Yes.

25   BY MR. HUTCHINSON:

Confidential - Subject to Protective Order

1          Q.      Let's turn to Exhibit 366, please.

2          A.      I'm sorry.  The number?  What number?

3                  MR. ZONIES:  366.

4                  MR. HUTCHINSON:  366.

5                  THE WITNESS:  366?

6                  MR. HUTCHINSON:  Correct.

7                  THE WITNESS:  Three numbers.

8                  MR. HUTCHINSON:  Yeah, it's -- can we

9    go off the record for a minute while he finds it?

10                 THE VIDEO TECHNICIAN:  We're going

11   off the record.  The time is 2:57 p.m.

12                         -  -  -

13                 (A discussion off the record

14            occurred.)

15                         -  -  -

16                 THE VIDEO TECHNICIAN:  We're back on

17   the record.  Time is 2:59 p.m.

18   BY MR. HUTCHINSON:

19         Q.      Mr. Smith, do you recall being asked

20   questions about this e-mail?

21         A.      Yes, I do.

22         Q.      And is this an e-mail from you to

23   Janice Burns, dated February 27, 2004?

24         A.      Yes, it is.

25                 MR. HUTCHINSON:  And, Mr. Lawlor, if

Confidential - Subject to Protective Order

1    you will, would you highlight the paragraph that
2    begins with "This is not going away"?
3    BY MR. HUTCHINSON:
4            Q.      Do you see that, Mr. Smith?
5            A.      Yes, I do.
6            Q.      Is that something you wrote?
7            A.      Yes, it is.
8            Q.      What was going on at the company at
9    the time you wrote this e-mail?
10           A.       My understanding of this e-mail and
11   what was going on at the company at the time was, we
12   were -- competition was taking our mesh and
13   stretching it in front of prospective customers over
14   different-colored paper and rubbing the edges and
15   showing them that, look at all these particles that
16   are falling off, and using it to basically try to
17   say that the mesh was inferior when, in fact, it had
18   the largest clinical data.
19                   So what I was saying here was that,
20   obviously, they were going to have a field day and
21   we needed to have a statement from management that
22   -- so that everyone had the same information and was
23   -- would be able to counter the measures that the
24   competition was doing by destroying the mesh.
25                   And then -- that was the intent of

Confidential - Subject to Protective Order

1    this.

2         Q.      Mr. Smith, let's turn, if we will, to

3    Exhibit 3585.

4         A.      Filament; correct -- no, sorry.

5         Q.      Do you have that document in front of

6    you?

7         A.      I do.

8         Q.      And I want to turn your attention to

9    the e-mail from Bob Rousseau or Robert Rousseau,

10   rather, dated August 18, 1999.  Do you see that?

11        A.      Yes.

12        Q.      And what does the first sentence

13   state?

14        A.      "I am forwarding this message to

15   yourself regarding your request for mesh samples to

16   perform laser cutting experiments in Scotland."

17        Q.      Mr. Smith, you were asked a lot of

18   questions about laser cutting mesh.  Do you remember

19   that?

20        A.      Yes.

21        Q.      Was laser cut technology available at

22   Ethicon in 1999 or was it in the experimental stage?

23             MR. ZONIES:  Object to the form.

24             THE WITNESS:  Well, based on this

25   e-mail, which was not to me, it was the beginning

Confidential - Subject to Protective Order

1    stages called experimentation.

2              MR. HUTCHINSON:  Mr. Smith, thank you

3    for your time.  I don't have any further questions.

4              THE WITNESS:  Thank you.

5              THE VIDEO TECHNICIAN:  We're going

6    off the record.  The time is 3:02 p.m.

7              (A recess was taken from 3:02 p.m.

8         to 3:10 p.m.)

9              THE VIDEO TECHNICIAN:  We're back on

10   the record.  Here begins disc number four of the

11   deposition of Dan Smith.  The time is 3:10 p.m.

12                   -  -  -

13              EXAMINATION

14                   -  -  -

15   BY MR. ZONIES:

16        Q.    Mr. Smith, if you could -- just a few

17   follow-up questions -- if you could pull out Exhibit

18   3582 -- Mr. Smith, Joe Zonies again for plaintiffs.

19              If you could pull out Exhibit 3582.

20   Do you have that in front of you?

21        A.    Yes.

22        Q.    This is a marketing piece and it says

23   there on the front of it "Gynecare TVT Family of

24   Products" in the bottom-right corner; is that right?

25        A.    It does.

Confidential - Subject to Protective Order

1        Q.      Do you have in front of you Exhibit

2    3587?

3                Leave that picture up, please.  I

4    just want to talk about those particles.

5        A.      I'm sorry.  Can you repeat that

6    number?

7        Q.      Sure.  Do you have in front of you,

8    please, Mr. Smith, Exhibit 3587, which was

9    previously marked as 3160?

10       A.      I do.

11       Q.      Exhibit 3587 is an e-mail in 2004

12   that was forwarded to you discussing that one of the

13   top complaints about TVT meshes was that the mesh

14   would fray; is that right?

