IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

_____x
                                :
IN RE:  ETHICON, INC., PELVIC   :
SYSTEM PRODUCTS LIABILITY        :          MDL
LITIGATION                       :
                                :          No. 2:12-MD-2327
                                :
                                :
                                :          Date:  November 10, 2015
_____x


TRANSCRIPT OF MOTIONS HEARING HELD
BEFORE THE HONORABLE CHERYL A. EIFERT, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT
IN CHARLESTON, WEST VIRGINIA

APPEARANCES:              (All telephonically.)

For the Plaintiffs:       MR. BRYAN F. AYLSTOCK
                          Aylstock Witkin Kreis & Overholtz PLLC
                          17 East Main Street, Suite 200
                          Pensacola, FL 32502

                          ANDREW N. FAES, ESQ.
                          Wagstaff & Cartmell
                          Suite 300
                          4740 Grand Avenue
                          Kansas City, MO  64112

                          RICHARD A. FREESE, ESQ.
                          Freese & Goss
                          Regions Harbert Plaze, Suite 3120
                          191 6th Avenue North
                          Birmingham, AL  35203


For the Defendants:       BENJAMIN M. WATSON, ESQ.
                          Butler Snow O'Mara Stevens & Cannada
                          P. O. Box 6010
                          Ridgeland, MS  39158-6010

```
(Appearances continued.)      RICHARD BERNARDO, ESQ.
                              Skadden Arps Slate Meagher & Flom
                              4 Times Square
                              New York, NY  10036

                              PHILIP J. COMBS, ESQ.
                              Thomas Combs & Spann
                              P. O. Box 3824
                              Charleston, WV  25338-3824




Court Reporter:               Ayme Cochran, RMR, CRR

Proceedings recorded by mechanical stenography;
transcript produced by computer.
```

1          PROCEEDINGS had before The Honorable Cheryl A. Eifert,

2     Magistrate Judge, United States District Court, Southern District

3     of West Virginia, in Huntington, West Virginia, on November 10,

4     2015, at 2:30 p.m., as follows:

5          JUDICIAL ASSISTANT:  Hello.  This is Laura, Judge

6     Eifert's judicial assistant, and I would first like to confirm

7     our court reporter today, Ayme Cochran, is on the line.

8          COURT REPORTER:  Yes, ma'am.  Hello.

9          JUDICIAL ASSISTANT:  Hi.  Thank you, Ayme.  We are here

10    in In re:  Ethicon, Inc., case number 2:12-md-2327.

11        I hear a lot of noise in the background.  Is someone moving

12    around or -- all right.  That's better.

13        We are here on a telephonic motion hearing concerning

14    defendants' motion for entry of protective order and to quash

15    plaintiffs' 30(b)(6) deposition notice, ECF number 1735.

16        If I could please have plaintiffs' counsel?

17          MR. FAES:  Andy Faes, F-a-e-s.

18          MR. AYLSTOCK:  Hi, Laura.  This is Bryan Aylstock.

19          JUDICIAL ASSISTANT:  Hello.  Thank you.

20          MR. FREESE:  This is Richard Freese, F-r-e-e-s-e.

21          JUDICIAL ASSISTANT:  Thank you.

22        If that's everyone for plaintiffs' counsel, may I please

23    have counsel for Ethicon?

24          MR. COMBS:  This is Phil Combs on behalf of Ethicon.

25          MR. WATSON:  Ben Watson for Ethicon.

1          MR. BERNARDO:  Richard Bernardo, also for Ethicon.

2          JUDICIAL ASSISTANT:  All right.  And, everyone, if you

3     will please hold just a moment for Judge Eifert.

4          (Pause.)

5          THE COURT:  Hello.

6          UNIDENTIFIED SPEAKER:  Good afternoon, Your Honor.

7          UNIDENTIFIED SPEAKER:  Good afternoon, Judge Eifert.

8          THE COURT:  All right.  We are here, first off, on

9     Ethicon's motion for entry of a protective order and to quash a

10    Rule 30(b)(6) notice of deposition.  I have looked through

11    everyone's materials and let me ask if -- first, let me ask

12    Ethicon to answer this question.  Have the plaintiffs done any

13    discovery specifically about the 2010 Taiwan events?

14         MR. COMBS:  Yes, Your Honor.  There was questioning of

15    Dan Lamont on that topic.

16         COURT REPORTER:  I'm sorry.  Who's speaking, please?

17         MR. COMBS:  This is Phil Combs.

18         THE COURT:  Let me just remind everyone to state your

19    name so that Ayme can get down the right person.

20       I saw -- I looked through that transcript.  I looked at the

21    pages that were listed and it was unclear to me whether that

22    really was about 2010 or not.  It looked like there were

23    references to 2005 and 2004, so I was a little confused about

24    that.

25       Let me ask the plaintiffs, what discovery have you already

1   done on the 2010 events in Taiwan?

2          MR. FAES:  Your Honor, this is Andy Faes.  The answer

3   to that is very little.  There was some limited discovery on that

4   topic during the Dan Lamont deposition, as Mr. Combs noted, but

5   what we didn't have for that deposition is, you know, the color

6   photos of the return products that were attached as Exhibit A-1

7   to our notice and we didn't have that document.  It wasn't

8   produced to us until 2014, well after the majority of our --

9   actually, all of our 30(b)(6) deponents had gone forward and, as

10  I tried to make clear in our response to our motion, it's quite a

11  different matter when you're confronted with the photos of actual

12  return product, as opposed to, I think, what we had was a

13  three-page complaint file that was topically discussing this

14  issue.

15      So, it's fair to say that there's been very limited

16  discovery during Dan Lamont's deposition but, certainly, not on

17  manufacturing issues related to the TVT.  At least Dan Lamont was

18  more designated on other issues.

19          THE COURT:  All right.  Let me let Ethicon go ahead

20  then and say whatever else they might want to say in support of

21  their motion.

22          MR. COMBS:  Judge, this is Phil Combs.  Over the last

23  couple of years when we've been in front of you, you've told us

24  several times that you don't understand why the depositions in

25  this case go on for days on end and you don't understand why

1   we're still doing fact discovery in the case and this is a

2   perfect example of both of the issues.  The topics that are in

3   the notice have either been the subject of questioning or could

4   have been the subject of questioning.

5       Judge, these cases have not turned on manufacturing defects.

6   There have been seven cases litigated to either verdict, or tried

7   and then settled, and none of them have been on manufacturing

8   defect theories.

9       Additionally, and I think most importantly, is that particle

10  loss, it's not an issue that the plaintiffs have been able to

11  show had impact to these plaintiffs.  In these cases, the

12  plaintiffs have explants and they have a pathologist who

13  testifies based upon his review of the tissue surrounding the

14  explanted mesh.  It's typically been Dr. Iakovlev.  Dr. Iakovlev

15  does not see particles in the tissue that is explanted, that is

16  surrounding the mesh.

17      In the Ramirez case, which is the case in Texas that the

18  plaintiffs have argued is the reason that this deposition needs

19  to go forward quickly, is a very good case in point.  I took his

20  deposition last Thursday in Toronto and, in that testimony, he

21  said he has reviewed the tissue from the explant and there are no

22  particles that he can see with a microscope and that he does not

23  plan on telling the jury in his testimony in this case that there

24  are any particles of polypropylene in Ms. Ramirez's explanted

25  tissue.

1        So, our motion is pursuant to Rule 26(b)(2)(C) and, under

2    Sub-part 2, we're seeking the protective order because the topics

3    have already been addressed, or should have been addressed in

4    prior depositions and, under Sub-part 3, we believe that the

5    burden and expense of the proposed discovery outweighs its likely

6    benefit and its importance in resolving the issues in this case.

7        And, finally, Judge, you know, pursuant to Waves 1 and 2 in

8    the MDL 200, we're going to be taking over a thousand depositions

9    in the next six months in these cases and we believe that that's

10   what the parties should be focused on, not conducting additional

11   fact discovery on topics that are not material to the issues

12   presented in the cases.  Thank you, Judge.

13            THE COURT:  All right.  Who wants to speak on behalf of

14   the plaintiffs?

15            MR. FAES:  This is Andy Faes, Your Honor, and I'll

16   respond briefly to that.  The defendants' primary objection to

17   this notice has been that it's about particle loss and particle

18   loss has already been covered in multiple depositions, so they

19   shouldn't have to put up a witness on particle loss again.

20       I've made it clear from the onset in correspondence and

21   meet-and-confers with the defendants that this deposition is not

22   about particle loss.  It's a very specific focused deposition on

23   manufacturing policies, standards, and specifications related to

24   the TVT.

25       Now, the policy standards and specifications include but are

1    not limited to those which set forth the acceptance or rejection

2    criteria for foreign matter and the product and packaging when it

3    leaves the hands of the manufacturer.  Those policies and

4    procedures do cover things like hair, dirt, fiber, and medical

5    [sic] -- metal particles that can be in the packaging and they

6    also include particles from the product, as well.

7         And, just to respond to Mr. Comb's, you know, point, just

8    because there have been no other cases that have turned on a

9    manufacturing defect issue in the seven cases that have been

10   tried so far doesn't mean that there won't be one in the future.

11   I assume you've thoroughly reviewed our filings and have noticed

12   the fact that, for instance, the entire TVT manufacturing line

13   was shut down in 2010 due to these issues with foreign materials

14   being present in the product and packaging and over 2,000

15   products were discarded in the month of March of 2010 alone and

16   we feel that this is evidence of a systemic manufacturing issue

17   that the plaintiffs need to -- need to discover for the Wave 1

18   and Wave 2 cases going forward and, in addition, the Mullins

19   case, which is going forward on the sole issue of design defect.

20        I assume that in the event that there is a -- you know, a

21   defense verdict on the design defect issue, that Judge Goodwin

22   isn't going to give us another six months or however long it

23   takes to discover additional manufacturing issues.  We feel that

24   this issue is timely, and this notice was actually originally

25   filed in June of this year, and we -- we've re-filed it and

1    re-filed it attempting to provide additional time for

2    meet-and-confers with the defendants to try to work out the

3    issues and we just weren't able to do that.

4         Just responding to Mr. Comb's two other specific points on

5    proving up that particle loss is actually -- you know, caused a

6    -- a clinical impact.  Two of the exhibits attached to our reply

7    motion are new risk analyses that were just performed in 2013 and

8    '14 where Ethicon's own engineers admit that there are potential

9    clinical risks from particles and -- foreign material and

10   products and packaging that can occur and those are new documents

11   that were just produced within the last six months, so we

12   obviously haven't had the opportunity to depose any witnesses on

13   those points.

14        And, finally, to conclude that just because the limited

15   cases that Mr. Combs cited were Dr. Iakovlev concluded that he

16   couldn't find any particles in a particular case doesn't mean

17   that there won't be future pathologists or we might send clients

18   out to have ultrasounds that might find particles embedded in the

19   mesh or foreign material left in the body in cases in the future.

20             THE COURT:  Okay.  I tell you, the problem that I have

21   with your deposition notice as it currently exists, I don't

22   understand why many of these things weren't already covered.  I

23   do think you had an opportunity to explore a manufacturing defect

24   in the whole product line in the past and you had clues in the

25   record that that was an area that you could explore, and not to

1    mention that that's a standard area that people would explore in

2    a products liability case.

3         So, I -- when I saw your notice, I thought to myself, we are

4    not going to go back to square one and start doing a whole new

5    type of discovery on all of these products because this case has

6    been -- this MDL has been going on for quite awhile now.  I mean,

7    we're into the third year of it, and maybe even broaching a

8    fourth year here shortly.

9         So, to start off, I mean, to look at all of these products

10   from the beginning of their production to the present is just --

11   it's too broad and it should have been done already.  You did

12   have plenty of opportunity to explore that.  It looks like there

13   was discussion about particle loss and the effect of particle

14   loss.  I've scanned through these depositions.  Clearly, the

15   subject was brought up.

16        Clearly, there were some records in front of you that should

17   have clued you in to even the Taiwan incident in 2010, but on

18   that point, I do think you are entitled to do some discovery on

19   the events that occurred in 2010, the recall of the -- the

20   production stop, the problems with the particles in the blister

21   packs.  I didn't see -- I didn't see anything in the depositions

22   that were produced to me that really talked about that, at least

23   not in any detail.  In fact, I really didn't see anything that

24   would make it clear to someone who wasn't involved in the case

25   that there was discussion about what happened in 2010.

1          So, I think there's going to have to be a limitation, a

2    significant limitation, to what you're going to be able to ask a

3    30(b)(6) witness.  I do think you ought to be able to explore the

4    Taiwanese events, as I stated, and whatever would have -- would

5    have grown out of that, that incident, if there were changes in

6    manufacturing processes, if there were new policies, if there

7    were new guidelines, if something came out of that, then I --

8    then I'm going to allow you to discover that, but I'm not going

9    to allow you to go back to the beginning of time and compile all

10   of these documents, and complaints, and communications, and

11   things that you really should have already gotten.  So, that's

12   where I'm going with this.

13         I think the question I have for both sides is, with that as

14   your parameters, do you think that you could come up with the

15   topics yourself, or do you think you can look at these 23 topics

16   and pare them down so that we're starting at 2010 and maybe

17   moving forward a little bit?

18         And I'm not saying you can't ask anything about the

19   pre-period, but only as it affects the event that occurred in

20   Taiwan, and those cases that were returned, and that sort of

21   thing.  I just don't see it opening up for a whole new set of

22   discovery on manufacturing defects.  That really should have

23   already been done.

24              MR. COMBS:  Judge -- Judge, this is Phil Combs.  I

25   mean, we're certainly willing to meet and confer with the

 1    plaintiffs to see if that can be done, and then, if it can't be

 2    done, to come back to Your Honor.

 3             THE COURT:  And I would -- I would say we need to do

 4    that pretty quickly because it does sound like -- you know, I

 5    know that the Texas case doesn't have anything directly to do

 6    with the MDL, but it does appear as though, if this woman in fact

 7    received a product from one of the lots that was determined to

 8    have these particles in the blister packs, then I think the

 9    plaintiffs ought to be able to have that discovery prior to the

10    trial.  So, I don't think this can go on forever but, you know,

11    certainly, if you can work it out, that's better than me trying

12    to wade in there and tell you what to do.

13         I do think a couple of categories that I looked at that I --

14    I think, at this point, doesn't seem to make a lot of sense

15    particularly going back, but 20, 21, 22 and 23, where now you're

16    just talking about maintenance of old -- of old samples and

17    whatnot, I mean, I can't -- I can't believe this hasn't already

18    been covered.  I mean, I would have thought that these things

19    would have already been talked about pretty much at the outset of

20    the discovery.  So, that seems a little odd to me.

21         But, anyway, is that what you all --

22             MR. FAES:  Your Honor?

23             THE COURT:  Yes?

24             MR. FAES:  If I could respond to -- briefly to those

25    points, just so I can perhaps seek some further guidance and

1    clarification from Your Honor before we have a meet and confer on

2    Topics 20, 21, 22 and 23?

3              THE COURT:  Yes.  Go ahead.

4              MR. FAES:  With regard to Topic 20, the only thing that

5    we're really seeking to discover there is the fact that these

6    nine products that are depicted in Exhibit A-1 to our deposition,

7    they were apparently discarded despite the fact that there was a

8    litigation hold in place in 2010.  So, all they're really seeking

9    to discover there is that specific issue with regard to that

10   particular product and what testing they did on Subject 21 with

11   regard to those particular products.

12       On 22 and 23, what we had asked -- what we were looking for

13   for there is, certainly, with respect to the 2010 time period and

14   March of 2010 when the TVT production line was shut down, we were

15   wanting, you know, procedures and daily records of cleaning and

16   inspection and maintenance of the facility and equipment that was

17   used that was ultimately shut down.

18       I mean, obviously, if we get daily cleaning records showing

19   that they're, you know, sweeping up huge piles of metal

20   particles, or hair, or fibers in that area, that is certainly

21   something we'd want to discover.  So, that's -- that's what we're

22   looking for on Topics 22 and 23.

23             THE COURT:  Okay.  Well, I don't think that sounds

24   unreasonable if you're limiting it to the 2010 time frame with

25   the Taiwan incident, and so I'll -- why don't you all try to meet

1    and confer about how you can limit these categories?  And I don't

2    know if you just want to say, okay, they're all limited to 2010

3    and to the events that arose in Taiwan and what that led to and

4    keep the categories as they are.  I don't -- it doesn't make a

5    lot of difference to me.  I think the only thing that I would

6    find unacceptable would be going back to the very beginning of

7    this product line and now starting to look for all complaints

8    that have to do with manufacturing and particles because I think,

9    really, all of that should have been done and you have had an

10   opportunity to do that.

11       So, the other thing you might do some limitation on is, I

12   think, in the few depositions that I glanced at, I saw in one

13   deposition alone where the person was asked like 30 times, "Have

14   you done any testing on particles and have you put particles in

15   -- you know, in a rat to see what happens to them," and that

16   question was asked over and over again and it seemed pretty clear

17   to me that they hadn't.

18       So, things that have already been asked about the treatment

19   of particles and how -- what testing Ethicon did, I don't want

20   you to repeat what's already been told to you about that.

21       Now, maybe there's -- because I only have portions of these

22   depositions, maybe these were -- these were confined to a certain

23   time frame or a certain product that's not really applicable to

24   the Taiwan events and, to that extent, you could ask those things

25   again, but it seemed to me like they were just saying in general

1  from -- from the beginning of time until 2014, Ethicon had never

2  tried to test with rats what particles did.

3      So, you know, if that happens to be the case, I don't think

4  you should be asking a bunch of questions about that again

5  because it seemed like that was pretty well covered, but why

6  don't I let you take a stab at it.

7          MR. COMBS:  Judge, this is Phil Combs.  Just two brief

8  points.  One is, we would ask, also, that the Court place some

9  temporal limit on this deposition.  I mean, I've been involved in

10  these depositions and they just go on, and on, and on, and they

11  don't quit.

12          THE COURT:  Uh-huh.

13          MR. COMBS:  And we would ask, since the Court has now

14  focused this on this one issue, the Taiwan particle loss, we have

15  some temporal limit on that.

16          THE COURT:  Well, I think the rule does limit you to

17  one day, a seven-hour deposition, unless you want to agree to

18  something other than that.  So, you know, that's -- I don't -- I

19  don't recall anymore what the deposition protocol says, but it

20  seemed to me like you didn't put any -- you didn't do anything

21  exceptional, you just -- you just either have been agreeing or --

22  or it's not expressed anywhere that you can do a time frame other

23  than what's been set out in the rules.

24          MR. FREESE:  And, Your Honor, this is Richard Freese.

25  If I can just jump in here for a second.  I'm one of the lawyers

1    in the Ramirez case in Texas.  Obviously, I've been in dozens of

2    deposition with Phil and I'm happy to limit what we do.  I have

3    no intention of going back and re-plowing old ground, but my

4    client did get implanted with a lot -- within the suspected lot.

5    So -- and they intend, I'm certain, to cross-notice this

6    deposition that Your Honor is allowing in the Ramirez case.  So,

7    they're at least -- I mean, there's an MDL issue, there's a state

8    court issue, which they will expect that -- that I will get my

9    one and only chance to do it at this opportunity, which I'll do,

10   but -- and I suspect they will have a significant direct exam

11   their whole witness would normally do.  So, I think we can do it

12   in a one-hour -- or, I'm sorry, in a one-day deposition, as Your

13   Honor is expressing, and I certainly will commit not to re-plow

14   old ground and that we can get it done in one day.

15          THE COURT:  Okay.  Well, why don't you, again, work on

16   that and, if you find that you're having a problem agreeing, Mr.

17   Combs, it might, in part, depend upon how many witnesses you have

18   to identify to cover the topics and I don't know what that would

19   be without first you doing some meeting and conferring to figure

20   out which of these categories you still want to cover and -- but

21   I do -- I do want everyone to understand it should be a pretty

22   focused deposition.  It's not one that should go on for a week.

23   It shouldn't go on for three days.

24       It should be pretty focused on the Taiwan event, 2010 time

25   frame, and what may have come out of that.  I saw somewhere where

```
 1    it looked like they worked on that problem until maybe 2013, so
 2    I'm not saying that you're just limited to 2010, but I want the
 3    focus to be around that event and what arose from that event,
 4    okay?
 5              MR. COMBS:  Okay.  Thank you, Your Honor.  Your Honor,
 6    this is Phil Combs.  I'm going to drop off the call.  That's the
 7    only issue that I was involved with today, but thank you.
 8              THE COURT:  Thank you.  And, if you have any problems,
 9    just contact my office.  All right?
10              MR. COMBS:  Yes, ma'am.
11              THE COURT:  All right.  I saw this other issue.  Oh,
12    before we go on to this other issue with you all on the phone,
13    awhile back, in August, there was a motion filed that had to do
14    with this video deposition of Chuck Austin and, of course, I
15    didn't even see the motion until the deposition was already over,
16    but it's still kind of sitting out there.  There's nothing that
17    needs to be done on that; is that correct?
18              MR. FREESE:  Your Honor, I actually took Mr. Austin's
19    deposition, so I didn't know there was an issue about it, to be
20    honest with you.
21              THE COURT:  Okay.  So --
22              COURT REPORTER:  I'm sorry.  Who was that speaking?
23              THE COURT:  We won't need to worry about that one.
24              MR. FREESE:  That was Mr. Freese, by the way.  I'm
25    sorry.
```

1            THE COURT:  Yes, Mr. Freese.  All right.

2        All right.  Then, the last issue had to do with the

3    coordination of the deposition of, I guess, Marty Weisberg and

4    the problems that we're having making it work for both the MDL

5    and the state cases.  Who wants to talk about that?

6            MR. BERNARDO:  Your Honor, this is Richard Bernardo,

7    and I would like to address that, if I may, and thank you for

8    making additional time to discuss that.

9        We've discussed on prior calls our concerns about and our

10   belief of the importance of coordination of the discovery and

11   we're finding ourselves again in a situation that, despite our

12   best efforts, discovery really isn't being coordinated and it's

13   creating unnecessary and increased burdens and it's also

14   providing plaintiffs with, I'll say, multiple chances to depose

15   the same witness and we're seeing an increasing pattern of

16   duplicative depositions being taken in state cases that were

17   taken in the MDL, and now we have one where it looks like the MDL

18   is not going to participate in a state case.

19       And I understand and appreciate that, at this point and on

20   this day, we can't ask you to force the MDL to participate in

21   this upcoming deposition, but I'd like to take a few moments to

22   make the Court aware of what is going on here because we expect

23   that we're going to be back in front of Your Honor when the MDL

24   comes and says, "Well, now it's our turn," or "We wanted to take

25   the deposition," and we want to make sure we've provided you

1    notice of what's going on and seek your guidance, if there's a

2    different way we ought to be proceeding.  Again, I apologize for

3    the short notice here, Your Honor, but it was our belief until

4    late last week that this was going to be a coordinated

5    deposition.

6        By way of very brief background, Ethicon harmonized and made

7    changes to its IFU's for its pelvic mesh products and, before

8    even receiving discovery requests on those changes, we

9    anticipated that plaintiffs would want discovery and we sought to

10   collect what we believe were relevant materials and began to roll

11   them into the production.

12       We later received discovery, formal discovery, from

13   plaintiffs in the MDL, from plaintiffs in Texas, and from

14   plaintiffs in New Jersey on this particular issue.  In Texas, we

15   received document requests and a notice of deposition.  In New

16   Jersey, we received documents, requests that overlapped but were

17   different, and a notice of deposition and, in an MDL, we received

18   document requests that overlapped, again, in Texas, and we

19   anticipated that the MDL would be seeking a deposition.

20       So, rather than just sit back, we reached out to New Jersey,

21   and Texas, and the MDL, and we set up a phone call.  We said we

22   would like to coordinate this.  We understand that they have

23   discovery needs.  We want to be as efficient as we can.  We

24   volunteered that we would do this for two days, recognizing that

25   there were multiple parties.

1        We talked about the tight timing and suggested that we would

2    do this late in November, but got pushed back, that it needed to

3    be sooner, so we had folks do back flips to finish producing

4    documents that had been specifically sought in some of the

5    requests that, while we may have objected to on the grounds of

6    relevance, we thought we will just, in a spirit of compromise,

7    produce those, and we talked to each of the players about, rather

8    than responding to each of their individual requests which are

9    all overlapping, what we would try and do, which we thought would

10   be helpful, we would create a master document, that we would

11   break all of the documents that we were producing into

12   categories, and say, "Here.  Here are all the Bates numbers of

13   the IFU changes.  Here are the Bates numbers of the drafts.  Here

14   are the Bates numbers of the regulatory submissions," et cetera,

15   and we put together a very comprehensive and easy-to-use document

16   and we, again, tried to schedule this, all this time thinking

17   everybody was going to participate and, as of the last week, we

18   started getting some responses, particularly from Mr. Aylstock in

19   the MDL, saying, "Well, all your documents haven't been produced

20   yet.  We can't even, you know, notice a deposition until

21   everything has been produced yet."

22        But, Your Honor, obviously, you can take the deposition, as

23   the folks in New Jersey are doing, before every last piece of

24   paper has been produced and, in any event, all of it has been

25   produced already and a lot of it was produced months ago.

1          So, we're very concerned that, again, this is becoming a

2     pattern, and we're troubled by the fact that now we have a

3     deposition going forward in the end of this week, and we have the

4     MDL saying that, "Well, we -- you know, we reserve our right to

5     take another deposition and we're going to ask non-duplicative

6     questions."  That's really not the way we think this ought to be

7     happening.

8          Again, we understand there may be little that Your Honor can

9     do, at this point, but it was important for us to bring it to

10    your attention now, particularly so that if we're back here in

11    another month, we were just concerned you might say, "Well, I

12    wish you would have raised this with me when it first arose," and

13    also to solicit your guidance as to whether there's anything else

14    we can do to better coordinate this because we really think we

15    made great efforts here and, obviously, lack of coordination on

16    something like this is a tremendous waste of time, it's a waste

17    of our clients' resources.

18         I mean, these are individuals.  Marty Weisberg, you know,

19    has other things he's got to do, and to prepare for a deposition

20    takes a lot of time, and we're a little perplexed why the

21    documentary record is sufficient for, let's say, New Jersey to

22    take their deposition, but not sufficient for the MDL,

23    recognizing that if they later see something specific that they

24    say, "Oh, now I need to ask a question about this," just like we

25    talked about with particle loss, they can come back.

1    So, again, just wanted to raise this with Your Honor and

2    make you aware of it and seek your guidance, if you have any, as

3    to how best to proceed.

4         THE COURT:  I do have a question.  I really didn't

5    understand when I saw the letter why there was such a rush to

6    take this person's deposition.  How is anything that he has to

7    say about changes made in 2015 going to affect these upcoming

8    trials?  How is that even admissible if there were changes made

9    to IFU's?  Wouldn't that be a post-remedial measurement?  I don't

10   understand how any of this is even going to be relevant and, if

11   it is relevant, why does it have to be done right now?  What's

12   the big rush on it?

13        MR. AYLSTOCK:  Your Honor, this is Bryan Aylstock.

14   Yeah, I don't -- from the MDL's perspective, and this has been

15   made clear consistently and it's in the back and forth e-mails

16   that were attached by Mr. Bernardo, as well as myself.  I'd like

17   to do this right.  I'd like to have reviewed the documents.  And,

18   whether or not it's a remedial measure or whether there's an

19   exception vis-a-vis feasibility, or some sort of requirement made

20   by a regulatory agency that might get around that, I don't know

21   yet, because I haven't -- I haven't seen the documents.  I'd like

22   to do this right on behalf of the, you know, many, many people we

23   represent and have a fiduciary responsibility for as MDL

24   leadership.

25        And, just by way of example, Mr. Bernardo did finally,

1    actually, Saturday afternoon, provide sort of a breakdown of the
2    Bates numbers that are responsive to various topics.  Of course,
3    Your Honor has -- we had had that fight many years ago in a
4    discovery dispute and I think Your Honor had ruled that, yes, you
5    need to do that in response to discovery.  So, the IFU change was
6    made back -- all the way back in May and, just last week, within
7    the past ten days, I think we have received over a hundred
8    productions totaling over a hundred thousand pages, not all
9    related to the IFU notice, but understand, Your Honor, that it
10   takes time for our vendor to load the documents, days, and they
11   always seem to be produced on a Friday afternoon, or something
12   like that, so that affects us.
13        And, even today, I checked this morning with our vendor and
14   not all of the documents are even on the platform yet to be -- to
15   be reviewed and one of the big productions, 14,000 pages were
16   produced by -- from Marty Weisberg's custodial file, he's the
17   30(b)(6) witness, but there's a lot of other custodians that are
18   related to this issue and eight different people on the Copy
19   Review Team.
20        So, the MDL agrees with you, let's do this once, let's do it
21   right.  New Jersey, and Mr. Slater's not on this call, but they
22   have a trial starting in January, and Mr. Slater also has a trial
23   against Ethicon starting in December.  So, I think he'd like to
24   get some questions nailed down, at least as it relates to the TVT
25   Retropubic, which is the subject of the trial set by Judge

```
 1    Martinotti in mid-December, but the notice itself, it not only
 2    covers all of these documents and these very important label
 3    changes, but involves multiple products.  It's TVT, TVT-O, TVT
 4    Abbrevo, Triple-A, Exact, Gynemesh PS, which, of course, is a POD
 5    product, so it's a big deal to us, and I don't want to just rush
 6    head long half-cocked not having reviewed the documents because
 7    of some event in some state court of which I have no control.
 8              MR. BERNARDO:  Your Honor, if I --
 9              THE COURT:  Mr. Bernardo, let me ask you, in the state
10    court, has the judge allowed these depositions to be taken?  You
11    know, has there been -- has this motion been brought to the judge
12    and has the judge ordered that Ethicon has to put somebody up
13    prior to these trials on this subject?
14              MR. BERNARDO:  No, Judge.
15              MR. AYLSTOCK:  Your Honor -- I --
16              MR. BERNARDO:  Your Honor --
17              MR. AYLSTOCK:  I -- I -- I haven't been involved in
18    those hearings.
19              THE COURT:  Well, Mr. --
20              MR. AYLSTOCK:  So, I don't --
21              THE COURT:  -- Aylstock, wait.  Wait.  Wait.
22              MR. AYLSTOCK:  Nor have I ever --
23              THE COURT:  Wait.  Mr. Aylstock, Mr. Aylstock, just
24    wait a second, because I actually had directed that question to
25    Mr. Bernardo.
```

1          MR. AYLSTOCK:  Oh, I'm sorry.

2          THE COURT:  Yes, Mr. Bernardo, I was asking you.

3          MR. BERNARDO:  Thank you, Your Honor.  No, the judge

4    hasn't because, frankly, this was one of those issues we did not

5    raise with the judge because it was our view that we would put up

6    a witness to testify.  We certainly agree with your issue with

7    respect to admissibility and relevance and recognize we're going

8    to have to address that, but for discovery purposes, we decided

9    to allow it, but we did on the notion that everybody was going to

10   be participating and we wouldn't be doing this piecemeal.

11         And, in fact, Mr. Aylstock was one of the people, I recall,

12   who, while the notice was an issue, was bridling at the fact on

13   one of our earlier calls, that the deposition was going to have

14   to wait and, I guess the two points that were raised, the

15   breakdown of document was provided two weeks or more ago.  What I

16   provided on a Saturday was a supplement to that, as I had

17   described all along and, I guess, Your Honor, the frustrating

18   piece of this is that we've been having discussions for the last

19   month, all along anticipating that there would be a coordinated

20   deposition.

21         We -- we agree that it needs to happen this quickly, but we

22   also understood that, rather than fight it, we'd be cooperative

23   and make it happen soon, but -- but now, to learn that it's just

24   going to be for a state case and that the MDL is not going to be

25   coming in, at least making a good faith effort to ask questions.

1    If there's something that needs to get addressed that couldn't be

2    addressed because of a document that produced late, well, then,

3    fine, we can address that, but to say that, nope, we're not going

4    to do this now, we're going to reserve our right, again, and

5    force the whole concept and leaves us at a point in which,

6    frankly, it's too late for us, given where we've gone with this,

7    to go and raise that we're not going to do this in connection

8    with the New Jersey state case.  So, it kind of leaves us in a

9    difficult situation where we're having to do this discovery

10   piecemeal.

11          THE COURT:  Right.  Well, on that point, I agree with

12   Ethicon.  I mean, the whole point at the very outset of discovery

13   was that we were to do our best to coordinate it.  And I think

14   what you're saying, Mr. Bernardo, makes sense that the -- some

15   lawyer from the MDL should participate in this deposition and ask

16   what questions can be asked based on what's available to them

17   now, particularly if one of the main issues is going to be

18   whether this information is at all relevant in any of these

19   lawsuits.  On its face, it doesn't seem to me like it would be.

20   Maybe it will fall into some exception, but at first blush, I

21   don't see how any of this would be admissible.

22        So, I would think that that -- somebody from the MDL ought

23   to go and ask questions if, for no other reason, than to figure

24   out whether any of this information is going to be relevant and

25   admissible at trial.

1          And then, as Mr. Bernardo says, if there is a reason to do

2     some non-duplicative discovery, that could be discussed at a

3     later point, but I don't think the MDL lawyers should just

4     presume that they cannot come to the deposition and then ask

5     whatever they want at some subsequent deposition because that is

6     not the way that we've ever said it should work.  We've always

7     said these things should be coordinated.  So --

8               MR. AYLSTOCK:  Your Honor --

9               THE COURT:  Yes?

10              MR. AYLSTOCK:  This is Bryan Aylstock.  I appreciate

11    what you say and I -- in my correspondence with Mr. Bernardo,

12    I've made clear that we do not intend, at any later date, if

13    there is a deposition and the Court allows it, if there's a

14    fight, to ask any duplicative questions.  That's never been our

15    goal.  That's never -- and that's what I've told Mr. Bernardo.

16         I can have, and will have at the Court's instruction, an MDL

17    lawyer there to ask what questions can be asked, but what I'm

18    concerned about is there are thousands and thousands of documents

19    that they may be in a system somewhere and they may have been

20    produced.  I got notice today the production is finally over

21    with, but they will logistically not have been thoroughly

22    reviewed, or perhaps reviewed at all, and so, I don't want to be

23    caught in this catch-22 because of a deposition that we didn't

24    notice, but I agree with Your Honor.  We don't intend to ask any

25    duplicative questions at a later date and maybe we don't even

1    need the deposition, but I don't know that until I have had a

2    chance to really look at the depositions -- at the documents.

3            THE COURT:  Right, and that makes sense to me, too.  I

4    think -- I do think it would be wise to have an MDL lawyer

5    present at the deposition.  I don't think any party has really

6    been denied the opportunity to do discovery, unless it's just

7    been really late and you really had the opportunity to do it and

8    you just didn't do it.  Generally, if something comes up, like

9    this whole Taiwanese thing, you've been allowed to go back and do

10   some discovery on that.  So, I don't think you have to be

11   unnecessarily worried that you'll be precluded at some point.  I

12   mean, even in the deposition protocol, it says if there's a good

13   cause for doing a second deposition of the same person, in this

14   case, a corporate representative or, no, this is -- yeah, it is a

15   30(b)(6), isn't it?

16        So, you know, that -- that can be done, if there's

17   non-duplicative, non-cumulative evidence out there that you

18   didn't reasonably have an opportunity to discover, but I do think

19   the point is that we -- we can't -- we can't be saying, "Oh, I'm

20   not coming to that.  I want to do my own later."  That's not the

21   way this has ever been handled.  So, I think, to the extent

22   possible, you need to show up for this deposition and ask

23   whatever you can ask.

24            MR. AYLSTOCK:  Yes, Your Honor.  We understand.

25            MR. BERNARDO:  Thank you, Your Honor.  We appreciate

1       that.

2               THE COURT:  Is there anything else that we need to talk

3       about today?

4               UNIDENTIFIED SPEAKER:  Not from Ethicon's perspective.

5               THE COURT:  All right.  On the 30(b)(6) regarding the

6       manufacturing and particle issues, as I said, if you can't work

7       something out in the next few business days, I think you need to

8       contact my office and we'll have another phone call and just go

9       through it in more detail, each category, but I'm hopeful you'll

10      be able to get that worked out.

11          All right then.  I appreciate you all coming and I'll talk

12      with you later.

13              MR. AYLSTOCK:  Thank you.  Your Honor.

14              THE COURT:  Thank you.  Bye-bye.

15          (Proceedings concluded at 3:15 p.m., November 10, 2015.)

16

17      CERTIFICATION:

18          I, Ayme A. Cochran, Official Court Reporter, certify that

19      the foregoing is a correct transcript from the record of

20      proceedings in the matter of In Re:  Ethicon, Inc., Pelvic Repair

21      System Products Liability Litigation, MDL No. 2:12-md-2327, as

22      reported on November 10, 2015.

23

24      s/Ayme A. Cochran, RMR, CRR                    November 19, 2015

25      Ayme A. Cochran, RMR, CRR                      DATE