# EXHIBIT 2

Confidential - Subject to Protective Order

```
 1              IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2                    CHARLESTON DIVISION
 3
     IN RE: ETHICON, INC.,     Master File No. 2:12-MD-02327
 4   PELVIC REPAIR SYSTEM                MDL 2327
     PRODUCTS LIABILITY
 5   LITIGATION
 6   THIS DOCUMENT RELATES TO     JOSEPH R. GOODWIN
     ALL CASES                    U.S. DISTRICT JUDGE
 7
 8        CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
 9                          - - -
10                      June 19, 2015
11                          - - -
12         Videotaped deposition of LAURA ANGELINI,
     held at Rogers Towers, 1301 Riverplace Boulevard, Suite
13   1500, Jacksonville, Florida 32207, commencing at 8:14 a.m.,
     on the above date before Celeste O. Werkheiser, RMR, CRR.
14
15                          - - -
16
17
18
19
20
21
22              GOLKOW TECHNOLOGIES, INC.
            877.370.3377 ph|917.951.5672 fax
23                  deps@golkow.com
24
25
```

Confidential - Subject to Protective Order

```
 1   APPEARANCES:
 2        Andrew N. Faes, Esquire
          Wagstaff & Cartmell, LLP
 3        4740 Grand Avenue, Suite 300
          Kansas City, Missouri 64112
 4        (816) 701-1100
          afaes@wcllp.com
 5            Attorney for Plaintiff
 6        Adam M. Slater, Esquire
          (Appeared by phone)
 7        Mazie Slater Katz & Freeman, LLC
          103 Eisenhower Parkway, 2nd Floor
 8        Roseland, New Jersey 07068
          (973) 228-9898
 9        aslater@mskf.net
              Attorney for Plaintiff
10
          Calle M. Mendenhall, Esquire
11        (Appeared by phone)
          Freese & Goss, PLLC
12        Regions Harbert Plaza
          1901 6th Avenue North
13        Suite 3120
          Birmingham, Alabama 35203
14        (205) 871-4144
          calle@freeseandgoss.com
15            Attorney for Plaintiff
16        Ebiho T. Ahonkhai, Esquire
          (Appeared by phone)
17        Kline & Specter, P.C.
          1525 Locust Street
18        18th Floor
          Philadelphia, Pennsylvania 19102
19        (215) 772-0416
          Ebiho.Ahonkhai@KlineSpecter.com
20            Attorney for Plaintiff
21        Cathryn R. Paton, Esquire
          (Appeared by phone)
22        Thiebaud Remington Thornton Bailey LLP
          Two Energy Square
23        4849 Greenville Avenue, Suite 1150
          Dallas, Texas 75206
24        (214) 954-2224
          cpaton@trtblaw.com
25            Attorney for Teresa Kowalczyk, M.D.
```

Confidential - Subject to Protective Order

```
 1   APPEARANCES:  (Continued)
 2       Jacqueline E. Fusco, Esquire
         (Appeared by phone)
 3       Tooher Wocl Leydon, LLC
         80 Fourth Street
 4       Stamford, Connecticut 06905
         (203) 517-0456
 5            Attorney for Plaintiff
 6       William M. Gage, Esquire
         Butler Snow, LLP
 7       Renaissance at Colony Park
         1020 Highland Colony Parkway
 8       Suite 1400
         Ridgeland, Mississippi 39157
 9       (601) 948-5711
         william.gage@butlersnow.com
10            Attorney for Johnson & Johnson
11       Maha M. Kabbash, Esquire
         Riker Danzig Scherer Hyland Perretti, LLP
12       Headquarters Plaza
         One Speedwell Avenue
13       Morristown, New Jersey 07962-1981
         (973) 538-0800
14       mkabbash@riker.com
              Attorney for Johnson & Johnson
15
16
17
18   VIDEOGRAPHER:
19       David Lane
20
21
22
23
24
25
```

Confidential - Subject to Protective Order

```
 1   surgeons that any of your mesh products had a short-term

 2   foreign body reaction, and it ended and was not ongoing

 3   and chronic if, in fact, the foreign body reaction would

 4   continue.  You couldn't want to misstate the truth,

 5   right?

 6           MR. GAGE:  Objection.

 7           THE WITNESS:  I'm not sure that I understand

 8       your question, sir.  Sorry.  Can you rephrase your

 9       question?

10   BY MR. SLATER:

11       Q   No, it doesn't matter.

12           All right.  Let's go to the next document,

13   which is -- November 20, 1998 is the first e-mail.

14           MR. FAES:  Handing the witness what's been

15       marked as Exhibit T-3731, which starts with

16       ETH.MESH.12009066.

17           (Exhibit T-3731 marked.)

18   BY MR. SLATER:

19       Q   Looking at this exhibit, 3731, let's go to the

20   bottom of the first page.  It's an e-mail regarding the

21   Medscand contract, and it's dated November of 1998.  Do

22   you see that?

23       A   Yes.

24       Q   And if we go up above, we see that this chain

25   of e-mails, you actually wrote the e-mail in the middle
```

Confidential - Subject to Protective Order

```
 1   of the first page, and you were one of the recipients of
 2   the one at the top.  So you received these e-mails,
 3   correct?
 4        A   Yes.  Correct.
 5        Q   And e-mails like this, that's something that
 6   was exchanged in the ordinary day-to-day business when
 7   you were working here at Ethicon, correct?
 8        A   Can I read it to be able to answer your
 9   question?  Give me a minute.
10            Yeah, well, I wouldn't qualify as a regular
11   because this refers in particular to a very specific
12   transaction between Ethicon and Medscand was the -- at
13   that time, the owner of the TVT technology.
14            So I wouldn't qualify this as a normal e-mail
15   in a normal day of life because it refers to a -- you
16   know, a very particular event, which is the acquisition
17   or the licensing of a new technology.
18        Q   Ms. Angelini, you see these e-mails in front of
19   you?
20        A   Yes.
21        Q   Your company, in its ordinary business, when
22   you would communicate with other people you would use
23   e-mails like these, correct?
24        A   Oh, yes.
25        Q   And that's what these e-mails are, is you and
```

Confidential - Subject to Protective Order

 1    other people in your company communicating within the

 2    company about company business, correct?

 3        A    Correct.

 4        Q    And if we go to the second page, which is part

 5    of the e-mail from Mark Dumenil, he talks at the very

 6    bottom about purchasing the manufacturing rights of TVT

 7    from Medscand for 22 million dollars.  That's what's

 8    documented there, correct?

 9        A    Correct.

10        Q    If we flip to the first page, at the very top

11    there's an e-mail from Rodrigo Bianchi, and you're one

12    of the people who got that e-mail.  Do you see that?

13        A    Yes.

14        Q    November 20, 1998 is the date, right?

15        A    Yes.

16        Q    And in this e-mail, Rodrigo Bianchi -- and who

17    is he?

18        A    He was the Vice President at that time, in '98,

19    was Vice President for Gynecare and Mitek for Europe.

20        Q    And he says in this e-mail, talking about

21    Professor Ulmsten and Medscand, that he doesn't see any

22    reason why they should be going to Somerville -- and

23    that would be Ethicon's offices, their U.S. headquarters

24    in Somerville, New Jersey, right?

25        A    Right.

Confidential - Subject to Protective Order

 1   Q   It says:  "Many times Ulmsten" -- and let me
 2   just stop there.  Ulmsten is the surgeon who actually
 3   developed and created the TVT, correct?
 4   A   Correct.
 5   Q   It says:  "Many times Ulmsten tried to
 6   interfere in marketing issues.  We clarified that
 7   is not his job."  That's what's documented here,
 8   correct?
 9   A   Yeah.  That's what Mr. Bianchi said in this
10   e-mail.
11   Q   And he then indicates, a little further down:
12   "TVT is a European project, and Laura is the global
13   project leader.  Let's respect roles and
14   responsibilities."
15       He's talking about you as being the global
16   project leader for the TVT, correct?
17   A   Yes.
18   Q   Global means the entire world, right?
19   A   Well, in that time, that context meant my
20   primary responsibility was, you know, the responsibility
21   for the European business.
22       Because this product was invented in Europe and
23   was originally manufactured by Medscand, I had
24   additional responsibility of coordinating activities
25   globally, which included me being in contact with my