UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

| | |
|---|---|
| IN RE:  ETHICON, INC. PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION | Master File No. 2:12-MD-02327<br>MDL No. 2327 |
| THIS DOCUMENT RELATES TO:<br>WAVE I CASES | JOSEPH R. GOODWIN<br>U.S. DISTRICT JUDGE |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' EMERGENCY MOTION TO RECONSIDER THE SCOPE OF WAVE 1 DEFENSE MEDICAL EXAMS**

**INTRODUCTION**

The physicians retained by Ethicon, Inc. and Johnson & Johnson (collectively, "Ethicon") to conduct IMEs of the Plaintiffs have at all times acted professionally and courteously in their dealings with them.  The misleading and at times untrue allegations found in Plaintiffs' Motion to Reconsider the Scope of Wave I Defense Medical Exams [ECF No. 1912] simply illustrate the wisdom of the Court's prior rulings, which were calculated to prevent the kind of "examining room litigation" which the Plaintiffs now seek to impose on this Court.

This Court has, of course, already denied Plaintiffs' request that defense medical examinations ("DMEs") be audio recorded (*see* PTO #214 ¶8); and, likewise, in *Carolyn Lewis v. Ethicon, Inc., et al.*, Case No. 2:12-cv-04301 (Oct. 23, 2013), this Court denied plaintiff's request to authorize a nurse to accompany Ms. Lewis and observe her DME.  *See* Order Granting Independent Medical Examination (Oct. 23, 2013) ("Lewis Order") (ECF No. 82).  The Court's decisions in both cases are sound and there is no basis to reverse or reconsider them here.

On March 2, 2016, Ethicon counsel wrote lead counsel for the Plaintiffs and complained about the failure of the Plaintiffs two instances to cooperate with this Court's orders. *See* Ex. A

(3-2-2016 letter from C. Jones to MDL Leadership Liason (without attachments). In one instance, discussed below, plaintiff Joyce Justus came to a DME and delivered to the physician a letter from her attorney with instructions to ask for conditions this Court has refused and specific coaching as to how to answer certain questions.[1] Ethicon counsel sought to resolve these issues without the help of the Court.

The plaintiffs' response was to ask for the letter back, *see* Ex. B (3-3-2016 letter from K. White to C. Jones), and then to bring this "emergency" motion, which not only fails to mention Ethicon's attempt to resolve issues like these between counsel, but then adds a litany of complaints about other examinations, none of which have been brought to the attention of Ethicon counsel. If the patient instruction letter ever was privileged, that privilege was waived both when the patient gave it to her physician knowing it would be discussed with Ethicon counsel and again when the letter was placed in issue in Plaintiffs' Motion.

The motion is an obvious preemptive strike. In it Plaintiffs make baseless accusations of unprofessional conduct concerning eight of the 30 DMEs that have taken place in the course of Wave I litigation,[2] with an implied threat to sue the physicians conducting these exams. Plaintiffs offer evidence to support only three of these accusations. The other five are wholly without any supporting proof. The accusations are also reckless, misleading, and untrue, as set out more fully below and as supported by the attached affidavits or other documentation gathered in the 24 hours allowed for this Opposition:

---

[1] Because Plaintiffs deny that privilege has been waived, Ethicon has not attached the instruction letter to this opposition, but will supply it to the Court if requested.

[2] To put Plaintiffs' complaints in perspective, 91 Plaintiffs in this Wave have had IMEs conducted by Plaintiffs' experts, with some having multiple IMEs for a total of 103 IMEs conducted by their own experts.

- The physical examination of Ms. Freitas took approximately 10 minutes, at her request a smaller speculum was used to minimize pain, and at the conclusion of the examination she was not bleeding and did not report being in pain. *See* pp. 6-8, *infra*.

- Ms. Wolfe, a world traveler, has traveled to Houston twice for medical examination by Plaintiffs' experts who have reported findings that cannot be confirmed by her medical records. When a scheduling misunderstanding resulted in a request that the DME take place an hour and a half after the time she had believed it would start, she left the physician's office and returned home. *See* pp. 8-10, *infra*

- Ethicon's defense medical examiner had a nurse present during Ms. Springer's examination, allowed her to call her lawyer before he performed an external bladder ultrasound, and allowed her husband to be present and to participate in giving her medical history, even though the rules plainly allowed the ultrasound and forbad the husband's participation. The same physician examined another plaintiff on the same day and she was so pleased she asked him to be her doctor. *See* pp. 10-11, *infra*.

- When the defense medical examiner found that Ms. Forester was not suffering from pain he observed that he did not think her mesh should be removed. That is his finding in his report. He did not say anything to her about her lawsuit. *See* pp. 11-12, *infra*.

- Ms. Daino objected to the ultrasound allowed by the court order, called her attorney, consented to it, and made no further objection to her examination. The physician had a chaperone present during the pelvic exam. *See* pp. 12-13, *infra*.

- Ethicon's defense medical examiner told Ms. Conti that her pain was at an incision site for several surgeries. This is in his expert report. He did not tell her that her pain was from only one of them, her hysterectomy. *See* p. 13, *infra*.

- Ms. Ruiz did not show signs of overt pain during her examination, did not cry, and was not in distress when it ended. *See* pp. 13-15, *infra*.

- When Ms. Justus presented a letter from her lawyer to Ethicon's defense medical examiner that made demands this Court had rejected, that necessarily delayed her examination while the DME consulted with Ethicon counsel. The letter instructed her to use certain specific language when asked questions during the independent medical examination. *See* pp. 15-16, *infra*.

No improprieties occurred during these DMEs. The physicians Ethicon has retained are highly respected professionals who are willing to submit themselves to cross-examination about what they have done. Many, if not all, of the situations presented in Plaintiffs' motion could have been avoided if Plaintiffs' counsel had fully informed their clients of what to expect during

3

the DMEs, and had not turned them into negotiations. This Court should stop this attempt to turn the DMEs into a litigation battleground. Plaintiffs' request for audio recordings of the examinations or allowing a third-party in attendance at the DMEs should be denied for all the reasons addressed below.

## LEGAL ARGUMENT

1. As an initial matter, Ethicon has good cause to conduct DMEs of Plaintiffs pursuant to Fed. R. Civ. P. 35: Simply stated, a plaintiff who asserts injury, either physical or mental in nature, "provides the defendant with good cause for an examination to determine the existence and extent of such asserted injury." *Schlagenhauf v. Holder*, 379 U.S. 104, 118-119 (1964); *see also Hall v. Rost Enterprises*, No. CIV.A. 2:04-CV-01038, 2006 WL 1210311, at *1 (S.D.W. Va. Apr. 28, 2006) (finding that good cause exists under Rule 35 where "plaintiff's purported ailment places her neurological condition in issue.").

2. One of the purposes of Rule 35 is to provide a "'level playing field' between the parties in their respective efforts to appraise the Plaintiff's physical state." *Sauer v. Burlington Northern*, 169 F.R.D. 120, 124 (D. Min. 1996) (quoting *Tomlin v. Holecek*, 150 F.R.D. at 632). Another purpose of Rule 35 is to "inform the court and the parties of the true facts as to the physical condition of the party claiming injury...." *Hardy v. Riser*, 309 F. Supp. 1234, 1241 (N.D. Miss. 1970). These are the reasons why allowing Ethicon to conduct DMEs is important here.

3. Plaintiffs' request that a third party be allowed at the DMEs, or, alternatively, that an audio recording be made of the DMEs (*see* Pltfs' Mot. at 9) are requests already rejected by this Court -- and are no more than thinly-veiled attempts to interject the adversarial process in the

4

examination room and to interfere with Ethicon's ability to properly conduct its DMEs – both reasons to deny Plaintiffs' requested relief.

4. As the Court already explained in *Lewis*, "well-established federal law [rejects] 'the notion that a third party should be allowed, even indirectly through a recording device, to observe a Rule 35 examination.' *Holland v. United States,* 182 F.R.D. 493, 495 (D.S.C. 1998)." Lewis Order. (ECF No. 82) at 4. Elaborating on the numerous "problems associated with a third party observer", the Court recognized that "certainly one major concern is the 'infusion of the adversary process into the ... examining room.'" *Id.*, citing *Tomlin v. Holecek,* 150 F.R.D. 628, 634 (D.Minn. 1993); *see also McKitis v. Defazio,* 187 F.R.D. 225, 228 (D.Md. 1999).

5. Moreover, the Court continued, "'an observer [could] potentially distract the examining [physician] and examinee thereby compromising the results of the examination ... the presence of an observer would lend a degree of artificiality to the examination that would be inconsistent with the applicable professional standard.'" *Id.*, citing *Romano v. II Morrow, Inc.,* 173 F.R.D. 271, 274 (D.Or. 1997) (quoting *Shirsat v. Mutual Pharm. Co.,* 169 F.R.D. 68, 70-71 (E.D.Pa. 1996); *See also* MDL 2327 PTO #214 at ¶8.

6. The need (i) to prevent "infusion of the adversary process into the. . . examining room;" and (ii) to avoid distractions to the physician and examinee that may compromise its results, are the very concerns that are relevant here. Just as these reasons supported denying plaintiff's request for a third party observer in *Lewis*, or even an audio recording of the examination, these reasons likewise support denying Plaintiffs' requested relief here.

7. Plaintiffs seek to circumvent the sound basis for prohibiting third party observations in the exam room by describing "special circumstances" that require an exception to this rule. Pltfs' Mot. at 2-8. But Plaintiffs' descriptions – or, more accurately, accusations –

do not correlate with what actually occurred. As detailed below, nothing improper happened during these DMEs, and nothing that occurred would support allowing third party observers, or audio recordings, in the examination room.

8. In addition, because Plaintiffs have now conducted their own IME'S – 103 IMEs of 91 Plaintiffs, it is too late to make any requirements for audio taping or witnessing reciprocal and Ethicon would be prejudiced by now changing the rules in a manner that favors Plaintiffs only.

**Plaintiff: Monica Freitas. Plaintiff's Attorney: Fidelma Fitzpatrick. <u>Defendant's Physician: Brian Flynn, M.D.</u> (Centennial, Colorado) Date of Exam: 2/24/2016.**

9. Contrary to the circumstances described in Plaintiffs' Motion at 3-4, the DME Dr. Flynn conducted of Ms. Freitas was entirely professional and appropriate, as detailed below.

10. Dr. Flynn examined Ms. Freitas on February 24, 2016 with his medical assistant present. *See* Ex. C, Decl. of Brian J. Flynn, MD, ¶¶ 6, 12. The DME took one hour, about 50 minutes of which were spent taking Ms. Freitas's medical history. *Id.* at ¶ 10.

11. Dr. Flynn is Co-Director of the Female Pelvic Medicine and Reconstructive Surgery and an Associate Professor of Surgery/Urology at the University of Colorado Denver. *Id.* at ¶ 1. As part of his medical training, he completed an internship/residency in General Surgery, a residency in Urology, and a fellowship in Female Pelvic Medicine and Reconstructive Urology. *Id.* at ¶ 2. He has been a Diplomate of the American Board of Urology for the past 12 years. *Id.* at ¶ 4.

12. In his 14 years of practice, Dr. Flynn has performed over 1,000 pelvic examinations a year. *Id.* at ¶ 24.

13. Before the examination began, Ms. Freitas mentioned to Dr. Flynn she was having cramps and pelvic pain. *Id.* at ¶ 10. Though Dr. Flynn performs examinations under

anesthesia in rare instances, Dr. Flynn did not believe that was indicated in this case because of the fact that Ms. Freitas's other healthcare providers and Plaintiffs' expert Dr. Margolis were able to perform pelvic examinations of Ms. Freitas without anesthesia. *Id.*

14. Once the examination began, Ms. Freitas showed signs of pain, pulling away and beginning to cry. *Id.* at 14. As soon as Ms. Freitas began to cry, Dr. Flynn stopped the examination and gave Ms. Freitas a tissue. *Id.* at ¶¶ 14-15. After Ms. Freitas regained composure, Dr. Flynn asked her if she would like to a) stop the exam, in which case the DME report would be that the exam was incomplete, or b) continue the exam. *Id.* at ¶¶ 15-16. This was not a threat, as Plaintiffs imply, but a fact — Dr. Flynn's report would be incomplete if the examination was incomplete. Ms. Freitas chose to continue the exam. *Id.* at ¶ 17.

15. Upon continuation of the exam, Dr. Flynn made efforts to make the examination less painful for Ms. Freitas. For example, Dr. Flynn used a smaller speculum, even though it would compromise Dr. Flynn's view of the vaginal wall. *Id.* at ¶ 17. Dr. Flynn also chose to forgo a bimanual exam, as Ms. Freitas was uncomfortable and he did not consider it critical. *Id.* at ¶ 19. During the second portion of the examination, Dr. Flynn asked Ms. Freitas to push or strain. *Id.* at ¶ 18. Known as the Valsalva maneuver, this is a routine part of an examination for urinary incontinence or prolapse. *Id.*

16. During the second part of the examination, Ms. Freitas was not tearful and did not appear to be in pain. *Id.* at ¶ 17. Ms. Freitas asked Dr. Flynn the cause of her pain and if it was "her mesh," and he responded that it was not part of the DME for him to share any such opinions. *Id.* at ¶ 20.

17. After the examination, Dr. Flynn left the room and returned after Ms. Freitas was dressed. *Id.* at ¶ 21. Dr. Flynn asked Ms. Freitas if she would like to use the restroom, which

she did, and he showed her where it was. *Id.* After she exited the bathroom, Dr. Flynn informed Ms. Freitas that the DME was complete and walked her to the waiting area. *Id.* At this point, she was not crying, had regained composure, showed no signs of bleeding, and was not in distress. *Id.* at ¶ 22.

18. Contrary to Ms. Freitas's allegation that Dr. Flynn said "he had to hurry because his next appointment was there," he had no other patients or exams that day and never rushed her. *Id.* at ¶ 23.

19. In every examination, including Ms. Freitas's, Dr. Flynn makes every effort to perform the examination as thoroughly, carefully, and gently as possible. *Id.* at ¶ 24.

**Plaintiff: Sandra Wolfe. Plaintiff's Attorney: Derek Potts and Richard A. Voytas. Defendant's Physician: Christina Pramudji, M.D. (Houston, TX). Date of Exam: 2/19/2016**

20. Plaintiffs describe a scheduling miscommunication that occurred with respect to a DME of Ms. Wolfe which was to be conducted by Dr. Pramudji at her offices. Not only do Plaintiffs omit key facts in describing what occurred, but, as an initial matter, nothing about this scheduling conflict constitutes the "special circumstances" that would require the need for a third party observer, or audio recording, of Ms. Wolfe's DME – the relief Plaintiffs request in their motion.

21. Additionally, though in their motion Plaintiffs describe Ms. Wolfe's lack of mobility (Pltfs' Mot. at 4-5), this too is an exaggeration. No request for an attendant was made by her counsel, and, as Ms. Wolfe has testified, she does the laundry and most of the household chores (Ex. D, Wolfe Dep. (11-5-15) at106:6-10); and travels frequently, including trips to South Africa, South Dakota, Sacramento, California, and Montana. *Id.* at 108:9-13; 111:1-24; 110:1-9;

109:21-24; 108:5-9. As she describes herself: "I'm a very, very healthy person. . . . When I go places, people have – don't believe I'm the age that I am." *Id*. at 93:18-94:10.

22. As for the scheduling conflict, Plaintiffs misconstrue the facts.

23. Specifically, Dr. Pramudji provided defense counsel the date and time for the DME that was scheduled for Ms. Wolfe – February 19, 2016 at 1:30 in Houston, Texas. Ex. E (email string from 2.12.16 through 2.19.16between defense and Plaintiff's counsel regarding Ms. Wolfe DME and subsequent circumstances). Unfortunately, it was a simple mistake that confirmation of the appointment was not communicated to Dr. Pramudji's staff – a mistake that was remedied within a few minutes of its discovery when Mr. Voytas called defense counsel, Ms. Strauss, about the mix-up.

24. Ms. Strauss explained to Mr. Voytas that due to a miscommunication, Dr. Pramudj was in surgery, but would be available later that day to conduct the examination at around 3 pm, approximately an hour and a half from the originally scheduled appointment. Ms. Strauss also identified for Mr. Voytas another flight for Ms. Wolfe; offered to change her flights for her; and assured Mr. Voytas that Ms. Wolfe's return home would be unaffected. A hotel room for Ms. Wolfe had already been reserved in St. Louis, so she would not be making the additional 3 hour trip back to Elrod, Missouri, that night. *Id.*

25. Mr. Voytas reached Ms. Wolfe regarding the proposed new time, but she only stayed one hour after her appointment (until 2:30) rather than the additional half hour when Dr. Pramudji was to free up from surgery. *Id*. No explanation was provided for why Ms. Wolfe refused to stay for the appointment when she knew that Dr. Pramudji would see her.

26. Plaintiffs are seeking a tactical advantage here due to a minor scheduling conflict. They have said they refuse to submit to a DME and seek unreasonable restrictions as a result of

9

this brief one and a half hour delay in Ms. Wolfe's appointment. This would be inequitable, particularly because Mrs. Wolfe traveled to Houston for *2 IME's* with plaintiff's IME physicians Drs. Gonazales and Dr. Reeves and because those physicians claim to have found physical findings not found in any of Ms. Wolfe's medical records.

**Plaintiff: Cherise Springer. Plaintiff's Attorney: Mason Boling. <u>Defendant's Physician: Melvyn Anhalt, M.D. (Houston, TX).</u> Date of Exam: 2/24/2016**

27.   Plaintiffs' description discussing the DME of Cherise Springer is factually inaccurate and does not support for the relief requested by counsel. It is not supported by a declaration or other evidence. Although not required to do so under PTO 214, Ethicon and Dr. Anhalt agreed to allowing Ms. Springer's husband to remain present for the entire examination. Ex. F, Affidavit of Melvyn Anhalt, M.D. ("Anhalt Aff.") ¶¶ 2, 4. Dr. Anhalt's nurse, Ms. Danielle Word, was also present for the entire examination. Ex. G, Declaration of Danielle Word ("Word Dec.") ¶¶ 1, 2, 7; Anhalt Aff. ¶ 4. Both Dr. Anhalt and Ms. Word have provided sworn affidavits refuting Ms. Springer's claim that Dr. Anhalt's examination was rough, that he was combative and/or argumentative, or that he acted inappropriate in any way. Word Dec. ¶¶ 4, 7; Anhalt Aff. ¶¶ 5, 7. To the contrary, both Dr. Anhalt and Ms. Word observed that Ms. Springer was disagreeable and hostile during the examination. Word Dec. ¶ 4, 7; Anhalt Aff. ¶ 5

28.   When Dr. Anhalt requested an external bladder ultrasound, Ms. Springer refused and called her lawyer during the examination. Word Dec. ¶ 6; Anhalt Aff. ¶ 5. Dr. Anhalt did not impede or threaten her in any way to prevent her from contacting counsel – who ultimately instructed her to allow Dr. Anhalt to perform the ultrasound. Word Dec. ¶ 6; Anhalt Aff. ¶ 5. Dr. Anhalt also did not suspend his examination when Mr. Springer violated the parties' agreement by participating in the history / interview portion of the DME. Anhalt Aff. ¶ 6. It should also be noted that Dr. Anhalt performed a DME on another litigant the same day, Ms.

Melissa Clayton, who was so pleased with Dr. Anhalt's treatment of her that she asked if he would be her doctor. Anhalt Dec. ¶ 10.Plaintiffs' allegations with respect to Dr. Anhalt's examination of Ms. Springer are unsupported, inaccurate, and do not support any modifications to the Court's prior order.

**Plaintiff: Karen Forester. Plaintiff's Attorney: Mason Boling. <u>Defendant's Physician: Lee Congleton (Knoxville, TN).</u> Date of Exam: 2/25/2016.**

29. Plaintiffs, who offer no evidence to support their accusations, mischaracterize what Dr. Congleton told Ms. Forester during her DME regarding her mesh. They claim he "told Ms. Forester that the mesh was not the cause of her problems and that she absolutely should not have it taken out" – though the essence of what they say is true, it was not conveyed in this way, as Dr. Congleton's report shows:

> I discussed findings with patient. It seemed on my exam, and she agreed, that upon palpating the sling it seemed to be non-tender. It was in the appropriate mid urethral position without any evidence of erosion or inflammation. The sling in my opinion is still probably improving her continence and I would definitely not recommend removing.

Ex. H, Congleton Report (K. Forester) at 3.

30. In short, Dr. Congleton discussed his findings with Ms. Forester, and she agreed with his clinical assessment that, when he palpated her sling, it did not hurt. In his opinion, he would not recommend removal. The relevant point is that Dr. Congleton is a practicing physician, not a professional witness who routinely conducts IMEs. He has never been an expert in a circumstance like this. There is nothing in the governing case management orders preventing him from doing what comes naturally to him by virtue of his profession - telling the patient in front of him at that moment his own opinion about her medical condition. He hid nothing. He was clear and up-front by putting it in his report.

31. What Dr. Congleton did was ethical and legal and Plaintiffs can examine him about that opinion in a deposition. The solution is not to make this process more contested and adversarial by filling the room with monitors. Nothing that occurred in Ms. Forester's DME constitutes grounds for any revisions the scope of Wave I DMEs.

**Plaintiff: Constance Daino. Plaintiff's Attorney: Fidelma Fitzpatrick. <u>Defendant's Physician: Cynthia Bergmann, M.D.</u>**

32. Plaintiffs offer no evidence to support their accusations against Dr. Bergmann. When Dr. Bergmann examined Ms. Daino on February 26, 2016, she first obtained written and verbal consent for the examination. Ex. I, Declaration of Cynthia Bergmann, M.D. at ¶7. She then performed a complete history and physical examination including breast, pelvic and neurological examinations, as is recommended by the American Congress of Obstetrics and Gynecology and the American Urogynecologic Society. This is also Dr. Bergmann's practice when approaching any new patient. *Id*. There was nothing improper about her examination.

33. Indeed, Dr. Bergmann went out of her way to accommodate Ms. Daino. Dr. Bergmann was accompanied by a chaperone for the pelvic exam, as is her custom. *Id*. at ¶8. When she asked for the bladder ultrasound, Ms. Daino demurred on the basis that it was invasive. Dr. Bergmann told her that she had been informed that it was permissible to do the study, so she suggested that Ms. Daino contact her lawyer to confirm that it was permitted. *Id*. She did so and was told that the ultrasound was allowed. Even so, Dr. Bergmann informed Ms. Daino that if she did not want the ultrasound then she would not do it. Dr. Bergmann also informed her that if she objected to any other part of the exam, she would not do it. Ms. Daino stated that she had no objections. *Id*.

34. A bladder ultrasound was done before and after her cough test. A Marshall test was not performed, as it had not been specifically permitted. With the exception of her concern

over the ultrasound, Ms. Daino was relaxed and co-operative throughout the examination. *Id*. at ¶ 9.

**Plaintiff: Patricia Conti. Plaintiff's Attorney: Renee Baggett. <u>Defendant's Physician: Marc Toglia, M.D. (Media, PA).</u> Date of Exam: 2/25/2016.**

35. Contrary to Plaintiffs' description of the circumstances surrounding Ms. Conti's DME, which is not supported by any evidence, during the history Dr. Toglia took from Ms. Conti, Dr. Toglia asked her about her symptoms and surgeries she had undergone for mesh removal to determine whether her recollection of these procedures was consistent or inconsistent with the medical records. Ex. J, Toglia Report (Conti) at 4-6. He confirmed that her sling was removed in pieces by Dr. Bolton first, then Dr. Murphy, who removed a portion abdominally, and later Dr. Lebed, who performed an autologous sling and who reported that he found a remaining portion. *Id.* at 2-6. Ms. Conti reported pain at the incision site where she has undergone numerous surgeries, including the hysterectomy. *Id*. at 5. Dr. Toglia did not tell Ms. Conti that her pain was from her hysterectomy. As stated in his report, Dr. Toglia believes the pain to be the result of these multiple surgeries. *Id.* at 6. ("It should be noted that this incision has been opened multiple times – initially for her hysterectomy, and subsequently by Dr. Murphy at the time of the TVT removal, Dr. Ledbed – it is the site where the autologous sling was harvested."). During the DME, Dr. Toglia did not try to get Ms. Conti to commit to his way of thinking. He did not offer her any insight into his way of thinking.

**Plaintiff: Patricia Ruiz. Plaintiff's Attorney: Renee Baggett. <u>Defendant's Physician: Bryan Flynn, M.D. (Centennial, CO).</u> Date of Exam: 2/29/2016**

36. Ms. Ruiz was examined on February 29, 2016, by Dr. Brian Flynn, with his medical assistant present. *See* Ex. C, Decl. of Brian J. Flynn, MD, ¶¶ 26, 33. The DME took one hour, about 50 minutes of which were spent taking Ms. Ruiz's medical history. *Id.* at ¶ 30.

Nothing that occurred during the course of this examination was improper or would require any modification of the scope of DMEs in this litigation.

37. Though it is true that before the examination, Ms. Ruiz was provided incorrect information about the location of the examination, the relevant point here is that Dr. Flynn had nothing to do with that. *Id.* at ¶ 26. Though unfortunate, it certainly would not have been prevented by the relief requested in Plaintiffs' motion.

38. As noted above, Dr. Flynn is Co-Director of the Female Pelvic Medicine and Reconstructive Surgery and an Associate Professor of Surgery/Urology at the University of Colorado Denver. *Id.* at ¶ 1. As part of his medical training, he completed an internship/residency in General Surgery, a residency in Urology, and a fellowship in Female Pelvic Medicine and Reconstructive Urology. *Id.* at ¶ 2. He has been a Diplomate of the American Board of Urology for the past 12 years. *Id.* at ¶ 4.

39. In his 14 years of practice, Dr. Flynn has performed over 1,000 pelvic examinations a year. *Id.* at ¶ 24.

40. Ms. Ruiz complains that Dr. Flynn was disorganized and unprofessional in taking her medical history and that he "scowl[ed] at her" when she attempted to correct errors in what he said to her and trivialized her complaints. [Doc. 1912, p. 7].

41. It is routine for a physician taking a medical history to read back to the patient what he heard in order to confirm its accuracy. *Id.* at ¶ 31. The "history of present illness" portion is the physician's narrative summary of the patient's current complaints, and the "chief complaint" portion is verbatim what the patient tells the physician, though it is not a transcript. *Id.* In taking her history, Dr. Flynn did not "scowl" at Ms. Ruiz or trivialize her complaints. *Id.* at ¶¶ 42-43.

42. During the physical examination, Dr. Flynn explained to Ms. Ruiz what he was doing during each portion of the physical exam and gave her the option of deferring the exam. *Id.* at ¶ 34. Ms. Ruiz elected to proceed. *Id.*

43. Ms. Ruiz did not show overt signs of pain, crying, grimace, bucking, or withdrawing in the examination. *Id.* at ¶ 35. Dr. Flynn asked Ms. Ruiz to estimate her pain on a scale of zero to 10, explaining that a 2 would be toothache, 10 would be the worst pain imaginable, and 4 would be pain "that would require a pain pill." *Id.* at 37.

44. After the examination, Dr. Flynn left the room and returned after Ms. Ruiz was dressed. *Id.* at ¶ 38. Dr. Flynn asked Ms. Ruiz if she would like to use the restroom, which she did, and he showed her where it was. *Id.* After she exited the bathroom, Dr. Flynn informed Ms. Ruiz that the DME was complete and walked her to the waiting area. *Id.* Dr. Flynn helped Ms. Ruiz to call her driver, and at her request, he waited with her until the driver arrived. *Id.* At this point, she was not crying and did not appear in distress. *Id.* at ¶ 39.

45. In every examination, including Ms. Ruiz's, Dr. Flynn makes every effort to perform the examination as thoroughly, carefully, and gently as possible. *Id.* at ¶ 41. He was never rough with Ms. Ruiz during her exam. *Id.* at 44.

**Plaintiff: Joyce Justus. Plaintiff's Attorney: Kimberly Wilson White. <u>Defendant's Examining Physician: Rebecca Ryder, M.D. (Chesapeake, VA).</u> Date of Exam: 2/29/2016**

46. Plaintiffs' description of what occurred at Ms. Justus's DME is not supported by any evidence and is far from what actually happened. Dr. Ryder was in her office at 8:30 am when the DME was supposed to start. She arrived to the office early that day for the DME. Ex. K, Decl. of Rebecca M. Ryder MD at ¶ 3. Indeed, prior to the DME, Dr. Ryder had informed her office manager, her nurse and her usual receptionist that Ms. Justus would be arriving for her

15

DME. If Ms. Justus spoke to someone who was not aware of the DME, it must have been that a different staff member happened to come to the window. *Id*. at ¶¶ 4-5.

47. It is not the normal practice of Dr. Ryder's office staff to ask patients what paperwork they brought with them, so she believes Ms. Justus elected to hand over the letter from her counsel on her own. That letter from Ms. Justus's counsel was put in Ms. Justus's chart, which Dr. Ryder reviewed before she commenced her examination. *Id*. at ¶ 6. In the letter, Dr. Ryder saw Plaintiffs' demands to audio record, to have her companion present during the exam, and to refuse cystoscopy. Before going in to see Ms. Justus, Dr. Ryder called defense counsel to get guidance on an appropriate response to the plaintiffs' requests. Defense counsel (Kelly Crawford) reviewed the court's IME orders with Dr. Ryder and provided copies to her. Their conversation lasted 10-15 minutes. Dr. Ryder "then showed up about 20 minutes later" because she was seeking guidance from defense counsel regarding Plaintiff's demands as set forth in the letter Ms. Justus handed over to the office staff. *Id*.

48. Ms. Justus was not "left in this exam room" during this time period as Plaintiffs describe; rather her companion was with her, until Dr. Ryder asked the companion to leave so that the exam could commence. Dr. Ryder then went in to see Ms. Justus and explained the court's rulings. Ultimately Ms. Justus's companion agreed to leave the exam room and did not seek to audio record any of the exam. Dr. Ryder's nurse Chanel was present during the exam to assist with the DME. *Id*. at ¶¶ 7-9.

49. And, finally, Dr. Ryder does not agree that the exam was so painful that Ms. Justus "almost came off the table." While Ms. Justus may have reported tenderness in particular points during the pelvic exam, Dr. Ryder believes it is a gross exaggeration to say she "almost came off the table." *Id*. at ¶ 10.

16

For all the reasons addressed above, Ethicon respectfully request that this Court enter an order denying Plaintiffs' Motion to Reconsider the Scope of Wave I Defense Medical Exams and for any other relief this Court deems appropriate.

Respectfully submitted,

/s/ Christy D. Jones
Christy D. Jones
Butler Snow LLP
1020 Highland Colony Parkway
Suite 1400 (39157)
P.O. Box 6010
Ridgeland, MS 39158-6010
(601) 985-4523
christy.jones@butlersnow.com

/s/ David B. Thomas
David B. Thomas (W.Va. Bar #3731)
Thomas Combs & Spann PLLC
300 Summers Street
Suite 1380 (25301)
P.O. Box 3824
Charleston, WV 25338
(304) 414-1807
dthomas@tcspllc.com

COUNSEL FOR DEFENDANTS
ETHICON, INC. AND
JOHNSON & JOHNSON

## CERTIFICATE OF SERVICE

I certify that on March 9, 2016, I electronically filed this document with the clerk of the court using the CM/ECF system, which will send notification of this filing to CM/ECF participants registered to receive service in this MDL.

/s/ Christy D. Jones
Christy D. Jones

30176233v2