

```
 1            IN THE UNITED STATES DISTRICT COURT

 2          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

 3                      AT CHARLESTON

 4

 5    _____
                                            )
 6    IN RE:  ETHICON, INC., PELVIC         )
                                            ) MDL NO.
 7    REPAIR SYSTEM PRODUCTS LIABILITY      ) 2:12-md-2327
      _____)

 8

 9

10            TRANSCRIPT OF TELEPHONE CONFERENCE
          BEFORE THE HONORABLE CHERYL A. EIFERT
              UNITED STATES MAGISTRATE JUDGE
11           FRIDAY, MARCH 11, 2016; 1:30 P.M.
                    HUNTINGTON, WV
12

13

14

15       Proceedings recorded by mechanical stenography,
      transcript produced by computer.
16
                  Mary A. Schweinhagen, RDR, CRR
17                 Federal Official Court Reporter
                    300 Virginia Street, East
18                    Charleston, WV  25301

19                  *** *** *** ***

20

21

22

23

24

25
```

```
 1    APPEARANCES: (All telephonically)

 2    For the Plaintiffs:

 3    BRYAN F. AYLSTOCK, ESQ.
      D. RENEE BAGGETT, ESQ.
 4    Aylstock, Witkin, Kreis & Overholtz
      17 East Main Street
 5    Suite 200
      Pensacola, FL  32502
 6
      FIDELMA L. FITZPATRICK, ESQ.
 7    Motley, Rice
      321 South Main Street
 8    Suite 200
      Providence, RI  02903
 9
      SEAN T. KEITH, ESQ.
10    MASON LEE BOLING, ESQ.
      Keith, Miller, Butler, Schneider & Pawlik
11    224 South 2nd Street
      Rogers, AR  72756
12
      MIKALIA MICELI KOTT, ESQ.
13    Herman, Herman & Katz
      820 O'Keefe Avenue
14    New Orleans, LA  70113

15    ANDREW WOELLNER, ESQ.
      The Potts Law Firm, LLP
16    1901 West 47th Place
      Suite 210
17    Westwood, KS  66205

18    KIMBERLY R. WILSON-WHITE, ESQ.
      Wilson Law
19    P.O. Box 10389
      Raleigh, NC  27605

20

21    For the Defendants:

22    ANITA MODAK-TRURAN, ESQ.
      BENJAMIN M. WATSON, ESQ.
23    Butler, Snow, O'Mara, Stevens & Cannada
      P.O. Box 6010
24    Ridgeland, MS  39158-6010

25                    *    *    *    *    *
```

1          THE JUDICIAL ASSISTANT:  Good afternoon.  This is

2     Laura, Judge Eifert's judicial assistant, and I would first

3     like to confirm the court reporter today, Mary Schweinhagen,

4     is on the line?

5          THE COURT REPORTER:  Yes, Laura, I'm here.

6          THE JUDICIAL ASSISTANT:  Who is on the line for

7     plaintiffs' counsel, please?

8          MR. AYLSTOCK:  Hi, Laurie.  This is Bryan Aylstock

9     on behalf of the plaintiffs.

10          MS. BAGGETT:  Renee Baggett also on behalf of the

11     plaintiffs.

12          THE JUDICIAL ASSISTANT:  Thank you.

13          MS. FITZPATRICK:  Fidelma Fitzpatrick on behalf of

14     the plaintiffs.

15          MR. KEITH:  Sean Keith on behalf of the plaintiff,

16     Cherise Springer.

17          THE JUDICIAL ASSISTANT:  I am sorry.  Would you

18     repeat your last name, please?  I didn't quite get that.

19          MR. KEITH:  I am sorry.  Keith, K-E-I-T-H.

20          THE JUDICIAL ASSISTANT:  Someone is shuffling

21     papers or something; it's very hard to hear.  I am not sure,

22     but that's what it sounds like anyway, if we could maybe

23     refrain.

24        All right.  Continue, plaintiffs' counsel.

25          MS. KOTT:  Mikalia Kott on behalf of various

```
 1   plaintiffs.
 2           THE JUDICIAL ASSISTANT:  Could you repeat your
 3   name?
 4           MS. KOTT:  It's Mikalia, is the first name,
 5   M-I-K-A-L-I-A; last name, K-O-T-T.
 6           THE JUDICIAL ASSISTANT:  Thank you.
 7           MR. WOELLNER:  And Andrew Woellner for Ms. Wolfe,
 8   plaintiffs.
 9           THE JUDICIAL ASSISTANT:  Andrew, would you please
10   spell your last name?
11           MR. WOELLNER:  Certainly.  W-O-E-L-L-N-E-R.
12           THE JUDICIAL ASSISTANT:  Thank you.
13           MR. BOLING:  Mason Boling for various --
14           UNIDENTIFIED:  Kimberly Wilson-White on behalf
15   of Joyce Justus.
16           THE JUDICIAL ASSISTANT:  I'm sorry.  Could Mason
17   repeat your name again, please?  I think that's what I
18   heard.
19           MR. BOLING:  Yes.  Mason Boling, B-O-L-I-N-G, for
20   various plaintiffs.
21           THE JUDICIAL ASSISTANT:  All right.  Thank you.
22       Is that all --
23           KIMBERLY WILSON:  Kimberly Wilson-White on behalf
24   of Joyce Justus.
25           THE JUDICIAL ASSISTANT:  I'm sorry.  Could you
```

1   repeat your name, please?

2           MS. WILSON-WHITE:  Kimberly Wilson-White.

3           THE JUDICIAL ASSISTANT:  All right.  Thank you.

4           MS. WILSON-WHITE:  On behalf of Joyce Justus.

5           THE JUDICIAL ASSISTANT:  All right.  Is there

6   anyone else for plaintiffs' counsel?

7       All right.  May I please have Ethicon counsel?

8           MS. MODAK-TRURAN:  Anita Modak-Truran on behalf of

9   Ethicon and Johnson & Johnson.

10          MR. WATSON:  Ben Watson on behalf of Ethicon and

11  Johnson & Johnson.

12          THE JUDICIAL ASSISTANT:  All right.  If that's

13  everyone, we are here in the case of Ethicon Pelvic Repair

14  Systems Products Liability Litigation, Case Number

15  2:12-md-2327, regarding plaintiffs' emergency motion to

16  reconsider the scope of wave 1 defendants' medical exams.

17  That's ECF number 1912.

18      Please hold one moment for the Judge.

19          THE COURT:  Hello.

20          UNIDENTIFIED:  Good afternoon, Your Honor.

21          UNIDENTIFIED:  Good afternoon, Your Honor.

22          THE COURT:  All right.  We are here on plaintiffs'

23  emergency motion to reconsider the scope of wave 1 defense

24  medical exams in the wave 1 cases.

25      And I appreciate you all getting your materials to me

1   so quickly.  I wanted to do this as soon as possible because

2   I know that there are exams probably being done as we speak

3   right now.

4        So I have read the materials.  Let me ask the

5   plaintiffs first if there is anything they would like to

6   highlight or anything they would like to add to what they

7   have written?

8            MR. AYLSTOCK:  Good afternoon, Your Honor.  Bryan

9   Aylstock on behalf of the plaintiffs.  Just a few

10  introductory comments, and I have invited the plaintiffs'

11  attorneys with particular plaintiffs where evidence has been

12  submitted to be on the phone as well to answer any

13  particular questions.

14       But we didn't bring this -- this brief motion for

15  reconsideration lightly, and we recognize and appreciate the

16  Court's prior ruling on the DME progress.  It's important to

17  note that we are not seeking to prohibit the defense medical

18  examinations in this motion for reconsideration but rather

19  just a certain portion of this Court's order which disallows

20  audio recordings for the process.  And we did that not

21  lightly.

22       To say that the coordination of the DME process has

23  been difficult is a gross understatement, and I know

24  Ms. Modak-Truran's on the phone and I think she'd be in

25  agreement with me on that.  It's not a slight on anybody's

1    efforts.  In fact, I know that the efforts of defense

2    counsel have been in good faith.

3         However, we've been forced to deal with a number of

4    complaints and tried to smooth over issues in this process,

5    everything from asking a woman in Mississippi to fly all the

6    way to Seattle.  I have an 82-year-old client from North

7    Carolina who is with a 52-year-old disabled son forced to

8    fly to New York for a DME.  I know there are some doctors

9    that are closer.  And then the case of Ms. Justus where she

10   had to travel 400 miles by car each way for her particular

11   examination.

12        None of this -- that's not why we're here, but it does

13   highlight the fact that we've been trying to work through

14   this, but certain things have forced us to bring matters to

15   the Court's attention.  And they generally fall in three

16   categories:

17        One relates to very painful, invasive, and, in fact,

18   hurtful and harmful examinations by certain IME physicians

19   in the context of the examination.  We've had some issues

20   where women have traveled hundreds and hundreds of miles

21   only to be told that their physician doesn't even know that

22   there is an examination that day and been turned away.

23        And then we've had some, some situations that are

24   highlighted for Your Honor where the physician is making

25   pejorative comments to our clients about the nature of their

1    claims and who's the innocent party and who's the victim

2    here and so forth.

3        But the stroke that broke the camel's back and the

4    reason that we felt compelled to file this motion was really

5    Ms. Freitas and the clients who have complained about the

6    very painful examinations.  So far there's only been, I

7    think, about 30 examinations, so there are a lot upcoming.

8    And of those 30, about one third have now had major, major

9    issues.

10       And I -- if the Court would permit, I'd like to concede

11   the floor to Ms. Fitzpatrick who represents Ms. Freitas to

12   kind of go over what happened with her and why we think we

13   need the audio recording.

14       MS. FITZPATRICK:  Good afternoon, Your Honor.

15   Thank you for the opportunity to address this issue with

16   you.

17       Monica Freitas is my client.  She has been working with

18   us closely on her case and been trying to cooperate with

19   everything that has been going on here.  And she was taken

20   for a defense medical examination; she had to go from Los

21   Angeles to Denver, which was extraordinary difficult for

22   her, but in light of the Court's order she complied with

23   going to Denver instead of finding a defense medical

24   examiner who was closer to her home and would help out more

25   with her scheduling issues, particularly with her children.

1      And she was -- and I know this personally -- very

2   nervous and very apprehensive about the exam.  She was

3   worried about it.  And she called us as soon as she got out

4   of the examination room.  And I can tell you, she was

5   hysterical.  She was literally beside herself, sobbing,

6   hysterically upset, in an extreme amount of pain.  She was

7   bleeding vaginally.  She was cramping.  And she quite

8   honestly, Your Honor, had felt completely violated by what

9   had happened to her in the exam room.

10      We set that forth in an affidavit.  I don't think I

11   need to go through all of the ins and outs of it, but

12   perhaps one of the most disturbing things to her was when

13   she told Dr. Flynn how painful the exam was, how difficult

14   it was for her, and he told her that she had to go through

15   with the exam; that she was required to do it; and that if

16   she didn't go through with the exam, he implied that there

17   would be adverse consequences to her legal action.

18      And so she felt completely intimidated.  She felt

19   completely alone and intimidated in that room.  She had felt

20   she had no one to speak for her or to comfort her or to help

21   her through that process.

22      And it was -- it was a very disturbing thing to receive

23   that phone call.  And it was also very disturbing as a

24   plaintiff's attorney to feel that we hadn't done enough to

25   protect her or that there was something going on that --

1    that we put our clients in this position.

2        And so not only did she have -- you know, she was then

3    miles and miles away from home.  She had to get herself out

4    to the Denver airport; she had to get herself home.  And by

5    the time she landed in California, she was still having

6    extreme vaginal pain, cramping, bleeding.

7        Dr. Flynn told her that the bleeding couldn't be on

8    account of his exam, that it must be that she was having her

9    period.  And no matter how she stressed that she wasn't on

10   her period, she knew she wasn't on her period, he wasn't

11   willing to consider anything else and he left her there.  He

12   left her in the examining room.  He left her there by

13   herself.

14       And so by the time she got back to California, she did

15   go to an Urgent Care facility and has been prescribed

16   medication, both muscle relaxants as well as pain reliever

17   because of the pain that she was having.  And she also later

18   had a fainting episode as a result of this.  So it was a

19   pretty egregious exam.

20       We have other clients who've -- who've been

21   inconvenienced, have had problems, things haven't gone

22   smoothly, but Mrs. Freitas was a really extreme case of what

23   has happened and has raised the issue certainly for us again

24   about requiring these women to go alone into these exams

25   that are so invasive and to be there without someone to

1   advocate for them, comfort them in case something like this

2   happens, to do whatever needs to be done.

3      And now we have a situation with Mrs. Freitas that her

4   version of what happened is going to be a he said/she said

5   of what happens in that room, of what Dr. Flynn said to her

6   or didn't say to her.  It's just extremely disturbing on a

7   personal level, but it's also disturbing on a -- you know,

8   as an advocate, as someone who is going to be trying

9   Ms. Freitas' case, the implications of what this -- this

10   incident raises for this litigation.

11      THE COURT:  All right.  Who would like to speak

12   then on behalf of the defendant?

13      MS. MODAK-TRURAN:  Your Honor, Anita Modak-Truran,

14   and I will speak on behalf of the defendants.

15      I will tell you that everything this Court has just

16   heard, as well as the papers filed by the plaintiffs,

17   demonstrates again the wisdom of this Court's prior orders

18   that there not be audio recordings and there not be some

19   third party selected by the plaintiffs because it will only

20   increase the adversarial process.

21      All of our physicians that have been retained by

22   Ethicon and Johnson & Johnson to conduct the IMEs have at

23   all times acted professionally and courteously in their

24   dealings with them.  And I find that while Ms. Freitas has

25   her version of the events, Dr. Flynn has prepared a

1  declaration.  He has reviewed this order.  And let me just

2  go through a little bit about what Dr. Flynn says about it

3  and why it goes to the wisdom of this Court's prior ruling.

4       Because if we add audio and other things, we will be

5  compounding what is a very difficult situation with

6  examining room litigation.  And that's exactly where we're

7  at right now.  When Dr. Flynn -- first of all, he is a

8  urologist.  He specializes in female pelvic medicine and

9  reconstructive surgery.  He is the co-director of the female

10 pelvic medicine and reconstructive surgery group.  He's an

11 associate processer of surgery and urology at the University

12 of Colorado in Denver.  He attended medical school at

13 Temple.  He did further training in Pennsylvania.  He is

14 licensed to practice law.  He is a diplomate of the American

15 Board of Urology.  He is an impeccably qualified physician.

16      And to have this type of accusations upon him, we

17 think, is designed to have a chilling effect on our experts.

18 Because, can you imagine, he was completely surprised when

19 we had to turn around in a very -- as we understood it, the

20 Court wanted to do the hearing on an emergency basis because

21 of upcoming IMEs, but we had to forward him that.  We had to

22 say, we need you to tell us what happened.

23      Now, the good news is Dr. Flynn is never alone in an

24 examining room with a patient.  None of our experts are.

25 There is always an independent witness there, somebody -- a

1    female assistant to make sure that when this comes up, that

2    we can be able to discharge these type of accusations.

3         He says in his declaration, which he veri -- which he

4    states under oath is true and correct, that he did examine

5    Ms. Freitas on February 24th, 2016; that he established with

6    her the expectations of the IME; and that there would not be

7    a doctor/patient relationship that would be established.

8         Ms. Freitas elected to travel to the IME alone.

9    Nothing prohibited her from bringing a companion.  There was

10   no medical necessity reason for her -- for Ethicon to pay

11   for them, but she certainly could have brought family and

12   friends as other people have done on other IMEs.

13        He told her that the IME would be similar to the one

14   that was performed by the plaintiffs' expert, Dr. Margolis.

15   He gave her expectation.  The IME only took an hour.  Most

16   of the time was spent taking down her history, and she did

17   mention that she was having cramps and pelvic pain.  That's

18   in his -- that's in his declaration.

19        He did the examination, and he said that he has his

20   assistant who was there in the room at the entire time.  He

21   explained to her during the entire -- and we're not talking

22   about a pelvic examination.  This is not some sort of

23   invasive procedure.  It is a normal, routine procedure that

24   women undergo all the time when they want to take care of

25   their gynecologic health.

1    He gave her the option to defer the examination, but he

2    did tell her that if she stopped, then he would write in his

3    report that she stopped.  There is nothing intimidating

4    about that.  That is a fact.

5        She did cry during the examination; he says that, and

6    he gave her a tissue.  When she had regained her composure

7    five minutes later, the medical assistant offered to comfort

8    her by holding her hand, and she declined that.

9        He continued on with the examination, and he used the

10   smaller speculum, which he --

11       When the exam was done, Ms. Freitas asked him

12   questions.  He did not give a bimanual exam because she said

13   she was uncomfortable with that, and the doctor did not

14   think that this was a critical part of her exam and he did

15   not do that.

16       Ms. Freitas asked him if -- what was the cause of the

17   pain, was it her mesh, and he responded that it was not part

18   of the IME for him to reveal to her the physical exam

19   findings or share the opinion.  We all know here on this

20   call that that will be in the report and that whatever notes

21   he has will be disclosed to the other side.

22       Ms. Freitas, after she was dressed, the doctor came

23   back out.  He sat next to her.  He asked her politely if she

24   wanted to use the restroom.  She did.  She -- he told her

25   that the IME was complete, that she was free to leave.  He

1    walked out with her to the waiting area.  There was a cab,

2    and she left.

3        When she left the examination room, there was no

4    crying.  She was composed.  There was no signs of bleeding.

5    And she did not appear in distress.  She had -- he had no

6    other patients that day, and he said he did not feel that he

7    rushed her.

8        He's been practicing medicine for 14 years.  He's

9    performed over 1,000 pelvic exams, and he makes every effort

10   to be as thorough, careful, and gentle as possible.

11       He says that under rare circumstances there are -- can

12   be a need to perform an exam under anesthesia, and that

13   would be where there is children or patients with physical

14   or mental disabilities or fistulas; but he determined that

15   the fact that Mrs. Freitas had other providers that had

16   performed pelvic examination without an anesthesia, that

17   Dr. Margolis was able to perform a pelvic exam without

18   anesthesia, he made a medical judgment that anesthesia was

19   not indicated for her.

20       And that's just one of the cases.

21       All of our doctors that were still in the country, we

22   have declarations for.  I think there was one doctor that

23   was out of the country, but we provided his report.

24       I agree with Mr. Aylstock that his process of going

25   through the IMEs has been challenging.  I think certainly

1    that with the Aylstock firm and with the Cart -- Cartmell

2    firm, the parties have been working very hard to work

3    through different obstacles.

4         For example, one of the plaintiffs here -- and I know

5    because some of this I am personally involved with -- was a

6    lady who decided that she wanted to go 400 miles in a car

7    instead of flying.  And, you know, I didn't really

8    understand why she would prefer to take a long car ride

9    rather than fly, but it was explained to me by her lawyer

10   that that's the way she wanted to do it.  We made

11   arrangements to have a limo service pick up her up at her

12   home and take her to the examination.  Because it was a car

13   service, we said, you know, if you want to bring a

14   companion, go ahead and bring a companion; you are going to

15   be in the car.

16        What we later found out in this situation -- and this

17   part is very, very troubling to us, because while we thought

18   everybody has tried to work within Court's orders for the

19   IMEs to work under very challenging deadlines -- this

20   particular plaintiff had with her a letter from her

21   plaintiff's attorney which actually was telling her what to

22   say during the examination, to make sure that she took

23   frequent bathroom breaks on the car ride, and that she

24   should go to the medical examination and tell the doctor

25   that she wanted to audio record it and that she wanted to

1   have her companion there.

2       And what our declaration shows that's attached in our

3   opposition is that when this particular plaintiff goes to

4   see the doctor, she provides this letter to -- to the intake

5   people and that goes in her chart.  And our doctor who's

6   performing the IME, who does not want to be in an

7   adversarial situation -- our -- our experts are working

8   professionals who do pelvic examinations all the time, and

9   the next thing you know, she has in her file this letter

10  saying that, you know, she's got to do this and do that and

11  the plaintiff is going to tell her certain things about

12  where she has her pain and her other history.

13      And so what she does is she does the proper things.

14  She called Kelly Crawford, who is the defense counsel on

15  that particular case, and decides what to do.  And

16  Ms. Crawford sends her a copy of this Court's order, which

17  is pretty clear that there is no audio and there is nobody

18  present.

19      And when we raised this, we didn't come running to the

20  Court with this issue, Your Honor.  What we did is we went

21  to -- we reached out to the leadership and said can you

22  please communicate with all members of your team that Judge

23  Eifert has ruled in this way, and we are trying to follow

24  her orders, and we are trying to reduce the adversarial

25  process under these challenging circumstances.  And the

1   response we got was this motion.  The response was this

2   motion.

3        Your Honor, I know that you've read the papers, but I

4   want to be very clear about this.  We believe that our

5   physicians, who are the best in their field, have acted

6   professionally at all times.  They have been courteous.

7   There have been scheduling difficulties; we admit that.  But

8   that is not the doctor's fault.

9        There is one doctor where a number was left off, and it

10  is unfortunate.  And I take full responsibility that there

11  was a mistake made like that.  It should not have been made.

12  I understand that if I -- if it was me and I was trying to

13  get to an IME and I didn't have the right address and I was

14  trying to be timely, I would be shaken up by that.  And we

15  have tried to do everything we can to make sure that that

16  never, ever happens again.  It should never have happened.

17       But the relief that the plaintiffs are seeking in this

18  case, the one to add audio recordings and to add another

19  person in that room, is not going to have the desired effect

20  of making this litigation any easier.  It's simply going to

21  escalate the adversarial process.  And I would respectfully

22  request that this Court stand by its original orders and

23  deny this motion for reconsideration.

24            MS. FITZPATRICK:  Your Honor --

25            MR. AYLSTOCK:  Your Honor -- I'm sorry.

1          MS. FITZPATRICK:  No.  I just wanted to address

2   one thing, Bryan, before you took up the more global issue.

3   On behalf --

4          (Court reporter interrupts.)

5          MS. FITZPATRICK:  -- of Mrs. Freitas.  This is

6   Fidelma Fitzpatrick; I'm Miss Freitas' lawyer.

7          I'll be honest.  I take exception to what was just said

8   by Ethicon because the implication appears to be that

9   Mrs. Freitas has misrepresented or made an affirmative

10  misrepresentation to this Court in this time-sworn affidavit

11  that she signed.  That is absolutely, completely, and

12  totally unfounded and untrue.

13         And I would note, Your Honor, this is precisely what

14  the problem is, and that there is right now differing

15  opinions and different factual recitations of what happened

16  in that exam room at that time.

17         I'd also note that the doctor had someone in there who

18  has a (phone beep) ally, whatever we want to call it, (phone

19  beep) was there alone.  And I think that the patent

20  unfairness of that position is pretty clear from the record

21  here.

22         But I take great exception.  I don't think that this is

23  designed to -- to hash out the details, but I take great

24  exception to the fact that Ethicon -- how Ethicon is

25  representing my client and her truthfulness on this call,

1   and, I would say, quite shocked by it, and I do believe that

2   it underscores every reasons why my clients have a right to

3   have someone to advocate for them and to be their witness to

4   what happens in those exam rooms.

5              THE COURT:  All right.  Well, let me -- let me say

6   this.  I have not changed my mind about recordings.  I don't

7   think that having an audio recording will help at all with

8   what you perceive to be problems in these visits.  I don't

9   think an audio recording of a vaginal examination is going

10  to be helpful.  I think it would be too confusing.  It could

11  be easily distorted.  I don't think anybody will really

12  understand any better what's going on in the examination

13  room by listening to an examination of a vaginal

14  examination.  So I'm not going to allow an audio recording.

15  I don't think that would be helpful at all.  I don't -- I

16  can't see that.

17      The next issue then would be the organization or

18  disorganization, and, Ms. Truran, you are going to have to

19  do something about that.  These people are traveling too far

20  to show up at addresses that are not correct addresses and

21  show up and have the doctor not know that there is -- that

22  they are supposed to be there or to have someone at the

23  front desk who doesn't know there is an IME scheduled.  I

24  mean, there's that -- those things have got to be worked

25  out.

1    And there is -- you know, maybe these are the only -- I

2    think there were 3 or 4 of those situations listed out of

3    the 10 that were given to me.  That's, you know, 30 percent

4    of the 10 they gave me.  That's way too many.  Maybe out of

5    the 30 that were done, it was only those 3 or 4, but even

6    still, when you've got somebody who's traveling as far as

7    these women are traveling, there shouldn't be errors like

8    that.  So I could see, you know, maybe 1 out of 100, but not

9    3 or 4 or 5 out of 30.  That's too high of an error rate.

10    So you need to get on your people that are doing the

11    scheduling, and somebody needs to be very conscientious

12    about making sure that everybody is on the same page.

13    Also, I think we talked about the fact that I -- I

14    really wanted the defense to try to coordinate the IMEs so

15    the women wouldn't have to travel halfway across the

16    country, if there was some way that they could go somewhere

17    closer.  Maybe you are trying to do that and you just

18    haven't been able to do it in certain circumstances.  I can

19    understand that.  But I think the organization needs to get

20    a little bit more attention.  So I would appreciate it if

21    you would do that.

22    But, again, you know, an audio recording in the

23    examination isn't going to help solve that problem for

24    you -- for the plaintiffs.

25        MS. FITZPATRICK:  Your Honor, I --

1            MR. AYLSTOCK:  Your Honor --

2            MS. FITZPATRICK:  Go ahead, Bryan.  I'm sorry.

3            MR. AYLSTOCK:  I hate to interrupt, Your Honor.

4    This is Bryan Aylstock on behalf of the plaintiffs.  On the

5    recording audio issue in particular, one of the things we

6    brought out, and, in fact, defense brought it out in their

7    response, is that nearly an hour is being spent picking and

8    then reciting and then in some cases in a scowling manner

9    cross-examining our women about things that clearly were in

10   their deposition and so forth.

11           And I do think there is an effort to circumvent the

12   time limitations of PTO 205, and I hear what you are saying

13   about what the recording of a vaginal exam is really going

14   to say.

15           But in the case of Miss Freitas, as well as Miss Ruiz,

16   who also went to Dr. Flynn, when she jumps off the table in

17   pain or something like that, it would capture that, but it

18   would also capture this effort to -- to cross-examine our

19   plaintiffs.

20           And, finally, the other thing I'd say is these

21   physicians, okay, they have credentials.  We all have

22   physicians with credentials.  Dr. Flynn's been a KOL for

23   Ethicon for years.  He's been a consultant.  He is -- it is

24   an adversarial proceeding.  It just is.

25           These are paid consultants.  They have been paid vast

1    sums of money over and over and over again.  In a lot of

2    cases they've been in direct communication with Ethicon

3    personnel for years and years and years to influence

4    behavior of other physicians.

5        So I don't think it's fair to characterize them as

6    somehow holier than thou or -- and they are certainly not a

7    court-appointed expert.  It's a very different situation,

8    and if special circumstance aren't warranted here for audio

9    recording under the case law, I don't know what would be

10   considered special circumstances.

11        THE COURT:  Well, the case law does not support

12   you at all.  I've gone through the case law, and I went

13   through it again today, Mr. Aylstock, and the case law does

14   not support your position.

15        So what you're talking about is just run-of-the-mill

16   stuff.  And the federal courts have almost -- well, the

17   majority.  I won't say uniformly.  There have been a few odd

18   cases here and there like the one that was cited in your

19   reply memorandum from 1984, but most federal courts have

20   found that this so-called cross-examination by the

21   interviewing physician is just not a compelling or special

22   or good-cause reason to audiotape or record in any way an

23   IME.

24        Because there are plenty of ways for a plaintiffs'

25   attorney to rectify what they may perceive as the

1    cross-examination.  They are going to get the report.  They

2    are going to get the report in advance of any trial.  They

3    have their own client's medical records and history.  They

4    have their own IME.  They have their own experts.

5         So if there is some glaring piece of history or

6    statement in this physician's IME report that stands out and

7    is inconsistent with everything else in the record, then I'm

8    sure the plaintiff's attorney can point that out and

9    certainly undermine the credibility of the physician who

10   conducted the IME for the defendant.

11        So I'm not really -- that's not compelling to me.  I

12   think having it recorded is not the way that a typical

13   examination is done.  It's not the way any of the

14   plaintiffs' IMEs or any of the plaintiffs' examinations have

15   been done.  And it's not at this point an equal playing

16   field to have all of the defendants' examinations recorded

17   and none of the plaintiffs' examinations recorded.  So we're

18   not going to do that.  I don't see any compelling reason to

19   do it.

20        The main problem here I think that might be disturbing

21   is that if there are -- if there is mistreatment occurring

22   in the examinations.  That would be concerning to me.

23   However, I don't think audio recordings are going to really

24   uncover that because you are not going to be able to tell

25   what's going on, number one; and they can be distorted.

1    You know, I'm not saying the doctors are holier than

2   thou, but I also am not going to say the plaintiffs are

3   holier than thou.  We both know there are true believers on

4   both sides of the V here.

5        So, you know, I've read enough in these blogs to know

6   that there are plaintiffs out there that are vilifying the

7   attorneys in this case.  So, you know, I'm not -- I'm not --

8   I'm not naive enough to think that every doctor is gentle

9   and I am not naive enough to think that every plaintiff is

10  just sweet and kind and has no hidden agenda.

11       So, you know, I don't think we can assume -- and,

12  unfortunately, because we're not viewing, we can't deal with

13  this on a case-by-case basis.  I'm having to do what is

14  basically a blanket order.  So I am not going to order as a

15  blanket matter that there be audio recordings, and I am not

16  seeing anything that makes me think it would be helpful.  So

17  that is out of the picture for me.

18       What I do want to talk a little bit more about is the

19  third party in the room, what has been brought up in this

20  wave 1 situation.  I have said there is to be no plaintiff's

21  lawyer, there is to be no representative of a plaintiff's

22  lawyer, no employee of a plaintiff's lawyer, no nurse hired

23  by a plaintiff's lawyer, no consultant; nobody like that

24  should be present during the examination.  I've said that in

25  Boston Scientific, I've said that in Lewis, and I still

stand by that.  I firmly do not believe that anyone representing the plaintiffs' counsel in any way should be present at the examination.

I've also said, though, in Boston Scientific, if you've got a plaintiff who has a mental or physical disability, who has a caretaker, who's elderly and typically has somebody accompany them into their examinations, then they should be allowed to have that person accompany them into their examinations.  I am not going to change their normal, customary routine for when they get their doctors' examinations.

So the question in my mind is, is there some area in between there where you have a woman who may not have, per se, a mental or physical disability but for some reason is so terrified that they want to have a family member accompany them, and should that family member be allowed to stand there during the examination.  So that is -- that's where my mind is right now.

What I'd like to hear, I'd like to hear from both sides on that point.  What is the position -- I know what the position of the plaintiff would be is, yes, that person ought to be able to be there and present through the whole thing.  But if you want to say anything else on that, I'm going to give you the opportunity.

Then I'd like to hear from Ethicon about its position

1  on whether these women ought to be allowed to have a family

2  member, not only -- I agree with Ms. Truran.  They have

3  never said that these people can't take family members with

4  them, ride with them, sit with them in the waiting room.

5  Ethicon shouldn't have to pay for that.  But they certainly

6  haven't been precluded from taking somebody with them on the

7  trip if they want to, and pay the expenses.

8       The question is, if they take someone, a family member

9  I'm talking about, with them, should that person be allowed

10 to go into the examining room.  Now, you know, I think in

11 part it should depend on the physician and whether that's

12 something the physician allows or doesn't allow.  But I also

13 want to hear what the parties have to say about that.

14      So let me start with the plaintiffs.

15           MR. AYLSTOCK:  Your Honor, Bryan Aylstock on

16 behalf of the plaintiffs.  We did actually submit some sworn

17 testimony from one of the DME doctors that's performing

18 these examinations, Dr. Kenton, on that very point.  And I

19 will venture to say that virtually any doctor, OB/GYN, is

20 going to allow a husband or a next friend to be in the

21 examination room.  I've certainly done that with my wife

22 without any objection whatsoever on occasion.

23      And one of the things that Ms. Modak-Truran said just

24 now or a few minutes ago makes it even more important.  In

25 the context of what happened with Miss Freitas, as well as

1   what happened with Miss Ruiz, Miss Springer, Miss Justus,

2   Miss Bennett, where there was this extremely painful exam,

3   of course the doctor's going to say they didn't do anything

4   wrong.  And the doctor has the advantage of having

5   his employee, also being paid by Ethicon in the case of the

6   DMEs, directly or indirectly, to back him or her up on

7   whatever is said in that examination room.

8        So I certainly believe that we're going to have a he

9   said/she said.  One side shouldn't have the advantage of

10  some third party without the benefit of another third party,

11  particularly here when we are talking about very personal,

12  invasive exams that can be very painful, and where it's the

13  practice of Ethicon's own expert to perform these to allow

14  whoever the plaintiff wants -- and I hear what you are

15  saying, certainly not a lawyer or a representative of the

16  lawyer, but a friend of the plaintiff -- to be there during

17  this very traumatic experience.

18          THE COURT:  Well, before you -- before you --

19  before Ethicon talks, let me say this.  Two points on that I

20  want to make, Mr. Aylstock.

21       As far as the -- as far as it being painful.  You know,

22  a doctor doing this kind of examination doesn't know ahead

23  of time whether it's going to be painful or not.  And I

24  think as a woman, I know that from time to time those kinds

25  of examinations can be discomforting.  They can be slightly

1   painful.  And the doctor doesn't necessarily know ahead of

2   time.  So I don't think you should get too angry at the

3   doctor if the -- if the doctor caused your client some pain.

4   As long as when the client -- as long as the doctor stops

5   when the client complains of pain, then that's all the

6   doctor can do.  I mean, sometimes these examinations do

7   cause discomfort.  That's the way that they are, number one.

8       Number two, you know, the reason that the doctor has

9   the nurse in there is that that is the standard of practice.

10  It may even be the law in some states that they have to have

11  somebody else standing there.  So I don't know that that's

12  necessarily a fair comparison.  I don't think the doctor has

13  the person in there just so they have some extra person in

14  there to say that whatever they have done is correct or

15  right or to lie for them.

16      I think that's just the standard; they always have that

17  extra person in there with them.  And maybe that's, you

18  know, from like 100 years ago when you just -- those kind of

19  examinations, they didn't want to -- didn't want to have a

20  man and a -- doing that kind of examination on a woman

21  without another woman in the room.  I don't know.

22      But it's a little bit different than what we are

23  talking about now.  The one thing I don't want to interject

24  into this is I don't want it to become just a sideshow of

25  evidence, you know, where two people are saying one thing

1    and two people are saying another.

2         So let me hear from Ethicon.

3             MS. MODAK-TRURAN:  Your Honor, on behalf of

4    Ethicon.  You know, I understand that if somebody is

5    traveling and they want to have a companion in the

6    examination room, and I, you know, I would imagine that all

7    of our IME doctors would be okay with that.  In fact, there

8    was one instance where one of the plaintiffs wanted to have

9    her husband present in the room, and he was in the room.  So

10   I don't think that's an issue for us.  Especially if it

11   relieves somebody's discomfort in traveling.

12        We do the best we can to schedule these IMEs with

13   doctors who are experts in the case who have the expertise

14   in the product at issue.

15        The real issue is I don't think it's fair for Ethicon

16   to have to pay for a companion, a family member, to be there

17   unless that person is -- it's a medical necessity for them.

18   But if it's a matter of somebody traveling and, you know,

19   they have their daughter with them and gave them a level of

20   comfort, yes, I say that is perfectly acceptable.  I mean,

21   I've run it -- I'm going to say, yes, our doctors can

22   accommodate that.

23            THE COURT:  All right.  Then I think that settles

24   that.  I think that I agree with Ms. Truran, that Ethicon

25   should not have to pay the cost of that traveling companion.

1    I do think that then if the plaintiff wants to take a

2    family member or a very close friend -- but you,

3    Mr. Aylstock, I'm going to rely on you and Ms. Fitzpatrick

4    to make it clear to your colleagues it is -- that that

5    person is not to be a plaintiff's lawyer, a paralegal from a

6    plaintiff's office, a secretary, a paid consultant, a nurse,

7    anybody at all who is in any way connected with the

8    litigation from the representation side of it, if you

9    understand what I mean.  If it's a spouse, a family member

10   of the plaintiff, a close friend, but nobody, nobody else.

11   Do you hear what I'm saying?

12        MR. AYLSTOCK:  I do, Your Honor.  This is Bryan

13   Aylstock.

14        MS. FITZPATRICK:  Yes, Your Honor.  Fidelma

15   Fitzpatrick.

16        THE COURT:  I think that most doctors will be okay

17   with that.  I mean, I don't know why they wouldn't be.  You

18   know, I don't know why -- I don't know why most women would

19   want somebody else in the room, but maybe they do.

20        UNIDENTIFIED:  I would never want my husband in

21   the room if I was having that done but --

22        THE COURT:  I wouldn't either.  I wouldn't want

23   anybody in the room, I mean.

24        UNIDENTIFIED:  I know.  I --

25        UNIDENTIFIED:  No, sorry.

1          UNIDENTIFIED:  -- for the other side that would

2   like to have someone with her, but I don't think that

3   matters right now.

4          THE COURT:  So that's the way we'll do that then.

5   We still -- we will not -- I am not allowing any recordings,

6   but if the plaintiff wishes to take somebody in their family

7   or a close personal friend with them and wants for some

8   reason to have that person in the examining room -- but now

9   that person is just to stand there and comfort, not to

10  interject themselves in any way into the examination, of

11  course -- then that will be fine.

12      Is there anything else on this motion?

13          MR. AYLSTOCK:  No, Your Honor.

14          MS. MODAK-TRURAN:  Your Honor, the only other --

15          MR. AYLSTOCK:  Sorry.

16          MS. MODAK-TRURAN:  Bryan, do you mind if I just

17  finish this thought?

18          THE COURT:  Sure.  Go ahead.

19          MS. MODAK-TRURAN:  Your Honor did mention --

20      (Court reporter interrupts.)

21          MS. MODAK-TRURAN:  Anita Modak-Truran.  And what I

22  was going to address is the Court pointed out that we've had

23  logistical problems and that falls on Ethicon, and we are in

24  complete agreement that that should not happen.  We have put

25  measures in place to make sure that there is better

1    communication with the IMEs.  The doctors know that there is

2    the IMEs, but one area that we needed to do a better job was

3    to make sure that there is communication with the doctor's

4    staff that there is an IME, and that is under way, that we

5    are doing a better job on that.  We are confirming

6    addresses.  So I am hoping, Your Honor, we never have this

7    problem ever come back to you.  We are doing our best to

8    rectify that.

9             THE COURT:  That's good news.

10        Let me ask you all, while I have you on the phone,

11   you're probably not the right people, but I'm going to take

12   a stab at it.

13        I have two other motions that are pending, and I don't

14   even know if these are wave 1 cases, but they have to do

15   with PTO 205 and PTO 190, I think.  Are any of you who are

16   on the phone involved in either one of these motions?

17            MR. WATSON:  Your Honor, this is Ben Watson for

18   Ethicon.  I believe you are talking about the motion for

19   protective order on PTO 205, about filing confidential

20   documents under seal.  If so, then, yes, Your Honor, I can,

21   I can -- I can speak to that.

22            THE COURT:  Okay.  Really all I wanted to know

23   about that is it looks like we're going to need to set up

24   some kind of telephone call or some sort of process, and I

25   didn't know what you were all doing on that.

1      I was going to have Laura send out an email and was

2   (phone beep) who should get the email, and maybe you can

3   tell me, it would be who, you and?

4            MR. WATSON:  Your Honor, I and --

5            MR. AYLSTOCK:  Bryan Aylstock on behalf of the

6   plaintiffs.  We have not yet responded to that.  I did just

7   try to talk directly to Mr. Watson, but I did send you an

8   email before you filed that motion, sort of laying out our

9   position, and I think you said you didn't get it, but I'll

10  resend it to you.

11     But we're not yet -- we have not yet responded to that

12  motion, but I will probably be one of the ones involved in

13  the argument, if it gets that far.

14           MR. WATSON:  And this is Ben Watson.  Bryan, thank

15  you.  No, I don't recall receiving the email.  If you can

16  resend it, that would be great.

17           MR. AYLSTOCK:  Okay.  I'll do it right now.

18           MR. WATSON:  Thank you.

19           THE COURT:  Before we cut you off, with you,

20  Mr. Aylstock, and you, Mr. Watson, if either one or both of

21  you could send Laura just an email giving a summary of

22  the -- does this need to be expedited?  Are you going to go

23  on a regular briefing schedule?  Do you think you will need

24  a hearing?  Just give us some idea of what your thinking is

25  on this particular motion so we know how to plan for it.

1    That would be very helpful.

2              MR. AYLSTOCK:  Yes, Your Honor.

3              MR. WATSON:  Yes, Your Honor.

4              THE COURT:  And the other one, 190, has to do with

5    Ethicon not paying its half of the storage fee.  Does any --

6              MS. MODAK-TRURAN:  Your Honor, this is Anita

7    Modak-Truran, and I have been aware, made aware of that

8    issue.  I know there is -- that issue is pending in the

9    *Carpenter* case, and I have spoken to Andy Snowden, who is

10   our person on that.  We do need to pay that.  That is the

11   agreement.  It fell through the cracks.  It shouldn't have.

12   But we do -- we do owe half on that case, of the storage

13   fee.

14             THE COURT:  All right.  It look like --

15             MS. MODAK-TRURAN:  We checked.

16             THE COURT:  Yes.  It looks like there is several

17   cases.  So if somebody could check into that, maybe that's a

18   motion that can wind up -- those motions can be withdrawn at

19   some point.  So if somebody would follow up with that and

20   just let me know at some point what's going on with that,

21   I'd appreciate it.

22             MS. MODAK-TRURAN:  Your Honor, on behalf of

23   Ethicon, Anita Modak-Truran, I can do that.

24             THE COURT:  All right.  I appreciate that.  Thank

25   you.

1          UNIDENTIFIED:  The only other issue related to

2    sort of this IME processing, and I hope it's been worked

3    out, but in certain circumstances, Ms. Modak-Truran, you are

4    insisting on 1099s and tax information be provided by the

5    plaintiffs, and, you know, that creates all sorts of tax

6    issues and -- potentially when that really shouldn't, for

7    reimbursement, I mean.  And I think you have changed that,

8    but maybe if you could spread the word on that, that would

9    be helpful.

10          MS. MODAK-TRURAN:  All right.  I will check into

11   that.  Nobody actually told me that we were asking for 1099s

12   for reimbursement, so let me check into that issue.

13          UNIDENTIFIED:  Thank you.

14          THE COURT:  All right.  Does that cover it?

15          MR. AYLSTOCK:  I think so, Your Honor.

16          THE COURT:  All right.  Thank you all very much.

17          MR. AYLSTOCK:  Thank you, Judge.

18          MS. MODAK-TRURAN:  Thank you, Your Honor.

19       (Proceedings concluded at 2:19 p.m.)

20

21

22

23

24

25

```
1                    CERTIFICATE OF REPORTER

2

3         I, Mary A. Schweinhagen, Federal Official Realtime

4   Court Reporter, in and for the United States District Court

5   for the Southern District of West Virginia, do hereby

6   certify that pursuant to Section 753, Title 28, United

7   States Code that the foregoing is a true and correct

8   transcript of the stenographically reported proceedings held

9   in the above-entitled matter and that the transcript page

10  format is in conformance with the regulations of the

11  Judicial Conference of the United States.

12

13  s/Mary A. Schweinhagen

14  _____ March 18, 2016

15  MARY A. SCHWEINHAGEN, RDR, CRR
    FEDERAL OFFICIAL COURT REPORTER
16

17

18

19

20

21

22

23

24

25
```