# EXHIBIT C

Scott A. Guelcher, Ph.D.

1           SUPERIOR COURT OF THE STATE OF CALIFORNIA

                 FOR THE COUNTY OF KERN

2              CASE NO. S-1500-CV 279123 LHB

3

    COLEEN M. PERRY,                          PLAINTIFF

4

5   vs.

6

    HUNG T. LUU, M.D.,                        DEFENDANTS

7   JOHNSON & JOHNSON, a New Jersey

    Corporation; ETHICON, INC., a

8   New Jersey Corporation; and

    DOES 1-60,

9

10

11

12

13      The deposition of SCOTT A. GUELCHER, Ph.D.,

14  called by the Defendants for examination, taken

15  before Michelle E. Kerr, RPR, a Notary Public in and

16  for the Commonwealth of Kentucky, Daviess County, at

17  1719 West End Avenue, Nashville, Tennessee, on

18  December 18, 2014, commencing at 9:40 a.m.

19

20

21

22

23

24

25

Scott A. Guelcher, Ph.D.

```
 1    A    Yes.  It's been registered with the secretary

 2         of state.

 3    Q    As I understand it from your testimony at

 4         Huskey and other matters, you believe your

 5         expertise is in the field of biomaterials

 6         design?

 7    A    That's one way of saying it.  I have

 8         expertise in biomaterials science and

 9         engineering.  Another way you could say it is

10         that my work involves design of materials for

11         use as bone grafts or skin grafts, design of

12         biomaterials as diagnostics for studying

13         cancer metastasis.

14    Q    You have a Ph.D., correct?

15    A    Yes.

16    Q    Any higher education than that?

17    A    I did a postdoctoral research training at

18         Carnegie Mellon in biomedical engineering.

19    Q    But that was not something for which a degree

20         was earned; is that correct?

21    A    It's not a degree, but it's postdoctoral

22         training.  It counts as training.

23    Q    You're not a medical doctor, correct?

24    A    No, I'm not a medical doctor.

25    Q    You're not a pathologist?
```

Scott A. Guelcher, Ph.D.

1   A   I'm not a pathologist.

2   Q   You don't treat any patients, correct?

3   A   I don't treat patients.

4   Q   You're not a toxicologist, correct?

5   A   I'm not a toxicologist.

6   Q   What is the difference between your expertise

7       and Dr. Dunn's expertise?

8   A   So Dr. Dunn and I have overlapping expertise

9       in polymer science and engineering.  My

10      expertise is differentiated from Dr. Dunn's

11      in biomaterials, preclinical testing of

12      biomaterials, evaluation of biomaterials

13      using in vitro and in vivo models.  Those

14      would be some examples of how my expertise is

15      differentiated from Dr. Dunn's.

16  Q   Is Dr. Dunn more of a polymer chemist than

17      you are?

18  A   I would not state it this way.  I've had

19      extensive experience in polymer chemistry,

20      science and engineering.  I've worked for

21      several companies in the area of polymers.

22      My postdoctoral training was in polymers for

23      bone scaffolds.  And for the past ten years

24      at Vanderbilt, I've been working on polymers

25      and I taught -- and I developed and taught a

Scott A. Guelcher, Ph.D.

1       solution of 20 percent hydrogen peroxide with

2       cobalt chloride, and I don't remember the

3       exact amount.  That's the solution.

4    Q  And this solution is used for the in vitro

5       testing of mesh?

6    A  This solution was first developed by Dr. Jim

7       Anderson in 1993.  It was first published --

8       his group published a number of papers on it.

9       I published two papers with it.  It's used to

10      assess the degradation of biomaterials under

11      oxidative conditions that are similar to

12      those in the human body, more specifically,

13      that are similar to those under conditions

14      where there are adherent inflammatory cells

15      in the biomaterial, the foreign body

16      reaction, I should say, the effects of the

17      foreign body reaction on the stability of the

18      biomaterial.

19          It's a very general well-known

20      established test that's been cited dozens of

21      times.

22   Q  So did Ms. Talley or any of your other

23      graduate students do any in vitro testing on

24      the mesh?

25   A  No.  As I said before, that testing was done

Scott A. Guelcher, Ph.D.

```
 1    Q    My question is this.  It's straight forward.

 2         The fact that you see chemical oxidation,

 3         that does not mean that you would also see

 4         under SEM analysis physical degradation if

 5         you were to look at that particular time; is

 6         that correct?

 7                   MR. KUNTZ:  Objection.  Asked

 8         and answered.  Calls for speculation, and is

 9         an incomplete hypothetical.  But go ahead.

10    A    This is a speculative question.  What I'm

11         saying is, if there is oxidative changes, the

12         body of literature teaches within a

13         reasonable degree of scientific certainty

14         that there will be at some time physical

15         degradation.  That's what the literature is

16         teaching us.

17   BY MR. SNELL:

18    Q    You keep saying at some time there will be

19         physical degradation.  At what time will

20         there be physical degradation?

21    A    As I've said in my previous testimony, it's

22         unpredictable.  And that's a problem for the

23         design of the device, because it's subject to

24         changes that can happen that you can't

25         predict the timing of these changes and what
```

Scott A. Guelcher, Ph.D.

1         the implications will be.

2    Q    Do you have an opinion as to what is the

3         earliest point in time where there can be

4         physical degradation of Ethicon's Prolene

5         polypropylene used in TVT Abbrevo?

6    A    Again, that's a speculative question.  I

7         believe that upon implantation, the device

8         will be colonized by adherent inflammatory

9         cells.  This is well-known in the literature,

10        the foreign body reaction.  Those cells will

11        secrete species that oxidize it.  The timing

12        of all these events can depend on a number of

13        factors, the nature of the inflammatory

14        response where it's implanted, the mechanical

15        stresses in the environment, whether there is

16        a bacterial infection.

17            The timing can be highly variable.  It

18        can happen early or it can happen late.  The

19        point is that it's unpredictable.  That's

20        what I've been saying.

21   Q    Well, I would like to know what does the

22        literature teach you about the earliest point

23        in time when you can say there is physical

24        degradation of the Prolene polypropylene

25        mesh?

Scott A. Guelcher, Ph.D.

1          I don't want to rehash everything you

2          talked about in Huskey.  I know you talked

3          about what was seen in two years and I

4          believe five or seven years in a dog study

5          and things like that.  So with all of those

6          principles that you've already testified

7          about, let me just back up and re-ask it.

8     A    Okay.

9               MR. KUNTZ:  Objection.

10   BY MR. SNELL:

11    Q    What is the earliest point in time that you

12         can say that there is physical degradation of

13         the Prolene polypropylene mesh?

14    A    I just can't answer that question.  There are

15         too many factors that can influence it.  To

16         say -- again, it's too speculative.  It

17         depends on many factors in addition to the

18         chemical oxidation.

19    Q    Based on all of the literature that you saw,

20         what was the earliest time reported that

21         there was physical degradation of the Prolene

22         polypropylene mesh?

23    A    For Prolene polypropylene, I can say from the

24         Clave paper and the explants that were

25         studied in Clave, he recorded degradation in

Scott A. Guelcher, Ph.D.

```
 1            Abbrevo?

 2       A    I have not.

 3       Q    Have you done any testing of any type on TVT

 4            product for stress incontinence?  And when I

 5            stay TVT, I mean Ethicon's particular TVT

 6            product.

 7       A    So only the testing performed at Dr. Dunn's

 8            laboratory.  Just to be clear, Dr. Dunn did

 9            that testing.  I consulted and advised.  We

10            discussed it, agreed to do it, but Dr. Dunn

11            physically performed the testing.

12       Q    Tell me what testing did Dr. Dunn do on an

13            Ethicon TVT device.  As I had read -- and

14            I'll tell you why I'm asking.  As I had read

15            your Huskey deposition testimony, he had done

16            some testing on maybe one or more AMS meshes

17            and Boston Scientific meshes.

18       A    These are new testing that we've done.

19       Q    Let me just back up then.  So as I understand

20            it, Dr. Dunn has done some testing on Ethicon

21            TVT products?

22       A    Yes.

23       Q    Are you relying on that testing for your

24            opinions in the Perry case?

25       A    Let me look at my opinions for a minute.
```

Scott A. Guelcher, Ph.D.

1       Yes, I am relying on that testing. So I

2       should say, I formed my opinions based on the

3       literature review. My opinions are the same

4       as they were in the Huskey case on this

5       particular topic of oxidation and

6       degradation, and this testing further

7       confirms my opinions.

8           And the testing was specifically done to

9       answer the question that Ethicon raised

10      during the trial in August, that Prolene is

11      different from polypropylene and doesn't

12      oxidize because it has antioxidants.

13          So in the testing done by Dr. Dunn, the

14      goal was to answer the question can Prolene

15      in a TVT device oxidize and degrade. And we

16      saw oxidation and degradation of the surface

17      pitting in that testing, in the oxidative

18      medium that I was describing earlier. So the

19      testing was performed to answer a very

20      specific question of -- and to answer the

21      specific question of can the Prolene

22      polypropylene oxidize. That was the purpose

23      of the test.

24   Q  Where is this testing, all of the notebooks,

25      the results, the data generated from it that

Scott A. Guelcher, Ph.D.

```
 1         you are relying on?

 2    A    So this is on the disk that was provided.

 3    Q    Okay.  Show me where on the disk that that is

 4         this TVTG testing is located.

 5    A    I don't have a computer but --

 6    Q    Can you use Mr. Kuntz'?

 7              MR. KUNTZ:  He can.

 8         Let's go off the record for a second.

 9              (Off-the-record discussion.)

10    BY MR. SNELL:

11    Q    Counsel is looking at the thumb drive.

12         Obviously, I can't look at it and question

13         the witness about 6,000 files today.  Let me

14         just get some basic information about this

15         testing.

16         The testing that was performed on

17         Ethicon's TVT mesh, what specific device or

18         devices were the subject of the testing?

19    A    I believe it was the TVT.

20    Q    The original TVT retropubic?

21    A    I believe so.  And we also tested an

22         unstabilized polypropylene controlled, it had

23         no antioxidant.

24    Q    Okay.  You said it was an unstabilized

25         Prolene polypropylene?
```

Scott A. Guelcher, Ph.D.

```
 1    A    No.  It's polypropylene without antioxidants.

 2         So it would be the equivalent of -- in the

 3         Liebert paper where they tested the

 4         monofilament with no stabilizers.  It's a

 5         polypropylene that has no antioxidants.  So

 6         it's unstabilized polypropylene I would call

 7         it.

 8    Q    So you didn't test the TVT retropubic mesh

 9         with antioxidants to the TVT retropubic mesh

10         with antioxidants?

11    A    No, we can't get TVT without the -- the TVT

12         is made from Prolene that has that Prolene

13         antioxidant package, because that's what we

14         tested, that's what we could get.  So we had

15         that exemplar, Dr. Dunn had it, and we

16         compared that to the unstabilized

17         polypropylene.  We also tested two Boston

18         Scientific meshes, but that's not in the

19         materials that we presented.  That's

20         different.

21    Q    You are not relying on this Boston Scientific

22         testing for your opinions in this matter,

23         correct?

24    A    I am not.

25    Q    Okay.
```

Scott A. Guelcher, Ph.D.

```
1    A    I am just disclosing what we did.

2    Q    This TVT retropubic device that Dr. Dunn

3         tested, was it one single device or was it a

4         batch or numerous ones?

5    A    I believe it was one device with three

6         replicate pieces, three distinct pieces cut

7         from -- it was three or four.  I can't

8         remember the details.  I would have to look

9         at it.  But there were multiple replicates

10        cut from the same mesh.

11   Q    And the unstabilized polypropylene control,

12        where was that obtained from?

13   A    I would have to look at the document to look

14        at the documents for the exact source, but it

15        was purchased from a third-party vendor that

16        sells polypropylene with antioxidants,

17        unstabilized polypropylene.

18   Q    Do you know the vendor?

19   A    I can't remember.  It's in the documents.  I

20        would have to find it.

21   Q    Do you know who purchased this control?

22   A    Dr. Dunn purchased it and did all of this

23        work.

24   Q    You personally were not the one who did any

25        of this testing on the TVT retropubic device,
```

Scott A. Guelcher, Ph.D.

```
 1            correct?
 2    A    No.  As I said previously, Dr. Dunn and I
 3            consulted, and Dr. Dunn did all of the work
 4            physically through his company.
 5    Q    So am I correct that you did not do any of
 6            the physical testing of this TVT or the
 7            control?
 8    A    That's right.  Dr. Dunn did.
 9    Q    And that was done at his company?
10    A    Yes.
11    Q    Was that testing done out of his house?
12    A    I don't know.  Maybe some of it was done from
13            his house.  I don't remember.
14    Q    Do you know where the testing took place on
15            this TVT retropubic compared to the
16            polypropylene control?
17    A    It was done in his lab at Vanderbilt.
18    Q    Who paid for the testing that Dr. Dunn
19            performed comparing the TVT retropubic to the
20            unstabilized polypropylene control?
21    A    I should clarify that all of these responses
22            I'm telling you to the best of my knowledge.
23            And if Dr. Dunn contradicts what I'm saying,
24            it's because I didn't remember it correctly.
25            I believe that this testing was billed to the
```

Scott A. Guelcher, Ph.D.

```
 1            litigation, but Dr. Dunn would have to

 2            confirm that.

 3       Q    Is your basis for your testimony in that

 4            regard something that Dr. Dunn told you?

 5       A    Yes, I'm basing it on -- I have not seen

 6            those invoices.  That would be between

 7            Dr. Dunn and plaintiff's counsel.

 8       Q    Did Dr. Dunn physically do all of his

 9            testing?

10       A    Again, I believe that he did, but I don't

11            know the details of -- he would be the one

12            that would have to speak to that.

13       Q    Unfortunately, he is not identified as an

14            expert here.

15       A    I understand that.

16       Q    Were you present for any of the physical

17            testing of the TVT retropubic or the

18            unstabilized polypropylene control?

19       A    Was I present?

20       Q    Present meaning on the premises where the

21            testing was performed, such that you could

22            yourself observe the testing.

23       A    Well, the testing was just very simple.

24            Dr. Dunn placed the -- I'm trying to answer

25            your question as best I can.  So Dr. Dunn
```

Scott A. Guelcher, Ph.D.

```
1        placed the specimens in vials.  They were
2        weighted down with glass beads in this
3        oxidative medium that I was describing that
4        simulates the environment between the
5        adherent inflammatory cells and the
6        biomaterial.  I have seen those vials.
7             And then at different time points,
8        Dr. Dunn removed the test specimens, rinsed
9        and dried them, and measured RI spectra.  And
10       I've seen those dried specimens.  I've seen
11       the specimens, and so I have seen aspects of
12       the testing, but I didn't watch him do the
13       testing.  But the testing essentially
14       involves incubating  the material in a
15       solution, and then taking it out and testing
16       it by FTIR and SEM.
17    Q  When was this testing on the TVT retropubic
18       device done?
19    A  September and October of 2014.
20    Q  And it was on a single TVT retropubic
21       exemplar, meaning that mesh had not been in
22       the body at all?
23    A  That's correct.
24    Q  When did you first discuss with Dr. Dunn this
25       testing on the TVT retropubic exemplar?
```

Scott A. Guelcher, Ph.D.

```
 1    A    Same time frame.  Maybe August -- it would

 2         have been September of 2014 after the Huskey

 3         trial.  And, again, the motivation for the

 4         tests was based on Ethicon's statements

 5         during trial that we had not tested it and

 6         couldn't -- we could not say definitively

 7         that Prolene polypropylene oxidizes, and that

 8         was the motivation for the test.

 9             So this is what was said in Huskey trial,

10         we decided to do the test to answer that

11         specific question, can Prolene polypropylene

12         oxidize.

13    Q    Now, Dr. Dunn's Vanderbilt lab, is that on

14         the premises here at Vanderbilt?

15    A    Yes, his lab is at Vanderbilt.

16    Q    Do you know if any graduate students or

17         other people were involved in the testing?

18    A    Dr. Dunn has employees.  I know that.  To

19         what extent they were involved in the

20         testing, I can't speak to.  Again, Dr. Dunn

21         just did all of his.  I don't know those

22         details.

23             I should qualify my comment.  Dr. Dunn

24         does not have employees, but I know that he

25         does pay contractors for services like he
```

Scott A. Guelcher, Ph.D.

```
 1    A    But the questions are being phrased that

 2         you're trying to misrepresent my testimony

 3         and misrepresent what I'm saying.

 4    Q    I'm not trying to misrepresent your

 5         testimony.

 6    A    You are.

 7    Q    I'm asking you a factual question.

 8    A    And the question is --

 9    Q    Was there a horse in the room at the time of

10         the test, yes or no?  No.

11              Was there a macrophage in the test, yes

12         or no?

13              The interpretation, I will get to that,

14         but I have simple questions, sir, and I'm

15         entitled to simple answers if they're simple

16         questions.  You can talk to Mr. Kuntz all

17         night long about your interpretation.  That's

18         fine.  But I'm actually going to ask you

19         about your interpretation too.

20    A    And I'm entitled to answer questions as I

21         need to.  And I'm not going to be put into

22         this difficult position of having things

23         recorded as my testimony that's not what I've

24         ever been saying.

25    Q    You would agree that -- let me back up.  What
```

Scott A. Guelcher, Ph.D.

```
 1         is it that you believe this test on this

 2         single TVT device compared to the control

 3         shows?

 4    A    I believe that it shows Prolene polypropylene

 5         used to manufacture the TVT device can

 6         oxidize and degrade under oxidative

 7         conditions similar to those experienced in

 8         the human body after implantation.

 9    Q    What documents or files out of those 6,000

10         plus show the oxidation?

11    A    The oxidation is evidenced by FTIRs spectra

12         that were measured in weeks zero, one, two,

13         three, four and five.  In the FTIRs spectra,

14         we saw minimal hydroxl and carbonyl peaks

15         until week five, where we saw a significant

16         increase in the magnitude of the hydroxl

17         and/or carbonyl peaks, which was indicative

18         of a chemical induction.

19    Q    So what are the file names and the documents

20         that showed this out of the 6,000?

21    A    I don't remember the file names.

22    Q    Well, I'm entitled to know them.

23    A    I know.  And I have to look at it.  I don't

24         have it here with me.  I know that you're

25         entitled to have it, but I don't have it here
```

Scott A. Guelcher, Ph.D.

```
 1            Dr. Iakovlev's, but I don't know.
 2    Q     And you understand that doctors are the ones
 3            who actually do differential diagnoses and
 4            draw conclusions about what complications
 5            patients have?
 6    A     Could you explain differential diagnosis,
 7            please?
 8    Q     Let me ask you, do you know what a
 9            differential diagnosis is?
10    A     Not precisely, I don't think.  So I suppose I
11            wouldn't do that.  I mean, it sounds like a
12            medical term to me.
13    Q     Opinion number nine, explain that opinion to
14            me.  Clearly, this is different.
15    A     So after reviewing all of the Ethicon
16            documents and some published papers, my
17            conclusion was that this TVT Abbrevo mesh is
18            stiffer.  There are several e-mails from
19            inventors of the mesh, such as Dr. Della
20            Valle, Dr. Nelson, that observed this
21            increase in stiffness, complained about an
22            increase in complications, asserted that this
23            mesh was different, and you could not rely
24            upon TVT machine-cut mesh data to support the
25            notion that TVT Abbrevo is the same.
```

Scott A. Guelcher, Ph.D.

```
 1            do those calculations now, and I review them.

 2            There are software programs that you can use

 3            to do this.  It's pretty routine, I think.

 4       Q    The software plugs in the number of tests and

 5            the time points and it generates --

 6       A    We can do this with software, yeah.

 7       Q    You haven't published or presented on this

 8            test, correct, that was done with the TVT

 9            device and the pellet control?

10       A    We presented it at the AICHE annual meeting.

11            And I think those slides are on the reliance

12            list.

13       Q    For the TVT?

14       A    In that presentation, we did not identify the

15            source of the mesh.

16                    MR. KUNTZ:  I don't think that's

17            on there, Burt.  We will get it to you,

18            though.

19       A    We called it mesh 1, 2 and 3.  We did not

20            identify it as TVT.

21  BY MR. SNELL:

22       Q    Do you know if it was TVT or would you have

23            to go back and look?

24       A    Yes, it was TVT.  We chose not to disclose

25            that at that meeting.
```

Scott A. Guelcher, Ph.D.

| | | |
|---|---|---|
| 1 | Q | Where was this at? |
| 2 | A | The AICHE, it's the American Institute of |
| 3 | | Chemical Engineers.  If you would like, I can |
| 4 | | circle it on my CV.  Would that help you? |
| 5 | Q | Sure.  That's fine.  Or if you just want to |
| 6 | | look at your CV and tell me what page or |
| 7 | | number. |
| 8 | A | That's fine too.  On the CV, it's |
| 9 | | presentation number 154. |
| 10 | Q | Was that a presentation that you actually |
| 11 | | gave and presented or did someone else do it? |
| 12 | A | Dr. Dunn and I both gave the presentation. |
| 13 | Q | Was it presented orally? |
| 14 | A | It was. |
| 15 | Q | Okay.  So I would like to request a copy of |
| 16 | | that. |
| 17 | | Did you have to prepare a manuscript in |
| 18 | | connection with that? |
| 19 | A | No.  We submitted a short abstract, which is |
| 20 | | available online.  We elected not to submit |
| 21 | | an extended abstract. |
| 22 | Q | What was the reason why you didn't submit an |
| 23 | | extended abstract? |
| 24 | A | We typically don't do that for that meeting. |
| 25 | Q | Is that the only presentation you have made |

Scott A. Guelcher, Ph.D.

| | | |
|---|---|---|
| 1 | Q | And just so I'm clear, you didn't conduct any |
| 2 | | type of differential diagnosis to assess the |
| 3 | | cause of dyspareunia or pain or the potential |
| 4 | | causes, correct? |
| 5 | A | No. |
| 6 | Q | You didn't rule out any other cause or |
| 7 | | potential causes? |
| 8 | A | I didn't rule out any other causes. |
| 9 | Q | And you didn't investigate the rates of |
| 10 | | dyspareunia or pain in the general background |
| 11 | | and compare them to these cohorts? |
| 12 | A | I did not. |
| 13 | Q | And in Clave, it's fair to state that one |
| 14 | | cannot say that the complications did not |
| 15 | | occur before the degradation; is that right? |
| 16 | A | It's not clear from Clave the timing of those |
| 17 | | events.  My opinion is that these changes in |
| 18 | | the mesh led to those events.  The mesh |
| 19 | | changed and there was an adverse event. |
| 20 | Q | And the adverse events are also you mention |
| 21 | | on items number eight and nine, extrusions, |
| 22 | | inflammation, pain, and you mention erosions |
| 23 | | on nine, correct? |
| 24 | A | Yes. |
| 25 | Q | You didn't not do any differential diagnoses |

Scott A. Guelcher, Ph.D.

| | | |
|---|---|---|
| 1 | | on those, correct? |
| 2 | A | No. |
| 3 | Q | You didn't assess causation by ruling in or |
| 4 | | ruling out different causes, correct? |
| 5 | A | No, I didn't do that. |
| 6 | Q | In the testing that Dr. Kammerer did we |
| 7 | | talked about earlier, where in the first |
| 8 | | 5 percent of elongation of the mesh, the |
| 9 | | mechanical-cut and the laser-cut were |
| 10 | | similar, do you dispute that finding? |
| 11 | A | I don't dispute the finding that of the very |
| 12 | | low elongation.  They are similar but -- |
| 13 | Q | Okay.  That's my question. |
| 14 | A | Yeah.  Okay. |
| 15 | Q | Did you look at the clinical expert report |
| 16 | | that was done by two medical doctors at |
| 17 | | Ethicon with regard to the laser-cut mesh and |
| 18 | | elongation? |
| 19 | A | I think I reviewed that document, but I can't |
| 20 | | remember what it said right now. |
| 21 | Q | Did that document affect your opinions? |
| 22 | A | I would have to look at it again to see what |
| 23 | | it says.  I don't remember. |
| 24 | Q | Did you consider whether either of those |
| 25 | | doctors had any experience implanting slings |

Scott A. Guelcher, Ph.D.

```
 1    STATE OF KENTUCKY        )

 2                             )

 3    COUNTY OF DAVIESS        )

 4

 5        I, MICHELLE E. KERR, A NOTARY PUBLIC AT LARGE IN

 6    AND FOR THE COMMONWEALTH OF KENTUCKY, DO HEREBY

 7    CERTIFY:

 8        THAT SAID DEPOSITION WAS TAKEN STENOGRAPHICALLY

 9    AND ELECTRONICALLY BY ME AND THAT THE TYPEWRITTEN

10    TRANSCRIPT ABOVE IS A TRUE RECORD OF THE

11    TESTIMONY GIVEN; THAT I ALSO RECORDED AND

12    TRANSCRIBED ANY AND ALL OBJECTIONS MADE BY COUNSEL

13    AND THE REASONS THEREFORE; AND THAT I AM NOT A

14    RELATIVE OR EMPLOYEE OR ATTORNEY OR COUNSEL OF ANY

15    OF THE PARTIES, NOR A RELATIVE OR EMPLOYEE OF SUCH

16    ATTORNEY OR COUNSEL, NOR AM I FINANCIALLY INTERESTED

17    IN THIS ACTION.

18

19

20        IN WITNESS WHEREOF, I HAVE HEREUNTO SET MY HAND

21    AND AFFIXED MY NOTARIAL SEAL ON THIS _____ DAY OF

22    DECEMBER, 2014.

23                          _____

                            MICHELLE E. KERR, NOTARY PUBLIC

24

25    My Commission Expires:

          March 21, 2017

          March 21, 2017
```