# EXHIBIT D

Scott Guelcher

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

IN RE: ETHICON, INC., PELVIC    )
REPAIR SYSTEM PRODUCTS          )
LIABILITY LITIGATION            )
_____  )
                                )
THIS DOCUMENT RELATES TO THE    )Master File No.
FOLLOWING CASES IN WAVE 1 OF    )2:12-MD-02327
MDL 200:                        )    MDL 2327
                                )
Marty Babcock v. Ethicon, Inc.  )JOSEPH R. GOODWIN
Civil Action No. 2:12-cv-01052  )U.S. DISTRICT
                                )JUDGE
[Complete caption below]        )
_____

DEPOSITION OF

SCOTT GUELCHER

Taken on behalf of the Defendants

March 23, 2016

8:51 a.m.

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

ed529c64-35ef-4150-8686-915d23914a31

Scott Guelcher

1    Q.       Fair enough.  My question, though, as

2    it relates to pelvic organ prolapse products, have

3    you discussed those opinions as they relate to

4    pelvic organ prolapse products with anyone else?

5    A.       I -- I don't believe so.

6    Q.       Doctor, have you -- have you ever told

7    any doctor at Vanderbilt that you have concerns

8    about the safety of polypropylene or PROLENE mesh?

9    A.       I had some email correspondence with a

10   Vanderbilt OB/GYN.  I had some -- we -- it wasn't

11   about -- it wasn't about opinions about the

12   products.  It was about research on polypropylene

13   oxidation.  But I haven't discussed my opinions

14   with them.

15   Q.       Okay.  Do you know how many doctors

16   practice medicine at Vanderbilt?

17   A.       No.

18   Q.       Have you ever told a doctor at

19   Vanderbilt that you believe PROLENE mesh degrades

20   via oxidation?

21   A.       No.  I haven't had the opportunity.

22   Q.       Doctor, you -- your lawyers -- or a

23   lawyer sitting to the right of you is producing me

24   a flash drive with all the documents you have

ed529c64-35ef-4150-8686-915d23914a31

Scott Guelcher

Page 21

1    A.      Yes, I am.

2    Q.      The Society for Biomaterials?

3    A.      Yes.

4    Q.      Research Society For Bone and Joint
5    Injectable Biomaterials?

6    A.      Yes.

7    Q.      I noticed that your expert report,
8    which is marked as Exhibit 2, doesn't include those
9    professional societies.  Why not?

10   A.      They're listed on my CV, which is part
11   of the report.  I -- I don't know why.  I just
12   didn't list them.

13   Q.      Doctor, do you recall -- did you ever
14   read the deposition transcript from the Mullins
15   litigation?

16   A.      I don't remember.  I've -- I just don't
17   remember.

18   Q.      Have any of your opinions changed since
19   you were deposed in the Mullins litigation?

20   A.      No.

21   Q.      What has been your total billing amount
22   that you have billed plaintiff attorneys since the
23   Mullins litigation?

24   A.      Oh, in this particular case.  I

ed529c64-35ef-4150-8686-915d23914a31

Scott Guelcher

1   submitted a bill for the report, for 10,000 for the

2   medium report.

3       Q.      What about any charges for your time?

4       A.      For this litigation?  I don't think so.

5   Oh.  No.  This -- this is the only -- that was the

6   only one for this litigation.

7       Q.      Have you done any additional work since

8   the Mullins deposition regarding mesh?

9       A.      What do you mean by "work"?  Do you

10  mean testing or reading?  I'm not sure what you

11  mean.

12      Q.      Well, any other work that you believe

13  is applicable to the mesh litigation since you were

14  deposed in Mullins in September 2015.

15      A.      I -- I've not done any -- any testing.

16  I've done more reading, research.  But I've not

17  done any testing since that time.

18      Q.      What additional research have you done?

19      A.      Reviewing the newer papers that were in

20  the report, reviewing the -- the Ethicon internal

21  documents, that sorts of activities.

22      Q.      The "newer papers" that you're

23  referring to, are those contained in your expert

24  report?

ed529c64-35ef-4150-8686-915d23914a31

Scott Guelcher

1    Q.     Do you still defer to Dr. Dunn on the

2    interpretations of the FTIR spectra?

3    A.     I do.

4    Q.     And you disclosed this work in the

5    Perry litigation, didn't you?  That was for TVT

6    ABBREVO?

7    A.     The ABBREVO would be another product.

8    Yes.

9    Q.     And you attempted to rely on this paper

10   in the Perry litigation, didn't you?

11                  MR. BOWMAN:  Object to form.

12                  THE WITNESS:  I -- I just don't

13   remember.  It may have been on the -- on the -- on

14   the reliance list, but I don't -- I know it came up

15   in the deposition, but I deferred to Dr. Dunn for

16   the experimental details in the deposition.  That's

17   what I remember.

18   BY MR. HUTCHINSON:

19   Q.     Did you rely on this, Doctor, in

20   forming your opinions in the Perry litigation

21   regarding TVT ABBREVO?

22   A.     I don't believe so.  I mean, my

23   opinions have not changed in some time.  So this

24   was supplemental information that supported my

ed529c64-35ef-4150-8686-915d23914a31

Scott Guelcher

1    opinion, but -- and it was on the reliance list

2    but -- I think it was.  I just -- I can't remember

3    the details.

4        Q.     Doctor, you relied on this work, that

5    we've marked as Exhibit 3 to your deposition, in

6    the Winebarger versus Boston Scientific litigation;

7    is that correct?

8        A.     Winebarger?  What product was this?  I

9    can't remember the names -- the plaintiff name.

10       Q.     It was a lawsuit styled Winebarger,

11   W-i-n-b-a-r-g-e-r, versus Boston Scientific.

12       A.     That name just doesn't sound -- was it

13   part of a wave?  Was it -- I just don't remember

14   the plaintiffs' names probably.

15       Q.     Do you recall relying on this work that

16   was marked as Exhibit 3 in the Winebarger versus

17   Boston Scientific litigation?

18       A.     I don't.  Because I don't recall the

19   litigation.  I just -- I don't -- the -- the

20   plaintiff's name is -- that doesn't sound familiar

21   to me.

22       Q.     Okay.  Doctor, when we look at Exhibit

23   3, what product was used in your work?

24       A.     It's been some time.  I don't remember.

Golkow Technologies, Inc. - 1.877.370.DEPS

ed529c64-35ef-4150-8686-915d23914a31

Scott Guelcher

1    an answer, based upon a reasonable degree of

2    scientific certainty.  Can you testify today, to a

3    reasonable degree of scientific certainty,

4    regarding the specific names of the products used

5    in this experiment?

6        A.       I mean, I believe, to a reasonable

7    degree of scientific certainty, that's what we --

8    that's what we used.  That's what I remember.  You

9    know, I work closely with Dr. Dunn.  Our offices

10   are right beside each other.  So, I mean, he --

11   he -- that's what I believe he did.

12       Q.       Okay.  And, Doctor, when you were

13   deposed in September in the Mullins litigation, you

14   didn't rely on this abstract for your opinions in

15   that; is that correct?

16       A.       I don't believe so.

17       Q.       And you're not relying on the abstract

18   that you published for your opinions in this

19   litigation; is that correct?

20       A.       No, I'm not.

21       Q.       Okay.  Why not?

22       A.       Well, we -- we -- we would like to

23   publish it.  And that's something -- that's part of

24   what we're -- we -- we just -- we're -- we're

ed529c64-35ef-4150-8686-915d23914a31

Scott Guelcher

Page 36

1    working on it.  We don't know what we're going to

2    do yet.  It's just -- you know, we have -- very

3    busy, and it's -- I don't -- I don't know what the

4    plan is.  But I'm not relying on it because we

5    haven't published it.

6        Q.      Okay.  Any other reasons?

7        A.      No.  That's the main reason.  I -- I

8    believe the Court likes to see published studies

9    and that's --

10       Q.      Okay.

11       A.      -- that -- that's our plan.

12       Q.      But it's fair to say that you've

13   written a paper that investigated oxidative

14   degradation of polypropylene mesh in vitro using an

15   oxidative medium and you're not relying on that

16   work in this litigation?

17               MR. BOWMAN:  Object to form.

18               THE WITNESS:  Can you repeat that?  I'm

19   sorry.

20   BY MR. HUTCHINSON:

21       Q.      Yes.

22       A.      It was long.

23       Q.      It's fair to say that you've written a

24   paper --

ed529c64-35ef-4150-8686-915d23914a31

Scott Guelcher

Page 37

1      A.       Okay.

2      Q.       -- that investigated oxidative

3    degradation of polypropylene using an oxidated

4    medium and you're not relying on it in this

5    litigation; is that fair to say?

6      A.       I would say it's a submitted abstract.

7    This is a submitted abstract.  I wouldn't call this

8    a paper.  It's a published abstract, and it is peer

9    reviewed but not like a paper.  It's not -- I'm not

10   relying on it.

11     Q.       And --

12     A.       And that -- go ahead.

13     Q.       What is the status of this work,

14   Doctor?

15     A.       As I said, I -- I -- I don't know.  We

16   don't know what we're going to do with it yet.

17     Q.       When is the last time you talked to

18   Dr. Dunn about this?

19     A.       I don't remember.

20     Q.       Has it been more than six months?

21     A.       Probably not.  But I just don't -- I

22   don't remember what we said about this.  We

23   haven't -- I haven't relied on it in the recent

24   litigation in some time.  And it's -- you know,

ed529c64-35ef-4150-8686-915d23914a31

Scott Guelcher

1    Q.      And, Doctor, for the POP products, do

2    you know the weight of the mesh per meter squared?

3    A.      I don't remember them all.  The

4    GYNEMESH is 45 grams per square meter.  The -- the

5    PROLIFT+M, that's the one that's the blend, has the

6    resorbable polyester.  After the polyester resorbs,

7    the density is 28.  So it's probably, roughly, you

8    know, half, something in that range.  So as the

9    polyester resorbs, the density goes down.

10   Q.      And, Doctor, if we look at the Moalli

11   paper --

12   A.      Okay.

13   Q.      -- that you have, the mesh didn't

14   oxidize after 12 weeks, did it?

15   A.      Well, she wasn't testing for oxidation.

16   She was looking at the cellular response.  So I

17   wouldn't say that it didn't oxidize.  I just -- I

18   don't think she reported that it did.  But I don't

19   know that she really did any testing for that.

20   Q.      A causal relationship wasn't

21   established in that paper, was it, sir?

22   A.      A causal relationship --

23   Q.      Correct --

24   A.      -- between what?

Golkow Technologies, Inc. - 1.877.370.DEPS

ed529c64-35ef-4150-8686-915d23914a31

Scott Guelcher

Page 61

1          A.          Okay.

2          Q.          -- Number 1 --

3          A.          So we -- okay.  Go ahead.  Sorry.

4          Q.          Number 1 discusses "polypropylene

5     reacts with molecular oxygen by autoxidation

6     outside the body at elevated temperatures,

7     resulting in chain scission and deterioration. . ."

8                      Do you see that?

9          A.          Yes.

10          Q.          At what elevated temperatures outside

11     the body?

12          A.          I have to look at the details again.

13     Temperatures above 100 C.  That is 100 Celsius.

14          Q.          And -- and what is the normal body

15     temperature in Celsius degrees of the human body?

16          A.          37.

17          Q.          And what is autoxidation, Doctor?

18          A.          Well, "autoxidation" is a term that

19     some use to describe the reactive -- the reaction

20     of the polypropylene with molecular oxygen at

21     elevated temperatures.

22          Q.          And we don't have elevated temperatures

23     in the body, in vivo, do we, to the point where it

24     would autoxidate?

ed529c64-35ef-4150-8686-915d23914a31

Scott Guelcher

1          MR. BOWMAN:  Object to the form.

2          THE WITNESS:  Well, the body

3   temperature is 37 degrees C.  So that reaction with

4   molecular oxygen would be slow.  I mean. . .

5   BY MR. HUTCHINSON:

6      Q.      In fact, have you quantified how slow

7   it would be?

8      A.      Well, I mean, Leibert addressed that

9   question with molecular oxygen.

10     Q.      But my question to you, sir, is have

11  you personally quantified that?

12     A.      No.  Because I don't think it's

13  relevant because there's more reactive forms of

14  oxygen in the body that are causing the reaction.

15  So. . .

16     Q.      What is -- what is required for PROLENE

17  to undergo autoxidation?

18     A.      Well, PROLENE will undergo oxidation

19  with molecular oxygen.  It -- it -- it can happen

20  at lower temperatures.  It's just very, very slow.

21     Q.      Okay.

22     A.      So, I mean, it happens faster.  Like

23  any chemical reaction --

24     Q.      I understand.

ed529c64-35ef-4150-8686-915d23914a31

Scott Guelcher

Page 66

1          THE WITNESS:  Well, I mean, the paper

2      published in 2015 by Mays, et al., showed

3      reductions in molecular weight.  Now, that wasn't

4      PROLENE, but it was still polypropylene with

5      antioxidants.

6      BY MR. HUTCHINSON:

7          Q.      Okay.

8          A.      It's very similar material.

9          Q.      Okay.  Let's -- let's focus on PROLENE,

10     though, Doctor.

11          What scientific evidence do you have

12     for chain scission having occurred with PROLENE in

13     vivo?

14          MR. BOWMAN:  Object to form.

15          THE WITNESS:  PROLENE in vivo.  I don't

16     know of a study that specifically looked at chain

17     scission of PROLENE in vivo.

18     BY MR. HUTCHINSON:

19          Q.      And, Doctor, what scientific evidence

20     do you have for any PROLENE implant having oxidized

21     to produce a carbonyl group, a C double bond O?

22          A.      Can we go back to the chain scission

23     one?  I just remembered something or -- or I need

24     to answer this first.

ed529c64-35ef-4150-8686-915d23914a31

Scott Guelcher

Page 69

1      A.      Clavé would be the one that -- I think
2    Céline Mary discussed this as well.

3      Q.      Okay.  And is that the only scientific
4    evidence that you're relying on is Clavé and the
5    internal Ethicon documents for a PROLENE implant
6    having oxidized to produce a carbonyl group?

7               MR. BOWMAN:  Object to form.

8               THE WITNESS:  Those are the documents
9    that come to mind that I've testified about before.

10   BY MR. HUTCHINSON:

11     Q.      Okay.  Doctor, do you have -- and let's
12   talk about -- my question is very specific as it
13   relates to the nine specific products that you're
14   here to give testimony about.

15     A.      Okay.

16     Q.      TVT, TVT-O, TVT ABBREVO, TVT-SECUR, TVT
17   EXACT, PROSIMA, GYNEMESH PS, PROLIFT, and
18   PROLIFT+M.  Okay?

19     A.      Yes.

20     Q.      So my question, when I talk about the
21   nine products, that's what I'm talking about.

22     A.      I understand.

23     Q.      All right.  Do you have any scientific
24   evidence that any of those nine products were

ed529c64-35ef-4150-8686-915d23914a31

Scott Guelcher

Page 70

1   implanted and oxidized to produce a carbonyl group?

2       A.        Again, the only study that could have

3   included those devices would be the Clavé study

4   where he took the 100 explants.  And also the study

5   with Dr. Iakovlev, but that was looking more at --

6   that was explanted mesh as well, that looked at the

7   degradation layer.  But not -- well, he did look at

8   the question of oxidation indirectly with the

9   myeloperoxidase staining that we saw.

10      Q.        Right.  But not specifically for those

11  nine products, correct?

12      A.        Those nine products were not

13  specifically mentioned in the Iakovlev study that I

14  remember.

15      Q.        Thank you.

16              So the only -- the only paper that

17  you're relying on as it relates to whether any of

18  those nine products oxidized to produce a carbonyl

19  group, after it was implanted in vivo, is the Clavé

20  study; is that correct?

21              MR. BOWMAN:  Object to form.

22              THE WITNESS:  For those nine products,

23  that would be the one that I would. . .

24  BY MR. HUTCHINSON:

ed529c64-35ef-4150-8686-915d23914a31

Scott Guelcher

Page 72

1    Iakovlev study, we -- there were a lot of explants,
2    but they weren't specifically named.  They were
3    slings, POPs, maybe some hernia mesh, too.  But
4    they -- the products weren't specifically named.
5    So I -- I -- I can't -- I mean, it was a number of
6    devices, right?
7    BY MR. HUTCHINSON:
8        Q.      Yeah.
9        A.      Not -- not -- those specific products
10   were not named.
11       Q.      Right.  So I'm not asking about whether
12   or not Iakovlev named them.  My question to you,
13   sir, is do you have any scientific evidence that
14   any of those nine products have become embrittled
15   in vivo?
16              MR. BOWMAN:  Object to form.
17              THE WITNESS:  Again, not direct -- what
18   did you say?  Embrittled?  I mean, there's no
19   direct evidence that those specific products has
20   been published.
21   BY MR. HUTCHINSON:
22       Q.      And nor do you have any scientific
23   evidence that any of those nine products have
24   become embrittled, do you?

ed529c64-35ef-4150-8686-915d23914a31

Scott Guelcher

Page 73

1          MR. BOWMAN:   Object to form.

2          THE WITNESS:   I guess I'm a little hung

3   up on scientific evidence.   I mean, you mean

4   directly measured, right?   Reported?

5   BY MR. HUTCHINSON:

6      Q.       (Indicating yes.)

7      A.       I mean, I believe -- well, you know my

8   opinions.   But I --

9      Q.       Well, I'm trying to find out your

10  opinions.

11     A.       Okay.

12     Q.       So my opinions are -- that's the goal

13  of today.

14     A.       No.   I understand.   But -- okay.   So

15  I'll state it again.   I mean, I believe -- I don't

16  want to argue about it.   I mean, I believe that

17  those devices are made of polypropylene, which

18  these fundamental chemical reactions apply to.

19  Now, has anyone specifically measured it for those

20  devices?   I -- I -- I don't know that that's been

21  reported, but I believe the body of scientific

22  evidence says that that's what's happening.   That's

23  my opinion.   Okay?

24     Q.       But my question to you, do you know of

ed529c64-35ef-4150-8686-915d23914a31

Scott Guelcher

Page 75

1       Q.      Nor are you aware of any evidence that

2   any of those nine products, specific products, have

3   become embrittled in vivo, are you?

4               MR. BOWMAN:  Object to form.

5               THE WITNESS:  Again, I've not seen

6   anybody actually measure that, I mean, if that's

7   what you're. . .

8   BY MR. HUTCHINSON:

9       Q.      And you haven't measured that, have

10  you?

11      A.      No.

12      Q.      And, Doctor, are you aware of any

13  scientific evidence that any of those nine products

14  have lost molecular weight in vivo?

15              MR. BOWMAN:  Object to form.

16              THE WITNESS:  For those nine specific

17  products, no one has shown -- published that they

18  lose molecular weight.

19  BY MR. HUTCHINSON:

20      Q.      And are you aware, personally, of any

21  evidence that any of those nine specific products

22  have lost molecular weight in vivo?

23      A.      Could you rephrase that?  I didn't --

24      Q.      Are you personally aware of any

ed529c64-35ef-4150-8686-915d23914a31

Scott Guelcher

1           MR. BOWMAN:  Object to form.

2           THE WITNESS:  I'd have to refresh

3     myself with the documents.  I -- I -- I can't

4     remember them.

5     BY MR. HUTCHINSON:

6        Q.      And as a material scientist, you'll

7     agree that PROLENE has a different chemical

8     composition than pure polypropylene, correct?

9        A.      So PROLENE has two antioxidants, one

10    designed to prevent oxidation during

11    high-temperature processing, another during

12    storage.  There are flow additives designed to make

13    extrusion easier, calcium stearate, some

14    surfactants.  So there's other additives in there,

15    but those additives are added mainly for

16    manufacturing, in my understanding.

17       Q.      Right.  But PROLENE has a chemical

18    different composition -- strike that.

19           PROLENE has a different chemical

20    composition than pure PROLENE, correct?

21           MR. BOWMAN:  Object to form.

22    BY MR. HUTCHINSON:

23       Q.      I'm sorry.  PROLENE has a different

24    chemical composition than pure polypropylene,

ed529c64-35ef-4150-8686-915d23914a31

Scott Guelcher

Page 88

1    correct?

2       A.        Well, the -- yeah, the composition's

3    different because it has these additives.

4                 MR. HUTCHINSON:  I'm sorry.  Did he say

5    "well, yeah"?

6                 (Whereupon the previously mentioned

7    answer was read back by the reporter.)

8                 THE WITNESS:  I probably said -- yes,

9    it's -- it has additives.

10   BY MR. HUTCHINSON:

11      Q.        Doctor, turn to Exhibit 1.  I'll

12   represent to you and the Court that there are 44

13   different plaintiffs named on the notice of

14   deposition, starting with Marty Babcock --

15      A.        Okay.

16      Q.        -- and ending with Thelma Wright.

17   That's 44 different cases.

18      A.        I see.

19      Q.        Did you know you were designated in 44

20   cases in this litigation?

21      A.        I -- I didn't know the exact number of

22   44.  I knew it was a wave.  So I knew there were a

23   number of cases, but I wasn't familiar with the

24   specific plaintiffs because I'm not giving

ed529c64-35ef-4150-8686-915d23914a31

Scott Guelcher

1    of that are difficult to predict.

2    BY MR. HUTCHINSON:

3        Q.       But my question is, sir, are you

4    testifying, to a reasonable degree of scientific

5    certainty, without having reviewed an explant, that

6    Marty Babcock's mesh is oxidizing in her body?

7                 MR. BOWMAN:  Object to form.

8                 THE WITNESS:  I mean, I believe that

9    the science tells you it's oxidizing.  I did not

10   specifically measure it.

11   BY MR. HUTCHINSON:

12       Q.       Thank you.  In fact, you didn't

13   specifically measure oxidation of any of the women

14   listed in Exhibit Number 1, correct?

15       A.       I've already answered that.  No.

16       Q.       Okay.

17       A.       Yeah, I didn't do that.

18       Q.       And you can't tell us whether or not

19   the mesh of any of the women listed in Exhibit 1

20   oxidized in their body, can you?

21                MR. BOWMAN:  Object to the form.  Asked

22   and answered.

23                THE WITNESS:  I believe I've asked --

24   I've answered this.  I mean, it's -- the science

ed529c64-35ef-4150-8686-915d23914a31

Scott Guelcher

1   tells you that that would be -- you would expect it

2   to oxidize and degrade.  The -- the timing of that

3   is unpredictable.  That's what I've said.  I didn't

4   measure it.  But scientific evidence --

5   polypropylene oxidizes.  There are cells in the

6   body that make reactive oxygen species, and you

7   would expect it to oxidize in the body based on

8   the -- what we know scientifically.

9   BY MR. HUTCHINSON:

10      Q.      I understand that.  But I'm -- my

11   question is related to these 44 women.  Can you

12   tell us, to a reasonable degree of scientific

13   certainty, whether or not the mesh, in any of these

14   44 women, ever oxidized?

15             MR. BOWMAN:  Object to form.  This is

16   asked and answered.

17             THE WITNESS:  I feel like we're going

18   to go round and round on this.

19             (Simultaneous speaking.)

20             MR. BOWMAN:  I'm going to instruct him

21   not to answer.

22             (Reporter interruption for

23   clarification.)

24             MR. BOWMAN:  I said if we're going to

Scott Guelcher

1   keep asking the same question, I'm going to start

2   instructing him not to answer.

3   BY MR. HUTCHINSON:

4       Q.      I need a clean answer, then I'll move

5   on.

6                   MR. BOWMAN:  Objection.

7                   THE WITNESS:  I'm giving you my clean

8   answer.  I've said this in trials.  I've said this

9   in depositions.  You know the record of my

10  testimony.  It hasn't changed.

11                  The scientific principles states that

12  this chemical reaction is going to occur.  It's

13  going to oxidize.  The clinical implications of

14  that are unknown.  I did not specifically look at

15  oxidation in these meshes.  My testimony has been

16  that these reactions are occurring.  And the

17  clinical implication of that in a specific patient

18  is unknown.  It's unpredictable.  That's been my

19  testimony.  I --

20  BY MR. HUTCHINSON:

21      Q.      And you can't tell us when it's

22  occurring, can you, in any of these 44 women?

23      A.      I think that's what unpredictable means

24  is you don't -- you don't know when it's -- when it

ed529c64-35ef-4150-8686-915d23914a31

Scott Guelcher

Page 104

1    question.

2    BY MR. HUTCHINSON:

3        Q.      All right.  Doctor, have you ever

4    instructed your students at Vanderbilt to use

5    scientific data in reaching a conclusion?

6                MR. BOWMAN:  Object to form.

7                THE WITNESS:  Again, we do experiments,

8    make measurements and test hypotheses.

9    BY MR. HUTCHINSON:

10       Q.      All right.  And, Doctor, let's talk

11   about these nine specific products that you're here

12   to give testimony about.

13               Are you aware of any data that confirms

14   these nine specific products degraded to the extent

15   it compromised the functionality of the product?

16               MR. BOWMAN:  Object to form.

17               THE WITNESS:  Again, you've asked this

18   many times.  I've not looked at physical changes in

19   these specific products, these patients.  I've not

20   looked at that.  I didn't test the explants.

21   BY MR. HUTCHINSON:

22       Q.      I understand that.  But my question is

23   a little bit more general, is -- and it relates to

24   these nine specific products, okay?  Are you aware

ed529c64-35ef-4150-8686-915d23914a31

Scott Guelcher

1    of any data that confirms these nine products will

2    degrade to the extent their intended function is

3    compromised during a woman's lifetime?

4                MR. BOWMAN:  Object to the form.

5                THE WITNESS:  Again, you asked this

6    before and I said, no, for these products that's

7    not been directly measured.

8    BY MR. HUTCHINSON:

9        Q.      And, Doctor, do you know -- we talked

10   about -- well, strike that.

11               Do you know what the mechanism of

12   action of tissue negatively reacting to any of

13   these nine products is?

14               MR. BOWMAN:  Object to form.

15               THE WITNESS:  Can you repeat that?

16   BY MR. HUTCHINSON:

17       Q.      Right.  Doctor, do you believe that the

18   tissue in women negatively reacts to any of these

19   nine products?

20       A.      The --

21       Q.      Or are you qualified to give that

22   opinion?

23       A.      Well, I believe I'm -- that's what my

24   report is about.  That's what these papers are

ed529c64-35ef-4150-8686-915d23914a31

Scott Guelcher

1    resulting in a scar plate.  I should be more

2    precise.

3              There's the macrophages and other

4    inflammatory cells, foreign body giant cells, that

5    migrate into the mesh, adhere to the mesh, secrete

6    reactive oxygen species, including hydroxyl

7    radicles, that oxidize the polypropylene.  That --

8    that -- that's in my report.  That's the -- that's

9    the tissue response.  The primary components are

10   the fibroblasts and -- and with the collagen matrix

11   deposition and the -- and the macrophages.

12   BY MR. HUTCHINSON:

13       Q.      Doctor, can you tell us from a

14   physiological standpoint how oxidation causes pain

15   in a woman?

16       A.      Again, it's in my report.  Oxidation

17   leads to reduction of molecular weight,

18   embrittlement, and that can lead to cracking, which

19   can lead to erosions and pain.  It's hard plastic

20   in the pelvic floor.  That's going to cause pain.

21       Q.      And oxidation also leads to reduction

22   in physical properties, correct?

23              MR. BOWMAN:  Objection to form.

24              THE WITNESS:  What -- physical

ed529c64-35ef-4150-8686-915d23914a31

Scott Guelcher

Page 134

1   anatomic site.  It depends possibly on the patient.

2   It depends on lots of factors, but it's something

3   that you can't predict, and it's something you

4   can't design for.

5       Q.      If we look at Exhibit 6 to your

6   deposition --

7       A.      Okay.

8       Q.      -- none of the specimens that Imel,

9   I-m-e-l, studied were PROLENE, were they?

10      A.      These were Boston Scientific meshes, so

11  they -- they did not include PROLENE.

12      Q.      And when a medical device is first

13  implanted in the body, it comes in contact with

14  body fluids, fair to say?

15      A.      Yes.

16      Q.      And macrophages are some of those body

17  fluids.

18      A.      Well, macrophage is a cell, not a

19  fluid.

20      Q.      Okay.  Or -- or body -- body material.

21  And macrophages contain proteins, correct?

22      A.      Well, I mean, all cells contain

23  proteins, but it's a -- it's a cell.  I mean, a

24  cell --

ed529c64-35ef-4150-8686-915d23914a31

Scott Guelcher

1                    C E R T I F I C A T E
2     STATE OF TENNESSEE )
      COUNTY OF DAVIDSON )
3              I, Lise S. Matthews, RMR, CRR, CCP, LCR
      353, Licensed Court Reporter and Notary Public, in
4     and for the State of Tennessee, do hereby certify
      that the above deposition was reported by me, and
5     the transcript is a true and accurate record to the
      best of my knowledge, skills, and ability.
6              I further certify that I am not related
      to nor an employee of counsel or any of the parties
7     to the action, nor am I in any way financially
      interested in the outcome of this case.
8              I further certify that I am duly
      licensed by the Tennessee Board of Court Reporting
9     as a Licensed Court Reporter as evidenced by the
      LCR number and expiration date following my name
10    below.  I further certify that this transcript is
      the work product of this court reporting agency and
11    any unauthorized reproduction and/or transfer of it
      will be in violation of Tennessee Code Annotated
12    39-14-104, Theft of Services.
               IN WITNESS WHEREOF, I have hereunto set
13    my hand and affixed my notarial seal this _____
      day of _____, 2016.
14
15

      _____
16    Lise S. Matthews, RMR, CRR, CRC
      LCR 353 Expiration Date 6/30/2016
17    Notary Public Commission Expires
      March 6, 2018
18
19
20
21
22
23
24

Golkow Technologies, Inc. - 1.877.370.DEPS

ed529c64-35ef-4150-8686-915d23914a31