# EXHIBIT J

Scott A. Guelcher, Ph.D.

```
1            IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
2                        AT CHARLESTON
3
    IN RE: ETHICON, INC., PELVIC REPAIR)
4   SYSTEM PRODUCTS LIABILITY          )MASTER FILE NO.
    LITIGATION                         )2:12-MD-02327
5                                      )MDL 2327
    ---------------------------------- )
6   THIS DOCUMENT RELATES TO CASE      )
    CONSOLIDATION:                     )JOSEPH R. GOODWIN
7                                      )U.S. DISTRICT JUDGE
    TERRESKI MULLINS, et al.,          )
8                                      )
                          Plaintiffs,  )
9   vs.                                )CASE NO.
                                       )2:12-CV-02952
10  ETHICON, INC., et al.,             )
                                       )
11                        Defendants.  )
12
13                     DEPOSITION OF
14                SCOTT A. GUELCHER, Ph.D.
15             Taken on Behalf of the Defendants
16                   September 15, 2015
17
18
19
20
21
22
23
24
25
```

Scott A. Guelcher, Ph.D.

```
 1   Dr. Iakovlev.  I'm sorry.  Could you repeat the --
 2   you're -- you're referring back to Huskey trial?
 3   Q.      The Huskey deposition.
 4   A.      Huskey deposition.
 5   Q.      That's right.
 6   A.      Okay.  So the new work that's been done is
 7   the study with Dr. Dunn that was funded by his
 8   company.  Mr. Snell deposed me on this in the
 9   Perry case.  It was produced in Perry by Jeff
10   Kuntz.  So Mr. Snell deposed me on it.  But it was
11   part of research at Vanderbilt, paid for by
12   Dr. Dunn's company.  Then there's the paper with
13   Dr. Iakovlev, and then there's the IUGA meeting
14   that I went to in June.
15   Q.      And where was the IUGA meeting?
16   A.      It was in France.
17   Q.      And who paid for you to attend the IUGA
18   meeting in France?
19   A.      I paid.  It was not part of the
20   litigation.
21   Q.      Did you attend -- did any plaintiff's
22   counsel attend that meeting?
23   A.      For any mesh litigation?
24   Q.      Yes.
25   A.      Okay.  There either were two attorneys...
```

Scott A. Guelcher, Ph.D.

1   Q.      And who attended that meeting that you
2   knew --
3   A.      Margaret Thompson and Bri Olson (phonetic)
4   from Motley Rice.
5   Q.      And did you work with Ms. Thompson or
6   Ms. Olson while you were in France on the issues
7   presented by this litigation?
8   A.      So Ms. Thompson requested a workshop, a
9   mock trial workshop at the IUGA meeting. And I
10  participated in that mock trial workshop.
11  Q.      And what did you do at the mock trial
12  workshop at the IUGA meeting?
13  A.      I was an expert witness.
14  Q.      Were you compensated for your time?
15  A.      No.
16  Q.      Who else participated in the mock trial
17  workshop?
18  A.      Dr. Iakovlev, Dr. Carey, Dr. Ostergard.
19  That's all I remember.
20  Q.      And was this mock trial workshop put
21  together by Dr. Thompson?
22  A.      It was.
23  Q.      And what did you do to prepare for that
24  mock trial workshop?
25  A.      Well, Ms. Thompson prepared slides for my

Scott A. Guelcher, Ph.D.

1  direct exam. And she prepared handouts for the
2  attendees who -- the people who attended the
3  workshop were divided into two juries, and
4  Ms. Thompson gave them several documents.
5  Q.     And who conducted your direct examination?
6  A.     Ms. Thompson.
7  Q.     Were there any other lawyers other than
8  Margaret Thompson and Bri Olson who were present
9  at the IUGA meeting that you met with?
10 A.     I don't know everyone who was in the
11 audience. I don't know.
12 Q.     And the people who attended the workshop
13 were doctors?
14 A.     There was a mix. They were doctors,
15 Ph.D.s, maybe some trainees. There was a mix of
16 people. I didn't meet all of them.
17 Q.     Do you have a list of attendees?
18 A.     I don't. The IUGA would have that, the
19 people who registered for the workshop. Margaret
20 Thompson may have that. I don't have it that I
21 know. I don't believe I have that.
22 Q.     Do you still have a set of the slides that
23 you used at the mock trial?
24 A.     I was told by plaintiff's counsel that
25 there are objections pending on that.

1   Q.   That's right.
2   A.   So I -- I paid for it out of my faculty
3   development fund at Vanderbilt as a discretionary
4   expense.
5   Q.   Did you receive any compensation from
6   plaintiff's counsel for your participation in the
7   workshop?
8   A.   No.
9   Q.   You know that all the people you've
10  identified have testified as witnesses for the
11  plaintiffs in the mesh litigation?
12  A.   I do.
13  Q.   Do you know whether there was any effort
14  to present expert witnesses from the defense
15  litigation?
16  A.   Ms. Thompson could speak to that. I can
17  say that there were no defense witnesses. I -- I
18  don't know if there was an attempt or not. She
19  would know. But there was a cross-exam, but there
20  were no defense witnesses, and I don't know why.
21  Q.   Did -- who conducted the cross-exam?
22  A.   Ms. Olson.
23  Q.   Was the presentation videotaped?
24  A.   I don't know.
25  Q.   Do you know whether the presentation was

Scott A. Guelcher, Ph.D.

1  A.     It is.
2  Q.     Tell me what Exhibit No. 9 is.
3  A.     So this is an abstract that was submitted
4  to the IUGA meeting.  It was accepted for an oral
5  presentation, and it was published in the
6  supplement in the International Urogynecology
7  Journal this year.
8  Q.     And did you write Exhibit No. 9?
9  A.     I co-authored it with Dr. Dunn.
10 Q.     Who was the primary author?
11 A.     Well, I was.
12 Q.     All right.  And what contribution did
13 Dr. Dunn make to the writing of Exhibit No. 9?
14 A.     I don't remember.
15 Q.     Okay.
16 A.     I don't remember.
17 Q.     And Exhibit No. 9 is a discussion of the
18 research that you and Dr. Dunn conducted that was
19 produced and discussed in the Perry litigation,
20 fair?
21 A.     Yeah, it was produced and it was
22 discussed.  But Dr. Dunn was not deposed on it.
23 It wasn't -- it was withdrawn from the Perry
24 litigation.
25 Q.     Okay.  And I believe you said that you

Scott A. Guelcher, Ph.D.

| | | |
|---|---|---|
| 1 | | presented this information orally at the meeting? |
| 2 | A. | That's right. |
| 3 | Q. | And you presented it to doctors and Ph.D.s? |
| 5 | A. | I presume that's who was in the audience. I don't know who was in the audience. |
| 7 | Q. | How long was your presentation? |
| 8 | A. | Oh, I don't know. Something around ten minutes. I'm not sure. |
| 10 | Q. | Did you have a PowerPoint presentation with your presentation? |
| 12 | A. | I did. And those have been produced. I gave them to plaintiff's counsel. It's on the drive, I believe. |
| 15 | Q. | Okay. Is that on the thumb drive that we have today? |
| 17 | A. | I believe so. |
| 18 | Q. | Thank you. |
| 19 | | Okay. Was Dr. Dunn present for the presentation? |
| 21 | A. | No. |
| 22 | Q. | And what was the message you were trying to convey to your audience when you made the presentation of the information in Exhibit No. 9? |
| 25 | | MR. BOWMAN: Object to form. |

Scott A. Guelcher, Ph.D.

```
 1                THE WITNESS:  The message?  You mean
 2     the conclusions?
 3     BY MR. THOMAS:
 4     Q.      Right.  What were you trying to convey to
 5     your audience?
 6     A.      That oxidative -- it's stated in the
 7     conclusions.  Oxidative degradation of
 8     polypropylene pelvic mesh was evidenced by
 9     chemical and physical changes under simulated in
10     vivo conditions.  That was the conclusion from the
11     study.
12     Q.      Okay.  And did you discuss the actual
13     experiment that you and Dr. Dunn conducted with
14     the group?
15     A.      I did.  It's in the slides.
16     Q.      All right.
17     A.      I had a slide showing the methods.
18     Q.      What's your -- strike that.
19             Tell me what expertise you have in FTIR.
20     A.      In FTIR?
21     Q.      Yes.
22     A.      Well, I've published a number of papers
23     with FTIR data.  We -- we use it quite a bit for
24     characterizing the composition of polyurethanes.
25     Q.      Mm-hmm.
```

Scott A. Guelcher, Ph.D.

1   I mean, I know there's references on this. I -- I
2   don't remember exactly which specific one. I
3   mean, they're probably cited in some of my papers.
4   Q.     Okay. And do you remember presenting
5   these slides as a part of your presentation?
6   A.     Well, it wasn't this -- I mean, you have
7   the slides, so it was -- it was similar. It was
8   FTIR data and SEM data. That's what I showed. I
9   didn't present the XPS. Just a FTIR and the SEM
10  is what I showed.
11  Q.     Okay. Let's go back to the first page of
12  Exhibit No. 9, down under "Results."
13  A.     Okay.
14  Q.     And midway through that paragraph it says,
15  "The dramatic increase in the size of the dash OH
16  and C" -- I think that's called --
17  A.     That's the carbonyl.
18  Q.     "Double -- double bond O peaks from four
19  (not shown) to five weeks is indicative of
20  chemical induction."
21         And what you're referring to is the --
22  again, that image on the page 2 of Exhibit No. 9?
23  A.     Yeah. I'm going from memory because this
24  wasn't in my report, and I'm not relying on it in
25  this case. But, I mean, what -- what I remember

Scott A. Guelcher, Ph.D.

1  you want to know about these documents, you have
2  to depose Dr. Dunn because I didn't do these
3  measurements, I didn't write these spectra. I
4  didn't do it. I got data from Dr. Dunn for -- for
5  this abstract, but I don't know what the source
6  data is. He's the one that knows all of that. I
7  said that in Perry. Nobody wanted to depose
8  Dr. Dunn. So I don't understand why we're doing
9  this again. It's a rerun.
10 Q.    Okay. Let's go to page 188, please.
11 Pages 187 and 188 of Exhibit No. 12 are a report
12 dated November the 6th, 2014, from Professor
13 Bridget Rogers to -- to Russell Dunn. You've seen
14 that before, correct?
15 A.    Yes.
16 Q.    Are you able to answer questions about the
17 findings on page 188 of Exhibit No. 12? The XPS
18 findings?
19 A.    No. I didn't review it. I need -- if
20 we're going to talk about that, I need a break to
21 review these. I will answer them if I have time
22 to review them, but I'm not going to answer them
23 right now. I need time to review it. This was
24 not -- I'm not relying on this for this case. It
25 was produced in Perry. It wasn't brought up in

Scott A. Guelcher, Ph.D.

1 trial. No deposition of Dr. Dunn was taken. So I
2 don't understand why I'm being asked these
3 questions again. It doesn't seem reasonable to
4 me. And if you want to ask me about it, I need
5 time to look through this book, look through my
6 notebook. I can write down -- write down all the
7 peak numbers and -- and give you a story, but it's
8 going to take me a couple of hours to do that.
9 And I don't -- I don't know that you want to do
10 that today.
11 Q. Well, I don't want to waste my time or
12 your time.
13 A. I live here. I'm here all day til 5:30,
14 so we can do it if you want to. But I don't want
15 you to be trying to give the impression that I
16 don't know how to read FTIR spectra just by
17 putting a book in front of me that I haven't seen.
18 Q. Please don't read anything into my
19 questions. I'm just asking --
20 A. Well, that's the way it comes across. I'm
21 sorry, but --
22 Q. Well, that's not my intention.
23 Let me ask you this question. Are you
24 able, without spending a couple hours going
25 through this information as you've just described,

Scott A. Guelcher, Ph.D.

```
1   to tell me what it is about the data in Exhibit
2   No. 12 that you believe shows that
3   polypropylene -- excuse me, that Ethicon TVT mesh
4   underwent oxidative degradation that's indicative
5   of chemical induction?  Are you able to do that
6   without spending the time looking at the report?
7              MR. BOWMAN:  Object to form.
8              THE WITNESS:  I'm not willing to do
9   that without reviewing these documents because I
10  did not rely upon them for my opinions.
11  BY MR. THOMAS:
12  Q.   Okay.  It's not my intention to aggravate
13  you or frustrate you.  It is my intention to get
14  the best answers I can based on the information I
15  do -- I'm not going to argue with you.
16  A.   I don't want to argue either, but I -- I'm
17  just not prepared.  I didn't rely on them.
18  They're not in my report.  If you want to ask me
19  questions about it, I need time to review it.  I
20  think that's reasonable.
21  Q.   Okay.  Doctor, I'm going to hand you now
22  what's been marked as Deposition Exhibit No. 13.
23  Deposition Exhibit No. 13 is a study titled
24  "Materials Characterization and Histological
25  Analysis of Explanted Polypropylene, PTFE, and PET
```

```
 1   that you gave them, weren't they?
 2   A.    I believe so.
 3   Q.    Why aren't you relying on this testing for
 4   your report?
 5         MR. BOWMAN:  Objection to form.
 6         THE WITNESS:  We haven't published it
 7   yet.
 8   BY MR. THOMAS:
 9   Q.    Okay.  Is that the sole reason?
10   A.    Probably the main reason.
11   Q.    Do you plan to publish these -- this data?
12   A.    We're discussing it.
13   Q.    Have you prepared a manuscript?
14   A.    It's in draft form, but we're -- we're
15   deciding what to do.
16   Q.    Has it been submitted to any journals?
17   A.    We submitted it to the IUGA, the
18   International -- since we had a podium
19   presentation, we submitted it to the -- the
20   International Urogynecology Journal.
21   Q.    Okay.  And are they considering it or did
22   they refuse it?
23   A.    They didn't want to publish it.  We didn't
24   have -- yeah, they didn't want to publish it.
25   Q.    Why not?
```

Scott A. Guelcher, Ph.D.

```
 1   A.      No, I don't believe so because the
 2   workshop was -- the workshop was probably -- it
 3   was a proposal to include in a meeting.  By the
 4   time I submitted that abstract, the sessions had
 5   already been determined.
 6   Q.      Okay.  So you had already signed --
 7   A.      The workshop was first, I think.
 8   Q.      Okay.
 9   A.      That's typical.
10   Q.      All right.  Exhibit No. 10, the article
11   that you co-authored with Dr. Iakovlev and
12   Dr. Bendavid?
13   A.      Yes.
14   Q.      Did -- do you know whether this article
15   was reviewed by plaintiff's counsel before it was
16   submitted?
17   A.      I don't know who -- like I said,
18   Dr. Iakovlev is the corresponding author.  I
19   don't -- I -- I don't know what he did there.
20   Q.      On page -- on -- go back to Exhibit No. 9
21   real quick.  On page 2 under "Disclosure Block,"
22   did you decide what to include under the
23   disclosure block?
24   A.      I'm looking for it.
25           No.  Well, okay.  I need to explain that.
```

Scott A. Guelcher, Ph.D.

1   I -- I'm going by my memory, but these are -- all
2   the meetings have different requirements. I think
3   that this one may have had specific blocks that I
4   could choose from. That's probably why -- I --
5   that says "consulted" and "consulting fee."
6   Those -- those look like fields that I had to
7   select, is what I -- but I don't remember what I
8   did exactly.
9   Q.      What did you intend to convey when you
10  said you were a consultant?
11  A.      Well, I think consultant is probably what
12  I had to select to choose expert witness.
13  Q.      Was there --
14  A.      I --
15  Q.      I'm sorry.
16  A.      I'm sorry. I don't think that I chose --
17  I can't remember, but I -- this -- that doesn't
18  look like words that I would use to describe my
19  activities, which probably tells me that there was
20  a field that I had to fill out, and that was the
21  closest. That's -- that's my best guess, but I
22  don't -- I don't really remember.
23  Q.      Was there an opportunity to disclose that
24  you were a testifying expert for the plaintiffs in
25  the mesh litigation?

Scott A. Guelcher, Ph.D.

```
 1   A.        I don't remember.  That's -- I -- I don't
 2   know that it was that detailed.
 3   Q.        At the time of this publication and for
 4   years prior to that time, Dr. Dunn had also been a
 5   consultant who would testify as an expert, hasn't
 6   he?
 7   A.        That's right.
 8   Q.        Do you know why he didn't disclose
 9   anything?
10   A.        That's an error.  And I don't -- when I
11   presented this talk, I had a disclosure slide.  I
12   don't know why it says nothing to disclose.  It
13   may have been that he had to fill that out and
14   didn't realize it.  I don't -- I don't know.
15   That's an error.  But I did clarify that point --
16   Q.        Is the --
17   A.        -- in the talk.
18   Q.        I'm sorry.
19   A.        Yeah.
20   Q.        Is the disclosure slide one of the ones
21   that you produced to me?
22   A.        Well, it's -- it's in the -- it's -- you
23   have slides for the AIChE presentation and for the
24   IUGA presentation, and I believe there's a
25   disclosure slide that says we were testifying
```

Scott A. Guelcher, Ph.D.

```
 1                  E X A M I N A T I O N
 2   BY MR. BOWMAN:
 3   Q.      So, Dr. Guelcher, you've looked at
 4   Exhibit 12, the folder for PCT-168?
 5   A.      Yes.
 6   Q.      And you've already testified that you
 7   hadn't reviewed this prior to today?
 8   A.      That's right.
 9   Q.      You also testified that you're not relying
10   on anything in this document for the opinions that
11   you're expressing at trial; is that right?
12   A.      Yes, that's correct.
13   Q.      Can I ask you, do you know what Ethicon
14   product was examined for this report?
15   A.      I believe it was a TVT laser-cut mesh.
16   Q.      And is it your understanding that your
17   reports being offered in this case are -- are --
18   do they -- do they at all apply to the laser-cut
19   mesh?
20   A.      No.  My understanding, it's machine cut.
21   Q.      Have you at any time ever held in your
22   hand, examined, or looked at a -- to your
23   knowledge, a -- a mechanical-cut TVT?
24   A.      Not to my knowledge.
25   Q.      Do you know, is -- besides the fact that
```

Scott A. Guelcher, Ph.D.

```
 1                REPORTER'S CERTIFICATE

 2

 3              I certify that the witness in the

 4    foregoing deposition, SCOTT GUELCHER, PH.D., was

 5    by me duly sworn to testify in the within entitled

 6    cause; that the said deposition was taken at the

 7    time and place therein named; that the testimony

 8    of said witness was reported by me, a Shorthand

 9    Reporter and Notary Public of the State of

10    Tennessee authorized to administer oaths and

11    affirmations, and said testimony, pages 1 through

12    121 was thereafter transcribed to typewriting.

13              I further certify that I am not of

14    counsel or attorney for either or any of the

15    parties to said deposition, nor in any way

16    interested in the outcome of the cause named in

17    said deposition.

18              IN WITNESS WHEREOF, I have hereunto

19    set my hand the 21st day of September 2015.

20

21

22    _____

23    GARY SCHNEIDER, RMR, CRR, TLCR No. 676

24    My commission expires:  1/9/2018

25
```