# EXHIBIT A

Thomas C. Wright, Jr., M.D.

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

AT CHARLESTON

```
------------------------------X
                              )
IN RE:  ETHICON, INC.,        ) Master File No.
PELVIC REPAIR SYSTEM PRODUCTS ) 2:12-MD-02327
LIABILITY LITIGATION          )
                              )  MDL-2327
------------------------------)
 THIS DOCUMENT RELATES TO THE )
 FOLLOWING CASES IN WAVE 1 OF ) JOSEPH R. GOODWIN
 MDL 200:                     ) U.S DISTRICT JUDGE
                              )
                              )
 DEE MCBRAYER AND TIMOTHY     ) Civil Action No.
 MCBRAYER,                    )
                 Plaintiff    ) 2:12-CV-00779
 vs.                          )
 ETHICON, INC., ET AL.        )
                 Defendant.   )
                              )
------------------------------X
```

DEPOSITION OF THOMAS C. WRIGHT, JR., M.D.

New York, New York

March 29, 2016

Reported by:

MARY F. BOWMAN, RPR, CRR

Golkow Technologies, Inc. - 1.877.370.DEPS

Thomas C. Wright, Jr., M.D.

Page 2

1      March 29, 2016
2      9:10 a.m.
3
4
5         Deposition of THOMAS C. WRIGHT,
6      JR., M.D., held at the offices of Butler
7      Snow, LLP, 1700 Broadway, New York, New
8      York, before Mary F. Bowman, a Registered
9      Professional Reporter, Certified Realtime
10     Reporter, and Notary Public of the State of
11     New Jersey.
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 3

1              APPEARANCES:
2
3      PERDUE & KIDD, ESQS.
4      Attorneys for Plaintiffs
5         510 Bering Drive, Suite 550
6         Houston, TX  77057
7      BY:  JIM M. PERDUE, JR., ESQ.
8
9
10
11     THOMAS, COMBS & SPANN, ESQS.
12     Attorneys for Ethicon
13        300 Summers Street, Suite 1380
14        Charleston, West Virginia  25301
15     BY:  PHILIP COMBS, ESQ.
16
17
18
19
20
21
22
23
24

Page 4

1           (Exhibit 1, Expert Report of Dr.
2       Thomas Wright marked for
3       identification, as of this date.)
4           (Exhibit 2, Curriculum Vitae of
5       Dr. Thomas Wright marked for
6       identification, as of this date.)
7           (Exhibit 3, Thomas Wright's
8       Supplemental Reliance List in Addition
9       to Materials Referenced in His Report,
10      MDL Wave 1 marked for identification,
11      as of this date.)
12    THOMAS C. WRIGHT, JR., M.D.,
13      called as a witness by the plaintiffs,
14      having been duly sworn, testified as
15      follows:
16    EXAMINATION BY
17    MR. PERDUE:
18      Q.   Good morning, Dr. Wright.  My
19    name is Jim Perdue.  I am here on behalf of
20    plaintiffs, that is women who have brought
21    claims against Ethicon in a consolidated
22    litigation in federal court.
23           Do you understand that?
24      A.   I do.

Page 5

1       Q.   We had an opportunity to meet
2    briefly before we began today.  You
3    understand that you are here to give your
4    deposition on a general basis regarding
5    your opinions in that litigation?
6       A.   I do.
7       Q.   You have issued a report of your
8    general opinions in that litigation?
9       A.   I have.
10      Q.   In front of you, Dr. Wright, I
11   have marked Exhibit, Wright Exhibit 1.  Can
12   you identify that for us?
13      A.   This is my expert report, the
14   general report on the litigation.
15      Q.   So that we are clear and
16   understand exactly what Exhibit 1
17   represents, is it fair to describe
18   Exhibit 1 as an effort by you, Dr. Wright,
19   to describe your opinions as they relate to
20   the Ethicon Prolene Soft Mesh and any
21   products in which it is included?
22      A.   That is correct.
23      Q.   So that we have the parameters of
24   today's deposition, you are by specialty a

Thomas C. Wright, Jr., M.D.

Page 6

1  pathologist, correct?
2      A.  Correct.
3      Q.  And within the field of
4  pathology, there are some subspecialties.
5  As I understand it, you are an anatomic
6  pathologist?
7      A.  Correct.
8      Q.  That means, Doctor, that your
9  medical practice has been one in which you
10 have looked at and interpreted tissue
11 samples over your career, fair?
12     A.  Fair.
13     Q.  You have not been a clinician in
14 your medical practice?
15         MR. COMBS:  Object to form.
16     Q.  There will be times --
17     A.  In which I don't know what to do.
18     Q.  I will talk to you about your
19 history testifying in a second.
20         There will be times today where
21 counsel for Ethicon may make an objection.
22 That objection can only be ruled on by
23 somebody who is not in the room today.
24         So for the purposes of the

Page 7

1  transcript, he will make an objection,
2  preserve it for the record, and then the
3  day will come where that objection may be
4  heard, but you get to go ahead and answer
5  to the best of your ability.  Fair?
6         MR. COMBS:  At all times today,
7     go ahead and answer the question,
8     unless I were to direct you not to
9     answer.  The likelihood of that
10    happening is very small.  It would only
11    be if Mr. Perdue were to ask a question
12    that I thought invoked privileged
13    materials or something like that.
14        For the vast majority, what will
15    happen today, either if I'm asking a
16    question and Mr. Perdue objects, or if
17    he asks you a question and I object,
18    you just keep rolling.
19        THE WITNESS:  OK.
20        MR. COMBS:  We will let you know
21    if anything changes.
22     A.  For a number of years at
23 Columbia, I ran the colposcopy clinic,
24 which is pretty invasive disease.  So I saw

Page 8

1  patients having preinvasive cervical
2  disease.
3      Q.  And colposcopy is basically a
4  cervical biopsy?
5      A.  Colposcopy is looking at the
6  cervix with a microscope, a long-range,
7  dissecting microscope.  We look, we
8  identify areas of abnormality, we take
9  biopsies, and then if we find a
10 precancerous condition, we treat it locally
11 with excessive types of methods.
12     Q.  Let me back up to your
13 background, training and experience.
14         Can you tell us, Dr. Wright, what
15 Wright Exhibit 2, which is marked and is in
16 front of you, is?
17     A.  This is my CV.
18     Q.  Does your CV in effect serve as
19 your resume and a description of your
20 education, training and experience in the
21 field of medicine?
22     A.  It does.
23     Q.  If I look at Wright Exhibit 2,
24 Doctor, I see that you completed a

Page 9

1  residency in pathology, true?
2      A.  That is correct.
3      Q.  And then after your residency in
4  pathology, you went on to do what's called
5  a fellowship in gynecologic/obstetric
6  pathology some years later, fair?
7      A.  Fair.
8      Q.  The difference between a
9  residency and a fellowship is, after a
10 student of medical school attends three
11 years of medical school, they essentially
12 choose their specialty path going forward,
13 true?
14     A.  Yes.
15     Q.  Your choice as of the third year
16 of medical school, or your placement, was
17 in the field, the subspecialty of medicine
18 called pathology, correct?
19     A.  Correct.
20     Q.  From the practice then as a
21 pathologist after completed a residency,
22 you continued on to do some subspecialty
23 education called a fellowship training in
24 obstetric and gynecologic pathology, fair?

3 (Pages 6 to 9)

Thomas C. Wright, Jr., M.D.

### Page 22

1  attending or a consultant, that would
2  involve looking at the specific pathology
3  in that specific case and coming up with a
4  pathologic diagnosis?
5      A.  Correct.
6      Q.  Broader than just a
7  case-specific, whether attending or
8  consultant, have you ever, in any context,
9  analyzed multiple patients or multiple
10 experiences or research involved with the
11 histopathology of female tissue response to
12 polypropylene meshes?
13     A.  I have looked at a number of
14 cases through this litigation.
15     Q.  Again, in this particular
16 litigation, you have looked at multiple
17 individual cases and have issued
18 corresponding individual reports regarding
19 those reviews, fair?
20     A.  Fair.
21     Q.  But outside of the judicial
22 context, it is fair to say that you have
23 never engaged in a systemic review of cases
24 or literature related to the topic of

### Page 23

1  polypropylene mesh and human tissue
2  response?
3      A.  Correct.
4      Q.  So the record is clear, because
5  you mentioned -- when you talked about as a
6  pathologist having some clinical
7  experience, that experience is uniquely
8  involved in the procedure called
9  colposcopy, as I understand it?
10        MR. COMBS:  Object to form.
11     A.  Correct.
12     Q.  Colposcopy being a procedure to
13 diagnose a condition but also may be an
14 interventional procedure to treat upon
15 diagnosis?
16     A.  Correct.
17     Q.  And other than that specific
18 instance, it is fair to say that you are
19 not in a practice that involves the
20 diagnosis and treatment of stress urinary
21 incontinence?
22     A.  Correct.
23     Q.  You are not in a practice and
24 have never been in a practice that involved

### Page 24

1  the diagnosis and treatment of female
2  pelvic organ prolapse?
3      A.  Correct.
4      Q.  You are not a urologist by
5  training?
6      A.  Correct.
7      Q.  You are not a urogynecologist by
8  training?
9      A.  Correct.
10     Q.  You are not a gynecologist by
11 training?
12     A.  Correct.
13     Q.  You do not and have not performed
14 gynecologic surgery?
15     A.  Correct.
16     Q.  You do not and have not performed
17 urologic surgery?
18     A.  Correct.
19     Q.  Fair to say you have never
20 implanted a mid-urethral sling?
21     A.  Correct.
22     Q.  Fair to say that you have never
23 implanted a pelvic organ prolapse mesh?
24     A.  Correct.

### Page 25

1      Q.  Fair to say you have never
2  excised portions of a mid-urethral sling?
3      A.  Correct.
4      Q.  Fair to say you have never
5  excised portions of a pelvic organ prolapse
6  mesh?
7      A.  Correct.
8      Q.  Any involvement that you would
9  have in the issue of tissue response and
10 polypropylene mesh would be within the
11 specialty of pathology, correct?
12     A.  Correct.
13     Q.  So that is not a practice that
14 involves seeing the patient in an office
15 setting, correct?
16     A.  Correct.
17     Q.  It is not a practice that
18 involves diagnosing a patient before a
19 surgical procedure?
20     A.  Correct.
21     Q.  It is not a practice that
22 involves making a clinical diagnosis on a
23 patient after a procedure?
24     A.  Correct.

Thomas C. Wright, Jr., M.D.

Page 46

1 (Discussion off the record)
2 Q. I did not see in your report, and
3 based on the last answer, I want to
4 understand, as far as the design history of
5 Prolene mesh, are you familiar at all or
6 have any opinions regarding the design
7 history of Prolene mesh?
8 A. I do not.
9 Q. Whether a sufficient design
10 analysis or failure analysis was done on
11 this product before Ethicon put it on the
12 market, fair to say you do not have any
13 opinions one way or the other?
14 A. No opinion.
15 Q. As a pathologist, then, we have
16 already established you have never treated
17 before surgery or followed up after surgery
18 a woman suffering from stress urinary
19 incontinence or pelvic organ prolapse?
20 A. Correct.
21 Q. The histology related to those
22 disease states is something you're familiar
23 with from your experience?
24 A. Correct.

Page 47

1 Q. But the clinical effect of mesh
2 to treat those disease states is not
3 something within your practice, fair?
4 A. Can you explain "clinical
5 effect"?
6 Q. So you have never in your
7 practice examined, interviewed, treated a
8 woman for stress urinary incontinence or
9 pelvic organ prolapse after they have been
10 implanted with mesh?
11 A. Correct.
12 Q. You have never come across a
13 situation as a pathologist where you needed
14 to analyze whether a mesh was effective in
15 curing an individual woman of stress
16 urinary incontinence or pelvic organ
17 prolapse?
18 A. Correct.
19 Q. Fair to say that's just not
20 something in the field of pathology that
21 you would come across in your experience,
22 correct?
23 A. Correct.
24 Q. As I understand your role, that

Page 48

1 would have been -- outside of a litigation
2 context, but in the actual experience and
3 training of you as a pathologist, the way
4 you would encounter tissue response to
5 polypropylene mesh would be for a pathology
6 sample to be excised by someone else in the
7 operating room and sent to the pathology
8 department, and that sample would be
9 assigned to you?
10 A. Correct.
11 Q. That's the way that you would
12 have, in your experience, ever come across
13 one of these samples, fair?
14 A. Correct.
15 Q. And the extent of which you were
16 familiar in your practice with what that
17 individual woman's clinical symptoms were,
18 were on the pathology requisition form,
19 correct?
20 A. Correct.
21 Q. So her other comorbidities, other
22 symptomatology, before or after that
23 surgery, was not something that you would
24 have been aware of in your practice of

Page 49

1 pathology, correct?
2 A. Correct.
3 Q. And the clinical indications that
4 you can recall seeing in your personal
5 experience for pathological samples
6 submitted to you that involved mesh would
7 have been pain or erosion of mesh?
8 A. Correct.
9 Q. I've marked, Dr. Wright, as
10 Exhibit 3, a document that was provided to
11 us by Ethicon's counsel, which is, as you
12 can see, titled "Thomas Wright's
13 Supplemental Reliance List in Addition to
14 Materials Referenced in His Report, MDL
15 Wave 1."
16 Do you see that, sir?
17 A. I do.
18 Q. Now, in your report, which we
19 have marked as Exhibit 1, there are 33
20 footnotes, correct?
21 A. References.
22 Q. References.
23 A. Correct.
24 Q. And I take it then by the

13 (Pages 46 to 49)

Page 146

1  Q. So your report concludes, "As the
2  literature and my own experience have
3  shown, the histologic findings cannot be
4  correlated with clinical complications,
5  particularly in regards to inflammation,
6  foreign body response and fibrosis, where
7  histology studies have rejected such a
8  correlation."
9      Do you see that?
10 A. No. What page are you on?
11 Q. I'm on page 11 and 12.
12 A. Sorry, I was in the conclusion.
13 Q. Yeah. I'm leaving the Occulip
14 stuff. Sorry. Yeah, the very bottom
15 there. Before the Occulip stuff.
16 A. "As the literature and my own
17 experience have shown" -- correct?
18 Q. Yes, sir.
19 A. Correct.
20 Q. And so it is your position --
21 that is your position, as Dr. Wright,
22 pathologist, even after we've reviewed the
23 Hill article, correct?
24 A. Correct.

Page 147

1  Q. And also we have talked about
2  your personal experience in reviewing
3  explanted meshes?
4  A. Correct.
5  Q. Can you give us an estimate of
6  the number of explanted tissue-mesh samples
7  that you have reviewed in your career?
8  A. We review a handful a year at
9  Columbia. And all --
10 Q. Four to five?
11 A. Four to five. And it's been
12 since 2000 when they first started.
13 Q. So if we started in 2000 and just
14 estimated four to five --
15 A. You know, 40.
16 Q. So 40 --
17 A. 40 to 50.
18 Q. OK. As we have already
19 identified, of that 40 to 50, you do not
20 know what the mesh -- whose mesh it was,
21 where it came from, or its mesh
22 characteristics, correct?
23 A. I would know where it came from.
24 Q. You would know where in the body

Page 148

1  it came from?
2  A. And was it a TVT would be listed.
3  Is -- and we know anterior versus
4  posterior, if it was a mesh. I might.
5  They may say "posterior."
6  Q. Your personal experience with
7  looking at excised mesh can't give us any
8  data as far as the numbers of TVT versus
9  POP -- Ethicon versus other manufacturers?
10 A. Correct.
11 Q. You have no way of knowing in
12 your personal experience how much of it may
13 have been Prolene versus Prolene Soft,
14 correct?
15 A. Correct.
16 Q. Is it ultimately your opinion
17 that there is no pathology finding that
18 would be seen in a microscope of
19 inflammation, foreign body response, nerve
20 entrapment, fibrosis formation, that in
21 your opinion correlates to a clinical
22 symptom of pain, dysfunction, sexual or
23 urinary -- you know, that?
24     MR. COMBS: Object to form.

Page 149

1  Q. I didn't want to say erosion,
2  because you told me you can see
3  pathologically erosion.
4  A. Erosion has clear pathological
5  features.
6  Q. That's why I wanted to stop at
7  that waterfront, Doctor.
8      So my question is this: Is it
9  your opinion that there is no pathological
10 finding under the microscope that involves
11 either inflammation, foreign body response,
12 fibrosis or nerve entrapment that in your
13 opinion, you would correlate to a clinical
14 complaint of pain, or sexual or urinary or
15 defecatory dysfunction?
16     MR. COMBS: Object to form.
17 A. With nerve entrapment, this is a
18 different -- a large nerve such as a
19 pudendal nerve that was entrapped in mesh,
20 that would clearly cause a nerve
21 entrapment, as opposed to nerve twigs. I
22 just want to be specific.
23 Q. OK.
24 A. The entity of nerve entrapment

Page 174

1  2-by-7-centimeter TVT sling, you have that
2  microscopic event on a much, much grander
3  scare, fair?
4      A.  I take the brick and I make it
5  into a brick wall.
6      Q.  That's right.
7          So that brick wall can be the
8  size of a sling or it can be a brick
9  building the size of a POP mesh, fair?
10     A.  Fair.
11     Q.  What you are seeing at the level
12 of a single brick is different than what
13 may be going on, on a gross level, fair?
14     A.  The individual components, the
15 host tissue response to the individual
16 components is the same, which is what I was
17 responding to.  It is just that there are
18 many more individual components.
19     Q.  Right.
20         And so for example -- well,
21 you -- for the ladies and gentlemen of the
22 jury, what is your pathologic understanding
23 of what a suture, a Prolene permanent
24 suture is designed to do?

Page 175

1      A.  It is designed to provide a
2  robust, long-lasting holding the structures
3  together.
4      Q.  It is --
5      A.  A permanent suture.
6      Q.  It is a stitch?
7      A.  It is a stitch, correct.
8      Q.  So you have two areas of tissue
9  that have been cut, and to hold them
10 together, you put in some number of
11 sutures, correct?
12     A.  Correct.
13     Q.  And then the tissue grows back to
14 each other through the inflammatory
15 response and in the chronic inflammatory
16 matrix response as we have discussed today,
17 correct?
18     A.  Correct.
19     Q.  A suture is not designed or
20 intended to be a framework for tissue
21 integration, correct?
22     A.  Correct.
23     Q.  So the fact that you see on a
24 localized basis a cellular response to a

Page 176

1  suture does not translate to what a
2  female's symptomatology or clinical
3  presentation may be for an integrated
4  pelvic mesh?
5      A.  Correct.
6          MR. PERDUE:  OK.  I think I had
7  one other, but I'm finished.  I'm done.
8          Thank you, Doctor.
9  EXAMINATION BY
10 MR. COMBS:
11     Q.  Dr. Wright, what is the
12 discipline that makes the determination of
13 a cause of the symptomology of a woman who
14 has had implanted mesh?  Is that a
15 pathologist or urogynecologist?
16     A.  That would be a urogynecologist.
17     Q.  I should have asked that question
18 first.  Off the record.
19         (Time Noted:  12:35 p.m.)

Page 177

1              CERTIFICATE
2       STATE OF NEW JERSEY )
3                           )ss:
4       COUNTY OF UNION     )
5           I, MARY F. BOWMAN, a Registered
6  Professional Reporter, Certified
7  Realtime Reporter, and Notary Public
8  within and for the State of New Jersey,
9  do hereby certify:
10          That THOMAS C. WRIGHT, JR., M.D.,
11 the witness whose deposition is
12 hereinbefore set forth, was duly sworn
13 by me and that such deposition is a
14 true record of the testimony given by
15 such witness.
16          I further certify that I am not
17 related to any of the parties to this
18 action by blood or marriage and that I
19 am in no way interested in the outcome
20 of this matter.
21          In witness whereof, I have
22 hereunto set my hand this 29th day of
23 March, 2016.
24          _____