# EXHIBIT E

Kimberly H. Allison, M.D.

```
 1              IN THE UNITED STATES DISTRICT COURT
 2          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 3                     CHARLESTON DIVISION
 4   IN RE:  ETHICON, INC., PELVIC    ) MASTER FILE NO.
     REPAIR SYSTEM PRODUCTS           ) 2:12-MD-02327
 5   LIABILITY LITIGATION             ) MDL NO. 2327
                                      )
 6   THIS DOCUMENT RELATES TO THE     )
     FOLLOWING CASES IN THE WAVE 1    )
 7   OF MDL 200:                      )
     LISA THOMPSON, et al.,           ) CASE NO.
 8                                    ) 2:12-cv-01199
                    Plaintiff,        )
 9                                    )
     V.                               )
10                                    )
     ETHICON, INC., ET AL.,           )
11                  Defendants.       )
12         DEPOSITION OF KIMBERLY H. ALLISON, M.D.
13
14   DATE:              THURSDAY, MARCH 17, 2016
15   TIME:              12:58 P.M.
16   LOCATION:          STANFORD PARK HOTEL
17                      100 El Camino Real
18                      Menlo Park, California
19
20
21   Reported by:
22   LUCY CARRILLO-GRUBBS, RMR, CRR, RPR, CRP, CSR
     License No. 6766
23
24
25
```

Kimberly H. Allison, M.D.

```
 1              A P P E A R A N C E S
 2    FOR PLAINTIFF:
 3      P. LEIGH O'DELL, ESQUIRE
        Law Offices of BEASLEY ALLEN CROW METHVIN PORTIS
 4      & Miles, P.C.
        218 Commerce Street
 5      Montgomery, AL  36103
        Tel:  334.269.2343
 6      Fax:  334.954.7555
        Email:  Leigh.Odell@BeasleyAllen.com
 7
      FOR DEFENDANTS:
 8
        S. PETER VOUDOURIS, ESQUIRE
 9      Law Offices of TUCKER ELLIS, LLP
        950 Main Avenue, Suite 1100
10      Cleveland, Ohio  44113
        Tel:  216.592.5000
11      Fax:  216.592.5009
        Email:  peter.voudouris@tuckerellis.com
12
        TRACI L. SHAFROTH, ESQUIRE
13      Law Offices of TUCKER ELLIS, LLP
        One Market Plaza, Steuart Tower
14      Suite 700
        San Francisco, CA  94105
15      Tel:  415.617.2400
        Fax::415.617.2409
16      Email:  traci.shafroth@tuckerellis.com
17                       -oOo-
18
19
20
21
22
23
24
25
```

Kimberly H. Allison, M.D.

1       BE IT REMEMBERED THAT, pursuant to the laws

2    pertaining to the taking and use of depositions,

3    and on THURSDAY, MARCH 17, 2016, commencing at the

4    hour of 12:58 p.m. thereof, at the STANFORD PARK

5    HOTEL, 100 El Camino Real, Menlo Park, CA

6    California, before me, LUCY CARRILLO-GRUBBS, CRP,

7    RMR, CRR, RPR, CSR No. 6766, a Certified Shorthand

8    Reporter in and for the State of California,

9    personally appeared

10

11              KIMBERLY H. ALLISON, M.D.

12

13   being called as a witness by the Defendants, who,

14   having been by me first duly sworn, was thereupon

15   examined and interrogated as hereinafter set forth.

16                      -oOo-

17       (Defendants' Exhibit No. 1, 2, 3, 4 and 5 were

18   marked for identification.)

19                      -o-

20                  EXAMINATION

21       BY MR. VOUDOURIS:

22       Q.  Can you state your full name for the

23   record, please?

24       A.  Kimberly Heller Allison.

25       MR. VOUDOURIS:  Before we start today, I just

Kimberly H. Allison, M.D.

1    want to put something on the record.

2         As you know, Ms. O'Dell, it was our

3    position that since Dr. Allison has never given a

4    deposition in an Ethicon case or any kind of TVT

5    case, and does have a report that has a general

6    opinion section, that we believe that we are

7    entitled to a three-hour expert deposition on her

8    general opinions.

9         You have objected to that in two of the

10   e-mails, both to Mr. Snowden, I believe one was on

11   March 15th, and another one on March 16th, where

12   you said we will not make Dr. Allison available for

13   a general expert three-hour deposition.

14        Is that still your position today?

15   MS. O'DELL:  Yes, it is.  The agreement in the

16   MDL between counsel for Ethicon and the Plaintiffs'

17   Steering Committee has been that for experts who

18   have been disclosed as general causation experts,

19   that they are subject to a three-hour deposition on

20   their general opinions.

21        For experts who have not been disclosed as

22   a general causation expert but only as a case

23   specific expert, like Dr. Allison, the agreement of

24   the parties was limited to two hours per case.

25        So our position is, as you know, that

Kimberly H. Allison, M.D.

1  Dr. Allison has not been disclosed as a general

2  causation expert.  She has only been disclosed as a

3  case specific expert; and, therefore, for her

4  deposition in the Thompson, Phelps and Barker

5  cases, the limitation is two hours per case.

6      MR. VOUDOURIS:  And you understand from

7  previous e-mails that that is not the defense's

8  opinion and we're going to file a motion on that

9  issue, just so you know.

10          Second part of housekeeping, prior to last

11  evening we were anticipating taking your deposition

12  in at least four case specific cases, maybe a

13  fifth, and we just were informed last night that

14  you would no longer be giving case specific

15  opinions in the Deborah Joplin case; is that

16  correct?

17      MS. O'DELL:  That is correct.

18      MR. VOUDOURIS:  Okay.

19      Q.  Do you understand, Dr. Allison, that to be

20  correct?

21      A.  Yes.

22      Q.  And you're also not going to be giving any

23  expert testimony in the Maria --

24      MS. O'DELL:  It's Quijano.

25      MR. VOUDOURIS:  Quijano.

Kimberly H. Allison, M.D.

1     MS. O'DELL:  And as -- Dr. Allison will not be

2  giving case specific opinions in the Quijano case,

3  based on the decision of counsel.

4       I would say further --

5     MR. VOUDOURIS:  And I have copies of everything

6  if you want to see it.

7       Go ahead.

8     MS. O'DELL:  Further, Dr. Allison has been

9  disclosed not only in the Thompson, Phelps and

10  Barker matters, and -- and I'm counsel of record in

11  those matters, but she's also been disclosed as a

12  case specific expert in numerous cases that are

13  represented by Blazen, Game, Birch & Girard, and

14  those cases, as I understand, have been deferred to

15  another setting that's not yet been decided.

16     BY MR. VOUDOURIS:

17     Q.  Dr. Allison, I've handed you what we've

18  marked as Defendants' Exhibit C, can you identify

19  that for us?

20     A.  Yes.  This is the spreadsheet of my case

21  specific findings on the pathology and review of

22  records.

23     Q.  You created this spreadsheet?

24     A.  Yes.

25     Q.  And the purpose of creating this

Kimberly H. Allison, M.D.

1      Q.  All right.

2          What was the product that you were

3   involved with in that deposition?

4      A.  Bard slings.

5      Q.  And have you -- you've given other

6   deposition testimony against Bard; is that correct?

7      A.  Correct.

8      Q.  How many times have you testified in cases

9   against Bard?

10     MS. O'DELL:  Just to clarify, Peter, you're

11  talking about like a day-long deposition or are you

12  talking about the number of cases?

13     MR. VOUDOURIS:  Well, we can break that down.

14     Q.  How many depositions have you given in

15  cases against Bard?

16     MS. O'DELL:  And I would just clarify the

17  record, those depositions were done in composite so

18  it was one deposition, it was multiple cases, so I

19  don't know -- your question's a little unclear.

20     THE WITNESS:  Yeah.

21         So I think there have been two

22  depositions, different time points; is that

23  correct?  And there were multiple patients,

24  multiple cases in each deposition.

25     BY MR. VOUDOURIS:

Kimberly H. Allison, M.D.

1      Q.   Do you remember how many cases or patients

2   those involved?

3      A.   Ten to 15.  I could -- again, I could look

4   at my records.

5      Q.   All right.

6           And then you'll let us know?

7      A.   Yes.

8      Q.   Have you testified in court?

9      A.   No.

10      Q.   Do you have any plans to?

11      A.   No.

12      Q.   I'm sorry?

13      A.   No.

14      Q.   The three patients that we're going to be

15   talking about over the next two days, I just want

16   to make sure, have you seen any of those patients?

17      A.   No.

18      Q.   Treated them in any way?

19      A.   No.

20      Q.   Talked to any of their doctors?

21      A.   No.

22      Q.   Read any of the other expert reports in

23   those cases?

24      A.   I think they've been made available to me,

25   but I may have read parts of some.

Kimberly H. Allison, M.D.

1      Q.   I'm sorry, you have to keep your voice up.

2      A.   I may have read parts of some of them.

3      Q.   In what case or cases?

4      A.   I believe Barker.

5      Q.   You read an expert report in Barker?

6      A.   Yes.

7      Q.   Do you know who it was authored by?

8      A.   Felix.

9      Q.   Do you know Dr. Felix?

10     A.   No.

11     Q.   Do you know him by reputation?

12     A.   No.

13     Q.   Do you know what type of pathologist he

14  is?

15     A.   OB-GYN.

16     Q.   Okay.

17          And would I be correct in saying that your

18  specialty in pathology is breast?

19     A.   And GYN.

20     Q.   And we'll talk about your experience with

21  GYN in a moment.

22          Any other reports?

23     A.   I read the Longacre report that was -- I

24  don't believe it was case specific, maybe it was.

25     Q.   Do you know Dr. Longacre?

Kimberly H. Allison, M.D.

1       A.  Yes.

2       Q.  I imagine you do.

3           What is her position at Stanford?

4       A.  She's a professor of pathology.

5       Q.  And you are an associate professor?

6       A.  Associate professor.

7       Q.  So in terms of the hierarchy, she's higher

8   up on the totem pole, so to speak, than you?

9       A.  Yes, she's been there a lot longer.

10      Q.  Right.

11          What's her position at Stanford?

12      A.  Professor of pathology.  She has many

13  positions, I mean, many other roles,

14  administrative-wise.

15      Q.  Right.

16      A.  So...

17      Q.  Is she known as a GYN pathologist at

18  Stanford?

19      A.  She is, and we codirect the breast and GYN

20  fellowship together.

21      Q.  I'll talk about that in a minute.

22          Do you trust Dr. Longacre?

23      A.  Yes.

24      Q.  Do you believe she's a competent and

25  capable GYN pathologist?

Kimberly H. Allison, M.D.

1      A.  Yes.

2      Q.  Would you send patients to her to have

3   their GYN path read?

4      A.  Yes.

5      Q.  You value her opinion?

6      A.  Yes.

7      Q.  And she's well respected in the GYN

8   pathology community?

9      A.  Yes.

10      Q.  Any other reports?

11      A.  I'm not recalling.  I definitely read

12   those two.

13      Q.  Anything else that you can remember?

14      A.  No.

15      Q.  All right.

16          Any expert reports in those three cases?

17      MS. O'DELL:  Other than the one she just

18   mentioned.

19      MR. VOUDOURIS:  I'm sorry.

20      Q.  Plaintiff's expert reports.

21      A.  Besides the pathologist ones?

22      Q.  Well, you named two defense pathologists,

23   you named Dr. Felix and Dr. Longacre, who you know

24   very well.

25      A.  Yeah, yeah, yeah.

Kimberly H. Allison, M.D.

 1          No, I don't think I have.

 2      Q.  When did you read Dr. Felix's report?

 3      A.  I was just perusing it.  It was made

 4  available last night, so I was just perusing it an

 5  hour ago.

 6      Q.  Okay.

 7          Did you finish it?

 8      A.  I did not read it in-depth.

 9      Q.  Okay.

10          Did you have any disagreements with it, as

11  you sit here today?

12      A.  Well, yes, of course I did.  I mean, we

13  have different opinions on the -- on the cases,

14  yes.

15      Q.  Okay.

16          How do you differ from Dr. Felix's

17  opinions?

18      A.  Well, shall we go through them step by

19  step or can I see the report so we can discuss them

20  and I can --

21      Q.  Did you bring it with you?

22      A.  No.

23      Q.  Okay.

24          How about Dr. Longacre?

25      A.  I didn't bring that one with me either.

Kimberly H. Allison, M.D.

1          You're welcome to ask her about anything

2    in her report.

3        BY MR. VOUDOURIS:

4        Q.  You do mention here that you're the

5    codirector at the Stanford Breast/GYN Pathology

6    Fellowship; is that accurate?

7        A.  Yes.

8        Q.  Is there a director?

9        A.  A director that --

10       Q.  At Stanford -- sorry.

11       A.  Teri Longacre.

12       Q.  So Teri Longacre sits above you in that

13   position; is that correct?

14       MS. O'DELL:  Object to the form.

15       THE WITNESS:  Correct, she was there before I

16   came to Stanford in 2013.  She had that fellowship

17   established, and when I arrived, she asked me to

18   codirect it with her.

19       BY MR. VOUDOURIS:

20       Q.  She was part of your hiring process,

21   correct?

22       A.  Yes.

23       Q.  Now, at Stanford, do you review GYN

24   pathology?

25       A.  Not currently.  They have needed me more

Kimberly H. Allison, M.D.

1    in the breast pathology, but I originally applied

2    for the job which was posted as a GYN pathologist,

3    and they hired me based on my expertise in both

4    breast and GYN.  They've needed people to fill in

5    more on the breast service, and so that's what I've

6    done.

7        Q.  You came to Stanford in January of 2013, I

8    believe?

9        A.  Yes.

10       Q.  Since January 2013, have you signed out

11   any GYN path at Stanford?

12       A.  No, I have not.

13           I've done frozen sections on GYN

14   pathology, which is intraoperative consultations.

15       Q.  Right, but that's for cancer, correct?

16       A.  No.  They're not all for cancer.

17       Q.  What else are they for?

18       A.  Intraoperative evaluations are for "what

19   is this" questions, a surgeon wants to know what

20   they have in the OR, immediately, and so they'll

21   send tissue to us to freeze and rapidly tell them.

22       Q.  How often do you do that?

23       A.  Every single day that I'm on service.

24       Q.  And have you ever asked to evaluate a

25   frozen section regarding vaginal tissue while at

Kimberly H. Allison, M.D.

1    Stanford?

2        A.   Vaginal tissue, there's a lot of GYN

3    frozen, but vaginal tissue is not an intraoperative

4    consultation.

5        Q.   So the answer to my question would be no?

6        A.   I think it would be no, yes.

7        Q.   When was the last time you looked at -- or

8    signed out, I'm sorry, a report on vaginal tissue

9    that was not a frozen section?

10       MS. O'DELL:  Are you talking about in the -- in

11   the course of her clinical --

12       MR. VOUDOURIS:  Yes.

13       MS. O'DELL: -- practice?

14       MR. VOUDOURIS:  I'm sorry.

15       THE WITNESS:  Probably would have been in 2012,

16   before I came.  I -- you know.

17       BY MR. VOUDOURIS:

18       Q.   To the best of your knowledge, have you

19   ever looked at mesh from a TVT product as part of

20   your clinical practice?

21       A.   I've looked at explanted mesh as part of

22   my clinical practice in the past.  I was not paying

23   attention during those years I was looking at those

24   cases with, you know, what type of procedure it had

25   been removed from, so I don't know.

Kimberly H. Allison, M.D.

1    Q.  You don't know?

2    A.  I don't know.

3    Q.  I apologize, we got a little sidetracked.

4        We were going through Dr. Longacre's

5  report, and you were up to page 7, I believe.

6    A.  Yes.

7    Q.  Do you agree with everything that she said

8  before page 7?

9    A.  I would really rather not have to disagree

10  on a case on a statement-by-statement basis with my

11  colleague.  I'm happy to talk about my case

12  specific findings and if you have disagreements

13  with them, to go through them, but it's putting me

14  in a very awkward position.

15       I -- we all disagree with each other in

16  practice on occasion, but this is a very awkward

17  position for me to be in.

18    Q.  Well, it's going to be an awkward position

19  regardless, Dr. Allison.  So is there anything that

20  you disagree with up to page 7 in Dr. Longacre's

21  report?

22    MS. O'DELL:  And, Dr. Allison, if you -- if

23  you -- if he's asking you to go through every line

24  and word, then feel free to just take a few minutes

25  and to do that.

Kimberly H. Allison, M.D.

1        THE WITNESS:  I need a break.

2        MS. O'DELL:  Okay.  Let's go off the record.

3        (Recess taken from 1:34 p.m. to 1:56 p.m.)

4        MR. VOUDOURIS:  It's -- we've been off the

5    record now for how long, court reporter?

6        THE REPORTER:  From 1:34 to 1:56.

7        BY MR. VOUDOURIS:

8        Q.  And, Dr. Allison, you went outside to

9    collect yourself, correct?

10       A.  Yes.

11       Q.  Are you ready to proceed?

12       A.  Yes.

13       Q.  Okay.

14           And you understand the defense didn't put

15   you in this position, okay?  You're going to be

16   offering testimony that's going to be directly

17   adverse to and opposite to the chairman of the

18   department of GYN pathology at Stanford.

19           Do you understand that?

20       A.  Yes.

21       Q.  And are you ready to proceed?

22       A.  Yes.

23       Q.  Okay.

24           We're going through Dr. Longacre's report,

25   right?

Kimberly H. Allison, M.D.

1      Q.  Do you disagree with that statement?

2      MS. O'DELL:  And if you don't have an opinion

3   about it, you're welcome to say that.

4      MR. VOUDOURIS:  Objection.

5      THE WITNESS:  I mean, I told you my opinion.

6      MR. VOUDOURIS:  Stop, stop, excuse me --

7      THE WITNESS:  You're trying to make me say --

8      THE REPORTER:  I'm sorry, I can't take two of

9   you at the same time.

10      BY MR. VOUDOURIS:

11      Q.  Go ahead, Dr. Allison.

12      MS. O'DELL:  She's answered your question.

13      MR. VOUDOURIS:  I don't think she has.

14      Q.  Go ahead.

15      MS. O'DELL:  I believe she has.

16      THE WITNESS:  I told you what I would say

17   instead of this statement, so it's not that I a

18   hundred percent disagree with the statement, I

19   would state it in a different way.

20      BY MR. VOUDOURIS:

21      Q.  Have you ever contacted the FDA and told

22   them that you don't think that polypropylene is

23   safe and effective in a few patients or however you

24   worded it?

25      A.  No, and I don't think Dr. Longacre

Kimberly H. Allison, M.D.

1  contacted them either to ask them if it was safe

2  and effective.

3      Q.  That wasn't the question.

4          The question was you, have you ever

5  contacted the FDA --

6      A.  No. Of course not.

7      Q.  -- and told them that polypropylene is not

8  safe and effective in the treatment of stress

9  urinary incontinence?

10     A.  No.

11     Q.  Continue, please.

12     A.  So she says:  "There's no correlation

13  between the degree of fibrosis and inflammation in

14  the presence of pain and/or mesh exposure."

15         So there are parts I agree with and parts

16  I disagree with about that statement.

17         The degree of fibrosis and inflammation, I

18  agree that that hasn't been systematically linked

19  to patients with pain versus patients without pain

20  or patients with exposure versus patients without

21  exposure.

22         However, I don't think that that means

23  that the patients who have those symptoms, that it

24  wasn't caused by the presence of the mesh and the

25  fibrosis and inflammation in those patients.

Kimberly H. Allison, M.D.

1      Q.   And is that based on your experience?

2      A.   My experience as a pathologist?

3      Q.   Yes.

4      A.   Yeah, my experience looking at 80 to 100

5    of these cases of explants and reading the

6    literature and understanding these are known

7    complications of this procedure.

8      Q.   You've looked at 80 to 90 what?

9      A.   Mesh explant tissues.

10     Q.   Okay.

11          How many TVT explant tissues have you

12   looked at?

13     A.   Again, you asked me that question earlier,

14   and I don't know the exact percentage.

15     Q.   Do you have any idea what the percentage

16   is?

17     A.   No.

18     Q.   And in the -- I'm sorry, what was the

19   number, 80 to 90 of mesh explants?

20     MS. O'DELL:   I think it's what she said.

21     THE WITNESS:   I said 80 to 100, yes.

22     MR. VOUDOURIS:   Okay.

23     Q.   Where did you get those cases from?

24     A.   Well, in my prior practice at University

25   of Washington, I probably saw ten to 20, just

Kimberly H. Allison, M.D.

1    explants being removed.

2           And then I saw I think 60 or so cases when

3    I was first working on the Bard product litigation,

4    that were sent to me just to review.  Some of them

5    weren't even cases I was opining on, just to look

6    at what kinds of findings there were in mesh

7    explants, so that I could have more exposure to it.

8       Q.  I've had an opportunity to look at some of

9    your depositions in the Bard cases, and you

10   testified that when you were at University of

11   Washington you saw maybe ten to 12; is that

12   accurate?

13      A.  Sure, that's between ten and 20.

14      Q.  All right.

15          Of those ten to 20 patients, did all of

16   them experience pain?

17      A.  So when you're making a surgical pathology

18   report, you're cognizant of what symptom -- why --

19   why something's being removed when the clinician is

20   asking you to explain a symptom.

21          So if there was a biopsy for a mass and

22   they want to know what is the mass, we explain to

23   them what is the mass.

24          So for -- for most foreign material

25   removal, the clinician already knows this is the

Kimberly H. Allison, M.D.

1   reason I'm removing this.  I've made a decision as

2   the surgeon that I think this is causing a problem,

3   whether it's pain, erosion, dysfunction of some

4   kind.  It's time to take this out, this foreign

5   body out.

6        And so -- so as a pathologist, your job is

7   to document that something was removed for them.

8   It's not the same question as is being asked of me

9   here, in these cases.  It's linking the pathology

10  with the clinical symptoms.

11      Q.  Okay.

12        I believe my question was pretty simple,

13  the ten to 12 cases that you looked at at

14  University of Washington of mesh explants, did all

15  of those women complain of pain?

16      MS. O'DELL:  Objection to the form.

17      THE WITNESS:  We didn't always have the

18  clinical information about why things were being

19  removed.

20      BY MR. VOUDOURIS:

21      Q.  So you don't know?

22      A.  I don't know.

23      Q.  All right.

24        The other meshes you've looked at have all

25  been part of litigation, correct?

Kimberly H. Allison, M.D.

1      A.   Correct.

2      Q.   And they were provided to you by

3  plaintiffs?

4      A.   Yes.

5      Q.   Okay.

6           Is it fair for me to assume that all of

7  those patients complained of pain?

8      A.   I think many of them did, yes.

9      Q.   Okay.

10          As we sit here today, can you tell me any

11 of them who didn't?

12     A.   I believe some were probably just for

13 erosion or other dysfunction.

14     Q.   Do you know that or are you just guessing?

15     A.   I don't -- I don't have a spreadsheet of

16 all of the cases I've ever looked at and have a --

17 of course I'm just guessing.

18     Q.   All right.

19     A.   These are all educated guesses you're

20 asking me to make.

21     Q.   What statement were you at, or sentence?

22     A.   The degree of fibrosis and inflammation.

23 So I think I addressed that one.

24     Q.   Anything else in 4 you agree with?

25     MS. O'DELL:   Object to form.

Kimberly H. Allison, M.D.

1      THE WITNESS:  I'm not going to go through each

2  sentence in great detail because we'll be here way

3  too long.  I think it would be better if I just

4  scanned through and said which ones I disagree with

5  in a major way.  And I think I reserve the right to

6  go back and look at some of the details and say

7  whether I agree or disagree.

8      BY MR. VOUDOURIS:

9      Q.  Dr. Allison.

10      A.  Yes.

11      Q.  The task that you've been asked to do, and

12  Ms. O'Dell has asked you to do too, is to go

13  through here line by line and tell us where you

14  disagree with the head of GYN pathology at

15  Stanford, Dr. Longacre.

16      A.  Should I read the entire statement to you,

17  then?

18      Q.  Yeah, keep reading.  You don't have to

19  read out loud, read to yourself.

20      A.  Okay.

21      Q.  And when you get to a place where you

22  disagree with Dr. Longacre, you tell us, and you

23  tell us the basis for that disagreement.

24      MS. O'DELL:  And, Dr. Allison, you're free to

25  read out loud if you'd like to, you're free to

Kimberly H. Allison, M.D.

```
 1       THE WITNESS:  It's not his theories, per se,

 2  but the evidence he presents for the tree barking

 3  effect that I can see under the microscope.

 4       BY MR. VOUDOURIS:

 5       Q.  Other than you qualifying it a different

 6  way, am I correct?

 7       MS. O'DELL:  Object to the form.

 8       THE WITNESS:  Can you state it again for me?

 9       (The Reporter read back as follows:

10       "Question:  Other than you qualifying

11        it a different way, am I correct?")

12       THE WITNESS:  Before that.

13       MS. O'DELL:  I think she meant the statement

14  before that.

15       (The Reporter read back as follows:

16       "Question:  Is it fair to stay that

17        it's his theories on degradation

18        upon which you rely for your

19        specific case opinions?")

20       MS. O'DELL:  Object to the form.

21       THE WITNESS:  It's the -- yeah, the evidence

22  that he presents, yes, I wouldn't call them

23  theories.  He's published about them and provided

24  evidence that was accepted in peer reviewed

25  literature.
```

Kimberly H. Allison, M.D.

1      BY MR. VOUDOURIS:

2      Q.  Have you ever dictated in a path report

3  that you saw degradation of mesh as part of your

4  clinical practice?

5      A.  His papers were describing this entity in

6  the last several years, so no, I've not.

7      Q.  Have you told Dr. Longacre that you

8  believe mesh in vivo degrades?

9      A.  We do not speak -- we have not spoken

10  about this litigation.

11      Q.  Okay.  Continue.

12      A.  On page 6 she talks about nerve twigs in

13  the first paragraph, and mentions:  "The presence

14  of nerves or nerve twigs in and around the mesh

15  material does not necessarily (and, in fact, is

16  unlikely to) reflect the presence of increased pain

17  sensation."

18          And I am of the opinion that the

19  integration of nerve fibers into the scarring

20  around these mesh fibers more likely than not

21  contributes to the pain in these patients, and

22  would emphasize that there are plenty of sensory

23  nerves in that area that it is likely to affect.

24      Q.  All right.

25          This is your opinion, but see, as an

Kimberly H. Allison, M.D.

1    expert, you have to have a basis for your opinion.

2    So what's the basis for that opinion?

3       MS. O'DELL:  Object to the form.

4          You asked her what she disagreed with,

5    she's told you.

6       MR. VOUDOURIS:  Yeah.

7       MS. O'DELL:  So don't lecture her about being

8    an expert.

9       MR. VOUDOURIS:  I've asked you three times now,

10   maybe four, to stop.

11      MS. O'DELL:  Just --

12      MR. VOUDOURIS:  Just stop.

13      Q.  Go ahead, Dr. Allison.

14      MS. O'DELL:  Just fine, I'll keep making my

15   objections.  Stop lecturing the witness.

16      THE WITNESS:  Your question is why do I think

17   I'm qualified -- I'm a pathologist.

18      BY MR. VOUDOURIS:

19      Q.  No, it wasn't my question.

20          You're a breast pathologist, right, you're

21   not a GYN pathologist?

22      A.  I'm trained in GYN and breast pathology,

23   I'm trained in pathology as well.

24      Q.  And you do not --

25      A.  Nerves are not unique --

```
 1        A.   Yes, I consult with him for brain tumors
 2   most often.
 3        Q.   So you've -- you've reached out to
 4   Dr. Vogel and consulted with him on brain tumors;
 5   is that correct?
 6        A.   Well, I don't read out brain tumor
 7   pathology, but he consults with me when he has
 8   metastatic breast cancer cases in the brain, so we
 9   do -- we do look at cases together occasionally.
10        Q.   Would you have -- would you feel
11   comfortable referring a patient or a friend to
12   Dr. Vogel to review their slides?
13        A.   Yes.
14        Q.   For any type of nerve pathology?
15        A.   Yes.
16        Q.   By the way, in the three case specific
17   reports that you're going to talk about, were you
18   able to visualize nerve receptors on any of those
19   slides?
20        A.   Nerve receptors?
21        Q.   Yes.
22        A.   What do you mean by that?
23        Q.   You don't know what a nerve receptor is?
24        A.   A neurotransmitter, a neuro- -- the
25   receptor?
```

Kimberly H. Allison, M.D.

1      Q.   Yeah.

2      A.   It's smaller than I could see with a light

3   microscope.

4      Q.   Okay.

5           So the answer to my question would be, no,

6   you didn't identify any, correct?

7      A.   No, of course not.

8      Q.   All you did was H&E and S100 stains?

9      A.   H&E and S100 stains were provided to me, I

10   didn't perform them.

11      Q.   Okay.

12           I want you to turn to page 6 of

13   Dr. Vogel's report.  And again, you don't dispute

14   that he's an expert in the field of neuropathology,

15   do you?

16      A.   Of course not.

17      Q.   All right.

18           Page 6, fourth line down, can you read

19   that -- that sentence that starts with pathologists

20   and then has a dash?

21      A.   "Pathologists - even those trained and

22   experienced in neuropathology such as myself - are

23   not able to examine a histology section under the

24   light microscope and determine whether nerve twigs

25   in the field are sensory, motor or autonomic in

Kimberly H. Allison, M.D.

1    nature."

2         Q.   Keep reading.

3         A.   "Stains such as immunohistochemistry for

4    S100 and neurofilament, which can aid in the

5    identification of parts of nerves, specifically

6    Schwann cells and axons respectfully, are incapable

7    of differentiating between sensory, motor and

8    autonomic nerves.  Moreover, S100 and neurofilament

9    do not identify sensory receptors."

10        Q.   Do you disagree with those sentences?

11        A.   No.

12        Q.   Okay.

13             Can we go back to Dr. Longacre again.

14             I believe we're on page 5.  The second

15   full paragraph.

16        A.   Page 5 or 6?  I think 6.

17        Q.   Okay, even better.

18        A.   So on page 7, second paragraph:  "The mesh

19   material as itself as a foreign object and the body

20   reaction to the mesh do not significantly damage

21   the tissues in this anatomic location."

22             I mean, I've seen cases where skeletal

23   muscle is scarred and fibrosed and in the

24   surrounding tissue with mesh kind of embedded

25   within it, and I think that that's damaging the

Kimberly H. Allison, M.D.

1    tissue in that anatomic location.

2         So I disagree with that statement as an

3    all-encompassing statement.  I think in some

4    patients the mesh has -- is causing very

5    problematic symptoms, and that reaction is -- the

6    reaction that occurs is not causing the same

7    symptoms in every patient, but it doesn't detract

8    from the women who are experiencing the sequelae of

9    the mesh eroding and causing dyspareunia.

10        Should I move on?

11   Q.   Yes.

12        Before you do, I'm sorry to interrupt.

13        Was it part of your medical school, your

14   residency, your training fellowship -- where did

15   you go to medical school?

16   A.   New York Medical College.

17   Q.   Okay.

18        As part of any of that training there,

19   were you taught how to look at a nonneoplastic

20   tissue on a slide and correlate it with clinical

21   symptoms of pain?

22   MS. O'DELL:  Object to the form.

23   THE WITNESS:  We're taught to correlate

24   clinical symptoms in general with pathologic

25   findings, and that's part of our training as

Kimberly H. Allison, M.D.

1    pathologists.

2        MR. VOUDOURIS:  That wasn't my question.  Could

3    you read it back, please.

4        (The Reporter read back as follows:

5        "Question:  As part of any of that

6         training there, were you taught

7         how to look at a nonneoplastic

8         tissue on a slide and correlate

9         it with clinical symptoms of pain?")

10       THE WITNESS:  There wasn't a course on pain and

11   correlation with pathology, no.  It's not as common

12   a clinical symptom to produce a pathologic specimen

13   as other findings are, so it's for any pathologist

14   probably the minority of clinical symptoms that

15   we're correlating with.

16           But in this case we are being asked to do

17   that.

18       BY MR. VOUDOURIS:

19       Q.  So that the answer to my question is "no"?

20       MS. O'DELL:  She answered your question.

21       THE WITNESS:  Let me think about the

22   specific -- more specific scenarios.

23           So for a patient who's experiencing bone

24   pain and they do a bone biopsy, we would be

25   describing the findings that would be causing the

Kimberly H. Allison, M.D.

1    bone pain, whether it be cancer or Paget's disease

2    or osteomalacia or some other fracture.  So there's

3    an example for you of a time it might correlate

4    with pain.

5        If a woman had a lot of pain during labor

6    and she has a condition where her placenta has

7    embedded too deep into the uterus, that would be a

8    reason for pain.

9        Endometriosis causes pain and when we look

10   under the, you know, microscope at the findings in

11   one of those patients, we diagnose endometriosis,

12   which correlates with the symptom of pain.

13       BY MR. VOUDOURIS:

14       Q.  So Dr. Longacre testifies that at Stanford

15   the medical students, the residents and the fellows

16   in pathology are not instructed or taught or told

17   that they're able to look at a nonneoplastic tissue

18   on a slide and correlate it with a clinical

19   symptom, is she wrong?

20       MS. O'DELL:  Object to the form.

21       THE WITNESS:  She may be just looking at it

22   from a different angle and not thinking about

23   examples that I just gave.

24       BY MR. VOUDOURIS:

25       Q.  You mean angle as a GYN pathologist at

Kimberly H. Allison, M.D.

1    Stanford?

2         MS. O'DELL:  Object to form.

3         THE WITNESS:  She is the GYN pathologist at

4    Stanford, yes.

5         MR. VOUDOURIS:  Okay.

6         Q.  Keep going, please.

7         A.  She mentions scar form- -- this is on page

8    7.  It's a sentence on its own without supporting

9    sentences.  "While scar formation does occur, it is

10   typically minimal and does not lead to deformation

11   of the mesh."

12        Others have described in the literature

13   deformation of mesh.  And from my personal

14   experience, looking at cases of mesh removed, I've

15   seen -- in one of the patients we'll talk about

16   today, I've seen extensive scarring and surgery --

17   the operative reports describe extensive scarring,

18   it's why this mesh is hard to remove in its

19   entirety.  So I don't agree with the statement that

20   it's minimal in the patients that have issues that

21   require removal of the mesh.

22        Q.  In the patients that you've seen that have

23   been sent to you by plaintiffs' counsel?

24        A.  The ones that have symptoms and are --

25   yes.

Kimberly H. Allison, M.D.

1      Q.   And --

2      A.   Need examination.

3      Q.   -- what literature supports your

4  disagreement with Dr. Longacre?

5      A.   The deformation and scarring?  Oh, there's

6  plenty of those.

7           Let's see.  2013, Rogo Rogowski, we could

8  look at that one if you want, or do you want me

9  just to list?

10     Q.   Just list.

11     A.   Okay.

12          Garcia-Urena, 2007; Tunn, T-u-n-n, 2007.

13  I have ultrasound data looking at decreases in mesh

14  size after insertion.  Animal studies have also

15  shown, like Feola in 2014, F-e-o-l-a.  And then

16  there's been literature describing the severity of

17  the scarring and how irreversible that can be, such

18  that it can continue to cause symptoms even after

19  it's removed.

20          And I list Crosby with a C, 2014;

21  Bendavid, 2014; and Rogo-Gupta, 2013.

22     Q.   Anything else?

23     A.   No.

24     Q.   Continue, please.

25     A.   She talks about mesh erosion at the end of

Kimberly H. Allison, M.D.

1   page 7 stating it's a rare complication, but a

2   known complication, and that there are a multitude

3   of factors, including infection inherent poor

4   vascular supply, and poor or impaired wound

5   healing.

6        And I guess I don't disagree with any of

7   the statements she's made, but I think it is caused

8   by the mesh and it's -- it is a known complication,

9   so actually I agree with that statement.

10   Q.   What sentence are you up to, Dr. Allison?

11   A.   I'm on page 9, I'm trying to --

12   Q.   Why don't we stop there, because that

13   talks about pelvic organ prolapse mesh implants --

14   A.   Yeah.

15   Q.   All right, so we're done, you've gone

16   through this, at least up to the page -- the

17   section on pelvic organ prolapse mesh implants and

18   told us all the places where you disagreed with

19   Dr. Longacre, is that accurate?

20   A.   The most -- ones that stand out most to

21   me, yes.

22   BY MR. VOUDOURIS:   Okay.

23        Let's talk about the Thompson case.

24   (Defendants' Exhibit No. 8 was marked for

25   identification.)

Kimberly H. Allison, M.D.

1      BY MR. VOUDOURIS:

2      Q.  Dr. Longacre (sic), we're handing you

3  Defendants' Exhibit 8.

4          Can you tell us what that is?

5      A.  My name is Dr. Allison.

6      Q.  I'm sorry, Dr. Allison.

7      A.  This is a photograph of -- it's an image

8  of a photograph I took of material that was removed

9  from patient Thompson.

10     Q.  And this correlates with which pathology?

11     A.  So this is from her 2010 -- let me get my

12  spreadsheet.  Her third, I believe, revision.

13         So this is from part A, the squamous

14  mucosa that was removed during the procedure where

15  they removed -- attempted to remove all the mesh

16  that was present in the patient, because she had

17  continued symptoms of erosion and urinary

18  retention.

19     Q.  I'm going to hand you -- you might have it

20  in front of you, you're welcome to use mine, I have

21  a red pen and I have a blue pen.

22     A.  Okay.

23     Q.  And if you can, on Exhibit 8, please

24  highlight for us all the things that you think are

25  abnormal on that slide and what you're going to

Kimberly H. Allison, M.D.

1  the review of her medical records, the clinical and

2  pathological literature and your training and

3  experience?

4       MR. VOUDOURIS:  Objection.

5       THE WITNESS:  Yes, I used all of that.

6       BY MS. O'DELL:

7       Q.  And when you considered Ms. Thompson's

8  case, did you consider other possibilities for the

9  cause of her symptoms?

10      MR. VOUDOURIS:  Objection, asked and answered.

11      THE WITNESS:  Yes.  The -- yeah, earlier I was

12 asked about differential diagnoses, if that's what

13 you mean.

14      MS. O'DELL:  Yes.

15      Q.  Tell us what would -- what -- as a

16 pathologist, what would be involved in the

17 differential diagnosis of a patient like

18 Ms. Thompson?

19      A.  The differential diagnosis in a patient

20 like her is very short, given that, as I mentioned

21 before, the presence of a vaginal erosion would be

22 very rare.  And, you know, typically in diabetics,

23 ulcers and erosions are caused by pressure ulcers.

24 I'd never heard of a pressure ulcer in the vagina.

25 This is clearly caused by a foreign object, which

Kimberly H. Allison, M.D.

1    she had removed, because of the symptoms she was

2    having.

3            So the list became very short very quickly

4    to implicating mesh as the cause of her symptoms.

5        MR. VOUDOURIS:  Objection, lack of foundation.

6        MS. O'DELL:  I have no further questions,

7    Dr. Allison.

8                          -o-

9                    FURTHER EXAMINATION

10       BY MR. VOUDOURIS:

11       Q.  Dr. Allison, I have a few follow-up

12   questions.

13           Did any of the opinions that you gave me

14   over the two hours that we talked going through

15   Dr. Longacre's report actually that dealt with TVT

16   and TVT-O, are any of your opinions different now

17   because we're talking about a TVT-O product?

18       A.  No.

19       MS. O'DELL:  Object to the form.

20       BY MR. VOUDOURIS:

21       Q.  Has any urologist, gynecological surgeon

22   at Stanford come down to your office with a vaginal

23   slide after a mesh excision and asked you to

24   correlate any symptom with what you found on the

25   slide?

Kimberly H. Allison, M.D.

1    A.  No.  And I doubt any pathologist has had

2  that occur.

3    MR. VOUDOURIS:  Okay.

4    MS. O'DELL:  Nothing further.

5    (Recess.)

6    MR. VOUDOURIS:  Going back on the record.

7    Q.  Dr. Allison, I'm going to hand you what we

8  marked as Defense Exhibit 1, could you identify

9  that, please?

10    A.  This is the notice of deposition.

11    Q.  Had you seen that prior to today?

12    A.  Yes.

13    Q.  When did you see that?

14    A.  I don't recall.  I saw it again this

15  morning, though.

16    Q.  All right.

17      There's an exhibit A attached, did you

18  have an opportunity before the deposition started

19  to look at Exhibit A?

20    A.  Attached?

21    MS. O'DELL:  I would just note for the record

22  that plaintiffs filed responses and objections to

23  Exhibit A to the notice and we reassert those

24  objections at this time.

25    MR. VOUDOURIS:  When did you file those?  I

Kimberly H. Allison, M.D.

1  never saw anything?

2      MS. O'DELL:  Last week.  What's today?

3      MR. VOUDOURIS:  Today is Thursday, the 17th.

4      MS. O'DELL:  Yeah.  It was either late last

5  week or early this week.

6      THE WITNESS:  I don't have that.

7      MS. O'DELL:  Yeah.

8      BY MR. VOUDOURIS:

9      Q.  And Dr. Allison, as you're briefly looking

10  through that and take the time that you need, but

11  do you believe that you've -- other than the

12  objections stated by counsel -- provided or brought

13  the information that's requested?

14      A.  Not all of it, no.

15      MS. O'DELL:  Dr. Allison has -- has brought

16  information to the deposition in keeping with the

17  objections that were filed on the March 15th

18  document No. 92 in --

19      MR. VOUDOURIS:  Did she bring billing records?

20  I'm sorry to interrupt.

21      MS. O'DELL:  We've not been billed for her work

22  in the Thompson matter, or Barker or Phelps for

23  that.

24      BY MR. VOUDOURIS:

25      Q.  So you have no bills for those cases; is

```
 1              REPORTER'S CERTIFICATE

 2          I hereby certify that the witness in the

 3   foregoing deposition, KIMBERLY H. ALLISON, M.D.,

 4   was by me duly sworn to testify to the truth, the

 5   whole truth, and nothing but the truth, in the

 6   within-entitled cause; that said deposition was

 7   taken at the time and place herein named; that the

 8   deposition is a true record of the witness'

 9   testimony as reported by me, a duly certified

10   shorthand reporter and a disinterested person, and

11   was thereafter transcribed into typewriting by

12   computer.

13          I further certify that I am not interested

14   in the outcome of the said action, nor connected

15   with, nor related to any of the parties in said

16   action, nor to their respective counsel.

17          IN WITNESS WHEREOF, I have hereunto set my

18   hand 3/21/2016.

19

20

21          _____

22          LUCY CARRILLO-GRUBBS RPR

23          CSR No. 6766

24          STATE OF CALIFORNIA

25
```