# EXHIBIT G

```
 1            IN THE UNITED STATES DISTRICT COURT

 2        FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

 3                  CHARLESTON DIVISION

 4

    IN RE: ETHICON, INC.,      )  Master File No.

 5  PELVIC REPAIR SYSTEM        )  2:12-MD-02327

    PRODUCTS LIABILITY          )

 6  LITIGATION                  )  MDL 2327

                                )

 7                              )  JOSEPH R. GOODWIN

                                )  U.S. DISTRICT JUDGE

 8  THIS DOCUMENT RELATES TO    )

    THE FOLLOWING CASES IN      )

 9  WAVE 1 OF MDL 200:          )  Civil Action Number

                                )  2:12-cv-00899

10  Daphne Barker, et al. v.    )

    Ethicon, Inc., et al.       )

11                              )

                                )

12

13

14                    - - - -

15           EXPERT WITNESS TESTIMONY OF

16           KIMBERLY H. ALLISON, M.D.

17               (Pages 1 - 64)

18          Held at the Stanford Park Hotel

19     100 El Camino Real, Menlo Park, California

20         Friday, March 18, 2016, 8:45 a.m.

21                    - - - -

22  REPORTED BY:  ELAINA BULDA-JONES, CSR NO. 11720

23           GOLKOW TECHNOLOGIES, INC.

24       877.370.3377 ph | 917.591.5672 fax

25               deps@golkow.com
```

Kimberly H. Allison, M.D.

```
 1                    APPEARANCES

 2

 3    For the Plaintiffs:

 4         Beasley Allen Crow Methvin Portis & Miles, P.C.
           218 Commerce Street
 5         Montgomery, Alabama 36104
           BY: P. LEIGH O'DELL, ESQUIRE
 6         334.269.2343
           Leigh.ODell@Beasley Allen.com

 7

 8
      For the Defendants:
 9
           Tucker Ellis LLP
10         950 Main Avenue, Suite 1100
           Cleveland, Ohio 44113-7213
11         BY: S. PETER VOUDOURIS, ESQUIRE
           216.696.4634
12         Peter.voudouris@tuckerellis.com
13         Tucker Ellis LLP
           One Market Plaza
14         Steuart Tower, Suite 700
           San Francisco, California 94105
15         BY:  TRACI L. SHAFROTH, ESQUIRE
           415.617.2228
16         Traci.shafroth@tuckerellis.com

17

18

19

20

21

22

23

24

25
```

Kimberly H. Allison, M.D.

```
 1                    INDEX OF EXAMINATIONS

 2

 3   EXAMINATIONS                                   PAGE

 4    MR. VOUDOURIS                                   6

 5    MS. O'DELL                                     57

 6    MR. VOUDOURIS                                  58

 7

 8

 9

10                    INDEX OF EXHIBITS

11     NO.                DESCRIPTION          PAGE

12   Exhibit 1      Amended Notice of Deposition      6
                    of Kimberly H. Allison, M.D.
13
     Exhibit 2      Rule 26 Expert Report of          7
14                  Kimberly H. Allison, M.D.

15   Exhibit 3      Curriculum Vitae of Kimberly      7
                    H. Allison, M.D.
16
     Exhibit 4      Facts or Data Considered in       8
17                  Forming Opinions

18   Exhibit 5      Exhibit C, Updated 3/16/2016,     9
                    spreadsheet
19
     Exhibit 6      Expert Report of Teri            10
20                  Longacre, M.D.

21   Exhibit 7      Expert Report of Hannes Vogel,   11
                    M.D.
22
     Exhibit 8      Supplemental Rule 26 Expert      11
23                  Report of Kimberly H. Allison,
                    M.D.
24
     Exhibit 9A     Photograph                       12
25
```

Kimberly H. Allison, M.D.

```
1    Exhibit 9B      Photograph                  12

2    Exhibit 9C      Photograph                  12

3    Exhibit 9D      Photograph                  12

4    Exhibit 9E      Photograph                  12

5    Exhibit 9F      Photograph                  12

6    Exhibit 10      Surgical Pathology Report,  12
                     2/12/2016, BARKER, D - 000503
7
     Exhibit 11      Histopathology of Excised   31
8                    Midurethral Sling Mesh, Audra
                     Jolyn Hill
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Kimberly H. Allison, M.D.

```
 1              KIMBERLY H. ALLISON, M.D.,

 2   called as a witness by the Defendants herein, being

 3   first duly sworn by the Certified Shorthand Reporter

 4   was thereupon examined and testified as is

 5   hereinafter set forth.

 6              MR. VOUDOURIS:  Let the record reflect

 7   we're here to cross-examine Dr. Allison on her

 8   opinions in the Barker case, but by doing so, we're

 9   not going to waive any right we have to strike her

10   supplemental report of those opinions based on their

11   untimely production.

12              MS. O'DELL:  For the record, the report in

13   this matter was produced after February 1st, which

14   is the deadline set by the Court because

15   Ms. Barker's surgery occurred after the deadline and

16   it would have been impossible to comply with the

17   Court's scheduling order.

18              And so on that basis --

19              MR. VOUDOURIS:  Counsel, I believe --

20              MS. O'DELL:  -- I'll oppose your motion.

21              MR. VOUDOURIS:  I believe you produced her

22   supplemental report of materials on March 16th; is

23   that correct?

24              MS. O'DELL:  That's correct.  You will

25   have full opportunity to examine her on the report
```

Kimberly H. Allison, M.D.

```
 1   today.

 2                        EXAMINATION

 3   BY MR. VOUDOURIS:

 4       Q.   Dr. Allison, good morning.

 5       A.   Good morning.

 6       Q.   Maybe we can go through some clerical

 7   housecleaning before we start asking some further

 8   questions.  I'm going to hand you what we've marked

 9   as Exhibit 1.

10            Can you identify that, please?

11       A.   This is the notice of deposition.

12            (Whereupon, Exhibit 1 was marked for

13   identification.)

14   BY MR. VOUDOURIS:

15       Q.   And you've seen that document before?

16       A.   Yes.

17            MR. VOUDOURIS:  And, Counsel, regarding

18   Schedule A, do we have agreement that she has

19   produced the documents or materials requested in

20   Schedule A, although I know you did file objections,

21   correct?

22            MS. O'DELL:  They are produced consistent

23   with her -- excuse me, consistent with the

24   objections and responses involved in this case.  I

25   would give to you, Peter, a jump drive.  I think I
```

Kimberly H. Allison, M.D.

1    gave it to you yesterday.

2            MR. VOUDOURIS:  I don't believe so.  You

3    showed it to me.

4            MS. O'DELL:  Yes, and I will give it to

5    you.  Giving you that jump drive will ensure that

6    everything that is consistent with our objections

7    and responses have been produced to you during the

8    depositions yesterday and today.

9    BY MR. VOUDOURIS:

10       Q.   Dr. Allison, I'll hand you what we have

11   marked as Exhibit 2.  Could you identify that for

12   the record, please?

13       A.   This is my expert report.

14            (Whereupon, Exhibit 2 was marked for

15   identification.)

16   BY MR. VOUDOURIS:

17       Q.   Is that your first expert report regarding

18   this case?

19       A.   Yes, my supplemental report --

20       Q.   We'll get there.

21       A.   -- came subsequently.

22       Q.   Can you identify for us what we have

23   marked as Exhibit 3?

24       A.   This is my CV.

25            (Whereupon, Exhibit 3 was marked for

Kimberly H. Allison, M.D.

```
 1    identification.)

 2    BY MR. VOUDOURIS:

 3         Q.   Is it current?

 4         A.   Yes.

 5         Q.   Any additions or deletions you would like

 6    to make?

 7         A.   No.

 8         Q.   Doctor, I'm going to hand you what we have

 9    marked as Exhibit 4.  Can you identify that?

10         A.   These are my literature lists.

11              (Whereupon, Exhibit 4 was marked for

12    identification.)

13    BY MR. VOUDOURIS:

14         Q.   Your reliance list?

15         A.   Reliance list.

16         Q.   There is also some medical records that

17    are listed in the back.

18         A.   Yes.

19         Q.   And you have additional medical records

20    for Ms. Barker; is that correct?

21              MS. O'DELL:  Object to the form.  Did you

22    say additional medical records?

23              THE WITNESS:  Beyond this list, let's see.

24    BY MR. VOUDOURIS:

25         Q.   What I'm getting at is you -- in our other
```

Kimberly H. Allison, M.D.

1   cases, you had a document very similar to this, but

2   it did not list out Ms. Barker's medical records

3   concerning her revision or her excision, so --

4       A.   Yes.

5       Q.   -- that's what I'm asking.

6       A.   They were likely not available at the

7   time.

8       Q.   Do you know when you got the medical

9   records in Barker that resulted in your

10  supplementation of your report?

11      A.   Medical records, I got the slides in the

12  beginning of March.  So I was reviewing medical

13  records and the pathology at that time.  I have been

14  away at a meeting for the last week.

15      Q.   Up in Seattle, right?

16      A.   Yes.

17      Q.   Was Dr. Longacre at the same meeting?

18      A.   Yes, she was.

19      Q.   I'm going to hand you what we -- and I'm

20  sorry, did you get the pathology slides and the

21  medical records at the same time, at the beginning

22  of March?

23      A.   I believe so.

24      Q.   I'll hand you what is marked as Exhibit 5.

25           (Whereupon, Exhibit 5 was marked for

Kimberly H. Allison, M.D.

```
 1   identification.)

 2   BY MR. VOUDOURIS:

 3        Q.   What is that?

 4        A.   This is the spreadsheet that I used to

 5   summarize my findings.

 6        Q.   And it now has a column filled in for

 7   Ms. Barker?

 8        A.   Correct.

 9        Q.   Whereas the similar sheets that we talked

10   about yesterday did not have any information filled

11   in for Ms. Barker?

12        A.   Correct.

13        Q.   Handing you what is marked as Exhibit 6.

14             (Whereupon, Exhibit 6 was marked for

15   identification.)

16   BY MR. VOUDOURIS:

17        Q.   Can you identify that, please?

18        A.   This is the expert report of Dr. Teri

19   Longacre.

20        Q.   And we discussed in detail the contents of

21   that report yesterday, correct?

22        A.   Yes, we did.

23        Q.   And for the record, Dr. Longacre is whom?

24        A.   She is a GYN pathologist at Stanford.

25   She's a professor of pathology.
```

Kimberly H. Allison, M.D.

```
1        Q.   Is she head of the GYN department at

2   Stanford?

3        A.   There is no GYN department currently.

4        Q.   She's a program director of the breast/GYN

5   residency training program, correct?

6        A.   Yes, which I co-direct.

7        Q.   Handing you what is marked as Exhibit 7.

8             (Whereupon, Exhibit 7 was marked for

9   identification.)

10  BY MR. VOUDOURIS:

11       Q.   Can you identify that, please?

12       A.   This is the expert report of Dr. Hannes

13  Vogel.

14       Q.   And Dr. Vogel is who?

15       A.   He's a neuropathologist at Stanford.

16       Q.   And do you know Dr. Vogel?

17       A.   Yes, he is one of my colleagues.

18       Q.   Well respected in his field?

19       A.   Yes.

20       Q.   Exhibit 8.

21            (Whereupon, Exhibit 8 was marked for

22  identification.)

23            THE WITNESS:  This is my supplemental

24  report on the pathology that became available to me

25  after my initial report was produced.
```

Kimberly H. Allison, M.D.

```
1    BY MR. VOUDOURIS:

2        Q.   And that's dated when?

3        A.   It's dated February -- what is the date?

4        Q.   The last page.

5        A.   16th of March.

6        Q.   Handing you what is marked as Exhibits 9A

7    through 9F.

8             (Whereupon, Exhibit 9A, Exhibit 9B,

9    Exhibit 9C, Exhibit 9D, Exhibit 9E, and Exhibit 9F

10   were marked for identification.)

11   BY MR. VOUDOURIS:

12       Q.   Can you identify those, please?

13       A.   These are the representative photographs I

14   took of the pathology slides on Ms. Barker.

15       Q.   Were the slides already given to you

16   stained?

17       A.   Yes, they were.

18       Q.   Did you do anything to the slides other

19   than take photographs?

20       A.   No, I did not.

21            MS. O'DELL:  Other than review them.

22            MR. VOUDOURIS:  Exhibit 10.

23            (Whereupon, Exhibit 10 was marked for

24   identification.)

25            THE WITNESS:  This is the pathology report
```

Kimberly H. Allison, M.D.

1    from Ms. Barker's February 12, 2006, procedure.

2    BY MR. VOUDOURIS:

3        Q.    And does that correspond with the slides

4    that you reviewed?

5        A.    It is the gross specimen -- gross

6    exam-only component of that.  They did not do a

7    microscopic examination.

8        Q.    Do you know what the volume of GYN path

9    sign-outs was in 2015 at Stanford?

10       A.    No, I do not.  I don't know the volume of

11   breast pathology either.  I don't know the volume.

12   I know our overall volume.  We hit -- how many --

13       Q.    50?

14       A.    -- thousands of specimens.

15       Q.    If you can, can you get Dr. Longacre's

16   report in front of you?

17       A.    Okay.

18       Q.    Has plaintiffs' counsel told you, informed

19   you that Dr. Longacre is going to be an expert in

20   this case for the defense?

21       A.    I am aware of that now.

22       Q.    When did you become aware of that?

23       A.    Last week.

24       Q.    Can you go to page two of Dr. Longacre's

25   report?  That top paragraph, there is a sentence

Kimberly H. Allison, M.D.

1    that starts "Because," about six or seven lines

2    down.

3         A.   Page two?

4         Q.   Yes.

5         A.   Okay.

6         Q.   Do you see that?

7         A.   Yes.

8         Q.   Can you read that sentence, please?

9         A.   "Because of my expertise in gynecologic

10   pathology, I was invited to become a member of the

11   American Board of Pathology Test Committee in order

12   to provide gynecologic pathology questions for the

13   certification exam for pathology residents as well

14   as the maintenance of certification exam for

15   practicing pathologists."

16        Q.   Okay.  What does that mean?

17        A.   It means she helps write questions for the

18   boards.

19        Q.   Helps write GYN pathology questions for

20   the board exam, correct?

21        A.   Correct.

22        Q.   Do you do that?

23        A.   No, I do not.

24        Q.   Let's go to Dr. Vogel's report.  You can

25   also go to page two of that report.  Bottom

Kimberly H. Allison, M.D.

1   paragraph that starts with, "I held."  Can you read

2   that, please?

3        A.   "I held a position of responsibility for

4   writing test questions in neuropathology, including

5   nerve and muscle pathology, on the American

6   Association of Neurologists Committee For Preparing

7   the Residency In-Service Training Examination used

8   in every accredited neuropathology training program

9   in the United States between 2005 and 2012."

10       Q.   And the next sentence, please?

11       A.   "I have recently provided test questions

12   in the field of nerve and muscle pathology for the

13   autologous in-service examination of neuropathology

14   fellows in the U.S. administered by the American

15   Association of Neuropathologists."

16       Q.   And what does that basically mean?

17       A.   He writes test questions.

18       Q.   For the board exam?

19       A.   For the -- one is the residency in-service

20   training exam so it's a practice board exam.  And

21   the same thing, they are not board exams.

22       Q.   Have you ever been asked to do -- to write

23   questions, board exam questions, for these entities

24   like Dr. Vogel?

25       A.   No.

Kimberly H. Allison, M.D.

```
 1        Q.   So when it comes to interpretation of
 2   nerves and scar tissue surrounding mesh and whether
 3   there is a generation of pain sensation, who is more
 4   qualified to answer those questions, you or
 5   Dr. Vogel?
 6        A.   Dr. Vogel is an expert in neuropathology.
 7   He does a lot of work with nerve, muscle and brain
 8   tumors.  I am a pathologist who was trained in
 9   general pathology and specialized in GYN and breast
10   pathology.  I have been in practice for ten years
11   and I -- it's -- evaluating whether nerves are
12   present in scar tissue is not an expert-level
13   diagnosis.  Identification of nerves and scar tissue
14   is pretty basic.
15        Q.   All right.  Listen to my question again,
16   please.  When it comes to the interpretation of
17   nerves in scar tissue or adjacent to scar tissue,
18   and whether there is a generation of pain sensation,
19   who is more qualified to answer those questions,
20   Dr. Vogel or you?
21        A.   Dr. Vogel has more experience than I do in
22   his career, and I think the identification of nerves
23   in scar tissue and linking them to clinical symptoms
24   like pain is something that both of us are qualified
25   to do.
```

Kimberly H. Allison, M.D.

1      Q.    And what makes you qualified to do that?

2      A.    It's part of general pathology.

3      Q.    Yesterday we had an opportunity to go

4  through Dr. Longacre's report line by line and had

5  you indicate where you disagreed with Dr. Longacre's

6  opinions.  So I would like to do the same with

7  Dr. Vogel, please.  Take your time.

8      A.    I have not seen this report before.  So it

9  could take some time.

10      Q.    I want you to read from page one to the

11  top of page 15, including that last paragraph.  And

12  I want you to jump, when you are finished with that,

13  to his conclusion that starts on page 19.

14          MS. O'DELL:  Dr. Allison, if there are

15  other aspects of the report that you need to read to

16  answer Peter's question, you are welcome to do that.

17          THE WITNESS:  Okay.

18  BY MR. VOUDOURIS:

19      Q.    What page are you on?

20      A.    Seven.

21      Q.    Let me know when you get to -- when you

22  finish before you get to response to plaintiffs'

23  expert.

24      A.    Okay.  So I'm now at response to

25  plaintiffs' expert.  I don't disagree with anything

Kimberly H. Allison, M.D.

1    he said so far.

2        Q.   All right.  Now let's go on to the next

3    paragraph, response to plaintiffs' expert.

4        A.   So he is mainly discussing Dr. Iakovlev.

5        Q.   Correct.  Who you rely upon for many of

6    your opinions in this case, correct?

7            MS. O'DELL:  Object to the form.

8            THE WITNESS:  I relied upon the literature

9    that he has published as a pathologist who has

10   looked at many of these questions about mesh.

11   BY MR. VOUDOURIS:

12       Q.   So the answer to my question is yes?

13           MS. O'DELL:  Object to the form.

14           THE WITNESS:  Yes, but I may not have the

15   exact same assessment on a case as Dr. Iakovlev.

16   BY MR. VOUDOURIS:

17       Q.   Tell me when you get to response to

18   Dr. Iakovlev's published medical literature.

19       A.   Okay.  Okay.  I'm now at response to

20   Dr. Iakovlev's published medical literature.

21       Q.   Okay.  So you have read the response to

22   plaintiffs' expert which is on pages 7, 8, and 9,

23   correct?

24       A.   Yes.

25       Q.   Any disagreements with what Dr. Vogel has

Kimberly H. Allison, M.D.

1    written in this report?

2         A.   He's mainly discussing Dr. Iakovlev's

3    interpretation of cases that -- and publications as

4    well that look at the number of nerve fibers present

5    and argues that they may not be significant and it's

6    hard to link them to pain.  I have reviewed cases

7    and the constellation of findings, I think, are

8    linked to the patient's pain.

9              So -- which include the presence of nerves

10   entrapped in the dense scar and the erosions that

11   are formed and it's multifactorial.  Pain isn't

12   caused by a single factor, I think.  But it all is

13   linked to the mesh present in the cases that I have

14   reviewed.

15             So I really can't comment on what he's

16   referring to in Dr. Iakovlev's report, which I don't

17   have.  And it just doesn't seem that relevant to my

18   evaluation of the cases.

19        Q.   Dr. Allison, is there any sentence in this

20   section of Dr. Vogel's report response to

21   plaintiffs' expert that is incorrect?

22        A.   No, I mean, he is very specific in the

23   sentences he's using.  I don't disagree with the

24   specific things that he is saying.  "For example, as

25   the case with his vaginal mesh analysis,

Kimberly H. Allison, M.D.

1  Dr. Iakovlev has not established anything that would

2  enable other pathologists to predict which patients

3  would experience pain based on nerve fiber

4  densities."

5          I have not argued that nerve fiber density

6  is the only factor that I'm using in my analysis.

7  Pathologists use many features to come to

8  conclusions about linking clinical symptoms to

9  pathology.

10      Q.   All right.  Can you read the next section,

11  please, response to Dr. Iakovlev's expert report?

12      A.   Response to Dr. Iakovlev's.

13      Q.   I apologize.  I skipped a whole section.

14  We're on page nine, right?

15      A.   Yes.

16      Q.   Response to Dr. Iakovlev's published

17  medical literature.  Which you have reviewed,

18  correct?

19      A.   Yes.

20      Q.   And you reviewed as part of your

21  conclusions reached to a reasonable degree of

22  medical certainty in this case, correct?

23      A.   Correct.

24      Q.   All right.  So you and Dr. Vogel have read

25  the same literature, correct?

Kimberly H. Allison, M.D.

```
1        A.    Some of it, yes.

2        Q.    All right.  Please read this section that

3   starts on page nine and goes to 13 and tell us any

4   sentence in here that you disagree with.

5              MS. O'DELL:  Dr. Allison, if there are any

6   references that are mentioned in Dr. Vogel's report

7   that you need to see, I'm sure Peter can provide

8   those to you.

9              MR. VOUDOURIS:  Let the record reflect

10  that plaintiffs' counsel has opened up one of the

11  binders and put it in front of Dr. Allison with an

12  article by Blaivas.

13       Q.    Continue to read, please.

14       A.    And Iakovlev.  So that section of his

15  report really is quoting Dr. Iakovlev and mentioning

16  studies and statistics that I don't disagree with

17  because it's -- it's not relevant to my opinion.

18             It's discussing Iakovlev's particular

19  phrasing in his articles.  I mean, the fact is that

20  it is a known complication of mesh procedures to

21  have chronic pain.  That's in studies that Iakovlev

22  has not authored.

23             Erosions are also a known complication.

24  Erosions can be painful as well.

25       Q.    Are you through?
```

Kimberly H. Allison, M.D.

1      A.   And I don't disagree that, you know, we

2  can't tell what kind of receptors are on the nerves

3  present.  Their presence alone is something that I

4  comment on in my report and link it all together to

5  the full picture of the patient who actually

6  presents with pain.

7      Q.   Do you disagree with any sentence that

8  Dr. Vogel has in his report in the section response

9  to Dr. Iakovlev's published medical literature?

10      A.   Some of the reason I disagree with, but I

11  can't pick out a sentence that I would say, oh, I

12  don't agree -- that's relevant to my case opinions.

13      Q.   All right.  The next section starts on

14  page 13 of Dr. Vogel's report, response to

15  Dr. Iakovlev's expert report, correct?

16      A.   Correct.

17      Q.   Could you read that, please, and tell us

18  if there is any sentence in this section that you

19  believe is incorrect?  And you only have to read to

20  the top of page 15.

21           MS. O'DELL:  I would object to this line

22  of inquiry because Dr. Allison has neither seen nor

23  relied on Dr. Iakovlev's report in rendering her

24  opinions in this case.  So it's unfair to ask her to

25  read criticisms of a report that is not been made

Kimberly H. Allison, M.D.

```
1    available to her.

2              THE WITNESS:  So the first sentence, you

3    know, that Dr. Iakovlev's expert report

4    recapitulates "the erroneous link between fibrosis

5    and/or inflammation with pain in a small percentage

6    of patients having undergone mesh explantation as

7    described above."

8              I mean, I think that that is a link that

9    has been appropriately documented in patients with

10   pain.

11   BY MR. VOUDOURIS:

12       Q.   So are you saying that first sentence by

13   Dr. Vogel is incorrect?

14       A.   I would not use the word "erroneous" in

15   that sentence.

16       Q.   I'm sorry, my question was --

17              MS. O'DELL:  She answered your question,

18   no.

19              MR. VOUDOURIS:  No, she didn't.

20              MS. O'DELL:  Yes, she did.  And she --

21              MR. VOUDOURIS:  So you're saying that the

22   first sentence --

23              MS. O'DELL:  I'm talking.  I'm talking.

24   She answered your question and just because you

25   don't like the answer doesn't mean you are entitled
```

Kimberly H. Allison, M.D.

1    to badger the witness.

2            MR. VOUDOURIS:  Are you done with your

3    speaking objections?

4            MS. O'DELL:  Probably not.  But you may

5    talk now.

6            MR. VOUDOURIS:  Thank you.

7        Q.    Dr. Allison, is the first sentence of

8    Dr. Vogel's report response to Dr. Iakovlev's expert

9    report contained on page 13 incorrect?

10       A.    I answered that question saying I would

11   remove the word "erroneous" from that sentence.

12       Q.    Keep reading.

13           MS. O'DELL:  I would renew my objection to

14   this line of questioning because Dr. Allison has

15   neither been provided nor has she reviewed nor has

16   she relied on Dr. Iakovlev's expert report that was

17   served in this case.

18           MR. VOUDOURIS:  Counsel, you already made

19   that objection.  It's duly noted.

20           THE WITNESS:  So the end of page 14,

21   Dr. Vogel states, "Stated differently, Dr. Iakovlev

22   has not provided any criteria of any sort whereby an

23   independent and unbiased microscopist could make a

24   link between the presence of incidental nerve twigs

25   and the usual inflammation associated with implanted

Kimberly H. Allison, M.D.

 1   mesh and pain symptoms in a small minority of

 2   patients reporting pain versus the significant

 3   majority of symptom-free patients having undergone

 4   synthetic sling implantation."

 5          Again, I would reiterate my previous

 6   comments that when you are -- when I'm evaluating a

 7   patient presenting with pain, which can be

 8   multifactorial, I am going to note things like the

 9   presence of nerve fibers embedded in the dense

10   fibrosis and consider it more likely than not that

11   they may contribute.  This is in a patient who is

12   presenting with pain.

13          Erosion also can contribute to pain.  And

14   when a patient walks in the door presenting with a

15   symptom, whether it be pain or a mass, we don't look

16   at randomized controlled trials to evaluate that

17   patient.  We evaluate that patient.

18   BY MR. VOUDOURIS:

19      Q.   I don't want to cut you off.  Are you

20   through?

21      A.   Yes.

22      Q.   Okay.  So is Dr. Vogel's statement that

23   you just requoted incorrect?

24      A.   It's a little more subtle answer than that

25   because he is being very specific in this sentence

Kimberly H. Allison, M.D.

1    saying that Dr. Iakovlev has not provided any

2    criteria of any sort.  And I am telling you that

3    when I evaluate a case, I can't comment on what

4    Dr. Iakovlev is doing.  I can comment on what I am

5    doing.

6              I don't have access to this report.  I

7    don't know what Dr. Iakovlev's opinions are on the

8    case.  I have read some of his literature.  So I

9    can't say that he is incorrect.  I could say that I

10   disagree with the concept that we can never link a

11   patient's symptom to the pathology in cases like

12   this.

13       Q.   And your basis for that statement is?

14       A.   Evaluation of cases where patients are

15   presenting with specific symptoms and linking the

16   pathology findings with them on a case-by-case

17   basis.

18       Q.   In all the medical literature that you

19   have reviewed for your opinions in this case, which

20   is in Exhibit 3 -- I'm sorry, Exhibit 4, what

21   articles support the statement that you just made?

22       A.   That patients present with pain.  You want

23   me to find articles that look at patient's

24   presenting with pain?  That --

25       Q.   No, I'm sorry.  And we can have the court

Kimberly H. Allison, M.D.

1   reporter read back your answer so you know exactly

2   what the question is.  Please?

3              (Whereupon, the reporter read the record

4   as follows:

5              "Answer:  Evaluation of cases where

6   patients are presenting with specific symptoms and

7   linking the pathology findings with them on a

8   case-by-case basis.")

9              THE WITNESS:  That's in general the

10  pathologist's job is to link the pathology findings

11  whenever possible with the symptoms the patient is

12  presenting with.  There is not literature to tell me

13  what my job is.

14  BY MR. VOUDOURIS:

15      Q.   Can you show us any literature in

16  Exhibit 4 that supports your opinion that you can

17  look at histology of vaginal tissue and link

18  specific symptoms, and I'm going to call pain the

19  specific symptoms, with what is found on a pathology

20  slide?

21      A.   Again, that's not the sort of thing that

22  you would put in a random -- in an article that --

23  this is my job that I do every day.  Someone

24  presents with a mass, I'm going to try to explain

25  the mass on pathology.

Kimberly H. Allison, M.D.

1           When a physician sees a patient in their

2    office, they are going to take a history and try to

3    figure out what is going on and what is causing

4    their symptoms.  There are not randomized trials on

5    when to use a microscope or when to use a

6    stethoscope.

7       Q.   Are there any randomized trials that you

8    know of contained in your Exhibit 4 that link the

9    clinical symptom of pain to what is seen on vaginal

10   tissue surrounding mesh?

11      A.   The studies link the presence of pain and

12   erosions to the clinical presentation.  Pathologists

13   were not involved in the randomized trials.  We get

14   left out of a lot of studies.

15      Q.   Can you point to anything in Exhibit 4

16   that is a randomized trial or trial that has a

17   control that links a specific clinical symptom of

18   pain to what can be seen on a pathology slide of

19   vaginal tissue that contains mesh?

20      A.   No.

21      Q.   Can you go to the conclusion in

22   Dr. Vogel's report that starts on page 19?

23           Are you finished?

24      A.   Yes.

25      Q.   Is any sentence in Dr. Vogel's conclusion

Kimberly H. Allison, M.D.

1    in this report incorrect?

2        A.   Dr. Iakovlev describes the pathologic

3    findings in patients that have had mesh removed and

4    for a variety of reasons, including pain.  So I

5    disagree with the sentence that his methodology is

6    not accepted.  These were peer-reviewed articles

7    that were published, so the scientific community did

8    accept them for publication.

9        Q.   Anything else that is incorrect in that

10   conclusion?

11       A.   I disagree that it's a normal -- well, it

12   may be part of the normal healing process.  He

13   states, "Dr. Iakovlev's opinions are not supported

14   by the histology which shows the normal healing

15   process in the vicinity of an implanted mesh."

16            So while some of that healing process may

17   be normal, so I don't disagree with that, the issue

18   is that those nerves are there in this disrupted

19   tissue which has a foreign material in it and that

20   has the potential to create pain by having a scarred

21   area have nerve entrapped in it and disrupt the

22   functionality of that area.

23       Q.   So you are saying that sentence by

24   Dr. Vogel is incorrect?

25            MS. O'DELL:  She answered your question.

Kimberly H. Allison, M.D.

```
1              THE WITNESS:  I said I don't disagree that
2    it may be part of the healing process.  So I guess I
3    don't disagree with that specific sentence, you
4    know.  Obviously we have slightly different
5    opinions.
6    BY MR. VOUDOURIS:
7       Q.   I don't think you have slightly different
8    opinions, Dr. Allison.  I think you have vastly
9    different opinions than Dr. Longacre and Dr. Vogel.
10             In Exhibit 4, which is your reliance list,
11   is there any literature or randomized control study
12   in there that compares the tissues surrounding
13   midurethral slings in women who did not complain of
14   pain versus women who did complain of pain?
15             MS. O'DELL:  Would you mind repeating the
16   question, please?
17             THE WITNESS:  Yeah.
18             (Whereupon, the reporter read the record
19   as follows:
20             "Question:  In Exhibit 4, which is your
21   reliance list, is there any literature or randomized
22   control study in there that compares the tissues
23   surrounding midurethral slings in women who did not
24   complain of pain versus women who did complain of
25   pain?")
```

Kimberly H. Allison, M.D.

```
 1              THE WITNESS:  Yes.  Is this on my reliance
 2    list?
 3    BY MR. VOUDOURIS:
 4        Q.   Are you talking about the Hill study?
 5        A.   Yes.  So the Hill study addresses --
 6        Q.   Hold on one second.  I'm sorry.  There is
 7    no -- I'm looking for a sticker.  Are we on 11?
 8              (Whereupon, a brief discussion off the
 9    record.)
10              (Whereupon, Exhibit 11 was marked for
11    identification.)
12    BY MR. VOUDOURIS:
13        Q.   Doctor, I'm handing you what we have
14    marked as Exhibit 11.  Can you identify that,
15    please?
16        A.   This is a histopathology of excised
17    midurethral sling mesh, which is an article by
18    Dr. Hill.
19        Q.   And these physicians and these authors are
20    from the Cleveland Clinic?
21        A.   Yes.
22        Q.   Is the Cleveland Clinic a well-respected
23    medical institution in the United States?
24        A.   Yes.
25        Q.   Is their pathology department also highly
```

Kimberly H. Allison, M.D.

```
 1   regarded?

 2        A.   Yes.

 3        Q.   I know you mentioned the Hill paper as one

 4   of your references, but do you mention the Hill

 5   paper in your report itself?

 6        A.   No.

 7        Q.   Does Dr. Vogel mention the Hill paper in

 8   his report?

 9        A.   I would have to look.  I'm not sure.

10   Would you like me to go through it?

11        Q.   Let me see if I can help you out.  Page

12   ten.

13        A.   Yes, he does.

14        Q.   And could you read the conclusion for us

15   on the first page of the Hill paper?

16        A.   "Midurethral sling mesh excised for

17   voiding dysfunction demonstrates elevated levels of

18   inflammation compared to mesh that is excised for

19   pain and/or exposure."

20        Q.   All right.  Next sentence.

21        A.   "The vaginal tissue fibrosis and giant

22   cell reaction are similar in patients who undergo

23   mesh excision for voiding dysfunction and pain

24   and/or mesh exposure."

25        Q.   Do you question those conclusions?
```

Kimberly H. Allison, M.D.

1       A.   Well, this study tries to look at pain

2  versus no pain and in different groups.  But there

3  is no control group of patients with absolutely no

4  symptoms.  So they are comparing voiding dysfunction

5  without pain.  They are calling that the control

6  group.

7       Q.   Right.  Sounds like a reasonable control,

8  doesn't it?

9       A.   There is still -- I mean, the best control

10 would be patients who don't have any dysfunction.

11 Don't you agree?

12      Q.   I'm sorry.  Sounds like a reasonable

13 control?

14           MS. O'DELL:  Object to the form.  Asked

15 and answered.

16           THE WITNESS:  I would say a better control

17 would be patients who don't have any symptoms.

18 BY MR. VOUDOURIS:

19      Q.   I know.  My question was, is that a

20 reasonable control?

21           MS. O'DELL:  That was not your question.

22           MR. VOUDOURIS:  That's my question now.

23           THE WITNESS:  I would have preferred a

24 different control group, but that's the one that

25 we're working with in this study and you have to

Kimberly H. Allison, M.D.

1   draw your conclusions on the basis of what they used

2   for their control group.

3   BY MR. VOUDOURIS:

4        Q.   Is it a reasonable control?

5        A.   I have answered your question two times.

6             MS. O'DELL:  Yes, she has.

7   BY MR. VOUDOURIS:

8        Q.   Is it a reasonable control?

9             MS. O'DELL:  You have no -- you are not

10  compelled to give a different answer to the same

11  question, Dr. Allison.  If you have answered his

12  question, you stand on your answer.

13            MR. VOUDOURIS:  Are you done with your

14  speaking objection?

15            MS. O'DELL:  I'm done.

16            THE WITNESS:  I am not obligated to give a

17  yes-or-no answer.  So I gave you my answer.

18  BY MR. VOUDOURIS:

19       Q.   Who says you are not obligated to give a

20  yes-or-no answer, the judge?

21       A.   I thought I was allowed to speak freely

22  about my opinions in this setting and explain my

23  answers.

24       Q.   Who told you you are not allowed to give a

25  yes-or-no answer?

Kimberly H. Allison, M.D.

1      A.   I was under the assumption that I wasn't

2  forced into a yes-or-no response, but maybe I'm not

3  accurate in that assumption.

4          MS. O'DELL:  You may answer the questions

5  in any fashion you want to, Dr. Allison.  And you

6  can disregard the representations being made by

7  counsel for Ethicon.

8          MR. VOUDOURIS:  Speaking objection

9  number seven.

10     Q.   Dr. Allison, in the Hill paper that you

11 have in front of you that we have marked as

12 Defendants' Exhibit 11, is that a reasonable

13 control?

14         MS. O'DELL:  Object to the form.  Asked

15 and answered.

16         THE WITNESS:  I believe I answered your

17 question.

18 BY MR. VOUDOURIS:

19     Q.   Then do it again.  Please answer my

20 question.

21         MS. O'DELL:  Stop badgering the witness,

22 Counsel.  She's answered your question.  You may not

23 like the answer, but she's answered it.

24         MR. VOUDOURIS:  There is no badgering

25 going on.  Did I raise my voice?

Kimberly H. Allison, M.D.

```
1              MS. O'DELL:  You don't have to raise your

2       voice to badger the witness.  You are clearly

3       badgering the witness and it's improper.  So let the

4       record reflect that you have asked the same question

5       five times.  It's improper.

6              MR. VOUDOURIS:  And let the record reflect

7       she hasn't answered it five times.

8              MS. O'DELL:  She has answered your

9       question.

10             MR. VOUDOURIS:  One more time,

11      Dr. Allison.

12         Q.   The exhibit that you have in front of you,

13      which is the Hill paper marked as Defendants'

14      Exhibit 11, is that a reasonable control, yes or no?

15         A.   It's the control group that they had and

16      you have to draw your conclusions on the basis of it

17      in the context of this study.  They thought it was a

18      reasonable control group.  They published the study.

19      I would have preferred a different control group.

20      That is my answer.

21         Q.   So you can't comment one way or another

22      whether it was a reasonable control?

23         A.   I just did comment whether it was

24      reasonable or not.

25         Q.   So it is?
```

Kimberly H. Allison, M.D.

1        A.   It's reasonable in the context of their

2    study.

3             MS. O'DELL:  We have been going about an

4    hour.  Let's go off the record.

5             MR. VOUDOURIS:  What is our time?

6             (Whereupon, a brief recess was taken.)

7    BY MR. VOUDOURIS:

8        Q.   Dr. Allison, in reaching your opinions in

9    any of the three Ethicon cases that we have been

10   discussing over the last two days, did you rely on

11   any of Dr. Iakovlev's expert reports?

12       A.   No.

13       Q.   In rendering your opinions or reaching

14   your opinions in these three Ethicon cases, did you

15   rely on any of Dr. Iakovlev's sworn testimony?

16       A.   No.

17       Q.   If we can, let's go to the

18   photomicrographs that you took.  And again, if you

19   don't mind, I'm going to come over your shoulder

20   again and I'm going to give you a blue pen.

21            MS. O'DELL:  Why don't you just stay right

22   there.

23            MR. VOUDOURIS:  I'll stand up.  How is

24   that?

25            THE WITNESS:  Okay.  So you want me to --

Kimberly H. Allison, M.D.

1  BY MR. VOUDOURIS:

2      Q.   Hold on one second.

3      A.   -- use a different set of -- we want an

4  exhibit or --

5      Q.   Yes, you want the ones that have the

6  exhibit stickers on them.  There you go.

7           Identify for the record, please, the first

8  photograph.

9      A.   First photograph is a low-power image of

10  the tissue removed for microscopic examination from

11  the February 12, 2006, surgery to remove the

12  patient's TVT device.

13      Q.   And do you know exactly where this tissue

14  was taken from?

15           MS. O'DELL:  Can I just -- excuse me,

16  Counsel.

17           I'm sorry, I think you said 2006.  Did you

18  mean --

19           THE WITNESS:  I meant 2016, yes.  Thank

20  you.

21           MS. O'DELL:  I'm sorry.  Go ahead.

22  BY MR. VOUDOURIS:

23      Q.   I forgot my question.

24           (Whereupon, the reporter read the record

25  as follows:

Kimberly H. Allison, M.D.

1            "Question:  And do you know exactly where

2      this tissue was taken from?")

3            THE WITNESS:  It was taken from the three

4      fragments of cauterized pink, tan, red, brown soft

5      tissue that contained the mesh.

6      BY MR. VOUDOURIS:

7        Q.   Does cauterized mean heat was used to take

8      this material out of the body?

9        A.   Potentially.  I couldn't comment on that.

10       Q.   Can you please explain to us what you find

11     of significance on 9A that you are going to tell the

12     jury is related to Ms. Barker's mesh?

13       A.   So she has findings typical of the cases

14     that I have examined in patients that are

15     complaining of symptoms related to their mesh.  So

16     she's got dense fibrosis and scarring surrounding

17     the mesh fibers which are these holes here, one of

18     which has retained some blue suture or mesh

19     material.

20       Q.   Can you circle for us dense fibrosis?

21       A.   (Witness complies.)

22       Q.   I think Ms. O'Dell has a pen that has more

23     ink in it.

24       A.   (Witness complies.)

25       Q.   And can you mark for us the scar?

Kimberly H. Allison, M.D.

1        A.    Oh, it's all sort of one in the same.

2        Q.    So you equate dense fibrosis with scar?

3        A.    Yes.

4        Q.    Any other findings that you're going to

5    tell the jury that is of significance to this

6    microphotograph 9A?

7        A.    Presence of the mesh fibers and the dense

8    fibrosis scar is the main findings demonstrated in

9    this image.

10       Q.    Okay.  I understand they are the main

11   findings in this image, but I need to know what you

12   are going to tell the jury about the significance of

13   this slide.  Or have we covered it all?

14       A.    I think we have covered it.

15       Q.    All right.

16       A.    So Exhibit 9B has a higher power image,

17   representative image, of the area of the fibrosis

18   and the scar which is encasing the mesh fibers.

19   Again, I'll circle the entire area and label it.

20              And there is minimal chronic inflammation

21   in this image.

22       Q.    Can you circle the minimal chronic

23   inflammation, please?

24       A.    (Witness complies.)

25       Q.    And can you somehow label that?  Thank

Kimberly H. Allison, M.D.

```
 1   you.

 2        A.   And then there's also --

 3        Q.   I'm sorry to interrupt you.

 4        A.   You want me to label each one?

 5        Q.   Yes.

 6        A.   Okay.  In addition to the spaces formed by

 7   mesh fibers, there is one mesh fiber present that

 8   was retained in the tissue and then there is the

 9   so-called tree barking that I take as evidence under

10   the light microscope of degradation of the mesh

11   fiber that's present in one of these spaces.  I'll

12   label that "tree barking."

13        Q.   Did you measure that tree barking?

14        A.   No.

15        Q.   Do you have any idea how -- the depth of

16   that tree barking?

17        A.   No, I didn't measure it.

18        Q.   Anything else of significance that you are

19   going to tell the jury about Exhibit 9B?

20        A.   No.

21        Q.   9C?

22        A.   9C is just a higher power image so you can

23   see that tree barking in the mesh fiber region.  You

24   can see it around a mesh fiber that is still intact

25   here a little bit better.  I'll try to highlight
```

Kimberly H. Allison, M.D.

```
1   this.  You can see it's present around the mesh

2   fiber and then in most of these spaces, the main

3   component of the mesh fibers come out with tissue

4   processing, but it's left behind this rind or rim of

5   material.

6        Q.   That you believe is tree barking?

7        A.   Yes.

8        Q.   That represents degraded polypropylene

9   in vivo?

10       A.   That's what has been described and I see

11  evidence of that under the microscope in this case.

12       Q.   Anything else?

13       A.   I could circle some of the chronic

14  inflammation, although it's a bit crushed in these

15  particular fields.  I'll write "crushed."

16       Q.   And why is it crushed?

17       A.   It looks like it's just crushed from

18  compression of the tissue, maybe it was being pulled

19  out.  The lymphocytes are fragile and they can crush

20  easily.  So you can see the rest of the tissue is

21  not that crushed.

22       Q.   Do you see any blood vessels?

23       A.   I see some red blood cells, but I think

24  they are probably procedure related.  So not in a

25  blood vessel, per se.  So I don't see good
```

Kimberly H. Allison, M.D.

```
 1   capillaries in here.
 2       Q.   Good capillaries -- are you saying you
 3   don't see any capillaries in here?
 4       A.   I don't see ones that I could label for
 5   you and say this is definitely a capillary.
 6       Q.   Do you see any traumatic neuromas?
 7       A.   No, I do not.
 8       Q.   Do you see any ganglia?
 9       A.   No, I do not.
10       Q.   Do you see any abnormal vessels?
11       A.   No, I don't believe that was part of my
12   findings that I listed in my report.
13       Q.   Same questions on 9A and B regarding
14   finding any neuromas, traumatic neuromas, ganglia,
15   abnormal vessels?
16       A.   No.
17       Q.   All right.  Anything else you want to tell
18   us about photograph 9 -- your thumb is on it.
19       A.   9C.
20       Q.   9C.
21       A.   No.
22       Q.   All right.  9D.
23       A.   9D is a trichrome stain which highlights
24   areas of collagen deposition in blue.  So that's
25   what you would see in fibrosis and scar.  So all of
```

Kimberly H. Allison, M.D.

1    this blue is collagen-related tissue, so...

2         Q.   Can you indicate that, please, on there?

3         A.   It highlights the scar.  Red blood cells

4    are stained in red.

5         Q.   So there are blood vessels in that scar?

6         A.   I can't definitively say there are blood

7    vessels in there based on this.

8         Q.   Do you know who stained that slide?

9         A.   No, it was provided to me.

10        Q.   Did you request that particular stain?

11        A.   No.

12        Q.   Anything else you want to tell us about

13   9D?

14        A.   Mesh fibers are present, but the main

15   finding is the blueness of the collagen.

16        Q.   Do you see any traumatic neuromas?

17        A.   No.

18        Q.   Any ganglia?

19        A.   No.

20        Q.   Any thrombosed vessels?

21        A.   No.

22        Q.   Anything else of significance that you

23   want to tell us about the photomicrograph 9D?

24        A.   No.

25        Q.   9E.

Kimberly H. Allison, M.D.

1      A.    9E and 9F are both S100 stains which were

2   performed to highlight the nerves present in the

3   tissue.  On low power 9E shows the distribution of

4   these S100 positive nerve fibers and then 9F shows a

5   higher power image of the nerve fibers.

6      Q.    Is there anything of significance on 9E

7   that you are going to tell the jury about?

8           MS. O'DELL:  Objection to the form.

9           THE WITNESS:  So the nerve fibers are

10   embedded in the scar tissue immediately around the

11   mesh.

12   BY MR. VOUDOURIS:

13      Q.    Could you draw for us the scar tissue?

14      A.    (Witness complies.)

15      Q.    And could you label that, please?

16      A.    (Witness complies.)

17      Q.    And circle, if you can, nerves that are in

18   the scar tissue.

19      A.    The reason I have a higher power image is

20   because it's hard to identify them definitively on

21   low power, so I'm showing you two images to confirm

22   their presence.

23      Q.    And you have no idea whether those nerves

24   are motor or sensory, do you?

25      A.    No.

Kimberly H. Allison, M.D.

1      Q.   Okay.  9E?

2           MS. O'DELL:  Were you finished?

3           MR. VOUDOURIS:  I'm sorry.  I don't want

4    to cut you off.

5           THE WITNESS:  I was going to say in a

6    patient presenting with pain in this area, I would

7    assume that some of these are sensory.

8    BY MR. VOUDOURIS:

9      Q.   And the basis for that statement?

10     A.   The pain the patient is experiencing in

11   the area.  If I cut your finger and you're

12   experiencing pain in the area, I'm going to guess

13   you have some sensory nerves there that caused the

14   pain.

15     Q.   And I'm sorry if I already asked this, but

16   in your reference list I think that we had as

17   Exhibit 4, are there any case-controlled studies

18   comparing nerves contained in mesh scar tissue in

19   women who do not complain of pain versus an

20   assessment of nerves and scar tissue with women who

21   do complain of pain after removal of a midurethral

22   sling?

23     A.   Yes.

24     Q.   Which one?

25     A.   Hill.  We discussed that one.

Kimberly H. Allison, M.D.

1        Q.    Anything else?

2        A.    Pain perception can be complex.  I'm only

3    documenting that the nerves are present in the

4    patients who are complaining of pain.

5        Q.    And I'm sorry if my question wasn't clear.

6    We were talking about Exhibit 4.  And the question

7    was, could you point me to any case-controlled

8    studies that compared nerves and scar tissue in

9    women who did not have complaints of pain versus

10   nerves and scar tissue with women who did complain

11   of pain after excision of a midurethral sling?

12       A.    Yes.

13       Q.    You mentioned Hill.  Is there anything

14   else on Exhibit 4?

15       A.    Hill would be the best example of that, I

16   believe.

17       Q.    Okay.

18       A.    That comes to mind.

19       Q.    Next.

20       A.    But I would mention that pain is -- we all

21   know different people have different thresholds for

22   pain.  And that doesn't mean that you can't find

23   similar findings in patients who experience pain.

24   Pain is a complex clinical entity, but I think that

25   the pathology in these patients who are experiencing

Kimberly H. Allison, M.D.

1    pain supports their clinical symptoms presentation.

2         Q.   And what about the appearance on histology

3    that you believe supports your opinion?

4         A.   The extensive scarring, the presence of

5    the nerves entrapped in the scar, and the physical

6    presence of erosions in the area.  That's what I'm

7    linking together.

8         Q.   9E.  And I'm sorry, is there -- 9E, is

9    there anything else you want to tell the jury about

10   that is significant on 9E?

11        A.   No.

12        Q.   9F?

13        A.   I have circled the higher power areas of

14   nerves.

15        Q.   Do you have an opinion to a reasonable

16   degree of medical certainty whether the nerves in 9E

17   and 9F are motor or sensory?

18        A.   Some of them are likely -- more likely

19   than not sensory.

20        Q.   Which ones?

21        A.   I cannot point to -- you cannot tell under

22   histology which ones are.  That's not something we

23   can do.

24        Q.   What type of sensory-invoking nerves are

25   these?

Kimberly H. Allison, M.D.

```
1         A.    I don't know.

2         Q.    Okay.  Anything else in Exhibit 9F that

3   you find significant that you are going to tell the

4   jury?

5         A.    No.

6         Q.    We marked your supplemental report as

7   Exhibit 8?

8              MS. O'DELL:  You marked it as Exhibit 8.

9              MR. VOUDOURIS:  Is that correct?

10             THE WITNESS:  Yes.

11  BY MR. VOUDOURIS:

12        Q.    As part of your review of these three

13  Ethicon cases, including Ms. Barker, did you,

14  yourself, do any experiments with a control group?

15        A.    No.

16        Q.    Do you know how this tissue was fixed

17  after it was removed from Ms. Barker?

18        A.    In formalin.

19        Q.    What does formalin do to tissue?

20        A.    It hardens it, makes it easier to cut.  It

21  cross-links proteins and makes them better for

22  processing in histology, the tissue better

23  preserved.

24        Q.    Do you know if formalin has any effect on

25  polypropylene?
```

Kimberly H. Allison, M.D.

1      A.    Dr. Iakovlev did look at that question in

2  one of his studies.  Would you like me to refer to

3  that one?

4      Q.    I'm asking you, I'm sorry.

5      A.    So I haven't performed experiments

6  personally.  But there is literature available that

7  I relied on that used control groups looking at

8  polypropylene mesh exposed to formalin that had not

9  been implanted in patients and in ones that had been

10 implanted in patients.  The longer they were

11 implanted in patients, the more degradation they

12 saw.  They did not see degradation in the ones that

13 had sat in formalin for up to, I think, four months.

14     Q.    And those case-controlled studies would be

15 contained in Exhibit 4?

16     A.    They are Iakovlev, the most recent one,

17 2005, I believe.  Would you like me to --

18     Q.    2005?

19     A.    2015.

20     Q.    Yes, please tell us the one that you are

21 referring to.

22     A.    Oh, yeah.  Let's see.

23     Q.    Just -- can you tell us the title of the

24 article?

25     A.    I just want to confirm because there are

Kimberly H. Allison, M.D.

1    several articles here which one it is so I'm not

2    giving you the wrong testing of pristine mesh.

3              Up to four months of formalin exposure and

4    there was no detectable degradation.  So this is the

5    study and it was published in 2015.

6        Q.   Could you --

7        A.   Title is Degradation of Polypropylene

8    In Vivo, a Microscopic Analysis of Meshes Explanted

9    From Patients.

10       Q.   Anyone else other than Dr. Iakovlev that

11   you're relying upon for that statement?

12       A.   I don't believe that there is other

13   literature to the contrary, looking at the specific

14   finding of the tree barking.

15       Q.   That wasn't my question.

16       A.   Your question is are there other articles

17   that I looked at?

18            MR. VOUDOURIS:  Can you read it back,

19   please?

20            (Whereupon, the reporter read the record

21   as follows:

22            "Question:  Anyone else other than

23   Dr. Iakovlev that you're relying upon for that

24   statement?")

25            THE WITNESS:  I guess his coauthors,

Kimberly H. Allison, M.D.

1   Scott Guelcher, G-U-E-L-C-H-E-R, and

2   Robert Bendavid.   There are multiple institutions.

3   BY MR. VOUDOURIS:

4        Q.   Any article in your reference list other

5   than that one?

6        A.   I don't think so.   I think that was a nice

7   case-controlled study looking at the effects of

8   formalin on mesh.

9        Q.   What is Xylene?

10       A.   What is Xylene?

11       Q.   Yes.

12       A.   It's another preservative and used in

13   tissue processing as well.

14       Q.   Do you know if it was used in the tissue

15   processing in Ms. Barker?

16       A.   I don't know.

17       Q.   How about in Ms. Thompson or Ms. Phelps?

18       A.   I don't know.

19       Q.   What does Xylene do to polypropylene?

20       A.   I don't know.

21       Q.   Have you ever treated women who have had a

22   midurethral sling implanted for erosion?

23       A.   I am a pathologist, so I don't treat

24   patients.

25       Q.   Same question for urinary dysfunction?

Kimberly H. Allison, M.D.

1      A.    I'm a pathologist.  I don't treat

2   patients.

3      Q.    Same for pelvic pain?

4      A.    I am a pathologist.  I don't treat

5   patients.

6      Q.    Same for dyspareunia?

7      A.    Same answer.

8      Q.    I also imagine you don't have any opinions

9   on when a midurethral sling should be revised

10  because you don't perform the surgery, correct?

11     A.    True, I don't perform the surgery.

12     Q.    Exhibit 10, please.

13     A.    Exhibit 10 is the surgical pathology

14  report.

15     Q.    Right.

16     A.    For Ms. Barker.

17     Q.    Does the pathologist comment on any mesh

18  degradation?

19     A.    No, they did a gross exam only, which is

20  common in some pathology labs.

21     Q.    Did this pathologist mention tree barking?

22     A.    They didn't do a microscopic examination

23  so they could not have commented on tree barking.

24     Q.    So the answer to my question is no?

25     A.    Correct.

Kimberly H. Allison, M.D.

1       Q.    Did this pathologist document anything

2    about mesh shrinkage?

3       A.    No, they were documenting that the mesh

4    material was removed.

5       Q.    Did this pathologist document anything

6    about mesh contracture?

7       A.    No.

8       Q.    Did this pathologist document anything

9    about mesh roping?

10      A.    No, that wouldn't be standard.

11      Q.    And how about curling?

12      A.    No, it would not be standard.

13      Q.    And how about fraying?

14      A.    No.

15      Q.    Did this pathologist do any type of

16   clinical pathologic diagnosis?

17      A.    They did a gross diagnosis only.

18      Q.    So the answer to my question is no,

19   correct?

20           MS. O'DELL:  She answered your question.

21           THE WITNESS:  Well, the clinical

22   pathologic correlation that they did was

23   confirmation that it was a GU device that was

24   removed, basically.

25

Kimberly H. Allison, M.D.

```
 1   BY MR. VOUDOURIS:

 2       Q.   That's it, correct?

 3       A.   Yeah.

 4            MR. VOUDOURIS:   Can we go off the record

 5   for a minute.

 6            (Whereupon, a brief recess was taken.)

 7   BY MR. VOUDOURIS:

 8       Q.   Dr. Allison, did you ever examine

 9   Ms. Barker?

10       A.   No.

11       Q.   Did you ever speak to any of her

12   physicians?

13       A.   No.

14       Q.   Have you read any depositions in this

15   case?

16       A.   No.

17       Q.   Have you consulted with any other health

18   care professional in your review of the Barker case?

19       A.   No.

20       Q.   Did you consult with any health care

21   professional in your review of either the Phelps or

22   the Thompson case?

23       A.   No.

24       Q.   Is the extent of your review in this case,

25   when it comes to the pathology, reviewing the slides
```

Kimberly H. Allison, M.D.

1    under the light microscope?

2         A.    Yes.

3         Q.    Did you measure the tree barking thickness

4    in any of your photographs?

5         A.    No.

6         Q.    Do you have any idea what the thickness

7    is?

8         A.    I did not measure them.

9         Q.    Do you believe it's all -- that they are

10   five microns or less?

11        A.    Likely.

12        Q.    Handing you what is marked as Defense

13   Exhibit 5.  Can you identify that again for us,

14   please?

15        A.    This is the spreadsheet used to summarize

16   my findings.

17        Q.    And this is a spreadsheet that you

18   created?

19        A.    Yes.

20        Q.    And have we discussed all the findings for

21   Daphne Barker that you have on this spreadsheet?

22        A.    I believe we have when we reviewed the

23   images.

24        Q.    Did you do any testing of the mesh that

25   was explanted from Ms. Barker last month?

Kimberly H. Allison, M.D.

```
 1        A.    No, I did not.

 2        Q.    Are you relying on anyone's opinions

 3   regarding an inspection for analysis of that

 4   explanted mesh for your opinions in this case?

 5        A.    I have the gross examination report from

 6   the person who grossed the case.

 7        Q.    But other than that, no?

 8        A.    No.

 9        Q.    Dr. Allison, those are all the questions I

10   have for now.  I may have a few follow-up questions

11   after redirect by counsel.

12        A.    Okay.

13              MR. VOUDOURIS:  What one are you looking

14   for?

15              MS. O'DELL:  I'm looking for Exhibit 10.

16              THE WITNESS:  This one?

17              MS. O'DELL:  I'm sorry, Exhibit 8.

18                         EXAMINATION

19   BY MS. O'DELL:

20        Q.    Dr. Allison, Exhibit 8 is your

21   supplemental report in the Barker case, correct?

22        A.    Correct.

23        Q.    And looking at page one, is there a typo

24   regarding the date of Ms. Barker's implant in -- or

25   excuse me, explant surgery on the first page of your
```

Kimberly H. Allison, M.D.

1   report?

2       A.   Yes, there is.  I noticed that this

3   morning.

4       Q.   Okay.  And describe what the typo is.

5       A.   So the date of the partial excision of the

6   TVT midurethral sling is -- the year is incorrect.

7            So February 12, 2012, should read

8   February 12, 2016.  I mean, that's documented in the

9   pathology report and obviously occurred after she

10  presented in December 29, 2015.

11      Q.   Okay.  Would you mind just correcting that

12  on the exhibit, please?

13      A.   (Witness complies.)

14           MR. VOUDOURIS:  You probably just want to

15  put your initials next to that.

16           MS. O'DELL:  I have nothing further.

17           MR. VOUDOURIS:  One follow-up question

18  regarding your report, which is Exhibit 8.

19           THE WITNESS:  Yes.

20                      EXAMINATION

21  BY MR. VOUDOURIS:

22      Q.   The paragraph that starts with "My job."

23      A.   Okay.

24      Q.   Do you have a sentence there that says,

25  "Other physicians rely on me to diagnose the cause

Kimberly H. Allison, M.D.

1    of their patient's problems," correct?

2        A.   Yes.

3        Q.   Does any physician at Stanford rely upon

4    you to diagnose clinical sequelae from explanted

5    midurethral meshes?

6        A.   No, not currently.

7        Q.   Has any surgeon relied upon you to

8    diagnose the cause of sequelae from explanted

9    midurethral meshes?

10       A.   No, the surgeons are removing them because

11   they have made their own clinical judgment that they

12   need to be removed because the symptoms they are

13   causing.

14       Q.   And you are not a surgeon, correct, who

15   implants or explants these?

16       A.   No, I simply describe the findings that

17   are linked to those in my pathology report.

18           MR. VOUDOURIS:  Those are all the

19   questions I have unless there is further direct.

20           MS. O'DELL:  I have nothing further.

21           MR. VOUDOURIS:  All right.  We're done.

22           (Whereupon, a brief recess was taken.)

23           MR. VOUDOURIS:  Are you having her read

24   any of these transcripts?

25           MS. O'DELL:  She will read and sign.

Kimberly H. Allison, M.D.

```
 1              MR. VOUDOURIS:  And do you plan to appear

 2    live at trial in this case?

 3              THE WITNESS:  If necessary.

 4              MR. VOUDOURIS:  Now we're done.  Thank

 5    you.

 6              (Whereupon, the deposition was concluded

 7    at 10:33 a.m.)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Kimberly H. Allison, M.D.

```
 1                   INSTRUCTIONS TO WITNESS

 2

 3          Please read your deposition over carefully

 4   and make any necessary corrections.  You should

 5   state the reason in the appropriate space on the

 6   errata sheet for any corrections that are made.

 7          After doing so, please sign the errata

 8   sheet and date it.

 9          You are signing same subject to the

10   changes you have noted on the errata sheet, which

11   will be attached to your deposition.

12          It is imperative that you return the

13   original errata sheet to the deposing attorney

14   within thirty (30) days of receipt of the deposition

15   transcript by you.  If you fail to do so, the

16   deposition transcript may be deemed to be accurate

17   and may be used in court.

18

19

20

21

22

23

24

25
```

Kimberly H. Allison, M.D.

```
 1                         ERRATA SHEET

 2

 3    PAGE    LINE      CHANGE

 4    _____   _____   _____

 5                    REASON:_____

 6    PAGE    LINE      CHANGE

 7    _____   _____   _____

 8                    REASON:_____

 9    PAGE    LINE      CHANGE

10    _____   _____   _____

11                    REASON:_____

12    PAGE    LINE      CHANGE

13    _____   _____   _____

14                    REASON:_____

15    PAGE    LINE      CHANGE

16    _____   _____   _____

17                    REASON:_____

18    PAGE    LINE      CHANGE

19    _____   _____   _____

20                    REASON:_____

21    PAGE    LINE      CHANGE

22    _____   _____   _____

23                    REASON:_____

24

25
```

Kimberly H. Allison, M.D.

```
1                 ACKNOWLEDGMENT OF DEPONENT

2

3

4

5          I,_____, do hereby certify

6    that I have read the foregoing pages, and that the

7    same is a correct transcription of the answers given

8    by me to the questions therein propounded, except

9    for the corrections or changes in form or substance,

10   if any, noted in the attached Errata Sheet.

11

12

13        _____  _____

14         KIMBERLY H. ALLISON, M.D.      DATE

15

16

17

18   Subscribed and sworn

     to before me this

19   _____ day of _____, 20_____.

20   My commission expires:_____

21

     _____

22   Notary Public

23

24

25
```

Kimberly H. Allison, M.D.

1    STATE OF CALIFORNIA    )

2    COUNTY OF YOLO          )

3         I, ELAINA BULDA-JONES, a Certified Shorthand

4    Reporter of the State of California, duly authorized

5    to administer oaths pursuant to Section 2025 of the

6    California Code of Civil Procedure, do hereby

7    certify that

8              KIMBERLY H. ALLISON, M.D.,

9    the witness in the foregoing deposition, was by me

10   duly sworn to testify the truth, the whole truth and

11   nothing but the truth in the within-entitled cause;

12   that said testimony of said witness was reported by

13   me, a disinterested person, and was thereafter

14   transcribed under my direction into typewriting and

15   is a true and correct transcription of said

16   proceedings.

17        I further certify that I am not of counsel or

18   attorney for either or any of the parties in the

19   foregoing deposition and caption named, nor in any

20   way interested in the outcome of the cause named in

21   said deposition dated the 23rd day of

22   March____, 2016.

23

24        _Elam Bulda-Jones_

25   ELAINA BULDA-JONES, RPR, CSR 11720