# EXHIBIT K

In The Matter Of:

*In Re: CR Bard 200*

_____

**Kimberly Allison, M.D.**

October 30, 2014

_____

**Tiffany Alley Global Reporting & Video**

730 Peachtree Street NE

Suite 470

Atlanta, GA 30308

770.343.9696

www.tiffanyalley.com



```
              IN THE UNITED STATES DISTRICT COURT
     FOR THE SOUTHERN DISTRICT OF WEST VIRGINIACHARLESTON DIVISION

     IN RE: C.R. BARD, INC., PELVIC    MDL No. 2187
     REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION
     _____
     LYNDA BARNER and RODNEY BARNER,  Civil Action File No.
               Plaintiffs,            2:11-CV-00055
          vs.
     C.R. BARD, INC.,
               Defendant.
     _____
     TAMMY M. LAMBERT and DAVID W. LAMBERT,
               Plaintiffs,       Civil Action File No.
          vs.                    2:14-CV-12092
     C.R. BARD, INC.,
               Defendant.
     _____
     PATSY LUTTRELL,
               Plaintiff,        Civil Action File No.
          vs.                    2:13-CV-03151
     C.R. BARD, INC.,
               Defendant.
     _____
     SAUNDRA NEVELS and RANDY NEVELS, Civil Action File No.
               Plaintiffs,            2:13-CV-01024
          vs.
     C.R. BARD, INC.,
               Defendant.
     _____
     BEVERLY PENNINGTON and WAYNE PENNINGTON,
               Plaintiffs,
          vs.                         Civil Action File No.
     C.R. BARD, INC.,                 2:11-CV-00010
               Defendant.
     _____
     DEBORAH WHITE and RONNIE WHITE,  Civil Action File No.
               Plaintiffs,            2:11-CV-00234
          vs.
     C.R. BARD, INC.,
               Defendant.

      VIDEOTAPED EXPERT DEPOSITION OF KIMBERLY H. ALLISON, MD
                       October 30, 2014
```

.

In Re: CR Bard 200          Kimberly Allison, M.D.          10/30/2014

```
                                                    Page 2
 1   .VIDEOTAPED EXPERT DEPOSITION OF KIMBERLY H. ALLISON, MD
 2
 3                    October 30, 2014
 4
 5                       9:13 a.m.
 6
 7                    Los Altos Room
 8
 9                   100 El Camino Real
10
11                  Menlo Park, California
12
              ALICE CHANG, RPR, CSR No. 13654
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                                                    Page 4
 1                INDEX OF EXAMINATION
 2   WITNESS:  KIMBERLY H. ALLISON, MD
 3   EXAMINATION                                      PAGE
 4   BY MS. MOBERG                                      10
 5
 6                 INDEX OF EXHIBITS
 7   EXHIBIT      DESCRIPTION                         PAGE
 8    #1          Notice of Deposition                  29
 9    #2          Dr. Allison's CV                      29
10    #3          Material Reviewed                     29
11    #4          Invoice from Dr. Allison,             30
12                Oct. 9th, 2014
13
      #5          Handwritten notes                    102
14
      #6          Rule 26 Expert Report of             106
15                Kimberly H. Allison, MD
16    #7          Plaintiffs' Designation and          122
                  Disclosure of General Expert
17                Witnesses Applicable to All Wave
                  1 and Wave 2 Cases
18
      #8          Exhibit C spreadsheet                140
19
      #9          Wound Closure Biomaterials and       147
20                Devices
21    #10         Position Statement on Mesh           157
                  Midurethral Slings for Stress
22                Urinary Incontinence
23    #11         Pathology of Explanted               199
                  Transvaginal Meshes
24
      #12         Polypropylene as a reinforcement     200
25                in pelvic surgery is not inert:
                  comparative analysis of 100
                  comparative analysis of 100
```

```
                                                    Page 3
 1   APPEARANCES OF COUNSEL
 2   For the Plaintiffs:
 3      BEASLEY ALLEN
 4      BY: P. LEIGH O'DELL, ESQ.
 5      234 Commerce Street
 6      PO Box 4160
 7      Montgomery, AL 31603
 8      334.269.2343
 9      334.954.7555 (Fax)
10      leigh.odell@beasleyallen.com
11
12   For the Defendant C.R. Bard, Inc.:
13      REED SMITH, LLP
14      BY: MARILYN A. MOBERG, ESQ.
15      355 South Grand Avenue
        Suite 2900
16      Los Angeles, CA 90071
        213.457.8035
17      213.457.8080 (Fax)
        mmoberg@reedsmith.com
18
        REED SMITH, LLP
19      BY: MARK A. SENTENAC, ESQ.
        101 Second Street
20      Suite 1800
        San Francisco, CA 94105
21      415.659.5957
        415.391.8269
22      msentenac@reedsmith.com
23
24   Also Present:
25   Eli Good, videographer
```

```
                                                    Page 5
 1                explants
 2    #13         Materials Characterization of        202
 3                Explanted Polypropylene Hernia
 4                Meshes
 5    #14         Characterization of Heavyweight      202
 6                and Lightweight Polypropylene
 7                Prosthetic Mesh Explants From a
 8                Single Patient
 9
10    #15         Basic science and clinical           229
11                aspects of mesh infection in
12                pelvic floor reconstructive
13                surgery
14    #16         Photograph of Pennington slide,      242
15                S11-15871 A1 2x
16
17    #17         Photograph of Pennington slide,      242
18                S11-15871 A1 4x S100
19    #18         Photograph of Pennington slide,      242
20                S11-15871 A1
21
22    #19         Photograph of Pennington slide,      242
23                S11-15871 A1 10x
24    #20         Photograph of Pennington slide,      242
25                S11-15871 A1
```

Page 70

1  work. It's not I get to do it on my own time. I have
2  to show up and be here all day.
3      Q. So if -- when you testify in trial in this
4  matter, assuming counsel decides to call you to trial,
5  you're going to be charging them $6,800 a day for the
6  trial, right?
7      A. That's right.
8      Q. Let's just go through this. So the first --
9  you have two hours for "meeting to discuss cases" on
10 June 11th, 2014; is that right? That's the first entry?
11     A. First entry, yes, "meeting to discuss cases."
12     Q. And who were you meeting with?
13     A. Henry Garrard and Leigh O'Dell.
14     Q. Where was that meeting?
15     A. In my office at Stanford.
16     Q. And was that the first time that you had ever
17 been retained in connection with any sort of litigation
18 involving transvaginal mesh products?
19     A. Yes. Besides the phone calls that led up to,
20 you know, "Can we meet?"
21     Q. And I don't -- the reason I'm asking is
22 because I don't see any billings for phone calls. So
23 were those just sort of preliminary scheduling calls,
24 nothing substantive?
25     A. That's right. Yeah.

Page 71

1      Q. Okay. Now, when you first met at that time,
2  had you already been retained in these cases? Do you
3  understand what I mean by that?
4      A. No, I had not. I don't think. No, I don't
5  think I had. Because I -- I hadn't said, yes, I want to
6  do this.
7      Q. And at what point in terms of this, you know,
8  chronology of events here in the billing did you
9  actually say, yes, I want to do this?
10     A. I believe it was -- at the end of the meeting
11 I said, "Hey, I'm interested. I reviewed the
12 literature." And I believe there was follow-up
13 afterwards that -- you know, I showed my rate agreement,
14 and we agreed that I would serve as their expert.
15     Q. Okay. So are you saying that you reviewed
16 some literature before the meeting on June 11th?
17     A. I did do a brief literature search, yes.
18     Q. That was on your own?
19     A. On my own.
20     Q. Okay. And after the meeting, it looks like
21 you reviewed some more literature on -- in July of this
22 year, correct?
23     A. Correct.
24     Q. All right. And you said "literature review
25 and preliminary case review," ten hours and a quarter.

Page 72

1      A. Right.
2      Q. What does that mean?
3      A. They sent a lot of cases, boxes of cases, for
4  me to review. So I think I had -- I have in my office
5  now 90-some explant cases, and I've not reviewed all of
6  them at this point, but I reviewed a large percentage of
7  them. I think probably close to 60 that -- you know,
8  the majority of which are not the patients that we're
9  talking about today, just to get an overview of the
10 detailed findings.
11         Looking at medical records -- I did get
12 medical records on some of those patients just to see
13 what kinds of links there are. Because in the
14 standard -- the standard of care for looking at mesh
15 cases is not an in-depth review of the medical record.
16 And the question here is: Can I -- can I explain
17 clinical symptoms by the histology that's present? And
18 so that was my initial preliminary case review,
19 essentially.
20     Q. Let me see if I just understand this. So you
21 received -- when you say you received boxes of cases,
22 you got -- did you get pathology slides for those cases?
23     A. Yes.
24     Q. And then you also got medical records for
25 those cases, correct?

Page 73

1      A. Yes.
2      Q. And -- but you're not here testifying about
3  those individual cases --
4      A. Correct.
5      Q. -- today? You're only talking about seven
6  plaintiffs, right?
7      A. Correct.
8      Q. But am I -- is it fair to say that in terms of
9  your opinions that you're offering here today, you are
10 relying on your review -- or are you relying on your
11 review of what was in the other boxes for the 90 cases?
12     A. I think they've added to my experience. And
13 so what -- what I was interested in seeing was: Are
14 these findings consistent? And they -- they appear to
15 be very consistent. So, you know, many of the mesh
16 cases I was looking at had very consistent findings
17 histologically.
18     Q. And do you know how those 90 cases were
19 selected for you?
20     A. Patients complained of some -- either erosion
21 or pain or some other clinical symptoms. They were
22 removed.
23     Q. Okay. I think you -- and it could be because
24 it was a bad question, so I apologize for that.
25         What I'm asking is: Do you know the -- the --

Page 74
1  sort of how those particular cases were selected --
2  And let me back up and ask you: Do you have
3  any kind of understanding as to how many cases there are
4  that are pending around the country, these mesh cases?
5  A. I think hundreds, if not thousands. I
6  don't --
7  Q. Okay. And --
8  A. A lot.
9  Q. And let's just assume for the moment that
10 there are thousands. You got 90, right, to review?
11 A. Yes.
12 Q. Do you know how those 90 were selected out of
13 the thousands of cases for you to review?
14 A. No.
15 Q. And did you ask counsel whether or not you
16 could see the rest of the cases? To review?
17 A. The thousands? No. I could not have fit them
18 all in my office. I -- I trusted that they were a slice
19 of the kinds of cases that have come through and, you
20 know, the level of consistency that I was seeing makes
21 me think the findings are very similar in explanted mesh
22 for symptoms.
23 Q. Now, you said something in -- this morning,
24 it's still this morning, I guess. But you said
25 something earlier. About -- I wrote down "60 surgical

Page 75
1  explants that were previously part of litigation that
2  were examples of vaginal mesh" in terms of other vaginal
3  mesh cases that you've been involved in -- I'm not
4  talking about litigation cases. I'm talking about
5  pathology examinations. Do you recall that testimony?
6  A. So repeat it again, that I had seen 60 --
7  Q. Yeah. Let me --
8  A. What were they associated with?
9  Q. Yeah. Let me -- and you know what, rather
10 than go back to what you said, which I could have easily
11 written down wrong, let me ask you this way.
12 So aside from the 90 cases that you were given
13 that are back in your office, aside from these cases --
14 And are these cases part of the 90, the 7?
15 A. Yes.
16 Q. Okay. So you've reviewed less than 100
17 litigation mesh cases and files, right?
18 A. Sure. Yes.
19 Q. Aside from those, how many pathology files and
20 records of mesh explants have you -- had you seen in
21 your normal practice? About -- we already established
22 that, about 10 to 12?
23 A. We did, yes. Exactly.
24 Q. Have you ever been involved in actually
25 getting the actual explant and preparing the slides from

Page 76
1  the explant?
2  A. Pathologists don't generally prepare slides.
3  The histotechnologists in the laboratory do. So we
4  select what tissue to put in cassettes, and then it gets
5  sent to a laboratory that makes the slides. And then we
6  look at the slides.
7  Q. Okay. And, again, that was showing kind of my
8  broader level of -- that's what I meant, but I didn't
9  quite ask it that way. So I'm glad you clarified.
10 Now, back to that.
11 A. Okay.
12 Q. Have you ever done that with the -- with a
13 transvaginal mesh product?
14 A. Made the gross tissue selection?
15 Q. Correct.
16 A. No. And often I think the -- you get small
17 pieces, only, that are removed.
18 We also have pathology assistants and
19 residents who do most of the gross examination.
20 Q. In terms of any of the opinions that you're
21 going to offer today concerning degradation of
22 polypropylene, is it -- am I correct that you are not a
23 biomaterials expert?
24 A. I'm an expert in the pathology of the tissue
25 response to biomaterials, in that sense. But I don't

Page 77
1  study biomaterials for a living.
2  Q. And you have no -- you hold no PhDs or
3  advanced educational degrees in the field of
4  bioengineering, biomaterials, or polymers, correct?
5  A. No. I'm a pathologist.
6  Q. And -- you know, bear with me, Doctor, here,
7  because this going to help me figure out what you are
8  going to talk about and what you're not going to talk
9  about at trial. So that's why I'm doing this. So I'm
10 going to go through a process of elimination here to try
11 to figure that out. Okay?
12 You are not a urogynecologist and you have no
13 expertise in urogynecology, correct?
14 A. I am a pathologist. I am not a
15 urogynecologist.
16 Q. And you're not a urologist?
17 A. No, I'm not a urologist.
18 Q. And you are not an obstetrician or
19 gynecologist, correct?
20 A. That's correct.
21 Q. And you are not an expert in regulatory
22 compliance issues as it pertains to the clearance or
23 approval of medical devices; is that fair?
24 A. That's correct.
25 Q. You did not perform any analysis of the actual

In Re: CR Bard 200                    Kimberly Allison, M.D.                    10/30/2014

```
                                                Page 350
 1                 REPORTER'S CERTIFICATION
 2
 3        I, Alice Chang, Certified Shorthand Reporter in and
 4   for the State of California, do hereby certify:
 5
 6        That the foregoing witness was by me duly sworn;
 7   that the deposition was then taken before me at the time
 8   and place herein set forth; that the testimony and
 9   proceedings were reported stenographically by me and
10   later transcribed into typewriting under my direction;
11   that the foregoing is a true record of the testimony and
12   proceedings taken at that time.
13
14        IN WITNESS WHEREOF, I have subscribed my name this
15   2nd day of November, 2014.
16
17
18
19        _____
20             Alice Chang, CSR No. 13654
21
22
23
24
25
```

```
                                                Page 351
 1   TO: Kimberly Allison, M.D.
 2   Re: Reading and Signing Your Deposition Transcript
 3   Date Errata due back at our offices:  12/3/2014
 4
 5   Greetings:
 6   You have reserved the right to read and sign your
     deposition transcript. Please review the attached
 7   PDF transcript, noting any changes or corrections
     on the attached PDF Errata.  You may fill out the
 8   Errata electronically or print and fill out manually.
 9
     The PDF files open with Adobe Reader. If you need help
10   opening these files, please see the instructions in the
     cover letter of this email.
11
     Once you have completed your Errata, please print it, sign
12   it, and have the document notarized in the place provided.
13
     When the signed Errata is returned to us, we will seal
14   and forward to the taking attorney to file with the
     original transcript.  We will also send copies of the
15   Errata to all ordering parties.
16
     If the signed Errata is not returned within the time
17   below, the original transcript may be filed with the
     court without your signature.
18
19
20   Please send completed Errata to:
21   Tiffany Alley Global Reporting & Video
22   730 Peachtree St. NE, Ste 470
23   Atlanta, GA 30308
24   (770) 343-9696
25
```

```
                                                Page 352
 1   ERRATA
 2   I, the undersigned, do hereby certify that I have read the
     transcript of my testimony, and that
 3
 4   ___ There are no changes noted.
 5   ___ The following changes are noted:
 6
     Pursuant to Rule 30(7)(e) of the Federal Rules of Civil
 7   Procedure and/or OCGA 9-11-30(e), any changes in form or
     substance which you desire to make to your testimony shall
 8   be entered upon the deposition with a statement of the
     reasons given for making them.  To assist you in making any
 9   such corrections, please use the form below.  If additional
     pages are necessary, please furnish same and attach.
10
11   Page _____ Line _____ Change _____
12   _____
13   Reason for change _____
14   Page _____ Line _____ Change _____
15   _____
16   Reason for change _____
17   Page _____ Line _____ Change _____
18   _____
19   Reason for change _____
20   Page _____ Line _____ Change _____
21   _____
22   Reason for change _____
23   Page _____ Line _____ Change _____
24   _____
25   Reason for change _____
```

```
                                                Page 353
 1   Page _____ Line _____ Change _____
 2   _____
 3   Reason for change _____
 4   Page _____ Line _____ Change _____
 5   _____
 6   Reason for change _____
 7   Page _____ Line _____ Change _____
 8   _____
 9   Reason for change _____
10   Page _____ Line _____ Change _____
11   _____
12   Reason for change _____
13   Page _____ Line _____ Change _____
14   _____
15   Reason for change _____
16   Page _____ Line _____ Change _____
17   _____
18   Reason for change _____
19
20        _____
                   DEPONENT'S SIGNATURE
21
     Sworn to and subscribed before me this ___ day of
22   _____, _____.
23
     _____
24   NOTARY PUBLIC
25   My Commission Expires:_____
```