# EXHIBIT C

Donald R. Ostergard, M.D.

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON
Master File No. 2:12-MD-02327   MDL 2327

_____

DEPOSITION OF                        March 9, 2016
DONALD R. OSTERGARD, M.D.

_____

IN RE:  ETHICON, INC., PELVIC REPAIR   JOSEPH R. GOODWIN
SYSTEM PRODUCTS LIABILITY LITIGATION   U.S. DISTRICT JUDGE

_____
THIS DOCUMENT RELATES TO THE FOLLOWING CASES
IN WAVE 1 OF MDL 200:

HARRIET BEACH v. ETHICON, INC., ET AL.
Civil Action No. 2:12-cv-00476
SHARON BOGGS, ET AL. v. ETHICON, INC., ET AL.
Civil Action No. 2:12-cv-00368
ROBIN BRIDGES v. ETHICON, INC., ET AL.
Civil Action No. 2:12-cv-00651
ANGELA COLEMAN, ET AL. v. ETHICON, INC., ET AL.
Civil Action No. 2:12-cv-01267

AMANDA DELEON, ET AL. v. ETHICON, INC., ET AL.
Civil Action No. 2:12-cv-00358
DENNIS W. DIXON, ESTATE OF VIRGINIA DIXON,
Deceased v. ETHICON, INC., ET AL.
Civil Action No. 2:12-cv-01081
DINA DESTEFANO-RASTON, ET AL. v. ETHICON, INC.,
ET AL.
Civil Action No. 2:12-cv-01299
PAULA FISK v. ETHICON, INC., ET AL.
Civil Action No. 2:12-cv-00848

JACKIE FRYE v. ETHICON, INC., ET AL.
Civil Action No. 2:12-cv-1004
TERESA GEORGILAKIS, ET AL. v. ETHICON, ET AL.
Civil Action No. 2:12-cv-00829

ROSE GOMEZ, ET AL. v. ETHICON, ET AL.
Civil Action No. 2:12-cv-00344

Donald R. Ostergard, M.D.

```
                                                     Page 2
 1    LOUISE GRABOWSKI v. ETHICON, INC., ET AL.
      Civil Action No. 2:12-cv-00683
 2
      PAMELA GRAY-WHEELER v. ETHICON, INC., ET AL.
 3    Civil Action No. 2:12-cv-00455
 4    DAWNA HANKINS v. ETHICON, INC., ET AL.
      Civil Action No. 2:12-cv-00369
 5
      JEANIE HOLMES, ET AL. v. ETHICON, INC., ET AL.
 6    Civil Action No. 2:12-cv-01206
 7    NANCY HOOPER, ET AL. v. ETHICON, INC., ET AL.
      Civil Action No. 2:12-cv-00493
 8
      WILMA JOHNSON v. ETHICON, INC., ET AL.
 9    Civil Action No. 2:12-cv-00809
10    BEVERLY KIVEL v. ETHICON, INC., ET AL.
      Civil Action No. 2:12-cv-00591
11
      PAUL KRIZ, ET AL. v. ETHICON, INC., ET AL.
12    Civil Action No. 2:12-cv-00938
13    DEBORAH LOZANO, ET AL. v. ETHICON, INC., ET AL.
      Civil Action No. 2:12-cv-00347
14
      BARBARA MASSICOT v. ETHICON, INC., ET AL.
15    Civil Action No. 2:12-cv-00856
16    EDITH NOLAN v ETHICON, INC., ET AL.
      Civil Action No. 2:12-cv-00864
17
      NOEMI PADILLA v. ETHICON, INC., ET AL.
18    Civil Action No. 2:12-cv-0567
19    STACEY PANGBORN v. ETHICON, INC., ET AL.
      Civil Action No. 2:12-cv-01198
20
      MIRANDA PATTERSON v. ETHICON, INC., ET AL.
21    Civil Action No. 2:12-cv-00481
22    JENNIFER REYES, ET AL. v. ETHICON, INC., ET AL.
      Civil Action No. 2:12-cv-00939
23
      JENNIFER SIKES, ET AL. v. ETHICON, INC., ET AL.
24    Civil Action No. 2:12-cv-00501
25
```

Donald R. Ostergard, M.D.

Page 3

 1  CARRIE SMITH v. ETHICON, INC., ET AL.
    Civil Action No. 2:12-cv-00258
 2
    JANET SMITH, ET AL. v. ETHICON, INC., ET AL.
 3  Civil Action No. 2:12-cv-00861
 4  MARGARET STUBBLEFIELD v. ETHICON, INC., ET AL.
    Civil Action No. 2:12-cv-00842
 5
    MARY LEE SWEENEY, ET AL. v. ETHICON, INC., ET AL.
 6  Civil Action No. 2:12-cv-00807
 7  KRYSTAL TEASLEY v. ETHICON, INC., ET AL.
    Civil Action No. 2:12-cv-00500
 8
    SUSAN THAMAN v. ETHICON, INC., ET AL.
 9  Civil Action No. 2:12-cv-00279
10  PATRICIA TYLER v. ETHICON, INC., ET AL.
    Civil Action No. 2:12-cv-00469
11
    CATHY WARLICK, ET AL. v. ETHICON, INC., ET AL.
12  Civil Action No. 2:12-cv-00276
    _____
13
14       The deposition of DONALD R. OSTERGARD, M.D.,
15  taken before Leeann Keenan, a Registered Merit
16  Reporter, Certified Realtime Reporter, and a Notary
17  Public in and for the County of Summit and the State
18  of Colorado, at 7171 West Alaska Drive, Lakewood,
19  Colorado, on Wednesday, March 9, 2016, at the hour
20  of 9:01 a.m., pursuant to Notice.
21
22
23
24
25

Donald R. Ostergard, M.D.

```
                                                    Page 4
 1   APPEARANCES:
 2
 3          MOTLEY RICE, LLC
            BY: MARGARET M. THOMPSON, J.D., M.D.
 4                    and
            BREANNE V. COPE, ESQ.
 5          28 Bridgeside Boulevard
            Mt. Pleasant, South Carolina  29464
 6          (843) 216-9000
            mmthompson@motleyrice.com
 7          bcope@motleyrice.com.com
            appeared on behalf of the Plaintiffs
 8
 9          BUTLER SNOW, LLP
            BY: NILS B. SNELL, ESQ.
10          500 Office Center Drive, Suite 400
            Fort Washington, Pennsylvania  19034
11          (267) 513-1885
            burt.snell@butlersnow.com
12          appeared on behalf of the Defendants
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Donald R. Ostergard, M.D.

Page 9

1                    P R O C E E D I N G S

2                    (Witness duly sworn.)

3                    DONALD R. OSTERGARD, M.D.,

4       having been first duly sworn, was examined and

5       testified as follows:

6                              EXAMINATION

7       BY MR. SNELL:

8            Q.    Good morning, Doctor.

9            A.    Good morning, sir.

10           Q.    We met briefly off the record.  My name

11      is Burt Snell.  I'm from the law firm Butler Snow,

12      and I represent Ethicon and Johnson & Johnson in

13      this litigation.

14                    I have a head cold, as I told you.

15      So if you cannot understand my questions or if you

16      need me to repeat something, please just tell me and

17      I'll do my best.  I'm going to try to drink a lot of

18      water and coffee --

19           A.    Yeah.

20           Q.    -- to keep us on track.

21                    Can you state your full name and

22      your current address, please.

23           A.    Donald R. Ostergard.  The only address I

24      have is a home address, and I'd just as soon not

25      have that on the record.

Donald R. Ostergard, M.D.

Page 10

1      Q.     That's fine.  What city do you live in?

2      A.     I live in Salida, S-A-L-I-D-A, Colorado.

3      Q.     Colorado, okay.

4      A.     I do have an office address in Torrance,

5   California at the Harbor UCLA Medical Center.

6      Q.     Are you still affiliated with the Harbor

7   UCLA Medical Center?

8      A.     I am professor in residence there, yes.

9      Q.     What does "professor in residence" mean?

10  That's a term I've never heard before.

11     A.     Okay.  It basically means that someone

12  else is paying my salary.  The university or the

13  county are not paying a salary.  So it's almost like

14  a volunteer faculty.

15     Q.     Okay.  And how long have you held that

16  position?

17     A.     It's been, I think, a couple years at

18  this point, approximately.

19     Q.     Do you no longer treat patients?

20     A.     I do not have a practice.

21     Q.     Okay.  When's the last time you treated a

22  patient for pelvic organ prolapse?

23     A.     Well, I assisted some of the fellows at

24  Harbor UCLA a few years ago.

25     Q.     Can you be more specific?  When you say

Donald R. Ostergard, M.D.

Page 11

1  "a few years ago," are you talking about 2010?

2  2013?

3      A.    Let's see.  Probably 2014, 2015.  I'm

4  sorry, I don't remember exactly.

5                    (Exhibit No. 1 was marked.)

6      Q.    I've marked as Exhibit 1 a copy of the

7  amended notice of deposition.  It's similar to the

8  prior notice, except it just has more names.  I saw,

9  when I looked at the original notice, you had been

10  disclosed as a general expert in some cases, and

11  they did not have that on there.

12                    So that's the purpose of the

13  amended notice, and also to indicate that we're here

14  taking your deposition regarding your general expert

15  report today, as opposed to the case specific

16  depositions that, as I understand it, will be later.

17      A.    That's correct.

18                    MS. THOMPSON:  And just for the

19  record, we filed objections to the notice.

20                    MR. SNELL:  Okay.

21                    MS. THOMPSON:  Hopefully you are

22  aware of that.

23                    MR. SNELL:  I did see -- I have not

24  been able to look it up, but I did see it on my

25  phone that objections were filed.

Donald R. Ostergard, M.D.

Page 12

1          Q.     Can you tell me what, if anything, did
2     you do to prepare for today's deposition, Doctor?
3          A.     I reviewed lots of records, depositions,
4     and the report pretty much outlines what I reviewed.
5          Q.     When you say reviewed records, are you
6     speaking to medical records or some other type of
7     document?
8          A.     The Ethicon records primarily.  Of course
9     medical literature as well.  That's all outlined in
10    the report.
11         Q.     Fair to say, did you go back and
12    re-review every piece of literature or document or
13    deposition that you referenced in the body of your
14    report?
15         A.     Not every one, no.
16         Q.     Any particular topic you refreshed
17    yourself on in preparation for the deposition?
18         A.     Mostly regarding Gynemesh.
19         Q.     And how much time did you spend in
20    preparation for today's deposition?
21         A.     Since the --
22                MS. THOMPSON:  Object to form.
23         A.     Since the report was filed, do you mean?
24         Q.     Well, how about we do it like that.
25    Let's back up.

Donald R. Ostergard, M.D.

Page 25

1    we did use Gynemesh after that.

2         Q.    What was the reason or reasons why you

3    abandoned Gore-Tex?

4         A.    Because of the complications we were

5    having with it.

6         Q.    Meaning erosion?

7         A.    Erosion was the main one, yes.

8         Q.    Sinus tract formation?

9         A.    What formation?

10        Q.    Do you have sinus tract formation with

11   Gore-Tex?

12        A.    Sinus tract.  I would have to go back and

13   look at our papers to see if that happened.  I don't

14   recall.

15        Q.    And the Gore-Tex we're talking about is

16   Gore-Tex mesh, right?

17        A.    Yes, not Gore-Tex clothing.

18        Q.    Or the Gore-Tex sutures that I know

19   you've used over your career, true?

20        A.    Yes.

21        Q.    Okay.  And the Gore-Tex mesh is a

22   microporous mesh, true?

23        A.    Yes, incredibly microporous.

24        Q.    It's essentially like the Gore-Tex winter

25   wear jackets you would have, true?

Donald R. Ostergard, M.D.

Page 26

1        A.      Right.   It's impermeable.

2        Q.      Right.   What is the pore size of the

3   Gore-Tex mesh?

4        A.      I really don't know, but I don't think

5   you could call them pores.

6        Q.      It's more like a sheet?

7        A.      It's a sheet, yes.

8        Q.      You understand the pore size of Gynemesh

9   PS to be about 2 1/2 millimeters?

10               MS. THOMPSON:  Object to form.

11       A.      Well, that's what's been reported, but

12   that totally ignores all the other pores, the ones

13   that go down to maybe a third of a micron.  So

14   there's not a good idea that Ethicon actually

15   acknowledged that, to put a number on pore size,

16   because there are multiple pores involved.

17       Q.      You understand in your field, by doctors

18   who look at and characterize meshes, they tend to

19   report the largest pore size for a mesh, true?

20       A.      That's true.

21               MS. THOMPSON:  Object to form.

22       A.      That's not a correct characterization of

23   the mesh.

24       Q.      And if there is a pore that's 2 1/2

25   millimeters, yet there's a strand of the filament

Donald R. Ostergard, M.D.

Page 27

1    running through the middle, what you're saying is

2    then that makes the pore not 2 1/2, but 1.25 and

3    1.25, hypothetically?

4                 MS. THOMPSON:  Object to form.

5         Q.    I'm not locking you into those numbers.

6    I'm just trying to understand what you're saying.

7         A.    Well, if you look at the diagram of a

8    pore --

9         Q.    All right.

10        A.    -- or of the mesh, let's say, you will

11   see that there are multiple pores, and some of them

12   are considered interstices.  In other words, so

13   small that a macrophage or a white blood cell can't

14   get in, but the bacteria can.  And that's one of the

15   big disadvantages of the use of this form of

16   material.

17        Q.    When you used Gynemesh PS, did you notice

18   any type of very high infection rate with it?

19        A.    No, because we put it in sterilely.

20        Q.    Now, you've heard of the Amid

21   classification, obviously?

22        A.    Yes, for what it's worth.

23        Q.    Biologically the cells that are involved

24   in the laying down of collagen, but also the cells

25   that are responsible for attempting to handle

Donald R. Ostergard, M.D.

Page 28

1   bacteria, those are all cells that are so small you

2   can only see them on a microscope, true?

3        A.    Those cells require a microscope for

4   visualization, yes.

5        Q.    All right.  And you mentioned a

6   macrophage.  You are aware that a macrophage can

7   traverse around a mesh filament, true?

8                  MS. THOMPSON:  Object to form.

9        A.    Yes, that has been published.

10       Q.    You are --

11       A.    They can change their shape to some

12   degree to do that.

13       Q.    Exactly.  You are aware that macrophages

14   can change their shape and emit, some people have

15   called it, like an arm, pseudopod?

16       A.    Pseudopod, that's right.

17       Q.    True.  Such that if there was a bacteria

18   in the interstices, the macrophage can come sit down

19   on top of it and emit pseudopod filled with

20   bacteria, true?

21                  MS. THOMPSON:  Object to form.

22       A.    Assuming that bacterium had not encased

23   itself in bacterial slime.  If it does that, then it

24   cannot do as you described.

25       Q.    However, if it does that and the

Donald R. Ostergard, M.D.

Page 33

1    sacrocolpopexy?

2         A.    More often than not, I would just use the

3    sacrocolpopexy.

4         Q.    Okay.  You've read literature that

5    indicates that there is a relation between the

6    apical part of the vagina as well as the anterior

7    and posterior walls?

8         A.    I don't understand your question.

9         Q.    Are you generally familiar with

10   literature that indicates, going back to

11   publications by John DeLancey, that if there's a

12   multicompartment defect, including the apex, the

13   most important part to try to put back anatomically

14   is the apex because it has an effect on the anterior

15   and posterior walls if not treated?

16        A.    Typically that's true, yes.

17        Q.    And is that something you subscribe to?

18        A.    Yes.

19        Q.    Did you use Gynemesh PS transvaginally?

20        A.    No.

21        Q.    Did you use any meshes transvaginally?

22        A.    The only meshes that I have used are

23   Gore-Tex.

24        Q.    Gore-Tex.

25        A.    And polypropylene mesh for suburethral

Donald R. Ostergard, M.D.

Page 34

1    slings.

2         Q.    You never freehand cut the Gynemesh or

3    Gynemesh PS and sutured in place for prolapse

4    repair?

5         A.    No.

6         Q.    The polypropylene mesh you used for

7    stress incontinence was the TVT, true?

8         A.    No.

9         Q.    Do you recall giving deposition testimony

10   that you've used the TVT, but you alter the approach

11   by making a wider dissection near the urethra, and

12   you don't pass the trocars fully from the top all

13   the way down to the bottom.  You stop when you hit

14   your finger.  Do you not recall giving that

15   testimony?

16        A.    I did that, but not with the TVT.

17        Q.    Have you ever used the TVT?

18        A.    No.

19        Q.    What polypropylene mesh slings have you

20   used for stress incontinence?

21        A.    The SPARC.  I've used the components of

22   the SPARC, but not as directed by AMS.  I did it the

23   way you described, basically.

24        Q.    Okay.  And did you find that use of SPARC

25   to be safe and effective transvaginally?

Donald R. Ostergard, M.D.

Page 35

1        A.     In the absence of data, I'm not sure I
2   can answer that question because I did not follow-up
3   these patients to the point where I can make a
4   definitive statement to that regard.
5        Q.     Per your general recollection, do you
6   have any reason to believe that your patients did
7   not do well that you treated with SPARC?
8        A.     In the absence of data, I suppose.  But
9   if I don't have any objective information to verify
10  that, I really can't tell you.
11       Q.     Are you aware that the pore size of TVT
12  is larger than the pore size of SPARC?
13       A.     I don't recall --
14              MS. THOMPSON:  Object to form.
15       A.     -- specifically.
16       Q.     Are you aware that -- you know there's a
17  Cochrane review on slings, just like the Cochrane
18  review you brought about prolapse mesh?
19       A.     Yes, there's Cochrane reviews on
20  virtually everything.
21       Q.     I think the lead author of that sling
22  Cochrane review was Ogah, O-G-A-H.  Are you
23  generally familiar with that Cochrane review?
24       A.     Yes, generally, but I would have to see
25  it again at this point to make any comments on it

Donald R. Ostergard, M.D.

Page 36

1    definitively.

2        Q.    I'm going to ask you to do this:  Do you

3    have a general recollection that when top-to-bottom

4    polypropylene slings, like SPARC, are compared to

5    bottom-to-top, like TVT, the slings like SPARC had

6    lower efficacy and higher exposure rates?

7        A.    Well, since I didn't do it as a SPARC

8    procedure, we're not talking about what I did in

9    comparison to the TVT.

10        Q.    But you still left a polypropylene

11    midurethral sling implanted transvaginally in the

12    patients, true?

13        A.    That is true.

14        Q.    What was your exposure rate with the

15    SPARC, if you track that at all?

16        A.    I did not track anything regarding these

17    patients.

18        Q.    Okay.  When did you learn to do the

19    sacrocolpopexy?

20        A.    When?

21        Q.    Yes.  Is that something you learned in

22    your residency or once you got out in practice?

23        A.    I'm not really sure.  I certainly used it

24    in my practice, but I don't recall specifically

25    being taught it in residency.

Donald R. Ostergard, M.D.

Page 37

1      Q.    Okay.  Sacrocolpopexy has been out since
2  the 1960s, true?
3      A.    Yes, I would assume.
4      Q.    When did you begin doing
5  sacrocolpopexies?  You can just tell me the decade.
6      A.    Probably in the '80s.
7      Q.    Okay.  Did you find that there was
8  adequate tissue integration with the Gynemesh PS
9  that you placed?
10      A.    I never evaluated the patient for tissue
11  integration.
12      Q.    Was there adequate suspension of the
13  prolapsed organs, in your opinion, with the Gynemesh
14  PS you placed?
15      A.    Yes.
16      Q.    What was your rate of exposure with the
17  Gynemesh PS, if you tracked it at all?
18      A.    I did not track them, so I cannot tell
19  you.
20      Q.    For the Gore-Tex mesh you used, did you
21  track those complication rates?
22      A.    Gore-Tex for?
23      Q.    For prolapse repair.
24      A.    For prolapse repair.  We tracked them for
25  suburethral slings.  That was all.

Donald R. Ostergard, M.D.

Page 38

1       Q.    Okay.  Have you ever had to go in and
2    remove a Gynemesh PS mesh that got infected?
3       A.    No.
4             MS. THOMPSON:  Object to the form.
5       Q.    Can you give me your best estimate of how
6    many Gynemesh PS meshes you placed in your career?
7       A.    You want a guess?  That's what it's going
8    to be.
9       Q.    I don't want a guess.  I want your best
10    estimate.  So if you say, you know, on average I
11    did, you know, 20 or 30 sacrocolpopexies a year, the
12    majority of those were Gynemesh PS.  I'm just
13    looking for your best estimate.
14       A.    Yeah.
15       Q.    I'm not going to hold you to a number.  I
16    will promise you that.  I'm asking you, so let me
17    just make the record completely clear, can you give
18    me your best estimate as to the number of Gynemesh
19    PS meshes you placed over your career?
20             MS. THOMPSON:  Object to form.
21       A.    I'm not even sure I can even characterize
22    it as an estimate, but probably in the range of 50
23    to 100.
24       Q.    Okay.  I think earlier you mentioned you
25    worked with training residents at UCLA Harbor View a

Donald R. Ostergard, M.D.

Page 39

1    couple years back?

2         A.    I primarily was training the fellows.

3         Q.    The fellows, sorry.

4               Were those fellows using the TVT

5    sling made by Ethicon?

6         A.    I do not believe so.

7         Q.    They were using SPARC?

8         A.    No, sir.

9         Q.    What sling were they using, if you know?

10        A.    It was the, I believe the Boston

11   Scientific Advantage sling.

12        Q.    That's a polypropylene sling?

13        A.    Yes, sir.

14        Q.    When did you begin using the SPARC sling?

15              MS. THOMPSON:  Object to form.

16        A.    I know I used it before I closed my

17   practice in Long Beach.

18              THE WITNESS:  I'm sorry, I'm not

19   speaking up.  My voice, same cold he has

20   (indicating).

21        A.    The -- again, as best estimate, 2010.

22        Q.    During your residency, can you tell me

23   what were the prolapse repairs you were trained on,

24   besides the anterior and posterior colporrhaphy?

25        A.    The procedures you mentioned, plus the

Donald R. Ostergard, M.D.

Page 40

1  plication of the uterosacral ligaments as part of a

2  prolapse repair for the apex of the vagina,

3  primarily posthysterectomy.

4      Q.   I'm familiar with the term "uterosacral

5  ligament suspension."  Is that the same thing as

6  what you just referenced as a uterosacral plication,

7  or are they different?

8      A.   I think you probably would say they were

9  different, since the suspension you're talking about

10  is usually done at the level of the spine,

11  approximately.  And sutures are placed there and

12  then into the vagina.

13              We're talking about a -- very much

14  a lower plication of the uterosacral ligaments.

15  It's called a McCall culdoplasty.

16      Q.   Okay.  I've heard of that.  So you're

17  going more lateral as opposed to high up?

18      A.   No, we're not going lateral.  We're

19  following the uterosacral ligaments and placing

20  sutures in it.

21      Q.   Okay.

22      A.   The uterosacral ligament that we've just

23  detached from the uterus.

24      Q.   Okay.

25      A.   And plicating that and obliterating the

Donald R. Ostergard, M.D.

Page 101

1      Q.     For purposes of my question --

2      A.     As --

3      Q.     For purposes of my question, I'm not

4    focused on him.  I want to go back to my question.

5                    So are there any Level 1

6    randomized control trials that report degradation

7    with Gynemesh PS?

8                    MS. THOMPSON:  Object to form.

9      A.     There's no randomized control trials.  I

10   mean, no one has ever taken 100 patients with the

11   mesh there, extracted that mesh from those 100

12   patients and looked at it.  That would be something

13   no Human Subjects Committee would approve, so it's

14   not possible to do such a study.  So to answer your

15   question, there is no Level 1 evidence --

16     Q.     Okay.

17     A.     -- from such a study designed that way.

18     Q.     So the surface cracking that you

19   mentioned, a study has not been done yet which shows

20   whether that is a finding in patients who have good

21   prolapse repair and no complications as compared to

22   patients who have complications, true?

23     A.     Well, the mesh is --

24                    MS. THOMPSON:  Object to form.

25     A.     -- available for analysis.  It comes from

Donald R. Ostergard, M.D.

Page 102

1    patients who have a complication severe enough to

2    remove that mesh.  It couldn't be done otherwise.

3    No Human Subjects Committee would approve that.

4          Q.    What I'm saying is the surface cracking

5    that's been reported by some folks, that could be a

6    normal finding in asymptomatic patients with good

7    cure of their prolapse and no complications because

8    the study -- a study hasn't been done with that type

9    of control to show whether this cracking is actually

10   causal of any of the complications, true?

11               MS. THOMPSON:  Object to form.

12         A.    At this point in time, we cannot

13   specifically relate degradation to complications in

14   patients.  The only time we are able to see this

15   degradation, and I think this was mentioned in one

16   of Ethicon's patients -- oh, it is attached to one

17   of the expert reports, or is mentioned that on

18   removal of the mesh, it fell apart.  It fell apart,

19   so all the mesh could not be taken out.

20               And this has been my experience as

21   well.  The mesh frequently does that.  You can't get

22   it all out.  And even Ethicon has likened this to

23   rebar in concrete.  You can't get the rebar out.

24   And now these patients have remaining polypropylene

25   mesh in them, which can at some time in the future

Donald R. Ostergard, M.D.

Page 103

1    cause problems for them.

2                        And I hate to bring up the cancer

3    issue, but there are now two neoplasms that have

4    been described with polypropylene mesh.  And they'll

5    actually be published formally next month, and so

6    these patients have this knowledge if that work gets

7    caught in the media attention and the media says

8    that it causes cancer.  Well, there's no proof it

9    causes cancer.  It's just an association at this

10   point.  But these patients then are going to be

11   clamoring to have their mesh taken out so they don't

12   have to worry about the possibility of cancer

13   sometime in the future, and I think this is a major

14   issue.

15       Q.    So I'm going to respectfully move to

16   strike some of your answer that went beyond my

17   question.

18                        MR. SNELL:  Can you read back his

19   answer where he says, "At this point we cannot

20   relate degradation to complications."  I think

21   something like that.

22                        (Record read as follows:

23                            at this point in time, we cannot

24                            specifically relate degradation

25                            to complications in patients.

Donald R. Ostergard, M.D.

Page 104

1                          The only time we are able to see
2                          this degradation, and I think
3                          this was mentioned in one of
4                          Ethicon's patients -- oh, it is
5                          attached to one of the expert
6                          reports, or is mentioned that on
7                          removal of the mesh, it fell
8                          apart.  It fell apart, so all the
9                          mesh could not be taken out.)
10                     MR. SNELL:  So strike everything
11       after that.
12           Q.    The reason I'm doing that, I didn't see
13       in your expert report that you issued opinions about
14       cancer.
15           A.    No, these hadn't been published at the
16       time that that report was written.
17           Q.    No, I'm talking about --
18           A.    But they're on my reliance materials.
19           Q.    Well, I didn't see that you issued
20       opinions that you plan to testify at trial that
21       Gynemesh PS causes cancer or sarcoma.
22           A.    I would never testify that it causes
23       cancer.  All I could testify to is it has been found
24       in association with cancer.
25           Q.    At a break I'm going to look at your

Donald R. Ostergard, M.D.

Page 105

1   report because if it's not in the report, then I'm
2   going to respectfully move to strike.
3                    But if you disclosed in here that
4   you plan to talk about cancer or sarcoma, then we'll
5   get into that a little bit.
6        A.    I don't think it's in the report.
7        Q.    Okay.
8                    THE WITNESS:  Can we take a real
9   quick break?
10                   MR. SNELL:  Absolutely.
11                   THE WITNESS:  Thank you.
12                   (Break from 11:33 a.m. to
13                    11:40 a.m.)
14                   (Exhibit No. 14 was marked.)
15  BY MR. SNELL:
16       Q.    I've handed you Exhibit 14, Doctor, which
17  is a paper by Withagen and other authors concerning
18  sexual functioning after Prolift.  Do you see that?
19       A.    Yes, I do.
20       Q.    Is this a study you're familiar with?
21       A.    It's an abstract I'm familiar with, yes.
22       Q.    So preoperatively in these patients who
23  were treated Prolift, it was reported that their
24  prolapse significantly interfered with their sexual
25  function, correct?

Donald R. Ostergard, M.D.

Page 113

1    Q.    What types of surgeries?

2    A.    Pardon me?

3    Q.    What types of surgeries?

4    A.    Either abdominal or vaginal.

5    Q.    In a hysterectomy, or...

6    A.    I don't remember.

7    Q.    Let me just ask you:  So what surgical

8    procedures did you use Prolene sutures in?

9    A.    I don't remember specifically.

10   Q.    Okay.

11   A.    It was one of the choices we had.

12   Q.    For your prolapse surgeries, do you

13   have -- when you use sutures, do you have a personal

14   preference?

15   A.    Yes.

16   Q.    What was that?

17   A.    Delayed absorbable sutures.

18   Q.    Did you use delayed absorbable sutures --

19   let me back up.  I'm not sure if I asked you this

20   question.

21              Did you do sacrospinous ligament

22   fixation for prolapse?

23   A.    Yes.

24   Q.    Okay.  And you also did uterosacral

25   ligament suspension for prolapse as well, true?

Donald R. Ostergard, M.D.

Page 114

1      A.     From the standpoint of a McCall
2   culdoplasty, yes.
3      Q.     Did you use permanent or delayed
4   absorbable sutures for those procedures?
5      A.     Those are permanent sutures.
6      Q.     What prolapse surgeries did you prefer
7   the delayed absorbable sutures for?
8      A.     Typically colporrhaphies.
9      Q.     When you did the sacrospinous ligament
10  fixation, what suture did you use?
11     A.     I think we used the braided polyester
12  suture probably most commonly, Ethibond.
13     Q.     Would you have used that same braided
14  polyester permanent suture for the uterosacral
15  ligament suspensions as well?
16     A.     Yes, likely.
17     Q.     You don't consider yourself a
18  biomaterials expert?
19     A.     A biomaterials expert, no.
20     Q.     There's been reports in the literature
21  that the surface cracking seen on some of the
22  explants could be due to a biologic proteinaceous
23  material.  Are you familiar with that?
24     A.     Yes.
25             MS. THOMPSON:  Object to form.

Donald R. Ostergard, M.D.

```
                                                      Page 115
   1          A.     I've seen some people postulate that.
   2          Q.     Have you done any testing to evaluate
   3    that postulation?
   4                 MS. THOMPSON:  Object to form.
   5          A.     I've done SEM of polypropylene, and
   6    significant biofilm was not apparent.
   7          Q.     That wasn't the Gynemesh PS, though,
   8    right?
   9          A.     It was not.
  10          Q.     What was this done in connection with?
  11    What type of polypropylene?
  12          A.     I'm sorry?
  13          Q.     That was my fault.
  14          A.     No, my hearing aid.
  15          Q.     The polypropylene you did look at, what
  16    was that polypropylene?
  17          A.     Which products?
  18          Q.     (Nodding head.)
  19          A.     Uphold.
  20          Q.     How many specimens did you evaluate of
  21    that Uphold?
  22          A.     How many specimens?
  23          Q.     Yes.
  24          A.     There was just one specimen, one specimen
  25    taken out of the patient.
```

Donald R. Ostergard, M.D.

Page 116

1          Q.     Okay.  You didn't have a control group
2     that you used and compared it to?
3                    MS. THOMPSON:  Object to form.
4          A.     We did look at pristine sutures, as I
5     recall -- excuse me, pristine mesh as well.
6          Q.     But not mesh that had been in the human
7     body?
8          A.     Mesh that's not been in the human body,
9     correct.
10          Q.     So my question is for this one specimen,
11     you didn't have a control of mesh that had been in
12     the human body to compare the two, true?
13          A.     No, there was only one specimen.
14          Q.     Okay.  Do you believe that you're an
15     expert in polymer chemistry?
16          A.     No.
17          Q.     Have you read in the literature that
18     there can be a cross-linking when pathologists use
19     formalin for preservation?
20                    MS. THOMPSON:  Object to form.
21          A.     Excuse me, there can be what?
22          Q.     A cross-linking of proteins when
23     pathologists use formalin for preservation of
24     specimen?
25                    MS. THOMPSON:  Objection.

Donald R. Ostergard, M.D.

Page 117

1    Q.    Have you read that, or not?

2    A.    It seems like I have, yes.

3    Q.    Do you consider yourself an expert in

4    that?

5    A.    No.

6    Q.    I take it you don't consider yourself to

7    be an expert in pathology either?

8    A.    I'm not --

9         MS. THOMPSON:  Object to form.

10   A.    -- a trained pathologist, if that's what

11   you mean.

12   Q.    Would you agree that the high rates of

13   anatomic efficacy seen with Prolift is inconsistent

14   with a theory of degradation?

15        MS. THOMPSON:  Object to form.

16   A.    Inconsistent with what?

17   Q.    A theory of degradation.

18   A.    No, because mesh can degrade and leave

19   scarification behind.  And so you'll still have the

20   same effect, irregardless of the fact that

21   degradation has occurred.

22   Q.    Has that been tested, to your knowledge,

23   as to whether the sustained anatomic efficacy is

24   because of scarring or the mesh?

25        MS. THOMPSON:  Object to form.

Donald R. Ostergard, M.D.

Page 118

1        A.      Because of what?

2        Q.      Because of the scarring or because of the

3    mesh providing support?

4        A.      That's a study that's almost impossible

5    to do.

6        Q.      You haven't seen anyone try to do that

7    study in the literature?

8        A.      No, I haven't.

9                MR. SNELL:  Let's take a break.  Let

10   me organize myself.

11               THE WITNESS:  Okay.

12                   (Whereupon, a lunch break was had

13                   from 12:03 p.m. to 1:08 p.m.)

14                   EXAMINATION (CONTINUED)

15   BY MR. SNELL:

16       Q.      In your expert report, Doctor, at pages 3

17   and 4 you list some other meshes; Polyform, POP

18   Mesh, Pelvitex, and TiMesh.  Do you see that?

19       A.      I think I did list them.  I don't see

20   them right now.

21       Q.      (Indicating).

22       A.      Oh, okay.

23       Q.      And then if you flip the page

24   (indicating).

25       A.      Pelvitex, TiMesh.

Donald R. Ostergard, M.D.

Page 119

1       Q.    My question to you, Doctor, is have any
2   of those meshes been studied in patients with
3   prolapse in randomized control trials?
4       A.    I don't know.
5       Q.    Have you seen any studies in women who
6   have undergone implantation of those meshes for the
7   treatment of pelvic organ prolapse?
8       A.    Not that I recall.
9       Q.    We saw that there are various studies
10  with Gynemesh PS, some of them even going out to
11  five or seven years, correct?
12      A.    Yes.
13      Q.    Would you consider five-year studies to
14  be long-term studies?
15      A.    Yes.
16      Q.    As far as you're aware, those other
17  meshes, there are no long-term studies in the
18  treatment of pelvic organ prolapse for those, true?
19      A.    I don't believe so.
20      Q.    You have not seen any prospective studies
21  that show that Gynemesh PS has a statistically
22  significant increased risk of any complication
23  compared to those other meshes; Polyform, POP Mesh,
24  Pelvitex and TiMesh, true?
25      A.    I'm not aware of any comparative studies

Donald R. Ostergard, M.D.

Page 120

1    with them.

2         Q.    We've talked about Gynemesh PS, and it

3    has demonstrated anatomic superiority to native

4    tissue, according to Level 1 randomized control

5    trials, true?

6                   MS. THOMPSON:  Object to form.

7         A.    Yes, in those individual studies.

8         Q.    For these other meshes you reference --

9    Polyform, POP Mesh, Pelvitex, TiMesh -- there is no

10   similar data that you're aware of demonstrating that

11   benefit, true?

12        A.    That is correct.

13                   MS. THOMPSON:  Object to form.

14        Q.    Have you seen any studies reporting rates

15   of a mesh exposure or dyspareunia with those other

16   meshes?

17        A.    No, I have not.

18        Q.    It is not your opinion that those are

19   suitable alternative meshes to Gynemesh PS, true?

20        A.    No, those were just ones that were

21   compared to these particular studies.

22        Q.    And you have seen no demonstrable benefit

23   to those meshes compared to Gynemesh PS in women,

24   true?

25        A.    I don't think there are any publications

Donald R. Ostergard, M.D.

Page 121

1    on these other meshes.

2         Q.    TiMesh, do you even know if that's been

3    FDA cleared in this country?

4         A.    I haven't -- I don't have information one

5    way or the other.

6         Q.    Have you looked at the regulatory status

7    of any of those alternative prolapse meshes?

8         A.    I don't know that they are alternative

9    prolapse meshes.  They were just exemplar just to

10   compare Gynemesh to.

11        Q.    Let me rephrase then.  Thank you for that

12   correction.

13              For those exemplar other meshes,

14   did you investigate the regulatory status of them

15   for the treatment of pelvic organ prolapse in women

16   in this country?

17        A.    No, I did not.

18        Q.    There are no studies in patients that

19   show that having a mesh with a larger pore size than

20   Gynemesh PS leads to a statistically significant

21   reduction in complications, true?

22              MS. THOMPSON:  Object to form.

23        A.    I think that's correct.

24        Q.    You have not seen any randomized control

25   trials that demonstrate that non-mesh native tissue

Donald R. Ostergard, M.D.

Page 122

1    has a statistically significant better anatomic

2    benefit compared to Prolift or Gynemesh PS, true?

3            MS. THOMPSON:  Object to form.

4       A.   I'm wondering about one study, but

5    without seeing it I can't comment.

6       Q.   As you sit here today, you're not aware

7    of any native tissue studies that show a

8    statistically significant benefit in anatomic

9    correction of prolapse compared to Gynemesh PS and

10   Prolift, true?

11      A.   As I'm sitting here today.  That doesn't

12   mean it doesn't exist.

13      Q.   There are no randomized control trials

14   that compare native tissue repairs to Gynemesh PS or

15   Prolift that show that the native tissue repair has

16   statistically significant better subjective benefits

17   for prolapse symptoms, true?

18            MS. THOMPSON:  Object to form.

19      A.   I think that the studies that have been

20   done have shown equal effectiveness in that regard,

21   as far as the patient is concerned.

22      Q.   So the answer then would be you're not

23   aware of any studies showing native tissue having a

24   statistically significant benefit over and above

25   Prolift and Gynemesh PS for subjective patient

Donald R. Ostergard, M.D.

Page 143

1    comparisons.

2         Q.    Is it correct then that you do not hold

3    an opinion as to the adequacy of the Prolift IFU?

4              MS. THOMPSON:  Object to form.

5         A.    That is not correct.

6         Q.    Are you basing -- well, do you -- do you

7    have an opinion then that the Prolift IFU is

8    inadequate in some form or fashion?

9         A.    Yes.  It doesn't warn against

10   degradation, for one thing.

11        Q.    So is there any regulatory standard that

12   you have considered and factored in in that opinion?

13        A.    A regulatory standard for devising an

14   IFU?

15        Q.    Yes.

16        A.    I'm not sure if one exists.

17        Q.    Is it your opinion that the IFU should --

18   strike that.

19              Is it your opinion that the

20   Prolift IFU should say that the mesh can degrade?

21        A.    Yes, absolutely.

22        Q.    And that is based on your personal

23   opinion, true?

24              MS. THOMPSON:  Object to form.

25        A.    That is based on my opinion and my review

Donald R. Ostergard, M.D.

Page 144

1    of the information regarding degradation, when
2    Ethicon knew about it and physicians should have
3    been told.  It's a very important factor in their
4    decision whether or not to use a product.
5         Q.    Have you done any study of physicians'
6    attitudes as to whether surface degradation would
7    lead them to not use Prolift?
8                   MS. THOMPSON:  Object to form.
9         A.    I have not done any such studies.
10        Q.    Hypothetically, if degradation were to
11   occur, the clinical manifestation of that, if any,
12   would be variable, true?
13                   MS. THOMPSON:  Object to form.
14        A.    Well, since we don't know what the
15   manifestations are, it's very difficult to answer
16   that question.
17        Q.    Fair enough.
18                   When did you first look at the
19   Prolift IFU?
20        A.    When did I first look at it?
21        Q.    Yes.
22        A.    I can't tell you the exact date.
23        Q.    Okay.  You have looked at it, though?
24        A.    I have looked at it, yes.
25        Q.    Okay.

Donald R. Ostergard, M.D.

```
                                                        Page 145
  1                    MR. SNELL:  Let's mark it.
  2                    (Exhibit No. 16 was marked.)
  3        Q.    16.
  4        A.    Thank you.
  5                    MS. THOMPSON:  Thank you.
  6        Q.    We've talked about a whole lot of
  7   different complications that can occur with the
  8   different prolapse surgeries.
  9                    Mesh exposure/erosion, that's a
 10   unique risk with mesh, correct?
 11        A.    Quite unique.
 12        Q.    Conversely, you can have suture erosions
 13   with non-mesh repair, true?
 14        A.    Which are typically of no consequence,
 15   whereas the erosions that you're speaking of do have
 16   consequences.
 17        Q.    There can be contraction with Prolift,
 18   correct?
 19        A.    Yes.
 20        Q.    And there's also tissue contraction with
 21   native tissue, true?
 22                    MS. THOMPSON:  Object to form.
 23        A.    Depends on how the surgery is done.  It
 24   can be avoided, generally.
 25        Q.    Well, if there's scarring, there's going
```

Donald R. Ostergard, M.D.

Page 146

1    to be tissue contraction.  I thought we agreed to

2    that?

3         A.    I'm sorry, I'm not hearing.

4              MS. THOMPSON:  Object to form.

5    Misstates his testimony.

6         Q.    If there's scarring, there is going to be

7    tissue contraction?

8         A.    Yes.  But the type of contraction you're

9    talking about is not something that generally

10   bothers a patient.

11        Q.    Well, what we've discussed is that with

12   contraction, the potential outcome of that is pain,

13   that you identified, right?

14        A.    Not with --

15             MS. THOMPSON:  Object to form.

16        A.    -- native tissue repairs, no.

17        Q.    Have you -- let me back up.

18                  Regardless of what the contraction

19   leads to, there is no data showing a significantly

20   higher rate of those complications with Prolift

21   compared to non-mesh repair --

22             MS. THOMPSON:  Object to form.

23        Q.    -- true?

24        A.    I think we've been over this already.

25        Q.    I'm just trying to make sure that we're

Donald R. Ostergard, M.D.

Page 147

1    not changing now.

2          A.    I'm not going to change.

3          Q.    So let's look at the Prolift IFU.

4    Actually, on the first page you see it says,

5    "Training on the use of Prolift is recommended and

6    available."

7          A.    That's too bad it doesn't say it's

8    required.

9          Q.    Well, are you --

10         A.    That's a defect in this.

11         Q.    Are you aware of any regulatory standard

12   that requires a surgeon to undergo specific training

13   of a device before he or she can use that device?

14               MS. THOMPSON:   Object to form.

15         A.    Physicians typically undergo training for

16   any type of surgery they do before they do that

17   surgery.   Why should mesh be an exception?

18         Q.    So if a surgeon wants to use a specific

19   medical device, are you aware of any regulatory

20   standard or requirement that they be trained on that

21   particular device?

22               MS. THOMPSON:   Object to form.

23         A.    I am not aware of any regulatory

24   standard, but it does not mean that Ethicon or any

25   other company can't go beyond and make sure that the

Donald R. Ostergard, M.D.

Page 148

1    physicians that are going to use their devices are

2    adequately trained to put the devices in safely.

3         Q.    Well, you do know that Ethicon offered

4    training, true?

5         A.    Yes, they offer it.

6         Q.    You are aware that AUGS has come out with

7    guidelines for credentialing surgeons in doing

8    prolapse surgeries, true?

9         A.    Yes, I've seen that.

10        Q.    Part of what they recommend is that, hey,

11   surgeons go do training, true?

12        A.    Absolutely.

13        Q.    Are you saying it's a bad thing that

14   Ethicon offered professional education training for

15   Prolift?

16        A.    Definitely not.

17             MS. THOMPSON:  Object to form.

18        A.    The bad thing is that it wasn't required,

19   since this was for something that was brand new to

20   the gynecologic and urological communities.  They

21   didn't know anything about how to place these

22   meshes, and the insertion technique for the Prolift

23   is extremely, extremely complicated.

24        Q.    You didn't undergo any specific industry

25   training when you decided to start using mesh to

Donald R. Ostergard, M.D.

Page 149

1    treat sacrocolpopexies, true?

2         A.    I had done the procedure using other

3    things before.

4         Q.    You felt competent --

5         A.    So it's simply a matter of substituting

6    something else for what I had been doing.

7         Q.    You felt competent in your ability to

8    carry out that mesh procedure safely, without going

9    to Ethicon or some other manufacturer and saying,

10   "Can you train me on this," true?

11        A.    Since it's the same procedure that I've

12   done for many years before, I don't see any reason

13   to do that.  This is brand new.

14        Q.    Well, what Prolift --

15        A.    If I was going to start doing these, I

16   would want to know everything about it and I would

17   definitely go to training to see what is

18   recommended.  No question.

19        Q.    And your understanding is that with

20   Prolift, the anterior Prolift, the mesh goes out to

21   the arcus tendineus, true?

22        A.    Yes.

23        Q.    And that's a route of prolapse repair

24   that had been in existence before Prolift, true?

25        A.    Yeah, but --

Donald R. Ostergard, M.D.

Page 198

1      A.    I can't point to any specific thing at
2    this point.
3      Q.    So on a scale of 1 to 10, with 1 being
4    just piss-poor shoddy and 10 being perfect, where
5    would you put Ethicon's IFU and professional
6    education program?
7            MS. THOMPSON:  Object to form.
8      A.    The big problem is the omission of the
9    things that I've already talked about.  So I would
10   have to say that this is a good attempt, but there
11   are very important things that have been left out.
12           MR. SNELL:  All right.  Let's take a
13   break and let me just wrap it up.
14           MS. THOMPSON:  Sure.  And then I'm
15   probably going to need a little break between when
16   you finish and redirect.  Unless you just have a
17   couple questions, then we can take the whole break
18   at the same time.
19           MR. SNELL:  I'll do whatever you want
20   to do.
21           MS. THOMPSON:  Oh, my gosh, you're so
22   agreeable.
23           MR. SNELL:  I am very accommodating.
24           (Break from 2:58 p.m. to
25            3:06 p.m.)

Donald R. Ostergard, M.D.

Page 199

1  BY MR. SNELL:

2      Q.    You had mentioned the cancer thing

3  earlier.  I'm just going to ask you a couple

4  questions about that and see if we can't be done

5  with it.  Because I don't really think it was within

6  the scope of your report, but you did raise it.

7                  So as we sit here today, there are

8  no studies in women that demonstrate that Gynemesh

9  PS or Prolift causes cancer, true?

10     A.    No causation has been established, only

11 association.

12     Q.    And the truth of the matter is an

13 association has not been established because there

14 have been no epidemiologic studies that show a

15 statistically significant increased risk of any

16 cancer or seroma formation in women, when adjusted

17 for potential confounding factors, as compared to

18 the population background, true?

19     A.    Well, since there's only been one case

20 reported, yes.

21     Q.    Are you familiar with -- there's been a

22 couple epidemiologic studies that have been

23 published recently, looking at cancer rates in women

24 treated with polypropylene midurethral slings?

25     A.    Yes.

Donald R. Ostergard, M.D.

Page 200

1     Q.    I think the most recent one was a paper

2     by a Dr. Linder.  It was in the International

3     Urogyne Journal just last month, a cohort of 2,474

4     women.

5          A.    Yes.

6          Q.    Is that a paper you've read?

7          A.    Yes.  The time period is too short,

8     however, to make any conclusions.

9          Q.    Well, what they found was that there was

10    about a 2 percent rate of background cancer in those

11    patients, true?

12         A.    Something like that, yes.

13         Q.    And there were only two cases out of the

14    entire cohort where the cancer was diagnosed after

15    sling implantation.  Do you recall that?

16         A.    But not associated with the sling.

17         Q.    Correct.  The rate was 0.08 percent.

18         A.    It takes 20, 30 years for a

19    carcinogenesis to be effective.  So we haven't seen

20    the last of this, I'm sure.

21         Q.    But the fact of the matter is obviously

22    vaginal bladder cancers, those are naturally

23    occurring in the background, as one can see in that

24    Linder paper, where 2 percent of the patients had a

25    preexisting history of cancer, correct?

Donald R. Ostergard, M.D.

Page 201

1      A.     There are background rates of neoplasia,

2  yes.

3      Q.     And you have seen no reliable

4  epidemiologic studies in women that show that the

5  rate of cancer with the polypropylene mesh is

6  statistically significantly higher than the

7  background, when adjusted for other confounders,

8  true?

9      A.     There's been no such paper.

10     Q.     And you would agree with authors who have

11  written on this topic, that have stated in order to

12  establish an association between polypropylene mesh

13  and cancer one has to be -- it has to be

14  demonstrated by more than mere case reports, true?

15     A.     It has to be demonstrated by more than a

16  mere case report?  Is that what you said?

17     Q.     More than mere case reports.

18     A.     Well, the case report is the starting

19  place to call people's attention to this may be

20  possible.

21     Q.     Right.

22     A.     And one of the problems that I've noticed

23  in reviewing cases, that when specimens are excised

24  from a patient, frequently there's never histology

25  to them.  So they may be throwing away preneoplastic

Donald R. Ostergard, M.D.

Page 202

1   or neoplastic conditions, and they don't even know

2   it.

3        Q.    They may be throwing away totally benign?

4        A.    Absolutely.  I sure hope so.

5        Q.    And we don't know because we don't have

6   those data, true?

7        A.    They have not been examined

8   histologically, so we don't know.

9        Q.    I believe you made mention of toxins in

10  your report.  Are you aware of any studies in women

11  that show that any toxins lead to significantly

12  higher complication rates for Prolift or Gynemesh

13  PS?

14       A.    There are no studies in relation to

15  polypropylene.  We don't even know for sure what the

16  toxins are.  They haven't been measured, and we do

17  not know if there is increase in adverse events

18  because of it.

19       Q.    Okay.

20       A.    We have no way, no way to know at this

21  point.

22       Q.    Okay.

23            MR. SNELL:  That's all the questions

24  I think I have.  I'll pass the witness.

25            MS. THOMPSON:  Okay.  Let me go ahead

Donald R. Ostergard, M.D.

Page 203

1    and take a break.

2                    MR. SNELL:  Okay.

3                    MS. THOMPSON:  And then I'll be ready

4    to go all the way through without having to stop.

5    So break.

6                    THE WITNESS:  Okay.

7                    (Break from 3:12 p.m. to

8                     3:23 p.m.)

9                    (Exhibit Nos. 21 through 46 were

10                    marked.)

11                    EXAMINATION

12   BY MS. THOMPSON:

13       Q.    Dr. Ostergard, did you review and

14   critically assess all the literature that you found

15   on Gynemesh and Prolift, regardless of whether it

16   was favorable or unfavorable to your opinions?

17       A.    Yes, I did.

18       Q.    I want to go through just a few, not all,

19   of the literature that counsel showed you earlier.

20   But let's start with the Francis and Jeffcoate

21   article from the Journal of Obstetrics and

22   Gynecology.  I don't remember the exhibit number,

23   unfortunately.  We're going to mess all these up for

24   Leeann.

25       A.    1 or 2.  It was actually 7.  The staples

1                    REPORTER'S CERTIFICATE

2              I, LEEANN L. KEENAN, Registered Merit

3      Reporter and Certified Realtime Reporter within

4      Colorado, appointed to take the deposition of DONALD R.

5      OSTERGARD, M.D., do hereby certify that before the

6      deposition he was duly sworn by me to testify to the

7      truth; that the deposition was taken by me at 1801

8      California Street, Suite 5100, Denver, Colorado; then

9      reduced to typewritten form herein; that the foregoing

10     is a true transcript of the questions asked, testimony

11     given and proceedings had.

12

13             I further certify that I am not related to

14     any party herein or their Counsel, and have no interest

15     in the result of this litigation.

16

17             In witness hereof I have hereunto set my

18     hand this 28th day of March, 2016.

19

20             _____
               Leeann L. Keenan
21             Registered Merit Reporter
               Certified Realtime Reporter
22             and Notary Public

23

24     My commission expires June 8, 2016

25