# EXHIBIT D

Elizabeth Kavaler, M.D.

```
1              IN THE CIRCUIT COURT
          TWENTY-SIXTH JUDICIAL CIRCUIT
2            CAMDEN COUNTY, MISSOURI
3                 -   -   -
4   DONALD BUDKE                      :
          Plaintiff,                  :
5          v.                         :
    JOHNSON & JOHNSON, a NEW          :
6   Jersey Corporation, ETHICON      :
    INC., a New Jersey Corporation, :
7   GYNECARE WORLDWIDE, a division :
    of Ethicon, Inc., BECKY           :
8   SIMPSON, M.D., P.C., d/b/a        : Cause No.
    LAKE AREA WOMEN'S CENTER          : 10CM-CC00085
9   and BECKY SIMPSON, M.D.,          :
          Defendants.                 :
10
11                -   -   -
             OCTOBER 14, 2014
12                -   -   -
13            Videotaped deposition of
14  ELIZABETH KAVALER, M.D., taken pursuant
15  to notice, was held at the law offices of
16  Bryan Cave LLP, 1290 Avenue of the
17  Americas, New York, New York 10104,
18  commencing at 10:37 a.m., on the above
19  date, before Amanda Dee Maslynsky-Miller,
20  a Certified Realtime Reporter and Notary
21  Public in and for the State of New York.
22                -   -   -
23        GOLKOW TECHNOLOGIES, INC.
      877.370.3377 ph|917.591.5672 fax
24            deps@golkow.com
```

Elizabeth Kavaler, M.D.

```
 1                 Since -- well, let me ask
 2     you this:   In connection with your
 3     evaluation in this case, did you look at
 4     any internal Ethicon documents?
 5          A.     No.
 6          Q.     That's something you've not
 7     looked at in connection with any of your
 8     reviews, correct?
 9          A.     That's correct.
10          Q.     And am I correct that you
11     haven't reviewed any deposition testimony
12     of any Ethicon witnesses in connection
13     with this case?
14          A.     That's correct.
15          Q.     And am I correct that you're
16     not relying on any deposition testimony
17     from any witnesses from Ethicon in order
18     to offer your opinions?
19          A.     That's correct.
20          Q.     Have you reviewed any
21     depositions in connection with forming
22     your opinions in this case?
23          A.     I've read depositions for
24     the case, yes.
```

Elizabeth Kavaler, M.D.

1             to -- you can hold it or whatever.

2    BY MR. SLATER:

3             Q.    You have not seen the

4    deposition of Vincent Lucente, correct?

5             A.    I have not.

6             Q.    You haven't seen the

7    deposition of Miles Murphy that was taken

8    this year, have you?

9             A.    I have not.

10            Q.    You've not seen the

11   depositions that were taken of Jeffrey

12   Drazen or Gregory Kurfman of the New

13   England Journal of Medicine, have you?

14            A.    I have not.

15            Q.    Did you know those

16   depositions were taken before I just

17   asked you those questions?

18            A.    Well, I knew about Lucente,

19   because it was alluded to in Dr.

20   Webber's.  But the others I did not know.

21            Q.    You have no opinions

22   regarding whether or not Ethicon's own

23   internal procedures and criteria for

24   whether or not the PROLIFT® should be

Elizabeth Kavaler, M.D.

1    marketed were met or not; that's not a

2    subject you've looked at, correct?

3         A.    That's correct.

4         Q.    Do you rely in any way on

5    the TVT, TVT-O, and the mid urethral

6    slings manufactured by Ethicon in any way

7    for your opinions in this case?

8         A.    No.  My opinions are all

9    based on PROLIFT®.

10        Q.    Do you rely in any way on

11   the literature in connection with the TVT

12   and the TVT-O group of mid urethral

13   slings, in any way, in forming your

14   opinions in this case?

15        A.    There's a little bit of

16   overlap in the material, so there's some

17   literature that will overlap in that

18   area.

19             But in terms of the actual

20   specifics of this case and the PROLIFT®

21   in this case, it's PROLIFT® literature.

22        Q.    And what I'm getting at is,

23   I need to know if I should expect you, on

24   the witness stand, to be referring to any

Elizabeth Kavaler, M.D.

1          those -- that kind of -- that kind

2          of situation, that outcome.

3    BY MR. SLATER:

4          Q.    You don't know the purpose

5    of the IFU from the perspective of

6    Ethicon, correct?

7          A.    That's correct.

8               MR. BALL:  Object to the

9          form.

10              THE WITNESS:  I only know

11         from the perspective as a surgeon.

12              MR. SLATER:  Move to strike

13         after "that's correct."

14   BY MR. SLATER:

15         Q.    Let me just ask it again to

16   get it clean.

17              You don't know, as you sit

18   here now, the purpose of the IFU from the

19   perspective of Ethicon; is that a true

20   statement?

21              MR. BALL:  Object to the

22         form.

23              THE WITNESS:  That's

24         correct.

Elizabeth Kavaler, M.D.

1   BY MR. SLATER:

2        Q.    You have no knowledge of

3   what the FDA regulations that apply to

4   the IFU require with regard to an IFU,

5   correct?

6        A.    Correct.

7        Q.    You have no idea what

8   testimony has been given by the people at

9   Ethicon who are responsible for the IFU

10  and the content of the IFU; you don't

11  know what they have said needed to be in

12  the IFU, correct?

13            MR. BALL:   Object to the

14        form.

15            THE WITNESS:   That's

16        correct.

17  BY MR. SLATER:

18        Q.    Your opinions on the IFU are

19  limited to your perspective, based on

20  your medical practice for what you think

21  is necessary; is that fair?

22        A.    That's fair, right.

23        Q.    Have you ever studied what

24  other doctors think should be in an IFU

Elizabeth Kavaler, M.D.

1          product and how to compare it to

2          the way I was -- I was shown how

3          to use it.

4               But a lot of the information

5          in there is not something that I'm

6          looking to Ethicon to tell me.

7    BY MR. SLATER:

8          Q.    I understand you're smart

9    and you don't need it, but other doctors

10   may not --

11              MR. BALL:  I move to strike

12         the --

13   BY MR. SLATER:

14         Q.    Let me ask you this --

15              MR. BALL:  -- the

16         argumentative preamble.

17   BY MR. SLATER:

18         Q.    -- do you think Ethicon has

19   an obligation, and had an obligation,

20   with the PROLIFT® IFU that when they put

21   information in it, that Ethicon thought

22   the information was truthful?

23              MR. BALL:  Object to the

24         form.

Elizabeth Kavaler, M.D.

1          THE WITNESS:  I don't put
2      this much thought into the IFU.  I
3      don't know any surgeons who do put
4      that much into the IFU.
5  BY MR. SLATER:
6      Q.    You don't have an opinion on
7  that?
8      A.    I don't really have much of
9  an opinion on the IFU.
10      Q.    Okay.  If I understand
11  correctly, you, in your practice, didn't
12  even the read the section of the warnings
13  and indications and adverse reactions;
14  that wasn't even something that you
15  looked at, correct?
16          MR. BALL:  Object to the
17      form.
18          THE WITNESS:  I read it.  I
19      looked at it.  But that wasn't the
20      basis for which I would use it or
21      not use it.
22  BY MR. SLATER:
23      Q.    Did I ask you if that was
24  the basis for which you would use it or

Elizabeth Kavaler, M.D.

1    obligation, from your perspective, when

2    they put information in the IFU, to give

3    truthful information?

4        A.    I would assume that the

5    information they wrote down there was

6    truthful, to the best of their knowledge

7    at the time they wrote it.

8        Q.    Did you think if Ethicon

9    made claims about the PROLIFT® or the

10   mesh in the PROLIFT®, clinical claims

11   about how it would actually work in the

12   body, that they should have data to

13   support making those claims?

14           MR. BALL:  Object to the

15       form.

16           THE WITNESS:  I didn't think

17       about that at the time and I still

18       don't --

19   BY MR. SLATER:

20       Q.    I'm asking you now.

21       A.    I don't -- I don't have a --

22   really have an opinion on that because I

23   don't have -- I don't really hold a lot

24   of stock in that.

Elizabeth Kavaler, M.D.

```
 1          Q.      Okay.   When Ethicon listed
 2    the risks and the complications in the
 3    warning and adverse reaction sections,
 4    did Ethicon have an obligation to list
 5    those that they knew could occur with the
 6    PROLIFT®?
 7                      MR. BALL:  Object to the
 8          form and the foundation.
 9                      MR. SLATER:  You can answer.
10                      THE WITNESS:  The mesh that
11          they were using was the same mesh
12          I had already been using for three
13          or four years before the PROLIFT®.
14          It's the same mesh.
15                 So I wasn't -- so I was more
16          interested in the application and
17          how the mesh was cut and how it
18          was implanted.  So all the
19          warnings relating to the mesh
20          itself wasn't relevant anymore to
21          me, because I had been using it
22          for so many years.
23                      MR. SLATER:  Move to strike.
24    BY MR. SLATER:
```

Elizabeth Kavaler, M.D.

```
 1          Q.     You understand, Doctor,
 2   you're not being put up on the witness
 3   stand to talk about Dr. Kavaler's
 4   experience as a doctor and just to, you
 5   know -- your purpose is to be an expert
 6   witness.
 7                 So I'm going to ask you --
 8                 MR. SLATER:   I'm going to
 9          move to strike that and try to ask
10          the question again, okay?
11                 Do you want to object to the
12          form, too?
13                 MS. STRAUSS:   Yes.
14                 MR. SLATER:   You can do it
15          all you want.
16                 MR. BALL:   There wasn't any
17          question out there.   So just go
18          ahead.
19   BY MR. SLATER:
20          Q.     In the PROLIFT® IFU, when
21   Ethicon listed risks and complications
22   that could occur with the PROLIFT® in the
23   adverse reaction section, the warning
24   section, did Ethicon have an obligation
```

Elizabeth Kavaler, M.D.

1    to list those risks and complications

2    they knew would occur in some women?

3              MR. BALL:  Object to the

4         form.

5              THE WITNESS:  I don't know

6         what the obligation is.  I'm not

7         an FDA person.  I don't have any

8         association with that.

9              I can just tell you, as a

10        surgeon, what my expectations

11        would be.

12   BY MR. SLATER:

13        Q.   I want to know, in response

14   to my question is that you don't have an

15   opinion on that?

16        A.   On their obligations, I have

17   no opinion on their obligation.

18        Q.   Okay.  I want to talk about

19   the patient brochure for the PROLIFT®

20   now.

21              When Ethicon provided

22   information in the patient brochure for

23   the PROLIFT®, did Ethicon have an

24   obligation to provide truthful

Elizabeth Kavaler, M.D.

1    information or don't you have an opinion

2    on that?

3                    MR. BALL:  Object to the

4            form.  Foundation.

5                    THE WITNESS:  So --

6    BY MR. SLATER:

7            Q.    I'll ask it again.

8            A.    Okay.

9            Q.    When Ethicon published the

10   PROLIFT® patient brochure, did Ethicon

11   have an obligation to provide truthful

12   information in that document?

13                   MR. BALL:  Same objection.

14                   THE WITNESS:  I didn't use

15           their patient brochure, so I don't

16           really have an opinion on it.

17   BY MR. SLATER:

18           Q.    That's fair.  No opinion.

19           A.    Yeah.

20           Q.    Would the same answer hold

21   true -- rephrase.

22                   Would it be accurate that

23   you have no opinion -- I'm sorry.  I left

24   my phone on.

Elizabeth Kavaler, M.D.

```
 1              Would I be correct that with
 2   regard to the patient brochure, you would
 3   have no opinion regarding whether or not
 4   Ethicon needed to have a basis for any
 5   claims made about the PROLIFT® --
 6              MR. BALL:  Object to the
 7         form.
 8   BY MR. SLATER:
 9         Q.    -- in that brochure?
10              MR. BALL:  Object to the
11         form and foundation.
12              THE WITNESS:  I didn't -- I
13         have to say, I didn't use the
14         patient brochure.  It's not part
15         of what I gave to patients.
16   BY MR. SLATER:
17         Q.    So it's not -- you have no
18   opinion on that?
19         A.    I have no opinion.
20              MR. BALL:  Object to the
21         form.
22   BY MR. SLATER:
23         Q.    Just so I can maybe cut off
24   a lot of questions.
```

Elizabeth Kavaler, M.D.

```
1    the PROLIFT® about the potential risks

2    and complications, did Ethicon have an

3    obligation to disclose each of the risks

4    and complications that Ethicon knew would

5    occur to certain women with the PROLIFT®?

6              MR. BALL:  Object to the

7         form and the foundation.

8              THE WITNESS:  The patient

9         brochure is a tool for the doctor

10        to use to discuss with the

11        patient.

12             So the obligation is -- it's

13        universal for everybody to discuss

14        with the -- what the issues are.

15        I don't know what Ethicon's legal

16        obligations are.  I don't know

17        anything about that.

18             The ethical obligations are

19        between the patient and the

20        doctor.  And the patient brochure

21        is a tool.

22             MR. SLATER:  Move to strike.

23   BY MR. SLATER:

24        Q.   You're not familiar with any
```

Elizabeth Kavaler, M.D.

1    standard, criteria, any information that

2    would tell you what needed to be in a

3    patient brochure, correct?

4         A.    I don't know legal

5    obligations.

6         Q.    You don't know based on the

7    FDA regulations, correct?

8         A.    That's right.

9         Q.    You don't know what Ethicon

10   medical affairs thought needed to be in

11   the patient brochure, right?

12        A.    That's right.

13        Q.    You don't know what Ethicon

14   regulatory affairs thought needed to be

15   in the patient brochure, correct?

16        A.    Right.  Because my

17   obligation is to the patient.  So what --

18             MR. SLATER:  Move to strike

19        after "right."

20             MR. BALL:  Please don't

21        interrupt her, Adam.

22   BY MR. SLATER:

23        Q.    To the extent that any

24   claims were made in the patient brochure

Elizabeth Kavaler, M.D.

1      Q.    So with regard to the

2  subject of collapse of the pores of the

3  PROLIFT® mesh in the body, that's not

4  something that you've looked at or

5  considered, correct?

6      A.    Right, that specific

7  question.

8      Q.    And you don't know if the

9  people within Ethicon were studying that

10  question, right?  You haven't looked at

11  the internal documents or depositions, so

12  you don't know if Ethicon was looking at

13  that question, do you?

14      A.    The clinical application of

15  the PROLIFT® is what's important.  I

16  don't know what -- I don't know if

17  anybody was looking at that question on

18  any level.

19          MR. SLATER:  Move to strike.

20  BY MR. SLATER:

21      Q.    You don't know whether

22  Ethicon, people in Ethicon were looking

23  at that question, correct?

24      A.    I don't know what people in

Elizabeth Kavaler, M.D.

1    Ethicon were doing for any -- I can't

2    speak to Ethicon.

3          Q.     Have you ever studied

4    explanted mesh to determine the pore

5    sizes after explant?

6          A.     I don't look at pore -- no,

7    I don't look at pore sizes.

8          Q.     Have you ever had explanted

9    mesh from a patient that you were

10   involved in the treatment of where you

11   sent it to pathology and asked them to do

12   a study of the mesh pores and the pore

13   sizes?

14         A.     I did not.

15         Q.     So when you made the

16   statement earlier that, in your opinion,

17   the mesh pores for the PROLIFT® don't

18   collapse under 75 microns, that wasn't

19   based on you actually ever evaluating

20   mesh or looking at a study that evaluated

21   mesh to determine whether the pores

22   collapse down to that size, right?

23              MR. BALL:  Object to the

24         form of the question.