# EXHIBIT E

Jaime Sepulveda, M.D.

```
 1              IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2                     CHARLESTON DIVISION

 3   _____
     IN RE:  ETHICON, INC.,            Master File No.
     PELVIC REPAIR SYSTEM PRODUCTS      2:12-MD-02327
 4   LIABILITY LITIGATION,             MDL No. 2327
     _____/  JOSEPH R. GOODWIN
 5   THIS DOCUMENT RELATES TO          U.S. DISTRICT JUDGE
     PLAINTIFFS:
 6   Joplin, Deborah Lynn     2:12-cv-00787
     Wheeler, Pamela Gray      2:12-cv-00455
 7   Collins, Fran             2:12-cv-00931
     Frye, Jackie              2:12-cv-01004
 8   Bennett, Dina Sanders     2:12-cv-00497
     Miracle, Charlene         2:12-cv-00510
 9   Adams, Joan               2:12-cv-001203
     Grabowski, Louise         2:12-cv-00683
10   Vignos-Ware, Barbara      2:12-cv-00761
     Harter, Beth                12-cv-00737
11   Scholl, Sheri               12-cv-00738
     Stubblefield, Margaret      12-cv-00842
12   Warmack, Roberta            12-cv-01150
     Smith, Carrie             2:12-cv-00258
13   Thomas (Wyatt), Kimberly  2:12-cv-00499
     Georgilakis, Teresa       2:12-cv-00829
14   Cone, Mary                2:12-cv-00261
     Destefano-Raston, Dina    2:12-cv-01299
15   Hooper, Nancy             2:12-cv-00493
     Lee, Alfreda              2:12-cv-01013
16   Reyes, Jennifer           2:12-cv-00939
     Fisk, Paula               2:12-cv-00848
17   Sikes, Jennifer           2:12-cv-00501
     Swint, Isabel             2:12-cv-00786
18   Teasley, Krystal          2:12-cv-00500
     Thaman(Reeves), Susan     2:12-cv-00279
19   Warlick, Cathy            2:12-cv-00276
     Sheperd, Donna            2:12-cv-00967
20
21
                 DEPOSITION OF JAIME SEPULVEDA, M.D.
22
                     Wednesday, March 30, 2016
23                    8:12 a.m. - 4:33 p.m.
                     200 South Biscayne Blvd.
24                    Miami Beach, Florida
```

Jaime Sepulveda, M.D.

```
 1    APPEARANCES:
 2    On behalf of Plaintiffs:
 3         EDWARDS & DE LA CERDA
           3031 Allen Street, Suite 100
 4         Dallas, Texas 75204
           888.795.3352
 5         BY:  PETER DE LA CERDA, ESQUIRE
                peter@edwardsdelacerda.com
 6
           MOSTYN LAW
 7         6280 Delaware Street
           Beaumont, Texas   77706
 8         800.400.4000
           BY:  MARK C. SPARKS, ESQUIRE
 9              mark@mostynlaw.com
10
      On behalf of Defendant:
11
           BUTLER SNOW, LLP
12         500 Office Center Drive
           Suite 400
13         Fort Washington, Pennsylvania  19034
           267.513.1884
14         BY:  NILS B. SNELL, ESQUIRE
                burt.snell@butlersnow.com
15
16
17
18
19
20
21
22
23
24
```

Jaime Sepulveda, M.D.

```
1
2                        I N D E X
3    Examination                                Page
4    Direct          By Mr. De La Cerda            5
     Cross           By Mr. Snell                269
5
6    Certificate of Oath                         302
     Certificate of Reporter                     303
7
8
9
10                       EXHIBITS
11   No.                                        Page
12   Exhibit 1   Gynecare Prolift and Gynecare   43
                 Gynemesh PS Preceptor
13               Presentation Kit
14   Exhibit 2   Surgeon's Resource Monograph    43
15   Exhibit 3   Medical Literature              44
16   Exhibit 4   Book: Biomechanics:  Mechanical 46
                 Properties of Living Tissues,
17               Chapter 7
18   Exhibit 5   Book:  Introductory             46
                 Biomechanics From Cells to
19               Organisms, Chapter 9
20   Exhibit 6   Book:  Introductory             47
                 Biomechanics From Cells to
21               Organisms, Chapter 12
22   Exhibit 7   Thumb Drive with Materials      49
                 Related to TVT and TVT-O
23
     Exhibit 8   Thumb Drive with Materials      49
24               Relating to TVT-S
```

Jaime Sepulveda, M.D.

1   Exhibit 9     Thumb Drive with Materials       49
                  Relating to Prolift

2

    Exhibit 10    Thumb Drive with Materials       50
3                 Relating to RVT-S

4   Exhibit 11    Medical Literature               51

5   Exhibit 12    Article:  Randomized controlled  52
                  trial comparing TVT-O and TVT-S
6                 for the treatment of stress
                  urinary incontinence:  2-year
7                 results

8   Exhibit 13    Curriculum Vitae                 53

9   Exhibit 14    Reliance List                    54

10  Exhibit 15    General Expert Opinion Report    55
                  on Gynemesh PS, Prolift and
11                Prosima

12  Exhibit 16    General Expert Opinion Report    55
                  on TVT and TVT-O

13

    Exhibit 17    Invoices                         60

14

    Exhibit 18    Thumb Drive with Presentation    71
15                Material

16

17

18

19

20

21

22

23

24

Jaime Sepulveda, M.D.

```
 1              P R O C E E D I N G S

 2                    -  -  -

 3   Thereupon:

 4                 JAIME SEPULVEDA, M.D.,

 5   having been first duly sworn, was examined and

 6   testified as follows:

 7              THE WITNESS:  I do.

 8                 DIRECT EXAMINATION

 9   BY MR. DE LA CERDA:

10       Q.   Okay.  Doctor, could you please state your

11   full name for the record?

12       A.   Jaime L. Sepulveda.

13       Q.   You're a urogynecologist hired by Johnson &

14   Johnson and Ethicon, Inc. to provide opinions in

15   support of TVT, TVT-O, Gynemesh, Prolift and Prosima;

16   correct?

17              MR. SNELL:  Form.

18       A.   I have -- I have been subpoenaed to provide

19   expert testimony about these products.

20       Q.   (By Mr. De La Cerda)  My name is Peter

21   de al Cerda, I'm one of the attorneys who represents

22   the plaintiffs' group.

23              Do you understand who I am and who I

24   represent?
```

Jaime Sepulveda, M.D.

1        A.   Yes, I do.

2        Q.   A couple of deposition rules.  As we begin,

3    first of all, we want to try to let each other finish,

4    so allow my question to get out fully before you begin

5    your answer and then I'll allow your answer to get out

6    fully before I begin my next question.  Is that fair?

7        A.   Yes.

8        Q.   And also when you're responding to

9    questions, please do so verbally as opposed to an

10   "uh-huh" or "uh-uh" or a head nod so it is clear on

11   the record.  Okay?

12       A.   Yes.

13       Q.   Also, if you don't understand my question,

14   please ask me to repeat or rephrase it, otherwise,

15   I'll assume that you understood my question.  Is that

16   fair?

17       A.   Yes.

18       Q.   And, of course, if you need a break at any

19   time, please let me know and we'll take a break.  The

20   only thing is if there's a question pending, I ask the

21   question be responded to before we take the break.

22   Okay?

23       A.   I -- I understand.

24       Q.   All right.  This is not the first deposition

Jaime Sepulveda, M.D.

```
 1   you've given; correct?

 2       A.   That's correct.

 3       Q.   What other depositions have you given?

 4       A.   I have given depositions on Garcia versus

 5   Ethicon.

 6       Q.   Okay.  Anything else?

 7       A.   Yes, I have given deposition in local cases

 8   against a physician.

 9       Q.   Okay.  So any other mesh cases where you've

10   given a deposition other than Garcia?

11       A.   Only Garcia.

12       Q.   Okay.  And then you've also given

13   depositions, I guess, in medical malpractice cases?

14       A.   Yes.

15       Q.   Okay.  How many of those have you given?

16       A.   I have given two.

17       Q.   Two.  And have you acted as a treater or as

18   an expert in those cases?

19       A.   One was as a treater and the other one was

20   as an expert.

21       Q.   Okay.  And when you acted as the expert,

22   were you for the plaintiff or for the defense?

23       A.   I was for the defense.

24       Q.   And generally speaking, in the case where
```

Jaime Sepulveda, M.D.

1    you were the treater, what type of case was that?  I

2    know it's medical malpractice, but what was the

3    subject of that case?

4         A.   That -- that was in 1994, a pelvic mass,

5    specifically a sacral mass.

6         Q.   Okay.  And then how about the one where you

7    acted as the expert for the defense?

8         A.   It was a case of urinary incontinence after

9    a vaginal delivery.

10        Q.   And do you recall approximately when that

11   one was?

12        A.   That may have been three to four years ago.

13        Q.   Did either of those cases involve Butler

14   Snow?

15        A.   No.

16        Q.   Okay.  And then in the Garcia versus

17   Ethicon, you acted as an expert on behalf of Johnson &

18   Johnson and Ethicon; correct?

19        A.   That's correct.

20        Q.   All right.  Any other depos other than the

21   ones you already mentioned?

22        A.   No other depos.

23        Q.   Okay.  A few questions here.  I assume the

24   answers to these are all no, but have you ever had

Jaime Sepulveda, M.D.

1    your privileges at a hospital revoked, suspended or

2    limited in any way?

3         A.   No.

4         Q.   Have you ever personally been sued for

5    medical malpractice?

6         A.   Yes.

7         Q.   Okay.  And what was the subject of that

8    particular case?

9         A.   It -- it was, again, a chordoma,

10   c-h-o-r-d-o-m-a, a chordoma, which is a tumor on the

11   sacrum.

12        Q.   I see.  Okay.

13        A.   And the other one was an injury to the

14   ureter during the excision of a 20-centimeter pelvic

15   mass.

16        Q.   Okay.  So these are two separate cases;

17   correct?

18        A.   Yes.

19        Q.   In the first case that involved the

20   chordoma, so you were the defendant in that case?

21        A.   Yes.

22        Q.   And was this the one from 1994?

23        A.   Yes.

24        Q.   Okay.  So you actually gave a deposition in

Jaime Sepulveda, M.D.

1    that case; right?  Is that right?

2         A.   Yes.

3         Q.   And in the second case, the injury to ureter

4    with the pelvic mass, did you end up not giving a

5    deposition in that case?

6         A.   There was no deposition.

7         Q.   Okay.  Without revealing -- I know

8    settlements many times can be confidential.  Without

9    revealing any confidentiality, can you tell us

10   anything about the resolution of those two cases?

11        A.   They were both settled.

12        Q.   Settled, okay.

13             Okay.  So no trial; right?

14        A.   There -- there was no trial and it was for a

15   fully disclosed amount.

16        Q.   Okay.  Any other litigation against you

17   other than those two cases that we talked about, any

18   litigation of any type?

19        A.   No.

20        Q.   Have you ever had a disciplinary action

21   against you by any medical board?

22        A.   No.

23        Q.   Have you ever been arrested or convicted of

24   a crime?

Jaime Sepulveda, M.D.

```
1        A.    No.

2        Q.    Okay.  We discussed -- okay.  Other than

3   being retained in the Garcia case as an expert and in

4   this -- in the case where you were retained as an

5   expert that you mentioned before where you did a

6   deposition, have you ever been retained as an expert

7   in litigation, other than those two instances you've

8   already mentioned?

9            MR. SNELL:  Hold on, hold on.  I'm going to

10           instruct you.  To the extent you have not been

11           disclosed, you should be mindful of that and not

12           identify those cases.  To the extent you have not

13           been disclosed, either by deposition, expert

14           report, doing an IME of the plaintiff, under the

15           rules, depending upon where you may have been

16           retained, that is confidential information.

17       A.    I gave testimony on Cavness.

18       Q.    (By Mr. De La Cerda)  Okay.  Other than

19   Cavness, Garcia and then this other case involving

20   urinary incontinence after vaginal delivery, any

21   other cases where you've been designated as an

22   expert?

23       A.    On -- on Ramirez.

24       Q.    Right.  Is there a name to the case where
```

Jaime Sepulveda, M.D.

1    you were the expert for the defense on the urinary

2    incontinence after the vaginal delivery?  Do you

3    remember a name?

4         A.   I cannot recall.

5         Q.   Okay.  That would just make it easier to

6    reference, but ...

7              Okay.  In all four of these cases, the

8    Cavness case, the Garcia case, the Ramirez case and

9    the case involving urinary incontinence after vaginal

10   delivery, all four of those cases you were retained by

11   the defense; correct?

12        A.   That's correct.

13        Q.   You've never testified for the plaintiff as

14   an expert; is that right?

15        A.   I have not testified for the -- for a

16   plaintiff.  I have given opinions as part of the State

17   of Florida Prosecution Unit, which is actually known

18   as the Department of Health, Department of Health now.

19   It's work that I have done for years for the

20   Department of Health.

21        Q.   Are these like criminal investigations into

22   doctors or what -- what is it?

23        A.   You know, that's why they eliminated the

24   Prosecution Unit name because it sounds criminal, so

Jaime Sepulveda, M.D.

1    now we all understand that it's -- it's any complaints

2    that have been brought against a physician in my -- in

3    my specialty, I and the board feels that needs to be

4    reviewed, I review.

5        Q.   Okay.  And how long have you been doing

6    that?

7        A.   Close to 15 years.

8        Q.   15 years.  Okay.

9        Let's talk briefly about your role as a

10   consultant for Ethicon outside of litigation.  Okay?

11   So this word "litigation" is not contemplated, this is

12   just your role as a consultant in what -- helping out

13   what Ethicon does in its normal business.  Okay?

14       So, first of all, in the past, you have been

15   hired as a consultant for Ethicon; correct?

16       A.   Yes.

17       Q.   Okay.  And do you recall when you were first

18   hired as a consultant for Ethicon?

19       A.   It may have been just after the year 2000,

20   2002.  I don't recall the specific year.

21       Q.   Okay.  But early 2000s?

22       A.   About -- about that time.

23       Q.   Okay.  And what was the purpose of you being

24   hired on as a consultant when you first started?

Jaime Sepulveda, M.D.

1      A.   Initially, I was given the opportunity to --

2   to dissect cadavers and to put together the anatomy

3   for the dissection in specimens as it would apply to

4   the use of products.

5      Q.   Okay.  So I'm having a little trouble

6   understanding what that might be.  Explain to me what

7   you would do, then, on a typical day involving that

8   particular role.

9      A.   It changed.  It changed over the -- over the

10  years.  I started dissecting and teaching and being

11  involved with my peers on how to use the different

12  products and it was just an interest that I -- that I

13  had very early in my career about surgical anatomy.

14  So I just expanded that and I was given the

15  opportunity while -- I was given instruments to work

16  in the gallery.

17     Q.   Okay.  Did you have a title when you first

18  began as a consultant for Ethicon?

19     A.   No.

20     Q.   Okay.  Were there defined duties that you

21  had when you first started out as a consultant?

22          MR. SNELL:  Form.

23     A.   No, nothing -- nothing that was defined as

24  different task.

Jaime Sepulveda, M.D.

1      Q.   (By Mr. De La Cerda)  Okay.  They didn't

2   have, like, a job description that was given to you

3   when you first started?

4      A.   No.

5      Q.   Okay.  And so in this role involving

6   dissecting cadavers, where you were teaching other

7   peers about how to use the Ethicon products, was that

8   a role that remained consistent throughout your time

9   as a consultant for Ethicon or did it change over

10  time?

11     A.   It changed based on the needs that they had,

12  for what -- what they understood was my expertise.

13     Q.   Okay.  So let's do this.  So the beginning

14  is approximately the beginning of the 2000s.  Has that

15  con- -- has that role as a consultant for Ethicon

16  ended or do you continue to be a consultant for

17  Ethicon?

18     A.   No, I don't consult with them anymore beyond

19  the legal.

20     Q.   And so when did your role as a consultant

21  end?

22     A.   Just -- just about the time that the

23  products -- the prolapse products were

24  decommercialized.

Jaime Sepulveda, M.D.

```
1          Q.    Okay.  So is that 2012, approximately?

2          A.    Yes.

3          Q.    Okay.  So I guess that's about ten years of

4    acting as a consultant; is that fair?

5          A.    Yes.

6          Q.    Okay.  So the manner in which your role as a

7    consultant changed, was it really in -- in regard to

8    the products themselves, what kind of product you were

9    teaching, or is there some other way in which it

10   changed?

11         A.    It changed.  It changed based on what --

12   whatever was understood that there was a need.

13         Q.    Okay.  Can you give me some examples?

14         A.    Initially, it was seeing the products, how

15   they would work, and nothing -- nothing in terms of

16   experiment or research and development.  It was more

17   on how -- how to reproduce their use in the -- in the

18   operating room.

19         Q.    Mm-hmm.

20         A.    And then I was able to -- to see -- to see

21   how -- how the products were actually implemented

22   in -- in the surgical environment.  And there was a

23   time in which I would just see other surgeons that

24   were consultants.  And then there was a time in which
```

Jaime Sepulveda, M.D.

1    I would go to and meet with -- with a group at Ethicon

2    and give a conference on anatomy or I would take them

3    to the lab and show them the anatomy.

4         Q.    Mm-hmm.

5         A.    And then there was a time in which I

6    actually wrote a manual of how to dissect -- dissect a

7    specimen, make the best of that dissection.

8         Q.    Okay.  But tell me about this manual.  What

9    is it that you'd be dissecting -- so tell me, what was

10   the content of this manual?

11        A.    The labs -- the labs using specimens are

12   very unique and they're very -- they're very

13   expensive.

14        Q.    Okay.

15        A.    And the whole setup of getting a good

16   specimen.  And what we call "specimens" is a portion

17   of a person and there -- there are certain things that

18   we have to follow over the years, over the last 25

19   years that I have learned dissecting and understanding

20   the anatomy.  One of the most complex anatomies that

21   you can have in any other -- other part of the body.

22   So when we -- when we did this and there's -- my

23   interest was that, and I verbalized that, that we

24   could make the best use of these specimens in the lab.

Jaime Sepulveda, M.D.

1        Q.    Mm-hmm.

2        A.    And not only that it would be -- it would be

3    the best use, but also that it would be a systematic

4    approach in the same way that first-year medical

5    students are taught anatomy.

6        Q.    Mm-hmm.  Okay.

7        A.    So to get -- to make that organized and to

8    make that systematic and to make that consistent, then

9    there was -- there was a proposal for a manual.  That

10   was just one part of -- of what could be done in -- in

11   the lab- -- laboratory.

12       Q.    And this was a manual that was done for

13   Ethicon; right?

14       A.    It was done for -- for them, but I think it

15   was -- there were other -- other considerations

16   beyond -- beyond anatomy and probably did not get

17   developed, but I got the -- I got the opportunity to

18   take my pictures and actually put it in -- on my thumb

19   drive with presentations, which you're going to be

20   requesting.

21       Q.    Okay.  Are these cadaver specimens, they're

22   reused for purposes of teaching doctors how to do --

23   how to, for example, implant Ethicon's products;

24   right?

Jaime Sepulveda, M.D.

```
1      A.   Well, cadavers are used in sections and,
2  obviously, we're going to -- we're going to use a
3  section that pertains to the procedure that we're
4  doing and they -- they form the basis of teaching
5  anatomy from the first year of medical school.
6      Q.   Do they -- do the cadaver -- I guess the
7  portions of the cadaver that are used to present how
8  to implant products, do they eventually get used, to a
9  certain extent, to where, okay, we can't use this
10 cadaver anymore, like it's been used too much for this
11 particular presentation?
12     A.   You can -- you can always make -- make the
13 best of what you're examining.  So, yeah, if there is
14 a portion that is used, you can always go to different
15 things that you can teach from the -- from the
16 cadaver.  That's highly dependent on the condition of
17 the cadaver.
18     Q.   Yeah.
19     A.   It's highly dependent on how it was
20 prepared.  It's highly dependent on how those
21 individuals that are doing the dissection know how to
22 do it.
23     Q.   Okay.  Okay.  So going back to your role as
24 a consultant for Ethicon and what it is that you did,
```

Jaime Sepulveda, M.D.

```
 1   have you now explained all the various things that you

 2   did as a consultant on behalf of Ethicon?

 3          MR. SNELL:  Form.

 4      A.   I -- I actually look at presentations.  In

 5   addition to, I look at presentations.  I would make a

 6   presentation to -- to different groups within Ethicon.

 7      Q.   (By Mr. De La Cerda)  You would do

 8   presentations for other physicians about Ethicon's

 9   products; is that correct?

10      A.   About Ethicon products and about the

11   condition itself.

12      Q.   Okay.  And did the presentations that you do

13   to other doctors for Ethicon include TVT, TVT-O,

14   Gynemesh, Prolift and Prosima?

15      A.   It was TVT-O, TVT-Secur, Gynemesh, Prosima,

16   and Prolift.

17      Q.   Any reason why you didn't do presentations

18   on regular TVT or TVT-R?

19      A.   I had a -- I had a preference for the

20   transobturator slings.

21      Q.   Had you used in the past a TVT Retropubic

22   for your patients?

23      A.   Yes.

24      Q.   And why is it that you preferred the TVT-O
```

Jaime Sepulveda, M.D.

1    over the TVT?

2        A.    I felt I could do the same with less risk.

3        Q.    And what risk are you specifically talking

4    about?

5        A.    Getting to the bladder.  Very rare, but

6    potential getting to the bowel and getting to a major

7    blood vessel.

8        Q.    You've testified before that you've made --

9    you've made about $100,000 a year as a consultant for

10   Ethicon; is that right?

11       A.    That -- I may have testified to that number,

12   yes.

13       Q.    Okay.  And so if we're talking about ten

14   years, we're talking about approximately a million

15   dollars you made as a consultant for Ethicon; correct?

16            MR. SNELL:  Form.

17       A.    No, it doesn't -- doesn't get to that

18   because it wasn't -- it wasn't like a salary.  It was

19   in a -- in a need and there were years that it was

20   $3,000.

21       Q.    (By Mr. De La Cerda)  Do you have an

22   approximation of how much you made total as a

23   consultant for Ethicon?

24       A.    I -- I think the largest and the best year,

Jaime Sepulveda, M.D.

1  most active year, I may have done about 100.  But

2  that -- that's probably one or two years.

3      Q.   Do you have a range, total, for all the

4  years that you acted as a consultant for Ethicon?

5      A.   Never -- never really counted.

6      Q.   Do you have any documentation of that, of

7  what the numbers might be?

8      A.   My 1099s that I receive or my tax returns.

9      Q.   Okay.  And if Ethicon has records of that,

10  you'd, of course, defer to whatever those records say;

11  right?

12          MR. SNELL:  Objection, form, foundation.

13      A.   As -- as long as they correlate with my

14  1099.

15      Q.   (By Mr. De La Cerda)  Right.  So if they

16  had records of the 1099s, which I assume they do,

17  you would defer to whatever those numbers are;

18  right?

19      A.   I -- I would defer to that.

20      Q.   When you've presented on Ethicon's products,

21  where have those presentations occurred,

22  geographically?

23      A.   You know, it happened mostly here either in

24  Florida or in New Jersey.  Occasionally, I would go

Jaime Sepulveda, M.D.

```
 1   to -- to other cities, Austin, Toronto, Dallas,

 2   Boston.  Never -- never too -- never too far.  I -- I

 3   made that decision that I wasn't going to go, let's

 4   say, to the Northwest or California maybe once because

 5   I have a practice that I have to take care of.

 6        Q.   Right.  I guess you have the advantage, too,

 7   of being in Miami, doctors would want to come to you

 8   for the -- were there many presentations here in

 9   Miami, too?

10        A.   There -- there were -- yeah, there were some

11   in Miami, absolutely.

12        Q.   Okay.  When the presentations were out of

13   town, Ethicon, of course, covered your -- your meals,

14   your lodging, your transportation; right?

15        A.   With- -- within the -- within the range that

16   was specified for that kind of traveling.

17        Q.   How was that done?  How was the range

18   specified?

19        A.   We -- we were required to take a course on

20   guidelines for -- as consultants for any kind of

21   industry.

22        Q.   Mm-hmm.  And do you recall any of what those

23   guidelines were?

24        A.   I -- I do recall there was -- there were
```

1  specifics on which hotel we could stay and -- and no

2  first class traveling, and there was compensation, if

3  we would drive, for the miles --

4      Q.   Okay.

5      A.   -- and there were also some -- some limits

6  on what we could spend on food, although most of the

7  time food was provided there.

8      Q.   Do you know whether Ethicon believed you to

9  be a good preceptor or teacher on its TVT products?

10     A.   I -- I think that they visualized me as a

11 good surgeon with good common surgical sense.

12     Q.   And I just used the term "preceptor," I need

13 to make sure that's understood.  Could you explain to

14 us what the term -- what your understanding of the

15 term "preceptor" is?

16     A.   The preceptor is -- is a term that was, I

17 believe, from mostly the marketing people.  I never

18 really saw myself as a preceptor.

19     Q.   Mm-hmm.

20     A.   I saw myself as a surgeon.  And if you ask

21 any of my colleagues, they don't see me as a

22 preceptor.  Through the course -- through the years, I

23 have seen doctors that have seen me for every single

24 product and we always ended up talking about the same

Jaime Sepulveda, M.D.

1    thing, the anatomy and the surgery.

2        Q.    Mm-hmm.  And so preceptor, I guess that's

3    used as some version of saying that someone's a

4    teacher; is that right?

5        A.    I -- I think it was an internal term for --

6    for them, preceptor, and it's -- it doesn't get to the

7    level of a teacher or a professor, it doesn't have

8    that -- that responsibility.  It doesn't have -- it

9    has mostly the role of showing something, of

10   demonstrating.

11       Q.    Okay.  Do you know whether Ethicon ever

12   criticized the way in which you taught other

13   physicians in preceptorships?

14       A.    They -- they did not have a specific

15   criticism and they -- they would ask, whenever they

16   would bring someone to see me operating, that they had

17   a -- that the doctors could get to see as much as they

18   could see in terms of the variety of procedures, but,

19   obviously, that -- the cases are what the cases are.

20       Q.    Yeah.

21       A.    You show what you have.

22       Q.    Ethicon -- I guess, in other words, Ethicon

23   never said -- made you personally aware of any

24   specific criticisms of any type of the manner in which

Jaime Sepulveda, M.D.

1    you were teaching other doctors how to perform these

2    procedures; right?

3                MR. SNELL:   Form.

4         A.    There -- there was -- it was a relationship

5    with -- with a lot of respect for what I did, for what

6    I brought to the -- to their table.

7         Q.    (By Mr. De La Cerda)   Okay.  So the answer

8    is no, you never became aware of any criticisms;

9    right?

10        A.    No.

11        Q.    In August of 2011, you decided to stop

12   preceptorships due to the FDA situation; correct?

13        A.    I -- I -- there was a communication that

14   said we -- we need to look at this and we need to look

15   at what the FDA is saying, and everybody needs to be

16   on the same wavelength.

17        Q.    Mm-hmm.  And so what -- how long did that

18   last, that decision to suspend or interrupt your

19   preceptorships?

20        A.    I don't -- I don't remember exactly how --

21   how long did it last or if I ever went back and did a

22   consultation in other -- other regards.  It's -- it

23   was just a gen- -- probably a general concern from all

24   sides.

Jaime Sepulveda, M.D.

1     Q.    Okay.  Just to make sure.  So you're unsure

2  whether, in August of 2011 when you decided to stop

3  the preceptorships due to the FDA concern, you're

4  unsure whether you went back to consulting for Ethicon

5  after that point?

6     A.    Yeah, I --

7           MR. SNELL:  Objection to form.

8           Go ahead.

9     A.    -- I did -- I did not cut completely at that

10  time and actually it was -- it was me relating, I

11  believe, to Bob Zipfel, who was the professional

12  education manager --

13     Q.    (By Mr. De La Cerda)  You said Bob Zipfel?

14     A.    Zipfel, Z-i-p-f-e-l.

15           -- relating that we -- we need to get clear

16  on the -- on the message and we need to include

17  whatever is out there and be transpiring about it.

18     Q.    And so what was it that you decided, along

19  with Ethicon, to make clear about the message

20  involving this issue?

21           MR. SNELL:  Objection, form, Ethicon.

22     A.    As far as I remember from my side, it was

23  let's -- let's look at this.  It was -- that's more of

24  the attitude that I can recall.

Jaime Sepulveda, M.D.

1      Q.   (By Mr. De La Cerda)  Do you remember ever

2  discussing this FDA issue with doctors during a

3  consultation on behalf of Ethicon?

4      A.   I -- I don't remember that.

5      Q.   Okay.  Do you remember discussing this issue

6  at all with any doctors in regard to Ethicon products?

7           MR. SNELL:  Objection, form.

8           Go ahead.

9      A.   I don't -- I don't remember specifics of

10 talking to a specific doctor or being at a conference

11 just talking about -- about this.

12           I don't even remember if it was 2007, 2008,

13 or -- I don't remember which time frame it was.  I

14 am -- you know, I became aware of this, that I say at

15 one point we need to stop or we need to review, we

16 need to revise it, or we need to look at it, but it

17 was never like, oh, no, I'm not teaching anymore, I'm

18 not demonstrating anymore for you.

19      Q.   (By Mr. De La Cerda)  Mm-hmm.

20      A.   That's what I can recall.  That's the best

21 of my recollection right now.

22      Q.   Why is it important when the FDA puts out a

23 warning, like they did in 2011, to investigate and

24 look into what -- the reason behind the warning?

Jaime Sepulveda, M.D.

```
 1              MR. SNELL:  Form.

 2        A.   It's because the results and the clinical

 3   experience that we're getting was different from what

 4   we were seeing in those -- in those reports.

 5        Q.   (By Mr. De La Cerda)  Okay.  So the FDA

 6   warning came out in July of 2011, was that a

 7   surprise to you?

 8        A.    It was -- it was a surprise in 2008 and it

 9   was in 2011.  What I -- what I thought is evidence is

10   going to come in and is going to show -- it's going to

11   solve this difference that a group of doctors may have

12   with other group of doctors.

13        Q.   You're familiar with the Abbott study that

14   came out -- it came out probably in 2014, I think.

15   Abbott -- the lead author is Abbott, Mickey Karram is

16   one of the authors as well.  And one of the

17   discussions they have is that many times when -- I

18   think about half the time, at least -- when a patient

19   has a complication involving a mesh implant, whether

20   it be a sling or a pelvic organ prolapse mesh, they do

21   not return to the physician that implanted it.

22              Are you aware of that phenomenon?

23              MR. SNELL:  I'm going to object to the

24         foundation on that.
```

Jaime Sepulveda, M.D.

 1              Go ahead.

 2       A.   I -- I've heard about that.  I never

 3   believed that that's the case.

 4       Q.   (By Mr. De La Cerda)  Okay.  And why is

 5   that?

 6       A.   Because of my own experience, because of

 7   my -- the experience that I have heard from my

 8   colleagues.  That's -- that's not what our experience

 9   is.

10              You -- you may have a small percentage that

11   may not come back, but in my community, for example,

12   we all know, we all communicate.  There are four, five

13   board-certified female pelvic medicine in the whole

14   stretch all the way to Boca from here.  We know each

15   other and -- and the doctors also communicate with us,

16   so there is a lot of communication there.

17              If there is a loss to follow up, it might be

18   on the clinic setting, when you have these clinics,

19   other -- other types of settings, but not in the

20   private-practice setting.

21       Q.   If a patient went to go receive treatment

22   for a complication in a different city that's

23   something like Dallas, for example, would you

24   necessarily find out about that?

Jaime Sepulveda, M.D.

1      A.   I may not -- I may not find out, but I know

2   that most of the time it's not even dependent on the

3   patient.  They -- they come and they communicate with

4   me.  I've had patients that have gone to New York,

5   they come back and tell me this was my experience.

6      Q.   You mentioned something interesting because

7   you're -- and I hear this from physicians every time.

8   I think this is our natural inclination.

9           You mentioned in your experience you haven't

10   seen that happen.  Ultimately, you would agree that

11   your personal experience on that issue, on whether

12   people come back to the primary physician or not, is,

13   at best, only anecdotal.  Do you agree with that?

14      A.   It's -- it is definitely a portion that is

15   anecdotal.  I do talk to so many of my colleagues and

16   if it's anecdotal, it repeats a lot.

17      Q.   Yeah, I get that.  I mean, here you are in a

18   community where you do actually know all these

19   physicians that do this thing and if the general

20   consensus is that this is what's happening, it can

21   certainly feel like this is the reality of it.  But

22   ultimately we've got a study that was done that looked

23   at many people -- by the way -- strike that.

24           Are you familiar with this study, the Abbott

Jaime Sepulveda, M.D.

1   study?  Like have you actually reviewed it?

2        A.   I -- I did not read that study complete, no.

3        Q.   Okay.  Then I'm going to move on to another

4   subject then.

5             Going back to acting as a consultant, have

6   you ever acted as a consultant for any other

7   pharmaceutical or medical device company?

8        A.   For pharmaceuticals, I work for ALZA

9   Pharmaceuticals.

10       Q.   Is that --

11       A.   A-L-Z-A.  When they came -- they came in

12  with a new anticholinergic.

13       Q.   I'm sorry, what is that?

14       A.   ALZA, A-L-Z-A, Pharmaceuticals.

15       Q.   And the drug?

16       A.   It was Ditropan XL.

17       Q.   Ditropan XL.

18            And what was that drug for?

19       A.   For overactive bladder.

20       Q.   How long did you work as a consultant for

21  ALZA Pharmaceutical?

22       A.   About two years.

23       Q.   And do you recall approximately when that

24  was?

Jaime Sepulveda, M.D.

1    A.   It was when I was starting the urogyne

2    center here, so it may have been '96, '97.

3    Q.   Any other medical device or pharmaceutical

4    companies that you've acted as a consultant for, other

5    than ALZA and Ethicon?

6    A.   I -- oh, I worked for Ethicon on the

7    laparoscopy area around 1994, internationally.

8    Q.   Was that just for one year?

9    A.   A year, year and a half, yes.

10   Q.   Any other consulting work for pharmaceutical

11   or medical device companies?

12   A.   You know, I may have -- I may have had

13   representatives from one or two companies that say I

14   want you to go ahead and teach me how my product works

15   and -- and teach me how -- how is it that urge

16   incontinence is managed.

17        And I may say, okay, and some of them may

18   give me a check, which I ended up either giving to the

19   Residents Fund in Puerto Rico or did something with

20   it, but it was something sporadic.

21   Q.   Would these be some of the other mesh

22   manufacturers, like Boston Scientific or American

23   Medical Systems, companies like that?

24   A.   No, I did not -- I -- I never did consulting

Jaime Sepulveda, M.D.

1    for any other company on mesh but Ethicon.

2        Q.   Do you remem- -- do you recall the names of

3    the companies that you did this urge incontinence work

4    for?

5        A.   I think it may have been Detrol or --

6        Q.   Detrol?

7        A.   -- Enablex.  I don't remember the name of

8    the company.

9        Q.   Okay.  And do you recall the approximate

10   years that would have happened?

11       A.   No.

12       Q.   Okay.  Now let's get to the part that's

13   always the most tedious.  What is it that you brought

14   here today with you?

15       A.   I brought here in compliance with the papers

16   served for the subpoena, I brought my CV --

17            You have a copy?

18       Q.   Yes.

19       A.   -- and a USB, in which I have any file that

20   I had on my computer that when I -- when I was at

21   Ethicon, I just downloaded my presentations.

22       Q.   Okay.

23       A.   And there were some videos of surgeries

24   here.

Jaime Sepulveda, M.D.

1      Q.    Okay.

2      A.    And I brought my biomechanics books and the

3    book that Ethicon put together for -- about Gynemesh

4    and Prolift, and I did -- the one on Gynemesh is about

5    my slides.

6            And I -- but all the materials that were

7    cited in my report and materials for prolapse, my

8    materials for case specifics for tomorrow,

9    depositions, and the Prolift monograph.

10     Q.    Okay.  And that's it?

11     A.    I am missing the white paper on

12   hydrodissection.  That I could not find at all.  I

13   will make it my business to provide to you.

14           MR. SNELL:  Peter, I think we provided --

15       there's thumb drives that my office did, too.

16           MR. DE LA CERDA:  Are those all -- those are

17       the case-specific ones?

18           MR. SNELL:  Case and general.

19     Q    (By Mr. De La Cerda)  Okay.  So that we're

20   not taxing the court reporter too much on copying

21   and the like -- first of all, are the materials that

22   you brought, other than the books, are those all

23   copies?

24     A.    Yes.

Jaime Sepulveda, M.D.

```
 1        Q.   Okay.  What -- I guess what I would be most
 2   interested in is what you brought that is not on the
 3   Reliance List.  Because most of -- just about
 4   everything on the Reliance List we can find.
 5             And so, first of all, these book chapters,
 6   are those referenced in the Reliance List, these books
 7   that you have listed here in -- here in front of us?
 8        A.   No, they're not.
 9        Q.   Okay.  So are there particular portions of
10   those books that are relevant to your opinions or is
11   it the whole book?
12        A.   I -- I -- there are portions that are
13   relevant to the way I see slings and meshes work.
14        Q.   Okay.  Okay.  And can you tell us what -- is
15   it a chapter?  Is it a particular passage or --
16        A.   They're -- they're chapters.
17        Q.   Okay.  And as far as you know, they are not
18   referenced in the Reliance List at all?
19        A.   They're -- they're not, that's why I brought
20   them, and the same with the -- with the USB.
21        Q.   Okay.  So, again, first of all, let's do
22   this.  Let's separate out the items that are not on
23   the Reliance List so we can make sure and mark and
24   identify those and -- so let's do that.
```

Jaime Sepulveda, M.D.

1            So the books that are here, these are the

2    ones not on the Reliance List; right?

3        A.   Yes, sir.

4        Q.   And then you've got -- and I'm going to mark

5    each of these in a second-- the USB that you brought;

6    correct?

7        A.   Yes.

8        Q.   Okay.  Anything else, other than those and

9    other than the case-specific USBs that you brought,

10   anything else that is not on the Reliance List?

11       A.   The only one missing that I -- that I didn't

12   bring today that I'm -- I made my best effort to bring

13   you is the white paper that I wrote on hydrodissection

14   along with Dr. Lucente and -- yeah.

15           MR. DE LA CERDA:  Okay.  So as far as

16       marking these, anything -- any particular way you

17       want to -- you want to do this, Burt?

18           MR. SNELL:  It doesn't matter.  This stuff

19       here is like all general stuff, from his general

20       reports and the Reliance List, and I think it's

21       probably duplicative of the hard copies and also

22       specific citations in the materials.  I was just

23       trying to sort out --

24           MR. DE LA CERDA:  The case-specific --

Jaime Sepulveda, M.D.

```
 1           MR. SNELL:  We sent so many cases to the
 2      thumb drives and stuff like that over time.  This
 3      is general.  If you want a copy -- I don't even
 4      know what's on these.  I know they reproduced --
 5      I think they were supposed to reproduce the
 6      materials list, but I haven't checked them to
 7      see.
 8           MR. DE LA CERDA:  Okay.
 9           MR. SNELL:  I mean, I agree, I think you
10      ought to mark definitely the stuff that was just
11      kind of general -- general impression, the
12      general stuff that he brought.
13           MR. DE LA CERDA:  Yeah.
14           MR. SNELL:  And if you want to -- mark
15      whatever you want, you know.
16           MR. DE LA CERDA:  Yeah.
17           MR. SNELL:  These just have his reports and,
18      like he said, everything that he cited -- here's
19      some articles in here.  You can tell him, those
20      are probably cited within there.
21           THE WITNESS:  This is cited and this is
22      cited, this is cited, too.  This is a monograph.
23      These two are new.  These two are new.
24           MR. SNELL:  Is there anything in this?
```

Jaime Sepulveda, M.D.

```
 1            Here.

 2                 THE WITNESS:  This is not cited.  Cited,

 3            cited.

 4                 MR. DE LA CERDA:  I think we're going to

 5            have to do this the long way.

 6            Q.   (By Mr. De La Cerda)  Okay.  All right.

 7       So here's what I want to do.  Just to make --

 8       because I don't want to miss anything, because it

 9       looks like you might have some newer stuff.  Maybe

10       you looked at some additional research or something

11       and found some newer stuff, but what I want to do

12       is, let's just -- I want to stack it by category and

13       then I'll mark each stack.

14                 So the easiest way to do it, for me, at

15       least, is do it by -- you know, we do ours like this,

16       too.  We're going to do it by stacks that involve

17       certain subject matters, like, for example, everything

18       you've brought today that is a medical literature,

19       let's put that all into one stack and I'm going to

20       mark that.  Okay?  And then everything you brought

21       today that would be Ethicon documents, internal

22       documents, we'll -- we'll mark that.  And then

23       everything you brought today that would be depositions

24       or testimony that you reviewed and relied on, we'll
```

Jaime Sepulveda, M.D.

 1   mark that.

 2        A.   This -- this is all medical literature.

 3        Q.   Okay.  So of the stuff that we've got here,

 4   what -- we have a stack here that's medical

 5   literature.

 6        A.   Yes.

 7        Q.   Are any of the binders medical literature?

 8        A.   All of it.

 9             MR. SNELL:  It's all literature.  It's the

10        stuff cited directly in his reports.

11             MR. DE LA CERDA:  Okay.

12             MR. SNELL:  Do you use footnotes or --

13             THE WITNESS:  Yes, I did.  Every footnote --

14             MR. SNELL:  It should correspond in here.

15             MR. DE LA CERDA:  And then this stack here

16        that I've got is all not in the Reliance List;

17        right?

18             MR. SNELL:  I will say with the -- I'm about

19        99 percent sure that this would have been.  The

20        Prolift monograph, surgeons' monograph is

21        definitely on his materials list and he's

22        referenced that before.  This is his actual --

23        this is your actual preceptor book.  I don't know

24        what you called it.

Jaime Sepulveda, M.D.

1            THE WITNESS:  It's the book that Ethicon

2       made on Gynemesh and Prolift and they -- and I

3       put together the first one.

4            MR. SNELL:  I think that that's on his

5       materials list, too, but just in case, I mean he

6       brought that.  That's his actual one.

7            The Surgeons' Resource Monograph, I know for

8       a fact, has got to be on there.

9            MR. DE LA CERDA:  So what I'm going to do

10      is --

11           MR. SNELL:  He brought that.  That's

12      obviously his originals.

13      Q.   (By Mr. De La Cerda)  I'm not going to

14   mark these, I'm just going to identify them.

15           So today you brought with you the Gynecare

16   Prolift and the Gynecare Gynemesh Preceptor

17   Presentation Kit; correct?

18      A.   Yes.

19      Q.   And these are your -- this is your original?

20      A.   Yes.

21      Q.   Now, do you have this available at all

22   electronically?

23      A.   No.

24           MR. DE LA CERDA:  Okay.  Do you know if

Jaime Sepulveda, M.D.

1        these are available electronically?

2             THE WITNESS:  There might be a CD.

3             MR. SNELL:  I think if you open the inside

4        cover, there are CDs.

5             THE WITNESS:  There might be a CD there,

6        yes.

7             MR. DE LA CERDA:  Because what I would like

8        to do is get a copy of this, just electronically,

9        because this -- so it's not copied -- so the

10       court reporter doesn't have to copy it.

11            So how do you want to do that?

12            MR. SNELL:  Do you want -- can I take it?

13            THE WITNESS:  Yeah.  Send it back because

14       it's the only one I have.

15            MR. SNELL:  I mean, there's two ways.  We

16       can either have the court reporter do it and then

17       it's going through multiple people's hands or if

18       you give it to me, I'll make color copies of

19       everything, the cover, the back, the pages, and

20       then I'll burn the CDs.

21            MR. DE LA CERDA:  Okay.

22            MR. SNELL:  I'll basically give you an exact

23       copy of what you're holding and then I'll

24       actually make a copy for myself, because I don't

Jaime Sepulveda, M.D.

1        have a copy of that exact one, and then I'll give

2        it back to the doctor.

3              MR. DE LA CERDA:  Okay.  So then that --

4              MR. SNELL:  Let's make a record for that, a

5        note for that.

6              MR. DE LA CERDA:  So for the record, then,

7        that will be Exhibit 1.  I'm just going to put

8        this here for now.

9              MR. SNELL:  I will make a note I need to

10       take that and copy it.

11             MR. DE LA CERDA:  So for the record,

12       Exhibit 1 is the Gynecare Prolift and Gynecare

13       Gynemesh PS Preceptor Presentation Kit.

14             (Plaintiff's Exhibit No. 1 was marked for

15       identification.)

16             MR. DE LA CERDA:  Exhibit 2 is going to be

17       Dr. Sepulveda's original Prolift Surgeon's

18       Resource Monograph.

19             (Plaintiff's Exhibit No. 2 was marked for

20       identification.)

21       Q.   (By Mr. De La Cerda)  Now, Exhibit 3, I'm

22    going to mark, these are -- this is medical

23    literature that you've gathered, Dr. Sepulveda;

24    correct?

Jaime Sepulveda, M.D.

1      A.    Yes.

2      Q.    And this is medical literature that happens

3    not to be on the Reliance List; correct?

4      A.    That's correct.

5            MR. DE LA CERDA:  So I'm marking that as

6      Exhibit 3.

7            (Plaintiff's Exhibit No. 3 was marked for

8      identification.)

9            MR. SNELL:  Just for the record, since,

10     obviously, my firm was the one who made the

11     Reliance List, I do believe that one of those may

12     be on there.

13           MR. DE LA CERDA:  Okay.

14           MR. SNELL:  Like the ACOG committee opinion

15     on vaginal prolapse mesh, I'm pretty sure that's

16     on the materials list, if I even have his

17     materials list.

18           You can keep doing that.

19           MR. DE LA CERDA:  Okay.

20           MR. SNELL:  But I'm pretty sure that would

21     have been sent.

22           MR. DE LA CERDA:  Prosima IFU, I'm sure that

23     was on the Reliance List.

24           MR. SNELL:  All that stuff is on the

Jaime Sepulveda, M.D.

1        Reliance List.

2              THE WITNESS:  I can take that back.

3              MR. SNELL:  All the professional education

4        slides, those are on there.

5        Q.  (By Mr. De La Cerda)  All of these are

6   also on the Reliance List; right?  Okay.  So I'm not

7   going to mark those.

8              And then, now, books.  Let's go through each

9   of these.

10             First of all, I'm looking at a book called

11  "Biomechanics:  Mechanical Properties of Living

12  Tissues," the Second Edition, published by Springer

13  and the author is Y.C. Fung, F-u-n-g.

14             Do you have specific chapters that you can

15  identify within this book that you rely on?

16       A.   Yes.  Chapter 7.

17       Q.   Okay.  Any others?

18       A.   No, 7.

19             MR. DE LA CERDA:  Okay.  So I'm going to

20        mark this book as Exhibit 4 and then if we can

21        just get a copy of chapter 7, just chapter 7,

22        then the book can be returned.

23

24

```
 1              (Plaintiff's Exhibit No. 4 was marked for
 2         identification.)
 3         Q.   (By Mr. De La Cerda)  You've also brought
 4    a book entitled "Introductory Biomechanics From
 5    Cells to Organisms."  The author is -- or authors
 6    are C. Ross Ethier, E-t-h-i-e-r, and Craig A.
 7    Simmons.  It looks like this is published by
 8    Cambridge University Press.
 9              Are there any chapters or passages within
10    this book --
11         A.   Yes.
12         Q.   -- that supports your opinions?
13         A.   Chapter 9.
14         Q.   Okay.  Great.  I'll mark this book,
15    "Introductory Biomechanics," as Exhibit 5 and then
16    we'll just get a copy of that particular chapter you
17    referenced, chapter 9.
18              (Plaintiff's Exhibit No. 5 was marked for
19         identification.)
20              MR. DE LA CERDA:  Another book you brought
21         is called "Biomaterials and Biomedical
22         Engineering" published by Trans, T-r-a-n-s, Tech,
23         T-e-c-h, Publications.  This one is edited by W.
24         Ahmed, A-h-m-e-d, N. Ali, A-l-i, and A. Öchsner.
```

Jaime Sepulveda, M.D.

1        It's O-umlaut-c-h-s-n-e-r.

2        And I'm marking this book as Exhibit 6.

3        (Plaintiff's Exhibit No. 6 was marked for

4    identification.)

5    Q.   (By Mr. De La Cerda)  Are there any

6    chapters or passages in that book that you rely on?

7    A.   Yes.

8    Q.   What are they?

9    A.   Chapter 12.

10   Q.   Okay.  Thank you.  And then we'll get a copy

11   of that and return the original book to you.

12        Okay.  Now, you've also -- the other

13   material other than the case-specific materials, the

14   other material -- materials you've brought with you

15   have all been cited either in your report or in your

16   Reliance List; correct?

17   A.   That's correct.

18   Q.   Okay.  Great.  Now the last thing I'm going

19   to do --

20        MR. SNELL:  Peter, one thing --

21        MR. DE LA CERDA:  Yes.

22        MR. SNELL:  -- for clarification.  I had

23   mentioned I thought the ACOG physician statement

24   from 2011 on transvaginal POP mesh was in.  It's

Jaime Sepulveda, M.D.

```
 1          on his materials list.  For some reason these

 2          don't have page numbers, but it's under "other

 3          materials."

 4               MR. DE LA CERDA:  Okay.

 5               MR. SNELL:  I put a check next to it.

 6               MR. DE LA CERDA:  Okay.  Great.  All right.

 7          Q.   (By Mr. De La Cerda)  Now, the last bit of

 8    materials that you brought with you are various

 9    thumb drives.  What are these thumb drives?

10          A.   These are the thumb drives that have the

11    articles that you see in these binders.

12          Q.   Oh, I see.  Okay.  So actually, it would be

13    nice to go ahead and mark these.  So we have four

14    different thumb drives.  Each of these thumb drives is

15    actually labeled with a product, as well.  So there is

16    Sepulveda TVT - TVT-O, Sepulveda TVT-S, Sepulveda

17    Prolift, and then there's another Sepulveda TVT-S, I

18    don't know if that's just a repeat, but I'll mark each

19    of these with its own sticker.  We're on 6.

20               So I'm marking as Exhibit 7 to your

21    deposition the thumb drive that has Sepulveda TVT and

22    TVT-O and this thumb drive contains reliance materials

23    and materials cited in your report; correct?

24          A.   Yes.
```

Jaime Sepulveda, M.D.

```
1              (Plaintiff's Exhibit No. 7 was marked for

2        identification.)

3        Q    (By Mr. De La Cerda)  Then I'm marking as

4   Exhibit 8, Sepulveda TVT-S, and these are also

5   documents referenced in your Reliance List and your

6   report relating to TVT-S; correct?

7        A.   Yes.

8              (Plaintiff's Exhibit No. 8 was marked for

9        identification.)

10       Q    (By Mr. De La Cerda)  Then I'm marking as

11  Exhibit 9 to your deposition the thumb drive that

12  has -- that's marked Sepulveda Prolift, and these

13  are materials referenced in your Reliance List and

14  your report for Prolift; correct?

15       A.   Yes.

16             (Plaintiff's Exhibit No. 9 was marked for

17       identification.)

18             MR. DE LA CERDA:  Do you know why there is a

19       second TVT-S one?

20             MR. SNELL:  I have no idea.

21             MR. DE LA CERDA:  I'll just mark it as

22       another one.

23             MR. SNELL:  Somebody might have just made

24       two copies.  I can open it up and look at it real
```

Jaime Sepulveda, M.D.

```
 1     quick.

 2          MR. DE LA CERDA:  I'll just mark it.

 3          Then I'm also marking as Exhibit 10 to your

 4     deposition a second thumb drive labeled

 5     "Sepulveda TVT-S," which I assume is also

 6     reliance materials and documents referenced

 7     within your report; correct?

 8     A.   Yes.

 9          (Plaintiff's Exhibit No. 10 was marked for

10     identification.)

11          MR. DE LA CERDA:  Case-specific, they can

12     deal with that.

13          THE WITNESS:  I need to -- to -- I did not

14     remember seeing the Bianchi-Ferraro --

15          THE COURT REPORTER:  I'm sorry, the --

16          THE WITNESS:  I do not remember seeing the

17     Bianchi-Ferraro paper on TVT-Secur and TVT-O.

18          MR. SNELL:  Is it in this pile?

19          THE WITNESS:  I want to double-check that

20     because I --

21          MR. SNELL:  Bianchi-Ferraro?

22          THE WITNESS:  Bianchi-Ferraro, which I

23     referred to in the Garcia deposition.

24          MR. SNELL:  Okay.  This is other literature.
```

Jaime Sepulveda, M.D.

1         You want to give that to him.  That's additional.

2             THE WITNESS:  Additional.

3             MR. DE LA CERDA:  Oh, okay.  All right.  I'm

4        also marking as Exhibit 11 medical literature

5        that you've handed to me.

6             (Plaintiff's Exhibit No. 11 was marked for

7        identification.)

8        Q    (By Mr. De La Cerda)  What is this medical

9    literature?

10       A.   That is -- this is medical literature about

11   the -- one case report of clear cell carcinoma of the

12   vagina and there's -- in a patient that has had a

13   midurethral sling.  This is the response to that

14   article.

15       Q.   (By Mr. De La Cerda)  Okay.  So this is

16   all within Exhibit 11.  So the second article within

17   Exhibit 11 is?

18       A.   The response to this article.

19       Q.   Okay.  And the third article within

20   Exhibit 11?

21       A.   This is vaginal -- these are different

22   papers, but they're not directly related to this one.

23       Q.   That's okay.  So these are all -- I guess

24   just to make sure just for purposes of the record,

Jaime Sepulveda, M.D.

1    Exhibit 11 contains additional medical literature that

2    you're relying on for your opinions; is that right?

3        A.   Yes.

4        Q.   Okay.  We'll just leave it at that and then,

5    of course, if you need to refer to any of it during

6    your deposition --

7        A.   And this is the paper that I was just

8    referring about the Bianchi-Ferraro on TVT-O and

9    TVT-S.

10           MR. DE LA CERDA:  Okay.  So I'll mark this

11       one separately as Exhibit 12.

12           MR. SNELL:  Is that one in your report, do

13       you know?

14           THE WITNESS:  No, but I refer to it on the

15       Garcia deposition.

16           (Plaintiff's Exhibit No. 12 was marked for

17       identification.)

18           MR. DE LA CERDA:  For purposes of the

19       record, Exhibit 12 is a article entitled

20       "Randomized controlled trial comparing TVT-O and

21       TVT-S for the treatment of stress urinary

22       incontinence:  2-year results."

23           Is it okay if I clip --

24       A.   Yes.

Jaime Sepulveda, M.D.

1    Q.   (By Mr. De La Cerda)  Just for now, and

2    then if you need to look at them, of course.

3    A.   And I gave you a copy of my CV --

4    Q.   Yes.

5    A.   -- without my home address.

6    Q.   Okay.  I've got one here and if you like, I

7    can use this one for the record.

8    A.   Yes, I just made it available to you in

9    case ...

10             MR. SNELL:  Is that the same thing?

11             THE WITNESS:  Yes, that's the one.  The

12        Bianchi-Ferraro has been referred already on

13        this.

14             MR. SNELL:  Footnote 117.

15    Q.   (By Mr. De La Cerda)  Okay.  What I'm

16    going to do is I'm going to mark as Exhibit 13 to

17    your deposition your CV.

18             (Plaintiff's Exhibit No. 13 was marked for

19        identification.)

20    Q   (By Mr. De La Cerda)  So I'm marking as

21    Exhibit 13, that's your -- is that your current

22    curriculum vitae?

23    A.   Yes.

24    Q.   And is that, to the best of your knowledge,

Jaime Sepulveda, M.D.

```
 1   current?

 2        A.   It is -- it is current.

 3        Q.   Okay.  Anything else -- anything on it that

 4   you know of that needs to be updated, corrected,

 5   edited, anything like that?

 6        A.   On my report that I'm the principal

 7   investigator at the Fibroid Registry research project,

 8   that project was completed and closed.

 9        Q.   Okay.  And is that the only thing on your CV

10   that you know of that would need to be corrected?

11        A.   It was the only research project that was

12   open.

13             (Plaintiff's Exhibit No. 14 was marked for

14        identification.)

15        Q.   (By Mr. De La Cerda)  Okay.  I'm also

16   marking as Exhibit 14 to your deposition your

17   Reliance List for the general report.

18             This is what I've received as your Reliance

19   List.  Does that appear to be a true and correct copy

20   of it?

21             MR. SNELL:  Is this Exhibit 14?

22             MR. DE LA CERDA:  Yeah.

23        A.   I don't see any discrepancies overall in

24   this list from what I have here.
```

Jaime Sepulveda, M.D.

```
1        Q.    (By Mr. De La Cerda)   Okay.  Great.  Now

2   I'm going to show you what I've marked as Exhibit 15

3   to your deposition.

4              (Plaintiff's Exhibit No. 15 was marked for

5        identification.)

6        Q.    (By Mr. De La Cerda)  Does this appear to

7   be a true and correct copy of your expert report,

8   your general expert report, on Gynemesh, Prolift and

9   Prosima?

10       A.    This is accurate and correct.

11             (Plaintiff's Exhibit No. 16 was marked for

12       identification.)

13       Q    (By Mr. De La Cerda)  Okay.  And now I'm

14   showing you what I've marked as Exhibit 16 to your

15   deposition.  Does this appear to be a true and

16   correct copy of your general expert report on TVT

17   and TVT-O?

18       A.    It is a correct copy.

19             MR. DE LA CERDA:  We've been going now for

20       about an hour.  Are you okay to continue or do

21       you want to take a break?

22             THE WITNESS:  Let's take a bladder break and

23       we'll come back in five.

24             MR. DE LA CERDA:  Sounds good.
```

Jaime Sepulveda, M.D.

```
 1              (Thereupon, a recess was taken from

 2         9:24 a.m. until 9:26 a.m., after which the

 3         following proceedings were held:)

 4         Q.   (By Mr. De La Cerda)  All right.  Doctor,

 5    we're back on the record.

 6              When -- when was it that you were first

 7    contacted regarding the general opinions that you have

 8    as to these products that we're here today for?

 9         A.   For -- for the -- for the MDL, around

10    September.  We spoke around September.

11         Q.   September --

12         A.   Last year.

13         Q.   -- of last year, 2015?

14         A.   Yes.

15         Q.   And do you recall who you talked to first?

16         A.   I -- I spoke to Burt.

17         Q.   Okay.  And was the topic discussed that you

18    would be providing general opinions as to these

19    specific products: TVT, TVT-O, Prosima, Prolift and

20    Gynemesh?

21         A.   That's correct.

22         Q.   And what was the scope of your assignment

23    for this particular -- for your opinions in this case,

24    to your understanding?
```

Jaime Sepulveda, M.D.

```
 1        A.   Yes, I understand the scope is to -- to

 2   review the literature and -- and go over things that I

 3   have read for -- throughout the years.

 4        Q.   Were there certain things that you were to

 5   focus on within the context of your opinions?

 6        A.   The --

 7             THE COURT REPORTER:  I'm sorry, did you --

 8             MR. SNELL:  Objection, form.  I just say

 9        "form," but that means objection, form.  I try to

10        cut down your typing on the record.

11        A.   The randomized controlled trials concentrate

12   in the evidence.

13        Q.   (By Mr. De La Cerda)  What about internal

14   documents, was there any focus that you were to

15   place on the substance or the significance of

16   Ethicon's internal documents in forming your

17   opinions?

18        A.   No.  It's -- I have received -- just to be

19   accurate in my response, I received, probably a year

20   ago, internal documents, but not as part of this.

21        Q.   Okay.  So your focus really was and your

22   opinions here was to provide those opinions based on

23   literature as opposed to what was found in the

24   internal documents; is that fair?
```

Jaime Sepulveda, M.D.

```
 1                MR. SNELL:  Form.
 2        A.   Based on the -- on the evidence, on the
 3   scientific evidence.
 4        Q.   (By Mr. De La Cerda)  As opposed to the
 5   internal documents; right?
 6        A.   The internal documents are not -- are not
 7   included on -- on this review or -- because it's a
 8   scientific review.
 9        Q.   I guess you haven't completed all -- well,
10   let me just ask.
11                Have you completed all of your work on this
12   case?
13        A.   Yes.  So far from my Reliance List and this
14   is -- this is the product.
15        Q.   Do you currently have any further work
16   planned?
17        A.   As -- as information may be required,
18   I'll -- I'll review the papers, I'll review scientific
19   literature, and everything that is coming up.
20        Q.   So -- but as far as anything specific
21   planned, is there any additional -- is there any
22   additional task that you have planned?  Other than,
23   you know, tomorrow we have depositions for the
24   case-specific, but other than the depositions coming
```

Jaime Sepulveda, M.D.

```
 1    up tomorrow, are there any specific tasks that you

 2    have planned relating to your opinions in this case?

 3        A.   No, this is -- this is my -- my product.

 4             MR. SNELL:  I'll make a note for the record.

 5        As plaintiff's experts' depositions are coming

 6        in, I know there are still depositions going on

 7        today, tomorrow, we'll send those to him, and if

 8        he has commentary or his opinions are changed,

 9        then, obviously, I'll let you know.

10        Q.   (By Mr. De La Cerda)  How much have you

11    billed thus far for your general opinions involving

12    TVT, TVT-O, Prosima, Prolift and Gynemesh?

13        A.   I have -- I have copies of the invoices that

14    I have submitted.

15             Is it okay if he has other -- other hours

16    from another case, or should I just say the number of

17    hours?

18             MR. SNELL:  Let me see what you're talking

19        about.  The invoices -- let me look at them real

20        quick.

21             MR. DE LA CERDA:  Do you want to go off the

22        record for a second?  Let's go off the record.

23             (Discussion held off the record.)

24             (Mr. Sparks entered the room.)
```

Jaime Sepulveda, M.D.

```
1         A.   I can make copies again of it, but I did

2    prepare your invoices.  My invoices to -- I put it in

3    a folder, they were neatly organized, the hours.  I --

4    I just cannot find it, honestly cannot find it.

5         Q.   (By Mr. De La Cerda)  Okay.  So what we'll

6    do is when you do find it, you'll agree to provide

7    that to us?

8         A.   Absolutely.

9         Q.   Okay.  And so --

10             MR. SNELL:  Why don't we save an exhibit

11         number on the record, and I'll produce that, but

12         I think he probably has a good idea as to how

13         many hours he spent.

14             MR. DE LA CERDA:  Okay.  So what I'm going

15         to do is, I'm reserving Exhibit 17 for the

16         invoices that Dr. Sepulveda has prepared

17         reflecting his work and his opinions for this

18         case.

19             (Plaintiff's Exhibit No. 17 was marked for

20         identification.)

21         Q.   (By Mr. De La Cerda)  First of all, do you

22    have an idea of approximately how many hours you've

23    spent preparing your opinions?

24         A.   It's -- an approximate is about 120 hours.
```

Jaime Sepulveda, M.D.

1      Q.   And your report mentions that you bill at

2  $500 an hour; right?

3      A.   Yes.

4      Q.   And so was it -- was that rate the same for

5  all 120 hours that you performed --

6      A.   Yes.

7      Q.   And was -- do you know whether your invoice,

8  did it break down the tasks that you were performing,

9  did it break it down by product?

10      A.   No, it's all MDL.

11      Q.   Okay.  Was it broken down by, for example,

12  reviewing documents, meeting -- meetings with defense

13  counsel, deposition time?  Was it broken down in any

14  way like that?

15      A.   No, it's just for MDL, all the time that

16  I've spent in putting -- putting together -- putting

17  the reports together, putting -- for all the different

18  products all into one MDL.

19      Q.   Okay.  So one block bill of 120 hours --

20      A.   Right.

21      Q.   -- approximately?

22      A.   That's correct.  Around -- approximately.

23      Q.   Okay.  Now, the types of tasks you would

24  perform in developing your opinions, what did those

Jaime Sepulveda, M.D.

1    include?

2        A.   I have to write the report, I have to

3    proofread -- proofread it, and I update it with the --

4    with the Reliance List.  I -- I do research and

5    whatever papers I -- I find that are relevant, I just

6    submit it and it gets added to the Reliance List.

7        Q.   Okay.

8        A.   I also -- I review the case specifics and

9    that included seven -- seven cases in which -- in

10   which depositions and medical records and summaries

11   were reviewed.

12       Q.   Okay.

13       A.   And then the time, getting together, getting

14   prepared for this.

15       Q.   Anything else that you can think of?

16       A.   That would be at a later time because we got

17   ready yesterday and the time today.

18       Q.   Let's talk a little about what you just

19   mentioned.  Does the 120 -- approximately 120 hours

20   that you mentioned, does that include all of your work

21   for the case-specific?

22       A.   Yes.

23       Q.   Okay.  Do you know approximately how much

24   you spent -- how much time you spent as to each

Jaime Sepulveda, M.D.

1  case-specific report that you prepared?

2      A.   I -- I probably spend about, just -- just a

3  rough, rough estimate, it's ten hours per each one,

4  each one of them.

5      Q.   And do you know how many case-specific

6  reports you prepared?

7      A.   Seven.

8      Q.   Seven.  Okay.  I know these are rough

9  numbers here, but so seven case-specific reports at

10  about ten hours a piece, it's about 70 hours.  So the

11  balance, the rest of that, would that be dedicated

12  towards your general opinions as to the products

13  involved here?

14      A.   Yes.

15      Q.   Okay.  And you mentioned preparation for

16  your deposition.  When is it that you prepared for

17  your deposition today?

18      A.   Yesterday.

19      Q.   And how long did you prepare?

20      A.   We -- we spend eight, ten hours.

21      Q.   And that's eight to ten hours that you spent

22  with Burt Snell?

23      A.   Yes.

24      Q.   Counsel for Ethicon; right?

Jaime Sepulveda, M.D.

1      A.    Yes.

2      Q.    Anybody else?

3      A.    No.

4      Q.    In your deposition preparation, you reviewed

5   documents; is that right?

6      A.    Yes.

7      Q.    Okay.  Are those the documents that we have

8   here that we've marked today?

9      A.    Yes.

10      Q.    Okay.

11      A.    And -- yeah, all this has been marked.

12      Q.    Do you have any rough estimate of how much

13   more you anticipate billing before trial?

14      A.    I -- I don't know when it's going to trial.

15   It's -- as they -- as they require, I just -- I'll

16   just review.

17      Q.    Okay.  Have you ever rendered an opinion in

18   litigation that was adverse to Johnson & Johnson or

19   Ethicon, Inc.?

20      A.    No.

21      Q.    Did you take any notes while you were doing

22   your preparation for your opinions?

23      A.    I -- I'm a better highlighter than note

24   taker.

Jaime Sepulveda, M.D.

1       Q.   Okay.  I can never read my own notes, so I

2   don't -- I don't even take notes.

3            Okay.  So you don't have any handwritten

4   notes regarding your opinions; is that right?

5       A.   No, not on this.

6       Q.   You mentioned the Reliance List.  Was the

7   Reliance List originally prepared and provided to you

8   by Ethicon counsel?

9       A.   It -- it was given by counsel, but I can

10  tell you that most of that Reliance List is trials

11  that are relevant enough that I have read it over

12  time.

13      Q.   Okay.  So then as you performed your own

14  research and found additional articles, you would then

15  submit them to Ethicon's counsel and then they would

16  get added to the Reliance List; is that right?

17      A.   Right.  That's -- whatever I want to add up,

18  I just submit.

19      Q.   And that Reliance List is exhaustive other

20  than a few of the articles that we've identified

21  today, is that right, that have been marked?

22      A.   Right, that's -- this is what includes it.

23      Q.   Does your Reliance --

24           MR. SNELL:  Could I make -- let me just make

Jaime Sepulveda, M.D.

```
1        a note on the record.  He did bring another thumb

2        drive with a lot of Ethicon documents and

3        materials that he had in his possession and,

4        obviously, those would go and make up part and

5        parcel of his knowledge base as well.

6               MR. DE LA CERDA:  I'm glad you brought that

7        up because I forgot to mark this thumb drive.

8               THE WITNESS:  Can you just take a look

9        because I want to make sure I brought the right

10       thumb drive.

11              MR. SNELL:  Okay.

12              THE WITNESS:  I just dump it and I really

13       never review it.

14              I'm seeing one of the slides have the name

15       of a patient.

16              MR. SNELL:  How do we deal with that?

17       because it looks like an image.

18              THE WITNESS:  It's an image, yeah, it has a

19       name of a patient.

20              MR. SNELL:  It has to be redacted.

21              THE WITNESS:  Yeah.

22              MR. SNELL:  Why don't we take it off the

23       thumb drive and we can figure out how to redact

24       it.
```

Jaime Sepulveda, M.D.

1          So Peter, just for your reference, we're

2     looking at the thumb drive Dr. Sepulveda brought.

3     There is a PowerPoint titled "Pillowing,

4     P-i-l-l-o-w-i-n-g, .ppxt, and it's got patient

5     identification information, so we'll take that

6     off the thumb drive and figure out how to redact

7     that.  It looks like it's images.  I can't even

8     read the name, but obviously once you open up the

9     file in realtime you can see it.

10          MR. DE LA CERDA:  Okay.  So for purposes of

11     the record, we're going to reserve --

12          Did we already reserve 17?

13          THE COURT REPORTER:  Yes, for --

14          MR. SNELL:  I think 17 was invoices.

15          MR. DE LA CERDA:  Okay.  So for purposes of

16     the record, we're going to reserve Exhibit No. 18

17     for a thumb drive that Dr. Sepulveda has brought

18     here today.

19     Q    (By Mr. De La Cerda)  And, for the record,

20     Dr. Sepulveda, can you tell us, generally speaking,

21     what is on the thumb drive that will be marked as

22     Exhibit 18?

23     A.    It -- it has the presentations that I have

24     used for Prolift throughout the years, and it has the

Jaime Sepulveda, M.D.

1   presentation on Gynemesh, and it has the surgical

2   videos, and it has pictures of surgery that I have

3   included in those presentations.

4          MR. SNELL:  Did you mention this product?

5          THE WITNESS:  TVT-Secur.

6     Q.   (By Mr. De La Cerda)  And, apparently,

7   there are patient-identifying information on that

8   thumb drive and so that information is going to be

9   redacted and then the thumb drive will be provided

10  at a later date; correct?

11    A.   There is one slide that has the patient ID.

12         MR. SNELL:  What I was going to do is take

13         the file titled "Pillowing" with the

14         patient-protected information off the thumb

15         drive, put it on my local computer, and figure

16         out some time today if this law firm can redact

17         that.

18         MR. DE LA CERDA:  That would be perfect.

19         MR. SNELL:  But you'll have -- I mean, but

20         we'll mark the thumb drive, because I want a copy

21         of it, too.

22         MR. DE LA CERDA:  Okay.

23         MR. SNELL:  I'm just looking for -- is that

24         your data?

Jaime Sepulveda, M.D.

```
 1              THE WITNESS:  Yes, that's my own data.

 2              MR. SNELL:  Tell him about that.

 3         A.   I also included data of my own

 4    complications.

 5         Q.   (By Mr. De La Cerda)  Let's discuss them.

 6    Actually, you know what, we'll come to that shortly.

 7              MR. SNELL:  Is that the same as the earlier

 8         stuff without the patient identifying --

 9              THE WITNESS:  No, that's -- I put all the

10         files that have to do with it, so I had the files

11         that I use to prepare the presentation, and I

12         have the actual file slides with the

13         presentation.

14              MR. SNELL:  Did you mention this product?

15              THE WITNESS:  That's TVT-Secur.

16              MR. SNELL:  This one?

17              THE WITNESS:  And there's another

18         presentation on TVT-O.

19              MR. SNELL:  Okay.  Let me pull that one off.

20         Q.   (By Mr. De La Cerda)  Okay.  And we'll

21    come back to the data on your own complications,

22    too.  We'll discuss that in a moment.

23              Okay.  Directing your attention back to

24    Exhibit 16 -- oh, wait.  Is this report -- in
```

Jaime Sepulveda, M.D.

1  Exhibit 16 is your general report on TVT and TVT-O;

2  correct?

3      A.   That's correct.

4      Q.   Is this report a complete statement of all

5  general opinions that you'll express as to the TVT and

6  the TVT-O and the reasons for those opinions?

7      A.   That report includes that, up to -- up to

8  today.

9      Q.   So up to today, that report is a complete

10  statement of all general opinions you'll express as to

11  the TVT and TVT-O and the reasons for those opinions;

12  correct?

13          MR. SNELL:  Form.

14          Go ahead.

15      A.   That's correct.

16      Q.   (By Mr. De La Cerda)  Does this report,

17  your Reliance List, and the materials you've brought

18  today include all facts or data considered by you as

19  of today in forming your general opinions about the

20  TVT and the TVT-O?

21      A.   Yes.

22          MR. SNELL:  I took the one file off so you

23      can go ahead and mark that.

24          MR. DE LA CERDA:  All right.  So I am, for

Jaime Sepulveda, M.D.

1          the record, marking the thumb drive that we've

2          just discussed that Dr. Sepulveda brought as

3          Exhibit 18.

4               (Plaintiff's Exhibit No. 18 was marked for

5          identification.)

6          Q.   (By Mr. De La Cerda)  Okay.  Now, Doctor,

7     directing your attention to Exhibit 15 and that's

8     your report on the Gynemesh, Prolift and Prosima;

9     correct?

10         A.   Yes.

11         Q.   Now, is this report a complete statement of

12    all general opinions you will express as to the

13    Gynemesh, Prolift, and Prosima and the reasons for

14    those opinions as of today?

15         A.   Yes.

16         Q.   And does this report, your Reliance List,

17    and the materials you brought today include all facts

18    or data considered by you in forming your general

19    opinions about the TVT and the TVT-O as of today?

20         A.   Yes.

21         Q.   Okay.  Let's talk a little bit about your

22    practice.  Where do you currently have privileges?

23         A.   At South Miami Hospital, Baptist Hospital,

24    and South Miami Medical Arts Surgery Center.

Jaime Sepulveda, M.D.

1      Q.   And do you currently perform surgeries to

2  correct stress urinary incontinence?

3      A.   Yes.

4      Q.   Now let's focus over the last ten years.

5           Over the last ten years, what surgeries have

6  you performed to correct stress urinary incontinence?

7      A.   I have performed Burch procedures, TVT,

8  retropubic, and transobturator inside-out.

9      Q.   Is that TVT-O?

10     A.   That's correct, that's TVT-O.

11          And TVT-Secur, TVT-ABBREVO.

12     Q.   Okay.  Any others that you can recall

13  sitting here today?

14     A.   I -- I recall doing 50 outside-in slings.

15     Q.   Fifty outside-in slings.

16     A.   Slings.

17     Q.   Okay.  Do you recall the brand of those?

18     A.   That was from AMS.

19     Q.   AMS.  Is that the Monarc?

20     A.   Monarc.

21     Q.   You mentioned that you performed Burch as a

22  surgery to correct stress urinary incontinence.  What

23  to you would be an indication to perform a Burch as

24  opposed to a synthetic midurethral sling?

Jaime Sepulveda, M.D.

1        A.    I perform Burches rarely and I cannot -- I

2    cannot really remember off my head my last Burch.

3        Q.    Why do you perform them rarely?

4        A.    Because midurethral synthetic slings work

5    very well.

6        Q.    Performing a synthetic midurethral sling,

7    it's a quicker procedure than a Burch; right?

8        A.    It's just more than -- than quicker.  It

9    performs -- short term and a long term, it performs

10   better than a Burch and it's -- that has been -- has

11   been my experience and that's what's supported by

12   data.

13       Q.    Okay.  So -- but are there any indications

14   to you -- when a patient comes into your office and

15   you're going to perform a surgery to correct the

16   stress urinary incontinence, what indications do you

17   say, I'm going to perform a Burch instead of a

18   synthetic midurethral sling?

19       A.    My first option is a synthetic midurethral

20   sling and I counsel the patients on it.  There may --

21   I may have a patient that may say I want a Burch for

22   one or other reason.

23       Q.    Okay.  So it's the patient making the

24   decision that they prefer a Burch over a synthetic

Jaime Sepulveda, M.D.

1    midurethral sling as opposed to you recommending the

2    Burch as the first option?

3         A.   My patients are -- I have a well-educated

4    practice and they -- they actually may -- may bring

5    great questions about one or the other.  My experience

6    is that they will follow my -- my recommendations.

7         Q.   Right.  Do you recall any instance where

8    you've recommended a Burch over a synthetic

9    midurethral sling?

10        A.   There -- there was a time about when TVT

11   came in and for one or two years that we spoke in

12   those terms, but once randomized controlled trials

13   came in, it was -- I tell them that that's

14   basically -- is the best evidence that I have.

15        Q.   Your understanding was that at least at one

16   time the Burch was the gold standard for correcting

17   stress urinary incontinence surgically; correct?

18        A.   I -- I'm going to take exception to the

19   "gold standard" term, but there was a time in which

20   the Burch was the correct clinical -- clinical

21   practice.

22        Q.   Would you use the gold standard term to

23   describe a synthetic midurethral sling?

24        A.   I -- I just try to shy away from "gold

Jaime Sepulveda, M.D.

1    standard."  I think that clinically, it's -- the

2    current clinical standard is probably a better -- a

3    better term.

4        Q.   So a current clinical standard is a better

5    term to use than the term "gold standard"; right?

6        A.   I -- I agree.

7        Q.   Did you -- in the last ten years, have you

8    ever used slings using biologic materials?

9        A.   I -- I don't know if it's within the last

10   ten years, but I -- I have used slings using

11   autologous, I have done slings using dermis cadaver

12   material.  I may have used them one time posing, but

13   this is so -- so remote that -- that I cannot tell you

14   how many or which brand did I use.

15       Q.   Do you remember any reasons why you would

16   have used those biologic slings?

17       A.   If I had some- -- if I had someone that --

18   that was -- the person that comes to mind is my -- the

19   last pubovaginal sling and it was a smoker with --

20   with bad pressures in the urethra and I used the

21   pubovaginal sling in that patient at that time.

22       Q.   What do you mean by "bad pressures"?

23       A.   Very, very low pressures in the urethra.

24       Q.   Okay.

Jaime Sepulveda, M.D.

1      A.    It took very little for her to leak.

2      Q.    Okay.  And so why would it be that you would

3   use a biologic sling under those circumstances?

4      A.    I use actually her own fascia and it -- it

5   was -- we didn't have anything -- anything -- we have

6   things that were synthetic but that were not

7   well-studied at that time.

8      Q.    So this would have been, I assume, in either

9   the late '90s or early 2000s?

10     A.    That's a wide range, yes.

11     Q.    Okay.  You mentioned TVT Retropubic, TVT-O,

12  TVT-S, and TVT-ABBREVO that you performed in the last

13  ten years.

14           Do you know approximately how many of each

15  of those you performed?

16     A.    I -- I counted about -- at one time it was

17  about 300 slings a year.

18     Q.    Okay.  And do you know what the breakdown

19  was of those 300 per year as to the TVT Retropubic,

20  TVT-O, TVT-S, and TVT-ABBREVO?

21     A.    It was an evolution from TVT Retropubic to

22  TVT-O and to TVT-Secur and then ABBREVO.

23     Q.    Okay.  So over -- over time, you might --

24  you know, you started with a TVT Retropubic, then

Jaime Sepulveda, M.D.

1   you -- then you preferred the TVT-O, so you would

2   switch to that; is that right?

3        A.   Yes.

4        Q.   And then you would prefer the TVT-S and you

5   would switch to that?

6        A.   Yes.

7        Q.   And then later you preferred the TVT-ABBREVO

8   and switched to that; is that right?

9        A.   Right.

10       Q.   Do you still perform TVT-Os, though, or do

11   you just kind of stick with the TVT-ABBREVO?

12       A.   I do it at the surgery center so we choose

13   one.  And since I do most of the slings, and I'm the

14   medical director for the surgery center, I decide I'm

15   going to use this or that one.  We still have TVT-O on

16   the shelf, but we -- we use TVT -- TVT-ABBREVO.

17       Q.   Okay.  Why would you prefer a TVT-ABBREVO

18   over a TVT-O?

19            MR. SNELL:  Form.

20       A.   I have not found a scientific -- a

21   scientific reason for it except for the fact that --

22   that it's the most recent product and it's -- it's a

23   12-centimeter sling instead of a longer sling.

24       Q.   (By Mr. De La Cerda)  What's the

Jaime Sepulveda, M.D.

1  significance of it being a shorter sling as opposed

2  to a longer sling?

3      A.   It's -- I decided that if I can do it with

4  12 centimeters, I'm not going to use 19 centimeters

5  when the evidence is good in my practice.

6      Q.   Is -- you agree with the general theory that

7  less foreign body is better when it comes to these

8  types of procedures?

9          MR. SNELL:   Form.

10     A.   No, I think that there are physicians that

11  have a level of comfort with TVT-O or, for that sake,

12  with TVT Retropubic, and that being with a

13  5-millimeter needle, a 3-millimeter needle.

14         Each physician has his own level of comfort

15  and they're going to use what works well for them.  I

16  have not found any scientific evidence that points out

17  to one being better than the other based on that.

18     Q.   (By Mr. De La Cerda)  What about the

19  general -- do you agree with the general

20  proposition, though, that more foreign body will

21  cause more foreign body reaction within the human

22  body?

23         MR. SNELL:   Objection, asked and answered.

24     A.   It assumes -- it assumes that there's -- the

Jaime Sepulveda, M.D.

1  term "foreign body" probably is the same -- in the

2  same area as "gold standard."  They're -- they're very

3  wide, very unscientific.  They -- in terms of the

4  material that you leave in the area, if a physician

5  would come and ask me, "Do you think I should do this

6  because it leaves less material," I could not tell him

7  with certainty, "Yes, you definitely need to move from

8  one to the other."  I have no evidence to support

9  that.

10      Q.  (By Mr. De La Cerda)  And so, ultimately,

11  you switched to the TVT-ABBREVO just because of your

12  personal experience with it?

13      A.  It's easier -- easier to keep on the shelf,

14  the TVT-ABBREVO.  If -- I guess, right now, if there

15  would be -- there would be only TVT-O, I would be

16  perfectly comfortable with it.

17      Q.  Okay.  Do you know whether TVT-ABBREVO comes

18  in laser cut or mechanically cut?

19      A.  Laser -- it comes in laser cut.

20      Q.  TVT-ABBREVO is only laser cut; right?

21      A.  Right.

22      Q.  Do you know whether the Burch procedure is

23  still taught in medical school?

24      A.  I don't know.

Jaime Sepulveda, M.D.

1    Q.   Is the Burch procedure within the standard

2    of care?

3    A.   I think that for a physician that wants to

4    do Burch procedures, that may apply.

5    Q.   You wouldn't criticize another doctor for

6    doing a Burch procedure over a synthetic midurethral

7    sling; right?

8    A.   I would not be -- be critical.  I can share

9    it, the evidence, but there's -- there's no reason for

10   being critical over the Burch procedure.

11   Q.   Are pubovaginal slings using native tissue

12   still taught in medical school, to your knowledge?

13   A.   No, I don't think they are taught -- I

14   probably don't know, but I don't think they are.

15   Q.   And if a physician performed a pubovaginal

16   sling using native tissue, would you criticize him or

17   her for doing that?

18   A.   That's -- I have to say that's an excellent

19   question because it's -- it probably is the procedure

20   that would prompt me to say, "Listen, you need to

21   reevaluate on how you're taking care of these

22   patients," because that can be a morbid procedure.

23   Q.   So that one is a little more borderline for

24   you?

Jaime Sepulveda, M.D.

1    A.   Yes.

2    Q.   Yeah.

3    A.   And I can -- I can do that well -- I want to

4    think that I can do it well because I did it well at

5    one time, it's just that it's -- in terms of morbidity

6    and seroma and wound complications and obstruction,

7    it's -- it's a different -- different surgery.

8    Q.   Would you consider it to be within the

9    standard of care or no?

10   A.   I -- I think that in certain areas, probably

11   if that's -- we go to areas where they don't have what

12   we have, that could be considered standard of care.

13   Q.   You've never done a study to determine what

14   percentage of medical schools are teaching Burch or

15   pubovaginal slings using native tissue; right?

16   A.   No, I don't know that.

17   Q.   In your career, how many revision or

18   excision surgeries involving synthetic midurethral

19   slings have you performed?

20   A.   I -- I think I have done three.  I may have

21   done more than that.  Just in my mind it's -- it's

22   infrequent enough that I actually -- one of the

23   presentations on the thumb drive is me excising a

24   sling, the pictures.  That's how infrequent it is.

Jaime Sepulveda, M.D.

1      Q.   So to -- I'm sorry, I didn't want to cut you

2  off.

3      A.   So I actually consent to the patient and I

4  said, "This is unusual."  I consent to the patient to

5  have it removed.

6      Q.   Okay.  So to your recollection, you've done

7  three revision or excision surgeries involving

8  synthetic midurethral slings?

9      A.   I don't want to come into a fault -- faulty

10  memory, but I can recall about three.

11      Q.   Okay.  Of those three, how many were you

12  able to remove the entire sling?

13           MR. SNELL:  Form.

14      A.   On the -- it's probably two of them, the

15  entire -- the entire sling being up -- up to the

16  descending pubic ramus in that area.  I remove the

17  entirety of it.

18      Q.   (By Mr. De La Cerda)  And so that was --

19  that's the portion that is actually under the

20  urethra but not the portion that goes into the pubic

21  ramus; is that right?

22      A.   The portion that gets about -- to about

23  1 centimeter from the obturator internus muscle.

24      Q.   Okay.

Jaime Sepulveda, M.D.

1    A.   So anything that is beyond the obturator

2    internus muscle, I -- I stay away from that.

3    Q.   Is that because the risk outweighs the

4    benefit of removing that mesh that's beyond the

5    obturator internus muscle?

6    A.   It's -- there are three factors to it.

7    Q.   Okay.

8    A.   The first one is that the orientation of the

9    tape is very misleading to the surgeon.  It comes

10   forward to you and many surgeons, if they're

11   inexperienced, they'll keep digging into the area and

12   cause harm to the lateral side.  That's one -- one of

13   the other reasons.

14        The second reason is that I haven't found

15   any -- anything convincing, and I keep looking for

16   anything that has been written about excising that --

17   that portion of the -- of the tape.

18        And number three is that most of the time,

19   2, 3 percent of the time that we're going to revise a

20   sling for avoiding this function, it makes no -- no --

21   there's no justification, I should say, there's no

22   justification to go beyond that area.

23   Q.   Okay.

24   A.   Beyond the area within the obturator

Jaime Sepulveda, M.D.

1   internus muscle.

2       Q.   And of these three revisionary excisions --

3   let me first clarify.

4            Are the three revision or excision

5   surgeries, are they all three excision surgeries or

6   revision or both?  How would you characterize them?

7       A.   They are excisions.  I was speaking about

8   removing the whole thing.

9       Q.   So those three were excision surgeries.

10           Were those three patients, patients you had

11  implanted the sling or someone else?

12      A.   I had one that I implanted the sling and two

13  that came from -- came referred to me.

14      Q.   Okay.  So to your recollection, and you've

15  implanted 300 synthetic midurethral slings for the

16  last -- per year for approximately the last ten years;

17  right?

18      A.   Lately, they're -- the number of slings is

19  less.

20      Q.   Okay.  So would a fair estimation be that

21  somewhere between 2- and 3,000 synthetic midurethral

22  slings is what you've implanted?

23      A.   Yes.

24      Q.   Okay.  In the last ten years; right?

1      A.   Yeah, over the last ten years, yeah, that
2  would be accurate.
3      Q.   And of those 2- to 3,000 synthetic
4  midurethral slings, your testimony is that you've only
5  excised one of -- you've only, personally, excised one
6  of the slings that you've put in; is that right?
7      A.   Yes.  That I remember, one.  I may -- may
8  have taken a segment or a fiber from another sling
9  that I might have placed.  I haven't kept track of it
10  because the reality is that it's extremely rare.  I'm
11  going to tell you, what happens most of the time is
12  you put the sling, the patient comes in, she's dry,
13  she's happy, she moves on.
14      Q.   What were the reasons why you performed the
15  three excision surgeries that you can recall?
16      A.   One of them was -- was just a tight sling on
17  the patient.  A young patient with a tight sling and
18  she was having difficulty urinating.
19           I recall one -- another one was someone with
20  a sling that was not a mid-urethra, it was higher.
21  The sling was placed higher than the urethra and it
22  wasn't working and I took that one and put one in the
23  urethra.
24      Q.   Any other reason that you can recall?

Jaime Sepulveda, M.D.

1    A.   No.  I had -- I had one that came in because

2    she had -- she had pain on the area of the insertion

3    of the sling.

4    Q.   Okay.  So you had one with pain -- have you

5    ever removed a synthetic midurethral sling because of

6    an erosion?

7    A.   Yes, I have.  I have removed that erosion

8    and I actually had one that I didn't put in -- put in

9    those three.  Now I recall one that she broke the

10   incision and when I saw the patient coming on the

11   third week, on the third week, I asked her, "How is it

12   working?"  She said, "Well, it's working."

13        And I examine her and she -- she had an

14   exposure on the -- on the sling.  She was honest --

15   honest enough to tell me, "Doctor, I was at home

16   eating, I was choking on food and I threw myself over

17   a chair and I felt -- I felt something."  So she broke

18   the incision line, and I saw it and I said, "Okay,

19   well, I'll -- I recommend that you have this removed."

20   Q.   So is that the -- is your testimony that's

21   the only exposure -- or that circumstance you just

22   mentioned, is that the only exposure where erosion of

23   a synthetic midurethral slings that you had to treat?

24   A.   No, I had a couple of exposures in the -- in

Jaime Sepulveda, M.D.

1    the past, but it's something that either you give

2    estrogen or you just take the fibers with a tenotomy

3    scissors, which are using in reconstructive surgery,

4    actually they're used in the eye and they have --

5    they're just perfect for this.

6         Q.   I guess my crude understanding of that is

7    it's like an in-office trimming of the exposed mesh;

8    is that right?

9         A.   It's -- you may have a few segments.   In

10   other words, you have not seen the whole incision open

11   up.

12        Q.   Okay.

13        A.   And I -- I do remember a long time ago I saw

14   a patient with a segment on one side.   That's the only

15   one I remember that the exposure was not in the

16   midline on the incision.   And that patient, I tried to

17   convince her to let me take it and she said, "No,

18   you're not going to take anything because it's not

19   bothering me."

20        Q.   So these are -- these are done -- this

21   procedure you just mentioned, this trimming of the

22   sling is done in-office, not under general anesthesia

23   in surgery; right?

24        A.   Right.

Jaime Sepulveda, M.D.

1    Q.   Have you ever performed an excision surgery

2    or revision surgery because the patient was suffering

3    from dyspareunia?

4         MR. SNELL:   Form.

5    A.   I -- I did one, same one that was having --

6    Q.   (By Mr. De La Cerda)   Pain?

7    A.   -- the pain, yeah.

8    Q.   Got it.   Okay.

9         All right.   The TVTs and the TVT-Os that

10   you've placed, those have involved -- or have been

11   mesh that is mechanically cut mesh and mesh that is

12   laser cut mesh; right?

13   A.   Both.

14   Q.   Did that have anything to do with the time

15   period in which you were implanting it or do you

16   just -- did you stock both or what did that have to

17   do -- any factors that that had to do with?

18   A.   No, I did not have any specific reason to

19   choose one over the other.

20   Q.   Okay.   Over the last ten years you performed

21   surgeries to correct pelvic organ prolapse; right?

22   A.   Yes.

23   Q.   What types of surgeries have you performed?

24   A.   I have performed anterior repairs, posterior

Jaime Sepulveda, M.D.

1    repairs, enterocele repairs, iliococcygeal suspension,

2    sacral spinous ligamentous suspension, abdominal

3    sacrocolpopexies, robotic sacrocolpopexies, Prolift,

4    graft reinforced repair with biologicals, augmented

5    repairs with Gynemesh, perineoplasty.

6           I think I have mentioned probably all of

7    them.

8       Q.   The anterior and posterior repairs, did

9    those include colporrhaphies?

10      A.   Yes.

11      Q.   Are those synonymous or --

12      A.   Pretty much, yes.

13      Q.   Okay.  Now, all the repairs that you just

14   mentioned, those are all within the standard of care;

15   right?

16      A.   Yes.

17      Q.   Is implanting transvaginal mesh -- strike

18   that.

19           Is implanting synthetic polypropylene mesh

20   transvaginally still within the standard of care?

21           MR. SNELL:  Form.

22      A.   It's still within the standard of care if it

23   will have the product available.

24      Q.   (By Mr. De La Cerda)  As of now, from the

Jaime Sepulveda, M.D.

1    Ethicon products, Gynemesh is still available;

2    right?

3        A.   Gynemesh is still available.

4        Q.   And do you -- is it your opinion that it's

5    still within the standard of care to implant Gynemesh

6    transvaginally for the treatment of pelvic organ

7    prolapse?

8        A.   I believe it changed, the actual indication

9    or clearance.  I may have read that.

10       Q.   So the indication now is to use it for

11   abdominal sacrocolpopexies; right?

12       A.   Yes.

13       Q.   So is it within the standard of care,

14   though, to implant Gynemesh -- I'm talking about

15   today -- so is it as of today within the standard of

16   care to implant Gynemesh transvaginally for the

17   treatment of pelvic organ prolapse?

18       A.   Not -- not today.

19       Q.   Okay.

20       A.   Based on what I just stated.

21       Q.   Okay.  What was -- what was for you an

22   indication in the past to implant synthetic mesh

23   transvaginally for the treatment of pelvic organ

24   prolapse as opposed to doing one of the other non-mesh

Jaime Sepulveda, M.D.

1    procedures that you've mentioned?

2        A.   I -- I came to the clinical appreciation

3    that patients that have had a hysterectomy, patients

4    that have had recurrent prolapse, patients that had a

5    high degree of exertion, and patients that have a

6    recurrent compartment or a contralateral compartment

7    defect, those patients benefit from it.

8             I -- that's the general.  I knew that I had

9    patients that have -- I had one shot to take to the

10   operating room and I -- for whatever reason, and those

11   are the most difficult ones because they were more

12   complicated, but on the other side, you wanted to give

13   her the durability of the repair.

14            That's -- that's in general what I -- what I

15   use when I counsel someone on the -- on the use of

16   this synthetic graft.  We started -- we started

17   reading then, around the time that we had Gynemesh,

18   more and more about durability and the repairs,

19   specifically for those apical -- apical defects, so it

20   became very attractive to treat patients on the

21   apical, with apical defects, and when we didn't have

22   to do an incision.

23       Q.   Have you ever performed revision or excision

24   surgeries involving synthetic polypropylene

Jaime Sepulveda, M.D.

1    transvaginal mesh for pelvic organ prolapse?

2         A.   Yes, I have.

3         Q.   And how many have you done of that?

4         A.   I look at those and they may be in the -- in

5    the 10, 20, may be right -- right there based on what

6    I saw the last time.

7         Q.   So approximately 10 to 20 in your career

8    revision or excision surgeries involving synthetic

9    polypropylene transvaginal mesh?

10        A.   That's -- that's a ballpark figure, yes.

11   That's a very general figure.

12        Q.   And of those 10 to 20, how many were you

13   able to remove the entire mesh device?

14             MR. SNELL:   Form, foundation.

15        A.   In most of them -- most of them you can

16   dissect the space -- the same space where you place it

17   and you can -- you can remove it.  It's -- if you have

18   it in the muscle, obviously that's -- I already stated

19   that there is no benefit of doing that.  But if you

20   dissect that area, you bring it up and you

21   hydrodissect your segments, you're -- you can remove

22   most of it.

23        Q.   (By Mr. De La Cerda)  Have you ever

24   performed a revision or excision surgery because the

Jaime Sepulveda, M.D.

1    patient was reporting pain and this is, again, I'm

2    talking about patients with transvaginal mesh for

3    pelvic organ prolapse?

4         A.   You know, pain -- pain is rare after this

5    kind of repair.  What most frequently happen is that

6    you would get in to have -- to remove an exposure, and

7    then you end up -- you ended up removing more than

8    what you thought you were going to remove because you

9    had the plane and you were just dissecting the area

10   and remove it.  Then you ended up reinforcing the area

11   with sutures.

12        There are times in which I -- I -- I say I

13   have to do something to support it and it becomes such

14   a subjective thing that I wish I could have explained

15   this not now, but even when doctors would ask me the

16   same questions and -- and be accurate and precise

17   about it, but no, it's a general -- it's a general

18   idea.  What I'm explaining now is a general idea of

19   what happens in the operating room when you're going

20   to remove it.  So you start small, but you start

21   extending yourself on the dissection.

22        Q.   So of the 10 to 20, though, how many of

23   those did you remove for the reason of that they

24   had -- they were experiencing pain?

Jaime Sepulveda, M.D.

1       A.   It's -- I think it's rare.  I can't give you

2  a specific number without -- okay, I want to be

3  accurate and precise, but it was rare.  The most

4  recurring reason was an exposure.

5       Q.   Okay.  And did they report exposure with

6  pain or no?

7       A.   No.  No.  They -- most frequent complaint

8  with the exposure was vaginal discharge.

9       Q.   So were the 10 to 20 excision surgeries,

10  were those primarily because of exposures?

11       A.   It's -- it's -- mostly exposure and

12  symptomatic exposures, exposures in which you saw

13  granulation tissue.

14       Q.   Of granulation tissue, okay.

15            Were any of the excision procedures

16  performed specifically because of dyspareunia?

17       A.   No, I don't remember anyone specific on

18  dyspareunia.  I remember taking one Prolift that was

19  dyspareunia and pain.

20       Q.   Have you ever -- have you ever had a patient

21  come to you reporting dyspareunia or pain after having

22  had a transvaginal mesh or pelvic organ prolapse where

23  you believed it was the transvaginal mesh causing the

24  pain or dyspareunia?

Jaime Sepulveda, M.D.

```
1        A.   No.  Most of the patients that we see with
2   dyspareunia, in a busy vaginal surgery practice, is
3   without mesh.
4        Q.   So you've never had that happen where you
5   believed the dyspareunia was being caused by the
6   transvaginal mesh; right?
7        A.   By -- specifically by transvaginal mesh, no.
8        Q.   Same question for the -- I don't know if I
9   asked you for the slings, but have you ever had a
10  patient come to you reporting pelvic pain or
11  dyspareunia after having had a synthetic midurethral
12  sling where you believed that it was the sling causing
13  that pain or dyspareunia?
14       A.   No, I -- I saw one sling that was low enough
15  that I -- it could -- that could have been the source
16  of dyspareunia.
17       Q.   Okay.  And I guess really you're thinking
18  it's more the positioning of the sling as opposed to
19  the actual sling; right?
20       A.   Yes.
21       Q.   Okay.  How many Gynemesh PS's have you
22  implanted in your practice, in your career?
23       A.   Over a hundred.
24       Q.   And how many Prolifts have you implanted in
```

Jaime Sepulveda, M.D.

1   your career?

2       A.   Definitely more than 100.

3       Q.   Between 100 and 200?

4       A.   Easily.

5       Q.   How many Prosimas have you implanted in your

6   career?

7       A.   I did about 50.

8       Q.   Okay.  Turning -- we've now been going

9   another hour.  Would you like to take a break?

10      A.   Yes, just quick as before.

11           (Thereupon, a recess was taken from

12           10:21 a.m. until 10:29 a.m., after which the

13           following proceedings were held:)

14      Q.   (By Mr. De La Cerda)  Okay.  We are back

15   on the record.

16           Doctor, I wanted to direct your attention

17   back to your CV, please, which is Exhibit 13.  Just a

18   couple quick things.  If you'll turn to the fourth

19   page, the section which is "Courses Presented."

20      A.   Yes.

21      Q.   The entities that I've seen -- well, the

22   entities that are mentioned within this section where

23   you've presented a course, the only entities I've seen

24   mentioned are Johnson & Johnson, Ethicon Endo and

Jaime Sepulveda, M.D.

1    Ethicon.

2              Are there any other entities mentioned here

3    or no?

4         A.   No, I never worked outside of Ethicon for

5    any another company.

6         Q.   Then under "Research Experience," which is,

7    I guess, a couple pages later, is there -- do you have

8    listed here any research on transvaginal polypropylene

9    midurethral slings or transvaginal polypropylene

10   pelvic organ prolapse mesh?

11        A.   No, I did not do research on transvaginal

12   sling.  I rely on the randomized control trials.

13        Q.   And then under "Presentations and

14   Publications as Author or Coauthor," I didn't see any

15   presentations or publications that involve

16   transvaginal polypropylene midurethral slings or

17   transvaginal polypropylene mesh for pelvic organ

18   prolapse; is that right?

19        A.   Yes, I did not -- I did not publish on

20   transvaginal slings.

21        Q.   We can set that aside for a second.

22             Okay.  You're not a biomedical engineer;

23   correct?

24        A.   I -- I have a very good understanding of

Jaime Sepulveda, M.D.

1   biomedical engineering.

2       Q.   Okay.  Would you consider yourself a

3   biomedical engineer?

4       A.   I do not get compensated for doing

5   biomedical engineering.

6       Q.   Okay.

7       A.   And I did not graduate from -- with a degree

8   of biomedical engineering.  I do -- I do understand

9   biomedical engineering well.

10      Q.   I saw that you brought some books here that

11  would relate to that, I believe.  What is it that

12  would provide the basis for your belief that you have

13  expertise in biomedical engineering?

14      A.   I have devoted years to understand it, to

15  read about it beyond what any other physician that I

16  ever met have done.

17      Q.   Anything else?

18      A.   I have studied, I have spoken to biomedical

19  engineers, but specifically it's a passion and a

20  dedication that I have had to understand it.

21      Q.   Would you consider yourself an expert on the

22  design of medical devices?

23      A.   It goes right along with the biomedical

24  engineering, with the surgical expertise that allows

Jaime Sepulveda, M.D.

1   me to see what -- what can save in terms of efficiency

2   in the operating room, what can I do better for my

3   patients.  That's what I use this for.  This allows me

4   to understand the design better.

5        Q.   Have you ever, personally, designed a

6   medical device?

7        A.   I -- not -- not a medical device, but I have

8   my own set of needles that I actually had made.

9        Q.   What were those needles for?

10       A.   For -- to approach the deep space in the

11  pelvis.

12       Q.   Were those used in connection with

13  implanting mesh at all?

14       A.   No, I use them for sutures.

15       Q.   Okay.  Have you ever been involved in the

16  design of a medical device?

17       A.   I -- I did give input to the design.  It was

18  not -- it was not my own patent.

19       Q.   And what device was that?

20       A.   Staplers for -- for -- staplers, a

21  retractor, again, a circumferential needle.

22       Q.   And these are all devices that are used in

23  connection with surgery?

24       A.   Yes.

Jaime Sepulveda, M.D.

1    Q.   Were you ever designed -- were you ever

2  involved in the design of any transvaginal mesh

3  devices?

4    A.   Not in the devices of the ones that I use.

5    Q.   Do you have any patents on medical devices?

6    A.   No.

7    Q.   Do you know what the standard is for a --

8  that a manufacturer must follow in designing mesh

9  products?

10   A.   I'm -- I became very familiarized with --

11 when I was with Ethicon by my own inquiries.

12   Q.   What standards did Ethicon employ in the

13 design of its mesh products?

14   A.   It's -- it was from the initiation, from

15 what they had an idea of what the device was, what the

16 need was, and then there were -- I know there was a

17 structure for research and development with the

18 running of different -- different trials at different

19 levels.  And I get that information and submit it,

20 along with other information that I was -- in which --

21 that had nothing to do with surgery, but cytotoxicity,

22 paragenicity assays, cell cultures assays, and all

23 this information submitted to the FDA, who would then

24 review it and -- and within its own division for the

Jaime Sepulveda, M.D.

1    device and then get back to them.

2         Q.   Do you know what a manufacturer researches

3    before a product is designed or released?

4              MR. SNELL:  Form, overbroad.

5         A.   The --

6         Q.   (By Mr. De La Cerda)  Let's take it a

7    little more specific to the mesh products.

8              What did -- what, to your knowledge, did

9    Ethicon research in regard to its mesh products before

10   they were released?

11        A.   I know that they -- they went through their

12   suture -- suture research and -- and I know that they

13   did experiments short term and long term with sutures.

14             I know that there was an opinion acquired

15   from the field on the use of different sutures.  Then

16   there was a -- there was a use on the type of mesh

17   that was used for prolapse on the different types of

18   meshes.  That wasn't done in the United States, that

19   was done in France.

20             And there was also -- the materials were

21   even evaluated in the same -- in the same way that

22   sutures are evaluated, but also in the operating room.

23   I'm aware of that one, too.

24             I'm aware that the needles and the approach

Jaime Sepulveda, M.D.

```
 1   that was used was evaluated by them before it was even
 2   used in the United States.  And I know the packaging,
 3   the packaging was evaluated.  I was able to see how
 4   they design the package for the operating room.
 5            So all those lines never got to the place
 6   where they actually do the knitting of the material,
 7   never -- never got to see that, but I know there was a
 8   facility for that.
 9            So there was a step of -- actually quite an
10   elaborate chain that ended up giving the product.
11       Q.   Do you know what types of experts were
12   involved in the design of Ethicon's mesh products?
13       A.   I spoke to materials engineers.  I actually
14   enjoy very much when I interacted with one of the
15   biomechanical engineers over there that had a doctor's
16   degree on biomaterials and I actually -- and I enjoyed
17   that.  I look at different -- they asked me for
18   different types of materials.  We look at -- they got
19   my input on fibers.
20            I know that there was another group in
21   France that was using those materials.  One thing that
22   I observed is that it would not just go with just one
23   opinion, it was a consensus of different surgeons and
24   different -- different settings.
```

Jaime Sepulveda, M.D.

1      Q.   Do you remember the names of any of the

2  folks that you interacted with on those issues?

3      A.   I can't -- I can't remember because it's

4  over -- over five years and, you know, it's -- it

5  wasn't a friendship that would continue beyond that.

6  It was a work relationship.

7      Q.   Do you know what a "design history file" is?

8      A.   No.

9      Q.   Are you familiar with industry standards

10  that govern medical device design?

11      A.   I read at one time, I read that.  I read

12  about ISO testing.  I read about ISO testing.  I read

13  about the different toxicity assays and, actually, at

14  one time I even may have read about the testing that

15  was done for -- for meshes that was using sutures,

16  i.e., I actually research it and read about it.

17      Q.   Anything else that you can recall?

18      A.   No.

19      Q.   I'm sorry, is that --

20      A.   I'm sorry.  Not at this moment.

21      Q.   Are you familiar with regulatory standards

22  that govern medical devices?

23      A.   I became -- I became aware of the regulatory

24  standards.  I knew about the classifications of

Jaime Sepulveda, M.D.

1    devices.  I had an idea of the classification of the

2    devices and I had an idea, because I use other types

3    of -- of devices that have nothing to do with mesh.

4        Q.   What's your understanding of the

5    classifications of devices?

6        A.   I knew that heart -- heart monitors and

7    nerve stimulators and intermittent nerve stimulator

8    had a different classification than our meshes had and

9    that surgical instruments would have and that sutures

10   would have.  You can -- you can just open -- you go to

11   the operating room and get into one of the boxes of

12   the sutures and you can pull that paper that gives all

13   these different things about the sutures.  So it's --

14   I knew I had -- I had an idea of the different -- at

15   least three classifications that were used.

16       Q.   Some requiring testing before they go out on

17   the market, some perhaps not; right?

18            MR. SNELL:  Form.

19       A.   Some methods -- some methods did require

20   different type -- different types of testing,

21   different -- each one had different requirements.

22       Q.   (By Mr. De La Cerda)  Do you know how

23   pelvic organ prolapse, transvaginal synthetic

24   polypropylene mesh is currently classified?

Jaime Sepulveda, M.D.

```
 1        A.   It's -- I read, recently, the classification

 2    for prolapse meshes and for -- they went up to

 3    Class 3.

 4        Q.   And what does that mean to your

 5    understanding?

 6        A.   They are classified as high-risk devices.

 7        Q.   Do you agree with that?

 8        A.   I -- I'll -- I agree with the approval that

 9    the FDA has and I'm not going to challenge the FDA or

10    their panel on that one.

11        Q.   Fair enough.  Would you -- are you an expert

12    in polymer chemistry?

13        A.   I -- I don't design polymer chemicals.  I do

14    understand certain -- the polymers that are used in my

15    specialty.

16        Q.   And what polymers would those be?

17        A.   When it comes down to polymers used in my

18    specialty, it's polypropylene.

19        Q.   Are you an expert in surgical pathology?

20        A.   That -- that's an average over the last 25

21    years, I do look at slides.

22        Q.   And that would -- that would be the basis

23    for you stating that you had expertise in surgical

24    pathology; is that right?
```

Jaime Sepulveda, M.D.

1        A.   I think that everyone that is a surgeon

2   needs to have an expertise in surgical pathology.

3        Q.   Okay.  So that would be your basis for

4   saying that; right?

5        A.   That's correct.

6        Q.   I didn't ask you this.  What would be your

7   basis for saying you have expertise in polymer

8   chemistry, is it your experience?

9        A.   My experience and what I read, the time that

10   I devote, the time that I have devoted over the years

11   to look at sutures and specifically polypropylene.

12        Q.   Have you ever personally done chemical tests

13   to determine if polypropylene mesh degrades?

14        A.   I have not personally done -- done that

15   testing.  I did -- I did -- I have -- I read about it

16   and have considered that hypothesis.

17        Q.   Have you ever done a microscopic analysis of

18   explanted polypropylene mesh to determine if the mesh

19   degraded personally?

20        A.   Not -- not with the purpose of degradation

21   because I still -- I still looking for what -- what

22   does degradation really mean in the pathology

23   specimen.

24        Q.   Okay.  I'm going to shift gears a little

Jaime Sepulveda, M.D.

1    bit.

2            Would it be fair to say that before a

3    physician decides to utilize a transvaginal

4    polypropylene mesh or sling to treat a patient, that

5    it's necessary for the physician to warn the patient

6    of all known side effects of the product, including

7    severe ones?

8            MR. SNELL:  Objection, form, speculation.

9        A.   I think that before any -- any surgery,

10   there has to be -- there has to be a full

11   understanding of the -- as part of the informed

12   consent.  And when -- when that's happening, there --

13   there are factors that are going to play into it.

14           Yes, ideally, we should be able to clear our

15   patients and get -- get a full understanding of it.

16   There are times in which the patient cannot understand

17   it and we have to find, as physicians and surgeons, a

18   way to get them through the most relevance.  But that

19   including -- includes surgery with or without mesh.

20       Q.   (By Mr. De La Cerda)  Okay.  So do you

21   think that all the known side effects, including

22   severe ones, should be disclosed to patients?

23           MR. SNELL:  Same objection, form.

24       A.   It's all known -- not only side effects, but

Jaime Sepulveda, M.D.

1    essentially what -- what could happen that is within

2    my control that is -- and what's not in my control and

3    patients appreciate that we do that.

4         Q.   (By Mr. De La Cerda)  A physician should

5    warn his patient -- his or her patient of

6    characteristics of the transvaginal mesh or sling

7    product that can significantly increase their risk

8    of severe complications; correct?

9              MR. SNELL:  Form, foundation.

10        A.   On that counseling, the counseling should

11   involve what has been tested.  In other words, the

12   last thing that you want as a patient is to be

13   overwhelmed by just a wealth of data that is not

14   clinically relevant, and we -- we have studies that

15   actually address that.

16        Q.   (By Mr. De La Cerda)  So I think we might

17   be getting to something there.  If -- if a

18   characteristic of a transvaginal mesh or sling

19   product is clinically relevant, should that be

20   disclosed to a patient during the informed consent

21   process?

22             MR. SNELL:  Same objection, foundation.

23        A.   The informed consent addresses that.

24        Q.   (By Mr. De La Cerda)  So is that a "yes"?

Jaime Sepulveda, M.D.

```
 1        A.   That would be in general a yes within --

 2   within the parameters of that conversation between the

 3   physician and the -- and the patient.  So it would be

 4   a yes with a condition that with knowing that that's

 5   very unique.  That's a very unique interaction.

 6        Q.   Okay.  Do you agree that a physician has a

 7   duty to inform his or her patients of the material

 8   risks associated with a transvaginal mesh or sling

 9   product before it's implanted in the patient?

10             MR. SNELL:  Form, foundation, overbroad.

11        A.   I -- I -- my opinion is that the patient

12   should be informed not only of -- of the mesh, but

13   if -- if surgery is being done with sutures, the

14   patient should know that, too.

15        Q.   (By Mr. De La Cerda)  I mean, what I'm

16   trying to do is use different terms for the risks or

17   complications and in this one I'm using material

18   risks associated with transvaginal mesh or sling

19   product.  Do you think that material risks should be

20   disclosed to the patient?

21             MR. SNELL:  Same objection, vague,

22        immaterial.

23        A.   Just to clarify, are you talking about the

24   material or the material risk?
```

Jaime Sepulveda, M.D.

1      Q.   (By Mr. De La Cerda)  That's a good

2   question.

3           Material, that term I'm using -- because

4   there's different ways that we've seen risks and

5   complications associated with mesh products described

6   by physicians.  Sometimes they describe those risks as

7   material risks, not as the material polypropylene, but

8   as being relevant risks.

9      A.   Oh.

10     Q.   They're using that word.

11     A.   I understand.

12     Q.   That's a good question.  Some doctors have

13  used the term "material risk, "Yeah, I disclose it if

14  it was a material risk."

15          Now with that explanation, do you believe

16  that material risks associated with these products

17  should be disclosed during the informed consent

18  process?

19          MR. SNELL:  Same objection.

20     A.   The material risk associated with the whole

21  extent of the procedure should be -- should be

22  disclosed.

23     Q.   (By Mr. De La Cerda)  Okay.  You mentioned

24  the term "clinically relevant."  Is that the same

Jaime Sepulveda, M.D.

 1    thing as clinically significant?

 2        A.   Um, clinically relevant is statistically

 3    significant.

 4        Q.   Could you explain what that means, what your

 5    understanding is of that?

 6        A.   It's -- with the best level of evidence that

 7    we have for what we're doing, explain to the patient

 8    this is -- we're going to translate it from the

 9    statistically significant to what's common and what's

10    relevant in the surgery.

11        Q.   Okay.  I'm going to try and ask this

12    properly.

13             Do you agree that a physician should warn

14    his or her patients of risks or complications

15    associated with the transvaginal mesh or sling

16    products that are clinically relevant or statistically

17    significant?

18             MR. SNELL:  Form.

19        A.   For the whole extent of the procedure.

20        Q.   (By Mr. De La Cerda)  Including the

21    products, though; right?

22        A.   Including the products.

23        Q.   Okay.  Now, the purpose of warning a patient

24    during the informed consent process is to allow that

Jaime Sepulveda, M.D.

1  patient to make a determination of whether she wants

2  to undergo the surgery; right?

3      A.   It's -- patients are going -- are going to

4  eventually follow your -- the -- the doctor, the

5  doctor's advice.  But the reason why you do the

6  informed consent is, more than the patient deciding,

7  which many times they -- they cannot decide, it's to

8  empower that patient with the information of this is

9  what I use for my decision, the decision that I

10  recommended to you.

11      Q.   Okay.  Ultimately, though, it is -- the

12  patient has the right to decide one way or another

13  what they want to do; right?

14          MR. SNELL:  Form, overbroad.

15      A.   Patient -- patients may -- may ask more

16  questions or may -- say "I will have a preference,"

17  but in 25 years seeing patients, patients will tell --

18  will ask you, "Doctor, tell me what you -- you think

19  is the best way of doing it and tell me why and how

20  you come to that decision."

21      Q.   (By Mr. De La Cerda)  Okay.  So have you

22  ever had a patient say, after being consented or

23  receiving informed consent, saying, "No, I don't

24  want to have that procedure," as to mesh?

Jaime Sepulveda, M.D.

1      A.   No, I -- I have not had that experience.

2      Q.   Do you agree it's important for the

3  physician to have as much information about the risks

4  associated with transvaginal mesh or sling product so

5  that the physician can make an informed decision on

6  whether to recommend those products?

7      A.   I think it's important that the physician

8  gets accurate and makes a reasonable effort to get

9  better on what they use and what they do every single

10 day.

11     Q.   Including the information that they are

12 going to communicate to the patient; right?

13     A.   It's especially if you're going to

14 communicate to the patient and -- especially when it

15 has to do with you making a clinical decision.

16     Q.   Do you agree that physicians rely on a

17 transvaginal mesh manufacturer to provide them with

18 information about the risks and complications

19 associated with their transvaginal mesh products?

20          MR. SNELL:  Objection, overbroad and

21          requires speculation.

22     A.   I can't -- I cannot think for all the

23 physicians, but I -- I can tell you that their

24 responsibility is within ourselves before we use any

Jaime Sepulveda, M.D.

1    product.

2        Q.   (By Mr. De La Cerda)  Do you agree the

3    transvaginal mesh manufacturers are at least one

4    source of information that a physician can rely on

5    in obtaining information about their risks and

6    complications of transvaginal mesh products?

7             MR. SNELL:  Objection, speculation.

8        A.   It might be at the low end of the -- of the

9    evidence that we gather.

10       Q.   (By Mr. De La Cerda)  You're not saying

11   that a physician shouldn't rely on information from

12   a transvaginal mesh manufacturer about the risks and

13   complications of those products; right?

14            MR. SNELL:  Form, overbroad.

15       A.   I think that a physician needs to rely on

16   the best evidence, best clinical evidence, not just in

17   any sort of marketing communication or sales

18   communication.  They need to know that the decision to

19   do surgery is a scientific process and they need to

20   read that.

21       Q.   (By Mr. De La Cerda)  If -- but certainly

22   if a transvaginal mesh manufacturer is providing a

23   serious warning about its products, even if that

24   warning hasn't played out in the scientific

Jaime Sepulveda, M.D.

1    literature, I mean, that's still something that

2    needs to be considered; right?

3            MR. SNELL:  Form, overbroad.

4        A.   There's a degree of information that you

5    need to consider.  You -- you have -- you're a doctor

6    and you have the scientific information because that

7    allows you to analyze information better.  So in that

8    regard, what we're going to see is information that is

9    relevant because they're at the highest level of

10   evidence, information that is less relevant because

11   they are the lowest one, but there's a -- there's a

12   hierarchy -- did I say that word okay? -- there is a

13   hierarchy of information and we're going to go for the

14   highest one.

15       Q.   (By Mr. De La Cerda)  Okay.  Let's take a

16   silly example for a second.  If the manufacturer of

17   transvaginal mesh knows that there's a

18   one-in-a-million chance that it explodes inside a

19   human body, but that is never played out in the

20   RCTs, never, ever been seen by anyone other than the

21   manufacturer, does that information need to be put

22   out to the public and told to physicians?

23           MR. SNELL:  Objection.  I'm going to have to

24       object, incomplete, purely speculative,

Jaime Sepulveda, M.D.

1      hypothetical.

2           Q.   (By Mr. De La Cerda)   The answer is of

3      course; right?

4                MR. SNELL:   I don't know about that.   I

5           mean, that's the doctor's answer, but my

6           objection is incomplete hypothetical, purely

7           speculative.

8                Go ahead.

9           A.   The explosion thing is a little out there.

10     It's -- we have not seen any devices that actually

11     explode for prolapse or incontinence.   I don't know

12     for the other ones.

13               The point I'm trying to come across is, to

14     answer your question, when we look at information, we

15     look at randomized control trials.   Now, randomized

16     control trials in cohort studies, even case control

17     studies, you can go down to a list and you're going --

18     the methodology is what allows you to give

19     recommendations and form your counseling.

20          Q.   (By Mr. De La Cerda)   So even if the

21     manufacturer knows of severe life-altering

22     complications associated with its products, if that

23     severe life-altering complication hasn't played out

24     in the randomized control trials, you believe that

Jaime Sepulveda, M.D.

```
1    physicians shouldn't place much weight on that?

2         A.   I think as humans -- as humans, if we see

3    that there is any -- any danger for anyone, for any

4    other human being, we'll just go and say it,

5    regardless of who we work for.  And at the end it's

6    not a company, it's a group of people working.  So the

7    human -- the human nature is to -- the human thing is

8    to actually do that, and that's our nature.  But

9    that's different from having -- making a clinical

10   decision.

11        Q.   Okay.  So, ultimately, should information

12   like that, if it's known to manufacturer, but it

13   hasn't played out in the randomized control trials,

14   should information like that about severe

15   life-altering complications be communicated to a

16   patient during the informed consent process?

17             MR. SNELL:  Form, asked and answered.

18        A.   What we're going to use to counsel patients

19   is randomized control trials.  And if -- if the

20   question is if the manufacturer should disclose it,

21   I -- I -- my opinion is probably most people would go

22   ahead and disclose it, but in terms of making a

23   clinical decision, we're going to use for the best

24   evidence that we have.
```

Jaime Sepulveda, M.D.

1    Q.   (By Mr. De La Cerda)  And I understand, I

2  definitely understand.  I guess what I'm trying to

3  get at, though, is:  Should that information be

4  communicated to the patient during the informed

5  consent process or not?

6    A.   Only the information that is backed by good

7  science.

8    Q.   Okay.  So the answer is; no, right?

9         MR. SNELL:  Objection, asked and answered.

10   A.   If it's not -- if it's not backed by

11 science, it plays no role in the counseling of a

12 patient.

13   Q.   (By Mr. De La Cerda)  Including if the

14 manufacturer has discovered severe life-altering

15 complications that it knows of, even though it

16 hasn't been played out in the randomized control

17 trials and the medical literature; right?

18   A.   Our counseling --

19        MR. SNELL:  Same objection.

20   A.   Our clinical counseling is evidence-based.

21   Q.   (By Mr. De La Cerda)  Okay.  And evidence

22 from the manufacturer wouldn't necessarily count --

23 well, the finding of a manufacturer as to a severe

24 life-altering complication wouldn't count as

Jaime Sepulveda, M.D.

1    evidence under the framework that you're using;

2    right?

3         A.   The -- the findings, whatever findings, that

4    being from a physician, that being from a patient,

5    that being from -- from a manufacturer or anybody

6    else, a group -- whatever findings needs to be

7    corroborated by evidence, that's why we have studies,

8    that's why we have a well-placed methodology for

9    evidence.

10        Q.   And so the medical -- well, the studies are

11   going to be the foundation of that evidence, not some

12   information from the manufacturer; right?

13        A.   Any -- any -- any radical information, that

14   being of things being too good or too bad need to be

15   evaluated on the light of a randomized control trial,

16   needs to be evaluated on if there is no randomized

17   control trial, needs to be evaluated based on the type

18   of the study that we have and the clinical experience.

19        Q.   Do you consider a permanent injury a severe

20   side effect?

21        A.   A permanent injury is different from a side

22   effect.

23        Q.   Okay.  So what -- so you don't believe that

24   a permanent injury is a severe side effect or they're

Jaime Sepulveda, M.D.

1    just totally different?

2        A.    They're -- there's side effects and there's

3    injuries.

4        Q.    Okay.

5        A.    And the side effect has more to do with what

6    pertains to one particular product and an injury could

7    be from anything that is used in surgery.

8        Q.    Do you consider a permanent injury a severe

9    injury?

10            MR. SNELL:   Form, incomplete hypothetical.

11       A.    I apologize for that.

12            Can you please repeat that?

13            (The requested portion of the record was

14       read back by the reporter.)

15       A.    There could be permanent effects of surgery

16    that are not necessarily severe and severe that are

17    not exactly permanent.

18       Q.    (By Mr. De La Cerda)  Do you consider a

19    risk or complication that requires additional

20    surgeries a severe side effect?

21       A.    Based on the -- on the -- on the evidence on

22    which -- which has a classification is not considered

23    severe, is not considered severe if he needs just to

24    go back to the operating room.

Jaime Sepulveda, M.D.

1      Q.   So that's not severe in your eyes.

2      A.   Yeah.

3      Q.   Do you consider risk or complication that

4    seriously alters a patient's quality of life a severe

5    side effect?

6      A.   It could be -- that side effect could be for

7    improvement of a quality of life, that could be --

8    that's an effect on the side or a side effect, the way

9    we usually recognize it, can be deteriorating to the

10   quality of life.  I will have to look at the specific

11   situation and look at the specific data on it.

12     Q.   Okay.  Let's shift gears.  The content and

13   substance of the professional education sponsored by

14   Ethicon on it's TVT, TVT-O, Gynemesh, Prolift and

15   Prosima did not and does not contradict the content

16   and substance of the IFUs for these products; correct?

17          MR. SNELL:  Form, overbroad.

18     A.   The content of the -- of these programs use

19   the IFU.

20     Q.   (By Mr. De La Cerda)  They don't

21   contradict it; right?

22     A.   No, there is -- there is actually -- in the

23   presentations that you're going to see, they -- they

24   work -- they work together.

Jaime Sepulveda, M.D.

1    Q.   Okay.  Now, I figured the most efficient way

2    to do this, because now we'll get into the substance

3    of the various issues that you've opined on, there are

4    many of these issues that can be grouped together as

5    to all the products and I think that will be the

6    fastest way to get through it, so that's what I'm

7    going to do.

8         So, for example, I'm about to ask you about

9    the IFU.  I'm going to ask you about -- these are

10   general questions about the IFUs of the TVT, TVT-O,

11   Gynemesh, Prolift and Prosima. I think we can do it

12   all at once.

13   A.   Yes.

14   Q.   First of all, are you familiar with the

15   contents of the various versions of the IFUs for the

16   TVT, TVT-O, Gynemesh, Prolift and Prosima?

17   A.   I'm aware that they're -- they have changed

18   in 2015.

19   Q.   And you're generally aware of the contents,

20   right, of those -- of those various IFUs?

21   A.   Yes, there are IFUs that actually might be

22   able to tell you separate steps.

23   Q.   Okay.  Do you intend to offer an opinion as

24   to whether the warnings in the IFUs for the TVT,

Jaime Sepulveda, M.D.

1    TVT-O, Gynemesh, Prolift and Prosima were sufficient

2    to apprize doctors of the risks of those products?

3         A.   Yes, I will -- I will give an opinion on

4    that.

5         Q.   And your opinion will be that they were

6    sufficient warnings; right?

7         A.   Yes, that will be my opinion.

8         Q.   Do you know what standards Ethicon applied

9    in terms of what needed to be included in the warnings

10   in the IFUs for the TVT, TVT-O, Gynemesh, Prolift and

11   Prosima?

12        A.   That's the standards apply?

13        Q.   Yes.

14        A.   I'm aware of certain standards that were

15   used for the IFU.

16        Q.   Okay.  And what were those?

17        A.   The area on side effects, on warnings,

18   procedure steps, and the specifics on informing about

19   the need for specialized training to perform these

20   procedures.

21        Q.   Do you know what -- do you know whether

22   there's any -- are there specific, like, written

23   standards, though, that you're aware of that Ethicon

24   used in deciding exactly what warnings would go in

Jaime Sepulveda, M.D.

1    there, what adverse reactions would go in there, and

2    what procedure steps would go in there?  Do you know

3    if there's any written standards that Ethicon relied

4    on?

5         A.   I'm -- I'm aware of that.  As for many

6    products, they -- the ones that are disclosed are the

7    ones that are specific to that product.

8         Q.   Okay.

9         A.   In other words, they're not comprehensive

10   guides on incontinence or -- or prolapse care.

11        Q.   Okay.  Have you ever, in your career, been

12   involved in writing or preparing an IFU for a medical

13   device?

14        A.   I have not written an IFU.  I read -- I read

15   IFUs through most of my career.

16        Q.   Have you ever studied the question of what

17   risks and complications were known to doctors across

18   the country with various background and levels of

19   experience with regard to the use of the TVT, TVT-O,

20   Gynemesh, Prolift and Prosima?  Did you ever study

21   that question?

22        A.   The risk with mesh were, with these

23   procedures in general, were addressed in a variety of

24   ways.  And those were -- there were communications

Jaime Sepulveda, M.D.

1    from the American College of OB/GYN, there were

2    meetings that -- there were journals, there were so

3    many different -- different venues that we have grown

4    used to read and understand.

5         The IFU, we -- we all expected that it was

6    going to give us one specific set, but the other set

7    on the evidence, we expected that from our -- our

8    scientific data.

9         Q.   So back to the question, though:  Did you

10   ever study -- ever perform a study or ever study or do

11   questionnaires that determine what doctors actually

12   knew about these products, about the risks and

13   complications of those products?  Did you ever perform

14   a study like that?

15        A.   There was -- to my -- to my knowledge,

16   there's no -- not a study that have address -- address

17   it.

18        Q.   And you, personally, haven't done a study

19   either; right?

20        A.   No, I have not done -- done a study.  I have

21   examined forms on evaluation of surgical skills that

22   at one time I use.

23        Q.   Okay.  But on this specific question, you

24   haven't actually performed a specific study looking at

Jaime Sepulveda, M.D.

1   what doctors actually knew about the risks and

2   complications associated with transvaginal mesh

3   products?

4        A.   I have not performed such study.

5        Q.   Do you agree that a surgeon should be able

6   to solely rely on the warnings and description of risk

7   and complications in the IFUs for the TVT, TVT-O,

8   Gynemesh, Prolift and Prosima?

9             MR. SNELL:  Form, incomplete.

10       A.   We -- we don't rely just on the IFU.

11       Q.   (By Mr. De La Cerda)  Do you agree that a

12  surgeon should be able to just rely on the IFU or do

13  you disagree?

14            MR. SNELL:  Same objection, asked and

15       answered.

16       A.   I -- I disagree that a surgeon should be --

17  rely just on the IFU.

18       Q.   (By Mr. De La Cerda)  Should the IFUs for

19  the TVT, TVT-O, Gynemesh, Prolift and Prosima

20  include the frequency, duration and severity of

21  risks associated with those devices?

22            MR. SNELL:  Same objection, lacks

23       foundation.

24       A.   No.  As complete as an IFU could be, as

Jaime Sepulveda, M.D.

1   complete as an IFU may want to be, it would not be

2   able to address all of them.  It may comply with what

3   we expect from the IFU, but it will not be able to

4   address every single -- every single risk that has to

5   do with a surgery that is much more complicated than

6   what an IFU can address.

7        Q.   (By Mr. De La Cerda)  The IFUs for the TVT

8   TVT-O, Gynemesh, Prolift and Prosima should include

9   all known material risks associated with these

10  products; right?

11           MR. SNELL:  Form, asked and answered.

12       A.   It should -- it should include all -- all

13  unknown risks about the material, but not necessarily

14  will address all known material risk.

15       Q.   (By Mr. De La Cerda)  The IFUs for the

16  TVT, TVT-O, Gynemesh, Prolift and Prosima should

17  include all characteristics of these products that

18  can significantly increase the risk of severe

19  complications; right?

20           MR. SNELL:  Object to form, lacks

21           foundation.  This was asked and answered earlier.

22       A.   Is the -- the instructions for use for the

23  device, it addresses one area.  The -- the rest is

24  based on the data.

Jaime Sepulveda, M.D.

1      Q.   (By Mr. De La Cerda)  So is that a no?

2      A.   No, that's not necessarily a no.  Actually,

3  that's -- that's exactly -- the IFU cannot -- cannot

4  be a comprehensive guide.

5      Q.   So what -- what characteristics of these

6  products -- strike that.

7           Do you believe that the IFUs for the TVT,

8  TVT-O, Gynemesh, Prolift and Prosima sufficiently

9  address any characteristics of those products that

10  could significantly increase their risk of severe

11  complication?

12           MR. SNELL:  Objection.

13      A.   As it pertains to the product, yes.

14      Q.   (By Mr. De La Cerda)  The information in

15  the IFUs for the TVT, TVT-O, Gynemesh, Prolift and

16  Prosima should be truthful; correct?

17      A.   Yes.

18      Q.   The information in the IFUs for the TVT,

19  TVT-O, Gynemesh, Prolift and Prosima should be

20  accurate; correct?

21      A.   Yes.

22      Q.   The information in the IFUs for the TVT,

23  TVT-O, Gynemesh, Prolift and Prosima should be

24  complete; correct?

Jaime Sepulveda, M.D.

1          MR. SNELL:  Objection, form.  Prior

2      testimony.

3      A.   It is complete -- it is complete for the

4   product.  That's my -- my opinion.

5      Q.   (By Mr. De La Cerda)  The information in

6   the IFUs for the TVT, TVT-O, Gynemesh, Prolift and

7   Prosima should be fair and balanced about the risks

8   and benefits of these products?

9          MR. SNELL:  Same objection.

10     A.   It -- it should be fair and balanced for

11  what pertains to the product.

12     Q.   (By Mr. De La Cerda)  Once an IFU is out

13  there and -- for physicians to review, if Ethicon

14  learned of a risk or complication that was not

15  previously warned about in the IFU and it was a

16  significant risk or complication in terms of the

17  harm it caused to women, do you know whether or not

18  Ethicon had an obligation to get that information in

19  the IFU?

20         MR. SNELL:  Objection, hypothetical, legal

21     standard.

22     A.   As long as it's evidence-based, yes.

23     Q.   (By Mr. De La Cerda)  Have you compared

24  the differences between the IFUs for the TVT, TVT-O,

Jaime Sepulveda, M.D.

1    Gynemesh, Prolift and Prosima, are you aware of the

2    differences between them?

3        A.   I have -- I have read those -- read those --

4    and I have read them many times and I have use it to

5    explain the procedure.

6        Q.   And so you've seen that over time there's

7    been some updates to the IFUs; right?

8        A.   Yes, I have seen that.

9        Q.   Is there a single long-term randomized

10   control trial for TVT, TVT-O, Gynemesh, Prolift or

11   Prosima with safety as a primary end point?

12       A.   I -- I -- they don't -- they're not all

13   included.  There is a randomized control trial that

14   explains about safety of Gynemesh, there is a

15   randomized control trial that explains for Prolift.

16            For each one of them, there's -- safety have

17   been included.  Not only have those randomized control

18   trials explain about safety, they have -- it has

19   spoken specifically about the percentage and the

20   clinical significance of each one of the

21   complications.

22       Q.   Are any of the studies that you're

23   referencing there, has the primary end point, though,

24   been safety in the study?

Jaime Sepulveda, M.D.

```
 1         A.    The safety -- the safety was evaluated on --

 2   on Gynemesh.

 3         Q.    Do you know what the name of that study was?

 4         A.    Yes, yes.

 5         Q.    There is another one over here too.

 6         A.    Gynemesh.  Gynemesh on the -- okay.  So --

 7   so on the -- to begin with the mesh, we have the

 8   Flood, F-l-o-o-d, paper on the use of Marlex.

 9         Q.    And what does that study show?

10         A.    That's for the anterior colporrhaphy

11   reinforced with Marlex mesh for treatment of

12   cystocele.

13         Q.    Is this one of the studies that shows it has

14   a primary end point of safety?

15         A.    It's not titled "safety," but they -- they

16   conclude on that study that this is safe to use.  And

17   then there's Nicita, Giulia.

18         Q.    How do you spell that?

19         A.    Giulia Nicita, N-i-c-i-t-a.

20         Q.    And what is that study?

21         A.    And it shows exactly applications in terms

22   of they were able to save -- to do it with safety.

23               So to be accurate to the response to your

24   question, there's no study that says safety of
```

Jaime Sepulveda, M.D.

1    Gynemesh on -- or safety of Marlex in the use -- use

2    on -- for cystocele repair.

3            There's -- there are multiple studies -- I

4    can go on with the list -- that cites safety as one of

5    the -- of the things that they study.

6        Q.   So the point of this -- by the way, this is

7    not my question.  I never -- this question, to me,

8    never really gets me anywhere.

9            But the point is that all the studies that

10   have been done on any of these mesh products, the

11   number one end point is, is it effective; right?  Is

12   it effective and then, by the way, was it safe, too?

13           None of these studies is like number one

14   thing safety; right?

15           MR. SNELL:  Objection, overbroad.

16       A.   The -- there's even a better level of

17   evidence that speaks about safety and is when you

18   compare the use of any of these products with what

19   has -- with the -- with the safety profile when you

20   don't use the product.  And that's where the

21   randomized control trial comes into -- into play.

22           The randomized control trials has the

23   capability of evaluating something that I have use

24   without mesh and compare it with something with mesh.

Jaime Sepulveda, M.D.

1    And that has been used -- that has been reported for

2    Gynemesh, it has been reported for Prolift, it has

3    been -- was reported for -- for TVT and TVT-O, and it

4    was so -- so consistently demonstrated that when it

5    came to Prosima, it became a cohort study.

6         Q.   (By Mr. De La Cerda)  Is it -- is it your

7    opinion that the studies show that any time that

8    mesh products have been compared to whatever the

9    alternative was, a non-mesh alternative, that the

10   mesh products have been shown to be safer than the

11   non-mesh alternative?

12        A.   It's -- it has been shown not to have

13   statistically significantly increased in the number of

14   complications or the frequency of these complications.

15        Q.   Right.  But that's a good point.  So it's

16   been shown to be as safe; right?  And really, the

17   differentiating factor is whether it's more effective;

18   is that fair?

19        A.   It has been shown to be as safe and in some

20   situations, it has been shown -- it has shown to be

21   even safer.

22             Take, for example, the use in the initial

23   study of Marcus Carey on mesh, on Prosima, and

24   straight -- and the known use of an implant.

Jaime Sepulveda, M.D.

1          When you compare, you see that the three

2     patients that he had to operate for vaginal stenosis

3     were the ones that did not have a mesh.  So there you

4     have an instance in which there was more complications

5     with -- by not using mesh than by using the mesh.

6          Is that directly related to the mesh?  And

7     that's something that could be addressed with a

8     randomized control trial.

9          When we do sutures, suture repairs, and we

10    call them "native tissue repairs," in a randomized

11    control trial or even when we do a cohort of sutures,

12    we see complications on sutures in 36% of uterosacral

13    ligament suspension, we see suture complications in

14    sacrospinous ligament fixations, and when they're

15    compared with mesh, there is -- there is much less.

16    Q.   So on the issue of whether -- you know, the

17    FDA came out with an opinion about -- they actually

18    described that repairs with pelvic organ prolapse mesh

19    are no more effective and might be more dangerous than

20    the alternative non-mesh repairs; right?

21          MR. SNELL:  Objection to foundation.

22    A.   That -- that was the -- that was an opinion

23    that they came in, in the small panel, analyzing the

24    data, I don't know, for two, three days, but that's

Jaime Sepulveda, M.D.

```
 1   not -- I don't know for how many days they analyze it.

 2   I don't even know what papers they consider.

 3            But the preponderance of the evidence in the

 4   randomized control trial is that it's not more

 5   dangerous.

 6       Q.   (By Mr. De La Cerda)  Okay.  So on that

 7   particular -- I'm sorry.

 8       A.   I apologize.  I'll just turn it off.

 9       Q.   So on that particular issue, you disagree

10   with the FDA; right?

11            MR. SNELL:  Form, foundation.

12            I think that's misleading because there's

13       two different time periods, Counsel.

14       A.   I -- I disagree -- I disagree with -- with

15   the FDA opinion based on everything else that I review

16   and that I present on my report.

17       Q.   (By Mr. De La Cerda)  All right.  Let's

18   shift gears a little bit and talk some about this is

19   a TVT and TVT-O issue.

20            You're aware that the TVT and the TVT-O can

21   either be mechanically cut into its sling shape or

22   laser cut into its sling shape; right?

23       A.   It can -- the edges can be mechanically cut

24   or laser cut or personically cut.
```

Jaime Sepulveda, M.D.

1      Q.   You're aware that Ethicon had evidence as

2   early as 2006 that after elongation, mechanically cut

3   mesh has a greater tendency than laser cut mesh to

4   degrade, lose particles, lose structure, rope, fray

5   and curl; right?

6           MR. SNELL:   Form.   Form, foundation.

7           Go ahead.

8      A.   What -- what I saw in a picture was an

9   uniaxial test done in a sling beyond the capabilities

10   of a sling and beyond any forces that could be placed

11   on a sling when used properly.

12      Q.   (By Mr. De La Cerda)   But you also saw in

13   those pictures that at least under those

14   circumstances, the mechanically cut mesh as compared

15   to the laser cut mesh had a tendency to lose

16   particles, lose structure, rope, fray and curl;

17   correct?

18      A.   They -- they show particles that we -- we

19   have seen over -- over time, not only on that, but

20   also in sutures.   They -- in a picture, I saw a

21   picture of it, and I saw the pictures of uniaxial

22   testing and I saw the communications about it, but

23   that's as much as I can say, I saw it.

24      Q.   And you know that that information was in

Jaime Sepulveda, M.D.

1    the files of Ethicon at least as of 2006; right?

2        A.   I -- I don't know the time when the

3    information was.

4        Q.   Have you personally seen a TVT or TVT-O that

5    has lost particles, lost structure, roped, frayed or

6    curled in your practice?

7        A.   The only time that I have seen it stretch

8    like that is when I'm actually -- one that I was

9    removing that I put a lot of force into it.  That's --

10   that's a way much force that any patient could ever

11   generate with a sneeze or cough.

12       Q.   You mentioned the one patient that you had

13   that you're removing the sling where it's too tight?

14       A.   Right.

15       Q.   Is this the person you were talking about?

16       A.   That might be the same person; I cannot tell

17   you with certainty.

18       Q.   So when the mesh was placed too tightly, you

19   saw -- would you call that roping or what was it that

20   you actually saw?

21       A.   I -- I -- I started dissecting it and I saw

22   that she still had some -- and the only way I can -- I

23   can recall it is because I actually saw those pictures

24   yesterday in one of the -- of the slide sets.

Jaime Sepulveda, M.D.

1              And all I could -- all I could see was that

2      I actually had to -- had to pull on it from inside,

3      normal attachment.  This was not roped, this was not

4      curled, this not -- there's no such thing that I could

5      describe in telling in general terms or in scientific

6      terms.  I -- this was one -- one anecdotal case in

7      which I -- that's the only one that looks like the

8      dimensions stretch -- stretch on that device.

9          Q.   So would your testimony be that you've never

10     seen a TVT or TVT-O mechanically cut, lose particles,

11     lose structure, rope, fray or curl in your own

12     practice?

13         A.   No, because it has a plastic sheath.

14         Q.   So you've never seen that yourself?

15         A.   No.

16         Q.   Should the mechanically cuts -- strike that.

17     Excuse me.

18              Should mechanically cut meshes tendency

19     to -- in comparison to laser cut mesh -- so should

20     that tendency to degrade, lose particles, lose

21     structure, rope, fray or curl be included in the IFU

22     for the TVT and TVT-O or no?

23              MR. SNELL:  Objection, foundation.

24         A.   I don't find a need to include that because

Jaime Sepulveda, M.D.

```
 1    that's something that has not been demonstrated

 2    consistently.

 3         Q.   (By Mr. De La Cerda)  Is that -- is that

 4    your basis for that opinion or are there

 5    additional -- is there additional information that

 6    provides a basis for that opinion?

 7         A.   I have not seen any scientific evidence that

 8    the mesh curls or ropes or -- or -- or frays.  Nothing

 9    that I can -- I can tell you that, okay, this is --

10    we -- we saw this observation on this patient and we

11    have reported it consistently or out of this number of

12    procedures that we did, this number actually showed

13    that.  And if it happened, what is -- how does that

14    translate into the clinical -- and I keep talking with

15    my hands because -- that will never get into the

16    deposition, but the -- on the -- I have not seen that

17    be reported or how that can translate into clinical --

18    into clinical behavior.

19         Q.   So on this issue, the basis for your opinion

20    is really the absence of information supporting this

21    information should be in the IFU; right?

22         A.   And the fact that there are multiple

23    randomized control trials well -- well-designed

24    control trials, surgical trials by good surgeons
```

Jaime Sepulveda, M.D.

1   within groups that are well-respected within my

2   specialty, that have not describe, not in a single

3   time, not in any of these papers, that there is such a

4   thing happening.

5       Q.   If mechanically cut mesh's tendency in

6   comparison to laser cut mesh to degrade, lose

7   particles, lose structure, rope, fray and curl is

8   clinically significant or clinically relevant, should

9   it be included in the IFU for the TVT and TVT-O?

10      A.   It --

11           MR. SNELL:   Objection.  Hold on, give me a

12      minute.

13           Objection, improper hypothetical based on

14      the particle.

15      A.   It would have -- it would have to be

16   reported.  It would have to be reported by

17   something -- by something dependent by randomized

18   control trial.

19           If -- any attributes that being on any of

20   the polar sides of things -- things working at one

21   level or another in both sides of the spectrum needs

22   to be validated by scientific testing.

23      Q.   (By Mr. De La Cerda)  This is a question

24   that I'll have throughout several of these opinions.

Jaime Sepulveda, M.D.

```
 1   I want to make sure to say it in a way that you
 2   would agree with, because I want you to define for
 3   me what it would require for this information to
 4   suddenly be required to be in the IFU.
 5          And so what -- what would be required from
 6   your perspective for the information about the
 7   differences between a mechanically cut and laser cut
 8   mesh on the issue of degradation, loss of particles,
 9   loss of structure, roping, fraying, curling, what
10   would it take for that information to suddenly be
11   information that needs to be in the IFU?
12          MR. SNELL:  Objection, same objection as
13      before.
14      A.   To make it to the -- to the IFU, needs to be
15   something that is independent of -- of just -- just
16   the technique beyond what's described in the IFU.  If
17   you see something like a device or a suture breaking,
18   it needs -- the IFU should say, do not make it so
19   tight or place a spacer under the urethra in the case
20   of slings.  The IFU says that.
21          So -- so -- and the insertion of the needle
22   or the removal of the plastic sheath is being done,
23   there needs to be instructions in the IFU for the
24   appropriate placement.  So this -- this is not about
```

Jaime Sepulveda, M.D.

1    saying this mesh curls or ropes or -- that's not --

2    that's not what the -- what I expect from IFU.  What I

3    expect is give me the proper technique so I don't put

4    this material to this extremes that would cause it to

5    behave this way.

6         Q.   (By Mr. De La Cerda)  So I understand

7    the -- first it would need to be independent of the

8    technique, but if the roping, fraying, curling, loss

9    of structure, if it's clinically relevant and

10   statistically significant, that would need to be in

11   the IFU; right?

12           MR. SNELL:  Objection, improper

13        hypothetical, vague.

14        A.   And to the -- and to the level that it would

15   say, okay, this is -- this is how it happens in the

16   clinical setting, not just in a machine.

17        Q.   (By Mr. De La Cerda)  And I guess that

18   would be encompassed though -- I mean, if it's

19   statistically significant through randomized control

20   trials -- let me think about that.  So it would need

21   to be shown through randomized control trials that

22   actually involve human implants, not just benched-up

23   testing or whatever it is in the lab; right?

24        A.   If you blind -- if you blind this study in a

Jaime Sepulveda, M.D.

1   way that physicians don't know which type of mesh

2   they're -- they're using, you could -- that would be a

3   good start.

4        Q.   Okay.  Do you know if Ethicon ever performed

5   a test like that, where they compared laser cut mesh

6   versus mechanically cut mesh actually implanted in

7   women?

8        A.   I -- I don't see anyone placing any human

9   through the stress that a machine could do -- could do

10  that.

11       Q.   But Ethicon never performed a study like

12  that; right?

13       A.   I'm going to give you a better -- that was a

14  very unclear answer what I just gave you.

15            I don't see -- I don't see an implant being

16  stressed to the forces that could be done in uniaxial

17  testing.  Uniaxial testing doesn't always translate

18  into the behavior in the human body.

19            The IFU was good in addressing the area that

20  was most important on the urethra and the design was

21  good in addressing the placement and the -- and the

22  confirmation of the mesh with the minimum of the

23  formation.

24       Q.   But back to the question.  Ethicon never

Jaime Sepulveda, M.D.

1    performed a study comparing mechanically cut mesh

2    versus laser cut mesh in -- actually in women; right?

3         A.   It's --

4              MR. SNELL:   Foundation.

5              Go ahead.

6         A.   It's -- I'm not aware of any study that was

7    performed like that, in that model.

8         Q.   (By Mr. De La Cerda)   If mechanically cut

9    mesh, TVT or TVT-O, loses particles when its

10   implanted in a woman, is there potential for those

11   lost particles to migrate into the woman's vaginal

12   wall and cause pain?

13        A.   That's a hypothesis.   It has never been

14   demonstrated.

15        Q.   Do you know if it's possible or no?

16        A.   It's medically -- it's medically --

17   medically possible, which is way below that within

18   the -- within the settings of certain medical

19   probability.

20        Q.   Okay.   Still on this mechanically cut versus

21   laser cut issue.   You agree that mesh -- that mesh and

22   polypropylene slings that is too stiff or rigid can

23   increase the risk of complications like erosion,

24   voiding dysfunction, and urethral obstruction; right?

Jaime Sepulveda, M.D.

1          MR. SNELL:   Form.

2      A.   No -- no study has been able to corroborate

3   that.

4      Q.   (By Mr. De La Cerda)  So would you

5   disagree with that statement?

6      A.   I -- I would disagree to that statement

7   based on the fact that there's no evidence confirming

8   it.

9      Q.   You know that in 2004, Ethicon tested laser

10  cut mesh and found it to be more rigid or stiffer than

11  mechanically cut mesh; right?

12     A.   Regardless of the findings that Ethicon may

13  have found, I'm not aware that they found one way or

14  the other, and with all the research, it would not

15  surprise me that they may have found one way or the

16  other.  The question is if that has any -- any

17  translation to clinical symptoms and the ans- -- of

18  the ones you described, and my answer to that is no

19  evidence of it.

20     Q.   Okay.  So that leads to the next question

21  and this is a question I'm going to have with all

22  these opinions, but should laser cut mesh's greater

23  stiffness or rigidity in comparison to mechanically

24  cut mesh be included in the IFUs for the TVT and

Jaime Sepulveda, M.D.

1    TVT-O?

2            MR. SNELL:  Objection, lacks foundation.

3        A.   No -- no -- there's no evidence that it

4    could work one way or the other.  Why would they

5    include it in the IFU?

6        Q.   (By Mr. De La Cerda)  Okay.  So let's talk

7    about the bases for why it doesn't need to be

8    included in the IFU.  What is your basis for that?

9        A.   It's a -- the use of a laser cut or

10   mechanical cut meshes do not translate into your

11   procedure being performed any differently and they --

12   with laser cut or without or with mechanical cut, what

13   you need to be aware is not to place a sling under

14   excessive tension, which is something that we have

15   learned even before there was mesh, not to place a

16   sling under excessive tension, follow good surgical

17   principles.  And if there was any question about that,

18   then doctors could have -- could have requested to be

19   trained on it, but I would not include something on

20   the IFU that would just confuse the issue on how to --

21   how to perform the procedure.

22       Q.   Okay.  If laser cut mesh has greater

23   stiffness or rigidity in comparison to mechanically

24   cut mesh, is clinically relative and statistically

Jaime Sepulveda, M.D.

1    significant, should it be included in the IFUs for the

2    TVT and TVT-O?

3         MR. SNELL:  Objection, lacks foundation,

4         improper hypothetical.

5    A.   There's -- there's no correlate it

6    clinically.  So my answer to that is no, I would not

7    expect them to write in the IFU.

8    Q.   (By Mr. De La Cerda)  So this is a

9    hypothetical.  I'm saying assume that it's

10   discovered to be clinically relevant and

11   statistically significant, under those circumstances

12   would it then be proper to put it in the IFU?

13        MR. SNELL:  Same objection.

14   A.    If it's clinically -- clinically relevant or

15   statistically significant, then it may have been

16   included on the IFU if it pertains to the performance

17   of the procedure.

18   Q.   (By Mr. De La Cerda)  Now, you're aware

19   that -- you know Ulmsten is the original -- one of

20   the original inventors of the TVT; right?

21   A.   Yes.

22   Q.   You know a couple of the guys that studied

23   TVT with him were Nilsson and Falconer, you remember

24   those names being mentioned in the studies?

Jaime Sepulveda, M.D.

```
 1        A.    Yes.

 2        Q.    And you're aware that Nilsson and Falconer

 3   opposed the use of laser cut mesh because it did not

 4   have the same stretch profile of mechanically cut

 5   mesh.  Are you aware of that?

 6              MR. SNELL:  Form.

 7              Go ahead.

 8        A.    I am not aware of their internal

 9   conversations about it.

10        Q.    (By Mr. De La Cerda)  And does that have

11   any effect on your opinion one way or the other?

12        A.    It doesn't.  Whatever -- whatever

13   interaction they had, I would consider just a healthy

14   scientific exercise, but until there's data supporting

15   its use and there's data showing that there is a

16   difference in performance, there is no need to make a

17   difference -- to make a different recommendation.

18        Q.    What is the proper way to tension the TVT

19   device?

20        A.    It's -- it's to do it tension-free and

21   tension-free means that there is preservation of the

22   width of the sling up to 75 percent.

23        Q.    I think I missed something.  What did you

24   mean -- can you explain that again?
```

Jaime Sepulveda, M.D.

```
1        A.   By the time that I finish doing my

2   procedure, the width on my TVT needs to be at least

3   1.1 -- at least 75 percent of 1.1-centimeter, that's

4   not just with TVT --

5        Q.   Okay.

6        A.   -- that's with any sling that I may place.

7        Q.   Where is that information in the IFU?

8        A.   That's not going to be in the IFU because

9   that's an observation of Jaime Sepulveda.

10       Q.   Do you believe that Ethicon is responsible

11  to tell physicians how to properly tension the TVT?

12       A.   There's -- there's -- there's information on

13  the IFU about not overtensioning.

14       Q.   There's information about that, but is there

15  information, like an exact measurement on how to

16  tension?  For example, I liked your example of

17  75 percent of 1.1 centimeters.

18            Does Ethicon have a responsibility to

19  communicate to physicians an exact way in tensioning

20  the TVT?

21            MR. SNELL:  Form.

22       A.   I think that Ethicon make every possible

23  effort through their -- through their education

24  programs to -- to emphasize good practices in doing a
```

Jaime Sepulveda, M.D.

1    sling.  Ethicon is not re-inventing our technique to

2    do a continence procedure.

3         Q.   (By Mr. De La Cerda)  When you taught on

4    behalf of Ethicon regarding slings, did you discuss

5    this issue of the 75 percent of 1.1 centimeters

6    indicating proper tensioning?

7         A.   That's a concept that we all have -- have --

8    we, as surgeons, we know we don't want to bring it

9    tighter than that.  But we learned that with the

10   pubourethral slings.

11        Q.   Okay.  So are you saying no, you didn't

12   personally discuss that issue or because everyone

13   already knew it anyway?

14        A.   Right.  This is -- this is a common surgical

15   knowledge, which Ethicon may or may not have known.  I

16   don't know if they -- if they knew it.  This is just a

17   personal observation.

18        Q.   So you believe that Ethicon properly

19   instructs physicians on how to tension the TVT; right?

20        A.   They -- they cover that in the IFU.

21        Q.   Do you agree that the strongest unmet need

22   with the TVT is the ability to adjust tension both

23   intraoperatively and post-operatively?

24             MR. SNELL:  Form.

Jaime Sepulveda, M.D.

```
 1        A.   Well, there's no -- no way to assess

 2   post-operatively.  You're going to close and there's

 3   no -- no study that says how you're going to tension

 4   it.  We try to make an inference with biomechanics.

 5        Q.   (By Mr. De La Cerda)  But do you agree

 6   with that statement?  That the strongest unmet need

 7   of the TVT's ability to adjust tension both

 8   intraoperatively or post-operatively, do you agree

 9   or disagree with that statement?

10        A.   I --

11             MR. SNELL:  Form.

12             Go ahead.

13        A.   I would agree to an extent, but it's so --

14   so vague that I cannot tell you that I agree

15   completely with it.

16        Q.   (By Mr. De La Cerda)  Do you agree that

17   the mesh and TVT may be too wide?

18             MR. SNELL:  Form.

19        A.   I don't -- no, I think it has shown to be of

20   the -- of the right -- of the right width to work

21   clinically.

22        Q.   (By Mr. De La Cerda)  Do you agree that

23   there is no calibration to let you know when you

24   have the tension right?
```

Jaime Sepulveda, M.D.

1      A.   That's -- that's part of the art of surgery

2  that I described before.

3      Q.   So you do agree with that; right?

4      A.   Repeat that.

5      Q.   So do you agree with, quote, there is no

6  calibration to let you know when you have the tension

7  right, close quote?

8      A.   No, we know -- we know when the tension is

9  right.  We have experience -- enough experience to

10  know when the tension is right.

11          It's extremely subjective, but I can tell

12  you if you, at the end of your surgery, you see that

13  width that goes underneath, that width that has been

14  shown study after study, that is effective, if you

15  know that is not the width you have at the end of your

16  surgery, you overtensioned it.

17      Q.   But there's not like a general calibration

18  for that; right?  Or is there?  I mean, is the general

19  calibration the 75 percent of 1.1 centimeters, is that

20  the general calibration for everybody or no?

21          MR. SNELL:  Form.

22      A.   It's a visual inspection.

23      Q.   (By Mr. De La Cerda)  So is that a yes?

24          MR. SNELL:  Objection, asked and answered.

Jaime Sepulveda, M.D.

```
 1       A.    Yeah, that's a general calibration that is

 2  been used -- I'm sorry, Burt.

 3             MR. SNELL:  I said, objection, asked and

 4       answered.

 5             Go ahead and answer it.

 6       Q.    (By Mr. De La Cerda)  Do you agree that

 7  there is no -- quote, there is no consensus on the

 8  amount of tension needed and many feel that the

 9  tension will vary based on patient presentation and

10  patient anatomy?  Do you agree with that?

11             MR. SNELL:  Form.

12       A.    It's -- I would have to agree that it

13  changes from patient to patient and that's one of the

14  biggest challenges not only in this proceeding, any

15  surgery.

16       Q.    (By Mr. De La Cerda)  Are you going to

17  offer the opinion that tensioning of the TVT sling

18  is the same regardless of whether the sling is made

19  of mechanically cut mesh or laser cut mesh?

20       A.    You're going to visually see at the end of

21  your procedure and you know if you tensioned it right

22  when you look at it.

23       Q.    So tensioning might change as long as the

24  width that you're looking for is correct?
```

Jaime Sepulveda, M.D.

1      A.   I just say visually see.  I don't know how

2   another way you're going to see if it's not visually.

3      Q.   Right.

4      A.   But it's -- what I -- my opinion is that

5   once you -- once you place a sling, that being laser

6   cut or mechanically cut, at the end of your procedure,

7   that sling needs to look the way -- in a way that it

8   covers the mid urethra to an extent of at least .75 to

9   1-centimeter.

10      Q.   Do you agree that a responsible medical

11   device company would determine the proper way to place

12   a device before putting that product on the market?

13           MR. SNELL:   Form.

14      A.   They -- they have no way -- we have no way

15   to -- to -- to communicate that to each other.  That

16   is -- that is the hard part of surgery.

17           I think that when they say, "Do not

18   overtension it," and when they say, "You need to have

19   experience in continence procedures," and when they

20   say, "This is not a comprehensive guide for continence

21   care," I think that's accurate and fair and as a

22   surgeon you understand that.

23      Q.   (By Mr. De La Cerda)  And so this question

24   is really more of a general proposition, though.

Jaime Sepulveda, M.D.

1   Would you agree that a responsible medical device

2   company would determine the proper way to place a

3   device before putting that product on the market?

4        MR. SNELL:  Same objection, asked and

5        answered.

6        A.   That's where -- that's where all the studies

7   with cadavers come in.

8        Q.   (By Mr. De La Cerda)  So the answer is

9   yes; right?

10       A.   Yes, the device company does that.

11       Q.   Okay.  Shifting gears to a new issue.

12            Before I do that, are you okay?  Do you want

13   to take a break at all?

14       A.   No, I'm okay, if you guys are okay.

15            MR. SNELL:  What time are we going to have

16       lunch?

17            MR. DE LA CERDA:  Yeah, it's almost noon.

18       Do you want to do it now.

19            MR. SNELL:  If he's fine, I'm fine.

20            (Thereupon, a recess was taken from

21       11:47 a.m. until 12:00 p.m., after which the

22       following proceedings were held:)

23       Q.   (By Mr. De La Cerda)  So we're back on the

24   record.

Jaime Sepulveda, M.D.

```
 1              There's a fault question on -- earlier we

 2    discussed your work as a consultant for Ethicon and we

 3    briefly discussed what you estimated to be what you

 4    had received from Ethicon in compensation for that.

 5              In another case, the Raviola case, which you

 6    may recall, there was actually a production of the

 7    payments and it was produced in a -- in hard copy --

 8    and this question is probably really for Burt.

 9              MR. DE LA CERDA:  If I forward that to you,

10       can you send that to us in like an Excel or

11       whatever it originally came in because the print

12       is tiny?

13              MR. SNELL:  Okay.  Yeah, I mean -- well, I

14       can do my best.

15              MR. DE LA CERDA:  Okay.

16              MR. SNELL:  I've been trying to send

17       e-mails.  My e-mail is not working.  It's not

18       letting me send stuff.  I have something

19       important to send.  It's not related to this

20       deposition.  I've been trying all morning.  Is

21       the Internet --

22              MR. DE LA CERDA:  It's coming off and on for

23       me.

24              I'm forwarding this to you and then if we
```

Jaime Sepulveda, M.D.

1        can get the native version.  It looks like it was

2        an Excel that was then printed off, but the type

3        on it is really small and then that will

4        provide -- this is what Ethicon shows its records

5        of payments and then that can kind of settle that

6        issue.

7              THE WITNESS:  Yeah, it was actually

8        presented on the Cavness trial.

9              MR. DE LA CERDA:  Oh, okay.

10             THE WITNESS:  It was in very small -- very

11       small letters.

12             MR. DE LA CERDA:  Okay.

13             THE WITNESS:  And just as clarifying that

14       number, what was allocated to pay me, not actual

15       payments.

16             MR. DE LA CERDA:  Okay.  So we'll have to

17       clear that up, but if, Burt, you can take a look

18       at getting us that version, thanks.

19       Q.   (By Mr. De La Cerda)  Okay.  All right.

20  The issues that I'm about to discuss will relate to

21  TVT, TVT-O, Gynemesh, Prolift and Prosima, so I'm

22  going to do it all at once.

23             First, you're aware that the TVT and TVT-O

24  are made of Prolene mesh, which is constructed of

Jaime Sepulveda, M.D.

1    knitted filaments of extruded polypropylene strands,

2    identical in composition to that used in Prolene

3    polypropylene nonabsorbable surgical suture; correct?

4         A.   I agree with that.

5         Q.   You're also aware that the mesh in Gynemesh,

6    Prolift, and Prosima is Prolene Soft, which is also

7    constructed of knitted filaments of extruded

8    polypropylene identical in composition to Prolene

9    polypropylene suture; correct?

10        A.   To a -- to a -- identical in composition,

11   yes.

12        Q.   And the IFUs for the TVT, the TVT-O,

13   Gynemesh, Prolift and Prosima all characterize Prolene

14   as inert; correct?

15        A.   They -- they characterize it as that word

16   inert, yeah.

17        Q.   They state:  "This material, when used as a

18   suture, has reported to be nonreactive and retain its

19   strength indefinitely in clinical use"; right?

20        A.   I -- I'm aware of that statement, yes.

21        Q.   They also -- the IFUs for those products

22   also state:  "The material is not absorbed nor is it

23   subject to degradation or weakening by the action of

24   tissues enzymes"; right?

Jaime Sepulveda, M.D.

```
 1       A.   That's a statement on the IFU.

 2       Q.   The mesh in these products not being -- or

 3  strike that.

 4            The mesh in these products being nonreactive

 5  or inert or not subject to degradation, that's a

 6  property or those are properties that are desirable

 7  for an implant designed for a human body; right?

 8            MR. SNELL:  Form, overbroad.

 9       A.   That -- that is -- that is a characteristic

10  that we did not see in other types of materials and

11  that we're pursuing when we placed those sutures.

12       Q.   (By Mr. De La Cerda)  Okay.  Why would you

13  want a human -- an implant designed to be implanted

14  in humans to be inert or nonreactive or not subject

15  to degradation?

16            MR. SNELL:  Objection, overbroad.

17            Go ahead.

18       A.   The degradation has to -- has to do with --

19  the way we interpret degradation has to do with

20  absorbables or partially absorbable sutures.

21            The way that non- -- nonreactive means that

22  there's no reaction to hydrolysis.

23            And the way that it was described as non- --

24  nondegraded is it was that there was no loss on the
```

Jaime Sepulveda, M.D.

1  strength of the suture on testing that was done before

2  placing it on a patient.

3      Q.   (By Mr. De La Cerda)  Okay.  So why would

4  it be desirable for a human implant to have those

5  characteristics that it doesn't degrade, that it's

6  inert, that's it's nonreactive?

7          MR. SNELL:  Same objection.

8          Go ahead.

9      A.   It is -- it translates, theoretically, on

10 the durability of the repair.

11     Q.   (By Mr. De La Cerda)  Because these mesh

12 implants are intended to be permanent implants;

13 correct?

14     A.   They're intended to -- to last a lifetime if

15 you can make it interact in a way that it can last a

16 lifetime.  In other words, if the host doesn't change,

17 you'll want that implant to work and give you

18 durability.

19     Q.   Now you're aware that as early at 1987,

20 Ethicon had evidence of degradation of Prolene in the

21 human body; correct?

22     A.   I -- I don't believe that they call it

23 degradation in the sense that we interpret

24 degradation.  There's -- there's degradation from the

Jaime Sepulveda, M.D.

1    biomechanical point of view and there's degradation

2    from what we see in normal life of degradation.

3        Q.    Okay.  So what is it that you believe that

4    Ethicon saw in terms of degradation in 1987?

5        A.    Well, what they saw -- what they saw is

6    purely a microscopic study.  If there will be

7    degradation, there will be a significant impact on the

8    durability of the effect of the sling or in the

9    durability of the repair.

10       Q.    In the context of safety, though -- strike

11   that.

12             If Prolene has a tendency to degrade in a

13   human body, would that indicate that it's not inert?

14             MR. SNELL:  Form, improper hypothetical.

15       A.    If it would degrade, it would dissolve.  And

16   if it would dissolve, it would just lose all its

17   effect.  So whatever -- whatever conclusion is met of

18   degradation is on hypothetical grounds and not based

19   on the evidence that we have.

20       Q.    (By Mr. De La Cerda)  What evidence are

21   you referencing?

22       A.    The durability of a procedure for

23   incontinence on prolapse.

24       (Brief interruption and off the record discussion.)

Jaime Sepulveda, M.D.

1    Q.   I can't remember if you were finished with

2    your response.  If you could read it back.

3             (The requested portion of the record was

4        read back by the reporter.)

5    A.   Let me clarify this.  The reason why I

6    generalize it on incontinence on prolapse is because

7    we're talking about more than one product here.

8    Q.   (By Mr. De La Cerda)  Yes, yes.

9             And all these products have, within their

10   mesh -- one mesh is called regular Prolene or just

11   Prolene and the other one is called Prolene Soft, but

12   both meshes are made of essentially woven Prolene

13   suture.  It's the same material as Prolene; right?

14             MR. SNELL:  Objection.

15   A.   No, it's not woven.

16   Q.   (By Mr. De La Cerda)  How is it made then?

17   A.   It's knitted.

18   Q.   Knitted, okay.

19             But it's all made of knitted polypropylene

20   that's identical in composition to Prolene; correct?

21   A.   It's knitted -- it's knitted extruded

22   polypropylene.

23   Q.   It's identical in composition to Prolene

24   suture; right?

Jaime Sepulveda, M.D.

1      A.   It is -- it has been shown to have the same

2   level of crystallinity as Prolene suture.

3      Q.   If there were findings as to Prolene suture,

4   would those findings, the characteristics of Prolene

5   suture, have relevance to meshes that are also made of

6   extruded polypropylene that's identical in composition

7   to Prolene suture?

8           MR. SNELL:  Form, vague.

9      A.   I did not get that one.  Sorry.

10          (The requested portion of the record was

11       read back by the reporter.)

12      A.   As it pertains to composition, the evidence

13   shows that TVT-O and Prolene sutures, that's the

14   extent of the evidence, has -- has the same

15   crystallinity.  When we define crystallinity, is the

16   most accurate way to evaluate that one material is

17   like the other.

18      Q.   (By Mr. De La Cerda)  Well, what I'm

19   saying, though, is if there is a finding about a

20   characteristic of Prolene sutures like, for example,

21   degradation, if Prolene sutures degrade in the human

22   body, can we also say or is that evidence of that

23   Prolene mesh would also degrade in the human body?

24          MR. SNELL:  Form.

Jaime Sepulveda, M.D.

```
1        A.    And there is -- first of all, there is

2   more -- there are three -- there are three parts to

3   that question.  The first one is the concept of

4   degradation.  And if Prolene would degrade, all the

5   Burches that we did with polypropylene would

6   eventually fail.  And all the -- and most of the

7   slings that we did with polypropylene would eventually

8   fail clinically.

9             And we know that the evidence points out

10  that that's -- that's not the case.  That's the first

11  part of degradation.

12            Number two is polypropylene, the way it

13  defines degradation on a dog or in a rabbit or in a

14  Himalayan or a Wistar rat or a Himalayan -- Himalayan

15  rabbit, the way it's defined cannot be translated

16  to -- to a -- to a person because they're completely

17  different hosts and the stresses that are placed on --

18  on those implants are completely different.

19            The immunologic reaction is different and

20  the cellular level is different, cellular findings are

21  different.  And, finally, is the concept that -- that

22  Prolene and -- would -- would degrade and create

23  anything beyond what the sling would create.  No, they

24  stay -- they're both exactly the same, the same.  Not
```

Jaime Sepulveda, M.D.

1    exactly, but they're both very similar implants.

2            So those are the three -- three aspects to

3    your question, and I know it's an extremely elaborate

4    answer for probably a much more straightforward

5    question.  But there's -- the concept of degradation,

6    I would have to accept that concept to agree with

7    your -- with what you just presented.

8        Q.   (By Mr. De La Cerda)  I think step one is

9    we need to define what we're talking about by

10   degradation.

11           We know that in 1987 there was a study done

12   by Ethicon on explanted Prolene suture from humans;

13   right?

14       A.   On explanted and not -- I believe it's from

15   the dog study.

16       Q.   There is one of humans, too.  Have you seen

17   that one?

18       A.   No, I haven't -- haven't.  I'm not aware of

19   that one.

20       Q.   Okay.  If there's a study from 1987 on --

21   and these are Prolene sutures explanted from humans,

22   if those show the cracking and degrading that's

23   indicative of degraded polypropylene, that's the kind

24   of degradation that I'm talking about.

Jaime Sepulveda, M.D.

1      A.    Are you referring to the eye study?

2      Q.    I'm sorry?

3      A.    To the eye study.  Are you referring to the

4   polypropylene being removed from the eye?

5      Q.    Vascular -- I believe they were implanted in

6   the heart.  Unfortunately, I didn't bring that study

7   with me.  I assumed you would already be aware of it.

8            My understanding is they were explanted from

9   the hearts of the patients.  They were Prolene sutures

10  explanted from the heart of human patients.

11           Are you aware of that one?

12     A.    No, I'm not aware.  I know there is a study

13  on blood vessels and I know that there is a study

14  of -- on the eye and I know about the dog study.

15     Q.    Okay.

16           MR. SNELL:  For clarification purposes, you

17           have -- maybe if you knew -- I can tell you -- I

18           know what the name of it is.  I mean, if that

19           would ring a bell with him.

20           MR. DE LA CERDA:  Professor --

21           MR. SNELL:  Gudion, blood vessels.

22           THE COURT REPORTER:  Can you spell that one?

23           MR. DE LA CERDA:  I think it's G-u-d-o-i-n

24           or something like that.  That's the professor's

Jaime Sepulveda, M.D.

1      last name.

2      Q.   (By Mr. De La Cerda)  Does that ring a

3  bell?

4      A.   It's -- I am -- I read that.  I do recall

5  reading it and I do recall that it was a very thin

6  polypropylene suture that was hand tied, but

7  there's -- I don't know how that translate to

8  degradation.

9      Q.   (By Mr. De La Cerda)  Okay.  So the

10  finding in that study was at the surface, that there

11  was cracking on the surface of the suture; right?

12  And that when they tested the material from the

13  cracking, that it was indicative of oxidative

14  degradation to polypropylene; right?

15          MR. SNELL:  I'm going to object on

16      foundation.

17          Go ahead.

18      A.   I cannot confirm that, no.

19      Q.   (By Mr. De La Cerda)  Okay.  Well, what

20  I'm trying to do is define the degradation I'm

21  talking about.  And I think this is even in the

22  studies that discuss it, degradation, and there have

23  been in the studies discussion of the surface of

24  polypropylene has some sort of cracking that's going

Jaime Sepulveda, M.D.

1    on and when they look at that cracking, it's

2    believed to be polypropylene that's cracking and

3    degrading.

4           Now you've seen studies that have discussed

5    that issue; right?

6    A.   I'm -- I'm aware of the paper by Clavé.

7    Q.   Okay.

8    A.   By one of the Clavés, by the way, not --

9    Q.   Is there a brother, like an evil twin?

10   A.   So I am aware of that paper and in that same

11   paper they cite the UV -- ultraviolet degradation, but

12   I am also aware that that paper was about normal

13   samples.

14          I'm also aware that the number of

15   low-density polypropylene study was less than -- I

16   believe it was a quarter of the sample and -- I don't

17   have to believe it, I actually have it here.

18   Q.   You're welcome to pull out anything you'd

19   like to review.

20          What I'm trying to get at -- I'm just trying

21   to get us to agree at least on a definition of

22   degradation that I'm going to ask you about.  And what

23   I'm trying to say is that's the version of degradation

24   I'd like to ask you about.

Jaime Sepulveda, M.D.

1          Now, I know you're already going to tell me

2     that's not clinically significant.  I know you're

3     going to tell me it's not going to matter.  I know

4     that.  What I'm trying to first get is let's get an

5     agreement on that's the degradation I'm talking about

6     and then we can go through the -- to kind of finish up

7     the questions because you'll end up telling me that it

8     doesn't need to be in the IFU.

9          So focusing, first, on the degradation, the

10    version that I'm talking about is the cracking, the

11    surface cracking that happens of the polypropylene

12    that's at least been seen and reported on in some of

13    the studies.  Is that version of degradation, is that

14    clinically significant or clinically relevant such

15    that it needs to be in the IFU for the TVT, TVT-O,

16    Gynemesh, Prolift and Prosima?

17         MR. SNELL:  Objection, lacks foundation.

18         Go ahead.

19    A.   The way it stands right now, with the

20    studies that I have seen, specifically the ones on --

21    in general polypropylene -- the ones on the eye, I

22    believe I saw that.  The way it stands right now, that

23    type of degradation has not been shown on the -- on

24    actual samples of slings.  It has been shown in

Jaime Sepulveda, M.D.

```
1   abnormal samples, not in slings that work or come --

2   or have the clinical results that we have seen on

3   reports and it have -- it have not been shown in

4   any -- any studies having a clinical impact.

5       Q.  (By Mr. De La Cerda)  Okay.  What do you

6   mean by "abnormal slings"?

7       A.   If there is a sling that has an exposure,

8   and especially slings that are exposed to a surface,

9   then that will be abnormal sample.

10      Q.   Okay.  Exposed to what kind of surface?

11      A.   To the vagina or the bladder or the bowel.

12      Q.   Okay.  So is there something that's

13  happening during that exposure that -- that your

14  belief is causing this phenomenon of degradation?

15          MR. SNELL:  Objection.  Hold on.

16      Misstates -- I don't think he testified, Counsel,

17      that he believes in degradation.  I think you're

18      taking what he said -- I think you're misstating

19      his answer.

20          Go ahead.

21      A.   The -- what we see in abnormal slings is

22  that a biofilm is created and this biofilm is -- has

23  been seen in catheters, it has been seen in IUDs, it

24  has been seen in other implants that are exposed to
```

Jaime Sepulveda, M.D.

1   air.

2       Q.   (By Mr. De La Cerda)  Okay.  So is that --

3   is that your explanation of what you believe is

4   actually being seen when we see this cracking?

5       A.   That -- that is -- that is actually what --

6   what I see, the only correlation that I can put

7   together with the cracking.

8           There's no other explanation based on what I

9   know and what I have researched that mechanical stress

10  retrieval or a biofilm.

11      Q.   Okay.  We know -- well, you know that raw

12  polypropylene without any antioxidants would degrade

13  in the human body.  Do you know that or no?  Or do you

14  believe that or no?

15      A.   No, there's no evidence that there's

16  degradation.

17      Q.   Okay.  Do strong oxidizers like peroxide, do

18  those affect raw polypropylene or no?

19      A.   The only report that I was able to find on

20  it was in containers, which is different from this --

21  it's the same hydrocarbon, but different containers on

22  a surface outside.

23      Q.   Okay.

24      A.   Actual containers that were used for

Jaime Sepulveda, M.D.

1    storage.  This is completely different from -- from

2    what is used in slings in prolapse.  So there's --

3    it's a hypothesis.  That's probably upgrading it to a

4    hypothesis.

5         Q.   Ultimately you believe, though, that the

6    cracking that's seen when the studies are discussing

7    degradation is really a biofilm and not the

8    polypropylene itself; right?

9         A.   I -- I don't know if it's the biofilm or

10   it's a matter of technique or if it's a stressor that

11   was placed on the sample on retrieval.  We -- we don't

12   know that.  And most -- most importantly, we know that

13   probably any -- regardless of the reason why it

14   happens, it doesn't translate in any physical outcome,

15   in a clinical significant outcome.

16        Q.   What about the erosions, though?  So you

17   mentioned that they were abnormal meshes that had

18   eroded and were exposed to air, isn't the fact there

19   is an erosion, isn't that some sort of clinical --

20   clinically significant event?

21             MR. SNELL:  Form.

22        A.   No, the exposed segment of the sling doesn't

23   mean that it eroded.  The most frequently -- the

24   most -- normally, the most frequent reason why you see

Jaime Sepulveda, M.D.

1   an exposed sling or a mesh is because there's a bone

2   healing that -- the dehiscence of the wound, there is

3   a dehiscence of the wound, there is a disorder of the

4   wound healing.

5           So we have seen disorders of wound healing

6   in patients that have prolapse even before we place --

7   we replace it, and we actually have seen it with

8   sutures.  Not only with polypropylene sutures, we have

9   seen it with polyester sutures, specifically, and we

10  have seen it with GORE-TEX sutures.

11          And there's actual clinical evidence that

12  shows these abnormal wound healing occurring on the

13  presence of these sutures, and also with native

14  tissue.  So this is not that the sling work itself

15  around and erode.  This is an incision that has been

16  open.

17      Q.   (By Mr. De La Cerda)  And is there any --

18  and what's responsible for the poor wound healing or

19  the wound healing issue?

20      A.   There are a variety of factors.  These are

21  defects in the fibromuscular layer, specifically, as I

22  place -- as I wrote in my report, loss of tensile

23  strength in the abdominal sutures that put the wound

24  together.

Jaime Sepulveda, M.D.

1               Number two, there are mechanical factors.

2               Number three, there are actual wound-healing

3        factors, such as immune disorders, poor tissue

4        healing, cigarette smoking, and finally hematomas,

5        just to mention a few.

6               And these conditions may predispose a wound

7        to open and expose the graft.  It may predispose the

8        wound not to heal properly over a suture and it may

9        predispose the wound not to heal properly just over

10       native tissue.

11          Q.   Have you -- are you aware of an exposure and

12       erosion ever happening not related to a wound healing

13       issue?

14          A.   No, that's -- that's -- is a problem of

15       wound healing.

16          Q.   And that's it?

17          A.   And that's what I see consistently.

18          Q.   But it's your belief that that's the only

19       reason why there might be an exposure or erosion is

20       because of wound healing; right?

21          A.   It is the most viable factor of the three

22       fact- -- of the three -- of the interaction between a

23       graft on a host, is the most viable factor is the

24       host.  And the -- the sling's consistent.  Or the --

Jaime Sepulveda, M.D.

1    or the polypropylene is a consistent material.  And

2    there's obviously the third one, which is the

3    insertion, the technique, but if you really look at

4    technique being constant, it's always a wound healing

5    issue.

6         Q.   So one of the problems could be the doctor's

7    fault, the other problem could be the patient's fault

8    because of their body and their wound healing, but

9    third issue can't be the implant because it is what it

10   is and it's --

11        A.   I would not simplify just with it being a

12   fault.  We -- this is not -- these are not issues that

13   are just -- that just happened with -- with mesh.

14   We -- we know that these issues go way -- for any

15   prosthetic material, way back before any prosthetic

16   material.  We know that these issues happen with

17   polyester sutures in uterosacral ligament suspensions.

18   We know that there are instances in which there has

19   been no mesh, there being a suture and the suture had

20   to be removed.  And we know there are instances in

21   which we don't use a mesh at all and that incision

22   opens up.  The most viable aspect is the host.

23   There's definitely a variation on the insertion

24   technique and I think that by now we all have evidence

Jaime Sepulveda, M.D.

1    that those with the most experience have the lowest

2    rate of -- lowest rate of problems.  Not only this

3    surgery, any other surgery, but the most consistent

4    part is the prosthesis, the polypropylene.

5         Q.   Do you believe that mesh degrading or

6    breaking down can lead to an erosion or exposure or

7    no?

8              MR. SNELL:  Foundation.

9         A.   There's -- there's no evidence that that's

10   the case.

11        Q.   (By Mr. De La Cerda)  Do you believe that

12   polypropylene can become brittle?

13        A.   How -- how do we define brittle?

14        Q.   That's a good question.

15        A.   You're going to probably --

16        Q.   What's your understanding of the term

17   "brittle"?

18        A.   Brittle is weak.  Brittle could be friable.

19   Decreased tensile strength to put it in exact terms.

20        Q.   So using that explanation of what brittle

21   means to you, do you believe that polypropylene can

22   become brittle?

23        A.   No.

24        Q.   Okay.  So now let's get to the question

Jaime Sepulveda, M.D.

1    about your opinion.  Should Prolene's tendency to

2    degrade in the human body be included in the IFUs for

3    the TVT, TVT-O, Gynemesh, Prolift and Prosima?

4              MR. SNELL:  Lacks foundation, misstates,

5         opinion testimony.

6         A.   There's -- there's nothing to place the

7    result of degradation.

8         Q.   (By Mr. De La Cerda)  And your basis for

9    that opinion is what?

10             MR. SNELL:  Asked and answered.

11        A.   That degradation has not been defined in a

12   reproducible scientific way to have -- to be present

13   or, if present, to have any consequences in clinical

14   outcomes.

15             MR. DE LA CERDA:  All right.  I think that's

16        a good break point.  It's 12:30.

17             (Thereupon, a lunch recess was taken from

18        12:30 p.m. until 1:20 p.m., after which the

19        following proceedings were held:).

20        Q.   (By Mr. De La Cerda)  All right.  Doctor,

21   we're back on the record.  There is one question I

22   wanted to ask you on the degradation issue.

23             If Prolene's tendency to degrade the human

24   body is clinically significant, clinically relevant

Jaime Sepulveda, M.D.

1    and statistically significant, should that information

2    be included in the IFUs for the TVT, TVT-O, Gynemesh,

3    Prolift and Prosima?

4              MR. SNELL:  Objection, foundation, form.

5              Go ahead.

6         A.   Any -- any significant clinical response

7    that deviates from what's reported in randomized

8    control trials should be -- should be a matter of

9    addressing it, regardless if there is a degradation

10   there underneath or not.  And there -- there are

11   systems in place that allows for that reporting, more

12   than one system, actually.

13        Q.   (By Mr. De La Cerda)  So any risk or

14   complication that's clinically significant,

15   clinically relevant and statistically significant,

16   any risk or complication that's like that should be

17   included in the IFU, do you agree with that?

18             MR. SNELL:  Form, foundation, misstates.

19        A.   If there's -- anything that is clinically

20   significant, statistically significant, let's say we

21   have a voiding dysfunction that is higher than would

22   happen with a Burch procedure, if we have pain, any

23   type of an incidence of urge incontinence or urge

24   incontinence, incidents of any -- that should be

Jaime Sepulveda, M.D.

1    addressed.  If it's different from the RCTs.  But if

2    you're going to challenge what's reported on RCTs,

3    then you need to come up with a similar number of

4    patients and you need to have some statistical

5    validity to it.

6        Q.   (By Mr. De La Cerda)  Okay.  Moving on to

7    a new issue and this one involves TVT and TVT-O.

8             What does cytotoxicity mean?

9        A.   It means in the -- in experiment, the number

10   of cells that are not viable after exposure to an

11   agent is lower than the expected of the benchmark we

12   established.

13       Q.   The definition you gave me, which, by the

14   way, is very accurate in a certain sense.  It's funny,

15   so you told me exactly what the scientific definition

16   is.  The other thing I was asking -- that I was

17   thinking in my mind is cytotoxicity, what does that

18   word mean, literally?

19            MR. SNELL:  Form.

20       A.   It means it will -- it means toxicity to the

21   cell.

22       Q.   (By Mr. De La Cerda)  Right.  And you're

23   aware that the cytotoxicity assessment of the

24   Ulmsten Prolene polypropylene sling, using the ISO

Jaime Sepulveda, M.D.

1   elution method showed cell lysis and toxicity;

2   correct?

3        A.   There was one other place, and I was able to

4   see that on company documents.  There was one other

5   place in which they saw that there was a little

6   cytotoxicity, but when it was -- it could never be

7   reproduced, actually, when it was redone in the

8   agarose, in the agarose form, there was -- in the

9   agarose overlay method, it was not -- it was not

10  cytotoxicity.

11           And this is significant because the -- when

12  you do a drug elution test, essentially, you're

13  immersing the cells on a pool of this -- of this

14  polypropylene.  It will be -- it's a huge amount.

15  It's an amount that you, on purpose, make it -- make

16  it toxic.  The toxicity -- the toxicity is -- is

17  supposed to affect a lot more than this.

18           One of the biggest drawbacks of cytotoxicity

19  assays is that you cannot have a positive control.  So

20  when you put agarose on it, you neutralize and you

21  make it more real.  You neutralize it and make it more

22  real.

23       Q.   In one of those two testing methods

24  cytotoxicity was shown; right?

Jaime Sepulveda, M.D.

```
 1        A.    It was in one plate.  It was not

 2   scientifically significant to it.  When normal

 3   polypropylene was -- was examined on L929 mouse

 4   fibroblast cells, there was no cytotoxicity.

 5        Q.    Have you studied what happens to tissues

 6   when it's exposed to a cytotoxic substance?

 7        A.    Yes, I have.

 8        Q.    And can you explain what those studies were?

 9        A.    Before going to OB/GYN, I did a fellowship

10   on molecular pharmacology, and I did a flow cytometry

11   and cytotoxicity assays, that's what I did every day.

12        Q.    Okay.

13        A.    And we use different agents.  So there's --

14   one thing that we know that tissue configures a

15   protection different from cells.  Tissue makes --

16   makes the viability of cells coming -- mediating by

17   whatever response that you may have to a cytotoxic

18   agent.

19              So far, and there has not been any evidence

20   that polypropylene is a cytotoxic in the muscle that

21   been by biopsy or by any other -- other test.

22        Q.    Would you agree that necrotized tissue

23   surrounding mesh could lead to erosion or exposure of

24   the mesh?
```

Jaime Sepulveda, M.D.

```
 1       A.   If you see a necrotic tissue in an incision,

 2   it's a wound dehiscence.

 3       Q.   So do you agree or disagree with that

 4   statement -- or that question?

 5            MR. SNELL:  Form.

 6       A.   That -- you will have to repeat it.  I'm

 7   sorry.

 8       Q.   (By Mr. De La Cerda)  Would you agree that

 9   necrotized tissue surrounding the mesh could lead to

10   an erosion or exposure of the mesh?

11       A.   If it's at the wound, yes, it can lead to

12   that.

13       Q.   Should the cytotoxicity assessment of the

14   Ulmsten polypropylene sling showing cytotoxicity be

15   included in the TVT or TVT-O IFUs?

16            MR. SNELL:  Form, misstates.

17       A.   Once you have a pyrogenicity assays and once

18   you have a drug elution and agarose test, if your

19   testing is negative, you just submit it to the FDA.

20   It doesn't have to be included as cytotoxic because it

21   will be -- it will be inaccurate.

22       Q.   (By Mr. De La Cerda)  So the answer is no;

23   right?

24       A.   No.
```

Jaime Sepulveda, M.D.

1      Q.   And what would be your basis for that

2  opinion?

3      A.   My -- the review of the -- the review of the

4  cytotoxicity assays that were made available to me

5  through company documents.

6      Q.   Okay.  And which ones were those?

7      A.   The ones on TVT.

8      Q.   And those included the ISO agarose diffusion

9  method?

10     A.   That includes -- there are two types of

11  tests that were done.  There was the agarose, the drug

12  elution, and pyrogenicity and to check for the

13  inflammatory reaction also of injected polypropylene.

14     Q.   Any other bases for this opinion?

15     A.   This is -- this is the basis for the

16  opinions.

17     Q.   Do you know what the significance is of mesh

18  being heavyweight as opposed to lightweight?

19     A.   There's -- there's -- the difference --

20  difference in weight -- in the weight, essentially.

21     Q.   And it's really a description of density,

22  right, not actual mass?

23     A.   It has -- it has to do with how much per a

24  square -- square millimeter is, how much does it weigh

Jaime Sepulveda, M.D.

```
 1    in terms of grams per square millimeters.

 2         Q.   And so do you have an understanding of what

 3    the significance in terms of risks and

 4    complications --

 5         A.   I -- I misspoke.

 6         Q.   Okay.

 7         A.   I misspoke.  It's not per square millimeter.

 8    It is per square meter.

 9         Q.   Okay.

10         A.   I can double-check that.

11         Q.   Do you have any understanding of what the

12    significance is in terms of risks and complications

13    when you look at lightweight mesh versus heavyweight

14    mesh?

15              MR. SNELL:  Form.

16              Go ahead.

17         A.   The heavy -- heavyweight meshes with -- not

18    only just with the weight, but with all the other --

19    the other factors, including fiber size, pore -- pore

20    diameter, and method of coming together, either being

21    knitted or woven, had to do with the tolerability and

22    biocompatibility of the implant.

23         Q.   (By Mr. De La Cerda)  So let's get back to

24    my question, though.  Is there a difference in terms
```

Jaime Sepulveda, M.D.

1   of risks and complications for a patient between

2   lightweight and heavyweight mesh?

3            MR. SNELL:   Form.

4       A.   Not to the point that has been clinically

5   demonstrated.

6            In theory, we could -- in theory, there is a

7   difference.   In the lab, when we use large portions we

8   can infer that, but that has not been shown in the

9   clinical arena of incontinence.

10      Q.   (By Mr. De La Cerda)   Okay.   So now --

11  okay.

12           First of all, let's discuss, what is the

13  theory of the difference -- the theory of the

14  significance as to risks and complications when you

15  compare lightweight versus heavyweight mesh?

16      A.   It's the biomechanical behavior is

17  different.   The biomechanical behavior is different

18  not only for that type of preparation, but it's also

19  different for the caliber of the sutures.

20           In other words, if I use a thinner suture,

21  that being polypropylene or any other material, it

22  will -- it can behave differently.   It has a tendency

23  to behave differently than a lightweight mesh or a

24  heavyweight mesh.

Jaime Sepulveda, M.D.

1      Q.    Okay.  In what ways?

2      A.    In the testing, when you stretch it, when

3    you fold it, when you place it and have fibroblast

4    growing along the lines of stress of the implant.

5      Q.    Okay.  What about in terms of foreign body

6    reaction, is there a difference between lightweight

7    and heavyweight mesh?

8      A.    We used to believe that there was much more

9    on the heavyweight meshes, much more foreign body

10   reaction.  But has been found is that that initial

11   reaction of the acute inflammatory -- of the acute

12   inflammatory process and eventually of the chronic

13   inflammatory process leads to the creation of

14   fibroblast.

15         What biomechanically has been concluded is

16   that that level of stress, the level of stress in

17   these implants, the level of tension or forces that

18   are applied to these implants, behave differently and

19   that seems to determine how fibroblasts grow.

20         So the heavyweight and the lightweight

21   behave differently.  There has not been a single study

22   that shows, at a microscopic level, 80,000, 100,000

23   samples, but we do have clinical studies that show

24   that number of women.  So in terms of the clinical

Jaime Sepulveda, M.D.

1    behavior, it's probably less difference than what we

2    could see microscopically.  In terms of the acute

3    inflammatory reaction, the difference between

4    200-micron of fiber and a 300-micron fiber is probably

5    not that much.

6         Q.   So do you disagree with the theory that

7    lightweight mesh is safer for patients than

8    heavyweight mesh for use in the pelvic floor?

9              MR. SNELL:  Form.

10             Go ahead.

11        A.   I think that's a very broad statement to say

12   lightweight meshes for sure are safer.  That is a very

13   elementary statement that -- for much more complicated

14   issue.

15        Q.   (By Mr. De La Cerda)  Okay.  Are you

16   familiar with Closterhofen, Clinga?  Are you

17   familiar with Todd Heniford?  Are you familiar with

18   these physicians' and scientists' opinions about the

19   safety of lightweight mesh versus heavyweight mesh?

20        A.   I am familiar with their work.

21        Q.   Okay.  Do you disagree with their

22   conclusions about lightweight mesh being safer for a

23   patient as compared to heavyweight mesh?

24        A.   I think that their --

Jaime Sepulveda, M.D.

1           MR. SNELL:  Form, foundation.

2           Go ahead.

3      A.   I think that their conclusions are very,

4   very hypothetical at best.

5      Q.   (By Mr. De La Cerda)  Okay.  Would you use

6   standard Prolene in the correction of pelvic organ

7   prolapse?

8      A.   We did.  Actually, we didn't just use

9   Prolene, we use Mersilene.  We used Marlex.  We used a

10  variety of materials before this, before we actually

11  use it for slings.

12          We didn't use it for slings because by the

13  time that midurethral slings came in, we have that

14  200-micron -- actually 196-micron fiber with a pore

15  size of 1500, and it was -- it was something -- it was

16  something that we knew that would match the thinnest

17  sutures that we could use for a Burch.

18     Q.   To be sure I've got an answer to that

19  particular question, though, the answer is yes, you

20  would use standard Prolene mesh in the surgical

21  correction of pelvic organ prolapse; is that right?

22     A.   Yes.

23     Q.   Okay.

24     A.   I could consider using it.  There are other

Jaime Sepulveda, M.D.

1    factors that may not lead me to use it, but the weight

2    of the mesh is not the only factor.

3        Q.   So you would disagree with anyone that would

4    say that using Prolene mesh in the treatment of pelvic

5    organ prolapse is too dangerous and risky.  You

6    disagree with that; right?

7        A.   I would disagree with that, yes.

8        Q.   Have you ever read the deposition of Jorge

9    Holste?

10       A.   I may have read it and if I did, I probably

11   read it over a year ago.

12       Q.   Head of the preclinical department of

13   Ethicon for 30 years, german guy, he opined that

14   Prolene mesh is heavyweight mesh.

15           Does that ring any bells?

16           MR. SNELL:  Foundation on that one.

17       A.   Prolene mesh, the way they classify is

18   heavy -- heavyweight mesh.  There were a number of

19   materials that I'm aware that they work with and they

20   classify according to weight.  From the engineering

21   point of view, that might be accurate.  From a

22   surgical point of view, there are a lot of other

23   factors that have to be considered.

24       Q.   (By Mr. De La Cerda)  Okay.  Do you agree

Jaime Sepulveda, M.D.

1   or disagree that heavyweight mesh causes greater

2   foreign body reaction than lightweight mesh?

3           MR. SNELL:   Form.

4       A.   There might have -- there could be in

5   existence something that says that increases the

6   number of neutrophils, but I have not found any -- any

7   utility on clinical care on predicting the behavior of

8   TVT.

9       Q.   (By Mr. De La Cerda)  So do you agree or

10  disagree with that statement?

11      A.   I -- I could not agree or disagree with

12  that.  That's so general and I would be speculating on

13  it.

14      Q.   Okay.  Do you agree or disagree that leaving

15  less mesh material in the patient's body is important

16  because it will reduce the amount of inflammation and

17  foreign body reaction?

18      A.   That's --

19          MR. SNELL:  Hold on.  You have to give me a

20      chance to object.

21          Overbroad and incomplete hypothetical.

22      A.   That's more than a scientific approach.

23  That's a very attractive approach.  And that's -- as

24  surgeons, we don't always base what we do on -- on

Jaime Sepulveda, M.D.

1    science, but also on common sense backed by science.

2         And, yeah, if I can take care of something

3    with less mesh, I probably would be attracted to it.

4    On the other side, you need to respect as surgeons

5    that say, "Well, you know, I will use the full-length

6    sling because it has the longest evidence behind it."

7    So in that regard, you're using more material, but you

8    have more evidence behind it.

9         Q.   (By Mr. De La Cerda)  Do you agree or

10   disagree that reducing the inflammatory reaction of

11   the body will also reduce the risk of contraction or

12   shrinkage of the mesh?

13        MR. SNELL:  Same objection.

14        A.   We don't -- we don't know that and I could

15   not agree with something that, in general, as a

16   specialty, we don't -- we don't know.

17        The reduced inflammatory reaction may not

18   work for the best.  There's a chain of events that

19   happens during the inflammatory process and that leads

20   ultimately to the creation of a fibroblast angle that

21   is what gives the support beyond the implant.

22        Q.   (By Mr. De La Cerda)  It's scarring;

23   right?

24        A.   It is -- it is not a scar.  Scar is the most

Jaime Sepulveda, M.D.

1  simplistic way of looking at it because a scar does

2  not have the same viscoelastic capabilities of tissue.

3  So you have to -- when you say a scar, it's not

4  necessarily a scar in the way that we see scars.  It's

5  viscoelastically it's different.

6          That's why someone can urinate after they

7  have a sling placed and they don't have retention.

8  That's how someone can have normal flows, someone can

9  be continent, at the same time also can go and

10  urinate.

11      Q.   Are you familiar with the term "fibrotic

12  bridging"?

13      A.   I've heard the term "fibrotic bridging,"

14  yes.

15      Q.   What's your understanding of that term?

16      A.   It's the growth of a fibroblast from one

17  segment to the next.

18      Q.   Do you agree or disagree that heavyweight

19  meshes induce more fibrotic bridging tissue reaction

20  causing more shrinkage during maturing of the

21  collagenous tissue?

22          MR. SNELL:  Form, foundation.

23      A.   I saw it described at one time.  I didn't

24  see anything that could conclude it.  I did not see a

Jaime Sepulveda, M.D.

1    paper that could conclude it.  I'm welcome to look at

2    anything that says that fibrotic bridging is

3    significantly more.  The first thing I would like to

4    know is how you're going to measure it.

5         Q.   (By Mr. De La Cerda)  Okay.  So I guess

6    you don't have enough information to either agree or

7    disagree; is that right?

8              MR. SNELL:  Object, misstates.

9         A.   I have -- I have enough information to -- to

10   not agree or disagree with it.  And that -- the

11   information that I have is that from one segment to

12   the other, just looking at two segments and the

13   fibroblast that grow between, at one point in time

14   that's not enough to make that conclusion, that

15   fibrotic bridging would cause contraction or

16   anything -- or anything similar like that.

17             There's -- in one of the papers that I gave,

18   there are two papers that I submitted today about the

19   effect of stress on fibroblast growth, and I think

20   that's more complete than fibrotic bridging.

21        Q.   (By Mr. De La Cerda)  So is it fair to say

22   that you disagree with that statement then?

23        A.   I -- I cannot say one way or the other

24   fibrotic bridging.  If I would have to commit to

Jaime Sepulveda, M.D.

1   agreeing or disagreeing with it, I think that fibrotic

2   bridging is, again, very hypothetical -- hypothetical

3   statement.  I also believe that I can change my

4   opinion based on what I read.

5        Q.   Okay.  So as you sit here today, though, I

6   think -- I think what you're saying, as you sit here

7   today, is you would have to disagree because you

8   believe there's not enough evidence to support the

9   statement?  I mean, is that what you're saying?

10       A.   There's not enough evidence to support

11  fibrotic bridging.  It's a concept that is

12  interesting.  It's a concept that can be studied.

13  It's a concept that has to be taken into the context

14  of what -- how fibroblast grow under stress.

15       Q.   Are you aware that Ethicon's own scientists

16  and consultants have opined that Prolene mesh, the

17  same mesh in the TVT and TVT-O, is heavyweight as

18  opposed to being lightweight?

19            MR. SNELL:  Lacks foundation.

20       A.   I -- I -- I haven't seen the opinion of each

21  one of them.

22       Q.   (By Mr. De La Cerda)  Okay.  So you're not

23  aware?

24       A.   I'm not aware.

Jaime Sepulveda, M.D.

1       Q.   Should a discussion of whether Prolene mesh

2   is heavyweight be included in the IFUs for the TVT and

3   the TVT-O?

4            MR. SNELL:  Form, foundation.

5       A.   No, I don't think that -- I actually believe

6   that most doctors, if you tell them heavyweight --

7   about heavyweight and lightweight meshes, they have

8   had to be educated on it.

9            I know that the great majority of them are

10  probably going to look at me and say, "Okay, Jaime, so

11  you're telling me about heavyweight and lightweight

12  and all these different aspects, tell me how does this

13  translate in the care of my patients?"  And I would

14  disagree with -- with any statement that makes

15  anything firm about heavyweights or lightweights

16  because the fact is that the model to a study have not

17  been found.

18      Q.   (By Mr. De La Cerda)  Okay.  And so your

19  opinion is that it doesn't need to be included in

20  the IFU; right?

21      A.   No, I don't think that has any -- any place

22  in the IFU.

23      Q.   And your basis for that is what?  I don't

24  want to put words in your mouth.

Jaime Sepulveda, M.D.

1          What would be your basis for not having to

2     include it in the IFU?

3          A.   Number one, it's not evidence -- the concept

4     of whatever implications they may have clinically is

5     not evidence-based and, number two, there are no

6     clinical implications that you can attribute to it.

7          Q.   Okay.  Part of your report discusses the

8     MSDS.  So you've reviewed the MSDS for the raw

9     polypropylene that goes into making the Prolene and

10    the TVT, TVT-O, Gynemesh, Prolift and Prosima?

11         A.   I saw the MSDS about raw -- raw material.

12         Q.   Right.  You're familiar with what a Material

13    Safety Data Sheet is?

14         A.   I learned about Material Safety Data Sheet

15    along the lines of this -- of this litigation.

16         Q.   Okay.  So you know that the Material Safety

17    Data Sheet states that raw polypropylene is

18    incompatible with strong oxidizers, such as peroxides;

19    correct?

20         A.   I read that in the MSDS.

21         Q.   And as a physician, you know that peroxides

22    are present in the human body; right?

23              MR. SNELL:  Form.

24         A.   I am not aware of anyone measuring the

Jaime Sepulveda, M.D.

1    levels of peroxide.

2         Q.   (By Mr. De La Cerda)  Well, as a physician

3    you know that the human body produces hydrogen

4    peroxide as part of the inflammatory process; right?

5         A.   I just have not seen a quantitative assay of

6    it.

7         Q.   Okay.  So you know it happens, you just

8    don't know what quantitatively it amounts to; right?

9         A.   I'm not aware of any quantitative study.

10        Q.   And the implantation of the TVT, TVT-O,

11   Gynemesh, Prolift and Prosima causes an inflammatory

12   process; correct?

13        A.   The inflammatory process being defined as a

14   cellular process.

15        Q.   Should the fact that raw polypropylene that

16   goes into making the Prolene, the TVT, the TVT-O,

17   Gynemesh, Prolift and Prosima is incompatible with

18   peroxides according to the MSDS, should that

19   information be included in the IFU?

20             MR. SNELL:  Form.

21        A.   No, it should not be included and based --

22   no, it shouldn't be included.

23        Q.   (By Mr. De La Cerda)  You already know my

24   next question.

Jaime Sepulveda, M.D.

1          What's the basis for not including that

2     information?

3          A.   No raw material is being asserted on humans.

4          Q.   Okay.  Anything else?

5          A.   No.

6          Q.   Okay.  You're also -- you addressed this in

7     your report.  You're also aware that the MSDS states:

8     "Polypropylene has been tested in laboratory rats by

9     subcutaneous implantation of disks or powder, local

10    sarcomas were induced at the site of implantation."

11         Do you recall that verbiage that's from the

12    MSDS?

13         A.   From the MSDS.

14         Q.   What does -- what does that verbiage mean?

15         A.   It's a disk, it's a disk of basically raw

16    polypropylene.  And the way I see it is there are two

17    factors to it.  Number one, the size and the volume of

18    the polypropylene that's being inserted, in addition

19    to the nature of this polypropylene.  I cannot speak

20    about this being even remotely similar to what we use

21    on -- on TVT-O and what we use in Prolene sutures

22    because there is not -- there has been no

23    chromatography, no crystallinity assays, no

24    temperature assays on any of this disk.  So I don't

Jaime Sepulveda, M.D.

1    have that information available.

2         That being said, you can also consider --

3    you should also consider the host in which most of the

4    time is Wistar rats, Wistar rats or Himalayan rabbits.

5    I had the opportunity to work with Wistar rats.  They

6    have a very, very peculiar immune system.

7    Q.   When there is an indication that a substance

8    can cause cancer in animals, like rats, what does that

9    possibly indicate for humans?

10        MR. SNELL:  Form, speculation.

11   A.   It has very, very little implications unless

12   you are consistently prove that these causes -- causes

13   cancer.

14        Now, this is -- these are -- it's very

15   important to define that these are two different

16   materials.  The raw preparations are different from

17   the preparations used in -- in sutures.  They're two

18   different things.

19   Q.   (By Mr. De La Cerda)  Chronic inflammation

20   has been linked to cancer; hasn't it?

21   A.   That's -- that's not even a theory.  That's

22   a hypothesis, actually.

23   Q.   Okay.  If mesh -- strike that.

24        Ethicon -- I need to go back for just a

Jaime Sepulveda, M.D.

1    second.

2              You're aware of no test performed by Ethicon

3    to determine whether the surface cracking or

4    degradation, or whatever you want to call it, that's

5    been -- that is seen under -- under microscope of the

6    mesh, whether it's biofilm or whatever you believe it

7    is, you've never seen a test by Ethicon to determine

8    whether that particular characteristic is clinically

9    significant to patients; right?

10       A.   No, there are only three reports that I'm --

11   that I'm aware of.

12       Q.   Okay.  And you're aware of no test by

13   Ethicon to determine whether the weight of Prolene

14   mesh causes more complications in patients in

15   comparison to lightweight mesh; correct?

16              MR. SNELL:  Form, foundation.

17       A.   There's no -- no basis to generate that --

18   that study.

19       Q.   (By Mr. De La Cerda)  What do you mean by

20   that?

21       A.   No one has come out with the actual question

22   in terms -- in the question on the hypothesis of it or

23   the theory of it.

24       Q.   Okay.

Jaime Sepulveda, M.D.

1      A.   In other words, just because we think that

2  there's a scientific study that we can do doesn't mean

3  that that needs to be done.

4      Q.   Okay.  But Ethicon -- Ethicon, itself,

5  hasn't performed that study; right?

6      A.   I -- I am -- I am not familiar with the

7  specific studies that they have performed on that

8  specific area.

9      Q.   You're aware of no study performed by

10  Ethicon to determine whether polypropylene could be

11  linked to cancer; right?

12      A.   I -- I am not familiar of that, but I know

13  about the dog study that -- in which they -- sutures

14  were evaluated at about eight years and there was

15  no -- no reported cancer that I'm aware of.

16      Q.   Okay.  You brought one study with you here.

17  I think it was a case report of cancer and

18  polypropylene.  What was it?  You mentioned it briefly

19  when we were looking through your materials.

20      A.   It is -- the first case reported of a clear

21  cell carcinoma in the surrounding area to the -- to

22  the incision for the midurethral sling.

23           I also brought the response from two experts

24  to that specific case report.

Jaime Sepulveda, M.D.

1    Q.   What did that study -- did that study have

2  some sort of conclusion about what might be causing

3  that clear cell carcinoma?

4    A.   No, it does not have a conclusion.  There's

5  a hypothesis and that's as far as they can get about a

6  hypothesis about inflammation, I believe.

7    Q.   And so that's one discussion of inflammatory

8  process being at least hypothesized as being

9  responsible for this particular cancer; right?

10   A.   Yeah, unfort- -- I don't want to say

11 unfortunately, it's not unfortunate.  It's -- this is

12 not an actual study.  This is a case report.

13   Q.   Case report.

14   A.   One case report.  And as we have gone

15 through so many times today, the overwhelming data --

16 there are papers that -- there are articles that

17 describe the continued use of polypropylene in

18 midurethral sling with the incidence of cancer in that

19 population or the frequency of cancer in that

20 population being actually zero.

21   Q.   Okay.  So then the question about your

22 opinion, should this warning that's included in the

23 MSDS -- or this verbiage that's included in the MSDS

24 regarding the subcutaneous implant of disk or powder

Jaime Sepulveda, M.D.

1   where local carcinomas were induced at the site of

2   implantation, should that information be included in

3   the IFUs for the TVT, the TVT-O, Gynemesh, Prolift and

4   Prosima?

5       A.    The answer is no, and the basis of that is

6   that is not relevant to the product that is being

7   implanted.

8       Q.    Has -- are you aware of any studies that

9   Ethicon's done comparing the raw polypropylene with

10  the manufactured version that is actually implanted in

11  humans, any test of any kind?

12      A.    Raw -- raw polypropylene is not used in

13  humans.  Raw polypropylene is actually not even used

14  on containers.  It has very -- it doesn't have an

15  actual use.  It's raw material.

16      Q.    And so you're aware of no studies, though,

17  where Ethicon's tested raw polypropylene versus the

18  finished manufactured product of any type; right?

19      A.    No, I'm not familiar with any studies using

20  raw polypropylene.

21      Q.    Okay.  Shifting gears a little bit.

22            You agree that as a scien- -- a scientist or

23  a physician should not go into a research study with a

24  desire to achieve a specific result; correct?

Jaime Sepulveda, M.D.

1      A.   I -- I -- I'll have to read that.  If you

2   can be blinded to your study, that would be optimal,

3   but that's not possible in every -- in every design.

4      Q.   So are you saying that a scientist in a

5   re- -- scientist and a physician -- it's okay for

6   that -- strike that.

7           It's okay for a scientist and a physician to

8   go into a research study with the desire to achieve a

9   specific result?

10     A.   No, I think that the design of the study

11  would actually protect the study from any desire that

12  anyone could have.

13     Q.   So should or should not the scientist and

14  the physician go into a study with the desire to

15  achieve a specific result?

16          MR. SNELL:  Form, overbroad.

17     A.   I don't -- I don't believe that anyone

18  should go into any study hoping or wishing for a

19  specific result.  That's not what the methodology of a

20  science is for.

21     Q.   (By Mr. De La Cerda)  You agree that a

22  scientist and a physician should not design a

23  research project for medical publication with the

24  specific purpose of a single result; correct?

Jaime Sepulveda, M.D.

```
1                MR. SNELL:  Form.

2        A.   It's -- there's no science if you are trying

3   to get it or achieve a specific result.

4        Q.   (By Mr. De La Cerda)  You can't go into a

5   medical scientific research trying to answer a

6   question with any preconceived biases; right?

7                MR. SNELL:  Form, overbroad.

8        A.   There's -- we -- we have seen that there --

9   there's some preconceived biases, but they become

10  clearly evident.

11       Q.   (By Mr. De La Cerda)  But you shouldn't go

12  in with any preconceived biases, that's what you

13  shouldn't do; right?

14       A.   You don't -- you don't do that as a

15  scientist.

16       Q.   Right.  Do you agree it's not ethical for

17  researchers performing clinical trials to be paid if

18  and only if the clinical trials have certain results?

19                MR. SNELL:  Form, overbroad.

20                Go ahead.

21       A.   I have no basis to judge anyone that has

22  good science, good knowledge, and to be compensated

23  for it.

24       Q.   (By Mr. De La Cerda)  No, and I -- well,
```

Jaime Sepulveda, M.D.

1    that's excellent, but my question is a little

2    different.

3           What I'm saying is whether you believe it's

4    ethical for researchers performing clinical trials to

5    be paid if and only if they produce a study with

6    specific results.

7           MR. SNELL:  Same objection.

8       Q.   (By Mr. De La Cerda)  So not the fact

9    they're being paid, just the fact they only get paid

10   if you give me these results?

11      A.   Well, it's -- you're going -- if I'm going

12   to acquire a product from you, and I'm going to make

13   an investment on that product, I'm going to pay you

14   based on what you show me with your -- with your

15   product.

16          Now, you can -- you can actually do that.

17   You can sell me a product that may not perform as I

18   expect, but if I try that product and I see that

19   consistently works in ways that are the same or better

20   as you present it, you can go back and say that was

21   not an issue there.

22      Q.   Okay.  So you can go back in time and say it

23   was okay, it wasn't unethical to do that?

24      A.   It's -- you can go back in time and say it's

Jaime Sepulveda, M.D.

1    not a matter of ethical or not ethical.  I know that

2    there was a truth -- a truthful interaction and that

3    what this physician or anyone in that calculating

4    innovation shows me was -- was real, was actually

5    accurate.

6        Q.    Okay.  You mean that you can at least agree

7    that that has a potential to create bias, doesn't it,

8    in the study?

9        A.    I -- but you can -- you cannot put that on

10   the person that is trying to bring it in.  There has

11   to be a level of -- of understanding and backtracking.

12          In other words, if you -- and I'm going to

13   allow myself to place an example.  If you try to sell

14   me a medical device, I will have a hard time buying it

15   from you.  But when -- if you try to sell me a legal

16   product, I might be more attracted to buy from you and

17   I might believe that you may deliver that legal

18   product.

19          That has nothing to do with science.  I

20   deviated into what -- just to illustrate a point just

21   to answer your question.

22       Q.    You're aware, of course, that Ulmsten was

23   the inventor of original TVT; right?

24       A.    Yes.

Jaime Sepulveda, M.D.

1      Q.   And you've seen the Ulmsten and Nilsson

2   studies that Ethicon tauts as long-term support for

3   their TVT line of slings; right?

4           MR. SNELL:  Form.

5      A.   They also wasn't just the inventor of the

6   TVT.  At that time he brought the most innovative kind

7   of approach to incontinence.  I mean, we -- we were --

8   until that time, we were doing continence procedures

9   in the urethrovesical junction, we were using sutures,

10   we were placing things under tension, we were using

11   absorbable materials that didn't work long term,

12   materials that were not pliable and they came up and

13   changed the way we were thinking about continence

14   care.  Continence care became different because of

15   Ulmsten and Petros.

16      Q.   (By Mr. De La Cerda)  Getting back to the

17   question.  You've seen the studies that Ethicon

18   touts as support for their TVT line of slings;

19   right?  You've seen those, the Ulmsten/Nilsson

20   studies; right?

21           MR. SNELL:  Form.

22           Go ahead.

23      A.   I've seen the Ulmsten studies, I've seen

24   Nilsson, I've seen Falconer, I've seen Petros.

Jaime Sepulveda, M.D.

```
 1        Q.    (By Mr. De La Cerda)  You've seen it in

 2   the marketing materials for Ethicon that they

 3   frequently site to those studies as being support

 4   for the use of their slings; right?

 5        A.    For that -- for that specific use, yes.

 6        Q.    And you've relied on these studies to

 7   support your practice of using the TVT line of

 8   products; right?

 9        A.    I rely on that and I rely more than that on

10   large studies.  And the fact is that it has been

11   reproduced over and over again.

12        Q.    Did Ethicon ever inform you that Professor

13   Ulmsten's company, MedScan, the company that owned the

14   rights to the TVT, was promised $400,000 if and only

15   if it produced a study with the TVT showing certain

16   results?

17              MR. SNELL:  Form.

18        A.    There's my interaction with -- or any

19   surgeon's interaction for that sake at that time,

20   would never get into that.

21        Q.    (By Mr. De La Cerda)  So you haven't heard

22   that?

23        A.    No, I -- I saw -- I saw that as one of the

24   claims, through all these documents, but really
```

Jaime Sepulveda, M.D.

```
 1   didn't -- didn't matter much to me.

 2        Q.   Okay.  So that particular fact doesn't

 3   matter to you?

 4        A.   No.

 5        Q.   Okay.  Shifting gears a little bit.  Should

 6   a medical device company put profits above patient

 7   safety?

 8             MR. SNELL:  Form, speculation.

 9             THE COURT REPORTER:  I'm sorry, form --

10             MR. SNELL:  Form, speculation.  Put

11        overbroad in there, too.

12        A.   Safety and results bring you profits.

13        Q.   (By Mr. De La Cerda)  So is the answer no?

14        A.   No.

15        Q.   Should a medical device company rush a

16   product to market with the primary purpose being to

17   defend its market share?

18        A.   There's -- when you have a good product and

19   you have enough market share, yeah, you want to make

20   sure that you keep it and you keep it with quality.

21        Q.   So the answer is yes to that one?

22             MR. SNELL:  Form.

23        A.   On that one -- on that regard, on the

24   general form of that question, yes.
```

Jaime Sepulveda, M.D.

1      Q.   (By Mr. De La Cerda)   What clinical

2   studies were done of the TVT-O before it was

3   released onto the market?

4      A.   There was -- there were a variety of

5   studies.   There was the Mulberry study --

6           THE COURT REPORTER:   The --

7           THE WITNESS:   The Mulberry.

8      A.   -- and there was -- there were cadaver

9   studies, and there were studies on outside-in

10  transobturator slings.

11     Q.   Was one of the studies by de Leval?

12     A.   By Delorme first and then de Leval.

13     Q.   Delorme was outside-in; right?

14     A.   Right.

15     Q.   And then de Leval was inside-out?

16     A.   Right.

17     Q.   De Leval is considered the inventor of the

18  TVT-O; is that right?

19     A.   Yes.

20     Q.   And do you know whether the results of

21  de Leval's clinical studies were included in the

22  application for clearance submitted to the FDA for the

23  TVT-O?

24     A.   I'm not familiar with what was exactly

Jaime Sepulveda, M.D.

1    submitted.  I cannot recall it right now.  I can go

2    back and check what was submitted, but I'm not

3    familiar with it.

4         Q.   If he had performed a study, do you believe

5    that that study should have been submitted along with

6    the information about the TVT-O to the FDA?

7              MR. SNELL:  Form, calls for regulatory

8              opinion, outside the regulatory scope.

9         A.   I think it goes to whatever -- whatever the

10   FDA feels that it requires from the company or

11   whatever the company fulfills in its obligations to

12   the FDA.

13        Q.   (By Mr. De La Cerda)  How about you as a

14   physician, before you're going to use a product,

15   would you want to know all the clinical studies that

16   are out there about that product before you start

17   implanting it?

18        A.   I actually gave -- I have given testimony

19   today that I trust that the FDA is going to do what's

20   best in that regard.

21        Q.   Do you have any understanding of what the

22   clearance process involves, 510(k) clearance?

23        A.   Yes.  I do have an understanding of it.

24        Q.   Do you know whether the FDA requires

Jaime Sepulveda, M.D.

1    clinical studies before a product is 510(k) cleared?

2        A.   I think that they have made -- I don't

3    think, I'm aware that they have made a decision to put

4    in place a mechanism that works exactly with a 510(k).

5            Now, am I someone to criticize or favor --

6    or favor that?  I probably could sit in my big chair

7    and decide that, but the reality is that there's

8    people with expertise in regulatory affairs at the FDA

9    and people with expertise on regulatory affairs at

10   Ethicon, and they're the ones that need to come

11   together on that.

12       Q.   I guess the issue that I'm really asking

13   about is what you want to know as a doctor.  Before

14   you ever implant a product, do you want to know that

15   if there are clinical studies on that product before

16   you've implanted it, do you want to know what those

17   clinical -- what the findings were of those clinical

18   studies before you implant the product?

19       A.   I'm aware of clinical products and design.

20   I'm aware of these studies, but you can present all

21   these studies and one final part is going to be what

22   the FDA regulatory process comes -- comes and tells

23   me.

24       Q.   What I'm saying, though, is you, as an

Jaime Sepulveda, M.D.

```
 1    implanting physician, okay, a product is presented to

 2    you by a medical device company and there are clinical

 3    studies out there that are about this particular

 4    product.  You're going to want to know all the

 5    clinical studies that are out there about that product

 6    before you implant it; right?

 7              MR. SNELL:  Form, asked and answered.

 8              Go ahead.

 9        A.   I want to know -- I want to know the studies

10    and I want to know -- obviously, I want to know more

11    than just the studies.  I want to know the

12    biomechanics of it, I want to know all these things.

13    But that's -- ultimately, it comes down to that

14    process between the -- between Ethicon and the FDA.

15        Q.   (By Mr. De La Cerda)  Okay.

16        A.   And I'm going to trust the product that

17    comes out from it.

18        Q.   Okay.  Let's shift gears a little bit.

19              You're aware that the IFUs for the Gynemesh,

20    Prolift and Prosima state:  "The mesh remains soft and

21    pliable and normal wound healing is not noticeably

22    impaired"; right?

23              MR. SNELL:  Foundation on that.

24              Do you have that IFU?  I'm not sure if you
```

Jaime Sepulveda, M.D.

 1        made a correct statement across all those IFUs.

 2             Do you mind taking a break?

 3             MR. DE LA CERDA:  That's fine.  Let's do

 4        that.

 5             (Thereupon, a recess was taken from

 6        2:11 p.m. until 2:18 p.m., after which the

 7        following proceedings were held:)

 8        Q.   (By Mr. De La Cerda)  Doctor, just for the

 9   sake of showing you, this is the Gynemesh -- sorry,

10   I didn't bring a copy of it -- so that's the

11   Gynemesh IFU.  The part that I'm referencing is at

12   the bottom, I think it's the second-to-last

13   sentence.  It starts with "the mesh remains

14   pliable."

15             MR. SNELL:  Soft and pliable.

16             Why don't you ask him to read it just so the

17        record is clear.

18             MR. DE LA CERDA:  Yeah, sure.

19        Q.   (By Mr. De La Cerda)  Can you read that,

20   Doctor?

21        A.   "The mesh remains soft and pliable and

22   normal wound healing is not noticeably impaired.  The

23   material is not absorbed, nor is subject to

24   degradation or weakening by the action of tissue

Jaime Sepulveda, M.D.

1    enzymes."

2         Q.   (By Mr. De La Cerda)  So that statement is

3    included, of course, in the Gynemesh IFU and the

4    Prolift and Prosima IFUs, which also use Gynemesh;

5    right?

6         A.   Yes.

7         Q.   Now, you're aware that Gynemesh PS is

8    Prolene Soft, except for it's used in the pelvic

9    application as opposed to hernia application; right?

10        A.   It's -- Pro- -- Prolene Soft, yes.

11        Q.   Are you aware that in 2001, Ethicon had in

12   its files a conclusion that Gynemesh PS was too stiff

13   for use in vaginal tissues?

14             MR. SNELL:  Form, foundation.

15        A.   It's -- I read something about that from

16   some investigator, but it was -- it was an opinion

17   about being too stiff.  I think it was at the -- at

18   the risk of -- I'm not remembering well or -- I'm not

19   speaking accurately, may have been an investigator's

20   opinion.

21        Q.   (By Mr. De La Cerda)  Okay.  Are you aware

22   that Ethicon also had in its files a conclusion that

23   Prolene Soft should not be pursued as a mesh used in

24   pelvic floor repair because it was too stiff for use

Jaime Sepulveda, M.D.

1    in vaginal tissues?

2            MR. SNELL:  Same objection.

3       A.   No, I'm not -- I'm not aware of that and

4    that's not what was eventually done.

5       Q.   (By Mr. De La Cerda)  Do you know whether

6    scar contracture around the mesh can occur with the

7    Gynemesh?

8       A.   There's -- there's -- there's this -- again,

9    hypothesis that scar contraction could happen around

10   the mesh.  So to that -- to that specific issue, I ask

11   what is the objective measurement of a scar

12   contraction or the mesh contraction.  I wanted to see

13   where -- where's the evidence to it?

14           Because when we repair these -- repair these

15   patients with permanent sutures, when we place

16   polypropylene in the uterosacral ligaments or in the

17   sacrospinous ligament, we didn't see any contraction

18   of those fibers.  So where is the evidence?  No one

19   could ever bring me evidence of a contraction on the

20   mesh.

21      Q.   Okay.  Do you know if that -- if this scar

22   contracture around Gynemesh was a problem that Ethicon

23   engineers were trying to solve?

24      A.   I -- I don't even know if they try to solve

Jaime Sepulveda, M.D.

1    it because I did not see a problem with contraction.

2        Q.   Okay.  So you're also not sure, though,

3    whether Ethicon was trying to solve this problem?  You

4    probably don't believe it's a problem.  That's what it

5    sounds like you're saying, that it's not a problem,

6    but my question is really are you aware whether

7    Ethicon was trying to solve what it perceived to be a

8    problem with contracture of scar tissue around

9    Gynemesh?

10           MR. SNELL:  Foundation.

11       A.   I don't -- I don't see in which model they

12   would try to solve it.

13       Q.   (By Mr. De La Cerda)  Okay.  But are you

14   aware if they were trying to solve this or not?

15       A.   No, I'm not aware of them trying to solve

16   contractions of any -- any type, any type of implants.

17       Q.   If scar contracture exists around Gynemesh,

18   would that translate into complications for a patient?

19           MR. SNELL:  Form.

20       A.   More than a complication for a patient.  The

21   contraction would just tell me that I have to -- I

22   have to make adjustments in my surgery and that brings

23   a whole new set of variables in my -- in my surgery.

24       Q.   (By Mr. De La Cerda)  Do you know whether

Jaime Sepulveda, M.D.

1    or not physicians were asking Ethicon for a mesh

2    which would be better than Gynemesh on the issue of

3    scar contracture?

4         A.   I -- I believe that there was always the --

5    the idea that we could always have innovation on the

6    type of implants that we would have.  Although

7    Gynemesh had more evidence than any other implant.

8    There was more evidence, there are more papers

9    published on Gynemesh than native tissue for specific

10   compartments.  We have that.  We all -- we all did

11   have an understanding that there was going to be a

12   progression on the innovation of the product.  So if

13   there is a course to do that, that's -- that's

14   something that I think every physician would want to

15   see.

16        Q.   And Ethicon did that -- they did just that,

17   didn't they?

18        A.   They -- they actually invited me and give

19   me -- with other doctors, tell me what -- what this --

20   what would you like to see in -- in the next

21   generation.

22        Q.   They innovated so well that they even

23   developed a mesh, other than Gynemesh, that they

24   thought was safer than Gynemesh; right?

Jaime Sepulveda, M.D.

1          MR. SNELL:  Actually, hold on.  Objection,

2     foundation, misstates company intent.

3     A.   I don't -- I don't think that that's what

4     they concluded, that it was safer.  I don't think that

5     there is anyone that actually came and say, "Okay,

6     this is safer," or, "We have more evidence to say that

7     it's safer, but you may have to adjust it," or "It may

8     not contract or they will contract."  I don't -- I

9     don't think it got to that point.  I think that we had

10    what we had with Gynemesh.

11    Q.   (By Mr. De La Cerda)  Okay.  Did you ever

12    do a presentation on the benefits of lightweight

13    mesh over heavyweight mesh?

14    A.   I did make presen- -- many presentations on

15    how -- on the benefits of lightweight mesh, and that

16    was a prevailing -- the prevailing thought at that

17    time and I still would make a presentation and say

18    there are some benefits on lightweight mesh.  There

19    are -- there's some benefits on having less implant,

20    in having less mesh.

21          The question is when we have all this -- all

22    these different -- different things that we wish for,

23    how much science do I have behind it?  And during

24    those -- those presentations, there's always the

Jaime Sepulveda, M.D.

1    discussion of:  Is this really what we want?  Do we

2    want bigger pores?  Do we want a lighter --

3    lightweight meshes?  Do we want lighter meshes?

4            I'm not saying that it's going to be a bad

5    thing.  It's probably going to be a good thing, but I

6    don't have the science to back it up.

7       Q.   You mentioned that you did present on some

8    of the benefits of lightweight mesh or using less

9    mesh.  What would those benefits be?

10      A.   It's a -- the benefits is that you have less

11   inflammatory response, you have less cellular

12   response, you have a better layout of fibroblast and

13   that's the hypothesis behind all this.

14           But none of those things that we, as a

15   group, thought as -- as physicians thought that was

16   going to be better, wasn't necessarily going to be

17   better.  These were things that were not statements.

18   These were things that we have it here and we have

19   this product and it's worth looking to it and it's

20   worth using it and, you know, if I'm going to have --

21   use something heavier or something light, I probably

22   go with something light because it's more innovative.

23      Q.   It's a reasonable theory to believe that the

24   lightweight mesh is safer for a patient than the

Jaime Sepulveda, M.D.

```
 1   heavyweight mesh; right?

 2        A.   No.  That's not --

 3             MR. SNELL:  Lacks foundation.

 4             Go ahead.

 5        A.   No.  That's not what we can conclude with

 6   it.  We're not talking -- Gynemesh proved to be safe.

 7   Gynemesh proved to be effective.  This is a totally

 8   different set of considerations, scientifically it's a

 9   totally different set of considerations.

10        Q.   (By Mr. De La Cerda)  Let's do it this

11   way.  What I want to do is work from possibility all

12   the way up to truth.  Okay?

13             Possibility, hypothesis, theory and we'll

14   just say reality or truth.  Okay?

15             Is it possible -- do you agree it's possible

16   that lightweight mesh is safer for patients than

17   heavyweight mesh?

18             MR. SNELL:  Calls for speculation.

19        A.   That's -- that's possible.

20        Q.   (By Mr. De La Cerda)  Okay.  Now let's

21   take the next step.

22             Would it be a fair hypothesis that

23   lightweight mesh is safer than heavyweight mesh?

24        A.   That's a hypothesis, period.  Not fair, not
```

Jaime Sepulveda, M.D.

1  unfair, it's just a hypothesis that we would have to

2  test.

3      Q.   Okay.  Is it a fair -- based on what you

4  know, is that a hypothesis that could be confirmed?

5      A.   Well, that's a hypothesis that has much less

6  evidence behind it than -- than using Gynemesh.

7      Q.   The step where you would stop the

8  progression, though, would be a theory.  You don't

9  believe there's enough to support the theory that

10  lightweight mesh is safer for patients than

11  heavyweight mesh; is that right?

12      A.   These were -- these were considerations that

13  were entertained not at that time.  They still

14  entertain a scientific meeting.  It doesn't mean that

15  we're going to go -- go out and start using the

16  lightest weight mesh.  It doesn't mean -- because we

17  understand meshes a lot better now as -- as

18  physicians.  As surgeons, as scientists, we understand

19  it better.

20          Now, we knew that what we had would -- would

21  give durability.  We knew that what we had would

22  give -- would be a good product to use for

23  reinforcement on augmented repairs.  There was --

24  there was some concept along the lines that were not

Jaime Sepulveda, M.D.

1    as explored as is being explored now.  And based on --

2    on those concepts that were unexplored, we made

3    inferences on how we would like the next mesh to be.

4         That doesn't take the fact that what we had

5    behind us was data from Gynemesh.

6    Q.   Do you agree that scar contracture can cause

7    recurrence of prolapse?  This is in terms of if scar

8    contracture is happening around Gynemesh, can that

9    cause recurrence of prolapse?

10        MR. SNELL:  Foundation.

11   A.   Are you talking about the same side or

12   opposite side or just in general?

13   Q.   (By Mr. De La Cerda)  In general.

14   A.   No, that's not the biggest factor on a

15   recurrence of a prolapse.

16   Q.   I'm just going to go through a little list

17   right here.

18        Do you agree that scar contracture around

19   Gynemesh can cause pain?

20   A.   Contractions of scarring always have the

21   potential to decrease the pliability of not only a

22   mesh augmented repair but of any -- any repair.

23   Q.   That was actually going to be my next

24   question.

Jaime Sepulveda, M.D.

```
 1           First of all, the pliability can lead to
 2    pain?  Like reduced pliability can lead to pain in a
 3    patient; is that right?
 4        A.   If there's less pliability and there are a
 5    number of factors to -- for a repair being less
 6    pliable, but if there is less pliability and the
 7    tissue is placed under -- under stress, yeah, you
 8    would -- you would feel more that it would be more
 9    pliable.
10        Q.   Could the scar contracture lead to erosion?
11        A.   No.
12        Q.   How about discomfort during sex?
13        A.   Less, less pliability could make things feel
14    not -- not as soft, not as elastic.
15        Q.   Would you agree that for a mesh to be
16    successfully used for the treatment of pelvic organ
17    prolapse it should be soft and compliant with a
18    woman's vaginal tissues?
19        A.   And that is -- that is an excellent question
20    because I would like to define, which I didn't have to
21    define before in the medical arena, I didn't have to
22    define as much what soft and pliable and elastic is.
23           I have tried to come to -- to the conclusion
24    that there is a level of the formation of stress that
```

Jaime Sepulveda, M.D.

1    is required.  You cannot have so much deformation that

2    the prolapse comes out, but you still have to have

3    some firmness to your repair.  In other words, you

4    drive your car, you need your shock absorbers to give

5    some give, to give some, but you don't want your shock

6    absorbers to be bouncing all over the place.  It would

7    be as uncomfortable as no bouncing at all.

8         So when I -- when I take my car for a shock

9    absorbers check, they have something that actually

10   measures it and they can adjust it.  They can adjust

11   the damper and give.  We don't have that in the

12   vagina.

13   Q.   Ethicon certainly never tested that issue;

14   did they?

15        MR. SNELL:  Objection, lacks foundation.

16   A.   The vaginal pliability, I think that there

17   was some papers about designing a device -- there was

18   a paper, actually, Dr. Willy Davila, I believe, was

19   testing a device for vaginal pliability; and that

20   would be very useful in getting an actual number,

21   getting an actual measurement that we can take from.

22   Q.   (By Mr. De La Cerda)  Is that something

23   that Ethicon did?

24   A.   No, I think -- I don't think -- I'm not

Jaime Sepulveda, M.D.

1  aware of Ethicon doing that.

2      Q.   Would you agree that clinically there may be

3  an impact of increased rigidity with any given mesh as

4  it may increase vaginal stiffness post-operatively

5  with a potential to impair sexual function?

6      A.   I -- I misspoke on my last answer.  I want

7  to correct that.

8          When I say Ethicon never -- never did that,

9  I cannot conclude that because I'm not aware if they

10  did or if they didn't, but I'm just -- that's what I'm

11  aware of, that I don't know if they did or didn't.

12      Q.   That's fair.

13          Let me go back to my question, the next

14  question.  Would you agree that clinically there may

15  be an impact of increased rigidity with any given mesh

16  as it may increase vaginal stiffness post-operatively

17  with a potential to impair sexual function?

18          MR. SNELL:  Form, speculation, incomplete

19      hypothetical.

20      A.   There's -- the papers that we have does

21  not -- does not suggest or indicate rigidity.  If

22  there is a shrinkage or rigidity, it was not

23  demonstrated on the measurements of total vaginal

24  length.  When you measure total vaginal length, not on

Jaime Sepulveda, M.D.

1   one but in two, three studies with comparing different

2   repairs and native tissue repairs to mesh augmented

3   repairs, the vaginal length stays exactly at the

4   same -- at the same length.

5       Q.   (By Mr. De La Cerda)  Should Ethicon's

6   conclusion -- strike that.

7           Should information about the concerns of

8   physicians and at least some within Ethicon that

9   Gynemesh was too stiff or too rigid for vaginal

10  tissues, should that information be included in the

11  IFU or no?

12          MR. SNELL:  Form, asked and answered.

13      A.   No, I don't think that it needed to be

14  included and the fact is that surgeons have the

15  options of doing augmented repairs or doing --

16  continue doing native tissue repairs.  And they will

17  have whatever concern they may have with one or the

18  other, they have the option of doing one or the other.

19  No one mandated to do a mesh repair or a native tissue

20  repair at a certain time.  But if you went by the data

21  and went by the durability and went by the evidence

22  about -- with Gynemesh, you have -- you were empowered

23  with information to decide one way or the other.

24          Ethicon does not tell surgeons who --

Jaime Sepulveda, M.D.

1    actually, they never told me, I can tell you that, and

2    they would never tell anyone, "You have to do this

3    repair with this type of material."  And I don't think

4    they would include that in the IFU and they would not

5    include that on any communication because it's up to

6    the surgeon to decide that.

7        Q.   (By Mr. De La Cerda)  So would that be the

8    basis for why that information is not -- does not

9    need to be included in the IFU, according to your

10   opinion?

11       A.   If the information on the -- on the IFU has

12   to do with the product itself and if there's no

13   evidence of the product performing one way or the

14   other, I would not expect anyone to misrepresent it

15   one way or the other.  In other words, I don't --

16   don't misrepresent it saying that it performs better,

17   don't misrepresent it saying that it performs worse.

18   Just give me what the evidence shows.

19       Q.   Would you agree that any future meshes

20   developed by Ethicon for pelvic organ prolapse should

21   be less rigid than Gynemesh?

22       A.   I don't -- I don't know if it's going to be

23   any development, I don't know if it's -- it's going to

24   be on the same rate of damage.  I think that --

Jaime Sepulveda, M.D.

```
 1              THE COURT REPORTER:  On the same?

 2        A.   On the same rate of -- on the same rate

 3   of -- when I say "rate," on the same elasticity or

 4   pliability of Gynemesh.

 5              I don't know if it's going to be the same

 6   stiffness or not.  I just don't know what they're

 7   going to do with the next generation.

 8        Q.   But my question is, though, is:  If they are

 9   going to develop the next generation, do you agree

10   that that next generation should be less rigid than

11   Gynemesh?

12              MR. SNELL:  Objection, foundation.

13        A.   I think we will have to first establish a

14   way of rigidity in -- once in the vagina and not just

15   on the testing that we have, biomechanical testing.

16              We know that biomechanical testing as

17   accurate and as elaborate and as complicated as it can

18   be, it doesn't always predict the -- the rigidity in

19   the vagina, because we don't know how to measure

20   rigidity in the vagina.  We don't know how you're

21   going to measure it.

22        Q.   Let me shift gears a little bit.

23              Okay.  You understand before a medical

24   device can be marketed in the United States, the FDA
```

Jaime Sepulveda, M.D.

1    requires that the device receive some level of

2    clearance or approval before that marketing happens;

3    right?

4         A.   Yes.

5         Q.   You're aware that Prolift wasn't cleared for

6    marketing in the United States by the FDA until

7    May 15, 2008; right?

8              MR. SNELL:  Form.

9         A.   There were some -- some dates in there, but

10   I don't have the dates complete.

11        Q.   (By Mr. De La Cerda)  You understand that

12   Prolift was marketed in the United States for

13   approximately three years before it received

14   clearance.  Do you understand that?

15             MR. SNELL:  Form, foundation.

16        A.   Yeah, it's -- it may have been marketed,

17   yes.  I don't -- I don't know -- I cannot give you an

18   accurate answer on that.

19        Q.   (By Mr. De La Cerda)  Should the fact that

20   Prolift wasn't cleared for marketing in the United

21   States been included in the Prolift IFUs in place

22   prior to May 15, 2008?

23             MR. SNELL:  Form, foundation, misstates the

24        regulatory --

Jaime Sepulveda, M.D.

1       A.   Marketing -- marketing a device -- marketing

2   a device doesn't mean that you cannot -- you cannot

3   sell it.  I don't think it has the relationship of one

4   with the other.  If you -- if marketing means someone

5   visited me and giving me a brochure and telling me all

6   these things about the product, I really want to look

7   at the evidence.  I will be courteous and I will

8   listen to it, but I will go to -- with the evidence.

9           And the evidence was, at that time and still

10  today, that -- that the materials used were as good as

11  a native tissue and was more durable.

12      Q.   (By Mr. De La Cerda)  So you're telling me

13  that doctors didn't need to know before they put in

14  a Prolift if it hadn't even been cleared by the FDA

15  until May 15, 2008?

16          MR. SNELL:  Same objections.

17      Q.   (By Mr. De La Cerda)  Because there

18  were -- there were hundreds, if not thousands, of

19  Prolifts put in before it was ever cleared.  Do you

20  understand that?

21          MR. SNELL:  Same foundation, objection.

22      A.   I'm not -- I'm not aware of that specific --

23      Q.   (By Mr. De La Cerda)  We can -- we don't

24  even have to have a number.  If one was put in

Jaime Sepulveda, M.D.

1    before it was ever cleared by the FDA, do you think

2    it's okay for a doctor to not know that it wasn't

3    cleared by the FDA before he puts it in to a

4    patient?

5              MR. SNELL:  Same objection.

6        A.   It had a 510(k) approval; correct?

7        Q.   (By Mr. De La Cerda)  May 15, 2008.  So

8    for three years it didn't.

9              Have you ever seen the correspondence

10   between Ethicon and the FDA about that clearance

11   issue?

12             MR. SNELL:  Same objection, foundation.

13       A.   I'm not aware of that, no.

14       Q.   (By Mr. De La Cerda)  Are you aware of the

15   510(k) being rejected a couple times?

16             MR. SNELL:  Actually misstates the evidence,

17        foundation as well.

18       Q.   (By Mr. De La Cerda)  You haven't seen any

19   of that correspondence?

20       A.   Not -- not on that specific issue, no, I

21   have not seen it.

22       Q.   All right.

23       A.   But if you give it to me, I'll check it out.

24   I'll give an opinion on it.  That's -- that's ...

Jaime Sepulveda, M.D.

1    Q.   So let's take the simple fact this product

2   was marketed in the United States before it ever had

3   clearance.  Now, before a doctor ever implants the

4   product, do you think it's fair for him not to know

5   that the product he's implanting hasn't even been

6   cleared by the FDA?

7         MR. SNELL:  Same objection, misstates the

8         evidence and the foundation as to the clearance.

9    A.   If it's -- I don't want to give you an

10   opinion on something that I haven't seen.

11   Q.   (By Mr. De La Cerda)  As you sit here

12   today, you have not reviewed any of the

13   correspondence between the FDA and Ethicon regarding

14   the clearance of the Prolift under the 510(k)

15   process; right?

16   A.   I -- I know that Prolift was cleared and I

17   know that there was -- the product had been sold.  I

18   just don't know the specifics of when was it cleared

19   and the dates as you're referring to.

20   Q.   What I want to try to get at now is, as you

21   sit here today, are you going to provide any opinions

22   about the Prolift and the timing of its clearance and

23   what effect that might have on warnings to doctors?

24   A.   As we sit here today, I cannot give you an

Jaime Sepulveda, M.D.

1   opinion about something that I have not read.

2       Q.   Okay.  And so you know today is my

3   opportunity to question you about this issue.  This

4   isn't a new issue, it's been around since 2008.  So if

5   you're telling me today that you don't have -- you're

6   not prepared to provide an opinion on that issue,

7   that's great.  That sends me down one road.

8           If you're telling me today that you do have

9   an opinion, then that's why -- then I would like to

10  ask questions about it.  But if you're not going to

11  opine -- if you don't intend to opine on the effect of

12  the timing of the clearance of the Prolift through the

13  510(k) process and that effect on what should be

14  warned or what should be told to doctors about the

15  Prolift, then that's fine and we can move on to the

16  next subject.

17      A.   No, I can -- I can look at those papers and

18  I cannot give you an opinion at this time about papers

19  that I have not seen.

20      Q.   Are those papers in your Reliance List?

21      A.   No, I don't think they're in my Reliance

22  List.  If they would be, I would have read it.

23          THE WITNESS:  Oh, you didn't --

24          MR. DE LA CERDA:  I'm actually the nice one.

Jaime Sepulveda, M.D.

```
 1        Out of all the plaintiff's guys you meet, I'm the

 2        nice one.

 3              MR. SPARKS:  Hey.

 4              MR. DE LA CERDA:  He's a nice one, too.

 5        Q    (By Mr. De La Cerda)  Let's switch gears a

 6   little bit.

 7              Do you agree with the FDA's viewpoint that

 8   there is a need for more rigorous studies regarding

 9   the safety and efficacy of transvaginal mesh kits?

10        A.   The --

11              MR. SNELL:  Hold on.  You said -- can you

12        read that last -- he said transvaginal --

13              THE COURT REPORTER:  Mesh kits.

14              MR. SNELL:  I'm going to object, overbroad,

15        to the extent you're including Prolift

16        midurethral slings.

17              MR. DE LA CERDA:  And I'm not, so I do want

18        to be clear about that.

19              When I'm using this term "transvaginal mesh

20        kits," it's transvaginal mesh for the correction

21        of pelvic organ prolapse.

22              So let me go back.  Let me read the question

23        one more time.

24        Q.   (By Mr. De La Cerda)  Do you agree with
```

Jaime Sepulveda, M.D.

1   the FDA's viewpoint that there is a need for more

2   rigorous studies regarding the safety and efficacy

3   of transvaginal mesh kits, meaning transvaginal mesh

4   for the correction of pelvic organ prolapse?

5       A.   No, I disagree with that recommendation.

6       Q.   (By Mr. De La Cerda)  Okay.  And why is it

7   that you disagree?

8       A.   I disagree because there was a wealth of

9   data on -- on the use of transvaginal mesh that has

10  been determined by more than 400 surgeons -- 400

11  active surgeons that it was adequate.

12          The decision of the FDA, with all due

13  respect to the organization or to whoever put the time

14  and put their effort in sitting on that committee, did

15  not -- did not translate on or did not convey the

16  experience of all the surgeons.

17      Q.   Did you ever actually see the FDA's 522

18  orders that were issued with regard to Gynemesh,

19  Prolift and Prosima?

20      A.   I did -- I did read about those, yes.

21      Q.   Do you know what these orders required of

22  Ethicon?

23      A.   Yes.  I -- I read about the requirements and

24  I also read at one time the response of Ethicon to the

Jaime Sepulveda, M.D.

1    FDA.

2         Q.   That was my next question.  Do you know what

3    is it that Ethicon did in response to the 522 orders?

4         A.    They -- they made a statement along the

5    lines of what I just mentioned, that there were

6    studies, not only RCTs, not only -- but also cohort

7    studies that show the benefits in durability, it

8    showed the safety profile, it showed risk and

9    complications, very well delineated in ways that no

10   other repair had been addressed.

11        Q.   Did you also see any information regarding

12   Ethicon's estimate on the cost to have complied with

13   the 522 orders?

14        A.   I did not see the exact cost, but I know

15   that any -- any study is costly.

16        Q.   And Ethicon ultimately decided not to

17   perform what was discussed within the 522 orders;

18   correct?

19        A.    That's -- that's what I -- I -- I saw from

20   the -- from that process, from that specific process.

21        Q.   Ultimately, Ethicon decided to pull those

22   products from the market; right?  Prolift and Prosima

23   were pulled from the market; correct?

24        A.   Yes.

Jaime Sepulveda, M.D.

1      Q.   And then Gynemesh, the indication was

2   changed from -- well, I guess before there were two

3   indications, then they changed it to just one.  So now

4   the indication for transvaginal implant was removed

5   and now it's just abdominal sacrocolpopexy; is that

6   right?

7      A.   That's correct.

8           MR. SNELL:  I'm going to object.  Wait.

9      Wait.

10          THE WITNESS:  Okay.

11          MR. SNELL:  Objection, foundation, misstates

12      the evidence and the clearance.

13          So go ahead.

14     Q.   (By Mr. De La Cerda)  So that's -- is that

15   your understanding of what was done is that Prolift

16   and Prosima were pulled from the market but Gynemesh

17   wasn't, just its indication was changed?

18          MR. SNELL:  I'm going to have to object.  I

19      didn't hear "pulled from the market."  Same

20      objection, misstates the evidence.

21          If you take my basis, I'm sure you can get a

22      clean question and answer.

23     Q.   (By Mr. De La Cerda)  What I'll do is I'll

24   ask it this way:  When Ethicon invented a word

Jaime Sepulveda, M.D.

1    called "decommercialization" and labeled that as

2    what it did for the Prolift and the Prosima, point

3    is ultimately Prolift and Prosima they stopped

4    selling; right?

5              MR. SNELL:  Form, predicate.

6         A.   Yes.

7         Q.   (By Mr. De La Cerda)  Gynemesh they

8    changed the indication; right?

9         A.   That's -- yeah, I became aware of that.

10        Q.   And that avoided Ethicon having to comply

11   with the studies required in the 522 orders; correct?

12             MR. SNELL:  Objection, speculation.

13        A.   I don't agree with that --

14        Q.   (By Mr. De La Cerda)  Why not?

15        A.   -- last statement.  Because I'm not -- I'm

16   disagreeing on the basis that there's -- they could

17   not continue without doing the 5- -- the 522s.  I

18   think that a fair trial of this would have been to at

19   least be on the committee that the FDA had.  And there

20   was actually the voice of surgeons saying these are --

21   this is the evidence and part of the evidence was

22   presented on a communication.  It was signed by over

23   400 surgeons and still that was ignored.

24             And that has less to do with what Ethicon

Jaime Sepulveda, M.D.

1    could do, the way I look at it, the way I appreciate

2    it, and more to the fact that the FDA decided no, this

3    is the way it's going to be, 522s or -- or not.  So

4    what could they do?

5        Q.   This is an interesting point that's come up

6    in my mind.  Why is it that the physicians didn't

7    petition Ethicon to comply with the 522 orders?  If

8    the product was so good, why don't the physicians say,

9    "Hey, Ethicon, this stuff is great, do the 522 orders,

10   we know it's going to turn out great, we all win"?

11           Why was there no petition for Ethicon to do

12   that?

13           MR. SNELL:  Calls for speculation.

14       A.   I -- I don't know.  That's exactly -- I'm

15   going to -- I'm going to probably answer it that way

16   because it calls for speculation.

17       Q.   (By Mr. De La Cerda)  Ultimately, if the

18   product's great, why didn't Ethicon do the studies?

19           Have you ever been provided a rationale as

20   to why Ethicon decided not to do the 522 studies?

21       A.   No, there was no -- no rationale and we

22   still cannot find a rationale for that, for not

23   complying with the 522.  I think that you can -- you

24   cannot tell a company how they're going to go about

Jaime Sepulveda, M.D.

1    their -- running their business.  Although I would

2    like, yeah, to have that power to tell everyone to run

3    their business, it's not like I'm going to be listened

4    on that.  And there are other considerations that they

5    may have.

6            I can tell you that from a surgeons'

7    perspective, yeah, we could have been compelled --

8    going along the statement that you just made, we could

9    have been compelled to go to Ethicon and I think that

10   that was conveyed at some point, but there's no -- no

11   way to go about it when you're imposed a 522 just off

12   like that.

13           And I think that part of it -- just to

14   elab- -- elaborate on that -- part of it was that we

15   saw -- we signed that petition, we signed that letter,

16   we say, "Please reconsider this.  Let's find another

17   method to do this.  There has to be a better method to

18   do this."  And I think ten years from now we're going

19   to look back on this and we're going to say that was

20   an inadequate method.  It was too rigid and we have to

21   find other methods to have these devices available to

22   surgeons.

23       Q.   Is it necessarily a bad thing, though, for

24   clinical studies to be required before another

Jaime Sepulveda, M.D.

1   transvaginal pelvic organ prolapse mesh is put on the

2   market?  I mean, is that a bad thing?  Isn't that a

3   good thing because it can ensure safety for patients?

4           MR. SNELL:  Form.

5       A.   I could -- let me tell you, I'm -- by now,

6   you know that I have done research in one way or

7   another for 25 years and I sponsor individuals to do

8   research and I believe in research and I believe in

9   evidence.

10          I can -- I will never be able to say, "Oh,

11  no, we don't need another study."  I think that

12  everybody wants another study, but the fact is that

13  are we going to put individuals through a study when

14  we have evidence from -- from before, multiple

15  randomized control trials, how fair is that to do

16  another study with women when we have evidence of how

17  it works?

18      Q.   (By Mr. De La Cerda)  Do you know if any

19  of the hospitals that you have privileges at had any

20  Prolift or Prosima devices leftover after Ethicon

21  stopped selling those products?

22      A.   No, that's -- in my -- my hospital, there

23  was -- it was not there.  Basically the communication

24  came in and the communication is clear and that was

Jaime Sepulveda, M.D.

1   it.

2       Q.   What do you mean by the "communication"?

3   Did Ethicon say, "Hey, take it off your shelves"?

4       A.   No, we have a product manager in the

5   operating room and any of us that have -- any surgeon

6   that receives a letter would go and send it right away

7   to the product manager.

8       Q.   And what did the letter say?

9       A.   That's the decommercialization letter.

10      Q.   Okay.

11      A.   And that was it.

12      Q.   And so at the time it was decommercialized

13  did those products then get pulled from the shelves of

14  the hospital?

15      A.   Yeah, that's it, they're in a separate cart

16  and the cart doesn't work anymore.  I actually tried

17  to find one a few -- a few months later, I couldn't

18  find it.  No, that goes to a facility, gets destroyed,

19  that's it.

20      Q.   Okay.  Here's a few statements, I want to

21  see if you agree with them.

22           Do you agree serious complications

23  associated with surgical mesh for transvaginal repair

24  of pelvic organ prolapse are not rare?

Jaime Sepulveda, M.D.

1      A.    They are rare.

2      Q.    They are rare?

3      A.    They are rare.

4      Q.    So you disagree with that statement?

5      A.    I disagree with the statement that they are

6  not rare.

7      Q.    Do you agree that there is no evidence that

8  transvaginal repair with mesh provides any added

9  benefit compared to traditional surgery without mesh?

10     A.    That's inaccurate and it's not supported by

11  evidence.

12     Q.    So you disagree with that one?

13     A.    I do.

14     Q.    Do you agree that it's not clear that

15  transvaginal repair with mesh is more effective than

16  traditional non-mesh repair in all patients with

17  pelvic organ prolapse and it may expose patients to

18  greater risk?  Do you agree or disagree with that?

19     A.    I disagree with that.

20     Q.    Do you agree that mesh used in transvaginal

21  pelvic organ prolapse repair introduces risks not

22  present in traditional non-mesh surgery for pelvic

23  organ prolapse repair?

24     A.    I -- in a general sense, I disagree with

Jaime Sepulveda, M.D.

1    that except with a fact that the risk is inherent to

2    the implant only.

3         Q.    Which would be exposure; right?

4         A.    Which would be mesh exposure.

5         Q.    Mesh exposure.  Mesh exposure.

6              Okay.  Do you agree mesh placed abdominally

7    for a pelvic organ prolapse repair results in lower

8    rates of mesh complications compared to transvaginal

9    pelvic organ prolapse surgery with mesh?

10        A.    I don't agree -- I don't agree with that.

11   And the basis for my disagreement with it isn't only

12   the clinical -- the clinical evidence, but also my

13   experience.

14        Q.    Do you agree that native tissue repairs have

15   similar outcomes to synthetic mesh without the risks

16   inherent in mesh use?

17             MR. SNELL:  Form, vague.

18        A.    They -- the evidence shows in randomized

19   control trials that native tissue repairs have

20   other -- other risks.

21        Q.    (By Mr. De La Cerda)  So you would

22   disagree with this statement; right?

23        A.    Yes, I would.

24        Q.    Do you agree or disagree the native

Jaime Sepulveda, M.D.

1    tissue -- strike that.

2         Do you believe it would be a reasonable

3    decision for a doctor to stop using the Prosima device

4    following the July, 2011, FDA warning?

5         MR. SNELL:  Incomplete hypothetical,

6      speculation.

7    A.   I think that there's a -- I mean, I will

8    have to think for all the other surgeons, but I think

9    it's reasonable whenever you have a letter from an

10   organization like the FDA and you -- all of us not

11   being completely -- completely aware of that process

12   on how it came through, it comes as a surprise that we

13   don't have a problem.  I think it comes as a surprise

14   not only for us, it comes as a surprise for the

15   patients.

16   Q.   (By Mr. De La Cerda)  So it would be

17   reasonable for a doctor to do that?

18   A.   I think it's reasonable for anyone to think

19   that there's something wrong and it requires a lot of

20   reading and a lot of research to really be in tune

21   with the reality.

22   Q.   And so it would also be reasonable for a

23   doctor to stop using the Prolift and the Gynemesh

24   transvaginally after that July, 2011, FDA warning;

Jaime Sepulveda, M.D.

1    correct?

2         MR. SNELL:  Same objection, speculation,

3    incomplete hypothetical.

4    A.   It's a -- it's reasonable on the basis of

5    human nature.

6    Q.   (By Mr. De La Cerda)  At any point after

7    the July, 2011, FDA warning, did you decide to stop

8    using Prosima, Prolift or Gynemesh transvaginally?

9    A.   I think that everyone look at it and

10   everyone stop using it for the wrong reasons, less

11   because of evidence, and more because of the -- of the

12   fear of being involved in litigation, which is real,

13   and being involved in a situation having to explain

14   themselves when there is not a clear -- a clear

15   picture about the reality of it.

16   Q.   But you did stop using Prosima, Prolift and

17   Gynemesh transvaginally at some point after the July,

18   2011, FDA warning; right?

19   A.   I -- I think I continue using what -- what

20   it did, it did happen is that I communicated, "Listen,

21   we need to take a look at this," but I continued using

22   it.

23   Q.   You continued implanting it?

24   A.   Yes.

Jaime Sepulveda, M.D.

```
1        Q.   Until they were pulled from the market or

2   stopped, they were stopped selling or

3   decommercialized; right?

4        A.   Yes, once you have -- you have that, I

5   don't -- I don't want to use it.

6        Q.   Do you agree -- do you agree that surgical

7   mesh to repair pelvic organ prolapse is a high-risk

8   device?

9        A.   It's a --

10            MR. SNELL:  Foundation.

11            Go ahead.

12       A.   It's a game like talking about 522, some

13  510(k)s, high risk, low risk, it's not -- it's not

14  scientifically accurate.

15            I do agree that if you're going -- if you're

16  going to use it, you need to be well-trained on it,

17  and you just don't start doing prolapse or continence

18  procedures because a device is easy to use.  You still

19  have to be trained and read what's behind all that.

20  That's my opinion of how I run my professional career.

21  It's my -- my profession.

22            That's how we do it on credentialing in my

23  hospital, that's going to be up to the credentialing

24  institutions and the physicians to decide how much
```

Jaime Sepulveda, M.D.

1    training they will -- they will have.

2        Q.   (By Mr. De La Cerda)  And so at this

3    point, you can't tell me whether you can label

4    surgical mesh to repair pelvic organ prolapse as

5    high risk; right?

6        A.   Yeah, it's labeled high risk and there's

7    communication from the FDA labeling it high risk.

8    What I -- I can tell you is that the terminology of

9    high risk or low risk brings other implications.  If

10   you look at the evidence, I will say, "Well, you know,

11   it's really a risky procedure like any surgery."

12       Q.   And so you're not going to offer testimony

13   that the Gynemesh implanted transvaginally or the

14   Prosima or Prolift are low-risk devices, are you?

15           MR. SNELL:  Objection, misstates his prior

16       testimony.

17           Go ahead.

18       A.   I will not go with low risk or high risk.  I

19   think that whole terminology is so -- is so

20   nonspecific.  What's -- if I -- if you compare it to a

21   heart surgery, if you compare it to -- to any other --

22   an appendectomy, there's always risk.  So I cannot

23   classify one way or the other.

24           There's -- there's -- I believe that there

Jaime Sepulveda, M.D.

1    is more to that high-risk, low-risk classification

2    than what we can actually explain on the frame of a

3    deposition.

4         Q.    (By Mr. De La Cerda)  Do you know whether

5    or not Ethicon did an internal risks analysis to

6    determine risk scores for the pelvic organ prolapse

7    mesh devices?  Like whether they were going to --

8    whether Ethicon was going to label them low,

9    moderate, high risk?

10        A.    I'm not aware of them doing that and

11   actually, there's -- there was an effort, not by

12   Ethicon but by the professional societies to use the

13   Dindo classification and modify it for -- for

14   prolapse.  So that's -- that tells you the extent.

15            The reason why I'm explaining is it tells

16   you the extent of how elaborate the process is.  I

17   don't think that Ethicon probably -- I think they were

18   too busy with other things to develop anything,

19   anything like that.

20        Q.    Let's switch gears a little bit here.

21            Are you okay on breaks?

22        A.    I'm good.

23        Q.    Okay.  We are getting close.  Okay.

24            If a synthetic graft product like Prosima

Jaime Sepulveda, M.D.

1    does not do better than a native tissue repair in

2    terms of safety and efficacy, do you think it should

3    be introduced to the market?

4            MR. SNELL:  Foundation.

5            Go ahead.

6        A.   The -- the basis for Prosima for any other

7    procedure, they don't do well with whatever benchmark

8    that you use, you need to reconsider, you need -- you

9    have a choice in the market, obviously, but there's --

10   that's not what we saw with Prosima.  The cohort

11   studies done on Prosima follow the experience with

12   Prolift and it showed that it was better than native

13   tissue repairs.

14       Q.   (By Mr. De La Cerda)  You're aware that

15   Ethicon was told by some of its top consultants it

16   did not make sense to use the Prosima in people with

17   lesser degrees of prolapse given the outcomes?

18       A.   Any consultant may have an opinion.  That's

19   something that -- that's something that Ethicon always

20   foster for anyone to give an opinion.  And it's not

21   like we were that shy of giving an opinion because we

22   actually offer plenty of it.

23       Q.   Would you disagree with that -- this

24   particular opinion?

Jaime Sepulveda, M.D.

1    A.    I disagree.

2    Q.    Do you agree or disagree with the following

3    statement:  There is no authoritative paper to support

4    that Prosima outcomes are superior or even comparable

5    to colporrhaphy?

6    A.    I disagree with that, and the papers are

7    authoritative and within the context of evidence

8    previously gathered by the use of Gynemesh and

9    Prolift.

10   Q.    So if the primary investigator for the

11   Prosima trial which studied whether or not the product

12   was effective for Grade II and III rectocele and

13   cystoceles made that statement, you would disagree

14   with her?

15   A.    I'm not aware -- are you speaking about

16   Dr. Zyczynski?

17   Q.    I guess ultimately -- you know, what I'll

18   do, I'll just withdraw the question.  I think you've

19   already answered anyway.

20         You disagree with the prior statement, so I

21   think you answered that anyway.

22   A.    I'm going to refer to her on first name

23   because I think that she will be okay with it.  Her

24   first name is Halina, H-a-l-i-n-a.

Jaime Sepulveda, M.D.

1     Q.   If the overall consensus of a medical device

2     company's consultants and experts is that it would be

3     a mistake to launch a device on the market, do you

4     think it would be wrongful for the company to launch

5     that device anyway?

6     A.   The --

7          MR. SNELL:  Wait.  Hold on.  Objection,

8          speculation, incomplete hypothetical.

9     A.   The fact that you are a scientist doesn't

10    always mean that you're going to know marketing.

11    That's -- there's more than one person making those

12    decisions.

13    Q.   (By Mr. De La Cerda)  So you don't believe

14    that it would necessarily be wrongful for a company

15    to launch a product under those circumstances; is

16    that right?

17         MR. SNELL:  Same objection.

18    A.   I think there's more than one opinion that

19    needs to be considered, especially in a multicenter

20    study.

21    Q.   If the overall consensus of a medical device

22    company's scientists and experts is that it would be a

23    mistake to launch the device on to a market, do you

24    think that doctors or patients who are provided the

Jaime Sepulveda, M.D.

1   device should be told the company's scientists and

2   experts think that the device is a mistake?

3           MR. SNELL:  Form, foundation, incomplete

4      hypothetical.

5      A.   Yeah, I don't think that any company is

6   going to tell you, "Yeah, I'm going to release it and

7   it's mistake."

8           No, the evidence is there and -- and the

9   evidence was so very clear with Prosima.  It was

10  presented in modules, it was presented on the number

11  of patients, it was presented in a multicenter study.

12  It had all the qualities of a good cohort study.

13     Q.   (By Mr. De La Cerda)  So you don't think

14  that a doctor or -- a doctor who's implanting a

15  Prosima or a patient who's going to receive a

16  Prosima wants to know before that Prosima is put in

17  that at some point the top consultants and experts

18  at the company believe that Prosima was a mistake,

19  they believe it was a reckless product, that they

20  believe if they put the product out on the market

21  they were going to stop working with Ethicon, you

22  don't think any of that information should be

23  provided to doctors or patients?

24     A.   No.

Jaime Sepulveda, M.D.

1           MR. SNELL:  Hold on.  You've got to give me

2      a chance.

3           Form, foundation.

4           Go ahead.

5      A.   No, it's -- I don't think that's -- that

6  that should be considered.  I think that the

7  scientific evidence supersedes whoever feels that it's

8  in so much power to say, "Oh, it's reckless because I

9  say it's reckless."

10          Well, this is the evidence, this is the

11 scientific evidence, this is the multicenter evidence.

12 If you insist on calling it reckless or giving an

13 irresponsible opinion, which is what it is, then it's

14 up to you, but this is the evidence on this device.

15     Q.   (By Mr. De La Cerda)  So Marcus Carey, you

16 know, is the inventor of Prosima; right?

17     A.   Yes.

18     Q.   And you know he received -- he would receive

19 royalties each time the Prosima was sold; right?

20          MR. SNELL:  Foundation.

21     A.   I -- I'm aware that he got paid for his

22 work.

23     Q.   (By Mr. De La Cerda)  Do you know how much

24 he got paid?

Jaime Sepulveda, M.D.

```
1        A.   No.

2        Q.   Do you know he was the lead author on the

3   Prosima study done by Ethicon prior to launch?

4        A.   There was the first one and then there was

5   another study.

6        Q.   Do you know what his success rate was with

7   the Prosima in that first study?

8        A.   It's -- on the -- the first study was

9   around -- above the hymenal ring, I believe it was in

10  the '70s.

11       Q.   What about below?  Below the -- I just lost

12  the word.  Hymenian, is that what you said?

13       A.   Hymenal ring.

14       Q.   Hymenal ring.

15            MR. SNELL:  Let me caution you.  If you have

16       a study, you should pull it out and look at it.

17       He's not asking you to guess.  I mean, we have

18       all this stuff here, you can look at it.

19            THE WITNESS:  Okay.

20            MR. SNELL:  I don't know where you have it,

21       but I would assume it's in one of these things.

22       A.   This is it.  This is the study.

23       Q.   (By Mr. De La Cerda)  Okay.  So go back to

24  the question.  Do you know what his success rate was
```

Jaime Sepulveda, M.D.

```
 1    with the Prosima in his first study?

 2        A.   Let me look through it and I'll --

 3    73.9 percent.

 4        Q.   And you say that is above or below the

 5    hymenal ring?

 6        A.   That's about the hymenal ring.

 7        Q.   And how about below the hymenal ring?

 8        A.   The rest of it.

 9        Q.   What do you mean "the rest of it"?

10        A.   The other percentage.

11        Q.   So it's 70/30?

12        A.   Yes, it's 70 -- yes, it's 73.9 versus

13    20-something.  Either one, yeah.

14        Q.   Do you think the fact that he was the

15    inventor of the product introduced bias in that study?

16             THE WITNESS:  Let me point out -- do you

17        see -- you saw that, right?

18             MR. SNELL:  Okay.

19        A.   Please repeat the question.

20        Q.   Sure.

21             Do you think the fact that he was the

22    inventor of the Prosima introduced bias into that

23    study?

24        A.   No.
```

Jaime Sepulveda, M.D.

1      Q.   Why not?

2      A.   I have no reason to believe that he would be

3   bias with it.

4      Q.   Do you know whether Ethicon thought there

5   was a fair amount of spin going on regarding Dr. Carey

6   reporting of his clinical data?

7      A.   Fair amount of?

8      Q.   Spin.  Have you ever heard that term "spin,"

9   spinning the data, spinning the information?

10     A.   No, no.

11     Q.   Like the politicians do?

12     A.   I have no reason to believe that

13   Professor Carey had any deviations from what he would

14   honestly do.

15     Q.   Do you know whether Ethicon believed that

16   Dr. Carey was spinning the data?

17     A.   No.  No, I don't -- I'm not aware of that.

18     Q.   The inventor of Prolift, Dr. Cosson,

19   C-o-s-s-o-n --

20     A.   Cosson.

21     Q.   Cosson.

22          MR. SNELL:  Misstates, lacks foundation.

23   You've got the wrong person.

24     Q   (By Mr. De La Cerda)  Is he the inventor of

Jaime Sepulveda, M.D.

1    Prolift?

2         A.   It was a group.

3         Q.   It was a group, right.

4         A.   It was a group.

5         Q.   You've relied on -- have you relied on data

6    and literature published by Dr. Cosson and the TVM

7    group to support your conclusions that Prolift is safe

8    and effective?

9              MR. SNELL:  Same objection.

10        A.   Well, there was a TVM and there was Prolift.

11   And TVM was a precursor, but is different from the

12   product on Prolift.

13        Q   (By Mr. De La Cerda)  Okay.  Do you know if

14   Dr. Cosson receives royalties for the Prolift or

15   received?

16        A.   No, I don't -- I'm not aware of what he

17   received.

18        Q.   Do you believe that an inventor who receives

19   royalties for selling his invention can be potentially

20   biased when publishing data regarding his invention?

21             MR. SNELL:  Speculation.

22        A.   I don't -- I don't see them being biased.  I

23   have no reason to believe that would be the case.

24        Q.   (By Mr. De La Cerda)  You're very

Jaime Sepulveda, M.D.

1    trusting.  You're very trusting.

2         A.   This is high caliber -- high-caliber

3    investigators.

4         Q.   Well paid, too.

5              You're aware that Ethicon had an alternative

6    mesh to Gynemesh PS that they believe would cause

7    fewer compli- -- fewer serious complications at least

8    as early as 2006; right?

9              MR. SNELL:  Foundation, misstates the

10        evidence.

11        A.   Could you please repeat that?

12        Q.   (By Mr. De La Cerda)  Sure.

13             Are you aware that Ethicon had an

14   alternative mesh to Gynemesh PS that they believed

15   would cause fewer complications at least as early as

16   2006?

17             MR. SNELL:  Same objections.

18        A.   No, I'm not aware of that, any mesh like

19   that, but I'm also aware that there's very low

20   likelihood that there was any evidence strong enough

21   for Prolene polypropylene.

22        Q.   (By Mr. De La Cerda)  What do you mean by

23   that?

24        A.   The evidence on Prolene polypropylene, on

Jaime Sepulveda, M.D.

1  the behavior of the material, it's -- it was

2  well-established by the time Gynemesh PS came in.

3      Q.   So you don't believe it's possible that

4  Ethicon can have evidence that it had a mesh different

5  from Gynemesh that they believe was safer than

6  Gynemesh?

7          MR. SNELL:  Objection, same objection.

8      A.   I believe it's possible to have another

9  mesh.  What I don't believe is that the mesh could be

10  based to be safer or with more evidence.

11      Q.   (By Mr. De La Cerda)  Okay.  I'm going to

12  ask you whether you agree with the following

13  statements.

14          Do you agree that physicians should be

15  aware -- made aware of all of the significant safety

16  risks associated with the product in the IFU?

17          MR. SNELL:  Objection, asked and answered.

18  I think he's testified three times on this.

19      A.   The -- the risk of the IFU should pertain to

20  the device.  There is no place in the IFU to make a

21  more comprehensive guide for incontinence, nor should

22  the IFU replace training, expertise and textbook

23  reading.

24      Q.   (By Mr. De La Cerda)  But you agree that

Jaime Sepulveda, M.D.

1    all significant safety risks associated with the

2    product should be included; right?

3            MR. SNELL:  Objection, misleads prior

4        testimony.

5            Go ahead.

6    A.   With the -- with the product specifically

7    associated to the device and -- and -- and the mesh.

8    Q.   (By Mr. De La Cerda)  Is that a "yes"?

9            MR. SNELL:  Objection, asked and answered.

10   A.   To the device and mesh, yes.

11   Q.   (By Mr. De La Cerda)  Okay.  Do you agree

12   that a manufacturer of a medical device that would

13   be implanted in a woman's body is required --

14   actually, strike that.

15           Do you agree that an IFU should never

16   exclude known hazards or complications?

17           MR. SNELL:  Objection, I think this is all

18       asked and answered.  He's given the same opinions

19       numerous times.

20           Go ahead.

21   A.   The IFU should talk about the things that

22   are inherent to the device.  It's -- it's a guide

23   about the device.

24   Q.   (By Mr. De La Cerda)  Can't -- is it okay

Jaime Sepulveda, M.D.

```
1    for it to exclude known hazards or complications?

2               MR. SNELL:  Form.

3         Q.   (By Mr. De La Cerda)  There are

4    circumstances where I think you believe that it can

5    exclude known hazards and complications; right?

6               MR. SNELL:  Same objections.

7         A.   Things that are not at risk to the patient.

8         Q.   (By Mr. De La Cerda)  No, I mean -- okay.

9               If it's a known hazard or complication to it

10   that could happen to a patient, should it ever be

11   excluded from an IFU?

12              MR. SNELL:  Same objection.

13        A.   If it's -- if the complication or the side

14   effect is the same as it would happen with a native

15   tissue repair, I believe that it does not have to be

16   included on the IFU.

17        Q.   (By Mr. De La Cerda)  Okay.  Do native

18   tissue repairs result in chronic foreign body

19   reaction?

20        A.   Yes.

21        Q.   How is that?

22        A.   There's a reaction to sutures.  There's the

23   plication of tissue that dehisce.  There is the

24   formation of hematomas or granulomas.  There are the
```

Jaime Sepulveda, M.D.

1   inherent conditions of the host that could cause it,

2   such as atrophy, autoimmune disorders, lichen planus.

3   So there are a number of conditions that can make a

4   native tissue repair not work, not work well or have

5   granulation tissue or have chronic -- chronic

6   inflammation.

7       Q.   Chronic inflammation.  Okay.

8            Do you agree that if a patient undergoes the

9   TVT procedure under general anesthetic, it has the

10  potential to put the patient at increased risk for

11  urinary retention or urethral erosion?

12      A.   No.

13      Q.   And why is that?

14      A.   Initially, the idea was that when you put a

15  midurethral sling, which is tension free, that you

16  have to adjust it so the patient would not be on

17  retention.

18           It was -- it was later described that that

19  may have been true for previous slings that were used

20  ideally for vesical junction, but not for midurethral

21  slings.  Eventually, the data proved that to be

22  correct, because the rate of voiding dysfunction was

23  below 1 percent.

24           So one of the -- one of the things that that

Jaime Sepulveda, M.D.

 1   experience validated is something that they didn't

 2   know, not even the inventor actually knew that, which

 3   is that there is some viscoelasticity to the implant

 4   itself.

 5              MR. DE LA CERDA:  Okay.  What I'd like to do

 6         now is take a break and review my notes and

 7         then --

 8              MR. SNELL:  I'm ready for another bathroom

 9         break.

10              MR. DE LA CERDA:  We'll go off the record,

11         thank you.

12              (Thereupon, a recess was taken from

13         3:24 p.m. until 3:45 p.m., after which the

14         following proceedings were held:)

15         Q.   (By Mr. De La Cerda)  Okay.  Doctor, we're

16   back on the record.

17              There was one thing you mentioned that I

18   wanted to make sure was clear.  When we were talking

19   about the compensation you had received as a

20   consultant and then we had a discussion about trying

21   to get --

22              MR. SNELL:  I haven't gotten that either.

23              MR. DE LA CERDA:  That's fine.  That's fine.

24         Get a better version.

Jaime Sepulveda, M.D.

```
 1              MR. SNELL:  People are running around like

 2         on your side, too, like all over the place.

 3         Q.   (By Mr. De La Cerda)  There was a

 4    discussion about trying to get -- there's a

 5    spreadsheet that has listed out some of this

 6    information and you mentioned, "Well, it might only

 7    be money that was allocated for me, but not

 8    necessarily money that I made."

 9              Do you remember discussing that?  You might

10    not have used the term --

11         A.   Yes.

12         Q.   -- "allocated."

13         A.   Yes, they did their own allocations for what

14    they were going to spend.  It was a budget, internal

15    thing from Ethicon, a budget planning.  So it could --

16    my point is that it could say a number -- it would

17    never be higher than that number, but it was -- it

18    could be lower than that.

19         Q.   So the numbers in the spreadsheet may just

20    be what would have been an allocation or a budget for

21    you for that year and it couldn't be higher, but it

22    might be lower?

23         A.   But it might be lower, yes.  It cannot be

24    over that number.
```

Jaime Sepulveda, M.D.

```
 1      Q.   Okay.  Okay.  And then have you had a chance

 2   to review that on your own, that spreadsheet?

 3      A.   I saw it before -- before the Cavness trial

 4   and I saw it at the Cavness trial.

 5      Q.   And are you sure one way or the other

 6   whether those numbers are allocated versus real

 7   numbers?

 8      A.   They're -- I know they're not real numbers

 9   because I would have -- I would have remembered that.

10      Q.   Yeah.

11      A.   The number is -- is high, and I don't

12   remember having 1099s that were that high.

13      Q.   Okay.  Okay.  Have you understood all of my

14   questions today?

15      A.   Yes, sir.

16      Q.   Have you answered them truthfully and to the

17   best of your ability?

18      A.   Absolutely.

19      Q.   Is there any testimony that you would like

20   to go back and change at this point?

21      A.   No.

22           MR. DE LA CERDA:  Okay.  I'll pass the

23      witness.

24
```

Jaime Sepulveda, M.D.

```
 1                   CROSS-EXAMINATION

 2   BY MR. SNELL:

 3        Q.   Doctor, I want to go through some topics and

 4   I'm actually going to go in the order that

 5   Mr. de la Cerda covered things just to make sure we're

 6   all clear on the record here about where you intend to

 7   testify and the bases and whatnot.

 8             Do you recall at the beginning of the

 9   deposition you were asked by Mr. de la Cerda about

10   that Abbott study where some of the patients didn't

11   return back to the implanting surgeon for care of a

12   complication?

13        A.   Yes.

14        Q.   All right.  In formulating your opinions on

15   the devices we've been discussing today, are there

16   studies in databases that have captive audiences that

17   look at treatment over time regardless of whether it's

18   the implanter, explanter, or someone else?

19        A.    No, there's -- one of the -- one of the

20   things that we have with these type of procedures is

21   that there have been tracks on Medicare databases,

22   they -- and we have other -- other -- other databases

23   that I -- and the citations I put, the Kaiser

24   Permanente, that's --
```

Jaime Sepulveda, M.D.

1      Q.   Why don't we go there because that's what I

2   was going to ask you about.  If you turn to page 14

3   and 15 --

4      A.   Yes, I got it.

5      Q.   -- of your TVT, TVT-O report.  Do you

6   identify different database studies that assess

7   reoperation complication management regardless of who

8   actually is doing that surgery?

9      A.   Right.

10      Q.   Okay.

11      A.   The Canadian registry, there is Medicare,

12   and there's Kaiser Permanente.

13      Q.   So -- and did you find those studies to be

14   reliable?

15      A.   That is -- that is reliable.

16      Q.   So let's take the first one that I'm looking

17   at, it's reference No. 45 in your report, Jonsson

18   Funk, J-o-n-s-s-o-n, Funk.  It's the nine-year study

19   where the rate of removal for mesh urethrolysis was

20   3.7 percent.

21      A.   Yes.

22      Q.   Do you have a recollection as to whether

23   that study contained, you know, over a 100,000

24   patients or --

Jaime Sepulveda, M.D.

1      A.   There was -- I know for a fact it's over

2  80,000 patients, close to -- close to 100,000

3  patients.  Most importantly, that rate of -- of

4  revision was about 3 percent.

5      Q.   And did you see a similar rate as to about

6  3 percent in different database studies and other

7  studies like the Cochrane reviews and randomized

8  control trials?

9      A.   Consistently you go from one paper to

10  another to another and it's 3 percent.  It's 2 percent

11  on one, 3 percent.  The maximum I have seen is

12  5 percent.  But the number that is most consistently

13  repeated is 3 percent.  And that's -- that's accurate

14  to cite to the patients.

15      Q.   So in the Abbott study, let me ask you this.

16  Do you recall that it was a case series based on

17  tertiary referral centers by Dr. Karram, who I think

18  plaintiff's counsel mentioned, and a couple other

19  doctors?

20      A.   Yes, there are probably two papers that say

21  patients would not follow through.  The first one is

22  about the -- a review about randomized control trials

23  or any follow up in which patients do not show up,

24  they tend to be considered as -- in the group that did

Jaime Sepulveda, M.D.

1    not respond to therapy, to treatment, or to the

2    intervention.

3            The second is that paper that you just

4    mentioned, but the overwhelming data is so high in

5    other areas, in other databases that we don't go by

6    specific papers like that.

7        Q.   So the case series, can -- when you

8    formulated your opinions, did you pay attention and

9    put more effort -- more emphasis on higher level data?

10       A.   Not only formulate my opinions.   In

11   everything I read, I need -- I need to know what is it

12   that I'm reading.   And I put that scale, that bridge,

13   some people see it as a pyramid, some people see it as

14   a list.   We know that case series are at the bottom,

15   randomized control trials reviews are on the top.

16       Q.   The first study, the Jonsson Funk study, can

17   you identify, just for the record, how many patients

18   did that involve in the assessment?

19       A.   It's 188,454 eligible women.

20       Q.   And then the other footnotes, 46, 47, 48,

21   and 49, were those also the different databases you

22   mentioned?

23       A.   Right.   The Canadian, the Canadian also has

24   good reliability because the Canadian does have -- has

Jaime Sepulveda, M.D.

```
1    a tracking because of their socialized system.  They

2    have tracking.  They are known to be able to track a

3    variety of conditions, and this is just another one

4    that they -- that they are -- they report.

5        Q.   And so I guess my question is:  Did you find

6    these database studies from different databases, based

7    on the volume of patients assessed and the

8    methodologies, to be more reliable than a case series

9    in a limited number of patients?

10       A.   Absolutely, besides these are up in the

11   hierarchy.

12       Q.   You were asked some questions about what you

13   did in formulating your opinions and you've talked

14   about and testified that you reviewed the medical

15   literature.  I want to make sure we're clear here.

16            Did you also look at various Ethicon company

17   documents and evaluate them?

18       A.   Yes, I -- I -- I did.  I just -- in the

19   order -- in the order that I read them, I -- I read

20   them most remotely.  In other words, I -- it has been

21   more time since I read than from this.

22       Q.   Did you specifically identify in your report

23   Ethicon documents on topics that Mr. de la Cerda asked

24   you about, like mechanical cut versus laser cut, and
```

Jaime Sepulveda, M.D.

1    degradation and pore size and things like that in your

2    reports?

3         A.   Well, by -- through the -- through my

4    testimony today, I address.  There is no way I would

5    have been able to address it if I wouldn't have read

6    it.

7         Q.   I think you testified to this and you can

8    tell me if I'm correct or wrong.

9              Did you earlier testify that based on all of

10   your analyses and the bases you talked about here

11   today, that you have not identified any

12   characteristics of the mesh that are a safety risk?

13        A.   Yeah, I don't -- I don't think that there

14   are concerns about safety on -- on -- on any of the

15   products that we were using.  If I would have thought

16   there were concerns about safety to begin with, I

17   wouldn't have used them.

18        Q.   And besides the medical literature and the

19   high-level data that you have referenced, do you also

20   rely on your clinical experience?

21        A.   There's -- my experience is important, the

22   data is important, and the caliber of the data is

23   important.  Not only that, my experience and the

24   experience of the people that I -- that I talk to.

Jaime Sepulveda, M.D.

1          You see, it's -- in medicine, we still -- we

2     still value very much the experience, the experience

3     of our colleagues, so I use that and I use also the

4     experience of -- my own experience and the experience

5     of those that investigate.  People -- people that are

6     extremely talented are looking at studies.

7          Q.   And at the end, though, in formulating your

8     opinions and coming to your final conclusions about

9     the safety and efficacy of Gynemesh PS, Prolift, TVT,

10    TVT-O, did you put more weight into the randomized

11    level on control trials than individual experience or

12    case series?

13         A.   Randomized control trial is what -- what we

14    wish we would have on everything.  But once you have a

15    few randomized control trials, you can build up with

16    other -- with the other studies.  You cannot just do

17    the reverse, you have to build up on the strongest

18    ones.

19         Q.   You were asked a lot of questions about your

20    opinions on IFUs and you told Mr. de la Cerda various

21    grounds and bases for your opinions and you talked

22    about how you had reviewed IFUs over many years and

23    numerous times.

24              Let me ask you this.  In your professional

Jaime Sepulveda, M.D.

1  education role, did you teach and cover the IFU with

2  other pelvic surgeons specific to these devices we

3  talked about today?

4       A.   We could -- we could make -- the answer is

5  yes.  We could make any presentation and present any

6  slide, but at the end when we're working together in

7  the specimen and they collaborate, it's the IFU, the

8  one that comes out.

9            And as a -- as a preceptor or as a teacher,

10  you need to know that IFU by -- by steps and know not

11  only what it says, but what it really says in terms of

12  mechanics.  That's important for all -- all products.

13      Q.   And how many of the cadaver labs or these

14  labs that you did included covering the IFU with the

15  surgeons?

16      A.   Every single -- every single lab.

17      Q.   How many cadaver labs did you do on these

18  products?  Your best estimate is fine.

19      A.   The VCS here did about six cadaver labs

20  locally.  We had -- we used to go to Orlando and it

21  was very convenient for me because when I would miss

22  the plane, because I was seeing patients, I would just

23  drive up there, and it's -- and it was six in the max

24  year, maybe eight.

Jaime Sepulveda, M.D.

1    Q.   Would there be just one surgeon at this

2  event or would there be multiple?

3    A.   No, multiple surgeons.  There was more than

4  one -- one preceptor.

5    Q.   Do you have an estimate as to the number of

6  pelvic floor surgeons you would have worked with and

7  trained and went through the IFU with?

8    A.   I never -- never saw more than four.  And if

9  I will have two, that would be good.  We -- we started

10  with the IFU.  We would teach the device and after

11  that, one of the opportunities that we have in the

12  cadaver lab is that we could dissect and get an

13  in-depth view of what -- where the devices went by

14  using the IFU.  So it was the ultimate test for an IFU

15  and the test is on performance of the procedure.

16    Q.   You were asked questions about TVT and these

17  products and you expressed the opinion that you don't

18  think that the devices rope, curl, degrade, et cetera.

19        Did you -- so let me -- so with that

20  preface, did you look at the literature to see whether

21  any of the studies in the patients reported a

22  difference or a hypothesis as to a difference as to

23  laser cut versus mechanical cut mesh?  Are there any

24  studies that describe it?

Jaime Sepulveda, M.D.

1      A.    There is not -- there are no actual studies

2    that define one way or the other.

3            There is actually the well-designed

4    randomized control trials, like the TOMUS, which is

5    evaluating midurethral sling, transobturator and

6    retropubic.  And what -- in that specific study, which

7    is an excellent study, it's one of the pillars of what

8    we do, it's -- we -- we found out there was no

9    description of one or the other; and I have the

10   impression that both were used and there was never any

11   difference on it.

12      Q.    For the mechanical versus laser cut, do you

13   cover that in-depth in your report on pages 23 through

14   25?

15      A.    Yes.

16      Q.    Do you have -- is there a TVT-Secur report

17   over there?

18      A.    Yeah.

19      Q.    Do you recall a study by the name -- maybe

20   the first author's name was Neuman that looked at

21   TVT-O versus TVT-Secur and it reported percentages of

22   complications for erosion and dyspareunia and there

23   was a difference seen on dyspareunia which the authors

24   reported may have been to -- may have been due to

Jaime Sepulveda, M.D.

1    laser cut mesh.  Do you recollect that?

2        A.   That's Dr. Menahem Neuman's study.  He's in

3    Israel and he study -- he studied TVT-Secur.

4        Q.   What page are you on?

5        A.   That's 44.

6        Q.   And was that the only study that you were --

7    that you found in your investigation in the clinical

8    application of these products on women that suggested

9    there may be a difference between the two?

10       A.   There's a -- there's another -- another

11   study that Bianchi-Ferraro and on the -- both of them,

12   there are TVT-Os and TVT-Securs compared and there's

13   no difference on them.  That's -- this is just -- this

14   is just illustrate that mechanical cut and laser cut,

15   unless you put it on extreme conditions, way beyond

16   the stressors that would be found on the pelvis, there

17   is no significant difference on the behavior.

18       Q.   Page 45 on the Neuman study, you wrote that

19   the authors theorized that the laser cut mesh was to

20   blame for higher dyspareunia, but there is no

21   scientific data confirming that.

22       A.   There is no scientific data and that is just

23   an opinion and that's -- that's what we -- we have to

24   define what's science, what's an opinion.  Sometimes

Jaime Sepulveda, M.D.

```
 1   you see a study that has good science, but then it

 2   becomes an opinion at the end.

 3        Q.   Do you recall Mr. De al Cerda asking you

 4   about a hypothetical that if laser cut mesh was three

 5   times stiffer or more stiffer than mechanical cut mesh

 6   would it lead to more complications and he may have

 7   even mentioned exposure.  Do you recall?

 8        A.   Yeah, I do recall.

 9        Q.   My question to you is:  So in that study by

10   Neuman, did the laser cut mesh have a significantly

11   different rate of erosion than the mechanical cut

12   mesh?

13        A.   There's -- the rate of erosions were -- was

14   lower on the Secur.  It was zero versus a 1.4 on the

15   TVT-O.

16        Q.   Have you found any reliable, convincing

17   clinical study evidence that, in your mind,

18   establishes that there is a significant difference in

19   laser and mechanical cut mesh when implanted with the

20   TVT devices in women?

21        A.   There has been no study up to now and,

22   obviously, I'm giving you the opinion that I will

23   welcome any study that makes a difference between --

24   between the two of them.
```

Jaime Sepulveda, M.D.

1          The Cochrane database, actually, did not

2   define that.  There is no other study that has defined

3   it.

4          Q.   Do you have an opinion as to whether the

5   weight, pore size, and width of the TVT mesh is proper

6   in that device for the treatment of stress urinary

7   incontinence?

8          A.   For which device specifically?

9          Q.   For the TVT, TVT-O devices, do you believe

10  that the mesh is the proper weight, pore size, and

11  width?

12         A.   Yes, and that's -- that's -- that's a mesh

13  that has the evidence behind it.

14         Q.   And when you say "the evidence," are you

15  talking about the various evidence that you put into

16  your reports?

17         A.   Yeah, we have come to the point, even the

18  communication from the FDA, most recent one, just --

19  just speaks about the standard for continence care

20  being a midurethral sling.

21         Q.   You were asked a question by plaintiff's

22  counsel about the lighter weight mesh and larger pore

23  mesh.

24         Has any lighter weight or larger pore mesh

Jaime Sepulveda, M.D.

1    been studied as much or demonstrated to be as useful

2    and safe as the mesh in TVT for the application of

3    stress incontinence?

4         A.   For -- for stress incontinence specifically,

5    there is no other mesh that has been tested to the

6    extent -- actually, there's no other continence

7    procedure material that have been tested to the extent

8    of TVT.

9         Q.   And is that all different types of studies

10   or just randomized control trials?

11        A.   There are all types of studies that -- but

12   predominantly randomized control trials as -- and

13   we're talking about devices for urinary incontinence.

14        Q.   You were asked a lot of questions about

15   degradation.  Do you believe that the available data

16   shows that the Prolene mesh degrades?

17        A.   No.

18             MR. DE LA CERDA:  Form.

19        Q.   (By Mr. Snell)  And did you review

20   specifically studies referenced by plaintiff's

21   counsel and others, you went and looked for like the

22   Clavé paper, that purportedly raised this issue of

23   degradation?

24        A.   That is one descriptive paper in which we --

Jaime Sepulveda, M.D.

1   we can actually look at 26 samples of low density.

2   That's 26 samples out of close to over 2 million --

3   between 2 million and 3 million slings that I don't

4   think you can reliably give any opinion on that and

5   actually, if it would degrade, I would expect it to

6   perform worse, and that's not the evidence that we

7   have.

8        Q.   Is there evidence, long-term data, that

9   shows sustained durability and low complications in

10  your view?

11       A.   Yes.  There is data at five years, ten years

12  and now I believe there is data bordering on the 15

13  years.

14       Q.   And is that data, in your opinion,

15  consistent or inconsistent with the degradation

16  theory?

17       A.   No.

18       Q.   What's that?

19       A.   It's not consistent with the degradation

20  theory.  It's actually inconsistent.

21       Q.   In the Clavé study, did you see that besides

22  the fact that a minority of the mesh is -- had this

23  surface cracking on SEM, when they actually did the

24  chemical analytical testing, did those tests

Jaime Sepulveda, M.D.

1    demonstrate degradation?

2        A.   No, the samples -- the samples were poorly

3    treated to the point that they -- they were not given

4    a good for analysis.

5             Classically, explant -- explanted tissue --

6    I'm sorry, explanted graft is not a good -- it's not a

7    good sample to begin with, much less when you put it

8    through -- through spectroscopy, spectroscopy or

9    chromatography and much less through thermal --

10   thermal changes.

11       Q.   Were there -- in the Clavé paper, did you

12   see that the authors acknowledged that there was no

13   control group to compare?

14       A.   No, that's not a control -- control study.

15   That's barely a descriptive study.

16       Q.   Did you find any of the data that purported

17   to raise this issue of the hypothesis degradation to

18   be reliable?

19       A.   No, I have not seen one yet that proves

20   degradation with any definition that I've been given

21   of degradation.

22       Q.   Mr. de la Cerda asked you about cytotoxicity

23   and your report -- your report, I believe, covers that

24   pretty much in-depth.

Jaime Sepulveda, M.D.

1        A.   Yes.

2        Q.   And you talked with Mr. de la Cerda about

3   the various Ethicon documents and testing you've

4   reviewed and your opinion about the different types

5   and what those studies show or don't show.

6        A.   Yes, I -- I reviewed the -- Ethicon actually

7   ask a third-party lab to do it.  It's a third-party

8   lab in Germany and the reports are clear on all the

9   assays.

10       Q.   And I think Mr. de la Cerda asked you to

11  identify, you know, the bases for your opinion for

12  your cytotoxicity opinions and you identified those

13  documents in your analysis.

14            Let me ask you this.  Is the basis for your

15  cytotoxicity opinions also your personal experience on

16  assessing cytotoxicity issues?

17            MR. DE LA CERDA:  Leading.

18       A.   Yeah, well, I assess cytotoxicity with word

19  in science starting to see cytotoxicity in -- in 1985,

20  from 1985 to 1986, that's all I did in the lab.  And

21  it's -- I did that -- I actually presented it at a

22  conference on -- on pharmaco -- on molecular

23  pharmacology.  And that's -- that's my experience with

24  it.

Jaime Sepulveda, M.D.

1    Q.   (By Mr. Snell)  So you have personal

2   experience in cytotoxicity analyses?

3    A.   I have done bench -- I have done bench work

4   on cytotoxicity.

5    Q.   Did you also evaluate the clinical

6   literature on these devices to see whether they

7   documented or raised a phenomenon that you would

8   attribute to cytotoxicity?

9    A.   I went through all these documents and I

10  read the results on each one of them and I -- I'm in a

11  good position to see what -- what the assays show.

12   Q.   In your opinion, is the TVT mesh cytotoxic?

13   A.   No.

14   Q.   You were asked about clinical data that was

15  available before TVT-O -- the TVT-O device was

16  marketed.  Do you recall just covering that topic with

17  Mr. de la Cerda?

18   A.   Yes.

19   Q.   Was there data on -- clinical data, clinical

20  studies on the TVT device before TVT-O went to market?

21   A.   There was clinical data, yes.

22   Q.   Is that data relevant, in your opinion, to

23  TVT-O?

24   A.   Yes, it is.

Jaime Sepulveda, M.D.

1      Q.   Is it the same mesh?

2      A.   It's the same implant.

3      Q.   You were asked about the MSDS sheet that you

4   looked at for the raw polypropylene and a statement in

5   it to the effect that the raw polypropylene -- I don't

6   remember the specific, but it had something to do with

7   compatibility.

8           My question to you is this:  Is the TVT

9   compatible with the female human body implanted --

10  implantation in the pelvis for treatment of stress

11  incontinence?

12     A.   It is biocompatible.  It has been

13  demonstrated that it's biocompatible and it has no

14  similarity to raw polypropylene.

15     Q.   That was going to be my next question.  Is

16  raw polypropylene implanted in the TVT process -- TVT

17  device?

18     A.   It's a -- it's a different thing.  Totally

19  different -- different type of material.

20     Q.   There was a discussion about sarcoma

21  formation in rats when raw polypropylene was implanted

22  in disk or powder form.  Do you recall that?

23     A.   Yes.

24     Q.   Is TVT disk or powder form?

Jaime Sepulveda, M.D.

1    A.   No.  And TVT has not been as to a sarcoma

2    and there is actual -- actually a publication about

3    it.

4    Q.   I think in your report at page 26 you go

5    through some of the different epidemiologic studies

6    with regard to the polypropylene slings and cancer and

7    sarcoma.

8    A.   On the --

9    Q.   On the --

10    A.   Which one of the reports?

11    Q.   Probably be TVT, TVT-O report, page 26.

12    A.   Yes.

13    Q.   The top paragraph where you state:  "The

14    available data does not show any causal links between

15    polypropylene and cancer," and then you have numerous

16    footnote citations.

17    A.   Actually, the evidence is for lack of the

18    carcinogenic.

19    Q.   And as part of Exhibit 11 there is a paper

20    by the lead author Linder where there was over 2,000

21    midurethral sling patients who were analyzed.  I'll

22    just hand it to you.  We'll make sure we put it back

23    into Exhibit 11.

24    A.   Yes.

Jaime Sepulveda, M.D.

1      Q.   Is that one of the studies that form the

2   basis of your opinion that the data show

3   noncarcinogenic --

4      A.   The rate of cancer in these patients was

5   reported to be below baseline.

6      Q.   Have you seen any studies utilizing the

7   Prolene polypropylene in any of these devices we

8   discussed today that show a statistically significant

9   elevated risk of sarcoma formation or cancer in women

10   over and above the expected background rate?

11      A.   No.

12      Q.   And in that study by Linder you just

13   mentioned, is it correct that 49 of the 50 patients

14   had cancer already a baseline?

15      A.   Yeah, that's -- that's the only -- it's 2

16   out of 2,474.  That's what makes for .0- -- 08.

17   That's extremely low.  That's actually lower than the

18   reported -- one of the cases was an ovarian cancer and

19   that's lower than the reported rate of ovarian cancer.

20      Q.   Let me put that back in Exhibit 11.  Make

21   sure we don't lose that.

22           You were asked questions by Mr. de la

23   Cerda -- I'm going to circle back around to the

24   lighter weight, larger pore mesh theory.

Jaime Sepulveda, M.D.

1           Do you know whether actually the TVM group

2    evaluated a larger pore, lighter weight mesh in the

3    development of what became Prolift --

4           MR. DE LA CERDA:  Leading.

5       Q.   (By Mr. Snell)  -- that was besides

6    Gynemesh PS?

7       A.   They did.  They did and it's in my Reliance

8    List.  Professor Jack Tanny evaluated the IFUs of

9    different meshes with absorbable components and with

10   large pore size.  Their first conclusion and that's

11   non- -- the first conclusion wasn't Dr. -- Professor

12   Berrocal, B-e-r-r-o-c-a-l.

13          Professor Berrocal's paper in which the

14   statement was clear the TVM group decided that no

15   absorbable meshes were going to be used.  And when a

16   combination was used without a partial absorbable

17   partial polypropylene, they decided that the pore size

18   being so large did not work.

19      Q.   Did you see whether or not the surgeons

20   evaluating the different meshes also evaluated a mesh

21   called Vipro?

22      A.   They did.  That's exactly what they did.

23      Q.   Is that a large pore, lightweight mesh as

24   well?

Jaime Sepulveda, M.D.

```
 1      A.    Yeah, it's a large -- large pore.  You can

 2   get pores as high as 5-, 6,000 microns.

 3      Q.    Did that mesh demonstrate better efficacy or

 4   tolerability than the Gynemesh PS?

 5      A.    No, actually it was -- the performance was

 6   worse.

 7      Q.    You've heard of the mesh Ultrapro,

 8   obviously.  Mr. de la Cerda talked to you today about

 9   presentations concerning the potential benefits of

10   lighter weight or larger pore meshes.

11      A.    Yes.

12      Q.    Does the Ultrapro mesh also have a risk of

13   mesh exposure?

14      A.    We had -- when we say "we," as the surgeons

15   doing these procedures, we expected that it was going

16   to be less mesh exposure.  We actually found that it

17   was exactly the same.

18      Q.    And same thing for dyspareunia or pain?

19      A.    Yes.

20      Q.    In your Prolift report -- do you have that

21   handy?  Let's go to page 10 and 11.

22      A.    Yes.

23      Q.    Before we actually get to that, let me ask

24   you this.
```

Jaime Sepulveda, M.D.

```
 1              Did you see any clinical studies that you
 2    found to be reliable that showed that a larger pore or
 3    lighter weight mesh than Gynemesh PS was more
 4    effective or safer than Gynemesh PS in the Prolift,
 5    Prosima or Prolapse application?
 6         A.   No, it was -- it remained on a hypothesis.
 7    It remained just as a hypothesis and just we -- we all
 8    consider at one point that when we we're talking, I'm
 9    talking again about the surgeons, the word preceptors
10    and the other surgeons, which one is going to have the
11    longest data behind it and it was polypropylene.
12         Q.   You mentioned earlier, told Mr. de la Cerda,
13    based on your review of the most reliable data that
14    actually the Gynemesh PS and Prolift had a lower risk
15    of wound complications in native tissue.  Do you
16    recall that?
17         A.   Yes.
18         Q.   And I think you also testified that based on
19    your analysis, there was a lower rate or risk of
20    vaginal stenosis requiring surgery for the Gynemesh PS
21    compared to native tissue and you mentioned the Carey
22    study?
23         A.   That is correct.  That's accurate.
24         Q.   Was that the same Carey study we were
```

Jaime Sepulveda, M.D.

```
1    looking at earlier?

2         A.    Yes.

3         Q.    Do you know where that is?  I want to ask

4    you a question about it.

5         A.    That is in the --

6         Q.    My question is:  Do you have it over there

7    somewhere?  I just want to ask you a question about

8    it.

9              Oh, here it is.

10        A.    It is the paper before the last one on the

11   top to the left.

12        Q.    So page 1384, does that report and what you

13   referenced in that randomized control trial that there

14   was a higher rate of reoperation for vaginal stenosis

15   in native tissue compared to the mesh?

16        A.    That's correct.

17        Q.    Do you remember Mr. de la Cerda asked you

18   did Ethicon ever test the pliability of the mesh?

19        A.    Yes, I do recall that.

20        Q.    Now, pliability of the mesh, I think you

21   told Mr. de la Cerda, that that could be related to

22   stenosis or pain.

23        A.    Well, it's -- one thing is that the

24   pliability and the other thing is about the
```

1    contraction or shrinkage and what we were talking was

2    along the lines of what mesh contraction or mesh can

3    increase the pliability.  Pliability of a tissue or

4    the elasticity of the tissue has more to do with the

5    tissue itself.

6           Now, the question is, if the mesh could add

7    to this and the answer is every clinical indication of

8    shrinkage or -- or elasticity does not hold the test

9    of clinical evaluation.  If there would be a

10   shrinkage, there would be an actual contraction.  The

11   vagina would be shorter.  And there is no -- there's

12   no study that demonstrates that the vagina is shorter

13   on this -- on all patients that have been repaired

14   with mesh.

15          We have had instances in which the vagina is

16   shorter with native tissue repair because there's no

17   augmentation with the mesh.  So -- and that

18   communication is not just on my opinion, that's part

19   of the communication that was sent to the FDA.

20      Q.   Are you talking about the paper that was

21   endorsed by hundreds of pelvic surgeons?

22      A.   Yes.

23      Q.   At page 10 and 11 of your report you talk

24   about the Cochrane review and then the randomized

Jaime Sepulveda, M.D.

1    control data do not show a statistically significant

2    difference in de novo dyspareunia, de novo pelvic

3    pain, vaginal pain, change in sexual function, or

4    change in vaginal length or vaginal caliber.

5        A.   That's the latest Cochrane review, that's

6    exactly what it demonstrates.

7        Q.   And did you also assess the randomized

8    control trials to see if that was an accurate

9    statement, specifically for Gynemesh PS and Prolift?

10       A.   Yeah, there's a -- there's an actual --

11   there's a -- there are randomized control trials and

12   there is the Lowman paper in which mesh is placed

13   transabdominally, sacrospinously on fixations,

14   uterosacral suspensions, anterior/posterior repairs,

15   they were all evaluated for the incidence of

16   dyspareunia.

17       Q.   You mention that the urine analysis was

18   consistent with the findings by Dietz and Maher, who

19   did a systematic review and found no difference in

20   post-operative or de novo dyspareunia or change in

21   sexual function.  Do you see that?

22       A.   Yes.

23       Q.   And that citation is number 24?

24       A.   24.

Jaime Sepulveda, M.D.

1      Q.   Is that a high-level of evidence, a

2  systematic review metanalysis?

3      A.   That is at the highest level.

4      Q.   And is that what your opinions are based

5  upon?

6      A.   Yes.

7      Q.   You were asked questions by Mr. de la Cerda

8  about characterization of mesh as high risk or low

9  risk, and I think you basically disagreed and said you

10  prefer to kind of evaluate it on its own terms.  Is

11  that correct or not?

12      A.   I -- I saw the classification of low risk or

13  high risk to be restrictive and the question is if

14  this -- if this procedure is done with mesh have a

15  higher risk over native tissue repairs.

16      Q.   Did he -- I'm sorry, go ahead.

17      A.   And the answer to that is every time we look

18  at that randomized control trial, the answer to that

19  is no.

20      Q.   So my question is this:  Have you put in

21  your report and will you be prepared to discuss at

22  trial how Prolift, Prosima, Gynemesh PS comparing

23  risk, whether it's less risky or higher risk than

24  native tissue repair for things that we talked about

Jaime Sepulveda, M.D.

1   today with Mr. de la Cerda like recurrence, wound

2   complications, pain, change in vaginal shape, length,

3   things like that?

4              MR. DE LA CERDA:  Form.

5        A.   Surgery has risk.  Surgery has multiple

6   risk.  Surgery for prolapse has specialized risk that

7   we face every single time that we work with mesh or

8   without mesh.  We haven't had a mesh now for a few

9   years and patients still having the same kind of

10  complications that they had with the exception of a

11  mesh exposure because there's no mesh.

12             Incisions still dehisce the same way,

13  incisions still separate, challenges of wound healing

14  are still seen, granulation tissue is still seen, and

15  actually what we're seeing now is a higher rate of

16  hysterectomies with -- with shorter vaginas.

17       Q.   (By Mr. Snell)  Do you plan to discuss at

18  trial how the rates and risks with the Gynemesh PS,

19  Prolift, Prosima compare to the rates and risks with

20  native tissue?

21             MR. DE LA CERDA:  Form.

22       A.   Yes.

23       Q.   (By Mr. Snell)  For example, in your

24  report, you -- so for your Prolift report, page 9,

Jaime Sepulveda, M.D.

```
1   you have -- you have multiple studies that show the

2   efficacy of Prolift and Gynemesh PS compared to

3   native tissue.  Do you see that?

4        A.   Yes.

5        Q.   Do you plan to talk about the different

6   rates and risks of recurrence for mesh-based repair,

7   particularly I'm focused on Ethicon Gynemesh PS and

8   Prolift, Prosima compared to native tissue.

9             MR. DE LA CERDA:  Form.

10       A.   Yes.

11       Q.   (By Mr. Snell)  And do you plan to discuss

12  rates of wound complications, sexual function and

13  dyspareunia for Ethicon's meshes compared to native

14  tissue?

15            MR. DE LA CERDA:  Form.

16       A.   Yes, I plan -- I plan to testify on those.

17       Q.   (By Mr. Snell)  And have you evaluated and

18  investigated those issues?

19       A.   I have thoroughly evaluated.  I have -- I

20  run randomized control trial after randomized control

21  trial.  I have highlighted the areas that I feel are

22  most important and I have summarized them today on

23  my -- on my testimony.

24       Q.   And have you also identified those --
```

Jaime Sepulveda, M.D.

1    examples of those data in your reports, as well?

2        A.   I am -- I am ready to go on presented on the

3    numbers.

4        Q.   Lastly, Mr. de la Cerda asked you about if

5    you had any plans for further work in the formulation

6    or analysis.  Obviously, you're being deposed today

7    and tomorrow and I will represent to you that there

8    are transcripts not yet available for plaintiffs'

9    experts and some of plaintiffs' experts are not being

10   deposed until even after you.

11           Do you plan to review those transcripts when

12   they're provided to you and assess them?

13       A.   I will -- I will evaluate them.  I'll assess

14   them, and I'm looking forward to see the scientific

15   validity of it.

16           MR. SNELL:  Okay.  That's all I have.

17           MR. DE LA CERDA:  Nothing further from me.

18           MR. SNELL:  Thank you.

19           THE COURT REPORTER:  Do either of you need a

20       rough draft on this?

21           MR. SPARKS:  Yeah, I put my email on --

22           MR. DE LA CERDA:  Yeah, I'll take one, too.

23           (Thereupon, the taking of the deposition

24       was concluded at 4:33 p.m. )

Jaime Sepulveda, M.D.

1

2                          CERTIFICATE OF OATH

3

4     STATE OF FLORIDA        )

      COUNTY OF BROWARD        )

5

6             I, JODY L. WARREN, Registered Professional

7     Reporter, Florida Professional Reporter, Notary

8     Public in and for the State of Florida at Large,

9     certify that the witness, JAIME SEPULVEDA, M.D.,

10    personally appeared before me on 3/30/16 and was

11    duly sworn by me.

12            DATED this 11th day of April, 2016.

13

14

15

16            _____

              JODY L. WARREN, RPR, FPR

17            Notary Public, State of Florida at Large

              My Commission Expires 2/28/19

18            My Commission No. FF 188650

19

20

21

22

23

24

Jaime Sepulveda, M.D.

```
 1                    CERTIFICATE OF REPORTER

 2

 3          I, JODY L.WARREN, Registered Professional

 4    Reporter, Florida Professional Reporter, certify

 5    that I was authorized to and did stenographically

 6    report the deposition of JAIME SEPULVEDA, M.D., the

 7    witness herein on 3/30/16; that a review of the

 8    transcript was requested; that the foregoing pages

 9    are a true and complete record of my stenographic

10    notes of the deposition by said witness.

11          I further certify that I am not a relative,

12    employee, attorney, or counsel of any of the

13    parties, nor am I a relative or employee of any of

14    the parties' attorney or counsel connected with the

15    action, nor am I financially interested in the

16    action.

17          DATED this 11th day of April, 2016.

18

19

20

21          _____

            JODY L. WARREN, RPR, FPR

22          Notary Public, State of Florida at Large

23

24
```

Jaime Sepulveda, M.D.

1                     -  -  -  -  -  -

                    E R R A T A

2                     -  -  -  -  -  -

3

4    PAGE   LINE   CHANGE

5    _____  _____  _____

6        REASON: _____

7    _____  _____  _____

8        REASON: _____

9    _____  _____  _____

10       REASON: _____

11   _____  _____  _____

12       REASON: _____

13   _____  _____  _____

14       REASON: _____

15   _____  _____  _____

16       REASON: _____

17   _____  _____  _____

18       REASON: _____

19   _____  _____  _____

20       REASON: _____

21   _____  _____  _____

22       REASON: _____

23   _____  _____  _____

24       REASON: _____

Jaime Sepulveda, M.D.

```
 1

 2          ACKNOWLEDGMENT OF DEPONENT

 3

 4              I,_____, do

 5    hereby certify that I have read the

 6    foregoing pages, and that the same is

 7    a correct transcription of the answers

 8    given by me to the questions therein

 9    propounded, except for the corrections or

10    changes in form or substance, if any,

11    noted in the attached Errata Sheet.

12

13

14    _____

15    JAIME SEPULVEDA, M.D.              DATE

16

17

18    Subscribed and sworn

      to before me this

19    _____ day of _____, 20____.

20    My commission expires:_____

21

      _____

22    Notary Public

23

24
```

Jaime Sepulveda, M.D.

1                    LAWYER'S NOTES

2       PAGE  LINE

3       _____  _____  _____

4       _____  _____  _____

5       _____  _____  _____

6       _____  _____  _____

7       _____  _____  _____

8       _____  _____  _____

9       _____  _____  _____

10      _____  _____  _____

11      _____  _____  _____

12      _____  _____  _____

13      _____  _____  _____

14      _____  _____  _____

15      _____  _____  _____

16      _____  _____  _____

17      _____  _____  _____

18      _____  _____  _____

19      _____  _____  _____

20      _____  _____  _____

21      _____  _____  _____

22      _____  _____  _____

23      _____  _____  _____

24      _____  _____  _____