# EXHIBIT F

Exhibit consists of deposition testimony from a Texas state court action, *Ramirez v. Cesar Reyes, M.D., Johnson & Johnson, and Ethicon, Inc.*, Cause No. 2012-CI-18690, in which Ethicon retained Dr. Sepulveda-Toro to defend Ethicon's TVT products against substantially similar allegations as presented in the instant litigation. Any excerpts contained in Ex. F are taken from portions of that deposition which speak to general causation. Because much of Ex. F contains deposition testimony directed at specific causation, that portion of the transcript is not excerpted due to confidentiality concerns. Should the Court desire to examine the entire transcript, Plaintiffs request this be submitted under seal, or some other similarly protective measure.

Jaime Sepulveda, M.D.

Page 1

CAUSE NO. 2012-CI-18690

| | |
|---|---|
| JENNIFER RAMIREZ F/K/A<br>JENNIFER GALINDO,<br><br>Plaintiff,<br><br>v.<br><br>CESAR REYES, M.D., JOHNSON &<br>JOHNSON, AND ETHICON, INC.,<br><br>Defendants. | ) IN THE DISTRICT COURT<br>)<br>)<br>)<br>) 438th JUDICIAL DISTRICT<br>)<br>)<br>)<br>) BEXAR COUNTY, TEXAS<br>)<br>)<br>) |

DEPOSITION OF

JAIME SEPULVEDA, M.D.

DATE:  April 8, 2016

TIME:  9:17 a.m. - 5:10 p.m.

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Jaime Sepulveda, M.D.

Page 2

```
 1              I N D E X
 2    WITNESS:
 3                                      Page
 4    Jaime Sepulveda, M.D.
        Direct Examination by MR. FREESE       9
 5      Cross Examination by MR. GOSS         310
        Cross Examination by MR. FREESE      316
 6
              EXHIBITS
 7
      For Plaintiff:
 8
      No. 1 -  Deposition Notice
 9      For Identification                     9
10    No. 2 - Ethicon's response to deposition
      notice
11      For Identification                    10
12    No. 3 - Reliance List
        For Identification                    12
13
      No. 4 - Supplemental Reliance List
14      For Identification                    12
15    No. 5 - Binder of Ethicon documents
        For Identification                    17
16
      No. 6 - Expert opinion
17      For Identification                    17
18    No. 7 - Invoices with cover letter
        For Identification                    75
19
      No. 8 - Cochrane review
20      For Identification                    79
21    No. 9 - FDA Executive Summary
        For Identification                    82
22
      No. 10 - Appendix III - Methodology for
23    Systematic Epidemiologic Review of
      Published Literature
24      For Identification                    89
25    No. 11 - ETH.MESH.0547953
        For Identification                   108
```

Page 4

```
 1    e-mails
        For Identification                   308
 2
      No. 27 - ETH.MESH.06878438 and 439, Memo
 3      For Identification                   320
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
        No. 12 - Transcript excerpt of Dr. Joerg
 2    Holste
        For Identification                   117
 3
      No. 13 - ETH.MESH.01424029
 4      For Identification                   122
 5    No. 14 - Transcript excerpt of Brigette
      Hellhammer, M.D.
 6      For Identification                   120
 7    No. 15 - Thumb drive
        For Identification                   293
 8
      No. 16 - Medical records of Dr. Graham
 9      For Identification                   191
10    No. 17 - CV
        For Identification                   218
11
      No. 18 - Ultrasound images
12      For Identification                   222
13    No. 19 - Ultrasound image
        For Identification                   222
14
      No. 20 - CDs
15      For Identification                   231
16    No. 21 - Ultrasound imaging of the pelvic
      floor
17      For Identification                   229
18    No. 22 - Record of Examination of
      Jennifer Ramirez by Dr. Sepulveda
19      For Identification                   234
20    No. 23 - Article on Pudendal Neuralgia
        For Identification                   274
21
      No. 24 - ETH.MESH.00028555 to 556
22      For Identification                   300
23    No. 25 - ETH.MESH.03026399, 400 and 401,
      with attachments.
24      For Identification                   306
25    No. 26 - ETH-MESH-O50983794 and 795,
```

Page 5

```
 1        The deposition of JAIME SEPULVEDA, M.D., a
 2    witness in the above-entitled and numbered cause, was
 3    taken before me, Dorothy Linda Minor, Registered
 4    Professional Reporter and Notary Public for the State
 5    of Florida at Large, at 200 South Biscayne Boulevard,
 6    Suite 4600, in the City of Miami, County of Miami-Dade,
 7    State of Florida, on Friday, the 8th day of April,
 8    2016.
 9        APPEARING ON BEHALF OF THE PLAINTIFF:
10        Richard A. Freese, Esq.
          FREESE & GOSS, PLLC
11        3031 Allen Street, Suite 200
          Dallas, Texas   75204
12        rich@freeseandgoss.com
13        Tim K. Goss, Esq.
          FREESE & GOSS, PLLC
14        3031 Allen Street, Suite 200
          Dallas, Texas   75204
15        tim@freeseandgoss.com
16        APPEARING ON BEHALF OF DEFENDANTS JOHNSON & JOHNSON
          and ETHICON:
17
18        Kat Gallagher, Esq.
          BECK REDDEN, LLP
19        1221 McKinney Street, Suite 4500
          Houston, Texas   77010
          kgallagher@beckredden.com
20
          Jordan N. Walker, Esq
21        BUTLER SNOW, LLP
          1020 Highland Colony Parkway, Suite 1400
22        Ridgeland, Mississippi  39157
          jordan.walker@butlersnow.com
23
24
25
```

Jaime Sepulveda, M.D.

Page 6

1    APPEARANCES (Continued):
2        APPEARING ON BEHALF OF DR. REYES:
3            David J. McTaggart, Esq.
             SCOTT, CLAWATER & HOUSTON, LLP
4            2727 Allen Parkway, 7th Floor
             Houston, Texas  77019
5            dmctaggart@schlawyers.com
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

1            THE VIDEOGRAPHER:  We're on the record.
2    The witness is not present.  Counsel Tim Goss
3    has requested the video be turned on for
4    objections regarding the video.  The time is
5    9:12 a.m., and the matter is Jennifer Ramirez
6    versus Ethicon, et al.  Today's date is April
7    8, 2016.
8            MS. GALLAGHER:  This is Kat Gallagher on
9    behalf of Johnson & Johnson, and we have a, and
10   Ethicon, and we have a deposition notice for
11   Dr. Sepulveda today that was noticed for
12   stenographic only.  Pursuant to Rule 199.2, we
13   object to this going forward by video because
14   under Rule 199.2, at least five days prior to
15   the deposition, the party must serve on the
16   witness and all parties a notice that the
17   deposition will be recorded by other than
18   stenographic means.  We did not get five days
19   notice and I object to it going forward by
20   video.
21           MR. GOSS:  And just so I'm clear on your
22   objection, you object to us by recording -- you
23   object to our recording of the deposition, even
24   in the event that we do not intend to use the
25   video of the deposition at any trial in this

Page 8

1    cause?
2            MS. GALLAGHER:  Yes, I do, because under
3    the rule it says that notice must be given that
4    the deposition will be recorded by other than
5    stenographic means.  It does not say used.
6            MR. GOSS:  And you refuse to let us go
7    forward in the event that we want to record it,
8    video it for our own purposes and for no
9    purpose to be used at trial?
10           MS. GALLAGHER:  Yes.
11           MR. GOSS:  And we've offered you that we
12   would not use it for any purpose at trial and
13   you refuse to proceed forward, even under that
14   condition?
15           MS. GALLAGHER:  Yes.
16           MR. GOSS:  Okay.  Just for the record, we
17   will take this to the Court.  In the event that
18   the Court determines that we are entitled to
19   video it for our own purposes, then we're going
20   to ask to come down here and take it again.
21   That's all.
22           THE VIDEOGRAPHER:  This is the end of
23   video portion.  It's 9:14 a.m.
24           THE COURT REPORTER:  Raise your right
25   hand, please, sir.  Do you swear or affirm that

Page 9

1    the testimony you are about to give will be the
2    truth, the whole truth and nothing but the
3    truth?
4            THE WITNESS:  I do swear.
5    THEREUPON,
6            JAIME SEPULVEDA, M.D.,
7    having been first duly sworn/affirmed to tell the
8    truth, the whole truth and nothing but the truth, was
9    examined and testified under oath as follows:
10           DIRECT EXAMINATION
11   BY MR. FREESE:
12       Q.   Good morning.  Good to see you again.
13   I'm going to mark Exhibit 1 to your deposition, which
14   is the notice of your deposition.
15           (Plaintiff Exhibit No. 1 was marked for
16   identification.)
17   BY MR. FREESE:
18       Q.   Have you seen that before, sir?
19       A.   Yes, sir.
20       Q.   All right, and you were provided a copy
21   of it before the deposition?
22       A.   Yes.
23       Q.   And you were requested to bring some
24   documents?
25       A.   Yes.

3 (Pages 6 to 9)

Jaime Sepulveda, M.D.

Page 10

1    Q.   Okay.  And did you do so?
2    A.   Yes, I did.
3    Q.   And I'm going to mark Exhibit 2 to your
4  deposition, which is Ethicon's response to the
5  deposition notice.
6         (Plaintiff Exhibit No. 2 was marked for
7         identification.)
8  BY MR. FREESE:
9    Q.   Have you seen that before?
10   A.   I see it for the first time now.
11   Q.   Me showing you now, that's the first time
12  you've seen it?
13   A.   Yes, sir.
14   Q.   Okay.  You don't know what Ethicon
15  objected to producing and what it didn't object to
16  producing?
17   A.   Yeah, I'm aware that they objected to my
18  1099s.
19   Q.   Okay, and other than your 1099s, was
20  there anything withheld that we requested to be
21  brought, other than the 1099s?
22   A.   Not that, not that I'm aware.
23   Q.   Okay.  So, everything that you have
24  looked at and relied upon is either physically in the
25  room either in paper form or on a thumb drive?

Page 11

1    A.   I have, I have made an effort to put
2  everything there on the floor and I have my thumb
3  drive.
4    Q.   Okay, my question is, is everything that
5  you have reviewed and relied on in this case either on
6  the thumb drive or on the floor in paper format?
7    A.   Yes.
8    Q.   And the only set of documents that have
9  been withheld are your 1099s?
10   A.   Yes.
11        MS. GALLAGHER:  And, Rich, just to be
12   clear, I don't know if all of the literature is
13   on this thumb drive, but I think all the
14   case-specific materials are on there.  I'm just
15   not clear if we loaded up all the literature
16   again.
17        MR. FREESE:  Okay.
18  BY MR. FREESE:
19   Q.   And, Doctor, we were provided a
20  supplemental reliance list of yours this week.  Did you
21  realize that?
22   A.   Yes.
23   Q.   So, let me go ahead, and I'm going to
24  mark what was referenced to us as your reliance list as
25  Exhibit 3, and I'm going to mark as Exhibit 4 your

Page 12

1  supplemental reliance list that is printed, it says
2  April 5, 2005, which I guess was three days ago.
3         (Plaintiff Exhibits No. 3 and 4 were
4         marked for identification.)
5    A.   Yeah.
6  BY MR. FREESE:
7    Q.   Is that right?
8    A.   That's right.
9    Q.   Okay.  And is Exhibit 4 your supplemental
10  reliance list?
11   A.   Yes, this looks like my reliance list and
12  I would say supplemental reliance list.
13   Q.   Okay, and do you know sitting here what
14  was added or subtracted from your supplemental reliance
15  list?
16   A.   This has articles on, on other, other,
17  this has articles on biomechanics, and, as I can see
18  just flipping through these, these pages, it has my,
19  all the things that I relied that I testified on last
20  week.
21   Q.   Okay.  Well, what I'm, what I'm trying to
22  find out is, is there a way that I can, without going
23  line by line, figure out what it is you added to your
24  supplemental reliance list on the 5th of April, three
25  days ago?

Page 13

1    A.   No, I've been giving articles that I come
2  across but I did bring the articles that are not in
3  here.
4         MS. GALLAGHER:  Rich, I might be able to
5         short change this.  I think the only thing that
6         was added were additional medical records that
7         didn't make the original list.  I don't believe
8         there's any additional articles on there, is my
9         understanding.
10        MR. FREESE:  That's what I'm trying to
11        find out.
12  BY MR. FREESE:
13   Q.   So, based on what, what Ms. Gallagher
14  said, does that sound accurate to you, Doctor, that the
15  only supplement has been additional records?
16   A.   That sounds accurate.
17   Q.   And in fairness, this reliance list is
18  not prepared by you, is it?
19   A.   No, initially it's given in a packet,
20  although I can tell you that most of these articles I
21  read through the years.
22   Q.   I understand.  I move to strike that.
23  That's not really my question, Dr. Sepulveda.  These
24  reliance lists, Exhibit 3 and Exhibit 4, are prepared
25  by lawyers for Ethicon, not by you, correct?

4 (Pages 10 to 13)

Jaime Sepulveda, M.D.

Page 14

1    A.   That is correct.
2    Q.   You didn't sit here at your computer and
3  create 70 or 80 pages of single-spaced reliance
4  materials?
5    A.   I did put together the articles, I did
6  the research for the articles that are included
7  initially on the TVTO summary that is used in this
8  case.
9        MR. FREESE:  Move to strike.
10  BY MR. FREESE:
11    Q.   Not my question, sir.  You didn't sit
12  here and prepare at a computer your reliance materials.
13  That was done by the lawyers, correct?
14    A.   Yes, on the computer was done by them.
15    Q.   And then it's attached to your report,
16  correct?
17    A.   Yes.
18    Q.   Okay.  And your testimony is that you
19  think over the years you've seen or read most of the
20  things on your reliance list?
21    A.   I would say all of them.
22    Q.   So you've read all the internal Ethicon
23  documents referenced on your reliance list?
24    A.   I have a binder that has been provided to
25  me with the TVTO company documents.

Page 15

1    Q.   Okay, and did you bring it here with you
2  today?
3    A.   Yes, I did.
4    Q.   And do you have a binder of those?
5    A.   Yes.
6    Q.   Do you mind grabbing that?
7    A.   No.
8    Q.   And would you go ahead and describe
9  what's in this binder for me?
10    A.   It's a, it's a group of, it's a mixed
11  group of the history of TVTO, the -- I'm not going to
12  read the whole thing.
13    Q.   That's fine, just a narrative.
14    A.   But, the summaries of how TVTO was
15  developed.
16    Q.   Okay.  And, again, these were internal
17  documents that were hand picked by the lawyers for
18  Ethicon, is that correct?
19    A.   They, they were provided to me.  I don't
20  know what, what method they used.
21    Q.   Well, the method was, they chose which
22  documents to supply to you, correct?
23    A.   I, I think, I think, yes.
24    Q.   Okay.  And is there any specific internal
25  document that you asked them to provide to you?

Page 16

1    A.   No.
2    Q.   Okay.  So, one hundred percent of the
3  internal documents that you've looked at regarding TVTO
4  or any meshes that you testify about are hand selected
5  and given to you by Ethicon, correct?
6    A.   Yes.
7    Q.   All right, Doctor, we're going to go
8  ahead and mark your copy of the -- this is the report
9  prepared in this case, is that correct?
10    A.   Yes.
11    Q.   All right, I'm going to mark as Exhibit
12  5 --
13        MR. JORDAN:  Can we mark this and get a
14  copy of this?  I think what we would like to do
15  is just mark it so he can have his original
16  back and we can replace the copy with the depo
17  when we get it.  I just want it in the record
18  that he brought this and what it is.
19        MS. GALLAGHER:  Yeah, that's fine, it's
20  just because trial is so close we just want to
21  get his materials back to him as fast as we
22  can.
23  BY MR. FREESE:
24    Q.   So, I'm going to mark as Exhibit 5 the
25  documents that Ethicon's lawyers provided to you of the

Page 17

1  internal records of the company, the binder.
2    A.   I understand.
3        (Plaintiff Exhibit No. 5 was marked for
4  identification.)
5  BY MR. FREESE:
6    Q.   Okay.  I'll mark as Exhibit 6 your expert
7  opinion in the Jennifer Ramirez case.
8        (Plaintiff Exhibit No. 6 was marked for
9  identification.)
10  BY MR. FREESE:
11    Q.   Is that correct?
12    A.   Yes.  You mean my marked copy?
13    Q.   Yes, I want to mark your marked copy.
14    A.   Yes.
15    Q.   And these are, the pink stickies are
16  yours?
17    A.   Yes.
18    Q.   In your handwriting?
19    A.   Yes.
20    Q.   And there's highlighting here also,
21  correct?
22    A.   Yes.
23    Q.   Generally, what is it that you
24  highlighted?
25    A.   Anything that I, I anticipate that you

Jaime Sepulveda, M.D.

Page 18

1    would ask me about.
2       Q.   Okay.  Fair enough.  And I'm going to
3    give it back to you, and I may, I may ask to get it
4    back to see what's highlighted and what the notes say
5    when I get to that particular page.  Okay?
6       A.   Okay.
7       Q.   Doctor, I'm going to try to do this in
8    just page-flipping order so we can get through this,
9    but am I correct that this expert report is virtually
10   identical to a number of expert reports that you have
11   issued in synthetic mesh litigation lawsuits?
12      A.   They, the general report, yes.
13      Q.   The credentials and qualifications would
14   be virtually identical?
15      A.   Yes.
16      Q.   Okay, and the general opinions that you
17   hold about TVT and TVTO and TVTS are all virtually
18   identical?
19      A.   Yes, sir.
20      Q.   Okay, and then we have some opinions that
21   are specific to Ms. Ramirez's case, correct?
22      A.   Yes.
23      Q.   Okay.  Am I correct, like your reliance
24   list, that your expert report is not prepared by you
25   but rather is prepared by the lawyers for Ethicon?

Page 19

1       A.   No, that's not correct.
2       Q.   Okay.  So, who actually types this
3    report?
4       A.   I, I did.
5       Q.   You typed this 66-page report?
6       A.   I actually did.
7       Q.   Okay, and how long did it take you to
8    type this 66-page report?
9       A.   I'm going to, I'm going to, I misspoke on
10   the, the whole report.  The, the part that has to do
11   with the life care plan, I did not type that one.
12      Q.   Okay.  So, the life care plan opinion
13   starts at page 63 of your report?
14      A.   Yes, that's correct.
15      Q.   And you did not type that?
16      A.   No, I did not type the comments on the
17   life care plan.
18      Q.   Who prepared your comments on the life
19   care plan?
20      A.   The, the attorney's office.
21      Q.   Okay.  Do you know who in the attorney's
22   office?
23      A.   No.
24      Q.   Okay.  Did you actually review any
25   underlying records to create the comments in the life

Page 20

1    care plan?
2       A.   If I -- repeat that again, please.
3       Q.   Yes, sir.  There's four pages of, of
4    opinions that you have about the life care plan that
5    you say you did not prepare.
6       A.   No, I did not type those, and, and those
7    were prepared by the attorney's office and I reviewed
8    them.
9       Q.   Okay, you reviewed the comments?
10      A.   Yes.
11      Q.   Did you review any of the underlying
12   documents that made up the life care plan?
13      A.   Yes, I reviewed the documents prepared by
14   Mr. Harrell, and I read the deposition of Dr. Elizondo.
15      Q.   All right, and these are -- were there
16   anything other than those two depositions that you
17   read?
18      A.   No.
19      Q.   Did you read the entirety of the
20   depositions?
21      A.   I, yeah, Elizondo, I read the whole
22   thing.
23      Q.   Were there portions selected for you by
24   the lawyers, or did you just, you sat down and read the
25   whole deposition?

Page 21

1       A.   No, that one I read the whole, whole
2    deposition.
3       Q.   I can look at your reliance list, but
4    there are a lot of depositions that are listed here.
5    Did you read every one of them?
6       A.   At some point, I have read them, because
7    being this is so long, this is two years, but yes, I
8    have read the depositions, and they don't all come, as
9    you probably would know, they don't come at one time.
10   They come in sequence.
11      Q.   So, over the period of Ms. Ramirez's
12   case, you've read several thousands of pages of
13   deposition testimony to form your opinion, correct?
14      A.   Yes, sir.
15      Q.   And that would include all of her
16   treating physicians?
17      A.   Yes, all the treating physicians that
18   I've been made aware of by the medical records.
19      Q.   Her deposition, correct?
20      A.   Two, both of them.
21      Q.   Three of them.  Did you know there were
22   three, three installments of her deposition?
23      A.   No, I read two, two depositions.
24      Q.   Did you know there were three?
25      A.   No.

6 (Pages 18 to 21)

Jaime Sepulveda, M.D.

Page 22

1    Q.   Okay. What two versions did you read?
2    A.   I read the first and the second
3  depositions.
4    Q.   Okay.
5    A.   That's the transcript of each one.
6    Q.   You didn't read the third version?
7    A.   No.
8    Q.   So your opinions can't be influenced in
9  any way by what she said in her third deposition,
10  correct?
11    A.   No, I have not read it, I cannot rely on
12  it.
13    Q.   And you don't intend to give any opinions
14  based on anything that was said in her third
15  deposition?
16    A.   I'm not even aware that there was a third
17  deposition, so I definitely could got rely on.
18    Q.   So anything that was said in the third
19  deposition can't form any basis for any opinion you're
20  giving, correct?
21    A.   Unless I read them before trial, and then
22  everybody should be aware if anything changes.
23    Q.   I'm talking about as you sit here today,
24  we've got your report, we've got you here under oath
25  giving your opinions, you can't opine, don't intend to

Page 23

1  opine on anything said in her third deposition?
2    A.   No, I have not read it.
3    Q.   Okay. Now, real quickly, you're the
4  medical director of South Miami Medical Arts Surgery,
5  correct?
6    A.   Yes.
7    Q.   And that's, that's where you work?
8    A.   That's one of the places where I work.
9  That's, that's a surgery center that is a partnership
10  between the surgeons and Baptist Health System.
11    Q.   And what do you do as the medical
12  director?
13    A.   I oversee credentialing, oversee the
14  directory for pharmacy, I oversee any incidents,
15  incident reports, and I, I also prepare for joint
16  commission reviews and AHCA, A-H-C-A, reviews.
17    Q.   It says you are a principal investigator
18  of the Fibroid Registry Research Project. What is
19  that?
20    A.   Yes, that's a registry, it's a research,
21  and, it's a research project, and it was registered and
22  has been closed.
23    Q.   What was it a research project of? And
24  what was the purpose of the project?
25    A.   Well, there's a fibroid center at the

Page 24

1  hospital, and I put together the research, I cooperate
2  with the research instruments, I oversee the research
3  instruments as the principal investigator. That
4  includes IRB submissions and registering in the
5  clinicaltrials.gov site.
6    Q.   But the registry is closed?
7    A.   Yes, when we finish our project, we are
8  required to close that registry or that project on the
9  clinicaltrials.gov.
10    Q.   So you're no longer an investigator for
11  that?
12    A.   No.
13    Q.   I guess we should take that out of your
14  résumé, should we not?
15    A.   You can actually strike it, yeah.
16    Q.   Okay. And it says that, the conference
17  director for the Pelvic Floor Board. What is that?
18    A.   The Pelvic Floor Board is a group of
19  colorectal, radiologists, physical therapists,
20  gastroenterologists, neurologists, urogynecologists,
21  gynecologists, and neurologists and pain management
22  specialists. We all get together every quarter and we
23  present cases, discuss cases and treatment strategies
24  and share knowledge.
25    Q.   Is this national or international, or is

Page 25

1  that just here in Miami?
2    A.   That's a CME activity. It's one-credit
3  CME activity here at Baptist Health.
4    Q.   Okay, that's what I'm getting at, it's a
5  local entity?
6    A.   That's correct.
7    Q.   And you set up the conferences for it?
8    A.   Yes, I'm the conference director.
9    Q.   Okay. Now, you're a member of the
10  American Urologic, Urogynecologic Society, is that
11  right?
12    A.   Yes.
13    Q.   That is an organization made up of
14  doctors who practice urology and gynecology?
15    A.   Yeah, we, AUGS started in the '90s, and
16  it was put together by Dr. Jack Robertson, and he, now
17  it's just the society that represents those with an
18  interest or a board certification in urogynecologic
19  medicine and reconstructive surgery.
20    Q.   That's commonly referred as to AUGS?
21    A.   AUGS.
22    Q.   And am I correct, as long as you're a
23  doctor practicing urology or urogynecology and you
24  submit your application, you can be a member of the
25  organization, correct?

Jaime Sepulveda, M.D.

Page 26

1    A.   That's correct.
2    Q.   You don't have to take a test to get in
3  there?
4    A.   No.
5    Q.   You don't have to be invited?
6    A.   No.
7    Q.   You're just, I'm a doctor, I do
8  gynecology, I do urology, I would like to be a member,
9  here's my dues, I'm in, correct?
10    A.   Yes.
11    Q.   Okay, and in fact, Ethicon is a member of
12  AUGS, is that correct?
13    A.   I did not know that.
14    Q.   Is me telling you, is that the first time
15  you ever heard it?
16    A.   Yes.
17    Q.   Okay.  And then it says that you're a
18  member of the American Urological Association, AUA, is
19  that correct?
20    A.   Yes.
21    Q.   Same thing, that's an organization that
22  you don't have to be invited to, correct?
23    A.   No, that one I was invited.
24    Q.   You don't have to be invited to it,
25  correct?

Page 27

1    A.   For me as a gynecologist to be a member,
2  yes.
3    Q.   Generally, anyone who is a practicing
4  urologist who wants to be a member of the AUA can
5  submit an application to be a member, correct?
6    A.   If you are a urologist.
7    Q.   That's my point.  And you are.
8    A.   No, I'm a urogynecologist.
9    Q.   I understand, but you practice urology
10  and gynecology, do you not?
11    A.   I practice female pelvic medicine and
12  reconstructive surgery.  That's my board certification.
13    Q.   And, so, any doctor who practices in that
14  field can apply, pay a due and be a member of AUA,
15  correct?
16    A.   I think for urologists, they are board
17  certified in urology.  I am not sure.
18    Q.   As you sit here today, you didn't have to
19  take a test to be an AUA member, did you?
20    A.   No, for me to be a member, I had to be
21  invited and sponsored by a urologist.
22    Q.   And then you pay your dues and you become
23  a member, correct?
24    A.   Yes.
25    Q.   All right.  The IUA, the International

Page 28

1  Urogynecologic Association?
2    A.   Yes.
3    Q.   Is that IUGA?
4    A.   Yes.
5    Q.   Okay.  What about that organization, do
6  you have to be invited to that, or can you simply join
7  it?
8    A.   No, you join.
9    Q.   Okay, you pay your dues, submit your
10  application, Dr. Sepulveda, you're a member, correct?
11    A.   Yes.
12    Q.   ICS, International Continence Society,
13  that's also a group, that was founded in England,
14  right?
15    A.   I don't know if it was founded in
16  England.  I know it's a great source of information.
17    Q.   And that's simply, I'm Jaime Sepulveda
18  and I want to be a member, here's my money and here's
19  my application, and you're in, correct?
20    A.   Yes.
21    Q.   All right, you were not invited to be a
22  member of ICS?
23    A.   No.
24    Q.   Anybody who is a doctor who pays the dues
25  can be a member of ICS, correct?

Page 29

1    A.   Yes.
2    Q.   Does your experience in neuromodulation
3  have anything to do with the opinions you're giving in
4  this case?
5    A.   No, not neuromodulation.
6    Q.   It's in your report, so I just want to
7  make sure, as I go through this, I want to see if it
8  impacts your opinions, and if it doesn't, we won't
9  spend any time on it.
10    A.   No, neuromodulation is used for urge
11  incontinence, but it's not something that I would
12  recommend for Mrs. Ramirez at this time.
13    Q.   And you said that you have a good bit of
14  experience with TVT, TVTO and TVT Secur, correct?
15    A.   Yes.
16    Q.   And you describe it in your report as
17  three generations of TVT products, correct?
18    A.   Yes.
19    Q.   Okay.  And all three of those use the
20  same mesh, correct?
21    A.   Yes.
22    Q.   The, the method of implanting is
23  different, correct?
24    A.   Yes.
25    Q.   The length is different?

8 (Pages 26 to 29)

Jaime Sepulveda, M.D.

Page 30

1      A.   Yes.
2      Q.   And, but in your mind, those three
3  products represent three different generations of, of
4  the TVT family of products?
5      A.   Yes.
6      Q.   All right.  You also implant TVT
7  Abbrevos, do you not?
8      A.   Yes.
9      Q.   Is that part of the third generation, or
10 is it a fourth generation, or where do you put Abbrevo
11 in the hierarchy of --
12     A.   It's probably, we're going to call it
13 fourth generation just by when they came in.
14     Q.   Okay.  It was put on the market in 2010
15 after, after the other three, correct?
16     A.   It might be around that time.
17     Q.   I'm just curious why you didn't put
18 Abbrevo in your report.
19     A.   I don't know, probably just going the
20 Abbrevo in the same, in my mind I think it's the same
21 way as the TVTO.
22     Q.   It's an obturator approach?
23     A.   It's a transobturator approach with
24 midurethral synthetic sling.
25     Q.   And you put a lot of Abbrevos in, don't

Page 31

1  you?
2      A.   Yes.
3      Q.   Okay.  You're not putting the Secur in
4  anymore, correct?
5      A.   I don't have it.
6      Q.   Okay.  Because it was taken off the
7  market, wasn't it?
8      A.   I don't have it, I just don't have it
9  available.
10     Q.   I know you don't, and the reason you
11 don't have it is because it's not made anymore, is it?
12     A.   It's not made anymore.
13     Q.   Because Ethicon took it off the market,
14 correct?
15         MS. GALLAGHER:  Object to form.
16     A.   Yeah, they decommercialized it.
17 BY MR. FREESE:
18     Q.   Well, decommercialization, is that what
19 you mean, they decommercialized it?
20     A.   Yeah, that's the term that has been used.
21     Q.   That's not even a word, is it?
22     A.   I don't know.
23     Q.   I mean, I'm not trying to be funny.
24 Decommercialization is not even a word, is it, Doctor?
25     A.   I don't know.

Page 32

1      Q.   Did you ever look up decommercialization
2  in the dictionary?
3      A.   Never looked at it.
4      Q.   It doesn't exist, I'll invite you to look
5  it up.  What you mean by decommercialization is, TVT
6  Secur was taken off the market by Ethicon, was it not?
7          MS. GALLAGHER:  Object to form.
8      A.   What I consider is that they don't sell
9  it anymore.
10 BY MR. FREESE:
11     Q.   That's right, because they don't make it
12 anymore and they don't market it anymore, correct?
13     A.   They don't sell it, they don't market it
14 anymore.
15     Q.   And why don't they market it anymore?
16         MS. GALLAGHER:  Object to form.
17     A.   It was a decision that came on, on a
18 letter that they explained that, because there were
19 other, other -- there was other methodology that was
20 going to be used for submission to the FDA.  They, they
21 could not make it anymore.  They decided not to make it
22 anymore.
23 BY MR. FREESE:
24     Q.   And they decided not to make it anymore
25 because the FDA told them that the FDA was not

Page 33

1  satisfied with the safety of the TVT Secur, correct?
2          MS. GALLAGHER:  Object to form.
3      A.   I think that it was -- I don't know if it
4  was about safety, I think it was more about getting
5  post-market surveillance.
6  BY MR. FREESE:
7      Q.   You know that the FDA sent a letter to
8  Ethicon saying that it was not satisfied that the
9  safety of the TVT Secur was established and therefore
10 the company was going to be required to do 522 studies
11 in order to keep marketing the product, and rather than
12 do the studies to prove the safety, the company took
13 the product off the market, correct?
14         MS. GALLAGHER:  Object to form.
15     A.   I know that there was a request for a
16 522.  I cannot tell you that it was because of safety.
17 BY MR. FREESE:
18     Q.   Well, what else does the FDA regulate
19 products for other than safety?
20     A.   They, they, they do safety, efficacy and
21 quality of products.
22     Q.   Okay, and as you sit here today, do you
23 know of anybody disputing the quality of the TVT Secur?
24     A.   No.
25     Q.   Do you know of anybody disputing the

9 (Pages 30 to 33)

Jaime Sepulveda, M.D.

Page 34

1   efficacy of the TVT Secur?
2        A.   No.
3        Q.   You do know that they were disputing the
4   safety of the TVT Secur, correct?
5        A.   I do not know that.
6        Q.   As you sit here today, you have no idea
7   why the company took the TVT Secur off the market?
8        A.   I, I don't have a clear idea why.
9        Q.   And does the 522 order relate to the
10   safety of a product or the efficacy of a product?
11        A.   I think it has to do with post-market
12   surveillance.
13        Q.   And is post-market surveillance focused
14   on safety or efficacy?
15        MS. GALLAGHER:   Object to form.
16        A.   I already say I don't know if it's about
17   safety.  I know a post-market surveillance is a lot
18   more involved than just safety.
19   BY MR. FREESE:
20        Q.   You think post-market surveillance has to
21   do with the efficacy of a product?
22        A.   I believe it does.
23        Q.   And you think the criticism that the FDA
24   had in the post-market surveillance of TVT Secur was
25   because of the efficacy of the product?

Page 35

1        MS. GALLAGHER:   Object to the form.
2        A.   There was a, there was a, now that you
3   mentioned it -- can I refer to one of my documents?
4   Because it's in my, it's in one of the documents that I
5   brought.
6   BY MR. FREESE:
7        Q.   Sure.  Do you need to look at a document
8   to answer my question?
9        A.   Well, we have been talking about the same
10   question already in four separate instances, and if I'm
11   going to answer your question accurately I would like
12   to refer to my document.
13        Q.   You mean four separate depositions you've
14   given?
15        A.   I don't understand your question.
16        Q.   I don't understand your answer.  You said
17   we've been talking about it in four separate instances.
18   What did you mean, sir?
19        A.   Well, you asked me already about safety
20   and that the 522 has to do with safety, and before I
21   give you an answer I want to make sure that I give you
22   an accurate answer, and I want to see the document.
23        Q.   Go ahead.
24        A.   I'm looking at the white paper from the
25   FDA.

Page 36

1        Q.   All right.  Look at page 4, if you don't
2   mind, sir.
3        MS. GALLAGHER:   What document are you
4        looking at?
5        MR. FREESE:   I'm looking at this
6        document.
7   BY MR. FREESE:
8        Q.   Is that the same one you're looking at?
9        A.   Yes, this is the FDA Executive Summary
10   for surgical mesh for treatment of women with pelvic
11   organ prolapse and stress urinary incontinence.
12        Q.   Look at page 4, section 2.3, regarding
13   522 post-market surveillance studies.
14        A.   I'm looking at page 4.
15        Q.   Okay.  Is this what you needed to look at
16   to answer the question?
17        A.   No, I was looking at the decision of the
18   committee on the post-market option.  Yes.  What would
19   you like me to read?
20        Q.   My question is, the post-market
21   surveillance studies that the FDA had required Ethicon
22   to conduct related to the serious adverse health
23   consequences that may be caused by a failure of the
24   product, correct?
25        A.   About the, about the efficacy and safety

Page 37

1   and quality.
2        Q.   About the, the 522 allows the FDA to
3   order the study where the failure of the device was
4   reasonably likely to have a serious adverse health
5   consequence.  Correct?
6        A.   Are you reading on the pelvic organ
7   prolapse section?
8        Q.   I'm reading page 4 on 522 studies.
9        A.   Yes.  Well, I'm going to read on page 47,
10   which is a more specific question about TVT Secur.
11        Q.   Okay.  Go ahead.
12        A.   The panel will be asked to consider
13   whether 522 studies are needed for cleared mini-slings,
14   all cleared surgical mesh indicated for stress urinary
15   incontinence, not needed for these devices.  If the
16   panel believes 522 are needed for all or just a subset
17   of these products, the panel will be asked to discuss
18   the type clinical study that should be required with
19   consideration to patient selection, controls,
20   randomizations, outcome measures, concomitant
21   surgeries, follow-up duration, etcetera.
22        Q.   Okay, and you agree with the FDA
23   statements in the summary about the TVT Secur?
24        A.   I, I agree that they are in all the power
25   to choose whatever method they decide to choose.

10 (Pages 34 to 37)

Jaime Sepulveda, M.D.

Page 38

1    Q.   I understand, but do you agree with the
2  comments that they made about the safety of the TVT
3  Secur?
4    A.   I don't think that TVT Secur is an unsafe
5  procedure; therefore, I see no reason to go beyond what
6  was already being done. Now, I do understand that will
7  benefit from surveillance in any product in which there
8  are being reports of any, any type of incident.
9    Q.   Rather than do the post-market 522
10 studies, the company, rather than approve the safety of
11 the product through those post-market studies, chose to
12 take it off the market, correct?
13    MS. GALLAGHER:  Object to form.
14    A.   The safety of the product has been, is
15 already being examined independently from the FDA.
16 There have been through, there have been studies
17 through separate, separate studies and trials. What
18 they, the FDA decided was to do 522 because that's a
19 mechanism that they have in place.
20 BY MR. FREESE:
21    Q.   All you're saying is the FDA did what
22 they have the right to do. I'm asking you if you
23 agreed with what they did.
24    MS. GALLAGHER:  Object to form.
25    A.   I, I disagree with the methodology of the

Page 39

1  FDA which has proven to this time to be inadequate to
2  regulate and innovate at the same time. This type of
3  criminology of 522s or 510(k)s have been in place for a
4  long period of time, and it's, there's a consensus that
5  this need to be reviewed. Now, at the time that this
6  was decided, all this consensus came through, the 522
7  was the mechanism in place.
8  BY MR. FREESE:
9    Q.   Right. You read the executive summary,
10 did you not?
11    A.   I did.
12    Q.   And you read it in forming your opinions
13 in this case?
14    A.   Yes.
15    Q.   And you agree with all the, the FDA
16 statements in the summary?
17    A.   No, I don't agree with all of them and I
18 don't disagree with all of them.
19    Q.   You disagree with some and agree with
20 others?
21    A.   There are parts in which I have no
22 opinion.
23    Q.   I guess it would be fair to say you don't
24 think that FDA statements are always well founded in
25 science, correct?

Page 40

1    A.   That's correct. I think it's based on
2  the best science that they consider, but there's a bias
3  on the methodology to come to their conclusions and
4  recommendations.
5    Q.   Can you describe to me, Dr. Sepulveda,
6  what bias the FDA has?
7    A.   Well, it's a very small group, and, and
8  it's, it's a group, I believe it's 12, 12 individuals,
9  and the methodology used on the statistical analysis
10 was not, was not fully, fully completed, fully
11 disclosed, I should have said, fully disclosed. Also,
12 the way the complaint were examined, from the MAUDE,
13 from the MAUDE database was put through an Excel
14 program, it was required to be placed on an Excel
15 program to trim down the repeated complaints. So, the
16 MAUDE database was used but there's, within itself has
17 its own, its own limitations.
18    I'm going to, I'm going to, I'm going to
19 read the limitations of the MAUDE data analysis, which
20 is on the FDA reports, in which it says the reports
21 were unduplicated using Excel on duplication function,
22 not by reviewing the individual reports. A few
23 unduplicated reports might still exist in the data.
24 This auto function does not exemplify reports that have
25 different numbers but are related to the same events.

Page 41

1  If one event has two reports, one from the manufacturer
2  and one from voluntary reporter, but they are not
3  linked in the MAUDE database as one event, they will
4  not be taped by auto function as one event.
5    So, that tells you the accuracy of the
6  data that was obtained on, on, on this recommendations.
7    In addition, even though the result of
8  data mining were refined multiple times, it is still
9  possible that a few reports are placed in the wrong
10 group and in the wrong adverse event group.
11    I just read the way, the way the FDA
12 itself, the group, says that there's a limitation about
13 data analysis. That is biased.
14    Q.   And, therefore, you think that
15 conclusions that the FDA reached are unreliable?
16    A.   I think that they were biased.
17    Q.   Okay, and therefore, if they're biased,
18 they're unreliable, correct?
19    A.   They're not accurate.
20    Q.   And if they're not accurate, they're not
21 reliable?
22    A.   If you want to equate accurate with
23 reliable, yes.
24    Q.   I just want to see if you agree with me.
25    A.   Well, reliable is more, is no more the

Jaime Sepulveda, M.D.

Page 42

1    word of accuracy.  Reliable is how good the
2    methodology and conclusions are.
3         Q.   And if methodology is biased, that would
4    lead to unreliable results, correct?
5         A.   I think that most people would judge it
6    as unreliable.
7         Q.   I mean, you understand evidence-based
8    medicine, correct?
9         A.   Yes.
10        Q.   If you're practicing evidence-based
11   medicine, you don't want unreliable data to rely on, do
12   you?
13        A.   No, I want the most accurate data that I
14   can obtain.
15        Q.   And, therefore, bias would be a type of
16   unreliable data, correct?
17             MS. GALLAGHER:  Object to form.
18        A.   There's no cohort methodology, there's no
19   randomization, there's no actual analysis conducted on
20   this.  The whole, the whole concept of evaluating
21   either efficacy or quality in general, in general, I'm
22   talking in general now, in general, we already
23   mentioned for mini-slings and now we're talking in
24   general, in general is that the amount of database is
25   not accurate, and if it's not accurate, you cannot

Page 43

1    consider reliable.
2    BY MR. FREESE:
3         Q.   Thank you.  And, Dr. Sepulveda, do you
4    think that you are more qualified to assess the safety
5    and efficacy of mesh products than the FDA?
6         A.   I, I cannot substitute a panel of 12
7    people.  I cannot substitute a cohort study.  It's not
8    that I'm more qualified.  I, I am the receiving end of
9    it.  So, I can tell you in this receiving end how I can
10   use it.
11        Q.   Okay, that's not really my question.  My
12   question is, do you think that you're more qualified to
13   assess the safety and efficacy of mesh products than
14   the FDA, yes or no?
15             MS. GALLAGHER:  Object to form.
16        A.   I have, I have the experience with
17   working with mesh, I have the knowledge on the
18   biomechanics of mesh, I have the knowledge on the
19   conditions that require the mesh, and I have 25 years
20   doing surgery, but that still leaves me in the
21   receiving end of it.  Am I more qualified than FDA?
22   I think I am as qualified as anyone that was in that
23   panel or that spoke to the FDA.
24   BY MR. FREESE:
25        Q.   Now, Doctor, you said in your report that

Page 44

1    you have had over 500 surgeons visit your operating
2    room to watch you place slings, correct?
3         A.   Yes.
4         Q.   How many of those were sponsored by
5    Ethicon?
6         A.   I think that the majority of them.
7         Q.   Well, I mean, like 99 percent or 51
8    percent?
9         A.   I never run a percentage of it, but I
10   have had, I have had surgeons that come without,
11   without Ethicon.  The majority could be more than 50
12   percent.  This, this pelvic floor, pelvic floor surgery
13   and the specific procedures did not start with mesh.
14   We were doing this procedures and we were using
15   different procedures even before mesh.  In the same way
16   that I visited many surgeons, even before there was
17   mesh, they also visited me.
18        Q.   Okay.  Well, did you place any
19   midurethral slings that weren't synthetic?
20   Midurethral slings by definition are synthetic slings,
21   are they not?
22        A.   Yes, there's no data that indicates that
23   midurethral slings should be anything but synthetic.
24        Q.   I understand.  My question, Doctor, I'm
25   asking you about your report, and you said 500 doctors

Page 45

1    have come to my operating room to watch Dr. Sepulveda
2    put in midurethral slings.  You did say that, did you
3    not?
4         A.   No, not just midurethral slings.
5         Q.   Well, let's look at your report, sir.
6    Page 2, quote, "I have had over 500 physicians visit my
7    operating room to watch me place midurethral slings."
8    Did you write that?
9         A.   Midurethral slings along with other
10   procedures.
11        Q.   That's not what your report says, is it,
12   Doctor?  Is it?
13        A.   No, it's not what my report says.
14        Q.   What your report says is 500 doctors have
15   come to your OR to watch you place midurethral slings,
16   correct?
17        A.   Yes.
18        Q.   That means 100 percent of those 500
19   doctors would be watching you place a synthetic
20   midurethral sling, correct?
21        A.   Yes, they have watched me place a
22   midurethral sling, correct.
23        Q.   Okay.  How many of these 500 doctors that
24   came to watch you put synthetic slings in were
25   sponsored by Ethicon?

Jaime Sepulveda, M.D.

Page 46

1    A.   The majority.
2    Q.   Is it closer to 500 or is it closer to
3  250?
4    A.   It might be a number between the both of
5  them, but I can not give you an accurate number because
6  I never recorded it.
7    Q.   Okay.  How do you know it's 500 then, if
8  you never recorded it?
9    A.   Because that's the number, that's the
10  number that -- it may have been a thousand.
11    Q.   Okay.
12    A.   It may have been a thousand, may have
13  been 400, but I can tell you that at least 500, because
14  in 25 years doing surgery and you have individuals
15  coming to watch you.
16    Q.   Did you just pick the 500 out of the air?
17    A.   Yeah, that's the safest number I could
18  pick.  I could have picked a larger number, though.
19    Q.   Okay.  And how many years have you been
20  doing midurethral slings?
21    A.   It's since TVT came out.
22    Q.   1998?
23    A.   Yes.
24    Q.   All this 25-year stuff you're talking
25  about has nothing to do with when you're talking about

Page 47

1  midurethral slings, does it?
2    A.   No, we, we actually dissected the
3  urethra, so that -- okay, yes --
4    Q.   Just answer my question, Doctor.  All of
5  this talk about I've been doing this 25 years has no
6  application to midurethral slings, does it?
7    A.   Yes, I have not placed midurethral slings
8  for 25 years.
9    Q.   Because they've only been on the market
10  for 18 years, correct?
11    A.   That is correct.
12    Q.   Okay, and no 500 doctors have seen you
13  place a midurethral sling?
14    A.   It might be 500, it might be more.
15    Q.   And who comes and sees you place
16  midurethral slings in the OR other than people
17  sponsored by Ethicon?
18    A.   I have, I have colleagues that come in, I
19  do Miami, they come to Miami, and they say I'm going to
20  go and see Jaime do surgery.  The first one that comes
21  to mind is the chairman, the director of gynecologic
22  surgery at the University of Puerto Rico.  Another
23  colleague in Savannah.  Another colleagues also from
24  Puerto Rico that is doing academics.  I have had
25  fellows, I have had residents from other institutions

Page 48

1  that come and watch me place it.  That's essentially.
2  I could go on with a list, but I don't keep a registry.
3    Q.   All right.  And when, when Ethicon
4  sponsors these doctors to come watch you place slings,
5  is Ethicon paying you to do that?
6    A.   Yes, they, they, they were, those were
7  mostly activities in which I demonstrated how to place
8  product, and some patients with product also had a
9  midurethral sling.
10    Q.   Okay, but when these doctors that are
11  sponsored by Ethicon are coming in, you're being paid
12  by Ethicon to let them come into your OR to watch you
13  do surgeries?
14    A.   Yeah, they compensate me for my time
15  before I do my surgery.  When I'm doing my surgery, I'm
16  being compensated for my surgery.
17    Q.   Now, you say that you, you've used
18  laser-cut mesh and mechanically-cut mesh, correct?
19    A.   Yes.
20    Q.   If I'm holding a TVTO box, for example,
21  all right, how can I tell if it's a mesh, if the mesh
22  is laser cut or mechanically cut?
23    A.   I don't know by looking at the box
24  because when I'm scrubbed, I'm not looking at a box but
25  I look at the product.

Page 49

1    Q.   Okay.  So, you're an expert, you hold
2  yourself out as an expert in TVTO, correct?
3    A.   Right.
4    Q.   And we can agree that if you're looking
5  at the box, even you, who implants them all the time,
6  you don't know if it's mechanical cut or laser cut?
7    A.   I think that there's a way to know it.  I
8  just never looked at that box.
9    Q.   But sitting here today, you can't think
10  of what that way is?
11    A.   Yeah, I look at the sling.
12    Q.   Okay, you pull it out and you look at it,
13  so you don't know until you open the box, pull back
14  the, the plastic cover to figure out if it's laser cut
15  or mechanical cut?
16    A.   No, not with the plastic cover.  You can
17  actually see it on the sheet.
18    Q.   But you have to open the plastic
19  container to get to the TVTO, do you not?
20    A.   No, it's transparent.  You can actually
21  see it without even opening it.
22    Q.   Well, the body is transparent, the top is
23  not transparent, is it?
24    A.   The body, yeah, all the other sides are
25  transparent.

13 (Pages 46 to 49)

Jaime Sepulveda, M.D.

Page 50

1    Q.   The tub is transparent but the top is
2  not?
3    A.   No, the top is like a paper with a name.
4    Q.   And you can look through the plastic tub
5  and tell if it's laser cut or mechanical cut?
6    A.   You can look at the sling in that area,
7  yes.
8    Q.   Without opening it?
9    A.   Without opening it.
10    MS. GALLAGHER:   Y'all are talking about
11  different things.  He's talking about the top
12  of the box.  Can you look through the top of
13  the box and tell whether it's laser cut or
14  machine cut?
15    THE WITNESS:   No.
16    MR. FREESE:   I understand what he was
17  saying.
18  BY MR. FREESE:
19    Q.   You're saying you can look through the
20  clear plastic portion of the TVT before you even open
21  the tub and tell if it's laser cut or mechanical cut?
22    A.   I have used it so many times and I have,
23  and there's a plastic cover in there, and you can see
24  the whole device right through there.  It's, it's, if I
25  tell you, though, in order to be accurate with you, I

Page 51

1  cannot tell you that I look right through there and
2  say, okay, which one is that, laser cut or mechanical
3  cut.
4    Q.   I'm asking you, are you able to do that?
5    A.   I will have to look at it, because as I
6  sit here today, I don't remember looking through it.
7    Q.   When you open it and pull it out, it's
8  got a plastic sheath on it, does it not?
9    A.   It does.
10    Q.   Well, can you see the edges?
11    A.   Yes.
12    Q.   And you can tell if it's laser cut or
13  mechanical cut without ever pulling the plastic sheath
14  back?
15    A.   Yes.
16    Q.   Okay.  Is there any study that you have
17  looked at that compared how laser-cut versus
18  mechanical-cut mesh performs?
19    A.   No.
20    Q.   Do you order the slings, Doctor, that you
21  implant in your patients?
22    A.   No, the hospital orders it.
23    Q.   When, when you order them, do you tell
24  the hospital I need five TVTOs, or do you say, I need
25  five TVTO laser cut or five TVTO mechanical cut?

Page 52

1    A.   No, I have ordered just, just give me
2  five TVTOs.  Actually, you know, I don't tell someone I
3  need TVTOs.  Someone keeps my TVTOs there and and, and
4  I don't, I don't order like I would say that I order
5  things for my office, no.
6    Q.   Okay, but what I'm getting at is, when
7  you, I mean, you are the doctor and if a TVTO is needed
8  to be implanted in your patient, do you know whether or
9  not it's a laser cut or mechanical cut?
10    A.   Well, I look at it.
11    Q.   At the time of the placement?
12    A.   At the time that I have it there.
13    Q.   Yes, sir, what I'm trying to find out is
14  at the time that you buy it from Ethicon, are you
15  dictating it be one or the other?
16    A.   No.
17    Q.   Who does that?
18    A.   They, they, they order it from, from the
19  company.  There's no one that determines laser cut or
20  mechanical cut.
21    Q.   And it doesn't make any difference to you
22  which one it is?
23    A.   No.
24    Q.   Am I correct that after the TVTO laser
25  cut was introduced, Ethicon introduced several more

Page 53

1  synthetic sling products, correct?
2    A.   I overheard on the, on the different
3  conferences and activities by Ethicon that there was,
4  they were talking about laser cut and mechanical cut.
5  It never made a difference to me, laser cut or
6  mechanical cut.
7    Q.   And is that -- it's fair to say then that
8  you've actually never studied the clinical differences
9  between laser cut and mechanical cut?
10    A.   No, there has been no actual clinical
11  studies to my knowledge, and if you have something that
12  I don't know, please, I will read it.
13    Q.   Sure, and that's fine, Doctor, but my
14  question to you is, and I think you may have told me,
15  there are no studies comparing laser cut to mechanical
16  cut and you have not endeavored in forming your
17  opinions in this case to do any studies on the
18  difference from a clinical standpoint of laser cut
19  versus mechanical cut, correct?
20    A.   To my knowledge, there has not been a
21  randomized control trial comparing laser cut versus
22  mechanical cut.
23    Q.   Yes, sir, I understand that, and nor have
24  you done any kind of literature search to see if
25  there's any literature, even if it's not a randomized

14 (Pages 50 to 53)

Jaime Sepulveda, M.D.

Page 54

1    control trial, correct, about the difference between
2    mechanical cut versus laser cut?
3         A.   No, there's no -- I actually look for
4    mechanical cut versus laser cut, and what I have is
5    what's in the company documents.
6         Q.   So the only documents you've looked at
7    that discuss the difference between mechanical cut and
8    laser cut is what the company lawyers supplied you?
9         A.   Yes, the company documents.
10        Q.   And you've done no other independent
11   literature review or scientific review of any
12   literature on any difference that may exist between
13   laser cut and mechanical cut from a clinical
14   standpoint?
15        A.   I did an PubMed search and I could not
16   find any.
17        Q.   Okay.  The only documents that you have
18   looked at comparing laser cut to mechanical cut are the
19   internal documents of Ethicon, correct?
20        A.   That is correct.
21             MR. FREESE:  Let's take a break.
22             (Break taken from 10:25 to 10:30 a.m.)
23   BY MR. FREESE:
24        Q.   Dr. Sepulveda, before our break we were
25   talking about laser cut versus mechanical cut, and real

Page 55

1    quickly, I am correct that after TVTO laser cut was
2    introduced, Ethicon introduced TVT Secur, correct?
3         A.   Yes.
4         Q.   TVT Abbrevo, correct?
5         A.   Yes.
6         Q.   TVT Exact, correct?
7         A.   Yes.
8         Q.   Am I also correct that after TVTO laser
9    cut was introduced, Ethicon never introduced another
10   mechanically-cut synthetic midurethral sling again, am
11   I correct?
12        A.   I, I could not track, but I take it as
13   you're telling me.
14        Q.   You agree with me that TVT Secur is laser
15   cut, correct?
16        A.   Yes.
17        Q.   Every version of it?
18        A.   Yes.
19        Q.   TVT Exact is laser cut, is it not, every
20   version of it?
21        A.   Yes.
22        Q.   TVT Abbrevo is laser cut, every version
23   of it, correct?
24        A.   Yes.
25        Q.   So you cannot think of a single

Page 56

1    midurethral sling that Ethicon manufactured after the
2    introduction of TVTO that was anything other than
3    laser-cut mesh, correct?
4         A.   I cannot think of any other.
5         Q.   And do you have any explanation why that
6    was, why they don't make mechanically-cut mesh in any
7    of the products once laser-cut TVTO became available?
8             MS. GALLAGHER:  Object to form.
9         A.   I did not know the reason for it.
10   BY MR. FREESE:
11        Q.   Okay.  Doctor, in your overview and
12   review of literature, you say stress urinary
13   incontinence is a common condition in women, and we can
14   look at some data, but am I correct that, that AUA said
15   that up to 50 percent of women will suffer some form of
16   the SUI in their lifetime?
17        A.   I read that, yes.
18        Q.   And you agree with that?
19        A.   I would agree with that.
20        Q.   It's that common of a problem?
21        A.   It is a very common problem, yes.
22        Q.   You say all procedures, but in
23   particular, you say earlier procedures, in other words
24   pre, pre-midurethral sling procedures I gather is what
25   you're talking about here?

Page 57

1         A.   Yes.
2         Q.   Carry the risk of urinary outlet
3    obstruction, voiding dysfunction, major nerve and
4    vascular injuries, pain, relatively high frequency of
5    revision and wound healing complications?
6         A.   Yes.
7         Q.   No previous surgery prior to midurethral
8    slings caused a risk of erosion, am I correct?
9         A.   No, there was exposure of the sutures, we
10   did see that, and we did see sutures inside the
11   bladder.
12        Q.   Okay.  That's not my question.  My
13   question is that erosion of the midurethral sling is a,
14   is a, is a complication unique to midurethral slings,
15   synthetic midurethral slings, correct?
16        A.   Yes, exposure of the tape was not seen
17   before when tapes were not being used.
18        Q.   Okay, and, Doctor, you say that Burch
19   colposuspensions had earlier been associated with the
20   term gold standard which established a clinical
21   benchmark of efficacy for the treatment of SUI.  You
22   see that?
23        A.   Yes.
24        Q.   I'm read some of your prior depositions,
25   so I'm going to try to speed through some of this.

15  (Pages 54 to 57)

Jaime Sepulveda, M.D.

Page 58

1    You're not a fan of the phrase gold standard, are you?
2        A.   Never been much of a fan of that.
3        Q.   So you're not going to come into court
4    and start giving us opinions that the TVTO is the gold
5    standard of anything, correct?
6        A.   I would refer to anything that was
7    referred before as a gold standard as the current
8    clinical standard.
9        Q.   Current standard, and in fact, there have
10   been articles published in the New England Journal of
11   Medicine that say you shouldn't use the word gold
12   standard, you should use the word current standard,
13   correct?
14       A.   Yes, it was in -- I don't know if it was
15   in the New England Journal of Medicine, but it was
16   definitely in the AUGS Journal.
17       Q.   Okay.  And you agree that that's a more
18   appropriate phrase to use?
19       A.   Current clinical standard seems to be a
20   more objective way of looking at things.
21       Q.   And, so, when you come to San Antonio to
22   testify, is it fair to say that you're not going to be
23   sitting there pontificating about gold standards,
24   that's just not a term that you think is appropriate?
25       A.   I agree, I would not be pontificating

Page 59

1    about the gold standard.
2        Q.   Okay, thank you.  Doctor, you said that
3    the studies in the medical literature prior to the
4    midurethral sling, prior to the arrival of TVT were
5    lacking and of poor quality.  Do you see that?
6        A.   Yes.
7        Q.   And I'm just, I'm just trying to figure
8    out, what is your basis for saying that the studies
9    prior to TVT were of poor quality?
10       A.   Well, there were, there were
11   retrospective cohort studies that were case reports,
12   there were groups of case reports, but there was a lack
13   of randomized control trials.
14       Q.   Is this just simply, and -- strike that.
15            The lack of a substantial number of
16   randomized control studies is, is how you reached the
17   conclusion that the study quality is poor?
18       A.   Right.
19       Q.   In other words, you have to have a
20   significant number of randomized control studies in
21   order to have good-quality data, in your mind?
22       A.   I, I look at the, at the cohort studies
23   and there are instances in which I may not have a
24   randomized control trial.  I would like to see multiple
25   cohort studies if I don't have a randomized control

Page 60

1    trial.
2        Q.   All right, and the reason I asked you
3    about gold standard is because about three pages later
4    you then invoke the gold standard language on the TVT.
5        A.   I actually saw that on my report, and I,
6    I apologize for that.  That should be current clinical
7    standards.
8        Q.   Okay, and that's fine, and fair enough.
9    So, even though you have it in your report, you won't
10   be referring to the TVTO as the gold standard?
11       A.   I'm going to repeat my answer, I will not
12   be pontificating about gold standard.  I will be saying
13   current clinical standards.
14       Q.   Thank you, sir.  You have no idea how
15   much time that saved us.
16            Doctor, when you say, quote, "The use of
17   monofilament, non-absorbable polypropylene predominates
18   in the current clinical practice," you're not
19   distinguishing between mechanical cut and laser cut?
20       A.   I'm not distinguishing between one or the
21   other.
22       Q.   Am I correct that in that sentence there,
23   when you say that those monofilament non-absorbables
24   predominate the current clinical practice, you're
25   lumping mechanical cut and laser cut meshes together?

Page 61

1        A.   Yes.
2        Q.   Okay.
3        A.   As they are available, because we don't
4    have it available anymore in the mechanical cut.
5        Q.   When did Ethicon stop making TVTO
6    mechanical cut?
7        A.   I, I, I cannot recall one specific date,
8    no.
9        Q.   So, let me clarify that.  So, as of
10   today, you think all TVTOs are laser cut?
11            MS. GALLAGHER:  Object to form.
12       A.   Yes.
13   BY MR. FREESE:
14       Q.   And you don't know exactly when Ethicon
15   stopped manufacturing TVTO mechanical-cut mesh?
16            MS. GALLAGHER:  Object to form.
17       A.   I don't know a specific date.
18   BY MR. FREESE:
19       Q.   And is that why you said you don't
20   concern yourself with it, because it's only laser cut,
21   right?
22       A.   It's only laser cut now.
23       Q.   All right, thank you.  Doctor, you say
24   that, quote, "These anatomical considerations," and I'm
25   on page 8 of your report if you want to follow along

16 (Pages 58 to 61)

Jaime Sepulveda, M.D.

Page 62

1  with me.  Quote, "These anatomical considerations were
2  well documented during the description and the design
3  of the TVTO."  Do you see that?
4      A.   Okay, yes.  These anatomical
5  considerations were well documented during the
6  description and design of the TVTO.  I am talking about
7  the hammock of the, in the suburethra and the
8  periurethral tissue.
9      Q.   All right, and we can agree that prior to
10  the launch of the TVTO, there were no randomized
11  controlled studies of that product done, correct?
12      A.   No.
13      Q.   Okay, and the product was launched in the
14  U.S. and worldwide without a single randomized control
15  study being performed by Ethicon, correct?
16      A.   It was, it was released on a 510(k)
17  approval.
18      Q.   And, so, the answer to my question is, at
19  the time the TVTO was released to the world by Ethicon,
20  there were no randomized control studies demonstrating
21  the safety or efficacy of the product, correct?
22      A.   That's correct.
23      Q.   And the prelaunch studies that Dr. de
24  Laval performed didn't even use the same kit that
25  became the TVTO, did it?

Page 63

1      A.   I think that the needles were, were
2  different.
3      Q.   Okay.  And he was, he was, he was cutting
4  it himself, correct?
5      A.   He may have cut it himself, I'm not aware
6  of which methodology he used for that.
7      Q.   Because there was no kit for him to
8  implant in women, he created it, correct?
9      A.   He created it.
10      Q.   And just so we're clear, Doctor, my
11  question may have lent us to RCTs.  At the time that
12  the TVTO was launched by Ethicon, there were no
13  clinical studies whatsoever on the TVTO, correct?
14      A.   There were, there were the studies from
15  the, from the inventor, and there was data on the TVT.
16      Q.   And I'm not talking about TVT now,
17  because that's a different product, isn't it?
18      A.   That, that is, there's a different site
19  on the anatomy where it's inserted.
20      Q.   And it's implanted differently, correct?
21      A.   It is implanted different.
22      Q.   You say there existed the de LaVal
23  clinical data, correct?
24      A.   Yes.
25      Q.   But he's the inventor, correct?

Page 64

1      A.   He's the inventor.
2      Q.   And you know he had an economic stake in
3  the results that he reported on his clinical data,
4  correct?
5      A.   Yeah, you know, I was asked the same
6  question last week, and these are high-caliber
7  investigators.  I have no reason to believe that they
8  are going to be biased specifically by money.  I cannot
9  say, I cannot sit here and testify under oath that I
10  believe that that's the case.
11      Q.   Okay.  Well, I'm simply asking you, you
12  recognize that the only clinical data that existed was
13  that produced by the guy who had an economic stake in
14  the outcome of these results, correct?
15      A.   That's correct.
16      Q.   Okay.  And that data was based on his own
17  pre-cut invention, not what ultimately became TVTO,
18  correct?
19      A.   His own device.
20      Q.   In other words, de LaVal was using a
21  homemade product when he was implanting women with the,
22  the, his obturator-approach midurethral sling, correct.
23      MS. GALLAGHER:  Object to form.
24      A.   I don't think he made it at home.  He may
25  have made it elsewhere, but I --

Page 65

1  BY MR. FREESE:
2      Q.   In his own lab is what I mean.
3      A.   In his own lab, correct.
4      Q.   Okay.  It wasn't done in a factory like
5  TVTO is made today, correct?
6      A.   It wasn't manufactured by a third party,
7  no.
8      Q.   And have you reviewed the original launch
9  plan that Ethicon prepared before the launch of the
10  TVTO?
11      A.   I went through a few papers because I
12  believe it's included in that binder, and I reviewed
13  them probably, I saw it about a year ago.
14      Q.   Okay, and do you know the original launch
15  plan Ethicon had was that they were going to do
16  clinical studies before the TVTO was launched?
17      A.   I can't recall specifically they were
18  deciding to do clinical studies on TVTO.
19      Q.   I'll make that representation to you.
20  You don't have any reason to dispute that, do you?
21      A.   No, no reason to one way or the other.
22      Q.   And if the original launch plans
23  anticipated Ethicon was going to conduct its own or
24  independent clinical trials before the launch of TVTO,
25  you would have no objection to that, would you?

17 (Pages 62 to 65)

Jaime Sepulveda, M.D.

Page 66

1    A.   I would have no objection to, to, to
2  that.
3    Q.   So, because that would be the responsible
4  thing to do, wouldn't it?
5        MS. GALLAGHER:  Object to form.
6    A.   No, they'll have their reasons to conduct
7  their studies, and they have their, their own
8  justifications to do whatever trial they may think.  I
9  believe that what, what determined that was what their
10 interaction was between what was established between
11 the FDA and Ethicon at that time.
12 BY MR. FREESE:
13   Q.   And that's not really my question, Dr.
14 Sepulveda.  My question is, you would agree with me
15 that the plan to do clinical trials before launching a
16 product is a responsible thing to do, that plan itself,
17 theoretically?
18   A.   In general terms, you could say that
19 doing clinical trials is a good idea, as long as those
20 clinical trials don't put unnecessary subjects to
21 demonstrate things that have already been demonstrated.
22   Q.   Okay.  And that's why you normally want
23 to do clinical trials, right?  You want to build a body
24 of science that supports the safety and efficacy of
25 your product, correct?

Page 67

1    A.   Before I continue, I may have said
2  unnecessary subjects.  I mean as long as it doesn't put
3  subjects through unnecessary risks.  That's what I
4  meant on my answer.
5    Q.   Yes, sir.
6    A.   And following with your question?
7        MR. FREESE:  Would you read back my
8  question?  I'm sorry.
9        THE COURT REPORTER:  And that's why you
10 normally want to do clinical trials, right?
11 You want to build a body of science that
12 supports the safety and efficacy of your
13 product, correct?
14   A.   Yes, science built up on previous
15 studies.
16 BY MR. FREESE:
17   Q.   And you know that those clinical trials
18 never occurred, correct?
19   A.   I am not aware of those clinical trials
20 happening.
21   Q.   And you don't know the reason why they
22 didn't occur, correct?
23   A.   No, I don't know the reason.
24   Q.   You said for whatever, whatever reason
25 Ethicon had for not doing those clinical trials prior

Page 68

1  to the launch of the TVT is an Ethicon decision and you
2  have no idea why they didn't do it?
3    A.   That's going to be an Ethicon decision
4  alone in their interaction with the FDA.
5    Q.   Should the decision to not do clinical
6  trials ever be based on simply wanting to rush your
7  product to market?  Should that ever be a basis not to
8  do a clinical trial?
9        MS. GALLAGHER:  Object to form.
10   A.   No, I think that --
11       THE WITNESS:  Did you get that objection?
12       MR. FREESE:  She got it, don't worry.
13 She's a big girl.  You worry about you, she'll
14 worry about her.
15   A.   The decision, I believe whenever there
16 are products like this that are innovative, that that
17 decision is going to be again, what I already said, I'm
18 not going to repeat, I mean, I will repeat what I
19 already said, between Ethicon and the FDA, but it's
20 also determined internally by Ethicon, by the different
21 branches that are input in a project, because you may
22 have marketing individuals, you may have sales
23 individuals, you will have scientific individuals, you
24 have engineers, medical liaisons, so you cannot, you
25 cannot just point to one area.  I believe that in every

Page 69

1  company, every device company, there's going to an
2  interaction between all these different individuals
3  deciding which, which product gets the studies done.
4  BY MR. FREESE:
5    Q.   And I'm not quibbling with you about
6  that, Doctor.  My question was quite different.  Do you
7  agree with me, generally speaking, that, that a
8  responsible medical device company shouldn't forgo
9  clinical trials simply to rush their product onto the
10 market?  That's my only question.
11       MS. GALLAGHER:  Object to form.
12 BY MR. FREESE:
13   Q.   That would not be the responsible thing
14 to do.  You agree with that?
15       MS. GALLAGHER:  Object to form.
16   A.   It's going to be a decision of the
17 company, but in general, in general, you don't, you
18 don't rush things.  You don't rush decisions for
19 surgery, you don't rush decisions to place or take out
20 implants.  You don't rush in general any of these
21 decisions.
22 BY MR. FREESE:
23   Q.   And if the decision to forgo clinical
24 trials was simply an economic decision and not based on
25 safety or efficacy, we can agree that would be

Jaime Sepulveda, M.D.

Page 70

1  something that Dr. Sepulveda would be critical of?
2      MS. GALLAGHER: Object to form.
3      A.  If anything that is motivated purely by
4  economics, it belongs in a different arena and not
5  health care.
6  BY MR. FREESE:
7      Q.  Thank you.  Doctor, this is sort of a
8  question we had started the last hour, but other than
9  the life care plan, you said that you prepared the
10  entirety of this report.  Is that correct?
11      A.  Yes.
12      Q.  Did you prepare all the footnotes, too?
13      A.  Yes, I did, I did, I did prepare those,
14  those papers.
15      Q.  And the reason I was curious is because
16  the reports and the footnotes have a remarkable
17  similarity to doctors from all over the country that
18  work for Ethicon, Dr. Permugia and Dr. Grier and Dr.
19  Flynn, I mean, we've got these reports and it's
20  remarkable how similar your work is and their work.
21      A.  I can tell you this, I spent a lot of
22  time sitting down and writing.  It has, there were a
23  few other things that were added to it, there were
24  things that have been edited by me on consultation with
25  the attorneys, but there's, there's no attorney that is

Page 71

1  going to bring out a report that I don't, I don't
2  approve.
3      Q.  I'm not saying you don't approve, but, I
4  mean, you sat down and actually put all these footnotes
5  in your report?
6      A.  Yeah, actually the footnotes, I remember
7  exactly going through the two papers on the frequency
8  of these devices, I remember going through all the
9  papers that I have saved over time, and there are other
10  papers that were given to me about randomized control
11  trials.  I wrote this, I wrote this just after, just
12  after my, my board, my subspecialty board
13  certification.
14      Q.  Did you cut and paste any of this report
15  from another report?
16      A.  No, I wrote a report, I submitted it, and
17  then they came back with extra, extra bibliography, but
18  I actually submitted a bibliography.
19      Q.  Okay, you said they came back with a
20  bibliography.  You're talking about the footnotes,
21  correct?
22      A.  No, if there's a footnote, if there's a
23  citation, there's a citation, I look at these
24  citations, and the ones that were submitted, I look at
25  them before they came.

Page 72

1      Q.  My question is, was any of this report
2  cut and pasted from any other report, or was this all
3  original work product as of March 23rd, 2016?
4      A.  No, my report on TVTO is my report on
5  TVTO, and if it looks like Christina Permugia's report
6  or whoever report, it's what's available there.  There
7  are no more papers.
8      Q.  But what I'm saying is this, I won't find
9  any, any language in your report that, in any report
10  prior to March 23rd, 2016, correct, because this is all
11  your work product, so I won't be able to go and find
12  any reports prepared by you that looks identical, in
13  fact is identical in the entire report, because you
14  created this on March 23rd, 2016, correct?
15      MS. GALLAGHER: Object to form.
16      A.  I did not create this on March 23rd.
17  This has been written and reviewed over the last year
18  and a half, two years.
19  BY MR. FREESE:
20      Q.  When did you start writing your Ramirez
21  report?
22      A.  Over a year ago.
23      Q.  How many hours do you have in the Ramirez
24  matter?
25      A.  Lot of hours.  I mean, this is probably

Page 73

1  the case that has taken the longest number of hours.
2      Q.  And so what is that?
3      A.  I put it together and I submitted as a
4  whole group.  Let me tell you, when I started seeing
5  this, this, these cases, I had like four or five cases
6  that I was reviewing, and, then, I was asked to do a
7  report on Ramirez.  There were other cases that did not
8  require a report.  That's how I know that I, I recall
9  sitting weekends and going, and writing this.
10      Q.  I just haven't seen a Ramirez invoice.
11  Have you prepared one?
12      A.  I believe that there are a few with
13  Ramirez numbers.
14      Q.  But do you have a total Ramirez invoice
15  somewhere?
16      A.  They were submitted last -- well, that's,
17  that's, there was a time in which I say no, we want you
18  to put for each specific case, and that's when I
19  started doing it, a few months ago, that was for
20  Ramirez, and I was here with, with Mr. Schnel last week
21  and he had, he had those documents.
22      Q.  Do you have your Ramirez invoice with
23  you?
24      A.  No.
25      MS. GALLAGHER:  You already have them.

Jaime Sepulveda, M.D.

Page 74

1    They were here we when started the depo.
2        MR. FREESE:  Where are they?
3        THE WITNESS:  These are my invoices.
4        MR. JORDAN:  There were two exhibits to
5    the letter that Chris Morris sent.  One of them
6    you were asking to be blown up.  The other is
7    the invoice.
8        MR. FREESE:  Right.
9    BY MR. FREESE:
10       Q.   These don't break down Ramirez.  Are
11   these all Ramirez invoices?
12       A.   No, there's a group, it's grouping all
13   the MDL cases, the most recent ones.
14       Q.   But you can't tell from these invoices
15   what they're for?
16       A.   Yeah, I just group all the hours on
17   there.
18       Q.   How many hours do you have in your best
19   judgment on the Ramirez matter?
20       A.   I would say over, over a hundred hours.
21       Q.   Over a hundred hours on Ramirez?
22       A.   Yeah, easily.
23       Q.   And that doesn't include your MDL time?
24       A.   Nor my MDL.
25       Q.   I'm going to mark as the, the cover

Page 75

1    letters from, the payments from Ethicon and the
2    invoices here as Exhibit 7 to your deposition.  Okay?
3        A.   Okay.
4        (Plaintiff's Exhibit No. 7 was marked for
5        identification.)
6    BY MR. FREESE:
7        Q.   When doing your report, Dr. Sepulveda,
8    did you attempt to look and see how many of the authors
9    that you were citing in support of your opinions were
10   paid consultants by Ethicon?
11       A.   No.
12       Q.   Do you even know how many of these
13   authors you cited are paid consultants of Ethicon?
14       A.   No.
15       Q.   And were paid consultants at the time
16   they wrote their reports?
17       A.   I do not know that.
18       Q.   Is that a fact of no consideration of
19   yours, you don't care?
20       A.   No, the methodology takes care of
21   whatever bias to be introduced.
22       Q.   Well, assuming one knew what the
23   methodology was.
24       A.   Yes, there's a methodology, there's
25   auditing on research projects, there's supervision,

Page 76

1    procedures manuals, there are lab manuals.  So this is
2    not, there are people looking over each other's
3    shoulders on research projects.  So that's what I call,
4    what I call about the methodology is not only the
5    methodology for the randomized control trial but also
6    the surveillance on it.
7        Q.   Who was overlooking Dr. Ulmsten's study,
8    for example, on TVT?  Who is looking over his shoulder?
9        A.   I don't know who was looking at him.
10       Q.   Nobody was.  You know that, don't you?
11       A.   No, I don't.
12       Q.   You realize that nobody was overlooking
13   Ulmsten's studies?
14       A.   No, I don't know that.
15       Q.   Well, can you name me one person who
16   oversaw what Dr. Ulmsten prepared?
17       A.   No, I just don't know who overlooked.
18       Q.   Did you ever look at the patient level
19   data for Dr. Ulmsten?
20       A.   No.
21       Q.   Did you know that Ethicon never even
22   looked at the patient data for TVT studies that Ulmsten
23   did?
24       A.   No, I do not know how Ulmsten conducted
25   his research, his research project.

Page 77

1        Q.   Am I correct that you have not looked at
2    the patient level data of any of these authors that
3    you're citing in your report?
4        A.   No, that's not correct.  I have looked
5    at, at these reports and I look at the methodology that
6    they have used.
7        Q.   I'm not asking that.  I'm talking about,
8    I know you've looked at the methodology.  Have you
9    looked at the patient level data that the authors were
10   looking at when they write these reports?
11       A.   Define patient level data.
12       Q.   The actual data that's collected at the
13   sites for these trials that are being performed.
14       A.   How it was collected?
15       Q.   Yes, sir.  Have you ever gotten the
16   patient level data of any of these studies?
17       A.   No, it's not described on the report on
18   any papers, any research papers.
19       Q.   You simply take what the authors say and
20   give credit to what they say, assuming that they have
21   given credible, reliable, unbiased results, correct?
22       A.   They -- I don't assume.  I read the
23   papers, and I read papers that have more accuracy than
24   others in methodology, but that's why there's a section
25   on methodology on each paper.

20 (Pages 74 to 77)

Jaime Sepulveda, M.D.

Page 78

1      Q.   And you see what the methodology is and
2   then read it, decide you like it, and then cite it?
3      A.   I decide if I find it accurate, yes.
4      Q.   You say on page 4 of your report:
5   Overall, there are over 100 randomized control trials
6   that have accumulated and countless more cohort studies
7   on TVT and TVTO.  Do you see that?
8      A.   Yes.
9      Q.   We can agree, you've lumped TVT and TVTO
10  there in that sense together, have you not?
11     A.   Yes.
12     Q.   And we've agreed that they're two
13  different products, correct?
14     A.   The insertion is different.
15     Q.   And they're different products?
16     A.   They are different products because the
17  insertion is different, the needles are different.
18     Q.   And they have different clearance
19  applications, correct?
20     A.   They have different clearance
21  applications.
22     Q.   The TVT was cleared using ProteGen as the
23  predicate product, correct?
24     A.   Yes.
25     Q.   So when you say a hundred randomized

Page 79

1   control trials, we can agree that you didn't mean to
2   suggest to the reader of this that there are over 100
3   randomized control trials of TVTOs.  We can agree on
4   that, can we not?
5      A.   No, of TVT and TVTO.
6      Q.   Yeah.  So, my question to you is, you
7   agree with me that there are not over 100 randomized
8   control trials of TVTO, correct?
9      A.   That is correct.
10     Q.   And if you then looked and said I want to
11  know how many -- first of all, do you know how many
12  randomized control trials of TVTO exists?
13     A.   It's in the Cochrane paper, and I do have
14  an abbreviated portion of the Cochrane and I can refer
15  to it.
16     Q.   All right, without referring, do you have
17  a judgment how many randomized control trials of TVTO
18  exists?
19     A.   No, it's in the Cochrane.  If I would
20  have asked, if a patient would come and ask me that
21  question I would say I will have to look at the
22  Cochrane review.
23     Q.   Do you have the Cochrane review with you
24  right now?
25     A.   Yes.

Page 80

1      Q.   Why don't you grab that.
2          MR. FREESE:  Let's go ahead and mark
3   that, let's slap Exhibit 8 on there.
4   BY MR. FREESE:
5      Q.   And would you tell us what you're looking
6   at there, sir?
7      A.   I'm looking at the review article from
8   Neurourology and Urodynamics from 2011, and I should
9   have an updated version in my reliance list.
10     Q.   Okay.  Do you know whether or not this
11  was the one that the FDA was looking at in the white
12  paper?
13     A.   Most likely that's the one that they
14  were, they were looking at.
15     Q.   Because it's 2011?
16     A.   Exactly.  I don't have the 2016 easily
17  marked in here.  I know it's in this pile.
18     Q.   Let's try to work on this.  If you think
19  it's substantially different, then we can maybe find it
20  during a break.  Does Exhibit 8 answer your question
21  that I -- does it answer my question?  Do you want me
22  to remind you what my question is?
23     A.   It's how many randomized control trials
24  are on TVTOs.
25     Q.   Yes, sir.

Page 81

1      A.   Okay, they found 24 trials.
2      Q.   Where are you looking?
3      A.   Right here.
4      Q.   Okay.  Are you saying 24 trials address
5   the comparison of transobturator route versus
6   retropubic route?
7      A.   Yes.
8      Q.   And then it has those cited.  Okay, now,
9   let me ask you further, of these 24, of these 24
10  randomized control studies, they weren't all TVTO
11  studies, were they?  They were comparing retropubic
12  versus obturator approach, correct?
13     A.   Right.
14     Q.   So, of those 24, not even all 24 of those
15  are dealing with Ethicon's TVTO, is that correct?
16     A.   No, there's, to do a randomized control
17  trial, if it would be just TVTO, it would be a cohort
18  study.  If it's a randomized control trial, you have to
19  have two arms, and with those two arms classically what
20  we have is the retropubic and the, and the TVTO.  The
21  biggest study on that is the TOMUS, T-O-M-U-S, the
22  TOMUS trial.
23     Q.   But my question is, some of these 24
24  studies are not even studying the Ethicon TVTO, they
25  are simply comparing midurethral slings that are using

21 (Pages 78 to 81)

Jaime Sepulveda, M.D.

Page 82

1    an obturator approach, it may not even be Ethicon's
2    products being studied, correct?
3        A.   There are two, they made two comparisons
4    in the Cochrane data review.  They made a comparison
5    between transobturator slings and they made a
6    comparison between retropubic and transobturator
7    slings.
8        Q.   And not necessarily even Ethicon's
9    transobturator slings, correct?
10       A.   Yeah, they compared different ones.
11       Q.   And, so, am I correct, you cannot sit
12   here today, Dr. Sepulveda, and tell me how many
13   randomized control studies have been done looking at
14   Ethicon's TVTO?  Can you agree that you can't tell me
15   that number?
16       A.   I can, I can say for certain, without
17   looking into the long version, this is the short
18   version of the Cochrane data review, I can say with
19   accuracy the TOMUS trial.
20       Q.   One?
21       A.   Yes.
22       Q.   Okay.  I'll mark Exhibit 9 to your
23   deposition, which is the, do you recognize that as the
24   white paper?
25       A.   Yes, the FDA Executive Summary.

Page 83

1            (Plaintiff's Exhibit No. 9 was marked for
2            identification.)
3    BY MR. FREESE:
4        Q.   And you've looked and relied upon this,
5    did you not, in forming your opinions?
6        A.   I read it and it just allow me to
7    understand.  There was no specific cite on my opinion
8    that refers to, to that paper.
9        Q.   But you actually showed up to your
10   deposition with a highlighted copy of it, did you not?
11       A.   No, I -- yes, I actually did have a
12   highlight copy, but the only data, the only place in
13   which I refer to the Executive Summary from my report
14   is when I, when I speak about the MAUDE database.
15       Q.   Let's talk about something different,
16   though.  Let me show you Exhibit 9, page 42, of the FDA
17   Executive Paper.
18           Now, you've -- and before we get to that,
19   your testimony is you relied on the Cochrane report in
20   forming your opinions today about the safety and
21   efficacy of TVTO, am I correct?
22       A.   And the Cochrane report and the TOMUS
23   trial and the Tommaselli analysis.
24       Q.   And the FDA had some comments about the
25   Cochrane review, did it not?

Page 84

1        A.   Yes, they did have an opinion here.
2        Q.   And it says in the first paragraph, under
3    conclusion, safety of mesh used in repair of stress
4    urinary incontinence based on published literature.  Do
5    you see that?
6        A.   Yes.
7        Q.   Quote, "The Cochrane reviews are limited
8    in the ability to fully evaluate the safety of profile
9    of the surgical mesh used in SUI patients.  The main
10   objective of these reviews is to evaluate the
11   effectiveness of the SUI procedures using randomized
12   control trials that have compared a mesh procedure to
13   another approach."  Do you see that?
14       A.   Yes.
15       Q.   So, the FDA was criticizing the
16   reliability of the Cochrane reviews from a safety
17   standpoint, correct?
18           MS. GALLAGHER:  Object to form.
19       A.   That is, that is, that is correct.  They
20   disagree with the methodology.
21   BY MR. FREESE:
22       Q.   I accurately read what the FDA said about
23   the Cochrane reviews that you are relying on, correct?
24       A.   Yes, they, I think that, when you look --
25       Q.   Hold on.  I don't mean to cut you off,

Page 85

1    but I'm simply asking you, did I accurately read to you
2    just now what the FDA's conclusion was of the Cochrane
3    reviews?
4        A.   That's what they described, yes.
5        Q.   If you'll drop down three paragraphs, it
6    says, quote, "The Cochrane reviews did however identify
7    noteworthy differences between mesh procedures and open
8    colposuspension.  The risk of perioperative
9    complications favored colposuspension compared to all
10   sling procedures combined, and the risk of voiding
11   dysfunction was similar between colposuspension and the
12   TVT sling."  Do you see that?
13       A.   Yes.
14       Q.   Did I read that correctly?
15       A.   You read that.  I didn't follow word by
16   word, but you...
17       Q.   Okay, and that's, that's contrary to the
18   opinion that you've expressed in your report, is it
19   not?
20       A.   That's, the Cochrane review and the most
21   recent Cochrane review and the TOMUS report are what's
22   used in my report, and there's, I was looking for my
23   2015 Cochrane review, and I just found it.
24       Q.   Okay, and we'll get to that, but let me
25   finish my question here.  You agree with me that the

22 (Pages 82 to 85)

Jaime Sepulveda, M.D.

Page 86

1    FDA concluded that the, the Cochrane reviews that you
2    have relied on were noteworthy because they found, in
3    the view of the FDA, that the risks of perioperative
4    complications made mesh less safe compared to
5    colposuspension, correct?
6         A.   But that's not what it says on the
7    Cochrane review.
8         Q.   That's what the FDA concluded after
9    reading the Cochrane review, correct?
10        A.   Yes, but I don't know how they came to
11   that conclusion.
12        Q.   And you understand, Doctor, what the FDA
13   was doing in 2011 when they prepared this white paper,
14   they were doing a systematic review of all known
15   literature, were they not?
16             MS. GALLAGHER:  Object to form.
17        A.   Yes, but that's not what's been published
18   on the summary.
19   BY MR. FREESE:
20        Q.   But what I'm saying, you understand
21   that's what the FDA undertook to do?  They undertook to
22   independently collect all known literature on the
23   safety and efficacy of midurethral slings and draw some
24   conclusions from those studies, correct?
25        A.   If they did a systematic review, I have

Page 87

1    not seen any publication about the systematic review
2    made by the FDA, because the document that you have in
3    front of you is an executive summary, it's not a
4    systematic review report.
5         Q.   Would you look at the second paragraph,
6    sir?
7         A.   Yes.
8         Q.   Okay.  Quote, "The FDA's systematic
9    literature review found that the weighted average rates
10   of urinary problems, re-surgery rates and perioperative
11   organ perforations were similar to overall rates
12   presented in published meta-analyses and systematic
13   reviews."  Do you see that?
14        A.   Yes.
15        Q.   They're saying they did a systematic
16   literature review.
17        A.   Yes, they say that.
18        Q.   Do you dispute that they did a systematic
19   literature review?
20        A.   I don't dispute they did it.  I just have
21   not seen the document.
22        Q.   Well, we're looking at the document.
23        A.   No, this is not a report of a systematic
24   review.
25        Q.   This is the report of the review.

Page 88

1         A.   This is not a report of a systematic
2    review.  This is an executive summary.
3         Q.   Have you looked at the systematic review?
4         A.   I have not seen a systematic review.
5         Q.   So you're not saying that the systematic
6    review came to any different conclusion than what the
7    summary did, correct?
8         A.   Well, I have not seen it.
9         Q.   Okay.  But you disagree with the
10   conclusions they reached regarding the Cochrane
11   reviews?
12        A.   Yes, I do disagree.
13        Q.   Okay.  So, in your view, at least in this
14   respect, Dr. Sepulveda, you would say that the FDA got
15   it wrong in their conclusion regarding what the
16   Cochrane reviews showed about complications from
17   midurethral slings, correct?
18        A.   Yes, and I base my, my answer on the
19   last, on the last statement on the review article, that
20   says that monofilament tape has significantly higher
21   objective cure rates, and the obturator use wasn't less
22   favorable than retropubic, but only on an 84 to 88
23   percent --
24        Q.   That's on the cure rates, though.
25        A.   That's on cure rate.

Page 89

1         Q.   We're talking about complications right
2    now.
3         A.   Yes, we go through that.  However, there
4    were less voiding dysfunction, blood loss, bladder
5    perforation with the obturator route.
6         Q.   Compared to what?
7         A.   Compared to colposuspension, pubovaginal
8    slings and retropubic procedures.
9         Q.   Doctor, let's move up a paragraph here.
10   In the Cochrane review, minimally-invasive synthetic
11   suburethral sling operation appeared to be as effective
12   as open retropubic colposuspension, correct?
13        A.   Yes.
14        Q.   That's talking about efficacy, correct?
15        A.   Yes.
16        Q.   But that it had significantly more
17   bladder perforations, correct?
18        A.   There were more bladder perforations when
19   we compare, when you compare colposuspensions with
20   retropubic slings.
21        Q.   Doctor, I'm going to mark as Exhibit 10
22   to your deposition the actual appendix to the published
23   review of literature that we've looked at with the FDA.
24             (Plaintiff's Exhibit No. 10 was marked
25             for identification.)

23 (Pages 86 to 89)

Jaime Sepulveda, M.D.

Page 90

1    BY MR. FREESE:
2        Q.  Do you see, you've seen this was actually
3    part of the Executive Summary.  Correct?
4        A.  Yes.
5        Q.  And it says the FDA evaluated the
6    peer-reviewed scientific literature to revisit the
7    fundamental question of safety and effectiveness for
8    surgical mesh for POP and SUI, correct?
9        A.  Yes.
10       Q.  A systematic literature review was
11   conducted by searching the PubMed database from
12   January, 1996, to April, 2011.  Do you see that?
13   A.    Yes.
14       Q.  I won't read you all this, but this says
15   what the FDA actually did, correct?
16       A.  Yes.
17       Q.  You have no reason to dispute that they
18   actually did what they say here in Exhibit 10?
19       A.  I have no reason to dispute that's what
20   they do.
21       Q.  You just dispute some conclusions they
22   reached?
23       A.  Yes, I think that the Cochrane review,
24   with all the possible limitations that any study would
25   have, have less limitations than the FDA executive

Page 91

1    report.
2        Q.  Even the FDA said the Cochrane review
3    results were only of moderate value, did they not?
4        A.  Well, there's no standardization of
5    statistical analysis done in concluding that, if they
6    say that.
7        Q.  Well, they do that say that, don't they?
8    They said that the strength of the Cochrane data is
9    moderate.  That's how way they described it, did they
10   not?
11       A.  Yes, most of it is not moderate.
12       Q.  And, Doctor, back to page 43 of the
13   executive study.
14       A.  Yes, I have that right here.
15       Q.  The FDA said that in the systematic
16   review of the literature conducted by the FDA and based
17   on adverse event reports in the MAUDE database, there's
18   a potential for serious complications with mesh
19   products indicated for SUI repair.  Do you see that?
20       A.  Yes.
21       Q.  Do you disagree with that?
22       A.  No, they actually table it, they actually
23   got the frequency, and they actually mentioned the
24   limitations of the MAUDE database.  So, that's, I find
25   this, this statement to be overreaching.  I think that

Page 92

1    this, the fact that we're looking at an executive
2    summary and the fact that we don't have a systematic
3    review publication just speaks for itself in looking at
4    the overreaching of these conclusions.
5        Q.  And this goes on to say, quote, "The FDA
6    is concerned that the safety outcomes may not have been
7    comprehensively evaluated by the randomized control
8    trial to date and that the safety of SUI repair with
9    mesh needs to be further considered in evaluating the
10   overall risk-to-benefit profile of these products."  Do
11   you see that?
12       A.  And it was actually further considered.
13       Q.  Did I read that correctly?
14       A.  Yes.
15       Q.  Okay, and do you agree with that
16   conclusion?
17       A.  Yes, it needs to be further considered.
18   I do agree with that.  And it was further considered.
19       Q.  And you agree that the comprehensive
20   review of the RCTs may not have been able to
21   comprehensively capture all of the safety data on the
22   midurethral slings?
23       A.  No, the RCTs will have established
24   benchmark for safety.
25       Q.  Well, the conclusion was that they didn't

Page 93

1    comprehensively gather the safety data, the RCTs
2    didn't.
3        A.  That's the executive summary conclusion,
4    but that's not the conclusion of the mesh analysis done
5    by the Cochrane review.
6        Q.  Again, that's the conclusion of the FDA
7    that you disagree with?
8        A.  That's what they state and I disagree
9    with it, yes.
10       Q.  And let me just ask one more question and
11   we'll move on to something else.  So, now that we've
12   gone through this discussion, Dr. Sepulveda, we
13   can agree that the only long-term randomized controlled
14   study of TVTO that you're aware of is the TOMUS study?
15       A.  No, I am aware of the, of the study done
16   by Cloe in 2013, which is a randomized control trial of
17   the TVT and TOT.  I'm also aware of the RCT comparing
18   TVT and TVTO of Aniulene, which is a prospective
19   randomized control trial of TVTO and TVT.
20       Q.  Over what period of time?
21       A.  On 264 women.
22       Q.  For how long?
23       A.  For -- I cannot answer that question
24   based on this, on what I have.
25       Q.  So you can't tell if it's a long-term

24 (Pages 90 to 93)

Jaime Sepulveda, M.D.

Page 94

1 study or not?
2     A.   Well, it's a randomized control trial
3 that looks at safety of the TVTO. I also have, and
4 these are from the new Cochrane review which I found,
5 the one from 2015. I have TVTO being compared to TOT
6 in 2008.
7     Q.   How long?
8     A.   That's a three month, three month.
9     Q.   That's not a long-term study, is it?
10    A.   No, there are other longer-term studies.
11    Q.   But we can agree that three months is not
12 by anybody's definition a long-term study, correct?
13    A.   No, that's a study just about safety.
14    Q.   First of all, you're looking at the 2015
15 Cochrane review?
16    A.   Yes.
17    Q.   Okay. As you sit here today, Doctor, can
18 you tell me how many long-term randomized control
19 trials there are of TVTO --
20         MS. GALLAGHER: Object to form.
21 BY MR. FREESE:
22    Q.   -- whose primary end point is safety?
23         MS. GALLAGHER: Object to form.
24 BY MR. FREESE:
25    Q.   How many of those exist?

Page 95

1     A.   I'm just looking through them.
2     Q.   Listen to my question. How many of those
3 are long-term studies, what I mean by that, five years
4 or more, how many long-term, controlled, randomized
5 controlled studies of TVTO exist, five years or
6 greater, with the primary end point of safety? How
7 many of those studies?
8     A.   Well, I've already gone through three of
9 them, because there's also the Chen study.
10    Q.   How long is that?
11    A.   This was 12 to 24 months.
12    Q.   That's not five years. Doctor, listen to
13 my question. Close the book, you've got to look at me
14 and listen to my question because I think you're
15 getting distracted. Do you know how many randomized
16 controlled studies, long term, by which I mean longer
17 than five years, and whose primary end point was
18 safety, are there dealing with TVTO?
19    A.   No, I do not, I do not recall the
20 specific number of them and I know there are trials at
21 five years, seven years, and ten years.
22    Q.   Okay.
23    A.   There are trials in here, and I have it
24 in my reliance list, but if you're asking me just to
25 recall as a memory test, no, I do not recall that.

Page 96

1     Q.   Okay, and in those five-, seven- and
2 ten-year trials, the primary objective was safety. Is
3 that correct?
4     A.   Safety.
5     Q.   As opposed to efficacy?
6     A.   Safety and efficacy is evaluated on both,
7 but now that you mention, the TOMUS trial was safety
8 and efficacy. The Tommaselli medium-term and long-term
9 following midurethral slings, which is a systematic
10 review of meta-analysis as the highest level of
11 evidence, was at 36 months and at 60 months.
12    Q.   Okay. So, there's one at 60 months,
13 correct?
14    A.   I can, I can continue looking, looking
15 for it, on the different ones, but --
16    Q.   That's fine, and this is not a memory
17 test, and I'm sure your lawyer will be happy to walk
18 you through when we get to the courthouse, but just
19 sitting here right now, you can't name me one study
20 that meets the parameters I just defined, correct?
21    A.   Yes, I just, I just mentioned them to
22 you.
23    Q.   Which, TOMUS?
24    A.   Tommaselli.
25    Q.   Tommaselli?

Page 97

1     A.   TOMUS trial, which is the best designed
2 and most accurate trial that have ever been done with
3 TVT and TVTO. There's the, there's Chen.
4     Q.   Chen was five years or greater?
5     A.   That's less.
6     Q.   Doctor, we're not getting -- it has to be
7 five years or greater. That's all I'm asking you. How
8 many studies, TVTO, five years or longer, that study
9 the safety of the device?
10         MS. GALLAGHER: Object to form.
11    A.   I, I already say that I cannot recall one
12 specific number.
13 BY MR. FREESE:
14    Q.   And we can agree that it's way less than
15 a hundred, correct?
16    A.   It is less than, than a hundred.
17    Q.   It's way less than 24, is it not?
18    A.   It might be more than 24 now.
19    Q.   As you sit here right now, you're unable
20 to name one.
21         MS. GALLAGHER: Object to form.
22 BY MR. FREESE:
23    Q.   Correct?
24    A.   I said I cannot recall it.
25    Q.   That's fine. That's all I want to know.

25 (Pages 94 to 97)

Jaime Sepulveda, M.D.

Page 98

1    Sitting here right now, you cannot name one.
2         MS. GALLAGHER:  Object to form.  He's
3    already told you about three.
4         MR. FREESE:  Counsel.
5         A.    I already told you the studies that I can
6    recall, and I looked at them and I gave you my best
7    effort to give you that information.
8    BY MR. FREESE:
9         Q.    All right.  And of the TVTO studies that
10   you rely on, Doctor, can we agree that none of them
11   make a distinction between laser cut versus mechanical
12   cut?
13        A.    Yes, that has been established already.
14        Q.    Even the doctors who did the study don't
15   say whether or not the patients they are studying were
16   implanted with laser-cut versus mechanical-cut TVTO,
17   correct?
18        A.    That's correct, there's no definition of
19   it.
20        Q.    And you don't know?
21        A.    No, I don't know because they did not
22   disclose it.
23        Q.    And if there's in fact a clinically
24   significant difference in safety between
25   mechanically-cut TVTO and laser-cut TVTO, it won't be

Page 99

1    discernable from the studies, will it?
2         A.    No, it's not discernable from the
3    studies.  That has not been defined.
4         Q.    That has what?
5         A.    That has not been defined.
6         Q.    Okay.  Doctor, would you look at page 14
7    of your report?
8         A.    Yes.
9         Q.    I just want to ask you real quick, the
10   bottom of the first paragraph there, it says no medical
11   certification of these complications or diagnostic
12   confirmation was required on this report.  Do you see
13   that?
14        A.    Yes.
15        Q.    Would you just -- I don't understand the
16   sentence.  Can you tell me what that means?
17        A.    Before we, we saw TVT and before we saw
18   TVTO, before we actually saw midurethral slings, the
19   quality of the studies were not, were not strong.  We,
20   we actually saw the first comparison between
21   pubourethral slings and colposuspension in the, in the
22   Alba trial published in the New England Journal of
23   Medicine, but until then there was a very weak, very,
24   very small cohort studies establishing the safety and
25   efficacy of Burch colposuspensions and pubovaginal

Page 100

1    slings.
2         Q.    It goes on to say, quote, "Surgical
3    experience made clear that patients treated with TVT
4    had less voiding dysfunction, less wound complications
5    and less retention than the historic numbers from
6    patients treated with pubovaginal slings, needle
7    procedures or retropubic procedures."  Do you see that?
8         A.    Yes.
9         Q.    You don't cite anything for that
10   statement, do you?
11        A.    No, but I --
12        Q.    Hold on, I'll ask, you don't cite
13   anything for that statement?
14        A.    No, sir, I don't.
15        Q.    And you're referring to TVT studies, not
16   TVTO studies, correct?
17        A.    I'm referring to TVT studies and I'm
18   referring to TVTO studies.
19        Q.    Well, it says TVT.  The sentence says
20   that surgical experience made clear that patients
21   treated with TVT.  That's a different product than
22   TVTO, is it not?
23        A.    Okay, we keep saying that it's a
24   different product.  I have the impression that we're
25   going to be looking at those different products through

Page 101

1    the course of the day.  So, do you want me to go
2    through the, and I'm sure if you want you'll probably
3    ask, but in which regard are we defining those
4    differently?
5         Q.    Well, if I said give me a TVT and give me
6    a TVTO, we would have to have two different boxes,
7    wouldn't we?
8         A.    Yes.
9         Q.    Okay, because they're two different
10   products, correct?
11        A.    They're two different products in the
12   insertion needles, yes.
13        Q.    They were cleared in a different way?
14        A.    They were cleared in a different way.
15        Q.    They had different predicate products?
16        A.    Yes.
17        Q.    That's what I mean by they're different
18   products.  So, when you're citing a TVT study, that's
19   not a study of TVTO, correct?
20        A.    That's, that's not necessarily a study of
21   TVTO.  That's a study about the tape.
22        Q.    That's my point.  When you cite a TVT
23   study, it's not a study of TVTO, is it?
24        A.    No, if I cite a TVT study, I'm citing
25   that.  TVTO is TVTO.  But, yes, the surgical experience

26  (Pages 98 to 101)

Jaime Sepulveda, M.D.

Page 102

1    showed that there were less complications with
2    pubovaginal slings or colposuspensions.
3        Q.    Against TVT?
4        A.    Against TVT, and when TVTO was compared
5    to TVT, there was less.
6        Q.    But your sentence doesn't even mention
7    TVTO, is my only point.
8        A.    I did not mention TVTO in that sentence.
9        Q.    I mean, is the point you're trying to
10   make, Dr. Sepulveda, that, that you, you like to use
11   TVT and TVTO studies interchangeably because they
12   involve the same polypropylene mesh?
13       A.    Well, there are more similarities than
14   differences.
15       Q.    But is it because they use the same mesh?
16       A.    No, not necessarily just the same mesh.
17       Q.    Well, is that one of the reasons why you
18   use the studies interchangeably?
19       A.    Yes, you can actually use one or the
20   other, but I don't even need to refer to TVT.  TVTO has
21   been shown in randomized control trials has been as
22   effective and safer than TVT.
23       Q.    Okay.  And, so I guess it would be a fair
24   comparison to compare TVT Secur to TVTO, right, because
25   it uses the same mesh?

Page 103

1        MS. GALLAGHER:  Object to form.
2        A.    We're not talking about TVT Secur now.
3    We can talk about how TVT Secur, and I have provided
4    testimony before about how TVT Secur shares
5    similarities with previous generations of TVTs.
6    BY MR. FREESE:
7        Q.    They share the same mesh, do they not?
8        A.    They do.
9        Q.    As does Abbrevo, that has the same mesh?
10       A.    That has the same mesh, right.
11       Q.    So, basically, Doctor, on page 14, all
12   these numbers and results of studies you're referring
13   to, these are all TVT studies, are they not?
14       A.    These are TVT studies.
15       Q.    They're not TVTO studies.
16       A.    And whatever complication might be
17   reported from TVT is not going to be higher on TVTO.
18       Q.    That's not my question, sir.  Everything
19   you're quoting here in your report are TVT studies, not
20   TVTO studies?
21       A.    These are TVT studies, right.
22       MR. FREESE:  Let's take about two
23   minutes.  I want to grab some exhibits real
24   quick.
25       (Break from 11:35 a.m. to 11:45 a.m.)

Page 104

1    BY MR. FREESE:
2        Q.    Now, Doctor, am I correct that Prolene
3    mesh is the mesh that's used in all TVT products,
4    correct?
5        A.    Yes.
6        Q.    And that's the original old construction
7    Prolene, correct?
8        A.    That is the construction of Prolene and,
9    and it's to the same degree of crystallinity that the,
10   of Prolene sutures.
11       Q.    I'm not asking about sutures right now,
12   we can talk about that in a minute, but am I correct
13   that the Prolene that is in the TVTO is the same
14   Prolene that was used in Dr. Ulmsten's original TVT
15   product?
16       A.    It's the same construction Prolene.  I
17   cannot recall if the exact crystallinity or purity or
18   analysis from Ulmsten.  I don't think that he did that.
19       Q.    Well, you know that the formulation for
20   Prolene mesh has not changed since the original TVT
21   produced by Ethicon, correct?  And what I'm asking
22   there is, the same mesh that's in TVT is in TVTO, is in
23   TVT Abbrevo, TVT Secur, TVT Exact.  Correct?
24       A.    Yes.
25       Q.    Okay.  And that is a, that is a

Page 105

1    small-pore, heavyweight mesh, is it not?
2        A.    No, it's not small pore.
3        Q.    You think it's a large-pore mesh?
4        A.    It is a large pore.
5        Q.    And do you think it's a heavyweight mesh?
6        A.    It's, in all, of all the applications
7    that I use for midurethra, it's a lightweight mesh.
8    When it's compared to the meshes for prolapse, it's on
9    the heavyweight, it's close to the heavyweight, but not
10   at the level that was the old meshes for hernias.
11       Q.    Well, the old hernia mesh is Prolene,
12   correct?
13       A.    The old hernia mesh is Prolene.
14       Q.    Okay.  So, you're agreeing that the
15   Prolene mesh is heavyweight mesh?
16       A.    The Prolene mesh is heavyweight, yes.
17   The Prolene that was initially described that we had 20
18   years ago, that's heavyweight.
19       Q.    Well, what is used today is heavyweight
20   mesh, is it not?
21       A.    No, the fiber is lightweight.
22       Q.    You think the fiber in the TVTO is
23   lightweight?
24       A.    Yes.
25       Q.    And you think it's large pore?

27 (Pages 102 to 105)

Jaime Sepulveda, M.D.

Page 106

1      A.    It's large pore.
2      Q.    What is the basis for that opinion?
3      A.    The large pore is over 75 microns, and
4   the pore size on the mesh for TVT is 1,200 microns.
5      Q.    That's an AMI classification that you're
6   using?
7      A.    That's on the AMI classification, which
8   we know has its own limitations, but that's the only
9   one that we have to compare the, the large pores with
10  the small pores.
11     Q.    The sole basis of you describing Prolene
12  as large pore and lightweight is the AMI
13  classification?
14     A.    Yes, on the, on the slings, on the
15  monofilament polypropylene slings, this is one of the
16  largest pores.
17     Q.    I'm just asking the sole basis for your
18  opinion on that is the AMI classification?
19     A.    No, that's not the sole basis.  It's also
20  the fact that it's a large pore, it's over 75 microns,
21  and even when you define larger pores at 200, 300, it's
22  still a lot larger than that.
23     Q.    I'm asking you what is your basis for 75
24  microns, other than the AMI classification?
25     A.    For the classification of 75 microns, it

Page 107

1   is the AMI classification.
2      Q.    So, if I say, Doctor, what is the basis
3   of your opinion that Prolene mesh is lightweight and
4   large pore, you would say AMI classification, correct?
5      A.    That's, that's the only classification
6   that defines pores.
7      Q.    And you have no other basis for that
8   opinion other than that?
9      A.    I would not have any, any other on that
10  specific pore size.
11     Q.    You understand, Dr. Sepulveda, that the
12  engineers at Ethicon disagree with you, do you not?
13     A.    No, I --
14           MS. GALLAGHER:  Object to form.
15     A.    I cannot base, that's an ambiguous
16  question.  I don't know which way they would disagree
17  or what they're saying.
18  BY MR. FREESE:
19     Q.    I'm asking you, have you ever seen any
20  internal Ethicon documents describing the Prolene mesh
21  as heavyweight and small pore?
22     A.    They -- no, I don't, I don't, I haven't
23  seen anything as small pore.
24     Q.    Okay.  So, if I looked through your TVTO
25  company documents selected for your review by the

Page 108

1   company, I wouldn't find any internal documents in
2   there saying that Prolene is small pore, heavyweight,
3   would I?
4      A.    That would be the basis of the
5   disagreement of the engineers with me.  So if there's a
6   document in there, I would like to see it.
7      Q.    I'm asking you, Doctor, if I look through
8   here, as you sit here right now, you don't remember
9   them supplying you with any internal documents where
10  the scientists and the researchers at Ethicon
11  repeatedly described their Prolene mesh as heavyweight
12  and small pore?  It's not in that binder, is it?
13     A.    I don't recall it being in the binder,
14  no.
15     Q.    And as you sit here, you don't have any
16  recollection that they supplied you any such documents
17  stating that Prolene is heavyweight and small pore?
18     A.    No, I do not.
19           (Plaintiff's Exhibit No. 11 was marked
20  for identification.)
21  BY MR. FREESE:
22     Q.    Now, I'm going to show you what I've
23  marked as Exhibit 11 to your deposition.  And do you
24  see this chart here, Doctor?
25     A.    Yes, I do see it.

Page 109

1      Q.    Have you ever seen this chart before?
2      A.    No.
3      Q.    Okay.  You see where it has type of mesh,
4   microporous, medium, and macroporous?
5      A.    Yes.
6      Q.    Can we agree microporous means small pore
7   and macroporous means large pore?
8      A.    We can agree on that, yes.
9      Q.    All right, and, then, you see where it
10  says hernia?
11     A.    Yes.
12     Q.    And then you see where it EWH&U?  Do you
13  see that?
14     A.    Yes.
15     Q.    Is that abbreviation for Ethicon Women's
16  Health?
17     A.    Yes.
18     Q.    And if you look at the first page, you'll
19  see that this document came out of Ethicon's internal
20  files, correct?
21     A.    Yes.
22     Q.    Because it bears a Bates stamp number
23  from the company, correct?
24     A.    That's correct.
25     Q.    And under microporous meshes, does the

28 (Pages 106 to 109)

Jaime Sepulveda, M.D.

Page 110

1      document list Prolene as a microporous mesh?
2          A.   This documents list Prolene as
3      microporous.
4          Q.   And it's not just talking about hernia
5      mesh, is it?
6          A.   No, it does mention TVT slings.
7          Q.   Okay.  That includes TVTO, doesn't it?
8          A.   It just says TVT slings, in plural.
9          Q.   Which would include the entire family of
10     TVT slings, correct?
11             MS. GALLAGHER:  Object to form.
12         A.   I cannot testify to that because there's
13     no date on this document and there's no specification
14     of TVTO or TVT or any other TVTs.
15     BY MR. FREESE:
16         Q.   Well, because TVTs all use the same mesh,
17     do they not?
18         A.   TVTs use the same, and all the products
19     use the same mesh.
20         Q.   So, when it says TVT slings, that
21     includes the entire family of TVTs, right, because they
22     all use the same, and have always used the same mesh?
23         A.   Yes, but all it says is TVT slings.
24         Q.   Right, and they're talking about the mesh
25     being microporous.  You see that?

Page 111

1          A.   Yes.
2          Q.   And you've never seen this document
3      before, have you?
4          A.   No.
5          Q.   The lawyers didn't show it to you, did
6      they?
7          A.   I, I just, I just haven't seen it.
8          Q.   You disagree with that description, I
9      gather?
10         A.   I do.
11         Q.   Okay.  And it says macroporous, and it
12     has Vypro, Vypro II, Ultrapro.  Do you know what those
13     are?
14         A.   Yes.
15         Q.   Those are, Ultrapro is the mesh that was
16     used in Gynemesh Plus M and Prolift Plus M, correct?
17         A.   Yes.
18         Q.   And you're familiar with those products,
19     correct?
20         A.   I am familiar with them.
21         Q.   You implanted Prolift repeatedly, did you
22     not?
23         A.   I did.
24         Q.   And that used a lighter-weight,
25     large-pore mesh, did it not?

Page 112

1          A.   It used a light, lighter weight, yes.
2          Q.   And the lighter-weight, large-pore
3      Ultrapro mesh has been available to the market since at
4      least 2003, has it not?
5          A.   I don't know exactly when.  You're
6      talking about the Ultrapro?
7          Q.   Yes, sir.
8          A.   No, I don't know when that was available
9      on the market.
10         Q.   You know it was years before 2010,
11     though?
12         A.   No, I do not know that.
13         Q.   You don't know, you have no clue when
14     Ultrapro was put on the market?
15         A.   No.
16         Q.   Okay.  Do you, you, you've implanted
17     Prolift Plus Ms, have you not?
18         A.   Yes.
19         Q.   Okay.  That's a partially-absorbable
20     mesh?
21         A.   That's a partially-absorbable mesh, yes.
22         Q.   And you know you were implanting that
23     years before 2010, correct?
24         A.   I did not use Ultrapro.
25         Q.   Okay.  When did you use Ultrapro?

Page 113

1          A.   I used the polyglecaprone polypropylene
2      mesh when it became available with Gynemesh.  I'm
3      sorry, with Prolift Plus M.
4          Q.   What mesh was Prolift Plus M?
5          A.   Polyglecaprone polypropylene.
6          Q.   Okay.  That's partially absorbable, is it
7      not?
8          A.   That's partially absorbable.
9          Q.   It's a lighter-weight mesh, is it not,
10     than Prolene?
11         A.   It's heavier when it's implanted.  It
12     just gets lighter as the polyglecaprone component is
13     absorbed.
14         Q.   Because it absorbs and becomes a lighter
15     mesh, correct?
16         A.   Yes, it's lighter when you, when you take
17     it out, and you measure after the polyglecaprone
18     component, it's lighter.
19         Q.   And the pores on the Ultrapro are
20     considerably larger than they are in the Prolene, are
21     they not?
22         A.   I don't know exactly in the product of
23     Ultrapro, and I don't want to infer from one product to
24     another on these, on these devices.
25         Q.   You've implanted all of them, Prolifts,

29 (Pages 110 to 113)

Jaime Sepulveda, M.D.

Page 114

1    TVT slings, correct?
2        A.   Yes.
3        Q.   And you know that they have considerably
4    larger pores in the Ultrapro than the TVT Prolift.
5        A.   You're asking about Ultrapro, but if you
6    ask me about Prolift Plus M, we'll have a better
7    understanding of it.  I just don't want to give
8    testimony on Ultrapro that is used for hernia.
9        Q.   Okay.  I see the distinction.  Let me
10   clear it up.  You know that Ultrapro mesh is used in
11   Prolift Plus M?
12       A.   It is polyglecaprone polypropylene, yes.
13       Q.   And you've used it?
14       A.   I have used it, yes.
15       Q.   And it has considerably larger pores than
16   Prolene mesh, correct?
17       A.   It has a larger pore than Prolene mesh,
18   yes.
19       Q.   And all of these products that are being
20   discussed here, these are either pelvic floor
21   products or stress urinary incontinence products,
22   correct?
23       A.   Well, Gynemesh Plus M and Prolift Plus M
24   are for prolapse.  TVT slings are for incontinence.
25       Q.   And Prosima is for prolapse, correct?

Page 115

1        A.   Prosima is for prolapse as well as
2    Prolene and Gynemesh.
3        Q.   That's what I'm saying, every one of the
4    products listed on this exhibit are products for the
5    treatment of either pelvic organ prolapse or stress
6    urinary incontinence, correct?
7        A.   On the column, on the side, under EWH&U,
8    yes.
9        Q.   And you would disagree with that
10   document?
11       A.   On what part would I disagree?
12       Q.   That, describing TVT slings as being
13   microporous?
14       A.   Yeah, I do disagree with that.
15       Q.   Do you agree that Gynemesh Plus M and
16   Prolift Plus M is macroporous, do you agree with that
17   portion?
18       A.   They're all macroporous.
19       Q.   You would put every one of these products
20   in the macroporous category, not the three separate
21   categories that Ethicon internally did, correct?
22       A.   Yes, that's, they're all macroporous
23   products.
24       Q.   Even if Ethicon describes them as three
25   different weights?

Page 116

1        A.   Yeah, the, the reports for -- the
2    definitions for microporous and macroporous are very
3    clear.
4        Q.   Now, do you know Joerg Holste?
5        A.   No.
6        Q.   Have you ever heard of him before?
7        A.   No.
8        Q.   I'm the first, me uttering his name is
9    the first time you ever heard it?
10       A.   Yes.
11       Q.   Okay.
12       A.   I may have heard his name from, or seen
13   it, but I don't, maybe once, I don't know, I don't
14   recall this, this person.
15       Q.   Okay, did you know that you put down on
16   your reliance list that you read his deposition and
17   relied on it in forming your report in this case?
18       A.   I read that over a year, a year ago, yes.
19       Q.   Well, you just signed this last week,
20   didn't you, sir?
21       A.   Well, you just asked me if I knew him.  I
22   don't know him.
23       Q.   I asked you do you know who he is.  You
24   don't even know who he is?
25       A.   I don't know who he is.

Page 117

1        Q.   Okay, that's fine.  And three days ago
2    you supplemented your reliance list, and Dr. Holste
3    is listed as one of the depositions you read and relied on
4    in forming your opinions, correct?
5        A.   Yeah, I read it a very long time ago.
6        Q.   Okay.  But he's on your reliance list,
7    correct?
8        A.   He's on my reliance list, yes.
9            (Plaintiff's Exhibit No. 12 was marked
10       for identification.)
11   BY MR. FREESE:
12       Q.   Let me show you Exhibit 12 to your
13   deposition, sir, and show you a question and answer
14   that Dr. Holste was asked at his deposition, the
15   deposition that you got on your reliance list.  He
16   says, the question is, quote, "And Prolene
17   old-construction mesh at 100 to 110 grams per meter
18   squared is considered a heavyweight mesh, correct?"
19           Answer:  "Correct."
20           Do you see that?
21       A.   Yes.
22       Q.   And you disagree with Dr. Holste?
23       A.   No, 110 grams per square meter, that's
24   heavy.
25       Q.   That's a heavyweight?

30 (Pages 114 to 117)

Jaime Sepulveda, M.D.

Page 118

1     A.   That's the heaviest I've ever seen, by
2  the way.
3     Q.   Did you know that Prolene was 100 to 110
4  grams per meter squared?  Did you know that was the
5  weight of Prolene?
6     A.   No, that's old-construction Prolene.
7     Q.   That's old-construction Prolene.  Do you
8  know that's the same mesh that TVTs are made out of?
9     A.   No, I don't know that.
10    Q.   Okay, you don't believe that?
11    A.   I don't believe that.
12    Q.   Okay.  But you would agree that if the
13 mesh is 100 to 110 grams per meter squared, that's a
14 heavyweight mesh under anybody's definition, correct?
15    A.   That's the heaviest I've ever seen.
16    Q.   Okay.  And you think that's a different
17 mesh than what's used in TVT?
18    A.   Yes.
19    Q.   And you've never seen, that you recall,
20 this deposition testimony I just showed you, right?
21         MS. GALLAGHER:  Object to form.
22    A.   I, I read about his deposition, I read
23 his, may have read his deposition once.
24 BY MR. FREESE:
25    Q.   Which you said you relied on in your

Page 119

1  reliance materials, correct?
2     A.   Right.
3     Q.   This is the guy who you said you relied
4  on, correct?
5     A.   No, this is the guy that you're showing
6  me a picture right now that you tell me that I have
7  relied on.
8     Q.   No, sir, I'm showing you your reliance
9  list.  Joerg Holste.  You see that?  Here's a nice
10 picture of Dr. Holste.  Deposition testimony of Dr.
11 Holste taken July 29th, 2013.  Do you see that?
12    A.   Yes.
13    Q.   Same guy, right?
14    A.   Yes.
15    Q.   Okay.
16    A.   I don't know if that's the same guy.
17    Q.   Well, if it's not, I'm sure Ms. Gallagher
18 is going to let me know very quickly, but if that's the
19 same guy, we can at least agree that you don't agree
20 with Dr. Holste saying that Prolene mesh is
21 heavyweight, but you agree that at 110 grams per meter
22 squared is heavyweight mesh?
23         MS. GALLAGHER:  Object to form.
24    A.   Yes, that's the heaviest I've ever seen.
25 BY MR. FREESE:

Page 120

1     Q.   Now, do you know who Brigette Hellhammer
2  is?
3     A.   No.
4     Q.   Have you ever heard that name before?
5     A.   I don't recall that one.
6         (Plaintiff's Exhibit No. 14 was marked
7     for identification.)
8  BY MR. FREESE:
9     Q.   All right.  Let me show you what I've
10 marked as Exhibit 14 to your deposition, sir.
11        MS. GALLAGHER:  Did we skip 13?
12        MR. FREESE:  I did.  I'm going to come
13    back to 13.
14 BY MR. FREESE:
15    Q.   You see Dr. Hellhammer here?  Do you see
16 that, sir?
17    A.   Okay, yeah, I see her name here.
18 Brigette Hellhammer.
19    Q.   And you testified that Prolene was, was a
20 large-pore mesh, correct?
21    A.   Yes.
22    Q.   All right.  And you see that in
23 September, 2013, Dr. Hellhammer's deposition was taken,
24 just like we're here taking yours, and she's under
25 oath, and she was asked the question:  "And you agree

Page 121

1  that Prolene mesh that was used in TVT was small-pore
2  mesh, correct?"  And what was her answer, sir?
3     A.   She answered yes.
4     Q.   And do you recall ever seeing this
5  deposition question and answer before today?
6     A.   No.  No, I certainly do not recall this
7  one specifically.
8     Q.   Do you realize that she also appears on
9  your reliance list?
10    A.   Yes.
11    Q.   That you relied specifically on her
12 deposition that was taken on 9/11 and 9/12 of 2013.  Do
13 you see that?
14    A.   Oh, she's in the whole list of those
15 documents.  I did not, I do not rely for my opinion on
16 whatever she says.
17    Q.   I'm not asking you that, sir.  I'm asking
18 you, you put on your reliance list that you read and
19 relied on Dr. Hellhammer, and I've just shown you a
20 question and answer where she said Prolene mesh was a
21 small-pore mesh.  Do you see that?
22        MS. GALLAGHER:  Object to form.
23    A.   But I disagree with her.
24 BY MR. FREESE:
25    Q.   I understand that.  That was my next

31 (Pages 118 to 121)

Jaime Sepulveda, M.D.

Page 122

1      question.  You disagree with her, correct?
2          A.   Yes, I do.
3          Q.   Do you know who she is?
4          A.   No.
5          Q.   Do you know what her background is?
6          A.   No.
7          Q.   Do you know whether or not you're more
8      familiar with the pore size of mesh than Dr. Hellhammer
9      is?
10         A.   I know what I know.  I don't know what
11     she knows.
12         Q.   Do you know she's a German employee of
13     Ethicon?
14         A.   No.
15         Q.   Did you know that Dr. Holste was a
16     materials expert for Ethicon in Germany?
17         A.   No, I don't, I don't know that.
18         Q.   And you simply disagree with her
19     conclusion, is that correct?
20         A.   Yes.
21         Q.   All right.  Now, let me show you what I'm
22     marking as Exhibit 13 to your deposition.
23             (Plaintiff's Exhibit No. 13 was marked
24             for identification.)
25     BY MR. FREESE:

Page 123

1          Q.   I think we went backwards.  But, you see
2      this article, sir?
3          A.   Yes.
4          Q.   The argument for lightweight
5      polypropylene mesh in hernia repair?
6          A.   I see this article, yes.
7          Q.   By Dr. Cobb and Dr. Kercher and Dr.
8      Heniford?
9          A.   Yes.
10         Q.   Have you seen this article before, sir?
11         A.   I may have seen it.  I can not remember.
12         Q.   Did you realize it's on your reliance
13     list?
14         A.   It's probably on my reliance list, yes.
15         Q.   Okay.  And did you read it?
16         A.   Yes, actually, I read that sometime ago,
17     even before it was, it was a matter of litigation.
18         Q.   Okay, turn to the second page.  It says
19     concept of lightweight mesh.  Do you see that?
20         A.   Yes.
21         Q.   And you see that there's a table of
22     polypropylene meshes with different densities?
23         A.   Yes.
24         Q.   And you see that Dr. Cobb has reported
25     that Prolene mesh is 105 grams per meter squared?

Page 124

1          A.   Yes.
2          Q.   That's heavyweight mesh, is it not?
3          A.   That is a heavyweight, yes.
4          Q.   And you just described, you told me
5      anything that would be 105 to 110 grams would be the
6      heaviest mesh you can recall, correct?
7          A.   A hundred ten is the largest that I have
8      seen.
9          Q.   And if we look at Prolene mesh, that is
10     the mesh used in TVT, is it not?
11         A.   The Prolene mesh are used on TVT may be
12     lower than that.
13         Q.   Well, do you have anything that says it
14     is?
15         A.   Yes, actually, yes, I think I have a
16     paper that actually says that.
17         Q.   Well, I'm showing you a paper that you
18     relied on to put in your, your reliance list that says
19     the weight of the Prolene mesh is 105 grams per meter
20     squared.  You have no reason to dispute that, do you?
21         A.   Yeah, but this is a, this is a paper
22     about hernia.
23         Q.   It's dealing with Prolene mesh, sir.  You
24     understand that, do you not?
25         A.   Yeah, I do understand that.

Page 125

1          Q.   And it's reporting Prolene mesh at 105
2      grams per meter squared, correct?
3          A.   Yes, it is reporting that.
4          Q.   And you said it's dealing with hernia,
5      but you cited it yourself in your own report, did you
6      not?
7          A.   It's not specifically for this hernias.
8      I do not cite in this report for Jennifer Ramirez, I do
9      not cite this specific report.
10         Q.   Yes, you did.  You don't think that you
11     cited this article in your report?
12         A.   Yeah, I want to see exactly where, where
13     is it.
14         Q.   I'm talking about in your reliance list.
15         A.   Oh, okay, you're talking about reliance
16     list, yes, it is in the reliance list.
17         Q.   Okay, because you've given us a 100-page
18     reliance list that says these are the materials that
19     Jaime Sepulveda has relied on in forming my opinions,
20     correct?
21         A.   Yes, but --
22             MS. GALLAGHER:  Form.
23     BY MR. FREESE:
24         Q.   And that includes this article, does it
25     not?

32 (Pages 122 to 125)

Jaime Sepulveda, M.D.

Page 126

1     A.   Yes, but the definition of relied doesn't
2  mean that I'm using it for my, for my, to, to
3  substantiate my, my opinion.  I, I do read papers that
4  I exclude as I, as I'm reading them.
5     Q.   You didn't exclude this paper from your
6  reliance list, did you?  You included it.
7     A.   Yes, it's included in there, but it's not
8  in my report.
9     Q.   And, in fact, Prolene mesh is even
10 heavier than Marlex, is it not?
11    A.   Yes, it shows that.
12    Q.   And you know what Marlex is, do you not?
13    A.   I know Marlex, yes.
14    Q.   It's polypropylene also, is it not?
15    A.   Yes, but it's not a multifilament.
16    Q.   You think Marlex is a multifilament?
17    A.   Yes, it's just a multifilament.
18    Q.   Okay, and what product is Marlex used in?
19    A.   The pore size is a lot smaller because
20 it's a multifilament.
21    Q.   Okay, where did you get that from?
22    A.   From what I have read.
23    Q.   Okay, can you cite me any --
24    A.   That's Mersilene.
25    Q.   You think Marlex is Mersilene?

Page 127

1     A.   Yes.
2     Q.   Okay.  Marlex is polypropylene, Dr.
3  Sepulveda.
4     A.   Yes, so, it's a Mersilene.
5     Q.   And you think that, that Marlex is a
6  multifilament?
7     A.   Yes.
8     Q.   And what is your support for that?
9     A.   That I have read about Marlex before.
10    Q.   Okay.  Do you know that it's used in, in
11 Boston Scientific and AMS slings?
12    A.   I never used a Boston Scientific.
13    Q.   You've used AMS slings before, have you
14 not?
15    A.   I used AMS slings, but they were not made
16 of Marlex.
17    Q.   Okay.  Who do you think makes the
18 polypropylene for AMS and Bard and Boston Scientific
19 slings?
20    A.   I don't know.
21    Q.   You don't think it's Marlex, though?
22    A.   No, it's not Marlex.
23    Q.   And you see where it says the weight of
24 Ultrapro is 28 grams per meter squared?
25    A.   Yes.

Page 128

1     Q.   And that is about one-quarter the weight
2  of Prolene, is that correct?
3     A.   That's about a quarter, yes, according to
4  this table, yes.
5     Q.   Now, Doctor, would you look at, down at
6  the first column on the concept of lightweight mesh,
7  you see it there?
8     A.   Yes.
9     Q.   See where it says Marlex?
10    A.   Yes.
11    Q.   Marlex, paren, C.R. Bard.  Do you know
12 who C.R. Bard is?
13    A.   That's a company, yes.
14    Q.   That makes slings, correct?
15    A.   They, they do make slings.
16    Q.   It says Marlex is a standard monofilament
17 heavyweight polypropylene mesh.  Do you see that?
18    A.   Is a monofilament, yes.
19    Q.   So, you want to retract your last answer
20 about Marlex?
21    A.   No, because it's a, with the pore size
22 that it has, it's a, that's a multifilament.
23    Q.   Well, according to the Cobb article, it's
24 a standard monofilament.  Do you disagree, then, that
25 Marlex is a standard monofilament heavyweight

Page 129

1  polypropylene mesh?
2     A.   Yes, the pore size in Marlex is a small,
3  is a small size and it behaves like a multifilament.
4  The weave, the weave -- I'm sorry, the knit is a
5  multifilament.
6     Q.   This article says it's a monofilament,
7  not a multifilament.  Do you see that?
8     A.   That's what this article says.
9     Q.   And you disagree with the Cobb article on
10 that?
11    A.   Yes, the fibers are too close.
12    Q.   It goes on to say that it contains 95
13 grams per meter squared of polypropylene, is porous but
14 has very small inter -- I always have a hard time
15 pronouncing that.
16    A.   Interstices.
17    Q.   Would you tell us what that is, please?
18    A.   It's the space in between the fibers.
19    Q.   It says it's extremely strong.  It says
20 several comparable formulations of heavyweight
21 polypropylene are available with a similar
22 polypropylene content as Marlex, including Prolene,
23 Ethicon, Inc., Somerville, New Jersey.  Do you see
24 that?
25    A.   Yes, that's what it says, yes.

33 (Pages 126 to 129)

Jaime Sepulveda, M.D.

Page 130

1    Q.   That's saying that, that from a weight
2  standpoint, that Prolene and Marlex are both
3  monofilament heavyweight meshes, correct?
4        A.   Marlex is lighter, but the configuration
5  of Marlex makes it as a multifilament.
6        Q.   That's not my question.  According to Dr.
7  Cobb, both Prolene and Marlex are heavyweight
8  polypropylene meshes, correct?
9        A.   According to, to Dr. Cobb, it's, it's
10  porous but has very small interstices, which is what
11  I've been referring to.
12       Q.   And it says several comparable
13  formulations of heavyweight polypropylene are available
14  with similar polypropylene content as Marlex, including
15  Prolene, correct?
16       A.   Yes, including Prolene.
17       Q.   Do you agree or disagree with that
18  statement?
19       A.   Well, it says that there are several,
20  several heavyweights.  That's what he is explaining.
21       Q.   He says Marlex and Prolene are both
22  heavyweight polypropylene mesh.
23       A.   That's what he says, that it's
24  heavyweight, yes.
25       Q.   And you disagree with that?

Page 131

1        A.   Yeah, the, the mesh in use of slings is
2  not a heavyweight mesh.
3        Q.   Well, if it's 105 grams per meter
4  squared, you would agree that it's heavyweight, right?
5        A.   Yes, that's heavy.
6        Q.   All right, and if I proved to you at
7  trial that Prolene mesh used in TVT and TVTO and TVT
8  Abbrevo and TVT Secur is 105 grams per meter squared,
9  we would all agree then that that's heavyweight mesh?
10       A.   At 105 or 110, what I have shown you, you
11  have shown me, I will have no other choice but to agree
12  with you.
13       Q.   Thank you, sir.  Dr. Sepulveda, if you
14  would look at page 18 of your report.  You see where,
15  in the first full paragraph, you say, when placed per
16  the IFU, the risk of deformation of the tape is
17  reduced?
18       A.   When placed per the IFU, the risk of
19  deformation of the tape is reduced.
20       Q.   You see that?
21       A.   Yes.
22       Q.   And my only question is, is reduced
23  compared to what?
24       A.   It's to, to the deformation that you
25  would have if you put it without plastic sheaths.

Page 132

1        Q.   Okay, you're saying the use of the
2  plastic sheath reduces the deformation of the mesh when
3  it's being implanted?
4        A.   Yes, and the, when the IFU explains that
5  there is, not to put it too tight, that's how you
6  prevent deformation.
7        Q.   Deformation of the, of the mesh is an
8  unwanted result, is it not?
9        A.   No, when I talk about deformation, I'm
10  talking about biomechanical deformation.  Deformation
11  in biomechanics is different from deformation that we
12  see normally, and deformation has to do with the change
13  on the dimensions of the tape.
14       Q.   I'm not, I'm not quibbling with you about
15  that, but we can agree that deformation generally is an
16  unwanted result of the mesh, either mechanically or in
17  vivo, or any process you don't want the mesh to deform,
18  correct?
19       A.   Well, in any viscoelastic that is used
20  will have a degree of deformation, which is that it
21  changes in shape.  Any, any viscoelastic, any
22  viscoelastic substance will go through deformation,
23  your skin, your ligaments, and any implant that you may
24  place.
25       Q.   Look at page 19, sir.  The last

Page 133

1  paragraph, where it starts with complications.
2        A.   Yes.
3        Q.   You see where it says the transobturator
4  approach showed a higher frequency of early
5  postoperative pain as the insertion needle went through
6  the superficial muscles of the leg?  Do you see that?
7        A.   Yes.
8        Q.   What are you defining as superficial
9  muscles of the leg?
10       A.   Specifically, the adductor magnus.
11       Q.   The adductor magnus muscles?
12       A.   Yes.
13       Q.   Okay.  And you go on, this complication
14  is most often transient and managed with medication.
15  What does it mean, most often transient?
16       A.   It's of short duration.
17       Q.   Okay.  So, more than half the time it's
18  of short duration?
19       A.   Yes.
20       Q.   All right, and it could also be a
21  long-term pain and a long-term complication, can it
22  not?
23       A.   I think that was defined as something
24  that is extremely rare.
25       Q.   And how do you define extremely rare?

34 (Pages 130 to 133)

Jaime Sepulveda, M.D.

Page 134

1      A.   It's when, when you look at the, at the
2  leg pain in the cohorts that are five years and seven
3  years, there's, there's a very low rate of long-term
4  pain.  Actually, it's not, it's not described in many
5  of these papers, it's not described.
6      Q.   Look on page 20.  You see the paragraph
7  that begins it became evident that specialized
8  knowledge of the obturator site and the anatomy and
9  relationship of the vascular, muscular and nerve
10 studies were required for a reproducible and safe
11 obturator procedure, do you see that?
12     A.   Yes.
13     Q.   Where is that in the IFU?  Where does it
14 say that, that you need special knowledge of the
15 anatomy in order to safely implant an obturator device?
16     A.   It's part, knowing the anatomy is part of
17 what is required from a physician as stated on the IFU.
18 It's physicians that are familiarized with continence
19 procedures.
20     Q.   But you're saying specialized knowledge
21 over and above the average physician is necessary?
22     A.   No, specialized knowledge is knowing
23 exactly about the obturator space.
24     Q.   But specialized knowledge compared to
25 who?

Page 135

1      A.   Compared to what you do normally.  I'm
2  going to explain that.
3      Q.   What I want to know is, are you talking
4  about special knowledge within a subgroup of doctors,
5  or simply you have to have more anatomical knowledge
6  than, say, a court reporter or a lawyer?
7      A.   No, you, you need, even if do you
8  continence procedures, you're going to, you're needing
9  to know the anatomy of the obturator space.
10     Q.   Is it anywhere in the IFU that you have
11 to have specialized knowledge of the anatomy in order
12 to safely reproduce an obturator procedure?
13     A.   It just says that physicians should be
14 trained on the procedure.
15     Q.   Okay.  And it says that the, the, the
16 obturator neurovascular bundle 1.2 to 1.5 centimeters
17 for TVTO, that's the distance between where a
18 properly-placed TVTO should go in the obturator nerves?
19     A.   That's what has been, has been measured.
20     Q.   Okay.  So, in other words, if a TVTO is
21 properly placed, it should be 1.2 to 1.5 centimeters
22 from the obturator nerve bundle?
23     A.   Yes, there's a safe area for placement of
24 a transobturator sling that is about 2.5 centimeters,
25 1.5 to 2.5 centimeters from the obturator neurovascular

Page 136

1  bundle.
2      Q.   How far is a properly-placed TVTO from a
3  pudendal nerve bundle?
4      A.   It's at least four centimeters.
5      Q.   You go on to say, on the next page, the
6  proximity to the obturator neurovascular bundle was
7  most frequently a failure to orient the device from 45
8  degrees to 90 degrees as specified by the IFU.
9      A.   Yeah, there are three, three factors that
10 have been validated as the variations in the placement
11 of a transobturator sling from the inside out.  The
12 first factor is the dorsal lithotomy position, which is
13 addressed by the IFU.  The second factor is the
14 insertion, or the depth of the insertion of the needle
15 in the periurethral space, and the, the third factor is
16 a full rotation of the wrist with rotation from 45 to
17 90 degrees when the needle is exteriorized.  Those
18 three factors determine how close the tape is going to,
19 is going to be in relation to the neurovascular bundle.
20     Q.   All right, and if it's not done that way,
21 then you can get an obturator nerve injury?
22     A.   Yes, if you, if you actually dissect a
23 cadaver and you insert it wrong to see where you get
24 out, you can, you can get there.
25     Q.   You say you can get there, you can get

Page 137

1  there and you can damage or injure an obturator nerve?
2      A.   You can, you can injure an obturator
3  nerve as has been shown in some, some reports.
4      Q.   Now, Doctor, you discussed --
5      A.   And when I say as it has been shown in
6  some reports is that anatomically, it has been
7  described that when you don't insert the device
8  properly, you can injure the neurovascular bundle.
9      Q.   All right.  Have you ever seen a report
10 of an obturator nerve injury from the explant of a TVT?
11     A.   No.
12     Q.   As you sit here today, there's no
13 literature that we can find that, that you've seen
14 that's been reported where any patient has suffered an
15 obturator nerve injury from the revision or removal of
16 a mesh sling?
17     A.   No, I have not seen an obturator nerve
18 injury from the removal of a, a sling.
19     Q.   And what about the pudendal nerve injury,
20 have you ever seen a report of a patient getting a
21 pudendal nerve injury from the removal or revision of a
22 sling?
23     A.   I have not seen that, that report.
24     Q.   Ever?
25     A.   It has not been published.

35 (Pages 134 to 137)

Jaime Sepulveda, M.D.

Page 138

1      Q.   Have you in your practice come across
2  that?
3      A.   No, I have not seen that in my practice.
4      Q.   You say in 2013 that the -- well, strike
5  that.
6          You document 2008, 2011, 2013 FDA Public
7  Health Notifications regarding synthetic mesh?
8      A.   Well, for this one it's the 2008 because
9  the sling wasn't implanted in 2010 in this case.
10     Q.   Right.  So, the only, the only FDA notice
11 that Dr. Reyes could have been aware of is the 2008,
12 correct?
13     A.   That is correct.
14     Q.   Because the 2011, 2013, hadn't even come
15 out yet?
16     A.   That's correct.
17     Q.   All right.  Doctor, you say on page 22 of
18 your report that the TVTO device is accompanied by an
19 IFU and that you have reviewed the TVTO IFU.  Correct?
20     A.   Please repeat that.
21     Q.   Yeah, I was reading that you have
22 reviewed the TVTO IFU and you find it adequate and
23 complete for its use in the operating room?
24     A.   Yes, I did.
25     Q.   And you said I understand that the IFU is

Page 139

1  not a comprehensive guide for surgical treatment of
2  SUI.  Do you see that?
3      A.   Yes, that's the way it's stated.
4      Q.   Do you agree that a doctor implanting a
5  TVTO should be allowed to rely solely upon the IFU to
6  ascertain what complications if any may result from the
7  use of that device in counseling his patient?
8      A.   I think that the IFU needs to speak about
9  the specifics of the implant, but the continence
10 procedure, the risk of the continence procedure
11 pertains to the formation and the training of the
12 doctor.
13     Q.   Well, that's not my question.  My
14 question is, do you agree that a doctor should be able
15 to rely solely on the IFU and nothing else in educating
16 himself about the complications that could result from
17 the use of a device?
18     A.   No.
19     Q.   Is that reasonable or not?
20     A.   No, they should not rely just on the IFU.
21 There's a wealth of data out there about the
22 indications and the use of the device.
23     Q.   Do you agree with me that in order for
24 Ethicon to do its best to make sure that a patient is
25 appropriately counseled, that Ethicon needs to provide

Page 140

1  the known risks and adverse events in the IFU so that
2  information will be available to the doctor to pass on
3  to patient, do you agree with that?
4      A.   I expect Ethicon to state the risks
5  inherently associated to the mesh.
6      Q.   And do you agree with me that if Ethicon
7  fails to provide the necessary information regarding
8  the risks and adverse events and complications to the
9  doctor, there's a risk at that point that the patient
10 cannot be properly counseled because the information
11 has not been provided to the doctor, do you agree with
12 that statement?
13     A.   The IFU is intended to educate the
14 physician on the performance of the procedure.  Part of
15 it is going to be the complications from the device
16 that remains on the patient.
17     Q.   Listen to my question.  Do you agree with
18 me that if Ethicon fails to provide the necessary
19 information regarding the risks and adverse events and
20 complications to the doctor, there's a risk at that
21 point that the patient cannot be properly counseled?
22     MS. GALLAGHER:  Object to form.
23 BY MR. FREESE:
24     Q.   Do you agree with that statement or not?
25     A.   We don't, we don't use the IFU for

Page 141

1  patient counseling.
2      Q.   Well --
3      A.   So I disagree, I disagree with the
4  statement that if it's not placed on the IFU, I expect
5  the IFU to address the complications that have to do
6  with the tape, it should give me direction on how to
7  use the device, but I, I don't expect them to give me
8  the benchmark for patient education.
9      Q.   And, Doctor, that question didn't involve
10 the IFU.
11     A.   Okay.
12     Q.   So, you have to listen to my question.
13 I'm just asking you if you agree with this statement,
14 that if Ethicon fails to provide the necessary
15 information regarding the risks and adverse events of
16 complications to a doctor, there's a risk at that point
17 that the patient cannot be properly counseled because
18 the information has not been provided to the doctor.
19 Do you agree with that?
20     MS. GALLAGHER:  Object to form.
21     A.   No, I disagrees with that because the
22 only source of information for a physician before they
23 counsel a patient is not Ethicon.
24 BY MR. FREESE:
25     Q.   And do you agree or disagree that if

36 (Pages 138 to 141)

Jaime Sepulveda, M.D.

Page 142

1    Ethicon fails, if it happens that Ethicon fails to
2    provide material information about the risks of, for
3    example, a TVT or any medical device, to the physician,
4    if it actually happens and the doctor just relies on
5    the IFU regarding the risks and doesn't tell a patient
6    a risk that the doctor wasn't told about, the patient
7    would not have been properly counseled?
8         MS. GALLAGHER:  Object to form.
9    BY MR. FREESE:
10        Q.   Do you agree or disagree with that?
11        A.   I agree that if the doctor relies just on
12   the IFU, they will not be able to provide enough
13   counseling to the patient.
14        Q.   Do you know Dr. Hinoul?
15        A.   Yes.
16        Q.   He's a medical affairs director at
17   Ethicon, is he not?
18        A.   Yes.
19        Q.   He's a urogynecologist, is he not?
20        A.   He is.
21        Q.   He's trained the same way you're trained,
22   correct?
23        A.   I don't know if it was the same way, but
24   I know he's a urogynecologist.
25        Q.   And his job is to make sure that, from a

Page 143

1    medical standpoint, that doctors are getting properly
2    warned of the risks of using TVT, correct?
3         MS. GALLAGHER:  Object to form.
4         A.   I'm not aware of his job description.
5    BY MR. FREESE:
6         Q.   When is the last time you talked to him?
7         A.   At an AUGS meeting.
8         Q.   Okay.  You actually reviewed and logged
9    his deposition in this case, did you not?
10        A.   Yes, I did see one of his depositions.
11        Q.   I want to show you page 2007 and 2008 of
12   his deposition that was given January 14th, 2014, okay?
13   And you see where it says, quote, "In order for Ethicon
14   to do its best to make sure that a patient is
15   appropriately counseled, Ethicon needs to provide the
16   known risks and adverse events in the IFU so that
17   information will be available to the doctor to pass on
18   to the patient.  Right?"  And he says, "Absolutely."
19   Do you see that?
20        A.   Yes.
21        Q.   Do you agree with his answer?
22        A.   If Ethicon is the only source, but I
23   think in the context in which he was asked, from what I
24   see from that answer, absolutely, is, is Ethicon going
25   to provide that information, and he's testifying as a

Page 144

1    medical director for Ethicon.
2         Q.   Yes.
3         A.   So, so, the question is, is that the only
4    thing the doctor relies on, do I agree to that?
5         Q.   No, I'm asking do you agree with Dr.
6    Hinoul's answer, absolutely, to the question that was
7    just asked; do you agree with his answer?
8         A.   Yeah.  In order for Ethicon to do its
9    best to make sure that a patient is properly counseled,
10   Ethicon needs to provide the known risks and events in
11   the IFU so that information will be available to a
12   doctor to pass on to the patient.  Yes, that's --
13        Q.   You agree with that?
14        A.   If they're aware, if they're aware of any
15   complications, that will be, that's, Ethicon will have
16   to transmit it for the doctor to be aware.
17        Q.   If Ethicon is aware of a complication,
18   they have to transmit it to the doctor?
19        MS. GALLAGHER:  Object to form.
20        A.   I would agree that that's the only way
21   that the doctor could know.
22   BY MR. FREESE:
23        Q.   All right.  Okay.  And, he goes on to
24   say, "And, therefore, if Ethicon fails to provide the
25   necessary information regarding risks and adverse

Page 145

1    events and complications to the doctor, there's a risk
2    at that point that the patient cannot be properly
3    counseled because the information has not been provided
4    to the doctor, correct?"  And Dr. Hinoul's answer is,
5    "That is correct."  Do you see that?
6         A.   Yes, but I disagree with him because I
7    don't --
8         Q.   So, let me, first of all, did I read the
9    question and answer correctly?
10        A.   Yes, sir.
11        Q.   Do you agree with Dr. Hinoul?
12        A.   No, I don't agree that Ethicon is the
13   only source.  In his answer, he's saying that, I mean,
14   there's this long, long question, and then he says he
15   agrees.  The substance of it is Ethicon is not the only
16   source that I'm going to consider counseling my
17   patients.
18        Q.   It doesn't say only source.  It says if
19   Ethicon fails to provide the necessary information
20   regarding risks and adverse events and complications.
21   to the doctor, there's a risk at that point that the
22   patient cannot be properly counseled because the
23   information has not been provided to the doctor,
24   correct?  And Dr. Hinoul says that is correct, and you
25   disagree with that?

37 (Pages 142 to 145)

Jaime Sepulveda, M.D.

Page 146

1          A.   Okay, the specific question there on what
2    can be inferred from the question, so I'm going to
3    answer to you the best, the best way I can answer is,
4    if Ethicon does not disclose it, if there's no
5    disclosure, there's no way for the physician to know it
6    unless it has to do with the procedure itself.  Now, we
7    don't rely just on the IFU and we don't just rely on
8    Ethicon to tell us about the, Doctor.
9          Q.   I'm going to get there, Doctor.  I just
10    want to know whether or not you agree or disagree with
11    what Dr. Hinoul just said there.
12          MS. GALLAGHER:  Objection to form.  He's
13    explaining to you why he can't say agree or
14    disagree.
15          MR. FREESE:  Well, I'm not sure he is --
16          MR. GOSS:  I think the form is fine.
17          MR. FREESE:  Just form, that's all we
18    need.
19    BY MR. FREESE:
20          Q.   Do you understand my question, Dr.
21    Sepulveda?  I read you the question on lines 1 through
22    7 of page 1208 and the answer on line 8.  All I want to
23    know is, do you agree with Dr. Hinoul or do you
24    disagree with Dr. Hinoul?
25          MS. GALLAGHER:  Objection to form.

Page 147

1          A.   I will have to disagree with that with
2    Dr. Hinoul, because it implies that the only source
3    that you have is Ethicon, and that's not the only
4    source that I have.
5    BY MR. FREESE:
6          Q.   And you understand he was speaking on
7    behalf of Ethicon in his deposition?
8          MS. GALLAGHER:  Objection to form.
9          A.   Yes, he's the medical director for
10    Ethicon.
11    BY MR. FREESE:
12          Q.   And the next question, "And, in fact, if
13    Ethicon fails, if it happens that Ethicon fails to
14    provide material information about the risks, for
15    example, of the TVT or any medical device, to the
16    physician, if that actually happens and the doctor just
17    relies on the IFU regarding the risks and doesn't tell
18    the patient the risks that the doctor wasn't told
19    about, the patient would not have been properly
20    counseled, correct?"  His answer is, "I am in full
21    agreement, the surgeon should be able to rely solely on
22    the IFU, absolutely."  Do you see that?
23          A.   For the patient counseling, solely on the
24    IFU?
25          Q.   Yes, sir.

Page 148

1          A.   I would disagree on that, no.
2          Q.   Even though Dr. Hinoul says absolutely, a
3    doctor should be able to rely solely on the IFU, you
4    disagree with Dr. Hinoul?
5          MS. GALLAGHER:  Object to form.
6    BY MR. FREESE:
7          Q.   Correct?
8          A.   Yes, I don't think you're going to find
9    any physician that would agree with just relying solely
10    on the IFU.
11          Q.   Let me ask you this, Dr. Sepulveda.  Who
12    knows more about the complications of Ethicon's
13    products, you or the medical affairs doctor at Ethicon?
14          MS. GALLAGHER:  Object to form.
15          A.   I think I'm in a privileged position to
16    know what kind of complications patients have when you
17    follow the IFU.
18    BY MR. FREESE:
19          Q.   I'm asking you, who knows more about the
20    complications related to TVTs, Dr. Hinoul or you?
21          MS. GALLAGHER:  Object to form.
22          A.   I do.
23    BY MR. FREESE:
24          Q.   Okay.  So the jury should conclude that
25    Jaime Sepulveda knows more than the urogynecologist

Page 149

1    hired by Ethicon to be its worldwide medical affairs
2    doctor, you know more than he does?
3          MS. GALLAGHER:  Object to form.
4          A.   Yes, I have implanted more TVTs than he
5    has.
6    BY MR. FREESE:
7          Q.   Who has seen more internal documents
8    about the complications of the use of TVT, you or Dr.
9    Hinoul?
10          A.   Dr. Hinoul sees more internal documents.
11          Q.   It's not your job to write the IFUs for
12    TVT, is it, or TVTO?
13          A.   No, it's not, I don't write the IFUs.
14          Q.   You understand that all of the warnings
15    and complications that appear in a TVTO IFU are written
16    by the medical affairs people at Ethicon, correct?
17          MS. GALLAGHER:  Object to form.
18          A.   That's what I would expect to write it,
19    yes.
20    BY MR. FREESE:
21          Q.   People like Dr. Hinoul?
22          A.   Yes.
23          Q.   He's the one in charge of making sure
24    it's accurate and full and gives the doctors all the
25    information they need regarding complications of the

38 (Pages 146 to 149)

Jaime Sepulveda, M.D.

Page 150

```
 1   procedure, correct?
 2          MS. GALLAGHER: Object to form.
 3      A.  He writes the IFU.
 4   BY MR. FREESE:
 5      Q.  And that's his job 24/7, correct?
 6          MS. GALLAGHER: Object to form.
 7      A.  I don't know if it's 24/7. He writes the
 8   IFU.
 9   BY MR. FREESE:
10      Q.  But that's his job, that's what a medical
11   affairs director does, correct?
12      A.  I'm not familiar with their duties, but I
13   think that he has an input on the IFU.
14      Q.  And yet, you would substitute your
15   judgment for his on what a doctor should rely or not
16   rely on out of the IFU?
17      A.  No, I did not testify on that. I said --
18      Q.  I'm asking you, is it your opinion
19   that --
20          MS. GALLAGHER: Don't cut him off,
21   please.
22   BY MR. FREESE:
23      Q.  Sorry. Go ahead.
24      A.  What I testified is that I have placed
25   more TVTOs, I've done more follow up on these patients
```

Page 151

```
 1   than he has. I use the product, I would know about any
 2   problems it would have. I would not have continued to
 3   use the polypropylene mesh for midurethral slings to
 4   this day if I would have seen or I would have had any
 5   problems.
 6          MR. FREESE: Move to strike.
 7   BY MR. FREESE:
 8      Q.  That's not my question, sir. My question
 9   is simply, Doctor, you would substitute your judgment
10   on what an implanting physician should rely on in the
11   IFU over Dr. Hinoul's judgment about what a doctor
12   should rely on or can rely on from the IFU, correct?
13          MS. GALLAGHER: Object to form.
14      A.  No, Dr. Hinoul does the, he writes the
15   IFU. Dr. Hinoul is in a, in a position to see skewed
16   data of how the procedure performs, because I can tell
17   you that Dr. Hinoul do not get a phone call or a report
18   of how many patients have done better and how many
19   patients have been improved in their quality of life.
20   He gets --
21   BY MR. FREESE:
22      Q.  How do you know that?
23      A.  He gets a report about complications.
24      Q.  How do you know that? How do you know
25   what he gets?
```

Page 152

```
 1      A.  I can tell you that any of my 2,000
 2   patients have called him and say, Piet Hinoul, I'm
 3   doing great.
 4      Q.  Let's do this, Doctor, can you we agree
 5   you don't know what, you have no personal knowledge of
 6   what Dr. Hinoul knows or he doesn't know?
 7          MS. GALLAGHER: Object to form.
 8      A.  No, I already testified, I'm not aware of
 9   his job description.
10   BY MR. FREESE:
11      Q.  And you have no idea what he knows or
12   what he doesn't know, do you?
13      A.  Actually, I --
14      Q.  My question is, what personal knowledge
15   do you have of what Piet Hinoul knows or doesn't know
16   about complications of TVT slings?
17      A.  I do not know. I just, I do not know
18   that. I just --
19      Q.  And how many --
20          MS. GALLAGHER: Please, let him finish
21   his answer.
22          MR. FREESE: Because he's now off, not
23   responding to my question anymore. He's
24   answered my question, now he editorializing.
25   So, I mean, as long as I can charge the time
```

Page 153

```
 1   back to you, I don't mind, but he can't sit
 2   here and read out of a telephone book, either.
 3   So, if it's not responsive to my question,
 4   we're wasting time. He's answered my question.
 5   If you want to ask him a question on redirect,
 6   that's fine.
 7   BY MR. FREESE:
 8      Q.  My question to you is you have no clue
 9   how many slings Dr. Hinoul has implanted, do you?
10      A.  Yeah, actually, I asked him.
11      Q.  And what was his answer?
12      A.  I, I, I probably remember that it was
13   none here in the United States.
14      Q.  I didn't ask you that. How many slings
15   has Dr. Hinoul implanted in his life?
16      A.  I think in my conversation with him at
17   some point, I asked him if he could, if he could just
18   come to clinical practice on, on, on, on the
19   United States, and he told me no, that he is a medical
20   director.
21      Q.  Dr. Sepulveda, I have no idea what you
22   just said. My question is just simply --
23      A.  I agree that I ramble. I agree with you
24   on that.
25      Q.  Sir, I have a great deal of respect for
```

39 (Pages 150 to 153)

Jaime Sepulveda, M.D.

Page 154

1   you, let's try not to ramble.  My question is simply,
2   do you know how many slings Dr. Hinoul has ever
3   implanted in his life?
4        A.   No, Mr. Freese, I don't know how many
5   slings he has implanted.
6        Q.   And do you know how many slings he has
7   taken out in his life?
8        A.   No.
9        Q.   Do you know how many peer-reviewed
10  articles he's written about slings?
11       A.   No, I'm only familiar with his articles
12  on the anatomy of TVTO.
13       Q.   You know he's written at length on TVT,
14  correct?
15       A.   He, for this case, I actually relied on
16  one specific article that he wrote about the anatomy.
17       Q.   My question is you understand that Dr.
18  Hinoul is published in peer-review articles, correct,
19  on TVTs?
20       A.   Yes.
21       Q.   You, sir, have published zero peer-review
22  articles on TVT slings, correct?
23       A.   Yes.
24       Q.   Okay.  And you've done 2 to 3,000 sling
25  procedures, correct?

Page 155

1        A.   Yes.
2        Q.   And you've only seen two or three
3   complications in your entire 2 to 3,000?
4        A.   Yes.
5        Q.   Do you know how many complications Dr.
6   Hinoul has seen?
7        A.   In his line of work, probably has seen
8   more than three.
9        Q.   And, so, you've seen three out of 3,000,
10  you have no idea how many he's seen, yet you feel
11  comfortable saying you know more about complications
12  from slings and what doctors need to know than he does?
13       A.   No, I say I know more about outcomes.  I
14  could say, I could say that I know more about outcomes.
15       Q.   You know about three complications out of
16  3,000, he may know way more than that.  Yet you want to
17  say that your information is superior to his?
18       MS. GALLAGHER:  Object to form.
19  BY MR. FREESE:
20       Q.   I mean, you realize Dr. Hinoul is
21  responsible --
22       A.   I still have to answer your question.
23       Q.   I'm sorry.  Go ahead.
24       A.   My, my information, my information is on
25  the, on the, on my clinical experience and my

Page 156

1   information is based on my, on dissection of multiple
2   specimens, on the communications that I've had with my
3   peers, and on the, on the, on what's published,
4   although it is true that I have not published on TVT, I
5   am in the forefront of providing patient care, so I
6   know how this product performs.
7        MR. FREESE:  Move to strike,
8        non-responsive.
9   BY MR. FREESE:
10       Q.   Doctor, you have no personal knowledge of
11  how many doctors just like you that Dr. Hinoul talks to
12  every day in his job?
13       A.   I don't know who he talks to in his job.
14       Q.   He talks to you, right?
15       A.   No, we, we don't talk as part of his job.
16  We, the last time we spoke we were sitting on a meeting
17  enjoying the presentations of the scientific meeting.
18       Q.   So, you were not talking about business
19  with Ethicon with Dr. Hinoul?
20       A.   No, I don't, I don't talk about those
21  things.  We have, we have other subjects that we speak
22  about.
23       Q.   You understand Dr. Hinoul has access to
24  all the internal information available at Ethicon,
25  correct?

Page 157

1        A.   Yes.
2        Q.   You do not, do you?
3        A.   I do not.
4        Q.   In fact, all you have available to you,
5   Dr. Sepulveda, is what the lawyers for Ethicon want to
6   show you, correct?
7        MS. GALLAGHER:  Object to form.
8        A.   In terms of the company documents, yes.
9   BY MR. FREESE:
10       Q.   Okay.  So, the company documents, let's
11  define that, company documents about complications and
12  the frequency of complications, those type of documents
13  within Ethicon you don't have access to, do you?
14       A.   No, I do not have access to that.
15       Q.   Dr. Hinoul does, does he not?
16       A.   I think he does.
17       Q.   He has to.  He's the medical affairs
18  director.
19       A.   He's the medical director for Ethicon.
20       Q.   Real quick, Dr. Sepulveda, you've never
21  measured the pore size of the TVT sling, have you?
22       A.   Yes.
23       Q.   Yes, you have never measured it?
24       A.   Yes, I have measured it.
25       Q.   Okay, when did you measure it?

40 (Pages 154 to 157)

Jaime Sepulveda, M.D.

Page 158

1    A.   I put it together actually under the
2  microscope at the pathology at South Miami Hospital,
3  and I look at it and I measure it and then I confirmed
4  what it was.  Not only that, the pore size, but also
5  the pore sizes with, with Prolift Plus M.
6    Q.   The Ultrapro?
7    A.   Prolift Plus M.
8    Q.   Ultrapro?
9    A.   It could be Ultrapro, but I did not take
10 it as Ultrapro.
11   Q.   Okay.  What was the largest dimension of
12 the pore?
13   A.   On which one?
14   Q.   On Prolene.
15   A.   On the Prolene used for TVT was 1,200.
16   Q.   Okay.  And what was -- but that's not
17 symmetrical, is it?
18   A.   No, because of the knit, because of the
19 way it's knitted, it could be 1,200, but it's never
20 less than a thousand on each side.
21   Q.   It's never less than a thousand and at
22 its greater point it's 1,200?
23   A.   Yes.
24   Q.   1,200 microns?
25   A.   Microns.

Page 159

1    Q.   And what did you use to measure the
2  microns?
3    A.   There's a little caliber on the
4  microscope.
5    Q.   When did you do this?
6    A.   Years so.
7    Q.   Okay.  It's not in your report anywhere.
8    A.   No.
9    Q.   Okay, why didn't you put it in the
10 report?
11   A.   I didn't think it was relevant because
12 the pore size have been well established by other
13 publications.
14   Q.   Did you record this somewhere when you
15 did it?
16   A.   No, I did not record that.
17   Q.   Why did you measure the pore size?
18   A.   Because I like to become familiarized
19 with what I implant in my patients.
20   Q.   What is the basis of your opinion that a
21 TVTO made out of Ultrapro is not a safer alternative
22 than a TVTO made out of Prolene?
23   A.   There's a few areas on that.  Number one
24 is biomechanically, the TVT made of Ultrapro will not
25 behave in the same way that a TVT made of Prolene.

Page 160

1    Q.   Let me stop you and do it one at a time,
2  okay?  What is your basis for saying biomechanically
3  they will not operate the same?
4    A.   Well, they're two different types of
5  material.
6    Q.   Let me ask a better question.  Have you
7  seen any internal documents from Ethicon saying that
8  they will act differently biomechanically?
9    A.   No, I have not seen any internal
10 documents.  I have not read any internal documents.
11   Q.   If there are internal documents that say
12 they would behave similarly biomechanically, would you
13 have liked to have seen these documents?
14   A.   Either similarly or separate, but that's
15 just the first part of my answer.
16   Q.   I understand.  We're taking them one at a
17 time.  So you've seen no document that says it would,
18 that an Ultrapro TVTO sling would operate differently
19 than one made for a POP, correct?
20   A.   They're two different, those are two
21 different applications.
22   Q.   Okay, and you've never seen a single
23 internal document making that comparison, correct?
24   A.   No, I have not seen that comparison.
25   Q.   And whether or not Ethicon concluded

Page 161

1  internally that it would be suitable to use Ultrapro in
2  a TVTO application?
3         MS. GALLAGHER:  Object to form.
4    A.   I have not seen, I have not that on
5  internal documents from Ethicon.
6  BY MR. FREESE:
7    Q.   So your opinion is, I'm Dr. Sepulveda and
8  because they're two different applications my opinion
9  is they would behave differently?
10        MS. GALLAGHER:  Object to form.
11   A.   Yes, biomechanically, they would behave
12 differently.  It's not that they would say that to me.
13 BY MR. FREESE:
14   Q.   And it's so because Jaime Sepulveda says
15 it's so.
16   A.   No, that's not exactly the case.  That
17 brings me to the --
18   Q.   Hold on, we'll stay on this for a second.
19 What is your basis other than it's my opinion that they
20 would behave differently biomechanically?
21   A.   By my biomechanical knowledge.
22   Q.   Okay.  Have you conducted any
23 biomechanical testing of Prolene mesh versus Ultrapro
24 mesh?
25   A.   No, I have not conducted that test.

41 (Pages 158 to 161)

Jaime Sepulveda, M.D.

Page 162

1     Q.   Okay.  All right, what's your second
2  basis for saying that Ultrapro would not be suitable?
3     A.   There was, the way they behave, in my,
4  when you're using it in the operating room, the way
5  they handle, they're different.
6     Q.   I understand that's your opinion, but
7  you've done no bench testing on that, correct?
8     A.   There's no bench testing on it.
9     Q.   You've done no tensile testing, correct?
10    A.   I have not done any of the bench testing
11 that would be required to make that conclusion.
12    Q.   You've done no cadaveric testing on
13 Ultrapro as a sling versus Prolene, correct?
14    A.   No, I have not done that test.
15    Q.   And have you reviewed any of Ethicon's
16 internal cadaveric testing?
17    A.   No.
18    Q.   Do you know whether or not actually
19 Ethicon even tested Ultrapro in a sling application in
20 cadavers?
21    A.   No, I'm not aware of their testing.
22    Q.   So they didn't show you the results of
23 any cadaver testing for the use of Ultrapro as a sling
24 internally, correct?
25    A.   I can not say, I can not under oath say

Page 163

1  that I'm aware of specific testing or, or experiment
2  that has been done.
3     Q.   On anything, bench, cadaver, any kind of
4  application?
5     A.   No, I'm not aware of that.
6     Q.   All right, what was the next reason,
7  other than biomechanical, why you said that Ultrapro
8  would not be suitable as a sling?
9        MS. GALLAGHER:  Object to form.
10    A.   The next reason is that there have been
11 no clinical studies --
12       MR. FREESE:  Stop for a second.  What's
13 the objection?  I want to cure it.
14       MS. GALLAGHER:  Because it's as a safer
15 alternative design, that's the question you're
16 asking him.
17       MR. FREESE:  No, he told me that he had
18 three reasons why Ultrapro would not be
19 suitable as a, to be used as a TVTO.
20       MS. GALLAGHER:  As a safer alternative
21 design is what you're questioning him about.
22 That's what he's answering.
23       MR. FREESE:  Yes.
24       MS. GALLAGHER:  Okay.
25       MR. FREESE:  So, will you withdraw your

Page 164

1  form objection?
2        MS. GALLAGHER:  No, because you're asking
3  him about -- I thought the question had safety
4  in it and suitability.  He's talking about
5  safer alternative design.  That's a different
6  analysis.  That's my objection.
7        MR. FREESE:  Okay.
8  BY MR. FREESE:
9     Q.   Let me clarify.  You're answering, Dr.
10 Sepulveda, why Ultrapro would not be suitable or a
11 safer alternative than Prolene for use in a sling
12 application, correct?  That's what you're answering?
13    A.   In the sling application, yes.
14    Q.   And you told me biomechanically, you
15 didn't think it would operate the same?
16    A.   That's correct.
17    Q.   All right, what's your next reason?
18    A.   The second is that we already have a
19 device in place that has been tested extensively
20 clinically.  So, whatever, whatever evidence is, comes
21 in has to be stronger than the evidence that we have on
22 TVT.
23    Q.   All right.  Now, the only, you say that
24 there's not demonstrating empirical evidence because
25 you haven't seen any, you don't know if it's been done

Page 165

1  or not, you just haven't seen any, right?
2     A.   Yes, there's, there has been no
3  presentations that I heard on conference, there has
4  been no texts that I have read, there has been no
5  scientific randomized control trials, not even a cohort
6  study that shows the use of a hybrid or partially
7  absorbable sling.
8     Q.   So, basically, then, that would be just
9  the same as TVTO, wouldn't it?  There were no
10 randomized control studies, there were no cohorts, any
11 of that done before TVTO was launched, correct?
12    A.   No, that mischaracterizes my testimony on
13 the basis that they're different, they're two different
14 implants.  The implant used on TVTO was the same
15 implant that was used on TVT.  The implant that would
16 be used on Ultrapro is not the same as the implant that
17 would be used on TVTO.
18    Q.   Well, it's the same implant that was used
19 in Prolift, was it not?
20    A.   They are different applications.  One
21 is --
22    Q.   They're both pelvic surgeries, are they
23 not?
24    A.   Well, they're different applications.
25 One is urinary incontinence, the other one is prolapse.

42 (Pages 162 to 165)

Jaime Sepulveda, M.D.

Page 166

```
 1         Q.   Okay, so, you said that there was no
 2    empirical science, and that is because you haven't seen
 3    any, you don't know if there is empirical data within
 4    Ethicon because you haven't seen that, but you're
 5    simply saying you have not seen a published empirical
 6    data comparing an Ultrapro as a sling versus a Prolene,
 7    correct?
 8         MS. GALLAGHER:  Object to form.
 9         A.   There's no clinical evidence that shows
10    that using a partially-absorbable sling is superior to
11    the sling that we have used.
12    BY MR. FREESE:
13         Q.   Okay, any other reason?
14         A.   Yeah, the third reason is the consensus
15    from the societies.
16         Q.   Well, what has the society said about
17    using Ultrapro as a sling?
18         A.   I trust that the societies will come up
19    with, with recommendations specifically on the use of
20    established clinical standard for the treatment of
21    incontinence.
22         Q.   Should I interpret that to mean that the
23    relevant clinical societies have not commented one way
24    or the other about the use of Ultrapro as a sling?
25         A.   Actually, they have commented that
```

Page 167

```
 1    specifically the use of monofilament polypropylene is
 2    the clinical standard on the case, on the treatment of
 3    urinary stress incontinence.
 4         Q.   I understand that.  I'm asking -- my
 5    question is different, that no society has said that,
 6    that use of Ultrapro as a mesh sling would not be safer
 7    than the current design?
 8         A.   They have not recommended it, and they
 9    have not said that it's safer.
10         Q.   So that's not really a reason because
11    they haven't said one way or the other, correct?
12         A.   As surgeons, we also follow the
13    recommendations of the societies.
14         Q.   I know, but the society has made no
15    assertion one way or the other, so there's nothing to
16    follow.
17         A.   I'm not saying the society, I'm saying
18    the societies, the clinical societies.
19         Q.   I understand, you're talking about AUGS
20    and ACOG and --
21         A.   Right.
22         Q.   And they have just not spoken to it,
23    correct?
24         A.   That's correct.
25         Q.   Okay, so that's not a reason for it or a
```

Page 168

```
 1    reason against it.  It's silent.
 2         MS. GALLAGHER:  Object to form.
 3         A.   They have no evidence to speak one way or
 4    the other.
 5         The fourth reason is that the FDA, the
 6    panel on the FDA on the executive summary did not offer
 7    that even as an alternative.
 8         MS. GALLAGHER:  We have lunch.  Do you
 9    want to break?
10         MR. FREESE:  Sure.
11         (A lunch break was taken from 1:17 p.m.
12    to 1:29 p.m.)
13    BY MR. FREESE:
14         Q.   Dr. Sepulveda, I want you to turn to the
15    Roman numeral IV, expert opinion overview in your
16    report.  I think it may be 55 on your version.  It's
17    page 54 on mine, I think that's just because of the way
18    it's printed.  Tell me when you get there.
19         A.   Yeah, I'm here.
20         Q.   Just so I understand, you give opinions
21    throughout your report, but is section IV intended to
22    sort of like summarize the important opinions that you
23    intend to give in a case?
24         A.   Yes.
25         Q.   Okay, I realize you give more than what's
```

Page 169

43 (Pages 166 to 169)

Jaime Sepulveda, M.D.

Page 314

Page 316

1  whether or not polypropylene mesh degrades?
2      A.  I may be asked questions about it.  I
3  think I have testified already last week on, on, on the
4  degradation of polypropylene.
5      Q.  But you're not a polymer scientist?
6      A.  No, I'm not a polymer scientist.
7      Q.  And there are others that are more
8  qualified than you to testify about whether or not
9  polypropylene degrades?
10     A.  I think that as a surgeon, there is a
11  very limited information that we can give about
12  degradation.
13     Q.  And that would be including yourself?
14     A.  Yes, we don't have that information one
15  way or the other.
16         MR. GOSS:  Thank you, Doctor.
17             CROSS EXAMINATION
18  BY MR. FREESE:
19     Q.  Dr. Sepulveda, we were talking briefly
20  about the particle loss.  Remember the discussion we
21  had about Jennifer's TVTO sling, and you said Dr. Reyes
22  reported he didn't see any particles.  Do you remember
23  that discussion?
24     A.  Yes.
25     Q.  Is the phrase linting the same thing as

Page 315

Page 317

80 (Pages 314 to 317)