# EXHIBIT C

Stephen M. Factor, M.D.

Page 1

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION - ATLANTIC COUNTY
-  -  -

IN RE:                  : CIVIL ACTION
PELVIC MESH/GYNECARE    : CASE NO. 291 CT
LITIGATION              :
                        :
                        : MASTER CASE NO.
                        : L-6341-10
(GENERAL, GROSS, WICKER):

-  -  -

-  -  -
NOVEMBER 27, 2012
-  -  -


Videotaped deposition of

STEPHEN M. FACTOR, M.D., held at Jacobi

Medical Center, 1400 Pelham Parkway

South, Bronx, New York 10464, commencing

at 2:08 p.m., on the above date, before

Margaret Peoples, a Registered

Professional Reporter.




-  -  -




GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph|917.591.5672 fax
deps@golkow.com

Stephen M. Factor, M.D.

## Page 2

```
 1   A P P E A R A N C E S :
 2   MAZIE, SLATER, KATZ & FREEMAN, LLC
     BY: DAVID MAZIE, ESQUIRE
 3     103 Eisenhower Parkway, 2nd Floor
       Roseland, New Jersey 07068
 4     (973) 228-9898
       Counsel for the Plaintiffs
 5
 6   BUTLER, SNOW, O'MARA, STEVENS & CANNADA, PLLC
     BY: NILS B. (BURT) SNELL, ESQUIRE
 7   Suite 400
     500 Office Center Drive
 8   Fort Washington, Pennsylvania 19034
     (267) 513-1885
 9   Counsel for the Defendants
10
11
12
13
14
15
     A L S O   P R E S E N T :
16
17   Christopher Campbell, Videographer
18
19          - - -
20
21
22
23
24
25
```

## Page 3

```
 1          - - -
 2          I N D E X
 3   WITNESS             PAGE NO.
 4   STEPHEN M. FACTOR, M.D.
 5      By Mr. Mazie       8
 6
        By Mr. Snell        129
 7
 8
           - - -
 9
        E X H I B I T S
10
     NO.      DESCRIPTION      PAGE NO.
11
     EXH.1    Pathology Slides      7
12
13
14         - - -
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1
 2          DEPOSITION SUPPORT INDEX
 3
     Direction to Witness Not To Answer
 4   Page  Line  Page  Line
     None
 5
 6
 7
 8
     Request For Production of Documents
 9   Page  Line  Page  Line
     None
10
11
12
     Stipulations
13   Page  Line  Page  Line
     None
14
15
16
     Questions Marked
17   Page  Line  Page  Line
     None
18
19
20
21
22
23
24
25
```

## Page 5

```
 1          Reserved for Confidential Designation Index as
 2               Pursuant to the Protective Order
 3
 4   Defendants did not have any Confidential Designations
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

2 (Pages 2 to 5)

Stephen M. Factor, M.D.

|  | Page 6 | | Page 8 |
|---|---|---|---|

**Page 6**

1  Reserved for Confidential Designation Index as
2  Pursuant to the Protective Order
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 7**

1           - - -
2           (Whereupon, Exhibit 1 was
3  marked for identification.)
4           - - -
5           VIDEOGRAPHER:  We are now on
6  the record.  My name is
7  Christopher Campbell.  I'm a
8  videographer for Golkow
9  Technologies.  Today's date is
10  November 27, 2012 and the time is
11  2:08.
12           This deposition is being
13  held in Bronx, New York, In Re:
14  Pelvic Mesh, for the Superior
15  Court of New Jersey, Atlantic
16  County.
17           The deponent is Dr. Stephen
18  Factor.
19           At this time, will counsel
20  please announce their appearances
21  for the record?
22           MR. MAZIE:  David Mazie,
23  Mazie, Slater, Katz & Freemen on
24  behalf of the plaintiffs.
25           MR. SNELL:  Burt Snell,

**Page 8**

1  Butler Snow on behalf of the
2  defendants, Ethicon and Johnson &
3  Johnson.
4           VIDEOGRAPHER:  The court
5  reporter is Margaret Peoples and
6  will now swear in the witness.
7           - - -
8           STEPHEN M. FACTOR, M.D.,
9  after having been duly sworn, was
10  examined and testified as follows:
11           - - -
12           EXAMINATION
13           - - -
14  BY MR. MAZIE:
15      Q.   Dr. Factor, my name is David
16  Mazie and I represent the plaintiffs in
17  two cases in which you are being deposed,
18  hopefully at least one of them today.
19  Certainly, we will find out from the
20  Court whether we will be deposing you on
21  the second case.
22           How many times have you been
23  deposed before?
24      A.   Many.
25      Q.   How many is many?

**Page 9**

1      A.   I don't keep a precise
2  count, but somewhere close to 125 to 150
3  over the last 30-plus years.
4      Q.   Over the past 10 years, how
5  many times do you think you have been
6  deposed?
7      A.   It's averaged about six to
8  eight a year.
9      Q.   And what percentage of your
10  cases in which you have been deposed have
11  been on behalf of the defense versus the
12  plaintiff?
13      A.   My breakdown has been about
14  85 percent for defense and 15 percent or
15  so for plaintiff.
16      Q.   Have you ever worked in a
17  pharmaceutical-type case?
18      A.   Yes.
19      Q.   On how many occasions?
20      A.   I have done products
21  liability now for 20 years, 15 to 20
22  years.  I have testified in virtually
23  none of them, at least with the
24  pharmaceutical cases, but I have been
25  working over that period of time.

3 (Pages 6 to 9)

Stephen M. Factor, M.D.

Page 10

1      Q.   How many times have you been
2  retained in a medical device case over
3  the past 20 years?
4      A.   I've had a long-standing
5  involvement with St. Jude Medical for
6  over 8 to 10 years, leading to testimony
7  last year.
8      Q.   On how many occasions have
9  you been retained where there was an
10  issue of whether or not a medical device
11  was defective?
12      A.   That was, I believe, the
13  only medical device case.  The other
14  products liability have been drug or --
15  and even with the products liability, it
16  was primarily -- I was involved mainly
17  with the experimental studies dealing
18  with the device.
19      Q.   On how many occasions over
20  the past 20 years have you acted as an
21  expert in where there was an issue of
22  whether a drug or medical device was at
23  issue?
24      A.   I don't keep a precise
25  count, so I don't know.

Page 11

1      Q.   Can you estimate for us?
2      A.   It's, I'd say, between five
3  and ten cases a year over the past 10
4  years.
5      Q.   And what percentage of those
6  cases in which there was an issue
7  involving the medical device or drug did
8  you testify or were you an expert,
9  rather, on behalf of the plaintiff versus
10  the defense?
11      A.   They were all for defense.
12      Q.   Fair to say that -- strike
13  that.
14          Can you tell me how many you
15  said per year?
16      A.   Five to ten.
17      Q.   So, is it fair to say you
18  have acted as an expert in cases in which
19  there was either a medical device or drug
20  at issue on more than 100 cases?
21          MR. SNELL:  Objection, form.
22      A.   I think in total, more
23  likely, yes, because a number of cases
24  dealt with specific issues from
25  individuals dealing with the same

Page 12

1  subject.
2      Q.   And in every single case in
3  which there's a medical device or drug at
4  issue, and we're talking at least 100, if
5  not more, you have acted as the expert on
6  behalf of the defense, correct?
7          MR. SNELL:  Objection to the
8      form.
9      A.   Correct, except for one case
10  a number of years ago that I did for
11  plaintiffs in an asbestos litigation.
12      Q.   That doesn't involve a
13  medical device or a drug, correct?
14      A.   No.  Correct.
15      Q.   Fair to say in the more than
16  100 cases in which there's been an issue
17  involving a medical device or drug, you
18  have acted as an expert on behalf of
19  defense in every single one of those
20  cases?
21      A.   Correct.
22          MR. SNELL:  Objection to
23      form.
24  BY MR. MAZIE:
25      Q.   And you've never acted as an

Page 13

1  expert on behalf of the plaintiff in a
2  case in which there was a medical device
3  or drug at issue, correct?
4      A.   Correct.
5          MR. SNELL:  Objection to
6      form.
7  BY MR. MAZIE:
8      Q.   I'm going to give you some
9  just ground rules, even though you're
10  obviously familiar with them.  First of
11  all, you understand you're under oath?
12      A.   Correct.
13      Q.   You understand that your
14  testimony has the same force and effect
15  as if you were sitting before a judge and
16  jury at this time?
17      A.   Yes.
18      Q.   If I ask you a question and
19  you answer it, I'm going to presume you
20  understood the question.  If you don't
21  understand the question or any part of
22  it, let me know and I'll rephrase it.
23  But if you answer the question, I'm going
24  to presume you understood it.  Okay?
25      A.   Yes.

4 (Pages 10 to 13)

Stephen M. Factor, M.D.

Page 14

1      Q.   Obviously, don't speculate,
2    don't guess.  If you know something, you
3    will tell us that.  Okay?
4      A.   Yes.
5      Q.   Doctor, are you affiliated
6    with any type of expert organization that
7    advertises your services?
8      A.   None whatsoever.
9      Q.   Do you advertise your
10   services?
11     A.   Absolutely not.
12     Q.   Have you worked with Butler
13   Snow or any of its attorney in the past?
14     A.   I have worked with Mr. Snell
15   once.  I don't recall whether he was at
16   Butler Snow at the time, but I have
17   worked with him.
18     Q.   And what type of case did
19   you work with Mr. Snell?
20     A.   It was a Phen-fen case.
21     Q.   And did you actually testify
22   at a deposition in the Phen-fen case?
23     A.   Not that I recall.
24     Q.   And aside from that one
25   occasion with Mr. Snell, have you ever

Page 15

1    worked with him or anyone at his firm?
2      A.   Not to my recollection.
3      Q.   Never worked with Christie
4    Jones?
5      A.   No.
6      Q.   Have you ever worked as an
7    expert or been retained as an expert on
8    behalf of Ethicon, Johnson & Johnson or
9    any of the affiliated entities with
10   Johnson & Johnson?
11     A.   Johnson & Johnson, yes, not
12   Ethicon.
13     Q.   On how many occasions have
14   you acted as an expert for Johnson &
15   Johnson?
16     A.   I don't know the number, but
17   it's -- they were all drug cases and I
18   would be guessing.  I don't know.
19     Q.   Have you worked as an expert
20   on behalf of Johnson & Johnson more than
21   ten times?
22     A.   Yes.
23     Q.   Have you worked as an expert
24   on behalf of Johnson & Johnson more than
25   25 times?

Page 16

1      A.   I don't know.
2      Q.   Fair to say that you have
3    worked as an expert on behalf of Johnson
4    & Johnson between 10 and 20 times?
5      A.   By definition.
6      Q.   Is that correct?
7      A.   Yes.
8      Q.   Doctor, you have privileges
9    at Jacobi Medical Center?
10     A.   Yes, I do.
11     Q.   Do you have privileges
12   anywhere else?
13     A.   I don't know if I have
14   active privileges at Montefiore.  I don't
15   think I do anymore.
16     Q.   You don't hold any positions
17   at Montefiore?
18     A.   Correct.
19     Q.   What positions do you hold
20   at Jacobi Medical Center?
21     A.   I'm chairman of the
22   department of pathology.
23     Q.   Any other positions?
24     A.   I'm director of anatomic
25   pathology as well as chairman.

Page 17

1      Q.   Are those all of your
2    positions at this hospital?
3      A.   At the hospital, yes.
4      Q.   Do you have any positions
5    with any professional organizations?
6      A.   Well, I'm -- I have
7    positions at the medical school.  I,
8    also, belong to a number of organizations
9    where I have had positions and still have
10   some degree of active positions.
11     Q.   What medical school are we
12   speaking about?
13     A.   Albert Einstein College of
14   Medicine.
15     Q.   What is your position there?
16     A.   I'm a tenure full professor
17   of pathology of medicine.
18     Q.   Do you have a subspecialty
19   in pathology?
20     A.   Yes, I do.
21     Q.   What is that?
22     A.   Cardiovascular pathology.
23     Q.   You are not a urogynecologic
24   pathologist, correct?
25     A.   That is correct.

5 (Pages 14 to 17)

Stephen M. Factor, M.D.

**Page 18**

1              MR. SNELL:  Object to form.
2    BY MR. MAZIE:
3         Q.   What is the difference
4    between a urogynecologic pathologist and
5    a cardiologic pathologist?
6         A.   Well, it has to do not so
7    much with day to day examination of
8    tissues.  It has to do with, in my case
9    at least, with my research and the bulk
10   of my writing has dealt with
11   cardiovascular disease of all aspects
12   and, also, my teaching deals with
13   cardiovascular disease.  I see
14   urogynecologic specimens all the time as
15   part of my surgical pathology experience,
16   but I'm not a urogynecologic pathologist.
17        Q.   What percentage of the time
18   do you examine urogynecologic specimens?
19        A.   There's no way to calculate
20   that.  I sign out surgical specimens on a
21   daily basis.  I sign out cytology,
22   generally, on a daily basis.  And even
23   the cases that I don't actually -- that
24   I'm not actually responsible for, I see
25   along with my staff during a daily peer

**Page 19**

1    review conference.
2         Q.   So you can't estimate for me
3    and for this jury what percentage of the
4    time that you actually examine
5    urogynecologic specimens?
6         A.   Absolutely not.  There's --
7    I mean, we receive specimens on a daily
8    basis.  The gynecologists tend to operate
9    or oncologic gynecologic surgeons operate
10   one day a week, but our other
11   gynecologists operate daily and we
12   receive specimens virtually every day.
13        Q.   In your professional
14   practice outside of this particular case,
15   how many times have you reviewed or
16   examined any type of transvaginal mesh
17   from a pathologist standpoint?
18        A.   None that I can recall.
19        Q.   And aside from transvaginal
20   mesh, how often do you actually -- strike
21   that.
22             In your work as a
23   pathologist, how often do you actually
24   examine specimens involving any type of
25   mesh or any type of mesh, surgical mesh?

**Page 20**

1         A.   I was trying to estimate.  I
2    would say yearly I see between eight and
3    ten mesh cases from abdominal ventral
4    hernias and inguinal hernias.  I, also,
5    see significantly more vascular graphs
6    with -- usually with GORE-TEX as the
7    material used.  And, occasionally, I see
8    particularly at autopsy, vascular grafts
9    from large vessels.
10        Q.   If you take GORE-TEX out of
11   the mix, how often do you see any other
12   type of surgical mesh?
13        A.   Well, it's EIGHT to ten
14   hernia cases.  And that's -- and other
15   than that, the Dacron used for vascular
16   grafts.
17        Q.   What the hernia mesh made of
18   that you see?
19        A.   Most often, it's, to my
20   knowledge, it's polypropylene, but I
21   don't know that all of them include that.
22        Q.   Doctor, you're board
23   certified?
24        A.   Yes, I am.
25        Q.   And in what discipline?

**Page 21**

1         A.   Anatomic and clinical
2    pathology.
3         Q.   You were board certified in
4    1995?
5         A.   Correct.
6         Q.   Did you have to take both
7    oral and written boards?
8         A.   It was written and I believe
9    a portion of the anatomic boards were
10   oral at that time, yes.
11        Q.   Did you pass your written
12   and oral boards on the first try?
13        A.   Yes.
14        Q.   Have your privileges in any
15   hospital ever been suspended or revoked?
16        A.   No.
17        Q.   Have you ever been -- strike
18   that.
19             Has anyone ever filed a
20   complaint against you with the Board of
21   Medical Examiners or any other
22   organizations?
23        A.   No.
24             MR. SNELL:  Form.
25   BY MR. MAZIE:

6 (Pages 18 to 21)

Golkow Technologies, Inc. - 1.877.370.DEPS

Stephen M. Factor, M.D.

Page 22

1      Q.   Have you ever been sued for
2  malpractice?
3      A.   I was named in a suit that I
4  had nothing to do with, just as the
5  chairman of the department and then I was
6  subsequently dropped.
7      Q.   Just once?
8      A.   To my knowledge, yes.
9      Q.   Have you ever written any
10 articles involving mesh?
11     A.   No.
12     Q.   Mesh of any sort?
13     A.   No.
14     Q.   Have you ever given any
15 presentations concerning mesh, surgical
16 mesh?
17     A.   No.
18     Q.   Have you ever studied
19 surgical mesh?
20         MR. SNELL:  Objection to
21 form.
22     A.   I don't recall because I
23 have done studies with my surgical
24 colleagues, my cardiac surgical
25 colleagues and whether or not they used

Page 23

1  any mesh materials in those studies, I
2  don't recall whether it did or not.
3      Q.   As you sit here today, you
4  can't recall any presentations you have
5  given on surgical mesh?
6      A.   To my knowledge, I haven't
7  given any presentations.
8      Q.   To your knowledge, you have
9  never done any research on surgical mesh,
10 correct?
11     A.   Correct.
12     Q.   Doctor, what percentage of
13 your income over the past 10 years has
14 been as a result of medical-legal expert
15 work?
16     A.   It's averaged between 25 and
17 40 percent.
18     Q.   What percentage of your time
19 over the past 10 years has been as a
20 result of medical-legal expert work?
21     A.   It's difficult to total.  In
22 general, with all cases, between 10 to 20
23 hours a week, but not every week.  And
24 usually that's during evenings and
25 weekends, other than actually reviewing

Page 24

1  pathology slides that I have to do here
2  in the office, but most of the remaining
3  work is done at night and weekends.
4      Q.   How many cases do you
5  currently have for J&J?
6      A.   None that I recall.  They're
7  still active.  There may be one or two
8  out there, but I don't know.
9      Q.   Can you estimate for me over
10 the past 10 years how much money J&J has
11 paid you for expert work?
12     A.   I have no idea.
13     Q.   What are you being paid on
14 an hourly basis for this case?
15     A.   $500 an hour.
16     Q.   Do you know how much you
17 have been paid to date?
18     A.   Yes.
19     Q.   How much?
20     A.   21,000.
21     Q.   Doctor, you have issued one
22 report in this case?
23     A.   Correct.
24     Q.   Linda Gross?
25     A.   Correct.

Page 25

1      Q.   That would be dated October
2  9, 2012?
3      A.   Yes.
4      Q.   And does this report contain
5  all of your opinions in the case?
6      A.   To date, yes.
7      Q.   What do you mean to date?
8      A.   Well, if additional
9  information becomes available, I might be
10 asked to write a supplement, but I
11 haven't done so as of yet.
12     Q.   As of right now, these are
13 all the opinions you have in the case,
14 correct?
15     A.   Right.
16     Q.   And let me ask you, is it
17 fair to say that mesh when it's placed in
18 the human body elicits a foreign body --
19 I'm sorry.  Is it fair to say that when
20 mesh is placed into the human body
21 provokes inflammation?
22     A.   Yes.
23     Q.   And explain to us how that
24 works?
25     A.   The mesh is recognized as a

7 (Pages 22 to 25)

Stephen M. Factor, M.D.

Page 26

1   foreign material and it elicits an
2   inflammatory response, which is --
3   includes changes comparable to wound
4   healing with the development of
5   granulation tissue, the laying down of
6   fibrosis, the development of
7   neovasculature.  And along with that, it
8   elicits an inflammatory response.  And
9   that includes the reaction of mononuclear
10  cells, monocytes that are altered into
11  macrophages and then ultimately, in some
12  cases, multinuclear giant, foreign body
13  type giant cells, along with lymphocytes
14  and rarely eosinophils or mass cells.
15      Q.   And as you sit here today,
16  do you know how much mesh was placed in
17  Linda Gross?
18      A.   How much volumetrically?
19      Q.   Yes.
20      A.   I don't know.
21      Q.   If you took each fiber and
22  stretched it out, do you know how much
23  distance that would be?
24      A.   I have no idea.
25      Q.   In your review of the

Page 27

1   pathology slides for Linda Gross, you saw
2   lymphocytes?
3       A.   Yes.
4       Q.   You saw macrophages?
5       A.   Yes.
6       Q.   Did you see giant cells?
7       A.   I saw some, yes.
8       Q.   Did you see fibroblasts?
9       A.   Yes.
10      Q.   Did you see scar tissue?
11      A.   There was fibrosis, yes.
12      Q.   And how is fibrosis formed?
13      A.   Fibrosis is the response of
14  the body again to healing with the
15  development of granulation tissue which
16  includes fibroblasts and endothelia cells
17  and buds of endothelia cells forming new
18  vessels.  The fibroblasts secrete
19  procollagen, which polymerizes and then
20  initially develops a matrix of type three
21  collagen, which is also called reticulin,
22  and then over the course of days and
23  weeks and months, leads to the
24  development of type one collagen, which
25  is the typical collagen present in

Page 28

1   natural tissue, as well as in response to
2   injury.
3       Q.   Doctor, you've reviewed a
4   number of slides with regard to Linda
5   Gross, correct?
6       A.   Yes.
7       Q.   Can you tell me how many
8   slides?
9       A.   I have to total them up.
10  There were 19 slides, but then
11  subsequently I saw a second set, one
12  initially with the plaintiff's slides and
13  then I saw a set of defense slides.  And
14  there were, also, some blanks in there.
15  So, my -- as best as I can tell from my
16  report, and I didn't quantify them, but
17  just going by the number of cases, the
18  number of accession cases and the number
19  of slides listed with those cases, I
20  believe there are 19.
21      Q.   19 pieces of tissue were
22  examined by you?
23      A.   There may be even more
24  tissue on one slide, but 19 slides.
25      Q.   Can you estimate for me how

Page 29

1   many pieces of tissue you actually
2   examined?
3       A.   I can't tell you that.
4       Q.   Approximately.
5       A.   I have no idea.  It's,
6   approximately, 19.  But whether any one
7   slide had two separate pieces of tissue,
8   I can't tell.
9       Q.   From how many operations --
10  strike that.
11          The, approximately, 19
12  slides that you examined, how many
13  different sources did they come from?
14  And what I'm asking about sources,
15  sources within Linda Gross' body.
16      A.   Well, this is separate
17  accessioned tissues that are from the
18  gynecologic track, as well as elsewhere,
19  but total is the total number of
20  accession cases.
21      Q.   And from how many operations
22  did those slides come from?
23      A.   By my count, eight.
24      Q.   Do you know how many
25  operations Linda Gross has had?

Stephen M. Factor, M.D.

Page 30

1     A.   I believe 18.
2     Q.   As you sit here today, can
3  you tell us those areas of Linda Gross'
4  body, those tissue samples came from that
5  you examined in this case?
6     A.   I can go by what or how they
7  are labeled or how they were identified.
8  One was rectovaginal mass.  One was left
9  posterior vagina, right posterior vagina.
10 Another was large bowel biopsy, upper
11 posterior vagina and ischial spine.  It
12 wasn't identified as the left or right.
13 And then a separate one from left ischial
14 spine, a separate one from soft tissue
15 left buttock.  Another one from left
16 buttock.  Another from fallopian tubes
17 and another from retropubic mass.
18    Q.   Doctor, is it fair to say in
19 those areas where you did not examine any
20 tissue samples you have no opinion as to
21 whether and to what extent there was any
22 type of inflammation or fibrosis?
23    A.   Correct.
24    Q.   Doctor, is it fair to say
25 that wherever the mesh is --

Page 31

1     A.   Can I add something?
2     Q.   Sure.
3     A.   Because in the defense
4  slides, there were other tissues that
5  were not included with the plaintiff's
6  slides.
7     Q.   I'm talking about any slides
8  you've reviewed.
9     A.   Okay.
10    Q.   Just so we're clear, you
11 have no opinions on what is going on any
12 part of Linda Gross' body aside from what
13 you saw on those particular tissue -- s?
14    A.   No.
15    Q.   -- samples?
16       MR. SNELL:  Object to form.
17    A.   But the ones I've identified
18 for you were from the plaintiff's slide I
19 initially reviewed and then I
20 subsequently reviewed similar tissues
21 from the plaintiff, but I, also reviewed
22 others that were not included with the
23 plaintiff's slides.
24    Q.   In addition to the 19 or?
25    A.   In addition to the number of

Page 32

1  cases, the accession cases I also,
2  reviewed other slides.
3     Q.   So your answer has to do
4  with two questions ago.  Let's make sure.
5  Is that correct?
6     A.   I believe I said there were
7  eight accession cases and I listed those
8  eight.  There are additional other slides
9  from the defense set of slides that I,
10 also, reviewed that were not included
11 with the plaintiff's slides.
12    Q.   Do you have a list of what
13 those --
14    A.   Yes.  That includes the
15 cervix and uterus, it includes the
16 gallbladder, it includes hemorrhoids, and
17 that's it.
18    Q.   Okay.  And just so the
19 record is clear, aside from what the
20 slides you looked at, whether they be
21 from the plaintiff or the defense, you
22 have no opinion as to those other areas
23 of Linda Gross' body and what was
24 transpiring within those other parts of
25 her body?

Page 33

1     A.   Correct.
2     Q.   So whether or not there's
3  inflammation, fibrosis or anything else
4  going on in her body, if you didn't
5  examine a tissue slide relating to it,
6  you have no opinion on it?
7     A.   Correct.
8     Q.   And the -- just so I'm
9  clear, is it fair to say that any time
10 there is mesh, the tissue next to the
11 mesh has inflammation or becomes
12 inflamed?
13       MR. SNELL:  Objection to
14 form.
15    A.   Not universally, no.  There
16 are areas even in these slides that show
17 mesh without inflammation or without any
18 meaningful inflammation.
19    Q.   Are you going to be
20 rendering an opinion in this case --
21 strike that.
22       Is it fair to say that the
23 majority of the time where mesh is
24 touching tissue it will cause
25 inflammation in that tissue?

9 (Pages 30 to 33)

Stephen M. Factor, M.D.

Page 34

1      MR. SNELL:  Objection to
2  form.
3      A.   It's variable.  The
4  inflammation that's present in some areas
5  is obvious and in other areas, there's
6  virtually no inflammation.  Or if there's
7  inflammation, it may be associated -- or
8  it is associated with other findings,
9  including the presence of hemosiderin.
10      Q.   What is the significant of
11  the presence of hemosiderin?
12      A.   It's a natural response or
13  natural result from surgery during the
14  course of surgery regardless of what the
15  surgical procedure is, there is
16  disruption of blood vessels bleeding into
17  the tissue and then the blood breaks
18  down, the hemoglobin is released from the
19  red cells and turns in to hemosiderin
20  which elicits an inflammatory response.
21      Q.   How long does it take for
22  hemosiderin to form?
23      A.   Within four to seven days,
24  you see hemosiderin in the tissue.
25      Q.   So if hemosiderin is shown

Page 35

1  on some of these pathology slides, as it
2  relates to the actual operation from
3  which the tissue was taken or a prior
4  operation?
5      A.   There's no way to determine
6  that other than the immediacy of the
7  hemosiderin to the tissue that's being
8  resected at the time.  Whether it was
9  there prior to that, it's unlikely, but
10  theoretically it's possible.  Hemosiderin
11  persists in the tissue, essentially,
12  forever.
13      Q.   Well, I'm trying to
14  understand.  So if there's an operation
15  and they take a piece of tissue to send
16  to pathology, does hemosiderin continue
17  to form from that point forward?
18      A.   Hemosiderin -- you mean once
19  the tissue is out of the body?
20      Q.   Yes.
21      A.   No.
22      Q.   So, once the tissue is taken
23  out of the body, it's then sent to
24  pathology, correct?
25      A.   Sent in fixative.  It

Page 36

1  doesn't change at all from that moment
2  on.
3      Q.   You said it takes four to
4  seven days for hemosiderin to form.
5      A.   Once you get bleeding in the
6  tissue, from the surgical procedure, you
7  will develop breakdown of the red cells
8  and the development of hemosiderin.  So,
9  obviously, the hemosiderin is not for the
10  surgical procedure that was done at the
11  time of the resection, it was done -- or
12  is associated with procedures that were
13  antecedent to the procedure.
14      Q.   That was my point.  I want
15  to make sure we were on the same page.
16      So, if a tissue sample shows
17  hemosiderin, that relates to a prior
18  procedure?
19      A.   Correct.
20      Q.   And so you are not giving
21  any opinion in this case as to how often
22  mesh causes inflammation in the tissue?
23      MR. SNELL:  Objection to
24  form.
25      A.   All I said was that the

Page 37

1  inflammation associated with the mesh is
2  variable.  There are areas with virtually
3  no inflammation and that are areas with
4  more obvious inflammation.
5      Q.   My question is, you are not
6  giving an opinion in this case on a
7  global scale as to how often the Prolift
8  mesh will cause inflammation in the
9  adjoining tissues?
10      A.   I don't understand the
11  question.
12      MR. SNELL:  Object to form.
13  BY MR. MAZIE:
14      Q.   Okay.  Well, you're giving
15  opinions in this case in the tissue
16  samples you examined, correct?
17      A.   Correct.
18      Q.   Beyond those tissue samples,
19  there's an overall question I'm asking
20  you.  And that is, whether you're giving
21  an opinion as to how often and to what
22  extent the Prolift mesh will cause
23  inflammation in the patient's tissues.
24      A.   You are talking about --
25      MR. SNELL:  Objection to

10  (Pages 34 to 37)

Stephen M. Factor, M.D.

Page 38

1    form.
2        Q.   Global?
3        A.   -- global patient's tissues.
4    The answer is, no.
5        Q.   You are not giving that
6    opinion?
7        A.   No.
8        Q.   Doctor, were there is
9    inflammation, will that inflammation
10   inflame nerves?
11       A.   Say that again.
12       Q.   Where you do have a
13   situation where the mesh causes
14   inflammation, will the inflammation to
15   the extent there's nerves there, inflame
16   the nerves?
17           MR. SNELL:  Objection to
18       form.
19       A.   Only if one identifies
20   evidence of neural involvement by
21   inflammation, which I did not.
22       Q.   I'm asking you
23   theoretically.
24       A.   Theoretically, if you have
25   nerves and tissue and you have

Page 39

1    inflammation, you can theoretically
2    develop a neuritis, an inflammatory
3    process involving nerves for any surgical
4    procedure, regardless of what the
5    procedure is and regardless of whether
6    you use foreign material.
7        Q.   But my question is, if you
8    have a situation where the Prolift mesh
9    is causing inflammation and there's
10   nerves within that tissue, is it fair to
11   say that can inflame the nerves?
12           MR. SNELL:  Objection to
13       form.
14       A.   Theoretically, if one sees
15   it.  But, if it's not seen, I can't
16   answer in the global because we're not
17   talking about the global picture.  I'm
18   talking about Mrs. Gross.  And in that
19   case, there is no inflammation of nerves,
20   so I comment further than that.
21       Q.   You don't know what -- you
22   didn't examine every nerve in every part
23   of Mrs. Gross' pelvic area, correct?
24       A.   I examined the nerves that
25   were present in all of the tissues that I

Page 40

1    have identified that were present after
2    being removed from her.  In none of those
3    nerves was there evidence of significant
4    inflammation of nerves.
5        Q.   You don't know what went on
6    or what is going on in the rest of her
7    nerves or the rest of her tissues because
8    you didn't examine them, correct?
9            MR. SNELL:  Objection to
10       form.
11       A.   Well, that's a theoretical
12   and, essentially, absurd comment.
13   There's no way to know that without a
14   biopsy, without knowing in other sites
15   what is happening to nerves.  There's
16   no -- absolutely no scientific or
17   otherwise way to know that.
18       Q.   And I asked you
19   hypothetically if you have a situation
20   where there's inflammation, can that
21   cause inflamed nerves.  And you called it
22   neuritis.
23           MR. SNELL:  Objection to
24       form.
25       A.   I said, theoretically, one

Page 41

1    could have inflammation causing a
2    neuritis, but one has to demonstrate it
3    to make the diagnosis of neuritis.
4        Q.   Doctor, how would you
5    characterize the inflammation that you
6    saw within the tissue slides?
7        A.   As I indicated earlier, it
8    was variable.  There were areas with
9    virtually no inflammation or very mild
10   inflammation.  There were areas with
11   inflammation, particularly in the
12   pictures that I saw today, areas
13   predominantly associated with the
14   presence of hemosiderin in the tissue.
15   And there were a few areas where the
16   inflammation was more significant.
17           If taking the entire samples
18   of tissue with it and without mesh --
19   and, also, by the way, there's fat
20   necrosis which causes inflammation,
21   taking all that together, I would say the
22   overall picture is one of mild to minimal
23   in some cases inflammation.
24       Q.   And in some instances, is
25   the inflammation that you saw more

11 (Pages 38 to 41)

Stephen M. Factor, M.D.

Page 42

1    severe?
2        A.   In a few areas, the
3    inflammatory response is more active.  I
4    don't know that I could quantify it as
5    severe.  If one is to do this from a
6    scientific perspective, one would
7    actually want to know the entire picture
8    of inflammation.  This is not a
9    picture -- the tissues do not show a
10   picture of severe inflammation
11   throughout.  There are few areas where
12   the inflammatory response is more active
13   and a few other areas where the
14   inflammatory response is more active, but
15   explained by other things, such as, as I
16   said, hemosiderin or fat necrosis.
17       Q.   Doctor, does the -- when
18   there's inflammation, does inflammation
19   remain or does it then change into
20   fibrosis?
21       A.   Inflammation and fibrosis
22   are two separate processes.  They go
23   together to a certain extent, but the
24   fibrosis is a response, as I indicated
25   before, to wound healing, granulation

Page 43

1    tissue, laying down of collagen.
2    Inflammation is, initially, associated
3    with the macrophage and giant cell
4    inflammation associated with foreign
5    material, foreign bodies and that
6    includes hemosiderin and fat necrosis,
7    generally persists for long periods of
8    time, sometimes as long as one can track
9    the process, but it is not --
10   inflammation and fibrosis go together but
11   not directly.
12       Q.   Is it fair -- strike that.
13           Are you saying that
14   inflammation does not cause fibrosis?
15       A.   Well, depends what the
16   inflammation is.  If you have an abscess
17   in the tissue due to infection, obviously
18   you're going to get fibrosis as a result.
19   But inflammation, per se, if it damages
20   structures, if it damages the heart
21   muscle, you will get fibrosis as a
22   response to that.  But when you're
23   dealing with tissues, as we are in this
24   case, the inflammation, per se, is not
25   the cause of the fibrosis.

Page 44

1        Q.   Doctor, do you have an
2    opinion as to what the cause of the
3    fibrosis is that you saw within Ms.
4    Gross' body?
5        A.   It's the normal response
6    to -- that falls under the broad category
7    of wound healing with -- as I said
8    before, granulation tissue, laying down
9    of collagen.  And together with that,
10   there's a macrophage response that in
11   some areas is associated with the mesh or
12   in some areas is associated with other
13   phenomenon going on in the tissues.
14       Q.   Doctor, are you rendering an
15   opinion in this case as to how mesh works
16   within the female body?
17       A.   No.
18       Q.   Do you have an understanding
19   of how the mesh is intended to work
20   within the female body?
21       A.   Only in very broad senses.
22   I mean, I'm not a bioengineer or
23   mechanical engineer.  I understand the
24   general concept of support of the
25   tissues, but I'm not here as an expert in

Page 45

1    that area.
2        Q.   Doctor, do you have an
3    understanding that the mesh is intended
4    to have scar tissue form within it?
5        A.   Yes.
6        Q.   And did you see fibrosis or
7    scar tissue form within the pieces of
8    mesh that you saw on the slides?
9            MR. SNELL:  Objection to
10   form.  Can you read that question
11   back, actually?
12           - - -
13           (Whereupon, the requested
14   portion was read.)
15           - - -
16           MR. SNELL:  My objection
17   holds.
18           THE WITNESS:  There is
19   fibrosis in the tissue associated
20   with the mesh.
21   BY MR. MAZIE:
22       Q.   I'm not sure if I understand
23   your answer.  There's fibrosis in the
24   tissue associated with the mesh.  What
25   does that mean?

12  (Pages 42 to 45)

Stephen M. Factor, M.D.

Page 46

1        A.   Well, it's -- one of the
2    problems in dealing with tissues from the
3    vaginal wall is that the vagina is
4    fibrous tissue surfaced by mucosa.  And
5    so, attempting to quantify the degree of
6    fibrosis in the tissue is very difficult.
7    One can see fibrous tissue surrounding
8    mesh fibers.  One can see fibrous tissue
9    in areas of other damage, including fat
10   necrosis and hemosiderin deposition, but
11   to attempt to quantify it when you have a
12   background of fibrosis is very difficult.
13   There's no one way to pick out the
14   fibrous tissue that formed as discrete
15   scar related to the mesh from the tissue
16   that's normally present in the vaginal
17   stroma.  There is fibrous tissue around
18   mesh fibers and, presumably, that's
19   fibrous tissue that formed as a response
20   to the mesh.
21        Q.   Fair to say -- first of all,
22   let me back up.  Are you rendering any
23   opinions in this case as to what the
24   cause was of the fibrous tissue or the
25   fibrosis that you visualized on any of

Page 47

1    these slides?
2        A.   It's a response to the
3    surgery.  It's a response to the presence
4    of mesh.  It's a response to the other
5    phenomenon that were present in the
6    tissue, including bleeding and fat
7    necrosis.
8        Q.   Are you rendering an opinion
9    in this case as to whether and to what
10   extent any of the fibrosis that you saw
11   on the slides was the result of mesh
12   versus something else?
13       A.   As I just indicated, there
14   is evidence of fibrous tissue associated
15   with the mesh fibers.  To quantify that
16   or to separate that from the surrounding
17   fibrous tissue, in my opinion, is very
18   difficult, if not impossible.
19       Q.   So you are not going to tell
20   this jury at trial when showing a piece
21   of -- or a slide that shows fibrosis
22   whether that fibrosis comes from the mesh
23   or whether it's comes from something
24   else?
25            MR. SNELL:  Objection to

Page 48

1    form.
2        A.   You are asking, am I going
3    to or not going to?
4        Q.   Are you going to -- do you
5    have -- let me ask it this way.  Do you
6    have any opinions in this case as to what
7    the specific cause was of any of the
8    fibrosis that you saw in any of the
9    slides?
10       A.   Yes.
11            MR. SNELL:  Objection to
12   form.
13            THE WITNESS:  I said before,
14   it formed in response to the mesh,
15   it formed in response to other
16   injuries in the tissue.
17   BY MR. MAZIE:
18       Q.   I understand that those are
19   the things that can cause the fibrosis.
20   My question to you is, are you going to
21   be able to look at fibrosis and say this
22   actual fibrosis here is as a result of
23   mesh, or this fibrosis is not the result
24   of mesh, it's a result of something else?
25            MR. SNELL:  Objection TO

Page 49

1    form.  Are you taking about like
2    every strand of fibrosis, every
3    strand of fiber?
4            MR. MAZIE:  Yes, any of
5    them.  Any of them.
6            MR. SNELL:  Object to form,
7    I mean --
8            THE WITNESS:  All that I can
9    do and I think any examiner can do
10   is to assess the presence of
11   fibrous tissue in its immediate
12   environment.  Mesh fibers are
13   present.  There is fibrous tissue
14   around -- between mesh fibers and
15   presumably that the mesh fiber
16   elicited the collagen deposition
17   of fibrosis.  There are other
18   areas, as I said before, with fat
19   necrosis and with hemosiderin
20   that, also, are within an area of
21   fibrosis and presumably that
22   fibrosis was associated with those
23   changes.  But to try and quantify
24   the extent of the fibrosis that's
25   present related to any one of

13 (Pages 46 to 49)

Stephen M. Factor, M.D.

Page 50

1    those processes, I believe, is not
2    possible.
3  BY MR. MAZIE:
4    Q.   Doctor, are you going to be
5  rendering any opinions in this case on
6  mesh contraction?
7    A.   No.
8    Q.   Doctor, are you going to be
9  rendering any opinions on the size of the
10 mesh pores?
11   A.   No.
12   Q.   Doctor, are you going to be
13 rendering any opinions in this case on
14 whether a scar net formed or scar bridge?
15   A.   Well, I didn't see anything
16 that was -- that could be, at least in my
17 understanding of scar bridges, that could
18 be interpreted as a scar bridge.  There
19 was -- as I said, there was fibrous
20 tissue in the tissues, there were mesh
21 fibers and there were the other changes
22 that I indicated.  There was nothing that
23 I could identify as a bridge.
24   Q.   Are you rendering an opinion
25 in this case that there was no scar

Page 51

1  bridge or scar net formed anywhere within
2  Linda Gross' body?
3    A.   Well, I didn't see
4  everywhere within Linda Gross' body.  All
5  I saw was the tissues that I indicated
6  before.  In those tissues, I see nothing
7  that indicates the presence of a bridge.
8  And if I'm asked that question, that's my
9  answer.
10   Q.   Doctor, do you have an
11 opinions in this case on how the mesh
12 itself will change within the body?
13       MR. SNELL:  Objection to
14   form.
15   A.   I don't understand your
16 question.
17   Q.   Do you have an understanding
18 of what happens to mesh once it's
19 surgically placed within the female body?
20       MR. SNELL:  Same objection,
21   form.
22   A.   I don't understand that
23 question, either.
24   Q.   Do you have an
25 understanding -- I don't know how else to

Page 52

1  say it more simply.
2        Do you have an understanding
3  of how the mesh changes, if at all, once
4  it's surgically placed into the body?
5    A.   Are you asking about
6  degradation of the mesh?
7    Q.   I'm asking you about about
8  degradation.  I'm asking you whether it
9  contracts.  I'm asking you whether it
10 becomes brittle or hard.  I'm asking any
11 of those things?
12       MR. SNELL:  Let me object to
13   the form.  Are you talking Prolift
14   mesh?
15 BY MR. MAZIE:
16   Q.   Prolift mesh, of course.
17   A.   I see no evidence of
18 degeneration.  I see no evidence, in my
19 experience of polypropylene, ever
20 undergoing degeneration of tissues.  It
21 persists for years in a state comparable
22 to the way when it is placed in the body.
23 I see that in vascular specimens for
24 years.  And I see nothing in these
25 tissues, other than the disruptions

Page 53

1  associated with the sectioning, the
2  histological processing of the tissue
3  that indicates there's any change in the
4  mesh fiber.
5    Q.   Aside from that one opinion
6  that you do not see any degeneration of
7  the Prolift mesh, do you have any other
8  opinions on what happens to the mesh once
9  it's placed in the female body?  I'm
10 talking only about Prolift mesh.
11   A.   No.
12       MR. SNELL:  Objection to
13   form.
14 BY MR. MAZIE:
15   Q.   If there's inflammation,
16 does it go through a process -- let me
17 ask it a different way.  It's kind of a
18 lead up.
19       You talked about active
20 inflammation earlier, correct?  You saw
21 no evidence of active inflammation or did
22 I misunderstand you?
23   A.   No.  I think that's a
24 misunderstanding because I have no way of
25 know whether those inflammatory cells

14 (Pages 50 to 53)

Stephen M. Factor, M.D.

Page 54

1    are, in fact, active or quiescent.
2         MR. MAZIE:  By the way,
3    Burt, to the extent that since
4    this is a deposition that either
5    will be completed today as to Mrs.
6    Wicker or on another occasion, any
7    of the questions I'm asking him
8    about his background, about the
9    overall response of the mesh,
10   things that are generic to both
11   cases, I'm assuming you will agree
12   that I can use those questions in
13   both cases, so I don't have to ask
14   him the same questions again at
15   the second deposition, if there is
16   a second deposition?
17        MR. SNELL:  I don't know if
18   I can agree to that because they
19   are different cases with different
20   pathologic aspects from my limited
21   attorney's understanding.  So,
22   what his background was and legal
23   work and payments and things like
24   that, general questions about in
25   general how the inflammatory

Page 55

1    process happens or how collagen
2    lays down, those are general
3    things, but --
4         MR. MAZIE:  I'm not --
5         MR. SNELL:  I'm confused by
6    your question.
7         MR. MAZIE:  The question
8    really relates to his background,
9    it relates to whether he has any
10   opinions on the pore size or
11   whether there's degradation or how
12   it effects the female body
13   generically, Prolift mesh, all
14   those questions would be the same
15   for both cases.  They're not
16   specific to one versus the other.
17   So all I'm saying is, I'm going to
18   ask him now, so I don't have to
19   ask him the exact same questions
20   and get the exact same questions
21   either later today or another day.
22   It would be silly.
23        MR. SNELL:  If they're
24   general questions, they're general
25   questions.  I just don't

Page 56

1    understand -- if you put in the
2    context of Wicker, then there may
3    be differences, there may be
4    things he saw that have bearing
5    upon inflammation, there might be
6    other causes of inflammation.
7    That's why I'm note sure if I can
8    agree to that.  I'm not trying to
9    be difficult.  I'm not a
10   pathologist, so there may be
11   differences.  I don't know.
12        MR. MAZIE:  I'm going to
13   take the position that anything
14   that I'm asking him today that is
15   generic as to the mesh or,
16   obviously, relating to his
17   background or anything like that
18   or as to science regarding
19   macrophages and inflammation and
20   how fibrosis formed can be used on
21   any case that he's been identified
22   as an expert on in the
23   consolidated cases.
24        All right.  Why don't we go
25   off the record.

Page 57

1         VIDEOGRAPHER:  The time is
2    now 2:57.  We are going off the
3    record.
4              - - -
5         (Whereupon, a brief recess
6    was taken.)
7              - - -
8         VIDEOGRAPHER:  The time is
9    now 3:05.  We are back on the
10   record.
11   BY MR. MAZIE:
12        Q.   Let's go to your report now,
13   Doctor.  In the first paragraph, you
14   state fibrosis --
15        A.   What page?
16        Q.   Conclusions.  You say that
17   fibrosis, whether it's secondary to
18   traumatic or -- how do pronounce that?
19        A.   Iatrogenic.
20        Q.   Iatrogenic injury or
21   response to tissue necrosis or damage
22   elicits a chronic inflammatory response
23   in association with the maturation of the
24   collagen fibers.
25             Is what you are saying there

15 (Pages 54 to 57)

Stephen M. Factor, M.D.

Page 58

1  fibrosis itself elicits a chronic
2  inflammatory response?
3      A.   There are inflammatory cells
4  that are associated with the development
5  of granulation tissue that will persist
6  in the tissue once the collagen and the
7  new vessels have formed.
8      Q.   So, sometimes inflammation
9  causes fibrosis, correct?
10     A.   Well, it's not causing the
11 fibrosis.  There's an injury to the
12 tissue of one sort or another that leads
13 to fibrosis.  The inflammatory response
14 is part of that.
15     Q.   Okay.  And if there is
16 inflammation as a result of the fibrosis,
17 will you be able to see that in the
18 slides?
19     A.   Well, you can see --
20 certainly see the inflammatory cells and
21 the presence of the collagen.  They are a
22 normal component of healing regardless of
23 what, as I said here, regardless of what
24 the injury is.
25     Q.   You say lower down, foreign

Page 59

1  bodies are present, the inflammatory
2  response is chronic and persistent.  What
3  does that mean?
4      A.   That the macrophage and
5  giant cell response -- the macrophage and
6  giant cell response will persist in the
7  tissue in some cases forever.  It will --
8  even in situations where you look at
9  surgical suture granulomas ten years
10 later, it will still be inflammatory
11 cells, macrophages in a few lymphocytes.
12     Q.   Is it fair to say as a
13 general proposition where mesh -- and I'm
14 talking about Prolift mesh -- is placed
15 within the female body where there's an
16 inflammatory response is going to be
17 chronic in many instances?
18     A.   Almost exclusively, yes.
19     Q.   So, any time there's a
20 Prolift mesh, there will be a chronic
21 inflammatory response within the female
22 body?
23     A.   Of one degree or another.
24 It's not universal.  In other words, you
25 don't see inflammation all over the

Page 60

1  place.  You see it in selected areas.
2      Q.   But that inflammation itself
3  will be chronic?
4          MR. SNELL:  Objection to
5      form.
6      A.   Chronic inflammation has two
7  definitions.  One is in -- relative to
8  the type of inflammatory cell that's
9  present, just like acute inflammation
10 tends to mean neutrophils and occasional
11 eosinophils.  Chronic inflammation is
12 composed of lymphocytes, monocytes,
13 macrophages and occasionally mass cells.
14 That's a particular terminology that's
15 used in a pathologic sense.  It's not a
16 temporal sense.  It has some temporal
17 component because the more chronic
18 inflammatory response tends to follow the
19 more acute inflammatory response.  So
20 there is a time dependency.  But when you
21 are talking about chronicity,
22 long-standing process, that's a different
23 kind of chronic.
24     Q.   Okay.  Let's talk about the
25 temporal relationship to the chronic

Page 61

1  inflammatory response from the mesh.
2  Okay?
3          Where there is a chronic
4  inflammatory response from the mesh in
5  the female body that mesh will stay
6  inflamed for how long?
7          MR. SNELL:  Objection to
8      form.
9      A.   Well, the concept of
10 inflamed, generally, indicates an act of
11 process of inflammation.  And that's not
12 what is present, at least as best as we
13 can tell.  There is inflammatory cells as
14 a result of the foreign material, but
15 they aren't necessarily doing anything in
16 an inflammatory process.  In other words,
17 they're not, to the best of my knowledge,
18 releasing enzymes or other substances in
19 the tissue that have an adverse effect on
20 the tissue, they're just there.
21     Q.   Where there is that type of
22 chronic inflammatory response, how long
23 will it last?
24     A.   Potentially, forever.
25     Q.   So, when there is a chronic

16 (Pages 58 to 61)

Stephen M. Factor, M.D.

Page 62

1    inflammatory response from the mesh
2    itself, it's permanent in nature?
3             MR. SNELL: Objection to
4        form.
5    BY MR. MAZIE:
6        Q.   That response.
7        A.   If there's inflammation, it
8    can persist, essentially, forever.
9        Q.   You would expect that, where
10   there is inflammation, that the
11   inflammation will persist within the body
12   until the person dies?
13       A.   Correct.
14       Q.   And you say that for
15   some unknown -- I'm sorry.  You say for
16   unknown reasons, some patients may have a
17   much more intense response than others
18   even when using similar materials and
19   surgical techniques.  What did you mean
20   by that?
21       A.   That there's patient
22   variability, unpredictable patient
23   variability regardless of what the
24   materials are, that some patients react
25   more actively, more exuberantly to

Page 63

1    foreign material than others.  And you
2    can see this in a number of different
3    situations.  It's -- there's no way to
4    understand it, to predict it, to even
5    truly understand the mechanism, whether
6    it's an allergic phenomenon or some other
7    phenomena, it's not known.
8        Q.   So it's fair to say that the
9    mesh will react differently within
10   different women?
11            MR. SNELL: Objection to
12       form.
13       A.   Well, I don't know that.
14   I'm just -- this was a general statement
15   of observations with foreign materials in
16   many different situations where, in some
17   cases, they're of a much more pronounced
18   inflammatory response with similar
19   materials versus other patients.  I can't
20   speak to the vast population of patients
21   with mesh other than the mesh that I have
22   seen in hernia procedures.
23       Q.   You're experience as a
24   pathologist in examining mesh is that
25   some patients have a much more intense

Page 64

1    inflammatory response to the mesh as
2    opposed to others?
3        A.   Well, I don't -- as I said,
4    I don't know that's true with mesh.  I
5    haven't -- most of the cases of mesh that
6    I have seen in regard to hernias were
7    removed for other reasons, either
8    adhesion to other sites to other organs
9    and in many cases due to infection.  So
10   it's difficult to generalize to meshes as
11   a class of materials.
12       Q.   All right.  Then, we'll back
13   it up one.  And it's fair to say that
14   it's your opinion that when foreign
15   bodies, such as mesh, are placed into
16   the body, some people have more of an
17   intense response, inflammatory response
18   to the foreign body as opposed to others?
19            MR. SNELL: Objection to
20       form.
21       A.   As I said, I don't know I
22   can generalize to mesh because I don't
23   have the experience, other than that
24   which I have indicated.  The statement
25   had to do with foreign material across

Page 65

1    the spectrum of foreign materials used in
2    surgical procedures.
3        Q.   So you can't give us an
4    opinion one way or the other as to
5    whether or not mesh, in particular
6    Prolift mesh, affects different people
7    differently?
8        A.   Correct.
9        Q.   And you can't give an
10   opinion with regard to Prolift mesh as to
11   what type of inflammatory response is
12   expected within the average person?
13            MR. SNELL: Objection to
14       form.
15   BY MR. MAZIE:
16       Q.   Or the average female.
17            MR. SNELL:  Same objection.
18       A.   Well, my understanding is
19   that the type of inflammation is what I
20   have described.  That it's mononuclear
21   and macrophage inflammation with
22   fibroblast as a general response to the
23   presence of the mesh material.
24       Q.   But can you quantify what is
25   the expected inflammation; in other

17 (Pages 62 to 65)

Stephen M. Factor, M.D.

Page 66

1    words, how bad or how severe that
2    inflammation is in the typical female
3    anatomy?
4         MR. SNELL:  Objection to
5         form.
6         THE WITNESS: I would have to
7         look at large numbers of specimens
8         to be able to answer that and I
9         can't answer that.
10   BY MR. MAZIE:
11        Q.   So you don't have such an
12   opinion?
13        A.   Correct.
14        Q.   Do you have any opinions as
15   to whether someone who has a pre-existing
16   chronic pain syndrome is affected
17   differently by the mesh?
18        A.   I do not, no.
19        Q.   You say that surgery, per
20   se, regardless of whether foreign
21   material is used, including sutures, will
22   lead to tissue damage with necrosis of
23   connective tissue and fat; is that
24   correct?
25        A.   Correct.

Page 67

1         Q.   Then you say, there's always
2    some degree of associated damage to blood
3    vessels and tissue nerve bundles leading
4    to entrapment.  These responses are not
5    unique to mesh.  What do you mean by
6    that?
7         A.   I think precisely what I
8    said, that the surgical procedure,
9    itself, if the tissue has nerve bundles
10   and, obviously, has -- unless we're
11   dealing with tendon or similar tissue,
12   has blood vessels and often adipose
13   tissue, there's going to be damage to
14   those tissues that will be affected by
15   the healing process.
16        Q.   We touched on this earlier.
17   Doctor, do you agree that the mesh itself
18   can cause scar tissue?
19        MR. SNELL:  Objection to
20        form.
21        A.   The mesh cause fibrosis.  It
22   depends on how one defines scar tissue.
23        Q.   How do you define scar
24   tissue?
25        A.   It's not an easily defined

Page 68

1    process.  Obviously, if one makes an
2    incision in the skin, a scar will form.
3    That's easily identifiable because
4    there's an absence -- there are changes
5    in the epidermis and there's an absence
6    of skin appendages in the underlying
7    tissue and we see that grossly, as well
8    as microscopically.  In dealing with
9    tissues, such as mesh implanted in
10   vaginal tissue, there is fibrosis,
11   there's no question, but -- and one
12   could, based on the general concept that
13   when you have surgical disruption of the
14   tissue, you will develop fibrosis which
15   is equivalent to scar.  I would agree
16   that there is some -- there's scar
17   tissue, but it's not as easily definable
18   as it is in certain tissues because of
19   the nature of the underlying tissue
20   itself.
21        MR. MAZIE:  I object and
22        move to strike as nonresponsive.
23   BY MR. MAZIE:
24        Q.   Doctor, all I've asked you
25   was, does the mesh cause scar tissue.

Page 69

1         A.   I think I've answered it.
2         Q.   Well, I don't understand
3    your answer, Doctor.
4         A.   Well, that's different.
5         MR. SNELL:  That's not a
6         basis for an objection.
7    BY MR. MAZIE:
8         Q.   I don't think your answer
9    was responsive.
10        MR. SNELL:  I think it was.
11        Q.   Let me ask you simply, does
12   the mesh cause fibrosis?
13        MR. SNELL:  Objection tp
14        form.
15        A.   Yes.
16        Q.   Is fibrosis different than
17   scar tissue?
18        A.   Under certain circumstances,
19   yes.
20        Q.   Okay.  Within Linda Gross,
21   is the fibrosis different than scar
22   tissue?
23        MR. SNELL:  Object to form.
24        A.   It is not easily discernable
25   whether she has a well-defined scar or

18 (Pages 66 to 69)

Stephen M. Factor, M.D.

Page 70

1  scars versus just deposition of collagen
2  in the tissue surrounding the mesh.
3      Q.   And if the mesh itself is
4  the cause of the -- strike that.
5          Mesh doesn't cause scar
6  tissue unless there's an incision related
7  to that, is that correct?
8      A.   No.  One has to implant,
9  imbed the mesh or implant the mesh in the
10  site, one will develop, obviously,
11  disruption of the surrounding tissues.
12      Q.   You say on the -- on page 5
13  that Mrs. Gross, also, had evidence of
14  chronic endometriosis in the uterus in
15  the specimen, possibly indicating that
16  she had or was susceptible to chronic
17  inflammation in her pelvic organ.  Do you
18  see that?
19      A.   Yes.
20      Q.   Doctor, can you give an
21  opinion within a reasonable degree of
22  medical probability that Linda Gross was
23  susceptible to chronic inflammation in
24  her pelvic organs?
25      A.   All I can say within a

Page 71

1  degree of medical probability is that she
2  had inflammation in her pelvic organs.
3  The -- at least involving the uterus.
4  More than that, I can't say.
5      Q.   And what you are saying is
6  she had endometriosis?
7      A.   No.  Endometritis and
8  endometriosis is two different things.
9      Q.   You're saying she had
10  evidence of endometritis in her uterus?
11      A.   In the lining of the --
12  endometrial lining of the uterus, she had
13  inflammation.
14      Q.   You can't give an opinion
15  within a reasonable degree of medical
16  probability as whether or not she was
17  susceptible to chronic inflammation in
18  her pelvic organs outside of the uterine
19  lining?
20          MR. SNELL:  Objection to
21  form.
22      A.   Of the other pelvic organs
23  that I examined, which included the
24  cervix and the fallopian tubes, she did
25  not have inflammation of those sites.

Page 72

1      Q.   So I want to make sure I
2  understand this.  You are not giving an
3  opinion that Linda Gross was susceptible
4  to chronic inflammation in her pelvic
5  organs?
6          MR. SNELL:  Objection to
7  form.
8      A.   Other than the inflammation
9  she had in her uterus.
10      Q.   Doctor, you saw in the
11  slides that there were entrapment of
12  multiple nerves?
13      A.   Correct.
14      Q.   You can't tell us within a
15  reasonable degree of medical probability
16  as to how those nerves became entrapped?
17          MR. SNELL:  Objection to
18  form.
19  BY MR. MAZIE:
20      Q.   Correct?
21      A.   They are a response to the
22  surgical reparative process.
23      Q.   How do you know that?
24      A.   Because they're occurring in
25  the site of surgery.

Page 73

1      Q.   You mean an actual area
2  where there was incision?
3      A.   Yes.  There was implanting
4  of -- there was an incision, there was
5  placement of mesh, there was removal of
6  mesh.  There are multiple procedures
7  taking place in those tissues that will
8  lead to fibrosis and surrounding of nerve
9  tissue, nerve fibers.
10      Q.   We, also, know that the mesh
11  can cause fibrosis as well; correct?
12      A.   Yes, but it's a natural
13  response to any surgical procedure,
14  whether regardless of whether you use
15  mesh or not, that you will see nerve
16  fibers enveloped or surrounded by fibrous
17  tissue.
18      Q.   You can't tell us within a
19  reasonable degree of medical probability
20  as to whether those nerves that were
21  entrapped were the result of the actual
22  surgical process or whether they were the
23  result of fibrosis due to the mesh
24  itself?
25          MR. SNELL:  Objection to

19 (Pages 70 to 73)

Stephen M. Factor, M.D.

Page 74

1    form.
2        A.   There's absolutely no way
3    anyone scientifically can separate those
4    two processes.
5        Q.   Now, you talked about the
6    fact that you saw a neuroma.  What is a
7    neuroma?
8        A.   A neuroma, in this case, is
9    what's called a traumatic neuroma.  It is
10   secondary to disruption or transection
11   of nerve, and it subsequently leads to
12   the proliferation of little nerve fibers
13   that extend out from the end of the
14   disrupted segment.
15       Q.   Could that neuroma have been
16   caused by a reaction to the mesh?
17       A.   No.  It's a reaction to
18   transection.  It's a surgical process.
19       Q.   How do we know that?
20       A.   Because that's how traumatic
21   neuromas develop.  They're either
22   disrupted by trauma, external trauma or
23   they're disrupted by iatrogenic trauma.
24   They are not responding to the presence
25   of surrounding mesh.

Page 75

1        Q.   How many neuromas did you
2    see?
3        A.   One.
4        Q.   And is the reason that you
5    arrive at the opinion that the neuroma
6    was traumatic in nature due to the
7    transection because there was no mesh
8    next to it or adjacent to it?
9        A.   No.  That's the
10   pathophysiologic mechanism by which
11   traumatic neuromas develop.
12       Q.   Do you have an opinion as to
13   whether or not the mesh itself migrates
14   within the female body?
15       A.   I do not, no.  I have no
16   opinion.
17       Q.   You say in your opinion that
18   Mrs. Gross did not -- I'm sorry, strike
19   that.
20            You say that in your opinion
21   Ms. Gross had an unremarkable response to
22   the Ethicon mesh, is that correct?
23       A.   Correct.
24       Q.   Have you studied whether and
25   to what extent the inflammatory response

Page 76

1    changes depending on how much mesh is in
2    the female body?
3            MR. SNELL:  Objection to
4    form.
5        A.   Have I studied that myself,
6    no.
7        Q.   Are you aware of any
8    literature that speaks to that issue?
9        A.   No.
10       Q.   Can you tell us within a
11   reasonable degree of medical probability
12   as to how this amount of mesh that's
13   contained within the Prolift system will
14   affect the female body as opposed to a
15   smaller amount of mesh used in several
16   sutures?
17            MR. SNELL:  Objection to
18   form.
19       A.   It's a quantitative process.
20   Where you have mesh, there are areas in
21   which there is adjacent fibrosis and
22   adjacent inflammatory response, in some
23   areas.  In other areas, there's almost
24   none.  Where you have a suture or
25   sutures, the response is localized to the

Page 77

1    presence of the suture.  It does not
2    spread out through the tissue.
3        Q.   Where there's mesh, such as
4    the Prolift mesh, do you know if that
5    inflammatory response builds on itself?
6        A.   I don't understand that
7    question.
8        Q.   Where there's more mesh,
9    such as the amount of mesh we have in the
10   Prolift system, do you know if that
11   insights a much greater multiple of
12   inflammatory response and/or fibrosis as
13   opposed to a smaller amount of mesh you
14   would see in a couple of sutures?
15            MR. SNELL:  Objection to
16   form.  Go ahead.
17       A.   The response is associated
18   with the mesh fibers themselves.  It's
19   not going -- obviously, if you have
20   multiple fibers, just as if you had
21   multiple sutures in a tissue you would
22   have quantitatively more inflammation in
23   total, but it's a question of whether the
24   mesh fiber has elicited an inflammatory
25   response and how much of it is elicited.

20  (Pages 74 to 77)

Stephen M. Factor, M.D.

Page 78

1    In many areas, the mesh is not elicited,
2    a significant or, if any, inflammatory
3    response in other areas, there's more of
4    an inflammatory response.  Obviously, if
5    you have more mesh, you potentially can
6    have more inflammation.
7         Q.   Are you aware of any
8    literature, Doctor, that talks about the
9    multiplication effect where there's more
10   mesh?
11        A.   I'm not you aware of it and
12   biologically it makes no sense.
13        Q.   Have you reviewed any of
14   Linda Gross' medical records?
15        A.   I reviewed some portions of
16   them.  Obviously, I reviewed the
17   operative reports and the surgical
18   pathology reports.
19        Q.   Do you have any opinion as
20   to whether and to what extent Linda Gross
21   suffers from chronic pain as a result of
22   the mesh?
23        A.   I'm aware she's had
24   complaints of chronic pain.  Whether it's
25   due to the mesh or not, I don't know.

Page 79

1         Q.   I'm to go through some of
2    the slides.  I'm going to show you
3    Doctor, what has been marked as Factor 1,
4    which is sample CR07-8397.  These are
5    slides you have seen before; correct?
6         A.   Just the ones I got this
7    morning, or this afternoon.
8         Q.   But the --
9         A.   I saw the slides.  I saw
10   these pictures today.
11        Q.   Right.  But you have seen
12   these slides before?
13        A.   Oh, absolutely.
14        Q.   Let's turn to -- I want to
15   start with -- I guess we'll start with
16   the 13th slide.
17        A.   What is the picture?
18        MR. MAZIE:  Okay.  Why don't
19   we change tape.
20        VIDEOGRAPHER:  The time is
21   now 3:30.  This is the end of Disc
22   Number 1.  We are now going off
23   the record.
24              - - -
25        (Whereupon, the following

Page 80

1    was held off the video record:)
2         MR. MAZIE:  We are here with
3    the understanding of taking the
4    deposition of Dr. Factor with
5    regard to both the Gross and the
6    Wicker case.  I arrived here today
7    without prior warning.  And Mr.
8    Snell told me that he was going to
9    refuse to allow the Doctor to
10   answer questions concerning the
11   Wicker case.  Is that correct?
12        MR. SNELL:  You're patently
13   wrong.  You were told by Kelly
14   Crawford that we were not
15   producing Dr. Factor, we object to
16   producing him -- producing Dr.
17   Factor in the Wicker case that in
18   light of the fact that, A., Dr.
19   Faulk (ph) is a new expert and he
20   has not been deposed.  There's a
21   motion pending on him.  B, Dr.
22   Welsh has not even been deposed
23   yet on Wicker.  Therefore, we did
24   not believe it would be pertinent
25   or right to produce Dr. Factor in

Page 81

1    the Wicker case concerning that
2    plaintiff's experts have not even
3    been disclosed, let alone one of
4    may not be allowed to so testify
5    in the Wicker case.
6         So your representation is
7    wrong.  Whether you were copied on
8    the e-mail to your partner, Adam
9    Slater, I frankly did not go back
10   and check that.
11        MR. MAZIE:  I was aware you
12   were taking that position, but the
13   judge had said that you should
14   take whatever you can with regard
15   to Dr. Welsh.  You were given the
16   opportunity.  He was not finished
17   for whatever reason.  He was
18   prepared to stay.  Kelly decided
19   not to stay.  And in either event,
20   the Judge said that we should go
21   ahead and take Dr. Factor on both
22   cases regardless.
23        MR. SNELL:  It's my
24   understanding that was not what
25   happened, that the court reporter

21 (Pages 78 to 81)

Stephen M. Factor, M.D.

Page 82

```
 1    needed to leave.  The Judge said
 2    we should focus on Gross first,
 3    that's why Kelly focused on Gross
 4    first and the Judge has not said
 5    that Dr. Factor should be deposed
 6    on Wicker in addition to Gross as
 7    we sit here today at this
 8    deposition.  So I think that's
 9    attorney/lawyer argument, and if
10    there's a disagreement, it's
11    amongst the counsel.
12         MR. MAZIE:  So we're clear,
13    to the extent you do not allow me
14    to ask questions concerning Wicker
15    and we're not getting in touch
16    with the Judge, we'll seek to move
17    to bar Dr. Factor's testimony in
18    the Wicker case.  And to the
19    extent the Judge does not grant
20    that, we're going to ask that the
21    deposition take place at our
22    office at our convenience.  Okay.
23         MR. SNELL:  We are fine with
24    producing Dr. Factor for the
25    Wicker case.  And Dr. Factor,
```

Page 83

```
 1    you're fine with giving a
 2    deposition in the Wicker case.
 3         THE WITNESS:  I have no
 4    problem giving a deposition, but
 5    it limits the number of days that
 6    you have available because I often
 7    have to be here at the hospital
 8    for portions of those days.
 9         MR. SNELL:  So we will
10    produce Dr. Factor here, and it
11    will be done -- I would like to
12    put something else on the record.
13    We offered to move the deposition
14    in toto until after Dr. Welsh was
15    deposed.  And I believe Dr. Factor
16    gave a date of December 19th in
17    response to Mr. Mazie's dates that
18    he provided for potential
19    availability in December.
20         So, that was an offer that
21    we made that was rejected and
22    we've never stated our position
23    was otherwise.  So, Dr. Factor --
24    I'm more than willing to produce
25    him.  He's more than willing to be
```

Page 84

```
 1    deposed on Wicker.  But at this
 2    point, he should be after Dr.
 3    Welsh and after the motion is
 4    decided on plaintiff's newly
 5    disclosed, last minute expert on
 6    the amyloidosis pertinent to the
 7    Wicker case, who has refused Dr.
 8    Factor's report and opines about
 9    it.
10         MR. MAZIE:  I want to place
11    on the record that the first time
12    amyloidosis was ever raised was by
13    Dr. Factor and we turned around
14    and produced an expert within a
15    week or less and that was, by the
16    way, close to a month ago.
17         MR. SNELL:  The fact that
18    Dr. Welsh did not recognize it, I
19    cannot speak to that.
20         MR. MAZIE:  Okay.  It's
21    there.
22              -  -  -
23         (Whereupon, a discussion was
24    held off the record.)
25              -  -  -
```

Page 85

```
 1         VIDEOGRAPHER:  The time is
 2    now 3:42.  We are back on the
 3    record.
 4    BY MR. MAZIE:
 5         Q.   Doctor, I'm showing you what
 6    has been, I think, considered to be slide
 7    number 14, which is part of Factor 1.
 8    Why don't you hold that up for the
 9    camera, so we're all on the same page?
10         MR. SNELL:  I think you've
11    identified it as the 13th slide.
12         MR. MAZIE:  It's 13th, but
13    if you include the first page,
14    it's the 14th.
15    BY MR. MAZIE:
16         Q.   Doctor, can you tell us what
17    is going on in that slide?
18         MR. SNELL:  Objection to
19    form.
20         MR. MAZIE:  What is the
21    objection?
22         MR. SNELL:  What is going
23    on?
24         MR. MAZIE:  Yes.
25    BY MR. MAZIE:
```

22 (Pages 82 to 85)

Stephen M. Factor, M.D.

Page 86

1    Q.   What do you see?
2    A.   There are number of fiber
3  mesh spaces with some residual mesh
4  material.  A lot of it has been disrupted
5  by technical artifact -- the sectioning
6  of the tissue.  There is a longitudinal
7  vessel running obliquely across the
8  humoids (ph).  There's several small
9  vessels off to one side, and there are
10 inflammatory cells, including what
11 appears to be lymphocytes and macrophages
12 along with a few multi-nucleated giant
13 cells.
14    Q.   Doctor, fair to say there's
15 active chronic inflammation on this
16 slide?
17      MR. SNELL:  Objection to
18    form.
19      THE WITNESS:  There's
20    inflammation.  Again, there's no
21    way to determine that this is
22    active.
23 BY MR. MAZIE:
24    Q.   And there's, at least, one
25 or two giant cells?

Page 87

1    A.   There are several giant
2  cells, both off -- slightly away from the
3  fibers as well as appearing to be near
4  the fibers.
5    Q.   There's chronic inflammation
6  adjacent to the mesh fibers where the
7  chronic fibers were?
8    A.   Chronic inflammation is
9  between the mesh fibers.  It's, actually,
10 closest to the blood vessel that runs
11 obliquely through the field.
12    Q.   Just so we're clear, there
13 is chronic inflammation between the mesh
14 fibers; correct?
15    A.   That's just what I said.
16    Q.   And there are, also, giant
17 cells there?
18    A.   There's, at least, one giant
19 cell in that particular area.
20    Q.   Let's turn to the 15th
21 slide.  Fair to say that all of the pink
22 stuff you see on this slide is fibrosis?
23    A.   Yes.
24    Q.   And within or surrounding
25 the mesh fibers that you see or where the

Page 88

1  mesh fibers were is fibrosis?
2    A.   It is around the fibers and
3  between the fibers, yes.
4    Q.   You can't give us an opinion
5  as to what the cause of that fibrosis is
6  in this tissue sample from Linda Gross,
7  correct?
8      MR. SNELL:  Objection to
9    form.
10    A.   It's part of the process of
11 the implantation of the mesh and the
12 surgical ailment.
13    Q.   Can you tell whether or not
14 the surgical fibers themselves caused the
15 fibrosis that you see in this slide,
16 number 15?
17      MR. SNELL:  Objection.
18    A.   There's no way to
19 specifically ascribe the fibrosis to the
20 mesh.  In fact, in the central portion of
21 the field, there are virtually no fibers
22 and there's still fibrosis and fibrosis
23 extends beyond the mesh fibers.  So
24 trying to directly relate the fibrosis to
25 the mesh is not possible.

Page 89

1    Q.   You can't tell us one way or
2  the other, correct?
3    A.   Correct.
4    Q.   Next, Number 16, do you see
5  chronic inflammation around the mesh in
6  the slide?
7    A.   Well, this is the same field
8  as the higher power that we saw in the
9  previous, the number 13 or 14, whatever
10 that number was.
11    Q.   Can you see extensive
12 fibrosis in this slide?
13    A.   There is fibrosis that
14 extends around the mesh fibers and
15 extends away from the mesh fibers.  The
16 area off to the upper right has no mesh
17 fibers and has the same fibrosis
18 elsewhere.
19    Q.   Let's go to the 26th slide,
20 which looks like this.
21    A.   That's the same field as we
22 have already discussed.
23    Q.   Okay.  That's it.
24      MR. SNELL:  Why don't we
25    call it, is it CR078 --

23 (Pages 86 to 89)

Stephen M. Factor, M.D.

Page 90

1           THE WITNESS:  They're all
2      the same, unfortunately.
3   BY MR. MAZIE:
4        Q.    This shows chronic
5   inflammation, this slide?
6        A.    This is the same field that
7   we saw.
8        Q.    Let's go two more, number
9   28.  We haven't talked about this one
10  yet, have we?
11       A.    Not to my knowledge, no.
12       Q.    This shows fibrosis
13  surrounding the mesh fibers?
14       A.    Yes, with virtually no
15  inflammation.
16       Q.    There's fibrosis surrounding
17  the mesh fibers, correct?
18       A.    I just said so, yes.
19       Q.    And the fibers themselves
20  here, the fibrosis is, actually, pulling
21  the fibers together; correct?
22       A.    Well you --
23           MR. SNELL:  Object to form.
24           THE WITNESS:  -- you can't
25      make that conclusion.  There's

Page 91

1      fibrosis and there are fibers, but
2      there's no way you can make a
3      conclusion, especially because
4      there's, also, artifacts in this
5      tissue that the whole -- that is
6      at 12 o'clock, there's a tear in
7      the tissue which disrupts the
8      fibrous tissue.
9   BY MR. MAZIE:
10       Q.    Doctor, do you know one way
11  or the other whether the fibrosis is
12  affecting the distance between the mesh
13  fibers?
14       A.    I don't know.
15       Q.    Okay.  Let's go to Number
16  33, which looks like that.  You might
17  want to count it from the last one, which
18  is 26?
19       A.    Is it this one?
20       Q.    There's a number of them in
21  a row that look alike.  So, let's see.
22  The first one you see of this, looks like
23  that.
24       A.    Yes.
25       Q.    So not that one, not the

Page 92

1   next one, the fourth one we're looking
2   at.  It's this one.
3        A.    No.  It's not that one.
4   It's this one.
5        Q.    Okay.  And it's Number 33.
6           MR. SNELL:  Let me get that.
7      What is in front of it?
8           THE WITNESS:  It's the
9      same.
10          MR. MAZIE:  Fourth one of
11     this series.
12          MR. SNELL:  You are saying
13     this is page what?
14          MR. MAZIE:  33.
15  BY MR. MAZIE:
16       Q.    Doctor, what do you see
17  there?
18       A.    I see a portion of fiber.  I
19  see a few inflammatory cells.  I see some
20  spaces off to the upper left.
21          MR. MAZIE:  I need to pick
22     this up.  I'm sorry.
23          VIDEOGRAPHER:  The time is
24     now 3:50.  We're going off the
25     record.

Page 93

1           - - -
2           (Whereupon, a brief recess
3      was taken.)
4           - - -
5           VIDEOGRAPHER:  The time is
6      now 3:51.  We are back on the
7      record.
8   BY MR. MAZIE:
9        Q.    Doctor, you see the
10  degradation of that mesh fiber there?
11       A.    I see changes associated
12  with the edge of the mesh.  I can't tell
13  whether that's pre-existent degradation
14  or changes associated with the sectioning
15  because there artifacts associated with
16  the sectioning.  The mesh fiber,
17  actually, can be seen in its entirety on
18  the two photographs next, which shows
19  polarization of that mesh fiber and shows
20  it intact.
21       Q.    Let's go to Number 35.  Do
22  you see the polarized portion -- it's all
23  polarized, but you see the colored
24  portion in the middle of the mesh fiber?
25       A.    Yes.

24 (Pages 90 to 93)

Stephen M. Factor, M.D.

Page 94

1    Q.   Fair to say there's
2   degradation of that mesh fiber?
3        A.   I don't know that's, in
4   fact, the case.  There's tearing of the
5   tissue.  There's a -- what looks like
6   connective tissue or inflammatory tissue
7   that's crossing that space.  And I cannot
8   tell whether that is degradation of the
9   surface or a portion of the surface or is
10  a disruption secondary to sections
11  artifact.
12       Q.   Just so we're clear --
13           VIDEOGRAPHER:  The time is
14  now 3:52o.  We're going off the
15  record.
16               - - -
17           (Whereupon, a brief recess
18  was held.)
19               - - -
20           (Whereupon, the following
21  discussion was held off the video
22  record:)
23               - - -
24           THE COURT:  Hello, Counsel.
25           MR. SLATER:  Hello, Judge.

Page 95

1            THE COURT:  Hi, how are you,
2   Adam?
3            MR. SLATER:  Fine, thanks.
4   How are you?
5            The COURT:  Good.  So we
6   have Adam Slater on the record and
7   Ms. Crawford.
8            MS. CRAWFORD:  Kelly
9   Crawford.
10           THE COURT:  Okay, good.  So
11  we have a certified court reporter
12  taking down the record?
13           MR. MAZIE:  Judge, it's Dave
14  Mazie and Burt Snell.
15  Unfortunately, we only have an
16  iPhone on speaker.  It is next to
17  the court reporter, but she's
18  going to have some difficulty.  So
19  everyone needs to keep their
20  voices up.  We're at the
21  deposition of Dr. Factor.
22           THE COURT:  So what is the
23  issue?
24           MR. SLATER:  The issue, your
25  Honor, is that my partner, Dave

Page 96

1   Mazie, was -- before starting the
2   deposition, he was informed by the
3   defense he was not to ask any
4   questions of Dr. Factor about the
5   Wicker case.  And we are prepared
6   to proceed and take the deposition
7   fully on both cases, and we think
8   we should be permitted to fully
9   take the deposition today.
10           THE COURT:  Is the
11  deposition as to Gross completed?
12           MR. MAZIE:  Judge --
13           MS. CRAWFORD:  Kelly
14  Crawford.  I don't know if you're
15  directing that at me.
16           THE COURT:  Go ahead, Kelly.
17           MS. CRAWFORD:  I'm not at
18  the deposition, Judge, but as I
19  understand it, Mr. Snell can
20  confirm, they're in the middle of
21  the Gross deposition regarding Dr.
22  Factor at this point and it's not
23  yet completed.
24           MR. MAZIE:  Judge, Dave
25  Mazie.  I will be done with the

Page 97

1   Gross deposition within the next
2   20 to 30 minutes and ready to
3   proceed and finish up with the
4   Wicker deposition, which quite
5   honestly, will not take more than
6   an hour.
7            MS. CRAWFORD:  If you're
8   prepared for defense's position,
9   Judge, just let us know.
10           THE COURT:  Go ahead, Kelly.
11           MS. CRAWFORD:  We took Dr.
12  Welsh's deposition.  Your Honor
13  will recall at the last case
14  management conference this issue
15  came up in connection with the
16  defendant's pending motion to stay
17  the Wicker specific case
18  discovery.  And we talked
19  specifically at the case
20  management conference about the
21  fact that the pathologist --
22  defendant's -- plaintiff's expert
23  pathologist is going to be deposed
24  on the 16th before the Court was
25  going to have an opportunity to

25 (Pages 94 to 97)

Stephen M. Factor, M.D.

| Page 98 | Page 100 |
|---|---|
| 1  address that motion.  And the | 1  case will be ready.  But we're in |
| 2  Court indicated that we should | 2  New York and ready to take the |
| 3  start with Gross and, you know, | 3  deposition of Dr. Factor, and it |
| 4  try the finish Gross and if there | 4  will be done. |
| 5  was time available to move on to | 5     MS. CRAWFORD:  Judge, I |
| 6  Wicker.  We did not start Wicker. | 6  don't want to get into an issue |
| 7  We completed Gross.  But it had | 7  about that.  I started the |
| 8  been our position that we are not | 8  deposition on time.  We took no |
| 9  prepared now prepared to produce | 9  break, except for ten minutes so |
| 10  Dr. Factor and have him deposed on | 10  the court reporter can quickly |
| 11  the Wicker until we complete the | 11  shovel in something to eat.  We |
| 12  Welsh corresponding deposition in | 12  were there until 7 o'clock.  I |
| 13  Wicker, and that hasn't happened. | 13  rushed to try and finish the Gross |
| 14     THE COURT:  Welsh would have | 14  aspect of the deposition.  We do |
| 15  to go before Wicker? | 15  have a pending motion on this |
| 16     MS. CRAWFORD:  Correct. | 16  issue.  We are all spinning our |
| 17     THE COURT:  Is he before? | 17  wheels trying to complete the |
| 18     MS. CRAWFORD:  That is our | 18  Gross specific discovery in order |
| 19  position, Judge.  We will recall | 19  to be ready for trial.  And Dr. |
| 20  we had made the motion to stay | 20  Factor is willing to come back at |
| 21  Wicker's specific case discovery. | 21  a later time after we had the |
| 22  We talked -- or I didn't talk at | 22  opportunity to take the Wicker |
| 23  that conference, Mary Ellen was my | 23  deposition from Dr. Welsh, |
| 24  mouthpiece because I couldn't | 24  assuming that your Honor denies |
| 25  talk -- about the fact that we had | 25  the motion that's pending, which |

| Page 99 | Page 101 |
|---|---|
| 1  that deposition scheduled for | 1  is still open. |
| 2  Friday and your Honor was going to | 2     THE COURT:  Okay. |
| 3  try to set up a call for -- | 3  I have had an opportunity to |
| 4     THE COURT:  Right. | 4  review the motion.  I read the |
| 5     MS. CRAWFORD:  -- the week, | 5  papers on both sides.  It was, I |
| 6  but everything got sort of busy. | 6  think, important that both cases |
| 7     MR. SLATER:  Your Honor, | 7  be prepared and that they be |
| 8  it's Adam Slater.  It doesn't | 8  jointly prepared, but there comes |
| 9  really make sense to us.  Defense | 9  a practical point where it simply |
| 10  counsel they took the deposition | 10  becomes too much of a burden on |
| 11  they wanted to take.  It was a | 11  both sides to get ready for a case |
| 12  very long deposition and they | 12  that's not going to be the one |
| 13  didn't finish, or they finished | 13  that's going at this point. |
| 14  Gross and didn't have time to do | 14     I understand Mr. Slater's |
| 15  the Wicker questioning.  I don't | 15  concern that Wicker would be the |
| 16  know how that impacts on the | 16  back up case.  And Ms. Crawford, |
| 17  deposition of Dr. Factor.  We just | 17  at the last conference, had |
| 18  want to get it done while we're | 18  indicated to me that there was |
| 19  here.  It's counsel's choice not | 19  slim and no chance of a settlement |
| 20  to finish.  You know, it turns out | 20  offer being made to resolve the |
| 21  it seems like it was a strategy or | 21  Gross case prior to trial.  And |
| 22  something.  We don't really | 22  that, unless the defendants -- the |
| 23  understand why, or maybe we do | 23  plaintiffs intended to dismiss it, |
| 24  understand why they don't want us | 24  it would be going, barring some |
| 25  to take Wicker discovery, so the | 25  unusual event such as a death or |

26 (Pages 98 to 101)

Stephen M. Factor, M.D.

Page 102

1    an injury or something.
2         Wicker just got treatment.
3    She needs to have the examination
4    and I think it's scheduled, right?
5         MR. SLATER:  That happened
6    yesterday, Judge.
7         THE COURT:  So his report
8    should still issue in a timely
9    fashion.  That doesn't take up
10   counsel's time, except maybe to
11   discuss it with him, but it
12   doesn't take up significant time.
13   So, his -- the defense report
14   should issue, the Wicker defense
15   report, but I'm not going to
16   require that the rest of the
17   Wicker discovery take place
18   between now and the trial.
19        If anything happens to the
20   Gross trial, we'll immediately do
21   the Wicker discovery within a week
22   or two and move on to the Wicker
23   trial, but I'm assuming that's not
24   going to be necessary.  There does
25   come a point where it's now the

Page 103

1    end of the week, it's going to be
2    December.  Trial is in January.
3    We have, you know, a holiday week
4    in there, at least, simply a
5    couple different holidays, and I'm
6    not going to require -- so I'm
7    going to grant the defense motion
8    to stop the Wicker discovery
9    pending the outcome of the Gross
10   case.
11        The only thing that I am
12   going to require is that the
13   defense independent medical exam,
14   which has been done, that that
15   report issue in a timely fashion
16   as scheduled previously.  And
17   then, basically, you will have
18   some clean-up depositions to do.
19   But we can move very quickly to
20   Wicker if we needed to.  All
21   right?
22        MR. MAZIE:  Thank you, your
23   Honor.
24        MR. SNELL:  Thanks, Judge.
25        MR. SLATER:  Thank you,

Page 104

1    Judge.
2         VIDEOGRAPHER:  The time is
3    now 4:03.  We are back on the
4    record.
5    BY MR. MAZIE:
6         Q.  Doctor, just so I'm clear,
7    you have no opinion one way or the other
8    as to whether this represents degradation
9    of the mesh?
10        MR. SNELL:  Objection to
11   form.
12   BY MR. MAZIE:
13        Q.  As a natural process of the
14   mesh.
15        MR. SNELL:  Objection to
16   form.
17        A.  It cannot be determined
18   whether the changes that are present just
19   at the edge or the end of that fiber
20   represent any degree of degradation or
21   changes associated with the technical
22   processing of the tissue.  The remaining
23   portion of that fiber as seen in the
24   polarized photograph appears to be smooth
25   and unremarkable.

Page 105

1         Q.  But you don't have an
2    opinion as to what the cause of what is
3    occurring at the end of that, whether
4    it's degradation, naturally occurring or
5    something else?
6         MR. SNELL:  Objection to
7    form.
8         A.  Correct.
9         Q.  Let's go to slide number 51,
10   which to make it easier for you is the
11   5th from the end.  Yes.
12        Fair to say that you see
13   mesh fibers here encased in or surrounded
14   by fibrosis?
15        A.  I see mesh fibers with
16   fibrosis and I see fibrosis without mesh,
17   with spaces that I -- that are more
18   likely than not fat or disruption of the
19   tissue in the center and off on the far
20   right, but certainly the ones in the
21   center are not mesh, but there is fibrous
22   around it.
23        Q.  You see multiple mesh fibers
24   or holes where fiber was, correct?
25        A.  And there are multiple mesh

27 (Pages 102 to 105)

Stephen M. Factor, M.D.

Page 106

1    fibers.  There are a few tears in the
2    tissue above the mesh on both sides and
3    there is fibrosis around those fibers.
4        Q.   As you sit here today, you
5    cannot tell us specifically what caused
6    the fibrosis surrounding these mesh
7    fibers?
8            MR. SNELL:  Objection to
9        form.
10       A.   I've answered the question
11   before that the fibrosis is part of the
12   surgical repair process.
13       Q.   But you can't tell us
14   whether it's the actual surgery as an
15   insult to the tissue versus a cause
16   instead by the mesh fibers themselves
17   reacting with the tissue?
18           MR. SNELL:  Object to form.
19       A.   The fact that the fibrosis
20   is present in this field as well as in
21   many other fields without any mesh fibers
22   immediately associated with it would
23   argue that this is a process of surgical
24   repair.
25       Q.   What about in the areas that

Page 107

1    immediately adjacent to the mesh fibers?
2        A.   It's the same fibrosis.  So
3    one can't -- as I pointed out earlier,
4    one can't easily discriminate between
5    fibrosis associated with repair versus
6    fibrosis associated with mesh.
7        Q.   Can or can't?
8        A.   Cannot.
9        Q.   Let's go to the second to
10   last slide, which is number 53.  I'm
11   sorry, third to the last slide.  The one
12   with the hemosiderin in the middle.
13       A.   Yes.
14       Q.   What do you see here,
15   Doctor?
16       A.   I see fibrosis, some, I
17   believe, small blood vessels cut
18   longitudinally and I see multiple
19   hemosiderin deposits and macrophage.
20       Q.   Does this slide demonstrate
21   chronic injury?
22       A.   It demonstrates injury with
23   chronicity because the collagen is mature
24   and the macrophages are in response to
25   the hemosiderin, so this is a chronic

Page 108

1    process.
2        Q.   Do you see any inflammation
3    on that slide?
4        A.   I described the
5    inflammation.  There's macrophages and
6    there may be a few lymphocytes scattered
7    around, but the predominant cells are
8    macrophages.
9        Q.   Put this grouping aside.
10   And let's go to Welsh 14, and ask you to
11   go -- these are numbered, so that will
12   make it easier.
13           MR. SNELL:  Do you by chance
14       have a copy?
15           MR. MAZIE:  No.
16           MR. SNELL:  I'm just going
17       to look over.
18   BY MR. MAZIE:
19       Q.   Doctor, go to 62.  What do
20   you see there?
21           MR. SNELL:  Objection to
22       form.
23       A.   I see a central area which
24   appears to be -- it's not forming a true
25   granuloma, but it appears to be a

Page 109

1    granulomatis-type process with even at
2    the low power, I think spindle cells,
3    fiberglass and what happens to be
4    hemosiderin and inflammatory cells.
5    There's a space running vertically or
6    relatively vertically which appears to be
7    a blood vessel, but I'm not entirely
8    sure.  Portions of it appear to be blood
9    vessel.
10       Q.   Do you see in -- is there,
11   also, fibrosis?
12       A.   There's fibrous tissue
13   around the central area of inflammation
14   and hemosiderin.
15       Q.   Let's jump to number 70.
16   It's fair to say this slide shows chronic
17   inflammation?
18           MR. SNELL:  Objection to
19       form.
20       A.   It's a terrible picture and
21   it's difficult to make out, but there are
22   what appears to be giant cells, some of
23   them are multinucleated and lymphocytes
24   with, at least, some of the giant cells
25   appearing, even though it's difficult to

28 (Pages 106 to 109)

Stephen M. Factor, M.D.

Page 110

1  make out on this exposure.  It appears
2  that they have hemosiderin within them or
3  near them.
4       Q.   Do you see any mesh?
5       A.   No.
6       Q.   The amount of inflammation
7  you see here, is that something you would
8  expect from a normal surgical process
9  without a foreign body?
10      MR. SNELL:  Objection to
11      form.
12      A.   If this is an area that has
13 had extensive bleeding and disruption,
14 this is a normal response.  There,
15 obviously, has been bleeding because
16 there's hemosiderin throughout the
17 tissue.  It's hard to make out the full
18 extent of this process from this view and
19 from the exposure.
20      Q.   Let's go to the next one,
21 number 71.  Can you interpret for me the
22 cluster of dark cells in the pink area?
23      A.   There are --
24      MR. SNELL:  I object to the
25      form.  Are you -- any particular

Page 111

1      place you're referencing?
2      MR. MAZIE:  There are dark
3      cells.  I think he understands
4      what I'm asking.  There's an
5      accumulation of the dark cells in
6      the middle to left of the center.
7      THE WITNESS:  There are
8      lymphocytes or they appear to be
9      lymphocytes.  There may be
10     monocytes in there.  It's hard to
11     see whether or not there are
12     macrophages, I think there are a
13     few.  There are -- there's, at
14     least, one vessel, possibly
15     represents the same vessel, cut in
16     several planes, but there are
17     vessels adjacent to this cluster
18     of inflammatory cells.
19 BY MR. MAZIE:
20      Q.   Let's go to 73, Doctor.
21      A.   73.
22      Q.   Yes.  Doctor, do you see
23 chronic inflammation on the this slides?
24      A.   It's the same picture that
25 we had before.  It's the same field.

Page 112

1       Q.   It shows --
2       A.   Lower magnification.
3       Q.   Number 73 shows chronic
4  inflammation?
5       A.   Yes.
6       Q.   It shows scarring?
7       A.   It shows fibrous tissue,
8  yes.
9       Q.   Does it show nerve?
10      A.   It shows a longitudinal
11 segment of myelinated nerve.
12      Q.   Is there mesh fiber shown?
13      A.   There are spaces, but I
14 don't believe those are mesh spaces.
15      Q.   Why not?
16      A.   Because I believe they're
17 too small.  I believe that's fat.
18      Q.   When you say they're too
19 small, again, you don't whether or not
20 the mesh fibers themselves squeeze or
21 contract?
22      MR. SNELL:  Objection.
23      A.   They don't change their
24 diameter overall and all the spaces that
25 we have seen which have mesh are much

Page 113

1  large than those three spaces that we see
2  adjacent to the nerve.
3       Q.   Why don't you think they
4  change their overall diameter?
5       A.   Because I see no evidence of
6  it.  The spaces are relatively the same
7  size or the fibers that one can see with
8  light microscopy, H&E, light microscopy
9  and with polarization show fibers that
10 are of a similar size.
11      Q.   You're basing your opinion
12 on the 18 or so slides that you've looked
13 at?
14      MR. SNELL:  Object to the
15      form.
16      A.   Yes.
17      Q.   Okay.  You don't know
18 whether and to what extent the mesh
19 fibers contract because you haven't seen
20 most of the mesh fibers within Linda
21 Gross' body or pulled out of her body,
22 correct?
23      MR. SNELL:  Objection to
24      form.
25      A.   It's irrelevant what's been

29 (Pages 110 to 113)

Stephen M. Factor, M.D.

Page 114

1   pulled out of her body.  It's is
2   irrelevant what I haven't seen.  What I
3   have seen is clear that the mesh fibers
4   show no evidence of retraction or
5   contraction.  The spaces are enlarged.
6   Some are larger than one would
7   anticipate, but that is a technical
8   artifact of dragging with spaces and
9   disrupting the fibers.  These spaces that
10  are off to the right, at least from this
11  view, and, obviously, this is showing the
12  whole field, I do not believe are mesh,
13  nor is there any mesh evidence with any
14  mesh fiber that I can see at this
15  magnification within those spaces.
16      Q.   Doctor, you understand that
17  there is clear testimony from both sides
18  that the mesh contracts within the female
19  body?  Do you know that?
20      A.   Well, there's contraction of
21  scar tissue or fibrous tissue which is
22  recognized with any scar.  All scars will
23  retract to some degree.  Fibrous tissue,
24  and obviously when one cuts the skin,
25  gets a scar.  One knows that scars

Page 115

1   retract or fibrous tissue retract.  So
2   that's not unusual.  It's not unique.  It
3   has nothing to do specifically with the
4   mesh.  Its the natural property of the
5   fibrous tissue.
6       Q.   Listen my question.
7       A.   I did.
8       Q.   You understand that it's
9   undisputed that the mesh contracts.
10      MR. SNELL: I object to the
11  form.  That's actually a
12  misrepresentation.
13      A.   I don't know that that's the
14  case.  It is -- since the mesh is
15  enveloped or surrounded by fibrous tissue
16  that extends through the mesh pores, the
17  process of retraction or contraction is
18  potentially only due to the fibrous
19  tissue healing.
20      Q.   Either way, whether it's the
21  fibrous tissue causing the contraction or
22  the mesh itself causing the contraction,
23  you understand that the mesh once
24  implanted contracts, correct?
25      MR. SNELL:  Objection to

Page 116

1   form.
2       A.   Again, I don't know that --
3   that indicates or that implies that the
4   mesh has an active process of contraction
5   independent of what is going on in its
6   implantation site and that's not the
7   case.  The mesh is implanted in the
8   tissue.  It elicits an inflammatory  and
9   fibrous reaction and that fibrous
10  reaction retraction contracts.  I have no
11  evidence that the mesh itself is an
12  active participant in that process.
13      Q.   I understand that.  I think
14  we're saying the same thing.  So once the
15  mesh is implanted, it interacts with the
16  female tissue; correct?
17      A.   Well, it interacts with the
18  fibrous tissue that's part of the healing
19  process.
20      Q.   And then that fibrous tissue
21  causes the mesh itself to contract in
22  size; correct?
23      MR. SNELL:  Objection.
24      A.   Potentially, yes.
25      Q.   Page 75, last one on this.

Page 117

1   Doctor, you see a nerve there?
2       A.   There's a nerve cut across
3   by the -- whatever that disruption is in
4   the picture.  But, yes, there's a nerve.
5       Q.   And there's chronic
6   inflammation near the nerve?
7       A.   There's chronic inflammation
8   near the nerve, but it's associated with
9   fat.
10      Q.   Do you see any fibers, mesh
11  fibers?
12      A.   I do not know what is off to
13  the far left.  I don't believe it is, but
14  it possibly could be, but all the
15  remaining spaces are fat tissue, both
16  above the nerve and below the nerve.
17      Q.   In order to have pain, is it
18  your position you have to have neuritis?
19      A.   You either have to have
20  neuritis or evidence of disruption,
21  damage to the nerve fiber.  Whether the
22  surrounding of nerves by fibrous tissue
23  is sufficient to produce pain is
24  unknowable.  There is potential for
25  secretion of irritant materials that

30 (Pages 114 to 117)

Stephen M. Factor, M.D.

Page 118

1   could lead to pain, but there's
2   absolutely no way biologically to
3   determine any one nerve or any group of
4   nerves is the source of a particular pain
5   when you are dealing with nerves of the
6   size. The absence of inflammation, the
7   absence of neuroma formation with the
8   exception of that one that I mentioned
9   earlier, is a normal response of nerves
10  in tissue that is undergoing fibrosis and
11  some degree of inflammation.
12      Q.   Just so we're clear, you
13  can't tell one way or the other whether
14  fibrosis is causing a nerve to cause
15  pain?
16      A.   Nobody can.
17      Q.   Okay. All right. Put that
18  one away. Let's see what else we have
19  here.
20          Number 12. Welsh 12, I will
21  ask you to look at a couple of slides
22  here. Number 36, which is the second
23  slide, what do you see there?
24      A.   I see.
25          MR. SNELL: Objection to

Page 119

1       form.
2       A.   I see a nerve that's been, I
3   assume, inked or surrounded by ink that
4   looks to be irregular and surrounded by
5   fibrous tissue.
6       Q.   And go to number 47, please.
7       A.   47, you said?
8       Q.   47. Do you see a nerve
9   there?
10      A.   There are nerves or there
11  is, at least, one nerve off to the right.
12  I don't know what the tissue is in the
13  center of the field.
14      Q.   Okay. Can you tell whether
15  the nerve itself is degenerated?
16      A.   The nerve that I see off to
17  the right is not. I don't know what the
18  remaining tissue is.
19      Q.   Is the nerve itself imbedded
20  in the fibrosis, the one you see?
21      A.   Well, there's a space around
22  the nerve, but that's probably
23  retraction. So, yes, the nerve is
24  surrounded by fibrous tissue.
25      Q.   Put that one away. Let's

Page 120

1   look at number 8, and look at number 3 on
2   this. Do you see a nerve there?
3       A.   I do.
4       Q.   Is it normal or degenerated?
5       A.   It looks partially torn.
6   The portion of it that appears to be
7   unaffected off to the center towards the
8   left appears normal. It looks like there
9   is some disruption of the nerve possibly
10  by a sectioning.
11      Q.   You can't tell us within a
12  reasonable degree of medical probability
13  as to what disrupted this nerve?
14          MR. SNELL: Objection to
15      form.
16      A.   Well, since only a portion
17  of it is affected and there's no
18  inflammation associated with it and no
19  difference in the fibrosis that's around
20  it, I believe it's due to the sectioning.
21      Q.   Doctor, what is around the
22  fibrous?
23      A.   Fibrous tissue and a few
24  inflammatory cells.
25      Q.   Is there some collagen as

Page 121

1   well?
2       A.   That's fibrous tissue.
3   Collagen is fibrous tissue.
4       Q.   Let's go to number 4. Does
5   this show a damaged or dying nerve
6   surrounded by collagen?
7           MR. SNELL: Objection to
8       form.
9       A.   It shows a nerve. It's not
10  damaged or dying.
11      Q.   What do you see?
12      A.   I see a nerve in three
13  different planes, or two different
14  planes.
15      Q.   Can you tell whether or not
16  the nerve itself is degenerated?
17      A.   It does not look
18  degenerated.
19      Q.   Turn to number 5. Do you
20  see a nerve there?
21      A.   It's the same nerve, I
22  believe.
23      Q.   And can you tell whether
24  that nerve is degenerated?
25      A.   It wasn't degenerated on the

31 (Pages 118 to 121)

Stephen M. Factor, M.D.

Page 122

1  high magnification, so it's not
2  degenerated on this, either.  It, also,
3  shows that there's multiple technical
4  artifacts in the tissue immediately
5  around the nerve.
6      Q.   Number 13, do you see the
7  nerve?
8      A.   There are three nerves.
9      Q.   Is there fibrous tissue
10  surrounding the nerves?
11      A.   Above the nerve, there is
12  fibrous tissue and tearing.  And below
13  the nerve, there is fat necrosis.
14      Q.   Which nerve are you
15  referring to, the one on the right?
16      A.   I'm referring to all three
17  of the nerves that run, more or less,
18  through the center of the field.
19      Q.   Turn to number 14.  Can you
20  identify for us the circled vessels?
21      A.   Can I identify them?
22      Q.   Yes.
23      A.   One of them is a vessel.
24  The other -- or two of them are vessels.
25  The other are damaged by sectioning.

Page 123

1  They're tangential and the tissue is not
2  easily seen and, actually, even the other
3  two have the same problem.  There's a
4  tangential sectioning, the two vessels
5  that I believe I can recognize in the
6  right center and upper portion.
7      Q.   So the first on the upper
8  right and the one right below it?
9      A.   Not the upper right.  That
10  one is not -- cannot be evaluated because
11  of its tangential sectioning and
12  destruction of the tissue.
13      Q.   Can you point?
14      A.   This one.
15      Q.   That one cannot be?
16      A.   No.
17      Q.   So which one --
18      A.   So this one is a vessel and
19  this one is a vessel, both of them
20  because of the smudginess of the inner
21  lining, they're not cut appropriately
22  across, so they're difficult to evaluate.
23  The other two above and below, and I'm
24  not sure what this is, and this, cannot
25  be evaluated at all.

Page 124

1          MR. SNELL:  So the record --
2          MR. MAZIE:  I'm going to do
3      it right now.
4  BY MR. MAZIE:
5      Q.   The ones you say are
6  vessels, there are three circles to the
7  right and it's the middle one?
8      A.   The middle one is a vessel,
9  but even that is not appropriately cut
10  across in such a way that it can be
11  evaluated.  The one to the --
12      Q.   Left?
13      A.   -- to the upper left is
14  longitudinal or oblique and it, too,
15  shows smudginess of the lining, the
16  endothelium and cannot be adequately
17  assessed.
18      Q.   And that drawing, just so
19  we're clear, is the upper left shaped
20  like a pickle?
21      A.   Or other structures, yes.
22      Q.   The surrounding tissue,
23  especially in particular in the bottom
24  left quadrant, do we see collagen and
25  fibroblast?

Page 125

1      A.   I believe there is collagen
2  and there appears to be fibroblast.
3      Q.   Let's go to number 15.  Do
4  you see a damaged vessel there?
5      A.   It's very difficult to
6  make -- I mean, I believe there's a
7  vessel in the center that's been circled.
8  Again, it's longitudinal.  It's not a
9  nice cross-section.  So it's difficult to
10  make sense out of it.  The lower portion
11  of it is out of focus.  So it's hard to
12  know what to make of this.
13      Q.   Okay.  Let me show you the
14  last set which is 10.  Let's go to number
15  4.  Is there any info -- strike that.
16          Is there any information
17  here as to the pore size in vivo?
18          MR. SNELL:  Objection to
19      form.
20      A.   No.  One can't measure the
21  pore size in fields like this.  I mean,
22  one can approximate it because the
23  individual fibers have a certain
24  diameter, but it can't be a precise
25  measurement.

32 (Pages 122 to 125)

Stephen M. Factor, M.D.

Page 126

1    Q.   Can you approximate the size
2  of those pores?
3    A.   Not without a micrometer or
4  ruler, no.
5    Q.   We're here at your
6  deposition.  You are not, as to this
7  point, rendering any opinion on the size
8  of any of the pores?
9    MR. SNELL:  Objection.
10   A.   Correct.
11   Q.   Next one, number 5, is it
12 fair to say that on this polarized slide,
13 the white is the mesh that's remaining
14 within this sample?
15   A.   The few fibers, yes, or
16 fragments of mesh that are in the sample.
17   Q.   Number 6, is that all mesh?
18   MR. SNELL:  Objection to
19 form.
20   MR. MAZIE:  Strike that.
21 BY MR. MAZIE:
22   Q.   Do you see mesh on this?
23   A.   Well, I don't
24 specifically -- I see some spaces that I
25 believe are mesh, some of the spaces

Page 127

1  appear to be tearing of the tissue.  I'm
2  not quite sure what several of the other
3  spaces are.  They may be vessels in here.
4  It's difficult to tell.
5    Q.   Let's go to the next slide,
6  which is polarization.  The white stuff,
7  is that all mesh?
8    A.   Yes.
9    Q.   Let's go to number 10.  This
10 slides shows hemosiderin?
11   A.   This slide shows hemosiderin
12 and some lymphocytes and a few
13 macrophage.
14   Q.   What is shown in the lower
15 quadrant there, lower right quadrant?
16   A.   Fibrous tissue.
17   Q.   Is there mesh within it?
18   A.   There's one space that
19 appears to be a complete mesh fibrous
20 space and another that is an incomplete
21 space.
22   Q.   Let's go to number 12.  Does
23 this slide show chronic inflammation?
24   A.   It shows a few areas of
25 chronic inflammation in the center, a

Page 128

1  little bit off to the left and a little
2  bit off to the right.
3    Q.   Is the chronic inflammation
4  adjacent to mesh fibers?
5    A.   It's in the general vicinity
6  of mesh fibers, yes, but not directly
7  associated with it.
8    Q.   Can you tell one way or the
9  other whether the mesh fibers incited any
10 of the chronic inflammation shown on this
11 slide?
12   A.   It's part of the process of
13 fibrosis and mesh placement.  I'm sure
14 the mesh has some relationship to it, but
15 it's not an obvious one.
16   Q.   Do you see any lymphocytes?
17   A.   I believe this micro -- this
18 power, which is a low power, the small
19 cells are more likely than not
20 lymphocytes.
21   Q.   Okay.  You can put that
22 away.  Let me see if I have anything else
23 for you.
24        Doctor, do you have an
25 opinion as to whether or not the mesh

Page 129

1  itself migrates or moves?
2    A.   I don't have an opinion.
3    MR. MAZIE:  That's all I
4  have.  Thank you.
5    THE WITNESS:  Okay.  Thank
6  you.
7    MR. SNELL:  I have a couple
8  quick ones.
9         - - -
10        EXAMINATION
11         - - -
12 BY MR. SNELL:
13   Q.   Did you see any evidence of
14 of degradation?
15   A.   No.
16   Q.   Plaintiff's counsel asked
17 you some questions about the inflammatory
18 state and chronic inflammation.  Do you,
19 in general, recall those questions?
20   A.   In general, yes.
21   Q.   What do you consider to be
22 chronic inflammation?
23   A.   Again, it comes back to what
24 I indicated before.  Chronic inflammation
25 refers to a subset of inflammatory cells

33 (Pages 126 to 129)

Stephen M. Factor, M.D.

Page 130

1  that are predominantly lymphocytes,
2  monocytes, macrophages and giant cells,
3  but there's, also, a temporal component
4  and that is, as tissue injury heals,
5  there are inflammatory cells that are
6  associated with the healing process and
7  they, then, persist in the tissue to
8  varying degrees.
9      Q.   And I believe you identified
10  that Mrs. Gross had chronic inflammation
11  associated with factors other than mesh,
12  is that correct or not?
13      A.   There were chronic
14  inflammatory cells in a number of
15  different areas of her tissues associated
16  with hemosiderin deposition and -- and/or
17  fat necrosis.
18      Q.   Has any of the pictures that
19  plaintiffs have showed you today changed
20  any of the opinions that you submitted in
21  your written report in the Gross case?
22      A.   No.
23      Q.   Do you hold all those
24  opinions, including the opinions today,
25  to a reasonable degree of medical

Page 131

1  certainty?
2      A.   I do.
3      Q.   If I asked questions about
4  the degree of inflammation and Mrs.
5  Gross' inflammatory state, beyond the --
6  beyond what was specifically seen on
7  certain slides, will you, indeed, render
8  such opinions on the nature of her
9  inflammatory state?
10      MR. MAZIE:  Objection as to
11  form.
12      A.   Yes.
13      Q.   In your report at page 5,
14  you state that the inflammatory
15  changes -- on the third paragraph below,
16  "the inflammatory changes were not
17  significant and they were highly
18  variable."
19      A.   Yes.
20      Q.   That's an opinion you hold
21  today?
22      A.   Yes.
23      Q.   You, also, write, "Her
24  tissues had evidence of fat necrosis and
25  hemorrhage that independently led to

Page 132

1  further scarring often in areas distant
2  from mesh fibers.  The entrapment of some
3  nerves and the sclerosis of blood vessels
4  was a result of surgical manipulation of
5  the tissues and cannot be linked to
6  speculative and biologically unsupported
7  effects of the mesh."
8      That's what you wrote?
9      A.   Yes, I did.
10      Q.   Is that your opinion today
11  as well?
12      A.   It is.
13      MR. SNELL:  That's all I
14  have.  Thank you.
15      MR. MAZIE:  Okay.
16      VIDEOGRAPHER:  The time is
17  now 4:38.  This is the end of disk
18  two.  This completes today's
19  deposition.
20          - - -
21      (Whereupon, the videotaped
22  deposition concluded at 4:38
23  p.m.)
24          - - -
25

Page 133

C E R T I F I C A T E

    I HEREBY CERTIFY that the
witness was duly sworn by me and that the
deposition is a true record of the
testimony given by the witness.

    _ _ _ _ _ _ _ _ _ _ _ _ _
    Margaret Peoples, RPR
    Dated: November 27, 2012

    (The foregoing certification
of this transcript does not apply to any
reproduction of the same by any means,
unless under the direct control and/or
supervision of the certifying reporter.)

34 (Pages 130 to 133)

Stephen M. Factor, M.D.

Page 134

```
 1              INSTRUCTIONS TO WITNESS
 2          Please read your deposition over
 3  carefully and make any necessary changes.
 4  You should assign a reason in the
 5  appropriate column on the errata sheet
 6  for any change made.
 7          After making any change which has
 8  been noted on the following errata sheet,
 9  along with the reason for any change,
10  sign your name to the errata sheet and
11  date it.
12          You are signing it subject to the
13  changes you have made in the errata
14  sheet, which will be attached to the
15  deposition.  You must sign in the space
16  provided.
17          Return the original errata sheet
18  to the deposing attorney within thirty
19  (30) days of receipt of the transcript by
20  you.
21
22
23
24
25
```

Page 136

```
 1          ACKNOWLEDGMENT OF DEPONENT
 2      I,_____, do
 3  hereby certify that I have read the
 4  foregoing pages, 1 through 135 and that
 5  the same is a correct transcription of
 6  the answers given by me to the questions
 7  therein propounded, except for the
 8  corrections or changes in form or
 9  substance, if any, noted in the attached
10  Errata Sheet.
11  _____
12  STEPHEN M. FACTOR, M.D.        DATE
13
14  Subscribed and sworn to before me this
15  _____day of_____,
16  20_____.
17  My commission expires:_____
18
19  _____
20
21  Notary Public
22
23
24
25
```

Page 135

```
 1           - - - - - - - -
 2           E R R A T A
 3           - - - - - - - -
 4  PAGE   LINE   CHANGE/REASON
 5  _____  _____  _____
 6  _____  _____  _____
 7  _____  _____  _____
 8  _____  _____  _____
 9  _____  _____  _____
10  _____  _____  _____
11  _____  _____  _____
12  _____  _____  _____
13  _____  _____  _____
14  _____  _____  _____
15  _____  _____  _____
16  _____  _____  _____
17  _____  _____  _____
18  _____  _____  _____
19  _____  _____  _____
20  _____  _____  _____
21  _____  _____  _____
22  _____  _____  _____
23  _____  _____  _____
24  _____  _____  _____
25  _____  _____  _____
```

35 (Pages 134 to 136)