# EXHIBIT D

Rebecca M. Ryder, M.D.

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

```
------------------------------  )
                                )
IN RE:  ETHICON, INC., PELVIC   )  Master File No.:
REPAIR SYSTEM PRODUCTS          )  2:12-MD-02327
LIABILITY LITIGATION            )
                                )  MDL-2327
------------------------------  )
                                )  JOSEPH R. GOODWIN
THIS DOCUMENT RELATES TO THE    )  U.S. DISTRICT JUDGE
FOLLOWING CASES IN WAVE 1 OF    )
MDL 200:                        )
                                )
                                )
DEE McBRAYER,                   )
(Case No. 2:12-cv-00779)        )
and                             )
JOYCE JUSTUS, ET AL.,           )
(Case No. 2:12-cv-00956)        )
          Plaintiffs,           )
vs.                             )
ETHICON, INC., ET AL.,          )
                                )
          Defendants.           )
                                )
------------------------------  )
```

DEPOSITION UPON ORAL EXAMINATION

OF REBECCA M. RYDER, M.D.

TAKEN ON BEHALF OF THE PLAINTIFFS

Chesapeake, Virginia

Monday, March 21, 2016

9:00 a.m.



Reported by:  Bobbi J. Case, RPR, CCR

Rebecca M. Ryder, M.D.

<table>
<tr><td colspan="2">

**Page 2**

1  Appearances:
2      ROBINSON, CALCAGNIE, & ROBINSON,
       SHAPIRO, DAVIS, INC.
3      19 Corporate Plaza Drive
       Newport Beach, CA  92660
4      (949) 720-1288
       By:  AMANDA ROBINSON, ESQUIRE
5           arobinson@rcrsd.com
            Counsel for Plaintiff Dee McBrayer
6
       WILSON LAW, P.A.
7      1111 Haynes Street, Suite 103
       Raleigh, NC  27604
8      (877) 571-4047
       By:  KIMBERLY WILSON WHITE, ESQUIRE
9           kim@wilsonlawpa.com
            Counsel for Plaintiff Joyce Justus
10
       RIKER DANZIG SCHERER HYLAND PERRETTI, LLP
11     Headquarters Plaza
       One Speedwell Avenue
12     Morristown, NJ  07962
       (973) 538-0800
13     By:  MAHA M. KABBASH, ESQUIRE
            mkabbash@riker.com
14          Counsel for the Defendants
15
16
17
18
19
20
21
22
23
24

</td></tr>
</table>

**Page 4**

1
2                   E X H I B I T S
3  NO.      DESCRIPTION       PAGE
4   1   Notice to take Expert Deposition of      7
        Rebecca M. Ryder, M.D.
5   2   Invoices            11
6   3   Curriculum Vitae of Rebecca Margaret     20
        Ryder, M.D.
7
8   4   Expert Report of Rebecca M. Ryder, M.D.  32
9   5   Supplemental Report of Rebecca M.        42
        Ryder, M.D., Joyce Justus vs. Ethicon,
10      March 16, 2016
11  6   Exhibit B to Prolift General Report of   43
        Rebecca Ryder, M.D., March 18, 2016, List
12      of Materials Reviewed
13  7   E-mail string from Lisa Kwiatek to various  64
        people, October 10, 2000, Re: TVT Updates,
14      ETH.MESH.10217937, 938, 939, 940
15  8   Gynecare Division, Business Review,      68
        ETH.MESH.1831479-1484
16  9   E-mail from Jim Gatewood to Pete Travis,  74
        Regarding Chesapeake Trip, May 14, 2004,
17      ETH.MESH.11831154-55
18 10   E-mail from Cindy Pypcznski to Bruno de  81
        Lacroix, Re: Recap on our meeting 9/22,
19      September 23, 2004, ETH.MESH.11831646 & 647
20 11   E-mail from Jim Gatewood to Timothy      83
        Carroll, Re: Consulting Agreement,
21      October 20, 2004, ETH.MESH.11831194
22 12   E-mail from Paul Parisi to and Jim       88
        Gatewood, Re: Gynecare Prof Ed - Customer
23      Confirmed for Practical Training, March 10,
        2005, ETH.MESH.11831246
24

**Page 3**

1            I N D E X
2
   DEPONENT        EXAMINATION      PAGE
3
   Rebecca M. Ryder, M.D.  By Ms. White      6
4
            By Ms. Kabbash    149
5
            By Ms. White      160
6
            By Ms. Kabbash    161
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**Page 5**

1  13   E-mail from Jim Gatewood to Barbara      93
        Summers, Re: New Prolift account request,
2       May 19, 2005, ETH.MESH.11831256-257
3  14   E-mail from Jim Gatewood to Rebecca Ryder,  119
        Re: Thursday's Advanced Users Forum, August
4       26, 2009, ETH.MESH.03988276 & 278
5  15   E-mail from Jim Gatewood to Dr. Lucente and  121
        Lydia Lucente, Re: FW, August 27, 2009,
6       ETH.MESH.03988270-275
7  16   E-mail from Rebecca Ryder to Jim Gatewood,  128
        Re: Hi, November 2, 2009, ETH.MESH.03988064
8
9  17   E-mail from Jim Gatewood to Greg Ullman,  131
        Re: Abbrevo Targets, ETH.MESH.03987340
10 18   E-mail from Jim Gatewood to Greg Ullmann,  134
        Re: Traveling Proctor Request,
11      ETH.MESH.03989861
12 19   Issue Report, Gynemesh PS, Open Date     144
        between 23-Mar-2004 and 14-Feb-2012,
13      ETH.MESH.02641631
14
15
16
17
18
19
20
21
22
23
24

2  (Pages 2 to 5)

Rebecca M. Ryder, M.D.

## Page 6

1         Deposition upon oral examination of REBECCA
2 RYDER, M.D., taken on behalf of the Plaintiffs, before
3 Bobbi J. Case, a Registered Professional Reporter and
4 Notary Public for the Commonwealth of Virginia at
5 Large, pursuant to notice, commencing at 9:00 a.m. on
6 Monday, March 21, 2016, at the Marriott Chesapeake
7 Hotel, 725 Woodlake Drive, Chesapeake, Virginia; and
8 this in accordance with the Rules of the Supreme Court
9 of Virginia, 1950, as amended.
10
11      REBECCA M. RYDER, M.D., was sworn and deposed
12 on behalf of the Plaintiffs as follows:
13            DIRECT EXAMINATION
14 BY MS. WHITE:
15   Q.  Dr. Ryder, my name is Kimberly Wilson White,
16 and I'm here to take your deposition this morning as a
17 general expert designated by Ethicon in the Joyce
18 Justus case and the McBrayer case.
19     Do you understand that?
20   A.  Yes.
21   Q.  Okay.  And did you receive a Notice of
22 Deposition in this case?
23   A.  Yes.
24   Q.  And did you bring that with you today?

## Page 7

1   A.  I personally did not.
2   Q.  Okay.  Have you reviewed that document
3 before?
4   A.  Yes.
5   MS. WILSON:  Let's go ahead and mark that
6 as 1.
7     (Notice to take Expert Deposition of Rebecca
8 Ryder, M.D., marked for identification as Ryder
9 Deposition Exhibit No. 1.)
10 BY MS. WHITE:
11   Q.  So I'm handing you what we've marked as
12 Plaintiffs' Exhibit 1.  Have you seen that document
13 prior to today?
14   A.  Yes.
15   Q.  And did you bring any documents responsive to
16 this deposition?
17   A.  I have some documents in my possession, yes.
18   Q.  Okay.  So let's go over what you brought with
19 you today in response to this notice of deposition.
20   A.  I have invoices for what I've billed, I have
21 some notes on medical literature, and I have copies of
22 my general report --
23   Q.  Okay.
24   A.  -- as well as the individual reports on

## Page 8

1 Justus and McBrayer.
2   MS. KABBASH:  And just to clarify, Kim.  She
3 does have some invoices here that we're happy to have
4 marked and produce.  The rest of what she has with her
5 is for reference -- for her reference during the
6 deposition, should she choose to need it.
7   With regard to other documentation, we're
8 referring to her individual reliance lists for the
9 material that she's reviewed.
10   MS. WILSON:  Okay.  We're going to go over
11 that.
12   MS. KABBASH:  Okay.
13 BY MS. WHITE:
14   Q.  So you have -- again, what did you bring with
15 you today responsive to Plaintiffs' Exhibit 1?
16   A.  I brought with me the invoices, the -- on
17 Exhibit 1.
18   Do you mean Schedule A?
19   Q.  Yes.
20   A.  A lot of this has been produced already, is
21 my understanding.  So I have the reports, the invoices,
22 notes of the medical literature, and that's it.
23   Q.  Did you bring any consulting agreements with
24 you today?

## Page 9

1   A.  I did not bring it with me.
2   Q.  Okay.  Do you currently have a consulting
3 agreement with Ethicon?
4   A.  Yes.
5   Q.  And you've had many consulting agreements in
6 the past with Ethicon pertaining to various products
7 over the years.  Is that correct?
8   MS. KABBASH:  Objection to form.
9   THE DEPONENT:  No.
10 BY MS. WHITE:
11   Q.  That's not correct?
12   So tell me about the consulting agreement you
13 currently have with Ethicon.
14   MS. KABBASH:  Objection to form.
15   You can answer.
16   THE DEPONENT:  I was retained by Ethicon in
17 2012 as an expert witness for TVT and pelvic mesh
18 litigation.
19 BY MS. WHITE:
20   Q.  So TVT and pelvic mesh litigation?
21   A.  Yes.
22   Q.  And it is your testimony that's the only
23 consulting agreement, in your 27 years practicing
24 medicine, you've ever entered into with Ethicon?

Rebecca M. Ryder, M.D.

Page 10

1  A. No, I did not say that, or if I did, that was
2  not correct. But I believe in the past I had a
3  consulting agreement with Ethicon to help train
4  physicians in either TVT or TOT sling.
5  Q. In either TVT or --
6  A. Transobturator sling.
7  Q. So how much have you been paid to date by
8  Ethicon for any work you've ever done as an expert or a
9  training physician, a preceptor?
10  A. Approximately, $34,000.
11  Q. And in -- you're saying in your extensive
12  years of working with Ethicon, that's all you've been
13  paid to date, total?
14  A. Correct.
15  Q. And that would include your consulting
16  agreements for TVT and transobturator slings?
17  A. Actually, hold on for just a second.
18  I think it was less than $30,000, actually.
19  I've been paid $29,000 since 2012 on expert witness
20  materials related to TVT, and I was paid approximately
21  $500 for precepting one case.
22  Q. And what was that one case?
23  A. I believe it was a transobturator sling.
24  MS. WILSON: I want to go head, Madam Court

Page 11

1  Reporter, and mark as an exhibit the invoices she
2  brought with her today.
3  (Invoices, marked for identification as Ryder
4  Deposition Exhibit No. 2.)
5  BY MS. WHITE:
6  Q. And how much are you charging for your time
7  here today?
8  A. $750 an hour.
9  Q. And what did you do to prepare for today's
10  deposition?
11  A. I looked at extensive medical literature. I
12  looked at the medical records, Justus and McBrayer. I
13  looked at deposition testimony by plaintiffs' fact
14  witnesses, experts. I looked at FDA memoranda. I
15  looked at Ethicon documents, patient education
16  documents, surgeon's resource documents, professional
17  education slides.
18  Q. Anything else?
19  A. I can tell you.
20  Abstracts presented at national,
21  international society meetings, FDA public health
22  notifications, position statements from AUGS, American
23  Urologic Associations.
24  Q. And I'm talking about to prepare specifically

Page 12

1  for today's deposition.
2  A. Correct.
3  Q. Okay. If there's more, go on.
4  A. Expert reports. Gynemesh PS instructions for
5  use. I think that's pretty inclusive.
6  Q. Okay. All right. Have you ever given a
7  deposition prior to today?
8  A. Yes.
9  Q. And when was that?
10  Well, first of all, how many have you given?
11  And this includes any deposition.
12  A. Six, I believe.
13  Q. When was the last time you gave a deposition?
14  A. Well, it would be an estimate, but I believe
15  it was 2014. It could have been 2015. I'd have to
16  research to find the exact date.
17  Q. Okay. And what case did that pertain to?
18  A. That pertained to a medical malpractice case.
19  Q. And what was your role in that medical
20  malpractice case?
21  A. I was the expert witness for the plaintiff.
22  Q. Have you given any deposition testimony prior
23  to today in the transvaginal mesh litigation?
24  A. No.

Page 13

1  Q. Okay. Let's go back now.
2  So in 2014, you gave deposition testimony as
3  an expert for the plaintiff, and where was that
4  litigation at? What venue?
5  A. Michigan.
6  Q. And what type of expert were you?
7  A. I was plaintiff's expert.
8  Q. No. I know, but what specialty?
9  A. Urogynecology.
10  Q. And what was the caption of that case? Who
11  was the plaintiff and who was the defendant?
12  A. The plaintiff was Regina Gunn and the
13  defendant was Dr. Susan, I believe, Hendricks.
14  Q. And where in Michigan was this case pending?
15  A. Detroit, I believe.
16  Q. Who was the plaintiff's lawyer?
17  A. Chaiken, C-h-a-i-k-e-n, was the firm, but the
18  man who -- I'm sorry.
19  The plaintiff's lawyer?
20  Q. Yes, ma'am.
21  A. I don't recall.
22  Q. So --
23  A. I'm sorry. Wait. Cirocco. Terrance
24  Cirocco. C-i-r-o-c-c-o. It's the defense attorney I

Rebecca M. Ryder, M.D.

|  | Page 14 |
|--|--|
| 1 | don't recall. |
| 2 | Q. Okay. And then prior to 2014, when did you |
| 3 | give a deposition? |
| 4 | A. Let's see. I need to write this down for a |
| 5 | second. |
| 6 | Probably prior to 2004. |
| 7 | Q. Okay. I'm going to make this real easy. |
| 8 | You said that you've given six depositions |
| 9 | prior to today. The last one was in 2014. You were an |
| 10 | expert in a medical malpractice case on behalf of the |
| 11 | plaintiff. |
| 12 | Have you ever given expert testimony in -- |
| 13 | and served as an expert in another medical products |
| 14 | case? |
| 15 | A. No. |
| 16 | Q. So this would be your first products case? |
| 17 | A. Yes. |
| 18 | Q. Okay. And then did some of the other |
| 19 | depositions -- were they for workers' comp? |
| 20 | A. No. |
| 21 | Q. Okay. And were the other depositions -- |
| 22 | did -- were you serving as a fact witness in any of |
| 23 | those? |
| 24 | A. No. |

|  | Page 15 |
|--|--|
| 1 | Q. Okay. So all the other depositions, prior to |
| 2 | 2014, you were serving as an expert witness? |
| 3 | A. No. One deposition I -- two depositions I |
| 4 | was a named party. |
| 5 | Q. Okay. I was going to get to that. |
| 6 | Okay. So tell me about the depositions where |
| 7 | you were a named party. Were these medical malpractice |
| 8 | actions? |
| 9 | A. Yes. |
| 10 | Q. And tell me about the first one, what year |
| 11 | was that? |
| 12 | A. Approximately, 1997. |
| 13 | Q. And why were you sued in 1997? |
| 14 | A. Because a patient came in for her annual GYN |
| 15 | exam, and I asked her if she had her mammogram the |
| 16 | previous year and she said yes. And I said, "Well, we |
| 17 | don't have a record of it in the chart." |
| 18 | So I got the mammogram, and there was an |
| 19 | abnormality that had not been followed up on, and the |
| 20 | patient ultimately had breast cancer, but the mammogram |
| 21 | report had been sent to the wrong physician. |
| 22 | Q. Okay. And did the plaintiff receive either a |
| 23 | settlement or trial verdict in that case? |
| 24 | A. We did not go to trial. I do not know if she |

|  | Page 16 |
|--|--|
| 1 | received a settlement or not. |
| 2 | Q. You don't know if your insurance paid a claim |
| 3 | to this lady? |
| 4 | A. Not that I'm aware of. |
| 5 | Q. Okay. Did you give a deposition in that |
| 6 | case? |
| 7 | A. Yes. |
| 8 | Q. Okay. And where was this case filed? What |
| 9 | was the venue? |
| 10 | A. Norfolk, Virginia. |
| 11 | Q. And what was the plaintiff's name? |
| 12 | A. I don't recall. |
| 13 | Q. Who was your lawyer? |
| 14 | A. Carolyn Oast. |
| 15 | Q. How do you spell her last name? |
| 16 | A. O-a-s-t. |
| 17 | Q. And then prior -- well, when was the next |
| 18 | time you were sued? |
| 19 | A. I was named in, approximately, 2003 or 2004. |
| 20 | Q. And why were you named in that suit? |
| 21 | A. Because I was an on-call covering physician |
| 22 | for my partner on a weekend, and I took a phone call -- |
| 23 | two phone calls from a patient regarding a |
| 24 | postoperative problem. |

|  | Page 17 |
|--|--|
| 1 | Q. What sort of postoperative problems? |
| 2 | A. Nausea and abdominal pain. |
| 3 | Q. What was ultimately wrong with her? |
| 4 | A. She had an intestinal injury from a |
| 5 | laparoscopy. |
| 6 | Q. Did you see her? |
| 7 | A. I did not. |
| 8 | Q. So you took the call and then what happened? |
| 9 | A. The patient ultimately, I believe, went to |
| 10 | the emergency room and was seen and evaluated by my |
| 11 | partner. |
| 12 | Q. And did that plaintiff end up receiving a |
| 13 | settlement or a verdict? |
| 14 | A. I do not recall. I was dismissed from the |
| 15 | case. |
| 16 | Q. All right. So that's three depositions that |
| 17 | we've covered. What are the other three? |
| 18 | A. There may only be five, as I'm writing them |
| 19 | down. Well, the first one -- well, not in |
| 20 | chronological order. |
| 21 | One of the other depositions was as an expert |
| 22 | witness in a shoulder dystocia case when I was still |
| 23 | practicing obstetrics. So that was in 2001. |
| 24 | Q. What state was that case in? |

Rebecca M. Ryder, M.D.

## Page 18

1     A. Virginia.
2     Q. And were you testifying on behalf of the
3  doctor or the plaintiff?
4     A. Doctor.
5     Q. And what venue in Virginia?
6     A. Norfolk.
7     Q. And do you remember the name of the plaintiff
8  or the defendant?
9     A. The defendant was Dr. Alfred Abuhamad.
10    Q. And how do you spell his last name?
11    A. A-b-u-h-a-m-a-d.
12    Q. Okay. And then what's the next case?
13    A. Was an ovarian cancer case.
14    Q. And what was your role in that case?
15    A. I was an expert witness for the defending
16  physician.
17    Q. And who was the defending physician?
18    A. Bill -- William Atkins.
19    Q. And do you know if the plaintiff received a
20  settlement in that case, or did the case go to trial?
21    A. The case did not go to trial.
22    Q. Do you know how it resolved?
23    A. No.
24    Q. So you served as an expert witness twice on

## Page 19

1  behalf of defendant physicians. Is that correct?
2     A. Yes.
3     Q. Okay. So you understand, I mean you've given
4  at least five depositions, as you sit here today, you
5  understand that in a deposition you're testifying under
6  oath?
7     A. Yes.
8     Q. Okay. And it is the same as testifying in a
9  courtroom?
10    A. Yes.
11    Q. Okay. Have you testified under oath in any
12  other capacity that we haven't covered?
13    A. I don't believe so.
14    Q. Have you ever testified in court?
15    A. No.
16    Q. And you've been named as a party to a lawsuit
17  two times?
18    A. Yes.
19    Q. And you don't know if you've ever paid a
20  malpractice claim. Is that correct? You said you
21  don't recall in the first one?
22    A. Right. I was on faculty at Eastern Virginia
23  Medical School, and I did not have a direct
24  relationship with a malpractice insurance carrier, so I

## Page 20

1  don't know what the disposition of that case was.
2        As far as I'm aware, there are no pending --
3  no payments listed in National Practitioner Data Bank
4  Notice to take Expert Deposition of Rebecca
5  Ryder, M.D., on my account.
6     Q. As you sit here today, are you currently
7  involved in any sort of pre-suit or pre-litigation
8  claim with a patient?
9     A. No.
10    Q. Let's mark as Exhibit 3 your curriculum vitae
11  that's been provided to me in this case.
12        (Curriculum Vitae of Rebecca Margaret
13  Ryder, M.D., marked for identification as Ryder
14  Deposition Exhibit No. 3.)
15  BY MS. WHITE:
16    Q. Is this your up-to-date curriculum vitae?
17    A. Yes.
18    Q. Okay. Just to save time here, let's go
19  through this very briefly.
20        As I understand it, and correct me if I'm
21  wrong, you have never completed a medical residency in
22  general surgery. Is that correct?
23    A. Correct.
24    Q. And you've never completed a residency in

## Page 21

1  surgical urology. Correct?
2     A. Correct.
3     Q. And you've never completed a medical
4  fellowship in general surgery?
5     A. Correct.
6     Q. You've never completed a fellowship in
7  surgical urology?
8     A. Correct.
9     Q. And as I understand it, you've never
10  completed any sort of medical fellowship in any area.
11  Is that correct?
12    A. Not an official fellowship, no.
13    Q. Well, that's what I'm asking, an official
14  medical fellowship.
15    A. No.
16    Q. Okay. And I want to talk to you about your
17  subspecialty in female pelvic medicine and
18  reconstructive surgery. You got that in 2013?
19    A. Yes.
20    Q. All right. And you were grandfathered in so
21  as not to have to complete a fellowship. Is that
22  correct?
23    A. Correct.
24    Q. And who paid for you to get your fellowship?

6 (Pages 18 to 21)

Rebecca M. Ryder, M.D.

Page 22

1    Did you pay for that, or your business or Ethicon?
2        MS. KABBASH: Objection to form.
3        THE DEPONENT: Paid for my fellowship?
4    BY MS. WHITE:
5    Q. Uh-huh.
6    A. My --
7    Q. I mean, not your fellowship. Strike that.
8        Who paid for your subspecialty certification
9    in female pelvic medicine and reconstructive medicine?
10   A. I did.
11       MS. KABBASH: Objection to form.
12   BY MS. WHITE:
13   Q. And who -- when you say "I did," did you
14   personally or did your business?
15   A. My practice, in which I'm an owner, paid for
16   it, yes.
17   Q. Okay. And which practice is that?
18   A. Gynecology Specialists.
19   Q. Because you actually have two businesses.
20   Right?
21   A. Yes.
22   Q. And what's your other business?
23   A. It's called Synergy Integrated Medical
24   Center. A holistic, integrated functional medical

Page 23

1    practice.
2    Q. And you've got websites for both of these
3    businesses. Correct?
4    A. Yes.
5    Q. Who is responsible for the content of the
6    material on each of these business's web sites?
7    A. The combination of doctors and providers in
8    my two businesses.
9    Q. Okay. Which includes you?
10   A. Yes.
11   Q. Okay. So let's talk about Gynecology
12   Specialists real quick. Who owns that company?
13   A. Dr. Linda Long and myself.
14   Q. Linda Long?
15   A. And Zenette Leao.
16   Q. And who?
17   A. Zenette Leao. Z-e-n-e-t-t-e, L-e-a-o.
18   Q. Okay. And who owns Synergy Integrated?
19   A. Dr. Linda Long and myself.
20   Q. Okay. And as I understand it, you have never
21   done research that led to a thesis in order to obtain
22   certification in any area?
23   A. Correct.
24   Q. And other than your undergraduate program,

Page 24

1    have you taken graduate-level courses in epidemiology?
2    A. Yes.
3    Q. Okay. And where did you do that?
4    A. In medical school, University of North
5    Carolina, Chapel Hill.
6    Q. Who taught you that? Dr. Weber?
7    A. No. I cannot recall.
8    Q. Okay. And other than your undergraduate
9    program, have you taken graduate-level courses in
10   statistics?
11   A. Yes.
12   Q. And when did you take a graduate-level course
13   in statistics?
14   A. Medical school.
15   Q. And who taught you that?
16   A. I don't know.
17   Q. And other than undergraduate -- well, let me
18   ask you this: Either in undergraduate or
19   graduate-level program, have you ever had an
20   engineering class?
21   A. No.
22   Q. Any classes specifically --
23   A. I take that back.
24       In undergraduate -- my graduate degree was

Page 25

1    bachelor of science and public health, and I took a
2    class in environmental engineering.
3    Q. In environmental engineering?
4    A. Yes.
5    Q. Not environmental sciences?
6        MS. KABBASH: Objection to form.
7        THE DEPONENT: I don't recall.
8    BY MS. WHITE:
9    Q. So you're not sure if it was environmental
10   engineering?
11   A. Correct.
12   Q. Have you ever specifically taken a class, a
13   graduate-level class dealing with material sciences or
14   polymer science --
15   A. No.
16   Q. Polymer materials?
17   A. No.
18   Q. And during your -- first of all, so you went
19   to medical school where?
20   A. University of North Carolina.
21   Q. And I'm a Tar Heel myself.
22       Where did you go then after you completed
23   your medical degree? What year was that?
24   A. 1989.

7 (Pages 22 to 25)

Rebecca M. Ryder, M.D.

## Page 26

1    Q.  Where did you do your residency?
2    A.  University of North Carolina.
3    Q.  And what was that in?
4    A.  OB/GYN.
5    Q.  Okay.  During your residency in OB/GYN, did
6  you perform surgery on patients to treat POP or SUI?
7    A.  Yes.
8    Q.  Okay.  And did you use polypropylene ever in
9  these procedures during your residency?
10    A.  Yes.
11    Q.  Okay.  And tell me about that.  So during
12  your residency, you would use polypropylene to treat
13  POP?  Let's just start with that.
14    A.  Yes.  We did abdominal sacrocolpopexies that
15  used polypropylene mesh.  And although I cannot recall
16  specifics, PROLENE suture was probably used in some of
17  the uterosacral ligament fixations.
18    Q.  Other than in those two ways, did you
19  transvaginally use mesh during your residency program?
20    A.  No.
21    Q.  And did you use polypropylene to treat stress
22  urinary incontinence during your residency?
23    A.  I can't recall if we would have used it for
24  anterior colporrhaphies or Kelly plication surgeries.

## Page 27

1  It's possible.
2    Q.  Okay.  But you don't recall?
3    A.  I don't.
4    Q.  How many times do you think you used it for
5  POP abdominally?  How many procedures do you think you
6  were involved in during your residency using mesh
7  abdominally?
8    A.  Abdominally?  Probably 10 to 20.
9    Q.  And, in fact, I mean, back when you did
10  residency you probably, during your residency program
11  -- or tell me, had you ever heard of transvaginal mesh,
12  the transvaginal mesh kits to treat POP or SUI?
13    A.  No.
14    MS. KABBASH:  Objection.
15  BY MS. WHITE:
16    Q.  Do you currently have a teaching appointment
17  at any educational institution?
18    A.  No, not currently.
19    Q.  Do you currently act as a peer reviewer for
20  any medical journal?
21    A.  Not currently.
22    Q.  Well, have you ever in your career?
23    A.  Yes.
24    Q.  Okay.  So for what medical journal were you a

## Page 28

1  peer reviewer?
2    A.  Obstetrics & Gynecology.
3    Q.  And what years were you a peer reviewer?
4    A.  From approximately 1994 to 2001.
5    Q.  Okay.  Why did you stop?
6    A.  They stopped sending me articles to review.
7    Q.  And during '94 to 2001, did you ever review
8  an article dealing with transvaginal mesh?
9    A.  Not that I recall.
10    Q.  And you've never published any peer-review
11  article directly addressing using polypropylene as a
12  transvaginal surgical treatment for stress urinary
13  incontinence or pelvic organ prolapse?
14    A.  No.
15    Q.  And you've never been a clinical trial
16  manager or a clinical trial leader for a study -- for a
17  study using transvaginal mesh for treatment of stress
18  urinary incontinence or POP?
19    A.  No.
20    Q.  Okay.  And we've covered this a little bit
21  earlier.  Other than serving as an expert witness for
22  Justus and McBrayer, have you ever served as an expert
23  witness in a case before, involving transvaginal mesh?
24    A.  No.

## Page 29

1    Q.  Okay.  You hesitated a little bit.  Have you
2  been paid to look at cases perhaps by other
3  manufacturers?
4    A.  I have not been paid by any other
5  manufacturers to look at anything, no.
6    Q.  Only Ethicon?
7    A.  Only Ethicon.
8    Q.  When were you first contacted to do work in
9  this case?
10    A.  In this case?
11    Q.  Yes, ma'am.
12    A.  Justus and McBrayer?
13    Q.  Yes.
14    A.  October or November of 2015, I believe.
15    Q.  Okay.  What other case could we be talking
16  about?  Your invoices go back to 2012.
17    A.  TVT case.
18    Q.  So let me understand this correctly.
19    You were contacted in 2012 just to serve as
20  an expert in general, and you didn't know exactly what
21  case -- cases you would be working on ultimately.  Is
22  that correct?
23    A.  I would have to look back at my retention
24  letter, but I know initially from 2012 to 2015, I

8 (Pages 26 to 29)

Rebecca M. Ryder, M.D.

Page 30

1  solely looked at things about TVT and -- two TVT cases.
2       Q.  So is there any specific reason you didn't
3  bring your consulting agreement and your retention
4  letter with you today in response to your notice of
5  deposition?
6       A.  I provided it to counsel.
7            MS. KABBASH:  If you have a request for it,
8  Counsel, I'm happy to look at that request.
9            MS. WILSON:  I'm asking the witness.
10           MS. KABBASH:  She can answer as best she can.
11  Objection to form.
12           You can answer.
13           MS. WILSON:  And objection to speaking
14  objections.
15  BY MS. WHITE:
16       Q.  And what's your answer, ma'am?
17       A.  There's no particular reason I did not bring
18  it, no.
19       Q.  But you did provide it to counsel?
20       A.  I did.
21       Q.  Okay.  So when you were first contacted in
22  2012, it looks like by Butler Snow, what did they ask
23  you to do?
24       A.  Serve as a general expert witness on -- I

Page 31

1  cannot recall if it was solely TVT or TVT and
2  transvaginal mesh litigation.
3       Q.  Well, prior to agreeing to do that, did you
4  have any questions for them or need more information,
5  or did you just immediately agree to do it?
6            MS. KABBASH:  Objection to form.
7            THE DEPONENT:  I discussed with the attorney
8  what the scope of my intended role would be.  I'm sure
9  I asked him questions at the time.  I can't recall what
10  they were at the time.
11  BY MS. WHITE:
12       Q.  And what attorney contacted you about this?
13       A.  Burt Snell.
14       Q.  And when were you contacted about being an
15  expert for Prolift?
16       A.  I don't know if that just evolved over time
17  or if it was specific to the Justus-McBrayer and
18  Prolift general report in the fall of 2015.  I cannot
19  recall.
20       Q.  Okay.  So when were you contacted then about
21  being an expert in Justus and McBrayer?
22       A.  I believe October of 2015.
23       Q.  And who contacted you?
24       A.  Burt Snell or Maha, I'm not sure.  I think it

Page 32

1  was Burt.
2       Q.  Okay.  And what did they ask you to do in
3  Justus and McBrayer?
4       A.  To look at the individual medical records and
5  give an opinion.
6       Q.  Give an opinion about what?
7       A.  About the case, about the facts, about the
8  medical information contained there.
9       Q.  Okay.  And, again, did you immediately agree
10  to do it, or did you have to think about it?
11           MS. KABBASH:  Objection to form.
12           THE DEPONENT:  I agreed to do it.  I don't
13  recall specifically if I had to -- if I had other
14  questions, or...
15           MS. WILSON:  What's our next exhibit?
16           THE COURT REPORTER:  4.
17           (Expert Report of Rebecca M. Ryder, M.D.,
18  marked for identification as Ryder Deposition Exhibit
19  No. 4.)
20  BY MS. WHITE:
21       Q.  This report is something that we're going to
22  be referring to throughout the day, and I only have
23  three hours to talk to you this morning about your
24  general opinions.  So, Doctor, I'm going to be jumping

Page 33

1  around some, and can we have an understanding
2  that you will only answer questions that you
3  understand, and if you don't understand a question
4  you'll ask me to rephrase it?  Can we have that
5  agreement?
6       A.  Yes.
7       Q.  Okay.  And I mentioned this prior to the
8  deposition starting, but at any point you need a break
9  or want to take a break, that's fine with me.  This
10  isn't a marathon, and I'm not here to make you
11  uncomfortable.  So please let me know.
12           The only thing I ask, and pursuant to the law
13  that governs this case, if I have a question on the
14  table, you need to answer that question before you take
15  a break.
16           Can we have that understanding?
17       A.  Yes.
18       Q.  Okay.  All right.  I have marked as Exhibit 4
19  what's titled "Expert Report of Rebecca M. Ryder."  Do
20  you see that?
21       A.  Yes.
22       Q.  Okay.  I want to ask you some general
23  questions about this report.
24           First of all, when did you write this report?

Rebecca M. Ryder, M.D.

Page 34

1      A.  I started in December 2015, and I kept
2  working on it between then and February of 2016.
3      Q.  Did you have any help with this report?
4          MS. KABBASH:  Objection to form.
5          THE DEPONENT:  I had some advice from counsel
6  at certain points, or comments.
7  BY MS. WHITE:
8      Q.  So it was a collaboration between you and
9  counsel?
10         MS. KABBASH:  Objection to form.
11         THE DEPONENT:  It's my report.
12 BY MS. WHITE:
13     Q.  That's not what I asked you.  I know it's
14 you're your report.  You signed it.  Right?
15     A.  Yes.
16     Q.  Okay.  And you're here under oath, testifying
17 to the opinions you formulated in this report.  Right?
18     A.  Yes.
19     Q.  So what I'm asking you is:  Did you
20 collaborate with other people to prepare this report?
21     A.  Yes.
22         MS. KABBASH:  Objection to form.
23 BY MS. WHITE:
24     Q.  And does this report contain each of the

Page 35

1  opinions that you formed in connection with this case?
2      A.  Yes.
3      Q.  And did you set forth and discuss those facts
4  that you felt were most important to you in forming
5  your opinions in this case?
6      A.  Can you state the question again?
7      Q.  Sure.
8          Did you set forth and discuss those facts
9  that you felt were most important to you in forming the
10 opinions in this case?
11     A.  Yes.
12         MS. KABBASH:  Objection to form.
13         Just to clarify, Kim.  You said "in this
14 case."  You don't mean specifically Mrs. McBrayer and
15 Justus -- right? -- because that's a separate report.
16 So you mean her general opinions on Prolift in the
17 litigation.
18 BY MS. WHITE:
19     Q.  General opinions on Prolift.  Okay?  But
20 you're here today because you're designated as the
21 general expert in McBrayer and Justus, but this is your
22 general report we're talking about.  Okay?
23     A.  Yes.
24     Q.  Do you want me to repeat that question?

Page 36

1      A.  No.
2      Q.  Okay.  And we've already talked about whether
3  or not you wrote this report yourself.  You
4  collaborated with counsel, and did you collaborate with
5  any Ethicon employees on this report?
6      A.  No.
7          MS. KABBASH:  Objection to form.
8  BY MS. WHITE:
9      Q.  Did you look at other reports drafted by
10 other experts prior to drafting this report?
11     A.  Not prior to drafting it, no.
12     Q.  Okay.  So you drafted this report without
13 looking at any other experts' reports?
14     A.  During the course of drafting it, other
15 expert reports came in that I looked at.
16     Q.  Okay.  So you did look at other expert
17 reports prior to this being complete?
18     A.  Prior to being complete, yes.
19     Q.  Okay.  What other reports did you look at as
20 you were working on this report, your report,
21 Exhibit 4?
22     A.  I looked at a general TVT report by Dr. Dan
23 Elliot.  I looked at a, I believe, a general report by
24 Dr. William Porter, and I looked at a report by

Page 37

1  Dr. Vladimir Iakovlev.
2      Q.  Go ahead.
3      A.  And I looked at a report of Dan Elliott, the
4  general Prolift report.
5      Q.  Do you know Dr. Elliot?
6      A.  No.
7      Q.  Do you know anything about his credentials?
8      A.  What I read in his report.
9      Q.  Okay.  Do know Piet Hinoul?
10     A.  No.
11     Q.  David Robinson?
12     A.  I know of him.
13     Q.  Have you ever met Mr. Robinson?
14     A.  Possibly, but I'm not sure.
15     Q.  When do you think maybe you met him?
16     A.  Could have been at one of the AUGS society
17 meetings, or it could have been in a training
18 situation.  I'm not sure.
19     Q.  Do you know Vince Lucente?
20     A.  Yes.
21     Q.  And, in fact, he trained you, didn't he?
22     A.  Yes.
23     Q.  Would you say you know him well?
24     A.  No.

Rebecca M. Ryder, M.D.

Page 38

1    Q. You've communicated with him several times
2    over the past 16 years. Is that a fair statement?
3        A. Maybe a few times.
4        Q. And what's Dr. Lucente's role with Ethicon?
5        A. I don't know.
6        MS. KABBASH: Objection to form.
7    BY MS. WHITE:
8        Q. Do you know whether or not he's a paid
9    consultant for Ethicon?
10       A. I do not.
11       Q. Do you know how much money Ethicon has paid
12   him to date?
13       A. No.
14       Q. Would that in any way bear on your opinions
15   in this case, to know how much he's been paid?
16       A. No.
17       Q. Even if it's more than a million dollars?
18       A. No.
19       MS. KABBASH: Objection to form.
20   BY MS. WHITE:
21       Q. Do you now Paul Parisi?
22       A. No.
23       Q. Do you know Pre Saint-Hilaire?
24       A. No.

Page 39

1        Q. Do you know Axel Arnaud?
2        A. No.
3        Q. Jim Hart?
4        A. No.
5        Q. Who is Jim Gatewood?
6        A. He was my product rep for Ethicon/Johnson &
7    Johnson.
8        Q. And you do know him well?
9        A. Fairly well, yes.
10       Q. Well, you and him, you've communicated a lot
11   since 2000. Is that a fair statement? Either by
12   e-mail, cell phone, him calling your office manager
13   to set up meetings, him coming to see you?
14       A. I guess it depends on how you define "a lot,"
15   but I've had interactions with him over the years, yes.
16       Q. More than 5 times?
17       A. Yes.
18       Q. More than 10 times?
19       A. Yes.
20       Q. More than 20 times?
21       A. Probably.
22       Q. In fact, he's actually been in the operating
23   room with you before, hasn't he?
24       A. Yes, probably.

Page 40

1        Q. And you've traveled with him before?
2        A. I guess he was there when I got trained with
3    Lucente.
4        Q. Right. He went with you when you got
5    trained, your sales rep. Correct?
6        A. Well, we didn't stay in the same hotel room
7    or anything, but he --
8        Q. That's not what I asked you, Doctor.
9        A. You asked if I traveled with him, so.
10       Q. He was there when you got trained?
11       A. He was there when I got trained.
12       Q. Do you consider Jim a friend?
13       A. I consider him a professional colleague.
14       Q. When was the last time you spoke with Jim
15   Gatewood?
16       A. Probably more than five years ago.
17       Q. Who's your sales rep to date now?
18       A. My sales rep for?
19       Q. Ethicon.
20       A. I don't know.
21       Q. When was the last time you spoke with anyone
22   employed by Ethicon? Sales rep, anyone? Received an
23   e-mail? A phone call? Text? Letter?
24       A. I'm trying to remember. I think there was a

Page 41

1    rep whose name started with a "J" that came to the
2    office perhaps three years ago.
3        Q. So in preparing your report today, did you
4    read deposition transcripts of any witnesses employed
5    by Ethicon, in preparing for your depo today?
6        A. No.
7        Q. Have you ever read any deposition transcript
8    of Vince Lucente?
9        A. No.
10       Q. Did you speak with Dr. Lucente prior to doing
11   any work from 2012 forward for Ethicon?
12       A. No.
13       Q. Can I rely upon your report and supplemental
14   report for your opinions in this case?
15       MS. KABBASH: Objection to form.
16       THE DEPONENT: Yes.
17   BY MS. WHITE:
18       Q. And do you have other opinions as a general
19   expert designated in Justus and McBrayer that are not
20   contained in your report?
21       A. There may be. I don't know. The vast
22   majority of what I expect to be reasonably asked is in
23   the report.
24       Q. Okay. Well, I need to get all your opinions.

Rebecca M. Ryder, M.D.

## Page 42

1  Okay. And I want to do it today.
2      So, if as the day progresses, you formulate
3  other opinions that are not in this report, will you
4  give me those opinions?
5      A. Yes.
6      Q. Because I want to leave here today
7  understanding what your opinions are, and I'm relying
8  on your report and supplemental report.
9      Do you understand that?
10     A. Yes.
11     Q. Okay. I'm handing you --
12     MS. WHITE: Let's go off the record for a
13 minute.
14     (Whereupon, a brief recess was taken.)
15     (Supplemental Report of Rebecca M.
16 Ryder, M.D., Joyce Justus vs. Ethicon, March 16, 2016,
17 marked for identification as Ryder Deposition Exhibit
18 No. 5.)
19 BY MS. WHITE:
20     Q. I'm handing you what we're going to mark as
21 Plaintiffs' Exhibit 5, and we'll be referring back and
22 forth for to that today. But just for the record's
23 sake, can you tell me what Exhibit 5 is?
24     A. Supplemental report of Rebecca M.

## Page 43

1  Ryder, M.D., Joyce Justus vs. Ethicon.
2      Q. Okay. And when did you complete this report?
3      A. March 16, I believe.
4      Q. Okay.
5      MS. KABBASH: Do you have another copy of
6  that, Kim?
7      MS. WILSON: Oh, I do. I'm sorry about that.
8  I sure do.
9      (Exhibit B to Prolift General Report of
10 Rebecca Ryder, M.D., March 18, 2016, List of Materials
11 Reviewed, marked for identification as Ryder Deposition
12 Exhibit No. 6.)
13 BY MS. WHITE:
14     Q. Now, I want to hand you is the next exhibit,
15 Ryder Exhibit 6.
16     Can you tell the jury what Exhibit 6 is,
17 Dr. Ryder?
18     A. Exhibit B to Prolift General Report of
19 Rebecca Ryder, M.D.
20     Q. Okay. What relevance is it to your report in
21 this case?
22     A. It's a list of materials that I reviewed in
23 the preparation of the report.
24     Q. And were the studies and articles actually

## Page 44

1  cited in your report in this case the ones you felt
2  were most important and most significant to you in
3  forming your opinions about Prolift?
4      A. Yes. That, and my clinical experience.
5      Q. All right. So not everything contained in
6  the reliance list is actually cited in the report. Is
7  that right?
8      A. That's correct.
9      Q. Okay. And I'm curious, did you compile
10 Exhibit 5 all by yourself?
11     A. Not all by myself, no.
12     Q. Okay. And, in fact, was Exhibit B supplied
13 to you by lawyers for Ethicon?
14     MS. KABBASH: You mean the articles in it?
15 BY MS. WHITE:
16     Q. Yes, ma'am.
17     A. No, not all of them.
18     Q. So I want you to tell me -- go through
19 Exhibit B and tell me what you added to the medical
20 literature. Which ones did you put on this list?
21     A. I don't know that I can say which ones -- I
22 don't know.
23     Q. Let's do it this way: Is it fair to say that
24 more than half the articles contained in Exhibit B were

## Page 45

1  references that were supplied to you?
2      A. Depends by number or volume of paper, I'm not
3  sure. But, yeah, a significant number were supplied to
4  me, yes.
5      Q. Well, you know you're not the first expert
6  that's given a deposition in a transvaginal mesh
7  litigation. Right?
8      A. I assume so.
9      Q. Well, you know that there's been several of
10 these cases taken to trial. Right?
11     A. Yes.
12     Q. So I'm trying to get an understanding as to
13 whether or not you stub substantively contributed to
14 Exhibit B.
15     A. I did substantively contribute to Exhibit B,
16 yes.
17     Q. Did you add more than two articles to this
18 list?
19     A. I advised counsel when I found articles that
20 may not have been in other things that were supplied,
21 and there were more than two of them, yes.
22     Q. Less than 10?
23     A. I would say more than 10.
24     Q. Okay. Well, then, this is important. Please

Rebecca M. Ryder, M.D.

Page 46

1  tell me then, approximately how many articles you put
2  on Exhibit B that was not supplied to you by Ethicon.
3  You say more than 10. Was it less than 20?
4      A. Probably less than 20.
5      Q. All right. Have you read all of the articles
6  that are listed in Exhibit B?
7      A. I'm familiar with all the articles. I have
8  not read all the articles from start to finish, no.
9      Q. So you are familiar with 382 articles, most
10 of which have been supplied to you by Ethicon?
11     A. I would say I have familiarity with most of
12 them, yes.
13     Q. Okay. Have you read the ones that were cited
14 in your report?
15     A. Yes.
16     Q. Okay. So you're intimate with those
17 articles, so if we need to talk about those today, you
18 can answer questions about the articles cited in your
19 report?
20     A. General questions, yes. I think if you're
21 going ask me exact numbers and very small details, I
22 would have to refer to the article.
23     Q. Okay. With regard to Exhibit B, we'll say
24 approximately 362 of these articles supplied to you by

Page 47

1  Ethicon, in evaluating them, did you look to whether or
2  not the people who performed the studies and wrote the
3  articles had financial relationships with Ethicon?
4      MS. KABBASH: Objection to form.
5      THE DEPONENT: When it was listed as a
6  disclosure on their articles, yes. And I would also
7  like to say, all these articles were not supplied to me
8  by Ethicon. As I said, somewhere between 10 and 20 of
9  them, maybe more, I don't know, I already had on my
10 own, I was already familiar with. So not all the 382
11 were supplied to me.
12 BY MS. WHITE:
13     Q. I didn't say it was. I said approximately
14 362.
15     A. 362.
16     Q. I agree. 10 to 20 you supplied, per your
17 testimony.
18     A. But I would have seen or been familiar with
19 way more than 10 to 20. So this entire list was not
20 given to me by Ethicon.
21     Q. Okay. But in coming up with Exhibit B, as I
22 understand you, your substantive contribution was 10 to
23 20 articles.
24     A. I don't know what you mean by "substantive

Page 48

1  contribution," but I was familiar with many of the
2  articles before Exhibit B was produced.
3      Q. Okay. What do you think, then, are some of
4  the most important articles listed in Exhibit B, in
5  formulating your opinions in this case?
6      A. The review by Maher in 2014 and 2016.
7      Q. So let's do it like this, so the court
8  reporter can get down your testimony.
9      Tell me what page and on that page, tell me
10 the number of the article.
11     A. Page 18.
12     Q. Page 18. So we're going all the way to
13 page 18.
14     And which article?
15 A. 222.
16 Q. 222. Okay.
17 A. 223. 224.
18 Q. Okay.
19     A. There's a Karram article, page 14, number
20 171.
21     Q. Okay. So page 14, 171.
22     A. Page 3, number 25.
23     Page 5, number 49.
24     Page 5, number 54.

Page 49

1      Page 7, number 81.
2      Page 8, number 97.
3      Page 9, number 108.
4      Page 10, number 126.
5      Page 11, number 131.
6      Page 11, number 131.
7      Page 12, number 155.
8      Page 13, numbers 156, 157, 158, 159, 160,
9  168.
10     Page 14, number 171. I may have said that
11 already.
12     Page 17, number 215.
13     Page 20, number 258, I believe. 259, 260.
14     Page 21, 263 -- 264.
15     Q. Did you say 263 as well?
16     A. I think 264 is more applicable.
17     Q. Okay.
18     A. 266.
19     Page 25, 319.
20     Page 25, 322.
21     Page 29, 368, 373, 375.
22     Page 36, 106.
23     Q. Okay. I want you to focus on the medical
24 literature.

13  (Pages 46 to 49)

Rebecca M. Ryder, M.D.

Page 50

1    A. So stop there.
2    Q. Yes. So any on page 30?
3    A. No.
4    Q. Okay. So you took a lot of time there. You
5    went through and you identified the ones that you feel
6    are most relevant and most important in formulating the
7    opinions in this case. Right?
8    A. Yes.
9    Q. And you are familiar with these articles that
10   we just highlighted. Is that correct?
11   A. Yes.
12   Q. And you have read those articles. Is that
13   correct?
14   A. Yes.
15   Q. Okay. And I think you circled Altman. Is
16   that correct?
17   A. I noted that as something I relied on for my
18   opinions, yes.
19   Q. Well, is that an article you have read?
20   A. Yes. Yes, ma'am.
21   Q. And do you know anything about the authors or
22   Dr. Altman?
23   A. No.
24       MS. KABBASH: And if we can plan on a break

Page 51

1    soon, a short break, I would appreciate that.
2        MS. WILSON: Sure. Let me ask her a couple
3    more questions and I will take a break. That would be
4    a great time.
5        MS. KABBASH: Okay.
6    BY MS. WHITE:
7    Q. All right. Are you aware of what involvement
8    that Ethicon had with the study design, the analysis or
9    the interpretation of the data, or the writing or
10   editing of the manuscript that was published in the
11   Altman study?
12   A. No.
13   Q. Do you have any knowledge that Ethicon was
14   involved in the study design, the interpretation of the
15   data, or the writing or editing of the manuscript?
16   A. No.
17   Q. And in relying on Altman, which you went
18   through and designated as one of your most important
19   articles, in formulating your opinions, did you think
20   that the study was designed, conducted, and results
21   interpreted by an independent scientist?
22       MS. KABBASH: Objection.
23       THE DEPONENT: I do not know.
24

Page 52

1    BY MS. WHITE:
2    Q. Would that be important to you?
3        MS. KABBASH: Objection.
4        THE DEPONENT: It was published in the
5    peer-reviewed medical literature, so I take that to be
6    -- that the peer reviewers have investigated it and
7    found it to be worth communicating to the practicing
8    physicians.
9    BY MS. WHITE:
10   Q. Do you know if any of those folks have been
11   deposed in regards to this litigation?
12   A. I do not.
13   Q. If Ethicon, in fact, had involvement in
14   editing the article and, in fact, if at least four
15   Ethicon employees had involvement in editing the
16   article, four of them, and if Ethicon wasn't involved
17   in the study, design, and interpretation of the
18   results, that information could impact the evaluation
19   of the data. Right?
20       MS. KABBASH: Objection.
21       THE DEPONENT: I think the evaluation of data
22   is incumbent on the physician, to look at the datas
23   presented and interpret it.
24

Page 53

1    BY MS. WHITE:
2    Q. Okay. But if the Ethicon employees are
3    involved in the actual design and type of data that
4    gets interpreted, that ultimately could impact the
5    result. You agree, as a physician who's actually
6    reviewed articles before, as a peer reviewer?
7        MS. KABBASH: Objection.
8    BY MS. WHITE:
9    Q. Study design is important, isn't it, Doctor?
10   A. Yes, it is.
11       MS. KABBASH: Objection to form.
12   BY MS. WHITE:
13   Q. You know that as a scientist?
14   A. Yes.
15   Q. And that's important as a peer reviewer,
16   isn't it?
17   A. Yes.
18   Q. And would that impact your opinion on this
19   case, if you knew how this study was designed?
20       MS. KABBASH: Objection.
21       THE DEPONENT: It would not change my
22   opinions on the case.
23       MS. WILSON: Okay. Let's take a break.
24       MS. KABBASH: Okay.

14  (Pages 50 to 53)

Rebecca M. Ryder, M.D.

Page 54

1      (Whereupon, a recess was taken from
2   10:08 a.m. to 10:17 a.m.)
3   BY MS. WHITE:
4      Q.  So, Doctor, as I understand it, as you sit
5   here today, you don't know anything about whether or
6   not the authors of the Altman study had a financial
7   consulting relationship with Ethicon?
8      A.  I do not.  If I looked at the study itself,
9   there may be a disclosure listed on the front page of
10  the article, but I don't recall it.
11     Q.  Okay.  And that's fine, but you testified
12  here today that you got a reliance list, and we took a
13  lot of time to let you go through and circle your most
14  important studies.  So you've already testified today
15  that that was one of your most important studies.
16  Correct?
17     A.  It is.
18     Q.  Okay.  And are you aware that that study
19  showed that the de novo dyspareunia rate was more than
20  native tissue suture repair.  Is that correct?
21     MS. KABBASH:  Objection to form.
22     THE DEPONENT:  I am not aware of that, no.
23  BY MS. WHITE:
24     Q.  Well, what was its importance to you, the

Page 55

1   study?
2      MS. KABBASH:  Objection.
3      THE DEPONENT:  The importance of it was, it
4   showed a higher objective success rate in the Prolift
5   procedures, that there were significantly less symptoms
6   of vaginal bulging in the Prolift group.  There was a
7   significantly higher rate of Stage 0 or 1 prolapse, and
8   that there were no differences between the groups and
9   PISQ scores between anterior colporrhaphy or Prolift
10  anterior.
11     Q.  Well, did it matter to you that three times
12  as many of those women, despite their functional
13  outcome, left there with a higher rate of dyspareunia
14  than the native tissue suture group?
15     MS. KABBASH:  Objection.
16     THE DEPONENT:  I would need to look at the
17  article again, because my notes on the article say that
18  de novo dyspareunia was not reported.
19  BY MS. WHITE:
20     Q.  Okay.  Well, again, if the authors of the
21  Altman study had a financial consulting relationship
22  with Ethicon, would it impact your opinion?
23     A.  It does not substantially change my opinions
24  in the report, no.

Page 56

1      Q.  Well, would it change your opinion about this
2   study?
3      A.  Not necessarily.
4      Q.  Okay.  So is there -- let me ask you this:
5   As I take it from your testimony, if every single
6   article you circled, if you found out that Ethicon had
7   a relationship in study, design, or the authors, would
8   that change your opinion in any way?
9      MS. KABBASH:  Objection.  Form.  Foundation.
10  You can answer.
11     THE DEPONENT:  My opinions are based on a
12  general view of the entire medical literature,
13  including the Cochrane database, that looks at
14  randomized control trials, and my clinical experience.
15  BY MS. WHITE:
16     Q.  So your opinion is not going to change, no
17  matter how many financial disclosures are made in
18  regard to -- financial relationships between Ethicon
19  and either the authors or the study design?  I mean,
20  there's -- I can go through the whole list and it's not
21  really going to matter to you if there's financial
22  relationships between these authors and Ethicon or if
23  Ethicon had anything to do with the articles.  Right?
24     MS. KABBASH:  Objection.

Page 57

1      THE DEPONENT:  I realize that when studies
2   are done, sometimes there are grants from companies to
3   do the studies.  It does not substantively change my
4   opinions.
5   BY MS. WHITE:
6      Q.  Well, was it a grant in the Altman study?
7      A.  I do not know.
8      Q.  Right.  Okay.
9      So just specifically with regard to Prolift,
10  and I know your answer to this, but did you look to
11  whether or not the people who performed the studies and
12  wrote the articles had financial relationships with
13  Ethicon?
14     A.  I read the articles and if there were
15  financial disclosures on the beginning of the articles,
16  I read those, yes.
17     Q.  Well, do you remember which ones had the
18  financial disclosures?
19     A.  I believe all of them do.  I believe that's
20  part of the peer-review process now, that it's to be
21  disclosed.
22     Q.  Well, but specifically, do you remember the
23  ones with financial relationships with Ethicon?
24     A.  I do not specifically recall them.

15 (Pages 54 to 57)

Rebecca M. Ryder, M.D.

Page 58

1     Q.  So again, you took that into account when
2  formulating your opinions?
3     A.  I took the medical literature into account in
4  forming my opinions, yes.
5     Q.  Okay.  This is very important.
6         With regard to the various studies that have
7  evaluated Prolift, in evaluating them, did you look to
8  whether or not the people who performed the studies and
9  wrote the articles had financial relationships with
10 Ethicon?
11        MS. KABBASH:  Objection.
12        THE DEPONENT:  Did I look at that?  Yes.
13 BY MS. WHITE:
14    Q.  So you looked at that and you took that into
15 account in formulating your opinions?
16    A.  It wasn't a major factor in the formulation
17 of my opinions.
18    Q.  And you've already testified that there are
19 many articles on the reliance list that you haven't
20 read.  Is that correct?
21        MS. KABBASH:  Objection.
22        THE DEPONENT:  I have a familiarity with, as
23 far as I can tell you at this moment, pretty much
24 everything on that list.

Page 59

1  BY MS. WHITE:
2     Q.  You're familiar with all 382 articles?
3     A.  For the vast majority, yes.
4     Q.  Again, but have you read all 382 articles?
5     A.  Have I read every word of all 382 articles?
6  No.
7     Q.  When was the last time you spoke with
8  Dr. Lucente, who was the doctor who trained you on
9  Prolift?
10    A.  I have no idea.  Could have been 2005.  Could
11 have been within a year or two of that.
12    Q.  And I just want to make sure I covered this
13 earlier, and I think I did.
14        Do you know what Dr. Lucente's relationship
15 is with Ethicon?
16    A.  Not exactly.
17    Q.  Well, what do you mean by that?
18    A.  I know he trained me in the Prolift device.
19    Q.  And your training, we're going to talk more
20 about that, but your training consisted of going up to
21 Allentown, PA, for one day?
22        MS. KABBASH:  Objection.
23        THE DEPONENT:  Yes.
24

Page 60

1  BY MS. WHITE:
2     Q.  So you trained with Dr. Lucente for one day?
3     A.  Yes.
4     Q.  And I got an e-mail from Ethicon's lawyer
5  last night that you had put in your report that you
6  were trained in 2007, but that's not accurate?
7     A.  I believe that when we researched it, it was
8  actually 2005.
9     Q.  So who discovered that error in your report,
10 did you or Ethicon's lawyer?
11    A.  I believe counsel discovered it.
12    Q.  How far back have you had a direct
13 relationship with Ethicon?
14    A.  I began using TVT in approximately 2000, I
15 believe is in my report, and I believe they had
16 THERMACHOICE endometrial ablation device that may have
17 predated that.
18    Q.  So at least 2000?
19    A.  Yes.
20    Q.  Do you know when was the first time you
21 attended an Ethicon-sponsored educational event
22 pertaining to a transvaginal mesh product?
23    A.  2005.
24    Q.  So you didn't attend any Ethicon-sponsored

Page 61

1  educational events pertaining to TVT?
2     A.  Yes, but you asked me about transvaginal
3  mesh.
4     Q.  Okay.  Fair enough.
5         So when's the first time you attended an
6  Ethicon-sponsored educational event?
7     A.  I don't recall specifically.  There could
8  have been something about the THERMACHOICE, which could
9  have been in the mid-90s, and there was probably
10 something in '99 or 2000 about TVT.
11    Q.  Are you aware that there's lots of
12 communications between Johnson & Johnson employees,
13 Ethicon employees about you specifically?  Did you know
14 that?
15        MS. KABBASH:  Objection to form.
16        THE DEPONENT:  No, I don't know that I'm
17 aware of that.  I think there's some.
18 BY MS. WHITE:
19    Q.  Well, have you reviewed any?
20    A.  I've reviewed -- I can't recall all the
21 documents, if anything was sent with my name in it
22 specifically.
23    Q.  So you think your relationship goes back to
24 about 2000?

16  (Pages 58 to 61)

Rebecca M. Ryder, M.D.

Page 62

1      A.  Well, as I said, if it had to do with the
2  THERMACHOICE balloon, I believe that predated the 2000
3  time frame.
4      Q.  Do you know whether or not you were the top
5  user of THERMACHOICE in Chesapeake, Virginia?
6      A.  I do not.
7      Q.  Have you ever attended an educational session
8  sponsored by Ethicon in Hilton Head, South Carolina,
9  for TVT?
10      A.  I don't recall.
11      Q.  Back in 2000?
12      A.  Sounds possible.
13      Q.  And have you attended educational programs
14  put on by Ethicon where they paid for your travel?
15      A.  Yes.  I believe they paid for my travel when
16  I got trained by Lucente, and that's the only one I
17  recall.  I cannot remember who trained me on TVT and if
18  there was paid travel involved with that.
19      Q.  And when you would go to places where Ethicon
20  would have educational programs, would they provide the
21  food?
22      A.  Yes.  Sometimes.
23      Q.  And were you a preceptor, or did you become a
24  preceptor for TVT?

Page 63

1      A.  I can't recall if it was -- I believe it was
2  for TVT.  It could have been for TVT-O, or it could
3  have been both.
4      Q.  And did you have consulting agreements for
5  TVT and TVT-O?
6      A.  I believe I had a consulting agreement with
7  them, yes.
8      Q.  Okay.  And would you get paid, per your
9  consulting agreement?
10      A.  Yes.
11      Q.  And you don't recall whether or not you went
12  to a pre-beach primer at Alexander's Restaurant and
13  Bar, Hilton Head, South Carolina, October 27, 2000?
14      A.  I don't recall.
15      Q.  TVT?
16      A.  No.
17      Q.  And did you understand that the more you used
18  your sales rep's products, that the sales rep made more
19  money?  You understand that.  Right?
20      A.  In general, I suppose, yes.
21      Q.  I mean, you've been practicing medicine for
22  27 years.  Do you know how it works with sales reps?
23      A.  I figure they work on commission or some
24  sales like that.

Page 64

1      Q.  So do you accept everything that your sales
2  rep says is true --
3      A.  No.
4      Q.  -- with regard to a product?
5      A.  No.  I don't believe that they intentionally
6  lie to us, but I don't rely solely on what they say.
7      Q.  And you understood that back in 2000, you
8  were what was considered a target customer for TVT?
9      A.  I do not know that.
10      MS. KABBASH:  Objection.
11      MS. WILSON:  Let's go ahead and mark this,
12  and we're going to mark as the next exhibit, which I
13  think is 7, it's going to be Ethicon Document 10217937
14  through 10217938, and then as one Exhibit 10217939
15  through 10217940.  This is going to be all one
16  document.
17      MS. KABBASH:  I do appreciate that, by the
18  way.
19      MS. WILSON:  I'm OCD.
20      MS. KABBASH:  That's good.
21      (E-mail string from Lisa Kwiatek to various
22  people, October 10, 2000, Re: TVT Updates,
23  ETH.MESH.10217937, 938, 939, 940, marked for
24  identification as Ryder Deposition Exhibit No. 7.)

Page 65

1  BY MS. WHITE:
2      Q.  All right.  And have you ever seen this
3  e-mail before?
4      A.  It does not look familiar.
5      Q.  Do you know who your sales rep was for TVT?
6      A.  I believe it was Jim Gatewood.
7      Q.  Okay.  And if you turn to 10217939, do you
8  see your name on that list?  You're number 17?
9      A.  Yes.
10      Q.  And that you were an invited guest to the
11  pre-beach primer at Alexander's Restaurant & Bar?
12      A.  Yes.
13      Q.  And do you recall whether you went there for
14  your TVT educational program?
15      A.  I do not recall.
16      Q.  And if you go to the first page, 10217937, at
17  the bottom of the page, Roman Numeral III, AUGS, next
18  to the last sentence, "I just hope we have more
19  customers than preceptors.  After all, this was a
20  peer-to-peer selling opportunity, and we know it
21  works."
22      I mean, as you sit here today as a physician
23  with 27 years of experience, I mean, you understood
24  that Jim Gatewood was -- looked at this not so much as

Rebecca M. Ryder, M.D.

Page 66

1 healthcare, but selling you a product? I mean, you
2 understood that. Right?
3     MS. KABBASH: Objection. Calls for
4 speculation.
5 BY MS. WHITE:
6     Q. Tell me what you understood.
7     A. I understand it was his job to represent the
8 product to me.
9     Q. How long was Jim your sales rep? Was it
10 about 15 years?
11     A. I don't know.
12     Q. Tell me approximately. We know it began back
13 in 2000. You say the last time you talked to him was 4
14 or 5 years ago?
15     A. I believe so. So -- but the last few years,
16 he changed jobs or retired, I believe, somewhere in the
17 2000s. So it could have been 10 years. Could have
18 been slightly more.
19     Q. And when you and him would e-mail back and
20 forth, I mean you'd ask how each other's doing, ask
21 about each other's families, bring each other up to
22 date. Right?
23     A. I think sometimes.
24     Q. I think I know the answer to this, but I need

Page 67

1 to ask it.
2     Have you ever worked on a study where Ethicon
3 paid money for the study to be performed?
4     A. No.
5     Q. Have they ever asked you to work on a study
6 for them?
7     A. No.
8     Q. As you sit here today, do you have a specific
9 recollection of being trained on TVT?
10     A. No.
11     Q. What about on TVT-O?
12     A. No.
13     MS. KABBASH: I apologize. When you say
14 "trained," do you mean in a company-sponsored event?
15     MS. WILSON: Yes. Yes. Thank you.
16     MS. KABBASH: Okay.
17 BY MS. WHITE:
18     Q. In an Ethicon-sponsored event?
19     A. I do not recall the exact details of my
20 training in those, no.
21     Q. Were you trained -- let's talk about TVT-O --
22 were you trained to use TVT-O?
23     A. Yes.
24     Q. Who trained you?

Page 68

1     A. I don't recall.
2     Q. Well, you've already said you've never done a
3 fellowship. Right?
4     A. Not an official fellowship, no.
5     Q. Right, and I'm talking about an official
6 fellowship.
7     You've never done a medical fellowship.
8 Right?
9     A. No.
10     Q. Okay. So who would have trained you other
11 than on Ethicon, on TVT-O?
12     A. I'm not suggesting that anybody other than
13 Ethicon trained me, I just can't recall the details.
14     Q. You can't recall. Okay.
15     And even prior to Prolift, which we're here
16 today on, you were utilizing all the products Gatewood
17 was selling you, right, prior to Prolift being launched
18 in 2005?
19     A. I have no idea. I don't know all the
20 products he was selling.
21     (Gynecare Division, Business Review,
22 ETH.MESH.1831479-1484, marked for identification as
23 Ryder Deposition Exhibit No. 8.)
24

Page 69

1 BY MS. WHITE:
2     Q. I'm handing you what's titled as "Gynecare
3 Division Business Review," and it's Ethicon document
4 11831479 through 11831484. Have you ever seen this
5 document before?
6     A. No.
7     Q. And do you remember Cynthia Pypcznski?
8     A. No.
9     Q. Well, do you remember getting e-mails from
10 her directly?
11     A. No.
12     Q. Do you know whether or not she was Jim's
13 boss?
14     A. No.
15     Q. I'll represent to you she was Jim's boss.
16     A. Okay.
17     Q. And if you go to -- well, let's start with
18 the first page, and under "Comments."
19     Cynthia is telling Jim that, "Jim, as we
20 discussed over the past several days, there are many
21 areas where you will be able to impact your commission
22 plan by year-end."
23     Okay. So she's talking about his performance
24 and how to raise sales.

18 (Pages 66 to 69)

Rebecca M. Ryder, M.D.

## Page 70

1    Do you accept that as true on that first
2  page?
3    THE DEPONENT:  Yes.
4    MS. KABBASH:  Objection.
5  BY MS. WHITE:
6    Q.  All right.  And then if you go to the next
7  page, 11831480, under THERMACHOICE, Cynthia is talking
8  about "Chesapeake and Mary Immaculate are your other
9  top TC users."
10    And that's THERMACHOICE users.  Right?
11    A.  Yes.
12    Q.  And you've already testified you use
13  THERMACHOICE?
14    A.  Yes.
15    Q.  Prior to seeing this document --
16    A.  Yes.
17    Q.  -- you volunteered that?
18    A.  Yes.
19    Q.  And it goes on to say, "Your relationships
20  and selling skills have paid off.  Drs. Hardy, Kemp,
21  Ryder, Grey, and Whittle continue to use all of our
22  technology."
23    Do you see that?
24    A.  I do.

## Page 71

1    Q.  And then --
2    A.  I don't necessarily agree with it, but I see
3  it.
4    Q.  Okay.  Well, as you sit here today, back in
5  that time frame, what products was Jim Gatewood
6  detailing you on that you didn't use?
7    A.  I didn't use INTERGEL.  I didn't use
8  VERSASCOPE --
9    Q.  Would he be --
10    A.  -- disposables laparoscopy.
11    Q.  And did he specifically detail you on those
12  products?
13    MS. KABBASH:  Objection.
14    THE DEPONENT:  I don't recall.  I believe I
15  remember him talk about INTERGEL.
16  BY MS. WHITE:
17    Q.  Okay.  So you do remember that back in 2000?
18    A.  I think so.
19    Q.  Okay.  Let's go to the second page, 11831481,
20  beginning of that first complete paragraph.
21    Cynthia is telling Jim, this is Jim's boss,
22  "Chesapeake utilizes all of our technology.  I was
23  happy to be with you for the luncheon you gave them in
24  support of Gynecare and being able to offer women

## Page 72

1  minimally invasive alternatives to surgery."
2    Do you remember Cynthia and you and Jim
3  attending a lunch?
4    A.  I do not.
5    Q.  Okay.  So it's fair to say that you remember
6  some things from 2000, but other things you just don't
7  remember.  Right?
8    A.  Yes.
9    Q.  Okay.
10    A.  I remember the birth of my son in 2000.
11    Q.  That's a good thing to remember.
12    A.  Yes.
13    Q.  Now, at some point did you switch from TVT to
14  Monarc?
15    A.  I tried Monarc in a few cases, yes.  I didn't
16  switch.
17    Q.  You didn't switch?
18    A.  No.
19    Q.  Okay.  So if Jim Gatewood/Ethicon have you
20  documented as someone who switched and they were trying
21  to get you back, they got all of that wrong?
22    MS. KABBASH:  Objection.
23    THE DEPONENT:  Yes.
24

## Page 73

1  BY MS. WHITE:
2    Q.  So why did you try Monarc?
3    A.  Monarc was a transobturator procedure, and
4  TVT is a retropubic procedure.
5    Q.  And so then did you go from TVT to Monarc and
6  back to TVT?
7    A.  No.  I still used TVT in some cases.  It
8  depends on the patient.
9    Q.  So did you have any problems with TVT?
10    A.  I did not.
11    Q.  And were you aware that the goal of Ethicon's
12  sales team was for you to become a TVT-O local
13  preceptor, that that was an internal goal of theirs?
14    MS. KABBASH:  Objection.
15    THE DEPONENT:  I believe they came to me with
16  a contracting agreement as such, yes.  I believe that's
17  the one case in which I was paid any money, I believe
18  was a TVT-O case.
19    It could have been a retropubic TVT case, but
20  I think it was TVT-O.
21  BY MS. WHITE:
22    Q.  Okay.  I want to talk about this switch,
23  according to J&J, from TVT to Monarc, which you
24  say did not happen.  Right?

19  (Pages 70 to 73)

Rebecca M. Ryder, M.D.

Page 74

1    A.  Correct.
2    Q.  Okay.  And they -- and if they think you
3  switched, they just got it wrong back in 2004, they
4  were detailing you?
5    A.  Yes.
6    Q.  Okay.
7       MS. KABBASH:  Objection.
8       (E-mail from Jim Gatewood to Pete Travis,
9  Regarding Chesapeake Trip, May 14, 2004,
10  ETH.MESH.11831154-55, marked for identification as
11  Ryder Deposition Exhibit No. 9.)
12  BY MS. WHITE:
13    Q.  So this is an e-mail from Jim Gatewood to
14  Pete Travis.  He's another sales rep.  He's having to
15  cover for him because you were going to try TVT-O for
16  the first time and they are very excited.  So this is
17  Ethicon Document 11831154, and the date on this is
18  May 14, 2004, and this is Jim to Pete at the bottom of
19  the page.
20       First of all, it's talking about the case.
21  It's TVT-O.  You're going to do a procedure at 7:30.
22  You're going to have the sales rep in there with you.
23  It says "Dr. Ryder knows you're coming, has your name,
24  has your voice mail."  He has your number.  He knows to

Page 75

1  contact Barbara, who's your office manager, once he
2  gets there, and at the bottom of the page it says,
3  "Okay" -- all in caps -- "Here we go.  Dr. Ryder has
4  switched from TVT to Monarc.  She tried TVT-O today for
5  the first time and loved it!!!  She will be doing one
6  7:30 TVT-O with you on Friday, May 21st.  So in another
7  week, you're going to do another one unless you hear
8  otherwise."
9       Do you recall doing that second TVT-O and a
10  sales rep, who I don't think you had even met before,
11  accompanied you in the surgical procedure?
12    A.  I don't have --
13       MS. KABBASH:  Objection.
14       THE DEPONENT:  -- independent recollection of
15  that, no.
16  BY MS. WHITE:
17    Q.  Do you deny that that happened?
18    A.  I don't deny it.
19    Q.  How did your patients feel about these sales
20  reps being in the room as they were getting these
21  products surgically implanted in them?
22    A.  They were advised that there may be a
23  representative from the company present.
24    Q.  Why did you feel the need to have these folks

Page 76

1  in the room with you, these sales reps?
2       MS. KABBASH:  Objection.
3       THE DEPONENT:  If it was a new product, they
4  often also detailed the staff on how to take the
5  packaging out, things like that.  I didn't feel a
6  clinical need to have them there.
7  BY MS. WHITE:
8    Q.  Okay.  So you didn't feel a clinical need.  I
9  mean, they weren't doctors, were they?
10    A.  No.
11    Q.  Jim Gatewood had no educational training as a
12  doctor.  Correct?
13    A.  Correct.
14    Q.  I mean he --
15    A.  As far as I know.
16    Q.  -- wasn't a doctor.  He wasn't a nurse.
17  Correct?
18    A.  Correct.
19    Q.  He wasn't a PA.  Correct?
20    A.  Correct.
21    Q.  But you let him in there with your patients.
22  Right?
23    A.  Yes.
24       MS. KABBASH:  Objection.

Page 77

1  BY MS. WHITE:
2    Q.  And you testified that was not medically
3  necessary.
4    A.  Correct.
5    Q.  And Pete, who you had never met before, you
6  let him in the room with the patient for your second
7  TVT-O.  Right?
8    A.  Apparently.
9    Q.  And Pete didn't help you with that surgery,
10  did he?
11    A.  No.
12    Q.  Okay.  Let's goes on.
13       "She tried TVT-O today for the first time and
14  loved it.  She'll be doing one at 7:30, TVT-O, with you
15  on Friday, May 21st, unless you hear otherwise.  There
16  will be one TVT-O kit in Ruthel's office waiting for
17  you when you get there."
18       He's telling them to call Ruthel.  Who's
19  Ruthel?
20    A.  She was like the purchasing person, the woman
21  in the OR who had the product.
22    Q.  "I would call Ruthel the day before to
23  confirm exactly" -- exactly is capitalized -- "where
24  the kit."  And then he goes on to describe where

Rebecca M. Ryder, M.D.

Page 78

1    Ruthel's office is.
2        "Ruthel's office is the first office on the
3    right as you walk into the department of surgery. If
4    Dr. Ryder wants to do more than one case, you'll have
5    to bring another kit with you. If you can, you may
6    want to bring another kit anyway as backup."
7        So they're kind of hoping you're going to do
8    more than one TVT-O on that day. Right?
9        MS. KABBASH: Objection.
10       THE DEPONENT: No. They usually bring a
11   backup kit in case something falls on the floor or
12   can't be used.
13   BY MS. WHITE:
14       Q. Okay. "So if Dr. Ryder wants to do more than
15   one case, you'll have to bring another kit with you."
16   Does that not imply that they're hoping that you're
17   going to want to do more than one case, as per what
18   they have written in this e-mail?
19       MS. KABBASH: Objection. Calls for
20   speculation.
21       You can answer.
22       THE DEPONENT: It sounds like it.
23   BY MS. WHITE:
24       Q. And I do object to the speaking objections.

Page 79

1    It's just not permitted in the Fourth Circuit. You can
2    object to form.
3        Then he goes on to talk about how to get the
4    purchase order number up and running, and the last page
5    is, if you turn over, "Tell her that purchasing should
6    hold" -- all caps -- "the PO," purchase order, "until I
7    can get it and place the order myself." All caps,
8    "They should not place the order themselves because it
9    is a bill-only PO, which will get screwed up unless we
10   arrange it with JJHCS."
11       Is it fair to say that Jim Gatewood was very
12   "intimate" with your practice as of May 2004?
13       MS. KABBASH: Objection.
14       THE DEPONENT: I would not use the word
15   intimate, no.
16   BY MS. WHITE:
17       Q. He knew all your staff. Right?
18       A. He knew some of my staff. I don't know if he
19   knew all my staff. I had 14 employees. I highly doubt
20   that he knew all of them.
21       Q. He knew how a purchasing order worked for
22   your practice. Right?
23       A. I have nothing to do with purchase orders.
24   My practice has nothing to do with purchase orders.

Page 80

1    That's all the hospital.
2        Q. So he actually knew more about purchasing
3    orders than you did?
4        A. Yes.
5        Q. Okay. And he knew exactly where these
6    procedures were performed. Right?
7        A. Yes.
8        Q. He gave Pete directions, didn't he?
9        A. Yes.
10       Q. So you think you signed a consulting
11   agreement for TVT-O?
12       A. I think so.
13       Q. And you were aware that one of their goals
14   was to get you to be a preceptor? That's what J&J
15   wanted. Is that correct?
16       MS. KABBASH: Objection.
17       THE DEPONENT: I assume so.
18   BY MS. WHITE:
19       Q. Because they asked you to enter into a
20   consulting agreement?
21       A. Yes.
22       Q. And you agreed?
23       A. Yes.
24       Q. How many TVT-O procedures had you personally

Page 81

1    performed before you started teaching other doctors how
2    to do it?
3        A. I don't know.
4        MS. WILSON: Let's go ahead and mark this for
5    the heck of it.
6        (E-mail from Cindy Pypcznski to Bruno de
7    Lacroix, Re: Recap on our meeting 9/22, September 23,
8    2004, ETH.MESH.11831646 & 647, marked for
9    identification as Ryder Deposition Exhibit No. 10.)
10   BY MS. WHITE:
11       Q. I will hand you what is Ryder 10. This is
12   from Jim's boss, Cindy, September 23, 2004, and what
13   she's doing for the territory she's responsible for,
14   which is Jim's territory, she's sending out a list of
15   priorities --
16       And do you see that you're a priority there?
17       A. Yes.
18       Q. -- Dr. Rebecca Ryder --
19       A. Yes.
20       Q. -- Jim, and her priority for you is for you
21   "to be a local preceptor for us, Ethicon on TVT-O"?
22       A. Yes.
23       Q. And she met her priority. Right?
24       A. Yes.

Rebecca M. Ryder, M.D.

Page 82

1    Q.  And is it fair to say you probably entered a
2  consulting agreement for TVT-O, October 2004?  Does
3  that sound right?
4    A.  I don't recall.
5    Q.  And you turned that consulting agreement over
6  to counsel?
7    A.  No.
8    Q.  You have not?
9    A.  I don't believe I still have that consulting
10  agreement.
11    Q.  Okay.  So when -- your fees today that we've
12  talked about, the $30,000, that does include the TVT-O
13  money?
14    A.  Yes.
15    Q.  Okay.  So you don't have the consulting
16  agreement.  I guess, did you have to go back and look
17  at your taxes, or how did you come up with that figure?
18    A.  My invoices showed $29,000 that I've billed
19  in the preparation of the expert witness reports, and
20  then I received less than a thousand dollars in
21  compensation as a preceptor, as far as I recall.
22    Q.  Oh, so that's based on your recollection.
23    A.  And counsel provided me with a list --
24  counsel found some information on payments made to me

Page 83

1  from J&J prior to the 2012 consulting agreement.
2    Q.  Okay.
3    MS. KABBASH:  If it assists you, Counsel, we
4  searched the database that we search when we perform
5  every defense fact sheet and searched that database for
6  payments to Dr. Ryder, and that's where that
7  information came from.
8    MS. WILSON:  I got it.  Fine.
9    Let's go ahead and mark this.
10    (E-mail from Jim Gatewood to Timothy Carroll,
11  Re: Consulting Agreement, October 20, 2004,
12  ETH.MESH.11831194, marked for identification as Ryder
13  Deposition Exhibit No. 11.)
14  BY MS. WHITE:
15    Q.  So this is Jim to Tim Carroll, and he's
16  telling Tim Carroll on October 20, 2004, to send you a
17  consulting agreement.  Do you see that?
18    A.  Yes.
19    Q.  Okay.  And as we sit here today, you already
20  testified that you had a consulting agreement for
21  TVT-O.  Right?
22    A.  Yes.
23    Q.  All right.  And then after entering into the
24  consulting agreement, they want you to train Kris

Page 84

1  Kennedy and Naved Jafri on TVT-O.  Right?
2    A.  Yes.
3    Q.  Do you remember doing that?
4    A.  No.  I don't have an independent recollection
5  of that.
6    Q.  Do you still have a relationship with Kris?
7    A.  I know who she is.  She retired from medical
8  practice.
9    Q.  All right.  What about Naved?
10    A.  I have a relationship with him.
11    Q.  Is he still using mesh products?
12    A.  I believe so.
13    Q.  He practices here in the area?
14    A.  In Hampton and Newport News, I believe.
15    Q.  And, again, as you sit here today, you
16  don't know how many TVT-O procedures you performed
17  prior to training the other doctors on TVT-O?
18    A.  I do not.
19    Q.  What did you like about TVT-O?
20    A.  The less voiding, the function of a
21  retropubic TVT, and less potential for bladder
22  perforation.
23    Q.  Do you know whether or not you trained
24  Dr. Montgomery Johns on TVT-O?

Page 85

1    A.  I do not.
2    Q.  Do you know who he is?
3    A.  Unh-unh.
4    Q.  Oh, wait.  Maybe Montgomery Johns -- do you
5  know if you got trained by Montgomery Jones on TVT-O?
6    A.  It doesn't sound familiar.
7    Q.  And you just don't recall back in 2004 who
8  trained you on TVT-O?
9    A.  I don't.
10    Q.  It doesn't sound like very significant
11  training if you don't remember it.
12    MS. KABBASH:  Objection.  Objection to
13  commentary, Counsel.
14  BY MS. WHITE:
15    Q.  Is that fair to say?
16    A.  No.
17    Q.  Do you remember anything at all, as you sit
18  here today, about how you were trained on TVT-O?
19    A.  I don't have independent recollection, no.
20    Q.  Okay.  So what does it mean to be a
21  preceptor?
22    A.  To have another physician come in and assist
23  them with learning about the device, or in this case,
24  the TVT-O.  There's an educational component and a

22 (Pages 82 to 85)

Rebecca M. Ryder, M.D.

## Page 86

1  practicum component.
2      Q.  What does it mean to be a proctor?
3      A.  My understanding is preceptor and proctor
4  would be the same.
5      Q.  When Jim would contact you, was it
6  primarily by e-mail during that ten years he was your
7  sales rep?
8      A.  I don't recall.  Probably.  I mean, he would
9  -- we would see each other sometimes.  He was in some
10  of the cases, as you know.  So I can't recall how he
11  primarily contacted me.
12      Q.  I mean, it was far easier for Jim Gatewood to
13  get up with you personally than it was a patient during
14  the ten years that he was your sales rep.  Right?
15      A.  No.
16      MS. KABBASH:  Objection.
17  BY MS. WHITE:
18      Q.  Did patients have your e-mail during those
19  ten years?
20      A.  No.
21      Q.  Was it easier for Jim to get on your schedule
22  than for a patient to get on your schedule during those
23  ten years?
24      MS. KABBASH:  Objection.

## Page 87

1      THE DEPONENT:  No.
2  BY MS. WHITE:
3      Q.  Other than the training you did in Allentown,
4  PA, did you attend any other professional education
5  presentations sponsored by Ethicon regarding Prolift,
6  just Prolift?
7      A.  Possibly.
8      Q.  Okay.  Do you recall attending any other
9  professional education presentations sponsored by
10  Ethicon regarding Prolift?
11      A.  I am not sure.  I know at the AUGS meetings,
12  sometimes there would be symposia sponsored by industry
13  that I would go to.  I do not have an independent
14  recollection on one on Prolift.
15      Q.  So we know that you were trained on Prolift,
16  approximately April 11, 2005.  Right?
17      A.  Yes.
18      Q.  And as of 2005, we know just from the e-mails
19  I've got that you'd at least been using Ethicon
20  products since 2000.  Right?
21      A.  Yes.
22      Q.  You had a five-year relationship with Ethicon
23  and, in fact, had been a preceptor for them.  Right?
24      A.  As of 2005, yes.

## Page 88

1      MS. WILSON:  Okay.  Let's go ahead and mark
2  this.
3      (E-mail from Paul Parisi to Jim Gatewood,
4  Re: Gynecare Prof Ed - Customer Confirmed for Practical
5  Training, March 10, 2006, ETH.MESH.11831246, marked for
6  identification as Ryder Deposition Exhibit No. 12.)
7  BY MS. WHITE:
8      Q.  So do you remember going up to Allentown, PA,
9  in 2005 and training with Dr. Lucente?
10      A.  Yes.
11      Q.  Tell the jury about that training.  What did
12  that day entail?
13      A.  Tell the jury about the training?
14      Q.  Yes, ma'am.
15      A.  Okay.  I don't see a jury here, but the
16  training entailed -- I believe I probably flew up the
17  night before.  There would have been a shuttle from the
18  hotel to the training facility.  We had a didactic
19  presentation.  We had informal discussion about the use
20  of the product, and then I believe Dr. Lucente had
21  perhaps two patients, that we were in the operating
22  room with him while he was doing the procedure,
23  observing the procedure and the steps.
24      Q.  Okay.

## Page 89

1      A.  And then there may have been a postprocedure
2  discussion.
3      Q.  And Jim Gatewood traveled with you to this
4  training.  Right?
5      A.  We did not -- as far as I recall, we didn't
6  fly on the same plane or anything, but he was there.
7      Q.  He was there with you.  Okay.
8      And the document that I just handed you,
9  Ethicon 11831246, that's from Paul Parisi to Jim
10  Gatewood, and Cynthia, Jim's boss, is copied.  And you
11  testified earlier, you don't know who Paul Parisi is?
12      A.  No.
13      Q.  Does this document ring a bell?
14      A.  I did not see this document.
15      Q.  No.  I'm asking you, though.  I've just shown
16  it to you.  Does it ring a bell?  Does it refresh your
17  recollection as to who Paul Parisi is, whether or not
18  you know him?
19      A.  No.
20      Q.  And is it fair to say that Jim made all your
21  travel arrangements?
22      A.  I don't recall who made the travel
23  arrangements.
24      Q.  Well, if this document says he did and he was

Rebecca M. Ryder, M.D.

Page 90

1  told to make specific travel and logistic instructions
2  for you, you don't deny that happened?
3       A.  No.
4       Q.  So you were trained, then, on April 11, 2005.
5  Do you know when you did your first Prolift procedure?
6       A.  I do not.  Sometime in 2005.
7       Q.  How did you first hear about Prolift?  Like
8  what was your first knowledge of Prolift?
9       A.  I believe probably at an AUGS meeting.
10      Q.  Which one?
11      A.  I believe it was the one in -- well, TVT was
12  New Orleans.  So I can't recall.  It's been so many
13  AUGS meetings over the years, so I'm not sure which
14  one.
15      Q.  So you're saying you heard about Prolift from
16  an AUGS meeting before --
17      A.  I heard about TVM.
18      Q.  TVM?
19      A.  TVM.
20      Q.  Okay.  I'm talking about Prolift.
21      A.  Okay.
22      Q.  My question was:  How did you first hear of
23  or learn about Prolift?
24      A.  I don't recall.

Page 91

1       Q.  Was it from Jim Gatewood?
2       A.  I don't recall.
3       Q.  Was it most likely from Jim Gatewood?
4          MS. KABBASH:  Objection.
5          THE DEPONENT:  No.
6       Q.  No.  Okay.  Where was it most likely from?
7       A.  Either the medical society meetings,
8  abstracts, or perhaps Dr. Jon Crockford.
9       Q.  Who is Jon Crockford?
10      A.  He's a urogynecologist in the area.
11      Q.  And did he have any involvement in training
12  you?
13      A.  Yes.  I believe he did.  I believe he was my
14  preceptor when I did my first few Prolift cases.
15      Q.  So staying focused on that training date of
16  April 11, 2005, when Dr. Lucente trained you, did he
17  talk about his personal data or the outcomes of his
18  patients when he talked about Prolift on that day?
19      A.  I believe so.
20      Q.  What did he tell you?
21      A.  I believe he had slides that he presented the
22  history of the TVM procedure, sort of morphing into the
23  Prolift.  I believe he showed abstracts and initial
24  experience, I believe, in centers in France and the

Page 92

1  U.S.
2       Q.  Okay.  So you remember seeing slides that
3  day?
4       A.  I remember seeing slides that day, yes.
5       Q.  Do you remember seeing a PowerPoint
6  presentation?
7       A.  I believe so.
8       Q.  And you feel like you were adequately trained
9  on April 11, 2004?
10      A.  I was --
11         MS. KABBASH:  Objection.
12         THE DEPONENT:  -- adequately introduced to
13  the product, and I thought the training was well done
14  and informative and comprehensive.
15  BY MS. WHITE:
16      Q.  What more did you feel like you needed in
17  able to be able to competently and safely use this
18  as a surgical treatment in a patient?
19      A.  I felt like I wanted to have a another
20  physician with me when I did my first cases, for any
21  guidance and things that might come up that weren't
22  discussed in the training.
23      Q.  And how many times did you feel like you
24  would -- you would need someone there with you before

Page 93

1  you went alone on a patient?
2       A.  For Prolift specifically?
3       Q.  Yes, ma'am.
4       A.  Probably somewhere between two and three
5  times, maybe up to five.  Something like that.
6       Q.  Is it your testimony today that you had a
7  preceptor with you five times before you did a Prolift
8  procedure on your own?
9       A.  No.  I don't recall how many times.
10      Q.  And you don't remember when you first
11  performed a Prolift procedure after Lucente's training?
12      A.  Not exactly.
13      Q.  Well, when approximately?
14      A.  2005.
15         (E-mail from Jim Gatewood to Barbara Summers,
16  Re: New Prolift account request, May 19, 2005,
17  ETH.MESH.11831256-257, marked for identification as
18  Ryder Deposition Exhibit No. 13.)
19  BY MS. WHITE:
20      Q.  I'm handing you what's been marked as
21  Exhibit 13.  And, in fact, we just talked about
22  Dr. Crockford, and this is a -- and this is an e-mail,
23  you've got to start at the bottom of the page --- from
24  Cindy -- no.  Actually, it's an e-mail from Jim to

Rebecca M. Ryder, M.D.

Page 94

1  Barbara Summers.
2        And does Barbara work for you, or did she
3  work at the hospital?
4        A. She doesn't work for me, and I don't know if
5  she worked at the hospital.
6        Q. Did she work at the hospital?
7        A. I don't know.
8        Q. Do you know who -- oh, no. Scratch that.
9        I'm sorry. Barbara Summers is an Ethicon
10  employee.
11        So this is an e-mail dated May 19, 2005, from
12  Jim to Barbara Summers, and he's copying his boss, and
13  the subject is "New Prolift account request."
14        And the e-mail says, "Barbara, Dr. Rebecca
15  Ryder was trained on Prolift, Monday, April 11.
16  Dr. Ryder has scheduled her first cases, and her
17  hospital has given me a PO, a purchase order. Please
18  clear Chesapeake General account number 6003 for
19  ordering Prolift."
20        That's from Jim.
21        So is it fair to say that after your
22  April 11th training, you'd already scheduled in May,
23  one month later, your first Prolift cases?
24        A. Apparently.

Page 95

1        Q. Okay. Then if you go on up -- let's go up to
2  the top of the page. It's Jim to Cindy, his boss
3  again, May 19th. It's later. It's that night he's
4  sending this e-mail.
5        "Cindy," he's talking about her concern --
6  oh, about paying Crockford money to teach you. So
7  let's go back to that e-mail in the middle of the page
8  there.
9        Again, we're on Ethicon 11831256.
10        In the middle of the page, do you see Cindy
11  is responding to Jim at 10:10 a.m. in the morning,
12  May 19, 2005? She's saying, "Hey, Paul told me that
13  Jon is going to train Dwight on Prolift soon. Are we
14  paying Jon for this? If so, how much of my dollars are
15  we dwindling as we speak? That will give you five docs
16  then." She ends it "C" for Cindy.
17        Does that sound like she's concerned about
18  the amount of money that Ethicon is actually having to
19  pay their preceptor to train folks like you?
20        MS. KABBASH: Objection.
21        THE DEPONENT: I have no idea.
22  BY MS. WHITE:
23        Q. Does it sound like that?
24        MS. KABBASH: Objection.

Page 96

1        THE DEPONENT: It sounds like she has a
2  budget.
3  BY MS. WHITE:
4        Q. Well, do you think a good way for Ethicon to
5  spend their money is to train doctors competently and
6  adequately on their products?
7        A. Yes.
8        Q. That's important. Right?
9        A. Yes.
10        MS. KABBASH: Objection.
11  BY MS. WHITE:
12        Q. And that's important for patient safety.
13  Correct?
14        MS. KABBASH: Objection.
15        THE DEPONENT: That's part of what's
16  important for patient safety. It's not all that's
17  important for patient safety.
18  BY MS. WHITE:
19        Q. You don't disagree that a doctor being
20  competently trained on how to surgically implant these
21  products is important for patient safety?
22        A. I do not disagree.
23        Q. Okay. Go back to the top now. Jim to Cindy.
24        Is it fair to say that they're talking about

Page 97

1  Dr. Crockford will be allowed to be a Prolift preceptor
2  after he does 50 procedures and that should happen by
3  early July? Do you see that?
4        A. I see that.
5        Q. And then he address Cindy's concern about the
6  money. Right? That as a Prolift preceptor, "Jon will
7  expect an honorarium when he conducts training
8  sessions. The honorarium amount will be agreed upon by
9  Paul and Jon. I have not discussed amounts with either
10  Paul or Jon. Also be aware that Jon is conducting a
11  proctorship, 25-case requisite, with Rebecca Ryder at
12  Chesapeake General on June 7th." Do you see that?
13        A. Yes.
14        Q. Okay. So if all we have in our possession is
15  evidence that he trained you, that you had a preceptor
16  with you on one day, one month after you received your,
17  you say, introduction to Prolift by Dr. Lucente, do you
18  have any independent recollection that that's not true
19  or that you had more training, other than that one day
20  by Dr. Crockford?
21        MS. KABBASH: Objection.
22        THE DEPONENT: It was two months later, and
23  no, I have no other recollection of any other training.
24

25 (Pages 94 to 97)

Rebecca M. Ryder, M.D.

Page 98

1   BY MS. KABBASH:
2       Q.  Okay.
3       A.  Preceptorship.
4       Q.  Well, do you have any recollection of any
5   other training on Prolift?  And if you do, please tell
6   me about them.
7       A.  Not company-sponsored training, no.
8       Q.  Okay.  Well, what about outside
9   company-sponsored training?
10      A.  I did my own research.  Let's put it that
11  way.
12      Q.  Let's go to your report.
13          In fact, let's go off the record for a
14  minute.
15          (Whereupon, a recess was taken from
16  11:15 a.m. to 11:22 a.m.)
17  BY MS. WHITE:
18      Q.  Doctor, let's 's look back at Exhibit 4 --
19  and let me find.
20          Off the record.  I'm sorry.  I've got to find
21  what I'm looking for here.
22          (Whereupon, a recess was taken from 11:24 to
23  11:28 a.m.)
24

Page 99

1   BY MS. WHITE:
2       Q.  I apologize for that break, Dr. Ryder, but
3   I'm going to -- I've got an hour left, so we're going
4   to jump around a little bit and I'm just going to
5   ask you what I now deem to be the most important
6   questions pertaining to opinions you have formulated in
7   this case and your education and training with regard
8   to the Prolift, but let's look at your report, page 13.
9       Okay.  And you say in your report on page 13,
10  that you decided -- and we're talking about Prolift
11  specifically on this page -- that you decided to
12  "investigate further and ultimately use the Prolift
13  system in your patients due to the positive experience
14  of leaders in the field, the consistency of the product
15  and the reproducibility of a standardized POP repair
16  procedure."  Do you see that?
17      A.  Yes.
18      Q.  Can we agree, though, that you began using
19  Prolift two months after you were trained or
20  professionally -- professionally introduced to the
21  product, per your testimony this morning, by Vince
22  Lucente on April 11, 2005?
23      A.  Yes.
24      Q.  So I want to know what all you did between

Page 100

1   your introduction and training on the product from
2   April 11, 2005, to, I think it's June 7, 2005, to
3   investigate the product.
4       A.  I did some medical research.  I did, I
5   believe, PubMed searches, looked at things that had
6   been presented, and I don't remember if there's another
7   meeting in there.  I don't remember when AUGS was that
8   year.  Could have been something like that.
9           Talked to other people, but probably talked
10  to Jon Crockford about it.
11      Q.  You think there was an AUGS meeting between
12  your training on April 11, 2005, and your first use of
13  the product, less than eight weeks later?
14      A.  There could have been.  I don't recall
15  specifically.
16      Q.  Okay.
17      A.  But that is a place that I would normally get
18  more information about procedures, products,
19  experiences, and things like that.
20      Q.  Okay.  And you say that prior to using this
21  in patients, you also did a PubMed search?
22      A.  Yes.
23      Q.  Do you recall what all articles you found
24  between April 11th and June 7th of 2005 that helped

Page 101

1   solidify your mind to go forward with using Prolift in
2   your patients?
3       A.  I do not.
4       Q.  And then you say that you decided to start
5   using it because of "due to positive experiences of
6   leaders in the field."  Who are you talking about
7   specifically, prior to your use of the product June of
8   2005?
9       A.  The French TVM group and Lucente, and any
10  data that he presented.
11      Q.  Are you aware that they didn't even start
12  marketing it until May 2005, and then you started using
13  it in June of 2005?
14      A.  I'm aware of that now, yes.
15          MS. KABBASH:  Objection.
16  BY MS. WHITE:
17      Q.  So is it fair to say that you were one of the
18  first doctors to use the product?
19          MS. KABBASH:  Objection.
20          THE DEPONENT:  Well, Lucente and his group
21  had been using it for quite a while, and the French
22  group had been using it since, I believe, 2000.  So I
23  don't believe I was one of the first users of the
24  product.

26 (Pages 98 to 101)

Rebecca M. Ryder, M.D.

## Page 102

BY MS. WHITE:
1  BY MS. WHITE:
2  Q. Dr. Ryder, Prolift was not sold in the United
3  States until May of 2005. Is that right?
4  MS. KABBASH: Objection.
5  THE DEPONENT: As far as I'm aware.
6  BY MS. WHITE:
7  Q. You began using it June 7th of 2005. Right?
8  A. Yes.
9  MS. KABBASH: Objection.
10  BY MS. WHITE:
11  Q. What procedures do you currenly utilize for
12  -- to treat anterior prolapse or cystocele?
13  A. Native tissue repairs.
14  Q. What else?
15  A. And Uphold LITE.
16  Q. What's Uphold LITE?
17  A. It's a vaginal mesh procedure.
18  Q. Who's the manufacturer?
19  A. Boston Scientific.
20  Q. And is it important, in determining a
21  prolapse procedure has been successful, you not just
22  look at functional outcomes, but you -- you look at how
23  the patient is doing?
24  A. Yes.

## Page 103

1  Q. And did you -- do you know what Ethicon's
2  internal criteria was for whether or not Prolift should
3  be utilized on a woman prior to them marketing it in
4  the United States?
5  A. Can you repeat the question?
6  Q. Yes, ma'am.
7  Do you know what Ethicon's internal criteria
8  was for whether or not a Prolift should be utilized on
9  a woman, Ethicon's criteria for who's an appropriate
10  candidate for Prolift?
11  A. Well, I read the instructions for use, and I
12  would read indications and contraindications, but
13  ultimately it's the surgeon's responsibility to figure
14  out if the patient's appropriate for the device.
15  Q. Again, other than the IFU, do you have any
16  information about what Ethicon's internal criteria was
17  for whether or not a Prolift should be utilized on a
18  woman prior to marketing it in 2005?
19  A. I don't believe I know what Ethicon's
20  internal criteria were, no.
21  Q. Would that be of any significance to you in
22  forming your opinions in this case as a general expert?
23  A. I don't believe so.
24  Q. And do you know anything about criteria

## Page 104

1  applied by Ethicon in deciding whether or not the
2  Prolift should be put on the market in 2005?
3  A. I do not.
4  Q. Would that be of any significance to you?
5  A. I don't believe so.
6  Q. And I think I know the answer to this, but do
7  you know who Bernard Jacquetin and Michele Coffin?
8  A. Yes.
9  Q. And who are they?
10  A. They were two of the investigators, I
11  believe, in the French TVM group.
12  Q. And, in fact, in forming your opinions today,
13  you're relying on articles that Goffin and Jacquetin
14  and their group of physicians in France published.
15  Right?
16  A. Yes.
17  Q. There's a lot of them in your reliance list.
18  A. Uh-huh.
19  Q. And do you know what Ethicon's internal
20  thoughts were with regard to whether the Prolift should
21  be limited to advanced stage prolapse?
22  A. I don't know what Ethicon's internal thoughts
23  were, no.
24  Q. Well, would that be of importance to you?

## Page 105

1  A. Not particularly.
2  Q. And do you believe you have access to the
3  same amount of data and information about the risks and
4  benefits of the Prolift as Ethicon did?
5  MS. KABBASH: Objection.
6  THE DEPONENT: There may be other data that I
7  am not aware of, yes.
8  Q. So as you sit here today, who knows more
9  about the risks and benefits of Prolift, you or
10  Ethicon?
11  MS. KABBASH: Objection.
12  THE DEPONENT: I know about the risks and
13  benefits of using Prolift in my patients that are
14  clinically applicable that I believe to be important to
15  them, and for myself as the implanting surgeon.
16  BY MS. WHITE:
17  Q. Is it fair to say that your opinions in this
18  case today, from what I'm hearing, it is based upon
19  your clinical experience and your review of the
20  literature?
21  MS. KABBASH: Objection.
22  THE DEPONENT: It is based on my review of
23  the literature, my attendance at professional
24  societies, my discussion with colleagues, my reading of

27 (Pages 102 to 105)

Rebecca M. Ryder, M.D.

Page 106

1    the FDA reports.  It is a global impression based on
2    many, many factors.
3    BY MS. WHITE:
4        Q.   And so it's -- your opinions here today are
5    based upon what you believe the facts to be about the
6    Prolift.  Right?
7            MS. KABBASH:  Objection.
8            THE DEPONENT:  Yes.
9    BY MS. WHITE:
10       Q.   Who, within Ethicon, evaluated the safety of
11   the Prolift device while it was on the market?
12       A.   I don't know.
13       Q.   Have you ever asked to see any information
14   that Ethicon had compiled internally about the safety
15   or the efficacy of the Prolift while it was on the
16   market?
17       A.   I have not asked for that, no.
18       Q.   Do you consider yourself to be an expert with
19   regard to the design of the Prolift?
20       A.   Design, no.
21       Q.   Do you have any information at all that
22   you're relying on as an expert in this case about the
23   steps that are taken, or were actually taken, with the
24   design and the development of the Prolift by Ethicon?

Page 107

1        A.   I have information that was presented to me
2    at my Prolift training about the evolution of the TVM
3    into the Prolift procedure.
4        Q.   So you're relying upon what you learned from
5    Dr. Lucente on April 11, 2005.  Right?
6            MS. KABBASH:  Objection.
7            THE DEPONENT:  Yes, as well as other things I
8    may have learned from colleagues or meetings or
9    literature searches on my own.
10   BY MS. WHITE:
11       Q.   But nothing from Ethicon internal documents
12   about the design, the development of the Prolift?
13       A.   Nothing about that what?  What's the
14   question?
15       Q.   Do you have any information at all that
16   you're relying on, at all, as an expert in this case
17   about the steps that were taken by Ethicon with regard
18   to the design and the development of Prolift?  Are you
19   taking a look -- as an expert today, did you look at
20   what they did to design this product?
21       A.   I looked at some information from Ethicon
22   from company documents, yes.
23       Q.   Okay.  Tell me about that in regards to the
24   design and development of the product.

Page 108

1        A.   There was a -- I believe it was a round table
2    discussion or an expert users forum, or something, I
3    believe, that talked about the design.  I can't recall
4    specific documents.
5        Q.   Do you recall any other things specifically,
6    other than the round table discussion?
7        A.   I think there was more than one.  I think
8    there were several proceedings of physicians who had
9    been using the product, talking about the design and
10   maybe some memos or something.
11       Q.   Do you know what design control is?
12       A.   Design control?
13       Q.   Uh-huh.
14       A.   No.
15       Q.   Do you know what design requirement matrix
16   is?
17       A.   No.
18       Q.   Do you know what the initials FNEA stand for?
19       A.   No.
20       Q.   What about DDSA?
21       A.   I think I may have run across that one, but I
22   can't recall what it means.
23       Q.   Do you know anything about the internal
24   steps, anything at all that Ethicon took as a device

Page 109

1    manufacturer to develop the Prolift, meaning the
2    internal steps that the company went through, to get
3    from the point when somebody brought the idea to
4    Ethicon about this particular product to the point that
5    Ethicon was put on the market?
6        A.   I don't believe so.
7        Q.   You're familiar with Dr. Klinge.  Right?
8        A.   I've seen his name in articles.
9        Q.   Well, he's cited in your reliance list.
10       A.   Yes.
11       Q.   So are you familiar with him?
12       A.   As a person, no.
13       Q.   Okay.  Are you familiar with the medical
14   literature that he's put out about polypropylene, and
15   specifically about the Prolift?
16       A.   Yes.
17       Q.   Well, what's his opinion about whether or not
18   Prolift was safe for use in women for POP?
19       A.   I didn't specifically analyze his data and
20   make an opinion solely based on his article.
21       Q.   Do you know what his specialty is?
22       A.   I don't recall.
23       Q.   Okay.  You also have said in Justus and -- at
24   least in Justus that you reviewed his report.

28 (Pages 106 to 109)

Rebecca M. Ryder, M.D.

Page 110

1    A. I didn't -- Klinge's report?
2    Q. Yes, ma'am.
3    A. Well, that's an error. I did not review his
4  report?
5    Q. You did not review Klinge?
6    A. I did not review Klinge's.
7    Q. And you don't deny, though, he's in your
8  reliance list?
9    A. I've seen some articles, I believe, by him,
10 yes. I did not read an expert report by him.
11   Q. Let's bring out your reliance list.
12      And you've testified under oath today that
13 you are familiar with all 382 articles. Right?
14   A. I'm familiar with them.
15   Q. Okay. Do you know that he's considered an
16 expert in the area of biomaterials science?
17      MS. KABBASH: Objection.
18      THE DEPONENT: I do not.
19 BY MS. WHITE:
20   Q. Okay. Well, do you know that he's an expert
21 in the Justus case?
22   A. I believe so.
23   Q. Okay. And would you agree that -- so you
24 don't know what his specialty is, but you've read his

Page 111

1  articles?
2    A. I'm familiar with his articles. I have not
3  read them word for word.
4    Q. Well, if he's considered a world-renown
5  expert in the area of material sciences, would you
6  agree that Dr. Klinge has a much higher degree of
7  expertise in biomaterial sciences than you do?
8      MS. KABBASH: Objection.
9      THE DEPONENT: In biomaterial sciences?
10 BY MS. WHITE:
11   Q. Yes, ma'am.
12   A. Yes.
13   Q. And you've already testified that you rely in
14 part on Dr. Klinge's literature about the mesh in
15 Prolift in forming your opinions. Right?
16   A. I have reviewed his -- his articles.
17   Q. Okay. You put him, his literature on your
18 reliance list.
19      MS. KABBASH: Objection. It is not a
20 reliance list. It is a list of materials reviewed. I
21 just don't want you to mischaracterize the document.
22 BY MS. WHITE:
23   Q. Materials reviewed. Let's bring that out for
24 a second.

Page 112

1      Let's take a break.
2      (Whereupon, a brief recess was taken.)
3  BY MS. WHITE:
4    Q. All right. Let's go to page 13, list of
5  materials reviewed.
6      And you see, you have Klinge listed twice?
7    A. Yes.
8    Q. 179 and 180. Right?
9    A. Yes.
10   Q. Okay. So you're familiar with Dr. Klinge?
11   A. I'm familiar.
12   Q. Okay. Do you know what Dr. Klinge's opinions
13 are about whether or not the mesh in the Prolift is
14 safe for transvaginal treatment of prolapse?
15   A. I do not.
16   Q. Are you aware that he says it is absolutely
17 not safe for use in prolapse?
18   A. I'm not aware of that.
19   Q. Would that opinion be significant to you?
20   A. It would not change my overall opinion of
21 using the device clinically.
22   Q. Okay. If this material is not safe -- to be
23 determined not safe by someone who's an expert in
24 biomaterial sciences, that doesn't matter to you?

Page 113

1      MS. KABBASH: Objection.
2      THE DEPONENT: If this material is deemed to
3  be unsafe by a material scientist, who has not taken
4  care of patients and implanted polypropylene mesh since
5  1963, that would not substantially alter my opinion,
6  no.
7  BY MS. WHITE:
8    Q. Okay. What would alter your opinion?
9      MS. KABBASH: Objection.
10 BY MS. WHITE:
11   Q. I mean, if not someone like Dr. Klinge or
12 Dr. Elliott, what would alter your opinion that Prolift
13 was not safe for use in a woman? What would mean
14 something you?
15      MS. KABBASH: Objection.
16      THE DEPONENT: If, you know, many women
17 started coming down with cancer, if the clinical
18 experience over time changes, that would be important.
19 I will continue to review my use of all surgical
20 options that I provide to my patients. Every month I
21 read medical literature, I go to meetings, I keep up.
22 So if a substantial amount of adverse reactions start
23 to change my opinions, then that could.
24 BY MS. WHITE:

29 (Pages 110 to 113)

Rebecca M. Ryder, M.D.

## Page 114

1    Q.  Now, wait.  I'm talking about Prolift.
2    A.  Uh-huh.
3    Q.  Okay?
4        What would mean something?  I mean, Prolift
5    is not even on the market anymore.  Right?
6    A.  Right.
7    Q.  As an expert sitting here today, I mean,
8    you've already talked about before you decided in that
9    eight weeks to use the product, you talked to leaders
10   in the industry, you talked to colleagues.
11       I mean, is it fair to say, based upon your
12   experience, that over time doctors started using
13   Prolift less and less?
14   A.  I have no idea.
15   Q.  Okay.  You have no idea as an expert on
16   Prolift in this case?
17       MS. KABBASH:  Objection.  Argumentative.
18       THE DEPONENT:  I have no idea if doctors over
19   time decreased their use of Prolift, no.
20   BY MS. WHITE:
21   Q.  Okay.  Well, would that be significant to
22   you, that during the time that it was on the market
23   from 2005 to 2012 that it start -- that it was being
24   used less and less, as an expert for Ethicon in this

## Page 115

1    case?
2    A.  Well, other products came on the market and
3    there were other choices.  So the practice of medicine
4    changes over time.  So it wouldn't surprise me that
5    people do different things over time.
6    Q.  In your career have you been involved in
7    treating complications with Prolift?
8    A.  Yes.
9    Q.  And was -- did that involve your own
10   patients?
11   A.  Yes.
12   Q.  Okay.  What kind of complications did you see
13   with the Prolift?
14   A.  Mesh exposure.
15   Q.  What else?
16   A.  Vaginal pain.  Dyspareunia.
17   Q.  Anything else?
18   A.  Not that I can recall.
19   Q.  And did you treat these complications in your
20   own patients?
21   A.  Yes.
22   Q.  Did you ever have patients you had to revise
23   more than one time who had the Prolift?
24   A.  No.

## Page 116

1    Q.  Did you treat complications from patients of
2    other doctors?
3    A.  Yes.
4    Q.  And is it fair to say that -- first of
5    all, do you recall how many complications within
6    your own patient group that you had regarding Prolift?
7    A.  I have an estimate.
8    Q.  Okay.  What is that?
9    A.  I estimate my mesh exposure rate to be five
10   to ten percent.
11   Q.  Okay.  Now, that's not what I asked you --
12   A.  Okay.
13   Q.  -- because there's more than just mesh
14   exposure as a complication.
15       How many complications did you have with your
16   approximately 100 Prolift patients, that you know
17   about?
18   A.  Ten, approximately.
19   Q.  So 10 percent.
20       Okay.  And it's fair to say that some of your
21   patients who you implanted with Prolift could have went
22   to other doctors for complications and you wouldn't
23   know about that.  Right?
24       MS. KABBASH:  Objection.

## Page 117

1        THE DEPONENT:  Right.
2    Q.  So you estimate that you had about 10 percent
3    complication rate?
4    A.  Yes.
5    Q.  And we don't know for sure if that's
6    accurate, because we don't know how many of your
7    patients went to other doctors.  Right?
8        MS. KABBASH:  Objection.
9        THE DEPONENT:  Right.
10       I have not received a substantial amount of
11   records requests from other physicians regarding my
12   patients.
13       MS. WILSON:  Thank you.
14   BY MS. WHITE:
15   Q.  How do you treat SUI now?
16   A.  Predominantly with a transobturator or
17   single-incision slings.  Sometimes retropubic TVTs.
18   Q.  When was the last time you performed a
19   Prolift procedure?
20   A.  Approximately, 2008 or 2009.
21   Q.  When?
22   A.  2008 or 2009.
23   Q.  Why did you stop using Prolift?
24   A.  Because I transitioned to Uphold.

Rebecca M. Ryder, M.D.

Page 118

1    Q.  Why did you transition to Uphold?
2    A.  Because Uphold has -- gives you about 2
3    centimeters higher suspension of the apex.
4    Q.  Isn't it true, Doctor, that you stopped using
5    Prolift because of your concerns over the trocar arms?
6    A.  That's not true.
7    Q.  Okay.  Well, if there's e-mails documenting
8    that's exactly what you told Jim Gatewood, did you make
9    that up?
10   MS. KABBASH:  Objection.  You're talking
11   about a statement by Jim Gatewood or a statement from
12   her.
13   BY MS. WHITE:
14   Q.  I'm going to show you a document.  Okay?
15   So I just want to know under oath, why did
16   you stop using Prolift?
17   A.  Because I wanted higher apical support.
18   Q.  And was Prolift not giving you enough apical
19   support?
20   A.  Any time you can get higher apical support,
21   it would be advantageous for the patient.
22   Q.  And what's the significance of higher apical
23   support?
24   A.  Less chance of recurrent prolapse or less --

Page 119

1    you're starting from a higher point.  So even if
2    gravity pushes on it, you're starting from a higher
3    point.
4    Q.  Okay.  Did you ever use Prolift+M?
5    A.  No.
6    Q.  And you think it was 2008 you stopped using
7    Prolift?
8    A.  That's my approximation.  I don't know
9    exactly.
10   Q.  What are the trocars?
11   A.  The trocars are stainless steel needles.
12   Q.  They're instruments used to help you
13   surgically implant the device?
14   A.  Yes.
15   MS. WILSON:  Okay.  Let's mark this.
16   (E-mail from Jim Gatewood to Rebecca Ryder,
17   Re: Thursday's Advanced Users Forum, August 26, 2009,
18   ETH.MESH.03988276 & 278, marked for identification as
19   Ryder Deposition Exhibit No. 14.)
20   BY MS. WHITE:
21   Q.  So I'm going to show you first -- I've got a
22   couple I'm going to show you.  This is Ethicon document
23   03988276 through 03988278, and if you look at the
24   bottom, this e-mail is dated August 26, 2009.

Page 120

1    And is it fair to say that this is Jim
2    Gatewood inviting you to an Advanced Users Forum at
3    McCormick & Schmick's, Town Center, Virginia Beach?
4    "Dr. Lucente will be there leading a discussion on
5    pelvic floor repair that will include new information
6    about Prolift+M."
7    Do you see that?
8    A.  Yes.
9    Q.  Okay.  And do you tell Jim that you can't
10   make it?
11   A.  Yes.
12   Q.  Okay.  And do you specifically remember being
13   invited to this?
14   A.  I did not specifically remember that, no.
15   Q.  And then if you go on up -- and he calls you
16   Rebecca.  Right?
17   A.  Yes.
18   Q.  That's your first name, right, Dr. Ryder?
19   A.  Yes.
20   Q.  Okay.  So this is from Jim to you.  Looks
21   like your Gmail account.  And he says, "Rebecca, I'm
22   disappointed that you won't be there.  It's always
23   great to see you, even if it's just to catch up.  You
24   have a standing offer to go up to Allentown to visit

Page 121

1    with Dr. Lucente.  When you want to revisit Prolift or
2    learn more about the newest mesh, please let me know."
3    Okay.  So as of August 26, 2009, do you
4    accept as true that apparently you were not using
5    Prolift?
6    A.  Yes.
7    Q.  Okay.  Okay.  Let me make sure I'm not giving
8    away my document.
9    Okay.  I'm going to hand you two documents,
10   we're going to do it as one exhibit, and it is Ethicon
11   03988270 through 3988272 -- actually, strike that.
12   These documents are 03988270 all the way
13   through 03988275.  So I'm going to hand you this,
14   Doctor.
15   MS. KABBASH:  Do you want to mark it first?
16   MS. WILSON:  Yeah, I'm sorry.  Let's mark
17   that.
18   (E-mail from Jim Gatewood to Dr. Lucente and
19   Lydia Lucente, Re: FW, August 27, 2009,
20   ETH.MESH.03988270-275, marked for identification as
21   Ryder Deposition Exhibit No. 15.)
22   BY MS. WHITE:
23   Q.  So Exhibit 15.  And this is an e-mail from
24   Jim Gatewood to -- I think it's Dr. Lucente -- well, it

Rebecca M. Ryder, M.D.

Page 122

1    is definitely Dr. Lucente and maybe his wife, and Greg
2    Ullman, who works for J&J is copied, and it's about an
3    advance -- PFR advanced user's forum, and this is
4    Document 03988272, and if you look down at the bottom,
5    you've been targeted to come to this event, and you've
6    been sent an invitation and your picture's there at the
7    bottom.
8         It says you're not coming, but you're
9    identified as Dr. Ryder, "OB/GYN, with a focus on PFR
10   and incontinence, past Prolift user. "Stopped using
11   due to fear of not being able to manage complications
12   caused by trocars. Currently uses Pinnacle three to
13   four times a month."
14        Do you see that?
15   A.   Yes.
16   Q.   Okay. So where did Jim get the information
17   that you stopped using Prolift because of fear of not
18   being able to manage complications caused by trocars?
19   A.   I'm not sure.
20   Q.   He made that up?
21        MS. KABBASH: Objection.
22        THE DEPONENT: One advantage of going to, I
23   guess it was Pinnacle before it was Uphold, was that it
24   was all internal vaginal surgery, so you didn't have to

Page 123

1    have the external incisions with the trocar, and that
2    was another factor that formed in my opinion of
3    changing from Prolift to the Boston Scientific
4    products.
5    BY MS. WHITE:
6    Q.   Was it difficult to use the trocars?
7    A.   No, not particularly. There was a learning
8    curve.
9    Q.   And would you say that all doctors, just like
10   you, had that learning curve?
11   A.   Yes.
12   Q.   Uh-huh. Okay. So you have not implanted a
13   woman with a Prolift since 2008. Right?
14        MS. KABBASH: Objection.
15        THE DEPONENT: As far as I can recall, I
16   don't remember, 2008 or 2009, apparently. I do not
17   recall the last time I did a Prolift.
18   BY MS. WHITE:
19   Q.   Okay. In forming your opinions in this
20   litigation as a general expert for Ethicon, did you
21   consider that some patients with a Prolift have to be
22   revised more than once?
23   A.   I'm aware that some patients do, yes.
24   Q.   And lots of patients don't have acute or

Page 124

1    transient pain with Prolift. They have prolonged
2    or chronic pain?
3    A.   Some patients do, yes.
4    Q.   So you considered all of that?
5    A.   I did, because they also have native tissue
6    repairs and abdominal sacrocolpopexy.
7    Q.   Are you saying, and this is very important,
8    Doctor, that patients who have Prolift [sic] have the
9    same rates of pain as patients who were implanted with
10   the Prolift?
11   A.   Say that again?
12   Q.   Patients who are implanted have the same rate
13   of pain with native tissue as patients implanted with
14   Prolift?
15   A.   The most recent Cochrane data review in 2016
16   suggests that, yes.
17   Q.   If Ethicon knew at any point, either prior to
18   launching Prolift or afterwards, that there were mesh
19   erosion reoccurrence issues, is that something you as
20   an expert would have wanted to know in formulating your
21   opinions?
22        MS. KABBASH: Objection.
23        THE DEPONENT: I don't think it's unlikely --
24   it's not -- pelvic reconstructive surgeons know that

Page 125

1    sometimes you have to fix things more than once.
2    BY MS. WHITE:
3    Q.   I mean, would you have wanted that
4    information, the information they had on mesh erosion
5    reoccurrence, would you have wanted that information as
6    an expert --
7        MS. KABBASH: Objection.
8    BY MS. WHITE:
9    Q.   -- in formulating opinions in this
10   litigation?
11   A.   Yes.
12   Q.   And would you have wanted that information as
13   a physician implanting this product in your patients?
14        MS. KABBASH: Objection.
15        THE DEPONENT: Yes.
16   BY MS. WHITE:
17   Q.   And the opinions that you have formed in this
18   case with regard to safety and the efficacy of the
19   Prolift are based on what? And I'm talking about
20   safety and efficacy, because you give an opinion in
21   your report that this product was safe and efficacious
22   for use in patients.
23   A.   Yes.
24   Q.   So what was that based upon?

Rebecca M. Ryder, M.D.

Page 126

1      A.  That was based upon the medical literature,
2  my attendance at professional meetings, position papers
3  by the societies, my personal experience with patients.
4  Again, it's a global synthesis of available information
5  and my experience.
6      Q.  Why did you not use Prolift+M?
7      A.  I believe it came out about the time I had
8  transitioned over to Pinnacle.
9      Q.  And do you know whether or not the material
10  used in the Prolift+M was the same as the material used
11  in the Prolift?
12      A.  I do not.
13      Q.  Did anyone at Ethicon ever tell you that they
14  internally believed that the Prolift+M could have
15  safety advantages for patients because of the fact that
16  it was larger pores, lighter-weight mesh than Prolift?
17      A.  No.
18      Q.  They never told you that?
19      A.  I don't believe I talked with anybody about
20  Prolift+M.
21      Q.  And do you know what Dr. Lucente's opinion
22  was as to whether or not one should use the Prolift or
23  Prolift+M in terms of what was more compatible with the
24  female tissue?

Page 127

1      A.  I do not.
2      Q.  Do you respect Dr. Lucente?
3      A.  I do.
4      Q.  Well, is his opinion as to what's safer,
5  Prolift or Prolift+M, would that have been important to
6  you?
7      A.  Yes.
8      Q.  Do you know why Ethicon stopped marketing the
9  Prolift?
10      A.  I do not.
11      Q.  As part of your work as an expert, did you
12  seek to find out why Ethicon stopped selling Prolift?
13      A.  No.
14      Q.  Did you ever ask Mr. Gatewood?
15      A.  No.
16      Q.  Did he tell you that Ethicon was going to
17  stop marketing the Prolift September 1, 2012?
18      A.  I believe at some point I received some
19  communication that they were going to stop marketing.
20  Whether it came from the company or him, I don't know.
21  I think he was retired by then.
22      MS. WILSON:  Okay.  Let's go off the record.
23      (Whereupon, a recess was taken from
24  12:04 p.m. to 12:05 p.m.)

Page 128

1      MS. WILSON:  Okay.  Back on.
2      And I just want to revisit this trocar issue
3  again, because Jim keeps talking about it in e-mails
4  directly to you, so let's go ahead and mark this.
5      (E-mail from Rebecca Ryder to Jim Gatewood,
6  Re: Hi, November 2, 2009, ETH.MESH.03988064, marked for
7  identification as Ryder Deposition Exhibit No. 16.)
8  BY MS. WHITE:
9      Q.  So I've handed what we've marked as
10  Plaintiffs' Exhibit 16.  He sent this to you, if you
11  look down, it was on Monday, November 2, 2009, at 9:36
12  9:36 a.m., and it goes to what's a Gmail account.  It
13  says, "Dr. Ryder, I hope you are well.  I've been
14  extremely busy" --
15      A.  I don't have that one.
16      Q.  Exhibit 16?
17      A.  Oh, I see.  Yes.  Okay.
18      Q.  Okay.  And it says, "J. Gatewood wrote"?
19      A.  Yes.
20      Q.  "Dr. Ryder, I hope you are well.  I've been
21  extremely busy and absolutely loving being back in the
22  field.  I don't ever want an office job again!!  I will
23  be trained on a new trocar-less" -- and that's
24  trocar-less -- "mesh kit on November 30th and

Page 129

1  December 1st.  I have seen it, and I think you may be
2  interested.  I would like to show it to you ASAP after
3  I return from training.  Could I get on your schedule
4  in early December?  I am wide open the week of
5  December 7th, except Monday after 3:00 p.m.  Can we
6  meet?"
7      And you're reply was, "Sure, Jim.  Just give
8  Michael at" -- should be "a" -- "call at 312-8221 and
9  get on my schedule."
10      Does this e-mail refresh your recollection?
11      MS. KABBASH:  As to?
12  BY MS. WHITE:
13      Q.  Do you remember this e-mail?
14      A.  I did not until I just saw it, no.
15      Q.  Well, do you remember it now?
16      A.  It looks like I did it, yes.
17      Q.  Okay.  And so he's saying, "Look, I've got
18  something that's trocar-less."  Now you remember that
19  you and Jim had conversations about the fact you didn't
20  like the trocar complications with the Prolift?
21      MS. KABBASH:  Objection.
22      THE DEPONENT:  I had no trocar complications
23  with the Prolift.  I saw an advantage to having fewer
24  incisions for the patients.  That's the conversation

33  (Pages 126 to 129)

Rebecca M. Ryder, M.D.

Page 130

1   that Jim and I would have had.
2   BY MS. WHITE:
3       Q.   Okay.  So in the previous e-mail, once again
4   -- I just want to make sure I understand your
5   testimony, because it's probably the last time I'm
6   probably going to talk to you before trial -- he says
7   you had complications and he was worried about it, and
8   he was trying to introduce you to a new product.
9           So is it your testimony that Jim Gatewood
10  categorized that wrong?
11      A.   That is my testimony.  I did not have any
12  trocar complications.
13      Q.   But we can all agree, you stopped using it in
14  2008?
15          MS. KABBASH:  Objection.
16          THE DEPONENT:  Somewhere between 2008 and
17  2009, yes.
18  BY MS. WHITE:
19      Q.   Okay.  You weren't using Prolift the year it
20  went off the market, 2012?
21      A.   I was not.
22      Q.   So he sent you this e-mail to your personal
23  account.  You say, "Sure, Jim.  Call Michelle to get on
24  my schedule."

Page 131

1       A.   That's my business account.
2       Q.   Okay.  Your business account.  Fine.
3           And who's Michelle?
4       A.   My office manager.
5       Q.   Okay.  And do you recall meeting with Jim?
6       A.   Probably.  Now that I see this e-mail.
7       Q.   Okay.
8       A.   And that was probably about Prosima.
9       Q.   Did you use Prosima?
10      A.   No.
11      Q.   And why not?
12      A.   Because I was happy with what I was doing.
13      Q.   Okay.  And what were you doing?
14      A.   Pinnacle or Uphold.
15      Q.   Okay.  And it doesn't surprise you that
16  pretty much any product that Jim Gatewood was
17  detailing, that you were a target for him.  Right?
18          MS. KABBASH:  Objection.
19          THE DEPONENT:  Apparently, from the documents
20  you have shown me.
21          MS. WILSON:  I will show you some more here.
22          All right.  Let's go ahead and mark this one.
23          (E-mail from Jim Gatewood to Greg Ullman, Re:
24  Abbrevo Targets, ETH.MESH.03987340, marked for

Page 132

1   identification as Ryder Deposition Exhibit No. 17.)
2   BY MS. WHITE:
3       Q.   If you go down to the bottom, Ethicon
4   document 03987340.  This is an e-mail from Greg Ullman
5   to Jim Gatewood.
6           Do you know who Greg Ullman is?
7       A.   No.
8       Q.   I think he's Jim's new boss, and this is
9   about Abbrevo targets.  Do you see that?
10      A.   Yes.
11      Q.   Did you use Abbrevo?
12      A.   No.
13      Q.   Okay.  And he says, "Jim, can you give an
14  update on your Abbrevo progress, specifically with
15  these targets?  Include any others.  Good job pulling
16  through with DePaul/Hughes."
17          Now, do you see that you are the number 2
18  target?
19      A.   Yes.
20      Q.   Okay.  Does that offend you in any way,
21  Doctor, that these sales reps or these employees at
22  Ethicon identify you as a target?
23          MS. KABBASH:  Objection.
24          THE DEPONENT:  It is their job to make their

Page 133

1   product available to implanting surgeons.  I understand
2   that's their job.
3   BY MS. WHITE:
4       Q.   You think that they're doing it as a service?
5       A.   They're doing it as their job.
6       Q.   Do you find the word "target" distasteful?
7           MS. KABBASH:  Objection.
8           THE DEPONENT:  I'm neutral about that word.
9   BY MS. WHITE:
10      Q.   Okay.  Well, do you know that Jim has
11  identified you as the highest-volume mesh kit user in
12  all of Chesapeake, Dr. Ryder?  Did you know that?
13      A.   I did not.
14      Q.   Did you know that you were?
15          MS. KABBASH:  Objection.
16          THE DEPONENT:  I have no statistics to deny
17  or confirm that.
18  BY MS. WHITE:
19      Q.   So not only -- I mean, not only Ethicon
20  products, which he identified you as one of the highest
21  users of that, but you also used other polypropylene
22  transvaginally in women?
23      A.   Yes.
24          I'm also probably the highest-volume pelvic

Rebecca M. Ryder, M.D.

Page 134

1    reconstructive surgeon at Chesapeake General, period.
2        MS. WILSON: Go ahead and mark this.
3        (E-mail from Jim Gatewood to Greg Ullmann,
4    Re: Traveling Proctor Request, ETH.MESH.03989861,
5    marked for identification as Ryder Deposition Exhibit
6    No. 18.)
7    BY MS. WHITE:
8        Q.    Out of 1,000 pelvic surgeries that you've
9    done that you've identified on your report, what
10   percentage of those have involved polypropylene?
11       A.    15 to 20.
12       Q.    15 to 20 percent?
13       A.    Approximately.
14       Q.    Okay.  I'm handing you what's been marked as
15   Ryder 18, and this is Jim Gatewood, June 2, prolonged
16   2011, to Greg Ullman.
17       "Traveling" -- the subject, "Traveling
18   Proctor Request."  And if you go down to the second
19   paragraph of this e-mail, and the document number is
20   03989861.
21       "Since being trained, Dr. Hardy has taken
22   both Abbrevo and Prosima to Chesapeake Regional
23   Hospital's VAC for approval.  He did this on two
24   separate days, pitched both products, and both were

Page 135

1    approved.  This approval gains us access to several
2    doctors using competitive slings.  Five have expressed
3    interest in trying Abbrevo.  Also, with Prosima
4    approved, I now can approach the highest-volume mesh
5    kit user in Chesapeake, Dr. Ryder."
6        Did he approach you with Prosima?
7        A.    I believe so.
8        Q.    And do you have a specific recollection of
9    that?
10       A.    I think so.
11       Q.    And why did you decide not to use Prosima?
12       A.    Because I had good results with what I was
13   experiencing, and the Prosima procedure, I believe,
14   involved a patient using -- wearing a pessary for two
15   weeks, and I just didn't feel that that was a necessary
16   step.
17       Q.    In the time that you used Prolift, would you
18   have -- for pelvic organ prolapse, would you have used
19   it with someone with Stage 1 prolapse?
20       A.    No.
21       Q.    Would you have used it with someone with
22   Stage 2 prolapse?
23       A.    Perhaps, if it was at or beyond the introitus
24   and they had significant risk factors for native tissue

Page 136

1    failure like chronic heavy lifting, chronic coughing,
2    straining.
3        Q.    Would you -- during the time you used
4    Prolift, would you have used it with women who were
5    sexually active?
6        A.    Yes.
7        Q.    And would it have been important to you as an
8    expert and a practicing physician using Prolift that --
9    that you would have been aware of what Ethicon's
10   criteria from the doctors that actually designed
11   Prolift were, who was an appropriate candidate for this
12   product?
13       A.    Yes.
14       Q.    And, Doctor, as an OB/GYN and you've have
15   been practicing for 27 years, have you ever had an
16   occasion to call in an antibiotic for a patient who
17   says -- who's called in to your practice, saying that
18   they have a urinary tract infection, that you didn't
19   make them come in, you didn't make them undergo a
20   urinalysis, but you called in an antibiotic for them?
21       A.    Yes.
22       Q.    When was the last time you did that?
23       A.    Probably within the last month.
24       Q.    And is it fair to say that women often know

Page 137

1    when they have a UTI?
2        A.    Yes.
3        MS. KABBASH: Objection.
4    BY MS. WHITE:
5        Q.    And do you think it's a deviation from the
6    standard of care that you have done that for your
7    patients?
8        A.    No.
9        Q.    And do you think it would be a waste of money
10   and time, and inconvenient for patients to make them
11   come in every single time they have a UTI?
12       MS. KABBASH: Objection.
13       THE DEPONENT: It really depends on the
14   clinical situation.  If you have a person who is
15   thinking that she has recurrent urinary tract
16   infections, I think she needs further evaluation.  And
17   when women are calling frequently, I will make them
18   come in and have an evaluation.
19       Q.    Sure.  And that's really not the question.
20       But if you've got a patient and you trust
21   them, you know them, there's a history there and they
22   call up and say, "Dr. Ryder, I have these symptoms," I
23   mean, it's perfectly acceptable, you haven't done
24   anything wrong by calling in an antibiotic for your

Rebecca M. Ryder, M.D.

Page 138

1    patients under those circumstances --
2         MS. KABBASH: Objection.
3         THE DEPONENT: I don't believe so. I always
4    tell them to follow up in two to three days if they're
5    not better.
6
7    BY MS. WHITE:
8         Q.  -- Okay. When's the last time you
9    reviewed -- strike that.
10        When you would implant a Prolift in a woman,
11   would you always read the IFU every time you did it?
12        A.  Not every time, no.
13        Q.  Do you know any of the standards that Ethicon
14   itself applied to whether or not the warnings and
15   information provided in the IFU and the patient
16   brochure were adequate?
17        A.  I understand that the FDA instructions on
18   labeling and warnings were reviewed and adhered to.
19        Q.  Do you know whether or not Prolift had 510(k)
20   clearance at the time it began being sold in the United
21   States?
22        MS. KABBASH: Objection.
23        THE DEPONENT: Prolift did not.
24   BY MS. WHITE:

Page 139

1         Q.  In fact, they sold it without 510(k). Right?
2         A.  Right.
3         MS. KABBASH: Objection.
4    BY MS. WHITE:
5         Q.  Is there anything in the IFU about how to
6    take the Prolift out of a woman in the event of
7    complications?
8         A.  No.
9         Q.  Do you know any of the standards that area
10   applied in general to medical device manufacturers in
11   providing information in IFU or a patient brochure in
12   terms of what type of information should be supplied?
13        A.  I know the things from the FDA memos.
14        Q.  Now, what, specifically, are you talking
15   about?
16        A.  I think they call it a blue book memo or
17   something -- FDA -- that discusses labeling warnings,
18   contraindications, things like that.
19        Q.  Other than Prolift, what were the other
20   available treatments for pelvic organ prolapse between
21   spring of 2005 and September 1st of 2012?
22        A.  For pelvic organ prolapse?
23        Q.  Yes, ma'am.
24        A.  Abdominal sacrocolpopexy, anterior

Page 140

1    colporrhaphy, posterior colporrhaphy, uterosacral
2    ligament suspension, sacrospinous ligament fixation,
3    abdominal and vaginal perivaginal repairs, culdoplasty,
4    vaginal and abdominal enterocele repairs.
5         Q.  Is there anything in the IFU about how to
6    manage complications caused by the trocars?
7         A.  How to manage them, no, I don't believe so.
8         Q.  Have you ever attended a professional
9    education event sponsored by Ethicon on how to manage
10   complications by trocars?
11        A.  No. I don't believe so.
12        Q.  Do you know why Ethicon marketed Prolift+M?
13        A.  I do not know why.
14        Q.  Do you think it was because Prolift was
15   unsafe?
16        MS. KABBASH: Objection.
17        THE DEPONENT: I doubt it.
18   BY MS. WHITE:
19        Q.  Well, if Ethicon thought the Prolift+M was
20   safer, a safer product for Prolift, would you want to
21   know that in considering -- in formulating your
22   opinions in this case?
23        MS. KABBASH: Objection.
24        THE DEPONENT: I've been retained as an

Page 141

1    expert on Prolift. I'm not an expert on Prolift+M.
2    BY MS. WHITE:
3         Q.  I'm not asking you to offer. I'm saying in
4    formulating your opinions on Prolift, would you want to
5    know whether or not Ethicon, the company manufacturing
6    both products, thought Prolift+M was safer than
7    Prolift, and why they thought that, would that be
8    important to you?
9         MS. KABBASH: Objection.
10        THE DEPONENT: I could consider it.
11   BY MS. WHITE:
12        Q.  Do you know whether or not it had anything to
13   do with Prolift+M being a lighter-weight mesh than
14   Gynemesh PS?
15        A.  I do not.
16        Q.  Okay. Do you agree that lighter-weight mesh
17   is considered in the urogynecology community in
18   literature to have safety advantages as against a
19   heavier-weight mesh?
20        MS. KABBASH: Objection.
21        THE DEPONENT: I understand that they have
22   been proposed. I'm not aware of trials between
23   lightweight and heavyweight meshes, or heavier.
24   Heavyweight.

36 (Pages 138 to 141)

Rebecca M. Ryder, M.D.

Page 142

```
1    BY MS. WHITE:
2        Q.  Well, let me just ask you, you said you're
3    basing a lot of these opinions on your clinical
4    experience.  Do you think that the safety profile for a
5    heavyweight mesh or mid-weight mesh is the same for
6    that of a lightweight mesh?
7        MS. KABBASH:  Objection.
8    BY MS. WHITE:
9        Q.  In your 27 years of experience?
10       MS. KABBASH:  Objection.
11   Mischaracterization.
12       THE DEPONENT:  I know my clinical experience
13   with the meshes I have implanted.
14   BY MS. WHITE:
15       Q.  Okay.  So is a lightweight mesh, does it have
16   a better safety profile than a heavyweight or
17   mid-weight mesh?
18       MS. KABBASH:  Objection.
19       THE DEPONENT:  I don't believe we know that.
20   BY MS. WHITE:
21       Q.  Okay.  Do you have an opinion, to a
22   reasonable degree of medical probability, as to whether
23   or not there are any safety advantages as between the
24   Prolift+M as compared to Prolift?
```

Page 143

```
1        A.  I do not.
2        Q.  Are you aware that mesh can contract anywhere
3    within the pelvis, including in areas where it's
4    difficult to operate through conventional techniques?
5        MS. KABBASH:  Objection.
6        THE DEPONENT:  I think it's controversial
7    whether it's the mesh that contracts or the tissue
8    that's around the mesh that contracts, but I'm aware
9    that there can be tissue contraction around mesh, yes.
10   BY MS. WHITE:
11       Q.  You think that's controversial, whether the
12   mesh contracts or the tissue around it?
13       A.  I do.
14       Q.  And you don't think the medical literature
15   has ironed that out?
16       A.  Correct.
17       Q.  And are you aware that contraction can lead
18   to pain for patients?
19       A.  Yes.
20       Q.  Do you know whether Ethicon, in designing the
21   Prolift, made any effort to come up with a way to treat
22   complications when women would suffer complications
23   related to the mesh?
24       A.  I do not know if Ethicon did that, no.
```

Page 144

```
1        Q.  Are you aware that the French TVM group who
2    designed Prolift were concerned that the rate of
3    de novo dyspareunia was unacceptably high?
4        MS. KABBASH:  Objection.
5        THE DEPONENT:  I remember reading something
6    to that effect.
7        MS. WILSON:  Off the record.
8        (Whereupon, a recess was taken from
9    12:24 p.m. to 12:26 p.m.)
10   BY MS. WHITE:
11       Q.  Doctor, have you ever reported any adverse
12   events to the FDA with regard to complications you've
13   had with Gynemesh or Prolift in your patients?
14       A.  I think I reported one complication, and I
15   believe it was with Gynemesh.
16       Q.  And is the material used in Prolift the same
17   material that was used in Gynemesh?
18       A.  Yes.
19       (Issue Report, Gynemesh PS, Open Date between
20   23-Mar-2004 and 14-Feb-2012, ETH.MESH.02641631, marked
21   for identification as Ryder Deposition Exhibit No. 19.)
22   BY MS. WHITE:
23       Q.  So I will give you just a second to look at
24   that.
```

Page 145

```
1        And at the time you started using Prolift,
2    were you aware it was the exact same material?
3        A.  Yes.
4        Q.  Vince Lucente told you that at your training
5    on April 1st?
6        A.  I believe so.
7        Q.  Okay.  And I've handed you what we've marked
8    as Exhibit -- what was the number?
9        MS. KABBASH:  19.
10   BY MS. WHITE:
11       Q.  Does this ring a bell?
12       A.  Yes.
13       Q.  You having a serious injury related to
14   Gynemesh that you reported to the FDA?
15       A.  Well, I wouldn't call it a serious injury,
16   but I had a complication, yes.
17       Q.  Well, let's go to the top of the document.
18   Okay?  And the MDR determination was what?
19       A.  Serious injury.
20       Q.  Okay.  And then was this a situation where
21   you had mesh erosion?
22       A.  Yes.  Exposure.
23       Q.  What's the difference, Doctor?
24       A.  Well, to me mesh erosion is if it would erode
```

Rebecca M. Ryder, M.D.

Page 146

1    into nearby structures like bladder, urethra, rectum.
2    Q.  And tell the jury what mesh exposure is?
3    A.  When you can look in the vagina and see a
4    portion of the mesh.
5    Q.  Okay.  And would mesh exposure cause a woman
6    pain?
7    A.  Sometimes.
8    Q.  And can it interfere with sex?
9    A.  Sometimes.
10   Q.  And sometimes can it cause infection?
11   A.  This is my only case in -- since implanting
12   vaginal mesh in 2000, of a mesh infection.
13   Q.  Okay.  That's not what I asked you.
14       Can mesh extrusion, as you call it, into a
15   woman's vagina cause infection?
16   A.  I'm not sure we know that.  It can get
17   infected, but whether it is the cause or not, I'm not
18   sure that we know that.
19   Q.  Okay.  Well, would you defer to other doctors
20   who have used more mesh implants than you, if they have
21   an opinion that, yes, it does cause an infection?
22       MS. KABBASH:  Objection.  You're just
23   referring to some other random doctors, or are you
24   referring to someone in particular?

Page 147

1    BY MS. WHITE:
2    Q.  Okay.  I'm going to ask this question again.
3    All right?  It's to you.
4        Would you defer to doctors who have implanted
5    far more transvaginal mesh than you have as to whether
6    or not mesh extrusion into the vagina can cause
7    infection, like it did in the case you reported to the
8    FDA?
9        MS. KABBASH:  Objection.
10       THE DEPONENT:  Possibly.
11   BY MS. WHITE:
12   Q.  And in this case, it, in fact, caused
13   infection.  Right?
14       MS. KABBASH:  Objection.
15       THE DEPONENT:  She got an infection with a
16   vaginal mesh product in, yes.
17   BY MS. WHITE:
18   Q.  I realize you're not willing to say it caused
19   infection, but this woman got an infection.  Right?
20   A.  She did.
21   Q.  And she had to be treated with antibiotics?
22   A.  Yes.
23   Q.  And then you had to go and do another
24   surgery.  Right?

Page 148

1    A.  Yes.
2    Q.  You had to revise her?
3    A.  I just took the mesh out.
4    Q.  You had to revise her?
5    A.  Yes.
6        MS. KABBASH:  Okay.  I think we're out of
7    time.
8        MS. ROBINSON:  A minute and a half.
9        MS. KABBASH:  What?
10       MS. ROBINSON:  A minute and half.
11       MS. KABBASH:  I won't object for one minute.
12   BY MS. WHITE:
13   Q.  Doctor, is there anything about the opinions
14   in Ryder 4 or your supplemental report that you want to
15   change today or add to?
16   A.  Well, I think we already advised you that we
17   found out my training was 2005 instead of 2007, and
18   other than that, I don't believe so.
19   Q.  Do you want to change any of your answers
20   you've given under oath today?
21   A.  I don't believe so.
22       MS. WILSON:  Okay.  That's all I have.
23       MS. KABBASH:  Okay.  I have a few follow-up
24   questions, shouldn't take very long.

Page 149

1
2        CROSS-EXAMINATION
3    BY MS. KABBASH:
4    Q.  Dr. Ryder, are you board certified in female
5    pelvic medicine?
6    A.  Yes.
7    Q.  And when did you receive that board
8    certification?
9    A.  June of 2013.
10   Q.  Was that the first time that that board
11   certification was offered?
12   A.  Yes.
13   Q.  Are you board certified in any other
14   specialties?
15   A.  Obstetrics and gynecology.
16   Q.  And how long have you held that board
17   certification?
18   A.  Since 1998, I believe.
19   Q.  You're welcome to look at your CV.
20   A.  Yes, my CV.
21   Q.  Go ahead and look at your CV.
22   A.  Yes.  It might have been '94, I guess is when
23   I passed the oral boards.
24   Q.  Exhibit 3.

38  (Pages 146 to 149)

Rebecca M. Ryder, M.D.

Page 150

1    A. 1995.
2    Q. Okay. So that's been over 21 years that
3  you've been board certified in OB/GYN. Correct?
4    A. Yes.
5    Q. How long have you been in private practice?
6    A. Since 1998.
7    Q. So that is about 16 years?
8    A. Yes.
9    Q. Okay. And how many of those years --
10   A. 18 years, I guess.
11   Q. Okay. And how many of those years have you
12 been treating women for prolapse?
13   A. All 18.
14   Q. And --
15   A. Well, actually, before private practice, you
16 know, since residency.
17   Q. And so you treated women for prolapse in your
18 residency as well. Correct?
19   A. Yes.
20   Q. For how much of that period of time had you
21 been using mesh transvaginally to treat prolapse?
22   A. It probably started somewhere, at the
23 earliest, maybe, 2002 or 2003. So that would be 13 or
24 14 years maximum.

Page 151

1    Q. So you've been, for 13 or 14 years, using
2  transvaginal mesh to treat prolapse in women?
3    A. Yes.
4    Q. Dr. Ryder, you were asked several questions
5  regarding Exhibit B to your general report, which is
6  the list of materials reviewed. Correct?
7    A. Yes.
8    Q. And you were asked many questions regarding
9  the articles of medical literature that were included
10 in that list. Correct?
11   A. Yes.
12   Q. Plaintiffs' counsel asked you at one point --
13 was discussing with you which articles you contributed
14 to the list versus articles that were provided to you.
15 Do you recall that line of questioning?
16   A. Yes.
17   Q. Dr. Ryder, were there articles on Exhibit B
18 that while they were provided to you, you had already
19 reviewed as a practicing physician before your
20 involvement in the mesh litigation?
21   A. Yes.
22   Q. Can you describe, please, what your practice
23 is as a urogynecologist in reviewing medical
24 literature, what role did medical literature play in

Page 152

1  your practice?
2    A. It played a significant role. I look at the
3  journals monthly. I get recertified yearly. They give
4  us 90 questions on 40 to 45, or 30 to 45 articles
5  specifically related to urogynecology and female pelvic
6  medicine.
7        I do independent literature searches. So it
8  plays a significant role.
9    Q. Is it fair to say that several of the
10 articles that were provided to do you that are on
11 Exhibit B were not new to you at the time you were
12 provided them?
13   A. Correct.
14   Q. You were asked questions regarding the Altman
15 randomized control trial regarding Prolift. Do you
16 recall that?
17   A. Yes.
18   Q. And if Altman -- I believe you identified
19 Altman as one of the more key articles that you relied
20 upon in forming your opinions. Correct?
21   A. Yes.
22   Q. Why did you find the Altman RCT to be
23 credible?
24   A. Because it was a randomized control trial,

Page 153

1  and it had a large number of patients, and I think
2  randomized control trials in general are the best
3  evidence we have of safety and efficacy.
4    Q. Is the Altman RCT published in The New
5  England Journal of Medicine?
6    A. Yes.
7    Q. Are you familiar with that publication?
8    A. Yes.
9    Q. Did the fact that it was published in that
10 publication bear on your opinion or your weighing of it
11 in any way?
12   A. It lends credibility to it.
13   Q. And why is that?
14   A. Because it's a very well-respected medical
15 journal.
16   Q. Dr. Ryder, you were asked several questions
17 regarding the role of the sales rep in your operating
18 room. Do you recall that?
19   A. Yes.
20   Q. Doctor, have you sought -- strike that.
21       Any time that you have had a sales rep in
22 your operating room, have you sought the consent of
23 your patient for the presence of that sales rep?
24   A. Yes.

Rebecca M. Ryder, M.D.

Page 154

1     Q.  Would you permit the sales rep to be present
2  in the operating room if your patient did not consent,
3  or expressed discomfort with the idea?
4     A.  Absolutely not.
5     Q.  So in cases where Jim Gatewood or any other
6  rep would be present in your operating room, that would
7  be with the consent of your patient?
8     A.  Yes.
9     Q.  You were asked some questions regarding your
10 training by Dr. Lucente on the Prolift.  Correct?
11    A.  Yes.
12    Q.  Do you recall during that training whether
13 the potential risk of dyspareunia was discussed?
14    A.  Yes.
15    Q.  So did he share with you at this Prolift
16 training that dyspareunia was a possible risk of
17 Prolift?
18    A.  Yes.
19    Q.  Was that news to you?
20    A.  No.
21    Q.  Why is that?
22    A.  Because you can get dyspareunia after any
23 pelvic reconstructive surgery.
24    Q.  Am I correct, Dr. Ryder, that when you

Page 155

1  started using Prolift and when you trained on Prolift,
2  that mesh was not new to you?  Correct?
3     A.  Correct.
4     Q.  You had already been using Gynemesh PS in
5  your treatment of several patients.  Correct?
6     A.  Correct.
7     Q.  And plaintiffs' counsel asked you about the
8  fact that your training lasted for a day, 1 believe?
9     A.  Yes.
10    Q.  Dr. Ryder, as you started your first Prolift
11 case, is that one training session the sole body of
12 knowledge that you took in with you to the operating
13 room as you operated on your first Prolift patient?
14    A.  No.
15    Q.  What else did you bring to the table as you
16 operated on your first Prolift patient?
17    A.  Approximately, 20 years of surgical
18 experience, and -- as well as using other grafts, other
19 slings, having used Gynemesh.  So all of that
20 information I brought with me to the OR that day.
21    Q.  In your decision to use Prolift, was the
22 experience of the French TVM surgeons relevant to your
23 assessment of the safety of the product?
24    A.  Yes.

Page 156

1     Q.  And how was it relevant?
2     A.  Well, I wanted to know the experience of the
3  people who were instrumental in designing the product,
4  what their experience with patients had been, what
5  their experience with interoperative and postoperative
6  complications were.
7     Q.  And was the fact that the TVM data involved
8  the same mesh as Prolift relevant to your assessment?
9     A.  Yes.
10    Q.  Dr. Ryder, if you could, open or find your
11 general report, which is Exhibit 4.  And if you could
12 look to page 21.  That's where your numbered opinions
13 begin.
14    A.  Yes.
15    Q.  Opinion No. 2 is the Gynemesh -- strike that.
16       Opinion No. 2 is that "Gynecare, Gynemesh PS
17 used in Prolift is an appropriate, effective, and safe
18 material for use in this indication.  Polypropylene
19 mesh and sutures have been used as an implant for
20 decades.  The pore size is sufficiently large to allow
21 for proper tissue ingrowth and has not presented
22 increased risk of infection, particularly in
23 relationship to other implants."
24       Can you explain to me what is the basis for

Page 157

1  that opinion?
2     A.  The review of the medical literature, the
3  presentations at international meetings, national
4  meetings, the physician statements by societies, and by
5  clinical experience.
6     Q.  Doctor, if you will look to Exhibit 15.  1
7  believe Exhibit 15 had one -- had two components to it.
8  And if you could turn to the second part of that, and
9  on the bottom of the page that's Bates numbered
10 03988272 there is a statement there.  And this document
11 overall is addressed to Dr. Lucente.  Correct?
12    A.  Yes.
13    Q.  And there is a statement there at the bottom
14 that says "Stopped using due to fear of not being able
15 to manage complications caused by trocars."  Do you see
16 that?
17    A.  Yes.
18    Q.  Is that statement as it's written, accurate
19 based on your recollection of your experience?
20    A.  No.
21    Q.  Why is it not accurate?
22    A.  Because that's not why I stopped using
23 Prolift.  I started using something new to gain more
24 apical support and to do fewer incisions for the

40  (Pages 154 to 157)

Rebecca M. Ryder, M.D.

Page 158

1   patient.
2        Q.  Did you personally experience complications
3   with Prolift that you deemed to be caused by the
4   trocars?
5        A.  No.
6        Q.  Dr. Ryder, you were asked a couple of
7   questions by plaintiffs' counsel that -- and I'm
8   paraphrasing a bit -- but the substance of the question
9   was, would you have wanted information on recurrent
10  exposures.  Do you recall that?
11       A.  Yes, ma'am.
12       Q.  As you sit here today, do you have any reason
13  to believe that Ethicon ever withheld information from
14  you about the risk of recurrent exposures?
15       A.  No.
16       Q.  Has the risk of recurrent exposures with mesh
17  a risk that has been reported about in the medical
18  literature over the past, at least, ten years?
19       A.  I don't believe I've seen any literature on
20  recurrent mesh exposures, no.
21       Q.  Have you reviewed the medical literature
22  going back to the Gynemesh PS?
23       A.  Yes.
24       Q.  And the risk of mesh exposure has been

Page 159

1   reported about frequently in the medical literature.
2   Correct?
3        A.  Yes.
4        MS. WILSON:  Objection to form.
5
6   BY MS. KABBASH:
7        Q.  It's reported -- is it reported in the Mar
8   meta-analysis that you reviewed?
9        A.  Yes.
10       Q.  Is it reported in the RCTs that you listed in
11  a table to your report?
12       A.  Yes.
13       Q.  Is it referenced in the Prolift IFU?
14       A.  Yes.
15       Q.  Is it referenced and discussed in the Prolift
16  surgeon's resource monograph?
17       A.  Yes.
18       MS. KABBASH:  That's all I have.
19       MS. WILSON:  I just have a couple followup.
20
21
22
23            REDIRECT EXAMINATION
24  BY MS. WHITE:

Page 160

1        Q.  In drawing your opinions in this case with
2   regard to the safety of the Prolift, was it your
3   assumption, based upon all your experience, and
4   experience with the Gynemesh that your lawyer for
5   Ethicon just talked about, that if a woman has
6   complications related to the Prolift mesh, that those
7   complications could be safely and effectively treated,
8   such that a woman would be okay going forward?
9        MS. KABBASH:  Objection.
10       THE DEPONENT:  Was it my assumption they
11  could be?
12  BY MS. WHITE:
13       Q.  Yes, ma'am.
14       A.  Yes.
15       Q.  And did you assume that for some women they
16  could have Prolift mesh-related complications that
17  could not be safely and effectively treated, despite
18  the best care provided by a doctor and the woman would
19  be left with permanent pain and permanent damage?
20       MS. KABBASH:  Objection.
21       THE DEPONENT:  I understood that that was a
22  possible complication of that, as well as other pelvic
23  reconstructive surgeries.
24  BY MS. WHITE:

Page 161

1        Q.  And did you assume that -- that to happen on
2   very rare occurrences in your use of the Prolift?
3        A.  In my use of the Prolift?  Yes, very rare.
4        Q.  In not your actual practical experience, but
5   before you began using this on patients, did you assume
6   that the risk of a woman having a complication that
7   couldn't be treated and her being left with permanent
8   pain and permanent damage was a very rare risk?
9        A.  Rare, yes.
10       MS. WILSON:  That's all I have.
11       MS. KABBASH:  Just one or two followups.
12
13            RECROSS-EXAMINATION
14  BY MS. KABBASH:
15       Q.  Dr. Ryder, in the -- one of the sources that
16  you relied on was the Mar Cochrane review from 2016.
17  Correct?
18       A.  Yes.
19       Q.  And that Cochrane reviewed over 30 RCTs in
20  over 4,000 women.  Correct?
21       A.  Yes.
22       Q.  Was there a single report in the Mar Cochrane
23  review of a woman experiencing permanent pain and
24  permanent injury?

41 (Pages 158 to 161)

Rebecca M. Ryder, M.D.

Page 162

1    A.  A single report of the 37 randomized
2  controlled trials?
3    Q.  Yes.
4    A.  I'm not sure.
5    Q.  Okay.  Do you recall -- you have reviewed the
6  RCTs that are listed in your Table 1 to your report.
7  Correct?
8    A.  Yes.
9    Q.  In your review of those RCTs, did you note
10  any single patient receiving a mesh or a Prolift that
11  reported permanent pain and permanent injury?
12    A.  Not that I recall.
13      MS. KABBASH:  I'm done.
14      MS. WILSON:  I don't have anything else.
15      (Witness was not advised of reading and
16  signing.)
17      (Whereupon, the deposition of REBECCA M.
18  RYDER, M.D., was concluded at 12:45 p.m.)
19
20
21
22
23
24

Page 163

1  COMMONWEALTH OF VIRGINIA AT LARGE, to wit:
2      I, Bobbi J. Case, Registered Professional Court
3  Reporter and Notary Public for the Commonwealth of
4  Virginia at Large, and whose commission expires
5  October 31, 2019, do hereby certify that the
6  within-named deponent, REBECCA M. RYDER, M.D., appeared
7  before me at Chesapeake, Virginia, as hereinbefore set
8  forth, and after being first duly sworn by me, was
9  thereupon examined by counsel for the parties; that her
10  examination was recorded in Stenotype by me and reduced
11  to computer printout under my direction; and that the
12  foregoing constitutes a true, accurate, and complete
13  transcript of such proceeding, produced to the best of
14  my abilities. I further certify that the deponent was
15  not advised as to reading and signing.
16      I further certify that I am not related to nor
17  otherwise associated with any counsel or party to this
     proceeding, nor otherwise interested in the event
18  thereof.
19      Given under my hand and notary seal this 24th
20  day of March 2016 at Virginia Beach, Virginia.
21
22  Bobbi J. Case, RPR, CCR
23  NCRA No. 837774, VCRA No. 0315042
24  Notary No. 181018

Page 164

1      - - - - - -
2      E R R A T A
3      - - - - - -
4
5  PAGE  LINE  CHANGE
6  ____ ____ _____
7  REASON: _____
8  ____ ____ _____
9  REASON: _____
10  ____ ____ _____
11  REASON: _____
12  ____ ____ _____
13  REASON: _____
14  ____ ____ _____
15  REASON: _____
16  ____ ____ _____
17  REASON: _____
18  REASON: _____
19  ____ ____ _____
20  REASON: _____
21  ____ ____ _____
22  REASON: _____
23  ____ ____ _____
24  REASON: _____

Page 165

1  ACKNOWLEDGMENT OF DEPONENT
2
3      I, _____, do
4  hereby certify that I have read the
5  foregoing pages, and that the same is
6  a correct transcription of the answers
7  given by me to the questions therein
8  propounded, except for the corrections or
9  changes in form or substance, if any,
10  noted in the attached Errata Sheet.
11
12
13  _____
14  REBECCA M. RYDER, M.D.      DATE
15
16
17  Subscribed and sworn
18  to before me this
19  _____ day of _____, 20____.
20  My commission expires:_____
21
22  _____
23  Notary Public
24

**A**

A-b-u-h-a-m-a-d
18:11
**a.m** 1:22 6:5 54:2,2
95:11 98:16,16,23
128:12
**Abbrevo** 5:9
131:24 132:9,11
132:14 134:22
135:3
**abdominal** 17:2
26:14 124:6
139:24 140:3,4
**abdominally** 27:5,7
27:8
**abilities** 163:14
**ablation** 60:16
**able** 69:21 71:24
92:17,17 122:11
122:18 157:14
**abnormality** 15:19
**absolutely** 112:16
128:21 154:4
**abstracts** 11:20
91:8,23
**Abuhamad** 18:9
**accept** 64:1 70:1
121:4
**acceptable** 137:23
**access** 105:2 135:1
**accompanied** 75:11
**account** 5:1 20:5
58:1,3,15 93:16
94:13,18 120:21
128:12 130:23
131:1,2
**accurate** 60:6
117:6 157:18,21
163:12
**ACKNOWLED...**
165:1
**act** 27:19
**actions** 15:8
**active** 136:5
**actual** 53:3 161:4
**acute** 123:24

**add** 45:17 148:15
**added** 44:19
**address** 97:5
**addressed** 157:11
**addressing** 28:11
**adequate** 138:16
**adequately** 92:8,12
96:6
**adhered** 138:18
**advance** 122:3
**advanced** 5:3
104:21 119:17
120:2 122:3
**advantage** 122:22
129:23
**advantageous**
118:21
**advantages** 126:15
141:18 142:23
**adverse** 113:22
144:11
**advice** 34:5
**advised** 45:19
75:22 148:16
162:15 163:15
**ago** 40:16 41:2
66:14
**agree** 31:5 32:9
47:16 53:5 71:2
99:18 110:23
111:6 130:13
141:16
**agreed** 32:12 80:22
97:8
**agreeing** 31:3
**agreement** 4:20 9:3
9:12,23 10:3 30:3
33:5 63:6,9 73:16
80:11,20 82:2,5
82:10,16 83:1,11
83:17,20,24
**agreements** 8:23
9:5 10:16 63:4
**ahead** 7:5 37:2
64:11 81:4 83:9
88:1 128:4 131:22

134:2 149:21
**AL** 1:11,13
**Alexander's** 63:12
65:11
**Alfred** 18:9
**Allentown** 59:21
87:3 88:8 120:24
**allow** 156:20
**allowed** 97:1
**alter** 113:5,8,12
**alternatives** 72:1
**Altman** 50:15,22
51:11,17 54:6
55:21 57:6 152:14
152:18,19,22
153:4
**AMANDA** 2:4
**amended** 6:9
**American** 11:22
**amount** 95:18 97:8
105:3 113:22
117:10
**amounts** 97:9
**analysis** 51:8
**analyze** 109:19
**annual** 15:14
**answer** 9:15 30:10
30:12,16 33:2,14
46:18 56:10 57:10
66:24 78:21 104:6
**answers** 148:19
165:6
**anterior** 26:24 55:9
55:10 102:12
139:24
**antibiotic** 136:16
136:20 137:24
**antibiotics** 147:21
**anybody** 68:12
126:19
**anymore** 114:5
**anyway** 78:6
**apex** 118:3
**apical** 118:17,18,20
118:22 157:24
**apologize** 67:13

99:2
**apparently** 77:8
94:24 121:4
123:16 131:19
**Appearances** 2:1
**appeared** 163:6
**applicable** 49:16
105:14
**applied** 104:1
138:14 139:10
**appointment** 27:16
**appreciate** 51:1
64:17
**approach** 135:4,6
**appropriate** 103:9
103:14 136:11
156:17
**approval** 134:23
135:1
**approved** 135:1,4
**approximately**
10:10,20 15:12
16:19 28:4 46:1
46:24 47:13 60:14
66:12 87:16 93:13
116:16,18 117:20
134:13 155:17
**approximation**
119:8
**April** 87:16 90:4
91:16 92:9 94:15
94:22 99:22 100:2
100:12,24 107:5
145:5
**area** 21:10 23:22
84:13 91:10
110:16 111:5
139:9
**areas** 69:21 143:3
**Argumentative**
114:17
**arms** 118:5
**Arnaud** 39:1
**arobinson@rcrs...**
2:5
**arrange** 79:10

**arrangements**
89:21,23
**article** 28:8,11
46:22 48:10,14,19
50:19 52:14,16
54:10 55:17,17
56:6 109:20
**articles** 28:6 43:24
44:14,24 45:17,19
46:1,5,7,8,9,17,18
46:24 47:3,6,7,23
48:2,4 50:9,12
51:19 53:6 56:23
57:12,14,15 58:9
58:19 59:2,4,5
100:23 104:13
109:8 110:9,13
111:1,2,16 151:9
151:13,14,17
152:4,10,19
**ASAP** 129:2
**asked** 15:15 31:9
34:13 40:8,9
41:22 61:2 67:5
80:19 106:13,17
116:11 146:13
151:4,8,12 152:14
153:16 154:9
155:7 158:6
**asking** 21:13 30:9
34:19 89:15 141:3
**assessment** 155:23
156:8
**assist** 85:22
**assists** 83:3
**associated** 163:17
**Associations** 11:23
**assume** 45:8 80:17
160:15 161:1,5
**assumption** 160:3
160:10
**Atkins** 18:18
**attached** 165:10
**attend** 60:24 87:4
**attendance** 105:23
126:2

attended 60:21
61:5 62:7,13
140:8
attending 72:3 87:8
attorney 13:24 31:7
31:12
AUGS 11:22 37:16
65:17 87:11 90:9
90:13,16 100:7,11
August 5:3,5
119:17,24 121:3
121:19
authors 50:21 54:6
55:20 56:7,19,22
available 126:4
133:1 139:20
Avenue 2:11
aware 16:4 20:2
51:7 54:18,22
61:11,17 73:11
80:13 97:10
101:11,14 102:5
105:7 112:16,18
123:23 136:9
141:22 143:2,8,17
144:1 145:2
Axel 39:1

**B**

B 4:1,10 43:9,18
44:12,19,24 45:14
45:15 46:2,6,23
47:21 48:2,4
151:5,17 152:11
bachelor 25:1
back 13:1 24:23
27:9 29:16,23
42:21 60:12 61:23
62:11 64:7 66:12
66:19 71:4,17
72:21 73:6 74:3
82:16 85:7 95:7
96:23 98:18 128:1
128:21 158:22
backup 78:6,11
balloon 62:2

Bank 20:3
Bar 63:13 65:11
Barbara 5:1 75:1
93:15 94:1,2,9,12
94:14
based 56:11 82:22
105:18,22 106:1,5
109:20 114:11
125:19,24 126:1
157:19 160:3
basing 142:3
basis 156:24
Bates 157:9
Beach 2:3 120:3
163:20
bear 38:14 153:10
began 60:14 66:12
99:18 102:7
138:20 161:5
beginning 57:15
71:20
behalf 1:19 6:2,12
14:10 18:2 19:1
believe 10:2,23
12:12,14 13:13,15
17:9 19:13 29:14
31:22 36:23 43:3
49:13 57:19,19
60:7,11,15,15
62:2,15 63:1,6
64:5 65:6 66:15
66:16 71:14 73:15
73:16,17 82:9
84:12,14 88:16,20
90:9,11 91:13,13
91:19,21,23,24
92:7 100:5 101:22
101:23 103:19,23
104:5,11 105:2,14
106:5 108:1,3
109:6 110:9,22
126:7,19 127:18
135:7,13 138:3
140:7,11 142:19
144:15 145:6
148:18,21 149:18

152:18 155:8
157:7 158:13,19
believed 126:14
bell 89:13,16
145:11
benefits 105:4,9,13
Bernard 104:7
best 30:10 153:2
160:18 163:13
better 138:5 142:16
beyond 135:23
Bill 18:18
bill-only 79:9
billed 7:20 82:18
biomaterial 111:7
111:9 112:24
biomaterials
110:16
birth 72:10
bit 28:20 29:1 99:4
158:8
bladder 84:21
146:1
blue 139:16
board 149:4,7,10
149:13,16 150:3
boards 149:23
Bobbi 1:24 6:3
163:2,22
body 155:11
book 139:16
boss 69:13,15 71:21
81:12 89:10 94:12
95:2 132:8
Boston 102:19
123:3
bottom 65:17 74:18
75:2 93:23 119:24
122:4,7 132:3
157:9,13
break 33:8,9,15
50:24 51:1,3
53:23 99:2 112:1
breast 15:20
brief 42:14 112:2
briefly 20:19

bring 6:24 7:15
8:14,23 9:1 30:3
30:17 66:21 78:5
78:6,10,11 110:11
111:23 155:15
brochure 138:16
139:11
brought 7:18 8:16
11:2 109:3 155:20
Bruno 4:18 81:6
budget 96:2
bulging 55:6
Burt 31:13,24 32:1
business 4:14 22:1
22:14,22 68:21
69:3 131:1,2
business's 23:6
businesses 22:19
23:3,8
busy 128:14,21
Butler 30:22

**C**

C 95:16
C-h-a-i-k-e-n 13:17
C-i-r-o-c-c-o 13:24
CA 2:3
CALCAGNIE 2:2
call 16:22 17:8
40:23 77:18,22
129:8 130:23
136:16 137:22
139:16 145:15
146:14
called 22:23 136:17
136:20
calling 39:12
137:17,24
calls 16:23 66:3
78:19 120:15
cancer 15:20 18:13
113:17
candidate 103:10
136:11
capacity 19:12
capitalized 77:23

caps 75:3 79:6,7
caption 13:10
care 113:4 137:6
160:18
career 27:22 115:6
Carolina 24:5
25:20 26:2 62:8
63:13
Carolyn 16:14
carrier 19:24
Carroll 4:20 83:10
83:15,16
case 1:10,11,24 6:3
6:18,18,22 10:21
10:22 12:17,18,20
13:10,14 14:10,14
14:16 15:23 16:6
16:8 17:15,22,24
18:12,13,14,20,20
18:21 20:1,11
28:23 29:9,10,15
29:17,21 32:7
33:13 35:1,5,10
35:14 38:15 41:14
43:21 44:1 48:5
50:7 53:19,22
73:17,18,19 74:20
78:4,11,15,17
85:23 99:7 103:22
105:18 106:22
107:16 110:21
114:16 115:1
125:18 140:22
146:11 147:7,12
155:11 160:1
163:2,22
cases 1:7 29:2,21
30:1 45:10 72:15
73:7 86:10 91:14
92:20 94:16,23
154:5
catch 120:23
categorized 130:10
cause 146:5,10,15
146:17,21 147:6
caused 122:12,18

140:6 147:12,18
157:15 158:3
**CCR** 1:24 163:22
**cell** 39:12
**Center** 22:24 120:3
**centers** 91:24
**centimeters** 118:3
**certain** 34:6
**certification** 22:8
23:22 149:8,11,17
**certified** 149:4,13
150:3
**certify** 163:5,14,16
165:4
**Chaiken** 13:17
**chance** 118:24
**change** 53:21 55:23
56:1,8,16 57:3
112:20 113:23
148:15,19 164:5
**changed** 66:16
**changes** 113:18
115:4 165:9
**changing** 123:3
**Chapel** 24:5
**charging** 11:6
**CHARLESTON**
1:2
**chart** 15:17
**Chesapeake** 1:20
4:16 6:6,7 62:5
70:8 71:22 74:9
94:18 97:12
133:12 134:1,22
135:5 163:7
**choices** 115:3
**choose** 8:6
**chronic** 124:2
136:1,1
**chronological**
17:20
**Cindy** 4:18 81:6,12
93:24 95:2,5,10
95:16 96:23
**Cindy's** 97:5
**circle** 54:13

**circled** 50:15 56:6
**Circuit** 79:1
**circumstances**
138:1
**Cirocco** 13:23,24
**cited** 44:1,6 46:13
46:18 109:9
**claim** 16:2 19:20
20:8
**clarify** 8:2 35:13
**class** 24:20 25:2,12
25:13
**classes** 24:22
**clear** 94:18
**clearance** 138:20
**clinical** 28:15,16
44:4 56:14 76:6,8
105:19 113:17
137:14 142:3,12
157:5
**clinically** 105:14
112:21
**Cochrane** 56:13
124:15 161:16,19
161:22
**Coffin** 104:7
**collaborate** 34:20
36:4
**collaborated** 36:4
**collaboration** 34:8
**colleague** 40:13
**colleagues** 105:24
107:8 114:10
**colporrhaphies**
26:24
**colporrhaphy** 55:9
140:1,1
**combination** 23:7
**come** 82:17 85:22
92:21 122:5
136:19 137:11,18
143:21
**coming** 39:13 47:21
74:23 113:17
122:8
**commencing** 6:5

**commentary** 85:13
**comments** 34:6
69:18
**commission** 63:23
69:21 163:4
165:20
**Commonwealth**
6:4 163:1,3
**communicated**
38:1 39:10
**communicating**
52:7
**communication**
127:19
**communications**
61:12
**community** 141:17
**comp** 14:19
**companies** 57:2
**company** 23:12
75:23 107:22
109:2 127:20
141:5
**company-sponso...**
67:14 98:7,9
**compared** 142:24
**compatible** 126:23
**compensation**
82:21
**competently** 92:17
96:5,20
**competitive** 135:2
**compile** 44:9
**compiled** 106:14
**complete** 21:21
36:17,18 43:2
71:20 163:12
**completed** 20:21,24
21:3,6,10 25:22
**complication**
116:14 117:3
144:14 145:16
160:22 161:6
**complications**
115:7,12,19 116:1
116:5,15,22
**contact** 75:1 86:5

122:11,18 129:20
129:22 130:7,12
139:7 140:6,10
143:22,22 144:12
156:6 157:15
158:2 160:6,7,16
**component** 85:24
86:1
**components** 157:7
**comprehensive**
92:14
**computer** 163:11
**concern** 95:5 97:5
**concerned** 95:17
144:2
**concerns** 118:5
**concluded** 162:18
**conducted** 51:20
**conducting** 97:10
**conducts** 97:7
**confirm** 77:23
133:17
**Confirmed** 4:23
88:4
**connection** 35:1
**consent** 153:22
154:2,7
**consider** 40:12,13
106:18 123:21
141:10
**considered** 64:8
110:15 111:4
124:4 141:17
**considering** 140:21
**consisted** 59:20
**consistency** 99:14
**constitutes** 163:12
**consultant** 38:9
**consulting** 4:20
8:23 9:2,5,12,23
10:3,15 30:3 54:7
55:21 63:4,6,9
80:10,20 82:2,5,9
82:15 83:1,11,17
83:20,24
**contact** 75:1 86:5

**contacted** 29:8,19
30:21 31:12,14,20
31:23 86:11
**contain** 34:24
**contained** 32:8
41:20 44:5,24
**content** 23:5
**continue** 70:21
113:19
**contract** 143:2
**contracting** 73:16
**contraction** 143:9
143:17
**contracts** 143:7,8
143:12
**contraindications**
103:12 139:18
**contribute** 45:15
**contributed** 45:13
151:13
**contribution** 47:22
48:1
**control** 56:14
108:11,12 152:15
152:24 153:2
**controlled** 162:2
**controversial** 143:6
143:11
**conventional** 143:4
**conversation**
129:24
**conversations**
129:24
**copied** 89:10 122:2
**copies** 7:21
**copy** 43:5
**copying** 94:12
**Corporate** 2:3
**correct** 9:7,11 10:2
10:14 12:2 19:1
19:20 20:20,22,23
21:1,2,5,8,11,22
21:23 23:3,23
25:11 29:22 40:5
44:8 50:10,13,16
54:16,20 58:20

Case 2:12-md-02327   Document 2016-4   Filed 04/21/16   Page 47 of 64 PageID #: 33189
Rebecca M. Ryder, M.D.

Page 169

74:1 76:12,13,17
76:18,19,20 77:4
80:15 96:13
143:16 150:3,18
151:6,10 152:13
152:20 154:10,24
155:2,3,5,6
157:11 159:2
161:17,20 162:7
165:6
**corrections** 165:8
**correctly** 29:18
**coughing** 136:1
**counsel** 2:5,9,14
30:6,8,19 34:5,9
36:4 45:19 60:11
82:6,23,24 83:3
85:13 151:12
155:7 158:7 163:9
163:17
**couple** 51:2 119:22
158:6 159:19
**course** 24:12 36:14
**courses** 24:1,9
**court** 1:1 6:8 10:24
19:14 32:16 48:7
163:2
**courtroom** 19:9
**cover** 74:15
**covered** 17:17
19:12 28:20 59:12
**covering** 16:21
**credentials** 37:7
**credibility** 153:12
**credible** 152:23
**criteria** 103:2,7,9
103:16,20,24
136:10
**Crockford** 91:8,9
93:22 95:6 97:1
97:20 100:10
**CROSS-EXAMI...**
149:2
**culdoplasty** 140:3
**curious** 44:9
**currency** 102:11

**currently** 9:2,13
20:6 27:16,18,19
27:21 122:12
**curriculum** 4:6
20:10,12,16
**curve** 123:8,10
**customer** 4:22 64:8
88:4
**customers** 65:19
**CV** 149:19,20,21
**Cynthia** 69:7,19
70:7 71:21 72:2
89:10
**cystocele** 102:12

**D**

**D** 3:1
**damage** 160:19
161:8
**Dan** 36:22 37:3
**DANZIG** 2:10
**data** 20:3 51:9,15
52:19,21 53:3
91:17 101:10
105:3,6 109:19
124:15 156:7
**database** 56:13
83:4,5
**datas** 52:22
**date** 5:12 10:7,13
12:16 38:12 40:17
66:22 74:17 91:15
144:19 165:14
**dated** 94:11 119:24
**David** 37:11
**DAVIS** 2:2
**day** 32:22 42:2
59:21 60:2 77:22
78:8 88:12 91:18
92:3,4 97:16,19
155:8,20 163:20
165:19
**days** 69:20 134:24
138:4
**DDSA** 108:20
**de** 4:18 54:19 55:18

81:6 144:3
**dealing** 25:13 28:8
**decades** 156:20
**December** 34:1
129:1,4,5
**decide** 135:11
**decided** 99:10,11
101:4 114:8
**deciding** 104:1
**decision** 155:21
**decreased** 114:19
**Dee** 1:9 2:5
**deem** 99:5
**deemed** 113:2
158:3
**defendant** 13:11,13
18:8,9 19:1
**Defendants** 1:14
2:14
**defending** 18:15,17
**defense** 13:24 83:5
**defer** 146:19 147:4
**define** 39:14
**definitely** 122:1
**degree** 24:24 25:23
111:6 142:22
**deny** 75:17,18 90:2
110:7 133:16
**department** 78:3
**DePaul/Hughes**
132:16
**depends** 39:14 45:2
73:8 137:13
**depo** 41:5
**deponent** 3:2 9:9
9:16 22:3 25:7
31:7 32:12 34:5
34:11 41:16 47:5
51:23 52:4,21
53:21 54:22 55:3
55:16 56:11 57:1
58:12,22 59:23
61:16 70:3 71:14
72:23 73:15 75:14
76:3 78:10,22
79:14 80:17 87:1

91:5 92:12 95:21
96:1,15 97:22
101:20 102:5
105:6,12,22 106:8
107:7 110:18
111:9 113:2,16
114:18 117:1,9
122:22 123:15
124:23 125:15
129:22 130:16
131:19 132:24
133:8,16 137:13
138:3,23 140:17
140:24 141:10,21
142:12,19 143:6
144:5 147:10,15
160:10,21 163:6
163:14 165:1
**deposed** 6:11 52:11
**deposition** 1:17 4:3
6:1,16,22 7:7,9,16
7:19 8:6 11:4,10
11:13 12:1,7,11
12:13,22 13:2
14:3 15:3 16:5
19:5 20:4,14 30:5
32:18 33:8 41:4,7
42:17 43:11 45:6
64:24 68:23 74:11
81:9 83:13 88:6
93:18 119:19
121:21 128:7
132:1 134:5
144:21 162:17
**depositions** 14:8,19
14:21 15:1,3,6
17:16,21 19:4
**describe** 77:24
151:22
**DESCRIPTION**
4:2
**design** 51:8,14
52:17 53:3,9 56:7
56:19 106:19,20
106:24 107:12,18
107:20,24 108:3,9

108:11,12,15
**designated** 6:17
35:20 41:19 51:18
**designed** 51:20
53:19 136:10
144:2
**designing** 143:20
156:3
**despite** 55:12
160:17
**detail** 71:11
**detailed** 76:4
**detailing** 71:6 74:4
131:17
**details** 46:21 67:19
68:13
**determination**
145:18
**determined** 112:23
**determining**
102:20
**Detroit** 13:15
**develop** 109:1
**development**
106:24 107:12,18
107:24
**deviation** 137:5
**device** 59:18 60:16
85:23 103:14
106:11 108:24
112:21 119:13
139:10
**didactic** 88:18
**difference** 145:23
**differences** 55:8
**different** 115:5
**difficult** 123:6
143:4
**direct** 6:13 19:23
60:12
**direction** 163:11
**directions** 80:8
**directly** 28:11
69:10 128:4
**disagree** 96:19,22
**disappointed**

120:22
disclosed 57:21
disclosure 47:6
54:9
disclosures 56:17
57:15,18
discomfort 154:3
discovered 60:9,11
discuss 35:3,8
discussed 31:7
69:20 92:22 97:9
154:13 159:15
discusses 139:17
discussing 151:13
discussion 88:19
89:2 105:24 108:2
108:6 120:4
dismissed 17:14
disposables 71:10
disposition 20:1
distasteful 133:6
DISTRICT 1:1,1,7
Division 1:2 4:14
68:21 69:3
docs 95:15
doctor 18:3,4 32:24
40:8 53:9 54:4
59:8 76:12,16
96:19 98:18 118:4
121:14 124:8
132:21 136:14
144:11 145:23
148:13 153:20
157:6 160:18
doctors 23:7 76:9
81:1 84:17 96:5
101:18 114:12,18
116:2,22 117:7
123:9 135:2
136:10 146:19,23
147:4
document 1:7 7:2
7:12 64:13,16
69:3,5 70:15
74:17 89:8,13,14
89:24 111:21

118:14 119:22
121:8 122:4 132:4
134:19 145:17
157:10
documentation 8:7
documented 72:20
documenting 118:7
documents 7:15,17
11:15,16,16 61:21
107:11,22 108:4
121:9,12 131:19
doing 41:10 66:20
75:5,9 77:14
81:13 84:3 88:22
102:23 131:12,13
133:4,5
dollars 38:17 82:20
95:14
doubt 79:19 140:17
Dr 5:5 6:15 13:13
18:9 23:13,19
24:6 36:22,24
37:1,5 38:4 41:10
43:17 50:22 59:8
59:14 60:2 74:23
75:3 78:4,14
81:18 83:6 84:24
88:9,20 91:8,16
93:22 94:14,16
97:1,17,20 99:2
102:2 107:5 109:7
111:6,14 112:10
112:12 113:11,12
120:4,18 121:1,18
121:24 122:1,9
126:21 127:2
128:13,20 133:12
134:21 135:5
137:22 149:4
151:4,17 153:16
154:10,24 155:10
156:10 157:11
158:6 161:15
drafted 36:9,12
drafting 36:10,11
36:14

drawing 160:1
Drive 2:3 6:7
Drs 70:20
due 99:13 101:5
122:11 157:14
duly 163:8
Dwight 95:13
dwindling 95:15
dyspareunia 54:19
55:13,18 115:16
144:3 154:13,16
154:22
dystocia 17:22

## E

E 3:1 4:1 164:2
e-mail 4:12,16,18
4:20,22 5:1,3,5,7
5:8,10 39:12
40:23 60:4 64:21
65:3 66:19 74:8
74:13 78:18 81:6
83:10 86:6,18
88:3 93:15,22,24
94:11,14 95:4,7
119:16,24 121:18
121:23 128:5
129:10,13 130:3
130:22 131:6,23
132:4 134:3,19
e-mails 69:9 87:18
118:7 128:3
earlier 28:21 59:13
89:11
earliest 150:23
early 97:3 129:4
easier 86:12,21
Eastern 19:22
easy 14:7
Ed 4:22 88:4
editing 51:10,15
52:14,15
education 11:15,17
87:4,9 99:7 140:9
educational 27:17
60:21 61:1,6 62:7

62:13,20 65:14
76:11 85:24
effect 144:6
effective 156:17
effectively 160:7,17
efficacious 125:21
efficacy 106:15
125:18,20 153:3
effort 143:21
eight 100:13 114:9
either 10:4,5 15:22
24:18 39:11 56:19
91:7 97:9 124:17
Elliot 36:23 37:5
Elliott 37:3 113:12
emergency 17:10
employed 40:22
41:4
employee 94:10
employees 36:5
52:15 53:2 61:12
61:13 79:19
132:21
endometrial 60:16
ends 95:16
engineering 24:20
25:2,3,10
England 153:5
entail 88:12
entailed 88:16
enter 80:19
entered 9:24 82:1
entering 83:23
enterocele 140:4
entire 47:19 56:12
environmental
25:2,3,5,9
epidemiology 24:1
erode 145:24
erosion 124:19
125:4 145:21,24
Errata 165:10
error 60:9 110:3
ESQUIRE 2:4,8,13
estimate 12:14
116:7,9 117:2

ET 1:11,13
ETH.MESH.026...
5:13 144:20
ETH.MESH.039...
5:9 131:24
ETH.MESH.039...
5:7 128:6
ETH.MESH.039...
5:6 121:20
ETH.MESH.039...
5:4 119:18
ETH.MESH.039...
5:11 134:4
ETH.MESH.102...
4:13 64:23
ETH.MESH.118...
4:17 74:10
ETH.MESH.118...
4:21 83:12
ETH.MESH.118...
4:23 88:5
ETH.MESH.118...
5:2 93:17
ETH.MESH.118...
4:19 81:8
ETH.MESH.183...
4:15 68:22
Ethicon 1:4,13 4:9
6:17 9:3,6,13,16
9:24 10:3,8,12
11:15 22:1 29:6,7
36:5 38:4,9,11
40:19,22 41:5,11
42:16 43:1 44:13
46:2,10 47:1,3,8
47:20 51:8,13
52:13,15,16 53:2
54:7 55:22 56:6
56:18,22,23 57:13
57:23 58:10 59:15
60:13 61:13 62:8
62:14,19 64:13
67:2 68:11,13
69:3 74:17 81:21
87:5,10,19,22
89:9 94:9 95:9,18

96:4 104:1 105:4
105:10 106:10,14
106:24 107:11,17
107:21 108:24
109:4,5 114:24
119:22 121:10
123:20 124:17
126:13 127:8,12
127:16 132:3,22
133:19 138:13
140:9,12,19 141:5
143:20,24 158:13
160:5
**Ethicon's** 60:4,10
73:11 103:1,7,9
103:16,19 104:19
104:22 136:9
**Ethicon-sponsored**
60:21,24 61:6
67:18
**Ethicon/Johnson**
39:6
**evaluated** 17:10
58:7 106:10
**evaluating** 47:1
58:7
**evaluation** 52:18
52:21 137:16,18
**event** 60:21 61:6
67:14,18 122:5
139:6 140:9
163:17
**events** 61:1 144:12
**evidence** 97:15
153:3
**evolution** 107:2
**evolved** 31:16
**exact** 12:16 46:21
67:19 145:2
**exactly** 29:20 59:16
77:23,23 80:5
93:12 118:8 119:9
**exam** 15:15
**examination** 1:17
3:2 6:1,13 159:23
163:10

**examined** 163:9
**excited** 74:16
**exhibit** 4:10 7:9,12
8:15,17 11:1,4
20:10,14 32:15,18
33:18 36:21 42:17
42:21,23 43:9,12
43:14,15,16,18
44:10,12,19,24
45:14,15 46:2,6
46:23 47:21 48:2
48:4 64:12,14,24
68:23 74:11 81:9
83:13 88:6 93:18
93:21 98:18
119:19 121:10,21
121:23 128:7,10
128:16 132:1
134:5 144:21
145:8 149:24
151:5,17 152:11
156:11 157:6,7
**expect** 41:22 97:7
**experience** 44:4
56:14 65:23 91:24
99:13 105:19
113:18 114:12
126:3,5 142:4,9
142:12 155:18,22
156:2,4,5 157:5
157:19 158:2
160:3,4 161:4
**experiences** 100:19
101:5
**experiencing**
135:13 161:23
**expert** 4:3,7 6:17
7:7 9:17 10:8,19
12:4,21 13:3,6,7
14:10,12,13 15:2
17:21 18:15,24
20:4 28:21,22
29:20 30:24 31:15
31:21 32:17 33:19
35:21 36:15,16
41:19 45:5 82:19

103:22 106:18,22
107:16,19 108:2
110:10,16,20
111:5 112:23
114:7,15,24
123:20 124:20
125:6 127:11
136:8 141:1,1
**expertise** 111:7
**experts** 11:14 36:10
**experts'** 36:13
**expires** 163:4
165:20
**explain** 156:24
**exposure** 115:14
116:9,14 145:22
146:2,5 158:24
**exposures** 158:10
158:14,16,20
**expressed** 135:2
154:3
**extensive** 10:11
11:11
**external** 123:1
**extremely** 128:14
128:21
**extrusion** 146:14
147:6

**F**
**facility** 88:18
**fact** 11:13 14:22
27:9 37:21 39:22
44:12 52:13,14
83:5 87:23 93:21
98:13 104:12
126:15 129:19
139:1 147:12
153:9 155:8 156:7
**factor** 58:16 123:2
**factors** 106:2
135:24
**facts** 32:7 35:3,8
106:5
**faculty** 19:22
**failure** 136:1

**fair** 38:2 39:11
44:23 61:4 72:5
79:11 82:1 85:15
89:20 94:21 96:24
101:17 105:17
114:11 116:4,20
120:1 136:24
152:9
**Fairly** 39:9
**fall** 31:18
**falls** 78:11
**familiar** 46:7,9
47:10,18 48:1
50:9 59:2 65:4
85:6 109:7,11,13
110:13,14 111:2
112:10,11 153:7
**familiarity** 46:11
58:22
**families** 66:21
**far** 20:2 58:23
60:12 76:15 82:21
86:12 89:5 102:5
123:15 147:5
**FDA** 11:14,21
106:1 138:17
139:13,17 144:12
145:14 147:8
**fear** 122:11,17
157:14
**February** 34:2
**feel** 50:5 75:19,24
76:5,8 92:8,16,23
135:15
**fees** 82:11
**fellowship** 21:4,6
21:10,12,14,21,24
22:3,7 68:3,4,6,7
**felt** 35:4,9 44:1
92:19
**female** 21:17 22:9
126:24 149:4
152:5
**fewer** 129:23
157:24
**field** 99:14 101:6

128:22
**figure** 63:23 82:17
103:13
**File** 1:4
**filed** 16:8
**financial** 47:3 54:6
55:21 56:17,18,21
57:12,15,18,23
58:9
**find** 12:16 98:19,20
127:12 133:6
152:22 156:10
**fine** 33:9 54:11
83:8 131:2
**finish** 46:8
**firm** 13:17
**first** 12:10 14:16
15:10 17:19 19:21
25:18 29:8 30:21
33:24 45:5 60:20
61:5 65:16 69:18
70:1 71:20 74:16
74:20 75:5 77:13
78:2 90:5,7,8,22
91:14 92:20 93:10
94:16,23 100:12
101:18,23 116:4
119:21 120:18
121:15 149:10
155:10,13,16
163:8
**five** 17:18 19:4
40:16 93:5,7
95:15 116:9 135:2
**five-year** 87:22
**fix** 125:1
**fixation** 140:2
**fixations** 26:17
**flew** 88:16
**floor** 78:11 120:5
**fly** 89:6
**FNEA** 108:18
**focus** 49:23 122:9
**focused** 91:15
**folks** 52:10 75:24
95:19

Rebecca M. Ryder, M.D.

**follow** 138:4
**follow-up** 148:23
**followed** 15:19
**FOLLOWING** 1:7
**follows** 6:12
**followup** 159:19
**followups** 161:11
**food** 62:21
**foregoing** 163:12
  165:5
**form** 9:8,14 22:2,11
  25:6 30:11 31:6
  32:11 34:4,10,22
  35:12 36:7 38:6
  38:19 41:15 47:4
  53:11 54:21 56:9
  61:15 79:2 159:4
  165:9
**formed** 35:1 123:2
  125:17
**forming** 35:4,9
  44:3 58:4 103:22
  104:12 111:15
  123:19 152:20
**formulate** 42:2
**formulated** 34:17
  99:6
**formulating** 48:5
  50:6 51:19 58:2
  58:15 124:20
  125:9 140:21
  141:4
**formulation** 58:16
**forth** 35:3,8 42:22
  66:20 163:8
**forum** 5:3 108:2
  119:17 120:2
  122:3
**forward** 41:11
  101:1 160:8
**found** 45:19 52:7
  56:6 82:24 100:23
  148:17
**Foundation** 56:9
**four** 52:14,16
  122:13

**Fourth** 79:1
**frame** 62:3 71:5
**France** 91:24
  104:14
**French** 101:9,21
  104:11 144:1
  155:22
**frequently** 137:17
  159:1
**Friday** 75:6 77:15
**friend** 40:12
**front** 54:9
**function** 84:20
**functional** 22:24
  55:12 102:22
**further** 99:12
  137:16 163:14,16
**FW** 5:5 121:19

—————————
G
—————————
**gain** 157:23
**gains** 135:1
**Gatewood** 4:16,20
  4:22 5:1,3,5,7,8
  5:10 39:5 40:15
  65:6,24 68:16
  71:5 74:8,13
  76:11 79:11 83:10
  86:12 88:3 89:3
  89:10 91:1,3
  93:15 118:8,11
  119:16 120:2
  121:18,24 127:14
  128:5,18 130:9
  131:16,23 132:5
  134:3,15 154:5
**Gatewood/Ethicon**
  72:19
**general** 4:10 6:17
  7:22 20:22 21:4
  29:20 30:24 31:18
  32:24 33:22 35:16
  35:19,21,22 36:22
  36:23 37:4 41:18
  43:9,18 46:20
  56:12 63:20 94:18

97:12 103:22
  123:20 134:1
  139:10 151:5
  153:2 156:11
**getting** 69:9 75:20
**give** 14:3 16:5 32:5
  32:6 42:4 95:15
  125:20 129:7
  132:13 144:23
  152:3
**given** 12:6,10,22
  14:8,12 19:3 45:6
  47:20 94:17
  148:20 163:19
  165:7
**gives** 118:2
**giving** 118:18 121:7
**global** 106:1 126:4
**Gmail** 120:21
  128:12
**go** 7:5,18 8:10
  10:24 12:3 13:1
  15:24 18:20,21
  20:18 25:22 29:16
  37:2 42:12 44:18
  54:13 56:20 62:19
  64:11 65:16 69:17
  70:6 71:19 73:5
  75:3 81:4 82:16
  83:9 87:13 88:1
  95:1,1,7 96:23
  98:12,13 101:1
  112:4 113:21
  120:15,24 127:22
  128:4 131:22
  132:3 134:2,18
  145:17 147:23
  149:21
**goal** 73:11,13
**goals** 80:13
**goes** 61:23 70:19
  77:12,24 79:3
  128:12
**Goffin** 104:13
**going** 8:10 14:7
  15:5 32:21,24

42:20 46:21 48:12
  56:16,21 59:19,20
  64:12,13,15 74:15
  74:21,22 75:7
  78:7,17 88:8
  95:13 99:3,3,4
  118:14 119:21,22
  121:9,10,13
  122:22 127:16,19
  130:6 147:2
  158:22 160:8
**good** 64:20 72:11
  96:4 132:15
  135:12
**GOODWIN** 1:6
**governs** 33:13
**graduate** 24:24
**graduate-level** 24:1
  24:9,12,19 25:13
**grafts** 155:18
**grandfathered**
  21:20
**grant** 57:6
**grants** 57:2
**gravity** 119:2
**great** 51:4 120:23
**Greg** 5:8,10 122:1
  131:23 132:4,6
  134:3,16
**Grey** 70:21
**group** 55:6,14
  101:9,20,22
  104:11,14 116:6
  144:1
**groups** 55:8
**guess** 39:14 40:2
  82:16 122:23
  149:22 150:10
**guest** 65:10
**guidance** 92:21
**Gunn** 13:12
**GYN** 15:14
**Gynecare** 4:14,22
  68:21 69:2 71:24
  88:4 156:16
**gynecology** 22:18

23:11 28:2 149:15
**Gynemesh** 5:12
  12:4 141:14
  144:13,15,17,19
  145:14 155:4,19
  156:15,16 158:22
  160:4

—————————
H
—————————
**H** 4:1
**half** 44:24 148:8,10
**Hampton** 84:14
**hand** 43:14 81:11
  121:9,13 163:19
**handed** 89:8 128:9
  145:7
**handing** 7:11 42:11
  42:20 69:2 93:20
  134:14
**happen** 73:24 97:2
  161:1
**happened** 17:8
  75:17 90:2
**happy** 8:3 30:8
  71:23 131:12
**Hardy** 70:20
  134:21
**Hart** 39:3
**Haynes** 2:7
**head** 10:24 62:8
  63:13
**Headquarters** 2:11
**health** 11:21 25:1
**healthcare** 66:1
**hear** 75:7 77:15
  90:7,22
**heard** 27:11 90:15
  90:17
**hearing** 105:18
**heavier** 141:23
**heavier-weight**
  141:19
**heavy** 136:1
**heavyweight**
  141:23,24 142:5
  142:16

heck 81:5
Heel 25:21
held 149:16
help 10:3 34:3 77:9
119:12
helped 100:24
Hendricks 13:13
hereinbefore 163:7
hesitated 29:1
Hey 95:12
Hi 5:7 128:6
high 144:3
higher 55:4,7,13
111:6 118:3,17,20
118:22 119:1,2
highest 133:20
highest-volume
133:11,24 135:4
highlighted 50:10
highly 79:19
Hill 24:5
Hilton 62:8 63:13
Hinoul 37:9
history 91:22
137:21
hold 10:17 79:6
holistic 22:24
honorarium 97:7,8
hope 65:18 128:13
128:20
hoping 78:7,16
hospital 80:1 94:3
94:5,6,17
Hospital's 134:23
hotel 6:7 40:6
88:18
hour 11:8 99:3
hours 32:23
HYLAND 2:10

**I**

Iakovlev 37:1
idea 59:10 68:19
95:21 109:3
114:14,15,18
154:3

identification 7:8
11:3 20:13 32:18
42:17 43:11 64:24
68:22 74:10 81:9
83:12 88:6 93:17
119:18 121:20
128:7 132:1 134:5
144:21
identified 50:5
122:9 133:11,20
134:9 152:18
identify 132:22
IFU 103:15 138:11
138:15 139:5,11
140:5 159:13
III 65:17
Immaculate 70:8
immediately 31:5
32:9
impact 52:18 53:4
53:18 55:22 69:21
implant 96:20
119:13 138:10
156:19
implanted 75:21
113:4 116:21
123:12 124:9,12
124:13 142:13
147:4
implanting 105:15
125:13 133:1
146:11
implants 146:20
156:23
imply 78:16
importance 54:24
55:3 104:24
important 35:4,9
44:2 45:24 48:4
50:6 51:18 52:2
53:9,15 54:14,15
58:5 96:8,12,16
96:17,21 99:5
102:20 105:14
113:18 124:7
127:5 136:7 141:8

impression 106:1
incisions 123:1
129:24 157:24
include 10:15 82:12
120:5 132:15
included 151:9
includes 12:11 23:9
including 56:13
143:3
inclusive 12:5
incontinence 26:22
28:13,18 122:10
inconvenient
137:10
increased 156:22
incumbent 52:22
independent 51:21
75:14 84:4 85:19
87:13 97:18 152:7
indication 156:18
indications 103:12
individual 7:24
32:4
industry 87:12
114:10
infected 146:17
infection 136:18
146:10,12,15,21
147:7,13,15,19,19
156:22
infections 137:16
informal 88:19
information 31:4
32:8 52:18 82:24
83:7 100:18
103:16 105:3
106:13,21 107:1
107:15,21 120:5
122:16 125:4,4,5
125:12 126:4
138:15 139:11,12
155:20 158:9,13
informative 92:14
ingrowth 156:21
initial 91:23
initially 29:24

initials 108:18
injury 17:4 145:13
145:15,19 161:24
162:11
institution 27:17
instructions 12:4
90:1 103:11
138:17
instrumental 156:3
instruments 119:12
insurance 16:2
19:24
integrated 22:23,24
23:18
intended 31:8
intentionally 64:5
interactions 39:15
interest 135:3
interested 129:2
163:17
interfere 146:8
INTERGEL 71:7
71:15
internal 73:13
103:2,7,16,20
104:19,22 107:11
108:23 109:2
122:24
internally 106:14
126:14
international 11:21
157:3
interoperative
156:5
interpret 52:23
interpretation 51:9
51:14 52:17
interpreted 51:21
53:4
intestinal 17:4
intimate 46:16
79:12,15
introduce 130:8
introduced 92:12
99:20
introduction 97:17

100:1
introitus 135:23
invasive 72:1
investigate 99:12
100:3
investigated 52:6
investigators
104:10
invitation 122:6
invited 65:10
120:13
inviting 120:2
invoices 4:5 7:20
8:3,16,21 11:1,3
29:16 82:18
involve 115:9
involved 20:7 27:6
51:14 52:16 53:3
62:18 115:6
134:10 135:14
156:7
involvement 51:7
52:13,15 91:11
151:20
involving 28:23
ironed 143:15
issue 5:12 128:2
144:19
issues 124:19

**J**

J 1:24 6:3 41:1
128:18 163:2,22
J&J 73:23 80:14
83:1 122:2
Jacquetin 104:7,13
Jafri 84:1
Jim 4:16,20,22 5:1
5:3,5,7,8,10 39:3
39:5 40:12,14
65:6,24 66:9
69:19,19 71:5,21
72:2,19 74:8,13
74:18 76:11 79:11
81:20 83:10,15
86:5,12,21 88:3

89:3,9,20 91:1,3
93:15,24 94:12,20
95:2,11 96:23
118:8,11 119:16
120:1,9,20 121:18
121:24 122:16
128:3,5 129:7,19
130:1,9,23 131:5
131:16,23 132:5
132:13 133:10
134:3,15 154:5
**Jim's** 69:12,15
71:21 81:12,14
89:10 132:8
**JJHCS** 79:10
**job** 66:7 128:22
132:15,24 133:2,5
**jobs** 66:16
**Johns** 84:24 85:4
**Johnson** 39:7 61:12
61:12
**Jon** 91:8,9 95:13,14
97:6,9,10,10
100:10
**Jones** 85:5
**JOSEPH** 1:6
**journal** 27:20,24
153:5,15
**journals** 152:3
**Joyce** 1:11 2:9 4:9
6:17 42:16 43:1
**JUDGE** 1:7
**July** 97:3
**jump** 99:4
**jumping** 32:24
**June** 97:12 100:2
100:24 101:7,13
102:7 134:15
149:9
**jury** 43:16 88:11,13
88:15 146:2
**Justus** 1:11 2:9 4:9
6:18 8:1 11:12
28:22 29:12 31:21
32:3 35:15,21
41:19 42:16 43:1

109:23,24 110:21
**Justus-McBrayer**
31:17

_____

**K**
**Kabbash** 2:13 3:4,6
8:2,12 9:8,14 22:2
22:11 25:6 27:14
30:7,10 31:6
32:11 34:4,10,22
35:12 36:7 38:6
38:19 41:15 43:5
44:14 47:4 50:24
51:5,22 52:3,20
53:7,11,20,24
54:21 55:2,15
56:9,24 58:11,21
59:22 61:15 64:10
64:17,20 66:3
67:13,16 70:4
71:13 72:22 73:14
74:7 75:13 76:2
76:24 78:9,19
79:13 80:16 83:3
85:12 86:16,24
91:4 92:11 95:20
95:24 96:10,14
97:21 98:1 101:15
101:19 102:4,9
105:5,11,21 106:7
107:6 110:17
111:8,19 113:1,9
113:15 114:17
116:24 117:8
118:10 121:15
122:21 123:14
124:22 125:7,14
129:11,21 130:15
131:18 132:23
133:7,15 137:3,12
138:2,22 139:3
140:16,23 141:9
141:20 142:7,10
142:18 143:5
144:4 145:9
146:22 147:9,14

148:6,9,11,23
149:3 159:6,18
160:9,20 161:11
161:14 162:13
**Karram** 48:19
**keep** 113:21
**keeps** 128:3
**Kelly** 26:24
**Kemp** 70:20
**Kennedy** 84:1
**kept** 34:1
**key** 152:19
**Kim** 8:2 35:13 43:6
kim@wilsonlaw...
2:9
**Kimberly** 2:8 6:15
**kind** 78:7 115:12
**kit** 77:16,24 78:5,6
78:11,15 128:24
133:11 135:5
**kits** 27:12
**Klinge** 109:7 110:5
111:6 112:6,10
113:11
**Klinge's** 110:1,6
111:14 112:12
**knew** 53:19 79:17
79:18,19,20,21
80:2,5 124:17
**know** 13:8 15:24
16:2 18:19,22
19:19 20:1 24:16
29:20,24 31:16
33:11 34:13 37:5
37:7,9,12,19,23
38:5,8,11,15,23
39:1,8 40:20
41:21 44:21,22
45:5,9 47:9,24
50:21 51:23 52:10
53:13 54:5 57:7
57:10 59:14,18
60:20 61:13,16
62:4 63:22 64:9
65:5,20 66:11,12
66:24 68:19 69:12

76:15 79:18 81:3
84:7,16,23 85:2,5
86:10 87:11,15,18
89:11,18 90:5
94:4,7,8 99:24
103:1,7,19,24
104:6,7,19,22
105:12 106:12
108:11,15,18,23
109:21 110:15,20
110:24 112:12
113:16 116:16,23
117:5,6 118:15
119:8 121:2
124:20,24 126:9
126:21 127:8,20
132:6 133:10,12
133:14 136:24
137:21 138:13,19
139:9,13 140:12
140:13,21 141:5
141:12 142:12,19
143:20,24 146:16
146:18 150:16
156:2
**knowledge** 51:13
90:8 155:12
**knows** 74:23,24
105:8
**Kris** 83:24 84:6
**Kwiatek** 4:12 64:21

_____

**L**
**L-e-a-o** 23:17
**labeling** 138:18
139:17
**Lacroix** 4:18 81:7
**lady** 16:3
**laparoscopy** 17:5
71:10
**large** 6:5 153:1
156:20 163:1,4
**larger** 126:16
**lasted** 155:8
**launched** 68:17
**launching** 124:18

**law** 2:6 33:12
**lawsuit** 19:16
**lawyer** 13:16,19
16:13 60:4,10
160:4
**lawyers** 44:13
**lead** 143:17
**leader** 28:16
**leaders** 99:14 101:6
114:9
**leading** 120:4
**Leao** 23:15,17
**learn** 90:23 121:2
**learned** 107:4,8
**learning** 85:23
123:7,10
**leave** 42:6
**led** 23:21
**left** 55:13 99:3
160:19 161:7
**lends** 153:12
**let's** 7:5,18 13:1
14:4 20:10,18
23:11 26:13 42:12
44:23 48:7 53:23
64:11 67:21 69:17
71:19 77:12 81:4
83:9 88:1 95:1,7
98:10,12,13,18
99:8 110:11
111:23 112:1,4
119:15 121:16
127:22 128:4
131:22 145:17
**letter** 29:24 30:4
40:23
**LIABILITY** 1:5
**lie** 64:6
**lifting** 136:1
**ligament** 26:17
140:2,2
**lighter-weight**
126:16 141:13,16
**lightweight** 141:23
142:6,15
**limited** 104:21

Case 2:12-md-02327   Document 2016-4   Filed 04/21/16   Page 53 of 64 PageID #: 33195
Rebecca M. Ryder, M.D.

Page 175

Linda 23:13,14,19
line 151:15 164:5
Lisa 4:12 64:21
list 4:11 43:10,22
  44:6,20 45:18
  47:19 54:12 56:20
  58:19,24 65:8
  81:14 82:23
  104:17 109:9
  110:8,11 111:18
  111:20,20 112:4
  151:6,10,14
listed 20:3 46:6
  47:5 48:4 54:9
  112:6 159:10
  162:6
lists 8:8
LITE 102:15,16
literature 7:21 8:22
  11:11 44:20 49:24
  52:5 56:12 58:3
  105:20,23 107:9
  109:14 111:14,17
  113:21 126:1
  141:18 143:14
  151:9,24,24 152:7
  157:2 158:18,19
  158:21 159:1
litigation 1:5 9:18
  9:20 12:23 13:4
  31:2 35:17 45:7
  52:11 123:20
  125:10 151:20
little 28:20 29:1
  99:4
LLP 2:10
local 73:12 81:21
logistic 90:1
long 23:13,14,19
  66:9 148:24
  149:16 150:5
look 29:2,5,23 30:8
  32:4 36:9,16,19
  47:1 52:22 55:16
  57:10 58:7,12
  65:4 82:16 98:18

99:8 102:22,22
  107:19,19 119:23
  122:4 128:11
  129:17 144:23
  146:3 149:19,21
  152:2 156:12
  157:6
looked 11:11,12,13
  11:14,15 30:1
  36:15,22,23,24
  37:3 54:8 58:14
  65:24 100:5
  107:21
looking 36:13
  98:21
looks 30:22 56:13
  120:20 129:16
lot 8:20 39:10,14
  50:4 54:13 104:17
  142:3
lots 61:11 123:24
loved 75:5 77:14
loving 128:21
Lucente 5:5,5
  37:19 40:3 41:8
  41:10 59:8 60:2
  62:16 88:9,20
  91:16 97:17 99:22
  101:9,20 107:5
  120:4 121:1,18,19
  121:24 122:1
  127:2 145:4
  154:10 157:11
Lucente's 38:4
  59:14 93:11
  126:21
lunch 72:3
luncheon 71:23
Lydia 5:5 121:19

——————
M
——————
M 1:18 2:13 3:3 4:4
  4:7,8 6:11 32:17
  33:19 42:15,24
  162:17 163:6
  165:14

M.D 1:18 3:3 4:4,6
  4:7,9,11 6:2,11
  7:8 20:5,13 32:17
  42:16 43:1,10,19
  162:18 163:6
  165:14
ma'am 13:20 29:11
  30:16 44:16 50:20
  88:14 93:3 103:6
  110:2 111:11
  139:23 158:11
  160:13
Madam 10:24
Maha 2:13 31:24
Maher 48:6
mail 74:24
major 58:16
majority 41:22
  59:3
malpractice 12:18
  12:20 14:10 15:7
  19:20,24
mammogram
  15:15,18,20
man 13:18
manage 122:11,18
  140:6,7,9 157:15
manager 28:16
  39:12 75:1 131:4
manufacturer
  102:18 109:1
manufacturers
  29:3,5 139:10
manufacturing
  141:5
manuscript 51:10
  51:15
Mar 159:7 161:16
  161:22
marathon 33:10
March 1:21 4:9,11
  4:23 6:6 42:16
  43:3,10 88:5
  163:20
Margaret 4:6 20:12
mark 7:5 11:1

20:10 42:20 64:11
  64:12 81:4 83:9
  88:1 119:15
  121:15,16 128:4
  131:22 134:2
marked 7:8,11 8:4
  11:3 20:13 32:18
  33:18 42:17 43:11
  64:23 68:22 74:10
  81:8 83:12 88:5
  93:17,20 119:18
  121:20 128:6,9
  131:24 134:5,14
  144:20 145:7
market 104:2
  106:11,16 109:5
  114:5,22 115:2
  130:20
marketed 140:12
marketing 101:12
  103:3,18 127:8,17
  127:19
Marriott 6:6
Mary 70:8
Master 1:4
material 8:9 23:6
  25:13 111:5
  112:22 113:2,3
  126:9,10 144:16
  144:17 145:2
  156:18
materials 4:11
  10:20 25:16 43:10
  43:22 111:20,23
  112:5 151:6
matrix 108:15
matter 55:11 56:17
  56:21 112:24
maximum 150:24
McBRAYER 1:9
  2:5 6:18 8:1
  11:12 28:22 29:12
  31:21 32:3 35:14
  35:21 41:19
McCormick 120:3
MDL 1:8

MDL-2327 1:5
MDR 145:18
mean 8:18 19:3
  22:7 27:9 35:14
  35:16 44:14 47:24
  56:19 59:17 63:21
  65:22,23 66:1,20
  67:14 76:9,14
  85:20 86:2,8,12
  113:11,13 114:4,4
  114:7,11 125:3
  133:19 137:23
meaning 109:1
means 108:22
medical 7:21 8:22
  11:11,12 12:18,19
  14:10,13 15:7
  19:23 20:21 21:3
  21:10,14 22:23,24
  24:4,14 25:19,23
  27:20,24 32:4,8
  44:19 49:23 52:5
  56:12 58:3 68:7
  84:7 91:7 100:4
  109:13 113:21
  126:1 139:10
  142:22 143:14
  151:9,23,24
  153:14 157:2
  158:17,21 159:1
medically 77:2
medicine 9:24
  21:17 22:9,9
  63:21 115:3 149:5
  152:6 153:5
meet 129:6
meeting 4:18 81:7
  90:9,16 100:7,11
  131:5
meetings 11:21
  37:17 39:13 87:11
  90:13 91:7 107:8
  113:21 126:2
  157:3,4
memo 139:16
memoranda 11:14

memos 108:10
  139:13
mentioned 33:7
mesh 9:17,20 12:23
  26:15,19 27:6,11
  27:12 28:8,17,23
  31:2 45:6 60:22
  61:3 84:11 102:17
  111:14 112:13
  113:4 115:14
  116:9,13 121:2
  124:18 125:4
  126:16 128:24
  133:11 135:4
  141:13,16,19
  142:5,5,6,15,17
  143:2,7,8,9,12,23
  145:21,24 146:2,4
  146:5,12,12,14,20
  147:5,6,16 148:3
  150:21 151:2,20
  155:2 156:8,19
  158:16,20,24
  160:6 162:10
mesh-related
  160:16
meshes 141:23
  142:13
met 37:13,15 75:10
  77:5 81:23
meta-analysis
  159:8
Michael 129:8
Michele 104:7
Michelle 130:23
  131:3
Michigan 13:5,14
mid-'90s 61:9
mid-weight 142:5
  142:17
middle 95:7,10
million 38:17
mind 101:1
minimally 72:1
minute 42:13 98:14
  148:8,10,11

Mischaracterizat...
  142:11
mischaracterize
  111:21
mkabbash@rike...
  2:13
moment 58:23
Monarc 72:14,15
  73:2,3,5,23 75:4
Monday 1:21 6:6
  94:15 128:11
  129:5
money 38:11 63:19
  67:3 73:17 82:13
  95:6,18 96:5 97:6
  137:9
monograph 159:16
Montgomery 84:24
  85:4,5
month 94:23 97:16
  113:20 122:13
  136:23
monthly 152:3
months 97:22
  99:19
morning 6:16
  32:23 95:11 99:21
morphing 91:22
Morristown 2:12

N

N 3:1
name 6:15 16:11,15
  18:7,10 41:1
  61:21 65:8 74:23
  109:8 120:18
named 15:4,7
  16:19,20 19:16
national 11:20 20:3
  157:3
native 54:20 55:14
  102:13 124:5,13
  135:24
Nausea 17:2
Naved 84:1,9
NC 2:7

NCRA 163:23
nearby 146:1
necessarily 56:3
  71:2
necessary 77:3
  135:15
need 8:6 14:4 31:4
  33:8,14 41:24
  46:17 55:16 66:24
  75:24 76:6,8
  92:24
needed 92:16
needles 119:11
needs 137:16
neutral 133:8
never 20:21,24
  21:3,6,9 23:20
  28:10,15 68:2,7
  77:5 126:18
new 5:1 76:3 90:12
  93:16 94:13 120:5
  128:23 130:8
  132:8 152:11
  153:4 155:2
  157:23
newest 121:2
Newport 2:3 84:14
news 84:14 154:19
night 60:5 88:17
  95:3
NJ 2:12
Norfolk 16:10 18:6
normally 100:17
North 24:4 25:20
  26:2
notary 6:4 163:3,19
  163:24 165:23
note 162:9
noted 50:17 165:10
notes 7:21 8:22
  55:17
notice 4:3 6:5,21
  7:7,19 20:4 30:4
notifications 11:22
November 5:7
  29:14 128:6,11,24

novo 54:19 55:18
  144:3
number 45:2,3
  48:10,19,22,23,24
  49:1,2,3,4,5,6,7
  49:10,12,13 65:8
  74:24 79:4 94:18
  132:17 134:19
  145:8 153:1
numbered 156:12
  157:9
numbers 46:21
  49:8
Numeral 65:17
nurse 76:16

O

O-a-s-t 16:16
Oast 16:14
oath 19:6,11 34:16
  110:12 118:15
  148:20
OB/GYN 26:4,5
  122:9 136:14
  150:3
object 78:24 79:2
  148:11
objection 9:8,14
  22:2,11 25:6
  27:14 30:11,13
  31:6 32:11 34:4
  34:10,22 35:12
  36:7 38:6,19
  41:15 47:4 51:22
  52:3,20 53:7,11
  53:20 54:21 55:2
  55:15 56:9,24
  58:11,21 59:22
  61:15 64:10 66:3
  70:4 71:13 72:22
  73:14 74:7 75:13
  76:2,24 78:9,19
  79:13 80:16 85:12
  85:12 86:16,24
  91:4 92:11 95:20
  95:24 96:10,14

97:21 101:15,19
  102:4,9 105:5,11
  105:21 106:7
  107:6 110:17
  111:8,19 113:1,9
  113:15 114:17
  116:24 117:8
  118:10 122:21
  123:14 124:22
  125:7,14 129:21
  130:15 131:18
  132:23 133:7,15
  137:3,12 138:2,22
  139:3 140:16,23
  141:9,20 142:7,10
  142:18 143:5
  144:4 146:22
  147:9,14 159:4
  160:9,20
objections 30:14
  78:24
objective 55:4
observing 88:23
obstetrics 17:23
  28:2 149:15
obtain 23:21
occasion 136:16
occurrences 161:2
OCD 64:19
October 4:13,21
  29:14 31:22 63:13
  64:22 82:2 83:11
  83:16 163:5
offend 132:20
offer 71:24 120:24
  141:3
offered 149:11
office 39:12 41:2
  75:1 77:16 78:1,2
  78:2 128:22 131:4
official 21:12,13
  68:4,5
oh 43:7 82:22 85:4
  94:8 95:6 128:17
okay 6:21 7:2,18,23
  8:10,12 9:2 12:3,6

12:17 13:1 14:2,7
14:18,21 15:1,5,6
15:22 16:5,8
18:12 19:3,8,11
20:18 21:16 22:17
23:9,11,18,20
24:3,8 26:5,8,11
27:2,24 28:5,20
29:1,15 30:21
31:20 32:2,9 33:7
33:18,22 34:16
35:19,22 36:2,12
36:16,19 37:9
41:24 42:1,11
43:2,4,20 44:9,12
45:24 46:13,16,23
47:21 48:3,16,18
48:21 49:17,23
50:4,15 51:5 53:2
53:23,24 54:11,18
55:20 56:4 57:8
58:5 61:4 63:8
65:7 67:16 68:10
68:14 69:16,23
71:4,17,19 72:5,9
72:19 73:22 74:2
74:6 75:3 76:8
77:12 78:14 80:5
82:11,15 83:2,19
85:20 87:8 88:1
88:15,24 89:7
90:20,21 91:6
92:2 95:1 96:23
97:14 98:2,8 99:9
100:16,20 107:23
109:13,23 110:15
110:20,23 111:17
112:10,12,22
113:8 114:3,15,21
115:12 116:8,11
116:12,20 118:7
118:14 119:4,15
120:9,12,20 121:3
121:7,7,9 122:16
123:12,19 127:22
128:1,17,18

129:17 130:3,19
131:2,5,7,13,15
132:13,20 133:10
134:14 138:8
141:16 142:15,21
145:7,18,20 146:5
146:13,19 147:2
148:6,22,23 150:2
150:9,11 160:8
162:5
**on-call** 16:21
**once** 75:1 123:22
125:1 130:3
**ones** 44:1,20,21
46:13 50:5 57:17
57:23
**open** 5:12 129:4
144:19 156:10
**operate** 143:4
**operated** 155:13,16
**operating** 39:22
88:21 153:17,22
154:2,6 155:12
**opinion** 32:5,6
53:18 55:22 56:1
56:8,16 109:17,20
112:19,20 113:5,8
113:12 123:2
125:20 126:21
127:4 142:21
146:21 153:10
156:15,16 157:1
**opinions** 32:24
34:17 35:1,5,10
35:16,19 38:14
41:14,18,24 42:3
42:4,7 44:3 48:5
50:7,18 51:19
53:22 55:23 56:11
57:4 58:2,4,15,17
99:6 103:22
104:12 105:17
106:4 111:15
112:12 113:23
123:19 124:21
125:9,17 140:22

141:4 142:3
148:13 152:20
156:12 160:1
**opportunity** 65:20
**options** 113:20
**oral** 1:17 6:1
149:23
**order** 17:20 23:21
79:4,6,7,8,21
94:17
**ordering** 94:19
**orders** 79:23,24
80:3
**organ** 28:13 135:18
139:20,22
**Orleans** 90:12
**other's** 66:20,21
**outcome** 55:13
**outcomes** 91:17
102:22
**outside** 98:8
**ovarian** 18:13
**overall** 112:20
**owner** 22:15
**owns** 23:12,18

**P**
**P.A** 2:6
**p.m** 127:24,24
129:5 144:9,9
162:18
**PA** 59:21 76:19
87:4 88:8
**packaging** 76:5
**page** 3:2 4:2 48:9,9
48:11,12,13,19,21
48:22,23,24 49:1
49:2,3,4,5,6,7,8
49:10,12,13,14,19
49:20,21,22 50:2
54:9 65:16,17
69:18 70:2,7
71:19 74:19 75:2
79:4 93:23 95:2,7
95:10 99:8,9,11

112:4 156:12
157:9 164:5
**pages** 165:5
**paid** 10:7,13,19,20
16:2 19:19 21:24
22:3,8,15 29:2,4
38:8,11,15 62:14
62:15,18 63:8
67:3 70:20 73:17
**pain** 17:2 115:16
124:1,2,9,13
143:18 146:6
160:19 161:8,23
162:11
**paper** 45:2
**papers** 126:2
**paragraph** 71:20
134:19
**paraphrasing**
158:8
**Parisi** 4:22 38:21
88:3 89:9,11,17
**part** 57:20 96:15
111:14 127:11
157:8
**particular** 30:17
109:4 146:24
**particularly** 105:1
123:7 156:22
**parties** 163:9
**partner** 16:22
17:11
**party** 15:4,7 19:16
163:17
**passed** 149:23
**patient** 11:15 15:14
15:20 16:23 17:9
20:8 73:8 77:6
86:13,22 92:18
93:1 96:12,16,17
96:21 102:23
116:6 118:21
135:14 136:16
137:20 138:15
139:11 153:23
154:2,7 155:13,16

158:1 162:10
**patient's** 103:14
**patients** 26:6 75:19
76:21 86:18 88:21
91:18 99:13
100:21 101:2
105:13 113:4,20
115:10,20,22
116:1,16,21 117:7
117:12 123:21,23
123:24 124:3,8,9
124:12,13 125:13
125:22 126:3,15
129:24 137:7,10
138:1 143:18
144:13 153:1
155:5 156:4 161:5
**Paul** 4:22 38:21
88:3 89:9,11,17
95:12 97:9,10
**pay** 22:1 95:19
**paying** 95:6,14
**payments** 20:3
82:24 83:6
**pee-** 28:10
**peer** 27:19 28:1,3
52:6 53:6,15
**peer-review** 57:20
**peer-reviewed** 52:5
**peer-to-peer** 65:20
**pelvic** 1:4 9:17,20
21:17 22:9 28:13
120:5 124:24
133:24 134:8
135:18 139:20,22
149:5 152:5
154:23 160:22
**pelvis** 143:3
**pending** 13:14 20:2
**people** 4:13 34:20
47:2 57:11 58:8
64:22 100:9 115:5
156:3
**percent** 116:10,19
117:2 134:12
**percentage** 134:10

Case 2:12-md-02327   Document 2016-4   Filed 04/21/16   Page 56 of 64 PageID #: 33198
Rebecca M. Ryder, M.D.

Page 178

perfectly 137:23
perforation 84:22
perform 26:6 83:4
performance 69:23
performed 47:2
  57:11 58:8 67:3
  80:6 81:1 84:16
  93:11 117:18
period 134:1
  150:20
perivaginal 140:3
permanent 160:19
  160:19 161:7,8,23
  161:24 162:11,11
permit 154:1
permitted 79:1
PERRETTI 2:10
person 77:20
  109:12 137:14
personal 91:17
  126:3 130:22
personally 7:1
  22:14 80:24 86:13
  158:2
pertain 12:17
pertained 12:18
pertaining 9:6
  60:22 61:1 99:6
pessary 135:14
Pete 4:16 74:8,14
  74:18 77:5,9 80:8
PFR 122:3,9
phone 16:22,23
  39:12 40:23
physician 10:9
  15:21 16:21 18:16
  18:17 52:22 53:5
  65:22 85:22 92:20
  125:13 136:8
  151:19 157:4
physicians 10:4
  19:1 52:8 104:14
  108:8 117:11
picture's 122:6
Piet 37:9
Pinnacle 122:12,23

126:8 131:14
PISQ 55:9
pitched 134:24
place 79:7,8 100:17
places 62:19
plaintiff 2:5,9
  12:21 13:3,11,12
  14:11 15:22 17:12
  18:3,7,19
plaintiff's 13:7,16
  13:19 16:11
Plaintiffs 1:12,19
  6:2,12
plaintiffs' 7:12
  8:15 11:13 42:21
  128:10 151:12
  155:7 158:7
plan 50:24 69:22
plane 89:6
play 151:24
played 152:2
plays 152:8
Plaza 2:3,11
please 33:11 45:24
  94:17 98:5 121:2
  151:22
plication 26:24
PO 79:6,9 94:17
point 33:8 72:13
  109:3,4 119:1,3
  124:17 127:18
  151:12
points 34:6
polymer 25:14,16
polypropylene 26:8
  26:12,15,21 28:11
  109:14 113:4
  133:21 134:10
  156:18
POP 26:6,13 27:5
  27:12 28:18 99:15
  109:18
pore 156:20
pores 126:16
Porter 36:24
portion 146:4

position 11:22
  126:2
positive 99:13
  101:5
possession 7:17
  97:14
possible 27:1 62:12
  154:16 160:22
Possibly 37:14 87:7
  147:10
posterior 140:1
postoperative
  16:24 17:1 156:5
postprocedure
  89:1
potential 84:21
  154:13
PowerPoint 92:5
practical 4:23 88:4
  161:4
practice 22:15,17
  23:1 79:12,22,24
  84:8 115:3 136:17
  150:5,15 151:22
  152:1
practices 84:13
practicing 9:23
  17:23 52:7 63:21
  136:8,15 151:19
practicum 86:1
Practitioner 20:3
Pre 38:23
pre-beach 63:12
  65:11
pre-litigation 20:7
pre-suit 20:7
precepting 10:21
preceptor 10:9
  62:23,24 73:13
  80:14 81:21 82:21
  85:21 86:3 87:23
  91:14 93:7 95:19
  97:1,6,15
preceptors 65:19
Preceptorship 98:3
predated 60:17

62:2
Predominantly
  117:16
preparation 43:23
  82:19
prepare 11:9,24
  34:20
preparing 41:3,5
presence 153:23
present 75:23
  154:1,6
presentation 88:19
  92:6
presentations 87:5
  87:9 157:3
presented 11:20
  52:23 91:21 100:6
  101:10 107:1
  156:21
pretty 12:5 58:23
  131:16
previous 15:16
  130:3
primarily 86:6,11
primer 63:12 65:11
printout 163:11
prior 7:13 12:7,22
  14:2,6,9 15:1
  16:17 31:3 33:7
  36:10,11,17,18
  41:10 68:15,17
  70:15 83:1 84:17
  100:20 101:7
  103:3,18 124:17
priorities 81:15
priority 81:16,20
  81:23
private 150:5,15
probability 142:22
probably 14:6
  26:16 27:8,10
  39:21,24 40:16
  46:4 61:9 82:1
  86:8 88:16 90:9
  93:4 100:9 130:5
  130:6 131:6,8

133:24 136:23
  150:22
problem 16:24
problems 17:1 73:9
procedure 73:3,4
  74:21 75:11 88:22
  88:23 90:5 91:22
  93:8,11 99:16
  102:17,21 107:3
  117:19 135:13
procedures 26:9
  27:5 55:5 80:6,24
  84:16 97:2 100:18
  102:11
proceeding 163:13
  163:17
proceedings 108:8
process 57:20
proctor 5:10 86:2,3
  134:4,18
proctorship 97:11
produce 8:4
produced 8:20 48:2
  163:13
product 39:6 60:22
  64:4 66:1,8 76:3
  77:21 88:20 92:13
  99:14,21 100:1,3
  100:13 101:7,18
  101:24 107:20,24
  108:9 109:4 114:9
  125:13,21 130:8
  131:16 133:1
  136:12 140:20
  147:16 155:23
  156:3
products 1:4 9:6
  14:13,16 63:18
  68:16,20 71:5,12
  75:21 84:11 87:20
  96:6,21 100:18
  115:2 123:4
  133:20 134:24
  141:6
Prof 4:22 88:4
professional 6:3

11:16 40:13 87:4
87:9 105:23 126:2
140:8 163:2
**professionally**
99:20,20
**profile** 142:4,16
**program** 23:24
24:9,19 26:19
27:10 65:14
**programs** 62:13,20
**progress** 132:14
**progresses** 42:2
**prolapse** 28:13
55:7 102:12,21
104:21 112:14,17
118:24 135:18,19
135:22 139:20,22
150:12,17,21
151:2
**PROLENE** 26:16
**Prolift** 4:10 5:1
31:15,18 35:16,19
37:4 43:9,18 44:3
55:4,6,9 57:9 58:7
59:9,18 68:15,17
87:5,6,10,14,15
90:5,7,8,15,20,23
91:14,18,23 93:2
93:7,11,16 94:13
94:15,19,23 95:13
97:1,6,17 98:5
99:8,10,12,19
101:1 102:2 103:2
103:8,10,17 104:2
104:20 105:4,9,13
106:6,11,15,19,24
107:2,3,12,18
109:1,15,18
111:15 112:13
113:12 114:1,4,13
114:16,19 115:7
115:13,23 116:6
116:16,21 117:19
117:23 118:5,16
118:18 119:7
121:1,5 122:10,17

123:3,13,17,21
124:1,8,10,14,18
125:19 126:11,16
126:22 127:5,9,12
127:17 129:20,23
130:19 135:17
136:4,8,11 138:10
138:19,23 139:6
139:19 140:14,20
141:1,4,7 142:24
143:21 144:2,13
144:16 145:1
152:15 154:10,15
154:17 155:1,1,10
155:13,16,21
156:8,17 157:23
158:3 159:13,15
160:2,6,16 161:2
161:3 162:10
**Prolift+M** 119:4
120:6 126:6,10,14
126:20,23 127:5
140:12,19 141:1,6
141:13 142:24
**prolonged** 124:1
134:15
**proper** 156:21
**proposed** 141:22
**propounded** 165:8
**Prosima** 131:8,9
134:22 135:3,6,11
135:13
**provide** 30:19
62:20 113:20
**provided** 20:11
30:6 82:23 138:15
151:14,18 152:10
152:12 160:18
**providers** 23:7
**providing** 139:11
**PS** 5:12 12:4
141:14 144:19
155:4 156:16
158:22
**public** 6:4 11:21
25:1 163:3 165:23

**publication** 153:7
153:10
**published** 28:10
51:10 52:4 104:14
153:4,9
**PubMed** 100:5,21
**pulling** 132:15
**purchase** 79:4,6,23
79:24 94:17
**purchasing** 77:20
79:5,21 80:2
**pursuant** 6:5 33:12
**pushes** 119:2
**put** 44:20 46:1 60:5
62:14 98:10 104:2
109:5,14 111:17
**Pypcznski** 4:18
69:7 81:6

---

## Q

**question** 33:3,13,14
35:6,24 90:22
103:5 107:14
137:19 147:2
158:8
**questioning** 151:15
**questions** 31:4,9
32:14 33:2,23
46:18,20 51:3
99:6 148:24 151:4
151:8 152:4,14
153:16 154:9
158:7 165:7
**quick** 23:12
**quite** 101:21

---

## R

**R** 1:6 164:2,2
**raise** 69:24
**Raleigh** 2:7
**random** 146:23
**randomized** 56:14
152:15,24 153:2
162:1
**rare** 161:2,3,8,9
**rate** 54:19 55:4,7

55:13 116:9 117:3
124:12 144:2
**rates** 124:9
**RCT** 152:22 153:4
**RCTs** 159:10
161:19 162:6,9
**reactions** 113:22
**read** 37:8 41:4,7
46:5,8,13 50:12
50:19 57:14,16
58:20 59:4,5
103:11,12 110:10
110:24 111:3
113:21 138:11
165:4
**reading** 105:24
144:5 162:15
163:15
**real** 14:7 23:12
**realize** 57:1 147:18
**really** 56:21 137:13
137:19
**reason** 30:2,17
158:12 164:7,9,11
164:13,15,17,18
164:20,22,24
**reasonable** 142:22
**reasonably** 41:22
**Rebecca** 1:18 3:3
4:4,6,7,8,11 5:3,7
6:1,11 7:7 20:4,12
32:17 33:19 42:15
42:24 43:10,19
81:18 94:14 97:11
119:16 120:16,21
128:5 162:17
163:6 165:14
**recall** 13:21 14:1
16:12 17:14 19:21
24:7 25:7 26:15
26:23 27:2 28:9
31:1,9,19 32:13
54:10 57:24 61:7
61:20 62:10,17
63:1,11,14 65:13
65:15 67:19 68:1

68:13,14 71:14
75:9 82:4,21 85:7
86:8,10 87:8 89:5
89:22 90:12,24
91:2 93:9 100:14
100:23 108:3,5,22
109:22 115:18
116:5 123:15,17
131:5 151:15
152:16 153:18
154:12 158:10
562:12
**Recap** 4:18 81:7
**receive** 6:21 15:22
149:7
**received** 16:1 18:19
40:22 82:20 97:16
117:10 127:18
**receiving** 17:12
162:10
**recertified** 152:3
**recess** 42:14 54:1
98:15,22 112:2
127:23 144:8
**recollection** 67:9
75:14 82:22 84:4
85:19 87:14 89:17
97:18,23 98:4
129:10 135:8
157:19
**reconstructive**
21:18 22:9 124:24
134:1 154:23
160:23
**record** 15:17 42:12
98:13,20 127:22
144:7
**record's** 42:22
**recorded** 163:10
**records** 11:12 32:4
117:11
**RECROSS-EXA...**
161:13
**rectum** 146:1
**recurrent** 118:24
137:15 158:9,14

Rebecca M. Ryder, M.D.

158:16,20
**REDIRECT**
159:23
**reduced** 163:10
**refer** 46:22
**reference** 8:5,5
**referenced** 159:13
159:15
**references** 45:1
**referring** 8:8 32:22
42:21 146:23,24
**refresh** 89:16
129:10
**regard** 8:7 46:23
56:18 57:9 58:6
64:4 99:7 104:20
106:19 107:17
125:18 144:12
160:2
**regarding** 4:16
16:23 74:9 87:5
87:10 116:6
117:11 151:5,8
152:14,15 153:17
154:9
**regards** 52:11
107:23
**Regina** 13:12
**Regional** 134:22
**Registered** 6:3
163:2
**related** 10:20
143:23 145:13
152:5 160:6
163:16
**RELATES** 1:7
**relationship** 19:24
54:7 55:21 56:7
59:14 60:13 61:23
84:6,10 87:22
156:23
**relationships** 47:3
56:18,22 57:12,23
58:9 70:19
**relevance** 43:20
**relevant** 50:6

155:22 156:1,8
**reliance** 8:8 44:6
54:12 58:19
104:17 109:9
110:8,11 111:18
111:20
**relied** 50:17 152:19
161:16
**rely** 41:13 64:6
111:13
**relying** 42:7 51:17
104:13 106:22
107:4,16
**remember** 18:7
40:24 57:17,22
62:17 69:7,9
71:15,17 72:2,5,7
72:10,11 84:3
85:11,17 88:8
92:2,4,5 93:10
100:6,7 120:12,14
123:16 129:13,15
129:18 144:5
**reoccurrence**
124:19 125:5
**rep** 39:6 40:5,17,18
40:22 41:1 63:18
64:2 65:5 66:9
74:14,22 75:10
86:7,14 153:17,21
153:23 154:1,6
**rep's** 63:18
**repair** 1:4 54:20
99:15 120:5
**repairs** 102:13
124:6 140:3,4
**repeat** 35:24 103:5
**rephrase** 33:4
**reply** 129:7
**report** 4:7,8,10
5:12 7:22 15:21
31:18 32:17,21
33:19,23,24 34:3
34:11,14,17,20,24
35:15,22 36:3,5
36:10,12,20,20,22

36:23,24 37:3,4,8
41:3,13,14,20,23
42:3,8,8,15,24
43:2,9,18,20,23
44:1,6 46:14,19
55:24 60:5,9,15
98:12 99:8,9
109:24 110:1,4,10
125:21 134:9
144:19 148:14
151:5 156:11
159:11 161:22
162:1,6
**reported** 1:24
55:18 144:11,14
145:14 147:7
158:17 159:1,7,7
159:10 162:11
**reporter** 6:3 11:1
32:16 48:8 163:3
**reports** 7:24 8:21
12:4 36:9,13,15
36:17,19 82:19
106:1
**represent** 66:7
69:15
**representative**
75:23
**reproducibility**
99:15
**reps** 63:22 75:20
76:1 132:21
**request** 5:1,10 30:7
30:8 93:16 94:13
134:4,18
**requests** 117:11
**requirement**
108:15
**requisite** 97:11
**research** 12:16
23:21 98:10 100:4
**researched** 60:7
**residency** 20:21,24
26:1,5,9,12,19,22
27:6,10,10 150:16
150:18

**resolved** 18:22
**resource** 11:16
159:16
**respect** 127:2
**responding** 95:11
**response** 7:19 30:4
**responsibility**
103:13
**responsible** 23:5
81:13
**responsive** 7:15
8:15
**rest** 8:4
**Restaurant** 63:12
65:11
**result** 53:5
**results** 51:20 52:18
135:12
**retained** 9:16
140:24
**retention** 29:23
30:3
**retired** 66:16 84:7
127:21
**retropubic** 73:4,19
84:21 117:17
**return** 129:3
**review** 4:14 28:6,7
28:10 48:6 68:21
69:3 105:19,22
110:3,5,6 113:19
124:15 157:2
161:16,23 162:9
**reviewed** 4:11 7:2
8:9 43:11,22 53:6
61:19,20 109:24
111:16,20,23
112:5 138:9,18
151:6,19 158:21
159:8 161:19
162:5
**reviewer** 27:19
28:1,3 53:6,15
**reviewers** 52:6
**reviewing** 151:23
**revise** 115:22 148:2

148:4
**revised** 123:22
**revisit** 121:1 128:2
**right** 12:6 17:16
19:22 21:20 22:20
33:18 34:14,17
35:15 40:4 44:5,7
45:7,10 46:5 50:7
51:7 52:19 56:23
57:8 63:19 65:2
66:2,22 68:3,5,8
68:17 70:6,10
72:7 73:24 76:22
77:7 78:3,8 79:17
79:22 80:6 81:23
82:3 83:21,23
84:1,9 86:14
87:16,20,23 89:4
96:8 97:6 102:3,7
104:15 106:6
107:5 109:7
110:13 111:15
112:4,8 114:5,6
116:23 117:1,7,9
120:16,18 123:13
131:17,22 139:1,2
147:3,13,19,24
**RIKER** 2:10
**ring** 89:13,16
145:11
**risk** 135:24 154:13
154:16 156:22
158:14,16,17,24
161:6,8
**risks** 105:3,9,12
**Robinson** 2:2,2,4
37:11,13 148:8,10
**role** 12:19 18:14
31:8 38:4 151:24
152:2,8 153:17
**Roman** 65:17
**room** 17:10 39:23
40:6 75:20 76:1
77:6 88:22 153:18
153:22 154:2,6
155:13

round 108:1,6
RPR 1:24 163:22
Rules 6:8
run 108:21
running 79:4
Ruthel 77:18,19,22
Ruthel's 77:16 78:1
  78:2
Ryder 1:18 3:3 4:4
  4:6,7,9,11 5:3,7
  6:2,11,15 7:8,8
  11:3 20:5,13,13
  32:17,18 33:19
  42:16,17 43:1,10
  43:11,15,17,19
  64:24 68:23 70:21
  74:11,23 75:3
  78:4,14 81:9,11
  81:18 83:6,12
  88:6 93:18 94:15
  94:16 97:11 99:2
  102:2 119:16,19
  120:18 121:21
  122:9 128:5,7,13
  128:20 132:1
  133:12 134:5,15
  135:5 137:22
  144:21 148:14
  149:4 151:4,17
  153:16 154:24
  155:10 156:10
  158:6 161:15
  162:18 163:6
  165:14

              S
s 4:1 98:18
sacrocolpopexies
  26:14
sacrocolpopexy
  124:6 139:24
sacrospinous 140:2
safe 109:18 112:14
  112:17,22,23
  113:13 125:21
  156:17

safely 92:17 160:7
  160:17
safer 127:4 140:20
  140:20 141:6
safety 96:12,16,17
  96:21 106:10,14
  125:18,20 126:15
  141:18 142:4,16
  142:23 153:3
  155:23 160:2
Saint-Hilaire 38:23
sake 42:23
sales 40:5,17,18,22
  63:18,18,22,24
  64:1 65:5 66:9
  69:24 73:12 74:14
  74:22 75:10,19
  76:1 86:7,14
  132:21 153:17,21
  153:23 154:1
save 20:18
saw 129:14,23
saying 10:11 90:15
  95:12 124:7
  129:17 136:17
  141:3
says 64:2 74:23
  75:2 89:24 94:14
  112:16 120:21
  122:8 128:13,18
  130:6 132:13
  136:17 157:14
schedule 8:18
  86:21,22 129:3,9
  130:24
scheduled 94:16,22
SCHERER 2:10
Schmick's 120:3
school 19:23 24:4
  24:14 25:19
science 25:1,14
  110:16
sciences 25:5,13
  111:5,7,9 112:24
Scientific 102:19
  123:3

scientist 51:21
  53:13 113:3
scope 31:8
scores 55:9
Scratch 94:8
screwed 79:9
seal 163:21
search 83:4 100:21
searched 83:4,5
searches 100:5
  107:9 152:7
second 10:17 14:5
  71:19 75:9 77:6
  111:24 134:18
  144:23 157:8
see 14:4 17:6 33:20
  39:13 65:8 70:23
  71:2 81:16 83:17
  86:9 88:15 89:14
  95:10 97:3,4,12
  99:16 106:13
  112:6 115:12
  120:7,23 122:14
  128:17 131:6
  132:9,17 146:3
  157:15
seeing 70:15 92:2,4
  92:5
seek 127:12
seen 7:12 17:10
  47:18 65:2 69:4
  109:8 110:9 129:1
  158:19
selling 65:20 66:1
  68:17,20 70:20
  127:12
send 83:16
sending 28:6 81:14
  95:4
sent 15:21 61:21
  122:6 128:10
  130:22
sentence 65:18
separate 35:15
  134:24
September 4:19

81:7,12 127:17
  139:21
serious 145:13,15
  145:19
serve 29:19 30:24
served 14:13 18:24
  28:22
service 133:4
serving 14:22 15:2
  28:21
session 62:7 155:11
sessions 97:8
set 35:3,8 39:13
  163:7
settlement 15:23
  16:1 17:13 18:20
sex 146:8
sexually 136:5
SHAPIRO 2:2
share 154:15
She'll 77:14
sheet 83:5 165:10
short 51:1
shoulder 17:22
show 118:14
  119:21,22 129:2
  131:21
showed 54:19 55:4
  82:18 91:23
shown 89:15
  131:20
shuttle 88:17
sic 124:8
signed 34:14 80:10
significance 103:21
  104:4 118:22
significant 44:2
  45:3 85:10 112:19
  114:21 135:24
  152:2,8
significantly 55:5,7
signing 162:16
  163:15
single 56:5 137:11
  161:22 162:1,10
single-incision

117:17
sit 19:4 20:6 54:4
  65:22 67:8 71:4
  83:19 84:15 85:17
  105:8 158:12
sites 23:6
sitting 114:7
situation 37:18
  137:14 145:20
six 12:12 14:8
size 156:20
skills 70:20
slides 11:17 91:21
  92:2,4
slightly 66:18
sling 10:4,6,23
slings 10:16 117:17
  135:2 155:19
small 46:21
Snell 31:13,24
Snow 30:22
societies 105:24
  126:3 157:4
society 11:21 37:16
  91:7
sold 102:2 138:20
  139:1
sole 155:11
solely 30:1 31:1
  64:6 109:20
solidify 101:1
somebody 109:3
son 72:10
soon 51:1 95:13
sorry 13:18,23 43:7
  94:9 98:20 121:16
sort 17:1 20:7
  21:10 91:22
sought 153:20,22
sound 82:3 85:6,10
  95:17,23
sounds 62:12 78:22
  96:1
sources 161:15
South 62:8 63:13
SOUTHERN 1:1

Case 2:12-md-02327   Document 2016-4   Filed 04/21/16   Page 60 of 64 PageID #: 33202
Rebecca M. Ryder, M.D.

Page 182

**speak** 41:10 95:15
**speaking** 30:13
   78:24
**Specialists** 22:18
   23:12
**specialties** 149:14
**specialty** 13:8
   109:21 110:24
**specific** 30:2 31:17
   67:8 90:1 108:4
   135:8
**specifically** 11:24
   24:22 25:12 32:13
   35:14 57:9,22,24
   61:7,13,22 71:11
   93:2 99:11 100:15
   101:7 108:5
   109:15,19 120:12
   120:14 132:14
   139:14 152:5
**specifics** 26:16
**speculation** 66:4
   78:20
**Speedwell** 2:11
**spell** 16:15 18:10
**spend** 96:5
**spoke** 40:14,21
   59:7
**sponsored** 62:8
   87:5,9,12 140:9
**spring** 139:21
**staff** 76:4 79:17,18
   79:19
**stage** 55:7 104:21
   135:19,22
**stainless** 119:11
**stand** 108:18
**standard** 137:6
**standardized** 99:15
**standards** 138:13
   139:9
**standing** 120:24
**start** 26:13 46:8
   69:17 93:23 101:4
   101:11 113:22
   114:23

**started** 34:1 41:1
   81:1 101:12
   113:17 114:12
   145:1 150:22
   155:1,10 157:23
**starting** 33:8 119:1
   119:2
**state** 17:24 35:6
**statement** 38:2
   39:11 118:11,11
   157:10,13,18
**statements** 11:22
   157:4
**States** 1:1 102:3
   103:4 138:21
**statistics** 24:10,13
   133:16
**stay** 40:6
**staying** 91:15
**steel** 119:11
**Stenotype** 163:10
**step** 135:16
**steps** 88:23 106:23
   107:17 108:24
   109:2
**stop** 28:5 50:1
   117:23 118:16
   127:17,19
**stopped** 28:6 118:4
   119:6 122:10,17
   127:8,12 130:13
   157:14,22
**straining** 136:2
**Street** 2:7
**stress** 26:21 28:12
   28:17
**strike** 22:7 121:11
   138:9 153:20
   156:15
**string** 4:12 64:21
**structures** 146:1
**stub** 45:13
**studies** 43:24 47:2
   54:14,15 57:1,3
   57:11 58:6,8
**study** 28:16,17 51:8

51:11,14,20 52:17
   53:9,19 54:6,8,18
   55:1,21 56:2,7,19
   57:6 67:2,3,5
**subject** 94:13
   134:17
**Subscribed** 165:17
**subspecialty** 21:17
   22:8
**substance** 158:8
   165:9
**substantial** 113:22
   117:10
**substantially** 55:23
   113:5
**substantive** 47:22
   47:24
**substantively** 45:13
   45:15 57:3
**success** 55:4
**successful** 102:21
**sued** 15:13 16:18
**suffer** 143:22
**sufficiently** 156:20
**suggesting** 68:12
**suggests** 124:16
**SUI** 26:6 27:12
   117:15
**suit** 16:20
**Suite** 2:7
**Summers** 5:1 93:15
   94:1,9,12
**supplemental** 4:8
   41:13 42:8,15,24
   148:14
**supplied** 44:12
   45:1,3,20 46:2,10
   46:24 47:7,11,16
   139:12
**support** 71:24
   118:17,19,20,23
   157:24
**suppose** 63:20
**Supreme** 6:8
**sure** 25:9 31:8,24
   35:7 37:14,18

43:8 45:3 51:2
   59:12 87:11 90:13
   117:5 121:7
   122:19 129:7
   130:4,23 137:19
   146:16,18 162:4
**surgeon** 105:15
   134:1
**surgeon's** 11:16
   103:13 159:16
**surgeons** 124:24
   133:1 155:22
**surgeries** 26:24
   134:8 160:23
**surgery** 20:22 21:4
   21:18 26:6 72:1
   77:9 78:3 122:24
   147:24 154:23
**surgical** 21:1,7
   28:12 75:11 92:18
   113:19 155:17
**surgically** 75:21
   96:20 119:13
**surprise** 115:4
   131:15
**Susan** 13:13
**suspension** 118:3
   140:2
**suture** 26:16 54:20
   55:14
**sutures** 156:19
**switch** 72:13,16,17
   73:22
**switched** 72:20
   74:3 75:4
**sworn** 6:11 163:8
   165:17
**symbola** 87:12
**symptoms** 55:5
   137:22
**Synergy** 22:23
   23:18
**synthesis** 126:4
**system** 1:4 99:13

_____

**T**

**T** 4:1 164:2
**table** 33:14 108:1,6
   155:15 159:11
   162:6
**take** 4:3 6:16 7:7
   20:4 24:12,23
   33:9,14 51:3 52:5
   53:23 56:5 76:4
   112:1 139:6
   148:24
**taken** 1:19 6:2 24:1
   24:9 25:12 42:14
   45:10 54:1 98:15
   98:22 106:23,23
   107:17 112:2
   113:3 127:23
   134:21 144:8
**talk** 21:16 23:11
   32:23 46:17 59:19
   67:21 71:15 73:22
   79:3 91:17 130:6
**talked** 36:2 66:13
   82:12 91:18 93:21
   100:9,9 108:3
   114:8,9,10 126:19
   160:5
**talking** 11:24 29:15
   35:22 68:5 69:23
   70:7 74:20 90:20
   95:5 96:24 99:10
   101:6 108:9 114:1
   118:10 125:19
   128:3 139:14
**Tar** 25:21
**target** 64:8 131:17
   132:18,22 133:6
**targeted** 122:5
**targets** 5:9 131:24
   132:9,15
**taught** 24:6,15
**taxes** 82:17
**TC** 70:9
**teach** 95:6
**teaching** 27:16 81:1
**team** 73:12
**techniques** 143:4

technology 70:22
  71:22
tell 9:12 11:19 15:6
  15:10 26:11 27:11
  42:23 43:16 44:18
  44:19 46:1 48:9,9
  58:23 66:6,12
  79:5 88:11,13
  91:20 98:5 107:23
  120:9 126:13
  127:16 138:4
  146:2
telling 69:19 71:21
  77:18 83:16
ten 86:6,14,19,23
  116:10,18 158:18
terms 126:23
  139:12
Terrance 13:23
territory 81:13,14
testified 19:11,14
  54:11,14 58:18
  70:12 77:2 83:20
  89:11 110:12
  111:13
testifying 18:2 19:5
  19:8 34:16
testimony 9:22
  11:13 12:22 13:2
  14:12 47:17 48:8
  56:5 93:6 99:21
  130:5,9,11
Text 40:23
Thank 67:15
  117:13
theirs 73:13
thereof 163:18
THERMACHOI...
  60:16 61:8 62:2,5
  70:7,10,13
thesis 23:21
thing 33:12 72:11
things 30:1 45:20
  72:6,6 76:5 92:21
  100:5,19 107:7
  108:5 115:5 125:1

139:13,18
think 10:18 12:5
  27:4,5 31:24
  32:10 37:15 40:24
  46:20 48:3 49:16
  50:15 51:19 52:21
  59:13 61:17,23
  64:13 66:23,24
  71:18 73:20 74:2
  75:10 80:10,12
  96:4 100:2,11
  104:6 108:7,7,21
  119:6 121:24
  124:23 127:21
  129:1 132:8 133:4
  135:10 137:5,9,16
  139:16 140:14
  142:4 143:6,11,14
  144:14 148:6,16
  153:1
thinking 137:15
thought 92:13
  140:19 141:6,7
thoughts 104:20,22
thousand 82:20
three 17:16,17
  32:23 41:2 55:11
  93:4 122:12 138:4
Thursday's 5:3
  119:17
Tim 83:15,16
time 11:6 12:13
  16:18 20:18 31:9
  31:10,16 40:14,21
  50:4 51:4 54:13
  59:7 60:20 61:5
  62:3 66:13 71:5
  74:16 75:5 77:13
  113:18 114:12,19
  114:22 115:4,5,23
  117:18 118:20
  123:17 126:7
  130:5 135:17
  136:3,22 137:10
  137:11 138:8,11
  138:12,20 145:1

148:7 149:10
  150:20 152:11
  153:21
times 19:17 27:4
  38:1,3 39:16,18
  39:20 55:11 92:23
  93:5,7,9 122:13
Timothy 4:20
  83:10
tissue 54:20 55:14
  102:13 124:5,13
  126:24 135:24
  143:7,9,12 156:21
titled 33:19 69:2
today 6:24 7:13,19
  8:15,24 11:2,7
  12:7,23 14:9 19:4
  20:6 30:4 35:20
  41:3,5 42:1,6,22
  46:17 54:5,12,14
  65:22 67:8 68:16
  71:4 75:4 77:13
  82:11 83:19 84:15
  85:18 93:6 104:12
  105:8,18 106:4
  107:19 110:12
  114:7 148:15,20
  158:12
today's 11:9 12:1
told 90:1 95:12
  118:8 126:18
  145:4
top 62:4 70:9 95:2
  96:23 145:17
TOT 10:4
total 10:13
Town 120:3
tract 136:18 137:15
train 10:3 83:24
  95:13,19 96:5
trained 37:21 40:2
  40:5,10,11 59:8
  59:18 60:2,6
  62:16,17 67:9,14
  67:21,22,24 68:10
  68:13 84:23 85:5

85:8,18 87:15
  90:4 91:16 92:8
  94:15 96:20 97:15
  99:19 128:23
  134:21 155:1
training 4:23 10:9
  37:17 59:19,20
  67:20 76:11 84:17
  85:11 87:3 88:5,9
  88:11,13,16,18
  89:4 91:11,15
  92:13,22 93:11
  94:22 97:7,19,23
  98:5,7,9 99:7
  100:1,12 107:2
  129:3 145:4
  148:17 154:10,12
  154:16 155:8,11
transcript 41:7
  163:13
transcription 165:6
transcripts 41:4
transient 124:1
transition 118:1
transitioned
  117:24 126:8
transobturator
  10:6,16,23 73:3
  117:16
transvaginal 12:23
  27:11,12 28:8,12
  28:17,23 31:2
  45:6 60:22 61:2
  112:14 147:5
  151:2
transvaginally
  26:19 133:22
  150:21
travel 62:14,15,18
  89:21,22 90:1
traveled 40:1,9
  89:3
Traveling 5:10
  134:4,17,17
Travis 4:16 74:8,14
treat 26:6,12,21

27:12 102:12
  115:19 116:1
  117:15 143:21
  150:21 151:2
treated 147:21
  150:17 160:7,17
  161:7
treating 115:7
  150:12
treatment 28:12,17
  92:18 112:14
  155:5
treatments 139:20
trial 15:23,24 18:20
  18:21 28:15,16
  45:10 130:6
  152:15,24
trials 56:14 141:22
  153:2 162:2
tried 72:15 75:4
  77:13
Trip 4:16 74:9
trocar 118:5 123:1
  128:2 129:20,22
  130:12
trocar-less 128:23
  128:24 129:18
trocars 119:10,11
  122:12,18 123:6
  140:6,10 157:15
  158:4
true 64:2 70:1
  97:18 118:4,6
  121:4 163:12
trust 137:20
try 73:2 74:15
trying 40:24 45:12
  72:20 130:8 135:3
turn 65:7 79:5
  157:8
turned 82:5
TVM 90:17,18,19
  91:22 101:9
  104:11 107:2
  144:1 155:22
  156:7

Rebecca M. Ryder, M.D.

**TVT** 4:13 9:17,20
  10:4,5,16,20
  29:17 30:1,1 31:1
  31:1 36:22 60:14
  61:1,10 62:9,17
  62:24 63:2,5,15
  64:8,22 65:5,14
  67:9 72:13 73:4,5
  73:6,7,9,19,23
  75:4 84:21 90:11
**TVT-O** 63:2,5
  67:11,21,22 68:11
  73:12,18,20 74:15
  74:21 75:4,6,9
  77:7,13,14,16
  78:8 80:11,24
  81:21 82:2,12
  83:21 84:1,16,17
  84:19,24 85:5,8
  85:18,24
**TVTs** 117:17
**twice** 18:24 112:6
**two** 15:3 16:23
  19:17 22:19 23:8
  26:18 30:1 45:17
  45:21 59:11 88:21
  93:4 97:22 99:19
  104:10 121:9
  134:23 135:14
  138:4 157:7
  161:11
**type** 13:6 53:3
  139:12

---

      **U**

**U.S** 1:7 92:1
**Uh-huh** 22:5
  104:18 108:13
  114:2 123:12
**Ullman** 5:8 122:2
  131:23 132:4,6
  134:16
**Ullmann** 5:10
  134:3
**ultimately** 15:20
  17:3,9 29:21 53:4

**99**:12 103:13
**unacceptably**
  144:3
**uncomfortable**
  33:11
**undergo** 136:19
**undergraduate**
  23:24 24:8,17,18
  24:24
**understand** 6:19
  19:3,5 20:20 21:9
  23:20 29:18 33:3
  33:3 42:9 47:22
  54:4 63:17,19
  66:7 130:4 133:1
  138:17 141:21
**understanding**
  8:21 33:1,16 42:7
  45:12 86:3
**understood** 64:7
  65:23 66:2,6
  160:21
**Unh-unh** 85:3
**United** 1:1 102:2
  103:4 138:20
**University** 24:4
  25:20 26:2
**unsafe** 113:3
  140:15
**up-to-date** 20:16
**update** 132:14
**Updates** 4:13 64:22
**Uphold** 102:15,16
  117:24 118:1,2
  122:23 131:14
**urethra** 146:1
**urinalysis** 136:20
**urinary** 26:22
  28:12,18 136:18
  137:15
**urogynecologist**
  91:10 151:23
**urogynecology**
  13:9 141:17 152:5
**Urologic** 11:23
**urology** 21:1,7

**use** 12:5 26:8,12,19
  26:21 67:22 70:12
  70:21 71:6,7,7
  79:14 88:19 92:17
  99:12 100:12
  101:7,18 103:11
  109:18 112:17
  113:13,19 114:9
  114:19 119:4
  123:6 125:22
  126:6,22 131:9
  132:11 135:11
  155:21 156:18
  161:2,3
**user** 62:5 122:10
  133:11 135:5
**user's** 122:3
**users** 5:3 70:9,10
  101:23 108:2
  119:17 120:2
  133:21
**uses** 122:12
**usually** 78:10
**uterosacral** 26:17
  140:1
**UTI** 137:1,11
**utilize** 102:11
**utilized** 103:3,8,17
**utilizes** 71:22
**utilizing** 68:16

---

      **V**

**VAC** 134:23
**vagina** 146:3,15
  147:6
**vaginal** 55:6 102:17
  115:16 122:24
  140:3,4 146:12
  147:16
**various** 4:12 8:8
  9:6 58:6 64:21
**vast** 41:21 59:3
**VCRA** 163:23
**venue** 13:4 16:9
  18:5
**verdict** 15:23 17:13

**VERSASCOPE**
  71:8
**versus** 151:14
**view** 56:12
**Vince** 37:19 41:8
  99:21 145:4
**Virginia** 1:1,20 6:4
  6:7,9 16:10 18:1,5
  19:22 62:5 120:3
  163:1,4,7,20,20
**visit** 120:24
**vitae** 4:6 20:10,12
  20:16
**Vladimir** 37:1
**voice** 74:24
**voiding** 84:20
**volume** 45:2
**volunteered** 70:17
**vs** 1:12 4:9 42:16
  43:1

---

      **W**

**wait** 13:23 85:4
  114:1
**waiting** 77:16
**walk** 78:3
**want** 10:24 21:16
  33:9,22 35:24
  42:1,6 43:14
  44:18 49:23 59:12
  73:22 78:6,17
  83:24 99:24
  111:21 118:15
  121:1,15 128:2,22
  130:4 140:20
  141:4 148:14,19
**wanted** 80:15 92:19
  118:17 124:20
  125:3,5,12 156:2
  158:9
**wants** 78:4,14
**warnings** 138:14
  138:18 139:17
**wasn't** 52:16 58:16
  76:16,16,19
**waste** 137:9

**WAVE** 1:7
**way** 38:14 44:23
  47:19 48:12 56:8
  64:18 96:4 98:11
  121:12 132:20
  143:21 153:11
**ways** 26:18
**we'll** 42:21 46:23
**we're** 8:3,7,10
  32:21 35:22 42:20
  48:12 59:19 64:12
  68:15 95:9 99:3
  99:10 121:10
  148:6
**we've** 7:11 17:17
  28:20 36:2 82:11
  128:9 145:7
**wearing** 135:14
**web** 23:6
**Weber** 24:6
**websites** 23:2
**week** 75:7 129:4
**weekend** 16:22
**weeks** 100:13 114:9
  135:15
**weighing** 153:10
**welcome** 149:19
**well-respected**
  153:14
**went** 17:9 25:18
  40:4 50:5 51:17
  63:11 65:13 93:1
  109:2 116:21
  117:7 130:20
**weren't** 76:9 92:21
  130:19
**WEST** 1:1
**when's** 61:5 138:8
**White** 2:8 3:3,5
  6:14,15 7:10 8:13
  9:10,19 11:5
  20:15 22:4,12
  25:8 27:15 30:15
  31:11 32:20 34:7
  34:12,23 35:18
  36:8 38:7,20

41:17 42:12,19
43:13 44:15 47:12
51:6 52:1,9 53:1,8
53:12 54:3,23
55:19 56:15 57:5
58:13 59:1 60:1
61:18 65:1 66:5
67:17 69:1 70:5
71:16 73:1,21
74:12 75:16 76:7
77:1 78:13,23
79:16 80:18 81:10
83:14 85:14 86:17
87:2 88:7 92:15
93:19 95:22 96:3
96:11,18 98:17
99:1 101:16 102:1
102:6,10 105:16
106:3,9 107:10
110:19 111:10,22
112:3 113:7,10,24
114:20 117:14
118:13 119:20
121:22 123:5,18
125:2,8,16 128:8
129:12 130:2,18
132:2 133:3,9,18
134:7 137:4 138:7
138:24 139:4
140:18 141:2,11
142:1,8,14,20
143:10 144:10,22
145:10 147:1,11
147:17 148:12
159:24 160:12,24
**Whittle** 70:21
**wide** 129:4
**wife** 122:1
**William** 18:18
36:24
**willing** 147:18
**Wilson** 2:6,8 6:15
7:5 8:10 10:24
30:9,13 32:15
43:7 51:2 53:23
64:11,19 67:15

81:4 83:8 88:1
117:13 119:15
121:16 127:22
128:1 131:21
134:2 144:7
148:22 159:4,19
161:10 162:14
**wit** 163:1
**withheld** 158:13
**within-named**
163:6
**witness** 9:17 10:19
12:21 14:22 15:2
17:22 18:15,24
28:21,23 30:9,24
82:19 162:15
**witnesses** 11:14
41:4
**woman** 77:20 103:3
103:9,18 113:13
123:13 138:10
139:6 146:5
147:19 160:5,8,18
161:6,23
**woman's** 146:15
**women** 55:12 71:24
109:18 113:16
133:22 136:4,24
137:17 143:22
150:12,17 151:2
160:15 161:20
**Woodlake** 6:7
**word** 59:5 79:14
111:3,3 133:6,8
**work** 10:8 29:8
41:11 63:23 67:5
94:2,3,4,6 127:11
**worked** 67:2 79:21
94:5
**workers'** 14:19
**working** 10:12
29:21 34:2 36:20
**works** 63:22 65:21
122:2
**world-renown**
111:4

**worried** 130:7
**worth** 52:7
**wouldn't** 115:4
116:22 145:15
**write** 14:4 33:24
**writing** 17:18 51:9
51:15
**written** 78:18
157:18
**wrong** 15:21 17:3
20:21 72:21 74:3
130:10 137:24
**wrote** 36:3 47:2
57:12 58:9 128:18

**X**

**X** 3:1 4:1

**Y**

**yeah** 45:3 121:16
**year** 15:10,16
25:23 59:11 100:8
130:19
**year-end** 69:22
**yearly** 152:3
**years** 9:7,23 10:12
28:3 38:2 39:15
40:16 41:2 63:22
65:23 66:10,14,15
66:17 86:6,14,19
86:23 90:13
136:15 142:9
150:2,7,9,10,11
150:24 151:1
155:17 158:18

**Z**

**Z-e-n-e-t-t-e** 23:17
**Zenette** 23:15,17

**0**

**0** 55:7
**0315042** 163:23
**03987340** 132:4
**03988270** 121:11
121:12
**03988272** 122:4

157:10
**03988275** 121:13
**03988276** 119:23
**03988278** 119:23
**03989861** 134:20
**07962** 2:12

**1**

**1** 1:7 4:3 7:6,9,12
8:15,17 55:7
127:17 135:19
162:6
**1,000** 134:8
**10** 4:13,18,23 27:8
39:18 45:22,23
46:3 47:8,16,19
47:22 49:4 64:22
66:17 81:9,11
88:5 116:19 117:2
**10:08** 54:2
**10:10** 95:11
**10:17** 54:2
**100** 116:16
**10217937** 64:13
65:16
**10217938** 64:14
**10217939** 64:14
65:7
**10217940** 64:15
**103** 2:7
**106** 49:22
**108** 49:3
**11** 4:5,20 49:5,6
83:13 87:16 90:4
91:16 92:9 94:15
99:22 100:2,12
107:5
**11:15** 98:16
**11:22** 98:16
**11:24** 98:22
**11:28** 98:23
**1111** 2:7
**11831154** 74:17
**11831246** 89:9
**11831256** 95:9
**11831479** 69:4

**11831480** 70:7
**11831481** 71:19
**11831484** 69:4
**119** 5:3
**11th** 94:22 100:24
**12** 4:22 49:7 88:6
**12:04** 127:24
**12:05** 127:24
**12:24** 144:9
**12:26** 144:9
**12:45** 162:18
**121** 5:5
**126** 49:4
**128** 5:7
**13** 5:1 49:8 93:18
93:21 99:8,9
112:4 150:23
151:1
**131** 5:8 49:5
**132** 49:6
**134** 5:10
**14** 4:16 5:3 48:19
48:21 49:10 74:9
74:18 79:19
119:19 150:24
151:1
**14-Feb-2012** 5:12
144:20
**144** 5:12
**149** 3:4
**15** 5:5 66:10 121:21
121:23 134:11,12
157:6,7
**155** 49:7
**156** 49:8
**157** 49:8
**158** 49:8
**159** 49:8
**16** 4:9 5:7 38:2
42:16 43:3 128:7
128:10,16 150:7
**160** 3:5 49:8
**161** 3:6
**168** 49:9
**17** 5:8 49:12 65:8
132:1

Rebecca M. Ryder, M.D.

**171** 48:20,21 49:10
**179** 112:8
**18** 4:11 5:10 43:10
    48:11,12,13 134:6
    134:15 150:10,13
**180** 112:8
**181018** 163:24
**19** 2:3 5:2,12 93:16
    94:11 95:12
    144:21 145:9
**1950** 6:9
**1963** 113:5
**1989** 25:24
**1994** 28:4
**1995** 150:1
**1997** 15:12,13
**1998** 149:18 150:6
**19th** 95:3
**1st** 129:1 139:21
    145:5

---

**2**

**2** 4:5 5:7 11:4 118:2
    128:6,11 132:17
    134:15 135:22
    156:15,16
**2:12-cv-00779** 1:10
**2:12-cv-00956** 1:11
**2:12-MD-02327** 1:4
**20** 4:6,21 27:8
    39:20 46:3,4 47:8
    47:16,19,23 49:13
    83:11,16 134:11
    134:12 155:17
    165:19
**200** 1:8
**2000** 4:13 39:11
    60:14,18 61:10,24
    62:2,11 63:13
    64:7,22 66:13
    71:17 72:6,10
    87:20 101:22
    146:12
**2000s** 66:17
**2001** 17:23 28:4,7
**2002** 150:23

---

**2003** 16:19 150:23
**2004** 4:16,19,21
    14:6 16:19 74:3,9
    74:18 79:12 81:8
    81:12 82:2 83:11
    83:16 85:7 92:9
**2005** 4:23 5:2 59:10
    60:8,23 68:18
    87:16,18,24 88:5
    88:9 90:4,6 91:16
    93:14,16 94:11
    95:12 99:22 100:2
    100:2,12,24 101:8
    101:12,13 102:3,7
    103:18 104:2
    107:5 114:23
    139:21 148:17
**2007** 60:6 148:17
**2008** 117:20,22
    119:6 123:13,16
    130:14,16
**2009** 5:4,5,7 117:20
    117:22 119:17,24
    121:3,19 123:16
    128:6,11 130:17
**2011** 134:16
**2012** 9:17 10:19
    29:16,19,24 30:22
    41:11 83:1 114:23
    127:17 130:20
    139:21
**2013** 21:18 149:9
**2014** 12:15 13:2
    14:2,9 15:2 48:6
**2015** 12:15 29:14
    29:24 31:18,22
    34:1
**2016** 1:21 4:9,11
    6:6 34:2 42:16
    43:10 48:6 124:15
    161:16 163:20
**2019** 163:5
**21** 1:21 6:6 49:14
    150:2 156:12
**215** 49:12
**21st** 75:6 77:15

---

**222** 48:15,16
**223** 48:17
**224** 48:17
**23** 4:19 81:7,12
**23-Mar-2004** 5:12
    144:20
**24th** 163:19
**25** 48:22 49:19,20
**25-case** 97:11
**258** 49:13
**259** 49:13
**26** 5:4 119:17,24
    121:3
**260** 49:13
**263** 49:14,15
**264** 49:14,16
**266** 49:18
**27** 5:5 9:23 63:13
    63:22 65:23
    121:19 136:15
    142:9
**27604** 2:7
**278** 5:4 119:18
**29** 49:21
**29,000** 10:19 82:18

---

**3**

**3** 4:6 20:10,14
    48:22 149:24
**3:00** 129:5
**30** 50:2 152:4
    161:19
**30,000** 10:18 82:12
**30th** 128:24
**31** 163:5
**312-8221** 129:8
**319** 49:19
**32** 4:7
**322** 49:20
**34,000** 10:10
**36** 49:22
**362** 46:24 47:14,15
**368** 49:21
**37** 162:1
**373** 49:21
**375** 49:21

---

**382** 46:9 47:10 59:2
    59:4,5 110:13
**3988272** 121:11

---

**4**

**4** 4:7 32:16,19
    33:18 36:21 66:13
    98:18 148:14
    156:11
**4,000** 161:20
**40** 152:4
**42** 4:8
**43** 4:10
**45** 152:4,4
**49** 48:23

---

**5**

**5** 4:8 39:16 42:18
    42:21,23 44:10
    48:23,24 66:14
**50** 97:2
**500** 10:21
**510(k)** 138:19
    139:1
**538-0800** 2:12
**54** 48:24
**571-4047** 2:8

---

**6**

**6** 3:3 4:10 43:12,15
    43:16
**6003** 94:18
**64** 4:12
**647** 4:19 81:8
**68** 4:14

---

**7**

**7** 4:3,12 49:1 64:13
    64:24 100:2
**7:30** 74:21 75:6
    77:14
**720-1288** 2:4
**725** 6:7
**74** 4:16
**750** 11:8
**7th** 97:12 100:24
    102:7 129:5

---

**8**

**8** 4:14 49:2 68:23
**81** 4:18 49:1
**83** 4:20
**837774** 163:23
**877** 2:8
**88** 4:22

---

**9**

**9** 4:16 49:3 74:11
**9/22** 4:18 81:7
**9:00** 1:22 6:5
**9:36** 128:11,12
**90** 152:4
**92660** 2:3
**93** 5:1
**938** 4:13 64:23
**939** 4:13 64:23
**94** 28:7 149:22
**940** 4:13 64:23
**949** 2:4
**97** 49:2
**973** 2:12
**99** 61:10