# Exhibit D

```
 1            IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2                     CHARLESTON DIVISION

 3   IN RE: ETHICON, INC. PELVIC      Master File No.
     REPAIR SYSTEM PRODUCTS LIABILITY 2:12-MD-02327
 4   LITIGATION                       MDL No. 2327

 5   THIS DOCUMENT RELATES TO         JOSEPH R. GOODWIN
     PLAINTIFFS:                      US DISTRICT JUDGE
 6
     Mary Cone
 7   Case No. 2:12-cv-00261

 8   Dina Destefano-Raston
     Case No. 2:12-cv-01299
 9
     Shirley Freeman
10   Case No. 2:12-cv-00490

11   Carrie Smith
     Case No. 2:12-cv-00258
12
     (Continued on next page)
13

14                        - - -
15                   APRIL 4, 2016
16                        - - -
17
             Deposition of BARRY SCHLAFSTEIN, MD, held at
18     Hilton Garden Inn Savannah, Scarborough Conference
       Room, 321 West Bay Street, Savannah, Georgia 31404,
19     commencing at 9:03 a.m., on the above date, before
       Joan L. Pitt, Registered Merit Reporter, Certified
20     Realtime Reporter, and Florida Professional
       Reporter.
21
                           - - -
22
23              GOLKOW TECHNOLOGIES, INC.
              877.370.3377 ph | 917.591.5672 fax
24                   deps@golkow.com
```

```
 1   (Continued from previous page)
 2   Donna Zoltowski
     Case No. 2:12-cv-00811
 3
     Roberta Warmack
 4   Case No. 2:12-cv-01150
 5   Fran Collins
     Case No. 2:12-cv-00931
 6
     Noemi Padilla
 7   Case No. 2:12-cv- 00567
 8   Jennifer Sikes
     Case No. 2:12-cv-00501
 9
     Isabel Swint
10   Case No. 2:12-cv-00786
11   Krystal Teasley
     Case No. 2:12-cv-00500
12
13
14
15
16
17
18
19
20
21
22
23
24
```

```
 1   to be fair.
 2        Q.   So at some point during the first quarter of
 3   2016, you believed there to be over 950 TVT products
 4   that you had placed in women suffering from SUI;
 5   correct?
 6        A.   Correct.
 7        Q.   Same question with regard to Prolift and
 8   Prolift+M, which, as you established earlier, it's no
 9   longer on the market, so it would be more of a static
10   number?
11        A.   Well, I don't have the number of Prolift or
12   Prolift+M.  I have the number of transvaginal mesh
13   procedures, which would include Prolift and Prolift+M,
14   and it would include other types of meshes.
15             So that would be -- that number, which would
16   include all the transvaginal meshes, would be greater
17   than 630 transvaginal procedures.  Transvaginal mesh
18   procedures.
19        Q.   Greater than, did you say, 600?
20        A.   6-3-0.
21        Q.   6-3-0.
22             Do you have any way to quantify, of those 630
23   procedures, approximately how many would have been
24   Ethicon products versus other manufacturers?
```

Barry Schlafstein, M.D.

```
 1    A.   No, I'd have to go back.  I'd have to do a
 2  little more detailed analysis, which would be the
 3  date -- you know, looking at the dates of the procedures
 4  and before and after.
 5         MR. OTTAWAY:  Doctor, he didn't ask you how
 6     you'd do it.  He asked you if you did do it.
 7         THE WITNESS:  No.
 8         MR. OTTAWAY:  So just try to listen to the
 9     question and answer it.  He's entitled to a direct
10     answer to a direct question.
11    A.   Can you repeat the question, please?
12         MR. SCHNIEDERS:  Can you read it back?  I lost
13     it.
14         (The question was read by the reporter.)
15         THE WITNESS:  Not at the moment.
16  BY MR. SCHNIEDERS:
17    Q.   And I believe, based upon your answer earlier,
18  the only way to do that would be a chart search; is that
19  correct?
20    A.   That is correct.
21    Q.   Because the billing for that procedure is more
22  of a general billing code that would encompass all
23  products; correct?
24    A.   It would encompass all transvaginal mesh
```

1   yourself that you cited it in your report, for the most

2   part?

3       A.   Yes, for the most part, yes.

4       Q.   Okay.  So there may be a couple odds and ends

5   on here that you also requested that you didn't end up

6   putting into your report, but for the most part, if it's

7   not in your report, it's likely something that the

8   defendant provided you?

9       A.   I think that's fair.

10      Q.   Did you read every document that is on your

11  reliance list?

12      A.   I did not read every single document that's on

13  this reliance list, no.

14      Q.   For instance, if you go to, they're not

15  numbered, but the third or fourth from last page, do you

16  see at the bottom there are several documents with a

17  convention code that says "ETH.MESH" and then "."

18  numbers?

19           Do you see that?

20      A.   Yes.

21      Q.   Is it fair to say that you didn't request those

22  documents?

23      A.   That is fair to say.

24      Q.   Is it fair to say that you didn't review those

1    documents?

2        A.   That is fair to say.

3        Q.   Similarly, if there are some internal documents

4    that are listed on this reliance list, based upon your

5    testimony previously, it's fair to say that those

6    weren't things that you read and considered in your

7    expert report; right?

8        A.   And just to be clear, by "internal," you're

9    referring to?

10       Q.   Documents, e-mails, things that were only

11   between Ethicon employees.

12       A.   The answer then would be correct.

13       Q.   You did not review those?

14       A.   Correct.

15       Q.   And you did not consider them in forming your

16   opinions; correct?

17       A.   Correct.

18       Q.   You can set that to the side, Doctor.

19            As we look back at your invoice here, I believe

20   it's Exhibit 14, there are notations like "write Prolift

21   general," "chart review," "telephone conference," but I

22   don't see anything that says "review of literature."

23       A.   Yeah.

24       Q.   Is there anything in there that would fall

1    Q.   Doctor, if you would go to page 4 of Exhibit 2.
2    There is -- about halfway down the page, you've listed
3    several professional societies by name stating that they
4    have offered up statements in support of mesh.
5         Do you see that?
6    A.   I do.
7    Q.   And are there also societies that have spoken
8    out against mesh?
9    A.   Well, this is -- first of all, this isn't
10   specific about TVT.  This is as it applies to TVT.
11        So your question?  I'm sorry, sir.
12   Q.   Are there societies that have spoken out
13   against the use of mesh?
14   A.   I think there are, yeah.
15   Q.   Have you cited any of those in your report?
16   A.   No.
17   Q.   Why is that?
18   A.   I'm citing -- I'm presenting my own opinions,
19   and this is -- this is -- I didn't think it was
20   appropriate.  I didn't see any reason to.
21   Q.   These are -- this is evidence that you're
22   citing that you believe supports your opinion; correct?
23   A.   Right, correct.
24   Q.   But there's no citation of the evidence that

1  doesn't support your opinion; right?

2  A.  I'm not necessarily aware of what specific

3  societies have come out against the TVT, so, no, I'm not

4  aware of any in particular that have come out against

5  it, so there wouldn't be any reason to include that.

6  Q.  I believe earlier, Doctor, when you were

7  talking about your reliance list, you said that there

8  may be some statements from societies that you had asked

9  counsel for when you were forming your opinions;

10  correct?

11  A.  Yes, sir.

12  Q.  Did you ask for all of the statements that

13  would have been contrary to mesh usage?

14  A.  I specifically asked for some statements from

15  societies in particular that I rely on.

16  Q.  Is the SGS a society that you rely upon?

17  A.  I've been to a meeting and I did a

18  presentation, but I wasn't seeking their opinion about

19  this.

20  Q.  Why is that?

21  A.  I didn't know that they had an opinion on this.

22  Q.  Is that because you didn't look?

23  A.  I just didn't have -- I didn't know they had an

24  opinion on it.

1   Q.   It would allow you to counsel a patient that
2   they may have dyspareunia which may not resolve?
3   A.   I think unless it were -- that they may have
4   dyspareunia that may not resolve unless they had some
5   further treatment.
6   Q.   And where in here does it say that some further
7   treatment may be necessary to relieve symptoms?
8   A.   It's inherent in this.  I mean, they don't --
9   they're not necessarily spelling out every single thing
10  on here, but it's inherent in these adverse reactions
11  what this can lead to.
12  Q.   What was the reasoning behind putting specifics
13  in the 2015 IFU?
14  A.   I'm not a part of that discussion.
15  Q.   But it's your testimony here today that all of
16  these adverse reactions that are located within 14
17  bullet points are the same things that are warned about
18  and contained within the adverse reactions in Exhibit 18
19  within these four bullet points?
20  A.   If you look here, let's look at No. 2 in the
21  old, transitory local irritation of the wound, if you
22  look at that, three of these bullet points say exactly
23  the one bullet point.
24       You can look at No. 2 on Exhibit 18 and then

1  make the statement, "Larger pore size also enhances
2  other favorable host responses, such as greater Type III
3  collagen deposition, greater capillary penetration, and
4  greater attachment strength."
5          Do you see that?
6     A.   I do.
7     Q.   You would agree that larger pore size is
8  better; correct?
9     A.   In the context of mesh repairs, pore sizes
10  greater than 75 microns is essential.
11    Q.   And, for you, the magic number is 75 microns?
12    A.   Well, the magic number is not -- it's not my
13  magic number, sir.
14    Q.   Whose is it?
15    A.   It was postulated by a fella named Amid, and
16  there's reasons for that number.
17    Q.   But fair to say that your opinion is that mesh
18  needs to be 75 microns in order to have a large enough
19  pore size?
20    A.   By definition, macroporous measures greater
21  than 75 microns.
22    Q.   Going to page 10, at the bottom there's a
23  statement that you make that says, "Although as yet
24  unpublished, our outcomes today have been favorable.

1   The overwhelming majority of such patients have
2   expressed extreme satisfaction with their experience,
3   and not infrequently the results have been
4   enthusiastically described as life-changing."
5           Do you see that?
6       A.  I do.
7       Q.  Why is your data unpublished?
8       A.  Because it's unpublished.  But it's unpublished
9   because of time constraints and because, as a solo
10  practitioner managing my own practice, doing my own
11  cases, doing all the work of a practice, that amount of
12  work, just it seems fairly daunting, but there's some
13  medical students who are working with me that might be
14  interested in helping do some of the legwork and get
15  some of that done.  But it really is more of a time
16  issue than anything else.
17          The other thing about my data is it's not a
18  prospective type of data, so although it's, I think,
19  interesting and it's very useful for my own patients,
20  I'm not sure, in the big body of medical literature,
21  where it would fall out in that pyramid of hierarchy of
22  literature.  So I think it's essential that the world
23  knows, other than I think it is interesting and would be
24  useful.

```
 1     Q.   You've never done lab research on
 2   polypropylene; correct?
 3     A.   What do you mean by that, sir?
 4     Q.   Have you ever done research within a lab on
 5   polypropylene?
 6     A.   I thought you said lab search.  You said lab
 7   research?
 8     Q.   Lab research.
 9     A.   Sorry about that.  No.
10     Q.   You've never done any type of pathological
11   analysis on explanted polypropylene mesh, have you?
12     A.   I've not physically done that myself, no.
13     Q.   You're not a biomaterials specialist; correct?
14     A.   Again, I'm not paid to do anything like that.
15     Q.   You've never published opinions that
16   polypropylene does not degrade in the human body, have
17   you?
18     A.   I've never published that, no.
19     Q.   You've never published opinions that
20   polypropylene does not create a foreign body reaction;
21   correct?
22     A.   I've never published on that, so, no.
23     Q.   You're not an expert on warnings; correct?
24     A.   In terms of calling me an expert, in the
```

1  context of how I use these products and how I warn

2  patients, I think I am actually an expert in giving

3  warnings to patients.  So if that's what you mean, yes,

4  but it may not be what you mean.

5      Q.   What risk information are medical device

6  companies required to put in the IFU?

7      A.   These are -- those are requirements that are

8  between them and the regulatory agencies.

9      Q.   And you wouldn't be an expert on those

10  requirements; correct?

11      A.   No.

12      Q.   You're not a biomechanical engineer; correct?

13      A.   No, I'm not paid to be a biomechanical

14  engineer.

15      Q.   You're not an expert on the design of medical

16  devices, are you?

17      A.   I use the devices a lot and I have opinions

18  about devices, but I'm not paid to design medical

19  devices.

20      Q.   You've never designed a medical device

21  yourself; correct?

22      A.   We've done a lot -- we've done some interesting

23  things.  I don't know if I've designed.  I've never

24  designed something to go to market, no.

1  We do what we have to do to get our job done,
2  and sometimes that requires improvisation, so I do some
3  designing, but I wouldn't call it -- I've never done
4  anything commercial, no.
5  Q. Who's "we"?
6  A. Me. Me and the nurses, actually. Sometimes
7  they help.
8  Or let me rephrase that. They always help.
9  Q. Do you know what standards a manufacturer must
10 follow in designing mesh products?
11 A. I think it's between them and the -- whoever
12 the regulatory agencies are, so, no.
13 Q. You wouldn't have any expertise in that;
14 correct?
15 A. Not in the manufacturing, no.
16 Q. Have you ever reviewed any of Ethicon's
17 internal standard operating procedures?
18 A. No.
19 Q. Have you ever authored a peer-reviewed article
20 on stress urinary incontinence?
21 A. No.
22 Q. Have you ever authored a peer-reviewed article
23 on midurethral slings?
24 A. No.

1  Q. Have you ever authored a peer-reviewed article
2  on any pelvic floor surgery?
3  A. I don't know if that bladder perforation thing
4  would be considered pelvic floor surgery, but absent
5  that, no.
6  Q. Do you consider yourself to be an expert on the
7  design of transvaginal mesh?
8  A. More on the use, not the design.
9  Q. I think we established you've never designed a
10 medical device yourself that was taken to market;
11 correct?
12 A. That is correct.
13 Q. Do you own any patents for any medical devices?
14 A. No.
15 Q. Have you ever sought to publish any of the
16 opinions you're offering here today in this litigation
17 within a peer-reviewed journal?
18 A. I have not.
19 Q. Have you ever been involved in any clinical
20 trials comparing midurethral slings to any other pelvic
21 surgery?
22 A. No.
23 Q. Have you ever been involved in a randomized
24 controlled trial involving transvaginal mesh treatment