# Exhibit F

```
 1            IN THE UNITED STATES DISTRICT COURT

 2          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

 3                      CHARLESTON DIVISION

 4

 5   IN RE: ETHICON, INC. PELVIC REPAIR     )
     SYSTEM PRODUCTS LIABILITY LITIGATION   )
 6   _____    )
     THIS DOCUMENT RELATES TO THE           )
 7   FOLLOWING CASES IN WAVE 1 OF 200:      )
                                            ) 2:12-MD-02327
 8   Barbara A. Hill                        )
     Case No. 2:12-cv-00806                 ) MDL No. 2327
 9                                          )
     Constance Daino                        )
10   Case No. 2:12-cv-01145                 )
                                            ) Joseph R. Goodwin
11   Monica Freitas                         ) U.S. District Judge
     Case No. 2:12-cv-01146                 )
12                                          )
     Patricia Ruiz                          )
13   Case No. 2:12-cv-01021                 )
                                            )
14   Pamela Gray Wheeler                    )
     Case No. 2:12-cv-00455                 )
15                                          )
     Rebekah Bartlett (Pratt)               )
16   Case No. 2:12-cv-01273                 )
                                            )
17   Dawna Hankins                          )
     Case No. 2:12-cv-00369                 )
18                                          )
     Patricia Tyler                         )
19   Case No. 2:12-cv-00469                 )
20

                DEPOSITION OF DOUGLAS GRIER, M.D.
21

                        March 22, 2016
22

23                    Seattle, Washington

24

25
```

Douglas Grier, M.D.

```
 1   Q   Any documents in there specifically that you remember

 2       reading front to back?

 3   A   At this -- well, the IFU is in there, so I have read that

 4       in the past front to back.  I read the historical

 5       documents about how TVT first was developed.  And those

 6       are the ones that I remember in particular.  There are a

 7       couple PowerPoint presentations that I probably was in --

 8       present for or were delivered to me.

 9   Q   Doctor, how many of these -- how many of these 34

10       documents do you think you actually reviewed in full?

11                   MR. KOOPMANN:  Object to form.

12                   THE WITNESS:  I can't give you an

13       exact answer to that, but if you look through it, they're

14       historical documents, so I don't -- I didn't spend much

15       time at all with the Internet discussions between the

16       Ethicon people and the corporation.

17   Q   (By Mr. DeGreeff)  Did you -- in rendering your opinions,

18       did you rely at all on internal company documents?

19   A   No.

20   Q   Why not?

21   A   I don't find them necessarily relevant.

22   Q   Why are they not relevant?

23   A   Well, because a lot of it has to do with research and

24       development early on in the development of the products,

25       and quite frankly, it's not -- I don't find it relevant
```

Douglas Grier, M.D.

```
 1        for me in rendering an opinion.

 2    Q   Did you review any of the design documents for the

 3        product?

 4                    MR. KOOPMANN:  Objection.  Form.

 5                    THE WITNESS:  I don't recall design

 6        documents.  You mean the original design of the -- of the

 7        mesh?

 8    Q   (By Mr. DeGreeff)  Yeah, the design documents, the

 9        internal design documents for the mesh product?

10    A   Well, if you could show me one, I could tell you whether

11        I've reviewed it or not.

12    Q   Well, do you know what I'm talking about when I say

13        design documents?

14    A   Not precisely, no.

15    Q   Okay.

16    A   Are you talking about before it was submitted to the FDA?

17    Q   Well, have you reviewed the design device file?

18                    MR. KOOPMANN:  Objection.  Form.

19                    THE WITNESS:  I don't recall.

20    Q   (By Mr. DeGreeff)  As you sit here, do you remember

21        recalling any -- reviewing any internal Ethicon documents

22        specifically relating to design of the TVT products?

23    A   I'm sure I've looked at several, but none come to mind

24        specifically.

25    Q   Okay.  If you think you looked at several, what did those
```

Douglas Grier, M.D.

```
 1        documents look like?  What did they tell you?

 2  A     Oh, I don't recall.  I looked at them prior to the Perry

 3        trial, I would imagine.

 4  Q     Okay.  So -- and the Perry trial was about the TVT

 5        Abbrevo; correct?

 6  A     Correct.

 7  Q     And we're not here -- you're not rendering any opinions

 8        in this -- at this point generally about the TVT Abbrevo?

 9  A     No.

10  Q     So my question is about design documents that would be

11        relevant to the products that we're here about.  Do you

12        remember reviewing any of those design documents?

13  A     Not specifically.

14  Q     Well, not specifically.  Do you remember reviewing any at

15        all?

16  A     If you put one in front of me, I can tell you whether I

17        have or not.

18  Q     Well, Doctor, you've got them -- are they on your

19        reliance list?

20  A     Some may be.

21  Q     And did you review everything on your reliance list?

22  A     I've -- in a general sense, yes.  Specifically, I mean,

23        there's a lot of documents, and some I may have just

24        looked at the title and then what the conclusions were,

25        and if something was interesting in there, I would go
```

Douglas Grier, M.D.

```
 1   Q   Did defense counsel select the documents that went into

 2       that binder?

 3   A   Yes.

 4   Q   Have you reviewed all of the documents in that binder?

 5   A   Well, I've reviewed them -- a lot of them I've reviewed

 6       before they ever were put in the binder, before I was

 7       ever asked to review them.

 8   Q   Okay.  So my question was a little different than that.

 9           Have you reviewed -- and I don't care when you

10       reviewed them.  Have you reviewed all of the lit- -- all

11       of the documents that are in that binder?

12   A   Well, no.  The ones I haven't reviewed were the pre-FDA

13       design documents, which are very tedious, and I didn't

14       find relevant.

15   Q   So fair to say, you did not review the design documents

16       that were relied on by Ethicon for approval by the FDA?

17                       MR. KOOPMANN:  Objection to form.

18                       THE WITNESS:  That's true.

19   Q   (By Mr. DeGreeff)  Anything else?

20   A   Well, there's just a bunch of minutes and discussions by,

21       I guess, engineers within the -- within the company on

22       the product specifications and the launch of the product.

23   Q   And did you review those?

24   A   I did not.

25   Q   Why not?
```

Douglas Grier, M.D.

```
 1   A   Well, because I don't find it relevant.

 2   Q   And that's the -- those are memos done by the engineers

 3       who designed the product?

 4   A   Correct.

 5   Q   Why did you not find that relevant?

 6   A   Well, because it's tremendously tedious, and it's not

 7       clinically relevant.  It was how they developed the

 8       product and -- the device, and it's kind of too technical

 9       for my interest.

10   Q   And you didn't -- so you didn't review that in rendering

11       your opinions?

12   A   No.

13   Q   Did you review any documents related to the -- kind of

14       the -- what you referred to as the tedious portion of the

15       design of the -- of the document and getting FDA

16       approval?

17                     MR. KOOPMANN:  Objection.  Form.

18                     THE WITNESS:  There may be a few that

19       I reviewed.

20   Q   (By Mr. DeGreeff)  Which ones?  Any as you sit here that

21       you remember?

22   A   My patients' list at home.

23   Q   I was wondering how that got in there.

24   A   Yeah, that just got -- it fell in.

25           The ones I reviewed were -- see, a lot of this is
```

Douglas Grier, M.D.

```
 1                    MR. KOOPMANN:  Objection.  Form.

 2                    THE WITNESS:  I will say no.  I will

 3        say, though, that -- that all of us give feedback to the

 4        companies that we use mesh, as to what might be better

 5        about it.

 6   Q    (By Mr. DeGreeff)  I think we agree.  My question is

 7        pretty simple.  Yes or no, are you holding yourself --

 8        yes, no, or you can't answer.  Are you holding yourself

 9        out as an expert on the design of transvaginal mesh

10        products?

11                    MR. KOOPMANN:  Objection.  Form.

12        Asked and answered.

13                    THE WITNESS:  Do I answer?

14                    MR. KOOPMANN:  Go ahead, yeah.

15                    THE WITNESS:  So I am not a product

16        engineer that has designed mesh products.  However, I

17        have used them, and I have opinions about what -- what is

18        good or bad about a particular product, which I have

19        expressed to multiple companies when asked.  So -- but I

20        am not an engineer.

21   Q    (By Mr. DeGreeff)  Let's try this again.  Doctor, yes,

22        no, or you cannot answer my question as it's phrased:

23        Are you holding yourself out as an expert in the design

24        of transvaginal mesh products?

25                    MR. KOOPMANN:  Same objection.
```

Douglas Grier, M.D.

```
 1                        THE WITNESS:  No, I'm not a design

 2       expert.

 3   Q   (By Mr. DeGreeff)  Doctor, one more binder.  And I don't

 4       know -- let's see.  This says --

 5   A   That's TVT and TVT-O.  I think it's -- is it long-term

 6       studies?  It's a series of studies.  Now, some of this is

 7       contained in these other binders.

 8   Q   I was going to ask, this says long-term studies.  Does

 9       this contain the same ten studies that we talked about

10       earlier?

11   A   If you'd hand it to me, I could answer that.

12                        MR. DEGREEFF:  Sure, I will.  Let's

13       mark this.  I'll mark this as Deposition Exhibit 11.

14                             (Exhibit No. 11 marked for

15                              identification.)

16   Q   (By Mr. DeGreeff)  Have I done so?

17   A   Yes.

18   Q   And can you tell us the -- before we get started, can you

19       tell us the title of that?

20   A   "TVT and TVT-O Long-Term Studies for Experts."

21   Q   Why would that be called long-term studies for experts

22       rather than long-term studies for Dr. Grier?

23   A   Well, because this series of articles, which are

24       long-term, is probably used by other -- other

25       gynecologists or urologists who have been asked to be
```

Douglas Grier, M.D.

1    not create a foreign body reaction, have you?

2  A  No.

3  Q  Have you ever authored an article on SUI or incontinence

4    in general?

5              MR. KOOPMANN:  Object to the form.

6              THE WITNESS:  Well, yes.

7  Q  (By Mr. DeGreeff)  Which one would that be?

8  A  That's the Tincello article that's in here, the TVT World

9    Registry.

10 Q  You believe that deals with SUI or incontinence

11   generally?

12 A  Oh, well, it's for the treatment of stress incontinence.

13 Q  And that was the one that got cut off early?

14 A  That was the one that was completed at the one-year mark

15   and published.

16 Q  Published in 2014?

17 A  That's my memory.

18 Q  After the TVT-S was taken off the market?

19 A  I don't remember the chronology of which was which, but

20   yeah, that probably is true.

21 Q  Doctor, what was the point of publishing the article

22   after the product was removed from the market?

23 A  That's the point of science.  It's to -- it's an ongoing

24   investigation that -- that's a philosophical question.

25 Q  Doctor, you're not an expert on warnings, are you?

Douglas Grier, M.D.

```
 1                    MR. KOOPMANN:  Objection.  Form.

 2   Q   (By Mr. DeGreeff)  Medical device warnings?

 3                    MR. KOOPMANN:  Same objection.

 4                    THE WITNESS:  No.

 5   Q   (By Mr. DeGreeff)  You're not a biomedical engineer, are

 6       you?

 7   A   No, I'm not.

 8   Q   And we've already talked about this, but you're not

 9       holding yourself out as an expert on the design of

10       medical devices, are you?

11                    MR. KOOPMANN:  Objection to form.

12       Asked and answered many times.

13                    THE WITNESS:  I'm not an expert on it,

14       although I have been using medical devices for my entire

15       career.  So I certainly can give opinions on their safety

16       and efficacy.

17   Q   (By Mr. DeGreeff)  Well, now, giving an opinion on

18       whether you believe a device is safe and effective is

19       different than being able to give an opinion on design;

20       correct?

21   A   Yes.

22   Q   Are you qualified to give -- you're not holding yourself

23       out as an expert on the area of design, are you?

24                    MR. KOOPMANN:  Objection to form.

25                    THE WITNESS:  No.
```

Douglas Grier, M.D.

```
1    Q    (By Mr. DeGreeff)  I mean, you've never designed a

2         medical device; correct?

3    A    Correct.

4    Q    Never been involved in the design of a medical device?

5    A    I've been in -- I've been asked to give opinions on

6         devices and -- during their development.

7    Q    You don't have any patents on medical devices?

8    A    No.

9    Q    Doctor, do you know what employees from Ethicon were

10        involved in the design of the TVT?

11   A    No.  I thought Ulf Ulmsten was the one who designed the

12        TVT.

13   Q    Do you know what Ethicon paid Ulf for the product?

14   A    No.

15   Q    What is MedScan?

16   A    I'm not sure.  Is that a search engine for medical -- or

17        articles, scientific articles?

18   Q    I'm asking you, Doctor.  Did Dr. Ulmsten design the mesh

19        used in the TVT?

20                   MR. KOOPMANN:  Objection.  Form.

21                   THE WITNESS:  My memory is that in the

22        1990s -- and this is coming from his mouth -- he was

23        experimenting with -- he came up, along with a

24        gynecologist from Australia by the name of Petros, of a

25        new and novel integral theory of continence, which was
```

Douglas Grier, M.D.

```
 1        in studies on the inventor's device?

 2   A    Oh, again, I have no idea.  How would I know that

 3        information?  I've not heard it.

 4   Q    Do you think they should?

 5   A    Should prevent?  No.

 6   Q    Do you know whether Ethicon has any policies in place

 7        that prohibit inventors from participating in studies on

 8        the inventor's device?

 9   A    I'm not aware.

10   Q    Do you think they should?

11   A    It's -- I don't have an opinion.

12   Q    It doesn't matter to you?

13   A    No.

14   Q    Doctor, are you aware of how long it took the -- it took

15        Ethicon to get the TVT-O product to market?

16   A    I don't recall the timeline.

17   Q    Doctor, what is Provencia?

18   A    I don't know.

19   Q    Do you know what a failure modes and effect analysis is?

20   A    That sounds like an engineering design study to look at

21        physical properties of different products/materials.

22   Q    Have you ever been involved in one of those analyses?

23   A    No.

24   Q    What should be in a failure modes and effects analysis?

25                    MR. KOOPMANN:  Objection.  Form.
```

Douglas Grier, M.D.

```
 1                      THE WITNESS:  Well, can you give me a

 2         product or material that you want to apply it to?

 3    Q    (By Mr. DeGreeff)  Mesh.  What should be in a failure

 4         mode designs effect analysis for mesh?

 5                      MR. KOOPMANN:  Objection.  Form.

 6                      THE WITNESS:  Well, one would be what

 7         its tensile strength is, elongation overload.  Those

 8         would be the main ones.

 9    Q    (By Mr. DeGreeff)  Have you ever -- did you review the --

10         any of the FMEAs in this case?

11    A    I've seen some, yes.

12    Q    For transvaginal mesh?

13    A    Uh-huh.

14    Q    Which ones?

15    A    Oh, I think Guenther is one.  Moalli has some.  But

16         there's Dietz study from Australia that described the

17         bench loading and elongation.

18    Q    You're talking about articles and studies; correct?

19    A    Yes.  But I -- as far as the -- you mean as far as

20         corporate documents in terms of what they did prior to

21         the product being released?

22    Q    Yes.

23    A    I would glance over them and not -- and not read them.

24    Q    All potential hazards should be in the failure modes

25         effects analysis for TVT; correct?
```

Douglas Grier, M.D.

```
 1                    MR. KOOPMANN:  Objection.  Form.

 2                    THE WITNESS:  Again, I don't know what

 3        that means.

 4    Q   (By Mr. DeGreeff)  You don't know what a design failure

 5        modes effect analysis is?

 6    A   Well, I know -- I know what the term is, but when you're

 7        saying -- there's a difference between in vivo and ex

 8        vivo.  If you're talking about bench testing products

 9        that the stresses that are put on them are greater than

10        the physiologic stress in the body, I don't think those

11        are relevant.

12            I mean, it's fine to do the studies to get a sense

13        of what the burst strength is of mesh, but it's never

14        going to be seen after it's deployed.

15    Q   And you don't find those studies relevant, or those

16        relevant?

17    A   Well, it has a relevance, but it doesn't have a high

18        significance.

19    Q   You don't find them significant?

20    A   It has a significance.  I can't -- I'm not going to give

21        you a degree of significance.

22    Q   You didn't rely on them in giving your opinions in this

23        case; fair?

24    A   Well, when I looked at them, I want to make sure that the

25        stressors of these meshes, after they're deployed in the
```

Douglas Grier, M.D.

```
 1        body, that they're not going to degrade at those -- at

 2        those loads.  In that regard they're relevant.  When

 3        you're talking about you're pushing out the load a long

 4        way, which is not physiologic, that's not relevant.

 5   Q    Okay.  So I guess my -- I'm not sure that you ever

 6        answered my question.  As you sit here, do you remember

 7        reviewing any of the design failure mode effects analysis

 8        for the transvaginal -- the Ethicon transvaginal mesh

 9        products in rendering your opinions?

10   A    I don't recall specific ones.  If you put one in front of

11        me, I can tell you whether I've reviewed it.

12   Q    You told me a lot of the documents were in another

13        language.  Did you ask for those to be translated?

14   A    No.

15   Q    As you sit here, you don't remember -- you can't remember

16        reviewing any specific design failure mode effects

17        analysis on -- regarding transvaginal mesh made by

18        Ethicon?

19   A    I can't recall a specific one, no.

20   Q    Did you review any internal documents discussing how long

21        it took Ethicon to get the TVT-O product to the market?

22                     MR. KOOPMANN:  Objection.  Form.

23        Asked and answered.

24                     MR. DEGREEFF:  It was?

25                     MR. KOOPMANN:  I think so.
```

Douglas Grier, M.D.

```
 1        of TVT-Os due to complications; correct?

 2                         MR. KOOPMANN:  Objection.  Form.

 3                         THE WITNESS:  I have removed sections

 4        of TVT-Os for exposure.  I can't remember any for any

 5        other reason.

 6   Q    (By Mr. DeGreeff)  And is that something you track?

 7   A    Oh, I -- well, I track all my patients.  I see them -- I

 8        try to see them on an annual basis, and if they don't

 9        agree, I try to make it every other year.

10   Q    So do you have something in your office where you track

11        the reason for each removal and what product it is you're

12        removing?

13   A    Their medical records.

14   Q    Is that a list you would keep in your office somewhere?

15   A    It's one I could retrieve.

16   Q    So you have a list currently kept in your office of the

17        product you removed and with -- with the reason for

18        removal?

19   A    No, I don't have a list.

20   Q    And how many TVT-O removal surgeries have you done?

21   A    Well, partial TVT-O, I would say a half dozen maybe.

22   Q    What about TVT-R?

23   A    Same.  About a half dozen.

24   Q    What about TVT-S?

25   A    Maybe three or four.
```

Douglas Grier, M.D.

```
 1   Q   So in your entire time working with transvaginal mesh,

 2       between TVT, TVT-O, and TVT-S, you believe you've only

 3       done 15 to 16 removal surgeries?

 4   A   I'm sure I've removed 35, 40 other products that are

 5       either transobturator or retropubic slings.

 6   Q   So you've only done 50 total removal surgeries in your

 7       time working with transvaginal mesh?

 8   A   Do you -- are you including POP repair, like Prolift or

 9       elevate, Apogee, Perigee, the other products?

10   Q   Well, I was asking specifically about TVT, but sure, we

11       can talk about those too.

12   A   I mean, I don't keep numbers of it, but I've removed each

13       of those products in the past.

14   Q   That was going to be my question.  Where's the tracking

15       data on TVT-Rs that were removed, on the number of

16       explants you've done?

17   A   What do you mean by "tracking data"?

18   Q   Is that something you keep track of in your office?

19   A   No, I don't keep track of the numbers.

20   Q   How long have you been doing removal surgeries?  When did

21       you first start doing them?

22   A   Well, again, when you use the word "removal," I'll take

23       out a specific area that may be exposed, or if there's a

24       specific trigger point area of pain, I'll remove that

25       part.
```

Douglas Grier, M.D.

```
 1       my entire practice was.  At that point I was probably

 2       seeing one-third males and two-thirds females.  But

 3       because of the shrinking volume of women who seek care

 4       for these problems, I do less and less each year.

 5   Q   And what percentage of your practice is related to

 6       treating TVM complications?

 7   A   Oh, less than 1 percent.

 8   Q   What percentage of your practice is related to the

 9       surgical treatment of TVM complications?

10   A   Oh, I'd say less than 1 percent at this point.  I don't

11       see them that often.

12   Q   Doctor, do you do anything within your office to track

13       what percentage of the women that you do implants in are

14       lost to follow-up?

15   A   No.

16   Q   Do you know what the national average is?

17   A   No.

18   Q   Do you know what the national average is on complications

19       related to following implant surgeries with TVM?

20   A   Oh, there's several papers that provide those numbers.

21   Q   Certainly greater than 1 percent, isn't it?

22   A   I think it's about 3 and a half percent.

23   Q   So you believe 3 and a half is the rate?

24   A   One recent paper I reviewed, that was the rate of

25       complications that required something to be done.
```

Douglas Grier, M.D.

```
 1   Q   Ever seen any others that's different?

 2   A   Oh, it's all -- it depends on what study and what cohort.

 3       If you happen to be a referral center, you're going to

 4       see a lot more because a lot of gynecologists aren't

 5       comfortable with doing repairs or revisions.

 6   Q   And a lot of patients aren't comfortable going back to

 7       the person who put in an implant that gave them

 8       complications; fair?

 9   A   That's -- complications in general, for all of medicine,

10       a lot of times patients have unrealistic expectations and

11       will go elsewhere when they don't have exactly the

12       outcome that they want.  That's very common, not just in

13       this.

14   Q   Okay.

15   A   It's common with all complications.

16   Q   So it's typical for anybody -- any surgeon to have a

17       significant loss to follow-up; is that fair?

18   A   It really -- it depends on what community you're in.  If

19       there are -- if you're in a smaller community and there's

20       less choices of where to go, a lot of times, if a patient

21       has a complication and doesn't see you, they'll see one

22       of your colleagues, and they'll -- we can discuss it,

23       they'll -- you'll find out about it.  There's many a time

24       where I've called a physician to tell them that a patient

25       of theirs came in and this was their concerns.
```

Douglas Grier, M.D.

```
 1   A   Yes.

 2   Q   And again, that's an email that you sent to Lori

 3       Campbell?

 4   A   Yes.

 5   Q   And why the exclamation mark, Doctor?  Were you proud

 6       that you'd spent $104,000 on Ethicon products?

 7   A   No.  Kind of the opposite.  I was shocked that I had

 8       spent so much money for a product, you know, as far as

 9       checks are.  It just kind of shocked me that it had been

10       that much.

11   Q   Well, was it important to you to be considered a good

12       account?

13   A   No.  No.  It was a realization that the products are

14       expensive.

15   Q   When does your -- when you say "this year to date," when

16       does your fiscal year start?

17   A   Oh, I don't -- I guess January 1st to December 31st.

18   Q   And what was the point of this email?  What was -- what

19       were you trying to tell her with that?

20   A   I was -- I saw a rolling -- a rolling average of what I

21       had spent for slings, and so I was kind of shocked by

22       that number.  I can't remember what they cost, but that's

23       the equivalent of 100 -- probably 100 slings --

24       surgeries.

25           So I -- just like I don't count what -- what I've
```

Douglas Grier, M.D.

```
 1        been paid, I normally don't count how many slings that

 2        I've done in a given year.  And so this was toward the

 3        end of the year, and it looks like I did 100 slings.

 4    Q   Okay.  So if you had -- 100 slings in a year, is that a

 5        lot?

 6    A   Yes.

 7    Q   What percentage of your -- of your practice would that

 8        have made up for the year 2004?

 9    A   Oh, probably 20, 25 percent of -- of the female side that

10        I was doing either a prolapse -- a prolapse repair or

11        slings for incontinence.

12    Q   And then if you'll look at the email right above that,

13        it's Lori Campbell responding to you directly on

14        November 15th of 2004; correct?

15    A   Yes.

16    Q   And if you look at that second paragraph, it says, "Yes,

17        you're one of our best customers," triple exclamation

18        mark.  "Funny you should be looking at that today,"

19        period.  "Erika and I were just reviewing preceptor

20        payout," period.  "You've just about maxed out your

21        contract for the year," period.

22            Did I read that correctly?

23    A   Yes.

24    Q   And we talked earlier about the fact that your max amount

25        on your consulting agreement in 2004 was $100,000; right?
```

Douglas Grier, M.D.

```
 1   A   No.

 2   Q   Fair to say you haven't reviewed everything on your

 3       reliance list?

 4   A   Yes.

 5   Q   What percentage of the documents on your reliance list

 6       would you say you've reviewed?

 7   A   I can't give a percentage because a lot of these are

 8       just -- are internal documents that I did not read, and

 9       there's a lot of them.

10   Q   Did you just -- did you not read the internal

11       documents -- the Ethicon internal documents?

12   A   Very few of them.  I just didn't find them relevant or

13       find anything in there that I could use.

14   Q   And which of the depositions that -- looking at your list

15       of depositions, were there any in particular that you

16       remember reading that stood out to you?

17   A   Well, I remember reading Ostergard, Margolis, Blaivis.

18   Q   Any others?

19   A   Moore.

20   Q   Any others?

21   A   In the past, Rosenzweig.

22   Q   Any others?

23   A   I don't recall any other.

24   Q   Did you read any depositions of Ethicon employees?

25   A   I did for the Perry trial.  Not since.
```

Douglas Grier, M.D.

```
 1        opinions to a reasonable degree of medical certainty?

 2    A   Yes.

 3    Q   You don't hold yourself out to the community as a design

 4        expert; is that fair?

 5    A   That is fair.

 6    Q   But are you an expert in urologic surgery?

 7    A   Yes.

 8    Q   And are you an expert in the materials used in urologic

 9        surgery?

10    A   Yes, I am.

11    Q   And you don't hold yourself out to the community as a

12        warnings expert; correct?

13    A   No, I don't.

14    Q   But you've used a lot of medical devices throughout your

15        career?

16    A   Yes.

17    Q   Dozens, certainly?

18    A   Yes.

19    Q   Hundreds?

20    A   Yes.

21    Q   And before you use a medical device, you read the

22        instructions for use accompanying the device?

23    A   I do.

24    Q   And after treating patients with devices, you get a sense

25        of what sort of complications you see?
```

Douglas Grier, M.D.

```
 1       what is the standard of care.

 2   Q   And are there different levels of evidence?

 3   A   There is different levels of evidence.  From the bottom,

 4       which is anecdotal reporting, to the top, which is, say,

 5       Cochrane review, meta-analysis, systematic reviews.

 6   Q   Where do internal company emails fall on the hierarchy of

 7       levels of evidence?

 8   A   They don't fall at all, in any of it.

 9   Q   Where do failure modes and effects analyses fall in the

10       hierarchy of levels of evidence?

11   A   They don't fall at all in the levels of evidence.

12   Q   The opinions that you've expressed in your reports

13       regarding the safety and efficacy of the TVT, TVT-O, and

14       TVT slings, are those opinions based in part on your

15       education, including your medical school and residency?

16   A   Yes.

17   Q   Is it also based on continuing ed courses?

18   A   Yes.

19   Q   Are those opinions about the safety and efficacy of the

20       devices based on your clinical training and experience?

21   A   Yes.

22   Q   Are those opinions about the safety and efficacy of the

23       devices based on your review of the peer-reviewed

24       literature, book chapters, podium, and poster

25       presentations and abstracts?
```

Douglas Grier, M.D.

```
 1      reliance list?

 2   A  If it's alphabetically -- oh, yes.  Yes.

 3   Q  And what date were those depositions taken?

 4   A  May 30th and 31st of 2013.

 5   Q  Have you -- is Dr. Weisberg's deposition from

 6      November 12th and 13th of 2015 on your reliance list?

 7   A  No.

 8   Q  Are you aware that Dr. Weisberg was chosen by Ethicon to

 9      testify as their corporate representative on the revised

10      TVT and Gynemesh IFUs?

11   A  No, I was not aware.

12   Q  Do you know he's Ethicon's medical director?  Correct?

13   A  Is he currently?

14   Q  I believe so.

15   A  I thought he was ten years ago.

16   Q  Okay.  Have you -- I'm assuming, given that it's not on

17      your reliance list, that you haven't reviewed that

18      deposition?

19   A  No.  Don't recall it.

20   Q  And do you see Dr. Laura Angeleni's June 2015 deposition

21      on your reliance list?

22   A  Yes.  Did -- what was the date?

23   Q  June of 2015.

24   A  No.

25   Q  Do you know that she's the -- she was the woman who
```