# **EXHIBIT E**

Marc R. Toglia, M.D.

```
 1              UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF WEST VIRGINIA
 2                  CHARLESTON DIVISION
 3    ------------------------------
      IN RE:  ETHICON, INC.,        :MASTER FILE NO.
 4    PELVIC REPAIR SYSTEM PRODUCTS :2:12-MD-02327
      LIABILITY LITIGATION          :MDL 2327
 5    --------------------------------
      THIS DOCUMENT RELATES TO THE  :
 6    FOLLOWING CASES IN WAVE 1 OF  :
      THE MDL 200:                  :
 7    Betty Funderburke             :JOSEPH R. GOODWIN
      Case No. 2:12-cv-00957        :U.S. DISTRICT JUDGE
 8                                  :
      Patricia Conti                :
 9    Case No. 2:12-cv-00516        :
                                    :
10    Donna Massey                  :
      Case No. 2:12-cv-00880        :
11                                  :
      Amanda Deleon                 :
12    Case No. 2:12-cv-00358        :
                                    :
13    Wilma Johnson                 :
      Case No. 2:12-cv-00809        :
14                                  :
      Harriet Beach                 :
15    Case No. 2:12-cv-00476        :
                                    :
16    Virginia Dixon                :
      Case No. 2:12-cv-01081        :
17                                  :
      ------------------------------
18
19                   _ _ _
                March 24, 2016
20                   _ _ _
           DEPOSITION OF MARC R. TOGLIA, M.D.
21
22          GOLKOW TECHNOLOGIES, INC.
        877.370.3377 ph | 917.591.5672 fax
23             deps@golkow.com
24
```

Marc R. Toglia, M.D.

1

                         — — —

2                      March 24, 2016

                         — — —

3

4

5            Oral sworn deposition of MARC R. TOGLIA,

6       M.D., held at RADNOR HOTEL, 591 East Lancaster

7       Avenue, Wayne, Pennsylvania, commencing at 1:20

8       p.m., before Margaret M. Reihl, a Registered

9       Professional Reporter, Certified Realtime

10      Reporter, and Notary Public.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Marc R. Toglia, M.D.

```
 1   A P P E A R A N C E S:

 2

     WAGSTAFF & CARTMELL, LLP

 3   BY:  CHRISTOPHER L. SCHNIEDERS, ESQUIRE

     4740 Grand Avenue

 4   Suite 300

     Kansas City, Missouri  64112

 5   (816) 701-1145

     cschnieders@wcllp.com

 6   Counsel for Plaintiffs

 7

 8   BUTLER SNOW LLP

     BY:  NILS B. (BURT) SNELL, ESQUIRE

 9   500 Office Center Drive

     Suite 400

10   Fort Washington, Pennsylvania  19034

     (267) 513-1884

11   burt.snell@butlersnow.com

     Counsel for Defendant

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Marc R. Toglia, M.D.

```
 1                    I N D E X
 2   WITNESS:                                    Page
     MARC R. TOGLIA, M.D.
 3
            By Mr. Schnieders                    7
 4          By Mr. Snell                         254
 5                    _ _ _
 6               E X H I B I T S
 7
     TOGLIA DEPOSITION EXHIBITS                  MARKED
 8
     No. 1     Notice to Take Deposition
 9             of Marc Toglia, M.D.              8
10   No. 2     Curriculum Vitae of
               Marc Richard Toglia, M.D.         36
11
     No. 3     Website printout of
12             Urogynecology Associates of
               Philadelphia                      65
13
     No. 4     Box of materials relied on        75
14
     No. 5     Invoices of Marc R. Toglia,
15             (two pages)                       77
16   No. 6     Expert Report of Marc R. Toglia,
               M.D.                              77
17
     No. 7     Marc Toglia Reliance List in
18             Addition to Materials Referenced
               in Report                         79
19
     No. 8     E-mail string, top one dated
20             7/21/09
               [ETH.MESH.00585587 through 585589]   90
21
     No. 9     E-mail string, top one dated
22             1/26/10
               [ETH.MESH.01221280 through 01221283]   101
23
24
```

Marc R. Toglia, M.D.

 1   No. 10    Gynecare, Gynemesh PS pamphlet
               Released:  03 Feb 2015                137
 2
     No. 11    Gynecare, Gynemesh PS pamphlet
 3             copyright 2008
               [ETH.MESH.02342218 through 02342249]  141
 4
     No. 12    Slide deck, "KOL Strategy" dated
 5             February 2008
               [ETH.MESH.01177099]                   163
 6
     No. 13    E-mail string, top one dated 11/30/10
 7             [ETH.MESH.05131435 through 05131436]   177
 8   No. 14    Chart, Accurate HCP Report             180
 9   No. 15    Chart, HCP Cognos report run 11.17.10
               with all end dates in 2010 & some
10             2011
               [ETH.MESH.17782434]                    183
11
     No. 16    Ethicon Master Consulting Agreement
12             [ETH.MESH.05277161 through 05277171]   185
13   No. 17    E-mail dated 2/16/12, with attached
               Master Consulting Agreement for
14             Marc Toglia, M.D.
               [ETH.MESH.09158028]                    189
15
     No. 18    Consulting Agreement Requisition
16             Form-Part I, for Marc Toglia
               [ETH.MESH.07635991 through 07636003]   190
17
     No. 19    E-mail string, top one dated
18             11/19/10
               [ETH.MESH.07386591 through 07386592]   194
19
     No. 20    E-mail string, top one dated
20             2/9/09
               [ETH.MESH.07383824 through 07383825]   197
21
     No. 21    E-mail string, top one dated
22             10/3/10
               [ETH.MESH.15186000 through 15186001]   203
23
24

Marc R. Toglia, M.D.

```
 1   No. 22    E-mail  dated 4/21/11
                [ETH.MESH.10818812 through 10818813]   206
 2
     No. 23    E-mail string, top one dated
 3              4/7/10
                [ETH.MESH.09211317 through 092111318]  209
 4
     No. 24    E-mail string, top one dated
 5              5/6/10
                [ETH.MESH.09217182 through 09217183]   213
 6
     No. 25    TVT Exact:  Editor's Backgrounder
 7              [ETH.MESH.09210943 through 09210947]   217
 8   No. 26    E-mails dated 4/5/10
                [ETH.MESH.09211216]                    221
 9
     No. 27    Roadmap charts
10              [ETH.MESH.02229625 through 02229633]   223
11   No. 28    Document titled "Overview"
                [ETH.MESH.03898389 through 03898398]   225
12
     No. 29    Slide deck, "The Mesh Story"
13              [ETH.MESH.16440031]                    234
14   No. 30    ProPublica, Dollars for Docs            248
15                            _ _ _
16
17
18
19
20
21
22
23
24
```

Marc R. Toglia, M.D.

```
 1                    ... MARC R. TOGLIA, M.D., having been duly

 2            sworn as a witness, was examined and testified

 3            as follows ...

 4   BY MR. SCHNIEDERS:

 5            Q.     Good afternoon, Doctor.

 6            A.     Good afternoon.

 7            Q.     My name is Chris Schnieders, and I'm

 8   here on behalf of the plaintiff steering committee to

 9   take your deposition based upon an expert report that

10   you wrote for a couple of products.

11            Do you understand that today?

12            A.     Yes.

13            Q.     Would you please state your name for the

14   record.

15            A.     Mark Richard Toglia.

16            Q.     And I believe, Dr. Toglia, that you have

17   given a deposition related to your TVT report already;

18   is that correct?

19            A.     That is correct.

20            Q.     And you understand that we are here

21   today on the Gynemesh PS and Prolift report that you

22   had written?

23            A.     Yes, I do.

24            Q.     Doctor, I'm going to mark as Exhibit 1
```

Marc R. Toglia, M.D.

1    the notice that has asked you to come here today and

2    hand it to you.

3             A.      Sure.

4                     (Document marked for identification as

5             Toglia Deposition Exhibit No. 1.)

6    BY MR. SCHNIEDERS:

7             Q.      Have you seen this document before,

8    Doctor?

9             A.      I have.

10            Q.      And we were talking about this briefly

11   beforehand, but you've brought some documents with you

12   here today; is that correct?

13            A.      Yes, I have.

14            Q.      Okay.  I'm going to go through Schedule

15   A, and you just tell me what you brought today that is

16   responsive to those things, and I'm going to ask you

17   some questions on if there are other things that you

18   haven't brought today that are responsive as well,

19   okay?

20            A.      Yes.

21            Q.      Number 1, this is on Page 7, a complete

22   copy of your Curriculum Vitae?

23            A.      I believe that's part of my expert

24   report.

Marc R. Toglia, M.D.

```
 1            Q.      Number 2, "Any and all documents in your
 2    possession, including but not limited to,
 3    correspondence, notes, videos, CDs, DVDs, flash or USB
 4    drives, photographs, databases or materials in other
 5    form provided to you or created by you which relate to
 6    your opinions, expected testimony or development of
 7    your opinions in this litigation."
 8            A.      Yes.
 9            Q.      Have you brought everything that you
10    believe that you have is responsive in regard to Number
11    2?
12            A.      Yes.
13            Q.      Number 3, "Any and all documents
14    reviewed by you in preparation for this deposition."
15            A.      Yes, I have.
16            Q.      Okay.  And, Doctor, I believe off the
17    record we had discussed the fact that all you've
18    brought with you today are literature that is in your
19    reliance list and your expert reports; is that correct?
20            A.      Yes.
21            Q.      Okay.  So you have not reviewed any
22    documents in preparation for your deposition here today
23    that were not in your reliance list?
24            A.      I mean, with the understanding that this
```

Marc R. Toglia, M.D.

 1    is what I do for a living, there's a tremendous amount

 2    of stuff that I do read and review, in general, that's

 3    on the subject matter, but I believe that the stuff

 4    that's in my report is on the reliance list.

 5                    MR. SNELL:  Just for clarification,

 6            counsel, are you asking about things he's

 7            reviewed since his report or depositions of

 8            plaintiffs' experts, things like that, because,

 9            obviously, those were not available to him at

10            the pertinent time.

11                    MR. SCHNIEDERS:  I'm asking for anything

12            at this point with Number 3 that he has

13            reviewed in preparation for this deposition

14            here today.

15    BY MR. SCHNIEDERS:

16            Q.     Does that cover it, Doctor?

17            A.     Essentially, yes.  Understand that I

18    also have access to information that is not published

19    and that I am not at liberty to share because I'm an

20    editor for journals and I review for -- so, obviously,

21    I have not brought that, but I don't quote or cite that

22    information in my report.

23            Q.     Are you relying on any unpublished

24    information --

Marc R. Toglia, M.D.

```
1              A.      I'm sorry.  I'm not relying upon --

2       sure, I'm not relying upon that information.

3              Q.      Okay.  Did you review that information

4       in preparation for your deposition here today?

5              A.      That is information that I have reviewed

6       for my own role outside of this deposition, so not in

7       preparation for this deposition.

8              Q.      Has your counsel been privy to those

9       documents?

10             A.      He has not.

11                     MR. SNELL:  I'm not his counsel.

12                     MR. SCHNIEDERS:  I'm sorry.

13                     THE WITNESS:  I'm sorry.  Does that

14             make -- is my intent clear with that?

15      BY MR. SCHNIEDERS:

16             Q.      Well, if we're going to be clear, I

17      think what you're telling me is that you may have come

18      about information outside of this litigation that has

19      not informed your opinions in this litigation in any

20      way, shape or form, correct?

21             A.      Correct.

22             Q.      And you're not relying upon that

23      information to put forth your opinions in this case,

24      correct?
```

Marc R. Toglia, M.D.

```
 1          A.      Yes, that's correct.

 2          Q.      So is it fair to say that whatever

 3   information this is you're talking about, you didn't

 4   review it in anticipation for this deposition?

 5          A.      Right.

 6          Q.      Did you review any depositions that are

 7   not on your reliance list?

 8          A.      Again, I've got the Ostergard

 9   deposition, which I only recently received, so I don't

10   know if that would be on the list or not, but I did

11   bring the deposition with me.

12               MR. SNELL:  Since we're the ones who

13          generated the list, it would not be on there,

14          since the list was -- I took Ostergard's

15          deposition, it was a week or two at least after

16          he produced expert reports, so I do not think

17          it's on there.  I haven't even looked.

18               MR. SCHNIEDERS:  Well, and I believe,

19          counsel, did we receive a new reliance list

20          yesterday.

21               MR. SNELL:  It wasn't a new reliance

22          list.  It was, essentially, a corrected one.  I

23          think the paralegals attached his sling TVT

24          reliance list to both his TVT report and his
```

Marc R. Toglia, M.D.

```
 1          prolapse report, instead of attaching the right

 2          prolapse list to the prolapse report.  So it's

 3          not amended or updated or anything like that.

 4          It's just they stuck the wrong one on the POP

 5          report.

 6                   MR. SCHNIEDERS:  Okay.  So the list that

 7          was produced yesterday was the list as of the

 8          date of the issuance of the report?

 9                   MR. SNELL:  Like 29th to 30th of

10          February.

11                   MR. SCHNIEDERS:  And did you bring a

12          copy of that list that was produced yesterday

13          because I don't know if I have that list to

14          mark as an exhibit here today.

15                   MR. SNELL:  Do you have a copy?

16                   THE WITNESS:  This, POP?

17                   MR. SNELL:  If you want to take that,

18          you can mark it.

19                   MR. SCHNIEDERS:  We'll get to that in a

20          second.

21                   MR. SNELL:  But as to your question, I

22          doubt Ostergard's deposition was on this, I

23          don't see it on here.

24     BY MR. SCHNIEDERS:
```

Marc R. Toglia, M.D.

```
 1        Q.    Doctor, have you reviewed any documents

 2   since your deposition on the TVT report that you hadn't

 3   previously reviewed before the TVT report deposition?

 4              MR. SNELL:  Form.

 5              THE WITNESS:  Yes, the information as it

 6         relates to Gynemesh and Prolift were not part

 7         of my TVT report.

 8   BY MR. SCHNIEDERS:

 9        Q.    But you issued those reports at the same

10   time, didn't you?

11        A.    No.  This report was issued February 26,

12   2016.  The other report was issued back in October.

13        Q.    Okay.  Doctor, have you brought --

14   strike that.

15        You haven't brought -- are there any

16   photographs or other images including photographs of

17   the plaintiffs, the plaintiffs' explanted mesh or

18   products taken by you or for you which relate to your

19   opinions in this case?

20        A.    No.

21        Q.    Have you brought any Ethicon products in

22   your possession?

23        A.    I don't have any Ethicon -- oh, Ethicon

24   products, no.
```

Marc R. Toglia, M.D.

```
1              Q.      "Any and all documents, including time
2    sheets, invoices, time records, billing records which
3    record or document the work performed, time spent or
4    charges made in connection with your expert opinion in
5    this matter."
6              A.      I have my invoices, yes.
7              Q.      And are they here today?
8              A.      I'm sorry.  What is the date of the last
9    invoice?  There should be a date end of February.
10             Q.      Yeah, there's a February 29th of this
11   year.
12             A.      Right.
13             Q.      Is that the most recent invoice?
14             A.      Most recent invoice that I have
15   submitted, correct.
16             Q.      Any communication between you and your
17   counsel -- I'm sorry, strike that.
18             Any communication between you and counsel for
19   the defendants, to the extent such communications
20   relate to your compensation; identify facts or data
21   that you were provided and that you considered in
22   forming your opinions; or identify assumptions that
23   plaintiffs' counsel provided you and that you relied on
24   in forming your opinions.
```

Marc R. Toglia, M.D.

```
 1          A.     No.

 2          Q.     How have you communicated with defense

 3   counsel in this case?

 4          A.     By phone.

 5          Q.     Have you ever e-mailed with defense

 6   counsel?

 7          A.     Not an opinion or the stuff that you

 8   just referred to, no.

 9          Q.     So nothing about compensation rates or

10   bill sheets or anything like that?

11          A.     No.

12          Q.     Did you collect a retainer in this case?

13          A.     I did not.

14          Q.     Do you typically collect retainers in

15   cases in which you --

16          A.     I do not.

17          Q.     And if you let me finish my questions,

18   I'll let you start off after that, if you don't mind,

19   because otherwise we'll get on top of each other.

20          So, as I sit here, I've got two invoices that

21   are dated January 31st of 2016 and February 29th of

22   2016, and that is all of the time that you have billed

23   to date in the Ethicon Gynecare mesh litigation titled

24   MDL 200?  I'm just reading off of this.
```

Marc R. Toglia, M.D.

1         A.      That is everything I have billed to

2    date.

3         Q.      When were you first contacted to work in

4    this case?

5         A.      End of August 2015.

6         Q.      All right.  Moving through the notice to

7    get through that, Number 10, any and all documents,

8    including consulting agreements, time sheets, invoices,

9    time records, billing records which record or document

10   the work performed, time spent or charges made in

11   connection with consulting related to studies,

12   consulting work, cadaver labs, professional education

13   training and any other work that has been compensated

14   by defendants or expert fees charged to defendant

15   related to any female pelvic mesh product sold by

16   Ethicon for treatment of stress urinary incontinence or

17   pelvic organ prolapse.

18        Did you bring any documents related to

19   Number 10?

20             MR. SNELL:  I'll just note for the

21        record, I think we filed objections as to some

22        of these requests.  Go ahead.

23             THE WITNESS:  I don't believe we've

24        provided any of that.

Marc R. Toglia, M.D.

1    BY MR. SCHNIEDERS:

2         Q.    Have you provided any of that to defense

3    counsel?

4         A.    I don't have an independent recollection

5    that I have.

6         Q.    Whether you have provided it to defense

7    counsel or not, do you have documents that would fall

8    under category 10?

9         A.    I don't have documents.  If I'm not

10   mistaken, at the TVT deposition we did cover the amount

11   and extent of my participation and compensation from

12   Ethicon.

13        Q.    I appreciate that, Doctor, but as far as

14   the documents that have been requested here at Number

15   10, do you have any responsive documents in your

16   possession?

17        A.    Like I said, they were covered in the

18   TVT deposition, that's all.  That's all I have.

19        Q.    You produced all the documents you had

20   in your possession as part of the TVT deposition?

21        A.    I don't recall the specifics, but I do

22   recall that we went over all that on record, correct?

23             MR. SNELL:  Yeah, I think he did produce

24        whatever he had.

Marc R. Toglia, M.D.

```
 1                    THE WITNESS:  Right.

 2                    MR. SNELL:  I think this is the same as

 3           what he produced -- whatever he had, he

 4           produced.

 5                    THE WITNESS:  Right, yes.

 6   BY MR. SCHNIEDERS:

 7           Q.    So you produced consulting agreements?

 8           A.    I don't know the answer to that.  I

 9   don't recall.

10           Q.    Do you have consulting agreements with

11   Ethicon?

12           A.    None actively, no.

13           Q.    Do you have the paper that reflects the

14   consulting agreement with Ethicon?

15           A.    No, I do not.

16           Q.    You don't keep any of those for your

17   files?

18           A.    No.

19           Q.    Do you keep records of your invoices

20   that you send to Ethicon?

21                    MR. SNELL:  Object to form.  Go ahead.

22                    THE WITNESS:  I don't have the records,

23           no.  I haven't done consulting with Ethicon in

24           years, and I discard such things after usual
```

Marc R. Toglia, M.D.

```
1              tax, it might be five years, I can't remember,

2              three to five years I discard them.

3    BY MR. SCHNIEDERS:

4         Q.    Just so we're clear on the record, right

5    now we're talking about things that are outside of

6    litigation, correct?

7         A.    Understood.

8         Q.    And so when is the last time that you

9    consulted outside of litigation with Ethicon?

10              MR. SNELL:  Object.  This is covered in

11              his first deposition, but go ahead.

12              THE WITNESS:  It's to the best of my

13              recollection, and it is a guesstimate at best,

14              2011.  It's not been -- not in my working

15              memory.

16   BY MR. SCHNIEDERS:

17        Q.    Do you recall in the last six months

18   destroying any of these kind of documents?

19        A.    No, I did not.

20        Q.    So is it your testimony here today that

21   you have no documents that are responsive to Number 10

22   in your possession that you have not previously

23   produced as part of your TVT deposition?

24        A.    Yes, it is.
```

Marc R. Toglia, M.D.

```
 1          Q.      Is that because the documents are all in

 2   the possession of your practice?

 3          A.      I don't believe they are.

 4          Q.      Okay.  Well, if we go back, Doctor, and

 5   see from the TVT deposition that there wasn't anything

 6   produced that's responsive to Number 10 from you, are

 7   there responsive documents somewhere that you have?

 8          A.      I think I've answered that.  I do not

 9   have what you're asking for in my possession, because I

10   have not had any active consulting agreement with

11   Ethicon for more than five years.  I certainly have not

12   destroyed anything since I was contacted by Mr. Snell

13   regarding these matters.

14          Q.      And you were contacted in August of

15   2015?

16          A.      I believe so.

17                  THE WITNESS:  Does that sound right to

18          you?

19                  MR. SNELL:  I can't testify, but I think

20          you're in the right ballpark.

21                  THE WITNESS:  Okay.

22                  MR. SNELL:  And this is to the best of

23          your recollection.

24                  THE WITNESS:  To the best of my
```

Marc R. Toglia, M.D.

```
 1          recollection.

 2  BY MR. SCHNIEDERS:

 3          Q.      How were you contacted by Mr. Snell?

 4          A.      Telephone.

 5          Q.      Did you know Mr. Snell prior to that

 6  conversation?

 7          A.      No, I did not.

 8          Q.      Did you know any of Mr. Snell's partners

 9  prior to that?

10          A.      No, I do not.

11          Q.      Had you ever worked on a legal case

12  prior to Mr. Snell contacting you?

13               MR. SNELL:  Form.

14               THE WITNESS:  I had worked on

15       malpractice cases but not product liability

16       cases.

17  BY MR. SCHNIEDERS:

18          Q.      So you served as an expert witness in a

19  medical malpractice case before?

20          A.      I have.

21          Q.      We'll talk about that in just one

22  moment.

23               MR. SNELL:  Counsel, this was all

24       covered in depth in the TVT deposition.
```

Marc R. Toglia, M.D.

```
1              MR. SCHNIEDERS:  Taking my deposition,

2         Burt, you can talk about whatever you want.

3         They're responsive questions.

4              MR. SNELL:  Actually, no, you're not,

5         because the parties have an agreement; there

6         shall not be duplicative discovery of experts.

7              MR. SCHNIEDERS:  I've looked through the

8         entire transcript, and I'm very comfortable

9         that I'm asking the right questions, not to

10        mention the fact that you've given me a whole

11        other reliance list that I got yesterday, so

12        I've got to ask my questions and see what's out

13        there.  There weren't any consulting agreements

14        produced as part of the TVT deposition.

15             MR. SNELL:  I know that because he

16        didn't have any, but I think he told you they

17        were marked.  They were definitely discussed in

18        that deposition.  I don't have the deposition

19        with me, but I know for a fact that they were

20        marked.

21             MR. SCHNIEDERS:  Well, I just read it

22        again last night so -- and those consulting

23        agreements would have been there and, okay, you

24        can look at what's been marked in there, if you
```

Marc R. Toglia, M.D.

```
1              have the transcript.  There weren't any.

2                   MR. SNELL:  I don't have the transcript

3              with me.

4                   MR. SCHNIEDERS:  Okay.  Let's not waste

5              time on it, all right.

6    BY MR. SCHNIEDERS:

7         Q.    Number 11, "Copies of Schedule C and

8    Form 1099 of your tax records for the preceding five

9    (5) tax years, as well as any other documentation that

10   reflects consulting and/or expert fees charged to

11   defendants (with personal information and any other

12   information unrelated to consulting fees redacted)."

13                  MR. SNELL:  We objected to that, and

14             this witness will not be producing his tax

15             forms.

16                  MR. SCHNIEDERS:  And what's the basis of

17             that objection?

18                  MR. SNELL:  Invades his privacy, all the

19             bases we set forth.  Your experts have not

20             produced any of their tax forms.

21   BY MR. SCHNIEDERS:

22        Q.    Number 12, "All correspondence,

23   memoranda, e-mails and/or any other documentation

24   reflecting communications (including written,
```

Marc R. Toglia, M.D.

1    electronic and/or oral) with any employees of

2    defendants related to any female pelvic mesh product

3    sold by Ethicon, Inc. for treatment of stress urinary

4    incontinence or pelvic organ prolapse."

5        Have you produced any such correspondence,

6    memoranda, e-mails or other documentation, Doctor?

7        A.    I believe I answered earlier that I

8    don't have any of those correspondence in my

9    possession.

10       Q.    What's your current e-mail address?

11       A.    I think that's personal information.

12   That's not a question I'm willing to answer on the

13   record.

14       Q.    Is it @ATT.net address?

15       A.    I'm not going to answer that question.

16       Q.    Is that on counsel's instruction or on

17   your own volition?

18       A.    I don't see how that's relevant to my

19   role.  I'm here to discuss my expert report and my

20   opinions in that regard.

21       Q.    In your communication with sales

22   representatives for the defendant, did you ever use

23   your personal e-mail address?

24                MR. SNELL:  I'm going to object.  This

Marc R. Toglia, M.D.

```
1           is irrelevant.  This is, I think, covered in

2           the first deposition, and you're about to get

3           into areas that -- well, we'll leave it at

4           that.

5               MR. SCHNIEDERS:  I think I know what

6           you're talking about, and I don't intend to go

7           anywhere near that, so you can relax on that.

8               THE WITNESS:  I'm not trying to be

9           obstructive or difficult, but to the best of my

10          knowledge, I don't recall ever using personal

11          e-mail to respond -- well, I don't, I don't.  I

12          don't remember.  I don't recall.

13  BY MR. SCHNIEDERS:

14      Q.    I'll be fair to you on this, Doctor.

15  I'm not trying to elicit some of what I think you're

16  thinking I'm trying to elicit right now.

17      A.    I understand.

18      Q.    In your first deposition there were some

19  e-mails where you did, and I'm not talking about any

20  specific instance, but there were e-mails back and

21  forth with other people that are involved in Ethicon in

22  their professional capacity?

23      A.    Correct, right, okay, correct.  But I

24  don't have in my possession any of that, those
```

Marc R. Toglia, M.D.

```
 1   transcripts, I don't have any copies or -- I don't have

 2   copies of those e-mails.  I haven't used an AT&T

 3   address in I don't know how long.

 4          Q.     And did -- with your new address which

 5   I've also seen on some e-mails, did you go back when

 6   you received this notice to review to see if you had

 7   any responsive e-mails?

 8          A.     I did not have any responsive e-mails.

 9          Q.     You looked for them?

10          A.     Yes.  The last -- I mean, the last

11   communications I had with Ethicon had nothing to do

12   with any of the stuff that we're discussing today.

13   They were on projects that were unrelated to any of

14   this.

15          Q.     What projects?

16          A.     They were projects for other products

17   that are not related to Gynemesh or Prolift.

18          Q.     Okay.  They were other products that

19   were made or in production or premarket by Ethicon?

20          A.     They were concepts for potential

21   products within this sphere of female pelvic floor

22   disorders.

23          Q.     Like the Sphinx?

24          A.     Correct.
```

Marc R. Toglia, M.D.

1          Q.      Any others?

2          A.      No, no.

3          Q.      And the Sphinx never made it to market,

4     correct?

5          A.      It never made it past the conceptual

6     stage.  Does that make sense to you?

7          Q.      It does.

8          A.      Okay.

9          Q.      Number 13 is duplicative of some of the

10    other ones.  I'm assuming you are going to tell me that

11    you have produced everything that is responsive to

12    Number 13; is that correct, Doctor?

13         A.      That would be my position, correct.

14         Q.      Number 14, "All documents related to

15    deponent's involvement with Ethicon's professional

16    education, including, but not limited to any and all

17    PowerPoints, course materials, outlines, videos or

18    presentations, live surgical presentations, marketing

19    evaluations created by or provided to deponent related

20    to any female pelvic mesh product sold by Ethicon, Inc.

21    for treatment of stress urinary incontinence or pelvic

22    organ prolapse.

23         Do you have any responsive documents to Number

24    14?

Marc R. Toglia, M.D.

1          A.      I do not have any of those items in my

2    possession.

3          Q.      You didn't keep any PowerPoints or

4    anything you put together?

5          A.      No.  To be clear, I never created any of

6    those talks.  There were talks that might have been

7    provided to me.  Once my consulting arrangement changed

8    and I threw things out, I don't really keep that stuff.

9          Q.      They were provided to you by Ethicon,

10   right?

11         A.      Products related, right.  I mean, I

12   think some of them we have -- we have brought, the

13   Prolift professional education materials.  Nothing

14   different than that.

15              MR. SNELL:  Right, but I think he's

16         asking you did you have -- do you have any from

17         back when you were a consultant, not stuff that

18         you reviewed and prepared that's on the thumb

19         drives.

20              MR. SCHNIEDERS:  Right.

21              MR. SNELL:  I think that's what he's

22         asking about.

23              MR. SCHNIEDERS:  That's correct.

24              THE WITNESS:  No, I don't have it.

Marc R. Toglia, M.D.

```
 1    BY MR. SCHNIEDERS:

 2          Q.     Just so we're clear on the record here,

 3    Doctor, you've given talks on behalf of Ethicon, right?

 4          A.     Correct.

 5          Q.     You've used presentations in those talks

 6    at times like PowerPoints, right?

 7          A.     That were provided to me by Ethicon.

 8          Q.     And those were put together by Ethicon

 9    for you to present?

10          A.     Correct.

11          Q.     And you don't have any of those in your

12    possession, as we sit here today, correct?

13          A.     I do not.

14          Q.     Okay.  Number 15, "Any and all materials

15    including, but not limited to, protocols, results,

16    adverse events, minutes for study meeting related to

17    any clinical trials and/or studies of any type related

18    to deponent's work as consultant for defendant in any

19    capacity related to any female pelvic mesh product sold

20    by Ethicon, Inc. for treatment of stress urinary

21    incontinence or pelvic organ prolapse."

22          Do you have any responsive documents, Doctor?

23          A.     I do not.

24          Q.     Are you currently involved in enrolling
```

Marc R. Toglia, M.D.

```
 1   in a clinical trial?

 2           A.      I am not.

 3           Q.      So just so we're clear, anything that is

 4   responsive to Number 15 you've either produced or don't

 5   have anymore, correct?

 6           A.      Correct.

 7           Q.      "16.   Any reports/documents, whether

 8   kept in hard copy or electronic form, relating to any

 9   other matter involving any female pelvic mesh product

10   for treatment of stress urinary incontinence or pelvic

11   organ prolapse."

12           Do you have any responsive documents to Number

13   16, Doctor?

14           A.      I do not.

15           Q.      You don't keep anything on any other

16   female pelvic products?

17           A.      I do not.

18           Q.      "Any and all documents, including

19   transcripts or statements, between you and any

20   governmental agency regarding any female pelvic mesh

21   product used for treatment of stress urinary

22   incontinence or pelvic organ prolapse."

23           Do you have any responsive documents to Number

24   17, Doctor?
```

Marc R. Toglia, M.D.

1          A.      I do not.

2          Q.      Have you ever reported an adverse event

3    to the FDA?

4          A.      I have.

5          Q.      Do you ever keep a record of that?

6          A.      No.

7          Q.      Have you ever reported an adverse event

8    related an Ethicon product to the FDA?

9          A.      I have.

10          Q.      On how many occasions?

11          A.      I don't know the answer to that.

12          Q.      Ballpark, ten?

13          A.      Ten may be a reasonable guess.

14          Q.      Have you ever reported any adverse

15    events to the FDA for any of the products we're here to

16    talk about today?

17          A.      I have.

18          Q.      Can you tell me which products?

19          A.      Prolift, I'd say three or five.

20          Q.      Any for Gynemesh PS?

21          A.      No.

22          Q.      Any for TVT?

23          A.      Not that I can specifically recall.

24    Hold on.

Marc R. Toglia, M.D.

1           In all honesty, most of the reports that I have

2    filed with the MAUDE probably involved non-Ethicon

3    products.

4           Q.     Any particular reason?

5           A.     I think that they reflect what -- these

6    were not products that I personally had implanted, but

7    they were women that I subsequently cared for, and it

8    just simply reflects the nature of my referral

9    practice.

10          Q.     Because as a physician, you have a duty

11   when you find out about an adverse event to report it,

12   regardless of how you come about that information,

13   right?

14               MR. SNELL:  Objection, calls for a legal

15          conclusion.

16   BY MR. SCHNIEDERS:

17          Q.     Was that a yes, Doctor?

18          A.     I have reported events that I have come

19   across as a surgeon.

20          Q.     And my point is just that regardless of

21   whether or not it's your patient or you find out about

22   it from another manner, you would still report an

23   adverse event because you have a duty as a doctor to do

24   that, correct?

Marc R. Toglia, M.D.

```
 1                    MR. SNELL:  Objection, calls for legal
 2           conclusion.
 3                    THE WITNESS:  I'm not so sure about the
 4           duty, but my personal practice is to report
 5           those events.
 6  BY MR. SCHNIEDERS:
 7           Q.    And it's fair to say that with regard to
 8  types of mesh products that we're talking about here
 9  today, and I'm talking about the entire spectrum,
10  regardless of Ethicon or other manufacturers, that
11  you've reported more adverse events for the other
12  manufacturers than Ethicon?
13                    MR. SNELL:  Form.
14                    THE WITNESS:  I would say that is likely
15           true.
16  BY MR. SCHNIEDERS:
17           Q.    Do you have any recollection of what
18  product you've likely reported the most times as an
19  adverse event?
20           A.    I do.
21           Q.    Which product is that?
22           A.    I believe Apogee Perigee.
23           Q.    Do you have any idea of how many adverse
24  events you reported on that product?
```

Marc R. Toglia, M.D.

1          A.      I do not.

2          Q.      Number 18 says, "Any and all documents

3    relating to an presentations, PowerPoints or lectures

4    regarding any female pelvic mesh product used for

5    treatment of stress urinary incontinence and pelvic

6    organ prolapse."

7          Is your answer the same as it was regarding the

8    materials themselves that you don't have anything in

9    your possession?

10         A.      That is correct.

11         Q.      Lastly, Number 19, "Any demonstrative

12   exhibits, such as graphics or charts, prepared by or on

13   your behalf for use at trial."

14         Do you have any responsive documents?

15         A.      We're talking about other than what has

16   already been provided either in my TVT deposition or

17   currently?

18         Q.      Yes.

19         A.      I have nothing in addition.

20         Q.      You can set that to the side.

21                 MR. SCHNIEDERS:  I'm going to do a

22            little housekeeping here because I actually

23            premarked a few things, and I'm going to get

24            off track if I don't do it the right way.

Marc R. Toglia, M.D.

```
 1                  (Document marked for identification as

 2           Toglia Deposition Exhibit No. 2.)

 3                  MR. SCHNIEDERS:  I'm going to hand you

 4           your CV, which I've marked as Exhibit 2.

 5   BY MR. SCHNIEDERS:

 6           Q.     Doctor, this looks like this was revised

 7   at the top right there on 8/13 of 2015; is that

 8   correct?

 9           A.     Yes.

10           Q.     Is this your most current CV?

11           A.     Yes.

12           Q.     Doctor, you are what's called a

13   urogynecologist, correct?

14           A.     Actually, I am a specialist in female

15   pelvic medicine and reconstructive surgery, which was

16   formerly referred to as urogynecology.

17           Q.     I see in 2013 that you went to get a

18   board certification in female pelvic medicine and

19   reconstructive surgery.

20           Can you tell me what that entailed?

21           A.     I didn't go in 2013.  I went in 2012 and

22   in 2013 I received certification.  So female pelvic

23   medicine and reconstructive surgery is the fourth

24   subspecialty within the specialty of obstetrics and
```

Marc R. Toglia, M.D.

1    gynecology.  It is duly accredited by both the American

2    Board of Obstetrics and Gynecology and the American

3    Urologic Board.

4          This involved -- this is a multipart process

5    culminating in taking and passing a written exam.

6    Prior to that, there were demonstration of adequate

7    case volume and level of training.  For example, you

8    had to be previously board certified either by the

9    American Board of OB-GYN in OB-GYN or the American --

10   the ABU, the American Board of Urology.

11         Q.    And was that a facility locally that you

12   were able to go and do some of this work, or how did

13   that actually work out?

14         A.    Well, the process is guided by the

15   ACGME, the American College of Graduate Medical

16   Education.  The exam itself was taken via computer by

17   local sites throughout the country, locally through

18   some of the different learning centers.

19         Q.    Prior to 2013 when you received the

20   board certification and began your work, did you

21   consider yourself to be a specialist in the area of

22   female pelvic medicine and reconstructive surgery?

23         A.    That's correct.

24         Q.    How many people nationwide hold this

Marc R. Toglia, M.D.

```
 1   subspecialty, if you know?

 2         A.    So in 2013 approximately 750 of us were

 3   board certified, and 2014/2015 there might have been

 4   the addition of another 100 or so each year.  I

 5   couldn't give you the final number.  I'm sure it's

 6   something that's readily available, but I'm going to

 7   guesstimate we're talking about 1,200 individuals who

 8   are currently board certified in the subspecialty.

 9         Many others, including some of your experts,

10   did not sit for the boards, but this is still their

11   area of expertise and practice.

12         Q.    Did any pharmaceutical company or device

13   company in any way, shape or form fund or help with

14   your board certification?

15         A.    No, none whatsoever.

16         Q.    They didn't sponsor any programs that

17   had to do with it?

18         A.    No.

19         Q.    Do you have any academic appointments,

20   Doctor?

21         A.    I do.  They're listed on my CV.

22         Q.    And when I say that, are you employed by

23   any of these facilities?

24         A.    I am not.
```

Marc R. Toglia, M.D.

```
1          Q.     Do you teach any classes?

2          A.     I teach clinically, I give lectures.  I

3     don't teach classes in the sense that a college

4     professor would teach classes.

5          Q.     On Page 2 and, obviously, you know your

6     CV so you probably don't need it to talk through it,

7     but I see that you're a member currently of some

8     professional societies.  I think I know which ones they

9     are, but there was a couple typos later on, so I just

10    want to make clear which of these professional

11    societies are you currently a member of?

12         A.     Sure.  I'm currently a member of the

13    American Urogynecologic Society, the Society for

14    Gynecologic Surgeons, the International Urogynecology

15    Society, which is not on this list, I don't think.  I'm

16    a fellow of the American College of Obstetrics and

17    Gynecology as well.

18         Q.     Okay.  And moving to the next page, it

19    appears that you hold or at least held as of 2015 a

20    vice chair position for the Committee for Government

21    Relations and Coding at the American Urogynecologic

22    Society; is that correct?

23         A.     I'm currently the chair of that

24    committee.
```

Marc R. Toglia, M.D.

```
1          Q.      Okay.

2          A.      And it's actually the chair of coding.

3          Q.      Okay.  And in your position as vice

4   chair and now chair, what are your duties?

5          A.      I represent the society nationally at

6   meetings such as the CPT, the RUC.  I interact directly

7   with the government through CMS.  I represent the

8   society as a liaison member to the American College of

9   Obstetrics and Gynecology, and I either head or direct

10  certain task forces as they relate to coding and health

11  economics within the sphere of female pelvic medicine.

12         Q.      Okay.  And if I say AUGS, you know what

13  I'm talking about, right?

14         A.      I do.

15         Q.      So your position as vice chair, then

16  chair of this committee with AUGS is tied to this

17  bottom one here, where it says "Member, ACOG Committee

18  of Health Economics and Coding, AUGS Liaison"?

19         A.      Yes.

20         Q.      Okay.  Tell me what AUGS is.

21         A.      AUGS is a professional organization of

22  healthcare providers, which includes physicians,

23  physical therapists, nurse specialists that are

24  interested in promoting excellence in female pelvic
```

Marc R. Toglia, M.D.

1   medicine and reconstructive surgery.

2           Q.      Is it sponsored by any pharmaceutical or

3   device companies?

4           A.      It is not.

5           Q.      What about ACOG, tell me what ACOG is.

6           A.      ACOG is the professional organization,

7   it's the American College and Congress of Obstetrics

8   and Gynecology that is based out of Washington, DC and

9   comprises the professional members, again, doctors,

10  nurse practitioners, other healthcare providers in the

11  specialty of obstetrics and gynecology.

12          Q.      Okay.  And is ACOG sponsored or funded

13  by any pharmaceutical or device companies?

14          A.      No.

15          Q.      And you're sure about that with regard

16  to AUGS and ACOG?

17          A.      I am certain about that.

18          Q.      Down here under Hospital Service it

19  says, "System Chief, Division of Female Pelvic Medicine

20  and Reconstructive Pelvic Surgery, Main Line Health."

21          What is Main Line Health?

22          A.      Main Line Health is the largest health

23  system here in Philadelphia.  It's a not-for-profit

24  system consisting of four hospitals.

Marc R. Toglia, M.D.

1      Q.      And do you have privileges at all four

2   of those hospitals?

3      A.      I have privileges at all four hospitals.

4      Q.      Is there any particular hospital you do

5   the majority of your procedures at?

6      A.      Yes.

7      Q.      Which one is that?

8      A.      I split my time clinically between Paoli

9   Hospital located in Paoli, Pennsylvania and Riddle

10  Hospital located in Media, Pennsylvania.

11     Q.      If you want to move on, Doctor, to Page

12  4, there is a section at the bottom there that's called

13  "Past Clinical Research Projects."

14          Do you see that?

15     A.      I do.

16     Q.      And it looks to me as if there are nine

17  times in your past in which you've participated in a

18  clinical study; is that correct?

19              MR. SNELL:  Hold on.  Did you say nine?

20              MR. SCHNIEDERS:  That's what I see,

21          because I'm skipping ten, so I'm going to ask

22          him separately.

23              MR. SNELL:  I'm going to object to form.

24  BY MR. SCHNIEDERS:

Marc R. Toglia, M.D.

```
 1          Q.      You tell me, because ten seems to be a

 2    bit different, because I asked you earlier if you were

 3    in the process of enrolling patients, and you told me

 4    no.  So let's just start with 1 through 9.  It looks

 5    like there were several clinical research projects you

 6    were involved with?

 7                  MR. SNELL:  I'll just note for the

 8          record this issue in Number 10 and the

 9          statement about currently enrolling patients I

10          know was covered in his prior deposition.

11                  MR. SCHNIEDERS:  I'll let you make your

12          objections.  If I can finish my questions

13          before you start them, if you don't mind.

14                  MR. SNELL:  Go ahead.  Covered.

15    BY MR. SCHNIEDERS:

16          Q.      So, Doctor --

17          A.      I've participated in ten, and I am not

18    currently enrolling.

19          Q.      Okay.  And tell me why that is?

20          A.      Because this is simply a typographical

21    error, and that was covered in my deposition with the

22    TVT trial.  And my apologies, the problem is I can't

23    make corrections because these belong to the Court.  If

24    I had another copy, I'm happy to correct that for the
```

Marc R. Toglia, M.D.

```
 1   next time, but I realize this comes up, but I don't
 2   have my own set of private things that I can correct
 3   these things on, but I will tell you that that is an
 4   old trial that has already been published.
 5           Q.     And that's my question, Number 10 then,
 6   is that the actual trial that you did go on to publish?
 7           A.     Yes.
 8           Q.     That's listed as Number 23 under your
 9   publications?
10           A.     Yes.
11           Q.     Doctor, other than 23, are there any
12   publications that you have ever made with regard to any
13   mesh product?
14                  MR. SNELL:  Form.
15                  THE WITNESS:  Twenty-four is an
16              editorial that I wrote that talked about
17              sacrocolpopexy, which would involve the mesh,
18              but that is an editorial.
19   BY MR. SCHNIEDERS:
20           Q.     But no other articles other than those
21   two?
22           A.     Article 16 was a study I published with
23   my own patient population.  Some of those patients did
24   have a mesh procedure, although, to the best of my
```

Marc R. Toglia, M.D.

```
 1   knowledge, we did not stipulate what that was.

 2           Q.     But fair to say that that article was

 3   primarily about polyester sutures?

 4                  MR. SNELL:  Form.

 5                  THE WITNESS:  As the title suggests, it

 6           was about both long-term surgical outcomes as

 7           well as wound complications in that population.

 8   BY MR. SCHNIEDERS:

 9           Q.     All right, Doctor, I'd like to switch

10   topics now, and I'd like to start with your first work

11   with Ethicon.

12           It's my understanding that you were recruited

13   by Dr. Lucente; is that correct?

14                  MR. SNELL:  Objection, asked, and this

15           is all covered in his first deposition.

16                  THE WITNESS:  No, I was not recruited by

17           Dr. Lucente.

18   BY MR. SCHNIEDERS:

19           Q.     Well, how would you characterize it?

20                  MR. SNELL:  Objection, asked and

21           answered, prior covered.

22                  THE WITNESS:  How I was contacted by

23           Ethicon?

24   BY MR. SCHNIEDERS:
```

Marc R. Toglia, M.D.

```
1          Q.      Yes.

2          A.      I don't recall the specifics.  I would

3    have been contacted probably by a product manager.

4          Q.      Approximately what year would that have

5    been?

6                  MR. SNELL:  Same objection.  This is all

7          covered in the prior deposition.

8                  THE WITNESS:  1999.

9    BY MR. SCHNIEDERS:

10         Q.      Okay.  Had you ever worked for Ethicon

11   prior to being contacted for that consulting?

12         A.      That was the first contact.

13         Q.      Okay.  Prior to 1999 had you worked with

14   other pharmaceutical or device companies?

15         A.      I think I had, yes.

16         Q.      Which companies had you worked with

17   prior to working with Ethicon?

18         A.      Well, I did clinical trials for what we

19   then called Yamanouchi, which is now called Astellas.

20   I did a clinical trial with Eli Lilly, a clinical trial

21   with Pfizer.

22         Q.      Pharmacia?

23         A.      I did some work with Johnson & Johnson,

24   which owns Ethicon, but at the time it was not with
```

Marc R. Toglia, M.D.

```
 1   Ethicon, I don't believe, no.  Realize this is not

 2   directly relevant, but whether or not Monistat as a

 3   product was Ethicon versus Johnson & Johnson, I don't

 4   know.

 5           Q.      But that was the product at that time?

 6           A.      Correct.

 7           Q.      Aside from what's listed in your past

 8   clinical research projects and the companies that

 9   you've listed as the sponsors, do you recall any other

10   pharmaceutical companies you worked with prior to 1999?

11           A.      Yes, there were a host of them.

12           Q.      Which ones can you name for me?

13           A.      Now you're really taxing my long-term

14   memory.  Rhone-Poulenc Rorer.  As you probably are

15   aware, counselor, many of these companies have been

16   absorbed and renamed.

17           Q.      That is Aventis now, that would be

18   Aventis?

19           A.      Right, correct.  Pharmacia Upjohn,

20   that's probably it.

21           Q.      Other than the ones that are listed in

22   your CV, that would be about it?

23           A.      Correct.

24           Q.      Okay.  Starting in 1999, what was your
```

Marc R. Toglia, M.D.

```
1    work with Ethicon?

2              MR. SNELL:  Objection, form and covered

3         in prior dep.

4              THE WITNESS:  I think I previously

5         stated that initially I may have participated

6         in some kind of market research that actually

7         probably was prior to '99, let's say '98.  I

8         don't necessarily consider that a consulting

9         relationship.  I was just asked to give

10        feedback from a marketing perspective on the

11        TVT product.  At some point in time, I started

12        to get involved more in the professional

13        education teaching, the TVT technique.

14             Does that answer your question?

15   BY MR. SCHNIEDERS:

16        Q.    Sure, that's the beginning.  So as a

17   preceptor, correct?

18        A.    Correct.  And I also started to serve in

19   an advisory or a consultant role.

20        Q.    What products did you serve as a

21   preceptor for with Ethicon?

22        A.    I would say the TVT family of products,

23   TVT, TVT obturator, TVT Secur, TVT Abbrevo, TVT Exact.

24        Q.    Did you ever serve as a preceptor for
```

Marc R. Toglia, M.D.

```
 1   Gynemesh PS?

 2          A.      To the best of my knowledge, no.

 3          Q.      Same question with regard to Prolift?

 4          A.      Yes.

 5          Q.      Have you ever served as a preceptor for

 6   any company that was not Ethicon?

 7          A.      I don't believe so.

 8          Q.      So your relationship with Ethicon would

 9   have began with a market research consulting or

10   whatever you want to call that in 1998 and, based upon

11   your recollection, continued till about 2011?

12               MR. SNELL:  Object to form, previously

13          covered.

14               THE WITNESS:  I believe so, yes.

15               MR. SCHNIEDERS:  I'm going to switch

16          topics.  Does anyone want to take a break, or

17          are we okay?

18               MR. SNELL:  Take a five-minute break.

19               (Brief recess taken at 2:09 p.m.)

20               (Deposition resumes at 2:14 p.m.)

21   BY MR. SCHNIEDERS:

22          Q.      Doctor, we're back after a short break.

23               In your current practice, Doctor, what

24   surgeries do you perform for stress urinary
```

Marc R. Toglia, M.D.

1    incontinence?

2         A.      Currently, we perform a combination of

3    midurethral slings, such as TVT Exact, TVT Abbrevo.  We

4    perform periurethral bulking procedures, autologous

5    fascial slings, retropubic urethropexies.

6         Q.      And are there any slings that you use

7    aside from TVT products?

8         A.      There are not.

9         Q.      Have you ever used any sling aside from

10   a TVT product?

11              MR. SNELL:  Objection.

12   BY MR. SCHNIEDERS:

13        Q.      Strike that.  Have you ever used any

14   sling aside from an Ethicon product?

15              MR. SNELL:  Form, previously covered.

16              THE WITNESS:  Yes.

17   BY MR. SCHNIEDERS:

18        Q.      What products have you used in addition?

19        A.      Boston Scientific, Advantage Fit, AMS

20   RetroArc.  Cook had a biologic sling, Surgisis ST,

21   don't quote me on the trade name on that one.  I think

22   that's it.

23        Q.      Fair to say the vast majority of the

24   slings that you've put in have been TVTs?

Marc R. Toglia, M.D.

1          A.      I would say 99%.

2          Q.      What nonsurgical remedies are you using

3     for women suffering from stress urinary incontinence

4     currently?

5          A.      Currently, we use biofeedback,

6     electrical stimulation, pelvic floor muscle therapy.

7     We actually have a physical therapist within the

8     practice for that.  Previously, as you can see from my

9     CV, we were involved in the Duloxetine trial.

10    Occasionally, we will use barrier type devices.

11         Q.      When a woman comes into your office with

12    stress urinary incontinence, what's your first line

13    treatment?

14         A.      Well, first line treatment starts with

15    education, pelvic floor muscle exercises, behavioral

16    modification, fluid management.

17         Q.      What current surgeries do you use for

18    pelvic organ prolapse?

19         A.      Again, this is what I do for a living.

20    There's a wide breadth of procedures that we do either

21    abdominal, vaginal, with or without hysterectomy,

22    native tissue plications, graft augmentation,

23    specifically abdominal sacrocolpopexies, obliterative

24    procedures such as colpocleisis,

Marc R. Toglia, M.D.

1    c-o-l-p-o-c-l-e-i-s-i-s.

2            Q.      What nonsurgical remedies do you use?

3            A.      Again, we will use physical therapy,

4    pelvic floor muscle rehabilitation, pessaries.

5            Q.      Do you currently use the Gynemesh PS?

6            A.      I do.

7            Q.      How often would you say you currently

8    use the Gynemesh PS?

9            A.      Two days a week.

10           Q.      And is that two surgeries a week, or is

11   that on two days you use it several times?

12           A.      Two days a week I typically do between

13   six and eight surgical procedures a week for

14   incontinence or prolapse.

15           Q.      Okay.  And specific to Gynemesh PS, how

16   often are you using that?

17           A.      I use it two days a week, as I

18   mentioned, perhaps maybe half my surgical repairs,

19   maybe 40%.

20           Q.      40% of surgical repairs of POP?

21           A.      For prolapse.  It varies obviously.

22           Q.      How many pelvic organ prolapse surgeries

23   would you estimate you have performed as a surgeon?

24           A.      Thousands.  I've been in practice for

Marc R. Toglia, M.D.

1    nearly 25 years.  I have an annual surgical load that

2    varies probably between 150 and 200 surgical procedures

3    a year.

4         Q.    And how many times do you believe or

5    would you estimate that you used Gynemesh PS for the

6    surgery?

7         A.    I believe that's in my surgical --

8    excuse me.  I believe that's in my report.  Off the top

9    of my -- I just want to verify it.  Off the top of my

10   head, I believe it was 3,000, approximately 3,000

11   within our practices.

12        Q.    And that's specific to Gynemesh PS?

13        A.    I believe so.  I mean, it's Gynemesh and

14   related materials.

15        Q.    Well, I'm going to ask, so how many

16   Prolifts?

17        A.    Prolifts probably number 200 or more.

18        Q.    You say "and related materials," are you

19   including the Prolift within that 3,000 for Gynemesh?

20        A.    I'm sorry, let me try to be more clear.

21   I'm talking about specifically macroporous

22   polypropylene graft material, which would include

23   Gynemesh PS, Prolift predominantly.

24        Q.    Can you explain how that mesh differs

Marc R. Toglia, M.D.

```
 1   from the TVT mesh?

 2                   MR. SNELL:  Form.

 3                   THE WITNESS:  Yes, I mean, they're both

 4            type 1 polypropylene mesh.  I believe I covered

 5            this in my report.  There are differences in

 6            terms of both weight and pore size.

 7   BY MR. SCHNIEDERS:

 8            Q.    And what are the differences in weight

 9   and pore size?

10            A.    Again, I believe I've covered that in my

11   reports.  Approximately, Gynemesh PS is going to be

12   about 42, 43 grams per meter squared.  It's got a pore

13   size of about 2,400 microns.

14            The mesh used for TVT is approximately twice

15   that.  I believe the mesh is probably in the

16   neighborhood of 90 grams per meter squared.  The pore

17   size is probably around 1,200 microns.

18            Q.    You said 2,400 microns for Gynemesh?

19            A.    2.4 millimeters is the pore size.

20            Q.    Doctor, do you keep track of any

21   complications you have with your mesh surgeries?

22            A.    Yes.

23                   MR. SNELL:  Form, asked and answered

24            earlier.
```

Marc R. Toglia, M.D.

```
 1   BY MR. SCHNIEDERS:

 2          Q.     How do you keep track of that?

 3                 MR. SNELL:  Same objection.

 4                 THE WITNESS:  Are you allowing me to

 5          answer?

 6                 MR. SNELL:  You can go ahead and answer.

 7          I mean, it's all in the report.

 8                 THE WITNESS:  It's changed throughout

 9          the years.  Currently, our patients are

10          enrolled in a national registry prospectively,

11          where we keep track of all prolapse surgery.

12                 Previously, we would use private

13          databases.  Obviously, we have medical records

14          in our office.  We have electronic health

15          records in our system.  I've been in the same

16          practice now for 19 years.

17   BY MR. SCHNIEDERS:

18          Q.     Okay.  And you keep track of all those

19   numbers?

20          A.     The records are all available to us.  We

21   review them periodically as we go on.

22          Q.     When you say "periodically," who are

23   "we"?

24          A.     I guess you're looking at we.  We would
```

Marc R. Toglia, M.D.

```
1    be me.  It would be me, my partners.

2           Q.    How many partners do you have?

3           A.    I currently have one physician partner

4    and one nurse practitioner partner.

5           Q.    And does your nurse -- or I'm sorry,

6    your physician partner, does she review those along

7    with you?

8           A.    My current partner who has been with me

9    less than two years has not.  My previous partner had.

10          Q.    And when you review the data that you

11   have in your office regarding how many you've put in,

12   what kind of report, if anything, do you output as a

13   result of that?

14          A.    It depends.  I'll offer as an example,

15   you know, my partner at the time Dr. Fagan and I

16   published the article that we spoke of earlier, in

17   which we, from the database, reviewed nearly 100 women

18   that had undergone prolapse surgery using a specific

19   technique sacrospinous ligament suspension, and we

20   looked at outcomes, we looked at complications,

21   recurrences, re-operations.  So temporally we may stop

22   and look at what we've been doing to better understand

23   what the limitations and successes are of those

24   procedures.
```

Marc R. Toglia, M.D.

```
1              Q.      Okay.  And do you reduce what you look
2      at to any sort of a tangible form that you can share
3      with the company or other physicians?
4                      MR. SNELL:  Object to form.
5                      THE WITNESS:  I wouldn't share anything
6              with a company.  It has nothing to do with a
7              company.  It varies.  Sometimes we review it
8              internally and we do nothing with it.
9              Sometimes we publish it, sometimes we present
10             it.  Sometimes this is done as part of a larger
11             consortium of researches, such as the TVT
12             Secur.  Obviously, the prospective registry
13             database is something that we contribute to.  I
14             guess in that regard my current partner and I
15             contribute to that database together.  Someone
16             else is analyzing that, so it just varies.
17     BY MR. SCHNIEDERS:
18             Q.      Do you keep track of complications as a
19     result of your database?
20             A.      Yes.
21             Q.      And do you review those periodically as
22     well?
23             A.      Yes.
24             Q.      When is the last time you looked at
```

Marc R. Toglia, M.D.

```
1    that?

2            A.      Yesterday.

3            Q.      Forgive me, Doctor, but when you look at

4    this, what are you looking for?  Are you just looking

5    at straight numbers?  What is it that you're seeing?

6            A.      It depends upon the clinical question

7    that at the time we're interested in looking at.  It's,

8    you know, currently we've been looking at voiding

9    function following midurethral slings in our patients,

10   how they are at, say, one month.  You know, we'll look

11   at our rates of retention, need for revision, things

12   like that.

13           Q.      Do you have a number of women that

14   needed revisions that you implanted mesh in?

15                   MR. SNELL:  Form.

16                   THE WITNESS:  It's a very, very small

17           number.

18   BY MR. SCHNIEDERS:

19           Q.      Well, let me ask you this, Doctor:  Can

20   you tell me how many revisions you've performed in your

21   career?

22                   MR. SNELL:  Object.  I think this was

23           covered in prior depo.

24                   THE WITNESS:  It was.
```

```
 1                  MR. SNELL:  You can go ahead and answer

 2           the question.  Let me try and pull up the

 3           transcript.

 4                  THE WITNESS:  I don't have that in my

 5           working fund of knowledge.  It's essentially on

 6           an annual basis and, again, understand that

 7           more the revisions that I do are not patients

 8           that I was the implanter so -- but it's about 1

 9           to 2%.

10     BY MR. SCHNIEDERS:

11           Q.    One to 2% of your --

12           A.    Of those I implant, correct.

13           Q.    And I've seen you testify on this

14     particular issue before, and you stated that it's your

15     belief that it's physician error when there's a

16     complication; is that correct?

17                  MR. SNELL:  I'm going to have to object.

18           I think you may have misstated his testimony.

19                  MR. SCHNIEDERS:  Well, he can certainly

20           tell me that, if that's the case.

21                  MR. SNELL:  -- in its entirety.  Why

22           don't you show it to him then, because I don't

23           know what you're talking about, to be honest

24           with you.
```

Marc R. Toglia, M.D.

```
1              MR. SCHNIEDERS:  I'm asking him a

2         question.  If he says I'm not stating it right,

3         then please do, Doctor.  I'll ask the question

4         again.

5              THE WITNESS:  You're asking me a

6         question, and I'm more than happy to answer,

7         but you're not providing me with the foundation

8         or the reference.

9  BY MR. SCHNIEDERS:

10         Q.    Okay.  Let me ask it this way:  Do you

11  believe that when there is a mesh complication that it

12  is the result of physician error?

13              MR. SNELL:  Form, overbroad.

14              Are you talking sling, prolapse or

15         anything?

16              MR. SCHNIEDERS:  I'm asking a question.

17              MR. SNELL:  So overbroad.

18              THE WITNESS:  Would you be okay with

19         substituting operator dependent for physician

20         error?  I don't know that I'm not comfortable

21         with the term "physician error."  I mean, I

22         think it's operator dependent, rather than

23         material related.

24  BY MR. SCHNIEDERS:
```

Marc R. Toglia, M.D.

```
 1            Q.     Okay.  That's fair.

 2            So to put it in simpler terms, it's the result

 3   of something that was or was not done by the physician,

 4   not saying it was negligent or anything like that?

 5            A.     I understand.

 6            Q.     That was the variable, not the material,

 7   correct?

 8                   MR. SNELL:  Same objection, overbroad.

 9                   THE WITNESS:  So --

10                   MR. SNELL:  Vague as to time and scope.

11                   Go ahead.

12                   THE WITNESS:  So the background is

13             simply, you know, you've got the surgeon,

14             you've got the patient, and the patient

15             certainly -- the risks for something like

16             retention varies based upon the patient and

17             related co-morbidities.  Understand that pelvic

18             floor disorders rarely exist in isolation;

19             therefore, you can have stress leakage, you can

20             also have bladder dysfunction, voiding

21             difficulty.  So -- and you can have stress

22             leakage and prolapse.  You can have stress

23             leakage, prolapse and voiding dysfunction.  You

24             can have all three of them with pre-existing
```

Marc R. Toglia, M.D.

```
 1              neurologic conditions, like Parkinson's,

 2              multiple sclerosis, diabetes.

 3                   So understanding that you've got

 4              operator variables and then you have patient

 5              variables as well, and then you have

 6              technique-related specifics.  So they can be

 7              any combination, you know, of the above.  Most

 8              of them, in my experience and in my extensive

 9              review of the literature, relate to the ones

10              other than the material itself.

11  BY MR. SCHNIEDERS:

12              Q.    And is it your opinion, Doctor, that

13  with regard to the Ethicon products that you are

14  testifying as an expert in this litigation, that those

15  products do not cause mesh complications?

16                   MR. SNELL:  Form.  Same objections as

17              before.

18                   THE WITNESS:  There are complications

19              related to Gynemesh and prolapse, such as

20              erosion, that obviously it's the material that

21              has eroded, but it is my opinion, as stated in

22              my report, that this is not inherent in the

23              material itself.

24  BY MR. SCHNIEDERS:
```

Marc R. Toglia, M.D.

1          Q.      Okay.  And explain that for me.

2          A.      Sure.  I think I have explained it in my

3     report quite extensively that, first of all, all

4     patients who have prolapse have deficient tissue,

5     nonfunctioning muscle and pre-existing issues that any

6     of the surgical techniques that we employ in prolapse

7     surgery come with inherent risks, and I think the

8     literature is quite clear across thousands of studies

9     involving tens of thousands of women that risks are

10    related to surgery as a broad category and not

11    specifically the Prolift or Gynemesh procedure.  It's

12    quite clear to me that it's very similar and sometimes

13    lower than the baseline risk of surgery.

14         Q.      So in those women, erosion would have

15    occurred no matter what you put in them, right?

16             MR. SNELL:  Objection, form.

17             THE WITNESS:  With the understanding

18         that most prolapse surgeries involve either

19         suture or synthetic grafts or biological grafts

20         or combinations thereof, complications such as

21         wound complications, I'll take mesh erosion is

22         simply one type of wound complication, the

23         complications occur equally whether it's

24         sutures or biologic grafts or synthetic grafts,

Marc R. Toglia, M.D.

```
 1              and I think the literature more than adequately

 2              supports that position.

 3   BY MR. SCHNIEDERS:

 4        Q.     Doctor, when I say mesh complications,

 5   what does that mean?

 6              MR. SNELL:  Form, calls for speculation.

 7              THE WITNESS:  I don't know what you mean

 8         by that.

 9   BY MR. SCHNIEDERS:

10        Q.     What does it mean to you?

11        A.     What does mesh complications mean to me?

12   I guess literally it means any adverse event that may

13   be associated with mesh.

14        Q.     And what adverse events, in your mind,

15   may be associated with mesh?

16        A.     Again, counselor, maybe I didn't make

17   myself clear, given that it is impossible to separate

18   out the other variables, operator dependent variables,

19   patient related risk factors, general techniques

20   regarding prolapse surgery, the risks seem to be

21   similar across the board and independent of the

22   specific techniques.

23        Q.     So when I asked you what mesh

24   complication meant to you, you said it meant any
```

Marc R. Toglia, M.D.

1   adverse event that may be associated with mesh,

2   correct?

3         A.     Yes, I'm just interpreting what you

4   asked me.

5         Q.     That's what you said, those were your

6   words, right?

7         A.     Those were my words.

8         Q.     Okay.  And when I ask you what adverse

9   events might be associated with mesh, your answer is

10  there are none?

11        A.     That's not what I said, counselor.  I

12  gave you my answer.

13               (Document marked for identification as

14               Toglia Deposition Exhibit No. 3.)

15  BY MR. SCHNIEDERS:

16        Q.     I'm going to show you what I've marked

17  as Exhibit 3, which is a copy of your website's front

18  page.  It's several pages long because if you go on the

19  right side of the second page, you'll see there's a

20  section entitled "Questions About Vaginal Mesh?"

21        Do you see that?

22        A.     I do.

23        Q.     Who wrote that?

24        A.     I would say I was probably the author of

Marc R. Toglia, M.D.

```
1    that.

2           Q.      Okay.  And at the very beginning there,

3    it's got a link to the position statement from

4    AUGS/SUFU, correct?

5           A.      Correct.

6           Q.      But what I want to go to is down the

7    second to last page, and just so everybody is aware,

8    and you know this, Doctor, everybody else in this room

9    might not, but there's a section where you click for

10   more, and that's where the rest of this language comes

11   from.

12          Does that seem familiar with your website,

13   Doctor?

14          A.      Correct.

15          Q.      So that's why it's several pages longer

16   than the rest of it.

17          But if you go to the last page that has words

18   on it, in the second to last paragraph it says,

19   "Urogynecology Associates maintains a large patient

20   database of women in whom we have performed these

21   procedures, and we are continually reviewing our

22   results.  Our physicians have been involved in clinical

23   research in this area, and, in general, our data

24   suggests a largely positive experience and high patient
```

Marc R. Toglia, M.D.

```
1    satisfaction."

2           Do you see that?

3           A.    I do.

4           Q.    This database, is that what you are

5    discussing when you say that you review these things on

6    a regular basis?

7           A.    Yes.

8           Q.    And did you think about putting your

9    data into a form that you might be able to bring here

10   today in order to support your opinions?

11          A.    No.

12          Q.    Why not?

13                MR. SNELL:  I'm going to object.  I

14          don't think it's actually called for, but go

15          ahead.

16                THE WITNESS:  You know, I don't think

17          that that would be something that would be --

18          it's not something I could easily put together,

19          you know, quickly.

20   BY MR. SCHNIEDERS:

21          Q.    But you are able to look at it and tell

22   patients that are coming into your office that the data

23   suggests a largely positive experience and high patient

24   satisfaction?
```

Marc R. Toglia, M.D.

1          A.      That is correct.

2          Q.      And going on to the last paragraph right

3    here it says, finally, our physicians -- just so we're

4    clear, Doctor, it's you and one other partner right

5    now, correct?

6          A.      That's correct.

7          Q.      "Finally, our physicians have extensive

8    experience in the evaluation and management of women

9    who have experienced complications from transvaginal

10   mesh procedures, including the surgical revision or

11   removal of such devices."

12         Do you see that?

13         A.      I do.

14         Q.      When you say "complications from

15   transvaginal mesh procedures," what do you mean when

16   you write that?

17         A.      I mean that if a women previously

18   underwent a transvaginal mesh procedure or really any

19   kind of surgery for pelvic organ prolapse or

20   incontinence, whether it involved sutures or mesh

21   material, that we have experience in evaluating and

22   treating those conditions.

23         Q.      So, as it sits here today with regard to

24   the Ethicon products that you are opining about, the

Marc R. Toglia, M.D.

```
1    products themselves don't cause the complications, it's

2    some mixture of the patient, the doctor and potentially

3    some other variable, correct?

4               MR. SNELL:  Form.

5               THE WITNESS:  It's a combination of all

6          those things.  I mean, if you do surgery

7          without suture, you can't have suture-related

8          problems.  If you do surgery with suture, if

9          it's permanent suture, you know, you can have

10         mesh -- excuse me -- you can have suture

11         related complications or adverse consequences,

12         as I've previously published.  And if you do

13         procedures with biological grafts or synthetic

14         mesh materials, there is a, you know, baseline

15         risk as it is laid out in our report of, you

16         know, percentages of patients that might

17         experience exposure of the material.

18   BY MR. SCHNIEDERS:

19         Q.    If a woman came in to your office and

20   had previously had a Ethicon product, whether it be

21   Gynemesh PS or Prolift or TVT and they had a

22   complication, immediately you would understand that it

23   wasn't that product that caused the complication,

24   correct?
```

Marc R. Toglia, M.D.

```
 1              MR. SNELL:  Objection, form, incomplete

 2         hypothetical, vague.

 3              THE WITNESS:  I'm not sure that I

 4         understand the foundation.  If somebody had a

 5         Prolift procedure and comes to my office with

 6         exposed mesh, it's going to be my assumption

 7         that it is the Prolift mesh that is what I'm

 8         seeing in the vagina.

 9   BY MR. SCHNIEDERS:

10         Q.    But it would be your assumption that the

11   Prolift mesh didn't cause the problem, correct?

12              MR. SNELL:  Objection, same objection.

13              THE WITNESS:  Wound complications are

14         caused by problems with wound healing.

15   BY MR. SCHNIEDERS:

16         Q.    Not the mesh, correct?

17         A.    Not the mesh, correct.

18         Q.    Okay.  Would your opinion be the same if

19   it was a Boston Scientific product?

20         A.    Yes.

21         Q.    So you don't believe that Boston

22   Scientific products can cause complications, the mesh

23   itself?

24              MR. SNELL:  Form, overbroad.
```

Marc R. Toglia, M.D.

```
 1                    THE WITNESS:  I think complications can

 2             occur in people who have undergone implantation

 3             with these materials.  I think that the opinion

 4             that I have expressed in my report is that

 5             these are known complications that occur with

 6             all of our surgeries to similar degrees.

 7   BY MR. SCHNIEDERS:

 8        Q.    And I guess that's my question.  You're

 9   saying that these are known complications that can

10   occur with these products, but you're saying that

11   across the board it's not the product causing the

12   complication, correct?

13        A.    It is not the product causing the

14   complication, correct.

15        Q.    It's something else, it's a variable of

16   either the physician, the patient or some combination

17   of those two?

18                    MR. SNELL:  Form.

19                    THE WITNESS:  It's always a combination

20             of everything.

21   BY MR. SCHNIEDERS:

22        Q.    But not including the mesh?

23                    MR. SNELL:  Same objection, form.

24                    THE WITNESS:  You can't have mesh
```

Marc R. Toglia, M.D.

```
 1            erosion if mesh isn't part of the procedure, so

 2            in that context, mesh erosion necessitates

 3            previous placement of mesh.

 4    BY MR. SCHNIEDERS:

 5            Q.    And in that context, does the mesh cause

 6    the erosion?

 7                  MR. SNELL:  Form, incomplete

 8            hypothetical.

 9                  THE WITNESS:  I think the opinion that I

10            state in my report that the material itself

11            does not cause the complication.

12    BY MR. SCHNIEDERS:

13            Q.    Is there any mesh that causes that sort

14    of complication that's on the market or has been taken

15    off the market in the last ten years?

16                  MR. SNELL:  Form, vague.

17                  THE WITNESS:  I think my opinion is

18            limited to, you know, the products being --

19            what I prepared for and what I've written is

20            specific to Prolift and Gynemesh PS.  I'm happy

21            to answer those questions as they relate to

22            that.

23    BY MR. SCHNIEDERS:

24            Q.    When you report an adverse event to the
```

Marc R. Toglia, M.D.

1    FDA, you're able to give an opinion as to whether or

2    not the product that you're reporting the adverse event

3    on was the cause or was related, correct?

4            A.      Correct.

5            Q.      Okay.  Every time you reported an

6    Ethicon product to the FDA as an adverse event, you

7    said it wasn't related, correct?

8                    MR. SNELL:  Objection, lacks foundation.

9                    THE WITNESS:  I don't recall ever saying

10           that I was concerned that the material itself

11           was the problem.

12   BY MR. SCHNIEDERS:

13           Q.      What about when you reported an Apogee?

14           A.      Again, it could be patient selection, it

15   could be patient risk factors, we usually report all

16   those.  You know, this was a smoker, obese patient who

17   had previous surgery, you know.  I mean, obviously, I

18   don't identify the surgeon individually, but I will

19   make comment whether they came locally, you know, from

20   a local institution, whether they came from another

21   state.

22           Again, my role is not to pass any kind of

23   judgment or make any kind of decision.  I'm simply

24   reporting what I'm finding, and I trust it to the FDA

Marc R. Toglia, M.D.

1    that they're collecting similar information, if it does

2    exist.  So I'm simply reporting it in a non-judgmental

3    manner.  I'm not offering an opinion to them as far as

4    what I think happened.

5           Q.    Well, there's a subsection of the form

6    that allows for you to say it's related or not related,

7    correct?

8                 MR. SNELL:  Foundation.

9                 THE WITNESS:  I don't recall

10                specifically.  It's been a number of years

11                since I've had to report something.  I wouldn't

12                argue with you if you told me specifically that

13                there was an area that said it was related.

14   BY MR. SCHNIEDERS:

15          Q.    It's been several years since you've

16   reported anything as an adverse event?

17          A.    Two years, I would say.  I can't give

18   you an independent recollection of the last time that I

19   reported something of that matter.

20          Q.    When was your last mesh revision

21   surgery?

22          A.    Maybe six months ago.

23          Q.    You didn't report that as an adverse

24   event?

Marc R. Toglia, M.D.

```
1              A.      So my understanding is that the FDA

2    wants us to report on established products that were,

3    you know, approved for the indication.  So if somebody

4    took a piece of Surgimesh or some Gortex mesh and had

5    used it vaginally in the repair, and there was erosion

6    of Gortex, which I think might have been the last one

7    that I saw, I would not have reported that to the FDA.

8              But if someone had a manufactured product, like

9    even things like NovaSure ablation or a device, you

10   know, Therma -- whatever the Thermachoice device is or

11   in this case Apogee Perigee, I report those type of

12   cases.

13             Q.      When is the last time you did a revision

14   on a product like that?

15             A.      Within the last year.  I couldn't be

16   more specific than that.  There are not very common

17   occurrences, fortunately, in our area.

18                     (Document marked for identification as

19             Toglia Deposition Exhibit No. 4.)

20   BY MR. SCHNIEDERS:

21             Q.      So housekeeping wise, I think I marked

22   as Exhibit 4 your box of your materials, and, as we

23   said off the record, we're going to -- after the

24   depositions tomorrow, you're going to put all your
```

Marc R. Toglia, M.D.

```
1    materials in that box and leave that with the court

2    reporter; is that fair, Doctor?

3          A.     We will have copies -- I just want to

4    make sure that I have copies for further.

5                 MR. SNELL:  He is talking about after

6          the depositions.

7                 MR. SCHNIEDERS:  After tomorrow.

8                 MR. SNELL:  Yeah, that's fine.  Just

9          make sure it gets back to Dr. Toglia.  In TVT

10         last time he had an issue where --

11                THE WITNESS:  I didn't get the material

12         for four months.  So, unfortunately, counselor,

13         prior experience has got my guard up, and I

14         mean no offense to you.

15                MR. SCHNIEDERS:  That's fair, and, of

16         course, you know that has nothing to do with us

17         either.

18                THE WITNESS:  I'm willing, but if I seem

19         hesitant or reluctant, once bitten, twice shy,

20         but I plan to be fully cooperative with

21         whatever the Court requests of me.

22   BY MR. SCHNIEDERS:

23         Q.     And then Exhibit 5 I've actually

24   separately marked, this will not go in that box.
```

Marc R. Toglia, M.D.

1                  (Document marked for identification as

2          Toglia Deposition Exhibit No. 5.)

3    BY MR. SCHNIEDERS:

4          Q.     Exhibit 5 is your two invoices that you

5    brought here today as well, okay?

6          A.     Sure, yes.

7                  (Document marked for identification as

8          Toglia Deposition Exhibit No. 6.)

9    BY MR. SCHNIEDERS:

10         Q.     Moving on to Exhibit 6, although I

11   believe you have a copy of it over there, Doctor, your

12   expert report.

13         A.     Yes.

14         Q.     Doctor, you are here today talking about

15   your general expert report regarding Gynemesh PS and

16   Prolift, correct?

17         A.     That is correct.

18         Q.     And this report, as we established

19   earlier, was issued --

20         A.     February 26, 2016.

21         Q.     And that's your signature that appears

22   on Page 25?

23         A.     That is my signature.

24         Q.     Does this report contain all of your

Marc R. Toglia, M.D.

1    opinions you intend to offer in this matter?

2         A.    It does.

3         Q.    And, obviously, we've been doing it up

4    to this point, but if you need that to refer or to

5    answer any questions, clearly, go to it and use it.

6         A.    I appreciate that.

7         Q.    I have copies here, just to be -- make

8    sure I've got everything, but I have copies here of the

9    TVT expert report that was marked as part of the

10   previous deposition.

11        I assume nothing about your opinions has

12   changed since the time of your deposition?

13        A.    That's correct.  Nothing has changed.

14        Q.    I will not mark that.

15        So I also have reliance list, which I think we

16   established earlier in the deposition is actually the

17   reliance list for your TVT report, and my confusion

18   came from the fact that it has the same date at the

19   very top there, and it didn't say TVT, so I think we

20   have a copy of your reliance list for the Gynemesh and

21   Prolift report somewhere around here, don't we?

22        A.    Right.  It's not in the exhibit that you

23   marked.

24             MR. SNELL:  You can give that to him and

Marc R. Toglia, M.D.

1       mark that.

2                   THE WITNESS:  It's been in my report.  I

3             don't know what was provided to you, but my

4             report is accurate.

5                   MR. SNELL:  You can give him that.  That

6             way he can mark it.

7                   MR. SCHNIEDERS:  I'm just going to mark

8             that reliance list.

9                   MR. SNELL:  Sure.

10                  MR. SCHNIEDERS:  I'm marking Exhibit 7

11            as that reliance list.

12                  (Document marked for identification as

13            Toglia Deposition Exhibit No. 7.)

14      BY MR. SCHNIEDERS:

15            Q.    Doctor, what we've now marked as Exhibit

16      7, I think we established earlier all the materials you

17      brought today with you are somewhere on that list with

18      the exception of one deposition that you've received I

19      think since the TVT -- or I'm sorry -- since the actual

20      report was issued; is that correct?

21            A.    Yes, correct.

22            Q.    And as we sit here today, you don't have

23      any other materials to add to it or that you believe

24      are missing, correct?

Marc R. Toglia, M.D.

```
 1          A.      That is correct.

 2                  MR. SNELL:  If I can say something, I

 3          just don't want there to be a misstatement on

 4          the record, and maybe I'm misremembering.  I

 5          thought you had materials that Ostergard cited

 6          in his report too, or did you not have those?

 7                  THE WITNESS:  I showed this to you

 8          earlier, counselor.  This is the -- these are

 9          the materials that Dr. Ostergard cited in his

10          report that I don't believe were previously

11          marked.  Earlier you asked me about the

12          educational materials that I did not have them

13          in my personal records, but I did know that

14          they were somewhere here.

15  BY MR. SCHNIEDERS:

16          Q.      And that binder is part of what I'm

17  considering to be Exhibit 4 that's going to go in the

18  box afterwards, fair?

19          A.      That's fair.

20                  MR. SNELL:  That makes sense.

21  BY MR. SCHNIEDERS:

22          Q.      And both the deposition and the

23  materials from the Ostergard deposition and expert

24  report are not a part of your reliance list, as it sits
```

Marc R. Toglia, M.D.

1    today, but you have reviewed them?

2         A.      Because they came after the fact.

3         Q.      Okay.  But aside from the materials from

4    the Ostergard expert report and that deposition,

5    everything is on the reliance list?

6         A.      That's correct.

7         Q.      Doctor, who drafted the reliance list

8    for you?

9         A.      The list itself was drafted by

10   Mr. Snell's office with the understanding that much of

11   the material were studies and reports that I provided

12   to them.

13        Q.      Were there any materials that they

14   provided to you that you did not ask for?

15        A.      My recollection is that there were

16   studies that I was familiar with that I may not have

17   had a hard copy of, and I received a hard copy from

18   them, but, in general, you know, you're looking at how

19   I spend many of my nights and weekends over the past 25

20   years, the type of materials that I read.  So much of

21   this is stuff that I've been familiar with for decades

22   or from whenever it was published.

23        Q.      So as I'm looking at your invoices, the

24   last one was billed on February 29th of 2016, which was

Marc R. Toglia, M.D.

```
1    right about the same time, if not the same day --

2         A.    Correct.

3         Q.    -- that you issued your report.

4         So does that invoice encompass all the time

5    that you spent up to the time you issued your report?

6         A.    With regard to the general Prolift,

7    Gynemesh report and the case specific reports, yes,

8    separate from the TVT.

9         Q.    Okay.  So are these invoices that I'm

10   looking at that we've marked as Exhibit 5, do they not

11   include your work on TVT?

12        A.    That's correct.

13        Q.    Okay.  There are separate invoices for

14   that?

15        A.    That's correct.

16        Q.    And so you're keeping track of your

17   time, whether you believe you're working on the Prolift

18   side of things or the TVT side of things?

19        A.    Separately, correct.

20        Q.    I think that here as of January 31st of

21   this year, you had 12 hours billed at $400 an hour, and

22   that was to the Ethicon Gynecare mesh litigation MDL,

23   and it says 200, although, obviously, that's not the

24   right MDL.
```

Marc R. Toglia, M.D.

```
 1              Does that look correct.

 2         A.    Is it 2000?  What's the --

 3         Q.    Well, either way, but that's as of

 4    January 31st, that's the date that --

 5         A.    Yes.  The inclusive dates are on the

 6    list and you can see -- I mean, I know you weren't at

 7    the TVT deposition, but we switched -- I switched gears

 8    after that, correct.  So I believe it's a total of

 9    about 47 hours that was billed by the end of February,

10    if I'm not mistaken.

11         Q.    It's 35 on this one and then it was 12

12    on this one, so 47 hours as of the time that you issued

13    your report that you had spent working specific to

14    these two products we're here today for?

15         A.    Mm-hmm.

16         Q.    Is that a yes?

17         A.    Excuse me, that I've billed for.

18         Q.    That you've billed for?

19         A.    Correct.

20         Q.    Okay.  As we sit here, do you still have

21    uninvoiced time?

22         A.    I do.

23         Q.    How much time would you estimate that

24    you have that has not been billed?
```

Marc R. Toglia, M.D.

1          A.     I want to say maybe an additional 20

2     hours.

3          Q.     And that goes to what my question was,

4     and maybe I wasn't very clear, so I apologize.  You

5     issued your second invoice as of February 29th of 2016.

6          Did that include -- because it says

7     consultation fee, 2/1/16 through 2/29/16, did that

8     include all the work that you had put in up until you

9     signed your expert report?

10         A.     The question that you had asked me

11    previously is what I billed them, and I've given you

12    the information that I billed them.  That would include

13    all the work that I did up until the final date on that

14    bill.  Anything outstanding is subsequent to that date.

15    Is that what you're asking.

16         Q.     Yeah.  So this February 29, 2016 --

17         A.     There's no additional unbilled time for

18    that time.

19         Q.     Okay.  I apologize for being scattered

20    on it.  To make it clear --

21         A.     No, you were quite clear.  You asked me

22    what time I had billed and I answered what time I had

23    billed.  So I was clear on what you asked me,

24    counselor.

Marc R. Toglia, M.D.

1          Q.      So then as of March, so from the date

2    that you signed your expert report forward, you've done

3    an additional 20 hours approximately?

4          A.      Approximately.

5          Q.      Did that include deposition preparation

6    time with Mr. Snell?

7          A.      It will.

8          Q.      Did you prepare for today's deposition?

9          A.      Yes.

10         Q.      How long did you spend with Mr. Snell or

11   any of his partners to prepare?

12         A.      Ninety minutes.

13         Q.      So then the other 18 and a half hours or

14   so would have been spent reading literature?

15         A.      No.  Again, not wanting to waste the

16   Court's time, I wanted to read through the report and

17   make some tabular notes, so when you asked me a

18   specific question, I'd be able to find that information

19   quickly, so reading, rereading, rechecking, summary

20   type statistics.  As I was provided, for example,

21   Dr. Ostergard's deposition and materials, reviewing.

22         Q.      I think you testified to this, but just

23   so we're clear, when you met with Mr. Snell and anyone

24   else from his office to prepare, they didn't show you

Marc R. Toglia, M.D.

1    any documents?

2           A.      I'm not clear.

3           Q.      Did they show you any documents when you

4    were preparing for your deposition?

5           A.      They provided me with Ostergard's.

6           Q.      But that's it?

7           A.      That's the example, yes.

8           Q.      Anything else?

9           A.      Specifically, no, not that I can think

10   of.

11          Q.      Have you ever seen any internal Ethicon

12   documents?

13          A.      I have seen Ethicon documents.  I

14   believe that was covered in the last TVT report.  I do

15   not think I've seen anything additionally since.

16          Q.      The last TVT deposition?

17          A.      Excuse me, the TVT deposition, correct.

18          Q.      So has the defendant ever shown you any

19   internal documents?

20          A.      The ones that I just mentioned.  There

21   were documents provided -- there were documents of

22   internal communication provided to me by Mr. Snell

23   initially that were reviewed relevant to the TVT

24   report.  I mean, obviously, some of the information is

Marc R. Toglia, M.D.

1  relevant to the content today, but I've received no

2  additional documents other than the ones that we listed

3  for that report, and I believe they're listed on our

4  reference list here as well.

5         Q.     Anything that you're talking about that

6  you had seen, you would have -- you believed it was on

7  your reliance list for the TVT report?

8         A.     I do believe, yes.

9         Q.     Doctor, earlier you mentioned a product

10 called the Sphinx.

11        Do you recall that?

12        A.     I do.

13        Q.     What was the Sphinx?  Is it Sphinx or

14 the Sphinx?

15        A.     I think the project was just generically

16 called Sphinx, as a pun on the word sphincter, and I

17 believe we covered that during the TVT deposition.

18        Q.     What is the Sphinx?

19        A.     The Sphinx is a large stone structure in

20 Cairo, Egypt.  Sphinx was a project that looked at --

21 Sphinx was a project that looked at whether or not we

22 could extrapolate the integral theory to the posterior

23 compartments specifically for fecal continence.  It's

24 my belief, as it is the belief of others, that the body

Marc R. Toglia, M.D.

1    doesn't go out of its way to come up with new

2    mechanisms to control a common function.  So if the

3    body already has a functioning mechanism for the

4    control of urinary -- of urine, that's similar type

5    physiologic mechanisms might exist for fecal control.

6    So we were exploring the feasibility of that, and that

7    has also been explored by other surgeons with other

8    companies.

9            Q.    Doctor, would you say that, in your

10   experience, Prolift and TVT have clearly shown that

11   erosion occurs at the incision line all the time?

12                 MR. SNELL:  Form.

13                 THE WITNESS:  Can you repeat the

14          question.

15   BY MR. SCHNIEDERS:

16           Q.    Sure.  Would you say that, in your

17   experience, that Prolift and TVT clearly show that

18   erosion occurs at the incision line all of the time?

19                 MR. SNELL:  Objection.

20                 THE WITNESS:  As a general rule, the

21          exposure that I have seen and that I have read

22          about tend to be in the incision line.  Less

23          commonly, you might see an erosion at other

24          points of tension.  Obviously, there are

Marc R. Toglia, M.D.

```
 1          probably situations where the vaginal

 2          epithelium was unintentionally breached, and so

 3          then you would have exposure of mesh that was

 4          subsequently discovered that likely was there

 5          initially.

 6   BY MR. SCHNIEDERS:

 7          Q.     If there's more surface area of a sling

 8   that is directly below an incision, is there a higher

 9   risk of erosion?

10          A.     More surface area than what?

11          Q.     Than less surface area.

12                 MR. SNELL:  Form.

13                 THE WITNESS:  I'm not sure that I

14          understand what you're asking me.

15   BY MR. SCHNIEDERS:

16          Q.     Is it better to eliminate as much

17   surface area of sling directly below an incision in

18   order to keep a lower rate of erosion?

19          A.     I don't believe so.

20          Q.     Does a larger surface area of sling

21   directly below an incision increase the risk of

22   erosion?

23          A.     Not that I'm aware of.

24                 (Document marked for identification as
```

Marc R. Toglia, M.D.

```
1              Toglia Deposition Exhibit No. 8.)

2    BY MR. SCHNIEDERS:

3         Q.    Let me show you what I've marked as

4    Exhibit 8.  This is an e-mail string from inside of

5    Ethicon.  At the very top you see that there's an

6    e-mail from a gentleman named Gene Kammerer?

7         A.    I do.

8         Q.    Do you know Gene Kammerer?

9         A.    I do.

10        Q.    Who is Gene Kammerer?

11        A.    Gene Kammerer I believe was an engineer

12   consultant that worked with the R&D team at Ethicon on

13   some of their projects.  He's one of the project people

14   that I worked with directly, probably was my most

15   direct contact regarding the Sphinx or PASS procedure

16   as we were considering it.

17        Q.    And you see the subject he's responding

18   to there says re: Dr. Toglia's comments on Sphinx and

19   PASS.

20        Do you see that?

21        A.    Yes.

22        Q.    Okay.  And we don't need to go through

23   that e-mail.  You're welcome to look at it, if you

24   like, but the very first e-mail is at the very bottom,
```

Marc R. Toglia, M.D.

1    and that's also from Mr. Kammerer, and on the second

2    page it continues, "As you know I have been keeping a

3    dialogue going with some of the advisory panel surgeons

4    regarding our work and the concepts.  Dr. Toglia has

5    responded to the changes we made to the PASS concept

6    and feels adamant that the 2 lateral incisions are

7    crucial to its success.  He has also provided some

8    insight to the customer database which I haven't heard

9    in our market research interviews.  Here are some of

10   his comments," and then you see what at least

11   Mr. Kammerer is saying is a comment from you.

12        Do you see that?

13        A.    Yes.

14        Q.    Okay.  Why don't you read that first

15   paragraph right there regarding the two?

16        A.    Regarding the 2 incisions versus a

17   midline incision, as you know, there are many reasons

18   why I feel that a single midline incision is a bad

19   idea.  Mostly, I am concerned about the erosion of the

20   sling material through the perianal skin.  Our

21   experience with Prolift and TVT clearly show that

22   erosions occur at the incision line all of the time,

23   which is I think what I just stated to you.  The

24   perianal skin is very thin, and the sphincter is

Marc R. Toglia, M.D.

1   located very close to the skin.  Therefore, a post anal

2   sling will sit very close to the surface epithelium as

3   well, and a crescent incision will significantly

4   increase the surface area of sling directly beneath the

5   incision and, therefore, the risk for erosion.  A

6   significant erosion rate will be the death of this

7   procedure.

8          Q.     This procedure, as we stated earlier,

9   never made it to market; it was abandoned before it got

10  there, correct?

11         A.     I would like to think that it was placed

12  on a shelf.  Abandoned is kind of a cruel word for the

13  parent of the concept.

14         Q.     Well, at any rate, it's not on the

15  market currently?

16         A.     No.  There are no sling based repairs on

17  the market for this problem.

18         Q.     Okay.  And were you being truthful when

19  you told Mr. Kammerer that the surface area of sling

20  that is directly beneath the incision would increase

21  the rate of erosion?

22                MR. SNELL:  Objection, lacks foundation,

23         assumes --

24                THE WITNESS:  I mean, this was my

Marc R. Toglia, M.D.

```
 1              theory, and I'm sorry, I mean, what you asked

 2              me earlier was -- I didn't hear you say below

 3              the incision.  I simply heard you say below the

 4              epithelium.  My point was at least in this

 5              location, you know, this is not the same

 6              location, by any means, compared to, say, the

 7              suburethral or the vagina but in basically the

 8              post anal area, it was at least my theory that

 9              we would be better off with separate lateral

10              incisions as opposed to a contiguous incision.

11   BY MR. SCHNIEDERS:

12              Q.    Would you agree with this statement that

13   a significant erosion rate would be the death of the

14   procedure?

15                   MR. SNELL:  Form, lacks foundation.

16                   THE WITNESS:  No.  I think that with

17              regard to this particular concept, which was

18              the PASS procedure, that I was concerned that

19              that would be a significant limitation.

20              Obviously, I had no data because there was no

21              data to support that, but I was -- I don't

22              think you can extrapolate what I'm saying here

23              to anything other than the concept of what we

24              have here.
```

Marc R. Toglia, M.D.

```
 1   BY MR. SCHNIEDERS:

 2          Q.      What kind of mesh was used in the

 3   Sphinx?

 4          A.      Well, to be determined.  We tried a

 5   variety of materials.  I can't tell you that we ever

 6   got to that, you know, to the specific platform.

 7          Q.      Isn't it true that you started off with

 8   the concept of the TVT mesh?

 9          A.      Well, we had to play around with

10   something, and what was readily available to Ethicon

11   and Ethicon engineers were the TVT material, and so we

12   did utilize TVT passers and the TVT mesh to see if we

13   could anatomically place that material within that

14   space.

15          Q.      And that's the mesh you were using when

16   you were concerned here in 2009 regarding erosions,

17   correct?

18          A.      One had nothing to do with the other.

19   It had to do more with the type of incision being made,

20   which is different than the type of -- we don't make

21   lateral incisions next to the urethra.

22          Q.      So you wanted to make a different type

23   of incision, correct?

24          A.      Given that we were operating close to
```

Marc R. Toglia, M.D.

```
 1    the rectum where stool comes out of, you know, if I
 2    had -- you know, my concept was how can I locate the
 3    incisions a little bit away, away from the actual anal
 4    verge so that it's not in direct contact with the
 5    passage of stool.  Additionally, considering the normal
 6    surface tension when a person sits down that would be
 7    placed on the perianal area, that's much more
 8    susceptible to say midline tension, we were looking at
 9    incisions that were non-midline, but, again, I don't
10    think that this -- I don't think that I'm necessarily
11    commenting on my concerns relative to the other
12    procedures, but I was trying to use terms that they
13    were familiar with based upon their other products.
14         Q.    Like erosion?
15         A.    I'm sorry.
16         Q.    Terms they were familiar with on their
17    other products like erosion?
18         A.    No.  I'm sorry, as far as the location
19    of the incision.  They were used to -- all of their
20    sling products were done through a midline, vertical
21    incision, and I was suggesting in this concept that the
22    incisions be at a right angle to that, obviously in a
23    different location, and I was trying to position -- I
24    was trying to position the incisions away from the anal
```

Marc R. Toglia, M.D.

1    verge.  And rather than one contiguous incision, I was

2    suggesting two smaller incisions.

3         Q.     Fair to say that you were attempting to

4    decrease the surface area of sling that was directly

5    beneath the incision, correct?

6              MR. SNELL:  Form.

7              THE WITNESS:  There were many different

8              things that I was thinking about doing.  And,

9              again, that's a very different area, the

10             concerns are somewhat different.  The tension

11             lines are different.  We now have the added

12             possibility of stool, you know, close to the

13             incision.  I was simply trying to move the

14             incisions away from the anal verge, as I've

15             already stated.

16   BY MR. SCHNIEDERS:

17        Q.     And that's because your experience with

18   Prolift and TVT clearly shows that the erosion occurs

19   at the incision site all the time?

20        A.     No.  It was for the reasons that I just

21   mentioned.  In my head, I was thinking I want to get

22   these incisions away from the anal verge, away from the

23   path of stool.  I think that there's different surface

24   tension forces next to the anus, and so I at least

Marc R. Toglia, M.D.

1   wanted to start with the concept would it be feasible

2   to place the incisions there.

3        And they would say, well, why, why do you think

4   that?  And I would, again, try to communicate to them

5   in their own language, and I would say, well, as you

6   know, we were aware of circumstances where the slings

7   are showing exposure, and, you know, the one factor at

8   the time that was being considered was the location or

9   type of incision.

10       The French, when they did their TVM products,

11   also were looking at transverse incisions as opposed to

12   midline incisions.

13       Q.    Doctor, yes, no or you can't answer,

14   larger surface area of sling directly beneath an

15   incision increases the risk of erosion?

16            MR. SNELL:  Objection, asked and

17            answered.  You don't have to answer it yes, no

18            or I don't know.  You told him before.

19            THE WITNESS:  I've already stated my

20            answer, counselor.  I'm really trying not to be

21            difficult.  I honestly -- and I realize that

22            you have no expertise in this area of the body,

23            but there were unique challenges working near

24            the rectum, and I was trying to address those,

Marc R. Toglia, M.D.

```
 1              you know, again, just based on theory.  There's

 2              no evidence that what I said would have borne

 3              out to be true.  It may have turned out that a

 4              midline incision was perfectly feasible and/or

 5              easier.  I was just starting with a slightly

 6              different concept for the reasons that I

 7              explained.

 8                   In addition, there was another product

 9              in development for a similar indication, and I

10              was trying to make this one different, you

11              know, in its approach.

12    BY MR. SCHNIEDERS:

13         Q.    So the reason you said the Sphinx at

14    that time was because you were trying to differentiate

15    the product and because you had a theory that

16    potentially the surface area of the sling above the

17    incision site could increase the risk of erosion,

18    correct?

19                   MR. SNELL:  Objection, misstates.

20                   THE WITNESS:  One of a number -- again,

21              I was trying to explore a unique concept that

22              whether or not this would work to our

23              advantage.  You know, obviously we already had

24              experience with midline incisions.  In general,
```

Marc R. Toglia, M.D.

```
 1              they worked well.  I was trying to come up with

 2              a more unique concept.  You know, with two

 3              separate incisions, I was hoping that there

 4              would be no tension at the midpoint or directly

 5              beneath the incision line.

 6    BY MR. SCHNIEDERS:

 7         Q.    But you weren't concerned about the

 8    amount of surface area of the sling beneath the

 9    incision, correct?

10         A.    I would say yes.  I would say surface

11    area was really not my concern but, again --

12         Q.    That's what you wrote down here?

13         A.    I understand.

14              MR. SNELL:  Actually, no, you're

15              misstating.  That is not his writing, so don't

16              say he wrote that.

17              THE WITNESS:  That's true, good point.

18              MR. SNELL:  That lacks foundation.

19    BY MR. SCHNIEDERS:

20         Q.    Are you saying that you didn't have a

21    conversation about this topic with Gene Kammerer?

22         A.    No, no.  I'm saying I had a

23    conversation.  I'm just saying I did not write these

24    paragraphs, that these are not my words, okay.  But,
```

Marc R. Toglia, M.D.

```
 1   again, I was trying to explain to them in terms that an

 2   engineer, who is familiar with the different product,

 3   would understand.  But, obviously, I did not edit --

 4   write or edit this information.

 5           Q.     Did you ever e-mail with Mr. Kammerer?

 6           A.     Yes.

 7           Q.     Are you able to testify this wasn't an

 8   e-mail that he had cut and pasted into this e-mail that

 9   he sent?

10           A.     I have no idea, sir.

11           Q.     And did you go to look in your own

12   personal e-mails to see if you could find this one from

13   2009?

14           A.     I no longer own -- I no longer have --

15   that computer has been destroyed along with all of its

16   material.  I don't own the rights to this concept, so I

17   was informed to discard all of that once the product

18   was abandoned, as you so put it.

19           Q.     And you went through and cleaned out all

20   of your e-mails and deleted all of them at that point?

21           A.     I deleted all of those e-mails and then

22   when I wiped the hard drive on that computer, that just

23   went wherever those bits go, yes.

24           Q.     Sure, sure.  But there's a server
```

Marc R. Toglia, M.D.

1   somewhere where those e-mails probably exist; you know

2   that?

3          A.     I don't know.  I don't know.  I honestly

4   don't know.

5          Q.     What account would you have been using

6   at that time to communicate with Mr. Kammerer?

7          A.     I honestly don't know.

8                 (Document marked for identification as

9          Toglia Deposition Exhibit No. 9.)

10  BY MR. SCHNIEDERS:

11         Q.     Let me mark as Exhibit 9 another e-mail

12  from Mr. Kammerer.

13         Is it possible that this e-mail address that

14  you sent him an e-mail from, that's a Verizon address,

15  is that the one you might have been using?

16         A.     It would seem to me that this would be

17  the account that I e-mailed him from, correct.

18         Q.     Do you currently have the Verizon.net

19  e-mail address?

20         A.     Yeah, and I would appreciate for privacy

21  reasons if we didn't go into any more detail than that,

22  given that this is a public document.

23         Q.     I'm assuming he's going to ask to have

24  most of this sealed, to be honest.

Marc R. Toglia, M.D.

```
 1                  MR. SNELL:  We'll go ahead and seal
 2          anything personal.
 3                  THE WITNESS:  I apologize, but there are
 4          concerns about identity theft and information
 5          that I have.
 6  BY MR. SCHNIEDERS:
 7          Q.     I'm not going to e-mail you, I promise.
 8          A.     Yes.  So, again, this represents sort of
 9  my emotional response perhaps, and, again, remember as
10  the parent to the concept, I was a little bit resistant
11  to people wanting to change my concept because I
12  thought that I had thought them out pretty clearly.
13          Q.     So, Dr. Toglia, if you go to the e-mail
14  down below where you're actually e-mailing to
15  Mr. Kammerer, and the subject is re: checking in,
16  because I think if you go back there was originally an
17  e-mail from you asking if the project was dormant?
18          A.     Sure.
19          Q.     But if you see here the third, and this
20  is I think what you're talking about your emotional
21  response to the way that they were approaching the
22  project perhaps, but that third line starting
23  "Ethicon," could you read that sentence or that
24  paragraph there?
```

Marc R. Toglia, M.D.

```
1            A.      I'm happy to.  Let me just make sure I

2      understand you clearly.  You want me to begin reading

3      the paragraph entitled "another key concept."

4            Q.      No.  The one that starts with "Ethicon

5      has enjoyed."

6            A.      Oh.  Ethicon has enjoyed its greatest

7      success with simple, straightforward thin sling - the

8      TVT.  Attempts to develop more comprehensive mesh

9      solutions have far -- have not only been far less

10     successful, but as a class have had serious

11     complications and are rapidly falling out of favor.

12           Q.      What mesh solutions, comprehensive mesh

13     solutions were you talking about there?

14           A.      I honestly don't know.  This is from six

15     years ago.  These may have been other concept projects

16     that -- at one point I sat down with them and we went

17     over eight to ten new concepts for other projects

18     within this sphere.  Obviously, I would think in my

19     mind if it was an existing project, I would have used

20     the existing product's name.

21           Q.      How many comprehensive mesh solutions

22     can you think of that have had serious complications?

23           A.      As a class, I don't know of any actually

24     at this point.
```

Marc R. Toglia, M.D.

1        Q.      Well, then what did you mean?

2        A.      I might have been referring specifically

3    to the IVS Tunneller.  You know, the IVS Tunneller,

4    this was a concept that also involved the tunneling of

5    mesh through several compartments over a long period of

6    time, and the IVS Tunneller was also in its initial

7    form both anterior and posteriorly involved similar

8    type concepts.  So now that I sort of reinvigorate my

9    brain, I wouldn't be surprised if I'm referring to the

10   IVS Tunneller in this statement.

11       Q.      You're referring to the IVS Tunneller

12   with regard to Ethicon because it says Ethicon products

13   right there?

14       A.      I didn't say that Ethicon's attempts, I

15   just said attempts.  The bottom line is that I don't

16   recall, as I sit here, specifically what I was

17   referring to in this e-mail.  I'm sorry.

18       Q.      So it could be that you're talking about

19   things like Gynemesh PS, correct?

20               MR. SNELL:  Objection, lacks foundation.

21               THE WITNESS:  I highly doubt this had

22          anything to do with the Gynemesh PS.

23   BY MR. SCHNIEDERS:

24       Q.      Could have been Prolift, right?

Marc R. Toglia, M.D.

```
 1                MR. SNELL:  Same objection.

 2                THE WITNESS:  I honestly don't think it

 3          had to do with Prolift, in all honesty.

 4    BY MR. SCHNIEDERS:

 5          Q.    Explain for the jury what the Tunneller

 6    does.

 7          A.    Explain to you?

 8          Q.    To the jury, you're talking to the jury

 9    right now.

10          A.    Am I talking to the jury right now?  Is

11    that who I'm talking to?

12                MR. SNELL:  You can just answer his

13          questions to the best of your ability.

14          Sometimes lawyers say things --

15                THE WITNESS:  I'm sorry.  Got you.  I

16          mean, I'm just very literal, and I just want to

17          make sure I don't misstate anything.  Well, I

18          mean, obviously, to deliver a product to its

19          destination and whether it's laparoscopy or

20          cannulas for TVT, cannulas for Prolift, you

21          have to have a way to deliver the product to

22          its final destination, and, again, the PASS

23          concept involved placing a mesh sling below the

24          anal sphincter and towing it up, if I remember
```

Marc R. Toglia, M.D.

```
 1              correctly, through the obturator space as a

 2              point of exit.

 3   BY MR. SCHNIEDERS:

 4         Q.     And what were the serious complications

 5   that were related to that?

 6         A.     There weren't anything.  The PASS

 7   concept never was done in a live person.

 8         Q.     So, sitting here today, you can't think

 9   of any comprehensive mesh solutions that were developed

10   as a class that have had serious complications and are

11   rapidly falling out of favor that you might have been

12   referencing in January of 2010?

13              MR. SNELL:  Objection, asked and

14         answered.

15              THE WITNESS:  Yes, I mean, again, I

16         cannot tell you what I specifically had in mind

17         behind that statement.  I was clearly, as you

18         can see from the overall emotional tone of the

19         letter, of the e-mail that I was being very

20         emotionally resistant to the idea that we

21         change anything.  We hadn't even done anything

22         with it yet.  I wanted to test the original

23         idea, as I had laid it forth to see what the

24         feasibility was, and I was not open at the time
```

Marc R. Toglia, M.D.

```
 1              to making changes.

 2     BY MR. SCHNIEDERS:

 3          Q.     But sitting here today, you're sure that

 4     it's not Prolift that you were talking about?

 5          A.     I don't recall it as being Prolift at

 6     the time, no.

 7          Q.     And you're sure it's not Gynemesh PS

 8     that you're talking about?

 9          A.     You know, I think I would have listed it

10     by name.  I listed their success by name.  I think if I

11     had a specific concern, I would have listed that as

12     well.

13          Q.     You didn't mention Tunneller there, did

14     you?

15          A.     No.  I was talking about just the

16     overall where we were conceptually, you know, at the

17     time.

18                  MR. SCHNIEDERS:  Maybe now is a good

19          time to take a break.

20                  (Brief recess taken at 3:27 p.m.)

21                  (Deposition resumes at 3:38 p.m.)

22                  MR. SCHNIEDERS:  We're back after a

23          short break.

24                  MR. SNELL:  Let's mark that last portion
```

Marc R. Toglia, M.D.

```
1              confidential.  Let's mark the whole thing.  For

2              the purpose of whoever is going to be reviewing

3              this on this issue, there are discussions about

4              intellectual property concepts, thoughts by the

5              doctor and what not which he has concerns about

6              it falling into other people's hands.  That is

7              the basis and the purpose.

8                   THE WITNESS:  Thank you.

9    BY MR. SCHNIEDERS:

10        Q.   Doctor, are you doing any current

11   research on polypropylene meshes?

12        A.   I mean, I consider the reviews that I do

13   here where, you know, basically systematic review is a

14   type of, you know, research project.  In terms of --

15   I'm not currently engaged in any clinical trials of

16   that material.

17        Q.   Are you engaged in any attempts to

18   publish any retrospective data or anything like that?

19        A.   My current role in that arena is that,

20   you know, since I serve as an editor of two journals,

21   my energy is spent actually reviewing studies and

22   manuscripts submitted for publications, much of which

23   is on the subject matter that we're discussing today,

24   but I have no -- I have nothing pending to be
```

Marc R. Toglia, M.D.

1    published.

2            Q.      Have you ever written anything on the

3    Burch procedure?

4                    MR. SNELL:  Form.

5                    THE WITNESS:  There may be mention in a

6            book chapter, but I have not published on my

7            personal experience with that procedure

8            independent from a more general discussion.

9    BY MR. SCHNIEDERS:

10           Q.      Have you ever written anything on

11   biologic tissue slings?

12           A.      I have not.

13           Q.      You would agree that you're not an

14   academic physician, correct?

15                   MR. SNELL:  Form.

16                   THE WITNESS:  I would not agree with

17           that, no.

18   BY MR. SCHNIEDERS:

19           Q.      Explain, please.

20           A.      Much of the work that I do is equivalent

21   to what you do in academics.  I was previously employed

22   at an academic institution.  I'm simply not employed by

23   an academic institution.  Obviously, I have

24   appointments at an academic institution.  Our current

Marc R. Toglia, M.D.

```
 1    institution involves -- does have a residency, so I am

 2    directly involved in teaching and the creation of

 3    academic curriculum, resident education, resident

 4    teaching.  I do speak nationally in postgraduate

 5    medical educations through venues such as AUGS, Society

 6    of Gynecologic Surgeons.  Those are academic endeavors.

 7            Q.    But you also have a private clinical

 8    practice, correct?

 9            A.    Correct.

10            Q.    So insofar as you are a private clinical

11    physician, in that portion of your life, that would not

12    be academic medicine, correct?

13                  MR. SNELL:  Objection.

14                  THE WITNESS:  I disagree.  Again, before

15            I came here today, I was in the operating room

16            in my private practice.  I had a resident with

17            me and a medical student with me.  That is

18            academic in nature.  We are discussing and

19            teaching.  So it's all of the above.

20    BY MR. SCHNIEDERS:

21            Q.    I may have asked this before, so forgive

22    me if I have.  Are you currently under contract as a

23    consultant for any pharmaceutical or device company?

24            A.    You did not ask that before.  I
```

Marc R. Toglia, M.D.

1    currently consult with a pharmaceutical company.  I had

2    a consulting -- an active consultant agreement with a

3    medical device company that if we wait another week

4    will no longer exist.

5            Q.     So would that be AMS?

6            A.     That would be, very good.

7            Q.     And who is the pharmaceutical company

8    you consult with currently?

9            A.     So it would be Astellas Pharma whom I've

10   consult with since 1994, I believe, unrelated to what

11   we're discussing today.

12           Q.     And would that be the longest standing

13   relationship you have in consulting with a

14   pharmaceutical or a device company?

15           A.     I believe so.

16           Q.     Have you continuously worked for

17   Astellas since 1994?

18           A.     I have never worked for Astellas.

19           Q.     Point taken.  Have you continuously

20   worked with Astellas since 1994?

21           A.     You know, intermittent relationship.

22   There are periods of time, different cycles of the

23   economy where they are more interested, less

24   interested.  It varies widely.  I would say, as a

Marc R. Toglia, M.D.

```
 1   general rule, my involvement in the past several years

 2   has been fairly minimal.

 3            Q.     You would agree that less rigidity with

 4   regard to mesh is better, correct?

 5                   MR. SNELL:  Form, overbroad, lacks

 6            foundation.

 7                   THE WITNESS:  I would not agree.

 8   BY MR. SCHNIEDERS:

 9            Q.     Okay.  Explain to me why not.

10            A.     I'm not sure what the foundation is that

11   you're asking me.  Less better for what?

12            Q.     Less likely to cause or impair -- strike

13   that.

14            Less likely to impair sexual function?

15                   MR. SNELL:  Same objection, incomplete

16            hypothetical.

17                   THE WITNESS:  Yeah, it's more

18            complicated than that, counselor.  Please keep

19            in mind that we don't have any cutoffs or

20            agreements, there are no expert consensus as

21            far as what's lightweight, what's not

22            lightweight, what's rigid, what's less rigid,

23            you know.  These are just sort of a continuum

24            of ideas.  You know, everything is relative.
```

Marc R. Toglia, M.D.

```
1              You know, is this lightweight, well, it might
2              be lighter than something previously, not as
3              light as something later.  But, in general, my
4              objection is that we don't have cutoffs, no one
5              has ever published, you know, this is heavy,
6              this is light.  There's no expert consensus.
7              People do throw around the terms relatively,
8              this is lighter weight mesh, this is
9              lightweight, but I don't know what the cutoffs
10             are, and the same would apply to rigidity.
11       Q.    So there are cutoffs, you just don't
12  know what they are?
13             MR. SNELL:  Objection.
14             THE WITNESS:  If I don't know -- if I
15             don't know what they are, how would I know that
16             there were cutoffs?
17  BY MR. SCHNIEDERS:
18       Q.    You said but I don't know what the
19  cutoffs are, and the same would apply to rigidity.
20  That implies that there are cutoffs somewhere, right?
21             MR. SNELL:  I'm going to object.
22             THE WITNESS:  No.
23             MR. SNELL:  Hold on.  You have to let me
24             object.  You're actually misstating his
```

Marc R. Toglia, M.D.

```
 1            testimony.  His testimony he did say there is

 2            no cutoff.

 3                    MR. SCHNIEDERS:  I'm again going to read

 4            because I don't need you to speak for the

 5            witness.

 6                    MR. SNELL:  I'm not speaking, but you

 7            are misstating his testimony --

 8                    MR. SCHNIEDERS:  I'm reading from it

 9            right here.

10                    MR. SNELL:  His answer was 21 lines

11            long.

12                    MR. SCHNIEDERS:  He said I don't know

13            what the cutoffs are and the same would apply

14            to rigidity.

15                    MR. SNELL:  No, his answer was 20 lines

16            longer than the little thing you pulled out of

17            there.

18                    MR. SCHNIEDERS:  Whatever.

19     BY MR. SCHNIEDERS:

20            Q.    Are there cutoffs?

21            A.    There are currently no established

22     cutoffs, there are no definitions, and there is no

23     expert consensus.

24            Q.    But, theoretically, there are cutoffs
```

Marc R. Toglia, M.D.

```
 1   somewhere, right?

 2                    MR. SNELL:  Form, hypothetical.

 3                    THE WITNESS:  No.

 4   BY MR. SCHNIEDERS:

 5        Q.     No?

 6        A.     There are no established, universally

 7   accepted definitions, cutoffs, consensus of opinion.

 8        Q.     Doctor, listen to my question.  I said

 9   theoretically, there are cutoffs.  I didn't say they

10   were established, universally accepted cutoffs.  I said

11   theoretically there would be cutoffs, right?

12                    MR. SNELL:  Objection, vague, calls for

13         speculation.

14                    THE WITNESS:  I don't know how further

15         to answer that.  I'm sorry.

16   BY MR. SCHNIEDERS:

17        Q.     Why hasn't AUGS filed a consensus

18   statement on what levels of rigidity are acceptable?

19        A.     I can't answer that question.  I can't

20   speak for AUGS.

21        Q.     Are you a member of that society?

22        A.     Yes.

23        Q.     Have you ever gone to them and said why

24   don't we put out a consensus statement on this?
```

Marc R. Toglia, M.D.

```
 1            A.      No, I have not.

 2            Q.      Did you go to them and have any input in

 3    their position statement regarding vaginal mesh?

 4            A.      I did not have any direct input into

 5    that statement.

 6            Q.      Did you ever review a draft of that

 7    statement?

 8            A.      I don't believe that I reviewed a draft

 9    of that statement.

10            Q.      Were you ever circulated a draft of that

11    statement?

12            A.      I might have been circulated a draft of

13    that statement.  I don't independently recall that.

14            Q.      And not to -- honestly not to make you

15    uncomfortable, but had you received a draft of that

16    statement, would that have been to that Verizon e-mail

17    address?

18                    MR. SNELL:  Objection.

19                    THE WITNESS:  I don't know.  I don't

20            know.  That would be one of the more common

21            addresses that I might receive material, but I

22            didn't receive it.

23    BY MR. SCHNIEDERS:

24            Q.      You didn't receive it, or you don't know
```

Marc R. Toglia, M.D.

```
 1   if you received it?

 2            A.     I think it's the same thing.  I do not

 3   recall that I have ever received a draft, to the best

 4   of my knowledge, of that statement, of the proposed

 5   statement.

 6            Q.     Sorry didn't mean to interrupt.

 7            Do you know who the authors are of that

 8   statement?

 9            A.     I do.

10            Q.     Do you know them personally?

11            A.     I do.

12            Q.     Do you consider yourself to be friends

13   with those gentlemen?

14            A.     They are colleagues of mine.

15            Q.     Are they people you would see socially

16   as well or just professionally?

17            A.     I think those lines are blurred in my

18   area, as I'm sure they are in yours.  You know, we have

19   social events at our academic meetings, our scientific

20   meetings.  I don't believe I was in any of their

21   wedding parties or went on vacation or sat in a Jacuzzi

22   with any of them, but I would say, certainly, you know,

23   I think it would be accurate to say that we have

24   collegial relationships that are both social and
```

Marc R. Toglia, M.D.

1    academic.

2            Q.     Have you ever discussed authoring

3    anything with any of them?

4            A.     I would have to look at the

5    comprehensive list of the people on that if you want to

6    share that with me.

7            Q.     We can cover that in a moment.

8            A.     Yeah.

9            Q.     You are not an expert in chemical

10   engineering, correct?

11                  MR. SNELL:  Form.  This is covered in

12           the earlier deposition.

13                  MR. SCHNIEDERS:  And I am aware and

14           that's why I'm asking it.

15   BY MR. SCHNIEDERS:

16           Q.     Do you hold yourself out as an expert in

17   chemical engineering?

18           A.     I think -- no, I don't hold myself out

19   in a general sense in chemical engineering.  I think I

20   have expertise in this particular arena in front of any

21   audience that I might be asked to participate as it

22   relates to polypropylene mesh being used for its

23   intended purpose.

24           Q.     You're not an expert in pathology,

Marc R. Toglia, M.D.

```
 1   correct?

 2              MR. SNELL:  Objection.

 3              THE WITNESS:  I'm -- I don't have any

 4         certification in pathology.  I have certainly

 5         an in-depth knowledge and, again, you know, if

 6         we were to go to the Villanova game together,

 7         I'd probably know more than the majority of

 8         people at that game.

 9   BY MR. SCHNIEDERS:

10         Q.    But you would defer to a pathologist,

11   correct?

12         A.    I don't know what you mean by "defer."

13   I mean, if we had a disagreement, I wouldn't stand up

14   and say you're a pathologist, you're absolutely right.

15   No, I wouldn't defer in that regard.

16         Q.    So you believe that you have an equal

17   expertise as a pathologist?

18         A.    I don't know where you're getting this

19   from.  I never made that statement.

20         Q.    You would agree that a pathologist has a

21   greater expertise in pathology than you do?

22              MR. SNELL:  Form.

23              THE WITNESS:  Yes, I would say, in a

24         general sense, a pathologist has a more
```

Marc R. Toglia, M.D.

```
 1              in-depth level of knowledge than I.

 2    BY MR. SCHNIEDERS:

 3         Q.    You agree you're not an expert in

 4    polymer chemistry, correct?

 5              MR. SNELL:  Objection, asked and

 6         answered in earlier deposition.

 7              THE WITNESS:  I think relative to the

 8         topic at hand, I would be considered by many to

 9         possess expertise in polymer chemistry.

10    BY MR. SCHNIEDERS:

11         Q.    Relative to a jury, but not relative to

12    a polymer chemist, correct?

13              MR. SNELL:  Same objections.

14              THE WITNESS:  You know, in terms of the

15         application of this material within the human

16         body, I've got a pretty good understanding of

17         the working of polymer, yes.  I have a degree

18         in biochemistry.  I've been reviewing this

19         material extensively.  I am certainly reading

20         materials that are beyond what the average

21         gynecologist or even urogynecologist female

22         pelvic medicine or urologist would have

23         reviewed.

24    BY MR. SCHNIEDERS:
```

Marc R. Toglia, M.D.

```
 1          Q.     When was that degree in biochemistry?

 2          A.     1985.

 3          Q.     And when is the last class you took in

 4   biochemistry?

 5          A.     Well, I mean, I'm constantly reading

 6   material.  Obviously at this stage of the game I don't

 7   pay to enroll in college courses, but my -- you know,

 8   foundation of my knowledge did not end when I graduated

 9   from college.

10          Q.     When is the last class you took in

11   biochemistry?

12          A.     I took a class in medical school in

13   biochemistry.

14          Q.     About what year would that have been?

15          A.     That would have been 1986, '87.

16          Q.     You've never done bench research on

17   polypropylene, correct?

18          A.     I have not.

19          Q.     You've never done lab research on

20   polypropylene, correct?

21          A.     I have not.

22          Q.     You've never done any sort of

23   pathological analysis on explanted polypropylene, have

24   you?
```

Marc R. Toglia, M.D.

```
 1              MR. SNELL:  Form.

 2              THE WITNESS:  I have not.  Understand

 3         that I've done lab work as it pertains to my

 4         consultation with polypropylene products in

 5         medical, you know -- in the medical arena.

 6    BY MR. SCHNIEDERS:

 7         Q.    When you explant mesh, what do you do

 8    with that mesh?

 9         A.    The majority, depending upon -- you

10    know, depending upon the situation, the majority of

11    that material is sent to pathology for identification

12    and labeling.

13         Q.    Okay.  You don't do that yourself, you

14    send it to a pathologist?

15         A.    Well, I'm operating on a patient, so I

16    can't do both things, so I will send that to the

17    pathologist.

18         Q.    Could you?

19         A.    Could I what?

20         Q.    Could you do what the pathologist does?

21         A.    Given that what the pathologist does is

22    typically measure the dimensions of the material and

23    simply reports that I have in front of me a 2 by 1

24    centimeter piece of blue mesh, that I can do, correct.
```

Marc R. Toglia, M.D.

```
 1    I can't tell you that in the medical world that there's

 2    any further analysis being done routinely.

 3         Q.    You've never published any opinion that

 4    polypropylene does not cause a foreign body reaction,

 5    correct?

 6         A.    Well, that's a double negative so -- and

 7    I do want to answer you accurately, so if you can

 8    restate that question without a double negative, I

 9    would appreciate it.

10         Q.    Have you ever published an opinion that

11    polypropylene does not cause a foreign body reaction?

12         A.    Of course, polypropylene causes a

13    foreign body reaction.  Any foreign material implanted

14    in the body will cause a foreign body reaction.  That's

15    what foreign body reaction is by definition.

16         Q.    You are not an expert on warnings,

17    correct?

18              MR. SNELL:  Objection.

19              THE WITNESS:  I don't hold myself out to

20         offer an expert opinion on warnings, although I

21         have, you know, ample experience in, you know,

22         reading about them and reading those materials.

23    BY MR. SCHNIEDERS:

24         Q.    You're not a biomechanical engineer,
```

Marc R. Toglia, M.D.

```
 1   correct?

 2           A.    I am not, no.

 3           Q.    I think we're going to get sideways

 4   here.  You are not an expert on the design of medical

 5   devices, correct?

 6                 MR. SNELL:  Objection, covered in his

 7           first deposition extensively.

 8                 THE WITNESS:  I have worked on the

 9           design of medical devices.  I have worked on

10           the design and redesign of existing devices, as

11           well as the device -- the medical device that

12           we referred to earlier as the PASS device.

13   BY MR. SCHNIEDERS:

14           Q.    And have you ever designed a device that

15   made it to market?

16           A.    I have not.

17           Q.    I don't say that to cruel.

18           A.    No, I apologize.  I had -- and, again,

19   I'm a relatively humble person.  I had extensive input

20   into the design of the TVT Exact, which is currently on

21   the market.

22           Q.    You had extensive input into the design

23   before it went to market?

24           A.    Correct.
```

Marc R. Toglia, M.D.

```
 1          Q.      Do you know what standards a

 2   manufacturer must follow in designing mesh products?

 3          A.      I have a general awareness, a general

 4   awareness only.

 5          Q.      But you couldn't cite us CFRs or

 6   statutes or anything like that, correct?

 7          A.      I couldn't cite it, no.

 8          Q.      Have you ever seen the statutes that

 9   relate to the responsibilities a manufacturer holds in

10   designing a product?

11          A.      I don't recall, no.

12          Q.      Have you ever reviewed any of Ethicon's

13   standard operating procedures relating to design?

14          A.      I do not believe so.

15          Q.      Do you know what a clinical expert

16   report is?

17          A.      I believe this is the second one that

18   I've issued in this arena, if I'm not mistaken.  Is

19   this what we're referring to?

20          Q.      What you've issued is a clinical expert

21   report, that's your definition of it?

22          A.      Yes.

23          Q.      Do you know what a design history file

24   is?
```

Marc R. Toglia, M.D.

```
 1          A.      In a general sense.

 2          Q.      What is it?

 3          A.      You know, when a manufacturer sets out

 4   to design a product, they would keep track of the

 5   history of that development and they would keep track

 6   of the communications between the different parties and

 7   the steps along that -- along that design.

 8          Q.      All right, Doctor.  So earlier we were

 9   talking about two days that you put in the Gynemesh PS

10   on your operating days.

11          What days are your operating days currently?

12          A.      How is this relevant to the testimony

13   that I'm giving?  I operate two days a week.  Is that

14   not sufficient information?

15          Q.      If you really don't want me to know what

16   day, it's fine.

17          A.      Yes, thank you.

18          Q.      Two days a week?

19          A.      Correct.

20          Q.      And that's every week?

21          A.      Correct.

22          Q.      And how many surgeries do you do on

23   those two days, typically?

24          A.      Sure, I previously answered that on
```

Marc R. Toglia, M.D.

1    average, I'll do between six and eight procedures, and

2    they are virtually all related to pelvic floor

3    disorders.

4         Q.    Are there any surgeries that you're

5    doing currently that are not related to pelvic floor

6    disorders?

7         A.    There may be some surgeries that are

8    more general gynecology in nature.  For example, if a

9    woman is sent to me with prolapse and she tells me she

10   has bleeding, I may first have to do a D&C or a biopsy

11   or some other general thing prior to completing the

12   treatment for the prolapse.  So I would say it's within

13   the sphere of gynecologic surgery and urogynecologic

14   surgery.

15        Q.    So vast majority of your procedures

16   currently are going to be a TVT product or the Gynemesh

17   PS, correct?

18        A.    No.  The vast majority of my procedures

19   are prolapse and incontinence.  Procedures, the

20   prolapse procedures could be native tissue plication,

21   obliterative procedures, Gynemesh or sacrocolpopexy

22   procedures.  The majority of my incontinence procedures

23   are retropubic TVT procedures, specifically TVT Exact.

24        Q.    So out of approximately 12 surgeries

Marc R. Toglia, M.D.

1    that you perform weekly, how many of those surgeries

2    are likely to be Gynemesh PS?

3           A.     I didn't say I did 12 surgeries a week,

4    for clarification.  I said I did between six and eight

5    procedures a week.

6           Q.     Oh, I thought that was per day.

7           A.     No, I'm sorry.

8           Q.     Okay.  Six to eight per week?

9           A.     Correct.

10          Q.     So spread out over the two days?

11          A.     Correct, right.

12          Q.     And of those six to eight, how many are

13   Gynemesh PS, typically?

14          A.     I would say it may range from two to

15   four.

16          Q.     And with the understanding that,

17   typically, it's going to be TVT Exact, how many are

18   TVT?

19          A.     Again, I would say as an average range

20   two to four, it could be five.  It could be four to

21   five in a single day.

22          Q.     So these are procedures that on a weekly

23   basis you are discussing with patients and then

24   performing, correct?

Marc R. Toglia, M.D.

```
 1          A.      I would say on a daily basis, whether

 2    it's in the office or in the operating room, I am in

 3    constant, you know, dialogue, examinations that would

 4    involve these type of products, absolutely.

 5          Q.      So specific, and, you know, I guess we

 6    haven't said this, but is the Prolift on the market

 7    right now?

 8          A.      It is not.

 9          Q.      Why is that?

10          A.      The manufacturer decided to withdraw the

11    product from the market.

12          Q.      Was there FDA action that preceded that?

13          A.      It's my understanding that the FDA

14    wanted to require very specific research at certain

15    endpoints.  Moving forward the company felt that they

16    had already invested a significant amount of resources

17    and felt that they had already adequately demonstrated

18    what the FDA was asking for, but the FDA was not

19    satisfied with what had been provided and wanted

20    everything to sort of be redone.

21          Q.      And, to your understanding, what did

22    Ethicon do in response to that?

23          A.      Again, I wasn't involved at that level

24    in the decision-making itself.  It's my understanding
```

Marc R. Toglia, M.D.

1    that they chose to withdraw the products, the family of

2    products on the market.

3            Q.      Rather than perform the studies that the

4    FDA was asking for?

5            A.      I mean, I don't know that it's a rather

6    than.  They just decided to withdraw the products.

7            Q.      And the defendants haven't made you

8    privy to any of the internal communications regarding

9    this business decision, have they?

10                   MR. SNELL:  Who?  Answer to your

11               recollection.

12                   THE WITNESS:  To my recollection, I

13               don't remember being privy to that information,

14               no.

15                   MR. SCHNIEDERS:  Do you have a --

16                   MR. SNELL:  Well, I mean, he has the 522

17               orders and the back and forth of what the FDA

18               said, if that's what you're talking about.  I

19               should have objected because your question was

20               a little vague.  I wasn't quite sure what you

21               were talking about exactly.

22                   MR. SCHNIEDERS:  I said internal -- you

23               got real time right there, just read it.  It

24               says and the defendants haven't made you privy

Marc R. Toglia, M.D.

1          to any of the internal communications regarding

2          this business decision, have they, and I think

3          the answer is no, to your recollection.

4                    MR. SNELL:  I don't know.  I haven't

5          looked through everything Ostergard has, and

6          there's a huge binder, and if it's in his

7          stuff, it's been given to him.

8                    THE WITNESS:  But, no, I have not.

9     BY MR. SCHNIEDERS:

10          Q.     Okay.

11          A.     In my recollection is that I have not.

12     I don't recollect, rather.  I'm sorry.

13          Q.     And the most recent things that you

14     might have read would have been Ostergard, correct?

15          A.     I don't recall reading any of that in

16     Ostergard, but, no.

17          Q.     Have you asked the defendant for any of

18     those internal communications?

19          A.     I have not.

20          Q.     Why not?

21          A.     I don't consider them to be relevant to

22     my generating the expert report.

23          Q.     You're not curious what their

24     decision-making process was in to why they wouldn't do

Marc R. Toglia, M.D.

```
 1   extra testing?

 2              MR. SNELL:  Form, foundation.

 3              THE WITNESS:  I have no curiosity in

 4        that domain.  I have plenty of other work to

 5        occupy my time.

 6   BY MR. SCHNIEDERS:

 7        Q.    But, as we sit here today, and we've

 8   established from your expert report you believe that,

 9   for instance, the Prolift is a safe product when used

10   according to its indications, correct?

11        A.    I think that we have over 3,000 clinical

12   trials involving tens of thousands of women with data

13   collected out to seven years that more than adequately

14   supports the use of Prolift for the treatment of

15   prolapse in women as an effective product, correct.

16        Q.    But you don't know why the defendant

17   pulled the product, if that's the case, correct?

18              MR. SNELL:  Form, foundation, asked and

19        answered.

20              THE WITNESS:  I'm assuming like much in

21        life, it was a business decision.  They

22        balanced potential revenue versus whatever

23        investments, and but no.

24   BY MR. SCHNIEDERS:
```

Marc R. Toglia, M.D.

```
1          Q.      It was a money decision?

2          A.      I don't know.

3                  MR. SNELL:  Same objection.

4                  THE WITNESS:  I don't know, sir.  I'm

5      sorry.

6   BY MR. SCHNIEDERS:

7          Q.      We've established in the six to eight

8   procedures per week, at least several of them are going

9   to involve the products that you are testifying in this

10  litigation?

11         A.      That is correct.

12         Q.      So take me through when you have a woman

13  that comes in with pelvic organ prolapse and you've

14  determined that Gynemesh PS would be a suitable

15  surgical placement for her, what do you tell her about

16  the risks and benefits?

17         A.      Specifically, the discussion is the

18  same.  Women with prolapse have a certain set of

19  baseline symptoms.  Obviously, they have both symptoms,

20  they frequently have bladder or bowel dysfunction.  The

21  majority of them have pre-existing sexual dysfunction.

22  We explain to them the intent and the limitations of

23  surgery in general in correcting those problems.  I try

24  to set realistic expectations as far as what is likely
```

Marc R. Toglia, M.D.

```
1   to get better, what may not get better, and then we

2   start to go through their options.

3           As I go through their options, I try to, in a

4   fairly nondirective manner, to guide them to a decision

5   based very much on the information that we're reading

6   in my report.  You know, these are the different

7   procedures at our disposal.  These are the different

8   approaches.  Some of these approaches may include

9   hysterectomy or not hysterectomy.  Some may involve

10  simple tissue plication.  Some are done abdominally,

11  some are done vaginally, some are done as a combination

12  of both.  Some may involve the placement of mesh

13  surrounding the vagina, and we go over what these

14  women's priorities are, what their concerns are, what

15  they hope to accomplish.  We look at their ages, their

16  co-morbidities, and I try to help them on an individual

17  level to make a decision that's best for them.

18          Q.    And on the topic of mesh and more

19  specifically Gynemesh PS comes up, what do you tell

20  them the risks are of that procedure?

21          A.    Again, the conversation is largely, you

22  know, all prolapse surgery come with very similar risks

23  in terms of whether or not it will be successful,

24  whether or not you will develop normal bladder
```

Marc R. Toglia, M.D.

1    emptying, abnormal bladder emptying, could you

2    experience chronic pain, could you experience pain with

3    sexual intercourse.  I can't tell you that I -- you

4    know, I don't necessarily distinguish from one to the

5    other in a general sense.

6          Obviously, if we're going to implant mesh, I

7    speak to them about the fact that polypropylene mesh is

8    the most widely used material in our field, that

9    there's experience that goes back decades.  That, in

10   general, this is the consensus standard of care

11   material used throughout the world, and obviously we

12   talk to them a little bit about our personal experience

13   in our practice and over my 24, 25 years of clinical

14   practice.

15         Q.    So when you're talking to a woman about

16   placement of Gynemesh PS, do you tell her that it's

17   possible that she will have chronic pain following the

18   surgery?

19         A.    To be honest with you, we rarely see

20   pain as a consequence of these procedures.  I certainly

21   will say that there's always the potential for pain.

22   Again, I don't believe that it's the mesh itself.  To

23   be honest with you, most of the pain that we see is

24   certainly more related to the plication parts of the

Marc R. Toglia, M.D.

1   procedure.

2        Rarely do I think the mesh has anything to do

3   with that.  You know, I think certainly if you look at

4   the report, counselor, vaginal length tends to be

5   longer when we use the mesh, sex tends to be more

6   comfortable when we use the mesh.  The incidence of

7   pain is no higher than it is with the other techniques.

8   The incidence of dyspareunia in most studies is

9   extremely low, you know, certainly 10% is the summary

10  incident that we will talk about.  In randomized

11  trials, it's been as low as 3%.

12       Native tissue repairs, in my opinion and in the

13  literature that I've reviewed, often times have

14  dyspareunia rates that are far higher, 15%, 25%.

15  Again, it's a complicated discussion.  The majority of

16  these people have some degree of pain with sex prior to

17  surgery.  We have to speak about the likelihood that

18  that pain will improve.  There are some women that have

19  no pain.  We talk about the chance or the rates of de

20  novo dyspareunia.  It's not a black-and-white kind of

21  discussion, and it's typically a discussion that takes

22  place over three or four visits.

23             MR. SCHNIEDERS:  I will object and move

24        to strike as nonresponsive.

Marc R. Toglia, M.D.

```
 1    BY MR. SCHNIEDERS:

 2         Q.    Doctor, when you are talking to a women

 3    about placement of Gynemesh PS, do you tell her it's

 4    possible that she will have chronic pain following the

 5    surgery?

 6              MR. SNELL:  Objection.  I think he's

 7         asked and answered that.

 8              THE WITNESS:  Okay.  So the Gynemesh is

 9         only one part of the surgical procedure that

10         I'm doing.  So we are talking -- I talk to them

11         about the overall risk of the surgical

12         intervention.  If we're going to do a

13         hysterectomy and a sacrocolpopexy with mesh and

14         a posterior repair, I'm talking about the

15         overall likelihood of complications.

16              MR. SCHNIEDERS:  Mark as Exhibit 10 the

17         IFU for Gynemesh PS.

18              (Document marked for identification as

19         Toglia Deposition Exhibit No. 10.)

20    BY MR. SCHNIEDERS:

21         Q.    Doctor, are you familiar with this

22    document?

23         A.    I am familiar with the IFU, yes.

24         Q.    For the jury's benefit, what does the
```

Marc R. Toglia, M.D.

1    IFU tell a doctor?

2         A.    The IFU stands for information for use.

3    It's a document that will explain everything from the

4    material you use, how it's sterilized what the intended

5    uses are, situations in which it might be used.  There

6    is a listing of precaution and adverse events that are

7    known and some suggestions to the surgeon to keep in

8    mind when the surgeon is coming up with a surgical

9    plan.

10        Q.    And this is the 2015 version of this IFU

11   because you understand that this IFU is updated

12   February of 2015, correct?

13        A.    That is my understanding, correct.

14        Q.    Do you make it a habit as a surgeon to

15   read the IFUs for all products that you're placing?

16        A.    I am pretty much an instruction reader

17   in general.  I even read the instructions to my VCR and

18   my phone, although, obviously, I missed the part about

19   the voice speaking, but, yes, I am -- I do read, and

20   largely, you know, I do teach, so I want to make sure

21   that what I say is consistent with the IFU.

22        Q.    Just excited you still have a VCR.

23        A.    I know, right.

24        Q.    If you go to the indications, what are

Marc R. Toglia, M.D.

```
 1    the indications for Gynemesh PS?  It's on the second

 2    page.

 3              A.     With the understanding that as a

 4    surgeon, I've got the ability to use things as I see,

 5    you know, fit for what I'm working on.  Specifically,

 6    we use Gynemesh for the correction of pelvic organ

 7    prolapse.  What it says here specifically that it's

 8    being used as a bridging material for apical, vaginal

 9    and uterine prolapse.  This one here that you've given

10    me specifically, in my opinion, is referring to an

11    abdominal approach.

12              Q.     Okay.  And was Gynemesh previously

13    indicated for only an abdominal approach?

14              A.     My understanding back in 2002, when

15    Gynemesh -- Gynemesh PS received its indication, it was

16    not stated in the same language, it was stated in a

17    much more general sense that it could be used for

18    prolapse, and the implication was either abdominally or

19    vaginally.

20              Q.     And is it your -- do you have the --

21    strike that.

22              Are you aware that that indication was changed

23    at the same time that Prolift was removed from the

24    market?
```

Marc R. Toglia, M.D.

```
 1              A.      I'm aware through my review of these

 2     materials.  I can't tell you at the specific moment

 3     that it was removed from the market that I was abruptly

 4     aware of that.

 5              Q.      So there wasn't an Ethicon rep that was

 6     coming by your office to let you know?

 7              A.      I mean, in general, I'm an expert in

 8     this area.  I possess far more expertise than

 9     representatives.  I can't tell you that I really depend

10     upon the sales rep, in general.  I know most things way

11     before and beyond what any of the sales reps, so I

12     cannot tell you that I have -- you know, that that's

13     a -- where I depend upon the information from.

14              Q.      But fair to say that the IFU is a

15     document that's intended to give surgeons additional

16     information about a product, including safety

17     information, correct?

18              A.      It's a document that provides guidance.

19              Q.      If you go to the third page under

20     adverse reactions, and I can mark the other IFU, if you

21     like, Doctor, but if you have a recollection, do you

22     recall that -- well, actually, let's just do it this

23     way.

24              Strike that.
```

Marc R. Toglia, M.D.

```
1              (Document marked for identification as

2         Toglia Deposition Exhibit No. 11.)

3   BY MR. SCHNIEDERS:

4         Q.     I'm marking as Exhibit 11 the previous

5   IFU for Gynemesh PS, although I apologize that it's got

6   a lot of other languages in there along with it.  But

7   the English version should be right out front.

8         So, Doctor, if you go to what we've marked now

9   as Exhibit 11, that is the version of the IFU for

10  Gynemesh PS that was in effect previous to this

11  February of 2015.

12        Does that look consistent with your

13  recollection?

14              MR. SNELL:  Give me a second to look at

15         it.  Okay.  Go ahead.

16              THE WITNESS:  Sure.  The date on here is

17         September 15, 2008.  I agree with you that this

18         one preceded this one.

19  BY MR. SCHNIEDERS:

20        Q.     If you look at the second page, would

21  you look at the indication there for Gynemesh PS as of

22  2008?

23        A.     Yes, I do see that paragraph.

24        Q.     And that's a different indication than
```

Marc R. Toglia, M.D.

```
1    what is in place in February of 2015, correct?

2                   MR. SNELL:  Foundation.

3                   THE WITNESS:  I would say the

4             indications to me seem similar.  The wording

5             has been changed.  In both they mention that

6             the material is used for bridging material for

7             the treatment of prolapse.  One mentions

8             vaginal wall.  The other one is more inclusive

9             of apical, vaginal and uterine.  So, I mean,

10            the language is slightly different.  My opinion

11            is the intent is pretty much the same.

12   BY MR. SCHNIEDERS:

13            Q.    But the previous version of the IFU

14   didn't infer an abdominal approach, correct?

15            A.    Correct.

16            Q.    Whereas the February 2015 IFU does,

17   correct?

18            A.    Correct.

19            Q.    Okay.  Doctor, if you go to the third

20   page of both IFUs, you'll find the section that's

21   called adverse reactions, and you can see just by

22   looking at it at first glance, that the adverse

23   reactions section in 2015 is much longer than it was in

24   the previous version, correct?
```

Marc R. Toglia, M.D.

```
 1          A.      Yes.

 2          Q.      And under -- in the previous version it

 3    states potential adverse reactions are those typically

 4    associated with surgically implantable materials,

 5    including infection, potentiation, inflammation,

 6    adhesion formation, fistula formation, erosion,

 7    extrusion and scarring that results in implant

 8    contraction.

 9          Did I read that correctly?

10          A.      Yes, you did.

11          Q.      And that's the only thing that's listed

12    under adverse reactions in the previous IFU, correct?

13          A.      Yes.

14          Q.      If we go to the more recent IFU, I

15    believe that that bullet point essentially that I just

16    read with a few additional terms appears as the first

17    bullet point in adverse reactions.

18          Does that look like a fair reading?

19          A.      I agree.

20          Q.      And then there's several -- there's

21    eight more bullet points that follow in adverse

22    reactions, correct?

23          A.      Yes.

24          Q.      And I missed two.  There's two more on
```

Marc R. Toglia, M.D.

1    the next page as well, so ten more, correct?

2         A.    Yes.

3         Q.    Okay.

4         A.    Well, and then there are other adverse

5    reactions, but I'm with you, counsel.  I'm following

6    along with you.

7         Q.    Okay.  So that second bullet point there

8    that starts with "as with any implants," could you read

9    that, Doctor.

10        A.    As with any implant, a foreign body

11   response may occur.  This response could result in

12   extrusion, exposure -- excuse me -- erosion, exposure,

13   fistula formation and/or inflammation.

14        Q.    And the third bullet point there that

15   begins with "potential adverse reactions," could you

16   read that?

17        A.    Potential adverse reactions are those

18   typically associated with pelvic organ prolapse repair

19   procedures, including pelvic pain, pain with

20   intercourse, which in some patients may not resolve.

21        Q.    If you go to the bullet point that

22   begins with "excessive contraction," could you read

23   that, Doctor.

24        A.    "Excessive contraction or shrinkage of

Marc R. Toglia, M.D.

1   the tissue surrounding the mesh, vaginal scarring,

2   tightening and/or shortening may occur."

3          Q.     And what would happen if there was

4   excessive contraction or shrinkage of the tissue

5   surrounding the mesh?

6          A.     I guess it would vary, depending upon

7   where specifically we were talking about that.

8          Q.     As the expert here, Doctor, tell me what

9   are the different alternatives.

10         A.     As the expert I can tell you I've never

11  observed shortening or shrinking or scarring, but,

12  again, I'm speaking to, you know, in the anterior

13  compartment, there could be some influence on bladder

14  function.  At the apical end of things, I would think

15  that it could affect sexual intercourse.  In the

16  posterior compartment, there could be events there,

17  although, again, I point out in my report, I evaluated

18  this extensively, and there's no evidence from the

19  literature that these types of events are occurring

20  with any greater frequency with these products as

21  compared to other types of repairs, and that is

22  inferred in the paragraph I believe that you read

23  yourself, that these are risks typically associated

24  with pelvic organ prolapse repair.

Marc R. Toglia, M.D.

1      Q.      Actually, that's the first paragraph.

2      A.      Sorry.  Third bullet point, "Potential

3  adverse reactions are those typically associated with

4  pelvic organ prolapse repair procedures."

5      Q.      And obviously excessive contraction or

6  shrinkage of the tissue surrounding the mesh, vaginal

7  scarring, tightening and/or shortening is not something

8  that is caused by pelvic organ prolapse, correct?

9      A.      Pelvic organ prolapse or pelvic organ

10  prolapse repair procedures?

11      Q.      Fair enough.  The repair procedure.

12      A.      It is, and, again, if you read through

13  my report, these are common adverse events that are

14  associated.  That's why it says that.  It says

15  potential reactions and it says typical, not unusual,

16  typically associated with pelvic organ prolapse repair

17  procedures.  And, again, I have cited several very

18  reputable sources analyzing over 100 studies involving

19  10, 11,000 patients suggesting low incidence of these

20  things and incidences that are not any different than

21  what is typically associated with pelvic organ prolapse

22  repair that does not involve mesh.

23      Q.      Regardless of whether it's caused by

24  pelvic organ prolapse repair or by the mesh, you've

Marc R. Toglia, M.D.

1    never seen it either way, right?

2         A.    That's not what I've said, sir.  I said

3    that, in my experience, as I stated in my report, I've

4    never seen the mesh cause shrinkage or scarring above

5    or beyond what we would typically see.

6         Q.    Do you see the second to last bullet

7    point that says "neuromuscular problems, including

8    acute and/or chronic pain in the groin, thigh, leg,

9    pelvic and/or abdominal area may occur"?

10        A.    I do see that.

11        Q.    Do you agree with that statement?

12        A.    I agree, yes, that with pelvic organ

13   prolapse repair procedures that we do that those

14   problems can occur.  They can occur with suture based

15   repairs.  They can occur with mesh based repairs.  If I

16   could refer you to the study, and I'm sorry, some of

17   these names I have trouble pronouncing, he did

18   sacrospinous ligament suspension, Qatawneh, okay, he

19   points out, for example, temporary sciatic neuralgia,

20   this is on Page 15 of my report, pointed out that about

21   I believe it was 11% of patients in either group

22   experienced sciatic neuralgia.

23        Actually, Barber et al. in what's the OPTIMAL

24   trial, and the OPTIMAL trial is included in the

Marc R. Toglia, M.D.

1   materials I provided for you, and these were suture

2   based repairs, nerve pain was observed in one arm,

3   6.9%, in the second arm 12.4%.

4          Q.     Okay.  In your risk-benefit discussion

5   with a patient who is potentially going to have a

6   Gynemesh PS placed, do you tell her that excessive

7   contraction or shrinkage of the tissue surrounding the

8   mesh, vaginal scarring, tightening and/or shortening

9   may occur?

10         A.     Again, we don't do these procedures in

11   isolation, so I speak to them about the total

12   procedure.  In general, that's not been our experience

13   to see that, but I do explain to them that sometimes

14   surgery can result in pain, either pain during sex or

15   even pain not related to sex.  And, obviously, they

16   have an incision in the vagina.  It's -- the incision

17   is obviously going to be tender initially.  That

18   tenderness usually resolves over time; however, there

19   are instances in which the pain will persist.  I don't

20   specifically say it's the product that causes those

21   procedure because based upon the records -- excuse me,

22   the literature that I have reviewed and my own personal

23   experience in 25 years, that has not been what we have

24   observed or is what's been reported.

Marc R. Toglia, M.D.

1           Q.      Do you tell that woman that potentially

2    is going to have Gynemesh placed that neuromuscular

3    problems, including acute and/or chronic pain in the

4    groin, thigh, leg pelvic and/or abdominal area may

5    occur.

6           A.      I think that's what we just address, in

7    general I tell them that is part of the risks of

8    surgery in general for pelvic organ prolapse, that they

9    are uncommon problems, and, again, if it's a patient

10   with fibromyalgia, they probably have a little bit

11   higher risk because they're already sort of predisposed

12   to that.  Again, it may vary based upon age.  So it's

13   really a general discussion that is sort of tuned for

14   that individual, but, overall, I am covering the

15   general topics as listed in -- that we've just been

16   discussing from the IFU.

17          Q.      But your discussion with women that are

18   undergoing surgery to correct pelvic organ prolapse is

19   the same, regardless of whether you're placing a mesh

20   or you're doing any other surgery, correct?

21          A.      Yes, because the risks are the same.

22   Incidence of dyspareunia, pain, defecatory dysfunction,

23   voiding dysfunction, incontinence, in general is not

24   different percentage-wise between the procedures, and

Marc R. Toglia, M.D.

1   that is sort of the sum and basis of the report that

2   I've generated for this purpose.

3          Q.     Do you tell a woman that potentially is

4   to receive a Gynemesh PS product that at some point

5   another surgeon or you may have to go in there and

6   remove the mesh?

7          A.     In general, I inform the woman that the

8   mesh is permanent, that the good news is is that,

9   typically, if we get a satisfactory result, that result

10  is long lasting.  I explain to them that typically the

11  literature has supported that repairs done with mesh

12  are typically superior to the results without mesh, and

13  that certainly has matched our personal experience in

14  this field in the last 25 years, but, yes, if they were

15  to develop pain that there may be a risk of

16  re-intervention.  Typically, that risk of

17  re-intervention is low in our practice.  It's probably

18  5%.

19          The literature would suggest that the risk of

20  re-intervention is in the low teens, again, depending

21  risk factors.  What's the patient's age, is she a

22  smoker, is she obese.  So sometimes I do fine-tune that

23  and say I would consider you to be somebody at a little

24  bit higher risk than what I'm explaining to you right

Marc R. Toglia, M.D.

```
 1   now or somebody that I believe are a little bit lower

 2   risk, but, again, it's always part of that general

 3   discussion about the surgery in general because we

 4   rarely go in and just sort of do one thing and nothing

 5   else.

 6          Q.    But it's fair to say that if mesh is

 7   never placed, that you don't have to go in and remove

 8   mesh if there's a complication, correct?

 9          A.    If mesh is not placed, then you don't

10   have to go in to remove mesh.  If suture is placed, you

11   may have to go in to remove sutures, and, again, in our

12   experience, those occur with equal likelihood.

13          Q.    With sutures there's equal likelihood

14   that another intervention would be necessary?

15          A.    Correct.  In fact, I published a paper

16   in which the likelihood re-intervention to remove

17   sutures exceeded 30%, and that is certainly -- that is

18   probably three times the incidence of us having to go

19   back to deal with mesh-related wound -- I'm just going

20   to classify these are all types of wound complications.

21   So whether the wound opens up, whether there's a suture

22   that's exposed, whether the wound opens up and mesh is

23   exposed, that's a wound complication.

24          In our practice and supported by the
```

Marc R. Toglia, M.D.

1    literature, they occur at least with equal frequency.

2    In our hands, they occurred three times higher with

3    suture based repairs.

4         Q.    Did you ever approach Ethicon and ask

5    that Gynemesh's mesh be less rigid?

6         A.    I don't know.  I'm concerned because you

7    seem to be reading from something while you're asking

8    me that question, but I honestly don't know.  I'm sure

9    I offered them opinions, again, in a theoretical sense

10   whether it was Prolift+M, whether it was Prolift,

11   whether it was Gynemesh, there were subtle variations,

12   there were other products from other companies, I may

13   have had ideas about what I thought.

14        I mean, my recollection is that I said to them,

15   look, at least in my observation, I find that, you

16   know, Prolift+M is a more rigid material.  At the time

17   of implantation, that may be beneficial, it's a little

18   easier to work with if it's rigid; however, it could,

19   in fact, maybe be associated with more wound

20   complications, and I would let them know that just so

21   they can just include that in the information that

22   they're receiving.

23        You know, again, I tended to be an early

24   adopter of these procedures, and I felt a

Marc R. Toglia, M.D.

1   responsibility as an early adopter to provide early

2   feedback.

3            Q.      What is your understanding of what a KOL

4   is?

5            A.      A KOL is a term that means key opinion

6   leaders, and it's a term used by industry to identify

7   people that they considered to be key opinion leaders.

8   What they specifically mean by that and what I might

9   think about that may not be the same thing.

10           Q.      Would you have considered yourself to be

11  a KOL for industry?

12           A.      I mean, I think they might consider me

13  to be a KOL.  You know, I mean, certainly, at this

14  point in time, I've been doing this for a long time, I

15  do a high clinical volume, I'm a relatively

16  straightforward and approachable person, and I'm pretty

17  liberal with my opinions, but I would say -- sorry to

18  give you a long-winded answer, I know that

19  organizations have considered me to be a key opinion

20  leader in this area.

21           Q.      What is -- in medicine, what's a

22  conflict of interest?

23                   MR. SNELL:  Form, overbroad.

24                   THE WITNESS:  Exactly.  You know, I

Marc R. Toglia, M.D.

```
 1            mean, there are very many different forms of

 2            conflict of interest.  I mean, you know, I'd

 3            have to get -- have a specific situation.

 4  BY MR. SCHNIEDERS:

 5       Q.    Well, when drafting an article, is it

 6  part of the canon that physicians will disclose

 7  potential conflicts they might have that could

 8  potentially affect their opinion?

 9            MR. SNELL:  Form, vague, also undefined

10            as to scope and time.

11            THE WITNESS:  You know, I think there's

12            a fine line between bias and conflict of

13            interest, however, you know.  For example, in

14            the TVT Secur trial, I revealed to the

15            publishing journal and the people reviewing the

16            manuscript that, you know, yes, I have taught

17            this procedure and I have been compensated for

18            that time.

19            I'll tell you, quite honestly, I don't

20            think the results of that trial was of any

21            benefit to the company, you know.  The company

22            did not pay for that trial directly.  It

23            involved their products, so my involvement was

24            based on my experience.  My involvement was not
```

Marc R. Toglia, M.D.

```
 1              based upon the fact that I had a relationship

 2              with the company, but I understand that some

 3              people might view that as a negative, so I did

 4              disclose that.

 5    BY MR. SCHNIEDERS:

 6         Q.    Well, what's the purpose of disclosing

 7    conflicts in literature?

 8              MR. SNELL:  Same objection.

 9              THE WITNESS:  You know, I think when you

10              read something, you're trying to understand

11              where that person is coming from and whether or

12              not they may be otherwise motivated.  You know,

13              if I own stock in a company, I could run around

14              and say -- you know, if I own stock in

15              Volkswagen and I drove a Volkswagen, I might

16              tell Bert and yourself and anybody else what a

17              great car, I've never driven a better car, and

18              I own stock in this company because I've got a

19              conflict, in a sense.  So that's how I would

20              view a conflict.  I might be otherwise

21              motivated in revealing that information.

22    BY MR. SCHNIEDERS:

23         Q.    As a physician, when you're reading

24    literature how do you factor in potential conflicts?
```

Marc R. Toglia, M.D.

1          A.      You know, it's just one of a host of

2   variables.  Everybody clearly has a bias, you know, or

3   a prejudice, you know, many of which might be based

4   upon personal experience.  So, you know, even if

5   there's no industry related conflict, you know, there's

6   always bias involved, and it's just one thing to keep

7   in mind and it's a very -- you have to balance, you

8   know, that with everything else that you're reading.

9          Q.      And is that something that you as a

10  reviewer of literature do when you're reviewing

11  studies, for instance, in this case?

12         A.      We look at their disclosures, you know.

13  We looked at funding for the study direct.  We look at

14  what the authors would reveal as potential conflicts.

15  I can't tell you that that is -- that commonly changes

16  the overall value of the report or what's being said.

17  The results typically speak for themselves.  There are

18  a number of internal controls.

19         So, for example, when you randomize somebody to

20  one intervention or the other, you're looking to

21  minimize bias.  When you do a randomized trial that

22  might involve over 50 surgeons across five different

23  countries, as had been done, for example, with Prolift,

24  you will also minimize those biases as well.  When

Marc R. Toglia, M.D.

1    things are blinded to the patient, you're trying to

2    minimize the bias.  If the patient knew that they were

3    having the same procedure that maybe their sister had

4    and their sister had a great result, for example.

5            Obviously it's a little harder to blind a

6    surgeon.  You can't blind them to do the actual

7    procedure, I don't think that would be safe, but

8    sometimes the person who is doing the evaluation of the

9    result might be blinded to what the surgeon did.  That

10   was the case, for example, I believe with the TVT Secur

11   trial, it was sort of single blinded in that regard.

12           Q.    Is it significant to you when you review

13   literature how much money one of the authors might have

14   made from a company that that study benefits?

15           A.    Typically, no.

16           Q.    Is there a threshold where it does

17   become important, for instance, if they make $500,000?

18           A.    I'm not aware -- I don't have a

19   threshold, no.

20           Q.    So not a million dollars?

21           A.    I don't have a threshold.

22           Q.    $10 million?

23           A.    I don't know how I can say I don't have

24   a threshold any differently.  You know, again, from

Marc R. Toglia, M.D.

1   where I sit, as you can tell from my report, I'm more

2   interested in the -- what we call sort of the summary

3   or the pooled analysis of data.  I'm not going to hold

4   any single study as being the Holy Grail.  I'm looking

5   for consistencies between studies.  I'm factoring in

6   thing like biological plausibility to what's being

7   offered.  I'm looking very specifically at levels of

8   evidence, you know, reproducibility of the results.

9   Those are far more important to me than who was paid

10   what for what and why.

11          Q.     Who other than authors of a study should

12   hold editorial power over the study?

13                 MR. SNELL:  Form.

14                 THE WITNESS:  You know, again, all

15          studies are different.  You know, some

16          studies -- you know, if somebody is paying for

17          a study to be performed, and, again, that's an

18          arrangement made between the investigator and

19          the source of the research, you know, for

20          example, the NIH if they're going to sponsor a

21          study, they oftentimes will insist that that

22          study be available at no cost in a public forum

23          to anybody who might want.

24                 Certainly, in some of these studies that

Marc R. Toglia, M.D.

```
 1              were directly funded by the company, the

 2              company wanted to have access to those results.

 3              I don't know that it is common for there to be

 4              any undue influence, but, again, that sort

 5              of -- you know, you would think that once a

 6              study was published, it's sort of passed

 7              certain bars of professionalism to get to that

 8              point.

 9    BY MR. SCHNIEDERS:

10         Q.    Just so I'm clear because you just said

11    after published, I'm talking about before it's

12    published when it's still a draft manuscript?

13         A.    Sure.  I'm sorry.  What I was saying if

14    a study becomes published, you would assume this would

15    have been vetted.  It varies, it varies widely, you

16    know, in our experience, as far as how much influence.

17    Sometimes it's simply they want to be aware of the

18    data.  You know, sometimes they may want to contribute

19    information.  I'm not sure exactly what you're

20    implying.

21         Q.    I'm just asking is it appropriate for a

22    pharmaceutical or a device company to have a draft copy

23    of a study and add or subtract words from it prior to

24    it being published?
```

Marc R. Toglia, M.D.

```
 1                    MR. SNELL:  Objection, vague, lacks
 2            foundation, incomplete hypothetical.
 3                    THE WITNESS:  I think if -- I think that
 4            typically that is an agreement and a decision
 5            that is made before the study actually begins
 6            and, therefore, is kind of sort of removed from
 7            the actual results of the study, so it varies
 8            widely.  You know, as an investigator you have
 9            to decide your level of comfort of that
10            involvement.
11                    You know, you appear to be maybe too
12            young to have children in college, but it's the
13            same argument, if I'm paying for my son to go
14            to college, do I deserve to know, you know, his
15            shenanigans, his grades, potential issues, you
16            know.  Again, there are agreements between you
17            and your child, between you and the school,
18            same thing in here.  But those are usually
19            clearly defined at the time that there's an
20            agreement to fund the study and it varies.
21   BY MR. SCHNIEDERS:
22            Q.     In your study that was funded by
23   Ethicon, did they have editorial control?
24            A.     My study was not funded by Ethicon.
```

Marc R. Toglia, M.D.

```
1          Q.     It wasn't?

2          A.     Not directly, no.

3          Q.     What do you mean "not directly"?  That

4    sounds like a qualifier.

5          A.     My study was not -- again, I was not the

6    study designer, but the study was funded by -- the

7    funding is listed on the actual study, I believe it was

8    the foundation, and I'm sorry if I'm forgetting the

9    exact terms, the foundation of women's health.  I did

10   not receive any compensation, and I don't -- it was

11   founded by the foundation, and it was a randomized

12   study between seven sites.  So I would violently object

13   to you telling me that that study was funded by Ethicon

14   because it was not.

15         Q.     And not sure if I'm clear, are you

16   saying you didn't get compensated at all for that

17   study, or you didn't get compensated by Ethicon?

18         A.     I was not compensated by Ethicon for

19   that study.

20         Q.     But the foundation, they compensated

21   you, right?

22         A.     The -- excuse me, the study compensated

23   my practice for the data collection and the clinical

24   nurse coordinator and stuff like that.
```

Marc R. Toglia, M.D.

```
 1            Q.    Did you get paid anything yourself?

 2            A.    I mean, in my employment all monies go

 3     into a pool.  We subtract expenses from revenue.  The

 4     money doesn't come to me directly labeled or traceable

 5     from any one site.

 6            Q.    So, clearly, if Ethicon didn't fund your

 7     study, it would be inappropriate for them to have a

 8     draft copy and make edits on that, right?

 9            A.    Those are two completely separate

10     issues.

11            Q.    How so?

12            MR. SNELL:  Objection, asked and

13            answered.

14            THE WITNESS:  Again, I was not part of

15            the -- that discussion.  I did not discuss the

16            study with Ethicon.  I don't -- was not part of

17            that discussion.  My understanding is that they

18            saw a copy of the results.  I do not believe

19            that they had any influence.  I will tell you

20            that that particular study won two first prizes

21            as best surgical paper of the year, both one

22            nationally, one internationally.  That is not

23            something that occurs with an industry -- you

24            know, an industry sponsored study.
```

Marc R. Toglia, M.D.

1    BY MR. SCHNIEDERS:

2         Q.    So that was not an industry sponsored

3    study, correct?

4         A.    Again, I was not -- I did not design the

5    study.  I am not employed by the foundation that I

6    mentioned, so that was not directly funded by Ethicon.

7    The foundation collects money from various sources,

8    including people like myself that would make a

9    contribution.  The pooled resources of the foundation

10   funded studies.  The studies were designed by the

11   investigators.  The company had no influence on the

12   study design.  The company had no influence on the

13   study results.  The company had no influence on the

14   writing of the manuscript and they certainly had no

15   influence in the presentation or the submission of the

16   data.  I hope I've clarified that for you because you

17   seem to be a little misinformed in that regard.

18              (Document marked for identification as

19         Toglia Deposition Exhibit No. 12.)

20   BY MR. SCHNIEDERS:

21        Q.    Doctor, I'm showing you what I'm marking

22   as Exhibit 12, which is a PowerPoint that came from

23   Ethicon and it's entitled "KOL Strategy."

24        A.    Uh-huh.

Marc R. Toglia, M.D.

```
1          Q.    So a moment ago when we were talking

2    about KOLs, we discussed the fact that that means key

3    opinion leader within the industry, correct?

4          A.    That's my assumption.  I can't tell you

5    that anyone has ever -- I've kind of figured that out

6    myself.  Obviously, it doesn't stand for Knights of

7    Columbus, but I'm assuming that that's what that means.

8    I have no objection if you tell me that that's what

9    that means.

10         Q.    That's my understanding as well.

11         If you see on the front page of this, this is

12   from February of 2008, you see that?

13         A.    And this is coming specifically from

14   where?

15         Q.    This is from Ethicon.

16         A.    But where specifically within Ethicon?

17   This is marketing, this is R&D, this is --

18         Q.    We would have to get the Bates number

19   and tell you whose file it was in, but it's from one of

20   their internal files.

21         A.    Sure.

22         Q.    So if you go to the third page --

23   probably marketing, typically.

24         A.    I would agree with that.  I'm sorry that
```

Marc R. Toglia, M.D.

1    I led you to that statement.

2            Q.    Typically, KOLs work with marketing,

3    right?

4            A.    I mean, I was a KOL that worked -- like,

5    my involvement, say, with Astellas, which is more

6    Astellas global international, my involvement is not

7    marketing.  It's more R&D, and, you know -- and as

8    we've been discussing, much of my relationship and

9    interest with Ethicon has been R&D.

10           Q.    So if we got to this third page that

11   says "KOL Categorization," there's a circle with

12   several other circles surrounding it?

13           A.    Yes.

14           Q.    It starts off it's got the KOL here in

15   the middle in the blue circle, and then it's got all

16   these different categories, it appears, that whoever

17   put this PowerPoint together feels fall within that KOL

18   categorization.

19           You see that?

20           A.    Yes.

21           Q.    And there's things like society or

22   influencer, expert user, advocacy/PR, faculty.  Are

23   those all things that you've seen in other KOLs that

24   were with Ethicon as well as you?

Marc R. Toglia, M.D.

```
 1              MR. SNELL:  Foundation.

 2              THE WITNESS:  You know, I got to be

 3         honest with you, I was not someone that was,

 4         you know, involved at all levels.  I did my

 5         little piece and stuck to my little piece.  To

 6         me, I look at this, and I'm like, what is a

 7         KOL?  Well, a KOL could be any of these things,

 8         or all of these things would contribute to a

 9         KOL.  You know, some of these people could be

10         physicians, advocacy, could be some of these

11         advocacy groups that are out there, the

12         incontinence -- National Incontinence Society.

13   BY MR. SCHNIEDERS:

14         Q.    Do you consider AUGS to be an advocacy

15   group?

16         A.    AUGS is an advocacy group, yes.

17         Q.    If you go to next page, there is a title

18   that says "Objective," and there it says, "Engage KOLs

19   across the spectrum of functional expertise to partner

20   with EWH&U in supporting organizational objectives."

21         Did I read that correctly?

22         A.    You did.

23         Q.    And EWH&U stands for Ethicon, correct,

24   women's health?
```

Marc R. Toglia, M.D.

1          A.      It stands specifically for Ethicon

2    women's health and urology.

3          Q.      So the group putting this together at

4    Ethicon feels that KOLs can be brought in in order to

5    support organizational objectives, correct?

6                  MR. SNELL:  Calls for speculation.

7                  THE WITNESS:  Again, you know, my

8          role -- and, again, my role as a KOL person of

9          influence was infinitesimal.  I was not as --

10         as they would say, I was not in the starting

11         lineup.  You know, I take it for what it reads,

12         that the objective of this project was to

13         engage KOLs across the spectrum, meaning that

14         we're not just going to focus on surgeons, you

15         know, we're just not going to focus on

16         inventors.  We're looking for a broad range of

17         individuals that might be able to help us.

18   BY MR. SCHNIEDERS:

19         Q.      If you keep going, skip the next page,

20   next two pages actually and there should be something

21   that says "Categories" at the top.  There you go.

22         A.      Yes.

23         Q.      And it's got several different

24   specialities, for lack of a better term.

Marc R. Toglia, M.D.

```
1          A.     Sure.

2          Q.     The top one is "Incontinence/Pelvic

3    Floor Specialist (UroGyn, GYN)," and of these groups,

4    and you can look at it, by all means, but that's

5    probably the group that you would identify most

6    specifically with, right?

7          A.     Yes.

8          Q.     If you go to the next page, it starts

9    off with -- it's got a title, it says "Incontinence

10   (UroGyn, Gyn)," and then it's got different categories,

11   as you can see, in the top.  It's got "Prof Ed

12   Faculty," which is professional education, right?

13         A.     Yes.

14         Q.     And under that it says "National TVT

15   Preceptor," and you're at one point a national TVT

16   preceptor, weren't you?

17         A.     Yes, I do believe that I was categorized

18   as a national preceptor.

19         Q.     And there's a category called

20   "Published," and under that it says "Published in peer

21   reviewed journals."  Is that read correctly there?

22         A.     I'm sorry.  I was looking at a different

23   page, and I apologize for not paying attention.

24         Q.     So right next to Prof Ed, there's a
```

Marc R. Toglia, M.D.

```
 1    category called "Published."

 2            A.     Yes.

 3            Q.     And under that it says -- under where it

 4    says "Description/Criteria," it says "Published in peer

 5    reviewed journals."  Did I read that right?

 6            A.     Yes.

 7            Q.     And then if you go all the way, there's

 8    "Academic" and then there's "Inventor."

 9            A.     Yes.

10            Q.     And there's "Emerging," and then there's

11    "Expert User."

12            A.     Okay.

13            Q.     And "Description/Criteria" is "High

14    utilization of product (EWH&U and Competitive)."

15            Did I read that correctly?

16            A.     Yes.

17            Q.     Okay.  And what does that mean to you as

18    far as high utilization of product?

19            A.     My interpretation is given that this was

20    a marketplace that had 49 slings, my interpretation is

21    that if 99% of what you did in this sphere was with our

22    product, as opposed to I dabbled with everybody's

23    product, I would interpret that to mean, you know, that

24    that's where high utilization.
```

Marc R. Toglia, M.D.

1        Q.      And then there's "Advocacy/PR/Policy"

2    and the criteria there is "Practice in top 25 media

3    market, academic/society affiliation," and last one is

4    "Society Leadership or Influencer, leadership role in

5    AUA, AUGS SUFU" --

6        A.      Sure.

7        Q.      "AAGL, ACOG, General Influencer."

8        A.      Uh-huh.

9        Q.      If you go to the next page, then it puts

10   some names here with the group.  I'm sure you're

11   shocked by that.

12       A.      I have no vested interest and could care

13   less.  This is their opinion.  It means nothing to me.

14   I could care less where -- I'm just laughing as far as,

15   you know, they have me listed as an inventor, you know.

16       Q.      They do?

17       A.      Yeah, see that.

18       Q.      They have you listed under inventor

19   actively engaged in the creation of new products?

20       A.      Right.  How come I'm not in the top ten?

21       Q.      And then -- well, you are in the top ten

22   on several of these.

23       A.      No, I'm not.  Not on this one I'm not.

24   This is TVT.

Marc R. Toglia, M.D.

1          Q.     Under "Expert User, High utilization of

2    product," you're actually in bold there, if you see

3    that down at the bottom?

4          A.     I have no idea what that means.  I'm

5    actually on that list twice.

6          Q.     You are, you are.

7          A.     Yes, I don't know.  I mean, again, I

8    don't know how to interpret this, in all fairness.

9    Competitive in my mind is, you know, maybe Boston

10   Scientific would be interested in this person, so this

11   is somebody that, you know, other people might be of

12   interest.  That's how I would look at competitive.

13         High utilization, I mean, you know my history

14   with the company, I've used their products extensively,

15   more so than any other things.  So to me that speaks to

16   the fact that I was an early adopter, and I've remained

17   engaged throughout that period of time.  That's how I

18   look at it.

19         Q.     And if you look at this across the way,

20   then you'll see that there's probably some names that

21   are very familiar to you as well?

22         A.     I will tell you almost everybody on this

23   list is familiar to me.

24         Q.     And specifically Vincent Lucente who is

Marc R. Toglia, M.D.

1   someone that you are a colleague of here in the area,

2   right?

3           A.      Yes.

4           Q.      And then I believe that in that same

5   column there, Mickey Karram was an author along with

6   you in your study?

7           A.      Correct, right.

8           Q.      Under academic I think Dr. Iglesia was

9   an author with you as well?

10          A.      Yes.

11          Q.      Sokol is that someone that you're

12  familiar with?

13          A.      Well, that's an interesting thing.  The

14  Sokols are twins, and they are both urogynecologists,

15  and this does not distinguish which Sokol we're talking

16  about.

17          Q.      Both of them happen to be defense

18  experts in this litigation, so it could be either one

19  of them.

20          And then if you go across --

21                  MR. SNELL:  Who for?

22                  MR. SCHNIEDERS:  I don't know the answer

23          to that.

24                  MR. SNELL:  I didn't know that.  That's

Marc R. Toglia, M.D.

```
 1           news to me.

 2                   THE WITNESS:  I'm sorry.  Are you

 3           testifying?

 4                   MR. SNELL:  No, he made a statement on

 5           the record, so I want to understand it.  I

 6           don't know if Eric and the other Sokol are

 7           experts, whatever.

 8                   MR. SCHNIEDERS:  I can find out for you.

 9           I was told that they were.

10   BY MR. SCHNIEDERS:

11           Q.    And then over on the far right, you see

12   that there are some members of the various advocacy

13   groups, AUA, AUGS.  Do you see over there, do you know

14   Rebecca Rogers?

15           A.    I do.

16           Q.    Do you know Dee Fenner?

17           A.    I do.

18           Q.    Do you know Anton Bueschen?

19           A.    I do not.

20           Q.    John Barry?

21           A.    I do not.

22           Q.    Are you a member of AUA?

23           A.    I'm not a urologist.  I am not.

24           Q.    But fair to say that there's many names
```

Marc R. Toglia, M.D.

1   on here that you're familiar with and that are

2   colleagues of yours, correct?

3            A.      They are.  Again, I don't know the

4   context.  I don't know that this is just simply a list

5   of people to be aware of.  So Rebecca Rogers probably

6   at the time that this was published was the president

7   maybe of AUGS.  Maybe this is someone that they just

8   want people to be aware of the names or if they saw

9   them, they would introduce themselves.  Maybe this is

10  somebody that they were hoping to have a better

11  relationship with.  I think -- I mean, the fact that

12  they considered me to be an inventor I think they're

13  being very generous or liberal in how they're -- I

14  think they're just categorizing people, which is

15  certainly innately human to take things and put them

16  into nice little boxes.

17           Q.      Interesting.  But as of February of

18  2008, you had done some consulting with Ethicon, hadn't

19  you?

20           A.      I had, yes.

21           Q.      And if you go there's several pages of

22  these types of categories, the one I was reading off of

23  was "Incontinence."  The next one is "Incontinence

24  (Urologist)," and then after that there's a section

Marc R. Toglia, M.D.

1    called "Pelvic Floor Specialist," which is also a

2    specialty that I believe you would probably hold

3    yourself out as holding, correct?

4              MR. SNELL:  Form.

5              THE WITNESS:  You know, I mean, the

6         specialty has gone by many names.  I think here

7         they were trying to be inclusive, you know, of

8         urology, at the time what we called

9         urogynecology, colorectal, perhaps.

10   BY MR. SCHNIEDERS:

11        Q.    But if you look at the page where you'll

12   have some names that are pelvic floor specialists on

13   the next page from where you are, I believe, you made

14   the list.  You're an expert user down there?

15        A.    I am.  Where am I?  Oh, there we are.

16        Q.    Third from the bottom down there.

17        A.    It's a miss -- I don't know who

18   Dr. Tolia is, but that could be me.

19        Q.    I think it's you.

20        A.    I would not object to that.

21        Q.    And do you know a Dr. Fagan?

22        A.    He was my partner.

23        Q.    That would make a lot of sense.

24        A.    Yeah.

Marc R. Toglia, M.D.

1          Q.      And then there's some other names that

2    we saw on the other page, but then there's a couple new

3    ones under "Published" and "Academic."  You see a

4    couple that are Goldman.

5          You see that?

6          A.      On the same page?

7          Q.      On the same page.  If you go to

8    "Published," the second -- sorry, the third name down

9    and on "Academic" is Goldman?

10         A.      Yes.

11         Q.      Do you know Howard Goldman?

12         A.      I do.

13         Q.      Howard Goldman was one of the authors of

14   the AUGS mesh statement, correct?

15         A.      I will accept that if you tell me that,

16   yes.  I don't have a visual picture of the author list.

17         Q.      And just so --

18         A.      Are we certain that that's the same

19   Goldman?  It's fairly common.

20                 MR. SNELL:  How about object,

21         foundation.  Go ahead and lay that for me.

22   BY MR. SCHNIEDERS:

23         Q.      So to spell it out for all of you, my

24   next question on the next page under "Expert User,"

Marc R. Toglia, M.D.

1    it's spelled out as Howard Goldman.  What is the group

2    CCF?  Do you know what the group CCF is?

3            A.     I can guess.  I can't tell you that I

4    recognize those initials.

5            Q.     Well, I'm not going to hold you to it.

6    I'm just curious, can you guess for me?

7            A.     My guess would be Cleveland Clinic

8    Foundation.

9            Q.     And does Howard Goldman work at

10   Cleveland Clinic?

11           A.     I believe so.

12                  MR. SNELL:  Can we take a break in a

13           minute?

14                  MR. SCHNIEDERS:  I'm switching topics,

15           so let's take a break.

16                  (Brief recess taken at 5:02 p.m.)

17                  (Deposition resumes at 5:12 p.m.)

18   BY MR. SCHNIEDERS:

19           Q.     I'm going to mark as Exhibit 13 an

20   e-mail chain that you were included on, Doctor.

21                  (Document marked for identification as

22           Toglia Deposition Exhibit No. 13.)

23   BY MR. SCHNIEDERS:

24           Q.     Do you recall earlier when we were

Marc R. Toglia, M.D.

```
 1   discussing the concept of whether or not funding from

 2   industry or other funding might lead to a conflict of

 3   interest.

 4           Do you recall that discussion?

 5       A.    I do.

 6       Q.    Okay.  You can take a minute, if you

 7   want, to read that bottom e-mail so you have some

 8   context here, and I'm going to ask you if you recall

 9   this?

10       A.    I mean, I'm aware of the -- you know,

11   the discourse between two of my colleagues.  Are you

12   asking me specifically am I aware of the e-mail or just

13   of the circumstances?

14       Q.    Either one.

15       A.    I'm aware of the circumstances.  I don't

16   recall whether this was covered in the TVT deposition

17   or not.

18       Q.    You guys covered a lot of stuff that

19   never made it to the record, and that's impressive.

20           You were on this e-mail?

21       A.    Well, I was copied on this e-mail, okay,

22   right.

23       Q.    Right.  And what, to your knowledge, was

24   this consternation about?
```

Marc R. Toglia, M.D.

```
 1              A.     If I remember correctly, and this, of

 2    course, is going back for six years, and this is a

 3    relatively minor issue that I think Dr. Iglesia had

 4    either responded in a letter to the editor, it could

 5    have even have been -- you know, when we present things

 6    at national meeting, we allow people to get up, make

 7    comments, suggestions.  So in one of these forums, she

 8    was trying to -- and I can't remember which way it

 9    went, whether it was Lucente initially commenting to

10    Iglesias on her work or whether it was Iglesias

11    commenting to Lucente, but all I can tell you is that I

12    recall that there was some friction and really just

13    collegial -- or not collegial, but discourse between

14    two colleagues about that interaction.

15              Q.     Fair to say that Dr. Iglesias inferred

16    that Dr. Lucente's superior outcomes were perhaps due

17    to financially driven bias?

18                    MR. SNELL:  Objection, calls for pure

19              speculation what somebody else thought.

20                    THE WITNESS:  I don't know.  I'm sorry,

21              but I don't know what study or whether this was

22              written comments, comments in the cafeteria,

23              comments with someone on the podium.

24    BY MR. SCHNIEDERS:
```

Marc R. Toglia, M.D.

```
1          Q.     Do you know why you would have been
2    included on this e-mail?
3          A.     I don't, no.
4          Q.     And Dr. Lucente is a colleague of yours.
5    Do you consider him to be a friend as well, or is it
6    somewhere in that blurred line?
7          A.     I think it's fair to say that -- I've
8    known Vince since he was a fellow, so we go back at
9    least 25 years.  Vince is certainly both a colleague
10   and a friend of mine, as is Dr. Iglesias, who I've
11   known for about the same amount of time as well, I knew
12   her when she was a fellow as well.
13         Q.     Fair enough.  Set that to the side.
14         A.     You understand that Dr. Lucente and I
15   are both Italian, and so sometimes that may influence
16   the tone in which we respond to other people, and we're
17   both from New York.
18                (Document marked for identification as
19          Toglia Deposition Exhibit No. 14.)
20   BY MR. SCHNIEDERS:
21         Q.     Give you what's been marked as Exhibit
22   14.  Unfortunately, this is the method by which we get
23   this information a lot of times.  I want you to look at
24   this, and I'll give you an opportunity if you need to
```

Marc R. Toglia, M.D.

```
1   vet it in any way, shape or form as I go through some

2   of these, but I will tell you if I found one that's a

3   duplicate, but this is a report that was given to us as

4   part of a larger spreadsheet and it's been reduced just

5   down to your name instead of the thousands of columns

6   and everything like that, and it shows that from

7   March 1st of 2008 through February 2nd of 2010 that

8   Ethicon paid you $152,000.

9           Do you have any reason to dispute that?

10              MR. SNELL:  I'm going to object.  That

11          is purely without foundation.  You're making a

12          bald-faced assumption based on contract

13          amounts.  Do not make a statement on the record

14          that Ethicon paid him that amount of money

15          without proper foundation.  And this was

16          explicitly covered in the first deposition too.

17              MR. SCHNIEDERS:  I've got several of

18          these.

19              MR. SNELL:  You know how much he was

20          paid.  You know how much he was paid.  You have

21          the productions of how much he was paid.

22              MR. SCHNIEDERS:  I have this.

23              MR. SNELL:  No, no, no.  You have the

24          productions of how much he was paid in each
```

Marc R. Toglia, M.D.

```
1          year.

2                    MR. SCHNIEDERS:  Make your objections.

3                    MR. SNELL:  Don't make a ridiculous --

4          lacks foundation.

5                    MR. SCHNIEDERS:  Then make the lacks

6          foundation objection.

7                    THE WITNESS:  I don't -- I never

8          received $81,000 from Ethicon in any given

9          year.  If I looked at this, I would say it's

10         more like the number to the far left.  I mean,

11         I don't know what the two columns mean, but to

12         be honest with you, and we did cover this in

13         the other deposition, you know, the most I ever

14         got paid from Ethicon in a given year might

15         have been $31,000, but, no, $81,000 no;

16         $45,000, no.

17   BY MR. SCHNIEDERS:

18         Q.    Okay.  So this is incorrect, this

19   spreadsheet?

20         A.    I don't know what this represents, so

21   how do I say if it's correct or incorrect.  I just see

22   numbers on a page.  I don't -- and I'm being very

23   honest with you, that does not resemble anything in my

24   working memory.
```

Marc R. Toglia, M.D.

1       Q.    Okay.  So, sitting here today, your

2  testimony is that $152,000 for that time period doesn't

3  look like that was the right amount?

4       A.    Over the course of two -- over the

5  course of two years.

6       Q.    From March 1st of '08 through

7  February 2nd of 2010.

8       A.    No, this suggests that between -- that

9  between -- right, March 1st of 2008 to March 1st, 2009

10  they paid me $81,000, no, no, not even -- not even --

11  no.

12       Q.    You dispute that amount?

13       MR. SNELL:  He already told you.

14       THE WITNESS:  Yes.

15       (Document marked for identification as

16       Toglia Deposition Exhibit No. 15.)

17  BY MR. SCHNIEDERS:

18       Q.    I'm going to mark as Exhibit 15 the next

19  spreadsheet we had for this.  I actually handwrote the

20  Bates number on that one since they come from the Excel

21  spreadsheet.

22       This one covers -- and it just had end dates on

23  this spreadsheet, but the end dates are September 23rd

24  of 2010 through November 5th of 2011, and that covers

Marc R. Toglia, M.D.

```
1    $153,000.  As you can see the requesters, the contract

2    amounts are different than what you just saw, as are

3    the dates.  So is it your testimony -- that in 2010 and

4    2011 that this $153,000 is incorrect?

5              MR. SNELL:  Form, lacks foundation.

6              Go ahead.

7              THE WITNESS:  I honestly don't recognize

8         any of this.  I can tell you that often times

9         in the contract, there was a ceiling, so it

10        would say something like, in a given year, you

11        know, your compensation will not exceed, and so

12        these numbers like $30,000, $10,000, in my

13        mind, might have been a ceiling.  I just, you

14        know, I mean, if you said to me, you know, in

15        your relationship with Ethicon between 1999 and

16        2011 was your total compensation the 153?  I

17        mean, maybe.  I mean, is this just accounting

18        on how they sort of -- but, yeah, I don't know.

19   BY MR. SCHNIEDERS:

20        Q.    That's fine.  I just want to get your

21   testimony on it.  That's fine.

22             MR. SNELL:  You've already testified in

23        the first deposition.

24             THE WITNESS:  Yes, I did.  Okay.  That's
```

Marc R. Toglia, M.D.

```
 1            fine.

 2                  MR. SNELL:  You don't have to accept it.

 3                  MR. SCHNIEDERS:  Nobody is accepting.  I

 4            said all I said we're doing is getting your

 5            testimony.

 6                  THE WITNESS:  That's fine.

 7                  (Document marked for identification as

 8            Toglia Deposition Exhibit No. 16.)

 9    BY MR. SCHNIEDERS:

10            Q.    Exhibit 16 is Master Consulting

11    Agreement.  This one covers the time period that starts

12    on February 1st of 2011 and ends on March 31st of 2012.

13    It may have been a few years since you've looked at one

14    of these doctor, but if you go back to Exhibit A,

15    that's where it talks about what the fees are

16    associated with it?

17            A.    I'm sorry.  Would you mind giving me a

18    few more minutes to just --

19            Q.    If you look at Exhibit A, there's boxes

20    checked that cover this contract right here, and the

21    first one is --

22            A.    I apologize.  I'm not with you.  Can you

23    tell me again where you are.

24            Q.    Exhibit A.
```

Marc R. Toglia, M.D.

```
 1          A.     Sure.

 2          Q.     It's about three-fourths of the way

 3   through this, I would say.  The bottom number on the

 4   Bates number ends with 167.

 5          A.     Yes, okay.  Sorry.  Go ahead.

 6          Q.     Under A it says, "Consultant agrees to

 7   perform the Services below for which the 'Yes' box is

 8   checked for the compensation set forth therein."

 9   Company-sponsored speaker programs is checked yes, and

10   then if you read through there it says, "Consultant

11   shall present scientific, clinical and related

12   professional information by speaking at

13   Company-sponsored seminars and meetings as requested by

14   Company.  Consultant shall disclose to attendees that

15   he is being compensated by Company for the

16   presentation.  Consultant shall make such presentations

17   on 8 occasions.  The presentation will review stress

18   urinary incontinence procedures.  For each such

19   speaking engagement, Company shall pay consultant

20   $3,000 per 8 hour day plus reasonable out-of-pocket

21   expenses.

22          And I'll tell you that eight times 3,000 is

23   $24,000.  It says no under Subsection 2.  It says no

24   under Subsection 3.  Under Subsection 4 it says
```

Marc R. Toglia, M.D.

```
 1    "Preceptorship/Surgical Training, yes.  Consultant

 2    shall allow visiting surgeons and visiting Company

 3    sales representatives to observe surgical procedures

 4    involving the practice of stress urinary incontinence,

 5    the clinical uses of stress urinary incontinence family

 6    of products and to consult with Consultant regarding

 7    such procedures applicable to patient confidentiality

 8    and consent requirements.  In particular, Consultant

 9    agrees he or she shall secure appropriate patient

10    consent to the presence of any third party during

11    surgical training programs as necessary.  Consultant

12    shall allow such visits up to 9 occasions, and Company

13    shall pay consultant $3,000 for each such session per 8

14    hour day."

15            And that adds up, if you take nine times 3,000,

16    to 27,000.

17            If you go to the next page, it's checked no on

18    Number 5, 6, 7.  On 8 Other, it's checked as yes, and

19    it says, Consultant shall perform other services

20    designated below for, and it has a dollar sign and it

21    says varies per hour, and the description of services

22    is faculty training meetings and educational

23    summits/forums.  Negotiated rate to be no more than a

24    maximum of $375 rate/per hour.
```

Marc R. Toglia, M.D.

```
 1          And then it goes down to say "B. The parties

 2   agree that compensation paid to consultant shall not

 3   exceed $54,000 per contract term, except as may be

 4   mutually agreed in writing by the Parties."

 5          Do you see that?

 6          A.     Yes.

 7          Q.     Do you recall this contract?

 8          A.     Yes.

 9          Q.     So with counsel's caveat that these --

10   saying that these are agreed maximums, not payments

11   that are made out, I'm keeping a running list of these

12   amounts here.

13          A.     All right.  Can I point out that the

14   numbers you provided on this list for the period of

15   time covered in this contract greatly exceed this

16   $54,000, which is one of the reasons why I don't

17   believe that this represents actual compensation.

18          Q.     Sure, but you can also point out the

19   fact that the dates and contracts often coincide at the

20   same time because there's different consulting

21   agreements that you signed at different times with

22   different people, correct?

23                 MR. SNELL:  Form, foundation.

24                 THE WITNESS:  Can I disagree with you,
```

Marc R. Toglia, M.D.

1              because this document specifically refers to

2              this as a Master Consulting Agreement, and

3              everything on this list right here is

4              designated under the Master Consulting

5              Agreement.  So these two documents don't agree.

6              I mean, this is a completed document, and I

7              have recollection.  I have no idea where these

8              numbers came from.

9       BY MR. SCHNIEDERS:

10              Q.    Fair to say that you don't believe in

11      any given year you made over $100,000 from Ethicon?

12              A.    I think $31,000 was the highest I made,

13      and I will tell you that that was when we were working

14      on the PASS study.  That had nothing to do with other

15      stuff.

16              (Document marked for identification as

17              Toglia Deposition Exhibit No. 17.)

18      BY MR. SCHNIEDERS:

19              Q.    I'll keep going through and you can

20      disagree with me on the numbers, that's fine, I'm just

21      putting them on the record.  This is 17.

22              A.    Fine.

23              Q.    And this is part of an e-mail that is

24      titled Action Required with some numbers 2012 Master

Marc R. Toglia, M.D.

1   Consulting Agreement, Marc Toglia, MD, Incontinence

2   Annual, and it's some other contract numbers there.

3           It says under here under line items, Number 1,

4   Marc Toglia, MD, and then it says consulting fee.  It's

5   got a contract ID number, which if you want to

6   reference it on the spreadsheet over there doesn't show

7   up anywhere, and it's got an amount of $14,250.  I'm

8   not asking if it's accurate.  I'm asking if I read that

9   correctly.

10          A.    This is for 2012.  I don't recall

11  receiving -- I don't know that I received any

12  compensation from them.  I think this might be the

13  amount that I was approved, the maximum amount.  I have

14  no idea.  I have no idea what this refers to.

15          Q.    And you see down at the bottom that the

16  total cost of this contract is $15,000.

17          Do you see that?

18          A.    Yes.

19          Q.    You can set that to the side.  Give you

20  what I'm marking as Exhibit 18, which is another

21  consulting agreement.

22                (Document marked for identification as

23          Toglia Deposition Exhibit No. 18.)

24  BY MR. SCHNIEDERS:

Marc R. Toglia, M.D.

1      Q.     This takes a slightly different form

2   than the one we were looking at that was the master

3   agreement, correct?

4      A.     Yes.

5      Q.     Although, if you go through, you'll see

6   that when it gets to the third page, it starts to look

7   a little bit more like the Master Consulting Agreements

8   that we've seen before.  On this one the agreement

9   shall commence on April 1st, 2012 and then it goes

10  through March 31st of 2013.

11      It is nearly identical in content.  If you go

12  to the page where you signed it, you signed it on

13  February 6th of 2012.

14      Do you see that?

15      A.     Yes.

16      Q.     And Paul Parisi who is countersigned, do

17  you know who Paul Parisi is?

18      A.     He is an individual that worked for

19  Ethicon.

20      Q.     And on this one on the Exhibit A, it

21  appears that there was a yes checked next to

22  company-sponsored speaking program again, and it was

23  for one occasion for $3,000, and then the Number 4 the

24  preceptorship/surgical training was checked as well,

Marc R. Toglia, M.D.

```
1    and that was for four occasions at $3,000, and then

2    moving to the end, everything else was checked no, and

3    "The Parties agree that compensation paid to consultant

4    shall not exceed $15,000 per contract term, except as

5    may be mutually agreed by the Parties."

6            Do you see that?

7        A.    Yes.

8        Q.    So I will tell you that I have gone to

9    add up the amounts, and the amounts that I've added up

10   from the spreadsheets and from these contracts we've

11   been looking at after going through to make sure that

12   the contract numbers didn't duplicate was $389,000?

13       A.    Sir, this was --

14            MR. SNELL:  You got to let me object.

15       Objection, lacks foundation.

16            MR. SCHNIEDERS:  Everybody has to let me

17       ask my question first.  That's how this works.

18            THE WITNESS:  Fair enough.

19   BY MR. SCHNIEDERS:

20       Q.    I have gone through and added up the

21   amounts from the spreadsheets and from the contracts

22   and made sure that they didn't duplicate any contract

23   numbers, and it comes up to an amount of $389,000.  I

24   think what you're going to tell me is that you were
```

Marc R. Toglia, M.D.

1   never paid $389,000 from Ethicon?

2              MR. SNELL:  My objection is lacks

3         foundation, misstates the evidence.

4              THE WITNESS:  What do you think that

5         number represents?  I don't understand.  That

6         was the maximum that I could have done.  I can

7         tell you, say specifically the first thing

8         talked about giving presentations at a national

9         meeting, or, you know, I can't -- other than --

10        I can't tell you that I ever was asked to give

11        that kind of a presentation.  So even though it

12        says I could have given that presentation,

13        pretty much the only thing that I ever did in

14        prof ed was teach cadaver labs, which maybe

15        occurred once or twice a year, okay, or I

16        precepted an individual, which, on average, may

17        have occurred two to six times a year.  That

18        was probably -- you know, again, this might

19        have been an allowance.  You know, the company

20        was approving a maximum amount.  That does not

21        reflect what I was paid by the company.

22   BY MR. SCHNIEDERS:

23        Q.    I think you said, I just was looking at

24   the record, you said that probably the most you ever

Marc R. Toglia, M.D.

1   got paid in any given year was 31,000?

2          A.     My -- yes, my recollection from the

3   earlier deposition, and, again, this may not be

4   accurate, my recollection was that in 2011, I received

5   $31,000, and my recollection is that that related to

6   the period of time that I was working on product

7   development.  It did not reflect preceptor time,

8   lecturing time.  That was never a big part of my role

9   with the company.

10         Q.     Okay.  I'm going to mark as Exhibit 19

11  this e-mail string.

12                (Document marked for identification as

13         Toglia Deposition Exhibit No. 19.)

14  BY MR. SCHNIEDERS:

15         Q.     We can certainly look at the top e-mail

16  here in a moment, but it doesn't pertain to what we're

17  here to talk about, but if you go down to the bottom,

18  Ronald Horton writes an e-mail.

19         Do you know who Ronald Horton is?

20         A.     No.

21         Q.     But it says he's with ETHUS, which I

22  believe is Ethicon US.  He's written it to a Marti

23  Heckman, Alyson Wess, Lissette Caro-Rosado, Paul Parisi

24  and Matt Henderson.

Marc R. Toglia, M.D.

```
 1          A.     Right.

 2          Q.     Now, we've already talked about Paul

 3   Parisi.

 4          Do you recognize any of those other names?

 5          A.     Vaguely.

 6          Q.     And the subject is KOL Usage, which, as

 7   we established before, is a term used in industry?

 8          A.     Yes.

 9          Q.     And it means most likely key opinion

10   leader, and Ronald Horton writes, "All, please see the

11   below list of highly used KOLs and the total pay they

12   have received this year."  This is written on Friday,

13   November 19th, 2010?

14          A.     Uh-huh.

15          Q.     And if you look at the second page, it

16   says Toglia total, $153,000.

17          A.     No.

18          Q.     So someone at US group product director

19   for uterine health, Ronald Horton believes that you

20   were paid $153,000 in 2010?

21                 MR. SNELL:  Object on the foundation,

22          calls for speculation.  Also, I think this

23          e-mail was marked and covered in the earlier

24          deposition, but go ahead, tell him what you
```

Marc R. Toglia, M.D.

```
 1              think about that.

 2                      THE WITNESS:  I'm sorry.  Me tell him

 3              what I think about --

 4                      MR. SNELL:  You can answer.  I'm not

 5              sure if there's a question.  The question was

 6              so someone at US group, product director Ronald

 7              believes you were pay $153,000.

 8                      MR. SCHNIEDERS:  In 2010.

 9                      MR. SNELL:  In 2010.

10                      THE WITNESS:  I'm pretty confident that

11              I didn't receive anything like that, sorry.

12   BY MR. SCHNIEDERS:

13              Q.    So this e-mail is just wrong?

14              A.    I don't know, sir.  I was not part of

15   this e-mail.

16              Q.    Well, I understand that, Doctor.  What

17   I'm saying is it says that you were paid $153,000 in

18   2010.  You're saying you weren't, so it's wrong, right?

19                      MR. SNELL:  Lacks foundation.

20                      THE WITNESS:  Yes, I'm telling you that

21              I did not receive that compensation.

22   BY MR. SCHNIEDERS:

23              Q.    Does that mean that your group received

24   that compensation?
```

Marc R. Toglia, M.D.

```
 1          A.     No.

 2          Q.     Did anyone on your behalf receive that

 3   compensation?

 4          A.     No, not to my knowledge.

 5                 MR. SCHNIEDERS:  Marking as Exhibit 20

 6          this e-mail string.

 7                 (Document marked for identification as

 8          Toglia Deposition Exhibit No. 20.)

 9   BY MR. SCHNIEDERS:

10          Q.     I'll let you familiarize yourself with

11   it, the e-mail from Joy de los Reyes on down is the one

12   I'm talking about.  The very bottom one is an e-mail

13   from you.

14          So, Doctor, this is an e-mail that you wrote

15   from your e-mail address that we will make sure doesn't

16   show up anywhere it's not supposed to, to Melissa

17   Chaves.

18          Are you familiar with Melissa Chaves?

19          A.     I recognize the name.  I honestly

20   can't -- I don't know what role she plays in the

21   company.

22          Q.     The subject is "thanks," and it says,

23   Melissa, I wanted to thank you again for including me

24   on the sling discussion panel yesterday.  I very much
```

Marc R. Toglia, M.D.

```
1    enjoy working on these types of panels and did

2    appreciate what the others had to say on the other

3    approaches.  It's fascinating how different approaches

4    work equally well in different hands.  Thought it went

5    very well, and I received a lot of positive feedback

6    afterwards from the audience.  I think that everyone

7    felt that it was fairly balanced, and several folks

8    mentioned that they were glad to see that Ethicon is

9    still very much supportive of the retropubic design, as

10   many feel it is still your best product.

11          That said, it has occurred to me that your

12   company spends virtually no time on TVT-R training, and

13   this is something you may want to consider revisiting,

14   especially as you look to bring surgeons back to the

15   TVT family of products.

16          Now, when you said "bring surgeons back to the

17   TVT family of products," what did you mean?

18          A.    Okay.  So my recollection of the

19   contents of this discussion is that Ethicon held a

20   meeting of faculty members.  As part of that meeting,

21   they asked three of us to volunteer to do a

22   debate-style discussion.  I represented the retropubic

23   approach.  Another doctor represented the obturator

24   approach.  The third doctor represented the TVT Secur
```

Marc R. Toglia, M.D.

```
 1   approach.  They then presented us with a patient case

 2   and then asked us to defend why we would choose

 3   whatever approach we were assigned to.  My recollection

 4   is that I was assigned to the retropubic approach.  It

 5   was kind of a debate style amongst colleagues.

 6   Everybody I thought did a very good job of defending

 7   the position that they were asked to represent.

 8            Again, it was a -- it was a debate so we were

 9   just asked to defend our position, and at the end of

10   that debate, people commented to me that they thought

11   that my argument for that particular case for the

12   debate was very convincing.  As you well know, the

13   majority of what I do in my clinical practice is the

14   TVT retropubic approach.  As my expert report

15   previously illustrated, I believe that that is the

16   product that has the most data of any procedure for

17   incontinence in our history and that that represents

18   very solid data, and so obviously I feel very strongly

19   that that is the procedure of choice.  That's my

20   opinion.

21            So I was commenting to them that, you know, my

22   opinion was that they should spend more time, you know,

23   training and talking about this thing, and I just

24   simply told them that I would be happy to participate
```

Marc R. Toglia, M.D.

```
 1    in further -- they wanted to invite me to give a

 2    further debate or another talk in front of my

 3    colleagues that I enjoyed participating in that type of

 4    activity.

 5         Q.    So you wrote this in order to help

 6    Ethicon bring surgeons back to the TVT family of

 7    products, right?

 8              MR. SNELL:  Objection, misstates.

 9              THE WITNESS:  No, no.  I just -- you

10         know, I just thanked them.  I was not paid

11         separately to participate in the debate.  I was

12         just thanking them for thinking of me as a --

13         as somebody who could speak in a debate fashion

14         on this topic.  And, again, my feeling was is

15         that the TVT sling had the most data out there

16         relative to other retropubic products, and I

17         felt quite confident that this was the product

18         that was -- according to the data, had the most

19         efficacy and safety and just, you know, the

20         amount of data presented and that I thought

21         that they -- if they focused on presenting that

22         data the way that I did in the debate, that

23         hopefully others would also see that the TVT is

24         the best procedure based upon sound science for
```

Marc R. Toglia, M.D.

```
 1            the treatment of stress incontinence across the

 2            entire spectrum of the disease, mixed

 3            incontinence, plain stress incontinence, repeat

 4            surgery, et cetera.

 5       Q.    And you wrote here, "Certainly, users of

 6   other retropubic products could be persuaded, and

 7   perhaps those using obturator approaches could be asked

 8   if they would like to add the retropubic approach for

 9   their more complicated patients, (eg expand upon their

10   skill set, now that they are comfortable with TOT.)

11   From there, it might be easier to re-explore the

12   possibility of them using your brand of obturator

13   sling."

14            So it's a sales pitch, right?

15            MR. SNELL:  Objection.

16            THE WITNESS:  I was speaking to a

17            salesperson.  I again was trying to use

18            language.  I don't sell anything myself.  I

19            have no vested interest in what they get

20            revenue wise.  I certainly don't see any of it.

21            I was just defending TVT retropubic as the gold

22            standard in our field and just wanted to let

23            them know that I thought that that was -- you

24            know, in my opinion, as a minor player, you
```

Marc R. Toglia, M.D.

1             know, in this world for them, that this is

2             where I thought I was most passionate about,

3             and, again, I was speaking to the data and the

4             science, that to me this was a no brainer.  You

5             know, you should try to reengage people based

6             on the science and the data.

7        Q.     And you offered to do a dinner talk on

8   the merits, correct?

9        A.     Yes.  That might have been with other

10   members of her team.  I don't know.

11        Q.     Sure.  But you're compensated for dinner

12   talks as a teacher, correct?

13        A.     If I was speaking to -- I mean, I was

14   not -- like I said, I was not compensated for this

15   participation.  If I had dinner with them locally, I

16   don't get paid for that kind of stuff.  Again, I'm just

17   an advocate for the TVT retropubic approach.  I thought

18   that I made a strong argument why the data supports the

19   retropubic approach as the best procedure.  I got a lot

20   of positive feedback that my analysis was very

21   convincing, and given that that's one of my strengths,

22   the ability to read the data as I presented here

23   independently and articulate a comparison, I was simply

24   offering that, and that's all I remember.

Marc R. Toglia, M.D.

```
 1          Q.    Okay.

 2                MR. SCHNIEDERS:  I'll object and move to

 3          strike that last answer as nonresponsive, and,

 4          Doctor, if we don't keep it down to -- because

 5          I'm running out of time but...

 6                THE WITNESS:  I'm sorry that you don't

 7          like my answer, but that's my answer.

 8  BY MR. SCHNIEDERS:

 9          Q.    I asked you if you were compensated for

10  dinner meetings.  I don't think that was responsive.

11          A.    I don't think I've ever been

12  compensated.  I don't think I've ever been compensated

13  for a dinner meeting.  I don't think I've ever been

14  invited to participate in a dinner meeting.

15                (Document marked for identification as

16          Toglia Deposition Exhibit No. 21.)

17  BY MR. SCHNIEDERS:

18          Q.    This is Exhibit 21.

19                MR. SNELL:  I'm reading the transcript

20          where he does say.

21  BY MR. SCHNIEDERS:

22          Q.    So, anyway, this is Exhibit 22, and this

23  is another e-mail chain and, again, if you look at the

24  very top, it's got Ronald Horton on it again, who we
```

Marc R. Toglia, M.D.

1    just saw on that other e-mail regarding the top used

2    KOLs, but down below that, there's an e-mail from a

3    gentleman named Scott Jones.

4            Do you know Scott Jones?

5            A.     Yes.

6                   MR. SNELL:  Counsel, I think you

7            identified this as Exhibit 22, but I think it's

8            21, just so we get a clear record.  You started

9            off on 21 and then you said 22.

10                  MR. SCHNIEDERS:  It's 21.

11   BY MR. SCHNIEDERS:

12           Q.     So under here it says there's a heading

13   that says "Convention Updates," and then it says, "AUGS

14   was another huge success."

15           Does AUGS have a convention every year?

16           A.     No.  AUGS has an annual scientific

17   meeting.

18           Q.     Okay.

19           A.     Understand that industry looks at these

20   things different than how we look at it.

21           Q.     I can believe that.

22           A.     Right.

23           Q.     "The day prior to the official meeting

24   start, we hosted 2 educational events for urogyn

Marc R. Toglia, M.D.

```
 1    fellows.  These events are part of our fellowship

 2    education strategy being led by Jen Paradise, and

 3    fellow directors are taking of EWHU's involvement."

 4    And then the second bullet point or a line point there

 5    says, "The Prosima & TVT Exact symposium was well

 6    attended and highlights another success led by

 7    Dr. Toglia & Dr. Garris."

 8         Do you remember presenting at the Prosima and

 9    TVT Exact symposium at AUGS in 2010?

10         A.    I would have presented the TVT Exact

11    module of that.  I would not have presented the

12    Prosima.

13         Q.    And you would have been there on behalf

14    of Ethicon, correct?

15         A.    Typically, if I'm remembering the event,

16    I think this was a industry sponsored lunch, and during

17    the lunch hour, they provided lunch for whatever it is,

18    20 or 30 participants, and I would have given, you

19    know -- as you know, I was involved in the development

20    of TVT Exact, and so I would have provided some kind of

21    an update, you know, or some kind of just general

22    educational talk, as we've provided here.

23         Q.    And you would have been compensated for

24    that, correct?
```

Marc R. Toglia, M.D.

```
 1        A.     Yes, I would have thought so.

 2        Q.     And this was in 2010, which was the year

 3   that we saw the e-mail where they say you were paid

 4   $153,000, correct?

 5               MR. SNELL:  Foundation.

 6               THE WITNESS:  I will -- what's the date

 7        here?  I would say the event occurred in 2010.

 8               (Document marked for identification as

 9        Toglia Deposition Exhibit No. 22.)

10   BY MR. SCHNIEDERS:

11        Q.     I'm going to hand you what I'm marking

12   as Exhibit 22.  This is an e-mail from a gentleman

13   named Kevin Frost.

14               Do you know Kevin Frost?

15        A.     I do not.

16        Q.     The subject is "2011 Incontinence &

17   Pelvic Floor Recap," and then it begins, "Hello all,

18   the 2011 Ethicon Women's Health & Urology Incontinence

19   and Pelvic Floor Summit was recently held in Sonoma,

20   California (March 31-August 2nd)."

21               Are you familiar with the incontinence and

22   pelvic floor summit that Ethicon would hold annually?

23        A.     Yes.

24        Q.     And was it typically in Sonoma, or did
```

Marc R. Toglia, M.D.

1    it move around?

2         A.    No.  I only attended a handful of them.

3    This was the only one that I had -- I don't know if

4    they had ever been there before.  I had only been to

5    one that was in Sonoma.

6         Q.    Just so we're clear on the record here,

7    if you go back to exhibit -- it's the e-mail that's

8    talking about training around the TVR.  You see this

9    one, Doctor, Bates ends with 3824.

10        What exhibit is that, Doctor?

11        A.    Exhibit 20 is an e-mail from 2009.

12        Q.    Okay.  So in Exhibit 20, if you'll see

13   there it says under the subject "RE: thanks TVTR Prof

14   Ed training/summit comments."

15        Is it possible that when you met Ms. Chaves

16   that that was at the summit?

17        A.    Excuse me?

18        Q.    Is it possible that when you met

19   Ms. Chaves and then wrote this e-mail that was just

20   after the summit?

21        A.    I'm sorry.  I thought the summit was

22   2011.  This is 2009.

23        Q.    The summit was every year from my

24   understanding, and you said that you only went to it

Marc R. Toglia, M.D.

1    periodically, so I'm showing you from 2009, you go down

2    here where it says Dr. Toglia regarding a TVT panel at

3    the summit?

4            A.     Oh, okay.  I see.  I'm sorry.  Yes.

5            Q.     And that's in February of 2009?

6            A.     Yes.

7            Q.     So you would have been there in February

8    of 2009, and then looking at the document we're looking

9    at now, this is 2011, correct?

10           A.     Yes.

11           Q.     And if you go down it says in the middle

12   there a breakdown of this year's attendees are as

13   follows, 31 gyns, 31 urogyns (including 4 fellows), 19

14   urologists.  And then at the very bottom, it says, "a

15   special thanks to the following customers who served as

16   meeting moderators," and it lists you along with three

17   other doctors.

18           Do you see that?

19           A.     Yes.  I'm sorry, there are three more

20   names on the other page.  I understand your point.

21           Q.     There are three on this page, and then

22   there's three additional on the other page?

23           A.     Three others besides myself, yes.

24           Q.     And it refers to you as a customer.  Do

Marc R. Toglia, M.D.

1   you know why the company would refer to you as a

2   customer?

3          A.     I don't, because I use their products,

4   perhaps.

5          Q.     At the end of the day they're selling

6   doctors on using the products, not the patient, right?

7                 MR. SNELL:  Form, foundation.

8                 MR. SCHNIEDERS:  I'll withdraw.

9   BY MR. SCHNIEDERS:

10         Q.     You see where it says customers, and

11   it's referring to you and some other of your

12   colleagues, correct?

13         A.     Yes.  I don't know, but I don't

14   understand why I'm referred to as a customer.

15         Q.     Okay.  Set that to the side.

16                MR. SCHNIEDERS:  I'm going to mark this

17         Exhibit as 23.

18                (Document marked for identification as

19         Toglia Deposition Exhibit No. 23.)

20   BY MR. SCHNIEDERS:

21         Q.     This will be a very brief question,

22   Doctor, and I just want to call your attention to it.

23   It says under the subject, "Let me know your

24   thoughts... this is a draft."  So this e-mail that

Marc R. Toglia, M.D.

```
 1   we're looking at right here, the second doesn't show

 2   that it went to you, but the bottom one down here, the

 3   draft itself was a draft of an e-mail to you.

 4           Do you see that?

 5           A.    Okay.

 6           Q.    And it's from a woman named Rhonda

 7   Peebles.

 8           Do you know Rhonda Peebles?

 9           A.    Yes.

10           Q.    In that she says, "I am excited to

11   announce that Ethicon Women's Health & Urology received

12   approval for a new TVT sling, Gynecare TVT Exact, and

13   will be launching very quickly.  We are putting

14   together 2 key customer events to introduce the product

15   and would love for you to be a part of the launch.  You

16   were one of the initial physicians to be exposed to the

17   product via our customer labs last fall so your input

18   would be invaluable."

19           Do you recall if you attended that event?

20           A.    I don't even know that I ever received

21   this e-mail.  I don't think I attended either of those.

22   I don't recall.

23           Q.    Okay.  That's fair.  Set it aside.

24           Now, would you consider yourself when you're
```

Marc R. Toglia, M.D.

```
1   working on behalf of Ethicon, not for Ethicon, but on

2   behalf of Ethicon or any other device company to be a

3   salesperson for them?

4            A.      Not at all.

5            Q.      Okay.  Are you an advocate for them?

6            A.      I'm an advocate for women's health.  I'm

7   an advocate for women that suffer with pelvic floor

8   disorders, and I'm for anything that I can do that

9   helps to increase the awareness of these conditions and

10  treatments for it.  As you know, this is a major public

11  health burden, and there are more women that suffer

12  from incontinence and prolapse than we currently have

13  manpower to care for.

14           Q.      Earlier when you were talking about the

15  TVT-R panel that you had been part of, you said you

16  were advocating for that approach because you believe

17  that's the best approach, right?

18           A.      Understand, I was assigned it, right.

19  So if I had been assigned obturator, my assignment was

20  the same and I would have presented my argument in that

21  regard.  That said, I'm sure that they chose me for

22  TVT-R because they knew that despite the fact that

23  other products had been developed, despite the fact

24  that I had participated in trials with TVT Secur and
```

Marc R. Toglia, M.D.

```
 1   that I taught all three products, that my personal

 2   practice was still very much aligned with the

 3   retropubic approach, right.

 4         Q.    And, similarly, your belief in the TVT

 5   product has made you an advocate for it because you

 6   believe it's the safest option, right?

 7         A.    Well, I believe that the experience and

 8   the publications support the safety and the

 9   effectiveness of that product and that it is the most

10   vigorous scientific data that we have for any product

11   in the history of incontinence treatment.

12         Q.    But -- and you've advocated for that

13   product and other products you believe in to fellow

14   surgeons when they were talking about it, right?

15              MR. SNELL:  Form.

16              THE WITNESS:  Specifically that product,

17        yes.

18   BY MR. SCHNIEDERS:

19         Q.    But you would never consider anything

20   that you've done to be advertising for Ethicon, right?

21         A.    No.

22              MR. SCHNIEDERS:  Off the record.

23              (Brief recess taken at 5:59 p.m.)

24              (Deposition resumes at 6:02 p.m.)
```

Marc R. Toglia, M.D.

```
 1   BY MR. SCHNIEDERS:

 2        Q.    We're back on the record after a short

 3   break.  Doctor, I'm going to mark as Exhibit 24 an

 4   e-mail chain.

 5             (Document marked for identification as

 6             Toglia Deposition Exhibit No. 24.)

 7   BY MR. SCHNIEDERS:

 8        Q.    And this is from, again, Rhonda Peebles,

 9   who we just saw an e-mail from her a moment ago, right?

10        A.    Yes.  I'm sorry, just reviewing this.

11        Q.    And it's to a Lindsay Froelich.

12        Do you know her?

13        A.    Do not, no.

14        Q.    All right.  It starts off, "Sorry for

15   the delay.  I've been swamped with launch meeting

16   planning.  Feel free to put time on my calendar the

17   week of the 17th to discuss further, Rhonda."

18        And this is in response, if you go to the

19   second page, to questions that Ms. Froelich was asking

20   with regard to TVT Exact.

21        And so she answers several.  Under Number 3, a

22   question she's asked is "Is there any clinical data

23   that will be published or presented this year?"  And

24   Rhonda Peebles writes back, "There is no specific
```

Marc R. Toglia, M.D.

```
 1    clinical data.  Exact will leverage data from TVT

 2    classic."

 3           Is that an accurate statement, to your mind?

 4                MR. SNELL:  Foundation, speculation.

 5                THE WITNESS:  I'm sorry, I don't -- I

 6         don't see it.  Is there two pages?

 7    BY MR. SCHNIEDERS:

 8         Q.    There are two pages.

 9         A.    Okay.

10         Q.    But it's the front page you need look

11    at.  You don't need to go back and forth with the

12    questions.  They're written above each spot.  So go to

13    the first page.

14         A.    Oh, I'm sorry.

15         Q.    That's okay.  If you go to question 3,

16    you will see the question and the answer.

17         A.    Okay.  Sure.  What's your question?

18         Q.    So the question written there "Is there

19    any clinical data that will be published or presented

20    this year?  Answer, there is no specific clinical data.

21    Exact will leverage data from TVT classic."

22           Do you believe that statement to be true?

23         A.    I'm not aware whether data was -- I'm

24    not aware of data being presented that year.
```

Marc R. Toglia, M.D.

```
 1            Q.      Okay.  When she says "Exact will

 2   leverage data from TVT classic," what does that mean to

 3   you?

 4                    MR. SNELL:  Objection to form.

 5                    THE WITNESS:  How would I know what

 6            Ms. Peebles was meaning?  I mean, the product

 7            is the same.  The mesh itself is the same.  The

 8            modifications that we made to the product is we

 9            changed the handle design.  We made the trocar

10            thinner.  We made the handle disposable.  Other

11            than that, there really is no difference.  It's

12            sort of -- was sort of a refresh of the

13            product.

14   BY MR. SCHNIEDERS:

15            Q.      Under question 5, What do you hope to

16   achieve through PR with this program?  Answer,

17   increased awareness during the launch phase.

18            6.   What are the important

19   magazines/newsletters you would like to see cover this

20   product?  Answer, Urology and OB-GYN throw-away

21   journals.

22            7.   There are major medical meetings -- strike

23   that.  7.  Are there major medical meetings where you

24   will be unveiling/displaying this product?  And it
```

Marc R. Toglia, M.D.

```
1    lists AUA, AUGS and ICS-IUGA, the advocacy groups,

2    correct?

3         A.    Yes.

4         Q.    And then are any important advocacy

5    groups you'd like to reach at launch?  Do you have any

6    relationships with them already?  Good question, we

7    should discuss.

8         And lastly on 9, who do you recommend as

9    internal and external (KOLs) spokespeople for media

10   interviews?  Internal, Dr. Aaron Kirkemo.

11        Do you know Aaron Kirkemo?

12        A.    Dr. Kirkemo was a -- one of the medical

13   directors for Ethicon women's health at the time.

14        Q.    Okay.  And then Howard Goldman, the

15   urologist from Cleveland Clinic that we discussed

16   earlier --

17        A.    Yes.

18        Q.    -- that is also one of the authors on

19   the AUGS mesh position statement?

20             MR. SNELL:  Form.

21             THE WITNESS:  Yes.

22   BY MR. SCHNIEDERS:

23        Q.    And it says, "although the CC may not

24   allow doctors to participate in PR."
```

Marc R. Toglia, M.D.

1          A.      Yes.

2          Q.      And then lastly it mentions Dr. Marc

3     Toglia, urogyn, Philadelphia.

4          You see that?

5          A.      Yeah.

6          Q.      Do you recall being approached by Ms.

7     Peebles to be a spokesperson for TVT Exact?

8          A.      Yes, I recall that I was asked to help

9     with an article that addressed urinary incontinence in

10    women, treatment options in women, yes.  You understand

11    that, again, I was fairly involved in the development

12    of the TVT Exact product and served as -- I think the

13    video on the surgical steps is myself, you know,

14    demonstrating the procedure, so yes.

15              MR. SCHNIEDERS:  I'm going to mark as

16         Exhibit 25.

17              (Document marked for identification as

18         Toglia Deposition Exhibit No. 25.)

19    BY MR. SCHNIEDERS:

20         Q.      This document that is titled "TVT Exact:

21    Editor's Backgrounder (Gynecology).

22         A.      Mm-hmm.

23         Q.      If you look, do you know what a

24    backgrounder is, Doctor?

Marc R. Toglia, M.D.

```
 1          A.      I do not.

 2          Q.      Are you familiar with the publication

 3    Gynecology?

 4          A.      No.  I don't think that that was the

 5    publication.  I think it's the subject.

 6          Q.      Do you recall what publication this

 7    appeared in?

 8          A.      Cosmopolitan, Red Book, I think it was a

 9    consumer magazine, Reader's Digest.  I honestly -- I

10    vaguely recall that it was a direct-to-consumer thing.

11          Q.      And do you recall that you were the

12    spokesperson within it?

13          A.      I don't think that I would say that I

14    was a spokesperson.  I think that I contributed some

15    quotes.

16          Q.      I think it starts off the title is

17    "Gynecare TVT Exact:  Building on the Legacy of

18    Gynecare TVT," and it says, according to Marc Toglia,

19    MD, chief of urogynecology for the Main Line Health

20    System in suburban Philadelphia, gynecologic surgeons

21    now have a new option when retropubic placement of a

22    midurethral sling is the treatment of choice in women

23    with stress urinary incontinence.  Gynecare TVT Exact.

24          You see that?
```

Marc R. Toglia, M.D.

1          A.       Mm-hmm.

2          Q.       It goes on, "Gynecare TVT Exact retains

3    cardinal features of the Gynecare TVT retropubic

4    system, including the laser-cut mesh, protective

5    sheath, trocar geometry, and rigid needle design of the

6    original Gynecare TVT.  TVT Exact is engineered with

7    enhancements designed to further reduce tissue and

8    organ damage."

9          Now, the portion that was already written for

10   you, did you write that?

11         A.       I don't believe so.

12              MR. SNELL:  Form.

13   BY MR. SCHNIEDERS:

14         Q.       Going on to the next page, about two

15   lines down, I guess on Line 3 it says -- is the next

16   part that I see that you appear in the article, Doctor.

17   It says, Dr. Toglia noted that a good outcome of

18   minimally invasive surgery to place suburethral sling,

19   whether through the retropubic, transobturator, and I'm

20   not even going to get that one.  I'll let you read

21   this.  Why don't you read this.

22         A.       Well, it's obturator.  It's spelled

23   wrong or ischiorectal space, begins with the surgeon's

24   precision and control.

Marc R. Toglia, M.D.

1          Q.     And did you write the passage that your

2   -- this quote from you right here?

3          A.     I don't know.  It just says that

4   Dr. Toglia noted, so I may have had a discussion and an

5   interview, and they may have paraphrased me.  I

6   honestly don't know.

7          Q.     If you go to the next page at the top,

8   Line 1 it says, "Dr. Toglia observed that there has

9   been a great deal of concern about synthetic meshes.

10  And there's good reason for physicians and patients to

11  exercise due diligence when considering a suburethral

12  sling to treat SUI."

13         Do you agree with that statement?

14         A.     I was referencing the FDA safety warning

15  at the time.

16         Q.     And, to be fair, that was the FDA safety

17  warning of 2008, correct?

18         A.     I believe so, yes.

19         Q.     So the FDA safety warning of 2011 hadn't

20  come out at that point, right?

21         A.     Sure.  I mean, to be fair, I don't see a

22  date, but, you know, I will assume, let's say, for

23  argument sake that this was in the same time frame as

24  when the product was being launched.  That would be my

Marc R. Toglia, M.D.

```
 1    assumption.

 2           Q.      I can show you a little bit more

 3    specifically.

 4           A.      I think we're saying the same thing.

 5           Q.      I agree.

 6           A.      I don't want to waste anybody's time.

 7                   (Document marked for identification as

 8           Toglia Deposition Exhibit No. 26.)

 9    BY MR. SCHNIEDERS:

10           Q.      Marking this as Exhibit 26.  Doctor,

11    this is another e-mail from Ms. Peebles.  I'm sorry.

12    The top of it is an e-mail from Ms. Peebles to someone

13    at a group called idanda.com, something like that, and

14    it says "OB-GYN backgrounder...I'll give you a call,"

15    and then underneath it is an e-mail from you to

16    Ms. Peebles.

17           A.      Okay.

18           Q.      And it looks like it says, "Rhonda, here

19    you go," and it appears that at least part of the quote

20    that we just saw in that backgrounder is written right

21    there.

22                   Do you recall if you typed up -- do you recall

23    typing up an e-mail and sending it to Rhonda to give

24    her a quote?
```

Marc R. Toglia, M.D.

1          A.      I don't recall it, but I think it speaks

2      for itself and, certainly, you know, I'm sort of

3      reading through this, and I'm saying to myself, I never

4      would have said ischiorectal, we don't use that

5      passage, and I obviously read this for factual accuracy

6      and I was responding to her and making suggestions.

7          Q.      And did you notice what you called the

8      subject there when you sent it back to her?

9          A.      TVT ad.

10         Q.      TVT ad?

11         A.      TVT ad.

12         Q.      Is that an advertisement for TVT?

13         A.      I was probably whatever they were --

14     whatever they were referencing it to me.

15         Q.      Well, I don't -- to be fair, and this is

16     how they produced it to us, and we all know how e-mail

17     works, it usually says re: or forward or something

18     before that if you're just replying.  That looks like a

19     subject you picked out?

20              MR. SNELL:  Objection, foundation.

21              THE WITNESS:  Okay.  Again, my

22          recollection was there was a short article in

23          some consumer journal.  It might have been

24          Reader's Digest.  It might have been

Marc R. Toglia, M.D.

```
 1          Cosmopolitan, you know.  I was glad to see them

 2          being raising awareness directly to women, you

 3          know, telling them that there were treatment

 4          options for stress incontinence.

 5   BY MR. SCHNIEDERS:

 6          Q.     To be fair, they were only talking about

 7   their product, right?

 8          A.     I don't know.  I mean, I don't know the

 9   content of the entire article, but I would not -- I

10   would suspect that they would just talk about theirs.

11   I don't know what the rest of the article entailed.

12          Q.     It's an ad for TVT?

13          A.     I don't know that it's an ad for TVT.  I

14   just referred to it as TVT ad.  I don't know why I

15   referred to it as TVT ad.

16          (Document marked for identification as

17          Toglia Deposition Exhibit No. 27.)

18   BY MR. SCHNIEDERS:

19          Q.     I'm going to mark as Exhibit 27 a

20   spreadsheet that was given to us.  Don't worry about

21   the front page.  It's extremely hard to read, but we're

22   not going there.  It's going to be several pages in.

23          A.     Okay.

24          Q.     So the first page at the top lots like
```

Marc R. Toglia, M.D.

1    it says Gynecare Interceed, and obviously it's talking

2    about the barrier product, and then it goes forth, and

3    each page has a different product on it.  The product

4    that I want to call attention to is on Page 9631 are

5    the last four numbers of the Bates.  It's not perfect,

6    but it's better to read than the other pages.

7                A.     Okay.

8                Q.     At the top you see it says "Gynecare TVT

9    Exact Tension-free Support for Incontinence Roadmap"?

10               A.     Uh-huh.

11               Q.     And then it's got several different

12   categories on the left-hand side that say Strategy,

13   Sales Targeting, Launches, Marketing Tools, Key

14   Messages, Awareness, Contracting/Promotions and Prof Ed

15   Support.

16               Under "Launches" it says Gynecare TVT Exact,

17   Gynecare TVT Abbrevo launched May 2010 and

18   February 2011 respectively.

19               You see that?

20               A.     Mm-hmm.

21               Q.     And then under "Marketing Tools" it says

22   Gynecare TVT Exact, and it lists marketing tools on the

23   right-hand side, Gynecare TVT Exact sales aid, Gynecare

24   TVT Exact slim jim, Gynecare TVT Exact procedural

Marc R. Toglia, M.D.

1   video, Gynecare TVT Exact procedure steps flash card.

2   And then the female patient article featuring

3   Dr. Toglia is listed as a marketing tool.

4         If you go down to "Awareness," you see that

5   scientific meeting presence, and there's several

6   different advocacy groups that are all going to be

7   presented to, including AUGS, correct?

8               MR. SNELL:  Objection, foundation,

9           advocacy groups.

10              THE WITNESS:  Yeah, I wouldn't use the

11          word advocacy groups.  These are professional

12          organizations, but I see what they're saying.

13          I don't have any involvement in that.

14              (Document marked for identification as

15          Toglia Deposition Exhibit No. 28.)

16   BY MR. SCHNIEDERS:

17         Q.     I've marked as Exhibit 28 this document,

18   it's titled "Overview," and it's got a paragraph at the

19   top that says on January 30th, 2012 an approved

20   communication (VP of sales & marketing, RBDs, director

21   of communication GPD, PD were briefed on this

22   communication) went out to approximately 300 surgeons

23   who specialize in pelvic surgery (many of whom are

24   faculty for EWHU) notifying them of the following.

Marc R. Toglia, M.D.

1    Bullet point reads, in 2012, we will continue to

2    facilitate these types of important discussions in a

3    variety of formats but will not be holding a one-time,

4    formal summit meeting.  Instead, we plan to utilize

5    other interactive mediums and venues that will allow

6    for more frequent and meaningful dialogue with you and

7    your colleagues.

8            There was a very loud and emotional response to

9    this notification, which has provided the EWHU

10   organization the opportunity to re-evaluate how we will

11   need to communicate with this group regarding the FAD

12   mesh situation.

13           See what you've just read there?

14       A.     Yes.

15       Q.     Do you know what the FAD mesh situation

16   is?

17       A.     No.

18       Q.     Okay.  This is January 30th of 2012 is

19   what it says, and that's just after the FDA had

20   released their bulletin in 2011, correct?

21       A.     Mm-hmm.

22       Q.     Sorry.  I messed up the question, and

23   then you said uh-huh.  Was that correct?

24       A.     I'm sorry, that is correct.  I mean, I

Marc R. Toglia, M.D.

1    assume  that's yes.

2         Q.    So it's reasonable to say, although we

3    don't know sitting here, but that probably means the

4    FDA mesh situation, because I don't know what FAD

5    means?

6         A.    I don't know that, sir.  I don't know

7    that.  I can't speak to that.

8         Q.    I appreciate that, but we do know that

9    this is, from a temporal standpoint, just after the FDA

10   released its bulletin, correct?

11              MR. SNELL:  Form.

12              THE WITNESS:  I don't know.  All I know

13         is this communicates that a discussion that

14         they were considering not holding another

15         summit.

16   BY MR. SCHNIEDERS:

17        Q.    And in 2011 the FDA's release is

18   ultimately what precipitated several products being

19   pulled from the market by Ethicon, correct?

20              MR. SNELL:  Lacks foundation.

21              THE WITNESS:  I don't know the

22         relationship between the two, in all honesty.

23         I was not part of that decision.

24   BY MR. SCHNIEDERS:

Marc R. Toglia, M.D.

1      Q.      And you haven't been provided any

2  documents on that either?

3              MR. SNELL:  Objection, misstates earlier

4          testimony.

5              THE WITNESS:  I don't have an answer for

6          your question.

7  BY MR. SCHNIEDERS:

8      Q.      So if you go down it says, "Key

9  Takeaways," and it's in bold face-to-face "meetings are

10  being requested by the majority of respondents.  They

11  want a forum to vent, share & brainstorm on the future.

12  Lack of understanding on the current situation & EWHU's

13  position needs to be clarified."

14          Third bullet point, "A feeling that the company

15  is supporting them needs to be delivered.  Interactive

16  meetings have a role but second to face-to-face."

17          Do you recall receiving a communication that

18  would have told you that they were not going to have a

19  summit in 2012?

20      A.      Vaguely.

21      Q.      If you go to the second page, there's a

22  title that says "Feedback from Surgeons."

23      A.      Okay.

24      Q.      And then there are numbers and the first

Marc R. Toglia, M.D.

1    one is Bob Shull.

2           Do you know Bob Shull?

3           A.     I do, yes.

4           Q.     Second one is Doug Grier.

5           Do you know Doug Grier?

6           A.     I do not, no.

7           Q.     And Mike Vardy, then Neena Agarwala and

8    then there you are, Doctor, Marc R. Toglia, M.D.,

9    Number 5.

10          Do you see that?

11          A.     Yes.

12          Q.     And what you've written here is, "Given

13   the current controversies and challenges that we

14   physician are facing with regards to the use of vaginal

15   mesh, I would like to argue that we need this type of

16   meeting now more than ever.  The future for vaginal

17   mesh seems somewhat uncertain, however, many of us

18   still believe that it serves a vital, albeit more

19   limited role."

20          Continues on, "Ethicon's role in providing

21   peer-to-peer support with regards to new and innovative

22   products is what has separated your company from the

23   rest of the field.  Ethicon's willingness to partner

24   with and support surgeons in this regard has been

Marc R. Toglia, M.D.

```
1    second to none.

2          I would ask you to reconsider this decision.

3    If cost and travel are a major deterrent, I might

4    suggest that you consider a lower cost venue, such as

5    Philadelphia, or returning to Florida.  I am sure that

6    many of us would be willing to sacrifice the bells and

7    whistles to simply get together and meet again."

8          Did I read that correctly?

9          A.    Yes.

10         Q.    Going back to the first page statement,

11   you wrote, "The future for vaginal mesh seems somewhat

12   uncertain, however, many of us still believe that it

13   serves a vital, albeit more limited role."

14         What did you mean by "a vital, albeit more

15   limited role"?

16         A.    Well, you know, obviously the FDA's

17   statement was going to be interpreted differently by

18   many people, including people of your profession, sir,

19   and obviously this was going to create challenges

20   really in how we speak to people, you know, patients,

21   women, women that had it implanted previously, people

22   that were currently planning on implanting it.

23         At the time I don't believe that I was aware of

24   any plans to pull the product.  The FDA warning --
```

Marc R. Toglia, M.D.

```
1    yeah, the FDA warning also -- I mean, most of us

2    involved at this level were not aware of the numbers of

3    complications that had been reported to the FDA.  I

4    think we were surprised because, according to the

5    literature that we were reading and our own experience,

6    we were not seeing that complications but also the FDA

7    was not very clear.  The distinction -- their initial

8    statement seemed to sort of blend stress incontinence

9    with prolapse repair, whereas many of us thought that

10   they were referring specifically to prolapse repair.

11        And so in the past, the summit meeting was an

12   opportunity to bring people together and foster

13   discussions, and I was pointing out to them that, you

14   know, in that regard, it was still very variable to

15   bring us all together so that we could discuss, you

16   know, how are we going to counsel patients moving

17   forward, how do we counsel patients that have been

18   implanted and are doing well but have concerns.  You

19   know, immediately people were saying that there was a

20   recall, when, in fact, there wasn't a recall.

21        Again, most of us were reading the literature,

22   literature supported that this was a safe procedure

23   with excellent safety and efficacy.  Our own experience

24   would support that, mirror that as well.  So it seemed
```

Marc R. Toglia, M.D.

```
 1    a little bit out of sync.

 2          And, you know, again, Ethicon is based in New

 3    Brunswick, New Jersey, which is a stone's throw from

 4    Philadelphia.  I was just saying to them, look, let's

 5    still have this meeting, it could be a quick meeting.

 6    You know, let's just get the usual group together,

 7    wherever it might be convenient.  Again, most of the

 8    users, my understanding, were East Coast users.  That's

 9    why I said Philly or Florida.

10          Now, I'm sorry, and I apologize, I realize I'm

11    off track.  So, yes, as the science has supported,

12    anterior Prolift works extremely well in the anterior

13    vaginal compartment, and the literature states quite

14    clearly that the anatomic results are superior compared

15    to native tissue repair.

16          Prolift in the posterior compartment, that data

17    was not as robust, and so when I said limited -- vital

18    but limited role, vital meaning the most common

19    problem, the one that causes women the most symptoms is

20    anterior prolapse, and the data and experience clearly

21    demonstrate that this is a safe and effective

22    technique.

23          So the question in my mind was is that what we

24    concentrate on, do we concentrate on anterior Prolift
```

Marc R. Toglia, M.D.

1    as opposed to posterior Prolift.  Certainly, those of

2    us that were looking at things from a pooled analysis

3    were reaching the conclusion that the posterior

4    compartment, dyspareunia was a problem with all the

5    repairs.  It wasn't clear to us -- it seemed to us that

6    it was similar between the two, although we were

7    getting these reports.  So I was just advocating that,

8    and I think it's supported by my report, that at the

9    apex and anteriorly, this was a safe and effective

10   technique in the product, and that's what I meant by

11   vital because that's the most common, the most

12   bothersome, limited, let's concentrate on the anterior

13   and the apex.

14        Q.    What did you mean by "Ethicon's

15   willingness to partner with and support surgeons"?

16        A.    Again, many of us felt there was great

17   value in these summit meetings.  I recall that at one

18   or more of these meetings, some of the key inventors of

19   both the TVT and the TVM were brought in from Europe,

20   and we were allowed to listen to them discuss the

21   development of the product.  We were able to ask them

22   very clinical questions.  So I remember asking one of

23   the TVT individuals who had published on it what do you

24   tell patients when they can return to work and exercise

Marc R. Toglia, M.D.

```
 1    and stuff like that.  So we found the summit to be

 2    invaluable as an opportunity for colleagues to get

 3    together to further discuss the topic and specifically

 4    to listen to experts both nationally and

 5    internationally.

 6            Q.    But you would agree that it was an

 7    uncertain time for mesh, correct?

 8                  MR. SNELL:  Object, form.

 9                  THE WITNESS:  I would not agree.  I

10            think at the time I think the FDA's mesh

11            message, excuse me, was uncertain because,

12            again, initially they didn't draw -- they

13            didn't -- they said -- I'm sorry.  I lost my

14            train of thought.

15    BY MR. SCHNIEDERS:

16            Q.    The uncertainty you were referring to

17    was what the FDA's position was; is that what you're

18    telling me?

19            A.    It was unclear whether the additional

20    cases reported were sling related cases versus vaginal

21    mesh related cases, as well as what products were

22    involved.

23                  (Document marked for identification as

24            Toglia Deposition Exhibit No. 29.)
```

Marc R. Toglia, M.D.

1    BY MR. SCHNIEDERS:

2          Q.     Marking as Exhibit 29 a PowerPoint.

3          Doctor, do you recall this PowerPoint?

4          A.     I don't know if I ever gave this power

5    point in a meeting or not.

6          Q.     On the second page of the document you

7    see it's titled "The Mesh Story."

8          Do you see that?

9          A.     Yes.

10         Q.     And it's got your name on it as Director

11   of Urogynecology, Main Line Health System,

12   Philadelphia, PA right?

13         A.     Yes.

14         Q.     Are you familiar with The Mesh Story,

15   was that verbiage you ever used?

16         A.     No.

17                MR. SNELL:  Do you have a date on this

18         document?

19                MR. SCHNIEDERS:  What's that?

20                MR. SNELL:  Do you have a date for this?

21                MR. SCHNIEDERS:  I didn't look, to be

22         honest.

23                MR. SNELL:  That's okay.

24   BY MR. SCHNIEDERS:

Marc R. Toglia, M.D.

```
 1          Q.      You see on the bottom right-hand corner,

 2    it's got Ethicon Women's Health & Urology logo, right?

 3          A.      Yes.

 4          Q.      We can go off the record, and you can

 5    look over that for a second, if you'd like to, Doctor.

 6                  MR. SCHNIEDERS:  Let's go off the record

 7          so he can look at the PowerPoint.

 8                  (Brief recess taken at 6:33 p.m.)

 9                  (Deposition resumes at 6:34 p.m.)

10    BY MR. SCHNIEDERS:

11          Q.      Doctor, I think you were saying that you

12    may have worked on this, you're just not sure, right?

13          A.      I don't recognize this.

14          Q.      Okay.  But suffice it to say, it's got a

15    Bates number, it was produced to us, and it's titled

16    "The Mesh Story," and it's got your name on it, right?

17          A.      Correct.

18          Q.      It could possibly be one of those slide

19    decks that was made by Ethicon for a presentation they

20    wanted you to give?

21          A.      I would suspect so, yes.

22          Q.      Okay.  And, typically, when you would

23    give PowerPoints on behalf of Ethicon, would you do so

24    with Ethicon's logo on it?
```

Marc R. Toglia, M.D.

```
 1            A.      Typically, I am presenting material

 2   prepared by Ethicon in compliance with the FDA

 3   regulations, and I would disclose at the beginning that

 4   I was up there to speak on behalf of the company to

 5   present the company slides.

 6            Q.      Okay.  And so if you go to the second

 7   page, it says "Content."

 8            A.      Yes.

 9            Q.      And it gives a few things about -- and

10   the context, even though it's not dated, and, frankly,

11   it was my fault for not looking at the Bates number and

12   custodian, but the context would tell us that this has

13   got to be after a recent FDA notice, I suspect; is that

14   fair?

15            A.      I think so.  I'm -- I would think that

16   this is after the October 2008.

17            Q.      So you see the content there it says,

18   "What does the FDA notice tell us?"  And then "Why is

19   our mesh different?"  And is that how you talk in

20   PowerPoints that you give on behalf of Ethicon --

21            A.      No.

22            Q.      -- you say our mesh?

23            A.      No, I have no ownership.  I have no

24   ownership.  That would be an example of something that
```

Marc R. Toglia, M.D.

1    I might strike through and say, you know, you need to

2    be specific that this is Ethicon.

3         Q.    And it says, "How does it work?  Why is

4    it designed this way?  What does that mean

5    physiologically?"

6         A.    Yes.

7         Q.    Going on to the next page it says

8    "Navigating the Mesh Maze."

9         Did you ever call it the mesh maze?

10        A.    No.

11        Q.    Bullet point it says, "We have to deal

12   with competing messages surrounding mesh."

13        Do you agree with that statement?

14        A.    I don't know what that means.  I read

15   that as conflicting, but I don't know what that means.

16        Q.    Okay.  And it says, "Goal is safe and

17   effective treatment for patients with SUI."

18        A.    Yes.

19        Q.    And it says, "FDA has issued a Public

20   Health Notification warning about risks of mesh."

21        A.    Yes.

22        Q.    "Patients are concerned about mesh

23   implant.  We have to help our customers to understand

24   how to minimize their risk."

Marc R. Toglia, M.D.

1          It says our customers right there.  Do you

2    recall from the document we saw before that physicians

3    are referred to internally as customers?

4          A.     Yeah, I don't know that that's what this

5    refers to.  Again, I'm quite certain this is not

6    something that I ever presented myself because I would

7    not -- I would never have used the term customer in any

8    form.  I not have used the our on the previous page.  I

9    would not have used our customers.

10         This may have been an outline or a markup of

11   something that they were thinking about.  I can't tell

12   you I ever saw this.  I have no recollection of seeing

13   this.  This is certainly not something I've presented.

14         Q.     But fair to say that it says we have to

15   help our customers to understand how to minimize their

16   risk.  Fair reading of that is that Ethicon is trying

17   to help doctors that use their products to minimize

18   their risk, right?

19              MR. SNELL:  Foundation.

20              THE WITNESS:  I don't agree, no.

21   BY MR. SCHNIEDERS:

22         Q.     What do you think it means?

23         A.     I don't know the context, sir.

24         Q.     Okay.  Well, that's fair.

Marc R. Toglia, M.D.

```
 1              A.      As a surgeon, I look at this as we need

 2     to talk about women and help women to understand and --

 3     I mean, I'm really lost.  I'm so sorry.  I have no

 4     idea.

 5              Q.      Does it make you mad that Ethicon put

 6     your name on something like this?

 7              A.      No.  I mean, I don't -- again, this may

 8     have been an idea that they floated by me.  I don't

 9     know.

10              Q.      So the next slide goes on and talks

11     about the FDA alert, October of 2008.

12              And then the next slide basically breaks down

13     what that alert said, FDA Recommendations, be vigilant

14     for potential adverse events (erosion, infection).

15     Watch for perforation from tools.  Inform patients that

16     mesh implantation is permanent and that some

17     complications may require additional surgery that may

18     or may not correct the complication.  Inform patients

19     about potential for serious complications affecting

20     QOL, quality of life (dyspareunia, scarring).  Provide

21     patient with a written copy of the patient labeling.

22              Do you provide your patients with written

23     copies of the patient labeling?

24              A.      I think that -- again, I think what
```

Marc R. Toglia, M.D.

```
 1    they've done here is they have provided a summary of

 2    what the FDA had written.  In our practice, we do have

 3    readily available each of the FDA safety warnings.  We

 4    have the position statements from our organization.  We

 5    have brochures from Ethicon on the TVT, which would

 6    include the labeling information.  So those are

 7    discussed and, when appropriate, offered to the

 8    patient.

 9         Q.     If you go to the next page it says, "We

10    should be counseling patients differently about mesh.

11    When selecting a sling 'what's left behind' matters

12    more than the delivery system."

13         What does that mean to you, Doctor?

14         A.     To me what this means, and I think

15    you'll get your answer towards the end of this

16    presentation, is that the majority of the science

17    demonstrating the safety and efficacy of the TVT

18    product is specifically based upon the TVT product.

19    However, other companies that have similar products are

20    sort of borrowing from research that was done on TVT,

21    and so I think what we were speaking to here is the

22    fact that we have a wealth of data on TVT specifically.

23         And so when we talk to people about sling

24    choices, and, remember, there are 49 slings on the
```

Marc R. Toglia, M.D.

1   market or were on the market, what do we tell people,

2   what do we tell, do we tell them we're going to do a

3   sling, we're going to do a synthetic sling, we're

4   specifically using one versus another.

5          You know, this was -- the use of implants --

6   we've used implants from the '50s, but it was becoming

7   more commonplace.  So as a surgeon, our process for

8   informed consent and discussion was evolving.  We all

9   had different methods.  When we would go to the summit

10   meeting, different people would say, this is how I

11   present the information, this is how I present the

12   information, this is what I tell the patient, and I

13   think that that's probably what they were -- I think

14   that they were specifically saying, look, we have the

15   data, we've got -- at the time we have 40 some odd

16   clinical trials specifically with our product, whereas

17   competitors may have less than ten products.

18          Q.     And here it says "meshes are different

19   and should be assessed by their own clinical outcomes,"

20   which fits in with what you're saying right now, right?

21          A.     Mm-hmm.

22          Q.     And then the fourth category there it

23   says, "In a category of slings where 'Level I Evidence'

24   exists with proven safety and efficacy, why accept a

Marc R. Toglia, M.D.

1    mesh without outcomes data?"

2            Level 1 evidence is something that you say

3    quite a bit, right?

4            A.    Yes.

5            Q.    And the next page, "All meshes are not

6    equal."  And then it goes on to show the pictures of

7    the different meshes, "All are polypropylene...but

8    meshes have differences."

9            Do you recall this slide?

10           A.    I mean, this slide has come and gone

11   throughout the history of these discussions as far as

12   specifically how these products are knitted.

13           Q.    And do you believe that AMS or Boston

14   Scientific or Bard's mesh is different than Ethicon's?

15                 MR. SNELL:  Form.

16                 THE WITNESS:  I don't have much

17           experience using those products.  Again -- I

18           just, again, I'm an evidence-based guy, and you

19           can see just clinically my entire experience, I

20           stick with what seems to have the most

21           evidence, so they're all polypropylene, they

22           all are Type I Amid meshes, macroporous.  You

23           know, I'm not aware of major differences

24           between them.

Marc R. Toglia, M.D.

 1   BY MR. SCHNIEDERS:

 2          Q.     Do you believe that AMS or Boston

 3   Scientific or Bard's mesh can cause complications?

 4          A.     I don't, no, based upon my extensive

 5   review of the literature and the report that I've

 6   presented previously.  It's not the material.

 7          Q.     It goes on it says, "What are the

 8   mechanical properties of an ideal sling design?"  And

 9   it's got four bullet points and tell me if you agree

10   with these, that it "incorporates into tissue."

11          Do you agree?

12          A.     Sorry.  I lost my place.

13          Q.     It's right after the pictures of the

14   mesh.  It's titled "What are the mechanical properties

15   of an ideal sling design?"

16          Do you see it, Doctor?

17          A.     I do.  I mean, I believe that these are

18   points for discussion.  So, you know, is it important,

19   you know, how a sling incorporates into the tissue, is

20   it important the stiffness, is there a relationship

21   between stiff and non-stiff?  These are all the things

22   that we were exploring.

23          Obviously, we were all comfortable that the

24   introduction of midurethral slings was a major advance

Marc R. Toglia, M.D.

```
1    in this field.  We were aware of what was being

2    reported to the FDA, so we were saying to ourselves,

3    okay, we're on the front line, let's dig into this.  I

4    can't tell you that we drew any direct conclusions, but

5    these were the questions that we were asking.

6         Q.    But, sitting here today, you can't point

7    to those four things as the properties of an ideal

8    sling design?

9         A.    I'm sorry, I mean, yes.  Obviously, it

10   is important how the sling incorporates itself into

11   tissue.  You know, to me it just speaks to

12   biotolerability, and, yes, that's important as well.

13   Remember that around this period of time there were a

14   couple slings, ObTape, that was taken off the market,

15   had a very, very different design.  The original

16   Protogen sling, which is the precursor, was taken off

17   the market.  I vaguely remember that somebody had a

18   silicone-coated sling that was not used, you know,

19   after a while.  So, again, obviously, these type of

20   things facilitate discussion.

21        Q.    If you go two more slides down, it says,

22   "Gynecare TVT Tension-free Support for Incontinence

23   Mesh:  Unique Properties."  It says, "Measurable

24   differences from other polypropylene meshes, largest
```

Marc R. Toglia, M.D.

1   pore size, lowest stiffness, highest elongation."

2           Are those important to you as a physician?

3           A.      Again, I did not write this information,

4   you know, what we considered to be important clinically

5   and what the literature supports is that we're using a

6   macroporous product.  I mean, is there a difference

7   between 1,100 and 1,300 clinically?  I don't believe

8   so.  Is there a significance to stiffness?  I don't

9   know.  Elongation, I don't know either.  Is it true

10  that the TVT mesh has the largest pore size?  Yes.

11  That it has the lowest stiffness?  You know, my

12  recollection, yes.  I think those statements are

13  supported by the title.  I don't think it speaks to any

14  kind of clinical.

15          Q.      Significance?

16          A.      Application, clinical significance,

17  clinical difference.

18          Q.      Can you go back two pages to the page

19  that looks like the chart like this?

20          A.      Right.

21          Q.      You see there under the asterisk at the

22  bottom it says, AMS mesh was tested without tensioning

23  suture.  In another study comparison when measured with

24  the tensioning suture SPARC has a stiffness of

Marc R. Toglia, M.D.

```
1    .53 nanograms per milliliter and Gynecare TVT

2    Tension-free Support for Incontinence has a stiffness

3    of .23 nanograms per milliliter.  This is a highly

4    significant difference, and it gives a P value there.

5         You see that?

6         A.    Yes.

7         Q.    So, apparently, it wasn't you, but

8    whoever put this PowerPoint together and put your name

9    on it felt that that was an important difference,

10   right?

11        A.    Well, you know, yes.  I mean, there's --

12   but there's a difference between clinically significant

13   and the fact that -- I mean, that the numbers are

14   highly significant difference.  As we go through this,

15   as we had -- as you brought up earlier this afternoon,

16   there was a document that suggested that I participated

17   in a luncheon discussion at a meeting.  It may be that

18   this was something that was being considered for that

19   venue.  I don't know.  I have no recollection that this

20   is actually what I presented, but perhaps there's a

21   relation -- we don't have a date for this.

22        Q.    Finishing up, there's a page that is

23   right before what I've called the footnotes or the

24   credits I guess at the end, it's titled -- it says
```

Marc R. Toglia, M.D.

1    "Prolene polypropylene mesh is highly inert."

2         You see that page, Doctor?

3         A.     Mm-hmm.

4         Q.     And then it says, "treated over

5    1.5 million patients," and then it says "longest term

6    follow-up of any mesh at 11.5 years," and "The most

7    'Level I Evidence' with 41 RCTs."  Now, that bottom

8    cite, Number 7, if you go over to the references, it

9    says there was a PubMed search, and you can see PubMed

10   search was from 1/26 of '09 through 2/20 of '09, which

11   gives us a time frame for when this would have

12   occurred.  I'm assuming you didn't run that PubMed

13   search, right?

14        A.     That is correct.

15             MR. SCHNIEDERS:  Let me take five.

16             (Brief recess taken at 6:51 p.m.)

17             (Deposition resumes at 6:57 p.m.)

18             (Document marked for identification as

19        Toglia Deposition Exhibit No. 30.)

20   BY MR. SCHNIEDERS:

21        Q.     I have just marked as Exhibit 30 a

22   ProPublica document or it comes from the ProPublica

23   database where you can type in doctors' names and it

24   shows some of the payments they've received from the

Marc R. Toglia, M.D.

1    past couple of years.

2           Are you familiar with this type of document?

3           A.    I am, I am.

4           Q.    If you go to the second page, they don't

5    print out very nicely every time, but on the second

6    page it states that from August of 2013 through

7    December of 2014, you received a total of 137 payments

8    for 45,967 -- $45,976.

9           Does that sound about right to you or sound

10   high, sound low?

11          A.    And, again, not wanting to be

12   argumentative, I take issue with the 137 payments.  I

13   think that if somebody brought lunch to my office or to

14   my office staff, that perhaps that might be counted as

15   a payment.

16          Q.    I think, in fact, it is.  If you look

17   under down here under types of payments, it's going to

18   tell you exactly what it was.

19          A.    Right.  I think also I do recall, and it

20   may not be specifically this time period, that Pfizer

21   had floated a study by me.  We submitted the

22   information to the Lankenau Institute of Medical

23   Research.  They paid that institute $2,000 for their

24   review of the protocol.  We would not participate, but

Marc R. Toglia, M.D.

1  it was reported as income to me, but I never saw that

2  income.

3          Q.     So I'm going to ask you -- it lists

4  through every single payment here and talks it through.

5          A.     Sure.

6          Q.     I'm not going to ask you about each

7  individual payment.

8          A.     Sure.

9          Q.     I want to highlight or mention the

10  company that's listed just to see if that's something

11  that sounds right, like you would have received

12  something from that company?

13          A.     I mean, I see stuff on here that I

14  clearly had no involvement with, but go ahead.

15          Q.     That's fine, just tell me as we go

16  along.

17          A.     Sure.

18                 MR. SNELL:  Note my continuing objection

19          as to the foundation, accuracy of this

20          document, and move motion in limine to preclude

21          this document.

22                 Go ahead.

23  BY MR. SCHNIEDERS:

24          Q.     Astellas Pharma US, I think we talked

Marc R. Toglia, M.D.

1    about them earlier; is that right?

2           A.    Yes.

3           Q.    AMS?

4           A.    I'm sorry.  The question is specifically

5    is did I?

6           Q.    Do you recall consulting for American

7    Medical Systems Inc.?

8           A.    Yes.  Some of them, for example, Elevate

9    is AMS.  I never consulted.  That is not a consulting

10   thing, $19.  That was maybe a lunch, I don't know.  I

11   honestly don't know.

12          Q.    Uroplasty, Inc. do you recall that?

13          A.    Yes.

14          Q.    Is Uroplasty, Inc. a device

15   manufacturer?

16          A.    Uroplasty was a device manufacturer.

17   They were renamed Cogentix, C-o-g-e-n-t-i-x, and I

18   consulted with them on productional education slide

19   development.

20          Q.    There were a handful of Ethicon on here.

21   There's one on March 25th of 2014, which is Page 14 of

22   44 at the top.  It says uterine surgery for $107?

23          A.    I'm sorry, where?

24          Q.    If you go to the numbering up here,

Marc R. Toglia, M.D.

1    Number 14, and it's the top one.

2            A.      I'm sorry.  And this was which year?

3            Q.      March 25th of 2014.

4            A.      Got you.  I mean, there's probably

5    another physician in my office.  At that time there

6    were two other physicians in my practice, and they

7    might have been talking to them about either the

8    morcellator product, that wouldn't be me.  That's not

9    something that I would have likely participated in.

10           Q.      And I would note that and consistent

11   with what you said earlier that Astellas seems to be

12   the name that comes up the most often.

13           Does that sound right to you?

14           A.      Yes, during this time period, probably

15   the work that I did was with overactive bladder having

16   participated in some of the research previously.

17           Q.      Looks like there was food related to a

18   drug called Toviaz from Pfizer.

19           Do you recall that?

20           A.      Yeah, that's food provided to my office

21   staff.  I may or may not have been there.

22           Q.      Same thing with regard to Warner

23   Chilcott for a drug called Enablex?

24           A.      Yes.

Marc R. Toglia, M.D.

```
 1              Q.      Noven Pharmaceuticals for a drug called

 2   Brisdelle?

 3              A.      That's not me.  Brisdelle I believe is a

 4   birth control pill.  That's not accurate.  I never sat

 5   in on a lunch for -- no, I'm sorry, Brisdelle, PMS

 6   treatment perhaps.  Again, probably marketed towards my

 7   junior partner.  Forteo, not me.

 8              Q.      Forteo?

 9              A.      No, not me.  I have no idea what

10   Xartemis is, never heard of that.

11              Q.      Is that the one that's Mallinckrodt?

12              A.      I have no idea.

13              Adhesion prevention, I don't recognize that at

14   all.

15              Q.      Allergen for Botox?

16              A.      I've never used Botox.  I don't believe

17   that would be myself either.  This is not that

18   accurate.

19              Q.      Just so you're aware, for your own sake,

20   you can go and contest anything that's not accurate.

21              A.      I appreciate that.  Thank you.  Yes.

22              Q.      If you do feel that way.

23              That's the majority of the companies there.

24              Lastly, Doctor, when you give a risk-benefit
```

Marc R. Toglia, M.D.

1  discussion to any of your female patients about the

2  potential of receiving a TVT device or receiving

3  Gynemesh PS, do you disclose to them that you had a

4  financial relationship with Ethicon?

5          A.     I do.

6          Q.     And what do you tell them?

7          A.     I tell them that I have been involved

8  with professional education, research study, that I've

9  consulted on designs, development of such products.  I

10  disclose as much as, you know, they're interested in

11  hearing.

12          Q.     No amounts, I assume, right?

13          A.     I don't tell them specific amounts.

14  Obviously, these are all public records.  You can find

15  out how much Medicare paid me last month if you wanted

16  to.

17                 MR. SCHNIEDERS:  Doctor, I think my time

18          is up.  I have no further questions.  Thank you

19          for your time.

20  BY MR. SNELL:

21          Q.     Doctor, I'm just going to ask a few

22  follow-up questions on a couple topics.

23          Doctor, I'll represent to you that depositions

24  of the plaintiffs' experts are ongoing.  I know you've

Marc R. Toglia, M.D.

```
1   been provided Dr. Ostergard's deposition, but there are

2   many other depositions going on, and it will be, I'll

3   represent, sent to you.

4           Could you plan to reserve the right to issue

5   any new or updated opinions based on depositions of the

6   plaintiffs' experts?

7                   MR. SCHNIEDERS:  Object to the form.

8                   THE WITNESS:  Yes, I would say that

9           sounds fair.

10  BY MR. SNELL:

11          Q.      And will you look at any new studies

12  that come out that you may or may not find to be

13  pertinent to your opinions?

14                  MR. SCHNIEDERS:  Object to the form.

15                  THE WITNESS:  Yes, I read this

16          literature frequently so...

17  BY MR. SNELL:

18          Q.      You were asked questions about if you

19  were provided company documents.  Besides the IFUs, the

20  professional education materials, the slide decks, the

21  videos and all the stuff that are on the thumb drive

22  somewhere that we're going to put in the box as

23  Exhibit 4, I just want to call to your attention.  So

24  in Dr. Ostergard's materials that were provided to you,
```

Marc R. Toglia, M.D.

```
 1    are there company documents and things of that nature

 2    as well?

 3                    MR. SCHNIEDERS:  Object to the form.

 4                    THE WITNESS:  I mean, obviously, the

 5            Prolift documents, these are slides on Prolift,

 6            so, yes.  There are various e-mails.

 7    BY MR. SNELL:

 8            Q.    You were asked about your expertise in

 9    various areas.  Let me ask you about that.

10            Do you believe you're an expert in how the

11    chemical polypropylene the polymer performs in pelvic

12    surgery in a woman?

13                    MR. SCHNIEDERS:  Object to form.

14                    THE WITNESS:  Yes, I do believe I'm an

15            expert in that.

16    BY MR. SCHNIEDERS:

17            Q.    Besides, obviously, your testimony that

18    you've utilized polypropylene over many decades before

19    pelvic surgery, have you also researched that topic in

20    the reliable scientific medical literature?

21                    MR. SCHNIEDERS:  Object to the form.

22                    THE WITNESS:  Yes, I have.

23    BY MR. SNELL:

24            Q.    Have you analyzed the design of the
```

Marc R. Toglia, M.D.

```
 1    devices that utilize the Ethicon polypropylene?
 2                     MR. SCHNIEDERS:  Object to the form.
 3                     THE WITNESS:  Yes, I have.
 4    BY MR. SNELL:
 5          Q.    You were asked if you're an expert in
 6    polymer chemistry.  Do you believe you're an expert in
 7    that field?
 8                     MR. SCHNIEDERS:  Object to the form.
 9                     THE WITNESS:  As it pertains to what
10           we're discussing here and its intended use,
11           yes, I am.
12    BY MR. SNELL:
13          Q.    And before you even went to medical
14    school, I think you testified you have a degree in
15    biochemistry as well?
16          A.    Correct.
17          Q.    Do you believe you have a very good
18    working knowledge and understanding of chemistry?
19          A.    Yes, I have.
20          Q.    Including the chemistry of polypropylene
21    and what -- the atoms or molecules it's made up of?
22          A.    That's correct.  I did research as an
23    undergraduate in silastic plastic delivery systems.
24          Q.    You talked some in this deposition about
```

Marc R. Toglia, M.D.

```
 1   your consulting and evaluation of the development and

 2   design of sling and prolapse devices.

 3           In your earlier deposition, you recall covering

 4   that subject as well?

 5           A.    I do, yes.

 6           Q.    Do you stand by your testimony from your

 7   earlier deposition in the Mullens case about the

 8   various design and development work you did?

 9                 MR. SCHNIEDERS:  Object to the form.

10                 THE WITNESS:  Yes, I believe we covered

11          that pretty extensively.

12   BY MR. SNELL:

13           Q.    Do you recollect in that testimony you

14   discussed that you were involved in the design

15   validation of the Gynemesh M mesh?

16                 MR. SCHNIEDERS:  Object to the form.

17                 THE WITNESS:  Yes.

18   BY MR. SNELL:

19           Q.    And is that a prolapse mesh similar to

20   Gynemesh PS?

21                 MR. SCHNIEDERS:  Object to the form.

22                 THE WITNESS:  Yes.

23   BY MR. SNELL:

24           Q.    Do you recollect testifying and telling
```

Marc R. Toglia, M.D.

1    the lawyers under oath that in your role as being one

2    of the design validation surgeons, you assessed the

3    suitability, safety, efficacy and adequacy of the

4    design of that product?

5              MR. SCHNIEDERS:  Object to the form.

6              THE WITNESS:  I did, yes.

7    BY MR. SNELL:

8         Q.    Do you also recall and recollect your

9    testimony that in the design validation activities you

10   performed on the prolapse mesh for Ethicon, you also

11   assessed the instructions for use as to its adequacy

12   and clarity and how it laid out instructions?

13             MR. SCHNIEDERS:  Object to the form.

14             THE WITNESS:  Yes, I did.

15   BY MR. SNELL:

16        Q.    Do you recollect that you testified that

17   in connection with your evaluation of the IFU for the

18   prolapse device, you were asked whether it was clear or

19   cohesive or accurate?

20             MR. SCHNIEDERS:  Object to the form.

21             THE WITNESS:  Yes, I did.

22   BY MR. SNELL:

23        Q.    And besides the prolapse mesh, I think

24   you testified here today and you testified earlier, you

Marc R. Toglia, M.D.

```
 1   have consulted and evaluated the design of other

 2   Ethicon pelvic floor products over various time

 3   periods?

 4               MR. SCHNIEDERS:  Object to the form.

 5               THE WITNESS:  Yes, I have.

 6   BY MR. SNELL:

 7        Q.    For example, you testified about your

 8   design evaluation and your work with the TVT Exact

 9   product for stress urinary incontinence?

10               MR. SCHNIEDERS:  Object to the form.

11               THE WITNESS:  Yes, starting from the

12          concept of the design all the way through the

13          engineering, all the way through the

14          suitability of the product and the professional

15          education component of that, which included the

16          teaching, the filming of the video

17          demonstrating the technique.

18   BY MR. SNELL:

19        Q.    And would that professional education

20   also include the instructions for use?

21               MR. SCHNIEDERS:  Object to the form.

22               THE WITNESS:  Yes, it did include the

23          instructions for use.

24   BY MR. SNELL:
```

Marc R. Toglia, M.D.

```
1              Q.     And so do you believe you're an expert

2      and qualified to opine on the adequacy of the

3      instructions for use for the Gynemesh PS and Prolift

4      and the TVT product?

5                     MR. SCHNIEDERS:  Object to the form.

6                     THE WITNESS:  Yes, I will agree with

7            that.

8      BY MR. SNELL:

9              Q.     And did you actually teach the IFU

10     during your professional education activities for

11     various products in addition to the discussions or I

12     think you called them proctorships as well?

13                    MR. SCHNIEDERS:  Object to the form.

14                    THE WITNESS:  Yes, I did.

15     BY MR. SNELL:

16             Q.     And I think we've seen or you produced

17     earlier, as I recall, slide decks, maybe more than one.

18     Do you recollect during your professional education

19     activities talking to pelvic floor surgeons about the

20     potential risk and how to utilize and insert these

21     devices?

22                    MR. SCHNIEDERS:  Object to the form.

23                    THE WITNESS:  Yes.  We specifically

24           would go over techniques, strategies to
```

Marc R. Toglia, M.D.

```
 1              minimize, strategies to recognize the

 2              potential.

 3    BY MR. SNELL:

 4              Q.     You were asked about the TVT Secur

 5    randomized control trial.

 6              Do you recollect that?

 7              A.     I was asked about the security trial,

 8    which compared TVT retropubic with TVT Secur.

 9              Q.     Was your site paid by Ethicon?  I just

10    want to understand, because I think there was

11    questioning about that, and I got a little unclear.

12              A.     I understand.

13                     MR. SCHNIEDERS:  Object to the form.

14                     THE WITNESS:  My recollection is that we

15              were paid by the Cleveland Clinic.  I might

16              have earlier mentioned that the money came from

17              the foundation, but I do believe that the

18              actual payments came through the Cleveland

19              Clinic Foundation.

20    BY MR. SNELL:

21              Q.     You were asked questions about whether

22    you were an expert in pathology.  Let me ask you this:

23    In your review of the medical literature, have you

24    reviewed the pathology papers with the
```

Marc R. Toglia, M.D.

```
 1   photomicrographs, such as the Clave study?

 2                  MR. SCHNIEDERS:  Object to the form.

 3                  THE WITNESS:  Yes, I've reviewed the

 4            studies as we've listed them involving the

 5            scanning electron microscopy using the Fournier

 6            method of analysis, the optical method of

 7            analysis as well, the histologic -- several

 8            histologic studies.

 9   BY MR. SNELL:

10       Q.    And based upon your medical education

11   and training, were you able to adequately evaluate

12   those pathologic studies?

13                  MR. SCHNIEDERS:  Object to the form.

14                  THE WITNESS:  Yes, I think I have an

15            excellent working knowledge of those topics.

16                  MR. SNELL:  That's all I have.  Thank

17            you for your time.

18                        (Witness excused.)

19            (Deposition concluded at 7:17 p.m.)

20                           - - -

21

22

23

24
```

Marc R. Toglia, M.D.

```
1              C E R T I F I C A T I O N

2                   I, MARGARET M. REIHL, a Registered

3         Professional Reporter, Certified Realtime

4         Reporter, Certified Shorthand Reporter,

5         Certified LiveNote Reporter and Notary Public,

6         do hereby certify that the foregoing is a true

7         and accurate transcript of the testimony as

8         taken stenographically by and before me at the

9         time, place, and on the date hereinbefore set

10        forth.

11                  I DO FURTHER CERTIFY that I am

12        neither a relative nor employee nor attorney

13        nor counsel of any of the parties to this

14        action, and that I am neither a relative nor

15        employee of such attorney or counsel, and that

16        I am not financially interested in the action.

17

18

19                  -------------------------------

                    Margaret M. Reihl, RPR, CRR, CLR

20                  CSR #XI01497  Notary Public

21

22

23

24
```

Marc R. Toglia, M.D.

```
 1                    -   -   -   -   -   -

 2                    E  R  R  A  T  A

 3                    -   -   -   -   -   -

 4    PAGE   LINE   CHANGE

 5    _____  _____  _____

 6    REASON:  _____

 7    _____  _____  _____

 8    REASON:  _____

 9    _____  _____  _____

10    REASON:  _____

11    _____  _____  _____

12    REASON:  _____

13    _____  _____  _____

14    REASON:  _____

15    _____  _____  _____

16    REASON:  _____

17    _____  _____  _____

18    REASON:  _____

19    _____  _____  _____

20    REASON:  _____

21    _____  _____  _____

22    REASON:  _____

23    _____  _____  _____

24    REASON:  _____
```

Marc R. Toglia, M.D.

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2

 3              I, MARC R. TOGLIA, M.D., do hereby

 4         certify that I have read the foregoing pages,

 5         and that the same is a correct transcription of

 6         the answers given by me to the questions

 7         therein propounded, except for the corrections

 8         or changes in form or substance, if any, noted

 9         in the attached Errata Sheet.

10

11

12

      _____
13    MARC R. TOGLIA, M.D.              DATE

14

      Subscribed and sworn to before me this

15

      _____ day of _____, 2016.

16

      My commission expires:_____

17

18    _____
      Notary Public

19

20

21

22

23

24
```