# Exhibit D

Joseph M. Carbone, M.D.

```
 1              UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF WEST VIRGINIA
 2                  CHARLESTON DIVISION
 3   IN RE: ETHICON, INC., PELVIC   )  Master File No.
     REPAIR SYSTEM PRODUCTS         )  2:12-MD-02327
 4   LIABILITY LITIGATION           )  MDL 2327
     _____
 5   THIS DOCUMENT RELATES TO
     PLAINTIFFS:
 6
     Diane Kropf
 7   Case No. 2:12-cv-01202          JOSEPH R. GOODWIN
                                     U.S. DISTRICT JUDGE
 8   Judy Williams
     Case No. 2:13-cv-00657
 9
     Myra Byrd
10   Case No. 2:12-cv-00748
11   Angela Coleman
     Case No. 2:12-cv-01267
12
     Susan Thamen (Reeves)
13   Case No. 2:12-cv-00279
14   Donna Zoltowski
     Case No. 2:12-cv-00811
15
16
17       DEPOSITION OF JOSEPH M. CARBONE, M.D.
18                    GENERAL TVT
19             Wednesday, March 16, 2016
20                 Danville, Virginia
21                     5:18 p.m.
22
23   Reported by:  Karen K. Kidwell, RMR, CRR, CLR
24            GOLKOW TECHNOLOGIES, INC.
         877.370.3377 ph | 917.591.5672 fax
25                deps@golkow.com
```

Joseph M. Carbone, M.D.

```
 1   strike that.
 2            It's fair to say, starting in the year
 3   2003 through the year 2012, you had a relationship
 4   with Ethicon as a consultant physician, correct?
 5        A.   Yes.
 6        Q.   And it's fair to say from -- starting in
 7   the year 2003 through the year 2012, for each of
 8   those years, you received payments from Ethicon for
 9   your role as a consultant physician, correct?
10        A.   Correct.
11        Q.   It's fair to say, between the years 2003
12   to 2012, every single one of those years, you
13   performed work for Ethicon as a consultant physician,
14   correct?
15        A.   Correct.
16        Q.   It's fair to say before you agreed to be a
17   litigation consultant for Ethicon, you had a ten-year
18   relationship with Ethicon in your role as a
19   consultant physician, correct?
20        A.   2003 till when?
21        Q.   To the end of 2012.
22        A.   Yes.
23        Q.   Do you know how many days -- have you
24   tracked -- strike that.
25            Have you tracked at all how many days out
```

Joseph M. Carbone, M.D.

1    of the year on average you do consultant work for

2    Ethicon?

3        A.   No.

4        Q.   You don't know one way or the other how

5    many days in the calendar year 2010 you spent

6    consulting with Ethicon?

7        A.   No.

8        Q.   If someone, perhaps a juror, wanted to

9    know how many calendar days you spent in 2010

10   consulting with Ethicon, would there be a way for

11   them to find that information out?

12           MR. MORIARTY:  Objection.  Go ahead.

13           THE WITNESS:  I wouldn't know.

14   BY MR. JONES:

15       Q.   Okay.  So that's not information you have

16   at access?

17       A.   No.

18       Q.   Is it fair to say that, in your consulting

19   work between the years 2003 and 2012 for Ethicon,

20   some of the events you conducted for Ethicon were

21   marketing events?

22       A.   Yes.

23       Q.   Is it fair to say that, between the years

24   2003 and 2012 in your consulting work for Ethicon,

25   some of your work involved the promotion of Ethicon

Joseph M. Carbone, M.D.

```
 1   holding themselves out as an expert in this

 2   litigation?

 3        A.   Well, it means that I don't put as much

 4   weight in a Level 4 study, or a low-level study, than

 5   I do a high-level study.

 6        Q.   Is -- are studies that are not, as you

 7   call them, Level 1 evidence low-level studies?

 8        A.   I'm sorry?

 9        Q.   Are studies that are not Level 1 evidence

10   low-level quality of studies?

11             MR. MORIARTY:  Objection.

12             THE WITNESS:  Well, it's a spectrum.  So I

13        can't -- you know, it's not a dichotomy.  So I

14        would say lower.

15   BY MR. JONES:

16        Q.   Okay.  Are you familiar with the concept

17   of milestone payments?

18        A.   I'm sorry?

19        Q.   Are you familiar with the concept

20   milestone payments in the context of study -- studies

21   and trials and analyzing data?

22        A.   No, I'm not familiar with that.

23        Q.   You've never heard the term "milestone

24   payment"?

25        A.   I have not.
```

Joseph M. Carbone, M.D.

```
 1          A.   That was included in some of the review of

 2    case reports.

 3          Q.   Okay.

 4          A.   Okay.  I'm with you.  So 16 is there.

 5          Q.   All right.

 6          A.   Keep going.

 7          Q.   Everything else that Ethicon sent you, how

 8    much time did you spend reviewing that?

 9          A.   Well, it's hard to say because a lot of

10    the articles I had seen before.  So not a vast amount

11    of time.  I don't know.  Those materials back there,

12    I was able to go through relatively quickly.  I'd say

13    three or four hours looking through them, with the

14    understanding that a lot of them I had already seen.

15          Q.   Okay.  And you're talking about medical

16    literature primarily?

17          A.   That was all medical literature.

18          Q.   All medical literature.  Did you review

19    any internal Ethicon documents?

20          A.   Some of it is.

21          Q.   Some?

22          A.   Yeah.

23          Q.   Okay.  How many?

24          A.   Not -- a minority.

25          Q.   Very small amount of internal Ethicon
```

Joseph M. Carbone, M.D.

1    articles for you to review?

2         A.   A minority.  How do you define "very

3    small," right?

4         Q.   Did you review more than 100 internal

5    documents?

6         A.   No.

7         Q.   Did you review more than 50?

8         A.   I don't think so.

9         Q.   Okay.  If you want -- I think I've looked

10   at your reliance list.  There's about 10 --

11        A.   Yeah.

12        Q.   -- 10 --

13        A.   Yeah.

14        Q.   So 10 or 15 internal documents, okay.

15        A.   Yeah.  Not many at all.

16        Q.   Just so the record -- you reviewed a total

17   of 10 to 15 internal Ethicon documents, correct?

18        A.   See the reliance list.  Yeah.

19        Q.   Fair to say that the bulk of the materials

20   that you're relying on for your opinions in this case

21   come from the medical literature and your clinical

22   experience, correct?

23        A.   My knowledge, my training, my experience,

24   the medical literature, my interaction with

25   physicians, the totality of my career.

Joseph M. Carbone, M.D.

```
 1          Q.   But not the internal Ethicon corporate

 2    documents?

 3          A.   No.

 4          Q.   Okay.  Do you know -- did you review any

 5    internal Ethicon design documents?

 6          A.   I'm sure I may have or may have not.  I

 7    don't recall specific Ethicon -- what did you say?

 8          Q.   How about, did you review the design

 9    specifications for any of the products that we're

10    discussing here today?

11          A.   I don't remember specifically.

12          Q.   As you sit here today, you don't have any

13    recollection reviewing the design specifications for

14    the TVT line of products for the Prolift, correct?

15          A.   I do not have any specific recollection of

16    those things.

17          Q.   Do you know what a -- do you know what --

18    who the company MedScan is?

19          A.   MedScan?  No.

20          Q.   Do you know who Provincia is?

21          A.   No.

22          Q.   Do you know what an FMEA is?

23          A.   FEMA?

24          Q.   FMEA.

25          A.   Oh, FMEA.  No.
```

Joseph M. Carbone, M.D.

```
1          A.   Again, I can't remember specifically.  I

2     didn't do that many.  When did it come out?

3          Q.   Say 2008.

4          A.   2009.

5          Q.   Okay.  2008-2009?

6          A.   2008-2009.

7          Q.   How come you didn't do very many?

8          A.   I -- I like the product.  I felt the --

9     there were advantages, disadvantages.  I felt one of

10    the advantages was the trocharless insertion; one of

11    the disadvantages was the trocharless insertion.  And

12    so I tried it.

13         Q.   Sounds like Prosima in theory was a good

14    idea; in practice, maybe not so much?

15              MR. MORIARTY:  Objection.

16              Go ahead.

17              THE WITNESS:  I can't say I didn't do it

18         because it wasn't a good idea.  I just didn't do

19         all that many.

20    BY MR. JONES:

21         Q.   Okay.  Did you have any failures with

22    Prosima?

23         A.   Yes.

24         Q.   Okay.  How many?

25         A.   I can't remember specifically to the
```

Joseph M. Carbone, M.D.

1    Prosima device.  I kind of lumped all -- I can't

2    remember specifically to the Prosima device.

3         Q.   What other device?

4         A.   What do you mean by that?

5         Q.   You're saying -- did you have failures

6    with Prolift as well?

7         A.   I did.

8         Q.   How many?

9         A.   Let's say between Prosima and Prolift, 20,

10   25.

11        Q.   Okay.  Do you have an exact number?

12        A.   No.

13        Q.   Have you ever endeavored to do a survey or

14   study of your exact complication rate?

15             MR. MORIARTY:  Objection.  Go ahead.

16             THE WITNESS:  Not my exact complication

17        rate.

18   BY MR. JONES:

19        Q.   Okay.  How about have you ever done a

20   survey or study to discover your exact failure rate?

21             MR. MORIARTY:  Objection.  Form.

22             THE WITNESS:  Not my exact failure rate.

23

24   BY MR. JONES:

25        Q.   So you can't tell us one way or the other

Joseph M. Carbone, M.D.

```
 1   your precise success rate with the use of mesh,

 2   correct?

 3        A.   Not --

 4             MR. MORIARTY:  Objection.

 5             THE WITNESS:  -- my precise.

 6   BY MR. JONES:

 7        Q.   Have you ever attempted to create a

 8   registry with your mesh patients?  A registry that

 9   tracks your patients, say, five years down the road?

10        A.   No.

11        Q.   If the TVT-Secur device was still sold by

12   Ethicon today, would you use it?

13             MR. MORIARTY:  I'm sorry.  Could you just

14        read that back?

15             (Whereupon the Court Reporter read the

16             previous question.)

17             MR. MORIARTY:  Thank you.

18             THE WITNESS:  Not likely.

19   BY MR. JONES:

20        Q.   Why not?

21        A.   I like the device fair enough.  I think it

22   had a good success and safety profile in my hands.  I

23   feel more confident with the Abbrevo that I get the

24   ends of the mesh into the exact position that I want

25   them in in the obturator fascia.
```

Joseph M. Carbone, M.D.

1    sure I get it right.

2         Q.   Have you ever been asked by a medical

3    device company other than Ethicon to be an expert in

4    litigation?

5         A.   To the best of my recollection, I don't

6    believe any of the medical malpractice cases involved

7    medical devices.

8         Q.   Now I've got to ask you again.  Yes or no.

9    To the best of your recollection, has a medical

10   device company other than Ethicon ever asked you to

11   act as an expert in litigation?

12        A.   Is it the same question?

13        Q.   Yes or no?

14        A.   Was my answer inadequate?

15        Q.   Yes or no?

16        A.   Not that I recall.

17        Q.   Okay.  Perfect.

18        A.   Okay.

19        Q.   We went back and we did tally up the

20   payments from Exhibit 5.

21        A.   Okay.

22        Q.   So you have Exhibit 5 in front of you, and

23   we added up those payments from Ethicon to you

24   between the years 2003 to 2012.  And the total I'll

25   represent to you is $452,398.

Joseph M. Carbone, M.D.

1          Do you have any reason to disagree with

2    that?

3          A.   I have no reason to disagree with that.

4          Q.   Okay.  And am I correct in saying, between

5    the years 2003 to 2012, Ethicon paid you, according

6    to Exhibit 5, $452,398?

7          MR. MORIARTY:  Objection.

8          Go ahead.

9          THE WITNESS:  As a consultant, yes.

10   BY MR. JONES:

11         Q.   Did they pay you any other money outside

12   of your role as consultant?

13         A.   No.

14         Q.   So between the years 2003 to 2012, Ethicon

15   paid you 452,398, correct?

16         A.   Correct.

17         Q.   Okay.  When did Ethicon first contact you

18   to be an expert in this case?

19         A.   You know, I don't remember.  Obviously

20   sometime before 2003.

21         Q.   When did -- I probably did a bad job

22   asking that question.

23         A.   I apologize.

24         Q.   That's on me.  Ethicon -- I assume Ethicon

25   contacted you and said, "Hey, we've got this

Joseph M. Carbone, M.D.

1          A.   Since 2003, have I experienced, in my use

2    of TVT mesh, roping or curling?

3          Q.   (Nodding head up and down.)

4          A.   No.

5          Q.   Since 2003, in your use of TVT mesh, have

6    you ever seen the mesh deform without

7    supraphysiological tension?

8          A.   No.

9          Q.   Can TVT mesh cause chronic pain?

10              MR. MORIARTY:  Objection.  Form.

11              THE WITNESS:  I mean, I guess -- I kind of

12         feel like Bill Clinton here.  What do you mean

13         by "cause"?  Because if you use it in a broad, a

14         very broad sense, anything can cause chronic

15         pain, in a very broad sense.

16   BY MR. JONES:

17         Q.   I'm going to ask the question in a

18   yes-or-no form, and then I'm going to ask if you can

19   answer it yes or no.

20              Yes or no:  Can TVT mesh cause chronic

21   pain in women?

22              MR. MORIARTY:  Objection.  Form.

23              THE WITNESS:  I cannot answer that

24         specific question.

25   BY MR. JONES:

Joseph M. Carbone, M.D.

1          Q.    Okay.  Yes or no:  Can TVT mesh cause

2    chronic dyspareunia?

3                MR. MORIARTY:  Objection to form.

4                THE WITNESS:  Again, I cannot answer that

5        specific question.

6    BY MR. JONES:

7          Q.    Yes or no:  Can TVT mesh cause chronic

8    voiding dysfunction in women?

9                MR. MORIARTY:  Same objection.

10               THE WITNESS:  Again, I mean, the way

11       you're asking it, I cannot answer that question.

12   BY MR. JONES:

13         Q.    Yes or no:  Can TVT mesh cause nerve

14   damage in women?

15               MR. MORIARTY:  Objection.

16               THE WITNESS:  Again, the way you're asking

17       it, I cannot answer that question.

18   BY MR. JONES:

19         Q.    Yes or no:  Can TVT mesh cause death in

20   patients?

21               MR. MORIARTY:  I'm sorry.  Cause what?

22               MR. JONES:  Death.

23               MR. MORIARTY:  D-E-A-T-H.

24               MR. JONES:  D, starts with a D.

25               MR. MORIARTY:  D-E-A-T-H?

Joseph M. Carbone, M.D.

1    time for a medical device to market?

2         A.   No.

3         Q.   Have you reviewed any internal documents

4    related to how the TVT Obturator was developed to

5    market?

6         A.   Did you ask internal documents?

7         Q.   (Nodding head up and down.)

8         A.   I reviewed a few, but I don't recall

9    specifically something about that, no.

10        Q.   None specifically that spoke to the time

11   it took to get TVT-O to market?

12        A.   No.

13        Q.   Have you reviewed the contract between

14   Ethicon and Dr. Ulf Ulmsten?

15        A.   No.

16        Q.   Are you aware of the oxidizing agents

17   naturally occurring inside a woman's vagina?

18             MR. MORIARTY:  Objection.  Form.

19             Go ahead.

20             THE WITNESS:  Well, am I aware there are?

21        Yes.  What they specifically are, I can't say

22        with certainty.  I mean --

23

24   BY MR. JONES:

25        Q.   Sure.  But you're aware there's oxidizing

Joseph M. Carbone, M.D.

```
 1                 Are you an expert on warnings?
 2        A.   I'm sorry?
 3        Q.   I'll withdraw that last question.  Are you
 4   an expert on warnings?
 5        A.   Warnings?
 6        Q.   Warnings related to TVT mesh.
 7        A.   Warnings related to TVT mesh.  I'm trying
 8   to consider what an expert in warnings would be.
 9   Again, I don't know what an expert in warnings would
10   be.
11        Q.   Have you ever drafted an IFU?
12        A.   No.
13        Q.   Do you rely in your normal course of
14   practice as a physician on IFUs?
15        A.   Do I rely?
16        Q.   (Nodding head up and down.)
17        A.   No.
18        Q.   Do you review IFUs before you use the
19   product?
20        A.   Yes.
21        Q.   Okay.  Always?
22        A.   Which product?
23        Q.   Any product.
24        A.   It is my usual practice to review IFUs
25   before using a new product.
```

Joseph M. Carbone, M.D.

1        Q.    Thank you.  Do you -- are you aware the

2   industry standards that govern what warnings must be

3   in an IFU?

4        A.    The industry standards?  No, I don't know

5   that --

6        Q.    Do you agree that all material risks

7   related to the TVT mesh must be included in the IFU?

8             MR. MORIARTY:  Objection.  Form.

9             THE WITNESS:  I guess define "material

10      risk."

11  BY MR. JONES:

12       Q.    It's in your report.  How do you use it?

13  I'm using your term.

14       A.    I understand.  I just wanted to know on

15  how you were using it in your question.

16             (Off record discussion.)

17       Q.    I wish I could let you take all day,

18  Doctor, but we're on a tight time frame.

19       A.    I apologize.  I just don't see where I

20  write on this TVT IFU section the term "material

21  risk."  If you would like to point out to me

22  specifically where I'm using it, I'll be happy to cut

23  to the chase for you.

24       Q.    Yeah.  Why don't you go to page 4?  First

25  sentence, page 4.

Joseph M. Carbone, M.D.

1          A.    Oh.   That's under the section of informed

2   consent.   Okay.   Let me look at that.

3          Q.    So I'm using your term "material risk."

4   Okay?

5          A.    Okay.   But that --

6          Q.    See that?   You see the words?

7          A.    But that -- yeah, I see the word right

8   there.

9          Q.    All right.   Let me ask my question.

10          A.    Go ahead.

11          Q.    Is it your opinion that the TVT IFU should

12   include all material risks associated with the

13   device?

14              MR. MORIARTY:   Objection.

15              THE WITNESS:   And I know we're under a

16        time restraint, so I'll respect that by

17        answering I can't answer your question, because

18        I use the term "material risk" in my discussion

19        on informed consent between surgeon and

20        patients, not on the discussion in an IFU.   I

21        use the term differently.

22              So if you want to define what you mean by

23        "material risk in an IFU," I'll be happy to try

24        to answer your question.

25   BY MR. JONES:

Joseph M. Carbone, M.D.

1      Q.   Same what you mean in your report when

2   you're discussing it in that section.  That's what I

3   mean.

4      A.   Oh, I understand.

5      Q.   So same question, yes or no.  Does the IFU

6   for the TVT need to include all material risks

7   associated with the device?  Yes or no or I can't

8   answer the question?

9           MR. MORIARTY:  Objection.  Form.

10          Go ahead.

11          THE WITNESS:  I can't answer the question

12      for IFUs.

13  BY MR. JONES:

14      Q.   Does the TVT IFU need to include all risks

15  associated with the device?  Yes or no or I can't

16  answer the question?

17          MR. MORIARTY:  Objection.  Form.  Go

18      ahead.

19          THE WITNESS:  No.

20  BY MR. JONES:

21      Q.   What risk must be included in the TVT IFU?

22      A.   The material -- I'm sorry.  The risk

23  unique to the device.  The risks unique to the

24  device.

25      Q.   All --

Joseph M. Carbone, M.D.

```
 1          A.    20 to 25 percent.

 2          Q.    Before 2011, what percentage of your

 3    practice was related to operating on patients for

 4    stress urinary incontinence?

 5          A.    Maybe 30, 35 percent.

 6          Q.    Over the past three years, your usage of

 7    transvaginal mesh has decreased, correct?

 8          A.    Yes.

 9          Q.    Over the past three years, your usage of

10    TVT mesh has decreased, correct?

11          A.    Yes.

12          Q.    You no longer use transvaginal mesh to

13    treat pelvic organ prolapse whatsoever, correct?

14          A.    Correct.

15          Q.    Have you ever used any mesh products

16    transvaginally since the year 2000 that are not made

17    by Ethicon?

18          A.    No.

19          Q.    Do you treat mesh complications?

20          A.    Yes.

21          Q.    What percentage of your practice is

22    related to mesh -- treating mesh complications?

23          A.    A very small amount.  Less than 5 percent.

24          Q.    How many -- have you removed mesh from a

25    patient before?
```