Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

In Re: Ethicon, Inc. Pelvic Repair
System Products Liability Litigation
Master File No. 2:12-MD-02327
MDL No. 2327
_____/
This Document relates to:
CAROLYN LEWIS, et al.,
         Plaintiffs,
    -vs-               Case No. 2:12-CV-04301
ETHICON, INC.,
         Defendants.
_____/

DEPOSITION OF MICHAEL THOMAS MARGOLIS, M.D.

DATE:               November 25, 2013
TIME:               9:20 a.m.
LOCATION:          Pulone Reporting Services, Inc.
                   1550 The Alameda
                   Suite 150
                   San Jose, California  95126

REPORTED BY:       Diane S. Martin, CSR 6464, CCRR

Michael Thomas Margolis, M.D.

Page 122

1  Q. Prior cases you were involved in have
2  concerned medical malpractice?
3  A. Correct. Individual cases.
4  Q. When you're paid for your work here as an
5  expert, is that paid directly to you or some other
6  corporation?
7  A. To my S Corp.
8  Q. What's the name of that S Corp.?
9  A. Michael T. Margolis, M.D., PC.
10 Q. Have you ever been named as a defendant in a
11 lawsuit?
12 A. I have.
13 Q. How many?
14 A. I believe I've been sued five times.
15 Q. Can you tell me just the basics of what those
16 cases alleged against you?
17 A. Sure. One was a cervical cancer. The patient
18 expired after a hysterectomy, and you know, the
19 allegation was that, you know, I mean, you know, she
20 died. I mean, it was horrible.
21     I was dismissed, or whatever the word is.
22     The other was a retained sponge. I paid
23 20,000, I think, on that.
24     The other was a post-op infection that was
25 dismissed.

Page 123

1      The other was a post-op subsequent prolapse in
2  a patient who said I should have done a hysterectomy
3  when it wasn't indicated. I got dismissed in that.
4      And then the other one was I was the assistant
5  surgeon on a case in which a vascular injury occurred,
6  and they sued everyone, and they dropped me on that one
7  as well.
8      So I -- yeah, that's it. That's -- those are
9  the ones I remember.
10 Q. The case where the allegation was a
11 postoperative infection, what was the surgery at issue
12 there?
13 A. It was -- I can't remember.
14 Q. Have you ever been involved in the drafting of
15 a 510(k) application?
16 A. No, but I'm familiar with what's involved with
17 the 510(k) application and those processes.
18 Q. Have you ever been involved in drafting a
19 design history file?
20 A. No.
21 Q. You've never worked at a medical device
22 company; correct?
23 A. As an employee of a medical device company?
24 Q. Right.
25 A. No, I've never been an employee of a medical

Page 124

1  device company. I've done consulting work, you know,
2  again, with Cook Biomedical in Africa, but they didn't
3  employ me.
4  Q. What type of consulting work did you do with
5  Cook in Africa?
6  A. We worked on a fistula plug protocol.
7  Q. A clinical study protocol or --
8  A. It was a clinical study.
9  Q. Now, was that clinical study ultimately
10 published?
11 A. Not yet. Although we -- we do have an
12 abstract out. Boy, that just came out, too. We have
13 an abstract out. I have to put that on my paper, on my
14 on my CV.
15 Q. Where is the abstract going to be presented?
16 A. SUFU. The Society for Uro -- you know,
17 Urodynamics.
18 Q. And that's a plug to treat fistulas?
19 A. Actually, the broader abstract was on our
20 overall fistula experience, including the plugs.
21 Q. Are you a named author on that abstract?
22 A. I am.
23 Q. Where is SUFU going to be held?
24 A. You know, I'm not -- I'm not going this year.
25 It's in -- no, it's in late February. And I can't

Page 125

1  remember where because I'm not going because I'm going
2  to Uganda that week. Or right after SUFU. So I'm not
3  going. But I know it's just before I leave.
4  Q. Have you ever drafted a clinical expert
5  report?
6  A. Other than in a med mal?
7  Q. I'm sorry. When I refer to a clinical expert
8  report, I mean a document, an expert report that's
9  utilized in the preparation for CE marketing over in
10 Europe.
11 A. Oh, no.
12 Q. You've never written one of those; correct?
13 A. No.
14 Q. Have you ever been involved in the drafting of
15 a failure-modes-and-effect analysis on a device?
16 A. No.
17 Q. Have you ever been involved in drafting
18 instructions for use in a medical device?
19 A. Well, depends on how you define "involved." I
20 mean, I've lectured all over the world on complications
21 associated with slings and things and meshes, and I've
22 lectured to the FDA on it. So I -- I think I am
23 uniquely involved in the process.
24 Q. I guess my question was though, have you ever
25 been involved in the drafting of an instructions for

Page 126

1  use for a medical device?
2  A. Well, again, other than lecturing to the FDA
3  and lecturing all over the country on the risks
4  associated with slings in particular and meshes, I
5  haven't written it down, but I have lectured all over
6  on it.
7  And, of course, I'm familiar with the IFUs as
8  I use them every day in my practice as well as in my
9  teaching, including teaching to residents and fellows
10 and attendings physicians all over the country. So I
11 use them. And I lecture on them regularly.
12 Q. I'm sorry, objection. Move to strike. That
13 wasn't my question.
14 My question was, have you ever been involved
15 in drafting an IFU?
16 A. Well, I'm going to hold to my answer, because
17 that's -- that's the answer.
18 Q. I'm not asking -- I know you were involved
19 with the FDA. You were there. You talked to the ag
20 com. I'm familiar with all of that. My question is
21 very straightforward and simple.
22 Have you ever been involved in drafting an
23 IFU?
24 A. The answer is other than lecturing on it and
25 using it and using it as part of my teaching, no.

Page 127

1  Q. Move to strike everything before "no."
2  When is the last time you looked at a Gortex
3  IFU?
4  A. I haven't used -- haven't looked at a Gortex
5  IFU recently. I've been using it for long enough and
6  it hasn't changed.
7  Q. When is the last time you looked at an IFU for
8  the Boston Scientific Xenform sling?
9  A. Within the last year.
10 Q. When is the last time you looked at the
11 Coloplast human cadaveric fascia IFU?
12 A. Probably within the last two years.
13 Q. When is the last time you looked at the Boston
14 Scientific Repliform IFU?
15 A. Last time I used it. Several years ago.
16 Q. Would you typically look at an IFU every time
17 you do a procedure?
18 A. Any new instrument or material that I use
19 that's new to me or that I'm teaching about, I will
20 utilize the IFU in my analysis and my expertise or my
21 usage of it until, of course, I get to the point like
22 with Gortex where nothing has changed with Gortex for a
23 long time. So I don't use that. IFU since nothing has
24 changed. But with newer devices and newer products
25 that I start using and when I teach, I utilize the IFU.

Page 128

1  Q. What about the SIS product for Cook that you
2  used, the porcine pig small bowel, when is the last
3  time you looked at the IFU for that?
4  A. Back recently. I mean, that's -- that's a
5  recent study that we were working on. In fact, I
6  was -- I mean I was, you know, intimately involved in
7  the -- in working with the engineers on that product
8  because I was the technical surgeon who was helping
9  them work out their operative protocols on that device
10 that we were trying to develop. We were building a new
11 fistula plug.
12 Q. That's not the SIS product for Cook; is it?
13 A. Cook has an SIS product for rectovaginal
14 fistulas. We were working on a novel fistula plug for
15 vesicovaginal fistulas. We were working to transpose
16 their RVF plug to a VVF plug.
17 Q. The SIS product by Cook, which was the porcine
18 pig small bowel, I thought that was a sling-type
19 material you had used a few times?
20 A. Okay. So good question. It's the same
21 material. The sling -- the SIS material, the porcine
22 bowel submucosa can be used in the form of a sheet for
23 hernia and prolapse. It can also be made into a plug,
24 which is used for fistulas. So they use the same
25 material, but in different applications.

Page 129

1  Q. What Ethicon products besides Prolene have you
2  used in your career?
3  A. Ethicon? I used their trocars. I love their
4  trocars. Some of their instruments are good
5  instruments. Needle drivers and the like. But most of
6  what I use from Ethicon is the trocars or the preferred
7  trocars. I argue with the hospitals to use them.
8  Q. Is that the laparoscopic trocars?
9  A. The laparoscopic trocars, yeah. I argue. I
10 try to get the hospitals to use them. They like to get
11 the cheaper ones, but the Ethicon are better.
12 Q. Besides the TVT and TVT-O IFUs, have you
13 reviewed other manufacturers' IFUs --
14 A. I have.
15 Q. -- for polypropylene slings?
16 A. I'm sorry. I shouldn't have interrupted you.
17 Yes, I have.
18 Q. Which ones?
19 A. Every single one of the synthetic slings out
20 there.
21 Q. Have you ever been involved -- strike that.
22 Have you ever participated in the drafting of
23 a patient brochure?
24 A. A patient brochure?
25 Q. And I'm going to cast a broad net. I mean for

Michael Thomas Margolis, M.D.

Page 130

1  anyone.  Such as AUGS, AUA, SGS, the hospital systems
2  or industry.
3      A.  Well, I mean, I've used them -- I've drafted
4  them at Stanford when I was chief of the division.
5  Patient brochures.  Yeah, sure, as a matter of fact, I
6  did back at Stanford.
7      Q.  That was when you were the chief between 1996
8  and '97?
9      A.  Correct.  I draft patient brochures for my
10 office as well.
11     Q.  Is that a patient brochure you draft for your
12 patients?
13     A.  Yes.
14     Q.  The patient brochures you draft for your
15 office, what procedures do they cover?
16     A.  They cover the operative procedures that I do
17 in general.
18     Q.  Do you have a specific one for stress urinary
19 incontinence surgeries, or is it even to the level of,
20 you know, pubovaginal sling with a cadaveric material?
21     A.  No.
22     Q.  Versus a Burch?
23     A.  Right.  Thank you.
24         No.
25         It's for my surgeries in general.

Page 131

1      Q.  For how long have you drafted your own patient
2  brochures for your patients?
3      A.  Since 2007.
4      Q.  Do you keep copies of them?
5      A.  I do.
6      Q.  I'd like to make a request for those.
7      A.  Please.  If you would, if somebody could just
8  remind me.
9      Q.  Okay.  Do the patient brochures that you have
10 currently identify all the risks with the surgeries?
11     A.  The -- my consent form does, but the brochure
12 that I have is for postoperative management.  So the --
13 I guess the answer is, I have a consent form that goes
14 over all the risks that I previously described.  It's a
15 separate document, but I can get that to you as well if
16 you'd like.
17     Q.  The patient brochure, is that something
18 separate than the consent form, it sounds like?
19     A.  It is.
20     Q.  And is that patient brochure specific to only
21 the post-op management of -- strike that.
22         Is that patient brochure specific to the
23 post-op period of a surgery?
24     A.  Generally speaking, yes.
25     Q.  When you were at Stanford, did you draft any

Page 132

1  patient brochures during that 1996 to '97 time period
2  concerning stress urinary incontinence surgeries?
3      A.  Yes, I did.  It was regarding prolapse and
4  incontinence.
5      Q.  Do you happen to still have a copy of that?
6      A.  No, I don't.  I think it was all lost in a
7  fire somewhere.
8      Q.  You've never been an employee of the FDA;
9  correct?
10     A.  No.
11     Q.  Have you ever been a consultant to the FDA?
12     A.  No.
13     Q.  Have you ever submitted adverse event reports
14 to the FDA?
15     A.  Other than my meeting in Gaithersburg,
16 Maryland, no.
17     Q.  I'm sorry?
18     A.  Other than my meeting, you know, the FDA
19 hearing.  That's the only involvement I've had with the
20 FDA.
21     Q.  You know there's specific forms where a
22 surgeon or a doctor can fill out an adverse event
23 report and submit it to the FDA; correct?
24     A.  Correct.
25     Q.  You haven't submitted any of those; correct?

Page 133

1      A.  That's correct.
2      Q.  What was your undergrad in?
3      A.  My undergraduate degree or where I went to
4  school?
5      Q.  Yes, your grad.
6      A.  Degree was psychology, believe it or not.
7      Q.  Have you ever done any bench research on
8  polypropylene?
9      A.  I have not.
10     Q.  Have you ever done any laboratory research on
11 polypropylene?
12     A.  Not on polypropylene.
13     Q.  What have you done laboratory research on?
14     A.  I did some chemical laboratory research back
15 in undergrad on substituted alpha pyrones.  That was my
16 first publication.
17     Q.  What is that?
18     A.  Beta lactams.  It's a chemical.  It's a
19 relative of the cephalosporin class of antibiotics.
20     Q.  Do you have a background in the study of
21 polypropylene chemistry?
22     A.  Other than the training I got in premed and my
23 study of organic chemistry and industrial chemistry
24 which I took courses in, no.
25     Q.  You don't consider yourself to be a

34 (Pages 130 to 133)

Michael Thomas Margolis, M.D.

Page 158

1  doctors across the United States?
2       MR. CARTMELL:  Object to the form.
3       THE WITNESS:  It has -- it was a surgical
4  option amongst a variety of surgical procedures that
5  were and still are available.
6  BY MR. SNELL:
7     Q.  The plan to offer and to ultimately use the
8  TVT retropubic sling in Mrs. Lewis' case was not
9  against the standard of care; correct?
10    A.  As of that time, no.
11    Q.  No, it was not against the standard of care?
12    A.  No.  Correct.  I was agreeing with you.
13    Q.  And as we sit here today currently, the use of
14  TVT slings to treat stress urinary incontinence
15  surgically, that's not against the standard of care;
16  correct?
17    A.  It is used by some physicians and fewer and
18  fewer all the time, but it is still an accepted
19  modality in the repertoire.
20    Q.  You're aware that the American Urologic
21  Association has stated that midurethral slings are a
22  suitable surgical option to treat stress urinary
23  incontinence?
24       MR. CARTMELL:  Object to the form.
25       THE WITNESS:  Well, as a member of the

Page 159

1  American Urologic -- I'm sorry, AUA?
2  BY MR. SNELL:
3     Q.  Yes, the American Urology Association.
4     A.  The American Urologic Association?  Well,
5  since I'm a gynecologist, I don't really pay a lot of
6  attention to what the AUA says.  So I don't really --
7     Q.  You don't?
8     A.  The AUA is the AUA.  They're not -- they're
9  not joining us.
10    Q.  You're aware that the AUGS, American
11  Urogynecologic Society, has stated that synthetic
12  midurethral slings are the current gold standard?
13       MR. CARTMELL:  You do not object to the form?
14       THE WITNESS:  As a member of AUGS, I don't
15  agree with that.
16  BY MR. SNELL:
17    Q.  But you're aware that AUGS has stated that in
18  a position statement?
19    A.  I'm aware that AUGS members do slings,
20  Burches, collagen injections, robotic Burches, and
21  organic slings as well as synthetic slings, and that
22  the TVT sling in particular is losing favor because of
23  its high complication rate, but it is still an accepted
24  option.
25       But as a member of AUGS, I do not agree that

Page 160

1  it is considered the gold standard.  And if some people
2  say it, they don't speak for everyone in AUGS because I
3  am an AUGS member and have been since 1994.
4     Q.  I believe you testified that the TVT is being
5  used less often because of complication rates.
6        Can you point to any data, studies, any
7  surveys by any professional body which supports that
8  statement?
9     A.  I lecture all over the country.  I'm all over
10  the world, and I see people running away from it in
11  droves.  Data, published data, not yet.  It will be
12  there soon enough.
13    Q.  Are you aware of literature showing actually
14  that between 2000 and the present, surgeons have
15  stopped doing more and more colposuspensions and have
16  started doing more sling procedures with synthetic
17  slings?
18       MR. CARTMELL:  Object to the form.
19       THE WITNESS:  There are some that argue that.
20  Those are biased studies that are not accurate.  I
21  don't believe that's true.  I don't believe that's true
22  at all.
23  BY MR. SNELL:
24    Q.  Why do you say they're biased studies?
25    A.  Well, I mean, come on.  The study you showed

Page 161

1  me earlier was flawed, according to Dr. Karram.  I mean
2  it was the methodology himself.  He admitted the
3  methodology on the study that looked at the pubovaginal
4  sling versus TVT, the methodology was flawed.  There's
5  a lot of flaws in the studies that are being published
6  right now on TVTs.  A lot of industry bias.
7        I mean, let's face it.  The industry bias is
8  there.  A lot of these authors are paid consultants,
9  and you know, are publishing data that is not
10  accurate.  So I disagree with what you said, and I'm
11  going to hold to my answer.
12    Q.  So you think any author who's been paid
13  anything by industry is biased?
14    A.  I did not say that.  And I do not think that.
15    Q.  You've been paid; correct?
16    A.  I have been.
17    Q.  And are you biased towards Boston Scientific?
18    A.  No, I'm not.  I use the Boston Scientific
19  instruments, the Capio devices and the Xenform a lot,
20  but I am not bought or sold by those people.  I use
21  what I use because I find they work.
22    Q.  Is it your testimony that other than you, any
23  other doctor out there who gets money from companies
24  and writes about their product is biased?
25       MR. CARTMELL:  Object to the form.

Page 190

1    MR. CARTMELL: Objection. Asked and answered.
2    BY MR. SNELL:
3    Q. -- for --
4    MR. CARTMELL: Oh, sorry.
5    BY MR. SNELL:
6    Q. -- postoperative pain.
7    A. The same answer. I mean, all of my answers
8    are postoperative pain. I mean, you can't have pain if
9    you're asleep, right?
10   Q. I mean in the postoperative period. That's
11   what I'm talking about. We first talked about chronic,
12   permanent pain, okay? And you weren't able to identify
13   a study; correct?
14   MR. CARTMELL: Well, hold on. He said he
15   didn't think studies had been done.
16   MR. SNELL: That's fine.
17   BY MR. SNELL:
18   Q. Your answer is your answer.
19   But now I'm moving on to we're not talking
20   chronic pain. But we're talking about pain in the
21   postoperative period.
22   A. So your question is?
23   Q. So my question, let me repeat it.
24   Are you aware of any studies, or can you point
25   to any studies that support your opinion that show a

Page 191

1    statistically significant increased risk of
2    postoperative pain for the TVT compared to Burch or the
3    fascial slings?
4    A. Immediate postoperative pain; not chronic?
5    Q. Correct.
6    A. Not that I know of. I mean, everyone has pain
7    after surgery for a couple of -- for four to six weeks.
8    Q. You say the TVT could cause life-long risk of
9    erosions; correct?
10   A. Absolutely.
11   Q. There can be erosions with biologic materials;
12   correct?
13   A. Erosions with biologics are short lived and
14   self limiting. They resolve on their own. When in the
15   rare event that they do occur.
16   Q. There can be a life-long risk of suture
17   erosion if one uses a permanent suture in suspension
18   procedures; correct?
19   A. You mean like a Burch?
20   Q. Sure. You're using permanent sutures in a
21   Burch. There can be erosions that occur years and
22   years later; correct?
23   A. Have I seen that? Once. It's virtually a
24   reportable event.
25   Q. You know the Urinary Incontinence Treatment

Page 192

1    Network received funding for this study from the
2    National Institute of Diabetes and Digestive and Kidney
3    Diseases and the National Institute of Child Health and
4    Human Development? Do you see that?
5    MR. CARTMELL: What page are you on?
6    MR. SNELL: 2153.
7    MR. CARTMELL: 2153.
8    THE WITNESS: Yeah, but if you go further,
9    then Dr. Zyczynski receives funding from Ethicon, J&J.
10   You know, we can go down the list. Others received
11   funding from AMS.
12   BY MR. SNELL:
13   Q. Are you saying the publications by the Urinary
14   Incontinence Treatment Network shouldn't be trusted
15   because of disclosures that they identified?
16   MR. CARTMELL: Object to the form.
17   THE WITNESS: No. I mean, if you're talking
18   about potential bias, I mean, this study lists
19   potential bias, right. There are numerous individuals
20   here who received money from J&J.
21   Now, that's the purpose of disclosure is to
22   report to potential bias. And there are numerous
23   authors here who have received funding from J&J and
24   Ethicon. So I mean, it is written.
25   Q. But this study was supported not by Ethicon,

Page 193

1    but by the government; correct?
2    A. It was supported by, as you stated, and
3    written by people who received funding from industry.
4    Q. And Dr. Zimmern was one of the people who was
5    an author on this paper; correct?
6    A. Correct. I'm sorry. Yes.
7    Q. Same Dr. Zimmern who treated Mrs. Lewis;
8    correct?
9    A. Correct. Philippe Zimmern.
10   Q. And that study shows continence rates with the
11   Burch which are much lower than the success rates you
12   quote in your report; correct?
13   A. And reported all through the literature over
14   the last 60 years, correct.
15   Q. I don't see that you cited to any reference or
16   references when you identified the success of the
17   Burch. Can you tell me what study or studies you were
18   citing to?
19   A. Oh, sure. Let's see. I'm just going to give
20   you the numbers in my reference list, rather than read
21   the entire quote.
22   33.
23   Q. Let me just get to it.
24   A. Sorry, page -- well, it's in the 30s.
25   Q. Okay.

Michael Thomas Margolis, M.D.

Page 246

1    A.  Well, that's five-year followup.  I have to --
2  you know what?  I don't want to quote from this article
3  from C.S. Liu, but that was a five-year study, and the
4  rates were good.  The 80 to 90 percent.  So Linda's
5  study there just doesn't fit.
6        And I think they were using other definitions
7  in that study.  They kind of acknowledged in the
8  predicate study that there were -- there were -- there
9  were problems with their study, and we can get into
10 that if you want me to go off that original study.
11   Q.  The Liu study you talked about, it didn't have
12 over 500 patients; correct?
13   A.  I don't think so.
14   Q.  And it wasn't an RCT; correct?
15   A.  It was not.
16   Q.  And it wasn't a multicenter randomized control
17 trial; correct?
18   A.  I don't think so.
19   Q.  I didn't see in your report anywhere that you
20 indicated what the two-year, five-year, ten-year
21 continence rates were with the pubovaginal sling.
22   A.  I did not put that in there.
23   Q.  Have you ever -- have you surmised or come up
24 with the continence rate at those different periods of
25 time for the pubovaginal sling, or is that not

Page 247

1  something you're going to come and testify about at
2  trial?
3    A.  No.  I mean, the generally-accepted success
4  rate for a Goebell-Stoeckel sling at ten years is
5  around 88 percent.  Burch is about 90 percent.
6    Q.  When you say "generally accepted," you mean
7  generally accepted by who?
8    A.  That's reported in the literature.  The body
9  of work over the last 60 to 90 years.  90 if you
10 include the sling.  Because the sling first came out in
11 1907.
12   Q.  So you think that overall at ten years the
13 pubovaginal Goebell-Stoeckel sling efficacy rate is 88
14 percent?
15   A.  I don't think.  That's what's reported in the
16 literature.
17   Q.  In one study; correct?
18   A.  No.  No, more than that.
19   Q.  So the 88 percent is your analysis of the
20 literature?
21   A.  No.  It's reported in the literature.  The
22 procedure has been around for 90 years; right?  1907.
23 We have a lot of data on that.
24   Q.  What are you referencing as this 88 percent
25 for the sling?

Page 248

1    A.  What's reported in the literature.
2    Q.  At ten years?
3    A.  At ten years.
4    Q.  Is there a study or a book or something that
5  you're referring to?  I'm just asking because I've
6  never seen this 88 percent.
7    A.  Those are all references.  Well, they're all
8  referenced from the peer-reviewed journals.
9    Q.  Who concluded it was 88 percent at ten years?
10   A.  I'd have to go back and get the quote, but
11 it's in there.  It's in the peer-reviewed journals.
12 It's in the textbooks.
13   Q.  And the Burch, 90 percent success at ten
14 years, is that your opinion, or is that something
15 you've read?
16   A.  I think I've already answered this question
17 several times.  And I'll say it again.  It is reported
18 in the literature numerous times.  The procedure has
19 been around for over 60 years.  We have more than 60
20 years of data on the Burch and its predicate procedure,
21 the MMK.  We have 90 years of data on the traditional
22 sling.
23        These procedures have been around.  There have
24 been numerous, countless reports in the peer-reviewed
25 journals on their excellent success rates.

Page 249

1        The Albo study and the Brubaker studies are
2  completely inconsistent with the giant volume of
3  studies in the repertoire that say otherwise, and the
4  authors of the Albo study even acknowledge that they
5  have numerous -- that there are problems with their
6  study.
7    Q.  As you sit here today you're unable to point
8  to any studies, any specific studies that show an 88
9  percent success rate with the pubovaginal sling at ten
10 years; correct?
11   A.  Goebell-Stoeckel sling, I don't have any
12 studies right now in front of you.
13   Q.  That's fine.
14   A.  Or --
15   Q.  Or on your exhibit list or anywhere else?
16   A.  No, I do not include those references.
17   Q.  And as you sit here today you can't point to
18 any studies on the Burch where ten-year continence
19 rates were 90 percent?
20   A.  This is what I've been lecturing on since
21 1992.  All of my lectures are based on studies that I
22 pulled out of the peer-reviewed journals.  They're
23 there.  The data is there.
24   Q.  So if I go to the peer-review literature and I
25 find one study with an 88 percent success rate with the

63 (Pages 246 to 249)

Page 270

1  short term.
2  Q. Now, this is an actual Cochrane review from
3  2011; right?
4  A. That is correct. Cochrane review.
5  Q. So by 2011, these authors in the Cochrane
6  review are saying that the trials are short term.
7  They're moderate to moderate-to-low quality. And
8  they're not able to necessarily make conclusions
9  related to long-term complications with the mesh
10 slings; correct?
11 A. Correct.
12 Q. It then states, if you go under the
13 ÿConclusions" section, it specifically states that
14 "randomized control trials have limitations in
15 identifying true complication rates."
16     Do you see that?
17 A. I do.
18 Q. Now, these studies that they're looking at,
19 their primary end point was to look at whether or not
20 they were effective; right?
21 A. Effectiveness. But they didn't look at
22 complications and problems. They didn't look at
23 complications. Long-term complications.
24 Q. Right. They would report on complications,
25 but the authors are stating here that randomized

Page 271

1  control trials have limitations in identifying those;
2  correct?
3  A. Yes.
4  Q. And it states, "However, there is little
5  evidence about the long-term effectiveness or the
6  chance of adverse effects such as tape erosions."
7      Do you see that?
8  A. Yes.
9  Q. And then it states, "Nor is it clear how to
10 treat women after a tape procedure fails"?
11 A. That is stated.
12 Q. What does that mean to you?
13 A. Well, there is no well-established standard on
14 how to deal with tape complications. That's an area of
15 medicine that really hasn't evolved yet. It's only
16 starting to. It's only starting to develop as we learn
17 how to take out these slings. That's a whole new
18 frontier that's about ready -- that we're on the edge
19 of.
20 Q. Do you have an opinion regarding whether or
21 not Ethicon adequately warned physicians and/or
22 patients about the risk of needing the mesh tape to be
23 removed and how to treat that when it occurred?
24 A. I do.
25 Q. And what is that?

Page 272

1  A. Ethicon failed to warn physicians and patients
2  of the risks and complications inherent in the TVT
3  device, and that failure has led to a plethora of
4  complications and problems. They have failed to do
5  their due diligence and warn of the pros and cons, the
6  pros and cons of their procedure.
7  Q. And those opinions and others are further set
8  out in your report; is that correct?
9  A. They are. And they are based upon my review
10 of all of the documents that are described in my
11 report.
12     MR. CARTMELL: Okay. I don't have anything
13 else. Thanks.
14     MR. SNELL: A couple back.
15     MR. CARTMELL: I don't know, you didn't save
16 much of the seven hours for your recross.
17     MR. SNELL: You've gone into stuff so I'm
18 going to go ahead and go into it.
19            FURTHER EXAMINATION
20 BY MR. SNELL:
21 Q. Go back to Exhibit 8, the Albo study.
22 A. Okay.
23 Q. You were asked some questions about the bias
24 of the authors in this study; correct?
25 A. I was.

Page 273

1  Q. Do you know any of these authors?
2  A. I met Linda Brubaker many moons ago. I've met
3  Peggy Norton many moons ago at professional meetings.
4  I don't know them beyond just meeting at professional
5  meetings.
6  Q. Is it your testimony that Linda Brubaker is
7  pro mesh?
8      MR. FREESE: Object to the form of the
9  question.
10     THE WITNESS: I haven't said whether she's pro
11 or con.
12 BY MR. SNELL:
13 Q. Is it your testimony that Linda Brubaker has a
14 bias towards making the Burch procedure and the fascial
15 sling look bad to benefit industry?
16     MR. CARTMELL: Object to form.
17     THE WITNESS: I haven't -- I'm not identifying
18 her as good or bad in any sense of the form. I'm just
19 acknowledging that there are biases that are identified
20 in this document that the authors themselves
21 acknowledge, okay. It's what they wrote down on page
22 2153. They acknowledge their support, and that's
23 potential bias. That's all.
24 BY MR. SNELL:
25 Q. And is it your opinion or belief that these

Page 274

1  authors have changed or altered the data in any way in
2  this study to make the Burch or the fascial sling look
3  bad?
4      A. The FDA mandated that people put their
5  potential biases in because they were concerned that
6  there might be such a thing. These authors
7  acknowledged their potential biases. I commend them
8  for doing that. They're out there. They're in black
9  and white. There's a potential bias.
10     I'm not pointing a finger at Linda or Peggy,
11 but they do acknowledge that they have potential
12 biases. These authors admit. And not just Linda or
13 Peggy. All of these authors have put in their
14 potential conflicts of interest. I acknowledge them.
15 It's there for everyone to see. You'll have to judge
16 on your own.
17     Q. I understand. But I'm just asking you, is it
18 your opinion that these authors, because of the bias or
19 potential bias they've written and disclosed in the New
20 England Journal, that they have changed the data some
21 way such to make the Burch and the fascial sling
22 procedures look bad?
23         MR. CARTMELL: Object to the form.
24         THE WITNESS: Well, those are your words. I'm
25 not going to in any way, shape or form associate myself

Page 275

1  with those words. Okay.
2  BY MR. SNELL:
3      Q. So you don't hold that opinion?
4      A. I don't agree with what you said.
5      Q. It's a question. It's not -- I didn't say
6  it.
7      A. You're trying to put -- you're asking --
8      Q. It's a question. He asked you about bias.
9  You went on and on about how all these folks have
10 relationships with industry. My question is --
11     A. They do.
12     Q. Do you have an opinion that that relationship
13 with industry and the potential biases they've written
14 down here had an effect on this study?
15         MR. CARTMELL: Object to the form. I will
16 tell you we're not going to have him offer that
17 opinion.
18         MR. SNELL: Well, you've already opened that
19 door.
20         MR. CARTMELL: No, I haven't. He has
21 testified that there are biases that are listed,
22 potential biases listed. Potential biases is what he
23 has said. You obviously know he hasn't reviewed any of
24 the data. He's not going to come in and say that they
25 manipulated the data. The authors have said they have

Page 276

1  potential biases and, in fact, we looked in the
2  substance of the report and they identified a potential
3  bias there as well. That's all he said. He's not
4  coming in and saying they manipulated.
5          MR. SNELL: He said more than that. He said
6  that data can't be trusted.
7          MR. CARTMELL: I don't think he said it.
8          MR. SNELL: The record will speak for itself.
9          MR. FREESE: Then why are you guys arguing
10 about it? All he acknowledged was the authors
11 acknowledged their bias.
12         THE WITNESS: All I can say is that their
13 data --
14         MR. CARTMELL: Hold on.
15         He's told you several times throughout this
16 that one of the things he looks at when he's looking at
17 literature is bias or potential bias, and that's all
18 he's testifying to. He's looked at it here.
19 BY MR. SNELL:
20     Q. Are you going to come into trial and testify
21 that one cannot rely on these results in this study by
22 the Urinary Incontinence Treatment Network because of
23 their potential disclosed bias?
24         MR. CARTMELL: Object to the form.
25         THE WITNESS: I'm going to say what I've

Page 277

1  already said.
2  BY MR. SNELL:
3      Q. Okay. One of the things plaintiff's counsel
4  pointed you to in the Albo study is at page 2152. They
5  talked about all the patients in the study received
6  care at tertiary care centers. Do you recall that?
7      A. I see it right here.
8      Q. One of the things he read to you was in women
9  with stress-predominant incontinence; correct?
10     A. In women with pure or stress-predominant
11 incontinence.
12     Q. Right. And Mrs. Lewis has stress-predominant
13 incontinence; right?
14     A. That is correct.
15     Q. Next page, plaintiff's counsel pointed you to
16 the statement about rigorous comparative trials being
17 needed; correct?
18     A. Could you direct me to the --
19     Q. Page 2153.
20     A. Whereabouts?
21     Q. The left column, pretty much dead center.
22     A. Oh, here we go. Gotcha.
23     Q. And can you identify rigorous comparative
24 trials that you believe were done on the Burch and the
25 pubovaginal sling --

Page 278

1    MR. CARTMELL: Objection. Asked and answered.
2 BY MR. SNELL:
3    Q. -- that you relied on?
4    MR. CARTMELL: Objection. Asked and answered.
5    THE WITNESS: The whole body of work that's
6 been in publication for decades.
7 BY MR. SNELL:
8    Q. Page 2151 plaintiff's counsel pointed you to.
9    A. -- 2151.
10   Q. Yes. The statements "Success rates in our
11 trial were low as compared to those in previous
12 studies"?
13   A. I see that.
14   Q. Plaintiff's counsel read that to you; correct?
15   A. I see it, of course.
16   Q. And numbers 9 and 10, footnotes references 9
17 and 10; correct?
18   A. Correct.
19   Q. Turn back to footnotes 9 and 10. You see
20 those are two Cochrane reviews, the first by Bezerra,
21 the second by Lapitan?
22   A. Correct.
23   Q. Bezerra was a Cochrane review on the
24 traditional suburethral sling; correct?
25   A. Correct.

Page 279

1    Q. You read that?
2    A. I've read it in the past. I can't quote it
3 word for word.
4    Q. Lapitan was a Cochrane review on the open
5 retropubic colposuspension; correct?
6    A. Correct.
7    Q. That's the Burch; correct?
8    A. Correct.
9    Q. And in those Cochrane reviews that plaintiff's
10 counsel pointed you to, do you recall how they
11 characterized the quality of the data?
12   A. Oh, if you have those articles in front of you
13 and would like to share them with me, I would love to
14 see them.
15   Q. Well, you mentioned that in the Ogah Cochrane
16 review they talked about the quality of the data being
17 variable. Do you remember if similar statements were
18 made in the other Cochrane reviews?
19   A. I mean, again, if you have those, I'll be
20 happy to opine on them right here, but I'd like to see
21 those articles before I make any comment.
22   Q. You don't recall that?
23   A. I've already answered your question twice
24 now. I'll say it again. If you have those articles,
25 I'd be happy to opine on them. I'm not going to

Page 280

1 speculate.
2    Q. My question is, do you recall if they said
3 anything about the quality of the data in those
4 Cochrane reviews?
5    A. Okay. For the fourth time, I can't opine on
6 those articles without having them in front of me.
7    Q. I'm not asking you to opine.
8    MR. CARTMELL: He's just asking you if you
9 recall what they say.
10   THE WITNESS: No. I don't recall. That's
11 obviously why I'm saying I don't want to opine.
12 BY MR. SNELL:
13   Q. Okay. Plaintiff's counsel pointed out the
14 statement about that in the Ogah Cochrane review that
15 many of the studies were one-year RCTs?
16   A. Are we going to another exhibit now?
17   Q. I think it's the one you have in front of
18 you. The Ogah Cochrane review.
19   MR. CARTMELL: No, that's different.
20   THE WITNESS: I have Albo.
21 BY MR. SNELL:
22   Q. You know, we can stick with Albo. So for the
23 Bezerra and the Lapitan.
24   A. The reference is 9 and 10.
25   Q. Yes, for the Cochrane reviews that plaintiff's

Page 281

1 counsel pointed you to, do you know whether the
2 majority of the studies looked at in those Cochrane
3 reviews were one-year RCTs?
4    A. Again, I don't have that information in front
5 of me so I'd be happy to answer that if I have them in
6 front of me. I don't know. I don't know as I sit here
7 right now.
8    Q. If the same type language was in those
9 Cochrane reviews, you would give the same criticism
10 that you gave with regard to the midurethral sling;
11 correct, with regard to the majority being 12-month
12 RCTs?
13   A. I would read the entire article and opine on
14 the entire article as a generalized entity. I would
15 not go and look at one specific thing in the article.
16 I'd look at the entire article and opine upon it.
17   Q. You told plaintiff's counsel that regardless
18 of what you saw in the materials I presented to you,
19 that it's your belief that traditional slings are more
20 effective than the TVT; correct?
21   A. I said traditional slings have the success
22 rate of roughly 88 percent.
23   Q. I thought you testified to plaintiff's counsel
24 that in your opinion traditional slings are more
25 efficacious than TVT.

Page 282
1  A. Well, it depends on which -- whose data you
2  want to reference on the TVT. I think that they were
3  better. I think they work better, and I think that
4  they have a lower complication rate. I know they do.
5  Q. And as we sit here though, you can't point to
6  any comparative studies that support that opinion?
7  A. Other than all the studies I referred to
8  throughout today's deposition.
9  Q. As we sit here today, there have been no
10 comparative studies that we pointed to or referred to
11 or that are identified in your expert report or
12 reliance list that state the traditional sling is more
13 effective than TVT; correct?
14 A. Not that I have referenced.
15 Q. And you have not referenced, nor can you
16 identify any comparative studies that show that the
17 Burch is more effective than the TVT; correct?
18 A. I have not referenced that at this -- I don't
19 have anything standing in front of me that I can --
20 that I will use as a reference.
21 Q. Did you review any of the professional
22 education slide decks for the TVT product?
23 A. The professional education?
24 Q. Slides.
25 A. Slides?

Page 283
1  Q. For TVT retropubic.
2  A. That were given out to a lot of physicians
3  during the -- during its early years?
4  Q. Going back to, yes, going back to late 1990s,
5  even to the present.
6  A. Yes, I have. I have looked at those.
7  MR. SNELL: Okay, that's good. Thank you.
8  THE WITNESS: Thanks.
9  MR. FREESE: Can we just -- I think I'm making
10 sure to put this on the record.
11 Anything that Dr. Margolis has testified about
12 today that is general as opposed to being specific to
13 Ms. Lewis, we're going to agree that that -- those
14 opinions and testimony are as if they were given in the
15 Batiste case.
16 And also like we did before, Burt, any
17 questions that Michael has tomorrow that are general
18 versus Batiste specific, we're going to agree that they
19 are able to be used in the Lewis matter as though they
20 were given in the Lewis deposition.
21 Are we all good on that?
22 MR. BROWN: Agreed.
23 MR. SNELL: I'm fine with that.
24 MR. FREESE: Thanks.
25 (The deposition of MICHAEL THOMAS MARGOLIS, M.D.

Page 284
1  was adjourned at 6:45 p.m. this date.)
2  --- oOo ---

Page 285
1  REPORTER'S CERTIFICATE
2  The undersigned Certified Shorthand Reporter
3  licensed in the State of California does hereby certify:
4  I am authorized to administer oaths or
5  affirmations pursuant to Code of Civil Procedure, Section
6  2093(b), and prior to being examined, the witness was duly
7  administered an oath by me.
8  I am not a relative or employee or attorney or
9  counsel of any of the parties, nor am I a relative or
10 employee of such attorney or counsel, nor am I financially
11 interested in the outcome of this action.
12 I am the deposition officer who stenographically
13 recorded the testimony in the foregoing deposition, and the
14 foregoing transcript is a true record of the testimony
15 given by the witness.
16 Before completion of the deposition, review of the
17 transcript [X] was [ ] was not requested. If requested,
18 any changes made by the deponent (and provided to the
19 reporter) during the period allowed are appended hereto.
20 In witness whereof, I have subscribed my name this
21 ____ day of _____, 2013.
22
23 _____
    DIANE S. MARTIN, CSR No. 6464
24
25

Michael Thomas Margolis, M.D.

Page 286

1    REPORTER'S CERTIFICATE
2        The undersigned Certified Shorthand Reporter
3    licensed in the State of California does hereby certify:
4        I am authorized to administer oaths or
5    affirmations pursuant to Code of Civil Procedure, Section
6    2093(b), and prior to being examined, the witness was duly
7    administered an oath by me.
8        I am not a relative or employee or attorney or
9    counsel of any of the parties, nor am I a relative or
10   employee of such attorney or counsel, nor am I financially
11   interested in the outcome of this action.
12       I am the deposition officer who stenographically
13   recorded the testimony in the foregoing deposition, and the
14   foregoing transcript is a true record of the testimony
15   given by the witness.
16       Before completion of the deposition, review of the
17   transcript [X] was [ ] was not requested.  If requested,
18   any changes made by the deponent (and provided to the
19   reporter) during the period allowed are appended hereto.
20       In witness whereof, I have subscribed my name this
21   ____ day of _____, 2013.
22
         _____
23           DIANE S. MARTIN, CSR No. 6464
24
25

Page 287

1       INSTRUCTIONS TO WITNESS
2
3        Please read your deposition
4    over carefully and make any necessary
5    corrections.  You should state the reason
6    in the appropriate space on the errata
7    sheet for any corrections that are made.
8        After doing so, please sign
9    the errata sheet and date it.  It will be
10   attached to your deposition.
11       It is imperative that you
12   return the original errata sheet to the
13   deposing attorney within thirty (30) days
14   of receipt of the deposition transcript
15   by you.  If you fail to do so, the
16   deposition transcript may be deemed to be
17   accurate and may be used in court.
18
19
20
21
22
23
24
25

Page 288

1           - - - - - -
             E R R A T A
2           - - - - - -
3    PAGE  LINE  CHANGE
4    ____  ____  _____
5      REASON:  _____
6    ____  ____  _____
7      REASON:  _____
8    ____  ____  _____
9      REASON:  _____
10   ____  ____  _____
11     REASON:  _____
12   ____  ____  _____
13     REASON:  _____
14   ____  ____  _____
15     REASON:  _____
16   ____  ____  _____
17     REASON:  _____
18   ____  ____  _____
19     REASON:  _____
20   ____  ____  _____
21     REASON:  _____
22   ____  ____  _____
23     REASON:  _____
24   ____  ____  _____
25     REASON:  _____

Page 289

1       ACKNOWLEDGMENT OF DEPONENT
2
         I,_____, do
3    hereby certify that I have read the
     foregoing pages, and that the same
4    is a correct transcription of the answers
     given by me to the questions therein
5    propounded, except for the corrections or
     changes in form or substance, if any,
6    noted in the attached Errata Sheet.
7    _____
8    MICHAEL THOMAS MARGOLIS, M.D.     DATE
9
10
11
12
13
14
     Subscribed and sworn
15   to before me this
     _____ day of _____, 20____.
16
     My commission expires:_____
17
18   _____
     Notary Public
19
20
21
22
23
24
25