Michael Thomas Margolis, M.D.

Page 1

```
 1                    IN THE DISTRICT COURT
 2                    95th JUDICIAL DISTRICT
 3                    DALLAS COUNTY, TEXAS
 4
 5
 6   LINDA BATISTE,
 7              Plaintiff,
 8         -vs-                    No. DC-12-14350
 9   JOHN ROBERT McNABB, M.D.,
     JOHNSON & JOHNSON, and
10   ETHICON, INC.,
11              Defendants.
     _____/
12
13
14
15      DEPOSITION OF MICHAEL THOMAS MARGOLIS, M.D.
16
17
18   DATE:            November 26, 3013
19   TIME:            9:08 a.m.
20   LOCATION:        Pulone Reporting Services, Inc.
                      1550 The Alameda
21                    Suite 150
                      San Jose, California  95126
22
     REPORTED BY:     Diane S. Martin, CSR 6464, CCRR
23
24
25
```

Page 82

1 little bit? I mean, a site on my website?
2     MR. FREESE: Do you mean like a link?
3 BY MR. BROWN:
4     Q. Do you have a reference?
5     A. References.
6     Q. Let me restate it then.
7     Do you have a reference on your website that
8 shows the Burch is the gold standard for stress urinary
9 incontinence?
10     A. A reference list? I don't think I have quoted
11 or published a reference list.
12     Q. Doctor, you know at times that you make a
13 statement and then you put a reference below; is that
14 correct?
15     A. In publications you do so, that is correct.
16     Q. And my question to you is, do you have a
17 reference on your website that supports the statement
18 that the Burch is the current gold standard for stress
19 urinary incontinence?
20     A. I ever -- I do not have a reference list on my
21 website.
22     Q. You don't have a reference at all?
23     A. Correct. No reference.
24     Q. Doctor, please identify for me the article
25 that says that Burch is the current gold standard?

Page 83

1     A. I can --
2     MR. FREESE: Object to the form of the
3 question.
4     Go ahead.
5     THE WITNESS: I can get you articles that
6 support that position.
7 BY MR. BROWN:
8     Q. As you sit here today, Doctor, can you point
9 to an article that says that the Burch is the current
10 gold standard?
11     MR. FREESE: Object to the form of the
12 question.
13     THE WITNESS: I'll stick with my answer. I
14 can get you articles that support that position.
15 BY MR. BROWN:
16     Q. That's not my question, Doctor. My question
17 to you --
18     A. Well, I can't give you off the top of my head
19 right now a direct quote. There are plenty of articles
20 and -- but I can't quote one to you directly.
21     Q. Can you identify as you sit here today an
22 article in the last five years that has said that Burch
23 is the current gold standard?
24     MR. FREESE: Object to the form of the
25 question.

Page 84

1     THE WITNESS: Well, I'm going to hold to my
2 prior answer.
3 BY MR. BROWN:
4     Q. Which is that you can't do it as you sit here
5 today; correct?
6     A. I'm not going to speculate and give you an
7 incorrect answer. I won't speculate.
8     Q. Doctor, you told us yesterday that you read
9 literature every day; right?
10     A. I do.
11     Q. And you have the statement on here that says
12 "the 'gold standard' is the procedure for stress
13 urinary incontinence." It's the gold standard and you
14 can't state to me one article today as we sit here that
15 says that the Burch is the current gold standard?
16     MR. FREESE: All right. First of all, I
17 object. It's argumentative. It's been asked three
18 times and answered. And apparently you just don't
19 accept his answer.
20     So I'm going to instruct you not to answer the
21 question. It's argumentative.
22     MR. BROWN: Okay. Then I'll restate it.
23 BY MR. BROWN:
24     Q. Can you identify an article in the last five
25 years that says that the Burch is the current gold

Page 85

1 standard for stress urinary incontinence as you sit
2 here today?
3     MR. FREESE: Object to the form of the
4 question. Asked and answered.
5     Go ahead and answer.
6     THE WITNESS: I'm going to hold to my prior
7 answer.
8 BY MR. BROWN:
9     Q. Which is?
10     A. You know, the same that I gave before.
11     Q. Yes, you can, no you can't, or "I don't know,"
12 Doctor?
13     A. Okay.
14     MR. FREESE: Object to the form of the
15 question. Asked and answered.
16     THE WITNESS: As I've stated already, I'll be
17 happy to get you some articles, but I don't have one
18 that I can quote right now because I don't want to
19 speculate or give you an inaccurate answer.
20 BY MR. BROWN:
21     Q. Okay. Doctor, can you identify any of the
22 major professional organizations that we discussed
23 earlier that identify Burch as the current gold
24 standard for stress urinary incontinence?
25     MR. FREESE: Object. Asked and answered.

Page 90
1  Q. Let me restate that.
2     If you'll go back to the first page, please.
3  Under number 1. The second sentence says, "Neither the
4  FDA advisory panel, the NIH, the American College of
5  Obstetrics and Gynecology, ACOG, nor AUGS has
6  recommended removing any mesh products from the market
7  or withholding them from surgeon use."
8     Do you agree that's in the position statement?
9  A. Where is that? I'm sorry.
10    MR. FREESE: It's right here.
11    THE WITNESS: Oh, I'm sorry. I see it.
12    Yes.
13 BY MR. BROWN:
14 Q. Do you disagree or agree with that, Doctor?
15 A. That's what they wrote.
16 Q. No. I'm asking you, do you disagree with that
17 statement or do you agree with it?
18 A. I don't disagree that that's what they wrote.
19 Q. Doctor, that's not what I'm asking you.
20 A. Well, I'm misunderstanding you.
21 Q. I'm asking you, in your training, experience
22 and education do you agree as you sit here today with
23 the statement that we just read?
24 A. I don't disagree that neither the FDA advisory
25 panel, the NIH, the ACOG or AUGS has recommended

Page 91
1  removing any mesh. That what they state is factually
2  correct.
3  Q. Okay. Do you agree or disagree that mesh
4  products for stress urinary incontinence should be
5  withheld from surgeon use?
6  A. Transvaginal synthetic mesh materials, I
7  assume you're referring to?
8  Q. Yes.
9  A. I think -- I believe that once an accurate and
10 thorough understanding of all the pros and cons and all
11 of the literature and data on these materials is known
12 to everyone, including the failure to warn of all the
13 risks, that most physicians will choose not to use it
14 and will come to the conclusion that they should not be
15 used.
16 Q. Doctor, my question to you --
17 A. And should be pulled from the market.
18 Q. Do you as you sit here today believe that
19 transvaginal midurethral synthetic slings should be
20 removed from the market?
21    MR. FREESE: Object to the form of the
22 question. Asked and answered.
23    Go ahead and answer it again.
24    THE WITNESS: "Most" would include me. So
25 knowing what I know, having reviewed all of the data

Page 92
1  and documents, internal documents, I think they should
2  be removed.
3  BY MR. BROWN:
4  Q. Doctor, if you'll turn to page 3. You see
5  where it says in the first sentence under number 5, do
6  you see where it says, "2011 FDA warning"?
7  A. Correct.
8  Q. Do you see where it says "the 2011 FDA
9  warning, however, the warning was about transvaginal
10 mesh for prolapse."
11    Do you see that?
12 A. Correct.
13 Q. Do you agree or disagree that the 2011 FDA
14 warning was only about transvaginal mesh for prolapse?
15    MR. FREESE: Object to the form of the
16 question.
17    THE WITNESS: They are accurate that that's
18 what the FDA warning in 2011 was about.
19 BY MR. BROWN:
20 Q. About transvaginal meshes for prolapse only?
21 A. Correct.
22 Q. Doctor, you agree that the full-length
23 midurethral slings including TVT-O were excluded from
24 post marketing studies?
25    MR. FREESE: Object to the form of the

Page 93
1  question.
2     THE WITNESS: I believe that's accurate.
3  BY MR. BROWN:
4  Q. Are you aware of the FDA requesting Ethicon to
5  provide additional post-marketing studies for its TVT
6  Obturator?
7  A. Not that I'm aware of.
8  Q. Doctor, if you continue to go down I'm looking
9  at the last sentence where it says, "Full-length
10 midurethral slings, both retropubic and transobturator,
11 have been extensively studied, are safe and effective,
12 relative to other treatment options, and remain the
13 leading treatment option and current gold standard of
14 care for stress urinary incontinence surgery."
15    You agree that that is accurately read in the
16 AUGS position statement?
17 A. That is an accurately read opinion of those
18 who wrote this position statement, which is a minority
19 of the AUGS members. So yes, it is accurately read.
20 Q. Your testimony is that this is a minority of
21 the AUGS members?
22 A. Well, whoever wrote this is a small -- I mean,
23 the entire body of AUGS didn't write this. A small
24 cadre of individuals, members of AUGS wrote this,
25 right?

Michael Thomas Margolis, M.D.

Page 102

1    MS. REMINGTON: A comfort break.
2    MR. BROWN: Sure.
3    (Recess taken.)
4  BY MR. BROWN:
5    Q. Doctor, does literature today identify another
6  procedure as the gold standard?
7    A. Yes. I think there is some.
8    Q. And what is that procedure, Doctor?
9    A. The Burch.
10   Q. Are there other studies that identify the
11  midurethral slings as the current gold standard?
12   A. There are those who argue it. That's their
13  opinion.
14   Q. Is the answer to my question yes, Doctor?
15   A. There are those who say so.
16   Q. So just so I have a clean question here, is
17  there literature that identifies the midurethral sling
18  as the current gold standard?
19       MR. FREESE: Object to the form of the
20  question.
21       You may answer.
22       THE WITNESS: There are documents which you
23  have, of course, already brought to my attention that
24  say so, so the answer is yes.
25  BY MR. BROWN:

Page 103

1    Q. Is the TVT Obturator a midurethral sling?
2    A. The TVT Obturator is a midurethral sling.
3    Q. Doctor, are you familiar with a California
4  resolution 105-12?
5    A. Can you read it for me?
6    Q. I'll give it to you.
7       (DEFENDANT'S EXHIBIT 12 WAS MARKED.)
8       THE WITNESS: I am familiar with this
9  document.
10  BY MR. BROWN:
11   Q. Doctor, were you the proponent of this
12  resolution?
13   A. I was a co-proponent. Dr. Reeves Chalmers,
14  R-e-e-v-e-s, last name C-h-a-l-m-e-r-s, was the
15  co-author.
16   Q. Doctor, did the AUGS board of directors
17  strongly oppose this resolution?
18       MR. FREESE: Object to the form of the
19  question.
20       THE WITNESS: Members of the CMA house of
21  delegates who represented AUGS and who refused to
22  acknowledge their financial support did oppose this
23  resolution, which did, by the way, fail. So this is
24  actually technically not a resolution because it
25  failed.

Page 104

1  BY MR. BROWN:
2    Q. Let me ask you that then.
3    A. It's not a bill. It was a resolution that
4  failed.
5    Q. Just so I understand it correctly, this
6  resolution that you were a proponent for failed; is
7  that correct?
8    A. That is correct.
9    Q. And, Doctor, do you know if the AUGS board of
10  directors strongly opposed your resolution 105-12?
11       MR. FREESE: Object to the form of the
12  question.
13       THE WITNESS: I believe they did.
14  BY MR. BROWN:
15   Q. Do you know if SUFU -- what is SUFU, S-U-F-U?
16   A. The Society for Urodynamic study. You know --
17  Urodynamic Female Urology, something like that.
18   Q. Doctor, do you know if the ACOG board opposed
19  resolution 105-12?
20   A. One individual from ACOG, the vice president,
21  wrote a letter opposing it. And by the way, the
22  president of AUGS opposed it.
23       I don't know actually if the board opposed
24  it. I do know that a letter was written from AUGS
25  president and from ACOG vice president, both of which

Page 105

1  opposed it, but I don't know about their board.
2       So I guess to be clear on the prior answer and
3  this answer, those individuals wrote letters opposing
4  it, but I don't know about the boards.
5       (DEFENDANT'S EXHIBIT 13 WAS MARKED.)
6  BY MR. BROWN:
7    Q. Doctor, I'm handing you Exhibit 13.
8       I believe you stated in your designation that
9  you gave testimony at the FDA; is that correct?
10   A. That is correct.
11   Q. And I believe that testimony was September 8,
12  2011?
13   A. Correct.
14   Q. I believe this was on your reliance list; is
15  that correct, Doctor?
16   A. I hope so.
17   Q. If not, we'll make it.
18   A. I appreciate that.
19       MR. FREESE: We're going to do a battlefield
20  supplemental.
21  BY MR. BROWN:
22   Q. Doctor, again, I'm not trying to be
23  sarcastic. Not trying to insult your intelligence
24  here, but --
25   A. It wouldn't take much insulting.

Michael Thomas Margolis, M.D.

Page 114

1 commonly studied procedure using mesh for stress
2 urinary incontinence repair is the TVT procedure?
3    A.  The most commonly studied procedure using mesh
4 for SUI is the TVT?  Probably so.
5    Q.  Doctor, do you agree or disagree that there
6 are at least 80 RCTs with at least one arm randomized
7 for surgical mesh for the treatment of SUI?
8    A.  I agree that there are that many articles.
9    Q.  Has the FDA that you're aware of ever stated
10 that the Burch has unparalleled high success rates?
11        MR. FREESE:  Are you asking if he's ever said
12 that?
13        MR. BROWN:  The FDA.
14        MR. FREESE:  Oh.
15        THE WITNESS:  I'm not aware of the FDA stating
16 that.
17 BY MR. BROWN:
18    Q.  Are you aware that the FDA came out with an
19 executive summary for the September 8th and 9th, 2011
20 conference that you attended?
21        MR. FREESE:  I'm sorry, would you ask that
22 question again, Michael?
23 BY MR. BROWN:
24    Q.  Yes.  Are you aware that the FDA had an
25 executive summary for the September 8th and 9th, 2011

Page 115

1 FDA meeting that you attended?
2    A.  It was a hearing, actually.  And I believe
3 they did.  And I testified at the hearing.  Not
4 attended.  So ...
5    Q.  I think, Doctor, you identify number 5 on your
6 reference list as the FDA executive summary; is that
7 correct?
8    A.  You know, yes.  I'm pretty sure.  Okay.
9 Thanks.  Thank you.
10    Q.  So that's a document that you've reviewed
11 before; correct, Doctor?
12    A.  Yes.  Though I haven't kept it -- though I
13 haven't put it to memory, no.
14    Q.  Doctor, are you aware of any statement that
15 has come from the FDA that says that there are high
16 complication and low success rates for midurethral
17 synthetic slings?
18    A.  I can't quote you any FDA source as I sit
19 here.
20    Q.  Doctor, if you look on the -- your FDA
21 presentation, if you'll go to the second-to-last page.
22 The I guess you'd say second-to-last paragraph starts
23 with the sentence, "I hope."
24        Do you see that?
25    A.  Second to last sentence, I see.

Page 116

1    Q.  Do you see that, Doctor?
2    A.  I do.
3    Q.  And you stated, "I hope the FDA will, through
4 firm action, help save others from the painful
5 experiences that thousands of unfortunate women have
6 had to suffer through so far."
7        Did I accurately read that?
8    A.  Yes, you do, thank you.
9    Q.  And were you proposing that midurethral
10 synthetic slings be taken off the market?
11    A.  Ultimately I was hoping that they would do so.
12    Q.  Are you finished, Doctor?
13    A.  Yes.
14    Q.  And that's what I'm asking.  Were you
15 proposing that the FDA take the TVT off the market?
16    A.  At the time I was hoping that they would study
17 it more, get more information from industry, from every
18 available source, and come to the conclusion that we
19 are arguing here today, that they should be removed
20 from the market.
21    Q.  And you were arguing that they should be
22 removed from the market, the midurethral synthetic
23 slings; correct?
24        MR. FREESE:  Objection.  Asked and answered.
25        THE WITNESS:  I'm going to stick with my

Page 117

1 answer I already gave.
2 BY MR. BROWN:
3    Q.  I'm not sure I understand the second part.  I
4 think you said "we."  And so what I'm doing is
5 asking --
6    A.  Did I say we?
7        MR. BROWN:  Can you read back?  I think you
8 said "we" and I just want to make sure.
9        THE WITNESS:  No, I don't think I said "we."
10 Did I?
11        MR. FREESE:  You were saying in French, yes.
12        (Record read by the court reporter as follows:
13        "A:  At the time I was hoping that they would
14        study it more, get more information from
15        industry, from every available source, and
16        come to the conclusion that we are arguing
17        here today, that they should be removed from
18        the market.")
19        MR. FREESE:  He's saying "we," as in you and
20 he are arguing.
21        THE WITNESS:  Right.  Thank you.
22        MR. FREESE:  So if you want to ask the
23 question again now, I'll just object.  So the answer is
24 clear.
25        THE WITNESS:  That you and I are -- yeah,

30 (Pages 114 to 117)

Michael Thomas Margolis, M.D.

Page 118

1  that's what I meant.
2  BY MR. BROWN:
3      Q. I'm not sure what you meant, which is why I'm
4  trying to ask it. So let me ask my question again.
5      MR. FREESE: Let him ask the question again.
6  He'll start over.
7      THE WITNESS: All right.
8  BY MR. BROWN:
9      Q. Were you proposing or arguing that the
10 midurethral synthetic slings should be taken off the
11 market in your presentation to the FDA?
12     MR. FREESE: Object to the form of the
13 question.
14     Go ahead.
15     THE WITNESS: Well, again, you keep on calling
16 it presentation. It was testimony. But yes.
17 BY MR. BROWN:
18     Q. Okay. And the FDA did not mandate that
19 midurethral slings should be taken off the market; is
20 that correct?
21     A. As of yet they have not.
22     Q. Okay. And specifically, the FDA has not
23 mandated that the TVT Obturator be removed from the
24 market; is that correct?
25     A. As of yet they have not.

Page 119

1      Q. Today, Doctor, has the FDA mandated that the
2  TVT Obturator be taken from the market?
3      A. As of yet, they have not. That would be up to
4  right this moment.
5      Q. Doctor, did you make a statement right after
6  the FDA hearing that the FDA got caught with their
7  pants down? My question is, did you make that
8  statement?
9      A. I think that's accurate. I think I was called
10 back up to the microphone, and they asked me some
11 questions after my presentation. I'm sure you have the
12 quote in front of you. I actually would like to hear
13 what I said.
14     Q. To your recollection, Doctor, do you remember
15 saying that the FDA got caught with their pants down?
16     MR. FREESE: Objection. Asked and answered.
17 He's asked you to see what you're referring to. You
18 can show it to him or not.
19     THE WITNESS: Can I see the document so I can
20 answer?
21 BY MR. BROWN:
22     Q. I'm just asking if you remember that, Doctor?
23     A. I've answered the question. Now I'd like to
24 see the document that you're referring to.
25     Q. I might have missed your answer, but is your

Page 120

1  answer that you believe so?
2      A. Whatever I said. But I would like to see that
3  document.
4      MR. BROWN: Would you read it back?
5      MR. FREESE: I think what he's trying to do,
6  Michael, is to find context to the sentence.
7      (Record read by the court reporter as follows:
8      "Q: To your recollection, Doctor, do you
9      remember saying that the FDA got caught with
10     their pants down?")
11     MR. FREESE: That's a good sign. He's putting
12 stuff back in that red rope of his.
13     MR. BROWN: Maybe.
14     MR. FREESE: Oh, no, another one.
15     THE WITNESS: There goes lunch.
16     (Discussion off the record.)
17 BY MR. BROWN:
18     Q. Doctor, is it still your position today as you
19 sit here that the Burch procedure is the procedure of
20 choice for most patients, given its unparalleled high
21 success rates of approximately 90 percent nationwide?
22     A. Absolutely.
23     Q. Is it your position, Doctor, that the Burch
24 has higher success rates than the TVT?
25     A. Yes.

Page 121

1      Q. Can you, as you sit here today, point to a
2  study that says that the Burch has unparalleled high
3  success rates, or words to that effect?
4      A. Those are already in my statement.
5      Q. Maybe I didn't ask that appropriately.
6      Can you point to a study that states that the
7  Burch procedure has unparalleled high success rates?
8      A. I can, but not as I sit here right now.
9      Q. Okay.
10     A. I will get them for you. Plus they're also in
11 my -- whatever my -- whatever these documents are
12 called.
13     Q. Your reliance list?
14     A. Thank you.
15     Q. And, Doctor, it's interesting that you bring
16 that up because I read through every document on your
17 reliance list.
18     A. Cool.
19     Q. And I couldn't find one that said that the
20 Burch had unparalleled high success rates, or words to
21 that effect.
22     MR. FREESE: Okay. Well, first of all, I
23 object to that.
24     MR. BROWN: Well, let me --
25     MR. FREESE: Okay. You're right. Go ahead.

Page 126

1  So in answer to your question, everything I've
2  said about the Burch applies to the MMK, just to save
3  time.
4  BY MR. BROWN:
5  Q. Sure. So am I accurate in saying according to
6  your website, when it says that the Burch has
7  unparalleled high success rates, approximately 90
8  percent, that that would also apply to MMK?
9  A. Yes, sir.
10 Q. Doctor, are you aware of success rates sharply
11 declining after five years with the MMK?
12 A. They don't sharply decline.
13 Q. Is there an average, in your opinion, decline
14 of success after five years for MMK?
15 A. The ten-year success rate for the MMK/Burch is
16 in the 90 percent range.
17 Q. Did you say ten year?
18 A. The ten year.
19 Q. Have you seen studies, Doctor, that show that
20 the MMK has success rates around 58 percent at ten
21 years?
22 A. If you have a study you would like to quote,
23 I'm sure I'd be happy to review it. I'm sure there are
24 studies that say that.
25 Q. All right, Doctor, do you still have Exhibit

Page 127

1  10 in front of you, which is your website?
2  A. Okay.
3  Q. All right, Doctor, I'm now on your third
4  paragraph. Do you see where it says, "Well-publicized
5  high complication and low success rates of synthetic
6  slings"?
7  A. I do.
8  Q. And is that still your position today?
9  A. Yes.
10 Q. Doctor, have you ever seen a study that says
11 that the TVT is not safe?
12 MR. FREESE: Object to the form of the
13 question.
14 MR. BROWN: Let me restate it then.
15 BY MR. BROWN:
16 Q. Doctor, are you aware of a peer reviewed --
17 strike that.
18 Doctor, are you aware of a peer-reviewed
19 publication that indicates that the TVT is not safe?
20 A. We've gone through a lot of articles that
21 discuss the complications associated with the TVT. Has
22 any one of them said the TVT is not safe,
23 quote/unquote? I can't give you an answer to that.
24 I don't know of any study as I sit here now
25 that says, quote/unquote, the TVT is not safe.

Page 128

1  Q. Doctor, you know a lot of times that in
2  peer-reviewed publications, they'll have a conclusion
3  section?
4  A. Correct.
5  Q. And oftentimes they'll -- strike that.
6  Are you aware of any peer-reviewed published
7  literature that indicates that the TVT is not
8  effective?
9  MR. FREESE: Object to the form of the
10 question.
11 THE WITNESS: Well, sure. I mean, the studies
12 that I argue showing all the TVT complications are in
13 effect saying it's not effective.
14 BY MR. BROWN:
15 Q. What study is that, Doctor?
16 A. Well, we can go over if you want, and I can
17 pull some articles and come back with the exact quotes
18 for you, but I mean, I argued with references that the
19 TVT has a high complication rate, and a low success
20 rate, and I can get those articles and lay them out for
21 you again. So I mean, if you give us a little time.
22 But there's plenty of data in peer-reviewed journal,
23 RCT included, of studies showing that the TVT has got
24 issues.
25 Q. Doctor, as you sit here today can you point to

Page 129

1  a study that says that the TVT is not effective?
2  MR. FREESE: Object to the form of the
3  question.
4  THE WITNESS: I'll get them for you. As I've
5  just described. I'll be happy to bring them back, and
6  we'll go through them one at a time.
7  BY MR. BROWN:
8  Q. Doctor, respectfully, I didn't ask you if you
9  could get them. I said, as you sit here today can you
10 point to a study that says that the TVT is not
11 effective?
12 MR. FREESE: Object to the form of the
13 question.
14 THE WITNESS: As I sit here at this moment, at
15 this moment I don't have an article in front of me for
16 you at this moment.
17 BY MR. BROWN:
18 Q. Doctor, do you think over the lunch break you
19 could identify a study that says that the TVT is not
20 safe or effective?
21 A. I will do what I can.
22 MR. FREESE: Well, I object to that. So we
23 provided you reliance lists. Those documents are
24 available to you.
25 MR. BROWN: Well, Rich, I reviewed them and I

Page 150

1 they're falling out of favor.
2    Q. So currently at the medical institutions that
3 you teach and train at, the midurethral synthetic sling
4 is taught; is that correct?
5    A. Correct.
6    Q. Doctor, are you going to testify that
7 polypropylene causes sarcomas or cancer in humans?
8        MR. FREESE: Object to the form of the
9 question.
10       THE WITNESS: In humans?
11 BY MR. BROWN:
12   Q. Yes.
13   A. That it does cause sarcomas in humans? Was
14 that your question?
15   Q. Yes, sir.
16   A. I don't have evidence to -- to that effect.
17 So no.
18   Q. Is your sole testimony with regard to the
19 material safety data sheets, that Ethicon didn't
20 disclose that information to physicians?
21   A. Well, that's not my sole testimony. My sole
22 testimony is that Ethicon has failed to disclose a
23 whole laundry list of complications and potential
24 complications. Failure to warn of significant risks,
25 and we'll, I'm sure, go into those risks shortly.

Page 151

1    Q. We will, so let me narrow down my question
2 then.
3        Do you have any clinical evidence that
4 polypropylene causes sarcomas in humans?
5    A. I have no literature to substantiate that.
6    Q. Do you -- let me mark this document. I'm
7 going to hand you Exhibit 16. It's the MSDS sheet that
8 was on your reliance list.
9        (DEFENDANT'S EXHIBIT 16 WAS MARKED.)
10       THE WITNESS: Thanks.
11       MR. BROWN: That's 16, Rich.
12       MR. FREESE: Thank you.
13 BY MR. BROWN:
14   Q. This is one of the MSDS sheets that's on your
15 reliance list; is that correct?
16   A. Correct.
17   Q. I assume you've reviewed it before?
18   A. I have.
19   Q. If you'll go to the last page. Do you see
20 where it says that polypropylene has been tested in
21 laboratory rats by subcutaneous implementation of disc
22 or powder?
23   A. Yes.
24   Q. And it says local sarcomas were induced at the
25 site of implementation?

Page 152

1    A. I do. Implantation, sorry.
2    Q. Yeah.
3        Doctor, do you believe that the rat studies
4 correlate to what occurs in humans?
5    A. I believe that animal studies are very
6 important when studying materials and drugs,
7 particularly materials, and that any mammal response to
8 a material should be considered in the warning labels.
9 So yes, I think animal studies, and particularly this
10 animal study should be at least considered and put open
11 to the public for consideration.
12   Q. Doctor, are you aware of any literature that
13 says that the results of the rat study transferrable to
14 humans -- let me state it this way. Strike that.
15       Are you aware of any literature that states
16 that the results of the rat study transferrable to
17 humans and can -- strike it again. Sorry.
18       Are you aware that Dr. Klinge and
19 Klosterhalfen have stated that the rat study is not
20 transferrable to humans?
21       MR. FREESE: Object to the form of the
22 question.
23       THE WITNESS: Could you give me a direct
24 quote?
25 BY MR. BROWN:

Page 153

1    Q. I will.
2    A. Okay, cool.
3        (DEFENDANT'S EXHIBIT 17 WAS MARKED.)
4        MR. BROWN: Rich, we'll supplement it for a
5 clean copy, but I'm going to have to give him a
6 highlighted copy if that's fine with you.
7        MR. FREESE: Sure, that's fine. No problem
8 with me.
9        (Discussion off the record.)
10   A. Okay.
11   Q. Doctor, how about we look at it together?
12   A. Okay, sure.
13   Q. Doctor, I've handed you Exhibit 17; is that
14 correct?
15   A. Correct.
16   Q. Doctor, we're looking at the back, which is
17 page 260, and it says, "Finally, one decisive question
18 remains. Are the results of the rat study
19 transferrable to humans, and can surgical meshes induce
20 malignancies after long-term implementation in decades
21 in our hernia patients? The answer is no."
22       Did I read that correctly?
23   A. Correct.
24   Q. Do you agree or disagree with that statement?
25   A. I disagree.

Page 170

1  urinary incontinence.
2     Q.  Even severe stress urinary incontinence?
3     A.  Including severe.
4     Q.  Doctor, is there a midurethral sling that is
5  safer than the TVT Obturator?
6        MR. FREESE:  Object to the form of the
7  question.
8        THE WITNESS:  I'd have to look at the data on
9  all the TVT-O competitors, which I don't have in front
10 of me to answer that accurately.
11 BY MR. BROWN:
12    Q.  So as of right now you don't know?
13    A.  As of this moment I do not know.
14    Q.  Doctor, let's move to the instructions for
15 use.  And you might have already answered this
16 yesterday and if you did, I apologize, but have you
17 ever participated in the drafting of an instructions
18 for use?
19       MR. FREESE:  Object to the form of the
20 question.  It was asked at length yesterday.
21       Go ahead and answer it again.
22       THE WITNESS:  Other than my lecturing or
23 testifying to the FDA and lecturing all over the
24 country, I have not.
25 BY MR. BROWN:

Page 171

1     Q.  Doctor, what is the FDA requirement for
2  adverse reactions that are required to be placed into
3  an instructions for use, if you know?
4        MR. FREESE:  Object to the form of the
5  question.
6        THE WITNESS:  In a word that all potential
7  adverse events be written so that surgeons and patients
8  can make informed decisions.  All warnings be made
9  open.
10 BY MR. BROWN:
11    Q.  Is that the FDA requirement?
12    A.  Well, that's not their words.  I mean, just in
13 summary, they require that adverse reactions be
14 reported.
15    Q.  Doctor, I'm not talking about reporting.  I'm
16 talking about an IFU.  Let me restate my question.
17    A.  Well, reported in the IFU.  Noted or listed in
18 the IFU.
19    Q.  Do you know the specific FDA requirement for
20 what adverse reaction should be in an instructions for
21 use?
22       MR. FREESE:  Object to the form of the
23 question.
24       THE WITNESS:  I can't quote it to you word for
25 word as I sit here right now.

Page 172

1  BY MR. BROWN:
2     Q.  Do you know if the symptoms of an adverse
3  reaction are required by the FDA to be identified in an
4  instructions for use?
5     A.  That's kind of splitting hairs; isn't it?  I
6  mean, adverse reaction by definition is going to have
7  the symptoms in it.
8        I can't really answer your question the way
9  you've asked it.  That doesn't really make sense.
10       MR. BROWN:  Well, read it back if you don't
11 mind because I'm asking you about if the FDA requires
12 it.  So I want to know if you know if the FDA requires
13 it or not, but you can read it back?
14       THE WITNESS:  The specific symptoms associated
15 with adverse reactions.
16       MR. BROWN:  If you'll just let her read mine
17 back and answer that question.
18       (Record read by the court reporter as follows:
19       "Q:  Do you know if the symptoms of an adverse
20       reaction are required by the FDA to be
21       identified in an instructions for use?")
22       MR. FREESE:  Object to the form of the
23 question.  I think it's -- I think it's
24 incomprehensible but --
25       THE WITNESS:  I don't understand that

Page 173

1  question.  That doesn't make sense to me.
2        MR. FREESE:  And I don't want to quibble, but
3  are you saying is a fever a symptom of a fever and
4  therefore you have to disclose the fever as the symptom
5  of a fever?  I don't understand it.
6        MR. BROWN:  Will you just object and then let
7  him --
8        MR. FREESE:  I'm sorry.  I object.
9  BY MR. BROWN:
10    Q.  Doctor, do you know if the FDA requires that
11 the symptoms be identified --
12       MR. FREESE:  Object to the form of the
13 question.
14 BY MR. BROWN:
15    Q.  -- in an instructions for use?
16    A.  As I sit here, I don't know if the symptoms
17 are required.
18    Q.  Doctor, do you agree that the instructions for
19 use is written for physicians?
20    A.  I do.
21    Q.  And that -- strike that.
22       The physician is to use his training -- strike
23 that.
24       The physician is to use his or her training,
25 experience and education in conjunction with the

Page 202

1  Q. Doctor, have you ever attended Ethicon's
2  professional education program for TVT?
3  A. No.
4  Q. Have you attended Ethicon's professional
5  education program for any pelvic floor repairs?
6  A. No.
7  Q. Have you reviewed Ethicon's professional
8  education video on the TVT Obturator incontinence
9  procedure?
10  A. I've reviewed the videos on everything that's
11 out there published. All -- all of the devices that
12 have videos that are open to the -- that are posted on
13 the Web, I've watched.
14  Q. Let me just -- if you say, "I've already
15 answered it," that's fine, but have you watched a video
16 from Ethicon's professional education on the TVT
17 Obturator?
18  A. I believe I have. If it's on the Web, I've
19 seen it. I've seen -- I've seen all the videos. And
20 if it's available on the Web, then I've seen it. I
21 mean, I've watched every single video that is out
22 there, and if TVT is on that list, I believe I've seen
23 it.
24  Q. And does the Ethicon professional education
25 video have an instructor walking through the steps

Page 203

1 verbally?
2  A. As I recall, though I can't recall specifics,
3 it did.
4  Q. Doctor, do you know if Ethicon has a
5 professional education called the advanced users forum
6 that teaches and trains on the management of
7 complications?
8  A. I do not.
9      MR. BROWN: Would you read back my question,
10 because I'm not even sure what I asked exactly. I
11 apologize.
12     (Record read by the court reporter as follows:
13     "Q: Doctor, do you know if Ethicon has a
14     professional education called the advanced
15     users forum that teaches and trains on the
16     management of complications?")
17 BY MR. BROWN:
18  Q. Doctor, I'm going to talk about degradation.
19     Have you performed any studies on mesh
20 degradation?
21  A. No.
22  Q. Have you published any studies on mesh
23 degradation?
24  A. No.
25  Q. Have you ever assessed a TVT mesh under

Page 204

1 scanning electron microscope or any other kind of
2 microscope to assess degradation?
3  A. No.
4  Q. Have you ever assessed any polypropylene mesh
5 under scanning electron microscope or any other kind of
6 microscope to assess degradation?
7  A. No.
8  Q. Doctor, are you aware if Ethicon has an
9 antioxidant package for its polypropylene mesh?
10  A. No.
11  Q. Are you saying no, they do not, or no, you do
12 not know?
13  A. I do not know.
14  Q. Do you know if an antioxidant blend with the
15 polypropylene affects the potential for degradation in
16 a polypropylene mesh?
17  A. Could you repeat that question? That was a
18 little confusing.
19     MR. BROWN: I'm going to have to ask you to do
20 that.
21     (Record read by the court reporter as follows:
22     "Q: Do you know if an antioxidant blend with
23     the polypropylene affects the potential for
24     degradation in a polypropylene mesh?")
25     MR. BROWN: Let me restate that. I said

Page 205

1 polypropylene I think too many times.
2 BY MR. BROWN:
3  Q. Doctor, do you know if an antioxidant blend
4 that is incorporated in the polypropylene may prevent
5 degradation?
6  A. No.
7  Q. You don't know; is that correct?
8  A. I don't know that it does.
9  Q. Are you saying that it does not, or that you
10 don't know if it does?
11  A. I do not know if it does.
12  Q. Doctor, can you identify any studies that
13 degradation with the TVT has any clinical significance
14 if degradation exists?
15  A. There are internal documents that I've
16 reviewed, and there are the clinical correlates to what
17 has been described in the internal documents of mesh as
18 it has protruded through the vagina after having been
19 broken down. But I don't know of any studies.
20  Q. Let me ask you this, Doctor: Is it your
21 opinion that the TVT mesh degrades?
22  A. Yes.
23  Q. Is it your opinion that degradation that you
24 believe occurs with the TVT has clinical significance?
25  A. Yes.

Page 206

1    Q.  And what is that clinical significance,
2  Doctor?
3    A.  It breaks down.  It is found eroded through
4  the vaginal wall at various locations.  It causes --
5  its breakdown causes an increase in the chronic foreign
6  body reaction that is seen in pristine mesh.  And I do
7  have concerns that it might be found in other parts of
8  the body as a result of the breakdown.
9    Q.  Doctor, have you seen any clinical data that
10  the potentially degraded mesh is found in other parts
11  of the body?
12    A.  Other than the eroded -- or, rather, the
13  eroded mesh particles seen -- mesh fragments, that is,
14  seen, which is commonly reported in the literature, no.
15    Q.  Are you talking about the mesh that degrades
16  into the vagina, is that what you're talking about,
17  Doctor?
18    A.  Correct.
19    Q.  Are you aware of any mesh degradation
20  particles that are found in other places besides the
21  vaginal canal?
22    A.  No.
23    Q.  Doctor, can you identify any literature that
24  the degradation of polypropylene -- restate that.
25        Doctor, do you have any clinical literature

Page 207

1  that you can point to that degraded polypropylene mesh
2  increases the inflammatory response?
3    A.  No.
4    Q.  Doctor, I believe you stated that you read
5  Ms. Batiste's deposition transcript; is that right?
6    A.  Yes.
7    Q.  And you're aware that Ms. Batiste was not
8  provided a patient brochure; is that correct?
9    A.  Correct.
10    Q.  And you're aware from Ms. Batiste's testimony
11  that she was not provided any marketing materials from
12  Ethicon; is that correct?
13    A.  I believe that's accurate.
14    Q.  You have no independent knowledge -- let me
15  restate that question.
16        Doctor, you will not be opining that
17  Ms. Batiste saw a patient brochure from Ethicon; is
18  that correct?
19    A.  Correct.
20    Q.  Do you believe that the purpose of a patient
21  brochure is to facilitate a conversation with a patient
22  and the physician?
23    A.  Well, among other things.  I mean, I think the
24  patient brochure should provide accurate information to
25  the patient so the patient can do her research and due

Page 208

1  diligence, including a conversation with a physician.
2    Q.  Do you provide patient brochures to your
3  patients?
4    A.  Well, since I don't put these implants in, I
5  do not.
6    Q.  Do you provide patient brochures for any
7  device or -- well, let me ask you this:  Do you use any
8  device that would have a patient brochure?
9    A.  I don't know that Xenform has a brochure.  It
10  might.  But I don't know if they do, and I don't use
11  it.
12    Q.  Do you know the pore size of the Prolene mesh?
13    A.  I know that it's claimed to be macroporous.
14    Q.  Doctor, do you disagree that it's macroporous?
15    A.  I think as applied to the patient, it shrinks
16  up, it's microporous, but --
17    Q.  You think that Prolene mesh shrinks from its
18  pore size to under ten microns?
19    A.  I think it shrinks from its implanted size to
20  under macroporous.
21    Q.  I think we said earlier that macroporous was
22  75 microns or greater; is that correct?
23    A.  Correct.
24    Q.  And your testimony is that the -- strike that.
25        Your testimony is that the Prolene mesh in the

Page 209

1  TVT contracts below 75 microns in a patient?
2    A.  I think that's what the internal documents
3  from Ethicon show, correct.
4    Q.  Doctor, are you aware of any clinical
5  literature that identifies the TVT Prolene mesh
6  contracting from its pore size to below 75 microns?
7    A.  I don't think that that has been studied in
8  the clinical journals or reported.
9    Q.  Let me just ask you if this refreshes your
10  recollection or not.
11        Have you seen from Ethicon's documents and
12  potentially Dr. Pamela Moalli's document that the pore
13  size for the Prolene mesh is 1379 microns?
14    A.  I have.
15    Q.  Do you agree or disagree with that out of the
16  package?
17    A.  That's what it is claimed.
18    Q.  And my question to you, Doctor, is do you
19  agree or disagree that the pore size of the Prolene
20  mesh out of the package is 1379 microns, approximately?
21    A.  I don't recall.
22    Q.  Doctor, do you know if mechanical cut or laser
23  cut mesh was used in Ms. Batiste's TVT-O implant?
24    A.  Mechanical.
25    Q.  Doctor, the Prolene mesh that was used by

Michael Thomas Margolis, M.D.

### Page 282

1  REPORTER'S CERTIFICATE
2      The undersigned Certified Shorthand Reporter
3  licensed in the State of California does hereby certify:
4      I am authorized to administer oaths or
5  affirmations pursuant to Code of Civil Procedure, Section
6  2093(b), and prior to being examined, the witness was duly
7  administered an oath by me.
8      I am not a relative or employee or attorney or
9  counsel of any of the parties, nor am I a relative or
10 employee of such attorney or counsel, nor am I financially
11 interested in the outcome of this action.
12     I am the deposition officer who stenographically
13 recorded the testimony in the foregoing deposition, and the
14 foregoing transcript is a true record of the testimony
15 given by the witness.
16     Before completion of the deposition, review of the
17 transcript [X] was [ ] was not requested.  If requested,
18 any changes made by the deponent (and provided to the
19 reporter) during the period allowed are appended hereto.
20     In witness whereof, I have subscribed my name this
21 ____ day of _____, 2013.
22
                    _____
23                  DIANE S. MARTIN, CSR No. 6464
24
25

### Page 284

                    - - - - - -
                     E R R A T A
                    - - - - - -
3  PAGE  LINE  CHANGE
4  ____  ____  _____
5            REASON: _____
6  ____  ____  _____
7            REASON: _____
8  ____  ____  _____
9            REASON: _____
10 ____  ____  _____
11           REASON: _____
12 ____  ____  _____
13           REASON: _____
14 ____  ____  _____
15           REASON: _____
16 ____  ____  _____
17           REASON: _____
18 ____  ____  _____
19           REASON: _____
20 ____  ____  _____
21           REASON: _____
22 ____  ____  _____
23           REASON: _____
24 ____  ____  _____
25           REASON: _____

### Page 283

1      INSTRUCTIONS TO WITNESS
2
3      Please read your deposition
4  over carefully and make any necessary
5  corrections.  You should state the reason
6  in the appropriate space on the errata
7  sheet for any corrections that are made.
8      After doing so, please sign
9  the errata sheet and date it.  It will be
10 attached to your deposition.
11     It is imperative that you
12 return the original errata sheet to the
13 deposing attorney within thirty (30) days
14 of receipt of the deposition transcript
15 by you.  If you fail to do so, the
16 deposition transcript may be deemed to be
17 accurate and may be used in court.

### Page 285

1  ACKNOWLEDGMENT OF DEPONENT
2
3      I,_____, do
    hereby certify that I have read the
    foregoing pages, and that the same
4   is a correct transcription of the answers
    given by me to the questions therein
5   propounded, except for the corrections or
    changes in form or substance, if any,
6   noted in the attached Errata Sheet.
7
    _____
8   MICHAEL THOMAS MARGOLIS, M.D.     DATE

15 Subscribed and sworn
   to before me this
   _____ day of _____, 20____.
16
   My commission expires:_____
17
18 _____
   Notary Public