Exhibit G

Elaine Duncan

```
 1              UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF WEST VIRGINIA
 2                  AT CHARLESTON
 3   IN RE:  ETHICON, INC.      : Master File No.
     PELVIC REPAIR SYSTEM       : 2:12-MD-02327
 4   PRODUCTS LIABILITY LITIGATION : MDL 2327
                                 :
 5                               : JOSEPH R.
     THIS DOCUMENT RELATES TO    : GOODWIN
 6   THE FOLLOWING CASES IN      : US DISTRICT
     WAVE 1 OF MDL 200:          : JUDGE
 7   _____
     Myra Byrd, et al. v. Ethicon, Inc., et al.
 8   Civil Action No. 2:12-cv-00748
 9   Angela Coleman, et al. v. Ethicon, Inc., et al.
     Civil Action No. 2:12-cv-01267
10
     Dina Destefano-Raston, et al. v. Ethicon, Inc., et al.
11   Civil Action No. 2:12-cv-01299
12   Rose Gomez, et al. v. Ethicon, Inc., et al.
     Civil Action No. 2:12-cv-00344
13
     Dawna Hankins v. Ethicon, Inc., et al.
14   Civil Action No. 2:12-cv-00369
15   Donna Hankins, et al. v. Ethicon, Inc., et al.
     Civil Action No. 2:12-cv-01011
16
     Wilma Johnson v. Ethicon, Inc., et al.
17   Civil Action No. 2:11-cv-00809
18   Debra Lynn Joplin v. Ethicon, Inc., et al.
     Civil Action No. 2:12-cv-00787
19
     Margaret Kirkpatrick v. Ethicon, Inc., et al.
20   Civil Action No. 2:12-cv-00746
21   Paula Kriz, et al. v. Ethicon, Inc., et al.
     Civil Action No. 2:12-cv-00938
22
     Miranda Patterson v. Ethicon, Inc., et al.
23   Civil Action No. 2:12-cv-00481
              DEPOSITION OF ELAINE DUNCAN
24                 MARCH 31, 2016
```

Elaine Duncan

1

      (Caption Continued from Previous Page)

2   _____

3    Denise Sacchetti v. Ethicon, Inc., et al.
     Civil Action No. 2:12-cv-01148

4
     Stacy Shultis, et al. v. Ethicon, Inc., et al.

5    Civil Action No. 2:12-cv-00654

6    Jennifer Sikes, et al. v. Ethicon, Inc., et al.
     Civil Action No. 2:12-cv-00501

7
     Sheri Scholl, et al. v. Ethicon, Inc.

8    Civil Action No. 2:12-cv-00738

9    Carrie Smith v. Ethicon, Inc., et al.
     Civil Action No. 2:12-cv-00258

10
    Krystal Teasley, et al. v. Ethicon, Inc., et al.

11   Civil Action No. 2:12-cv-00500

12   Lisa Thompson, et al. v. Ethicon, Inc., et al.
     Civil Action No. 2:12-cv-01199

13
    Roberta Warmack, et al. v. Ethicon, Inc., et al.

14   Civil Action No. 2:12-cv-01150

     _____

15

16
               Deposition of

17             Elaine Duncan
          Thursday, March 31, 2016

18            10:20 a.m.

19

20   Reported by:
    Barbara J. Carey, RPR

21

22

23          GOLKOW TECHNOLOGIES, INC.
       877.370.3377 ph|917.591.5672 fax

24          deps@golkow.com

Elaine Duncan

```
 1       APPEARANCES:

 2

             APPEARING FOR THE PLAINTIFFS:

 3

             Fidelma L. Fitzpatrick, Esquire
 4           Motley Rice, LLC
             321 South Main Street, 2nd Floor
 5           Providence, Rhode Island 02903
             401-457-7728
 6           ffitzpatrick@motleyrice.com

 7

                       -and-

 8

             Edward A. Wallace, Esquire
 9           Wexler Wallace, LLP
             55 West Monroe Street, Suite 3300
10           Chicago, Illinois 60603
             312-346-2222
11           eaw@wexlerwallace.com

12

13           APPEARING FOR THE DEFENDANTS:
14           Paul N. Davis, Esquire
             Butler Snow, LLP
15           Renaissance at Colony Park
             1020 Highland Colony Parkway, Suite 1400
16           Ridgeland, Mississippi 39157
             601-985-4503
17           paul.davis@butlersnow.com

18
19                       -   -   -
20
21
22
23
24
```

Elaine Duncan

```
 1                    I N D E X
 2
    EXAMINATION:
 3
       By Mr. Wallace - Pages 6 and 181
 4     By Ms. Fitzpatrick - Page 120
       By Mr. Davis - Pages 177 and 188
 5
 6  EXHIBITS:
 7  Exhibit            Description                Page
 8     1    Notice to Take Deposition of Elaine Duncan...7
            (9 pages)
 9
       2    3/29/16 Letter Re Estimated Fees for Expert..8
10          Elaine Duncan
            (1 page)
11
       3    Rule 26 Expert Report of Elaine Duncan.......11
12          MSME, RAC
            (37 pages)
13
       4    Gynecare Product Description Document Bates..37
14          Stamped ETH-03261 and 3260
15     5    Gynecare Prolift* Pelvic Floor Repair........37
            Systems Bates Stamped ETH.MESH.06402274
16
       6    6/27/03 Gynecare Worldwide Athos/Aramis/.....49
17          Porthos Bates Stamped ETH.MESH.22602534 to
            579
18
       7    7/19/03 E-Mail String Re:  Gynemesh Holding..71
19          Force in Tissue Bates Stamped
            ETH.MESH.03919143 to 144
20
       8    1/13/05 E-Mail String Re:  IFU Prolift.......76
21          Bates Stamped ETH.MESH.02286052 to 053
22     9    2/19/09 E-Mail Re:  SLU Uro-GYN Follow-up....83
            Bates Stamped ETH.MESH.00005098 to 099
23
       10   Ethicon Document in German Bates Stamped.....94
24          ETH.MESH.10983825 to 852
```

Elaine Duncan

```
 1    INDEX CONTINUED:

 2

      EXHIBITS:

 3

      Exhibit              Description                    Page

 4

         11   Biocompatibility Risk Assessment Bates.......97
 5              Stamped ETH.MESH.06398628 to 643
 6       12   10/29/08 E-Mail Re:  Pre-Reading for........ 107
                Prolift M Bates Stamped ETH.MESH.00271215 to
 7              216
 8       13   7/5/90 Letter Re:  Reclassification of...... 114
                Nonabsorbable Polypropylene Surgical Suture
 9              Bates Stamped ETH.MESH.09634664 to 688
10       14   TVT-R Rule 26 Expert Report of Elaine....... 121
                Duncan, MSME, RAC
11              (56 pages)
12       15   TVT-O Rule 26 Expert Report of Elaine....... 121
                Duncan, MSME, RAC
13              (52 pages)
14       16   2/26/16 Reclassification of Urogynecologic.. 151
                Surgical Mesh Instrumentation, Food and Drug
15              Administration, Executive Summary
                (49 pages)
16
         17   2/26/16 Reclassification of Urogynecologic.. 156
17              Surgical Mesh Instrumentation, Food and Drug
                Administration, Gastroenterology-Urology
18              Medical Devices Advisory Committee Panel
                (54 pages)
19
         18   Urogynecology, Sling Surgery for Stress..... 169
20              Urinary Incontinence in Women:  A Systematic
                Review and Metaanalysis
21              (27 pages)
22

23

24
```

Elaine Duncan

```
 1                    Deposition of Elaine Duncan, taken

 2    pursuant to notice, was held at the law offices of Nilan

 3    Johnson Lewis, PA, 120 South Sixth Street, Suite 400,

 4    Minneapolis, Minnesota 55402, commencing at 10:20 a.m. on

 5    the above date, before Barbara J. Carey, Registered

 6    Professional Reporter and Notary Public in and for the

 7    State of Minnesota.

 8    WHEREUPON, the following proceedings were duly had:

 9    (The oath was administered by the reporter.)

10                    WITNESS RESPONSE:  I do.

11                    THE REPORTER:  Thank you.

12                    ELAINE DUNCAN,

13    after having been first duly sworn, was called as a

14    witness and testified as follows:

15                    EXAMINATION

16    BY MR. WALLACE:

17         Q.   Good morning, Ms. Duncan.  We met before;

18    right?

19         A.   Yes.

20         Q.   And I'm going to try to move quickly.  I think

21    there was a misunderstanding about the -- the start time,

22    but you're prepared to go forward; right?

23         A.   Certainly.

24         Q.   Okay.  I'm going to give you what we're first
```

Elaine Duncan

```
 1   going to mark as Exhibit 1.

 2                   (Whereupon, Exhibit 1 was marked.)

 3   BY MR. WALLACE:

 4        Q.   And I'll represent to you I believe it's a

 5   Deposition Notice, and I'm going to ask whether or not

 6   you've seen that before, or something like it, asking for

 7   you to attend the deposition today and also asking you for

 8   some documents.

 9        A.   Yes.

10        Q.   Okay.  Have you brought any additional

11   documents with you today that you haven't produced in the

12   past?

13        A.   Well, I brought the estimate of the fees for

14   this case, for the WAVE cases, rather.

15                   THE REPORTER:  For the what?

16                   THE WITNESS:  The WAVE cases, and -- and

17   I have another copy of my CV.

18            Do you need that?

19   BY MR. WALLACE:

20        Q.   Is it more up-to-date than what you attached

21   to your report?

22        A.   No, it's the same one.

23        Q.   Then I don't need a copy.

24        A.   All right.
```

Elaine Duncan

```
 1              Q.   We'll go ahead and mark this as Exhibit 2,

 2    then.  Can we -- do you mind if we mark this?

 3              A.   That's fine.

 4                   (Whereupon, Exhibit 2 was marked.)

 5    BY MR. WALLACE:

 6              Q.   So in response to the documents that were

 7    requested in Exhibit 1, which is the Notice, you brought

 8    with you another copy of your CV, as well as Exhibit 2,

 9    which is an estimate of hours you submitted in the case?

10              A.   Yes.

11                   MR. DAVIS:  Let me just note she does

12    have a number of other notebooks here of all the footnoted

13    documents.  Those have all been produced, but just note

14    that she does have them.

15    BY MR. WALLACE:

16              Q.   So you haven't brought any notes with you that

17    you took in the course of your work?

18              A.   I have not.  I didn't have any.

19              Q.   You brought a lot of documents with you that

20    look to be at least eight or nine, if not more, ten

21    binders on the table or benches over there, as well as

22    another four in front of you; is that right?

23              A.   Yes.

24              Q.   And how did you keep track of your thoughts or
```

Elaine Duncan

```
 1    ideas or opinions that eventually worked their way into

 2    the report?

 3          A.   I basically started writing the report with

 4    the main document, so I just had the document.

 5          Q.   Okay.  So if I understand you correctly, what

 6    you're saying is that as you came across documents that

 7    interested you or that you thought were relevant, you

 8    wrote about them in the report?

 9          A.   (Witness nodding head.)

10          Q.   And that sort of served as your note-taking,

11    as well?

12          A.   That -- that's pretty much as I did it.  So as

13    I would write, I would put the ETH.MESH information next

14    to it, so in the paragraph, and then I transposed those to

15    footnotes.

16          Q.   And with respect to Exhibit 2, the hours, you

17    say it's only an estimate.

18               Have you not invoiced for your work?

19          A.   I have not invoiced all of the work, just

20    we've sent out an invoice in January, so I added all of

21    these together, and it was only a partial invoice for the

22    TVT-R WAVE.  So we're pending an invoice for everything,

23    which we will finish off after this meeting.  So that's

24    why this is just an estimate.
```

Elaine Duncan

1          Q.    Okay.  Just to be clear, though, is Exhibit 2

2    a complete statement of your hours?

3          A.    Complete statement of my hours.  What it

4    doesn't include, as I say on this, it doesn't include any

5    expenses, any of our office staff help or the cost of the

6    bindings and that sort of thing.

7          Q.    And the handwriting on the document is yours?

8          A.    That's mine, and I was reminded that I needed

9    to put the hours on there and I hadn't done that, so we

10   back-calculated the hours.

11         Q.    So according to your handwriting on Exhibit 2,

12   you spent 63 hours writing the Prosima and Prolift report

13   that you're here to testify about today?

14         A.    That's correct.

15         Q.    And similarly, you spent about 82 hours

16   working on the TVT-O report?

17         A.    Yes.  Yes.

18         Q.    And 52 hours on the TVT-R report?

19         A.    Yes.

20         Q.    And that includes reviewing documents and

21   writing the report?

22         A.    Yes.

23         Q.    It includes editing the report?

24         A.    Yes.

Elaine Duncan

```
1              Q.    It includes any phone conversations you had

2    with anyone about your report?

3              A.    Anything that went on my fee time sheets, yes.

4              Q.    You, as a result of your work in the case,

5    authored three Rule 26 reports?

6              A.    Yes, sir.

7              Q.    And one of those related to pelvic organ

8    prolapse kits made by Ethicon?

9              A.    The Prosima Prolift, yes.

10             Q.    And the other two related to the TVT-O and the

11   TVT-R; right?

12             A.    Yes, sir.

13             Q.    And you're not offering any opinions on any

14   other products other than those?

15             A.    That's correct.

16             Q.    Okay.  We'll mark this as Exhibit 3.

17                   (Whereupon, Exhibit 3 was marked.)

18   BY MR. WALLACE:

19             Q.    That's your report for the pelvic organ

20   prolapse kit?

21             A.    Yes, sir.

22             Q.    And if you look at the first page, when you

23   discuss the scope of the report, you've identified the

24   exact products on which you're offering opinions; right?
```

Elaine Duncan

```
1          A.   In the report, yes, sir.

2          Q.   Okay.  If you look at page 8 of the report, I

3    want to just ask you some general questions.  You

4    discuss -- and this just generally with respect to the

5    report.  You discuss a lot of testing that either Ethicon

6    did or did not do and your reasons for why it was

7    necessary and not necessary; right?

8          A.   Let me just look at that page.

9          Q.   My question has to do with the report

10   generally.

11         A.   That particular page you're speaking of is

12   under the heading of how medical devices are developed

13   today, so this section is not specific to the Ethicon

14   products; this is just a general information outlining my

15   understanding in my practice of how medical devices are

16   developed today.  That was the intention of this section.

17         Q.   To back up then, you discussed testing in your

18   report; correct?

19         A.   In a general way.

20         Q.   Well, you actually mentioned specific tests

21   like that would be called for under ISO 10993; right, just

22   as an example?

23         A.   That's an example.  I don't think I went into

24   detail of the type of testing.
```

Elaine Duncan

```
 1          Q.   Okay.  In any event, you did discuss testing

 2   in your report generally?

 3          A.   Yes.

 4          Q.   And you talked about different kinds of

 5   testing.  In fact, you talked about animal testing.

 6          A.   Just a minute.  I can't recall that was in

 7   here.

 8          Q.   Look at page 8 under the biocompatibility

 9   paragraph.

10          A.   Oh, I said "Testing usually involves

11   sacrificing animals," yes.

12          Q.   And you mean that in the context of developing

13   medical devices?

14          A.   Yes, sir.

15          Q.   And even though you say that the section that

16   you're writing has to do with how medical devices are

17   developed today, your -- that is true, also, in the past;

18   that developing medical devices usually involve some form

19   of animal testing; right?

20          A.   Actually, sir, you're taking that a bit out of

21   context.

22               May I clarify?

23          Q.   If you feel like you can't answer the

24   question, tell me you can't answer the question.
```

Elaine Duncan

```
 1            A.    I can't answer the question the way you

 2    phrased it because in this section where I'm discussing

 3    animal testing, the sentence before it states, "For

 4    material that has already been thoroughly tested and/or

 5    has a long history of safe clinical use in a predecessor

 6    product, little or no further testing is required.

 7    Testing usually involves sacrificing animals.  Ethical

 8    standards caution against unnecessary animal testing."

 9            So the reference to animals in this context is

10    that I'm explaining why we rely on prior history of use

11    for the material in making a biocompatibility risk

12    assessment.

13            Q.    Okay.  But that wasn't my question.  Perhaps

14    you misunderstood.

15            All I'm saying and asking you is whether or

16    not, in the development of medical devices, medical device

17    manufacturers typically rely on animal testing --

18                    MR. DAVIS:  Object to form.

19    BY MR. WALLACE:

20            Q.    -- to validate the design of their product?

21            A.    No, sir, I can't say typically.

22            Q.    Sometimes?

23            A.    Sometimes.

24            Q.    Well, in this case, you would agree with me
```

Elaine Duncan

1    that Ethicon relied on animal testing to support the use

2    of its PROLENE sutures, which is a predecessor product to

3    the Prolift device?

4          A.   Yes.

5          Q.   And when you make the statement, by the way,

6    about sacrificing animals and that ethical standards

7    caution against animal testing, why are you saying that?

8          A.   It's important to put in perspective the way

9    biocompatibility risk assessment is done.  That's what I

10   was, essentially, teaching in this paragraph.  I was -- if

11   you read this paragraph, I'm explaining how a

12   biocompatibility risk assessment is -- is done, and

13   following ISO Standard 10993, we take time to understand

14   the prior knowledge about the materials and avoid simply

15   sacrificing animals for the sake of check-boxing that a

16   test was done.  If it's already been done, we factor that

17   into the risk assessment.

18         Q.   You would agree with me that, even in your

19   experience and what you've known about medical device

20   makers, that they use animal testing for -- for many other

21   reasons than simply validating a biocompatibility test;

22   right?

23         A.   It varies by the device.

24         Q.   And you're aware of certain studies that were

Elaine Duncan

```
1   done on animals with respect to PROLENE?

2        A.   I've read a lot of those reports.

3        Q.   Okay.  Are you aware of any -- so I guess what

4   I'm trying to figure out, as you say, ethical standards

5   caution against unnecessary animal testing, are you

6   saying -- I'm just trying to understand.

7             Are you saying that we shouldn't be

8   sacrificing animals if at all possible?  I'm trying to

9   understand the "ethical standards" comment.

10       A.   Well, I certainly didn't say, "If at all

11  possible."

12            What I'm trying to say is when you read

13  ISO 10993 and take it into the context of today's

14  expectations, here I'm speaking "ethical standards" with a

15  little "S," not standards like 10993, but even --

16       Q.   So what you're saying is a matter of --

17            MR. DAVIS:  She wasn't finished.

18  BY MR. WALLACE:

19       Q.   Go ahead.

20       A.   So particularly in Europe, the expectation is

21  that we don't run an animal study for the sake of show and

22  tell, to be elaborate.  We do it for a specific purpose

23  that offsets the sacrifice of that animal.  We give due

24  consideration.  For example, there's animal use committees
```

Elaine Duncan

1    for every protocol, and when we write those protocols, we

2    have to justify to that animal use committee the value of

3    the study compared to the sacrifice of the animal.

4         Q.    In other words, it's your position that

5    companies like Ethicon are obligated to make animals a

6    priority when they're designing a product?

7         A.    I didn't say a priority, no, sir.

8         Q.    Well, they're supposed to consider the welfare

9    of the animal before they sacrifice the animal?

10        A.    The value that is achieved from the protocol

11   study design, yes.  May I give an example?

12        Q.    In other words, we should not necessarily

13   experiment on animals?

14        A.    If I may give an example?

15        Q.    Well, can you answer my question?

16        A.    Well, I think that's generally accepted, that

17   we shouldn't unnecessarily, but if I may explain, it's a

18   part of the protocol and it's a part of the animal use

19   committee assessment.  The authors of animal study

20   protocols, today's expectations, are that they provide

21   literature summaries of anything pertinent that's already

22   been done in the past for that protocol, and they have to

23   justify that that study is going to provide information

24   that has not previously been determined.  That's more or

Elaine Duncan

```
 1    less a threshold or ethical use of animals.

 2         Q.   But Ethicon didn't give that same

 3    consideration to women?

 4         A.   Excuse me?

 5              MR. DAVIS:  Object to the form.

 6    BY MR. WALLACE:

 7         Q.   Well, where was the -- what did you call it --

 8    the animal use committee, is that what you talked about,

 9    you called it; that there are animal use committees?  Did

10    I use the right term?

11         A.   That's a general term for it, different --

12    IACUC is another name for it.

13         Q.   Okay.  Where's the women's use committee when

14    we're talking about putting a Prolift device in a woman?

15              MR. DAVIS:  Object to form.

16         A.   Every clinical trial in, as far as I know,

17    most civilized countries in the world, recognize the

18    Helsinki agreement which is the ethical use of

19    experimentation, and all clinical trials have to have

20    informed consent and undergo a protocol review.

21    BY MR. WALLACE:

22         Q.   And how many clinical trials were done before

23    this -- the products that you've talked about in Exhibit 3

24    were released to the market?
```

Elaine Duncan

```
 1            A.   I would have to check my notes.  Would you

 2    want me to look at that?

 3            Q.   Well, you should know that.  Don't you know

 4    that?  Do you know if any were done?

 5                 MR. DAVIS:  Object to the form.

 6            A.   Sir, I have looked at three different types of

 7    products.  Would you care to say which product you're

 8    speaking of?

 9    BY MR. WALLACE:

10            Q.   Any of those that are identified in the -- in

11    the exhibit that's in front of you.  Feel free to look at

12    your report.

13            A.   Well, first off, the scope of my report didn't

14    include the review of all of the clinical trials, but I do

15    know that there were clinical evaluation reports conducted

16    on all three of these products, and in those clinical

17    evaluation reports, there are literature summaries and

18    also summaries of experiences for the clinical studies

19    that were conducted, and they're organized and produced in

20    those clinical evaluation or clinical expert reports, as

21    they were called variously.

22            Q.   That's not answering my question.  You still

23    haven't pointed me to one clinical trial that was done

24    prior to launch of any of the products.
```

Elaine Duncan

1                    MR. DAVIS:  Object to the form.  Asked

2    and answered.

3          A.   I can point you to them if you want me to go

4    to my books and look them up.

5    BY MR. WALLACE:

6          Q.   So sitting here right now -- you can do that

7    on a break.

8                    Sitting here right now, you don't know, at

9    all, if there were any clinical trials that were done

10   prior to the release of any of the products that are

11   identified in Exhibit 3?

12                   MR. DAVIS:  Object to form, and this is

13   not a memory test; she's entitled to refer if she needs

14   to.

15         A.   Sir, I can recall that there were clinical

16   trials, even for the TVT-R and --

17   BY MR. WALLACE:

18         Q.   We're here -- we're not -- let me just make

19   something really clear.  We're here to answer my

20   questions, and we're talking about Exhibit 3.  TVT-R is

21   not included in Exhibit 3.  We're here to talk about the

22   Prolift and Prosima; okay?  Let's look at your report just

23   to orient you because I don't want to confuse you; okay?

24                   You're looking at the Gynemesh PS, Prolift,

Elaine Duncan

```
 1    Prolift+M and Prosima; okay?  You will, later on, be asked

 2    questions about the TVT-O and the TVT-R, but not now;

 3    okay?

 4         A.   Okay.

 5         Q.   Just to be clear and so you're not confused,

 6    I'm asking you very simply whether or not you know if any

 7    clinical trials were done with respect to those products

 8    before they were put on the market?

 9         A.   My answer is, I would have to consult the

10    notes for these devices because there were various phases

11    of these devices.  What I've covered in this report goes

12    back to the PROLENE Soft Mesh, the Gynemesh PS, Prolift,

13    Prolift M and Prosima, and it is my recall that the

14    clinical evaluation reports included listings of clinical

15    data from clinical reports.  I cannot recall each one of

16    those.

17         Q.   And you're not sure whether or not they were

18    actually clinical trials; right?

19         A.   Until I check my notes, I would be, you know,

20    concerned that I might be guessing, and I don't want to

21    guess.

22         Q.   Do you believe that the PROLENE Soft Mesh, in

23    and of itself, is one of the kits that you're here to

24    testify about?
```

Elaine Duncan

```
 1           A.    One of the kits?

 2           Q.    (Witness nodding head.)

 3           A.    PROLENE Soft Mesh, per se, was not put out as

 4   a kit, as far as I recall.

 5           Q.    Do you know if the Gynemesh PS is put out as a

 6   kit?

 7           A.    I would have to check my notes on the

 8   Gynemesh PS, but my recall is that that was before the

 9   kits, but I'm not certain.  I'd have to check.  There's a

10   lot of products here.

11           Q.    With respect to the Prolift and the Prolift+M,

12   you would agree with me that those are kits; right?

13           A.    The Prolift, Prolift M and Prosima were what

14   some people refer to as kits because they included

15   instrumentation.

16           Q.    If you look at page 13 and 14 of your report,

17   just going to give you a few examples where it shows up.

18   On page 13 under, "Development of PROLENE Soft Mesh," if

19   you look at the last sentence, it says, "Ethicon's design

20   history file and CE Mark files for PROLENE Soft Mesh are

21   very thorough."

22               Do you see that statement?

23           A.    Yes.

24           Q.    You make a similar statement right below that
```

Elaine Duncan

1    with respect to the Gynemesh PS where you say, "Ethicon's

2    design history file and CE Mark files for Gynemesh PS are

3    very thorough."

4              Do you see that?

5         A.   Yes.

6         Q.   You say the same thing with respect to the

7    Prolift and the Prolift+M, and I believe you also say that

8    for the Prosima.

9              What I'm trying to understand is what products

10   are you actually here to testify about?

11        A.   These products that you just listed, as

12   they're written in my report, within -- within the scope

13   of my report, which was the design review, the

14   documentation in the technical files and the quality

15   standards that went into the development of that

16   documentation.

17        Q.   Why did you -- do you know anyone that's

18   bringing a claim in this litigation in WAVE 1 relating to

19   PROLENE Soft Mesh?

20        A.   I don't know anyone.  Are you speaking of me

21   personally?  I mean, I know the names.

22        Q.   I'm wondering whether or not you were asked to

23   give an opinion on PROLENE soft mesh?

24        A.   Have I been asked to give an opinion of

Elaine Duncan

1    PROLENE soft mesh?  Yes, it's right here.

2         Q.   Who asked you to do that?

3         A.   Butler Snow hired me to do an expert review of

4    the documentation.  I'm not sure I understand your

5    question.

6              MR. DAVIS:  Can I say something?  It may

7    or may not help.  Frankly, she doesn't know which case

8    she's been designated in.  My understanding is, if you're

9    worried about whether she's planning to testify in like a

10   Gynemesh PS case, we have not designated her for those

11   cases, no.

12             THE WITNESS:  That's all I know.

13             MR. WALLACE:  I am not here, just so you

14   understand, under the agreement.  I'm not here to take a

15   deposition with respect to anybody that's brought a,

16   quote/unquote, a "PROLENE soft mesh claim" or a "Gynemesh

17   PS claim," and I can tell you that you haven't been

18   designated in any Prosima cases.

19             So I just -- and we can agree to disagree or

20   agree, it doesn't matter to me, Paul, but I'm here to take

21   a deposition today based upon the cases in which you've

22   been designated in the WAVE 1; okay?

23             And so what I'm asking you is whether or not

24   you know, as you sit here today, whether or not you've

Elaine Duncan

1  been designated as an expert or asked to, as an expert by

2  Ethicon, to testify in any WAVE 1 cases where the claim is

3  based upon either PROLENE soft mesh, Gynemesh PS or

4  Prosima?  Because I don't see any cases in WAVE 1 in which

5  you've been designated in that regard.

6           MR. DAVIS:  She -- I can state she's not

7  going to know which cases she's been designated in, but

8  the record speaks for itself.

9  BY MR. WALLACE:

10      Q.   Well, and just so we're clear, I'm not here to

11  take a deposition on behalf of clients who aren't bringing

12  those claims.  I'm here to take a deposition -- so I don't

13  want this later coming back that because you put in a

14  paragraph at page 13 about the PROLENE soft mesh and

15  discussed it in your report that somehow we're precluded

16  from taking an additional deposition of you.  That's my

17  point.

18      A.   Well, if I may, sir, it would seem to me to be

19  self-evident that I was designated as an expert for the

20  scope of the products I have in the report.  PROLENE soft

21  mesh is the key implant component for Prolift and Prosima;

22  therefore, I had to evaluate that material in order to

23  produce this report.  That's my best answer.

24      Q.   So if I hear you correctly -- and I want to --

Elaine Duncan

```
 1    and I appreciate you being polite, and I'm going to be

 2    polite about it, as well.

 3             What I hear you saying is because you believe

 4    that the PROLENE soft mesh is a component or predecessor

 5    product in a way that you necessarily had to evaluate it

 6    to evaluate the safety of, for example, the Prolift

 7    devices?

 8         A.   I had to evaluate the documentation for the

 9    risk management, for the design control and review, for

10    the general development documentation in the design

11    history file and the technical files, which included the

12    CERs.

13                  MR. DAVIS:  Okay.  Try to say your "yes"

14    first.

15                  THE WITNESS:  Okay.

16   BY MR. WALLACE:

17         Q.   That's exactly what I was just going to say.

18         A.   Okay.

19         Q.   We don't want to be here all day.

20         A.   Okay.

21         Q.   And I know you don't, either.

22         A.   No.

23         Q.   You want to get home or wherever you're going

24    to go, so if you could just try to answer my question
```

Elaine Duncan

```
1    first.  If you really feel an explanation is necessary,

2    I'm going to try to be accommodating to you.

3         A.   Okay.

4         Q.   But not unnecessarily so.

5         A.   Thank you.

6         Q.   Fair enough?

7         A.   Thank you.

8         Q.   Okay.  And let's just go back to the

9    statements that I pointed out where you said the design

10   history file and CE Mark files were very thorough.

11              With respect to all the products -- let's be

12   more specific.  With respect to the Prolift and the

13   Prolift+M, did you review the entire design history files

14   for both?

15        A.   I reviewed the documents that I was given,

16   yes, sir.

17        Q.   Okay.  But did you review the entire design

18   history file for the Prolift and the Prolift+M?

19        A.   Yes, sir.  To the extent I was given the

20   documents, yes, sir.

21        Q.   You don't know whether you were or not?

22        A.   I'm just trying to explain; I had a full

23   download of the documents, and all of the documents were

24   reviewed, yes, sir.
```

Elaine Duncan

```
1          Q.   Let's -- let's go at this, maybe, a different

2     way.

3               With respect to your opinions in this report,

4     is it fair to say that you reviewed enough documents in

5     your mind to satisfy yourself that the company considered

6     the design risk for the products?

7          A.   Yes, sir.

8          Q.   And in fact, that was one of the criteria that

9     you had that you had to satisfy yourself that the company

10    had considered the risk of the Prolift and the Prolift+M

11    and the Prosima; right?

12         A.   Yes, sir.

13         Q.   And the company even had to consider what

14    would be crippling, life-altering risk that might come

15    with the implant of those products; right?

16         A.   I had to review if they had done that, yes,

17    sir.

18         Q.   And you satisfied yourself that the company

19    had, in fact, considered life-altering risks that came

20    with the implant of the product; right?

21         A.   Yes, sir.

22         Q.   And in your opinion, the company considered

23    that, as you say, very thoroughly?

24         A.   Yes, sir.
```

Elaine Duncan

```
 1          Q.   Let me ask you some basic questions about

 2    design in general, and you can tell me whether or not you

 3    believe it applies to Ethicon when it made these devices

 4    that are at issue in Exhibit 3.

 5               If a company knows that a patient has certain

 6    comorbidities that may affect the function of the device,

 7    a responsible medical device manufacturer has to consider

 8    those comorbidities in its design; right?

 9               MR. DAVIS:  Object to the form.

10          A.   Yes, sir, if I may explain.

11    BY MR. WALLACE:

12          Q.   Go ahead.

13          A.   Often, in the beginning of a design, a company

14    may not know the impact of the comorbidity, so over time,

15    as clinical use expands to different countries or

16    different populations or different users, and more data

17    can be gained, the impact of comorbidities can become more

18    apparent.  So during development, sometimes the impact is

19    not known.

20          Q.   Well, based upon the documents that you

21    reviewed and what I'll call good, old-fashioned common

22    sense that I hope we both have, you would agree with me

23    that Ethicon knew that women would have the possibility of

24    multiple vaginal deliveries before they were implanted
```

Elaine Duncan

```
1    with the Prolift device; right?

2                    MR. DAVIS:  Object to form.

3         A.   Sir, yes, I understood from the labeling that

4    that was a warning that they had not evaluated that

5    sufficiently.

6    BY MR. WALLACE:

7         Q.   I'm not asking that.  We're going to be here

8    all day.  I'm just asking you basic questions.

9              Did Ethicon know or not know; yes or no?

10        A.   Know what, excuse me?  I don't --

11        Q.   That they were going to have -- and I'm trying

12   to use some common sense here so we can get through this.

13        A.   Okay.

14        Q.   They knew -- Ethicon knew that women could

15   possibly have multiple vaginal deliveries before they were

16   implanted with the Prolift or Prolift+M device; right?

17        A.   It is not a yes-or-no answer, sir.

18        Q.   It is a yes-or-no answer.

19        A.   No, sir.

20        Q.   All right.  Let's go off the record for a

21   second.

22                    (Discussion held off the record.)

23   BY MR. WALLACE:

24        Q.   We're back on the record.
```

Elaine Duncan

1              Did Ethicon know that women that might receive

2    their product, products that are identified in Exhibit 3,

3    might have had vaginal -- multiple vaginal deliveries

4    before those devices were implanted?

5         A.   I would say yes, they knew they might, which

6    is different from your other question.

7         Q.   Did Ethicon know that some women might -- that

8    might receive this device would be obese?

9         A.   I don't recall seeing any information about

10   obesity, so I can't say if they knew that or not.

11        Q.   You saw no information, at all, in the

12   thousands of documents you allegedly read that discuss

13   Ethicon's state of knowledge with respect to whether or

14   not they knew that women, certain women, could be obese

15   that would receive this product?

16        A.   My answer is no, I do not recall that.

17        Q.   Do you know whether or not Ethicon knew that

18   certain women would have had prior pelvic surgeries or

19   pelvic trauma?

20        A.   Yes, sir, I know that they knew that from my

21   reading, yes, sir.

22        Q.   Did you know that Ethicon knew that certain

23   women, before they received the implant of the device,

24   would have a loss of muscle tone in the area where the

Elaine Duncan

```
1    product was going to be implanted?

2         A.   No, sir, I cannot recall if they knew that.

3         Q.   Do you know that the disease itself, pelvic

4    organ prolapse, has, in part, to do with muscle tone?

5         A.   Yes, sir, I know that, but when you asked the

6    previous question about muscle tone, I was not thinking in

7    the general context of muscle tone as much as I was

8    thinking of athleticism.  So yes, pelvic floor prolapse is

9    an internal muscle issue, yes.  I knew that.

10        Q.   And with respect to all of the things that I

11   just listed; multiple vaginal deliveries, pelvic surgery

12   and pelvic trauma, obesity and loss of muscle tone, would

13   you agree with me that those are commonly described as

14   comorbidities?

15        A.   No, sir, I can't agree with that because I'm

16   not certain in my own mind that they were listed as

17   comorbidities.

18        Q.   Do you agree with me that a company making a

19   pelvic organ prolapse medical device should consider those

20   issues and incorporate them into the design, if possible?

21                  MR. DAVIS:  Object to the form.

22        A.   May I correct something I've said previously?

23   BY MR. WALLACE:

24        Q.   If that answers my question, go ahead.
```

Elaine Duncan

```
1            A.   Just give me a second.

2                 The multiple vaginal births, you've mentioned

3    those.  When you asked me that question, I was thinking in

4    terms of births after they received the mesh, not before

5    the mesh.  So that's what I am trying to clarify in my

6    mind with respect to the question had they, not -- not

7    would they after.  When you said it, you said "would

8    they," and I was thinking in terms of that's perfect --

9    that's a future perfect verb, so I was thinking of in

10   terms of would they have those births after they got the

11   mesh.

12                Now that you put it in the context of the

13   comorbidity question, I understand you were asking would

14   those women have had, previous to their surgery, multiple

15   vaginal births, and now I understand your question.

16           Q.   Okay.  And just to be clear, I said earlier,

17   prior to the implant.  So all of these things, like prior

18   pelvic surgery --

19           A.   The first time you asked it --

20           Q.   Let me finish my -- we're going to step all

21   over each other's toes if you keep doing that.

22           A.   Sorry.

23           Q.   My point is, all of these things, women were

24   going to go -- did Ethicon know that women were going to
```

Elaine Duncan

```
 1   be obese, have prior pelvic surgeries and multiple vaginal

 2   deliveries and prior pelvic trauma prior to the implant?

 3   That's what I was getting at.

 4              Now, with that in mind, do you agree with me

 5   that a responsible device manufacturer should take those

 6   prior conditions or events into account when designing the

 7   product?

 8        A.   Yes.

 9        Q.   What documents, when you say that their design

10   was thorough, what documents or evidence do you have to

11   show me that Ethicon considered those events or issues

12   that I've just described?

13        A.   I brought these along.  Would you like for me

14   to --

15        Q.   If you need to consult them, go ahead.

16        A.   Okay.  Just a minute.

17        Q.   I'm sorry, go ahead.

18              MR. DAVIS:  She wants me to pull up the

19   complete document.

20        A.   Because of their size, we didn't print the

21   full documents for both of these, but this is my footnote

22   for the Prolift and for the technical documentation --

23   design development, I should say, documentation, and then

24   this is the technical file document.
```

Elaine Duncan

```
1   BY MR. WALLACE:

2        Q.   And you think that, with respect to the

3   Prolift file, that the documents you're showing me would

4   demonstrate that Ethicon considered the multiple vaginal

5   deliveries, the prior pelvic surgery, the pelvic trauma in

6   its design and addressed it if at all possible?

7        A.   If it -- if the documents aren't specifically

8   in this document, they're referenced by this document.

9        Q.   Okay.  And why don't we, to be safe, I'm going

10  to give the court reporter the Bates Number and I'm going

11  to ask her to mark those.

12           So the first document that you've given me is

13  called "Gynecare Product Description Document."  It says

14  page 1 of 11, although I only have one page, and it's

15  ETH-03261; right?

16               MR. DAVIS:  Can I see that?

17  BY MR. WALLACE:

18       Q.   And the second page that you've given is the

19  "Gynecare Prolift Pelvic Floor Repair Systems CE Mark

20  Technical File" dated September 21, 2008,

21  ETH.MESH.06402274; correct?

22       A.   Yes.

23               MR. DAVIS:  But Ed, let me correct one

24  thing.  You said that -- I think you said this document is
```

Elaine Duncan

1    11 pages.  The document on my computer is 4,169 pages.

2                    MR. WALLACE:  All I'm saying is on the

3    right-hand column of the document, it says page 1 of 11.

4    I'm not representing to you something that I can't see.

5    I'm identifying the document for the record.

6                    THE WITNESS:  Okay.  So that's not the

7    full size of the document.

8    BY MR. WALLACE:

9         Q.  So you're pointing me to the Prolift technical

10   file; right?

11        A.  The second one is the Prolift technical file.

12        Q.  And what else are you pointing to me that's

13   4,000 pages long?

14        A.  Actually, you'll see if you look at that first

15   page --

16        Q.  Let me ask the question.

17        A.  Yes.

18                    MR. DAVIS:  She said it was Footnote 21,

19   I think.

20                    MR. WALLACE:  Okay.

21        A.  Yes, and this number, right there at the

22   bottom, the ETH number, in my footnote is 950, not 951,

23   and so the first page was not printed, and that's probably

24   why you're not seeing the full size of the document.

Elaine Duncan

```
 1   BY MR. WALLACE:

 2        Q.   In the interest of not belaboring the point,

 3   the bottom line is you're telling me that in Footnote 21

 4   in the document of which you don't have a full copy of,

 5   Footnote 21, Ethicon considered the -- Ethicon considered

 6   the issues that I raised earlier, which included multiple

 7   vaginal deliveries, prior pelvic surgery and the like;

 8   correct?

 9        A.   That one, plus the other one that you -- this

10   one plus this is the technical file on the same topic, and

11   this is --

12        Q.   Can we mark this?

13        A.   Uh-huh (affirmative).

14             (Whereupon, Exhibit 4 was marked.)

15             THE WITNESS:  It's actually Footnote 22

16   because this one was with the Prolift M.

17             MR. WALLACE:  Can you mark that one, as

18   well?

19             (Whereupon, Exhibit 5 was marked.)

20   BY MR. WALLACE:

21        Q.   Can I dumb this down for me?

22             What you're telling me is that in Footnote

23   22 --

24        A.   21 and 22.
```

Elaine Duncan

```
1           Q.    -- Footnote 21 and 22, Ethicon considered the
2   issues that the women had prior to the implant; correct?
3           A.    As I said previously, yes, they are in this
4   document or referenced by this document.  They may not be
5   included in this document per se, but in this document,
6   they have referenced it.
7           Q.    Okay.  In other words, even though they only
8   may be referencing the issue, in fact, you believe that
9   Ethicon considered those issues and incorporated them into
10  the design-planning process of the Prolift, Prolift+M and
11  Prosima; right?
12          A.    Yes, sir, I do.
13          Q.    Thank you.  And for example -- let me just
14  move on.
15               If you're implanting a medical device in a
16  space that needs to be elastic, like the vaginal space,
17  you want to figure that out in the design phase; right?
18          A.    Elastic?  Can you elaborate?  I didn't
19  understand.
20          Q.    Expand.  You would agree with me that the
21  vaginal space is a dynamic space that is not static; in
22  fact, it expands and contracts?
23          A.    Sir, I can't agree with you.  I don't have
24  expertise in that area.
```

Elaine Duncan

```
1           Q.   Okay.  Let's assume that I'm correct then.

2    You're an expert designated to testify, so I'm going to

3    use a hypothetical with you; okay?

4                Let's assume that I'm correct -- let me back

5    up for a second.

6                You don't know whether or not the vaginal

7    space expands and contracts?

8           A.   No, sir, I was not saying that.  I was saying

9    no to your previous question.

10          Q.   Okay.  Let me ask you this.

11               Do you know whether or not the vaginal space

12   expands and contracts?

13          A.   Yes, sir.

14          Q.   And you would agree with me that that would

15   include the area in which these devices are implanted?

16          A.   I cannot answer that question because it's --

17   there's a premise there that I would disagree with.

18          Q.   Tell me what you disagree with.

19          A.   I don't believe these materials are implanted

20   in the vaginal space.  It's not inside the vagina.

21          Q.   Do you believe that they're implanted in an

22   area that requires elasticity?

23          A.   I do not know that.

24          Q.   Okay.  Have you reviewed the instructions for
```

Elaine Duncan

```
1    use in this case?

2         A.   Yes, I have.

3         Q.   And you would agree with me, then, that it

4    talks about bidirectional elasticity as one of the

5    benefits of the devices; correct?

6         A.   As -- excuse me for -- I'm trying to say yes

7    or no, but I can't, because my understanding, again, is

8    that that doesn't require the mesh to be elastic; it's

9    part of the surgical procedure that allows the material to

10   be elastic.

11            Oh, were you speaking of Prolift M?  You got

12   that file out just now.  See, your -- you confused me with

13   these questions because you're not specific to the

14   products.

15        Q.   There's three products at issue; the Prolift,

16   the Prolift M and Prosima.

17        A.   Yes, and they're not the same type of

18   materials, so you have to be specific, please, when you

19   ask me a question.

20            Which one are we speaking of?

21        Q.   I'll be as specific as I need to be.

22        A.   All right.

23        Q.   And if you're confused by the question, I'd

24   like you to tell me that you are.
```

Elaine Duncan

```
 1          A.   I did.

 2          Q.   So you, regardless of whether it's the

 3  Prolift, the Prolift+M or the Prosima, do you believe that

 4  Ethicon thought the elasticity of those devices was

 5  important to their function?

 6                    MR. DAVIS:  Object to the form.

 7          A.   Sir, I cannot answer that question.

 8  BY MR. WALLACE:

 9          Q.   Why not?

10          A.   Because I do not know what they believed at

11  the time.

12          Q.   Well, you've reviewed documents that speak to

13  elasticity; right?

14          A.   Yes, with respect to the Prolift M, that

15  material changed its properties over time.

16          Q.   Well --

17          A.   Is that what you mean by elastic?  Could you

18  show me in the labeling what you're talking about because

19  I don't know.  Elastic means a lot of things to different

20  people.  What specific things are you speaking of?

21          Q.   Do you believe that any of these -- the three

22  devices that we're talking about -- the Prolift, the

23  Prolift+M or the Prosima -- needed to be flexible at all

24  in the human body?
```

Elaine Duncan

```
1          A.   Yes, sir, now you've used the word "flexible,"

2    and "elastic" and "flexible" are different for me.

3          Q.   Can you just answer my question?

4          A.   Sir, I just said yes.

5          Q.   My name is Ed.  You don't need to call me

6    "sir."  I appreciate the courtesy, but the bottom line

7    is -- let me just ask the question and you answer, okay,

8    as you need to.  Let's stay on the question that I asked.

9               Do you believe that Ethicon thought it

10   important that the Prolift, the Prolift+M and the Prosima

11   be flexible inside the human body; yes or no?

12         A.   Flexible during delivery and placement, yes.

13         Q.   What about afterwards?

14         A.   The mesh is ingrown and will not remain

15   flexible, so they would not have believed it should stay

16   flexible or elastic over time, but it needs to be that for

17   presentation.

18         Q.   In other words, you believe that once the

19   tissue ingrowth occurred, there was no more reason for the

20   mesh to be flexible according to Ethicon; right?

21         A.   Sir, when you added "according to Ethicon," I

22   cannot recall specifically how they expressed it, but it

23   is my understanding that when the mesh is ingrown, the

24   physical properties change and flexibility is no longer an
```

Elaine Duncan

1    attribute of concern.

2         Q.   And it's your understanding that if the mesh

3    is stiff after ingrowth, it is not a concern; right?

4         A.   I would say I don't know how to answer your

5    question.  They attempted to design Prolift M as an

6    alternative, and I do not have knowledge to tell you from

7    a biomaterials point of view if that was successful.  It's

8    not my expertise.

9         Q.   Do you think that you have an obligation as an

10   expert that is testifying in this case to have an

11   understanding of what design attributes Ethicon thought

12   were relevant?

13        A.   Yes, sir, I can tell you that looking at the

14   reports, if you would like for me to go back to those

15   reports.  We're talking about three different products

16   here, and so if you want to speak to each one of those, I

17   will try to answer each one of them.  They had different

18   attributes, particularly Prolift M, that they were trying

19   to design for.  Prolift M had a portion that was

20   absorbable, which changed its properties after

21   implantation.  So when you try to put all three of these

22   products together, I have a hard time trying to answer one

23   question yes or no.

24                  MR. WALLACE:  Let's go off for two

Elaine Duncan

```
 1   minutes.

 2                    (Whereupon, a recess was taken from

 3                    11:13 a.m. to 11:19 a.m.)

 4   BY MR. WALLACE:

 5        Q.   You want to clarify an answer?

 6        A.   Yes.

 7        Q.   Go ahead.

 8        A.   Previously we were talking about "elastic"

 9   versus "flexible," two different words.  In the

10   development of the Soft PROLENE Mesh, the team sought for

11   Soft PROLENE Mesh, for it to be more flexible than the

12   prior PROLENE mesh, and that was -- so yes is the answer

13   to the "flexible" question.

14                    Also, then, these two footnotes, I already

15   gave you 22, but additional Footnote 23 covers the

16   Prolift M development, which was the portion that is

17   absorbable, that changes its properties after implant;

18   okay?  That's what I was trying to clarify.

19        Q.   Thank you for clarifying that, and if I

20   understand you correctly, you've now pointed to

21   Footnotes 21, 22 and 23 --

22        A.   Yes, sir.

23        Q.   -- as the evidence that you looked at and

24   reviewed and concluded that Ethicon considered the issues
```

Elaine Duncan

1    that women had prior to implant, which included, for

2    example, prior vaginal deliveries, prior pelvic surgery

3    and the like; correct?

4         A.   That's correct.

5         Q.   Okay.  And it would be that -- and I would

6    assume that it would be the same thing for a hysterectomy;

7    that you would point to the same footnotes that Ethicon

8    considered that some of the women that would be receiving

9    this device would be -- either have had a hysterectomy or

10   would be concurrently receiving a hysterectomy with the

11   implant of the device?

12        A.   I believe that was considered, yes.

13        Q.   And it was considered in the design, and you

14   would point me to your report and, more specifically, you

15   believe, as you sit here today, that it's included in

16   those three footnotes?

17        A.   But it was also included in CER reports and --

18   that came subsequent, and I believe this particular

19   reference is an early technical file, Number 22.

20        Q.   And you've pointed out correctly that the

21   Prosima+M (sic) has a partially absorbable mesh?

22        A.   Yes, sir.

23        Q.   So you would agree with me the three

24   devices -- the Prolift, the Prolift+M and the Prosima --

Elaine Duncan

```
1   are all different devices?

2        A.   No, sir, they're not altogether totally

3   different.

4        Q.   I didn't say altogether totally different.

5   They may share some similarities; correct?

6        A.   They share similarities.

7        Q.   They all are designed to treat pelvic organ

8   prolapse?

9        A.   Yes, sir.

10       Q.   But at the end of the day, they were all

11  cleared as different products?

12       A.   They were cleared separately, yes.

13       Q.   Okay.  And you would agree with me that

14  they're different devices?

15       A.   They're different kits.

16       Q.   And they're -- they use different materials,

17  for example?

18       A.   Well, the Prolift M is different, but the

19  other -- others are the same.

20       Q.   You believe that the Prosima is identical to

21  the Prolift?

22       A.   The mesh is identical with the exception of

23  the manufacturing modifications.

24       Q.   Do you believe -- you would agree with me that
```

Elaine Duncan

```
 1    those three devices present different risk?

 2          A.   I would agree that they present different

 3    risks from the different surgeries, yes.

 4          Q.   And you would agree with me that they are

 5    different in the sense that their properties change over

 6    time?

 7          A.   I have difficulty with the underlying premise

 8    of that question.  I can't answer it.

 9          Q.   Let me ask it a different way.

10          The Prolift+M is different materially from the

11    Prolift; correct?

12          A.   It has a -- a single different material added.

13          Q.   And you would agree with me that, because of

14    that, the varying properties change differently over time

15    between the Prolift+M and the Prolift?

16          A.   Could you rephrase that?  I'm sorry, I

17    couldn't hear you.

18                    MR. WALLACE:  Could you read it back,

19    please?

20                    (The record was read back.)

21          A.   Prolift+M varies from the others, yes.

22    BY MR. WALLACE:

23          Q.   Okay.  The -- let's move on.

24          You would agree with me that the instructions
```

Elaine Duncan

1   for use is designed to communicate with an implanting

2   physician; right?

3          A.   Yes, sir.

4          Q.   And one of the things that the IFU is designed

5   to do is to make physicians aware of certain complications

6   that might come with the implant of the device, whether

7   through surgery or long-term; right?

8          A.   Yes, sir.

9          Q.   So the company uses the instructions for use

10  to warn of risk?

11         A.   That's one.

12         Q.   And you would agree with me that if Ethicon,

13  for example, knew about certain risks that came with the

14  device before launch, that -- that they should put it on

15  the instructions for use?

16              MR. DAVIS:   Object to the form.

17         A.   If they knew -- I'm just rephrasing that

18  question.

19              If they knew in advance of certain risks, they

20  should put it on the instructions, yes.

21  BY MR. WALLACE:

22         Q.   Okay.  And you would agree with me that they

23  should do that before the product is released to the

24  market if they hadn't -- (inaudible); right?

Elaine Duncan

```
1           A.   You dropped your voice.  I couldn't -- can

2   you --

3           Q.   I'll speak up for you.  Why don't I withdraw

4   the question.  I'll ask it again.

5           A.   Okay.

6           Q.   Actually, let's do something different.  Why

7   don't you take a peek at this next exhibit?

8                     (Whereupon, Exhibit 6 was marked.)

9   BY MR. WALLACE:

10          Q.   You've seen Exhibit 6 before; right?

11          A.   It's familiar, but I need to refresh on it.

12  Is that all right?

13          Q.   Go ahead.

14                    MR. DAVIS:  You don't have an extra

15  copy; do you?

16                    MR. WALLACE:  I thought I gave you one

17  (handing).

18                    MR. DAVIS:  Thanks.

19  BY MR. WALLACE:

20          Q.   I have some very specific questions about that

21  document, Ms. Duncan.

22          A.   Okay.

23          Q.   One is, you've seen this before?

24          A.   Yes.
```

Elaine Duncan

1          Q.   And you would agree with me that it is an

2    early design concept document that was created by Ethicon

3    with respect to its -- what became its Prolift devices;

4    right?

5          A.   Yes.

6          Q.   And would you agree with me that it

7    discusses -- it discusses some of the concepts and ideas

8    that the company had about these devices?

9          A.   It appears so, yes, sir.

10         Q.   And this is a -- a document that's commonly

11   prepared at the beginning of the design of the document;

12   right?

13         A.   It is, yes.

14         Q.   And it lays out the company's vision for what

15   it wants to achieve and the market that it wants to

16   address; right?

17              MR. DAVIS:   Object to the form.

18         A.   At an early feasibility level; correct.

19   BY MR. WALLACE:

20         Q.   So in other words, it might look at what it

21   believes the unmet needs are in the market; right?

22         A.   Typically.  I don't -- I haven't had a chance

23   to confirm that this does, yes, but go ahead.

24         Q.   You would agree with me that it can,

Elaine Duncan

1    oftentimes, in the concept phase, which is addressed in

2    Exhibit 6 also address an early idea what the financial

3    commitment of the company might be to the project?

4         A.   Often at this level, yes.

5         Q.   All right.  And you would agree with me that

6    you do see that Ethicon in that document, Exhibit 6,

7    discussed what it believed were the unmet needs in the

8    market?

9         A.   Yes, sir, it does.

10        Q.   And it has some early design drawings; right?

11        A.   Yes.

12        Q.   And you would agree with me that the document

13   is dated June 27, 2003, which is before the launch of the

14   devices, the Prolift devices that we're talking about

15   today; right?

16        A.   Sir, I don't recall the date of the launch.

17   I'll take your word for it.

18        Q.   Look at page 6 of the document, the unmet

19   needs.

20        A.   Yes, sir, I'm looking at that.

21        Q.   And you'll see that the company expressed an

22   unmet need that they wanted to come up with a standardized

23   procedure which had a consistently low complication rate.

24        A.   Yes, sir.

Elaine Duncan

```
 1          Q.   Do you see that?

 2          A.   Yes.

 3          Q.   And you would agree with me that that was a

 4   goal of the company; right?

 5          A.   Yes, sir.

 6          Q.   Would you please look at page 9?  You'll see a

 7   diagram on page 9, which talks about the concept

 8   progression.

 9               Do you see that?

10          A.   Yes.

11          Q.   And you would agree with me that that

12   generally describes how Ethicon was going to come up with

13   the concept; in other words, they were going to work with

14   key opinion leaders in France to come up with the

15   feasibility of the Prolift, which would ultimately result

16   in the design of the product?

17          A.   That's my recall, as well, from reading, yes.

18          Q.   And you actually have seen other documents

19   that tell that story; right?

20          A.   Yes, sir.

21          Q.   If you look at page 16, it describes the

22   anterior TVM procedure.

23          A.   16?

24          Q.   16, please.  And at the bottom, it talks about
```

Elaine Duncan

```
 1   some of the advantages that the company would like to have

 2   with the anterior TVM procedure.

 3              Do you see that?

 4        A.   Yes.

 5        Q.   And just to take a step back for a moment to

 6   orient ourselves with respect to the Prolift device,

 7   there's the anterior, posterior and total Prolift devices;

 8   right?

 9        A.   Yes.

10        Q.   And you know by looking at this document that

11   the company was considering, already, the anterior in

12   2003, and that's what this page 16 we're looking at?

13        A.   That's what we're looking at, yes, sir.

14        Q.   So we are on the same page?

15        A.   Yes, sir.

16        Q.   And one of the things they wanted with the

17   anterior was to promote a consistent repair and reduce

18   operative time; correct?

19        A.   Yes.

20        Q.   That was a goal of the company?

21        A.   It says the advantages of this approach would

22   be to do that.

23        Q.   In other words, if the anterior was developed,

24   that's an advantage that they wanted the anterior Prolift
```

Elaine Duncan

```
 1   to have; correct?

 2         A.   That would be an advantage if they followed

 3   this path, yes.

 4         Q.   Look at page 31 which lists manpower.

 5              Do you know, by looking at page 31 and also

 6   all the thousands of pages of documents that you've looked

 7   at, that Scott Ciarrocca was the project leader for the

 8   Prolift device?

 9              Do you see his name there?

10         A.   Yes.

11         Q.   And it's common in the concept design phase to

12   list who might be on the team that's ultimately going to

13   develop this device in the company; right?

14         A.   I believe, sir, this is referring only to the

15   feasibility phase.

16         Q.   Correct.  But you would also agree with me

17   that Scott Ciarrocca became the project leader for the

18   Prolift; right?

19         A.   I recall that from my reading.

20         Q.   If you look at the next page, the concept that

21   Ethicon expressed in 2003 was that this product would be,

22   from the feasibility stage to the product launch phase,

23   take about one year?

24         A.   Yes.
```

Elaine Duncan

1         Q.   And in order to come up with the idea that

2    this was going to be launched in one year, the company had

3    to make certain assumptions about the project; right?

4         A.   That's typical.  I don't know what their

5    assumptions were off the top of my head, yes.

6         Q.   Well, why don't -- you've actually,

7    fortuitously, flipped right to the page I was going to

8    direct you to.

9         A.   Okay.  Thank you.

10        Q.   Page 34.

11        A.   Okay.

12        Q.   You would agree with me that the company

13   listed, on page 34 of Exhibit 6, its critical assumptions

14   about the project; right?

15        A.   Yes.

16        Q.   And the top two were that, one, the device was

17   going to be cleared through the 510(k) system; right?

18        A.   Yes.

19        Q.   And that ultimately happened?

20        A.   Yes.

21        Q.   And that the devices would be CE marked at

22   initial offering, and that actually happened?

23        A.   It's my recall, yes.

24        Q.   And the third thing is that there would be

Elaine Duncan

```
 1   clinical trial of implants with six-month follow-up would

 2   be sufficient to support a launch; correct?

 3          A.   That's what they have here, yes.

 4          Q.   Okay.  Do you know, as you sit here today,

 5   whether or not that actually happened?

 6          A.   I'm going to try to recall, but I would like

 7   the opportunity to check my notes on this.  It's my recall

 8   that -- you see, we've got three different products here,

 9   so my recall, that one of these did not go through a

10   conventional clinical trial but relied on the clinical

11   history from the French physicians.  That's my recall.

12          Q.   And the assumptions that were being made were

13   about the project and how this was going to hit the

14   market; right?

15          A.   This is the assumptions in that plan, yes.

16          Q.   And if you look at the next page, the critical

17   assumptions that were being made were about the

18   performance of the product itself.  In fact, it says that

19   at the top of the page; right?

20          A.   Yes.

21          Q.   And so that's what the company was considering

22   were critical about how the product was going to perform?

23          A.   Right.

24          Q.   And there are six bullet points that the
```

Elaine Duncan

```
1   company considered critical about the products'

2   performance; right?

3        A.   It's -- it's what it says here, yes.

4        Q.   And looking at the bullet point, it says,

5   "Creates no additional problems possible with needle

6   passage through obturator foramen."

7        A.   "That's what it says, yes.

8        Q.   In other words, the company found it critical

9   with respect to the product that there would be no

10  additional problems possible with needle -- needle passage

11  through that space?

12       A.   Yes, sir.

13       Q.   The transobturator space?

14       A.   Yes.

15       Q.   And you believe that the company considered

16  and addressed that critical assumption; right?

17       A.   Yes.  Yes.

18       Q.   And that's your opinion that you're stating as

19  an expert in this case?

20       A.   I believe they did, yes.

21       Q.   And the next bullet point says, "Creates no

22  additional complications (erosion, pain)."

23            Do you see that?

24       A.   Yes.
```

Elaine Duncan

```
 1          Q.   And you would agree with me that it's your

 2   expert opinion that the company, in fact, assumed that as

 3   a critical assumption about their products at issue in

 4   Exhibit 6, and that it's your expert opinion in these

 5   cases that, in fact, Ethicon considered them and that the

 6   products, themselves, created no additional complications;

 7   correct?

 8          A.   Yes, I -- with the caveat that, as I

 9   understand this statement, their meaning creates no

10   additional complications like the other complications that

11   have already been identified, not -- not that they're

12   saying you can't have erosion or pain; they're speaking of

13   no additional complications beyond the known

14   complications.  That's my interpretation of that bullet.

15   I just want to clarify that.

16          Q.   Let's look at page 37, which is a risk

17   assessment.

18                    MR. DAVIS:  Object to the form.

19   BY MR. WALLACE:

20          Q.   It says "Risk Assessment" at the top of the

21   page; correct?

22          A.   It says it, but -- yes.

23          Q.   And you would -- we would agree that this is

24   not a full-blown risk analysis that the company conducted
```

Elaine Duncan

```
1    on page 37, but rather, it captures what the company felt

2    important, the project team at that time felt important

3    about the concept of this device as it related to risk;

4    right?

5         A.   I would agree it's a summary.

6         Q.   And it's an early assessment?

7         A.   Yes, sir.

8         Q.   And it's what they're identifying as important

9    early on in summarizing that; right?

10        A.   Yes.

11        Q.   And you know that, at this time, they were

12   working with these French physicians and, in fact, one of

13   the risks that they point out on page 37 is that the work

14   by this French group, that one of the risks is that the

15   product that they're coming up with may not be a less

16   traumatic transvaginal approach to pelvic floor repair;

17   right?

18        A.   No, sir.  I don't follow your -- your

19   conclusion from that.  Can you --

20        Q.   Well, what do you think you're seeing?

21        A.   What line are you looking at?

22        Q.   Looking at the first box under "Risk."

23        A.   Yes.

24        Q.   It says, "Kit and procedure as outlined by
```

Elaine Duncan

```
1    French group TVM does not address the need for a

2    standardized product for less traumatic, transvaginal

3    approach to pelvic floor repair."

4              Do you see that?

5         A.   Oh, I understand now, yes.

6         Q.   Okay.  So you agree with me that one of the

7    risks was that the French group's product would actually

8    be more traumatic?

9                   MR. DAVIS:  Object to the form.

10        A.   That's not the way I interpret it.

11   BY MR. WALLACE:

12        Q.   How do you interpret it?

13        A.   I interpret it as it would not meet that need.

14   This risk assessment is also in the context of success of

15   the project, so what they're saying is the risk is what

16   they are proposing does not address the need, not that it

17   would be more traumatic.  It says it doesn't address the

18   need, and in that circumstance, the impact on the project

19   would be that you would go back to the concept stage or

20   you would have a delayed launch.  This is not a risk

21   assessment from a patient point of view; this is a risk

22   assessment from a project point of view.

23        Q.   In other words, that the project may not do

24   what it's supposed to do?
```

Elaine Duncan

1           A.   The impact on the project would be that it

2    might have to go back to the concept stage or they may

3    have to have more resources, they would delay the launch,

4    or they could re-evaluate the project altogether.

5    That's -- that's what this risk assessment is describing.

6           Q.   And one that does actually address the patient

7    is that there would be erosion and recurrences due to mesh

8    used and if, in fact, that became a problem, they would

9    try to mitigate that by monitoring the patients in the

10   studies; right?

11                MR. DAVIS:   Object to the form.

12   BY MR. WALLACE:

13          Q.   Do you see that?

14          A.   It's a mitigation strategy for the project,

15   yes.

16          Q.   And that if -- and its potential impact, if

17   that was the case, they would need to go back in the

18   concept stage, delay launch and increase resources; right?

19          A.   Yes, sir.   That's what it says.

20          Q.   And the final thing that I'll point you to on

21   that page, it says one of the risks is that their approach

22   creates an additional risk by the obturator passage.

23                Do you see that?

24          A.   That's the risk that they're identifying, yes,

Elaine Duncan

1    but the design could do that, yes.

2         Q.   And that if there was additional risk that was

3    presented that, in fact, the company would have to -- need

4    to go back into the concept stage, delay launch and

5    increase the resources; right?

6         A.   That's possible, yes.

7         Q.   And we know that by looking at that, but we

8    also know that, by looking at what I showed you earlier on

9    page 35, where one of their critical assumptions was that

10   they wanted to create no additional problems with the

11   transobturator approach; right?

12        A.   That's correct.

13        Q.   And we know that --

14        A.   But may I correct you just a moment -- or not

15   correct you, but correct my statement, excuse me?

16             I also see that they had identified needle

17   passage as an existing risk, that that has always been for

18   all of these products that's been a known risk, but this

19   specific design is what they're speaking of here.

20        Q.   In other words, that the specific design at

21   issue created no additional risk?

22        A.   That's right.

23        Q.   So in other words, if a product had poorer

24   outcomes --

Elaine Duncan

```
1        A.   Yes.

2        Q.   -- with respect to the use of the

3   transobturator space, that that would be something that is

4   an additional risk that would require the company to go

5   back to the concept stage and delay launch; correct?

6        A.   I believe that's true, which is why they

7   worked hard on that aspect, yes.

8        Q.   Right.  And in your words, they did a very

9   thorough job assessing those additional risks?

10        A.   I believe they did, yes.

11        Q.   And as part of that -- and I don't want to

12   spend too much time on you and I trying to figure out how

13   these products work, but wouldn't you agree that the total

14   Prolift kit uses six arms of mesh that are anchored?

15        A.   That's my understanding, yes.

16        Q.   Okay.  And the posterior uses four; right?

17        A.   Yes, sir.

18        Q.   And the anterior uses two arms as anchors?

19        A.   Yes.

20        Q.   And if we needed to, we could look at

21   pictures, but you generally agree with me; right?

22        A.   I'm good with that, yes.

23        Q.   And that these arms and the passages were in

24   the obturator space; correct?
```

Elaine Duncan

```
1          A.   Yes.

2          Q.   And the design of these arms was to anchor

3    themselves through tissue ingrowth in those spaces?

4          A.   Yes, sir.

5          Q.   Speaking of Scott Ciarrocca -- I pronounced

6    that correct; didn't I?

7          A.   I wouldn't know; I've not heard it pronounced.

8          Q.   He was one of the employees of Ethicon that

9    worked on the failure modes and effects analysis that were

10   done with respect to the three products that we've been

11   talking about?

12         A.   It's my recall, yes.

13         Q.   And in other words, Scott and his team -- it

14   wasn't him alone -- prepared paperwork relating to how the

15   instruments might be used or misused; right?

16         A.   Yes.

17         Q.   Okay.  And they looked at potential ways that

18   the safety of the patient may be affected?

19         A.   It's my recall.

20         Q.   And they tried to document the ways in which

21   patient safety may be impacted by the implant of these

22   products in the Prolift and the Prolift+M; correct?

23         A.   They were done in different phases on

24   different documents.
```

Elaine Duncan

```
1            Q.   Was it -- was their work done just to get the

2   product cleared, or were they actually concerning

3   themselves with the safety of the device, as well?

4            A.   Sir, it's my recall that these -- the team was

5   very focused on the instrumentation because the material

6   had already been established in this clinical indication.

7   The -- the Prolift and then, later, the Prosima, were

8   focused to the delivery system for the existing Soft Mesh.

9   That's my interpretation of the projects, as I read them.

10           Q.   Okay.  But I just asked whether or not they

11  wanted to get the product cleared or whether or not the

12  project team for the Prolift, for example, was concerned

13  with safety.

14           A.   I believe they were concerned with the safety,

15  which is why they were developing the instrumentation,

16  yes.

17           Q.   And so, with respect to the instrumentation,

18  you're talking about the trocars themselves?

19           A.   Yes, and the delivery procedure.  The

20  instruments would have to have a surgical procedure

21  described with them, and they did it at work with the

22  physicians.

23           Q.   And you would agree with me, as a biomedical

24  engineer, that when you're describing the procedure and
```

Elaine Duncan

```
1    the way it's done and invented by the company, that that's

2    actually part of the product's design itself; right?

3         A.   Agreed.

4         Q.   And what you're saying is the company had an

5    obligation to satisfy itself that its delivery system,

6    which was part of the design of the product, had to be

7    safe?

8         A.   Yes, sir.

9         Q.   Do you agree with me that the company had an

10   obligation to look at whether or not the implementation of

11   additional mesh by using the Prolift device would equal

12   more safety complications for the patient?

13        A.   I have to have you repeat that.

14        Q.   Let me ask it more simply.

15             Do you believe that the company had an

16   obligation to look at the amount of mesh that it was

17   putting in women and determine whether or not putting more

18   mesh in a woman would potentially create more risk?

19             MR. DAVIS:  Object to the form.

20        A.   My answer is no, and the reason is because

21   it's my understanding that the procedure kit did not, in

22   and of itself, add more mesh because the amount of mesh

23   for each of these procedures was already established by

24   the physicians who were putting the mesh in without the
```

Elaine Duncan

1    kits, that the amount of mesh had already become an

2    understood requirement because the Soft Mesh was already

3    used in this indication for use prior to the creation of

4    the kits.

5              So that's why I have to say no; because I'm

6    saying I don't believe that they were increasing, as

7    you've put it, the amount of mesh.  The amount of mesh was

8    already established by the procedure created by the

9    physicians before the kit ever came along.  That's my

10   understanding of the development project.

11   BY MR. WALLACE:

12        Q.   And you believe that based upon Ethicon

13   documents that you've seen?

14        A.   That was the end of your question?

15        Q.   (Nodding head.)

16        A.   Yes.

17        Q.   So in other words, what you're saying is

18   Ethicon didn't have to assess the risk of the amount of

19   mesh it was putting inside of women because a similar

20   amount of mesh was already being used by physicians

21   anyways?

22        A.   Yes, sir, because you said "more," so I don't

23   believe there was more created by Prolift or Prosima.

24        Q.   Do you think that the mesh was being put in a

Elaine Duncan

```
 1   different area and the company had an obligation to assess

 2   how that amount of mesh in a different area would affect

 3   the safety of the patient?

 4        A.   The mesh was already cleared for that

 5   indicated use.  The kit came along to establish a

 6   standardized procedure, but the mesh was already cleared,

 7   both in the CE in Europe and in the U.S. for that

 8   indicated use.

 9        Q.   What indicated use?

10        A.   Pelvic floor repair.

11        Q.   Okay.  You realize that the Prolift device

12   was, for the first time for pelvic organ prolapse, being

13   put in an entirely new area called the transobturator

14   space, the obturator foramen?

15        A.   Yes, sir, but not --

16        Q.   The company itself --

17        A.   Wait, wait, wait.  No.

18             MR. DAVIS:  Let her finish her answer.

19        A.   Excuse me, the kit enabled that, but it had

20   already been done.

21   BY MR. WALLACE:

22        Q.   Sure of that?

23        A.   I would have to confirm that with my notes,

24   but I -- my -- my footnotes, but I believe that that had
```

Elaine Duncan

```
 1    already been described in the literature.  That was a part

 2    of their review.

 3         Q.   You would agree with me that the document that

 4    we just looked at assessed additional risk in the

 5    transobturator space.  That's one of the things that the

 6    company wanted to address; correct -- right there

 7    (pointing)?

 8         A.   Yes.

 9         Q.   One of the ways in which to seek feedback on

10    how a product might be performing early on is to just seek

11    out physicians' opinions on it; right?

12         A.   You dropped your voice again, sorry.

13         Q.   One of the things that the company might be

14    able to do and, in fact, did do, was seek out the opinion

15    on physicians on how their product was performing?

16         A.   Yes, sir.

17         Q.   And you would agree with me that you've seen

18    documents where French physicians that had this product

19    before it was released to sale in the United States

20    expressed their opinions about how the product was

21    performing; right?

22         A.   They have, yes.

23         Q.   And you would agree with me that this was a

24    novel product; right?
```

Elaine Duncan

```
1          A.   A what?

2          Q.   That this was a novel product?

3                    MR. DAVIS:  Object to the form.

4          A.   The instrumentation kit was new, but the

5     surgery was not new.

6     BY MR. WALLACE:

7          Q.   Was the design of the mesh new?

8          A.   There were new attributes to make it work with

9     the kit, yes, sir.

10         Q.   Like what?

11         A.   Folding and attachments.

12         Q.   More arms?

13         A.   More arms.  It was pre-cut because, prior to

14    the kit, the mesh was not pre-cut, is my recall.

15         Q.   In other words, the -- while you believe that

16    the mesh properties were made of the PROLENE --

17         A.   Soft Mesh.

18         Q.   -- Soft Mesh, that, in fact, you would agree

19    with me that the design of the Prolift mesh, itself, in

20    terms of its shape and size was new?

21         A.   It was pre-shaped and sized in the kit, yes,

22    sir.

23         Q.   Was it new --

24         A.   I --
```

Elaine Duncan

 1          Q.   -- or not?  I mean -- get an answer to my

 2  questions.

 3          A.   The material had not been sold previously

 4  pre-cut and set up for the kit; it had been sold as a flat

 5  sheet and altered by the physicians.

 6          Q.   If Ethicon called this a novel product, would

 7  Ethicon be wrong?

 8          A.   Sir, I am a regulatory person, so I look at

 9  similarities and differences, and if the marketing people

10  decide to call it novel, that's another interpretation.  I

11  couldn't speak to that.

12          Q.   So you can't answer the question?

13          A.   I can't answer the question.

14                    (Whereupon, Exhibit 7 was marked.)

15  BY MR. WALLACE:

16          Q.   You'll see Scott Ciarrocca's name at the top

17  of Exhibit 7?

18          A.   Yes.

19          Q.   And this is dated July 21, 2003.

20               Have you seen that?

21          A.   Yes.

22          Q.   And if you look at the prior exhibit,

23  Exhibit 6, it's dated June 27, 2000 --

24          A.   Yes.

Elaine Duncan

```
 1          Q.   And you would agree with me that, at the

 2   bottom of the first page, Scott is asking Professor

 3   Jacquetin and Dr. Cosson questions about how this device

 4   would perform; correct?

 5          A.   Let me read it a moment, if you would please.

 6   He's asking about slippage.

 7          Q.   And Dr. Cosson responds; right?  And he gives

 8   his opinion about the product.  At least in part, he notes

 9   that the problems are more erosion and retraction and that

10   it's possible to have a recurrence but it is usually due

11   to a retraction of the mesh and the arms of the mesh.

12                    MR. DAVIS:  Object to the form.

13   BY MR. WALLACE:

14          Q.   Do you see that?

15          A.   I believe, in the context, he's speaking

16   without the instrumentation.  He's saying this is an issue

17   we have to address.

18          Q.   And he's saying that there's problems with

19   more erosion and retraction; correct?

20                    MR. DAVIS:  Object to the form.

21          A.   If there's slippage of the implant, the

22   problems are more erosion and retraction.

23   BY MR. WALLACE:

24          Q.   Have you read any of the testimony relating to
```

Elaine Duncan

```
 1   this document?

 2         A.   I don't believe I have.

 3         Q.   Yet, you still gave the opinion that Ethicon

 4   was very thorough and considered all of the risk in

 5   designing its document -- or its devices; correct?

 6         A.   I believe they considered this risk, yes.

 7         Q.   But you haven't read any of the testimony

 8   relating to this document?

 9         A.   I read a lot of different testimony.  I can't

10   recall if I read this or not.  I've seen the e-mail, but I

11   can't recall if I read his -- I don't believe I've read

12   his testimony.

13         Q.   And if Ethicon did not address the concerns

14   that were being raised by the French physicians, did it

15   meet or exceed all applicable industry standards, as your

16   opinion states?

17              MR. DAVIS:  Object to the form.

18         A.   There's a presumption there.  I can't answer

19   the question as asked because you're saying they didn't.

20   I don't understand that they didn't.

21   BY MR. WALLACE:

22         Q.   Well, let's assume that they didn't.  Let's

23   assume that there were concerns about more retraction and

24   erosion prior to the product being launched that were
```

Elaine Duncan

1    raised to Ethicon and Ethicon had knowledge of that.

2         A.    You're not speaking of this e-mail anymore,

3    because I don't believe that's what he's trying to say

4    here.

5         Q.    Can you do me a favor?  Can you not interrupt

6    my questions?

7         A.    Sorry.

8         Q.    Let me ask the question.

9         A.    Sorry.

10        Q.    I'm going to go back.  You can put that down.

11        A.    All right.

12        Q.    Maybe that will help.

13             If Ethicon had knowledge that there were

14   problems with more erosion and contraction that presented

15   different risks with respect to these devices before these

16   devices were launched, would Ethicon be failing to meet

17   the standards that applied to them as a reasonable

18   manufacturer of medical devices?

19             MR. DAVIS:  Object to the form.

20        A.    You're speaking hypothetically?

21   BY MR. WALLACE:

22        Q.    Yes.

23        A.    Yes, hypothetically, yes.  I don't believe

24   they had the knowledge you're speaking of.

Elaine Duncan

```
 1          Q.   Well, if they --

 2          A.   Because you said "more."  I don't believe that

 3     they had more -- that there were more erosions and that

 4     they had prior knowledge of more erosions before they put

 5     the product out.

 6          Q.   Let's just talk about risk generally.

 7               Would you agree with me that if they had

 8     knowledge that the Prolift device presented risk of

 9     traumatic injury to the patient that were not identified

10     in the instructions for use and they failed to put that

11     information on the instructions for use that they failed

12     to meet the standards of a reasonable device manufacturer?

13               MR. DAVIS:  Object to the form.

14          A.   All of those "ifs" -- all of those "ifs" would

15     have to be correct, and then I would say yes.

16     BY MR. WALLACE:

17          Q.   You would agree with me if all of those "ifs"

18     were true?

19          A.   If all of those "ifs" were true.

20          Q.   But you don't believe, based upon your review

21     of documents in this case that, in fact, the hypothetical

22     that I gave you is true?

23          A.   I don't believe that it is true.

24          Q.   You have a right to say that.  I said you have
```

Elaine Duncan

```
 1   a right to say that.  That's fine.

 2                    MR. DAVIS:  Let's get to a point where

 3   we can take a short break to stretch my legs.

 4                    MR. WALLACE:  Give me a few minutes.

 5                    (Whereupon, Exhibit 8 was marked.)

 6   BY MR. WALLACE:

 7        Q.    Have you seen this document before?

 8        A.    It's familiar.

 9        Q.    Why don't you look.  It's a two-page document;

10   correct?

11        A.    Yes.

12        Q.    And it's an e-mail from Axel Arnaud to others;

13   right?

14        A.    Yes.

15        Q.    And at the bottom, in 2005, he is saying that

16   he wants to add a warning to the -- to the instructions

17   for use; correct?

18        A.    Let me finish.

19        Q.    Okay.

20        A.    Okay.  I've read it.

21        Q.    Okay.  Thank you.

22                If you go to the second page, you'll see that

23   Axel Arnaud is saying that he wants to add an additional

24   warning to the instructions for use, and I'll state what
```

Elaine Duncan

```
1    it says.  In capital letters, it says, "WARNING."

2              Do you see that?

3         A.   Yes, sir.

4         Q.   It then goes on to say, "Early clinical

5    experience has shown that the use of mesh through a

6    vaginal approach can occasionally/and commonly lead to

7    complications such as vaginal erosion and retraction,

8    which can result in an anatomical distortion of the

9    vaginal cavity that can interfere with sexual

10   intercourse."

11             Do you see that?

12        A.   Yes.

13        Q.   He goes on to say, "Clinical data suggests

14   that the risk of such a complication is increased in the

15   case of associated hysterectomy.  This must be taken into

16   consideration when the procedure is planned in a sexually

17   active woman."

18             Do you see that?

19        A.   Yes.

20        Q.   In other words, what he's saying is if you're

21   going to be sexually active and you're going to get the

22   IFU Prolift, you need to be told it might potentially or

23   occasionally lead to anatomical distortion of your vaginal

24   cavity so much that it could interfere with sexual
```

Elaine Duncan

```
 1   intercourse; right?

 2                 MR. DAVIS:  Object to the form.

 3         A.    Yes.

 4   BY MR. WALLACE:

 5         Q.    That's what he wants to do.

 6                 And Scott Ciarrocca asked Sean O'Bryan and

 7   Charlotte Owens, "Can we do this;" right?

 8                 And they say, "We can change the adverse event

 9   to whatever is most appropriate."

10                 Do you see that?

11         A.    Yes.

12         Q.    So they're saying "We can do it," but Scott

13   says, on January 13, 2005, "We have already printed launch

14   stock.  This would be a next-rev, R-E-V, addition but they

15   want it in there ASAP."

16                 Do you see that?

17         A.    Yes.

18         Q.    You would agree with me that Scott Ciarrocca

19   was a project leader for Prolift?

20         A.    Yes.

21         Q.    And that they've concluded that they can make

22   this change to the IFU; correct?

23                 MR. DAVIS:  Object to the form.

24         A.    Yes.
```

Elaine Duncan

```
1    BY MR. WALLACE:

2         Q.   But Scott decides that they're going to do it

3    next time around; right?

4         A.   I'm not clear what he means by, "But they want

5    it in there ASAP."  I wasn't clear what that particular

6    extra phrase meant.

7         Q.   Did you read his testimony?

8         A.   You've asked me that before, and I don't

9    recall.

10        Q.   Okay.  Do you -- do you know whether or not

11   Ethicon actually ever incorporated what Axel Arnaud wanted

12   in the IFU?

13        A.   Not these exact words, but that's not

14   uncommon.

15        Q.   Do you think that if a medical device company

16   is aware -- well, I've already asked you.

17             Isn't Ethicon failing to meet industry

18   standards when it knows about the risk that's being

19   identified here by one of its own employees and decides

20   that it's not important enough to put in the IFU?

21             MR. DAVIS:  Object to the form.

22        A.   I cannot answer the way you've asked because

23   you said they did not put it in there, and that they

24   didn't want to put it in there.  They did want to put it
```

Elaine Duncan

```
 1    in there.

 2    BY MR. WALLACE:

 3         Q.   But they didn't?

 4         A.   I as a regular --

 5              MR. DAVIS:  Object to form.

 6         A.   Not in these exact words, perhaps, but when a

 7    person proposes wording to go into an instruction for use,

 8    the process for approval and for writing the -- the

 9    information into the IFU has to go through many hands; for

10    example, someone might think it should be a warning,

11    someone else might think it should be a caution, someone

12    else might choose to write it a different way, but it's my

13    understanding that that information is in the instructions

14    for use, and that -- maybe not those exact words and

15    perhaps not as a warning.

16    BY MR. WALLACE:

17         Q.   Where's the debate that -- between the people

18    about whether or not it should be a warning or somewhere

19    else in the instruction for use?

20         A.   Of course it's not in this e-mail.  That takes

21    place in meetings where regulatory people and engineers

22    and physicians all get together and discuss how to word

23    the instructions for use, and he says here -- what you

24    didn't point out was he's talking about it has to be
```

Elaine Duncan

1    consistent with a Gynemesh PS, because as I was talking

2    about before, the material was used in similar procedures

3    so they have to make that similar, and they have to make

4    it similar -- he's talking about it would take to the

5    second rev of Prolift.  No one is saying not to put it in

6    here.

7         Q.   They didn't; did they?

8         A.   Sorry?

9         Q.   They didn't; did they?

10        A.   The exact wording -- sir, I don't recall the

11   exact wording, no.

12        Q.   Would you, if you were a woman getting a

13   Prolift, want to know if your vagina was going to be

14   anatomically distorted?

15        A.   You dropped your voice, I'm sorry.

16        Q.   Would you, as a woman who was going to be

17   possibly receiving the Prolift device, want to know, if

18   you're sexually active, that your vagina might be

19   anatomically distorted?

20             MR. DAVIS:  Object to the form.

21   BY MR. WALLACE:

22        Q.   That's a pretty easy yes-or-no; isn't it?

23        A.   As I understand it, sir, even a hysterectomy

24   can do that, so it's -- the way you've asked the question,

Elaine Duncan

```
 1    I would want to know that a hysterectomy would do that.

 2    Of course I would want to know that, but you're asking it

 3    in a way as if someone is holding that information back

 4    from me, and that's not the case.

 5         Q.   I'm asking you very simply.  I'm not talking

 6    about whether or not you're getting a hysterectomy.  I'm

 7    asking you, if you were sitting down to decide whether or

 8    not you were going to receive the Prolift device and

 9    you're a sexually active woman, would you want to know

10    whether that surgery can lead to complications which can

11    result in an anatomical distortion of the vaginal cavity

12    that can interfere with sexual intercourse.

13            Yes or no?

14         A.   Hypothetically speaking, I would, yes, but I

15    can't say that this statement is a correct wording.

16         Q.   You don't know whether or not, actually, that

17    can happen; right?

18         A.   I didn't say that.  I said I am not qualified

19    to speak to the terminology of the IFU for that particular

20    medical procedure.  Hypothetically, I would like to know

21    about it.

22         Q.   Right.  So if your vagina was going to be

23    permanently destroyed, you would want to know?

24                 MR. DAVIS:  Object to form.
```

Elaine Duncan

```
 1        A.   Permanently destroyed?

 2   BY MR. WALLACE:

 3        Q.   Right.

 4        A.   That certainly is not within the context of

 5   this.  Now you're bringing in something differently --

 6   different.

 7                   MR. WALLACE:  Mark that.

 8                   (Whereupon, Exhibit 9 was marked.)

 9   BY MR. WALLACE:

10        Q.   You've been provided Exhibit 9; is that

11   correct?

12        A.   I recall reading it.

13        Q.   And why did you read it?

14        A.   It was in the materials.

15        Q.   Is it, in fact, what this document -- which is

16   an e-mail exchange between Ethicon employees and a

17   doctor -- pointing out an anatomically distorted vagina?

18        A.   May I read it a moment?

19        Q.   Go ahead.

20        A.   I have to recall.

21                   MR. WALLACE:  Off the record.

22                   (Discussion off the record.)

23   BY MR. WALLACE:

24        Q.   Have you had an opportunity to look at the
```

Elaine Duncan

```
 1   document, Ms. Duncan?

 2        A.   I'm almost finished.

 3             MR. DAVIS:  We're not going off the

 4   record.  You did not allow Anne Wilson to go off the

 5   record.  If she needs to look at the document --

 6             MR. WALLACE:  We're not off the record

 7   right now; we're on the record.

 8             MR. DAVIS:  I'm sorry.  I apologize.  I

 9   thought I heard you tell her we're off the record.  I

10   apologize.

11   BY MR. WALLACE:

12        Q.   Are you done?

13        A.   Yes, sir.

14        Q.   Would you agree with me that the physician

15   that is sending this e-mail to Scott Jones is describing

16   an anatomically distorted vagina?

17        A.   It's what the physician says.

18        Q.   And he's saying that he's currently involved

19   in getting a patient to the OR, meaning the operating

20   room, who has mesh literally protruding everywhere; right?

21        A.   It's what he wrote.

22        Q.   And it's his opinion at the time that he's

23   writing this that it's likely that this patient is going

24   to lose any coital function.
```

Elaine Duncan

```
 1                    Do you see that?

 2         A.   That's what he says.

 3         Q.   And that is referring to sexual intercourse;

 4  correct?

 5         A.   Yes.

 6         Q.   And he's pointing out that her vaginal space

 7  is so distorted that it's now three centimeters.

 8                    Do you see that?

 9         A.   Yes.

10         Q.   And he is also pointing out that this patient

11  will have a permanently destroyed vagina and that he's

12  only hoping to get her out of this without any morbidity.

13                    Do you see that?

14                    MR. DAVIS:  Object to the form.

15         A.   Yes.

16  BY MR. WALLACE:

17         Q.   Isn't this document describing, in very clear

18  terms, exactly the kind of warning or event that Axel

19  Arnaud was warning about in 2003?

20                    MR. DAVIS:  Object to the form.

21         A.   No, sir, I cannot make that conclusion based

22  on this particular e-mail because there's no other

23  information about the patient other than what the

24  physician is saying in his e-mail.  There's -- there's a
```

Elaine Duncan

1    lot left unsaid here.

2    BY MR. WALLACE:

3         Q.   Well, this document is talking about the

4    Prolift; right?

5         A.   Yes.

6         Q.   Axel Arnaud was talking about the Prolift?

7         A.   Yes.

8         Q.   And this physician is describing an anatomical

9    distortion in the vagina, and Axel Arnaud was describing

10   an anatomical distortion in the vagina; right?

11                   MR. DAVIS:   Object to the form.

12        A.   Yes, they are describing that.

13   BY MR. WALLACE:

14        Q.   And the patient -- or Axel Arnaud was saying

15   that that could interfere with sexual intercourse;

16   correct?

17                   MR. DAVIS:   Objection --

18        A.   Yes, and they're also talking about training

19   practitioners.

20   BY MR. WALLACE:

21        Q.   Can I finish my question, please?

22        A.   Yes.

23        Q.   My question was, Axel Arnaud was describing

24   the fact that there could be a problem with sexual

Elaine Duncan

1    intercourse, and this physician is also saying that this

2    lady is likely to lose the ability to have sexual

3    intercourse; correct?

4         A.   Yes, sir.

5         Q.   And the fact that she's going to have a

6    permanently-destroyed vagina?

7         A.   Yes.

8         Q.   So I'm going to ask my question again.

9              Isn't this event that's being described by

10   this physician here with respect to the Prolift device

11   what Axel Arnaud was warning about; that, in fact, the

12   Prolift device could result in erosions which could result

13   in anatomical distortion of the vagina and interfere with

14   sexual intercourse?

15             MR. DAVIS:  Object to the form.

16        A.   Sir, this e-mail does not specifically state

17   whether or not this patient had a hysterectomy, concurrent

18   or prior.  You're trying to link the two, and I don't see

19   enough information in this e-mail to conclusively link the

20   two as you are doing.

21   BY MR. WALLACE:

22        Q.   Ma'am, you're -- I'm going to clear up the

23   confusion for you.

24             Why don't you look at the e-mail because the

Elaine Duncan

1    e-mail says that it may become more prevalent with a

2    hysterectomy.  It doesn't say that it only happens when

3    there's an associated hysterectomy.  So why don't you read

4    Axel's warning.

5              Does that clear up your confusion?

6                   MR. DAVIS:  Object to the form.

7         A.   I'm not confused.  I'm not confused about

8    these two.  I'm stating that this e-mail (pointing) is

9    separate from this e-mail (pointing) and he's --

10   BY MR. WALLACE:

11        Q.   They're describing the same events; correct?

12                  MR. DAVIS:  Finish your answer before --

13        A.   He was proposing wording of a specific

14   warning, and the context of the warning is clear.  The

15   context of this e-mail is not clear.  I don't know that

16   this physician did this procedure.  I don't know anything

17   about this particular patient.  I cannot leap from this

18   e-mail to that e-mail.  That would be inappropriate to do

19   that.

20   BY MR. WALLACE:

21        Q.   Well, you used the word "similar" before, so

22   I'm going to use it.

23             Would you agree with me that, because you've

24   already agreed with me, that this doctor has described

Elaine Duncan

```
 1   anatomical distortion that is interfering with sexual

 2   intercourse that, in fact, what he's describing is similar

 3   to what warning Axel Arnaud wanted to put on there?

 4                   MR. DAVIS:  Object to the form.

 5   BY MR. WALLACE:

 6         Q.   Yes or no?

 7         A.   There are similarities.

 8         Q.   Now, where are all the documents where Ethicon

 9   followed up on this adverse event?

10                   MR. DAVIS:  Object to the form.

11         A.   Did you ask me where they are?

12   BY MR. WALLACE:

13         Q.   Uh-huh (affirmative).

14         A.   I will have to go back to the documents and

15   look for them, I suppose.

16         Q.   Well, you said Exhibit 9 looked familiar to

17   you; right?

18         A.   Yes, sir.

19         Q.   And you read it in the course of your -- what

20   is it; 82 hours that you worked on the report?

21         A.   I read all of the complaint.

22         Q.   So when you read something about a woman

23   having a permanently destroyed vagina, was -- your first

24   thought was that this was an adverse event; right?
```

Elaine Duncan

1        A.   I was reading all of the complaints, trying to

2   understand the complaints as they had been reported.

3        Q.   And you would want to know, as someone in your

4   position that's rendering an opinion about how thorough

5   the company was, what the company might have done about

6   this complaint of an adverse event by a physician; right?

7        A.   First off, I have to say that it has to get --

8   we are making a presumption that this was submitted as a

9   complaint, and then, that way, they would be able to react

10  to it.  I don't know, sitting here today looking at this

11  e-mail, if the e-mail got through the complaint system or

12  not.  I would have to look at that.  I can't just recall.

13       Q.   Well, is this a compliment or a complaint?  Is

14  this a compliment about the Prolift or a complaint about

15  the Prolift?

16       A.   I just was explaining to you that an e-mail

17  like this has to go through the complaint system, and if

18  Scott submitted it in the complaint system, then I can

19  track that for you.  I can't sit here and tell you how it

20  was reacted to from memory.

21       Q.   So you don't, as a person who's opining with

22  respect to Ethicon and giving a Rule 26 expert report, you

23  did not say, "Listen, was this reported as a complaint or

24  not?"

Elaine Duncan

```
1          A.    There were many complaints that I did not

2    track each complaint to each response.  I looked at

3    complaint reports and how those complaint reports, which

4    are summaries of complaints, were reacted to by the

5    company.  I recall reading this complaint, but I do not

6    recall how this complaint filtered through the system.  I

7    would have to check that for you.  I can't recall that.

8          Q.    You would agree with me that the company, upon

9    receiving this information, should have put this through

10   the complaint process; right?

11         A.    I would assume that it would have gone through

12   the complaint system, but I would have to check that.

13         Q.    And one of the things that companies can do is

14   they can reach out to physicians, for example, to get

15   explanted material or try to work with those physicians as

16   much as possible to understand why complications are

17   occurring; right?

18               MR. DAVIS:  Object to the form.

19         A.    They do and can, yes.

20   BY MR. WALLACE:

21         Q.    And Ethicon had the opportunity, like other

22   medical device manufacturers, to actually reach out to

23   physicians to try to get those implants back if at all

24   possible?
```

Elaine Duncan

```
 1                    MR. DAVIS:  Object to the form.

 2          A.   I don't know what their opportunities were.

 3     They could have asked.  I don't know what real

 4     opportunities exist because if this was outside the

 5     country, I can't recall exactly the location for Dr. Long,

 6     but some countries do not allow them to be -- to leave

 7     their country.  Some hospitals will not release the

 8     samples.  I don't know what opportunities they had to get

 9     this back.

10     BY MR. WALLACE:

11          Q.   Well, my read of the e-mail is that Scott

12     Jones makes it very clear that he's e-mailing St. Louis

13     University Uro-GYN, and the e-mail is from a St. Louis

14     University address.

15          A.   But I'm saying -- you were speaking generally.

16     I do not know specifically what they were able to do.

17          Q.   With respect to the adverse event -- let me

18     back up for a second and then we'll take a break.

19               You have given the opinion that Ethicon's

20     follow-up on its adverse events was thorough and

21     appropriate; correct?

22          A.   I was -- I believe that I was speaking of the

23     design control and review and the risk analysis and the

24     risk management after the project was in the market.
```

Elaine Duncan

1          Q.   And with respect to the risk management that

2     was done after the products were in the market, those

3     products, by the way, being the Prolift, the Prolift+M and

4     the Prosima, it is your opinion that Ethicon did a

5     thorough job in following up on adverse event reports

6     after the product was released to the market?

7          A.   Yes, sir.

8          Q.   And tell me where there is any evidence

9     whatsoever in any of your documents or anywhere, for that

10    matter, that Ethicon attempted to get explanted material

11    back in order to determine or examine complications with

12    respect to those medical devices.

13               MR. DAVIS:   Object to the form.

14          A.   With respect to numerous complaints that I

15    read and MDR reports that I read that followed from those

16    serious complaints, basically a serious adverse event

17    would engender a complaint -- excuse me, an MDR -- as a

18    part of that process, the personnel asked for the implant

19    to be returned when they're doing their follow-up.

20    Individual people within a company may not have that

21    privilege.  That's usually delegated to the person in the

22    complaint department who's following up on an adverse

23    event that's reportable under MDR.  So they seek out

24    additional information about the event so that they can be

Elaine Duncan

```
 1   more thorough in their MDR reporting, and that that is

 2   their opportunity to ask if the implant will be returned.

 3                      MR. WALLACE:  Take a break?

 4                      MR. DAVIS:  Sure.

 5                      (Whereupon, a recess was taken from

 6                      12:24 p.m. to 12:34 p.m.)

 7                      (Whereupon, Exhibit 10 was marked.)

 8   BY MR. WALLACE:

 9        Q.   Have you seen that document before?

10        A.   Yes.

11        Q.   Do you know who -- I wish I could tell you the

12   page number, but let me ask you some names.

13             Do you know -- can you read German?

14        A.   I cannot read German.

15        Q.   What do the first 18 pages represent?

16        A.   These two pages?

17        Q.   No, the first 18?

18        A.   18, oh.

19        Q.   Are in German; correct?

20                      MR. DAVIS:  Object to the form.

21        A.   Yes.

22   BY MR. WALLACE:

23        Q.   Can you read them?

24        A.   I can tell you they are a procedure, and
```

Elaine Duncan

1    there's a couple of places where they are dual-translated

2    so I can get enough out of this to understand what it's

3    about.

4         Q.   What do you understand this exhibit to

5    represent?

6         A.   That this is a risk analysis procedure.

7         Q.   By whom?

8         A.   The Norderstedt location; is that what you

9    mean?  The author was Dr. Hinsch.  It says "Reviser."  I

10   don't know exactly what that means.

11        Q.   Can I -- let me ask a more simple question.

12             Does Exhibit 10 have any relevance to your

13   opinions whatsoever?

14        A.   Yes.

15        Q.   In what way?

16        A.   This was a procedure for the conduct of the

17   risk analysis that was conducted at Norderstedt.

18        Q.   And you would agree with me that it cites

19   1441?

20        A.    In the appendix, they -- they list the

21   appendices, but they're not attached here, of course, but

22   in the appendices, they refer to EN 1441.

23        Q.   And you would agree with me that Anne Wilson

24   believes that that applied to the company?

Elaine Duncan

```
 1                    MR. DAVIS:  Object to the form.

 2          A.   Sir, I don't know -- excuse me?

 3    BY MR. WALLACE:

 4          Q.   Let's back up for a second.

 5               You would agree with me that 1441 is an

 6    international standard; correct?

 7          A.   It was actually an EN standard.

 8          Q.   And what do you mean by that?

 9          A.   It was a European national standard.

10          Q.   Well, that's international; right?

11                    MR. DAVIS:  Object to the form.

12          A.   Outside of the U.S., it is, beyond our

13    borders.

14    BY MR. WALLACE:

15          Q.   I don't want to quibble with you about whether

16    it's international or European, but the bottom line is it

17    was a standard that was applied to Ethicon, and Ethicon

18    believed that this standard applied to it; correct?

19                    MR. DAVIS:  Object to the form.

20          A.   The second way you said that is correct;

21    Ethicon believed that it was applicable.  It is a

22    voluntary standard, so it is not applied to a company.

23    BY MR. WALLACE:

24          Q.   Ethicon adopted the 1441 standard?
```

Elaine Duncan

```
 1            A.   At a certain point in time, they did.

 2            Q.   You can put that to the side.

 3                      (Whereupon, Exhibit 11 was marked.)

 4    BY MR. WALLACE:

 5            Q.   You -- I'll represent to you that on page 12

 6    of your report, you refer to Exhibit 11, which is a

 7    biocompatibility risk assessment from the PROLENE

 8    technical file.

 9                 Do you recall footnoting or referencing this

10    document?

11            A.   It looks familiar, yes.

12            Q.   And it's signed by Thomas Barbolt, that's

13    spelled B-A-R-B-O-L-T; right?

14            A.   Yes.

15            Q.   And you cite to this document to make the

16    point that PROLENE was a successful suture device that had

17    an accepted indication for use; correct?

18            A.   I would -- you're speaking of what I said?

19            Q.   Yeah.

20            A.   What page is that, please?

21            Q.   On page 12.  You said that PROLENE was

22    successfully developed as a biomaterial.

23            A.   It's a suture biomaterial in the 1960s.

24            Q.   Right.  Just to be clear, you're referring to
```

Elaine Duncan

```
1    a suture, not a vaginal mesh; right?

2         A.   In that sentence, I'm speaking of a suture.

3         Q.   And you would agree with me that the document

4    you referred to, which is Exhibit 11, was signed by Thomas

5    Barbolt?

6         A.   Okay.  And excuse me, again, what was the

7    footnote you referenced?

8         Q.   Footnote 9.

9         A.   9, okay.

10        Q.   If you look at the second page of Exhibit 11,

11   you'll see the signature of Thomas Barbolt.

12             Do you see that?

13        A.   Yes, sir.

14        Q.   Do you recall reading his testimony in this

15   case?

16        A.   I recall reading it, but I can't recall exact

17   words.

18        Q.   Well, let me ask you this way, then.

19             If he testified that PROLENE is susceptible to

20   surface degradation, you wouldn't have any reason to

21   disagree with him; right?

22        A.   Is that another hypothetical?  I don't recall

23   his exact testimony, so if you want to read that to me, I

24   can tell you if I agree or disagree.
```

Elaine Duncan

1          Q.   I -- I get to ask the questions this way,

2    though.

3          A.   Okay.

4          Q.   So I'm going to ask -- it's a very basic

5    question.

6               If he testified --

7          A.   If he testified?

8          Q.   -- if he testified that PROLENE is susceptible

9    to surface degradation, you wouldn't have any reason to

10   disagree with that testimony; would you?

11         A.   If he testified, I would not disagree with

12   that statement.

13         Q.   Okay.  And did any of the testing that is

14   referenced or materials that are referenced in Exhibit 11

15   have anything to do with evaluating the performance of

16   PROLENE in the pelvic floor?

17                    MR. DAVIS:  You're pointing her to

18   Exhibit 11?

19                    THE WITNESS:  I can't make out the date.

20                    MR. DAVIS:  1997.

21                    THE WITNESS:  This is 1997?

22   BY MR. WALLACE:

23         Q.   Page 2, yes.  Just for the record, you've

24   written on the exhibit.

Elaine Duncan

```
1          A.   I'm sorry.

2          Q.   That's okay.  That's fine if you want to do

3    that.  That's not a problem for me.

4               I take it you're trying to reference the date

5    because you want to know if this predates the pelvic floor

6    repair kits; right?

7          A.   You introduced that point.

8          Q.   Okay.  So you would agree with me that, with

9    respect to Exhibit 11, that the materials or other

10   information, including the literature that's referenced in

11   Exhibit 11, do not evaluate the performance of PROLENE in

12   the pelvic floor?

13         A.   On page 33, he references an implant, and I

14   just need a moment to look at this.  And your question

15   again, please repeat.

16         Q.   The information and literature referenced in

17   Exhibit 11 does not reference the use of PROLENE in the

18   pelvic floor.

19         A.   On page 35, the reference is to

20   colposuspension and urinary incontinence, rectopexy,

21   colposacropexy.  So in some respects, I see it as being

22   pertinent to the general use in -- in pelvic floor, but

23   not specific to these devices as they are created in the

24   Prolift and the Prosima.
```

Elaine Duncan

```
1              Q.    Thank you.  You can put that to the side.

2              A.    Okay.

3              Q.    You -- with respect to the issue of

4     degradation, you noted that FDA inspection showed no

5     deficiency had been observed with respect to the risk

6     analysis relating to degradation.

7                    Is it fair to say that you can't offer your

8     opinions in this case without reference to FDA

9     regulations?

10                   MR. DAVIS:  Object to the form.

11             A.    No, sir.  Can you say -- can you cite to the

12    location in the report, please?

13    BY MR. WALLACE:

14             Q.    I think it was page 21, if I'm not mistaken,

15    but I'm just asking a more general question, ma'am.

16                   What I'm saying is you say that -- and I'm

17    going to generalize what you say in the report -- that you

18    can't take into account device design and risk assessment

19    without considering the FDA regulations that you believe

20    apply to it; right?

21                   MR. DAVIS:  Object to the form; asked

22    and answered, calls for speculation.

23             A.    No, not correct.

24    BY MR. WALLACE:
```

Elaine Duncan

1          Q.   Why aren't I correct?

2          A.   Because the review I did incorporated the

3   requirements in both a specific and a general sense.

4          Q.   What do you mean by that?

5          A.   I looked at requirements that were, for

6   example, standards that were referenced and considered by

7   the groups that were internationally located, as well as

8   the clearance requirements for selling the product in the

9   U.S.  So all of those were part of my review.

10         Q.   Fair enough.  I appreciate you clearing that

11  up.  What I'm getting at is that what you believe applies

12  here are standards that are recommended or required by

13  regulatory bodies; right?

14              MR. DAVIS:  Object to the form.

15  BY MR. WALLACE:

16         Q.   Whether they be European or FDA?

17         A.   Not all of the applicable standards at any

18  given time are adopted by each of these organizations, so

19  you have to -- so it's difficult, when you ask me a

20  general question, for me to give you a general answer.  We

21  have to look at when the standards were applicable in each

22  of these countries.

23         Q.   You spent a lot of time talking about the

24  510(k) process, for example.

Elaine Duncan

```
 1                Do you believe that your opinion is based

 2    on -- can exist with or without references to 510(k)?

 3         A.   Yes, I believe I can make the -- the report

 4    without reference to the 510(k).

 5         Q.   Do you believe that you can make this report

 6    without references to any FDA regulations whatsoever?

 7         A.   I would be remiss if I knew that there was an

 8    issue with regulatory clearance in any jurisdiction and

 9    didn't bring it up in the report.

10         Q.   Why?

11         A.   Because it was a part of my due diligence in

12    the review of the documentation.

13         Q.   And you think that affects how the company

14    would conduct its analysis of risk, for example?

15                MR. DAVIS:  Object to the form.

16         A.   For example, in 14971, the standard admonishes

17    you to take into consideration, when conducting a risk

18    analysis, the prevailing regulatory requirements in the

19    respective jurisdiction.  That's in the 14971.  So if I'm

20    looking at how somebody does the risk analysis, I have to

21    do that in the perspective as the standard directs me to

22    appreciate regulatory requirements on it.

23                Is -- is that clear?

24    BY MR. WALLACE:
```

Elaine Duncan

1          Q.   Well, it's your opinion on page 21, for

2     example, that the safety of the product is intertwined

3     with quality systems that must meet the requirements

4     established by regulatory authorities.

5               Do you see that?

6          A.   Do you have a specific paragraph?

7          Q.   The fourth full paragraph down.

8          A.   Starting with Dr. Dunn?

9          Q.   Yes.  What I'm understanding -- I'm just

10    telling you what I'm understanding reading your report is

11    that you cannot -- you can't give me your opinions without

12    referencing the requirements established by regulatory

13    authorities.

14               MR. DAVIS:  Object to the form.

15          A.   I disagree with your statement.  I'm -- on

16    page 21, I'm speaking specifically to what Dr. Dunn had

17    said.  This is part of the report that is, if you will, a

18    rebuttal to his claims, and so I'm commenting on his

19    accusation that Ethicon has an inadequate quality system.

20    He stated that, and I'm countering that I believe he

21    doesn't understand the scope of their quality system.

22               So when I'm discussing that, there's two

23    bullet points I speak of; the quality systems associated

24    with one of the primary jurisdictions, the U.S., and the

Elaine Duncan

```
1    other primary jurisdiction, Europe, and I'm pointing out

2    that his claim is incorrect.  That's what I'm saying in

3    this report.

4    BY MR. WALLACE:

5         Q.   Let's -- you can put that document away for a

6    moment.

7              You would agree with me that when a company

8    decides to launch a product like the Prolift, that they

9    need to understand how wound healing occurs in the space

10   in which the device is going to be implanted; right?

11        A.   That's correct.

12        Q.   And they need to understand how, if they're

13   working with different grafts, like the Prolift or the

14   Prolift+M or Prosima, how those devices might compare to

15   each other as to their performance in that space; right?

16        A.   The question contains a premise that I need

17   you to clarify.  The Prosima and the Prolift, differences

18   are primarily the instrumentation, so the material in that

19   space would not be different in its healing

20   characteristics.

21        Q.   If you want to limit your answer to the

22   Prolift and the Prolift+M, go ahead.

23        A.   But your question --

24        Q.   They want to see how different grafts are
```

Elaine Duncan

1   going to perform in the space; right?

2         A.   I don't characterize this as a graft, but

3   if -- that's your word.  It's a scaffold.

4         Q.   Would you agree with me that the mesh at issue

5   has pores to allegedly allow for tissue ingrowth?

6         A.   Yes, sir.

7         Q.   And you would agree with me that before this

8   product is launched, that the company needs to understand

9   the importance of pore size and how the mesh is going to

10  integrate with the tissue; right?

11        A.   That's correct.

12        Q.   And you would agree with me that if there are

13  issues about flexibility or elasticity, that the company

14  needs to understand that before it launches the product

15  for sale; correct?

16              MR. DAVIS:  Object to the form.

17        A.   As I pointed out, the PROLENE Soft Mesh design

18  team considered the flexibility issue as a part of their

19  design requirements.

20  BY MR. WALLACE:

21        Q.   Do you believe that the company needs to be

22  familiar with the applicable medical and scientific

23  literature that may relate to the device before that

24  device is launched?

Elaine Duncan

```
 1          A.   Yes, sir.

 2          Q.   All right.

 3                    (Whereupon, Exhibit 12 was marked.)

 4    BY MR. WALLACE:

 5          Q.   Have you seen that document before, which is

 6    Exhibit 12?

 7          A.   Let me read it a moment.  They all tend to

 8    blur together.

 9          Q.   And my question remains pending, that whether

10    or not you've seen this document before.  That's all I

11    want to know.

12          A.   It's not that familiar to me, but --

13          Q.   Is it possible that you could have seen it

14    before?

15          A.   It's possible I've read it, but I can't

16    recall.

17          Q.   Do you know who Jonathan Meek is?

18          A.   I recall his name, but I can't place his

19    position in the company.

20          Q.   Do you know who Piet Hinoul, P-I-E-T, Hinoul,

21    H-I-N-O-U-L?

22               Do you know who he is?

23          A.   Jonathan Meek, the worldwide director, sure,

24    I'm recognizing him, yes.  Like I said, I'm not recalling.
```

Elaine Duncan

```
1            Q.   What about Mr. Kirkemo; do you remember who he

2   is?

3            A.   Don't remember his title, but I remember

4   reading his and -- how do you say it; Piet Hinoul?

5            Q.   Uh-huh (affirmative).

6            A.   Yes.  Harel Gadot, yes.

7            Q.   Let me ask you a different question.

8            A.   These names are familiar, yes.

9            Q.   Okay.  So you're familiar with the names on

10   the e-mail?

11            A.   Yes, yes.

12            Q.   And you would agree with me that's an

13   October 29 -- I'm sorry, October 29, 2008 e-mail; right?

14            A.   Yes.

15            Q.   And that Mr. Meek is saying that they're --

16   that he's getting the team together to discuss the

17   pre-reading that will support the knowledge build for the

18   Prolift+M launch, and he admits that he was ignorant to

19   the work carried out by the likes of Cobb, Klosterfalfen

20   and Klinge, Klosterfalfen being spelled

21   K-L-O-S-T-E-R-F-A-L-F-E-N; right?

22            A.   Yes.

23            Q.   Do you see that?

24            A.   Yes.
```

Elaine Duncan

```
 1            Q.   Are you aware of the literature that

 2    Dr. Klosterfalfen published in 2000 about adverse events

 3    relating to mesh?

 4            A.   I believe I read that paper.

 5            Q.   Did you read the paper authored by Dr. Cobb

 6    from 2004?

 7            A.   I'm not as familiar with that name.

 8            Q.   Are you familiar with Dr. Klinge's work which

 9    has spanned, at this point, well over a decade?

10            A.   I'm familiar.  I've read a number of papers.

11            Q.   Would you think that it's important that

12    someone that is working on the Prolift M in the position

13    that Mr. Meek was as a worldwide marketing director who

14    would be describing the attributes of the product to be

15    familiar with the properties of the device?

16                      MR. DAVIS:  Object to the form.

17            A.   Properties of the device?

18    BY MR. WALLACE:

19            Q.   (Nodding head.)

20            A.   Which device are you speaking of?  All of the

21    devices?

22            Q.   The Prolift and the Prolift+M.

23            A.   I would think he would be generally familiar.

24    I don't know that he'd be able to recall physical
```

Elaine Duncan

```
 1    properties to the letter, but generally knowledgeable.

 2         Q.   Does it surprise you that he was ignorant to

 3    the work carried out by these physicians?

 4              MR. DAVIS:  Object to the form.

 5         A.   Frankly, no, because, as I recall, at least

 6    some of this work was in the biomaterials research area

 7    and not in clinical work, and so it's not out of the

 8    question that specific pockets of research don't filter up

 9    to clinical work.

10    BY MR. WALLACE:

11         Q.   You would agree with me that one of the

12    concepts in this exhibit that we looked at quite a while

13    back, Exhibit 6, was that they wanted to have the best

14    procedure.

15              Do you recall seeing that?

16         A.   Generally, it was -- yes, it was a safe --

17    that was one of their objectives, of course.

18         Q.   That it was going to be the best of the best;

19    right?

20         A.   The best -- I don't recall those exact words.

21              MR. DAVIS:  Object to the form.

22    BY MR. WALLACE:

23         Q.   I'll find it for you.

24              Here you go.  Look at page 39 of Exhibit 6 and
```

Elaine Duncan

1    tell me, when they're assessing the market, that they want

2    to employ the approach of the best product and the best

3    procedure.

4          A.   He says this, yes.

5          Q.   That's what the concept document says in

6    Exhibit 6?

7          A.   Yes, the market assessment in the EU, their

8    opportunity is to have the best product and the best

9    procedure.

10         Q.   And you would agree with me that that's, of

11   course, what any responsible medical device manufacturer

12   would want to do in the United States, as well; is to have

13   the best product available and the best procedure, if

14   possible; right?

15         A.   Yes.

16         Q.   And if you're making a marketing claim in that

17   regard, you want to be, of course, truthful and accurate;

18   right?

19         A.   Yes.  Did they make that claim?

20         Q.   Can you then, please, look at Exhibit 12 and

21   look at the key point at the bottom of the page?

22         A.   Okay.

23         Q.   And it says, "PP --" which I'll represent to

24   you stands for polypropylene "-- is the best of a bad lot

Elaine Duncan

```
1    re integration, retraction, and there is a need to develop

2    grafts that mimic the human tissue and mechanical

3    properties."

4              Do you see that?

5         A.   Yes.

6         Q.   And do you believe that Mr. Meek was being

7    truthful and accurate at the time that he wrote that

8    internal e-mail?

9                   MR. DAVIS:  Object to the form.

10        A.   I don't know what he meant, but I don't think

11   that anybody was arguing at that point in time that they

12   were seeking a material with better human tissue

13   mechanical properties.  That was -- that's been a quest

14   for 20 years.

15   BY MR. WALLACE:

16        Q.   Do you know whether or not Ethicon told

17   physicians and patients that polypropylene was the best of

18   a bad lot regarding integration and retraction?

19                  MR. DAVIS:  Object to the form.

20        A.   I don't know if anyone would use that

21   terminology.

22   BY MR. WALLACE:

23        Q.   Do you -- have you seen -- we've talked about

24   pore size already; right?
```

Elaine Duncan

```
1              A.    No, we haven't.

2              Q.    Okay.  Well, let's talk about it for a moment.

3                    You would agree with me that an effective pore

4     size is important for tissue ingrowth in the Prolift and

5     the other products you're here to testify about; right?

6              A.    Yes, pore size is a consideration.

7              Q.    And you would agree with me that these

8     products, especially the arms being placed under stress

9     and tension, that you would have to do some analysis as to

10    how pore size might be affected upon implant in order to

11    allow adequate tissue ingrowth; right?

12                   MR. DAVIS:  Object to the form.

13             A.    That would be one attribute.

14    BY MR. WALLACE:

15             Q.    And the company would want to look at that;

16    right?

17             A.    That would be one attribute, yes.

18             Q.    And do you say anywhere in your report, at

19    all, or cite to any documents where the company actually

20    considered how effective pore size might be in these

21    products after implant?

22                   MR. DAVIS:  Object to the form.

23             A.    My recall is that a part of the PROLENE Soft

24    development was to assess the properties of pores and also
```

Elaine Duncan

```
1    how pores change under tension, and I can't recall exactly

2    where that discussion was.  I'd have to look it up.

3    BY MR. WALLACE:

4         Q.   You would agree with me, though, when you're

5    talking about PROLENE generally, that PROLENE doesn't have

6    pores?

7         A.   Excuse me?  Say it again.

8         Q.   PROLENE does not have pores.  A PROLENE suture

9    does not have pores; does it?

10        A.   Oh, a PROLENE suture is not porous.  There

11   were PROLENE twist -- let me -- what's the term?  PROLENE,

12   as we're describing it, is a monofilament.  There was a

13   multi-filament PROLENE suture.

14        Q.   I'm going to mark this document and ask that

15   you flip to page 7.

16                  (Whereupon, Exhibit 13 was marked.)

17   BY MR. WALLACE:

18        Q.   You cited this document, didn't you, for the

19   proposition that others, including the FDA, have said that

20   the use of PROLENE as an implant is safe; correct?

21        A.   I would like to see how I cited it.  Would

22   you -- do you recall?  I'd have to look them up.

23        Q.   You don't remember citing to that document?

24        A.   I remember citing the document, but there are
```

Elaine Duncan

1    so many documents in here.

2          Q.   Page 26.

3          A.   Okay.  Thank you.

4          Q.   You actually -- you're quoting from the

5    document, but you don't cite it.  I'll represent that to

6    you.

7          A.   I'm sorry?

8          Q.   You're quoting from -- from this document.

9    You actually don't cite it, ma'am, but you're quoting from

10   it.  I'll represent that to you; okay?

11               What I want to know --

12         A.   Where do you say that I'm quoting from it?

13         Q.   "By 1990."  I assume you're referencing this

14   document.

15               MR. DAVIS:  He's pointing to right down

16   there (pointing).

17               THE WITNESS:  Oh.

18   BY MR. WALLACE:

19         Q.   Are you or are you not referring to this

20   document?

21         A.   I wasn't specific to that document, but that

22   certainly is one of the many documents.

23         Q.   Well, just real quickly, you would agree with

24   me that the -- if you look at page 8 of this document,

Elaine Duncan

1   that the type of tissue at the wound site and where the

2   device is actually going to be placed matter, and you, as

3   a biomedical engineer, know that that is a very critical

4   consideration that a company has to take into account when

5   designing a device; correct?

6        A.   Correct.

7        Q.   So the fact that the use of a suture without

8   pores is safe and effective, say for example, in

9   somebody's arm or in somebody's heart, doesn't necessarily

10   mean that it's safe when it's woven together as a

11   transvaginal mesh and placed inside a woman's transvaginal

12   tissues; right?

13             MR. DAVIS:  Object to the form.

14        A.   I disagree with what you are characterizing as

15   what I said.  I didn't say that.  I said it was already

16   well-known and studied that it had been tolerated within

17   the human body and that any oxidative degradation proceeds

18   slowly and it's not clinically significant, and that's

19   what I was speaking of.  I didn't leap from there to other

20   locations.

21   BY MR. WALLACE:

22        Q.   I'm just asking you generally, you can't sit

23   here today and testify that, because the FDA made a

24   statement in 1990 that oxidation proceeds slowly with

Elaine Duncan

1   respect to a suture, that it proceeds slowly with respect

2   to a transvaginal mesh placed inside a woman's vaginal

3   tissues; right?

4          A.   I can't say to the contrary, either.  I cannot

5   answer the question as -- as you have proposed it.

6          Q.   Who has the burden to prove that their device

7   is safe?

8          A.   The company putting it on the market.

9          Q.   Okay.  And so -- and you would agree with

10  me --

11              MR. DAVIS:  Object to form on that last

12  question.

13  BY MR. WALLACE:

14         Q.   Let's just move on.

15              You recall testifying before; right?

16         A.   Yes.

17         Q.   And we were in the room next door, I think.

18         A.   Okay.

19         Q.   And you, both in this report and at your

20  deposition back then, in my words -- not yours -- made it

21  a pretty big deal that the FDA had made some, what you

22  believe to be, favorable statements about the use of mesh,

23  right?

24              MR. DAVIS:  Object to the form.

Elaine Duncan

```
 1          A.   I believe I referenced the AUGS statement,

 2    A-U-G-S.

 3    BY MR. WALLACE:

 4          Q.   Well, you -- you also referenced the FDA in

 5    your deposition before.  You said -- you referenced the

 6    AUGS Organization, and even the FDA that, "I would be

 7    foolhardy to suggest that there was a better way to make

 8    this product."

 9               Do you recall making, generally, a statement

10    like that?

11          A.   I don't recall that exact wording.  If you

12    want to read it to me, I don't --

13          Q.   Well, let me ask you generally.

14               You would agree with me that you have taken

15    into account what the FDA has done in the past with

16    respect to both mesh and PROLENE in coming up with your

17    opinions; right?

18                    MR. DAVIS:  Object to the form.

19          A.   I've taken into account all aspects of the use

20    of the material, including hernia applications, and so

21    that would include any regulatory approvals in any

22    country.

23    BY MR. WALLACE:

24          Q.   And I'm getting at something much more simpler
```

Elaine Duncan

1    that shouldn't really be in debate.

2           A.   Okay.

3           Q.   You took into account all the documents that

4    you reviewed, and you also took into account what the FDA

5    had to say about them; right?

6           A.   Oh, I recall.  There was an FDA release, news

7    release where they accepted the TVT product from their 522

8    order.

9           Q.   And that was relevant to your opinion; right?

10          A.   At the time.

11          Q.   Okay.

12          A.   Because we were discussing the TVT product at

13   the time.

14          Q.   Well, if the FDA identified surgical mesh for

15   transvaginal repair of pelvic organ prolapse as an area of

16   serious concern, would that be something that you would

17   consider and take into account when rendering an opinion?

18          A.   You have to consider any organization of that

19   nature that would make a pronouncement of that sort.

20          Q.   Well, does that affect your view of the safety

21   of POP devices?

22              MR. DAVIS:  Object to the form.

23          A.   No, it has not.

24              MR. WALLACE:  I think we're going to

Elaine Duncan

```
1   switch seats for the time being.

2                    MS. FITZPATRICK:  You may want to take a

3   brief break.

4                    (Whereupon, a recess was taken from

5                    1:11 p.m. to 1:14 p.m.)

6                    EXAMINATION

7   BY MS. FITZPATRICK:

8        Q.   Ms. Duncan, my name is Fidelma Fitzpatrick.

9   We met a number of months ago here.

10            Do you recall?

11       A.   Yes.

12       Q.   And at that point, I took your deposition on

13  the TVT retropubic device.

14       A.   Yes, sir -- ma'am.

15       Q.   And that was in conjunction with a case that

16  was pending in the Southern District of West Virginia --

17  actually, 37 cases pending there; correct?

18       A.   Yes, ma'am.

19       Q.   And since that time, you have issued a report

20  on the TVT retropubic and the TVT-O devices; correct?

21       A.   Yes, ma'am.

22       Q.   So I'm going to go ahead and get these marked

23  as -- Exhibit 14 will be the TVT-R report, and the

24  Exhibit 15 will be the TVT0 report.
```

Elaine Duncan

```
 1                    MS. FITZPATRICK:  Do you need a copy?

 2                    MR. DAVIS:  Those two, I do already have

 3   a copy.

 4                    MS. FITZPATRICK:  I got them for you

 5   here if you want them.

 6                    (Whereupon, Exhibits 14 and 15 were marked.)

 7   BY MS. FITZPATRICK:

 8        Q.   So there's the marked copies.

 9             Now, have you had a chance to look at your

10   TVT-R deposition that I took a number of months ago?

11        A.   I read it some time ago.

12        Q.   And is there anything in that deposition that

13   you need to change or alter in any way?  I don't want to

14   rehash old ground.

15                    MR. DAVIS:  Just one technicality; you

16   mean other than the errata sheet she's already given?

17   BY MS. FITZPATRICK:

18        Q.   Other than the errata sheet that you've

19   already given; correct.

20        A.   Yes, I can't recall if we found any other

21   typos on footnotes, but I believe we caught the majority.

22   That was the only thing.

23        Q.   And have you changed your opinions in any way

24   concerning the TVT-R device from the time you issued that
```

Elaine Duncan

```
1    report until the time we're sitting here today?

2         A.   No, ma'am.

3         Q.   Okay.  I'm going to focus primarily, given the

4    limited amount of time, on the TVT-O device.

5         A.   All right.

6         Q.   But before I get there, you know Ethicon makes

7    a number of stress urinary incontinence devices that are

8    called the TVT family of devices; correct?

9         A.   Yes.

10        Q.   And that includes the TVT Retropubic; correct?

11        A.   Yes.

12        Q.   The TVT Obturator, the TVT-O?

13        A.   Yes.

14        Q.   The TVT Secur, TVT-S?

15        A.   Yes.

16        Q.   The Exact?

17        A.   Yes.

18        Q.   And the Abbrevo; correct?

19        A.   Yes.

20        Q.   And the two products that you have issued

21   reports for in connection with these WAVE 1 cases are the

22   TVT-R, or the retropubic, and the TVT-O, the

23   transobturator?

24        A.   Yes.
```

Elaine Duncan

1          Q.    And you have not issued and do not hold

2    opinions on any of the other products; correct?

3          A.    That's correct.

4          Q.    Okay.  And you'll agree with me that a medical

5    device manufacturer has a responsibility to design their

6    product so as to minimize the potential for injury to

7    patients; correct?

8          A.    That's correct.

9          Q.    And that -- you'll agree with me that, in

10   order to do that, a device manufacturer must consider and

11   understand the medical condition that the device is

12   designed to treat; correct?

13         A.    That's correct.

14         Q.    And it must also consider and understand the

15   anatomical location where that device is implanted;

16   correct?

17         A.    That's correct.

18         Q.    Where is a TVT-R device implanted?

19         A.    As I understand it -- and I may speak very

20   generically -- that it is in the same location but

21   different -- in a different way of implanting than the

22   TVT-O.

23         Q.    Okay.

24         A.    One's inside-out and the other's outside-in.

Elaine Duncan

```
 1    That's my basic understanding.

 2          Q.   Okay.  But it's your understanding that the

 3    implant site for both the TVT-R and the TVT-O are the

 4    same?

 5          A.   That's my understanding.

 6          Q.   Okay.  Did anyone at Ethicon ever tell you

 7    that?

 8          A.   I can't recall.  I believe I read that.

 9          Q.   Okay.  Did you look at the instructions for

10    use on where the two products were implanted?

11          A.   Yes.  That was the best of my recall.

12          Q.   Do you know what the obturator space is?

13          A.   Vaguely, anatomically, yes.

14          Q.   Okay.  Sitting here today, do you understand

15    that the TVT Retropubic and the TVT Obturator are

16    implanted into different locations in a woman's pelvis?

17          A.   It was my understanding that the mesh

18    material, essentially, winds up, more or less, in the same

19    location.

20          Q.   Okay.  And is that understanding that you have

21    concerning the two devices, did that factor into the

22    opinions that you gave in this case and the reports

23    identified as 14 and 15?

24          A.   I would have to say yes, it did.
```

Elaine Duncan

1          Q.    Okay.  And you agree with me that it's

2   important, when you are designing a device or doing --

3   scratch that.

4               You'll agree with me that it's important, when

5   you're doing a risk assessment of a device, to understand

6   where the device is going to be placed in the body;

7   correct?

8          A.    Yes.

9          Q.    And you'll agree with me that it's important

10  to understand the surgical approach that's going to be

11  used to implant those different devices; correct?

12         A.    Yes, and that's what I tried to understand.

13         Q.    Okay.  And you tried to understand that based

14  on the documents that you looked at and identified in your

15  reliance list?

16         A.    Yes.

17         Q.    Okay.  Did you understand when you put -- do

18  you have any understanding of whether the trocars that are

19  used to implant the TVT-R are the same or different than

20  the trocars that are used to implant the TVT-O?

21         A.    It's my understanding that the TVT-O trocars

22  are somewhat different.

23         Q.    Okay.  And they are a different shape;

24  correct?

Elaine Duncan

1          A.    Yes.

2          Q.    And that's used because there's a different

3    surgical placement of the TVT-O over the TVT-R; correct?

4          A.    It was my understanding that it was because of

5    the surgical approach.

6          Q.    Okay.  And when you say surgical approach, are

7    you referring to what you call the inside-out versus the

8    outside-in approach?

9          A.    Yes.

10          Q.    And so it's your understanding that the

11    trocars -- well, first of all, which one of these is

12    implanted with the inside-out approach; do you recall?

13          A.    Yes.

14          Q.    Okay.

15          A.    The TVT-O.

16          Q.    Okay.  Inside-out, let me ask if we're on the

17    same page.  Inside-out is when you go in through the

18    vagina and you put the trocars out of the pelvis by

19    introducing it through the vagina first?

20          A.    That's my understanding.

21          Q.    Okay.  And the outside-in approach that you

22    believe is used with the TVT-R is when you go from the

23    outer area in the abdomen or the pelvis and you push the

24    trocars through into the vagina and then pull them up

Elaine Duncan

```
1    again; correct?

2         A.   That's right.

3         Q.   And it's your understanding that those

4    different approaches, the inside-out versus the

5    outside-in, are what account for the different shapes of

6    the trocars that are used with the TVT-R and the TVT-O

7    procedure?

8         A.   That's my perception from reading the

9    documents I read.

10        Q.   Okay.  And you took that -- those -- the

11   difference in the trocars on the outside-in and the

12   inside-out approach into account when you were preparing

13   your reports on these two devices; correct?

14        A.   Yes.

15        Q.   Okay.  I'm going to skip --

16        A.   Not in a specific way of my judgment of their

17   design, good or bad, but that they needed to be shaped

18   differently because of the procedure.

19        Q.   Okay.  And since you're not opining on the

20   TVT-S or the Exact or Abbrevo, we've short-circuited some

21   of my exam today, so that's good.

22             And you'll agree with me that a medical device

23   manufacturer, when making a permanent device for implant

24   into the human body, has to be an expert on the material
```

Elaine Duncan

1    that is being used with the product itself; correct?

2         A.   They have to be knowledgeable and qualify the

3    material, yes.

4         Q.   And they have to be experts in the design of a

5    product for a permanent medical implant; correct?

6         A.   Yes.

7         Q.   Okay.  And they need to be experts in the

8    anatomical location of where the product is intended to be

9    placed?

10        A.   No, and let me qualify.  I don't know that

11   they have to be specifically experts in the sense of an

12   anatomist or a physician, but they certainly have to seek

13   that expertise as a part of their design review.

14        Q.   So fair enough.  So let me ask you this a

15   little bit differently.

16             When you're putting together a design team, a

17   medical device manufacturer would need to consult with an

18   expert on the particular anatomical location into which a

19   permanent medical device was going to be implanted; right?

20        A.   That's correct.

21        Q.   And would have to seek out clinical advice or

22   clinical information concerning the surgical procedure

23   that was to be used by the product?

24        A.   Yes.  For the product, yes.

Elaine Duncan

```
1          Q.   For the product and the surgical devices that

2     will be used by the product; correct?

3          A.   Are you speaking of in association at the same

4     time in the procedure?  Is that what you mean by your

5     question?

6          Q.   Well, okay.  Let me ask it a little bit

7     differently.

8               The TVT-R and the TVT-O we've discussed had

9     different trocars?

10         A.   Yes.

11         Q.   Ethicon needed to consult clinicians to

12    understand the implications of using those different

13    trocars with these procedures; correct?

14         A.   Correct.

15         Q.   And a medical device manufacturer, like

16    Ethicon, has to consider the potential severity of a

17    failure of this product, the effect of a failure of the

18    product on a woman; correct?

19         A.   That would be correct, in a general statement,

20    yes.

21         Q.   All right.  And would also have to take into

22    account the potential frequency of a complication

23    associated with a product; correct?

24         A.   That's correct.
```

Elaine Duncan

1          Q.   And they would need to take into account the

2     potential for the permanence of a failure of their

3     particular product; right?

4          A.   Excuse me for -- I need to clarify.

5     Permanence of --

6          Q.   Permanence of a complication.

7          A.   Permanence of the complication.  I believe

8     that would be true.

9          Q.   And would you agree with me that severity,

10    frequency and permanence are three issues that need to

11    be -- each need to be considered when assessing the

12    particular risk from a device?

13         A.   No in the way you spoke of it because you're

14    duplicating it, as I see it.  So severity and then you

15    said permanence.  So the severity is incorporated in --

16    excuse me, the permanence of the complication would be

17    included in the risk assessment for severity.  So you've

18    added a third item that I think is incorporated into the

19    term "severity."

20         Q.   Okay.  But you'll agree with me that you could

21    have a permanent complication that is not particularly

22    severe; correct?

23         A.   I -- that's hypothetical.  I don't know

24    exactly what you might be speaking of.

Elaine Duncan

```
 1          Q.   Okay.  Well, let me maybe ask it in the --

 2               You could have a severe complication that

 3     arises from the use of a medical device that's not a

 4     permanent complication; correct?

 5          A.   Typically, they -- such -- such an adverse

 6     event would be scored lower in the -- in the risk

 7     analysis.

 8          Q.   Okay.

 9          A.   A transient -- a transient risk would be

10     scored less severely but not always.

11          Q.   Okay.  So all I was trying to get at is

12     there's the severity of how bad the complication would be.

13          A.   Yes.

14          Q.   There's a consideration of whether it's a

15     transient complication versus a permanent complication;

16     correct?

17          A.   Which kind of goes with the bad, yes.

18          Q.   Right.  And then, how often that complication,

19     the frequency of that complication?

20          A.   That's correct.

21          Q.   Okay.  And it's your opinion, sitting here

22     today, that Ethicon performed an appropriate risk

23     assessment in 2003 on its TVT-O device before it went on

24     the market; correct?
```

Elaine Duncan

```
1            A.   I believe, in my review of it, that they did,

2    yes.

3            Q.   Okay.  And it's also your opinion sitting here

4    today that, after the launch of that product, Ethicon

5    continued to engage in appropriate risk assessments

6    through today, 2016, in association with its TVT-O

7    product; correct?

8            A.   Yes.

9            Q.   And there's different ways to do risk

10   assessment; aren't there?

11           A.   Yes.

12           Q.   And one of those ways can be through what is

13   called an FMEA?

14           A.   Yes, ma'am.

15           Q.   And I think last time we were here, we talked

16   about the different kinds of FMEAs that could be used, so

17   I don't want to rehash that.

18               But you'll agree with me that Ethicon chose to

19   use FMEAs as one of its ways to conduct risk analysis on

20   the TVT-O device?

21           A.   Yes.

22           Q.   You've had a chance to look at Dr. Wilson's

23   report, and actually, you provided some criticisms to that

24   report; is that right?
```

Elaine Duncan

```
 1                    MR. DAVIS:  Object to the form.

 2        A.   I didn't realize Anne was a doctor, but yes.

 3   BY MS. FITZPATRICK:

 4        Q.   Okay.  And one of the things that -- that

 5   Ms. Wilson said was that Ethicon's own procedures required

 6   that if a similar device is used for risk assessment

 7   instead of the actual device, Ethicon had to demonstrate

 8   that the changes that had been made to the system would

 9   not introduce significant differences in the results of

10   the risk assessment.

11             Do you agree, in principle, with that

12   statement?  And I apologize, I don't have a copy of her

13   report in front of me.  I used to have one.  If you have

14   one, I can --

15                    MR. DAVIS:  Talking about Anne Wilson's

16   report?

17                    MS. FITZPATRICK:  Yeah.

18                    MR. DAVIS:  I'll be glad -- I think I've

19   got a copy somewhere.  Which report are you referring to;

20   the TVT-O?

21                    MS. FITZPATRICK:  TVT-O.

22                    MR. DAVIS:  TVT-O?  As long as you don't

23   mind, you know, I may -- I may have some notes.

24                    MS. FITZPATRICK:  I just want -- you
```

Elaine Duncan

```
 1   know, it's just easier for her to look at the sentence in

 2   context.

 3                        MR. DAVIS:  I don't mind her looking at

 4   my copy.

 5                        THE WITNESS:  This is Anne's original

 6   report; right?

 7                        MR. DAVIS:  TVT-O report.

 8   BY MS. FITZPATRICK:

 9        Q.   I think it's the -- I'm pretty sure that it is

10   on page 14, but let me just pull it up here.  I'm sorry,

11   page 11, and I'm just looking at the bottom full

12   paragraph.  I'm asking you if you agree with the first

13   sentence of that paragraph, in principle?

14        A.   She hasn't footnoted the procedure that she's

15   speaking of.

16        Q.   Do you --

17        A.   So I --

18        Q.   So you don't -- you can't agree or disagree

19   with this statement?  Does this reflect your understanding

20   of Ethicon's procedures, or not?

21        A.   These are the procedures that I've reviewed,

22   and every one of these procedures has different revisions.

23        Q.   Okay.

24        A.   And so, when I speak of these procedures, I
```

Elaine Duncan

1    have to have a context of the time and the location for

2    these procedures.  And so, in Anne's statement here, she's

3    not given us any way to go and -- and confirm her

4    statement.

5        Q.   Okay.

6        A.   If I recall that they --

7        Q.   So you don't agree -- you don't believe that

8    Ethicon had a procedure in place that stated that if a

9    similar device system is used for the risk assessment

10   instead of the actual device, the team must demonstrate

11   that the changes that have been made to the system will

12   not introduce significant difference in the results of the

13   risk assessment?

14               MR. DAVIS:  Object to the form.

15   BY MS. FITZPATRICK:

16       Q.   I'm just wondering whether you agree or

17   disagree with it?

18               MR. DAVIS:  Object to the form.

19       A.   Yes, I agree that it's reasonable that they

20   would do that because that is the charge of various

21   standards, but I can't confirm Anne's statement on page 11

22   because I don't -- I don't know.

23   BY MS. FITZPATRICK:

24       Q.   So fair enough.  You -- you agree that the

Elaine Duncan

1    concept is reasonable, but you don't know whether Ethicon

2    had a procedure that implemented that concept; is that

3    right?

4         A.   Precisely.

5         Q.   Okay.  But you will agree with me that that

6    concept is reasonable and expected in your line of work;

7    right?

8         A.   That's correct.

9         Q.   Okay.  Now, Ms. Wilson also identified some

10   key differences between the TVT-R and the TVT-O.

11            Do you agree with her that there was a

12   difference in the technique and points of fixation for the

13   TVT-R and the TVT-O device?

14        A.   It's my understanding that that is the purpose

15   of the TVT-O.

16        Q.   Okay.  So you agree that there was a

17   difference in them?

18        A.   Yes.

19        Q.   Okay.  And she also identified a difference as

20   implantation through the obturator membrane.

21            Do you agree with that?

22        A.   Yes.

23        Q.   Being a difference in the procedures?

24        A.   I agree with that.

Elaine Duncan

```
1            Q.    Okay.  And do you agree that the mesh ends

2   designed to accommodate the -- let me just put it in

3   simpler terms, I think -- that the trocars are different

4   between the two devices?

5            A.    Trocars are different.

6            Q.    Okay.  Now, can you point me, sitting here

7   today, to any document in which Ethicon conducted a risk

8   assessment prior to the launch of the TVT-O that

9   independently identified -- or excuse me, independently

10  addressed the differences in the risks posed by the TVT-R

11  trocars versus the TVT-O trocars?

12           A.    It's my recall, but I would have to look at

13  some documents.  Would -- would you like for me to try to

14  locate one?

15           Q.    Well, let me ask you, it's your recall that

16  there was a risk assessment that was done by Ethicon that

17  looked at what new and independent risks would be posed by

18  the TVT-O trocar over the TVT-R trocar?

19           A.    Yes, I cannot recall if it was an FMEA style

20  or if it was a general part of the design history record.

21  I -- I'm rather vague in terms of the actual document.

22           Q.    How long would it take you?  Because I know

23  we're under a time frame and I know you need to get out of

24  here.  So how long do you think it would take you to go
```

Elaine Duncan

1    through these several binders that you have here to find

2    that?

3              A.   Less than 10 minutes.

4              Q.   Okay.  I'm going to -- I think I'm going to

5    find a list of these things that I want you to find, and

6    then I'm going to ask you to look for all of them at the

7    same time.  I think that might be a little bit easier for

8    us to do that way.

9              A.   If you'd like to try that, I'll do my best.

10             Q.   Okay.  And I appreciate that.

11                  And do you know of any document or risk

12   assessment in which Ethicon conducted -- scratch that.

13   That's a bad question.

14                  Can you show me any document in which Ethicon

15   conducted a risk assessment that independently assessed

16   the risks associated with the implantation of the TVT-O

17   through the obturator membrane?

18             A.   Independently assessed the TVT-O?

19             Q.   Uh-huh (affirmative).

20             A.   I believe that's the same question you had

21   asked.

22             Q.   No, what I was asking, if you had seen

23   anything that looked specifically at the risks posed by

24   the TVT-O trocar?

Elaine Duncan

```
1          A.   Oh, trocar versus --

2          Q.   Versus, and then the second I'm asking is if

3   you know any document that looks specifically at the risks

4   of the surgical implantation site of the TVT-O versus the

5   TVT-R?

6          A.   Again, it's my recall that there is such a

7   document, yes.

8          Q.   Okay.  You think that there's a document that

9   supports both of those; right?

10         A.   Yes.

11         Q.   Okay.  And are you -- well, let me -- let

12  me -- you know what?  Why don't you go ahead and find

13  those documents for us because that will help us get

14  through the other questions a lot quicker.

15         A.   First I've got to do it this way.

16              MS. FITZPATRICK:  I want to take a

17  quick break.

18              (Whereupon, a recess was taken from

19              1:37 p.m. to 1:43 p.m.)

20              THE WITNESS:  So on page 19 of my TVT-O

21  report.

22  BY MS. FITZPATRICK:

23         Q.   Okay.

24         A.   One of my references was Footnote 42, and this
```

Elaine Duncan

```
1    particular footnote was out of that technical file --

2    excuse me, design history file, so I don't know if you

3    want the estimate number or how --

4           Q.   Sure, estimation number is fine.

5           A.   Okay.

6           Q.   Is that what you have in front of you?

7           A.   Yes.

8           Q.   Okay.

9           A.   That's Number 42.

10          Q.   Okay.

11          A.   Just give me one more second here.

12                    (Discussion off the record.)

13          A.   I can tell you out loud.  I was just trying to

14   explain the report.

15               So on page 19, the other footnote of interest

16   is Number 41.  That is a broader reference all-inclusive

17   to the design history file, including, it says the design

18   controls, risk analysis, and that is referencing different

19   procedures.

20               Now, 42 specifically, is the TVT-O, DSA,

21   not -- not called an FMEA, but it was a risk analysis, and

22   on page 20 of my report, I have an excerpt directly from

23   that risk analysis.

24   BY MS. FITZPATRICK:
```

Elaine Duncan

1          Q.   And so is it -- so I've got your testimony

2     correct, what you note in Footnote 42 of your report,

3     which is the document I have in my hand now, this is the

4     document that you believe has independently looked at the

5     risks posed by the trocars used by the TVT-O device as

6     opposed to the risks posed by the trocars used with the

7     TVT-R device?

8          A.   That is my understanding as I read it, and

9     that's what's described in the scope that I have on

10    page 20.

11         Q.   Okay.  So anything that I would be looking for

12    and that you would be relying on for your opinion that the

13    trocars were independently assessed is going to be in this

14    document that starts with ETH.MESH00259416; correct?

15                   MR. DAVIS:  Object to the form.

16         A.   That's partly correct, partly not correct.

17    The part that's correct is this is the DDSA, but at other

18    times in the design history file, there are many

19    references to the design verification and validation, and

20    those were associated with mitigation of risks.  So

21    indirectly, they are incorporated in the risk analysis.

22    BY MS. FITZPATRICK:

23         Q.   Okay.  Now, taking a look at what you have on

24    page 20 of your report.

Elaine Duncan

```
1          A.   Okay.

2          Q.   And I think that references this DDSA.

3          A.   Yes.

4          Q.   Which stands for "Device Design Safety

5     Assessment"; correct?

6          A.   Yes.

7          Q.   The DDSA that was done by Ethicon prior to the

8     launch of the TVT-O, you'll agree with me it was done on

9     the components of the device as opposed to the -- all of

10    the components put together in a single device; correct?

11                    MR. DAVIS:  Object to the form.

12         A.    May I look at that, please?

13    BY MS. FITZPATRICK:

14         Q.   Sure.  I'm just looking right on page 20 where

15    you have, "Scope of the design safety assessment.  Define

16    the scope of this risk assessment."  It says, "This risk

17    assessment was completed on (check one):  Device,

18    subsystem or component."

19         A.   That's what they checked, but --

20         Q.   Okay.  Ethicon may have been wrong when they

21    said that.  Go ahead and take a look.

22         A.   No, the scope marked on components there, it's

23    my understanding that this document asked questions that

24    were broader than just single components.  That's a part
```

Elaine Duncan

```
1    of the DDSA.  They have a checklist.  The beginning

2    questions are systems-related, and then when they reviewed

3    it further, they incorporated more detail about the

4    components.

5         Q.   Okay.

6         A.   That were specific to the components.

7         Q.   But you'll agree with me that Ethicon, at

8    least itself, considered that DDSA to be based on the

9    components and not the device itself?

10             MR. DAVIS:  Object to the form.

11        A.    I believe that -- excuse me, sorry.

12             I believe that their perception was, and why

13   they put components, was because the components were

14   changing.

15   BY MS. FITZPATRICK:

16        Q.   Okay.  Did they perform a risk assessment on

17   the entire device itself or did the risk assessment

18   consist of looking at the components individually?

19             MR. DAVIS:  Object to the form.

20        A.    There's several revisions here and I just

21   want to refresh myself a second.

22             As I tried to explain, the scope was because

23   of the different components, but the qualitative and

24   quantitative characteristics worksheet incorporates
```

Elaine Duncan

1    questions that are system-related.  For example, they

2    speak in terms of sterilization.  That would be a system

3    level.

4    BY MS. FITZPATRICK:

5         Q.   This case isn't about sterilization; is it?

6              MR. DAVIS:  Object to the form.

7         A.   Actually, what would be important is if, for

8    example, the new components couldn't be sterilized in the

9    same way as the TVT, that would have a big bearing on the

10   potential for new risk associated with the new kit.

11   BY MS. FITZPATRICK:

12        Q.   Do you -- is it your understanding that these

13   lawsuits are about the inability to sterilize components

14   of the TVT-O device?

15        A.   Ma'am, I need to qualify that if there was a

16   difference in sterilization that affected the

17   sterilization of the entire system, the team would have to

18   consider that, and that, certainly, would have impact on

19   the mesh had they had to change the sterilization.  So I

20   would think that evaluating the question of sterilization

21   as a system is very germane to their work in risk

22   analysis.

23        Q.   Okay.  I don't want to be here late, so I want

24   to just focus on --

Elaine Duncan

1          A.   I know, but I'm trying to explain why.

2          Q.   I want to focus us on, though, on the stuff

3     that I think is relevant to the lawsuit, so let me ask you

4     the question again.

5               Do you believe that this lawsuit has anything

6     at all to do with the inability to sterilize the TVT-O

7     system?  Is that your understanding from talking to

8     Ethicon's lawyers, that that has anything to do with this

9     case?

10                   MR. DAVIS:  Object to the form.

11         A.     I can't answer the question the way you've

12    asked it because it -- in my due diligence and review of

13    the documentation, regardless of what the attorneys would

14    have spoken to me about, I had to consider whether or not

15    when they did the change to the TVT-O, did they consider

16    the impact on the system, including packaging and

17    sterilization and all of the components.  I would -- I

18    would have to consider all of that as -- when I'm reading

19    the risk analysis, did they consider that question; and

20    yes, they did, because that could have impacted the

21    properties of the mesh if they had had to change the

22    sterilization cycle.

23    BY MS. FITZPATRICK:

24         Q.   Okay.  What else besides sterilization and

Elaine Duncan

1    packaging do you see as germane to a system-wide analysis

2    of the risk posed by TVT-O devices when it's permanently

3    implanted into women?

4           A.   Well, another one is human factors.  One of

5    the most critical issues in the TVT-O was the difference

6    in the surgical procedure, so if -- and as I understand,

7    the TVT-O was desirable to reduce risks associated with

8    the surgery of the standard TVT-R, particularly the

9    bladder puncture, and so as these folks were looking at

10   the use-related hazard worksheet, that is clearly a

11   system-level review of the entire TVT-O product.

12          So they were compelled to do a revised risk

13   assessment because of the changes to the component; thus,

14   the check box, and then when they review the DDSA and go

15   through the DDSA procedure, they're compelled to review

16   all of these checks, and all of these checks are at a

17   system level as well as component level.

18          Q.   Okay.  So you believe that Ethicon performed

19   both a system risk assessment and a component risk

20   assessment when introducing the TVT-O to the market?

21          A.   Yes.

22          Q.   Is that fair?

23          A.   That's fair.

24          Q.   Okay.  And that -- you're getting that

Elaine Duncan

```
1    information from the document that you've identified in

2    Footnote 42 of your report?

3         A.    And 41.

4         Q.    Oh.

5         A.    Because 41 included the mitigation activities,

6    the physician consulting.  In fact, it even included the

7    pre-review of the risk associated with the TVT in general.

8         Q.    Okay.

9         A.    So the whole design history file, which we did

10   not bring, is associated with mitigating risk.

11        Q.    Okay.  And one of the ways, you'll agree with

12   me, that a company can mitigate risk is by providing

13   warnings to physicians and patients concerning the risks

14   inherent to a particular device; correct?

15        A.    That's generally correct, yes.

16        Q.    Okay.  And so, Ethicon had an obligation to

17   warn, through its IFU, physicians of the risks that are

18   inherent in the TVT-R device; correct?

19             MR. DAVIS:  Object to the form.

20        A.    Generally stating, yes.

21   BY MS. FITZPATRICK:

22        Q.    Okay.  And they had an obligation to warn the

23   physicians through the IFU about the risks that are

24   inherent in the TVT-O device; correct?
```

Elaine Duncan

```
 1                    MR. DAVIS:  Object to the form.

 2         A.   It's hard to --

 3  BY MS. FITZPATRICK:

 4         Q.   Just general.  I mean, that's a general

 5  principle?

 6         A.   Like love of mother and apple pie.

 7         Q.   It's difficult to disagree?

 8         A.   Right, right.

 9         Q.   And you'd agree with me that the IFU has to

10  incorporate in it the risks that are inherent in the

11  specific product.  So the IFU for the TVT-R should include

12  warnings about the risks that are inherent to the TVT-R;

13  correct?

14                    MR. DAVIS:  Object to the form.

15         A.    I guess you're going with, "And thus, the

16  TVT-O."  I can't answer this question the way you have

17  posed it.

18  BY MS. FITZPATRICK:

19         Q.   Sure.  Well, let me ask you to break it down.

20              There's an IFU for the TVT-R; correct?

21         A.   Yes.

22         Q.   And that's what a physician who's using the

23  TVT-R can consult; correct?

24         A.   Yes; that's correct.
```

Elaine Duncan

1          Q.    There's a separate IFU for the TVT-O; correct?

2          A.    Yes.

3          Q.    And that contains information for a physician

4     to look at who's using the TVT-O; correct?

5          A.    Correct.

6          Q.    And you would agree with me that the TVT-O IFU

7     should include the warnings about risks specific to the

8     TVT-O; correct?

9                    MR. DAVIS:  Object to the form.

10         A.    If there are any specific ones --

11    BY MS. FITZPATRICK:

12         Q.    Correct.

13         A.    -- to the TVT-O that are different.

14               Since TVT-R came first, if there were new

15    changes, if the changes introduced new risks that rise to

16    the level of warning --

17         Q.    Okay.

18         A.    -- then they should be on the labeling decks.

19         Q.    Okay.

20         A.    That's mother and apple pie, yes.

21         Q.    So if there's a difference in the risk

22    profile, assuming there's a difference in the risk profile

23    for the TVT-R versus the TVT-O, that should be reflected

24    in the instructions for use for each of those products;

Elaine Duncan

```
1    correct?

2                   MR. DAVIS:  Object to the form.

3         A.     Mother and apple pie, generally speaking,

4    yes.

5    BY MS. FITZPATRICK:

6         Q.    Okay.  Are you aware that the FDA recently

7    proposed to reclassify the trocars that are used with the

8    TVT-R and the TVT-O from Class 1 to Class 2 medical

9    devices?

10                  MR. DAVIS:  Object to the form.

11        A.   I haven't been following that.  No, I didn't

12   appreciate that.

13   BY MS. FITZPATRICK:

14        Q.    Let me go ahead and get this marked as

15   Exhibit 16, and I'm going to give you the full copy.  In

16   the interest of time, to keep us -- I'm going to give you

17   the couple pages that I'm using, but you have access to

18   the full document if you want to take a look.

19        A.   I probably won't be coming back to this, then.

20   I can get this off my desk?

21        Q.    No, don't get rid of that yet because you

22   reminded me there's something I didn't follow up on.

23        A.    Okay.  I just want to close it so I don't get

24   distracted.  Okay.
```

Elaine Duncan

```
 1                     (Whereupon, Exhibit 16 was marked.)

 2          A.   This is this (pointing)?

 3   BY MS. FITZPATRICK:

 4          Q.   Yes.  What I have here is I just copied the

 5   couple pages I'm going to use to save us some time from

 6   having to shuffle through the big thing.

 7          A.   Oh.

 8          Q.   But if you want the big one, it's in front of

 9   you for reference.

10          A.   Thank you.

11          Q.   So what I've handed you is a document that's

12   entitled "Reclassification of Urogynecological Surgical

13   Mesh Instrumentation" from the Food & Drug Administration,

14   the Executive Summary dated February 26, 2016.

15               And that's about a month ago; correct?

16          A.   Yes.

17          Q.   And you, before being here today, you weren't

18   aware that this had happened; correct?

19          A.   I hadn't been following this, no.

20          Q.   And no one from Ethicon told you there was a

21   potential reclassification of the trocars from a Class 1

22   to Class 2; correct?

23          A.   I hadn't been notified, no.

24          Q.   Okay.  So what -- if you can take a quick look
```

Elaine Duncan

```
 1   at a couple of issues.  The FDA, looking at -- I don't

 2   think I've got page 4 here.  I think you've got page 4 on

 3   the bigger one, and I apologize.  Was looking -- if you

 4   look at page 4 of the bigger one, I'm sorry, that's the

 5   only -- I don't have this copied right.

 6            It states that, "The FDA believes that

 7   intraoperative --" I'm sorry, I want to make sure you're

 8   on the same page, it's about halfway down -- that "The FDA

 9   believes that intra-operative and peri-operative adverse

10   events such as organ injury and perforation, hemorrhage

11   and bleeding and nerve injury and pain can be reasonably

12   attributed to the urogynecological surgical mesh

13   instrumentation and not the surgical mesh."

14            Do you see that?

15            MR. DAVIS:  Where are you reading from?

16   I don't think she sees it.

17        A.   I don't exactly see it.

18   BY MS. FITZPATRICK:

19        Q.   I'm sorry, I should have had this page.  I

20   have it on page 4, but since I can't find it right now,

21   I'll find it at a break and I'll come back to that

22   question.  But let me go on in page 5.

23            And so what the FDA is looking at here is at

24   the bottom, what you'll see is that the FDA identified --
```

Elaine Duncan

```
 1    "The FDA identified a total of 463 MDRs using particular

 2    search criteria."

 3              Do you see that right at the bottom here on

 4    page 5?

 5         A.   483, okay.

 6         Q.   Yeah.  438.

 7         A.   I mean 438.

 8         Q.   A total of 438 of the MDRs were submitted by

 9    manufacturers; 14 by a user facility, and 11 were

10    voluntary.

11              So I want to take a look on page 7 -- well,

12    page 6 to 7, there's a Table 2 that summarizes the MDRs by

13    manufacturer.

14              Do you know what an MDR is?

15         A.   Yes.

16         Q.   Okay.  And can you tell me what an MDR is?

17         A.   Medical device reports.

18         Q.   And those are reports that are made of adverse

19    events or complications that are experienced with a

20    particular medical device; correct?

21         A.   Sort of correct; medical device, serious

22    injuries that are device-related.

23         Q.   Okay.

24         A.   And deaths.
```

Elaine Duncan

```
1          Q.   Okay.  And those are required to be reported

2   to the FDA; correct?

3          A.   Yes, ma'am.

4          Q.   Okay.  And if you look at Table 2, it

5   summarizes the MDRs related to the surgical -- the trocars

6   by manufacturer, and if you look at page 7, it indicates

7   that there were 90 reports, MDRs, submitted concerning the

8   Ethicon trocars; is that right?

9               MR. DAVIS:  Object to the form.

10         A.   It's what is reported by FDA on page 7.

11  BY MS. FITZPATRICK:

12         Q.   Okay.  Correct.  And you don't have any

13  independent verification of these numbers, but I'm correct

14  in what I'm reading here from the FDA?

15         A.   From the FDA.

16              MR. DAVIS:  Object to the form.

17  BY MS. FITZPATRICK:

18         Q.   And do you have any reason to believe that the

19  FDA is misrepresenting or mischaracterizing the MDRs that

20  it has received concerning the Ethicon products?

21              MR. DAVIS:  Object to the form.

22         A.   Ma'am, "misrepresentation" could be an

23  incorrect term.  In my judgment, they could be listing in

24  this table, not a misrepresentation, but a categorical
```

Elaine Duncan

1    representation, which doesn't necessarily mean that they

2    always get the categories right.

3    BY MS. FITZPATRICK:

4        Q.    Okay.

5        A.    I'll just give them that benefit of the doubt.

6        Q.    Okay.  Now, Boston Scientific Corporation,

7    which is on the previous page, Boston Scientific has a

8    higher MDR count than Ethicon; correct, just by sheer

9    numbers?

10       A.    According to the FDA.

11       Q.    And I'm not asking you to endorse or adopt

12   these numbers as correct or incorrect.

13       A.    All right.

14       Q.    But we'll just agree that, at least, this is

15   what's reported here.

16       A.    That's what it says.

17       Q.    Okay.  And the vast majority of the Boston

18   Scientific MDRs are associated with the Pinnacle Pelvic

19   Floor Repair Kit and the Uphold Vaginal Support System.

20             Do you see that?

21       A.    That's what it says, yes.

22       Q.    Now, is it your understanding that the Boston

23   Scientific Pinnacle and Uphold devices do not use a trocar

24   in the same way that the Ethicon products do?

Elaine Duncan

```
1              A.    No, ma'am.  I have no understanding of the

2    Boston Scientific products.

3              Q.    Have you ever heard of the Capio device?

4              A.    No, ma'am.

5              Q.    Okay.  So you just don't know?

6              A.    I do not -- do not know.

7              Q.    Okay.  Now, let me set that aside for a minute

8    and let me mark this next one as Exhibit 17.  And, again,

9    I've copied a few pages that I'm actually going to look

10   at, but I'm going to give you the full document for you to

11   take a look at if you'd like.

12                    (Whereupon, Exhibit 17 was marked.)

13   BY MS. FITZPATRICK:

14             Q.    And so, what you're looking at is a PowerPoint

15   presentation that's entitled, "Reclassification of

16   Urogynecological Surgical Mesh Instrumentation" from the

17   FDA on February 26, 2016.

18             A.    Yes, ma'am.

19             Q.    Okay.  And if you look at the short one, just

20   help us because it's hard to find these pages.

21             A.    Okay.

22             Q.    Now, the FDA did a review of published

23   literature in support of its proposed reclassification;

24   correct?
```

Elaine Duncan

```
 1          A.   That's what they say, yeah.

 2               MR. DAVIS:  Object to the form.

 3    BY MS. FITZPATRICK:

 4          Q.   And you'll agree with me that a review of

 5    published literature is something that a medical device

 6    manufacturer should do with respect to its own particular

 7    medical devices; correct?

 8          A.   It's a requirement as a part of the MDRs.

 9          Q.   Okay.  And so Ethicon here has an obligation

10    to monitor the medical literature and to educate itself on

11    what is being reported about its pelvic organ prolapse and

12    SUI products in the medical literature; correct?

13               MR. DAVIS:  Object to the form.

14          A.   It's my understanding as a part of the MDR

15    process, most companies do do that, yes.

16    BY MS. FITZPATRICK:

17          Q.   Okay.  And so here, the FDA states that it

18    conducted a review of the published literature.  If you

19    can turn to page 31, it's got a PowerPoint slide that

20    outlines the methods that it used.  If you could quickly

21    read through that and ask me -- and let me ask you if you

22    believe that the methods that the FDA sets forth on this

23    slide are reasonable for a -- to conduct a review of

24    published literature.
```

Elaine Duncan

1          A.   No, I can't say that this would be sufficient

2   information for me to know how well they did their job.

3          Q.   Okay.  Just so these methods --

4          A.   It doesn't --

5          Q.   I'm not asking you whether they did it right

6   or they didn't do it right.

7               Do these methods that are set forth, do those

8   look reasonable to you as an expert here as reasonable

9   methods for conducting a review of published literature?

10          A.   As I say, I don't have any key words to go by

11   here.  This is a broad generalization of, I'm sure, what

12   their methods were, so I can't evaluate this slide.

13          Q.   Okay.  So you can't say, one way or the other,

14   whether these --

15          A.   It's not enough information provided here.

16          Q.   Okay.  Fair enough.  If you turn to page 32.

17   Let me ask you, you've got a lot of experience with the

18   FDA; right?

19          A.   I have some.

20          Q.   Okay.  And it's part of -- a significant part

21   of the job that you've done for the past however many

22   years; correct?

23          A.   Yes.

24          Q.   Do you have any reason to believe that the FDA

Elaine Duncan

```
1    would do an improper review of published literature when

2    they're looking at the reclassification of a surgical

3    device?

4                    MR. DAVIS:  Object to the form.

5         A.   Would they do an improper?

6    BY MS. FITZPATRICK:

7         Q.   Uh-huh (affirmative).

8         A.   I believe they could do an insufficient --

9    incorrect, yes.  Yes.

10        Q.   Okay.  How often do you think that the FDA

11   does an insufficient or an --

12        A.   I couldn't give you a number, but I've had

13   experience where the key word searching and the

14   methodology has not been as precise as it should be.

15        Q.   Okay.  Do you think Ethicon does a better job

16   at their literature reviews than the FDA does?

17                   MR. DAVIS:  Object to the form.

18        A.   I can't say that they do a better job, but I

19   can give you an example of how they've done their job, and

20   I think you'd see it's quite different from what's

21   represented here by FDA.

22   BY MS. FITZPATRICK:

23        Q.   Okay.  So you think that Ethicon does a more

24   thorough review of the medical literature than the FDA?
```

Elaine Duncan

1          A.   Probably searching published literature is all

2     in the key words, and not only the included words, but the

3     way you exclude certain terms, and without looking at

4     their methodology, I can't compare it to the Ethicon

5     methods.

6          Q.   Okay.  I was asking you more generally, but we

7     don't -- and I don't want to spend your time on this.

8               Taking a look at the bottom of page 31, it

9     indicates that the FDA found 207 references that the FDA

10    deemed to be relevant for its inquiry on this

11    reclassification question; correct?

12         A.   Yes.

13         Q.   And if you look at the page 32, what the FDA

14    has done here is it's divided up those 207 references into

15    whether it's -- the reference refers to an SUI or a POP?

16         A.   Yes.

17         Q.   And then, whether it's a retropubic

18    transobturator or mini-sling procedure for the SUI;

19    correct?

20         A.   Yes.

21         Q.   And then, whether it's a transvaginal repair

22    or an abdominal repair for the POP; correct?

23         A.   Yes.

24         Q.   Okay.  And set forth those references.

Elaine Duncan

```
1              Now, turning to page 33 here.

2        A.   Excuse me.

3        Q.   Sure.

4        A.   May I just say something?

5        Q.   You can say anything you want.

6        A.   I think that these 207 that we're speaking of

7    are broke down on 32, but I haven't actually confirmed

8    that.

9        Q.   Okay.

10       A.   I mean, I'll take it at their face value.

11       Q.   Fair enough.  And on page 33, what the FDA

12   does is it indicates that it extracted data from those 207

13   studies for three major categories of adverse events;

14   organ perforation and injury, second is vascular injury

15   and bleeding, and third is nerve injury and pain.

16             Do you see that?

17       A.   Yes.

18       Q.   And this is specifically associated with the

19   trocars?

20       A.   Yes.

21       Q.   Now, turning to page 34, the first thing that

22   the FDA noted is -- or looked at is organ perforation and

23   injury, and I want to focus here on the retropubic and the

24   transobturator; okay?
```

Elaine Duncan

```
1           A.   Yes.

2           Q.   And it found that the rate of organ

3    perforation and injury associated with the retropubic

4    trocar ranged between 0.3 percent to 23.8 percent;

5    correct?

6                     MR. DAVIS:  Object to the form.

7           A.   That's what they've written, yes.

8    BY MS. FITZPATRICK:

9           Q.   And for the transobturator, they found that it

10   ranged from 0.2 percent to 5.8 percent; correct?

11                    MR. DAVIS:  Object to the form.

12          A.   That's what they've written.

13   BY MS. FITZPATRICK:

14          Q.   That's what they've written.

15               And I'm not asking you to endorse these

16   numbers, but assuming that these numbers are correct,

17   you'll agree with me that there is a difference in the

18   risk profile between the retropubic trocar and the

19   transobturator trocar relative to organ perforation and

20   injury; correct?

21                    MR. DAVIS:  Object to the form.

22          A.   No, ma'am, I can't say correct because --

23   BY MS. FITZPATRICK:

24          Q.   Tell me why.
```

Elaine Duncan

1          A.    Because we're talking about a literature

2    search that went all the way back to 1997, and considering

3    the time involved and how these particular numbers are

4    laid out here, I would expect the retropubic to be higher

5    because it's an older product and it goes back to '97, and

6    in this circumstance of this table, I -- I can't make out

7    any useful information other than this is how they broke

8    their numbers down.

9          Q.    Okay.

10          A.    I mean, it's math.  If you agree with the

11    math, but I don't know, looking at this, anything more

12    than that.  So I -- I don't feel qualified to give you any

13    information here about this chart.

14          Q.    What does "rate" mean to you?

15          A.    It's a percentage, but what I'm saying is I

16    don't know if this is with respect to time.  I mean, we

17    could have -- when a new product comes out, you could have

18    a big burst and then they taper off, and FDA's not

19    provided any kind of temporal characterization of these

20    numbers.  So this is -- you know, you could take it for

21    what it's worth, but I don't have enough information to

22    make any judgment on this chart.

23          Q.    Okay.  Does it raise questions, at least, as

24    to whether there's a difference in the rates between organ

Elaine Duncan

1   perforation and injury for retropubic and transobturator?

2        A.   It raises question --

3             MR. DAVIS:  Wait.  Object to the form.

4        A.   Sorry.  It raises questions in my mind how

5   these numbers were derived, and I just saw this for the

6   first time today, and I don't have any opinion about this

7   document (pointing) or FDA's numbers.  I can tell you

8   whether or not I think they did the math right, but I

9   can't give you any opinion about this document.

10  BY MS. FITZPATRICK:

11       Q.   Well, sure you can.  Let me ask you a

12  hypothetical question.

13            Assuming -- and we're going to assume, I'm not

14  asking you to endorse the FDA numbers but assuming that

15  the FDA numbers are right, if there's a risk of organ

16  perforation and injury from 0.2 to 5.8 percent with the

17  retropubic procedure and a risk of organ perforation and

18  injury from a retropubic procedure that goes from 0.3 to

19  23.8 percent, assuming that those are correct numbers, you

20  would agree with me that there is a difference in the risk

21  profile between the retropubic trocar and the

22  transobturator trocar when it comes to organ perforation

23  and injury; correct?

24            MR. DAVIS:  Object to the form and asked

Elaine Duncan

1    and answered.  Go ahead.

2         A.   I will state that I cannot -- cannot confirm

3    your statement.  I do not agree with your statement.

4    There's not enough information here to agree with your

5    statement or disagree with your statement because these

6    numbers are not reflecting the -- anything about the

7    learning curve, the time reference.

8    BY MS. FITZPATRICK:

9         Q.   Okay.

10        A.   All these -- all these folks did was they went

11   to 1997 and grabbed up a bag of articles from the

12   literature, went through and counted numbers, then they

13   divided those numbers into categories.  And when you see a

14   number that ranges from .3 to 23.8, in my world, that

15   should immediately cause me to wonder how did you get that

16   big a swing of numbers, and so I would need to look at the

17   54 versus 74 papers that they're getting those numbers out

18   of.  I couldn't give you any information about this chart.

19        Q.   Okay.  Fair enough.

20             Did Ethicon, in any of the documents -- and

21   you've got a lot of binders around this room and you've

22   got a lot of documents you looked at -- have you seen

23   anything where Ethicon attempted to do what the FDA has

24   done in this document?

Elaine Duncan

1              MR. DAVIS:  Object to the form.

2         A.   I don't know what FDA attempted to do in this

3    document, but I have certainly seen clinical evaluation

4    reports where Ethicon has reviewed literature over a

5    certain period of time, they've stated in their document

6    how they did their literature searches, and they've

7    reported the incidences that they found in the literature.

8              And so, I believe on a par with looking at the

9    clinical experiences that Ethicon has, persistently

10   through the years, monitored the literature, and thus, the

11   complication rates reported in that literature.

12   BY MS. FITZPATRICK:

13        Q.   Do you believe that Ethicon has an obligation

14   to be monitoring the medical literature to see if there's

15   a difference in their risk profile for the retropubic

16   trocar versus the transobturator trocar?  Is that

17   something Ethicon should be doing?

18              MR. DAVIS:  Object to the form.

19        A.   I don't know what you mean by "risk profile,"

20   but I believe that Ethicon does that and should be doing

21   it, yes.

22   BY MS. FITZPATRICK:

23        Q.   Okay.  And so you -- you believe that

24   somewhere in all of the documents you have -- and I can

Elaine Duncan

```
 1   look at from your report -- I will find in there a place

 2   where Ethicon has looked specifically at whether there's a

 3   difference between the risk of organ perforation and

 4   injury from the retropubic trocar versus the risk of organ

 5   perforation and injury from the transobturator trocar?

 6                       MR. DAVIS:  Object to the form.

 7        A.   Specifically, I can tell you there is a report

 8   comparing the -- well, I should say complications and

 9   complaints, evaluated differently between the two systems,

10   and I can't recall if they broke it down to

11   instrumentation.

12   BY MS. FITZPATRICK:

13        Q.   Okay.  And knowing that you haven't looked at

14   this report, let me just ask you a general question on

15   page 35.

16             Do you agree with me that Ethicon should be

17   looking at whether there's a difference in the risk

18   profile between the TVT-R trocar and the TVT-O trocar for

19   vascular injury and bleeding associated with those

20   devices?

21                       MR. DAVIS:  Object to the form.

22        A.   I can't say from recall if that was conducted,

23   but I can say that that would be a reasonable thing to be

24   doing.
```

Elaine Duncan

```
1    BY MS. FITZPATRICK:

2         Q.   Okay.  And would it also be reasonable to

3    expect Ethicon to be looking at the relative risk profile

4    of nerve injury and pain caused by the TVT-R trocar versus

5    the TVT-O trocar?

6                   MR. DAVIS:  Object to the form.

7         A.   If their information is broken out that -- in

8    that detail, it would be reasonable.  I believe that I can

9    recall a document that did that.

10   BY MS. FITZPATRICK:

11        Q.   Okay.  And you would agree with me that if

12   Ethicon concluded that there was a difference, a

13   significantly higher risk of a complication from the TVT-R

14   device versus the TVT-O device, that information should be

15   reflected in the instructions for use that are given to

16   physicians; correct?

17                  MR. DAVIS:  Object to the form.

18        A.   I can't say that that would be true.  No, I

19   don't know that.

20   BY MS. FITZPATRICK:

21        Q.   Okay.  Well, let me ask you this.

22        A.   May I clarify?

23        Q.   Well, let me clarify that -- maybe that will

24   help -- maybe that will help.
```

Elaine Duncan

1                    MR. DAVIS:  If you need to explain your

2      answer -- if you need to explain your answer.

3                    THE WITNESS:  I just want to explain the

4      answer there.

5                    MR. DAVIS:  You're entitled.

6      BY MS. FITZPATRICK:

7          Q.   Sure, go ahead.

8          A.   When -- when we're looking at differences

9      sometimes and whether or not that difference needs to get

10     to the literature, you have to also appreciate the

11     differences in practices and preferences.  So if you were

12     just to take a number and say, "Well, this number is

13     higher and that number is lower," that doesn't necessarily

14     compel you to go out and say, "This week, it was higher

15     and the other one was lower."  You don't react in that way

16     just because you find some anomalies in numbers for a

17     while, particularly when a new product is being

18     introduced.  So that's what I wanted to clarify.

19         Q.   Okay.  But just to clarify for right now, the

20     TVT-O's been on the market for a long time.  It's not a

21     new product that was just introduced; correct?

22         A.   It's not new.

23         Q.   Okay.  Let me mark this as Exhibit 18.

24                    (Whereupon, Exhibit 18 was marked.)

Elaine Duncan

```
 1    BY MS. FITZPATRICK:

 2         Q.   Ms. Duncan, do you know what a meta-analysis

 3    is?

 4         A.   Yes.

 5         Q.   Okay.  And what I've put in front of you is a

 6    meta-analysis that was done by a Dr. Megan Schimpf and

 7    published in 2013 concerning sling surgeries for stress

 8    incontinence in women.

 9         A.   Okay.

10         Q.   And I'm going to represent to you that this

11    article is one that your gynecology experts for Ethicon

12    have relied on for their opinions concerning both the

13    TVT-R and TVT-O device in this case; okay?

14              And what I want you to do is I want you to

15    turn to Table 4, which is on page 71.E11; okay?  And about

16    halfway down Table 4, there's a section entitled,

17    "Retropubic vs. Obturator Midurethral Slings."

18              Do you see that?

19         A.   Yes.

20         Q.   And what they say here is, "For women

21    considering retropubic or transobturator midurethral

22    sling, we recommend either intervention for objective or

23    subjective cure."

24              And that means how well it cures the SUI;
```

Elaine Duncan

```
 1   correct, or corrects the condition?

 2              MR. DAVIS:  Object to the form.

 3        A.   I would have to read more, but if you say so.

 4   BY MS. FITZPATRICK:

 5        Q.   Okay.  "And that decision be based on which

 6   adverse events are of greatest concern to the patient."

 7              Do you see that?

 8        A.   I see that.

 9        Q.   And then underneath, it says, "Retropubic

10   slings result in lower rates of sling erosion, need to

11   return to operating room for treatment of sling erosion,

12   groin-like pain and vaginal perforation."

13              Do you see that?

14        A.   I see that.

15        Q.   And underneath, it says, "Transobturator

16   midurethral slings result in shorter operative time, fewer

17   bladder urethral perforations, less perioperative pain,

18   fewer urinary tract infections and less overactive bladder

19   symptoms."

20              Do you see that?

21        A.   Yes, I see that.

22        Q.   Now, you will agree with me that, according to

23   this Table 4, Dr. Schimpf is indicating that there's a

24   different risk profile for the retropubic slings versus
```

Elaine Duncan

1    the transobturator slings; correct?

2                    MR. DAVIS:  Object to the form.

3           A.   The context is within this paper and the

4    metadata analysis they did.  I can't agree with that

5    declarative statement you just made.  Within the context

6    of the paper and the metadata that she's looking at,

7    obviously, this is the conclusion she's made.

8    BY MS. FITZPATRICK:

9           Q.   Okay.

10          A.   I don't know for a fact how that would be

11   reflected in other practice.

12          Q.   Well, let me ask you it differently.

13               If Ethicon's experts, urogynecological and

14   gynecological and neurology experts, the medical experts,

15   have testified that this paper does, indeed, indicate that

16   there are different risk profiles for the retropubic and

17   the transobturator midurethral slings, you would have no

18   reason to disagree with those expert opinions; would you?

19                    MR. DAVIS:  Object to the form.

20          A.   This is outside my field of expertise.

21   BY MS. FITZPATRICK:

22          Q.   So you would have no reason to disagree with

23   those.  You would defer to those -- maybe a better way,

24   you would defer to Ethicon's clinical experts on the

Elaine Duncan

```
 1   different clinical --

 2        A.   It's outside my expertise.

 3                  MR. DAVIS:  Let her finish her question.

 4                  THE WITNESS:  Sorry.

 5   BY MS. FITZPATRICK:

 6        Q.   Do you defer to the Ethicon clinical experts

 7   on the clinical differences in the risk profiles of the

 8   retropubic versus transobturator slings?

 9        A.   Yes, I do.

10        Q.   Okay.  Now, what does Ethicon consider to be a

11   Legacy product?

12        A.   It is my recall that the term "Legacy product"

13   with respect to the documents that I was looking at, I

14   don't know if they use it in a different terminology

15   elsewhere, but within the context of these topics, it

16   means the products that were introduced to the marketplace

17   prior to the issuance, adoption to use your word, of

18   ISO 14971.

19        Q.   Okay.  And there are a series of risk

20   assessments that were done on those Legacy products;

21   correct?

22        A.   There have been a number, yes.

23        Q.   Okay.  And you know that the Legacy products

24   include the TVT-R and the TVT-O; correct?
```

Elaine Duncan

```
1          A.   Say it again, I'm sorry.

2          Q.   That the Legacy product risk assessments

3    include the -- apply to the TVT-R and to the TVT-O;

4    correct?

5          A.   They characterize them as Legacy products,

6    yes.

7          Q.   Okay.  And those risk assessments for the

8    Legacy products that you're talking about don't

9    differentiate between whether those products are

10   mechanically-cut or laser-cut; do they?

11         A.   It's my recall they do not.

12         Q.   And they don't differentiate between whether

13   it's a retropubic approach or a transobturator approach;

14   correct?

15         A.   I can't recall if they broke those out or not.

16         Q.   And those Legacy product documents create a

17   risk profile for the whole family of the Legacy

18   document -- the Legacy products out there, collectively,

19   as opposed to individually breaking those out; correct?

20              MR. DAVIS:  Object to the form.

21         A.   I'm not clear on your term "risk profile."

22   Can you tell me what you mean by that?  It's not a term I

23   use.

24   BY MS. FITZPATRICK:
```

Elaine Duncan

```
 1          Q.   I should be using the term "risk assessment,"

 2    not risk profile.

 3               So the risk assessments in the Legacy products

 4    that we're talking about create a single risk assessment

 5    for the TVT-R mechanically-cut, the TVT-R laser-cut, the

 6    TVT-O mechanically-cut, the TVT-O laser-cut.  They create

 7    a risk assessment for those -- all of those products

 8    together; correct?

 9          A.   Ethicon's Legacy Risk Report combined those

10    products, yes.

11          Q.   Okay.

12               MR. DAVIS:  Can we stop just one second?

13    I just want to know how much time we've been on the

14    record?

15               THE REPORTER:  We have -- in 14 minutes,

16    we'll be at four hours.

17               MR. DAVIS:  Okay.

18               MS. FITZPATRICK:  I'm not even going to

19    get to 14 minutes.

20               MR. DAVIS:  Okay.  I just didn't know if

21    you had any follow-up after I ask questions.  That's fine,

22    go ahead.

23    BY MS. FITZPATRICK:

24          Q.   In looking at the -- you've reviewed the IFUs
```

Elaine Duncan

1    for the TVT-R and TVT-O?

2         A.   Yes.

3         Q.   Have you ever compared the warnings,

4    precautions, contraindications, adverse events that are

5    set forth in the TVT-R versus the TVT-O IFU?

6         A.   I did not do that.

7         Q.   Okay.  So you don't know whether those

8    warnings, contraindications, adverse events, whatever

9    Ethicon calls them, are the same for both products or

10   different for those products; do you?

11        A.   I did the report separately, so I don't -- I

12   did not compare.  That was not a part of it.

13        Q.   Okay.

14              MS. FITZPATRICK:  Can you give us one

15   minute?

16              MR. DAVIS:  Sure.  We'll be right out

17   here.

18              (Whereupon, a recess was taken from

19              2:31 p.m. to 2:37 p.m.)

20              MR. DAVIS:  Did you have something you

21   wanted to --

22              MS. FITZPATRICK:  Well, let me end and

23   you can make it part of -- part of your questioning.  I

24   don't have any further questions for you at this time.

Elaine Duncan

```
 1                    THE WITNESS:  Okay.

 2                    EXAMINATION

 3    BY MR. DAVIS:

 4         Q.   Ms. Duncan, did I hear you say you had

 5    something you wanted to say?

 6         A.   Yes.  During the bathroom break, it occurred

 7    to me I had misspoken of inside-out and outside-in, so I

 8    want to clarify that.  The obturator approach is

 9    inside-out, and the other was outside-in, so instead of

10    outside in.

11              So the outside in -- I'm not sure which way I

12    had it.  Outside in, the original TVT-R had the potential

13    for the bladder perforation.  So the design for the new

14    obturator approach is going inside-out, and I don't know

15    if I had that right or not when I spoke, but then I got to

16    thinking maybe I hadn't.  But the outside in was the

17    original TVR and it had the higher observed bladder

18    perforation at the time when they were doing the risk

19    assessment.  That's my clarification, okay.

20                    MR. DAVIS:  Can I proceed?

21                    MS. FITZPATRICK:  Yeah.

22    BY MR. DAVIS:

23         Q.   I just have several questions.

24              Ms. Duncan, when you were asked questions
```

Elaine Duncan

1    today, I know a number of the questions you were asked,

2    counsel opposite would use the word "safe" in the

3    question.

4         A.   Yes.

5         Q.   And you would, then, answer the question.

6         A.   Yes.

7         Q.   In answering those questions where they were

8    using the word "safe," what definition were you applying

9    in your mind for the word "safe"?

10        A.   The safety of the product certainly has to be

11   considered in the context of the alternative therapies,

12   and the unknown risks associated with the product,

13   that's -- when I think of safe, I'm thinking there's no

14   unexpected risks and the alternatives would have

15   comparable risk or worse.  So if I'm making a safer

16   product, I would be safer than the alternative surgical

17   procedure or methods that would be available to me.

18        Q.   And you've mentioned ISO 14971.  In answering

19   those questions, were you applying a different definition

20   of safe than what appears in ISO 14971?

21        A.   No, I think that's comparable to 14971.

22        Q.   And then, another question, series of

23   questions that you were asked about, if Ethicon knew about

24   certain risks, should they be in the IFU.

Elaine Duncan

1          Do you recall, generally, some of those

2    questions?

3          A.   Yes.

4          Q.   And I wrote down one of your answers.  You

5    said, "Risks that rise to the level of warning."

6          Can you explain what you meant by that?

7          A.   In the FDA and the European standards, we talk

8    in terms of -- we see them talk in terms of precautions,

9    cautions and warnings.  So a precaution is an effort I

10   would need to do in advance because failure to do so may

11   cause a harm, and a caution says I could have a harm if

12   certain factors combine together, and then a warning is at

13   a level where it is known that certain conditions can --

14   can create a harm if you fail to take certain precautions.

15   So a warning is more of a certainty than a -- than a harm

16   that only might occur under certain conditions.

17         Q.   And you were asked about whether you could

18   base your -- or whether you had to have FDA standards in

19   your report in order to justify your opinions in your

20   report.

21         Do you recall, generally, those questions?

22         A.   Yes.

23         Q.   And can you -- can you explain to the Court to

24   what extent, if any, you based your report on Ethicon's --

Elaine Duncan

1    Ethicon's own internal procedures?

2         A.    Ethicon, at a certain point in their own

3    history, began to incorporate, based on jurisdictions,

4    certain international standards as well as U.S. guidance

5    documents.  So the procedures at the troop level governed

6    the activity of the troops.

7              So when Ethicon converts standards and

8    practices into their procedures, those are the activities

9    that the specific employees are expected to employ.

10   Ethicon does not expect that, on an ad hoc basis, people

11   just go and grab guidances and the like to do their job;

12   they want them to follow standardized procedures, which

13   have incorporated the currently-adopted guidances and

14   standards on a global level wherever Ethicon practices

15   their sales.

16        Q.    Okay.  And if the Court decides that the Court

17   does not want to hear any testimony or any opinions based

18   on FDA standards, does that present any problem for you to

19   present your opinions?

20        A.    No, I would be referring to the Ethicon

21   procedures and had Ethicon implemented their own internal

22   procedures for these various obligated activities, but

23   keep in mind that, even practicing 14971 for risk

24   assessment, it's incumbent upon us to understand the rules

Elaine Duncan

```
 1   of the land that we're operating in.  So if I go to

 2   Canada, I have to do my risk analysis in the context of

 3   any specific Canadian regulations, and if I go to

 4   Saudi Arabia, then I do my risk assessments incorporating

 5   those.

 6           And so, when you have an international

 7   worldwide company, their procedures have to reduce those

 8   unique regulatory requirements and standard adoptions into

 9   their procedures on an ongoing basis.  That's why you see

10   revision after revision after revision, because different

11   standards are adopted in different jurisdictions at

12   different times.

13           Q.   That's all I got.

14                        REEXAMINATION

15   BY MR. WALLACE:

16           Q.   You were just asked by Mr. Davis about whether

17   or not you could speak to the -- well, let me ask it a

18   different way.

19           You were asked whether or not certain

20   regulations, whether or not you could testify with or

21   without those regulations, including FDA regulations.

22           Do you recall what he just asked you about

23   that?

24           A.   I recall it.
```

Elaine Duncan

```
1            Q.   And what I think I heard, and you tell me if

2   I'm wrong, is you said it wouldn't change my analysis of

3   their internal standards because those changed over time

4   in response to different standards that were adopted

5   around the world.

6                 That's what you said; right?

7            A.   Yes.

8            Q.   Now, coming back to that, you also said that,

9   if I understand you correctly -- and again, tell me if I'm

10  wrong -- that you really have to put your opinions in the

11  context of the regulatory environment in which those

12  entities operate; right?

13                MR. DAVIS:  Object to the form.

14           A.   When I did my assessment, I had to appreciate

15  where the work was being done, where the product was being

16  sold and the time that it was being sold.

17  BY MR. WALLACE:

18           Q.   Okay.  So let's take the United States, for

19  example.

20                As I understand what you're saying, you cannot

21  offer your opinions without considering how the FDA

22  regulations would apply to Ethicon in the United States;

23  right?

24           A.   I can offer the opinions and exclude different
```

Elaine Duncan

```
1    countries, if that's what the job is, but now you're --

2    the request that was given of me was to assess the scope

3    of design control and review, risk management and how the

4    various companies of Ethicon implemented those activities.

5         Q.   Okay.  But to answer my question, though, I'm

6    specifically talking about the United States and this

7    product being sold in the United States; okay?

8              So with that in mind, forgetting about other

9    countries for a moment, can you tell us, as you sit here,

10   whether or not your opinions would be the same if the FDA

11   regulations were removed from your analysis?

12        A.   Yes, they would be the same.

13        Q.   Why is that?

14        A.   Because I was looking at the documentation of

15   the three products for the evidence of compliance with

16   their internal standards, as well as other obligations.

17        Q.   Okay.  So that's what I'm getting at.

18             You can say your opinion would be, then,

19   slightly revised to say, "I can tell you that they

20   complied with their internal standards;" right?

21                  MR. DAVIS:  Object to the form.

22   BY MR. WALLACE:

23        Q.   But when we're referencing external standards,

24   you wouldn't be able to give that portion of your opinion?
```

Elaine Duncan

 1                    MR. DAVIS:  Object to the form.

 2        A.   I would still be able to give that.  I think

 3   that's what I did.  I'm not following -- I mean, if I

 4   looked at the procedures, I also looked at the standards

 5   that were in place at the time, and not only the

 6   standards, but with respect to time.  So which standards

 7   were in effect in which location with respect to time.

 8   BY MR. WALLACE:

 9        Q.   Okay.  We're talking about the United States,

10   though.  Keep that in mind.

11        A.   Okay.

12        Q.   Just for this line of questioning.

13             You're able -- your opinions would change in

14   the sense that you can talk about whether or not Ethicon

15   followed its own internal standards in the U.S. and if the

16   FDA piece was removed from your analysis, if I hear you

17   correctly, what you're saying is, "I, then, wouldn't be

18   talking about external standards as it relates to this

19   product's performance in the United States."

20                    MR. DAVIS:  Object to the form, and

21   asked and answered.

22        A.   That's not a correct statement, as I

23   understood you to say it.  That's very difficult to

24   understand.

Elaine Duncan

1          I've said before that a job was what I

2    referred to as due diligence, looking back at the records,

3    how they complied with procedures and the procedures that

4    were enforced with respect to regulations and standards in

5    the jurisdictions with respect to time, and I can

6    certainly eliminate the question of how did they deal with

7    Canada or how did they deal with U.S. or how did they deal

8    with Saudi Arabia and still make an expert opinion on

9    their diligence with respect to design control and review

10   and risk management.

11   BY MR. WALLACE:

12        Q.   Okay.  So what standards would apply in the

13   U.S. if you removed the FDA analysis that you've done in

14   your reports?

15        A.   What standard would apply in the U.S.?

16        Q.   What external standards would apply in the

17   U.S.?

18        A.   I think -- I can give you one example;

19   ISO 10993.

20        Q.   Okay.  What else?

21        A.   I think, to some extent, the ISO 14971 would

22   still apply.

23        Q.   You agree with Ms. Wilson in that context if

24   that's her testimony?

Elaine Duncan

```
1          A.   I can't hear you very well.

2          Q.   You would agree with Ms. Wilson, if that was

3    her testimony, that that standard would apply?

4               MR. DAVIS:  Object to the form.

5          A.   Not with respect to time.  You can't -- I

6    mean, you're asking me in a very general way, but I have

7    to bring you back to that all of this work had to be done

8    with respect to the time in which it was done.  No single

9    product stayed still.

10   BY MR. WALLACE:

11         Q.   What -- what other standards would apply?

12         A.   Depending on the time frame you're talking

13   about, it may or may not have been EN 1441, depending on

14   the location you're speaking of --

15         Q.   U.S.

16         A.   -- it may have been an EN standard.

17              If you make a product in the U.S. and you sell

18   it to another country, you have to abide by those country

19   rules you're selling it into, so --

20         Q.   Again, my questions are limited right now for

21   selling to women in the United States.

22         A.   All right.

23         Q.   That's what -- these women that you -- you

24   realize that you've been designated to testify with
```

Elaine Duncan

1   respect to women that have brought claims in U.S. courts;

2   correct?

3        A.   Yes.

4        Q.   And under the U.S. legal system?

5        A.   Yes, sir.

6        Q.   And you've offered opinions on that; right?

7        A.   Broadly speaking, all of the standards.

8        Q.   So my question remains:

9             Tell me what other standards that would apply

10   in the United States that would apply to these women that

11   have brought these claims against Ethicon.

12        A.   Sterilization standards, packaging standards.

13   There's a host of standards that all the medical device

14   companies, regardless of their location, attempt to

15   satisfy for various reasons.  Maybe it's because of

16   regulatory, but maybe because of an understanding of the

17   state of the art.

18        Q.   Are there any standards that are not listed in

19   your report that you want to tell us about today that

20   might apply?

21        A.   I can't answer that.  I don't -- I don't know.

22   Now you're asking me something that was not specific -- I

23   mean, I wasn't asked to look at a -- list in my report all

24   of the applicable standards.  That was not the scope of

Elaine Duncan

1   the report.  I could go do that.

2        Q.  Let me ask you a question that would, perhaps,

3   short-circuit your concern that you weren't asked to do

4   certain things.

5            Are all the standards that would apply to your

6   opinions listed in your reports?

7        A.  I'll say the vast majority.  I can't say that

8   they're all listed individually, and if you will allow me,

9   that is because some of these standards existed by

10  different names in different locations.  Even ANSI, AAMI,

11  ISO will sometimes even change the name of a standard when

12  they adopt it, so you're asking a very broad question that

13  needs a very specific answer.

14                    THE REPORTER:  AAMI?

15                    THE WITNESS:  A-A-M-I.

16                    MR. WALLACE:  I'm done.

17                    REEXAMINATION

18  BY MR. DAVIS:

19       Q.  I have a follow-up on what you just said.

20           Ms. Duncan, you brought with you, I noticed,

21  various Ethicon's internal procedures.

22           Have I placed before you the book on

23  PR602-003?

24       A.  Yes.

Elaine Duncan

```
1          Q.   And can you look -- is it -- do you have a

2     recollection as to whether Ethicon, itself, in its

3     procedure, would list -- did it have a practice of listing

4     references to the various standards that they're applying

5     in developing their own procedures?

6          A.   They did, yes.

7          Q.   And do they list ISO, for example, ISO 13485

8     as one of the standards that they have opted to choose in

9     their own PR602-003 as a basis for compliance?

10         A.   That was an example in 1996, and then they

11    also referenced ISO 9001, which is not even a medical

12    standard, and a Canadian standard that is listed here, and

13    that's what I was trying to describe; that on any given

14    time we have a procedure, we have to look at the scope of

15    references in the back that were being considered when

16    they were writing the procedure, and this list may change.

17         Q.   And as I recall, I understand that, in your

18    report, you explained that the FDA has not, itself,

19    adopted ISO 13485?

20         A.   That's correct.

21         Q.   Or when I say "adopted," I mean recognize it

22    as a consensus?

23         A.   That's right.

24         Q.   But since Ethicon listed, in development of
```

Elaine Duncan

```
 1   its own procedures, did you consider the extent to which

 2   Ethicon's files on these various products met the

 3   requirements for 1345?

 4        A.   I certainly did, and I even went and got

 5   copies of those older standards to look at them.

 6        Q.   And so, if the Federal Court does not allow

 7   testimony and opinions concerning compliance with FDA

 8   standards, have your opinions addressed Ethicon's

 9   compliance with ISO 13485 with respect to these products?

10        A.   Certainly.

11        Q.   And what about ISO 14971?

12        A.   To the extent that it was applicable at the

13   time that Ethicon was doing their work, yes.

14        Q.   That's all I have.

15                  MS. FITZPATRICK:  Nothing further.

16                  MR. DAVIS:  Read and sign.

17                  MR. WALLACE:  We'd like it expedited.

18   Need it Monday.

19                  (The deposition of Elaine Duncan

20                  concluded at approximately 2:58 p.m.)

21                        *   *   *   *   *

22

23

24
```

Elaine Duncan

```
1                      CERTIFICATE

2

3           I, Barbara J. Carey, a Registered Professional
       Reporter and Notary Public for Anoka County, Minnesota
4      hereby certify that I reported the Deposition of Elaine
       Duncan, on the 31st day of March, 2016, in Minneapolis,
5      Minnesota, and that the witness was by me first duly sworn
       to tell the whole truth;

6

            That the testimony was transcribed under my
7      direction and is a true record of the testimony of the
       witness;

8

            That I am not a relative or employee or
9      attorney or counsel of any of the parties or a relative or
       employee of such attorney or counsel;

10

            That I am not financially interested in the
11     action and have no contract with the parties, attorneys,
       or persons with an interest in the action that affects or
12     has a substantial tendency to affect my impartiality;

13          That the right to read and sign the deposition
       by the witness was not waived;

14

            IN WITNESS WHEREOF, I have hereunto set my
15     hand this 4th day of April, 2016.

16

17
                                _____
18                              Barbara J. Carey
                                Registered Professional Reporter
19                              Notary Public

20

21

22

23

24
```

Elaine Duncan

```
 1                    -   -   -   -   -   -

 2                     E  R  R  A  T  A

 3                    -   -   -   -   -   -

 4    PAGE   LINE   CHANGE

 5    ____   ____   _____

 6          REASON: _____

 7    ____   ____   _____

 8          REASON: _____

 9    ____   ____   _____

10          REASON: _____

11    ____   ____   _____

12          REASON: _____

13    ____   ____   _____

14          REASON: _____

15    ____   ____   _____

16          REASON: _____

17    ____   ____   _____

18          REASON: _____

19    ____   ____   _____

20          REASON: _____

21    ____   ____   _____

22          REASON: _____

23    ____   ____   _____

24          REASON: _____
```

Elaine Duncan

```
 1                    ACKNOWLEDGMENT OF DEPONENT

 2

 3            I,_____, do

 4   hereby certify that I have read the foregoing pages, and

 5   that the same is a correct transcription of the answers

 6   given by me to the questions therein propounded, except

 7   for the corrections or changes in form or substance, if

 8   any, noted in the attached Errata Sheet.

 9

10   _____

11   Elaine Duncan                         DATE

12

13

14

15   Subscribed and sworn to before me this

16   _____ day of _____, 20_____.

17   My commission expires:_____

18

     _____

19

                    Notary Public

20

21

22

23

24
```