# Exhibit D

```
                         Christina Pramudji, M.D.

 1              IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2                     CHARLESTON DIVISION
 3    IN RE: ETHICON, INC.,    )MASTER FILE NO.
      PELVIC REPAIR SYSTEM     )2:12-MD-02327
 4    PRODUCTS LIABILITY       )
      LITIGATION               )JOSEPH R. GOODWIN
 5    ---------------------    )U.S. DISTRICT JUDGE
      THIS DOCUMENT RELATES TO )
 6    THE FOLLOWING CASES IN WAVE 1 OF MDL 200:)
      Joy Essman                )
 7    Case No. 2:12-cv-00277    )
                                )
 8    Barbara A. Hill           )
      Case No. 2:12-cv-00806    ) ORAL DEPOSITION OF
 9                              ) CHRISTINA PRAMUDJI, M.D.
      Paula Kriz                )
10    Case No. 2:12-cv-00938    ) MARCH 24, 2016
                                )
11    Brenda Riddell            )
      Case No. 2:12-cv-00547    )
12                              )
      Sharon Carpenter          )
13    Case No. 2:12-cv-00554    )
                                )
14    Mary Jane Olsen           )
      Case No. 2:12-cv-00470    )
15                              )
      Virginia White            )
16    Case No. 2:12-cv-00958    )
                                )
17    Sandra Wolfe              )
      Case No. 2:12-cv-00335    )
18                              )
      Marie Smith (f/k/a Banks) )
19    Case No. 2:12-cv-01318    )
                                )
20    Sherry Fox                )
      Case No. 2:12-cv-00878    )
21                              )
      Lois Durham               )
22    Case No. 2:12-cv-00760    )
                                )
23    Elizabeth Blynn Wilson    )
      Case No. 2:12-cv-01286    )
24
```

```
 1   Daphne Barker              )
     Case No. 2:12-cv-00899     )
 2                              )
     Wendy Hagans               )
 3   Case No. 2:12-cv-00783     )
                                )
 4   Maria Eugenia Quijano      )
     Case No. 2:12-cv-00799     )
 5                              )
     Sharon Boggs               )
 6   Case No. 2:12-cv-00368     )
                                )
 7   Robin Bridges              )
     Case No. 2:12-cv-00651     )
 8                              )
     Carey Cole                 )
 9   Case No. 2:12-cv-00483     )
                                )
10   Cathy Warlick              )
     Case No. 2:12-cv-00276     )
11                              )
     Donna Amsden               )
12   Case No. 2:12-cv-00960     )
                                )
13   Heather Long               )
     Case No. 2:12-cv-01275     )
14                              )
     Penny Rhynehart            )
15   Case No. 2:12-cv-01119     )
                                )
16   Nancy Jo Williams          )
     Case No. 2:12-cv-00511     )
17                              )
     Maria Stone                )
18   Case No. 2:12-cv-00652     )
                                )
19   Teri Key Shively           )
     Case No. 2:12-cv-00379     )
20                              )
     Charlene Logan Taylor      )
21   Case No. 2:12-cv-00376     )
                                )
22   Tina Morrow                )
     Case No. 2:12-cv-00378     )
23                              )
     Carol Jean Dimock          )
24   Case No. 2:12-cv-00401     )
```

1                Doctor, am I correct that you
2    don't hold yourself out to be an expert with
3    regard to the design of medical device kits
4    for the treatment of prolapse?
5        A.    I would say that I am somewhat
6    of an expert in that area as far as being a
7    user of the devices and also being involved
8    in some of the labs that are held during the
9    development of devices that I've been
10   involved in.  So as far as being asked to
11   evaluate different devices as they're being
12   produced, as far as that goes, I do have some
13   expertise in that area.
14       Q.    Well, let me see if I can ask
15   it a different way.  Am I correct that I
16   would not expect you to offer design --
17   strike that.
18               Am I correct that I would not
19   expect you to offer opinions on the design of
20   the Prosima?
21               MR. GAGE:  Object to form.
22       A.    My opinions would go to how I
23   feel the design is based on use in my hands
24   and based on the patient results.  So I feel

1    very confident and familiar with evaluating

2    the design based on those parameters.

3    BY MR. FAES:

4         Q.    Is that the extent of the

5    opinions that I would expect you to offer on

6    the Prosima -- on the design of the Prosima,

7    rather?

8              MR. GAGE:  Object to form.

9         A.    I may have some other opinions

10   as far as they go to the mesh in general or

11   pelvic floor kits or surgery in general.

12   BY MR. FAES:

13        Q.    So you would have opinions on

14   the design of the mesh in general or the

15   design of pelvic floor kits and surgery in

16   general?

17        A.    Yes.

18        Q.    Would those opinions on the

19   design go beyond how those devices -- you

20   believe those devices worked in your hands?

21        A.    Yes, they potentially could.

22        Q.    Well, you understand, Doctor,

23   that this is my opportunity here today to

24   learn what your opinions in this case might

1   be.  What other opinions might you offer on
2   the design of the Prosima or mesh kits or
3   mesh in general?
4       A.   Well, opinions about the design
5   of the mesh in general, the way that the mesh
6   is configured, the size of the pores, the
7   materials that the mesh is made of.  Or with
8   the kits, how they're designed, how they --
9   the development of the kits, the nuances of
10  the trocars and how it worked in patients.
11      Q.   Have you ever worked on the
12  design team for a medical device?
13      A.   No, only on a consulting basis.
14      Q.   Am I correct in that you're not
15  a biomedical engineer?
16      A.   I'm not a biomedical engineer.
17  I studied it, but I'm not a biomedical
18  engineer.
19      Q.   Do you hold yourself out as an
20  expert in biomedical engineering?
21      A.   To the degree that it applies
22  to my practice, yes.
23      Q.   Do you know what a design
24  failure modes analysis is?

```
 1            A.      I don't -- I'm not familiar
 2    with that term.
 3            Q.      Is it fair to say that you have
 4    never reviewed any design failure mode
 5    analysis with respect to the Prosima,
 6    Gynemesh PS or Prolift?
 7            A.      I may have, because just
 8    breaking down that terminology, I don't -- I
 9    can't give you a quick definition.  But just
10    breaking it down, it sounds like it's just
11    testing the failure of the design with
12    some -- probably some mechanical stretching
13    or that sort of thing, but that's my
14    conjecture.  So I may have read about that.
15            Q.      Do you know what a process
16    failure modes effects analysis is?
17            A.      I'm not familiar with that
18    term.
19            Q.      Do you recall if you reviewed
20    any process failure modes effects analysis
21    with the Prosima, Prolift or Gynemesh PS
22    devices?
23            A.      I'm not sure.
24            Q.      Do you know what an
```

```
 1    applications failure modes effects analysis
 2    is?
 3         A.    I'm not sure.
 4         Q.    Do you recall if you've
 5    reviewed any of those for the Gynemesh PS,
 6    Prolift or Prosima device?
 7         A.    I'm not sure.
 8         Q.    Do you hold yourself out as
 9    having expertise or specialized knowledge
10    regarding the type of mesh used in the
11    Prosima, Prolift -- I guess I'll say
12    Gynemesh PS device even though the mesh --
13    that's the only thing in the Gynemesh PS
14    device is the mesh?
15         A.    Could you repeat the first part
16    of the question?
17         Q.    Yeah, I'll re-ask it because I
18    didn't think it through before I asked it.
19               Am I correct in that you don't
20    hold yourself out as having expertise or
21    specialized knowledge regarding the type of
22    mesh used in the Prosima or Prolift device?
23               MR. GAGE:  Object to form.
24         A.    No, that's incorrect because I
```

1    when the Gynemesh PS was cut with scissors

2    and that those particles could become lodged

3    in a woman's vaginal tissues and cause

4    potential complications, do you believe those

5    physicians' fears are unfounded?

6              MR. GAGE:  Object to form.

7         A.   Absolutely.

8    BY MR. FAES:

9         Q.   Doctor, are you going to

10   offer -- do you plan to offer an opinion in

11   this case about your personal success rate

12   with the Prosima, Prolift or Gynemesh

13   products?

14        A.   Yes.

15        Q.   What is the opinion you intend

16   to offer about your personal success rate

17   with those products?

18        A.   What I found is that the

19   products were very successful with a high

20   patient satisfaction with few complications.

21        Q.   Do you intend to offer a

22   numeric success rate --

23        A.   No, I don't have a --

24        Q.   -- in conjunction with those

```
 1    products?
 2         A.    No, I don't have a calculated
 3    numeric rate for my patients.
 4         Q.    Same question with regard to
 5    complication or erosion or extrusion rates,
 6    do you intend to offer an opinion in this
 7    case with regard to a numeric percentage of
 8    complications or erosions or extrusion rates
 9    that you've experienced personally?
10         A.    Perhaps.  I have in the past
11    calculated reoperation rates, but I can't
12    recall right now if it was on Prolift or on
13    TVT.  I would have to go back and look at my
14    operative logs.
15         Q.    So --
16         A.    So I may have that rate on --
17         Q.    Just reoperation rates?
18         A.    Correct, just reoperation
19    rates.
20         Q.    Not exposure or extrusion
21    rates?
22         A.    Correct.
23         Q.    Can you tell me how you arrived
24    at those reoperation rates?
```

```
 1          A.      I took my total number of
 2    reoperations and my total number of cases and
 3    just divided it.
 4          Q.      And what --
 5          A.      So it's a rough number.
 6          Q.      And what is the numerator and
 7    denominator for those?
 8          A.      I don't recall, as I sit here
 9    right now.  I would have to look at it.
10          Q.      And who did -- who did the
11    review?
12          A.      Myself.
13          Q.      Is there any documentation
14    regarding the review or your findings that
15    you used to come up with those rates?
16          A.      I have an operative log that I
17    keep.
18          Q.      Do you know if that's been
19    produced to us in this litigation?
20          A.      No, I don't believe so.
21                  MR. FAES:  We would ask that
22          that would be produced if the doctor
23          is going to offer any opinions about
24          her reoperation rates at trial.
```

1              MR. GAGE:  I'll consult with
2      her and let you know what our position
3      is on that.
4  BY MR. FAES:
5      Q.     Did you do any kind of analysis
6  of patients that were lost to follow-up?
7      A.     No, I did not.
8      Q.     What time frame were you using
9  for your reoperation rates to come up with
10 your reoperation rate number for Prolift and
11 Prosima?
12     A.     Well, I just -- just from
13 the -- when I started using the products
14 until I did the analysis, however many years
15 that was.  I can't remember when I did that
16 analysis.
17     Q.     But you can't state a specific
18 year that you started and stopped?
19     A.     No, I can't remember right now.
20     Q.     But it's fair to say it would
21 go back to when you were working in Dallas in
22 Dr. Anhalt's practice, correct?
23     A.     Well, yeah.  It wasn't in
24 Dallas.  It was here in Houston.  But, yes,

Christina Pramudji, M.D.

1    back to 2005, when I started doing the

2    Prolift, until I did the analysis, because

3    there may have been some complications that

4    were treated after I stopped using the

5    products.  But I can't remember when I did

6    that.

7         Q.    And if a doctor [sic] needed a

8    reoperation and went to a different doctor

9    other than you, you wouldn't have that

10   information unless the patient shared it with

11   you, correct?

12        A.    That's correct.

13        Q.    So your reoperation rates that

14   you calculated would exclude any patients

15   that went to other doctors for reoperation

16   that you didn't know about, correct?

17        A.    Yes.  But kind of what I did in

18   reverse, which this is very rough, but I

19   included patients that came from other

20   doctors in my reoperation rate.  So some

21   patients were not my original -- I was not

22   the original implanter.  So it's kind of --

23   it's a very rough analysis.  There's just

24   sort of, okay, I did this many implants; how

1    many reoperations did I do?  And this is

2    just -- this isn't even -- this is just like

3    a mesh exposure, mesh explant-type

4    reoperation.  It's not comprehensive.

5         Q.   Okay.  I think you've answered

6    my question on that.

7              I hate to do this to you, but

8    since there's no invoices yet on your

9    case-specific depositions that you're going

10   to be offering opinions on, I need to go

11   through and ask you if you have a rough

12   estimate of the number of hours you've spent

13   on each of your cases.  Do you know

14   approximately how many hours you've spent on

15   the Sharon Carpenter case?

16              MR. GAGE:  Let me just say, I

17         assume that by doing this that the

18         individual lawyers will not ask the

19         question and that you would agree as

20         liaison counsel that I can say "asked

21         and answered," we don't have to do it

22         during the individual cases?

23              MR. FAES:  Well, they might ask

24         more specific questions, like break