# Exhibit F

Confidential - Subject to Stipulation and Oder of Confidentiality

```
 1                    - - -
 2
 3    IN RE:                    :SUPERIOR COURT OF
      PELVIC MESH/GYNECARE      :NEW JERSEY
 4    LITIGATION                :LAW DIVISION -
                                :ATLANTIC COUNTY
 5                              :
                                :MASTER CASE 6341-10
 6                              :
                                :CASE NO. 291 CT
 7
        CONFIDENTIAL-SUBJECT TO STIPULATION AND ORDER OF
 8                     CONFIDENTIALITY
                           - - -
 9
                      September 12, 2012
10
                           - - -
11
12          Volume I of the transcript of the
13    Deposition of CHARLOTTE OWENS, M.D., called for
14    Videotaped Examination in the above-captioned
15    matter, said deposition taken pursuant to
16    Superior Court Rules of Practice and Procedure,
17    by and before JoRita B. Meyer, a Certified
18    Realtime Reporter, Registered Merit Reporter,
19    and Certified Court Reporter for the State of
20    Georgia, at the offices of Troutman Sanders,
21    600 Peachtree Street Northeast, Atlanta,
22    Georgia, commencing at 9:39 a.m.
23                         - - -
24              GOLKOW TECHNOLOGIES, INC.
           877.370.3377 ph|917.951.5672 fax
25                 deps@golkow.com
```

Confidential - Subject to Stipulation and Oder of Confidentiality

```
 1   purpose of the IFU?
 2       A.   The IFU is a document to provide some
 3   general and some specific information to the
 4   physician about the use of our product.
 5       Q.   Did you understand that the IFU is
 6   considered under FDA regulations to be the
 7   primary label for the medical device, in this
 8   case, the PROLIFT?
 9       A.   Yes.
10       Q.   And you understood this would be the
11   primary source of information that surgeons
12   would look to to get information with regard to
13   the safety and efficacy and potential risks of
14   using the PROLIFT with patients, correct?
15       A.   When you say "primary," what do you
16   mean by "primary"?
17       Q.   Meaning this would be the first --
18   well, rephrase.
19            When I say "primary," I say that
20   if -- if there was anything that a surgeon
21   would look at, it would be this, this would be
22   the first thing that they would look to?
23       A.   I don't know if it's the first thing
24   that they would look to, because this would
25   have been part of our entire professional
```

Confidential - Subject to Stipulation and Oder of Confidentiality

```
 1    education package; so this would be one of the
 2    things that they would look to, yes.
 3         Q.   Do you understand the significance
 4    under FDA regulations of the IFU being the
 5    primary label for the PROLIFT?
 6         A.   I understand the FDA regulations
 7    around the document.  I also understand the way
 8    that physicians are trained and operate.
 9              MR. SLATER:  Move to strike from "I
10         also" forward.
11    BY MR. SLATER:
12         Q.   What's your understanding as to the
13    significance of the IFU being the primary label
14    for the PROLIFT from FDA regulatory standpoint?
15         A.   That the agency sees this as the
16    document that they review as a part of the
17    packaging for our materials.  So it should
18    contain the relevant indications, description,
19    and -- and other pertinent information as
20    prescribed by the regulations.
21         Q.   That would also include all necessary
22    contraindications, warnings and precautions,
23    and adverse reactions, correct?
24         A.   It would include warnings,
25    precautions, contraindications, adverse
```

Confidential - Subject to Stipulation and Oder of Confidentiality

```
 1    reactions, sterility, disposal, storage,
 2    et cetera.
 3         Q.   You have understood that all of the
 4    information in the IFU needed to be accurate,
 5    correct?
 6         A.   Yes.
 7         Q.   You understood that physicians were
 8    going to rely on the IFU in making decisions
 9    about whether or not to use the PROLIFT in
10    treating patients, correct?
11              MR. BROWN:  Objection.
12              THE WITNESS:  Physicians will not
13         rely solely on the IFU for making their
14         decisions.  Physicians will use the IFU
15         to help inform them, but they will also
16         use other information.
17    BY MR. SLATER:
18         Q.   You understood physicians would rely,
19    at least in part, on the PROLIFT IFU in making
20    decisions about whether they wanted to use that
21    product, that medical device, that system, in
22    their patients, correct?
23              MR. BROWN:  Objection.
24              THE WITNESS:  Physicians will use
25         this document and other documents to
```

Confidential - Subject to Stipulation and Oder of Confidentiality

```
 1          decide if they want to learn more about
 2          the system, and ultimately will use
 3          their training, education, and
 4          experience, plus this document, to
 5          decide if they want to use it.
 6   BY MR. SLATER:
 7       Q.   Did you understand that it was
 8   necessary to clearly and unambiguously
 9   communicate all necessary contraindications,
10   warnings and precautions, and adverse reactions
11   to physicians through the IFU?
12       A.   I understand the document should be
13   clear and unambiguous, yes.
14       Q.   Did you understand that it was
15   necessary for Gynecare, to the extent that a
16   risk was understood to exist with the PROLIFT,
17   to communicate it in the IFU as opposed to
18   assuming that surgeons would figure out that
19   risk on their own?
20       A.   I don't think you're giving surgeons
21   enough credit.  Surgeons don't have to figure
22   out the complications of an area that they
23   operate.  Surgeons are trained to know the
24   complications of the area in which they
25   operate.
```

Confidential - Subject to Stipulation and Oder of Confidentiality

1   BY MR. SLATER:
2       Q.   Does it mean too much tension?
3       A.   It's not that simple.
4       Q.   How would a surgeon doing the
5   procedure be able to objectively verify, based
6   on an objective standard, that they had placed
7   or not placed the mesh with excessive tension?
8       A.   They would be able to look at the
9   repair after surgery and see if it looks
10  relaxed or see if it looks like it's under
11  tension.
12      Q.   So that's how they would do it?
13      A.   That's generally how it was done.
14      Q.   Did you ever perform the PROLIFT
15  procedure?
16      A.   On the cadavers, yes.  In live
17  people, because I was not practicing during my
18  tenure at Ethicon, no.
19      Q.   Did you ever on your own, without any
20  other surgeon performing the procedure -- did
21  you ever place Gynemesh in a human's body?
22      A.   No.
23      Q.   Look at the adverse reactions,
24  please.  It was your understanding that you
25  needed to list each of the adverse reactions

Confidential - Subject to Stipulation and Oder of Confidentiality

```
 1    that were known to you in Medical Affairs in
 2    this section, correct?
 3         A.   Yes.
 4         Q.   And you understood that if you failed
 5    to list adverse reactions that you were aware
 6    of, that that would render that warning
 7    deficient to some extent, correct?
 8         A.   Deficient?
 9              MR. BROWN:  Objection.
10              THE WITNESS:  I would say that we
11         listed the adverse reactions that we
12         knew were adequate and sufficient for
13         this document.
14    BY MR. SLATER:
15         Q.   Well, you just said a moment ago you
16    agreed with me that you understood you were
17    supposed to list each of the adverse reactions
18    that you in Medical Affairs knew existed at the
19    time of launch, correct?
20         A.   We listed the adverse events that we
21    knew to be directly related to the information
22    that we had at this time.
23         Q.   Okay.  Were there risks -- well,
24    rephrase.
25              You see where it says, at the end of
```

Confidential - Subject to Stipulation and Oder of Confidentiality

```
 1          A.    Correct.
 2          Q.    And it says the potential effect of
 3    that is damage to the cannula and the potential
 4    hazard what could occur would be tissue damage,
 5    correct?
 6          A.    Correct.
 7          Q.    And the potential harm that could
 8    result here is described as bleeding, correct?
 9          A.    Correct.
10          Q.    And you understood that through your
11    review of this -- rephrase.
12                And you understood that it was
13    required that you capture all of the different
14    failure modes, all the things that could go
15    wrong in the procedure, even if the doctor was
16    properly trained and following the proper
17    procedure, and the effects of those failure
18    modes, the hazards that could occur, and the
19    resulting harms, and you were supposed to
20    capture all of them, correct?
21          A.    Yes, all that we could conceive of,
22    yes.
23          Q.    Now, one of the things that could
24    happen is during the passage of the guides, is
25    the pudendal nerve could be injured, correct?
```

Confidential - Subject to Stipulation and Oder of Confidentiality

 1         specifically mentioned in the document.
 2    BY MR. SLATER:
 3         Q.   And therefore, none of them are
 4    specifically scored, correct?
 5         A.   They would have been included in
 6    things other than the terms that you mentioned.
 7         Q.   As the document appears and as it was
 8    specifically and carefully written by quality
 9    engineering, with your approval, those items do
10    not appear and are not specifically scored,
11    correct?
12         A.   Those items are not specifically
13    mentioned, no.
14         Q.   All right.  Now let's look at the
15    dFMEA, which is Exhibit 629.  You understood
16    the purpose of the dFMEA, correct?
17         A.   Yes.
18         Q.   That's the Design Failure Modes and
19    Effects Analysis, correct?
20         A.   Yes.
21         Q.   And what was the purpose of this
22    analysis?
23         A.   To review the potential risk
24    associated with the design of the product.
25         Q.   And when you say "associated with the

Confidential - Subject to Stipulation and Oder of Confidentiality

```
 1    design of the product," that means that when

 2    the product is in a woman's body and the

 3    product was manufactured completely consistent

 4    with the specifications, these are the things

 5    that could go wrong and harm a patient,

 6    correct?

 7         A.   Correct.

 8         Q.   Let's look now at this dFMEA, and

 9    let's look at page -- looking at the Bates

10    number 03573, the actual chart and grid.

11              And it indicates that you were one of

12    the individuals who provided input as medical

13    director, correct?

14         A.   Yes.

15         Q.   And again, as with the aFMEA, you had

16    to sign off on the dFMEA in order for this gate

17    to be surpassed so the product could move

18    closer to Product Release Authorization and to

19    be marketed to be put in women's bodies,

20    correct?

21         A.   Correct.

22         Q.   And what this does is, in the chart,

23    is the different components of the PROLIFT kit

24    are each evaluated in terms of what harms they

25    could cause if they were to fail, correct?
```