Jerry G. Blaivas, M.D.

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST
VIRGINIA, CHARLESTON DIVISION

‑   ‑   ‑

IN RE:  BOSTON SCIENTIFIC  :MDL NO. 2326
CORP., PELVIC REPAIR SYSTEM:
PRODUCTS LIABILITY          :
LITIGATION                  :
------------------------------------------
THIS DOCUMENT RELATES TO:
ALL WAVE 1 AND 2 CASES IN MDL NO. 2326

‑   ‑   ‑

December 4, 2014

‑   ‑   ‑

Videotaped deposition of
JERRY G. BLAIVAS, M.D., held in the
offices of Motley Rice, LLC, 600 Third
Avenue, Suite 2101, New York, New York
10016, commencing at 9:10 a.m., on the
above date, before Margaret Peoples, a
Registered Professional Reporter and
Notary Public in and for the States of
Pennsylvania, New York and Connecticut.

‑   ‑   ‑

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Jerry G. Blaivas, M.D.

Page 77

1     recollection of that, of being given

2     trocars and asking what I thought, so is

3     the thought -- sort of as a consultant

4     and/or thought leader in a group of

5     people.

6                    So I have done that.  And my

7     comments, quite honestly, then were

8     pretty much the same.

9                    I definitely remember doing

10    it with American Medical Systems.  And I

11    think I did it with Boston Scientific,

12    but I can't be sure of that.

13          Q.    Do I understand correctly

14    that you have never used the trocars for

15    the Obtryx, Lynx, or Advantage to

16    actually implant those devices in a human

17    being?

18          A.    That's correct.

19          Q.    Now, you gave -- I think the

20    last time you gave a fairly long

21    deposition for these cases was in the

22    January to April time frame of this year.

23          A.    Of?

24          Q.    Of 2014.

Golkow Technologies, Inc. - 1.877.370.DEPS

Jerry G. Blaivas, M.D.

Page 135

1    that Ross does unique examinations?

2              MS. FITZPATRICK:  Objection.

3              THE WITNESS:  I think it's

4         plausible that Ross does a more

5         thorough examination with respect

6         to detecting banding than most

7         other people do.  Yes, I think

8         that's plausible.

9    BY MR. MYERS:

10        Q.    But you have no evidence to

11   demonstrate that, correct?

12        A.    I'm just answering your

13   question.  No, I don't.

14        Q.    So at this point in the

15   deposition, you have been shown I think

16   that AUGS and SUFU and IUGA and the FDA

17   have all issued statements in support of

18   the use and the safety of mid-urethral

19   slings.  Is there any data that you could

20   be shown that would change your opinion?

21        A.    My opinion with respect to

22   what?

23        Q.    The safety of mid-urethral

24   slings.

Jerry G. Blaivas, M.D.

Page 136

1      A.    No, I don't even think we

2   disagree about it.  We dis -- as I've

3   already testified, I think the people

4   that wrote those articles would agree

5   pretty much with my -- with the

6   statistics that I have quoted.  What they

7   seem to disagree with is about how

8   relevant that is to disclose that to

9   patients.  And I think that's a huge part

10  of the problem, that it wasn't disclosed.

11            I don't think we disagree

12  very much on this.  I mean, we may

13  quibble over percentage points whether

14  it's one, two, three, four, five, six,

15  but no one is going to say -- I would

16  venture to say no one is going to say

17  these lifestyle altering complications do

18  not occur.  Practically no one.

19       Q.    I'm pretty confident that

20  I'm not going to look on your website

21  tomorrow and find a statement saying Dr.

22  Blaivas supports the use of mid-urethral

23  slings for stress urinary incontinence;

24  is that correct?

Jerry G. Blaivas, M.D.

Page 138

1          Q.     And I'm trying to understand

2     the disconnect between you saying you

3     think they agree with everything you say

4     and yet they can make the statement that

5     they recommend the use of the products.

6     Are they reckless in your opinion about

7     harm to patients?

8          A.     I think we -- I think I have

9     already testified.  I think we just have

10    a disagreement about how relevant it is

11    that lifestyle altering complications

12    occur in single digit percents of

13    patients.  That's simply a difference of

14    opinion.  And I don't think it's a

15    disconnect.

16         Q.     You've said before that you

17    think that studies have not been powered

18    to evaluate whether mesh slings create a

19    long-term increase in adverse events.  Do

20    you recall that?

21         A.     I don't -- I don't recall it

22    and it may have been taken out of

23    context, but that's -- so the answer is,

24    I don't recall it.

Golkow Technologies, Inc. - 1.877.370.DEPS

Jerry G. Blaivas, M.D.

```
 1        IN THE UNITED STATES DISTRICT COURT
       FOR THE SOUTHERN DISTRICT OF  WEST VIRGINIA
 2                CHARLESTON DIVISION
                     -   -   -
 3

       IN RE:  BOSTON SCIENTIFIC  :MDL NO. 2326
 4     CORP., PELVIC REPAIR SYSTEM:
       PRODUCTS LIABILITY          :
 5     LITIGATION                  :
       -------------------------------------------
 6     THIS DOCUMENT RELATES TO:
       ALL WAVE 1 AND 2 CASES IN MDL NO. 2326
 7
 8                   -   -   -
 9             December 15, 2014
10                   -   -   -
11           Continued videotaped
12     deposition of JERRY G. BLAIVAS, M.D.,
13     held in the offices of Motley Rice, LLC,
14     600 Third Avenue, Suite 2101, New York,
15     New York 10016, commencing at 9:08 a.m.,
16     on the above date, before Margaret Peoples,
17     a Registered Professional Reporter and
18     Notary Public.
19
20
21                   -   -   -
22

          GOLKOW TECHNOLOGIES, INC.
23      877.370.3377 ph|917.591.5672 fax
             deps@golkow.com
24
```

Jerry G. Blaivas, M.D.

1          Q.    Let's talk about your

2     salvage article that was marked as an

3     exhibit a moment ago.

4                This is a peer-reviewed

5     published article, right?

6          A.    It is.

7          Q.    And it was published in

8     2013?

9          A.    It is.

10         Q.    So that's just a year ago,

11    right?

12         A.    It was a year ago it was

13    published.  Doesn't mean it was a year

14    ago that it was written.

15         Q.    Well, it was published in

16    October of 2013 --

17         A.    Yes.

18         Q.    -- right?

19               So it was published in the

20    latter part of 2015, right?

21         A.    Yes.

22         Q.    And you're saying now

23    everything has changed for you with

24    respect to the etiology of mesh

Jerry G. Blaivas, M.D.

1      complications, right?

2                    MS. THOMPSON:  Object to

3             form.  That misstates his

4             testimony.

5                    THE WITNESS:  Yeah, I didn't

6             say everything has changed.  I was

7             specifically asked if my opinions

8             about the etiology have changed.

9             And the answer is yes.

10     BY MR. MYERS:

11            Q.    Well, you -- I guess what

12     you said exactly is, you don't stand by

13     what you said in your peer-reviewed

14     publication about the etiology of mesh

15     complications.

16                    Is that fair?

17                    MS. THOMPSON:  Object to

18            form.  Misstates his testimony.

19                    THE WITNESS:  No.  That's --

20            that's not what I said.

21     BY MR. MYERS:

22            Q.    Okay.  Well, let's -- let's

23     go through and make sure we get what you

24     said because here's what I thought I

Jerry G. Blaivas, M.D.

1    heard.

2              Page 1284 says, "The

3    etiology of mesh sling complications is a

4    matter of conjecture."  Right?

5         A.    The use of the word

6    "conjecture" in the --

7         Q.    Hold on.

8         A.    -- in the peer-reviewed

9    literature is different than the use of

10   the word "conjecture" in the legal sense.

11             In the legal sense I am

12   obliged to, when I give an opinion, to --

13   that it's -- that it's with a reasonable

14   or high degree of medical certainty.

15             I can have the same high

16   degree of medical certainty in a

17   scientific journal, but I wouldn't state

18   it like that because that's not the --

19   there's a different context in the

20   medical literature than there is in -- in

21   the -- in the courtroom.

22             We do not use medical -- a

23   high -- reasonable degree of medical

24   certainty to come to conclusions.  And

Jerry G. Blaivas, M.D.

```
 1    the reason that we don't is that things
 2    that happen in the 4 or 5 percent range,
 3    which is -- let's just take that as one
 4    estimate of serious complications, things
 5    that happen that often in the -- you
 6    would never be able to say that within a
 7    reasonable degree of medical certainty
 8    something that happens 4 to 5 percent
 9    rises to a certain level in the
10    peer-reviewed literature.
11                    But I can say with a
12    reasonable degree of medical certainty --
13    I can -- let me say it another way.
14                    I can offer a different
15    opinion with a reasonable degree of
16    medical certainty than I can in the
17    peer-reviewed literature which requires,
18    in my judgment, a higher degree of
19    certainty than a reasonable degree.
20                    So I phrase my words
21    differently in the peer-reviewed
22    literature than I do in the legal
23    literature because it's two different
24    sets of rules.
```

Jerry G. Blaivas, M.D.

```
1              MR. MYERS:  I object and
2        move to strike --
3              MS. THOMPSON:  Object to the
4        objection.
5              MR. MYERS:  -- as
6        non-responsive.
7    BY MR. MYERS:
8        Q.   What you wrote in your
9    peer-reviewed publication was, "The
10   etiology of mesh sling complications is a
11   matter of conjecture."  Correct?
12       A.   That's what I wrote, yes.
13       Q.   And what you said 15 minutes
14   ago was you no longer stand by that
15   statement, correct?
16             MS. THOMPSON:  Object to
17        form.  Misstates his testimony.
18             THE WITNESS:  I think I
19        already answered that.
20             MS. THOMPSON:  And asked and
21        answered.
22   BY MR. MYERS:
23       Q.   Is that what you said or
24   isn't it?
```

Jerry G. Blaivas, M.D.

1          I mean, I don't have to --
2     if I misunderstood what you said, tell
3     me.
4          A.     I wrote --
5               MS. THOMPSON:   Hang on.
6               Object.   Asked and answered.
7               THE WITNESS:   I believe I
8          answered the question already.
9          You didn't like my answer
10         and asked to strike it, but that's
11         my answer.
12    BY MR. MYERS:
13         Q.    No.   No.   You have -- no, I
14    did not -- I didn't ask that question.
15    So you -- you can't conduct a deposition
16    this way.   I'm sorry, Doctor.   You have
17    to answer the question.
18         A.     I thought I did.
19              Can you say the question
20    again, please?
21              And I don't mean to be
22    disrespectful.
23         Q.    Well, and I don't either.
24    But the question I asked you was whether

Jerry G. Blaivas, M.D.

1    that's what the sentence wrote.   And

2    that's -- and the page-long answer you

3    gave had nothing to do with that.

4           A.     I definitely answered it.

5                  MS. THOMPSON:   What is your

6           question now?

7    BY MR. MYERS:

8           Q.     The question now is whether

9    you just testified, when counsel asked,

10   that you no longer stand by the statement

11   "The etiology of mesh sling complications

12   is a matter of conjecture."

13                 MS. THOMPSON:   And -- hang

14          on.

15                 Object.   It misstates his

16          testimony.   And it's been asked

17          and answered.

18                 THE WITNESS:   I'm sorry, but

19          I did answer it.

20   BY MR. MYERS:

21          Q.     Well, you're going to have

22   to answer it again.

23                 MS. THOMPSON:   No.   That's

24          his answer.

Jerry G. Blaivas, M.D.

1          MR. MYERS:  Are you going --
2     are you going to instruct him not
3     to answer?
4          You're actually going to do
5     that?
6          MS. THOMPSON:  He answered
7     the question.
8          MR. MYERS:  He did not
9     answer the question.  He
10    absolutely didn't.
11         You're going to instruct him
12    not to answer on this?
13         MS. THOMPSON:  I'm -- how
14    many times does he need to answer
15    it before --
16         MR. MYERS:  He needs to
17    answer --
18         MS. THOMPSON:  -- he --
19         MR. MYERS:  He needs to
20    answer one of my questions today,
21    at least, that I ask.
22         I'm allowed to ask
23    questions, just like you were.
24         Are you instructing him not

Jerry G. Blaivas, M.D.

1        to answer?

2             MS. THOMPSON:  I believe he

3        has answered.  I haven't

4        instructed him to do anything.

5             MR. MYERS:  Okay.  Okay.

6             MS. THOMPSON:  He can answer

7        your question again, and he's

8        going to answer it again.

9    BY MR. MYERS:

10        Q.    Then answer the question.

11             MS. THOMPSON:  Ask the

12        question, and he'll answer it.

13             MR. MYERS:  The question is

14        asked.

15             MS. THOMPSON:  He already

16        answered your --

17             THE WITNESS:  You read back

18        to me -- you read back my -- what

19        I wrote.

20    BY MR. MYERS:

21        Q.    I'm just trying --

22        A.    And I said that I did write

23    that.

24        Q.    No.  That is not the

Jerry G. Blaivas, M.D.

1    question I even just asked.

2            The question I asked is

3    whether I understood you to state earlier

4    that you no longer stand by the

5    statement.

6            MS. THOMPSON:  Asked and

7            answered.  And misstates his

8            testimony.

9            THE WITNESS:  I'm sorry, but

10           I -- I'll answer it again.

11           There is a different -- the

12           words mean different things in the

13           medical literature than they do in

14           the legal literature.

15           In -- in the -- in this

16           article, I bring up theoretical

17           reasons why -- different reasons

18           why complications can occur.  I

19           stand by that.

20           In the courtroom, you --

21           okay.  So I'll -- that's my answer

22           to that.

23   BY MR. MYERS:

24           Q.    So the issue is that the

Jerry G. Blaivas, M.D.

1    standard is different for the literature

2    in the courtroom.

3                    Is that fair?

4         A.    Yes.

5                    MS. THOMPSON:   Object to

6              form.

7    BY MR. MYERS:

8         Q.    And by the standard you

9    applied in the peer-reviewed literature,

10   you made the statement that we just read.

11   But by the standard you would apply to

12   your testimony, you would not make that

13   statement.

14                   Fair?

15                   MS. THOMPSON:   Object to

16             form.

17                   THE WITNESS:   I would say

18             that within a reasonable degree of

19             medical certainty, that what I

20             already said before -- I'm just

21             going to read this a second.

22                   (Witness reviewing

23             document.)

24                   Yeah, within a reasonable

Jerry G. Blaivas, M.D.

1        degree of medical certainty, the

2        reasons that I give in this paper,

3        in the paper, are due to faulty

4        mesh design.

5   BY MR. MYERS:

6        Q.    Okay.   And is the reason

7   that you did not put those in your

8   peer-reviewed article, again, because of

9   the difference in the standard for a

10  peer-reviewed article compared to the

11  standard for legal testimony?

12              MS. THOMPSON:   Object.

13              THE WITNESS:   Well, I think

14       there's two reasons.

15              Number one, there -- we

16       didn't study that.   Okay.   We

17       didn't -- we didn't study mesh

18       design.   So it would not have been

19       part of our methods, and that's

20       why we use -- that's where the

21       words "conjecture" come from.

22              I mean, "conjecture"

23       could -- could be -- could have

24       been properly turned hypothesis

Jerry G. Blaivas, M.D.

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST
VIRGINIA, CHARLESTON DIVISION
-  -  -

IN RE:  BOSTON SCIENTIFIC  :MDL NO. 2326
CORP., PELVIC REPAIR SYSTEM:
PRODUCTS LIABILITY        :
LITIGATION                :
------------------------------------------
THIS DOCUMENT RELATES TO:
ALL WAVE 1 AND 2 CASES IN MDL NO. 2326

-  -  -
December 4, 2014
-  -  -
Videotaped deposition of
JERRY G. BLAIVAS, M.D., held in the
offices of Motley Rice, LLC, 600 Third
Avenue, Suite 2101, New York, New York
10016, commencing at 9:10 a.m., on the
above date, before Margaret Peoples, a
Registered Professional Reporter and
Notary Public in and for the States of
Pennsylvania, New York and Connecticut.

-  -  -

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

---

Jerry G. Blaivas, M.D.

Page 63

1  simulated -- in simulations.  And I
2  actually did when -- I don't remember
3  where, but I was a visiting professor in
4  the days when you could still operate
5  when you were a visiting professor.
6           So I scrubbed in on cases
7  where they were being done.  And I
8  didn't -- and in that, it was using --
9  I'm pretty sure it predated the Obtryx.
10 But it was a similar design.
11          And I remember commenting on
12 how I was uncomfortable with that feel,
13 because I felt like I didn't have total
14 control of the needle tip, whereas with
15 the Curved I do.
16          And I don't think that's a
17 matter of personal preference, I think
18 it's just a different -- the way it's
19 constructed.  You know, the same motion
20 with your hand can give you -- can have
21 the needle move in different directions.
22      Q.    Can you identify any data to
23 suggest that one version or the other of
24 the handle of the Obtryx leads to more

---

Jerry G. Blaivas, M.D.

Page 135

1  that Ross does unique examinations?
2           MS. FITZPATRICK:  Objection.
3           THE WITNESS:  I think it's
4      plausible that Ross does a more
5      thorough examination with respect
6      to detecting banding than most
7      other people do.  Yes, I think
8      that's plausible.
9  BY MR. MYERS:
10     Q.    But you have no evidence to
11 demonstrate that, correct?
12     A.    I'm just answering your
13 question.  No, I don't.
14     Q.    So at this point in the
15 deposition, you have been shown I think
16 that AUGS and SUFU and IUGA and the FDA
17 have all issued statements in support of
18 the use and the safety of mid-urethral
19 slings.  Is there any data that you could
20 be shown that would change your opinion?
21     A.    My opinion with respect to
22 what?
23     Q.    The safety of mid-urethral
24 slings.

---

Jerry G. Blaivas, M.D.

Page 136

1      A.    No, I don't even think we
2  disagree about it.  We dis -- as I've
3  already testified, I think the people
4  that wrote those articles would agree
5  pretty much with my -- with the
6  statistics that I have quoted.  What they
7  seem to disagree with is about how
8  relevant that is to disclose that to
9  patients.  And I think that's a huge part
10 of the problem, that it wasn't disclosed.
11          I don't think we disagree
12 very much on this.  I mean, we may
13 quibble over percentage points whether
14 it's one, two, three, four, five, six,
15 but no one is going to say -- I would
16 venture to say no one is going to say
17 these lifestyle altering complications do
18 not occur.  Practically no one.
19     Q.    I'm pretty confident that
20 I'm not going to look on your website
21 tomorrow and find a statement saying Dr.
22 Blaivas supports the use of mid-urethral
23 slings for stress urinary incontinence;
24 is that correct?

Jerry G. Blaivas, M.D.

Page 267

```
 1    predating even the -- even the -- even
 2    the clinical trial.
 3              I mean, to start with, okay,
 4    there's problems with, I alluded to
 5    before, with the ergonomics.  Okay.
 6              What they did, I have
 7    testified before, that even the slightest
 8    changes in design and ergonomics, and in
 9    the particular case of the -- for
10    example, of the Boston Scientific, just
11    making the dilator thicker, okay, or
12    thinner, or making something, it changes
13    the tactile sensation that the surgeon
14    has in pulling it through.
15              It means that it's easier or
16    harder to adjust the tension.  It's
17    easier or harder to perforate the bladder
18    or the urethra or -- and particularly
19    with the transobturator -- to perforate
20    the vagina.
21              And to me, these are all
22    things that should be tested before it
23    goes to market, not afterwards.  I mean,
24    it's not good enough to just say, well,
```

*Golkow Technologies, Inc. - 1.877.370.DEPS*

Jerry G. Blaivas, M.D.

Page 359

```
          IN THE UNITED STATES DISTRICT COURT
     FOR THE SOUTHERN DISTRICT OF  WEST VIRGINIA
                 CHARLESTON DIVISION
                    -  -  -

     IN RE:  BOSTON SCIENTIFIC  :MDL NO. 2326
     CORP., PELVIC REPAIR SYSTEM:
     PRODUCTS LIABILITY         :
     LITIGATION                 :
     -------------------------------------------
     THIS DOCUMENT RELATES TO:
     ALL WAVE 1 AND 2 CASES IN MDL NO. 2326

                    -  -  -
               December 15, 2014
                    -  -  -
               Continued videotaped
     deposition of JERRY G. BLAIVAS, M.D.,
     held in the offices of Motley Rice, LLC,
     600 Third Avenue, Suite 2101, New York,
     New York 10016, commencing at 9:08 a.m.,
     on the above date, before Margaret Peoples,
     a Registered Professional Reporter and
     Notary Public.


                    -  -  -


             GOLKOW TECHNOLOGIES, INC.
        877.370.3377 ph|917.591.5672 fax
               deps@golkow.com
```

Golkow Technologies, Inc. - 1.877.370.DEPS

Jerry G. Blaivas, M.D.

Page 390

```
 1    heard.
 2              Page 1284 says, "The
 3    etiology of mesh sling complications is a
 4    matter of conjecture."  Right?
 5         A.    The use of the word
 6    "conjecture" in the --
 7         Q.    Hold on.
 8         A.    -- in the peer-reviewed
 9    literature is different than the use of
10    the word "conjecture" in the legal sense.
11              In the legal sense I am
12    obliged to, when I give an opinion, to --
13    that it's -- that it's with a reasonable
14    or high degree of medical certainty.
15              I can have the same high
16    degree of medical certainty in a
17    scientific journal, but I wouldn't state
18    it like that because that's not the --
19    there's a different context in the
20    medical literature than there is in -- in
21    the -- in the courtroom.
22              We do not use medical -- a
23    high -- reasonable degree of medical
24    certainty to come to conclusions.  And
```

Jerry G. Blaivas, M.D.

Page 391

```
 1    the reason that we don't is that things
 2    that happen in the 4 or 5 percent range,
 3    which is -- let's just take that as one
 4    estimate of serious complications, things
 5    that happen that often in the -- you
 6    would never be able to say that within a
 7    reasonable degree of medical certainty
 8    something that happens 4 to 5 percent
 9    rises to a certain level in the
10    peer-reviewed literature.
11              But I can say with a
12    reasonable degree of medical certainty --
13    I can -- let me say it another way.
14              I can offer a different
15    opinion with a reasonable degree of
16    medical certainty than I can in the
17    peer-reviewed literature which requires,
18    in my judgment, a higher degree of
19    certainty than a reasonable degree.
20              So I phrase my words
21    differently in the peer-reviewed
22    literature than I do in the legal
23    literature because it's two different
24    sets of rules.
```

Jerry G. Blaivas, M.D.

Page 397

1   question I even just asked.

2          The question I asked is

3   whether I understood you to state earlier

4   that you no longer stand by the

5   statement.

6          MS. THOMPSON:  Asked and

7      answered.  And misstates his

8      testimony.

9          THE WITNESS:  I'm sorry, but

10   I -- I'll answer it again.

11          There is a different -- the

12   words mean different things in the

13   medical literature than they do in

14   the legal literature.

15          In -- in the -- in this

16   article, I bring up theoretical

17   reasons why -- different reasons

18   why complications can occur.  I

19   stand by that.

20          In the courtroom, you --

21   okay.  So I'll -- that's my answer

22   to that.

23   BY MR. MYERS:

24      Q.   So the issue is that the

Golkow Technologies, Inc. - 1.877.370.DEPS