Exhibit B

1           IN THE UNITED STATES DISTRICT COURT

2         FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

3                    AT CHARLESTON

4

5    _____

6    JO HUSKEY AND ALLAN HUSKEY,           :

7            Plaintiffs,                    :   CASE NUMBER

8        v.                                 :   2:12-cv-05201

9    ETHICON, INC., ET AL.,                 :

10           Defendants.                    :

11   _____

12

13              TRANSCRIPT OF TRIAL - DAY SEVEN

14                  SEPTEMBER 02, 2014

15          BEFORE THE HONORABLE **JOSEPH R. GOODWIN,**

16              UNITED STATES DISTRICT JUDGE

17

18

19   Court Reporter:        Carol Farrell, CRR, RMR, CCP, RPR
                            (304)347-3188
20                          carol_farrell@wvsd.uscourts.gov

21                          Anthony Rolland, CRR, RMR, RPR
                            (407)760-6023
22                          rolland.crr@gmail.com

23
     Proceedings recorded by machine stenography; transcript
24   produced by computer.

25

**A P P E A R A N C E S**

**FOR THE PLAINTIFFS:**

**EDWARD A. WALLACE, ESQUIRE**
**MARK R. MILLER, ESQUIRE**
Wexler Wallace
55 West Monroe Street, Suite 3300
Chicago, IL  60603

**FIDELMA L. FITZPATRICK, ESQUIRE**
Motley Rice
321 South Main Street, Suite 200
Providence, RI  02903

**JEFFREY M. KUNTZ, ESQUIRE**
**ANDREW N. FAES, ESQUIRE**
Wagstaff & Cartmell
4740 Grand Avenue, Suite 300
Kansas City, MO  64112


**FOR THE DEFENDANTS:**

**CHRISTY D. JONES, ESQUIRE**
Butler, Snow, O'Mara, Stevens & Cannada, PLLC
1020 Highland Colony Parkway, Suite 1400
Ridgeland, MS  39157

**DAVID B. THOMAS, ESQUIRE**
**PHILIP J. COMBS, ESQUIRE**
Thomas Combs & Spann
PO Box 3824
Charleston, WV  25338-3824

1                               I   N   D   E   X

2

3                               Direct   Cross   Redirect   Recross

4    WITNESSES FOR
     THE DEFENSE

5    SHELBY F. THAMES, Ph.D.      5        94       146

6    AARON KIRKEMO, M.D.         155
7    (By Video)

8

9    EXHIBITS                            Ident.      Evid.

10   D-10351                                          7

11   D-23600                                          22

12   D-30884                                          27

13   D-23228                                          37

14   D-22463                                          81

15   D-21349                                          83

16   D-21229                                          86

17   D-21350                                          88

18   P-14462                                          124

19   P-14102                                          130

20   P-21963                                          132

21   P-13055                                          142

22   P-14116R                            X

23   P-14115                             X

24   P-2028

25

United States District Court
Southern District of West Virginia

```
                    ┌─ THAMES - DIRECT - THOMAS ─┐
```

1        PROCEEDINGS had before The Honorable Joseph R. Goodwin,

2    Judge, United States District Court, Southern District of West

3    Virginia, in Charleston, West Virginia, on September 02, 2014,

4    at 9:15 a.m., as follows:

5              COURT SERVICES OFFICER:  All rise.

6              (The jury entered the courtroom at 9:15 a.m.)

7              THE COURT:  Good morning, ladies and gentlemen.

8              RESPONSE:  Good morning.

9              THE COURT:  We are ready to resume the trial.  I have

10   been advised that you were told of Mrs. Fields' tragic loss.

11   I know you join me in extending the Court's sympathy to her

12   and to her family.  Mrs. Fields is excused as a juror.

13             We will continue the trial with the eight remaining

14   jurors.

15             Mr. Wallace?

16             MR. WALLACE:  Your Honor, with your permission, I

17   just want to move this screen.

18             THE COURT:  You may.

19             Ladies and gentlemen, the plaintiffs having rested,

20   we now turn to the defendants.  Call your first witness.

21             MR. THOMAS:  Thank you, Your Honor.  Defendants

22   called Dr. Shelby Thames.

23             THE DEPUTY CLERK:  Raise your right hand.

24   (**SHELBY F. THAMES, Ph.D.**, HAVING BEEN DULY SWORN, TESTIFIED AS

25   FOLLOWS:)

--- THAMES - DIRECT - THOMAS ---

```
 1          THE WITNESS:  I do.
 2          THE DEPUTY CLERK:  Thank you.  Please take the
 3   witness stand.
 4   (DIRECT EXAMINATION OF SHELBY THAMES, Ph.D. BY MR. THOMAS:)
 5   Q.  Good morning, Dr. Thames.
 6   A.  Good morning, sir.
 7   Q.  Would you tell the jury your name, please.
 8   A.  My name is Shelby Thames, T-H-A-M-E-S.
 9   Q.  Dr. Thames, are you comfortable there?
10   A.  Yes, sir.
11   Q.  There's some water there if you need some.
12   A.  Thank you.
13   Q.  Where do you live, Dr. Thames?
14   A.  I live in Hattiesburg, Mississippi.
15   Q.  And where do you work?
16   A.  I work at the University of Southern Mississippi,
17   although I was recently retired.  I went back and started
18   employment again.
19   Q.  And what's the name of the building where you work?
20   A.  The Polymer Science Research Center.
21   Q.  And does the Polymer Science Research Center have a name?
22   A.  Yes, it does.
23   Q.  And what is the name of that research center?
24   A.  The Shelby Freland Thames Polymer Science Research
25   Center.
```

THAMES - DIRECT - THOMAS

1  Q.   And how long has it been named the Shelby Freland Thames
2  Polymer Science Research Center?
3  A.   I believe since about 1998, sir, when it was built.
4  Q.   And is that the same Shelby Thames as you?
5  A.   Yes, sir.
6  Q.   Why is it named after you?
7  A.   Well, they had to have somebody to name a building after,
8  I guess, and they just picked me.  I was very pleased, of
9  course.
10  Q.   Why are you here today?
11  A.   I'm here to testify on behalf of Ethicon and to tell you
12  about the chemistry and the polymer science of Prolene.
13  Q.   Dr. Thames, did you help me prepare a PowerPoint
14  presentation to help the jury understand your credentials and
15  your opinions in this case?
16  A.   I did, sir.
17          MR. THOMAS:  May I approach, Your Honor?
18          THE COURT:  You may.
19          THE WITNESS:  Thank you.
20  BY MR. THOMAS:
21  Q.   Dr. Thames, I've handed you Defendants' Exhibit 10351,
22  which is entitled "Curriculum Vita for Shelby Freland Thames,
23  Ph.D."  What is that document?
24  A.   This is a document that describes my history of
25  employment, the activities that I've been involved in, and the

────────── THAMES - DIRECT - THOMAS ──────────

1  things that I've done over the years that I've been at

2  Southern Miss.

3         MR. THOMAS:  Your Honor, I would offer Dr. Thames'

4  curriculum vita into evidence.

5         MR. KUNTZ:  No objection.

6         THE COURT:  It may be received.

7  (DEFENDANTS' EXHIBIT D-10351 WAS RECEIVED IN EVIDENCE.)

8         (The document was published to the jury.)

9         MR. THOMAS:  Slide 1, please, Jamey.

10  BY MR. THOMAS:

11  Q.  Dr. Thames, tell us a little bit about your educational

12  background, please.

13  A.  I received a Bachelor's Degree in chemistry from the

14  University of Southern Mississippi, and that was followed by a

15  Master's Degree in organic chemistry from Southern Miss.  And

16  I traveled to Knoxville to receive a Ph.D. in organic

17  chemistry where I minored in analytical chemistry.

18  Q.  Would you tell the jury, please, what organic chemistry

19  is?

20  A.  Organic chemistry is the study of organic compounds which

21  are essentially made of carbon and hydrogen as the main

22  components.

23  Q.  And would you tell the jury, please, what analytical

24  chemistry is?

25  A.  Analytical chemistry is the study of equipment and

THAMES - DIRECT - THOMAS

1   techniques and methods for evaluating chemicals.  In other

2   words, once a scientist designs the polymer and synthesizes it

3   in the laboratory, they have to determine whether or not they

4   actually made what they thought they made.  So in order to do

5   that, we use analytical tools in order to determine the

6   structure of chemical compounds, how much something is

7   present, what it is, and so forth and so on.  That's

8   analytical chemistry.

9          MR. THOMAS:  Next slide, please, Jamey.

10  BY MR. THOMAS:

11  Q.  Can you tell the jury a little bit about your work

12  experience, please.

13  A.  Well, after graduating from the University of Tennessee,

14  I went to -- directly to Southern Mississippi to work in the

15  chemistry department.  My professor called me in and said,

16  "You need to come back to school here and to work," and I did

17  so and joined in the chemistry department where I became

18  associate professor of chemistry from 1964 to '71.

19         And then the president asked me to be vice president of

20  research for the Pan American Tung Research and Development

21  League and I did that.

22         And I was also chair and -- of the Department of

23  Polymer Science at Southern Miss.  And I founded the

24  Department of Polymer Science at Southern Miss in 1969.

25         1971, they asked me to be the dean of the College of

—————— THAMES - DIRECT - THOMAS ——————

1    Science.  We took that responsibility and transformed it into

2    the dean of Science and Technology, and at that time I, of

3    course, continued to be the professor of polymer science.

4         In 1982 to '86, I was a professor of polymer science.

5         From 1986 to present, I am called the Distinguished

6    University Research Professor of Polymer Science.  We have

7    added engineering so it's now --

8         THE COURT REPORTER:  I'm sorry.

9         THE WITNESS:  We have added engineering to our

10   program.  So it's now "Engineering" added to the title.

11   BY MR. THOMAS:

12   Q.   What does a polymer scientist do?

13   A.   A polymer scientist studies polymers, of course, and a

14   polymer is a molecule, "poly" meaning mini, "mer" meaning

15   single units.  And I like to liken that to a chain, each link

16   in the chain is a mer unit, one unit.  If you begin to link

17   those links together, you can have two, five, ten, a thousand,

18   a hundred, and that makes your polymeric chain.

19        And so if you do that with molecules, then you have a

20   polymer.  And polymers have some unique characteristics

21   because they're huge molecules.  You can design them to do

22   various things.  You can make them strong, you can make them

23   tough, you can make them soft.  So you can make them do almost

24   anything you want them to do, but you have to understand the

25   chemistry behind it.  And I have a saying that's more or less

THAMES - DIRECT - THOMAS

1    coined in a way, and it's the saying, "It's all in the

2    chemistry."  So you have to know the chemistry.

3    Q.   Dr. Thames, have you taught polymer science throughout

4    your career?

5    A.   Yes, sir, I have.

6    Q.   And to whom have you taught, what --

7    A.   To undergraduate students who are beginning students in

8    the university system, to graduate students who come to learn,

9    to attain Ph.Ds and master's degrees from my program, to

10   post-doctoral fellows who have earned a Ph.D. at other

11   institutions and want to learn about polymer science because

12   they didn't learn it any or enough at wherever they were

13   educated.  So they come to us, and they work with us, and we

14   teach them polymer science.

15   Q.   Have you continued to use your analytical chemistry minor

16   in your work?

17   A.   Yes, sir, I have.

18   Q.   And how have you done that?

19   A.   Well, the area that we are strong in is designing

20   materials, designing polymers.  Once you design them on a

21   piece of paper, then you set out to actually synthesize that

22   polymer, or make it.  And so you develop a protocol for how

23   you think you should make that polymer, you execute that

24   protocol in the laboratory, and then once you achieve a

25   product, you say, "Well, did I really make what I wanted to

THAMES - DIRECT - THOMAS

1   make?"

2        And then that's when you take it and you use the

3   analytical tools we were talking about to determine whether

4   you indeed did make what you wanted to make.  And so that's

5   how we do things.  And then we test the product to see if it

6   has the properties that we want.

7   Q.   Have you developed a specialty in polymer science over

8   the 50 years that you've been a polymer scientist?

9   A.   Yes, sir, I have.

10  Q.   And what is that specialty?

11  A.   That specialty is in coatings, and one simple term of a

12  coating is with pigments which would be paint.  But the

13  beautiful part about a coating is that it has to adhere, so

14  you have to have an understanding of adhesion, it has to have

15  physical properties that give it longevity, and in a multitude

16  of environments.  So it's a very fairly complex kind of

17  polymer system, but it's an awful lot of fun to study and to

18  work with.

19  Q.   Of what importance is your specialty in coatings in your

20  work that you've done in this case?

21  A.   Well, what we do in coatings, of course, is we design a

22  polymer and we make a polymer, and then we use analytical

23  tools to determine if it's what we made, and we study the

24  structure-property relationships, and by structure-property

25  relationship, I mean that if you change the structure of a

THAMES - DIRECT - THOMAS

1   molecule, you will change the properties.  So if it doesn't

2   have a particular kind of property that you want, then you see

3   about changing the structure to get the property that you

4   wish.

5         And so what we've done here in terms of studying a

6   Prolene is to determine what the properties were, to look at

7   them and to see if they were sufficient for its intended use.

8   Q.   And you indicated you've done research over the years?

9   A.   Yes, sir.

10  Q.   Can you give the jury an idea of some of the kinds of

11  polymer research that you've conducted?

12  A.   Well, I've studied -- I've done quite a bit of work in

13  proteins, in particular, in soy proteins, and adhesives.  I've

14  done a lot of work in vegetable oils and lipids and fats.

15  I've done quite a bit of work in biological materials from

16  agriculture.  I've done work from hydrogen carbon materials,

17  I've done work in powder coatings, polyurethanes and acrylic

18  polymers and oil-based polymers.  And it pretty much covers

19  the gamut of the kind of work that I've done and been -- had

20  fun doing it.

21  Q.   Prior to your work in this case, had you done any

22  research in polypropylene?

23  A.   I had done no research in polypropylene, no, sir.

24  Q.   Have you taught any of the chemical characteristics of

25  polypropylene?

THAMES - DIRECT - THOMAS

1    A.   Yes, I have.

2    Q.   And over how many years?

3    A.   Several.  You can look at my hair and I've taught courses

4    a long time.

5    Q.   Now, does the Shelby Freland Thames Polymer Science

6    Research Center have a laboratory?

7    A.   Yes, sir.  The building is -- has many, many

8    laboratories.  As a matter of fact, it only has two small

9    classrooms, and the remaining are laboratory or office spaces

10   for faculty members and staff members.

11   Q.   I put up a slide there.  Is that the Shelby Freland

12   Thames Polymer Science Research Center?

13   A.   Yes, sir, that's the front of it.

14   Q.   And what is in that building?

15   A.   Well, it's about 106,000 square feet, and it's offices,

16   laboratories, a multitude of different kinds of equipment,

17   analytical tools.  We are blessed to have a very finely

18   equipped facility.  I would estimate that we probably have $25

19   million of analytical tools in that facility.

20   Q.   And do you have those tools available to you for your

21   work?

22   A.   Yes, sir.

23   Q.   And when you do work that's not related to the

24   university, do you pay for that work?

25   A.   Yes, sir.

THAMES - DIRECT - THOMAS

1   Q.   Now, has the Shelby Freland Thames Polymer Science

2   Research Center ever received any research funding from

3   Ethicon or Johnson & Johnson?

4   A.   Not that I'm aware of.  Certainly not for me.

5        MR. THOMAS: Next slide, Jamey.

6   BY MR. THOMAS:

7   Q.   Let's talk a little bit about your professional

8   affiliations.

9   A.   Yes, sir.

10  Q.   Tell the jury about these organizations.

11  A.   Well, the Waterborne Symposium is a symposium that was

12  developed by myself and two other colleagues to exploit the

13  knowledge base behind waterborne polymers, and it's been

14  running now -- we have that symposium every year, and I think

15  it's in its 41st year this year.

16       I've been a member of the American Chemical Society my

17  entire career.  It's the national organization of chemists.

18  I've taught short courses for all of them.  I've given

19  presentations before them.  So I've been extensively involved

20  with them.

21       And then a couple of organizations of which I'm

22  basically just a member is the American Institute of Chemists

23  and the American Association of Advancement of Science, and

24  there's others but I didn't bother you with them.

25  Q.   And have you received any honors in your field?

THAMES - DIRECT - THOMAS

1   A.   A few.

2   Q.   I put up a magazine cover from 2002, person of the year,

3   people of the year from *Modern Paint & Coatings*.  Tell the

4   jury about that, please.

5   A.   Well, this particular journal -- or it's not a journal.

6   Actually, it's more like a magazine, but it's printed by the

7   coatings industry, and I was pleased to see that they elected

8   me to be one of the people of the year in 2002.

9   Q.   Okay.  Do you hold any patents?

10  A.   Yes, sir.

11  Q.   How many patents do you hold?

12  A.   Approximately 40.

13  Q.   Briefly describe some that relate to your work in

14  polymers.

15  A.   Well, there's a soy protein adhesive that we have patents

16  on, and what we found is that we can make an adhesive that

17  holds fibers together, particle board fibers together, that

18  really outperforms other adhesives that are used, and it's a

19  green product.  It's made essentially from all agricultural or

20  green materials, whereas most of the adhesives that's used in

21  the past have been made from petroleum and, therefore, from

22  oil-based substrates and, therefore, they were not green, as

23  per se.

24  Q.   Has any pharmaceutical or medical device company ever

25  provided financial support for your research that led to these

THAMES - DIRECT - THOMAS

1  patents?

2  A.   No, sir.

3         MR. THOMAS:   Next slide, please.

4  BY MR. THOMAS:

5  Q.   You've also made some publications and presentations?

6  A.   Yes, sir, I have, sir.

7  Q.   Tell the jury a little bit about your publications.

8  A.   Well, I have approximately 169 publications in journals

9  and so forth over the years, and they've involved the research

10 work and the writing of documents to describe the work that

11 we've done in our laboratories and so forth.  And then beyond

12 actually having them published in print, many times you're

13 asked to give presentations, and I've presented more than 150

14 presentations on the work and the activities that I've been

15 involved in as a polymer scientist.

16 Q.   How many of these publications and presentations have

17 been on polymers?

18 A.   There may be one or two that's not, but I can't remember,

19 but the vast, vast majority of them have been in polymers,

20 sir.

21 Q.   Now, Dr. Thames, have you testified from time to time

22 over the last several years as an expert witness?

23 A.   Yes, I have, sir.

24 Q.   And what do you charge for your time?

25 A.   $375 an hour.

THAMES - DIRECT - THOMAS

1          MR. THOMAS:  Your Honor, I offer Dr. Thames as an

2    expert in the field of organic chemistry, polymer science, and

3    analytical chemistry, specifically to discuss Prolene, the

4    chemical and physical properties and its propensity or lack of

5    propensity for degradation and oxidation.

6          THE COURT:  Any voir dire?

7          MR. KUNTZ:  No objection, Your Honor.

8          THE COURT:  All right.  You may offer opinions in

9    that area.

10          MR. THOMAS:  Thank you, Your Honor.

11   BY MR. THOMAS:

12   Q.   Dr. Thames, a moment ago you described what a polymer is.

13   What is a polypropylene polymer?

14   A.   It is a polymer made from the single link which is called

15   propylene.  So we have a single monomer called propylene, and

16   if it reacts with itself like a link in a chain, it's called

17   polypropylene.

18   Q.   Okay.  And is the polypropylene molecule a -- a diagram

19   that you can make, that you can show the jury?

20   A.   I'd love to.

21   Q.   Would you --

22          MR. THOMAS:  Your Honor, may he step down and show

23   the polypropylene molecule on the white board?

24          THE COURT:  Doctor, you may do that.  My caution is

25   that both the jury and the court reporter need to see and hear

THAMES - DIRECT - THOMAS

1   you.

2          THE WITNESS:  Yes, sir.

3          THE COURT:  All right.

4          MR. THOMAS:  Thank you.

5          (The witness left the stand.)

6          THE WITNESS:  I spoke of a single link being

7   propylene, and I'm going to draw the chemical structure of

8   propylene.

9          That would be your single link in a chain, and if you

10  take that molecule and add it to itself, I can -- one of the

11  ways I like to describe it is we probably all stood dominoes

12  up on the end of the table, and then we have tapped the one at

13  the far end and they continue to fall, one on top of the

14  other, and then make a stream of dominoes.  That's the way an

15  addition polymer like this forms.

16         So we take this molecule, and we initiate it with an

17  initiator, and it produces polymer called polypropylene.

18  BY MR. THOMAS:

19  Q.   Here's a fresh one.

20  A.   Good.  Thank you.

21         Draw an arrow to show what it will be.

22         Now, this molecule can become so huge that it can have

23  a mass of 3 to 400,000, and the way you determine the mass,

24  the weight, is you add up the elements that are there.  Carbon

25  weighs 12 anatomic mass units.

1          THE COURT:  Mr. Thomas, would you not get between the

2     court reporter and the witness?  Thank you.

3          THE WITNESS:  Carbon weighs 12 atomic mass units and

4     hydrogen weighs 1.  So each of these carbon weighs 12, each

5     hydrogen weighs 1.  You add all those up and you think about

6     how many of them you would have to have to have over 300,000

7     molecular weight.  It's a huge, long polymer chain.  That's

8     why I used X to show that it's many, many, many, many of these

9     segments that are present in polypropylene.

10          Now, this is propylene.  This is polypropylene

11     polymer.

12     Q.   Dr. Thames, what's the significance of the fact that it's

13     only carbon and hydrogen atoms?

14     A.   The molecule -- oxygen and hydrogen and sulphur and

15     nitrogen are polar molecules.  That means that they have a

16     distinct electrical environment where one end of the molecule

17     is positive, the other end of the molecule is more negative.

18     Kind of like a magnet.  And what that means is that in the

19     case of those polar molecules, polar chemical reagents have an

20     affinity to attack them.  In other words, negative attacks

21     positive.

22          Where if you have carbon and hydrogen molecules, there

23     are no polar groups.  It means it doesn't like water, water

24     doesn't like it, it's hydrophobic.  It has a phobicity to

25     water.  Doesn't care for it.  There is no tendency or

THAMES - DIRECT - THOMAS

1    rationale for why a polar molecule would attack this and

2    destroy it.

3         So that's part -- that's -- I hope that answers your

4    question, Mr. Thomas.

5    Q.   Would you take your seat, please?

6    A.   Yes.

7              (The witness resumed the stand.)

8    BY MR. THOMAS:

9    Q.   Dr. Thames, as a polymer scientist, are there things that

10   can disrupt a polymer?

11   A.   Yes.

12   Q.   And tell the jury about the disruption of the polymer

13   chain.

14   A.   Well, polymers in general can be disrupted in several

15   ways.

16        One is by heat.  You can actually put enough heat to it

17   that you will destroy it thermally.

18        One is by pH changes, going from acid to base, attacked

19   by acid or attacked by base.

20        The other is by light, UV light being impinged upon a

21   sample where it excites the molecule and causes a chemical

22   reaction to take place that would degrade the polymer.

23        And the other is by water.  Just simply because of

24   its -- a polymer, some polymers have a tenacity to attract

25   water.  Water can attack them.

THAMES - DIRECT - THOMAS

1          So those are the four, four general categories.

2    Q.   Dr. Thames, the jury has heard a word over the last

3    several days about a chemical being inert.  What does inert

4    mean?

5    A.   Inert means that it is nonreactive.  And in the general

6    sense when you just say "inert," you're saying it's

7    non-reactive to everything unless you specify what it is not

8    inert to.

9    Q.   Okay.  And is there anything in chemistry that's totally

10   inert?

11   A.   Not that I'm aware of.

12   Q.   All right.  Can you give the jury some understanding of

13   how polypropylene is used in a real-world context?

14   A.   Yes, sir.

15          (The document was published to the jury.)

16          THE WITNESS:  Well, for instance, we see a number of

17   objects made of polypropylene.  They are made of that because

18   they are durable, because they're tough, and you notice the

19   hand holds some little -- could be Skittles, I'm not sure.

20   What's important is the box with the top on it.  That's a

21   self-hinging box.

22          And polypropylene is -- has such durability, such

23   toughness that it can actually form as a hinge, and you can

24   imagine the kind of mechanical processes and stress that's on

25   the sample like that, because bending it -- you can take a

THAMES - DIRECT - THOMAS

1  paper clip, for instance, and bend it till it breaks.  Well,

2  you can open and close this box many, many, many times and you

3  don't sever the polypropylene.

4  BY MR. THOMAS:

5  Q.  Dr. Thames, the jury has heard about the Ethicon brand of

6  polypropylene known as Prolene.  What is Prolene?

7  A.  Prolene is a formulated product of polypropylene and some

8  selected additives that are placed in the polypropylene mass

9  or medium to provide certain characteristics to the molecule.

10  Q.  Dr. Thames, what makes Ethicon's Prolene different from

11  other polypropylene used by other medical devices?

12  A.  The nature of the additives that are added.

13         MR. THOMAS:  I have put up on the screen DX-23600.

14  May I approach, Your Honor?

15         THE COURT:  You may.  Is there an objection to the --

16         MR. KUNTZ:  No objection.

17         THE COURT:  All right.

18         MR. THOMAS:  This may have been received with

19  Dr. Guelcher.  Certainly used it with him.  I apologize.

20         THE COURT:  If it hasn't been received, let me know,

21  because I'm just going to leave this on, otherwise.

22         MR. THOMAS:  I'll offer it into evidence, Your Honor,

23  in the event it hasn't.

24         THE COURT:  All right.  It may be received.

25  (DEFENDANTS' EXHIBIT D-23600 WAS RECEIVED IN EVIDENCE.)

—————— THAMES - DIRECT - THOMAS ——————

1  BY MR. THOMAS:

2  Q.   The jury saw this document earlier with Dr. Guelcher.

3  You are familiar with this document?

4  A.   Yes, I am.

5  Q.   And on the board is the discussion of the five

6  additives --

7  A.   Yes, sir.

8  Q.   -- to Prolene?  And tell the jury the significance of

9  those five additives to Prolene polypropylene.

10  A.   Okay.  You need to keep in mind that we take

11  polypropylene and add to that these five materials.

12       The first material is called calcium stearate.  It is a

13  calcium salt with stearic acid.  It's a lubricant to help

14  reduce tissue drag and promote tissue passage.

15       The second additive is dilauryl thiodipropionate.  It's

16  abbreviated DLTDP, and it's added as an antioxidant to improve

17  long-term storage of the resin and fiber and to reduce the

18  potential oxidative reaction with ultraviolet light.

19       The second is Santonox R, and this is an antioxidant

20  which promotes stability during the compounding and extrusion

21  of the fiber from the extruder which is a heated extruder so

22  it needs to have protection from that, as far as thermal

23  degradation is concerned, and it will -- it will halt any

24  thermal degradation that might occur.

25       The next is Procol LA-10.  It's a lubricant again, to

THAMES - DIRECT - THOMAS

1    help reduce tissue drag and promote tissue passage.

2        And the last is CPC pigment, which is a copper-based

3    colorant to provide enhanced visibility to the TVT device

4    which is blue.

5    Q.   Dr. Thames, have you learned about how this Prolene

6    polypropylene is made?

7    A.   Yes, sir, I have.

8    Q.   Could you describe that briefly to the jury so they

9    understand how this material is made?

10   A.   Sure.

11       First of all, they take the polypropylene polymers,

12   which are made by -- it's been made by the same company since

13   their existence.  And they take this polymer and they put it

14   in an extruder.  It's a device that can be heated, and the

15   extruder is heated and it's blended with an auger, and that

16   blending takes place.  And then you add these five ingredients

17   to it, and they maintain it in that extruder under a blending

18   process until a sufficient time has been -- has come about

19   that you get good distribution of materials.  And then you

20   turn it into the extruding step --

21          MR. KUNTZ:  Your Honor, can we approach for a second?

22          THE COURT:  You may.

23          (The following occurred at sidebar.)

24          (A sidebar discussion was held off the record.)

25          MR. THOMAS:  Before that document would go back to

———— THAMES - DIRECT - THOMAS ————

1  the jury, Your Honor, we need to redact a sentence.

2       MR. KUNTZ:  But it's up there right now -- this

3  document is up on the screen right now, with "regulatory" and

4  "FDA" all over it.

5       THE COURT:  Well, take it down right now, and if it

6  ever happens again, this whole case is --

7       MR. THOMAS:  Yes, Your Honor.

8       (Sidebar concluded.)

9       THE COURT:  All right, sir.

10 BY MR. THOMAS:

11 Q.  Thank you.

12      Dr. Thames, could you continue discussing the

13 manufacturing process, please?

14 A.  Sure.

15      After you've appropriately blended the polypropylene

16 with these five ingredients, there is a barrel at the end of

17 the extruder that has the diameter of the fiber that you want

18 to extrude, and there's several of them, and I kind of liken

19 it to, if you've ever seen hamburger go through or pressed

20 through an extruder and it comes out in small strings, that's

21 kind of what we're talking about here.  And so the fibers are

22 extruded in that way.

23      And those fibers then are used, that is now Prolene.

24 We took polypropylene and we added the five ingredients and we

25 then made Prolene.

—— THAMES - DIRECT - THOMAS ——

1   Q.   Does the extrusion process leave any fingerprint or marks

2   on material?

3   A.   Yes, sir.  When it goes to the barrel, the barrel is not

4   precisely smooth, and you'll see some lines in it, but we call

5   those extruder lines.

6            MR. THOMAS:  May I approach, Your Honor?

7            THE COURT:  You may.

8            I'm turning this off until we --

9            MR. THOMAS:  I understand.

10  BY MR. THOMAS:

11  Q.   Dr. Thames, I have handed you what's been marked as

12  Defendants' Exhibit 30884.  It's an article by Timothy Liebert

13  and others published in the *Journal of Biomedical Material*

14  *Research*, titled "Subcutaneous implants of polypropylene

15  filaments."

16       Did you review this article in connection with your

17  work in this case?

18  A.   I have.

19  Q.   Do you consider it to be authoritative on the issues it

20  discusses?

21  A.   Yes, sir.

22            MR. THOMAS:  Okay.  And, Your Honor, I offer

23  Defendants' Exhibit 30884 as a learned treatise.

24            MR. KUNTZ:  No objection, Your Honor.

25            THE COURT:  Very well.

THAMES - DIRECT - THOMAS

1  (DEFENDANTS' EXHIBIT D-30884 WAS RECEIVED IN EVIDENCE.)

2          MR. THOMAS:  May I publish it to the jury?

3          THE COURT:  You may.

4          (The document was published to the jury.)

5          MR. THOMAS:  Thank you, Your Honor.

6          THE COURT:  With the --

7          MR. THOMAS:  We will check it.

8          THE COURT:  All right.

9  BY MR. THOMAS:

10 Q.   What -- tell the jury what Liebert and others did in

11 1976.

12 A.   These gentlemen studied Prolene, and they -- and also

13 polypropylene that was unstabilized.  That's important to

14 determine the distinction.  Prolene is stabilized with these

15 antioxidants, and we put those ingredients in to perform a

16 particular function.  You can just take polypropylene and not

17 stabilize it and then that's another species, but it's

18 different from the stabilized species.

19         And they performed infrared spectra and mechanical

20 testing of the implanted and non-implanted filaments,

21 containing an antioxidant, and showed that there were no

22 changes in the physical or chemical properties as a result of

23 implantation.

24         And, of course, these results support the fact that the

25 changes observed for pure implanted filaments are due to

THAMES - DIRECT - THOMAS

1  oxidation rather than diffusion.  What they mean by pure

2  filaments is that they didn't have any antioxidants.  They

3  used -- they used chemicals A and B.

4       In the case of A, there were no antioxidants put in

5  them.  In the case of B, the materials here, there were

6  antioxidants put in them.  And so they're different in that

7  respect.  They're looking to determine whether or not the

8  antioxidants did the job and when they didn't have them, what

9  happened to the system.

10 Q.  And what did Liebert find?

11 A.  Well, they found that when they used the antioxidants as

12 prescribed in the Prolene formulation, that there were no

13 changes in molecular weight, there was no oxidation, there was

14 no adverse effect on the Prolene fiber.

15 Q.  And what has Ethicon done with its Prolene polypropylene

16 to add antioxidants to it to protect against oxidation as

17 found in Liebert?

18 A.  Well, they've added antioxidants, and the two

19 antioxidants we talked about were Santonox R and dilauryl

20 thiodipropionate, DLTDP, that material that we talked about.

21 Q.  Dr. Thames, what is degradation?

22 A.  Degradation is a change in physical property such that a

23 material cannot and does not provide the same kind of property

24 that it was intended to provide or the same function it was

25 intended to provide.

THAMES - DIRECT - THOMAS

1   Q.   And what kind of changes happen in a polymer or

2   polypropylene that would cause it not to perform as it

3   intended?

4   A.   Well, if polypropylene were -- underwent some form of

5   degradation which caused it to change its molecular weight, in

6   other words, when we talk about a huge molecule having over

7   300,000 molecular weight, if something happened to begin to

8   chop that molecular weight up, and rather than having very

9   long and tangled polymers which are durable and strong, you

10  would have short, choppy polymers, and they would lose their

11  physical properties.  So breaking and cleaving of these

12  chemical bonds I've described up here would be a form of

13  degradation.

14  Q.   And what is tensile strength?

15  A.   Tensile strength is the -- if I take a string in my hand

16  and I pull it and I pull it and I pull it and I pull it, and

17  if I were able to measure the force, the point at which it

18  breaks, the amount of force required to break it, is its

19  tensile strength value.

20       And we have instrumentation in our laboratory that you

21  could put all sorts of polymers in and at very precise

22  measurements, and we used ASTM, American Society of Testing

23  Methods, to -- as a protocol for how you go about doing that,

24  and you stretch a fiber and you stretch a fiber, stretch a

25  polymer, any kind of polymer, and you determine what force is

THAMES - DIRECT - THOMAS

1   required to cleave or break the polymer.  And that's called

2   ultimate tensile strength, meaning -- ultimate means that's

3   the tensile strength at which it breaks.

4   Q.   And what is toughness of a polymer?

5   A.   Toughness?

6   Q.   Yes.

7   A.   You have to include another characteristic of polymer

8   before you can answer that question, and it's elongation.

9   During the time that we are pulling this polymer out under

10  this stress, it's elongating, it's elongating, it's like a

11  rubber band.  You pull, pull, pull, pull, pull.  And at the

12  time the polymer breaks, you measure the original length that

13  you started with and the final length that you have and you

14  measure the percent elongation that occurred during that time.

15  So you have two features to look at, is the strength and the

16  elongation.

17        And the area, if you plot that as stress and strain --

18  we'll do it this way, you would look at a chart this way.

19  This would be stress and this would be strain or elongation.

20  If you plot the curve like so, the area under that curve is a

21  measure of toughness.

22        MR. THOMAS:  Let's get the next slide please, Jamey.

23        (The document was published to the jury.)

24  BY MR. THOMAS:

25  Q.   Dr. Thames, you prepared a graph to show the jury the

1  stress-strain curve of polymer types?

2  A.   Yes, I have.

3  Q.   Would you explain that to the jury, please?

4  A.   Yes.  First of all, remember the stress is the vertical

5  axis, that's how much you -- tug you put on it.  The strain or

6  elongation is the horizontal axis.  And I've shown in red a

7  polymer that would be strong but not tough.  And you would

8  have to pull it, pull it, but finally when it broke, it would

9  snap down, and the dotted line would be the ultimate

10  elongation of that particular polymer.

11      Let's go down to the green one.  The green one here

12  doesn't require much stress at all to stretch it, and it

13  stretches a long, long way.  So it's not strong and it's

14  really not tough.  It's just easy to extend, doesn't take

15  much, and gets kind of like a weak rubber band.

16      The one in the middle, in blue, is the polymer type

17  that would be strong and tough, where you had to put a

18  sufficient amount of force to stretch it, but at the same

19  time, while it stretched, it elongated a significant amount

20  before it finally broke.

21  Q.   Okay.  And where does -- where does Prolene polypropylene

22  fall in this spectrum of stress-strain curve of polymer types?

23  A.   In the strong and tough category.

24  Q.   And what does that mean relative to other polymers?

25  A.   Well, that it -- it, by virtue of its chemical structure

THAMES - DIRECT - THOMAS

1  and so forth, is a strong and tough polymer system.  It's not

2  brittle.  And it's not just a rubber-band-type material with

3  not very much strength to it.

4       So it's a good composite between the two.  It's

5  designed to be -- have a good series of properties, between

6  strong and not tough polymer or not strong and not tough

7  polymer system.

8  Q.  Dr. Thames, a moment ago we were talking about molecular

9  weight.

10  A.  Yes, sir.

11  Q.  And we were talking about degradation.  How does

12  degradation of Prolene -- strike that.

13       How does degradation of polypropylene affect the

14  molecular weight of polypropylene?

15  A.  Degradation would cleave the polypropylene chain, like

16  we've drawn on the chalkboard here, cleave that chain.  And if

17  you cleave that chain, you're going to -- you're going to

18  reduce the tensile strength, and the reason behind that is

19  that -- we've all made spaghetti, and when you put it in the

20  colander, you notice that the spaghetti is all entwined and

21  entangled, and if you just try to take one piece of spaghetti

22  from the end and pull it out, just by itself, it's almost

23  impossible to do that, and that's because you've got

24  entanglement, so forth.

25       And what happens is the polymers are the same way.

1  They get their structures entangled, and so when you begin to

2  pull them, they slide across each other.  And they have a

3  phenomenon of attraction that's referred to in the chemical

4  profession as van der Waals force, it's V-A-N D-E-R W-A-A-L-S.

5  That means that attractive forces between molecules.

6       Well, if you cut a molecule up into small pieces, you

7  reduce the ability to have significant van der Waals forces

8  and you lose your tensile strength.  Your properties decline,

9  plummet, they go down.

10  Q.  When you break the molecules up into small pieces, what

11  happens to the molecular weight?

12  A.  The molecular weight goes down.

13  Q.  And do you have to have a decline in molecular weight to

14  have a change in the chemical composition?

15  A.  Yes.  And in this particular case we're talking about

16  here.

17  Q.  And tell the jury why that is.

18  A.  Well, I think I just did.  That was the explanation I was

19  trying to make, is that when you have a change in molecular

20  weight, you're reducing the ability for van der Waals forces

21  to interact with each other, you've got shorter chains and,

22  therefore, you're going to have less ability to -- it's not

23  going to be as strong as it was at one time.

24  Q.  Dr. Thames, have you analyzed yourself Prolene

25  polypropylene?

THAMES - DIRECT - THOMAS

1    A.   I have.

2    Q.   And have you analyzed yourself explants of humans --

3    A.   I have.

4    Q.   -- who have had Prolene polypropylene?

5    A.   Yes, sir.

6    Q.   And have you reviewed the work of others of explants of

7    Prolene polypropylene?

8    A.   I have.

9    Q.   Have you ever found in research in a controlled

10   experiment a decrease in molecular weight in explanted Prolene

11   polypropylene?

12   A.   No.

13   Q.   And what does that tell you as a polymer scientist if

14   there's no decrease in molecular weight in Prolene

15   polypropylene?

16   A.   If there is no decrease in molecular weight, there's no

17   degradation of the polypropylene, in this case, Prolene.

18   Q.   Have you also reviewed work by Ethicon studying Prolene

19   polypropylene?

20   A.   I have.

21           MR. THOMAS:  May I approach, Your Honor?

22           THE COURT:  You may.

23   BY MR. THOMAS:

24   Q.   Dr. Thames, I've handed you what's been marked as

25   Defendants' Exhibit 23228, titled "Seven-Year Dog Study."

————THAMES - DIRECT - THOMAS————

1  A.  Yes, sir.

2  Q.  Have you reviewed that in connection with your work in

3  this case?

4  A.  I have.

5      MR. THOMAS:  Your Honor, I'd offer this exhibit into

6  evidence.

7      THE COURT:  May I see you at sidebar just one second?

8      (The following occurred at sidebar.)

9      THE COURT:  This appears to be about a 50-page

10  exhibit.  Is counsel for the defendants representing to me

11  that the initials FDA or the Federal Drug Administration

12  appears nowhere in this document?

13      MR. THOMAS:  Not to my knowledge, Your Honor.

14      THE COURT:  I'm asking you if you're making that

15  affirmative representation?  I'm not -- it's happened twice.

16  I will take a ten-minute break if you want to look through it,

17  or if you want to go on to something else.  Otherwise, if it's

18  in here, I'm going to sanction you if it is, a very large

19  amount of money, if it's introduced by accident.

20      MR. THOMAS:  I understand, Your Honor.

21      THE COURT:  So what do you want to do?  Do you want

22  to take a break and look at it?

23      MR. THOMAS:  Yes, I do, Your Honor.

24      THE COURT:  All right.

25      (Sidebar concluded.)

THAMES - DIRECT - THOMAS

1            THE COURT:  Ladies and gentlemen, I think that we've

2     done very well.  We haven't had to take very many unscheduled

3     breaks.  This is a time when we have to take one.

4            Ten-minute break -- make it 15, and we'll look and

5     see how the morning goes.  Do a 15-minute break.

6            I hope you enjoy that healthy stuff that's back in

7     the jury room.  And I'll call you back when we're ready.

8            Court stands in recess.

9            (The jury left the courtroom at 10:03 a.m.)

10           (A recess was taken at 10:03 a.m.)

11           (The jury entered the courtroom at 10:22 a.m.)

12           THE COURT:  Okay.  Mr. Thomas.

13           MR. THOMAS:  May I proceed, Your Honor?

14           THE COURT:  Yes, sir.

15    BY MR. THOMAS:

16    Q.  Dr. Thames, before the break I was asking you about

17    defendants' exhibit 23228 which is titled *Seven Year Dog*

18    *Study*.  Did you review this document in connection with your

19    work in this case?

20    A.  Yes, I did.

21    Q.  And you relied on it for some of the opinions you have in

22    this case?

23    A.  Yes, I did.

24           MR. THOMAS:  Your Honor, I'd offer into evidence

25    defendants' exhibit 23228.

THAMES - DIRECT - THOMAS

1          MR. KUNTZ:  No objection.

2          THE COURT:  It may be received.

3          (Defendants' Exhibit 23228 received in evidence.)

4    BY MR. THOMAS:

5    Q.   Dr. Thames, what is the *Seven Year Dog Study*?

6    A.   A study where a number of dogs were used to implant

7    Prolene into the dogs and they were maintained over a period

8    of a number of years, in this case seven years, and at

9    intervals some of the dogs would be sacrificed.  The sutures,

10   the Prolene sutures that were implanted in the dog would be

11   removed and would be evaluated, evaluated for molecular

12   weight, evaluated for tensile strength, evaluated for

13   elongation, and other features like the infrared spectroscopy

14   would be done and so forth.  And at the end of seven years the

15   last dogs were used.  And this study compiles data that was

16   collected in that manner for over a seven year period.

17   Q.   Dr. Thames, the jury has already heard a little bit about

18   this study in the examination of Dr. Guelcher last week.  I

19   want to direct your attention to page 115, excuse me, 116 of

20   this document.  Jamie, could you pull that up, please?

21        Do you have that in front of you, Dr. Thames?

22   A.   Yes, sir.

23   Q.   Right in the middle of the page there's a heading called

24   optical microscopy and scanning electron microscopy.  Are

25   those analytical chemical techniques?

THAMES - DIRECT - THOMAS

1  A.   Yes, sir.

2  Q.   Can you tell the jury what optical microscopy and

3  scanning electron microscopy is?

4  A.   Sure.  Optical microscopy is looking through a microscope

5  with no unnecessary additional energy input into it, with good

6  lighting assistance and so forth, typical microscope, but a

7  sophisticated one and fairly expensive.

8       Scanning electron microscopy is a technique in which a

9  sample is placed in an instrument, it's bombarded with an

10 electron beam, and that electron beam then is reflected on to

11 a mirror of sorts and that produces an image, and that image

12 is of a surface that it's looking at.  It can be very high

13 magnification, five, six, seven thousand times, and it's a

14 good way of looking at fine structure of a material.

15 Q.   Under the heading conclusions, the second bullet point

16 reads, "Degradation in Prolene is still increasing and PVDF,

17 even though a few cracks were found, is still by far the most

18 surface resistant in-house made suture in terms of cracking."

19      What does that report mean from a scanning electron

20 microscopy perspective?

21 A.   Well, it suggests and states that the surface of the

22 Prolene explant that they saw cracks and that it would -- they

23 think it will continue to crack.

24 Q.   And as a polymer chemist, if there is degradation in

25 terms of cracking in the polypropylene, what would you expect

THAMES - DIRECT - THOMAS

1  to find?

2  A.   You would expect -- you would not only expect to find,

3  you would find a loss of, and they allege that this is

4  degradation, a loss of molecular weight, and you would change

5  different properties, tensile strength and elongation would be

6  changed from the normal not exposed sample.

7  Q.   Now, let's go back to the page 115 right before and under

8  IR and IR microspectroscopy.  Could you tell the jury what

9  that is, please?

10  A.   IR microscopy is infrared microscopy where an electron

11  beam hits the sample, reflects back to a sensor and it shows

12  the picture of the surface that you're looking at.

13  Microspectroscopy is looking at a very, very fine small point

14  under a microscope.  In other words, if you find an area under

15  a microscope, you can zero in on a very, very small area and

16  run an infrared spectra or see the spectra of that particular

17  compound, whatever that might be at that pinpoint type area.

18  Q.   And this report is October 15, 1992, is that right?

19  A.   Yes, sir, that's correct.

20  Q.   And that's seven years into the test?

21  A.   Yes, sir.

22  Q.   Under the second paragraph, under the IR and IR

23  microspectroscopy, it reads, "IR microspectroscopy was used to

24  examine cracked areas in Ethilon, Novafil and Prolene."  Just

25  for the jury's benefit, what are Ethilon and Novafil?

—————————— THAMES - DIRECT - THOMAS ——————————

1    A.   They're not Prolene, they are different structures of

2    materials, sir.

3    Q.   It says, "IR spectra obtained for cracked Prolene

4    specimens, paren, figure A, showed possible evidence of slight

5    oxidation, paren, a broadened weakened absorbance at about

6    1650 C M minus one."

7         What does that mean to you as a polymer chemist?

8    A.   Well, when I see the term *shows possible evidence*, that

9    means it's not clear and not concise, that it's possible.

10   Most anything is possible.  Then they say a broadened weak

11   absorption at about 1650 reciprocal centimeters.  My mind

12   would jump to the fact that the 1650 reciprocal centimeters is

13   an absorption frequency in the infrared that would be an area

14   where you would expect to see proteins perhaps, and that more

15   likely than you would see proteins then, of course, you would

16   see any degradation from polypropylene or Prolene.  So my

17   feeling is that we are looking at something that's not

18   Prolene, it may even be an acid salt, but not Prolene.

19   Q.   How would proteins get on to this suture?

20   A.   Proteins are in flesh.  When they take the explants out,

21   and they didn't clean these in any way, they didn't put them

22   in any sort of chemicals for anything, they're on flesh, you

23   would expect to see proteins from the flesh.

24   Q.   Down the next paragraph there's a heading for IV and GPC.

25   What is GPC?

THAMES - DIRECT - THOMAS

1   A.   Gel permeation chromatography.

2   Q.   Tell the jury what GPC does.

3   A.   GPC is a standard method for determining molecular

4   weight.  If I wanted to know the molecular weight of a

5   polymer, I would use the instrument called the gel permeation

6   chomatograph.  What you do in a situation like that is you

7   dissolve the polymer in a solvent, typically halogenated

8   hydrocarbon.  You inject it into a machine that has columns in

9   it that separate chemical species by virtue of their size and

10  molecular weight.  And as they elude from that column, the gel

11  permeation chromatograph measures the numbers of materials,

12  the weight, puts it into the computer, and at the end of the

13  run it provides you information about the molecular weight of

14  the sample that was just analyzed.

15  Q.   And read this with me for the jury, please.  It says,

16  "Gel permeation chromatography, paren, GPC, was run on Prolene

17  sutures explanted from dogs after seven years."  What does

18  that mean?

19  A.   They took the sutures, Prolene sutures from the dogs

20  after seven years.

21  Q.   And it says, "The GPC data was compared to data from a

22  current 4 slash O Prolene suture."  What does that mean?

23  A.   That means that they took the experimental sample from

24  the dog and they ran its molecular weight, and then they

25  compared it to a pristine sample of Prolene that had never

THAMES - DIRECT - THOMAS

1  been introduced to anybody, right out of the box so to speak,

2  brand new.

3  Q.   And why do you do that kind of analysis?

4  A.   Called a control.  In other words, if we want to know if

5  the molecular weight of the Prolene was reduced while it was

6  in the dog, then we need a standard or control, so we use the

7  unused, unimplanted material as a control.  This is what your

8  molecular weight ought to be.  And then you test the sample

9  from the dog and say, well, is it the same or is it within

10  experimental error.  If it is, then nothing has happened to

11  the molecular weight this seven years.  The polymer has not

12  degraded.

13  Q.   So continue reading on with me.  "The results indicate

14  that there was no significant difference in molecular weight

15  between the 4 slash O Prolene control and the seven year

16  explants."

17       What does that mean to a polymer chemist?

18  A.   That means that there was no degradation because of

19  implantation of Prolene in the dog over a seven year period of

20  time.

21  Q.   Had there been degradation, what would you expect to see?

22  A.   You would have seen a reduction in molecular weight would

23  be one thing that you would expect to see.

24  Q.   I want to direct your attention now to page 153 of this,

25  of exhibit 23228.  153 is an interim report dated October 19,

THAMES - DIRECT - THOMAS

1    1992.  Do you see that?

2    A.   Yes, I do.

3    Q.   Tell the jury what this document is.

4    A.   Well, this is a document that shows the physical

5    properties of explanted materials, in particular we're

6    interested in Prolene.  It measured the physical testing, it

7    took these samples and did tensile strength and elongation

8    studies on them and we talked about that earlier today.  And

9    they have a chart in here which I think we'll get to a little

10   bit later that will show you what happens to the physical

11   properties of Prolene over the seven year period.

12   Q.   And what were the findings -- strike that.

13        What different tests did they run, Dr. Thames?

14   A.   They ran tensile strength test, which is the pull test,

15   to determine how much force you have to put on the sample to

16   break it.  And then they determined elongation, which is how

17   much did it extend before it finally broke.  And finally they

18   looked at modulus, which is a measure of stiffness to see if

19   it was stiffer than when it was implanted or as stiff as when

20   it was implanted just to get a handle on what the

21   characteristics of stiffness was of that explanted material.

22   Q.   Dr. Thames, what did Ethicon find after seven years of

23   implantation happened to the tensile strength of these

24   sutures?

25   A.   They found that the tensile strength was reduced, as far

THAMES - DIRECT - THOMAS

1   as my memory, it's about five PSI, slight reduction in the

2   strength required to break the Prolene sample.

3   Q.   What did the Ethicon scientists find with respect to

4   elongation?

5   A.   The sample elongated twice its original length.  The

6   first length was like 37, 38, something like that, I forget

7   exactly the number, and finally upon explantation after seven

8   years it was twice as elongatable.

9   Q.   And what's the significance of the changed elongation?

10  A.   Well, when you talk about just a very, very small

11  reduction in strength and a very long elongation, the area

12  under that curve of is far greater after seven years of

13  explantation than before.

14  Q.   Tell the jury and me what it means, area under the curve,

15  as it relates to the ability of the suture to perform its

16  intended function.

17  A.   Remember we talked about the fact that the area under the

18  curve was a measure of toughness.  So what that means is that

19  not only, not only did the Prolene explant not undergo

20  degradation, but it improved with implantation.  It became

21  tougher.  It became more elongatable with only a very minor

22  reduction in tensile strength.  So it was a tougher strand of

23  polypropylene after seven years than it was when it was

24  implanted in the dog.

25  Q.   Finally, Dr. Thames, you talked about Young's modulus

THAMES - DIRECT - THOMAS

1    test?

2    A.   Yes, sir.

3    Q.   Tell the jury about that, please.

4    A.   Modulus is a test of toughness and typically slope of the

5    curve, and since I didn't have the exact numbers I couldn't

6    give you a curve that showed the exact shape of the modulus

7    curve, but it's reduced somewhat, and that means the stiffness

8    was reduced a bit during the period of time when it was being

9    implanted.  So we, we reduced stiffness, we improved

10   elongation with very minor changes in tensile strength, and so

11   overall the properties were enhanced during the seven year

12   implantation.

13   Q.   Dr. Thames, I put a slide up there that shows the data

14   and the cover page, page 115, so the jury can see it.

15   A.   Yes, sir.

16   Q.   And the citation there says that "Novafil samples show a

17   decrease in breaking strength while Prolene and PVDF showed no

18   significant change after seven years of implantation."  That

19   refers to the breaking strength?

20   A.   Yes, sir.  Or tensile strength, the same thing.  We're

21   going to call it the same thing, okay.

22   Q.   And is the other data up there, is that the data upon

23   which you relied for your opinions about the Prolene becoming

24   tougher after seven years?

25   A.   Yes, sir.

THAMES - DIRECT - THOMAS

1  Q.  Can you explain to the jury how you read that data just

2  so they understand?

3  A.  If you look at the chart that says, the first segment

4  says zero in the top line, that's at implantation.  That's at

5  the beginning.  And then they measured the breaking strength

6  or the tensile strength was 1.68, that's before it was ever

7  implanted.  And then after implantation, which is over here

8  under the seven column, breaking strength is 1.60.  So the

9  actual strength to break it reduced by point 08 pounds or

10 Newtons.

11      And then in terms of the elongation, which is the

12 second group of numbers, the original elongation was 37

13 percent at zero time of implantation.  After seven years it

14 was 78 percent, 78 percent, which means that it's doubled its

15 elasticity during the period of time that it was implanted.

16      And then the modulus was originally 721 and it went to

17 214 after seven years with a reduction of minus 70 in modulus,

18 meaning it became more flexible, more pliable, less stiff.

19 Q.  Can I have the next slide, please, Jamie?

20      Dr. Thames, I have a slide up called *Seven Year Dog*

21 *Study Break Strength Versus Percent Elongation*.  Can you

22 explain that to the jury, please?

23 A.  Yes, sir.  I've taken the numbers that we just talked

24 about in the table by the Ethicon scientists and I have

25 plotted them in terms of breaking strength is on the vertical

1  column or tensile strength, elongation is on the horizontal

2  column.  The red represents the original Prolene before it was

3  inserted into the dog, implanted; the blue represents the data

4  that was collected from the explanted sutures after seven

5  years of implantation in the dogs.

6       You'll notice the blue had a very small decline in

7  breaking strength, as we said, point 08 pounds, but its

8  elongation went out to 78 percent.  So if I measure the area

9  under the red and compare that area to the area under the

10 blue, we can see that the area under the blue is twice or

11 perhaps more than the area under the red.  And when we

12 understand that the definition of toughness is area under this

13 stress strain curve, it's obvious then that the Prolene

14 implant improved its toughness over the period of the seven

15 years it was implanted in the dog.

16 Q.  And from a polymer chemistry perspective, how can it

17 improve?

18 A.  It can improve by being able to be plasticized.  For

19 instance, we talked about the fact that polypropylene was a

20 group of chains and you pull them, and as you pull them they

21 began to stretch out and so forth, like the spaghetti that we

22 talked about.  Well, if you implant this in an animal or in

23 human flesh, the body, there are lipids there, there are fats.

24 Unfortunately there's probably too much on those that would be

25 put in me because I'm a little overweight, but every human

THAMES - DIRECT - THOMAS

1  body has a certain amount of fat in it, and those lipids are

2  fats, they're triglycerides, we go to the doctor and have our

3  triglycerides and our cholesterol looked at, and we know we

4  have them in our body.  Well, they can plasticize and make

5  more pliable a molecule like Prolene.

6       Now, in order to understand that, I think I have to

7  maybe use a human example.  There have been times when, you

8  know, I've worked in my shop and I've gotten grease on my

9  hands and I've wiped it off with an organic solvent, and my

10  hands felt dry and they felt rough.  First thing I do is reach

11  over for some hand lotion and rub it into my hands.  I bet you

12  there's been times when most of you all and I've also washed

13  dishes at times.  And when you get through washing dishes,

14  your hands feel a little dry and a little rough, and the first

15  thing you do is you reach over and put lanolin and lotion on

16  them.  What you're doing is putting a plasticizer on your

17  hands so that the plasticizer can soften, move in between the

18  molecules of your hand, your flesh, and provide elasticity and

19  lubricity, and that's what happened here is the lubricity has

20  been improved for the polypropylene or Prolene implant.

21  Q.  How about a little glass of water?

22  A.  I think I need it.

23       Thank you.

24  Q.  Next slide, please, Jamie.

25       Jamie, next slide, please.

THAMES - DIRECT - THOMAS

1       We already talked about this section of the report.

2   This refers to the GPC testing molecular weight?

3   A.   Yes, sir.

4   Q.   Let's go to the next slide, please.  What does this next

5   slide represent?

6   A.   Well, this next slide actually is looking at three

7   different pieces of Prolene that were taken from the dog after

8   the seven years and molecular weights were determined.  Now,

9   when it says current Prolene, that's the control, and we've

10  got current Prolene in the top bar, and we've got current

11  Prolene in the bottom bar.  So we're comparing the molecular

12  weight before implantation of Prolene to the molecular weight

13  after seven years' implantation in the dog.  And you'll notice

14  the numbers are very close together and what you see in

15  results below that, it says results indicate no degradation

16  have taken place.  That's in the top column.  The bottom one

17  says comparison of the seven year explants to the current

18  Prolene indicate no molecular weight degradation.

19       So the molecular weights, within experimental error,

20  are the same after seven years of implantation in the dog.

21  Q.   Dr. Thames, what does the fact that those numbers aren't

22  exactly the same mean?

23  A.   Well, this is an instrument that you're using, and to get

24  the exactly the same molecular weight actually would be

25  suspicious, but the test is a ten percent error that you can

—THAMES - DIRECT - THOMAS—

1  have and it be non -- if you have as much as ten percent,

2  that's not a problem, that's within statistical error of the

3  test, very close, very good.

4  Q.  As a polymer chemist, what do these findings of molecular

5  weight in the seven year explants tell you as compared to the

6  controls?

7  A.  Obviously there's been no degradation because when you

8  combine the fact that the molecular weight hasn't changed and

9  you've had an increase in toughness of the implant over the

10  seven year period, that is golden that there's been no

11  degradation of that implant after seven years.

12        MR. THOMAS:  Your Honor, may I approach?

13        THE COURT:  You may.

14  BY MR. THOMAS:

15  Q.  Dr. Thames, I've handed you what's been marked as

16  plaintiffs' exhibit number 2026, it's already been received

17  into evidence through Dr. Guelcher.

18  A.  Yes, sir.

19  Q.  The jury heard some testimony from Dr. Guelcher about

20  this, about this document.  Have you reviewed that in

21  connection with your opinions in this case?

22  A.  I have.

23  Q.  And tell the jury what's going on in exhibit 2026.

24  A.  Okay.  This exhibit says IR microscopy of explanted

25  Prolene received from Professor R. Guidoin, G-U-I-D-I-O-N.  I

1  hope I have pronounced it appropriately.

2  Q.  And what did those explants come from?

3  A.  Canada, I believe.

4  Q.  And can you tell from this document the history of those

5  explants before they come in Ethicon's possession?

6  A.  I have no information here.  I have no idea where they

7  came from.  I don't have any idea how long they've been

8  explanted.  It says eight years and two years, but I don't

9  know how they were treated after that, don't know where they

10  were stored.  Don't know anything about them.

11  Q.  Why is that important to know?

12  A.  Well, if you're going to draw a conclusion, conclusion

13  like we're drawing here today in terms of using data, you have

14  to have data to support your conclusion.  And when you don't

15  have any information about an explant, then you don't have

16  much data to deal with.  And, you know, we don't have any idea

17  how they were treated, if they were put in formaldehyde or

18  what was done to them or how long they were there.  So there's

19  just a lot of unknowns that we don't know.

20  Q.  Jamie, do you have that, 2026?

21      Let's look at the first paragraph where it begins

22  "Samples of Prolene suture carefully removed from human

23  vascular graft explants received from Professor R. Guidoin

24  were examined by IR microscopy as is.  What are vascular graft

25  explants?

THAMES - DIRECT - THOMAS

1  A.   I guess from the vascular part of the human body, and

2  they are looked at as is, meaning they just took them out,

3  didn't do any preparation for them, didn't change them in any

4  way.  And so we don't know much about them.

5  Q.   Dr. Thames, in your experience, what happens to explants

6  when they're removed from the body?

7  A.   Well, when they're removed from the body, upon removal

8  the surgeon drops them in formaldehyde or formalin in the vast

9  majority of the cases.  And when that happens, a chemical

10 reaction begins which we need to talk about, but, so they are

11 preserved, they are fixed as the process is called, called a

12 fixation process.

13 Q.   Does the potential for these explants to be stored in

14 formalin impact the analysis of these explants?

15 A.   To a significant degree, yes, sir.

16 Q.   Is there any indication from this document whether or to

17 what extent these explants were stored in formalin?

18 A.   Well, it doesn't say, but if they're eight years old and

19 you didn't store them in formalin, I think there would be a

20 great deal of decomposition associated with the explants, and

21 my feeling would be that they were stored in formalin.

22 Q.   Now, Dr. Thames, have you studied the IR spectra which

23 accompany this report?

24 A.   I have.

25 Q.   And tell the jury again what IR spectra are.

THAMES - DIRECT - THOMAS

1   A.   IR stands for infrared spectra, and the infrared spectrum

2   of a compound is like a fingerprint to you and me.  You know,

3   you're asked when you get your driver's license and things

4   like that to have your fingerprints made, and that's because

5   they want to be able to identify you or me, and that's the

6   reason there being that each individual has a unique

7   fingerprint pattern.  Well, that can be related to infrared

8   spectroscopy.  Each organic molecule has a unique infrared

9   spectra that gives some characteristics of that particular

10  compound.

11       So, but the one thing I do need to caution us about is

12  the fact that changing instrumentation, changing the light

13  source and so forth, will change the frequency a little bit

14  where you'd see a particular chemical bond in a compound.

15  Q.   Let's turn to page two of this document.

16  A.   Yes, sir.

17  Q.   Under conclusions.  We've been through the body of it

18  with Dr. Guelcher, I don't think the jury needs to hear this

19  again, but under conclusions.  "Number one, the amount of

20  DLTDP is reduced in the explanted sutures.  No DLTDP is

21  observed in the surface scraped, paren, cracked regions of

22  83DO35.  The observed DLTDP decreases with implant time.

23       Now, first, what is DLTDP?

24  A.   Dilauryl thiodipropionate which is the antioxidant.

25  Q.   Now, based on the work that you've done in your analysis

THAMES - DIRECT - THOMAS

1    of Prolene polypropylene both in pristine samples and in

2    explants, your training, education and experience, and your

3    review of the spectra, the IR spectra which accompanied this

4    report from 1987, do you agree with the finding expressed

5    there?

6    A.   No, sir, I do not.

7    Q.   Can you tell the jury why?

8    A.   Yes, sir.  Infrared spectroscopy is a qualitative

9    technique, meaning that it tells you if something is present.

10   It doesn't tell you how much.  If you want to do quantitative

11   measurements with infrared spectroscopy, you have to be very

12   serious about doing concentration curves and running a lot of

13   model structures and spectra so that you can plot intensity

14   versus concentration.  You have to do that.  And then once you

15   had that plot and you knew what the concentrations of samples

16   were and you knew what the intensity was, you could draw a

17   plot.  And then if you go to an unknown and you sample it and

18   see what its intensity was, you can go back to that plot and

19   estimate its concentration.

20        But this is a qualitative technique, it just says it's

21   there or it's not there, and there are too many things that

22   can interfere and override the quantity of material you may be

23   seeing in an infrared spectra.

24   Q.   And what is it about this statement that you disagree

25   with?

THAMES - DIRECT - THOMAS

1  A.  Well, first of all, it's not quantitative.  Secondly, it

2  said no DLTDP is observed in the surface scraped cracked

3  regions.  Well, I wouldn't expect the DLTDP to be observed in

4  the surface material.  It's in the Prolene.  And it says the

5  observed DLTDP decreases with implant time.  That's a

6  quantitative measurement, there's no way to make that with

7  this kind of information.

8  Q.  The next conclusion is "No protein is observed in any

9  spectra of the explanted sutures.  What would be the

10  significance of that finding?

11  A.  Well, protein is present in flesh and they made no effort

12  to clean the flesh.  They took these materials and didn't

13  clean them in any way, shape or form that I'm aware of, and so

14  you would expect to see some protein, and I think they

15  probably did, but they may not have recognized it.

16  Q.  And did you review the spectra that accompanied this

17  report and find evidence of protein?

18  A.  Yes, sir, I think so.

19  Q.  And could you show the jury what you mean by that?

20  A.  Well, if you -- let me take just a second, sir.

21      If you look at the spectras on figure three and figure

22  four, these are infrared spectra, figure five -- not so much

23  figure five -- figure six.

24  Q.  And we won't go through each of those, but tell the jury

25  what you're seeing on these spectra that cause you to believe

THAMES - DIRECT - THOMAS

1  you're seeing proteins.

2  A.   I'm seeing some frequencies that are associated with

3  proteins and -- oh, I see what you're talking about.  Do I

4  have something that I can point with, sir?

5         THE COURT:  You can touch it with your finger and it

6  should mark.

7         THE WITNESS:  Okay, sir.

8         Right in this region right here is, you notice down

9  here, this says 1600.  You'll see protein spectra at 1660 and

10  1540, so then right in this region right here, you can be

11  seeing proteins.  These are your polypropylene right here.

12  And then you also have a strong area over around the 3300

13  region which is where proteins absorb, right in this region

14  right here.  So that indicates to me that there's protein

15  present.  Now, there may not be much according to this, but

16  there's some present.

17  Q.   And how do you know as a polymer scientist what you're

18  looking at on that spectra are proteins?

19  A.   Well, because the chemical profession has taken a number

20  of compounds, they run the spectra and they put them in a

21  library, and then you run, you look at the library to see

22  where the typical absorption frequencies are for the compound

23  you're looking for, or you run the compound yourself, you take

24  the protein, run the spectra and see where the frequency

25  absorptions are.  And these frequencies here and here are

THAMES - DIRECT - THOMAS

1  where I would expect to see some protein absorption

2  frequencies.

3  Q.   And what do the findings of protein in the IR spectra do

4  to the conclusions in the report that there is DLTDP reduced?

5  A.   Well, if the proteins are there and the DLTDP is inside

6  the Prolene, then you're going to be seeing the, mostly the

7  proteins and not the DLTDP.

8  Q.   The next conclusion reads "The surface scraped material

9  from the cracked regions of 83DO35 has a melting range

10  indicative of degraded polypropylene."  Do you agree with

11  that?

12       THE COURT:  If you touch the corner of that, it will

13  clear it.

14  BY MR. THOMAS:

15  Q.   Do you agree with that?

16  A.   Sir, I'm sorry.

17  Q.   The third conclusion reads "The surface scraped material

18  from the cracked regions of 83DO35 has a melting range

19  indicative of degraded polypropylene."  Do you agree with

20  that?

21  A.   Well, I don't know how that can be derived from this kind

22  of information because it's well-known, and we've seen this

23  from the explanted materials that, and this was of course

24  identified in this study that there are fatty acids that are

25  present, that there are lipids that are present, and if those

THAMES - DIRECT - THOMAS

1   materials are present and you take a melting point, they're

2   going to function as impurities.  And any time you have an

3   impurity present, the melting point is going to be depressed.

4   That's just a fact of science.  So if this is not pure

5   Prolene, if there's any contaminants there, you will see a

6   slight change in the melting point.  And I don't think there's

7   enough specific information to be able to draw that

8   conclusion.

9   Q.   Now, Doctor, does the data in exhibit 2026 include any

10  molecular weight analysis?

11  A.   No, sir.

12  Q.   Does the data expressed in 2026 include any tensile

13  strength analysis?

14  A.   No, sir, it does not.

15  Q.   Does the data expressed in 2026 include any elongation

16  analysis?

17  A.   No, sir.

18  Q.   And of what significance to you as a polymer chemist is

19  data from molecular weight, tensile strength and elongation to

20  understand the extent to which what they are looking at in

21  2026 has degraded?

22  A.   Well, it's critical because, as we pointed out this

23  morning, that you can determine whether or not something has

24  been degraded by virtue of whether or not its molecular weight

25  is lowered, whether or not its physical properties have

THAMES - DIRECT - THOMAS

1  changed, and so it's critical to know information like that

2  if, of course, you can get that.

3  Q.   Comparing the data that you have from the seven year dog

4  study that the jury's already heard about and the data that

5  you have from plaintiff's 2026, which allows you to draw any

6  scientifically reliable conclusions?

7  A.   The dog study certainly.

8  Q.   Why is that?

9  A.   Well, it's a structured study, we know exactly what was

10  done, when it was done.  We know the kind of measurements that

11  were taken, we know how they were taken, we know how the data

12  was accumulated, we know how it was put together and charted,

13  it was followed with time.  A structured, scientific program

14  was affected.  And we know the results of it.

15  Q.   And what do you conclude from your review of the data

16  you've reviewed so far as to whether Prolene polypropylene

17  degrades in the body?

18  A.   My opinion is it does not.

19  Q.   Okay.  Let's move on to oxidation.  Let's talk about

20  oxidation generally now.  What is oxidation?

21  A.   Oxidation is the addition of oxygen to a molecular

22  species.

23  Q.   Can I have the next slide, Jamie?

24       Why did you add this slide in your presentation?

25  A.   Well, I just happened to have that because I took a slide

THAMES - DIRECT - THOMAS

1   of the hood of this automobile, there was a complaint about

2   the fact that it was degrading, and you can tell that this

3   coating has degraded significantly, that it has oxidized, it's

4   cracking, it's peeling and it's eroding away from the surface

5   of the hood.

6        Also a specific example is this spot right here is

7   rust, iron oxide, so we know that's oxidizing because iron

8   FE203 is rusty color and that's what rust is.  So we know

9   because the coating broke there and the environment was able

10  to reach the metal surface, we saw iron oxide form.  And yet

11  all around this hood we see similar results of the coating

12  failing, it's oxidizing, it's breaking, its molecular weight

13  is being changed.

14  Q.   What happens to the polypropylene molecule when it

15  oxidizes?

16  A.   It cleaves and produces a carbonyl group.

17  Q.   Can you show that on the board?

18  A.   Sure can.

19          MR. THOMAS:  May he step down, Your Honor?

20          THE COURT:  With the same caution, yes.

21          THE WITNESS:  I'm going to use my same --

22          MR. THOMAS:  That one's dried out.

23          THE WITNESS:  Okay.  I'm going to use the same

24  molecule without drawing another one, put you through that

25  again, and show you what happens when oxygen attacks this

1    molecule.

2            Oxygen can have a structure like this with, it's $O_2$

3    is the structure of oxygen, $O_2$.  And you see this is in a

4    dipolar state where this bond here represents two electrons,

5    this represents two electrons.  Well, when oxygen attacks this

6    particular polymeric system, it will extract a hydrogen from

7    here -- and I'm going to skip one step to make this closer or

8    easier, excuse me -- and it will perform or form a hydro

9    peroxide.  It will produce a hydro peroxide.  That's an

10   unstable molecule.  That molecule will degrade, one electron

11   will go here, one will go here, and one will go here, and the

12   result will be -- we have $CH_2$.  So we've taken what was

13   molecule X, we've chopped it in two, we now have two

14   molecules, and in the process we have produced this species

15   which is a C double mono, which is called a carbonyl band.

16   It's a very strong band of the infrared spectra.

17   Q.   And what is the significance of a carbonyl band being

18   very strong in the infrared spectra?

19   A.   It will be very visible, it will be one of the more

20   prominent bands in the infrared spectra.

21   Q.   So how does that impact any FTIR test?

22   A.   It impacts it in the fact that you would expect to see --

23   if this occurred, you will see a strong C double bond O

24   spectra in the infrared spectra.

25   Q.   And what does oxidation do to the molecular weight of

THAMES - DIRECT - THOMAS

1    polypropylene?

2    A.    It will reduce it.  It will reduce molecular weight,

3    which causes the sample to become more brittle and less

4    elongatable.

5    Q.    And how can you detect a loss of molecular weight?

6    A.    By gel permeation chromatography.

7    Q.    Thank you, Doctor.

8          We talked a little bit about the testing that you've

9    done in these cases, in this litigation.  Can I have another

10   slide, please?

11         Tell the jury about the various test methods that you

12   analyzed to analyze Prolene polypropylene?

13   A.    Well, I've used light microscopy, number one, and I've

14   used photo microscopy.  And we've got a light microscope,

15   photo microscopy unit over here.  We've used DSC, differential

16   scanning calorimetry studies there.  We've considered gel

17   permeation chromatography in drawing our conclusions, and

18   we've done Fourier transform infrared spectroscopy which is

19   here.  And scanning electron microscopy which is here, of

20   course.

21   Q.    And what are the results of the testing that you've

22   performed on Prolene polypropylene?

23   A.    I have not found any degradation of Prolene.

24   Q.    And where did you conduct these tests?

25   A.    In our laboratories at the University of Southern

1  Mississippi.

2  Q.   And were you involved in the testing that was performed?

3  A.   Yes, sir.

4  Q.   To your knowledge, has Dr. Guelcher performed any of the

5  same tests on Prolene polypropylene?

6  A.   I don't think so.

7  Q.   Did you ask to analyze a mesh explant from Mrs. Huskey?

8  A.   Yes.

9  Q.   And did you analyze a mesh explant from Ms. Huskey?

10  A.   No, sir.

11  Q.   Why?

12  A.   None was available.

13  Q.   Next slide, please.

14        Now, for the jury, could you clean that picture up?

15  There you go.

16        The jury has seen this last week.  This is a slide from

17  Dr. Guelcher's presentation, testimony, called the effect of

18  foreign body reaction on implants.  Are you familiar with this

19  slide?

20  A.   Yes, sir.

21  Q.   The slide discusses polyether urethane pacemaker lead

22  insulation.  What is polyether urethane?

23  A.   It's a completely different molecule than polypropylene

24  and I'd be happy to show you a structure of one, if you'd

25  like.

THAMES - DIRECT - THOMAS

1   Q.   Well, let's wait, maybe we'll get to that in a minute.

2   A.   All right.

3   Q.   Just tell the jury now how polyether urethane is

4   different from polypropylene?

5   A.   First of all, the urethane linkage, the thing that makes

6   urethane a urethane is it has a strong carbonyl bond with a

7   nitrogen atom attached to it, so it has a polarity associated

8   with it unlike Prolene.  In addition to that, it has a carbon

9   oxygen carbon bond which is the ether linkage which is unlike

10  Prolene.  And those two are polar receipt materials.  They

11  have some water sensitivity to them, and they can be

12  hydrolyzed and that means, hydrolyzed means breaking apart

13  under the influence of water.

14  Q.   And what's the significance of hydrolysis for

15  degradation?

16  A.   Well then, you reduce the molecular weight, that's the

17  way of reducing molecular weight.  If you hydrolyze a

18  molecule, you break it in two.

19  Q.   Dr. Guelcher used this diagram to show how polyether

20  urethane pacemaker lead insulation would degrade in the human

21  body.  Does this same schematic apply to Prolene polypropylene

22  in the human body?

23  A.   No, sir.

24  Q.   Why not?

25  A.   First of all, we didn't have any oxidation, which is

THAMES - DIRECT - THOMAS

1  here.  Secondarily, if you don't have oxidation, we didn't

2  have embrittlement.  And we know we didn't lose any

3  flexibility.  And so it doesn't apply.

4  Q.  What is it about the chemical structure about polyether

5  urethane that's different from Prolene polypropylene that

6  causes this analysis to be different?

7  A.  Because during the process of in the body, you can have

8  hydrolysis, you can have oxidation, and if you do that, if you

9  get that phenomenon, it's going to embrittle your polymer and

10  it's going to lose flexibility if the polymer is embrittled.

11  Q.  And where in this chain does this cycle stop if it

12  involves Prolene polypropylene?

13  A.  Well, it never starts.

14  Q.  Thank you.

15      Next slide, please.

16      What does this slide represent, Dr. Thames?

17  A.  That slide represents Prolene mesh.  It shows the TVT

18  device and it shows the knitting of that.  And on the bottom

19  right-hand side we have this red line here moving over in this

20  direction shows what an individual fiber would look like.

21  Q.  By the way, Dr. Thames, have you ever tested a TVT-O

22  laser-cut mesh?

23  A.  No.

24  Q.  Was it necessary for you to test a TVT laser-cut mesh to

25  formulate your opinions in this case?

THAMES - DIRECT - THOMAS

 1  A.    No.

 2  Q.    Why not?

 3  A.    Well, it has nothing to do with the composition of the

 4  polymer and the physical properties of the polymer.

 5  Q.    Next slide, please.

 6        What does this slide represent?

 7  A.    This is to represent protein rich tissue or flesh which

 8  would form around and through the mesh.  Now we begin to see

 9  some mesh and now the fiber is forming around it and through

10  it, and so the mesh becomes less and less visible to the naked

11  eye, but we can still see some particular blue strands.  And

12  it's pointed out, there's the blue strand of Prolene fiber

13  embedded in mesh.

14  Q.    So what's the significance of the statement protein rich

15  tissue, what's the significance of that?

16  A.    We know that the tissue contains protein.  And remember

17  we talked about the fact that when we take an explant out of a

18  human, we drop it in formaldehyde, and so we have tissue now

19  that's in the presence of formaldehyde, and the chemical

20  reaction takes place between the tissue, the proteins, and the

21  formaldehyde.

22  Q.    We're getting a little ahead of ourselves here.  Let's

23  look at the Prolene fiber there.  It's now a different color

24  than it was in the prior slide.  What does that Prolene fiber

25  represent?

—————————— THAMES - DIRECT - THOMAS ——————————

1  A.   It represents a strand of material, but what we're seeing

2  here in this case is biofilm that's formed around the Prolene

3  fiber.

4  Q.   Next slide, please.

5        Now, it says explant stored in formalin.  What does

6  that mean?

7  A.   When the tissue is, the explant is removed from the human

8  body, they drop it in formaldehyde to preserve it, to fix it.

9  It's a fixation process.  And that's what we see here is we

10 have a beaker with formaldehyde and then we have the explant

11 in the formaldehyde medium.

12 Q.   What is the fixation process?

13 A.   It's a chemical reaction that takes place between

14 formaldehyde and proteins to make a high molecular weight

15 brittle, insoluble polymer.

16 Q.   And what medical purposes does this formalin have?

17 A.   It's called a fixative, F-I-X-A-T-I-V-E, that's to set

18 the material, and it's traditionally done because a

19 histologist is going to want to slice a sample, and you want

20 the sample to have some stability to it when a knife goes

21 through it.  So it's to hold it in place, to fix it.

22 Q.   Next slide, please.

23        You spoke about a chemical reaction of protein and

24 formaldehyde.  Have you drawn a slide of that reaction?

25 A.   I have, sir.

THAMES - DIRECT - THOMAS

1  Q.   And would you tell the jury what you have done in this

2  slide?

3  A.   All right.  Here we see a protein molecule and we're only

4  seeing one segment of it.  It's a huge molecule.  Here, and so

5  I've used two of those because in this part of the slide and

6  that part of the slide, two proteins, and they are coming

7  together and they react with formaldehyde.  And they react in

8  such a way that this $CH_2$ right here becomes a bridge to tie

9  these two proteins together.  And so what we've done is take

10  two large protein molecules, react them with formaldehyde, and

11  produce even a larger, amorphous, brittle surface around the

12  fibers, encapsulating the fibers.

13  Q.   And how long has this chemical reaction of protein and

14  formaldehyde been known?

15  A.   Since 1948.

16  Q.   Next slide, please.

17       Is this the study where you first found this reaction

18  reported?

19  A.   Well, I knew the reaction occurred, but I found the

20  original document, yes, sir.

21  Q.   Next slide, sir.

22       Now, what is the practical, what is the practical

23  result of storing this explant in formalin?

24  A.   If you store the explant in formalin, the protein

25  formaldehyde polymer forms around it, as we've just shown here

1   in the last few slides.  And when that particular explant

2   dries out, that material becomes dry and it's brittle, and if

3   there's any flexing at all of the explant, it will crack.  And

4   you can see that happening on this particular explanted

5   material.  You see the cracks, the transverse cracks.  Right

6   here.  These cracks.  But that's protein and that's

7   formaldehyde.

8   Q.   The brown area on top of the Prolene polypropylene is

9   what?

10  A.   It's a layer of protein formaldehyde polymer.  The blue

11  is the polypropylene, or Prolene I should say.

12  Q.   Next slide, please.  This is another slide from Dr.

13  Guelcher, he referenced the 2007 Costello study.  Are you

14  familiar with that study.

15  A.   Yes, sir.

16          MR. THOMAS:  May I approach, Your Honor?

17          THE COURT:  You may.

18  BY MR. THOMAS:

19  Q.   Let me hand you what's already been received as a learned

20  treatise as exhibit 21468.

21  A.   Yes, sir.

22  Q.   And the title of the study is *Materials Characterization*

23  *of Explanted Polypropylene Hernia Meshes*, correct?

24  A.   Yes, sir.

25  Q.   If you turn to -- could you bring up the study, please,

THAMES - DIRECT - THOMAS

1   Jamie?  Go to page two of the study.  Under materials and

2   methods, it says all 14 samples.  Do you see that?

3   A.   Yes, sir.

4   Q.   "All 14 samples included in this study were the

5   polypropylene components from polypropylene expanded" -- I'm

6   not even going to try that one -- "composite hernia mesh such

7   as Composix FX or Kugel Composix, paren, C.R. Bard, Cranston,

8   Rhode Island, shown in figure 2."  What does that tell you

9   about the mesh that's being analyzed in this case?

10  A.   It's not an Ethicon mesh.  It was made by C.R. Bard.

11  Q.   And why is that important to you as a polymer chemist?

12  A.   Well, we don't know precisely what's in it.  We don't

13  know -- I don't know what the materials were that they used in

14  the formulation.  I do know exactly what was used in Ethicon.

15  I know that the antioxidants were there and so forth, but have

16  no idea what's here.

17  Q.   And down at the next paragraph, under tissue removal, the

18  first line says, "After explantation, the meshes were immersed

19  in a ten percent V slash V formalin solution and stored at

20  room temperature."  What's the significance of that finding in

21  the study?

22  A.   Well, we know that when the tissue was removed, the

23  surgeon dropped it in formaldehyde and the chemical reaction

24  that I've just described to you between proteins and

25  formaldehyde began.  And we know then from that result that

THAMES - DIRECT - THOMAS

1   there was a layer of protein formaldehyde fiber formed around

2   the fibers.

3   Q.   Okay.  And what significance to you is that protein

4   formaldehyde covering and your ability to analyze that

5   polymer?

6   A.   Yes.  You have to remove that covering completely before

7   you can do a scientific investigation of the Prolene fiber

8   itself.

9   Q.   And have you been involved in trying to remove this

10  formaldehyde protein surface?

11  A.   I have.

12  Q.   And tell the jury what the process entails.

13  A.   The process entailed reversing the reaction.  In other

14  words, if we look at that chemical reaction of the protein

15  plus formaldehyde, when it begins to form, the polymer begins

16  to form and it gets to be huge, become a solid, insoluble.

17  And so if it's insoluble, it's hard for chemical reagents to

18  get to it and destroy it.  And what we found is one of the

19  better ways to do that is because the formaldehyde reaction is

20  reversible, is add water.  Just leave it in water, heat it up

21  for long periods of time, for days, and you increase the

22  temperature because you want the reaction to reverse and go

23  back.  And you do that.  And then every 12 hours you take the

24  water and you remove it so that the formaldehyde that was put

25  in the water system is removed and won't react and go forward

THAMES - DIRECT - THOMAS

1    again, so you want to continue to reverse it.

2          And then at some point in time -- you continue to look

3    at these under a microscope to see how well you're doing.  And

4    then at some point in time, you may want to use a little

5    sodium hypochlorite to finish it off.  But it takes days to do

6    this.  And you have to elevate -- well, we elevated our

7    temperature because it reduces the time.  If you increase a

8    reaction by ten degrees centigrade it doubles the rate, so if

9    I want to really get the stuff to come off of the fiber, I've

10   got to heat it up and drive it to a reverse direction.

11   Q.   Have you been able to remove all the proteins?

12   A.   No, sir.

13   Q.   Even after all this effort?

14   A.   No, sir.

15   Q.   Why is that?

16   A.   It's because it's tenaciously bonded to the propylene

17   fiber.  Proteins have a lot of polarity and they are very good

18   adhesives.

19   Q.   Let's go back to the first page of 30302, please, under

20   the abstract, down towards the bottom of the abstract.  It has

21   "Several characterization techniques were utilized" --

22   A.   Yes, sir.

23   Q.   -- "including scanning electron microscopy, differential

24   scanning calorimetry, thermogravimetric analysis and

25   compliance testing."

THAMES - DIRECT - THOMAS

1        Is there any molecular weight analysis?

2   A.   No, sir.

3   Q.   Is there any tensile strength analysis?

4   A.   No, sir.

5   Q.   Is there any elongation analysis?

6   A.   No, sir.

7   Q.   Any attempt to measure the mechanical properties of that

8   mesh?

9   A.   None.

10  Q.   Go to the next slide, please, Jamie.

11       Now go to the next one, please.

12       The jury also heard from Dr. Guelcher about a study

13  done by Dr. Clavé and others in 2010 and they saw that slide

14  with that image that you see in front of you.  It suggests

15  that the images are consistent with images from the 1992

16  Ethicon dog study and the suture explants.  Have you reviewed

17  the Clavé study in connection with your work in this case?

18  A.   Yes, sir.

19            MR. THOMAS:  Your Honor, may I approach?

20            THE COURT:  You may.

21            MR. THOMAS:  The Clavé study has previously been

22  received as a learned treatise as 21457.

23            THE COURT:  Very well.

24  BY MR. THOMAS:

25  Q.   The title of the Clavé study is *Polypropylene As a*

THAMES - DIRECT - THOMAS

1  *Reinforcement in Pelvic Surgery is Not Inert, Comparative*

2  *Analysis of a Hundred Explants*.

3       What was Dr. Clavé and his other people in his study

4  trying to do?

5  A.   Well, they were trying to determine whether or not

6  polypropylene did undergo degradation, and they had a hundred

7  explants to look at, and they hypothesized that there was an

8  oxidation going on as we described it here on the white board

9  and that they were going to look to see if there was oxidation

10 or if there was any loss in properties and so forth, and

11 that's what their study focused on.

12 Q.   And some of these explants were Ethicon products?

13 A.   Yes, sir.

14 Q.   Let's go to page six, please, of 30267 under discussion,

15 first paragraph.  It says, "The primary objectives of this

16 study were to objectively observe a series of prosthetic

17 explants and to characterize potential degradation, which may

18 occur in vivo."  And they used three methods.  They used SEM,

19 correct?

20 A.   Correct.

21 Q.   And that's scanning electron microscopy?

22 A.   Yes, sir.

23 Q.   And FTIR?

24 A.   Yes, sir.

25 Q.   That's the infrared analysis we talked about?

THAMES - DIRECT - THOMAS

1   A.   Yes, sir.

2   Q.   And DSC is what?

3   A.   Differential scanning calorimetry.

4   Q.   Did they test molecular weight?

5   A.   No.

6   Q.   Did they test tensile strength?

7   A.   No, sir.

8   Q.   Did they test elongation?

9   A.   No, sir.

10  Q.   Go to the bottom right-hand corner of that same page,

11  please, and it says, "Several hypotheses concerning the

12  degradation of the polypropylene are described below.  None of

13  these, particularly direct oxidation, could be confirmed in

14  this study."

15       What's the significance of that to you as a polymer

16  chemist?

17  A.   Well, he looked at a hundred explants and he wasn't able

18  to prove that oxidation occurred, and that's oxidation that

19  we're showing here on the white board.

20  Q.   Let's go to page seven, please.  That refers to direct

21  oxidation of the polypropylene, the last sentence of that

22  first paragraph says, "The FTIR analysis neither confirmed nor

23  excluded oxidation of polypropylene in the in vivo

24  environment."  What does that tell you as a polymer chemist?

25  A.   The FTIR analysis did not confirm oxidation in the

THAMES - DIRECT - THOMAS

1  explanted materials that he looked at.

2  Q.   Let's go to page eight, please.  Page eight on the right

3  side, beginning in this study, do you see that right in that

4  paragraph?  "In this study, no difference between DSC

5  thermograms of pristine and degraded samples was found."

6  What's the significance of that to you as a polymer chemist?

7  A.   There was no change in the thermal history of the sample,

8  from the hundred explanted samples that he looked at, there

9  was no change in the thermal history, no change in the melting

10 point essentially.  There was not enough variation that he

11 could draw any conclusion from the thermal history that he

12 looked at those explants from.

13 Q.   Could you find in the Clavé study any objective

14 analytical chemist results that support the suggestion that

15 Ethicon Prolene polypropylene degraded in vivo?

16 A.   Absolutely none.

17 Q.   Let's go to the next slide, please.  And the next slide.

18      Plaintiffs also talked about the Wood article.

19      MR. THOMAS:  May I approach, Your Honor?

20      THE COURT:  You may.

21 BY MR. THOMAS:

22 Q.   The Wood article, plaintiffs used an abstract previously

23 received as 21925.  You've seen that before?

24 A.   Yes, sir.

25 Q.   And have you seen the actual study by Wood?

THAMES - DIRECT - THOMAS

1   A.   I have.

2   Q.   And were you able to determine from your review of the

3   actual study of Wood whether that study looked at Ethicon

4   Prolene polypropylene mesh?

5   A.   I have, and it is not Ethicon Prolene mesh.

6   Q.   What else did you learn from your review of the actual

7   study in that case?

8   A.   That they were looking at a polypropylene material that

9   oxidized and that was shown clearly in the infrared spectra,

10  but it was not Ethicon.

11  Q.   Next slide, please.

12       The actual study shows FTIR of 1740 for oxidized

13  polypropylene?

14  A.   Yes, sir.

15  Q.   And what's the significance of that to you and your work

16  in this case?

17  A.   Well, are we going to see the spectra?

18  Q.   Yes, sir.

19  A.   Could I have that?

20  Q.   Yes.  Let's go to the next slide, please, Jamie.

21       What are you showing the jury now in figure 3 of this

22  FTIR spectra?

23  A.   This is the spectra -- the blue spectra is pristine

24  polypropylene, in other words, it has never been implanted.

25  It's blue.  And the red is the explanted polypropylene sample

THAMES - DIRECT - THOMAS

1  that they used.  And you'll notice there's a designation there

2  of a carbonyl peak at 1740.  We're talking about right here.

3  And you'll notice, and I drew a structure of a carbonyl peak,

4  and I mentioned to you that if it were present that the

5  distinction would be strong and quite visible in the spectra,

6  and that's precisely what you see here is a strong, visible

7  peak at 1740.  And the reason that we know that it's oxidized

8  is because the blue sample, the pristine sample, has no peak

9  at that same frequency.  So it's been modified, it's been

10  modified by oxidation.

11  Q.  And how does the spectra which you've identified in

12  figure three of the Wood study of a polypropylene different

13  from Prolene compare to the FTIR spectra that you've taken of

14  Prolene polypropylene?

15  A.  I've never been able to identify an intensity of that

16  kind of material at that wave length due to oxidation of the

17  polypropylene.

18  Q.  And what does the your inability to define that peak

19  found in the Wood article tell you about Prolene

20  polypropylene?

21  A.  It didn't oxidize.

22  Q.  Now, Dr. Thames, did you analyze the benchtop testing

23  conducted by Ethicon concerning its laser-cut mesh and

24  mechanical-cut mesh?

25  A.  Yes, sir, I did.

THAMES - DIRECT - THOMAS

1  Q.   And tell the jury what benchtop testing is.

2  A.   Well, it's in a laboratory.  You go into a laboratory and

3  you have a work bench and you devise techniques to determine

4  what it is you want to determine.  For instance, if you want

5  to determine molecular weight of a GPC sitting on the

6  benchtop, so that's where experimentation was done to make the

7  studies with laser-cut versus mechanical cut mesh.

8  Q.   And did you analyze the kinds of testing that Ethicon did

9  in the machine-cut versus mechanical cut comparison?

10  A.   Yes, I did.

11  Q.   And would you tell the jury what elongation testing is,

12  please?

13  A.   Elongation testing, if we remember, we were talking about

14  the strands where you take the sample and you stretch it from

15  its original length and you see how far you can stretch it.

16  That's the elongation test.

17  Q.   And what is the, what is flexural rigidity?

18  A.   Flexural rigidity in this case is they want to know how

19  rigid the samples are, and what they do to evaluate that is an

20  ASTM test, American Society of Testing Materials type test,

21  where they take a piece of, I'll just use an example here of a

22  mesh, and they move it out over the table.  And you'll see how

23  the paper begins to bend?  And there's some point at which the

24  test will be over when it goes at a certain angle.  And then

25  the key is if it reaches that angle at a very short distance

THAMES - DIRECT - THOMAS

1   here, it's stiff.  If it takes it a long, you have to go out a

2   long way before the mesh bends, then it's not so stiff, it's

3   not so rigid.  And that's the way the evaluations were

4   determined.

5   Q.  And what do these benchtop tests tell the company about

6   the comparison between the machine-cut and the laser-cut mesh?

7   A.  They're essentially the same.

8   Q.  And just so the jury understands, what does it mean to

9   machine-cut a mesh as opposed to mechanically cut a mesh?

10  A.  Well, this is an example.  We all know what a paper

11  cutter looks like, one where you can cut a piece of paper,

12  that would be a mechanical cut, or a pair of scissors would

13  mechanically cut it.  Laser-cut is where enough energy is put

14  into a cutting edge that you can actually produce heat,

15  vibrating the sample, and you melt the sample rather than

16  physically cutting it.  So you will melt it and it's cut by

17  melting and not by physical cutting.

18          MR. THOMAS:  Your Honor, may I approach?

19          THE COURT:  You may.

20  BY MR. THOMAS:

21  Q.  Dr. Thames, I'm handing you what's been marked as

22  defendants' exhibit 22463.  It's an article by Dietz and

23  others concerning the mechanical properties of implanted

24  materials used in incontinence surgery.  Did you review this

25  study in connection with your opinions in this case?

THAMES - DIRECT - THOMAS

1    A.   I did.

2    Q.   And did you rely on it in the formulation of your

3    opinions in this case?

4    A.   Yes, sir.

5         MR. THOMAS:  Your Honor, I'd offer 22463 as a learned

6    treatise.

7         MR. KUNTZ:  No objection, Your Honor.

8         (Defendants' Exhibit 22463 received in evidence.)

9    BY MR. THOMAS:

10   Q.   Could you bring that up, please?

11        What are they doing in the Dietz study?

12   A.   They're looking at a variety of different materials that

13   are used for implantation; in this particular case, nylon,

14   IBS, TVT, Gore-Tex Soft, Gore-Tex Micromesh, Mersilene and

15   Prolene.  They're evaluating a variety of different materials

16   that are used.

17   Q.   What tests are they running?

18   A.   They're running a mean stiffness test to determine the

19   stiffness as we've described here, how stiff those meshes are

20   going to be.

21   Q.   Jamie, can we bring up table one, please?  Could you blow

22   up that, please?

23        And Dr. Thames, what does table one tell us?

24   A.   It tells us if you look at Prolene, TVT -- excuse me,

25   let's go TVT, you'll see that it has the lowest mean stiffness

THAMES - DIRECT - THOMAS

1  value and the second most lowest is the Prolene itself.  TVT

2  is of the device, and Prolene is the material, the material,

3  Prolene.  So it's very low, it shows very low stiffness in

4  relationship to the other materials that are used in that

5  particular work.

6  Q.  Let's go to the conclusions on the next page, please.

7  Beginning as demonstrated in this study.  It says, "As

8  demonstrated in this study, the TVT shows unusual

9  biomechanical properties when tested against other routinely

10 used implant materials."

11 A.  Yes, sir.

12 Q.  "Of the tested permanent mesh products, it has by far the

13 lowest initial stiffness, i.e., it exhibits less resistance to

14 defamation at forces below the elastic limit.  The elastic

15 limit is only reached at an elongation of almost 50 percent of

16 its initial length, although at relatively low forces.  The

17 fracture point is reached at very high elongation and on

18 exertion of a relatively high force."

19      Of what significance is that to you and your opinions

20 in this case?

21 A.  Well, it shows that it's a very good material, that it's

22 not stiff, it's not, we know it not to be brittle, and it's

23 one of the best materials on the market today according to

24 this work, if not the best.

25      MR. THOMAS:  Your Honor, may I approach?

THAMES - DIRECT - THOMAS

1           THE COURT:  You may.

2    BY MR. THOMAS:

3    Q.  Dr. Thames, I've handed you what's been marked as

4    defendant exhibits 21349.

5    A.  Yes, sir.

6    Q.  It's a memoranda from Gene Kammerer to Marty Weisberg and

7    David Robinson dated March 6, 2006.  Did you review this

8    document and utilize it in your opinions in this case?

9    A.  I did.

10          MR. THOMAS:  Your Honor, I offer into evidence

11   defendants' exhibit 21349.

12          MR. KUNTZ:  No objection.

13          THE COURT:  It may be received.

14          (Defendants' Exhibit 21349 received in evidence.)

15   BY MR. THOMAS:

16   Q.  Tell the jury what's going on in this exhibit, Dr.

17   Thames, 21349.

18   A.  Well, Ethicon did quite a bit of work to confirm that

19   laser cutting was an appropriate way to prepare the mesh

20   samples.  They did design experiment work, they determined the

21   best power out for the laser, they determined the length of

22   time that's best for cutting it, and then they compared that

23   to the mechanical cut, mechanical cut meshes, and those

24   analyses are somewhat included here in this particular report,

25   Mr. Thomas.

THAMES - DIRECT - THOMAS

1  Q.   And under conclusion?

2  A.   Yes, sir.

3  Q.   Can we scroll down to that, please?  And blow-up the

4  first paragraph.

5       "The elongation analysis determined that each of the

6  two methods of cutting produces meshes which have

7  statistically the same properties of elongation within the

8  first five percent elongation of the mesh.  This data is

9  contained in the report, *Performance Evaluation of TVT Prolene*

10  *Blue Mesh*."

11      What's the significance of that conclusion?

12  A.   Well, they're essentially the same, mechanical-cut and

13  laser-cut, up to five percent elongation of the mesh.

14  Q.   And what is the significance of the five percent figure?

15  A.   Well, that's the number that you would expect to not

16  exceed in the human body with a cough or a strong reaction.

17  Q.   And is that based upon findings from another study that's

18  cited in this report?

19  A.   Yes, it is; the Lin study.

20  Q.   And if you go to the next page, please, in the first full

21  paragraph, if we look at, 21349 looks at elongation tests,

22  correct?

23  A.   Yes, sir.

24  Q.   And did Ethicon look at the actual difference in distance

25  in elongation from a machine-cut and a laser-cut mesh?

THAMES - DIRECT - THOMAS

1  A.   Yes, they did.

2  Q.   And at one Newton force -- what's a Newton?

3  A.   A hundred pounds.  Per cubic grams, excuse me, grams.

4  Q.   At one Newton force, what is the difference in elongation

5  between machine-cut mesh and laser-cut mesh?

6  A.   Point 011 inches, one hundredth of an inch.

7  Q.   And at the bottom of the conclusion, it is evident.

8  Would you blow that up, please?  I'm sorry.  All the way down

9  at the bottom, please.

10      "It is evident the elongation profile, paren, curve, of

11 laser-cut mesh is equivalent to that of mechanically-cut mesh

12 within the critical physiological range as defined by the

13 maximum average force of 0.5 Newtons identified by A.T. Long

14 Lin in the referenced study from March 2005."

15 A.   Yes, sir.

16 Q.   What's the significance of that to your opinions in this

17 case?

18 A.   Well, this gentleman has established a maximum average

19 force and we know that the elongation goes with that force

20 over a five percent elongation range is no difference at all

21 in the two kinds of cutting techniques.

22      MR. THOMAS:  Your Honor, may I approach?

23      THE COURT:  You may.

24 BY MR. THOMAS:

25 Q.   Dr. Thames, I've handed you what's been marked as

THAMES - DIRECT - THOMAS

1  defendant exhibits 21229.  It's a document dated May 5, 2005

2  titled *Performance Evaluation of TVT, Mechanical-Cut Versus*

3  *Laser-Cut*.

4       Did you utilize that in the formation of your opinions

5  in this case?

6  A.  I did.

7            MR. THOMAS:  Your Honor, I offer into evidence

8  defendants' exhibit 21229.

9            MR. KUNTZ:  No objection.

10           THE COURT:  It may be received.

11           (Defendants' Exhibit 21229 received in evidence.)

12  BY MR. THOMAS:

13  Q.  What is flexural rigidity?

14  A.  We talked about this where we talked about the fact that

15  if you flex it, whether or not the sample is going to be rigid

16  or not, whether it's going to be pliable and move easily, then

17  it's not rigid.  And that's talked about here in table number

18  one, for instance.

19  Q.  Tell the jury, please, what Ethicon did to test flexural

20  rigidity of the machine-cut as compared to the laser-cut mesh?

21  A.  Well, they did the same sort of techniques that I

22  described earlier where they used an ASTM technique to

23  determine the rigidity, and that's an ASTM 1388 stiffness of

24  fabrics, rigidity of fabrics.

25  Q.  And if you go to page three of this exhibit, they report

1    their conclusions.

2    A.   Yes, sir.

3    Q.   The fourth bullet point down on flexural rigidity, it

4    reads "Flexural rigidity was higher for the mechanical-cut

5    one-by-eight inch versus the laser-cut one-by-eight inch in

6    the machine direction."

7    A.   Yes, sir.

8    Q.   What does it mean in the machine direction?

9    A.   Machine direction is the direction that cutting was done

10   to produce the Prolene mesh, and that's the direction that is

11   used of the manufacturer, and that's the direction that is

12   important for supporting the human organs that they're to

13   support.

14   Q.   And the next bullet point reads "Flexural rigidity was

15   similar between mechanical-cut mesh and laser-cut mesh, 0.433

16   one inch by eight inch samples in the machine direction."  And

17   what's the significance of that finding?

18   A.   Well, first of all, they're very similar.  It's basically

19   not much difference at all in the two of them, and that's in

20   the machine direction just like we talked about previously.

21   Q.   Are the elongation tests and the flexural rigidity tests

22   appropriate tests to evaluate the mechanical characteristics

23   of machine-cut and laser-cut mesh?

24   A.   Yes, sir.

25           MR. THOMAS:  May I approach, Your Honor?

THAMES - DIRECT - THOMAS

1          THE COURT:  You may.

2    BY MR. THOMAS:

3    Q.   Dr. Thames, I've handed you what's been marked as

4    defendants' exhibit 1350, a clinical expert report dated March

5    7, 2006.

6    A.   Yes, sir.

7    Q.   Have you seen that document before?

8    A.   I have, yes, sir.

9    Q.   Did you use that with the formulation of your opinions in

10   this case?

11   A.   I did.

12   Q.   And this is the laser-cut mesh for Gynecare TVT -- I'm

13   sorry.  This is the clinical expert report *Laser-Cut Mesh For*

14   *Gynecare TVT Support For Incontinence*?

15   A.   Yes, sir.

16   Q.   And Gynecare TVT-O obturator system?

17   A.   Yes, sir.

18          MR. THOMAS:  Your Honor, I move into evidence

19   defendant exhibits 21350.

20          MR. KUNTZ:  No objection.

21          THE COURT:  It may be received.

22          (Defendants' Exhibit 21350 received in evidence.)

23   BY MR. THOMAS:

24   Q.   Dr. Thames, this document is signed by Martin Weisberg,

25   M.D., senior medical director of Ethicon, Inc., and David

THAMES - DIRECT - THOMAS

1  Robinson, medical director of Ethicon Women's Health and

2  Urology on March 7, 2006, correct?

3  A.  Yes, sir.

4  Q.  Let's go to page three.  Under preclinical evidence,

5  first paragraph.  "In order to assure that changing from

6  mechanically-cut mesh to laser-cut mesh would not result in an

7  adverse clinical impact, preclinical investigations were

8  undertaken.  These investigations were performed to ensure

9  that there were no clinically significant changes in the

10 properties of the mesh resulting from process modifications.

11 These studies compared elongation, flexural rigidity, and

12 particle loss properties of laser-cut versus mechanically-cut

13 Prolene mesh."  Correct?

14 A.  Yes, sir.

15 Q.  Now, continuing on down, the clinical expert report

16 reports on the findings of the work that was done.  Is this

17 the studies that you've already just talked about?

18 A.  Yes, sir.

19 Q.  And the paragraph continues, "The elongation analysis

20 determined that each of the two methods of cutting produces

21 mesh that have statistically the same properties of elongation

22 within approximately the first four to five percent elongation

23 of the mesh, based on the selected cutting parameters."  Do

24 you agree with that finding?

25 A.  Yes, I do.

THAMES - DIRECT - THOMAS

1  Q.   And likewise, the next paragraph discusses the flexural

2  rigidity findings, correct?

3  A.   That's correct, sir.

4  Q.   And in this paragraph the clinical expert report states

5  that flexural rigidity was slightly higher for the

6  mechanically-cut mesh versus the machine-cut mesh.  What does

7  that mean?

8  A.   That means that the mechanical-cut mesh is going to be a

9  bit more rigid than the laser-cut mesh.

10  Q.   "The rigidity of the mechanically-cut and the laser-cut

11  for the samples in the cross direction was similar.  This

12  should result in no clinical differences in this respect."

13       Is that what you just discussed a few minutes ago?

14  A.   Yes, sir.

15  Q.   Dr. Thames, do you have an opinion to a reasonable degree

16  of certainty as to whether the Prolene mesh in the Ethicon

17  TVT-O device degrades in the human body?

18  A.   I do.

19  Q.   And what is that opinion?

20  A.   It does not degrade.

21  Q.   Do you have an opinion within a reasonable degree of

22  certainty as to whether the Prolene mesh in the Ethicon TVT-O

23  device oxidizes in the human body?

24  A.   I do.

25  Q.   And what is that opinion?

THAMES - DIRECT - THOMAS

1   A.   It does not oxidize.

2   Q.   And do you have an opinion to a reasonable degree of

3   certainty as to whether the Prolene mesh in the Ethicon TVT-O

4   performs as expected from a polymer chemistry perspective?

5   A.   I do.

6   Q.   And what is that opinion?

7   A.   It performs as expected.

8   Q.   Do you have an opinion to a reasonable degree of

9   certainty as to whether using a laser to cut the Prolene mesh

10  into the Ethicon TVT-O device adversely affects the mechanical

11  properties of that mesh?

12  A.   I do.

13  Q.   And what is that opinion?

14  A.   It does not adversely affect its properties.

15          MR. THOMAS:  Your Honor, may I have a moment, please?

16          THE COURT:  Yes.

17          MR. THOMAS:  That's all the questions I have.  Thank

18  you, Dr. Thames.

19          THE COURT:  All right.  Cross examine.

20          MR. KUNTZ:  Yes, Your Honor.  Can we approach real

21  quick?

22          THE COURT:  Sure.

23          (The following occurred at sidebar.)

24          THE COURT:  All right, sir.

25          MR. KUNTZ:  This is an issue we have about

*United States District Court*
*Southern District of West Virginia*

 1   cross-examining.  I was going to impeach him with a document

 2   after he got up and said over and over his name's on the

 3   building at Southern Mississippi, that his legacy is there.

 4   The truth is, Your Honor, there's a lot of issues related to

 5   his legacy.  This is an actual official document from the

 6   Southern Mississippi senate that shows that the faculty, 400

 7   members at a 93 percent voted no confidence against him.

 8          There's a lot of inflammatory stuff in this document.

 9   There's a whole another box about sexual misconduct.  I'm not

10   getting into any of that.  I'm not getting into any of the

11   issues about him spying on students' emails.  And you can read

12   the whole document yourself, Your Honor.  This is from the

13   Southern Mississippi, USM faculty senate, an official

14   document.

15          He just got up here and said his name's on the

16   building, he's trying to say that that's his legacy at the

17   university.  I'm going to simply ask him one question, you had

18   a vote of no confidence against you by 93 percent of a 400

19   person faculty.  That's it.  The fact that his name's on the

20   building doesn't -- they're trying to establish that's his

21   legacy and it's not.  You can pay to have your name on the

22   building, it doesn't reflect his legacy as evidenced there by

23   the senate and the faculty.

24          MR. THOMAS:  Your Honor, Dr. Thames was, in fact,

25   president of the University of Southern Mississippi.  I never

1  told the jury that.  He never told the jury that.  The fact

2  that he was president of the University of Southern

3  Mississippi has nothing to do with the opinions he offers in

4  this case as a polymer chemist.  The fact that he is a polymer

5  chemist qualified as he has been, we can't get into the

6  sideshow of what happens when you're president of a

7  university.  I think that we could be talking about all kinds

8  of issues that have nothing to do with his opinions in this

9  case.

10         MR. KUNTZ:  Judge, one, it's a cross of an expert.

11  Two, there's a lot of stuff I'm not going to get into.  But to

12  say that his legacy is his name on the building and to prop

13  him up like that opens it up to what his real legacy was at

14  the university.  The fact that his name on the building,

15  Bernie Madoff still has his name on buildings in New York.  My

16  point is you can pay for that.  And to prop him up like that,

17  I think it's a fair question to ask you had a vote of no

18  confidence against you.  If he disagrees, then I bring this

19  in.

20         THE COURT:  Let me ask you this:  When was his name

21  placed upon the building, before or after he was president?

22         MR. KUNTZ:  I don't know the answer to that question.

23         MR. THOMAS:  Before.

24         THE COURT:  The vote of no confidence was of him as

25  president?

1           MR. KUNTZ:  Yes.

2           THE COURT:  It seems to me to be attenuated when only

3   reference he made in direct that would make it relevant is the

4   legacy remark, which I don't recall, but I take your point.

5   Let me just finish.  And it seems to me it would be highly

6   prejudicial to show a vote of no confidence in him as

7   president when that was not brought up nor was his performance

8   as president in any way implicated in his direct examination.

9           Now, if there's something in here that goes to his

10  performance as a professor of polymer chemistry as head of the

11  building or what's the name of it?

12          MR. KUNTZ:  Shelby Thames Polymer Science Building.

13          THE COURT:  Yes.  If there's anything related to that

14  in here.  I'm ruling that his performance as president of the

15  university and impeachment regarding that is inappropriate.

16          MR. KUNTZ:  Okay.

17          THE COURT:  Do you have anything in here that goes to

18  his chemistry, his relationship with the chemistry?

19          MR. KUNTZ:  I'll look through my other stuff, but --

20          THE COURT:  Do you want a minute or to two?

21          MR. KUNTZ:  No.  I'll look at lunch.

22          (Sidebar concluded.)

23          MR. KUNTZ:  May it please the court.

24          THE COURT:  Yes, sir.  You may inquire.

25  (CROSS EXAMINATION OF SHELBY THAMES BY MR. KUNTZ:)

THAMES - CROSS - KUNTZ

1  Q.  Dr. Thames, good afternoon, or good morning.

2  A.  Hello, sir.

3  Q.  We just met the other day for the first time, correct?

4  A.  Yes, sir.

5  Q.  You're not a medical doctor?

6  A.  No, I'm not.

7  Q.  And you're not a biomedical engineer?

8  A.  No, sir.

9  Q.  And you're here testifying at the request of Mrs. Jones'

10 law firm, Butler Snow, correct?

11 A.  That's correct.

12 Q.  And you have worked with Ms. Jones and her law firm on

13 several occasions, haven't you?

14 A.  Yes, sir.

15 Q.  In fact, you have been providing expert testimony for

16 Butler Snow, her firm, for over 20 years, haven't you?

17 A.  Well, I wouldn't go so far as to say that.

18 Q.  You've been expert --

19 A.  I have worked with them before, but not over a 20-year

20 span, sir.

21 Q.  You haven't worked with her firm since 1996, is that your

22 testimony?

23 A.  I don't remember the exact dates, but I did some

24 testimony work for them in the breast implant litigation.

25 Q.  So you've been working with them for a long time?

1  A.   Well, not continuously, sir, but yes.

2  Q.   And you've given approximately 50 depositions as an

3  expert witness?

4  A.   That's an estimate, yes, sir.

5  Q.   And 99 percent of those times have been for corporate

6  defendants, correct?

7  A.   That's correct, sir.

8  Q.   Ninety-nine percent of the time that that's been for big

9  industry?

10 A.   Well, not necessarily big industries, but --

11 Q.   Chemical companies, medical companies, oil companies?

12 A.   Yes, I'd say that's probably right.

13 Q.   And so far in this case you've billed $200,000 worth of

14 --

15         MR. THOMAS:  Objection, Your Honor.  May we approach?

16         THE COURT:  Sure.

17         (The following occurred at sidebar.)

18         THE COURT:  All right.

19         MR. THOMAS:  Your Honor, he has billed $200,000 in

20 this litigation, but he has not billed $200,000 in this case,

21 and we're bringing in the other cases which is where I think

22 the court has cautioned us about throughout the litigation and

23 I think that's inappropriate.  In order for me to explain it

24 he'd have to talk about all other cases he worked on.

25         MR. KUNTZ:  Your Honor, he talked about all explanted

THAMES - CROSS - KUNTZ

1    meshes and the work he's done in the other cases and for that,

2    part of the testing for that he has billed 200,000.

3            THE COURT:  I'm trying to figure out without knowing

4    what percentage is fairly attributable to this case, do we

5    have any idea?

6            MR. THOMAS:  Yes, Your Honor.

7            MR. KUNTZ:  He talked about all of the explanted

8    mesh, that's part of his opinion.

9            THE COURT:  I know he did.  I know he did.

10           MR. THOMAS:  He at, as of the time of his deposition

11   it was about $19,000 for the Huskey and Edwards cases.

12           THE COURT:  Was that before he examined all the

13   meshes?

14           MR. THOMAS:  That was after because the Lewis case

15   was where he examined all the meshes with Dr. Jordi.  Same

16   reason we didn't go into, remember we were not able to cross

17   examine Dr. Jordi for the million dollars that he received

18   because it was on all these other meshes.

19           MR. KUNTZ:  Your Honor, he just talked about all the

20   work he did several times.  I've looked at all these explanted

21   mesh, I mean that's what he billed $200,000 for.  It's fair

22   game.  He talked about all the work he's done and all the

23   meshes he examined.

24           THE COURT:  I've got a direct contradiction between

25   what counsel is saying.  As I understand Mr. Thomas, he's

THAMES - CROSS - KUNTZ

1  saying that the 200,000 or that the $19,000 figure included

2  the examination of the meshes and you're saying --

3          MR. THOMAS:  If you understood that, Your Honor, then

4  I misspoke because he was first retained in the Lewis case and

5  that's when Dr. Jordi did all of his work.

6          THE COURT:  Question.  How much money was involved in

7  all of the examination the meshes which he talked about?

8  How much did you spend on that?

9          MR. THOMAS:  It's difficult to break that down from

10  the depositions and the preparation he did in reports for the

11  other cases.  What Mr. Kuntz has asked him about is the total

12  that he's been paid for all of the litigation.  That's the

13  problem that I have with it.

14          THE COURT:  Is it difficult, it is a difficult

15  circumstance, I can recall in the first Bard trial, you know,

16  hundreds of thousands of dollars if not millions came in

17  without objection and I was wondering about it at the time.

18          I don't think it's fair to bring it all in.  I do

19  think it's fair to say based on what you've represented and

20  what I heard him say about examining the meshes and so forth,

21  that he's been paid well into the six figure range.

22          MR. KUNTZ:  Right.  Here's my problem.  I wasn't

23  going to ask him until on direct he started getting into all

24  the materials and --

25          THE COURT:  Will you settle for well into six figure

THAMES - CROSS - KUNTZ

1    range?

2            MR. KUNTZ:  Yes.

3            THE COURT:  Go do it.

4            (Sidebar concluded.)

5            THE COURT:  All right, sir.  You may inquire.

6    BY MR. KUNTZ:

7    Q.   Dr. Thames, for your work in this litigation you have

8    earned into the six figures, correct?

9    A.   Probably.

10   Q.   And in just preparation for your deposition in this case

11   that you gave you charged $18,000, correct?

12   A.   No, sir.

13   Q.   You didn't earn $18,000 in 48 hours preparing for your

14   deposition in this case?

15   A.   Oh, you're talking about since I've been here?

16   Q.   Yes.

17   A.   I haven't added it up, sir.  It's $375 an hour, just like

18   I said.

19   Q.   You talked a lot about polypropylene on your direct,

20   remember that?

21   A.   I do.

22   Q.   This is the first case you've ever testified as an expert

23   regarding polypropylene material that was implanted in the

24   human body?

25           MR. THOMAS:  Your Honor, I'm sorry.  I have to

──────── THAMES - CROSS - KUNTZ ────────

1    approach again.

2           THE COURT:  All right.

3           (The following occurred at sidebar.)

4           THE COURT:  Yes, sir.

5           MR. THOMAS:  Your Honor, Dr. Thames testified in

6    Texas, in a TVT-O case down in Texas, and the question was you

7    haven't, it calls for him to answer that question.

8           MR. KUNTZ:  I'll rephrase it.  Prior to the Ethicon

9    litigation is the only way I can rephrase it.

10           THE COURT:  Let me hear it.

11           MR. KUNTZ:  Well, if he doesn't want to bring other

12    cases into it which was the previous objection, then I can say

13    prior to this Ethicon litigation you've never testified as an

14    expert about polypropylene planted in a human body.

15           MR. THOMAS:  I have no problem with that.

16           THE COURT:  Okay.

17           (Sidebar concluded.)

18           THE COURT:  Listen to the question carefully and I

19    think you can answer it yes or no.

20    BY MR. KUNTZ:

21    Q.   Prior to the Ethicon litigation regarding polypropylene

22    products in the pelvic floor you have never testified as an

23    expert regarding polypropylene material implanted in the human

24    body, correct?

25    A.   Yes.

THAMES - CROSS - KUNTZ

1  Q.  And prior to your involvement in the Ethicon mesh

2  litigation you've never analyzed explanted polypropylene

3  materials?

4  A.  Correct.

5  Q.  And prior to being hired by defendant Ethicon in this

6  litigation you've never evaluated or tested the durability of

7  polypropylene mesh?

8  A.  Correct.

9  Q.  And prior to this case you've never studied the potential

10  for degradation for polypropylene mesh and you've never

11  performed any testing or analysis of the polypropylene mesh

12  device, true?

13  A.  No, not true.

14  Q.  Prior to the time Ethicon hired you you've never studied

15  a polypropylene medical device, correct?

16  A.  Oh, medical device.  I have studied polypropylene, but

17  not as a medical device.

18  Q.  Never studied polypropylene as a medical device that's

19  permanently implanted in a person's body?

20  A.  That's correct, sir.

21  Q.  Prior to being hired by defendant Ethicon for the pelvic

22  mesh litigation you've never tested polypropylene for

23  degradation, correct?

24  A.  That's correct.

25  Q.  In fact, prior to this litigation you've never performed

THAMES - CROSS - KUNTZ

1   any testing on polypropylene?

2   A.   I can't say that's true.  I've done a lot of testing and

3   I can't say that I've never done any, but I've done very

4   little, if any, at all.

5   Q.   So very little before hired by Ethicon, testing on

6   polypropylene?

7   A.   Testing, that's correct.

8   Q.   And you've never published an article, out of the 169

9   that you were shown on direct, about polypropylene

10  degradation?

11  A.   Correct.

12  Q.   And you've never done any study comparing TVT-O laser-cut

13  mesh to mechanical-cut mesh, correct?

14  A.   Other than this study, yes, sir.

15  Q.   Well, in fact, you've never analyzed TVT-O laser-cut mesh

16  in this case, correct?

17  A.   That's correct, yes.

18  Q.   So you've never done a study between mechanical-cut and

19  laser-cut mesh, isn't that true, Doctor?

20  A.   That's correct.

21  Q.   In fact, you've never even held a TVT-O laser-cut device

22  in your hand, have you?

23  A.   That's correct.

24          MR. KUNTZ:  Probably a good place to stop, Your

25  Honor.

THAMES - CROSS - KUNTZ

1          THE COURT:  How much more you got?

2          MR. KUNTZ:  Probably 20 minutes.

3          THE COURT:  All right.  Twenty minutes is longer than

4    I would, yes.  We'll take our lunch break.  Hour and ten

5    minutes, we'll start again at ten after 1:00.

6          During the lunch break do not discuss the case among

7    yourselves, permit anyone to discuss it with you or in your

8    presence.  Do not read anything about this case.  Do not

9    listen to anything.  Do not watch anything.  Do not use any

10   social media.  Don't use a computer, don't do any research.

11   Have a nice lunch, I'll see you at ten after 1:00.

12          You may step down, sir.

13          Court's in recess.

14          (The Jury left the courtroom at 12:04 p.m.)

15          (A recess was taken at 12:04 p.m.)

16   (**SHELBY F. THAMES, Ph.D.,** HAVING BEEN PREVIOUSLY SWORN,

17   TESTIFIED AS FOLLOWS:)

18          (The witness resumed the stand.)

19          (The jury entered the courtroom at 1:10 p.m.)

20          THE COURT:  Please be seated.

21          You may proceed.

22   (CONTINUED CROSS EXAMINATION OF SHELBY F. THAMES BY

23   MR. KUNTZ:)

24   Q.   Dr. Thames, when we left off, you've never done any type

25   of study on the TVT-O laser-cut mesh, correct?

*United States District Court*
*Southern District of West Virginia*

—THAMES - CROSS - KUNTZ—

1   A.   That's correct.

2   Q.   I want to talk to you about a few articles you discussed

3   on direct examination.  Okay?

4          MR. KUNTZ:  Evan, if we could pull up what's already

5   been admitted Plaintiffs' Exhibit 14114.

6   BY MR. KUNTZ:

7   Q.   And this is the Céline Mary article?

8   A.   Yes, sir.

9   Q.   About halfway down, after one and two years -- do you see

10  that statement:  "After one and two years, in vivo," meaning

11  in the body, "the explanted polypropylene sutures showed

12  visual evidence of surface stress cracking."  Correct?

13  A.   That's what it says, sir.

14  Q.   Okay.  And this article states that polypropylene

15  degrades, correct?

16  A.   Would you show me that?

17         MR. KUNTZ:  If you turn to the back, Page 205, Evan.

18  BY MR. KUNTZ:

19  Q.   You reviewed this article closely in forming your

20  opinions you discussed on direct, correct?

21  A.   I reviewed the article, correct.

22  Q.   And under "Conclusion," if we go to "visual evidence."

23      "Visual evidence of surface degradation was observed

24  after one and two years for the polypropylene but not the PVDF

25  sutures."  Correct?

THAMES - CROSS - KUNTZ

1   A.   That's what it suggests.

2   Q.   Okay.  So this article suggests that degradation occurred

3   in polypropylene sutures.

4   A.   That's what they say.

5   Q.   Okay.  And the PVDF sutures where they don't see any

6   degradation is a completely different product than the Prolene

7   mesh, correct?

8   A.   That's correct.

9   Q.   Okay.  And so you disagree with Céline Mary's article

10  that degradation occurs?

11  A.   I do.

12  Q.   Okay.  And let me ask you, Dr. Thames, this is a

13  peer-reviewed article, correct?

14          MR. KUNTZ:  If you can pull back up the beginning.

15          (The document was published to the jury.)

16  BY MR. KUNTZ:

17  Q.   That's the conclusions of all of these authors in this

18  article that are all listed below the title that degradation

19  occurs in polypropylene, correct?

20  A.   I would gather so.

21  Q.   Okay.  And this is a peer-reviewed article, isn't it?

22  A.   I would think so.

23  Q.   So that means other people outside the authors have

24  reviewed this to its correctness and authenticity, correct?

25  That's what happens in the peer-review process?

—————— THAMES - CROSS - KUNTZ ——————

1   A.   That's correct, they have reviewed the article and --

2   and, yes --

3   Q.   And so you disagree with not -- all those authors and you

4   disagree with all the people that peer reviewed it, correct?

5           MR. THOMAS:  Your Honor, asked and answered.

6           THE COURT:  Overruled.

7           THE WITNESS:  I disagree with the analysis that --

8   the conclusions that they've arrived at for the reasons that

9   I've explained today.

10  BY MR. KUNTZ:

11  Q.   And you've never studied polypropylene mesh until this

12  litigation, correct?

13  A.   That's correct.

14          MR. KUNTZ:  Okay.  Please pull up Plaintiffs' Exhibit

15  14115.

16          (The document was published to the jury.)

17          THE COURT:  Would you scoot up a little bit closer to

18  the mic?

19          THE WITNESS:  Yes, sir.

20  BY MR. KUNTZ:

21  Q.   This is an article we discussed on the direct, the Clavé

22  article.  Do you remember that one?

23  A.   I do.

24  Q.   And, again, this is several authors, and this is 2009,

25  and the International Urogynecological Association, correct?

THAMES - CROSS - KUNTZ

1  A.   That's correct.

2  Q.   Okay.  And in this article, they also found that

3  degradation might occur in polypropylene, correct?

4  A.   They found it might but that they could not prove it,

5  sir.

6  Q.   But they -- they say in their conclusion -- let's pull up

7  the conclusion -- "This is the first study to evaluate

8  synthetic implants used in the vaginal approach for pelvic

9  floor reinforcement."  Correct?

10 A.   That's what it says, yes, sir.

11 Q.   Okay.  And if you go back over to the left side, under

12 "Abstract," they say, "While previously recognized as" -- "as

13 inert" -- correct, do you see that?

14 A.   I do.

15 Q.   -- "polypropylene is associated with high complication

16 rates."  Do you see that?

17 A.   That's what they say.

18 Q.   Okay.  And you believe it is inert, correct?

19 A.   No.  Nothing is inert.  I do not believe, under the

20 conditions that it's used in the body, that it degrades or

21 oxidizes.

22 Q.   You're not an expert in dealing with medical implants in

23 the body, are you?

24 A.   I'm an expert in polymer science and chemistry.

25 Q.   But you've never studied, never worked with, and your

—— THAMES - CROSS - KUNTZ ——

1  expertise is not how medical implants react in the body,

2  correct?

3  A.   I understand the chemistry, whether it's in the body or

4  out of the body.

5  Q.   But you don't understand, as a biomedical engineer or as

6  an expert, how it acts in the body, correct?

7  A.   Well, an engineer is different from a chemist.  And I am

8  a polymer scientist and I look at things differently.  I look

9  at the data that's arrived at, that I can look at and make a

10  conclusion, and every piece of data that I considered to be

11  validly taken and presented does not show degradation, sir.

12  Q.   Okay.  So you don't -- you disagree with this article

13  that even raises the concern of degradation, correct?

14  A.   No, I don't disagree with the fact that they are studying

15  it to determine whether it can degrade or not, but in this

16  article, he -- in every instance he tested, he said, "I cannot

17  prove that it degrades."  We went over that in the direct

18  examination.

19  Q.   Let's pull up Plaintiffs' Exhibit 4116.  This is the

20  Dr. Wood -- or the A.J. Wood study you talked about on direct.

21       MR. KUNTZ:  If you turn to the back page, Evan,

22  starting with the first page.  It's Plaintiffs' Exhibit

23  14166R.

24       (The document was published to the jury.)

25  BY MR. KUNTZ:

——— THAMES - CROSS - KUNTZ ———

1  Q.  And this is another article --

2          MR. THOMAS:  Excuse me, counsel.  I don't think this

3  is the same one that's in evidence.

4          MR. KUNTZ:  Okay.

5          MR. THOMAS:  I think we need to approach on this.

6          THE COURT:  All right.

7          (The following occurred at sidebar.)

8          THE COURT:  Mr. Thomas?

9          MR. THOMAS:  The one that I had was the abstract.

10  And the abstract was what I understood had been admitted, not

11  the study.  The reason why I approach here is because there is

12  a paragraph in there about the FDA that I'm sure you do not

13  want to publish to the jury.

14          MR. KUNTZ:  That's why it's redacted.

15          MR. THOMAS:  I just want to make sure.

16          THE COURT:  Okay.  You may proceed.

17          MR. KUNTZ:  It's redacted.

18          MR. THOMAS:  Is it the same exhibit?

19          MR. KUNTZ:  No, it's not.  This is the actual

20  published study, not the abstract.

21          MR. FAES:  That's the one you referred to, I believe,

22  in your direct examination.

23          MR. THOMAS:  That's fine.

24          THE COURT:  That's all right.  Go ahead.

25          (Sidebar concluded.)

—— THAMES - CROSS - KUNTZ ——

1        THE COURT:  You may proceed.

2        (The document was published to the jury.)

3        MR. KUNTZ:  May I approach, Your Honor?

4        THE COURT:  You may.

5        THE WITNESS:  Thank you.

6   BY MR. KUNTZ:

7   Q.   Dr. Thames, have you seen that article before?

8   A.   Yes, sir.

9   Q.   Okay.  And you would agree with Dr. Wood's article and

10  conclusion that mesh degrades -- you disagree with the

11  conclusions in this article, correct?

12  A.   This is not Ethicon's mesh, sir.

13  Q.   It's polypropylene mesh, correct?

14  A.   Well, it's polypropylene, but it's not Prolene.

15  Q.   Do you disagree with Dr. Wood who found that degradation

16  occurs in polypropylene mesh in this article?

17  A.   No, sir.

18  Q.   Okay.  You do not disagree with her?

19  A.   Polypropylene mesh degrades in this article, yes, sir.

20  Q.   Okay.  So polypropylene mesh degrades, but Ethicon's mesh

21  does not degrade?

22  A.   That's correct.

23  Q.   That's your position here today?

24  A.   That's the chemistry, sir.

25  Q.   Okay.  So there's something unique about Ethicon's

—— THAMES - CROSS - KUNTZ ——

1  Prolene mesh that doesn't degrade, while all other

2  polypropylene mesh degrades?

3  A.   There is, sir.

4  Q.   Okay.

5         MR. KUNTZ:  May I approach, Your Honor?

6         THE COURT:  You may.

7  BY MR. KUNTZ:

8  Q.   I hand you what's been marked Plaintiffs' Exhibit 893.

9         THE COURT:  Say that again.

10         MR. KUNTZ:  Plaintiffs' Exhibit 893.

11  BY MR. KUNTZ:

12  Q.   Have you ever seen this document before, Dr. Thames?

13  A.   I don't know that I have, sir.  Let me look just a

14  moment, please.

15  Q.   I'll represent to you that this document's not in your

16  reliance materials in this case.

17  A.   You said it's not?

18  Q.   It is not.

19  A.   Well, then I haven't seen it, sir.  It doesn't look

20  familiar to me.

21  Q.   So Ethicon's attorneys didn't give you this document to

22  review in forming your expert opinions?

23  A.   (Pause.)

24         I don't remember seeing this document.

25  Q.   Okay.  Do you understand -- let's look at the first page

─────── THAMES - CROSS - KUNTZ ───────

1  of this document.  What's the title of it?

2  A.   It says, "Investigating mesh erosion in pelvic floor

3  repair."

4  Q.   Okay.  It's dated when?

5  A.   22nd of June, 2011.

6  Q.   Okay.  Did you understand that this is an Ethicon

7  internal document related to a consulting group they hired to

8  review their meshes?

9  A.   Now, I've seen a document from PA Consulting.  I didn't

10  recognize it as this.  And I may have seen this, but I've seen

11  PA Consulting documents.

12  Q.   Okay.

13  A.   I'm sorry.  Go ahead and ask your question.

14       MR. KUNTZ:  I'll ask you to turn to Page -- this is

15  already in evidence, so if we can bring it up, it's the first

16  page.

17       (The document was published to the jury.)

18  BY MR. KUNTZ:

19  Q.   "Investigating mesh erosion in pelvic floor repair, June

20  22nd, 2011."  Do you see that?

21  A.   I do, sir.

22  Q.   And if you turn to Page 5, and this is all the groups of

23  people and scientists and Ethicon employees that the PA

24  Consultants met with.  Do you see that?

25  A.   I see the page, what it says, yes, sir.

THAMES - CROSS - KUNTZ

1   Q.   And that's 12 people that the outside consultants

2   interviewed about Ethicon meshes, correct?  Do you understand

3   that?

4   A.   Looks like that's the case.

5   Q.   And if we turn to Page 30 -- I'm sorry -- Page 35.

6   A.   35?

7   Q.   Yes.  The consultants that reviewed Ethicon's documents

8   reviewed their meshes -- the title of this slide was,

9   "Polypropylene can suffer from degradation following implant,"

10  correct?

11  A.   That's what the title says, yes, sir.

12  Q.   And you disagree with that, correct?

13  A.   Yes, sir, for the reasons I stated.

14  Q.   Okay.  And it states below that, "Polypropylene has a

15  long history of use, but it is subject to degradation, a

16  process which initiates after a few days postimplantation in

17  the animal studies."

18  A.   That's what it says.

19  Q.   Okay.  And you disagree with that, don't you?

20  A.   I certainly do.

21  Q.   Okay.  And, in fact, they talk about degradation of --

22  down three bullet points, "Degradation of polypropylene is

23  also reported in the eye, where sutures were used to implant

24  intraocular lenses," correct?

25  A.   That's what it says.

—————— THAMES - CROSS - KUNTZ ——————

1   Q.   At least they believe that sutures degrade as well,

2   correct?

3   A.   The eye is different from inside the body, sir.

4   Q.   And you've never studied meshes in the pelvic floor, have

5   you, Dr. Thames?

6   A.   What do you mean by meshes, sir?

7   Q.   Mesh.

8   A.   I have studied explant --

9   Q.   You're not an expert in how mesh reacts in the pelvic

10  floor, are you?

11  A.   I'm not a medical doctor.  I'm not a pathologist.  I'm a

12  polymer scientist and chemist.

13  Q.   Right.  And you never, until you got involved in this

14  litigation, ever looked at meshes in the pelvic floor or how

15  meshes react with the pelvic floor, correct?

16  A.   That is correct.

17  Q.   I'm going to hand you what has been marked -- and you

18  understand this PA Consulting document was a company hired by

19  Ethicon to review their meshes.  Do you understand that?

20  A.   I do.

21  Q.   Okay.  And you weren't shown this document before you

22  issued your expert report in this case, were you?

23  A.   Well, I'm not real sure about that.  I think that the

24  front page here didn't look familiar to me, but I did see a

25  document provided to me by PA Consultants and this may be it.

—————— THAMES - CROSS - KUNTZ ——————

1  Q.  It wasn't on your reliance list in this case, was it?

2  A.  Well, the PA Consulting document that I saw should have

3  been, because I've had it for some time, sir.

4  Q.  Did you see it for the first time this weekend?

5  A.  No, sir.

6      MR. KUNTZ:  May I approach, Your Honor?

7      THE COURT:  You may.

8  BY MR. KUNTZ:

9  Q.  I'm going to hand you what's been marked Exhibit 14462.

10  A.  Thank you.

11  Q.  Have you ever seen this document before, Dr. Thames?

12  A.  I need to look at it a little bit first.

13      MR. THOMAS:  Your Honor, may we approach?

14      THE COURT:  Yes.

15      (The following occurred at sidebar.)

16      THE COURT:  Mr. Thomas?

17      MR. THOMAS:  Plaintiffs have identified Exhibit

18  14462, but this witness has a TVT-SECUR system which is a

19  product that's not at issue in this case.

20      THE COURT:  That's not a sufficient reason for me to

21  sustain the objection.  I don't have a question pending before

22  the witness.  The TVT, as I recall the testimony, in this

23  case, is made out of exactly the same material as the TVT-O.

24      MR. THOMAS:  Correct, Your Honor.

25      THE COURT:  You may proceed.

—— THAMES - CROSS - KUNTZ ——

```
 1              (Sidebar concluded.)

 2   BY MR. KUNTZ:

 3   Q.   Doctor, have you ever seen this document before?

 4   A.   I don't believe so.

 5   Q.   Okay.  So you didn't look -- Ethicon's attorneys never

 6   gave you this document when you were forming your expert

 7   opinions in this case?

 8   A.   Like I said, sir, I'm a chemist and polymer scientist,

 9   and I looked at the characteristics of the chemical itself.

10   I'm not a doctor.  And this appears to me, from what I've seen

11   here, this is a lot of information that physicians need to

12   know about.  I need to know about the polymeric material,

13   Prolene and polypropylene.

14   Q.   Okay.

15   A.   I'm here to make a decision about that or opinions about

16   that, not about medical issues.

17   Q.   Well, if I'm not mistaken, in your direct you said the

18   laser-cut and mechanical-cut mesh was exactly the same, and

19   you pointed to some documents that it wasn't clinically

20   significantly -- didn't have -- different.  Do you remember

21   that testimony?

22   A.   I do.

23   Q.   Okay.  You've never seen this document before, have you?

24   A.   Not to my knowledge --

25   Q.   Okay.
```

———— THAMES - CROSS - KUNTZ ————

1  A.   -- as I sit here today.

2         MR. KUNTZ:  Let's pull this document up, Evan.

3         THE COURT:  Is it in evidence?

4  BY MR. KUNTZ:

5  Q.   I'm sorry.  Is this the type of document that -- well,

6  you reviewed a clinical -- let me ask you this, Doctor.

7  You're a scientist, right?  This is a risk assessment.  Do you

8  know what a risk assessment is?

9  A.   Yes, I believe so.

10 Q.   And would this have been helpful to you in forming your

11 opinions in this case, if you reviewed it?

12 A.   Well, not really, in the sense that I really don't know

13 what's in this document.  But if there's not a lot of

14 chemistry in here, if it doesn't talk about polypropylene and

15 Prolene in terms of its reaction, in terms of chemical

16 reactions that can occur, then with any factual data in there,

17 it would not do me a great deal of good.

18 Q.   Well, it talks about degradation 14 times.  Is that

19 relevant to your opinions?

20 A.   Well, let's go through those 14 times, if you will, and

21 I'll ask you -- I'll determine whether it is or not.

22 Q.   So if it talks about degradation, it would be important

23 to your opinions?

24 A.   Well, can we look and see where those 14 times are?

25 Q.   Go ahead and look.

———— THAMES - CROSS - KUNTZ ————

1   A.   Okay.

2          (Pause.)

3   BY MR. KUNTZ:

4   Q.   Look at Page 5 of 17, there's a chart that talks about

5   degradation.

6   A.   Would that be 595, sir?

7   Q.   Page 5 out of 17, it talks about Harms-hazard table.

8   A.   I see the Harms-hazard table.  That's Number 5?

9   Q.   Right.  Do you see the first harm is blood loss and

10  across from it, it says, damage, degradation or deterioration

11  in function.  Do you see that?  It's the first place it's

12  mentioned.

13          THE COURT:  Mr. Kuntz, could you stand a little

14  closer to the microphone?

15          MR. KUNTZ:  I apologize, Your Honor.

16          THE WITNESS:  I'm sorry.  I thought you were talking

17  to me.

18          THE COURT:  No, I was talking to Mr. Kuntz.

19          THE WITNESS:  Would you repeat that, please?

20  BY MR. KUNTZ:

21  Q.   My only question right now, Doctor, is this document

22  discusses degradation.  Do you understand that?

23  A.   No, sir, because I haven't seen degradation yet.  That's

24  what I'm looking for.

25  Q.   Okay.  If you go to Page 5 -- because you haven't

THAMES - CROSS - KUNTZ

```
 1  reviewed this document before?

 2  A.   That's right.

 3  Q.   Okay.  And you go to Page 5 of 17, there's a table called

 4  Harms-hazards table.

 5  A.   Okay.

 6  Q.   And if you go down to blood loss, it says, "Harm, blood

 7  loss," and then it says, "Related standardized hazards,

 8  damage, degradation or deterioration in the function."  Do you

 9  see that?

10  A.   I don't think I'm looking at the same chart you are.

11       MR. KUNTZ:  May I approach, Your Honor?

12       THE COURT:  You may.

13  BY MR. KUNTZ:

14  Q.   Right there.  (Indicating.)

15  A.   Oh.  Excuse me.  Under "Blood loss," it says the harm,

16  then it says, "Related standardized hazards, damage,

17  degradation or deterioration in function."

18  Q.   Okay.  And my question is:  If this document talks about

19  degradation, it would be helpful to your opinions in this

20  case, would it not, Doctor?

21  A.   It depends on how they determined degradation, whether

22  it's chemical degradation or degradation in the body for some

23  other purpose, sir.

24  Q.   Well, if Ethicon has an internal document talking about

25  degradation being fair, reviewing all the information equally,
```

THAMES - CROSS - KUNTZ

1    isn't it a document you'd like to have in forming your expert

2    opinions in this case?

3    A.   It certainly wouldn't hurt to read.

4         MR. KUNTZ:  Okay.  I will move for the admission of

5    this document, Your Honor.

6         MR. THOMAS:  Your Honor, there's no foundation for

7    this document.

8         THE COURT:  Well, it's -- based on that objection,

9    I'll allow you to continue on the foundation.  Do you have any

10   more questions?

11   BY MR. KUNTZ:

12   Q.   Dr. Thames --

13   A.   I don't understand why blood loss is related to

14   degradation.

15   Q.   It doesn't -- doesn't that --

16   A.   That doesn't resonate with me as a polymer scientist,

17   sir.

18   Q.   Does this document say that one of the related hazards --

19        MR. THOMAS:  Objection, Your Honor.

20        THE COURT:  Sustained.

21        Doctor, just listen to the question that he asks you

22   and answer it if you can.

23        THE WITNESS:  Okay, sir.  Thank you.

24        THE COURT:  Thank you.

25        THE WITNESS:  Yes, sir.

—————— THAMES - CROSS - KUNTZ ——————

1   BY MR. KUNTZ:

2   Q.  Let's look on down the line of that chart, correct?

3   Under "Exposure," on the next page, Page 6 of 17, under

4   "Exposure," it says, "One of the related" --

5          MR. THOMAS:  Objection, Your Honor.

6          THE COURT:  You can't read it to him.  You can do

7   what you were doing before and you didn't get a straight

8   answer.  Try it again.

9   BY MR. KUNTZ:

10  Q.  Doctor, wouldn't it be fair to your expert opinions in

11  this case to have this document to review and to opine to this

12  jury about degradation of mesh?  When it discusses degradation

13  14 times?

14         MR. THOMAS:  Objection, Your Honor.

15         THE COURT:  Leading at the end.  I sustain it.

16         Ask the question again without the leading.  The jury

17  will disregard.

18  BY MR. KUNTZ:

19  Q.  Wouldn't this document discussing degradation of

20  Ethicon's product be important to your opinions in this case,

21  Dr. Thames?

22         THE COURT:  You can lead on cross.  You understand

23  what I'm saying.

24         The question pending is:  "Wouldn't this document

25  discussing degradation of Ethicon's product be important to

 1  your opinions in this case, Dr. Thames?"

 2          THE WITNESS:  If it had to do with a chemical

 3  function, yes, sir.

 4          THE COURT:  All right.

 5          MR. KUNTZ:  May I admit the document, Your Honor?

 6          THE COURT:  I haven't read the article, but if you're

 7  making the representation that it does, it may be admitted.

 8          MR. THOMAS:  It has chemical degradation?

 9          THE COURT:  Chemical properties, I think he said, but

10  I'm not sure.

11          MR. THOMAS:  I don't see it, Your Honor.

12          THE COURT:  All right.  You're going to have to let

13  me see the article then.

14          MR. KUNTZ:  Can we approach, Your Honor?

15          THE COURT:  Sure.

16          (The following occurred at sidebar.)

17          MR. KUNTZ:  Here is my position real quick.  They

18  took him outside his expert report and started talking about

19  how different laser-cut and mechanical-cut mesh was and put up

20  benchtop testing and showed the end of it that said it had no

21  clinical significance, they are the same mesh.  This is the

22  laser-cut, the TVT-S that talks about all the potential

23  hazards and harms, including degradation.  This distinction

24  between chemical degradation sure didn't come out on direct

25  when he was an expert in all sorts of degradation.

THAMES - CROSS - KUNTZ

1          THE COURT:  Do you want to answer that?

2          MR. THOMAS:  Yes, Your Honor.

3          The clinical expert report was put in as the final

4    word on the benchtop testing.  That's the only reason that I

5    used it.  And to the extent that anything came in incidentally

6    on clinical issues, it's not what -- the reason why Dr. Thames

7    is offered.  Degradation in this paper, which I'll be honest

8    with you, I'm not familiar with, talks about degradation

9    without any kind of definition to it at all.  It's not a

10   chemical issue, it's not an oxidation issue, it's not a

11   handling issue, it's not a misuse issue.  Who knows what the

12   degradation is here?

13         And it does not have anything to do with chemical

14   degradation, by its terms, as Mr. Kuntz has shown the witness,

15   from what I have been able to see.

16         THE COURT:  You don't need to answer it.  I'm going

17   to rule in your favor.

18         MR. KUNTZ:  Okay.

19         THE COURT:  The document does in several places talk

20   about the interaction of material with the tissue.

21         MR. THOMAS:  Okay.

22         MR. KUNTZ:  Thank you.

23         (Sidebar concluded.)

24         MR. KUNTZ:  Plaintiffs would move to admit document

25   14462, Your Honor.

─── THAMES - CROSS - KUNTZ ───

1            THE COURT:  You may proceed.  It may be admitted.

2    (PLAINTIFFS' EXHIBIT P-14462 WAS RECEIVED IN EVIDENCE.)

3            MR. KUNTZ:  Do you want to pull that up?

4            (The document was published to the jury.)

5    BY MR. KUNTZ:

6    Q.  Have you ever reviewed a risk assessment before,

7    Dr. Thames?

8    A.  No, sir.

9    Q.  Do you know who wrote this document?

10   A.  Yes, I believe there's some names here, but I don't know

11   them.  As I said, I haven't read this before.

12   Q.  Do you know who Dr. Piet Hinoul is?

13   A.  I think he's the medical director of Ethicon or --

14   Q.  He's one of the authors of this document?

15   A.  Yes.

16   Q.  Okay.  And let's look at -- turn to Page 5 of 17,

17   correct?  I'm sorry.  Let's turn to Page 5 of 17, the

18   Harms-hazard table we were discussing.

19   A.  Okay.

20   Q.  And you understand TVT-SECUR, which this document is

21   about, uses the laser-cut mesh, correct?

22   A.  That's what I understand, yes, sir.

23   Q.  And so we're not talking about anybody else's

24   polypropylene mesh that's out there in the universe.  We're

25   talking about Ethicon's polypropylene mesh.  Correct?

THAMES - CROSS - KUNTZ

1  A.   Yes.

2  Q.   Do you understand that?  Okay.

3       And if you look in the blood loss section, it says,

4  "Harms, blood loss, one of the related standardized hazards

5  could be damage, degradation or deterioration in function."

6  Do you see that?

7  A.   I see it.

8  Q.   Okay.  So, according to Ethicon medical director Piet

9  Hinoul and others who authored this, degradation --

10       MR. THOMAS:  Objection, Your Honor.

11  BY MR. KUNTZ:

12  Q.   -- degradation of Ethicon's mesh is possible?

13       MR. THOMAS:  Argumentative, Your Honor.

14       THE COURT:  What?

15       MR. THOMAS:  Argumentative.  That's not what it says.

16       THE COURT:  Overruled.

17       THE WITNESS:  I think that it says that that's what

18  you want to look for, in terms of with blood loss.  Do you

19  have damage, degradation or deterioration, to determine if

20  this is a risk and how severe it might be.

21  BY MR. KUNTZ:

22  Q.   Okay.

23  A.   They're not saying that's what happens, as I look at

24  this.

25  Q.   Ethicon's medical directors believed that degradation was

THAMES - CROSS - KUNTZ

1   a possible risk for this product, correct?

2           MR. THOMAS:  (Stands.)

3           THE COURT:  Sustained.

4           THE WITNESS:  That's not --

5           THE COURT:  Whoa, whoa, whoa.

6           THE WITNESS:  I'm sorry.

7           THE COURT:  Sustained.

8           MR. THOMAS:  You don't have to answer that.

9   BY MR. KUNTZ:

10  Q.   But in this Ethicon document, we can agree, and I'll

11  represent to you, degradation is mentioned 14 times, correct?

12  Did you look at it earlier?

13  A.   No, sir, I haven't counted 14 times.

14  Q.   If we turn it over to the next page, Page 6 of 17, again,

15  with exposure, we see damage, degradation, or deterioration in

16  function, correct?

17  A.   My answer would be the same.

18  Q.   Okay.

19  A.   They're looking at whether or not exposure is -- would

20  provide damage, degradation, deterioration and trying to

21  establish if it did, the severity ranking, as I see this

22  document.

23  Q.   So they believe degradation is a possibility?

24          MR. THOMAS:  Objection, Your Honor.

25          THE COURT:  Sustained.  Jurors will disregard.

—— THAMES - CROSS - KUNTZ ——

1  BY MR. KUNTZ:

2  Q.   Do you remember talking about Plaintiffs' Exhibit 2028,

3  the 1987 Prolene explant study?

4  A.   Could I see it, please?  Thank you.

5  Q.   Do you agree that this -- have you reviewed this

6  document?  We talked about part of it on direct exam.  Do you

7  recall that?

8  A.   I remember parts of it, yes.

9  Q.   And they showed -- these explants show surface cracking,

10  correct?

11  A.   That's what they say was the case, but they did not --

12  did not identify where the cracking was from.

13  Q.   And this was a study done by Ethicon, correct?  The top

14  of the first page, Ethicon, Inc., a Johnson & Johnson Company?

15  A.   I'm going to have to take a minute to read this, sir.

16  This is the first time I've seen this in a long, long time.

17           (The document was published to the jury.)

18           MR. THOMAS:  (Stands.)

19           THE COURT:  Yes, sir?

20           MR. THOMAS:  Excuse me, Your Honor.  This is not the

21  same -- 2028, this is a different document than was shown on

22  direct.

23           THE WITNESS:  That's correct.

24           THE COURT:  What is the number on this document?

25  BY MR. KUNTZ:

───── THAMES - CROSS - KUNTZ ─────

1  Q.  Plaintiff's Exhibit 2028.  You've reviewed this document

2  before, haven't you?

3       THE COURT:  I'm sorry.  I'm sorry, just a minute.  I

4  hand you an exhibit that has a number on it.  What is that

5  number?

6       THE WITNESS:  2028.

7       THE COURT:  All right.  And plaintiffs' or

8  defendants'?  Does it say?

9       MR. KUNTZ:  Plaintiffs'.

10      THE COURT:  All right.  That document has not been

11  introduced.

12      MR. KUNTZ:  Okay.

13      THE COURT:  That doesn't mean it can't be.  It just

14  hasn't been.

15      MR. KUNTZ:  My fault, Your Honor.

16 BY MR. KUNTZ:

17 Q.  I've handed you what's been marked Plaintiffs' Exhibit

18 2028.

19      MR. THOMAS:  May I have a copy, please?

20 BY MR. KUNTZ:

21 Q.  Have you seen that document before, Dr. Thames?

22 A.  It does not ring a bell as I look at it, sir.

23 Q.  You never reviewed this document before?

24 A.  As I look at it, I do not remember this document.

25 Q.  Okay.  Let's pull up -- we'll move on.

THAMES - CROSS - KUNTZ

```
 1          Let's pull up Plaintiffs' Exhibit 14102.  This is the
 2  seven-year data for the dog study.
 3          THE COURT:  That's in, right?
 4          THE DEPUTY CLERK:  What's the number?
 5          THE COURT:  What's the number again?
 6          MR. KUNTZ:  I'm not sure of the defense numbering on
 7  it, but it's Plaintiffs' 14102.
 8          THE COURT:  Is it in evidence?
 9          MR. THOMAS:  Yes, Your Honor, two versions are in.
10  Our version is a longer version.  There are two versions in.
11          THE COURT:  Okay.  Is this one in?  Or do we know?
12  Give me the number again.
13          MR. KUNTZ:  It's 141 --
14          THE COURT:  I'm sorry to interrupt you, Mr. Kuntz.
15  I'm just trying to keep your record for you here.
16          MR. KUNTZ:  It's 10142.
17          THE COURT:  Let me check.  Just a second.  It is not
18  at the present time.
19          MR. KUNTZ:  May I approach, Your Honor?
20          THE COURT:  You may.
21  BY MR. KUNTZ:
22  Q.  I'm going to hand you what's been marked Plaintiffs'
23  Exhibit 14102.
24  A.  All right.
25  Q.  You reviewed -- you reviewed this document before,
```

THAMES - CROSS - KUNTZ

 1  haven't you, Dr. Thames?

 2  A.   Portions of it, yes, sir.

 3  Q.   And, in fact, we talked about portions of it on direct

 4  examination, correct?

 5  A.   Yes, sir.

 6  Q.   Okay.  And this is the seven-year data from the dog

 7  study, correct?

 8  A.   It's some of seven-year data.

 9  Q.   And this was a study done by Ethicon, correct?

10  A.   Yes, sir.

11       MR. KUNTZ:  And if you -- we'll move to admit this,

12  Your Honor.

13       MR. THOMAS:  No objection, Your Honor.

14       THE COURT:  It may be admitted.

15  (PLAINTIFFS' EXHIBIT P-14102 WAS RECEIVED IN EVIDENCE.)

16       (The document was published to the jury.)

17       MR. KUNTZ:  Pull that up.

18  BY MR. KUNTZ:

19  Q.   The first page, it's an Ethicon study, do you see that at

20  the top?

21  A.   Yes.

22  Q.   Okay.  And on the second page when we go to conclusions,

23  it says, "Degradation in Prolene is still increasing."  Do you

24  see that?

25  A.   That's what it says.

1   Q.   And then it talks about "PVDF, even though a few cracks

2   were found, it's still by far the most surface-resistant

3   in-house made suture in terms of cracking," correct?

4   A.   That's what it says.

5   Q.   And PVDF has nothing to do with the polypropylene mesh

6   that's in the TVT-O, correct?

7   A.   That is correct.

8   Q.   And that this study shows at seven years, "Degradation in

9   Prolene is still increasing," correct?

10  A.   That's what it says.

11  Q.   And you disagree with that?

12  A.   Absolutely.

13  Q.   You disagree with Ethicon's study that says, "Degradation

14  is still increasing"?

15  A.   Absolutely.

16  Q.   Dr. Thames, this is the first case you've testified about

17  polypropylene, correct?

18  A.   That is correct.

19  Q.   Okay.  Since you're now testifying in a case about

20  polypropylene, are you following all the literature out there

21  on polypropylene mesh?

22  A.   Well, I wouldn't say all of it, but I followed some.

23          MR. KUNTZ:  Okay.  May I approach, Your Honor?

24          THE COURT:  You may.

25  BY MR. KUNTZ:

THAMES - CROSS - KUNTZ

1  Q.   I'm going to hand you what's been marked Plaintiffs'

2  Exhibit 21963.  Have you ever seen this document before?

3  A.   Give me just a moment, please.

4        Yes, I think I have.

5  Q.   Okay.  When did you review that document?

6  A.   Several weeks ago.

7  Q.   Did it help your opinions in this case?

8  A.   Well, the part of this document that was really important

9  to me was the fact that --

10        THE COURT:  Is that a "yes"?

11        THE WITNESS:  Yes, sir.  Yes, sir.

12  BY MR. KUNTZ:

13  Q.   Plaintiffs' --

14  A.   Can I tell you why?

15        THE COURT:  Well, just a second.  I think he's going

16  to move its admission.

17        THE WITNESS:  Yes, sir.

18        MR. KUNTZ:  Plaintiffs would move to admit 21963.

19        THE COURT:  It may be received.  You may proceed.

20  (PLAINTIFFS' EXHIBIT P-21963 WAS RECEIVED IN EVIDENCE.)

21        (The document was published to the jury.)

22  BY MR. KUNTZ:

23  Q.   And, Dr. Thames, pull this up.  The title of this is

24  what?

25  A.   It says, "In-depth nano-investigation of vaginal mesh and

THAMES - CROSS - KUNTZ

1  tape fiber explants in women."

2  Q.   Okay.  And under "Results," if we go to that, it says,

3  "Seven explants were studied covering a range of currently M/T

4  devices (Gynemesh, TVT)," correct?

5  A.   That's correct.

6  Q.   And if we go down to the "Interpretations of results"

7  section, do you see that?

8  A.   Yes, I do.

9  Q.   They start off with a discussion, "The results of this

10 study," about four sentences down:  "The results of this study

11 point to significant physical degradation of the meshes for

12 all those implanted for several reasons, while no chemical

13 oxidation was observed."

14 A.   I see that.  And I note specifically there's a section

15 that says, "No chemical oxidation was observed."

16 Q.   But this study was done by doctors who took out meshes,

17 correct?

18 A.   That's right.  And they talk about physical degradation.

19 Q.   Okay.  And they noticed that the mesh was degraded when

20 they pulled it out of the body.  That's their findings,

21 correct?

22 A.   I wouldn't use the term "degrade."  It says,

23 specifically, "The results of this study point to significant

24 physical degradation," implying there is some physical forces

25 that have caused the implant to change.

THAMES - CROSS - KUNTZ

1  Q.  Okay.  So these doctors believe there's significant

2  physical degradation.  That's what they wrote, correct?

3  A.  They wrote "physical degradation."

4  Q.  Okay.  And so you disagree with them on that account?

5  A.  No, it is what it is.  But it says, "There is no chemical

6  oxidation or degradation," and that's what I've been

7  testifying to today.  I don't know how they treat it when

8  people take them out with trocars and their clips and how they

9  pull them out, I don't know how they treat it physically.

10 Q.  So if there's been two doctors that have testified in

11 this case that say they pulled out mesh and it looked degraded

12 to them, to you that's not chemical degradation, correct?

13 A.  I can't say, sir.  I wasn't there, didn't see it.

14 Q.  And These doctors that see degradation with the mesh,

15 that's somehow done when they took it out, is that what you're

16 telling the jury?

17 A.  I'm sorry.  I missed that statement.

18 Q.  And the physical degradation that's here, you believe

19 that that happened somehow in the surgery where they were

20 taking the mesh out, correct?

21 A.  That's too much information for me to answer at one step.

22 You might want to start over, and I'll answer one at a time.

23 Q.  You have no comment on whether there is physical

24 degradation, correct?

25 A.  I don't know.

––––– THAMES - CROSS - KUNTZ –––––

1   Q.   Okay.  Doctor, we talked about several documents on your

2   direct exam, or Mr. Thomas did, correct?

3   A.   Yes, sir.

4   Q.   Okay.  Do you remember discussing D-21349?

5   A.   I wouldn't know what that is, sir.

6       MR. KUNTZ:  Let's pull that up.  It's already been

7   admitted.

8       (The document was published to the jury.)

9   BY MR. KUNTZ:

10  Q.   And I think this was from Ethicon, some studies that

11  discussed the opinion on the second page.

12  A.   Yes, sir.  I can hardly read that screen.  Let me see if

13  I can find the document here.

14  Q.   Let me ask you this, Dr. Thames, and maybe shortcut this

15  a little bit.

16  A.   All right.

17  Q.   You went through this document and you went through

18  another one talking about benchtop testing in the clinical

19  expert report; do you remember that?

20  A.   Yes, I do.

21  Q.   And you looked at all those and you went through with

22  Mr. Thomas and you told the jury that supports your opinions

23  that there's absolutely no difference between the laser-cut

24  and mechanical-cut mesh, correct?

25  A.   It's performs essentially the same, sir.

THAMES - CROSS - KUNTZ

1   Q.   And I think you said it performs the same way both

2   scientifically and clinically, correct?

3   A.   No, sir.  I don't know about the clinical part.  I know

4   about the stiffness and the elongation of it, but I don't know

5   anything about the body that a physician would understand.

6   I'm a polymer scientist, sir.

7   Q.   Okay.  Did you ever talk to any of the doctors or ever

8   ask any of this information of the doctors who use this mesh?

9   A.   No, sir, I have not.  I have not.

10           MR. KUNTZ:  May I approach, Your Honor?

11           THE COURT:  You may.

12  BY MR. KUNTZ:

13  Q.   I'm going to hand you what's been marked 13055.

14  A.   Yes, sir.

15  Q.   Have you ever seen this document before?

16  A.   I don't remember seeing it, sir.

17  Q.   Okay.  This wasn't on your reliance list, was it?

18  A.   I don't remember seeing the document, sir.

19  Q.   Ethicon's attorneys didn't give you this document to

20  review, did they, in forming your opinions?

21  A.   I don't remember seeing this document, sir.

22  Q.   Have you had a chance to look over it?

23  A.   No, sir.

24  Q.   Okay.  Why don't you take a minute to look over it.

25  A.   Okay.

THAMES - CROSS - KUNTZ

1          (Pause.)

2          THE WITNESS:  All right, sir.

3    BY MR. KUNTZ:

4    Q.  You reviewed that document, haven't you --

5    A.  I have.

6    Q.  -- Dr. Thames?  And it talks about scientific --

7          MR. THOMAS:  Objection, Your Honor.

8    BY MR. KUNTZ:

9    Q.  It talks about scientific differences between laser-cut

10   and mechanical-cut mesh, doesn't it?

11          MR. THOMAS:  Objection, Your Honor.

12          THE COURT:  Wait just a second.

13          That's innocuous enough.  I'll overrule it.  Is that

14   the subject matter of the document?

15          THE WITNESS:  No, sir, not the way I understand it.

16          THE COURT:  All right.

17          MR. KUNTZ:  Can we approach, Your Honor?

18          THE COURT:  That was a responsive question, so you

19   can ask another question.

20   BY MR. KUNTZ:

21   Q.  Okay.  Dr. Thames, does this document talk about the

22   scientifical and theoretical calculations related to the

23   laser-cut and mechanical-cut mesh?

24   A.  The statement is specific.  It says, "From a

25   scientifically, but also clinical standpoint, it is

THAMES - CROSS - KUNTZ

1  impossible," so forth.  That's the term that's used.

2  Q.   Okay.  And so they're talking about the scientifical --

3  the benchtop testing, the stuff you talked about on direct,

4  the differences between -- or non-differences between

5  laser-cut and mechanical-cut mesh, correct?

6  A.   No, they talk about theoretical calculations are not

7  enough as evidence, and what we were talking about were not

8  theoretical calculations.  There was testing done.

9  Q.   Not testing -- not testing in the body, correct?

10  A.   No, testing was done, sir.  This says, "Theoretical

11  calculations are not enough as evidence."  Theoretical

12  calculations.  That means there's no -- there's no lab top

13  [sic] testing necessary.  We were talking about lab benchtop

14  testing.

15  Q.   And when would that -- when was that benchtop testing

16  done, in 2006, 2005?

17  A.   I'm not sure.  We'd have to look at those documents to

18  see.

19  Q.   I'll hand you the three documents you talked about on

20  direct with those.  What are the dates of all three of these?

21         THE COURT:  Do you want to identify those real quick

22  as exhibit numbers, please?

23         THE WITNESS:  Do you want me to do that, sir?

24         THE COURT:  Well, since you've got them, that would

25  be handy, yeah.

```
1            THE WITNESS:  987, DX-21229.1, and DX-21350.1.
2            THE COURT:  All right.
3    BY MR. KUNTZ:
4    Q.   What are the dates of those three documents?
5    A.   This is -- March 7 is the 350 document.  May the 5th,
6    '05 -- that was, by the way, '06.  May the 5th, '05 is the
7    229.1 document.  And March the 6th, '06 is the 349.1 document.
8    Q.   All right.  Are those all documents that -- and tests
9    that were performed before laser-cut TVT-O went out on the
10   market?
11   A.   I'm sorry, I didn't understand your question.
12   Q.   Were those all tests that were done before laser-cut
13   TVT-O mesh was put out on the market?
14   A.   Well, it was before this memorandum.  This memorandum is
15   in '08, I believe is the date on it.
16   Q.   And that's after TVT-O laser-cut has been on the market,
17   the document I've handed you, correct?
18   A.   It's '08.  Yes, sir.
19   Q.   And the documents --
20   A.   So these three documents, I can't tell you when it went
21   on the market, sir.  I don't know that.
22   Q.   And the document I have handed you, which is Plaintiffs'
23   Exhibit 13055, isn't that important in forming your opinions
24   or the basis of your opinions in this case?
25   A.   Let me find that document.  13055.  Would you show me
```

————— THAMES - CROSS - KUNTZ —————

1   that document again?  Oh, is this it right here, sir?

2   Q.   Another copy.

3   A.   No, sir.

4   Q.   So you don't have it?

5   A.   No, sir.

6   Q.   Sorry about that.

7   A.   Sorry.

8   Q.   I think I gave it to you.

9   A.   You may have.  Oh, yes, you did.  My apologies.  I was

10  looking at the wrong number.

11       Question, please?

12  Q.   This talks about Paragraph 2, scientific standpoint,

13  does it not?

14  A.   Yes, sir.

15  Q.   And that's the same type of studies you were talking

16  about, scientific is benchtop testing and clinical expert

17  reports, you testified about on direct about laser-cut and

18  mechanical-cut mesh, correct?

19  A.   Yes, sir, but this --

20       THE WITNESS:  Your Honor, I want to answer this

21  question "yes" or "no," but there's phraseology in here that

22  just doesn't allow me to do that.  If I might share them with

23  the Court.

24       THE COURT:  Well, it's not in evidence yet because he

25  hasn't moved it yet.  So I don't know who's reading --

—THAMES - CROSS - KUNTZ—

 1  BY MR. KUNTZ:

 2  Q.   In making your expert opinions and testifying to this

 3  jury, don't you want to see all the documents from Ethicon

 4  that relate to the differences between laser-cut and

 5  mechanical-cut mesh, Doctor?

 6  A.   Well --

 7  Q.   Is there a question?

 8          MR. THOMAS:  Objection, Your Honor.

 9          THE WITNESS:  If it is a legitimate --

10          THE COURT:  Overruled.  You understood the question?

11  All right.  Go ahead.

12          THE WITNESS:  I'm not sure I did, sir.  I was reading

13  this when he was asking me a question.

14          THE COURT:  "In making your expert opinions and

15  testifying to the jury, don't you want to see all of the

16  documents from Ethicon that relate to the differences between

17  laser-cut and mechanical-cut mesh, Doctor?"

18          THE WITNESS:  Well, sure.  That's important.  I don't

19  have a problem that.

20          THE COURT:  All right.  You may proceed.

21  BY MR. KUNTZ:

22  Q.   And you understand this is an internal Ethicon e-mail,

23  correct?

24  A.   I do.

25          MR. KUNTZ:  I would move to admit 13055, Your Honor.

THAMES - CROSS - KUNTZ

1          MR. THOMAS:  Objection, Your Honor.

2          THE COURT:  What is the objection?

3          MR. THOMAS:  There's still no foundation for this --

4    for this document.

5          THE COURT:  Is it an e-mail?

6          MR. KUNTZ:  Yes.

7          THE COURT:  Let me see it.  Let me see it.

8          (Pause.)

9          THE COURT:  I will admit 13055, noting the

10   defendants' objection.

11   (PLAINTIFFS' EXHIBIT P-13055 WAS RECEIVED IN EVIDENCE.)

12   BY MR. KUNTZ:

13   Q.  This is the first time you've ever seen this document,

14   isn't it, Dr. Thames?

15   A.  As far as I know, yes, sir.

16          MR. KUNTZ:  Let's go ahead and pull up Page 3 -- I'm

17   sorry -- Page 2.

18          (The document was published to the jury.)

19   BY MR. KUNTZ:

20   Q.  And this is an e-mail in 2008 between Ethicon employees.

21   I will represent that to you.  Do you understand that?

22   A.  That's what it appears to be.

23   Q.  Okay.  And this is two years after TVT-O laser-cut mesh

24   has been on the market; do you understand that?

25   A.  I don't know when it went on the market.  I think I've

THAMES - CROSS - KUNTZ

1   stated that.

2   Q.   And this is after the benchtop testing that we discussed

3   earlier, two years, correct?

4   A.   That's about right, yes, sir.

5   Q.   And if we go down to the third paragraph, it starts with

6   the word "then."

7   A.   Third paragraph?

8   Q.   Right.

9        MR. KUNTZ:  Would you highlight that, Evan?

10  BY MR. KUNTZ:

11  Q.   "Then it was decided that conversion was optional" -- and

12  they're talking about the conversion from mechanical-cut mesh

13  to laser-cut mesh.  Do you understand that?

14  A.   Yes, sir.

15  Q.   -- "was optional to the markets, and in Scandinavia we

16  got massive push back from our Key Opinion Leaders."

17       Do you know what a Key Opinion Leader is?

18  A.   Not really.

19  Q.   Okay.

20  A.   Not in this context.

21  Q.   I'll represent to you Key Opinion Leaders are doctors

22  that consult with Ethicon.  Do you understand that?

23  A.   That sounds logical.

24  Q.   Okay.  "The main arguments from the likes of Carl Gustaf

25  Nilsson."  Do you know who Carl Gustaf Nilsson is?

THAMES - CROSS - KUNTZ

1  A.  No, sir.

2  Q.  Do you know that he's the coinventor of the TVT line of

3  products, Dr. Thames?

4  A.  I don't know who he is, sir.

5  Q.  Okay.  I'm going --

6  A.  I don't know that.

7  Q.  He is the inventor of the TVT line of products.  I will

8  represent that to you as an officer of the court.  Do you

9  understand that?

10         MR. THOMAS:  Your Honor --

11         THE COURT:  Sustained.  Just ask a question.

12  BY MR. KUNTZ:

13  Q.  Do you know who Christian Faulkner is?

14  A.  No, sir.

15  Q.  And their comments on the difference between the

16  mechanical-cut and laser-cut are -- say what?  "From a

17  scientifical, but also clinical standpoint, it is impossible

18  and incorrect to say or assume that laser-cut would be the

19  same as mechanically cut."  Do you see that?

20  A.  I see that.

21  Q.  Okay.  So you disagree with those two people as well,

22  don't you?

23  A.  Well, what I disagree with is the word "assumed."  We

24  did -- to assume anything is improper from a scientific

25  perspective.

THAMES - CROSS - KUNTZ

1  Q.  Doctor, I'm sorry, but before that it says "impossible

2  and incorrect to say or assume," right?

3  A.  "Or assume."

4  Q.  They're saying it's impossible and incorrect to say that

5  the laser-cut mesh would be the same as mechanically-cut mesh

6  from both a scientific standpoint and from a clinical

7  standpoint, aren't they, Dr. Thames?

8  A.  This is what they're saying, but I'm not sure they're

9  aware of the testing that's been done.  Perhaps they are not.

10 Q.  Okay.  So it's your position that Dr. Nilsson, who is

11 just the -- one of the inventors of the TVT doesn't know about

12 the benchtop testing?

13 A.  I don't know whether --

14          MR. THOMAS:  Objection.

15          THE COURT:  Sustained, argumentative.

16 BY MR. KUNTZ:

17 Q.  So you disagree, at least in this document, with what

18 Dr. Nilsson and Dr. Faulkner are saying?

19          MR. THOMAS:  Your Honor, that's three times.

20          THE COURT:  It has been asked and answered, but you

21 can answer it.

22          THE WITNESS:  I don't disagree with what they say.  I

23 just don't know the context in which they're saying it, sir.

24 BY MR. KUNTZ:

25 Q.  Okay.  But you say the meshes are identical, correct?

——————— THAMES - REDIRECT - THOMAS ———————

1  A.   From the point of view of the properties that were

2  evaluated, the mechanical properties as a polymer scientist,

3  yes, sir.

4  Q.   And the inventors are saying they're not, correct?

5        MR. THOMAS:  Objection, Your Honor.

6        THE COURT:  Sustained.  The jury will disregard.

7  BY MR. KUNTZ:

8  Q.   They're not the same, are they?

9        MR. THOMAS:  Objection, Your Honor.

10        THE COURT:  Sustained.

11        MR. KUNTZ:  No further questions.

12        THE COURT:  All right.  Redirect.

13  (REDIRECT EXAMINATION OF SHELBY THAMES, Ph.D. BY MR. THOMAS:)

14  Q.   Dr. Thames, do you still have Exhibit 13055 in front of

15  you?

16  A.   One what, sir?

17  Q.   13055, that e-mail.

18  A.   Yes, sir.

19  Q.   You were asked quite a number of questions about this

20  e-mail.  Do the comments in this e-mail have anything to do

21  with the kind of work that you were asked to do in this case?

22  A.   Absolutely none.

23  Q.   Okay.  What, again, were you asked to do in this case?

24  A.   I was asked to look at the chemistry of Prolene and

25  polypropylene and determine whether or not it was sufficient

THAMES - REDIRECT - THOMAS

1   to be used as a polymeric system in the human body.

2   Q.   And what were you asked to do with respect to the

3   laser-cut mesh?

4   A.   To determine whether or not it was properly evaluated,

5   whether or not proper tests were run, to determine whether or

6   not the tests were done properly, and so that these

7   individuals could make a determination of what they did or did

8   not want to use.

9   Q.   And you've given the jury your opinions in that regard

10  based on the testing that Ethicon actually did?

11  A.   I have, sir.

12  Q.   Do you have any idea what these people know about the

13  testing?

14  A.   No, I do not.

15  Q.   Do these people's comments change your opinions about the

16  testing that was actually done?

17  A.   No, sir, not at all.

18  Q.   Let's go to -- do you know whether these people were even

19  aware of testing?

20  A.   I think I implied that I don't know if they were or not.

21  Q.   Let's go to Plaintiffs' Exhibit 893, the PA Consulting

22  report.  Do you have that in front of you, sir?

23  A.   I think I can find it.

24          MR. THOMAS:  I need you to go to Page 35.

25          (The document was published to the jury.)

THAMES - REDIRECT - THOMAS

1          THE WITNESS:  I'll just use this one.  It's easier.

2          MR. THOMAS:  Is it up on the screen, Jamey?  It's

3    893.

4          THE WITNESS:  It's up on my screen.

5    BY MR. THOMAS:

6    Q.  Page 35, do you have that in front of you?

7    A.  It doesn't --

8    Q.  Is it on your screen?

9    A.  Yes, sir, 35.

10   Q.  And Mr. Kuntz asked you about "Polypropylene can suffer

11   from degradation following implant," that's the title there,

12   isn't it?

13   A.  Yes, sir.

14   Q.  And the first bullet point reads:  "Polypropylene has a

15   long history of use, but it is subject to degradation, a

16   process which initiates after a few days postimplantation in

17   animal studies."

18        Did I read that correctly?

19   A.  You did.

20   Q.  Does this say "Prolene polypropylene"?

21   A.  No, sir.  Does not.

22   Q.  Okay.  Now, it cites to a footnote, doesn't it?

23   A.  Yes, it does.

24   Q.  And what's the footnote it cites to?

25   A.  Liebert.

THAMES - REDIRECT - THOMAS

1    Q.   And you talked with the jury about Liebert this morning,

2    didn't you?

3    A.   I did.

4    Q.   And remind the jury what you said about the Liebert

5    article.

6    A.   Mr. -- Dr. Liebert actually made his own polypropylene,

7    and he extruded it and he added antioxidants to Sample A and

8    he put no antioxidants in Sample B.  So he didn't use

9    Ethicon's material.  He just used polypropylene without any

10   additives, and as a matter of fact, the one that oxidized had

11   no antioxidants in it.  So this is a completely different set

12   of circumstances than we're dealing with today.

13   Q.   Based on Liebert, what happens when you have

14   polypropylene that has an appropriate antioxidant package in

15   it?

16   A.   No oxidation occurs, no molecular weight changes.  He

17   stops talking about it when he realized that there's no

18   changes going to take place.

19   Q.   All right.  Let's go to Plaintiffs' Exhibit 21963,

20   please.  This is the nano-investigation document you were

21   just --

22   A.   Yes, sir.

23   Q.   About the doctors who apparently had looked at some

24   explants and talked about physical degradation.

25   A.   Yes, sir.

———— THAMES - REDIRECT - THOMAS ————

1  Q.  When you talk about physical degradation, of what

2  significance is that to you as a polymer scientist?

3  A.  Well, I can take a pair of tongs or tweezers or a pair of

4  pliers, and I can pull something and I can physically degrade

5  it.  You know, it depends upon how kindly I treat the

6  material.  Physical degradation is quite different than

7  chemical degradation.  We've been talking about chemical

8  degradation here today.

9  Q.  And what did -- did they do any analytical chemistry

10  tests in that report?

11  A.  No, not that I can tell.

12  Q.  What's this Raman spectroscopy that's referenced at the

13  bottom of the results?  The last line, says, "Raman

14  spectroscopy did not reveal any major variation in the

15  chemical properties of the polypropylene fibers, especially no

16  new peaks for oxidation"?

17  A.  It's another form of infrared spectroscopy or the type of

18  spectroscopy and it's good with some materials and it's good

19  for this material.  So it's another way of looking at whether

20  there has been compositional exchanges or not.

21  Q.  What does that tell you the extent to which the

22  polypropylene in this study degraded in terms of a change in

23  chemical structure?

24  A.  It didn't.  No change.

25  Q.  So does this study, Plaintiffs' 21963, stand for the

THAMES - REDIRECT - THOMAS

1  proposition that these explants underwent a change in the

2  chemical structure of the polypropylene?

3  A.  No, sir.

4  Q.  Now, do they measure molecular weight?

5  A.  No.

6  Q.  Do they measure tensile strength?

7  A.  No.

8  Q.  Do you know whether it was stored in formalin?

9  A.  I do not know.

10 Q.  And why are those things important to know as well?

11 A.  We talked about it.  Molecular weight is changed and

12 there has been degradation.  If you have no molecular weight

13 determinations, if it hasn't changed, there is -- you know if

14 it hasn't changed, you can't say there has been any

15 degradation, because there has not.

16      And if it's stored in formalin then it's an opportunity

17 for the protein formaldehyde polymer to form around it, form a

18 brittle, amorphous structure that -- that will interfere with

19 your testing results and with your FTIR data, so none of that

20 was done here.

21 Q.  And you were also shown on cross-examination Plaintiffs'

22 Exhibit 14462, the risk assessment summary for the Gynecare

23 TVT-SECUR system where the word "degradation" is used?

24 A.  Yes, sir.

25 Q.  Do you have any idea of the context of the use of that

THAMES - REDIRECT - THOMAS

1   word?

2   A.   No, sir.   I could take a scientific guess, so to speak,

3   but I -- I think I know, but I don't really understand what

4   they're trying to do here.

5   Q.   Is there anything about what you reviewed in 14462,

6   Plaintiffs' Exhibits 14462, that impacts your opinions at all

7   about whether Prolene polypropylene degrades?

8   A.   Not at all.

9   Q.   Tell me why.

10   A.   Well, it doesn't have anything to do with the physical

11   properties.   It doesn't have anything to do with the

12   chemistry.   It talks about what-ifs, and we've talked about

13   the scientific properties of polypropylene and made into

14   Prolene, and we found out that it doesn't change molecular

15   weight when you implant it in -- in the case we've talked

16   about is in terms of dogs, we found out there's no change in

17   the mechanical properties, except for the good.   The polymer

18   gets tougher when it's implanted in the animals.   There is --

19   there is no -- no indication, no scientific data that says

20   polypropylene oxidizes or degrades.   Period.

21   Q.   Now, you also were asked some questions about the Mary

22   Céline article, and I'm sorry, I don't have the plaintiffs'

23   exhibit number.   Do you have that in front of you?

24   A.   I've got the article up here.   I'll just have to find it.

25        MR. KUNTZ:   14114.

1          MR. THOMAS:  Thank you.

2    BY MR. THOMAS:

3    Q.   Plaintiffs' Exhibit 14114.  Did you have the data that

4    the doctors in the Mary Céline article utilized in preparing

5    that report?

6    A.   No, sir.

7    Q.   And why is that a problem to you to understand what they

8    did?

9    A.   Well, for instance, if you look at infrared, they don't

10   show the infrared spectra.  They just say here's where there

11   was absorption frequencies.  And it's important to me that, as

12   a scientist, that when I look at -- at a peer-reviewed

13   article, I expect to see the data from which the conclusion is

14   drawn.  I don't want to just see the conclusion.  It doesn't

15   mean anything to me if I don't have the supporting background

16   data to form the conclusions.

17   Q.   In the Mary Céline article, did they measure molecular

18   weight?

19   A.   No, sir.

20   Q.   Do they measure tensile strength?

21   A.   No, sir.

22   Q.   Do they measure elongation?

23   A.   No, sir.

24   Q.   Do you have enough information about the sample

25   preparation to know whether the sample could have been

1   compromised in the tests that they did?

2   A.   Well, I know that they tried to clean it.  I know that

3   they treated it with formaldehyde and glutaraldehyde, so there

4   has been this -- this formation of protein aldehyde composite

5   around the fibers, and that has the ability to interfere, and

6   when it dries, it cracks, and you see that under scanning

7   electron microscope, you see the cracks.

8   Q.   Is there anything about the documents that were shown to

9   you by Mr. Kuntz on cross-examination that impacts the

10  opinions that you gave to the jury this morning?

11  A.   No, sir.

12          MR. THOMAS:  Thank you, Your Honor.

13          THE COURT:  May the witness be excused?

14          MR. KUNTZ:  Yes, Your Honor.

15          THE COURT:  Thank you, Doctor, you're excused.

16          Call your next witness.

17          MS. JONES:  Your Honor, at this time we would call

18  Dr. Aaron Kirkemo, by deposition.  And if we could approach

19  just one second, Your Honor.

20          THE COURT:  Sure.

21          (A sidebar discussion was held off the record.)

22          THE COURT:  Ladies and gentlemen of the jury, the

23  next testimony will be by video deposition.  This testimony is

24  a witness called by the defendant, but the testimony is going

25  to first have the questions by the plaintiff and then the

─────── KIRKEMO - BY VIDEO ───────

1    defendant.  Don't pay any attention to the order in which

2    it's -- the questioning comes in.  Just listen to all of the

3    evidence.  Give it the same weight you would as if the witness

4    were testifying here today.  You may proceed.

5             (The video testimony of Dr. Aaron Kirkemo was played

6    at 2:16 p.m.)

7             THE COURT:  Can we take a break here?  Let's take our

8    afternoon break.  Ladies and gentlemen, during the break, do

9    not discuss the case among yourselves, allow anyone to discuss

10   it with you, don't use any social media, listen to anything,

11   study anything or read anything.

12            See you back in 15 minutes.  Court stands in recess.

13            (The jury left the courtroom at 3:05 p.m.)

14            THE COURT:  Court is in recess.

15            (A recess was taken at 3:05 p.m.)

16   (The jury entered the courtroom at 3:20 p.m.)

17            THE COURT:  Ladies and gentlemen of the jury, we're

18   going to finish this videotape which has got a ways to go, and

19   then we have one more witness by videotape and we're going to

20   finish that today too.

21            Let's go.

22            (The video testimony of Aaron Kirkemo, M.D.

23   continued.)

24            MR. WALLACE:  Your Honor, we believe we need about

25   two more minutes to reboot.

*United States District Court*
*Southern District of West Virginia*

KIRKEMO - BY VIDEO

1          THE COURT:  That's fine.  This trial has been freer

2    of technical glitches than almost anything I had.

3          (The video testimony of Aaron Kirkemo, M.D.

4    continued.)

5          MS. JONES:  That's it, Your Honor.

6          THE COURT:  I had said we were going to have another

7    witness, but it's after five o'clock now, so we're not.  We're

8    going to break for the evening.  We'll start right at 9:00

9    o'clock.  Please do not discuss the case amongst yourselves or

10   permit anyone to discuss it with you.  Don't answer any

11   questions by family members.  Don't watch anything on local TV

12   news, don't read the local newspapers, don't listen to

13   anything about this case.  Don't use social media or computers

14   to do any research or any other methodology.  Forget about

15   case until tomorrow morning.  Have a nice evening, I'll see

16   you at 9:00 o'clock.

17          Counsel remain, please.

18          (The jury left the courtroom at 5:05 p.m.)

19          THE COURT:  I have an independent responsibility to

20   give a proper charge to the jury above and beyond the

21   suggestions which counsel always helpfully make to me as to

22   the contents of the charge, and in that regard there are a

23   number of things that are rattling around in my head about

24   products liability law and obviously about this product and

25   this case in particular.  Now, I would like your help, and by

KIRKEMO - BY VIDEO

1  that I don't mean big long briefs, I mean well thought-out

2  short statements of logical argument or support.

3       One of the things I think that might be helpful is if

4  you would address for me briefly the applicability of comment

5  K of restatement 402A to the facts of this case as it has

6  developed at trial.

7       Secondly, and perhaps more confused is the difficulty

8  I have with two legal concepts and settled principles

9  seemingly to being at odds in the way the case is right now;

10  and I need you to tell me if they are or they aren't, and if

11  they are, what to do about it, and if they aren't, what to do

12  about it.

13       The testimony in this case from all of the medical

14  witnesses has been that the use of the TVT-O by urologists and

15  other qualified physicians for the treatment of stress urinary

16  incontinence meets the standard of care.  I think even one of

17  the plaintiffs' doctors when asked that question said it met

18  the standard of care for a doctor to use.  If I'm wrong on

19  that, please point out where I'm wrong.

20       How can use of a device meet the standard of care and

21  still be unreasonably dangerous, which it must be under the

22  strict liability tort?  For that matter, how can a device

23  which meets the standard of care, if it does, when used by a

24  qualified physician, be negligent in its manufacture?  That is

25  to say, how can a device which is deemed the proper standard

KIRKEMO - BY VIDEO

1  device for the care of this problem be deemed negligently

2  designed or unreasonably dangerous?

3       Failure to warn is an easier concept for me to wrap

4  my head around.  I think I got that.  But I wonder, I wonder a

5  little bit, you don't have enough lawyers, I know you got lots

6  of lawyers, but you don't have enough lawyers to give me this

7  by tomorrow, so I won't go overboard, I'll just tell you what

8  I'm thinking about just so you'll know.

9       Is there a different measure or standard, if you

10  will, for proper warning where a medical device is

11  extraordinarily dangerous?  In other words, if you get back to

12  the comment that I asked you to brief, does it have any

13  relevance, does that comment have any relevance in failure to

14  warn claims?  It's not brought up in that context, but I just

15  wonder, does one have a further obligation?

16       You know, with drugs and regulated products, we have

17  black box warnings and all those things.  Is there any concept

18  here that says -- I don't think I can go on and make any

19  sense.  I think if you'll ignore the last two minutes and give

20  me the information I asked for in the beginning, that would be

21  very helpful to me.

22       There is clearly evidence before this court from

23  witnesses who qualified to testify and give their opinions

24  that they wouldn't use this device, that they have the expert

25  opinion that other devices meet the gold standard, and that

KIRKEMO - BY VIDEO

1    they believe the device is, one witness, one expert witness

2    said dangerously defective, one of plaintiffs' expert

3    witnesses.

4           I'm not throwing all this out there just to confuse

5    the issue for the evening because you got witnesses to deal

6    with and other things, but those are the things I'm thinking

7    about when I've got to instruct the jury, or when I've got to

8    ask them interrogatories.  So have a nice evening.  See you

9    back here tomorrow morning.

10          Why don't you come at 8:30 if you come up with any

11   wonderful ideas and you want to share them with me orally,

12   I'll listen to you then, okay?  Have a nice night.

13          (The Judge left the courtroom at 5:14 p.m.)

14          (A recess was taken at 5:14 p.m.)

15                      -  -  -  -  -

16

17

18

19

20

21

22

23

24

25

1                    **REPORTERS' CERTIFICATE**

2

3       **Carol Farrell, CRR, RMR, CCP, RPR**, Official Court

4   Reporter of the United States District Court for the Southern

5   District of West Virginia, and **Anthony Rolland, CRR, RMR, RPR,**

6   do hereby certify that the foregoing is a true and accurate

7   transcript, to the best of our ability, of the proceedings as

8   taken stenographically by and before us at the time, place,

9   and on the date hereinbefore set forth.

10

11

12  **/S/ Carol Farrell, CRR, RMR, CCP, RPR**          **09/02/14**

13  _____          _____
             **Court Reporter**                      **Date**

14

15  **/S/ Anthony Rolland, CRR, RMR, RPR**             **09/02/14**

16  _____          _____
             **Court Reporter**                      **Date**

17

18

19

20

21

22

23

24

25

*United States District Court*
*Southern District of West Virginia*