Exhibit H

Shelby F. Thames, Ph.D.

```
 1              UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF WEST VIRGINIA
 2                  CHARLESTON DIVISION

 3

 4    IN RE:  ETHICON, INC.,        MASTER FILE NO.
      PELVIC REPAIR SYSTEM          2:12-MD-02327
 5    PRODUCTS LIABILITY LITIGATION

 6                                  MDL 2327

 7

 8                                  JOSEPH R. GOODWIN
                                    U.S. DISTRICT JUDGE
 9

10    ****************************************************
11    The Document Relates to:
12    Constance Daino v. Ethicon, Inc.
13    Case No. 2:12-cv-01145

14

15         **********************************************
               DEPOSITION OF SHELBY F. THAMES, Ph.D.
16         **********************************************
17                   Taken at Butler Snow
            1020 Highland Colony Parkway, Suite 1400,
18                  Ridgeland, Mississippi,
                 on Thursday, March 24, 2016,
19            beginning at approximately 2:43 p.m.
20

21

22         ***********************************
23                 AMY M. KEY, RPR, CSR
                     Notary Public
24

25
```

Shelby F. Thames, Ph.D.

```
 1              A P P E A R A N C E S
 2
    REPRESENTING THE PLAINTIFFS:
 3      DOUGLAS C. MONSOUR, ESQ.
        KATY KROTTINGER, ESQ.
 4      Monsour Law Firm
        404 North Green Street
 5      Longview, Texas  75601
        (903) 758-5757
 6      doug@monsourlawfirm.com
        katy@monsourlawfirm.com
 7
 8
        MICHAEL H. BOWMAN, ESQ.
 9      Wexler & Wallace LLP
        55 West Monroe Street, Suite 3300
10      Chicago, Illinois  60603
        (312) 346-2222
11      mhb@wexlerwallace.com
12
13      KELSEY STOKES, ESQ.
        Fleming, Nolen & Jez, LLP
14      2800 Post Oak Boulevard, Suite 4000
        Houston, TX 77056
15      (866) 977-6671
        Kelsey_Stokes@fleming-law.com
16
17
    REPRESENTING THE DEFENDANTS:
18      CHAD R. HUTCHINSON, ESQ.
        Butler Snow
19      1020 Highland Colony Parkway, Suite 1400
        Ridgeland, Mississippi  39157
21      (601) 985-5711
        chad.hutchinson@butlersnow.com
22
23
24
25
```

Shelby F. Thames, Ph.D.

1                    TABLE OF CONTENTS

2                                              PAGE

3   Title Page.................................... 1

4   Appearance Page............................... 2

5   Table of Contents............................. 3

6   Exhibit Page.................................. 3

7   Stipulation Page.............................. 4

8

9                       * * * * * * *

10          EXAMINATION OF SHELBY F. THAMES, Ph.D.

11

12  By Mr. Bowman................................. 5

13

14  Certificate Page.............................. 30

15  Signature Page................................ 31

16

17                      * * * * * * *

18                    E X H I B I T S

19

20  Exhibit No. 1, Amended Case Specific Report of

        Shelby F. Thames, PhD, Constance Daino vs.

21  Ethicon, Inc., March 22, 2016............... 5

22

23

24

25

Shelby F. Thames, Ph.D.

```
1                          *******

2                 S T I P U L A T I O N

3              It is hereby stipulated and agreed by

4    respective attorneys of record, that this

5    deposition may be taken at the time and place

6    hereinbefore set forth, by AMY M. KEY, Court

7    Reporter and Notary Public, pursuant to the Rules;

8                  That the formality of reading and

9    signing is specifically RESERVED;

10                 That all objections, except as to the

11   form of the questions and the responsiveness of

12   the answers, are reserved until such time as the

13   deposition, or any part thereof, may be used or

14   sought to be used in evidence.

15                          *******

16

17

18

19

20

21

22

23

24

25
```

Shelby F. Thames, Ph.D.

```
 1               SHELBY F. THAMES, Ph.D.,

 2             having been first duly sworn,

 3         was examined and testified as follows:

 4                     EXAMINATION

 5   BY MR. BOWMAN:

 6        Q.   So, Doctor, it's me again, Mike Bowman.  I

 7   haven't handed you an exhibit.  But you have a

 8   report in front of you.  Who is it for?

 9        A.   It's for Constance Daino.

10             MR. BOWMAN:  Could we mark that as an

11        Exhibit 1 to this deposition, please?

12                  (EXHIBIT NO. 1 MARKED.)

13   BY MR. BOWMAN:

14        Q.   So, Doctor, have you seen this report

15   before?

16        A.   Yes, sir, I wrote it.

17        Q.   Did you have a chance to review it before

18   the deposition began?

19        A.   Briefly.

20        Q.   Have you ever met Ms. Daino?

21        A.   No, sir.

22        Q.   Do you know if I am pronouncing her last

23   name correctly?

24        A.   I do not know, sir.  I'm hoping I am.

25        Q.   I believe it's Daino.  As I understand it,
```

Shelby F. Thames, Ph.D.

1   you finalized this report on March 22nd; is that

2   right?

3        A.   Yes, sir.

4        Q.   And you also, as in the Stubblefield case,

5   worked with Dr. Kevin Ong at Exponent Labs; is that

6   correct?

7        A.   I did, sir.

8        Q.   And everything you testified to with

9   respect to your working relationship with Dr. Kevin

10  Ong previously, did that hold true in this case as

11  well?

12       A.   Yes, it does.

13       Q.   Do you know were there -- is there

14  anything that sticks out to you about the protocol

15  used in this case that didn't hold true in the

16  Stubblefield case?

17       A.   The protocol, no, but the sample was

18  different.

19       Q.   The sample was different?

20       A.   Yeah.  It was dry when we received it.

21       Q.   Can you explain that?

22       A.   It was not in formaldehyde, and so there

23  were decomposition products, as was the case with

24  Ms. Stubblefield.

25       Q.   Ms. Stubblefield was dry as well?

Shelby F. Thames, Ph.D.

```
 1        A.    No.   When we got it, it was in
 2   formaldehyde.   But the fact that it had these
 3   decomposition products meant at some point in time,
 4   between the time the explant had got to me, it had
 5   to be dry at some point because of the decomposition
 6   products.
 7        Q.    Do you have any idea when that might have
 8   happened?
 9        A.    No, sir.
10        Q.    Not with respect to Ms. Stubblefield, but
11   with respect to Ms. Daino?
12        A.    No, sir, I don't know.
13        Q.    So Ms. Daino's mesh came to you in a dry
14   format --
15        A.    Yes, sir.
16        Q.    -- with tissue attached?
17              And your light microscopy photo in figure
18   3 is representative of how you found it?
19        A.    Yes, sir.
20        Q.    Now, you didn't take this photo?
21        A.    No, sir, my associate did.
22        Q.    And just to talk again about what we
23   talked about in the last deposition, the figure 2
24   pristine TVT mesh, do you see that?
25        A.    Yes, sir.
```

Shelby F. Thames, Ph.D.

1      Q.   Do you know if that's a laser cut mesh or

2  a mechanically cut mesh?

3      A.   As we stand here today, I don't know, but

4  I could probably find out if I went through the

5  documents.

6      Q.   Does it look like a laser cut mesh to you?

7      A.   It's hard to say, sir, from the -- I

8  cannot be definitive.

9      Q.   Okay.  With respect to this laser cut

10  mesh, is it your understanding that it went through

11  the same cleaning process as the mesh that -- as

12  Ms. Daino's mesh went through?

13      A.   Yes.

14      Q.   And by that, of course, I mean that it

15  went through five cleaning processes as Ms. Daino's

16  mesh did?

17      A.   Yes, sir.

18      Q.   If we look at figure 4, you did 100 times

19  magnification?

20      A.   Yes, sir.

21      Q.   And this is under light microscopy; is

22  that correct?

23      A.   Yes, sir.

24      Q.   And this is of the mesh as it was produced

25  to you; is that correct?

Shelby F. Thames, Ph.D.

1        A.    It was before cleaning, and it's a

2   beautiful -- it shows a lot of stuff.

3        Q.    What does it show?

4        A.    Well, if you'll look at the -- this area

5   right here (indicating), that is protein material

6   that was on the surface of the explant, and it's

7   peeled back.  And you notice right here at the

8   bottom, I'm pointing at the bottom to the -- the

9   almost bottom fiber on the far left, the same thing

10  is here, and that's a classical example of what

11  we're seeing for this material that's on the surface

12  of Prolene.  Now, this is before anything has been

13  done to it.

14       Q.    I understand.

15       A.    And what we're going to find out is once

16  this is put through the first washing step, cleaning

17  step, that will disappear because it's so fragile.

18       Q.    So looking at this photograph in figure 4,

19  do you notice that in the direct center, down

20  here --

21       A.    Yes, sir.

22       Q.    -- that it appears that the protein has

23  been disturbed?

24       A.    Yes.  It's coming off the fiber.

25       Q.    So, actually, that's not what I'm looking

Shelby F. Thames, Ph.D.

1  at.  I'm looking at the jigsaw puzzle aspect of the

2  protein.  So it looks like there's a protein sheath

3  there, and it's been disturbed either by your

4  photographer or in shipping.

5          Do you see how they connect together?

6      A.   Well, to some degree, but not -- I also

7  see how, if this is laid back over this fiber, it

8  would have been right here where my little small

9  finger is pointing, which it's hard to, obviously,

10 say on the telephone and what else.  But it could

11 have been laid back this way, and this would be this

12 way, right in this clear area right here and this

13 clear area right here.

14     Q.   Do you think your associate disturbed that

15 protein on purpose or that layer of tissue or

16 whatever that is on purpose?

17     A.    No, sir.  I think that's the way it came

18 to us.  It had been -- obviously, it was disturbed

19 because it was received from the hospital.  It was

20 transmitted down to Kevin Ong's lab.  He put it in a

21 different container.  He had washed it, and he sent

22 it down to us.

23     Q.   Can I see the exhibit for a second?

24     A.   Sure.

25     Q.   I'm just going to circle the portion that

Shelby F. Thames, Ph.D.

1    I was asking you to look at as far as the jigsaw

2    nature of it.

3              Do you see what I'm marking as being

4    disturbed on this?

5         A.   I do.

6         Q.   So do you agree with me that at some point

7    that was connected or seems to be at some point that

8    was all one larger piece of protein or tissue?

9         A.   I can't say.  There's a possibility that

10   it was, but I can't say for sure that it was.

11        Q.   Do we see the same thing -- if you just

12   look directly above it, it looks like there's sort

13   of the same thing going on there.  There's like a

14   matrix of collagen or tissue, and there's some

15   see-through portions of it?

16        A.   Yeah, it's translucent material that we're

17   talking about, right.

18        Q.   I think so.  If that's what you're calling

19   it, yes.  To me, it sort of looks like a thin layer

20   of collagen or protein or something like that.

21             With respect to this mesh, does anything

22   else jump out at you?

23        A.   No, sir, not really.

24        Q.   Okay.  How about the fact there's no blue

25   filaments?

Shelby F. Thames, Ph.D.

1      A.   Well, it's an all-clear mesh.

2      Q.   So this would have been implanted prior to

3  2003 or something like that?

4      A.   Yes, sir, right.  I think it was 2003.

5  And I think, if I remember, they started using

6  colored mesh in like 2003, 2000 and 2003.  So this

7  could have been something that had on -- and I don't

8  know.  I'm speculating here that there might have

9  been some that they had reserved that hadn't been

10  used before.

11      Q.   With respect to the second full paragraph

12  on this page, which is page 4, it states -- you talk

13  about patient 4 from your general report.

14          Do you see that?

15      A.   Yes, I do.

16      Q.   And it talks about -- and patient 4 had

17  blue pigmented material, correct?

18      A.   Yes, sir.

19      Q.   And you actually make the reference that

20  both clear Prolene and pigmented Prolene are

21  translucent under light microscopy.

22          Do you see that?

23      A.   I do.

24      Q.   Is there any statement in here that

25  Ms. Daino -- let me see this.  So this entire

Shelby F. Thames, Ph.D.

1  paragraph is in reference to patient 4.  This is not

2  in reference to Ms. Daino at all?

3      A.   That's essentially correct, yes, sir.

4      Q.   So you're not saying anything about any

5  findings that you made on Ms. Daino's mesh in this

6  paragraph?

7      A.   I'm giving an example of what we had done

8  before on patient 4.

9      Q.   That doesn't -- does that have any --

10      A.   Not directly to --

11      Q.   Ms. Daino?

12      A.   Ms. Daino, yes.

13      Q.   Okay.  Thank you.

14           With respect to figure 5, --

15      A.   Yes, sir.

16      Q.   -- do you see any flakes or bark hanging

17  off of the figure itself?

18      A.   Yes.  But there's more flesh here than --

19  see, what we were looking at before in figure --

20  well, before cleaning was material that hadn't been

21  cleaned at all.  Now then, it has been cleaned a

22  step, and we see that we have disturbed some of the

23  flesh around the fibers.  We're seeing more of the

24  fibers, and we're also seeing some flaking.  You can

25  see it here.  Obviously --

Shelby F. Thames, Ph.D.

1     Q.   Can you mark it?

2     A.   Obviously, the flakes won't be as long and

3   prominent because they've been through a cleaning

4   step.

5     Q.   Can you mark where you see some flakes,

6   please?

7     A.   Sure.  It's a little difficult to find

8   here because we've still got flesh on it.

9     Q.   So with respect to figure 5, I can see at

10  least three or four portions where it's not clear?

11    A.   That's correct.

12    Q.   Do you see those?

13    A.   Yes.

14    Q.   So just seeing those alone is something

15  that would -- you would take the FTIR, do the light

16  microscopy, do the SEM.

17         Would you do SEM at this point?

18    A.   Yes, sir.

19    Q.   And then you would send it back to Kevin

20  Ong, correct?

21    A.   Yes, sir.

22    Q.   For more cleaning?

23    A.   Yes, sir.

24    Q.   But your determination wouldn't have been

25  made on sending it back to Kevin Ong until you saw

Shelby F. Thames, Ph.D.

1    the results of the FTIR, SEM and light microscopy?

2        A.    That's right.

3        Q.    Okay.  So getting into the next page,

4    there's a reference to blue fiber again?

5        A.    Yes, sir.

6        Q.    And this one appears to actually reference

7    it with Ms. Daino.

8        A.    Where are we, sir?

9        Q.    Sure.  Page 5, the section entitled,

10   "Chemical Structure Analysis by FTIR Spectroscopy."

11       A.    What paragraph?

12       Q.    The very first one.

13             So the second sentence reads, "The layer

14   on the blue fiber is clear, not blue, again

15   confirming its composition is not Prolene.  If it

16   were degraded Prolene, it would be blue, and it is

17   not."

18             Do you see that?

19       A.    Yes.

20       Q.    Does that belong in this report?

21       A.    Well, it's used there as a comparison.

22       Q.    Okay.

23       A.    The clear fiber is -- you can make a

24   comparison when you have a blue and a clear.  And I

25   wanted to make the comparison between patient 4,

Shelby F. Thames, Ph.D.

1  which we talked about earlier today, which was

2  Ms. Ramirez, and so I use that here as a comparison,

3  that the blue fiber in Ms. Ramirez was translucent

4  material, just like the material here is translucent

5  material.  Neither her translucent material was

6  blue, as this is not blue.

7      Q.  So way the sentence reads, "The layer in

8  the blue fiber is clear, not blue, again confirming

9  its composition is not Prolene."

10     A.  Right.

11     Q.  And then it says, "Daino 1.1," and that's

12  figure 5?

13     A.  Well, that was meant to be Ms. Ramirez.  I

14  guess I made a mistake here.  Let me check it out.

15  This is clear fiber.

16         Oh, I say in the first sentence, "It's

17  also important to note the identical translucent

18  nature of the cracked and peeling material on both

19  the blue and clear fibers as shown in patient 4,

20  examples in my general report.  The layer on the

21  blue fiber is clear, not blue, again confirming its

22  composition is not Prolene, Daino 1.1, comparatively

23  speaking."

24     Q.  So, again, I don't see any flaking, and I

25  don't see any blue on Ms. Daino's.

Shelby F. Thames, Ph.D.

```
 1          A.    There is none.  I'm trying to draw a

 2    comparison between Ms. Ramirez and Ms. Daino, so

 3    that's the only thing I'm trying to do here.

 4          Q.    Okay.  Without blue fibers?

 5          A.    That is correct, sir.

 6          Q.    Anywhere in this report is there a photo

 7    from patient 4?

 8          A.    Let me see.  No, sir.

 9          Q.    So with respect to the first paragraph and

10    the second paragraph, you are merely referencing

11    this case-specific report back to your general

12    causation report; is that right?

13          A.    Yes, sir.

14          Q.    And there is nothing specific that you can

15    relate with with blue fibers or with any kind of

16    photograph showing translucent blue fibers --

17    translucent cracks in blue fibers to Ms. Daino; is

18    that correct?

19          A.    It was used only as an example.

20          Q.    The next paragraph, it goes to -- it

21    starts describing the FTIR in figure 6.

22                Do you see that?

23          A.    Yes.

24          Q.    And in figure 6 we see that there is --

25    there are bumps and valleys in between the area of
```

Shelby F. Thames, Ph.D.

1    3000 and 3600.

2            Do you see that?

3    A.    Yes, sir.

4    Q.    And that's the general area where a

5    carboxyl group would be?

6            MR. HUTCHINSON:  Object to form.

7            THE WITNESS:  In that general area, yes,

8    sir.

9    BY MR. BOWMAN:

10   Q.    And with respect to the area between 1650

11   and 1750, we do see at least two peaks and maybe one

12   broad range, and this is an area where we would

13   expect to see carbonyls; is that correct?

14   A.    Well, you see two carbonyls, one is -- and

15   the two peaks, the one at 15 and 16, are

16   representative of proteins.  And the 1654 is

17   representative of the carbonyl group frequency of

18   the proteins.  And the 1741 is representative of

19   decomposition products that we talked about earlier,

20   because we received this explant dry.  And, here

21   again, we see the 1741 peak.

22   Q.    Besides your knowledge of knowing that

23   these peaks and valleys overlap between the hydroxyl

24   group and carbonyl group --

25   A.    Now, wait a minute.  That's not correct.

Shelby F. Thames, Ph.D.

1      Q.   I'll repeat the question.  Go ahead.

2           MR. HUTCHINSON:  I don't think there's a

3      question pending.

4  BY MR. BOWMAN:

5      Q.   I'll withdraw the question, and I'll

6  reask.

7      A.   Okay.  Thank you.

8      Q.   With respect to the peaks in the 1650 to

9  1750 range that you just identified as having to do

10 with decomposition and amide groups; is that right?

11     A.   The 1654 peak is the C=O of the amide

12 group, A-M-I-D-E.  The 1741 is an ester peak coming

13 from a decomposition product.

14     Q.   Now, besides the fact that you know that

15 that's where a carbonyl would show up, isn't this

16 also where a carbonyl would show up on oxidized

17 polypropylene?

18     A.   That could be the same reason, yes, sir.

19     Q.   And with this sample you -- with this

20 sample, was any care taken to preserve any oxidized

21 polypropylene that might be on the mesh?

22     A.   The cleaning protocol itself was a

23 caretaking process to try to make certain that

24 what's on the explant when we received it was on the

25 explant when we looked at it the last time, with the

Shelby F. Thames, Ph.D.

1   exception of proteins.

2        Q.   Now, can the same be said with respect to

3   the carboxyl groups between the area of 3000 and,

4   say, 3600?

5        A.   Yes.

6        Q.   And the --

7        A.   No.  Wait a minute.  You said carboxyl

8   groups?  You're getting your chemistry wrong.

9        Q.   I am.  So the hydroxyl group between the

10  area of, say, 3000 and 3600?

11       A.   In that range, yes, sir.

12       Q.   By hydroxyl group, can you tell me --

13  well, what do you understand a hydroxyl group to be?

14       A.   A COH.

15       Q.   And what do you understand a carbonyl to

16  be?

17       A.   A C=O.

18       Q.   And the cleaning protocol itself didn't

19  run oxidized polypropylene through it, did it, as a

20  control?

21            That didn't happen?

22       A.   No, sir.

23       Q.   With respect to any other part of the

24  cleaning process, was oxidized polypropylene used?

25       A.   Now, you're talking -- you keep talking

Shelby F. Thames, Ph.D.

1    about oxidized polypropylene.

2            Do you really mean that?

3        Q.   What I mean to say is --

4        A.   I didn't use polypropylene.

5        Q.   You used Prolene?

6        A.   I used Prolene.

7        Q.   What I mean to say is that for any one of

8    the steps, we're talking about the -- let's just

9    stick with the Proteinase K.

10           Did you put -- did you purposefully

11   oxidize Prolene and then put it through that step of

12   the cleaning process?

13       A.   No, sir.

14       Q.   And did you do that with any of the steps

15   of the cleaning process?

16       A.   No, sir.

17       Q.   But you did use pristine Prolene as a

18   control, and you did use a pristine Prolene sample

19   in Ms. Daino's case, TVT mesh?

20       A.   Yes, sir, that's correct.

21       Q.   And you ran that through the cleaning

22   process?

23       A.   That's correct.

24       Q.   With respect to figure 7, --

25       A.   Yes, sir.

Shelby F. Thames, Ph.D.

1        Q.    -- that is the before cleaning tissue

2   between fibers --

3        A.    Yes, sir.

4        Q.    -- overlaid in red?

5              And then the collagenase, Type VII, high

6   purity, this is just like a textbook examplar as

7   overlaid in blue?

8        A.    Yes, sir.

9        Q.    Can you tell me -- what do you see at

10   1742?

11        A.    The purpose of that spectra was to show

12   you the peak at 1742 was in the tissue between

13   fibers, but not in collagenase, and that's the -- so

14   it's not unique to collagenase, so it has to be

15   unique to something else.  And that means it's

16   unique to the tissue sample itself.

17        Q.    So this tissue sample --

18        A.    It's not proteins.

19        Q.    Right.

20              So this sample itself came to you

21   decomposed?

22        A.    Yes, sir.

23        Q.    Almost entirely?

24              MR. HUTCHINSON:  Object to form.

25              THE WITNESS:  Well, it was decomposed.

Shelby F. Thames, Ph.D.

1          I don't know to what extent it was

2          decomposed.

3     BY MR. BOWMAN:

4          Q.   It wasn't -- I'll strike the question.

5               It wasn't preserved in any way?

6          A.   When we received it, it was not preserved.

7     I cannot tell you what happened to it prior to our

8     receiving it or Dr. Ong.

9               I could ask Dr. Ong what happened before

10    he picked it up -- when he picked it up.  But before

11    that, I don't know who had it, for how long or what

12    they did with it.

13         Q.   Would this figure, figure 7, have been

14    more instructive if you had laid in the background

15    instead of collagenase some kind of collagen that

16    had been decomposed, an FTIR of that?

17         A.    No, I don't think so.  No, sir, I don't

18    believe so.

19         Q.   My question is just simply then that would

20    just tell me immediately that 1742 is decomposed

21    collagen?

22         A.   Well, this tells you it is because the

23    protein is a carbonyl group itself, and it's right

24    next to it.  It has a carbonyl group in it itself,

25    and that's at 1654.  We talked about that just a few

Shelby F. Thames, Ph.D.

1    seconds ago.  And then you have another carbonyl

2    group that's showing up at a different frequency.

3            So no, sir, to answer your question.

4        Q.   With respect to figure 8, --

5        A.   Yes, sir.

6        Q.   -- you had the before cleaning clear

7    fiber, and then you have the before cleaning tissue

8    between fibers; is that correct?

9        A.   Yes, sir.

10       Q.   And the peaks appear to be the same.

11           And this is just what you were saying.

12   The peaks appear to be the same, but they are at a

13   much higher concentration in the between fibers,

14   aren't they?

15           MR. HUTCHINSON:  Object to form.

16           THE WITNESS:  Yes, they are, as you

17       would expect them to be.  Because this is

18       decomposition of the tissue that's taking

19       place, which is between the fibers, not

20       Prolene.

21   BY MR. BOWMAN:

22       Q.   I get the answer.

23           With respect to the hydroxyl groups,

24   why -- you know, I'm going to strike that question.

25           Moving on to figure 9, this is the figure

Shelby F. Thames, Ph.D.

1    that encompasses all of the FTIRs that you took for

2    this mesh; is that correct?

3         A.   Yes, sir, from before cleaning to after

4    step five.

5         Q.   Now, with respect to the -- if we just

6    look at after cleaning five, which appears to be

7    gold, it has the lowest ranges possible.

8              It appears to have the lowest ranges

9    possible out of all of the FTIRs; is that correct?

10        A.   It shows you how effective our cleaning

11   process was, yes, sir.

12        Q.   And that cleaning process is directed by

13   you to send it back to get more cleaning?

14        A.   After cleaning five, I keep the explants.

15        Q.   So just at five, you wouldn't have gone

16   any further than what is in yellow; is that right?

17        A.   That is correct, sir.  And the reason is

18   shown on the next page.

19        Q.   If we go to the next page and we look at

20   figure 10, it shows that the TVT exemplar, FTIR,

21   clear fibers after cleaning steps; is that right?

22        A.   Yes, sir, and they're identical.

23        Q.   They appear to be identical.

24             Is there anywhere in the -- do you see a

25   carbonyl peak here in the blue?

Shelby F. Thames, Ph.D.

1        A.   No, sir.

2        Q.   So the TVT exemplar after cleaning five --

3        A.   It's not supposed to have a carbonyl

4   group, sir.  It doesn't have a carbonyl on it.  It

5   didn't oxidize.

6        Q.   But this is a different part of the TVT

7   exemplar that you looked at, though, right?

8             You didn't look at the same -- you didn't

9   do the FTIR on the same exact spot on every --

10            MR. HUTCHINSON:  Object to form.

11       Compound question.

12   BY MR. BOWMAN:

13       Q.   Do you want me to withdraw the question?

14   I'll withdraw the question.

15       A.   Thank you.

16       Q.   And what I'll ask is, did you do FTIR on

17   the TVT exemplar after every cleaning that was done?

18       A.   Yes, sir.

19       Q.   And where is that data?

20       A.   We just looked at them, sir, right here

21   (indicating).

22       Q.   This is after cleaning.  This is not the

23   exemplar, though.  This is of the mesh.

24       A.   Well, they are done.  I'm sorry.  We have

25   them in our documentation somewhere.  You have

Shelby F. Thames, Ph.D.

1    those.

2              MR. HUTCHINSON:  They have been produced

3        to counsel already.

4    BY MR. BOWMAN:

5        Q.   So there is quite a big peak, isn't there?

6              You don't see a peak at 1740, 1750 on the

7    TVT exemplar?

8        A.   No, sir.

9              MR. HUTCHINSON:  Object to form.

10   BY MR. BOWMAN:

11       Q.   What do you see there?

12       A.   Nothing.  I see some noise perhaps.  You

13   know, I told you earlier that this is not a

14   quantitative measurement.  We talked about

15   qualitative measurement.  And this is, in my

16   opinion, as close as you're going to be being

17   identical in a qualitative spectra that you can

18   achieve.

19       Q.   But isn't the FTIR just on one portion of

20   the --

21       A.   Yes, sir.  But it's not quantitative in

22   terms of telling you the exact amounts of materials

23   that are there.  So if there's a slight difference

24   in the peak height here, in the red, for instance,

25   the clear microscopy spectra of that fiber, that

Shelby F. Thames, Ph.D.

1  doesn't mean that it's not identical to the blue.

2  It's just qualitative and not quantitative.

3       Q.   That's my point.  I don't see a peak in

4  the one that you cleaned after the one that was

5  explanted from Ms. Daino.  I don't see --

6       A.   I don't either.  They look identical to

7  me.

8       Q.   Okay.  But we're looking at the same

9  figure, figure 10?

10      A.   Yes, sir, we are.

11      Q.   With respect to your SEM opinions again --

12  strike that.

13           With respect to your SEM opinions, do you

14  have anything in a peer review literature that would

15  support the opinion that the extrusion lines would

16  degrade along with the outer surface of the Prolene

17  fiber?

18      A.   If there was oxidation of Prolene, it is

19  my opinion that extrusion lines would be interfered

20  with.  They are not here.  I have not seen that

21  written in another document, is my belief.

22           And you can see the extrusion lines being

23  maintained all the way from an SEM -- well, about

24  one, but certainly three.  And you can see the

25  transverse cracking and extrusion lines are still

Shelby F. Thames, Ph.D.

1    there.

2              And you see how difficult it is to get all

3    the proteins off?  You see these little portions

4    there?  That continues to be proteins on there.  And

5    then you see number five, and we've got a really

6    clean spectra.

7         Q.   You mean a clean image?

8         A.   Yes, full micrograph spectra, clean image,

9    yes, sir.

10             MR. BOWMAN:  I'm done.  I pass.

11             MR. HUTCHINSON:  Just a quick break.

12                  (A BREAK WAS TAKEN.)

13             MR. HUTCHINSON:  We don't have any more

14    questions.  Thank you.

15                  (CONCLUDED AT 3:15 P.M.)

16

17

18

19

20

21

22

23

24

25

Shelby F. Thames, Ph.D.

```
 1              CERTIFICATE OF COURT REPORTER

 2         I, Amy M. Key, CSR, and Notary Public in

 3   and for the County of Lamar, State of Mississippi,

 4   hereby certify that the foregoing pages, under

 5   penalty of perjury, contain a true and correct

 6   transcript of the testimony of the witness, as

 7   taken by me at the time and place heretofore

 8   stated, and later reduced to typewritten form by

 9   computer-aided transcription under my supervision

10   and to the best of my skill and ability.

11         I further certify that I placed the witness

12   under oath to truthfully answer the questions in

13   this matter under the power vested in me by the

14   State of Mississippi.

15        I further certify that I am not in the employ

16   of or related to any counsel or party in this

17   matter, and have no interest, monetary or

18   otherwise, in the final outcome of the

19   proceedings.

20         Witness my signature and seal this the

21   _____ day of_____, 2016.

22

23        _____

             AMY M. KEY, CSR

24           My Commission Expires June 19, 2016

25
```

Shelby F. Thames, Ph.D.

```
 1                SIGNATURE OF WITNESS

 2
          I, _____, do solemnly swear that I
 3   have read the foregoing pages and that the same is
     a true and correct transcript of the testimony
 4   given by me at the time and place hereinbefore set
     forth, with the following corrections:

 5

 6    PAGE:   LINE:   SHOULD READ:    REASON FOR CHANGE:

 7    _____   _____   _____   _____

 8    _____   _____   _____   _____

 9    _____   _____   _____   _____

10    _____   _____   _____   _____

11    _____   _____   _____   _____

12    _____   _____   _____   _____

13    _____   _____   _____   _____

14    _____   _____   _____   _____

15    _____   _____   _____   _____

16    _____   _____   _____   _____

17    _____   _____   _____   _____

18

19                   _____
                         (SIGNATURE)
20

21    Subscribed and sworn
      to before me this
22    _____ day of _____, 20____.
23    My commission expires:_____
24

      _____
25    Notary Public
```