# EXHIBIT F

Nicolette S. Horbach, M.D.

```
 0   01



 2     KATHRYN E. CORBET and    : SUPERIOR COURT OF NEW JERSEY

 3     ERIC R. CORBET,          : LAW DIVISION - BERGEN COUNTY

 4         Plaintiffs,          : DOCKET NO. BER-L-14589-14 MCL

 5     v.                       :

 6     ETHICON, INC., ETHICON   : MASTER DOCKET NO.

 7     WOMEN'S HEALTH AND        : BER-L-11575-14

 8     UROLOGY, a Division of    :

 9     Ethicon, Inc.,           : CIVIL ACTION

10     GYNECARE, JOHNSON &       : In re Pelvic Mesh/Gynecare

11     JOHNSON, and JOHN DOES    : Litigation

12     1-20,                     : Case No. 291 CT

13         Defendants.          :

14

15

16      VIDEOTAPED DEPOSITION OF NICOLETTE S. HORBACH, M.D.

17                        Washington, D.C.

18                        December 23, 2015

19                          10:00 a.m.

20

21

22

23

24     Reported by: Linda S. Kinkade RDR CRR RMR CSR

25
```

Nicolette S. Horbach, M.D.

1

2

3

4          The following is the transcript of the

5    videotaped deposition of NICOLETTE S. HORBACH, M.D.

6    held at the offices of:

7

8

9          O'Melveny & Myers LLP

10          1625 I Street, NW

11          Washington, DC 20006

12

13

14

15          Taken pursuant to applicable Rules of Civil

16    Procedure, before Linda S. Kinkade, Registered

17    Diplomate Reporter, Certified Realtime Reporter,

18    Registered Professional Reporter, Registered Merit

19    Reporter and Certified Shorthand Reporter, as licensed

20    by the State of California, and Notary Public, as

21    commissioned by the District of Columbia.

22

23

24

25

Nicolette S. Horbach, M.D.

```
 1      APPEARANCES:

 2

 3      On Behalf of Plaintiff:

 4              Seeger Weiss, LLP

 5              By: Jeffrey S. Grand, Esquire

 6              (Appearing via videoconference)

 7              77 Water Street, 26th Floor

 8              New York, New York 10005

 9              212-584-0700

10              jgrand@seegerweiss.com

11

12

13

14      On Behalf of Defendants:

15              Ruprecht Hart Weeks & Ricciardulli, LLP

16              By: Judith A. Wahrenberger, Esquire

17              53 Cardinal Drive

18              Suite 1

19              Westfield, New Jersey 07090

20              908-232-4800

21              twahrenberger@rhwlawfirm.com

22

23

24

25
```

Nicolette S. Horbach, M.D.

```
1      APPEARANCES (continued):

2

3      Also Present:

4

5      On Behalf of Defendants:

6               Bowman and Brooke LLP

7               By: Barry J. Koopmann, Esquire

8               150 South Fifth Street

9               Suite 3000

10              Minneapolis, Minnesota 55402

11              610-339-8682

12              barry.koopmann@bowmanandbrooke.com

13

14

15

16

17

18              Michael Gay, Video Specialist

19

20

21

22

23

24

25
```

Nicolette S. Horbach, M.D.

```
1                    INDEX OF EXAMINATION

2

3        EXAMINATION of NICOLETTE S. HORBACH, M.D.    PAGE

4              BY MR. GRAND                           8

5                                                     144

6              BY MS. WAHRENBERGER                    120

7                                                     153

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Nicolette S. Horbach, M.D.

```
 1                     E X H I B I T S

 2

 3      NO.         DESCRIPTION                      PAGE

 4      Exhibit 1   Notice of Video Deposition        11

 5      Exhibit 2   Expert General Report of Dr.      48

 6                  Nicolette Horbach

 7      Exhibit 3   Supplemental Report Regarding     49

 8                  Stress Urinary Incontinence and

 9                  Ethicon Retropubic Mid-Urethral

10                  Slings

11      Exhibit 4   Updated Exhibit B to the General  67

12                  TVT Report

13      Exhibit 5   NSH TVT Additional References      85

14      Exhibit 6   Email correspondence from E.      105

15                  Globerman re TVT Targets

16      Exhibit 7   Email correspondence from C.      107

17                  Pypcznski re INOVA

18      Exhibit 8   Email correspondence from Cindy   109

19                  Pypcznski

20      Exhibit 9   Email correspondence from J.      114

21                  Russo

22

23

24

25
```

Nicolette S. Horbach, M.D.

```
 1              P R O C E E D I N G S

 2              VIDEO SPECIALIST:  We are on the record.

 3    The time now is 10:01.  This marks the beginning of

 4    disc 1 for the videotaped deposition testimony of

 5    Dr. Nicolette S. Horbach, in the matter of Corbet

 6    versus Ethicon, et al.  This case is pending in the

 7    Superior Court of New Jersey, Law Division, Bergen

 8    County, Master Docket No. BER-L-11575-14.

 9              Today's date is December the 23rd, 2015.  This

10    deposition is being conducted at 1625 Eye Street,

11    northwest, Washington, D.C.

12              Will all attorneys present please identify

13    themselves and who they represent.

14              MR. GRAND:  Jeffrey Grand on behalf of

15    plaintiff Kathryn Corbet.

16              MS. WAHRENBERGER:  Judith Wahrenberger on

17    behalf of Ethicon, Johnson & Johnson.

18              MR. KOOPMANN:  Barry Koopmann from Bowman

19    and Brooke law firm on behalf of Ethicon and

20    Johnson & Johnson.

21              VIDEO SPECIALIST:  My name is Michael Gay.

22    I am with Golkow Technologies.  Our court reporter

23    today is Linda Kinkade, also with Golkow Technologies,

24    and will now swear in the witness.

25                   NICOLETTE S. HORBACH, M.D.,
```

Nicolette S. Horbach, M.D.

1          Having been first duly sworn, was thereafter

2     examined and testified as follows:

3          VIDEO SPECIALIST:  You may proceed.

4                    EXAMINATION

5     BY MR. GRAND:

6          Q.  Good morning, Dr. Horbach.  My name is

7     Jeffrey Grand.  I represent plaintiff, Kathryn Corbet,

8     and her husband, Eric Corbet.

9          Before we begin, have you been deposed before?

10          A.  Yes, I have.

11          Q.  Okay.  How recently were you deposed?

12          A.  I believe within a year or so, within the

13     last year.

14          Q.  Okay.  I'm going to assume you know most of

15     the ground rules for a deposition.  I'm just going to

16     tell you that, if you need a break at any time, let me

17     know; I'll be happy to accommodate you.  I would ask,

18     if -- if we're in the middle of a question and an

19     answer, that we complete it before you take a break,

20     but if you need a break for any reason, let me know.

21          Also, if I ask a question that is unclear to

22     you, please tell me and I will do my best to rephrase

23     it.  Also, because the court reporter needs to take

24     down our questions and answers, I would ask that you

25     try to avoid nodding in responses or hand gestures.  I

Nicolette S. Horbach, M.D.

```
1    will try to do the same.

2         Also, to the extent that -- I ask that you let

3    me finish a question before you attempt to answer it.

4    I know we all have a tendency in conversation to

5    anticipate questions and answers, but I will do my

6    best not to step on your answers, and I would ask that

7    you do your best not to step on my questions.  Okay?

8         A.  That's fine.  Yes.

9         Q.  Okay.  We had just discussed that you have

10   been deposed before.  Can you tell me -- I believe --

11   when the last time you were deposed?

12        A.  I believe my last deposition was within the

13   last year or so.  It was in the Pamela Wicker versus

14   Ethicon, J&J case where I was deposed by Mr. Adam

15   Slater.

16        Q.  Okay.  And have you been deposed in any

17   other mesh-related cases?

18        A.  Yes.  I was also deposed in the case of

19   Connie Schubert, I believe is the last name, versus

20   J&J, Ethicon, which was, I believe, also a Prolift

21   case.

22        Q.  Okay.

23        A.  I've also -- I'm sorry.  I've also been

24   deposed in a medical malpractice case as a defense

25   witness in -- two to three years ago in Atlanta,
```

Nicolette S. Horbach, M.D.

1    Georgia.

2         Q.  Okay.  Any other cases you can think of?

3         A.  Not regarding mesh.

4         Q.  Okay.

5              MS. WAHRENBERGER:  Just answer the

6    question.

7    BY MR. GRAND:

8         Q.  In the three mesh-related cases that

9    you described, did you testify at trial in any of

10   those cases?

11        A.  No, I did not.

12        Q.  Outside the context of a mesh-related case,

13   have you served as an expert witness?

14        A.  Yes, I have.

15        Q.  Okay.  When was the last time you did that?

16        A.  I believe that the last time I served as a

17   both treating physician and causal -- causation, I

18   guess you call it -- physician, was within the last

19   two or three years here in Montgomery County,

20   Maryland.

21        Q.  Okay.  And what sort of case was that?

22        A.  The -- I was a plaintiff's witness --

23   expert.  The patient had developed a periclitoral cyst

24   that a physician had removed the cyst and the patient

25   subsequently became an orgasmic and sought my care to

Nicolette S. Horbach, M.D.

1    try to see if I could repair the nerves.  And she

2    subsequently then went forward with a malpractice suit

3    against the original surgeon.

4         Q.  Okay.  Thank you.  Would it be fair to say

5    that, outside the context of the three mesh-related

6    cases you've already told me about, that your previous

7    testimony in court cases has been with medical

8    malpractice cases?

9         A.  Yes, that's correct.

10        Q.  Okay.  Have you been an expert in any other

11   drug or medical device litigation --

12        A.  No --

13        Q.  -- other than mesh?

14        A.  No, I have not.

15        Q.  Okay.  Thank you.  Doctor, we're going to

16   mark as Exhibit 1 the deposition notice that was

17   served in this case.

18        (Exhibit 1 was marked for identification.)

19   BY MR. GRAND:

20        Q.  Doctor, have you seen this before?

21        A.  Yes, I saw this several days ago.

22        Q.  Okay.  Did you read it?

23        A.  Yes.

24        Q.  Okay.  Have you brought any of the materials

25   requested in the notice with you today?

Nicolette S. Horbach, M.D.

1          A.  I brought materials that were -- that I

2     have.  Some of the requested materials I -- I don't

3     ever keep copies of or I don't have copies of, so it's

4     not really relevant.

5               MS. WAHRENBERGER:  And for the record we

6     have provided you with the thumb drive of some of the

7     documents that are responsive to this notice to

8     produce.

9               MR. GRAND:  Okay.  We'll mark that later.

10    I assume you brought it to give to the court reporter?

11              MS. WAHRENBERGER:  The thumb drive?  Yes,

12    we have it.

13              MR. GRAND:  Yeah.  Okay.  Thank you.  I

14    appreciate that.  I had requested that, and obviously

15    that makes things easier.

16    BY MR. GRAND:

17         Q.  Okay.  Doctor, have you -- well, first off,

18    let's just go quickly through the notice so I can get

19    an understanding of what will be included on the thumb

20    drive.

21              Can you turn to Exhibit A, which is the third

22    page?

23         A.  Yes.

24         Q.  Okay.  On the thumb drive that you brought

25    with you today, will it contain any documents related

Nicolette S. Horbach, M.D.

1     to your fees and billing in this case?

2          A.  No, it will not.

3          Q.  Is that because you haven't generated any

4     invoices yet in this case?

5          A.  Correct.

6          Q.  Has your -- with respect to item 2, the CV,

7     is the CV that's attached to your general report the

8     most up-to-date CV you have?

9          A.  I actually updated the CV a few days ago

10    per this request, and I don't know whether you have

11    that most recent copy.  I had forwarded it to the

12    attorneys, but I don't know whether you received it.

13         Q.  Okay.  I have not, but I appreciate that.

14         A.  I have a copy here.  Would you like -- I

15    have a copy here, if you don't have.

16              MR. GRAND:  Is it on the thumb drive?

17    Could counsel confirm that?

18              MS. WAHRENBERGER:  No.  We have a hard copy

19    here at the deposition.

20              MR. GRAND:  Okay.  Obviously I can't see it

21    remotely, so --

22              THE WITNESS:  There are very -- sorry.

23    There are only a couple changes compared to I think

24    what would have been on my original report.

25    BY MR. GRAND:

Nicolette S. Horbach, M.D.

1          Q.   Thank you.  Can you describe those changes

2     for me?

3          A.   There is one additional publication that

4     has come out in 2015 where I'm one of the coauthors.

5          Q.   Okay.  What's the name of that article?

6          A.   The -- sorry.  The article is called

7     "Ureteral Compromise in Laparoscopic versus Vaginal

8     Uterosacral Ligament Suspension."

9          Q.   Okay.  And what journal is that published

10     in?

11          A.   It's published in Female Pelvic Medicine

12     and Reconstructive Surgery.

13          Q.   Okay.  Thank you.  And I think you said

14     there was another change --

15          A.   The only other change --

16          Q.   -- to the CV?

17          A.   The only other change is that I will be

18     serving as a expert reviewer for research grant

19     applications for the NIH regarding the Pelvic Disorder

20     Treatment Network grant fund applications.

21          Q.   Okay.  And is that an appointment by the

22     NIH or is that something you had to apply for?

23          A.   No, I was asked by the -- I was contacted

24     and asked by the NIH to serve as a special reviewer.

25     I've done that previously.

Nicolette S. Horbach, M.D.

1          Q.  Okay.  Is that typically something that --

2     is there a term that's served for that or is that an

3     indefinite role?

4          A.  The appointment is for specific grant

5     proposals, so it's specifically regarding this

6     particular project for a five-year pelvic floor or

7     Pelvic Disorder Treatment Network grants for the U.S.

8          Q.  Okay.  And what is a Pelvic Disorder

9     Network?

10          A.  The pelvic floor or Pelvic Disorder

11     Treatment Network is a multicenter collaborative

12     research program that the NIH funds with approximately

13     eight to nine different sites around the country who

14     pursue research in primarily prolapse but also

15     involving stress urinary incontinence or other

16     disorders of the pelvis.

17          Q.  Okay.  So I guess under this -- under the

18     umbrella of this network, researchers will be

19     submitting grant proposals to you to review?

20          A.  Yes, that's correct.

21          Q.  Okay.  And will you be -- are you the sole

22     reviewer or will this be in conjunction with other

23     physicians?

24          A.  Typically it is a committee that reviews

25     the different proposals.  In past experience the

Nicolette S. Horbach, M.D.

1    committee had approximately six reviewers to review

2    the proposals, score them, and then provide the NIH

3    with feedback regarding the priority scoring for who

4    should be funded.

5         Q.  Okay.  With respect to the committee of

6    reviewers, are -- is it comprised of specialists in

7    various areas?

8         A.  Yes, the committee is typically comprised

9    of individuals who may be urogynecologists like

10   myself.  I don't remember if there were any

11   urologists.  Epidemiologists would be potentially

12   involved as well.

13        Q.  I guess my question is, in your role, would

14   you be comfortable signing off on all aspects of a

15   proposal including clinical trial design?

16             MS. WAHRENBERGER:  Objection to the form of

17   the question.  You can answer.

18             THE WITNESS:  It would depend on the

19   specifics of what the issues were whether or not I

20   would be comfortable signing off on them.

21   BY MR. GRAND:

22        Q.  But you don't hold yourself out as an

23   epidemiologist, correct?

24        A.  Correct.

25        Q.  Okay.  Do you hold yourself out as an

1       expert in clinical trial design?

2               MS. WAHRENBERGER:  Objection to the form of

3       the question.  You can answer.

4               THE WITNESS:  I feel that I have a fairly

5       strong background and expertise in that particular

6       area.

7       BY MR. GRAND:

8               Q.  Have you designed randomized control clinical

9       trials before?

10              A.  I have been part of the process of

11      designing them, yes.

12              Q.  Okay.  How many times have you participated

13      in the process of designing a randomized control clinical

14      trial?

15              A.  I can't tell you the specific number.  It

16      was a little bit more during the early stages of my

17      academic career, but a number of times, including

18      submissions of NIH grants myself personally with me as

19      the principal investigator.

20              Q.  Okay.  How many times?

21              A.  I don't recall the specific number.

22              Q.  Less than ten?

23              A.  Yes.

24              Q.  Less than five?

25              A.  I don't know.

Nicolette S. Horbach, M.D.

1        Q.  You had said earlier that there are certain

2   types of documents that you don't keep in your file.

3   Could you describe those types of documents for me?

4        A.  One of the things that was requested was

5   photos of any mesh material that I have ever excised.

6   I don't take photos intraoperatively.  The specimen is

7   sent to the pathologist for documentation and

8   analysis.

9        Q.  Okay.  And have you conducted any research

10  yourself in examining explants, mesh explants?

11       A.  I'm not sure what you mean by "research."

12  Microscopic or --

13       Q.  Yeah.  Well, let's start there.  Have you

14  examined microscopically mesh explants?

15       A.  I have reviewed them with the pathologists

16  in individual patients where I have removed the

17  explants.

18       Q.  Okay.  And when was the last time you did

19  that?

20       A.  It's probably within the last 12 months or

21  so.  We're not having to explant quite as many meshes

22  as we have done in past time periods, so it's a little

23  less frequent now.

24       Q.  Is it your practice to conduct a

25  microscopic examination of all the mesh you explant?

Nicolette S. Horbach, M.D.

1           A.  It's my practice to send those for

2    microscopic analysis and histology.  The pathology

3    department will in the majority of cases run the

4    microscopic analysis.  Occasionally they will -- I've

5    had times where they haven't; they have just done

6    gross identification of it.

7           Q.  Okay.  So how many times have you reviewed

8    mesh explants under a microscope?

9           A.  Dozens.

10          Q.  Dozens?  Do you keep any database or

11   collection of records relating to that?

12          MS. WAHRENBERGER:  Objection to the form of

13   the question.  You can answer it.

14          THE WITNESS:  Database relating to what my

15   findings are of the -- of that?

16   BY MR. GRAND:

17          Q.  Yes.

18          A.  No, I don't.

19          Q.  Yeah.  Okay.  So any findings you may have

20   had you would have been recorded in the patient's

21   individual records?

22          A.  Yes, they -- yes, they may have been

23   recorded in the patient's individual records, yes.

24          Q.  With respect -- what other types of

25   documents would you not have in your file in

Nicolette S. Horbach, M.D.

1        connection with this case?

2                MS. WAHRENBERGER:  Referring to the notice

3        to produce?

4                MR. GRAND:  Yes.

5                THE WITNESS:  The -- we talked previously

6        about I have not submitted any invoices or bills for

7        my services.  We talked about the photographs.  The --

8        I didn't really quite understand the number 7, any

9        documents regarding any conversations I've had with

10       anybody regarding mesh.  That is a little bit broad

11       and/or wasn't really clear to me what, if anything, I

12       was supposed to produce for that.

13       BY MR. GRAND:

14               Q.  Have you billed for your time in the Wicker

15       case?

16               MS. WAHRENBERGER:  Excuse me.  Just before

17       you move on, Mr. Grand, I know the doctor was still

18       looking at Exhibit A.  So if you want to know whether

19       there are any other portions of Exhibit A that she

20       would not keep in a file, you've interrupted her

21       response.

22               MR. GRAND:  I'm sorry.  I thought she was

23       done.  She was silent.  So it's a little hard for me

24       to see.

25               MS. WAHRENBERGER:  Okay.

Nicolette S. Horbach, M.D.

```
1    BY MR. GRAND:

2        Q.  I'm sorry, doctor.  Please go on.

3            MS. WAHRENBERGER:  All right.

4            THE WITNESS:  Sorry.  I was silently

5    reviewing, going through to make sure that I had

6    included any of this.

7            I think that the majority of this is listed

8    in -- in either the thumb drive, the literature,

9    et cetera.  I have not communicated with any other

10   defendants' experts, I believe was number 16.  There

11   isn't any communication for me to provide.

12           The number 15 is difficult for me to provide

13   you for presentations or lectures, primarily because

14   my computer that had any of that on it died within the

15   last six or eight months, and I have no access to

16   that, and I do not have any lectures that I've given

17   since on the new computer.

18           I have testified in front of a Congressional

19   hearing regarding funding for or trying to advocate

20   for funding for research in our field, including

21   urinary incontinence.  I never received any transcript

22   and wouldn't even have the faintest idea how to

23   actually find that, and that was over ten years ago.

24   So that part I, unfortunately, can't give you.

25           I think the rest of the information I have here
```

Nicolette S. Horbach, M.D.

```
1    with me or it's on the thumb drive.

2              MS. WAHRENBERGER:  Look at 17.

3              THE WITNESS:  17 is -- oh, 17, no, I do not

4    advertise my services as an expert in any way or

5    website or anything like that, no, I do not.

6    BY MR. GRAND:

7         Q.  Are you finished, doctor?

8         A.  I think I've gone through them all.  If

9    there's anything specifically, we can go back to it.

10        Q.  Okay.  Thank you.  I think you can set that

11   aside.

12             With respect to the Wicker case, have you

13   billed for your time in that case?

14        A.  No, I have not.

15        Q.  And the Schubert case?

16        A.  No, I have not.  Much to my husband's

17   chagrin, but, no, I have not.

18        Q.  I'm sure defendants appreciate you

19   providing your services for free.

20             When did you start working on the Wicker case?

21             MS. WAHRENBERGER:  Wicker?

22   BY MR. GRAND:

23        Q.  Yes.

24        A.  You're asking about Wicker?

25        Q.  Yes.
```

Nicolette S. Horbach, M.D.

```
1              A.  I believe it was sometime in 2012, where I

2       was first contacted to determine if I would be

3       interested in serving as an expert witness or expert

4       reviewer, shall we say.

5              MS. WAHRENBERGER:  You answered the

6       question.

7       BY MR. GRAND:

8              Q.  And when did you begin working on the

9       Schubert case?

10             A.  I believe the Schubert case was sometime in

11      2013.

12             Q.  So you've been consulting with defendants

13      since 2012 and have not billed them yet?

14             A.  I'm not a very good business person.

15      That's correct; I have not billed them yet.

16             Q.  Have you entered into any consulting

17      agreements with Ethicon?

18             A.  I don't know whether this is considered

19      consulting agreement or not where I'm serving as an

20      expert.  So obviously I have the agreement that I'm

21      reviewing as an expert.  In the past I have attended

22      one focus-type group as a consultant but do not have

23      any specific consulting agreement with Ethicon.

24             Q.  Okay.  And was that in 2001?

25             A.  Yes, I believe so.
```

Nicolette S. Horbach, M.D.

1          Q.  Okay.  Have you ever served as a proctor or

2     a preceptor for Ethicon for any of its products?

3          A.  No, I have not.

4          Q.  Have you ever consulted with Ethicon in

5     regards to any of its clinical trials of its products?

6          A.  No, I have not.

7          Q.  Other than as a litigation consultant and

8     the focus group from 2001, which you've mentioned,

9     have you consulted with Ethicon in any way?

10         A.  No, I have not.

11         Q.  Over the years have you had any interaction

12    with any employees from Ethicon or developed any

13    professional relationships with employees from

14    Ethicon?

15              MS. WAHRENBERGER:  Beyond what we've

16    already discussed?

17              MR. GRAND:  Yes.

18              MS. WAHRENBERGER:  Focus group and the

19    expert work?

20              MR. GRAND:  Yes.

21              THE WITNESS:  I have seen Ethicon reps at

22    our national meeting in the exhibits hall and/or have

23    seen them at times in the operating room.

24    BY MR. GRAND:

25         Q.  You had Ethicon reps in the operating room

Nicolette S. Horbach, M.D.

```
 1        when you were performing surgeries?

 2             A.  I don't know that I've had them actually in

 3        the operating room with me rather than in the sort of

 4        general operating area.  I -- Ethicon also has other

 5        products that we use in the operating room that are

 6        not mesh or related for incontinence, et cetera, so

 7        some of my dealings with the Ethicon reps may be more

 8        related to that versus this particular thing, but I do

 9        not recall anytime where I've specifically had an

10        Ethicon rep in the operating room when I was

11        performing something like a TVT.

12             Q.  Okay.  Why would you have an Ethicon

13        representative in the operating room for any reason?

14             MS. WAHRENBERGER:  Well, objection.  I

15        think you're mischaracterizing her testimony.  She

16        said she didn't.

17             MR. GRAND:  Well, she started out saying

18        she's had them in the operating room, so --

19             THE WITNESS:  No, that's -- no, that's --

20        I'm sorry.  Then I mis -- I misspoke or misunderstood.

21        I've had them in the overall operating -- I've

22        interacted with them in the overall operating area in

23        like the hallway, or occasionally when we are looking

24        at a new product or the hospital is looking at a new

25        product, they will have them in the hallway to show
```

Nicolette S. Horbach, M.D.

```
 1    you what this cauterizing device does versus the one

 2    we traditionally use, if they are negotiating

 3    contracts, things like that.  So it was more -- that's

 4    sort of what I mean from the operating room rather

 5    than specifically in the operating room itself.

 6    BY MR. GRAND:

 7         Q.  Okay.  Thank you.  Have you had Ethicon

 8    sales reps visit you at your office or at your

 9    practice?

10         A.  Possibly, but I don't know for sure nor do

11    I know really who they are or what their names are.

12         Q.  Can you provide the names of any Ethicon

13    employees with whom you've interacted over the years?

14         A.  No, I don't have that -- that type of

15    relationship nor has it been a continuous person at

16    any point.

17         Q.  Have you attended any meetings sponsored by

18    Ethicon over the years?

19         A.  I'm not quite sure what you mean.  I mean,

20    the focus group was, I suppose, sponsored by Ethicon.

21    Our national meetings, whether at AUGS or SGS,

22    occasionally these -- those companies will be a, I

23    don't know, a contributor or whatever you say, I don't

24    know what you call it, for helping to underwrite maybe

25    the costs of the meeting.  So in that sense I probably
```

Nicolette S. Horbach, M.D.

```
 1      have attended something, but nothing specifically

 2      where I've gone just for that particular meeting and

 3      that's just sponsored by Ethicon.

 4              Q.  Have you ever spoken or given presentations

 5      about Ethicon products?

 6              A.  Not specifically regarding Ethicon

 7      products.  I -- yeah, not specifically regarding

 8      Ethicon products.  I may have discussed that Prolift

 9      was a treatment option for prolapse when I'm giving a

10      generalized discussion about prolapse in a grand

11      round, something like that, but ...

12              Q.  Do you know whether Ethicon has ever

13      promoted you to patients as a surgeon who uses their

14      products such as the TVT or the Prolift?

15              A.  I do not know that.

16              Q.  Have you heard of the Find-a-Doc program?

17              A.  Yes, I have, and I'm not listed on that, at

18      least when I just recently looked, because that's the

19      first time I've heard about it.

20              Q.  Have you -- do you know if you've ever been

21      listed on it?

22              A.  No, I don't.

23              Q.  Doctor, do you currently use the TVT

24      Retropubic device?

25              A.  No.
```

Nicolette S. Horbach, M.D.

1          Q.  When was the last time you implanted a TVT

2     Retropubic?

3          A.  It's probably been over five years, as I

4     use the TVT Exact at this point now.

5          Q.  When was the first time you implanted a TVT

6     Retropubic?

7          A.  I believe it was sometime in 2002 or 2003.

8          Q.  In 2003 did you begin using Boston

9     Scientific slings exclusively?

10          A.  Boston Scientific?

11          Q.  Yes.

12          A.  No, not that I know of or not that I

13     recall.

14          Q.  How often did you -- was the TVT -- was the

15     TVT Retropubic your preferred sling for patients at

16     any time?

17          A.  Yes, in the early times when I first

18     started doing the minimally invasive sling procedures.

19          Q.  That would be 2002?

20          A.  2002, 2003, as I mentioned.

21          Q.  And what other midurethral slings did you

22     use at that time?

23          A.  The only midurethral slings that I have

24     used are the TVT Retropubic, the TVT Exact, the Boston

25     Scientific Advantage, and I've implanted one SPARC

Nicolette S. Horbach, M.D.

```
 1      when the hospital had none of the other ones that I

 2      wanted to use -- they had run out.

 3           Q.  Prior to using TVT Exact, which I believe

 4      you said you started using that about five years ago,

 5      was the Boston Scientific Advantage your preferred

 6      sling?

 7           A.  I don't remember exactly when I

 8      transitioned to using the TVT Exact, but there was a

 9      period of time in the middle where I did use Boston

10      Scientific more often.

11           Q.  Would it be fair to say that from the time

12      you started using the TVT in 2002 or 2003, that you've

13      used it with decreasing frequency up until the time

14      you started using the TVT Exact?

15           MS. WAHRENBERGER:  Objection to the form of

16      the question.  You can answer.

17           THE WITNESS:  If I understand your question

18      to be that have I used the TVT Retropubic with

19      decreasing frequency, there was a period of time, yes,

20      where I transitioned to not using it.  So I guess

21      that's decreasing frequency.

22      BY MR. GRAND:

23           Q.  And by that you mean you transitioned to

24      the Boston Scientific sling, correct?

25           A.  Boston Scientific sling or the TVT Exact.
```

Nicolette S. Horbach, M.D.

1          Q.  What treatment options do you presently

2     offer for a patient with stress urinary incontinence?

3          A.  Are you asking surgical or nonsurgical or

4     both or ...

5          Q.  Let's go through both.

6          A.  I first discuss with patients nonsurgical

7     treatment options.  That includes evaluating and

8     adjusting behavioral habits, such as fluid intake,

9     frequency of voiding, habits relative to voiding

10     before exercise, other changes that I think would

11     improve their stress incontinence.

12          I offer them the alternative that, if it's not

13     bothering them enough, that they don't necessarily

14     have to treat it at all.  I offer them trying to use

15     something like pelvic floor exercises to improve their

16     muscular tone, if they are already able to at least

17     generate some type of pelvic floor contraction and

18     their symptoms are -- tend to be more isolated for

19     leakage that occurs with cough or sneeze, more brief

20     exposure for a leakage episode rather than per se

21     exercise.

22          I offer them vaginal support devices, whether

23     that is a incontinence ring, incontinence dish, ring

24     pessaries, a simple o.b. brand tampon to provide

25     support for the urethra.

Nicolette S. Horbach, M.D.

```
 1              Those are -- I don't use medications for stress

 2       incontinence, since duloxetine, although it has

 3       effectiveness, is almost never covered by their

 4       insurance plan, and the out-of-pocket expenses are

 5       typically too high for them to pay out of pocket.

 6              That would include primarily the surgical -- I

 7       mean nonsurgical issues.  I do tell them, if they are

 8       leaking with running only, that perhaps swimming might

 9       be a better exercise since it's going to reduce their

10       likelihood of leaking.

11              Then I discuss with them surgical treatment

12       options as well.  The surgical treatment options that

13       I include are periurethral bulking agents, midurethral

14       sling procedures.  I discuss with them -- oh, actually

15       suburethral plication, which would be more like a

16       traditional Kelley-Kennedy type plication with

17       sutures.

18              I discuss with them Burch or retropubic

19       urethropexies.  I at times will discuss with patients

20       an autologous usually rectus fascial sling in select

21       patients where I think that that type of option is

22       appropriate.

23              Q.  Do you recommend midurethral slings as a

24       first-line option for your patients?

25              A.  First-line surgical option?
```

Nicolette S. Horbach, M.D.

1        Q.  Strike that.  Let me go back a little bit.

2        You typically recommend a surgical treatment as

3    your first-line option for patients with SUI.

4        A.  No.

5        Q.  Would it be fair to say that you would

6    counsel them as to more conservative treatments before

7    recommending surgery?

8        A.  Yes.

9        Q.  With respect to surgical treatments, do you

10   recommend midurethral slings as a first-line treatment

11   option?

12       A.  It depends on the patient's specific

13   situation, medical factors, anatomy, other risk

14   factors, whether or not I would choose that as my

15   first choice -- first-line recommendation.

16       Q.  Okay.  Under what circumstances would you

17   not recommend a midurethral sling as a first-line

18   treatment option?

19       A.  If a patient has a history of treatment for

20   a urethral diverticulum or urethral fistula; if she

21   has had a prior sling procedure with a synthetic

22   material and has had problems with it or had it

23   partially resected; if a patient has no evidence of

24   urethral hypermobility on her examination; if a

25   patient has significant voiding dysfunction or

Nicolette S. Horbach, M.D.

```
 1    elevated post-void residual; if a patient has mixed

 2    urinary incontinence with a primarily urge component

 3    more than a stress component.  Those are typically the

 4    situations under which I would not suggest a

 5    midurethral sling.

 6           Q.  So if a patient came to you and had mixed

 7    urinary incontinence but their primary symptoms were

 8    more urge incontinence rather than stress urinary

 9    incontinence, you would not recommend a midurethral

10    sling?

11           MS. WAHRENBERGER:  Objection to the form of

12    the question.  You can answer.

13           THE WITNESS:  I would not recommend that as

14    my primary -- necessarily as my primary approach.  I

15    might discuss with them an option, but I wouldn't

16    necessarily say that's, you know, the number one

17    choice that I would end up doing right off the bat.

18    BY MR. GRAND:

19           Q.  What would be your number one choice doing

20    right off the bat?

21           MS. WAHRENBERGER:  With urge incontinence?

22           THE WITNESS:  If a patient had mixed

23    incontinence with primarily a urge component, actually

24    I would try to treat the urge incontinence and resolve

25    that before I would even consider any type of surgical
```

Nicolette S. Horbach, M.D.

1    intervention for the stress incontinence.  As some

2    patients, if you resolve the urge incontinence, the

3    stress incontinence component is fairly minor and they

4    may not choose any type of further treatment.

5    BY MR. GRAND:

6         Q.  Can a midurethral sling worsen urge

7    incontinence?

8         A.  Yes, it can in some women.

9         Q.  And when you make a recommendation to a

10   patient for a surgical option to treat their stress

11   urinary incontinence, you're weighing the risks and

12   benefits of that procedure for that patient, correct?

13        A.  Yes, for -- that's true for any surgical

14   patient you're weighing risks and benefits.

15        Q.  And when you recommend a mesh procedure

16   as opposed to other surgical options, that is in

17   your view because one mesh may be preferable for that

18   patient than another, correct?

19            MS. WAHRENBERGER:  Objection to the form of

20   the question.  You can answer.

21   BY MR. GRAND:

22        Q.  Strike that.  Let me re-ask it.

23        A.  Yeah, I'm not sure I understood that.

24        Q.  It was a poor question.  I'll try to do

25   better.

Nicolette S. Horbach, M.D.

```
 1              When you recommend a mesh procedure to a
 2     patient as opposed to other surgical options, that's
 3     because in your view the mesh product is a better
 4     option for them than another surgical procedure,
 5     correct?
 6              MS. WAHRENBERGER:  Objection to the form of
 7     the question.  You can answer it.
 8              THE WITNESS:  It's not necessarily that the
 9     mesh product is a better option.  It's the overall
10     surgical procedure is a better option for that patient
11     versus perhaps the alternative procedures.
12     BY MR. GRAND:
13         Q.  And when you implant a mesh device, you're
14     not -- it is a procedure as well, correct?
15              MS. WAHRENBERGER:  Objection to the form of
16     the question.  You can answer.
17              THE WITNESS:  To implant a mesh device is a
18     procedure.  It is a surgery, yes.
19     BY MR. GRAND:
20         Q.  And it's a procedure that is different
21     because you're using mesh than other surgical
22     procedures to correct stress urinary incontinence,
23     correct?
24         A.  It is a different procedure for many
25     reasons, including the fact that you are implanting a
```

Nicolette S. Horbach, M.D.

```
 1     mesh product, but that's not the only difference

 2     between those minimally invasive slings and other

 3     surgeries.

 4          Q.  Okay.  Thank you.  And if you were to

 5     recommend one mesh product to a patient over another

 6     mesh product, is that because you view one product as

 7     being more beneficial to that patient than the other?

 8               MS. WAHRENBERGER:  Objection to the form of

 9     the question.  You can answer.

10               THE WITNESS:  I would recommend one type of

11     midurethral -- I may recommend -- let me think.

12          I don't necessarily recommend to a patient one

13     type of midurethral sling over another type of

14     midurethral sling.  I choose to do one type of

15     midurethral sling procedure because of the overall

16     components involved with that procedure.

17     BY MR. GRAND:

18          Q.  Is that another way of saying you prefer

19     certain meshes to others?

20               MS. WAHRENBERGER:  Objection to the form of

21     the question.

22               THE WITNESS:  Again, it's not just the mesh

23     issue.  There are other things about the device or the

24     implantation that I might prefer from one type of

25     procedure versus another, such as, you know, a
```

Nicolette S. Horbach, M.D.

1      bottom-up versus a top-down procedure, a retropubic

2      versus an obturator procedure, the size of trocars,

3      the color of the mesh, the types of sheaths, I mean,

4      the handle on the insertion needle.  All of those I

5      factor in for me when I am choosing a midurethral

6      sling procedure.

7      BY MR. GRAND:

8          Q.  Okay.  And is that because the benefit/risk

9      profile for one procedure may be better for a patient

10     than for -- than another mesh procedure?

11             MS. WAHRENBERGER:  Objection to the form of

12     the question.  You can answer.

13             THE WITNESS:  I don't think the choice of

14     which midurethral sling procedure I do is

15     significantly affected by that component of whether

16     this mesh is better than that mesh.  I think it's more

17     based on the totality of the procedure itself rather

18     than on specifically the mesh as the driving force.

19     BY MR. GRAND:

20         Q.  Do you view certain mesh products or

21     procedures as being better than others for sexually

22     active patients?

23         A.  In my experience I typically prefer a

24     retropubic midurethral sling versus a transobturator

25     sling in someone who might be sexually active or

Nicolette S. Horbach, M.D.

```
 1        interested in future sexual activity.
 2             Q.   Do you view certain mesh products or
 3        procedures as being better for physically active
 4        patients?
 5             A.   I think that perhaps the same preference,
 6        as I just stated, that I would probably, again, prefer
 7        a retropubic approach versus a transobturator approach
 8        for someone who was physically active.
 9             Q.   Doctor, how many TVT Retropubics have you
10        implanted?
11             A.   I --
12                  MS. WAHRENBERGER:  Could I ask for
13        clarification?  Are you including Exact in that since
14        it is a retropubic?
15                  MR. GRAND:  No.  I'm including the TVT
16        Retropubic which is at issue in this case.
17                  MS. WAHRENBERGER:  Okay.
18                  THE WITNESS:  I can't give you a specific
19        number because that was -- it's been a number of years
20        since I have.  I tend to implant approximately a
21        hundred plus midurethral slings per year myself, and
22        in my overall practice of the three individuals we
23        usually implant between three hundred and four hundred
24        midurethral slings per year.  In particular --
25        BY MR. GRAND:
```

Nicolette S. Horbach, M.D.

1          Q.  You say you each do?  I'm sorry.  I didn't

2     mean to interrupt you.

3          A.  No, our practice as a group of three of us

4     usually implant between three hundred and four hundred

5     midurethral sling procedures per year.  One of my

6     partners does pretty much exclusively retropubic

7     slings based on his personal preference of the whole

8     device and the handle and the needles, and one partner

9     is more just, you know, TVT Exact.  I mean, I think

10    it's partially based on -- again, it's not just the

11    mesh that you factor in in making your decision.

12         Q.  Can you make an estimate as to how many TVT

13    Retropubics you implanted in 2002?

14         A.  In 2002 itself?  No, I wouldn't have a

15    clue.  I would be just guessing.

16         Q.  How about in 2003?

17         A.  Again, that was a long enough time period

18    ago that I can't give you the specifics of how many

19    procedures I would have done at that point.  I think

20    that the transition for me of using midurethral slings

21    as my primary treatment began in that 2002 to 2003

22    time period.

23         Ultimately, after a couple years, I used

24    midurethral slings fairly exclusively rather than

25    Burch procedures or traditional suburethral slings.

Nicolette S. Horbach, M.D.

1    So certainly by about 2004-ish, maybe 2004-2005, I

2    probably was, you know, 99% of the incontinence

3    procedures that I was doing at that time would have

4    been midurethral slings.  And during that time period

5    the bulk of them at that point would have been

6    probably the Retropubic TVT, if I recall exactly.

7         Q.  Do you know how many of your -- of the

8    patients in whom you've implanted TVT Retropubics have

9    returned to you with erosions?

10        A.  I have not seen any patient with an erosion

11   from a TVT Retropubic that I've implanted.  I've never

12   had an erosion -- to me at least.

13        Q.  Okay.  And is that qualification based on

14   the fact that there may be patients who have gone --

15   who have sought treatment elsewhere?

16        A.  Correct.  They may have moved to Florida,

17   which a lot of my patients do when they retire, or

18   someplace else, but I have not received request of

19   records from any physicians for -- that I've implanted

20   the TVT Retropubic on -- can't recall any request of

21   records that I would have received that would have,

22   you know, indicated transfer of care.  Again, that was

23   a long time ago, so it's hard to remember

24   specifically.

25        Q.  And would that be true -- what about

Nicolette S. Horbach, M.D.

```
 1      dyspareunia?  Do you know how many of your patients in

 2      whom you've implanted the TVT Retropubic have returned

 3      to you with dyspareunia?

 4            A.  I have seen a few patients who will present

 5      with dyspareunia.  The majority of those patients have

 6      had concomitant other procedures done at the same time

 7      as the midurethral sling.  And I certainly know that I

 8      have not had to go back and remove any -- any

 9      midurethral sling regardless of which product for pain

10      or dyspareunia, none -- not that I have implanted.

11            Q.  Have you had to remove a TVT-R that you've

12      implanted for any other reason?

13            A.  I have reoperated to release a TVT or

14      midurethral sling in a small number of women because

15      of, let's say, voiding difficulties, either slow

16      stream or perhaps elevated post-void residuals.  I

17      have had that where I've primarily divided the sling

18      rather than actually removed the sling.

19            Q.  And how many times have you had to do that?

20            A.  I have done that in 12 patients, although I

21      can't give you the specifics of which exact sling they

22      were.  It's more likely -- yeah, I'm not sure which

23      specific slings that they had done.

24            Q.  How many Boston Scientific slings have you

25      implanted over the years?
```

Nicolette S. Horbach, M.D.

```
 1              A.  I don't know.

 2              Q.  Hundreds?

 3              A.  Yeah, probably hundreds, in that category.

 4              Q.  When was the last time you implanted a

 5   Boston Scientific sling?

 6              A.  Within the last two weeks or so.

 7              Q.  Do you track complications among patients

 8   in whom you've implanted the TVT Retropubic device?

 9   Strike that.

10              Do you track complications among any of your

11   patients in whom you've implanted midurethral slings?

12              A.  Yes.

13              Q.  Do you keep a database?

14              A.  I keep a record of those particular

15   patients with these particular complications, yes.

16              Q.  And in what manner is that kept?  Is that

17   kept, for example, on a spreadsheet or do you have a

18   specific database?

19              A.  That type of record is not -- I'm not so

20   computer savvy, so it's actually the old-fashioned way

21   on a piece of paper so -- that I keep a list of

22   patients who I've had as -- if I've had an erosion, if

23   I've had to return to the operating room for a release

24   of a sling for voiding issues.

25              MR. GRAND:  Okay.  Counsel, we're going to
```

Nicolette S. Horbach, M.D.

1    request a copy of that, omitting any patient specific

2    -- patient identifying information.

3              MS. WAHRENBERGER:  Please put it in

4    writing.

5              THE WITNESS:  I'm not sure how I can

6    provide you that --

7              MS. WAHRENBERGER:  We'll worry about that.

8              THE WITNESS:  -- information without

9    patient identification, but, okay.

10             MS. WAHRENBERGER:  You make the request and

11   we'll deal with it.

12             MR. GRAND:  Your counsel --

13   BY MR. GRAND:

14       Q.  Has defense counsel provided you with the

15   names of any lawsuits in which you have been

16   identified as either the implanting physician or the

17   revising physician?

18       A.  Yes.

19       Q.  In that list was it identified for you in

20   which cases you were the identifying -- whether you

21   were the implanting physician or the revising

22   physician?

23       A.  The list did not identify which role I had,

24   no.

25       Q.  Okay.  How many cases were on that list?

Nicolette S. Horbach, M.D.

```
 1              A.  I received a list of two different -- two
 2      different lists, and the total number of patients on
 3      the list are 15.
 4              Q.  And when you say "two different lists,"
 5      what was the difference between the lists?
 6              A.  I was told that one was New Jersey and one
 7      was West Virginia.
 8              Q.  Okay.  And the total between both lists was
 9      15?
10              A.  Yes.
11              Q.  And when you received this list, did you go
12      look in your own records to see what, if any, of
13      those -- if any of those claimants were patients in
14      whom you had implanted an Ethicon device?
15              A.  Yes.
16              Q.  And how many of those patients -- how many
17      of those claimants were ones in which you had
18      implanted the device?
19              A.  Well, there are different Ethicon devices,
20      so that's going to make a difference.  There were two
21      out of the 13 that I did not implant; I was the person
22      that reoperated --
23              Q.  Revised?
24              A.  Revised, thank you, I was trying to think
25      of the word.  -- revised the surgery, so two I know
```

Nicolette S. Horbach, M.D.

```
 1      for that.  There were either two or three on the list
 2      that are Prolift patients.  There are a number of them
 3      on the list who are sacrocolpopexy patients where I
 4      believe the mesh that was used was probably either a
 5      straight Prolene mesh years and years ago or a
 6      Gynemesh type of product, but they did not receive a
 7      midurethral sling or Prolift.
 8              I think there were either four or five patients
 9      on the list who had received midurethral slings.  I
10      have not had time, since I just received the list
11      recently, to determine which sling product was
12      implanted.
13              Q.  Thank you.  With respect to -- strike that.
14              Did you ever receive any training from Ethicon
15      with respect to implanting the TVT Retropubic?
16              A.  No, I did not specifically from Ethicon.
17              Q.  Who did you receive training from with
18      respect to implanting the TVT-R?
19              A.  My partner had been implanting the device
20      for at least a year or more, and he and I scrubbed in
21      the beginning together when I was doing my cases.
22              Q.  And what's your partner's name?
23              A.  Jeffrey Wellgoss.
24              Q.  And so -- I just want to make sure I heard
25      you correctly.  Did you observe him do the procedure
```

Nicolette S. Horbach, M.D.

1    or did you participate in doing the procedure with

2    him?

3         A.  Actually both, first observing him do the

4    procedure, and then subsequently doing it with him

5    with the two of us scrubbed together and watching how

6    he did it, having him, you know, recommend how I would

7    do it, yes.

8         Q.  Okay.  And did you do that more than once with

9    him?

10        A.  Yes.

11            MS. WAHRENBERGER:  Objection.

12            THE WITNESS:  Yes.

13   BY MR. GRAND:

14        Q.  Okay.  How many times did you observe or

15   participate with him in doing a procedure before you

16   did one yourself?

17        A.  It was less than -- somewhere between

18   probably three to five.  I don't recall specifically.

19   Again, it was a long time ago.

20        Q.  At the time that you first implanted a

21   TVT-R -- sorry, TVT Retropubic -- would you -- did you

22   consider yourself to be an experienced pelvic floor

23    surgeon?

24        A.  Yes, I did at that time, yes.  Still do.

25        Q.  I wasn't questioning your experience,

Nicolette S. Horbach, M.D.

```
1        doctor.

2                    MS. WAHRENBERGER:  Yes, you were.

3                    MR. GRAND:  Not at all, and I don't

4        appreciate the comments, counsel.

5                    MS. WAHRENBERGER:  It's just what the

6        question was.  That's all right.

7                    MR. GRAND:  I asked her if at the time she

8        considered herself one.

9        BY MR. GRAND:

10               Q.  This is going back to 2003, correct?

11               A.  Correct.

12               Q.  Okay.  Do you believe there is a learning

13       curve associated with implanting the TVT Retropubic?

14               A.  I think there's a learning curve with any

15       surgical procedure, including that, yes.

16               Q.  How many times did you need to perform the

17       procedure before you felt proficient at it?

18               A.  For me, I don't think that it took very

19       many procedures before I felt comfortable in part

20       because I had been doing sling procedures and needle

21       suspension procedures for over 15 years previously, so

22       that the dissection, the retropubic space and the

23       passage of the instruments, tensioning of the sling,

24       et cetera, was something that I was quite familiar

25       with.
```

Nicolette S. Horbach, M.D.

```
 1              Q.  Okay.  Thank you.  With respect to

 2      synthetic midurethral slings, was the TVT Retropubic

 3      the first one you had used?

 4              A.  The first synthetic midurethral sling, yes,

 5      not the first synthetic sling.

 6              Q.  Okay.  Thank you.

 7              MR. GRAND:  Let's mark as Exhibit 2 your

 8      Expert General Report dated July 9, 2014.

 9              (Exhibit 2 was marked for identification.)

10              MS. WAHRENBERGER:  Before we start on that,

11      may I take a quick break?

12              MR. GRAND:  Absolutely.  Why don't we take

13      a ten-minute break.

14              VIDEO SPECIALIST:  The time now is 11:18.

15      We're going off the record.  This is the end of disc

16      1.

17              (Proceedings recessed.)

18              VIDEO SPECIALIST:  The time now is 11:35.

19      We are back on the record.  This is the beginning of

20      disc 2.

21      BY MR. GRAND:

22              Q.  Doctor, I believe before the break you were

23      given what's been marked as Exhibit 2, which is your

24      general report dated July 9th, 2014, correct?

25              A.  Correct.
```

Nicolette S. Horbach, M.D.

 1          Q.   When did you first begin working on this

 2     report?

 3          A.   Approximately a year prior to that time

 4     period.

 5          Q.   So roughly July 2013?

 6          A.   July, August, something around there, yes.

 7          Q.   And how many hours did you spend preparing

 8     this report?

 9          A.   The total number of hours is probably

10     60-ish or so.

11          Q.   And what was your hourly rate for preparing

12     your report?

13          A.   I charge $500 an hour.

14          Q.   And I'd like you to have what's marked as

15     Exhibit 3 the December 15th, 2015 supplemental report

16     that you prepared.

17          (Exhibit 3 was marked for identification.)

18     BY MR. GRAND:

19          Q.   Do you see that?

20          A.   Yes, I have it.

21          Q.   Okay.  And when did you begin working on

22     that report, the report you now have in front of you

23     dated December 15th?

24          A.   It was probably three or so weeks ago,

25     right around Thanksgiving.

Nicolette S. Horbach, M.D.

1          Q.   And how many hours would you say you spent

2     preparing this report?

3          A.   That one I can pretty much tell you -- 48

4     hours.

5          Q.   And that's at the same rate of $500 per

6     hour?

7          A.   Yes.

8          Q.   Doctor, in your report you've offered

9     opinions about the risk/benefit profiles of the TVT

10    Retropubic, correct?

11         A.   Yes.

12         Q.   Would you agree with me that for you to

13    offer a valid opinion about the risk/benefit profile

14    for the TVT Retropubic that you need to be familiar

15    with each of the risks of the product?

16              MS. WAHRENBERGER:   Objection, but you can

17    answer.

18              THE WITNESS:   Each of the, yeah, each of

19    the significant or relevant risks, yes.

20    BY MR. GRAND:

21         Q.   What do you mean by "relevant risks"?

22         A.   I think that the risks that would be

23    applicable to my decision as a clinician of whether or

24    not this was a procedure that I wanted to offer and

25    essentially do for my patients.

Nicolette S. Horbach, M.D.

1          Q.  Are there risks of the TVT Retropubic that

2     you think are not relevant to that consideration?

3          A.  I think there are risks that have been

4     alleged in the plaintiff's experts' reports that I

5     don't think are relevant risks in making my decision.

6          Q.  To decide whether the risks are relevant or

7     irrelevant, would you need to be familiar with those

8     risks?

9               MS. WAHRENBERGER:  Objection to the form of

10    the question.

11              THE WITNESS:  Yes, I would expect that's

12    the case, yes.

13    BY MR. GRAND:

14         Q.  In your report you've also expressed

15    opinions about the adequacy of the warnings for the

16    TVT Retropubic, correct?

17         A.  Yes.

18         Q.  Have you offered warnings opinions in

19    litigation before?

20         A.  Not that I can recall.  Okay.  Just making

21    sure I understand your question.  Have I offered

22    testimony about the, whatever, appropriateness of

23    written warnings in -- in testimony before; is that

24    what you're asking?

25         Q.  Yes.

Nicolette S. Horbach, M.D.

1          A.  Not relative to a product but relative to

2    consents.

3          Q.  You're talking about the consent process in

4    MedMal cases that you've testified in?

5          A.  Yes, that's a written warning or a

6    discussion regarding warnings, risks of the

7    procedures.

8          Q.  Okay.  Have you ever offered warning

9    opinions in connection with drugs or medical devices

10   in litigation before?

11         A.  Yes, I have, relative to the Prolift in my

12   prior two depositions.

13         Q.  Have you testified in court concerning the

14   adequacy of warnings for the Prolift?

15         A.  No.  As I said, I've not -- both cases have

16   settled, so I have not been in court.

17         Q.  Do you know whether the judges in those

18   cases determined whether you were qualified to give

19   such opinions?

20         A.  I don't know that.

21         Q.  In formulating your warnings opinions in

22   this case what standards did you apply?

23         A.  I applied the clinical standards for

24   determining -- determining how much information is

25   necessary or not necessary in a written document

Nicolette S. Horbach, M.D.

1      versus the current information that was in the medical

2      literature regarding the potential complications of

3      incontinent surgeries with or without the use of other

4      synthetic mesh materials.

5              Q.   Okay.  Whose clinical standards were those?

6              A.   Those are the clinical standards based on

7      my position in national organizations of having

8      written guidelines for education and training.  Those

9      are based on my work with having been recognized as an

10     expert by the American Board of Ob/Gyn, The American

11     College of Obstetrics and Gynecology, the NIH, The

12     American Urogynecologic Association, and -- so, yeah,

13     I think that -- it's that type of expertise.

14             Q.   Okay.  So I didn't ask expertise.  I'm

15     asking about standards, doctor.  Did you apply your

16     own personal standards in deciding whether the

17     labeling was adequate?

18             MS. WAHRENBERGER:  Objection, asked and

19     answered.

20             THE WITNESS:  I applied --

21     BY MR. GRAND:

22             Q.   You can answer.

23             A.   I applied what I believed to be the

24     clinical medical standards in the community -- in the

25     medical community for our field.

Nicolette S. Horbach, M.D.

1          Q.  Okay.  Are those published anywhere?

2          A.  No.

3          Q.  Did you consult any published standards

4      in formulating your warnings opinions?

5          A.  No.

6          Q.  Did you consult any FDA guidance documents

7      with respect to warnings for medical devices?

8          A.  No.

9          Q.  Did you look at any Ethicon internal

10      standards for warnings on medical devices?

11          A.  No.

12          Q.  Did you review any testimony from Ethicon

13      employees who had labeling responsibilities for the

14      TVT?

15          A.  I've seen some internal documents and/or

16      email things going back and forth, but I don't know

17      that I've specifically seen deposition testimony

18      regarding Ethicon employees.

19          Q.  Have you consulted with any drug or device

20      company on product labeling for their products?

21          A.  For product labeling?  No.

22          Q.  Have you ever been asked by a regulatory

23      agency to consult with them on product or device

24      labeling?

25          A.  I know that I had at one point done some

Nicolette S. Horbach, M.D.

```
 1        work with the FDA regarding device issues, but I can't

 2        recall whether that part is -- was specifically part

 3        of it or not, and it was a long time ago.

 4              Q.  Do you remember the name of the device that

 5        was involved?

 6              A.  I don't know whether it was when we were

 7        evaluating Miniguard or one of the bladder neck

 8        prosthesis or whether it was something even outside

 9        of, you know, urogynecology.  I seem to remember

10        something; I just can't tell you the specifics.

11              Q.  Did you consult any industry standards for

12        medical device labeling?

13              A.  No, I did not.

14              Q.  Is your opinion regarding the adequacy of

15        the labeling for the TVT Retropubic based on what you

16        believe would be adequate in your own medical practice

17        based on your own experience?

18              MS. WAHRENBERGER:  Objection to the form of

19        the question.

20              THE WITNESS:  No.

21     BY MR. GRAND:

22              Q.  You can answer.

23              What else did you base the adequacy -- what

24        else did you base your opinions on regarding the

25        adequacy of the TVT Retropubic labeling?
```

Nicolette S. Horbach, M.D.

```
 1              MS. WAHRENBERGER:  Objection, asked and

 2         answered.

 3              THE WITNESS:  I think -- I think I have

 4         answered that, but the -- one aspect of the IFU states

 5         that physicians who are using this product or device

 6         to do a surgical procedure for stress incontinence

 7         specifically specifies that the implanting physician

 8         has experience, familiarity, understands the issues

 9         involved with the treatment of stress incontinence

10         surgically and the issues involved with the use of a

11         synthetic mesh product, and based on the literature

12         that was available prior to -- at the time where the

13         TVT Retropubic was being marketed or put out,

14         essentially all of the risk issues that are involved

15         with the TVT Retropubic were already known risk

16         factors for either surgeries for stress incontinence

17         with or without the use of a synthetic mesh.

18              Therefore, the physician who is implanting

19         this, to be appropriately doing that surgery and

20         especially having the expertise and treating stress

21         incontinence and using mesh, would have been

22         familiar -- even if they had never read a single

23         portion of the IFU -- would have been familiar with

24         those risks that were outlined in the original IFU or

25         that the plaintiff's experts have said should have
```

Nicolette S. Horbach, M.D.

1        been included in the IFU.

2              Q.   Okay.   Is -- are your warnings opinions

3        in this case based on an assumption about what other

4        doctors should have known?

5                   MS. WAHRENBERGER:   Objection to the form of

6        the question.

7                   THE WITNESS:   Well, it's not -- I mean, the

8        issue is your -- I mean, I obviously can't determine

9        what is in someone's brain, but if you are implanting

10       a mesh device and you're doing an incontinent surgery,

11       then you shouldn't really be doing it unless you know

12       those risks going in even based on the literature that

13       was already out there that detailed the risks.

14             There isn't anything specifically different for

15       the midurethral sling or the TVT Retropubic risks that

16       had not already been addressed in the medical

17       literature regarding stress incontinence surgery or

18       mesh use.

19       BY MR. GRAND:

20             Q.   What about contraction as a result of the

21       mesh?

22             A.   That was known in the literature from prior

23       synthetic urethral slings -- prior synthetic

24       suburethral slings that have been done starting in the

25       early 1960s.

Nicolette S. Horbach, M.D.

```
 1              Q.  Okay.  So your warnings are premised on an

 2        assumption that all doctors would have been aware of

 3        all the literature out there, correct?

 4              MS. WAHRENBERGER:  Objection.

 5              THE WITNESS:  Again, the issue is that -- I

 6        mean, it's sort of -- somewhat of a ridiculous

 7        question in that the surgeon who is implanting this

 8        has to have the understanding and expertise of doing

 9        the surgery; otherwise, they shouldn't really be doing

10        the surgery.

11              So that's not my position nor Ethicon's nor,

12        you know, anyone else's position to tell the physician

13        yes or no, you have the knowledge base.  I mean,

14        there's not a checklist that you have to go through

15        saying do you know this, do you know this, do you know

16        this before you can actually do an operation.  That's

17        dependent upon the individual physician making the

18        personal assessment that they do or do not have that

19        information.

20              And I don't think that it is the obligation of

21        a company to ensure that the physician has that

22        knowledge base to go forward with the surgery.  That's

23        really the role of a credentialing body of a hospital

24        or a certification body for board certification.  It's

25        not the criteria of a company.
```

Nicolette S. Horbach, M.D.

1          Q.  Do you believe the company has an

2     obligation to ensure that doctors are aware of all

3     risks associated with the product and the procedure?

4          A.  I think that the company has a

5     responsibility to inform physicians of any risk that

6     is a new or different risk than what is already out

7     there in the literature regarding similar situations

8     or similar procedures or materials.

9          Q.  Okay.  And that opinion is based on a

10    premise that doctors have knowledge of what's out

11    there in all the literature, correct?

12               MS. WAHRENBERGER:  Objection to the form.

13               THE WITNESS:  Again, you should not -- the

14    doctors, if they are doing the procedure, shouldn't be

15    doing the procedure if they don't have a knowledge

16    about the literature and the data regarding the use of

17    synthetic materials in pelvic reconstructive surgery.

18    I'm not sure how I can answer the question any

19    differently.

20    BY MR. GRAND:

21         Q.  No, that's fine.  Thank you.

22         Do you have opinions regarding the adequacy of

23    the warnings contained in the TVT Retropubic patient

24    brochures?

25         A.  My determination about -- yes, I have an

Nicolette S. Horbach, M.D.

```
 1        opinion.
 2              Q.  Which brochures did you review?
 3              A.  I reviewed from the earliest ones up until
 4        the actually current one that is on the website at
 5        this particular time.
 6              Q.  You have not reviewed Mrs. Corbet's medical
 7        files, correct?
 8              A.  Not her entire medical files, no.
 9              Q.  You've reviewed some of her medical file?
10              A.  Not the medical record itself.  I've
11        reviewed expert -- an expert report by Dr. Rosenzweig
12        regarding her medical history and his IME.
13              Q.  You're not intending to offer opinions
14        specific to the Corbet case, are you?
15              A.  I don't believe so.
16              Q.  Do you understand that you haven't been
17        offered as an expert in this case on the specifics of
18        Kathryn Corbet's medical treatment, correct?
19              A.  That's -- yes, that's why I said I believe
20        so, I'm not going to be offering those opinions.
21              Q.  And you don't know if Kathryn Corbet ever
22        read a patient brochure, do you?
23              A.  No, I do not.
24              Q.  And you certainly -- if she did, you don't
25        know which one she read, correct?
```

Nicolette S. Horbach, M.D.

```
1              A.  Correct.

2              Q.  Do you have any knowledge as to the

3       agreements between Ethicon and Professor Olmsted and

4       his company?

5              A.  I have not seen the agreement, no.

6              Q.  Okay.  Do you know any of the details of

7       that interaction?

8              A.  Only from, you know, very peripherally,

9       that there was a relationship in the development and

10      design of the TVT Retropubic.

11             Q.  Do you intend to offer any opinions at

12      trial on that agreement?

13             MS. WAHRENBERGER:  Objection to the form of

14      the question.

15             THE WITNESS:  I don't think so.

16      BY MR. GRAND:

17             Q.  You don't discuss that in your report at

18      all, do you?

19             A.  No.

20             Q.  Okay.  Have you been involved in any

21      Ethicon clinical studies for any of its mesh products?

22             A.  No.

23             Q.  Are you familiar with the concept of

24      financial bias in a clinical trial?

25             A.  I'm familiar with the terminology, yes.
```

Nicolette S. Horbach, M.D.

1          Q.  What does financial bias in the context of

2     the clinical trial mean to you?

3          A.  Financial biased to me means that the

4     researchers either conduct the trial or report the

5     results of the trial in such a way that distorts/

6     changes the actual results to something different than

7     what they actually are.

8          Q.  Would you agree that, if there is a

9     potential for financial bias, that it should be

10     disclosed in the published article for that trial?

11          MS. WAHRENBERGER:  Objection to the form of

12     the question.  You can answer.

13          THE WITNESS:  I think that the need to

14     disclose any financial relationship is set out by

15     that -- the individual journal or publication

16     regarding the requirements for publishing in that

17     particular journal, and those need to be adhered to.

18     BY MR. GRAND:

19          Q.  Okay.  Independent of whether the journal

20     has any rules regarding that, do you think that a

21     researcher should disclose any potential conflicts of

22     interest in an article that they are publishing?

23          MS. WAHRENBERGER:  Objection to the form of

24     the question.  You can answer.

25          THE WITNESS:  I think that the approach to

Nicolette S. Horbach, M.D.

1     that in the medical literature has changed

2     significantly over the last two decades or so.  A

3     decade or two ago the issues of financial disclosure

4     was typically not something that was done and/or

5     stressed.  I think, as the last years have gone by,

6     that there has been more focus on ensuring that

7     researchers or even speakers list any financial

8     relationship that they have with a company.

9     BY MR. GRAND:

10         Q.  In forming your opinions about the risks

11    and benefits of the TVT Retropubic did you review and

12    consider Ethicon -- the testimony of Ethicon

13    employees?

14         A.  I did not consider the testimony of the

15    Ethicon employees.

16         Q.  Why not?

17         A.  Because my decision regarding the clinical

18    risks and benefits for any particular device or

19    product that I use is based on the information

20    provided in the peer-reviewed scientific literature

21    and not based on company documents.

22         Q.  Do you think Ethicon has a greater

23    knowledge base about the risks and benefits of the TVT

24    higher than you?

25         A.  Than me per se?  Possibly.

Nicolette S. Horbach, M.D.

1          Q.  Do you think Ethicon would have had

2    relevant information to the risks and benefits of the

3    TVT Retropubic that you did not have access to?

4              MS. WAHRENBERGER:  Are we talking a

5    specific time frame?

6              THE WITNESS:  Yeah, I'm -- I'm not -- can

7    you rephrase that question?  I'm sorry.

8    BY MR. GRAND:

9          Q.  Doctor, you would agree that Ethicon has

10   greater access to information about the TVT Retropubic

11   than you do, correct?

12             MS. WAHRENBERGER:  Objection to the form of

13   the question.

14             THE WITNESS:  I think that that is probably

15   true for any device that any physician uses in any

16   field when they are operating versus the company

17   itself.

18   BY MR. GRAND:

19         Q.  Okay.  So information, internal

20   information, that Ethicon had relating to the TVT

21   Retropubic would be relevant to your evaluation,

22   wouldn't it?

23             MS. WAHRENBERGER:  Objection to the form of

24   the question.

25             THE WITNESS:  I would have to see that --

Nicolette S. Horbach, M.D.

```
1       that information to determine whether I think it is

2       relevant or not.

3   BY MR. GRAND:

4           Q.  Did you ask to see any internal Ethicon

5       information relating to the TVT Retropubic?

6           A.  I don't recall that I asked specifically

7       for those documents, as, again, I'm making a decision

8       and my expertise in the clinical use and the clinical

9       risk/benefit profile of the particular surgery and

10      device.

11          Q.  So the testimony of Ethicon employees on

12      this issue is not important to you, correct?

13              MS. WAHRENBERGER:  Objection to the form of

14      the question.

15              THE WITNESS:  I think that the information

16      provided in the peer-reviewed literature regarding the

17      risks and benefits of what has been documented by

18      multiple different investigators, multiple different

19      sites over multiple different time periods and

20      research projects are more important.  Those are what

21      I'm -- more important than what would per se be from

22      Ethicon employee testimony, and that's the decision --

23      or that's the information I would use to make my

24      decision as a clinician.

25  BY MR. GRAND:
```

Nicolette S. Horbach, M.D.

1           Q.   Okay.  You don't actually know whether it's

2    more important because you didn't review Ethicon

3    testimony, correct?

4           A.   I think that it would be very unlikely that

5    there would be anything within the Ethicon testimony

6    that would alter my decision-making regarding the

7    risks and benefits of this particular procedure.

8           Q.   And is the same true of internal Ethicon

9    documents?

10          A.   Yes.

11          Q.   Doctor, in your report you've referenced

12   the term "Gold Standard," correct?

13          A.   Yes.

14          Q.   Okay.  That's not a medical term, correct?

15          A.   Actually it's a term used quite frequently

16   in the medical community.

17          Q.   Do you know the origin of that term?

18          A.   No, not specifically.

19          Q.   Okay.  Can you think of medical procedures

20   that were once considered the gold standard that are

21   no longer considered the gold standard today?

22          A.   Yes.

23          Q.   There are several, correct?

24          A.   Yes.

25          Q.   Doctor, we've marked as Exhibit 4 to your

Nicolette S. Horbach, M.D.

1     deposition a document entitled "Updated Exhibit B to

2     the General TVT Report."

3          (Exhibit 4 was marked for identification.)

4     BY MR. GRAND:

5          Q.  Do you recognize this document?

6          A.  No.

7          Q.  You've never seen this document before?

8          A.  No.

9          Q.  Can you turn to the inside page, I guess

10    the second page?  I don't know if yours -- mine is

11    double-sided.  Do you see it says "Nicolette Horbach

12    Reliance List"?  Do you see that?

13         A.  Yes.

14         Q.  You've never seen this document before?

15         A.  Not in and of itself, no.

16         Q.  You can set it aside.  Thank you.

17         Doctor, you drafted your own report, correct?

18         A.  Yes.

19         Q.  Okay.  And is it fair to say that if I want

20    to -- if I wanted to know the materials you relied

21    upon in formulating your opinions, that they would be

22    contained within the body of your expert report?

23         A.  Most likely, yes.  I think, yes, most

24    likely.  I mean, there is a lot of other material

25    obviously over -- because of my training, education,

Nicolette S. Horbach, M.D.

1    what I see on a day-to-day basis that I used in

2    generating my report that isn't necessarily

3    specifically referenced in that area in the report.

4         Q.   Okay.   I think I understand what you're

5    saying.   Other than your own experience and education,

6    is there anything you've relied upon in formulating

7    your opinions other than the documents cited in the

8    body of your report?

9              MS. WAHRENBERGER:   Objection to the form of

10   the question.

11             THE WITNESS:   Yes.   The studies and

12   documents specifically cited in the report were cited

13   to refer to, let's say, specific statistics or numbers

14   that I was quoting in the report.   There are other

15   studies that I have read over the years and/or more

16   recently that helps to frame my perspective that I may

17   not have specifically cited that particular statistic

18   in my report and reference that particular article.

19             Some of that may be listed in this gigantic

20   list here of reliance issues (indicating), and there

21   were some additional references that I -- or a list of

22   references that I had printed up last night that

23   involved things that even I had pulled up in the last

24   week or so as I was reviewing -- or maybe two weeks or

25   so.

Nicolette S. Horbach, M.D.

```
 1             Q.  Okay.  Doctor, do you understand one of the
 2       purposes of a deposition is that I need to understand
 3       what your opinions are and what you've relied upon in
 4       formulating those opinions?  Do you understand that?
 5             A.  Yes, I do.
 6             Q.  Okay.  Now you've just told me that Exhibit
 7       4, which purports to be your reliance list for your
 8       expert report, you've never seen before, correct?
 9             A.  I said that I've never seen it compiled in
10       such a fashion, that whole compilation in such a
11       fashion.  I have not seen this specific printout, no.
12       That doesn't mean --
13             Q.  Okay.  If I want to know -- I don't mean to
14       interrupt you, doctor.  Are you done?
15             A.  Yes.
16             Q.  Okay.  If I want to know what you've relied
17       upon in formulating your opinions, where am I going to
18       find that material?
19             A.  Either in this (indicating) --
20             MS. WAHRENBERGER:  Referring to Exhibit 4.
21             THE WITNESS:  Sorry, Exhibit 4, in the
22       report itself, or in the list of additional
23       references, which may be duplicate.  Actually there
24       may be some overlap that I have here, that I brought
25       with me today.
```

Nicolette S. Horbach, M.D.

```
 1        BY MR. GRAND:
 2             Q.  Okay.  Is that -- has that list been
 3        produced on the thumb drive?
 4                  MS. WAHRENBERGER:  No, it has not.  It was
 5        brought today by Dr. Horbach to this deposition.
 6                  MR. GRAND:  Okay.  I would ask counsel if
 7        you could make a copy of that list for me and email it
 8        to me?
 9                  MS. WAHRENBERGER:  Sure.
10                  THE WITNESS:  Alternatively, I can, yeah,
11        email it to -- I can just email the list to them and
12        they can forward it to you.
13                  MS. WAHRENBERGER:  Do you want it right
14        now?
15                  MR. GRAND:  Yes.  We can do it during a
16        break perhaps.
17                  MS. WAHRENBERGER:  Okay.  During the lunch
18        break, yeah.
19                  THE WITNESS:  Yeah, if I can just -- if I
20        can get on the Internet, I'll email it wherever you
21        want.
22        BY MR. GRAND:
23             Q.  I would rather have a copy of the list
24        you've brought with you.
25             A.  Sure.  We can fax it.
```

Nicolette S. Horbach, M.D.

```
 1                   MS. WAHRENBERGER:  Yeah.

 2        BY MR. GRAND:

 3             Q.   Now, doctor --

 4                   MS. WAHRENBERGER:  Jeff, give me your fax

 5        number, and we'll see if we can get the law firm to

 6        fax it when we take a break.

 7                   MR. GRAND:  It's 212-584-0799.

 8                   MS. WAHRENBERGER:  Okie-doke.

 9                   MR. GRAND:  Thank you.  I appreciate it.

10        BY MR. GRAND:

11             Q.   Doctor, if you could -- I'm referring to

12        Exhibit 4.  If you look through this list, would you

13        agree with me that a large number of the materials on

14        this list relate to the Prolift product and not the

15        TVT?

16             A.   I would have to start looking through it

17        here to be able to answer that for you.

18             Q.   I apologize, doctor.  The document is not

19        paginated in any way, so it's difficult for me to

20        point you to a specific page.

21             A.   Since it's done alphabetically, you could

22        ask me to look alphabetically.  I mean, I see that

23        there are references here for prolapse as well as for

24        urinary incontinence.

25                   It is my understanding that this list involves
```

Nicolette S. Horbach, M.D.

1       all of the documents that have been forwarded to me at

2       one time or the other from the defense attorneys.

3              Q.   Okay.  And that would be going back as far

4       as 2012, correct?

5              A.   It is -- that's potentially the case, yes.

6       I mean, I don't know what specific criteria they chose

7       versus just the entire list of everything.  Some of

8       this I have read, not read, as I felt appropriate.

9              Q.   Okay.  And is it fair to say that -- well,

10      let's sort of break this down into categories.  The

11      first part of the list contains medical literature,

12      correct?

13             A.   That it appears, yes, correct.

14             Q.   And to make it easier for you, if you look

15      at the heading underneath your name, as you go through

16      the list, it shows the category of document.  Do you

17      see that?

18                  MS. WAHRENBERGER:  Referring to up here.

19      BY MR. GRAND:

20             Q.   Most of the list is comprised of medical

21      literature.

22             A.   Okay.  Yes.  Thank you.

23             Q.   Okay?  Now, with respect to the medical

24      literature, did you collect this medical literature

25      yourself?

Nicolette S. Horbach, M.D.

1          A.   This is a list of medical literature that

2     was forwarded to me, as I mentioned, from the defense

3     attorneys.  Some of these would duplicate articles

4     that I have pulled myself in my own independent

5     research.

6          Q.   Okay.  So with respect to the TVT product,

7     the TVT Retropubic, how did you identify medical

8     literature?

9               MS. WAHRENBERGER:  Objection to the form of

10    the question.

11              MR. GRAND:  Excuse me.  I'll rephrase it.

12    BY MR. GRAND:

13         Q.   With respect to the TVT Retropubic, how did

14    you identify medical literature relevant to your

15    opinions in this case?

16         A.   That is -- there's a lot of -- that's a

17    long process.  I have reviewed or identified medical

18    literature based on several different ways or

19    techniques.  One is based on studies that I know have

20    been published in the literature because I've read

21    them, you know, previously over the years as they have

22    come out, some of which were obviously sentinel

23    studies.

24              Some of the literature that I pulled was based

25    on specific references made in certain articles to

Nicolette S. Horbach, M.D.

1    further data or other discussions that might be

2    similar to the article that I've just reviewed.  Some

3    of the information I pulled that I use based on a

4    fairly extensive review that I did of the topic and

5    the literature in preparation for taking my

6    subspecialty board certification.

7         Some of it is based on going back and pulling

8    articles that the plaintiff's expert has referenced,

9    to go over those articles and any other articles

10   perhaps cited in that as support.  Some of it is

11   involving a lot of time at the computer on PubMed

12   researching based on specific topics, whether it was

13   complications, issues related to reoperation for

14   midurethral slings versus other surgeries, searching

15   out mesh, mesh risk issues, you know, degradation

16   issues, the carcinogen issues, and searching those on

17   PubMed, searching by specific potential complications,

18   whether it's hematoma, dyspareunia, searching based on

19   chronic pain conditions in postoperative patients,

20   searching based on hernias, hernia meshes and some of

21   that literature.

22        I think there's obviously more that I'm -- but,

23   yeah, it's a fairly extensive amount of time in the

24   library.

25        Q.  You testified earlier that you spent

Nicolette S. Horbach, M.D.

1    approximately 60 hours preparing your general report.

2    How much of that time was devoted to research?  How

3    much time was devoted to identifying and reading

4    medical literature?

5            A.  Probably at least two-thirds or so.  I had

6    also, as I said, I just sat for my boards not too long

7    before that, so I had a fairly extensive collection of

8    literature already that I had accumulated and pulled

9    for that.  So sometimes it was re-reviewing articles

10   and data rather than having to pull new articles and

11   data.

12           Q.  And the medical literature that you

13   actually discuss in the body of your report, did you

14   read all those articles carefully?

15           A.  Yes, I believe I read them carefully.

16           Q.  Do you believe you summarized them fairly

17   and accurately in your report?

18           A.  Yes, I believe I did.

19           Q.  And if the medical literature conflicts

20   with your opinions in this case, you would want to see

21   it, correct?

22           A.  I think that I have -- I have still

23   reviewed medical literature that does conflict in my

24   opinion -- I have reviewed medical literature that

25   states an opinion different than perhaps I have, yes,

Nicolette S. Horbach, M.D.

1      I have reviewed that.

2          Q.  And to the extent that there is literature

3      out there that conflicts with your opinion, you would

4      want to see it, correct?

5          A.  Yes, I would want to see it.  I think I

6      certainly have seen it, yes.

7          Q.  Okay.  Do you consider yourself to be an

8      expert with regards to materials science or on the

9      mesh material that's used in the TVT Retropubic?

10         A.  I consider myself an expert in terms of its

11     clinical use as an implanting physician and the

12     subsequent manifestation in the patients clinically,

13     yes.

14         Q.  So you're saying you hold yourself out to

15     be a materials science expert?

16             MS. WAHRENBERGER:  Objection.

17             THE WITNESS:  That's not what I said.  I

18     said --

19     BY MR. GRAND:

20         Q.  No, I'm trying to understand what you said.

21     I asked you if you hold yourself out to be a materials

22     science expert.

23             MS. WAHRENBERGER:  And she responded.

24     BY MR. GRAND:

25         Q.  Okay.  You can answer the question.

Nicolette S. Horbach, M.D.

1              A.  I hold myself as a clinical expert in using

2       a material in mesh within a clinical setting, not in

3       the, necessarily, the biochemistry, shall we say, of

4       materials.

5              Q.  Okay.  Thank you.  In your report you

6       discuss a number of professional society papers and

7       opinions, correct?

8              A.  Yes, I do.

9              Q.  Did you read the references cited in those

10      papers?

11             MS. WAHRENBERGER:  Objection to the form of

12      the question.

13             THE WITNESS:  Can you be more specific?

14      Did I look --

15      BY MR. GRAND:

16             Q.  Well, many -- let me ask you a different

17      question.  Make it a little bit easier.

18             The society papers you discuss in your report,

19      they contain references to various studies, do they

20      not?

21             A.  Yes, they do.

22             Q.  Did you read the studies that were cited in

23      those reports, in the professional society papers?

24             MS. WAHRENBERGER:  Objection to the form of

25      the question.

Nicolette S. Horbach, M.D.

```
 1                    THE WITNESS:  I believe that I have read
 2        the bulk of them.  There might be one that I couldn't
 3        get access to, you know, in our medical library.
 4        There are certain journals that are difficult for us
 5        to get the full article, access to, but I think that
 6        the bulk of them I probably did, yes.
 7        BY MR. GRAND:
 8             Q.  Okay.  Did you satisfy yourself that the
 9        references in the society papers were actually
10        supported -- that the references cited in the society
11        papers actually support the statements contained in
12        the society papers?
13             A.  I think -- I can't answer that without you
14        asking me specifically what statement and what
15        reference.
16             Q.  I'm not asking you about a specific
17        statement or reference.  I'm asking you about your
18        process.  You've cited a number of professional
19        society papers in your report, correct?
20             A.  Yes.
21             Q.  Okay.  Those papers contain references to
22        studies, correct?
23             A.  Yes.
24             Q.  Did you review the underlying studies that
25        are cited in those papers?
```

Nicolette S. Horbach, M.D.

```
 1                 MS. WAHRENBERGER:  Asked and answered.

 2                 THE WITNESS:  As I said, I believe that I

 3        read the bulk of them, yes.

 4        BY MR. GRAND:

 5             Q.  Okay.  Is de novo urge incontinence a risk

 6        associated with the TVT Retropubic?

 7             A.  Yes.

 8             Q.  Is worsening urge incontinence a risk

 9        associated with the TVT Retropubic?

10             A.  Yes.

11             Q.  In your view what causes a mesh exposure?

12             A.  I think that there are multiple factors

13        that are associated with a mesh exposure.  Do you want

14        me -- I assume you want me to -- okay.

15             Q.  Yes, please.  Thank you.

16             A.  Sorry.  I think that there is -- there are

17        issues that are patient-centered or patient-related, I

18        think there are issues that are surgeon-related, and I

19        think that there are issues that are material-related.

20             Q.  Okay.  Let's start with the issues that are

21        patient-related.  Could you describe those for me,

22        please?

23             A.  The -- there are aspects of a patient's

24        either medical history, medical condition or tissues,

25        surgical history, that will affect the quality of the
```

Nicolette S. Horbach, M.D.

1          tissue in the vaginal area where we are operating.

2          Those have been shown in the medical literature and

3          can include issues related to a history of smoking, a

4          history of diabetes.  Obesity has been shown in some,

5          not shown in other aspects of a risk factor.  Age has

6          been shown to be a risk factor.  Prior surgery, prior,

7          let's say, incontinence or prolapse surgery in the

8          area.  Vaginal atrophy, I guess the quality of the

9          tissue has been shown.  I don't remember if I already

10         said smoking.

11                   MS. WAHRENBERGER:  You did.

12                   THE WITNESS:  Okay.  Use of medications

13         that might affect tissue healing, such as steroid

14         medications, may also factor -- be a patient-related

15         factor for mesh exposure.

16         BY MR. GRAND:

17              Q.  And what about surgeon-related?  I'm sorry.

18         Were you done or are there other factors?

19              A.  There probably are other factors that are

20         patient-related that will pop into my head in a minute

21         or two, but those are the ones that are, you know,

22         most commonly the ones that I think about.

23              Q.  Okay.  And what about surgeon-related?

24              A.  Clearly, during surgery the skill and

25         expertise of the surgeon in being able to

Nicolette S. Horbach, M.D.

1    appropriately dissect in the correct tissue plane is

2    important; the ability to correctly pass the

3    instruments or the trocars and to place the material

4    in the correct tissue spaces that it's designed to be

5    placed; the ability of the surgeon to correctly close

6    the incision are going to be factors affecting mesh

7    exposure.

8         There are factors that can happen

9    intraoperatively that are not always per se surgeon

10   skill set.  That's sort of one of those things that

11   sort of happens, such as, you know, exit bleeding,

12   hematoma formation, infected incision line -- what

13   else?  -- if the surgeon has had an unrecognized,

14   let's say, vaginal perforation at the time of the

15   implantation of the device.  Those are factors that

16   can affect the likelihood of an exposure or not.  I

17   think that's mainly the surgical-related factors.

18        Q.  And what would be the material-related

19   factors?

20        A.  The material-related -- actually I can go

21   back for the, I guess, the surgeon-related factors.

22   You know, again, ensuring how much of the mesh

23   material comes in contact with the vaginal epithelium

24   so that obviously more surface area coming in contact

25   with the more superficial tissue in the vaginal

Nicolette S. Horbach, M.D.

1      epithelium will put a larger area to be at risk for

2      erosion.

3              MS. WAHRENBERGER:  And just so it's clear,

4      that was going back to surgeon-related --

5              THE WITNESS:  Yes.

6              MS. WAHRENBERGER:  -- issues.

7              THE WITNESS:  Yes.

8      BY MR. GRAND:

9          Q.  Yeah, that was clear.  Thank you.

10         A.  Okay.  Sorry.  Everything sort of --

11     sometimes it pops in, something different.

12             So relative to materials-related, it is going

13     to be, again, the volume of material that is -- maybe

14     not volume -- probably more even the surface area of

15     material that is coming in contact with the vaginal

16     epithelium, if we're talking specifically about

17     vaginal exposures.  It's going to depend upon -- there

18     is some difference between types of meshes regarding

19     the porosity of the mesh that -- the macroporous, you

20     know, type 1 meshes will be typically less likely to

21     be -- have erosions than the microporous essentially,

22     like a polytetrafluoroethylene type mesh, that has a

23     higher rate of exposure.

24             Again, we've talked just vaginal exposure,

25     correct?

Nicolette S. Horbach, M.D.

1          Q.   Yes.

2          A.   That's what you want?  Okay.

3          Q.   Yes.  Do you have an opinion as to whether

4    the foreign-body reaction caused by the implanting of

5    a mesh, such as the TVT-R, Retropubic, is a transient

6    reaction or a chronic reaction?

7               MS. WAHRENBERGER:  Object to the form of

8    the question.

9               THE WITNESS:  I think that -- sorry.  Can

10   you repeat that?  My brain just went someplace.  It's

11   getting hypoglycemic.

12              MS. WAHRENBERGER:  I was going to say --

13              MR. GRAND:  Do you want to break?  We can

14   break.

15              MS. WAHRENBERGER:  It's between 25 and 20

16   of.  Shall we plan to break around 1:00?  I don't want

17   Dr. Horbach to go too long without having something to

18   eat.

19              MR. GRAND:  I suggest we break now.

20              MS. WAHRENBERGER:  Well, we have a question

21   pending.  Do you want to withdraw the question at this

22   point?

23              MR. GRAND:  I'll withdraw the question and

24   we can pick up after lunch.  I don't want the --

25              MS. WAHRENBERGER:  Okay.  So can we resume

Nicolette S. Horbach, M.D.

```
 1        at 1:00 or do you need more time?
 2               Do you think you need more time?
 3               THE WITNESS:  No, I'm fine.  We just got to
 4        find someplace that is going to be --
 5               MS. WAHRENBERGER:  No, I think they are
 6        bringing food in.
 7               MR. GRAND:  I have 20 to 1:00 now.  Is 20
 8        minutes enough time for you?
 9               MS. WAHRENBERGER:  What do you think?
10        Yeah.  Is that okay with you?
11               THE WITNESS:  Yes.  We would all like to be
12        able to finish and go about our Christmas shopping or
13        return things or something, so I'm fine to make it a
14        short lunch.
15               MR. GRAND:  That's fine.
16               MS. WAHRENBERGER:  1:00.
17               MR. GRAND:  We'll plan on returning at
18        1:00.
19               VIDEO SPECIALIST:  The time now is 12:38.
20        We're going off the record.
21               (Proceedings recessed.)
22               VIDEO SPECIALIST:  The time now is 1:04.
23        We are back on the record.
24        BY MR. GRAND:
25               Q.  Doctor, during the break I was faxed a copy
```

Nicolette S. Horbach, M.D.

```
 1        of the document you referenced before concerning

 2        additional references.

 3             A.  As I said, I'm not totally sure that these

 4        are additional or not duplicated here, but as I --

 5        some of these were things that I pulled up myself as I

 6        was researching.  I just kept a running list to make

 7        sure that there wasn't something that was missing.

 8             MR. GRAND:  Okay.  Can we go ahead and mark

 9        this as Exhibit 5 to the deposition?

10             (Exhibit 5 was marked for identification.)

11        BY MR. GRAND:

12             Q.  Doctor, when did you compile this list?

13             A.  It's been over the last couple weeks as I

14        was researching for my supplemental report and, you

15        know, depo prepping, et cetera.

16             Q.  Okay.  Looking at this list, it seems as if

17        the majority of references deal with sexual function

18        after surgery for stress urinary incontinence.  Would

19        that be fair?

20             A.  That's a good question.  There are a number

21        of those -- a number of the articles that are looking

22        at that, yes.  That was one of the things that I was

23        researching regarding sexual function after any stress

24        incontinent surgery and/or midurethral slings and/or

25        following any erosion issues.
```

Nicolette S. Horbach, M.D.

```
 1              Q.  And there are also articles on here

 2       relating to urge incontinency, correct?

 3              A.  Yes, I believe so.  Yes.

 4              Q.  And there's articles in here relating to

 5       infection, correct?

 6              A.  Yes, I believe so.

 7              Q.  Okay.  Is there a reason you were focusing

 8       on these issues in the last two weeks?

 9              A.  I was focusing on these issues relative to

10       potential complications associated with sling

11       surgeries in relation to having reread

12       Dr. Rosenzweig's depos and some of the comments that

13       he made.

14              Q.  Okay.  Are you aware that these are the

15       types of injuries that are alleged by the plaintiff in

16       this case?

17              A.  I understand that there are a couple

18       different issues that she has raised, yes.  And I read

19       his expert report, so -- specifically on the patient.

20              Q.  Okay.  Have you been asked by defense

21       counsel to tell your opinions to address case-specific

22       issues for Mrs. Corbet?

23              A.  Not for case-specific issues regarding her

24       care but more for global issues of the TVT or

25       midurethral slings, TVTs impact on potentially sexual
```

Nicolette S. Horbach, M.D.

1          function or overactive bladders or pain issues,

2          et cetera, afterwards.

3                  Q.  Okay.  And all of the articles on this list

4          were available at the time you wrote your general

5          report, correct?

6                  A.  My original general report?

7                  Q.  Yes.

8                  A.  My first one?  Not all of them, no.  Some

9          of them have been published subsequent to the time --

10         I mean there's one here I see from 2015.  Some of

11         them, yeah, there certainly could be some of them --

12         there's another 2015 --

13                 Q.  Other --

14                 A.  -- 2014.

15                 Q.  Well, you wrote your report in 2014,

16         correct?

17                 A.  Correct, but midway through the year.  So

18         some of the -- some articles for 2014 came out

19         subsequent to -- some articles for 2014 came out

20         subsequent to my report, and both of Dr. Rosenzweig's

21         depositions came out subsequent to my report.

22                 Q.  Okay.  Were you sent these articles by

23         defense counsel?

24                 A.  These articles?  No, these are articles

25         that I specifically pulled when you were asking me

Nicolette S. Horbach, M.D.

```
1        about my, you know, my whole process of how do I

2        research this and go into the library, et cetera.

3             Q.   Okay.  So you pulled these articles

4        yourself over the last two weeks?

5             A.   Yes.

6             Q.   Okay.  Thank you.  You can set that aside.

7             Doctor, would you agree that implantation of a

8        synthetic mesh such as contained in the TVT Retropubic

9        causes a foreign-body reaction in the patient,

10       correct?

11            A.   Yes.

12            Q.   Okay.  Do you have an opinion as to whether

13       that foreign-body reaction is a transient reaction?

14            A.   I think that the foreign-body reaction is

15       somewhat more pronounced usually in the beginning

16       acutely.  That more pronounced effect is more

17       transient, and, assuming that the patient does not

18       experience an erosion, then I think that the

19       foreign-body reaction does continue but not at the

20       same -- not at the same intensity and/or, you know,

21       manifesting as potentially clinically relevant, if

22       that makes sense.

23            Q.   And what do you base that opinion on?

24            A.   Which part of the opinion?

25            Q.   That the foreign-body reaction diminishes
```

Nicolette S. Horbach, M.D.

1        over time.  Is that what you stated?

2                   MS. WAHRENBERGER:  Well, no, she said it

3        was less intense and of less clinical relevance.

4                   THE WITNESS:  No, my comments were that

5        over time in a patient that does not experience an

6        erosion, that the foreign-body reaction will continue,

7        but that it may not manifest itself in a clinically

8        relevant way.

9        BY MR. GRAND:

10                  Q.  Okay.  So is the foreign-body reaction

11       chronic?

12                  A.  That's the definition of a foreign-body

13       reaction.  The body has a response to it as long as

14       it's there, whether it's a suture or a mesh or a screw

15       or a hip implant, like I just had, or any of those

16       things.

17                  Q.  Doctor, you're aware that Ethicon

18       discontinued the sale of certain pelvic organ prolapse

19       and SUI repair products, correct?

20                  A.  Yes, I'm aware of that.

21                  Q.  Do you have any understanding as to why

22       those products were discontinued?

23                  A.  I have -- I heard explanations regarding

24       it, but I don't know how accurate those comments were

25       or not.

Nicolette S. Horbach, M.D.

1           Q.   You don't intend to offer any opinions on

2      that at trial, correct?

3           A.   About why they discontinued the use?

4           Q.   Yes.

5           A.   I don't believe so unless I'm specifically

6      asked by, you know, you or counsel.  I mean, I'm

7      not -- I'm not -- I'm not proactively going forward in

8      asking those opinions.  The hard part is when you ask

9      if I'm ever going to state an opinion about this, I

10     don't know what questions necessarily I'm going to be

11     asked, but I'm not proactively going forward as that

12     as being one of my stated opinions.  Does that make

13     sense?  Hopefully.

14          Q.   It does.  You haven't reviewed documents

15     relating to the discontinuation of the POP products or

16     the SUI products, have you?

17          A.   Ethicon documents?  No, I have not.

18          Q.   Okay.  Have you reviewed any testimony

19     relating to that?

20          A.   No, I have not.

21          Q.   So at this time do you have any opinions

22     relating as to why Ethicon decided to discontinue

23     certain POP and SUI products?

24          A.   I don't have opinions.  I've, you know, as

25     I said, I've heard reasons or rationales, but I'm not

Nicolette S. Horbach, M.D.

1        sure that I have an opinion specifically about that.

2                Q.  Okay.  Where did you hear those reasons and

3        rationales?

4                    MS. WAHRENBERGER:  If I could short-circuit

5        this, I don't think there is any anticipation that

6        Dr. Horbach will be asked questions about her opinion

7        as to why Ethicon discontinued any products at the

8        Corbet trial.

9                    MR. GRAND:  Okay.  Thank you.

10                   THE WITNESS:  Okay.  I don't have to answer

11       it.

12       BY MR. GRAND:

13               Q.  Do you consider yourself an expert with

14       respect to the design elements of the TVT Retropubic?

15                   MS. WAHRENBERGER:  Objection to the form of

16       the question.

17                   THE WITNESS:  Yeah, I'm not sure what you

18       mean about the "design elements."

19       BY MR. GRAND:

20               Q.  Okay.  Let me give you examples.  Do you

21       have opinions as to whether the TVT Retropubic is a

22       lightweight or heavyweight mesh?

23               A.  I think that, relative to some of the

24       meshes that we've used previously in the past, it has

25       determined to be definitely lightweight.  Some other

Nicolette S. Horbach, M.D.

1      people will classify it more as heavyweight.  The

2      definition of what's lightweight and what's

3      heavyweight has evolved and/or there's different

4      classifications depending on who you read.  So I

5      typically would put it into more of a lightweight type

6      of category.

7              Q.  Okay.  Do you have any opinions relating to

8      the differences between mechanical-cut and laser-cut

9      TVT Retropubic mesh?

10              A.  In my experience -- excuse me.  In my

11      experience clinically I don't see a difference in how

12      the two meshes behave either during implantation or

13      subsequent to implantation in the patient.

14              Q.  How many laser-cut TVT Retropubic meshes

15      have you implanted?

16              A.  I can't recall specifically.  I mean, I

17      know I've certainly implanted laser-cut Ethicon

18      midurethral slings, because that's what the Exact is,

19      but I don't remember in the specific Retropubic

20      whether I was using primarily -- I mean, obviously

21      primarily machine-cut in the beginning, but I don't

22      recall how many I have done in that transition time

23      period when it became an option of laser-cut versus

24      mechanical-cut.

25              Q.  Do you recall when the TVT Retropubic

Nicolette S. Horbach, M.D.

1        became available in laser-cut?

2                A.  I think it was around 2006, but you had to

3        specifically order it as laser-cut versus

4        mechanical-cut, and I don't recall at this point now

5        whether our hospital ordered it specifically one way

6        or the other.

7                Q.  So sitting here today you don't know

8        whether you've ever implanted a TVT laser-cut mesh,

9        correct?

10               MS. WAHRENBERGER:  Objection.

11       BY MR. GRAND:

12               Q.  For Retropubic.

13               A.  Well, I mean, the Exact is a Retropubic

14       TVT, a retropubic midurethral sling.

15               Q.  Okay.  I'm not asking --

16               A.  It's just a different handle -- I'm sorry.

17               Q.  I'm not asking you about the TVT Exact,

18       doctor.  I'm asking you about the TVT Retropubic

19       laser-cut.

20               A.  I cannot tell you one way or the other

21       whether or not I've done a laser-cut one versus

22       mechanical-cut only.

23               Q.  Did you review any internal documents

24       relating to this issue, Ethicon internal documents?

25               A.  Regarding to the issue of what?

Nicolette S. Horbach, M.D.

```
 1              Q.  Laser-cut versus mechanical-cut.

 2              A.  I did review some Ethicon internal document

 3         emails regarding the discussion of should they offer

 4         laser-cut in addition to mechanical-cut for the

 5         traditional TVT Retropubic.

 6              Q.  Did you view -- did you review any

 7         laser-cut internal studies or testing regarding

 8         mechanical-cut versus the laser-cut mesh?

 9              MS. WAHRENBERGER:  From Ethicon?

10              MR. GRAND:  I said Ethicon.

11              THE WITNESS:  I think that I did perhaps in

12         the prior, you know, in formulating the original

13         general report, you know, a year and a half ago.  I

14         seem to recall I did not re-review that specifically

15         in the last short period of time, but I think I recall

16         seeing some of that, yes, but I still can't give you

17         the details.

18         BY MR. GRAND:

19              Q.  Doctor, would you agree with me that a

20         known complication of the TVT mesh is chronic pain?

21              A.  Yes.

22              Q.  Would you agree with me that one of the

23         risks of the TVT Retropubic is pain with intercourse

24         which in some patients may not resolve?

25              A.  I think that that is a very -- I think
```

Nicolette S. Horbach, M.D.

1        that's a very uncommon risk, at least in my experience

2        with the retropubic procedure.

3            Q.  Okay.  I'm not asking you whether it's

4        common or uncommon, doctor.  I'm asking if you would

5        agree that one of the risks of the TVT Retropubic is

6        pain with intercourse, which in some patients may not

7        resolve?

8            A.  I have seen that reported in the

9        literature, yes.

10           Q.  Would you agree with me that one of the

11       risks of the TVT Retropubic is contraction or

12       shrinkage of the tissue in combination with the mesh?

13           A.  I have seen that reported in studies where

14       they have interpreted that there was contracture based

15       on either the size of explanted mesh materials or I

16       think even based on perhaps ultrasound measurements,

17       if I recall.

18           So I think they have made the -- they have made

19       the clinical assumption that this was -- that

20       contracture was occurring based on changes or other

21       parameters that they noticed.

22           Q.  Is that a yes, that you would agree it's a

23       known risk?

24           A.  Yeah, I guess with any -- yeah, I suppose I

25       would say, yes, that that's a known risk.

Nicolette S. Horbach, M.D.

```
1              Q.  Would you agree with me that one of the

2      risks of the TVT Retropubic is that, when an adverse

3      reaction occurs, further surgery may be required to

4      correct it?

5              A.  Yes.

6              Q.  Would you agree with me that one of the

7      risks of the TVT Retropubic is that, when an adverse

8      reaction occurs, one or more revision surgeries may be

9      necessary to treat it?

10             A.  Yes.

11             Q.  Would you agree that one of the risks of

12     the TVT Retropubic is that, when revision surgery is

13     required, significant dissection of tissue may be

14     needed?

15             A.  I'm not sure what you mean by "significant

16     dissection."  Yes, you have to dissect.  I'm not sure

17     whether, you know, you call it significant dissection

18     or not.

19             Q.  Okay.  Would you agree that one of the

20     risks associated with the TVT Retropubic is scar

21     plating and bridging fibrosis?

22             A.  I've not seen that clinically, although I

23     have seen pathologists report that on explanted --

24     excuse me -- on explanted specimens that have been

25     evaluated histologically.
```

Nicolette S. Horbach, M.D.

1        Q.  Okay.  So would you agree that's one of the

2   risks, then?

3        A.  Yes, I would suppose so.  I mean, I haven't

4   seen it clinically, but I've seen it reported.

5        Q.  Would you agree that scar plating and

6   bridging fibrosis can cause contraction?

7             MS. WAHRENBERGER:  Objection to the form of

8   the question.

9             THE WITNESS:  I think -- are we talking

10   contraction of the mesh or the whole sort of

11   tissue-mesh complex or ...

12   BY MR. GRAND:

13        Q.  Yeah, let's say the tissue-mesh complex to

14   be fair.

15        A.  I think, again, there have been authors who

16   have stated that their findings suggest that.  I'm not

17   always sure -- I'm not sure that I agree that that,

18   again, clinically is an issue and/or that they

19   necessarily come to the correct conclusion based on

20   what they're -- what they're seeing in their research.

21        Q.  Would you agree that scar plating and

22   bridging fibrosis can cause pain in a patient?

23        A.  I think that pain can be found in patients

24   where that type of histologic sample, I guess, has

25   been seen.  I'm not sure that you can say that the

Nicolette S. Horbach, M.D.

1        pain is caused by that.

2               Q.  Would you agree that scar plating and

3        bridging fibrosis -- can cause erosion?

4               A.  I think -- could it ever possibly?  It's

5        perhaps possible.  I don't think that that typically,

6        though, is what you're going to see with, you know,

7        scar tissue or tissue growing into the mesh.  I don't

8        think that typically erosion is going to be the more

9        way you see that.

10              Q.  Do you agree that scar plating and bridging

11       fibrosis can lead to extrusion?

12              A.  I think if just scar plating is there and

13       that's the only abnormality and there's nothing that

14       is abnormal on the surface epithelium, I don't think

15       that the scar plating in itself by itself in a normal

16       type of epithelium without a prior perforation is

17       going to per se cause an extrusion.

18              Q.  Have you ever studied whether the Prolene

19       mesh in the TVT Retropubic can degrade?

20              A.  I have studied it in, you know, in clinical

21       situations in patients where I have operated on and --

22       or reoperated on and/or followed over time in terms of

23       changes in their anatomy from any degradation.

24              Q.  Have you ever seen degradation in any mesh

25       explants under a microscope?

Nicolette S. Horbach, M.D.

1              A.  Have I seen it under the microscope?  No.

2              Q.  Do you know whether the microscope you were

3      using was sufficiently powered to see degradation?

4              A.  Probably not since I think most of the

5      degradation reports seem to be more with, you know,

6      scanning electron microscopy or other very specialized

7      type of equipment and/or preparations.

8              Q.  Have you read literature relating to this

9      issue?

10             A.  Yes, I have.

11             Q.  Have you read internal Ethicon documents

12     relating to this issue?

13             A.  I don't recall that I have.  I don't

14     remember anything in particular, no.

15             Q.  Have you read any testimony of Ethicon

16     employees relating to this issue?

17             A.  No.

18             Q.  Just give me a second, doctor.  I want to

19     ask you about some things that are in your report

20     specifically but some of which I think I've already

21     covered.  So just give me a moment to catch up.

22             Doctor, if you can look at the exhibit, what's

23     been marked as Exhibit 2, your general report, and

24     turn to page 26, please.

25             A.  Okay.

Nicolette S. Horbach, M.D.

 1            Q.   Okay.  Do you see under the heading of

 2      Complications of MUS versus Other Surgeries for Stress

 3      Incontinence?

 4            A.   Yes.

 5            Q.   Okay.  If you look at the third sentence of

 6      that paragraph, it says:

 7                      Many of the earlier studies published

 8                      on the outcomes of Burch

 9                      colposuspension and pubovaginal sling

10                      procedures did not specifically

11                      describe all complications, failed to

12                      even consider quality of life and

13                      sexual function parameters and often

14                      had rather short length of follow-up?

15                      Do you see that?

16            A.   Yes.

17            Q.   Okay.  That criticism would be true of many

18      of the TVT studies as well, correct?

19                 MS. WAHRENBERGER:  Objection to the form of

20      the question.

21                 THE WITNESS:  Actually the quality of the

22      majority of the TVT studies are much better than what

23      I've listed here of the original Burch studies.  They

24      do address complications much more comprehensively

25      than prior reports had done as well -- from the

Nicolette S. Horbach, M.D.

```
 1        complications.

 2             Follow-up of the -- many of the TVT studies now

 3        are longer than just the one-year follow-up in

 4        patients, and especially some of the TVT studies that

 5        are done like through the NIH protocol and the Tomas

 6        study, they do indeed specifically address sexual

 7        function and quality of life issues.

 8        BY MR. GRAND:

 9             Q.  Okay.  Doctor, just to be clear, I wasn't

10        asking you about recent studies.  I was asking you

11        about the earlier studies.  Isn't it true that most of

12        the early studies on the TVT were short-term studies?

13             A.  I think that the original report was closer

14        to two years' follow-up, if I recall.  I'd have to

15        look back at it.  It did talk about complications.  It

16        did not address sexual function or quality of life

17        issues in the initial report.

18             Q.  Isn't it true, doctor, that very few of the

19        TVT studies actually collected information on sexual

20        function such as dyspareunia?

21                  MS. WAHRENBERGER:  Objection to the form of

22        the question.  Go ahead.

23                  THE WITNESS:  During which period of time

24        are we talking about?

25        BY MR. GRAND:
```

Nicolette S. Horbach, M.D.

```
 1              Q.  All periods of time.  Strike that.

 2         Do you have an understanding as to how many of

 3    the TVT studies you reviewed actually collected data

 4    on dyspareunia?

 5              A.  Dyspareunia or pain with sex is one of the

 6    domains of the sexual function questionnaire that is

 7    now commonly employed in doing the prospective studies

 8    for stress urinary incontinence treatments, including

 9    the midurethral slings.

10         So there's a domain part of that that talks

11    about pain with intercourse, and that's part of the --

12    I think there's five different domains that are looked

13    at.  So, yes, pain with intercourse is part of the

14    sexual function questionnaire.

15              Q.  And that's a more recent development, isn't

16    it?

17              A.  I can't tell you when the first

18    questionnaire was used in a TVT trial for this.  I

19    mean, the Tomas trial was going on five, probably

20    eight years ago or so, and that certainly included it.

21              Q.  Could you turn to page 30 of your report,

22    doctor?

23              A.  Yes.

24              Q.  And if you see the heading there, IFU in

25    Professional Education Opportunities?  Do you see
```

Nicolette S. Horbach, M.D.

```
1         that?

2               A.  Yes.

3               Q.  If you look, I guess, the second sentence

4         above that, my experience has confirmed that a

5         minimally invasive MUS is a preferred option for

6         treating stress incontinence.  Do you see that?

7               A.  Yes, I do.

8               Q.  Okay.  You say, "It is the Gold

9         Standard --" and before I read on, I want to actually

10        confirm what you're talking about.  Are you saying

11        that midurethral slings generally are the gold

12        standard or are you saying that the TVT is the gold

13        standard?

14              A.  In this particular situation I think I am

15        saying that minimally invasive slings are the gold

16        standard.

17              Q.  Okay.  And you go on to say, and I agree

18        with the position statements, practice guidelines and

19        analyses by AUGS, AUA, SUFU, SGS, ICS, NICE and IUGA,

20        which recognize TVT as a first-line option for women.

21              Did you mean to say MUS there or are you saying

22        that those societies are recommending the TVT

23        Retropubic as the first-line option for women?

24              MS. WAHRENBERGER:  Objection.  Retropubic

25        isn't even there.
```

Nicolette S. Horbach, M.D.

1      BY MR. GRAND:

2            Q.   Doctor, you can answer the question.

3            A.   The -- I think the reference would be more

4      for midurethral slings as first-line option.

5            Q.   Okay.  So you aren't suggesting there that

6      those societies are saying that the TVT is the

7      first-line option, correct?

8            A.   The Ethicon TVT, no, I'm not saying that

9      that -- I'm saying midurethral slings.

10           Q.   Okay.  Thank you.  With respect to

11     professional education, did you review professional

12     education materials that were created by Ethicon for

13     the TVT Retropubic?

14           A.   Yes, I did.  I reviewed some of the -- I

15     reviewed lecture slide sets that were developed as

16     part of the professional education material.

17           Q.   Okay.  And did you -- those materials

18     typically made reference to various studies in support

19     of the claims in the materials, correct?

20           A.   I think I'd have to look back at the slide

21     set to be able to answer that.  I think they probably

22     did, but I would -- I'm not totally sure.  I've

23     reviewed a lot --

24           Q.   You didn't check --

25           A.   No, I've reviewed a lot of material,

Nicolette S. Horbach, M.D.

```
1        especially, you know, as getting in preparation for

2        the deposition.  So sometimes things get a little

3        blurry about what you remember or what you don't

4        remember.  So prior to answering -- I know I looked at

5        that, the professional education slides, but which

6        studies they quoted or not, I would have to look back

7        at the slides.

8            Q.  Okay.  Okay.  Doctor, I'm going to ask the

9        court reporter to mark as Exhibit 6 an email from Eric

10       Globerman dated May 24, 2004.

11           (Exhibit 6 was marked for identification.)

12       BY MR. GRAND:

13           Q.  For the record this document is Bates

14       stamped ETHMESH 11840160.

15           Doctor, do you see it's an email from Eric

16       Globerman to Cindy Pypcznski?

17           A.  Yes, I see that.

18           Q.  Do you recognize either of those names?

19           A.  No.

20           Q.  Okay.  And do you see the subject line is

21       RE: TVT Targets?

22           A.  Yes.

23           Q.  Okay.  And I want to direct your attention

24       to paragraph 1 of that email.  Do you see it says,

25       Fairfax Hospital?
```

Nicolette S. Horbach, M.D.

1          A.  Yes.

2          Q.  Do you see it says, "Dr. Wellgoss and

3     Horbach have both been using the Boston Scientific

4     Advantage sling"?  Did I read that correctly?

5          A.  Yes, that's what it says.

6          Q.  Okay.  "Boston Scientific has consigned

7     this product to the hospital and also discounted the

8     price."  Did I read that correctly?

9          A.  Yes.

10          Q.  Were you using the -- were you not using

11     the TVT in May of 2004?

12          A.  I don't know.  I would expect that I was

13     potentially using both of them.  Sometimes the

14     hospital has gone back and forth with Ethicon

15     regarding contracts and getting, oh, a, whatever,

16     discounted stuff whatever so that they could be able

17     to have different products available.  Sometimes

18     there's a year that they're there; sometimes there may

19     be a year that they are not.

20          Q.  And the statement "Boston Scientific has

21     consigned this product to the hospital and also

22     discounted the price," would that suggest to you that

23     the hospital was only carrying the Advantage as

24     opposed to the TVT-R?

25          A.  No, that would not suggest that to me, not

Nicolette S. Horbach, M.D.

1     for -- not typically for Fairfax.  They may have had

2     the discounted for the Boston Scientific and been

3     preferring that we use that, but we've gone back and

4     forth with Fairfax for many years regarding what

5     materials or not or what slings or what mesh for

6     prolapse repairs we were going to end up being --

7     wanting to use.

8              Q.  You can set that aside, doctor.

9              MR. GRAND:  I'm going to ask the court

10    reporter to mark as Exhibit 7 an email from Cindy

11    Pypcznski dated February 9, 2009, subject line INOVA.

12             (Exhibit 7 was marked for identification.)

13    BY MR. GRAND:

14             Q.  Doctor, what's INOVA?

15             A.  INOVA is the parent company for my hospital

16    and a number of other hospitals in the northern

17    Virginia area.

18             Q.  And do you see in the email there's several

19    doctors listed?  And do you see your name there?

20             A.  I do.

21             Q.  And you're there as using the Prolift,

22    Apogee and the Perigee.  Do you see that?

23             A.  Correct.

24             Q.  And those are products you were using

25    for -- to repair pelvic organ prolapse?

Nicolette S. Horbach, M.D.

1           A.  No.  It's incorrect.

2           Q.  Incorrect?  And do you see it says you were

3      using Boston Scientific slings?

4           A.  I see that it --

5           Q.  Is that correct?

6           A.  I see that it says that, but I'm saying

7      that this information, wherever they got it, is

8      incorrect.  I have never used an Apogee or Perigee

9      sling -- or for a prolapse procedure period.  So

10     whoever said I was using it --

11          Q.  Okay.

12              MS. WAHRENBERGER:  Let her finish.

13              THE WITNESS:  So whoever said that I was

14     using this, it's not accurate.  So if they are saying

15     that I am using things that I'm not using, then also

16     saying I'm not using things that I am using, I think,

17     is certainly conceivable.  This simply is not

18     accurate.

19     BY MR. GRAND:

20          Q.  Okay.  You were using the Prolift at the

21     time, correct?

22          A.  Yes, I was using Prolift.

23          Q.  And you testified --

24          A.  Actually --

25          Q.  -- earlier --

Nicolette S. Horbach, M.D.

1          A.  Actually, yes, 2009, I think -- trying to

2     remember whether that was around the time that we

3     began not using Prolift or not.  It was -- I don't

4     even remember whether I was still using Prolift at

5     that particular time.

6          Q.  Okay.  Do you have any reason to doubt you

7     were using -- you were using Boston Scientific slings

8     at that time and not the TVT-R?

9          A.  I think that I was -- I'm pretty sure that

10    I was using Boston Scientific at that time and

11    probably not the TVT-R.  That's the middle round, as I

12    said to you, where I was going in transition.

13         Q.  Understood.  Thank you.

14             MR. GRAND:  I'm going to ask the court

15    reporter to mark as Exhibit 8 an email from Cindy

16    Pypcznski dated December 14th, 2010.

17             (Exhibit 8 was marked for identification.)

18             MS. WAHRENBERGER:  Just for the record,

19    none of the documents that you've passed to us,

20    Mr. Grand, have the Bates stamp marking on the bottom.

21    It looks like the way they were photocopied --

22             MR. GRAND:  That must be the way they were

23    printed out because they were on the PDFs I sent.

24             MS. WAHRENBERGER:  Yes.  So I just wanted

25    you to be aware that -- they're going to be attached,

Nicolette S. Horbach, M.D.

1      I assume.

2              MR. GRAND:  Understood.  For the record I'm

3      going to read them in, so if there's any dispute later

4      you can confirm it.

5              MS. WAHRENBERGER:  I can't confirm it one

6      way or the other because there's no -- I can't see a

7      Bates stamp.

8              MR. GRAND:  I'm not asking you to confirm

9      it right now.  Okay?  I'm going to represent to you

10     what the Bates number is and --

11             MS. WAHRENBERGER:  Fair enough.  Go ahead.

12             MR. GRAND:  Okay.  I had already read the

13     Bates number for Exhibit 6.  For Exhibit 7 the Bates

14     number is ETHMESH 11841786.  For Exhibit 8, which we

15     just handed to the witness, the Bates number is

16     ETHMESH 11847771.

17             MS. WAHRENBERGER:  And there are two

18     additional pages after that.

19             MR. GRAND:  Yes.  Oh.

20             MS. WAHRENBERGER:  The next two numbers, I

21     assume?

22             MR. GRAND:  It's sequential.  The last

23     Bates number is 11847773.

24     BY MR. GRAND:

25             Q.  Dr. Horbach, do you see this email is from

Nicolette S. Horbach, M.D.

```
 1          Cindy Pypcznski to Carole Carter-Cleaver?

 2              A.  Yes, I see that.

 3              Q.  Okay.  And do you see there's a number of

 4      names listed under the cc line?

 5              A.  I -- under the cc line, yeah, there are a

 6      lot of names.  Okay.

 7              Q.  Yeah.  Do you recognize any of those names?

 8              MS. WAHRENBERGER:  And we're talking about

 9      the KTrombly, Justin Preston, that group of names?

10              MR. GRAND:  Yes.

11              MS. WAHRENBERGER:  Okay.

12              THE WITNESS:  Only that I think the Kyle

13      Boyle was on the one just before that email.  The

14      previous email we looked at, Kyle Boyle was one of the

15      people, but the other names I don't recognize.

16      BY MR. GRAND:

17              Q.  Yeah.  Doctor, to be clear, I don't expect

18      that you would have ever seen any of these emails.

19      I'm asking if in the course of your career and

20      occasional interactions with Ethicon whether you

21      recognize any of these names as people you've met or

22      spoken with.

23              A.  You know, Kyle, that name sounds familiar.

24      He may have been the person that, you know, that was

25      around the operating room and showing us the new
```

Nicolette S. Horbach, M.D.

```
 1        things, whether it's morcellators or whatchamacallit,

 2        you know, the ligature kind of things, et cetera, that

 3        we do.  So I think, yeah, I think I've interacted with

 4        him previously.

 5               Q.   Okay.  And that's Kyle Boyd?

 6               A.   Yes, I believe so.

 7               Q.   Okay.  Do you see on the subject line is

 8        "Big East Division: TVT Roundtable"?

 9               A.   Yes.

10               Q.   Do you see that?

11               A.   Yes.

12               Q.   Okay.  And do you see you're listed --

13        you're listed on -- you're at the top of the list on

14        this list of surgeons, correct?

15               A.   My name is there.  I don't know what that

16        means.

17               Q.   And do you see next to your name in

18        parentheses it says "UroGyn uses BS Advantage"?

19               A.   I see that, yes.

20               Q.   Do you see that?

21               A.   Yes.

22               Q.   Okay.  And you would know that to be the

23        Boston Scientific Advantage sling?

24               A.   I assume that that's what he means or she

25        means.
```

Nicolette S. Horbach, M.D.

1          Q.  Okay.  And that's the sling you were using

2     in December 2010?

3          A.  It was one of the slings.  I mean, again,

4     this document -- the name of my practice isn't even

5     correct, so, you know, the accuracy of these emails

6     going back and forth, again, I don't know what the

7     emails are, but, you know, my practice wasn't at that

8     point, you know, Northern Virginia Pelvic Surgery

9     Associates.  We had a totally different name to our

10    practice, so -- anyway ...

11         Q.  Were you are using the -- had you started

12    using the TVT Exact at this point in time?

13              MS. WAHRENBERGER:  That's December of 2010.

14              THE WITNESS:  I don't remember, but around

15    this time period I was also -- I had privileges at

16    another hospital, and so I was operating there at

17    times as well, and they actually in the beginning --

18    they only carried the Ethicon products, and so I think

19    it would have been a TVT Exact when I was operating at

20    the other hospital.  So I think there was around that

21    time period that I would have potentially been using

22    one or both.

23    BY MR. GRAND:

24         Q.  Okay.  Thank you.

25         A.  What is this roundtable thing?  Can I --

Nicolette S. Horbach, M.D.

```
1          I'm just -- I can't ask questions.
2                    MS. WAHRENBERGER:  No, no questions.
3                    THE WITNESS:  Sorry.
4     BY MR. GRAND:
5               Q.   Doctor, I know you've used the -- strike
6          that.
7               Doctor, I have to ask you another question.  I
8          am not -- I want to assure you that I am not trying to
9          be disrespectful in any way or pry into your personal
10         life in any way.  I'm only asking this question
11         because it was spoken about in an Ethicon document
12         that was produced in this litigation.  And I think it
13         may relate to your opinions in this case.
14              A.   Okay.
15              Q.   What?
16              A.   Okay.  That's a good -- that's an
17         interesting forwarding.
18              Q.   I'm doing it, doctor, because I'm trying to
19         assure you that I'm not trying to be disrespectful.
20              A.   That's okay.  Thank you.
21                   MR. GRAND:  I'm going to ask the court
22         reporter to mark as Exhibit 9 an email from Jacqueline
23         Russo dated January 9th, 2003.
24              (Exhibit 9 was marked for identification.)
25                   THE WITNESS:  Ah.  Okay.
```

Nicolette S. Horbach, M.D.

```
 1       BY MR. GRAND:

 2              Q.  Okay.  So you --

 3              A.  I was wondering --

 4              Q.  Do you see --

 5              MS. WAHRENBERGER:  Wait until he asks the

 6       question.

 7              THE WITNESS:  Sorry.

 8       BY MR. GRAND:

 9              Q.  Do you see this is an email from Jacqueline

10       Russo to Cheryl Bogardus and others?

11              A.  Yes.

12              Q.  Okay.  And do you see the subject line is

13       "SUI/TVT article in Working Mother Magazine"?

14              A.  Yes.

15              Q.  Okay.  And if you look at the body of the

16       email, they are discussing the article generally and

17       that you're quoted in the article.  Do you see that?

18              A.  Yes, I do.

19              Q.  Okay.  I want to draw your attention to

20       the -- to the last two sentences.  It says, "An

21       interesting note, Dr. Horbach discussed her personal

22       experiences with stress incontinence that ultimately

23       she was treated with surgery."  Do you see that?

24              A.  Yes, I do.

25              Q.  Okay.  So, doctor, I'm just asking this
```

Nicolette S. Horbach, M.D.

1    because you are an expert in this case.

2              A.   That's okay.

3              Q.   Have you received the mesh implant for

4    stress urinary incontinence?

5              A.   I had my surgery done -- I had a sling in

6    1999, and I had severe intrinsic sphincter deficiency

7    at that point, and TVTs weren't really being used at

8    that point for severe ISD.  The data just wasn't out

9    at that point.  So I had a traditional fascial sling.

10   Nowadays I would have had a TVT.

11             Q.   Doctor, do you intend to testify regarding

12   your own personal experience with this surgery at

13   trial?

14             A.   With my personal experience with my sling

15   surgery?

16             Q.   Yes, your own condition, your own treatment.

17             A.   I didn't necessarily intend to bring that

18   up as part of it -- of the situation.  I mean, it's --

19   I've been open and there has been something in a

20   national magazine about the fact that I think women

21   need to be able to be forward and talk about it, and

22   if I'm not willing to step forward and say I've had

23   it, then how can I expect them to say they have had

24   it, but whether that is going to come up at trial,

25   I -- we -- I've not been specifically asked to bring

Nicolette S. Horbach, M.D.

1          that up at trial or discuss that at trial.

2                Q.  Okay.  Have you had complications as a

3          result of your own surgery?

4                A.  I mean, I've had, you know, after effects.

5          It's not what I would call complication, but, you

6          know, changes in how my bladder functions compared to

7          perhaps preoperatively, but the trade-off for me,

8          again, in the risk/benefit is much more in favor of

9          having done it.  I mean, I pee slower, so, you know,

10         that's not that big of a deal to me.

11               Q.  Okay.  I guess my question was you haven't

12         suffered any long-term -- you don't suffer any

13         complications today as a result of your sling surgery,

14         do you?

15               A.  Again, it depends on what you -- this is

16         that whole definition of what's a complication versus

17         what is a change or a difference compared to what it

18         was previously.

19               So just because something is different than

20         what it was previously doesn't necessarily mean it's a

21         complication.  If you were to say using some

22         definition my voiding would be considered to be

23         perhaps, I guess, it's not the same as what it used to

24         be, it doesn't really affect my life, but this is

25         where that whole issue of is it a complication versus

Nicolette S. Horbach, M.D.

```
 1          is it a change in things.

 2                    Q.   Okay.

 3                    A.   Does that make --

 4                    Q.   I think you meant -- I'm sorry.  I thought

 5          I heard an echo.

 6                    A.   No.

 7                    Q.   I think you mentioned when I first asked

 8          you about this that, if you, I guess, had to do it all

 9          over again, you would use a TVT.  Is that what you

10          said?

11                         MS. WAHRENBERGER:  Objection,

12          mischaracterization.

13                         THE WITNESS:  I said --

14                         MR. GRAND:  I'm not trying -- I'm asking

15          her the question so I'm not mischaracterizing it.  I'm

16          asking her to clarify what she said.

17                         THE WITNESS:  If I were to undergo surgery

18          for stress incontinence now in this day and age with

19          the data that we have available, I would choose to do

20          a TVT, yeah.

21          BY MR. GRAND:

22                    Q.   A TVT Exact?

23                    A.   Yeah, I would probably -- I mean, part of

24          it is actually I would probably, trying to be a good

25          patient and not being a doctor who is telling another
```

Nicolette S. Horbach, M.D.

```
1        doctor what to do, I would probably give my surgeon

2        the, you know, choice of, if you want, if it was my

3        partner and he wanted to do it as the Retropubic TVT

4        or my other partner wanted to do the Exact, fine,

5        whichever one you prefer doing.  I'm not going to tell

6        one of them to use one versus the other.

7                Q.  Okay.  Thank you, doctor.

8                A.  That's okay.

9                Q.  I appreciate your candor.  And, again, I

10       was not trying to be disrespectful.

11               A.  Actually this --

12               Q.  I have no --

13               A.  This is fine.  I mean, I -- that doesn't

14       bother me at all.  I'm very open with my patients

15       about it.

16                    MR. GRAND:  Doctor, I have no further

17       questions for you.

18                    MS. WAHRENBERGER:  You know, we're going to

19       take a quick break.  I have a few questions, but we'll

20       come back in a couple minutes.

21                    MR. GRAND:  Sure.

22                    VIDEO SPECIALIST:  The time now is 2:01.

23       We are going off the record.

24               (Proceedings recessed.)

25                    VIDEO SPECIALIST:  The time now is 2:12.
```

Nicolette S. Horbach, M.D.

```
 1      We are back on the record.  This is the beginning of

 2      disc 3.

 3                          EXAMINATION

 4      BY MS. WAHRENBERGER:

 5              Q.  Dr. Horbach, I have some questions I'd like

 6      to ask you.  You've been asked some questions by

 7      Mr. Grand about foreign-body reaction.  Do you recall

 8      those questions?

 9              A.  Yes.

10              Q.  Is foreign-body reaction something that is

11      seen all the time every time when a foreign body is

12      introduced into the human body?

13              A.  Yes.  Any foreign -- any nonhuman,

14      non-that-person, essentially, material that is in an

15      individual's body will create a foreign-body reaction,

16      whether it's a splinter or a suture that is permanent

17      or a mesh or a bone anchor or a screw or a joint

18      replacement or a stent or anything like that.

19              Q.  Does a foreign-body reaction differ from an

20      inflammatory response?

21              A.  An inflammatory response usually is a much

22      more accelerated or much more intense type of body

23      reaction than what you might see with a foreign-body

24      reaction.  So typically an inflammation will have a

25      foreign-body reaction but not always would a
```

Nicolette S. Horbach, M.D.

1      foreign-body reaction have evidence of, you know,

2      clinically significant inflammation.

3              Q.  What would be the signs and symptoms of

4      clinically significant inflammation?

5              A.  For -- in the vaginal area it will usually

6      be a combination of a couple different symptoms.

7      Number one, they will usually have some type of

8      abnormal discharge.  It will either be more yellow,

9      more tan, grayish kind of discharge.  It is -- it

10     usually has a little bit of an odor to it as well.

11     There will typically be -- there can be some periodic

12     spotting or bleeding that the patient reports

13     sometimes just during regular sort of physical

14     activity, other times following sexual activity.

15     There can be occasionally, depends on where the

16     inflammation is, there could be some irritated

17     symptoms, urinary type symptoms of irritation.

18              In examining the patient she's going to

19     usually, in addition to having the discharge, she may

20     show an area of the vagina with some increased

21     erythema, redness.  That area will typically be more

22     delicate or what we call friable, so you barely touch

23     it with a Q-tip and you'll see blood on the Q-tip or

24     see spotting.

25              And sort of in the more final phase of it you

Nicolette S. Horbach, M.D.

```
1        will actually see what we call frank granulation

2        tissue, which looks like sort of a red, beefy, polyp-y

3        looking tissue that is present around the area of

4        inflammation.

5              Q.  After a TVT Retropubic sling is implanted

6        and the incision that allowed the implantation of it

7        closed, where is the TVT sling located?

8              A.  It is located under the vaginal epithelium

9        or tissue layer under the mid portion of the urethra.

10       So it is usually about a centimeter and a half or so

11       inside from the hymen, under the epithelium and the

12       skin, and then it tunnels on either side of the

13       urethra up behind the pubic bone and out through the

14       abdominal incision.

15             Q.  Once it's in place is the sling within the

16       vaginal cavity or outside of it?

17             A.  It's deep to the vaginal cavity.  It's not

18       in the vaginal lumen or cavity itself.  It's under the

19       skin.

20             Q.  When a foreign-body reaction or an

21       inflammatory response occurs, can they be seen at

22       histopathological analysis?

23             A.  Yes.

24             Q.  Is foreign-body reaction an inflammatory

25       response part of the normal healing process in the
```

Nicolette S. Horbach, M.D.

1      body?

2          A.  A foreign-body reaction, yes, is part of

3      the normal process of healing, when there's anything

4      there that's not supposed -- or not normally there.

5      You can often see inflammation in the early stages of

6      healing.  As the incision is healing, sometimes it

7      will look a little red or even a little bit of

8      granulation tissue present within the first, you know,

9      few weeks or months, but usually as the healing

10     completes that the inflammation changes will no longer

11     be seen.

12         Q.  Does scar tissue develop all the time after

13     an incision has been made and closed as part of

14     surgery?

15         A.  Yes.  I mean, that's one of the challenges

16     of doing surgery that, whenever you make an incision

17     and the tissue heals together, that area almost always

18     is going to have -- be more restrictive and have less

19     stretchability or pliability than the surrounding

20     tissue that's separate from the incision.

21         Q.  Does scarring occur even when a foreign

22     body is introduced such as a sling?

23         A.  Yes, with or without -- with or without a

24     foreign body you're still going to have scar tissue

25     form.

Nicolette S. Horbach, M.D.

1        Q.  Is the scar tissue that develops permanent

2    within the body?

3        A.  Yeah, that -- that scar tissue is going to

4    be permanent.  The body doesn't dissolve the scar

5    tissue.

6        Q.  The tissue reaction that occurs when a TVT

7    mesh is implanted is considered to be part of what is

8    desired as the -- as part of the introduction of the

9    mesh into the body; isn't that true?

10           MR. GRAND:  Objection.

11           THE WITNESS:  Okay.  Yes, part of what

12    ideally helps a TVT do what it's supposed to do and

13    hold the tissues in its proper location is the

14    ingrowth of tissue through the mesh to create sort of

15    an interaction of both mesh and tissue together, which

16    is, as opposed to materials such as Gore-Tex, which

17    were used as a sling for a period of time, where scar

18    tissue didn't actually grow into the sling and that

19    was found to be much less effective as a sling

20    material.

21    BY MS. WAHRENBERGER:

22        Q.  Does the tissue reaction which you've

23    described occurs assist in making the sling effective

24    in preventing any further stress incontinence?

25           MR. GRAND:  Objection.

Nicolette S. Horbach, M.D.

```
 1                 THE WITNESS:  Yes, that -- that scar tissue
 2      is part and parcel of the overall effect of the sling
 3      in helping to correct the stress incontinence.
 4      BY MS. WAHRENBERGER:
 5           Q.  When mesh is the cause of pain within a
 6      woman's vagina, in your experience is removal of the
 7      mesh curative of the pain that the patient reports?
 8           A.  It depends on what procedure, you know, has
 9      been done, you know, what type of procedure was done
10      to implant the mesh, but in midurethral sling
11      procedures typically removal of the mesh in the area
12      where there's a problem usually has a fairly good
13      ability to resolve the pain.  At times there will
14      still be some residual pain in the area that may need
15      some additional treatment, but it is very unusual for
16      you to have removed the mesh and/or, you know,
17      incorporated tissue and have no change in the
18      patient's pain complaints.
19           Q.  What are the various treatments that are
20      available when pain persists after the mesh is
21      removed?
22           A.  In my experience the, you know, the most
23      sort of common things that we start with is ensuring
24      that the tissue has -- is of good-enough quality, not
25      atrophic, not inflamed or not having something like an
```

Nicolette S. Horbach, M.D.

```
 1      atrophic vaginitis as the cause of some of the

 2      irritation or discomfort, so we obviously -- we start

 3      with vaginal estrogen.  It also helps promote healing

 4      from, let's say, having removed the mesh and trying to

 5      make better quality tissue.

 6           Then if there -- depends a little bit on where

 7      the pain is located and how you elicit it, but if

 8      there is scar tissue that's there as residual or there

 9      is -- a lot of patients with pain issues have problems

10      with tightness or spasms or call it a knot of their

11      pelvic floor muscles, so physical therapy that

12      involves manipulation of the scar tissue, they call it

13      scar mobilization, there's techniques that they do,

14      and/or myofascial treatment for the -- those two

15      changes are usually very effective in resolving the

16      problem.

17           If that isn't effective, then the next step we

18      go to is perhaps a trigger-point injection into the

19      scar tissue and/or we've even used Botox injections

20      into the pelvic floor muscles that are in spasm.

21           Q.  In your experience, Dr. Horbach, are all

22      exposures or erosions of mesh symptomatic in the women

23      you're caring for?

24           A.  No.  I will periodically have a patient

25      referred to me because there is a small mesh exposure
```

Nicolette S. Horbach, M.D.

```
 1        that the general gynecologist or the internist has

 2        seen or felt during a routine examination and the

 3        patient may not be aware of it or have any symptoms

 4        from that, and that patient will then be referred in

 5        for treatment.

 6            Those treatments can sometimes involve

 7        conservative management not having to do anything

 8        surgically.  If it's a larger area of mesh that's

 9        exposed and doesn't respond conservatively, then

10        occasionally it does require surgical intervention.

11            Q.  Doctor, you described the gradual

12        transition from the TVT Retropubic to the Boston

13        Scientific product to the TVT Exact.  Comparing the

14        TVT Retropubic to the Exact, explain, if you would,

15        what the similarities and differences of the two

16        products are.

17            A.  The product itself and essentially the

18        mesh, assuming, you know, you'd do the laser-cut TVT

19        Retropubic mesh, and the sleeve, they are essentially,

20        you know, pretty much identical.  Even if you use

21        mechanical versus laser, the edges may be slightly

22        different, although not typically something that

23        affects, you know, your surgical procedure, but the

24        mesh and the porosity and the handling of the mesh is

25        very, very similar.
```

Nicolette S. Horbach, M.D.

1            It's really more the difference between the --

2      sort of the ends of what's attached to the mesh that

3      is different and how you actually are -- what -- what

4      type of instrument you're using to actually pass the

5      mesh into its position, but the position where you're

6      inserting the mesh is the same through each of the two

7      procedures.  You are tensioning it in the same way.

8      You know, risk issues are fairly much the same.  I

9      mean, you're really -- it's more the parts that stick

10     on the end that's the issue that's different.

11            Q.  Are they ultimately removed, the parts that

12     stick on the end?

13            A.  Yes.  Yes.  Sorry.  Sorry.

14            Q.  Do both of those meshes consist of

15     polypropylene?

16            A.  Yep, both of the TVT Retropubic and the

17     Exact are polypropylene.

18            Q.  Are they the same length ultimately?

19            A.  Yes.

20            Q.  Do they involve the same amount of mesh

21     being left within the -- inside of the patient?

22            A.  Yes.  If you were to implant either one in

23     the same patient, it's still the same length and

24     amount left behind.

25            Q.  Is it implanted through the exact same part

Nicolette S. Horbach, M.D.

1    of the body, both the -- both the Retropubic and the

2    Exact?

3        A.  Yes, same vaginal incision, essentially

4    same suprapubic incision, maybe a millimeter or two

5    different, and same pathway and tunneling that you do.

6        Q.  What caused you to use the Exact over time

7    as opposed to the Retropubic?

8        A.  I think part of it is surgeons, especially

9    reconstructive surgeons, we're always trying to figure

10   out, you know, do we like this versus that, is this

11   one better, that one better in our hands and handling

12   it.  Do we, you know -- and part of what we do in our

13   practice is we also teach a fair amount.  We are

14   involved with fellowship training, so part of our --

15   whether we choose one thing or another is to expose

16   our fellows to a variety of different ways of treating

17   it.  Because if they're going to go out, especially

18   our military fellows, that go out to a community or a

19   smaller hospital or sort of a more isolated area, they

20   may have only one thing that they have available

21   versus the other.

22       So I think it was for me more just a little bit

23   of a personal preference.  The introducer in one is

24   metal; the other one is plastic.  I mean, there are

25   really not a huge amount of difference.  One is white;

Nicolette S. Horbach, M.D.

```
 1        the other is metal.  So, you know, can you see one or

 2        the other more easily if you're looking inside the

 3        bladder.

 4              So I think that's part of the reason that I,

 5        you know, made my transition.  It's not anything to do

 6        with the mesh itself.  And actually whether I use

 7        Boston Scientific or Exact or Retropubic, really it's

 8        not related to what I'm actually implanting.  It is

 9        one's blue and the other thing is white, and one's

10        white and the other thing is blue, and which one, you

11        know, you may prefer to use.

12              I don't think that there is any ultimate

13        clinical difference in the outcome of the two products

14        with patients.  In fact I was actually, you know,

15        initially a little concerned when I went to the TVT

16        Exact versus a slightly larger trocar that, although

17        it was a smaller trocar, it might change my tactile

18        ability to pass this, and, you know, is it going to be

19        too easy to pass and you're going to lose that

20        sensation.

21              So you're always just trying to find something

22        that for you personally works the best.  And since

23        obviously one of my partners uses one, one of the

24        partners uses the other, I sort of mix and match.  We

25        haven't really seen a clear difference between the
```

Nicolette S. Horbach, M.D.

```
 1        ultimate outcome in the different products, which is

 2        why we don't all do it exactly with one product.

 3              Q.  And when you talk about the ultimate

 4        outcome, you're talking about the complications that

 5        may occur as a result of, you know, any one of those

 6        various techniques?

 7              A.  Yes, success and efficacy, also plus

 8        potential complications.

 9              Q.  You were asked some questions about the

10        learning curve associated with the TVT Retropubic

11        device.  The more traditional methods of approaching

12        stress incontinence, for example, the Burch or the

13        autologous sling, do they have learning curves that

14        are different from the learning curve associated with

15        the TVT Retropubic?

16              A.  I believe so, yes.  I think that the

17        autologous sling is probably the most difficult of all

18        of those procedures relative to a learning curve

19        because, you know, simply harvesting it, passing it,

20        there's not some of the same variables you can use for

21        inserting it.  It requires a little more invasiveness

22        to be able to obtain the sample, especially if you're

23        using a rectus fascia.  If you're using a fascia lata

24        graft, then it has to be harvested, so that's more

25        involved.  The --
```

Nicolette S. Horbach, M.D.

```
 1            So the learning curve for, I think, a
 2       traditional suburethral sling is probably the highest.
 3       In Burch procedures, an open Burch procedure is, you
 4       know, a moderately difficult procedure to do because
 5       the position that you have to be in, you know,
 6       stitching, you have to be able to sew essentially
 7       pretty much with one hand in the vagina holding up the
 8       tissue and another hand where you're going in the
 9       abdomen.  So it requires the surgeon to be much more
10       skilled at sewing one-handed, being able to get into
11       the retropubic space and working in a very small area,
12       especially if you're trying to do a small incision, is
13       very -- is more challenging.  And the Burch done as a
14       laparoscopic procedure is probably one of the most
15       difficult laparoscopic procedures we do in our field.
16       It is even more challenging, let's say, than a
17       laparoscopic sacrocolpopexy.
18            Q.  You were asked some questions about factors
19       that may lead to mesh exposure.  And, Dr. Horbach, is
20       lack of vaginal rest something that can lead to a mesh
21       exposure?  And in answering that, would you explain
22       what vaginal rest is?
23            MR. GRAND:  Objection.
24            THE WITNESS:  We use the term vaginal rest
25       with our patients postoperatively to mean you don't
```

Nicolette S. Horbach, M.D.

```
 1        put anything in your vagina for a period of time and

 2        whether that is tampons or douching or sexual

 3        intercourse.  So that if a patient were to do any of

 4        those things, especially the intercourse portion

 5        because that puts more stretch, during sort of too

 6        early prior to adequate healing, you could pull open

 7        or tear any of the tissue and potentially increase the

 8        risk of an exposure.

 9        BY MS. WAHRENBERGER:

10             Q.  Doctor, is it basic knowledge that pain can

11        be chronic or temporary?

12             A.  Absolutely.  Both surgical, you know, any

13        physician knows that essentially pain can be chronic

14        or temporary, and surgeons certainly are aware that

15        what they do with an operation and with cutting can

16        result in temporary pain in the acute postoperative

17        period or chronic pain in the long term.

18             Q.  Is that medical knowledge, that is, that

19        pain can be either temporary or chronic, applicable

20        also to the pain that can be associated with sexual

21        intercourse --

22             A.  That --

23             Q.  -- that it can be either temporary or

24        chronic?

25             A.  That pain with sexual intercourse can be
```

Nicolette S. Horbach, M.D.

```
1      temporary or chronic?  I think, yes, I think that
2      information is known.  It depends a little bit, again,
3      on what the cause of the pain with intercourse is.  If
4      there is a reversible cause, then it's going to be
5      more on a temporary basis.  If it's potentially a
6      nonreversible cause, then -- or the patient -- we
7      sometimes have patients where we have given them
8      options and they have chosen not to take those
9      options, then it's going to be potentially chronic.
10             Q.  Is it basic surgical knowledge -- excuse
11     me -- that when an adverse reaction occurs, further
12     surgery may become necessary to correct it?
13             MR. GRAND:  Objection.
14             THE WITNESS:  Yes.  Any surgical discipline
15     across the board, from day one of your training,
16     you're aware that, if you have a complication from
17     surgery, that it may require you to do additional
18     surgery to correct it.
19     BY MS. WAHRENBERGER:
20             Q.  Is it sometimes necessary to do more than
21     one additional surgery depending upon the situation?
22             A.  Unfortunately, yes, that is sometimes the
23     case.
24             Q.  Before you used the TVT Retropubic device,
25     which you've told us you used for a number of years
```

Nicolette S. Horbach, M.D.

 1      before you started to use either the TVT Exact or the

 2      Boston Scientific sling, did you read the IFU that

 3      came with the package?

 4              A.  I actually never read the IFU prior to

 5      using the package.

 6              Q.  How did you know what the proper way to

 7      implant the device was and what the complications or

 8      potential adverse reactions were that were associated

 9      with it, if you never read the IFU?

10              A.  I -- the -- knowing how to implant it or

11      learning how to implant it was something that I

12      learned, you know, more by demonstration, as I said,

13      watching my partner and having my partner teach me

14      more, I guess, the Kinesic, whatever, way of learning

15      rather than reading specifically about it.

16              From the standpoint of potential complications

17      associated with it, I had had a moderate amount of

18      experience with use of Prolene mesh per se in other

19      surgical procedures in the pelvis, and I certainly had

20      had a fair amount of experience in doing sling

21      procedures themselves and including sling procedures

22      with synthetic materials.

23              So that the type of complications that were

24      going to be specific for the TVT Retropubic weren't

25      any different than really what my prior experience

Nicolette S. Horbach, M.D.

1      clinically and operating had already indicated to me

2      and/or my, you know, reading of the literature.

3             Q.   And would that have gone back all the way

4      to your training as a surgeon, that is, your residency

5      training and your fellowship training?

6             A.   Yes, more so probably in fellowship than

7      per se residency, but, then, again, it depends on your

8      residency and whether you have someone who does these

9      types of procedures to be, you know, training you in

10     the beginning.

11            Q.   Is it your understanding that surgeons

12     expect that a medical device's IFU will advise the

13     doctor of all significant risks?

14            A.   Yeah, I think that the expectation for the

15     physician probably is that that would be included in

16     an IFU, but, again, the majority of the physicians

17     that I know, especially the surgeons that I know,

18     will -- they're not going to begin to use a piece of

19     equipment if they, you know, don't understand enough

20     of what's going on.  They're not going to go and rely

21     just on the IFU as being their sole source of

22     information, both in how to do it and why to do it and

23     the potential risks involved in it.  Most people, they

24     have done their learning and their research and their

25     education prior to ever, you know, getting in the

Nicolette S. Horbach, M.D.

```
 1        operating room to start using the device.

 2             Q.   The IFU itself is not expected to include

 3        every single solitary risk that could potentially

 4        occur, but rather the ones that are significant or

 5        material for the doctor to be aware of; is that the

 6        case?

 7             A.   I think that's --

 8             MR. GRAND:  Objection.

 9             THE WITNESS:  I think that's my

10        understanding of, you know, what the IFU is designed

11        to do.  Again, surgeons may do surgery without ever

12        looking at the IFU.  So even if there never, I guess,

13        was an IFU, you know, you're still potentially going

14        to be doing the procedures, assuming that you have the

15        appropriate knowledge and experience to potentially do

16        that.  It's not a prerequisite that you have to read

17        the IFU and sign off on it or whatever before you can

18        begin to do a surgical procedure.

19        BY MS. WAHRENBERGER:

20             Q.   And the knowledge that the surgeon would be

21        expected to have would be the various significant

22        risks associated with a particular procedure, true?

23             A.   Yes, that's what the knowledge that the

24        surgeon should have prior to undertaking the

25        procedure.
```

Nicolette S. Horbach, M.D.

1              Q.   What are the risks associated with pelvic

2        floor surgery in your experience?

3              A.   In discussing with patients, you know,

4        risks of surgery, you know, pelvic floor primarily,

5        you know, maybe stress incontinence issues, is we talk

6        about the risk of bleeding during surgery, that the

7        risk of bleeding is infrequently or rarely going to be

8        sufficient to cause a health compromise to the patient

9        that could require anything like a transfusion.

10             We talk about the risk of infection that is

11       more in the immediate time period from the standpoint

12       of incisional infections or abscesses or the

13       possibility, especially in the post-op time of, let's

14       say, urinary tract infection if the patient has to

15       wear a catheter for a more extended period of time.

16             We talk about the risks of injury to the

17       adjacent organs that we are operating nearby,

18       including the urethra, the bladder, the ureters, the

19       bowel, the major blood vessels in the area, or some of

20       the major nerves in the area.

21             We talk about, you know, pain with -- in the

22       short-term postoperatively and in the long-term

23       postoperatively.  We talk about risk of persistent

24       stress incontinence or, theoretically, even worsening

25       stress incontinence, the development of urge

Nicolette S. Horbach, M.D.

```
 1      incontinence, overactive bladder, or if the -- de novo

 2      essentially -- or if the patient has mixed

 3      incontinence that, following surgery, the mixed

 4      incontinence can, in some small number of women, it

 5      can get better.  Most of the women probably there's

 6      not a major change, and in a small number of women it

 7      can get worse, and that that can require the patient

 8      to undergo further treatment.

 9          We talk about there could be voiding

10      abnormalities or voiding dysfunction that could be

11      minor changes versus significant enough to require

12      further surgery to release the sling.

13          We talk about the risk of erosion into the

14      vaginal tissues, the urethra, or bladder that, again,

15      could require additional surgery.

16          We talk about obviously medical risks

17      associated with surgery, from health issues, you know,

18      that type of thing.

19          Trying to think of anything ... I mean, those

20      are, at least in our -- even for our practice, those

21      are already preprinted on the consent form as we go

22      through that and have the patient signing the consent

23      form.

24              MS. WAHRENBERGER:  We're going to change

25      the tapes.
```

Nicolette S. Horbach, M.D.

```
 1                VIDEO SPECIALIST:  The time now is 2:45.

 2      We are going off the record.

 3           (Proceedings recessed.)

 4                VIDEO SPECIALIST:  The time now is 2:46.

 5      We are back on the record.

 6      BY MS. WAHRENBERGER:

 7           Q.  Do you talk about anesthesia risks?

 8           A.  Yes.  Thank you.  I do discuss anesthesia

 9      risks with the patient, and those risks are going to

10      differ depending upon which procedure I do and which

11      type of anesthesia might be necessary -- whether it's

12      general anesthesia, with intubation, such as, you

13      know, typically a Burch, and especially a laparoscopic

14      Burch, regional anesthesia for open Burches and

15      autologous slings, and typically IV sedation or, let's

16      say, local anesthesia with or without IV sedation for

17      a midurethral sling.

18           Q.  We've already talked about the possible

19      need for reoperation.  Is that something you discuss

20      with patients?

21           A.  Yes, that's actually something we discuss

22      with any patient who we're doing -- any type of

23      reconstructive surgery on, whether it's incontinence,

24      prolapse or a combination of both.

25           Q.  Do you talk about the possibility of
```

Nicolette S. Horbach, M.D.

```
1        pulmonary embolus or deep vein thrombosis, things of

2        that sort?

3             A.  Yes.  Actually on our consent we have blood

4        clots listed as a potential risk, and we talk about

5        the steps that we do to try to reduce the likelihood

6        of DVT or pulmonary embolus from the surgery.

7             Q.  You mentioned erosion that you speak with

8        your patients about.  Does that occur only with

9        synthetic slings?

10            A.  No.  You can see erosion with -- when

11       permanent sutures are used that can erode through the

12       vagina or into the bladder and you can see erosion

13       with -- into the vagina, bladder, urethra, with any of

14       the biologic materials.

15            With autologous fascia, you can see vaginal

16       erosions maybe a little bit less, but you could

17       certainly see urethral and bladder erosions even with

18       autologous tissue.

19            Q.  All of the risks that we've just discussed

20       in the last few minutes, are they things that a

21       trained doctor needs to read an IFU to know about?

22            A.  I hope not.  I would not expect so.  I

23       mean, these are things --

24                 MR. GRAND:  Objection.

25                 THE WITNESS:  -- that you would -- these
```

Nicolette S. Horbach, M.D.

1     are things you would need to -- that you would learn

2     during your residency and, you know, probably wouldn't

3     pass your boards if you were not aware of these

4     things, even as a general ob/gyn.

5     BY MS. WAHRENBERGER:

6           Q.  Dr. Horbach, do you believe that the mesh

7     that's used in the TVT Retropubic product is the state

8     of the art?

9           A.  From the standpoint of mesh itself in

10    these -- in the midurethral slings, yeah, I think it

11    is absolutely the best alternative and option that

12    we've had for treating women, you know, for stress

13    incontinence for years.  I mean, it's the one typical

14    thing that has stood more of a test of time than some

15    of the other materials that we have used in the past

16    in terms of, again, risk, you know, benefit profile

17    for the patients, yeah.

18          Q.  Would you agree that the TVT Retropubic

19    device is the most studied SUI sling on the market?

20          A.  I personally think --

21              MR. GRAND:  Objection.

22              THE WITNESS:  I think that the data would

23    show that midurethral slings in general are the most

24    studied incontinence procedure that we have period,

25    and that, based on the number of Ethicon slings that

Nicolette S. Horbach, M.D.

```
 1        are done versus other companies, there's more data

 2        specifically on the Ethicon product than there are on

 3        the other products.

 4        BY MS. WAHRENBERGER:

 5              Q.  Have you read any randomized control trials

 6        that indicate that the TVT mesh either degraded or was

 7        determined to be cytotoxic?

 8              A.  No.

 9              Q.  Have you seen erosions in the left lateral

10        sulcus?

11              A.  With --

12              Q.  Ever.

13              A.  Yes, I have seen erosions in the left

14        periurethral, left sulcus area, yes.

15              Q.  With any particular product do you see

16        those erosions?

17              A.   In my experience I have only seen them when

18        an obturator sling has been done, a trans -- a

19        transobturator sling, not when a retropubic sling has

20        been done.

21                  MS. WAHRENBERGER:  I think that's all I

22        have.  Thank you.

23                  MR. GRAND:  I have a few follow-up

24        questions, doctor.

25                  EXAMINATION (continued)
```

Nicolette S. Horbach, M.D.

```
1    BY MR. GRAND:
2         Q.  Could a clinically significant inflammation
3    cause an erosion?
4         A.  A clinically significant inflammation could
5    lead to an erosion.  I'm not sure whether you could
6    say it's causative, but you could see that as a
7    sequelae of a clinically significant inflammation.
8         Q.  Okay.  With respect to -- you were asked
9    some questions by counsel about foreign-body response.
10   Do you recall that?
11        A.  Yes.
12        Q.  Okay.  Would it be fair to say that the
13   foreign body -- the foreign-body response to a piece
14   of suture would not be the same as the foreign-body
15   response to a piece of -- a much larger piece of mesh?
16        A.  If you're talking about -- yeah, I mean,
17   again, if it's a difference in the size and volume of
18   the material, I think the foreign-body reaction will
19   extend over more space if the material is over more
20   space than if it's under less space -- over less
21   space.  Makes sense ...
22        Q.  And you were asked some questions earlier
23   asking you to discuss the differences or similarities
24   between the TVT Retropubic and the TVT Exact.  Do you
25   recall that?
```

Nicolette S. Horbach, M.D.

```
 1              A.  Yes.

 2              Q.  Okay.  There have been some -- there are

 3      some differences in the procedure between the TVT

 4      Exact and the TVT Retropubic, correct?

 5              MS. WAHRENBERGER:  Object to the form of

 6      the question.

 7              THE WITNESS:  Yeah, I -- I think I would

 8      need you to be more specific about what you mean with

 9      the differences in the procedure.

10      BY MR. GRAND:

11              Q.  Are you aware of any differences between

12      the procedure described in the IFU between the TVT

13      Exact and the TVT Retropubic?

14              MS. WAHRENBERGER:  Do you mean how it's

15      implanted, by "procedure"?

16              MR. GRAND:  Are you -- are you testifying,

17      counsel?

18              MS. WAHRENBERGER:  No, no, I'm just trying

19      to understand your question.

20              THE WITNESS:  Your -- you do different --

21              MR. GRAND:  She didn't say she couldn't

22      understand it.

23              MS. WAHRENBERGER:  Yes, she did.

24              MR. GRAND:  And I rephrased it, and before

25      she could answer you interrupted.
```

Nicolette S. Horbach, M.D.

```
 1                MS. WAHRENBERGER:  It still wasn't clear.

 2                THE WITNESS:  Let me try to answer what I

 3      think you're asking me, and hopefully this is --

 4                MS. WAHRENBERGER:  Well, if you don't

 5      understand it, just say that.

 6      BY MR. GRAND:

 7           Q.  Doctor, I'll withdraw the question and I'm

 8      going to re-ask it.

 9           Are you aware of any differences in the

10      procedure for implanting a TVT-R and a TVT Exact as

11      described in the IFU for the product?  Strike that.

12      Let me rephrase it.

13           The TVT-R -- strike that.

14           The procedure for implanting the TVT-R at the

15      time you first began using it in 2003 is different

16      from the procedure to implant the TVT Exact as

17      described in the current IFU; is that correct?

18           A.  You know, I mean, there are differences in

19      how it shows on the IFU, how you attach this and how

20      you attach that and the size of incisions that you

21      make, et cetera.  So, yes, I guess there are

22      differences.

23           Q.  And the warnings that accompany -- the

24      warnings of the TVT are -- today -- are different than

25      the warnings that accompanied the TVT-R when you first
```

Nicolette S. Horbach, M.D.

```
 1        began using the product, correct?

 2                    MS. WAHRENBERGER:  Object to the form of

 3        the question.

 4                    THE WITNESS:  Yes, the current IFU is

 5        differently -- there are different wording in that

 6        versus the original.

 7        BY MR. GRAND:

 8             Q.  And those same warnings are contained in

 9        the IFU for the Exact today, correct?

10                    MS. WAHRENBERGER:  Objection to the form of

11        the question.

12                    THE WITNESS:  The same warnings from the

13        original or the same warnings from the current?

14        BY MR. GRAND:

15             Q.  Have you compared -- strike that.  I don't

16        need to ask that.

17             You were asked a question about whether the

18        TVT-R reflects the state of the art.  Do you recall

19        that?

20             A.  Yeah, I think that was the term.  Yes.

21             Q.  Okay.  Do you have an understanding of what

22        that term means in a legal sense?

23                    MS. WAHRENBERGER:  Objection to the form of

24        the question.

25                    THE WITNESS:  I have an understanding of
```

Nicolette S. Horbach, M.D.

1    what it means in the medical sense in terms of what we

2    consider state of the art.  I'm not sure if that's the

3    same definition legally.

4    BY MR. GRAND:

5         Q.  Have you ever designed a mesh sling?

6         A.  I have -- I guess I would say in some ways,

7    yes.  It -- when I began using Gore-Tex or a

8    polytetrafluoroethylene for slings, we fashioned and

9    created the slings ourselves, yes.

10        Again, your question, have I -- did I design

11   the material of the sling?  No.  Did I design the

12   sling and shape it and create it the way that I wanted

13   to, to use in the operating room?  Yes.

14        Q.  Okay.  Have you ever designed a mesh sling

15   for use by other doctors?

16        A.  No.

17        Q.  Have you read any of the design documents

18   created by Ethicon in its development of the TVT-R?

19        A.  I did a long time ago, so I wouldn't be

20   able to recall the specifics.

21        Q.  Okay.  Do you have any idea of what the

22   different considerations were undertaken by Ethicon in

23   its design of the TVT-R?

24             MS. WAHRENBERGER:  Objection to the form.

25             THE WITNESS:  Again, I -- I'd have to look

Nicolette S. Horbach, M.D.

```
1     back at the documents to be able to specify.

2     BY MR. GRAND:

3           Q.  Doctor, do you hold yourself out as an

4     expert on the design of medical devices?

5           A.  I am not a material engineer, no.

6           Q.  And at the time --

7           A.  I'm not a biomedical engineer -- sorry --

8     or a biomedical engineer, yes, I'm not that.

9           Q.  At the time that the TVT was implanted in

10    Mrs. Corbet in this case, which I'm going to represent

11    to you was 2011, do you have any idea of what other

12    design alternatives were available to Ethicon for its

13    midurethral slings?

14          A.  My understanding is that they looked at

15    other materials to consider as alternatives to the

16    mesh that was used in 2011.

17          Q.  Your understanding is that in 2011 you have

18    an understanding as to -- strike that.

19          Do you have any idea in the year 2011 what

20    other -- what design options were available to Ethicon

21    for its midurethral slings?

22              MS. WAHRENBERGER:  This was just asked and

23    answered.

24              THE WITNESS:  Yes, I do have an

25    understanding of some of the different design issues
```

Nicolette S. Horbach, M.D.

```
1       that came into play.  I mean, they -- the discussion

2       was -- can't find it -- one of the issues, because

3       they developed it around that time period, was the TVT

4       Secur that was to ideally be a single-incision sling,

5       avoid having to place --

6    BY MR. GRAND:

7            Q.  Doctor, I'm sorry to interrupt you, but I'm

8       not asking you about -- I'm asking you about what

9       options were available to them in 2011, not

10      historically before that.

11           A.  Okay.

12               MS. WAHRENBERGER:  So you're asking if she

13      knows what the options were available to Ethicon in

14      2011 --

15   BY MR. GRAND:

16           Q.  Yes.  Do you know if Ethicon --

17               MS. WAHRENBERGER:  -- for mesh design.

18   BY MR. GRAND:

19           Q.  -- had other materials?

20           A.  Yes.

21           Q.  Do you have any idea whether Ethicon had

22      other materials they could have used in a midurethral

23      sling in 2011?

24           A.  Thank you.  That clarifies it.  I'm sorry.

25      Yes, I am aware that Ethicon had other materials that
```

Nicolette S. Horbach, M.D.

```
 1        it could use for the sling.

 2               Q.  What materials were those?

 3               A.  The question was whether or not -- they

 4        looked at the use of Ultra Pro, a combination, sort of

 5        a multifilament mesh that combined absorbable

 6        suture with -- absorbable fibers, Monocryl, plus the

 7        polypropylene fibers.  So that was one of the

 8        materials they had and looked at as an option for

 9        their sling material.  They also had Vypro as an

10        alternative material to consider using at that time as

11        well.  Those two I'm -- I'm aware that they had.

12               Q.  Doctor, I'm sorry, I need about ten minutes

13        for a telephone call, and then I just have like one or

14        two more questions.

15               A.  Okay.

16               MR. GRAND:  But the Court is waiting.

17               VIDEO SPECIALIST:  The time now is 3:03.

18        We are going off the record.

19               (Proceedings recessed.)

20               VIDEO SPECIALIST:  The time now is 3:32.

21        We are back on the record.

22        BY MR. GRAND:

23               Q.  Dr. Horbach, you were asked questions by

24        counsel regarding cytotoxicity.  Do you recall that?

25               A.  I don't recall that we talked about
```

Nicolette S. Horbach, M.D.

1      cytotoxicity.

2           Q.  Okay.  Have you reviewed any internal

3      documents relating to cytotoxicity of Prolene mesh?

4           A.  I've reviewed documents regarding that.  I

5      think some of them perhaps were Ethicon and then some

6      additional -- some additional information in the

7      literature.

8           Q.  Okay.  Do you have any opinions on whether

9      or not the Prolene mesh that's used in the TVT

10     Retropubic is cytotoxic?

11          A.  Well, again, cytotoxicity from the

12     standpoint -- I don't think that it has a risk of --

13     or significant -- well, I don't think that it has

14     issues related to carcinogenic potential from the

15     standpoint of any type of cytotoxicity.

16          Q.  Thank you, doctor.  I don't have any

17     further questions.

18               MS. WAHRENBERGER:  Okay.  I just have a

19     couple.  I'd like to go back to the questions you

20     asked, Jeff, about the Ultra Pro and the Vypro, that

21     series of questions.

22                    EXAMINATION (resumed)

23     BY MS. WAHRENBERGER:

24          Q.  Dr. Horbach, when you were answering

25     questions about these two products, was it your

Nicolette S. Horbach, M.D.

1    opinion or was it your intention to suggest that these

2    were alternative designs that could have been utilized

3    as the mesh product that would be part of a sling that

4    could be implanted in a woman successfully, safely and

5    efficaciously?

6         A.   My comments about other products or other

7    materials, I think, that Ethicon had was that Ethicon

8    manufactured other types of mesh material, and Ethicon

9    actually around that time period, I think, starting in

10   2010, even looked at alternative mesh materials for

11   its minimally invasive sling.  One was the use of the

12   Ultra Pro to give less -- less long-term permanent

13   mesh fibers present, and that, with investigation, was

14   found to not work as effectively in the sling

15   situation because of the outer sheaths being sort of

16   stuck or partially -- having more difficulty with

17   removal and requiring more tension that placed the

18   mesh suburethrally under more tension.  So they were

19   concerned about use of that.

20        Plus there had been some additional work

21   looking at use of the Ultra Pro in more of a

22   patch-type of sling situation, and it still had very

23   similar erosion rates associated with it compared to

24   what was designed for the original -- or designed with

25   the typical Prolene mesh.  Plus Ultra Pro hadn't been

Nicolette S. Horbach, M.D.

1    FDA approved for use of -- in stress incontinence per

2    se.

3         They also had Vypro as an alternative with an

4    absorbable mesh, again, not FDA approved for this

5    indication, but the limited amount of studies that I

6    could find regarding any attempt at using that as a

7    sling actually showed even more problems with

8    reactivity in that material than even in the Ultra Pro

9    or the standard Prolene that they were using for their

10   mesh.

11        Q.  Doctor, and do you explain the full extent

12   of your opinion regarding these alternative substances

13   that might have been considered for use as part of a

14   sling in your supplemental report, the report that was

15   dated December 15th, 2015?

16        A.  Yes, I do.

17        Q.  And beginning on page 24 under category D

18   for the next three or four pages, all the way actually

19   until page 29, is there a detailed discussion in your

20   report of why these products that were available were

21   determined not to be --

22        A.  Optimal?

23        Q.  Well, not to be --

24        A.  Chosen?

25        Q.  Just get the correct term -- not to be

Nicolette S. Horbach, M.D.

```
 1        either practical or technically feasible alternative

 2        designs?

 3             A.  Yes, in my supplemental report, as part of

 4        my response to some of the plaintiff's experts'

 5        allegations, I did discuss the possibility of other

 6        materials being used for the pros and cons.

 7                  MS. WAHRENBERGER:  Thank you.  That's all I

 8        have.

 9                  MR. GRAND:  I have nothing further.  Thank

10        you, doctor.

11                  VIDEO SPECIALIST:  The time now is 3:38.

12        This deposition has concluded.

13        //

14                  (The deposition of NICOLETTE S. HORBACH,

15        M.D. adjourned at 3:38 p.m.)

16

17

18

19

20

21

22

23

24

25
```

Nicolette S. Horbach, M.D.

```
 1                    -  -  -  -  -  -

 2                   E  R  R  A  T  A

 3                    -  -  -  -  -  -

 4

 5        PAGE  LINE   CHANGE

 6        ____  ____   _____

 7           REASON:   _____

 8        ____  ____   _____

 9           REASON:   _____

10        ____  ____   _____

11           REASON:   _____

12        ____  ____   _____

13           REASON:   _____

14        ____  ____   _____

15           REASON:   _____

16        ____  ____   _____

17           REASON:   _____

18        ____  ____   _____

19           REASON:   _____

20        ____  ____   _____

21           REASON:   _____

22        ____  ____   _____

23           REASON:   _____

24        ____  ____   _____

25           REASON:   _____
```

Nicolette S. Horbach, M.D.

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2

 3                  I,_____, do

 4       hereby certify that I have read the

 5       foregoing pages, and that the same is

 6       a correct transcription of the answers

 7       given by me to the questions therein

 8       propounded, except for the corrections or

 9       changes in form or substance, if any,

10       noted in the attached Errata Sheet.

11

12

13       _____

14        NICOLETTE S. HORBACH, M.D.        DATE

15

16

17       Subscribed and sworn

18       to before me this

19       _____ day of _____, 20____.

20       My commission expires:_____

21

22       _____

23       Notary Public

24

25
```

Nicolette S. Horbach, M.D.

```
 1              C E R T I F I C A T E

 2

 3              I, LINDA S. KINKADE, Registered Diplomate

 4      Reporter, Certified Realtime Reporter, Registered

 5      Merit Reporter, Certified Shorthand Reporter, and

 6      Notary Public, do hereby certify that prior to the

 7      commencement of examination the deponent herein was

 8      duly sworn by me to testify truthfully under penalty

 9      of perjury.

10          I FURTHER CERTIFY that the foregoing is a true

11      and accurate transcript of the proceedings as reported

12      by me stenographically to the best of my ability.

13          I FURTHER CERTIFY that I am neither counsel for

14      nor related to nor employed by any of the parties to

15      this case and have no interest, financial or

16      otherwise, in its outcome.

17              IN WITNESS WHEREOF, I have hereunto set my hand

18      and affixed my notarial seal this 25th day of December

19      2015.

20          My commission expires:  July 31, 2017

21      _____

22      NOTARY PUBLIC IN AND FOR

23      THE DISTRICT OF COLUMBIA

24

25
```