# EXHIBIT G

Nicolette S. Horbach, M.D.

```
 1           IN THE SUPERIOR COURT OF NEW JERSEY
               LAW DIVISION - ATLANTIC COUNTY
 2              DOCKET NO. ATL-L-6951-10
 3   - - - - - - - - - - - - - - -+
                                   |
 4   PAMELA WICKER and WILLIAM     |
     WICKER,                       |
 5                                 |
             Plaintiffs,           |    Master Case No.
 6                                 |
        vs.                        |    L-6341-10-CT
 7                                 |
     ETHICON, INC., et al,         |
 8                                 |
             Defendants.           |
 9                                 |
     - - - - - - - - - - - - - - -+
10
11              Videotaped Deposition of
12             Nicolette S. Horbach, M.D.
13                  Washington, D.C.
14             Friday, November 22, 2013
15                    9:48 a.m.
16
17
18
19
20   Reported by:  Laurie Bangart, RPR, CRR
21
22
23             Golkow Technologies, Inc.
24        877.370.3377 ph|917.591.5672 fax
25                www.golkow.com
```

1           Videotaped Deposition of

2           NICOLETTE S. HORBACH, M.D.

3

4    Held at the offices of:

5           O'Melveny & Myers, LLP

6           1625 Eye Street, NW

7           Washington, D.C. 20006

8           (202)383-5300

9

10

11

12

13

14

15

16

17

18           Taken pursuant to notice, before

19    Laurie Bangart, Registered Professional

20    Reporter, Certified Realtime Reporter, and

21    Notary public in and for the District of

22    Columbia.

23

24

25

Nicolette S. Horbach, M.D.

```
1                    A P P E A R A N C E S
2    ON BEHALF OF THE PLAINTIFFS:
3              Mazie, Slater, Katz & Freeman, LLC
4              103 Eisenhower Parkway, 2nd Floor
5              Roseland, New Jersey 07068
6              (973)228-9898
7              By:  Adam Slater, Esq.
8                   aslater@mskf.net
9    ON BEHALF OF THE DEFENDANTS:
10             Thomas, Combs & Spann, PLLC
11             300 Summers Street, Suite 1380
12             Charleston, West Virginia 25301
13             (304)414-1800
14             By:  Philip J. Combs, Esq.
15                  pcombs@tcspllc.com
16   ALSO PRESENT:
17             Ken Nuzzi, Videographer
18             Stephanie Gardner, Esq.
19
20
21
22
23
24
25
```

Nicolette S. Horbach, M.D.

```
1                    EXAMINATION INDEX

2                                              PAGE

3   EXAMINATION BY MR. SLATER . . . . . . 9, 291, 309

4   EXAMINATION BY MR. COMBS  . . . . . . . 278, 307

5

6

7

8

9

10                 E X H I B I T S

11  EXHIBIT        DESCRIPTION                  PAGE

12  Exhibit 1      Curriculum vitae  . . . . . . .  11

13  Exhibit 2      Dr. Horbach's Expert Report . .  11

14  Exhibit 3      Report and Independent Medical

15                 Exam of Pamela Wicker . . . . .  12

16  Exhibit 4      List of materials reviewed  . .  12

17  Exhibit 5      Dr. Horbach's Supplemental

18                 Expert Report . . . . . . . .   12

19  Exhibit 6      Handwritten notes . . . . . .   151

20  Exhibit 7      Handwritten notes . . . . . .   151

21  Exhibit 8      Handwritten notes . . . . . .   151

22  Exhibit 9      Handwritten notes . . . . . .   151

23  Exhibit 10     Handwritten notes . . . . . .   151

24  Exhibit 11     Handwritten notes . . . . . .   151

25  Exhibit 12     Handwritten notes . . . . . .   151
```

Nicolette S. Horbach, M.D.

```
 1    (Exhibits continued)

 2    EXHIBIT          DESCRIPTION                    PAGE

 3    Exhibit 13    Pam Wicker's medical records

 4                  from Yale University

 5                  Urogynecology Practice  . . . .  151

 6    Exhibit 14    Pam Wicker's medical records

 7                  from Shoreline Medical  . . . .  160

 8    Exhibit 15    Pam Wicker's medical records

 9                  from UCLA Health System . . . .  173

10    Exhibit 16    Pam Wicker's medical records

11                  from UCLA Medical Center  . . .  200

12    Exhibit 17    Pam Wicker's medical records

13                  from UCLA Health System . . . .  202

14    Exhibit 18    Pam Wicker's medical records

15                  from UCLA Health System . . . .  208

16    Exhibit 19    Pam Wicker's medical records

17                  from UCLA Health System . . . .  214

18    Exhibit 20    Pam Wicker's medical records

19                  from UCLA Health System . . . .  214

20    Exhibit 21    ACOG Practice Bulletin  . . . .  282

21    Exhibit 22    Patient Consent Form from Yale

22                  New Haven Hospital  . . . . . .  308

23

24

25
```

Nicolette S. Horbach, M.D.

```
  1             P R O C E E D I N G S

  2             THE VIDEOGRAPHER:  We are now on

  3     the record.  My name is Ken Nuzzi.  I'm a

  4     videographer with Golkow Technologies.

  5     Today's date is November 22, 2013.  Our

  6     starting time is 9:48 a.m.  This deposition

  7     is being held in Washington, D.C. in the

  8     matter of Pamela Wicker and William Wicker

  9     versus Ethicon, Inc.; Ethicon Women's

 10     Health & Urology, a division of Ethicon,

 11     Inc.; Gynecare; Johnson & Johnson; and John

 12     Does 1 through 20.

 13             Our deponent today -- this is being

 14     heard in the Superior Court of New Jersey.

 15     This docket number is ATL-L-6951.  Our

 16     witness today is Dr. Nicolette S. Horbach,

 17     M.D.

 18             Will counsel please identify

 19     themselves and who they represent.

 20             MR. SLATER:  Adam Slater for the

 21     plaintiffs.

 22             MR. COMBS:  Phil Combs on behalf of

 23     the defendants.

 24             THE VIDEOGRAPHER:  Our court

 25     reporter is Laurie Bangart, also with Golkow
```

Nicolette S. Horbach, M.D.

```
 1          Technologies.  Ms. Bangart will now swear in
 2          our witness, please.
 3                    (Witness duly sworn.)
 4                    MR. COMBS:  All right.  Before,
 5          before we get started today, I'm just going
 6          to put a very brief objection on the record.
 7                    As far as I know, there isn't a
 8          notice for the deposition.  That's fine.
 9          We've agreed to produce Dr. Horbach today,
10          but I want to object to any video portion of
11          that deposition being played at trial for the
12          same reasons that Mr. Slater objected to the
13          videotaping of Pam Wicker's deposition on
14          Monday.
15                    Again, I'm not going to throw a
16          fit, say that the camera has got to be turned
17          off, anything like that, but I want to
18          reserve that right for that to be -- to
19          object to that being played at trial.
20                    MR. SLATER:  Really?  When did you
21          make the decision that you were going to make
22          that objection?
23                    MR. COMBS:  Today, Adam.
24                    MR. SLATER:  Really?  Pam Wicker
25          was deposed on Monday.  It's now Friday.
```

Nicolette S. Horbach, M.D.

1              MR. COMBS:  Yeah.

2              MR. SLATER:  You didn't think you

3       should let me know in advance?

4              MR. COMBS:  Listen --

5              MR. SLATER:  I told Kelly Crawford

6       unequivocally, and the protocol has been the

7       plaintiffs are deposing every witness by

8       video in this entire litigation.  Every

9       witness has been videotaped.  The defense is

10      on notice of that, that we are videotaping

11      every single witness that we depose, and you

12      walk in here and you make that objection now?

13      I hope you won't raise it at trial.  I'll ask

14      for sanctions.

15             Now let's proceed.

16             MR. COMBS:  You feel free to seek

17      whatever relief you think is appropriate.  I

18      have made my objection, and the objection --

19             MR. SLATER:  Okay.  Why do you

20      carry that on?  You said what you needed to

21      say.  I responded.  Now we're going to

22      proceed --

23             MR. COMBS:  No, I'm going to say --

24             MR. SLATER:  -- back in New

25      Jersey --

Nicolette S. Horbach, M.D.

```
 1                    MR. COMBS:  Hey.

 2                    MR. SLATER:  -- we're going to

 3        proceed now.

 4                    MR. COMBS:  You're not going to

 5        tell me not to talk.  When I have an

 6        objection to make on the record, I'll make

 7        it.

 8                    Now --

 9                    MR. SLATER:  Okay.

10                    MR. COMBS:  -- go ahead and proceed

11        with your deposition.

12                    MR. SLATER:  I plan to.  Welcome

13        back to the United States from Germany.

14        We're all happy to have you back.  We're now

15        going to proceed.

16                    NICOLETTE S. HORBACH, M.D.,

17        having been first duly sworn, testified

18        upon her oath as follows:

19            EXAMINATION BY COUNSEL FOR PLAINTIFF

20      BY MR. SLATER:

21          Q    Dr. Horbach, good morning.

22          A    Good morning.

23          Q    You understand you're under oath and

24      that if you don't tell the truth in response to

25      one of my questions, you can be criminally
```

Nicolette S. Horbach, M.D.

1   prosecuted for perjury?

2        A     I do.

3                   MR. COMBS:   Object to the form.

4   BY MR. SLATER:

5        Q     Now, we've marked several exhibits.   The

6   first exhibit -- well, actually, before I go

7   through that, let me just make one thing clear.

8              If I ask you a question you don't

9   understand for some reason, tell me, please, and

10  I'll rephrase it.   Okay?

11       A     Okay.

12       Q     If I ask you a question that you're not

13  sure you can answer truthfully and accurately and

14  completely for any reason, tell me that before you

15  answer the question.   Okay?

16       A     Okay.

17       Q     If counsel objects, let him place his

18  objection on the record, but if there's any

19  discussion by counsel of any substance, he'll have

20  to ask you to leave the room.   He's not allowed to

21  signal to you what he wants you to say or how to

22  answer a question with an objection.

23             Do you understand that?

24       A     Okay.

25

Nicolette S. Horbach, M.D.

```
 1                    (Exhibit 1 was marked for

 2                    identification.)

 3    BY MR. SLATER:

 4         Q    We've marked as Exhibit 1 a document

 5    entitled "Curriculum Vitae," for you.

 6                    Is that your current CV?

 7         A    It's the most current printed.  There's

 8    one change on the CV that's additional that is not

 9    on there.

10         Q    What is that?

11         A    That I am now a board-certified

12    subspecialist in female pelvic medicine and

13    reconstructive surgery.

14                    (Exhibit 2 was marked for

15                    identification.)

16                    (Discussion was held off the

17                    record.)

18    BY MR. SLATER:

19         Q    Let's go to Exhibit 2.  Please tell me

20    what Exhibit 2 is.

21         A    Exhibit 2 represents an expert report

22    that I compiled regarding prolapse, per se, as

23    well as Prolift in particular.

24         Q    My understanding, this is your general

25    report in this case.
```

Nicolette S. Horbach, M.D.

1             Is that correct?

2        A     Yes.

3             (Exhibit 3 was marked for

4             identification.)

5    BY MR. SLATER:

6        Q     Now can we look at Exhibit 3, please.

7             What is Exhibit 3?

8        A     Exhibit 3 is the report of my

9    independent medical examination of Pamela Wicker

10   and my opinions regarding that.

11       Q     It also includes your -- what records

12   you reviewed and what your opinions were based on

13   the records you found to be significant to you?

14       A     Yes.  It's based on my discussions with

15   Pamela regarding historical information she

16   provided, as well as records, medical records that

17   I used in asking those questions of Ms. Wicker.

18             (Exhibits 4 and 5 were marked for

19             identification.)

20   BY MR. SLATER:

21       Q     Let's look at Exhibit 4.

22       A     I don't know which one is 4.

23             Yes.  I'm sorry.  Okay.  Number 4.

24       Q     Okay.

25             It's my understanding that Exhibit 4 is

Nicolette S. Horbach, M.D.

1    the materials you had reviewed at the time that

2    you authored the reports that we marked as

3    Exhibits 2 and 3.

4              Is that correct?

5        A    This is the material that I was

6    provided.  Not all of the material has been

7    specifically reviewed by me or read by me in its

8    entirety.

9        Q    Okay.  Let me rephrase my question then.

10             Am I correct that Exhibit 4 is the list

11   of materials that had been provided to you at the

12   time that you were preparing your reports that we

13   marked as Exhibits 2 and 3?

14       A    Yes, although I would have to

15   double-check whether anything was added subsequent

16   to the time of my report.  There is a supplemental

17   list that I think is also included in this whole

18   thing.  Oh, that's number 5.  Sorry.

19             So I believe that these are records that

20   were available to me at the time that I was

21   writing my report, yes.

22       Q    Let me just be clear, because this --

23   well, rephrase.  Let me be clear.

24             This list of materials on Exhibit 4, did

25   you have all those materials at the time that you

Nicolette S. Horbach, M.D.

1    signed your reports, finalized your reports that

2    we marked as Exhibits 2 and 3, your general and

3    case-specific reports in this case?

4         A    To the best of my knowledge, although I

5    don't recall whether, in looking at the

6    transcripts here, whether -- I don't think -- I'm

7    not sure whether Dr. Raz's transcript was

8    available to me at that time.  Don't recall when

9    he was deposed relative to when the report was

10   written.

11        Q    Am I correct that you did not read all

12   the materials on this list?

13        A    That is correct.

14        Q    As you sit here now looking at the

15   transcripts, would you be able to tell me what you

16   read?

17        A    Most likely, yes.

18             MR. COMBS:  Well, wait, wait for

19        the question.

20             MR. SLATER:  I just asked the

21        question.

22             MR. COMBS:  Well, was the -- do you

23        want her to do that?  I wasn't sure, Adam, if

24        the question was can you tell me --

25             MR. SLATER:  Oh, I'm sorry.  I

Nicolette S. Horbach, M.D.

1          didn't know that I was -- I'm, I'm very

2          sorry.  Sometimes I -- I thought that that

3          was clear.  It obviously wasn't.

4                    MR. COMBS:  I'm, I'm not

5          complaining.

6     BY MR. SLATER:

7          Q    Doctor --

8                    MR. COMBS:  If, if, if that's what

9          you want her to do, she will do it.  I'm, I'm

10         not trying to interrupt you or complain about

11         it.

12                   MR. SLATER:  Can I just continue?

13                   MR. COMBS:  Yeah.

14                   MR. SLATER:  Okay.  I'm going to

15         continue.

16    BY MR. SLATER:

17         Q    Doctor, are you able to tell me, as you

18    sit here now, which of those transcripts you

19    actually read at the time you wrote your reports?

20         A    I believe I can provide you that

21    information.

22              Going down the list --

23         Q    Okay.

24         A    Do you want me just to go down the list?

25         Q    Yes, tell me what you read at the time

Nicolette S. Horbach, M.D.

1    you had written the reports, which of the

2    transcripts.

3         A    Amy Wicker, Katherine Wicker, David

4    Weinstein, Dena Harris.  I don't think this.  Jane

5    Wallace was for the supplemental report.  Pamela

6    Wicker times two, Polly Pinkham Herring, Richard

7    Bercik, Robert Baldwin, Shlomo Raz, Ayoub, and

8    bits and pieces of Lucente.

9              I don't recall -- although it may have

10   been sent to me, I don't recall seeing William

11   Wicker's transcript in the information that I had,

12   so occasionally either I've misplaced it or it

13   didn't get quite into the package.

14        Q    With regard to the balance of the

15   transcripts that you didn't just list for me, did

16   you read those subsequent to writing your reports,

17   or no?

18        A    No.

19        Q    Let's go to the expert reports.

20             Tell me which of those you read at the

21   time you wrote your reports.

22        A    That would be harder for me to

23   specifically say, because the report was written a

24   year ago, but to the best of my recollection, I

25   had read Margolis'.  I read Ann Weber's.

Nicolette S. Horbach, M.D.

1          I had read -- there -- I don't recall

2    who the individual is, but she's had, she had an

3    IME psychiatric evaluation from one of the

4    physicians.  Was that Dr. Payne perhaps?  Whoever

5    was the psychiatric IME, her report I also read.

6          I don't recall whether I had read

7    Klinge's or Klinge, however you want to pronounce

8    that.  And I'm trying -- for some reason Susan

9    Shott sounds like familiar, but I can't recall

10   specifically whether I had read her report.

11        Q    Do you know what Dr. Shott's opinions

12   were in the case?

13        A    I can't --

14        Q    Or what her opinions are?

15        A    No.  I mean I can't recall well enough

16   at this point a year past to be able to give that

17   information.

18        Q    So you don't know what, what Susan

19   Shott's expert report addressed or what her

20   testimony addressed; correct?

21        A    I do not know at this moment, a year

22   after I wrote the report.

23        Q    Did you ever read any of the other

24   expert reports after you wrote your reports?

25        A    There were -- no, I did not.  The ones

Nicolette S. Horbach, M.D.

1   like pathology, et cetera, I did not.

2       Q    Have you ever read Dr. Klinge's general

3   expert report?

4       A    The comment I made earlier was that I

5   believe that I read it around the time of my

6   expert report.  I don't recall whether it was

7   before or after, and I can't recall specifically

8   for you right now, because again, it would have

9   been a year ago, and I've read a lot of documents

10  in the meantime.

11      Q    Let's go to the section titled "Medical

12  Records."

13           Did you read all of those medical

14  records when you wrote your reports?

15      A    I am quite sure that I read every single

16  medical record that's on this list that was

17  provided to me.

18      Q    Let's go to the section titled

19  "Literature."

20           Have you read every one of those

21  articles that are listed?

22      A    At some point either prior to the report

23  or in the past as part of other educational

24  endeavors.

25      Q    If you found one of those articles

Nicolette S. Horbach, M.D.

1    listed in the literature section to be of

2    significance to you, did you cite to it or refer

3    to it in your expert report?

4         A    No, I did not.

5         Q    Did you rely on all of these articles in

6    writing your expert report, or were they simply

7    put on the list just to be over inclusive?

8                   MR. COMBS:  Object to form.

9                   THE WITNESS:  I, I have read all of

10        these in creating my expert report in

11        addition to my, you know, clinical expertise.

12        This is part and parcel of my clinical

13        expertise.

14   BY MR. SLATER:

15        Q    Are all of these articles listed in the

16   literature section significant to you as a basis

17   for the opinions you hold in this case?

18        A    I would say yes in that either the

19   article may substantiate my opinion, the article

20   may be contra to my opinion, although I may

21   disagree with parts of the article, but these were

22   all part of what I have read and reviewed prior to

23   the time of writing my general report.

24             So they -- I can't tell you, you know --

25   I'll just say prior to writing the report, these

Nicolette S. Horbach, M.D.

1  have all been reviewed, so they all are a basis

2  for my opinion.

3         Q    Let's look, if you go to the Ks, because

4  I guess it's in alphabetical order.  About midway

5  down the page, there's four articles by Klinge --

6         A    Yes.

7         Q    -- the, the name of the author you

8  listed.

9              Let's go to the first one.  It's titled

10  "Foreign Body Reaction to Meshes Used for the

11  Repair of Abdominal Wall Hernias," published in

12  1999 in the OP Journal of Surgery.

13             Do you see that?

14         A    Yes.

15         Q    Okay.

16             What is significant about that article,

17  in your opinion?

18         A    It discusses prior experiences with the

19  body's reaction to mesh placed in other locations.

20         Q    Was there anything in particular in the

21  article that was of significance to you?

22         A    The -- I mean it's the entire

23  information and how the body reacts and

24  discussions regarding some of the microscopic

25  evaluation of how the body reacts to meshes in the

Nicolette S. Horbach, M.D.

1    abdominal wall, which may, may or may not be how

2    the body reacts to meshes in the vaginal area.

3    It's a background of --

4         Q    Does the body react -- I'm sorry.

5              Does the body react the same way the

6    meshes -- rephrase.

7              Is the body's reaction to meshes in the

8    abdominal wall the same as the body reactions to

9    meshes in the female pelvis?

10        A    Not necessarily.

11        Q    What do you mean by that?

12        A    It may or may not.  There are different

13   parts of the body, and sometimes even in the

14   abdominal wall, use of meshes for hernias, there's

15   going to be differences in how a body will react

16   from one patient to another, similar to what may

17   happen in the vagina.

18        Q    As a general proposition, what are the

19   differences in the body's reaction to the mesh

20   material used in the Prolift when it's in the

21   abdominal wall as opposed to when it's in the

22   female pelvis?

23             Can you give me some general differences

24   about how the body will react to that mesh

25   material?  Do you have an opinion on that?

Nicolette S. Horbach, M.D.

1      A    I can give you information about how the
2  body can react to it.  I don't know that I can
3  predict that it will react in that way.
4      Q    Well, I want to know if you have an
5  opinion to a reasonable degree of medical
6  probability where you can say the body will react
7  differently to Gynemesh PS mesh material when it's
8  in the abdominal wall versus when it's in the
9  female pelvis, and tell me what those differences
10 are.
11     A    Again, you're asking me to say a will as
12 a definitive statement of future, and I can't.  I
13 will tell you what the body -- how the body may
14 react to the mesh in the vagina versus in the
15 abdomen and the differences that you may see in
16 those patients, but I can't say that it's a will
17 as an absolute.
18     Q    Well, reasonable degree of medical
19 probability means more likely than not.
20          Can you give me an opinion to a
21 reasonable degree of medical probability on that
22 question?
23     A    About how it may react in the vagina?
24     Q    Is there an understanding that the body
25 will react differently to Gynemesh PS mesh when

Nicolette S. Horbach, M.D.

1    it's placed in the abdominal wall versus when it's

2    placed in the female pelvis?  Is there a generally

3    accepted understanding that it will react

4    differently in any way in those two different

5    parts of the body?

6                    MR. COMBS:  Object to form.

7                    THE WITNESS:  There's some

8         information that there may be a different

9         reaction in those different parts of the

10        body, yes.

11   BY MR. SLATER:

12        Q    And what is that?

13        A    Well, part of the difficulty for the

14   vaginal area as opposed to the abdominal wall is

15   the nature of the environment, whether you're

16   dealing with a clean operative field versus

17   technically a clean contaminated field, although

18   that raises some of the controversial issues of

19   whether or not you can see infections or chronic

20   infections in the vagina relative to mesh, which I

21   don't think has been totally resolved one way or

22   the other.

23             You also have differences relative to

24   the depth of tissue layers.  In the abdominal

25   wall, the mesh has the advantage of having blood

Nicolette S. Horbach, M.D.

1  flow that can come from either above or below, so

2  the abdominal skin isn't necessarily -- or the

3  abdominal subcutaneous tissue isn't necessarily

4  totally dependent on blood flow from below and

5  through the mesh to be able to survive, whereas in

6  the vaginal area, the blood flow has to be able to

7  either come partially through the mesh or it has

8  to come laterally from the mesh to be able to

9  continue to provide blood flow to the vaginal

10  wall.

11        The issue about the degree of potential

12  scarring and contracture that occurs in the two

13  locations, there have been, you know, studies that

14  have said significant contracture in the abdominal

15  area, some studies saying less.  Some studies say

16  significant contraction in the vaginal area.  Some

17  studies say more.

18        So the difficulty is there's not an

19  absolute agreement on how everyone will -- how

20  each woman will react to the mesh placed in the

21  vaginal area.

22     Q    Any other differences?

23     A    I think that probably -- I'm trying to

24  remember the issues relative to the sort of

25  scarring and microscopic sort of scar plating, et

Nicolette S. Horbach, M.D.

1   cetera.  I -- it's been a year or so since I had

2   specifically read that article, so I would have to

3   pull it again to be able to specifically address

4   that with you.

5           Would you like me to do that?

6       Q   Well, I wasn't, I wasn't just asking

7   about the article.  I'm asking you about, in

8   general, your understanding of the differences in

9   how the body will react to the mesh, whether in

10  the abdomen or the female pelvis.

11          You understood that; right?

12      A   Okay.  That was not clear to me in the

13  question.  I thought you were saying -- referring

14  specifically to this article of how it reacts in

15  the abdomen versus other information about how it

16  reacts in the vagina.

17      Q   Well, the article that I cited to you

18  doesn't talk about the reaction of the mesh in the

19  female pelvis or vagina at all.

20          It's not even addressed in that article;

21  correct?

22      A   Correct.

23      Q   So what you were telling me about was

24  your general understanding of the different

25  reactions of the human body to the mesh, whether

Nicolette S. Horbach, M.D.

1   it's in the abdomen or the female pelvis; correct?

2       A    Yes, based on some of the information in

3   this article that was specifically cited versus

4   how it reacts in the abdominal area.  My

5   statements about the vaginal area reactions were

6   based on other articles and/or experience.

7       Q    Okay.

8           Well, based on all of your knowledge as

9   you sit here right now, are there any other

10  differences in how the body will react to Gynemesh

11  PS mesh, whether it's in the abdomen versus in the

12  female pelvis?

13      A    Well, yes.  There, there certainly is

14  going to be a, a risk in the female pelvis or when

15  it's placed in the vagina, of -- erosions of the

16  mesh is going to be higher than what you would

17  typically see in the abdominal wall.

18          That really reflects the information

19  that I had just discussed relative to blood flow,

20  that, you know, if you don't have blood flow to

21  those -- to the tissue in your optimal way, then

22  you may have that tissue die, and you may

23  experience a subsequent erosion or extrusion of

24  the material.

25          There can be neurologic irritation or

Nicolette S. Horbach, M.D.

1    neurologic symptoms post placement of a mesh

2    inside of the abdominal wall for hernia.  It's

3    difficult to determine whether or not that is

4    related to the mesh itself creating an issue or if

5    it's specifically more related to the surgery, and

6    so the similar situation would, would be present

7    in the vaginal area, that a mesh in and of itself

8    is not going to create a neuropathy or an injury

9    or a problem with the primary nerves to the

10   pelvis.

11        Q    Do you have an understanding of what

12   Ethicon Medical Affairs believes with regard to

13   whether or not when a woman has contraction of

14   mesh in her pelvis, and she complains of pain, as

15   to whether or not nerves are being involved in

16   that process?

17             MR. COMBS:  Object to form.

18             THE WITNESS:  I didn't know -- I do

19        not know what Ethicon Medical believes.

20   BY MR. SLATER:

21        Q    You agree with me that if there is

22   contracting mesh in the female pelvis and it's --

23   and the woman is complaining of pain, that the

24   pain is, is due to nerves being impacted by the

25   contracting mesh; correct?

Nicolette S. Horbach, M.D.

 1            MR. COMBS:  Object to form.

 2            THE WITNESS:  I disagree with that

 3      statement.  Well, actually, I don't agree

 4      with that statement as an absolute causative

 5      situation.

 6  BY MR. SLATER:

 7      Q    It's more likely than not that if a

 8  woman has a foreign body reaction and contraction

 9  of the mesh, that -- and that caused pain to the

10  woman, it's more likely than not that nerves are

11  involved in that process; correct?

12      A    Well, the way you've asked the question,

13  yes, nerves are involved, because nerves end up

14  conducting the sensation of pain, but that the

15  mesh is the causative situation in that in a

16  particular patient, you know, that's not something

17  that you can say to a complete degree of medical

18  certainty, no.

19      Q    I'm going to take a hypothetical.

20            A woman has Prolift mesh in her pelvis.

21  There is a foreign body reaction to the mesh.  It

22  causes an inflammatory response, leading to the

23  creation of fibrotic tissue.  That fibrotic tissue

24  interacts with the mesh and causes the mesh to be

25  contracted down by the, by the fibrotic tissue.

Nicolette S. Horbach, M.D.

1    The woman feels and experiences pain.

2              In that scenario, it's more likely than

3    not that nerves are being impacted by this

4    process, leading to the sensation of pain;

5    correct?

6              MR. COMBS:  Object to form.

7              THE WITNESS:  I agree that nerves

8         are being impacted, causing pain, but I won't

9         agree to within a medical degree of certainty

10        that the mesh is the underlying reason that

11        the patient is experiencing the nerves

12        sensation of pain.

13   BY MR. SLATER:

14        Q    In my hypothetical, why do you say that?

15        A    Because you have to postulate, you know,

16   what you're talking about.  Well, first of all,

17   you have to postulate that the patient's ability

18   to sense pain and recognize pain is appropriately

19   mapped, essentially, in her brain, that then ends

20   up being associated with the area that's involved,

21   because there -- oftentimes the neurologic

22   sensation, especially in the pelvis, and where the

23   patient perceives their sensation of pain isn't

24   necessarily related to a pathology in that

25   specific location.

Nicolette S. Horbach, M.D.

1        Q    All right.

2             Well, in my hypothetical, what's the

3    alternative likely cause of the pain other than

4    nerves being impacted by this process I described

5    in my hypothetical?

6        A    I can't make that decision without

7    having examined the patient to do a pain

8    evaluation.

9        Q    You would agree with me that my

10   hypothetical, as I phrased it, that it would be

11   reasonable if somebody were to say, well, that

12   process is leading to the pain that the woman is

13   experiencing?

14            That would be a reasonable diagnosis;

15   correct?

16            MR. COMBS:  Object to form.

17            THE WITNESS:  I think it's a

18       possible diagnosis, but I don't think it's

19       the only diagnosis that's present.  You have

20       to look for other causes of why the patient

21       may experience pain.

22   BY MR. SLATER:

23       Q    What would be the other potential

24   alternative causes in my hypothetical?

25       A    Well, it depends a little bit on where

Nicolette S. Horbach, M.D.

1    the mesh is, which part of the body the mesh is

2    placing that you're saying has the reaction, if

3    you're saying it's anterior wall versus, you know,

4    lateral wall versus posterior.

5         Q    I don't understand what you're --

6    honestly, with all due respect, I don't even

7    understand what that means.

8         A    That means you're telling me she had

9    mesh placed and that she's having a reaction, so

10   the question --

11        Q    I said Prolift.

12        A    Yeah.

13        Q    I said Prolift.

14        A    Fine.  A Prolift placed.

15             The question is where in the vagina is

16   the area that you're talking about that the

17   patient is having discomfort and sensitivity.

18        Q    Okay.

19             Let's say it's anterior Prolift, and

20   she's complaining of the pain and the sensitivity

21   in the anterior wall or anterior portion of her

22   vagina and anterior part of the pelvis near the

23   anterior wall.

24        A    Okay.

25             So in that case, you're going to have to

Nicolette S. Horbach, M.D.

1    rule out that there is any underlying urinary

2    pathology going on, whether it's urethral or

3    bladder.  You also have to rule out any -- you

4    know, depending on if the patient has gynecologic

5    organs, you have to rule out the gynecologic

6    organs, per se.

7              Alternatively, you also need to rule out

8    aspects of the overall pelvis and the pelvic --

9    the, the muscular situation, the ligaments that,

10   that could also be contributing to the pain.

11             Probably -- I mean although it would be

12   difficult for a patient to have a gastrointestinal

13   issue that's going to refer specifically to

14   pinpoint in the vagina anteriorly, that would be

15   pretty unusual.  I think it would have to be more

16   from a bladder standpoint, but there are other

17   reasons that a patient can experience pain.

18        Q    There may be other reasons, but my

19   scenario as refined by defining a Prolift anterior

20   system and the complaints of pain in the anterior

21   portion of the vagina, in that scenario, the

22   likely cause of the pain would be the

23   contracted -- the contraction of the mesh and this

24   inflammatory reaction; correct?

25                  MR. COMBS:  Object to form.

Nicolette S. Horbach, M.D.

1                    THE WITNESS:  I can't say that, no.

2    BY MR. SLATER:

3         Q    Okay.

4              When a woman has scarring and

5    contraction of a Prolift in her pelvis, that can

6    lead to clinically significant pain for the woman;

7    correct?

8         A    I can, I can answer that question in

9    such a way that if a patient experiences pain

10   after having had a Prolift placed, there is a

11   possibility that the Prolift is involved with the

12   pain issue.

13        Q    If a woman has a Prolift put in her

14   body, and the mesh contracts and also the mesh

15   erodes, leading to multiple operations, and the

16   woman is complaining of pain and discomfort from

17   the point the Prolift is in her body going forward

18   through this contraction of the mesh and the

19   erosions that are being treated, it's likely that

20   the Prolift is certainly a cause, if not the only

21   cause, since there may be other factors, but

22   certainly it is a cause of that pain most likely;

23   correct?

24                    MR. COMBS:  Object to form.

25                    THE WITNESS:  I think it depends on

Nicolette S. Horbach, M.D.

```
 1          the time period in which the -- you know,

 2          you're talking about the evaluation of the

 3          patient with pain.

 4                  If you're saying she's had multiple

 5          surgeries and she's had erosion and she's had

 6          her -- she's had mesh removed, then if you're

 7          palpating in an area of the vagina that does

 8          not have mesh, then at that particular time

 9          the mesh is not causing the patient's symptom

10          of pain.

11     BY MR. SLATER:

12          Q    Are you aware of the fact that a woman

13     may have either contracted mesh or eroding mesh

14     that contributed to an inflammatory reaction that

15     led to scar tissue formation in that area, but the

16     mesh can be removed, but the remaining scar tissue

17     can continue to cause pain and discomfort for the

18     woman?

19              You'd agree with that statement;

20     correct?

21          A    I think that that's an accurate

22     statement that, yes, that you can still have pain

23     from the scarring, yes.

24          Q    Let's look now again at your materials

25     reviewed.  Let's go to the second Klinge article,
```

Nicolette S. Horbach, M.D.

1    "Functional and Morphological Evaluation of a Low

2    Weight Monofilament Polypropylene Mesh for Hernia

3    Repair."

4           What was the significance of that

5    article to you?

6        A    Again, it goes into the issue of what

7    the microscopic changes are in meshes relative to

8    pore size.  Different --

9        Q    What's your understanding --

10       A    Different pore sizes --

11       Q    Sorry, sorry.

12       A    Different pore sizes of mesh will

13   typically induce a different reaction in a

14   biologic system.

15       Q    And what's your understanding as to the

16   significance of a one millimeter pore size in all

17   directions?  Do you have an understanding of the

18   significance to that figure?

19              MR. COMBS:  Object to form.

20              THE WITNESS:  Is it versus

21       something else, or -- I mean it usually is --

22   BY MR. SLATER:

23       Q    Does that have any meaning to -- I'll

24   ask it differently.

25              If I say to you there is a significance

Nicolette S. Horbach, M.D.

1   to whether or not the pores of a mesh used to

2   treat pelvic organ prolapse maintain a one

3   millimeter pore size in all directions under

4   strain, once in the body, does that statement have

5   any significance to you?  Does that make sense to

6   you?

7        A    Yes.

8        Q    You agree with that?

9        A    Can you make the statement again so I

10  can determine whether or not I agree with it.

11       Q    Let's ask the court reporter to read it

12  back to you, slowly.

13            (Whereupon, reporter reads

14            requested material.)

15            MR. COMBS:  Object to form.

16            THE WITNESS:  Again, the statement

17       "under strain," I'm not quite sure.  You

18       know, I understand that part of it, but I

19       think that if the -- that maintaining optimal

20       pore size would ideally have an impact on how

21       the mesh may respond in a patient.

22  BY MR. SLATER:

23       Q    And what you mean by that is if you've

24  maintained an optimal, optimal pore size of one

25  millimeter in all directions, that is understood

Nicolette S. Horbach, M.D.

```
1    to reduce the risk of scar plating and bridging

2    fibrosis and negative clinical impacts; correct?

3                    MR. COMBS:  Object to form.

4                    THE WITNESS:  In the -- I mean in

5         the hypothetical and in certain situations,

6         yes, but it may not make a difference in

7         other situations.  So I think that that's,

8         that's a difficult statement to make as a

9         global statement.

10   BY MR. SLATER:

11        Q    Well, as a general statement in regard

12   to the Prolift, you would agree that maintaining

13   pore size of one millimeter in all directions when

14   the mesh is actually in the body would reduce the

15   risk of scar plating and bridging fibrosis and

16   negative clinical impacts related to those --

17        A    It could --

18                    MR. COMBS:  Object to form.

19   BY MR. SLATER:

20        Q    -- phenomenons; correct?

21                    MR. COMBS:  Object to form.

22                    THE WITNESS:  It could reduce the

23        risk.  I'm not saying -- I don't think you

24        could say it would absolutely reduce the

25        risk.
```

Nicolette S. Horbach, M.D.

1    BY MR. SLATER:

2         Q    Meaning it can still occur even if you

3    maintain the one millimeter pore size, but if you

4    maintain that pore size, there's less risk of it

5    occurring?

6              Do I understand you?

7                   MR. COMBS:  Object to form.

8                   THE WITNESS:  I think in the

9         hypothetical case I would probably agree with

10        that.  I mean the problem is in, in humans we

11        can't really run those kind of experimental

12        studies and make those types of comparisons.

13   BY MR. SLATER:

14        Q    Are you aware of studies of explanted

15   mesh that have been performed by Dr. Klinge and

16   Dr. Klosterhoff, where they have actually measured

17   the pore sizes --

18        A    Yes.

19        Q    -- upon explant from the human body?

20        A    Yes.

21        Q    And you're, and you're familiar with

22   their theory that -- well, rephrase.

23             And you're -- are you familiar with

24   their findings that when they found -- well,

25   rephrase.

Nicolette S. Horbach, M.D.

1              And you're familiar with their findings

2     that confirmed that it's very important to

3     maintain at least a one millimeter pore size in

4     actual use in the body to try to reduce the risk

5     of scar plating, bridging fibrosis, resulting

6     contraction and erosion; correct?

7                     MR. COMBS:  Object to form.

8                     THE WITNESS:  I don't think that

9          they can make that conclusion based on

10         removal of explants from symptomatic

11         patients.  You have to be able to compare

12         that to explants removed from patients who

13         may not be symptomatic or who may or may not

14         have scar tissue, to be able to make a

15         comparison how the body is going to respond

16         if the pore sizes stay at one millimeter

17         versus how the body is going to respond if

18         they don't at, you know, less than a

19         millimeter.

20              You know, you can't run a

21         controlled evaluation in the individual

22         patient.  You have -- would have to, to be

23         able to also look at, you know, other

24         patients who are either not symptomatic,

25         don't have any scarring, don't have that so

Nicolette S. Horbach, M.D.

1        that you can make a comparison.

2              Otherwise you're just saying in

3        this particular patient and in this

4        particular situation, there is an association

5        that this particular patient has scarring and

6        a narrower pore size.

7              But to be able to say, you know,

8        that that won't happen or will happen

9        depending upon what the mesh does pore size

10       in a different patient, I don't think you can

11       make that statement.

12  BY MR. SLATER:

13       Q    Based on the scientific literature that

14  you've read, you would agree as a general

15  proposition that for the Prolift, if it can

16  maintain a one millimeter pore size in actual use

17  in the body, that that would reduce the risk of

18  bridging fibrosis, scar plating, contraction and

19  erosion?

20              As a general proposition, that is the

21  understanding in the literature that you've

22  reviewed; correct?

23              MR. COMBS:  Object to form.

24              THE WITNESS:  That is what is

25        proposed in the literature by some

Nicolette S. Horbach, M.D.

```
 1          individuals.  You know, whether they have,
 2          again, you know, sufficient information to
 3          make that assumption or make that conclusion
 4          I think is questionable.
 5     BY MR. SLATER:
 6          Q    That's what the considered -- well,
 7     rephrase.
 8               That is what the, the thought is in the
 9     literature you've reviewed now, at this point?
10               That's what the thinking is; correct?
11                    MR. COMBS:  Object to form.
12                    THE WITNESS:  That is what some
13          people have thought in -- that have written
14          their conclusions, but, you know, any of
15          these different individuals can publish an
16          article, publish their findings, and they can
17          make a conclusion that doesn't necessarily
18          mean that that conclusion is valid and can be
19          extrapolated across the board.
20     BY MR. SLATER:
21          Q    Do you, do you know whether or not
22     Medical Affairs at Ethicon believes that what I
23     just said to you is accurate?
24          A    I do not know what Ethicon Medical
25     Affairs believes.
```

Nicolette S. Horbach, M.D.

1    Q    Do you agree with me that Dr. Klinge and

2  Professor Klosterhoff are probably the two most

3  preeminent experts in the world with regard to

4  this subject of pore size and what impact that can

5  have clinically for a patient, in the world?

6              MR. COMBS:  Object to form.

7              THE WITNESS:  I think that they are

8         individuals that are -- have done a

9         tremendous amount of research and have a,

10        have a strong knowledge base on it, but I

11        don't know that they -- you know, if they're

12        only evaluating meshes that are explanted

13        from symptomatic individuals, you can't draw

14        that conclusion that the findings that they

15        see are, you know, absolutely a causative

16        reason for why the patient -- why the

17        scarring is there.

18  BY MR. SLATER:

19    Q    Move to strike.

20        Would you agree with me that Dr. Klinge

21  and Professor Klosterhoff are probably considered

22  to be the two most preeminent scientists in the

23  world with regard to the question of the

24  significance of pore size in meshes used within

25  the human body?

Nicolette S. Horbach, M.D.

1           And limit it to that question.

2           Would you agree with that statement?

3      A    I think they're one of the major

4   authorities.  I don't know if I would say the most

5   authority.

6      Q    Can you name anybody else?

7      A    No.

8      Q    Do you know whether or not Dr. Klinge

9   and Professor Klosterhoff told Ethicon that they

10  believed that the pores need to be at least one

11  millimeter in all directions in actual use in the

12  body to be safe?

13     A    I don't know whether they told Ethicon

14  that or not.

15     Q    Let's go to the fourth Klinge article,

16  "PVDF as a New Polymer for the Construction of

17  Surgical Meshes."

18          Do you know what PVDF is?

19     A    I did at one point.  I'm trying to

20  remember at this point now.

21     Q    Are you pulling the article out?

22     A    I'm looking to see if I have it, yes.

23     Q    What PVDF is?

24     A    I'm looking to see whether I have that

25  article in my folder here.

Nicolette S. Horbach, M.D.

1      Q    Doctor, Doctor, my question is:  As you

2   sit here now without looking at the article, do

3   you know what PVDF is?

4      A    I can't say that right this minute, no.

5      Q    Okay.

6           That was my question.

7      A    I had previously answered that.

8      Q    You listed articles here by Neilson,

9   several articles regarding the TVT.

10          Why were those listed?

11     A    Oh, I'm sorry.

12          The -- some of the original information

13   regarding how mesh responds in the body or in a

14   tunnel of the body can be potentially looked at

15   when you look at a TVT type procedure where

16   similar strips or arms of material have been

17   placed in the body.

18     Q    Do you know whether or not these

19   articles by Neilson actually deal with the TVT

20   that was marketed by Ethicon?

21             MR. COMBS:  Object to form.

22             THE WITNESS:  I can't recall that.

23   BY MR. SLATER:

24     Q    Do you feel that there can be

25   significance to -- well, rephrase.

Nicolette S. Horbach, M.D.

1              Even though the TVT is a different

2    device than the Prolift, do you feel that

3    information as to how the TVT reacts with tissue

4    can be significant to you with regard to how the

5    Prolift will react in the body?

6         A    Yes.  In my clinical experience, yes.

7         Q    Look at the cytotoxicity testing for the

8    TVT?

9         A    Did I look at that?

10        Q    Yes.

11        A    No.

12        Q    Do you, do you know what cytotoxicity

13   testing is?

14        A    I don't know the specific testing that

15   would be done for it, but I'm basing this based on

16   my clinical experience with dealing with these

17   types of materials and meshes placed in the body

18   under the epithelium and in the, in the tissues of

19   the pelvis.

20        Q    Move to strike after, I think the answer

21   was something to the effect of "I don't know what

22   cytotoxicity testing is," and then there was --

23   the second part of the answer is about the

24   doctor's own experience.  I'm moving to strike

25   that second part of the answer.

Nicolette S. Horbach, M.D.

1          Did anybody ever tell you that the

2    cytotoxicity testing for the TVT showed that it

3    had moderate to severe cytotoxicity, which was an

4    indicator that there were the potential issues

5    with biocompatibility of that mesh in the human

6    body?

7          Were you ever aware of that?

8               MR. COMBS:  Object to form.

9               THE WITNESS:  No.

10   BY MR. SLATER:

11      Q    Are you aware of what Ethicon told the

12   FDA with regard to whether or not comparison of

13   the Prolift to the TVT was appropriate in

14   determining the safety and effectiveness for the

15   Prolift?

16      A    No, I don't know what Ethicon told the

17   FDA regarding that.

18      Q    You have a long list of articles here,

19   and I certainly don't want to ask you about every

20   single one of them.

21          If you were to be walking up to the

22   witness stand right now, and you wanted to tell

23   the jury what you thought were the ten most

24   important articles to support your opinions on

25   this literature list, which ones would you point

Nicolette S. Horbach, M.D.

1   to?

2        A     It would totally depend upon what

3   questions I was asked regarding my opinions.

4        Q     Obviously I don't want to be in a

5   guessing game, so let me take a step back.

6              Your report does not specifically refer

7   to the articles on this literature list; correct?

8        A     It does not reference them specifically

9   during the report, no.

10       Q     So if I look at your report, that will

11  not tell me which of those articles you believe to

12  be most significant to you, because they're not

13  identified?

14       A     I'm not sure that question to be the,

15  the reason -- or "because" I don't think is, is a

16  valid comment.  I have --

17       Q     Let me tell you what I'm trying to get

18  at.  You gave me the answer.  That's fine.

19             Here's what I'm asking you.

20             You are now on the witness stand in

21  front of the jury in New Jersey, and you get asked

22  the following question by counsel for

23  Johnson & Johnson:  "Doctor, you have a long list

24  of literature here in the materials you reviewed.

25  Can you tell me your top ten list of the most

Nicolette S. Horbach, M.D.

1    important ten articles that support your opinions

2    in this case?"

3             Can you point those out to me, please.

4                  MR. COMBS:  Object to the form.

5                  THE WITNESS:  I mean I can't -- I

6         can potentially tell you articles that I

7         think are important relative to my expert

8         report, but since I am not, you know, able to

9         know exactly what opinions are going to be

10        asked of me at -- in the future on the stand

11        by either counsel for defense or by counsel

12        for the plaintiff, I can't sit there and say

13        these are the ten most important articles.

14   BY MR. SLATER:

15        Q    So you can't answer that, answer that

16   question for me as you sit here now?

17        A    Correct.  I don't think that I would

18   be -- it would be an accurate answer if I tried.

19        Q    Let me ask you this.

20             Your reports, which we -- well, all

21   right.  Let me, let me just -- we'll come back to

22   that.

23             In your list of materials reviewed,

24   there's a section titled "Other."

25             Am I correct you have not read all of

Nicolette S. Horbach, M.D.

1  those materials on that list?

2      A    There are -- one that I see sort of

3  right off, off the bat is that I have not reviewed

4  or read the plaintiff's specific complaints or her

5  I guess plaintiff's answers to uniform whatever,

6  the first two things listed.  I don't recall

7  reading that.

8      Q    Are you able to tell me which of these

9  materials you actually reviewed and are relying on

10  for your opinions?

11      A    It will be all of the material that I

12  don't tell -- sort of it's the opposite.  I will

13  tell you which ones I didn't do, because all the

14  rest of it would be in there.

15      Q    Okay.

16      A    So the first two I had told you.

17      Q    That's fine.

18      A    I don't recall having read the memo to

19  customer from Sean O'Brien.

20      Q    So you're on the next page now?

21      A    Yes.

22           On the final page there are two articles

23  about the tissue reaction or biocompatibility.

24  I'm quite sure that I read the first one on the

25  tissue reaction in the rat.  Don't recall at this

Nicolette S. Horbach, M.D.

1  point whether or not I read the second one.  I may

2  have.  I just don't recall now a year later.

3      Q    The second one is the Ethicon

4  biocompatibility risk --

5      A    Correct.

6      Q    -- assessment for the --

7      A    Right.

8      Q    -- Prolift?

9      A    I may or may not have.  Again, I'm

10  trying to remember what I read a year ago.

11      Q    As you sit here now, is that document of

12  any significance to you?

13      A    The, the biocompatibility risk document?

14  Is that what you're asking?

15      Q    Yes.

16      A    Well, if I don't remember whether I read

17  it or not, I'm not sure I can tell you whether it

18  is of any significance to me.

19      Q    Is the 91-day tissue reaction study with

20  the rat of significance to you?

21      A    Again, it depends on what you mean by

22  significant.  It is a -- it is one of the studies

23  that was done to look at tissue reactivity in an

24  animal model for a, you know, similar type of

25  mesh, but -- and I know that there were some

Nicolette S. Horbach, M.D.

1    different reactivity issues but that there was

2    not, at least at this point, a specific -- the

3    reaction was not as pronounced as -- I'll just,

4    I'll just stop there.  Sorry.

5        Q    Anything about the 91-day rat study as

6    cited right here, that as you sit here now you can

7    say the result of that study is important in

8    supporting my opinions for this reason?  Can you

9    tell me that?

10       A    The rat study I guess I would say is

11   important because it is an animal model evaluation

12   to look for tissue reactivity from the

13   polypropylene mesh that was done prior to the

14   launch of Prolift.

15       Q    And what, if anything, about the results

16   is significant to you in supporting your opinions?

17       A    Well, first of all, that the study was

18   done in and of itself, and secondly, in the

19   particular study there was variations between the

20   tissue reaction of the individual rats, so it

21   wasn't as if all of the animals responded in

22   exactly the same way.

23            So it does indicate that there is

24   variability to the biologic response to a mesh

25   material.

Nicolette S. Horbach, M.D.

1      Q    You would agree with me that with regard

2   to the Prolift, there is variability with how

3   different women will react to having the Prolift

4   in their pelvis; correct?

5                   MR. COMBS:  Object to form.

6                   THE WITNESS:  Yes.

7   BY MR. SLATER:

8      Q    And that can have a -- rephrase.

9           And that can be significant in terms of

10  whether or not the outcome will be positive or

11  negative; correct?

12     A    That can be a factor.  The issue of it

13  being significant, I mean I -- again, your

14  definition of significant, my definition of

15  significant may be different, but it can be a

16  factor in how the -- of the outcome, yes.

17     Q    I define "significant" to not be

18  trivial.  Okay?

19          In that definition, you would agree that

20  the variability in women's responses to having a

21  Prolift in their pelvis can be significant in the

22  context of whether or not they will have a good or

23  bad outcome; correct?

24                  MR. COMBS:  Object to form.

25                  THE WITNESS:  I don't know that I

Nicolette S. Horbach, M.D.

1           can say that based on your definition of

2           significance.  It will be a factor.  In some,

3           in some patients it will be more of a factor

4           than it will be in other patients.

5    BY MR. SLATER:

6           Q     For some women, their response to the

7    Prolift can be a significant factor in leading to

8    a poor outcome with a Prolift; correct?

9           A     Poor outcome in terms of what?

10          Q     In terms of complications in their

11   clinical course.

12          A     I would say that's probably the case,

13   that if a patient has an excess reaction to the

14   material, that they could have an increased risk

15   of complications after the surgery, just like that

16   would be true in any surgery that we do that

17   involves a material.

18          Q     Move to strike from "just like" forward.

19   I'm going to limit my questions to the Prolift

20   here.

21               Did you ever see any warning to

22   physicians or patients that Ethicon was aware that

23   some women could have a more heightened reaction

24   to the Prolift that could lead to a higher risk

25   for complications?

Nicolette S. Horbach, M.D.

```
 1                    MR. COMBS:  Object to form.
 2                    THE WITNESS:  I don't recall seeing
 3          a statement to that degree of specificity,
 4          no.
 5                    THE VIDEOGRAPHER:  Excuse me one
 6          second.  I'm going to change the tape.
 7                    MR. SLATER:  Okay.
 8                    THE VIDEOGRAPHER:  We're going to
 9          take a necessary break for about a couple
10          minutes.
11                    Going off record at 10:49.
12                    (Whereupon, a short recess was
13                    taken.)
14                    THE VIDEOGRAPHER:  At 10:56 we're
15          on record, and let the record reflect at
16          10:49 we went off record, ending tape 1.  At
17          10:56 now, beginning tape 2 in our continuing
18          deposition of Dr. Horbach.
19     BY MR. SLATER:
20          Q    Dr. Horbach, could you look at the prior
21     page, please, looking at your list of other
22     materials.
23                    Right in the middle of the page, it says
24     Exhibit 15, letter to Brian Lisa from Mark
25     Melkerson, and it goes on to a listing of a bunch
```

Nicolette S. Horbach, M.D.

1    of different documents.

2           Do you see that?

3    A    Yes, I do.

4    Q    Can you tell me what, if any,

5    significance there is to, to the documents listed

6    there.

7    A    To my, the best of my recollection,

8    there was a discussion among individuals that were

9    at Ethicon regarding whether or not to proceed

10   with evaluation and launching of a variation of

11   the Prolift, and they, and they called this the --

12   you know, Project Lightning was that particular

13   decision whether or not to go forward or not with

14   it, and there were some discussions and cost data

15   going back and forth regarding timing of the steps

16   or the process for this project and/or cost issues

17   that were involved, and they were trying to

18   determine whether or not to proceed with it.

19   Q    And was that significant to you in

20   forming your opinions in this case?

21   A    It was part of the information that I

22   reviewed.  I can't recall if I made a statement in

23   my report that was specifically -- would reference

24   that.

25   Q    As you sit here now, is there anything

Nicolette S. Horbach, M.D.

1  within those materials that is of significance to

2  you in supporting your opinions in this case?

3  Anything you can point to right now?

4      A    No, I don't think so from that

5  particular memo.

6      Q    Do you know whether Ethicon was

7  concerned with the rates and consequences of

8  contraction and erosion of the Prolift?

9      A    I don't know what they discussed about

10 that or what they knew about it or their feelings

11 about it.

12     Q    Would, would you agree with me that

13 based on what you know, that Ethicon should have

14 been concerned about contraction and erosion with

15 the Prolift?

16             MR. COMBS:  Object to form.

17             THE WITNESS:  Yes.

18 BY MR. SLATER:

19     Q    You ultimately stopped using the Prolift

20 in about 2011; correct?

21     A    Actually, I went back in my data in my

22 office, the best we could retrieve it, as we're

23 doing a practice separation, and it looks like it

24 was more 2009 that I transferred to the lap --

25 more of a laparoscopic type of procedure.

Nicolette S. Horbach, M.D.

1      Q    So am I correct that you basically

2 stopped using the Prolift in 2009 and transitioned

3 to laparoscopic abdominal sacral colpopexy?

4      A    That is what I transitioned as my

5 primary treatment for apical prolapse.

6      Q    And that was based on your assessment of

7 the risk/benefit profile of the Prolift as

8 compared to laparoscopic abdominal

9 sacral colpopexy?

10              (Discussion was held off the

11              record.)

12 BY MR. SLATER:

13      Q    In 2009, you transitioned from the

14 Prolift -- well, rephrase.

15              Am I correct that in 2009 you basically

16 stopped using the Prolift and transitioned to the

17 laparoscopic abdominal sacral colpopexy based on

18 your assessment of the risk/benefit profiles for

19 the alternative procedures?

20      A    Yes.

21      Q    Risk/benefit profile for the Prolift --

22      A    I'm sorry.  You, you cut out again at

23 the beginning of your statement.

24      Q    Oh, that's not good.

25              In assessing the risk/benefit profile

Nicolette S. Horbach, M.D.

1    for the Prolift, was one of your concerns on the

2    risk side the contraction that could occur with

3    the Prolift?

4        A    That was not a factor in my clinical

5    decision-making regarding the risk/benefits of the

6    two procedures.

7        Q    In assessing the risk/benefit profile

8    for the Prolift, was one of your concerns on the

9    risk side erosion?

10       A    That was a hypothetical risk, although

11   we were not really seeing any difference in

12   erosion rates between sacrocolpopexies and between

13   Prolift.  So for us clinically, that was not a

14   relevant part of the, of the decision-making.

15       Q    What were -- rephrase.

16            When you stopped using the Prolift in

17   2009, what was the reason you stopped using it?

18       A    The -- one of the, one of the balances

19   of Prolift or different surgical procedures,

20   whether it's Prolift, sacral colpopexy, other

21   vaginal procedures without mesh is going to be

22   what is the specific defect that I need to try to

23   correct at the time of surgery, and which

24   procedure is going to be ideally most effective in

25   simply just the anatomic correction of the

Nicolette S. Horbach, M.D.

1   problem, followed by the risks associated for the

2   procedure itself in terms of duration of surgery,

3   in terms of, you know, interoperative and

4   post-operative complications, individual medical

5   history, individual bone structure.

6          There's a whole host of different pieces

7   of information I use in making a determination of

8   which procedure I choose to do.

9   Q     You were using the same analysis before

10  you stopped using the Prolift; correct?

11  A     Yes, I was.

12  Q     So what was it that occurred in 2009 to

13  where your analysis led you to say, okay, I'm not

14  going to use the Prolift anymore?

15          MR. COMBS:   Object to form.

16  BY MR. SLATER:

17  Q     What changed?

18  A     One of the biggest changes was that we

19  were able to transition from doing the sacral

20  colpopexy as an open procedure to being able to do

21  it as a laparoscopic procedure.

22          When the sacral colpopexy was something

23  we performed as an open procedure, it had a then

24  higher risk of potential complications and

25  problems that then placed it perhaps at a

Nicolette S. Horbach, M.D.

1  disadvantage to the Prolift, whereas in our hands,

2  when we were able to do the laparoscopic

3  procedure, we were able to reduce some of the

4  problems that we had seen associated with the open

5  sacral colpopexy, so that the procedure is now

6  between sacral colpopexy and Prolift, would, at

7  least in the majority of my patients, end up going

8  towards the sacral colpopexy if I was looking to

9  do an apical support procedure.

10      Q    So if I understand correctly, one factor

11  in why you stopped using the Prolift in 2009 was

12  because you felt that the laparoscopic sacral

13  colpopexy alleviated some of the morbidity that

14  was associated with the open procedure, and all

15  things being equal at that point, you felt the

16  laparoscopic procedure was a better procedure for

17  your patients than the Prolift.

18          Do I understand that correctly?

19          MR. COMBS:  Object to form.

20          THE WITNESS:  The first part is

21      correct.  The second part is too much of a

22      generalization.  My comment was that I felt

23      in the balance that a laparoscopic sacral

24      colpopexy provided a better option for my

25      patients with an apical prolapse.

Nicolette S. Horbach, M.D.

1                  We're not discussing, you know,

2          midline, anterior walls, posterior walls, et

3          cetera.  We're simply talking about apical

4          prolapse.

5    BY MR. SLATER:

6          Q    You told me you stopped using the

7    Prolift in 2009; correct?

8          A    Correct.

9          Q    You stopped using it for all defects,

10   whether it was apical, anterior, posterior.

11              You stopped using it completely;

12   correct?

13         A    Yes.

14         Q    So if a woman came into your office and

15   she had an anterior vaginal wall defect like what

16   Pam Wicker had, from 2009, when you stopped using

17   the Prolift, forward, you were not recommending

18   the Prolift to that patient, you were recommending

19   an alternative procedure; correct?

20         A    Yes, but it wasn't -- she didn't -- her

21   anterior vaginal wall prolapse was not a,

22   specifically a midline defect.  She had an apical

23   defect as well, so it would have been that her

24   apex needed to be supported, and that would have

25   most likely corrected her anterior vaginal wall

Nicolette S. Horbach, M.D.

1    relaxation that was coming out the hymen.

2         So I would have recommended a procedure

3    that would provide apical support, and at that

4    particular time I felt that the risk/benefits of

5    laparoscopic sacral colpopexy versus Prolift for

6    apical support problem would probably be in favor

7    of the sacral colpopexy.

8    Q    When you had patients come to you in

9    2009, from the point when you stopped using the

10   Prolift, with a defect that was not apical in any

11   way, you were not recommending the Prolift to

12   them, you were recommending an alternative

13   procedure; correct?

14   A    So if their apex was fine and it was a

15   midline anterior/posterior procedure thing, no, I

16   wasn't recommending the Prolift, but I probably

17   wouldn't have been recommending the Prolift to

18   those patients prior to 2009 either.

19        It's not something that I -- I would

20   have used it more in patients with a combined

21   defect rather than a single isolated midline

22   defect.

23   Q    From your perspective, you felt the

24   Prolift was not indicated for your patients unless

25   there was an apical defect?

Nicolette S. Horbach, M.D.

```
 1        A    Again, it's not that black and white.
 2   It is -- if there was an apical defect that was
 3   manifesting potentially with anterior vaginal
 4   relaxation, or there was an apical defect
 5   manifesting with posterior, you know, prolapse,
 6   and certain other criteria were met, then I would
 7   recommend a Prolift in that particular patient.
 8   If there were different criteria with the same
 9   anatomy, I still may have recommended a, you know,
10   a different procedure than a Prolift.
11             I mean that's the hard part is that
12   anatomy of the pelvis, and when you're trying to
13   do a prolapse operation, you are rarely presented
14   with a single isolated defect of support.  It's
15   usually a global issue, and so you have to
16   determine what is the best approach to dealing
17   with the global components of that patient's
18   prolapse.
19        Q    From -- well, let me ask you this
20   question.
21             Where you had patients that did not have
22   apical defects, what procedure were you -- or
23   procedures were you recommending?
24                  MR. COMBS:  Object to form.
25                  THE WITNESS:  It would depend to
```

Nicolette S. Horbach, M.D.

1           some extent on the patient's prior history as

2           well as, you know, other factors that were

3           played -- other factors that came into

4           account.  I would recommend for some patients

5           potentially a colpectomy or colpocleisis.

6           I would recommend for other patients perhaps

7           a native tissue repair.  I would recommend

8           for other patients perhaps a Prolift.

9      BY MR. SLATER:

10          Q    Did you perform Prolifts on women

11     without apical defects?

12          A    Probably.  Again, I'd have to go back,

13     but probably.

14          Q    If you did, it was very, very few;

15     correct?

16          A    I'm not going to say very, very few.  I

17     can't give you the specific numbers.

18          Q    Do you remember any patient that did not

19     have an apical defect where you performed a

20     Prolift on that patient?

21          A    An individual patient off the top of my

22     head, no, but I only remember a few of the

23     patients specifically that I did Prolifts in,

24     regardless.

25          Q    Well, whether you can remember the name

Nicolette S. Horbach, M.D.

1    of the patient or not, do you remember any

2    particular patient or any specific instance where

3    you performed a Prolift on a patient who did not

4    have an apical defect?

5        A    Yes, I have done that.

6        Q    How many times?  How many times?

7        A    I can't tell you that number.

8        Q    It would be very few; correct?

9        A    I can't tell you that number.

10       Q    It would probably be less than ten

11   patients; correct?

12       A    I can't answer that question.

13       Q    You still feel that native tissue repair

14   is a reasonable procedure; correct?

15       A    For which part?

16       Q    Women with prolapse.

17       A    Depends on what part of their pelvis is

18   prolapsing.

19       Q    As a general proposition, you would

20   agree with me that native tissue repair is a

21   reasonable alternative; correct?

22               MR. COMBS:  Object to form.

23               THE WITNESS:  It is an alternative.

24       In some patients it's more reasonable than

25       others.

Nicolette S. Horbach, M.D.

1    BY MR. SLATER:

2         Q    Okay.

3              After you stopped using the Prolift in

4    2009, if a woman did not have an apical defect,

5    what were the options that you were offering?

6              Just want to know the list of procedures

7    you would offer to that patient.

8         A    Without an apical defect?

9         Q    Yes.

10        A    So it's midline only.

11             I would -- most likely it would be

12   either a -- if it was a nonsexually active

13   patient, it might be a colpectomy, especially if

14   the anterior wall was a large prolapse or there

15   was significant dilation of the introitus or the

16   patient had failed prior surgery.  Alternatively,

17   I would probably use a native tissue repair.  I

18   don't think I was using biologic grafts at that

19   particular time period.

20        Q    Have you since begun to use biologic

21   grafts?

22        A    I tend not to, since my experience with

23   using them, and I can't remember whether it was

24   pre-2009 or post, was that the biologic grafts

25   really don't provide any additional benefit for

Nicolette S. Horbach, M.D.

1    prolapse repairs, and in the posterior vaginal

2    wall, they actually can worsen the outcome of the

3    prolapse repair.

4        Q    So after 2009, if you had a patient with

5    no apical defect, you would either offer the

6    patient native tissue repair, or if the woman was

7    not sexually active or had some other very extreme

8    medical history, you would offer a colpectomy; is

9    that a good understanding?

10       A    Yes, and actually I would, I would put

11   Prolift on the options that I would offer her.  It

12   doesn't -- they may not have chosen Prolift, but I

13   certainly would have still counseled them

14   regarding that being an option.

15       Q    Well, I thought you stopped using it

16   completely.

17       A    My decision to stop using it isn't

18   necessarily solely going to be my decision.  If I

19   counsel a patient regarding treatment options and

20   the pros and cons of treatment options, and the

21   patient chooses not to have that procedure, then

22   I'm not going to have a record that I did the

23   procedure, but that doesn't mean that I didn't

24   offer it to the patient.

25       Q    Well, after the point -- well, let me

Nicolette S. Horbach, M.D.

1    ask you this.

2            When in 2009 did you perform your last

3    Prolift?

4        A    I don't remember exactly.  We tried to

5    print it out, and I couldn't -- I don't remember

6    exactly.

7        Q    But it's on -- it's documented in your

8    office?

9        A    The hard part is we don't know that that

10   is the complete documentation because of the split

11   we're doing in our practice and the ability to go

12   back into the computer system and try to retrieve

13   all of the information.  There's -- the

14   information is in several different sites, and

15   some of it is more retrievable than others.

16       Q    There came a point in 2009 where you

17   performed your last Prolift procedure.

18            You don't know the exact date, but it

19   occurred in 2009; correct?

20       A    Correct.  I could not find any record

21   for having performed a Prolift in 2010.  Again, it

22   might have happened.  I just couldn't find any

23   documented record.

24       Q    Based on your recollection -- well,

25   rephrase.

Nicolette S. Horbach, M.D.

1              Is your recollection consistent with

2    your review of the documentation in your office

3    that the last Prolift you performed was in 2009

4    sometime?

5        A    Well, actually my recollection probably

6    wasn't consistent with that documentation, because

7    in my previous deposition I said that I thought I

8    had continued to perform Prolifts up until 2011.

9    So obviously my recollection was that I continued

10   to perform them for a longer period of time, but I

11   could not find documentation for 2010 and 2011

12   with the system that I have available.

13       Q    After the, the date, whatever that was,

14   in 2009 when you performed your last Prolift

15   procedure, did you continue to offer the Prolift

16   as an option to patients?

17       A    Yes.

18       Q    Did any of those patients say, okay, I

19   want a Prolift?

20       A    Obviously not, since I didn't do it past

21   that point.

22       Q    If a patient had said yes, I want a

23   Prolift, would you have performed it, or would

24   it -- would you have referred them to a different

25   surgeon?

Nicolette S. Horbach, M.D.

1      A     It depends on whether I think the

2   Prolift would be an appropriate procedure for

3   them.

4             I do recall one specific patient where

5   the family, the daughter wanted the patient to

6   have a Prolift, and I did not think that it was an

7   appropriate choice for that individual patient, so

8   I, I said that I would not do that, and if they

9   wanted a Prolift, they could go elsewhere.

10     Q     What happened?

11     A     They went elsewhere but then turned

12  around and came back to me, because they were told

13  by everybody else that I was the best one to do

14  their surgery, and I did not do her surgery.

15     Q     What was the consent discussion -- well,

16  rephrase.

17            When you were consenting patients in

18  2009 before you stopped using the Prolift, what

19  were the risks that you were telling the patients

20  about the Prolift?

21     A     I'm going to isolate this to more

22  specifically the choice of, let's say, Prolift as

23  a material versus sutures versus sacrocolpopexy,

24  et cetera, because the typical risks of, you know,

25  injury to the bladder, injury to the rectum, you

Nicolette S. Horbach, M.D.

1    know, all the kind of normal surgical things and

2    stuff, we're going to assume that that's already

3    part of the factor.

4            Is that okay?

5        Q    That's fine.

6            The general surgical risks that would be

7    consistent from procedure to procedure, just

8    because you're operating, I don't need you to go

9    through those, because we understand those to be

10   the same regardless of what procedure.

11       A    Okay.

12           So if I was counseling a patient

13   regarding a choice of a surgical procedure and

14   whether Prolift was appropriate for her or not, I

15   would first start by discussing with her what her

16   anatomic defect is, and therefore, which --

17       Q    I don't mean to interrupt you, Doctor.

18   I -- this -- my question is very simple.

19           I just want to know the list of risks

20   you were counseling patients about with regard to

21   the Prolift in 2009, aside from those general

22   surgical risks that would apply regardless of what

23   type of surgery you're doing just because they're

24   surgical risks in general.

25           I just want to know the risks, the list

Nicolette S. Horbach, M.D.

 1    of risks.

 2                    MR. COMBS:  Object to form.

 3                    THE WITNESS:  I would say that

 4         failure of the procedure; reaction to the

 5         material, including erosion into the vagina,

 6         bladder, rectum that could require future

 7         surgery; pain; scarring; risk of stress

 8         urinary incontinence post-operatively; risk

 9         of irritating voiding, symptoms of urgency,

10         frequency.

11                    When we talk about post-operative

12         pain issues, you know, we talk about

13         post-operative pain, whether it's a surgical

14         pain, you know, around the time of surgery,

15         whether it's long-term pain from scarring or

16         whether it is dyspareunia, depending on

17         whether or not the patient is sexually

18         active.

19                    I'm trying to remember if there was

20         anything else on the list that I would

21         specifically say.  To the best of my -- I

22         mean I may remember another one, but to the

23         best of my recollection, that was the bulk of

24         it.

25

Nicolette S. Horbach, M.D.

1    BY MR. SLATER:

2         Q    In 2009, if a woman was under the age of

3    60 and sexually active, were you cautious about

4    whether or not to recommend a Prolift?

5                   MR. COMBS:  Object to form.

6                   THE WITNESS:  I would still, I

7         would still have Prolift as a possible option

8         on the, on the list of choices.

9                   I think what you may need to

10        understand also is that I don't tell a

11        patient what surgery she should have.  That

12        isn't my role.  My role is to present her

13        with the potential options for correcting her

14        problem, and the pros and cons of each of

15        those options, and depending upon the

16        individual goal that the patient has for her

17        surgery, she may choose one option over

18        another, even if it wasn't maybe my first

19        choice for her.

20                  If I feel that the option is

21        absolutely not a good choice for her, as in

22        this one particular patient, I won't

23        recommend it or I wouldn't put it on the

24        table or I wouldn't agree to do it, but I

25        will at times do a procedure in a patient

Nicolette S. Horbach, M.D.

1          where it's not necessarily my first choice

2          for that patient, but because -- based on my

3          totally objective position as a physician,

4          but because the patient has different goals

5          perhaps than what I might have, they are

6          willing to take more or less of a risk, and

7          they choose a different alternative.

8      BY MR. SLATER:

9          Q    When you counsel a patient, one thing

10     you do is you say -- you'll tell the patient what

11     you think are the reasonable options for her

12     prolapse condition; correct?

13         A    Yes.

14         Q    It's common for the patient to say,

15     okay, those are the options, but Doctor, which one

16     do you recommend is the option that you think is

17     best for me, and can you explain to me why?

18              That, that's common; right?  They want

19     the recommendation; right?

20         A    I'm asked that question.  I rarely give

21     them an answer that is where I say this is what I

22     would do.  I rarely say that to a patient.

23         Q    Okay.

24              Let's take a woman who is under the age

25     of 60, she's sexually active, you offer the

Nicolette S. Horbach, M.D.

1    Prolift as one of the options.

2            Were you telling a patient with that

3    profile, however, you need to be cautious because

4    of the risks to a sexually active woman with a

5    Prolift?  Was that something that you would

6    include in your discussion in 2009?

7                    MR. COMBS:  Object to form.

8                    THE WITNESS:  Yes.  I would do that

9        whether she was under 60 or over 60.

10   BY MR. SLATER:

11       Q    Okay.

12            When you stopped using the Prolift in

13   2009, did your partners in your medical practice

14   also stop using it?

15       A    I don't recall when they converted to

16   doing laparoscopic as their primary method.  I do

17   think that one in particular did continue using

18   the Prolift for an additional period of time,

19   because he was not experienced with doing

20   laparoscopic surgery, so he did continue using

21   transvaginal mesh type procedures for a longer

22   period of time.

23       Q    You actually published an article

24   regarding laparoscopic sacrocolpopexy in 2012;

25   correct?

Nicolette S. Horbach, M.D.

```
 1        A    Yes, that was published.  One of our
 2   fellows had gone through some of the information
 3   from our practice, yes.
 4        Q    One of the things it says in the article
 5   is, "Our suture extrusions were of minimal
 6   clinical significance, as most were asymptomatic
 7   and none required reoperation."
 8             That was, that was one of the things
 9   that was stated in that article; correct?
10        A    I assume that you're reading it, yes.  I
11   mean I don't have it in front of me.
12        Q    It's on page 116 of the article, just
13   for the record.
14        A    Do you have the -- do you have that as
15   an exhibit?
16        Q    No, I don't.  I'm just going to ask you
17   a quick question.
18             The reason -- well, rephrase.
19             In your experience, a suture extrusion
20   is usually of minimal clinical significance;
21   correct?
22                  MR. COMBS:  Object to form.
23                  THE WITNESS:  Yes.
24   BY MR. SLATER:
25        Q    In balance, if there's an extrusion of a
```

Nicolette S. Horbach, M.D.

1   suture as compared to an extrusion of Prolift

2   mesh, it's more likely that the Prolift mesh

3   extrusion is going to be more clinically

4   significant; correct?

5        A    Depends on the size of the mesh

6   extrusion.  Some, some mesh extrusions may be

7   totally asymptomatic, and others may be

8   symptomatic.

9        Q    General proposition, you would agree

10  that an extrusion of Prolift mesh will be more

11  clinically significant than an extrusion of a

12  suture; correct?

13       A    Again, it depends upon if you're talking

14  about the same size of mesh that's -- the same --

15  a suture is going to be a certain size.  If you're

16  talking about a mesh erosion that's the same size,

17  then they are both going to be probably fairly

18  similar in their clinical manifestation, but if

19  you're talking about a suture versus a larger mesh

20  erosion, then the larger mesh erosion will

21  typically be more clinically significant.

22       Q    Okay.

23            In your list of materials, the "Other"

24  section, on the page where we -- I had just been

25  asking you about, fourth from the top is a

Nicolette S. Horbach, M.D.

1    clinical expert report regarding the Prolift,

2    dated July 2, 2010.

3              Was that document of significance to you

4    in forming your opinions in this case?

5        A    I would have to pull the document before

6    I could say specifically what the significance of

7    that document was.  It was part of what I looked

8    at in forming my opinion.

9        Q    As you sit here now, is there anything

10   about that document that you can say, you know,

11   this was significant for this reason, I'm relying

12   on it for this reason for one of my opinions?

13   Anything like that you can tell me as you sit here

14   now?

15       A    Without pulling the article, the

16   document, I cannot say that.

17       Q    I saw no references to that document in

18   your report.

19              Is that accurate, based on your

20   knowledge of your report?

21       A    Not necessarily, because I didn't really

22   reference any of the -- I referenced very few of

23   the articles specifically by author, name, et

24   cetera.

25       Q    Do you know what a clinical expert

Nicolette S. Horbach, M.D.

1    report is?

2         A    In this particular patient or this

3    situation?  I'm trying to remember the specifics,

4    but I believe I recall it.  I think perhaps --

5         Q    What is a clinical expert report?

6         A    Just like what I've -- you know, a

7    report -- like what -- how can I explain it other

8    than it's a person who is an expert that's giving

9    a report on a particular product?

10             Let me see if I can pull that particular

11   article so that I can talk more --

12        Q    I'm not asking you to pull it.  Please

13   don't.  Doctor, I'm asking you not to pull it out,

14   please.

15        A    Then I can't discuss it with you.

16        Q    Okay, and that may be so.

17             Do you know what the purpose of a

18   clinical expert report is within Ethicon?

19        A    No, I don't know what Ethicon uses that

20   for.

21        Q    And as you sit here now, there's nothing

22   you can tell me about the July 2, 2010 clinical

23   expert report for the Prolift?  There's nothing

24   you can tell me about it at all as you sit here

25   now; correct?

Nicolette S. Horbach, M.D.

1    A    I told you that I can't answer that

2  question without retrieving the document.

3    Q    Did you prepare for this deposition

4  today?

5    A    I did, yes.

6    Q    How much time did you spend preparing

7  overall for this deposition?

8    A    In the --

9    Q    Not just today, but total.

10   A    Well, it depends on what -- again, it

11 depends on what you mean.

12        If you're talking about preparing the

13 actual reports for the deposition that were done a

14 year ago, that is one bulk of time.  If you're

15 talking about how much time I spent to prepare in

16 the recent past, you know, recently for this

17 particular deposition, that's going to be a

18 different amount of time.

19   Q    Why don't you tell me both.

20   A    So the amount of time that I spent prior

21 to, in drafting, in reviewing this information and

22 drafting the reports, probably is going to be

23 close to 80 to 100 hours.  I don't recall right

24 off the top of my head.

25        The amount of time that I have spent

Nicolette S. Horbach, M.D.

1   more recently within the last couple weeks

2   preparing for this deposition probably approaches

3   around 50 hours.

4        Q    As part of that preparation, did you

5   review the documents listed in this list of

6   materials?

7        A    Did I go back and reread them?  Not --

8        Q    Any of them.

9        A    Not -- I did not reread all of the --

10  yes, I did read some of them again, but I didn't

11  read all of them again.

12            It was primarily based -- I read

13  primarily clinical information, such as the

14  medical record reports, transcripts of

15  depositions.  I reread those rather than, per se,

16  the articles.

17       Q    Do you know whether the IFU for the

18  Prolift was changed over the course of time to add

19  risks --

20       A    Yes.

21       Q    -- or warnings?

22       A    Yes, it was.

23       Q    Do you know why that happened?

24       A    I can only make an assumption.

25       Q    From your review of the materials that

Nicolette S. Horbach, M.D.

1  you looked at, do you know why it occurred

2  specifically, not an assumption, but factually why

3  the changes were made?

4      A    I don't have an internal Ethicon

5  document that says we are making these changes in

6  the IFU because of this, no.  I have not seen a

7  document to that effect.

8      Q    Are you aware of whether or not the

9  discussion of risks and benefits in the patient

10  brochure for the Prolift was changed over the

11  course of time?

12     A    Yes, it was.

13     Q    Do you know why?

14     A    Again, I would be making an assumption

15  of why they made the change.

16     Q    Based on a review of any documents or

17  deposition testimony as to why those changes were

18  made?

19     A    I told you that I didn't review the

20  depositions of the Ethicon employees, so I can't

21  certainly do it based on that, and I don't recall

22  having seen a specific written document, email, et

23  cetera, about why they specifically made the

24  changes in the patient brochure information.

25     Q    The depositions of Ethicon witnesses

Nicolette S. Horbach, M.D.

1   that are listed on your list of materials, you did

2   not review those; correct?

3        A    Yes.  That's what -- we said that at the

4   very beginning.  I did not.

5        Q    Okay.

6             Did anybody tell you why those materials

7   were being listed on -- well, let me ask you this.

8             Did you prepare this list, or did

9   counsel prepare this list?

10       A    This was a list that was, that was put

11   together based on both counsel and myself.

12       Q    When you saw the depositions of Ethicon

13  witnesses listed on here that you had not read,

14  did you question that or suggest to take their

15  names off since you hadn't reviewed those

16  materials and since you hadn't looked at them?

17       A    No, I did not suggest that.

18       Q    Up until right now, have you ever made

19  an effort on your own part to review internal

20  Medical Affairs or other documents from Ethicon to

21  try to get an understanding of what their

22  knowledge was with regard to the Prolift?

23       A    I guess the simple answer would be no, I

24  have not contacted them and asked them for

25  specific documents that were internal documents.

Nicolette S. Horbach, M.D.

1        Q    You understood that if you wanted to,

2    you could have asked counsel to give you internal

3    Ethicon documents so you could have an

4    understanding of what Ethicon's internal

5    information was?

6            You knew you could have asked for that

7    if you wanted to; correct?

8                MR. COMBS:  Object to form.

9                THE WITNESS:  Yes.

10   BY MR. SLATER:

11       Q    You chose not to; correct?

12       A    Yes.

13       Q    Let's look at Exhibit 5, if we could.

14           This is a document that we were provided

15   about two days ago titled "Supplemental Expert

16   Report General and Specific to Pamela Wicker."

17           What is this document?

18       A    I was provided additional medical

19   records and deposition testimony on very short

20   notice that I used in confirming my opinions or

21   adding to my opinions that I had previously had in

22   this particular case.  The documents also provided

23   me an update regarding her medical treatment,

24   medical visits since the time that I had done the

25   IME.

Nicolette S. Horbach, M.D.

1           So I was asked by counsel to provide a

2    brief additional statement based on the additional

3    information that I reviewed that was sort of --

4    some of it which was sort of hot off the press,

5    including Ms. Wicker's recent deposition.

6           So that's what --

7    Q    When were these materials, when were

8    these materials provided to you that you based

9    this supplemental report on?

10   A    Many of them within the last -- less

11   than a week.

12   Q    What materials did you actually review

13   to write this supplemental report?

14   A    Do you want to start with -- well, let's

15   see.  Where shall we start with?  I can just start

16   with medical records, I assume, I guess.

17          Some of this information is redundant

18   from the other list, but the medical records that

19   I reviewed was her updated medical records, the

20   issues of having been seen for the headache

21   evaluation, the more recent information from

22   Dr. Raz.

23   Q    Let me ask you this.

24          Are you able to -- well, rephrase.

25          Attached to your one-page supplemental

Nicolette S. Horbach, M.D.

1    report is a list of materials from pages 2 through

2    6.

3             What I would like to know is which

4    materials listed on pages 2 through 6 did you

5    actually read as support for this supplemental

6    report.

7        A    The --

8        Q    If we go to page 2, let's start on page

9    2 on the literature list.

10            Did you read any of those materials in

11   order to write this supplemental report?

12       A    These were -- well, some -- most of the

13   materials were read prior to even the supplemental

14   report.  There are a couple things that, you

15   know -- the Lee article, which was recent, I read

16   just recently, within the last couple days.

17       Q    Are you saying you've read every bit of

18   the literature on page 2?

19       A    I believe so.  At one point or the

20   other, yes.

21       Q    Well, let me ask you this.

22            You wrote a supplemental report where

23   you gave I guess clarification and, and -- on your

24   opinions.

25       A    Mm-hmm.

Nicolette S. Horbach, M.D.

1      Q    You don't cite any of this medical

2   literature in that report; correct?

3      A    No.  I was given very short amount of

4   time to try to provide this, and I have an

5   extremely busy clinical practice, so the ability

6   on the short notice that I was given as well as

7   the short notice of receiving some of the

8   documents, i.e., Pam Wicker's deposition from

9   Monday, it would have been pretty much impossible

10  for me to have been able to write a report and

11  cite specifically each thing that was included in

12  that report.

13     Q    Here is what I want to understand.

14          You said you were provided materials

15  less than a week ago.  You reviewed those specific

16  materials, wrote this supplemental report, and it

17  was served on me a couple days ago.

18          That's what occurred; correct?

19     A    Correct.

20     Q    I want to know what are the materials

21  you actually read in the last less than a week to

22  write this supplemental report, and I'll start you

23  off.

24          It says you read Dr. Raz's trial

25  deposition.

Nicolette S. Horbach, M.D.

```
1        A     Yes.

2        Q     So that's something you read?

3        A     Yes.

4              MR. COMBS:  Object to form.

5   BY MR. SLATER:

6        Q     You've told me that you read Pam

7   Wicker's deposition from earlier this week.

8              So you read that; correct?

9        A     Yes.

10       Q     Did you read both of those documents in

11  their entirety?

12       A     Yes.

13       Q     Have you watched the video of Dr. Raz's

14  trial testimony or have you just read the

15  transcript?

16       A     I have just read the transcript.

17       Q     Other than reading Dr. Raz's trial

18  testimony and reading Mrs. Wicker's testimony from

19  Monday, what else did you read in the last week in

20  preparation for writing this supplemental report?

21       A     I read Wallace's deposition.  I read, to

22  the best of my recollection, I'm not sure, the,

23  the three articles that are by Dr. Tu, I guess,

24  T-U, one or a combination of those.

25       Q     Oh, the three articles by Dr. Tu?
```

Nicolette S. Horbach, M.D.

```
1        A    Tu, yes, one or the other of those.  I

2    think I briefly looked at Ozel.  That -- I mean

3    some of these things had been -- you know,

4    obviously I had read previously, but I think I

5    looked briefly at that article again.

6             I looked briefly at the Nygaard article.

7        Q    That's the "(2013) Long-term

8    Outcomes" --

9        A    Right.

10       Q    -- "following ASC"?

11       A    Yep.  That's the only one that's listed

12   here.

13            I looked at the Lee article, as we

14   talked about.  I'm trying to remember.  I looked

15   at one of the -- I'm going to kill his name --

16   Jacquetin articles.  I don't remember if that's,

17   if it's specifically this one or not, but I

18   remember reading more recently one of his articles

19   or her articles, because I can't pronounce the

20   name.  I think I read the Barber article.  The

21   Azar article.

22            Yeah, those are the best of my

23   recollection that I had either reviewed prior to

24   this.  Only -- I mean the Lee article was one of

25   the ones that was, you know, absolutely brand new
```

Nicolette S. Horbach, M.D.

1    kind of thing.

2           Many of these I've had previously and

3    sort of looked back at.  The Pelvic Pain One

4    issues were a part of it.  I mean I've even pulled

5    articles where information -- you know, last night

6    that isn't totally on this list, because I haven't

7    had the ability to put it on the list, so . . .

8           The medical record -- I'm sorry -- the

9    medical record part, the parts of the medical

10   record that were new since her -- since I did the

11   IME, so that would include the Newman, Nathan

12   Newman reports.

13        Q    Okay.

14        A    From that stuff.  The Mueller more

15   recent one.  I don't see it, but it may be under a

16   different name, but in terms of starting the beta

17   blockers.  The Raz report from March 2013.  There

18   were two Mueller visits.  The headache clinic

19   visits that she had.

20          The visits -- the foot -- she had an

21   evaluation for some left foot pain in, from March

22   of 2013 and April 2013, and she was seen by an

23   orthopedist for that.  Follow-up headache clinic

24   issues.  Follow-up headache clinic issues, and

25   Soundview Medical in September for her evaluation

Nicolette S. Horbach, M.D.

1    for hypothyroidism.

2           Those are the things I've specifically

3    listed here.

4       Q    Now let's go to the list of "Other" on

5    page 5 of 6.

6           Did you read any of these materials in

7    the last week in preparation of this supplemental

8    report?

9       A    Probably not, but let me look through.

10          The ACOG practice bulletin March 2004

11   and 2011.  I think that's probably -- I mean I

12   went back and looked, you know, briefly at the

13   IFUs and the patient brochure information and some

14   of the educational information, but I can't tell

15   you which of those umteen things listed there it

16   is, because it was just very, you know, flipping

17   through them, looking for stuff.

18          Again, there may be --

19      Q    This list -- I'm sorry.  Go ahead.

20      A    There may be additional new medical

21   records.  There was the one -- the Lawrence Newman

22   I think is one of her newer physicians.

23          So there may be additional records that

24   I looked at from, care from -- whatchamacallit --

25   last year after my IME onward, but I just didn't

Nicolette S. Horbach, M.D.

1    necessarily make a notation in my handwritten

2    notes, so there may be some additional things on

3    this one here.

4        Q    This supplemental report does not

5    reference any medical literature; correct?

6        A    Correct.

7        Q    This supplemental report does not list

8    or reference any expert reports; correct?

9        A    Correct.

10        Q    This supplemental report references the

11   deposition of -- the trial deposition transcript

12   of Dr. Raz and the transcript of Ms. Wicker's --

13   Mrs. Wicker's deposition this week; correct?

14        A    Correct.

15        Q    It does not reference any other

16   depositions; correct?

17        A    Well, the reference to Dr. Moldwin

18   was -- can -- is partially from deposition and

19   partially from medical record.

20        Q    Okay.

21             There's no other references to any

22   deposition testimony; correct?

23        A    There's not a reference to, although I

24   did -- I'm just trying to remember which ones I

25   have looked at further.

Nicolette S. Horbach, M.D.

1              There's --

2       Q    Move to strike.

3              There's no other reference to any

4    deposition transcripts in the supplemental report;

5    correct?

6       A    Correct, although I can add to the

7    supplemental list that I did re-review a portion

8    of Dr. Harris' deposition.

9              I'm trying to remember who else.  There

10   may be additional, but I don't recall right now.

11      Q    You listed certain specific facts from

12   certain medical records; correct?

13      A    Yes.

14      Q    The list of other documents on pages 5

15   and 6, none of those are referenced in your

16   supplemental report; correct?

17      A    They're not specifically referenced in

18   it.  They are information that I used.

19      Q    Move to strike.

20             None of the documents on page 5 or 6

21   attached to this supplemental report are

22   referenced in the supplemental report; correct?

23      A    Correct.

24      Q    On pages 5 and 6, there were lists of

25   anatomical videos, professional education slide

Nicolette S. Horbach, M.D.

```
 1    decks, IFUs, patient brochures.

 2             None of them are referenced in the

 3    supplemental report; correct?

 4        A    I already answered that question.

 5    Correct.

 6        Q    And as you sit here now, you couldn't

 7    tell me which of these you may have glanced at in

 8    the last week before writing this report; correct?

 9        A    Are you talking about from page, from

10    pages 5 and 6?

11        Q    Right.

12        A    From the anatomic videos and the Prolift

13    education ones, I can't tell you which of those I

14    specifically looked at.  I can tell you that the

15    ACOG practice --

16        Q    That wasn't my question.  Doctor, I

17    didn't ask about anything else.  I didn't ask

18    about ACOG.

19        A    You asked me about pages 5 and 6.

20    ACOG --

21        Q    I asked you about the, the videos and

22    the professional education slide decks.  That's

23    all I asked about in that question --

24        A    I misunderstood --

25        Q    -- and you answered that.
```

Nicolette S. Horbach, M.D.

1      A    I misunderstood the question.

2      Q    That's fine.

3           This list, was this prepared by you or

4    by counsel?

5      A    Both.

6      Q    The list of "other" materials, that was

7    prepared by counsel; correct?

8      A    Correct.  Oh, actually, counsel plus me

9    providing them some of the references.

10     Q    You provided the references for the ACOG

11   practice bulletins in March '04 and April 2011?

12     A    Correct, and there were some additional

13   references that I provided them, but they're not

14   on the list.  I just didn't have time to get them

15   on the list.

16     Q    Did you prepare the list of medical

17   records?

18     A    That list I did not specifically type in

19   myself, no.  They typed that in.

20     Q    On page 3, the list of expert reports,

21   was that prepared by counsel?

22     A    They did the typing, yes.

23     Q    The list of depositions, that was

24   prepared by counsel?

25     A    They did the typing, yes.

Nicolette S. Horbach, M.D.

1    Q    And you told me what you did, what you

2    did review, which means you did not review the

3    Barbolt, Kammerer, Weisberg --

4    A    Hang on.

5    Q    -- Weber or --

6    A    Can you --

7    Q    Did I go too fast?

8    A    So you're talking about depositions and,

9    and exhibits?

10    Q    Yeah, on page 3, am I correct you did

11    not read Barbolt, Kammerer, Weisberg, Weber or

12    Hinoul June 27, 2013?

13    A    I did not read them within this last

14    week in preparation for this, no.  I had

15    previously read Weber's.

16    Q    You have not read the others, Barbolt,

17    Kammerer, Weisberg and Hinoul?  You haven't read

18    those transcripts; correct?

19    A    Correct.

20    Q    Were you ever shown the clinical expert

21    report that Pete Hinoul prepared in 2012 for the

22    Prolift + M?

23    A    I don't recall.

24    Q    I don't see it listed anywhere.  You

25    don't remember seeing it; correct?

Nicolette S. Horbach, M.D.

1    A    I said I don't recall one way or the

2    other.

3    Q    I'll come back to this.

4         Well, let me ask you about this,

5    actually.  In the list of literature, there are

6    three references with an author whose last name is

7    Tu, T-U.

8    A    Yes, we talked about those before.

9    Q    Have you -- did you read each of those

10   articles?

11   A    I read the article -- I can't say that I

12   read all three of them in their entirety, but I

13   read portions of I believe all three.

14   Q    What was of significance to you, if

15   anything, from those articles?

16   A    The discussion regarding the pelvic pain

17   issues and approaches to pelvic pain.

18   Q    Is that what you mean by that?

19   A    I'm sorry?  I said --

20   Q    New question.

21        When you -- when you say "approaches to

22   pelvic pain," do you mean approaches to treatment

23   to pelvic pain?

24   A    Approaches to both evaluation and

25   treatment of pelvic pain in a patient that might

Nicolette S. Horbach, M.D.

1   be then referable -- or not might, but that is

2   referable to some of the issues I think going on

3   in Mrs. Wicker's situation.

4        Q    You would agree with me that Pam Wicker

5   has had chronic pelvic pain since the time the

6   Prolift was placed in her body; correct?

7                  MR. COMBS:  Object to form.

8                  THE WITNESS:  She has reported

9        episodic pelvic pain.  At times she has

10       reported not having pain.  So if you use the

11       definition of pain that's occurred for

12       greater than a six-month duration, then that

13       would -- her symptoms would fall into that

14       definition.

15                 THE VIDEOGRAPHER:  Excuse me one

16       second, counselor.  I have to change tapes.

17       At 11:56, off record, ending disc 1 in our

18       continuing deposition of Dr. Horbach.

19                 MR. COMBS:  Let's take a break for

20       a couple minutes.

21                 (Whereupon, a short recess was

22                 taken.)

23                 THE VIDEOGRAPHER:  Our time now is

24       1:07, and we are on record, beginning disc 2

25       in our continuing deposition of Dr. Horbach.

Nicolette S. Horbach, M.D.

```
 1              THE WITNESS:  Disc 3.

 2              THE VIDEOGRAPHER:  Well, it's

 3       actually disc 2, but thank you.

 4  BY MR. SLATER:

 5       Q    From the point you received the

 6  materials that you relied on for the supplemental

 7  report to the point when you authored the report,

 8  how much time did you spend on the review and the

 9  authoring of the report?

10       A    Sorry.  I'm just trying to add up.

11  Probably close to 20-ish hours.

12       Q    What day was it that you actually

13  received these materials?

14       A    I received some of the materials on

15  Monday and I received some of the materials on

16  Tuesday, and I'm trying to remember whether I had

17  anything additional come on Wednesday before I was

18  drafting it.  I actually had to cancel half a

19  day's worth of surgery to be able to draft this

20  given the time constraints, and so I'm actually

21  operating tomorrow morning as a result.

22       Q    So you received the materials that you

23  relied on to write the supplemental report Monday,

24  Tuesday, possibly into Wednesday, you drafted the

25  report, and it was served on me on Wednesday;
```

Nicolette S. Horbach, M.D.

1   correct?

2       A    Yes.

3       Q    And you spent about 20 hours; correct?

4       A    Reviewing -- again, reviewing the new

5   information that came and going back and reviewing

6   some of the older information as well in

7   preparation for this.

8       Q    The list of expert reports on page 3, I

9   don't remember if I asked you.  Did you read

10  those?

11      A    Well, I read mine again, and I don't

12  think -- I don't recall that I reread Dr. Weber's.

13  The other ones weren't -- I didn't read -- they

14  were sort of less relevant.  I mean granted with

15  more time I might have, but I didn't.

16      Q    So the only two depositions on that list

17  that you've read -- rephrase.

18          So the only two expert reports on that

19  list on page 3 that you have read are Dr. Weber's

20  and yours; correct?

21      A    I think previously, a year plus ago,

22  that I read either all or part of Dr. Murphy's.

23      Q    Did you make an effort to read all of

24  the articles written by the French TVM group with

25  regard to the Prolift?

Nicolette S. Horbach, M.D.

1      A     Prior to my expert report a year ago, I

2    had made an effort to read most, if not all.  I

3    have not subsequently pulled those specific --

4    that specific group of investigators' newer

5    literature.

6      Q     Here's what I want to understand very

7    clearly.  As you sit here now, are you able to

8    confirm for me whether or not the articles that

9    are listed on your two lists, that those that were

10   written by members of the French TVM group

11   constitute all the articles written by that group

12   regarding the Prolift?  Do you know whether or not

13   this covers all the Prolift articles by those

14   doctors?

15                  MR. COMBS:  Object to form.

16                  THE WITNESS:  No.  I'm sure -- I'm

17         sure it doesn't.  I mean there are other ones

18         that I've seen just in doing, you know, a

19         literature search or something else, that

20         I've seen, you know, a particular article

21         that I know is from that group, and haven't

22         necessarily pulled that article within the

23         last week as I was going through for this,

24         so -- but I know there's additional articles

25         by the French group.

Nicolette S. Horbach, M.D.

```
 1   BY MR. SLATER:
 2       Q    Let me, let me ask the question very
 3   simply.
 4            As you sit here now, you know that there
 5   are articles written by members of the French TVM
 6   group with regard to the Prolift that you have not
 7   read; correct?
 8       A    Correct.
 9       Q    Did you ever make an effort to ensure
10   that you would read all of the articles written by
11   the French TVM group with regard to the Prolift?
12   Did you ever set out to do that?  Was that ever
13   one of your goals as an expert in this case?
14       A    It was one of my goals to read those
15   articles that were done by the French group prior
16   to, you know, the 2008/2009 time period, because
17   that was most relevant with what was known in the
18   literature at the time.
19       Q    Why is that important?
20       A    Because you make a decision to some
21   extent, at least from a clinical standpoint, of
22   whether you choose to offer a treatment to a
23   patient, discuss the types of complications
24   associated with the patient, based on the
25   information that is available, you know, at the
```

Nicolette S. Horbach, M.D.

1    time that you're making those decisions and

2    counseling the patients, et cetera.

3           You know, we may have data that comes

4    out five years later, ten years later that there

5    is potentially another issue or new factors.

6    That, that information wasn't necessarily

7    available at the time.  It may change to some

8    extent what you choose to do or not do, but it

9    isn't necessarily as relevant to the information

10   and the decisions that were made at the time when

11   the Prolift was placed in this patient.

12       Q    Do you learn things about the risks of

13   the Prolift after October 20, 2008, the day of Pam

14   Wicker's surgery, that you felt were of

15   significance to you in doing a risk/benefit

16   profile for the Prolift?

17              MR. COMBS:  Object to form.

18              THE WITNESS:  I learned -- the, the

19        information that came out around that time

20        period -- and I can't tell you whether it was

21        right before that, before that October time

22        period in 2008, must have been right around

23        there -- was really more the information that

24        came out from our article that was published.

25              It was published in 2009, but the

Nicolette S. Horbach, M.D.

1        data was being gathered around that time,

2        sort of late 2000 -- or mid-2008, that that

3        manuscript and the abstract was being

4        prepared to submit to AUGS.

5                  So that information was coming out

6        just around the time of Pam Wicker's surgery,

7        and the information did affect to some degree

8        my counseling of the patients or going back

9        and looking and thinking would I approach a

10        patient differently or not with that

11        additional information.

12                  I don't think that there has been

13        information that's come out really

14        subsequently that has made, you know,

15        major -- made -- would make a major change in

16        my decision about how I choose to do Prolift

17        or not, because the, the risks that have come

18        out subsequently were risks that we knew

19        about at the time Prolift was being used.

20   BY MR. SLATER:

21        Q    You told me, if I understand correctly,

22   that when you were writing and then ultimately

23   publishing your article -- and you're talking

24   about the July 2009 article; correct?

25        A    The one that is authored by Matt Aungst?

Nicolette S. Horbach, M.D.

1        Q    Yes.

2        A    Okay, yeah, I didn't know that it was

3    July, but yes, his article in 2009, yes, that's

4    the article I'm referencing.

5        Q    Okay.

6             As you were gathering the data and then

7    participating in the writing of this article that

8    was published in July 2009, you said that there

9    were things that you were learning that had an

10   impact on your understanding of the risks, and

11   that, I believe you said, entered into your

12   evaluation of the Prolift; correct?

13                  MR. COMBS:  Object to form.

14                  THE WITNESS:  Correct to some

15        extent.  It was -- I knew those risks were

16        present.  You know, I knew these risks that

17        we talk about in the article were present.

18        The question is the prevalence or not of the

19        problems became a little bit clearer when we

20        had gone back and looked retrospectively at

21        the data, because it was the combination of

22        all four of us who were doing the surgery

23        rather than just my own specific clinical

24        experience with the patients.

25

Nicolette S. Horbach, M.D.

1    BY MR. SLATER:

2        Q    And what was it that you learned that

3    was of significance to you in connection with this

4    article that was published in July 2009 that had

5    an impact on your evaluation or your analysis of

6    the risk/benefit profile for the Prolift?

7        A    There were two issues, I think.  One was

8    that the rate of post-operative stress

9    incontinence ran, as the article says, around 25

10   or so percent, and that that information was

11   actually similar to what was being reported

12   through the CARE trial for sacrocolpopexies and

13   the likelihood of postoperative stress

14   incontinence for sacrocolpopexies.

15           So looking at the two procedures, the

16   concept that there was somewhat similar risks of

17   post-operative stress incontinence in women

18   post-op from a sacrocolpopexy versus a Prolift, my

19   perception, actually prior to getting all of this

20   data together, was that there was actually less

21   likelihood of post-operative stress incontinence

22   in the Prolift patients versus patients who had

23   undergone sacrocolpopexy.

24           That was my sort of personal Gestalt

25   when I had been doing these surgeries, but the

Nicolette S. Horbach, M.D.

1   data suggest that it's probably relatively

2   equivalent.  So it would simply mean that, you

3   know, I counseled -- I did not change per se how I

4   counseled patients regarding the risk of post-op

5   stress incontinence, because we talk about that

6   with any prolapse surgery that we do.

7            The second component was the issue of

8   the pain issue, and that there were a group of

9   patients who were -- who we had more difficulty

10  treating post-operative pain issues.  We hadn't

11  really looked at that in our sacrocolpopexy

12  patients or any of the other kinds of prolapse

13  patients we did.  We hadn't really gone back and

14  looked at specifically the number of patients who

15  experienced post-operative pain issues and whether

16  there was any kind of consistent pattern that we

17  could pick up preoperatively that we could use in

18  counseling, predicting, selecting patients, et

19  cetera.

20           This was sort of the first time we went

21  back and looked at those kind of issues, so it

22  alerted me to that for Prolift.  It also then

23  alerted me to looking at that for other prolapse

24  patients that were having sacrocolpopexies or

25  colpectomies, et cetera.  So it altered some of my

Nicolette S. Horbach, M.D.

1    preoperative evaluation of patients regardless of

2    which prolapse surgery I offered, and it altered a

3    little bit my preoperative management of some of

4    those patients.

5             A long answer, but hopefully that

6    clarifies it.

7        Q    Were the findings that you just

8    described to me factors in your decision to stop

9    using the Prolift?

10       A    No.

11       Q    Did you -- in the patients that you

12   operated on up until the point when you stopped,

13   did you modify your consent discussion in any way

14   as a result of what you just told me about, the

15   SUI rates and the paint issues and the difficulty

16   treating pain?

17       A    I did not modify the SUI counseling,

18   because it was essentially -- you know, that was

19   essentially similar rates we were quoting for

20   patients from prolapse surgeries of 20 to

21   40 percent based on CARE data and some of the

22   other data in the literature.  So it didn't really

23   change, since the 25 percent fit into that area.

24            The issue of counseling the patients

25   regarding post-op pain issues, it changed how I

Nicolette S. Horbach, M.D.

1    counseled them based on the changes of my

2    preoperative examination.

3            So if I had a patient with, you know,

4    fibromyalgia, or I had a patient who gave me a

5    history of underlying orthopedic issues, back

6    problems, hip problems, knee problems, et cetera,

7    patients who I felt were then potentially more at

8    risk for having, you know, some pelvic muscle

9    spasm or pelvic muscle problems even pre-surgery,

10   I became much more aggressive in my preoperative

11   assessment of that and screening them for

12   biomechanical issues, screening them more

13   intensively for pelvic muscle spasm preoperatively

14   or any symptoms that might suggest that, and then

15   counseling them that regardless of what procedure

16   we do, Prolift or anything else, you need to be

17   pretreated with physical therapy so that we can

18   make your post-operative course a little bit

19   easier for you.

20           If we don't and we just operate on you

21   as is, that your post-operative course may be more

22   difficult and that you may have more problems with

23   pain issues, or you may need physical therapy.

24           Even if we did pretreat -- pre-diagnose

25   it and pretreat it, we did have conversations with

Nicolette S. Horbach, M.D.

1    patients that we could still see a flare-up or

2    some recurrence of these symptoms postoperatively

3    that may require additional treatment.  Regardless

4    of whether we did Prolift or anything else, we

5    just had -- by co-coincidence, we picked Prolift

6    as our initial procedure to look at.

7         Q    Well, you had studied the Prolift as

8    part of this -- rephrase.

9              In this article you studied the Prolift,

10   so that was the data you had available to you was

11   Prolift; correct?

12        A    Well, yes, but at the same time as we're

13   collecting this data and we're seeing this

14   information, we are also then beginning to use

15   that sort of across the board when we evaluate

16   patients postoperatively for pain issues if they

17   have had a sacrocolpopexy, or if they've had a

18   colpectomy.

19             I mean this particular article for us or

20   for me in particular was really sentinel in

21   changing how, how aggressively I evaluate and

22   manage orthopedic, biomechanical pain conditions

23   in the pre- and the post-op patient, regardless of

24   the procedure I chose, even for, you know, even if

25   I was doing just a TVT.

Nicolette S. Horbach, M.D.

1      Q     Your study that you published in

2  July 2009 showed that there are some women who

3  develop pain following Prolift surgery that do not

4  respond to the treatment and could be left with

5  chronic pain; correct?

6      A     They had not responded to the treatment

7  to date at the time of the article.  I mean some

8  of the patients we don't know, because they were

9  lost to follow-up.

10      Q     During the time of the study, there were

11  patients who did not respond to treatment, and

12  their pain continued until the end of the study;

13  correct?

14      A     Correct.

15      Q     Did you change your counseling in any

16  way to start to counsel patients that the pain

17  that could result from a Prolift procedure,

18  despite treatment, could become chronic and

19  untreatable?

20      A     I --

21      Q     That's a yes-or-no question.  I really

22  just need to know if that's something you

23  counseled your patients about.

24              MR. COMBS:  Objection.

25              THE WITNESS:  I had, I had

Nicolette S. Horbach, M.D.

1        previously counseled the patients about that,

2        so no, I didn't change my counseling.

3    BY MR. SLATER:

4        Q    Did you always counsel your patients

5    about that, or was there a point in time when you

6    started to?

7        A    I always counseled.

8        Q    You actually pointed out in the article

9    that you believed that some of the patients had

10   pelvic pain due to mesh bunching and banding.

11        I want to ask you about mesh banding.

12   That is what Pam Wicker had; correct?

13            MR. COMBS:  Object to form.

14            THE WITNESS:  She had that at one

15       point in her care, yes.

16   BY MR. SLATER:

17       Q    And you pointed out in the article that

18   the banding can occur either due to the amount of

19   tension left on the mesh during the procedure, on

20   the actual arms, or it can happen if the mesh is,

21   as you describe it, properly placed due to

22   contraction with tissue ingrowth.

23        It can happen for either reason;

24   correct?

25       A    That is the hypothesis, yes.

Nicolette S. Horbach, M.D.

1      Q     And that's your, that's your current

2   hypothesis and your current opinion; correct?

3      A     Correct.

4      Q     So the mesh banding in the arms of the

5   Prolift in Pam Wicker, in your opinion, occurred

6   either due to the amount of tension left on the

7   arms at the conclusion of the procedure or due to

8   mesh contraction with tissue ingrowth following

9   the procedure.

10          You think those are the two likely

11  causes; correct?

12              MR. COMBS:  Object to form.

13              THE WITNESS:  For the -- those are

14         the two likely causes for the initial banding

15         I think that was noted when Dr. Bercik took

16         her back to the operating room on the second

17         occasion.  I'm not sure --

18  BY MR. SLATER:

19      Q     Answer my question.  That's all I was

20  asking about.

21      A     But there's also banding in discussions

22  potentially that Raz is talking about, and so

23  that's a separate issue, but if you're talking

24  just Bercik's second operation, then yes, those

25  would be the two possibilities.

Nicolette S. Horbach, M.D.

1      Q    Move to strike from "but" forward.

2           Dr. Raz clinically found what he

3    reported as tension bands of mesh around the

4    vagina; correct?

5      A    He reported in his first examination

6    that he felt a band, yes.

7      Q    That would likely be due to contraction

8    of the mesh due to tissue ingrowth; correct?

9               MR. COMBS:  Object to form.

10              THE WITNESS:  It is possible for

11         that, but it's also possible because she's

12         had the subsequent intervention from Bercik's

13         second surgery, so it's hard to say which one

14         of those were the biggest contributing factor

15         going into what Raz saw.

16   BY MR. SLATER:

17     Q    Do you believe it was a combination of

18   something that happened when Dr. Bercik operated

19   in February of '09 and contraction due to tissue

20   ingrowth that led to that banding Dr. Raz found?

21     A    I think that there is, yeah, reasonable

22   possibility that both factors were probably

23   involved.

24     Q    What about Dr. Bercik's February 2009

25   surgery would have contributed to that mesh

Nicolette S. Horbach, M.D.

1  banding that Dr. Raz found?

2      A    Well, there was, there was mesh banding

3  in association with scarring and vaginal, you

4  know, a vaginal band.  So it wasn't just an eroded

5  mesh band.  It was a combination of the two.  So

6  it is conceivable that what Dr. Raz found was

7  either from disruption of the Prolift mesh that

8  occurred during Dr. Bercik's second surgery and

9  potential retraction from the surgery he did the

10  second time, whether there was simply tightening

11  or scarring of that area, that vaginal -- that

12  vaginal tissue mesh, if you want to use that as a

13  combination, that band could have also been

14  partially due to scar tissue that forms just from

15  having had another procedure done.

16      Q    And you think more likely than not, it

17  was probably a combination of the two?

18      A    Yes.

19      Q    Plus, plus just contraction due to

20  tissue ingrowth as well?

21              MR. COMBS:  Object to form.

22              THE WITNESS:  I thought that was

23      what you were talking -- can you go back and

24      repeat the question.  I'm sorry.

25

Nicolette S. Horbach, M.D.

1   BY MR. SLATER:

2        Q    We're on the same page, so just to be

3   clear, it's your opinion that it's more likely

4   than not that that banding that Dr. Raz found was

5   due to a combination of what occurred during the

6   procedure Dr. Raz performed, as you described it,

7   and contraction due to tissue ingrowth; correct?

8                    MR. COMBS:   Object to form.

9                    THE WITNESS:   You said Dr. Raz, so

10        I think that that's not quite what the

11        question is.

12   BY MR. SLATER:

13        Q    Okay.

14        A    My understanding --

15        Q    I misstated the question.   Let me reask

16   it clean, just because otherwise the transcript

17   won't be clean.

18             And it's your opinion that it's more

19   likely than not that the banding Dr. Raz found was

20   due to the surgery Dr. Bercik did, as you

21   described it a moment ago, in combination with

22   contraction due to tissue ingrowth; correct?

23        A    Yes, with a small caveat.

24             That small caveat would be I don't know

25   whether or not the, quote, tissue ingrowth or

Nicolette S. Horbach, M.D.

1    contracture, whatever you're talking about,

2    whether that was a new phenomenon that occurred

3    between Dr. Bercik's second surgery and Dr. Raz's

4    first surgery, or was it potentially there even at

5    the first surgery to some extent and not

6    addressed, or by operating and doing what he did

7    at the second surgery, had he created a degree of

8    vaginal distortion that then pulls on the area

9    differently, and so the result is that combination

10   mesh vaginal band.

11           So that's the hard part.  Once you've

12   had the intervention of Dr. Bercik, it becomes

13   more difficult to say it's only caused by one

14   thing.

15       Q    Whether it's one of those things or some

16   combination of those factors you've listed, they

17   would all be causally connected to the Prolift

18   being in her body and then the treatment of the

19   complication of the contraction and the tension

20   band that Dr. Bercik treated in February; correct?

21               MR. COMBS:  Object to form.

22               THE WITNESS:  They would all be

23       related to the fact that there's a Prolift

24       there, yes.

25

Nicolette S. Horbach, M.D.

1    BY MR. SLATER:

2        Q    Okay.

3             You would agree the surgery Dr. Bercik

4    performed was indicated; correct?

5        A    Hang on just a second.

6             I -- based on his description of what he

7    found, it is certainly one option for treating it.

8    I probably would have considered a possible more

9    conservative option first, with trying to use some

10   physical therapy and see if you can improve the

11   pliability of the tissue prior to going in to, you

12   know, to cut or excise the mesh band.

13            I think it would be dependent on how

14   tight it really was of the tightness.  I mean

15   that's a subjective statement, but certainly a

16   very, very tight one that I didn't think was going

17   to be amenable to any type of tissue mobilization

18   or improvement of pliability by manual

19   manipulation, then I would have potentially

20   considered going in and reoperating on the

21   patient.

22       Q    Ultimately Dr. Bercik was -- rephrase.

23            Ultimately Dr. Bercik was exercising his

24   medical judgment as a surgeon as to what he

25   thought was the best way to treat this pain that

Nicolette S. Horbach, M.D.

```
1   Mrs. Wicker was complaining of from the Prolift;

2   correct?

3                   MR. COMBS:  Object.

4                   THE WITNESS:  Yes.  That appears to

5       be the case.  He was exercising his best

6       judgment.

7   BY MR. SLATER:

8       Q    In fact, in your July 2009 article you

9   talk about the fact that in two of the patients,

10  you actually excised mesh for pain, "and in both

11  cases we attempted to excise and release banding

12  that was palpable on examination rather than

13  remove the entire mesh."

14              And that's essentially what Dr. Bercik

15  did; correct?  He released the banding and removed

16  contracted mesh; correct?

17      A    Yes, that's correct.

18      Q    You talked a few minutes ago about the

19  fact that you were more focused on the literature

20  from predating Mrs. Wicker's surgery and you

21  weren't as concerned with literature post-dating

22  it, and we talked about that a few minutes ago.

23              Do you remember that?

24      A    When I was forming some of the opinions

25  that were in my report initially about
```

Nicolette S. Horbach, M.D.

1  decision-making process at that time, I mean

2  certainly I'm looking at the literature post that

3  to see whether it either confirms some suspicions

4  or doesn't confirm suspicions or raises new issues

5  or puts, you know, the old issues, you know, out

6  of the picture.

7      Q    If there were important issues with the

8  Prolift safety -- rephrase.

9          If there were important safety issues

10  with the Prolift that were discussed in literature

11  after October 2008, but Ethicon internally knew

12  those issues prior to the October of 2008 but

13  didn't warn about them, you would be critical of

14  that; right?

15              MR. COMBS:  Object to form.

16              THE WITNESS:  I mean I think it

17      would depend.  It would depend on what

18      Ethicon knew regarding the safety data or, or

19      not.  I mean I could say other things, but

20      you're just going to say strike it, so I'll

21      say it would depend on whether, what Ethicon

22      knew about the safety data and what level of

23      risk the safety data indicated.

24  BY MR. SLATER:

25      Q    Do you know whether or not Ethicon

Nicolette S. Horbach, M.D.

```
 1   Medical Affairs was learning about risks and
 2   adverse events with the Prolift after
 3   October 2008, or do you know as an alternative
 4   whether they claim to have known all the risks and
 5   adverse events from the very beginning?
 6            Do you know one way or the other?
 7                 MR. COMBS:  Object to form.
 8                 THE WITNESS:  I don't know what
 9        they claim.  I have sort of my opinion --
10   BY MR. SLATER:
11        Q    The question, though.
12        A    Yes.  I don't know what they claimed.
13        Q    Okay.
14            If Ethicon knew about a risk that had
15   not been described publicly, and that risk, if it
16   occurred to a woman, could cause very severe
17   injury to her, you would agree that risk would
18   need to be disclosed?  And I'm talking about
19   obviously with regard to the Prolift.  You'd agree
20   with that; right?
21                 MR. COMBS:  Object to form.
22                 THE WITNESS:  I think that, yes,
23        depending upon the, the frequency of the
24        risk.  You know, if there's something that
25        happens, you know, as one, once or twice, you
```

Nicolette S. Horbach, M.D.

```
1        know, incidental report, a death, things like

2        that, I mean you -- that's always a

3        possibility with surgeries, but I think if it

4        was something that was a repetitively present

5        problem, that that information needs to be

6        communicated whether it's by the company or

7        whether it's by us in the literature.

8        Sometimes we beat the companies.

9   BY MR. SLATER:

10       Q    You found in your July 2009 study that

11  3 percent of the women who had pelvic pain as a

12  result of the Prolift, it could not be

13  successfully treated through conservative

14  measures, and you talked about the fact that this

15  could be due to bunching or banding of the mesh,

16  and that that was leading to contraction; correct?

17             MR. COMBS:  Object to form.

18  BY MR. SLATER:

19       Q    You talked about 3 percent of the women

20  having that situation?

21       A    We talked about 3 percent of the women

22  having that situation, as we talked about before,

23  by the end of the study.

24       Q    And again, how long was that?

25       A    We followed the patients -- I'd have to
```

Nicolette S. Horbach, M.D.

1    pull out the article to see what the average

2    length of follow-up was for the patients and what

3    the standard deviation is.  I don't remember off

4    the top of my head, but it's probably going to be

5    in the results.

6        Q    It says on the front page "mean

7    follow-up was eight months."  Does that sound

8    right?

9        A    Yeah, that could be right, because it's

10   going to be patients that were relatively recently

11   treated or patients that were part of the earlier

12   group, but it also should give you a standard

13   deviation or a range, in parenthesis.

14       Q    I'm just looking at the abstract.  It

15   doesn't say it.  It just says "mean follow-up was

16   eight months."

17       A    Hang on two seconds.  I actually -- I

18   did bring it.  I just have to find it.

19       Q    You know, I'm actually not that

20   concerned about the time period.  My question

21   really goes to something else.

22       A    Okay.

23       Q    Let me ask you this question.

24            If Ethicon knew that there were women

25   who were going to have the Prolift put in their

Nicolette S. Horbach, M.D.

1    body, and as much as 3 percent of women were going

2    to have pain due to the Prolift that would not be

3    able to be resolved with conservative therapy, and

4    that that would relate to mesh bunching, mesh

5    banding due to mesh contraction, if they knew of

6    that, should they have warned about that from the

7    point they became aware of it?

8              MR. COMBS:  Object to form.

9              THE WITNESS:  I think that they

10        should warn about the risk of pelvic pain

11        after the procedure, whether it's due to mesh

12        bunching or banding or whatever the reason.

13        I think if there is -- if that is a risk of

14        the procedure, then it should be part of what

15        is in the warning.

16   BY MR. SLATER:

17        Q    Do you believe that if Ethicon knew that

18   the pelvic pain some women would experience due to

19   the Prolift would not be able to be safely and

20   effectively treated, if the company actually knew

21   that, that they should have warned doctors and

22   patients as to that fact, that you may not only

23   get pelvic pain, but it may not be treatable?

24        A    The issue of having that as a specific

25   statement in the literature, I mean I think that's

Nicolette S. Horbach, M.D.

1    a hard thing to say, because whether you say that

2    specifically or whether you say that the surgeon,

3    more so maybe than the patient, that the surgeon

4    needs to be aware of the risks and problems and be

5    familiar with mesh and be familiar with treating

6    patients with prolapse.

7            I mean a risk of persistent pain after a

8    mesh procedure, whether it's a Prolift, a TVT,

9    sacrocolpopexy, there is that risk, and that may

10   not be resolvable, it may not be reversible in a

11   patient, but that's in any of the patients that we

12   use a mesh procedure.

13           So does -- is Ethicon's role to

14   specifically spell that out as a statement versus

15   to say physicians need to be aware of the risks

16   associated with mesh surgery?  I mean, in part,

17   the people that are doing the surgery, and if

18   indeed they have that experience in whatever,

19   already know that that is an issue, that the

20   chronic pain could happen after a Prolift and that

21   it may not be treatable, I mean that's inherent in

22   knowing about doing mesh surgery.

23       Q    Do you know that the Prolift was

24   marketed as a revolutionary new procedure?

25       A    I'm not sure that the term

Nicolette S. Horbach, M.D.

```
 1    "revolutionary" per se was used.  It may have been
 2    used, but it was certainly marketed as a new
 3    procedure and being able to address things in a
 4    different way than we had done before.
 5         Q    And therefore, it would be important to
 6    make sure that doctors are told the full scope of
 7    risks, especially those that could be more severe,
 8    so the doctor would not be misled into thinking,
 9    well, this is new.  This is supposed to be so much
10    better than everything else, I don't have to worry
11    about these other issues I may have thought could
12    exist with mesh, because they're not telling me
13    it's a risk with this Prolift.
14              Isn't that a fair analysis?
15              MR. COMBS:  Object to form.
16              THE WITNESS:  No, because that
17         would assume the physician is an idiot,
18         because the problem is that there's no
19         physician who's going to sit there and think,
20         oh, well, I've been told by Ethicon this is
21         revolutionary and it involves mesh, and it's
22         going to eliminate any of the mesh problems
23         that I know can exist from all these other
24         procedures where we do mesh.
25              I mean you would have to be really
```

Nicolette S. Horbach, M.D.

1           naive, not thinking medically, you know, to,

2           to make that assumption, and I can't really

3           see any experienced surgeon who was doing

4           prolapse surgery, who was doing, you know,

5           mesh -- with or without mesh, thinking that

6           this procedure could, would eliminate the

7           possibility of a chronic pain issue and that

8           it would eliminate the possibility of

9           long-term pain that we can't treat.

10                  I just can't conceive of any

11          surgeon thinking that, regardless of what --

12          even if Ethicon told you that that was going

13          to be the way it was going to be, I wouldn't

14          believe it, because the bottom line is we

15          already know from our other experiences that,

16          that, that it's not necessarily the case.

17     BY MR. SLATER:

18          Q    Well, you're talking about what your

19     reaction would be.  Have you ever studied what

20     other doctors' reaction would be or how they

21     interpret warnings or information on labeling for

22     a medical device?  Have you ever studied that

23     question?

24                  MR. COMBS:  Object to form.

25                  THE WITNESS:  I have not studied

Nicolette S. Horbach, M.D.

1       the question.

2   BY MR. SLATER:

3       Q    If Ethicon knew from the very beginning

4   that the arms could become contracted and become

5   what we've been discussing as tension bands,

6   requiring surgery to get into those deep areas of

7   the pelvis to remove some of that mesh, but that

8   that might not resolve the pain being caused by

9   this contracting mesh, should that have

10  specifically been warned about, that phenomenon

11  specific to the Prolift?

12              MR. COMBS:  Object to form.

13              THE WITNESS:  Well, it's not a

14      phenomenon specific to the Prolift.  So I

15      mean it's a phenomenon --

16  BY MR. SLATER:

17      Q    The arms, the arms exist with the

18  Prolift -- I'm talking about the Prolift arms.

19      A    I understand that, but TVT has arms, TOT

20  has arms.  Those all can -- you know, those are

21  all mesh surgeries that have arms going into

22  tissue.

23              So I'm just trying to --

24      Q    My question is simple.  Here is my

25  question.

Nicolette S. Horbach, M.D.

```
 1              Should that have been warned about if
 2    Ethicon knew it at launch?  Simple question.  Yes
 3    or no?
 4                   MR. COMBS:  Object to form.
 5                   THE WITNESS:  Does that particular
 6         statement need to be placed in the warning?
 7         I would not think that it does, because I
 8         think it's already covered by the statements
 9         previously, which you have to have experience
10         and knowledge base with prolapse surgery and
11         meshes.
12    BY MR. SLATER:
13         Q    You think the warning said you need to
14    have experience with --
15         A    If you --
16         Q    -- prolapse surgery and meshes?
17         A    Yeah.
18              Sorry, sorry.
19         Q    Okay.
20         A    I think that --
21         Q    -- it says that --
22         A    I think that if you are an experienced
23    surgeon use, with the use --
24         Q    Doctor, there's no question.
25         A    -- of materials --
```

Nicolette S. Horbach, M.D.

1      Q    You're not answering a question right

2    now.

3      A    Okay.

4      Q    You're not answering a question.

5           It can be difficult, if not impossible,

6    to remove contracted mesh from some women

7    following Prolift surgery; correct?

8      A    It can be very difficult.  I'm not sure

9    I could go, you know, go to the extent of saying

10   impossible, but certainly it could be difficult

11   and could maybe be conceivably impossible to take

12   every bit out.

13     Q    If Ethicon knew that from the beginning,

14   should that have been warned about; yes or no?

15                  MR. COMBS:  Object to form.

16                  THE WITNESS:  I don't think it

17       needs to be a separate specific warning, no.

18   BY MR. SLATER:

19     Q    If Ethicon knew from the date of launch

20   of the Prolift that in some women the surgeon

21   would not be able to safely and effectively remove

22   mesh where necessary to treat complications, if

23   that was known, should that have been warned

24   about?

25     A    I don't think it needs to be

Nicolette S. Horbach, M.D.

1    specifically stated as such.

2        Q    And your -- and that opinion is based on

3    the fact that you just think doctors would just

4    figure that out all by themselves?

5              MR. COMBS:  Object to form.

6              THE WITNESS:  Doctors who do --

7        yes, doctors who do mesh surgery.

8    BY MR. SLATER:

9        Q    -- stop you for a second.

10       A    I'm sorry.  You, you cut out.

11       Q    We're talking --

12       A    You cut out.

13       Q    Let me stop you for a second.

14             MR. COMBS:  Well, wait, wait a

15       second.  We're, we're not --

16             MR. SLATER:  No, Phil, I'm

17       talking --

18             MR. COMBS:  No.

19             MR. SLATER:  -- so you don't

20       interrupt me.

21             MR. COMBS:  Well, no.  We're not

22       going to both speak at the same time.

23             MR. SLATER:  We're almost at lunch.

24             MR. COMBS:  She did not get to

25       finish her answer.

Nicolette S. Horbach, M.D.

```
 1              MR. SLATER:  Well, this is the
 2      problem.  I asked a yes-or-no question, and I
 3      have been very polite and let Dr. Horbach
 4      talk at length today, but now we're going to
 5      finish the deposition today.  We need to go
 6      to the part of the deposition where when I
 7      ask you a yes-or-no question, I get a yes or
 8      a no or you say you can't answer with a yes
 9      or no.
10              MR. COMBS:  But you're not going
11      to --
12              MR. SLATER:  And that's the part of
13      the deposition we -- I'm talking, so please
14      don't talk over me.  There is no way for the
15      court reporter to record two people at the
16      same time.
17  BY MR. SLATER:
18      Q    So that was a simple yes-or-no question,
19  and I know you want to get done today, and so do
20  I, so I'm going to ask you to just answer the
21  questions with a simple yes or no.  I don't want
22  explanations unless I ask for them.
23              MR. COMBS:  Are you finished?  Are
24      you finished, Mr. Slater?
25              MR. SLATER:  Yeah, I'm finished,
```

Nicolette S. Horbach, M.D.

```
1          Phillip.

2                  MR. COMBS:  Now, we're not going to

3          interrupt Dr. Horbach in the middle of her

4          answer with you berating her for what you

5          believe was an inappropriate answer.

6                  Now, if you don't like her answer,

7          you can object, but you're not going to

8          interrupt her, and you're not going to berate

9          her about it.

10                 MR. SLATER:  What do you want to

11         do?

12                 MR. COMBS:  You can ask her

13         questions and she can answer them, but you're

14         not going to interrupt her, and you're not

15         going to be -- you're not going to make

16         inappropriate comments about it.  That's --

17                 MR. SLATER:  Thank you for your

18         guidance.

19  BY MR. SLATER:

20      Q    Dr. Horbach, is the answer to my

21  question yes, or is the question [sic] no?

22                 MR. COMBS:  Object.

23                 THE WITNESS:  Could you read -- or

24         could the court reporter read the question

25         back for me?
```

Nicolette S. Horbach, M.D.

```
 1                 MR. SLATER:  Of course.
 2                 (Whereupon, reporter reads
 3                 requested material.)
 4                 THE WITNESS:  Yes.
 5    BY MR. SLATER:
 6        Q     -- in terms of what doctors knew --
 7        A     I'm sorry.  You cut out on the beginning
 8    of that.
 9        Q     Sure.  I'll ask again.
10              Have you ever studied in any way what
11    doctors knew aside from the warnings that were
12    given by Ethicon with regard to the particular
13    risks of not being able to safely or effectively
14    treat Prolift-related mesh complications?  Have
15    you ever looked at that?
16        A     I have not studied it, no.
17        Q     I want to come back to my question about
18    the TVM group literature.  There are several
19    articles that I'm familiar with that are not on
20    your list of materials reviewed.  Therefore --
21    well, let me ask it differently.
22              Are you familiar with an article that
23    was authored by Dr. Velimir and Dr. Jackatan
24    regarding a review of mesh with ultrasound?
25        A     Yes.
```

Nicolette S. Horbach, M.D.

1      Q    Did you see the level of the rates of

2  contraction that they found on that study?

3      A    Yes.

4      Q    Those rates were alarming, weren't they?

5           MR. COMBS:  Object to form.

6           THE WITNESS:  I think that's a

7      subjective statement.  There were various

8      rates.  They were what they were.

9  BY MR. SLATER:

10      Q    You would agree -- you would agree

11  they're very concerning; right?

12      A    They were what they were.  You have the

13  make the -- the individual has to make the

14  subjective conclusion about it.

15      Q    But you're the individual I'm asking

16  now, and that study showed over 80 percent of the

17  women had moderate to severe retraction of Prolift

18  mesh.

19           That is a concerning finding; correct?

20           MR. COMBS:  Object to form.

21           THE WITNESS:  It is a concerning

22      finding in the group of patients that they

23      selected.

24  BY MR. SLATER:

25      Q    You did not look at the ultrasounds

Nicolette S. Horbach, M.D.

1    performed by Dr. Raz, did you?

2        A    Yes.

3        Q    You did look at them?

4        A    Yes.

5        Q    I didn't see any opinions in your report

6    about those ultrasounds; correct?

7        A    I did not reference it in either report,

8    no, but I mean it's not something -- it is

9    something that I would potentially give an opinion

10   about if asked.

11       Q    You didn't mention it in your report;

12   right?  You didn't give any opinions about the

13   ultrasounds at all in your report; right?

14       A    No, I did not state that.

15       Q    Have you ever in your medical practice

16   used ultrasounds to locate mesh?

17       A    Yes.

18       Q    In a woman's body?

19       A    Yes.

20       Q    How often?  How many times?

21       A    A couple times.  Not a huge number, but

22   several.

23       Q    Less than five?

24       A    I don't know.

25       Q    Did you find that to be a useful tool to

Nicolette S. Horbach, M.D.

1    help to locate mesh?

2        A    In one particular patient it was

3    helpful, because the mesh was about one millimeter

4    by two millimeters, and I'm not even sure it

5    really was mesh, but in the other patients I don't

6    think it really was specifically helpful, because

7    the clinical impression helped me know where I was

8    looking for the mesh anyway.

9        Q    Was there a particular protocol used

10   when the ultrasounds were performed on those

11   patients that were your patients?

12       A    A particular protocol in terms of what

13   the radiologist did?

14       Q    In terms of how he -- was there --

15   rephrase.

16            Was there a particular protocol used in

17   terms of how the ultrasounds were performed with

18   your patients?

19       A    It was -- I can't answer that question.

20   I don't know, because it was done by radiology.

21       Q    Okay.

22            Did you read that Dr. Raz actually

23   interacted with the radiologist at UCLA Medical

24   Center, and together they developed a protocol to

25   image mesh on ultrasound?

Nicolette S. Horbach, M.D.

1        A    I know that he has a protocol that he

2    does, and I know that I spoke to my radiologist

3    about the same issues in trying to discuss what is

4    the best method -- what is the best method to

5    answer the question that I'm looking for, and so

6    if I talk to a radiologist and I say this is what

7    I'm concerned about, this is what I'm looking at,

8    ideally they use their expertise to be able to --

9    use their expertise to be able to answer the

10   question.  So I'm not going to tell them per se

11   how to do their protocol any more than they'll

12   tell me.

13       Q    Move to strike.

14            I don't -- Doctor, with all due respect,

15   I don't know why you're telling me that.  I didn't

16   ask any questions about that.  It was a very

17   simple question.

18            Here is my question.

19            Did you read that Dr. Raz worked

20   together with a radiologist at UCLA Medical Center

21   to establish a protocol to specifically use

22   ultrasound to image mesh?

23       A    I don't recall reading that he

24   specifically worked with the radiologist versus he

25   doing it himself.

Nicolette S. Horbach, M.D.

1      Q     Do you dispute that Dr. Raz imaged mesh

2  with the ultrasound as he testified to?

3                 MR. COMBS:  Object to form.

4                 THE WITNESS:  I think that the

5        photographs that I saw of the ultrasounds do

6        indicate mesh.

7  BY MR. SLATER:

8      Q     Did you actually look at the actual

9  ultrasounds themselves, the actual electronic

10  films?

11     A     No.  I looked at pictures of it rather

12  than the film itself.

13                MR. SLATER:  Why don't we do this.

14        It's 1:00.  We said 45 minutes, so why don't

15        we break for lunch until 1:30 and resume.

16        Does that sound good?

17                MR. COMBS:  Yeah, we'll try.  It

18        may take a little bit longer than 1:30, but

19        we'll try.  We'll definitely try to keep this

20        break as short as we can.

21                MR. SLATER:  All right.  Let's try

22        to shoot for 1:30 if you want to get out of

23        there.

24                (Discussion was held off the

25                record.)

Nicolette S. Horbach, M.D.

```
 1                    THE VIDEOGRAPHER:  Off the record
 2        at 12:56.
 3                    (Whereupon, the lunch recess was
 4                    taken.)
 5                    THE VIDEOGRAPHER:  Our time now is
 6        1:43.  On record.
 7   BY MR. SLATER:
 8        Q    Okay.
 9             Doctor, we've now gone through and
10   discussed Exhibits 2 -- and 5, which are the three
11   reports that you authored in this case; correct?
12                    (Discussion was held off the
13                    record.)
14   BY MR. SLATER:
15        Q    Doctor, we've now gone through the three
16   reports you've written in this case, which we've
17   marked as Exhibits 2, 3 and 5; correct?
18        A    Correct.
19        Q    And when you wrote those reports you
20   understood that you needed to express each of the
21   opinions that you formed in those reports;
22   correct?
23        A    Yes.
24        Q    And you did, in fact -- rephrase.
25             And those reports contain each of the
```

Nicolette S. Horbach, M.D.

1    opinions you formed in this litigation; correct?

2        A    Yes.

3        Q    When you wrote those reports, did you

4    write them carefully in the sense that you picked

5    your words carefully and tried to express as

6    clearly as possible what you intended to state?

7        A    Yes.

8        Q    For example, if you found, in your

9    opinion, that something was likely or probable,

10   you would say that; correct?

11       A    I would assume that if -- if it was

12   likely or probable by my definition of likely or

13   probable, then I would use that word.

14       Q    I -- in my -- rephrase.

15            I deposed you previously in August of

16   this year, August of 2013.

17            Do you recall that?

18       A    Yes.

19       Q    What I'd like to do now is see if I can

20   avoid going over old ground, so that's why I'm

21   going to ask you the following question.

22            In that deposition, when I questioned

23   you about your background, when I questioned you

24   about your experience, when I questioned you about

25   your opinions that were separate and apart from

Nicolette S. Horbach, M.D.

1   specific questions about the specific patient in

2   that case, if I were to ask you those same

3   questions today, could I expect to receive the

4   same answers?

5                    MR. COMBS:  Object to form.

6                    THE WITNESS:  I would expect so.  I

7          mean I can't say to absolute, because I'd

8          have to go back and read each of those

9          questions, but I would expect I would say the

10         same answers.

11  BY MR. SLATER:

12      Q     Did you review that deposition

13  transcript?

14      A     I read part of the deposition

15  transcript, skimmed more the other part of it.

16      Q     When you say you read part but skimmed

17  the other, did you skim the part that had to do

18  with that patient that was at issue in that case

19  but read the balance?

20      A     I think the majority of what I did

21  reading-wise, I think, was in the earlier part of

22  the deposition, and there were a number of

23  discussions relative to what I thought about

24  Ethicon's knowledge and Ethicon's

25  responsibilities, et cetera.  That part I did

Nicolette S. Horbach, M.D.

1   read.

2       Q    And with regard to those parts, was

3   there anything you saw where you said, oh, that's

4   wrong, or anything that you would say now you'd

5   give a different answer?

6       A    I don't believe so.

7       Q    Okay.

8       A    I'm sorry.  We had talked about the

9   issue, the one correction about when I stopped

10  doing TVTs -- or not TVTs.  Sorry.  Prolifts that

11  I corrected from instead of being 2011-ish, that

12  it was 2009, and --

13      Q    Right.

14      A    -- I'm trying to think if there were

15  anything -- I think that was the major issue.  It

16  turns out that I -- oh, the other correction was

17  you had asked me how long I had spent on looking

18  at just Pamela's records and stuff.  I guess --

19  well, maybe it was the -- I think I had perhaps

20  underestimated the number of hours, but I think --

21  the rest of it I think is pretty -- I didn't, I

22  didn't mark anything else that was to be

23  corrected.

24      Q    Okay.

25           You do not practice orthopedics, do you?

Nicolette S. Horbach, M.D.

1    A    No.

2    Q    You do not hold yourself out as an

3  expert in the field of orthopedics, do you?

4    A    No.

5    Q    When Pam Wicker went to Dr. Bercik,

6  there were several alternative treatments and

7  treatment strategies that would have been

8  reasonable; correct?

9    A    There were other treatment strategies

10  besides the surgery, yes.

11    Q    And the reason -- the reasonable

12  alternatives for Pam Wicker would have included,

13  for example, doing nothing and just watching and

14  waiting and seeing how she does going forward;

15  correct?

16    A    Yes, a little bit, with the comment

17  about relative to the pain issues she was

18  experiencing.  From the bulge itself, if you only

19  look at the anatomy, yes, she could have gone

20  ahead and just observed it.

21    Q    One option would have been for

22  Mrs. Wicker to do pelvic floor strengthening

23  exercises, not have surgery and see how she does

24  going forward?  That would have been one

25  reasonable option; correct?

Nicolette S. Horbach, M.D.

1      A     I would agree with all of that, other,

2   other than perhaps the pelvic floor strengthening

3   exercises.  That's usually used more for

4   incontinence patients than for prolapse patients.

5      Q     One option for Pam Wicker would have

6   been to have a suture repair without mesh;

7   correct?

8      A     Correct.  Transvaginal suture repair

9   without mesh, yes.

10     Q     -- option for Pam Wicker would have been

11  to have abdominal sacrocolpopexy, whether open or

12  laparoscopic; correct?

13     A     Yes, with perhaps some vaginal work done

14  simultaneously.  It would depend upon how the

15  anatomy sort of ended up being at the end of the

16  apical lift.

17     Q     And so each of those alternatives we

18  just went through would have been reasonable

19  alternatives to be selected; correct?

20     A     They are options that she could have

21  considered, yes.

22     Q     Can you tell me to a reasonable degree

23  of medical probability what would have happened if

24  Pam Wicker had chosen one of those other options?

25     A     In terms of what?

Nicolette S. Horbach, M.D.

1      Q    What happened within her pelvis, in

2   terms of whether or not she would have had pain.

3   What, if any, complications, whether or not she

4   would have felt pain.  Are you able to tell me

5   what would have happened if she had taken another

6   course?

7               MR. COMBS:  Object to form.

8               THE WITNESS:  I can give you my

9         clinical opinion regarding what I think would

10        happen in her case regarding a number of the

11        different issues with the different

12        approaches surgically, based to some extent

13        on her clinical situation and based on what

14        the literature says over all of the data,

15        failures, success, et cetera.

16   BY MR. SLATER:

17      Q    Well, I want to ask you in the case of

18   Pam Wicker, based on her own condition at the time

19   that she went in to Dr. Bercik on October 20,

20   2008, if she had had a suture repair or had no

21   treatment as of that time or one of these other

22   alternatives, are you able to tell me whether or

23   not she would have had to have further surgery?

24   Is there any way to know that?

25      A    I think that if she had had a

Nicolette S. Horbach, M.D.

1    transvaginal suture repair without mesh, that

2    there is probably -- there is a reasonable

3    likelihood she would have had a recurrence of her

4    prolapse and would have potentially faced another

5    surgery.

6         Q    What do you base that on?

7         A    My, my knowledge of the literature as

8    well as my experience over 25 years of doing these

9    types of surgeries.

10        Q    Are you saying that there would have

11   been a statistical possibility of that occurring?

12        A    Yes.

13        Q    But you can't say to a reasonable degree

14   of medical probability whether or not it would

15   have occurred.  You can just say statistically

16   it's a possibility; correct?

17        A    I think that in her case that it may be

18   a little bit higher possibility than in other

19   people, just based on her level of activity and

20   her, the demands that she would be placing on her

21   pelvic area and support tissues in the

22   post-operative time.

23             So I think if I were to say would she be

24   on the lower end of the recurrence rate or on the

25   higher end of the recurrence rate, I think that

Nicolette S. Horbach, M.D.

1    based on her age and the physical activity, that

2    she would probably be on the higher end of the

3    recurrence rate.

4         Q    In terms of it being a statistical

5    possibility?

6         A    In terms of her experiencing a

7    recurrence.  I'm not sure what you mean about

8    "statistical possibility."

9         Q    All you can say is based on the

10   literature and what you're looking at, that on a

11   statistical basis there's a possibility that that

12   would have needed to be done?

13             Rephrase.

14             You're saying that statistically it's

15   possible she would have had a recurrence.  You

16   can't say that she would have had one or wouldn't

17   have had one, because that's speculation, isn't

18   it?

19        A    It is, it is -- it is a -- it is a, an

20   opinion based upon not just the literature and

21   numbers, et cetera.  It's based on clinically

22   practicing and doing those operations for 25 years

23   and seeing what the outcome is in patients who

24   have those surgeries and watching them

25   postoperatively.

Nicolette S. Horbach, M.D.

1              So I think that from, it's not just a

2      purely statistical theoretic issue.  I think those

3      statistics have a basis, and they have a clinical

4      basis, and in this particular patient, I think

5      there is a clinical basis to say that she would

6      have had a reasonable possibility of needing a

7      subsequent surgery for prolapse if she had simply

8      a transvaginal suture repair.

9          Q    If Pam Wicker had not had a Prolift put

10     in her body and had not had mesh put in, she would

11     not have had mesh contraction; correct?

12         A    Well, assuming she didn't have one of

13     the alternative procedures done that involved

14     mesh, but if she had only a native tissue

15     procedure, then no, she wouldn't have had mesh in

16     her body.

17         Q    Okay.  Move to strike.

18              If Pam Wicker had not had mesh put into

19     her body as part of the procedure, she would not

20     have had a risk for mesh contraction; correct?

21         A    The way you phrased it, I can't answer

22     it.  That's why I was trying to rephrase it in the

23     way I did.

24         Q    -- if she --

25         A    I'm sorry.  We lost you.

Nicolette S. Horbach, M.D.

1    Q    If she did not have mesh put in her

2    body, there would be no risk of mesh contraction;

3    correct?

4    A    If she had no mesh put in under any

5    circumstances in any type of alternative surgery,

6    you're correct, she would not have had the risk of

7    mesh contraction.

8    Q    And if Mrs. Wicker had not had mesh put

9    into her body, she would not have had risk of mesh

10   erosion; correct?

11   A    Correct.

12   Q    If Pam Wicker had not had mesh put into

13   her body, she would not have needed operations to

14   revise or remove contracted mesh or eroded mesh;

15   correct?

16            MR. COMBS:  Object to form.

17            THE WITNESS:  The eroded mesh, I

18      would say yes.  Contracted mesh, hard to say.

19   BY MR. SLATER:

20   Q    Well, if she had no mesh in her body,

21   how could she have surgery to remove her

22   contracted mesh?

23   A    Sorry.  I sort of misinterpreted the

24   question.

25            So if she had no mesh in her body, she

Nicolette S. Horbach, M.D.

1    couldn't have had surgery for contracted mesh.

2    You're correct.

3                  MR. SLATER:  What I'd like to do

4         now is go to folder 20.  If you could,

5         Stephanie, I want to mark that as the next

6         exhibit.  The records in folder 20.

7                  (Exhibits 6 through 13 were marked

8                  for identification.)

9    BY MR. SLATER:

10        Q    Doctor, we've marked as Exhibit 13 the

11   records that we got from Dr. Bercik.

12             Have you seen those records?

13        A    I'm looking through them to see whether

14   I've seen this -- I've seen what I presume are

15   these records.

16        Q    You're confirming you have seen them;

17   correct?

18        A    I'm looking through to confirm that.

19             I believe I've seen all these records

20   other than the billing statements.

21        Q    I don't expect to ask you about those,

22   so we should be okay.

23             Okay.

24             First of all, when Pam Wicker came to

25   Dr. Bercik, she was 58 years old; correct?

Nicolette S. Horbach, M.D.

```
1      A    Correct.
2      Q    At that point she was a 50-year-old --
3  rephrase.
4           At that point Pam Wicker was a
5  58-year-old, physically active and sexually active
6  woman leading a fulfilling life; correct?
7                MR. COMBS:  Object to form.
8                THE WITNESS:  Based on -- you're
9       asking me that based on this record in front
10      of me?
11 BY MR. SLATER:
12     Q    Based on what you know.
13     A    Based on what I know, she was physically
14 active and sexually active.  I can't make any
15 conclusion about whether she viewed that as a
16 fulfilling life or not.
17     Q    Okay.
18          When Pam Wicker came to Dr. Bercik, she
19 was a young woman of 58 years old, she was
20 sexually active and physically active?
21     A    Correct.  Very young.
22     Q    Now, it's indicated that she had only
23 felt this bulge very recently; right?
24     A    For two weeks.
25     Q    There's an indication of mild to
```

Nicolette S. Horbach, M.D.

1    moderate pelvis pain, from your review of all the

2    materials, is it your understanding that there was

3    actual pain or that there was more pressure or

4    discomfort from the bulge?

5        A    Pain is referred to in, you know,

6    several situations, based on this history, based

7    on the deposition of her friend.  My -- in my

8    questioning of her during my IME, she doesn't

9    necessarily describe it as much as pain.

10            So there's some saying pain yes and some

11   saying no.

12       Q    Putting all the information you have

13   together, am I correct that as opposed to

14   describing her sensation as pain, it would

15   probably be more accurate to describe it as

16   pressure and discomfort from the bulge?

17                MR. COMBS:  Object to form.

18                THE WITNESS:  I can't make that

19        presumption.  Patients can have pressure.

20        Patients can have no symptoms.  Patients can

21        have pain.

22   BY MR. SLATER:

23       Q    So you can't say one way or the other

24   here?

25       A    I think that it's certainly conceivable

Nicolette S. Horbach, M.D.

1   that she had pain as part of her presenting

2   complaint.  It's also conceivable not.

3        Q    At the bottom of this front page, it

4   states that she's sexually active and that she has

5   "dyspareunia."

6            Do you see that?

7        A    I see that.

8        Q    If you flip to the next page, actually

9   two pages later, in the GYN history at the top of

10  page 3 it says that she denies various things,

11  including denying pain with intercourse.

12           Do you see that?

13           MR. COMBS:  Object to form.

14           THE WITNESS:  Yes.

15  BY MR. SLATER:

16       Q    So there's an inconsistency in the

17  record as to whether or not Pam told Dr. Bercik

18  she had dyspareunia or pain with intercourse at

19  that first visit; correct?

20       A    There's an inconsistency in the record.

21       Q    And did you see Dr. Bercik's deposition

22  testimony where he said he didn't know which was

23  correct?

24       A    Yes.

25       Q    Did you see Pam Wicker's deposition

Nicolette S. Horbach, M.D.

1    testimony where she said she did not have pain

2    with intercourse or dyspareunia at that time?

3        A    Yes.

4        Q    Based on that information, did you draw

5    an assumption one way or the other as to whether

6    or not Pam Wicker had pain with intercourse?

7        A    Initially based on those two pieces of

8    information, it was difficult to conclude.  Her

9    friend in her deposition is quite -- stresses

10   quite a bit that she was told by Ms. Wicker that

11   she was having significant pain, including pain

12   with intercourse.

13       Q    Did you have an understanding as to

14   whether or not her friend Jane Wallace was talking

15   about before the Prolift surgery or after?

16       A    It was before the Prolift surgery.

17       Q    That was your understanding?

18       A    Yeah, she said that's part of the reason

19   that she had gone ahead and had the surgery.

20       Q    There's clearly a conflict between the

21   testimony of Pam Wicker and her friend Jane

22   Wallace as well as right within the record of

23   Dr. Bercik as to whether or not Pam had pain with

24   intercourse before her Prolift surgery; correct?

25       A    Yes.

Nicolette S. Horbach, M.D.

1      Q    Do you feel comfortable drawing an

2  assumption as to whether or not she was having

3  painful intercourse, or is that something where

4  you say I just don't know, there's no way to know?

5      A    If you assume that her comment is that

6  she was having mild to moderate pelvic pain as

7  part of her presenting symptoms, I would draw the

8  conclusion that she also was having dyspareunia.

9      Q    And if you draw the conclusion that she

10  was not feeling pain but was feeling discomfort

11  and pressure, would that change your assumption?

12      A    It's possible that it would change it.

13      Q    Whether -- well, rephrase.

14         If we assume that Pam Wicker was having

15  either pain or discomfort with sexual relations,

16  that began two weeks before this visit of July 22,

17  2008, when she noticed the bulge; correct?

18      A    That appears to be the timing, yes.

19      Q    And one of the -- rephrase.

20         One of the purposes of the Prolift is to

21  resupport the bladder such that there's no longer

22  a bulge and presumably no longer discomfort or

23  pain with intercourse as a result of the bulge;

24  correct?

25      A    That is one of the goals of the

Nicolette S. Horbach, M.D.

1    procedure.

2        Q    Now, during the exam -- rephrase.

3             During the exam, Dr. Bercik performed an

4    examination of Mrs. Wicker's vagina both

5    externally and internally; correct?

6        A    Yes.

7        Q    He rated her prolapse and did a POP-Q

8    exam; correct?

9        A    Yes.

10       Q    He did not note finding any spasmodic

11   muscles within the vagina, did he?

12       A    He didn't note one way or the other, so

13   it's not a pertinent negative or -- I mean it's

14   not a, it's not a pertinent negative or a

15   pertinent positive noted.  Can't say one way or

16   the other.

17       Q    -- position whether he examined for

18   signs of pelvic muscle spasm?

19                 MR. COMBS:  Yeah, Adam, you cut

20       out --

21                 THE WITNESS:  That first part.

22                 MR. COMBS:  -- on half of the

23       question.

24                 MR. SLATER:  Okay.  I'll reask it.

25

Nicolette S. Horbach, M.D.

1    BY MR. SLATER:

2         Q    Was Dr. Bercik asked in his deposition

3    whether or not his examination included feeling

4    for pelvic floor muscle spasm?

5         A    I don't recall that part of the

6    deposition.

7         Q    In forming your opinions, did you assume

8    that Dr. Bercik did not examine for pelvic floor

9    muscle spasm?

10        A    I don't think I necessarily used that

11   fact as a significant part of my opinion.

12        Q    Being that Pam Wicker had pelvic

13   floor --

14        A    I'm sorry?

15        Q    -- muscle spasm --

16        A    I'm sorry.

17        Q    I'm sorry.  Sure.

18             Did you assume one way or the other

19   whether or not Pam Wicker had pelvic floor myalgia

20   or muscle spasm at the time that she went to see

21   Dr. Bercik before she had the Prolift?

22        A    I didn't assume --

23        Q    Did you assume one way or the other?

24        A    No.

25        Q    Okay.

Nicolette S. Horbach, M.D.

1              Was it of any significance to you in

2    forming your opinions whether or not she had

3    pelvic floor muscle spasm or myalgia before the

4    Prolift surgery?

5         A    Would it be of significance to me?

6    Yeah.

7         Q    -- your opinions.

8         A    Yes.  I understand, but I -- based on

9    the information here, I formed my opinion that

10   there was not conclusive evidence of pelvic muscle

11   spasm indicated on the exam.

12             Certainly it's not addressed per se one

13   way or the other, so one would assume that he

14   would have said positive if it was positive, but I

15   took the approach that he had evaluated it and

16   that it was not present on exam, and that is the

17   basis for forming my opinion.

18        Q    So in forming your opinions in this

19   case, you assumed that Pam Wicker did not have

20   pelvic floor myalgia or muscle spasm before the

21   Prolift surgery; correct?

22        A    There wasn't -- yeah.  No.  I mean there

23   wasn't conclusive evidence that she did.  I mean

24   there's certainly a possibility she could have,

25   but there wasn't conclusive evidence that she did.

Nicolette S. Horbach, M.D.

1    Q    You, in drawing your opinions, assumed

2  that she did not have pelvic floor myalgia before

3  the Prolift surgery?  That's the assumption you

4  formed and then drew your opinions based on that;

5  correct?

6    A    Yes, I believe that's probably correct.

7    Q    And just to be complete, it was your

8  assumption that -- well, I'm going to withdraw

9  that.

10        Let's go to folder 5.

11            (Exhibit 14 was marked for

12             identification.)

13  BY MR. SLATER:

14    Q    What we've marked as Exhibit 14 is the

15  preoperative exam before the surgery from

16  October 6, 2008.

17        Do you see that?

18    A    Yeah, I'm just looking through.

19        The, the handwritten portion of this I

20  had not previously seen, the handwritten portion

21  of the note.  The rest of it, yeah, I think I had

22  seen previously.

23    Q    Okay.

24        I want to just draw your attention to

25  the beginning of this document from this exam by

Nicolette S. Horbach, M.D.

1    Dr. Klein where it says "Past Medical History."

2            Do you see that?

3        A    Yes.

4        Q    It indicates "she feels well, was having

5    symptoms of vaginal prolapse, better now, no

6    urinary symptoms."

7            Do you see that?

8        A    Yes.

9        Q    So that's what Pam Wicker reported to

10   Dr. Klein two weeks before she was going to be

11   operated on by Dr. Bercik; correct?

12       A    Yes.

13       Q    Did you see in Pam Wicker's deposition

14   where she said that before Dr. Bercik operated,

15   that she was still fully sexually active with her

16   husband and was not feeling pain with intercourse?

17       A    I don't remember that specific

18   statement, but . . .

19       Q    Okay.

20           Turn forward a couple pages to the

21   operative report of October 20, 2008.  It's in

22   Exhibit 13, Dr. Bercik's records.

23           And do you see there's a preoperative

24   diagnosis in his operative report?

25       A    Yes.

Nicolette S. Horbach, M.D.

1    Q    One of the things listed is interstitial

2    cystitis.

3            Do you see that?

4    A    Yes.

5    Q    Dr. Bercik did not diagnose interstitial

6    cystitis.  He was just placing that there, because

7    that was part of the history given to him by

8    Mrs. Wicker; correct?

9    A    I assume that's why he placed it.

10   Q    And you saw Dr. Moldwin's deposition in

11   his records where he indicated he did not diagnose

12   interstitial cystitis; he just documented the past

13   diagnosis that had been brought to him by Pam

14   Wicker as well.

15           Did you see that?

16   A    Yes.

17           MR. COMBS:  Object to form.

18   BY MR. SLATER:

19   Q    And I read your report and didn't see

20   any opinion on this, but I just want to be clear.

21   You're not offering an opinion that Pam Wicker was

22   suffering from active interstitial cystitis when

23   the Prolift surgery was done, are you?

24   A    No, I'm not offering.  In fact, I don't

25   think she was when the Prolift surgery was done.

Nicolette S. Horbach, M.D.

1      Q    -- offer the opinion that she's

2   had interstitial cystitis since the Prolift

3   surgery; correct?

4                  MR. COMBS:  You cut out.

5                  THE WITNESS:  You cut out on that.

6   BY MR. SLATER:

7      Q    Trailed off again?  Okay.

8           And I'm correct that you haven't joined

9   the opinion that she's had interstitial cystitis

10  since the Prolift surgery; correct?

11     A    I don't have -- I have not drawn that

12  conclusion.  I don't really have evidence to

13  suggest that diagnosis.  I don't have any strong

14  evidence to suggest that diagnosis.

15     Q    Okay.

16          The preoperative diagnosis that's listed

17  there does not list dyspareunia; correct?

18     A    Correct.

19     Q    It does not list vaginal stricture;

20  correct?

21     A    Correct.

22     Q    It does not list vaginal pain of any

23  sort; correct?

24     A    Correct.

25     Q    Let's turn forward now to the

Nicolette S. Horbach, M.D.

1    January 29, 2009 office visit.  It's got a 66 in

2    the bottom right corner in the Bates numbers.

3              Do you have that record?

4         A    Yes, I do.

5         Q    On January 29, 2009, Mrs. Wicker went to

6    Dr. Bercik and advised him that she was having

7    dyspareunia especially on the left side; correct?

8         A    Yes.

9         Q    Dr. Bercik performed an exam and found a

10   band on the left side three centimeters in, and

11   then it says "C/W tight mesh arm, tender to

12   palpation, vagina is six centimeters depth."

13             Do you see that?

14        A    Yes.

15        Q    Do you, do you have an understanding of

16   what he means when he writes "C/W" before "the

17   tight mesh arm"?

18        A    "Consistent with" is usually what we use

19   that to mean.

20        Q    Okay, and then just below that he

21   writes, "Dyspareunia due to tight band of mesh

22   arm," and then he points out "revision of mesh

23   arm/release band" is his plan.

24             Do you see that?

25        A    Yes.

Nicolette S. Horbach, M.D.

1    Q    At this point Dr. Bercik had found that

2    there was a band which would signify contracted

3    scar-plated mesh within her pelvis where the mesh

4    arm is; correct?

5              MR. COMBS:  Object to form.

6              THE WITNESS:  Certainly that

7        finding could be consistent with that.

8    BY MR. SLATER:

9    Q    And he confirmed, based on his exam,

10   that that was the location where she was feeling

11   pain, because he palpated on the hardened mesh;

12   correct?

13   A    He palpated that that area was tender.

14   It didn't -- he doesn't indicate whether or not

15   that also reproduced the patient's complaints of

16   dyspareunia.

17   Q    Now let's turn to the next two pages

18   later, which is the next surgery.  I'm now going

19   to ask you about the February 20, 2009 operative

20   report for a couple minutes.

21             Dr. Bercik in that report indicates a

22   preoperative diagnosis of dyspareunia and vaginal

23   stricture; correct?

24   A    Yes.

25   Q    And the dyspareunia and vaginal

Nicolette S. Horbach, M.D.

1    stricture was due to the Prolift; correct?

2                    MR. COMBS:  Object to form.

3                    THE WITNESS:  Was due to the

4        surgery for the Prolift.

5    BY MR. SLATER:

6        Q    Well, Dr. Bercik found on his exam a

7    mesh band, he found a tight mesh arm, tenderness,

8    and determined to operate to release and remove

9    that mesh; correct?

10       A    He found, he found a tight band, yeah,

11   and that's what he was -- that was tender.  That's

12   what he was operating on, yes.

13       Q    The procedure that was performed on Pam

14   Wicker was the Prolift procedure.  That's the

15   procedure she had performed; right?

16       A    Yes.

17       Q    And as a result of that procedure, the

18   Prolift procedure, she was now suffering from

19   dyspareunia and a vaginal stricture, according to

20   Dr. Bercik's operative report; correct?

21       A    I can't say that the vaginal stricture

22   was due to the Prolift itself.  She's had surgery,

23   including with a Prolift, so the mesh portion

24   clearly is going to be related to the Prolift.  If

25   there is scarring or stricturing or scar bands

Nicolette S. Horbach, M.D.

1  without the mesh portion there that's causing any

2  type of constriction or whatever he calls it, I

3  can't say whether that's specifically from Prolift

4  versus just surgery itself.

5      Q    If you -- you've read through his

6  operative report before; right?

7      A    Yes.

8      Q    Dr. Bercik actually found that the areas

9  of stricture corresponded to areas of tight,

10 tensioned mesh that was contracted that he

11 released and removed; correct?

12     A    Certainly the -- he talks about that the

13 11:00 was related to a band of mesh.  The 2:00, he

14 says there was a stricture that he ended up

15 opening to excise the strictured area.  He talks

16 about an erosion was identified, but it's unclear.

17 I mean he talks about the erosion being from the

18 mesh.  He doesn't talk about the stricture being

19 from the mesh.

20     Q    Did you read his deposition?

21     A    Yes, I did.

22     Q    And you read where he said that on both

23 sides he cut tension bands of mesh?

24          MR. COMBS:  Object to form.

25          THE WITNESS:  I think I recall

Nicolette S. Horbach, M.D.

1          reading that, yes.  I'm just -- I'm doing it

2          based on his operative note that you asked

3          me.

4    BY MR. SLATER:

5          Q    Well, if you take together the operative

6    note and Dr. Bercik's testimony explaining what he

7    documented, he found that both of the strictures

8    were due to tensioned, contracted, scarred mesh;

9    correct?

10                    MR. COMBS:  Object to form.

11                    THE WITNESS:  With both of those

12         included, that was his conclusion, or that

13         was his findings.

14   BY MR. SLATER:

15         Q    And both of those were due to the

16   Prolift being in Pam's body; correct?

17         A    Yes.

18         Q    He also -- rephrase.

19              Dr. Bercik also found on February 20

20   eroded mesh, and he removed that as well; correct?

21         A    A 2-millimeter area of erosion he

22   removed, yes.

23         Q    And erosion was due to the Prolift;

24   correct?

25         A    I guess so.  The mesh that was there was

Nicolette S. Horbach, M.D.

1    the Prolift mesh, yes.

2         Q    Let's flip forward to the next office

3    visit, April 2, 2009.  Dr. Bercik documented on

4    April 2, 2009, that if --

5         A    Excuse me.  Just a second.  I'm just

6    making sure I'm on the right page.

7              Okay.  Thank you.

8         Q    It's got a 71 at the bottom.

9         A    That's fine.

10        Q    Okay.

11             The first visit documented after

12   February 20 is April 2.

13             Do you have that in front of you?

14        A    Yes.

15        Q    And at that point, following the release

16   and removal of contracted mesh and eroded mesh,

17   Mrs. Wicker indicated she was feeling well and

18   that she didn't have pain at that point; correct?

19        A    Correct.

20        Q    That would confirm that it was the mesh

21   that was causing her pain, since by removing the

22   mesh, the pain went away.

23             That makes sense; right?

24             MR. COMBS:  Object to form.

25             THE WITNESS:  It certainly is one

Nicolette S. Horbach, M.D.

1          cause that she could be having for pain.

2     BY MR. SLATER:

3          Q    Dr. Bercik documents that she has a

4     shortened posterior wall at 6 to 7 centimeters.

5               Do you see that?

6          A    Yes.

7          Q    You would agree a vagina that has a

8     length of 6 to 7 centimeters is a shortened

9     vagina?

10         A    It is on the -- it is in the -- it's the

11    lower limits or lower areas of what we would

12    typically think of as vaginal length.  I think to

13    some extent it would depend on the partner.

14         Q    Let's turn forward now to the next

15    visit.  Turn to April 28, 2009.

16              On April 28, 2009, Pam returned to

17    Dr. Bercik; correct?

18         A    Yes.

19         Q    She now reports that she "has

20    dyspareunia and bladder pain after exercise,

21    pressure-like pain, discomfort, symptoms of a

22    possible yeast infection.  Now on Cipro."

23              Do you see that under the comments

24    section?

25         A    Yes, yes.

Nicolette S. Horbach, M.D.

1      Q    An exam was performed, and Dr. Bercik

2  confirmed that the vagina was estrogenized, so she

3  was using the estrogen; correct?

4      A    Yes.

5      Q    Dr. Bercik also confirmed that the

6  incision for the surgery was intact; right?

7      A    Yes.

8      Q    Dr. Bercik documents that he felt --

9  well, rephrase.

10          Dr. Bercik says under the physical exam,

11  "Mesh felt 2/3 along vaginal wall anterior, apical

12  part of vagina with prolapse to minus 3 with

13  standing, mesh [is] not tender to palpation."

14          Do you see that?

15      A    Yes.

16      Q    So he's confirming that he felt mesh

17  along the anterior vaginal wall by palpation;

18  correct?  That's what that means?

19      A    Again, one would assume that he's

20  meaning he feels that under the vaginal wall

21  rather than through the vaginal wall, since he

22  doesn't say "erosion," but yes, I would assume

23  that it's -- he's feeling that there's mesh under

24  the vaginal wall.

25      Q    Where he writes "apical part of vagina

Nicolette S. Horbach, M.D.

1    with prolapse to minus 3," what does that

2    correlate to in terms of stage 1, stage 2, stage

3    3?

4         A    For the apex?  I think she would be in

5    this case probably a stage 2.

6         Q    So at this point following the Prolift

7    surgery, she's now beginning to reprolapse;

8    correct?

9         A    Yes.

10        Q    The arms of the Prolift have a

11   particular purpose in that procedure; correct?

12        A    Yes.

13        Q    One of the purposes of the arms is to

14   provide support to prevent a reprolapse of an

15   organ; correct?

16        A    Yes.

17        Q    By cutting the arms to treat the

18   contraction and the tension bands, that is

19   weakening the intended support from the Prolift

20   and making it more likely to end up with a

21   reprolapse; correct?

22        A    I think there is certainly a possibility

23   that the patient could have a reprolapse of the

24   apex if you cut the armbands.

25        Q    In Pam Wicker's case, you would agree

Nicolette S. Horbach, M.D.

1    with me that certainly the fact that the arms were

2    cut and some of the arms were removed was at least

3    a contributing factor to her ending up with a

4    reprolapse of her bladder; correct?

5              MR. COMBS:  Object to form.

6              THE WITNESS:  I think that that's a

7         reasonable statement.

8    BY MR. SLATER:

9         Q    Okay.

10             That was the last time that Dr. Bercik

11   saw Pam Wicker; correct?

12        A    That's correct.

13             MR. SLATER:  Okay.

14             Let's go to number 10, folder 10,

15        and mark it as the next exhibit, which I

16        guess puts us at 15.

17             (Exhibit 15 was marked for

18             identification.)

19   BY MR. SLATER:

20        Q    Exhibit 15 is the operative report from

21   Dr. Raz for his first surgery on Pam, July 9,

22   2009.

23             Do you see that?

24        A    It's just in a little different format

25   than what I've seen, so give me a second.

Nicolette S. Horbach, M.D.

1          Okay.

2     Q    The first thing Dr. Raz does in this

3  operative report is he describes a preoperative

4  diagnosis.

5          Do you see that at the top?

6     A    Yes.

7     Q    He indicates at that point that Pam had

8  "vaginal shortening post-hysterectomy, severe

9  vaginal pain and dyspareunia, and complications of

10  anterior mesh surgery for cystocele with prior

11  vaginal erosion."

12          Do you see that?

13     A    Yes.

14     Q    And that's a reasonable preoperative

15  diagnosis based on Pam's clinical course at that

16  point; correct?

17               MR. COMBS:  Object to form.

18               THE WITNESS:  It is a diagnosis

19          based on what he's saying he saw on exam and

20          based on what she's telling him symptom-wise,

21          so I think it would be consistent.

22  BY MR. SLATER:

23     Q    Let's go now to the indications for the

24  surgery.

25          Dr. Raz first indicates "Mrs. Wicker

Nicolette S. Horbach, M.D.

1    suffers from significant complications after a

2    prior Prolift surgery for cystocele."

3            That's a statement you would agree with;

4    right?  At that point that was accurate?

5        A    Again, significant?  Yeah, I would

6    probably say that she's certainly suffering from

7    complications from it.

8        Q    Would you agree that the complications

9    at this point are significant where she's now

10   facing her second operation, post Prolift?

11       A    I think from her perspective, they

12   probably were significant, yes.

13       Q    From your perspective as a physician

14   familiar with the Prolift procedure, do you look

15   at her course, she's now facing her second

16   post-Prolift operation, would you agree these are

17   significant complications at this point?

18       A    Again, I mean it, it's certainly -- I

19   guess I would say significant.  I mean it's, it's

20   not the level of significance of other

21   complications that we see, but, you know, again,

22   "significant" is going to be a relatively

23   subjective term.

24       Q    Dr. Raz points out that "on physical

25   examination, the vagina was extremely short, half

Nicolette S. Horbach, M.D.

1    of the normal size."

2           So there he's talking about the vaginal

3    shortening; correct?

4       A    Correct.

5       Q    Dr. Raz points out, "We can see white

6    spots of irregular intraepithelial elevations that

7    are mesh induration in the anterior vaginal wall."

8           So he saw that on his actual physical

9    exam of her vagina; correct?

10      A    Yes.

11      Q    Dr. Raz says, "We found also mesh in the

12   periurethral area, with significant scarring of

13   the vagina."

14          That is something he found on his exam;

15   correct?

16      A    That's what he's reporting.

17      Q    He then points out that, "Prior MRI

18   shows a cystocele grade 3 to 4, minimal urethral

19   hypermobility, and the ultrasound of the vagina

20   shows folded irregular mesh in the anterior

21   vaginal wall."

22          Do you see where I'm reading from?

23      A    Yes, I see that.

24      Q    Did you look at the MRI?

25      A    Yes.

Nicolette S. Horbach, M.D.

1    Q    Did you agree it showed a cystocele

2  grade 3 to 4 at that point?

3    A    I, I think that there is anterior wall

4  relaxation and a cystocele.  I'm not sure that I

5  would call it grade 3 to 4.  It depends on the

6  grading system you use, and he doesn't specify

7  that.

8    Q    Did you view the actual ultrasound of

9  the vagina he's pointing to?

10    A    With the folded arm or whatever he's

11  talking about, yes, I saw the photos.

12    Q    Was the irregular mesh in the anterior

13  vaginal wall part of the ultrasound?

14    A    I saw the, the picture of the folded

15  mesh.  It wasn't clear to me that it was

16  specifically in the anterior wall versus in the

17  tunnels from where the arms were placed.

18    Q    But it was one or the other location?

19    A    I'm sorry?

20    Q    You felt it was either the anterior wall

21  or in the tunnels where the arms had been placed,

22  one or the other?

23    A    Yeah, that's -- it would have to be one

24  or the other.

25    Q    We could certainly agree that folded

Nicolette S. Horbach, M.D.

1   Prolift mesh is not something that you want within

2   a woman's body under these types of circumstances

3   or any circumstances; right?  You want the mesh to

4   lay flat?

5       A    Yeah, ideally you want the mesh to lay

6   flat.  It doesn't always, but you want it to.

7       Q    -- "risk of contraction and formation of

8   scar plating and bridging"; correct?

9                MR. COMBS:  You cut out.

10               THE WITNESS:  You cut out in the

11      beginning.

12  BY MR. SLATER:

13      Q    No problem.

14           When the mesh is folded, as described

15  here and as shown on the ultrasound, that creates

16  an increased risk to end up with scar plating and

17  bridging fibrosis, because you have the mesh

18  folded and bunched together; correct?

19               MR. COMBS:  Object to form.

20               THE WITNESS:  I'm not sure that you

21      can make that causative statement.

22  BY MR. SLATER:

23      Q    Well as a general proposition you would

24  agree with that statement; right?

25      A    I, I mean I'm not going to say that I

Nicolette S. Horbach, M.D.

```
1   agree with the fact that there's more scar plating
2   and all that kind of stuff.  I said with the mesh
3   folded -- let's go back.  Why don't you ask the
4   question again so I make sure I answer it
5   correctly, or if you want to read back --
6       Q    When there's folding -- yeah, I'll ask
7   it again.  When the, when the Prolift mesh is
8   folded like this, it increases the risk to end up
9   with plates of scar tissue or bridging fibrosis,
10  because the mesh is bunched together and folded
11  together; correct?
12              MR. COMBS:  Object to form.
13              THE WITNESS:  Again, I don't think
14        that you can say that statement, that it
15        increases the risk of that and/or that it is
16        because of that.
17  BY MR. SLATER:
18      Q    Do you know the viewpoint of Ethicon
19  Medical Affairs on that --
20      A    No.
21      Q    -- subject of that question?
22      A    No, I do not.
23      Q    You know who -- I'm sorry.  You know who
24  Dr. Raz is; am I correct?
25      A    Yes.
```

Nicolette S. Horbach, M.D.

1      Q     Have you ever met him?

2      A     I've worked with him, yes.  He was a

3  member of the committee I chaired.

4      Q     Which committee was that?

5      A     For the American Board of Obstetrics and

6  Gynecology, the committee that was the fellowship

7  accreditation program for female pelvic medicine

8  and reconstructive surgery.  I was the chair and

9  he was a member.

10      Q     Would you agree with me that, to the

11  best of your knowledge, Shlomo Raz has probably

12  treated more mesh complications in more patients

13  than any doctor in the United States?

14      A     I can't make that statement.

15      Q     Is there any other doctor you can

16  suggest has treated anywhere close to the number

17  of patients he has with mesh complications?

18      A     There are -- there's one other physician

19  group that's in Atlanta that puts itself forward

20  as being the premier or prime group for mesh

21  complications.  I don't know what their numbers

22  are compared to Dr. Raz.

23      Q     Dr. Miklos and Moore; correct?

24      A     Correct.

25      Q     You read Dr. Raz's testimony that he's

Nicolette S. Horbach, M.D.

1    removed mesh from -- I believe the number was over

2    400 women.  Correct?

3         A    I think that's what he stated, yes.

4         Q    Would you -- rephrase.

5              Would you agree with me that Dr. Raz is

6    considered within the medical community to be the

7    foremost expert in the United States with regard

8    to the treatment of mesh complications?

9                   MR. COMBS:  Object to form.

10                  THE WITNESS:  I would not agree to

11        that statement at all.

12   BY MR. SLATER:

13        Q    Do you have respect for Dr. Raz's

14   knowledge and understanding in the area of

15   treating mesh complications?

16        A    That's -- I would really prefer not to

17   answer that question if at all possible on the

18   record.

19        Q    You need to answer.

20        A    Do I have respect for his ability to do

21   that?  No.

22        Q    I think you told me you've treated

23   between 10 and 20 patients maybe total in your

24   career with mesh complications at the prior

25   deposition?

Nicolette S. Horbach, M.D.

1     A    It's possible.  If I said that at the

2    prior deposition, that's certainly possible.

3     Q    As you sit here now, if I ask you how

4    many patients with mesh complications you've

5    treated for those complications, would you tell me

6    a different number than ten to 20?

7     A    I think it's probably going to be on the

8    higher side of ten to 20, but it may be up even to

9    30, but it's not going to be, you know, 400, no.

10    Q    What's your issue with Dr. Raz?  You

11    said you don't respect him or words to that effect

12    with regard to mesh removal.  What is the issue

13    you have?

14    A    Your, your question was slightly

15    different phrased -- differently phrased than

16    saying I just don't respect him for mesh removal.

17         I think that there are a number of

18    different issues that I have with Dr. Raz.  I

19    think that, first of all, when you approach a

20    problem, and your main approach is to be a surgeon

21    and cut something out, you have this tendency to

22    then repetitively go back and cut something out,

23    even when there might be other alternatives that

24    the patient could be treated with, and so that

25    sometimes as surgeons we are a little overly

Nicolette S. Horbach, M.D.

1    zealous about when we decide to operate rather

2    than deciding to not operate.

3             I think that there are other ways to

4    approach some of the mesh complications that would

5    potentially be less invasive for a patient, that

6    he doesn't really bring into play.  If the mesh is

7    there, he cuts it out.  I think that that can

8    sometimes create problems that -- additional

9    problems, shall we say, that may have been avoided

10   had they not done that.

11            In addition, you know, Dr. Raz on one

12   side of the equation is talking about the

13   horrendous aspects of mesh and the problems and

14   it's the worst thing in the world to put in the

15   vagina, despite the fact that he has put that in

16   the vagina in a fair number of women over the

17   years of his career, even within, you know, a

18   couple of years prior to the time that Pam Wicker

19   had her procedure.

20            He typically doesn't report his

21   complications or problems with it, so it becomes

22   very difficult to then know whether the

23   complications are mesh-dependent, the

24   complications that are surgeon-dependent, et

25   cetera.  I think that -- well, I think I'll stop

Nicolette S. Horbach, M.D.

1    at that point.

2            I just think that, you know, sometimes,

3    similar to Miklos' group, I've seen patients where

4    it would have been much better had the aggressive

5    surgeon not chosen to operate on the patient, and

6    they left the patient in worse shape than if they

7    had not operated at all.

8        Q    There's a difference of opinion among

9    certain surgeons out there about whether or not

10   it's -- one should remove mesh when a woman is

11   suffering from complications that are mesh-related

12   as opposed to trying conservative therapy?

13   There's a difference of opinion; correct?

14       A    Yes.

15       Q    And ultimately it comes down to the

16   judgment of the surgeon who is treating the

17   patient to determine what's the best course to

18   recommend; right?

19       A    With their own particular bias that they

20   have, yes.

21       Q    Well, every doctor has their own biases

22   and experience that enters into their judgment?

23   Everybody has that; right?

24       A    Correct, but again, if you are only

25   focused on offering one form of therapy for a

Nicolette S. Horbach, M.D.

1  patient, you're going to offer that form of

2  therapy.

3      Q    Are you under the impression that

4  Dr. Raz recommends surgery to every woman that

5  goes to him to consult with mesh complications?

6      A    No.

7      Q    So, and in fact, you know Dr. Raz

8  doesn't offer surgery to every woman who comes to

9  him with complications.  Some of them he

10 recommends conservative treatment; right?

11              MR. COMBS:  Object to form.

12              THE WITNESS:  I understand that

13       that is the case, yes.

14 BY MR. SLATER:

15      Q    In this case --

16              THE VIDEOGRAPHER:  Two minutes left

17       on this tape, counsel.

18              MR. SLATER:  Why don't you change

19       it then.

20              THE VIDEOGRAPHER:  Thank you very

21       much.  At 2:43 off record, ending disc number

22       2 in our continuing deposition of

23       Dr. Horbach.

24              (Whereupon, a short recess was

25              taken.)

Nicolette S. Horbach, M.D.

1                    THE VIDEOGRAPHER:  At 2:52 on

2          record, now 2:53, beginning disc 3 in our

3          continuing deposition of Dr. Horbach.

4    BY MR. SLATER:

5          Q    Dr. Horbach, looking again at the

6    July 9, 2009 operative report, Dr. Raz talks about

7    the procedure, and about four lines down in that

8    section he starts by saying, "We felt immediately

9    the induration and the infiltration of the mesh in

10   the superficial epithelial layer of the vagina.

11   All the spotty white areas are actually

12   intraepithelial infiltration of mesh."

13              Do you see that?

14         A    Yes.

15         Q    So he's describing that he clinically

16   found during the operation that the mesh was

17   eroding through the vaginal wall?

18         A    I assume that that's what he's stating.

19   I mean he took pictures showing these little white

20   spots, and I assume that that's what he's

21   referring to were these white spots with

22   infiltration of mesh.

23         Q    You're not denying that that's what that

24   is, are you?

25         A    No.

Nicolette S. Horbach, M.D.

1      Q    He points out in his operative report,

2  "The mesh was dissected sharply from the vaginal

3  wall, extended laterally toward the obturator

4  fascia."

5           Do you see that?

6      A    Yes.

7      Q    So when he was operating, he's actually

8  dissecting into the obturator area on both sides

9  ultimately; correct?

10     A    Not necessarily into.  He's dissecting

11  towards it.

12     Q    Okay.

13          Dr. Raz dissected towards the obturator

14  area on both sides; correct?

15     A    I don't know that he did both sides,

16  because he doesn't necessarily say bilaterally,

17  but it says that at least one side he did.

18     Q    Let me also ask you one question, just

19  going back.

20          The arms of the anterior Prolift, would

21  they have extended into the vicinity of the

22  levator ani?

23     A    It depends on how they were placed.

24  Theoretically, if you're talking about the

25  pubococcygeus muscle, the posterior -- I mean the

Nicolette S. Horbach, M.D.

1    superior arms of the anterior Prolift should more

2    be a little more laterally to the pubococcygeus.

3    In the distal arms of the anterior Prolift, those

4    may come through part of the insertion of the

5    pubococcygeus on pubic symphysis.

6         Q    So in the operations now performed by

7    Dr. Bercik and Dr. Raz, they're operating at least

8    in the area of the obturator and the levator ani;

9    correct?

10                   MR. COMBS:  Object to form.

11                   THE WITNESS:  Well, actually, if

12             he's, if he's dissecting primarily in the

13             anterior wall, he's not going to be out to

14             the levators.  If he's dissecting the distal

15             meshes towards the obturator fascia, he may

16             or may not gone -- may or may not have gone

17             actually to the insertion of the levators

18             there.

19                   So I mean he's going towards that

20             area, yes.

21   BY MR. SLATER:

22        Q    -- talking about distal, you're talking

23   about the arms; correct?

24        A    Yes, distal arms.

25        Q    So Dr. Bercik we know is operating out

Nicolette S. Horbach, M.D.

1   into the distal region when he was operating to

2   treat the contractures of the arms in February?

3       A    I'm -- I think for some reason I, my --

4   the question is whether he was doing the distal or

5   he was doing -- one would assume if it's

6   3 centimeters above the hymen, he would be doing

7   primarily the distal.  So that means he would have

8   cut those, and Raz is talking about dissecting out

9   laterally toward the obturator fascia, but it's

10  not really clear if he's talking about arms, if

11  he's talking about the proximal distal ones or

12  just the edge of the mesh itself.

13      Q    Would you agree with me that the

14  surgeries performed by Dr. Bercik in February '09,

15  Dr. Raz in July of 2009, could contribute to

16  causing pelvic floor myalgia in the obturator and

17  levator ani regions?

18              MR. COMBS:  Object to form.

19              THE WITNESS:  Dissection in those

20       regions can contribute to levator myalgia,

21       obturator internus myalgia, yes.

22  BY MR. SLATER:

23      Q    To the extent that you found or opined

24  that Pam Wicker has or has had pelvic floor

25  myalgia, would you agree with me that these

Nicolette S. Horbach, M.D.

1   dissections that Dr. Bercik and Dr. Raz did over

2   the course of time are likely contributing factors

3   to that?

4        A    They are a contributing.  I don't think

5   they're the most contributing.

6        Q    Let's go back to Dr. Raz's operative

7   report of July 9.  He points out that "the mesh we

8   found covered only the distal half of the

9   bladder."

10            What is he describing there?  What does

11  that mean?

12       A    That's a good question, other than I

13  would assume what he's meaning is that the portion

14  of the anterior wall just above the ureterovesical

15  junction, usually that would probably be the

16  distal portion of the area for the bladder, was

17  where there was mesh, and that the proximal

18  portion, sort of the upper part of the anterior

19  vaginal wall, he did not identify any mesh there.

20       Q    -- that is a consequence of the release

21  of the arms by Dr. Bercik?

22       A    I can't necessarily say that, because

23  theoretically, if Bercik released the distal arms,

24  that doesn't explain why it's not found in the

25  proximal portion of the bladder.

Nicolette S. Horbach, M.D.

1      Q    Let me ask you this.  The Prolift, when
2  it's -- well, rephrase.
3           The intent is for the Prolift to be
4  covering both the distal and proximal part of the
5  bladder; correct?
6      A    Correct.
7      Q    And for whatever reason, by July of 2009
8  Dr. Raz found it was not covering the proximal
9  half of the bladder and that this is where she had
10  bladder prolapse; correct?
11      A    Correct.  That's what he states in this.
12      Q    -- reasonable degree of medical
13  probability --
14      A    I'm sorry.
15      Q    -- as to --
16      A    You cut out.
17      Q    That's fine.
18           Do you have an opinion to a reasonable
19  degree of medical probability as to why the mesh
20  was no longer covering the proximal half of the
21  bladder at this point?
22      A    I can give you several reasons about
23  why.  I don't know that I can give you which of
24  those is the most likely cause.
25      Q    What would you say are the likely

Nicolette S. Horbach, M.D.

1    causes?

2         A    The -- it is possible that the proximal

3    edge of the anterior mesh was not adequately fixed

4    to the vaginal cuff.  It is possible that it was

5    fixed to the cuff but that you can get separation

6    a part of the pubocervical fascia from the cuff,

7    and it retracts down, and you don't have

8    pubocervical fascia in the upper portion of the

9    anterior wall, and the prolapse comes around that.

10   It is possible that Bercik's surgery caused

11   disruption of the position of the original

12   prolapse, and as a result, it wasn't covering the

13   upper portion of that area.

14             I think those are probably the likely

15   causes.

16        Q    Whichever one or a combination of those

17   causes it would be, they would all be related in

18   some way to the Prolift itself; correct?

19             MR. COMBS:  Object to form.

20             THE WITNESS:  The Prolift itself or

21        the manner in which it was placed.

22   BY MR. SLATER:

23        Q    The reprolapse -- well, rephrase.

24             The prolapse of Pam Wicker's bladder --

25   you didn't hear me again?

Nicolette S. Horbach, M.D.

```
 1        A     No.  I was going to actually stop.

 2              Going back to the last question you

 3     said, of the different theories that I have given

 4     for why that's the case, the not properly fixing

 5     the Prolift wouldn't be the Prolift's fault.

 6     Reoperating and distorting it -- I mean you're

 7     reoperating because of the Prolift, but the

 8     distortion isn't necessarily the Prolift's fault.

 9     The pulling down of the pubocervical fascia can

10     happen with or without Prolift there.

11              So I mean there can be an association of

12     Prolift with those things, but there also can be

13     those things happening without it being something

14     wrong with the Prolift itself.

15              Does that clarify things?

16        Q     Definitely, now that I understand.

17              Whichever one of these causes it was,

18     ultimately the prolapse of Pam Wicker's bladder

19     after the Prolift had been put in was a

20     complication related to, for whatever reason, the

21     Prolift no longer covering the bladder as

22     intended; correct?

23                   MR. COMBS:  Object to form.

24                   THE WITNESS:  That is correct.

25
```

Nicolette S. Horbach, M.D.

1  BY MR. SLATER:

2      Q     Dr. Raz in his July 9 operative report

3  talks about "reapproximating" Pam's vagina, trying

4  to treat the shortening and performing a vault

5  suspension procedure; correct?

6      A     Yes, I see that.

7      Q     Dr. Raz determined that he would attempt

8  to lengthen the vagina so that it would be

9  possible for Pam Wicker to try to have sexual

10  relations; correct?

11      A     That's what he was attempting to do.

12      Q     And that was a reasonable surgical

13  judgment to attempt to do that; correct?

14      A     It is an option.  Another judgment would

15  have been not necessarily to do it at the same

16  time that you're dealing with a treatment of a

17  mesh problem or mesh erosion because of the

18  inflammatory component that may be there, and you

19  may or may not get your optimal results.

20      Q     When you're talking about the

21  inflammatory component, you're talking about the

22  inflammatory component of the Prolift mesh?

23      A     Just the inflammatory component of the

24  tissue you're dealing with that he's saying is

25  indurated, et cetera, so it's a combination of

Nicolette S. Horbach, M.D.

1    probably the tissue and the Prolift.

2          Part of the difficulty -- part of the

3    difficulty is that when you are trying to create a

4    vaginal elongation after shortening, you have one

5    of a couple options, and so if a vagina is

6    contracted and scarred as he is suggesting is the

7    case, then trying to lengthen that by stretching a

8    somewhat noncompliant tissue is very often not

9    going to be effective, because you're trying to

10   pull and stretch something that he's saying really

11   isn't stretchable, because it's restricted and

12   constricted, et cetera.

13         If you have a vagina that's nicely

14   compliant and has a lot of give to it, then you

15   may be able to lengthen the vagina by doing the

16   types of suturing he's doing without adding a new

17   lining for the vagina, but if you're trying to

18   lengthen the vagina in a restricted vagina, you

19   often have to place something over that new

20   portion of the tunnel; otherwise, it just seals

21   back up on its own.  So you have to sometimes use

22   a graft, whether it's an animal biologic type

23   graft, like surgi-sist or like it's the patient's

24   own tissues, like a skin graft.

25         So he must have made the judgment that

Nicolette S. Horbach, M.D.

1    her vagina had enough give and compliance and give

2    and mobility and pliability to it that you could

3    take something and stretch it to double its

4    length, since he didn't add --

5        Q    Dr. Raz -- I'm sorry.  Dr. Raz describes

6    the use of Vicryl sutures.

7             Those are absorbable; correct?

8        A    They are absorbable, yes.

9        Q    He indicates about halfway down on the

10   second page of this operative report, "Interrupted

11   sutures of 3-0 Vicryl were interlocked with

12   lateral suspension sutures to provide a net of

13   Prolene sutures to support the bladder, a total of

14   four sutures are applied to the central defect."

15            Do you see that?

16       A    Yes.  Let me read back through that

17   sentence again.  I've read it before, but . . .

18            Okay.  Yes, I see that.

19       Q    -- defect, he's talking about the

20   location where the bladder is actually prolapsing

21   down and bulging into the vagina; correct?

22       A    It's my -- yes.  From what he's

23   described, he's attempting to correct the area in

24   the proximal portion of the anterior wall.

25       Q    And he describes that he used a total of

Nicolette S. Horbach, M.D.

1    four sutures, Vicryl and Prolene sutures that he

2    used to create this net.

3              Is that your understanding?

4       A     That is difficult to say that it was

5    only -- that it was a combination of the, of four

6    sutures between the two things or whether it was

7    four only of one or the other, based on the way

8    he's dictated.

9              The pictures from the operation seem to

10   suggest that he's either very good about being

11   able to conserve sutures or get, you know, a lot

12   out with four sutures, or he put more than four

13   in, because it looks like I could count more than

14   that coming out of the defect.

15      Q     So it could be that he used Vicryl and

16   he used four Prolene sutures as well and didn't

17   count the Vicryl?  That's possible?

18      A     It's possible.  That I don't know, and

19   the four sutures -- again, based on the pictures,

20   you can use four sutures with needles, but you can

21   cut it in half and you can use it more than just

22   four times.  That seemed to be the suggestion on

23   the photograph when there was the spokes of the

24   suture coming out.

25      Q     With regard to Dr. Raz's surgical skill,

Nicolette S. Horbach, M.D.

1    do you have a high level of respect for his skill

2    as a surgeon performing this type of a procedure?

3        A    I've never operated with him.

4        Q    By reputation, is he considered to be

5    highly skilled with this type of surgery?

6        A    He presents or he publishes fairly high

7    success rates with his surgeries.

8        Q    This operation, the July 9, 2009

9    operation, was performed to treat complications

10   that resulted at the base level from the Prolift;

11   correct?

12              MR. COMBS:   Object to form.

13              THE WITNESS:   I don't know that you

14       can say it is from the Prolift.  Again, it is

15       a complication of a prolapse surgery.  She

16       had a recurrence in that area.  Whether it

17       was specifically Prolift-related or not, I

18       can't say.

19   BY MR. SLATER:

20       Q    Well, she didn't have another procedure,

21   so you can't say that it was related to a

22   different procedure, because she had the Prolift

23   procedure; correct?

24       A    Okay.

25              Your comment -- I'm referring to Prolift

Nicolette S. Horbach, M.D.

1    as just a mesh.  If you're referring to Prolift as

2    the entire procedure, then we may be using

3    different semantics.

4           Are you referring to it as the entire

5    procedure?

6       Q    In this question I am, yes.

7       A    Then from the entire procedure, yes.

8    From it being specifically the mesh-related,

9    that's the one I can't say it's absolutely due to

10   that.

11      Q    And you understand, because you've

12   performed the procedure and you've read the

13   literature that was given to you when you were

14   learning the Prolift, that there's a Prolift

15   procedure, and the mesh and the instruments are

16   provided by Ethicon to perform the Prolift

17   procedure; correct?

18      A    Correct.

19      Q    So if you -- rephrase.

20          This surgery Dr. Raz performed in July

21   of 2009 was to treat complications that resulted

22   following from Prolift surgery that was done, and

23   then I think you explained earlier some of this

24   may have also been a result of the operation

25   Dr. Bercik had performed earlier in 2009 to try to

Nicolette S. Horbach, M.D.

1    treat Prolift complications earlier.

2              Fair statement?

3       A    Yes, or it could have been from

4    Dr. Bercik not performing the Prolift procedure in

5    an optimal way originally, or it could have just

6    been because it happens.

7       Q    Now, the surgical pathology report we

8    have marked as -- it's folder 11.  Let's mark it

9    as the next exhibit.

10             (Exhibit 16 was marked for

11             identification.)

12   BY MR. SLATER:

13      Q    Doctor, Exhibit 16 is the pathology

14   report following the July 9, 2009 surgery by

15   Dr. Raz.

16             Do you have that in front of you?

17      A    Yes, I do.  Can -- just for one second I

18   want to check one thing relative to my record.

19             Okay.  Sorry.  I just thought that this

20   was slightly different than the report I had

21   previously seen, but it's the same one.

22      Q    This pathology report from the July 9,

23   2009 surgery describes "benign fibrovascular

24   tissue with foreign body giant cell reaction."

25             Do you see that?

Nicolette S. Horbach, M.D.

1       A    Yes.

2       Q    And that just means that you have the

3   mesh, there's fibrovascular tissue, which is scar

4   tissue; correct?

5       A    Well, scar tissue can be fibrovascular,

6   but fibrovascular tissue can also be not scar

7   tissue, so . . .

8       Q    And there's a foreign body giant cell

9   reaction that's part of the foreign body reaction

10  to the mesh?

11      A    Yes.

12      Q    So at this point now in July of 2009,

13  about nine months after the Prolift was originally

14  put in, the pathology is showing that there is an

15  ongoing chronic foreign body reaction; correct?

16      A    It is showing that there is a foreign

17  body reaction.  My -- the timing of when those

18  giant cells showed up, whether they were early on

19  and just persisted or, you know, a more recent

20  event sort of implying a more chronic problem, I

21  can't recall my pathology well enough to know how

22  to separate that.

23      Q    You would agree with me that, based on

24  the records you've seen, that there was a foreign

25  body reaction to the mesh that was ongoing in July

Nicolette S. Horbach, M.D.

1    of 2009 when the surgery was performed; correct?

2                    MR. COMBS:  Object to form.

3                    THE WITNESS:  I would agree that

4          there was a foreign body reaction at the time

5          of the surgery, yes.

6                    MR. SLATER:  Let's go to folder 13.

7                    (Exhibit 17 was marked for

8                    identification.)

9    BY MR. SLATER:

10        Q    Exhibit 17 is Dr. Raz's October 19, 2009

11   operative report.

12                  Do you see that?

13        A    Yes.  Let me just sort of go -- yes, I

14   do see it.

15        Q    And at this point Dr. Raz documents his

16   preoperative diagnosis, "vaginal pain and vaginal

17   erosion post prior mesh excision and vaginal

18   reconstruction."

19                  Do you see that?

20        A    Yes.

21        Q    And you would agree that's a reasonable

22   preoperative diagnosis here at this point?

23        A    I'm trying to recall the issue of her

24   pain at that time.  I mean he's saying that he has

25   an erosion, so I would assume that that's the

Nicolette S. Horbach, M.D.

1    case.  Hang on.

2         In my notes from his office visit of

3    September, just before this, she was reporting

4    dyspareunia, not a consistent vaginal pain but a

5    dyspareunia, and so the rest of it would be

6    correct.

7    Q    Dyspareunia would be pain in the vagina

8    during sexual intercourse; correct?

9    A    Correct.

10   Q    Dr. Raz in his operative report -- I'm

11   not going to go through it in detail, talks about

12   removing granulating tissue and what he believed

13   to be eroding mesh; correct?

14            MR. COMBS:  Object to form.

15            THE WITNESS:  That's what it says

16      here.

17   BY MR. SLATER:

18   Q    You would agree that this is treatment

19   to treat a complication from a Prolift; correct?

20   A    Based on his description, I can't say

21   that that's indeed the case.  He -- well, he

22   describes dealing with an area where there is

23   granulating tissue that's more in the proximal

24   region where he was putting some of his sutures.

25            He does describe seeing a small

Nicolette S. Horbach, M.D.

1    ulceration of mesh, although it wasn't sent to

2    pathology to be able to differentiate that that

3    was indeed the case.  So it's hard for me to know

4    whether that granulating tissue is from the suture

5    that he placed or from the previous placement of

6    the Prolift.

7         Q    Dr. Raz actually describes three

8    different areas that he removed tissue and

9    material from.

10             Do you see that?

11        A    Let me go through it for three.

12        Q    You'll see first he talks about the

13   posterior --

14        A    Correct.

15        Q    -- vaginal wall, where he found

16   granulating tissue leading to a small

17   ulcerating -- ulceration of mesh.

18             Do you see that?

19        A    Yes.

20        Q    So that's, that's a mesh erosion;

21   correct?

22        A    Again, one would -- the location isn't

23   where mesh would be at this point, so it's where a

24   suture would be, so it's a little conflicting, and

25   we don't have a pathology report to know if that

Nicolette S. Horbach, M.D.

1   area that was removed was a reaction to mesh or a

2   reaction to suture.

3        Q    Dr. Raz calls it a "small ulceration of

4   mesh."  That's what he described it as; right?

5        A    That's what he calls it as, yes.

6        Q    Then just below that a few lines, it

7   says, "In the right cuff of the vagina there is a

8   one-millimeter area of minimal granulation

9   suspicious of the beginning of a vaginal erosion,"

10  and he excised that area?

11       A    Correct.

12       Q    Correct?

13       A    Mm-hmm.

14       Q    And then below he removed what he

15  described as "an area of mesh that appeared a

16  combination of mesh and sutures in the anterior

17  vaginal wall"; correct?

18       A    Correct.

19       Q    At least in part this operation was to

20  treat complications related to the Prolift being

21  in Mrs. Wicker's body; correct?

22       A    It was to treat -- it's difficult for me

23  to say specifically.  In the last area that he

24  removed, it doesn't say that they were

25  specifically erosions or whether he chose to

Nicolette S. Horbach, M.D.

1   remove it.  In the, in the second area that he

2   removed, he removed it because there was

3   granulation tissue and suspicion, although he

4   doesn't say what material.

5           In the first case, he says that he has

6   granulation tissue with this small ulceration of

7   mesh but in a place where mesh isn't supposed to

8   be, based on what he's done in the previous

9   surgery.  So it's hard for me to say it's

10  specifically that mesh was causing this at this

11  particular time.

12      Q    Two questions about that.

13          First of all, even if the doctor tries

14  to remove the mesh in a certain area, there's no

15  way for the doctor to be sure that they've gotten

16  all the mesh out of that particular area; right?

17      A    It depends on where the area is.

18      Q    Let's talk about --

19      A    Sorry.

20          In the arms I would agree that it is

21  difficult, because it's down a tunnel, and you may

22  have more difficulty being able to know that

23  you've removed it.

24          In the anterior/posterior vaginal wall,

25  usually, most commonly, you're pretty sure whether

Nicolette S. Horbach, M.D.

1    or not you've gotten the fibers and the mesh

2    removed.  I mean you can see that from his

3    photographs that he took during surgery.

4        Q    You can think that -- well, rephrase.

5             You can do your best to remove the mesh,

6    you can visualize an area and think you've gotten

7    the mesh, and it's common for more mesh to appear

8    in an area.  That happens all the time, doesn't

9    it?

10                  MR. COMBS:  Object to form.

11                  THE WITNESS:  Not typically in an

12          area of the anterior wall.  Yes, in the more,

13          you know, tunnel areas, possible, but usually

14          if you've removed what you perceive as all

15          the mesh material in that area, and you are

16          as competent of a surgeon as Dr. Raz is put

17          forward as, one would expect that you know

18          whether you've excised all the mesh or not in

19          that area.

20                  And to get a --

21    BY MR. SLATER:

22        Q    Are you familiar with --

23        A    I mean to get granulation tissue of a

24    centimeter and a half by, by half a centimeter, I

25    mean that's not a small area of granulation

Nicolette S. Horbach, M.D.

1    tissue.  You're not going to have that kind of

2    granulation tissue caused by a couple mesh fibers.

3         Q    According to Dr. Raz, he visualized a

4    small ulceration of mesh in the posterior -- what

5    he described actually as the posterior part of the

6    anterior part of the vaginal wall; correct?

7    That's what he described in his deposition; right?

8         A    That's what he's describing, yes.

9         Q    The sutures that are now in Pam Wicker's

10   vagina as of this time are sutures that were put

11   in following surgeries -- were as part of

12   surgeries that were performed to treat

13   complications that followed from the Prolift

14   surgery; correct?

15                  MR. COMBS:  Object to form.

16                  THE WITNESS:  I'm just trying to

17        follow your sequence.  The sutures, the

18        permanent sutures he placed were an attempt

19        to treat a complication/recurrence from the

20        Prolift surgery, yes.

21                  MR. SLATER:  Let's go the folder

22        15.

23                  (Exhibit 18 was marked for

24                  identification.)

25                  THE WITNESS:  Can you give me just

Nicolette S. Horbach, M.D.

1      a second so I can catch up with my notes?

2  BY MR. SLATER:

3      Q    No problem.  We're making good time now.

4      A    Okay.

5      Q    Exhibit 18 is the May 10, 2010 operative

6  report.

7           You have that in front of you; right?

8      A    Yes, I do.

9      Q    At this point the preoperative diagnosis

10 is "vaginal mesh erosion, post complications of

11 mesh reconstruction of the vaginal wall."  That's

12 number one, and number two is "cystocele."

13          Do you see that?

14     A    Yes.

15     Q    That's a reasonable preoperative

16 diagnosis for Pam Wicker at that point; correct?

17     A    The first part is.  I'm trying to look

18 for my notes about whether he had evidence of a

19 recurrent cystocele after his attempts at placing

20 the Prolene netting.  I'd have to look back at his

21 office notes, which I don't have right this

22 minute, to know whether the cystocele comment is a

23 correct one as well, but the first one is correct.

24     Q    Let's look at the Indications section.

25 Bear with me for one second.

Nicolette S. Horbach, M.D.

1           Rephrase.

2           In the Indications section, it appears

3    that Dr. Raz actually combines the indication and

4    the procedure note.

5           Do you see that?

6    A    Yes.

7    Q    He starts off and says that "Mrs. Wicker

8    is a patient suffering from complications of prior

9    mesh surgery."

10          You would agree with that statement;

11   correct?

12              MR. COMBS:  Object to form.

13              THE WITNESS:  Yes.

14   BY MR. SLATER:

15   Q    Dr. Raz points out, "This time she

16   presented with erosion of mesh that extends from

17   the obturator area in the right, to the left, with

18   two areas of erosion in the vaginal wall laterally

19   of an extent of 1.5 centimeters in each side."

20          See where I'm reading from?

21   A    Yes.

22   Q    Would those erosions be erosions of mesh

23   from the area where the arms would be?

24   A    Most likely, yes.

25   Q    And that's in the area of the obturator,

Nicolette S. Horbach, M.D.

1  as he described?

2      A    He doesn't really specify whether he's

3  distal or proximal, but yes, he could be in -- in

4  either place he could be near the obturator.

5      Q    Dr. Raz described the removal of the

6  eroded mesh.  He describes the incisions he

7  performed; correct?

8      A    Yes.

9           Hang on two seconds here.

10          Based on where he's placed the

11  incisions, it looks as if it's probably the distal

12  arms.

13     Q    Okay.

14     A    Okay.

15     Q    You would agree with me that the surgery

16  to treat the -- well, rephrase.

17          You would agree that the eroding mesh

18  described here in this operative report is a

19  complication from the Prolift; correct?

20     A    It is the Prolift mesh, yes.

21     Q    And the surgery to remove the eroding

22  mesh is a reasonable surgical judgment to remove

23  eroding mesh; correct?

24     A    Yes.

25     Q    After Dr. Raz removes the eroding mesh,

Nicolette S. Horbach, M.D.

1    he then talked about reconstructing the vaginal

2    wall and urethra with Vicryl sutures.

3              Do you see that?

4         A    Yes.

5         Q    And again, that was a reasonable

6    surgical step to take after dissecting the mesh

7    out?

8         A    Again, it would depend upon the anatomy.

9    He doesn't describe an anatomic problem that he's

10   plicating, but assuming there is an anatomic

11   problem, you can certainly plicate it.

12        Q    Do you have any reason to believe that

13   the reconstruction vaginal wall and urethra was

14   not necessary at this point, anything in the

15   records or documents?

16        A    Again, I'd have to pull his pre-, his

17   exam previous to this to see what the anatomy

18   shows per se to see if there was any potential

19   relaxation in that area.

20             Do you have the -- do you have that?

21             MR. COMBS:  No.

22             THE WITNESS:  Hang on.  Let me see

23        if I have it in my notes.  They're

24        unfortunately not quite in order.

25             I'm just having a little bit of

Nicolette S. Horbach, M.D.

1          difficulty locating the physical exam that

2          was done prior to that.  It's hard to tell,

3          because this one that I have indicates it

4          was -- the date stamp on the top is actually

5          three days after the surgery, so it's hard to

6          know if that was the pre-op one, just

7          post-dated.

8                    But anyway, if he found an area of

9          relaxation there, it would be appropriate to

10         plicate it.

11    BY MR. SLATER:

12         Q    According to the operative report,

13    there's a post-operative diagnosis confirming

14    there was a cystocele grade 2 to 3, so presumably

15    Dr. Raz confirmed that during the surgery?

16         A    Well, the hard part is during the

17    surgery you really can't confirm that so much,

18    because once the patient is under relaxation,

19    everybody looks like they have a cystocele.  So he

20    would have hopefully confirmed that in a

21    preoperative exam with the patient awake.

22         Q    Okay.

23                This surgery ultimately was performed to

24    treat complications that resulted from the Prolift

25    being in her body; correct?

Nicolette S. Horbach, M.D.

```
 1                    MR. COMBS:  Object to form.
 2                    THE WITNESS:  Yes.
 3                    MR. SLATER:  Let's go to folder 17.
 4                    (Exhibit 19 was marked for
 5                    identification.)
 6                    MR. SLATER:  We don't even have to
 7        use this.  Let's skip to the next one, the
 8        one in folder 18.
 9                    (Exhibit 20 was marked for
10                    identification.)
11   BY MR. SLATER:
12        Q    This is the next operative report.
13        A    Wish they would keep their format the
14   same so I wouldn't keep getting confused with
15   finding where the dates are.
16        Q    Now, looking at Exhibit 20, that's the
17   August 16, 2012 operative report for Dr. Raz?
18        A    Correct.
19        Q    His preoperative diagnosis is "mesh
20   exposure, status post multiple surgeries for
21   complications of mesh."
22             That's a reasonable preoperative
23   diagnosis at this point; correct?
24        A    Given that he's saying he found a
25   granulating area, yes.
```

Nicolette S. Horbach, M.D.

```
 1        Q    Dr. Raz actually in his indications
 2   confirms that he found an area of "granulating
 3   ulceration, maybe 2 or 3 millimeters in size, in
 4   the distal left vaginal wall," and then in the
 5   description of the operation, he confirmed that he
 6   found that and actually removes that mesh?
 7        A    Let me just make sure.
 8             Yes.
 9        Q    This surgery was done to treat a Prolift
10   complication involving eroding mesh; correct?
11        A    Yes.  I mean assuming that this is mesh
12   that he was removing, then -- ulceration with
13   mesh, then yes, it was from the mesh that was put
14   in for the Prolift.
15        Q    I want to change gears a little bit and
16   ask you a few questions about Mrs. Wicker's
17   medical, overall medical conditions, general
18   medical conditions.
19             Mrs. Wicker had breast implants and then
20   later had the silicone breast implants removed and
21   had saline implants put in.
22             You're aware of that from her history;
23   right?
24        A    Yes.
25        Q    That is of no significance to the
```

Nicolette S. Horbach, M.D.

1    injuries and damages claimed in this case;

2    correct?

3                    MR. COMBS:  Object to form.

4                    THE WITNESS:  Her breast implant

5        and removal didn't cause her to have a

6        problem with the Prolift surgery, correct.

7    BY MR. SLATER:

8        Q    In 1995, Pam Wicker had a Bartholin's --

9    and for our court reporter, that's

10   B-A-R-T-H-O-L-I-N, apostrophe, S -- cyst.

11              That's of no significance to you in

12   forming your opinions; correct?

13       A    Correct.

14       Q    In 1999 Mrs. Wicker underwent shoulder

15   surgery to remove a bone spur.

16              That's of no significance to you in

17   forming your opinions; correct?

18       A    Now we start getting into some of the,

19   you know, orthopedic issues and body mechanic

20   issues, per se.  I'm not sure that I can say that

21   specific procedure was involved in this situation,

22   but it's an indication of some component of --

23   bony abnormalities I guess is the best way I can

24   say it.

25       Q    -- the removal of a bone spur in 1999;

Nicolette S. Horbach, M.D.

1    do you have an opinion to a reasonable degree of

2    medical probability that the existence of the bone

3    spur or the surgery to remove it is connected in

4    some way to the injuries that we're claiming in

5    this case?

6                    MR. COMBS:  Adam, you cut out at

7         the beginning of the sentence.

8                    MR. SLATER:  I'll start again.

9    BY MR. SLATER:

10        Q    Mrs. Wicker having a bone spur in her

11   shoulder in 1999 and having that surgically

12   removed, are you saying to a reasonable degree of

13   medical probability, that had some connection to

14   her pelvic and vaginal issues since the Prolift

15   was put in her body?

16        A    Not in the way that -- I would answer no

17   to the question the way you phrased it.

18        Q    In February 2008, Mrs. Wicker underwent

19   a cervical discectomy with fusion.

20                    Do you have an opinion to a reasonable

21   degree of medical probability that that has some

22   causative connection to the conditions in

23   Mrs. Wicker's pelvis and vagina since the Prolift

24   surgery?

25        A    I think that that -- the hard part with

Nicolette S. Horbach, M.D.

1    this particular surgery is it certainly could play

2    a role in part of the complex.  It really depends

3    to some extent, going back to that, was there any

4    pelvic floor problems in her muscles at the time

5    of her original surgery or was there not, the

6    timing of her surgery with the neck issues.  She

7    then went through a three-month period of time of

8    postoperative recuperation.  She had the ability

9    to do some level of exercise during that issue but

10   really wasn't doing her full level of exercise.

11            She was released to do that full level

12   of exercise about six, maybe eight weeks prior to

13   her presenting with her initial prolapse symptoms.

14   If you then say that the prolapse symptoms are in

15   part, the pain issues, et cetera, may have some

16   role with her pelvic muscles.  It certainly is a

17   transition that we see where a -- some type of

18   intervention procedurally that affects the body

19   mechanics.

20            She's not working -- she's not really

21   working out at the same level, and she then begins

22   to -- again, it's sort of that last camel or straw

23   that broke the camel's back, and it creates the

24   problems or starts the process of problems in the

25   pelvic floor.

Nicolette S. Horbach, M.D.

1            So that is a conceivable portion of what

2    was going on.  It really depends upon whether or

3    not, you know, there was the muscular activity

4    going on at the time of the original surgery or

5    not.  If there was not any muscular activity, then

6    I would say that surgery isn't necessarily

7    related.  If there was some muscular activity,

8    then certainly there could be a component that

9    this starts the process.

10        Q    -- confirmed for me earlier in the

11    deposition you're not drawing the opinion that

12    there was any pelvic muscle issues before the

13    first Prolift surgery; correct?

14        A    Again, we have limited information about

15    that, but the assumption again is that there

16    wasn't that there, but, you know, I don't -- we

17    can't go back and check that, so . . .

18        Q    Based on what you know and what you have

19    available to you now, you're not drawing an

20    opinion to a reasonable degree of medical

21    probability that Mrs. Wicker had any pelvic floor

22    muscular issues before the Prolift was put in;

23    correct?

24            MR. COMBS:  Object to form.

25            THE WITNESS:  Again, I suspect she

Nicolette S. Horbach, M.D.

```
 1          may have.  I can't prove to within a

 2          reasonable degree of medical certainty.

 3     BY MR. SLATER:

 4          Q    And based on that, the neck surgery in

 5     February of 2008 would not be of any significance

 6     with regard to her pelvic and vaginal issues after

 7     the Prolift; correct?

 8                    MR. COMBS:  Object to form.

 9                    THE WITNESS:  I can't say that,

10          because, you know, this lady has, is sort of

11          like -- I hate to say it.  She's an

12          orthopedic nightmare in terms of multiple

13          different aspects of her body mechanics and

14          skeletal system that are affected, and if you

15          have one area that's affected and you begin

16          to change position, posture, walking, gait,

17          then you're going to potentially have this

18          domino effect.

19                    This particular one with the neck

20          surgery, I can't say for a specific degree of

21          medical certainty.  I think that the other

22          components of her orthopedic history

23          subsequent to that certainly could play a

24          role in her persistence of symptoms.

25
```

Nicolette S. Horbach, M.D.

1    BY MR. SLATER:

2        Q    Talking just about the neck, you're not

3    drawing an opinion to a reasonable degree of

4    medical probability that her neck surgery in

5    February 2008 is a cause of her pelvic and vaginal

6    condition after the Prolift; correct?

7        A    Again, the way that's stated

8    specifically, I would say no.

9        Q    Now, let's talk -- and I think we'll

10   probably talk for a few minutes about this.

11   Mrs. Wicker -- new question.  Mrs. Wicker had hip

12   replacement surgery August 25, 2010; correct?

13       A    Yes.

14       Q    Mrs. Wicker had been complaining of hip

15   issues and hip pain since about 2004; right?

16       A    Off and on, and although it's a little

17   more consistently stated, within the two years

18   prior to the replacement.

19       Q    In 2007 Pam Wicker stopped running

20   because of the pain in her hip; correct?

21       A    At some point she did -- she didn't stop

22   running.  She reduced her running, and I'm just

23   trying to remember when it was.

24            I think she, she had told me that around

25   the 2008 time period was she had cut back from her

Nicolette S. Horbach, M.D.

1   12 to 15 miles per week, but she did not tell me

2   that she wasn't running, because I have here that

3   before the Prolift surgery she's talking about

4   kick boxing, running, weights, spinning, Pilates,

5   all of those things before the 2008 surgery.

6       Q    On page 12 of your report you point out

7   that in September 2007 she presented to one of her

8   doctors with a six-month history of right hip

9   achiness and stiffness and reduced range of motion

10  in her cervical spine, and because of her hip

11  pain, she had eliminated running from her exercise

12  routine.

13          Does that refresh your memory that based

14  on your review of the records, Pam stopped running

15  in September of 2007?

16      A    It tells me that she wasn't running at

17  that point in 2007, but according to what she told

18  me when we were talking, she said -- I asked her

19  what work she was doing before the Prolift

20  surgery, and that's what she had told me.  She had

21  reduced her running from the long-distance

22  portion, but she stated she was still doing

23  running.

24          So at this point in 2007, she may have

25  not been running for that period of time.  Whether

Nicolette S. Horbach, M.D.

1    she began running again to a more limited

2    standpoint, that seems to be what her comments to

3    me would imply.

4        Q    From 2004 forward, Pam Wicker reported

5    painful osteoarthritis in her hip to the point

6    that it altered her exercise regimen; correct?

7        A    From two thousand -- you said what time

8    period?  2004 on?  Hang on.

9        Q    You say it on page 11, "In 2004 she was

10   noted to have complaints of right hip pain."  So

11   I'm using that as -- at least as of that time she

12   had hip pain?

13       A    Yes, but she also has had that hip pain

14   come and go at different periods of time, whereas

15   in the beginning, she then -- as she became closer

16   to the two years prior to the replacement, the hip

17   pain had become more of a problem to the point

18   where it was altering her gait.

19       Q    According to your report, by January of

20   2008 a doctor had recommended a hip replacement

21   for her.  Her condition was that severe; correct?

22       A    Yes.  Yes, I believe so.

23       Q    What I want to get at is this:  From at

24   least 2004, Pam was complaining of hip pain in the

25   right hip.  There were evaluations that showed her

Nicolette S. Horbach, M.D.

1  right leg was longer than her left leg.

2      A    Correct.

3      Q    And this was for at least four years

4  before her Prolift; correct?

5      A    That evaluation of the leg discrepancy,

6  yes.

7      Q    And during that entire time, four years,

8  right up until the Prolift, there's no

9  indication -- except in the two weeks before she

10  saw Dr. Bercik when he was operating on her for

11  prolapse, there's no indication of any pelvic or

12  vaginal pain at all; right?

13      A    I think so.  I'm just trying to recall

14  whether in any of her gyn stuff -- no, I think her

15  gyn history prior to that point was not -- did not

16  include pelvic pain.

17      Q    Okay.

18          After the Prolift, Pam Wicker has

19  complained of pelvic pain.  Whether we say it's

20  all the time or whether there had been a few

21  periods where she said that she didn't feel it as

22  much, she's fairly consistently and for long

23  stretches of time complained of pelvic and vaginal

24  pain; correct?

25      A    Correct.  Sometimes -- again, there is

Nicolette S. Horbach, M.D.

1    some conflict, because there's Raz notes that say

2    she's feeling well, she feels -- you know, she's

3    doing well, she doesn't have pain, and then there

4    are other notes or her report that she is still

5    having symptoms.

6        Q    To the extent and during the periods --

7    rephrase.

8            To the extent Pam Wicker has complained

9    of pelvic and vaginal pain after the Prolift

10   surgery, you would agree with me that the Prolift

11   is one cause of that pain and to the extent that

12   you believe her hip issue or her leg length issue

13   is contributing, that would be a contributing

14   factor, they would all be combining together to

15   lead toward the pain.

16           Is that essentially your opinion?

17              MR. COMBS:  Object to form.

18              THE WITNESS:  I think that there,

19         that it is a combination of factors that are

20         leading to her pain.  How much of her pain is

21         or is not related to the specific Prolift

22         and/or mesh is difficult for me to say, but I

23         don't think that, certainly not at the

24         present time or in the recent past, that

25         that's the primary problem.

Nicolette S. Horbach, M.D.

```
 1   BY MR. SLATER:

 2        Q    You believe the Prolift and the Prolift

 3   mesh is a contributing factor.  You also think her

 4   hip and her leg length issue is a contributing

 5   factor as well, and you're not going to tell me,

 6   you know, this is that percent or this is that

 7   percent.  It's just they all contribute.

 8             Is that fair?

 9        A    No, that's not what I said.  I said all

10   of that is correct except for this issue where you

11   said my comment about the Prolift is, as an

12   absolute, a contributing factor, and I think that

13   it could be, but I'm not saying that it's an

14   absolute.  I'm not saying yes for sure.

15        Q    More likely, more likely than not, to

16   the extent that Pam Wicker has complained of

17   vaginal and pelvic pain, the Prolift, the

18   complications she has suffered related to the

19   Prolift, and the surgeries to treat those

20   complications are a substantial contributing

21   factor; correct?

22        A    I don't agree with all of that

23   statement.  I think that the original issues of

24   the pain with the band that she originally had cut

25   by Bercik in the beginning certainly was a
```

Nicolette S. Horbach, M.D.

1  contributing issue for the pain, but it is

2  difficult for me to say in the more subsequent

3  episodes where she's having symptoms that it is --

4  that the Prolift is involved in that.

5      Q    Whatever hip issues and leg length

6  issues Pam Wicker had before the Prolift, they

7  caused her no pelvic pain and no vaginal pain,

8  according to the records; correct?

9      A    That's correct.

10     Q    It was only after Pam Wicker had a

11  Prolift put in her body, suffered complications

12  connected to the Prolift, had one operation by

13  Dr. Bercik to remove mesh, four operations in the

14  operating room by Dr. Raz to remove mesh; it

15  wasn't until all of the issues with the Prolift

16  manifested that she began to complain of pelvic

17  and vaginal pain; correct?

18              MR. COMBS:  Object to form.

19              THE WITNESS:  There is a temporal

20        relationship, but you cannot say there's a

21        causal relationship.

22              THE VIDEOGRAPHER:  I'm sorry.  I

23        have to change the tape.  At 3:53 off record.

24              (Whereupon, a short recess was

25              taken.)

Nicolette S. Horbach, M.D.

```
 1                    THE VIDEOGRAPHER:  At 4:03 p.m. on
 2      record.
 3   BY MR. SLATER:
 4      Q    If we look at the temporal -- I'm going
 5   to rephrase the question.
 6           Doctor, if we look at the temporal onset
 7   of pelvic and vaginal pain, it followed
 8   immediately after the Prolift was put in Pam
 9   Wicker's body; correct?
10                    MR. COMBS:  Object to form.
11                    THE WITNESS:  Correct.
12   BY MR. SLATER:
13      Q    By the same token, the hip pain and the
14   leg length difference had existed for at least
15   four years before the Prolift surgery, with no
16   complaints of pelvic or vaginal pain; correct?
17      A    Correct.
18      Q    Can you point me to any of the articles
19   listed on either of your list of materials that
20   we've gone through, any article that supports a
21   causative link between a hip issue or a leg length
22   discrepancy and pelvic and vaginal pain?
23      A    In the -- there's not a lot in the
24   literature regarding this, because it, it's more
25   of a physical therapy/physiatry type of thing, and
```

Nicolette S. Horbach, M.D.

1    it's just -- you know, the crossover with gyn is

2    not necessarily as good as we'd like, but even if

3    you look at ACOG's chronic pain practice bulletin,

4    there is a component or a section that talks about

5    faulty posture issues, you know, being seen and

6    being an issue in up to, you know, 75 percent of

7    patients who have, you know, chronic pelvic pain

8    issues.

9        Q    That's only one of the items on your

10   list of literature that you would say supports

11   that opinion?

12       A    On the -- I mean I, I have additional

13   literature that would support it.  It's not per

14   se -- I mean there's a whole book on pelvic pain

15   that talks about these whole issues and

16   everything.  I did not cite it as a specific

17   literature, because it's the whole darn book that

18   talks about it, but it does raise all these issues

19   of body mechanics, gait ambulation issues.

20           It talks about, you know, pelvic floor

21   muscle dysfunction, it talks about dyspareunia and

22   stuff, and all of that related to these whole

23   components.  And I will give you -- it's called

24   "Pelvic Pain," and I don't remember who the author

25   is, but I mean it's a huge book just on this.

Nicolette S. Horbach, M.D.

1    It's not something that's easily seen in the

2    literature per se.

3           There are some other references.  I just

4    can't tell them right off the top of my head.

5    Q    My question is this:  On the actual

6    lists of literature that you have served on me,

7    other than the ACOG practice bulletin dated

8    March 2004, none of those references you can point

9    to and say this supports my opinion that the hip

10   and leg length issue is a cause of the pelvic and

11   vaginal pain Mrs. Wicker has complained of;

12   correct?

13   A    Probably not on this list.

14   Q    Okay.

15          Now, do you have that ACOG practice

16   bulletin there in the room with you?

17   A    Yes, I believe so.

18   Q    We should pull it out for a minute.

19   We'll ask a couple questions about it.  I found

20   this to be interesting reading.

21   A    I thought I had it with me, but I seem

22   to have put it someplace.  I've got too many

23   stacks.

24          All right.  Let's just look at it.

25          Okay.

Nicolette S. Horbach, M.D.

1      Q    Do you have it there?

2      A    Yes.

3      Q    Okay, and just for the record, this is

4  ACOG practice bulletin number 51, March of 2004.

5      A    Yes.

6      Q    Correct?

7      A    Yes, reaffirmed in 2010.

8      Q    This is titled "Chronic Pelvic Pain";

9  right?

10      A    Yes.

11      Q    And the reason why you're referring to

12  this in this case is because you believe Pam

13  Wicker to have, overall, a reasonable diagnosis

14  for her chronic pelvic pain; correct?

15      A    Yeah, I think that that's probably a

16  reasonable diagnosis for her.

17      Q    Now, if you look at the third page,

18  which is page 79, there's a table that lists

19  "non-gynecologic conditions that may cause or

20  exacerbate chronic pelvic pain by level of

21  evidence."

22           Do you see that?

23      A    Yes.

24      Q    Level A evidence would be the highest

25  level, meaning the most valid?

Nicolette S. Horbach, M.D.

1      A    That's based on studies that have been

2  reported, yes, studies that have been done and

3  reported on that, yeah.  I guess yes.  I'll just

4  say that yes, Level A is considered to be better

5  quality studies.

6      Q    And in essence, in terms of the evidence

7  supporting inclusion of these different conditions

8  as potential causes or exacerbating factors for

9  chronic pelvic pain, the level of evidence --

10 Level A is the highest, Level B is the next, and C

11 is the lowest level of quality of evidence;

12 correct?

13     A    Correct.

14     Q    Now, there's a musculoskeletal column,

15 and under the Level A evidence it lists "pelvic

16 floor myalgia, levator ani or piriformis

17 syndrome."

18          Do you see that?

19     A    Yes.

20     Q    In Mrs. Wicker's case, the first time

21 that she had indications of or diagnosis of pelvic

22 floor myalgia was after the Prolift was put in her

23 body; correct?

24     A    That's the first time she had a clinical

25 diagnosis of that, yep.

Nicolette S. Horbach, M.D.

1        Q    The surgeries that she has had performed

2   to treat her complications from the Prolift, as

3   well as the inflammatory reaction of her body to

4   that mesh in her body could cause pelvic floor

5   myalgia; correct?

6                    MR. COMBS:  Object to form.

7                    THE WITNESS:  The surgeries

8             could -- the issue of the inflammatory

9             reaction, I really think it depends upon, you

10            know, how much mesh you're talking about.

11            You're talking about a 2- or 3-millimeter

12            mesh erosion, I don't think that that's going

13            to be something that's going to be causing a

14            pelvic floor myalgia from an inflammatory

15            reaction that's a 2- or 3-millimeter area.

16   BY MR. SLATER:

17        Q    The distal arms, for example, of the

18   anterior Prolift system were not completely

19   removed from Pam Wicker's body and were in there

20   for years.  They could certainly have incited a

21   continuing chronic foreign body reaction that

22   could cause myalgia; correct?

23                    MR. COMBS:  Object to form.

24                    THE WITNESS:  It could.

25

Nicolette S. Horbach, M.D.

1  BY MR. SLATER:

2      Q    Under the musculoskeletal column, under

3  Level C, the lowest level of evidence, it says

4  "degenerative joint disease."

5           Do you see that?

6      A    I see that.

7      Q    It's not specific to any particular area

8  of the body, as it's stated there; right?

9      A    Correct.

10     Q    That could, for example, be a reference

11 to degenerative joint disease within the pelvis

12 itself; right?

13     A    You don't -- well, you can get it in the

14 hips.  You don't get it within the pelvic bone

15 itself.

16     Q    -- get, for example, degeneration of the

17 sacroiliac joint; right?

18     A    You don't usually get degeneration so

19 much.  You get some mobility of the SI joint, but

20 it doesn't tend to degenerate, per se.

21     Q    Are you sure about that?  Are you sure

22 you don't get -- the degeneration of the SI joint

23 is not a common orthopedic diagnosis?

24     A    I think that it -- what I'm saying is in

25 the patients that I see with these types of

Nicolette S. Horbach, M.D.

1    things, it is typically more that they have some

2    hypermobility of the joint.  You know, you'd have

3    to X-ray them to see whether there was any

4    degenerative changes in the joint.

5         Q    You don't hold yourself out as an expert

6    with regard to degenerative joint disease, do you?

7         A    No.

8         Q    Okay.

9              Nowhere on this list is there a

10   reference to hip or leg issues such as we have

11   with Mrs. Wicker.  That's not on this list, is it?

12              MR. COMBS:  Object to form.

13              THE WITNESS:  I think that's part

14        of the issue of, that is included in the

15        faulty or poor posture, that it's -- whether

16        it's not moving, whatever that would be,

17        versus whether it is ambulation, it doesn't

18        necessarily specify it, but there is clearly

19        literature showing that patients who have

20        abnormal gait can be more susceptible to some

21        of these types of pelvic floor issues.

22              I mean she's got sleep

23        disturbances.  I mean she's got a number of

24        different things that you can sort of check

25        off on this list as non-gynecologic causes of

Nicolette S. Horbach, M.D.

1          chronic pelvic pain.

2     BY MR. SLATER:

3          Q    And she had all of those conditions

4     before she had the Prolift and didn't have any

5     complaints of pelvic or vaginal pain; right?

6                    MR. COMBS:  Object to form.

7                    THE WITNESS:  That is correct.

8     BY MR. SLATER:

9          Q    As I read this, what I thought they were

10    ultimately saying in this bulletin is you're going

11    to see most patients with more than one of these

12    factors, and if you have a patient who has pelvic

13    pain due to a gynecologic reason and they also

14    have non-gynecologic conditions, that just sets

15    the stage to have worse pain.

16                    Am I understanding that correctly?

17         A    I think that the combination of two,

18    gynecologic as well as non-gynecologic, could lead

19    to more problems of pelvic pain or more difficulty

20    in treating it, because even if you treat the

21    gynecologic issue, if the non-gynecologic issue

22    still remains, the pain is going to continue to

23    cycle and you're going to continue to have

24    problems occurring.

25         Q    In the case of Mrs. Wicker -- I know

Nicolette S. Horbach, M.D.

1   we've kind of talked about it, but I want to talk

2   about it in the context of this bulletin.

3           In Pam Wicker's case, she has a

4   combination of gynecologic issues that could, in

5   and of themselves, cause the pelvic and vaginal

6   pain she has; correct?

7       A   They could.

8       Q   She also has certain non-gynecologic

9   issues, such as her hip, her leg length, you said

10  her sleep, and she has these issues, which you're

11  saying you believe are contributing to her pain;

12  correct?

13      A   I think that they're -- yeah, they're a

14  significant contribution to the pain, the

15  persistence of the pain issues.

16      Q   And if I understand correctly, now in

17  the context of this bulletin as it's boiled down

18  here, your opinion is:  When you put all that

19  together, that's where you have Pam Wicker.

20  That's what makes the picture together.  When you

21  put her gynecologic issues related to the Prolift

22  and her complications and the surgeries related to

23  that, you put her orthopedic issues together, you

24  put all that together, and that's how you are able

25  to answer why Pam Wicker has been where she is and

Nicolette S. Horbach, M.D.

1    where she is.

2             Is that accurate?

3                  MR. COMBS:  Object to form.

4                  THE WITNESS:  I think that that is

5    accurate that there is probably a

6    combination, but again, if Prolift was the

7    major contributing factor or the mesh was the

8    major contributing factor, you know, you

9    would -- one would typically expect that

10   you're going to have, you know, reasonable

11   complete resolution of the problem as you

12   take away these different types of meshes.

13             And yes, I know there's literature

14   that says that even removal of the mesh may

15   leave a few fibers here and there, but you're

16   going to have to -- how are you going to

17   explain the fact that when she has a mesh

18   surgery or she has a mesh removal and even if

19   it's a little bit of granulation tissue of a

20   couple, you know, millimeters or something,

21   there is a period of time afterwards, usually

22   between about 6 to 12 weeks, where she feels

23   better, and then she begins to have

24   recurrence of symptoms.

25             So the question is:  The -- if

Nicolette S. Horbach, M.D.

1       you're talking the chronic inflammation from

2       the mesh as the only cause of this, the

3       chronic inflammation from the mesh would have

4       been ongoing even immediately

5       postoperatively, and she shouldn't really

6       have necessarily that improvement, because

7       you're saying she has still mesh there, she

8       still has chronic inflammation, and so

9       therefore she should still have the pain

10      component there.

11              So the fact that one of the common

12      denominators from the time period where she

13      has surgery until when she experiences

14      recurrence of the pain very interestingly

15      coincides with her resuming a significant

16      amount of her normal activities and her

17      exercise that, in turn, takes all of these

18      biomechanical issues that may have been given

19      an opportunity to sort of rest and not

20      continue to put demands on the area by her

21      being less active, you put her into the more

22      active situation and that begins to trigger

23      the whole process again.

24              You're making the assumption that

25      that retriggering is based on the mesh fibers

Nicolette S. Horbach, M.D.

1          creating an issue, and in the cases where she

2          has recurrence of symptoms and there is such

3          a minor amount of mesh involved, that just

4          doesn't make logical sense.

5     BY MR. SLATER:

6          Q     Let me ask you a couple things, because

7     I want to go through a few things you said.

8     Number one -- well, let me ask it this way.

9               Dr. Raz explained that when you operate

10    this many times on a woman's vagina, and you

11    continue to dissect the vaginal tissue, you

12    devascularize the tissue, because you're cutting

13    blood vessels, et cetera, which weakens the

14    tissue.

15              Do you agree with that?

16         A     Not necessarily.  If you had

17    devascularized tissue, the tissue would be dead

18    and necrotic and sloughing off.

19         Q     Well, you could also devascularize it to

20    the point where it's not going to be as healthy as

21    it would be otherwise, but it's not necessarily

22    dying due to the multiple dissections; right?

23              MR. COMBS:  Object to form.

24              THE WITNESS:  Yeah, and you could

25         postulate a whole lot of other things that go

Nicolette S. Horbach, M.D.

1          into the process as well, but what I'm

2          doing --

3     BY MR. SLATER:

4          Q     So you and Dr. Raz disagree?

5          A     Yes, and what I'm also basing it on is

6     the experience in patients who are non-Prolift,

7     non-mesh patients, and the people who are like

8     this where there's a mesh, and you can see exactly

9     the same course of events even in a patient who

10    doesn't have a mesh or mesh erosion, where there

11    is this chronic exacerbation and, and improvement

12    of pain issues based on the ability of her body to

13    compensate or not compensate for the demands that

14    are put on her.

15          So the challenge is:  If you were saying

16    that this was all Prolift and mesh-related, then

17    what you would have to say is the only people who

18    develop these kind of problems, et cetera, are

19    going to have to be those people who have had mesh

20    and have had Prolift, but what I'm saying, in

21    clinical practice that is not the case.

22          Q     In Pam Wicker's case, it's more likely

23    than not that it's a combination of the Prolift

24    and related issues and these orthopedic and other

25    non-gynecologic issues?

Nicolette S. Horbach, M.D.

1       A     I think --

2                 MR. COMBS:  Object to form.

3                 THE WITNESS:  I think that the

4       non-gynecologic issues are more contributory

5       than the gynecologic.

6    BY MR. SLATER:

7       Q     Is, is it your opinion that Pam Wicker

8    has poor posture?

9       A     They, they use the terminology of

10   "faulty posture" to describe someone with any type

11   of asymmetry when they're standing or when they're

12   sitting, and yes, she has asymmetry when she

13   stands and when she sits.  Her body is not in a

14   straight alignment.

15      Q     Why is that; because her legs are

16   different lengths?

17      A     No.  It's because of everything that's

18   going on.  She's got it from the shoulder issues,

19   the cervical issues.  She's got it from the pelvic

20   areas.  She's got it from the -- you know, she's

21   got some -- has had some knee issues in the past.

22   She's had some coccyx issues in the past from her

23   fall in 2007.

24                So, you know, again, if you take the

25   right side of her body, almost every joint system

Nicolette S. Horbach, M.D.

```
 1    along that way has had some impact, whether it's
 2    the cervical spine, the shoulder, the hip, the
 3    knee, the broken foot and the coccyx.
 4           So, you know, when you have all of that
 5    primarily on, primarily on one side -- I think the
 6    knee was the left side, but, you know, it's going
 7    to have a cumulative effect, even if the patient
 8    doesn't realize that they're sitting differently
 9    or they're standing differently.
10           You know, it, it happens all the time
11    when we look at a patient and I say you've got --
12    your right shoulder is higher than your left
13    shoulder even when you're trying to sit straight,
14    or this hip is over that hip even when they're
15    trying to stand straight.  That's something we see
16    quite regularly on a clinical exam, especially in
17    patients with this type of underlying medical
18    history.
19       Q    Pam Wicker likely has a great deal of
20    scar tissue within her pelvis both as a reaction
21    to mesh that was in there and the multiple
22    surgeries to remove that mesh; correct?
23                MR. COMBS:  Object to form.
24                THE WITNESS:  I can't make that
25        statement.  At the time that I examined her,
```

Nicolette S. Horbach, M.D.

1          she had some thickening at the top of the

2          vaginal apex which is, quote, scar.  It's

3          also consistent with what you see in a

4          post-hysterectomy patient.  I was not able to

5          palpate any kind of scar tissue that was in

6          the lateral areas anteriorly, posteriorly

7          when I examined her.

8     BY MR. SLATER:

9          Q    You could have scar tissue that's not

10    palpable through the vagina, right, that you

11    couldn't reach?

12         A    I, I guess it's possible, but for it to

13    be asymptomatic would be pretty uncommon with it

14    not having some manifestation vaginally.

15              You're trying to say the scar tissue is

16    bad enough that it's causing her dyspareunia,

17    which is caused when something pushes against the

18    vagina, but when I push against the vagina, I

19    can't palpate the scar tissue, so how is the

20    pressure against the vagina during intercourse

21    going to be triggering pain from the scar tissue?

22         Q    I didn't say that at all.

23         A    Okay.

24              Well, you're saying that if there was

25    deep scar tissue --

Nicolette S. Horbach, M.D.

1      Q    Can we go to the next question.  Let me

2  go to the next question.  I want to try to get --

3  I didn't ask another question is the whole point.

4  It's 4:30.  So let me go through a couple other

5  things with you.

6           In June of 2012, Mrs. Wicker came home

7  from a vacation with a bad cough, went to a

8  medi-center.  They, they offered to admit her, and

9  they said you may have a pulmonary embolism.  She

10  didn't want to be admitted.  She signed herself

11  out and went home.

12           Is that of any significance to you?  Is

13  that of any significance to you at all to a

14  reasonable degree of medical probability in

15  explaining her vaginal or pelvic pain that's at

16  issue in this case?

17      A    The cough?

18      Q    That episode in June of 2012 when she

19  had a bad cough, then went to the hospital, to the

20  medi-center and didn't want to be admitted to an

21  emergency room to be worked up for a pulmonary

22  embolism, which it turned out she didn't have, and

23  the cough went away with antibiotics.

24      A    I think that that's probably not really

25  a relevant situation here.

Nicolette S. Horbach, M.D.

1        Q    Okay.

2             In Pam Wicker's life she's had some

3    benign skin lesions removed, either by laser or

4    freezing of the lesions.  Is that of any

5    significance to you to a reasonable degree of

6    medical probability with regard to her pelvic or

7    vaginal issues?

8        A    Not -- it depends on what you mean

9    "issues."  It's not -- there's not an association

10   relative to, if you're talking about her pain or

11   dyspareunia.

12       Q    Right, to the injuries she's claiming,

13   that's not of any significance; right?

14       A    Not to the pain or dyspareunia issues,

15   yeah, correct.

16       Q    Okay.

17            Mrs. Wicker used Retin A for -- and

18   maybe she still does.  I don't remember.

19            That's of no significance to you with

20   regard to the vaginal or pelvic issues that are at

21   issue here, is that, if she used Retin A?

22                 MR. COMBS:  Object to form.

23                 THE WITNESS:  No, and it would be

24        simpler if you would just say related to

25        the -- if you're going to ask that series of

Nicolette S. Horbach, M.D.

1          questions, related to pelvic pain/

2          dyspareunia type of things.  That way I don't

3          have to qualify the discussion.

4     BY MR. SLATER:

5          Q    Okay.

6               Mrs. Wicker has had injections of

7     Restylane, R-E-S-T-Y-L-A-N-E, Botox, and

8     injections of fat for cosmetic purposes.

9               Are, are those injections of any

10    significance to a reasonable degree of medical

11    probability with regard to her pelvic or vaginal

12    issues or dyspareunia?

13                    MR. COMBS:  Object to form.

14                    THE WITNESS:  No.

15    BY MR. SLATER:

16         Q    In March of 2010, Pam Wicker had rotator

17    cuff surgery for her shoulder.

18              Do you have an opinion to a reasonable

19    degree of medical probability that that's somehow

20    connected to her pelvic and vaginal and

21    dyspareunia issues?

22         A    Yes.  I think that's part of the whole

23    complex about the flares and the improvements

24    related to when she has either change in her

25    physical activity level with the exercise, or she

Nicolette S. Horbach, M.D.

1   has the manifestation of a biomechanical problem.

2        Q    In February of 2012, around that time,

3   Mrs. Wicker had an issue with her ear with some

4   vestibular problems.  She got medication for that,

5   and apparently it was resolved.

6             Is that of any significance to you to a

7   reasonable degree of medical probability to her

8   pelvic or vaginal or dyspareunia issues?

9        A    No.  Her ear is not related.  I will

10  tell you that.

11       Q    Okay.

12            Did you see that Pam actually went and

13  did research and met with Dr. Newman in California

14  to explore the potential for stem cell injections

15  to try to rejuvenate her vaginal tissue?

16       A    Yes.  I saw that she had met with him on

17  I think two occasions and that he spoke with her

18  husband on the phone at one, one occasion.

19       Q    The fact that she went and met with this

20  doctor, never had the treatment, is that something

21  you're relying on in any way for your opinions in

22  this case?

23       A    No.

24       Q    You had said in your supplemental

25  report -- give me a second.

Nicolette S. Horbach, M.D.

1          You had said in the second paragraph of

2     your supplemental report that you wanted to

3     comment on her saying that she had the need to

4     stand up to urinate since around 2008.

5          You had commented on that; right?

6     A    Well, that was -- I'm commenting on it,

7     because that is, if I understand correctly, one of

8     the potential issues that's related to the

9     proposed sequelae of her surgery.

10    Q    Was it your point that -- it was your

11    point that you didn't see any records going back

12    to '08 or '09 or that time period indicating that

13    that had never been an issue?

14    A    No.  My point was that there are records

15    stating that this issue -- there's really a lot of

16    conflicting records talking about this particular

17    issue.  Although she does report at one point

18    following the surgery that she's having difficulty

19    with voiding and needs to stand to be able to

20    void, although she is able to empty her bladder,

21    that complaint is never evaluated by anyone in

22    terms of its underlying etiology.

23          There are other times throughout the

24    record and more specifically in Dr. Raz's record

25    where he reports no voiding problems.  However,

Nicolette S. Horbach, M.D.

1    then there's other statements where Ms. Wicker is

2    saying this is still an issue.  So there is

3    conflicting information regarding her potential

4    voiding complaints of yes, no, yes, no, yes, no,

5    and no evaluation at this point, so that was my --

6    that's this reference.

7         Q    On page 6 of your main report about Pam

8    Wicker, you point out that on May 4, 2009 she had

9    reported that she had to stand up in order to

10   void, in order to urinate; right?

11        A    That was from my review of the records.

12   That was the first time that it is indicated in

13   the medical records.

14        Q    Okay, and you saw Dr. Raz's testimony in

15   the transcript where he testified about this and

16   explained that he thought this was due to her

17   recurrent prolapse, and the fact that there is

18   obstruction, and he said at that point he wasn't

19   comfortable treating that because of the tissue

20   quality and the repetitive erosions; right?

21        A    I saw that he stated that.  I disagree

22   with that, and he has no data to support --

23        Q    I didn't ask you if you agree.

24        A    I saw --

25        Q    I didn't ask you if you agree.

Nicolette S. Horbach, M.D.

1      A    Okay.

2      Q    So --

3      A    I saw his statement.

4      Q    Okay.

5           You saw that Dr. Raz testified about the

6   need by Pam Wicker to stand up in order to

7   urinate; correct?

8      A    I saw that he -- I'm trying to remember

9   if I read in his deposition that he said that.  I

10  know in his notes he has said it, but then he's

11  also said subsequent to his surgeries that she did

12  not have voiding problems.

13     Q    Well, you understand that she's able to

14  void; she just has to stand up to do it.  You

15  understand that's what she's reporting; right?

16              MR. COMBS:  Object to form.

17              THE WITNESS:  Yes, but that's

18         considered by a physician to be a voiding

19         problem.  It's a voiding dysfunction when

20         you're not able to void in the normal

21         position.

22  BY MR. SLATER:

23     Q    Okay.  Let me ask you this very straight

24  out.

25          You met Pam Wicker; right?

Nicolette S. Horbach, M.D.

1     A     Yes.

2     Q     Spent two hours with her?

3     A     Yes.

4     Q     Did she strike you as somebody who is

5  going to make it up and say she needs to stand up

6  to urinate if she really doesn't need to?

7                    MR. COMBS:  Object to form.

8                    THE WITNESS:  I -- no, I don't

9       think that she would make it up.  I'm just

10      saying --

11  BY MR. SLATER:

12     Q     So you don't -- so you don't disbelieve

13  her that she needs to stand up in order to

14  urinate; right?

15     A     I don't believe her statement that she

16  makes -- I mean I don't -- double negative.  I

17  don't not believe her statement, if that double

18  negative makes sense.

19     Q     The, the quadruple negatives that we're

20  into now.

21            You agree that -- rephrase.  You do

22  not -- rephrase.

23            You believe Pam Wicker's report that she

24  needs to stand up in order to urinate; correct?

25     A     That's what the patient states, and so I

Nicolette S. Horbach, M.D.

1    would believe that that's what she is

2    experiencing.

3         Q    Okay.

4         A    I'm simply saying the medical record

5    says that she's not complaining of problems, so

6    that makes it a little more difficult, and since

7    it was never evaluated, I mean typically if a

8    problem is a problem enough to the patient that

9    she voices it or she says this is an issue, then

10   you're typically going to at least clinically

11   evaluate it.  You may not choose to treat it based

12   on the risk/benefits of the treatment, but Dr. Raz

13   hasn't even evaluated it to determine why this is

14   the issue.

15        Q    Dr. Raz actually testified that he did

16   evaluate and that it's his opinion it's due to the

17   descent of her bladder that's causing an

18   obstruction that she needs to stand up in order to

19   release that so she can let urine flow.

20             Did you see his testimony on that?

21        A    I did, but that's totally conjecture.

22   There is no medical evidence or testing evidence

23   to support that in any of his record, and there

24   are actually physiologic -- there's physiologic

25   information that could actually support

Nicolette S. Horbach, M.D.

1    alternatively.  You know, to say that she has an

2    obstructed urethra, you are going to need to have

3    some reason for that obstruction to exist.

4            The cystocele that she has on her MRI is

5    not of a sufficient degree to cause urinary

6    obstruction from the urethra.  The subsequent

7    recurrent cystocele that he's talking about that

8    he doesn't want to treat again is in and of itself

9    not a sufficient anatomic abnormality to cause

10   obstruction of the urethra.  And he has provided

11   no -- sorry.  You're cutting out, but he has

12   provided nothing in his evaluation to substantiate

13   that claim, and it's just not, it's just not

14   anatomically consistent.

15       Q    -- "I did."

16       A    I'm sorry.  You just cut out.

17       Q    I said I move to strike after the first

18   two words of the answer which is "I did," and then

19   there was a long explanation.  I'm moving to

20   strike after that first phrase.

21           Do you have an opinion, Doctor, as to

22   why it is that Pam Wicker needs to stand up in

23   order to begin to urinate, in order to urinate?

24       A    I think that there can be a number of

25   different reasons.  I don't think it is from the

Nicolette S. Horbach, M.D.

1    recurrence of the prolapse.  From the -- I'm

2    trying to remember exactly again, since my brain

3    is getting a little bit fuzzy at this point, when

4    was the first report that she said she had to

5    stand to urinate, whether that was pre-Raz or post

6    her initial Raz visit.

7                I'm looking here.

8                It sounds like it may have been just

9    pre- -- yeah, it's pre-Raz, because she's saying

10   it when she goes into the bladder control center

11   of Norwalk.

12               So pre-Raz, you know, yes, you could

13   have spasm in the area, you could have

14   overcorrection of urethral support from the base

15   of the Prolift put in too tightly.  You can

16   have -- those would probably be my most likely

17   situations.

18               I mean the difference between the

19   standing position and the sitting position is

20   usually the sitting position is going to put a

21   little more anterior pull or elevation of the

22   urethra, and he talks -- Dr. Raz talks about the

23   fact that she did not have a hypermobile urethra,

24   so it is certainly possible that that urethra was

25   perhaps over-elevated at the time of the original

Nicolette S. Horbach, M.D.

1    surgery.

2            However, then subsequent to that time,

3    you've also got Dr. Raz going in and putting in

4    his plication sutures around the urethra.  We

5    talked about in one of the operative notes where

6    he was putting Vicryl sutures and supporting

7    underneath the urethra.  We went back and forth

8    with that.  That can certainly exacerbate some of

9    the voiding complaints.

10            Yes, it was there beforehand.  Does it

11   persist because of the original problems?  Does it

12   persist because new issues come in as other things

13   fight?  I mean I can't totally tell you that,

14   because nobody has evaluated this patient.  Nobody

15   has done, you know, a basic uroflow study on the

16   patient or anything that would look for a, quote,

17   "obstructive" phenomenon.

18       Q    The orthopedic and, quote-unquote,

19   "postural" issues that you've talked about -- I'll

20   start over.

21            With regard to the orthopedic and

22   postural issues with her hip, her leg, her

23   shoulder, those issues together, do I understand

24   correctly that you believe those issues are

25   leading to pelvic floor muscle spasm, which is

Nicolette S. Horbach, M.D.

1  leading to the pelvic pain and dyspareunia, that

2  that's, that's how they're contributing to that?

3      A    I think that that's a significant

4  component based on my examination and the areas

5  where she was reporting the discomfort and

6  tenderness.

7          Now, in her most recent deposition, she

8  stated, made a comment about the fact that she was

9  experiencing more introital dyspareunia rather

10 than the deep penetration dyspareunia that she has

11 talked about from all the previous times.

12         The explanation for why she has the

13 introital dyspareunia, first of all, that's not

14 really going to be Prolift-related, really, in any

15 way I can think of, and there's not really --

16 based on my clinical examination, her introitus in

17 the area was totally normal.  So I can't tell you

18 if she's now experiencing introital versus deep

19 penetration dyspareunia.  You know, we've got

20 other factors coming into play.

21     Q    My question ultimately is:  Pam Wicker's

22 pelvic pain, her vaginal pain, you believe is

23 being caused primarily by pelvic floor muscle

24 spasm?

25     A    Yes.  Certainly at the current time,

Nicolette S. Horbach, M.D.

1    yes.

2         Q    When Pam Wicker was deposed the other

3    day and you saw her saying that she feels pain on

4    penetration towards the front of the vagina and

5    not just the -- well, rephrase.

6              The testimony that you're referring to

7    where Pam Wicker said she feels discomfort at the

8    introitus, she never said she doesn't feel it on

9    deep penetration, did she?

10                  MR. COMBS:  Object to form.

11                  THE WITNESS:  I don't remember

12            whether she specifically talked about that,

13            but she did talk about a new or different

14            aspect, an additional aspect in this

15            particular deposition that was not raised

16            previously in any of the medical records

17            and/or at least in my evaluation.

18    BY MR. SLATER:

19         Q    In fact -- tell me if I'm wrong, or if

20    you don't know, you don't know or don't

21    remember -- she wasn't asked whether she still

22    feels discomfort if she attempts deep penetration.

23         A    As I said, I don't remember the topic of

24    deep penetration specifically being discussed in

25    the most recent deposition, but I know --

Nicolette S. Horbach, M.D.

1        Q    Let me ask you this.

2             I'm sorry.  Go ahead.

3        A    I was saying but I do know that there

4   was the more upon, you know, entry kind of pain.

5   I remember seeing that and specifically noting

6   that, because it was a different statement than or

7   a different kind of complaint than she had had

8   previously.

9        Q    Is one of your opinions that Pam Wicker

10  should not exercise?

11       A    I think that she needs to make some

12  significant changes in how she makes demands on

13  her body.  I think that some of the changes that

14  she has stated she's made more recently, some of

15  the yoga type of situations, some of the more

16  stretching type of work and perhaps less of the

17  weight-bearing type of exercise, I think those are

18  potentially better choices for her.

19            You know, people like this, one of the

20  things we talk about is even swimming.  It's not

21  that she can't exercise.  It's that doing certain

22  exercises places increased demand on structures,

23  joints, muscles, et cetera, and so if those

24  muscles, bones, joints, et cetera, are

25  compromised, then you may have to adapt.

Nicolette S. Horbach, M.D.

1        Just like, you know, you got a bad knee,

2   you may stop running, but you might start -- I

3   don't know -- something else, you know.  It's just

4   there are adaptations that sometimes have to be

5   made, and what you choose or your form of exercise

6   you choose based on the wear and tear on your

7   body, and that is sometimes difficult to accept,

8   but the tradeoff is:  If you continue to do this,

9   you're going to continue to exacerbate that.  If

10  you want that to go away, then you have to make a

11  change in this.

12       Q    Move to strike.

13            When Mrs. Wicker has not been feeling

14  significant pain, she has been honest with her

15  doctors and told them that; right?

16       A    There are, there are comments in the

17  medical record where she says she is feeling a

18  little bit better or -- Raz is especially saying,

19  quote, "doing well," although there are other

20  comments that say she's still having an issue.  I

21  have not seen any comments in the records where

22  she's come in and she's, you know, reporting that

23  she's, you know, without pain, doing her normal

24  activities and without pain.

25       Q    So just coming back to my question, when

Nicolette S. Horbach, M.D.

1    Pam Wicker has reported when she was feeling

2    better and having better days and better periods

3    of time, she has been honest with her doctors and

4    told them that; right?

5              MR. COMBS:  Object to form.

6              THE WITNESS:  I mean I assume that

7         she's being honest with her doctors

8         throughout the time period.  So I assume that

9         yes, that's the case.

10   BY MR. SLATER:

11        Q    The scar at the apex of her vagina that

12   you found on your exam, what do you attribute that

13   to?

14        A    Surgery.  I mean a hysterectomy alone,

15   hysterectomy alone can cause -- you're going to

16   see an apical incision and you're going to see a,

17   quote, apical scar.  The vaginal cuff that we talk

18   about, that's going to be less distensible than

19   the surrounding tissue.

20             I think that this is probably not just

21   hysterectomy-oriented, because the scar, I guess

22   for a better word, does end up being a little bit

23   on the vertical side, not just horizontal.  If you

24   are just after hysterectomy, you usually see it

25   just a horizontal, so it's probably -- it's the

Nicolette S. Horbach, M.D.

 1   pelvic surgery she's had.  I can't tell you which

 2   one caused it.

 3        Q    You're talking about the subsequent

 4   surgeries following from the Prolift surgery?

 5        A    From the hysterectomy to the Prolift

 6   surgery to the subsequent repeat surgeries, I

 7   can't tell you which one is causing that.

 8             Can I go off the record for just a

 9   second, please.

10        Q    Sure.

11             THE VIDEOGRAPHER:  Off record at

12        4:49.

13             (Whereupon, a short recess was

14             taken.)

15             THE VIDEOGRAPHER:  At 4:56, on

16        record.

17   BY MR. SLATER:

18        Q    Doctor, when you did your exam, you

19   found the vaginal length to be 6 centimeters to

20   the left side and 6.5 centimeters to the right.

21             That would be a shortened vaginal

22   length; correct?

23        A    Yes.

24        Q    You point out that the right side of the

25   vaginal apex was "more distensible."

Nicolette S. Horbach, M.D.

1              What does that mean?

2      A    That means that there was more give of

3  the tissue, more pliability to the tissue so that

4  I could push from -- let's say the

5  6.5 centimeters, if I pushed on that area, it

6  would, it would allow the vagina to go a little

7  bit deeper, because there was more give in that

8  area, as opposed to the other side that had less

9  give of the tissue.

10     Q    And why do you think one side had less

11  give, in this case, the left side?

12     A    Because she has more scarring in that

13  side than she does on the other.

14     Q    So based on your opinion, you certainly

15  were able to confirm that there is scarring of her

16  vagina; correct?

17     A    Yeah, I mean this is, it's, it is

18  similar to what you will see in patients who have

19  had any type of vaginal surgery.

20     Q    Well, the only type that Pam Wicker had

21  was Prolift surgery; right?

22     A    I understand, but I'm saying that her

23  exam at the apex of the vagina with the way the

24  tissue gives a little more on one side versus

25  another side is consistent with anyone who has

Nicolette S. Horbach, M.D.

1    undergone a vaginal surgery, regardless of the

2    procedure.

3         Q    Well, Pam Wicker has had, if you include

4    the Prolift, six vaginal surgeries since

5    October 2008; right?

6                   MR. COMBS:  Object to form.

7                   THE WITNESS:  I believe that's how

8         many I counted, yes, and you can see this

9         after six.  You can see it after one.  I

10        actually was impressed that her vagina was in

11        as good a shape as it was, considering the

12        number of surgeries she had had.

13   BY MR. SLATER:

14        Q    Let me go through this a little bit.

15   Pam Wicker has vaginal scarring; correct?  You

16   confirm that on your exam; right?

17        A    She has an area of a scar.  She has an

18   area of less distensible tissue.  If you want to

19   use the word "scar" for that, that's fine.

20        Q    And that's on the left side of the

21   vertical cuff scar?

22        A    It's on -- no, it's on the left -- it's

23   on the left side of the horizontal plane --

24        Q    Okay.

25        A    -- of the vaginal cuff.

Nicolette S. Horbach, M.D.

1    Q    When you applied pressure with your

2   finger against the vaginal cuff, Mrs. Wicker

3   complained of tenderness along the scar; correct?

4    A    I'm just looking here back at my notes

5   here.

6    Q    To the top of 17 of your report.

7    A    Thank you.  I'm just looking at my

8   original comments here.

9         It did reveal some tenderness along in

10  the midline along that vertical area, not along

11  the horizontal area that we just talked about.

12   Q    You found a tenderness when you palpated

13  with your finger the lateral aspects of the vagina

14  over the pelvic floor muscles; correct?

15   A    Correct.

16   Q    And then you say -- rephrase.

17        "In the supine position, there was mild

18  tenderness along the right obturator internus

19  muscle."

20        That was another finding you made on

21  your exam; right?

22   A    Correct.

23   Q    You found increased tone and mild

24  tenderness of the left mid-pubococcygeus muscle;

25  correct?

Nicolette S. Horbach, M.D.

1      A      Yes.

2      Q      And when we're talking about these

3   findings in the lateral aspects over the pelvic

4   floor muscles and the findings in the supine

5   position, you're talking about tenderness that you

6   believe is due to pelvic floor myalgia?

7                  MR. COMBS:  Object to form.

8                  THE WITNESS:  Again, I don't

9         typically use "myalgia" as a terminology, but

10        tenderness due to the pelvic muscle,

11        increased tone and sensitivity, I guess.

12   BY MR. SLATER:

13      Q      And do you have an opinion as to why you

14   believe that Mrs. Wicker continues to be tender

15   over the midline scar at the vaginal cuff?

16                  MR. COMBS:  Objection.

17   BY MR. SLATER:

18      Q      Why that tenderness has not gone away?

19      A      Because that's what you sometimes see at

20   the vaginal cuff in a patient who's had one or

21   perhaps more than one surgery, and we don't always

22   know why that occurs, whereas someone else can

23   have exactly the same anatomy and not be tender.

24      Q      Based on your POP-Q measurements, what

25   would you say is the status at the time of your

Nicolette S. Horbach, M.D.

1    exam of Pam Wicker's prolapse?

2        A    In the standing position she has some

3    mild anterior wall relaxation, and she has some

4    slight descent of her vaginal cuff.  That's going

5    to be the position where the majority of the, you

6    know, the pressure is going to be.  She does not

7    appear to have really anything going on with the

8    posterior wall, and her vaginal opening appears to

9    be of normal diameter.

10       Q    If you had to stage or grade the

11   cystocele, what would you say that is?

12       A    I'd probably call it, for me, a stage 2.

13       Q    You saw the records of the physical

14   therapist, Heather Strauch, S-T-R-A-U-C-H;

15   correct?

16       A    Yes, I did see her records.  Some of

17   them were a little difficult to read based on the

18   Xerox copy and the handwriting, but yes.

19       Q    Did you read her deposition?

20       A    I -- even though it says I theoretically

21   received it, I don't recall having received it, so

22   no, I did not read her deposition.

23       Q    You note in your report on page 20 that

24   on July 26, 2012, Heather Strauch noted "right

25   coccygeus tenderness, left obturator severely

Nicolette S. Horbach, M.D.

```
1    tender, palpable scar tissue left posterior
2    superior vaginal vault, and palpable solid mesh
3    left urethral tissue"; correct?
4         A    Hang on two seconds.  Let me get the
5    original.
6              (Discussion held off the record.)
7              THE WITNESS:  What is the date of
8         the exam?
9    BY MR. SLATER:
10        Q    On page 20 of your report --
11        A    Yes.
12        Q    -- you refer to the last exam, the last
13   treatment on July 26, 2012.
14        A    Sorry.  My copy that I printed out last
15   night doesn't have pages on it.
16             MR. COMBS:  It's near the end.
17             THE WITNESS:  I'm sorry.  I'm
18        getting a little fried, so . . .
19             Thank you.  I'm glad somebody could
20        find it.  Ah.  On June 13, 2012.  All right.
21        There is one note I have from -- yeah, the
22        July 26.  Okay.
23             So which one are we talking about?
24        Which visit?
25
```

Nicolette S. Horbach, M.D.

1    BY MR. SLATER:

2         Q     On July 26 Heather Strauch confirmed

3    that she found on that exam and her treatment

4    right coccygeus tenderness?

5         A     Correct.

6         Q     Left obturator severely tender?

7         A     Correct.

8         Q     Palpable scar tissue left posterior

9    superior vaginal vault?

10        A     Hang on.

11        Q     And palpable solid mesh, left urethral

12   tissue.

13              You documented that in your report;

14   right?

15        A     Yes.  That's what she's stating she

16   palpated.  I mean I examined her subsequent to

17   that time, and I did not feel anything

18   suburethrally that I would consider to be mesh.

19   Other than that --

20        Q     Move to strike after "palpated."

21              A couple pages later you talk about --

22        A     Can you just hold it for just a second,

23   please.

24              Okay.  Thank you.

25        Q     Two pages later, middle of the page,

Nicolette S. Horbach, M.D.

1    talking about your exam, you say "while the

2    interior -- anterior" -- rephrase.

3              You say that "while the anterior vaginal

4    wall showed evidence of thinning consistent with

5    her lower anterior wall support defect, what are

6    you talking about there, the thinning?

7        A    I used that term to describe vaginal

8    tissue that has lost its rugae, lost the quality

9    of typically a pre-menopausal patient, or it

10   has -- or patients can have that sometimes if they

11   have had, you know, a significant prolapse more so

12   than usually hers, where it has taken the rugae

13   and just basically stretched it out like

14   corrugated cardboard, just being flattened out

15   like that.

16                   THE VIDEOGRAPHER:  We've got two

17       minutes on this tape.

18                   THE WITNESS:  Do you have an

19       estimate of about how much more time you're

20       going to want?

21                   MR. SLATER:  Not much longer.  20

22       minutes maybe.

23                   THE WITNESS:  Otherwise, we're

24       going to start getting to a point of needing

25       a second time.

Nicolette S. Horbach, M.D.

```
 1              MR. SLATER:  Why don't we do this?
 2       Why don't we change the tape?  I really don't
 3       think I have much left.  I mean I'm hoping to
 4       be done in 15 minutes or so.
 5              THE VIDEOGRAPHER:  At 5:09 we're
 6       going off the record in the continuing
 7       deposition of Dr. Horbach.
 8              (Whereupon, a short recess was
 9              taken.)
10              THE VIDEOGRAPHER:  Our time now is
11       5:11 p.m., and we're on record beginning
12       disc 4 in our continuing deposition of
13       Dr. Nicolette Horbach.
14  BY MR. SLATER:
15       Q    Doctor, one of the things you say in
16  your report is that when Dr. Raz attempted to
17  elongate Mrs. Wicker's vagina, that he could have
18  "altered the amount of tension on the Prolift mesh
19  arms and increased the likelihood of subsequent
20  scarring and mesh erosion and perpetuating the
21  need for further surgery."
22              Do you believe to a reasonable degree of
23  medical probability that likely occurred?
24       A    Yeah, I think that there is, that his
25  choice of how he approached the procedure did
```

Nicolette S. Horbach, M.D.

1  contribute to additional problems for her related

2  to the Prolift and the need for more surgery.

3       Q    You would agree with me that Pam Wicker

4  still has a risk of having more mesh erosions in

5  her life; right?

6       A    I, I don't -- I'm trying to recall.

7  There was one ultrasound that Raz did showing some

8  mesh in the suburethral area, although I think

9  that was the first initial ultrasound that he did.

10          If that's the case, at the present time

11  I certainly can't feel any additional mesh that

12  would be present that would be likely to come to

13  the surface, and we don't have any subsequent or

14  recent ultrasounds to indicate that there is still

15  residual mesh, if I'm recalling when that

16  ultrasound was done.

17       Q    It's possible for mesh that was not seen

18  on those ultrasounds, just due to normal movement,

19  mechanical forces in the pelvis to migrate; right?

20              MR. COMBS:  Object to form.

21              THE WITNESS:  If he's, if he's

22          putting forward, and if you believe that the

23          ultrasound is a highly diagnostic tool to

24          find mesh that you can't necessarily palpate

25          even, if the ultrasound doesn't find mesh,

Nicolette S. Horbach, M.D.

1           then the likelihood that that's superficial

2           enough or even there's something there that's

3           going to come to the surface I think is not

4           present, I think.

5    BY MR. SLATER:

6           Q    You don't believe that an ultrasound

7    shows all of the mesh in the pelvis?  You don't

8    believe that to be so; right?

9           A    Why would you say that?

10          Q    Because I think you probably don't.  I

11   think most people would say it wouldn't show all

12   the mesh.  I mean I've spoken to doctors who use

13   this exact technology who have told me that it's

14   not going to show you every bit of mesh.  It's the

15   best technology available to image mesh in the

16   pelvis, but it's not 100 percent.

17               MR. COMBS:  Object to form.

18   BY MR. SLATER:

19          Q    I'll ask the question clean, because it

20   had a little bit of my commentary in it.

21               Doctor, have you ever studied the

22   question of whether or not ultrasound of the type

23   Dr. Raz utilized would be expected to show

24   100 percent of the mesh within the pelvis?

25          A    I have not studied that, but again, the

Nicolette S. Horbach, M.D.

```
 1    hard part is --

 2         Q    That was my question, though.  I just

 3    asked if you studied it.

 4         A    I have not studied that.

 5              MR. SLATER:  I'm going to check

 6        some of my notes.  I think I may be done.

 7              Well, while I'm looking at my

 8        notes, let's do this.  We've marked as

 9        Exhibits 6 through 12 Dr. Horbach's

10        handwritten notes.  I would just ask you,

11        Doctor, for the record to just go through

12        them, 6 through 12, exhibit by exhibit, and

13        just in very simple terms, just tell us what

14        each exhibit is so we have that for the

15        record, and I'll check my notes while you're

16        doing it.

17              (Discussion was held off the

18              record.)

19              THE VIDEOGRAPHER:  At 5:17 off

20        record.

21              (Whereupon, a short recess was

22              taken.)

23              THE VIDEOGRAPHER:  Now 5:18 on

24        record.

25              THE WITNESS:  So in reviewing the
```

Nicolette S. Horbach, M.D.

```
 1        exhibits that you've asked, that have been

 2        marked, Exhibit 6 represents my handwritten

 3        questions and the answers of Ms. Wicker at

 4        the time I did her IME exam, as well as my

 5        handwritten notes of the physical findings at

 6        the time that I did her examination per se.

 7        Not -- I did not ask every question that I

 8        had pre laid out here, but there's questions

 9        that I planned to ask her as well as answers.

10             Exhibit 7 are notes that are a

11        summary of comments during depositions of

12        Dr. Raz, Ms. Wallace, Dena Harris and

13        Dr. Moldwin.

14             Exhibit 8 is a list of essentially

15        chronologically of medical surgeries and

16        procedures as well as chronologic history of

17        how different symptoms were presenting from

18        early gynecologic history going through to

19        2009, as well as notes that I've taken

20        regarding new medical records that were

21        provided to me of visits after my IME.

22             Exhibit 9 again is a summary of

23        medical history, pertinent issues that I

24        found in different systems, and in -- listed

25        chronologically.
```

Nicolette S. Horbach, M.D.

```
 1              Exhibit 10 is a summary of my notes
 2     when I did the original medical review.  It
 3     includes Bercik records, Raz records,
 4     orthopedic records, primary care, gyn
 5     records, so that's a summary for me to
 6     review.
 7              Exhibit 11 is a summary for myself
 8     of some of the different issues that I think
 9     are going on and information substantiating
10     that or not from the medical record.
11              And Exhibit 12 is a summary of the
12     patient's pharmacy records and when she's had
13     medications filled and which medications,
14     which doctor, over a multiple-year history of
15     time.
16              And that's it.
17              MR. SLATER:  I have no other
18     questions.
19              MR. COMBS:  Let's take about a
20     five-minute break, and then I will do a brief
21     redirect and see if we can finish.
22              MR. SLATER:  Let me just
23     understand.  I didn't know you were going to
24     do that.  I mean I'm trying to stop for
25     Dr. Horbach's benefit.  If you've got more
```

Nicolette S. Horbach, M.D.

```
1      time, I could ask more questions.  I have

2      three articles here I could question about

3      for a while.

4              MR. COMBS:  Well, I mean of course

5      I'm going to ask some questions.  You can't

6      say, oh, you don't get to ask any questions

7      because I want to stop.  I mean I have some

8      questions I'm going to ask.

9              MR. SLATER:  For hours.

10             MR. COMBS:  I don't plan on being

11     here for hours, but, you know . . .

12             MR. SLATER:  Well, I'm going to

13     reserve my right, if this become a lengthy

14     redirect, to resume my questions, because I'm

15     trying to be courteous, and if counsel

16     thinks, you know, is going to ask a lot of

17     questions, then I'm going to resume.

18             THE WITNESS:  If it goes on too

19     long, I'm going to request that we set up,

20     you know, another time.

21             THE VIDEOGRAPHER:  I have 5:23 off

22     record.

23             (Whereupon, a short recess was

24             taken.)

25             THE VIDEOGRAPHER:  It is now
```

Nicolette S. Horbach, M.D.

1          5:33 p.m., on record.

2             EXAMINATION BY COUNSEL FOR DEFENDANTS

3    BY MR. COMBS:

4       Q    Dr. Horbach, I have some brief questions

5    for you.

6             Do you remember when Mr. Slater asked

7    you questions regarding the pathology work of

8    Drs. Klinge and Klosterhoff?

9       A    Yes.

10      Q    Are you aware of any literature that

11   clinically correlates their hypothesis to outcomes

12   in actual patients?

13      A    No.  I'm not aware of any literature

14   that compares good and bad outcomes in patients,

15   based on explants and the pathology seen in

16   explants relative to the mesh or pore size.

17      Q    Same question on their theory about

18   average porosity.  Are you aware of any literature

19   that correlates their theory to clinical outcomes

20   in actual patients?

21      A    No.  I'm not aware of any literature

22   that looks at comparisons of clinical outcomes

23   from good outcomes or bad outcomes and compares

24   the porosity -- I think that's what you were

25   asking me -- of the mesh.

Nicolette S. Horbach, M.D.

1        Q     Dr. Horbach, Mr. Slater asked you

2    questions about review of internal company

3    documents.  Why is it that you did not ask to

4    review additional internal company documents?

5        A     I did not review the internal documents,

6    as I perceived my role as a clinical expert to

7    provide an opinion based on the clinical

8    management of prolapse, the surgery itself, the

9    management of a patient similar to Mrs. Wicker,

10   and that I am not an expert of the internal

11   regulatory or commercial requirements that are

12   necessary for companies to make decisions

13   regarding their activities.

14       Q     Now, you testified that you view your

15   role as providing clinical expertise.  Would that

16   include a review of the medical records?

17       A     Yes, that would include a review of the

18   medical records.

19       Q     And did you review all of the medical

20   records in this case?

21       A     I did.

22       Q     And would applying clinical expertise

23   include a review of the medical literature?

24       A     Yes, it would.

25       Q     And have you reviewed all of the

Nicolette S. Horbach, M.D.

1    articles that are set forth on the lists that were

2    introduced by Mr. Slater as Exhibits 4 and 5?

3        A    I have reviewed and read all that

4    literature at one point or another in my

5    evaluation of this particular case.

6        Q    Mr. Slater asked you questions about the

7    July 2009 article that your practice group

8    published.

9            Do you remember those questions?

10       A    I don't remember the questions, but I

11   remember he asked me about it.

12       Q    Did that article identify any new risks

13   related to pelvic floor or mesh surgery?

14            MR. SLATER:  Objection to the form.

15            THE WITNESS:  The -- our article

16       that was published in 2009 did not identify a

17       new risk in, for pelvic surgery or actually

18       for any surgery.  It identified that -- no,

19       let me back up.

20            We, as surgeons, realize that pain

21       is a consequence of any surgery we do,

22       whether it's in, you know, orthopedics or the

23       leg or your gall bladder or a hysterectomy or

24       a pelvic floor repair.  We have data that

25       supports that patients, even

Nicolette S. Horbach, M.D.

1      post-hysterectomy, will have -- a certain

2      percentage will develop pain over a period of

3      time that may not be amenable to treatment.

4                I think the article, from our

5      perspective as clinicians, helped us to try

6      to determine whether there was a group of

7      patients that were more susceptible to

8      developing these conditions.

9                Was there some clinical factor that

10     we could identify that would make the patient

11     more susceptible to developing these

12     conditions, and if so, you know, that we

13     needed to look for that in all of our

14     patients, which it changed, again, that

15     preoperative evaluation and preoperative

16     counseling and/or preoperative preparation

17     for surgery, but it also changed it not just

18     for whether it was a Prolift surgery or not.

19     It changed it across the board for all of the

20     surgeries that we do for our patients,

21     whether it's laparoscopic, abdominal, native

22     tissue, mesh, you know, hysterectomy.

23                It requires -- it alerted us to

24     screen for that in all of these types of

25     patients by trying to find clinical

Nicolette S. Horbach, M.D.

```
 1            correlates for who might be at more risk.
 2                    (Exhibit 21 was marked for
 3                    identification.)
 4     BY MR. COMBS:
 5        Q    I'm going to mark as Exhibit 21 the ACOG
 6     practice bulletin that you questioned Dr. Horbach
 7     on, the March 2004.
 8            Dr. Horbach, is this the ACOG practice
 9     bulletin that you were questioned about?
10        A    Yes.  It's bulletin 51 that was
11     originally written in 2004 and then, as noted, was
12     reaffirmed in 2010, which, per ACOG, means that
13     they re-reviewed it and either made potential
14     changes or just said this is fine the way it is.
15        Q    And was this one of the factors on which
16     you based your opinion regarding Mrs. Wicker's
17     musculoskeletal issues contributing to her current
18     condition?
19                    MR. SLATER:  Objection.
20                    THE WITNESS:  It was one of the
21            factors, but in reality it's, it's to some
22            extent a minor factor.  The question of give
23            me literature to show that these things are
24            going on, sometimes our understanding of
25            problems and our recognition of problems and
```

Nicolette S. Horbach, M.D.

```
 1          our communication of problems among ourselves
 2          way precedes things appearing in the
 3          literature.
 4                   And so this was an attempt to at
 5          least say yes, this has been -- you know,
 6          this is, this musculoskeletal issue, the
 7          orthopedics, the biomechanics is not just
 8          something that is pulled out of the air, that
 9          this is something that has been recognized as
10          part of the pelvic pain syndrome or
11          situation, and also to reiterate that
12          dyspareunia is viewed as a subset of pelvic
13          pain.
14     BY MR. COMBS:
15          Q    And did this article in regard to --
16     well, strike that.
17               Did this practice bulletin in regard to
18     musculoskeletal disorders conclude that "faulty
19     posture in particular and exaggerated lumbar
20     lordosis and thoracic kyphosis, called typical
21     pelvic pain posture, may account for up to
22     75 percent of cases of chronic pelvic pain"?
23          A    That is a statement that is made in the
24     bulletin based on a reference from, you know,
25     other articles, and it is ACOG's comments in the
```

Nicolette S. Horbach, M.D.

1    bulletin to highlight that musculoskeletal

2    disorders may be a one of the etiologies for

3    pelvic pain.

4        Q    Dr. Horbach, I want to ask you a

5    question about the procedure that Dr. Raz used

6    on -- I believe it's the July 9, 2009 surgery, the

7    suture net.

8        A    Yes.

9        Q    Are you aware of any randomized

10   controlled trials that address the safety or

11   efficacy of that procedure?

12       A    No.  I am not aware of any randomized

13   controlled trials.  There -- the procedure is

14   described in the literature in 2011 in an article

15   that was I think written in Current Urology, where

16   it describes what he calls the CRISP, C-R-I-S-P,

17   procedure, which is a procedure that he had

18   devised in an attempt to treat cystocele.

19            There was no data about randomized

20   trials being performed prior to that procedure

21   being used.  He does make a comment in that, in

22   this particular article that there are

23   complications, but, quote, "early treatable

24   complications such as exposed 2 to 3 millimeters

25   of suture can be ideally treated in the office."

Nicolette S. Horbach, M.D.

1    Q    And that article was from 2011?

2    A    Correct.

3    Q    And in that article does Dr. Raz state

4    that long-term data is still needed on this

5    procedure?

6    A    Yes, he does.  Unfortunately, he's got

7    several, multiple articles in the literature about

8    different procedures that he has developed over

9    the years with somewhat short follow-up but yet

10   advocating those procedures.

11   Q    Dr. Horbach, Mr. Slater asked you a

12   number of questions about the onset of

13   Mrs. Wicker's pelvic pain, and, in all those

14   questions, stated to you that the onset occurred

15   at the time of the Prolift surgery.  Now I want to

16   ask you some follow-up questions about that.

17        Now, did Mrs. Wicker's gynecological or

18   urogynecological condition change prior to the

19   Prolift surgery?

20   A    Yes.  I mean she had presented to both

21   her regular gynecologist and subsequently referred

22   to Dr. Bercik because of symptoms related to

23   pelvic relaxation with both a bulge that she was

24   aware of as well as complaints of pelvic pain that

25   was referred to in the medical record by

Nicolette S. Horbach, M.D.

1    Dr. Bercik in his first visit with her.

2        Q    And would that include the evidence in

3    the medical record that you and Mr. Slater

4    discussed earlier today about references to pelvic

5    pain prior to the Prolift procedure?

6                MR. SLATER:  Objection.

7                THE WITNESS:  Yes.  I think in my

8            comments previously about pelvic pain not

9            being present prior -- or prior to the

10           Prolift procedure, I think I was focused more

11           on our discussion about the musculoskeletal

12           levator issues, et cetera, and really focused

13           on that, that we didn't necessarily have

14           proof that she was having pain from that

15           muscular issue, even though I had neglected

16           to include that she was reported to have

17           pelvic pain at least for a period of time

18           prior to her Prolift procedure.

19   BY MR. COMBS:

20       Q    And in that procedure did Mrs. Wicker

21   also have a number of concomitant procedures as

22   well?

23       A    In addition to the Prolift, yes.

24       Q    Yes, ma'am.

25       A    She did.

Nicolette S. Horbach, M.D.

```
 1        Q    And was one of those a vaginal
 2   hysterectomy?
 3        A    It was.
 4        Q    Now, Mr. Slater asked you a number of
 5   questions about Mrs. Wicker's vaginal length, and
 6   is a shortened vaginal length a known complication
 7   of a vaginal hysterectomy?
 8              MR. SLATER:  Objection.
 9              THE WITNESS:  A shortened vaginal
10        length is a known complication of a vaginal
11        hysterectomy, yes.
12   BY MR. COMBS:
13        Q    Dr. Horbach, earlier today Mr. Slater
14   asked you questions about the risk/benefit
15   information conveyed by the IFU.
16              Do you remember those questions?
17        A    Yes.  We did discuss the IFU briefly.
18        Q    And is it your opinion that the IFU is
19   adequate to convey the risks and benefits of the
20   Prolift procedure to pelvic surgeons?
21              MR. SLATER:  Objection.  What's the
22        point of this?  Objection.
23              THE WITNESS:  It is my opinion that
24        the information provided in the IFU does
25        provide appropriate warning when taken into
```

Nicolette S. Horbach, M.D.

1           context with the experience and training of

2           pelvic surgeons and especially pelvic

3           surgeons who are involved with using

4           reconstructive materials, such as synthetic

5           meshes.

6    BY MR. COMBS:

7        Q    And just as Mr. Slater said that he

8    would ask if you could rely on your answers in the

9    Schubert deposition to shorten this deposition,

10   I'm going to ask you the same question about the

11   IFU.

12           You were asked a number of questions

13   about the IFU in the Schubert deposition.

14           Do you remember that?

15       A    I think so.  At this point I'm hoping

16   so, yes.

17       Q    And would your answers here be the same?

18       A    Yes.  I think that one of the, one of

19   the issues with the IFU is the IFU has to be taken

20   into context with the overall spectrum, as I

21   mentioned, of experience, training of a pelvic

22   surgeon.  The IFU is not designed to be a

23   substitute for clinical training or the single

24   source of clinical training for someone who is

25   doing a prolapse surgery or certainly a prolapse

Nicolette S. Horbach, M.D.

1    surgery with or without the mesh.

2           In many cases physicians don't even read

3    the IFUs or look at them any more than they do

4    when you get your warning thing from your

5    prescription that you fill at the pharmacy and you

6    toss that perhaps in the trash.

7           So it is -- the information that is

8    conveyed is not information in isolation.  It's a

9    part of the totality, and whether you're using

10   mesh in a Prolift or whether you're using mesh in

11   a sacrocolpopexy or any other type of procedure,

12   those same risks apply.

13      Q    And is it your opinion to a reasonable

14   degree of medical probability that the

15   complications that Mrs. Wicker alleges in this

16   case are complications that were warned of in the

17   IFU?

18              MR. SLATER:  Objection.

19              You can answer.

20              THE WITNESS:  I believe they were,

21       based on the complications related to mesh

22       surgeries and prolapse surgeries in general.

23       All surgeons know that the complications that

24       she experienced are complications that can

25       happen with any prolapse surgery and any

Nicolette S. Horbach, M.D.

1          prolapse surgery including mesh.

2     BY MR. COMBS:

3          Q    Dr. Horbach, Mr. Slater asked you some

4     questions about whether a number of cosmetic

5     procedures contributed to Mrs. Wicker's pelvic

6     pain or dyspareunia.

7               Do you remember those questions?

8          A    Yes.

9          Q    Now, it was your testimony in general --

10    and I'm paraphrasing -- that those cosmetic

11    procedures did not contribute to her pelvic pain

12    or her dyspareunia; is that correct?

13         A    That's correct.

14         Q    Now, does that mean that those

15    procedures are irrelevant to any of the analysis

16    that you've done in this case?

17               MR. SLATER:  Objection.  Improper

18         question.

19               You can answer.

20               THE WITNESS:  No.  I think that

21         the, the totality again of her medical record

22         and the fact that she has undergone multiple

23         surgical procedures prior to the Prolift,

24         including cosmetic and/or otherwise, as well

25         as has had an experience over the years with

Nicolette S. Horbach, M.D.

1            her children undergoing surgical procedures

2            means that this is not a patient who is a --

3            I hate to say "virgin" for surgery, but is

4            not -- this is not the first time she's

5            undergone a surgical procedure or the first

6            time she's seen a consent form or the first

7            time that she has been counseled regarding

8            the risks and benefits of a surgery and may

9            still elect to go ahead for the surgery, and

10           has chosen in the past to do procedures or do

11           surgeries that certainly can have at least --

12           can have the risk of at least a significant

13           or life-altering complications as what she is

14           alleging in the Prolift.

15                   MR. COMBS:  And that said -- strike

16           that.

17                   Dr. Horbach, I don't have any

18           further questions for you at this time.

19           Thank you.

20                   MR. SLATER:  But I do.  We're going

21           to do this quick.

22            FURTHER EXAM BY COUNSEL FOR PLAINTIFFS

23   BY MR. SLATER:

24           Q    Let's start where you just left off,

25   Doctor.

Nicolette S. Horbach, M.D.

1          You have no idea what Pam Wicker would

2    have chosen to do as between a Prolift or

3    alternative procedures or treatments if she had

4    been warned of additional risks?  You have no way

5    of knowing what she would have done; right?

6                    MR. COMBS:  Object to form.

7                    THE WITNESS:  No.  I don't know --

8    BY MR. SLATER:

9         Q    It's a yes-or-no question.

10                   MR. COMBS:  Objection.

11                   THE WITNESS:  It's not a yes-or-no

12        question.

13    BY MR. SLATER:

14        Q    You can't answer it yes or no?  That's

15    fine.

16        A    Actually I will answer it no with being

17    able to clarify.

18        Q    Doctor, tell me what about your training

19    and your experience and your study of the

20    literature and the medical records and everything

21    else tells you that Pam Wicker would have chosen a

22    Prolift no matter what she was told.

23               Is that what you're telling us?

24        A    No.

25                   MR. COMBS:  Object to form.

Nicolette S. Horbach, M.D.

```
 1                    THE WITNESS:  No.

 2   BY MR. SLATER:

 3        Q    Okay.  That's fine.  You're not saying

 4   that, so I needed to know that.  Okay.

 5             The fact is:  Whether or not Pam Wicker

 6   agreed to have a cosmetic procedure or some other

 7   procedure gives you no information as to what

 8   procedure Pam Wicker would have chosen if told

 9   about additional risks by Dr. Bercik; correct?

10                    MR. COMBS:  Object to form.

11                    THE WITNESS:  Your comment is

12        additional risk.  She was -- the risk that

13        she or the complications that she

14        experienced, she was warned about in the

15        consenting for the procedure.  So we're not

16        talking about -- you're saying -- you're sort

17        of implying that she had additional

18        complications or risks that were not part of

19        the consent process, and that's not the case.

20   BY MR. SLATER:

21        Q    Okay.  Move to strike.

22             Was Pam Wicker warned in the, by the --

23   rephrase.

24             Did the IFU warn about the risk that one

25   could have complex mesh erosions with the Prolift
```

Nicolette S. Horbach, M.D.

1    that would require multiple operations?  Was that

2    warned about in the IFU?

3                    MR. COMBS:  Objection.

4                    THE WITNESS:  It does not state

5        that specifically, but in her consent form --

6    BY MR. SLATER:

7        Q    Doctor, that was my only question.

8    Doctor, you're not going to get -- we're going to

9    stick with my questions now.  I don't want any

10   more speeches with all due respect.

11                   MR. COMBS:  Object to colloquy by

12       counsel.

13   BY MR. SLATER:

14       Q    Next question:  Was the word

15   "dyspareunia" or painful sexual intercourse warned

16   about in the IFU or patient brochure before Pam

17   Wicker's surgery to get a Prolift?

18                   MR. COMBS:  Objection.

19                   THE WITNESS:  Those terms were not

20       used.

21   BY MR. SLATER:

22       Q    Do you know that Ethicon added pain with

23   intercourse as a warning in a subsequent IFU after

24   Pam Wicker's surgery?  Did you know that was done?

25       A    Yes.

Nicolette S. Horbach, M.D.

1      Q    And you would agree with me that was a

2   risk that should have been in the IFU from the

3   very beginning; right?

4              MR. COMBS:  Object to form.

5              THE WITNESS:  No.

6   BY MR. SLATER:

7      Q    Do you disagree with Ethicon's decision

8   to warn about pain with intercourse in a

9   subsequent IFU after Pam Wicker's surgery?

10             Is that a true statement?

11     A    No, I'm not saying that I disagree with

12   it.  They're simply using a different term to

13   explain pain issues.  They're adding an extra

14   term.

15     Q    Move to strike.  I didn't ask for an

16   explanation.

17             Doctor, you made a statement that Pam

18   Wicker's complications were warned about because

19   these risks are essentially understood, and I

20   wrote a note that you said basically all surgeons

21   knew these things.  Okay?  I'm going to ask you a

22   question about that.

23             You have never studied the question of

24   what surgeons across the United States understand

25   or don't understand with regard to the risks of

Nicolette S. Horbach, M.D.

1    the Prolift?

2              MR. COMBS:  Object to form.

3              THE WITNESS:  That statement is

4        correct.

5    BY MR. SLATER:

6        Q    Okay.

7             Now, you do not know the purpose of the

8    IFU as intended by Ethicon; correct?

9        A    What Ethicon's intent was in publishing

10   the IFU, no.

11       Q    -- have an understanding of, pursuant to

12   FDA regulations, what the purpose of the IFU is;

13   correct?

14       A    I'm sorry.  You cut out in the

15   beginning.

16       Q    You do not know what the purpose of the

17   IFU is per FDA regulations; correct?

18       A    I guess I would say that.  Since the IFU

19   was published prior, I mean the FDA did not end up

20   approving or disapproving the IFU prior to it

21   being published.

22       Q    Do you know that the IFU that was relied

23   on at the time of Pam Wicker's surgery, that

24   before that time the FDA had required Ethicon to

25   make material changes to the IFU that had not yet

Nicolette S. Horbach, M.D.

1    been made by the time of Pam Wicker's surgery?  Do

2    you know that that occurred; yes or no?

3                    MR. COMBS:  Object to form.

4                    THE WITNESS:  I know that there was

5         a requirement or request or statement by the

6         FDA to change certain aspects of the IFU.  I

7         can't recall whether the timing was

8         specifically before or after her surgery.

9    BY MR. SLATER:

10        Q    Do you know that the FDA made Ethicon

11   change the wording in the patient brochure before

12   Pam Wicker's surgery, but those changes were not

13   made until after?  Yes or no; do you know that

14   that occurred?

15                    MR. COMBS:  Object to form.

16                    THE WITNESS:  That statement I

17        would say no.

18   BY MR. SLATER:

19        Q    You made a statement just before --

20   rephrase.

21                    You made a statement before about the

22   fact that one should not advocate for a procedure

23   when the only data available has short-term

24   follow-up.

25                    Remember you made that statement a

Nicolette S. Horbach, M.D.

 1   little earlier?

 2        A    I'm not sure that I stated it

 3   specifically that way.  What I stated was that in

 4   this particular situation, the procedure that Raz

 5   did with the netting did not have randomized

 6   trials and really didn't have any particular

 7   follow-up that he certainly had published.  He may

 8   know that within his own practice, but there was

 9   no -- that information wasn't available in the

10   literature.

11        Q    You would agree with me that a medical

12   device manufacturer should not advocate for a

13   procedure involving one of their medical devices

14   if they have no RCTs and all they have is

15   short-term follow-up; correct?

16                   MR. COMBS:  Object to form.

17                   THE WITNESS:  No, I don't agree

18        with that.  I don't think that devices

19        being --

20   BY MR. SLATER:

21        Q    That's all I asked you, Doctor.  I

22   didn't ask you why.  Don't care, honestly.

23                   MR. COMBS:  Again, I'll object to

24        counsel being rude to the witness.

25                   MR. SLATER:  I'm not being rude.

Nicolette S. Horbach, M.D.

1        I've been asking for four hours not to get a

2        story beyond a simple answer.  I'm trying to

3        get the doctor out of here.  She's told us

4        she wants to leave.  So I don't appreciate

5        that I'm rushing and I'm getting long answers

6        not asked for.

7                    MR. COMBS:  Again, I just

8        appreciate the witness being treated with

9        courtesy.

10                   MR. SLATER:  She's being treated

11       with extreme courtesy, as are you.

12   BY MR. SLATER:

13       Q    You said that in this ACOG bulletin,

14   it's basically standing for the proposition in

15   part and the part you're focused on,

16   "musculoskeletal issues may be one of the

17   etiologies for pelvic pain."

18                   You said that a little earlier; correct?

19       A    That musculoskeletal abnormalities is an

20   etiology, not may be, but it is an etiology for

21   pelvic pain.

22                   I'm sorry.  You cut out.

23       Q    Sure.

24                   Can you point me to any article, any

25   clinical study that's been peer-reviewed and

Nicolette S. Horbach, M.D.

1    accepted in the medical literature on the lists of

2    medical literature that you supplied to me that

3    stands for that proposition?

4                    MR. COMBS:  Object to form.

5                    THE WITNESS:  No.

6                    Well, actually, I guess I should

7         say yes, because the ACOG practice bulletin

8         is a peer-reviewed document, so other, other

9         things would -- studies I can't say, but

10        ACOG's practice bulletin is a peer-reviewed

11        document.

12   BY MR. SLATER:

13        Q    Let's look at that ACOG bulletin for a

14   minute.  Page 81, please, where they talk about

15   the heading "Musculoskeletal Disorders."

16        A    Okay.

17        Q    The thing they talk about is

18   "musculoskeletal disorders as causes of or risk

19   factors for chronic pelvic pain have not been

20   widely discussed in gynecologic publications."

21                  That's the first thing they say; right?

22        A    Yes.

23        Q    Let's go to the next paragraph.  It

24   talks about peripartum pelvic pain syndrome.

25                  Do you see that?

Nicolette S. Horbach, M.D.

```
1       A    Yes.

2       Q    And that relates to damage to pelvic

3  ligaments, pelvic muscle weakness, and they talk

4  about the weight of the fetus and "gravid uterus."

5            Do you see that?

6       A    Yes.

7       Q    So that's a condition within the pelvis

8  itself; correct?

9       A    Well, the fetus is -- yeah, I suppose a

10 fetus is in the pelvis, although they're talking

11 about lower spine and that type of thing, so

12 that's a little bit outside the pelvis.

13      Q    Now let's look at -- well, let me just

14 ask you this.

15           There is no issue of lower back lumbar

16 spine issues for Pam Wicker; correct?

17      A    She has not been diagnosed with anything

18 in the lumbar spine as far as I can recall.

19      Q    Okay.

20           Now, coming back to this, the third

21 paragraph, you see it says "faulty posture"?

22      A    Yes.

23      Q    It actually says, "Faulty posture, in

24 particular an exaggerated lumbar lordosis and

25 thoracic kyphosis," that's K-Y-P-H-O-S-I-S,
```

Nicolette S. Horbach, M.D.

1    "called typical pelvic pain posture."

2              Do you see that?

3    A     Yes.

4    Q     Pam Wicker does not have and has not had

5    exaggerated lumbar lordosis; correct?

6    A     She does not have an exaggerated lumbar.

7    Q     Does not have thoracic kyphosis?

8    A     No, that she does not.

9    Q     And they say, "Other musculoskeletal

10   disorders may cause or contribute to pelvic pain.

11   These include trigger points, fibromyalgia, lumbar

12   vertebral disorders, and pelvic floor myalgia."

13             Do you see that?

14   A     Yes.

15   Q     The only one of those that you offered

16   the opinion that Pam Wicker has is pelvic floor

17   myalgia, which in your opinion she has only had

18   after the Prolift surgery; correct?

19             MR. COMBS:  Object to form.

20             THE WITNESS:  We only have evidence

21      of symptoms after the Prolift surgery.

22   BY MR. SLATER:

23   Q     There is nothing in this description of

24   the musculoskeletal disorders that are being

25   described in this bulletin that's talking about

Nicolette S. Horbach, M.D.

1  osteoarthritis of the hip, one leg being longer

2  than the other, a bone spur in the shoulder,

3  rotator cuff surgery in the shoulder.

4       None of those conditions are described

5  in this list of what the musculoskeletal disorders

6  are; correct?

7            MR. COMBS:  Object to form.

8            THE WITNESS:  They are not listed

9       specifically in that list.

10 BY MR. SLATER:

11      Q    You said you're not an expert on the

12 internal requirements of companies, companies like

13 Ethicon who develop medical devices; correct?

14      A    Correct.

15      Q    And none of your opinions are based upon

16 any of the internal workings or internal standards

17 within Ethicon; correct?

18            MR. COMBS:  Object to form.

19            THE WITNESS:  Correct.

20 BY MR. SLATER:

21      Q    Your opinions are based solely on your

22 own personal opinions based on your experience;

23 correct?

24            MR. COMBS:  Object to form.

25            THE WITNESS:  No.

Nicolette S. Horbach, M.D.

1    BY MR. SLATER:

2         Q    Your opinions are based on no -- well,

3    rephrase.

4              You are not basing your opinions at all

5    on any of the internal standards applied by

6    Ethicon or any understanding of why Ethicon made

7    any decision; correct?

8         A    Yes.

9         Q    You were asked about whether or not you

10   are aware of any articles describing a clinical

11   correlation to clinical outcomes in patients with

12   respect to porosity, and you said you're not

13   familiar with any; correct?

14        A    I, I stated that, yes.

15        Q    So number one, if any such articles

16   exist, you just don't know about them; right?

17        A    I think that -- I can't answer that as a

18   yes or no, because I would have to make an

19   additional qualification of the statement that you

20   made, because you're not quite phrasing the way --

21   you're not -- you made a statement that is not

22   accurately representing what I said.

23        Q    Well, I'm asking you right now.

24             Are you familiar with any study

25   evaluating the clinical correlation with regard to

Nicolette S. Horbach, M.D.

1    outcomes for patients with respect to the porosity

2    of pelvic mesh?

3         A    I'm familiar, obviously, with the

4    studies we've talked about that look at the

5    porosity of the mesh in patients with a mesh

6    problem and a problem -- and a potential

7    complication from the surgery.  I am not aware of

8    any papers or articles that compare that type of

9    porosity and tissue sample, et cetera, in a

10   patient who is a normal post-operative patient

11   without clinical symptoms.

12        Q    You certainly would agree with me that

13   Klinge and Klosterhoff have written multiple

14   articles where they have opined, based on their

15   evaluation of explanted meshes and their study of

16   the explants, that porosity has a direct

17   contributing factor -- is a direct contributing

18   factor to poor clinical outcomes when the porosity

19   is not adequate.

20             You're familiar with that; right?

21             MR. COMBS:  Object to form.

22             THE WITNESS:  I'm familiar with

23        that opinion.

24   BY MR. SLATER:

25        Q    You have no idea what Ethicon thinks

Nicolette S. Horbach, M.D.

1   with regard to whether or not porosity can be a

2   contributing factor to poor clinical outcomes for

3   patients with the Prolift or other pelvic mesh

4   devices; correct?

5       A    I don't think that that's a correct

6   statement.  I have -- I'm aware of some documents

7   within Ethicon discussing the pros and cons of

8   different meshes and the preference to use or

9   preference not to use, you know, a small pore mesh

10  versus a larger pore mesh.  I'm aware of those

11  types of documents from Ethicon and their

12  discussions.

13      Q    So you certainly are aware -- rephrase.

14          You're certainly aware that Ethicon

15  believes that you need to have large pores that

16  will maintain a one-millimeter size in actual use

17  in order to try to minimize the risk of scar

18  tissue-related complications.

19          Are you aware of that?

20              MR. COMBS:  Object to form.

21              THE WITNESS:  That statement was

22      fine for the beginning part but not

23      necessarily for the end part.  I think that

24      Ethicon was aware that, that they felt there

25      was a benefit for having a, a mesh that

Nicolette S. Horbach, M.D.

1          maintained -- that was a larger pore mesh.

2          The statement of, you made of saying that

3          maintain that in the patient, et cetera, et

4          cetera, et cetera, after that, I am not aware

5          of that part of the documentation that -- of

6          Ethicon.

7     BY MR. SLATER:

8          Q    Do you feel that your expertise covers

9     the question of whether or not a mesh to be used

10    for the use like the Prolift needs to maintain a

11    one-millimeter pore size under strain and actual

12    use within the body when forces are actually

13    applied?  Do you feel like you have the expertise

14    to answer that question to a reasonable degree of

15    medical probability?

16              MR. COMBS:  Object to form.

17              THE WITNESS:  I guess I have to say

18         I don't know that I can answer that question.

19              MR. SLATER:  I have no other

20         questions.

21         FURTHER EXAM BY COUNSEL FOR DEFENDANTS

22    BY MR. COMBS:

23         Q    Dr. Horbach, just a housekeeping matter.

24    I don't know if we did or didn't, if the consent

25    was marked, so I'm going to mark it.

Nicolette S. Horbach, M.D.

```
 1                (Exhibit 22 was marked for
 2                identification.)
 3   BY MR. COMBS:
 4        Q    Let me hand you what's been marked as
 5   Exhibit 22.
 6             What is that document?
 7        A    This is the consent form that
 8   Mrs. Wicker signed on September 8, 2008 regarding
 9   the surgery that she underwent in October.
10        Q    Dr. Horbach, was the date of the ACOG
11   publication that we marked as Exhibit 21 2004?
12        A    I'm sorry.  Yes, it was marked 2004.
13        Q    Now, are your findings regarding
14   Mrs. Wicker's faulty posture set forth in the IME
15   section of the report?
16        A    Yes.
17        Q    Have you treated numerous patients that
18   have exhibited musculoskeletal problems during
19   your clinical practice?
20        A    Hundreds.
21                MR. SLATER:  Objection.
22   BY MR. COMBS:
23        Q    And is your treatment and clinical
24   practice regarding those patients part of your
25   foundation for your opinion in this case on that
```

Nicolette S. Horbach, M.D.

1    issue?

2                    MR. SLATER:  Objection.

3                    THE WITNESS:  Yes.

4                    MR. COMBS:  I don't have any

5        further questions.

6         FURTHER EXAM BY COUNSEL FOR PLAINTIFFS

7    BY MR. SLATER:

8        Q    One question to follow up that.

9             For any patients who you say had

10   musculoskeletal issues, are you able to give me

11   the entire profile of all of the conditions they

12   had and their full relevant medical history on

13   each one of those right now?

14       A    Could I name my patients and each

15   individual problem that they had?  No, but I could

16   certainly tell you the types of problems that

17   these patients experience that we see that are

18   associated with these kind of conditions.

19       Q    I'm asking you with these so-called

20   patients, if you were to say, well, these are my

21   patients with musculoskeletal conditions that I

22   think led to whatever condition you say it led to,

23   would you be able to say, well, let me tell you

24   the rest of the profile, other surgeries they had,

25   other comorbidities, their entire profile?  Would

Nicolette S. Horbach, M.D.

1  you be able to give that to me right now for every

2  one of those patients?

3      A    Not for every one, but I certainly could

4  for some.

5                    MR. SLATER:  I have no other

6       questions.

7                    MR. COMBS:  No questions.

8                    THE VIDEOGRAPHER:  Our time now is

9       6:15 p.m.  This concludes our videotaped

10      deposition.

11                   THE REPORTER:  Are you ordering a

12      transcript?

13                   MR. SLATER:  Yes.

14                   MR. COMBS:  Yes.

15                   (Signature having not been

16                   waived, the video deposition of

17                   NICOLETTE HORBACH, M.D. was

18                   concluded at 6:15 p.m.)

19

20

21

22

23

24

25

Nicolette S. Horbach, M.D.

1    CERTIFICATE OF SHORTHAND REPORTER -- NOTARY PUBLIC

2

3

4

5

6

7              I, Laurie Bangart, Registered
        Professional Reporter, Certified Realtime
8        Reporter, the officer before whom the
        foregoing deposition was taken, do hereby
9        certify that the foregoing transcript is a
        true and correct record of the testimony
10       given; that said testimony was taken by me
        stenographically and thereafter reduced to
11       typewriting under my supervision; and that I
        am neither counsel for, related to, nor
12       employed by any of the parties to this case
        and have no interest, financial or otherwise,
13       in its outcome.

14              IN WITNESS WHEREOF, I have hereunto
        set my hand and affixed my notarial seal this
15       3rd day of December, 2013.

16       My commission expires:  March 14th, 2016

17

18

19       _____

20       LAURIE BANGART
        NOTARY PUBLIC IN AND FOR
21       THE DISTRICT OF COLUMBIA

22

23

24

25

Nicolette S. Horbach, M.D.

1              INSTRUCTIONS TO WITNESS

2

3              Please read your deposition

4    over carefully and make any necessary

5    corrections.  You should state the reason

6    in the appropriate space on the errata

7    sheet for any corrections that are made.

8              After doing so, please sign

9    the errata sheet and date it.  It will be

10   attached to your deposition.

11             It is imperative that you

12   return the original errata sheet to the

13   deposing attorney within thirty (30) days

14   of receipt of the deposition transcript

15   by you.  If you fail to do so, the

16   deposition transcript may be deemed to be

17   accurate and may be used in court.

18

19

20

21

22

23

24

25

Nicolette S. Horbach, M.D.

```
 1                  - - - - - -

                 E R R A T A

 2                  - - - - - -

 3    PAGE   LINE   CHANGE

 4    _____  _____  _____

 5       REASON:    _____

 6    _____  _____  _____

 7       REASON:    _____

 8    _____  _____  _____

 9       REASON:    _____

10    _____  _____  _____

11       REASON:    _____

12    _____  _____  _____

13       REASON:    _____

14    _____  _____  _____

15       REASON:    _____

16    _____  _____  _____

17       REASON:    _____

18    _____  _____  _____

19       REASON:    _____

20    _____  _____  _____

21       REASON:    _____

22    _____  _____  _____

23       REASON:    _____

24    _____  _____  _____

25       REASON:    _____
```

Nicolette S. Horbach, M.D.

```
1            ACKNOWLEDGMENT OF DEPONENT
2
             I,_____, do
3    hereby certify that I have read the
     foregoing pages, and that the same
4    is a correct transcription of the answers
     given by me to the questions therein
5    propounded, except for the corrections or
     changes in form or substance, if any,
6    noted in the attached Errata Sheet.
7

     _____
8     NICOLETTE S. HORBACH, M.D.        DATE
9
10
11
12
13
14
     Subscribed and sworn
15   to before me this
     _____ day of _____, 20____.
16
     My commission expires:_____
17
18   _____
     Notary Public
19
20
21
22
23
24
25
```