EXHIBIT E

Cynthia Bergmann, M.D.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF WEST VIRGINIA

AT CHARLESTON

IN RE:  ETHICON, INC. PELVIC          Master File No.
REPAIR SYSTEM PRODUCTS                2:12-MD-02327
LIABILITY LITIGATION
                                      Joseph R.
CONSTANCE DAINO, ET AL. V             Goodwin
ETHICON, INC.                         U.S. District
Case No. 2:12-CV-01145                Judge


THIS DOCUMENT RELATES TO ALL

CASES


DEPOSITION OF

CYNTHIA BERGMANN, M.D.

FRESNO, CALIFORNIA

MARCH 15, 2016


REPORTED BY:  Karla M. Rocha, C.S.R. No. 8982

Cynthia Bergmann, M.D.

## Page 2

I N D E X

WITNESS: CYNTHIA BERGMANN, M.D.

EXAMINATION                                      PAGE
  BY MS. COPE                                      6
  BY MR. KOOPMANN                                117

RE-EXAMINATION                                   PAGE
  BY MS. COPE                                    122

EXHIBITS

PLAINTIFFS' DESCRIPTION                          PAGE
Exhibit 1   Notice of Taking Deposition          7
Exhibit 2   Curriculum Vitae                     9
Exhibit 3   Report Regarding the Ethicon        23
            TVT Incontinence Sling

Exhibit 4   Document Entitled "Gynecare         64
            TVT Tension-Free Support for
            Incontinence"

Exhibit 5   Document Entitled "Gynecare         69
            TVT Tension-Free Support for
            Incontinence"

Exhibit 6   E-Mail Exchange                     74

Exhibit 7   E-Mail Exchange                     81

Exhibit 8   E-Mail Exchange                     83

Exhibit 9   E-Mail Exchange                     86

Exhibit 10  Document Entitled                   88
            "Investigating Mesh Erosion
            in Pelvic Floor Repair"

## Page 3

Exhibit 11  E-Mail Exchange                     98
Exhibit 12  Handout to the Ethicon             102
            Women's Health & Urology
            Sales Force
Exhibit 13  Comparison of Different            104
            Surgical Treatments of
            Stress Incontinence Table
Exhibit 14  Packet of Articles                 122
Exhibit 15  Copies of Bills from               122
            Dr. Bergmann

Exhibit 16  Booklet Entitled "TVT              123
            Development and Early Data"
Exhibit 17  Binder Entitled "General           123
            Report & Sources"

Exhibit 18  Binder Entitled "Ethicon           123
            Gynecare Pelvic Mesh
            Litigation (TVT Medical
            Literature)"
Exhibit 19  Document Entitled "National        124
            Institute for Clinical
            Excellence Final Appraisal
            Determination Tension-Free
            Vaginal Tape"
Exhibit 20  Booklet of Plaintiffs'             125
            Expert Reports

Exhibit 21  E-Mail dated 2-10-16 to            126
            Mr. Koopmann from
            Mr. Koopmann and Attached
            Device Labeling Guidance
Exhibit 22  Three Thumb Drives                 126


DEFENDANTS' DESCRIPTION               PAGE

Exhibit    (None offered)

## Page 4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON
IN RE:  ETHICON, INC. PELVIC    )  Master File No.
REPAIR SYSTEM PRODUCTS          )  2:12-MD-02327
LIABILITY LITIGATION            )
                                )
                                )  Joseph R.
THIS DOCUMENT RELATES TO ALL    )  Goodwin
CASES                           )  U.S. District
                                )  Judge


        The deposition of CYNTHIA BERGMANN, M.D.,
was taken on behalf of the Plaintiffs at McCormick,
Barstow, Sheppard, Wayte & Carruth, 7647 North Fresno
Street, Fresno, California, commencing at 9:12 a.m.,
Tuesday, March 15, 2016, before Karla M. Rocha, CSR
No. 8982.

## Page 5

A P P E A R A N C E S


For the Plaintiffs:

     MOTLEY RICE, LLC
     By:  Breanne V. Cope, Esquire
     28 Bridgeside Boulevard
     Mount Pleasant, South Carolina 29464
     (512) 987-2336
     Bcope@motleyrice.com


For the Defendant:

     BOWMAN AND BROOKE, LLP
     By:  Barry J. Koopmann, Esquire
     150 South 5th Street, Suite 3000
     Minneapolis, Minnesota 55402
     (612) 672-3289
     Barry.koopmann@bowmanandbrooke.com

Cynthia Bergmann, M.D.

<table>
<tr><td>

Page 6

1            -oOo-
2     CYNTHIA BERGMANN, M.D.,
3     called as a witness herein, having
4     been heretofore duly sworn,
5     testified as follows:
6            -oOo-
7        EXAMINATION
8  BY MS. COPE:
9    Q  Good morning, Dr. Bergmann. Thank you for
10  making time for me today. My name is Breanne Cope. I
11  am here on behalf of all the MDL plaintiffs to ask you
12  questions about your general report about the TVT device
13  in this case that you submitted.
14    Have you been deposed before?
15    A  Yes.
16    Q  Can you tell me how many times?
17    A  Probably around a dozen.
18    Q  And can you tell me were you deposed as a fact
19  witness or an expert?
20    A  Fact, expert, plaintiff and defendant.
21    Q  And when was the most recent deposition?
22    A  Probably, I'm guessing, five or seven years
23  ago. It's been awhile.
24    Q  Okay, was that as an expert witness?
25    A  I'm trying to think. No, that was as a

</td><td>

Page 8

1  BY MS. COPE:
2    Q  And have you seen this document before?
3    A  Yes.
4    Q  Can you tell me when?
5    A  It was sometime this weekend.
6    Q  And if you can look to -- it says at the very
7  top of the page, Page 5 of 8, it says, "Schedule A."
8  And you've brought a lot of material with you today in
9  response to this deposition notice, correct?
10    A  Yes.
11    Q  And the CV that you brought with you, is this
12  different than the CV that was produced with your report
13  originally?
14    A  It's different. It's been updated.
15    Q  Okay, and you also brought a number of
16  documents that relate to your general opinions, correct?
17    A  Yes.
18    Q  And we can mark some of these at the break.
19  You also brought your billing invoices; is that correct?
20    A  Correct.
21    Q  And can you tell me which of these billing
22  invoices are for your general opinions for preparation
23  of the general report as opposed to case specific?
24    A  Probably not, because they all got lumped
25  together.

</td></tr>
<tr><td>

Page 7

1  defendant. It wasn't that long ago. That was, like,
2  four years ago.
3    Q  Okay, and for the cases where you have served
4  as an expert witness, can you tell me generally the
5  nature of those cases?
6    A  They have been as either a defendant, expert in
7  a medical malpractice case, and as a plaintiff's expert
8  in a motor vehicle accident.
9    Q  And did either of those cases involve
10  transvaginal mesh?
11    A  No.
12    Q  And when you were deposed as a fact witness,
13  was any of that related to your medical practice or your
14  treatment of patients?
15    A  Yes.
16    Q  And can you tell me generally the nature of
17  those cases or if they involved transvaginal mesh?
18    A  They did not involve transvaginal mesh and it
19  was about a patient who had a pituitary injury following
20  a motor vehicle accident.
21    Q  Okay, and I have marked as Exhibit 1 the notice
22  to take your deposition today.
23    (Whereupon Plaintiffs' Exhibit 1 was marked for
24  identification.)
25  ///

</td><td>

Page 9

1    Q  Okay, and I see the first invoice is dated
2  May 29th, 2014, is that close to the time that you were
3  originally contacted to serve as an expert in this case?
4    A  I was contacted in 2014. I don't have the
5  exact date.
6    Q  And when you were contacted, what exactly were
7  you asked to do as an expert?
8    A  I was asked if I would be willing to be an
9  expert for the defendants, you know, they asked me what
10  I knew about meshes, did I use them, et cetera.
11    And that particular invoice includes a meeting
12  with Bert Snell to go over basically -- basically, he
13  needed to know what I knew about meshes and how I used
14  them.
15    Q  And did you review any materials before
16  agreeing to be an expert for the defendants in this
17  case?
18    A  No, I don't believe that I did.
19    Q  And I marked as Plaintiffs' Exhibit 2 a copy of
20  the CV that you brought with you this morning.
21    A  All right.
22    Q  And I'd like to talk to you a little bit about
23  that and your experience.
24    (Whereupon Plaintiffs' Exhibit 2 was marked for
25  identification.)

</td></tr>
</table>

3 (Pages 6 to 9)

Cynthia Bergmann, M.D.

## Page 10

1    BY MS. COPE:
2        Q    You graduated from the Medical College of
3    Wisconsin, correct?
4        A    Correct.
5        Q    And do you consider that to be a good
6    institution?
7        A    Yes.
8        Q    And at the bottom of the first page I see you
9    have an internship residency, is that different from
10   just a normal residency?
11       A    University of Minnesota has a straight
12   residency program, so there is no internship with it.
13       Q    So is your being at the University of Minnesota
14   '79 to '80 considered part of your medical school
15   education?
16       A    No.
17       Q    Did you have to apply for this internship
18   residency?
19       A    For the residency, yes.
20       Q    And how long is that program?
21       A    The residency program is four years.
22       Q    But you were only at the University of
23   Minnesota for a year, correct?
24       A    Correct.
25       Q    Can you tell me why that is?

## Page 11

1        A    Because my husband got a job teaching at Tulane
2    University in speech and rhetoric, so I transferred my
3    residency to Tulane University at Charity Hospital.
4        Q    And how long were you at Tulane?
5        A    I was there for one year.
6        Q    And why were you only there for one year?
7        A    Because I got pregnant and did public health
8    service payback during my pregnancy.
9        Q    And can you explain what that is?
10       A    Oh, I was a public health service scholarship
11   recipient, so when I wasn't -- by the terms of my
12   scholarship, if I wasn't in residency I needed to be
13   paying back my public health service scholarship, which
14   I did by working at the Public Health Department for
15   Fresno County.
16       Q    And can you tell me why you chose to do public
17   health work instead of practicing on patients?
18       A    The Charity residency was an extremely
19   difficult -- physically difficult residency.  And I
20   already had one child at that time, I knew what it was
21   like to be a medical student and be pregnant.
22            I did not think it would be fair to me, to my
23   child or to my fellow residents to attempt a pregnancy
24   during that type of residency.  We would be on call for
25   eight days in a row.  Thirty-six hours of call was

## Page 12

1    typical.
2        Q    Then you eventually completed a residency at
3    the Kaiser Foundation Hospital in Oakland; is that
4    correct?
5        A    Correct.
6        Q    And can you tell me why you moved to
7    California?
8        A    Yes, my husband got a job at the old Valley
9    Medical Center and I was able to move out here to do my
10   public health service payback.
11       Q    So the Kaiser residency, was that also just
12   public health work, it didn't include practicing on
13   patients?
14       A    No, that's a full residency.
15       Q    And it says you've been in private practice
16   since 1985; is that correct?
17       A    Correct.
18       Q    And has that been with the Canterbury Women's
19   Healthcare Group?
20       A    Yes.
21       Q    And that was started by your ex-husband,
22   correct?
23       A    And myself, yes.
24       Q    And any particular story about why you named it
25   Canterbury?

## Page 13

1        A    We were in the Canterbury medical complex.
2        Q    And of the activities listed in your
3    professional activities, can you let me know which, if
4    any, of these involved practicing medicine versus
5    continuing your public health role?
6        A    I mean, well, all of them are ancillary
7    activities.  Can you be more specific as to which ones
8    you're talking about?
9        Q    Just there's a lot of medical -- there's
10   hospitals listed, for instance, and I'm just trying to
11   establish whether you treated patients in this capacity
12   or if you were just advising them on public health.
13       A    Well, you don't really advise on public health.
14   As a member of the medical staff, you often serve on
15   committees to help with the overseeing and the running
16   of the hospital, so I think that's what you're talking
17   about.
18            With the Fresno-Madera Medical Society, I was
19   very active in helping run the organization.  I was
20   actually president twice and served their needs at both
21   the state and national level.
22       Q    So is it fair to say that all these
23   professional activities involved participating on
24   committees and not treating patients?
25       A    No, they're not direct patient care.

4 (Pages 10 to 13)

Cynthia Bergmann, M.D.

Page 14

1      Q   And it says you're a trainer for Gynecare/
2    Gynemesh, can you tell me specifically what you're a
3    trainer for?
4      A   I had been designated as a trainer specifically
5    for TVT.  Unfortunately, that came -- I was designated
6    right before the FDA announcements came out, so I have
7    not actually been able to train anybody.
8      Q   Is the TVT made of Gynemesh?
9      A   Yeah, it's the same material.
10     Q   And you said you became a trainer around
11   the FDA public health announcement, was that 2008
12   or 2011?
13     A   2008.
14     Q   And what prompted you to become a trainer or a
15   preceptor for Ethicon?
16     A   I was asked by Ethicon to do so.
17     Q   Do you remember who at Ethicon asked you?
18     A   It was their local representative and I don't
19   remember her name.
20     Q   Did she tell you why they wanted you to be a
21   preceptor or a trainer?
22     A   Because they liked the way that I did the
23   procedure.  I'd had several of the reps in training in
24   my surgeries when I was doing them.
25     Q   And why would you have representatives in

Page 15

1    training watch your procedures?
2      A   So that they could see live procedure, see how
3    the product actually worked in the operating room.
4      Q   And in your lectures, are these speeches or
5    talks that you give repeatedly or are they classes that
6    you have taught?
7      A   Which lectures?
8      Q   All of these.  It's unclear whether these are
9    just general talks that you have given at a conference
10   or they're classes you've taught.
11     A   Usually the lectures are a single lecture.
12   They'll either be to a professional group or to a
13   patient group.  Usually it's hospital-sponsored.
14   They'll have women's conferences and I'll give lectures
15   about things at a women's conference, for example.
16     Q   And do you get support from industry to attend
17   any of the patient conferences?
18     A   No.
19     Q   Do you have a copy of your female incontinence
20   lecture with you today?
21     A   No.
22     Q   I'd like to request a copy of that lecture.
23     A   If I have one.
24     Q   So when's the last time you think you gave the
25   female incontinence lecture?

Page 16

1      A   That would have been probably 2008.
2      Q   And why is that the last time that you gave
3    that lecture?
4      A   Because the two weeks before I gave it the FDA
5    warnings came out.
6      Q   And what does that have to do with your lecture
7    schedule?
8      A   Well, as part of it we were talking about mesh
9    as part of the conference.  We were also talking about
10   pelvic organ prolapse.
11        So because of the mesh controversy and it being
12   so new, we didn't give it again.  And, again, this was a
13   one-time conference.
14     Q   And when you say "mesh controversy," what are
15   you referring to?
16     A   The FDA announcement about mesh.
17     Q   What was controversial about it?
18     A   Well, for me, they had numerators with no
19   denominators, so they were looking at, I thought, rather
20   small numbers of complications given the best numbers of
21   things that had been done.
22     Q   And who would have access to the numbers that
23   would be the denominators for transvaginal mesh?
24     A   Well, the FDA should be able to have them or
25   request them.

Page 17

1      Q   Request them from who?
2      A   They would be able to request them from
3    hospitals, they would be able to request them from the
4    manufacturers, because the manufacturers would know how
5    many kits have been sold.
6      Q   And are you aware if Ethicon ever provided that
7    information to the FDA?
8      A   No, I'm not aware of if it was provided or if
9    it was asked for.
10     Q   But you still believe in mesh to treat stress
11   urinary incontinence, correct?
12     A   Correct.
13     Q   And you chose to stop giving the lecture
14   because of the FDA warning instead of continuing to
15   educate patients about the treatment method that you
16   believe in, correct?
17        MR. KOOPMANN:  Object to the form.
18        THE WITNESS:  Okay, that was a lecture that was
19   given specifically for a conference.  I generally do not
20   repeat the lectures.
21   BY MS. COPE:
22     Q   So you gave it once in 2008, is that what
23   you're saying?
24     A   Correct.
25     Q   To a patient group or --

5 (Pages 14 to 17)

Cynthia Bergmann, M.D.

Page 18

1    A   To a patient group.
2    Q   And what hospital sponsored it, if you can
3  recall?
4    A   Saint Agnes.
5    Q   On the second page under "Certification" you
6  list "Suburethral sling." Can you tell me what you mean
7  by certification for suburethral sling?
8    A   Oh, just that I had training in it and received
9  a certificate for being able to do the sling surgeries.
10   Q   And who is the training with?
11   A   I did training with Ethicon. I believe that
12 was the only -- oh, and also did training with Bard.
13   Q   With Bard?
14   A   Bard, yeah.
15   Q   And the pelvic reconstruction, can you tell me
16 is that also a training that you received a certificate
17 for?
18   A   Yes.
19   Q   From which companies?
20   A   That one was Cooke. I'm trying to remember who
21 else. Again, this is going back to 2003. I did Cooke,
22 we did an Ethicon course and also went to a Bard course.
23   Q   And do you still use mesh when you're doing
24 pelvic organ prolapse to repair transvaginally?
25   A   Yes.

Page 19

1    Q   And what mesh do you use for a POP repair?
2    A   Usually I use a combination of the AMS Elevate
3  and some type of biologic graft.
4    Q   What biologic graft do you use?
5    A   Currently I'm using ACell.
6    Q   And when you say a combination of those two, do
7  you mean you're using those same meshes in a single
8  procedure or you use the Elevate with some patients and
9  the ACell with others?
10   A   I use them together.
11   Q   And can you describe to me how you do that?
12   A   What I'll do is do my usual dissection, put in
13 the -- I'll take the mesh and I'll actually baste the
14 acellular matrix to the surface of the mesh that faces
15 the vagina.
16   Q   And can you tell me why you don't use an
17 Ethicon product when you do your POP repair?
18   A   I like the AMS system the best. It gives me
19 really good vaginal support, as well as giving the
20 posterior compartment support. It's also very, very
21 simple to use.
22   Q   Is simplicity of use an important feature in a
23 medical device, do you believe?
24   A   Well, it makes things more efficient in the
25 operating room, cuts down on your operating time.

Page 20

1    Q   You can put your CV aside. Did you also found
2  some sort of endometriosis institute?
3    A   It's when we started our practice, we were doing
4  a lot of endometriosis surgery and there was -- so we
5  set up something called the Endometriosis Institute.
6  We've never actually used that, but I believe we still
7  own the name. So if you know anybody who would like to
8  buy it, it's available.
9    Q   And your practice now, in terms of physicians,
10 consists of you and your ex-husband; is that correct?
11   A   Correct.
12   Q   Do you know if Ethicon has ever asked your
13 ex-husband to be a consultant in this litigation?
14   A   Not that I'm aware of.
15   Q   And how many days a week do you currently see
16 patients in your practice?
17   A   Well, I see patients five days a week. Four
18 days we're in the office and then we have a day doing
19 surgery.
20   Q   And you treat women for stress urinary
21 incontinence in your practice, correct?
22   A   Correct.
23   Q   What percentage of the women that you treat for
24 stress urinary incontinence are housebound because of
25 their SUI?

Page 21

1    A   I don't know of any that are currently
2  housebound, but I would imagine they would quit coming
3  to see me if they were housebound.
4    Q   You think they would stop seeking medical
5  treatment if they were housebound --
6    A   If they're truly housebound, they would not get
7  out of their houses. I do have women where it has a
8  severe negative impact on their lives.
9       MR. KOOPMANN: Just make sure you let her
10 finish her question.
11      THE WITNESS: Sorry.
12 BY MS. COPE:
13   Q   What percentage of the women that you treat for
14 SUI report chafing of their vulva from wearing panty
15 liners or pads?
16   A   As far as report, it's generally in their
17 examination I'll see that they have a dermatitis from
18 wearing pads and I'll ask them about it. I would
19 estimate that somewhere between -- and, again, it's an
20 estimate, between 40 and 50 percent have some type of
21 dermatitis from wearing pads.
22   Q   But they don't report symptoms to you, it's
23 something you observe during the exam, correct?
24   A   It's observed and asked about and patients
25 admit to the symptoms.

6 (Pages 18 to 21)

Cynthia Bergmann, M.D.

Page 22

1  Q  And what are the symptoms?
2  A  Burning and itching, irritation of the vulva.
3  Q  And what percentage of the patients you treat
4  for SUI report vaginal infections from wearing panty
5  liners or pads?
6  A  Well, I don't believe that they -- I don't know
7  that -- well, usually they don't come in saying, "I have
8  stress incontinence and a vaginal infection." They'll
9  come in saying they have a vaginal infection and as part
10  of it I will ask them whether or not they're wearing
11  pads.  And if they're wearing pads consistently then we
12  talk about other ways of managing their problems.
13        And as far as percentage, that would be limited
14  to my patients 50 and older.  So if we want to limit it
15  to that, I would say a third of them wear pads.
16  Q  I just want to know of the ones that do wear
17  pads, how many of them have vaginal infections that you
18  believe are caused by using panty liners or pads?
19  A  I don't believe that wearing panty liners or
20  pads are necessarily the cause.  It would be the
21  organism, not the pads.
22  Q  And by "organism" what do you mean?
23  A  Say a yeast infection or a bacterial infection.
24  Q  Okay.  Can you tell me the racial makeup of
25  your patient population?

Page 23

1  A  We're about 50 percent Hispanic, 35 percent
2  white and the rest are divided among Oriental,
3  African-Americans and Native Americans.
4  Q  And what percentage of the patients that you
5  treat for SUI are overweight?
6  A  It's Fresno, everybody is overweight.  I would
7  say at least two-thirds of my patients are overweight,
8  so I -- and it's not something I split out particularly
9  when I'm addressing stress incontinence.
10  Q  How many surgeries have you performed in your
11  career to treat stress urinary incontinence?
12  A  I don't have a number.
13  Q  Over 1,000?
14  A  I would -- I'm sure it's over 500.  It could be
15  1,000.  I don't keep records that way.
16  Q  What way?
17  A  I don't track the number of cases that I do or
18  particular cases.
19  Q  You started using the TVT in 2001; is that
20  correct?
21  A  No, 2003.
22  Q  I'm going to show you what's been marked as
23  Exhibit 3, which is the report that was produced in this
24  litigation.
25        (Whereupon Plaintiffs' Exhibit 3 was marked for

Page 24

1  identification.)
2  BY MS. COPE:
3  Q  And on Page 2 under Paragraph B you state that
4  in 2001 your partner and you were trained in the use of
5  the Ethicon TVT device.
6  A  Yes.
7  Q  So you were trained in 2001, but didn't start
8  using it until 2003?
9  A  Correct.
10  Q  And why didn't you start using it until 2003?
11  A  Well, because it was a new device that had to
12  be approved by the hospital.  It took us a year and a
13  half to get the hospital to approve our using the
14  device.
15  Q  And can you explain to me the approval process
16  for the device with the hospital?
17  A  You know, I've not been on those committees, so
18  I'm not sure what goes on, other than they have to
19  decide whether or not it's cost effective for them,
20  which is the biggest thing, whether or not they want to
21  stock it if it's a procedure they want to do in the
22  hospital.
23  Q  I believe you testified that it took you a
24  year and a half to get it approved, but you didn't
25  mean you personally; is that correct?

Page 25

1  A  I'm sorry?
2  Q  You --
3  A  Oh, no, no, it wasn't -- again, once the device
4  is approved, anybody who shows sufficient certification
5  to do it can do it.
6        What I can say in general is that every
7  hospital has their own requirements for how the approval
8  process goes for physicians and that's up to the medical
9  staff.
10  Q  Well, before you were talking about getting the
11  actual device approved to be used in the hospital --
12  A  Correct.
13  Q  -- and not physicians who are able to use the
14  device.  So just in terms of the hospital being willing
15  to carry the Ethicon TVT device, do you know anything
16  about that process?
17  A  Again, all I was told was they had to make sure
18  it was cost effective.  There was -- I am aware that
19  there was one person on that committee who didn't think
20  that it was appropriate for gynecologists to do this
21  type of surgery, even though at the time my partner was
22  training in pubovaginal slings.
23  Q  You said your partner was training in
24  pubovaginal slings, were you also?
25  A  No, he was training.

7 (Pages 22 to 25)

Cynthia Bergmann, M.D.

Page 26

1    Q    And did you ever ask the person on the
2    committee who disagreed with the use of the TVT device
3    why they disagreed or what their reasoning was?
4    A    No.
5    Q    Do you know that person's name?
6    A    Yes.
7    Q    What is it?
8    A    Bernie Freeberg.
9    Q    And then you state in the next sentence of your
10   report that suburethral polypropylene mesh slings became
11   your surgical treatment of choice for SUI, correct?
12   A    Correct.
13   Q    Can you explain to me why, after your training,
14   they became your surgical treatment of choice?
15   A    They're simple to use.  They're very effective.
16   It's a short surgery.  The patients have a quick
17   recovery, back to normal function quickly.  It's long
18   lasting.  I found it far superior to the Burch --
19   colposuspensions that we were doing previously.
20   Q    What do you mean --
21   A    I'm sorry.  I'm sorry, go ahead.
22   Q    You said they were long lasting, what did you
23   mean by long lasting?
24   A    Well, I've been doing them since 2003, I've had
25   one failure in that time.

Page 27

1    Q    But when they became your surgical treatment of
2    choice in 2001, you hadn't been using them for that
3    long?
4    A    I hadn't been.
5    Q    How did you know they were long lasting when
6    they became your surgical method of choice?
7    A    By the data that had been presented.
8    Q    And what data was presented to you in 2001?
9    A    Dr. Ulmsten's studies had been presented.
10   Q    And how long had the follow-up been at that
11   point in 2001 for the TVT device?
12   A    I believe that he had data that was between
13   five and seven years at that point.
14   Q    And who provided that data to you?
15   A    Well, it was in our journals.  We got copies of
16   reprints when I went to the courses.
17   Q    When you say "courses" you mean Ethicon
18   training courses, correct?
19   A    Correct.
20   Q    How did you surgically treat stress urinary
21   incontinence before you started using the TVT?
22   A    With Burch.
23   Q    Any other procedures?
24   A    No.  At that point, Burch was the most effective
25   method that I had available to me.

Page 28

1    Q    And did you ever have a patient that had a
2    complication from anesthesia with the Burch procedure?
3    A    From anesthesia.
4    Q    Yes.
5    A    Not that I'm aware of.
6    Q    Ever have a patient that you performed a Burch
7    procedure on present with chronic pain related to the
8    Burch procedure?
9    A    No.
10   Q    And currently you state in your report that you
11   use the -- strike that.
12       You said you were trained in a variety of
13   products, including the TVT and the TVT SECUR, correct?
14   A    Correct.
15   Q    Do you use the TVT SECUR any longer?
16   A    No.
17   Q    Can you tell me why that is?
18   A    I didn't like its placement method as well.  I
19   use the AMS MiniArc instead.
20   Q    And you still use the MiniArc today, correct?
21   A    For today, yes.
22   Q    And the AMS ASTORA RetroArc, do you use that
23   device as well?
24   A    I use the RetroArc.
25   Q    And the Bard and Boston Scientific slings that

Page 29

1    you were trained on, did you ever use those for more
2    than one or two procedures?
3    A    Yes.  I think I did four, maybe five with the
4    Boston and probably did a dozen with the Bard.
5    Q    And why only 5 and 12 of those products?
6    A    I did not like the mesh for the Boston.  We had
7    problems with it.  It didn't erode, it didn't expose,
8    the edges actually were frayed and poked through the
9    mucosa and they couldn't explain why that had happened,
10   and short of an explanation, I was not willing to use
11   the product again.
12       And the Bard had a great delivery system, very
13   simple to use, but the mesh shrank more than the other
14   meshes so that we had -- almost a third of the patients
15   had urinary retention with the Bard, so we quit using it.
16   Q    And how quickly did you see that urinary
17   retention in patients you treated with the Bard device
18   after implant?
19   A    That would usually arise somewhere between four
20   and six weeks afterward, or even later, which was one of
21   the problems.  When it's early on it was easier to
22   correct, but if it occurs later then you've got to go in
23   and split the mesh.
24   Q    And by "later" can you just tell me what you
25   mean, time-wise?

8 (Pages 26 to 29)

Cynthia Bergmann, M.D.

Page 30

1    A   Anytime after six weeks.
2    Q   And you said that the Advantage Mesh frayed and
3  poked through patients' mucosa, did you believe that
4  that was a problem with the product?
5    A   Again, I had one patient where that happened.
6  For me it was a problem.  If the company had been able
7  to tell me why it happened and there was a way to
8  avoid it, I might have continued using it.
9    Q   Can you tell me what you mean by "the product
10  frayed"?
11    A   Well, I mean, you know what fraying is?
12    Q   That's my definition of fraying, I want to know
13  what yours is.
14    A   Okay, well, if you have a piece of material, the
15  edge should be solid.  If the threads come undone, I
16  think it's the wolf, which is the cross threads, will be
17  out and that's a fray.
18       And that appears to have happened with the
19  mesh, so we had those little ends sticking out.  There
20  were probably a half-dozen of them or more.
21    Q   And why did you consider that a problem in
22  treating your patient?
23    A   Well, it was not very comfortable for a husband
24  when they tried to have sex.
25    Q   And I imagine it wasn't very comfortable for

Page 31

1  your patient either?
2    A   Actually, she didn't feel it.
3    Q   And are you aware that American Medical Systems
4  is going to stop producing their mesh products?
5    A   I know that they're going to stop selling them
6  in this country.  I don't know if they're stopping them
7  in Europe or not.
8    Q   So do you have any plans on how you're going to
9  treat your patients if the RetroArc and MiniArc are no
10  longer available?
11    A   Well, I know the product is good for the next
12  year.  So, again, I use TVT for most of my slings.  For
13  the patients where I use the MiniArc, now I'll be using a
14  TVT instead.
15    Q   And can you tell me how you make the decision
16  in a patient whether you're going to use the TVT, the
17  RetroArc or the MiniArc?
18    A   It's basically, first of all, what the hospital
19  supplies and has available, because they have contracts
20  with various groups.  So at certain hospitals you can
21  get one type of mesh, at another hospital you can get
22  another.
23       But, basically, for me, patient selection is if
24  I have a patient who weighs more than 200 pounds or if
25  they're very physically active or have a child where

Page 32

1  they're going to be doing some type of lifting, then I
2  tend to put in the longer mesh rather than the short
3  mesh.
4    Q   And by longer mesh you mean the TVT?
5    A   TVT or RetroArc, yes.
6    Q   So other than body weight and their activity
7  level, is there any other patient selection criteria you
8  use when deciding what sling you will implant?
9    A   Other than having the fact that they actually
10  have stress incontinence.  The patient has to have a
11  desire to have the sling done.  We go through a workup,
12  we look at other modalities of treatment, physical
13  therapy, do Kegel exercises, weight loss, et cetera.
14    Q   So if you have a patient that's under
15  200 pounds, are those three devices interchangeable to
16  you for treatment?
17    A   For under 300 pounds?
18    Q   Under 200.
19    A   Yeah, I think they would be pretty much
20  interchangeable, again, depending upon their activity
21  level.  For example, if we're talking about 120-pound
22  nurse, she's going to be lifting 200-pound patients,
23  that kind of patient I will use the retropubic slings
24  instead of a MiniArc.
25    Q   And would you agree with me that there's a

Page 33

1  difference between post-operative pain and chronic pain?
2    A   Not knowing what you -- do you want me to
3  define them or. . .
4    Q   Sure.
5    A   Okay, post-operative pain would be pain that we
6  would expect in the immediate post-operative period,
7  usually resolved within 6 weeks to 12 weeks.  And
8  chronic pain is any pain that is long lasting and not
9  necessarily related to an operation.
10    Q   Can chronic pain from the TVT device develop
11  many months after it's been implanted?
12    A   I have never seen that.
13    Q   I understand you have never seen it, but is it
14  possible?
15    A   To the extent that anything is possible, I
16  assume that it would be.
17    Q   And do you believe it's important to have
18  scientific data before implanting a permanent medical
19  device into a woman?
20       MR. KOOPMANN:  Object to the form.
21       THE WITNESS:  Who is the "you"?  You mean as a
22  physician?
23  BY MS. COPE:
24    Q   Yeah.
25    A   Okay, as a physician I think that it behooves

9 (Pages 30 to 33)

Cynthia Bergmann, M.D.

Page 34

1 us to research any device, medication or procedure that
2 we do on a patient, and make sure that it's appropriate
3 for us to use and make sure that we're using it on
4 appropriate patients.
5 Q And what do you mean by "research"?
6 A That we review the literature, look at the
7 risks and benefits of what we're doing or giving to the
8 patients. And then, of course, knowing the individual
9 patient, their medical history and their particular
10 anatomy and physiology to see if whatever we're doing
11 for them is the best thing for that patient.
12 Q So it's important for you to have scientific
13 data before you put a medical device into a woman's
14 body, correct?
15 A That would fall within those categories, yes.
16 Q And you wouldn't implant any device into a
17 woman that's going to be there for her entire life
18 without having some data to rely on that establishes the
19 safety of the device, correct?
20 A Of the implant, yes.
21 Q Or the efficacy of the device, correct?
22 A Correct.
23 Q And that would apply to any type of implant,
24 not just transvaginal mesh, correct?
25 A As I said, anything we do for patients.

Page 35

1 Q And other than the Ulmsten data that you
2 mentioned previously, what other data did you look at to
3 make sure the TVT was safe and effective before you
4 began using it?
5 A Again, I know that we looked at other data. I
6 don't have the names of that data at this point.
7 Q Did you review any of that to prepare your
8 report in this case?
9 A No, no, at this point that's old data.
10 Q Can you tell me what you recall about your
11 training session with Ethicon regarding the TVT device?
12 A We had an in-classroom session first, going over
13 the need for the device, going over stress incontinence,
14 the impact of stress incontinence.
15 We then reviewed the data regarding the TVT,
16 its efficacy data, its safety data, and then they showed
17 us -- I can't remember if we had a video and slides or
18 just slides showing how the device was implanted.
19 Then we did passes with models first so we
20 could get an idea of how it would interact in the pelvis
21 and then we did a cadaver lab.
22 Q And, again, other than the Ulmsten data, you
23 don't remember the source of the information that was
24 supplied to you, correct?
25 A No -- correct.

Page 36

1 Q And do you have any other materials that you
2 received from that training session today?
3 A No.
4 Q And can you briefly describe for the jury how
5 you were trained to perform the TVT procedure?
6 A I'm sorry, to the jury?
7 Q So this deposition will be for a jury.
8 A Oh, okay. I was just like there's somebody
9 here I don't know about.
10 Q They're all the same.
11 A I'm sorry, go ahead and repeat the question.
12 Q Can you explain to me how you were trained to
13 perform the TVT procedure?
14 A Well, just what I said, we had a didactic
15 session --
16 Q I'm sorry to interrupt you, I mean the actual
17 procedure itself, if you could walk me through.
18 A Oh, you want to know how I perform it?
19 Q How you were trained to perform it.
20 A How I was trained to perform it, okay. What I
21 was trained to do is have the patient in the dorsal
22 lithotomy position with the legs at a 60-degree angle so
23 you don't have the pelvis over-rotated, to make a mark
24 suprapubically one and a half to two centimeters off of
25 midline.

Page 37

1 You can do it with a marking pen. My habit is
2 to just use the scalpel that I'm going to use to make
3 the incision anyway, so I've got a mark. You have to be
4 careful to make sure you're actually in the midline,
5 especially with obese patients, because their midline
6 can appear to be in one place and it's actually in
7 another.
8 Then put in an 18 French catheter with a large
9 bulb, blow that up. Using my left hand in the vagina, I
10 then take a spinal needle, I usually use an 18 or
11 20-gauge spinal needle, and inject 20 cc's of .0625
12 percent Marcaine solution on either side of the urethra.
13 I have personally modified that now to be 60 cc's on
14 each side.
15 Then I'll put a weighted speculum in the
16 vagina. I'll make a midline incision in the
17 mid-urethra, grab the edges of that with the Allis
18 clamps undermined at about a 45-degree angle, making
19 sure the undermining is no more than a centimeter wide.
20 At that point, we will put a urethral guide
21 through the catheter, deflect the urethra. Usually I do
22 my right pass first so we deflect the urethra to the
23 left side. I'll take the needle, I'll run it at about a
24 45-degree up to the endopelvic fascia and then I go
25 straight vertically from that, hugging the back of the

10 (Pages 34 to 37)

Cynthia Bergmann, M.D.

Page 38

1  pubic synthesis, bringing the needlepoint out at the
2  incision that I have made on the ipsilateral side.
3       At that point I will take out the catheter, do
4  a cystoscopy, ensure that I haven't perforated the
5  bladder. I then do the same procedure on the opposite
6  side.
7       At this point I will usually instill 500 cc's
8  of Methylene Blue sustained normal saline into the
9  bladder. That does two things. It stretches the
10 bladder a little bit, because many of these patients
11 have a rather small bladder, because they keep their
12 bladders empty so they don't have public embarrassment
13 from losing urine.
14       It also will let me know if I have any occult
15 holes in the bladder, because if I do, then we'll see
16 blue dye coming out of the pubic or the vaginal
17 incisions.
18       Once I have ensured bladder integrity, I will
19 then advance the mesh. I will take out the weighted
20 speculum. At this point, of course, the Foley catheter
21 is out, the cystoscope is out. I will use a nine Hegar
22 to space the mesh from the urethra. I'll make sure that
23 that's not under any tension.
24       We will then gently remove the sheaths from the
25 mesh. I will, again, check to make sure there's no

Page 39

1  tension between the urethra and the vagina.
2       At that point I will re-insert the weighted
3  speculum, close the vaginal incision with interrupted
4  sutures in number 3-0 chromic. The excess mesh is
5  trimmed superpubically. I will do that actually before
6  I remove the Hegar dilator for spacing, just so in case
7  there's any tension on the mesh we don't transmit that.
8       So once that's trimmed, the vaginal incision is
9  closed, then I close the superpubic incisions, and I'll
10 use 3-0 VICRYL for that, steriostrip it.
11       I'll put in a 12-inch Foley catheter, take the
12 patient out of the dorsal lithotomy position, and they
13 go to recovery.
14    Q    And do you leave a catheter in your patients
15 ever after performing the TVT?
16    A    I always leave it in overnight.
17    Q    And why is that?
18    A    Because in Fresno if you need to go to the
19 emergency room to get a catheter put back in it will be
20 six to eight hours before you're seen and have that
21 done.
22       Most patients don't mind having the catheter in
23 overnight verses trying to wade through an emergency
24 room, particularly because I do most of my cases on
25 Fridays and so they've got the Friday night knife and

Page 40

1  gun club to contend with if they would have to go to the
2  emergency room.
3    Q    And following your training on the TVT device,
4  how many procedures did you observe before performing
5  your own?
6    A    I think it was either four or five procedures
7  that we saw.
8    Q    And those were on live patients?
9    A    Yes.
10    Q    And how many procedures did you assist on
11 before you performed your first TVT procedure?
12    A    I didn't assist on any before I performed my
13 first TVT procedure.
14    Q    And the procedures that you observed, were
15 those done by the Ethicon preceptor?
16    A    Yes.
17    Q    And who was your preceptor?
18    A    I don't recall his name. It was out of Santa
19 Maria Hospital.
20    Q    Did you tell the woman that you first implanted
21 a TVT into that it was your first time doing that
22 procedure?
23    A    Yes.
24    Q    And when you were contacted to become a proctor
25 in 2008, I believe, can you tell me the process for

Page 41

1  becoming a proctor?
2    A    I was told that they had appointed me a proctor
3  and that they would be sending physicians to me to
4  observe me doing the procedure and that I would proctor
5  them and, as I said, after that nothing happened.
6    Q    Did they tell you how much you would be paid to
7  do that?
8    A    No.
9    Q    And when Ethicon representatives come and
10 observe you, how much are you paid for that?
11    A    Nothing.
12    Q    Do you tell your patients that there will be a
13 third party in the room while you're performing the
14 procedure?
15    A    If I have observers that they actually have to
16 get consent from the patient to be in the OR.
17    Q    And when a woman comes to you for treatment or
18 for stress urinary incontinence, can you walk me through
19 the process you use to reach a diagnosis?
20    A    Well, first thing I do is take a complete
21 history and physical. I'll ask them when they're losing
22 urine, how much they're losing, how often they're
23 losing, what sets it off. I ask about can they make it
24 to the bathroom, so I'll ask about other types of
25 incontinence at the same time.

11 (Pages 38 to 41)

Cynthia Bergmann, M.D.

Page 42

1      In the examination I will look for anterior
2  rotation of the urethra with Valsalva to see if they
3  have loss of urethral vesicle angle with pressure.
4      I will frequently suggest -- obviously, if
5  they're obese, I'll suggest that they try to lose
6  weight.  A lot of them tell me they have difficulty
7  because whenever they try to exercise they'll continue
8  to lose urine.  I have them do Kegel exercises.
9      Q   I don't mean treatments, I just mean your
10  diagnosis.
11     A   Oh, okay, sorry.  So that's -- so we'll start
12  out with history.  If they get to the point where they
13  are considering surgery because other methods have
14  failed, which is why I was going to the other methods,
15  then we do cystometrograms and urodynamics to determine
16  that it's actually stress incontinence and not some
17  other type of incontinence.
18     Q   Do you do a pelvic exam to diagnose SUI?
19     A   Yes, that's the anterior rotation of the
20  anterior rotation of the urethra, that's part of the
21  pelvic exam.
22     Q   Do you do a breast exam to diagnose SUI?
23     A   I do that as part of my -- if the patient comes
24  in de novo with stress incontinence they do get a breast
25  exam.

Page 43

1      Q   And what about an oral exam?
2      A   Yes.
3      Q   And why is that?
4      A   Because if I don't look, you never know what
5  you're going to find.  For example, doing an oral exam I
6  might find somebody who's actually bulimic, you can see
7  the loss of enamel on their teeth.
8      Q   What does that have to do with your treatment
9  of their stress urinary incontinence?
10     A   Well, when you throw up you tend to lose urine.
11  And they may also have a psychological component that we
12  need to address.
13     Q   So you do an oral exam on patients to determine
14  whether they have an eating disorder?
15     A   It's among other things.
16     Q   What are the other things?
17     A   What their general hygiene is, whether or not
18  they have missing teeth.  That's really important if
19  you're thinking about putting someone under anesthesia,
20  if they have loose or missing teeth those can get
21  knocked out.  They can have aspirations.
22     Q   Do you allow a woman to bring her husband or
23  someone else into the exam room with her if she wants?
24     A   Whoever she would like in the exam room.
25     Q   Have you ever told a patient she cannot bring

Page 44

1  someone with her into the exam room?
2      A   Not to my knowledge.
3      Q   And you stated that you perform urodynamics
4  testing, correct?
5      A   Correct.
6      Q   And do you give informed consent for that?
7      A   No, it's part of our general consent.
8      Q   In diagnosing your patients with SUI, do you
9  ever perform cystoscopies?
10     A   No, I don't perform cystoscopies in the office.
11     Q   Do you perform them in the hospital?
12     A   Yes.
13     Q   Outside of doing a pelvic floor surgery?
14     A   No.
15     Q   And do you give informed consent for
16  cystoscopies?
17     A   Yes.
18     Q   And can you tell me what informed consent is?
19     A   Informed consent is a process of talking with
20  the patients the risks and benefits of the particular
21  procedure you're planning to do.
22     Q   And a patient has the right to know of all the
23  inherent risks, correct?
24         MR. KOOPMANN:  Object to the form.
25         THE WITNESS:  Of all of the relevant inherent

Page 45

1  risks.
2  BY MS. COPE:
3      Q   And what do you mean by "relevant inherent
4  risks"?
5      A   Again, anything can happen to a patient or in
6  the operating room, so we go over the generally accepted
7  risks of a procedure.  If something is one in a hundred
8  thousand, I probably would not mention that as a risk,
9  but anything that's more common we go over.
10     Q   And what do you mean by more common?
11     A   Risk of death, for example, is usually around 1
12  in 10,000 or less.  We go over the risk of death.
13     Q   So you'll warn about anything that is greater
14  than or equal to a risk of 1 out of 10,000; is that
15  correct?
16     A   Again, in general.
17     Q   And is that what you mean when you say
18  generally accepted risks, the more common ones?
19     A   Correct.
20     Q   And the purpose of informed consent is to give
21  patients that information about risks, correct?
22     A   To give them the opportunity to be involved in
23  their care and their medical decision-making.
24     Q   And you would never make a decision on behalf
25  of a patient without her consent, correct?

12 (Pages 42 to 45)

Cynthia Bergmann, M.D.

Page 46

1    A    As long as the patient was able to give
2  consent.
3    Q    And patients have the right to refuse to
4  consent to medical treatment at any time, correct?
5    A    Correct.
6    Q    And there's lots of different reasons why a
7  woman may decline to have a cystoscopy or a procedure,
8  correct?
9    A    Correct.
10    Q    And currently what treatment options do you
11  give to women who want a surgical intervention for their
12  SUI?
13    A    Currently it will be one of the slings.
14    Q    You don't perform any non-mesh procedures to
15  treat SUI?
16    A    No.
17    Q    Do you tell the patients of the different sling
18  options?
19    A    Yes, I do.
20    Q    And can you tell me what you tell your patients
21  about the different sling options?
22    A    Again, it's the same process that I went
23  through with you before.  I will ask them about their
24  activity level, specifically if they do repetitive
25  lifting.  My horseback riders, for example, are lifting,

Page 47

1  you know, 20 to 40-pound saddles onto their horses, they
2  tug bales of hay.
3        Nurses.  If they're teachers, they teach young
4  children, they frequently have to pick them up and move
5  them around, so we determine that.
6        I tell them my experience with the shorter
7  slings versus longer slings, when I find them more useful
8  or less useful, so I'll present that information to
9  them.
10    Q    Do you tell your patients who the manufacturers
11  of the slings are?
12    A    No.
13    Q    And why do you give your patients the different
14  options between the slings?
15    A    For the reasons I stated before.  Did you want
16  me to go over them again?
17    Q    I just meant why you would present a patient
18  with different options for treatment?
19    A    Because I think patients need to be involved in
20  their medical care.  That's part of the medical
21  decision-making process.
22    Q    And you give your patients informed consent
23  before planning any of those mesh slings, correct?
24    A    Correct.
25    Q    And including the TVT?

Page 48

1    A    Correct.
2    Q    Do you have a standard informed consent that
3  you use with your patients that you implant a TVT in?
4    A    Yes.
5    Q    And did you bring a copy of that with you
6  today?
7    A    No.
8    Q    So I would like to request a copy of her TVT
9  informed consent.
10        Can you explain to me the risks of the TVT
11  procedure?
12    A    Okay, general risks is -- what I tell the
13  patients is given where we are we can injure the bowel,
14  the bladder, the urethra, the major blood vessels.
15  There's a risk of infection of the vagina, the bladder,
16  IV sites, lungs or bronchitis or pneumonia.
17        We could run into a lot of bleeding, either as
18  a result of an injury or as a normal part of the
19  procedure.  If the bleeding is bad enough, that can
20  entail more surgery, it can entail receiving blood
21  transfusions.  Blood clots in the legs are possible.
22        You can have reactions to medications, nausea,
23  vomiting, wheezing, dizziness, rashes, death is a
24  possibility.  With using mesh, it's a permanent
25  implanting device, there's a risk of either erosions or

Page 49

1  exposures of the mesh.
2    Q    What are the potential longer term
3  complications that you discuss with your patients
4  regarding the TVT?
5    A    We do discuss that there's a chance that they
6  will fail over time.
7    Q    And when you mentioned the infection of the
8  vagina, bladder, can you explain to me what you mean by
9  infection?
10    A    Occupation of the spaces with bacteria that
11  normally don't live there.
12    Q    In the immediate post-operative period?
13    A    Yes.  We also go over the risk of urinary
14  retention.  We go over the risk that the sling may not
15  work for them, they may continue to be incontinent.  We
16  talk about urge incontinence.
17    Q    What do you talk about specifically in regards
18  to urge incontinence?
19    A    That they may develop an urge incontinence that
20  can be as a result of age and time.  It's more frequent
21  in older women.  That their prolapse may actually be
22  masking their urge incontinence by kicking off the
23  urethra.  And, again, that doesn't tend to be so much
24  with people who have just stress incontinence and not
25  other pelvic organ prolapse.

13  (Pages 46 to 49)

Cynthia Bergmann, M.D.

Page 50

1     Q    And just to clarify, the discussion about urge
2   incontinence, is that because it's a specific risk
3   related to TVT?
4     A    It's a known risk that it can be, that there
5   can be more urge incontinence afterward.
6     Q    Any other longer term complications that you
7   discuss with your patients?
8     A    Not that I recall right now.
9     Q    Have you ever had a patient who declined a mesh
10   sling that you recommended?
11     A    Who then went on to other surgery?
12     Q    A patient who you had this informed consent
13   discussion process with and afterwards decided not to
14   proceed with the mesh implant.
15     A    No.
16     Q    What complications do you see with the TVT
17   during surgery?
18     A    Personally?
19     Q    Yes.
20     A    None.
21     Q    So you stated that you warn your patients of
22   common risks?
23     A    Correct.
24     Q    But, clearly, for you, these risks are not
25   common, correct?

Page 51

1     A    Correct.
2     Q    So where do you get your understanding of which
3   risks are common or not if it's not from your clinical
4   experience?
5     A    Literature.
6     Q    And what complications do you see with the TVT
7   after surgery?
8     A    Urinary retention is -- did I have anything
9   other than -- urinary retention and then early on had a
10   handful of cases of exposure.
11     Q    What's the difference between erosion and
12   exposure?
13     A    Exposure is failure of coverage.  Erosion is
14   something actually moving through a tissue.
15     Q    And can you explain to me what you mean by
16   failure of coverage?
17     A    What we found after doing this for a while, and
18   I can't tell you how long, some patients have -- I don't
19   want to call it an anomaly because it really isn't.
20   It's a variation of how the mucosa covers the urethra,
21   and so instead of having a relatively smooth covering,
22   they'll actually have two little wings that kind of come
23   out and then it dips in at the mid portion, and when
24   they have that kind of coverage of the urethra you have
25   to put in your sutures a little differently than you do

Page 52

1   if it's a smooth covering.
2     Q    And how do you put your sutures in differently
3   for those with this physical anomaly?
4     A    Instead of doing a simple closure I'll do a
5   mattress suture, so that will evert the edges of that
6   incision so it comes together.
7     Q    And when you were answering my question earlier
8   you said, "What we found."
9     A    Oh, my partner and I.
10     Q    What complications has your partner seen during
11   the TVT surgery that you're aware of?
12     A    That I'm aware of, he's had one bladder
13   perforation that was not with the TVT.  I know he's had
14   some retentions.  I don't know if he's had the exposure
15   problem or not.
16     Q    And the bladder perforation, that was with the
17   retropubic device?
18     A    Yes.  I think it was the Boston Scientific, but
19   I'm not positive.
20     Q    And how do you treat urinary retention in your
21   patients?
22     A    Depending upon when this occurs, if it's in the
23   first two weeks we do catheterization.  If it's longer
24   than that, say between two and four weeks, I'll actually
25   try to mobilize the urethra and the sling in the office

Page 53

1   using a dilator.
2          If it is after that or if it occurs later on,
3   then what I'll do is take them back to the OR, simply
4   divide the sling in the middle and close the mucosa over
5   it.
6     Q    And approximately how many times have you had
7   to go back into the OR to address urinary retention?
8     A    Maybe half a dozen.
9     Q    And how do you treat your patients with
10   exposure of the TVT mesh?
11     A    It depends upon -- if it's not much exposure
12   we'll just uses estrogen cream and generally mucosa will
13   grow over.  If it's a larger exposure, either put in a
14   suture in the office to reclose, and I don't believe
15   I've had to take anybody back to the operating room to
16   close a sling exposure.
17     Q    And when you say it's not much, can you sort of
18   define for me size-wise?
19     A    It's probably like the four-millimeter range.
20     Q    So anything greater than four millimeters, you
21   put in a stitch in the office?
22     A    I'll -- well, I don't -- again, trying to
23   remember how big the largest one was.  Most of them
24   we'll try treating with estrogen cream first.  And,
25   again, I don't recall one that has been that big that I

14  (Pages 50 to 53)

Cynthia Bergmann, M.D.

Page 54

1  would go primarily to closure. We usually try the
2  estrogen cream first.
3      Q   When you do go to closure, what suture do you
4  use?
5      A   I'll use a chromic suture, usually a 2 or 3-0.
6      Q   And what material is the chromic suture made
7  of?
8      A   Chromic cat gut. It's cat gut that's, I
9  believe, chromic coated.
10     Q   Is it a dissolvable suture?
11     A   Yes.
12     Q   And why do you use a dissolvable suture?
13     A   Well, the mucosa in the vagina heals up like
14 the inside of your mouth, so when it heals, it heals
15 rather quickly, so you want something that's also going
16 to go away fairly quickly, that reduces your risk of
17 getting any type of fistula formation.
18     Q   So you don't use polypropylene sutures in the
19 vagina, correct?
20     A   In the vagina to close the mucosa, no.
21     Q   In the vagina for any purpose?
22     A   I have never used polypropylene sutures in the
23 vagina.
24     Q   And approximately how many TVT procedures have
25 you performed?

Page 55

1      A   I have done in the 250 range.
2      Q   And how many RetroArc procedures?
3      A   RetroArc, because they just came out with a
4  type I liked about a year and a half ago, so maybe 25 of
5  the RetroArcs.
6      Q   And how many MiniArcs?
7      A   MiniArc, again, my guess is probably about
8  150.
9      Q   So if I add up those numbers correctly, over
10 the course of your entire career you have performed 425
11 sling procedures to treat urinary incontinence?
12     A   That sounds reasonable.
13     Q   When you're using the TVT do you use the
14 mechanical cut or the laser cut?
15     A   Whichever one the hospital has in.
16     Q   So you don't make a specific request for either
17 one?
18     A   No.
19     Q   Do you specifically request the TVT or the
20 RetroArc or the MiniArc?
21     A   Yes.
22     Q   Have you ever had an occasion where you show up
23 to do a procedure and the sling that you requested is
24 not present?
25     A   Yes.

Page 56

1      Q   And how did you address that?
2      A   Usually with the materials manager and the head
3  nurse.
4      Q   What did you actually do for the procedure,
5  though?
6      A   I have been fortunate that I have not had a
7  case where that's happened with a patient asleep on the
8  table. So we will either cancel the surgery if they
9  don't have the appropriate equipment in or we can
10 generally, because we have reps in town, we can
11 generally get another device either from the
12 representative in town or from another hospital.
13     Q   And did any representatives talk to you about
14 your work as a legal expert for Ethicon?
15     A   No.
16     Q   And do you have any idea of how many of the 250
17 TVT devices you have implanted were mechanically cut?
18     A   No.
19     Q   So you would have no idea how many of them are
20 laser cut either, correct?
21     A   Correct.
22     Q   Has Ethicon ever told you that there were
23 different risk profiles for the mechanically cut versus
24 the laser cut TVT device?
25         MR. KOOPMANN:  Object to the form.

Page 57

1          THE WITNESS:  No, they haven't.
2  BY MS. COPE:
3      Q   Has anyone at Ethicon ever told you that the
4  mechanically cut TVT can fray?
5      A   No.
6      Q   That the mechanically cut TVT can rope?
7          MR. KOOPMANN:  Object to the form.
8          THE WITNESS:  They haven't told me, but I am
9  aware that it can.
10 BY MS. COPE:
11     Q   And how are you aware that it can rope?
12     A   I have tugged on the meshes myself.
13     Q   And can you tell me the context in which you
14 were tugging on the meshes yourself?
15     A   Oh, in demos, people would bring me a piece of
16 mesh.
17     Q   And so what happened, you pulled on the mesh?
18     A   Pull on it to see how much tension you can put
19 on it.
20     Q   And what happened to the mesh?
21     A   If you pull hard enough, it will rope.
22     Q   And that was with Ethicon Prolene Mesh?
23     A   It was with almost every mesh out there.
24     Q   Anyone at Ethicon ever tell you that the TVT
25 device can curl?

15  (Pages 54 to 57)

Cynthia Bergmann, M.D.

Page 58

1    MR. KOOPMANN:  Object to the form.
2    THE WITNESS:  Again, that was something that I
3  observed myself, Ethicon did not tell me.
4  BY MS. COPE:
5    Q  Anyone from Ethicon ever tell you that the TVT
6  device could release particles?
7    MR. KOOPMANN:  Object to the form.
8    THE WITNESS:  No.
9  BY MS. COPE:
10   Q  Anyone from Ethicon ever tell you that the TVT
11  device can degrade?
12   MR. KOOPMANN:  Object to the form.
13   THE WITNESS:  No.
14  BY MS. COPE:
15   Q  So when you implant a TVT in a patient, you
16  don't know whether it's laser cut or mechanical cut,
17  correct?
18   A  Correct.
19   Q  And can you tell me what you did to prepare for
20  today's deposition?
21   A  I went over my -- you're talking about just
22  this part of the deposition, correct, not everything
23  else we're going to do?
24   Q  Once you found out you were going to be deposed
25  for your general opinions, what you did to prepare for

Page 59

1  this deposition.
2    A  Okay, I went over my general report and I
3  gathered the information that you asked for.
4    Q  And was that before or after March 1st, 2016?
5    A  That was after.
6    Q  So can you approximate for me how many hours
7  you spent since March 1st of 2016 on your work on this
8  case?
9    A  For just the general report or for everything?
10   Q  Just the general.  If you can't do that,
11  everything.
12   A  Can't do just the general report.  And I would
13  have to look for everything.  I know it was eight hours
14  yesterday and then I'd have to go back and look to see
15  what else since March 1st.
16   Q  And did you meet with any of Ethicon's attorneys
17  to prepare for today?
18   A  Yes.
19   Q  For approximately how long?
20   A  We met for seven hours yesterday.
21   Q  Any prep over the phone with an attorney?
22   A  One of the preps was over the phone.
23   Q  And how long was that?
24   A  I think we spent about an hour and a half.
25   Q  And you received money from pharmaceutical and

Page 60

1  medical device manufacturers, correct?
2    A  From pharmaceutical manufacturers, not from
3  medical device manufacturers.
4    Q  And are those the manufacturers that are listed
5  on the pharmaceutical speakers' bureaus portion of your
6  CV?  I guess the second to the last page.
7    A  Correct.
8    Q  And can you tell me approximately how much
9  money you have received from pharmaceutical companies?
10   A  No.
11   Q  Can you tell me what you've done for Shiongi,
12  if I'm pronouncing that correctly?
13   A  I speak for a product they have called Osphena.
14   Q  Are you involved in the clinical trial of
15  Osphena at all?
16   A  No.
17   Q  And how much are you paid by Shiongi?
18   A  For in-town lectures, 750 to 1,500, depending
19  upon the type of lecture, whether it's a lunch or a
20  dinner.  And out of town, I believe, is 2,500.
21   Q  And when did you start working with Shiongi?
22   A  I believe I started with Shiongi about two
23  years ago.  It was 2014.  Might have been 2013.
24   Q  And if I told you received $25,000,
25  approximately, from them in 2013, would that sound

Page 61

1  accurate to you?
2    A  2013 or 2014?
3    Q  2013.
4    A  That doesn't sound right.  It would sound right
5  for 2014.  Unless -- I don't know if they're
6  including -- because I assume you've looked that up on
7  the federal database, correct?
8    Q  I have.
9    A  Okay, that may include the training sessions
10  that they sent us to.
11   Q  But you're paid to attend those as well,
12  correct?
13   A  I'm paid to attend them, but not $25,000.
14   Q  Well, that's approximately what the total
15  amount that you were paid for in 2013 shows on the CMS
16  Open Payment database, and 17,000 in 2014.  Did you have
17  any reason to dispute those amounts?
18   A  Again, I haven't even gone and checked those.
19  That's not what I believe I received in actual
20  compensation for them.  My understanding is the CMS
21  database includes travel, hotels, our training sessions,
22  et cetera, so I don't have any reason to dispute them,
23  but that's not what I actually received from them.
24   Q  Does anyone travel with you when you go to
25  these speaking engagements or trainings?

16  (Pages 58 to 61)

Cynthia Bergmann, M.D.

Page 62

1    A   No.
2    Q   And approximately how many Ethicon
3  representatives do you believe have come in to observe
4  you over the years?
5    A   Ethicon, maybe four or five.
6    Q   And what was the time frame for that?
7    A   Oh, that would have been from 2005 to 2007 or
8  '08, I believe.
9    Q   And what types of questions would the sales
10 representatives ask you?
11   A   I don't recall any specific questions at this
12 time.
13   Q   Do you recall anything specific that you would
14 tell the representatives?
15   A   I would just show them how I would do the
16 procedure.  I would ask them if they had any questions
17 about what I was doing or how I was doing it.
18   Q   Let's take a quick break.
19        (Brief recess.)
20 BY MS. COPE:
21   Q   Doctor, you'll agree with me that the TVT is
22 designed to be permanently implanted in a woman's body,
23 correct?
24   A   Correct.
25   Q   And you agree with me that TVT mesh can cause

Page 63

1  harm to a patient years after it's implanted?
2        MR. KOOPMANN:  Object to the form.
3        THE WITNESS:  That's not been something I have
4  experienced.
5  BY MS. COPE:
6    Q   But you agree that it can happen, correct?
7        MR. KOOPMANN:  Object to the form.
8        You can answer.
9        THE WITNESS:  Again, it's not something that I
10 have experienced.
11 BY MS. COPE:
12   Q   Have you read about it in medical literature?
13   A   What I have read about I have seen -- again,
14 just for the TVT mesh there's problems that have
15 occurred at the time of surgery that become recognized
16 later, is that what you're talking about?
17   Q   I'm talking about a patient that's had the TVT
18 device implanted and years later has injuries from that
19 device.
20   A   Okay, you'd have to give me a specific type of
21 example.
22   Q   You can't think of anything that you have read
23 in the medical literature or heard from colleagues?
24   A   Where the device has, years later, caused
25 problems?

Page 64

1    Q   Yes.
2    A   That was a properly implanted device?
3    Q   Correct.
4    A   Again, not that I know of.
5    Q   Are you aware that many of the studies that you
6  have sited in your report don't track long-term
7  complications?
8        MR. KOOPMANN:  Object to the form.
9        THE WITNESS:  Again, you'd have to tell me the
10 specific studies so we could go over them.  I know I
11 have several other studies that show long-term.
12 BY MS. COPE:
13   Q   I'm just talking about the ones that have been
14 sited to you in your report for your --
15   A   I'm aware that there are also studies sited
16 which have long-term results.  I have also read studies
17 that have long-term results.
18   Q   And I'd like to show you what I have marked as
19 Exhibit 4.
20        (Whereupon Plaintiffs' Exhibit 4 was marked for
21 identification.)
22 BY MS. COPE:
23   Q   This is the one from 2015, which is from
24 Ethicon's website.
25   A   Okay.

Page 65

1    Q   And I will represent to you that I have only
2  printed the English pages, not the entire document.
3    A   Thank you.  So I don't have to use my Sylvanian
4  today.
5    Q   I'll just give you a minute to review that.
6  Have you seen this document before?
7    A   Yes.
8    Q   And when did you see this document?
9    A   Looked at it last year.  Don't recall exactly
10 when.
11   Q   And if you look on Page 5 the second bullet
12 point reads:  "Prolene Mesh in contaminated -- " sorry.
13 "Prolene Mesh in contaminated areas should be used with
14 the understanding that subsequent infection may require
15 removal of the material."
16   Q   Where is that?
17   Q   The second bullet point in the top.
18   A   All right.
19   Q   Do you agree that the vagina is a clean,
20 contaminated area?
21   A   Well, that's the -- we can use that term or
22 non-sterile.
23   Q   What does the term "clean, contaminated" mean
24 to you?
25   A   Well, surgically it's -- we know the vagina

17 (Pages 62 to 65)

Cynthia Bergmann, M.D.

Page 66

1  carries bacteria, you can't sterilize it, just as you
2  can't really sterilize the skin, so there may be some
3  residual bacteria in the vagina.
4      Q   And Page 5 continues.  There's an "Adverse
5  reaction" section and then an "Other adverse" reaction
6  section, correct?
7      A   Correct.
8      Q   I'll just give you a minute to review that.
9  Let me know when you're finished, please.
10      So would you agree with me that the TVT mesh
11  device can cause all of the items listed in the adverse
12  reactions and other adverse reaction section of this
13  document?
14      A   Well, they have it in here.  Again, as I said
15  before, this is something -- some of these are things
16  that I just haven't seen.  The recurrence of
17  incontinence, certainly.  Bleeding we talked about.
18  Division surgeries.
19      Q   Well, why would Ethicon put these adverse
20  reactions or other adverse reactions in the warnings for
21  their product if they weren't possible?
22      MR. KOOPMANN:  Object to the form, foundation.
23      THE WITNESS:  I don't know why they would do
24  that.  I would assume that it has something to do with
25  either their studies or what they need to do for the

Page 67

1  FDA.
2  BY MS. COPE:
3      Q   So is it your testimony that the items that are
4  listed in these two sections, there are some things that
5  are not caused by the TVT device?
6      A   Again, as I said before, some of these things
7  are things I haven't experienced.
8      Q   I didn't ask you what you had experience, I'm
9  asking you if you'll agree with me that these are things
10  that can be caused by the TVT and that's why they are in
11  the instructions for use as potential adverse reactions
12  to the TVT device?
13      A   Again, I don't know why they would be in there.
14  I have no idea how a TVT would cause chronic pain in the
15  groin.  To me, that doesn't make any sense.  So as to
16  why they would have something like that in there, I
17  don't know.
18      Q   Can you let me know what other items you don't
19  believe are possible for the TVT device to cause?
20      A   I'll just go to the first bullet point.  Those
21  things can occur.  Second bullet point, yes.  Third is a
22  warning, absolutely.  Fourth, those can occur.  Risk of
23  infection, absolutely.  Overcorrection, correct.  Acute
24  or chronic pain -- acute pain, yes.  Chronic pain,
25  again, that one I'm not so clear as to how the TVT would

Page 68

1  cause that.
2      Voiding dysfunction we discussed previously.
3  The pain with intercourse, as I said, I haven't seen
4  that, so I'm not sure why that's in there.  We talked
5  about the next bullet point.  Recurrence of incontinence
6  we talked about.  Bleeding we talked about that that can
7  occur.  Revision surgeries are possible, we talked about
8  that, that can occur.  And with the last bullet point I
9  would also agree to that.
10      Q   And for the other adverse reactions, which of
11  those do you believe are not possible with the TVT
12  device?
13      A   Well, again, I don't think the device itself
14  causes death.  I think they're talking about placing the
15  device.  For example, getting into the external iliac
16  artery and having the patient bleed out would cause
17  death, I don't think the device itself causes death.
18      Q   Are you aware of any reports of patient death
19  to Ethicon that don't involve a valve perforation or a
20  bladder perforation?
21      A   I'm sorry?
22      Q   Are you aware of any reports of patient death
23  involving the TVT device that have been made to Ethicon
24  from something other than a bladder or bowel
25  perforation?

Page 69

1      A   I'm not aware of -- I don't know what reports
2  have been made to them regarding patient deaths.
3      Q   I'm going to show you what's been marked as
4  Exhibit 5, which is an earlier version of the TVT IFU.
5      (Whereupon Plaintiffs' Exhibit 5 was marked for
6  identification.)
7  BY MS. COPE:
8      Q   And if you'll turn to Page 5 there is also an
9  adverse reaction section, do you see that?
10      A   Yes.
11      Q   And you would agree with me that the adverse
12  reactions listed in the 2015 IFU were much more
13  extensive than the adverse reactions listed in the 2010
14  IFU, correct?
15      A   Correct.
16      Q   And do you have any reason to believe Ethicon
17  would put in these additional warnings if they did not
18  believe that it was important and that they were
19  potential adverse reactions to their products?
20      MR. KOOPMANN:  Object to the form, foundation.
21      THE WITNESS:  Again, I don't know why they put
22  them in.
23  BY MS. COPE:
24      Q   Do you believe that Ethicon is responsible for
25  telling physicians how to properly tension the TVT

18 (Pages 66 to 69)

Cynthia Bergmann, M.D.

Page 70

1  device?
2      A   No, that should be our experience and that's
3  part of being a surgeon.
4      Q   Well, part of your experience is getting
5  trained by Ethicon about how to place the device,
6  correct?
7      A   Correct.
8      Q   And they taught you how to tension the TVT,
9  correct?
10     A   Correct.
11     Q   So have you changed how you tension the TVT
12  from how Ethicon instructed you?
13     A   The method that I use is similar.  I actually
14  tension it a little more loosely than I was originally
15  taught to.
16     Q   And why is that?
17     A   Because I got less retention and still got good
18  results by tensioning it two millimeters less than I had
19  initially.
20     Q   Did you ever communicate to Ethicon that you
21  thought their method they were teaching was unnecessary
22  or involved too much tension on the device?
23     A   I let them know what I was doing and the
24  success I was having with it.
25     Q   And who did you --

Page 71

1      A   And again --
2      Q   Go ahead.
3      A   Again, that's for me, my practice and my
4  patients.
5      Q   And who did you let know at Ethicon?
6      A   I talked -- I believe I talked with the
7  representative, local representative about it.
8      Q   And the first time that you deviated from
9  Ethicon's teaching for tensioning the device, did you
10  tell your patient that you were going to perform the
11  procedure differently?
12     A   I don't recall.
13     Q   Do you think it would be important to inform
14  your patient that you were straying from the
15  manufacturer's instructions in performing the procedure
16  on her?
17     A   I don't believe that I strayed in the
18  manufacturer's instructions.  If you look at the IFU it
19  doesn't give an exact number for how to tension it.
20     Q   Where in the IFU does it talk about tensioning?
21     MR. KOOPMANN:  Which IFU?
22     MS. COPE:  Either.
23     THE WITNESS:  That would be on Page 4,
24  Paragraph 18.
25     MR. KOOPMANN:  Exhibit 5?

Page 72

1      MS. COPE:  It's the 2010.
2      THE WITNESS:  Yes.  Now, I assume that this
3  would be -- would this be the same as the 2003 one, do
4  you know?
5  BY MS. COPE:
6      Q   Approximately.  I believe there were some minor
7  changes, but not very substantial.
8      A   Okay, so making the assumption that this
9  paragraph is the same as 2003, it talks about tension,
10  and they don't give an exact number.
11     Q   It says, "Avoid putting tension on the
12  implant."
13     A   Yeah.
14     Q   And that "A blunt instrument should be placed
15  between the urethra and the implant during the removal
16  of the implant sheaths," correct?
17     A   Correct.
18     Q   So it's your testimony that Ethicon doesn't
19  provide instruction on tensioning of the device to
20  surgeons?
21     MR. KOOPMANN:  Object to the form, misstates
22  testimony.
23     THE WITNESS:  That's not my testimony.  You're
24  misstating what I said.  They don't give an exact number
25  for how many millimeters of spacing to use.

Page 73

1  BY MS. COPE:
2      Q   But they do teach surgeons how to tension the
3  device, correct?
4      A   Correct.
5      Q   And as the manufacturer of the device don't you
6  think it's their job to teach surgeons how, in their
7  experience, it should be used in patients?
8      A   It's up to the surgeon to make those decisions.
9      Q   How is the surgeon going to make those
10  decisions if they've never done the procedure before?
11     A   As I was going to say, they give us a starting
12  point.  It's up to us as surgeons to evaluate our
13  patients, our experience, and how we do things.
14     Q   So let's talk about the starting point that
15  Ethicon gives physicians for tensioning.  If you could
16  go back to the 2015 IFU on Page 4, Number 17, it says,
17  "The ends of the implant are then pulled upward to bring
18  the implant loosely, i.e., without tension under the
19  mid-urethra."
20     A   Uh-huh.
21     Q   And then if you go on to Page 5, that top
22  bullet point says, "Ensure the tape is placed with
23  minimal tension under the mid-urethra."
24     A   Correct.
25     Q   And then on the first page the actual name of

19  (Pages 70 to 73)

Cynthia Bergmann, M.D.

Page 74

1  the product is Tension-Free Support, correct?
2      A    Tension-Free Vaginal Tape.
3      Q    So which is it, should the mesh be placed with
4  minimal tension, with no tension, without tension?  Is
5  it clear to you from this document?
6      A    Let me see.  Okay, so 18 says to avoid putting
7  tension on the implant.  It's hard to quantify minimal,
8  so I don't know why they use that particular verbiage.
9      Q    And do you tension -- strike that.
10          You testified earlier that you don't know
11  whether you're using a mechanical cut TVT versus a laser
12  cut TVT in your patients, so is it safe to assume that
13  you do not implant or tension the laser cut or the
14  mechanical cut TVT differently?
15     A    Correct.
16     Q    Anyone from Ethicon ever told you that the
17  tensioning needed to be different depending on whether
18  it was laser cut or mechanically cut?
19     A    No.
20     Q    I'll show you what's been marked as Exhibit 6.
21         (Whereupon Plaintiffs' Exhibit 6 was marked for
22  identification.)
23  BY MS. COPE:
24     Q    While you're reviewing that I'll read the Bates
25  number into the record, since it's cut off on the copy.

Page 75

1  It is ETH.MESH.03916905.  Do you know who Aaron Kirkemo
2  is?
3      A    No.
4      Q    He's the, or was at the time of this e-mail in
5  2009, the associate medical director of Ethicon.  And
6  I'd like to draw your attention to the second to the
7  last page.
8          And at the end of the first paragraph of
9  Number 4 it reads:  "That being said, I used laser cut
10  mesh in my clinical practice, and after some painful
11  initial experience realized that it performed
12  differently from mechanically cut mesh.  I had to lay my
13  laser cut mesh slings in much tighter than the
14  mechanically cut ones."
15     A    Okay.
16     Q    So you disagree with the medical director of
17  Ethicon about how to tension mechanically cut versus
18  laser cut slings?
19         MR. KOOPMANN:  Objection.
20         THE WITNESS:  He doesn't address the type of
21  tension that I use at all.  And I don't know, is this
22  TVT or is this TVTO?  This looks like it's TVT.
23  BY MS. COPE:
24     Q    Well, it's addressing the differences --
25     A    Yeah, this is TVTO.  This is not what I do.

Page 76

1      Q    So you don't care that the medical director of
2  Ethicon thinks that you need to tension laser cut mesh
3  verses mechanically cut mesh differently?
4      A    For a TVTO, no.
5      Q    If the device -- or sorry.  If the TVT mesh is
6  not tensioned correctly, do you believe that's the fault
7  of the physician?
8      A    Okay.
9      Q    If the TVT device is not tensioned correctly,
10  do you believe that is the fault of the implanting
11  physician?
12     A    What do you mean by "correctly" and how are we
13  determining whether it's correct or not?
14     Q    What is your definition of correct tensioning?
15     A    Well, correct tensioning the patient is able to
16  void, but doesn't lose urine when they cough or sneeze.
17     Q    So if that's not the case, do you believe that
18  it is due to over-tensioning of the TVT device?
19     A    For urinary retention it's either -- again,
20  assuming just the mechanical portion of it and there are
21  no other things adding into it, for retention, if it's
22  immediate retention I would be concerned about the
23  effect of the -- and, again, we're talking about my --
24  I'm sorry, are we talking about my practice or in
25  general?

Page 77

1      Q    You just defined for me what you meant by the
2  device being tensioned correctly, so I'm asking you if
3  it's not tensioned correctly, do you believe that's the
4  fault of the implanting physician?
5      A    It can be the fault of the implanting physician
6  for making it too tight.  It can also be reaction to
7  medications that are given at or around the time of
8  surgery, including local anesthetic.
9          It can also be the way that particular patient
10  heals up.  Those are all things that you would need to
11  look at if you're looking at somebody with retention.
12     Q    What specific medications are you talking about
13  that could affect the tensioning of the sling?
14     A    Oh, narcotics -- they don't affect the tension
15  of the sling, they affect retention.  They don't affect
16  the tension of the sling.
17     Q    I'm just talking about instances where the
18  tension of the device is not correct.
19     A    Okay.
20     Q    Is that the fault of the physician?
21     A    Well, again, we were talking about how we were
22  determining whether it was tensioned improperly or not,
23  so we were talking about retention as one of the ways
24  that you know whether or not it's properly tensioned.
25  So I'm not sure -- do you want to re-ask the question?

Cynthia Bergmann, M.D.

Page 78

1    Q   Well, you gave a definition of what it meant
2   for the device to be properly tensioned.
3    A   Right.
4    Q   And so in patients where it's not properly
5   tensioned, according to your definition, is that the
6   fault of the implanting physician?
7    A   And, again, that can -- if you're talking about
8   immediate tensioning that's different than the long-term
9   tensioning, because the patients scar up, the scarring
10  is going to retract a bit.
11   Q   So for immediate tensioning.
12   A   Immediate tensioning?  And we're talking about
13  retention or we're talking about --
14   Q   We're just talking about the sling not being
15  correctly tensioned under your definition of that term,
16  is that the fault of the implanting physician?
17   A   I'm really sorry, I'm not understanding what
18  you're asking me, because -- well, I don't know how I
19  know that it's improperly tensioned.
20   Q   Do you treat women who have mesh sling
21  complications who have been implanted by other
22  physicians?
23   A   Yes.
24   Q   And approximately what percentage of your
25  practice is spent treating mesh sling complications?

Page 79

1    A   Very small.  Less than one percent.
2    Q   And what complications do you see in that
3   patient population?
4    A   I have seen retention, I have seen stress
5   incontinence.  Those are the two.  Again, we're talking
6   strictly slings, correct?
7    Q   Correct.  And in any of those instances where
8   you have treated women for retention or recurrent SUI
9   following sling placement, do you believe that any of
10  those were attributable to incorrect tensioning of the
11  device at implant?
12   A   Okay, again, it wasn't recurrent stress
13  incontinence, it was immediate and persistent stress
14  incontinence.  And in the cases that I recall, there was
15  a problem with how they were either tensioned or placed.
16   Q   And how do you know in those cases that there
17  was a problem with how it was tensioned or placed?
18   A   By reviewing the records for the retention.
19  Again, I haven't seen one of those cases for a while.  I
20  believe it was a records review.  And the other one was
21  the --
22   Q   I'm just talking about patients you have
23  treated, not cases where you have served as an expert.
24   A   No, I haven't served as an expert.
25   Q   Why would you just do a records review for

Page 80

1   someone as opposed to seeing them?
2    A   No, you asked me how I would know about the
3   tensioning.
4    Q   Uh-huh.
5    A   That was through records review.
6    Q   Okay, what in the record indicated to you that
7   there was a tensioning issue?
8    A   In that particular case they placed the mesh
9   directly against the urethra.
10   Q   And did you talk to the implanting physician to
11  understand what he meant by what he dictated in his
12  operative note?
13   A   No.
14   Q   And that was for the case with the urinary
15  retention, correct?
16   A   Correct.
17   Q   And for the case in which the device failed and
18  the SUI was persistent?
19   A   The device had been placed superior to the
20  urethral vesicle junction.
21   Q   And how did you treat that?
22   A   Just removed the device and removed -- I didn't
23  remove the entire device, I removed, like, four or five
24  centimeters, just what was under the bladder, and then
25  we put a sling in to take care of her stress

Page 81

1   incontinence.
2    Q   And in all of the patients that you have
3   treated, including the ones in which you have implanted
4   a mesh device, have you ever had to put in a second mesh
5   sling?
6    A   I've had one patient where we had to put in
7   another sling.
8    Q   And did you completely remove the first device
9   that you placed?
10   A   No.
11   Q   You just put the second one in over it?
12   A   Uh-huh.
13   Q   And you have never been told by Ethicon that it
14  was not okay to do that, correct?
15   A   Correct.
16   Q   Would you agree that it's easy to overtighten
17  the TVT device?
18   A   I haven't found it to be so.
19   Q   I'll show you what's been marked as Exhibit 7.
20       (Whereupon Plaintiffs' Exhibit 7 was marked for
21  identification.)
22  BY MS. COPE:
23   Q   Let me know when you have had a minute to
24  review.
25   A   Okay.

21 (Pages 78 to 81)

Cynthia Bergmann, M.D.

Page 82

1    MR. KOOPMANN:  Do you have the Bates number for
2  this one?
3    MS. COPE:  I do, it's ETH.MESH.03910418.
4    MR. KOOPMANN:  Thanks.
5    MS. COPE:  Thank you for reminding me.
6  BY MS. COPE:
7    Q   Okay, so on the second page, just about in the
8  middle, it says, "Number 1."
9    A   Okay.
10   Q   "With TVT over tightening it is easy to achieve
11 since there is no limitation when one pulls on the
12 tapes.  If you pull sufficiently you will compress the
13 urethra."  So would you agree that it's easy to
14 overtighten the TVT device?
15   A   If you pull too hard.
16   Q   And define "pull too hard."
17   A   Well, if you're pulling it hard enough that the
18 TVT is deformed because of the pressure you put on it,
19 if it's compressing the urethra, that's overtightened.
20   Q   On Page 17 of your report -- you can put those
21 out of the way.
22   A   All right.
23   Q   It's the first full sentence of Page 17, "When
24 the mesh is properly implanted as set forth in the IFU
25 and as explained in Ethicon's professional education

Page 83

1  seminars and publications, roping or curling of the mesh
2  are not an issue."
3    A   Right.
4    Q   Can you tell me what you mean when you say they
5  are not an issue?
6    A   If you don't put too much tension on it, it
7  won't rope or curl.
8    Q   And what would be the clinical significance of
9  a TVT device roping or curling in a patient?
10   A   Well, biomechanically you would have less
11 support area.  So instead of having something a
12 centimeter wide you might make it into half a centimeter
13 wide, so you're not giving the urethral support you'd
14 like to get.
15       You're also doubling over the mesh so that it's
16 harder for fiberglass to grow through and properly put
17 the mesh in place.  You also run the risk of actually
18 kinking the urethra when you do that, because you have a
19 harder ledge that's pushing -- potentially that is
20 pushing up on the urethra.
21   Q   I'm going to show you what has been marked as
22 Exhibit 8.  The Bates number is ETH.MESH.01822361.
23       (Whereupon Plaintiffs' Exhibit 8 was marked for
24 identification.)
25 ///

Page 84

1  BY MS. COPE:
2    Q   Have you seen this before?
3    A   No.
4    Q   In the second full paragraph, "From an
5  engineering perspective, the laser cut mesh of TVT SECUR
6  has less potential to cause retention than TVT or TVT
7  Obturator because the tape will remain flat under the
8  urethra.
9        "TVT and TVT Obturator would curl and rope,
10 which reduces the surface area of the mesh under the
11 urethra and, therefore, increases the pressure in a
12 localized point."
13       So, obviously, Ethicon has received reports or
14 is aware that the device can rope and curl, correct?
15       MR. KOOPMANN:  Object to the form, foundation.
16       THE WITNESS:  Again, I don't know what he's
17 talking about for this.  I don't know if he's talking
18 about in vivo or in vitro.
19 BY MS. COPE:
20   Q   What if he's talking about in vivo?
21   A   Well, that would require me to speculate,
22 wouldn't it?
23   Q   I'm not asking you to speculate.
24   A   So what exactly do you want me to speculate as
25 to?

Page 85

1    Q   Well, you said you didn't know what it meant
2  because you weren't sure if he means in vivo or
3  in vitro.
4    A   Correct.
5    Q   So if he means in vivo, what does this mean to
6  you?
7    A   That they've had cases where it roped or
8  curled.  I assume that would be what that had meant,
9  but, again, that is speculation.
10   Q   Is that a defect in the mesh for it to rope or
11 curl inside a woman's body?
12       MR. KOOPMANN:  Object to the form.
13       THE WITNESS:  Again, we have gone over that.
14 If you pull too hard on it, it will rope or curl.  If
15 you place it tension-free, it won't do that.  And when
16 you get fibroblastic infiltration it will remain flat.
17 BY MS. COPE:
18   Q   But, again, we're not really clear what placing
19 it tension-free means because the IFU states tension-
20 free or minimal tension, you said that isn't very clear.
21       MR. KOOPMANN:  Object to the form.
22       THE WITNESS:  Again, if you put too much
23 tension on it, it will rope or curl.
24 BY MS. COPE:
25   Q   You can put that aside.  Have you reviewed any

22 (Pages 82 to 85)

Cynthia Bergmann, M.D.

Page 86

1    Ethicon documents stating that fraying of the TVT device
2    is a defect?
3        A    No.
4        Q    I'll show you what's been marked as Exhibit 9.
5            (Whereupon Plaintiffs' Exhibit 9 was marked for
6    identification.)
7    BY MS. COPE:
8        Q    The Bates number is ETH.MESH-01813975.  If
9    you'll look at the second page there's a little caret
10   that states:  "The mesh frayed is the reverse defect of
11   the mesh features."  Have you seen this document before?
12       A    No.
13       Q    Have you seen complaints from physicians to
14   Ethicon stating that the TVT device frays?
15       A    I have not seen that.
16       Q    That the TVT device sheds particles?
17       A    No.
18       Q    If you'll look at the next caret or paragraph
19   it says, "However, the root cause of this phenomenon are
20   known:  The way to cut the mesh, blade cutting.  If we
21   change the way to cut the mesh, ultrasonic cutting or
22   laser cutting, it seems we can limit the mesh frayed
23   defect significantly, but this needs to be proved after
24   a very detailed study, which is not still done."
25           Does this change your opinion that the

Page 87

1    properties between mechanical cut mesh and laser cut
2    mesh are different?
3        A    Again, without knowing what -- I really don't
4    know what this e-mail is about.  So I would be hesitant
5    to -- I mean, I don't know the antecedent incident that
6    brought up this e-mail in the first place.
7        Q    Well, unfortunately, this is all Ethicon has
8    provided to us.
9            MR. KOOPMANN:  Object to the form.
10           THE WITNESS:  Then I can't even begin to
11   speculate about this.  I don't know if they found frayed
12   mesh in a package, if this occurred in a patient.
13   BY MS. COPE:
14       Q    Did you review Ethicon e-mails as part of your
15   preparing and writing your report?
16       A    No.
17       Q    Have you seen any documents from Ethicon
18   stating that the TVT device degrades or can crack?
19       A    I'm sorry?
20       Q    Have you seen any documents from Ethicon
21   stating that the TVT device can degrade or crack?
22       A    I have seen -- I, in fact, provided you with
23   some articles, but I'm not sure if they're from Ethicon
24   or not.
25       Q    The articles you're talking about that are

Page 88

1    published literature, correct?
2        A    Correct.
3        Q    I'm going to show you what's been marked as
4    Exhibit 10.
5            (Whereupon Plaintiffs' Exhibit 10 was marked
6    for identification.)
7    BY MS. COPE:
8        Q    These are pages from a PowerPoint and you'll
9    see at the bottom it was prepared by PA Consulting Group
10   for Johnson & Johnson.
11       A    Uh-huh.
12       Q    And the Bates number for the entire
13   presentation is ETH.MESH.07192929.  And if you look at
14   the third page the slide states:  Polypropylene can
15   suffer from degradation following implant.
16   Polypropylene has a long history of use, but it is
17   subject to degradation of process which initiates after
18   a few days post implantation in animal studies."
19           And the last hash mark says, "High resolution
20   images of excised meshes clearly show physical
21   degradation of polypropylene filaments."  Were you
22   aware, prior to seeing this document, that the TVT
23   device degrades?
24           MR. KOOPMANN:  Object to the form, foundation.
25           THE WITNESS:  I was aware that polypropylene

Page 89

1    can have some minimal degradation in the body.
2    Basically, everything we implant in the body will
3    degrade over time.
4    BY MS. COPE:
5        Q    But specifically were you aware that the TVT
6    device degrades in the body and that process starts
7    shortly after implant?
8            MR. KOOPMANN:  Object to the form, asked and
9    answered, compound.
10           THE WITNESS:  Well, again, they're talking
11   about polypropylene degrading and I assume you're making
12   the jump to the TVT device.  Based on that assumption,
13   again, we know that anything we implant in the body will
14   degrade over time.
15   BY MS. COPE:
16       Q    So you know that the TVT device degrades in the
17   body over time?
18           MR. KOOPMANN:  Objection, asked and answered.
19           THE WITNESS:  Yes, I'm aware of that.
20   BY MS. COPE:
21       Q    And you stated in your report that you don't
22   believe there are -- let me find the exact one.  It's on
23   Page 17 as well.  And it's that first paragraph right
24   where we stopped reading last time.
25           You state:  "As far as degradation is

23  (Pages 86 to 89)

Cynthia Bergmann, M.D.

Page 90

1    concerned, again, I have not seen clinically significant
2    degradation of the TVT mesh in my practice, nor have I
3    seen clinically significant degradation described in the
4    published literature, even in those patients on whom I
5    re-operated following a prior mid-urethral sling
6    procedure."  What do you mean by "clinically significant
7    degradation"?
8        A    I think the longest implanted mesh that I have
9    taken out had been in for seven years and it was still
10   very strong.
11       Q    How do you know it was very strong?
12       A    Because in taking it out you have to grasp it,
13   you put tension on it to be able to dissect off the
14   surrounding tissues.  And if it were fragile, if you put
15   any tension on it, it would crumble and it does not.
16       Q    So clinically --
17       A    It's much stronger than the surrounding tissues
18   are.
19       Q    So clinically significant degradation to you
20   means that the device actually crumbles?
21       A    Well, clinically significant would mean it
22   would have to be falling apart and it doesn't.
23       Q    So you're not aware of any reports to Ethicon
24   of the TVT device crumbling in a patient?
25       A    Not that I'm aware of.

Page 91

1        Q    And the patient -- how many patients have you
2    removed a TVT device from?
3        A    Oh, I don't have it sorted out by which devices
4    were implanted, so I can't tell you specifically which
5    were TVT and which were other devices.  As far as doing
6    suburethral sling removals, whether they're TVT or TOT
7    devices, probably done about five, I would think.
8        Q    And so in those five patients do you send the
9    excised mesh to pathology?
10       A    Yes.
11       Q    Do you ask the pathology department to do
12   anything other than grossly examine the excised mesh?
13       A    Whatever their protocol is what they do.
14       Q    You don't ask them to examine it under a
15   microscope?
16       A    If that's their protocol they do, and as far as
17   I know, they do.
18       Q    I'm asking you if you have ever asked the
19   pathology department to look at excised mesh that you
20   have taken from a patient under a microscope?
21       A    Again, recalling the reports, they do a do a
22   microscopic examination.
23       Q    But you have never asked for it specifically?
24       A    It's part of submitting tissues to pathology.
25       Q    Well, I have seen a lot of pathology reports

Page 92

1    and those cover just gross examination, so I'm asking
2    you if you have ever specifically asked for examination
3    of excised mesh under a microscope?
4        A    No, I haven't, but my pathology department does
5    do that.
6        Q    In the next sentence of your report you state:
7    "If the TVT device degraded, as plaintiff witnesses
8    claim, one would not see the excellent long-term
9    efficacy and safety shown in the published medical
10   literature."  Can you tell me how you reached that
11   conclusion?
12       A    Just common sense.  If it were really falling
13   apart why would it last so long?  And the analogy is we
14   used to use absorbable sutures to do Kelly plication
15   procedures for stress incontinence.  Those fail, the
16   sutures get re-absorbed.
17       Q    And have you ever personally looked at mesh
18   either excised or pristine under a microscope?
19       A    No.
20       Q    And you're not a pathologist, correct?
21       A    Correct.
22       Q    And did you ask to see the same documents that
23   were cited in the plaintiffs' expert witness reports?
24       MR. KOOPMANN:  Object to the form.
25       THE WITNESS:  No, I did not.

Page 93

1    BY MS. COPE:
2        Q    Do you know if those were provided to you?
3        A    No, I don't.
4        Q    And going back to Exhibit 10, the third page,
5    the second to the last hash mark reads:  "One clinician
6    interview proposed that variability in the raw materials
7    and/or processing thereof could be affecting the
8    clinical performance and outcomes here articulated in
9    his intention to investigate this hypothesis."  So this
10   clinician clearly thinks the degradation affects
11   clinical outcomes, correct?
12       MR. KOOPMANN:  Object to form, foundation.
13       THE WITNESS:  Well, this particular paragraph
14   doesn't say anything about degradation, it talks about
15   affecting clinical performance and outcomes.
16   BY MS. COPE:
17       Q    Well, the whole slide is about polypropylene
18   can suffer from degradation and there's a bullet point
19   that states polypropylene has a long history of use, but
20   is subject to degradation and these are all sub-points
21   underneath that.
22       A    Okay, so. . .
23       Q    So we have at least one clinician who's
24   communicated to this consulting group that's now
25   communicated to Ethicon that he believes it affects

24 (Pages 90 to 93)

Cynthia Bergmann, M.D.

Page 94

1    clinical performance and outcomes, correct?
2        MR. KOOPMANN: Objection.
3        THE WITNESS: I don't think that's what it says
4    at all.
5    BY MS. COPE:
6        Q   What do you think it says?
7        A   They interviewed a clinician. I have no idea
8    why that clinician was chosen. I don't know if they
9    chose the clinician or the clinician contacted Ethicon.
10   And I don't know which clinical performance and outcomes
11   that particular clinician might be concerned about.
12       Q   Did you look at any internal Ethicon documents?
13       A   No.
14       Q   On Page 16 of your report in the final
15   paragraph you state: "In more than 250 uses of the TVT
16   devices in my career, I have not seen any clinically
17   significant particle loss in my patients." What do you
18   mean by "clinically significant particle loss"?
19       A   I haven't -- well, first of all, I haven't seen
20   any particles. Second of all, I haven't had any
21   patients with any adverse events that I could relate to
22   a particle.
23       Q   Well, according to you, the only adverse events
24   you had are urinary retention and an exposure, correct?
25       A   Correct.

Page 95

1        Q   Are you aware that particle loss was the reason
2    that Ethicon wanted to use laser cut mesh rather than
3    mechanically cut mesh for their TVT device?
4        MR. KOOPMANN: Object to the form, foundation.
5        THE WITNESS: No.
6    BY MS. COPE:
7        Q   Would that change your opinion about whether
8    particle loss is clinically significant or not?
9        MR. KOOPMANN: Same objection.
10       THE WITNESS: No.
11   BY MS. COPE:
12       Q   Have you seen any medical literature showing
13   increase in complications due to particle loss?
14       A   No.
15       Q   Are you aware of any studies that Ethicon did
16   to see if there were increased complications due to
17   particle loss?
18       A   No.
19       Q   And it's your --
20       A   Can I ask a question? How big a particle are
21   we talking about?
22       Q   Well, you wrote it in your report, so you tell
23   me.
24       A   Well, I mean, particles can be like atom-sized.
25   Again, it's certainly sub my ability to see them.

Page 96

1        Q   So there may be particle loss that you can't
2    see is what you're saying?
3        A   Well, that's part of degradation, which, as I
4    said before, happens to anything we put in the human
5    body.
6        Q   So what did you mean when you said that there's
7    been no significant particle loss or you haven't seen
8    particle loss?
9        A   I haven't seen any.
10       Q   If you saw complaints from -- off the record.
11       (Brief interruption.)
12   BY MS. COPE:
13       Q   If you saw complaints from physicians about
14   particle loss, would that change your opinion about the
15   TVT and particle loss?
16       MR. KOOPMANN: Object to the form.
17       THE WITNESS: I would certainly take those into
18   consideration. I would want to see the reports and see
19   what had actually happened.
20   BY MS. COPE:
21       Q   Do you think doctors would make complaints to
22   Ethicon about particle loss if they didn't think it was
23   clinically significant?
24       A   Again, without knowing how they're determining
25   particle loss, I really can't say.

Page 97

1        Q   Well, how did you determine particle loss?
2        MR. KOOPMANN: Object to the form.
3        THE WITNESS: Again, I said that I hadn't seen
4    any.
5    BY MS. COPE:
6        Q   Well, so what do you mean when you say you
7    haven't seen any?
8        A   Well, I haven't seen -- which is why I asked
9    you what your definition of "particle" was. I haven't
10   seen any bits of the mesh either in the packaging or in
11   putting it in the patients or in examining the patients
12   afterward.
13       Q   So I'm asking you if physicians told Ethicon if
14   they did see particles of mesh going into the patient or
15   in the box once they removed the product, would that
16   change your opinion that it doesn't happen?
17       MR. KOOPMANN: Object to the form, compound.
18       THE WITNESS: Run that back again. Would that
19   change my opinion that it doesn't happen?
20   BY MS. COPE:
21       Q   We'll try to this way: Just because you
22   haven't experienced it in your practice doesn't mean
23   that it doesn't happen, correct?
24       A   That would be correct.
25       Q   I'll show you what's been marked as Exhibit 11.

25 (Pages 94 to 97)

Cynthia Bergmann, M.D.

Page 98

1    (Whereupon Plaintiffs' Exhibit 11 was marked
2  for identification.)
3  BY MS. COPE:
4    Q   Have you had a chance to review this?
5    A   Yes.
6    Q   And so on the first page, the paragraph that
7  begins "Particle Loss," it states:  "Particle loss is
8  the reason why TVT wants to use laser cut mesh to
9  eliminate particle loss, which is critical to quality."
10  So, clearly, Ethicon thought that there was an issue
11  with particle loss of the TVT, correct?
12    MR. KOOPMANN:  Object to the form, misstates.
13    THE WITNESS:  Again, I have no idea what the
14  antecedent problem is.
15  BY MS. COPE:
16    Q   Well, the antecedent problem is particle loss.
17    A   Okay, but I don't know if it's finding
18  particles in the kit, I don't know if it's particles
19  found in the patient.
20    Q   Does it matter?
21    A   Well, yeah.
22    Q   Well, if there's particles in the container, in
23  the kit, why would you think that there wouldn't be
24  particles that could be lost in the patient's body?
25    A   Well, that's the if.  I mean, if you're seeing

Page 99

1  them in the container, you know, in the cutting process
2  those should be gone.  So that, to me, seems like it's a
3  packaging problem or something else going on.
4    Q   Do you know how Ethicon packages the TVT?
5    A   I don't know.  I have not been to their
6  production lines.
7    Q   But, clearly, Ethicon thought it significant
8  enough to eliminate particle loss with the TVT or
9  attempt to, correct?
10    MR. KOOPMANN:  Object to the form.
11    THE WITNESS:  I know that this person thinks
12  it's important.  Again, I don't know -- I really do not
13  know the antecedent problem that they're talking about.
14  BY MS. COPE:
15    Q   I'm telling you the antecedent problem is
16  particle loss, and they sought reason to eliminate that
17  problem, correct?
18    MR. KOOPMANN:  Object to the form, foundation.
19    THE WITNESS:  Again, I don't know.
20  BY MS. COPE:
21    Q   It says, "Particle loss is the reason why TVT
22  wants to use laser cut mesh, to eliminate particle
23  loss."
24    MR. KOOPMANN:  Wait for a question.
25    ///

Page 100

1  BY MS. COPE:
2    Q   Are you refuting that statement?
3    A   Again, I don't know who this is.  I don't know
4  what it's in reference to, so I can't reasonably make a
5  comment on it.
6    Q   So I'm assuming from your testimony here today
7  that you can't comment on any e-mails from any Ethicon
8  employee that's been produced in this litigation,
9  correct?
10    MR. KOOPMANN:  Object to the form.
11    THE WITNESS:  Not anything that you have
12  produced to me so far.
13  BY MS. COPE:
14    Q   You testified that you haven't reviewed any up
15  until today.
16    A   Right, so for what you've produced to me so
17  far, I can't comment on these because I don't know the
18  context in which these e-mails were sent.
19    Q   And what would you need to know the context of
20  what the -- of the e-mails sent?
21    A   Well, what they are considering product loss,
22  what their problem was when it happened, you know, what
23  they considered particle loss to be.  And, again, I
24  don't have those definitions, I don't know the
25  significance of it.

Page 101

1    Q   And you don't know, when you use the term
2  "particle loss" in your report, if you were using the
3  same definition that plaintiffs' experts were using or
4  that Ethicon was using, correct?
5    A   Correct.
6    Q   So how can you refute what plaintiffs' experts
7  are saying if you don't know what they mean by particle
8  loss?
9    MR. KOOPMANN:  Object to the form.
10    THE WITNESS:  I would have to go back and look
11  at their definition.  Again, I have not seen any visible
12  particles.
13  BY MS. COPE:
14    Q   And you haven't seen any of the documents that
15  are cited in plaintiffs' expert reports, correct?
16    MR. KOOPMANN:  Objection, and please let her
17  finish her response, too.  I think she got cut off.
18    MS. COPE:  And if you could keep your
19  objections to form, as the judge has ordered in this
20  case, I'd appreciate it.
21    MR. KOOPMANN:  I just want the witness to be
22  able to complete her answers and not be interrupted.
23    THE WITNESS:  Okay, can you repeat the
24  question, please?
25    MS. COPE:  Can you please read back the

26 (Pages 98 to 101)

Cynthia Bergmann, M.D.

Page 102

1  question?
2      (Record read as:
3      "Q   And you haven't seen any of the documents
4      that are cited in plaintiffs' expert reports,
5      correct?")
6      THE WITNESS:  I have provided you with all the
7  documents that I have seen, so I don't know -- without
8  cross-referencing those, I don't know whether or not I
9  have seen their articles or not.
10  BY MS. COPE:
11     Q   But you haven't seen any documents that are
12  internal Ethicon e-mails like this, which have a Bates
13  number at the bottom, up until today, correct?
14     A   Correct.
15     Q   I'll hand you what's been marked as Exhibit 12.
16         (Whereupon Plaintiffs' Exhibit 12 was marked
17  for identification.)
18  BY MS. COPE:
19     Q   And this is a letter or a handout to the
20  Ethicon Women's Health and Urology Sales Force, correct?
21     A   Yes.
22     Q   And the paragraph that begins, "Currently,
23  Gynecare Prolift," and the second sentence reads:  "In
24  an effort to gain efficiencies in manufacturing
25  processes, we decided to explore the impact of cutting

Page 103

1  our present Gynecare TVT products on the laser cutter.
2  We found by doing so we reduced particle loss, as well as
3  the potential for mesh fraying."
4      So, again, Ethicon was trying to address the
5  problem of particle loss and the Gynecare TVT mesh
6  fraying, correct?
7      A   It appears that they were.
8      Q   And in one of the last statements here it says,
9  "The laser cut mesh will be available for you to sell as
10  needed, particularly to customers that have voiced
11  concerns regarding particle loss and fraying."
12     So even though you have never seen it, Ethicon
13  is stating here that they have received complaints of
14  particle loss and fraying of the TVT device, correct?
15     MR. KOOPMANN:  Object to the form.
16     THE WITNESS:  It appears that they have had
17  customers voice that concern.  And, again, I don't know
18  if they're concerned about it or if they actually had
19  cases where it was important.
20  BY MS. COPE:
21     Q   Do you think Ethicon would try and fix the
22  problem if it wasn't important?
23     MR. KOOPMANN:  Object to the form.
24     THE WITNESS:  You know, I can't even begin to
25  speculate on that.

Page 104

1  BY MS. COPE:
2      Q   Have you made complaints to Ethicon about their
3  products for reasons that you didn't believe were
4  important to your patients?
5      A   I haven't made complaints to Ethicon.
6      Q   During any of your training or interaction with
7  Ethicon, did they tell you how to remove the TVT device
8  in case of complications?
9      A   I don't believe that they did.
10     Q   Did you ever communicate to the sales
11  representatives that would come and watch your
12  procedures how to remove the mesh or treat complications
13  from the TVT device?
14     A   I don't recall that I did.
15     Q   I'll hand you what's been marked as Exhibit 13.
16  This is the chart that was attached to your report,
17  correct?
18     A   Uh-huh.
19         (Whereupon Plaintiffs' Exhibit 13 was marked
20  for identification.)
21  BY MS. COPE:
22     Q   Can you tell me who prepared this report?
23     A   I did.
24     MR. KOOPMANN:  Object to the form.  You mean
25  the report or this table?

Page 105

1      MS. COPE:  The table.
2      THE WITNESS:  Oh, I prepared it.
3  BY MS. COPE:
4      Q   And can you tell me for the skill level
5  required what that key means of the pluses?
6      A   Oh, it's from difficult -- like two pluses
7  would be fairly simple, three pluses moderately
8  difficult, and four pluses more difficult.
9      Q   And is that a system that you came up with to
10  rate difficulty?
11     A   Yes.
12     Q   And for the data that you gathered for the TVT
13  column, do you know how much of that data related to
14  mechanically cut TVTs versus laser cut TVTs?
15     A   I don't.
16     Q   For the Trans-Obturator column, does this
17  include all Trans-Obturator products or specifically the
18  TVT Obturator?
19     A   All Trans-Obturator products.  Similarly for
20  the TVT.  That's all suburethral slings -- retropubic
21  suburethral slings.
22     Q   But all suburethral polypropylene slings are
23  not identical or interchangeable, correct?
24     A   Correct.
25     Q   So how is it fair to lump all the data for

27 (Pages 102 to 105)

Cynthia Bergmann, M.D.

Page 106

1  mid-urethral retropubic polypropylene slings into this
2  one column?
3      A   It was taking them as a whole.  And, again, it
4  is compilation based on a number of studies.
5      Q   But if this report and your opinions are about
6  the TVT, why did you feel the need to do a compilation
7  of all retropubic MUS's?
8      A   Well, because I considered this instructional
9  to try to compare -- since there are no head-to-head,
10  randomized, controlled trials comparing all of these
11  different methods, and I thought that this would be a
12  simpler way to look at each individual procedure and
13  looking at various aspects of it, how hard it is to do,
14  what the impact is on the patient, risk of retention,
15  et cetera.
16      So it was just -- it was a compilation of
17  things similar to what the Cochrane report does when
18  they compile various studies.
19      Q   But the Cochrane review has already done this
20  analysis, correct?
21      A   Yeah, and I use their data for a bunch of it.
22      Q   So why did you feel the need to redo it if the
23  Cochrane has already completed the same analysis?
24      A   Well, they didn't have all the things that I
25  have in here and -- may I finish?

Page 107

1      Q   I was just going to ask you to specify which
2  things were in here that were not included.
3      A   Can I finish what I was saying first?
4      Q   Sure.
5      A   Okay.  And I just found it a very simple way to
6  refer to the different types of things rather than write
7  it out as a paragraph or two or five.
8      As far as which ones are Cochrane and which
9  ones are not, I believe most of this is included in the
10  Cochrane, then I specifically put in areas which I got
11  from other studies, because they weren't necessarily
12  included in the Cochrane report.
13      Q   And how did you choose the studies that you
14  did?
15      A   On Google I looked for studies that address
16  those particular issues that I was trying to compare
17  from one type to another.
18      Now, looking at this you have to be aware that
19  these are not head-to-head studies and this is not meant
20  to be a comparison saying that, you know, Burch is
21  better than laparoscopic, Burch is better than whatever.
22  It's just a way of looking at them to make the data more
23  accessible.
24      Q   And this isn't something that's been peer
25  reviewed or published, correct?

Page 108

1      A   Oh, no, no.
2      Q   And in terms of the cost row, can you tell me
3  what your system of pluses means there?
4      A   Again, what cost the least versus what cost the
5  most.  And it's based on not only the cost of the
6  operation and the hospital stay, but to the cost of the
7  patient because of time off work.  And, again, that's my
8  own system.
9      Q   And does that include the cost of any
10  re-operations or times spent treating complications?
11      A   I did not include that in it.  But that would
12  be a good column to put in, too.
13      Q   And same for time off work, that doesn't
14  include time off work that's needed for any re-operation
15  or treatment of complications, correct?
16      A   Correct.
17      Q   Or any disability from long-term complications,
18  such as chronic pain?
19      A   Correct.
20      Q   And on Page 14 of your report -- I think I'm
21  done with everything else except your report.
22      A   Okay, I'll put those to the side.  Do you need
23  these back?
24      Q   You can put those to the side and we'll give
25  them to the court reporter.  On Page 14, about the fifth

Page 109

1  line down, you're quoting from SUFU and AUGS, I believe,
2  that there's a broad evidence base including high
3  quality scientific papers.  Can you tell me what high
4  quality scientific papers mean to you?
5      A   Things that are peer reviewed, randomized -- in
6  this case because it's surgery, randomized controlled
7  trials, longitudinal studies where they're looking at
8  patients over time.
9      Q   And the AUGS-SUFU physician's statement isn't
10  peer reviewed, correct?
11      A   It's based on peer-reviewed materials.
12      Q   But the statement itself is not peer reviewed
13  before it's published, correct?
14      A   Well, it's reviewed by experts, so I guess to
15  the extent that these are experts, these are the people
16  who would peer review papers --
17      Q   Is there a formal peer review process for
18  statements that come from AUGS or SUFU?
19      A   Again, I'm not privy to that, don't know the
20  process that they use.
21      Q   And ACOG practice bulletins are not peer
22  reviewed, correct?
23      A   Again, it's not like peer-reviewing a
24  scientific paper, but it's a committee opinion.  These
25  are the experts, these are the peers who review the

28 (Pages 106 to 109)

Cynthia Bergmann, M.D.

Page 110

1  papers, and it's their opinion based on the literature.
2      Q   Is there a peer review process for ACOG
3  practice bulletins that you're aware of?
4      A   I would have to check with ACOG.
5      Q   So you're not aware of any as you sit here
6  today, correct?
7      A   I don't know their process for determining what
8  they publish.  These are the people who do the peer
9  reviews.
10     Q   And there are also some people who serve as
11 consultants for medical device companies, correct?
12     A   If they do, those are disclosed.
13     Q   Well, they're supposed to be disclosed,
14 correct?
15     A   That's the ACOG policy.
16     Q   And on Page 2 of your report, you talk about the
17 nonsurgical methods for treating stress urinary
18 incontinence.  How often do you use those in your
19 practice?
20     A   All the time.
21     Q   With what percentage of patients that have
22 stress urinary incontinence being diagnosed?
23     A   Okay, every -- well, I encourage everybody to
24 use Kegel exercises if they're overweight.  I encourage
25 them to lose weight.  If they're estrogen-deficient we

Page 111

1  talk about estrogen replacement therapy, either locally
2  or systemically, again, depending upon the patient's
3  wishes and desires for that.
4      So that's prior to even doing any kind of
5  cystometrograms.  I usually review -- sorry, reserve
6  those for patients who are at the point where they are
7  considering going on to surgery to see if surgery is
8  going to be appropriate for them or not.
9      We have pelvic floor training that we do with
10 neurostimulators.  I'll put in pessaries for patients
11 who would like to use them.
12     Q   Those who don't wish to have surgery or are not
13 good surgical candidates?
14     A   Correct.
15     Q   Can you tell me what your definition of "not
16 surgical candidate" is?
17     A   Somebody with severe heart disease, multiple
18 medical problems, diabetes, hypertension, renal failure
19 where putting them under anesthesia might be a danger to
20 them.  Nursing home patients, patients with Alzheimer's.
21     Q   And do you know why Ethicon has never sent any
22 doctors to you to be trained?
23     A   No.
24     Q   And in your summary of opinions on Page 3, you
25 talk about your personal experience where you say, "I

Page 112

1  personally have found."  Are these numbers that you're
2  giving in this sentence, are they yours, those of your
3  practice?
4      A   In the second paragraph, "I personally found"?
5      Q   Correct.  Is this based on your clinical
6  experience?
7      A   What line?
8      Q   How quick it is and the effectiveness and your
9  one redo.
10     A   Oh, got it.  I'm in the wrong place.  This is
11 based on what it takes for me to do them.
12     Q   But you personally, not you and your partner,
13 correct?
14     A   No, though his usually take about the same time
15 as mine do.
16     Q   I meant for all these numbers, the 90 percent
17 efficacy and the numbers of mesh exposures of urinary
18 tensions?
19     A   No, those are mine, not his.
20     Q   And how do you track your 90 percent efficacy
21 rate?
22     A   Because I practice primary care.  These are my
23 patients for the most part, so I'll see them back for
24 years afterward and see them on an annual basis.
25     I also have very good relationships with my

Page 113

1  referral sources, so when I have a patient referred in
2  for a problem and do a surgery on them, they're, first
3  of all, told if they have any problems they can come
4  back anytime.
5      We also let the referral sources know that
6  should the patient develop any problems or questions
7  that they should call us.
8      Q   And how many patients do you lose to follow-up?
9      A   You mean for my practice, period?
10     Q   Yes.
11     A   Okay.  Percentage-wise you mean?
12     Q   Sure.
13     A   Okay.  Boy, maybe 10 percent, 15.  It's not
14 very much.
15     Q   But you don't obviously know the outcomes of
16 those 10 to 15 percent of your patients?
17     A   Correct.  But I assume that they would reflect
18 the patients that I -- for the most part follow the
19 patients that have continued to see me.
20     Q   And what's the basis for that assumption?
21     A   Just that they would be similar populations.
22     Q   And later on in that paragraph you say that you
23 have very good patient acceptance.  Can you tell me what
24 you mean by "patient acceptance"?
25     A   Patients are usually very willing to do the

29 (Pages 110 to 113)

Cynthia Bergmann, M.D.

Page 114

1  procedure.  Obviously, if somebody is not willing to do
2  it, we don't do it.  They are generally very pleased
3  with the outcomes.  There's nothing like coughing and
4  not wetting your pants to make your day.
5      Q   And on Page 4 under "Risk Factors for Stress
6  Urinary Incontinence," one of the things you list is
7  nerve injuries to the lower back.
8      A   Correct.
9      Q   Can you be more specific about what types of
10  nerve injuries?
11      A   Prolapsed discs, any kind of back injury,
12  anything that would cause sciatica, nerve root
13  irritation, something like spondylitis where you get --
14  or osteoarthritis of the spine where you're going to get
15  impediment of the motor neurons.
16      Q   And you note castration here also.
17      A   Uh-huh.
18      Q   Have you seen that in your female patients?
19      A   Where we take out their ovaries, that's
20  castration, so they go into menopause.
21      Q   And that can induce stress urinary
22  incontinence?
23      A   It can contribute to it, because when you lose
24  estrogen supply you actually decrease the amount of
25  blood supply to the pelvic musculature, the muscles get

Page 115

1  thinner, weaker, so that can be a factor.
2      And the mucosa also thins out so you have
3  less -- the mucosa goes from 26 layers down to 5 layers.
4  You go from nice, big fat cells to these little, thin
5  flat cells.
6      And the estrogen also affects the bladder and
7  the urethra.  You'll have a urethra that has all these
8  nice folds and thick mucosa in it before women go
9  through menopause, whether it's surgical or natural, and
10  afterward they get de-estrogenized and it will
11  look like a lead pipe, there will be no folds at all and
12  no support to it.
13      Q   And on Page 8 of your report in the second line
14  from the top, you state that non-absorbable sutures can
15  erode through surrounding tissues.
16      A   Yes.
17      Q   How many times have you seen a non-absorbable
18  suture erode through surrounding tissues in your
19  patients?
20      A   Oh, maybe half a dozen.
21      Q   And how would you treat that or how did you
22  treat that?
23      A   Well, it would be encountering the sutures on a
24  secondary surgery where patients had had a -- usually
25  they've had retention sutures put in to close an

Page 116

1  abdominal wound.  Do you know what retention sutures
2  are?
3      Q   Uh-huh.
4      A   Okay.  I didn't want to tell you stuff that you
5  didn't --
6      Q   Good assumption.
7      A   Okay, I don't want to speak above your pay
8  grade.
9      So those are sutures that have a lot of tension
10  on them to begin with, obviously, even when we put
11  rubber shods on them to helpep keep the tension off, and
12  sometimes we can see those going through the fascia.  So
13  when that happens we take them out.  And, of course, if
14  we're doing another surgery we're taking them out
15  anyway.
16      Q   And in those half a dozen times you have seen
17  the non-absorbable suture erode and treated it, have you
18  seen any long-term problems with those patients as a
19  result of the non-absorbable suture?
20      A   No.
21      Q   And I just want to make sure I'm clear, on
22  Page 10, the list you give with percentages at the top,
23  is that taken directly from the table that we have
24  already looked at?
25      A   This is from the Cochrane video.

Page 117

1      Q   So you're just listing what was in the Cochrane
2  review?
3      A   Right.
4      Q   And same thing for the chart below it, correct?
5      A   Correct.  SGS, I believe that's the site of
6  gynecological surgeons review.
7      Q   And are there any opinions that you are
8  planning on offering at trial that are not included in
9  this report?
10      A   None that I know of at this time.  Obviously,
11  the medical field is not static.  We're going to be getting
12  new -- I mean, new data comes out all the time, new
13  studies, papers.  I may have a patient experience that I
14  haven't had yet that will obviously affect how I testify
15  at trial.
16      MS. COPE:  I'm going to go ahead and reserve
17  the rest of my time for any redirect, so I have no
18  further questions at this time.
19      MR. KOOPMANN:  Okay.
20      EXAMINATION
21  BY MR. KOOPMANN:
22      Q   Dr. Bergmann, there was a question earlier
23  about Gynemesh.  Is it your understanding that the TVT
24  mesh is different than Gynemesh PS?
25      A   Yeah, because there's several different grades

30 (Pages 114 to 117)

Cynthia Bergmann, M.D.

Page 118

1  of Gynemesh is my understanding, so I know it's. . .
2      Q   In how many patients that you have implanted
3  the TVT in have you seen chronic pain as a complication?
4      A   None.
5      Q   Did you ever -- there were some questions
6  earlier about another manufacturer's mesh causing
7  fraying that caused some strands of the polypropylene to
8  poke through the vaginal mucosa.
9          My question is:  Did you ever see any fraying
10  with the TVT slings that you have used in your career
11  that caused the mesh to poke through the mucosa?
12      A   No.
13      Q   Ms. Cope asked you some questions about whether
14  it's easy to over-tension the TVT device and my question
15  for you is:  Is it also easy to not over-tension the TVT
16  device?
17      A   You guys are asking questions that don't exist
18  in the real world.
19      MS. COPE:  That's what we do.
20      THE WITNESS:  I know.  You have to treat it
21  gently.  You don't treat it like a rubber band.
22  BY MR. KOOPMANN:
23      Q   There was some discussion earlier about
24  degradation of any implanted materials in the body.  If,
25  for instance, somebody has a metal plate put in their

Page 119

1  body does that degrade?
2      A   Yes.
3      Q   And how do you know that implanted materials,
4  all of them, to some extent experience degradation?
5      A   Well, it's second law thermodynamics,
6  everything degrades over time.  And I have seen
7  studies -- actually, I looked up information, and I
8  didn't get that to you because I didn't keep it, it was
9  online, but basically everything we implant in the body
10  will degrade over time, including gold, which is a very
11  inert material.
12      Q   Do you practice evidence-based medicine?
13      A   I practice evidence-based medicine as is
14  appropriate for the patient sitting in front of me.
15      Q   And what does evidence-based medicine mean?
16      A   It's medical practice that's based on
17  algorithms that are set up using peer-reviewed studies.
18  Whenever possible we try to use double-blinded,
19  double-blinded control trials.  If you can do
20  double-blinded, randomized control with a crossover,
21  those are the very best ones.
22      Q   So there are different levels of evidence, some
23  are better than others?
24      A   Yes.
25      Q   And what do you consider the highest levels of

Page 120

1  evidence to be?
2      A   As I said, double-blind and randomized
3  crossover trials.
4      Q   Are systematic reviews and meta-analysis also
5  high quality evidence?
6      A   They're lesser quality.  Again, whenever you
7  add a meta you're not comparing exactly the same things
8  and they try to get as close as they can without -- you
9  know, given that limitation.
10          So I look at them, I consider them.  I don't
11  consider them as strongly as I would a randomized,
12  controlled trial, double-blinded, of course.
13      Q   Can you think of any randomized, controlled
14  trials that show that the TVT mesh degraded and that was
15  clinically significant in some way?
16      A   No, I don't know of any.
17      MR. KOOPMANN:  Counsel, do you want to -- are
18  you going to go through her file materials and
19  mark them?
20      MS. COPE:  I wasn't and yes.
21  BY MR. KOOPMANN:
22      Q   As part of your file materials you brought
23  along various articles that are in your file; is that
24  correct?
25      A   Correct.

Page 121

1      Q   And some of those articles discuss the
2  complication rates seen with TVT slings or other
3  retropubic slings over time?
4      A   Correct.
5      Q   They discuss things like erosions, for
6  instance?
7      A   Yes.
8      Q   Or mesh exposures?
9      A   Correct.
10      Q   And they describe the rates of those erosions
11  to exposures occurring?
12      A   Yes.
13      Q   They describe things like the number of
14  patients or the percentage of patients who have an
15  erosion or an exposure and have to have a re-operation,
16  correct?
17      A   I believe that's in there, yes.
18      Q   And how would you characterize those rates of
19  re-operation following a mesh erosion or exposure based
20  on all the literature you have reviewed?
21      A   Quite well.
22      MR. KOOPMANN:  Those are all the questions I
23  have right now.
24  ///
25  ///

31 (Pages 118 to 121)

Cynthia Bergmann, M.D.

Page 122

1           RE-EXAMINATION
2    BY MS. COPE:
3       Q   I just have one follow-up question.  Who
4    provided you with this stack of articles that Counsel
5    was just looking through?
6       A   Counsel provided me with almost all the
7    articles -- for this (indicating), that was from
8    Counsel.
9       Q   And had you seen any of these prior to them
10   being given to you by Ethicon's attorneys?
11      A   I don't believe I had seen that particular
12   group.  There may be a couple in there that I have seen
13   before.
14      Q   Okay.  Then I would just like to spend the rest
15   of the time cleaning up the record and marking all
16   exhibits, so I'll take this stack of articles that we
17   just mentioned and mark that as Exhibit 14.
18           (Whereupon Plaintiffs' Exhibit 14 was marked
19   for identification.)
20   BY MS. COPE:
21      Q   There is also a group of bills that you have
22   produced and I'll mark it Exhibit 15.
23           (Whereupon Plaintiffs' Exhibit 15 was marked
24   for identification.)
25           MS. COPE:  And a bound set of documents

Page 123

1    entitled, "TVT Development and Early Data," I'll mark it
2    as 16.
3           (Whereupon Plaintiffs' Exhibit 16 was marked
4    for identification.)
5    BY MS. COPE:
6       Q   This Exhibit 16 was prepared for you by Counsel
7    or provided to you by Counsel, correct?
8       A   Right.
9       Q   And there is a binder that is labeled, "General
10   Report and Sources," was this also prepared or given to
11   you by Counsel?
12      A   Yes.  It's a copy of my report and then
13   everything is referenced in case you wanted to look at
14   any of the -- well, because a lot of that stuff is on
15   the thumb drives, so that way we didn't have to get it
16   from the thumb drives.
17      Q   I'll mark this binder as Exhibit 17.
18           (Whereupon Plaintiffs' Exhibit 17 was marked
19   for identification.)
20           MS. COPE:  And there's another binder labeled,
21   "Ethicon Gynecare Pelvic Mesh Litigation, TVT Medical
22   Literature," and I'll mark that as Exhibit 18.
23           (Whereupon Plaintiffs' Exhibit 18 was marked
24   for identification.)
25   ///

Page 124

1    BY MS. COPE:
2       Q   And, again, this binder was prepared by or
3    given to you by Counsel, correct?
4       A   Correct.
5       Q   And there is the -- does this go in the other
6    stack, do you know?
7           MR. KOOPMANN:  I think so.
8           Was that a part of the other stack?
9           THE WITNESS:  Oh, no, this is one of -- that's
10   something that I looked at, because you had asked for
11   any papers that I had looked at.  That was one of the
12   ones I had on my computer.
13   BY MS. COPE:
14      Q   It's "National Institute for Clinical
15   Excellence Final Appraisal Determination Tension-Free
16   Vaginal Tape."  And where did you get this document
17   from?
18      A   Internet.
19      Q   I'll mark that as Exhibit 19.
20           (Whereupon Plaintiffs' Exhibit 19 was marked
21   for identification.)
22   BY MS. COPE:
23      Q   And you were also given copies of the
24   plaintiffs' expert reports in this bound packet,
25   correct?

Page 125

1       A   Correct.
2       Q   I'll mark that as Exhibit 20.
3           (Whereupon Plaintiffs' Exhibit 20 was marked
4    for identification.)
5           MR. KOOPMANN:  One of those might be Daino
6    related.
7           MS. COPE:  I saw that, yeah.
8           MR. KOOPMANN:  I don't know if you want to
9    separate that out.
10   BY MS. COPE:
11      Q   If you could look at this for me, Doctor, and
12   tell me what that document is.
13      A   This is from my Internet research and I was
14   trying to figure out how the FDA determines how they do
15   product labeling for devices.
16      Q   So that wasn't something you were aware of
17   prior to being retained as an expert in this litigation?
18      A   No, no.
19      Q   Do you normally look at FDA regulations as part
20   of your job?
21      A   You know, on occasion, depending upon what
22   they've done to us lately, but this -- I'm sorry.
23      Q   Do you look at FDA regulations as they relate
24   to medical devices?
25      A   No, no.

Cynthia Bergmann, M.D.

Page 126

```
 1        Q   Okay, so we'll mark -- it looks like this is an
 2   e-mail sending you the device labeling document,
 3   correct?
 4        A   Right.
 5        Q   So I'll mark that as the final exhibit, which
 6   is 21.
 7            (Whereupon Plaintiffs' Exhibit 21 was marked
 8   for identification.)
 9            MS. COPE:  And I believe the rest of these
10   materials relate specifically to individual cases.  I
11   have no further questions.
12            MR. KOOPMANN:  The thumb drives?
13            MS. COPE:  Sorry.  I'm guessing these are case
14   specific and general?
15            MR. KOOPMANN:  Yes.
16            MS. COPE:  So we will just mark all of these as
17   Exhibit 22.
18            (Whereupon Plaintiffs' Exhibit 22 was marked
19   for identification.)
20            MS. COPE:  Now we're finished.
21            (Time noted: 12:13 p.m.)
22
23
24
25
```

Page 128

```
 1   STATE OF CALIFORNIA    )
                            )  ss.
 2   COUNTY OF FRESNO       )
 3           I, Karla M. Rocha, Certified Shorthand Reporter
 4   licensed in the State of California, License No. 8982,
 5   do hereby certify that the foregoing proceeding was
 6   reported by me and was thereafter transcribed under my
 7   direction into typewriting; that the foregoing is a
 8   full, complete and true record of said proceeding.
 9           I further certify that I am not of counsel or
10   attorney for either or any of the parties in the
11   foregoing proceeding and caption named, or in any way
12   interested in the outcome of the cause named in said
13   caption.
14           In witness whereof, I have hereunto set my hand
15   and affixed my seal this day.
16       Date:  March 21, 2016
17
18
19
20
              _____
              Karla M. Rocha
21            CSR #8982
22
23
24
25
```

Page 127

```
 1
 2
 3
 4                  -oOo-
 5           I declare under penalty of perjury under the
     laws of the State of California that the foregoing is
 6   true and correct.
 7
 8   Executed at _____California on_____
     2016.
 9
10
11           _____
                 CYNTHIA BERGMANN, M.D.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 129

```
 1        ------
 2      E R R A T A
 3        ------
 4   PAGE  LINE  CHANGE
 5        _____
 6        REASON: _____
 7        _____
 8        REASON: _____
 9        _____
10        REASON: _____
11        _____
12        REASON: _____
13        _____
14        REASON: _____
15        _____
16        REASON: _____
17        _____
18        REASON: _____
19        _____
20        REASON: _____
21        _____
22        REASON: _____
23        _____
24        REASON: _____
25
```

33 (Pages 126 to 129)