EXHIBIT F

Cynthia Bergmann, M.D.

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

| | |
|---|---|
| IN RE: ETHICON, INC. PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION | Master File No. 2:12-MD-02327 |
| THIS DOCUMENT RELATES TO: | |
| CONSTANCE DAINO, ET AL. V ETHICON, INC. | Joseph R. Goodwin U.S. District Judge |
| Case No. 2:12-CV-01145 | |

DEPOSITION OF

CYNTHIA BERGMANN, M.D.

FRESNO, CALIFORNIA

MARCH 15, 2016

REPORTED BY: Karla M. Rocha, C.S.R. No. 8982

Golkow Technologies, Inc. - 1.877.370.DEPS

Cynthia Bergmann, M.D.

## Page 2

```
 1             I N D E X
 2   WITNESS: CYNTHIA BERGMANN, M.D.
 3   EXAMINATION                        PAGE
 4     BY MS. COPE                        5
 5     BY MR. KOOPMANN                   58
 6
 7   RE-EXAMINATION                     PAGE
 8     BY MS. COPE                       61
 9
10   EXHIBITS
11       PLAINTIFFS' DESCRIPTION        PAGE
12   Exhibit 1   Notice of Taking Deposition   5
13   Exhibit 2   Defense Medical Exam           7
14   Exhibit 3   Medical Chart of Ms. Daino     9
15   Exhibit 4   Document Entitled "Ethicon    10
                 Gynecare Pelvic Mesh
16               Litigation MDL 200
                 Dr. Cynthia Bergmann"
17
     Exhibit 5   Folder Containing E-Mail      10
18               Exchanges
19   Exhibit 6   Deposition Notebook           10
20   Exhibit 7   Binder of Records from        11
                 Kaiser Permanente
21
     Exhibit 8   Case Analysis - Constance     33
22               Daino
23
24       DEFENDANT'S DESCRIPTION        PAGE
25   Exhibit     (None offered)
```

## Page 3

```
 1         IN THE UNITED STATES DISTRICT COURT
 2        FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 3                   CHARLESTON DIVISION
 4   IN RE: ETHICON, INC. PELVIC
     REPAIR SYSTEM PRODUCTS           Master File No.
 5   LIABILITY LITIGATION.            2:12-MD-02327
 6
     THIS DOCUMENT RELATES TO:        Joseph R.
 7                                    Goodwin
     CONSTANCE DAINO, ET AL. V        U.S. District
 8   ETHICON, INC.                    Judge
 9   Case No. 2:12-CV-01145
10
11
12
13        The deposition of CYNTHIA BERGMANN, M.D.,
14   was taken on behalf of the Plaintiffs at McCormick,
15   Barstow, Sheppard, Wayte & Carruth, 7647 North Fresno
16   Street, Fresno, California, commencing at 1:34 p.m.,
17   Tuesday, March 15, 2016, before Karla M. Rocha, CSR No.
18   8982.
```

## Page 4

```
 1               A P P E A R A N C E S
 2
 3   For the Plaintiffs:
 4       MOTLEY RICE, LLC
         By: Breanne V. Cope, Esquire
 5       28 Bridgeside Boulevard
         Mount Pleasant, South Carolina 29464
 6       (512) 987-2336
         Bcope@motleyrice.com
 7
 8   For the Defendant:
 9       BOWMAN AND BROOKE, LLP
         By: Barry J. Koopmann, Esquire
10       150 South 5th Street, Suite 3000
         Minneapolis, Minnesota 55402
11       (612) 672-3289
         Barry.koopmann@bowmanandbrooke.com
```

## Page 5

```
 1                       -oOo-
 2            CYNTHIA BERGMANN, M.D.,
 3        called as a witness herein, having
 4           been heretofore duly sworn,
 5              testified as follows:
 6                       -oOo-
 7                  EXAMINATION
 8   BY MS. COPE:
 9      Q   Dr. Bergmann, thank you for making time for us
10   this afternoon. I represent Ms. Constance Daino and her
11   husband, Anthony Daino, in their lawsuit that they filed
12   against Ethicon, Inc., regarding injuries that we allege
13   she sustained from two Ethicon TVT devices. Does that
14   comport with your understanding of why we're here?
15      A   Yes.
16      Q   And I have marked as Exhibit 1 the deposition
17   notice in this case.
18          (Whereupon Plaintiffs' Exhibit 1 was marked for
19   identification.)
20   BY MS. COPE:
21      Q   And that asks you to bring documents with you
22   and I see that you have brought what I believe to be
23   your file in the Daino case; is that correct?
24      A   Correct.
25          MR. KOOPMANN: Just one clarification, Counsel.
```

Cynthia Bergmann, M.D.

Page 6

1  Those thumb drives that were marked during this
2  morning's deposition probably contained Daino-related
3  medical records.
4      MS. COPE: Okay, understood.
5  BY MS. COPE:
6    Q  The printed materials here, were those provided
7  to you recently or. . .
8    A  No, I don't think you have any in there that
9  are recent. You want to define "recent"? I mean, not
10 in the last couple of weeks.
11   Q  Okay, I guess I'm trying to understand what was
12 prepared for you specifically for the deposition today?
13   A  This one (indicating) has copies of all the
14 records in it.
15   Q  So this has copies of the depositions and this
16 is a binder that was prepared by Counsel for you for
17 purposes of today?
18   A  Correct.
19   Q  And anything else that was prepared for you
20 just for today's purposes?
21   A  For this deposition, no.
22   Q  Okay. I'm going to mark as Exhibit 2 what was
23 served on the plaintiffs in this case as your report on
24 March 2nd, 2015. All of your opinions regarding
25 Ms. Daino are in this report; is that correct?

Page 7

1      MR. KOOPMANN: Object to the form.
2      THE WITNESS: This is my independent medical
3  exam, so there's another report about opinions about the
4  case.
5  BY MS. COPE:
6    Q  We haven't received that.
7      MR. KOOPMANN: Well, it's here (indicating).
8      MS. COPE: Okay, I'm going to move to exclude
9  what is labeled "Case Analysis Constance Daino" as that
10 was never served on plaintiffs' counsel in this case and
11 is now being produced for the first time at the
12 deposition now.
13     MR. KOOPMANN: My understanding is that it was
14 produced, but, obviously, we'll need to look into that.
15     MS. COPE: Understood.
16     (Whereupon Plaintiffs' Exhibit 2 was marked for
17 identification.)
18 BY MS. COPE:
19   Q  So this document that's in front of you that's
20 been marked as Exhibit 2 is your defense medical exam,
21 this doesn't contain any causation opinions regarding
22 Ms. Daino's injuries, correct?
23   A  No, it does not.
24   Q  And do you recall when you were first contacted
25 to serve as an expert in the Daino case?

Page 8

1    A  Yes.
2    Q  When was that?
3    A  It was November, I believe, 16th of 2015.
4    Q  And in your earlier deposition there were some
5  billing statements; can you tell me how many of those
6  hours that you've billed were spent on the Daino matter?
7    A  No.
8    Q  Do you have an estimate as to how many were
9  spent on the Daino matter?
10   A  I'm going to say since that time probably a
11 third, but that's an estimate.
12   Q  And did you agree to serve as an expert in this
13 case before you reviewed the medical records of
14 Ms. Daino?
15   A  No.
16   Q  How long after receiving records did you agree
17 to be an expert in this case?
18   A  It was a couple of days later, I believe.
19   Q  And what records did you receive at that time?
20   A  I had received her medical records from Kaiser
21 Hospital and I believe from Antelope Valley Hospital.
22 Actually, it wasn't Kaiser Hospital, it was Kaiser
23 Permanente Medical Group.
24   Q  And do you know which of the providers it was
25 for at Kaiser?

Page 9

1    A  Dr. Lauria and Dr. Winter, and there may have
2  been some nurse practitioners that she saw in there as
3  well. But I don't recall if I saw those at that time or
4  at a later date.
5    Q  And I'll just quickly go through the materials
6  that you brought with you. So there's a manila folder
7  which appears to be a medical chart; is that correct?
8    A  Correct.
9    Q  I'll mark this medical chart as Exhibit 3.
10     (Whereupon Plaintiffs' Exhibit 3 was marked for
11 identification.)
12 BY MS. COPE:
13   Q  And then there's another binder that has a
14 divider labeled "Constance Daino" and Tabs 1 and 2, can
15 you tell me what this is, please?
16   A  This is the operative and pathology reports
17 going back to 2003, and that's under Tab 1, and under
18 Tab 2 are her office records. It also includes some
19 operative records in there.
20   Q  Of Dr. Lauria or --
21   A  This one is Dr. Lauria's.
22   Q  And that binder was prepared for you by
23 Counsel; is that correct?
24   A  Correct.
25   Q  I'll go ahead and mark that as Exhibit 4.

Page 10

1      (Whereupon Plaintiffs' Exhibit 4 was marked for
2  identification.)
3  BY MS. COPE:
4      Q   And then there's a manila folder of loose
5  papers that appear to be various e-mails sending you
6  medical records for Ms. Daino; is that correct?
7      A   Correct.
8      Q   So I'll mark that as Exhibit 5.
9      (Whereupon Plaintiffs' Exhibit 5 was marked for
10 identification.)
11 BY MS. COPE:
12     Q   And a binder labeled "Daino Depositions," which
13 I understand was prepared for purposes of today.  Did
14 you receive the depositions listed here in electronic
15 format previously?
16     A   Yes.
17     Q   I'll mark the deposition notebook as Exhibit 6.
18     (Whereupon Plaintiffs' Exhibit 6 was marked for
19 identification.)
20 BY MS. COPE:
21     Q   And the last item is another binder with a
22 document entitled, "Case Analysis" and then what looks
23 like various medical records.  Did you decide which
24 medical records would go with your case analysis?
25     A   No.

Page 11

1      Q   I'll mark this binder as Exhibit 7.
2      (Whereupon Plaintiffs' Exhibit 7 was marked for
3  identification.)
4  BY MS. COPE:
5      Q   So let's go through your defense medical exam
6  of Ms. Daino, which has been marked as Exhibit 2.  And
7  the first page, the chart number that you have here, is
8  that just how chart numbers are assigned in the general
9  practice of your office?
10     A   Yes.
11     Q   And is that chart what we've marked as
12 Exhibit 3?
13     A   This is the paper chart, but this is the
14 electronic medical record.
15     Q   Did you bring a copy of the electronic medical
16 record with you?
17     A   This is the copy of the electronic medical
18 record.  That has everything in it (indicating).
19     Q   And you didn't do this exam at your practice,
20 correct?
21     A   Correct.
22     Q   So how did you go about generating the
23 electronic record?
24     A   I took my notes, do my interview and exam, and
25 then entered the information afterward.

Page 12

1      Q   And on what date did you enter the information?
2      A   That would have been on the 26th.
3      Q   So you returned home after --
4      A   Sorry, 27th, the Saturday.
5      Q   And do you know why this exam was not performed
6  at your preface?
7      A   I was told that Ms. Daino was not able to
8  travel for more than half an hour at a time due to her
9  back surgery, which was done in May.
10     Q   And how did you find a location to perform your
11 medical exam?
12     A   I was informed by Counsel where the examination
13 would be performed.
14     Q   And during the examination was there a nurse or
15 chaperone present?
16     A   Yes.
17     Q   And who was that nurse employed by?
18     A   By the Antelope Valley Urology Group.
19     Q   Do you know anyone at that practice, by chance?
20     A   No.
21     Q   And you took a history from Ms. Daino; is that
22 correct?
23     A   Correct.
24     Q   Can you tell me approximately how long that
25 took?

Page 13

1      A   I think the total time -- you mean of this
2  history or the total exam?
3      Q   Just the history.
4      A   The history.  Probably between 45 minutes and
5  an hour.
6      Q   Is that typical for a patient that you would
7  have never seen in your practice before?
8      A   In my practice patients would have already
9  filled out all the forms.  So I would go over them with
10 Ms. Daino, we had to fill out the forms together, so
11 that took additional time.
12         Generally, in my practice it takes about
13 15 minutes for me to get information from a new patient.
14 But, again, the forms would have been filled out before
15 I seen them.
16     Q   In the last full sentence of Page 1 you state:
17 "The patient finds that her incontinence does not
18 interfere with her social life, her sexual life, her
19 financial gain or family relationships."  Can you tell
20 me how you came to that conclusion?
21     A   I asked her those questions and she said it did
22 not interfere.
23     Q   And was that part of the questionnaire?
24     A   Yes.
25     Q   That's contained in the patient chart?

Cynthia Bergmann, M.D.

Page 14

1   A   Yes.
2   Q   So did you get that information from
3   Question 38?
4   A   Yes.
5   Q   And for her social life it looks like the
6   answer is blank; is that correct?
7   A   I don't have anything written down there.
8   Q   And --
9   A   And I should have.
10  Q   And for her work it says, "Not applicable"
11  because she's not working; is that correct?
12  A   Correct.
13  Q   So do you still think it's fair to conclude
14  that her incontinence doesn't interfere with her social
15  life or her financial need?
16  A   What she told me was that she manages her
17  incontinence by restricting fluid when she goes out and
18  that she did not find it bothersome.  She also stated
19  that when she is working that she, again, manages it
20  with food restriction.
21  Q   The question asked, "Does your incontinence
22  interfere with" and for work she writes, "Not
23  applicable.  Yes, if working."
24  A   That's my writing, not hers.  She didn't fill
25  this out, I did.  And, again, the way she told me that

Page 15

1   it interferes was -- she was able to do her job, but
2   that she has to make modifications to her fluid intake
3   when she's working.
4   Q   So it does interfere with her work, correct?
5   She has to alter her behavior to complete her job
6   because of incontinence?
7   A   She has to alter how much she drinks.
8   Q   And she didn't write whether it interfered with
9   her social life or you didn't record the answer,
10  correct?
11  A   I didn't record that answer.
12  Q   But yet you still stated in your report that it
13  doesn't interfere with her social life?
14  A   Again, in interviewing her she had said it
15  didn't interfere with what she did.  Again, I did not
16  document it in that note, correct.
17  Q   So you were writing that portion of your
18  medical record from memory, correct?
19  A   For that particular question, yes.
20  Q   And can you walk me through the physical exam
21  and tests that were performed?
22  A   So starting on Page 5.
23  Q   Okay.
24  A   So I did a complete physical examination.  The
25  patient was clothed during the interview.  We had her

Page 16

1   change into a gown with a lap drape prior to initiating
2   the examination.  She was sitting on the table.
3       I examined her head, eyes, nose, her ears were
4   normal in appearance.  I looked in her mouth, had her do
5   ocular movements to check her cranial nerves.  Checked
6   her throat, didn't see anything wrong there.
7       Did a neck exam, checked her lymph nodes,
8   checked her heart, checked her lungs, looked at the
9   shape of her chest, did a breast exam, did an abdominal
10  exam.
11      Then I did a pelvic exam getting more specifics
12  with that.  I did the pelvic exam with and without the
13  speculum.  I had her bear down to see how that affected
14  her anatomy.
15      I then did a bimanual examination and, again,
16  had her bear down several times with my hand in the
17  vagina to determine where she might have prolapse
18  problems.  I palpated for tenderness, for masses, did a
19  rectal examination.
20      I then did her back examination.  It was a
21  little bit limited because she had -- she still had her
22  tape on from her surgery and I wanted to be careful not
23  to disturb that.  Checked her extremities, did
24  peripheral pulses, did a basic neurologic exam looking
25  at reflexes.

Page 17

1       And then for procedures I did a bladder scan to
2   see how much urine she had in her bladder.  She had a
3   sufficient amount that I thought it would be appropriate
4   to do a cough test.
5       We then had her stand over a pad, cough, she
6   lost urine.  She then went to the bathroom and voided,
7   and we were able to hear the voiding pattern, and she
8   came back in and we did another bladder scan to make
9   sure that she had emptied her bladder and she had.
10  Q   And what did you believe the purpose of your
11  exam on Mrs. Daino to be?
12  A   To help determine what was causing her
13  problems.
14  Q   And what did you believe her problems to be?
15  A   I knew that she had -- that there were
16  complaints of urinary retention, stress incontinence,
17  complaints of pelvic pain, complaints of dyspareunia.
18  Q   Any other complaints?
19  A   Not that I recall right now.
20  Q   You can feel free to reference anything that
21  you need to.
22  A   Do you have her complaint here?  Yeah, in
23  pelvic pain I'm including vaginal pain, if that makes a
24  difference.  So I think those are the basic complaints.
25  Q   Are those all the complaints?

Cynthia Bergmann, M.D.

Page 18

1  A  If you have a copy of her complaint I can read
2  it.
3  Q  Do you mean her actual legal complaint or. . .
4     You didn't document any that were in your chart
5  or in your medical exam what complaints you were
6  evaluating?
7  A  No.  I was doing her as a de novo patient
8  trying to do as independent a medical exam as I could.
9  Q  And all of the complaints you've listed so far,
10 urinary retention, stress urinary incontinence, pelvic
11 pain, including vaginal pain and dyspareunia, those all
12 involve her pelvis, correct?
13 A  Correct.
14 Q  So why did you find it necessary to examine
15 other areas of her body, including do a full breast
16 exam?
17 A  Because I was told to do a complete independent
18 medical exam.  That's part of -- that's my normal
19 examination for patients.  If I don't look for things
20 I'm not going to find them.
21    A breast exam, if I found a breast mass, it
22 might mean she had breast cancer.  Breast cancer
23 metastasizes to the ovaries.  If you have ovarian cancer
24 you can get ascites, that can cause pelvic pressure and
25 pelvic pain.

Page 19

1  Q  Have you done --
2  A  I might have also found galactorrhea, milky
3  discharge from the breast.  Even though she's of an age
4  where I would expect her to be menopausal or nearly
5  menopausal, that would indicate potentially
6  hyperprolactinemia.
7     With hyperprolactinemia you get a lowered
8  systemic estrogen and that can, as we discussed
9  previously, can contribute to problems with
10 incontinence.
11 Q  Did you determine whether Ms. Daino was
12 menopausal or not?
13 A  No.
14 Q  Have you ever done an independent medical exam
15 prior to examining Ms. Daino?
16 A  No.
17 Q  And so, again, you performed a breast exam
18 because she might have breast cancer which could cause
19 pelvic pain or milky discharge?
20 A  No, I examined her because she might have
21 breast cancer.  Breast cancer can metastasize to the
22 ovaries.  If it metastasizes to the ovaries you have a
23 pelvic mass, which can cause pelvic pain and pelvic
24 pressure.
25    It also causes a condition called ascites where

Page 20

1  you get a lot of fluid in the abdomen, which can also
2  cause pelvic pain and pelvic pressure.
3     A milky discharge called galactorrhea is an
4  entirely separate issue, but that can cause your
5  estrogen levels to go down.
6     Obviously, she's had a hysterectomy so we have
7  no idea what her periods are doing, but in patients with
8  galactorrhea, the estrogen levels go down, they're going
9  to start to have some symptoms that are similar to
10 menopause.
11 Q  And what menopausal symptoms from the milky
12 discharge -- symptom, disease, what's the proper term?
13 A  It would be a symptom.
14 Q  What are the menopausal symptoms that she might
15 be experiencing related to this milky discharge that you
16 believe are relevant to the pelvic issues we just
17 discussed?
18 A  Okay --
19 Q  I'm trying to understand how, if she did have
20 this condition where there was milky discharge, how
21 that's relevant to her pelvic complaints?
22 A  Oh, because her estrogen levels would go down.
23 Again, as we previously discussed, if her estrogen
24 levels go down then she's going to have less pelvic
25 support, the vagina gets thinner, she's going to have

Page 21

1  more dyspareunia.
2     So some of the symptoms that she complained of
3  might be explained by something like that.  Again, I
4  have to look for things to know whether they're there or
5  not.
6  Q  I understand that, but she's obviously coming
7  to you not of her own free will, you're not a doctor
8  that she's chosen, and you didn't find it at all
9  invasive to make her strip naked and do a full breast
10 exam and put her hands over every inch of her body?
11    MR. KOOPMANN:  Object to the form.
12    THE WITNESS:  First of all, she was clothed for
13 the examination, in examination clothing, we had as
14 little skin exposed as possible.  And, frankly, compared
15 to doing a pelvic exam, no, I don't think a breast exam
16 is invasive at all.
17 BY MS. COPE:
18 Q  Well, it's not really about what you think,
19 it's about what the patient thinks, correct?
20    MR. KOOPMANN:  Object to the form.  You just
21 asked what she thinks.
22    THE WITNESS:  I don't know what the patient
23 thought.  She did not object to it at the time.  Had she
24 done so I would not have done the exam and noted her
25 objection.

6 (Pages 18 to 21)

Cynthia Bergmann, M.D.

Page 22

1  BY MS. COPE:
2     Q   And what were you looking for in her skin, head
3  and eyes that would be related to any of the pelvic
4  complaints that we discussed?
5     A   Again, I was told I was to do a physical
6  examination, that's part of the physical examination.
7     Q   Is there anything that you could have found in
8  her skin, head and eyes that would have been related to
9  her pelvic complaints?
10     A   Well, for her eyes, if she's got dilated pupils
11  or pinpoint pupils that might indicate that she's having
12  some type of drug use or reaction, those can certainly
13  influence whether you have urinary retention or not.
14     Q   But you already went through her list of
15  medications and drug use as part of the history and
16  physical, correct?
17     A   Patients aren't always as truthful with you as
18  you might like them to be as a physician, so this is
19  another way of checking for other drug uses.
20         We also check -- I also check pupillary reflex
21  and accommodation to see if there might be a super
22  tentorial lesion, again, which can cause some urinary
23  problems.
24     Q   And same question for her ears, oral cavity,
25  throat, and neck, and lymph nodes, what could you find

Page 23

1  that could possibly be related to her pelvic complaints?
2     A   If she had oral thrush that can -- if patients
3  have oral thrush they can also have vaginal thrush or
4  candidiasis, which can cause irritation in some of her
5  complaints.
6     Q   Cause which of her complaints?
7     A   Pelvic pain or discomfort, discomfort with
8  intercourse.
9     Q   And can you tell me what peripheral pulses are?
10     A   Peripheral pulses are you check the boundary of
11  the artery at particular points.
12     Q   And can you tell me what you were looking for
13  in taking that that would be related to her pelvic
14  complaints?
15     A   Well, having noted that she's had multiple back
16  surgeries, that she had the motor vehicle injury, it's
17  just to make sure that her arteries were equal
18  bilaterally, which they were.
19         Again, if you have a compressed artery then you
20  start worrying about do you have other vascular
21  compression, particularly on that side, you don't know
22  if that might affect the pelvis or not.
23         For example, if patients have varicose veins
24  they often also have varicosities in their pelvis, which
25  can cause a feeling of pelvic heaviness or discomfort.

Page 24

1     Q   And what were your findings from the
2  incontinence evaluation?
3     A   I found that Ms. Daino has stress incontinence.
4  She also -- when she voided she appeared to have some
5  abdominal voiding going on because she took three tries
6  to completely empty.
7     Q   And so the post void scan, was that after the
8  third try?
9     A   Yes, it was when she felt her bladder was
10  empty.
11     Q   Was it that she felt her bladder was empty or
12  that she couldn't empty it further?
13     A   She stated that she felt her bladder was empty
14  at that point -- she always feels like there's something
15  in there, but she felt that it was back to what I would
16  call her baseline.
17     Q   Because in the next sentence you state that she
18  felt as though there was still urine remaining in her
19  bladder, correct?
20     A   Right.
21     Q   And according to what you wrote here, the post
22  void scan showed that there was no residual urine,
23  correct?
24     A   Correct.
25     Q   Are you aware that Ms. Daino used the restroom

Page 25

1  immediately after leaving your exam and did urinate?
2     A   That would not surprise me.  She drinks two
3  gallons of water a day.  She had at least 16 ounces
4  during the time of the examination.
5     Q   But wouldn't that conflict with your finding
6  that there was no residual urine in the bladder?
7     A   No.
8     Q   Why not?
9     A   Because the kidneys filter the blood and make
10  urine and they do it continuously.  So once a scan is
11  complete there's still time.  Again, she is drinking two
12  gallons of water a day.
13     Q   Do you know how much water she drank on the day
14  of the exam?
15     A   She said -- well, she told me how much she was
16  drinking and she said -- again, she had a bottle of
17  water with her and drank it during the examination.
18     Q   Do you know how much water she drank the day of
19  the exam?
20     A   I don't know exactly that day.  I know what her
21  habits are for drinking water because she told me.
22     Q   And do you know how much time passed between
23  the post void bladder scan and the end of the exam?
24     A   No.
25     Q   And on Page 6 --

7 (Pages 22 to 25)

Cynthia Bergmann, M.D.

Page 26

1   A   Oh, except that we did that prior to her pelvic
2   examination.
3   Q   Okay.
4   A   So there was, you know, at least another --
5   probably at least another 10 to 15 minutes between.
6   And, again, I don't know how much -- I know she was able
7   to fill her bladder during the time that I was talking
8   with her and putting in over 300 -- or 236 cc's during
9   that time.
10      But I did not scan her prior to her going and I
11  have no knowledge of how much urine she was able to
12  urinate following that.
13  Q   Did you do a urinalysis?
14  A   No.
15  Q   Why not?
16  A   Not in my office. I didn't have the equipment.
17  Q   Did you ask if they had equipment to do a
18  urinalysis?
19  A   No. And I also was not aware that that was one
20  of my lab examinations. They were quite limited.
21  Q   What were you informed were your limitations?
22  A   That I could do a physical examination, that I
23  couldn't do anything invasive, that I was allowed to do
24  a pelvic examination, but I was not allowed to do
25  urethroscopy, urodynamics.

Page 27

1   Q   Do you consider a urinalysis invasive?
2   A   No, but I was also not told that it was one of
3   the specifically allowed examinations.
4   Q   Did you ask if you could perform one?
5   A   No.
6   Q   And on Page 6 of the very bottom there's a
7   section entitled, "Assessment." These are not diagnoses
8   that you, yourself, made, correct?
9   A   What?
10  Q   These look like diagnoses of what Ms. Daino is
11  experiencing, but these aren't diagnoses that you made
12  yourself during the exam, correct?
13  A   Again, the formatting for the electronic
14  medical record is probably not the very most
15  appropriate, so these were -- well, obviously, I
16  diagnosed stress incontinence by her history. I
17  diagnosed urge incontinence. Again, I couldn't do
18  cystometrograms to confirm that. Possibly she has
19  interstitial cystitis.
20      By her history and, again, by her reflexes, she
21  appears to have sciatica. By her history I know that
22  she's had the dislocation of the various lumbar
23  vertebrae.
24      Hypothyroidism is by her history. I found a
25  thyroid nodule on examination, so she's got

Page 28

1   hypertension. She has mixed hyperlipidemia. I found
2   some hemorrhoids. And she has told me that she has
3   constipation if she takes narcotics.
4   Q   The possible interstitial cystitis, was that by
5   history?
6   A   Yes.
7   Q   And going back to your physical exam, when we
8   discussed what you were potentially looking for when you
9   examined all of Ms. Daino's body, did you find anything
10  that you believe might be contributing, like the milky
11  discharge or a breast mass, do you recall those
12  complaints?
13  A   She didn't have a milky discharge, so that
14  didn't contribute to her complaints. I did find
15  evidence of ongoing nerve damage, that can certainly
16  contribute to a complaint.
17  Q   But you're not a neurologist, correct?
18  A   No.
19  Q   And what evidence did you find of nerve damage?
20  A   She has hyperreflexia on the left side, which
21  is the same side on which she has her sciatica.
22  Q   And what's the significance of that?
23  A   When you have nerve damage to the back, the
24  pelvic musculature tends to not be as strong. You can't
25  contract it as well, you don't get as good a support.

Page 29

1   So it's very commonly associated with incontinence.
2       Also, the reflex for urination is in the back
3   so that can be a problem. Some of the medications that
4   people take for back pain can interfere with the ability
5   to void.
6   Q   When you find nerve damage in your patients in
7   your practice what do you do?
8   A   It depends upon where the nerve damage is and
9   how it's affecting them and if anybody else is taking
10  care of them.
11  Q   Do you treat them for nerve damage?
12  A   What I do is I refer them to -- if I had
13  somebody like Ms. Daino, she's already under care, it's
14  going to take, you know, probably at least two years for
15  her to get full functioning back from her back surgery
16  and have whatever nerve recovery she's going to have.
17      So somebody who is undergoing ongoing therapy,
18  I wouldn't do anything more. But I thought the therapy
19  were appropriate. If I thought it were inappropriate I
20  would refer the patient to somebody who I trusted and
21  thought did a good job.
22  Q   But, in any case, you would have them seek
23  treatment with a different provider who specialized in
24  neurology, correct, it's not a treatment you would
25  undertake?

Cynthia Bergmann, M.D.

Page 30

1  A   Either neurology or neurosurgery depending on
2  what complaint they have.  I would not do their surgery,
3  I would not order their physical therapy.  I might do a
4  work-up for them.  I might order an MRI, for example, to
5  see what was going on.  I would do further neurologic
6  workup than I did on Ms. Daino.
7      Q   And just a bit ago you stated that she is going
8  to need approximately two years to recover, is that what
9  you said?
10     A   Yeah.
11     Q   And is that something that she told you or a
12 conclusion you came to on your own?
13     A   No, that's from having spent a lot of time
14 doing neurosurgery and neurology during medical school.
15 Also, my current patients experience this when they have
16 back surgery and have any kind of neurologic deficit.
17     Q   But that's not any information you gained from
18 medical records of Ms. Daino, correct?
19     A   No.
20     Q   And can you tell me the findings of the pelvic
21 exam that you performed?
22     A   I did.  Did you want me to go over it again?
23     Q   Yes, I apologize.
24     A   I'll go ahead and read it to you.  Pelvic
25 examination, chaperone in the room, labia without

Page 31

1  lesions or masses --
2      Q   If you're just going to read it we don't need
3  to do that.
4      A   Okay.
5      Q   Was there anything of note in the pelvic exam
6  that you found?
7      A   Yeah, of note, I saw that the urethra came
8  down.  When she Valsalvaed it was not as much as I had
9  expected given her loss of urine.  I did not do a Q-tip
10 test to check for deflexion.
11         I found some scarring in the right
12 peri-urethral sulcus.  I didn't find any urethral
13 tenderness.  I didn't find any vaginal or pelvic
14 tenderness on examination.  I tried to reproduce the
15 pain that she had with intercourse, I was unable to do
16 that.
17         When I examined -- did a bimanual examination I
18 couldn't feel any masses or any fixation around the
19 vagina that might explain her pain.  I couldn't feel her
20 ovaries.
21     Q   And how did you attempt to reproduce the pain
22 she experiences with intercourse?
23     A   What I did was, using my hand, I felt in the
24 areas where she was describing getting pain, which was
25 primarily at the top of the vagina.  Again, she didn't

Page 32

1  react to that, didn't express any feelings of pain with
2  that.
3          I then felt along the walls of the vagina to
4  see if I could find any area that might be tender.  I
5  was unable to find any tenderness during the
6  examination.
7      Q   I don't have any additional questions about
8  your medical exam, but I would like to go off the record
9  so I can have a chance to review what was produced as
10 the case assessment.
11         MR. KOOPMANN:  Sure.
12         (Brief recess.)
13 BY MS. COPE:
14     Q   Of the time that you spent preparing for this
15 deposition how much of that was spent discussing
16 Ms. Daino's case specifically?
17     A   For -- in reference to what?
18     Q   In your preparation for preparing for today's
19 deposition.
20     A   All right, and which period of time are you
21 speaking of?  Are you talking about the preparation
22 yesterday or --
23     Q   The telephone call and the meeting that you
24 said, I believe, was seven or eight hours yesterday.
25     A   Right.  We spent about two to three hours on

Page 33

1  the Daino case.  Probably a little closer to two.
2      Q   And you state in this case analysis, which I'm
3  going to mark separately as Exhibit 8, that you believe
4  that the Gynecare TVT was an appropriate treatment for
5  Ms. Daino, correct?
6      A   Correct.
7          (Whereupon Plaintiffs' Exhibit 8 was marked for
8  identification.)
9  BY MS. COPE:
10     Q   And why do you believe it was an appropriate
11 treatment for her?
12     A   I believe it was appropriate for her in her
13 2003 surgery as she had symptoms of stress incontinence
14 and had a positive cough test done.
15     Q   But in that sentence it doesn't specify between
16 the 2003 and the 2010 surgeries, correct?
17     A   No.
18     Q   And in this paragraph here that begins on
19 June 21st you talk about the fact that Ms. Daino was on
20 two medications that could have been possibly causing
21 urinary retention; is that correct?
22     A   Correct.
23     Q   And what are those medications?
24     A   Cyclobenzaprine and Methocarbamol.
25     Q   Have you had patients that have had urinary

9 (Pages 30 to 33)

Cynthia Bergmann, M.D.

Page 34

1   retention caused by these medications?
2      A   No.
3      Q   And why do you believe that these medications
4   can cause urinary retention?
5      A   Because it says so in the literature.
6      Q   And what type of urinary retention can they
7   cause, in terms of duration, severity?
8      A   That, I don't know.  I know that there's no
9   literature that talks about polypharmacy where you have
10  more than one medication that can cause urinary
11  retention and how those two medications may interact.
12     Q   But you implant a TVT device in patients of
13  yours that are taking more than one medication at a
14  time, correct?
15     A   Correct, but not that are taking these
16  medications.
17     Q   You have never implanted a TVT device in a
18  woman who is taking Cyclobenzaprine and Methocarbamol?
19     A   At the same time, no.
20     Q   And do you know when Ms. Daino began taking
21  those medications?
22     A   I don't have that information in front of me.
23     Q   Do you have it anywhere?
24     A   I don't know if it's in her Kaiser records
25  somewhere.  I know that she was on them for her -- yeah,

Page 35

1   I don't know.  Let me see, they should be.  Well, she
2   was taking them in 2009.
3      Q   Okay, and --
4      A   Let me go back and see if they go any further.
5   And I believe on her admission form for the 2010 surgery
6   at Antelope Valley they also had those two medications.
7      Q   And how long would a patient need to be off of
8   those medications for any symptoms of urinary retention
9   caused by those medications to resolve?
10     A   That, I don't know.  It's going to be -- it
11  will be variable.
12     Q   What's your basis for making that statement?
13     A   Well, depends upon how quickly they clear the
14  medications from their system, especially when you have
15  been on them long-term you're going to have a buildup of
16  the medications, so it's not like it's a medication you
17  take every eight hours and it's out of your system in
18  eight hours, for example.
19     Q   But you don't know, as you sit here today, what
20  that time would be for Ms. Daino, correct?
21     A   No, I do not know for Ms. Daino.
22     Q   And do you know when she discontinued these
23  medications?
24     A   To my knowledge, she's still on them.
25     Q   So you believe she was on them at the time of

Page 36

1   your exam?
2      A   She stated that she was on them at the time of
3   my exam.
4      Q   And you wrote those down in the chart?
5      A   Yes.
6      Q   And you also stated in your case analysis that
7   in the 2010 preoperative note from Dr. Lauria there were
8   symptoms related to overactive bladder?
9      A   Correct.
10     Q   And can you tell me what those symptoms were?
11     A   She complained of urinary frequency, nocturia,
12  I believe -- and I can pull that up for you.  I believe
13  that she was getting up three times at night to go to
14  the bathroom.
15     Q   Any other symptoms?
16     A   Yeah, during the day she voided every hour.  At
17  night she voids three times.  Mild to moderate urinary
18  urgency.  Several episodes of urge incontinence during
19  the day with small amounts of urine.
20         Stress urinary incontinence, it says occasional
21  episodes of stress incontinence per week.  Small amounts
22  of urine provoked by moderate activity and she wasn't
23  using any pads.
24     Q   Of those preoperative symptoms that you just
25  listed, how many overlap with stress urinary

Page 37

1   incontinence?
2      A   The stress urinary incontinence would be
3   occasional episodes of stress incontinence per week and
4   not wearing any pads.
5      Q   So if Dr. Lauria diagnosed her with stress
6   urinary incontinence in 2010, why was the TVT not an
7   appropriate option or treatment?
8      A   Because her primary symptoms were of urge
9   incontinence.  Most women who have stress incontinence
10  or urge incontinence, only about ten percent will be
11  pure one way or the other.
12         Most of them have what's called mixed
13  incontinence, so they have symptoms of both stress and
14  urge incontinence.  And when the majority of the
15  symptoms are urge incontinence and not stress
16  incontinence, it would be more appropriate to take care
17  of the urge incontinence since that appeared to be what
18  was her primary complaint.
19     Q   And what's your basis for making that
20  statement?
21     A   Because she had several episodes of urge
22  incontinence per day, but occasional episodes of stress
23  incontinence per week.
24     Q   Sorry, I was referring to your statement that
25  it would have been appropriate to treat her overactive

10 (Pages 34 to 37)

Cynthia Bergmann, M.D.

Page 38

1  bladder for urge incontinence as opposed to treating her
2  stress urinary incontinence.
3      A   Okay, and what's the question then?
4      Q   You said it was inappropriate for Dr. Lauria to
5  treat her SUI with the TVT at the time, correct?
6      A   I believe that she should have treated her urge
7  incontinence and then determined if the stress
8  incontinence also needed to be treated or not,
9  particularly since she already had a sling in.
10     Q   My question to you is what is the basis for
11 your statement that Dr. Lauria should have addressed the
12 urge incontinence before implanting the TVT?
13     A   Oh, that's my experience, my education, my
14 attending conferences.
15     Q   Are you aware of any stress incontinence --
16 strike that.
17         Does it state in the IFU that the TVT device
18 should not be used if a patient is experiencing urge
19 incontinence?
20     A   No.
21     Q   And you also state in your case analysis that
22 Dr. Winter didn't separately identify the slings during
23 his dissection?
24     A   Yes.
25     Q   Is that significant?

Page 39

1      A   Well, he wasn't aware that there were two
2  slings in place.
3      Q   Why does that matter?
4      A   Well, if you're taking out sling material it
5  would be nice to know, and your goal is to take it all
6  out, it would be nice to know that you have done that.
7          If he's not aware that there are two slings in
8  and he's taking out mesh, how does he know that he has
9  gotten all the sling material he wants to.
10     Q   How do you know that his goal was to take all
11 the mesh out?
12     A   Well, he did a pretty good job taking it out.
13 Okay, so he's taking it out for urinary retention and
14 there are two slings in, what if he took out the sling
15 that was from 2003 that worked pretty well and left in
16 the sling from 2010 that was causing the retention, how
17 would he know that if he didn't know there were two
18 slings in there?  I mean, it's really important to know
19 that there are two in.
20     Q   Well --
21     A   I mean, if you have an ankle surgery and you
22 need to take out your screws afterward, and your surgeon
23 takes out two and they were supposed to take out four,
24 that doesn't make any sense.  He went in to take out
25 those screws.

Page 40

1      Q   But you testified earlier that when you've
2  operated on patients you don't know what type of sling
3  or devices they have implanted in them always before
4  you --
5      A   I won't always, but I usually know if they've
6  had one or two.
7      Q   And you weren't present for Dr. Winter's
8  surgery, correct?
9      A   No.
10     Q   So you have no idea of knowing if it was even
11 distinguishable which sling was from 2003 or 2010,
12 correct?
13     A   In Dr. Winter's deposition he said he didn't
14 realize until the deposition that there were two slings
15 implanted.
16     Q   So, obviously, it wasn't distinguishable during
17 the surgery, correct?
18     A   I don't know if it was distinguishable or not,
19 I know that he did not distinguish it.
20     Q   In terms of treating Ms. Daino for urinary
21 retention, how is that relevant?
22     A   Again, if he took out the 2003 sling that had
23 worked fairly well and left in the 2010 sling, which was
24 the one they were -- which is the one that they think
25 caused the urinary retention, then he would have not

Page 41

1  accomplished his goal in any way, shape or form.
2      Q   How would you take out the 2003 sling without
3  disturbing the 2010 sling when they're placed on top of
4  each other?
5      A   You don't know that they're placed on top of
6  each other.
7      Q   I'm asking you, because that's the situation
8  with Ms. Daino, how it would even be possible to remove
9  the 2003 sling without disturbing the 2010 sling?
10     A   Okay, because the urethra is about that long
11 (indicating), and in his operative report he testifies
12 that there was a sling that was higher up than he
13 expected, so that was the sling he took out.  Now, it
14 could be that that was a doubled-over sling.
15         When I looked at the pathology report they
16 didn't say that it was two layers of mesh put together.
17 They didn't -- you know, so I have never seen that there
18 were two layers of mesh for the suburethral dissection.
19         So it's possible that there is still a sling in
20 place even though he took a sling out at the time of
21 that surgery.
22     Q   How would that be consequential to Ms. Daino in
23 treating her for urinary retention?
24     A   If the sling is causing the retention and the
25 sling wasn't taken out, she would continue to have

11 (Pages 38 to 41)

Golkow Technologies, Inc. - 1.877.370.DEPS

Cynthia Bergmann, M.D.

Page 42

1 retention.
2 Q Does she continue to have retention now?
3 A She -- no, she doesn't. But, again, I don't
4 know -- if you're talking about the slings, I don't know
5 that both slings were taken out at that time.
6 Q But we know that she had urinary retention,
7 Dr. Winter performed his surgeries removing portions of
8 the TVT device or devices, and now she no longer has
9 urinary retention?
10 A Well, and then she continued to have urinary
11 retention after the surgery.
12 Q And then she had another surgery after that,
13 correct?
14 A Yeah, but that would have had nothing to do
15 with retention, that was for the bladder stone and the
16 TVT that was in the dome of the bladder.
17 Q Regardless, she does not have the same type of
18 urinary retention she had previously where she had to
19 self-catheterize even to urinate at all, correct?
20 A She no longer has that degree of urinary
21 retention, no. In fact, by my examination she has no
22 urinary retention.
23 Q So the surgery by Dr. Winter was effective to a
24 certain extent, correct?
25 A It was -- well, when patients have urinary

Page 43

1 retention caused by the sling, you take the sling out,
2 the urinary retention resolves immediately.
3 In her case it did not, which leads you to
4 suspect that that was not the cause of urinary
5 retention.
6 Q And you speculated that it's her medications,
7 correct?
8 MR. KOOPMANN: Object to the form.
9 THE WITNESS: Okay, she has multiple things
10 that could cause it, her medications are certainly among
11 them.
12 BY MS. COPE:
13 Q But she's still on those medications, according
14 to your testimony?
15 A Yes.
16 Q So we can rule those out as possible causes?
17 A She's taking a decreased amount of them. She's
18 also had two back surgeries since then.
19 Q I'm just talking about the medications. If she
20 was taking them and had urinary retention and now she no
21 longer has urinary retention, according to your exam,
22 and she's still taking them, what would lead you to
23 believe that the medications are causing urinary
24 retention?
25 A The amount of medication she was taking at the

Page 44

1 time.
2 Q And do you know when her dosage was dropped?
3 A She told me that she's just recently dropped
4 it --
5 Q So do you know --
6 A -- as a consequence of having her recent back
7 surgery.
8 Q But you don't know if the timing of her
9 dropping the dosage coincides with her no longer having
10 urinary retention, correct?
11 A No, I don't, though she had -- she's had
12 multiple examinations for urinary retention alone during
13 the last four to five years.
14 Q And in your assessment you also state that
15 following her back surgery she no longer had SUI or
16 urinary retention, correct?
17 A That was per Dr. Winter, he said that her
18 stress incontinence had resolved.
19 Q And according to your exam --
20 A She has stress incontinence.
21 Q Okay. Do you disagree that Ms. Daino's chronic
22 pain is from the TVT devices that have been implanted in
23 her?
24 A Again, I couldn't elicit any tenderness in any
25 of the areas where the TVT's had been implanted. She

Page 45

1 has horrific back problems, which can certainly cause
2 pelvic pain.
3 Q So is it your testimony that Ms. Daino does not
4 have chronic pelvic or vaginal pain?
5 A I do not believe that she has that as a result
6 of her TVT.
7 Q That's not what I asked you. I asked you if
8 your testimony is that she does not have chronic pelvic
9 pain or chronic vaginal pain?
10 A Again, when I examined her she didn't make a
11 complaint of that kind of pain.
12 Q So is it your testimony that she doesn't have
13 chronic vaginal or chronic pelvic pain?
14 A She did not make that complaint.
15 Q But it's in her deposition, correct?
16 A It's in her deposition. She did not tell me
17 that. So, you know, that's not to me to -- I assume
18 that the patient is going to tell me the truth when I
19 examine her.
20 Q Did you assume she was telling the truth in her
21 deposition?
22 A That, I have no -- I was not there to observe
23 her, I have no comment about that. I know it's supposed
24 to be truthful. So maybe -- so, again, there she said
25 she did, when she talked to me she said she didn't.

12 (Pages 42 to 45)

Cynthia Bergmann, M.D.

Page 46

1   Q   So I'm trying to establish whether you believe
2   she does have chronic pain and it's not caused by the
3   TVT or you don't think she has chronic vaginal and
4   pelvic pain at all.
5       A   She told me she did not have -- she told me she
6   did not give me a complaint of pain.
7       Q   And you recommended that Ms. Daino possibly try
8   Kegel exercises to help with her urge incontinence,
9   correct?
10      A   That would be among my recommendations to
11  improve her stress incontinence.
12      Q   And she reported to you that she already does
13  Kegels, correct?
14      A   Yes, she does some Kegeling.
15      Q   And has that helped her with any of her
16  symptoms?
17      A   I don't know how helpful it's been to her.  The
18  number that she does is considerably less than the
19  number that I recommend.
20      Q   And you mentioned in your case assessment that
21  she may possibly have interstitial cystitis?
22      A   Yes.
23      Q   But you are aware that she is under the care of
24  a urologist, correct?
25      A   Yes.

Page 47

1       Q   And would you agree that he has not diagnosed
2   her with interstitial cystitis?
3       A   I don't believe he has even thought of that as
4   a possibility.  He also states that he does not do much
5   of this type of work.
6       Q   Do you know Dr. Winter?
7       A   No, only from his depositions.
8       Q   And so you would agree with me that he hasn't
9   diagnosed her with interstitial cystitis?
10      A   He has not even approached that as a
11  possibility.
12      Q   And you would agree with me that Dr. Lauria
13  hasn't diagnosed her with interstitial cystitis,
14  correct?
15      A   Correct.
16      Q   And I didn't see any opinions in your case
17  assessment as to a need for Ms. Daino to have the sling
18  taken down by Dr. Winter; is that correct?
19      A   I don't recall if I put that in there or not.
20  Well, again, I have the luxury of looking with the
21  retrospective scope.  He took down the sling, her
22  retention didn't get better, therefore, you would have
23  to conclude that taking down the sling was unnecessary,
24  at least taking down the vaginal portion of the sling
25  was unnecessary.

Page 48

1       Q   But that's something you're stating right now,
2   but it's not included in your report, correct?
3       A   I don't think I specifically stated it.
4       Q   And I didn't see any opinions about the cause
5   of why she had foreign bodies or calculosis attached to
6   the wall of her bladder, those weren't included in your
7   case assessment, correct?
8       A   I don't believe I was asked to assess that.  I
9   did not.
10      Q   And at the beginning of your case assessment
11  you stated that the placement and management of
12  complications was not in accordance with the
13  manufacturer's instructions; is that correct?
14      A   Yes.
15      Q   What instructions are you referring to?
16      A   I'm referring to what we were told in our
17  classes.
18      Q   You took one class, correct?
19      A   I took two classes.
20      Q   Two classes and you have never taught a class,
21  correct?
22      A   Correct.
23      Q   And you took these classes in 2001?
24      A   In 2003, the same year Dr. Lauria did.
25      Q   And you don't know Dr. Lauria, correct?

Page 49

1       A   Not that I know of.
2       Q   So the instructions that you received in your
3   training, which you no longer have, would that include
4   the instructions for use as well?
5       A   Yes.
6       Q   And what did you learn in training or from the
7   IFU's about treating or management of complications
8   associated with the TVT device?
9       A   That you need to treat them fairly promptly.
10  If you do it within the first six weeks you can simply
11  dilate the urethra and put a little pressure posteriorly
12  and oftentimes that's enough to move the sling a
13  millimeter or so, so that patients are still continent
14  of urine, but no longer have retention.
15      Q   And that specific instruction is not included
16  in the instructions for --
17      A   In the IFU, no.
18      Q   So you believe it's the manufacturer's duty to
19  inform physicians about how to place the device and how
20  to manage complications, correct?
21          MR. KOOPMANN:  Object to the form.
22          THE WITNESS:  I don't know that it's -- it's a
23  little compound for me.  I know I have already gone over
24  this.  I believe that they need to make sure that the
25  device is safe to use.  It's great that they provide us

Cynthia Bergmann, M.D.

Page 50

1  instructions --
2  BY MS. COPE:
3     Q   Sorry. So you write in your report that the
4  placement and management of complications is not in
5  accordance with the manufacturer's instructions?
6     A   Right.
7     Q   What is the significance of that?
8     A   Oh, just -- well, it's a deviation from their
9  instructions. As physicians we don't have to follow
10 their instructions, just as we can give medications for
11 things that medications aren't approved for.
12       For example, we give aspirins for a heart
13 attack. Aspirin is not approved for heart attacks, as
14 an example.
15    Q   Just as you tension the TVT differently than
16 you were instructed, correct?
17    A   Yes, I tension it a little looser because I
18 find that works better on my patients. The problem for
19 Ms. Daino was that she was -- you know, Dr. Lauria
20 didn't do some simple things to relieve her obstruction.
21       When she had her retention in the hospital and
22 came back to have her catheter taken out, they didn't
23 check to see that she was able to void on her own. She
24 goes to the emergency room and has 1,400 cc's of urine
25 in her bladder --

Page 51

1     Q   Sorry, I'm going to cut you off just because we
2  don't have a lot of time and it's not really getting to
3  my question.
4     A   Okay.
5     Q   I want to know the significance of your opinion
6  that Dr. Lauria deviated from the manufacturer's
7  instructions in placing and managing of complications of
8  the TVT?
9        MR. KOOPMANN: Object to the form.
10 BY MS. COPE:
11    Q   You deviate from the manufacturer's
12 instructions so is Dr. Lauria not allowed to also or --
13    A   I would say that to the extent that it is
14 not -- that it is beneficial to patients it's okay. In
15 this case the patient went how many months with
16 retention? Where it's something that if it had been
17 from the sling could have been fixed in a two-week
18 period.
19       So you have a patient who's gone from -- what
20 is the date of her surgery? The 4th of April? No, I'm
21 sorry, April 29th, 2010 and on August 9th, 2011 she has
22 the sling taken out to relieve her retention. So that,
23 to me, is an extraordinarily long time to allow a
24 patient to be in retention.
25 ///

Page 52

1  BY MS. COPE:
2     Q   And when you've treated patients with
3  complications from sling devices, have you called the
4  manufacturers of those devices to see their recommended
5  instructions for managing or treating complications?
6     A   No, because I know them.
7     Q   And how do you know them?
8     A   Again, having gone to courses, reading the
9  literature, calling my colleagues, calling experts in
10 the field if I need to, to talk about things that are
11 going on with my patients.
12    Q   Didn't Dr. Lauria do those same things?
13    A   Not that I have documented in her record. She
14 referred to Dr. Winters and that was it.
15    Q   Well, you had Dr. Lauria's deposition, correct?
16    A   Right.
17    Q   About her review of literature and the training
18 she underwent and what she knew about the TVT device?
19    A   Right. And, again, but she didn't do what I
20 would consider appropriate to relieve the patient's
21 complaints of retention and then including the lateness
22 of the referral to Dr. Winter if she did not feel
23 comfortable managing those complications herself.
24       And I think it's absolutely fine that people
25 not manage complications that they're not comfortable

Page 53

1  managing, but the referral was not as prompt as it
2  should have been.
3     Q   And when you mentioned that you don't believe
4  Dr. Lauria did things that she should have to treat the
5  retention, what are those things?
6     A   Well, again, as I have told you before, she
7  didn't try to mobilize the device to see if that would
8  help. That would be number one. If that didn't work
9  then you can go in and, as is my custom, just simply
10 divide the mesh in the midline, and generally that's
11 enough to relieve the tension, while still allowing the
12 patient to remain continent.
13    Q   Anything else?
14    A   No. I mean, those are some very simple things
15 that could have been done. And, again, if you do
16 them -- in the first six weeks in an in-office, simple
17 procedure with very little discomfort to the patient.
18    Q   Is it your testimony that you were told to do
19 those things by Ethicon in the event that their TVT
20 device causes urinary retention?
21    A   I was told about doing the urethral
22 manipulations to get the TVT to loosen up slightly.
23    Q   And just for clarity sake, that was at your
24 training classes that you attended, correct?
25    A   Correct.

Cynthia Bergmann, M.D.

Page 54

1 Q And you weren't at any trainings that were
2 given to Dr. Lauria, correct?
3 A I believe that she also went to the training in
4 Las Vegas, as I did. I don't know if we were at the
5 same training session or not.
6 Q My question was: Were you at the same training
7 sessions as she was?
8 A I don't know. It's possible.
9 Q And the instruction to mobilize the device or
10 the urethra, that's not included in the instructions for
11 use, correct?
12 A Correct.
13 Q And neither is dividing the mesh at the midline
14 to relieve the retention, correct?
15 A Correct.
16 Q What do you feel was in error with the
17 placement of the device?
18 A The patient had absolutely no workup for stress
19 incontinence.
20 Q But you diagnosed Ms. Daino with stress
21 incontinence without doing a workup.
22 A Yes, I -- no, I did a workup. She did a cough
23 test, she lost urine. Dr. Lauria didn't even do a cough
24 test.
25 Q But Ms. Daino told her the symptoms she was

Page 55

1 experiencing and the loss of urine.
2 A Yeah, and you can get that from detrusor
3 dyssynergia as well. You can also get it if you have
4 urinary retention and an overfull bladder, you increase
5 the intra-abdominal pressure patience allusherum (ph.),
6 so you don't know what's causing her incontinence.
7 Q And you stated in your case assessment that you
8 believe there are additional medical problems and
9 treatments that caused or significantly contributed to
10 Ms. Daino's complaints, correct?
11 A Correct.
12 Q Are there any of those additional medical
13 problems or treatments that you believe have caused or
14 significantly contributed to Ms. Daino's complaints that
15 are not contained in that case assessment?
16 A I believe that they're within the case
17 assessment.
18 Q So you won't be offering any opinions at trial
19 that are outside the four corners of that document that
20 we have marked as Exhibit 8?
21 MR. KOOPMANN: Object to the form.
22 THE WITNESS: Again, absent getting additional
23 information either regarding Ms. Daino or regarding, you
24 know, changes in medical literature or how we do things,
25 no, I don't believe that I will change my opinion.

Page 56

1 BY MS. COPE:
2 Q Do you know whether Ms. Daino's TVT implants
3 were laser cut or mechanically cut?
4 A No, I do not.
5 Q Do you know how you would determine that?
6 A I believe you can go back to the hospital
7 records. They should have the serial numbers for the
8 implants within the medical records, I mean, you can go
9 back to the manufacturer and determine that.
10 And sometimes the medical manufacturers will
11 actually have a sticker that gives you even more
12 information than just the serial number.
13 Q And you had access to those hospital records
14 and the product ID sticker in preparing this case
15 assessment, correct?
16 A They were part of the record.
17 Q Do you believe there was anything wrong in the
18 placement of the TVT device during the 2003 procedure?
19 A Well, the bladder got perforated, so that was
20 an error in placement. Again, I think that she didn't
21 do as precise a tensioning as I would like to see,
22 however, the patient did quite well for seven years with
23 it.
24 Q And can you explain to me more of what you mean
25 by not as precise a tensioning as you would like to see?

Page 57

1 A As I said, my tensioning is by the millimeter
2 where she puts, I believe, a Heany clamp in to tension.
3 Heany clamps are graduated, so depending upon where you
4 are on the curve of the clamp and whether you are on the
5 straight part of the clamp or the curved part of the
6 clamp can make a difference in how much tension you
7 have.
8 Q But your method of doing it to the millimeter,
9 that's something that you developed on your own, not
10 something that you were taught by Ethicon, correct?
11 A We were taught to use a Heany -- sorry, a Hegar
12 dilator in the 2003 educational series.
13 Q The IFU does not give a specific millimeter,
14 does it?
15 A The IFU does not.
16 Q And did the bladder perforation in 2003 result
17 in any complications for the patient?
18 A I believe that's probably the mesh where she
19 got the bladder stone.
20 Q And when was the bladder stone?
21 A The bladder stone was -- when did they find
22 that, in 2012? It was Dr. Winter finding it. Yeah,
23 August 2nd, 2012.
24 Q So you think Dr. Lauria's bladder perforation
25 in 2003 caused the bladder stone in 2012?

15 (Pages 54 to 57)

Cynthia Bergmann, M.D.

Page 58

1  A   It might have been that one or it may have been
2  the bladder perforation she had in 2010. She had two of
3  them.
4     Q   So you can't state to a reasonable degree of
5  medical certainty what, if either of those, caused the
6  bladder stone?
7     A   I can give you a 50/50 on it.
8        MS. COPE: Okay. I think that's all the
9  questions I have. I will reserve the rest of my time
10 for any redirect and I will also just put on the record
11 again our objection about this case assessment which was
12 just produced today.
13       MR. KOOPMANN: Couple follow-up questions.
14              EXAMINATION
15 BY MR. KOOPMANN:
16    Q   Dr. Bergmann, you say on Page 3 of your case
17 assessment -- well, strike that.
18       Was the only vaginal pain that Ms. Daino
19 reported to you during the IME that you performed
20 vaginal pain that occurred during intercourse?
21    A   Yes.
22    Q   And you noted in your IME report that she
23 reported to you deep dyspareunia?
24    A   Correct.
25    Q   What's the significance of it being deep

Page 59

1  dyspareunia?
2        MS. COPE: Object to the form.
3        THE WITNESS: That tends to be deeper within
4  the pelvis, generally, at the top of the vagina or above
5  as opposed to vaginal pain. She did complain of some
6  vaginal dryness. She did not have any introital pain,
7  that introital pain being pain at the opening to the
8  vagina.
9  BY MR. KOOPMANN:
10    Q   And you reviewed Ms. Daino's medical records
11 prior to doing your medical examination?
12    A   Yes.
13    Q   Did she ever report dyspareunia in her medical
14 records prior to her TVT sling surgeries?
15    A   I believe that she had a complaint of
16 dyspareunia prior to her -- the sling that was placed in
17 2010. I think that was in 2009 when she was seeing
18 Dr. Lauria. Let me find that for you. On her
19 examination by Dr. Lauria, 11-3-09, sexual activity is
20 limited by dyspareunia.
21    Q   And then in the operative report from the June
22 2003 surgery she had a reported history of right-sided
23 pelvic pain and noted cyst on the right ovary by
24 ultrasound.
25    A   Okay.

Page 60

1     Q   Is that consistent with your recollection?
2     A   Yes.
3     Q   The TVT IFU says that the sling is indicated
4  for female urinary incontinence resulting from urethral
5  hypermobility and/or intrinsic sphincter deficiency,
6  right?
7     A   Correct.
8        MS. COPE: Object to the form.
9  BY MR. KOOPMANN:
10    Q   Before you ever implanted your first TVT sling
11 you had an understanding of how the mesh sling was
12 designed to work, correct?
13    A   Correct.
14    Q   You knew that it contained pores and that
15 tissue was going to be incorporated into those pores
16 that would then provide support for the mid-urethra?
17    A   Correct.
18       MS. COPE: I'll object to form. These are all
19 related to her general opinions that were already
20 covered this morning and not related to her opinions in
21 this case.
22 BY MR. KOOPMANN:
23    Q   So you knew that tissue incorporation was
24 supposed to occur?
25    A   Yes.

Page 61

1        MS. COPE: Same objection.
2  BY MR. KOOPMANN:
3     Q   Okay, and so based on that fact, did you also
4  know that if the patient was in retention after the
5  surgery that you would have a certain amount of time to
6  try to loosen that sling before the tissue incorporation
7  occurred?
8     A   Yes.
9        MS. COPE: Same objection.
10 BY MR. KOOPMANN:
11    Q   So did you need the IFU to tell you how to
12 manage the complication of retention if it occurred
13 after a TVT implant?
14    A   No.
15    Q   Is that something that you know because you're
16 a surgeon and you know how the mesh is designed to work?
17       MS. COPE: Object to form.
18       THE WITNESS: It's my knowledge as a surgeon,
19 my attending courses, reading literature, personal
20 experience.
21       MR. KOOPMANN: Those are all the questions I
22 have.
23              RE-EXAMINATION
24 BY MS. COPE:
25    Q   I just have a follow-up question. The

Cynthia Bergmann, M.D.

Page 62

1  right-sided pelvic pain that Ms. Daino reported in June
2  of 2003, did that resolve following her 2003 surgery
3  with Dr. Lauria?
4      A   I don't have any records of that.
5      Q   Do you have any records that it didn't resolve?
6      A   I don't have any records either way. I believe
7  that Kaiser -- well, they went from a written system to
8  an EMR and I believe a number of those records are not
9  available.
10     Q   So you have seen no records between June of
11 2003 and her surgery in 2010?
12     A   No, no, I think I have 2009. I have whenever
13 they started their new EMR, but I have no other written
14 records. 2003 they were still using written records.
15     Q   So did you see any reports of right-sided
16 pelvic pain from 2009 until her second TVT was
17 implanted?
18     A   I don't see any reports about that. All I have
19 is Dr. Lauria's notes saying that she has dyspareunia.
20         MS. COPE: And there can be -- strike that.
21     I have no further questions.
22         (Time noted: 3:12 p.m.)

Page 63

4           -oOo-
5       I declare under penalty of perjury under the
    laws of the State of California that the foregoing is
6   true and correct.

8   Executed at _____ California on _____
    2016.

11          _____
                CYNTHIA BERGMANN, M.D.

Page 64

1   STATE OF CALIFORNIA   )
                          ) ss.
2   COUNTY OF FRESNO      )
3       I, Karla M. Rocha, Certified Shorthand Reporter
4   licensed in the State of California, License No. 8982,
5   do hereby certify that the foregoing proceeding was
6   reported by me and was thereafter transcribed under my
7   direction into typewriting; that the foregoing is a
8   full, complete and true record of said proceeding.
9       I further certify that I am not of counsel or
10  attorney for either or any of the parties in the
11  foregoing proceeding and caption named, or in any way
12  interested in the outcome of the cause named in said
13  caption.
14      In witness whereof, I have hereunto set my hand
15  and affixed my seal this day.
16      Date: March 21, 2016

20          _____
                Karla M. Rocha
21              CSR #8982

Page 65

2           E R R A T A

4   PAGE  LINE  CHANGE
5   ____  ____  _____
6         REASON: _____
7   ____  ____  _____
8         REASON: _____
9   ____  ____  _____
10        REASON: _____
11  ____  ____  _____
12        REASON: _____
13  ____  ____  _____
14        REASON: _____
15  ____  ____  _____
16        REASON: _____
17  ____  ____  _____
18        REASON: _____
19  ____  ____  _____
20        REASON: _____
21  ____  ____  _____
22        REASON: _____
23  ____  ____  _____
24        REASON: _____

17 (Pages 62 to 65)