Bruce A. Rosenzweig, M.D.

```
 1              UNITED STATES DISTRICT COURT

 2            SOUTHERN DISTRICT OF WEST VIRGINIA

 3                       AT CHARLESTON

 4

 5   ---------------------------------)

 6   IN RE:  ETHICON, INC., PELVIC    )Master File

 7   REPAIR SYSTEM PRODUCTS           )No. 2:12-MD-02327

 8   LIABILITY LITIGATION             )MDL 2327

 9   ---------------------------------)

10   THIS DOCUMENT RELATES TO         )JOSEPH R. GOODWIN

11   CAROLYN LEWIS, et al. v.         )U.S. DISTRICT JUDGE

12   ETHICON, INC.                    )

13   Case No. 2:12-CV-04301           )

14   ---------------------------------)

15

16          The deposition of BRUCE A. ROSENZWEIG,

17   M.D., called for examination, taken pursuant to the

18   Federal Rules of Civil Procedure of the United

19   States District Courts pertaining to the taking of

20   depositions, taken before JULIANA F. ZAJICEK, CSR

21   No. 84-2604, a Certified Shorthand Reporter of said

22   State of Illinois, at the offices of Wexler

23   Wallace, Suite 3300, 55 West Monroe Street,

24   Chicago, Illinois, on November 4, 2013, at 9:00 a.m.

25
```

```
 1   APPEARANCES:
 2   APPEARED ON BEHALF OF THE PLAINTIFFS:
 3        WAGSTAFF & CARTMELL LLP
          4740 Grand Avenue, Suite 300
 4        Kansas City, Missouri 64112
          816-701-1100
 5        BY:  THOMAS P. CARTMELL, ESQ.
                  tcartmell@wcllp.com;
 6                JEFFREY M. KUNTZ, ESQ.
                  jkuntz@wcllp.com
 7
                  -and-
 8
          MATTHEWS & ASSOCIATES
 9        2905 Sackett Street
          Houston, Texas 77098
10        713-522-5250
          BY:  DAVID P. MATTHEWS
11                dmatthews@dpmlawfirm.com
12                -and-
13        AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC
          17 East Main Street, Suite 200
14        Pensacola, Florida 32502
          850-202-1010
15        BY:  RENEE BAGGETT, ESQ. (Telephonically)
                  rbaggett@awkolaw.com
16
     APPEARED TELEPHONICALLY ON BEHALF OF THE PLAINTIFF
17   CAROLYN LEWIS:
18        FREESE & GOSS PLLC
          Regions Harbert Plaza 1901
19        6th Avenue North
          Birmingham, Alabama 35203
20        205-871-4144
          BY:  CALLE M. MENDENHALL, ESQ.
21                calle@freeseandgoss.com
22
23
24
25
```

Bruce A. Rosenzweig, M.D.

```
 1   APPEARED ON BEHALF OF THE DEFENDANTS:
 2         BUTLER, SNOW, O'MARA, STEVENS & CANNADA, PLLC
           1020 Highland Colony Parkway, Suite 1400
 3         Ridgeland, Mississippi 39158-6010
           601-948-5711
 4         BY:   CHRISTY D. JONES, ESQ.
                 christy.jones@butlersnow.com;
 5               PAUL S. ROSENBLATT, ESQ.
                 paul.rosenblatt@butlersnow.com
 6
 7
 8
 9
10   REPORTED BY:   JULIANA F. ZAJICEK, CSR No. 84-2604.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Bruce A. Rosenzweig, M.D.

```
 1                  (WHEREUPON, the witness was duly
 2             sworn.)
 3             BRUCE A. ROSENZWEIG, M.D.,
 4   called as a witness herein, having been first duly
 5   sworn, was examined and testified as follows:
 6                      EXAMINATION
 7   BY MS. JONES:
 8       Q.   Doctor, would you state your name and
 9   address for us please, sir?
10       A.   Bruce Alan Rosenzweig.  My professional
11   address is 1725 West Harrison Street, Suite 358,
12   Chicago, Illinois 60612.
13       Q.   And, Doctor, you are an
14   obstetrician/gynecologist by training?
15       A.   That is correct.
16       Q.   And do I understand correctly that you
17   are in private practice, in the private practice of
18   medicine here in Chicago now?
19       A.   That is correct.
20       Q.   How long have you been in private
21   practice?
22       A.   Well, I -- I started here in Chicago at
23   the University of Illinois in 1998, I moved to
24   Mercy Hospital where I was in more of a private
25   practice than an academic practice, then I moved
```

Bruce A. Rosenzweig, M.D.

```
 1   time and the time that you started working in this
 2   litigation?
 3        A.    I -- I know I looked at a lot of patent
 4   documents.  I don't remember specifically if the
 5   patent infringement case I was working on I saw
 6   510(k) documents.  So, I don't want to say yes at
 7   that point, which was also about six or seven years
 8   ago.
 9        Q.    Have you ever prepared clinical expert
10   reports?
11        A.    No, I have not.
12        Q.    Have you ever prepared design history
13   files?
14        A.    No, I have not.
15        Q.    Have you ever prepared DFMEAs?
16        A.    No, I have not.
17        Q.    Have you ever prepared IFUs?
18        A.    Well, I did work with Gish Biomedical to
19   get the information that they needed to put in the
20   amnioinfusion catheter IFU.
21        Q.    Did you actually draft the IFU?
22        A.    No, I did not.  I worked as a consultant
23   on that.
24        Q.    Have you ever drafted an IFU?
25        A.    No, I have not.
```

1  Q. Have you ever drafted a patient
2  brochure?
3  A. I worked on the amnioinfusion catheter
4  brochures, yes.
5  Q. Other than your working as a consultant
6  with Gish on the IFU and patient brochure on the
7  IFU, have you ever had any other experience either
8  as a consultant or drafting an IFU or patient
9  brochure?
10  A. Yes. I was on EMPI's scientific
11  advisory committee in the mid-'90s and I know we
12  worked on various documents like that. I can't --
13  Q. You were on whose scientific advisory
14  committee?
15  A. EMPI. It is a company in Minnesota that
16  makes an electrical stimulator for the treatment of
17  stress incontinence and urge incontinence.
18  Q. And so your role there was?
19  A. An adviser to -- at that point they were
20  working on doing a prospective randomized
21  controlled trial because the insurance companies
22  were looking at this technique as experimental, and
23  so they needed to get some data in the literature
24  to show that it wasn't experimental.
25  Q. Have you ever prepared any risk

Bruce A. Rosenzweig, M.D.

1  management reports?

2      A.    No, ma'am.  Well, risk management as far

3  as medical -- medical products, right?

4      Q.    Right.

5      A.    Okay.  Good.

6      Q.    Not in terms of your hospital --

7      A.    Patients, doctors, right.

8      Q.    -- services and patients and all of

9  that.

10         Have you ever been an employee or

11 consultant to the FDA?

12     A.    No, I have not.

13     Q.    Have you ever served on an FDA advisory

14 committee meeting?

15     A.    No, I have not.

16     Q.    Have you ever corresponded with the FDA

17 with respect to your opinions on anything about a

18 medical device?

19     A.    No, I have not.

20     Q.    Have you ever shared with the FDA any of

21 your opinions that you have included within your

22 reports marked as Exhibits 2 and 3 here?

23     A.    No, I have not.

24     Q.    Have you ever published these opinions

25 in any other form other than in this report marked

```
 1   as Exhibit 2 and 3?
 2        A.   I think there is some of the I'll call
 3   it factual information in a presentation that I
 4   gave this year about polypropylene degradation and
 5   stuff like that, but that would be the only thing.
 6        Q.   That would be in one of the --
 7        A.   Slide decks, yes.
 8        Q.   -- slide decks?
 9        A.   Yes.
10        Q.   Again, we'll come back to those --
11        A.   Excellent.
12        Q.   -- in just a second.
13             You don't have any background in polymer
14   chemistry, do you?
15        A.   No, ma'am.
16        Q.   You don't consider yourself to be a
17   biomaterial specialist?
18        A.   I have not studied biomaterials, nor do
19   I have an advanced degree in biomaterials.
20        Q.   And I take it it's true that you've
21   never done any bench research or lab research with
22   respect to polypropylene?
23        A.   Not to polypropylene.
24        Q.   Am I correct that you have never advised
25   the FDA of any of your opinions that you've
```

Bruce A. Rosenzweig, M.D.

1  device report to either the FDA or to Ethicon?
2       A.    Yes.  I filled out the paperwork for
3  those.
4       Q.    And this was in when?
5       A.    2004, 2005, 2006.
6       Q.    On how many occasions?
7       A.    I'm going to say at the most five.
8       Q.    Were these implants that you had
9  implanted?
10      A.    There was one case that I remember that
11 I implanted that had an erosion, and I'm pretty
12 sure I filled out the paperwork with the rep on
13 that case, but the other ones were ones that were
14 sent to me.
15      Q.    All right.  Now, my initial question to
16 you was degradation --
17      A.    That is correct.
18      Q.    -- not erosion.  So my -- let me go back
19 and make sure that we are on the same page.
20            Did you report to anyone a finding of
21 erosion -- of degradation in 2004 or 2005?
22      A.    No, ma'am.
23      Q.    Have you ever reported that to anyone?
24      A.    No, ma'am.
25      Q.    Have you ever done any type of

Bruce A. Rosenzweig, M.D.

```
 1   pathological analysis on a removed TVT or implant?
 2        A.    Myself?
 3        Q.    Yes, sir.
 4        A.    No, ma'am.
 5        Q.    Have you ever ordered that one be done?
 6        A.    I send the explants that I do down to
 7   pathology, so I guess that would be considered
 8   ordering.
 9        Q.    And they would do whatever their normal
10   pathological process or procedure is in terms and
11   then those records would just be included within
12   the medical records?
13        A.    That is correct.
14        Q.    Other than that, have you been engaged
15   in any type of analysis of polypropylene?
16        A.    No, ma'am.
17        Q.    Have you ever reported to anyone that
18   you have seen or observed any particle loss from
19   polypropylene?
20        A.    Except to the patient, just to the
21   patient.
22        Q.    Have you ever reported that to the FDA?
23        A.    No, ma'am.
24        Q.    Have you ever reported it to Ethicon?
25        A.    No, ma'am.
```

Bruce A. Rosenzweig, M.D.

```
 1      A.   Those two in specific, no.  Just those
 2   two being representative of the body of retropubic
 3   and obturator TVTs.
 4      MS. JONES:  Let's just take a break and we'll
 5   do that and have lunch, unless you all are all
 6   assuming -- yes, it is one o'clock.  You all are
 7   ready for it.
 8      MR. CARTMELL:  Okay.
 9              (WHEREUPON, a recess was had
10                from 12:58 to 1:38 p.m.)
11   BY MS. JONES:
12      Q.   I'm going to quickly go through a series
13   of things just to clean up my notes to make sure
14   I've asked the question.
15              Other than Exhibit 6 which is your
16   PowerPoint, you never published anything on
17   polypropylene, is that correct?
18      A.   That is correct.
19      Q.   You never published anything on the
20   degradation of polypropylene, is that correct?
21      A.   That is correct.
22      Q.   You've never done -- never published
23   anything about the porosity of mesh, correct?
24      A.   That is correct.
25      Q.   You never published anything on the
```

```
 1   cytotoxicity of mesh, correct?
 2       A.   That is correct.
 3       Q.   You never published anything on fibrotic
 4   bridging, correct?
 5       A.   That is correct.
 6       Q.   You never published anything on
 7   contracture, correct?
 8       A.   That is correct.
 9       Q.   You are not a pathologist?
10       A.   I have not done a residency program in
11   pathology.  I am not boarded by the American
12   Pathological Association.
13       Q.   You are not a polymer chemist?
14       A.   That is correct.
15       Q.   Not an organic chemist?
16       A.   That is correct.
17       Q.   Not a toxicologist?
18       A.   That is correct.
19       Q.   You've done no research and development
20   with respect to polypropylene?
21       A.   That is correct.
22       Q.   You've never done any examination of a
23   biomaterial to evaluate tensile strength, for
24   example?
25       A.   A biomaterial, we did a study on -- on
```

1    Q.    And that information that you've
2    presented based upon your findings at that time, to
3    the extent that it was based upon any confidential
4    documents would have been based upon either Bard or
5    AMS documents, correct?
6    A.    That was not related to any confidential
7    documents.
8    Q.    So there wasn't any confidentiality
9    associated then with it, was there?
10   A.    Well, from -- quite frankly, I err on
11   the side of I don't know what I can or can't talk
12   about in this and I prefer not to talk about it so
13   that I don't have any problems later on.
14   Q.    Fair enough.
15   A.    Okay.
16   Q.    I'm going to skip around a little bit,
17   so just bear with me to get through with some of
18   this stuff.
19         You've never performed any pathological
20   testing on sutures, is that correct?
21   A.    I did a pathology rotation when I was a
22   student and also during residency.  We might have
23   looked at sutures under the microscope.  But are
24   you talking about doing any kind of pathological
25   stuff?

Bruce A. Rosenzweig, M.D.

```
 1      Q.    Analysis or study or --
 2      A.    No.
 3      Q.    And the same would be true with respect
 4  to mesh or polypropylene in general?
 5      A.    That is correct.
 6      Q.    You've never dried or cleaned mesh for
 7  any pathological analysis, correct?
 8      A.    That is correct.
 9      Q.    You have never sputter coated an
10  explanted mesh?
11      A.    Have I explanted mesh, yes, I have.
12      Q.    No.  Have you sputter coated?
13      A.    Sputter coated.
14      MR. CARTMELL:  It sounds funny.
15  BY THE WITNESS:
16      A.    I have explanted mesh.  I really do not
17  remember ever sputter coating the explanted mesh.
18  BY MS. JONES:
19      Q.    Have you ever done any differential
20  scanning calorimetry?
21      A.    I don't even think I can pronounce that.
22      Q.    Huh?
23      A.    No, I have not.
24      Q.    How about thermogravimetric analysis?
25      A.    No.
```

```
 1        Q.    How about compliance testing to
 2   determine mesh density?
 3        A.    No.
 4        Q.    How about any type of oxidative
 5   degradation testing?
 6        A.    No.
 7        Q.    Any type of molecular weight
 8   determination?
 9        A.    No.
10        Q.    Any type of uniaxial testing?
11        A.    Uniaxial tension testing?
12        Q.    Testing.
13        A.    Uniaxial would be a tensioning test?
14        Q.    Yes.
15        A.    Okay.  No.
16        Q.    Pore size measurement either with or
17   without load?
18        A.    No.
19        Q.    Mechanical testing?
20        A.    No.
21        Q.    Chemical analysis?
22        A.    Of what?
23        Q.    Of either polypropylene mesh or poly --
24        A.    Oh, okay.  I mean, I've done a lot of
25   chemical analysis back when I was in chemistry, but
```

Bruce A. Rosenzweig, M.D.

```
 1   not of mesh.
 2        Q.   Not of mesh, not of polypropylene?
 3        A.   That is correct.
 4        Q.   No toxicity or cytotoxicity testing of
 5   polypropylene or mesh?
 6        A.   That is correct.
 7        Q.   Have you ever read the FDA regulations
 8   pertaining to polypropylene meshes?
 9        A.   The FDA regulations regarding what?
10        Q.   Polypropylene meshes?
11        A.   Regarding what?
12        Q.   Anything.
13        A.   The -- quite frankly, that is such a
14   broad question, I don't know how to answer that
15   question.
16        Q.   Well, when is the last time you reviewed
17   the FDA regulations on medical devices?
18        A.   For what?
19        Q.   Just for any purpose.
20        A.   No, no, I mean for clearing devices, for
21   the various, you know, components of the device,
22   like the IFU?  That's why I'm having a little bit
23   of problems.
24        Q.   What I'm trying to find out is to what
25   extent you are going to claim that you are an
```

Bruce A. Rosenzweig, M.D.

1   you would, why it is that you as a surgeon who
2   performs pelvic surgery has expertise related to
3   what warnings and adverse reactions need to be in
4   an IFU?
5       A.   Well, I have experience using medical
6   devices, I have experience determining whether or
7   not I'm going to use medical devices in my
8   practice, I have experience determining if a
9   particular medical device is useful for a specific
10  patient and then counseling the patient on those
11  individual -- on the risks associated with a
12  particular medical device so that that patient can
13  determine if she wants to have a medical device
14  either implanted or used to treat her condition.
15      MR. CARTMELL:  All right.  Thanks.  That's all
16  I have.
17                   FURTHER EXAMINATION
18  BY MS. JONES:
19      Q.   Doctor, you would agree that any other
20  urogynecologist or specialist in female pelvic
21  surgery or treating stress urinary incontinence
22  would have similar expertise, correct?
23      MR. CARTMELL:  Object to the form.
24  BY THE WITNESS:
25      A.   I think that doctors have -- that are

Bruce A. Rosenzweig, M.D.

1  using the IFU, using it to decide if they are going

2  to keep it in their -- use a device in their

3  practice to determine if an individual patient that

4  device is useful for and then counseling the

5  patient on the use of that device, the risks and

6  benefits associated with it, I would say that that

7  would qualify them as an expert in IFUs.

8      MS. JONES:  Thank you.  That's all I have.

9           (Time Noted:  4:43 p.m.)

10          FURTHER DEPONENT SAITH NAUGHT.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25