Robert Shull, M.D.

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON
Master File No. 2:12-MD-02327
MDL 2327

JOSEPH R. GOODWIN
U.S. DISTRICT JUDGE

-----------------------------------------§
IN RE:  ETHICON, INC. PELVIC            §
REPAIR SYSTEM PRODUCTS                  §
LIABILITY LITIGATION                    §
                                        §
-----------------------------------------§
                                        §
Ana Ruebel v. Ethicon, Inc. et al.      §
Civil Case No. 2:12cv00663              §
                                        §
Harriet Beach v. Ethicon, Inc. et al.   §
Civil Case No. 2:12cv00476              §
                                        §
Carol Jean Dimock v. Ethicon, Inc. et al. §
Civil Case No. 2:12cv00401              §
                                        §
-----------------------------------------§

- - -
MARCH 10, 2016
- - -

Video deposition of Robert Shull, M.D.,
held at Beck Redden, LLP, 515 Congress,
Suite 1900, Austin, Texas 78701, commencing
at 9:54 a.m., digitally recorded at the date
and time aforesaid and transcribed by
Danielle Coleman, Court Reporter.

- - -

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph|917.591.5672 fax
deps@golkow.com

Robert Shull, M.D.

Page 2

```
 1   APPEARANCES:
 2   Counsel for the Plaintiff:
 3        DOUGLAS B. CANNON, ESQUIRE
          Fabian VanCott, P.A.
 4        215 South State Street, Suite 1200
          Salt Lake City, Utah 84111
 5        (801) 323-2227
          dcannon@fabianvancott
 6
     Counsel for Ethicon, Inc., and Johnson & Johnson:
 7
          TRACY J. VAN STEENBURGH, ESQUIRE
 8        Nilan Johnson Lewis, P.A.
          120 South 6th Street
 9        Minneapolis, Minnesota 55402
          (612) 305-7521
10        tvan@nilanjohnson.com
11   Also present:
12        PETER ZIERLIEN, VIDEOGRAPHER
13
14
15
16
17
18
19
20
21
22
23
24
```

Robert Shull, M.D.

```
 1                          - - -

                       I N D E X

 2                          - - -

     Testimony of:  ROBERT SHULL, M.D.                PAGE

 3
          DIRECT EXAMINATION BY MS. VAN STEENBURGH.....    4

 4
                            - - -

 5

                     E X H I B I T S

 6   DEPOSITION                                       PAGE

 7   EXHIBIT NO. 1      NOTICE OF TAKING DEPOSITION        5

 8   (Retained by Ms. Van Steenburgh)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Golkow Technologies, Inc. - 1.877.370.DEPS

Robert Shull, M.D.

1      THE VIDEOGRAPHER:  We are now on the record.

2    My name is Peter Zierlien.  I'm a videographer for

3    Golkow Technologies.  Today's date is March 10th,

4    2016.  The time is 9:54 a.m.  This video deposition

5    is being held in Austin, Texas, in the matter of

6    Carol Jean Dimock versus Ethicon, Inc., for the

7    United states District Court, Southern District of

8    West Virginia at Charleston.  The deponent is

9    Dr. Robert Shull.

10      Will counsel please identify yourselves for

11    the record?

12      MR. CANNON:  Doug Cannon appearing on behalf

13    of the plaintiff.

14      MS. VAN STEENBURGH:  Tracy Van Steenburgh on

15    behalf of the defendants.

16      THE VIDEOGRAPHER:  Will you raise your right

17    hand, sir?  Do you swear or affirm that the

18    testimony you give here today will be the truth,

19    the whole truth, and nothing but the truth?

20      THE WITNESS:  I do.

21      ROBERT SHULL, called as a witness by the

22    Defendants, having been first duly sworn, testified as

23    follows:

24

Robert Shull, M.D.

Page 5

1                        DIRECT EXAMINATION

2    BY MS. VAN STEENBURGH:

3         Q.    Good morning, Dr. Shull.

4         A.    Good morning.

5         Q.    We met off the record, but I'll introduce

6    myself again.  I'm Tracy Van Steenburgh and I represent

7    the defendants in a lawsuit brought by Carol Jean

8    Dimock, and we are here today to ask you some questions

9    about your expert opinion relative to Ms. Dimock's case.

10   You've had your deposition taken before, I take it?

11        A.    Yes, I have.

12        Q.    I will not go through all of the rigmarole in

13   terms of what we're going to be doing and the logistics

14   of it, then.  The only thing that I do like to say is I

15   fancy myself as being somewhat articulate, but if I am

16   not and you don't understand a question that I've asked,

17   please ask me to rephrase it, ask it in a different

18   way; otherwise, I'll just assume you understood the

19   question when you answer it.  Fair enough?

20        A.    Yes.

21        (Exhibit No. 1 was marked for identification.)

22        Q.    All right.  Doctor, I'm showing you what's

23   been marked as Deposition Exhibit 1.  I'll represent to

24   you that that is a notice of taking deposition in

Robert Shull, M.D.

Page 6

1    connection with the Dimock case along with a couple of

2    other cases you're going to sit for today, and as part

3    of the notice of taking deposition, you were asked to

4    some bring some materials with me -- with you.  Did you

5    bring some today?

6         A.   Yes, I did.

7         Q.   Okay.  And what did you bring with you as

8    materials?

9         A.   I have a current copy of my curriculum vitae.

10        Q.   Okay.

11        A.   I have the notice that you have referred to

12   previously.

13        Q.   Thank you.

14        A.   I have the schedule of time I've spent in

15   preparation and the billing for the preparation.  I

16   have the records, which are adjacent in a file box

17   which you can see at the end of the table.  I have

18   the case-specific opinion from Dr. Shoemaker and the

19   medical evaluation when Dr. Shoemaker examined

20   Mrs. Dimock, and I have a chronology of records

21   relating to her care, which was provided to me by

22   Mr. Cannon's law firm to summarize the chronology of

23   events.  I have a copy of the office visit Ms. Dimock

24   made when she saw me on the 25th of November, 2015.

Robert Shull, M.D.

Page 7

1    Q.   With respect to the medical records that you

2    brought with you today, I noticed that some of them were

3    tabbed.  Was there a rhyme or reason for the tabs that

4    you attached to the medical --

5    A.   Only because the volume of records was so

6    great that it is impossible to get back to something

7    meaningful without having some type of a marker.

8    Q.   With respect to the chronology that was

9    provided to you by Mr. Cannon's office, if you wouldn't

10   mind letting me take a look at that real quick.

11   A.   (Witness complies.)

12   Q.   Thank you.  And it looks like this is a

13   chronology that has a date, the name of the provider,

14   the occurrence or treatment, and then a reference to

15   certain Bates numbers.  This was prepared by counsel and

16   provided to you; is that right?

17   A.   Yes.

18   Q.   All right.  And the -- some of the entries are

19   highlighted in yellow.  Was that done before you got the

20   chronology?

21   A.   You know, it's possible some of them were.

22   They are also notes of mine in when I was reading them,

23   so I highlighted some things and have some handwritten

24   notes in the margins.

Robert Shull, M.D.

Page 8

1        Q.   And that's what I was going to ask, there was

2   some handwritten notes here, and I take it those are

3   your handwritten notes, correct?

4        A.   Yes.

5        Q.   All right.  And then with respect to you had

6   mentioned that you had made some notes at or about the

7   time that you visited with and examined Ms. Dimock, and

8   that is contained in a transcribed set of progress

9   notes; is that right?

10       A.   It is, and that has my own markings, because I

11  highlighted and excerpted from that for the final

12  report.  I didn't include everything that I had dictated

13  and I wanted to highlight the areas I wanted to include.

14       Q.   Okay.  And just so I am clear, you examined

15  Ms. Dimock in Texas?

16       A.   Yes.

17       Q.   All right.

18       A.   She came to my office in November of 2015.

19       Q.   And your -- and you followed your normal

20  procedure, which was to conduct an examination and do a

21  dictation of your -- the history and the findings at or

22  about that same time?

23       A.   On the same day.

24       Q.   On the same day.  Okay.  And then those are

Robert Shull, M.D.

Page 9

1    transcribed by somebody else and put into a final

2    report?

3         A.    Yes.   They are dictated and another person

4    transcribes them and then I validate them.

5         Q.    Okay.   In addition to the chronology and your

6    notes, I also note there are some documents in the

7    notebook that look like there maybe is an operative

8    report, and that contains some of the notes that you --

9         A.    Yes.

10        Q.    -- had as well?

11        A.    Yes.

12        Q.    Is that right?

13        A.    Yes.

14        Q.    And that appears to be the operative report

15   from the date of implant by Dr. Housel; is that right?

16        A.    I think there are several operative reports --

17        Q.    Okay.

18        A.    -- because she's had several procedures.

19        Q.    All right.   And you prepared an expert report

20   in connection with Ms. Dimock's case, correct?

21        A.    Yes, I did.

22        Q.    All right.   And what is the date of that

23   report, if you don't mind, if you know?

24        A.    It would be -- I don't know the exact date.

Robert Shull, M.D.

Page 10

1    It would be the last week of January of 2016, and it's

2    possible that I -- that Mr. Cannon's office has the

3    date which it was received.  It was prior to February

4    the 1st, and it would have been one of those last few

5    days of January, 25th or 6th possibly.  I don't remember

6    that for certain.

7         Q.   And I don't know if this may help you, you

8    gave me a copy of your billing statement, and it looks

9    like you had prepared a draft and that you may have had

10   a final call with Mr. Cannon on or about the 26th of

11   January?

12        A.   That's correct.

13        Q.   So using that as the date, when were you first

14   asked to get involved in connection with the claims by

15   Ms. Dimock?

16        A.   I believe the first correspondence I had with

17   Mr. Cannon's office was in the fall of 2015.  I don't

18   remember the exact month.  I don't have that letter with

19   me.

20        Q.   Okay.  And that was a direct contact from

21   Mr. Cannon's office to you, or is it through somebody

22   else?

23        A.   It was through his paralegal originally.

24        Q.   Okay.

Robert Shull, M.D.

Page 11

1        A.    And then he and I corresponded.  I emailed him

2    and/or called him to get information to decide if this

3    was something that fell into an area I had an interest

4    in and knowledge enough to be of assistance.

5        Q.    And what kinds of -- I mean, did you ask him

6    for materials in order to review it to assess that?

7        A.    No.  I asked him mainly about the patient

8    herself, what the possible concerns are, and what were

9    his expectations.  Did he simply want me to review the

10   record and contact him?  Did he want me to write a

11   case-specific report, simply to see her in consultation?

12   I wasn't clear in the beginning what he was asking me to

13   do.

14       Q.    Okay.  And I noticed in some of the materials

15   that you brought with you there are some handwritten

16   notes.  I'll strike that.  It looks like these are from

17   something else.

18             What was it that Mr. Cannon asked you to do in

19   connection with the Dimock case?

20       A.    Eventually, what he asked me to do, would I

21   see her for a medical evaluation, would I evaluate her

22   prior records, her current exam, and be willing to write

23   a case-specific report about her, I guess, fact sheet

24   would be the right word.  I'm not sure I saw it at the

Robert Shull, M.D.

Page 12

1    time, what was contained in the fact sheet about her

2    injuries associated with the product that had been

3    implanted in her.

4         Q.    And prior to that, you and Mr. Cannon had

5    talked about her case, and that was so that you could

6    assess whether this was something within your area of

7    expertise?

8         A.    Yes.  And to find out what he actually

9    expected someone to do, because I -- did it fit in a

10   calendar that I could do it?  Was it something I was

11   knowledgeable about?

12        Q.    And what was the nature of the scope of the

13   engagement, besides seeing her for evaluation,

14   evaluating her records; more specifically, were you

15   asked to provide some kind of opinion as to whether

16   there was a cause-and-effect relationship between the

17   implant and her injuries?

18        A.    Yes.

19        Q.    Okay.  Now, were you asked as part of the

20   scope of your engagement to determine whether -- well,

21   let me strike that.

22             In your review, Ms. Dimock received a Prolift

23   device as part of her procedure that Dr. Housel

24   performed back in 2008, correct?

Robert Shull, M.D.

Page 13

1          A.    That's accurate.

2          Q.    And Dr. Housel also implanted something called

3     a TVTO vaginal sling, correct?

4          A.    Yes.

5          Q.    All right.  Were you asked to provide an

6     opinion as to whether the Prolift device caused the

7     injuries that Ms. Dimock claims she now suffers?

8          A.    I was.

9          Q.    Okay.  Were you asked to provide an opinion as

10    to whether the TVTO device caused any of the injuries

11    that Ms. Dimock claims she has suffered?

12         A.    He asked if I was interested in that.  I told

13    him I was not likely to be prepared to do that on the

14    TVT.

15         Q.    All right.  And why is that?

16         A.    Because, one, we have a long record of

17    knowledge about TVT.  We are reasonably familiar with

18    its success, with the side effects, and potential

19    complications.  It's accepted as a method of treatment

20    for urinary incontinence.  I, in fact -- I don't use a

21    TVTO.  I do use a retropubic TVT, so I feel as if I'm

22    knowledgeable about that.

23         Prolift has a much shorter history with less

24    objective information about its indications,

Robert Shull, M.D.

Page 14

1    complications, and potential problems, and the truth is

2    that some of her physical findings could only be related

3    to the Prolift because of the areas in the vaginal canal

4    where the exposure is identified.

5         Q.    So just so that we are clear, you are not here

6    today and have not prepared any report or are prepared

7    to give an opinion as to whether the TVTO in any way

8    caused any injury to Ms. Dimock; is that right?

9         A.    That's accurate.

10        Q.    Okay.  Did you look at the records relative to

11   the implantation of the TVTO and her subsequent medical

12   treatment?

13        A.    Yes, I did.

14        Q.    Okay.  And do you believe that the TVTO was

15   effective for her stress urinary incontinence?

16        A.    To the best of my knowledge, it was helpful

17   for her stress urinary incontinence.  She still had

18   urinary complaints.  Probably not stress incontinence

19   but symptoms compatible with urgency incontinence or

20   overactive bladder.

21        Q.    Okay.  And urinary incontinence and overactive

22   bladder are usually not treated with a device such as a

23   TVTO; is that correct?

24        A.    That wouldn't be a standard method of therapy

Robert Shull, M.D.

1    for those complaints.

2         Q.    Okay.  And are you here today to provide any

3    opinions relative to any urinary incontinence issues

4    that Ms. Dimock might be currently experiencing?

5         A.    Well, if you ask me questions about her

6    symptoms, if I can answer them appropriately, I will.

7         Q.    Okay.  And the question, I guess, more

8    specifically is have you been asked to provide any

9    opinions relative to whether Prolift has caused any of

10   the issues that Ms. Dimock currently experiences with

11   urinary incontinence?

12        A.    Not with her current complaints.  When I

13   looked at the records, there were some concerns possibly

14   related to urethral obstruction associated with the

15   Prolift and Dr. Norton's preoperative and intraoperative

16   notes indicate some of that, so I feel comfortable

17   answering questions about that if you ask about them.

18        Q.    Okay.  And with respect to Dr. Norton's

19   findings in her notes, there was never any finding of

20   any kind of urethral obstruction with Ms. Dimock; is

21   that right?

22        A.    There was no objective evidence that she could

23   not empty her bladder effectively, for example.

24        Q.    Okay.  There are references in her record to

Robert Shull, M.D.

Page 16

1    some experience with urinary retention.  Do you remember

2    seeing that?

3         A.   Yes.  What I don't remember, and maybe you

4    have that, but I don't remember seeing it, the

5    documentation of a continued what are called postvoid

6    residual volumes, elevated postvoid residual volumes.

7    There may be something.  I don't recall that off the top

8    of my head.

9         Q.   Okay.  Well, the reason I ask is there are

10   some references in there to some of the medications that

11   she was taking that one of the side effects is urinary

12   retention.  I don't recall if you saw that or not?

13        A.   Yes.

14        Q.   Okay.

15        A.   She was taking some antispasmodics, and some

16   antispasmodics relax the bladder, and one of the

17   potential side effects is it may either take longer to

18   void or you may have incomplete voiding.

19        Q.   Okay.  Doctor, your report that you prepared

20   in connection with Ms. Dimock's case is based in part on

21   your review of her medical records, correct?

22        A.   Yes.

23        Q.   And is it also based in part on your medical

24   examination of Ms. Dimock?

Robert Shull, M.D.

Page 17

1         A.    Yes.

2         Q.    And then it's also based in part on your

3    clinical experience?

4         A.    Yes.

5         Q.    And also your review of the literature?

6         A.    Yes.

7         Q.    Okay.  Did you review Ms. Dimock's medical

8    records prior to performing a medical examination of

9    Ms. Dimock?

10        A.    I had access to some of her records that had

11   been given to me in advance, not the entire record, and

12   even if I had received all of those records, it would

13   have been impossible to review them before I saw her.

14   And then I spoke to her directly before examining her

15   about her own knowledge of the history of her

16   obstetrical history, surgical history, and her current

17   complaints.

18        Q.    And I guess more specifically, when you said

19   you had received some records, do you recall, did you in

20   fact review some of her medical records prior to meeting

21   with her?

22        A.    I cannot tell you for certain which ones, but

23   I believe that I had access to her operative note from

24   2008 and to at least some, if not all, of her explant

Robert Shull, M.D.

Page 18

1    procedures following that.

2        Q.    Okay.  And those would have been procedures

3    primarily performed by Dr. Norton?

4        A.    Yes.

5        Q.    Okay.

6        A.    Normally, I would like to have those when

7    someone is being seen for evaluation after having had

8    prior surgery.  It's helpful to see the operative notes

9    because in general they are more informative than the

10   history is.

11       Q.    With respect to the medical records, how did

12   you decide which medical records to reference in your

13   report?

14       A.    What I wanted to do was understand something

15   about her history before she had surgical management in

16   Utah.  So there were some things in her record that I

17   could see, but that came in part from simply

18   interviewing her about her past surgical history when

19   she was living in California.  And then in the remainder

20   of the records what happened now is when you, for

21   example, request a record or someone sends me a record,

22   it would be an exhaustive copying of every conceivable

23   thing, including in-hospital stays, a lot of nursing

24   documentation, which is appropriate for nurses to know

Robert Shull, M.D.

Page 19

1    about.  It isn't necessarily something that would be

2    helpful in understanding the details of how the patient

3    feels or about the surgical procedure.  So what I've

4    tried to do is find the parts of the record that

5    actually involve a face-to-face encounter with one of

6    the health-care providers, either in the outpatient

7    clinic or in the operating room or the recovery period,

8    as opposed to documentation for all of the other things.

9         Also with electronic medical records, many things

10    are repeated over and over and over again.  I'm sure

11    you've seen that, so once you've read that particular

12    entry one time, it normally isn't necessary to read it

13    on every other time that it's repeated in the medical

14    record.

15         Q.   Now, your report includes a summary of certain

16    medical records and also includes a -- your summary of

17    your examination of Ms. Dimock, correct?

18         A.   That's accurate.

19         Q.   All right.  So let's talk a little bit about

20    the format.  I'd like to talk about the examination and

21    when she came down to meet with you.

22         A.   Yes.

23         Q.   That was in November of 2015, correct?

24         A.   November the 25th, 2015.

Robert Shull, M.D.

Page 20

```
 1          Q.    Okay.  And where did the examination take

 2    place?

 3          A.    In my office in Temple, Texas.

 4          Q.    Okay.  And was anyone else present?

 5          A.    No, not with her.  She came by herself, and I

 6    inquired when she came if I were free to share her

 7    information with Mr. Cannon, and she gave me permission

 8    to do that.  He wasn't there, but she was comfortable

 9    letting me either copy him the records or -- I can't

10    remember if I spoke to him, quite honestly, but he had

11    access to the information in the record.

12          Q.    Prior to the examination, did you talk with

13    any of Ms. Dimock's physicians?

14          A.    No.  And I haven't since.

15          Q.    Okay.

16          A.    I haven't spoken to anyone else about it.

17          Q.    And the same question as to any of her family

18    members?

19          A.    I haven't met anyone.  I think she is single

20    and she has one child whom I've never met and never

21    spoken to.

22          Q.    All right.  How long did the examination take?

23          A.    Her visit, I would say it was probably 45

24    minutes to an hour from the time I saw her, interviewed
```

Robert Shull, M.D.

Page 21

1    her, examined her, then she would get dressed and come

2    back to my office, and we sat down to discuss her

3    history, the physical exam, answer her questions, and I

4    tried to give her as much information as I had about

5    what I thought I saw and felt and what some options for

6    her would be regarding management of her pain complaints

7    primarily.

8        Q.   And the recommendations or what you thought

9    about how to manage her pain complaints, are those

10   contained in your report?

11       A.   Yes, they are.  And they're --

12       Q.   Was there anything else you shared with her

13   that is not in your report with respect to

14   recommendations on treatment?

15       A.   No.  And my expert report has a condensed

16   version of my entire outpatient recording, but the

17   entire outpatient encounter is in the records that I

18   have here.

19       Q.   And just so that I am clear, the examination

20   you said was 45 minutes to an hour, and then after-

21   wards she came to your office and spent more time --

22       A.   That was --

23       Q.   -- or the whole --

24       A.   -- the entire visit.

Robert Shull, M.D.

Page 22

1          Q.    The entire visit --

2          A.    Yes.

3          Q.    -- was between 45 minutes and an hour?

4          A.    Right.

5          Q.    Okay.  And with respect to the history that

6     you took from Ms. Dimock, did that occur at the

7     beginning, before the physical examination, or

8     afterwards?

9          A.    It's before.

10         Q.    Okay.

11         A.    So normally, what I would do is introduce

12    myself to someone, particularly someone I've never met

13    previously, discuss the history in as much detail as

14    possible.  Then after I've obtained the history, then

15    the patients prepare for -- I leave the room.  The

16    patients prepare for an exam.  I come back and examine

17    her.  After the exam, she then gets dressed and after

18    she's dressed and comfortable, then she would come to

19    the office and we would discuss it.

20         Q.    Very good.  Thank you.  And just so I'm clear

21    on logistics.  During the time that you are taking the

22    history and doing the examination, are you

23    contemporaneously dictating?

24         A.    No.

Robert Shull, M.D.

Page 23

1          Q.    Okay.

2          A.    What happens now with electronic medical

3    records, you can enter all of those things while you're

4    interviewing the patient.  I don't do that.  I interview

5    them, discuss everything with them, and when they leave,

6    then I document the electronic records and dictate the

7    encounter.

8          Q.    If -- do you have a copy of your report?

9          A.    Yes.  Of the expert report?

10         Q.    Yes.

11         A.    Yes, I do.

12         Q.    There is a section in the ex report that

13   starts at Page 8 where it indicates you personally

14   interviewed and examined Ms. Dimock on November 25,

15   2015.  If you would turn to that.

16         A.    I see it.

17         Q.    Okay.  I want to make sure that I understand

18   the format.  It looks as though you took the history and

19   have recorded the history that goes through Page 10 to

20   the bottom, where then you describe the examination; am

21   I correct on that?

22         A.    It looks as if that's the case.

23         Q.    Okay.  Did you prepare this report yourself?

24         A.    Yes.

Robert Shull, M.D.

Page 24

1          Q.    And then on Page 11, there is a section that

2     starts in the middle of the page saying "Diagnosis"?

3          A.    Yes.

4          Q.    And that would be a diagnosis that you -- was

5     based on your taking the history and your examination

6     and evaluation; is that right?

7          A.    Yes.  That's still a continuation of her

8     personal visit with me on the 25th of November.

9          Q.    Okay.  And then on Page 12, starting at the

10    top, it looks to be the area where you start providing

11    information regarding your differential diagnosis and

12    your opinions relative to Ms. Dimock's injuries; is that

13    right?

14         A.    Yes.

15         Q.    All right.  I'd like to ask you a few

16    questions relative to the history, so that I understand

17    what you were asking and what Ms. Dimock was telling

18    you, and this is kind of a question-and-answer kind of

19    format; is that right?

20         A.    Sure.

21         Q.    I mean, not here, but when you were talking to

22    Ms. Dimock?

23         A.    Yes.

24         Q.    Yes.  All right.

Robert Shull, M.D.

Page 25

1          A.    That's correct.

2          Q.    And were you restricted in any way from asking

3     her any questions that --

4          A.    Not to the best of my knowledge.

5          Q.    Okay.  So on Page 8, it refers to the fact

6     that she had a hysterectomy and an oophorectomy in the

7     mid-'90s.  Do you recall whether that was a total

8     hysterectomy or a laparoscopic hysterectomy?

9          A.    I don't know the answer to that.

10         Q.    Okay.  Would that make a difference to you in

11    terms of any of your opinions in the case?

12         A.    No.

13         Q.    Okay.  Now, it also looks on Page 9 that she

14    said she'd never had any symptoms of fibromyalgia,

15    correct?

16         A.    That's accurate.

17         Q.    And was it that -- she reported she'd had no

18    history of chronic pain prior to having the mesh

19    surgery; is that right?

20         A.    That's accurate.

21         Q.    Okay.  So how do you define chronic pain --

22         A.    I would --

23         Q.    -- as you have written it here?

24         A.    In the history?

Robert Shull, M.D.

Page 26

1      Q.    Right.

2      A.    Well, I would ask a patient very specifically,

3    "Do you have a history of fibromyalgia, yes or no?  Do

4    you have a history of migraine headaches, chronic joint

5    disease, rheumatoid arthritis, lupus, anything that

6    could be associated with chronic pain?"

7      Q.    Okay.

8      A.    And her response to that was she had no

9    history of any of those things prior to her surgery,

10   and, in fact, I'm not sure she even has a current

11   history of any of them, to be quite honest.

12     Q.    Okay.  In taking her history, did you talk

13   with her about any history of previous pelvic pain that

14   she had experienced?

15     A.    In the past, I talked to her about

16   hysterectomy.  It's not uncommon when a woman has a

17   hysterectomy that among whatever the reasons are, pelvic

18   pain may be one of the reasons, it may be associated

19   with menstruation, with ovulation, with poor support.

20   So it's reasonably common in a woman who has had a

21   hysterectomy that one of the complaints would have

22   been painful menstruation or painful ovulation.

23     Q.    Did Ms. Dimock tell you that she had been

24   treated for pelvic pain syndrome in the past?

Robert Shull, M.D.

Page 27

1      A.   I'm not aware that she had chronic treatment

2    for that.  She may have had -- sometimes when she

3    developed abdominal or pelvic pain, it was seen

4    intermittently, but I'm not aware that was a chronic

5    issue with her.

6      Q.   Okay.  And just so you and I are on the same

7    page, when you say not a chronic issue, how would you

8    define that, that it's an ongoing -- well, you define it

9    for me?

10     A.   Well, it'd be -- usually chronic means lasting

11   six months or longer, or is recurrent, maybe

12   intermittent over a period of years with the same signs

13   and symptoms.

14     Q.   So to the best of her recollection in response

15   to your -- well, strike that.

16          Based upon the history that she provided to

17   you, you did not understand that she had had chronic

18   pelvic pain in the past, prior to the mesh surgery; is

19   that right?

20     A.   That's correct.

21     Q.   Okay.  In the history, it looks like she told

22   you that prior to her surgery in 2008, she had engaged

23   in a relationship where she had had sex on a regular

24   basis, is that right, and never had -- sorry -- and not

Robert Shull, M.D.

Page 28

1    had complaints associated with sexual intercourse; is

2    that right?

3         A.   Not -- that's accurate.

4         Q.   Okay.  And she told you that for about a year

5    prior to the surgery, which was in 2008, she had not had

6    any sexual intercourse; is that correct?

7         A.   Yes.

8         Q.   Is it your understanding based on talking with

9    her that from the mesh surgery to the time that you

10   examined her, she had not engaged in sexual intercourse?

11        A.   That's correct.

12        Q.   Now, in the history, it says approximately

13   three to six months before seeing Dr. Norton in 2010 she

14   developed complaints with what she calls pulling,

15   ripping, and a sense of stabbing pain in the pelvis.

16   There's a reference to her working with a bicycle pump?

17        A.   I presume what she was doing is blowing up a

18   tire or bicycle tire or a ball or something that

19   required you -- if she had used one the way you or I

20   probably would, she would be moving up and down with her

21   hands to pump something.

22        Q.   Okay.  Did you talk with her any more

23   specifically than the fact that she had been working

24   with a bicycle pump at the time?

Robert Shull, M.D.

Page 29

1           A.    No.

2           Q.    All right.  But was it your impression based

3    on what she told you that she recalls the onset of the

4    pain based upon that activity that she was engaged in in

5    using the bicycle pump; is that right?

6           A.    She at least -- she mentioned that.

7           Q.    Okay.

8           A.    It's not uncommon sometimes for people to date

9    an important medical activity to something.

10          Q.    Absolutely.  And then she also told you it was

11   approximately three to six months before she saw

12   Dr. Norton in 2010 that she began to develop the

13   complaints of pulling and ripping and that stabbing

14   pain?

15          A.    Yes.

16          Q.    Okay.  Did you see in the records that she

17   told Dr. Norton that it had been that way since the mesh

18   surgery itself?

19                MR. CANNON:  I'll just object.  I think it

20          mischaracterizes the record.

21                MS. VAN STEENBURGH:  All right.

22          A.    I think I would have to see that note.

23          Q.    Okay.

24          A.    I mean, I can't remember that right off the

Robert Shull, M.D.

Page 30

1    top of my head, but I'd be glad to look at the reference
2    if you would like me to do that.
3         Q.   We'll -- I'll bring those out in a bit.  On
4    Page 10, Doctor, it looks like you are indicating that
5    at your examination there were no signs of any vaginal
6    bleeding, correct?
7         A.   That's accurate.
8         Q.   And there was a reference to her having used
9    estrogen intermittently following her surgery in 2008.
10   Was that something that she reported to you or something
11   you gathered from the records?
12        A.   Well, it's -- it became clear in the interview
13   I had with her that she had used estrogen part of the
14   time.  She also later developed breast cancer, and I
15   think she stopped her estrogen temporarily at least
16   during the time she had the diagnosis in early
17   management of her breast cancer.
18             It isn't uncommon for me to see people who may
19   be on any number of medical regiments where their
20   persistence in taking something on a regular basis waxes
21   and wanes.
22        Q.   And my question merely was the extent to which
23   you talked with her about what her estrogen history had
24   been.  Do you have any more detail other than she had

Robert Shull, M.D.

Page 31

1   used it intermittently following the surgery?

2       A.   Not in this note, I don't.  There are

3   -- there's information in the various outpatient visits

4   she had with Dr. Sharp, with I think Dr. Summers was the

5   doctor treating her infections, so there are multiple

6   comments in Drs. Norton, Sharp, and Summers' note

7   regarding advice to use estrogen and whether she was

8   currently using it or not.

9       Q.   Do you recall seeing in her records that from

10  the time of her hysterectomy until approximately the

11  time that she saw Dr. Norton, she was taking estrogen

12  via injection?

13      A.   I don't have that documented.

14      Q.   Does that refresh your recollection at all, my

15  asking that question?

16      A.   No.

17      Q.   Okay.  Do you recall seeing anything in the

18  records that she was taken off of estrogen and -- by

19  Dr. Norton?

20      A.   No.

21      Q.   The injectable?  Okay.

22      A.   Oh, the injectable?  No.  She may have

23  transitioned to the topical estrogen.  I don't remember

24  the exact comment about that, but that would be a

Robert Shull, M.D.

Page 32

1  logical thing to do in someone in whom you want to

2  treat specifically the vaginal tissue is ask them to

3  use topical estrogen.

4       Q.   Do you recall seeing anything in Ms. Dimock's

5  records regarding any withdrawal she was having from no

6  longer taking estrogen via injection?

7       A.   No.

8       Q.   Okay.  Now, in the next paragraph, she

9  indicates to you that she has no sense of any tissue

10  bulging outside the vagina, correct?

11      A.   That's accurate.

12      Q.   And when you report that she says that she

13  feels as if she is imploding on the inside of the

14  vaginal canal, can you be any more specific as to how

15  she was describing her feeling there --

16      A.   Well --

17      Q.   -- or is that -- are those just words that she

18  used and you wrote them down?

19      A.   Those are her words, which I would take to

20  mean that's not a normal feeling and is not a pleasant

21  feeling, and then she subsequently described pain.  So I

22  don't normally have patients use that particular word.

23  I didn't ask her to expand on it --

24      Q.   All right.

Robert Shull, M.D.

Page 33

1          A.    -- any more than she did.

2          Q.    And when she said that she describes pain as

3     to her seat bones, do you know what she was referring to

4     when she said "her seat bones"?

5          A.    Oh, I think she means when she was sitting

6     down, probably on what she wouldn't know would either be

7     her ischial tuberosities or the lower part of her sacrum

8     or coccyx, but in fact in that area there are also

9     muscles and other tissues which would be related to

10    sitting and hurting.

11         Q.    The next paragraph describes a little bit

12    about her issues with incontinence, correct?

13         A.    Yes.

14         Q.    And this is what she reported to you, that

15    Dr. Norton had asked her to reduce her fluid intake

16    because there might be a connection between her urge

17    incontinence and the amount of fluid she was taking in?

18         A.    Yes.

19         Q.    All right.  And, again, if you drop down a

20    couple of paragraphs, she describes the pain in her seat

21    bones and in the back part of the vagina, correct?

22         A.    Yes.

23         Q.    Was it your understanding that this is a

24    constant pain that she experiences?

Robert Shull, M.D.

Page 34

1          A.    I believe she had told me.  My later -- the

2     last sentence in that paragraph said that there has not

3     been a day or a week or a month where she's been

4     pain-free since her surgery in 2008.  That would lead me

5     to think that she has pain on a regular basis, and it

6     varies in intensity on a scale of zero to 10 between a

7     four and a seven, and depending on what level it is, she

8     may use aspirin or ibuprofen.  Sometimes she would use

9     Percocet, which has a synthetic codeine in it.

10         Q.    So as far as you can tell, this is a constant

11    pain as opposed to an intermittent pain that she

12    experiences?

13         A.    I think she has a constant level of pain and

14    intermittently it changes.

15         Q.    Okay.  In terms of the --

16         A.    She has a baseline pain component with

17    intermittent changes in the intensity of the pain.

18         Q.    All right.  And her report is that she's had

19    that constant or baseline pain since the surgery in

20    2008; is that right?

21         A.    Yes.

22         Q.    All right.  Now, with respect to the

23    examination that you performed, you note that external

24    genitalia, Bartholin, Skene's, and urethra area are

Robert Shull, M.D.

Page 35

1    remarkable in that she has puncture sites from her prior

2    trocar placement of the mesh products, correct?

3        A.   Yes.

4        Q.   Did you notice anything -- she had a procedure

5    involving the Bartholin gland.  Were you aware of that?

6        A.   Yes.

7        Q.   All right.  And is one of the puncture sites

8    related to that procedure, or are you saying that

9    they're all related to use of the pelvic mesh product?

10       A.    It would be highly unlikely they would have

11   been related to Bartholin's gland, unless someone made

12   an incision in an unusual area.

13           In order to deploy the mesh arms, there's a

14   need to have puncture sites on the outside of the vulva,

15   in what's called the perianal area. Those puncture sites

16   sometimes heal where frankly it's quite difficult to see

17   where the puncture was, and sometimes it's easier to see

18   that.  That could vary depending on wound healing or

19   individual characteristics of a patient.  It could in

20   the case of early after surgery, it could be a

21   reflection of infection in the wound site.

22           The areas that I saw and commented on, I

23   didn't see any acute signs of infection, and I couldn't

24   expel anything from these puncture sites.  They simply

Robert Shull, M.D.

Page 36

1    were there.

2         Q.    Okay.  And with respect to any of your

3    opinions regarding Ms. Dimock's injuries, are you going

4    to provide an opinion that her injuries were due in any

5    part to the use and placement of a trocar for insertion

6    of the device in this case?

7         A.    Yes.

8         Q.    And what's your opinion?

9         A.    About the trocar use, you mean?

10        Q.    Yes.

11        A.    Trocars, in order to be used in the case of

12   a transvaginally placed mesh, have to traverse a number

13   of tissue planes, depending on whether the trocar goes

14   outside to inside or inside to outside, but the trocars

15   traverse the skin; the external skin; the underlying

16   fatty tissue, what's called fascia; muscles; the

17   connective tissue of the vagina; and the skin of the

18   vagina.  So in one way or the other, the trocars

19   traverse all of those tissue layers and those tissue

20   layers contain vessels, nerves, and areas where

21   lymphatic drainage, for example, which you cannot see by

22   simply looking at the skin any more than you could look

23   at my hand and see everything underneath.  It just

24   doesn't work that way.

Robert Shull, M.D.

Page 37

1          So the trocars are passed in an area where
2     presumably it's safe in terms of not injuring a major
3     artery, a major vein, or a major nerve, but when the
4     trocars are introduced, the mesh arms then are deployed.
5     In general, the trocars themselves have a smaller
6     diameter than the width of the synthetic product.  So
7     the trocar creates a passageway and when the arms are
8     deployed, the arms are not going to look the same as
9     they do when they come out of the package, for example;
10    and depending on where the trocars traverse, it's
11    entirely possible that there are going to be small
12    nerves, small vessels, possibly larger nerves or vessels
13    that could be injured because the trocars are passed not
14    under direct visualization but by palpation.  That's the
15    nature of using them for anything, so it's not possible
16    to see everything.
17          So in the case of the Prolift, which requires
18    multiple trocar passages, every time one is passed,
19    there is an opportunity for something to happen that you
20    wouldn't have anticipated, or every time an arm is
21    deployed, there is an opportunity for that arm of the
22    mesh product to lie adjacent to a nerve, a sensory
23    nerve, a muscle nerve.  And then because of the
24    placement of these arms, the configuration invariably is

Robert Shull, M.D.

Page 38

1    going to be different than it is when the arm is simply

2    lying out and hasn't passed through any tissue.  So the

3    trocars in this particular circumstance are important,

4    because she required multiple trocar passages in order

5    to deploy the arms in the mesh.

6        Q.   Well, let me ask you a question, because I

7    heard a couple of things there.  One, is it your opinion

8    that the trocar -- the trocar is used with respect to

9    the Prolift product itself, the trocars themselves

10   injured Ms. Dimock?  Because I heard you say something

11   about the trocars, but also when the mesh arms were

12   deployed, that the placement of the arms could lie

13   adjacent to a nerve, so I wanted to make sure I

14   understood the difference between the two of those.

15       A.   In the case of an immediate injury from the

16   trocar itself, what we would expect to see is the mesh

17   is deployed into the rectum, the bladder, or the

18   urethra.  There is no evidence that the trocars actually

19   passed into the rectum or into the bladder or into the

20   urethra, so that would be one possibility, where the

21   trocar itself could have created an injury.  There is

22   nothing to suggest that.  The trocars could penetrate a

23   large blood vessel and there could be hemorrhage

24   associated with the trocar placement.  There is nothing

Robert Shull, M.D.

Page 39

1   in the record to indicate that there was an immediate

2   hemorrhage.

3          The trocars could be placed so that instead of

4   the mesh being deployed under the vaginal skin, the mesh

5   could be deployed through the vaginal skin, and there is

6   no evidence in the record to suggest that happened.  The

7   trocars do pass through innervated tissue with blood

8   vessels in it in order to create a path to bring the arm

9   back out.  So in the sense that the trocars are

10  important, they create the pathway for the arms to be

11  deployed, and could they injure small nerves, small

12  vessels, impede the -- by direct trauma?  The answer is

13  yes, they could.

14         So let's presume that there isn't any mesh

15  product, but you simply took a group of women and took a

16  trocar as big as basically a pencil and stuck it six

17  times into the vaginal canal and out through the outside

18  of the pelvis, could someone be injured from that, and

19  the answer is yes.

20         In her case, she didn't have the trocar go

21  through the bladder, urethra, or rectum.  She didn't

22  have excessive bleeding, but she in fact could have had

23  trauma to those other structures, which could cause her

24  to have pain.  In that case, would the pain be chronic

Robert Shull, M.D.

Page 40

1    or would it be self-limiting?  In all likelihood in the

2    absence of actually severing a larger nerve, which could

3    happen, but there is no evidence that happened here,

4    trauma from the trocar passage itself is more likely to

5    have a self-limiting period where there is bruising,

6    swelling, and tenderness, but the trocar then brings the

7    mesh product into that same pathway, and the product is

8    there forever.  So the issue, then, is could you get the

9    product there without the trocar, and you can't.  That's

10   why they are trocar-based.

11        Q.   So the question I had was -- I think the

12   answer is no, if I hear you -- that there was not any

13   immediate injury by virtue of using the trocar itself,

14   correct?

15        A.   There is no evidence of that.

16        Q.   No evidence of that. And that's a possibility,

17   but there is no evidence in this case, correct?

18        A.   There is no evidence.

19        Q.   All right.

20        A.   We would see that if someone saw the trocar in

21   the bladder, felt it in the rectum --

22        Q.   Right.

23        A.   -- saw it in the urethra, saw it in the

24   vaginal tissue.  I'm talking about through the vaginal

Robert Shull, M.D.

Page 41

1   skin.  If we saw that, you could say, "Yes.  The trocar

2   was in the wrong place and it did something it

3   shouldn't have done."

4        Q.   And your opinion here is that the mesh itself

5   was the cause of the pain and other injuries that

6   Ms. Dimock suffered, not the trocars themselves,

7   correct?

8        A.   The trocar in and of itself isn't.  The

9   trocar -- the mesh couldn't have been deployed without

10  the trocar.

11       Q.   Understood.

12       A.   So however you separate that out.

13       Q.   Okay.  Is it possible during a native tissue

14  repair for there to be some kind of damage to any of the

15  nerves or tissue?

16       A.   Yes, it is.

17       Q.   Okay.  With respect to your pelvic exam, I

18  note that the vaginal canal measures approximately seven

19  centimeters deep.

20       A.   Yes.

21       Q.   Is that within a normal range based upon your

22  experience?

23       A.   It is.  You know, everything is an average,

24  just sort of whether you're tall or short or heavy or

Robert Shull, M.D.

Page 42

1    thin.  There is an average somewhere.  Not everybody is

2    on the average.  So seven centimeters for vaginal depth

3    would probably be on the lower end of normal as opposed

4    to a woman who has a vaginal depth that's 10 or 11

5    centimeters, for example; but it still would fall within

6    a range that's considered normal.

7         Q.   And the reason I ask that is there are some

8    references in the record to different measurements for

9    Ms. Dimock's vaginal canal.  Do you remember seeing

10   those in the record?

11        A.   Yes, I did.

12        Q.   And they range some place between three

13   centimeters and 10 centimeters, if I recall correctly?

14        A.   Well, different parts are being measured.

15   There is a system for measurement of specific areas of

16   the pelvis.  The acronym is POPQ, but the term is pelvic

17   organ prolapse quantification.  That system was created

18   and published in 1966 -- 1996.  I was on the committee

19   who helped to design this objective way to measure

20   things in the vaginal canal.

21             So we measure what's called the anterior

22   compartment, the posterior compartment, the depth of the

23   vagina, the vaginal opening, the perineal body.  There

24   are a variety of things that can be measured and

Robert Shull, M.D.

1    documented in a grid form.  Several of her reports from

2    Dr. Norton have that grid; others simply indicate the

3    depth of the vaginal canal.

4         Q.   And your measurement here was the depth of the

5    vaginal canal; is that right?

6         A.   Yes.

7         Q.   All right.  Now, are you going to give an

8    opinion in this case that Ms. Dimock's vaginal canal was

9    foreshortened by virtue of the fact that she had the

10   Prolift device?

11        A.   I don't think I said that anywhere.

12        Q.   I don't think you did either.  I just wanted

13   to make sure.

14        A.   No.

15        Q.   The answer is no?

16        A.   No, I'm not going to do that.

17        Q.   All right.  When you did the pelvic

18   examination, you noticed that she had atrophy.  What is

19   atrophy?

20        A.   Atrophy in the vaginal canal is tissue that

21   has reduced or no estrogen stimulation.

22        Q.   And what does that do to the tissue?  Does it

23   make it thinner --

24        A.   In general --

Robert Shull, M.D.

Page 44

1        Q.    -- if there's no estrogen?  I'm sorry.

2        A.    In general, women who have atrophy of the

3   vaginal canal may have the tissue be thinner, less

4   lubricated, and if you were to be able to do a

5   microscopic examination, there is reduced blood supply

6   to the tissue in the vaginal canal.

7        Q.    Okay.

8        A.    The tissue then becomes less soft or

9   distensible.

10       Q.    Less elastic?

11       A.    That could be a term.

12       Q.    Okay.  Then you say she has greatly increased

13   pelvic floor muscle tone.  What does that mean?

14       A.    That means in general when a woman has a

15   pelvic exam, if you ask her, she can relax the muscles

16   that -- in the vaginal canal, what are called the

17   levator muscles.  Many woman can relax that on request.

18   People who have chronic pain frequently cannot do that

19   because they anticipate something is going to hurt, and

20   human nature is to withdraw, and withdrawal usually

21   means contraction of the muscles.

22       Q.    And you note that initially you could only do

23   a digital exam using your index finger, but it sounds

24   like later on she was able to relax her muscles, and

Robert Shull, M.D.

Page 45

1    you were able to do a two fingerbreadth exam?

2         A.   I did.  And then I took the speculum, which I

3    use.  Instead of using the top and the bottom of the

4    speculum, I was able to use the bottom part only, so I

5    could retract the area between the rectum and the vagina

6    and look at the top part of the vaginal canal, the area

7    under the bladder.  Then I could turn that around and

8    look at the area between the rectum and the vagina.  So

9    she allowed me to do that, but it was only after those

10   muscles relaxed some.

11        Q.   Okay.

12        A.   That's not -- that would happen with people

13   that have pain.  They have increased muscle tone.

14        Q.   Well, and people who have a certain amount of

15   anxiety about examinations may tighten their muscles; is

16   that --

17        A.   They may.

18        Q.   -- true?

19        A.   They may.

20        Q.   All right.

21        A.   And maybe because it hurts them.  They may be

22   anxious because it hurts.

23        Q.   Well, when she was able to relax the muscles,

24   you did an examination, and where did you find

Robert Shull, M.D.

Page 46

1    tenderness, if at all?

2         A.   There were several things I found on exam.

3    One, on the anterior part of the vaginal canal, by the

4    urethra and bladder, I could feel a small area that had

5    a different consistency.  My note indicates it was about

6    four centimeters inside the vaginal opening.  There was

7    a well-defined area that could be scar tissue, could be

8    a foreign body.  By touch, it was not necessary -- you

9    couldn't possibly tell for sure which one it is, but I

10   described it as about the size of a small bean, and she

11   was tender in that area.

12        Q.   So when you palpated that, was it something

13   that moved under your touch, or was it a fixed feeling?

14        A.   It had minimal movement.

15        Q.   Okay.

16        A.   And then she was more tender, actually, to

17   palpation on the opposite side of the vaginal canal near

18   the top of the vagina on her left side.

19        Q.   Okay.

20        A.   And on that side, I didn't feel this, whatever

21   that was, whether it was scarring or foreign body or

22   induration.  I didn't feel that on the left side, but

23   she was tender.

24        Q.   And as we sit here today, you don't know what

Robert Shull, M.D.

Page 47

1    the small, bean-sized object consists of, correct?

2         A.   That's accurate.

3         Q.   All right.  Are you going to speculate as to

4    what you think it might be?

5         A.   Well, I could tell you it's likely one of

6    several things.  It could be scar tissue.  It could be a

7    small piece of mesh that's there.

8         Q.   Okay.

9         A.   It could be something we didn't anticipate

10   that is not scar tissue or not a piece of a foreign

11   body, but that's not a likely thing to happen.  There is

12   no way to know it until it's actually excised and

13   someone looks at it.

14        Q.   I was going to say -- right.  As you sit here

15   today, you don't know, correct?

16        A.   That's accurate.

17        Q.   All right.  And then on the rectal exam you

18   say you noted some banding of tissue near the ischial

19   spines on both sides.

20        A.   Yes.

21        Q.   When you say "banding," what do you mean?

22        A.   That means normally when someone has a pelvic

23   exam, including a rectal exam, there isn't any

24   definitive three-dimensional structure that feels the

Robert Shull, M.D.

Page 48

1    same as -- for example, I'll give you my hand as an

2    example,  So -- and my finger, index finger and thumb

3    are like this.  This tissue is very soft.  If I do that,

4    that feels entirely different.  That would -- to me,

5    that would feel like a band.

6            So in examining her on rectal examination,

7    what I felt near these landmarks, all the ischial

8    spines, are these areas that were tighter and more tense

9    and usually you don't feel that.

10        Q.   Okay.

11        A.   So that's not what you would find on most

12   people's exam.  That could be scarring.  That could be a

13   foreign body.  It would be most likely one of those two

14   things.

15        Q.   And your examination, you did not find any

16   erosion of the mesh, correct?

17        A.   That's accurate.

18            MS. VAN STEENBURGH:  All right.  Can we go off

19        the record for a second?

20            THE VIDEOGRAPHER:  Going of the record.  The

21        time is 10:51.

22     (Recess was taken from 10:51 a.m. until 10:57 a.m.)

23            THE VIDEOGRAPHER:  Back on the record.  The

24        time is 10:57.

Robert Shull, M.D.

Page 49

1    BY MS. VAN STEENBURGH:

2        Q.   Doctor, I'd like to make sure that we are on

3    the same page with respect to Ms. Dimock.  What were the

4    procedures that Dr. Housel or Housel performed in 2008

5    relative to Ms. Dimock?

6        A.   Ms. Dimock had previously had a hysterectomy.

7    When he saw her for evaluation, he identified cystocele,

8    rectocele, urinary incontinence.  The procedures he did

9    basically were placement of the anterior and posterior

10   Prolift and placement of a transobturator tension-free

11   vaginal tape.

12            His note details several procedures, including

13   cystocele repair, rectocele repair, enterocele repair,

14   and sacrospinous ligament suspension, and paravaginal

15   repair.  My interpretation of the note would be that he

16   identified the cystocele, rectocele, enterocele,

17   paravaginal defect, and the repair of those was

18   accomplished using the anterior and posterior Prolift.

19   In addition to that, he did the transobturator

20   tension-free tape and performed cystoscopy.

21       Q.   So is it your interpretation of his operative

22   note that he did not do a sacrospinous ligament

23   suspension?

24       A.   I do not -- let me just read that note one

Robert Shull, M.D.

Page 50

1   more time.

2        Q.    Sure.

3        A.    I do not see in the operative note that he

4   specifically exposed the sacrospinous ligament and

5   placed any sutures in that ligament to secure the

6   top of the vaginal canal or the graft, either one

7   really.

8        Q.    And so the absence of a description in his

9   operative note is what leads you to believe he did not

10  perform the sacrospinous ligament suspension?

11       A.    It would lead me to believe he didn't document

12  it if he did it.

13       Q.    So it's possible he did perform it but did --

14  his documentation is less than perfect?

15       A.    Well, I don't know that.

16       Q.    Well, I don't know that either, but I'm --

17  we're trying to get to the bottom of what he really did

18  do here.

19       A.    He didn't include a description of the

20  dissection to do a sacrospinous ligament fixation.  Now,

21  whether he did it or not is a different issue.

22       Q.    All right.  And he refers to -- there's a

23  reference to a anterior and posterior colporrhaphy.

24  That was -- that can be done with a native tissue

Robert Shull, M.D.

Page 51

1    repair, correct?

2         A.   Yes, it can.

3         Q.   All right.  And in this case, it's your

4    understanding in interpreting his operative note that he

5    used the Prolift device on the anterior and also on the

6    posterior, correct?

7         A.   That's accurate.

8         Q.   All right.  And when there is reference in his

9    operative report to repair of the enterocele via vaginal

10   approach, what do you understand that to entail?

11        A.   What he describes, an enterocele or the

12   enterocele was identified.  An enterocele is a type of

13   hernia.  It normally occurs between the tissue that

14   should support the top of the vaginal canal and the

15   rectum.

16             He says he identified an enterocele, and he

17   plicated that with zero Ethibond purse-string suture,

18   which would imply that he saw a hernia sac with the

19   peritoneal surface between him and the inside of the

20   abdominal cavity, and what he choose to do was take a

21   nonabsorbable suture and take a circular stitch around

22   this hernia sack.  When he tied the suture, it should

23   have obliterated the sac.  And the reason he used

24   purse-string, it would be very similar to the strings or

Robert Shull, M.D.

Page 52

1    cords on a coin purse, for example, where someone would

2    pull the ends of that and close the top of the purse.

3    So his enterocele repair was using that one suture to

4    reduce the size of the peritoneal sac that he saw.

5        Q.    And based upon your experience, are you aware

6    as to whether Ethibond sutures ever erode to the

7    surface?

8        A.    They may.

9        Q.    Okay.

10       A.    I use them quite regularly, actually, so I am

11   familiar with that.  In general, what happens with an

12   Ethibond suture or anything similar that is not

13   absorbable, you would like it to be underneath any skin

14   incision, ideally with another layer of tissue between

15   the skin and it, so that the skin and the soft tissue

16   heal and the stitch is under it.

17           Sometimes what will happen is people will

18   still react to that and at some time in the future, that

19   stitch may be obvious on physical exam that it has been

20   exposed through the skin incision.

21       Q.    And have you been able to eliminate the

22   possible exposure of the Ethibond suture in connection

23   with any of the procedures that Dr. Norton--strike that.

24           Have you been able to eliminate erosion of the

Robert Shull, M.D.

Page 53

1    Ethibond suture in the case of Ms. Dimock?

2         A.   Well, it's a single stitch that he used.

3    There is no evidence in any of the descriptions that

4    someone saw a single suture and removed it.  The

5    Ethibond usually will have some color to it.  It could

6    be a -- it could be white.  It could have a color to it,

7    but there is no description of a specific stitch being

8    removed, so I didn't consider that as the problem

9    because no one said they saw it, and it wouldn't have

10   been placed in the location where the different mesh

11   exposures were seen.  So I think that's highly unlikely.

12        Q.   But the best person to answer that question

13   would be Dr. Norton probably, yes?

14        A.   Yes.  Well, if you ask her personally.  Her

15   notes don't reflect that, and she has thorough notes.

16        Q.   Understood.  Now, your opinions as I

17   understand them is that Ms. Dimock's acute and chronic

18   pelvic pain and acute and chronic vaginal pain are the

19   result of Prolift, correct?

20        A.   Are you referring to a specific place in my

21   report now?

22        Q.   Yeah.  I'm looking at Page 12, and I want to

23   make sure I understand your opinion.

24        A.   Okay.

Robert Shull, M.D.

Page 54

1    Q.   So I'm actually going to repeat that so that I

2    split those two up.  Are you offering an opinion in this

3    case that Ms. Dimock suffered an onset of acute pelvic

4    pain as a result of the Prolift?

5    A.   Well, she -- in her history, which I obtained,

6    she had no pre-existing history of chronic pelvic pain,

7    fibromyalgia, or the other things we've reviewed.  In my

8    history, she says that she began to develop pain

9    complaints following her surgery.  Now, for something to

10   be acute, she may have had an acute onset of some pain

11   complaints, but acute implies that the pain or whatever

12   other symptom or sign it is, if it's acute, it would

13   occur, and then the implication is it would be resolved

14   some way or the other.  So her issue really is chronic

15   pain.

16   Q.   Okay.

17   A.   Even though she may have had acute pain to

18   begin with, the issue is it evolved into a chronic

19   concern, which has interfered with her quality of life.

20   Q.   All right.  So just to make sure I understand.

21   Your opinion is that Ms. Dimock has experienced chronic

22   pelvic pain, which was caused by the anterior and

23   posterior Prolift; is that right?

24   A.   Yes.

Robert Shull, M.D.

Page 55

1          Q.    All right.  And your opinion also is that she

2     has experienced and suffered from chronic vaginal pain

3     caused by the anterior and posterior Prolift?

4          A.    Well, when you say pelvic pain --

5          Q.    Well, you have pelvic and vaginal here.

6          A.    I understand.

7          Q.    Okay.

8          A.    Pelvic pain can be a variety of things.  It

9     can be muscle pain, for example, in the vaginal canal --

10    or in the -- not in the -- muscles not in the vagina.

11    It could be muscles in the pelvis, vaginal -- or it

12    could be chronic bladder pain, for example, and there's

13    a typical history for chronic bladder pain.

14               It could be chronic bowel complaints.  There's

15    a history for chronic -- I don't mean she has the

16    history.  There are histories for chronic bladder pain.

17    There are histories for chronic bowel pain, which are

18    different than her complaints.

19               Then vaginal pain, most women would describe

20    vaginal pain as a sensation that they may have either

21    with having something placed in the vaginal canal, like

22    a speculum or a tampon or a sex toy, or to have sexual

23    intercourse, so vaginal pain usually implies something

24    inside the vaginal canal, and pelvic pain is more likely

Robert Shull, M.D.

Page 56

1    to be considered in the nerves, the connective tissue,

2    the muscles of the pelvis.  And even though she may

3    describe her complaints as shooting pain in the vagina,

4    I don't doubt that she has them, so that could be

5    classified as vaginal pain or pelvic pain, either one.

6         Q.   All right.  So I just want to make sure that I

7    was understanding what your opinions are.  So one

8    opinion that you are going to offer in this case is that

9    she, Ms. Dimock, suffers from chronic pelvic pain caused

10   by the anterior and posterior Prolift, correct?

11        A.   Yes.

12        Q.   All right.  Are you also going to offer an

13   opinion that she suffers from chronic vaginal pain

14   caused by the anterior and posterior Prolift based on

15   your definition of vaginal pain?

16        A.   Yes.

17        Q.   All right.  You are also going to offer an

18   opinion that she experienced repeated episodes of mesh

19   exposure that were caused by the anterior and posterior

20   Prolift, correct?

21        A.   Yes.

22        Q.   All right.  So let me ask you a couple of

23   questions and let's start with erosion.  Ms. Dimock

24   underwent surgical procedures to remove eroded mesh on

Robert Shull, M.D.

Page 57

1     more than one occasion, correct?

2          A.   That's correct.

3          Q.   And if my notes are correct, she underwent

4     that in four instances?

5          A.   Yes.

6          Q.   And as far as you know, there have been no

7     other instances where she has undergone any kind of

8     excision or surgical procedure for erosion of the mesh

9     since 2014, correct?

10         A.   She did not describe it to me, and I didn't

11    see anything in her records to indicate that.

12         Q.   All right.  In some of the procedures where

13    she underwent excision of the mesh, also involved lysing

14    adhesions or releasing the mesh arms, correct?

15         A.   That's accurate.

16         Q.   All right.  Now, with respect to erosion, is

17    it your opinion that every erosion of mesh constitutes a

18    serious complication?

19         A.    In our literature there is an ongoing

20    discussion about the proper term to use to describe,

21    Is it mesh exposure?  Is it something eroded or not?  So

22    in the case of mesh exposure, what may happen, as I

23    understand it, is the patient herself may see or feel

24    the mesh outside the vaginal incision in the canal, or

Robert Shull, M.D.

Page 58

1    the doctor may see it, and then they respond to topical

2    estrogen treatment.  They may respond to observation.

3    It may respond to excising a small amount of mesh in the

4    examination room in the office, for example.

5              Erosion, in my mind, usually means something

6    that occurs at a later time away from the index surgery,

7    frequently involves bleeding, spotting, discharge, could

8    involve pain for the sexual partner, for example, and it

9    could involve pain for the patient.

10             Erosions possibly could respond to topical

11   estrogen.  Depending on the surface area of the erosion

12   and a variety of other things, that may be a reasonable

13   thing to offer a patient.  And then if they respond well

14   to that, that may be the end of it, but in the case

15   where that doesn't, the patient doesn't respond, then

16   excision of the mesh is the only other therapeutic

17   option.

18             Some doctors advocate removing only the part

19   of the mesh that's visible and closing the skin edges

20   over it.  There are a few surgeons who recommend

21   attempting to remove all of the mesh, which has been

22   implanted.  Most surgeons feel that trying to remove all

23   of the mesh, particularly when mesh arms have been

24   deployed, has a potential to create its own set of

Robert Shull, M.D.

Page 59

1    complications.

2         Q.   And, Doctor, I appreciate that.  I think we're

3    getting a little off topic, and I only have a limited

4    amount of time, so the question was whether you consider

5    the mesh exposure here for Ms. Dimock as you've

6    described in your report as a serious complication?

7         A.   Well, it's serious enough that when we report

8    on complications following surgery, a complication

9    requires -- something with an operative intervention is

10   a high-level complication.

11              There are scales for complications, the Dindo

12   scale, for example.  So some things require observation,

13   some require medicine, some require something, but

14   surgery, surgery moves up the scale of the significance

15   of a complication.

16        Q.   Right.

17        A.   Because it requires an anesthetic, a recovery,

18   and the whole works.

19        Q.   All right.  So in your mind, a serious

20   complication involving exposure would be one that

21   requires surgical intervention, as opposed to topical

22   treatment with estrogen, for example, correct?

23        A.   That's accurate.

24        Q.   Or what about someone who the mesh exposure is

Robert Shull, M.D.

Page 60

1    trimmed in an in-office procedure, would that be a

2    serious complication?

3         A.    That would fall on the lower level of

4    significance.

5         Q.    Okay.  Now, with respect to your opinion here,

6    how is it -- in summary form, without going into long

7    detail, you say the Prolift itself caused the exposure.

8    Can you tell me what the basis of that opinion is?

9         A.    Yes.

10        Q.    And what is that?

11        A.    She has a foreign body implanted in the vagina

12   that has a significant surface area.  The product itself

13   and the package has a significant surface area.

14            In the case of Mrs. Dimock, she had an inter-

15   val after her surgery that could have been 18 months or

16   20 months where the mesh was not exposed, and then her

17   complaints with pain increased.  She had evidence of

18   the exposure, and what I think most likely happened is

19   the mesh product itself became shorter, either through

20   scar contracture or contracture of the mesh product,

21   and as it became shorter, there are fixed arms of

22   the mesh that have gone through the muscles, nerves,

23   and tissue in the vaginal canal, and those arms rarely

24   move in terms of becoming looser.  So the arms became

Robert Shull, M.D.

Page 61

1    tighter in much the way this becomes tight, and when the

2    arms became tight, the central portion also became

3    taught, interfered with blood supply to the skin, erodes

4    through the skin, and then the skin is not able to heal

5    over that.  And the treatment and surgery for skin

6    drainage, skin erosion, infection, and there is a

7    foreign body, the treatment is to remove the foreign

8    body, and in this case, the Prolift is the foreign body.

9        Q.   Right.  And we're talking about erosion, so as

10   I understand your -- the basis for your opinion is that

11   the Prolift product, either through scar tissue or

12   because of the product itself, becomes more taught,

13   closer to the surface, and then eventually the mesh then

14   goes through the skin surface and is exposed; is that

15   what I heard you say?

16       A.   Yes, you did.

17       Q.   All right.  So did you take into consideration

18   at all the -- this patient's characteristics in your

19   opinion that it was the Prolift that caused the erosion?

20       A.   Do you have a specific question about the

21   patient characteristics?

22       Q.   Sure.  She's a smoker, right?

23       A.   Yes.

24       Q.   And she's been a smoker for 40 years, correct?

Robert Shull, M.D.

Page 62

1          A.    Yes.

2          Q.    What does smoking do to tissue?

3          A.    Smoking affects estrogen metabolism.  So the

4     way smoking affects tissue in the vaginal canal is when

5     women, primarily, make estrogen and it's metabolized in

6     the body and they don't smoke, the estrogen metabolize

7     to something that may have a significant amount of

8     biological activity.

9               Smoking changes the metabolic pathway so that

10    the estrogen metabolism pathway then results in an

11    estrogen that is less biologically active.  So if you

12    see someone, for example, a woman, particularly who is a

13    chronic smoker, frequently her skin will show that, the

14    skin in her face.  But the skin in the vaginal canal

15    will more likely have reduced blood supply and be thin

16    and dry.

17         Q.    And so could her vaginal tissue be a

18    contributing factor to the mesh erosion in her case?

19         A.    It's possible.

20         Q.    All right.  How about the fact that Ms. Dimock

21    engaged in self-examinations of her vaginal canal?  Did

22    you see that in the medical records?

23         A.    I did.

24         Q.    Could self-examination have contributed to any

Robert Shull, M.D.

Page 63

1     mesh erosion?

2          A.   I think that would be extremely unlikely.  It

3     would be less likely, for example, in a woman who is

4     having intravaginal intercourse or a woman who wears a

5     tampon or a woman who has a speculum exam, so I think

6     that would be a highly unlikely scenario unless you're

7     dealing with someone who does self-mutilation.  There is

8     no evidence she does that.

9          Q.   The erosion is a potential adverse consequence

10    of using mesh, is it not?

11         A.   Yes, it is.

12         Q.   And that's something that Ethicon warned about

13    it its IFU?

14         A.   In the most general terms, not in very

15    specific terms.

16         Q.   Well, it did identify that as a potential

17    consequence that might result in further surgical

18    procedures, did it not?

19              MR. CANNON:  I'll just object; argumentative.

20         A.   Without quantifying when and how many times.

21         Q.   And did you read Dr. Housel's deposition?

22         A.   I did.

23         Q.   And he was aware that erosion was a potential

24    consequence, correct?

Robert Shull, M.D.

Page 64

1          A.    I think everyone knows superficially that it's

2     possible.  What people -- including, I would say, the

3     majority of doctors and probably all patients.  They

4     don't understand that that event could occur at any time

5     in the future and may or may not require multiple

6     interventions to resolve.

7          Q.    And when you say that, have you done a study

8     that forms the basis of that opinion?

9          A.    No.  I've read literature that would form the

10    basis.

11         Q.    Okay.  And what literature are you relying on

12    for that?

13         A.    The literature -- well, part of it comes from

14    the University of Utah, for example, in evaluating women

15    who were referred for mesh exposure and mesh

16    complications, and on average, women required at least

17    two and frequently more procedures to resolve the

18    current issue.  And the potential concern about that is

19    you don't know in the future how many of those people

20    are going to come back again, so that's a snapshot in

21    time.

22              There's a report from the Cleveland Clinic,

23    Mayo Clinic, University of Michigan, so there are

24    multiple reports on the requirement for requiring more

Robert Shull, M.D.

Page 65

1    than one intervention to resolve these issues.

2         Q.   And intervention, are you referring to

3    specifically a surgical intervention --

4         A.   Yes.

5         Q.   -- as opposed to an in-office procedure or

6    topical treatment?

7         A.    It could be any or all of those, but

8    specifically surgery.

9         Q.   All right.

10        A.   But it could include other things also.

11        Q.   Doctor, with respect to your opinion regarding

12   the chronic pelvic pain that you -- that Ms. Dimock

13   claims to experience, your opinion is that the chronic

14   pelvic pain was caused by the Prolift, correct?

15        A.   Yes.

16        Q.   All right.  And what is the cause of that

17   pain?  What is the mechanism as you understand it?

18        A.   Okay.  In her particular circumstance, what I

19   believe transpired with her, she had the product placed.

20   I've already indicated to you the trocar passage in and

21   of itself is a traumatic event.  Surgery is traumatic.

22   So trocar passage is traumatic, and she may have had

23   some of her earlier complaints related to multiple

24   trocar passages with an expectation that's reasonable

Robert Shull, M.D.

Page 66

1    that that's going to improve.

2           The fact is she acquired a set of complaints

3    which haven't improved, despite several different

4    attempts at therapy.  And I believe the pathophysiology

5    of what's happened is the mesh was put in place, may

6    have been placed with relatively little tension, for

7    example, and may not have bothered her for 18 months,

8    particularly.  I mean, it may have had some low level

9    concern, but didn't come to her attention.

10          But as time goes on, the mesh contracts.

11   There's degradation of the mesh.  There's a chronic

12   inflammatory response.  There are nerves that grow into

13   the mesh product.  Those nerves can be sensory nerves,

14   carrying pain, and they -- the product goes through

15   muscle.  It goes through the skin of the -- through the

16   skin outside the pelvis and it goes underneath the

17   vaginal skin, so there are any number of places where

18   nerves could be entrapped and chronically irritated.

19   Q.   Well, let me ask you this:  Doctor, is the

20   cause of the pain, you know, as you say nerves are

21   entrapped, you said the mesh contracts, is it the mesh

22   that contracts, or is it the tissue around the mesh that

23   contracts?

24   A.   Well, there is evidence to show the mesh

Robert Shull, M.D.

Page 67

1    itself contracts.  There is literature to demonstrate
2    that, but it could be a combination of scar tissue and
3    mesh.  But the fact is it's highly unlikely to see
4    someone who doesn't have mesh products put in place to
5    have these ongoing chronic pain problems that require
6    multiple surgical interventions.  That's a --
7         Q.   Well, let me ask you this.  You attribute all
8    of her chronic pelvic pain issues to the Prolift
9    product, correct?
10        A.   I think that's likely, yes.
11        Q.   Okay.  Did you -- when you were considering
12   whether it was due to the Prolift product, did you take
13   into consideration other procedures she had had?
14        A.   Such as?
15        Q.   The hysterectomy.
16        A.   I did, but there is no reason to think that
17   would be related to her current complaints.
18        Q.   Well, I mean, you said any surgery is
19   traumatic, and there could be a development of scar
20   tissue relative to a hysterectomy; is that true?
21        A.   Not the complaints she has.
22        Q.   Okay.  How about the -- you're aware that she
23   had a wedge resection in 1972, correct?
24        A.   Of her ovaries?

Robert Shull, M.D.

Page 68

1      Q.   Yes.

2      A.   Yes.

3      Q.   And, in fact, those procedures were

4  discontinued because of the high rate of adhesions

5  that occurred afterwards; is that right?

6      A.   Related to fertility, not pain.

7      Q.   Well, as a matter of fact, Ms. Dimock here,

8  did she not make complaints about ovarian pain in her

9  pelvis as part of the procedure when she was seeing

10  Dr. Norton?

11      A.   She may have said it seems similar to ovarian

12  pain.

13      Q.   And so can you eliminate the fact that there

14  may have been some adhesional -- adhesions relative to

15  the wedge resection, and that was causing some of the

16  pelvic pain?

17      A.   Well, the only way to be certain that someone

18  has adhesions in the abdomen at all, whether they have

19  pain or not, the only way to be certain of that is to

20  look surgically, and no one looked in her abdomen

21  surgically to see.

22      Q.   Right.  And I'm just trying -- I mean, you

23  have come to the conclusion that all of her chronic

24  pelvic pain is due to the fact that she had the Prolift

Robert Shull, M.D.

Page 69

1    device and I wanted to understand whether you considered

2    other alternatives?

3         A.    Oh, yes, I did.  But let's just use that

4    specific example.  So 40 years ago she had wedge

5    resection of her ovaries and didn't have the current

6    complaints she has now.  In 2008, she had the Prolift

7    implanted and she's acquired these complaints.  So just

8    thinking about it logically, why would she have had a

9    surgery 40 years ago that didn't bother her until she

10   had the Prolift put in?

11        Q.    And so she had an additional surgical

12   procedure that could, in fact, have affected the

13   adhesions from the wedge resection possibly?  Yes?

14        A.    That would be highly unlikely because the

15   surgery that she had done in 2008 did not involve

16   entering the abdominal cavity.

17             In Dr. Housel's note where you asked me about

18   the enterocele, he specifically didn't enter the

19   abdominal cavity, so if she had adhesions following the

20   wedge resection, which it's possible she had them,

21   they're inside the abdomen.  That would be similar in

22   this case to the four of us who are in this room and

23   there is somebody out there.  So could she have

24   adhesions out there, but we're talking about everybody

Robert Shull, M.D.

Page 70

1    in here?  That's conceivable, but that's not a logical

2    conclusion to draw.

3         Q.   Are you making a distinction between the

4    pelvis and the abdomen in terms of your --

5         A.   In terms of --

6         Q.   You said the adhesions relative to the wedge

7    resection would appear in her abdomen --

8         A.   Yes.

9         Q.   -- as opposed to her pelvis?

10        A.   That's correct.

11        Q.   Okay.

12        A.   Through the abdominal cavity.

13        Q.   All right.

14        A.   No.  That is correct.  It would be what is

15   called "intraperitoneal."

16        Q.   All right.

17        A.   Now, does the peritoneal cavity go down into

18   the pelvis?  It does, but those adhesions would be in-

19   side the peritoneal cavity, and none of the procedures

20   she had done entered the peritoneal cavity, so it would

21   be -- I guess anything is possible -- that would be so

22   unlikely that there'd be something inside her abdomen

23   which is exaggerated by what was done here, unless a

24   trocar was passed inadvertently into her abdomen and

Robert Shull, M.D.

Page 71

1    injured her bowel.  Could that happen?  It could, and

2    if that were to happen, the patient would be sick.

3         Q.   All right.  You didn't see evidence of that

4    here?

5         A.   No.  She didn't --

6         Q.   Let me --

7         A.   She didn't report any of it.  She would have

8    been sick, sick, sick if that happened.

9         Q.   Let me ask you this just very briefly.

10        A.   Uh-huh.

11        Q.   She underwent a wedge resection, correct?

12        A.   That's -- yes.

13        Q.   And a hysterectomy, correct?

14        A.   Yes.

15        Q.   And an appendectomy, correct?

16        A.   Yes.

17        Q.   And she's also complained of pelvic plain

18   issues related to GI issues, correct?

19        A.   Right.

20        Q.   And she's been diagnosed with diverticulitis?

21        A.   In 2013.

22        Q.   Okay.

23        A.   Not in 2008 or '09 or '10.

24        Q.   Well, and she's previously had abdominal pain

Robert Shull, M.D.

Page 72

1    for which she has undergone examination and treatment in

2    the past, prior to 2008, correct?

3         A.   She has, that's accurate.

4         Q.   Yes.  A left lower quadrant pain, some right

5    lower quadrant pain; is that right?

6         A.   That's accurate.

7         Q.   All right.  And Dr. Housel's procedure, was

8    there any potential by virtue of the fact that he

9    engaged in surgery that there may have been a potential

10   for scarring?

11        A.   From the pelvic reconstructive surgery, you

12   mean, in the vaginal canal?

13        Q.   Other than the Prolift, he also performed --

14   it's a little questionable in your mind as to whether he

15   performed the ligament suspension, correct?

16        A.   Yes.

17        Q.   All right.

18        A.   And in general, if someone does sacrospinous

19   ligament suspension, in general, that is done on either

20   the left or the right side.  Since his note doesn't

21   describe what he did anyway, we don't know if he did

22   left side, right side, or both sides, so --

23        Q.   But can you eliminate that procedure as a

24   possible source of any pelvic pain she might have?

Robert Shull, M.D.

Page 73

1       A.    Well, the natural history of pain following

2   sacrospinous ligament suspension is when that operation

3   is performed in America, it normally is performed on the

4   patient's right side usually.  It could be the left, but

5   usually the right, and of the women who have

6   sacrospinous ligament suspension, what may happen is in

7   the early recovery and for the first eight or 10 weeks

8   after surgery, maybe one out of 10 or one out of eight

9   patients may say they hurt some on the side of the

10  suspension.

11          The natural history is that pain goes away.

12  So there aren't any syndromes described that I'm

13  familiar with that says a person who has sacrospinous

14  ligament suspension and then 18 months, 24 months, some

15  time in the future, they acquire these unremitting pain

16  complaints.

17      Q.   Can you eliminate that, then, as a source of

18  her pain complaints?

19      A.    I wouldn't have considered it as the source of

20  chronic pain complaints, and I don't think anyone who is

21  knowledgeable about the procedure would.

22      Q.   How about the plication procedure that he

23  engaged in with respect to the enterocele?

24      A.    I think that --

Robert Shull, M.D.

Page 74

1     Q.   Can you eliminate that as a possible source of

2  pelvic pain?

3     A.   That is so highly unlikely it would like being

4  hit by lightning.

5     Q.   Can you eliminate it as a possibility?

6     A.   I would.

7     Q.   Okay.  Can you eliminate any patient

8  characteristics involving Ms. Dimock as a factor in her

9  chronic pain?

10        MR. CANNON:  I'll just object; ambiguous.

11     A.   Specifically?

12     Q.   Sure.  Dr. Norton refers to Ms. Dimock's

13  patient characteristics specifically about the fact that

14  she has unusual scarring.  Do you remember seeing that?

15     A.   Uh-huh.

16     Q.   And do you agree with Dr. Norton's statement

17  in the medical records that some patients are not as

18  suited as others for use of the Prolift device?

19     A.   I think that's probably true.  It may be no

20  one is suited for it.  How's that?

21     Q.   Well, she also said that some people have

22  successfully undergone surgery using the device and

23  others have not.  Do you agree with that?

24     A.   I --

Robert Shull, M.D.

Page 75

1          MR. CANNON:  Well, I just -- if we've

2     got the record, I think that's the best thing to

3     look at.

4          MS. VAN STEENBURGH:  Sure.

5     A.   Do I agree that some people have had the

6 procedure and they haven't presented with complaints?  I

7 feel sure that's the case.

8     Q.   Okay.

9     A.   Now, what I don't know is what's going to

10 happen to those women in the future, and no one knows

11 the answer to that.

12     Q.   Well, that's true with surgery as well with

13 using native tissue, is it not?

14     A.   It's much less likely true, because we have

15 a hundred-year history of native tissue, 150 since

16 anesthesia, and we have a -- in this particular case, we

17 have a 10-year history, so they aren't the same.

18     Q.   Doctor, would you agree with me that Ethicon

19 warned about adhesion formation and contracture in its

20 IFU?

21     A.   I understand from reading the IFU that in very

22 general terms there was a laundry list of things that

23 were listed.

24     Q.   The question was --

Robert Shull, M.D.

Page 76

1        A.    Yes.

2        Q.    Yes.   Okay.   Thank you.   So let me make sure

3    that I understand the basis for your opinion with

4    respect to her pelvic pain.   Doctor, it's your opinion

5    that her chronic pelvic pain, which she claims to

6    currently experience, is the result of a combination of

7    the contraction of the mesh and contraction of scar

8    tissue; is that right?

9        A.    I'm sure they're associated with one other.

10       Q.    Okay.

11       A.    That the mesh incites inflammation, incites

12   scar tissue, the mesh contracts, the wound contracts,

13   nerves are irritated, the vascular supply is modified.

14   They're all -- yes, they all go together.

15       Q.    Okay.

16       A.    Incited by having a foreign body in the

17   pelvis.

18       Q.    Well, as a matter of fact, any time you put a

19   foreign body into a human, there is some kind of foreign

20   body reaction, is there not?

21       A.    There could be.   This one happens to be one

22   with a great surface area and then placed in a

23   contaminated part of your body, which flies in the face

24   of all surgical principles.

Robert Shull, M.D.

Page 77

1    Q.   Doctor, in your -- and you may be asked this

2    in a more general way, are you relying on some

3    particular literature that -- for the opinion that

4    there's a greater chance of inflammation and chronic

5    inflammation by virtue of the fact that this is placed

6    in the contaminated area of the body?

7    A.   Yes.

8    Q.   Okay.  And what's that literature?

9    A.   Well, it's all -- it's the history of medicine

10   and surgery that placing a foreign body in a

11   contaminated field is poor surgical judgment.

12        Now, do we do that sometimes?  When we operate

13   through the vaginal canal, yes, because the vaginal

14   canal is never sterile.  So when we operate through the

15   vaginal canal and we use whatever procedures we use,

16   suture material, let's say, we're putting it into a

17   contaminated field.  What happens, then, part of the

18   time and in many cases, the suture material dissolves,

19   so in a period of, let's say, 90 days or less, for all

20   practical purposes, that suture material has been

21   metabolized and is gone.

22        Sometimes -- and I do this -- I may use

23   nonabsorbable sutures, pieces of suture, to accomplish

24   part of the surgery, and occasionally some of those

Robert Shull, M.D.

Page 78

1    sutures will be exposed in the vaginal canal, and I can

2    see them and I can remove them in the office or I may

3    treat someone to estrogen hormone.

4            The thing that is different here is there is a

5    significant surface area of material that is not only

6    placed in the vaginal canal, but by virtue of using the

7    trocars, that same material is brought out through

8    multiple tissue layers in the bony and muscular pelvis.

9    So the product, then, is exposed to all of this

10   contamination in the vagina, in the muscles of the

11   pelvis, it just is.  That's what happens.

12        Q.   Well, Doctor, is there a difference between

13   infection and inflammation?

14        A.   Inflammation --

15        Q.   Is there a difference?

16        A.   Yeah, there could be, yes.

17        Q.   Okay.  And are you talking with contamination

18   and bacteria, are you talking about infection or

19   inflammation?

20        A.   Well, I'm talking about both actually

21   because --

22        Q.   Do we have any evidence here that Ms. Dimock

23   suffered from a chronic infection as a result of having

24   the Prolift?

Robert Shull, M.D.

Page 79

1      A.   Well, you -- in the path reports are the

2   foreign-body giant cells, so you see chronic

3   inflammation which leads to pain, for example.

4      Q.   Let me ask you the question, though.  Is there

5   any evidence of any kind of chronic infection with

6   Ms. Dimock that you've been able to identify?

7      A.   Well, let me look at the path reports.  I'm

8   going to see exactly what they said.  I'll read what the

9   pathologist said.  Did she have -- to answer your

10  question:  Did she have an abscess in the pelvis?  Did

11  she require hospitalization for treatment of high

12  temperature elevated white blood count?  No, she didn't.

13     Q.   So you indicate that the path reports show --

14     A.   No.  I'm going to read the path report here.

15     Q.   I'm sorry.

16     A.   If I find it.

17     Q.   I thought you were answering my question about

18  infection.

19     A.   Well, I am.  I just wanted to find the path

20  report and see what the pathologist said.

21     Q.   Okay.

22     A.   Okay.  This is from February 2010.  The

23  pathologist says, "Foreign material with adherent

24  benign squamous mucosa exhibiting chronic inflammation

Robert Shull, M.D.

Page 80

1    and foreign-body giant cell reaction."

2         Q.   That doesn't mean infection, correct?

3         A.   It means inflammation.

4         Q.   Right.  And inflammation, with any foreign

5    body, you would expect some of that reaction, would you

6    not?

7         A.   Yes.

8         Q.   Okay.

9         A.   And that would be why you would take the

10   foreign body out.  So if you stuck a splinter in your

11   finger, you wouldn't leave it there.

12        Q.   So if I had a heart valve and there is

13   inflammation around the heart valve, you'd take it out?

14        A.   That's different.  But the answer may be yes,

15   but the difference is the heart valve is placed in a

16   noncontaminated area of the body.  These meshes are

17   placed in a contaminated part of the body.

18        Q.   And contamination, in your definition, that's

19   bacterial contamination, correct?

20        A.   In the vaginal canal, yes.

21        Q.   All right.  That's all.

22        A.   The path report from October 2010, chronic

23   inflammation.

24        Q.   Again, no sign of infection, correct?

Robert Shull, M.D.

Page 81

1        A.    Not on those two.  I will see if I can find

2    the rest of them.  The path report from 2014, the

3    pathologist did not see mesh on that one.  I think we

4    knew that -- you knew that already.

5        Q.    Right.

6        A.    And then there is one other path report that I

7    don't have in front of me so -- but I have those three,

8    two showed chronic inflammation and one showed just scar

9    tissue.

10       Q.    And none of them showed any kind of infection,

11   correct?

12       A.    Not acute infection.

13       Q.    All right.  Doctor, do you remember seeing a

14   reference in the medical records to the fact that

15   Ms. Dimock was noticing -- let me see if I can get it

16   correct -- staples in her pelvis?

17       A.    She may have described that.

18       Q.    And Dr. Norton talked to her about that,

19   correct?

20       A.    Uh-huh.  But there weren't any staples in her

21   pelvis, not in her vagina.  People use different terms

22   to describe things, so patients by and large --

23       Q.    That's okay.  You don't have to go on.  I was

24   just asking the question.  There is a reference in the

Robert Shull, M.D.

Page 82

1    records to a permanent suture from the Bartholin gland

2    repair, though, correct?

3         A.    Right.

4         Q.    All right.  Doctor, are you claiming that pain

5    Ms. Dimock expresses relative to her levator ani muscles

6    is related to the Prolift device?

7         A.    Yes.

8         Q.    And how is it related?

9         A.    Well, chronic inflammation, irritation incites

10   a reaction in the tissues, and those trocars go through

11   muscle.  That's what they do.  They go through levator

12   muscles.  That's what they're designed to do, and then

13   they deploy mesh in there, and then the muscles heal the

14   tract.  The mesh gets smaller.  It gets inflamed.  The

15   muscles contract.  There are nerve fibers.

16              This isn't a giant leap to presume that if I

17   stuck something as big as a pencil in you six times and

18   put a product and pull it out six times that it's going

19   to hurt somewhere.

20        Q.    And so it's your opinion that any pain that

21   she has experienced in her levator ani muscles is

22   directly the result of having had the trocar passed

23   through those muscles?

24        A.    And deploy the mesh.  It's both of those.

Robert Shull, M.D.

Page 83

1      It's not one or the other.

2           Q.    And have you --

3           A.    It's deploying that mesh through those

4      muscles.

5           Q.    Okay.

6           A.    And the trocar is the way to do it.

7           Q.    And have you eliminated Ms. -- Ms. Dimock

8      underwent physical therapy for her levator ani muscles,

9      correct?

10          A.    Yes, she did.

11          Q.    And in fact she improved, did she not?

12          A.    Yes.

13          Q.    All right.  And have you eliminated her own

14     anxiety and her -- well, as a possible reason for the

15     muscle issues relating to her levator ani pain?

16          A.    What I would -- my interpretation of that is

17     that she acquired the complaints with pain and whatever

18     anxiety, if any, she had before would have been

19     exaggerated by virtue of the fact that it has now been

20     almost eight years since she had surgery and six

21     years since her first explant.  So it's a reasonable

22     thing to acquire complaints with anxiety if you hurt

23     all the time.  So do I think preexisting anxiety made

24     her hurt?  No.  Do I think she's anxious?  I probably

Robert Shull, M.D.

Page 84

1    would be too if I had six years of hurting.

2         Q.   Well, in connection with your opinions in this

3    case, did you take into consideration any of the

4    personality characteristics of Ms. Dimock relative to

5    anxiety or PTSD or any other psychological condition

6    she's been diagnosed with?

7         A.   I'm cognizant of it.  PTSD has nothing in the

8    to world to do with the exposed mesh that she has had

9    removed.  The operations --

10        Q.   How about the anxiety and the pain?

11        A.   Well, it may have something to do with being

12   anxious.  I don't doubt that.  I mean, that's a disorder

13   which I'm not personally familiar with, but it isn't

14   shocking that someone with PTSD would be anxious.

15        Q.   Did you take into consideration notes in her

16   file relative to Ms. -- assessment of Ms. Dimock that

17   she needs to be dramatic in order to focus?

18        A.   I asked her about that.

19        Q.   And what did she say?  She denied it?

20        A.   No.  She didn't deny it.  Some people are.

21        Q.   Okay.  And do you think --

22        A.   Some people are dramatic.

23        Q.   And do you think some people --

24        A.   That doesn't mean that they're going to have

Robert Shull, M.D.

Page 85

1    mesh exposed in their vagina.  Some people don't say

2    anything.

3         Q.   I'm not asking about mesh exposure.  We're

4    talking about the pelvic pain and the vaginal pain.

5         A.   Right.

6         Q.   Do you think that sometimes the issues with

7    respect to anxiety or being dramatic may increase issues

8    with respect to pain in any particular patient?

9         A.   Is it possible?  If she had no surgery, if she

10   had no product implanted, and she walked in off the

11   street and said that "I hurt," and I found nothing in

12   her surgical history, nothing on physical exam, nothing

13   in her medical history, and she said, "You know, I'm a

14   pretty dramatic person and I need to do that to get

15   attention," but nothing had ever happened to her before,

16   then I would be thinking, well, maybe that's an

17   attention-getting device.  I don't think that in this

18   woman.  That's not the case with her.

19            She specifically had something done that

20   required deployment of these products in her vagina and

21   whether she had PTSD or any other thing is unrelated to

22   putting a product in her, unless someone knows that

23   people with PTSD shouldn't have these procedures done.

24        Q.   Can those diagnoses in any way -- forget the

Robert Shull, M.D.

Page 86

1    product --

2         A.    Uh-huh.

3         Q.    Can they be in any way related to the

4    complaints of pain?

5         A.    I suspect without knowing it for a fact that

6    if you or I had PTSD and we were responding to anything

7    under the sun, a nightmare, a dream, a loud noise, it

8    would be different than someone who doesn't have it.

9    So I'm sure it affects how people respond to things.

10        Q.    And, now, are you aware that Ms. -- Ms. Dimock

11   told you she had not had sex since before the implant,

12   correct?

13        A.    For one year, before.

14        Q.    Right.  Did you ask her why there were

15   notations in her medical records where she indicated

16   that she was having dyspareunia?

17        A.    No.  I think that wouldn't be her

18   responsibility.  That would have been the person

19   documenting the record's responsibility for entering

20   that, because she was very clear to me and I suspect to

21   everybody else that she didn't have a sexual partner.

22        Q.    So Dr. Norton would be wrong if Dr. Norton

23   noted that she was experiencing dyspareunia?

24        A.    What the patient could have said --

Robert Shull, M.D.

1      Q.   Well, you know, the question is whether

2  Dr. Norton was wrong.

3      A.   Well, if you don't have --

4           MR. CANNON:  I'll just object.  I think we're

5           getting argumentative.

6      A.   Well, what I'll say is I don't know about

7  Dr. Norton's being wrong.  What I would say is

8  dyspareunia is pain with intercourse.

9      Q.   Okay.  How about when Dr. Sharp, did you see

10  the record where he said that Ms. Dimock reported to him

11  that she was having pain with sexual intercourse?

12      A.   Well --

13      Q.   Would that have been an incorrect record as

14  far as you know?

15      A.   Well, what she told me was she hadn't had

16  intercourse since the year before.

17      Q.   Okay.

18      A.   I wasn't there when she gave a history to

19  Drs. Norton and Sharp, so God only knows what she

20  told them.

21      Q.   Did you ask her about whether -- I guess you

22  did ask her, and she said she had not had intercourse,

23  correct?

24      A.   Yes.

Robert Shull, M.D.

Page 88

1     Q.   All right.

2     A.   And I didn't -- the time I saw her, I hadn't

3  reviewed all of those records.

4     Q.   Okay.

5     A.   So that would have required me getting on the

6  phone and saying, "You know, I saw you in November.

7  When did you tell them?"  I didn't --  she didn't give

8  me that history.

9     Q.   All right.  So at the time that you examined

10  her, you had not reviewed any records where there had

11  been a report of dyspareunia; is that what you're

12  saying?

13     A.   That's accurate.

14     Q.   All right.  Ms. Dimock has had some issues

15  with constipation and bowel movements, correct?

16     A.   Yes.

17     Q.   And did you eliminate those issues as a

18  possible source of any pelvic pain in connection with

19  your opinion that the pain she experiences is strictly

20  related to the Prolift device?

21     A.   Well, could she have pain with the

22  constipation?  She could.  Would she have chronic pain

23  with the physical findings that she has and the history

24  she has and constipation be the primary cause of her

Robert Shull, M.D.

Page 89

1    complaint?  And the answer is no.

2         Q.   Now, Doctor, you are of the opinion that

3    Ms. Dimock would not have experienced the issues she

4    did, specifically mesh erosion and chronic pain, had she

5    had a native tissue repair; is that correct?

6         A.   Yes.

7         Q.   All right.  So with respect to mesh erosion,

8    that's because in a native tissue repair, there is no

9    mesh used, correct?

10        A.   That's accurate.

11        Q.   All right.  Do you have an opinion as to

12   whether -- are you going to express an opinion as to

13   whether a native tissue repair in the case of Ms. Dimock

14   would have been more effective?

15        A.   The information that we have about native

16   tissue repairs -- I'll use rectocele. So the information

17   we have about native tissue repair for rectocele,

18   depending on the patient's complaints in advance, the

19   patient could have complaints of a bulge, they could

20   have complaints of inability to empty the distal rectum,

21   they could have complaints of discomfort with

22   intercourse, or they could have no complaints, falls in

23   those four categories.

24             With native tissue surgery, what we know is

Robert Shull, M.D.

Page 90

1    seven out of 10 women will have improvement in their

2    bowel function, and nine out of 10 will have reduction

3    of the bulge, not a hundred percent in either one.  We

4    know that.  We know that some women may have

5    postoperative pain complaints.  It is highly unlikely

6    they would be chronic.

7         Q.   Okay.

8         A.   What we know about mesh products and the

9    posterior vaginal canal for rectocele, there are no

10   reports that indicate improved outcomes in rectocele

11   repair with mesh.  None.

12        Q.   I understand that.  The question I had is:

13   Are you going to issue or render an opinion or testify

14   at trial that, in fact, a native tissue repair in the

15   case of Ms. Dimock would have been more effective than

16   the use of mesh in this particular patient?

17        A.   Well, what do you mean by more effective?

18        Q.   That there would have been -- the chance of a

19   recurrence would have been -- is higher and was higher,

20   and that if she had had a native tissue repair, the

21   chance of a recurrence would have been lower.  Can you

22   say that with any definitive --

23        A.   What I can say in her particular circumstance

24   if she had a native tissue repair, she wouldn't have had

Robert Shull, M.D.

Page 91

1    these four extra surgeries.

2         Q.    I understand the four extra surgeries have to

3    do with the mesh.

4         A.    Right.

5         Q.    Lysing the mesh arms and the erosion.  But the

6    question is efficacy.  Would there have been a

7    difference?  And you can just say to me, "I'm not going

8    to say that I have an opinion one way or the other as to

9    whether a native tissue repair would have been more

10   effective."  I don't care.  I just want to make sure I

11   understand what you're going to say.

12        A.    What I'm going to say is there is no

13   literature that documents that using a mesh product is

14   better, is more effective.  So if there is nothing to

15   say that it's more effective, then what you're left is

16   are they equal, or is one inferior to the other?  So

17   could a mesh product be equal in resolving the anatomic

18   abnormality, the bulge?

19        Q.    Right.

20        A.    They could be equal.  One is not better than

21   the other.

22        Q.    All right.

23        A.    But the issue, if that's all you look at, then

24   you could say the anatomic outcomes may be similar, but

Robert Shull, M.D.

Page 92

1    that isn't all we look at.

2         Q.   I understand that, but that was my question.

3    So now we'll get to the second question, which is your

4    opinion is had she had a native tissue repair, being

5    an anterior or posterior colporrhaphy --

6         A.   Right.

7         Q.   -- your opinion is that would have been a

8    safer procedure, because there would be fewer

9    complications, correct?

10        A.   That's accurate.

11        Q.   All right.  Now, I want to make sure that I

12   understand, though.  With any surgery, with a native

13   tissue repair, there is a chance or there is a

14   possibility that there can be pelvic pain, correct?

15        A.   What I would say is perfect doesn't exist.

16        Q.   Right.  There is no surgical procedure that's

17   perfect; is that right?

18        A.   That's accurate.

19        Q.   All right.  And with an anterior or posterior

20   colporrhaphy, if there were existing adhesions from some

21   other procedure, that wouldn't make a difference in

22   terms of Ms. Dimock's outcome; is that right?

23        A.   Well, I'm going to be a little bit more

24   specific.  There could be findings in the vaginal canal,

Robert Shull, M.D.

Page 93

1    and that would be very specific to a woman who has had

2    radiation therapy in the vagina.  So for some diseases

3    of the pelvis, cancer of the cervix or cancer of the

4    lining of the uterus, some women are treated with

5    radiation in the vagina causing scarring, and there

6    could be problems with vaginal surgery associated with

7    that.

8              When the adhesions are inside the abdomen,

9    which would happen after abdominal hysterectomy or ovary

10   surgery or whatnot, when adhesions are inside the

11   abdomen and the surgery is done through the vaginal

12   canal without entering the abdomen, there shouldn't be

13   anything done vaginally that would be an

14   intra-abdominal problem.

15        Q.   And to go back -- strike that.

16             MR. CANNON:  Let's go off the record for a

17        second.

18             THE VIDEOGRAPHER:  Going off the record.  The

19        time is 11:55.

20     (Recess was taken from 11:55 a.m. until 12:02 p.m.)

21             THE VIDEOGRAPHER:  Back on the record.  The

22        time is 12:02.

23   BY MS. VAN STEENBURGH:

24        Q.   Dr. Shull, a couple of follow-up questions.

Robert Shull, M.D.

Page 94

1    One, I believe that you testified that they're -- with

2    respect to Ms. Dimock, either the mesh itself

3    contracting or the scar tissue formed around the mesh

4    contracting is a source of Ms. Dimock's chronic pelvic

5    pain, correct?

6         A.   That's accurate.

7         Q.   All right.  And have you looked at literature

8    regarding scarring in connection with the Prolift

9    device?

10        A.   Yes, I have.

11        Q.   Is there anything different reported in the

12   literature than what you see here with respect to

13   Ms. Dimock?

14        A.   You mean on her clinical exam?

15        Q.   Right.  Either on the clinical exam when you

16   did it or anything in her medical records that would

17   indicate the scarring or adhesions in her particular

18   case are different from what you have seen in the

19   literature relative to the Prolift device?

20        A.   My impression is her history is compatible

21   with the chronology of what can happen with patients is

22   that they can have an interval where they're relatively

23   pain free followed by an interval of progressive chronic

24   pain because of these changes in the mesh, the

Robert Shull, M.D.

1    shrinkage, the contraction, the degradation, the chronic

2    inflammation, so I think her history actually fits what

3    some people are -- in fact do experience.

4          Q.   How about the type of scarring here in this

5    particular situation described by Dr. Norton, is that

6    different or is that consistent with what you have seen

7    reported in the literature as to scarring that occurs

8    with a Prolift device?

9          A.   It's similar to what I've read about and it's

10   similar to what I have seen personally in revising mesh

11   in patients who have required it.

12         Q.   Is it different in some way?  You say it's

13   similar, but is there a difference in some way?

14         A.   Well, I think every patient is different, so

15   the surgical dissection by her description is tedious,

16   difficult in developing tissue planes between the

17   bladder, the bowel, the vaginal skin, difficulty in

18   exposing the mesh through the scar, so those things are

19   all --

20         Q.   So does it sound like it's --

21         A.   -- characteristics I've observed when I've

22   done mesh explantation myself, and there are things that

23   are described in the literature that the surgery is

24   technically difficult to do.  And that's exactly what

Robert Shull, M.D.

Page 96

1   Dr. Norton's note describes.  She describes banding,

2   bunching, tissue being taught, difficulty in developing

3   tissue planes, so those are all various characteristics.

4        Q.   There is a reference in Dr. Norton's notes to

5   the scarring in this particular case with Ms. Dimock

6   being unusual based upon Dr. Norton's experience.  Did

7   you note that?

8        A.   Well, I think she probably means it's

9   unusually tedious to take care of it is what she --

10       Q.   Well, you don't know what she means, correct?

11       A.   No.  I would think she means it's unusually

12  difficult to do.

13       Q.   Well, in terms of if we are describing the

14  adhesions themselves, would you agree or disagree that

15  they are unusual based upon what is generally reported

16  in the literature?

17            MR. CANNON:  I'll object; speculation.

18       A.   I don't think I can say that I know that.

19       Q.   Okay.  And when you say that it's consist with

20  what you have experienced or what you've seen in the

21  literature, you're talking about the difficulty of

22  removing the mesh?

23       A.   That's accurate.  Identifying it, dissecting

24  it out, and protecting the surrounding structures so you

Robert Shull, M.D.

Page 97

1    don't injure the bowel, the bladder, the urethra, the

2    vaginal skin.

3        Q.   Okay.  Are you're not talking about the actual

4    adhesion constitution itself; is that right?

5        A.   That's correct.

6            MS. VAN STEENBURGH:  Let's just go off the

7        record for a second.  I want to ask Doug something.

8            THE VIDEOGRAPHER:  Going off the record.  The

9        time is 12:07.

10   (Recess was taken from 12:07 p.m. until 12:09 p.m.)

11           THE VIDEOGRAPHER:  Back on the record.  The

12       time is 12:09.

13   BY MS. VAN STEENBURGH:

14       Q.   Doctor, other than the opinions expressed in

15   your expert witness report and those that you have

16   described today, are there any other opinions that you

17   intend to give at the trial of this matter of

18   Ms. Dimock?

19       A.   I'm not aware of it.

20       Q.   All right.  And have you been asked to

21   supplement your report at all?

22       A.   No.

23           MS. VAN STEENBURGH:  Okay.  And to the extent

24       you do, we will ask for a further deposition on

Robert Shull, M.D.

1        that.  That's all I have.  Thank you.

2              THE WITNESS:  Thank you.

3              THE VIDEOGRAPHER:  This concludes the

4        deposition of Dr. Shull in the Dimock case.  Going

5        off the record.  The time is 12:09.

6              (The digital recording ended at 12:09 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Robert Shull, M.D.

Page 99

1                    CERTIFICATE OF REPORTER

2

3

4

5

6              I, Danielle C. Coleman, Stenographic Shorthand

7    Reporter, do hereby certify that I was authorized to and

8    did transcribe the foregoing proceedings from digital

9    recording, and that the transcript, pages 1 through 98,

10   is a true and correct record.

11

12             Dated this 15th day of March, 2016.

13

14

15                           _____

                             Danielle C. Coleman

16

17                           Stenographic Shorthand Reporter

18

19

20

21

22

23

24