In The Matter Of:
*~In Re: Avaulta~*

**Bobbie Shull, M.D.**
02/06/2013

Tiffany Alley Reporting & Video
3348 Peachtree Road
Tower Place 200, Suite 700
Atlanta, GA 30326

770.343.9696
www.tiffanyalley.com



**TIFFANY**ALLEY
REPORTING & VIDEO

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

| | |
|---|---|
| IN RE: C.R. BARD, INC.<br>PELVIC REPAIR SYSTEM PRODUCTS<br>LIABILITY LITIGATION: | MDL NO. 2187 |
| THIS DOCUMENTS RELATES TO: | |
| LINDA RIZZO and RONALD RIZZO,<br>    Plaintiffs,<br>    vs.<br>C.R. BARD, INC.,<br>    Defendant. | Case No.<br>2:10-cv-01224 |
| WANDA QUEEN and GREG QUEEN,<br>    Plaintiffs,<br>    vs.<br>C.R. BARD, INC.,<br>    Defendant. | Case No.<br>2:11-cv-00012 |

VIDEO DEPOSITION OF BOBBIE LEWIS SHULL, M.D.

February 6, 2013 - 9:14 a.m.

Mueller Law Offices

404 W. 7th Street

Austin, Texas   78701

Judith L. Leitz Moran - RPR, CCR-B-2312

1  A    I don't know who produces some of the
2  things we use at work, frankly.  So it's quite
3  possible because I believe our organization
4  maybe has a contract with Covidien for certain
5  items, but I don't know what they are.
6  Q    Are you familiar with the federal
7  regulations promulgated by the FDA concerning
8  the content of instructions for use with regard
9  to medical devices?
10 A    I don't think I understand the
11 question.
12 Q    Are you familiar with the federal
13 regulations that govern what goes into -- what
14 types of information goes into instructions for
15 use with regard to medical devices?
16 A    No, I'm not.
17 Q    Have you ever developed a training
18 program for the use of medical devices?
19 A    In our department we have taught
20 courses on surgery.  We began probably in the
21 19 -- early 1980s doing a postgraduate course
22 on the evaluation and management of women with
23 pelvic organ prolapse that was entirely
24 didactic.  There were no hands-on experiences
25 of any kind.

~In Re: Avaulta~  Bobbie Shull, M.D.  2/6/2013

```
 1   BY MR. NORTH:
 2        Q    Well, that leads me to my next
 3   question then.  I gather that you have never
 4   actually performed surgical tests with squirrel
 5   monkeys?
 6        A    I haven't personally, our lab has.
 7   So, yes, we have PhDs in the lab and physicians
 8   in the lab who do that.  I have not personally
 9   done the surgeries.
10        Q    Have you ever designed any sort of
11   animal test for the implantation of some sort
12   of product or device?
13        A    Our group has.  I didn't personally.
14        Q    I'm asking about you personally.
15        A    No, I haven't.
16        Q    You've never developed a protocol for
17   an animal test?
18        A    No.
19        Q    You've never performed an animal test
20   personally?
21        A    No.
22        Q    Have you ever witnessed animal
23   testing taking place?
24        A    How do you mean witnessing?  The
25   implantation of a product or the explantation
```

1  of a product?

2      Q    Right.

3      A    No.

4      Q    And to the extent that's done in your
5  group, that's done in the laboratory with other
6  physicians and PhDs?

7      A    That's correct.

8          MR. NORTH: If we could mark this as
9  the next exhibit. Is that No. 5?

10         THE COURT REPORTER: Uh-huh.

11         (Defendant's Exhibit 5 marked.)

12         MR. GARRARD: Do you got one that my
13  old eyes can read?

14         MR. NORTH: We are all in the same
15  boat, Mr. Garrard.

16  BY MR. NORTH:

17      Q    Doctor, is this an article that you
18  had prepared in the past?

19      A    Yes.

20      Q    And when was this published?

21      A    December 1994.

22      Q    This did not have to do with the
23  implant of any mesh product, did it?

24      A    In this series of 62 women, we used
25  native tissue and suture material.

1  I don't -- I didn't know the names of the
2  products.
3      Q    Now, to your knowledge, have we now
4  discussed all of your publications with regard
5  to mesh products for the treatment of pelvic
6  organ prolapse?
7      A    I hope so.
8      Q    Okay.
9           MR. GARRARD:  Do you need to look at
10 the new CV?
11          MR. NORTH:  Well, he can always --
12          MR. GARRARD:  Well, I'm just -- we
13 may --
14          MR. NORTH:  -- add something.  I'm
15 just asking to his knowledge now.
16 BY MR. NORTH:
17     Q    Let's talk a little bit about your
18 retention in this case as an expert witness.
19          Now, I certainly understand -- you
20 know, appreciate your expertise as an OB-GYN
21 and in the gynecological surgery area.  But I
22 want to see if we can be clear about areas
23 where you're not an expert.  And I asked you
24 about your training and expertise in some of
25 these areas earlier.

```
 1            But would you agree that you are not
 2   an expert in developing warnings and labels for
 3   medical devices?
 4       A    I have never developed a warning or a
 5   label.  I don't intend to do that.  And I don't
 6   know the process for doing it, so I would not
 7   claim to be an expert in that area.
 8       Q    And you are not an expert in the
 9   design of medical devices, are you?
10       A    No, I've never designed a device.
11       Q    And you are not an expert in
12   biomaterials?
13       A    No.
14       Q    And are you an expert in
15   biocompatibility?
16       A    No.
17       Q    And are you an expert in materials
18   manufacturing?
19       A    No.
20       Q    Are you an expert in the
21   manufacturing processes for medical devices?
22       A    No.
23       Q    And we talked about your training in
24   pathology.  Would you consider yourself an
25   expert in pathology?
```

```
 1    A    No.
 2    Q    Would you consider yourself an expert
 3  in toxicology?
 4    A    No.
 5    Q    Would you consider yourself an expert
 6  in the marketing of products?
 7    A    No.
 8    Q    Would you consider yourself an expert
 9  in the marketing of medical devices?
10    A    No.
11    Q    Do you deal with sales
12  representatives from various medical device
13  manufacturers as a part of your practice?
14    A    Sometimes.
15    Q    Do you deal with any medical device
16  or any sales representative from Bard?
17    A    Can you tell me what dealing with
18  means?
19    Q    With any type of product.
20    A    Do I sit down and discuss the
21  products with them?
22    Q    Uh-huh.
23    A    Perhaps I have.  I certainly wouldn't
24  do it with any frequency.
25    Q    Do you know the name of any Bard
```

```
 1      A    I don't believe so.
 2      Q    And you weren't shown the deposition
 3 of Tad Nations?
 4      A    I don't believe so.
 5      Q    You weren't shown the deposition of
 6 Melissa Johnson?
 7      A    I recognize that name.  I don't know
 8 that I saw her deposition.
 9      Q    The only depositions you've seen are
10 the ones that Mr. Garrard and Dr. Johnson
11 showed you, correct?
12      A    You mean Dr. Thompson?
13      Q    I'm sorry, Dr. Thompson.
14      A    I believe that would be true.
15      Q    And they selected the depositions to
16 show you, correct?
17      A    I presume they did.
18      Q    I mean, you didn't come up with a
19 list of the employees yourself that you wanted
20 to see their depositions, did you?
21      A    No.
22      Q    Okay.  As a part of your work in this
23 case, have you gone back and looked at any
24 regulations put out by the FDA that might
25 govern these products?
```

```
 1     A     The 510(k) -- I've looked at the form
 2  for 510(k) submission.
 3     Q     And that was given to you by the
 4  Plaintiffs' attorneys, correct?
 5     A     Yes.
 6     Q     Have you looked at any regulations
 7  from the FDA, though?
 8     A     I have not gone to an FDA website or
 9  obtained any information from the FDA regarding
10  how to submit a proposal or what's included or
11  the process for it.
12     Q     Well, the FDA regulations go beyond
13  how to submit a proposal.  So have you looked,
14  as a part of your work at this case, at any
15  regulations put out by the FDA that might be
16  applicable to this product?
17     A     No.
18     Q     Have you reviewed the 2008 and 2011
19  public health notifications put out by the FDA?
20     A     Regarding?
21     Q     Pelvic mesh products.
22     A     The warnings about pelvic mesh
23  products?
24     Q     The public health notification.
25     A     Yes, I have.
```

1    Q    With regard to medical devices, do
2 you know what percentage of medical devices go
3 through clinical studies before they're
4 introduced to the market?
5    A    No.
6    Q    Do you know with regard to medical
7 devices whether more products go through
8 clinical studies or don't go through clinical
9 studies before they're introduced to the
10 market?
11    A    **I do not know that.**
12    Q    Do you know whether Bard was required
13 to conduct clinical studies on Avaulta before
14 introducing it to the market?
15        MR. GARRARD: Required? In terms of
16 the form of your question, required by what
17 or whom?
18 BY MR. NORTH:
19    Q    By FDA rules and regulations.
20    A    **Do you mind repeating the question**
21 **for me?**
22    Q    Do you know whether Bard was required
23 under FDA regulations to perform clinical
24 studies on Avaulta before it was introduced to
25 the market?

```
 1      A    I do not know that.  My presumption
 2   is if they're using the predicate device as the
 3   mechanism for getting the clearance, that there
 4   may have been no requirements.
 5      Q    How long do you believe it would have
 6   taken to conduct a clinical study of Avaulta,
 7   or do you know?
 8      A    I can answer that in general.  It
 9   depends on what you would like to know about
10   it.  So depending on the knowledge you hope to
11   acquire, there would be varying time intervals.
12           If it's a question about indications
13   and patient selection, that may take a shorter
14   time period.
15           If there are questions about the
16   morbidity associated with the operation itself
17   or the morbidity in the first six weeks
18   following surgery, that would take a relatively
19   defined time period depending on the number of
20   patients required for you to draw conclusions
21   from.
22           If you're talking about the long-term
23   consequences of a product, in this case we have
24   previous information from reports on sacral
25   colpopexy, for example, which teaches us that
```

Case 2:11-cv-00195 Document 98-4 Filed 03/21/13 Page 1 of 282 PageID #: 2179

In The Matter Of:
## ~In Re: Avaulta~

## Robert Shull, Vol. II
02/28/2013

Tiffany Alley Reporting & Video
3348 Peachtree Road
Tower Place 200, Suite 700
Atlanta, GA 30326

770.343.9696
www.tiffanyalley.com



**TIFFANY**ALLEY
REPORTING & VIDEO

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

| | |
|---|---|
| IN RE: C.R. BARD, INC.<br>PELVIC REPAIR SYSTEM PRODUCTS<br>LIABILITY LITIGATION: | MDL NO. 2187 |
| THIS DOCUMENTS RELATES TO: | |
| LINDA RIZZO and RONALD RIZZO,<br>    Plaintiffs,<br>    vs.<br>C.R. BARD, INC.,<br>    Defendant. | Case No.<br>2:10-cv-01224 |
| WANDA QUEEN and GREG QUEEN,<br>    Plaintiffs,<br>    vs.<br>C.R. BARD, INC.,<br>    Defendant. | Case No.<br>2:11-cv-00012 |

VOLUME II

VIDEO DEPOSITION OF ROBERT L. SHULL, M.D.

February 28, 2013 - 8:53 a.m.

Mueller Law Office

404 W. 7th Street

Austin, Texas  78701

Judith L. Leitz Moran - RPR, CCR-B-2312

| | | |
|---|---|---|
| 1 | CAROLYN JONES, | |
| 2 |     Plaintiff, | Case No. |
| 3 | vs. | 2:11-cv-00114 |
| 4 | C.R. BARD, INC., | |
| 5 |     Defendant. | |
| 6 | | |
| 7 | DONNA CISSON and DAN CISSON, | |
| 8 |     Plaintiffs, | Case No. |
| 9 | vs. | 2:11-cv-00195 |
| 10 | C.R. BARD, INC., | |
| 11 |     Defendant. | |
| 12 | | |
| 13 | NANCY SMITH and JOHN SMITH, | |
| 14 |     Plaintiffs, | Case No. |
| 15 | vs. | 2:11-cv-01355 |
| 16 | C.R. BARD, INC. and SOFRADIM | |
| 17 | PRODUCTION SAS, | |
| 18 |     Defendants. | |

1  Q    Prior to your involvement in this
2  case, have you read the instructions for use of
3  any other manufacturer's mesh kit for
4  transvaginal use?
5       MR. GARRARD:  Objection, that's
6  already been asked and answered last time.
7  A    I think the same answer applies.  I
8  would go by the exhibits at scientific
9  meetings, look at what was available, and would
10 watch the DVDs, listen to the representatives,
11 and read some of the literature, including
12 IFUs, but I do not know for the specific
13 products.
14 BY MR. NORTH:
15 Q    Doctor, one statement you make on
16 Pages 28 and 29 of your report is the
17 suggestion that the IFU was deficient because
18 it did not warn or teach about patient
19 selection; is that correct?
20 A    Yes.
21 Q    Doctor, isn't the notion of patient
22 selection, doesn't that involve a medical
23 judgment?
24 A    Based on all of the factual
25 information you have, yes, it does.  My

1   contention here is the doctor doesn't have all
2   the medical information needed to make a
3   decision.
4       Q    But you would agree that a medical
5   device manufacturer can't tell a doctor which
6   patient should and should not have -- no, let's
7   strike that.
8            You would agree that a medical device
9   manufacturer should not be making medical
10  judgments as to patient selection, correct?
11      A    The manufacturer should provide a
12  physician enough information so the physician
13  can make an informed decision, relay that to
14  the patient and have the patient participate in
15  a decision about the use of a medication or a
16  device.
17           My contention is that there wasn't
18  enough information provided to anyone to
19  educate the physician or the patient about
20  patient selection or contraindications.
21           If I could give you an example of
22  something that has multiple meanings.
23           The IFU only states that Avaulta
24  products are contraindicated for patients who
25  are pregnant or may become pregnant.  That's

```
 1   clear.  Have urinary tract infection.  That is
 2   clear.  Have an infection in the operative
 3   field.  That is clear.
 4              Or patients in a period of growth
 5   because the mesh may not stretch significantly.
 6   That is extremely unclear.  What is a period of
 7   growth?
 8              That's only an example.  But my real
 9   concern isn't about the specific things that
10   were said, it's about the things that were not
11   said.  There have to be reasons not to use
12   implantable product in addition to these that
13   have been given.
14              Any reasonable doctor would agree
15   with that.  Any reasonable patient would like
16   to know has the doctor evaluated them to be a
17   satisfactory candidate for a drug, a product,
18   or a procedure.
19              MR. NORTH:  Move to strike as
20   nonresponsive.
21   BY MR. NORTH:
22        Q    Doctor --
23              MR. GARRARD:  It was responsive.
24   BY MR. NORTH:
25        Q    -- at some point in your report on
```

1  Page 25 you suggest that a surgeon needs to be
2  informed of the risks and benefits and be
3  supplied with the supporting data. Suggesting
4  to me that you believe the IFU should contain
5  supporting data regarding risks and benefits;
6  is that correct?
7      **A**    Yes.
8      Q    But you are not aware of whether
9  there's any FDA requirement regarding the
10 insertion of supporting data in an IFU, are
11 you?
12     **A**    **I do not know if the agency who**
13 **approves the IFU needs supporting data nor do I**
14 **know if it's a requirement to provide it to the**
15 **user. My point is, you can't intelligently use**
16 **something without this information.**
17     Q    Can you recall any IFUs for other
18 products that you've used that have supporting
19 data for their risks and benefits in the IFU?
20     **A**    **I don't know the answer to that. The**
21 **answer is I do not know.**
22     Q    The question was, do you recall,
23 so --
24     **A**    **I do not. I have not seen that in**
25 **another IFU.**

```
 1      Q      Okay.  You also state at one point --
 2             MR. GARRARD:  Wait a minute.
 3             (Off the record.)
 4   BY MR. NORTH:
 5      Q      Okay.  You state that the IFU should
 6   say that mesh products should not be used in
 7   women with a history of chronic pelvic pain.
 8             Do you recall saying that?
 9      A      I believe I did.
10      Q      Are you aware of whether any of the
11   Bellwether Plaintiffs whose records you
12   reviewed had a history, prior history, of
13   chronic pelvic pain?
14      A      I believe that Donna Cisson had an
15   abdominal hysterectomy and oophorectomy some 10
16   to 20 years prior to the implantation of the
17   device.  And I believe that one of the
18   indications in the record was for pelvic pain.
19      Q      Do you know whether that was chronic
20   pelvic pain?
21      A      I'm going to look that up.
22             I'm looking for the specific
23   reference in the records.  It's going to take
24   me just a moment to find that.
25             Well, I know that it is not
```