# EXHIBIT E

Russell F. Dunn, Ph.D., P.E.

```
 1              UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF WEST VIRGINIA
 2                    AT CHARLESTON
 3   IN RE: ETHICON, INC., PELVIC   )
     REPAIR SYSTEM PRODUCTS         )
 4   LIABILITY LITIGATION           )
     _____   )
 5                                  )
     THIS DOCUMENT RELATES TO THE   ) Master File No.
 6   FOLLOWING CASES IN WAVE l OF   ) 2:ll-MD-02327
     MDL 200:                       )
 7                                  ) MDL 2327
     Joan Adams v. Ethicon, Inc.,   )
 8   et al.                         )
     Civil Action No.               )
 9   2:12-cv-1103                   )
                                    )
10   Lois Hoy, et al v. Ethicon,    )
     Inc., et al.                   )
11   Civil Action No.               )
     2:12-cv-00876                  )
12                                  )
     Charlene Miracle v. Ethicon,   )
13   Inc., et al.                   )
     Civil Action No.               )
14   2:12-cv-00510                  )
                                    )
15   Donna Zoltowski, et al. v.     )
     Ethicon, Inc., et al.          )
16   Civil Action No.               )
     2:12-cv-00811                  )
17   _____
18
19
                    DEPOSITION OF
20
            RUSSELL F. DUNN, PH.D., P.E.
21
         Taken on behalf of the Defendants
22
                   March 7, 2016
23
24
25
```

Russell F. Dunn, Ph.D., P.E.

```
 1                RUSSELL F. DUNN, PH.D., P.E.
 2   was called as a witness, and after having been
 3   first duly sworn, testified as follows:
 4
 5   EXAMINATION BY MR. DAVIS:
 6       Q.       Good morning, Dr. Dunn.
 7       A.       Good morning.
 8       Q.       Since we've met before, I'll just kind
 9   of jump into things.  Let me hand you first, to
10   start off, a copy of Exhibit 1.
11                (Whereupon Exhibit 1 was marked as an
12   exhibit.)
13   BY MR. DAVIS:
14       Q.       And can you just confirm that that's a
15   copy of your report that is the subject matter of
16   this deposition?
17       A.       Yes, sir.
18       Q.       Okay.  Let me just run through a couple
19   more documents.
20                Well, why don't you just keep -- yeah,
21   we'll --
22       A.       Oh.  Sure.
23       Q.       I realize you've got your own notebook
24   with your copy.
25       A.       Uh-huh.
```

Russell F. Dunn, Ph.D., P.E.

1    configuration.

2    BY MR. DAVIS:

3        Q.      Okay.  Can you explain how Prolift+M

4    differs from Prosima?

5                MR. BOWMAN:  Object to the form.

6    BY MR. DAVIS:

7        Q.      And if it's the same answer, that's

8    fine.

9        A.      Oh, the Prolift+M has Monocryl filament

10   in it, also, in addition to the polypropylene.

11       Q.      And what is the significance of the

12   Monocryl?

13       A.      It's biodegradable.

14       Q.      Okay.  As I read your report, I -- I

15   see a number of references to ISO 14971.

16           Do you recall that?

17       A.      Yes, sir.

18       Q.      And were there any other medical

19   industry specific standards that you relied upon in

20   your report other than ISO 14971?

21       A.      I specifically dealt with the ISO 14971

22   and insofar as it references other standards that

23   it relies upon.

24       Q.      Okay.  Well, are you aware that

25   ISO 14971 does cite a number of other standards?

Russell F. Dunn, Ph.D., P.E.

1      A.       Absolutely, I'm aware of that.

2      Q.       And I'm just trying to understand.  Did

3   you go -- did you have any occasion to go review

4   any of those other standards that are cited in

5   ISO 14971?

6      A.       I may have reviewed some of those

7   standards.  Not -- they were not the subject of my

8   report.  I specifically dealt with 14971.

9      Q.       Okay.  And let me just follow up.

10            You may or may not recall that, at your

11  last deposition, I asked you some questions about

12  ISO 10993 and its various subparts.

13            Do you recall that generally?

14     A.       Yes.  Biocompatibility, yes, sir.

15     Q.       Have you had any occasion since your

16  last deposition to review any portions of

17  ISO 10993?

18     A.       That's -- no, sir.  That's not my area

19  of expertise, is biocompatibility.

20     Q.       Okay.  Do you -- do you know what all

21  the subject matter of biocompatibility encompasses?

22            MR. BOWMAN:  Object to form.

23  BY MR. DAVIS:

24     Q.       Well, I mean, I understand it's not

25  your expertise.

Russell F. Dunn, Ph.D., P.E.

```
 1                MR. BOWMAN:  Object to form.

 2    BY MR. DAVIS:

 3        Q.      Do you have an opinion as to how long

 4    Prolene mesh needs to be in the body before it

 5    doesn't matter whether it has some degradation?

 6                MR. BOWMAN:  Object to form.

 7                THE WITNESS:  That's not the subject of

 8    my report.

 9    BY MR. DAVIS:

10        Q.      Do you know of any harm associated with

11    the oxidative degradation of Prolene used in the

12    pelvic floor?

13        A.      All I know is how the properties of the

14    polymer change.  And that's the subject of my

15    report.  And that it gets hard and embrittled as it

16    oxidizes.

17        Q.      Well, but the subject of your report is

18    also FMEAs and risk analysis, right?

19        A.      It is FMEAs.

20        Q.      And you understand that, in order to

21    call something a hazard, which you've done -- well,

22    let's back up.

23                You -- throughout your report, you call

24    Prolene mesh in the body a hazard, correct?

25        A.      I say that it should be evaluated for
```

Russell F. Dunn, Ph.D., P.E.

1    potential failure modes.

2         Q.        Well, now, let me ask you.  I mean --

3    well, you agree your report repeatedly says that

4    Prolene used in a mesh in the pelvic floor is a

5    hazard?

6         A.        It readily oxidizes, yes.  And

7    that's -- and that is a defect.

8         Q.        But your opinion is that it is a

9    hazard, correct?

10        A.        Yes.

11        Q.        Okay.  And you understand -- according

12   to ISO 14971, you understand the definition of a

13   hazard, correct?

14        A.        Yes.

15        Q.        What is that definition?

16        A.        A potential source of harm.

17        Q.        Okay.  So please identify the harm that

18   you have associated with oxidative degradation of

19   polypropylene in order to allow you to call it a

20   hazard.

21        A.        You're -- I'm telling you that it gets

22   hard and it gets embrittled, and I'm also

23   indicating that, as a potential failure mode, it

24   has to be fully evaluated by Ethicon relative to

25   its harm.

Russell F. Dunn, Ph.D., P.E.

1    Q.      As -- as you sit here today, do you

2    know of any harm that you can tell the Court that's

3    associated with what you describe as Prolene being

4    a hazard?

5    A.      I know the changes in the polymer

6    itself, that it becomes cracked and embrittled and

7    hard.

8    Q.      Okay.  My question is, can you -- can

9    you identify any specific harm today?

10    A.      That it's changing the properties

11    inside the body over time.

12    Q.      Do you understand the definition of

13    "harm"?  What does "harm" mean?

14              MR. BOWMAN:  Object to form.

15              THE WITNESS:  Physical injury or damage

16    to the health of people or damage to the property

17    or the environment.

18    BY MR. DAVIS:

19    Q.      Okay.  Can you tell me any injury to

20    the person in whom the mesh is implanted?

21    A.      That's not the subject of my report.

22    Q.      Okay.  Yet -- so you've -- you've

23    labeled Prolene mesh in the pelvic floor as a

24    hazard, but you have not been able to associate

25    that hazard with any specific harm?

Russell F. Dunn, Ph.D., P.E.

```
1     it works, and then I'll hand it over.

2              MR. DAVIS:  Okay.

3     BY MR. DAVIS:

4         Q.      In the meantime, Dr. Dunn, I've handed

5     you Exhibit 6, and my first question is, can you

6     tell us whether this is a document that you

7     considered as part of your analysis?

8         A.      It could be.  I don't know.

9         Q.      Well --

10        A.      I don't have every document memorized.

11        Q.      Okay.

12        A.      And I've looked at documents over the

13    last two years.

14        Q.      Okay.  Let me put it this way:  In your

15    report, at various points you say that it's your

16    opinion that Ethicon failed to consider oxidative

17    degradation, correct?

18        A.      That is correct.

19        Q.      So did -- if -- did you make any effort

20    to look at Exhibit Number 6 and -- and distinguish

21    it or to justify an opinion that we're not

22    considering oxidative degradation?

23        A.      I am justifying that opinion based on

24    the failure mode and effects analysis.  This is not

25    the failure mode and effects analysis.  If they
```

Russell F. Dunn, Ph.D., P.E.

1    considered oxidative degradation, it will be in

2    their failure mode effects and analysis.

3              If you want to show me a failure mode

4    and effects analysis that has a line item of

5    oxidative degradation, then they considered it.

6    Otherwise, they did not consider it.  If it's not

7    in the FMEA, it was not considered.

8         Q.     Okay.  So -- have you ever heard of a

9    biocompatibility risk assessment?

10        A.     Not a specific biocompatibility risk

11   assessment.  The ISO 10- -- 14971 includes

12   biocompatibility.  It considers that -- it's

13   inclusive of that in the risk assessment.

14        Q.     Okay.

15        A.     You don't have separate risk

16   assessments for different matters.  When we talk

17   about the overall risk assessment of a product, it

18   all has to be within ISO 14971.

19              (Whereupon Exhibit 7 was marked as an

20   exhibit.)

21   BY MR. DAVIS:

22        Q.     Let me hand you Exhibit 7.

23        A.     Yes, sir.

24        Q.     Do you see the first page of this

25   exhibit has a title "Essential Requirements

Russell F. Dunn, Ph.D., P.E.

1    oxidative degradation of Prolene in the pelvic

2    mesh, once it's in the body, has any practical

3    consequence?

4        A.    I don't know what Ethicon's evaluation

5    of that was because it was not included in their

6    FMEA.  You're asking me to do what they should have

7    done, and I'm telling you that I want to look at

8    how they view that and how they judge that risk,

9    and it's not part of their analysis.

10       Q.    I hear you.  But --

11       A.    It's absent.

12       Q.    Yeah.  And -- I hear you.  But now --

13   listen very carefully to my question.

14       A.    Yes.

15       Q.    I just want a "yes" or "no," and then

16   you can explain.

17             Do you know whether there is any

18   practical consequence to oxidative degradation of

19   Prolene in the Prolene meshes that are the subject

20   of your report once they're in the body?

21       A.    That's -- that's not part of my report.

22   I know the consequences on the polymer properties

23   itself, and I've not extended that to the effect in

24   the human body.

25       Q.    So is the answer to my question "yes"

Russell F. Dunn, Ph.D., P.E.

1    Q.    Okay.  And so it says in Section 4.1,

2    the first sentence, quote, Risk analysis shall be

3    performed for the particular medical device as

4    described in 4.2 to 4.4, unquote.

5              Did I read that correctly?

6    A.    Yes.

7    Q.    Okay.  And notice that, under that

8    Section 4.1, it has a series of notes.

9              Do you see that series of notes?

10   A.    Yes.

11   Q.    Notes 1 through 4 and --

12   A.    Yes.

13   Q.    Look at Note Number 4.  Do you see it

14   says, quote, Additional guidance on risk analysis

15   techniques for toxicological hazards is given in

16   Annex I, unquote.

17   A.    Sure.

18   Q.    Did I read that correctly?

19   A.    Yes.

20   Q.    Okay.  So you're familiar with Annex I?

21   A.    I've seen Annex I, sure.

22   Q.    Okay.  And so -- you've turned to

23   Annex I?

24   A.    Yes.

25   Q.    Do you see it has a title, "Guidance on

Russell F. Dunn, Ph.D., P.E.

1    Risk Analysis Process for Biological Hazards"?

2    That's the title?

3        A.       Yes.

4        Q.       Okay.  And then what standard does it

5    cite the reader to for the general principles for

6    the biological evaluation of materials and medical

7    devices?

8        A.       For biological hazards, it's 10993, as

9    I indicated previously.

10       Q.       Well, it didn't say biological hazard;

11   it says "biological evaluation," doesn't it?

12       A.       That -- that sentence says that.  But

13   it's under Annex I, which is the guidance on risk

14   analysis process for biological hazards.

15       Q.       Okay.  You don't think it has anything

16   to do with chemical hazards?

17       A.       I -- let's address that.  Go back to

18   Table E.1, page 51.

19       Q.       Sure.

20       A.       I specifically indicated that those are

21   examples of hazards.  You should see in the second

22   column there is a heading called "Biological."  It

23   is not the same heading as "Chemical."

24             I told you before that degradation

25   products is under chemical; it's not under

Russell F. Dunn, Ph.D., P.E.

1    biological, nor is it under biocompatibility.

2             So let's don't confuse the two.

3    Q.       So what standard does the ISO refer you

4    to -- to -- for guidance on chemical hazards?

5    A.       There -- there isn't one.  You need

6    chemical expertise.  You need polymer expertise.

7    There's no one standard for chemical analysis.

8    Q.       Okay.  Let's turn back to Annex I for a

9    second.

10   A.       Okay.  I'm there.

11   Q.       Look at Section 1.2.1.  And do you see

12   where that section reads in part, quote, The

13   biological risk analysis should take account of,

14   and then it lists four bullet points, correct?

15   A.       Uh-huh.

16   Q.       The first bullet point is "The physical

17   and chemical characteristics of the various choices

18   of materials."

19             Do you see that?

20   A.       Yes.

21   Q.       And do you see on down in Section

22   1.2.2, it specifically includes, among the analysis

23   of biocompatibility, the influence of

24   biodegradation, correct?

25   A.       It does.

Russell F. Dunn, Ph.D., P.E.

1    Q.      Okay.  So will you now agree that

2    ISO 10993 does, in fact, address such matters as

3    how you do a risk analysis to look at oxidative

4    degradation?

5    A.      I will not.

6    Q.      Okay.  So --

7    A.      And I disagree totally.

8    Q.      Okay.  So your opinion is that Annex I

9    has nothing to do with analyzing oxidative

10   degradation?

11   A.      I'm saying -- I'm saying that Annex I

12   does not necessarily include oxidative degradation.

13   It is more -- more concerned with biocompatibility

14   and toxicity of chemical constituents and those

15   types of matters.

16   Q.      Okay.  Well, what does it mean when it

17   says -- when it says in 1.2.2, your risk analysis

18   should include the, quote, chemical nature of the

19   materials, unquote?

20   A.      Where -- where are you?

21   Q.      Look at the heading for Section 1.2.2,

22   "Chemical Nature of the Materials."

23          Is it your testimony that you don't

24   think that includes the possibility of oxidative

25   degradation?

Russell F. Dunn, Ph.D., P.E.

1     A.       The intent is to say that they -- that

2   Ethicon has not performed a risk analysis on

3   oxidative degradation.

4     Q.       Yeah.  And so let me ask you this.

5   Look on down to the third paragraph on that page.

6     A.       Uh-huh.

7     Q.       The second sentence.  Says, quote, An

8   important consideration in the acceptability of a

9   residual risk is whether an anticipated clinical

10  benefit can be achieved through the use of

11  alternative design solutions or therapeutic options

12  that avoid exposure to that risk or reduce the

13  overall risk, unquote.

14            Did I read that correctly?

15    A.       Yes.

16    Q.       Okay.  And, again, I just want to make

17  sure I've covered this -- well, first, do you agree

18  that that is an important consideration?

19    A.       Yes.

20    Q.       Okay.  And have you considered that in

21  any of your work on this case?

22    A.       That's not what I'm doing.  I'm

23  assessing whether or not Ethicon has performed a

24  risk/benefit analysis.

25    Q.       Okay.

Russell F. Dunn, Ph.D., P.E.

```
1        A.        And the problem is -- and you're not

2   asking me this question -- and I know why --

3   Ethicon can't do a risk/benefit analysis because

4   they haven't evaluated the risk.  So it's kind of

5   hard to do a risk/benefit analysis when you don't

6   evaluate the risk first.

7        Q.        Okay.

8        A.        And my assessment is to look at what

9   Ethicon has done, not to perform that for them.

10        Q.        Okay.  Thank you.

11                  Turn on page 39 of ISO 14971.

12        A.        Yes.

13        Q.        Do you see they have a section on "Risk

14   Evaluation and Risk Acceptability"?

15        A.        Yes.

16        Q.        Are you familiar with that section?

17        A.        Yes.

18        Q.        Okay.  So you do -- you do understand

19   that one important consideration when you're

20   evaluating risk is to have an understanding of what

21   the state of the art is?

22        A.        Yes.

23        Q.        Okay.

24        A.        Yes.

25        Q.        And, again, you don't have an
```

Russell F. Dunn, Ph.D., P.E.

1    understanding of what the state of the art is for

2    these pelvic floor mesh devices, do you?

3                    MR. BOWMAN:   Object to form.

4                    THE WITNESS:   That's not the purpose

5    of -- of my report.

6    BY MR. DAVIS:

7         Q.      Well, so do you or don't you?

8         A.      I understand different methodologies,

9    but that's not the subject of my report.

10        Q.      Okay.

11        A.      And I guess I'll point out, since

12   oxidative degradation risk was not assessed, I

13   can't tell how Ethicon viewed that potential

14   failure mode relative to the current state of the

15   art.

16        Q.      I meant to cover one more thing with

17   you back there on page 44.

18        A.      Yes, sir.

19        Q.      Are you familiar with Section D.6.3,

20   "Criteria for Risk/Benefit Judgments"?

21        A.      Yes.

22        Q.      Okay.  Do you see where it says, quote,

23   Those involved in making risk/benefit judgments

24   have a responsibility to understand and take into

25   account the technical, clinical, regulatory,

Russell F. Dunn, Ph.D., P.E.

1    A.    Not recently.

2    Q.    Which ones did you read?

3    A.    I can't tell you as I sit here today.

4    Q.    I mean, you're aware that some of these

5    folks had depositions of -- like up to six or seven

6    different days?  Are you aware of that?

7    A.    Yes.

8    Q.    And did you take any of these people

9    and look at all their depositions?

10         MR. BOWMAN:  Object to form.

11         THE WITNESS:  I've looked at some

12   depositions.  I can't recall which ones exactly

13   that I've looked at.

14   BY MR. DAVIS:

15   Q.    Well, in connection with forming your

16   opinions on whether or not Ethicon has support for

17   its belief that oxidative degradation is not an

18   issue, I mean, did you try to look at any

19   depositions --

20   A.    It is unnecessary.  If it was

21   considered, it will be in the FMEA.  Bottom line.

22   Doesn't matter who testified about it.  They can

23   say whatever they want to.  If it's not in the

24   FMEA, it was not considered.

25   Q.    Okay.  What if it's in the risk

Russell F. Dunn, Ph.D., P.E.

1    analysis that is referenced in the FMEA?  Does that

2    mean they considered it or does it mean they did

3    not consider it?

4        A.     Are you talking about the device design

5    safety assessment?

6        Q.     I want to go back to Exhibit 10, yes.

7        A.     Okay.

8        Q.     Question Number 10 again.

9        A.     You're talking about a question.

10   You're not talking about an actual analysis.

11   You're talking about a question.

12               Okay.  Go ahead.

13       Q.     You see it refers you to the Gynemesh

14   PS design history file as support for their answer

15   that they have considered the biocompatibility.

16       A.     Yes.

17       Q.     Okay.  So, if that reference takes you

18   to a risk assessment for the biocompatibility that

19   includes oxidative degradation, then you would have

20   to stand corrected?

21       A.     No.

22       Q.     Oh.  Okay.

23       A.     You don't have to go and fight through

24   the weeds to figure out what's been done as an

25   adequate safety analysis.  I teach failure mode and

Russell F. Dunn, Ph.D., P.E.

1    effects analysis.  It will be listed on the

2    document if it's considered.

3        Q.      Are you telling the jury that ISO 14971

4    does not allow reference to other documents?

5        A.      That's not what I said.

6        Q.      Okay.

7        A.      I said, if it's considered as a

8    potential failure mode, it will be listed on the

9    failure mode and effects analysis.  And of course

10   it references other documents.  But, if it was

11   considered as a potential failure mode, it will be

12   listed on the FMEA.

13       Q.      Can you explain --

14       A.      There's no if, ands, or buts about it.

15       Q.      Can you explain to the Court the

16   meaning of the word "biocompatibility" as it

17   relates to ISO 10993?

18               MR. BOWMAN:  Object to form.

19               THE WITNESS:  No.  I will relate it to

20   ISO 14971.

21   BY MR. DAVIS:

22       Q.      Well, I'm not asking you about that

23   ISO.  I'm asking you about 10993.  We'll talk about

24   that one -- other one in a minute.

25       A.      ISO 14971 references ISO 10993, and

Russell F. Dunn, Ph.D., P.E.

1    Q.      Have you ever prepared a -- or been on

2    a team that was preparing an FMEA for a medical

3    device?

4    A.      No.  No --

5    Q.      Making it easier --

6    A.      -- I've not been on a team.  I've --

7    I've led teams on hundreds of FMEAs and -- and

8    teach FMEAs, but I've not been on a particular team

9    that's performing that for a medical device.

10   Q.      But have you ever been on a team

11   preparing a biocompatibility risk assessment under

12   ISO 10993?

13   A.      That's -- that's not my area of

14   expertise.

15   Q.      Okay.  Do you know how to evaluate a

16   biocompatibility risk assessment according to

17   the -- to determine its compliance with the

18   ISO 10993 standards?

19   A.      That's not the subject of my report.

20   Q.      Is that because in part it's beyond

21   your expertise?

22   A.      That is not my expertise -- I wouldn't

23   say it's beyond my expertise; that's not my

24   expertise.

25   Q.      That's fair enough.

135

<pre>
1                    C E R T I F I C A T E

2     STATE OF TENNESSEE )
      COUNTY OF DAVIDSON )
3                 I, Lise S. Matthews, RMR, CRR, CRC, LCR
      353, Licensed Court Reporter and Notary Public, in
4     and for the State of Tennessee, do hereby certify
      that the above deposition was reported by me, and
5     the transcript is a true and accurate record to the
      best of my knowledge, skills, and ability.
6                 I further certify that I am not related
      to nor an employee of counsel or any of the parties
7     to the action, nor am I in any way financially
      interested in the outcome of this case.
8                 I further certify that I am duly
      licensed by the Tennessee Board of Court Reporting
9     as a Licensed Court Reporter as evidenced by the
      LCR number and expiration date following my name
10    below.  I further certify that this transcript is
      the work product of this court reporting agency and
11    any unauthorized reproduction and/or transfer of it
      will be in violation of Tennessee Code Annotated
12    39-14-104, Theft of Services.
                  IN WITNESS WHEREOF, I have hereunto set
13    my hand and affixed my notarial seal this _____
      day of _____, 2016.

14

15

16    Lise S. Matthews, RMR, CRR, CRC
      LCR 353 Expiration Date 6/30/2016
17    Notary Public Commission Expires
      March 6, 2018
18

19

20

21

22

23

24

25
</pre>