# Exhibit H

Ann M. Weber, M.D.

Page 1

```
 1          IN THE COURT OF COMMON PLEAS
 2      PHILADELPHIA COUNTY, PENNSYLVANIA
 3                 -  -  -
 4   IN RE: PELVIC MESH        :
     LITIGATION                :
 5   _____    :
     PATRICIA L. HAMMONS       : MAY TERM, 2013
 6                             :
             Plaintiff,        :
 7                             :
             v.                : NO. 003913
 8                             :
      ETHICON, INC., et al.  :
 9
10                 -  -  -
11          September 1, 2015
12                 -  -  -
13                  Oral deposition of
     ANNE M. WEBER, M.D.,taken pursuant to
14   notice, was held at the law offices of
     Kline & Specter, 1525 Locust Street,
15   Philadelphia, Pennsylvania commencing at
     9:03 a.m., on the above date, before
16   Michelle L. Gray, a Registered
     Professional Reporter, Certified
17   Shorthand Reporter and Notary Public.
18
19
20
                     -  -  -
21
22          GOLKOW TECHNOLOGIES, INC.
       877.370.3377 ph|917.591.5672 fax
23            deps@golkow.com
24
```

Ann M. Weber, M.D.

**Page 2**

```
1  APPEARANCES:
2
3   MAZIE SLATER KATZ & FREEMAN, LLC
    BY:  ADAM SLATER, ESQUIRE
4   103 Eisenhower Parkway, 2nd Floor
    Roseland, New Jersey 07068
5   (973) 228-9898
    aslater@mskf.net
6   Representing the Plaintiff
7
    KLINE & SPECTER, P.C.
8   BY: KILA BALDWIN, ESQUIRE
    1525 Locust Street, 19th Floor
9   Philadelphia, Pennsylvania 19102
    (215) 772-1000
10  kilabadwin@klinespecter.com
    Representing the Plaintiff
11
12  TUCKER ELLIS, LLP
    BY:  MATTHEW P. MORIARTY, ESQUIRE
13  950 Main Avenue, Suite 1100
    Cleveland, Ohio 44113
14  (216) 592-5009
    matthew.moriarty@tuckerellis.com
15  Representing the Defendants
16
    THOMAS, COMBS & SPANN, PLLC
17  BY:  SUSAN M. ROBINSON, ESQUIRE
    300 Summers Street, Suite 1380
18  Charleston, West Virginia 25301
    (304) 414-1805
19  srobinson@tcspllc.com
    Representing the Defendants
20
21              - - -
22
23
24
```

**Page 4**

```
1              - - -
2            I N D E X
3              - - -
4
    Testimony of:      ANNE M. WEBER, M.D.
5
      By Mr. Moriarty        8, 235
6
      By Mr. Slater          223
7
8
9              - - -
10         E X H I B I T S
11             - - -
12
13  NO.      DESCRIPTION        PAGE
14  Weber-1    Reliance Materials   9
15  Weber-2    Report of Anne M.    22
             Weber, M.D.
16           Volume I & II
17  Weber-3    Notice of Deposition  24
18  Weber-4    Invoices for Hammons  28
19  Weber-5    Patient Registration  37
             Daviess Hospital
20           2/1/07
             DAVIESSHOSP000974-985
21
    Weber-6    Report of Operation   80
22           5/5/09
             HAMMONSP_DAVCH_MDR00055-56
23
24
```

**Page 3**

```
1        (It is hereby stipulated and
2    agreed by and among counsel that
3    sealing, filing and certification
4    are waived; and that all
5    objections, except as to the form
6    of questions, be reserved until
7    the time of trial.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 5**

```
1              - - -
2        E X H I B I T S  (Cont'd.)
3              - - -
4
5   NO.      DESCRIPTION        PAGE
6   Weber-7    Heartland Office    91
             Visit 3/17/09
7            HAMMONSP_HEOBG_MDR00002-5
8   Weber-8    Daviess Community   102
             Hospital, History
9            & Physical
             5/5/09
10           HAMMONSP_DAVCH_MDR00015-16
11  Weber-9    Start Coping       112
             Start Living
12           Slide Deck
             ETH.MESH.03906037-52
13
    Weber-10   FDA Public Health   117
14           Notification
             10/20/08
15
    Weber-11   Dyspareunia and Mesh  118
16           Erosion After Vaginal
             Mesh Replacement with a
17           Kit Procedure
             (Boyles)
18
    Weber-12   Does the Prolift    120
19           System Cause Dyspareunia?
             (Lowman)
20
    Weber-13   ACOG Practice      121
21           Bulletin Pelvic Organ
             Prolapse
22           Obstetrics & Gynecology
23
24
```

2 (Pages 2 to 5)

Ann M. Weber, M.D.

Page 6

1              - - -
2        E X H I B I T S  (Cont'd.)
3              - - -
4
5    NO.        DESCRIPTION        PAGE
6    Weber-14   Deaconess Women's   147
             Hospital
7            Operative Note
             12/15/09
8            HAMMONSP_WHC_MDR00006
9    Weber-15   Operative/Procedure  148
             Report (Heit)
10           11/28/12
             HAMMONSP_RFC_MDR00088-91
11
     Weber-16   Operative/Procedure  148
12           Report (Heit)
             HAMMONSP_RFC_MDR00086-87
13
14
              - - -
15
16
17
18
19
20
21
22
23
24

Page 7

1              - - -
2        DEPOSITION SUPPORT INDEX
3              - - -
4
5    Direction to Witness Not to Answer
6    PAGE  LINE
      117   24
7     118   19
      213   16
8
9    Request for Production of Documents
10   PAGE  LINE
     None.
11
12   Stipulations
13   PAGE  LINE
     None.
14
15   Questions Marked
16   PAGE  LINE
     None.
17
18
19
20
21
22
23
24

Page 8

1              - - -
2        ... ANNE M. WEBER, M.D.,
3    having been first duly sworn, was
4    examined and testified as follows:
5              - - -
6        EXAMINATION
7              - - -
8    BY MR. MORIARTY:
9        Q.   Tell us your full name,
10   please.
11       A.   Anne Margaret Weber.
12       Q.   Okay.  You are Dr. Weber?
13       A.   Yes.
14       Q.   I know you've been through
15   depositions, and I know you've testified
16   in court.  Just to remind you, if you do
17   not understand my question, please just
18   tell me and I'll make it clear to you.
19   Okay?
20       A.   Yes.
21       Q.   All right.  How old are you,
22   Dr. Weber?
23       A.   53.
24           (Document marked for

Page 9

1    identification as Exhibit
2    Weber-1.)
3    BY MR. MORIARTY:
4        Q.   I'm going to hand you what
5    I've marked as Exhibit 1.  I apologize
6    for the thickness.  These were printed
7    just on one side.
8            Is that your report in this,
9    the Hammons case, plus the CV that you
10   attached to it and the reliance list?
11           MR. MORIARTY:  Off the
12   record.
13           (Whereupon, a discussion was
14   held off the record.)
15           THE WITNESS:  Yes.
16   BY MR. MORIARTY:
17       Q.   So that is your report in
18   this case and the reliance list?
19       A.   Yes.
20       Q.   All right.  The address
21   that's at the top, is that your home
22   address?
23       A.   Yes.
24       Q.   And you have an office

Ann M. Weber, M.D.

1  within your home?
2      A.   Yes.
3      Q.   Do you have any employees?
4      A.   No.
5      Q.   Okay.  So the research that
6  you do and the assembly of this sort of a
7  report is something that you do yourself?
8      A.   Yes.
9      Q.   All right.  Do you have any
10  research collaborators or subcontractors
11  that you hire to do research on matters
12  like this?
13      A.   No.
14      Q.   Now, I think, as you
15  understand, I'm here to ask you about
16  your opinions regarding Pat Hammons.
17  I've done my best to eliminate general
18  opinion questions that you may have been
19  asked before.  There may be times that I
20  stumble into one, if you'll excuse that.
21          Sometimes I need to do it as
22  background in context for a certain
23  Hammons issue.  Do you understand that?
24      MR. SLATER:  She may

1          understand, but I'm going to
2          object if you go into areas that
3          are outside the agreement.
4          MR. MORIARTY:  I understand
5          that.
6          MR. SLATER:  I'm not going
7          to have her answer those
8          questions.  We have an agreement
9          that's a national agreement.
10          MR. MORIARTY:  I understand.
11          I'm just asking if she
12          understands.
13          MR. SLATER:  She's here to
14          answer questions.  I'm the lawyer.
15          Please continue.
16  BY MR. MORIARTY:
17      Q.   Do you understand what I'm
18  saying?
19      A.   Yes.
20      Q.   Okay.
21          Now, I want to find out some
22  things about your background that may be
23  new or may not be new from just this
24  calendar year.  Okay?

1      A.   Okay.
2      Q.   All right.  In 2015, have
3  you resumed your license and the practice
4  of medicine?
5      A.   No.
6      Q.   In 2015, did you take any
7  privileges at any hospital?
8      A.   No.
9      Q.   In 2015, have you seen or
10  examined any patients?
11      A.   No.
12      Q.   In 2015, have you looked at
13  any pathological specimens under a
14  microscope?
15      A.   No.
16      Q.   In 2015, have you
17  participated in the conduct of any
18  clinical trials?
19      A.   No.
20      Q.   In 2015, have you spoken at
21  any continuing medical education
22  conferences?
23      A.   No.
24      Q.   Have you spoken at any legal

1  conferences in 2015?
2      A.   No.
3      Q.   In 2015, have you either
4  published or submitted to be published
5  any articles in the peer-reviewed medical
6  literature?
7      A.   No.
8      Q.   In 2015, have you been hired
9  to consult with any drug or device
10  manufacturer?
11      A.   No.
12      Q.   Was there any literature
13  published in 2015 on which you are
14  relying for opinions in this case?
15          MR. SLATER:  Objection.  Do
16          you want her to go through her
17          reliance list and see if there's
18          any 2015 articles on it?  I mean,
19          whatever is on her reliance list
20          is what she's relying on.
21  BY MR. MORIARTY:
22      Q.   Doctor, is the reliance
23  list, the medical literature portion, in
24  chronological order by year?

Ann M. Weber, M.D.

Page 14

1    A.   No.
2    Q.   Would you -- do you know off
3  the top of your head whether there are
4  any 2015 articles that you've added to
5  the reliance list?
6    A.   I don't know that off the
7  top of my head.
8    Q.   Okay.  Would you like to
9  check and look?
10       MR. SLATER:  You want her to
11  go through a 40-page reliance
12  list?
13       MR. MORIARTY:  Well, it's
14  your list.
15       MR. SLATER:  What does it
16  matter?  I mean, please.  This
17  isn't -- she's here -- you're here
18  to ask specific opinions about
19  Ms. Hammons.  So what literature
20  she's looked at -- literature
21  she's looked at, actually isn't
22  what you should be asking about
23  today.  You should be asking about
24  Patricia Hammons, sir.

Page 15

1  BY MR. MORIARTY:
2    Q.   Okay.  Would you like to
3  look at your list and tell me if there
4  are any new 2015 articles on which you
5  are relying for your opinions?
6    A.   If you like.
7       MR. SLATER:  Go ahead and
8  take as long as you want,
9  Dr. Weber.  I guess you have to go
10  through every page and see if the
11  articles are published this year,
12  even though counsel has it and he
13  obviously knows if any are dated
14  2015.
15       Although I will say,
16  Counsel, this deposition is not
17  going all night.  So if you're
18  going to --
19       MR. MORIARTY:  I don't
20  intend to go into the night.
21       MR. SLATER:  -- this is a
22  waste of time.
23       With all due respect, this
24  is a waste of time.  You have the

Page 16

1  reliance list.  You can read the
2  dates on the articles just as well
3  as she can.  I'm not really sure
4  of the point of this.
5       I would anticipate that
6  we'll be done before 4 o'clock.
7  Right?
8       MR. MORIARTY:  I don't know.
9       MR. SLATER:  I would expect
10  to be.  Dr. Weber has a train back
11  to Maryland, and I have meetings.
12       Let the record reflect, Dr.
13  Weber is continuing to flip page
14  by page trying to answer defense
15  counsel's questions about whether
16  or not any of the articles on the
17  reliance list that he's had in his
18  hands for however long it's been
19  -- weeks or months, I don't even
20  know when it was served -- whether
21  or not it says 2015 on any of the
22  articles, even though he obviously
23  could read that for himself.
24       And for the record, at the

Page 17

1  end of the day when we're ready to
2  go and we've wasted 20 minutes on
3  this, that time is going to come
4  out of this deposition.  It's not
5  going to be that we're going to go
6  on all day because Dr. Weber's
7  forced to read something that
8  counsel could have read himself.
9       MR. MORIARTY:  I understand.
10  We're on the record.  It's part of
11  the time.
12       Let me interrupt for a
13  second.  Doctor, what page are you
14  on?
15       MR. SLATER:  She'll keep
16  looking.  She won't answer till I
17  come back in the room.
18  BY MR. MORIARTY:
19    Q.   Doctor, what page are you
20  on?
21       MR. SLATER:  Please don't
22  ask a question.  I'm outside the
23  room.
24       (Brief pause.)

5 (Pages 14 to 17)

Ann M. Weber, M.D.

Page 18

1     MR. MORIARTY:  All I did was
2  ask her what page she was on.
3     MR. SLATER:  Sorry.  If I'm
4  not in the room, I don't want you
5  questioning when I'm not in the
6  room.
7     MR. MORIARTY:  Well, you
8  were in the room.
9     MR. SLATER:  I was walking
10  out with a phone.  I got a very
11  important call, I thought.
12     Now you can answer, Doctor.
13     THE WITNESS:  85.
14  BY MR. MORIARTY:
15     Q.    When you get to 101, please
16  let me know.
17     A.    Okay.  Page 101.
18     Q.    Page 101.  Is that where it
19  transitions into "Additional Documents"?
20     A.    It says that on the page.
21     Q.    Okay.  From your review of
22  the medical literature section of the
23  reliance list, were there any 2015
24  articles?

Page 19

1     MR. SLATER:  The medical
2  literature didn't end on Page 101,
3  Counsel.  It says "Abstracts."  It
4  says "Other Documents" --
5     THE WITNESS:  That's what
6  I'm trying to discern.
7  BY MR. MORIARTY:
8     Q.    All I want to know is if in
9  the medical literature section there were
10  any 2015 articles.
11     A.    No.
12     Q.    Okay.
13     MR. SLATER:  Do you want her
14  to stop reading that?  You want
15  her to go any further?
16     MR. MORIARTY:  No.  Thank
17  you.
18     MR. SLATER:  So you stopped
19  on Page 101.  Okay.
20  BY MR. MORIARTY:
21     Q.    Doctor, in 2015, have you
22  taught at any medical school or residency
23  program?
24     A.    No.

Page 20

1     Q.    Have you taken any
2  additional courses in any other line of
3  study, be it engineering, biomaterials,
4  anything else?  Formal education.
5     A.    No.
6     Q.    In 2015, have you performed
7  any studies on contraction or shrinkage
8  rates of polypropylene mesh?
9     A.    No.
10     Q.    In 2015, have you performed
11  or participated in any studies about the
12  degradation of polypropylene mesh?
13     A.    No.
14     Q.    In 2015, have you
15  participated in any studies on the
16  distinction between laser- or
17  mechanical-cut mesh?
18     A.    No.
19     Q.    In 2015, have you drafted
20  any labels for medical devices?
21     A.    No.
22     Q.    In 2015, have you
23  participated in preparing a 510(k)
24  application to the FDA?

Page 21

1     A.    No.
2     Q.    Do you continue to subscribe
3  to medical journals?
4     A.    Yes.
5     Q.    Which ones do you subscribe
6  to, continuing now?
7     A.    The American Journal of
8  Obstetrics & Gynecology.
9     Q.    That is "The Gray Journal"?
10     A.    Yes.
11     Q.    Okay.  And that is the only
12  one you continue to subscribe to?
13     A.    Yes.
14     Q.    In order to subscribe to
15  "The Gray Journal," do you have to be a
16  member of ACOG?
17     A.    I don't know.
18     Q.    And then I assume if you
19  needed to do medical literature today,
20  for purposes of this case, you could
21  access various resources on the Internet
22  or go to a medical library?
23     A.    Yes.
24     Q.    Okay.  I'm sorry I didn't

Ann M. Weber, M.D.

Page 22

1  bring extra copies of this.  The location
2  and date of today is highlighted on this
3  document.  But this is, Dr. Weber,
4  Exhibit 3.  It is the notice for this
5  deposition.
6          MR. SLATER:  Counsel, is
7      that the notice that you told me
8      in an e-mail don't worry about it,
9      you only wanted a couple of things
10     from it?  Yeah, that is.
11         You realize you wrote me an
12     e-mail --
13         MR. MORIARTY:  Yeah.
14         MR. SLATER:  -- that said
15     don't worry about this --
16         MR. MORIARTY:  Mr. Slater, I
17     remember my e-mail.  You haven't
18     even heard the question yet.
19         (Document marked for
20     identification as Exhibit
21     Weber-3.)
22  BY MR. MORIARTY:
23     Q.   Is that the notice for this
24  deposition?

Page 23

1      A.   It appears to be.
2      Q.   Okay.  Have you ever seen it
3  before?
4      A.   Yes.
5      Q.   All right.  Did you bring
6  any documents at all to today's
7  deposition?
8      A.   I don't have any hardcopy
9  documents, no.
10     Q.   Okay.
11         MR. SLATER:  We have -- we
12     have what you asked for.
13  BY MR. MORIARTY:
14     Q.   May I have that back,
15  please.
16         MR. MORIARTY:  Can I have --
17     what do you -- I don't know what
18     you have that I asked for.  I
19     don't need you to hand me medical
20     records, but if you've got billing
21     entries or anything like that.
22         MR. SLATER:  I have -- I
23     have copies of the letters billing
24     for this case.

Page 24

1          MR. MORIARTY:  Okay.
2          MR. SLATER:  Would you like
3      copies of those?
4          MR. MORIARTY:  Yes, please.
5          MR. SLATER:  Say "please"
6      again.  Just kidding.
7          These are our invoices dated
8      May 5th, June 3, July 1, August 2,
9      2015.
10         MR. MORIARTY:  Do you have
11     any objection to me marking them
12     collectively as Exhibit 4?
13         MR. SLATER:  I have no
14     objection to that.  That sounds
15     like a splendid idea.
16         (Document marked for
17     identification as Exhibit
18     Weber-4.)
19  BY MR. MORIARTY:
20     Q.   Dr. Weber, I've had marked
21  as Exhibit 4, a sequence of four letters
22  from you to Mr. Slater's office.  And all
23  it has to do with is the amount of time
24  that you've spent on this case.  Okay.

Page 25

1          MR. SLATER:  And the amounts
2      billed, right?
3          MR. MORIARTY:  And the
4      amounts billed.
5  BY MR. MORIARTY:
6      Q.   Is that what those are?
7      A.   Yes.
8      Q.   All right.  Did you do any
9  work on this case before 2015?
10     A.   No.
11     Q.   Other than reviewing your
12  report, any medical records, or
13  depositions specific to Mrs. Hammons, did
14  you do anything else to prepare for your
15  deposition today?
16     A.   Yes.
17     Q.   Tell me what you did besides
18  those things.
19     A.   We met in a group.
20     Q.   Okay.
21         MR. SLATER:  That's --
22     that's all work product and
23     privileged.  I assume you're not
24     going to get into what we

Ann M. Weber, M.D.

Page 26

1    discussed.
2  BY MR. MORIARTY:
3      Q.   How many -- I just want to
4  know how many people were in the group.
5      A.   Four.
6      Q.   And was the meeting today or
7  yesterday?
8      A.   Yesterday.
9      Q.   All right.  So you had a
10 meeting presumably with Ms. Hammons'
11 legal team.  You reviewed her medical
12 records, or re-reviewed them.  You
13 reviewed or re-reviewed some depositions.
14      You did those things,
15 correct?
16      A.   Yes.
17      Q.   All right.  Did you review
18 reports from other experts for
19 Mrs. Hammons such as Dr. Zipper,
20 Dr. Pence, any of those?
21      A.   I have reviewed Dr. Zipper's
22 report.
23      Q.   Okay.  Not -- not that of
24 Peggy Pence?

Page 27

1      A.   No.
2      Q.   Or Dr. Elliott?
3      A.   No.
4      Q.   Okay.  Did you review any
5  expert reports for the defense such as
6  Dr. Lowman or Dr. Drolet?
7      A.   Yes.
8      Q.   Did you review any other
9  defense expert reports besides those two?
10      A.   No.
11      Q.   Now, in your report, the one
12 that I have marked as Exhibit 1, you make
13 a reference to, I think you used the word
14 "primary report."  Do you remember that?
15      A.   No.  But I don't have any
16 reason to doubt that.
17      MR. SLATER:  Why don't you
18      look at it.  He'll show you where
19      it is if you're not sure.
20 BY MR. MORIARTY:
21      Q.   First place I can easily
22 find it is Page 3 of your report in the
23 second-to-last line, the last word and
24 the first word of the last line.

Page 28

1      A.   Yes.
2      Q.   Okay.  Now, it's my
3  understanding that "primary report"
4  refers to what I have had marked here as
5  Exhibit 2.
6      (Document marked for
7      identification as Exhibit
8      Weber-2.)
9  BY MR. MORIARTY:
10      Q.   Weber Exhibit 2.  It is a
11 report that you drafted in 2012.  Let me
12 get the specific date.  June 15, 2012,
13 addressed to Mr. Slater.
14      A.   Yes.
15      Q.   Okay.  And this is a
16 two-volume document; is that right?
17      MR. SLATER:  And, Counsel,
18      for the record, it's over 500
19      pages that you've put on the
20      table.  We're not going to go
21      through every page to confirm that
22      you actually -- that you have all
23      the pages.
24      MR. MORIARTY:  Well --

Page 29

1      MR. SLATER:  So we're taking
2      your representation that you have
3      provided it by other counsel of
4      Ethicon.  I assume you don't want
5      me to go through this thing and
6      confirm all the pages are there.
7      MR. MORIARTY:  I don't.  I
8      just want to make sure that this
9      is what Dr. Weber is referring to
10      as her primary report.  All I did
11      was print it.
12      MR. SLATER:  Okay.  I'm just
13      telling you.
14      MR. MORIARTY:  And it is
15      500-some pages long.
16      MR. SLATER:  I'm just saying
17      we're not going through every
18      page.  That's all.
19      I don't know why you are
20      shaking your head.  I'm just
21      making a record.
22      MR. MORIARTY:  That's fine.
23      MR. SLATER:  If there's a
24      couple pages missing, I don't want

Ann M. Weber, M.D.

Page 30

1  to be distracted by that.  I'm not
2  even sure why we're doing this.
3  You're supposed to be asking about
4  her opinions on the Hammons case.
5      MR. MORIARTY:  Because she
6  refers to it.  And I want to make
7  sure that that's what she's
8  referring to.
9  BY MR. MORIARTY:
10     Q.   That's your primary report?
11     A.   Yes.
12     Q.   Okay.  Thank you.  Have you
13  ever done a report like Exhibit 2 for any
14  other -- about any other Ethicon product
15  besides Prolift?
16     A.   No.
17     Q.   Getting back to Exhibit 4,
18  these billing records, I understand that
19  you may be consulting with Mr. Slater on
20  other cases.  Okay.  For 2014 --
21     MR. SLATER:  She's not going
22  to answer questions about billing
23  on other matters.
24     MR. MORIARTY:  Can you just

Page 31

1  object?
2      MR. SLATER:  My
3  understanding is it's only about
4  this case.
5      MR. MORIARTY:  Can you just
6  object?
7      MR. SLATER:  I'm just
8  telling you that we're not going
9  into that.  My understanding is --
10  I thought you knew that.
11     MR. MORIARTY:  This will be
12  a lot faster if all you do is
13  object and then instruct her or
14  not instruct her to answer.
15     MR. SLATER:  Please
16  continue.
17     MR. MORIARTY:  Because I'm
18  going to ask.  So just object.
19     MR. SLATER:  Why would you
20  ask in violation of agreements?
21     MR. MORIARTY:  It's not in
22  violation of the agreement.
23     MR. SLATER:  You should talk
24  to other people, then.  You're not

Page 32

1  prepared.
2  BY MR. MORIARTY:
3      Q.   For 2014, have you done a
4  tax return?
5      A.   Yes.
6      Q.   Okay.  Other than work done
7  for Mr. Slater's law firm in consulting
8  on pelvic mesh cases, did you have any
9  other earned income on your 2014 tax
10  return?
11     A.   No.
12     Q.   Other than consulting for
13  Mr. Slater on pelvic mesh cases in 2015,
14  to date, to the best of your knowledge,
15  have you had other earned income?
16     A.   No.
17     Q.   Okay.  I want to talk about
18  some risk factors for Mrs. Hammons.
19  Okay?  And your report is over there
20  somewhere.  You're more than welcome to
21  consult with it or the medical records if
22  you need to answer my question.  Do you
23  understand?
24     A.   Yes.

Page 33

1      Q.   Okay.  Do you still
2  subscribe to the view that risk factors
3  for POP fall into the categories of
4  predisposing, inciting, promoting, or
5  decompensating?
6      A.   In general, yes.
7      Q.   Okay.  Did Ms. Hammons have
8  at least two predisposing factors for
9  pelvic organ prolapse, being she was a
10  white female?
11     A.   Yes.
12     Q.   If a patient like
13  Mrs. Hammons has some of these factors --
14  and I'll get into the other categories in
15  a minute -- if they are at risk for
16  pelvic organ prolapse in the first place,
17  do the same factors put the patient at
18  risk for recurrence?
19     MR. SLATER:  Objection.
20  Ambiguous and multiple other
21  reasons why that question is
22  inappropriate.
23     You can answer it.
24     THE WITNESS:  They may.

9 (Pages 30 to 33)

Ann M. Weber, M.D.

1     MR. MORIARTY:  Okay.
2     MR. SLATER:  There's also a
3  foundational issue with the
4  question too.
5  BY MR. MORIARTY:
6     Q.    They may in what sense, and
7  in what sense may they not?
8     A.    In order to answer that
9  question, we would need to go through the
10  risk factors one by one.
11     Q.    Okay.  Well, let's go
12  through the factors, and then I'll ask
13  you that question again.  Okay?
14        Do we know whether
15  Mrs. Hammons had a genetic predisposition
16  to pelvic organ prolapse?
17     A.    I don't think that's known.
18     Q.    All right.  Did Mrs. Hammons
19  have at least two inciting risk factors,
20  being delivery, vaginal deliveries, and
21  surgery, being the hysterectomy?
22     A.    She had two vaginal
23  childbirths.  The hysterectomy was not a
24  predisposing factor for prolapse.

1     Q.    Because she had it at the
2  time of her prolapse surgery?
3     A.    She had prolapse at the time
4  of her prolapse surgery, at which time a
5  hysterectomy was done.
6     Q.    Okay.  Did she have at least
7  two promoting factors, being obesity and
8  smoking?
9        MR. SLATER:  Objection.
10  You can answer.
11        THE WITNESS:  Yes.
12  BY MR. MORIARTY:
13     Q.    And did Mrs. Hammons have
14  several decompensating risk factors,
15  including aging and menopause?
16     A.    Yes.
17     Q.    All right.  So a couple
18  minutes ago I asked you whether -- if a
19  woman has these factors, if she's at risk
20  for prolapse.  And the answer to that is
21  correct -- is yes, correct?
22     A.    In general, yes.
23     Q.    Do these same predisposing
24  factors put the patient at risk for

1  recurrence of prolapse after a repair
2  surgery?
3     A.    They may, yes, in general.
4     Q.    In what sense may they, and
5  in what sense may they not?
6     A.    If I'm understanding your
7  question correctly, you're asking about
8  the pathophysiology of recurrent
9  prolapse.  Is that right?
10     Q.    Let me bring it specific to
11  this case.  Was Mrs. Hammons, because of
12  these factors, at risk for recurrent
13  prolapse after a prolapse repair surgery
14  regardless of which technique was chosen?
15     A.    Yes.
16     Q.    Okay.  What is your
17  understanding of for how long
18  Mrs. Hammons complained of pelvic organ
19  prolapse symptoms prior to when she saw
20  Dr. Baker in 2009?
21     A.    In the records, it's
22  recorded as about two years.
23     Q.    Okay.  And what is the first
24  medical record that you have seen before

1  today with a complaint of pelvic organ
2  prolapse for Mrs. Hammons?
3     A.    To answer that accurately, I
4  would have to go through the records.  I
5  don't have that date fixed in my mind.
6     Q.    Okay.  Is the first mention
7  of POP in your report a reference to
8  Dr. Rohrer, a complaint to Dr. Rohrer in
9  2008?
10     A.    I identify that date.  I
11  don't -- that date does not mean that she
12  hadn't had -- hadn't been diagnosed
13  earlier.
14     Q.    Okay.
15        (Document marked for
16        identification as Exhibit
17        Weber-5.)
18  BY MR. MORIARTY:
19     Q.    Doctor, I've handed you what
20  I've had marked as Exhibit 5.  It's a
21  record that we obtained in the middle of
22  August 2015 from Kline & Specter.
23        Do you know if you've ever
24  seen this document before?

Ann M. Weber, M.D.

Page 38

1       And just so the record is
2   clear, I can tell you what my
3   understanding of this is.  An emergency
4   room record, February 1, 2007, from
5   Daviess Community Hospital.
6       A.   No, I have not seen this
7   before.
8       Q.   Okay.  Do you agree with me
9   that it's an emergency room record from
10  Daviess Community Hospital, February 1st
11  of 2007?
12      A.   Yes.
13      Q.   And the -- on the first
14  page, in the upper left-hand corner,
15  there's a section called "Diagnosis,
16  Symptoms, Procedure."
17      Do you see that?
18      A.   I'm sorry.  I'm just reading
19  her name, and that's not her name.
20      Q.   Okay.  Well, if you go down
21  and look at the emergency contact, do you
22  know that Chris Winkler is Patricia
23  Hammons' son?
24      A.   I'm aware that he is a

Page 39

1   family member.  Yes.
2       Q.   Okay.  And do you know that
3   Patricia Hammons works at Wal-Mart, which
4   is the listed employer here?
5       A.   I see that.
6       Q.   Okay.  Do you recognize Pat
7   Hammons' birth date being June of 1950 in
8   the upper right?
9       A.   No, I don't.  I don't.
10      Q.   Okay.  Let's just assume
11  that this is the same Pat Hammons.  So
12  what's the diagnosis, symptoms, procedure
13  there?
14      A.   I'm sorry.  Where are you
15  again?
16      Q.   Upper left under the
17  attending's name.
18      A.   Oh, I see.  Yes.
19      Q.   What does it say?
20      A.   C/o, pessary falling out.
21      Q.   And do you understand c/o to
22  mean "complains of"?
23      A.   Yes.
24      Q.   If you go to the third page,

Page 40

1   please, about a third of the way down,
2   there's a pain assessment.
3       Do you see that?
4       A.   Yes.
5       Q.   And was she complaining of
6   some vaginal area pain?
7       A.   Yes, in the vaginal area.
8       Q.   Okay.  If a patient has a
9   displaced pessary, can that be painful?
10      A.   I'm not sure what you mean
11  by "displaced."
12      Q.   Well, somewhere in here I
13  believe it either says that the pessary
14  is displaced or it's crooked or something
15  like that.
16      My question is:  Can a
17  displaced pessary, if it's still in place
18  but not aligned where it's supposed to
19  be, can that be painful?
20      A.   Yes.
21      Q.   Okay.  And if you go to the
22  second-to-last page of this, which is the
23  review of systems and history form, do
24  you see where it says "bladder fell"?

Page 41

1       A.   Yes.
2       Q.   All right.  So this record
3   would be consistent with a history given
4   to Dr. Baker that her symptoms of pelvic
5   organ prolapse had been in existence for
6   at least two years, correct?  He saw her
7   in March of 2009.
8       A.   Yes.
9       Q.   Okay.  And the fact that
10  she's got a pessary as of February 2007
11  is an indication that she's at least had
12  nonsurgical treatment for her cystocele,
13  correct?
14      A.   For her prolapse, yes.
15      Q.   Okay.  Now, from your review
16  of the medical records, did Patricia
17  Hammons give Dr. Rohrer and his staff a
18  history of some stress urinary
19  incontinence in February of 2009?
20      A.   To confirm that, I'd need to
21  see the medical records.
22      MR. MORIARTY:  Do you have
23  your chart here, Kila?
24      MS. BALDWIN:  Which one?

11 (Pages 38 to 41)

Ann M. Weber, M.D.

Page 42

1       MR. SLATER:  I thought you
2   said you had all the records you
3   need.
4       MR. MORIARTY:  I do.  I'm
5   just asking if you have yours.
6       MR. SLATER:  We don't have
7   it here.
8   BY MR. MORIARTY:
9       Q.   Doctor, I'm showing you what
10  is a February 19, 2009, Dr. Rohrer office
11  note.  And it's my copy, so it's
12  highlighted.
13       Do you see a complaint there
14  for stress urinary incontinence?
15       MR. SLATER:  A complaint?
16  BY MR. MORIARTY:
17       Q.   A report of a history of
18  stress urinary incontinence?
19       MR. SLATER:  Object to the
20   form.  The foundation is
21   inaccurate.
22       MR. MORIARTY:  Okay.
23       MR. SLATER:  It says
24   "diagnoses," Counsel.  It doesn't

Page 43

1   say complaint, and it doesn't say
2   history.
3       MR. MORIARTY:  That's fine.
4   BY MR. MORIARTY:
5       Q.   Did Dr. Rohrer diagnose
6   stress urinary incontinence?
7       A.   Stress incontinence is
8   listed as a diagnosis, yes.
9       Q.   In order for him to diagnose
10  that, would the patient have had to have
11  complained of symptoms consistent with
12  that?
13       A.   Not necessarily.
14       Q.   Okay.  Well, why don't you
15  look at the record and see if there's a
16  physical exam finding where he reproduced
17  stress urinary incontinence or a
18  urodynamic study.
19       You don't remember seeing --
20       MR. SLATER:  Which question
21   do you want her to answer?  You're
22   up to three or four questions.
23       I object.  It's argumentive.
24  BY MR. MORIARTY:

Page 44

1       Q.   Doctor, did -- do you
2   remember whether Dr. Rohrer did any
3   urodynamic studies in 2009?
4       A.   He did not, to my knowledge.
5       Q.   Okay.  Can I have those
6   records back, please.
7       MR. SLATER:  You want her to
8   stop looking.  Okay.  She stopped
9   looking in response to your
10   request for the records back.
11       MR. MORIARTY:  That's fine.
12  BY MR. MORIARTY:
13       Q.   Are you going to render
14  opinions in this case that Mrs. Hammons
15  has stress urinary incontinence now that
16  is related to her Prolift procedure in
17  2009?
18       A.   I'd have to look at her most
19  recent examination.  I can't recall off
20  the top of my head whether she had a
21  stress incontinence complaint when she
22  was evaluated by Dr. Zipper.
23       Q.   In your report, did you
24  comment on Dr. Zipper's exam?

Page 45

1       A.   Yes.
2       Q.   Could you look at that and
3   tell me?
4       A.   Yes, I can.
5       In my report on Page 9,
6   second full paragraph, five lines down, I
7   have a sentence that states, "She
8   described worsening frequency and urgency
9   of urination, but no incontinence."
10       Q.   And when you say "no
11  incontinence," do you mean no stress
12  incontinence?
13       A.   I mean no incontinence.
14       Q.   No --
15       A.   Urinary.
16       Q.   -- incontinence of any type,
17  be it stress, urge?
18       A.   No urinary incontinence,
19  yes.
20       Q.   Okay.  So you're -- as of
21  today, you're not going to be rendering
22  opinions at trial that Mrs. Hammons has
23  stress urinary incontinence as a result
24  of her Prolift procedure, correct?

12 (Pages 42 to 45)

Ann M. Weber, M.D.

Page 46

1      A.    She does not have stress
2  incontinence symptoms as of Dr. Zipper's
3  report.
4      Q.    Okay.  So does that mean
5  that you're not going to be rendering
6  opinions at the time of trial about
7  whether she's got stress urinary
8  incontinence as a result of her Prolift
9  procedure?
10      A.    I don't think I can answer
11  that question the way you're asking it.
12          She's had interventions
13  since her Prolift surgery.
14      Q.    Yes.
15      A.    So I just -- I don't think I
16  can answer your question the way it's
17  stated.
18      Q.    Okay.  So what I'm trying to
19  find out is about her current complaints,
20  not a complaint --  as you know them.
21  Okay.  I understand that you haven't seen
22  her and Dr. Zipper hasn't seen her in a
23  month or two.  I'm not asking about what
24  complaints she may have made in 2012.

Page 47

1  Okay.  I'm asking, to the best of your
2  understanding today, she's not
3  complaining of stress urinary
4  incontinence.  Is that true?
5      A.    True.
6      Q.    All right.  So you're not
7  going to be rendering any opinions at the
8  time of trial that she has stress urinary
9  incontinence related to her Prolift
10  procedure?
11      A.    I think we've been through
12  this cycle of question and answer.  I
13  can't answer that the way you've phrased
14  it.
15      Q.    Why can't you answer it?
16      A.    Because the fact that she
17  doesn't have stress incontinence symptoms
18  now is not necessarily -- it doesn't
19  exclude the possibility that she has had
20  stress incontinence symptoms in the past
21  that would have been related to the
22  Prolift procedure, because she's had
23  interventions in the intervening time.
24      Q.    All right.  I thought I made

Page 48

1  it clear in the prelude to my question
2  that I'm not asking you about 2012, what
3  complaints she made then prior to her
4  interventions.  I'm asking about now.
5  Okay.
6      A.    Okay.  So could you rephrase
7  the question again, please.
8      Q.    Based on what you know now,
9  you're not going to render opinions at
10  the time of trial that she currently has
11  stress urinary incontinence as a result
12  of her Prolift; is that correct?
13      A.    She does not currently have
14  stress urinary incontinence.
15      Q.    At all, right?
16      A.    She does not currently have
17  stress urinary incontinence.
18      Q.    Clarify for me, please, when
19  it is that you stopped practicing
20  medicine.  I know it was in 2005 or 2006.
21  But can you tell me specifically when
22  that was?
23      A.    I believe that was in
24  May 2006.

Page 49

1      Q.    Prior to May of 2006, was
2  there a period of time when you were not
3  practicing but had not retired or
4  resigned your license?
5      A.    No.
6      Q.    Okay.  So you were
7  practicing up until May of 2006, correct?
8      A.    Yes.
9      Q.    Okay.  Is that also when you
10  stopped performing surgery?
11      A.    No.
12      Q.    When did you stop performing
13  surgery?
14      A.    In the fall of 2004.
15      Q.    Now, obviously Dr. Baker
16  performed a vaginal hysterectomy in May
17  of 2009.  You are aware of that?
18      A.    Yes.
19      Q.    When you were a practicing
20  surgeon, did you perform hysterectomies?
21      A.    Yes.
22      Q.    Did you perform vaginal and
23  abdominal hysterectomies?
24      A.    Yes.

13 (Pages 46 to 49)

Ann M. Weber, M.D.

Page 50

1    Q.   Do you know how many you
2  performed?
3    A.   No.
4    Q.   Probably a lot, right?
5    A.   Probably.
6    Q.   Okay.  Do you have any
7  criticisms of Dr. Baker for performing a
8  hysterectomy in May of 2009 on
9  Mrs. Hammons?  I don't want to talk about
10  technique.  I just want to talk about the
11  decision to perform a hysterectomy.  Was
12  it indicated in 2009?
13    A.   Based on Dr. Baker's
14  surgical judgment, it was indicated.
15    Q.   Even -- okay.  Assuming
16  Dr. Baker performed just a hysterectomy
17  with no pelvic organ prolapse procedure
18  at all in 2009, was Mrs. Hammons at risk
19  for dyspareunia?
20    A.   Speaking in general,
21  dyspareunia is a possible risk factor
22  related to hysterectomy.  If you're
23  talking specifically about Mrs. Hammons,
24  that's a different situation.

Page 51

1    Q.   Okay.  Tell me why
2  Mrs. Hammons is a different situation.
3    A.   Because the patient you're
4  describing is not Mrs. Hammons.
5  Mrs. Hammons did not just have a
6  hysterectomy, if I understood your
7  question correctly.
8    Q.   Okay.  Well, you understand
9  my question is a hypothetical?
10       MR. SLATER:  I don't
11    understand.
12       THE WITNESS:  Well, it's
13    either hypothetical or
14    Mrs. Hammons.  It can't be both.
15  BY MR. MORIARTY:
16    Q.   Okay.  Assume a patient like
17  Mrs. Hammons just had a vaginal
18  hysterectomy in May of 2009.  She would
19  have been at some risk for dyspareunia,
20  correct?
21    A.   I would just like to
22  clarify.  In naming this hypothetical
23  patient as like or describing them as
24  like Mrs. Hammons, are you describing a

Page 52

1  patient who has prolapse?  Or are you
2  just describing a patient who's having a
3  vaginal hysterectomy?
4    Q.   Just a patient who's having
5  a vaginal hysterectomy.
6    A.   So, in general, a general
7  risk for a hysterectomy is dyspareunia.
8    Q.   All right.  And from your
9  experience and your review of the
10  literature, what was the de novo
11  dyspareunia rate following vaginal
12  hysterectomy, either now or in 2009?
13    A.   That's a number that's very
14  hard to pin down because of the different
15  definitions that are used, and many women
16  have concomitant operations, so it's very
17  difficult to parse what may be due
18  strictly to the hysterectomy.
19       So it's very hard to put an
20  absolute number on that rate.
21    Q.   How about a range?
22       MR. SLATER:  Objection.
23       THE WITNESS:  A range has
24    the same problem.

Page 53

1  BY MR. MORIARTY:
2    Q.   Okay.  Do you know the high
3  end of the range?
4       MR. SLATER:  Objection.
5       THE WITNESS:  That's the
6    same question.  If you ask me for
7    a range, and I replied that has
8    the same problems, then the high
9    end of the range has the same
10    problem also.
11  BY MR. MORIARTY:
12    Q.   Okay.  My question is just
13  from your own personal experience as a
14  surgeon who used to perform
15  hysterectomies and from your review of
16  the literature.  What is your
17  understanding of either the average or
18  the range of the de novo dyspareunia
19  rate?
20    A.   I have not done a specific
21  literature review --
22       MR. SLATER:  Objection to
23    the question.
24       THE WITNESS:  -- to be able

14 (Pages 50 to 53)

Ann M. Weber, M.D.

Page 54

1    to answer your question.
2          In my personal surgical
3    experience, I don't recall a
4    patient who had dyspareunia after
5    a hysterectomy alone.
6    BY MR. MORIARTY:
7          Q.   Okay.  Now, if a patient who
8    has a vaginal hysterectomy is going to
9    develop dyspareunia, is one of the
10   potential factors shortening of the
11   vagina as a result of the trimming that
12   is done as part of the surgery?
13         MR. SLATER:  Objection.
14         THE WITNESS:  Trimming is
15   not typically done at the time of
16   hysterectomy.
17   BY MR. MORIARTY:
18         Q.   Okay.  Is foreshortened
19   vagina following hysterectomy a potential
20   cause for dyspareunia?
21         MR. SLATER:  Objection.
22         THE WITNESS:  In general,
23   yes.
24   BY MR. MORIARTY:

Page 55

1          Q.   Okay.  Is it true that prior
2    to the procedures Dr. Baker performed in
3    2009, neither he nor Dr. Rohrer nor, to
4    the best of our knowledge, anyone else
5    measured the length of her vagina?
6          A.   That's correct.
7          Q.   Is the cervix typically 3 to
8    4 centimeters in diameter?
9          A.   I don't have a reason to
10   dispute that specific figure.  Cervical
11   size varies depending on a whole host of
12   factors.
13         Q.   Okay.  Now, when I asked you
14   a couple of minutes ago about whether
15   dyspareunia was a potential complication
16   of a vaginal hysterectomy, to your
17   knowledge from the published literature,
18   is there a breakdown of whether that
19   dyspareunia is chronic or transient?
20         MR. SLATER:  Objection to
21   the form of the question.
22         You can answer.
23         THE WITNESS:  To my
24   knowledge, no, there is no

Page 56

1    breakdown.
2    BY MR. MORIARTY:
3          Q.   Okay.  Can it be chronic?
4          A.   From hysterectomy alone?
5          Q.   Yes.
6          A.   In general?
7          Q.   Yes.
8          A.   Uncommonly so, yes.
9          Q.   Okay.  Let's talk about the
10   options that Dr. Baker had to address
11   Mrs. Hammons' pelvic organ prolapse in
12   May of 2009.  Okay?
13         A.   Okay.
14         Q.   Now, I assume that he could
15   have taken a watchful waiting perspective
16   and not treated her at all, correct?
17         MR. SLATER:  Objection to
18   the form.
19         THE WITNESS:  That's
20   possible.
21   BY MR. MORIARTY:
22         Q.   Okay.  If he had chosen that
23   course, what was the likely natural
24   course of her pelvic organ prolapse?

Page 57

1          MR. SLATER:  Objection to
2    the form.
3          You can answer.
4          THE WITNESS:  Yeah, that
5    varies very widely.  In some
6    women, the prolapse can be stable
7    for many, many years.  In other
8    women, it's a slowly progressive
9    condition, such that it may get
10   worse slowly over time.
11   BY MR. MORIARTY:
12         Q.   Okay.  Based on your
13   knowledge of what you know about
14   Mrs. Hammons in 2009, 2010, do you have
15   an opinion on what the likely course of
16   her pelvic organ prolapse would have been
17   had Dr. Baker not operated?
18         A.   Yeah, I don't have any
19   information on which to respond to that
20   since he -- his was the first-time visit,
21   so I don't have any information in the
22   past to know when she got to the point
23   she was when she saw him in order to
24   speculate about her future course.

Ann M. Weber, M.D.

Page 58

1    Q.   Okay.  So let me make sure I
2  understand what you just said.
3         If all we have in points of
4  time are this February of 2007 emergency
5  room record and then whatever Dr. Rohrer
6  noted in 2008 up to 2009, that isn't
7  enough information for you to render an
8  opinion about what I just asked you,
9  natural course?  Is that what you're
10 telling me?
11        MR. SLATER:  Objection.
12 You can answer.
13        THE WITNESS:  To my
14 understanding, there's no -- I
15 didn't look specifically for an
16 assessment of the extent of her
17 prolapse in her emergency room
18 record.
19        My understanding from
20 Dr. Rohrer's records was that he
21 did not perform an examination
22 that would identify the level or
23 degree of prolapse that she had.
24        So even though she was

Page 59

1        assessed at those points in time,
2        I don't have any extra information
3        about the level of her prolapse in
4        2007 or 2008 that would help me
5        predict what might happen to her
6        after Dr. Baker sees her in 2009.
7  BY MR. MORIARTY:
8     Q.   Okay.  Was Mrs. Hammons --
9  I'm sorry.  Let me rephrase that.
10        Would a pessary have been --
11 would a pessary likely have been a
12 successful treatment for her in 2009?
13     A.   Successful pessary use also
14 depends on a variety of factors, one of
15 them being the level of prolapse and --
16 well, I'll stop there.
17     Q.   Given what you know about
18 what happened to Mrs. Hammons in February
19 of 2007 and the fact that thereafter at
20 some point she discontinued using her
21 pessary, is it likely that she would not
22 have accepted pessary as a treatment
23 option in 2009?
24     A.   Now, I haven't read this

Page 60

1  emergency room record.  I just -- I know
2  the things that you pointed out to me.
3         Do you want me to read this
4  emergency room record to be able to
5  answer that question?
6     Q.   No.  All we know is that she
7  had one in February of 2007 and
8  apparently wasn't using one when she
9  reported to Dr. Rohrer in 2008 or to
10 Dr. Baker in 2009.  Okay.  Just those
11 facts.
12        Is it unlikely that she
13 would have accepted pessary as a
14 treatment for her pelvic organ prolapse
15 in 2009?
16        MR. SLATER:  Objection.  You
17 can answer.
18        THE WITNESS:  I don't know.
19 That's speculation.
20 BY MR. MORIARTY:
21     Q.   What other nonsurgical
22 treatments would have been likely to have
23 been available, acceptable options for
24 Dr. Baker to offer Mrs. Hammons in May of

Page 61

1  2009?
2     A.   In addition to the pessary,
3  you mean?
4     Q.   Yep.
5     A.   It depends on her symptoms.
6     Q.   Do you have enough
7  information about her symptoms from
8  Dr. Baker's medical records to answer
9  that question?
10    A.   No.  The doctor interviewing
11 the patient and examining the patient
12 always has more information than what's
13 recorded in the medical record.  So, no,
14 I don't have that information that he
15 had.
16    Q.   Okay.  Let me get back to a
17 pessary for a second.  Assuming that
18 Dr. Baker truly found a Grade 4 cystocele
19 and Mrs. Hammons had already tried and
20 stopped using a pessary before, is it
21 unlikely that the pessary was a viable
22 option for her in 2009?
23        MR. SLATER:  Objection.  You
24 can answer.

Ann M. Weber, M.D.

Page 62

1       THE WITNESS:  I'm sorry.
2   Could you repeat the last part of
3   the sentence?
4   BY MR. MORIARTY:
5       Q.    Is it unlikely that a
6   pessary was a viable option for her in
7   2009?
8       A.    No.  It was not unlikely.
9       Q.    Was it unlikely to be
10  accepted as an option in 2009?
11      MR. SLATER:  Objection to
12  the form of the question.
13      THE WITNESS:  I don't know.
14  The interaction between the doctor
15  and the patient and her symptoms
16  and her goals drive treatment
17  decisions.  And I don't have that
18  information.
19  BY MR. MORIARTY:
20      Q.    Okay.  If she had a Grade 4
21  cystocele as Dr. Baker writes in his
22  notes, and she had already tried and
23  stopped using a pessary and she wanted to
24  remain sexually active, is it unlikely

Page 63

1   that a pessary would have been an
2   acceptable option to the patient in May
3   of 2009?
4       A.    No, it is not unlikely.
5       Q.    Okay.
6       A.    It is not -- I'm sorry.  Now
7   I'm confused by the double negatives.
8   No, I'm -- could you repeat the question.
9   I'm sorry.
10      Q.    Let me ask this another way.
11      During your own practice, I
12  assume you had experience counseling
13  patients about pessaries.  Is that true?
14      A.    Yes.
15      Q.    Okay.  And in patients who
16  had a Stage IV prolapse of any type and
17  wanted to remain sexually active and had
18  already tried and stopped pessary use
19  once, did your patients tend to accept
20  pessaries on a second try?
21      A.    It would certainly be
22  something that I would discuss with them.
23      Q.    Okay.  I'm sure you would to
24  be thorough.  But the question is whether

Page 64

1   they typically would accept it, knowing
2   what you know about pessaries.
3       A.    It really depends on her
4   goals for treatment.
5       Q.    Okay.
6       A.    Is now a good time for a
7   break?
8       Q.    Sure.  If you want one.
9       A.    Please.
10      (Short break.)
11  BY MR. MORIARTY:
12      Q.    Dr. Weber, was it reasonable
13  for Dr. Baker to operate on Mrs. Hammons
14  for pelvic organ prolapse in 2009?
15      A.    Based on the discussion that
16  he had with her, all of which is not
17  recorded in the records, I would make the
18  assumption that, yes, he and she jointly
19  determined that it was reasonable.
20      Q.    Okay.  So when we talk about
21  his surgical options, if he was going to
22  perform a vaginal hysterectomy, how many
23  surgical options did he have at that
24  point to treat her pelvic organ prolapse?

Page 65

1       MR. SLATER:  Objection.
2   Foundation.
3       THE WITNESS:  At least
4   three.
5   BY MR. MORIARTY:
6       Q.    Okay.  And they were what?
7       A.    Well, she had an anterior
8   and uterine prolapse.  So her anterior
9   prolapse could be addressed by an
10  anterior vaginal repair, and there are a
11  number of techniques to accomplish that.
12      Addressing her uterine
13  prolapse, techniques that can be
14  performed vaginally include a uterosacral
15  ligament suspension, a sacrospinous
16  ligament fixation, and iliococcygeus
17  repair.
18      Q.    All right.  So I want to
19  make sure I understand this.  And, of
20  course, Prolift was an option at the
21  time, whether you agree with its use or
22  not.  It was an option at the time,
23  correct?
24      A.    It was an option at the

17 (Pages 62 to 65)

Page 66

1  time.
2      Q.    Okay.  And something like
3  Gynemesh PS was also an option at that
4  time, transvaginally, correct?
5      A.    The Gynemesh PS alone could
6  have been used to address her anterior
7  Prolift -- prolapse.  Excuse me.
8      Q.    Did -- as a surgeon, would
9  it make sense to do a vaginal
10  hysterectomy but an abdominal
11  sacrocolpopexy?
12      A.    No.
13      Q.    Okay.  So if you were going
14  to do an abdominal sacrocolpopexy, you'd
15  probably do an abdominal hysterectomy?
16      A.    If a hysterectomy was part
17  of the procedure, yes, it would be done
18  abdominally.
19      Q.    Okay.  All right.  So if I
20  understood you correctly, to address the
21  uterine prolapse, there were at least
22  three options, and you named them,
23  correct?
24      A.    Yes.

Page 67

1      Q.    And then to address the
2  anterior prolapse, you said that there
3  were a number of different vaginal repair
4  techniques.  Without naming them, how
5  many do you think there are?
6      A.    Three.
7      Q.    Okay.
8      A.    Three -- let me amend that.
9  Three native tissue repairs.
10      Q.    Okay.  Now, if you go to
11  Exhibit 2, which is your -- what's been
12  called your primary report, this one.
13      A.    Yes.
14      Q.    And you go to Page 8, back
15  in 2012, from Pages 8 through 10, you
16  talk about the alternatives to the
17  Prolift.
18          Do you see that?
19      A.    Yes, I do.
20      Q.    All right.  And would --
21  would your opinions about the
22  alternatives that were available to
23  Dr. Baker in 2009, would this material
24  from Exhibit 2 still apply to that

Page 68

1  decisionmaking process?  I mean, I know
2  you wrote this in 2012.  But at that
3  point, you were talking generally?
4      A.    In general, yes.
5      Q.    Of the options that you
6  mentioned for the uterine prolapse and
7  the anterior prolapse, just the native
8  tissue repairs, many of those had been in
9  use for many years before 2009; is that
10  correct?
11      A.    Yes.
12      Q.    And of all the options that
13  you mentioned to me -- I'm sorry.  Let me
14  take a step back.
15          What are the three native
16  tissue repairs that would have been
17  available to Dr. Baker?  I assume
18  anterior colporrhaphy?
19      A.    Yes.
20      Q.    What else?
21      A.    Paravaginal repair and a
22  site-specific fascial defect repair.
23      Q.    Okay.  So of the six native
24  tissue techniques that you've mentioned,

Page 69

1  how many of those had been the subject of
2  evidence-based controlled trials by 2009?
3          MR. SLATER:  What is the
4      question?
5          THE WITNESS:  Clarify --
6          MR. MORIARTY:  Could
7      you just read it back?
8          (Whereupon, the
9      court reporter read back the
10      requested portion of testimony.)
11  BY MR. MORIARTY:
12      Q.    By 2009.
13      A.    Can you clarify what you
14  mean by evidence-based controlled trials?
15      Q.    Okay.  Let's take out
16  evidence-based and just say controlled
17  trials reported in the peer-reviewed
18  literature.
19      A.    Can you tell me what you
20  mean by controlled trials?
21      Q.    Well, I think you have,
22  like, a subspecialty degree in
23  participating in clinical trials, don't
24  you?  Isn't "controlled trials" a term of

18 (Pages 66 to 69)

Ann M. Weber, M.D.

Page 70

1  art?
2      A.  Sir, I'm just trying to
3  understand your question so I can answer
4  it appropriately.  I know what it means
5  to me.  I'm -- I'm asking what it means
6  to you so I can be sure to answer
7  responsively.
8      Q.  I want -- I want you to
9  answer as it means to you.  As controlled
10 trials means to you.
11     A.  Okay.  Were any of the
12 procedures -- I'm sorry.  Now you're
13 going to have to start again with the
14 beginning of the question.
15     Q.  What I'm trying to figure
16 out -- and I will try to make this go
17 faster.
18         I've seen writings in the
19 peer-reviewed literature, including
20 things you've written that talk about the
21 lack of clinical trials on some of these
22 procedures, even many of the old ones
23 that have been around for years and years
24 and years.  Okay?

Page 71

1      A.  Okay.
2      Q.  So what I'm trying --
3          MR. SLATER:  Objection to
4      the characterization.
5  BY MR. MORIARTY:
6      Q.  So what I'm trying to find
7  out is, of the options available to
8  Dr. Baker, putting aside mesh for right
9  now, which one of those had been subject
10 to controlled trials?
11         Let me take one more step
12 back.  Let's just address the ones for
13 the anterior repair, not even the
14 uterine.  Okay.  Just the three you
15 mentioned:  anterior colporrhaphy,
16 paravaginal repair, and site-specific
17 fascial defect repair.  How many of those
18 have been subjected to controlled trials?
19     A.  One.
20     Q.  Which one?
21     A.  Anterior colporrhaphy.
22     Q.  How many trials by 2009, to
23 the best of your knowledge?
24         MR. SLATER:  Would that

Page 72

1      include a trial comparing
2      colporrhaphy to a use of mesh?
3          MR. MORIARTY:  Sure.  As
4      long as it was reported before May
5      of 2009.
6          THE WITNESS:  To the best of
7      my remembering at the moment, two.
8  BY MR. MORIARTY:
9      Q.  Okay.  And just so we're
10 clear for the record, by May of 2009,
11 Prolift had been -- the 510(k) had been
12 cleared by the FDA, correct?
13     A.  Yes.
14     Q.  Okay.  Do you -- are you
15 going to express any opinions about
16 whether the best surgical course for
17 Mrs. Hammons in May of 2009 was vaginal
18 hysterectomy plus a native tissue
19 prolapse procedure, or is it your opinion
20 that he should have done abdominal
21 sacrocolpopexy to address her prolapse?
22     A.  I'm sorry.  Could you repeat
23 the question?
24     Q.  Sure.  Just so we don't go

Page 73

1  off on a complete tangent talking about
2  abdominal sacrocolpopexy.  Okay.
3  Although it was an option available to
4  Dr. Baker in 2009, because of the uterine
5  prolapse and assuming he was going to do
6  a hysterectomy, is it your opinion that
7  the issue in this case and the surgical
8  decision we should be talking about in
9  this case is whether vaginal hysterectomy
10 and a native tissue procedure was the
11 appropriate way to go, or should we be
12 talking about abdominal hysterectomies
13 and abdominal sacrocolpopexies?
14         MR. SLATER:  Objection to
15     the foundation of your question.
16         THE WITNESS:  Well, from
17     what I understand from Dr. Baker's
18     deposition testimony, he wasn't --
19     didn't feel himself qualified to
20     be performing abdominal
21     sacrocolpopexy with or without a
22     hysterectomy.
23 BY MR. MORIARTY:
24     Q.  Okay.

19 (Pages 70 to 73)

Ann M. Weber, M.D.

1      A.    So I'm still trying to
2  understand your question.  Does this
3  apply to what Dr. Baker had to offer
4  Mrs. Hammons?
5      Q.    Yes.
6      A.    Okay.
7      Q.    Or do you think he should
8  have referred her immediately somewhere
9  else for treatment?
10      A.    It's Dr. Baker's judgment
11  that he was qualified to provide a
12  prolapse repair for her.
13      Q.    Okay.  And is it your
14  opinion, based on everything you know
15  about his qualifications, that he was
16  qualified to perform a vaginal
17  hysterectomy combined with, say, an
18  anterior colporrhaphy?
19      A.    And -- and only those
20  procedures in treatment of her prolapse?
21      Q.    I just used it as an
22  example.  Was he qualified to do at least
23  that?
24      A.    I -- I don't know.  Clearly

1  he thought so.
2      Q.    Okay.  Is it your opinion
3  that Dr. Baker was qualified to treat
4  Mrs. Hammons for the problems that she
5  had in March and May of 2009?
6      A.    I'm sorry.  I'm struggling.
7  Are you trying to -- are you asking me to
8  judge his quality as a surgeon?
9      Q.    I'm not asking you to.  I'm
10  just asking whether you have an opinion.
11  Are you going to express an opinion in
12  this case that Dr. Baker was not
13  qualified to treat this patient and he
14  should have referred her in the first
15  instance in March or May of 2009?
16          MR. SLATER:  Objection.
17  It's not an opinion that's been
18  drawn.
19          Objection.  Foundation.
20          THE WITNESS:  I don't think
21  I have enough information to judge
22  Dr. Baker's qualifications, if I'm
23  understanding your question
24  correctly.

1  BY MR. MORIARTY:
2      Q.    Okay.  So you don't have
3  enough information to judge his
4  qualifications or his skill as a surgeon.
5  True?
6      A.    That's true.
7      Q.    Okay.  Putting aside issues
8  regarding the use of mesh, did the
9  vaginal approach to treating
10  Mrs. Hammons' pelvic organ prolapse have
11  a benefit over an abdominal approach of
12  fewer wound complications, less
13  postoperative pain, a shorter hospital
14  stay, and less cost?
15          MR. SLATER:  Objection.
16  Foundation.
17          THE WITNESS:  That's been
18  reported in the literature.  As to
19  hospital stay and cost, those --
20  hospital stay varies so much with
21  individual practice, and cost
22  depends on so many other
23  variables, but it has been
24  reported, yes.

1  BY MR. MORIARTY:
2      Q.    Okay.  In 2009, was it still
3  controversial about whether the abdominal
4  or vaginal route was more effective or
5  durable --
6          MR. SLATER:  Objection.
7  BY MR. MORIARTY:
8      Q.    -- when compared with the
9  abdominal approach?
10          MR. SLATER:  Objection.
11  These questions are all vague,
12  ambiguous, and lack foundation,
13  this entire line.
14          THE WITNESS:  Yeah, I'm not
15  clear if you're comparing a
16  vaginal vault suspension procedure
17  with abdominal sacrocolpopexy.
18          Is that -- is that your
19  question?
20  BY MR. MORIARTY:
21      Q.    Any of the transvaginal
22  approaches.  Again, not mesh.
23          MR. SLATER:  Objection.
24  It's overbroad, vague, ambiguous,

Ann M. Weber, M.D.

Page 78

1    lacks foundation, and multiple
2    parts to that.
3         THE WITNESS:  I'm sorry.
4    Okay.  So any of the vaginal
5    operations for uterine or apical
6    suspension?
7    BY MR. MORIARTY:
8         Q.    Okay.  Let me -- let me just
9    make sure you understand the context in
10   which I'm asking this.
11        Dr. Baker had several
12   surgical options available to him,
13   correct?
14        A.    Yes.
15        Q.    Or he could have referred
16   the patient if he didn't feel comfortable
17   doing what he thought was the most
18   appropriate, correct?
19        A.    Yes.
20        Q.    Okay.  So if he was just
21   comparing abdominal approaches with
22   transvaginal approaches, in 2009, was
23   there still controversy about which
24   approach to the surgery was -- had better

Page 79

1    efficacy or durability?
2         A.    I can't answer that without
3    knowing exactly what procedures you're
4    referring to.
5         Q.    Okay.  Let's just take
6    anterior colporrhaphy versus an abdominal
7    approach.
8         MR. SLATER:  Abdominal
9    approach to what?  The question
10   doesn't make any sense as asked,
11   with all due respect.
12        MR. MORIARTY:  To repairing
13   her --
14        MR. SLATER:  There's a lack
15   of foundation.
16   BY MR. MORIARTY:
17        Q.    To repairing her pelvic
18   organ prolapse.
19        MR. SLATER:  Which prolapse
20   are you talking about, sir?
21        MR. MORIARTY:  She had two.
22        THE WITNESS:  She had two.
23   So which one are you --
24   BY MR. MORIARTY:

Page 80

1         Q.    Either.  He's going to
2    repair them both, theoretically, right?
3         A.    An anterior colporrhaphy and
4    abdominal sacrocolpopexy are not
5    comparable.  They have totally different
6    indications.
7         Q.    Okay.  If Dr. -- well, let's
8    just deal with the apical.  Is the apical
9    prolapse the uterine prolapse?
10        A.    Those terms are
11   interchangeably used, yes.
12        Q.    And at the time of surgery,
13   would you have expected Dr. Baker to
14   address the apex of the vagina because of
15   the apical prolapse?
16        A.    Yes.
17        Q.    All right.  In other words,
18   when Dr. Baker removed the uterus, that
19   isn't necessarily going to take care of
20   the apical prolapse; is that correct?
21        A.    Correct.  It does not.
22        (Document marked for
23        identification as Exhibit
24        Weber-6.)

Page 81

1    BY MR. MORIARTY:
2         Q.    I've handed you Exhibit 6.
3    Is this Dr. Baker's May 5, 2009,
4    operative report?
5         A.    Yes.
6         Q.    Does he describe a repair of
7    the apex or a suspension of the apex?
8         A.    No.
9         Q.    What are the consequences to
10   the patient, Mrs. Hammons -- I'm sorry.
11   Let me rephrase that.
12        What are the possible
13   complications or consequences to
14   Mrs. Hammons if Dr. Baker did not address
15   the apex in his repair on May 5, 2009?
16        A.    She may develop vaginal
17   vault prolapse.
18        Q.    Anything else?
19        A.    No.
20        Q.    In your opinion, based on
21   your review of the medical records, did
22   she develop subsequent vaginal vault
23   prolapse?
24        A.    By the time she saw

21 (Pages 78 to 81)

Ann M. Weber, M.D.

Page 82

1 Dr. Heit, yes.
2     Q.   Okay.  But not by the time
3 she saw Dr. Lackey in the fall of 2009?
4     A.   Can I refer to his notes?  I
5 know he diagnosed her with a rectocele.
6     Q.   Yes.  You're welcome to
7 review his notes or your report regarding
8 his notes.
9     A.   Right.  So Dr. Lackey
10 described a Grade 2 to 3 rectocele.  He
11 did not specifically describe anything
12 related to the apex.
13     Q.   Okay.  So if Dr. Baker had
14 chosen to perform vaginal hysterectomy
15 plus anterior colporrhaphy, what was the
16 risk of dyspareunia from that combination
17 procedure?
18         MR. SLATER:  Objection.
19     Ambiguous, compound, lacks
20     foundation.
21         THE WITNESS:  We discussed
22     this earlier, I think, as to
23     what's reported in the literature
24     as far as being able to pin that

Page 83

1     down to a number.  And for all the
2     same reasons that I described
3     before, it's not possible.
4 BY MR. MORIARTY:
5     Q.   Okay.  What about -- is it
6 any more possible to pin that down with
7 vaginal hysterectomy plus paravaginal
8 repair?
9     A.   No, not to a single number.
10     Q.   What about a range?
11     A.   No.  Again, we talked about
12 ranges.  I think we've been through this.
13 The same problems exist.
14     Q.   Okay.  Would your answer be
15 the same for vaginal hysterectomy plus
16 site-specific fascial defect repair?
17     A.   Yes.
18     Q.   Okay.  Do you have an
19 opinion as to the risk of dyspareunia
20 with a combination of vaginal
21 hysterectomy plus Prolift?
22     A.   And for all the same
23 reasons, a specific number can't be
24 applied to that.  I believe the risk is

Page 84

1 higher, but to give you a number, to say
2 X versus Y, the literature just does not
3 support that.
4     Q.   Can you quantify how much
5 higher the risk is with Prolift than it
6 is with any of the other -- any of the
7 three native tissue procedures that we
8 were talking about?
9     A.   Well, the distinction not
10 only applies to the number, but to the
11 nature of the condition, such that when a
12 woman experiences dyspareunia after a
13 native tissue repair, it's treatable, the
14 scar softens, it sometimes goes away by
15 itself, versus the dyspareunia that
16 occurs after Prolift, which is related to
17 factors like mesh contraction, vaginal
18 anatomic distortion, that Ethicon has all
19 over their documents that are difficult,
20 if not impossible, to treat.
21         So you have two totally
22 different mechanisms of dyspareunia
23 affecting native tissue repairs versus
24 Prolift mesh.

Page 85

1     Q.   Okay.  And I understand
2 that's your opinion.  But what I want to
3 stick with right now is the specific
4 question of whether you can quantify how
5 much higher the risk is with vaginal
6 hysterectomy plus Prolift as opposed to
7 vaginal hysterectomy plus ACPVR or SSFDR.
8         MR. SLATER:  Objection to
9     the form.
10         You can answer.
11         THE WITNESS:  Well,
12     dyspareunia that leads to
13     apareunia, being completely unable
14     to have intercourse, with native
15     tissue repair is zero.  And with
16     Prolift, apareunia occurs.  In my
17     entire clinical practice,
18     everything that I've read about
19     sexual function after prolapse
20     repairs, the circumstance where a
21     woman can never have normal
22     functional sex in her entire life
23     simply does not occur after native
24     tissue repair.

22 (Pages 82 to 85)

Ann M. Weber, M.D.

Page 86

1        And after Prolift, it does
2   occur.  And that's exactly what
3   happened to Mrs. Hammons.
4   BY MR. MORIARTY:
5        Q.   And do you know the rate at
6   which apareunia occurs with Prolift?
7        A.   No.  If Ethicon had studied
8   this before they put it on the market, I
9   may be able to answer your question, or
10  they would become so horrified by the
11  numbers they would decide not to put it
12  on the market altogether, which would be
13  my opinion.
14       Q.   Okay.  I'm just trying to
15  ask about rates.  Okay.  So with the
16  three native tissue repairs, you say
17  apareunia never happened in your
18  experience.  Is it reported in the
19  literature?
20       A.   I've never seen it.
21       Q.   Okay.  But you say it does
22  happen with vaginal hysterectomy plus
23  Prolift, but you don't know the rate at
24  which it happens, correct?

Page 87

1        A.   That's correct.
2        Q.   Okay.  Going back,
3   originally, can you quantify for me,
4   based on your experience or the published
5   literature, how much higher the
6   dyspareunia rate is with Prolift than it
7   is with the three native tissue repairs
8   that were available to Dr. Baker in 2009?
9        A.   No.
10       Q.   Getting back to abdominal
11  sacrocolpopexy for one second, you're
12  familiar with the CARE study?  C-A-R-E.
13       A.   Yes.
14       Q.   Okay.  Would that be a
15  reliable source of information for the --
16  the erosion or dyspareunia rates
17  following abdominal sacrocolpopexy?
18       A.   Yes.  Subject to the -- just
19  the limitations of the study population,
20  but yes.
21       Q.   Okay.  And those
22  limitations, I assume, would be discussed
23  in one or more of the papers reporting
24  the CARE study?

Page 88

1        A.   Yes.
2        Q.   Okay.  In 2009, when
3   Dr. Lackey operated on Mrs. Hammons, was
4   dyspareunia a risk of the native tissue
5   posterior repair that he performed?
6            MR. SLATER:  Objection.
7            THE WITNESS:  In general,
8        the type of repair he performed is
9        a risk for dyspareunia.
10  BY MR. MORIARTY:
11       Q.   Okay.  Do you know or do you
12  have an opinion about what the -- the
13  rate of dyspareunia is following that
14  type of posterior repair?
15       A.   No.  Again, the same
16  problems we've been talking about.
17       Q.   Now, I want to be clear on
18  this rate of dyspareunia issue.  There
19  are rates published in the literature,
20  correct?
21       A.   Yes.
22       Q.   Okay.  So you or I could
23  read a bunch of medical literature and
24  probably lay out 50 studies on this table

Page 89

1   that talk about the rates from various
2   studies, correct?
3        A.   Yes.
4        Q.   Okay.  In 2009, was there a
5   surgical approach to pelvic organ
6   prolapse available to Dr. Baker or
7   available on referral to someone else
8   using synthetic mesh that was a safe and
9   effective alternative to Prolift?
10           Did you understand that
11  question?
12       A.   No.
13       Q.   It wasn't very good.  Okay.
14           While we're talking about
15  options to Dr. Baker, some he could have
16  performed, some maybe he would have
17  needed to refer to another physician,
18  whether it was Dr. Lackey or one of
19  Lackey's partners or his own partner or
20  Dr. Heit.  Okay.
21           I'm trying to find out is
22  whether in 2009 there was a surgical
23  approach to her pelvic organ prolapse
24  which would involve the use of synthetic

23 (Pages 86 to 89)

Ann M. Weber, M.D.

Page 90

1  mesh that was a safe alternative in your
2  opinion.
3      A.   Alternative to what?
4      Q.   Prolift.
5      A.   Yes.
6      Q.   And that would be what?
7      A.   An abdominal sacrocolpopexy.
8      Q.   Okay.  And to do that
9  procedure involving mesh, you're using
10  something like Gynemesh PS --
11      MR. SLATER:  Objection.
12  BY MR. MORIARTY:
13      Q.   -- or similar?  In other
14  words, a sheet of mesh, not a mesh kit,
15  correct?
16      A.   Correct.
17      Q.   And when you were operating
18  as a surgeon, did you do abdominal
19  sacrocolpopexies?
20      A.   Yes.
21      Q.   Did you use mesh in any of
22  those procedures?
23      A.   Yes.
24      Q.   Okay.  In the beginning of

Page 91

1  the CARE study, were you one of the
2  operating surgeons, or were you a
3  consultant to the design of the trial?
4      A.   I was the program director
5  of the Pelvic Floor Disorders Network.  I
6  was not an investigator providing care at
7  any of the sites.
8      Q.   Okay.  By 2009, when
9  Dr. Baker operated on Mrs. Hammons, was
10  erosion a known risk of the use of pelvic
11  mesh?
12      A.   Yes.
13          (Document marked for
14          identification as Exhibit
15          Weber-7.)
16  BY MR. MORIARTY:
17      Q.   Dr. Weber, this is
18  Dr. Baker's March 17, 2009, office note,
19  correct?
20      A.   Yes.
21      Q.   And you've seen this before
22  as part of your analysis of the facts of
23  this case?
24      A.   Yes.

Page 92

1      Q.   And on the -- let's go to
2  the last two pages.  Under the female
3  exam, he has Grade 4 cystocele.  Do you
4  see that?
5      A.   Yes.
6      Q.   And then cervix, it just
7  says prolapse without the S -- or without
8  the E -- I'm sorry -- correct?
9      A.   Yes.
10      Q.   Now, granted, he does not
11  have a POP-Q score in here, but do you
12  have any reason to disagree that she had
13  a Grade 4 cystocele at the time of this
14  exam?
15      A.   Yes.
16      Q.   And what -- what, in your
17  opinion, was her degree of cystocele as
18  of March of 2009?
19      A.   Based on her deposition
20  testimony, I would say possibly Stage II
21  or early Stage III, using the POP-Q
22  system.
23      Q.   And is the basis for that
24  opinion solely Mrs. Hammons' deposition?

Page 93

1      A.   Yes.
2      Q.   Okay.  And whether it was a
3  Grade 4 or a Grade 2 to 3, does that make
4  any difference in your opinion for
5  purposes of this case?
6      A.   Yes.
7      Q.   Okay.  Tell me how that
8  makes a difference to your opinion.
9      A.   Well, the severity of
10  prolapse always is an important factor in
11  determining -- in helping to determine
12  treatment options as well as
13  understanding patient symptoms.
14      Q.   Okay.  So are you -- is it
15  your opinion that the treatment would
16  have been different or the outcome would
17  have been different had he scored this
18  appropriately?
19      A.   Yes.
20      Q.   And what's the difference?
21      A.   I think in the interaction
22  between the doctor and the patient,
23  making a decision about treatment and
24  what's expected in terms of outcomes

24 (Pages 90 to 93)

Ann M. Weber, M.D.

Page 94

1  would be different if you're dealing with
2  someone at a relatively low stage of
3  prolapse versus someone who is truly a
4  Stage IV with vaginal eversion.
5      Q.   Okay.  Are you -- is it your
6  opinion that, had he properly scored
7  this, he would have treated her
8  differently or she would have had a
9  different outcome?
10     A.   It's possible, yes.  Early
11 stage -- she has relatively early
12 prolapse.
13     Q.   Okay.  Do you have an
14 opinion, to a reasonable degree of
15 medical probability, as to how the
16 outcome would have been different in this
17 case had he scored this as a 2 to 3
18 cystocele?
19     A.   Well, if he had been trained
20 appropriately by Ethicon in their own
21 marketing and -- marketing of the Prolift
22 device, that it was intended to be used
23 for women with advanced prolapse, and if
24 he in his mind decided that his version

Page 95

1  of Grade 4 cystocele meant advanced
2  prolapse, then he would choose Prolift as
3  an option that would be appropriate for
4  her as opposed to what Ethicon itself was
5  saying, was that early stage prolapse was
6  not an appropriate -- patients with early
7  stage prolapse were not appropriate
8  candidates for Prolift.
9      Q.   Are you done with your
10 answer?  I just want to make sure I
11 understand your answer before I ask my
12 next question.
13     A.   Yes.
14     Q.   So if I understand you
15 correctly, more likely than not, she was
16 a Grade 2 to 3 as opposed to a Grade 4,
17 and had he properly scored her and
18 properly, in your opinion, operated on a
19 2 to 3, with whatever procedures applied
20 to a 2 to 3, other than a Prolift, her
21 outcome would have been different,
22 correct?
23     A.   I'm sorry.  That was very
24 long.  Can you rephrase, please?

Page 96

1      Q.   I'm just trying to
2  understand this sequence that follows
3  from him not scoring her prolapse
4  appropriately.  Okay.  I want to know the
5  endgame of what happens after he scores
6  her improperly.  Okay.
7          Are you saying that had he
8  scored her properly, more likely than
9  not, he would have chosen an anterior
10 colporrhaphy, for example?
11     A.   I can't say what -- his
12 decisionmaking regarding the treatment
13 options based on his understanding of
14 what stage of prolapse she had.  That's
15 speculation.
16     Q.   Okay.  Are you saying, to a
17 probability, that had he properly scored
18 her as a two to three, he is likely to
19 have used Prolift?
20     A.   I can't answer for his
21 medical judgment in deciding at what
22 level in his mind Prolift was indicated.
23     Q.   Okay.  So I'm trying to
24 figure out what your opinion is, to a

Page 97

1  probability, what the difference in
2  outcome is because of this scoring
3  discrepancy or scoring error.
4          MR. SLATER:  Objection to
5      the foundation for that.
6          THE WITNESS:  I'm not saying
7      it's an error.  You see, I can't
8      get into Dr. Baker's mind.  He
9      recorded a Grade 4.  That's what
10     he saw and recorded and in his
11     interactions with Ms. Hammons made
12     his decisions on.
13 BY MR. MORIARTY:
14     Q.   When you're relying on
15 Mrs. Hammons' deposition, are you relying
16 on some visual observations she made or
17 some feeling that she had about the
18 degree of bulge of her cystocele and her
19 apical prolapse?
20     A.   Well, first, of course, she
21 doesn't differentiate between a cystocele
22 and apical prolapse.  Women experience
23 prolapse.
24     Q.   Okay.

25 (Pages 94 to 97)

Ann M. Weber, M.D.

Page 98

1      A.    And to my understanding of
2  her deposition testimony, it was a
3  description of what she felt that she
4  described in deposition.
5      Q.    Okay.  And what you're
6  saying is what she felt, in your opinion,
7  is inconsistent with a Grade 4 cystocele?
8      A.    Yes.
9      Q.    Okay.  Had Dr. Baker chosen
10 anterior colporrhaphy to repair her
11 cystocele instead of Prolift, is it
12 likely that she would have had a
13 recurrence of her cystocele by now?
14     A.    So here, I'm going to ask
15 you to -- are you speaking about a
16 general patient who only has an anterior
17 cystocele, or Mrs. Hammons and her
18 situation?
19     Q.    Okay.  Let me ask it again.
20     We know that she had a
21 vaginal hysterectomy, anterior Prolift,
22 and no apical repair at the time of the
23 May 2009 procedure, correct?
24     A.    Correct.

Page 99

1      Q.    Okay.  Had he chosen vaginal
2  hysterectomy, no apical repair, and an
3  anterior colporrhaphy for the cystocele,
4  is it likely that by now she would have
5  had a recurrence of her cystocele?
6      A.    I don't think it's more
7  likely than not.
8      Q.    There's a high risk that it
9  would have recurred?
10     MR. SLATER:  Objection.
11 That question has been answered.
12     THE WITNESS:  It's a very
13 artificial type of question,
14 because you're asking me to try to
15 judge what her risk of anterior
16 vaginal prolapse would be in the
17 setting when her prolapse wasn't
18 necessarily treated adequately.
19     And we talk about the vagina
20 as if it exists in three
21 compartments.  But that's not --
22 that's our designation to make it
23 easier to talk about.
24 BY MR. MORIARTY:

Page 100

1      Q.    Well, when you say in your
2  answer that you just gave that it wasn't
3  treated adequately, you're talking about
4  the failure to do the apical repair,
5  correct?
6      A.    Yes.
7      Q.    Okay.  That put her at
8  higher risk of recurrence no matter which
9  technique he chose, correct?
10     A.    Yes, probably.
11     Q.    Okay.  Had Dr. Baker chosen
12 the combination of vaginal hysterectomy,
13 no apical repair, but used anterior
14 colporrhaphy, is it likely that she still
15 would have suffered a prolapse in the
16 posterior -- in other words, a
17 rectocele -- in 2009 or early 2010?
18     A.    I can't answer that.  That
19 would be guessing.
20     Q.    Okay.  Are you going to
21 render any opinions in this case that the
22 anterior Prolift was the cause of her
23 rectocele or enterocele that were
24 detected in the fall of 2009?

Page 101

1      A.    No.
2      Q.    Okay.  I want to get back to
3  this exhibit that I think that you have
4  in your left hand.  Is that 7, the office
5  visit?
6      A.    Yes.
7      Q.    On the last page under
8  diagnosis, he's got some shorthand for
9  what looks like an informed consent
10 discussion.  Would you agree with me?
11     A.    Yes.
12     Q.    Okay.  And I'm going to read
13 it, and I'm going to interpret it.  And
14 you tell me when I'm done if you think
15 that my interpretation is reasonable.
16 And it's based on what he testified to.
17     Okay.  Are you ready?
18     He's going to do a
19 vaginal -- total vaginal hysterectomy,
20 bilateral salpingo-oophorectomy, anterior
21 Prolift.  Discussed risks and
22 complications including not working; pain
23 with sex; bleeding; infection; injury to
24 bowel, bladder, and ureter.

26 (Pages 98 to 101)

Ann M. Weber, M.D.

Page 102

1    Based on what you know about
2 this case, is that basically what that
3 says there?
4    A.   I don't have a reason to
5 dispute that.  Dr. Baker I think read it
6 into the record on his -- in his
7 deposition.  So if he had a different
8 interpretation, I would defer to that.
9    Q.   And I'm sorry I don't have
10 an extra copy of this, but this is --
11    MR. MORIARTY:  I'll mark
12    this copy as 8.  I'm sorry.  The
13    word "consent" is highlighted with
14    a date.
15    (Document marked for
16    identification as Exhibit
17    Weber-8.)
18    MR. MORIARTY:  It's the
19    admission history and physical
20    from the day of the surgery.
21    We can make an extra copy at
22    a break if you need it, Adam.
23 BY MR. MORIARTY:
24    Q.   Doctor, does the consent

Page 103

1 section say that "I discussed the risks
2 of injury to bleeding and infection, risk
3 of injury to bowel, bladder, or ureters,
4 as well as not being happy with surgery
5 or having pain with intercourse or other
6 types of pain following surgery.  The
7 patient has agreed to these risks and
8 wishes to proceed with surgery despite
9 these risks"?  Is that what that says at
10 the very bottom of the first page and the
11 top of the second?
12    A.   Yes.
13    Q.   Okay.  Thank you.
14    Now, did you publish in 2005
15 an article with Dr. Richter about
16 diagnosis and treatment of pelvic organ
17 prolapse?
18    A.   I would need my CV.  I don't
19 have any reason to dispute that.
20    Q.   Okay.  From your -- we can
21 look at that if you need it.  But the
22 point of my question is this.  From your
23 understanding of Dr. Baker's deposition,
24 is the Green Journal a journal that he

Page 104

1 would have had been receiving and
2 reviewing because of his membership in
3 ACOOG, A-C-O-O-G?
4    MR. SLATER:  Objection.
5    Foundation.
6    THE WITNESS:  I believe that
7    was his testimony.
8    MR. SLATER:  Your question
9    wasn't whether he had seen a
10    specific issue?
11    MR. MORIARTY:  No.  I asked
12    whether it was a journal that he
13    would have had available to him.
14    MR. SLATER:  Okay.
15 BY MR. MORIARTY:
16    Q.   Now, obviously, Doctor,
17 you've got lots of writing in your
18 primary report, Exhibit 2, and then in
19 your report in this case, Exhibit 1, with
20 your opinions about how Prolift is
21 defective, correct?
22    A.   Yes.
23    Q.   I want to make sure that I
24 understand one point about that.  Is

Page 105

1 there any published literature that
2 indicates that the complication rate for
3 Prolift is greater than 50 percent?  In
4 other words, that the dyspareunia rate is
5 higher than 50 percent and the erosion
6 rate or any other complication?
7    MR. SLATER:  Objection.
8    This goes beyond the scope of this
9    deposition.  Please ask your next
10    question.
11 BY MR. MORIARTY:
12    Q.   Are you going to answer my
13 question?
14    MR. SLATER:  Counsel, why
15    are you asking the witness?  This
16    is a lawyer decision.  The
17    question is beyond the scope of
18    the agreed scope of these
19    depositions.  It's a general
20    question that has been covered in
21    other depositions.  It's been in
22    her report since day one.  Please
23    go to your next question.
24    I'm directing her not to

27 (Pages 102 to 105)

Ann M. Weber, M.D.

Page 106

1   answer, because there's an
2   agreement on a national level of
3   what the scope of this deposition
4   would be.
5          You asked me to inform you
6   if you went beyond what you were
7   supposed to be doing.  You just
8   did.  I've been very, very
9   patient.  You've asked a lot of
10  general questions.  You've asked a
11  lot of things that go beyond this
12  case.  I've tried to be patient.
13  This question is point blank
14  outside of the scope of our
15  agreement.
16         Please go to your next
17  question and focus on the patient.
18         MR. MORIARTY:  And I believe
19  that as a --
20         MR. SLATER:  I don't want to
21  dispute it.  Please go to your
22  next question.
23         MR. MORIARTY:  -- as a
24  free-thinking adult and at one

Page 107

1   point a licensed physician, she is
2   entitled to make the decision
3   about --
4          MR. SLATER:  She's not.
5          MR. MORIARTY:  -- whether
6   she answers the question or not.
7          MR. SLATER:  She's not.
8   Because this is a decision and
9   agreement that goes beyond one
10  question at one deposition.
11         MR. MORIARTY:  Okay.
12         MR. SLATER:  You know better
13  than that.  Please move on.
14         You're going to let me joust
15  with your experts and they're
16  going to make the decision whether
17  to answer questions and you're
18  going to stay out of it?  I doubt
19  it.  Let's just live in reality.
20         Please move on.
21  BY MR. MORIARTY:
22     Q.   Was stress urinary
23  incontinence a potential risk of
24  whichever surgery Dr. Baker chose to

Page 108

1   address the prolapse in addition to the
2   vaginal hysterectomy in 2009?
3      A.   Are we speaking in general
4   terms, or are we speaking specifically?
5      Q.   I'll rephrase.  Had
6   Dr. Baker chosen vaginal hysterectomy
7   with anterior colporrhaphy, was stress
8   urinary incontinence still a potential
9   risk of that procedure?
10     A.   A small risk, yes.
11     Q.   Okay.  Would the same be
12  true if he had chosen vaginal
13  hysterectomy plus paravaginal repair?
14     A.   Yes.
15     Q.   And would other forms of
16  incontinence, such as urge incontinence,
17  also have been potential risks, had he
18  chosen those procedures?
19     A.   Those are all risks in
20  general, yes.
21     Q.   Okay.  Do you have some
22  opinion that specifically gives -- I'm
23  sorry.  Let me withdraw that.
24         Is it your opinion that the

Page 109

1   risk of SUI following Prolift combined
2   with vaginal hysterectomy is higher than
3   it would have been with anterior
4   colporrhaphy or PVR?
5      A.   In general.  Not -- so we're
6   not speaking specifically of Mrs. Hammons
7   necessarily.  In general.
8      Q.   Well, sure.
9      A.   Yes.  That's been reported.
10     Q.   Okay.  And what's the
11  statistical difference between the risk
12  of SUI with Prolift versus native tissue
13  repair?
14     A.   I would need to refer to the
15  specific articles to give you an absolute
16  number.
17     Q.   Okay.  So specifically for
18  Mrs. Hammons, is it your opinion that
19  choosing the Prolift as opposed to
20  another native tissue repair of her
21  cystocele increased her risk of SUI or
22  another form of incontinence, I should
23  add?
24         MR. SLATER:  Objection.

28 (Pages 106 to 109)

Ann M. Weber, M.D.

Page 110

1       Compound.  Foundation.
2           THE WITNESS:  I believe the
3   literature supports any form of
4   incontinence after a Prolift
5   procedure is higher than native
6   tissue repairs.
7   BY MR. MORIARTY:
8       Q.   But standing here today --
9   sitting here today, you can't tell me
10  which article or what that rate is?
11          MR. SLATER:  Objection --
12          THE WITNESS:  No, I can't
13      pull that off the top of my head.
14  BY MR. MORIARTY:
15      Q.   Okay.  I want to talk about
16  what information Dr. Baker would have had
17  available to him.
18          We've been going about an
19  hour since the last break.  Are you good
20  to keep going?
21          MR. SLATER:  I could use a
22      break, actually.
23          THE WITNESS:  Yeah, this
24      would be a good time.  This is a

Page 111

1       good time for a break.
2           (Short break.)
3   BY MR. MORIARTY:
4       Q.   I want to ask you some
5   questions about sources of information
6   that would likely have been available to
7   Dr. Baker at the time he talked to
8   Mrs. Hammons in 2009.
9           MR. SLATER:  When you say
10      sources of information available,
11      do you mean that existed in the
12      world?
13          MR. MORIARTY:  Yes, sir.
14          MR. SLATER:  I see what you
15      have there.  And you're not going
16      to be able to lay a foundation to
17      establish what -- of what you most
18      of want to do, if you read the
19      depositions of the corporate reps
20      and the witnesses who were
21      involved in those documents.  So
22      I'm not really sure why you're
23      asking her these questions in a
24      case-specific deposition.  These

Page 112

1   are general questions about what
2   documents might have been
3   available in the world.
4           I'll see what you ask, but I
5       really think this goes beyond the
6       deposition.
7   BY MR. MORIARTY:
8       Q.   Doctor, I handed you what's
9   been marked Exhibit -- is it 9?
10      A.   Yes.
11          (Document marked for
12      identification as Exhibit
13      Weber-9.)
14          MR. SLATER:  Do you have a
15      copy for me?
16          MR. MORIARTY:  I'm sorry.  I
17      don't.  But I'll -- I can give you
18      this --
19          MR. SLATER:  Do you want to
20      make a proffer as to what it is?
21          MR. MORIARTY:  I'm going to
22      ask her.
23  BY MR. MORIARTY:
24      Q.   Doctor, do you see the

Page 113

1   fuchsia sticker at the bottom?
2       A.   Yes.
3       Q.   Okay.  This was marked as
4   Exhibit 6 in Dr. Baker's deposition.
5   Okay.
6       A.   Okay.
7       Q.   All right.  So, now,
8   whatever he said is what he said.  But if
9   Dr. Baker testified that he had documents
10  like this available, and assuming this
11  one was available in -- by May of 2009
12  when he took her to the operating room,
13  is this the kind of information from
14  which he could draw at least some
15  information about things like the risk of
16  the Prolift device?
17          MR. SLATER:  Wait a second.
18      I have an objection.  Objection to
19      the form.  It's compound.  It's
20      overbroad.  The foundation is
21      faulty and false.
22          You can answer if you want.
23  BY MR. MORIARTY:
24      Q.   Okay.

Ann M. Weber, M.D.

Page 114

1    A.   I'm sorry.  I lost you in
2  the middle of that question.
3    Q.   Okay.  Patient brochures, to
4  the extent that a doctor had one
5  available and to the extent that this was
6  available, if it was available to
7  Dr. Baker, this is the kind of thing that
8  he and his patient could use as at least
9  one source of information to discuss
10 risks and complications of the procedure
11 that he proposed, correct?
12   A.   Any of his patients, not
13 Mrs. Hammons in particular?
14   Q.   Including Mrs. Hammons.
15       MR. SLATER:  Objection.
16       THE WITNESS:  Well, they're
17   different.
18       MR. SLATER:  Same objection
19   I made before.  It's a patient
20   brochure.  Yes, it is.
21 BY MR. MORIARTY:
22   Q.   Okay.
23   A.   Is it something that
24 Mrs. Hammons would have seen?

Page 115

1    Q.   Well, that's something that
2  a jury will decide or a judge will decide
3  if this doesn't get proper foundation.
4  The question is, if this was available to
5  Dr. Baker, is this in general the kind of
6  information that he would have had
7  available to discuss with the patient,
8  including like Mrs. Hammons --
9       MR. SLATER:  Objection to
10   the form of the question.
11 BY MR. MORIARTY:
12   Q.   -- in May of 2009?
13       MR. SLATER:  Objection to
14   the form of the question.  No
15   foundation.  Do you want to make a
16   proffer that it was given to him,
17   which you know you can't do?
18       THE WITNESS:  It's a patient
19   brochure.  There were different
20   patient brochures available at
21   different times.
22 BY MR. MORIARTY:
23   Q.   I understand that.
24   A.   I'm not clear on what you

Page 116

1  want.
2    Q.   If the evidence is that
3  Dr. Baker had this document available to
4  him --
5    A.   That specific document?
6    Q.   Yeah.  It was marked in his
7  deposition, and he was asked about it.
8       MR. SLATER:  What does that
9       prove?  That's a misleading
10      question, deliberately misleading.
11      You know better than that.
12 BY MR. MORIARTY:
13   Q.   All I want to know is if
14 this was available to Dr. Baker and
15 Mrs. Hammons in May of -- March or May of
16 2009, this is the kind of information
17 that was available to give them some
18 information about Prolift and its risks.
19      MR. SLATER:  Objection.
20 BY MR. MORIARTY:
21   Q.   Yes or no?
22      MR. SLATER:  Same series of
23      objections.  Your question is, if
24      it was available, would it have

Page 117

1  been available?  Okay.  I object
2  to it for all the reasons I said
3  before.
4       You can answer.
5       THE WITNESS:  If it was
6  available, the kind of
7  information, not the exact
8  information, but the kind of
9  information would be something
10 that Dr. Baker would have
11 available to him.
12      (Document marked for
13 identification as Exhibit
14 Weber-10.)
15 BY MR. MORIARTY:
16   Q.   Exhibit 10.
17      (Whereupon, a discussion was
18 held off the record.)
19 BY MR. MORIARTY:
20   Q.   Doctor, how did you become
21 available -- how did you become aware of
22 Exhibit 10, the 2008 FDA notice?
23      MR. SLATER:  Objection.
24 Don't answer the question.

30 (Pages 114 to 117)

Page 118

1        Please ask about the Hammons
2   case.
3        Next question.
4   BY MR. MORIARTY:
5        Q.   Was the 2008 FDA notice
6   reasonably available to operating
7   surgeons in 2009?
8        MR. SLATER:  Objection to
9   the form of the question.
10       You can answer.
11       THE WITNESS:  Yes.
12  BY MR. MORIARTY:
13       Q.   To the best of your
14  knowledge, was there published
15  information available about dyspareunia
16  rates with pelvic mesh kits by May of
17  2009?
18       MR. SLATER:  Objection.
19  Don't answer the question.  It's a
20  general question.  It's not -- not
21  geared to this case.  Please move
22  on.
23       (Document marked for
24  identification as Exhibit

Page 119

1   Weber-11.)
2   BY MR. MORIARTY:
3        Q.   I'm handing you Exhibit 11.
4        MR. SLATER:  Are you
5   ignoring my objection?
6        MR. MORIARTY:  No.  I'm
7   going to ask a more specific
8   question.
9   BY MR. MORIARTY:
10       Q.   Is this article about
11  dyspareunia and mesh erosion after
12  vaginal mesh placement with a kit
13  procedure?
14       A.   Yes, that is the title.
15       Q.   Was it published in April of
16  2008?
17       A.   Yes.
18       Q.   In Obstetrics & Gynecology?
19       A.   Yes.
20       Q.   And that is The Green
21  Journal?
22       A.   Yes.
23       Q.   And is this the kind of
24  information that would have been

Page 120

1   available to Dr. Baker by virtue of his
2   membership in the American College of
3   Obstetrics and Gynecology, the D.O.
4   division, osteopathic?
5        MR. SLATER:  Objection.
6        THE WITNESS:  Yes.
7   BY MR. MORIARTY:
8        Q.   Handing you Exhibit 12.
9        (Document marked for
10  identification as Exhibit
11  Weber-12.)
12  BY MR. MORIARTY:
13       Q.   Have you ever seen this
14  document before?
15       A.   Yes.
16       Q.   Okay.  This is Dr. Lowman's
17  paper entitled "Does the Prolift System
18  Cause Dyspareunia?"
19       Is that the name of it?
20       A.   Yes.
21       Q.   Was it published in 2008?
22       A.   Yes.
23       Q.   Was it published in the
24  American Journal of Obstetrics &

Page 121

1   Gynecology?
2        A.   Yes.
3        Q.   Would this information have
4   been available to you when it was
5   published in 2008?
6        A.   Yes.
7        Q.   Was this kind of information
8   generally available to doctors who were
9   operating on the pelvic floor in 2008 and
10  2009?
11       MR. SLATER:  Objection.
12       THE WITNESS:  It was
13  generally available.
14       (Document marked for
15  identification as Exhibit
16  Weber-13.)
17  BY MR. MORIARTY:
18       Q.   Okay.  Doctor, is this --
19  Exhibit 13, is this an ACOG practice
20  bulletin from September 2007?
21       A.   Yes.
22       Q.   About pelvic organ prolapse?
23       A.   Yes.
24       Q.   And did you -- I don't know

Ann M. Weber, M.D.

Page 122

1  if "collaborate" is the right word.  Were
2  you involved in the drafting of this
3  document?
4      A.   Yes.
5      Q.    Would Dr. Baker, because of
6  his membership in ACOOG, have been aware
7  of this kind of information when it was
8  published?
9          MR. SLATER:  Objection.
10         THE WITNESS:  This was
11     published in The Green Journal
12     which he said he received.
13 BY MR. MORIARTY:
14     Q.   And I know at one point
15 there was an ACOG bulletin about which
16 you wrote a letter to the editor, and
17 there was an exchange back and forth.  Is
18 this the ACOG bulletin that was the
19 subject of that letter to the editor?
20     A.   No.  This is the revised.
21     Q.   Okay.  That's all I had to
22 ask you about that.
23         MR. SLATER:  Oh, it's the
24     same bulletin.  It's just the

Page 123

1      revised version.
2          THE WITNESS:  Correct.
3  BY MR. MORIARTY:
4      Q.   Well, when you say "revised
5  version," what do you mean?
6      A.   I mean that this was
7  published in September 2007 after
8  replacing a practice bulletin that was
9  published in February 2007, meaning this
10 is not the original practice bulletin;
11 this is the revised practice bulletin.
12     Q.   Okay.  To the best of your
13 knowledge, were there any limitations on
14 Dr. Baker's privileges to practice
15 surgery at Daviess Community Hospital?
16     A.   I have no knowledge of that.
17     Q.   All right.  Is the hospital
18 the entity that typically would
19 credential someone like Dr. Baker and lay
20 out the type of procedures they are
21 allowed to perform and not allowed to
22 perform?
23     A.   Yes.
24     Q.   All right.  I want to ask

Page 124

1  you about an opinion that you wrote at
2  Page -- Pages 9 through 10 of your report
3  in this case, Exhibit 1.  It's about this
4  training issue.
5      A.   Yes.
6      Q.   Do you have that there?
7          Now, Doctor, I don't know
8  the extent to which you have been
9  questioned about training issues that you
10 wrote in your primary report, Exhibit 2.
11 Okay.  So I'm sure Mr. Slater will tell
12 me if I'm asking questions that you've
13 already been asked about, but I need to
14 understand this --
15         MR. SLATER:  Counsel, if
16     your questions are specific to
17     this case, as I've been doing, I'm
18     not going to object.  If you're
19     going to ask general questions on
20     a report that's been out for three
21     and a half years, a little over
22     three years, you know, I'd rather
23     you not do it, because I'm going
24     to have to keep stopping her from

Page 125

1      answering.
2          We have an agreement that
3      this is supposed to be a
4      case-specific deposition.  She's
5      been deposed.  And more important,
6      Ethicon lawyers have had the
7      opportunity to depose Dr. Weber
8      for days and days and days on
9      multiple cases on her opinions.
10         MR. MORIARTY:  I understand
11     that.  But this opinion is
12     different.
13         MR. SLATER:  Well, let's see
14     what you ask.  If you're going to
15     ask general testimony, I'm not
16     going to let her answer, because
17     there's an agreement on this.
18 BY MR. MORIARTY:
19     Q.   Is it true that drug and
20 device manufacturers don't control how
21 Dr. Baker conducts his medical practice?
22         MR. SLATER:  Objection.
23         THE WITNESS:  The influence
24     that Ethicon has on a doctor like

32 (Pages 122 to 125)

Ann M. Weber, M.D.

Page 126

1    Dr. Baker is to select him for
2    training and lead him to believe
3    that he is qualified to perform
4    the Prolift surgeries, when,
5    according to their own internal
6    standards, they were looking
7    for -- they were targeting doctors
8    who had high volume, were
9    experienced pelvic floor surgeons.
10    According to those criteria, he
11    does -- he does not meet those
12    criteria.
13 BY MR. MORIARTY:
14    Q.   Okay.  I understand that's
15 the opinion in your report.  I'm asking a
16 different question.
17         When it comes to Dr. Baker's
18 decision about what drugs to prescribe or
19 devices to prescribe for his patients,
20 it's not the drug or device manufacturers
21 that control whether he does those things
22 or doesn't do those things, correct?
23         MR. SLATER:  Objection.  You
24    can answer.

Page 127

1         THE WITNESS:  He was
2    approached by sales
3    representatives and told he was
4    qualified to perform this
5    procedure and underwent -- to
6    perform the Prolift procedures,
7    and then underwent Ethicon's
8    training where they reinforced to
9    him that he was a suitable
10    candidate to perform Prolift
11    procedures in spite of what
12    they -- what their internal
13    documents show.
14 BY MR. MORIARTY:
15    Q.   Okay.  But when it comes to
16 actually prescribing the Prolift device
17 for a patient or not, that is up to the
18 judgment of Dr. Baker; isn't that true?
19    A.   It's up to the judgment of
20 Dr. Baker based on the information that
21 he'd received during his training, which
22 is inaccurate and misleading.
23    Q.   When Dr. Baker performed
24 surgery using any medical device, he

Page 128

1    didn't have to seek the permission of a
2    device company every time he did that,
3    did he?
4    A.   No.
5    Q.   Do you know what percentage
6 of surgeons perform Prolift, for example,
7 who never underwent the Ethicon-offered
8 training?
9    A.   No.
10    Q.   Even had Dr. Baker not
11 undergone the training, could he have
12 still used and prescribed the Prolift
13 device?
14    A.   My understanding of
15 Dr. Baker's testimony was that he would
16 not go rogue and use devices without that
17 kind of training.  The problem with the
18 training was that first it led him to
19 believe that he was qualified, and
20 provided him with inaccurate and
21 misleading information about how -- what
22 outcomes to expect from his patients,
23 which he then provided to his patients,
24 believing it to be true.

Page 129

1    Q.   Okay.  To the best of your
2 understanding, there's no requirement by
3 Indiana state law, Indiana regulation,
4 FDA regulation, anything that would
5 legally apply to Dr. Baker that would
6 require him to undergo Ethicon training;
7 is that true?
8    A.   Yes.
9    Q.   Okay.  I understand that
10 your opinion about which doctors should
11 have been trained and should not have
12 been trained is based on company
13 documents and, I think, testimony from
14 company witnesses.  I'm correct, am I
15 not?
16    A.   Yes.
17    Q.   Okay.  Is there any other
18 source of information that forms the
19 basis for your opinion that Dr. Baker
20 should not have been trained on Prolift
21 other than company documents and the
22 testimony of company witnesses?
23    A.   No.
24    Q.   In other words, you're not

33 (Pages 126 to 129)

Ann M. Weber, M.D.

Page 130

1  relying on any guidelines from ACOG or
2  AUGS or another organization like that
3  for the basis of this particular opinion
4  that we're talking about?
5       A.   Well, they referred to --
6  those guidelines that you point out do
7  refer to doctors having experience with
8  treating women with prolapse, so that
9  there -- those guidelines do exist and,
10  as guidelines, offer some guidelines --
11  I'm sorry.
12           They help define who's most
13  qualified based on experience and
14  training to perform reconstructive
15  surgery.
16       Q.   Do those guidelines set
17  volume limits, X number of procedures per
18  month or year?
19       A.   No, not those guidelines.
20  In the literature, there are studies of
21  the learning curve and how long it takes
22  to perform certain difficult --
23  technically difficult procedures.  But,
24  no, those numbers are not in the

Page 131

1  guidelines.
2       Q.   Okay.  And just because
3  Dr. Baker lives and practices surgery in
4  a rural part of southern Indiana doesn't
5  automatically mean that he's not a
6  skilled surgeon, true?
7       A.   His volume of prolapse
8  surgeries is very low.
9           MR. SLATER:  Dr. Weber, the
10       question was just because he's in
11       rural Indiana.  That's all that
12       was asked, right?
13           MR. MORIARTY:  Yes.
14           MR. SLATER:  Please stick to
15       the question.
16           THE WITNESS:  I'm sorry.
17       No, that does not reflect on his
18       skill as a surgeon.
19  BY MR. MORIARTY:
20       Q.   Okay.  And tell me what, in
21  your opinion -- does the volume of
22  procedures increase the skill level, or
23  is it the familiarity level, or are those
24  two interrelated?

Page 132

1       A.   I think they're
2  interrelated.
3       Q.   Do you have any evidence
4  from any source in this case to indicate
5  that Dr. Baker was not skilled when he
6  performed Prolift procedures?
7           MR. SLATER:  Objection.  You
8       can answer.
9           THE WITNESS:  The only
10       information I have specific to
11       that is Mrs. Hammons.  And she did
12       not experience any acute
13       intraoperative complications.
14  BY MR. MORIARTY:
15       Q.   Okay.  Now, I'll get back
16  later to what complications you believe
17  she did suffer as a result of the
18  May 2009 procedure.  But quickly tell me
19  what complications you believe she did
20  suffer from that surgery.
21       A.   She experienced progressive
22  Prolift mesh contraction that resulted in
23  vaginal anatomic distortion, pain, such
24  severe pain with intercourse that she has

Page 133

1  apareunia, vaginal mesh erosion, and
2  bladder mesh erosion.
3           MR. SLATER:  Could you read
4       that back?
5           (Whereupon, the court
6       reporter read back the requested
7       portion of testimony.)
8           MR. SLATER:  Thank you.
9  BY MR. MORIARTY:
10       Q.   In your opinion, are all of
11  those complications related to the mesh
12  or the transvaginal placement of the
13  mesh, or are any of them related to a
14  surgical technique issue or a skill
15  issue?
16       A.   The surgical technique issue
17  and the characteristics of the mesh.
18       Q.   What do you mean by "the
19  surgical technique issue"?
20       A.   Because of the way mesh
21  contracts during healing -- for example,
22  hernia repair surgeons have learned they
23  must overlap the boundaries of the hernia
24  by at least five centimeters to account

34 (Pages 130 to 133)

Ann M. Weber, M.D.

Page 134

1  for the kinds of contractions that occur.
2  In --
3       Q.   Okay.  I don't mean to cut
4  you off.  What I'm trying to get at with
5  this particular question -- and I
6  understand that you think that the use of
7  transvaginal mesh kits is defective and
8  it shouldn't have been done here.  Okay.
9       What I'm trying to figure
10 out is if it's the Prolift that caused
11 these complications that you just
12 mentioned or a specific lack of surgical
13 skill by Dr. Baker.
14      A.   Okay.  I understood your
15 question as surgical technique to refer
16 to the surgery --
17      Q.   No.
18      A.   -- the technique of the
19 Prolift itself.
20      The problem with the
21 surgical technique --
22      MR. SLATER:  Dr. Weber, all
23      he's asking is are you saying
24      Baker did it wrong, or are you

Page 135

1       saying that the Prolift procedure
2       is unsafe.  That's all he wants to
3       know.
4       THE WITNESS:  I'm saying the
5       Prolift procedure is unsafe in
6       terms of what happens
7       postoperatively.
8  BY MR. MORIARTY:
9       Q.   Okay.  I understand that.
10 I'm just trying to find out whether you
11 have an opinion in this case that a
12 particular aspect of Dr. Baker's surgical
13 skill was the result -- I'm sorry -- was
14 the cause of any of the complications
15 that you listed.  Okay?  Not the Prolift
16 device or the mesh itself, a particular
17 aspect of his surgical skill or lack
18 thereof.
19      A.   At least according to the
20 operative note as written, he performed
21 the Prolift procedure the way he had been
22 taught, trained by Ethicon.
23      That doesn't take into
24 account the problems with the technique

Page 136

1  itself, like the tension-free aspects and
2  how he would -- could have been trained
3  or not trained on that, because there's
4  no agreed-upon definition of tension.
5       But as I said, during the
6  operation, she did not experience any
7  acute complications.
8       Q.   Well, did she experience any
9  chronic complications that you would, to
10 a probability, attribute to his lack of
11 surgical skill?
12      A.   No.  It's not a surgical
13 skill issue specifically.
14      Q.   Just to put it another way,
15 and to make sure --
16      MR. SLATER:  We don't need
17      to put it another way.  We spent
18      ten minutes on it.  Come on.
19      Let's move on.
20 BY MR. MORIARTY:
21      Q.   To make sure I understand --
22      MR. SLATER:  If you don't
23      really understand that, Counsel --
24      really?  You really don't

Page 137

1       understand that?
2       MR. MORIARTY:  Okay.  That's
3       fine.
4  BY MR. MORIARTY:
5       Q.   I don't remember what
6  exhibit this was, Doctor.  This was
7  Dr. Baker's operative note.  Exhibit 6.
8       On the second page, I just
9  have a couple questions about this.  He
10 says, "A midline incision was made,"
11 talking about the section where he's
12 going to do the Prolift.
13      Do you see that?
14      A.   Yes.
15      Q.   And based on this report,
16 where do you understand that incision to
17 be in relationship with any incisions he
18 made for the hysterectomy?
19      A.   The midline incision's made
20 in the anterior vagina, from the point
21 outside distal -- nearest the urethral
22 natus to the vaginal cuff along the
23 anterior wall.
24      The incision that's made in

35 (Pages 134 to 137)

Ann M. Weber, M.D.

Page 138

1  the hysterectomy is typically
2  circumferential around the cervix itself.
3      Q.   And is that at the --
4  considered to be in the posterior portion
5  of the vagina?
6      A.   No.  That would be the apex.
7      Q.   Okay.  On the second page,
8  it says, "There was a small hole noted in
9  the membrane between that plane and the
10  intra-abdominal cavity which was closed
11  with purse-string 2-0 Vicryl."
12      What is your understanding
13  of where that hole was and through what
14  planes?
15      A.   The hole was in the
16  peritoneum, so the peritoneal membrane is
17  what he's describing there.
18      Q.   All right.  And then a few
19  lines down it says, "There was a lot of
20  fluid that was draining into the vagina."
21      Do you have an opinion as to
22  what the source of that fluid was?
23      A.   It's not something that I
24  can say with certainty from his operative

Page 139

1  report.
2      Q.   Do you have an opinion, to a
3  probability?
4      A.   No.
5      Q.   Do you have a list of
6  differential possibilities for the source
7  of that fluid?
8      A.   The differential would be
9  the bladder and the intraperitoneal
10  cavity.
11      Q.   What fluid would drain from
12  the intraperitoneal cavity all the way
13  into the vagina in a procedure like this?
14      A.   Well, he has the closure of
15  the peritoneum that -- through a Vicryl
16  suture.  It's not something that's
17  watertight.  There's a certain amount of
18  fluid that's in the intra-abdominal
19  cavity that could come through that.
20  Obviously, there's no characterization of
21  the volume other than "a lot of fluid."
22      Q.   Okay.  Was it your
23  understanding that Dr. Lackey -- I'm
24  sorry.  Was it your understanding that

Page 140

1  Dr. Baker's partner also was a user of
2  Prolift?
3      A.   I don't recall that
4  specifically from the deposition
5  testimony, whether it was specific to
6  Prolift or a different type of mesh
7  procedure.
8      Q.   Okay.  We're talking about
9  this Dr. Francis who assisted in the
10  procedure?
11      A.   Yes.
12      Q.   Do you know whether
13  Dr. Lackey's partners are users of
14  transvaginal mesh products?
15      A.   I don't know.
16      Q.   You know Dr. Heit was,
17  correct?
18      A.   A user of mesh procedures?
19      Q.   Yes.  Transvaginal mesh
20  procedures in 2009.
21      A.   Yes, I believe so, yeah.
22      Q.   Was Dr. Heit the first
23  physician to measure the dimensions of
24  Mrs. Hammons' vagina in 2012?

Page 141

1      A.   Yes.
2      Q.   And by then, Mrs. Hammons
3  had had the vaginal hysterectomy,
4  anterior Prolift, and a posterior repair
5  by Dr. Lackey?
6      A.   Yes.
7      Q.   Is it likely that the
8  combination of a vaginal hysterectomy,
9  any type of anterior repair for a
10  cystocele, and a posterior repair for a
11  rectocele/enterocele, would shorten the
12  vagina?
13      A.   We're speaking in general?
14      Q.   Yes.
15      A.   There's a risk of that.
16      Q.   Okay.  And that risk would
17  apply to Mrs. Hammons?
18      A.   It would apply to
19  Mrs. Hammons.  We have the evidence from
20  Dr. Heit's exam regarding abnormalities
21  he found in the anterior vagina related
22  to the Prolift mesh where it was tense
23  and taut, and the mesh contraction would
24  be contributing based on his exam to the

Ann M. Weber, M.D.

Page 142

1 shortened vaginal length at that point.
2      Q.    Did Dr. Heit mention in his
3 records or in his deposition that it was
4 his opinion that the shortened vagina was
5 multifactorial?
6      A.    Yes, I believe that was his
7 deposition testimony.
8      Q.    Would Mrs. Hammons, by
9 virtue of her age and her menopausal
10 status, would that also increase the risk
11 of her having a shortened vagina?
12      A.    No.  I don't believe so.
13      Q.    Why not?
14      A.    In my clinical experience,
15 only a severe atrophy that occurs in
16 women who are much farther past their age
17 of menopause results in a change in the
18 vaginal dimensions.  For someone like
19 Mrs. Hammons, the atrophy is more
20 superficial and related to the changes in
21 the epithelium of the vagina.
22      Q.    How many years was she
23 postmenopause by May of 2009?
24      A.    I don't remember exactly.

Page 143

1 It would be less than ten.
2      Q.    Is ten about the time that
3 the risk of vaginal shortening begins
4 secondary to menopause?
5      A.    In my clinical experience,
6 I've seen that in -- in elderly women,
7 70 plus.
8      Q.    Okay.
9      A.    If this is a good stopping
10 point, perhaps we can take a break.
11      Q.    Sure.
12          (Short break.)
13 BY MR. MORIARTY:
14      Q.    Sorry to circle back on two
15 things that I forgot about before.  I
16 want to go back to what I was asking you
17 about, stress urinary incontinence after
18 Prolift.  And I think you said in general
19 you -- your opinion is that Prolift
20 increased the risk of SUI over native
21 tissue repairs.
22          Is it your opinion that it
23 increased the risk for Mrs. Hammons?
24      A.    To my understanding, from

Page 144

1 Dr. Zipper's report, she wasn't having
2 urinary incontinence at the time he saw
3 her.  So whether that had anything to do
4 with stress incontinence symptoms she had
5 in between, I can't say that with
6 certainty.
7      Q.    Okay.  And she didn't
8 actually complain of stress urinary
9 incontinence until after Dr. Lackey
10 performed his posterior repair, correct?
11      A.    I would have to see the
12 records to answer that with certainty.
13      Q.    One quick question about
14 Exhibit 10, which is that FDA statement
15 in 2008.  At the bottom of the first
16 page, there are some recommendations,
17 correct?
18      A.    Yes.
19      Q.    And FDA did not recommend
20 that the procedure be -- the Prolift
21 procedure be restricted to -- I'm sorry.
22 Let me withdraw that question.
23          FDA's notification was not
24 just about one specific company's

Page 145

1 product, correct?
2      A.    Correct.
3      Q.    And these recommendations
4 didn't include that only high-volume
5 surgeons should be trained on the
6 procedure --
7          MR. SLATER:  Objection.
8 BY MR. MORIARTY:
9      Q.    -- and perform the
10 procedure, correct?
11          MR. SLATER:  Objection.  Why
12 are we going through this, sir?
13          Sir, please don't ignore
14 that I'm talking to you.  I never
15 appreciate that.
16          MR. MORIARTY:  Because my
17 answer is not going to satisfy
18 you.
19          MR. SLATER:  I don't
20 understand why you are questioning
21 her about a PHN that she wrote
22 about three years ago when she's
23 been deposed about it already.  I
24 don't understand why you're doing

Ann M. Weber, M.D.

Page 146

1  this.
2         MR. MORIARTY:  Because this
3  was available before Dr. Baker
4  operated.
5         MR. SLATER:  So what?  She's
6  been deposed on it.
7         MR. MORIARTY:  Just either
8  tell her to answer or not.
9         MR. SLATER:  Please move on
10  to something that's case-specific.
11  BY MR. MORIARTY:
12     Q.   In 2009, were reasonably
13  prudent pelvic surgeons like Dr. Baker
14  performing Prolift procedures?
15     A.   Surgeons were performing
16  Prolift procedures based on -- yes, they
17  were.
18     Q.   Okay.  So Dr. Baker was not
19  committing malpractice when he used
20  Prolift on Mrs. Hammons, correct?
21     A.   I'm not giving
22  standard-of-care opinions on Dr. Baker.
23     Q.   Okay.  Either way, that he
24  was or was not within the standard of

Page 147

1  care, correct?  You're giving no opinion
2  about that subject?
3         MR. SLATER:  That's correct.
4         THE WITNESS:  Correct.
5         MR. SLATER:  She's not
6  proffered on standard of care.
7  BY MR. MORIARTY:
8     Q.   Okay.  Did Dr. Lackey's
9  procedure --
10         (Document marked for
11  identification as Exhibit
12  Weber-14.)
13  BY MR. MORIARTY:
14     Q.   I'll give you this operative
15  report if you need to refresh your
16  memory.  We're up to 14.  This is
17  Dr. Lackey's procedure note from
18  December 15, 2009.
19     A.   Yes.
20     Q.   All right.  And did
21  Dr. Lackey perform any sort of anterior
22  repair during this procedure?
23     A.   No.
24     Q.   So at the time of this

Page 148

1  procedure in December of 2009, the
2  Prolift was at least managing
3  Mrs. Hammons cystocele, correct?
4     A.   She did not have a recurrent
5  cystocele at this point.  That's correct.
6     Q.   Okay.  From your
7  understanding of Dr. Heit's operative
8  notes -- and I will mark them -- did he
9  ever actually perform an anterior
10  prolapse procedure?
11         (Document marked for
12  identification as Exhibit
13  Weber-15.)
14  BY MR. MORIARTY:
15     Q.   So 15 is his 2012 procedure.
16         (Document marked for
17  identification as Exhibit
18  Weber-16.)
19  BY MR. MORIARTY:
20     Q.   And 16 is the January 2013
21  procedure.
22         So you're looking at the one
23  from November 28, 2012?
24     A.   Yes.

Page 149

1     Q.   Did he -- as far as you can
2  tell from this operative report, did he
3  perform any sort of anterior support
4  procedure?
5     A.   No, he did not.
6     Q.   Okay.  And his pre- and
7  postoperative diagnosis didn't include
8  any recurrent cystocele, did they?
9     A.   No.
10     Q.   And the same is true of the
11  January 28, 2013, procedure?
12     A.   Yes.
13     Q.   You're not claiming in this
14  case, are you, that Mrs. Hammons has
15  chronic hip, knee, or lower back pain as
16  a result of a Prolift procedure, are you?
17     A.   No.
18     Q.   Other than what we've
19  already discussed about the lack of an
20  apical repair and understanding that you
21  have not yourself actually performed a
22  Prolift procedure, is there anything in
23  Dr. Baker's operative note of May 2009
24  that stands out to you as unusual or

38 (Pages 146 to 149)

Ann M. Weber, M.D.

Page 150

1 inappropriate?
2      A.   No.
3      Q.   And is the same true with
4 his description of the hysterectomy?
5      A.   Yes.
6      Q.   Dr. Baker's first post-op
7 office visit was May 17, 2009.  And I
8 believe at that point in your report you
9 mentioned that she was having some
10 complaints of urinary problems.
11          Was it appropriate for him
12 to tell her at that point essentially to
13 give it more time?
14          May 17, 2009.
15     A.   Okay.  Yes.
16     Q.   And did whatever urinary
17 symptoms she complained about on May 17,
18 2009, seem to resolve over the course of
19 the next few office visits?
20     A.   Yes.
21     Q.   In June -- I'm sorry.  On
22 June 9, 2009, I think Dr. Baker's office
23 note reflects that he was seeing a
24 suture.  Is it your opinion that that

Page 151

1 was, in fact, a non -- as of then,
2 not-yet-absorbed suture?
3      A.   I can only go by his
4 records.  If he reported that he saw a
5 suture, it's probably a suture.
6      Q.   Okay.  It's not your opinion
7 that she had a vaginal mesh exposure at
8 that point, June of 2009?
9      A.   No.
10     Q.   So on July 20th of 2009,
11 Mrs. Hammons complains to Dr. Baker about
12 dyspareunia, correct?
13     A.   Yes.
14     Q.   And Dr. Baker writes in his
15 note, "This was mostly at the back cuff."
16 Did he not?
17     A.   On the back cuff, yes.
18     Q.   What is the differential
19 diagnosis, in your opinion, for the
20 causes of that dyspareunia at that
21 location on July 20, 2009?
22     A.   The differential diagnosis
23 would include tenderness from the scar
24 from the hysterectomy, tenderness from a

Page 152

1 problem with the anterior mesh, which
2 would include a contraction, infection.
3 She could possibly have a pelvic
4 infection that he was feeling a
5 tenderness at that point.
6      Q.   Anything else?
7      A.   Those are the main ones, I
8 think.
9      Q.   To the best of your
10 understanding from these medical records
11 and the testimony, she did not have
12 either a mesh infection or a pelvic
13 infection at that point; is that true?
14     A.   Yes.
15     Q.   Were there any complaints of
16 dyspareunia recorded in the medical
17 records -- withdraw that question.
18          Were there any complaints of
19 dyspareunia recorded in the medical
20 records between Dr. Lackey's procedure in
21 December of 2009 and January of 2012?
22 I'm just referring to what was recorded
23 in the medical records.
24     A.   So, in my report, I'm just

Page 153

1 referring to records from Dr. Lackey.
2      Q.   I'm sorry.  Could you tell
3 me what page you're looking at?
4      A.   I'm on Page 3 at the bottom,
5 which is the July 20, 2009, with
6 Dr. Baker.
7      Q.   Okay.
8      A.   And you're asking about the
9 time -- I'm sorry.  Could you remind me
10 of the time frame that you're asking
11 about?
12     Q.   Yeah.  My question was
13 between Dr. Lackey's procedure in
14 December of 2009 and January of 2012.
15     A.   January of 2009?
16     Q.   No.  Between Dr. Lackey's
17 surgery of December 2009 and January of
18 2012, is there any voiced complaint in
19 the medical records of dyspareunia?
20     A.   I gotcha.  In my report, I'm
21 just referring to Dr. Lackey.  And I
22 don't have the information from
23 Dr. Rohrer as to whether she reported
24 that to him in that time period.

39 (Pages 150 to 153)

Ann M. Weber, M.D.

Page 154

1       Q.    Okay.  So as of right now,
2  you don't know the answer?
3       A.    Correct.
4       Q.    Okay.  Let me go back to
5  July 20th of 2009.  In your report, you
6  gave the opinion that the most likely
7  cause of her dyspareunia at that point
8  was mesh contraction; is that right?
9       A.    Yes.
10      Q.    And do you have an opinion,
11 to a reasonable degree of medical
12 probability, as to the degree of that
13 contraction at that point?
14      A.    Not a specific degree.
15      Q.    Had somebody operated on her
16 at that point and removed the mesh, would
17 it have been flat, folded, bunched?  Do
18 you have an opinion on that?
19      A.    She's experiencing pain at a
20 location where the mesh arms are
21 inserting into the pelvic side wall.  So
22 the Prolift mesh contraction that was
23 going on at that point leading to that
24 pain, I believe that the findings, if

Page 155

1  someone took that out, would represent
2  the bridging fibrosis and the scar
3  plating that happens with mesh
4  contraction.
5       Q.    Okay.  So you don't have an
6  opinion, to a probability, that there was
7  folding of the mesh or bunching of the
8  mesh as of July of 2009?
9            MR. SLATER:  Objection.
10 Mischaracterization.  Foundation.
11           THE WITNESS:  Well, we know
12 from reports in the literature
13 what contraction looks like.
14 Mrs. Hammons didn't have that kind
15 of an evaluation.
16           But based on her symptoms at
17 that point and then the course
18 that she followed over the next
19 several years, that definitively
20 demonstrated mesh contraction.
21           At this point, she's having
22 some degree of mesh contraction
23 that's responsible for her
24 dyspareunia.  And then it follows

Page 156

1  a predictable course over the next
2  several years where the
3  contraction becomes more and more
4  evident, until we reach Dr. Heit's
5  exam where he finds that the
6  anterior vagina is tense and taut
7  and tender as the cause of her
8  dyspareunia.
9  BY MR. MORIARTY:
10      Q.    Okay.  As a complaint of
11 dyspareunia, just as a subjective
12 complaint, was it, I guess, stable from
13 the summer of 2009 up until Dr. Heit saw
14 her in the summer of 2012?
15      A.    Mrs. Hammons reported in her
16 deposition testimony that after the
17 Prolift procedure, she was never able to
18 complete the act of sexual intercourse.
19 Her physical findings on examination
20 changed over time as the degree of mesh
21 contraction became more severe.
22      Q.    They changed how?  Her
23 physical findings changed how?
24      A.    They changed from when

Page 157

1  Dr. Baker initially felt the tenderness
2  at the apex of the vagina, which is where
3  the top anterior body of the Prolift mesh
4  is, and the two deep mesh arms of the
5  Prolift.
6            Dr. Lackey, who palpated
7  mesh in the anterior vagina, and then
8  Dr. Heit, who not only palpated the mesh
9  as being contracted and a source of her
10 pain, he found at surgery that it had
11 contracted to such an extent that it was
12 bunched and rolled and crumpled
13 underneath the latter base of the
14 urethra, not extending the length of the
15 anterior vagina as it was intended to do.
16      Q.    Did Dr. Heit testify that
17 that's because of contraction?
18      A.    Yes, I believe he did.
19      Q.    In your answer, you said
20 definitive demonstration of mesh
21 contraction.
22           What are you referring to
23 was definitively demonstrated that there
24 was mesh contraction?

Ann M. Weber, M.D.

Page 158

1      A.    Dr. Heit's description on
2  his examination, Dr. Heit's findings in
3  the operating room, the fact that the
4  mesh was so contracted and causing
5  distortion and adherence under the
6  bladder base that he injured the bladder
7  twice in the course of trying to remove
8  the Prolift mesh, and the pathology
9  findings that describe the gross
10  specimens as rubbery and firm, which is a
11  description that's classic for the
12  bridging fibrosis scar plating that
13  happens with the Prolift mesh.
14      Q.    Okay.  Is there any
15  diagnosis actually in the medical records
16  of contraction?  Did anybody write that
17  as a diagnosis in the medical records?
18      A.    I would have to look to see
19  if the exact word exists.
20      Q.    Did anybody write the word
21  or words "roping," "fraying," or
22  "degradation of mesh" in Mrs. Hammons'
23  medical records?
24      A.    Not to my knowledge, no.

Page 159

1      Q.    To the best of your
2  understanding, is there any published
3  literature which describes mesh
4  contraction like that -- I'm sorry.
5  That's poorly phrased.
6          To the best of your
7  understanding, is there any published
8  medical literature which, when describing
9  this phenomena of contraction, describes
10  something like what Dr. Heit saw at
11  surgery?
12      A.    Yes.
13      Q.    Okay.  Do you know any
14  studies, off the top of your head?
15      A.    Yes.
16      Q.    Tell me one or two of them.
17      A.    There's a study performed
18  by -- Velemir is the first author.
19      Q.    You're going to have to
20  spell that for our court reporter.
21      MR. SLATER:  V-E-L-E-M-I-R.
22      THE WITNESS:  And Jacquetin
23  is the last author.
24  J-A-C-Q-U-E-T-I-N.

Page 160

1  BY MR. MORIARTY:
2      Q.    In the same study?
3      A.    Yes.
4      Q.    Okay.
5      A.    And this was a study of
6  ultrasound signs of mesh contraction in
7  women after the Prolift procedure.
8          And they found that
9  87 percent of women had moderate to
10  severe retraction by ultrasound, and they
11  described that as crumpled, folded,
12  bunched.  They measured the mesh
13  thickness and found that the mesh
14  thickness increased in a direct
15  relationship with the level of mesh
16  retraction.
17          And in addition, we know
18  that these same patients experienced a
19  painful mesh contraction of more than
20  19 percent.  So these are the ultrasound
21  and clinical findings that are exactly
22  what happened to Ms. Hammons.
23      Q.    Is there another study?
24      A.    There are other mesh

Page 161

1  studies -- I'm sorry -- other ultrasound
2  studies that show mesh contraction.
3  Another one is by Tunn, T-U-N-N.
4      Q.    Okay.  Were there any
5  ultrasounds even ordered of Mrs. Hammons
6  between Dr. Baker's procedure in 2009 and
7  today, ultrasounds of her pelvis?
8      A.    And the first date was?
9      Q.    Dr. Baker's procedure in May
10  of 2009.
11      A.    She had a pelvic ultrasound
12  in that time, yes.
13      Q.    Okay.  Do you know when that
14  was?
15      A.    It was ordered by
16  Dr. Lackey, I believe.
17      Q.    Did it show bunched mesh or
18  any abnormality with the Prolift mesh?
19      A.    The indication was not
20  specifically looking at the mesh.  What
21  I've been describing to you is those are
22  research findings.  Ultrasound to
23  demonstrate mesh, that was not the
24  clinical indication given for the

41 (Pages 158 to 161)

Ann M. Weber, M.D.

Page 162

1 ultrasound that was performed at that
2 time.
3          Q.    Why do you rule out vaginal
4 atrophy and vaginal shortening as causes
5 of Mrs. Hammons' dyspareunia?
6          MR. SLATER:  Objection.
7 Compound.  Confusing.  Lack of
8 foundation.
9          THE WITNESS:  I don't
10 believe I did that, to rule those
11 diagnoses out.
12 BY MR. MORIARTY:
13          Q.    Well, I asked you for your
14 differential diagnosis of her dyspareunia
15 in July of 2009.  Okay.  And when you
16 gave it to me, I assumed that -- let me
17 back up.
18          The differential diagnosis
19 that you gave me for her complaints of
20 dyspareunia were hysterectomy scar,
21 anterior mesh, either infected or
22 contracting, or a pelvic infection.
23 Okay.  So let me circle back and ask you.
24          Wouldn't vaginal atrophy and

Page 163

1 a foreshortened vagina be in the
2 differential diagnosis?
3          MR. SLATER:  Objection.
4 Lack of foundation.
5          THE WITNESS:  Her physical
6 findings at the time of Dr. Heit's
7 examination show specifically
8 where the pain is in the anterior
9 vagina.  If the vaginal atrophy
10 were a small contributing factor,
11 then you would expect that to be
12 relieved by the appropriate use of
13 estrogen.
14          And, in fact, she had been
15 using estrogen.  And that wasn't
16 sufficient to relieve her
17 dyspareunia.
18 BY MR. MORIARTY:
19          Q.    Okay.  Let me -- let me ask
20 you this.
21          Are atrophy and a shortened
22 vagina at least in the differential
23 diagnosis?
24          A.    Of anyone?

Page 164

1          Q.    Of Mrs. Hammons in 2009.
2          A.    So we're talking
3 specifically at the 12-week visit with
4 Dr. Baker?
5          Q.    In July of 2009.
6          A.    Okay.
7          Q.    I'm just asking if atrophy
8 and a shortened vagina are at least in
9 the differential diagnosis.
10          A.    In general terms.  In his
11 examination, he described the pain
12 specifically at the back cuff where the
13 body of the Prolift and the deep arms are
14 located.
15          Q.    Okay.  After Dr. Lackey's
16 surgery in December of 2009, would
17 atrophy and a shortened vagina be in the
18 differential diagnosis for Mrs. Hammons'
19 complaints of dyspareunia?
20          A.    Those would be potentially
21 in the differential, yes.
22          Q.    All right.  And how do you
23 rule them out?
24          I'm sorry.  Do you rule them

Page 165

1 out as part of the differential
2 diagnosis?
3          A.    It depends on the
4 examination at that point and if the
5 findings point to those features of
6 atrophy or foreshortening as a potential
7 component of her dyspareunia.  And when
8 Dr. -- after he did what he felt he could
9 do for her to help her, he decided to
10 send her to a specialist, the kind of
11 person who was taking care of these mesh
12 complications day in and day out.  And
13 that's when he found the tense, tender,
14 taut, anterior vagina where the anterior
15 Prolift had been placed.
16          Q.    Okay.  From whatever
17 descriptions Dr. Lackey had in his
18 records or in his deposition about
19 Mrs. Hammons' complaints of dyspareunia,
20 whenever she made them after December of
21 2009 and before he referred her to
22 Dr. Heit, okay, would atrophy and a
23 shortened vagina be in the differential
24 diagnosis for Mrs. Hammons?

42 (Pages 162 to 165)

Ann M. Weber, M.D.

Page 166

1    A.   They would be in the
2  differential, yes.
3    Q.   Okay.  And do you have an
4  opinion, to a probability, just based on
5  Dr. Lackey's records and deposition
6  testimony, whether that should be ruled
7  out as a cause of Mrs. Hammons'
8  complaints of dyspareunia?
9    A.   It should be evaluated.  I
10  don't recall off the top of my head, from
11  the office visits that she had, whether
12  he described atrophy at those visits.
13    Q.   From your understanding of
14  the medical records, did Mrs. Hammons use
15  the estrogen cream that she was
16  prescribed as it was prescribed?
17    A.   I'm sorry.  I don't remember
18  that off the top of my head.
19    MR. MORIARTY:  I'm happy to
20    keep going.  But if you all want
21    to get your sandwiches and eat,
22    you're more than welcome to do
23    that.  And if Dr. Weber wants to
24    take a few-minute break to get

Page 167

1    something to eat, that's fine,
2    too.
3    (Brief interruption.)
4  BY MR. MORIARTY:
5    Q.   Okay.  Doctor, these are the
6  two pages that have the notes for that
7  visit.
8    A.   Okay.  Thank you.
9    Q.   Got it?  Why don't you just
10  quickly look at the bottom and the typed
11  notes on the second page.
12    A.   Okay.
13    Q.   Doctor, while we're after
14  the lunch break, I started by going to
15  January 9, 2012.  And I just want to
16  quickly repeat the lead-in, because there
17  was a computer glitch with the court
18  reporter.  Okay?
19    A.   Yes.
20    Q.   All right.  So Mrs. Hammons
21  returns to Dr. Lackey January 9, 2012,
22  correct?
23    A.   Yes.
24    Q.   And this is after some

Page 168

1  hiatus of a year or more since he had
2  last seen her; is that right?
3    A.   Yes.
4    Q.   Now, one of the complaints
5  and one of the physical findings at that
6  point was a recurrence of her prolapse,
7  correct?
8    A.   Yes.
9    Q.   And the recurrence was a
10  rectocele; is that right?
11    A.   Yes.
12    Q.   In other words, whatever
13  native tissue repair Dr. Lackey performed
14  in December of 2009 was not successful
15  beyond at least January of 2012, correct?
16    A.   Yes.
17    Q.   All right.  In other words,
18  it's a recurrence of her posterior
19  prolapse?
20    A.   Yes.
21    Q.   Some doctors would call it a
22  failure of the first procedure; is that
23  right?
24    A.   A failure of the procedure

Page 169

1  that Dr. Lackey performed?
2    Q.   Yes.
3    A.   Yes.
4    Q.   Okay.  In that same visit,
5  she's complaining of dyspareunia, is she
6  not?
7    A.   Actually, that's apareunia.
8  The inability to have intercourse at all,
9  apareunia.
10    Q.   All right.  So she had
11  dyspareunia to the point where they
12  stopped trying?
13    A.   Yes.
14    Q.   In Dr. Lackey's physical
15  examination, does he note atrophy?
16    A.   Yes.
17    Q.   Does he describe it in any
18  more detail than that?
19    A.   No.
20    Q.   Would the differential
21  diagnosis for her dyspareunia and
22  apareunia include atrophy, the rectocele
23  surgery from 2009, the vaginal
24  hysterectomy and Prolift procedure from

43 (Pages 166 to 169)

Ann M. Weber, M.D.

Page 170

1  May of 2009, at least those things?
2      A.   I think, if I understand
3  your question correctly, the anterior
4  Prolift and hysterectomy are joined by an
5  "and."
6      Q.   Well, it was a combined
7  procedure, correct?
8      A.   Correct.  So in that case,
9  yes.
10      Q.   All right.  I believe on
11  August 3rd, 2012, Dr. Rohrer mentioned
12  something in his notes about a surgeon
13  puncturing the bladder prior to that
14  time.  Did you see that in the notes when
15  you reviewed them?
16      A.   I did.
17      Q.   And that's a mistake, is it
18  not?
19      A.   I believe so, based on the
20  operative report.  That was not recorded.
21      Q.   All right.  Was Mrs. Hammons
22  having overactive bladder symptoms in the
23  summer of 2012, either based on notes by
24  Dr. Lackey or Dr. Rohrer?

Page 171

1      A.   Now, overactive bladder
2  typically refers to the constellation of
3  urgency, frequency, and urge
4  incontinence.  What she was describing
5  when she saw Dr. Lackey on August 14th
6  was leaking urine without any warning.
7      Q.   And you're talking about
8  2012, correct?
9      A.   Yes.  So that's not -- that
10  brief description is not really
11  consistent with urge incontinence.
12  That's typically labeled under the rubric
13  of overactive bladder.
14      Q.   I'm sorry.  I didn't
15  understand that.  I thought you were
16  saying it wasn't overactive bladder.  Are
17  you saying it is?
18      A.   No, no.  Leaking without
19  warning, without an overwhelming sense of
20  urgency, that is not OAB.
21      Q.   So she has that complaint
22  that she's leaking without the sense of
23  urgency.  What's your differential
24  diagnosis of that problem at that point?

Page 172

1      A.   Urethral instability,
2  overflow incontinence, stress
3  incontinence, fistula, ectopic ureter,
4  restrictive bladder disease, which has a
5  number of causes.  I think those are the
6  main ones.  Oh, excuse me.  Urinary tract
7  infection.
8      Q.   Eventually, Dr. Heit finds
9  mesh bunched in the midline, does he not?
10      A.   Yes.
11      Q.   All right.  Other than
12  contraction, what are the possible causes
13  of that finding?
14      A.   In general terms, not
15  specific to Mrs. Hammons, it could be
16  implantation technique.  It could be
17  something -- some external influence like
18  radiation therapy that would have an even
19  more pronounced scarring effect,
20  particularly -- well, let's just go
21  there.  Let's just stop there.  Those are
22  the main ones that I can think of.
23      Q.   So several times in your
24  report in this case, you refer to

Page 173

1  Dr. Heit mentioned that he thought it was
2  a surgical technique issue.  Do you
3  disagree with him?
4      A.   I disagree to the extent
5  that his findings are the worse
6  representation of mesh contraction.  And
7  when she had been examined earlier in
8  time, less severe manifestations of the
9  mesh contraction existed.  From surgical
10  videos, et cetera, we know that the
11  Prolift mesh often doesn't go in flat.
12  It's crumpled, roping, pore collapse.
13      And at that point, that's
14  not something that can be visualized by
15  the surgeon after the vaginal epithelium
16  has been closed.
17      Q.   Okay.  Maybe I didn't ask a
18  very good question.
19      Dr. Heit, in his -- in at
20  least his deposition, said that he
21  thought it was a technique error by
22  Dr. Baker, the implant.  Do you disagree
23  with Dr. Heit?
24      A.   I believe what Dr. Heit was

Ann M. Weber, M.D.

Page 174

1  explaining in his deposition testimony
2  was, as if the bunching and crumpling,
3  had it existed to the extent it was when
4  he first saw her all along the way, but
5  with the benefit of the longitudinal
6  records that we have, we can see that, at
7  least to the extent when Dr. Baker saw
8  her at 12 weeks and he was palpating the
9  vaginal apex where the deep arms of the
10  anterior Prolift mesh go and the deep
11  aspect of the body of the Prolift mesh,
12  by his recorded exam, the mesh did extend
13  from the vaginal apex to the location
14  under the bladder base.
15         So to the extent that that
16  represents the coverage that the body of
17  the Prolift mesh is supposed to account
18  for, that didn't -- later in time then,
19  as the contraction progressed, Dr. Heit
20  had his findings.
21         So that in -- if there was
22  folding or clumping, we know there's
23  floor collapse, it would be of a
24  relatively less degree when Dr. Baker saw

Page 175

1  her at 12 weeks, because he documented
2  that the mesh extended from the apex
3  proximally, versus what Dr. Heit found,
4  which was the concentration of the
5  clumping mesh below the bladder base and
6  the urethra and closer to the outside.
7     Q.   Okay. I'm not fully
8  understanding your answer. So let me try
9  to follow up.
10         I assume, based on what I
11  know of your beliefs about mesh
12  contraction, that if Dr. Baker put the
13  mesh in perfectly flat, the way it was
14  designed to be put in, there could be
15  contraction that causes a patient
16  problems, correct?
17         MR. SLATER: Objection.
18  Lack of foundation.
19         THE WITNESS: There will be
20  contraction, because mesh
21  contracts under all circumstances
22  in all women. In some women, it
23  will cause them complications.
24  BY MR. MORIARTY:

Page 176

1     Q.   Okay. Do we know what that
2  "some" is, in a percentage?
3     A.   I can give you examples from
4  the literature.
5     Q.   No, that's okay.
6         All right. So Scenario 2.
7  If Dr. Baker puts in the mesh and he
8  doesn't lay it completely flat and
9  contraction occurs, could it accentuate
10  the -- whatever fold there was at the
11  time of the implant?
12     A.   I'm sorry. Now you've lost
13  me. Can you repeat or rephrase?
14     Q.   I asked, do you disagree
15  with Dr. Heit that this configuration he
16  found was a technique error by Dr. Baker.
17  And I think what you're saying is that --
18  I think what you're saying -- and please
19  correct me if I'm wrong -- is that
20  Dr. Baker could have put it in wrong to
21  some degree, but not the degree that
22  Dr. Heit found in 2012.
23         Is that what you're saying?
24         MR. SLATER: Objection. You

Page 177

1  can answer.
2         THE WITNESS: I think we're
3  getting there.
4         When Dr. Baker examined
5  Mrs. Hammons at 12 weeks
6  postoperatively, the main location
7  of mesh contraction that he could
8  identify was at the apex, which
9  are the deep anterior arms of the
10  Prolift. And then based on her
11  subsequent findings, ultimately
12  ending up with Dr. Heit, that mesh
13  contraction continued to occur in
14  a direction, if you will, that
15  sort of drags the vagina closer to
16  the vaginal opening, such that he
17  found it in that bunched and
18  rolled and crumpled position.
19  BY MR. MORIARTY:
20     Q.   Okay. So, now if I
21  understand what you're saying, you have
22  no opinion on whether Baker put it in, in
23  some degree, wrong. But if he did, the
24  contraction made that error substantially

Ann M. Weber, M.D.

Page 178

1  worse --
2        MR. SLATER:  Objection.
3  BY MR. MORIARTY:
4        Q.   -- for the patient?
5        Is that what you're saying?
6        MR. SLATER:  Objection.
7  Lack of foundation,
8  mischaracterization.
9        THE WITNESS:  I can try
10  again.  This is a progressive
11  process.
12  BY MR. MORIARTY:
13        Q.   I understand.  I'm just
14  trying to find out if you disagree with
15  Dr. Heit that it was a technique error.
16        MR. SLATER:  Just that
17  question.
18        THE WITNESS:  Just that
19  question.  I disagree with
20  Dr. Heit.
21  BY MR. MORIARTY:
22        Q.   Okay.  Is it your opinion
23  that the condition in which Dr. Heit
24  found the mesh, when he operated in 2012,

Page 179

1  is solely related to contraction?
2        A.   Well, it's a whole spectrum.
3  There's the mesh contraction, the rigid
4  scar plating, the bridging fibrosis.  All
5  of those things happen in concert with
6  the mesh contraction that leads to
7  pathology findings like the rubbery,
8  firm.  Not a little thin layer of tissue
9  ingrowth as claimed in the IFU.
10        Q.   Okay.  At the November 8,
11  2012, office visit, does Dr. Heit
12  describe a mesh erosion in the vagina?
13        A.   November 8th?  I have
14  November 6th.  Is the 8th correct?
15        Q.   I may have written it down
16  wrong.
17        He has a November office
18  visit.  Did he describe a mesh erosion in
19  the vagina?
20        A.   The sentence I have in my
21  report is "Vaginal mesh erosion was again
22  seen, with odorous vaginal secretions."
23        So that's not a direct quote
24  lifted from his records word for word,

Page 180

1  but that's my paraphrasing to put it into
2  a complete sentence.
3        Q.   Okay.  Where in Dr. Heit's
4  November 28, 2012, operative note, if you
5  recall, does it describe the treatment of
6  a vaginal exposure?
7        A.   Could I have his operative
8  note?
9        Q.   It's in this stack here.
10  It's Exhibit 15.  Right there.
11        A.   So, in the findings, this is
12  on the first page towards the bottom, the
13  last sentence in the findings, "There's
14  also communication with the vaginal
15  mucosa through a sinus tract formation."
16        Then in the body of the
17  operative report -- the body of the
18  operative report does not describe the
19  specific step in the procedure in which
20  he managed the sinus tract formation.
21        Q.   Okay.  And when it says in
22  the findings section on the first page of
23  Exhibit 15, "There was also communication
24  with the vaginal mucosa through a sinus

Page 181

1  tract formation," does that mean to you
2  that there was an erosion in the vaginal
3  mucosa of mesh?
4        A.   The way I interpret that is,
5  there's been an interruption of the
6  continuity of the vaginal epithelium.
7  And within that disruption, there's a
8  little tunnel.  That's the sinus tract,
9  that has epithelium on it, but it
10  connects directly to the mesh so that
11  there's an area of the mesh that is not
12  fully covered by the vagina.
13        Q.   Okay.  But there's no
14  description of size in this operative
15  note?
16        A.   That's correct.
17        Q.   And in that procedure, did
18  Dr. -- Dr. Heit use a biologic mesh?
19        A.   Not a mesh.  That term would
20  be a "graft."
21        Q.   Okay.  Biologic graft?
22        A.   Biologic graft.
23        Q.   And do biologic grafts have
24  the potential to erode?

Ann M. Weber, M.D.

Page 182

1      A.   Yes.
2      Q.   Have you ever spoken with
3  Dr. Zipper?
4      A.   No.
5      Q.   Ever met him?
6      A.   No.
7      Q.   Have you seen any record in
8  this -- any record of Mrs. Hammons in
9  this case diagnosing a neuronal
10  entrapment?
11      A.   In her clinical care, is
12  that what you're referring to?  In her
13  medical records?
14      Q.   Yes.
15      A.   Yes, okay.  Then the answer
16  is no.
17      Q.   Okay.  Are there studies
18  available to diagnose whether there's
19  such a thing as neuronal entrapment in a
20  patient?
21      A.   Yes.
22      Q.   And what kind of study is
23  that?
24      A.   Those are primarily based

Page 183

1  out of the hernia mesh literature where,
2  in the shrinkage and contraction that
3  occurs with hernia mesh, the neurons that
4  supply different sensations to the skin,
5  of pain, heat, pressure, become entrapped
6  and cause symptoms, primarily pain.
7      Q.   No.  I'm asking, is there a
8  test that you as a doctor could order to
9  diagnose neuronal entrapment?
10      A.   No.  That's a clinical
11  decision -- a clinical diagnosis.  Pardon
12  me.
13      Q.   Okay.  And when you say
14  clinical diagnosis, that's a physician's
15  judgment kind of diagnosis using all the
16  clues that you can gather from a physical
17  exam and a history, right?  Is that
18  right?
19      A.   A physical exam and history
20  on that patient, in addition to the
21  studies.  You're not necessarily taking a
22  tissue sample from this patient.  But
23  there are plenty of clinical studies in
24  which tissue samples have been processed

Page 184

1  findings nerves entrapped in mesh that
2  leads to the diagnosis of neuronal
3  entrapment.
4      So it's a clinical diagnosis
5  for doctors caring for patients in the
6  office.  It's been substantiated by
7  research, as I just described to you.
8      Q.   Is that process that you're
9  describing part of a foreign body
10  reaction?
11      A.   Yes.  The foreign body
12  reaction, inflammatory reaction, which
13  worsens -- the higher the mesh burden,
14  the worse the foreign body reaction and
15  inflammatory reaction.  So definitely,
16  yes, it would also be directly related to
17  the neuronal entrapment.
18      Q.   Have you ever published on
19  foreign body reactions?
20      A.   No.
21      Q.   Okay.  Are there -- what
22  tests can be run on a patient to see if
23  they have reduced bladder compliance?
24      A.   You could do urodynamic

Page 185

1  testing in which the bladder is
2  backfilled with fluid.  You could also
3  have the patient go home with a measuring
4  device and have her measure voids over a
5  short period of time, like 24 hours, and
6  see what her volumes voided are.
7      There are also pressure
8  studies -- that's part of the
9  urodynamics -- where you're not only
10  looking at the volume instilled, but also
11  the pressure increase as the volume is
12  being instilled.
13      Q.   Has -- to the best of your
14  knowledge, has Mrs. Hammons undergone any
15  of those studies in 2015?
16      A.   Not in 2015, no.
17      Q.   Are you going to render any
18  opinions in this case about Mrs. Hammons'
19  restriction on lifting at her job?
20      MR. SLATER:  Objection.
21  Depends on the question that's
22  being asked.
23      THE WITNESS:  I wasn't aware
24  that she had restrictions on

47 (Pages 182 to 185)

Ann M. Weber, M.D.

Page 186

1    lifting related to her job.
2  BY MR. MORIARTY:
3      Q.   Okay.  Do you know anything
4  about who put on any particular
5  restrictions that she's under or when
6  those restrictions were placed?
7      A.   No, I don't.
8      Q.   Okay.  In your opinion, to a
9  probability, has Mrs. Hammons' smoking
10  had any effect on the health of her
11  tissues?
12      A.   No, I don't believe so.
13  She's evidenced normal healing throughout
14  her course if her -- in her gynecologic
15  surgeries and also others.
16      Q.   So even though it's
17  considered to be a risk factor for
18  someone like Mrs. Hammons, in your
19  opinion it was not a factor at all in her
20  development of prolapse originally or the
21  recurrence of her posterior prolapse?
22      A.   Correct.
23      Q.   And is that just based on
24  the fact that she seemed to heal well

Page 187

1  after her surgeries in 2009 and 2012 and
2  2013?
3      A.   And 2014, I believe, is when
4  she had a knee replacement.  Yeah.
5      I've never seen any healing
6  impairment in her at all.
7      Q.   All right.  Well, could she
8  have a chronic impact on tissues without
9  having acute healing issues
10  postoperatively?
11      A.   That's possible.  I don't
12  think that's been demonstrated in the
13  literature.
14      Q.   At Page 8 of your report,
15  Exhibit 1, you're talking about
16  Dr. Heit's two procedures, and you went
17  back to the pathology reports and you
18  were doing some calculations about how
19  much mesh was there compared with the
20  total mesh that may have been implanted,
21  correct?
22      A.   Yeah.
23      Q.   Do you see those
24  measurements?

Page 188

1      A.   Yes.
2      Q.   All right.  I have a couple
3  of questions about that.  First of all,
4  do you know whether Dr. Heit submitted
5  100 percent of the mesh that he removed
6  to the pathology department?
7      A.   I'd have to refer to his
8  operative report.
9      Q.   Well, they're here.  Here's
10  the first one right there.  So right now
11  you are looking at Exhibit 15, is it?
12      A.   Yes, 15.  On the second page
13  of the operative note toward the bottom
14  of the description of procedures, "The
15  right portion of the mesh was excised by
16  cutting its insertion points into the
17  obturator internus muscle with curved,
18  heavy Mayo scissors.  Sent to pathology
19  for evaluation."
20      Q.   Okay.  So are you assuming
21  that he sent 100 percent of what he
22  removed?
23      A.   That's what it sounds like.
24  And then on the left side, he describes a

Page 189

1  similar dissection and removal of the
2  mesh.  He doesn't specifically state
3  again that the specimen was sent to
4  pathology, but since pathology received
5  two specimens -- and I think, on the
6  pathology report, they were identified as
7  right and left, if I'm not mistaken.
8      So without the specific
9  words saying he sent the left, I would
10  assume that to be the case.
11      Q.   Okay.  And do you know
12  whether the pathologist just measured the
13  specimen as submitted or whether they
14  tried to flatten out the mesh, if you
15  will?
16      A.   I have no idea.
17      Q.   All right.  Do you have an
18  opinion, to a reasonable degree of
19  medical probability, as to how much mesh
20  remains in Patricia Hammons?
21      A.   Well, clearly, she has the
22  entirety of the four mesh arms.  And it's
23  possible that she also has a component of
24  the mesh body leading up to the arms and

Ann M. Weber, M.D.

Page 190

1  existing lateral -- in a lateral
2  position.
3      Q.   Have you ever done a
4  calculation of what you believe is that
5  amount of mesh?
6      A.   Remaining in her?
7      Q.   Yes.
8      A.   No.
9      Q.   In your report, you stated
10 that it's your opinion that the mesh will
11 continue to cause inflammation and
12 continue to contract; is that right?
13     A.   Yes.
14     Q.   What's the basis for that
15 opinion?
16     A.   The basis for that opinion
17 is the fact that the body's response to a
18 foreign body doesn't ever go away.  It's
19 not transient.  It continues for as long
20 as the foreign body -- in this case, the
21 mesh -- is in place.  And we know that
22 the higher the level of inflammatory
23 reaction you have incites an even greater
24 degree of mesh contraction.

Page 191

1      So there's plenty of
2  evidence about how mesh behaves in use,
3  in the body, to support that opinion.
4      Q.   Have you seen any evidence
5  from the medical records themselves that
6  Mrs. Hammons has had chronic bladder or
7  vaginal infections?
8      A.   No, I don't believe so.
9      Q.   What about chronic urinary
10 tract infections?
11     A.   Oh, I'm sorry.  I thought
12 that was part of the question that you
13 just asked.  But in any event, no.  No.
14     Q.   I don't recall right now.
15 Did you see the office records of
16 Dr. Thorn, the orthopedic surgeon who
17 performed the knee replacement surgery?
18     A.   I'd have to look at my
19 reliance list.  I believe so, but I would
20 know better to look at the list.
21     Q.   If Mrs. Hammons claims
22 that -- I'm sorry.  Let me rephrase that.
23     If Mrs. Hammons currently
24 has a rectocele or an enterocele, those

Page 192

1  are not recurrences caused by Prolift,
2  are they?
3      A.   Now, in general, what we
4  know from the literature is that when
5  mesh is used, Prolift mesh is used in one
6  compartment, that that can deflect the
7  forces of intra-abdominal pressure and
8  have that force impact more fully on the
9  compartment that had not previously been
10 treated with the Prolift mesh.
11     Q.   I thought I asked earlier
12 whether the rectocele and enterocele that
13 Dr. Lackey found in the fall of 2009 were
14 related to Prolift.  And you said no.  I
15 thought I asked that.
16         MR. SLATER:  Could you read
17     that back.
18         (Whereupon, the court
19     reporter read back the requested
20     portion of testimony.)
21         MR. SLATER:  Objection.
22     Foundation, argumentative.
23         THE WITNESS:  Perhaps I
24     misunderstood the question.

Page 193

1  BY MR. MORIARTY:
2      Q.   Okay.  Well, let's -- let me
3  ask it this way.  Is it your
4  understanding that Mrs. Hammons currently
5  has a rectocele and/or enterocele?
6      A.   Give me a minute.  Yes.
7      Q.   And are you attributing her
8  current rectocele and enterocele to
9  Prolift, the Prolift surgery she had in
10 May of 2009?
11     A.   In general, we know that her
12 risk is higher.  If that's exactly why
13 her rectocele developed, I can't say that
14 with 100 percent certainty.
15     Q.   Are you going to render an
16 opinion, to a reasonable probability,
17 that that's what happened?
18     A.   Yes, I think it's more
19 likely than not that the Prolift would
20 have had a role in that.
21     Q.   If Dr. Baker had performed a
22 vaginal hysterectomy and an anterior
23 colporrhaphy in May of 2009, doesn't that
24 native tissue repair similarly deflect

Ann M. Weber, M.D.

Page 194

1  forces to the untreated compartment?
2      A.   It can.  What happens
3  when -- the difference between a native
4  repair like an anterior colporrhaphy is
5  that that's closer to what the outcome
6  is.  It's not a stage zero.  What we've
7  learned over time is that getting women
8  like Mrs. Hammons to a point where they
9  are at stage zero, that's not necessarily
10  the best outcome for them.  And,
11  certainly, with regard to the Prolift,
12  there are a lot of reasons why, in
13  addition to the prolapse issue.
14          So that in an anterior
15  repair, to a lesser extent the forces
16  could affect the posterior wall.
17      Q.   Let me make sure I
18  understand what you're saying.
19  Mrs. Hammons had a pelvic floor disorder,
20  did she not?
21      A.   Yes.
22      Q.   And she was at risk for
23  that, correct?
24      A.   Yes.  She developed it.

Page 195

1      Q.   Okay.  And the first
2  manifestation of it was a cystocele,
3  correct, and an apical prolapse?
4      A.   Yes.
5      Q.   Okay.  And the posterior
6  prolapse, the rectocele and enterocele,
7  manifested later, correct?
8      A.   Yes.
9      Q.   After her first repair
10  surgery, correct?
11      A.   Yes.
12      Q.   All right.  It's not the
13  mesh that actually creates a rectocele.
14  It just deflects forces in the direction
15  of the posterior compartment; is that
16  correct?
17      A.   That's the explanation or
18  the rationale given for this research
19  finding, yes.
20      Q.   All right.  And so, in some
21  sense, it unmasks a part of the body
22  that's already diseased --
23          MR. SLATER:  Objection to
24      that term "unmasked."

Page 196

1  BY MR. MORIARTY:
2      Q.   -- is that right?
3      A.   No, I wouldn't agree with
4  that.  She didn't have any evidence of a
5  posterior pelvic disorder, if you want to
6  call it that.
7          Unmasking means something is
8  in place and you just happened to find it
9  later, as opposed to something that's not
10  there and develops subsequently.
11      Q.   Is it likely -- is it more
12  likely than not, that regardless of the
13  surgical technique chosen by Dr. Baker in
14  May of 2009, that Mrs. Hammons at some
15  point would have developed a rectocele
16  and enterocele?
17      A.   No.  I can't say it's more
18  likely that she would.  She is at risk.
19  But I -- I wouldn't say that it's more
20  than likely that she definitely would.
21      Q.   Do you have any way to know,
22  Dr. Weber, the degree to which
23  Mrs. Hammons' vagina was shortened by
24  Prolift versus her vaginal hysterectomy

Page 197

1  and her posterior procedures done by
2  Dr. Lackey?
3      A.   No, I don't.
4          Do you mind if I stop for a
5  few minutes and run to the restroom?
6          (Short break.)
7  BY MR. MORIARTY:
8      Q.   In your report, you comment
9  or mention Dr. Zipper's findings of a
10  Grade 3 apical prolapse.  Did you see
11  that?  And a Grade 3 posterior prolapse?
12      A.   I believe he described those
13  as stages.  I want to be sure about that.
14  Yes.  Stage.  Correct.
15      Q.   If she has apical and
16  posterior prolapse, those are recurrences
17  from the procedure done by Dr. Heit and
18  Lackey, correct?
19      A.   I would agree with that as
20  far as -- excuse me -- as far as the
21  posterior prolapse.  She had apical
22  prolapse even before she saw Dr. Baker.
23      Q.   I understand that.  But
24  Baker didn't repair it.  Lackey didn't

50 (Pages 194 to 197)

Ann M. Weber, M.D.

Page 198

1  repair it in the fall of '09.  The only
2  apical repair was by Dr. Heit in November
3  of 2012, correct?
4      A.   Yes.
5      Q.   So if Mrs. Hammons now has
6  an apical prolapse, that is a recurrence
7  from his repair; is that true?
8      A.   Yes.
9      Q.   Was that apical prolapse
10 repair to the native tissue, or was that
11 part of the mesh procedure that he
12 performed?
13     A.   The apical suspension
14 procedure was a sacrospinous ligament
15 fixation.  And in the operative report,
16 he described providing a connection
17 between the anterior vaginal cuff, the
18 deepest part of the anterior of the
19 vagina, to the sacrospinous ligament
20 sutures, and posteriorly using the
21 biological graft.
22     Q.   All right.  So if I
23 understand what you just said, he used
24 the biological graft for the posterior

Page 199

1  repair, but the apical repair was a
2  native tissue repair, correct?
3      A.   Yes.
4      Q.   So if she now has a
5  Stage III rectocele, that is a failure of
6  the biologic graft that Dr. Heit used in
7  November of 2012, correct?
8      A.   Yes.
9      Q.   And if she has an apical
10 prolapse, that's a failure of the native
11 tissue repair that he did also in
12 November of 2012, correct?
13     A.   Yes.
14     Q.   All right.  So, for
15 Mrs. Hammons, she's had recurrences now
16 twice in the posterior compartment; is
17 that right?
18     A.   She developed posterior
19 vaginal prolapse.  Dr. Lackey fixed it.
20 She developed a recurrence, and Dr. Heit
21 fixed it.
22     Q.   Right.  So she's recurred
23 twice.
24     A.   Yes.  I see what you're

Page 200

1  saying.  Yes.
2      Q.   Every time -- I'm sorry.
3          Would you agree with me that
4  every time Mrs. Hammons has one of these
5  procedures from May of 2009 onward, it
6  increases the risks of her having scar
7  tissue and dyspareunia?
8      A.   In general terms, yes.
9      Q.   Now, I know in at least your
10 primary report you have rendered some
11 opinions about bidirectional elasticity,
12 correct?
13     A.   Yes.
14     Q.   Is there some aspect of
15 Mrs. Hammons' current complaints which is
16 a result, in your opinion, of mesh not
17 being bidirectionally elastic?
18         MR. SLATER:  Objection.
19 Foundation.
20         THE WITNESS:  I think that
21     is related to issues of pore
22     collapse and maintaining the
23     intended characteristics of the
24     mesh out of the box and into the

Page 201

1      patient.  I'll just stop there.
2  BY MR. MORIARTY:
3      Q.   All right.  Let me make sure
4  I understand.  I asked earlier about what
5  you thought Mrs. Hammons' current
6  problems were related to her Prolift.
7  And what she told me back then -- and I
8  told you I would give you more of a
9  chance to talk about it -- dyspareunia
10 leading to apareunia, contraction and
11 vaginal distortion, erosions in the
12 vagina and the bladder, correct?
13     A.   Those are the problems that
14 she has experienced and some she
15 continues to experience.
16     Q.   Okay.  To the best of -- I'm
17 sorry.
18         In your opinion, to a
19 probability, does she continue to
20 experience erosion in the bladder?
21     A.   She hasn't been evaluated
22 for that since her last visit with
23 Dr. Heit, so I can't exclude that with --
24 definitely.

51 (Pages 198 to 201)

Ann M. Weber, M.D.

Page 202

1      Q.    There's no evidence in the
2   medical records from 2013 to now, August
3   2015, that she has further bladder
4   erosion, correct?
5      A.    Her worsening frequency and
6   urgency of urination could be a sign of
7   bladder mesh erosion.  She hasn't been
8   further evaluated on the basis of those
9   symptoms in the only way that you can
10   diagnose bladder mesh erosion.
11      Q.    Okay.  I just need to know,
12   and my client needs to know, whether, in
13   your opinion, to a reasonable degree of
14   medical probability, she currently has
15   erosion into the bladder from any mesh.
16      A.    Yeah, I can't answer that
17   with a yes or a no.  It's possible.  The
18   only way to find that out would be for
19   her to have further evaluation.
20      Q.    In your opinion, to a
21   probability, is she currently having
22   erosion of mesh into the vagina?
23      A.    No, not as of May 5, 2015.
24      Q.    In your opinion, to a

Page 203

1   probability, what is the current cause of
2   her dyspareunia and/or apareunia?
3      A.    I think the causes are
4   related to the presence of the Prolift
5   mesh, even though a certain amount of it
6   has been removed.  The scarring and
7   damage to the vaginal tissue on a nerve
8   and blood vessel level that continues to
9   affect her, and to the -- in the areas
10   where the Prolift mesh still exists, the
11   ongoing foreign body reaction and
12   inflammatory process that continues the
13   vicious cycle of scarring, and so on.
14      Q.    Are there any objective
15   tests that can be run on Mrs. Hammons to
16   confirm or deny the description that you
17   just gave?
18      A.    Imaging can identify the
19   mesh.  MRI, ultrasound.
20         An objective test is --
21   other than linking her symptoms -- her
22   symptoms, the findings on the physical
23   examination, and then possibly the
24   results of imaging, that would be the way

Page 204

1   to further evaluate her situation to get
2   the kind of information that I think
3   you're looking for.
4      Q.    As of today, the opinion
5   that you just gave is a clinical
6   diagnosis, in your terms; is that right?
7      A.    Yes.
8      Q.    Okay.
9      A.    Based on how -- what we know
10   about how mesh behaves and everything
11   that Mrs. Hammons has been through.
12      Q.    Okay.  And are you going to
13   render opinions, to a reasonable degree
14   of medical probability, about any other
15   problems that she will experience in the
16   future as a result of her Prolift?
17         MR. SLATER:  When you say
18         "other problems," do you mean are
19         there opinions as to the future?
20         MR. MORIARTY:  Yeah.
21   BY MR. MORIARTY:
22      Q.    Other medical problems that
23   she -- that Mrs. Hammons is going to
24   experience in the future.

Page 205

1      A.    In -- in addition to the
2   ones that she already has?
3      Q.    Well, we've talked about
4   erosions, and now we've talked about
5   dyspareunia and apareunia.  And I assume
6   that the contraction and vaginal
7   distortion is, in your opinion, linked to
8   the dyspareunia and apareunia, correct?
9      A.    Yes.
10      Q.    Okay.  So what I need to
11   find out before I leave Philadelphia is
12   whether you intend to go to trial and
13   testify that Mrs. Hammons is likely to
14   experience other physical complaints
15   related to Prolift into the future.
16      A.    I think it's more likely
17   than not, she has a substantial mesh
18   burden.  She's already, unfortunately,
19   shown herself to be someone who's
20   responding with a severe intensity of the
21   inflammatory reaction and the foreign
22   body reaction and bridging fibrosis and
23   the scar plating.  And she has all of
24   those mesh arms in the obturator spaces,

Ann M. Weber, M.D.

Page 206

1 the hip and the groin.  I would be very
2 concerned that she would be developing
3 new complications as a result of that.
4      Q.   Okay.  I understand as a
5 physician and a compassionate person you
6 may be very concerned about that.  My
7 question is whether you have an opinion,
8 to a reasonable degree of medical
9 probability, that she is going to develop
10 certain specific problems in the future
11 related to her Prolift.
12      A.   Yes.
13      Q.   Okay.  And what are those
14 problems going to be?
15      A.   The problems are likely to
16 be in the areas where she continues to
17 have the mesh, which are the obturator
18 spaces in the groin and all the muscles
19 that the mesh arms have gone through and
20 the reaction that we talked about.  And
21 to the extent that there's still mesh
22 left in the vagina, then she would be
23 manifesting that as a vaginal mesh
24 erosion.  Even worse, another bladder

Page 207

1 mesh erosion.  Those would be the
2 locations.
3      Q.   Okay.  So the only specific
4 medical problems you mentioned were
5 vaginal mesh erosion and bladder erosion.
6 Do you think either of those are likely,
7 based on everything you've reviewed in
8 this case?
9      A.   Well, I think you also
10 included in that the mesh -- or at least
11 I did -- the mesh arms.  So they are
12 carrying on with their issues.  They
13 could be infected.  There are many cases
14 in the literature reported of rapidly
15 developing severe infections that occur
16 quite remote from the index mesh
17 implantation.  So she remains at risk for
18 that in the groin where those four mesh
19 arms are.
20      Q.   Okay.  Dr. Weber, I
21 understand that she may be at risk.  All
22 kinds of things are possible.  What I
23 need to find out is whether you have an
24 opinion that mesh erosion in the vagina,

Page 208

1 mesh erosion in the bladder, or some
2 infection of the remaining mesh arms, is
3 more likely than not to happen with
4 Patricia Hammons.
5      A.   Yes.  I did think I answered
6 that.
7      Q.   And what is the basis for
8 your opinion that she is likely to suffer
9 either bladder or vaginal erosion?
10      A.   The ongoing mesh burden.
11 The ongoing chronic inflammatory foreign
12 body reaction that's continuing to incite
13 chemicals, cell death, scarring, further
14 nerve damage.  Those are all the things
15 that form the basis for that opinion.
16      Q.   So is it your opinion that
17 because these are likely to occur,
18 these -- this should all be removed
19 surgically soon to prevent that?
20      A.   That's --
21      MR. SLATER:  Objection.
22 Foundation.
23      THE WITNESS:  That's a
24 clinical decision that would need

Page 209

1      to be made between Mrs. Hammons
2      and her possible explanting
3      surgeon.
4 BY MR. MORIARTY:
5      Q.   Okay.  To the best of your
6 knowledge, is there any peer-reviewed
7 literature published that would support
8 your opinion that mesh arms in a patient
9 like Mrs. Hammons are likely to be
10 infected long-term?
11      A.   Well, as I told you, there
12 are reports in the literature.  That's
13 not a number that you can relate to,
14 okay, because of this mesh arm, she has a
15 risk of XY over her lifetime.  Those data
16 don't exist.
17      Q.   Is there any data to support
18 a mesh infection rate of greater than
19 50 percent?
20      A.   That's something that can't
21 be calculated from the literature, as it
22 exists.
23      Q.   So there is no literature to
24 support an opinion that mesh arms are

53 (Pages 206 to 209)

Ann M. Weber, M.D.

Page 210

1  likely to be infected long-term, correct?
2      A.   I've told you what I know
3  about the literature.  That's -- you
4  don't get a numerator and a denominator.
5  I don't have an -- I don't have a figure
6  for you, a percentage figure, 50 percent
7  or higher.  You asked for my opinion, and
8  I gave it to you.
9      Q.   Well, what -- is your
10 understanding of more likely than not to
11 be greater than 50 percent chance of
12 something occurring?
13     A.   More likely than not.
14     Q.   Is it greater than
15 50 percent chance of occurring, correct?
16     A.   Yes.
17     Q.   Okay.  So what I'm trying to
18 find out is whether there's any published
19 literature --
20     A.   No.
21     Q.   -- to support a greater than
22 50 percent chance that a patient with a
23 mesh will be infected.
24     A.   No.  That literature does

Page 211

1  not exist.
2      Q.   Okay.  So from all the
3  hernia literature, from all the pelvic
4  mesh literature, the thousands of
5  articles that have been written, there's
6  nothing about infection rates greater
7  than 50 percent in patients who have mesh
8  long-term?
9      A.   I misunderstood your
10 question, then.  I thought we were
11 talking about prolapse.  I didn't realize
12 we were talking about hernia.  Because
13 the most common chronic infection that
14 hernia patients have is pain.  So pain
15 would be another thing that would happen
16 with her mesh arms.
17     I have not done a complete
18 review of the hernia literature to come
19 up with a percentage.
20     Q.   Is there any published
21 literature regarding mesh for pelvic
22 organ prolapse in which there was an
23 infection rate greater than 50 percent?
24     A.   No.  I think I told you,

Page 212

1  that literature does not exist.
2      Q.   Is there any literature
3  regarding midurethral slings for stress
4  urinary incontinence with infection rates
5  of greater than 50 percent?
6      A.   I have not mastered that
7  literature completely.
8      Q.   Has Mrs. Hammons ever
9  complained to a physician, in any of the
10 medical records that you have seen, of
11 pelvic pain unrelated to sexual
12 intercourse?
13     A.   Not that I can recall right
14 now.
15     Q.   All right.  So as I
16 understand it from your general primary
17 report, you have criticisms of Ethicon
18 for the representations they made about
19 bidirectional elasticity, correct?
20         MR. SLATER:  Didn't we go
21 over this already?  You want to go
22 over it again?
23         MR. MORIARTY:  She didn't
24 answer me.  That's why I want to

Page 213

1  find out what the damages were
2  first.  So now I'm circling
3  back --
4          MR. SLATER:  I object.  The
5  question doesn't make sense as
6  asked.  Lack of foundation,
7  mischaracterization.
8          MR. MORIARTY:  Okay.
9          MR. SLATER:  It doesn't make
10 sense.
11         THE WITNESS:  Could you
12 repeat that?
13 BY MR. MORIARTY:
14     Q.   What's your -- in just a few
15 sentences, what is your opinion about
16 bidirectional elasticity?
17         MR. SLATER:  Don't answer
18 that question.
19         Next question.  It's been
20 asked in other depositions.  She's
21 been through it.
22 BY MR. MORIARTY:
23     Q.   So how did Ethicon's
24 representations about bidirectional

54 (Pages 210 to 213)

Ann M. Weber, M.D.

Page 214

1  elasticity harm Patricia Hammons, in your
2  opinion?
3      A.    Once a claim has been
4  recognized as without foundation, without
5  data, despite the fact that it's been
6  present in IFU after IFU, then I become
7  very concerned that other statements also
8  lack data to support.
9          And, in fact, that is also
10 true, that there are claims that Ethicon
11 has made time and time again until
12 finally someone challenges them, like the
13 FDA, and it turns out they have no
14 clinical data to support that.  In fact,
15 they're misrepresenting that this is a
16 statement that they can actually support.
17     Q.    All I want to find out is
18 how Ethicon's claims regarding
19 bidirectional elasticity harmed this
20 specific patient.
21     A.    Because she believed what
22 Ethicon said.  She made a decision to
23 allow this to be implanted in her body
24 based on information that she had been

Page 215

1  given by the company and from her doctor
2  who had been given that information by
3  the company, when the company is known to
4  withhold information, make misleading and
5  inaccurate claims.
6          And if Mrs. Hammons had
7  known that Ethicon was doing those kinds
8  of things to information that she
9  received and Dr. Baker knew, as he
10 testified, he would not have offered her
11 the Prolift, and she wouldn't be in the
12 situation that she's in now.
13     Q.    Is there any evidence that
14 Dr. Baker talked with Mrs. Hammons
15 specifically about bidirectional
16 elasticity?
17     A.    No, he didn't talk with
18 Mrs. Hammons about that.
19     Q.    Okay.  So Mrs. Hammons
20 didn't rely on statements about
21 bidirectional elasticity in deciding
22 whether to have this procedure or not,
23 correct?
24     A.    She relied --

Page 216

1      Q.    Mrs. Hammons did not?
2      A.    Mrs. Hammons relied on
3  Dr. Baker's expertise and authority as a
4  physician to follow his recommendations.
5  And the information that he conveyed to
6  her, his misplaced confidence in the
7  Prolift product was what made
8  Mrs. Hammons get the Prolift in the first
9  place.
10     Q.    Okay.  I understand that's
11 your opinion.  My question is very
12 simple.
13         Did Mrs. Hammons herself
14 rely on anything about bidirectional
15 elasticity when she made the decision --
16     A.    No.
17     Q.    -- to have Prolift?
18     A.    No.
19         MR. SLATER:  Are you guys
20 withdrawing the intermediary from
21 this case?
22         MR. MORIARTY:  Is that a
23 rhetorical question?
24         MR. SLATER:  It's an ironic,

Page 217

1  tired comment.  Or a tired, ironic
2  comment.  It seemed funnier in my
3  head.
4          Susan almost laughed.
5          MS. ROBINSON:  I almost
6  responded.
7  BY MR. MORIARTY:
8      Q.    And so did Mrs. Hammons have
9  any physical injury because of a
10 characteristic of the mesh, such as that
11 it was not bidirectionally elastic?
12         MR. SLATER:  Objection.
13 Foundation.  Misconstrues the
14 issue.
15         THE WITNESS:  She may have.
16 BY MR. MORIARTY:
17     Q.    Did she, to a reasonable
18 degree of medical probability, have an
19 injury associated with some
20 characteristic that it was not
21 bidirectionally elastic?
22     A.    I don't know.
23         MR. SLATER:  It happened
24 quickly.  I object again.  Lack of

55 (Pages 214 to 217)

Ann M. Weber, M.D.

Page 218

1    foundation, misconstrues the
2    issue.
3 BY MR. MORIARTY:
4    Q.   There's some discussion in
5 your primary report about pore size, this
6 difference between -- I think it's a
7 millimeter and 75 microns.  You're very
8 familiar with that issue, correct?
9         MR. SLATER:  Objection.
10       Mischaracterizes.
11       THE WITNESS:  Yes.
12 BY MR. MORIARTY:
13   Q.   Okay.  Can you point to any
14 specific harm caused to Patricia Hammons
15 assuming that the pore size was
16 75 microns instead of one millimeter?
17       MR. SLATER:  Objection.
18       Lack of foundation.
19       Mischaracterizes the issue.
20       THE WITNESS:  Yes.
21 BY MR. MORIARTY:
22   Q.   Okay.  Is that a separate
23 opinion from what you've already told me
24 about the foreign body reaction and

Page 219

1 contraction?
2    A.   No, that's the same issue.
3    Q.   Okay.  So, in your opinion,
4 if the Prolift inserted in Ms. Hammons
5 had one-millimeter pore sizes, she
6 wouldn't have developed these problems?
7         MR. SLATER:  Objection.
8         Foundation.  Incomplete question.
9         Incomplete hypothetical.
10        Misconstrues the issue.
11 BY MR. MORIARTY:
12   Q.   Is that your opinion?
13        MR. SLATER:  You can answer.
14        THE WITNESS:  Effective pore
15     size and -- and I can't predict
16     what would happen with a specific
17     patient.  Effective pore size
18     greater than one millimeter has
19     been identified by mesh experts as
20     what's needed for a safe mesh.
21     Effective pore size.
22 BY MR. MORIARTY:
23   Q.   Okay.  I'm just trying to
24 figure out -- let's assume all the same

Page 220

1 facts in this case except for one.  So
2 Mrs. Hammons, same age, same
3 characteristics, has a vaginal
4 hysterectomy.  There's no apical repair.
5 Has a transvaginal mesh placed with the
6 same kind of trocars and equipment.  But
7 that mesh has pore sizes or effective
8 pore sizes of one millimeter.
9         Is it your opinion that
10 these things would not have happened to
11 Mrs. Hammons over the course of 2009 and
12 '10?
13   A.   It is my opinion that she
14 would not have developed mesh contraction
15 to the extent that she did because of
16 pore collapse and bridging fibrosis and
17 ridged scar plating and all the things
18 that we've been talking about all day.
19        Whether she would have had
20 no complications whatsoever, I can't
21 answer that.
22   Q.   Okay.  So is it your opinion
23 that with a pore size or an effective
24 pore size of one millimeter, she would

Page 221

1 not have had dyspareunia?
2    A.   No, that is not my opinion.
3    Q.   Okay.  So what complication
4 would she not have had with an effective
5 pore size of one millimeter?
6    A.   Mrs. Hammons has dyspareunia
7 because of mesh contraction.  There are
8 many other causes of dyspareunia that
9 don't apply to Mrs. Hammons.  And I can't
10 predict in some future hypothetical
11 whether she would have an experience of
12 one of those other factors.
13   Q.   But are you saying that she
14 would not have dyspareunia from mesh
15 contraction had the pore size been
16 different?
17   A.   That's my understanding,
18 yes.
19   Q.   Okay.  Did Dr. Heit ever say
20 in his deposition that it was impossible
21 to remove the mesh that he did remove
22 from Patricia Hammons?
23   A.   I'm sorry?  It's impossible
24 to remove the mesh he removed?

56 (Pages 218 to 221)

Ann M. Weber, M.D.

Page 222

1      Q.   I knew somebody was going to
2  flag that silly question.
3           MR. MORIARTY:  I thought it
4  was going to be you.
5           MR. SLATER:  I'm just trying
6  to figure out what happened when
7  you said we were almost done an
8  hour ago.
9           MR. MORIARTY:  It's not my
10 fault.
11          MR. SLATER:  Now I feel
12 responsible.
13 BY MR. MORIARTY:
14     Q.   So, obviously, Dr. Heit was
15 able to remove some of the mesh, correct?
16     A.   Yes.
17     Q.   Now, did he say in his
18 deposition that he left whatever mesh he
19 left behind because it was impossible to
20 remove?
21     A.   Because it -- in his
22 judgment, the risk of continuing to
23 remove the mesh was not in the patient's
24 best interest, not that it was

Page 223

1  necessarily impossible.  He's making a
2  judgment based on his experience about
3  how to proceed in the best interest of
4  the patient.
5      Q.   In other words, that the
6  risk of continuing the dissection
7  exceeded the risk of leaving the mesh
8  behind?
9      A.   Correct.  At that one --
10 yes, at that setting.
11          MR. MORIARTY:  I'm done.
12 Thanks for your patience.
13          MR. SLATER:  I have a few
14 cleanup questions.  Do you want me
15 to do them now?
16          (Whereupon, a discussion was
17 held off the record.)
18               - - -
19          EXAMINATION
20               - - -
21 BY MR. SLATER:
22     Q.   Dr. Weber, you were shown
23 earlier in the deposition a record from
24 February 1, 2007, from Daviess Community

Page 224

1  Hospital, which is a emergency room
2  record.  Remember you were shown that
3  earlier?
4      A.   Yes.
5      Q.   And you talked about a
6  complaint of a pessary falling out.  Do
7  you remember that question?
8      A.   Yes.
9      Q.   And I just want to show you
10 on the third page.  It says that "she had
11 pain in the vaginal area and the
12 aggravating factor was the pessary" and
13 that "the onset of that pain was this
14 evening," correct?
15     A.   Yes.
16     Q.   Is there any indication this
17 was anything other than an acute event
18 that caused discomfort?
19     A.   No.
20     Q.   Okay.  I'll start at the end
21 and work my way forward.
22          You were asked about the
23 bidirectional elasticity statement that
24 was in the IFU, even though Ethicon

Page 225

1  eventually admitted they had obviously
2  had no data to support it and removed it
3  for that reason.  Do you remember you
4  were asked some questions about that?
5      A.   Yes.
6      Q.   Just to be clear, and make
7  sure the testimony is clear.  Did you see
8  in Dr. Baker's deposition where he said
9  that he believed that statement to be
10 true and supported?
11     A.   Yes.
12          MR. MORIARTY:  Objection.
13 BY MR. SLATER:
14     Q.   And did you see in his
15 deposition that Dr. Baker indicated that
16 was a factor that led him to use the
17 Prolift?
18          MR. MORIARTY:  Objection.
19 BY MR. SLATER:
20     Q.   You can answer.
21     A.   Yes.
22     Q.   Okay.  If Dr. Baker hadn't
23 used the Prolift, would I be correct that
24 the injuries you've attributed to the

Ann M. Weber, M.D.

Page 226

1  Prolift couldn't have happened because
2  there would have been no Prolift to cause
3  them?
4       A.   Correct.
5       Q.   The bidirectional elasticity
6  statement actually has a second half that
7  says that it allows adaptations to the
8  body's stresses, correct?
9       A.   Yes.
10      Q.   And when the mesh contracts
11 and becomes inflexible and hard, it's not
12 adapting to the body's stresses, is it?
13      A.   No.
14           MR. MORIARTY:  Objection.
15 BY MR. SLATER:
16      Q.   So the lack of adaptation to
17 the body's stresses would actually be one
18 of the factors that was causing harm to
19 Mrs. Hammons, wouldn't it?
20           MR. MORIARTY:  Objection.
21           THE WITNESS:  Yes.
22 BY MR. SLATER:
23      Q.   You were asked about the
24 frequency and urgency in relation to

Page 227

1  whether or not there was some -- well,
2  rephrase.
3           You were asked about the
4  frequency and urgency that's been
5  reported for Ms. Hammons, correct?
6       A.   Yes.
7       Q.   And am I correct that there
8  were -- there are indications in the
9  records that the mesh was irritating and
10 actually eroding into the detrusor?
11           MR. MORIARTY:  Objection.
12           THE WITNESS:  Yes.
13 BY MR. SLATER:
14      Q.   And is it likely that that
15 is a contributing factor to her frequency
16 and urgency complaints?
17      A.   Yes.
18      Q.   And is it likely that
19 continued irritation from the mesh and
20 the scarring in that area would be a
21 likely contributing factor to any ongoing
22 frequency and urgency that she has?
23      A.   Yes.
24      Q.   You were asked about -- by

Page 228

1  counsel about your opinions on future
2  injuries and symptoms she suffered due to
3  the mesh.  Do you remember those
4  questions a few minutes ago?
5       A.   Yes.
6       Q.   And you were asked by
7  counsel would the mesh need to be
8  removed, and you indicated, Well, that
9  would be a conversation she'd have to
10 have with a surgeon that was actually
11 considering treating her, correct?
12      A.   Yes.
13      Q.   Am I correct that the
14 removal of any large amount of mesh,
15 especially the arms, meaning the mesh
16 that remains in her body, would not
17 likely be safe and certainly not feasible
18 to a large extent, especially taking into
19 account the arms?
20           MR. MORIARTY:  Objection.
21           THE WITNESS:  Yes.
22 BY MR. SLATER:
23      Q.   Early on in the deposition,
24 you were asked about Dr. Baker's

Page 229

1  evaluation of the stage of prolapse when
2  he first was evaluating Ms. Hammons.  Do
3  you remember those questions from earlier
4  in the deposition?
5       A.   Yes.
6       Q.   And Dr. Baker -- tell me if
7  I'm correct -- indicated a Stage IV
8  prolapse in his records, correct?
9       A.   A Grade 4.
10      Q.   Grade 4.  Sorry.
11           And his definition of a
12 Grade 4 prolapse -- tell me if I'm
13 wrong -- was that it protrudes outside
14 the vagina at all?
15      A.   Outside -- right.  Correct.
16 Outside of the hymen, yes.
17      Q.   Outside of the hymen.  I'm
18 sorry.
19           Under the POP-Q measurement
20 system, which is the rigorous clinical
21 evaluation system, could the bladder
22 protrude outside the hymen, beyond the
23 hymen and be a Stage II?
24      A.   Yes.

Golkow Technologies, Inc. - 1.877.370.DEPS

Ann M. Weber, M.D.

Page 230

1    Q.    So is that one of the
2  factors that you considered in evaluating
3  what her stage of prolapse likely was?
4    A.    Yes.
5    Q.    Did you see documents
6  internal to Ethicon indicating that the
7  Prolift was actually only indicated for
8  Stage III and IV prolapse?
9       MR. MORIARTY: Objection.
10  This is a general opinion.
11       MR. SLATER: You asked about
12  this. And she said it. I'm going
13  to make it clean.
14       But that was good. You kept
15  a straight face.
16  BY MR. SLATER:
17    Q.    Are you familiar with those
18  documents?
19    A.    Yes.
20    Q.    Did Ethicon warn Dr. Baker
21  in any way, to your knowledge, that he
22  would need to have a rigorous clinical
23  evaluation performed of the prolapse to
24  ensure that it was at least a full-blown

Page 231

1  Stage III or IV before this procedure
2  would be indicated? Was he told that --
3       MR. MORIARTY: Objection.
4  BY MR. SLATER:
5    Q.    -- to your knowledge, in any
6  of the documents that were available at
7  the time?
8    A.    No.
9    Q.    Was Dr. Baker -- I'm just
10  going to expand it -- advised by Ethicon
11  that he would have to make sure that she
12  had a clearly defined Stage III or IV
13  prolapse as defined by the rigorous
14  criteria; otherwise the Prolift should
15  not be put in this woman's body? Was he
16  given any information to that extent at
17  all?
18       MR. MORIARTY: Objection.
19       THE WITNESS: No.
20  BY MR. SLATER:
21    Q.    Was Dr. Baker given any
22  indication that the stage of prolapse
23  actually mattered in terms of whether or
24  not a Prolift was indicated? Was he told

Page 232

1  that at all?
2    A.    No.
3    Q.    In terms of evaluating,
4  again, what the stage of prolapse was,
5  you indicated that Ms. Hammons was able
6  to actually -- she commented on what she
7  could feel, correct?
8    A.    Yes.
9    Q.    Did she also indicate that
10  she saw a bit of the bladder, that she
11  could see that under certain
12  circumstances as well?
13    A.    Yes.
14    Q.    And when you put together
15  everything that Ms. Hammons said and
16  everything Dr. Baker said, you believe
17  she had a Stage II, possibly an early
18  Stage III?
19    A.    Yes.
20    Q.    You were asked a question
21  about restrictions on Ms. Hammons when
22  she went back to work. Do you remember
23  that question earlier?
24    A.    Yes.

Page 233

1    Q.    Was Ms. Hammons cleared to
2  go back to work, according to the
3  records, by Dr. Baker?
4    A.    Yes.
5    Q.    You were asked about the
6  question of whether or not Dr. Baker met
7  the internal criteria Ethicon stated they
8  had created for surgeons who should use
9  the Prolift. Do you remember you were
10  asked about that?
11    A.    Yes.
12    Q.    And, in fact, are there
13  committee opinions from AUGS and other
14  organizations that talk about the fact
15  that only the most highly skilled
16  surgeons should use these types of mesh
17  kits?
18       MR. MORIARTY: Objection.
19       THE WITNESS: Yes.
20       MR. SLATER: I don't have
21  any other -- oh, I do have a
22  couple other questions.
23  BY MR. SLATER:
24    Q.    You were asked about the

Ann M. Weber, M.D.

Page 234

1  2000 date FDA public health notification
2  and asked if that was available,
3  something that could have been available
4  to Dr. Baker.  Remember you were asked
5  that?
6       A.   Yes.
7       Q.   That was certainly available
8  to Ethicon, wasn't it?
9       A.   Yes.
10      Q.   They knew about it, right?
11      A.   Yes.
12      Q.   The 2008 -- 2007 ACOG
13 bulletin, you authored that, called these
14 procedures experimental.  Was that
15 something that was available to Ethicon?
16          MR. MORIARTY:  Objection.
17          THE WITNESS:  Yes.
18 BY MR. SLATER:
19      Q.   Did Ethicon have the
20 opportunity to warn about all those types
21 of things if they had wanted to?
22      A.   Yes.
23          MR. SLATER:  I don't have
24 any other questions.

Page 235

1          - - -
2       FURTHER EXAMINATION
3          - - -
4  BY MR. MORIARTY:
5       Q.   Sorry.  He raised a couple
6  new ones.
7          Mr. Slater was just talking
8  about -- something about whether Ethicon
9  needed to warn Dr. --
10         MR. SLATER:  That's not what
11 I said.
12 BY MR. MORIARTY:
13      Q.   -- Baker about performing a
14 rigorous assessment of the true stage or
15 grade of prolapse.  Do you remember that
16 question that he was just asking?
17      A.   That was the theme.  I don't
18 think those were the words.
19      Q.   Okay.
20      A.   But, anyway.
21      Q.   Is that an opinion that you
22 wrote somewhere in Exhibit 2, your
23 primary report?
24      A.   I would have to look through

Page 236

1  the report to find those specific words.
2  Certainly, the issue of selecting the --
3  I'm sorry -- that Ethicon intended
4  Prolift to be used for advanced stages of
5  prolapse, meaning Stage III and IV, is
6  something that is discussed in my report.
7       Q.   Okay.  And I understand that
8  that is.  What I'm trying to find out is
9  whether you have rendered an opinion
10 previously in your primary report, or
11 even in your report in this case,
12 Exhibit 1, that Ethicon had some duty to
13 go so far as to tell the doctors to be
14 extra careful about the documentation and
15 physical examination of the degree of
16 existing prolapse.
17      A.   That would be part and
18 parcel of being a highly skilled,
19 high-volume-performing pelvic
20 reconstructive surgeon, to have the
21 familiarity and experience in doing
22 detailed assessments of women's prolapse.
23      Q.   That's not my question.  My
24 question is only whether you have written

Page 237

1  about this opinion before in either
2  Exhibit 1 or Exhibit 2.
3          MR. SLATER:  Objection.
4  That's argumentative.  And it
5  mischaracterizes.
6          I'll let Dr. Weber answer
7  again.  I think she was very
8  direct on that.
9          You can answer again.
10         THE WITNESS:  I thought I
11 understood that you were asking
12 whether I address this issue of
13 being skilled and experienced
14 enough to know how to correctly
15 assess a patient's prolapse and
16 then make any decisions about
17 whether the Prolift is indicated
18 or not.
19 BY MR. MORIARTY:
20      Q.   Well, I don't want to
21 characterize what you've previously
22 written.  My understanding is that you've
23 written opinions before based on company
24 documents and company witness testimony

Ann M. Weber, M.D.

Page 238

1  that the device was intended to be used
2  by high-volume surgeons. Let's just
3  leave it at that, whether the words
4  "highly skilled" are in those testimony
5  or documents. Okay. That's a separate
6  question.
7          What I'm trying to find out
8  is whether you have previously rendered
9  an opinion before today that a company
10 like Ethicon had to go so far as to
11 basically tell doctors how to stage and
12 grade their patients.
13         MR. SLATER: Objection.
14      That mischaracterizes all the
15      testimony and lack of foundation.
16      You can answer.
17 BY MR. MORIARTY:
18      Q.   That's a "yes" or "no" or an
19 "I don't remember if I've written that
20 before"?
21         MR. SLATER: I don't agree
22      with the characterization. The
23      doctor can answer as she sees fit
24      to a question that's very

Page 239

1  confusing.
2          THE WITNESS: In the very
3      specific way your question is
4      worded, I don't believe I've
5      written on that in my report.
6  BY MR. MORIARTY:
7      Q.   Okay. The other thing that
8  Mr. Slater asked you about is, is it your
9  opinion that Mrs. Hammons currently has
10 frequency and urgency related to her
11 Prolift?
12      A.   Mrs. Hammons has urinary
13 symptoms related to the fact that the
14 Prolift was implanted and, in the process
15 of scarring and all the things that we've
16 been talking about, affected her bladder
17 function to an ongoing extent, regardless
18 of what small portion of the mesh may be
19 removed and what portion remains.
20      Q.   All right. So it's your
21 opinion that Mrs. Hammons has ongoing
22 urinary complaints related to her
23 Prolift?
24      A.   Yes.

Page 240

1          MR. MORIARTY: Okay. I
2  don't have any other questions.
3          (The witness was excused.)
4          (Deposition concluded at
5  approximately 3:08 p.m.)

Page 241

1
   State of Pennsylvania     :
2                      :SS
   County of Philadelphia    :
3
4          CERTIFICATE
5      I, MICHELLE L. GRAY, a
   Registered Professional Reporter,
6  Certified Shorthand Reporter and Notary
   Public do hereby certify that, pursuant
7  to notice, the deposition of ANNE M.
   WEBER, M.D. was duly taken at Kline &
8  Specter, 1525 Locust Street,
   Philadelphia, Pennsylvania, on
9  September 1, 2015 at 9:03 a.m. before me.
   ANNE M. WEBER, M.D. was first duly sworn
10 by me according to law to tell the truth,
   the whole truth and nothing but the truth
11 and thereupon did testify as set forth in
   the above transcript of testimony. The
12 testimony was taken down stenographically
   by me.
13     I do further certify that
   the above deposition is full, complete
14 and a true record of all the testimony
   given by the said witness.
15
16
17
   MICHELLE L. GRAY,
18 A Registered Professional
   Reporter, Certified Shorthand
19 Reporter and Notary Public
   Dated:  September 2, 2015
20
21     (The foregoing certification
   of this transcript does not apply to any
22 reproduction of the same by any means,
   unless under the direct control and/or
23 supervision of the certifying reporter.)
24

Ann M. Weber, M.D.

Page 242

1     INSTRUCTIONS TO WITNESS
2
3          Please read your deposition
4   over carefully and make any necessary
5   corrections.  You should state the reason
6   in the appropriate space on the errata
7   sheet for any corrections that are made.
8          After doing so, please sign
9   the errata sheet and date it.  It will be
10  attached to your deposition.
11         It is imperative that you
12  return the original errata sheet to the
13  deposing attorney within thirty (30) days
14  of receipt of the deposition transcript
15  by you.  If you fail to do so, the
16  deposition transcript may be deemed to be
17  accurate and may be used in court.
18
19
20
21
22
23
24

Page 244

1          ACKNOWLEDGMENT OF DEPONENT
2          I,_____, do
3   hereby certify that I have read the
    foregoing pages, 1 - 245, and that the
4   same is a correct transcription of the
    answers given by me to the questions
5   therein propounded, except for the
    corrections or changes in form or
6   substance, if any, noted in the attached
    Errata Sheet.
7
8
    _____
9   ANNE M. WEBER, M.D.          DATE
10
11
12
13
14
15
    Subscribed and sworn
16  to before me this
    _____ day of _____, 20_____.
17
    My commission expires:_____
18
19  _____
    Notary Public
20
21
22
23
24

Page 243

1          - - - - - -
             E R R A T A
2          - - - - - -
3   PAGE  LINE  CHANGE
4   ____ ____ _____
5     REASON:  _____
6   ____ ____ _____
7     REASON:  _____
8   ____ ____ _____
9     REASON:  _____
10  ____ ____ _____
11    REASON:  _____
12  ____ ____ _____
13    REASON:  _____
14  ____ ____ _____
15    REASON:  _____
16  ____ ____ _____
17    REASON:  _____
18  ____ ____ _____
19    REASON:  _____
20  ____ ____ _____
21    REASON:  _____
22  ____ ____ _____
23    REASON:  _____
24  ____ ____ _____

Page 245

1          LAWYER'S NOTES
2   PAGE  LINE
3   ____ ____ _____
4   ____ ____ _____
5   ____ ____ _____
6   ____ ____ _____
7   ____ ____ _____
8   ____ ____ _____
9   ____ ____ _____
10  ____ ____ _____
11  ____ ____ _____
12  ____ ____ _____
13  ____ ____ _____
14  ____ ____ _____
15  ____ ____ _____
16  ____ ____ _____
17  ____ ____ _____
18  ____ ____ _____
19  ____ ____ _____
20  ____ ____ _____
21  ____ ____ _____
22  ____ ____ _____
23  ____ ____ _____
24  ____ ____ _____