15       A.      It's about fraying, yes.

16       Q.      And what we're seeing in the picture

17   that's up on the screen, those particles, that is,

18   particle loss is mesh fraying; is that correct?

19       A.      Yes.

20               MR. HUTCHINSON:  Object to form.

21               MR. ZONIES:  I'm sorry?

22               THE WITNESS:  Yes.

23   By MR. ZONIES:

24       Q.      And as described in this e-mail by

25   Laurent Treyvaud, the mesh fraying -- he's

Confidential - Subject to Protective Order

1    discussing how laser cutting the mesh, which is what
2    we see on the right up here, would, quote, limit the
3    mesh frayed defect, close quote; is that right?  Is
4    that what he wrote?
5                    MR. HUTCHINSON:  Object to form.
6                    THE WITNESS:  I'm not sure where you
7    are, but if it says that -- but if I could -- I
8    mean, it also in here talks that it's due to the
9    construction.  I think we've established that mesh
10   fraying is due to the construction and it has no
11   clinical issues.
12                   MR. ZONIES:  Move to strike after "if
13   it says that."
14   BY MR. ZONIES:
15        Q.     So, Mr. Smith, if my client had a
16   mechanically cut mesh implanted, that mechanically
17   cut mesh had the potential to rope, had the
18   potential to have particle loss, had the potential
19   to have the fraying defect described in this e-mail;
20   correct?
21                   MR. HUTCHINSON:  Object to form.
22                   THE WITNESS:  I could not agree with
23   that.  I would say that the top surgeons still use
24   mechanically cut mesh; and if your client had such
25   defects, it would most likely be that -- the surgeon

Confidential - Subject to Protective Order

```
 1    error.
 2    BY MR. ZONIES:
 3           Q.      You'd blame the doctor, wouldn't you,
 4    Mr. Smith?
 5           A.      No.  I'm -- you're asking my opinion.
 6           Q.      If you turn to Exhibit 3591, Mr.
 7    Smith, this is an e-mail that discusses the
 8    mechanically cut mesh having sharp edges.
 9                   Do you recall looking at this?
10           A.      Same document or is this a different
11    one?
12           Q.      It's Exhibit 3591.  And it's the one
13    that actually has the pictures of the mechanically
14    cut mesh and its sharp edges.
15                   MR. HUTCHINSON:  I'm going to object
16    to the form of the question.
17    BY MR. ZONIES:
18           Q.      Do you have Exhibit 3591 in front of
19    you, Mr. Smith?
20           A.      I do.
21           Q.      And this is an e-mail that says on
22    the first paragraph that the mechanically cut mesh
23    can provide sharp edges; is that right?
24                   MR. HUTCHINSON:  I'm going to object
25    to the extent that mischaracterizes the document.
```

Confidential - Subject to Protective Order

1                    THE WITNESS:  In my opinion, "sharp"
2    is very subjective; and in this particular case, it
3    comes -- it comes to an edge that isn't round, but
4    that does not mean it's going to cut you in terms of
5    sharp, so -- "sharp" is very relative.
6    BY MR. ZONIES:
7         Q.      Well, let's take a look at the
8    picture.  Go ahead.  Show the picture of the
9    mechanically cut mesh that my client had.  It's the
10   one -- the bottom two.
11                   The jury can decide if those are
12   sharp edges, but you would agree, wouldn't you, Mr.
13   Smith, that that is mechanically cut mesh?
14        A.      This is mechanically cut mesh.
15        Q.      With those sharp edges; correct?
16                   MR. HUTCHINSON:  Object to form.
17                   THE WITNESS:  No, I can't agree with
18   that.  There has -- it's been cut.  It has not been
19   laser cut.  It's been mechanically cut.  I can't
20   agree to sharp.  Sharp -- surgical scalpels are
21   sharp.  That would not cut you.
22   BY MR. ZONIES:
23        Q.      That piece of plastic cut like that,
24   you don't think that would cut a human being.
25        A.      I know it wouldn't.

Confidential - Subject to Protective Order

1                    MR. HUTCHINSON:  Object to form.

2                    THE WITNESS:  I mean, it's a piece of

3      plastic.  It's soft plastic.

4                    (Pause.)

5                    MR. ZONIES:  Can we go off the

6      record?

7                    THE VIDEO TECHNICIAN:  Going off the

8      record.  The time is 3:31 p.m.

9                         -  -  -

10                   (A discussion off the record

11             occurred.)

12                        -  -  -

13                   THE VIDEO TECHNICIAN:  We are back on

14     the record.  Time is 3:47 p.m.

15     BY MR. ZONIES:

16          Q.      Mr. Smith, we're back on the record

17     and before we broke, we were looking at a picture of

18     -- a zoomed-in picture of the mechanically cut mesh

19     and what was described in the e-mail attaching the

20     picture as its sharp edges.

21                   Do you recall that?

22                   MR. HUTCHINSON:  I'm going to object

23     to form.

24                   THE WITNESS:  I recall the picture.

25     BY MR. ZONIES: