# Exhibit C

Joye K. Lowman, M.D., MPH

Page 1

```
 1          PHILADELPHIA COUNTY COURT OF COMMON PLEAS
                 TRIAL DIVISION - CIVIL
 2
                    MAY TERM, 2013
 3
                    No. 003913
 4
   _____
 5
   PATRICIA L. HAMMONS,
 6
              Plaintiff,
 7
        vs.
 8
   ETHICON WOMEN'S HEALTH AND UROLOGY, a Division of
 9 Ethicon, Inc.,

10        and

11 ETHICON, INC.,

12        and

13 GYNECARE,

14        and

15 JOHNSON & JOHNSON,

16            Defendants.

17 _____

18

19            VIDEOTAPED DEPOSITION OF
              JOYE K. LOWMAN, M.D., MPH
20

21            Atlanta, Georgia

22         Friday, November 13, 2015

23

24      Court Reporter:  Michelle M. Boudreaux, RPR
```

Joye K. Lowman, M.D., MPH

Page 2

```
1
2
3
4
5
6                November 13, 2015
7                10:22 a.m.
8                Golkow Job No. 117256
9
10
11       Videotaped deposition of
12   JOYE K. LOWMAN, M.D., MPH, held at the
13   offices of Troutman Sanders LLP, Bank of
14   America Plaza, Suite 5200, 600 Peachtree
15   Street, Atlanta, Georgia pursuant to
16   Agreement before Michelle M. Boudreaux, a
17   Registered Professional Reporter in the State
18   of Georgia.
19
20
21
22
23
24
```

Page 3

```
1        APPEARANCES OF COUNSEL
2
3   On behalf of the Plaintiff:
4       ADAM M. SLATER, Esq. (via videoconference)
        Mazie Slater Katz & Freeman LLC
5       103 Eisenhower Parkway, 2nd Floor
        Roseland, New Jersey 07068
6       973.228.9898
        aslater@mskf.net
7
        JONATHAN GOODALL, Esq.
8       Kline & Specter, P.C.
        1525 Locust Street
9       Philadelphia, Pennsylvania 19102
        215.772.1000
10      jonathan.goodall@klinespecter.com
11
    On behalf of the Defendants:
12
        TAREK ISMAIL, Esq.
13      Goldman Ismail Tomaselli Brennan & Baum LLP
        564 West Randolph Street
14      Suite 400
        Chicago, Illinois 60661
15      312.681.6000
        tismail@goldmansmail.com
16
        N. "KAY" KAREN DEMING, Esq.
17      Troutman Sanders LLP
        Bank of America Plaza, Suite 5200
18      600 Peachtree Street, N.E.
        Atlanta, Georgia 30308-2216
19      404.885.3000
        karen.deming@troutmansanders.com
20
21   Videographer:  Josh Coleman
22
23
24
```

Page 4

```
1        THE VIDEOGRAPHER:  We are now on the
2   video record.  My name is Josh Coleman.  I'm
3   the videographer for Golkow Technologies.
4   Today's date is November 13th, 2015.  The
5   time is approximately 10:22 a.m.
6        This video deposition is being held in
7   Atlanta, Georgia, in the matter of Patricia
8   Hammons versus Ethicon, Inc., et al., for the
9   Philadelphia County Court of Common Pleas,
10  Trial Division.  The deponent is Joye Lowman,
11  M.D.
12       Counsel will now please identify
13  themselves for the record.
14       MR. SLATER:  Adam Slater for
15  plaintiff.
16       MR. GOODALL:  Jon Goodall for
17  plaintiff.
18       MR. ISMAIL:  Tarek Ismail for the
19  defendants.
20       MS. DEMING:  Kay Deming for the
21  defendants.
22       THE VIDEOGRAPHER:  The court reporter is
23  Michelle Boudreaux and will now swear in the
24  witness.
```

Page 5

```
1        JOYE K. LOWMAN, M.D., MPH,
2   being first duly sworn, was examined and testified as
3   follows:
4             EXAMINATION
5   BY MR. SLATER:
6   Q    Dr. Lowman, good morning.
7   A    Good morning.
8   Q    I'm Adam Slater.  I'm here to take your
9   deposition today.  You've been named as an expert
10  witness.  You understand you've been put forward as an
11  expert witness for Ethicon and Johnson & Johnson in
12  this case?
13  A    I'm -- yes, I'm counseling -- I am a
14  consultant with Troutman and Sanders, yes.
15  Q    You're a consultant with Troutman and
16  Sanders.  Do you understand that you've been named as
17  an expert witness for Ethicon and Johnson & Johnson in
18  a litigated case in Philadelphia County?
19  A    I understand that I'm an expert witness, yes.
20  Q    Have you ever been an expert witness in
21  another case before this?
22  A    I have not.
23  Q    Okay.  You understand you're under oath now,
24  right?
```

Joye K. Lowman, M.D., MPH

Page 6

1    A   I understand that.  My understanding of your
2  question is have I served as an expert witness.  I've
3  served as a fact witness.  I don't know if there's --
4  I'm assuming that there's a difference there.
5    Q   There is.  We'll talk about that later.
6        You understand you're under oath and must
7  tell the truth in response to every question I ask you,
8  correct?
9    A   Correct.
10   Q   Okay.  If you have a question about something
11 that I ask you or anyone else asks you --
12   A   Uh-huh.
13   Q   -- because the question is unclear to you for
14 some reason, just tell me or whoever is asking you the
15 question so that we can clarify what it is that you
16 don't understand, okay?
17   A   Okay.  I thought I understood the question,
18 but I'll make sure that I clarify, uh-huh.
19   Q   I'm just telling you in the course of the
20 deposition, for example, I may ask you about medical
21 terminology that I don't understand.  I may
22 mispronounce a word.  I may ask you something that
23 makes no sense to you whatsoever because I mumble --
24   A   Right.

Page 7

1    Q   -- or because I'm tired or I can't get my
2  sentences put together.  Whatever the issue is, if you
3  don't feel comfortable answering the question because
4  you don't understand what you're being asked, just ask,
5  you know, for clarification on what seems unclear,
6  okay?
7    A   Okay, not a problem.
8    Q   There will be objections during the course of
9  the deposition.  I don't expect that there will be
10 substantive objections, but you may hear "objection to
11 the form of the question" sometimes.  That's not a
12 signal and it's not anything that you should be
13 distracted by.  Lawyers do that because they want to
14 preserve their rights under the evidence rules at
15 times.  So just let somebody state their objection and
16 then answer the question after the objection, okay?
17   A   Okay.
18   Q   When were you first contacted to do work in
19 this case?
20   A   I don't remember exactly.  Karen reached out
21 to me at some point during the summer about possibly
22 consulting with them about cases like this, but I don't
23 remember the exact date.
24   Q   The summer of 2015?

Page 8

1    A   The summer of 2015, yes.
2    Q   When did you first have any discussion with
3  anybody or receive any information with regard to the
4  Hammons case?
5    A   Again, I don't remember that exact date, but
6  I believe it was also in the summer as well.
7    Q   Summer of 2015, correct?
8    A   Of 2015.  I think it was around August, but
9  I'm not sure.
10   Q   Is this case the first time you've acted as
11 an expert witness in a litigated matter?
12   A   Yes.
13   Q   Have you ever been deposed before?
14   A   Yes.
15   Q   How many times?
16   A   Once before.
17   Q   Do you remember the name of that case?
18   A   I -- the patient's name?
19   Q   Anything about the name of the case.
20   A   I remember the patient's name, yes.
21   Q   Okay.  What was it?
22       THE WITNESS:  Am I allowed to disclose
23 that?
24       MR. ISMAIL:  You are.

Page 9

1        MR. SLATER:  Yes.
2        THE WITNESS:  Okay.
3        MR. SLATER:  Yes.
4        THE WITNESS:  Annette Lucas.
5    Q   (By Mr. Slater)  Were you deposed as a
6  treating doctor in that case?
7    A   I was.
8    Q   What are the fees that you're charging for
9  your work in this case?
10   A   I'm charging 400 an hour and 600 an hour for
11 deposition and trial.
12       MR. SLATER:  What I'd like to do -- I
13 think we've marked as Exhibit 1 Dr.
14 Lowman's expert report and the materials
15 attached to it.  So if we could, let's -- if
16 we could hand that to her, I'd appreciate it.
17   Q   (By Mr. Slater)  Dr. Lowman, you've had put
18 in front of you what we've marked as Exhibit Lowman 1.
19 Tell me what that is.
20   A   It's my expert report.
21   Q   When did you write this report?
22   A   I don't remember the exact date.
23   Q   And we'll start with this:  You didn't write
24 it yesterday, right?

Joye K. Lowman, M.D., MPH

1    A    I didn't write it yesterday, that's correct.
2    Q    All right.  Well, tell me -- tell me what
3  month you wrote it in.
4    A    I think it was September.
5    Q    September of 2015?
6    A    2015, yes.
7    Q    Does this report contain each of the opinions
8  that you formed in connection with this case?
9    A    It does.
10    Q    In the course of the report, you discussed
11  certain facts, both general facts about the Prolift and
12  about the medical literature, as well as about
13  Ms. Hammons in specific.
14    A    Yes.
15    Q    Did you set forth and discuss those facts
16  that you felt were most important to you in forming
17  your opinions?
18    A    Did I spell out the facts that were most
19  important to me?  I believe I did, yes.
20    Q    This report is 58 pages long and it's dated
21  August 2015, correct?
22    A    Yes, not including the appendix, my part of
23  the report is 58 pages long.
24    Q    Did you write this report yourself, every

1  word of it?
2    A    I wrote this report myself.
3    Q    Nobody else had any input into writing this
4  report?
5        MR. ISMAIL:  Objection.  Are we getting
6      into drafting of the report?
7        MR. SLATER:  I'm not asking if -- who
8      was involved or what involvement anybody else
9      had.  I just want to understand whether
10      Dr. Lowman wrote every word in this report
11      herself.
12        THE WITNESS:  Yes.
13    Q    (By Mr. Slater)  Doctor, when you wrote this
14  report, did you look at other reports to see what the
15  report was supposed to look like for format, for
16  example?
17    A    In writing the report, I reviewed other
18  expert reports, yes.  I'm not sure if I understand the
19  question.
20    Q    What other expert reports did you review?
21    A    I reviewed Dr. Zipper's report and I reviewed
22  Dr. Weber's report.
23    Q    Do you know Dr. Zipper?
24    A    I don't.

1    Q    Do you know Dr. Raders, who works with
2  Dr. Zipper?
3    A    I have met Dr. Raders before, yes.
4    Q    Did you work with him in Pennsylvania?  Was
5  he with Dr. Lucente at that point, or had he left by
6  then?
7    A    He was with Dr. Lucente at that point.
8    Q    What was Dr. Raders' role or what was his
9  position at the time that you knew him in Pennsylvania?
10    A    I don't know his position specifically.  My
11  understanding is that he was training under
12  Dr. Lucente.
13    Q    Do you know Dr. Weber?
14    A    I've never met her, but I am -- I've heard
15  her name before, yes.
16    Q    You know who she is, correct?
17    A    I've seen her name on several publications,
18  but I've never met her.
19    Q    Do you know Charlotte Owens?
20    A    No.
21    Q    Do you know who Charlotte Owens is?
22    A    I don't know.  That name doesn't ring a bell,
23  no, but I'm bad with names, so I can't say that I've
24  never met her.  I just don't know that person.

1    Q    My question is:  Do you know who Charlotte
2  Owens is?
3    A    No.
4    Q    Robinson is?
5    A    I'm sorry?
6        THE WITNESS:  He's coming in and out.
7    Q    (By Mr. Slater)  Do you know who David
8  Robinson is?
9    A    I don't believe so.
10    Q    Do you know Pete Hinoul?
11    A    Could you repeat that?
12    Q    Sure.  Do you know Pete Hinoul?
13    A    No.
14    Q    H-I-N-O-U-L.
15    A    H-I-N-O-U-L.  No, I don't.
16    Q    Do you know who Pete Hinoul is?
17    A    I don't.
18    Q    Do you know who David Robinson is?
19    A    You just asked me that, I think.  No.
20    Q    I thought I asked you if you knew him.  I
21  just wanted to ask you, do you know who David Robinson
22  is?
23    A    I don't think so.
24    Q    Do you know who Scott Ciarrocca is?

Joye K. Lowman, M.D., MPH

Page 14

1    A   That name doesn't ring a bell either.
2        MR. ISMAIL:  Did you ask a question?
3    Q   (By Mr. Slater)  Do you know Paul Parisi?
4    A   Paul Parisi.  I don't think so.
5    Q   Do you know who Scott Ciarrocca or Paul
6 Parisi are?
7    A   No.
8    Q   Do you know who Price St. Hilaire is?
9    A   No.
10   Q   Do you know who Axel Arnaud is?
11   A   I don't.  I've seen that name in some of the
12 expert reports, but I don't know who that person is.
13   Q   Do you know who Jim Hart is?
14       THE WITNESS:  What did he say?  Jim --
15 did you say Jim Hart?
16       MR. SLATER:  Yes.
17       THE WITNESS:  No.
18   Q   (By Mr. Slater)  In preparing your report,
19 did you read the deposition transcript of any witness
20 employed by Ethicon?
21   A   Did I read the deposition transcript of any
22 witness employed by Ethicon?  No.
23   Q   In preparing your report, did you read the
24 deposition transcript of any deposition taken of

Page 15

1 Dr. Vincent Lucente?
2    A   No.  We can't hear you.
3    Q   Read any deposition or --
4        THE WITNESS:  He's coming in and out.
5        MS. DEMING:  Well, actually, it's just
6 the delay in the video.
7        THE WITNESS:  Oh, it's a delay.  Oh.
8        MS. DEMING:  So his question will
9 actually ultimately get to you.
10       THE WITNESS:  Gotcha.
11       MS. DEMING:  But it's looking different
12 on the camera.
13       THE WITNESS:  Okay.  Sorry.
14   Q   (By Mr. Slater)  Any deposition transcript or
15 testimony given by Miles Murphy?
16   A   No.
17       MS. DEMING:  I just misspoke.
18 Sometimes, Adam, you're beginning a question,
19 but it's not coming in over the microphone.
20 So she's getting sort of the back end of your
21 question.
22       MR. SLATER:  There's no bridge on this,
23 right?  Nobody else is on this line, right?
24       MS. DEMING:  Correct.

Page 16

1        MR. SLATER:  Okay.
2        MS. DEMING:  Unless it's our -- you
3 know, the guy that's in charge of our all
4 video stuff that will make sure that it's
5 coming through and everything is goes kosher
6 here, he'll check periodically, but other
7 than that, no.
8    Q   (By Mr. Slater)  Doctor, attached to your
9 report is an Appendix A.  Can you turn to that, please?
10   A   Okay, I'm here.
11   Q   It says "Curriculum Vitae" with your name.
12 Is that what this is?
13   A   Yes, that's part of it, uh-huh.
14   Q   It says that you did your residency in
15 obstetrics and gynecology at Abington Memorial
16 Hospital.
17   A   Yes.
18   Q   Is that correct?
19   A   That's correct.
20   Q   Who trained you at Abington?
21   A   Oh, my gosh.  A number of different
22 physicians were involved in training us there.
23   Q   Great.  Tell me who they were.
24   A   I can't list -- I mean, it was, I think, 10

Page 17

1 groups, different private practice groups, so I can't
2 list all of them.  I don't remember all of their names.
3    Q   Were you trained by Vincent Lucente?
4    A   Dr. Lucente was one of them, yes.
5    Q   Tell me about the training Dr. Lucente did
6 with you.
7    A   Dr. Lucente was the -- I don't know the
8 formal name for it, but he was over our urogynecology
9 training, so he provided that aspect for us.  We have
10 to be exposed to all of the surgical subspecialties,
11 and he was the person that did that for our residency
12 program.
13   Q   What did the training that Dr. Lucente gave
14 you consist of?
15   A   It consisted of didactics and operating room
16 experience, as well as office -- you know, he would
17 oversee us seeing patients that came with
18 urogynecologic problems to our clinic.  We had a
19 resident clinic, and he would oversee patients that had
20 problems with urogynecology.
21   Q   Other than general training in the residency
22 for urogynecology, did you do any other work with
23 Dr. Lucente?
24   A   At one point, we were trying to do some

Golkow Technologies, Inc. - 1.877.370.DEPS

Page 18

1    research together.  I don't remember the specifics of
2    it at this point.  But other than that, no.
3        Q    What type of research was it?
4        A    I don't remember.  It was so along ago and it
5    never really got anywhere because Dr. Lucente was so
6    busy at the time, so I honestly don't remember.
7        Q    You don't remember anything about the
8    research at all?
9        A    No.  I just -- I just --
10       Q    Nothing that you can tell me?
11       A    I don't.  I remember that as a resident, we
12   had to do a thesis research project, and I wanted to do
13   my project within the field of urogynecology, so I
14   remember us talking about that, but we just weren't
15   able to really get anything together.  So my project
16   ended up being on magnesium sulfate prophylaxis in
17   hypertensive disorders in pregnancy.  So I honestly
18   don't -- I don't remember what we talked about.
19       Q    Other than being the head of the
20   urogynecology training during your residency, did
21   Dr. Lucente have any other involvement with your
22   education?
23       A    Not with direct education.  He did write a
24   letter of recommendation for me and going to -- when I

Page 19

1    was trying to pursue fellowship.  I don't know if you
2    would consider that a part of my education.
3        Q    Have you spoken with Dr. Lucente at all about
4    this litigation, either this case in specific or
5    general mesh litigation?
6        A    I have.
7        Q    When was that?
8        A    I don't remember exactly.  It was within the
9    last three months for sure because I remember wanting
10   to speak with him specifically about Dr. Zipper's
11   report, or about Dr. Zipper, I should say.
12       Q    You spoke with Dr. Lucente within the past
13   three months?
14       A    Yes.
15       Q    And you spoke to him about Dr. Zipper?
16       A    I wanted to.  I couldn't remember -- like I
17   said, I'm bad with names, and so when I actually spoke
18   with Dr. Lucente, I couldn't remember Dr. Zipper's
19   name.  But the goal of the conversation for me was to
20   try to get some better perspective on Dr. Zipper.
21       Q    You originally said that you discussed
22   Dr. Zipper's report with Dr. Lucente.
23       A    Right.
24       Q    Tell me about that.

Page 20

1        A    I misspoke.  What I meant to say was I was
2    trying to get some greater perspective on
3    Dr. Zipper's -- on his opinions, where that was coming
4    from.
5        Q    When you say you wanted better perspective on
6    Dr. Zipper's opinions, does that mean you told
7    Dr. Lucente what Dr. Zipper's opinions were and asked
8    him --
9        A    No --
10       Q    -- his thoughts?
11       A    -- I did not.  No.  What I wanted to do was
12   to understand why someone who has actually used mesh
13   for pelvic reconstructive surgery was now so against
14   its use.  My exposure and experience up until that
15   point had been with physicians who were nonmesh users
16   who thought very negatively about mesh.  And I
17   understood that perspective because they see some of
18   the complications and don't get the benefit of seeing
19   some of the successes.  So I understand their
20   perspective.
21       I was surprised by Dr. Zipper's perspective,
22   and I wanted to speak with Dr. Lucente about whether or
23   not he had any understanding that might make that
24   more -- that might make it make sense to me.

Page 21

1        Q    What did Dr. Lucente tell you?
2        A    He just, you know, sort of lamented the fact
3    that that is the current situation, that there are some
4    people that feel that way.  Again, I couldn't remember
5    Dr. Zipper's name and I don't know who Dr. Zipper is.
6    So he just sort of gave some general opinions about the
7    fact that that's the way it is.
8        Q    Tell me what he said.
9        A    Oh, I don't -- I don't remember exactly what
10   he said.  Like I said, it was three months ago or
11   sometime over the past three months.
12       Q    Did you consider this an important
13   conversation when you spoke to Dr. Lucente about the
14   work you were going to do in this case where you were
15   going to be an expert witness?
16       A    What do you mean by did I consider it an
17   important conversation?  It was just a conversation --
18       Q    I'm trying to figure out -- I'm trying to
19   figure out why it is that you're having trouble
20   recalling things that I'm asking you, because my guess
21   is that you'll have recollection of things that are
22   favorable to the position that you've been hired to
23   defend.
24       A    No, that's not true.

Joye K. Lowman, M.D., MPH

Page 22

1    Q   So I'm trying to get at why you're having
2  trouble.
3    A   Yeah.
4    Q   I'm sorry, but I was talking.
5    A   Okay.
6    Q   I'm trying to figure out why you're having
7  such trouble recalling things that I'm asking you
8  about.
9    A   Because --
10      MR. ISMAIL:  Objection.  Move to --
11   sorry.  Objection to form.  Move to strike
12   the attorney commentary.
13      THE WITNESS:  You're asking me specifics
14   about a conversation that was just a regular
15   conversation that I wasn't thinking, oh, this
16   is something that I should be able to tell
17   somebody about three months from now.  This
18   was a conversation that I had with somebody
19   that I consider to be a friend and colleague
20   that I -- had nothing to do with any
21   specifics of this case.
22      If you asked me a -- what conversation I
23   had with my mom two days ago, I wouldn't be
24   able to recount to you exactly what we said.

Page 23

1  I can tell you the general gestalt, but I
2  cannot tell you exactly what was said.
3    Q   (By Mr. Slater)  You consider Dr. Lucente to
4  be a friend?
5    A   Absolutely.
6    Q   You consider Dr. Lucente to be a colleague?
7    A   I do.
8    Q   Do you -- do you respect Dr. Lucente's
9  research in the field of pelvic surgery and
10  particularly with regard to the Prolift?
11   A   I do.
12   Q   Do you think that Dr. Lucente's literature
13  with regard to the Prolift is something that's
14  important to consider in forming your opinions?
15   A   I do.
16   Q   Has anybody ever indicated to you that there
17  were any questions about the validity of the data
18  reported by Dr. Lucente in any of his studies?
19   A   No.
20   Q   Are the findings that Dr. Lucente has made in
21  the medical literature and the things that you've
22  learned from him important to you in forming your
23  opinions about the Prolift?
24   A   All of the data is important to me in forming

Page 24

1  my opinions about the Prolift.  It's not just
2  Dr. Lucente.  But did I consider his data, yes.
3    Q   Was Dr. Lucente's -- well, rephrase.
4      Is Dr. Lucente's data and the things that he
5  has written and said about the Prolift, the things
6  you're aware of, is that an important part of what you
7  rely on?  I understand you rely on multiple things, but
8  is that an important part of what you rely on?
9    A   It's part of what I rely on, yes.
10   Q   Would you consider it to be an important part
11  of what you rely on?
12   A   Not any more important than any of the other
13  literature that I considered, no.
14   Q   Have you ever been paid money by Ethicon?
15   A   No.
16   Q   Other than as an expert witness?
17   A   No.
18   Q   Have you ever worked on a study where Ethicon
19  paid money for the study to be performed?
20   A   We did a study on the Prolift, an MRI study,
21  when I was a fellow with Dr. Hale, and Dr. Hale was
22  involved in securing some funding to be able to perform
23  the MRIs.
24   Q   Were you ever given any nonfinancial benefits

Page 25

1  by Ethicon, for example, meals or travel expenses being
2  paid, anything like that?
3    A   I don't remember specifically.  I know
4  that -- I think that I may have attended a training
5  session, and sometimes they do reimburse for travel and
6  meals when you attend training sessions.  So they may
7  have.
8    Q   Have you ever signed a consulting agreement
9  or any type of an agreement with Ethicon to perform any
10  work on behalf of their professional education or
11  marketing department where they would agree to pay you
12  for what you did?
13   A   No.
14   Q   Have you ever acted as a proctor or a
15  preceptor for a Prolift procedure where you've been
16  involved in demonstrating for other doctors how the --
17  how the Prolift is performed?
18   A   Not where -- not where -- not being paid, no.
19  When I was a fellow, we would sometimes --
20   Q   Well, how about --
21   A   When I was a fellow, we would sometimes train
22  residents on some of the procedures that we were
23  performing, but I have not trained other physicians for
24  payment, no.

Joye K. Lowman, M.D., MPH

Page 26

1    Q    Have you ever been involved in a proctorship
2  or a preceptorship where physicians watched a procedure
3  that you performed, whether or not you were being paid?
4  And I'm talking about Prolift procedure.
5    A    No.
6    Q    Have you ever been involved in a proctorship
7  or a preceptorship that was sponsored by Ethicon where
8  they were going to bring doctors to see you operate?
9    A    No.
10   Q    Were you ever involved in planning an event
11 where you were going to either participate in a
12 proctorship or a preceptorship where Ethicon was going
13 to sponsor the event and bring doctors to see you
14 perform a procedure?
15   A    I don't believe so.  Not that I can remember.
16   Q    Have you interacted over the years with
17 Ethicon employees?
18   A    Yes.
19       MR. SLATER:  I'm sorry, are you guys not
20 hearing me?
21       MR. ISMAIL:  No.
22   Q    (By Mr. Slater)  I asked who, which Ethicon
23 employees have you interacted with?
24   A    Oh, I don't remember.  Most of that was

Page 27

1  during my fellowship, so I -- again, I'm bad with
2  names.  I don't -- I don't remember their names.
3    Q    What did those interactions involve?
4    A    Sometimes the reps would come to the
5  operating room to make sure that we had the products
6  that we needed.  I remember interacting with someone
7  when I was preparing my Prolift paper for presentation
8  at the Society of Gynecologic Surgeons because I needed
9  an electronic picture.  I don't remember any other
10 specifics.
11   Q    Have you ever spoken with Dr. -- well, let me
12 ask you this.  Let me take a step back.  You said you
13 spoke with Dr. Lucente in the last three months about
14 Dr. Zipper, correct?
15   A    That's correct.
16   Q    How long was that conversation?
17   A    Very brief.  If I had to guess, maybe three
18 minutes, three, four minutes.
19   Q    Have you spoken to Dr. Lucente since that
20 time?
21   A    I have not.
22   Q    When was the last time you had spoken to
23 Dr. Lucente before that?
24   A    It had been quite some time.  Months.

Page 28

1    Q    You had spoken with Dr. Lucente?
2        MR. ISMAIL:  Restate your question,
3  please.
4    Q    (By Mr. Slater)  What was the context that
5  you spoke to Dr. Lucente in -- the last time you had
6  spoken to him before you spoke to him about Dr. Zipper?
7    A    I don't remember.  It had been a long time
8  since we actually spoke.  I -- unfortunately, we're all
9  very busy and so we don't often, you know, talk as much
10 as we'd like, maybe.  I don't speak with him on the
11 phone regularly.
12   Q    What procedures do you currently utilize to
13 treat anterior prolapse or cystocele?
14   A    The -- most often an abdominal
15 sacrocolpopexy.
16   Q    You currently would use abdominal
17 sacrocolpopexy to treat a cystocele?
18   A    If -- yes, if it's a significant cystocele
19 and I'm -- that I think requires surgical treatment,
20 that's my procedure of choice, yes.
21   Q    Do you perform anterior colporrhaphy?
22   A    No.
23   Q    Have you performed anterior colporrhaphy with
24 sutures in your practice?

Page 29

1    A    I have.
2    Q    Do you perform abdominal sacrocolpopexy on a
3  patient where they have a cystocele but no vaginal
4  vault prolapse?
5    A    It's unusual to see that.  But if I had a
6  patient who had a significant cystocele, I would
7  recommend an abdominal sacrocolpopexy even in the
8  absence of apical prolapse.
9    Q    What is a significant cystocele?  What does
10 that mean?
11   A    A cystocele that's symptomatic.  Sometimes
12 patients are referred to me because they have a
13 cystocele but the patient is not actually complaining
14 of anything or the cystocele is not bothering them.  If
15 it's just there, then it doesn't require treatment.
16 But if the patient is actually bothered by the
17 cystocele, then I would recommend an abdominal
18 sacrocolpopexy.
19   Q    So the extent of surgery you would perform
20 would be dependent not just on the anatomic findings,
21 but also on the clinical symptoms reported by the
22 patient?
23   A    Correct.
24   Q    In terms of evaluating the success of a

Joye K. Lowman, M.D., MPH

Page 30

1 prolapse repair surgery, do you agree that the
2 functional outcome in terms of how it -- how the
3 patient is functioning day to day is more important
4 than the anatomic outcome?
5    A   No.
6    Q   Literature and statements by professional
7 organizations to that effect?
8    A   I'm sorry, you dropped off for a second.  Can
9 you repeat the question?
10    Q   Are you familiar with statements by medical
11 societies and/or medical literature indicating that
12 functional outcomes should be the primary measure for
13 whether or not a prolapse procedure has been successful
14 or not?
15    A   I'm aware of literature that says that
16 functional outcomes should be considered.  Whether or
17 not it's more important, I'm not aware of that, no.
18    Q   In determining whether a -- rephrase.
19        In determining whether a prolapse procedure
20 has been successful, you would not just look at the
21 anatomic outcome, correct?
22    A   That's correct.
23    Q   In determining whether a prolapse procedure
24 was successful, you would look at the functional

Page 31

1 outcome in terms of how the patient is doing and how
2 they feel, as well as the anatomic outcome in terms of
3 how the organs and how the vagina looks, correct?
4    A   Yes, but more specifically the symptom that
5 relates to that anatomic outcome would be the thing
6 that I'd be most interested in.
7    Q   I think what you're saying is, if you saw,
8 for example, after a cystocele repair, that the patient
9 had a second-degree cystocele eight months later but
10 was -- said, "Oh, I feel a little bulge, but it's not
11 really bothering me," would you feel that that surgery
12 was generally successful because the patient was
13 functioning well?
14        MR. ISMAIL:  Objection to form.
15        THE WITNESS:  No.
16    Q   (By Mr. Slater)  If the patient said that she
17 was not really bothered by a slight bulge and she felt
18 okay, would you recommend surgery to repair a
19 second-degree cystocele?
20    A   No.
21    Q   Do you know what Ethicon's internal criteria
22 was for whether or not a Prolift should be utilized on
23 a woman?
24    A   No.

Page 32

1    Q   Is that of any significance to you in forming
2 your opinions in this case, what Ethicon internally
3 believed?
4    A   No.
5    Q   Do you know anything about the criteria
6 applied by Ethicon in deciding whether or not the
7 Prolift should be put on the market in 2005?  Do you
8 know what criteria they applied?
9    A   No.
10    Q   Did you ask the attorneys who retained you to
11 get you any information about the criteria Ethicon
12 applied when deciding whether or not the Prolift should
13 be marketed?
14    A   No.
15    Q   Was that of any significance to you at all?
16    A   No.
17    Q   Do you know what Ethicon knew internally,
18 outside of what is in the published medical literature
19 or literature that you've seen at meetings, with regard
20 to the risk-benefit profile of the Prolift?
21    A   No.
22    Q   Was that of any significance to you?
23    A   No.
24    Q   Do you know who Bernard Jacquetin and

Page 33

1 Michelle Cosson are?
2    A   I've read their names in the literature.
3 I've never met them.
4    Q   Do you know what role they played with regard
5 to the Prolift?
6    A   Yes.
7        MR. GOODALL:  Adam, we didn't hear that
8 question.
9    Q   (By Mr. Slater)  As to the role that Bernard
10 Jacquetin and Michelle Cosson played with regard to the
11 Prolift.
12        MR. ISMAIL:  Can you restate, please?
13        MR. SLATER:  There's sometimes these
14 delays on these videoconferencing.
15    Q   (By Mr. Slater)  What is your understanding
16 as to the role that was played by Michelle Cosson and
17 Bernard Jacquetin with Prolift?
18    A   My understanding is that they were part of a
19 group of surgeons from France who were involved in
20 developing the product.
21    Q   In forming your opinions in this case, are
22 you relying on the articles that Cosson and Jacquetin
23 and their group of physicians in France have published?
24    A   That's part of the literature, yes.

9 (Pages 30 to 33)

Joye K. Lowman, M.D., MPH

Page 34

1    Q    Do you feel that the literature that was put
2  out by Jacquetin and Cosson and their group of
3  physicians is an important source of information about
4  the Prolift?
5    A    It's one of many sources, yes.
6    Q    Do you know what Bernard Jacquetin and
7  Michelle Cosson were telling Ethicon in 2004 and 2005
8  with regard to the Prolift and whether they thought the
9  mesh was an appropriate mesh to use in the Prolift?
10   A    No.
11   Q    Is that of any significance to you?
12   A    No.
13   Q    Have you seen any literature written by
14 Jacquetin or Cosson indicating that the use of the
15 Prolift should be limited to certain types of patients?
16   A    Yes.  I remember reading one of the first
17 descriptions of the product, and they were remarking
18 that they thought it should be used for advanced stage
19 prolapse.
20   Q    Do you agree with that?
21   A    No.
22   Q    Do you know what Ethicon's internal thoughts
23 were with regard to whether the Prolift should be
24 limited to advanced stage prolapse?

Page 35

1    A    I don't.
2    Q    Is that of any significance to you?
3    A    No.
4    Q    Do you believe you have access to the same
5  amount of data and information about the risks and
6  benefits of the Prolift as Ethicon does?
7    A    No.
8    Q    You -- would you agree with me that Ethicon
9  has access to more information about the risks and
10 benefits of the Prolift than you do?
11   A    I believe that they have access to more
12 information in regards to the development of the
13 product, but I've used the product in clinical
14 practice, and so I believe that I have information with
15 regards to that that they might not have.  So I do
16 think that they have more information about its
17 development, yes.
18   Q    Did you ever tell Ethicon anything about the
19 outcomes you had with your patients?  Did you ever
20 discuss that with anybody from Ethicon?  I'm talking
21 about Prolift patients.
22   A    I don't remember.  Not outside of my
23 research.
24   Q    Do you know what Ethicon does to get

Page 36

1  information from doctors about their mesh devices?
2    A    Do I know what they do to get information
3  from doctors?  I'm not sure what you are asking, what
4  you mean by that question.
5    Q    Let me ask you this:  Do you know who within
6  Ethicon evaluates the safety of the Prolift?
7    A    I don't.
8    Q    Do you know what Ethicon did to evaluate the
9  safety of the Prolift on a day-to-day basis once it
10 went on the market?
11   A    I don't.
12   Q    Was that of any interest to you?
13   A    No.
14   Q    Asked to see any information that Ethicon had
15 compiled internally about the safety or the efficacy of
16 the Prolift?
17   A    Could you repeat the question?
18   Q    To see any information that Ethicon had
19 compiled --
20   A    I'm sorry --
21   Q    -- internally --
22   A    -- you keep -- the beginning of your question
23 keeps falling out.
24   Q    It may be that my voice doesn't start to pick

Page 37

1  up until after I say the first few words.  Is that
2  what's happening?
3    A    Yes.
4        MR. ISMAIL:  In part.  Sometimes that
5  happens and we can follow along.  Sometimes
6  the first few words just don't come through
7  at all, and we just start picking you up in
8  mid sentence.  It hasn't happened every
9  question, and we've alerted you when it's
10 happened.
11       MR. SLATER:  All right, I'm going to
12 start to say, "My next question."  It's going
13 to be cumbersome, but hopefully that will
14 help.  Because I think what happens is the
15 mic picks up the speaker and it takes a
16 second for it to transfer to the other
17 speaker.  So I'm just going to start saying,
18 "My next question."  Don't -- I don't want
19 you to think I'm like lecturing you.
20       THE WITNESS:  Okay.
21       MR. SLATER:  I'm just going to do it so
22 the mic will pick up.
23       THE WITNESS:  Okay.
24       (Discussion off the written record.)

10 (Pages 34 to 37)

Joye K. Lowman, M.D., MPH

Page 38

1    Q    (By Mr. Slater)  My next question:  Did you
2  make any effort to learn what information Ethicon had
3  internally compiled regarding the safety or the
4  efficacy of the Prolift?
5    A    No.
6    Q    Would that have been of any significance to
7  you?
8    A    No.
9    Q    You -- let me rephrase.
10       My next question:  Do you consider yourself
11  to be an expert with regard to the design of the
12  Prolift or a pelvic mesh system like the Prolift?
13       MR. ISMAIL:  Objection to form.
14       THE WITNESS:  I'm not sure what you mean
15    by that.  I think that I'm an expert in the
16    way that the Prolift works, yes.
17    Q    (By Mr. Slater)  My next question:  Do you
18  have any information at all that you're relying on at
19  all as an expert in this case about the steps that are
20  taken and were actually taken with the design and the
21  development of the Prolift by Ethicon?
22    A    Yes, I do.
23    Q    What's that?
24    A    I understand some of the biomaterial science

Page 39

1  that went into developing the mesh that's used with the
2  Prolift, and that information has been obtained through
3  the literature.
4    Q    Anything else?
5    A    No.
6    Q    My next question:  Do you know anything about
7  the steps that Ethicon took as a device manufacturer to
8  develop the Prolift, the internal steps that they went
9  through to get from the point when somebody brought the
10  idea to them to the point they put it on the market?
11  Do you know anything about that process at all?
12       MR. ISMAIL:  Objection to form.
13       THE WITNESS:  Could you be more
14    specific?
15       MR. SLATER:  Sure.
16    Q    (By Mr. Slater)  Do you know what design
17  control is?
18    A    I don't.
19    Q    Do you know what design requirements matrix
20  is?
21    A    I don't.
22    Q    FMEA is?
23    A    You -- I missed part of that.
24    Q    Do you know what an FMEA is?

Page 40

1    A    I don't.
2    Q    A DDSA is?
3       THE WITNESS:  He keeps dropping off.
4    You keep falling off --
5    Q    (By Mr. Slater)  Let me ask you this --
6  ma'am, it's okay.  It's fine.  You don't have to get
7  frustrated.  It's not -- it's a technical problem with
8  us talking from a thousand miles away from each other.
9    A    No, I understand.  I'm not frustrated.
10    Q    If I have to repeat a question --
11    A    I'm just informing you.
12    Q    -- it's not a big deal.  It's fine.
13       Okay.  My next question is:  Do you know what
14  a DDSA is?
15    A    No.
16    Q    Okay.  My next question:  Do you know what a
17  clinical expert report is as that is used within
18  Ethicon?
19    A    I don't.
20    Q    Okay.  You said that you are familiar with
21  some biomaterial science that went into the development
22  of the mesh through the literature, right?
23    A    That's correct.
24    Q    Are you familiar with the literature by

Page 41

1  Dr. Klinge?  K-L-I-N-G-E.  Are you familiar with his
2  literature?
3    A    Yes.
4    Q    Do you -- new question:  Do you rely in part
5  on Dr. Klinge's literature about the mesh in the
6  Prolift in forming your opinions?
7    A    Yes.
8    Q    Do you find Dr. Klinge's literature to be
9  important in this field?
10    A    Yes.
11    Q    Let me ask you this:  Do you know what
12  Dr. Klinge's opinions are about whether or not the mesh
13  in the Prolift is safe for transvaginal treatment of
14  prolapse?
15    A    Yes.
16       MR. ISMAIL:  Objection to form.  Go
17    ahead.
18       THE WITNESS:  Yes.
19    Q    (By Mr. Slater)  Klinge's opinion?
20       MR. ISMAIL:  Restate, please.
21       THE WITNESS:  I think it's actually --
22       MR. SLATER:  My next question --
23       THE WITNESS:  -- better when his head is
24    down.

11 (Pages 38 to 41)

Joye K. Lowman, M.D., MPH

Page 42

1      MS. DEMING:  Okay.
2      THE WITNESS:  I think it's better when
3   his head is down.
4      Q   (By Mr. Slater)  Okay.  My next question:
5   What is your understanding of Dr. Klinge's opinion
6   about whether or not the mesh in the Prolift is safe
7   for treatment of pelvic organ prolapse through the
8   vagina?
9      A   I don't know if he stated specifically that
10  it was or was not safe.  My impression is that he feels
11  that the evidence that he has participated in creating
12  is not relevant for the mesh that was used in the
13  Prolift.
14     Q   I'm sorry, let me just ask you a question.
15  When you say "he feels his evidence is not relevant" --
16     A   Uh-huh.
17     Q   -- what do you mean by that?
18     A   When I was reviewing his report, he remarked
19  that the biomaterial science that he helped to generate
20  is not relevant for the Gynemesh because they were
21  looking at biomaterial science as it related to the
22  abdominal -- an abdominal hernia.  And he felt that a
23  model for vaginal hernias should be the paradigm that
24  should be used to establish whether or not the mesh was

Page 43

1   safe for use with a vaginal hernia.
2      Q   Okay.  So you're not -- let me just
3   understand.  So you're not aware of whether Dr. Klinge
4   has offered an opinion directly about whether or not
5   the mesh in the Prolift is safe for use to treat
6   Prolift -- prolapse through the Prolift system?
7      A   That's correct.
8      Q   Based on -- let me just ask you this:  Based
9   on Dr. Klinge's work in this field, would that opinion
10  be significant to you?
11     A   It would be something that I would consider,
12  yes.
13     MR. SLATER:  If we could, can we hand
14  Dr. Lowman Exhibit 17, please.
15     MR. ISMAIL:  Thank you.
16     Q   (By Mr. Slater)  Okay, Doctor, do you see
17  Exhibit 17 that we've handed to you?
18     A   Yes.
19     Q   You see these are some emails in September
20  2007 between some people at Ethicon named Bart Pattyson
21  and Paul Parisi and Dr. Lucente?  Do you see that?
22     A   Yes.
23     Q   Have you ever known about the amount of money
24  that Ethicon has paid Dr. Lucente as a paid consultant

Page 44

1   for them?
2      A   No, I don't.
3      Q   Do you have any idea what they've paid him?
4      A   No.
5      Q   If I told you that Dr. Lucente testified he's
6   been paid 1.7 million dollars, would that surprise you?
7      MR. ISMAIL:  Objection to form.
8      THE WITNESS:  Would that surprise me?
9   It's a big number.
10     Q   (By Mr. Slater)  Looking at this set of
11  emails, you see that in the first email in the chain,
12  which is at the bottom of the page, someone name Bart
13  Pattyson from professional education is writing to
14  Dr. Lucente, and he wants to schedule some sort of a
15  dinner in Indianapolis.  Do you see that?
16     A   That's the same email I'm looking at now?
17  Yes, I think so.
18     Q   He suggests inviting Douglass Hale to the
19  dinner?
20     A   Uh-huh, yes.
21     Q   You did your fellowship with Doug Hale in
22  Indianapolis, right?
23     A   That's correct.
24     Q   Were you aware, when you were training with

Page 45

1   Dr. Hale, that he was a paid Ethicon consultant?
2      A   I was not.
3      Q   Did you know that before right now?
4      A   I did not know that before right now.
5      Q   Looking now -- I'm sorry, looking now at the
6   second email in the chain, which is actually just
7   towards the top at 3:44 p.m. on September 11, 2007, do
8   you see Dr. Lucente's email to Bart Pattyson?
9      A   Yes.
10     Q   Okay.  Dr. Lucente talks about the fact that
11  the last time he tried a venue like they're proposing
12  for this meeting, Dr. Hale "flipped, totally got pissed
13  off.  It was ugly.  He has some issues.  We are cool
14  now, but it was insightful as to where his head is at."
15  Do you know what that's -- what that's talking about at
16  all?
17     A   I don't.
18     Q   Okay.  Now, looking further into that email
19  of September 11 at 3:44 p.m., Dr. Lucente says,
20  "Lastly, his senior fellow, Joye Lowman, was a resident
21  of mine from Abington.  Like Steph, well, needless to
22  say, her loyalty to me was a friction point."  Do you
23  see that?
24     A   I see that.

Joye K. Lowman, M.D., MPH

Page 46

1    Q    Do you know what Dr. Lucente is talking about
2    there?
3         MR. ISMAIL:  Objection to form.
4         THE WITNESS:  I don't.
5    Q    (By Mr. Slater)  Do you consider yourself to
6    have a level of loyalty to Dr. Lucente that it caused
7    friction with Dr. Hale in any way?
8    A    Not that I'm aware of.
9    Q    Okay.  Where Dr. Lucente says that you had
10   loyalty to him, would you agree with that statement?
11        MR. ISMAIL:  Objection to form.
12        THE WITNESS:  I don't know what he means
13        by that.  I respect Dr. Lucente, but I don't
14        know what he means by loyalty to him.
15   Q    (By Mr. Slater)  Let me ask you a question:
16   Has Dr. Lucente ever indicated to you that he would
17   talk to Ethicon about you in emails or in any
18   conversations?  Did you know that you were a subject of
19   communications with Ethicon about you?
20   A    In the last deposition that I participated
21   in, they showed an email where Dr. Lucente had reached
22   out to someone about my employment.  That's the only
23   thing that I'm aware of.
24        MR. SLATER:  If we could, Jon, could we

Page 47

1        show Dr. Lowman Exhibit 18.
2    Q    (By Mr. Slater)  Okay.  Doctor, I've given
3    you Exhibit 18, which is some emails in June of 2009.
4    A    Uh-huh.
5    Q    And in the middle of the page is one from a
6    guy named Robert Zipfel, a professional education
7    manager at Ethicon, to Vince Lucente.  And he's asking
8    Dr. Lucente if he's interested in going to Atlanta,
9    Georgia on a Thursday for a 3 o'clock p.m. Prolift
10   surgery with you and other physicians at Northside
11   Hospital followed by a dinner lecture on Prolift.  Do
12   you see that?
13   A    I see that.
14   Q    And do you recall being approached by Ethicon
15   to be involved in performing a Prolift surgery that
16   Ethicon would sponsor and then it would be connected to
17   a dinner Ethicon would sponsor?
18   A    I don't remember that.
19   Q    Okay.  And looking up above, you see where
20   Dr. Lucente says that you are his former resident and
21   you [sic] "helped her secure her fellowship in
22   Indianapolis."  Do you see that?
23   A    I see that.
24   Q    And when he says he helped secure your

Page 48

1    fellowship in Indianapolis, is that accurate?
2    A    Well, I mentioned before that he wrote me a
3    letter of recommendation.  To my knowledge, that's all
4    that he did.
5    Q    One other question:  Did Dr. Lucente write
6    letters of recommendation for you that you were able to
7    send to whatever fellowships you were applying to, or
8    was it just to this specific one at your request?
9    A    To whatever fellowships I was applying to.
10   Q    So was it like a standard letter about you
11   and then you could give it to whatever fellowship you
12   wanted to as part of your application process?
13   A    That's correct.
14   Q    So are you surprised to see Dr. Lucente sort
15   of taking credit for helping you get that fellowship?
16   Do you think that's overstating things a little bit?
17        MR. ISMAIL:  Objection to form.
18        THE WITNESS:  He wrote the letter of
19        recommendation for me.  I don't have any
20        opinion beyond that.
21   Q    (By Mr. Slater)  Okay.  When you -- when you
22   got the fellowship with Dr. Hale, did he tell you
23   anything about whether or not Dr. Lucente's
24   recommendation was of any significance to him in giving

Page 49

1    you that fellowship?
2    A    No.
3         MR. SLATER:  Okay, can we give
4    Dr. Lowman Exhibit 7, please.
5         MR. ISMAIL:  Adam, it's been about an
6        hour, if we can take a break when it's -- if
7        this is going to be a short exhibit, we can
8        finish it up.  If you're going to be a while,
9        maybe we'll take a break now.
10        MR. SLATER:  Are we saying we have to
11       take a break every hour?
12        MR. ISMAIL:  I'm not saying that.  I'm
13       just asking if we can have a break.  If this
14       is going to be a long exhibit, we can take it
15       now.  If this will be a short exhibit, we'll
16       take it after.
17        (Discussion off the written record.)
18   Q    (By Mr. Slater)  Okay, Doctor, I've given you
19   Exhibit 7, which is a set of email -- which actually is
20   an email from Scott Finley, who's a division manager in
21   the sales department at Ethicon, and it's the day after
22   the exhibit we just went through.  It's now June 16,
23   2009.
24   A    Okay.

Joye K. Lowman, M.D., MPH

Page 50

1    Q    And you see it's about the Lucente Advanced
2  Prolift Users Program?
3    A    Yes.
4    Q    And you -- do you know any of the people in
5  the email up above where it says "From" and "To" and
6  the cc's?  Do you know any of those people or did you
7  know any of them?
8    A    None of these names ring a bell other than
9  possibly Robert Zipfel, but I don't -- I don't remember
10  why that names looks familiar to me.
11    Q    Okay.  Robert Zipfel was in the sales
12  department.  Does that ring a bell to you?  He was --
13  he was -- he oversaw sales.
14    A    In Indianapolis?  I mean, that's the only
15  thing I could think as why that name would look
16  familiar to me.
17    Q    The email says that this guy Scott Finley
18  "attached a target list for each of you to complete and
19  return for me for our Advanced Prolift Program with
20  Dr. Lucente."  They're setting -- you can see they're
21  trying to fix the date, and he gives some
22  responsibilities to some of the people on the email for
23  helping to set up this event.  Do you see that?
24    A    Yes.

Page 51

1    Q    And then he says, "Below is the plan.
2  Thursday (date to be announced), 3 p.m., Prolift
3  proctorship at Northside with Dr. Joye Lowman, and we
4  will need to get credentialing for Dr. Lucente to scrub
5  in.  Also need room for eight surgeons to observe."
6  And then at 7 p.m. would be a dinner, Prolift users and
7  competitive doctors.  Do you see that?
8    A    I see that.
9    Q    Does this refresh your recollection that you
10  had spoken with Ethicon and agreed to participate in a
11  proctorship for the Prolift in 2009?
12    A    No, I don't remember that.
13    Q    Are you saying that they were scheduling this
14  without even talking to you?
15    MR. ISMAIL:  Objection to form.
16    THE WITNESS:  What I'm saying is I don't
17  remember that.
18    Q    (By Mr. Slater)  This -- I'm sorry, this
19  email is 2009.  This would have been in the year after
20  you finished your fellowship, correct?
21    A    That's correct.
22    Q    And this talks about further down, "Dinner
23  targets:  Need Prolift users, +M users, and competitive
24  users as well."  And they want to get at least 30 to 40

Page 52

1  doctors, and they want to go heavy on the competitive
2  folks.
3    And if you go further down to the proctorship
4  targets, they talk about who they want, "Prolift users,
5  +M users, and any busy competitive doctors who want to
6  learn Prolift.  You-all need to discuss this program
7  with every mesh doctor in Atlanta.  Seize the moment
8  and let's conquer."  Do you see that?
9    A    I do.
10    Q    Let me ask you this:  Before right now, are
11  you saying you had no idea that Ethicon was scheduling
12  this proctorship where they were planning to have you
13  operate with Dr. Lucente in an effort to conquer
14  doctors and create new customers for the Prolift?
15    MR. ISMAIL:  Objection.
16    Q    (By Mr. Slater)  Are you saying that you knew
17  nothing about this until I showed you this email?
18    MR. ISMAIL:  Objection to form.
19    THE WITNESS:  I don't remember anything
20  like this.  I don't know if there was a
21  discussion maybe with Dr. Lucente and some of
22  these reps about coordinating this, and then
23  he was going to reach out to me to get it --
24  to get it together and maybe that part never

Page 53

1  happened.  I don't know.  But I don't
2  remember anything like that.
3    Q    (By Mr. Slater)  Let me ask you this:  Was
4  there ever a time where you did a proctorship in
5  Atlanta where you operated and did a Prolift procedure
6  either with or without Dr. Lucente and other doctors
7  observed it through Ethicon?  Did that ever happen?
8    MR. ISMAIL:  Objection.  Asked and
9  answered.
10    THE WITNESS:  No, I don't remember that
11  ever happening.
12    Q    (By Mr. Slater)  Let me ask you this:  Do you
13  have any idea what it is that these people at Ethicon
14  thought that they were going to be able to use a
15  procedure performed by you as a Prolift proctorship and
16  to have Dr. Lucente participate in that?  Do you have
17  any idea how your name got into this and how they
18  thought you would participate?
19    MR. ISMAIL:  Objection to form.
20    THE WITNESS:  I would have to suspect.
21  I would think that maybe Dr. Lucente thought
22  I'd be able to do something like this, but I
23  don't remember participating in anything like
24  this at all.

Joye K. Lowman, M.D., MPH

Page 54

1    Q   (By Mr. Slater)  Let me ask you this:  Do you
2  have any recollection of Dr. Lucente ever speaking to
3  you about such an event?
4    A   I don't remember him -- but that -- I mean,
5  that was, what, a long time ago.  I can't add.  Six
6  years ago.
7    Q   Let me ask you this:  Have you ever -- I'm
8  sorry.  Have you ever done any sort of a proctorship or
9  a preceptorship where you have participated in an event
10 in connection with any mesh device or mesh procedure in
11 connection with a manufacturer where you were training
12 other doctors or showing other doctors anything about a
13 procedure?
14   A   Outside of fellowship, no.
15       MR. SLATER:  All right, if you want to
16 take a break now, we can do a break now.
17       MR. ISMAIL:  Great.
18       THE VIDEOGRAPHER:  We are now going off
19 the video record.  The time is currently
20 11:26 a.m.  This is the end of Tape No. 1.
21       (Recess taken.)
22       THE VIDEOGRAPHER:  We are now back on
23 the video record with Tape No. 2.  The time
24 is currently 11:40 a.m.

Page 55

1    Q   (By Mr. Slater)  Okay.  All right, Doctor, if
2  you could, let's look back at your report, Exhibit 1.
3    A   Okay.
4    Q   And if you could, let's go to the second
5  page.
6    A   Okay.
7    Q   In the first page over to the second page,
8  you talk about that you started the urogynecology
9  department at Southeast Permanente Medical Group of
10 Kaiser Permanente Georgia in 2008.  Do you see that?
11   A   Yes.
12   Q   What does that mean?
13   A   That means that they did not have a
14 urogynecology department before I came and started it.
15   Q   Let me ask you:  When you say they didn't
16 have a department, does that mean they didn't have a
17 urogynecologist on staff?
18   A   That means they didn't have a department.
19 They also did not have a urogynecologist on staff, but
20 they did not have a department either.
21   Q   Well, if they didn't have a urogynecologist
22 on staff before you joined their staff, they couldn't
23 have a urogynecology department, right?
24   A   Correct.

Page 56

1    Q   Okay.  So you -- so you joined this medical
2  practice, and how large is the medical practice, how
3  many doctors?
4    A   Two.
5    Q   Okay.  And is it two doctors currently, or
6  was it two at the time, or has it always been two?
7    A   It was just me when I first started there,
8  and now it's two.
9    Q   How did you get that job?  What happened to
10 get you into that position?
11   A   One of my colleagues and I were talking.
12 She's actually from Indianapolis and she -- I was
13 talking about the fact that I wanted to move to Atlanta
14 or I was considering moving to Atlanta, and she asked
15 me what I was doing.  I told her about my fellowship,
16 and she said, "Oh, that sounds like a skillset that we
17 could use at Kaiser."  And so she passed my CV a long
18 to the chief of the department at the time.
19   Q   Now, when you say "the department," is this
20 at a particular hospital?
21   A   No.  This is at Kaiser.  The chief of the
22 women's services department.
23   Q   Tell me -- okay.  Tell me what Kaiser is.
24   A   Kaiser is a health management organization

Page 57

1  where physicians are hired to take care of patients who
2  have Kaiser insurance.
3    Q   Okay.  And so it's a group of doctors, and
4  then if somebody is part of the Kaiser health insurance
5  company, basically, they go to the doctors that are
6  hired by that company?
7    A   That's correct.
8    Q   Okay.  And you indicate that there's 250,000
9  members of this -- I guess it's a health insurance
10 company?
11   A   Right.
12   Q   Okay.  The 250,000 members, they're not all
13 potential patients of yours; that includes everybody,
14 men, women, children, the whole gamut, right?
15   A   That's correct.
16   Q   Okay.  How many of the 250,000 members are
17 actually urogynecology patients?
18   A   I don't know.
19   Q   Okay.  Do you have privileges at a particular
20 hospital?
21   A   Yes.
22       MR. GOODALL:  Repeat that, Adam.
23   Q   (By Mr. Slater)  You have privileges at a
24 hospital.  Which hospital is it?

15 (Pages 54 to 57)

Joye K. Lowman, M.D., MPH

Page 58

1      A    Northside Hospital, Piedmont Hospital, and
2  Gwinnett Medical Center, as well as Atlanta Outpatient
3  Surgery Center.
4      Q    Okay.  Northside Hospital, how many beds is
5  that hospital?
6      A    I don't know.
7      Q    Okay.  Let me ask you this:  How many
8  urogynecologists are on staff at Northside?
9      A    I don't know how many urogynecologists are on
10  staff there.  It's a very busy hospital.  They deliver
11  over 5,000 babies a year, but I don't -- I don't know
12  the answer to that question.
13     Q    When you operate, where do you operate, at
14  all three or at one in particular of those hospitals?
15     A    At all three.
16     Q    Okay.  Piedmont, how many beds is that
17  hospital?
18     A    I don't know.
19     Q    How many urogynecologists are on staff at
20  Piedmont?
21     A    None now besides myself.  Actually, my
22  partner, my partner and I both have privileges there.
23  So the only -- the only ones --
24     Q    Who's your --

Page 59

1      A    -- the only ones I'm aware of --
2      Q    Go ahead.  I'm sorry.
3      A    There are two that are on staff there that
4  I'm aware of.
5      Q    Just for the record, who's your partner?
6      A    She is the person that we hired once we
7  decided that we needed to expand the department to
8  include another physician besides myself.  Are you
9  asking her name?
10     Q    Okay.  What's -- yes.
11     A    Dr. Saguan.
12     Q    And when was she hired?
13     A    2012.  2012, I believe.
14     Q    Let me ask you this:  Do you currently have
15  any teaching appointments?
16     A    No.
17     Q    Do you currently act as a peer reviewer for
18  any medical journal?
19     A    No.
20     Q    As a peer reviewer for any medical journal?
21          MR. ISMAIL:  Restate, please.
22     Q    (By Mr. Slater) For any medical journal in
23  your career?
24          MR. ISMAIL:  Once again, please.

Page 60

1          MR. SLATER:  Sure.
2      Q    (By Mr. Slater)  Have you been a peer
3  reviewer for any medical journal?
4      A    I don't remember.
5      Q    Okay.  Let me ask you this:  When you were a
6  fellow, did you have teaching responsibilities as part
7  of your fellowship?
8      A    Yes.
9      Q    Other than in your fellowship, have you had
10  any teaching appointments?
11     A    I have not had any appointments.  I have been
12  involved in teaching, yes.
13     Q    What do you mean by that?
14     A    There are Emory residents that rotate through
15  Piedmont Hospital from the OB/GYN department, and
16  sometimes they will observe or assist with surgical
17  cases.
18     Q    Do you -- let me ask you this:  Do you have
19  any sort of a teaching appointment with Emory?
20     A    No.
21     Q    So they'll observe a procedure you might
22  perform, but you're not actually -- you don't have an
23  appointment to actually be an instructor of any of
24  these residents --

Page 61

1      A    I don't get --
2      Q    -- is that accurate?
3      A    I don't get paid to teach them, no.
4      Q    And you don't have a particular appointment
5  where you're some sort of an assistant or associate
6  professor or anything at a medical school, you don't
7  have those appointments?
8      A    That's correct.
9      Q    Okay.  Let me ask you this:  On page 2, you
10  give some figures, and I want to understand them a
11  little bit.
12     A    Okay.
13     Q    You indicate -- you indicate that you have
14  performed well over 2700 procedures.  Do you see that?
15     A    Yes.
16     Q    All right.  I want to understand how that
17  breaks down.  Just below that, you say you've done 150
18  surgeries using the Prolift.  Is that accurate?
19     A    That's accurate, uh-huh, approximately.
20     Q    So is that -- rephrase.
21          The Prolift procedures, the 150 figure, does
22  that include Prolifts that you participated in as a
23  resident and a fellow?
24     A    Yes.

Joye K. Lowman, M.D., MPH

Page 62

1    Q    How many of the Prolifts that you did were
2  you participating in as a resident, how many of the
3  150?
4    A    I'm sorry, there were none during residency.
5  They were during fellowship.
6    Q    Okay.  How many of your -- let me rephrase.
7    How many of the 150 Prolift procedures
8  occurred during your fellowship?
9    A    Approximately 80.
10    Q    And let me ask you:  In your fellowship when
11  you were participating in the approximately 80 Prolift
12  procedures, would you have been the primary surgeon, or
13  would you have been assisting either Dr. Hale or
14  somebody else?
15    A    The primary surgeon.
16    Q    Okay.  Now, your fellowship ended in 2008, so
17  the 80 procedures that you're talking about would have
18  been from 2005 to 2008?
19    A    That's correct.
20    Q    During 2005 to 2008, what other procedures
21  were you performing to treat pelvic organ prolapse
22  besides the Prolift?
23    A    Abdominal sacrocolpopexy, high uterosacral
24  ligament suspension, laparoscopic abdominal

Page 63

1  sacrocolpopexy.
2    Q    Did you perform colporrhaphy during your
3  fellowship?
4    A    I'm sure that I did.
5    Q    Okay.  Now, based on the figures you gave,
6  after your fellowship, beginning in -- when you got out
7  in 2008 going forward, that would mean you performed
8  approximately 70 Prolifts going forward after that
9  time, correct?
10    A    That's correct.
11    Q    Can you tell me when you last did a Prolift
12  procedure?
13    A    I don't remember exactly.
14    Q    Can you tell me approximately when it was,
15  what year it was, that you last performed a Prolift?
16    A    I don't remember.
17    Q    Let me ask you this:  Did you ever use the
18  Prolift+M?
19    A    No.
20    Q    Did you ever use a mesh kit other than the
21  Prolift to treat prolapse?
22    A    Not outside of fellowship, no.
23    Q    Okay.  In fellowship, what else did you
24  utilize, what other mesh kit?

Page 64

1    A    I honestly don't remember.
2    Q    Let me try to refresh your recollection.  The
3  Elevate?
4    A    No.
5    Q    The Apogee, the Perigee, the Avaulta?
6    A    I don't remember --
7    Q    The Pinnacle?
8    A    -- specifically.  I remember that we did not
9  use Elevate or Pinnacle.  I don't remember the others
10  that we used.
11    Q    Let me ask you this:  In either your
12  fellowship or your private practice, have you used
13  Gynemesh PS flat mesh where you've cut the mesh and
14  used it in treating prolapse?
15    A    Yes, frequently.
16    Q    Would that be an abdominal sacrocolpopexy?
17    A    Yes.
18    Q    How about through the vagina, have you used
19  Gynemesh PS flat mesh that you've cut and used
20  transvaginally to treat prolapse?
21    A    No.
22    Q    In your current practice when you do
23  abdominal sacrocolpopexy, what type of mesh do you use?
24    A    Gynemesh.

Page 65

1    Q    Do you use any other types of mesh?
2    A    I have used.  I've used Smartmesh.
3    Q    Any other meshes?
4    A    I believe I've used IntePro as well.
5    Q    Okay.  When you -- when you do an abdominal
6  sacrocolpopexy procedure and you cut a portion of
7  Gynemesh PS flat mesh, what are the dimensions of the
8  mesh that you actually leave in the body?
9    A    It's usually -- it's approximately 4-by-15
10  centimeters.
11    Q    When you cut Gynemesh PS and use it in
12  abdominal sacrocolpopexy, it's in a rectangular shape?
13    A    Sort of.  It's kind of a rectangular strip.
14    Q    Once you've cut it and fashioned it, it will
15  be basically a rectangular strip that you'll implant?
16    A    Yeah.
17    Q    In your career, have you been involved in
18  treating complications with Prolift from other doctors
19  who had implanted it, where the patient would come to
20  you with Prolift complications?
21    A    I'm sure I have.
22    Q    How many times?
23    A    I don't remember.
24    Q    Is there anything you remember about any of

Joye K. Lowman, M.D., MPH

Page 66

1  those patients in terms of the complications you
2  treated?
3      A    You're asking me about people that were sent
4  to us from outside of our practice, or are you asking
5  in general?
6      Q    What I'm asking you is where a patient came
7  to you, not necessarily sent to you, because some
8  patients self-refer --
9      A    Uh-huh.
10     Q    -- where a patient came to you with
11  complications from a Prolift and you didn't implant it.
12  And I'm asking how many of those, if you recall, and
13  what types of complications you saw.
14     A    I don't remember how many that would be, but
15  I'm sure I've seen that.
16     Q    Can you estimate the number of times patients
17  have come to you with complications from a Prolift that
18  was implanted by another doctor?
19     A    I can't estimate that.  I don't know.
20     Q    Less than 10?
21     A    I don't -- I honestly don't know.
22     Q    Than a thousand?
23     A    It's less than a thousand.
24     Q    Than a hundred?

Page 67

1          MR. ISMAIL:  Restate, please.
2      Q    (By Mr. Slater)  Would it be less than a
3  hundred?
4          MR. ISMAIL:  Objection to form.
5          THE WITNESS:  It's less than a
6  hundred.
7          MR. ISMAIL:  Restate, please.
8      Q    (By Mr. Slater)  Would it be less than 20?
9          MR. ISMAIL:  Objection to form.
10         THE WITNESS:  I honestly don't know.
11     Q    (By Mr. Slater)  Can you tell me anything
12  about the complications you saw for those patients who
13  came to you with Prolift complications where the
14  Prolift was placed by another doctor?
15     A    It would be conjecture.  I can speak
16  generally.  I can't speak about specific patients and
17  who they came from.
18     Q    I don't care about specific names or where
19  they came from.  I want to know about the complications
20  that you've treated for Prolift patients where they
21  were implanted by another doctor and came to you with
22  complications for treatment.
23     A    I can't speak to that.
24     Q    What you've seen?

Page 68

1      A    I can speak to the complications that I've
2  seen involving mesh in general.  I don't remember which
3  patient had Prolift versus which patient had some other
4  type of mesh.  I've seen complications from
5  transvaginal mesh, and I have treated them.  Some of
6  them have been procedures that I did -- that we did in
7  my training program, and I have seen complications in
8  patients that I've treated since training.  But I
9  cannot say which patients had Prolift and which
10  patients came from other doctors.  I don't know the
11  answer to that.
12     Q    Let me ask you a question about your
13  practice.  Because you're part of the Kaiser Permanente
14  organization, do you only treat patients that are
15  within that network?
16     A    Yes.  Well, actually --
17     Q    So if a patient --
18     A    -- let me qualify that.  That's not -- that's
19  not correct.  In general, that is correct, but I do
20  have some patients that pay to see me who don't have
21  Kaiser insurance.
22     Q    Okay.  Where patients have come to you in
23  your private practice with complications from a mesh
24  kit, were they all Kaiser patients?

Page 69

1      A    They were Kaiser patients at that time, yes.
2      Q    Okay.  Let me ask you this:  Going back to
3  your report, the 2,700 procedures, is that two hundred
4  and seven -- rephrase.
5          The 2,700 procedures you listed, are those
6  2,700 prolapse procedures?
7      A    Prolapse and -- it's not all prolapse, no.
8      Q    It's prolapse, incontinence, or a
9  combination?
10     A    Correct.
11     Q    Of the 2,700 -- well, rephrase.
12         Would that basically be 2,700 pelvic floor
13  repair procedures?
14     A    Yes.
15     Q    Okay.  Of those 2,700, in looking at your
16  report a little further down, you said you've used mesh
17  in over 1200 procedures.  Do you see that?
18     A    Yes.
19     Q    The 1200 would be your fellowship plus your
20  private practice?
21     A    Yes.
22     Q    And of that 1200, 150 are Prolift and the
23  rest would either be abdominal sacrocolpopexy or the
24  handful of other kits you used in your fellowship?

18 (Pages 66 to 69)

Joye K. Lowman, M.D., MPH

Page 70

1     A    And midurethral slings.
2     Q    Well, this says you've used mesh to treat
3  pelvic organ prolapse -- oh, I see what you're saying.
4  Okay. All right, let me -- I understand now. Of the
5  2700 procedures, 1200 involved mesh of some sort,
6  whether it was sacrocolpopexy, whether it was a
7  Prolift, whether it was a midurethral sling --
8     A    Right.
9     Q    -- correct?
10    A    Yes.
11    Q    Okay. So 1500 of the procedures would
12 involve no mesh?
13    A    That's correct.
14    Q    What are those procedures? What do those
15 include?
16    A    Those would include pelvic organ prolapse
17 repairs that don't involve mesh, for instance, a high
18 uterosacral ligament suspension or a colporrhaphy.
19    Q    Anything else?
20    A    Vaginal hysterectomy, colpocleisis.
21    Q    Anything else?
22    A    Surgeries to correct complications not
23 necessarily just with mesh, but with other procedures.
24    Q    In treating incontinence, do you perform the

Page 71

1  Burch procedure?
2     A    I was trained to do that in fellowship. I do
3  not do it now.
4     Q    Do you only use midurethral slings to treat
5  incontinence now, or do you use other procedures as
6  well?
7     A    To treat stress incontinence, that's my
8  procedure of choice, yes.
9     Q    Urethral sling or slings do you use?
10    A    I use the TVT.
11    Q    Which one do you use?
12        MR. ISMAIL: Restate, please.
13        MR. SLATER: Sure.
14    Q    (By Mr. Slater) Which TVT, since there's a
15 bunch of different TVT devices, which TVT do you use in
16 your practice?
17    A    The tension-free vaginal tape, the retropubic
18 sling.
19    Q    You don't use the TVT obturator?
20    A    Not currently, no.
21    Q    Did you use the TVT obturator?
22    A    In training, yes.
23    Q    Why don't you use the TVT-O since your
24 training?

Page 72

1     A    I prefer the retropubic route.
2     Q    Why?
3     A    It has a higher success rate.
4     Q    Does it have a higher success rate in your
5  hands, or are you saying the literature shows that?
6     A    Both.
7     Q    Do you not use the TVT-O because of any
8  issues with safety?
9     A    No.
10    Q    You're not concerned about injuries in the
11 obturator region that are not implicated with the TVT
12 retropubic?
13        MR. ISMAIL: Objection to form.
14        THE WITNESS: That's not the main reason
15    why I don't -- why I prefer to use the
16    retropubic route, no.
17    Q    (By Mr. Slater) I understand it's not the
18 main reason, but is that one of your considerations,
19 one of your reasons for not using the TVT-O?
20    A    Is -- can you repeat what the risk was?
21    Q    Sure. Is one of the reasons that you do not
22 use the TVT obturator in your practice because of
23 concerns for safety due to the obturator route that's
24 used and the fact that mesh is put into the obturator

Page 73

1  part of the pelvis?
2     A    I wouldn't characterize it as a concern for
3  safety, but pain has been something that's seen more
4  often in a transobturator sling versus a retropubic
5  sling.
6     Q    And that is one of your considerations in why
7  you use the retropubic?
8     A    Yes.
9     Q    Let me ask you: Have you used any other
10 midurethral slings other than the TVT retropubic and
11 TVT obturator?
12    A    Yes.
13    Q    What?
14    A    The Monarc.
15    Q    Anything else?
16    A    No.
17    Q    The Monarc, is that something you only used
18 in your fellowship?
19    A    I believe that I used the Monarc once or
20 twice after fellowship as well.
21    Q    That's an obturator procedure, correct?
22    A    That's an obturator procedure, yes.
23    Q    So you used it just those one to two times
24 and then decided not to use it because, again, it was

19 (Pages 70 to 73)

Joye K. Lowman, M.D., MPH

Page 74

1    an obturator procedure?
2        A    Right.
3        Q    Let me ask you a question.  On page 3 of your
4    report, at the top you say, "I comfortably manage mesh
5    complications, complex female pelvic pain, and
6    recurrent prolapse and recurrent or complex urinary
7    incontinence."  Do you see that?
8        A    Yes.
9        Q    With regard to your comfortable management of
10   mesh complications -- I know I asked you this before; I
11   just want to be very clear because you wrote this in
12   your report -- were you speaking about mesh
13   complications from the Prolift?  Is that included in
14   here?
15       A    That's included, yes.
16       Q    Have you personally had patients with the
17   Prolift who have had complications that you had to
18   treat that you related to the Prolift?
19           MR. ISMAIL:  Objection to form.
20           THE WITNESS:  I have had patients who
21       have had Prolift procedures who have had
22       complications that we've had to treat, yes.
23       Q    (By Mr. Slater)  Can you tell me what
24   complications those include?

Page 75

1        A    Mostly mesh erosions.
2        Q    Anything else?
3        A    You're talking about treating it surgically,
4    surgical treatment, or are you including things like
5    physical therapy, estrogen?
6        Q    Any treatment.
7        A    Yes, I mean, there --
8        Q    I want to know what the -- well, let me just
9    say -- let me stop.  I'm asking you what the
10   complications were.  I'm not necessarily asking you
11   what the treatment was.  I want to know what the
12   complications you had with your Prolift patients where
13   you treated them.
14       A    So mesh erosion was the most common.  We also
15   saw patients that had scarring or band -- tense sort of
16   areas of the mesh that was tender to touch.
17       Q    Anything else?
18       A    That's mostly what I remember.
19       Q    When you talk about tenseness or tense
20   banding that's tender to the touch --
21       A    Uh-huh.
22       Q    -- just to fast-forward a little bit --
23       A    Uh-huh.
24       Q    -- that's one of the things that Dr. Heit

Page 76

1    reported with Ms. Hammons, correct?
2        A    That's correct.
3            MR. ISMAIL:  Objection to form.
4        Q    (By Mr. Slater)  Have you -- let me ask you
5    this:  Have you had patients with mesh erosions where
6    you surgically revised the mesh and then had to do so
7    more than once because the mesh erosions recurred?
8        A    Are you asking about with Prolift or just in
9    general?
10       Q    Prolift.
11       A    No.
12       Q    Are you aware from the literature that that
13   does occur with some Prolift patients, that they'll
14   have mesh erosion, it will be treated, and then the
15   patient will have a recurrence erosion and sometimes
16   that can happen more than once, more than twice, even,
17   you know, three, four, five times in some patients?
18   Are you aware of that occurring?
19       A    I'm not aware of that occurring with the
20   Prolift, no.
21       Q    In forming your opinions in this case, you
22   did not assume that there are some patients who get an
23   erosion with Prolift and it's operated on and then they
24   have another erosion and another and that that can

Page 77

1    happen multiple times, you were not assuming that in
2    forming your opinions, correct?
3            MR. ISMAIL:  Objection to form.
4            THE WITNESS:  I'm not assuming that,
5        no.
6            MR. SLATER:  Okay.
7        Q    (By Mr. Slater)  Do you know whether Ethicon
8    knows that that occurs in some patients?
9        A    I don't know.
10       Q    If Ethicon knows that, is that information
11   that you would like to have in forming your opinions in
12   this case?
13           MR. ISMAIL:  Objection to form.
14           THE WITNESS:  Not necessarily.
15       Q    (By Mr. Slater)  It wouldn't matter to you in
16   forming your opinions?
17       A    My opinions are based on my clinical
18   experience and what I have read in the scientific
19   literature.  So what they know internally is not what I
20   use to base my opinions on.
21       Q    Okay.  Let me -- let me walk through this a
22   little bit with you.  The opinions that you have formed
23   in this case with regard to the safety and the efficacy
24   of the Prolift are based on, number one, your clinical

20 (Pages 74 to 77)

Joye K. Lowman, M.D., MPH

Page 78

1  experience with the Prolift, correct?
2      A    Correct.
3      Q    Number two, your reading of the scientific
4  literature that you've been able to read that's been
5  published with regard to the Prolift, correct?
6      A    With regard to the Prolift and other meshes,
7  yes.
8      Q    Relying for your opinions not just on
9  literature about the Prolift, but also about other mesh
10  devices and mesh products, correct?
11      A    Yes.
12      Q    Are there any other products or mesh devices
13  that you can list for me that you are relying on
14  literature about other than the Prolift?
15      A    I can't list them for you. What I am
16  referring to when I say that is the fact that I'm
17  relying on meta-analyses and things like the Cochrane
18  review, which review all transvaginal meshes and not
19  just the Prolift.
20      Q    Let me ask you a question: Would you agree
21  with me that the risk-benefit profile for the Prolift
22  is not identical to that for other mesh products and
23  mesh devices?
24      A    That's correct.

Page 79

1      Q    All right, let me ask you this: Other than
2  your clinical experience and the scientific literature
3  with regard to the Prolift and those meta-analyses and
4  the Cochrane review, is there any other foundation of
5  information that you're relying on for your opinions
6  about the safety and efficacy of the Prolift?
7      MR. ISMAIL: Objection to form.
8      THE WITNESS: We often discuss safety
9  and efficacy, what we're seeing in clinical
10  practice, at our conferences and meetings.
11  And I rely on that information as well, in
12  addition to my conversations with
13  colleagues.
14      Q    (By Mr. Slater) Anything else?
15      A    I think that sums it up.
16      Q    Okay. Let me ask you this about your
17  discussions at conferences and conversations with
18  colleagues.
19      A    Uh-huh.
20      Q    Are there any in particular that you can tell
21  me about right now and say, "This is a discussion that
22  I had and this is information that I'm specifically
23  relying on," or is it more general than that where you
24  just say, "I know I've spoken to people in general

Page 80

1  about this topic, so that's just part of my fund of
2  knowledge"?
3      A    It would be the second, more general.
4      MR. SLATER: If we could, Bob [sic] can
5  we hand Dr. Lowman Exhibit 10 and Exhibit
6  11.
7      (Discussion off the written record.)
8      Q    (By Mr. Slater) Okay, Doctor, looking at
9  Exhibit 10, there is a set of emails from February of
10  2010. And if you look at it, in the middle of the --
11  well, actually, if you go to the second page, there's
12  an email that goes from the first page to the second
13  page written by Scott Jones, product director at
14  Ethicon. Do you see that?
15      A    Yes.
16      Q    Okay. Do you know Scott Jones?
17      A    I don't.
18      Q    Do you know -- other than what you're reading
19  here, obviously his title is there, did you have any
20  idea who he was before I showed you this email?
21      A    No.
22      Q    Okay. This email is written by Scott Jones,
23  and you'll see he's talking about needing help to
24  "quantify the number of customers that we have lost to

Page 81

1  a competitive procedure focused on apical support. Our
2  customers continue to tell us that they want to see
3  Prolift+M introduced with an anterior apical product
4  code." And then he talks about in order to present
5  this business case, he needs a bunch of information,
6  and he talks about needing information about the
7  doctors that they have lost from the Prolift to other
8  procedures. Do you see that?
9      A    Let me just read it really quickly.
10      Q    Sure. You can scan through it. I'm just --
11  that's generally what it's about, but you can take a
12  look.
13      A    Okay.
14      Q    Okay, so let me ask you just one basic
15  question first.
16      A    Uh-huh.
17      Q    When you were performing the Prolift, did you
18  have an understanding that in addition to treating a
19  cystocele, that it should also provide some benefit to
20  an apical prolapse or apical weakness as well?
21      A    What type of Prolift are you referring to?
22      Q    Let's talk about an anterior Prolift to begin
23  with.
24      A    No, the anterior Prolift doesn't provide

Joye K. Lowman, M.D., MPH

Page 82

1 apical support.
2    Q    Which Prolift provides apical support?
3    A    The posterior Prolift.
4    Q    Would the total also provide apical support?
5    A    Yes.
6    Q    If you turn to the front page of this email,
7 in the middle of the page, there's an email from Robert
8 Zipfel to several people.  And again I'm just asking,
9 do you know Robert Zipfel or have any involvement --
10 you ever have any involvement with him or know who he
11 is?
12    A    I believe that I have.  I recognize the name,
13 but I don't remember him specifically.
14    Q    Do you have any recollection of what
15 connection you ever had with him?
16    A    I don't remember.
17    Q    Robert Zipfel writes, "Last week at the
18 summit, it was clear that our physicians want anterior
19 apical support modification to Prolift."  Do you see
20 that?
21    A    Yes.
22    Q    Okay.  And then they had asked for a list.
23 And at the top, there's an email and it says, "Attached
24 is the list."  And Exhibit 11 is a portion of the

Page 83

1 list, and if you look at the -- about halfway down,
2 you're listed and that your product conversion was to
3 sacrocolpopexy.  Do you see that?
4    A    I see --
5        MR. ISMAIL:  Objection to form.
6        THE WITNESS:  I see that.
7    Q    (By Mr. Slater)  Okay.  Is it accurate that
8 you stopped using the Prolift because of concern over
9 the lack of apical support with the Prolift?
10    A    No.
11        MR. ISMAIL:  Objection to form.
12        MR. GOODALL:  Adam, you're going to have
13    to repeat that.
14    Q    (By Mr. Slater)  Next question:  Doctor, why
15 did you stop using the Prolift?
16    A    I stopped using the prolapse -- Prolift when
17 it was no longer marketed, from what I remember.
18    Q    Okay.  Let me ask you this:  This document
19 says that as of February of 2010, the -- they had data
20 that you had switched from the Prolift to
21 sacrocolpopexy.  Are you saying that information is
22 untrue?
23        MR. ISMAIL:  Objection to form.
24        THE WITNESS:  I'm saying that that's

Page 84

1 incorrect.
2        MR. SLATER:  Okay.
3    Q    (By Mr. Slater)  Let me ask you this:  The
4 Prolift stopped being marketed as of September 1, 2012.
5    A    Uh-huh.
6    Q    Are you aware of that, that that was when
7 they stopped marketing it?
8    A    I remembered that it was 2012 or I had a
9 gestalt --
10    Q    Are you saying that you were -- okay, I'm
11 sorry.  So you -- after your fellowship, beginning in
12 2008 through September of 2012, which is four years,
13 approximately, you did 70 Prolifts, according to the
14 figures we went through earlier, correct?
15    A    Yes, approximately.
16    Q    Approximately how many prolapse repair
17 procedures did you perform during those four years
18 total?  Can you estimate that number?
19    A    How many prolapse procedures did I do during
20 the four years total?  I don't know.
21    Q    Did there come a time when you were doing --
22 well, rephrase.
23        In your practice after fellowship, was there
24 a point where you were doing more Prolifts then it

Page 85

1 tapered off?
2        MR. ISMAIL:  Objection to form.
3        THE WITNESS:  I don't remember.  I
4 believe so.
5    Q    (By Mr. Slater)  And why was that?
6    A    Because of the FDA Public Health
7 Notification.
8    Q    Which one?
9    A    2011.
10    Q    Why did that impact your volume of Prolift
11 procedures?
12    A    Patients became acutely aware that there were
13 reports of complications because of all the
14 advertisements on TV.
15    Q    When you say "advertisements on TV," are you
16 talking about advertisements by law firms?
17    A    I'm assuming that's who they're by, yes.
18    Q    You said that your use tapered off after the
19 Public Health Notification in 2011.  Was there
20 something about that Public Health Notification that
21 caused you to taper off your use of the Prolift?
22    A    No.
23    Q    Did you ever consider using the Prolift+M?
24 Was that ever presented to you?

22 (Pages 82 to 85)

Joye K. Lowman, M.D., MPH

Page 86

1    A    I -- I did consider it, yes.
2    Q    You said you never used it.  Why?
3    A    It takes a lot to get me to change from what
4  I'm doing.  If I'm satisfied with what I'm currently
5  doing, then I don't usually switch unless there's some
6  compelling reason.
7    Q    Did Ethicon provide you information about the
8  Prolift+M?
9    A    Not that I remember.
10   Q    For example, did a sales representative
11 provide you information or invite you to any sort of a
12 meeting or did you see any presentations at a
13 conference about it that Ethicon sponsored, anything
14 like that?
15   A    I may have seen something at a conference.  I
16 don't remember specifically.
17   Q    You're -- are you saying a sales -- did a
18 sales representative provide you information about the
19 Prolift+M?
20   A    Not that I remember, no.
21   Q    Anybody from Ethicon ever tell you that they
22 internally believed that the Prolift+M could have
23 safety advantages for patients because of the fact that
24 it was a larger pore, lighter weight mesh than the

Page 87

1  Prolift?
2         MR. ISMAIL:  Objection to form.
3         THE WITNESS:  Can you repeat the
4    question?
5         MR. SLATER:  Sure.
6    Q    (By Mr. Slater)  Did anybody from Ethicon
7  ever communicate to you that Ethicon thought that there
8  were potential safety benefits to the Prolift+M because
9  it had a larger pore, lighter weight mesh than the
10 Prolift?
11        MR. ISMAIL:  Objection to form.
12        THE WITNESS:  No.
13   Q    (By Mr. Slater)  Do you know anything about
14 the mesh used in the Prolift+M, for example, what type
15 of mesh it is?
16   A    I know that it's a partially absorbable mesh.
17   Q    And how do you know that?
18   A    Through the literature and through
19 conferences.
20   Q    Do you know anything else about the mesh
21 other than that it's a partially absorbable mesh?
22   A    That it's ultra lightweight as well.
23   Q    Do you know anything about the pore sizes?
24   A    No.

Page 88

1    Q    In determining what type of mesh you use in
2  your clinical practice, is the pore size of the mesh
3  something you consider?
4    A    Yes.
5    Q    Why is that, why do you consider the pore
6  size?
7    A    Because the pore size is important to how the
8  mesh performs.
9    Q    Tell me about that.  Why is that -- why is
10 the pore size important to how the mesh performs?
11   A    It helps to determine how well the mesh is
12 incorporated into the body.  It also helps to determine
13 the risk of infection with the mesh, and it helps to
14 determine the mesh -- its pliability.
15   Q    Do you know the pore size of the mesh in the
16 Prolift?
17   A    I do.
18   Q    What is it?
19   A    2.4 millimeters.
20   Q    Is that uniform across the entire Prolift,
21 all the pores are 2.4?
22   A    I don't know.
23   Q    Do you know what happens to the Prolift mesh
24 when it's placed under strain and when tension is

Page 89

1  placed on it?
2         MR. ISMAIL:  Objection to form.
3    Q    (By Mr. Slater)  Do you know what happens to
4  the pores then?
5    A    I don't.
6    Q    Do you know what Ethicon's internal knowledge
7  is about what happens to the pore sizes of the Prolift
8  when it's placed under tension in actual use in the
9  body?
10   A    No.
11   Q    You -- we had talked about the literature by
12 Dr. Klinge a little earlier.  Have you read his
13 literature where he has discussed the importance of the
14 mesh maintaining at least a thousand microns of pore
15 size under strain?
16   A    No.
17   Q    Have you read the literature discussing the
18 importance of having at least a thousand microns of
19 pore size in all directions when the -- when the mesh
20 is incorporated into the body?
21   A    I'm familiar with the literature that
22 states that the pore size needs to be greater than
23 1 millimeter.  I don't remember it saying anything
24 about being under strain.

23 (Pages 86 to 89)

Joye K. Lowman, M.D., MPH

Page 90

1    Q    You do know -- well, rephrase.
2        And certainly one of the things that you rely
3  on for your opinions is that literature that discusses
4  and establishes the need for the pore sizes to be at
5  least 1 millimeter, correct?
6    A    That's correct.
7    Q    But you're not familiar with literature
8  or documents that talk about the need for it to be
9  1 millimeter even when it's under tension or strain
10 when it's actually implanted in the body?
11       MR. ISMAIL:  Objection to form.
12       THE WITNESS:  Not in the literature,
13 no.
14   Q    (By Mr. Slater)  Do you know anything about
15 the relationship between the need for a 1-millimeter
16 pore size and the propensity of the mesh to develop
17 scar plating or bridging fibrosis?
18   A    Yes.
19   Q    And is it your understanding that it's
20 important that the pore sizes be at least 1 millimeter
21 in order to reduce the risk of scar plating?
22       MR. ISMAIL:  Objection to form.
23       THE WITNESS:  Yes.
24   Q    (By Mr. Slater)  Do you know why the Prolift

Page 91

1  was removed from the market?
2        MR. ISMAIL:  Objection to form.
3        THE WITNESS:  I don't.
4    Q    (By Mr. Slater)  And just -- there was an
5  objection to the form, so I'm just going to ask it
6  differently.  Do you know why the Prolift -- rephrase.
7        Do you know why Ethicon stopped marketing the
8  Prolift?
9    A    No.
10   Q    Did you ever try to find that information
11 out?
12   A    I did.
13   Q    How did you try to find that out?  What did
14 you do?
15   A    I found the rep for Ethicon at Northside and
16 asked why they were no longer marketing the Prolift.
17   Q    Who was that?
18   A    I don't remember his name.
19   Q    Okay.  And when did this conversation take
20 place?
21   A    I don't remember.
22   Q    Was it before the Prolift went off the
23 market, or was it after it went off the market?
24       MR. ISMAIL:  Objection to form.

Page 92

1        THE WITNESS:  I don't remember.
2    Q    (By Mr. Slater)  What did the sales rep from
3  Ethicon tell you about why Ethicon had stopped selling
4  the Prolift?
5    A    He just sort of shook his head and -- he
6  didn't give me any specifics.  I don't know.  I don't
7  remember anything in -- anything specifically.
8    Q    So let me understand.  You sought out the
9  sales rep from Ethicon at your hospital, Northside?
10   A    Uh-huh.
11   Q    You asked him, "Why is Ethicon stopping
12 selling the Prolift?"
13   A    Uh-huh.
14   Q    He shook his head and gave you no information
15 at all and that was the end of it?
16   A    Yes.
17   Q    Did you make another effort after that to get
18 that information from somebody else who could actually
19 answer your question?
20   A    No, because if it's no longer being marketed,
21 it's -- I mean, it's no longer being marketed.  I was
22 just curious.  And if he couldn't answer it, who else
23 would I ask?
24   Q    You got hired to be an expert for Ethicon in

Page 93

1  a Prolift case.  As part of your work as an expert, did
2  you seek to find out why Ethicon stopped selling the
3  Prolift?
4    A    No.
5    Q    It didn't matter to you?
6    A    No.
7    Q    Once you got retained as an expert, did you
8  ask anybody, "Why did Ethicon stop selling the
9  Prolift"?
10   A    No.
11   Q    As we sit here right now, are you curious why
12 Ethicon stopped selling the Prolift?
13   A    I don't think that has any relevance to my
14 professional opinion about the facts of this case.
15 They decided to stop marketing it.  Beyond that, you
16 know, I don't have any further opinion about it.
17   Q    Where were you trained on the Prolift, to do
18 the Prolift procedure?
19   A    At Indiana University.
20   Q    During your fellowship?
21   A    Yes.
22   Q    When you were a resident, did you observe
23 Prolift procedures?
24   A    I don't remember.  I don't believe so.  I

Joye K. Lowman, M.D., MPH

Page 94

1  believe that my first visual evaluation of the product
2  was in fellowship. I do remember a lecture.
3      Q   When you were in your residency -- I'm sorry.
4  When you were in your residency, did you know of the
5  existence of the Prolift?
6      A   Yes.
7      Q   How did you know about the Prolift in your
8  residency?
9      A   Dr. Lucente talked -- spoke about it in one
10 of his lectures.
11     Q   What did he say?
12     A   I don't remember.
13     Q   Did Dr. Lucente talk about his personal data
14 or the outcomes of his patients when he spoke about the
15 Prolift?
16     A   No. This was -- that would have been beyond
17 the scope of a resident lecture.
18     Q   You went to your fellowship and then how were
19 you exposed to the Prolift in your fellowship?
20     A   What do you mean by that?
21     Q   I'm trying to ask as broadly as I can. What
22 was the first involvement, how did you become involved
23 with the Prolift during your fellowship?
24     A   Well, during fellowship, we performed

Page 95

1  procedures usually at the direction of our program
2  directors. So I'm assuming that one of the program
3  directors felt that that procedure was indicated in a
4  patient that we were going to operate on together and
5  that's what we decided to do.
6      Q   Were you trained on how to perform the
7  Prolift procedure in your fellowship before you took
8  part in those procedures?
9      A   Yes.
10     Q   Who trained you?
11     A   I don't remember. It would have been one of
12 my program directors, either Dr. Hale or Dr. Woodman.
13     Q   Did you ever attend a professional education
14 presentation sponsored by Ethicon regarding the Prolift
15 procedure?
16     A   I may have. I don't remember specifically.
17     Q   Well, I need to -- I need to know -- you have
18 to understand, this is the time I get to ask you
19 questions and learn things.
20     A   Yes.
21     Q   So I need you to think real hard for me. Did
22 you, yes or no, attend a professional education event
23 regarding the Prolift sponsored and run by Ethicon?
24         MR. ISMAIL: Objection to form.

Page 96

1         THE WITNESS: I don't remember.
2         MR. SLATER: Okay.
3      Q   (By Mr. Slater) Is it fair to say that you
4  would not be able to tell me anything that you might
5  have seen or learned during professional education on
6  the Prolift because you can't remember whether or not
7  you attended such an event; is that fair?
8      A   No, that's not fair. I can't remember when I
9  attended professional education about the Prolift. I'm
10 sure that I have attended some professional education
11 about the Prolift. And I'm familiar with the
12 information that is usually described in those
13 situations. But I can't say when I did that or whether
14 or not that was a part of my fellowship.
15     Q   Well, I'm not asking if it was part of your
16 fellowship, I'm actually distinguishing, but let me ask
17 you the question more clearly. As you sit here now --
18     A   Uh-huh.
19     Q   -- do you recall attending a professional
20 education event regarding the Prolift?
21     A   I don't remember a specific professional
22 event. What I can say is I've attended a lot of
23 professional events, and I'm sure that the Prolift,
24 if -- that the Prolift may have been one of them.

Page 97

1      Q   You don't know if you attended a Prolift
2  professional education event, you think you may have
3  but you don't know; is that true?
4      A   That's correct.
5      Q   Okay. As you sit here now, am I correct that
6  you don't recall actually attending a professional
7  education event with regard to the Prolift and at that
8  event actually seeing a particular lecture, a
9  particular PowerPoint, being given particular
10 materials, you don't remember that because you don't
11 remember whether you attended such as event; is that
12 true?
13     A   That's true.
14     Q   You've attended professional education events
15 for various procedures, correct?
16     A   Correct.
17     Q   Okay. Did you attend a professional
18 education event with regard to the TVT or the TVT-O?
19     A   I don't remember.
20     Q   Is there any particular mesh device that you
21 do remember actually attending a professional education
22 event for?
23     A   When you say "professional education event,"
24 what do you mean?

Golkow Technologies, Inc. - 1.877.370.DEPS

Joye K. Lowman, M.D., MPH

1    Q    Where a mesh manufacturer has one of their
2  preceptors, one of their consulting doctors actually
3  teach doctors through a lecture and then potentially
4  even by demonstrating the surgery after the lecture,
5  "This is this mesh device, this is how it works, this
6  is the data, these are things you need to know," and
7  demonstrating it to teach doctors how to do the
8  procedure.
9    A    Okay.  Then I would not have attended
10 something like that in fellowship.
11   Q    Okay.  How about after your fellowship?
12   A    No.  I already knew how to do the procedure.
13   Q    So the training you got on the Prolift was in
14 the context of your fellowship from the fellowship
15 directors who just taught you in the operating room,
16 basically, "This is what the Prolift is and this is how
17 you do it," is that correct?
18   A    That's correct.
19   Q    Did your fellowship directors show you videos
20 about the Prolift as part of your training?
21   A    Not that I remember.
22   Q    Did your fellowship directors show you
23 PowerPoints or literature from Ethicon about the
24 Prolift?

1    A    Not that I remember.
2    Q    Did your fellowship directors, when they were
3  training you on the Prolift, give you specific medical
4  literature and say, "You should look at this literature
5  to help learn about the Prolift"?
6    A    They didn't often give us literature.  I
7  mean, that was something that we did often, reviewing
8  the literature, but it wasn't often given to us by our
9  program directors.
10   Q    Did the fellowship directors suggest that you
11 read any particular literature to help you to learn how
12 to perform the Prolift or to -- or how to determine who
13 to use it with?
14   A    It was customary for us to be reviewing
15 literature.  I don't remember either of them giving us
16 anything specific.
17   Q    When you say -- and when you say "giving,"
18 not just handing it to you, but suggesting, "Hey, you
19 should read this article, this is a good article about
20 the Prolift, you'll learn some valuable information,"
21 that -- you don't recall --
22   A    Oh, we had those types --
23   Q    -- that happening either?
24   A    -- of discussions all the time, sure.

1         MS. DEMING:  Let him finish his
2  question.
3         THE WITNESS:  Oh, sorry.
4    Q    (By Mr. Slater)  Do you -- that's fine.
5         Do you recall that happening with the Prolift
6  where your fellowship director said, "Hey, you know,
7  you should look at this article about the Prolift, it
8  has important information, you should read this"?  Is
9  there any particular article you can point to?
10   A    Not that I remember.
11   Q    Okay.  In your report, you focused on certain
12 medical literature.  Is that literature that you
13 focused on the literature you just -- you personally
14 think is most important with regard to the Prolift in
15 forming your opinions?
16   A    Could you ask that question again?
17   Q    Sure.  In your report, you actually discuss
18 certain medical literature, certain studies and certain
19 articles.
20   A    Yes.
21   Q    You pick certain ones and actually talk about
22 them in your report, correct?
23   A    Correct.
24   Q    All right.  First of all, were those the

1  studies and the articles you felt were most important
2  and most significant to you in forming your opinions
3  about the Prolift?
4    A    They were articles that I thought helped to
5  elucidate the ideas that I was trying to describe in
6  the report, yes.
7    Q    Okay.  And the reason I'm asking is because
8  obviously there's a lot of literature out there and
9  there's a lot of literature on your list that's
10 attached to your report.
11   A    Right.
12   Q    But you obviously made decisions on what to
13 actually discuss in your report, correct?
14   A    Correct.
15   Q    And I'm trying just to understand your
16 thought process.  The articles that you actually and
17 the studies that you actually discuss in the report are
18 those that you -- are those the ones you felt were most
19 important to you in forming your opinions?
20         MR. ISMAIL:  Objection to form.
21         THE WITNESS:  It doesn't mean that some
22 of the other articles may not have been
23 important.  It just means that those are the
24 ones that illustrate the points that I was

Joye K. Lowman, M.D., MPH

Page 102

1    trying to make in the report.
2        Q    (By Mr. Slater)  The list of medical
3    literature on your report, did you compile that
4    yourself?
5        A    Not completely, no.
6        Q    Have you read all the articles that are
7    listed in the appendix to your report?
8        A    At some point, yes.
9        Q    And this is -- this is what I'm trying to get
10   at with my question before, since there's obviously a
11   lots of articles listed there and I was not -- I was
12   hoping not to walk through every single one of them
13   with you.
14       A    Yeah.
15       Q    So what I was trying to get at is, I know
16   you've listed a lot of articles, but I just want to
17   understand, those that you describe and discuss in the
18   report itself, are those the ones that you felt were
19   the most important ones to you in illustrating and
20   forming your opinions?
21       MR. ISMAIL:  Objection.  Asked and
22   answered.
23       THE WITNESS:  What I'm trying to explain
24   is that there may be other articles that are

Page 103

1    important that I didn't cite specifically.
2        The articles that I cited specifically
3        usually are relevant to either the numbers
4        that I used specifically or to the specific
5        sentence that was -- that I typed up before I
6        cited those articles.
7        Q    (By Mr. Slater)  This list of medical
8    literature in the appendix to your report, the reliance
9    list of medical literature, am I correct that you don't
10   weigh all these articles equally, you don't say they
11   all have the same importance to your opinion?
12       A    That's -- yeah, that's correct.
13       Q    So if my starting point -- if I want to
14   figure out which articles were most important to you,
15   certainly those you discussed in your report would be
16   at the top of the list, correct?
17       A    Correct.
18       Q    Are there any other particular articles, and
19   you can look at the list, where you'd say, "These
20   additional studies are important to me also, and I put
21   them also at the top of the list in forming my
22   opinions"?
23       A    You want me to go through them all?
24       Q    Well, I'm not -- I'm actually not trying to

Page 104

1    make you do that.  I'm actually trying to short-cut a
2    little with how I'm asking the question, but my feeling
3    would be that you would know which articles are most
4    important to you or which studies are most important to
5    you in forming your opinions.  So that's what I'm
6    trying to understand, so that when I see you testify at
7    trial, I can anticipate what you'll probably focus on
8    when you testify.
9        A    The only hesitation I have with doing that is
10   that there's a lot that I've read in my career.  And
11   there might be something that comes to mind as we
12   progress through this that I realize, oh, this -- in
13   this article, they said something very important.  So I
14   don't want to exclude things that might have something
15   of importance in them.  I can try to go through this
16   list if you'd like.
17       Q    What I want to understand is this:  As you
18   sit here now, other than what you've discussed
19   specifically in the report, are there any other
20   articles that jump out at you and you say, "This one is
21   clearly important to me also; I didn't discuss it, but
22   it's significant"?
23       A    I'd have to go through this and try to
24   remember and figure it out.  I don't think I can answer

Page 105

1    that question effectively.
2        MR. ISMAIL:  And, Adam, just so you
3    know --
4        Q    (By Mr. Slater)  Any that jump out at you?
5        MR. ISMAIL:  Sorry, just to interpose,
6    there's a -- there's a supplemental list that
7    we've tendered as well, but I know you're --
8        MR. SLATER:  I don't know what you're
9    talking about with a supplemental list.  I
10   have this report.
11       MR. ISMAIL:  I understand what you have
12   and that's why I interposed it, so you were
13   aware.
14       MR. SLATER:  Was it sent to me?
15       MR. ISMAIL:  I have no idea if it was
16   sent to you.  I'm telling you it's here.
17       MS. DEMING:  It was sent yesterday.
18       MR. ISMAIL:  It was -- we believe it was
19   sent yesterday.  It's here.
20       MR. SLATER:  Well, you understand I'm
21   the lawyer that was going to take the
22   deposition.  Did anybody actually email it to
23   me and say, "Hey, here's a supplemental list
24   of literature"?

27 (Pages 102 to 105)

Golkow Technologies, Inc. - 1.877.370.DEPS

Joye K. Lowman, M.D., MPH

Page 106

1    MR. ISMAIL:  I just told I don't know.
2    MR. SLATER:  Do you think somebody could
3  do that for me now so during a break I could
4  take a look at it?
5    MR. ISMAIL:  I'm sure that can be done.
6    MS. DEMING:  I'll be glad to.
7    (Discussion off the written record.)
8    Q    (By Mr. Slater)  Doctor, as you sit here
9  now --
10   A    Yes.
11   Q    -- looking at the reliance list of medical
12 literature that was attached to your report --
13   A    Yes.
14   Q    -- are there any of those articles that jump
15 out at you and you say, "I know that this is important
16 to me also in addition to what I discussed in my
17 report," as you sit here now?
18   A    I'd have to go through them and look.  If you
19 want me to do that, I can.
20   Q    Sure, take a look.
21   THE WITNESS:  Does anyone...
22   MR. SLATER:  It's attached to your
23 report.
24   THE WITNESS:  Yep, I see it.

Page 107

1    MS. DEMING:  And then there were the
2  additional articles that we included in
3  the --
4    MR. SLATER:  I don't want the additional
5  articles.  Ma'am, I don't know why you're
6  talking about the additional articles.  That
7  will be a separate part of this deposition.
8  I'll take my deposition, okay?  I asked
9  Dr. Lowman to look at that reliance list that
10 was attached to the report that was served,
11 and that's what we're talking about right
12 now.
13   THE WITNESS:  So you'd like me to go
14 through and speak to which articles I think
15 would be of importance?
16   Q    (By Mr. Slater)  Ma'am -- Doctor, I think
17 I've asked this question six times.  In your report,
18 you discussed certain articles --
19   A    Yes.
20   Q    -- which you have acknowledged to me would
21 certainly be very important to you at the top of the
22 list.  All I want to know is, you've got pages and
23 pages of lists of articles, some of which you didn't
24 even put on this list.  So I just want to know, are

Page 108

1  there any others on this list that you can tell me,
2  "Yes, those are important to me also in forming my
3  opinions; I put them right up there with the ones that
4  are discussed in the report"?
5    A    Okay.
6    MR. ISMAIL:  Objection to form.
7    Q    (By Mr. Slater)  There might be some; there
8  may not be any.
9    A    Okay.
10   MR. ISMAIL:  Objection to form.
11   THE WITNESS:  The first article I would
12 say is important.
13   Q    (By Mr. Slater)  That's the Abed systematic
14 review?
15   A    Yes.  The -- they're not numbered, so this is
16 going to be --
17   THE WITNESS:  Could I have a pen,
18 please.
19   Q    (By Mr. Slater)  Alphabetical order, so you
20 can just tell me the last name of the author.
21   A    Okay.  The first Altman study.
22   Q    That's in your report, you discuss that in
23 the report, right?
24   A    Yes, I did.

Page 109

1    Q    I don't need you to list those that are
2  discussed in the report.  I just want to know, in
3  addition to those you actually discussed in the report,
4  which ones are also very important to you.
5    A    Okay.  The second Altman study.  The last
6  Altman study.  The Amid study.  The Araco study.  The
7  Aungst study.  The optimal study.
8    Q    Which one?
9    A    The optimal trial.
10   Q    Who's the first listed author?
11   A    Dr. Barber.
12   Q    Got it.
13   A    The third Barber article.
14   Q    Success?
15   A    Yes, "Defining Success."  The Bartley
16 article.  The Bartuzi article.  The Benbouzid article.
17 Dr. Benson's article.  Dr. Bhatia's abstract.  The
18 Caquant article.  The Carey article.  I think I cited
19 that.  The Climent article.  The Cosson article.
20   Q    Which one?
21   A    The first one that's listed.
22   Q    The 687 patients?
23   A    Yes.
24   Q    The abstract?

28 (Pages 106 to 109)

Joye K. Lowman, M.D., MPH

1     A    Yes.
2     Q    Got it.
3     A    I believe I cited the Da Silveira article.
4  The -- I can't pronounce his last name, the
5  second-to-the-last one listed on this page.
6     Q    D-A-M-O-I-S-E-A-U-X?
7     A    That's correct.
8     Q    Okay.
9     A    De Landsheere.  I cited that article.  The
10  Demirci article, both of those and both of the
11  De Landsheeres.  The Dietz article I believe I cited.
12  The El Haddad article.  The last Fatton article.  The
13  Feiner articles.  The Francis article.  The Glatt
14  article.  The Gupta article.  The Gutman article.  I
15  cited Halaska.  The article by Handa.  The Heinonen
16  articles.  The Iglesia article.  The Ignjatovic
17  article.
18     Q    Which one?
19     A    The second one.  Jacquetin.
20     Q    Which?
21     A    All of them.  The Kahn article I believe I
22  cited.  The Karram article.  The Komesu article.  The
23  Kozal articles.
24     Q    Doctor, you can keep looking and indicating

1  them on your -- you know, for yourself.  They're going
2  to change the tape, but hopefully they can do that
3  quickly and we can continue.
4     A    Okay.
5         THE VIDEOGRAPHER:  We are now going off
6     the video record.  The time is currently
7     12:59 p.m.  This is the end of Tape No. 2.
8         (Recess taken.)
9         THE VIDEOGRAPHER:  We are now back on
10     the video record with Tape No. 3.  The time
11     is currently 1:04 p.m.
12         THE WITNESS:  So I'm looking at the page
13     with Krasnopolsky or polsky (pronunciation)
14     at the top.
15         MR. SLATER:  Right.
16         THE WITNESS:  Those first three articles
17     I would think might be important.  The Lane
18     article, the Lensen article, Liang, Long,
19     Long, Lowder, Lucente's last two articles,
20     Lykke, Maher, and I believe I cited one of
21     those, but all of the Maher articles.  McEvoy
22     on the next page, McLennan, Milani, Miller.
23     I cited the Murphy "Time to Rethink" article,
24     I believe.  If I didn't, that would be

1  important.
2         MR. SLATER:  Oh, you did.
3         THE WITNESS:  I thought that I did.
4         THE WITNESS:  Murphy.  The 2008 article.
5     The Nguyen article.  The Nygaard article I
6     believe I cited.  Both of those would be
7     important.
8         MR. SLATER:  Both of the Nygaard
9     articles?
10         THE WITNESS:  Uh-huh.
11         MR. SLATER:  Okay.
12         THE WITNESS:  Okui, Olsen, Pandit,
13     Patel, both of those --
14         MR. SLATER:  Which one?
15         THE WITNESS:  Both of them.  Perez and
16     Perschler.  I'm sorry, not Perschler, I
17     thought that was one article.  Popov,
18     Salimova, Sand, Sanses, Sato.  Silva I
19     believe I cited.  Skala.  Sokol I believe I
20     cited.  Su.  Both of those.  Subak.  Sung.
21     Q    (By Mr. Slater)  You said Sun or Sung?
22     A    Sung, S-U-N-G.
23     Q    Okay.  Got it.
24     A    Svabik.  Toglia I believe I cited.

1  Vaiyapuri, two-year outcomes.  Vaiyapuri, three-year
2  outcomes.  The Valentim-Lourenco article.  Velemir.
3  Wang, the first -- the second study.  Weber I believe I
4  cited.  The last Weber article.  Whiteside.  All of the
5  Withagen articles.  Wong and Dietz, Wong's ICS
6  abstract, Wu, Yakasai.
7     Q    There's two Wus.
8     A    Oh, I'm sorry.  The second Wu.
9     Q    Okay.
10     A    And Yazdany and Yesil.
11     Q    All right.
12         MR. SLATER:  Now, you guys mentioned
13     lunch.  Do you want to break for lunch now
14     and then come back soon?
15         MR. ISMAIL:  Sure.
16         MR. SLATER:  Or do you want to keep
17     going?  I'll do whatever you want.
18         MR. ISMAIL:  No, let's take a break.
19         (Discussion off the written record.)
20         THE VIDEOGRAPHER:  We are now going off
21     the video record.  The time is currently
22     1:13 p.m.
23         (Lunch recess taken.)
24         THE VIDEOGRAPHER:  We are now back on

Joye K. Lowman, M.D., MPH

Page 114

1    the video record.  The time is currently
2    1:56 p.m.
3        Q    (By Mr. Slater)  Okay, Dr. Lowman --
4        A    Yes.
5        Q    -- I'm looking at your report, and you also
6    have a list after the list of literature of what you
7    called production materials at the end.
8        A    Okay, let me get to that.
9        Q    Sure.
10       A    This is after the reliance list you're
11   talking about?
12       Q    After the list of literature --
13       A    Yes.
14       Q    -- the next thing, you have a list of
15   production materials.
16       A    Yes.
17       Q    Okay.  What I'd like to do is ask you, first
18   of all, is this a list of materials that you compiled
19   yourself?
20       A    Not completely myself, no.
21       Q    Have you actually looked at everything on
22   this list of production materials, these three pages?
23       A    I've looked at most of this at some point,
24   yes.

Page 115

1        Q    Well, before you became an expert in this
2    case, had you looked at -- other than -- well,
3    rephrase.
4            Before you were retained as an expert, had
5    you looked at these materials?
6        A    No.  I may have looked at an anatomy video,
7    but certainly not this expansive materials, no.
8        Q    So basically you were just provided a bunch
9    of -- talking -- you just mentioned videos, so I'll
10   just talk about the videos.  You were just given a
11   bunch of videos that were from Ethicon, and did you
12   actually watch them?
13       A    I've watched anatomy videos over the course
14   of my career.  I haven't watched all of these videos in
15   the past three months, no.
16       Q    Have you watched any -- let's rephrase.
17           Talking on the first page, there's a series
18   of anatomy videos.
19       A    Yes.
20       Q    Have you watched any of those, those specific
21   anatomy videos, have you watched them?
22       A    No, not recently.
23       Q    When you say "not recently" --
24       A    Uh-huh.  I've watched an anatomy video --

Page 116

1        Q    -- are you going to tell me that you --
2        A    I've watched an anatomy video in the past.  I
3    don't know which one is -- there's several here, so I'm
4    not sure which of those anatomy videos I've actually
5    watched or not watched.  I have not watched them all.
6        Q    Is it possible that the anatomy video that
7    you've seen in the past is not one of these?
8        A    I don't know if that's possible or not.  I'm
9    assuming that this is exhaustive.
10       Q    When you say you've seen an anatomy video --
11       A    Uh-huh.
12       Q    -- are you able to tell me -- you're not able
13   to tell me which of these you have may have seen?
14       A    No.
15       Q    Is that correct?
16       A    That's correct.
17       Q    Is the anatomy video that you saw, regardless
18   of whether you can tell me which one it is --
19       A    Uh-huh.
20       Q    -- of any significance to you in your
21   opinions in this case?
22       A    No.
23       Q    If we go to the last -- the third page of the
24   production materials, there's a series of Prolift

Page 117

1    professional education videos.  Are those of
2    significance to you in forming your opinions in this
3    case?
4        A    No.
5        Q    Did you even watch those in connection with
6    your work in this case?
7        A    No.
8        Q    Do you even know if you've ever seen any of
9    them?
10       A    I don't know if I've seen these specifically.
11   I have seen professional education videos during my
12   career.
13       Q    You just don't know if it's those?
14       A    I don't know if it's those.
15       Q    If we go to the first page of the production
16   materials, there's a list of -- at the beginning a
17   series of materials, and I'll just go through them real
18   quick.
19       A    Okay.
20       Q    There's one that just has some Bates numbers
21   on it.  Do you know what that is?
22       A    I don't know what a Bates number is.
23       Q    It says ETH.MESH.020 --
24       A    Yes.

30 (Pages 114 to 117)

Joye K. Lowman, M.D., MPH

Page 118

1    Q    -- 17152.
2    A    I see that, uh-huh.
3    Q    Do you know -- do you know what that is?
4    A    No.
5    Q    Let me -- let me make this simple.
6  There's -- you obviously gave some opinions about
7  warnings or the information that was provided in the
8  IFU and the patient brochure.
9    A    Right.
10    Q    We'll talk about that later, but you've given
11  those opinions, correct?
12    A    Yes.
13    Q    Or you set forth that you had seen the IFU
14  and seen the patient brochure; is that correct?
15    A    That's correct.
16    Q    Okay.  Other than the IFUs and patient
17  brochures that you've seen, on these three pages of
18  production materials, I need to know, is there anything
19  else you can -- well, let me withdraw that.
20        Putting aside IFUs and patient brochures for
21  a moment --
22    A    Yes.
23    Q    -- is there anything on these three pages of
24  production materials that is significant to you in

Page 119

1  forming your opinions, something where you'll say,
2  "Well, that document is important to me in forming my
3  opinions in this case"?
4    A    Yes.
5    Q    So if you could just go through those three
6  pages and tell me.
7    A    Okay.
8    Q    We've already talked about the videos, so --
9    A    Okay.
10    Q    -- we don't have to talk about those again.
11    A    Okay.
12    Q    But the rest, I just want to know if anything
13  is of significance to you.
14    A    Okay.  The professional education slide
15  decks, the resource monographs, the surgical technique
16  guides.  I'm assuming you're considering the patient
17  counseling guide as part of the patient brochures?
18    Q    Where do you see the patient counseling
19  guide?
20    A    It's right before the videos.
21    Q    Oh, right.  Is that something that you're
22  relying on?
23    A    Yes.
24    Q    You realize that's a 2011 document, so it's

Page 120

1  two years after her surgery?
2    A    Yes.  It still goes to the effort of Ethicon
3  in educating the people that are using their products.
4    Q    Okay.
5    A    The biocompatibility risk assessment towards
6  the bottom of the page.
7    Q    Okay.
8    A    Obviously the FDA safety communication on the
9  second page.  And then I think the rest are patient
10  brochures and IFUs, slide decks.  That would be it.
11    Q    Nothing else on these three pages --
12    A    No.
13    Q    -- other than what you identified, plus the
14  IFUs, the patient brochures, and the side decks and the
15  other materials you specifically identified?
16    A    That's correct.
17    Q    Okay.  Now, if we go to the next page after
18  that, there's a list of two pages -- there's a list of
19  two pages that says "Other Materials."
20    A    Uh-huh.
21    Q    Are those materials of significant to you --
22  significance to you in forming your opinions?
23    A    I'm reading through them.  Obviously the FDA
24  Public Health Notification we've already talked about

Page 121

1  that, 2008, 2011, are important.  The ACOG Frequently
2  Asked Questions, the committee opinion, AUA position
3  statement, I cited those.  The IUGA Prolapse Guide for
4  Women.  ACOG Frequently Asked Questions again.  The
5  AUGS position statement.  ACOG committee opinion, the
6  AUA position statement.  The Public Health Notification
7  is listed a couple times.  The SGA -- SGS position
8  statement.  And that would be it before the
9  case-specific list.
10    Q    Okay.  And you -- and that's including both
11  pages, right?
12    A    That's both.
13    Q    Because there's two materials on the second
14  page.
15    A    Yes, that's both pages.
16    Q    Okay.  The last thing on that list of other
17  materials is a June 2, 2006 Ethicon expert meeting,
18  meshes for pelvic floor repair.  Did you even look at
19  that document?
20    A    I did not.  If that relates to the consensus
21  in the surgeon's monograph, that would be what I've
22  looked at, but not this particular thing.
23    Q    But if there were meetings where Ethicon
24  brought doctors and scientists together in 2006 and

31 (Pages 118 to 121)

Joye K. Lowman, M.D., MPH

Page 122

1  2007 in Germany, you're not aware of that?
2      A   I don't have those documents, no.
3      Q   Correct?
4      A   No, I haven't reviewed them.
5      Q   Okay.  And then the last thing we have is the
6  materials you looked at in connection with Ms. Hammons
7  specifically, correct?
8      A   That's correct.
9      Q   There's a list of depositions.  Did you read
10  all those depositions?
11      A   No.
12      Q   Which did you read?
13      A   I read Dr. Baker's deposition, Patricia
14  Hammons, Mike Heit, Dr. Lackey.  Ann Weber is not on
15  there, but I've read hers.  And Dr. Zipper is not on
16  here either, but I read his as well.  And then
17  Dr. Drolet.
18      Q   You've read Dr. Drolet's report?
19      A   I have.
20      MR. SLATER:  Okay, I was just handed
21  what I guess is the materials list dated
22  November 12, 2015, which I guess is an
23  update.  Can somebody mark that as an exhibit
24  and give it to Dr. Lowman.

Page 123

1      MS. DEMING:  I'll need to go make a copy
2  of it, but I can do that and come back.
3      MR. SLATER:  Questioning while that's
4  being done.  We can come back to it.
5      Q   (By Mr. Slater)  I want to ask you a question
6  about the AUGS/ACOG joint committee opinion, No. 513.
7  That's one of the materials you said you relied on in
8  this case?
9      A   Yes.
10      Q   Okay.  Do you agree with the conclusions that
11  are set forth in that committee opinion about what
12  patients are appropriate candidates for the use of mesh
13  kits like the Prolift?
14      MR. ISMAIL:  Objection to form.
15      THE WITNESS:  Do we have that available
16  for me to look at?  Do I have -- do you have
17  that available for me to look at?
18      MR. SLATER:  No.  I figured you knew it.
19  I know it, so I just --
20      THE WITNESS:  I don't know it --
21      MR. SLATER:  -- ask questions about
22  it.
23      THE WITNESS:  I don't know it word for
24  word.

Page 124

1      Q   (By Mr. Slater)  Do you know, as you sit here
2  now, what criteria that committee opinion sets forth as
3  the appropriate patients to have a mesh kit like the
4  Prolift put in their body?
5      A   They support its use in high-risk patients.
6      Q   Do you recall how they define a high-risk
7  patient?
8      A   I remember that they specifically state
9  patients who have had recurrence, patients who have
10  advanced degrees of prolapse.  I don't remember beyond
11  that.
12      Q   Do you know whether Patricia Hammons meets
13  the criteria in Committee Opinion 513, or do you need
14  to see the committee opinion?
15      A   She does.
16      Q   Okay.  You think she does.  Okay, that's
17  fine.
18      If, in fact, Patricia Hammons did not meet
19  the committee opinion criteria, is it your opinion that
20  she would not be a suitable candidate for the Prolift?
21      A   No.
22      Q   What was your criteria for the Prolift in
23  terms of what patients you would offer it as an option
24  to?

Page 125

1      A   Symptomatic pelvic organ prolapse.
2      Q   Any particular severity or grade?
3      A   Not necessarily.
4      Q   Would you put a Prolift into a Stage 1
5  prolapse?
6      A   If it were symptomatic.
7      Q   Did you ever put a Prolift into a Stage 1
8  prolapse?
9      A   It's not usually symptomatic, so, no, I have
10  not.  But if it were, I would consider it.
11      Q   But you never did, right?
12      A   No.
13      Q   Stage 1 prolapse actually is considered a
14  normal finding, right?
15      A   I wouldn't call it normal.  It's not normal
16  support, which is Stage 0.  Stage 1 is mild prolapse.
17      Q   What percentage of women do you think are
18  walking around with a Stage 0?
19      A   I'd guess maybe 10 percent.  If you haven't
20  had children, the likelihood that you have Stage 0 is
21  very high.  Just -- it depends on the patient
22  population that you're discussing.
23      Q   Percentage of women who have had children
24  would you think are walking around with a Stage 0?

32 (Pages 122 to 125)

Joye K. Lowman, M.D., MPH

Page 126

1      A    If I had to guess, maybe 5 percent.
2      Q    Now, is that a guess, or are you basing that
3  on any study or clinical data?
4      A    I'm guessing, basing on my clinical
5  experience, on my -- I'm basing that on my clinical
6  experience.
7      Q    Would you agree there are many women who have
8  Stage 2 prolapse and the symptoms are manageable and
9  they don't need surgery?
10     A    Yes.
11     Q    Would you agree, in Patricia Hammons' case,
12 that abdominal sacrocolpopexy was a reasonable
13 treatment option for her?
14     A    Yes.
15     Q    Would you agree with me that for Patricia
16 Hammons, that a suture repair of her prolapse was a
17 reasonable treatment option?
18     A    That's a hard one for me to agree with.  I'd
19 have to say no.
20     Q    Understand my question.  I'm not asking what
21 you would have done, but here's my question:  Do you
22 agree with me that one of the reasonable options that
23 could have been offered to Mrs. Hammons was a suture
24 repair of her prolapse?

Page 127

1          MR. ISMAIL:  Objection.  Asked and
2      answered.
3          THE WITNESS:  No.
4          MR. SLATER:  Okay.
5      Q    (By Mr. Slater)  One of the materials on your
6  reliance list that you said is significant to you is
7  the surgeon's monograph, right?
8      A    Yes.
9      Q    Do you know if it was available when
10 Dr. Baker was trained?
11     A    I believe so.  Well, I don't know when he was
12 trained.  I know it was available before the procedure
13 that Mrs. Hammons had.
14     Q    Okay.  Do you know whether or not Dr. Baker
15 ever saw the monograph?
16     A    I don't know.
17     Q    Do you know whether or not the monograph was
18 available when Dr. Baker was trained?
19     A    I don't know when he was trained.
20     Q    Do you know which patient brochure --
21 rephrase.
22         Do you know which IFU was actually available
23 to Dr. Baker when he counseled Ms. Hammons and operated
24 on her?

Page 128

1          MR. ISMAIL:  Objection to form.
2          THE WITNESS:  I believe there was an
3      update to the IFU either in 2008 or 2009, and
4      I believe that that would have been available
5      to him.
6      Q    (By Mr. Slater)  Do you know which patient
7  brochure Ms. Hammons testified that she saw?
8      A    I don't.
9      Q    Do you know which patient brochure was --
10 withdrawn.
11         Do you know whether or not Dr. Baker
12 identified a patient brochure that he had seen and was
13 relying on at the time he counseled and operated on
14 Ms. Hammons?
15     A    He did remark about giving -- that it was
16 likely that he gave her a patient brochure.
17     Q    Do you know which one?
18     A    No.  I don't believe he testified to that.
19     Q    In drawing your opinions in this case, was it
20 important to you to know which IFU was actually
21 available at the time that Dr. Baker counseled and
22 operated on Ms. Hammons?
23         MR. ISMAIL:  Objection to form.
24         THE WITNESS:  No.

Page 129

1      Q    (By Mr. Slater)  In forming your opinions in
2  this case, was it important for you to know which
3  patient brochure Ms. Hammons actually saw?
4      A    No.
5      Q    In forming your opinions in this case, was it
6  significant to you whether or not Dr. Baker actually
7  saw the monograph?
8      A    No.
9      Q    Do you know which of the Prolift professional
10 education decks was in use when Dr. Baker was
11 trained on the Prolift at an Ethicon event?
12     A    I don't.
13     Q    Was it of any significance to you -- well,
14 rephrase.
15         Is it of any significance to you to know
16 which professional education slide deck would have been
17 utilized in Dr. Baker's training by Ethicon on the
18 Prolift?
19     A    No.
20     Q    Do you know why Ethicon marketed the
21 Prolift+M?
22         MR. ISMAIL:  Objection to form.
23         THE WITNESS:  No.
24     Q    (By Mr. Slater)  Do you know why Ethicon

Joye K. Lowman, M.D., MPH

Page 130

1  developed the Prolift M in order to be able to market
2  it?
3        MR. ISMAIL:  Objection to form.
4        THE WITNESS:  I have an idea about some
5     of the concepts behind lighter weight mesh,
6     if that's what you're getting to.  I can't
7     speak to what Ethicon was thinking.
8     Q    (By Mr. Slater)  It's your assumption that
9  Ethicon developed the Prolift+M because it was a
10  lighter weight mesh than the Gynemesh PS mesh?
11    A    That's my assumption, yes.
12    Q    Do you agree that lighter weight mesh is
13  considered in the urogynecology community and
14  literature to have safety advantages as against heavier
15  weight meshes?
16        MR. ISMAIL:  Objection to form.
17        THE WITNESS:  I believe that is a
18     theory, yes.
19    Q    (By Mr. Slater)  Do you agree with that?
20    A    No.
21    Q    Do you think that the safety profile for a
22  heavyweight mesh or a mid-weight mesh is the same for
23  that as a lightweight mesh?
24        MR. ISMAIL:  Objection to form.

Page 131

1        THE WITNESS:  No.
2     Q    (By Mr. Slater)  Do you -- do you agree with
3  me that a lightweight mesh is considered to be safer
4  than a mid-weight or a heavyweight mesh?
5        MR. ISMAIL:  Objection to form.
6        THE WITNESS:  No.
7     Q    (By Mr. Slater)  Do you have an opinion to a
8  reasonable degree of medical probability as to whether
9  or not there are any safety advantages as between the
10  Prolift M as compared to the Prolift?  Do you have an
11  opinion one way or another on that subject?
12    A    I do.
13        You fell out.  I'm sorry.
14    Q    Sure.  What is your opinion?
15    A    My opinion is that there is a theory that
16  lighter weight mesh might decrease the risk of
17  complications with pelvic organ prolapse repair.
18  However, that has not been demonstrated in the
19  literature.
20    Q    I asked you a little bit earlier about your
21  own Prolift patients.  I want to go back to that for a
22  couple of minutes.
23    A    Okay.
24    Q    With your -- with patients that you operated

Page 132

1  on with the Prolift --
2     A    Yes.
3     Q    -- those 150 patients, do you know how many
4  of them had erosions?
5     A    I can't speak to that because I left my
6  fellowship program during part of what would have been
7  the follow-up for some of them.  I can say for the
8  approximately half that I operated on in -- while I've
9  been at Kaiser, that there have been three erosions.
10    Q    That you know of?
11    A    That I know of.
12    Q    You would agree with me that you may have
13  patients who had complications from a Prolift who
14  didn't return to you but went to another doctor for
15  treatment?
16    A    That's possible.  That would be unlikely,
17  though, because of the way that Kaiser is structured
18  where patients have to see Kaiser doctors if they have
19  Kaiser insurance, but it is possible.
20    Q    Well, it's possible that you operated on a
21  patient with a Prolift, she had complications, and then
22  whether or not you treated those complications,
23  eventually went to somebody else?
24    A    That's possible.

Page 133

1     Q    You can't say that hasn't happened, right?
2        MR. ISMAIL:  Objection.  Asked and
3     answered.
4        THE WITNESS:  That's possible.
5     Q    (By Mr. Slater)  Do you know any of the
6  standards that Ethicon itself applied to whether or not
7  the warnings and information provided in the IFU and
8  the patient brochure were adequate?
9     A    I don't know.
10    Q    Do you know any of the standards that are
11  applied in general to medical device manufacturers in
12  providing information in an IFU or a patient brochure
13  in terms of what type of information should be
14  supplied?
15    A    No.
16    Q    In giving your opinions as to whether or not
17  the warnings and information in the IFU was adequate,
18  were you basing that on your own analysis of the
19  information and your own understanding of what
20  information you would need?
21    A    Yes.
22    Q    In offering your opinions with regard to
23  whether the information provided in the patient
24  brochure was adequate, were you basing that upon your

Joye K. Lowman, M.D., MPH

Page 134

1  own evaluation of what information you would personally
2  need in your practice?
3      A   Yes.
4      Q   Were you at all curious as to what standards
5  Ethicon felt it was bound to meet in terms of what
6  information and warnings would need to be provided to
7  physicians with regard to the Prolift?
8          MR. ISMAIL:  Objection to form.
9          THE WITNESS:  No.
10     Q   (By Mr. Slater)  That was of no significance
11  to you?
12     A   No.
13     Q   If I understand correctly, with regard to the
14  warning opinions, those are based on your own
15  evaluation of what information you would need in your
16  practice; is that a correct statement?
17     A   That's correct.
18     Q   In your own practice, if Ethicon had
19  information that patients were experiencing very severe
20  complications from the Prolift and that some of those
21  complications could not be safely and effectively
22  treated and the women were being left with permanent
23  pain due to the Prolift itself, would you have wanted
24  to have that information?

Page 135

1          MR. ISMAIL:  Objection to form.
2          THE WITNESS:  Not necessarily.
3      Q   (By Mr. Slater)  In drawing your opinions in
4  this case with regard to the safety of the Prolift, did
5  you assume that there are some women who have a Prolift
6  put in their body and that due to the complications
7  with the mesh, they suffer injuries that are permanent
8  and life altering?  Did you assume that that happens to
9  some women due to the Prolift mesh?
10         MR. ISMAIL:  Objection to form.
11         THE WITNESS:  No.
12     Q   (By Mr. Slater)  In drawing your opinions in
13  this case, did you assume -- rephrase.
14         In drawing your opinions in this case with
15  regard to whether or not the Prolift is safe, was it
16  your assumption that if a woman has complications
17  related to the Prolift mesh, that those -- those
18  complications can be safely and effectively treated
19  such that the women will be okay going forward?
20         MR. ISMAIL:  Objection to form.
21         THE WITNESS:  That's been my
22  experience.
23     Q   (By Mr. Slater)  And is that your assumption
24  in drawing your opinions in this case?

Page 136

1          MR. ISMAIL:  Objection to form.
2          THE WITNESS:  Could you repeat the
3  question?
4      Q   (By Mr. Slater)  Is that your assumption in
5  drawing your opinions in this case?
6          MR. ISMAIL:  Objection to form.  Do you
7  need to hear back --
8          THE WITNESS:  I need to hear back the
9  question.  I'm sorry.
10     Q   (By Mr. Slater)  In drawing your opinions in
11  this case with regard to whether the Prolift is safe or
12  not --
13     A   Uh-huh.
14     Q   -- did you assume that when a woman would
15  have complications related to the Prolift mesh, that
16  those complications could be safely and effectively
17  treated and the woman would then be okay going forward?
18         MR. ISMAIL:  Objection --
19     Q   Is that your assumption with regard to
20  mesh-related complications?
21         MR. ISMAIL:  Objection to form.
22         THE WITNESS:  The majority of cases,
23  yes.
24     Q   (By Mr. Slater)  Did you assume that for some

Page 137

1  women, that they could have Prolift mesh-related
2  complications that could not be safely and effectively
3  treated despite the best care and the women would be
4  left with permanent pain and permanent damage?
5          MR. ISMAIL:  Objection to form.
6          THE WITNESS:  Okay, you keep saying
7  "assume," and I'm not sure what you're
8  implying by that.  Is it my opinion --
9      Q   (By Mr. Slater)  As an expert --
10     A   I'm sorry.
11     Q   I'm asking, in drawing your opinions, what
12  facts you're assuming or what your understanding of the
13  facts is --
14     A   Okay.
15     Q   -- or are.
16     A   Okay.
17     Q   So you draw an opinion based on facts that
18  you believe exist, right?
19     A   That's correct.
20     Q   In drawing your opinions regarding the safety
21  of the Prolift --
22     A   Uh-huh.
23     Q   -- did you assume that if a woman has
24  complications related to the Prolift mesh, that for

Golkow Technologies, Inc. - 1.877.370.DEPS

Joye K. Lowman, M.D., MPH

Page 138

1  some of those women, they can't be successfully treated
2  and they can be left with permanent disabling pain and
3  damage?
4      MR. ISMAIL:  Objection to form.
5      THE WITNESS:  I didn't make any
6  assumptions in formulating my opinions about
7  the Prolift.  In my clinical experience,
8  women that have had complications with the
9  Prolift have been able to be successfully
10  treated.
11     Q    (By Mr. Slater)  So in evaluating the safety
12  of the Prolift, you base that on your personal
13  experience with managing complications?
14     A    As well as the medical literature.
15     MR. SLATER:  Do we have the updated
16  reliance list yet in the room?
17     MR. GOODALL:  Yes, we do.
18     MR. SLATER:  All right.  Can we mark
19  that as whatever the next -- you know what,
20  actually, don't mark it as the next exhibit
21  because I have a series that are premarked,
22  so just to be safe, let's mark it as Exhibit
23  22.
24     (Exhibit 22 marked for identification.)

Page 139

1      THE WITNESS:  Okay.
2      Q    (By Mr. Slater)  Okay, Doctor, I was provided
3  this list of updated -- well, rephrase.
4      Doctor, what we've marked as Exhibit 22, can
5  you tell me what that is?
6      A    I believe that this is a supplement to my
7  reliance list.
8      Q    Did you prepare this supplement?
9      A    Not by myself, no.
10     Q    Are there articles on this list that you have
11  not read?
12     A    I've read most of these articles at some
13  point.
14     Q    Well, most.  I'm asking, are there any that
15  you haven't read?
16     A    There might be.
17     Q    All right.  This list looks like it is the
18  prior list with some additions to it.  Is that
19  accurate?
20     A    Yes.
21     Q    There's no way for me to know unless I go
22  through it.  Is there any way for you to tell me what
23  was added to this list yesterday that I saw today for
24  the first time?

Page 140

1      A    There's no way for me --
2      Q    First it's just a yes or no.  Would you be
3  able to tell me?
4      A    There's no way for me to tell you that, no.
5      Q    Let me ask you this:  Did you personally add
6  anything to this list because you thought it was
7  something that was important to you and significant to
8  you in forming your opinions in this case?
9      A    If I added it to the list, most likely, yes.
10     Q    Now, you have this list here.  Is there
11  anything that you can identify for me on this list that
12  was added by you at your insistence because you felt
13  like, "Oh, I left this off the list.  I need to rely on
14  this, it's important to me for my opinions, so I'm
15  adding it to the list"?
16     A    Okay, let me look through it.  On the third
17  page, the articles by Cobb.  And I'm not -- I think the
18  Feloa might be in addition.  I don't remember
19  specifically.
20     Q    Which one?
21     A    The Feola article towards the end of that
22  same page.
23     Q    Feola I have on the third -- I have on the
24  next page.

Page 141

1      A    There must be another one.  The article title
2  is "Deterioration in Biomechanical Properties of the
3  Vagina Following Implantation of a High Stiffness
4  Prolapse Mesh."
5      Q    Got it.  You originally told me the Cobb
6  articles and I checked them.  After that, the next one
7  is Feola, right?
8      A    Yes, yes.
9      Q    Okay.
10     A    I think my tobacco use article might be an
11  addition.  I'm not sure about the Peter Sand article.
12  This is -- three, four, five, six, seven, eight, nine,
13  ten.  It's on the tenth page, the very top.
14     Q    I see it.  Okay.
15     A    I need to keep up with the pages.  I think
16  it's three pages after the page we were just on.
17  Velemir -- no, I'm sorry, Walters, Urogynecology and
18  Reconstructive Pelvic Surgery, Third Edition.
19     Q    Okay.
20     A    And I think that's it.
21     Q    If you turn forward, there's the section of
22  materials list where you have -- it starts with
23  "Document Description" after the -- after the
24  literature list.  Do you see that?

36 (Pages 138 to 141)

Joye K. Lowman, M.D., MPH

Page 142

1    A    Yes.
2    Q    Was anything added to this list?
3    A    Let me look.
4    Q    And I'll ask the question differently.  Was
5  anything added to this list that's of any significance
6  to you in forming your opinions?
7    A    Okay.  I don't see anything added to that
8  section that was important for me.
9    Q    Then if we go to the list three pages forward
10  that says "Publicly Available" at the top --
11    A    Uh-huh.
12    Q    -- was anything added to that list that's of
13  any significance to you?
14    A    Not other than what we've talked about, no.
15    Q    Then if we go to the depositions and
16  exhibits, in comparing, it looks like they added
17  Dr. Zipper's deposition?
18    A    Uh-huh.  Yes.  And Dr. Weber.
19    Q    And Dr. Weber's deposition?
20    A    Yes.
21    Q    Do you know if any medical records were
22  added?
23    A    I don't know.
24    Q    Have you looked at any additional medical

Page 143

1  records in the -- since the time you wrote your report,
2  or had you seen them all at the time you wrote the
3  report?
4    A    I'd seen them all at the time I wrote the
5  report, I believe.  There were some additional records
6  given.  I have not reviewed them.  So what I had at the
7  time of the report is what I reviewed.
8    Q    Do you know what it was that you were given
9  but you have not reviewed since you wrote the report?
10    A    There were some additional hospital records,
11  but I don't know what hospital they were from.
12    Q    For your opinions because you haven't seen
13  them, correct?
14    A    Correct.
15    Q    I'm sorry.  Okay, you heard me?
16    A    Yes, I could read your lips.
17    Q    We're getting better at this.
18    A    Yeah.
19    Q    They added at the end of this expert reports.
20  Have you read each of those expert reports?
21    A    I have not read the report of Peggy Pence.
22    Q    The expert report of Ann Weber, was it -- was
23  it a single report that was written in this case, the
24  one that you read?

Page 144

1    A    Yes.
2    Q    Then there's an "Other" section.  Let me ask
3  you this:  The expert reports, had you read them when
4  you wrote your original report, or did you read them
5  after you wrote your report?
6    A    I did not have available to me the reports of
7  Julie Drolet or Dr. Klinge.  The rest of them I had.
8    Q    And you've already confirmed to me that the
9  report contains your opinions.  Are there any other
10  opinions outside of the report that you formed based on
11  what you saw after you wrote your report, or can I rely
12  on your report for your opinions?
13        MR. ISMAIL:  Objection to form.
14        THE WITNESS:  I'm not sure I know how to
15    answer that.
16    Q    (By Mr. Slater)  Getting at.  As a lawyer, we
17  use the report to have an understanding of what
18  opinions the expert has so we can be prepared.
19    A    Right.
20    Q    I just need to know, are there other opinions
21  that you have that are not in the report?  Before, you
22  told me they're in the report.
23    A    Oh, my --
24    Q    I just want to know if there's anything else.

Page 145

1    A    Yes, there are, because I was not privy to --
2  I didn't have Dr. Drolet's report or Dr. Klinge's
3  report at the time, and I do have some opinions about
4  those.
5    Q    Let's go.  Dr. Drolet, tell me your opinions.
6    A    Do you want to ask me a question?
7    Q    Based on Dr. Drolet's report, what are those
8  opinions?
9    A    We can't -- you have to restate the question.
10    Q    You said -- okay.  You said that you have
11  additional opinions based on Dr. Drolet's report.  What
12  are those opinions?
13    A    Well, if I had to identify one that stands
14  out in my mind that is different is that when I wrote
15  my initial report, I talked about the fact that I felt
16  like Mrs. Hammons might have interstitial cystitis
17  because Dr. Zipper noted that she had pain with
18  palpation of her anterior vaginal wall.  Dr. Drolet did
19  not make that notation.  So if that's not the case,
20  then that diagnosis would be less likely.
21    Q    Interstitial -- well, rephrase.  Let me
22  withdraw it.
23        Are there any other opinions based on
24  Drolet's report?

Joye K. Lowman, M.D., MPH

Page 146

1    A    You know, there might be.  I'd have to have
2  you ask me a specific question.  That was one thing
3  that I remember, but I --
4    Q    I'm not going to --
5    A    That's what I remember.
6    Q    The way this works is -- I'm sorry, Doctor,
7  the way this works is I ask you what opinions you have.
8    A    Okay.
9    Q    I'm not going to -- you know, so I need to
10  know.  This is my chance to get notice.
11    A    Okay.
12    Q    So are there any other opinions that you have
13  based on Drolet's report other than what you just told
14  me?
15    MR. ISMAIL:  Objection to form.
16    THE WITNESS:  Just opinions about the
17  entire case, opinions about the patient's
18  pain, just anything?
19    MR. SLATER:  I'm asking for new
20  opinions.  I'm asking for new opinions,
21  anything new beyond what's in your report
22  based on reading Drolet's report.
23    THE WITNESS:  I'd have to think about
24  the report.

Page 147

1    MR. SLATER:  Understand, Doctor, I'm not
2  going to trying to convince you to come up
3  with more opinions.  I just want to know that
4  when I'm done with the deposition --
5    THE WITNESS:  Right.
6    MR. SLATER:  -- I know what opinions you
7  have.  I'm not asking you to come up with
8  stuff.
9    THE WITNESS:  Right.  I mean, that's the
10  only think that I can think of that would be
11  different.
12    Q    (By Mr. Slater)  Let me ask you a question
13  about interstitial cystitis.
14    A    Okay.
15    Q    Ms. Hammons has had cystoscopy, correct?
16    A    She has.
17    Q    There have been no findings on cystoscopy
18  through which a diagnosis of interstitial cystitis was
19  made, correct?
20    A    That's not how interstitial cystitis is
21  diagnosed.
22    Q    Doctors will not use a cystoscopic view of
23  the inside of the bladder as part of the process of
24  diagnosing or ruling out interstitial cystitis?

Page 148

1    A    No.
2    Q    Is that your testimony?
3    A    That's my testimony.
4    Q    Okay.  Are you saying that interstitial
5  cystitis is purely a clinical diagnosis without
6  observation of the inside of the bladder?
7    A    You -- interstitial cystitis is a clinical
8  diagnosis.  There is a procedure called cystoscopy with
9  hydrodistention that is done in the operating room
10  under general anesthesia, which can be used to aid in
11  that diagnosis.  Office cystoscopy does not rule in or
12  rule out interstitial cystitis.
13    Q    Let me ask you a question.  If somebody has
14  interstitial cystitis and they have cystoscopy, there
15  are certain things that one would expect to see on the
16  bladder wall on cystoscopy, correct?
17    A    Not in office cystoscopy, no.
18    Q    Okay.  Did any doctor ever diagnose
19  interstitial cystitis for Ms. Hammons?
20    A    No.
21    Q    You said that you saw Dr. Klinge's report
22  after you submitted your report and that that -- I
23  think you said that that may have also triggered new
24  opinions.  Did it or did I misunderstand?

Page 149

1    A    Did that trigger new opinions?  I don't think
2  so, no.
3    Q    I'm just going through a few things to try to
4  shorten this fun process.
5    MR. SLATER:  All right, can we -- if
6  you could, Jon, could we give Dr. Lowman
7  Exhibit 2.
8    THE WITNESS:  I have the exhibit.
9    Q    (By Mr. Slater)  Doctor, I want to ask you
10  one -- okay.  Let me ask you a question.  Have you
11  published any articles in the peer-reviewed literature
12  since your -- since your fellowship was done?
13    A    I have not.
14    Q    Now, this Exhibit 2 is an article titled
15  "Pelvic Magnetic Resonance Imaging for Assessment of
16  the Efficacy of the Prolift System for Pelvic Organ
17  Prolapse," and you're listed as one of the authors,
18  correct?
19    A    That's correct.
20    Q    You worked on this study during your
21  fellowship under Dr. Hale, correct?
22    A    That's correct.
23    Q    This study and the conclusions were based on
24  MRIs performed on 10 patients, correct?

Joye K. Lowman, M.D., MPH

Page 150

1    A    Yes.
2    Q    If you could, go to page E4.
3    A    Okay.
4    Q    In the "Comments" section in the center
5    column about halfway down the page, there's a sentence
6    that says that, "Minimal tissue reaction was observed
7    on postoperative MRIs which supported the inert nature
8    of the polypropylene mesh."  Do you see that sentence?
9    A    Not yet.  Yes, I see it.
10   Q    Are MRIs routinely used to evaluate patients
11   following mesh surgery?
12   A    No.
13   Q    A little more than halfway down in the
14   "Comment" column in the middle of page E4, there's a
15   sentence that says, "However, it certainly does not
16   deem it to be 'safe.'  Pain, fibrosis, mesh erosion,
17   and mesh contracture are complications that have been
18   reported with vaginally placed mesh and may not depend
19   on inflammation."  Do you see that?
20   A    I do.
21   Q    Is that a statement that you stand by?
22   A    I did not write that statement.
23   Q    You're one of the co-authors.  Do you
24   disagree with that statement?

Page 151

1    A    I would not have used the word that this
2    doesn't mean it to be safe.  I think that's misleading.
3    Can you see pain, fibrosis, et cetera, yes, I agree
4    with that part.
5    Q    Each of those complications listed -- pain,
6    fibrosis, mesh erosion, and mesh contracture -- are
7    complications that occur in some women with the
8    Prolift, correct?
9    A    Correct.
10   Q    Let's go to Exhibit 3.
11   A    Sorry.  Okay.
12   Q    Exhibit 3 is an article titled "Does the
13   Prolift System Cause Dyspareunia," and you're listed as
14   one of the authors, correct?
15   A    Yes.
16   Q    The order in which the authors are listed is
17   significant; the most senior author who's generally the
18   lead of the study is listed last, correct?
19   A    The most senior author is listed last, yes.
20   Q    And that would be Dr. Hale here?
21   A    Dr. Hale.
22   Q    Okay.  Is there any disclosure of conflict of
23   interest in this article?
24   A    I don't see one, no.

Page 152

1    Q    Did Dr. Hale participate in writing this
2    article?
3    A    I wrote the article.  I'm sure that I had him
4    to review the article before it was published.
5    Q    I want to ask you a few questions about,
6    first, the body of the article.  Right on the front
7    page, the right-hand column, the third column over --
8    A    Uh-huh.
9    Q    -- about four lines down there's a sentence
10   that says, "Its ergonomic design makes it easier to
11   place the graft in traditionally 'hard to reach
12   places.'"  Do you see that?
13   A    I do.
14   Q    Did you write that sentence?
15   A    I did.
16   Q    Did Ethicon see this article before it was
17   published?
18   A    I don't remember.
19   Q    Did Ethicon have input into the language of
20   this article before it was published?
21   A    No.
22   Q    How do you know that?
23   A    Because I wrote it.
24   Q    Was the article -- well, let me ask you this:

Page 153

1    Do you know if Dr. Hale shared the article with Ethicon
2    before it was published and accepted any of their input
3    into the language?
4    A    I don't know if he shared the information
5    with Ethicon or not, but I'm the one that wrote this
6    article and I'm responsible for that sentence.
7    Q    When you said that "the graft can be placed
8    in traditionally hard to reach places," where are you
9    talking about?
10   A    I'm talking about the fact that the mesh
11   spans from arcus to arcus and provides almost a
12   paravaginal-like repair in doing that.  It's very
13   difficult to do a paravaginal repair vaginally.  It's
14   hard to see those spaces.  And with the Prolift, the
15   way that it's designed, you don't have to see them.
16   Q    Are you talking about the places where the
17   arms can be placed?
18   A    No.  I'm talking about -- I do think that it
19   applies in that situation as well, but I'm talking
20   about the way that the mesh spans in the anterior
21   compartment, the mesh is designed to go from what we
22   call arcus to arcus, and in -- and in doing so, it
23   provides a paravaginal defect repair.  It's difficult
24   to do that vaginally, and with the Prolift, it's

39 (Pages 150 to 153)

Joye K. Lowman, M.D., MPH

Page 154

1 easier.
2    Q   Do the arms and the use of the cannula and
3 guide system enable one to be able to get the body of
4 the mesh to go arcus to arcus?  Does that help to
5 enable that?
6    A   Yes.
7    Q   It does that because the arms get pulled out
8 through the exit points and that helps to pull the mesh
9 out and span that area within the pelvis that you just
10 described, correct?
11    A   That's correct.
12    Q   Okay.  And those are areas that are difficult
13 to reach with conventional surgical techniques,
14 correct?
15    A   That's correct.
16    Q   Therefore, when one has complications with
17 the mesh in those areas, those are difficult to reach
18 areas to treat those mesh complications, correct?
19    A   You don't -- you don't need to reach those
20 same areas that the trocars are traversing.  Usually
21 areas that are causing the patient's pain are palpable
22 transvaginally, and if you're able to transect or
23 release tension in that area, then it's not necessary
24 to kind of get out to those same spaces.

Page 155

1    Q   Are you aware that the mesh can contract
2 anywhere within the pelvis, including in areas where
3 it's difficult to operate through conventional
4 techniques?
5        MR. ISMAIL:  Objection to --
6        THE WITNESS:  Yes.
7        MR. ISMAIL:  -- form.
8        THE WITNESS:  Sorry.
9    Q   (By Mr. Slater)  And are you aware that that
10 contraction can lead to pain for the patient?
11    A   Yeah.
12    Q   Do you know whether Ethicon, in designing the
13 Prolift, made any effort to come up with a way to treat
14 complications when women would suffer complications
15 related to the mesh?  Do you know if Ethicon even
16 looked at that issue?
17        MR. ISMAIL:  Objection to form.
18        THE WITNESS:  I don't know.
19    Q   (By Mr. Slater)  On the first page just below
20 where we just read, there's a sentence that says --
21 it's the first full paragraph -- "There is concern,
22 however, that the rate of de novo dyspareunia with this
23 procedure may be unacceptably high."  Do you see that?
24    A   I'm sorry, where did you say you were?

Page 156

1    Q   I'm about -- just below where I just read,
2 maybe about 10 lines further down, 12 lines further
3 down.
4        MR. ISMAIL:  In the next paragraph.
5        THE WITNESS:  Next paragraph.
6        MR. SLATER:  And it's -- the references
7    to that sentence are 12 and 14.
8        THE WITNESS:  Yes, I see it.
9    Q   (By Mr. Slater)  And those references, 12 and
10 14, include an article.  No. 12 is by members of the
11 French TVM group, correct?
12    A   That's correct.
13    Q   They're the people that developed and
14 invented the Prolift system, correct?
15    A   That's correct.
16    Q   So you're citing the inventors of the Prolift
17 for the proposition that there is concern that the rate
18 of de novo dyspareunia with this procedure may be
19 unacceptably high, correct?
20    A   That's correct.
21    Q   This "Materials and Methods" section of this
22 article says that all cases of Prolift performed
23 between August 2005 and August 2007 were evaluated.
24 Those are cases that were performed on patients during

Page 157

1 your fellowship?
2    A   Yeah.
3    Q   Were you personally involved in each of those
4 procedures?
5    A   Not in all of them, no.
6    Q   On page E2, in the left-hand column, about
7 eight lines down, it says, "The rate of de novo
8 dyspareunia was calculated using chart review and
9 telephone interview."  That's what it says, correct?
10    A   Yes.
11    Q   And I've read through the article, and it
12 appeared to me that the way that you calculated these
13 numbers ultimately was you did a chart review and,
14 based on what was documented in the chart, calculated
15 the percentages and the figures you came up with; is
16 that correct?
17    A   And telephone interview, yes.
18    Q   What -- the telephone interview, what did
19 that entail?
20    A   I'm trying to recollect that.  If I remember
21 correctly, I believe that the telephone interview was
22 specifically for patients that we had incomplete data
23 on, to try to get a better picture of who actually had
24 dyspareunia and who didn't if they hadn't followed up.

40 (Pages 154 to 157)

Joye K. Lowman, M.D., MPH

Page 158

1    Q   I'm looking at the left column on page E2 and
2  then over to the center column.  And what it appears to
3  me from reading it is that you had the data you had
4  from the chart review and then you contacted people and
5  asked them if they were willing to answer
6  questionnaires; and if they were willing to do it, you
7  sent the questionnaires to them to potentially
8  supplement the information that you had obtained
9  through the chart review.  Is that accurate?
10       MR. ISMAIL:  Objection to form.  If you
11    need to read it, you can.
12       THE WITNESS:  Yeah, let me read it.
13       Yes, so I believe that I did the
14    telephone interview to confirm those that
15    were sexually active so that we could send
16    them the questionnaire, those that were
17    sexually active and willing to participate.
18    Q   (By Mr. Slater)  Based upon the data from the
19  chart review -- well, rephrase.
20       The chart review means that after treating
21  the patients, you went back and looked at those medical
22  charts to take the information from the medical chart
23  and that's how you calculated the numbers ultimately,
24  correct?

Page 159

1    A   That's part of it, yes.
2    Q   In terms of the dyspareunia numbers, that's
3  where you got the data that came to the 16.7 percent
4  de novo dyspareunia rate, correct?
5    A   Yes.
6    Q   Going by the chart review, tell me if I'm
7  correct, that ultimately there were 57 women who were
8  sexually active at the start, 21 of them preoperatively
9  had dyspareunia, so you excluded them to get down to 36
10  women for evaluation, and six of those 36 women, based
11  on chart review, had de novo dyspareunia, and that told
12  you that it was 16.7 percent, correct?
13    A   Yes.
14    Q   The article says -- well, let me withdraw
15  that.  Let me just figure something out here.
16       MR. SLATER:  Okay.  If we could, can we
17    mark the abstract for this as the next
18    exhibit, which I guess would be up to 23.
19       (Exhibit 23 marked for identification.)
20       THE WITNESS:  Okay.
21    Q   (By Mr. Slater)  Okay.  The abstract was
22  presented where?
23    A   At the Society of Gynecologic Surgeons.
24    Q   Okay.  And when was it presented?

Page 160

1    A   In 2008, I believe.
2    Q   Am I correct that you presented this abstract
3  at the Society of Gynecologic Surgeons, and subsequent
4  to that your article was published in American Journal
5  of Obstetrics and Gynecology?
6    A   Yeah.
7    Q   Am I correct about that?
8    A   Yes.
9    Q   And when you -- rephrase.
10       When you presented this data, did you present
11  it at a meeting to other doctors?
12    A   Yes, at the Society of --
13    Q   And when you presented, were -- okay.  And
14  when you presented, were you on the stage with several
15  other physicians who were also presenting data and
16  findings about the use of mesh?
17    A   Yes.
18       MR. ISMAIL:  Restate, please.
19    Q   (By Mr. Slater)  Do you recall what other
20  physicians were presenting with you during that
21  presentation, who else was on stage with you?
22    A   I don't.
23    Q   One name of one of the doctors you presented
24  with at SGS?

Page 161

1    A   I can't.  I don't remember.
2    Q   Big day for you, you're a fellow, you're
3  going to present at SGS on a study, I mean, this must
4  have been a big day, right?
5    A   It was a big day.
6    Q   And you can't remember what other doctors
7  were on the stage with you that day?
8    A   No.  I was never told that I was going to be
9  on the stage with other doctors.  That was a surprise.
10    Q   But then you got up there.  Were they -- but
11  you were with other doctors on the stage.  Were they
12  people that you respected?
13    A   I didn't know who they were.
14    Q   Your involvement with SGS, was that
15  facilitated at all through Miles Murphy?
16    A   No.
17    Q   Now, let's look at the abstract of the
18  presentation you made at the Society of Gynecologic
19  Surgeons that we've marked as Exhibit 23.  If I'm --
20  tell me if I'm correct.  You based this data on the
21  questionnaires that were filled out by the patients and
22  specifically a validated condition specific sexual
23  function questionnaire known as the PISQ-12; is that
24  correct?

Joye K. Lowman, M.D., MPH

Page 162

1     A    Yes, that's correct.
2     Q    And it's a validated questionnaire, meaning
3   it's accepted in the urogynecologic community that the
4   questionnaire questions and the responses that one gets
5   to them can be relied on, correct?
6     A    Yes, that's correct.
7     Q    And based on the questionnaire responses, you
8   calculated a rate of 24 percent de novo dyspareunia,
9   correct?
10    A    Let me look at that.
11    Q    There in the conclusion, bottom right.
12    A    It looks like that, yeah.
13    Q    So that percentage was significantly higher
14  than the percentage that you put into your published
15  article about this study when you decided to rely on
16  the chart review instead, right?
17        MR. ISMAIL:  Objection to form.
18        THE WITNESS:  No.  What I'm suspecting
19  is that -- well, you know, I don't know.  Let
20  me just look at this quickly.
21        MR. SLATER:  Let's change --
22        MR. ISMAIL:  Hold on.
23        THE WITNESS:  Let me just look at it,
24  please.  I'm wondering if there may have been

Page 163

1     a misclassification error, because in the
2     actual paper, it says that 129 cases of
3     Prolift were performed, and in the abstract,
4     it says that 128 Prolift cases were
5     performed, and that may have affected that
6     number.
7         MR. SLATER:  Let's change the tape --
8         THE VIDEOGRAPHER:  We are now going off
9     the --
10        MR. SLATER:  -- because it's running
11    out.
12        THE VIDEOGRAPHER:  We are now going off
13    the video record.  The time is currently
14    3:08 p.m.  This is the end of Tape No. 3.
15        (Recess taken.)
16        THE VIDEOGRAPHER:  We are now back on
17    the video record with Tape No. 4.  The time
18    is currently 3:19 p.m.
19    Q    (By Mr. Slater)  Doctor, just to confirm, you
20  presented at SGS on your study of Prolift patients from
21  your fellowship and reported at that meeting,
22  consistent with your abstract, a 24 approximate de novo
23  dyspareunia rate, correct?
24    A    I don't know the time frame of when this

Page 164

1     abstract was sent and my presentation.  I do not
2   remember presenting a de novo dyspareunia rate of
3   24 percent.  So I'm suspecting that the classification
4   error was discovered before presentation.  So I do not
5   think that I presented a dyspareunia rate of 24
6   percent.
7     Q    Doctor, there's no classification error here.
8   What are you -- what is a classification error?
9         MR. ISMAIL:  Objection.
10        THE WITNESS:  That --
11        MR. ISMAIL:  Move to strike.
12        MR. SLATER:  I'll withdraw the question.
13    Q    (By Mr. Slater)  Let me walk you through what
14  happened, okay?  If you look at your data --
15    A    You're going to walk me through what
16  happened?
17    Q    Yeah, I'm going to -- yeah, Doctor, I'm going
18  to walk you through it.
19    A    Okay.
20    Q    When you did -- when you originally did your
21  abstract, you based it on the results from the
22  questionnaires, correct?
23    A    I based it on the results from chart review
24  and questionnaires and telephone interview, yes.

Page 165

1     Q    Well, the data that was reported in the
2   abstract, the 24 percent number, that came from the
3   result of the questionnaires --
4     A    That's correct --
5     Q    -- correct?
6     A    -- but as I said before, there was 128 cases
7   that were evaluated for the abstract.  In the paper and
8   in the presentation, there were 129 cases.  So we must
9   have missed a patient.  That's why the number is
10  different.
11    Q    I'm going to walk you through some numbers,
12  and you're going to tell me if I have the numbers
13  right, okay?
14    A    Okay.  Are you looking at the abstract?
15    Q    I'm looking at both.  I've been through them
16  both pretty thoroughly.
17    A    Okay.
18    Q    Fifty-six women agreed originally to fill out
19  the questionnaires.  Eventually 41 of those 56 women
20  responded to the questionnaires, correct?
21    A    I have to -- are you looking at the abstract
22  or the paper?  At some point, the numbers changed.  So
23  I need to know which one you're looking at.
24    Q    Let me see.  Okay.  Look at the article.

Joye K. Lowman, M.D., MPH

Page 166

1     A    Okay.
2     Q    We can look at your published article.
3     A    Okay.
4     Q    The right-hand column of the "Results" column
5  on page E2.
6     A    Uh-huh.
7     Q    And what it says here halfway down is,
8  "Fifty-six of the sexually active patients agreed to
9  answer questionnaires.  The response rate was 73
10  percent, meaning 41 women actually responded to the
11  questionnaires," correct?
12     A    Uh-huh.
13     Q    It says, "Twenty of the 41 sexually active
14  patients who responded to the questionnaires described
15  themselves as pain-free."
16     A    Okay.
17     Q    And then if you go further down, we know that
18  there's 21 patients who reported dyspareunia, correct?
19     A    That's correct.
20     Q    Okay.  Now, if you go further to the bottom
21  of the page, of the 21 patients who reported
22  dyspareunia, 38 percent, 8 out of 21 -- it goes
23  through -- describe their pain as mild, 8 of 21 is
24  moderate, and 5 of 21 is severe.  Do you see that?

Page 167

1     A    I do.
2     Q    Okay.  Now, on page E3, at the top of the
3  first paragraph, it says, "Eight respondents reported
4  dyspareunia at baseline, leaving 13 with de novo
5  dyspareunia by retrospective self-report."  That would
6  be the questionnaire, correct?
7     A    Yes, that's what it says, uh-huh.
8     Q    Reported dyspareunia, eight of which said
9  they had it preoperatively, correct?
10     A    Eight said that they had dyspareunia at
11  baseline, which would mean preoperatively, yes.
12     Q    Okay.  And since you're trying to evaluate
13  de novo dyspareunia, you then subtract the eight who
14  had it preoperatively from the 21, correct?
15     A    That's correct.
16     Q    And what you also do when you're trying to
17  get a percentage is you then also subtract eight from
18  the 41 so that your numerator and denominator will be
19  consistent, so you have -- you have 13 women with
20  de novo dyspareunia out of a set of 33 women.  That
21  becomes how you would calculate this, correct?
22     MR. ISMAIL:  Objection to form.
23     Q    (By Mr. Slater)  Eight out of -- eight out of
24  33, correct?

Page 168

1     A    No.  The way that I calculated it is
2  what's --
3     Q    Wait, let me withdraw it --
4     A    -- the summary numbers.
5     Q    -- because I just missed -- Doctor, Doctor,
6  Doctor, I misspoke, so I want to just get a clean
7  question, okay?
8     A    Okay.
9     Q    Here's a calculation.  Twenty-one women had
10  dyspareunia postoperatively, eight of whom also had it
11  at baseline preoperatively, correct?
12     A    Let me just see that.
13     MR. ISMAIL:  Objection to form.
14     MR. SLATER:  Okay.
15     THE WITNESS:  Yeah, I think that's
16  correct.  I mean, I go through a bunch of
17  numbers here.  The bottom line is that there
18  were --
19     MR. SLATER:  Doctor, I'm going through
20  this the way I'm going through it.  I don't
21  want to know your bottom line right now.
22     THE WITNESS:  Okay.
23     MR. ISMAIL:  Move to strike.
24     Q    (By Mr. Slater)  Okay.  So let's do this.  We

Page 169

1  have a set of 41 women, correct, 41 women responded to
2  the questionnaires, right?
3     A    I believe that's correct, yes.
4     Q    The prior page, E2.
5     A    Yes.
6     Q    Okay.  Eight of those women preoperatively
7  had dyspareunia, so you're going to drop them out of
8  the set because you're not looking to measure women
9  that already had dyspareunia, you want to know women
10  who were pain-free at baseline, correct?
11     A    Correct.
12     Q    Forty-one, which is the denominator, you
13  would subtract those eight out and that would be
14  33 --
15     A    But where are you seeing the eight?
16     Q    -- and then 21 --
17     A    Where did the eight come from?
18     Q    On page E3, the first full paragraph in the
19  left column, eight respondents reported dyspareunia at
20  baseline, leaving 13 with de novo dyspareunia.
21     A    By retrospective self-report.
22     Q    The questionnaire we're talking about, right?
23     A    That's correct, but the questionnaire wasn't
24  the only thing we used.  We were also using chart

Joye K. Lowman, M.D., MPH

1  review.  Patients sometimes --
2      Q    Doctor, I'm only doing -- holy moly.  Doctor,
3  I'm not asking about --
4      A    I've outlined in this --
5      Q    I'm calculating -- Doctor, I'm calculating
6  the results based on the questionnaire right now.
7      A    Okay.  The questionnaire was not the only --
8      Q    And then we'll talk through all the different
9  statistics.
10     A    The questionnaire was not the only thing we
11  used.
12     Q    It doesn't matter.  I realize that, Doctor.
13  Do you understand that one of the things I can do if
14  you testify in this case in a public courtroom is
15  attack the validity of how you came to the numbers you
16  publicly recorded?
17     A    I understand that.
18     Q    Well, we're going through that process right
19  now, with all due respect.
20     A    Okay.
21     Q    So there were 41 women total that responded,
22  eight of them had preoperative dyspareunia, right?
23     A    I think that's correct.  I have to go through
24  and write this all out.

1      Q    Right there, the full -- first full paragraph
2  on page E3.  I've shown it to you three times.
3      A    It says --
4      Q    Eight women had preoperative dyspareunia.
5      A    That's correct.
6      Q    And we've already established that post --
7  when they filled out the questionnaires, 21 women
8  reported dyspareunia, correct?
9      A    Twenty-one patients reported dyspareunia,
10  that's right.
11     Q    Okay.  So if you want to only evaluate
12  de novo dyspareunia, you subtract eight from the
13  numerator of 21 and you subtract eight from the
14  denominator of 41, correct, so you're excluding those
15  eight women from your calculation, correct?  That's a
16  way to do this, right?
17     A    Like I said, we did not determine who had
18  dyspareunia at baseline and who had dyspareunia after
19  surgery solely based on the questionnaires.  We also
20  went through chart review.  Patients sometimes don't
21  recollect whether or not they had dyspareunia before
22  surgery or not.  If they documented dyspareunia before
23  surgery and that was discordant with the
24  questionnaires, then we would defer to the chart.  So

1  like I said, I have to --
2      Q    Okay.
3      A    -- look through all of this to make sure that
4  the numbers that you're saying are right.  What I
5  published is right.
6      Q    Doctor, I'm accepting your numbers.
7      A    Okay.
8      Q    I'm accepting the number of eight women,
9  okay, so -- and I think I understand what you just
10  said.  In order to determine the preoperative
11  dyspareunia rate, you used the questionnaires and you
12  cross-checked with the chart review?
13     A    Exactly.
14     Q    Okay.  So the number of eight you were able
15  to double-check and get yourself more confidence and
16  you were able to say eight women had preoperative
17  dyspareunia, correct?
18         MR. ISMAIL:  Objection to form.
19         THE WITNESS:  Of the patients that
20  responded by self-report, yes.
21     Q    (By Mr. Slater)  Okay.  So all I want to do
22  is tell me if these numbers are accurate.  You have a
23  denominator of 41 women and a -- and a numerator of 21,
24  meaning 21 out of 41 women reported dyspareunia on the

1  questionnaires, correct?
2      A    Are you talking about preop dyspareunia or
3  postop dyspareunia?
4      Q    Postoperatively, postop on the
5  questionnaires.
6      A    You know what, let me look at something else
7  that I have here.
8      Q    It's right on page E2 --
9      A    Uh-huh.
10     Q    -- in the bottom right-hand corner paragraph
11  where it says, "Fifty-six of the sexually active
12  patients agreed to answer questionnaires.  The response
13  rate was 73 percent, meaning 41 responded."
14     A    Uh-huh.
15     Q    So we know we have a set of 41 women that
16  responded.
17     A    Okay.
18     Q    Then it says, "Twenty of the 41 sexually
19  active patients who responded to the questionnaires
20  describe themselves as pain-free."  So 20 out of 41 had
21  no dyspareunia, and that leaves 21 at the bottom of the
22  page right there --
23     A    Uh-huh.
24     Q    -- who reported dyspareunia?

Golkow Technologies, Inc. - 1.877.370.DEPS

Joye K. Lowman, M.D., MPH

Page 174

1   A   That's correct.
2   Q   So 21 out of 41 reported dyspareunia on the
3   questionnaires, correct?
4   A   That's correct.
5   Q   Okay.  If you want to then eliminate the
6   women who had dyspareunia at baseline because you're
7   trying to evaluate preoperative -- rephrase.
8       If you're trying to eliminate the women who
9   had dyspareunia at baseline because you're trying to
10  study de novo dyspareunia, you would subtract those
11  eight women from both the numerator and the
12  denominator, right?
13  A   That's correct.
14  Q   Right, so it would be -- on the numerator, 21
15  minus 8 would be 13, and 41 minus 8 would be 33,
16  correct?
17  A   You said 18 and 33?
18  Q   Thirteen and thirty-three.
19      MR. ISMAIL:  Restate.
20  Q   (By Mr. Slater)  Twenty-one minus 8 equals 13
21  and 41 minus 8 equals 33, correct?
22  A   I think that's correct.  Math is not my
23  strong point.
24  Q   Okay.  I took out my calculator on my handy

Page 175

1   iPhone and divided 13 divided by 33 to see the
2   percentage of de novo dyspareunia, and I came up with
3   39.4 percent based on the questionnaires and using the
4   chart review to establish who had dyspareunia at
5   baseline.
6       MR. ISMAIL:  Objection.
7   Q   (By Mr. Slater)  Will you accept 39.4 percent
8   as an accurate calculation?
9       MR. ISMAIL:  Objection to form.
10      THE WITNESS:  No, that's what I'm
11  saying, we didn't use just the
12  questionnaires.  I can't agree --
13  Q   (By Mr. Slater)  Thirteen divided by 33 -- 13
14  divided by 33 is 39.4 percent, will you agree to that
15  percentage --
16  A   Yes.
17  Q   -- that the calculation is accurate?  Okay.
18      Okay.  Now, what you did, as well, is you
19  then went to -- rephrase.
20      In the abstract, you reported 24 percent
21  de novo dyspareunia rate, which you described as a high
22  rate in the abstract, correct?
23  A   That's correct.
24  Q   And you would agree with me that a

Page 176

1   dyspareunia rate of 24 percent is a high rate, correct?
2   A   That's correct.
3   Q   When you published the article, which we've
4   marked as Exhibit 3, if you look at the last page of
5   your article, you made a finding in the bottom left
6   column over to the center column --
7   A   On what page again?
8   Q   -- that --
9   A   I'm sorry.
10  Q   Page E5.
11  A   Okay.
12  Q   You made a finding -- in the bottom of the
13  left column and the bottom of the center column, you
14  talk about it -- that you decided chart review provided
15  a more valid calculation rather than a retrospective
16  questionnaire assessment.  That was the decision you
17  made, so you decided to rely on the chart review
18  without reference to the questionnaires in reporting
19  16.7 percent, correct?
20  A   Let me just read this, please.  Okay, yes, I
21  did conclude that.
22  Q   If you had reported the de novo dyspareunia
23  rate that the patients reported on the questionnaires,
24  while using the chart review as a check on the

Page 177

1   preoperative dyspareunia that was actually reported
2   when the patients came in, the percentage is what I
3   gave you, 39.4 percent, correct?
4   A   Ask that question again.
5   Q   Decided to report in your published article
6   the rate of de novo dyspareunia based on the results of
7   the questionnaires while cross-checking with the chart
8   to determine the preoperative -- the preoperative
9   dyspareunia rate, we've gone through it, the rate would
10  have been 39.4 percent, correct?
11      MR. ISMAIL:  Objection to form.
12      THE WITNESS:  I believe that's
13  incorrect.  From what I'm understanding from
14  what I wrote here is that there was a
15  discrepancy between what we found with chart
16  review versus what we found with the
17  questionnaires.  And there were six patients
18  who reported de novo dyspareunia by chart
19  review on telephone interview and then 13 by
20  questionnaire.  And so we decided that the
21  most objective evaluation was chart review
22  because it was an objective assessment and we
23  weren't asking people to recollect.
24  Q   (By Mr. Slater)  Doctor, the charts were

Joye K. Lowman, M.D., MPH

Page 178

1  filled out by the doctors who were treating the
2  patients, right?
3      A   No, that part of the chart was filled out by
4  the patient.
5      Q   I'm talking about chart review.  You're
6  saying that there were independent questionnaires in
7  the medical chart?
8      A   Yes.
9      Q   These aren't medical charts that the patients
10 were having their results tracked in?
11     A   We have a patient questionnaire that is part
12 of the medical record.
13     Q   And that questionnaire was filled out at
14 baseline in order for them to document their
15 preoperative condition, correct?
16     A   Correct.
17     Q   Right?
18         MR. ISMAIL:  Restate, please.
19     Q   (By Mr. Slater)  That is what you're
20 referring to by what the patients filled out in the
21 chart, correct?
22     A   Correct.
23     Q   The rest of the medical chart is the findings
24 of the doctors and what's recorded in the medical chart

Page 179

1  while they're patients, correct?
2      A   Correct.
3      Q   And the number of women who had dyspareunia
4  following the surgery based on chart review was what
5  was documented in the chart by the doctors who were
6  treating the patients, correct?
7          MR. ISMAIL:  Objection to form.
8          THE WITNESS:  Not completely.  There
9      are -- when we have -- see our patients back,
10     they fill out a short patient questionnaire
11     as well.  So there's patient -- what do you
12     call it -- patient information that the
13     patient responds to in addition to our
14     findings as well.  So when patients come for
15     an office visit, they're usually given a
16     small -- because it's -- it was an academic
17     practice, so we tried to incorporate
18     standardized questionnaires to be able to do
19     research.  So patients gave us subjective
20     assessments at each -- at each -- at each
21     visit.
22     Q   (By Mr. Slater)  Ultimately you made a
23 decision that you were going to rely on the chart
24 review and you were going to disregard the validated

Page 180

1  questionnaires that were sent to patients and filled
2  out by 41 women, correct?
3          MR. ISMAIL:  Objection to form.
4          THE WITNESS:  No, we didn't disregard
5      them.  But when it came to classifying
6      patients as having de novo dyspareunia, we
7      used their baseline complaint of, you know,
8      whether or not they had dyspareunia or not,
9      versus a questionnaire that asked them to
10     recollect whether or not they had dyspareunia
11     or not before surgery.
12     Q   (By Mr. Slater)  With regard to whether they
13 had dyspareunia postoperatively, you decided to rely on
14 the chart and disregard what they wrote in the
15 validated questionnaires, correct?
16         MR. ISMAIL:  I think you just stated
17     that backwards.  Try that again.
18     Q   (By Mr. Slater)  When you then reported in
19 your published article and came to your percentage of
20 16.7 percent, that was based on the complaints of
21 de novo dyspareunia in the chart and it disregarded
22 what was reported in the validated questionnaire,
23 correct?
24         MR. ISMAIL:  Objection to form.

Page 181

1          THE WITNESS:  No.  We only deferred to
2      the chart if there was a discrepancy between
3      the -- in the information.
4      Q   (By Mr. Slater)  Your article and it seems to
5  be saying to me that you relied on the chart review for
6  these de novo dyspareunia numbers.  That's what it says
7  here in the bottom of the page on E5.
8      A   The bottom of the page where?
9      Q   In fact -- yeah, the bottom of the left
10 column, "We therefore calculated the de novo
11 dyspareunia rate by chart review, which allowed an
12 objective preop and postop assessment of all sexually
13 active patients."
14     A   Right, and we explained --
15     Q   That's what you wrote in the article.
16     A   That's what I just said.  If there was a
17 discrepancy, we relied on the chart review because
18 that's a more objective assessment that is not subject
19 to recall bias, as I describe in that paragraph.
20     Q   Where does it say, "If there was a
21 discrepancy, we relied on the chart review; and if
22 there wasn't a discrepancy, we relied on the
23 questionnaire"?
24     A   It says, "Interestingly, assessing

Joye K. Lowman, M.D., MPH

Page 182
1  dyspareunia by two different methods led to two
2  different results."  That means there's a discrepancy.
3  There were six patients who reported de novo
4  dyspareunia by chart review in telephone interview and
5  13 by questionnaire.  So that's the discrepancy.
6  The --
7      Q    Okay, I got what you're saying.  I got it.
8  Okay.
9      A    Yeah.
10     Q    The number -- the numbers were different and
11  you chose the lower numbers ultimately, right?
12         MR. ISMAIL:  Objection to form.
13         THE WITNESS:  We chose the numbers that
14     we thought were more objective.
15     Q    (By Mr. Slater)  Those happened to be the
16  lower numbers, right?
17     A    They happened to be lower.
18     Q    And, in fact, just to understand where the
19  24 percent came from, just below what you just read,
20  you indicated that 5 percent of patients who reported
21  immediate postop dyspareunia reported that it resolved
22  at the time of chart review.
23         When I did these calculations and it was 13
24  over 33, you cut those out of the -- of the numerator

Page 183
1  so that it was 8 out of 33, which comes to the 24
2  percent.  That's how you got to 24 percent, right?  You
3  actually cut out the people whose complaints resolved
4  in the short term, right?
5      A    I don't know.  I'd have to look at it, but
6  I'll take your word for it.  I don't think it matters.
7  Twenty-four percent -- if you want to say 24 percent,
8  that's fine.  Nobody was impressed by a low number when
9  I presented this paper.  A dyspareunia rate of 17
10  percent is high -- is just as high as 24 percent, so if
11  you want to say it's 24 percent, that's fine.  The
12  dyspareunia rate --
13     Q    Dyspareunia --
14     A    -- was high.  It was high in this study.
15     Q    Dyspareunia -- you would agree with me
16  postoperative dyspareunia after Prolift surgery is
17  high; that's documented in the literature, including
18  your own article, correct?
19         MR. ISMAIL:  Objection to form.
20         THE WITNESS:  That is not correct.
21     Q    (By Mr. Slater)  Well, in your abstract, you
22  called it a high de novo dyspareunia rate, right?
23     A    That's correct, 24 percent is high.
24     Q    You just said it -- and you just said a

Page 184
1  moment ago that 17 percent is high, right?
2      A    That's correct.
3      Q    Okay.  So Prolift patients, based on your own
4  study, have a high postoperative de novo dyspareunia
5  rate, correct?
6          MR. ISMAIL:  Objection to form.
7          THE WITNESS:  That's incorrect.
8          MR. SLATER:  Okay.  We'll try it in
9     court, then, and we'll see how it goes.
10         THE WITNESS:  Let's go.
11         MR. SLATER:  Okay.
12         THE WITNESS:  I mean, this is 2015.
13     This was in 2008.  We've learned a --
14         MR. SLATER:  Okay.
15         THE WITNESS:  We've learned a lot since
16     then.
17         MR. SLATER:  We have, except you don't
18     know why the Prolift isn't being marketed
19     anymore, right?
20         THE WITNESS:  That's correct, I do not.
21     It should be.
22     Q    (By Mr. Slater)  What if the Prolift wasn't
23  being marketed because internally they were concerned
24  about the dyspareunia rate, would that matter to you?

Page 185
1          MR. ISMAIL:  Objection to form.
2          THE WITNESS:  No.
3      Q    (By Mr. Slater)  What if the Prolift wasn't
4  being marketed because Ethicon was worried that so many
5  women were being harmed that they couldn't ethically
6  leave it on the market anymore, would that be
7  significant to you?
8          MR. ISMAIL:  Objection to form.
9          THE WITNESS:  No.
10     Q    (By Mr. Slater)  What if one of the top
11  medical directors in all of Johnson & Johnson said that
12  a reasonable argument could be made that the Prolift
13  should not have been marketed based on the severe
14  complications that they're aware of, would that be
15  significant to you?
16         MR. ISMAIL:  Objection to form.
17         THE WITNESS:  No.
18         MR. SLATER:  Let's pull out Exhibit 4,
19     if we could, Jonathan, 4 and 5.
20         (Discussion off the written record.)
21         MR. SLATER:  March of 2008.
22         THE WITNESS:  Yes.
23     Q    (By Mr. Slater)  Do you see that?
24     A    I do.

Golkow Technologies, Inc. - 1.877.370.DEPS

Joye K. Lowman, M.D., MPH

Page 186

1    Q   Okay.  Let's look at the first email in the
2  middle of the page.  Someone -- a Mel Seitz wrote an
3  email to you.  Do you remember who Mel Seitz is?
4    A   I don't.
5    Q   Mel Seitz wrote to you and said, "Hi,
6  Dr. Lowman.  It was great talking with you today.  You
7  are a class act.  Here is the info on our upcoming
8  cadaver lab that I mentioned today.  Apparently they
9  don't have the faculty nailed down yet, but I am
10  assuming that Vince Lucente and/or Jim Raders will be
11  involved.  If you are able to attend, let me know and I
12  will get you the details as they are made available.  I
13  would love to get anything you are able to send me
14  regarding your upcoming presentation in Savannah.  Good
15  luck on the presentation.  Have a great weekend.
16  Mel Seitz."  Do you see that?
17    A   I do.
18    Q   Now, the presentation in Savannah, what
19  presentation was that?
20    A   The one we just discussed.
21    Q   That was the SGS presentation?
22    A   Yes.
23    Q   You wrote back to Mel Seitz on March 12,
24  2008.  "It was great talking with you, Mel.  I have

Page 187

1  attached my abstract and a rough draft of my
2  presentation.  Won't be able to attend the cadaver lab,
3  but keep me posted on upcoming events."  You see what
4  you wrote there?
5    A   I do.
6    Q   So you sent Mel Seitz your abstract and a
7  rough draft of your presentation, right?
8    A   It looks like I did, uh-huh.
9    Q   So you felt it was appropriate to share a
10  presentation you were going to make at a medical
11  meeting of a medical society with an Ethicon corporate
12  representative, someone who worked for Ethicon, you
13  felt it was appropriate to share your presentation with
14  him in advance, correct?
15    A   That's correct.
16    Q   That's what it says here, right?
17    A   That's correct.
18    Q   Jon Salyer, "Hey Scott.  Here is the
19  PowerPoint that Dr. Joye Lowman, Doug Hale's senior
20  fellow, is presenting next month in Savannah on Prolift
21  and dyspareunia.  Let me know if you have any
22  questions.  Mel."  Do you see that?
23    A   I do.
24    Q   So you sent this presentation over and shared

Page 188

1  it with Ethicon; and as you can see, they were -- they
2  were talking about it internally and getting ready for
3  that meeting on their end.  Do you see that?
4    A   I do.
5    Q   Why did you send your presentation to Ethicon
6  in advance of the presentation?
7    A   Because he asked for it.
8    Q   That's it?  I mean, no matter what they asked
9  you for, you would send them?
10    A   No.  I didn't see any problem with sending
11  the presentation to them.
12    Q   Do you remember sending the presentation to
13  Ethicon?
14    A   I don't remember that, but I don't see -- I
15  wouldn't see a problem doing that.  So if this email
16  is, you know, real, I assume I did that.
17    Q   Exhibit 5, do you have that in front of
18  you?  That's the --
19    A   Yes, I do.
20    Q   -- the presentation you sent over to Ethicon.
21    A   Uh-huh.
22    Q   And if you turn forward, the -- well,
23  rephrase.
24         This is the rough draft of your presentation

Page 189

1  that you shared with Ethicon in March of 2008, correct?
2         MR. ISMAIL:  Objection to form.
3         THE WITNESS:  I'm sorry, could you ask
4    the question again?
5    Q   (By Mr. Slater)  The way this was produced to
6  us by Ethicon --
7    A   Uh-huh.
8    Q   -- this was the attachment to the email that
9  is apparently the rough draft of your presentation.
10  And the Bates number of it, for the record, is
11  ETH.MESH.00006815.  That's the placeholder Bates number
12  for this presentation.
13         Do you recognize this as the PowerPoint for
14  the presentation you gave to SGS on your study of the
15  Prolift and dyspareunia?
16         MR. ISMAIL:  Objection to form.
17         THE WITNESS:  This looks like the data
18    that I would have presented.
19    Q   (By Mr. Slater)  And if you turn forward
20  about five pages, there's a "Methods" section.
21    A   Uh-huh, yes, I'm here.
22    Q   And you indicate on that de novo
23  dyspareunia rate was calculated by chart review.  Do
24  you see that?

Joye K. Lowman, M.D., MPH

Page 190

1      A   Yes.
2      Q   And then you say that, "Patient satisfaction
3  was assessed anonymously with a seven-item dyspareunia
4  specific questionnaire."  I want to stop there.
5      A   Okay.
6      Q   That questionnaire, the seven-item
7  questionnaire, was not a validated questionnaire,
8  correct?
9      A   That's correct.
10     Q   Patient satisfaction, you say here, was also
11  assessed by a validated condition-specific
12  questionnaire, the PISQ-12, right?
13     A   Yes.
14     Q   What you don't disclose is that de novo
15  dyspareunia was also assessed by the PISQ-12.  You
16  don't say that, correct?
17     A   I don't see that stated here, no.
18     Q   And then on the next page, you go through the
19  results.
20     A   Uh-huh.
21     Q   And you have the dyspareunia rate of 16.7
22  percent, which is based on the chart review, correct?
23     A   That's correct.
24     Q   And that's what you presented to SGS, the

Page 191

1  16.7 percent, correct?
2      A   Yes.
3      Q   And that's what you published in the American
4  Journal of Obstetrics and Gynecology, 16.7 percent,
5  correct?
6      A   That's correct.
7      Q   Okay, let's go back to your report now.
8      A   Okay.
9      Q   And let's turn -- let's figure out where we
10  want to pick up.  Give me one second.  See what I've
11  covered.
12         Okay, I have one question before I get into
13  this.  You'll agree with me that abdominal
14  sacrocolpopexy is the gold standard treatment for the
15  treatment of prolapse, correct?
16     A   For the treatment of apical prolapse, yes.
17     Q   I'm just flipping through your report.  Give
18  me a second.  I'm trying to shorten things here.
19     A   Okay.
20     Q   Okay, let's turn to page 13, if you could.
21     A   Okay.
22     Q   On page 13, there's a paragraph that starts
23  in the middle of the page, and if you read down,
24  there's a list, it says, "Other risks associated with

Page 192

1  mesh augmentation that are less common are mesh
2  extrusion and mesh contraction."  Do you see that?
3      A   That's correct.
4      Q   Do you know what the mesh contraction rate is
5  that was found by the French doctors who developed the
6  Prolift, in their studies?
7      A   I don't.  Actually, I don't know if you're
8  referring to the original studies or if you're
9  referring to their meta-analysis.  I am familiar with
10  the data from the meta-analysis.
11     Q   You think that -- what meta-analysis?  You're
12  saying that the French doctors who developed the
13  Prolift did a meta-analysis?
14     A   Jacquetin and Cosson, yes.
15     Q   The meta-analysis of what?
16     A   Of outcomes with vaginal mesh procedures.
17     Q   Limited to the Prolift?
18     A   They did a subanalysis with Prolifts, yes.
19     Q   That's -- what I'm asking is this:  Are you
20  familiar with the rates of contraction that were
21  reported by the French doctors who developed the
22  Prolift in their various studies?
23         MR. ISMAIL:  Objection to form.
24         THE WITNESS:  Yeah.

Page 193

1      Q   (By Mr. Slater)  For example, are you aware
2  they reported 17 percent shrinkage or contraction with
3  their initial sets of Prolift patients?
4      A   I don't know what they reported with their
5  initial sets of Prolift patients, no.
6      Q   You talk a lot in your report about the fact
7  that one can get dyspareunia after Prolift surgery and
8  one can have dyspareunia after a native tissue repair
9  with sutures.  You talk about that in your report,
10  right?
11     A   Yes.
12     Q   If one has dyspareunia after a Prolift
13  surgery and it's related to the mesh, the cause of that
14  dyspareunia is different than what the cause would be
15  with a nonmesh suture procedure because there would be
16  no mesh there; would you agree with that?
17         MR. ISMAIL:  Objection to form.
18         THE WITNESS:  If the cause of -- could
19     you restate the question, please?  I'm sorry.
20         MR. SLATER:  Sure.
21     Q   (By Mr. Slater)  If somebody has a Prolift
22  surgery and has dyspareunia after it, related to the
23  Prolift mesh --
24     A   Uh-huh.

49 (Pages 190 to 193)

Joye K. Lowman, M.D., MPH

Page 194

1    Q    -- then by definition the cause of that
2   dyspareunia would be different than in the case of a
3   suture repair because the suture repair does not have
4   mesh, correct?
5        MR. ISMAIL:  Objection to form.
6        THE WITNESS:  I think that's correct.
7        MR. SLATER:  Okay.
8    Q    (By Mr. Slater)  The treatment of dyspareunia
9   caused by Prolift mesh is different very often from the
10   treatment of dyspareunia where there's no mesh
11   involved, correct?
12    A    Not necessarily, no.
13    Q    Sometimes the treatment is different, for
14   example, if mesh has to be removed or revised, correct?
15    A    If mesh has to be removed or revised, that's
16   obviously different than a -- than what you would do
17   with a traditional repair where there's no mesh, yeah.
18    Q    Ms. Hammons did not have recurrent prolapse
19   at the time that Dr. Baker put the Prolift in, correct?
20        MR. ISMAIL:  Objection to form.
21        THE WITNESS:  Not that I'm aware of.
22    Q    (By Mr. Slater)  The operation by Dr. Baker
23   to place the Prolift was Ms. Hammons' primary prolapse
24   repair, her first one, correct?

Page 195

1    A    That's correct.
2    Q    Ms. Hammons was not complaining of any pelvic
3   pain or dyspareunia at the time that she had the
4   Prolift placed in her body, correct?
5    A    She was not complaining of that to Dr. Baker,
6   that's correct.
7    Q    Well, when you say she wasn't complaining to
8   Dr. Baker, are you contending that she had pelvic pain
9   or dyspareunia before the Prolift was placed?
10    A    No, I'm not.  I'm just saying that what I
11   have to go on is what she reported to Dr. Baker.
12    Q    And you have no reason to believe that
13   Patricia Hammons had pelvic pain or dyspareunia before
14   the Prolift was placed, correct?
15    A    That's correct.
16    Q    Report that she has pelvic pain and
17   dyspareunia after the Prolift?
18    A    You -- I missed half of that question.
19    Q    Opinions in this case, do you accept Patricia
20   Hammons' report -- you're not hearing me?
21    A    No.  I missed the first half of that one too.
22    Q    Okay.  I'll start over.  In forming your
23   opinions in this case, do you accept Ms. Hammons'
24   report to her physicians and those who have examined

Page 196

1   her that she has had pelvic pain and dyspareunia after
2   the Prolift surgery?
3        MR. ISMAIL:  Objection to form.
4        THE WITNESS:  I accept that.
5    Q    (By Mr. Slater)  Okay.  I want to ask you
6   about the Altman study.  Can you hear me?  I'm going to
7   ask you about the Altman study from 2011, the one
8   published in the New England Journal of Medicine.  You
9   talk about that study quite a bit in your report,
10   correct?
11    A    I do.
12    Q    That study and the results of that study are
13   very important to you in forming your opinions in this
14   case; is that true?
15    A    That's true.
16    Q    Do you consider the Altman study to basically
17   be the landmark study with regard to the Prolift?
18        MR. ISMAIL:  Objection to form.
19        THE WITNESS:  I consider it to be one of
20   the landmark studies, not just with regard to
21   the Prolift, but with pelvic organ prolapse
22   repair, period.
23    Q    (By Mr. Slater)  Have you seen -- well,
24   rephrase.

Page 197

1        Have you seen any information about the
2   depositions that were taken of the editors of the
3   New England Journal of Medicine about the Altman study?
4    A    No.
5    Q    Deposed?
6    A    I missed your question.
7    Q    Depositions of the editor-in-chief and
8   executive editor of the New England Journal of Medicine
9   were taken with regard to the Altman study?
10    A    I'm sorry, I still missed the first part of
11   your question.
12    Q    Are you -- can you hear me now?
13    A    I can hear you now.
14    Q    Okay.  All right, I'll just talk, because
15   when you talk, it brings the mic back to your room, so
16   let me just finish.
17    A    Okay.
18    Q    Are you aware that Dr. Curfman, the executive
19   editor of the New England Journal of Medicine, and
20   Dr. Drazen, the editor-in-chief of the New England
21   Journal of Medicine, had their depositions taken with
22   regard to the Altman study?
23    A    I'm not aware of that.
24    Q    Are you aware -- let me ask you this:  Are

Joye K. Lowman, M.D., MPH

Page 198

1 you aware of any issues with the POP-Q measurements
2 that were relied on to give the anatomic recurrence
3 results that are relied on in the Altman study?
4     A   I'm not.
5     Q   Are you aware of what involvement Ethicon had
6 with the study design, the analysis or interpretation
7 of the data, or the writing or editing of the
8 manuscript that was published?  Do you know anything
9 about Ethicon's involvement in that at all?
10    A   No.
11    Q   As you sit here now, do you have any
12 knowledge that Ethicon was involved in the study
13 design, the interpretation of the data, or the writing
14 or editing of the manuscript, do you have any knowledge
15 of that occurring?
16    A   No.
17    Q   Is it your assumption that Ethicon had no
18 involvement with the Altman study other than providing
19 funding?
20    A   That's my understanding, yes.
21    Q   If Ethicon, in fact, had involvement in
22 editing the article and, in fact, if at least four
23 Ethicon employees had involvement in editing the
24 article, and if Ethicon was involved in the study

Page 199

1 design and the interpretation of the results, that
2 information could impact on your evaluation of the
3 data, right?
4         MR. ISMAIL:  Objection to form.
5         THE WITNESS:  No.
6     Q   (By Mr. Slater)  Let me ask you this:  If
7 Ethicon made edits to the article such that they would
8 make the dyspareunia rates look more acceptable, lower,
9 would that be of any concern to you?
10        MR. ISMAIL:  Objection to form.
11        THE WITNESS:  I'm not sure how you would
12    edit numbers.  I mean, the numbers really are
13    the numbers, which is what I based my
14    assessment on.
15    Q   (By Mr. Slater)  Let me ask you this:  The
16 de novo dyspareunia rate with the Prolift was 7 percent
17 and the de novo dyspareunia rate with anterior
18 colporrhaphy was 2 percent.  That's what was reported,
19 correct?
20    A   That's correct.
21    Q   So let me ask you this:  The de novo
22 dyspareunia rate was more than three times higher with
23 the Prolift than with native tissue suture repair,
24 correct?

Page 200

1         MR. ISMAIL:  Objection to form.
2         THE WITNESS:  That's correct.
3     Q   (By Mr. Slater)  Let me ask you this:  When
4 the authors of the Altman study evaluated the data
5 based on functional outcomes, they found that the
6 Prolift was no better than anterior colporrhaphy in
7 terms of the functional outcomes reported by the
8 patients, correct?
9     A   I think that's incorrect, but I -- if you --
10 do you have that article by any chance?
11    Q   I don't have the article.
12    A   Okay.
13    Q   Let me ask you this:  From a statistical --
14    A   My recollection is that's incorrect.
15    Q   I'm not asking for the actual pure, specific
16 numbers.  This is what I'm asking you:  In the manner
17 in which people evaluate the data --
18    A   Uh-huh.
19    Q   -- and the way the authors evaluated the data
20 in their conclusion --
21    A   Uh-huh.
22    Q   -- it was found that from a statistical
23 perspective, the functional outcomes between the
24 Prolift and anterior colporrhaphy were essentially the

Page 201

1 same, correct?
2     A   You're talking about the number of 7 and 2?
3     Q   No, I'm talking about the functional outcomes
4 for the people after the surgery.
5     A   That's incorrect.
6     Q   Fine.  Thank you.
7         Do you know -- well, let me ask you this:  Do
8 you know anything about whether or not the authors of
9 the Altman study had financial consulting relationships
10 with Ethicon?
11    A   I don't.
12    Q   Does it matter to you?
13    A   No.
14    Q   With the concept of financial bias in
15 clinical studies?
16        MR. ISMAIL:  Restate, please.
17        MR. SLATER:  Sure.
18    Q   (By Mr. Slater)  Are you familiar -- let me
19 ask this:  Are you familiar with the concept of
20 financial bias in clinical studies?
21    A   I've never heard that term used before, no.
22    Q   Let me ask you this question:  With regard to
23 the various studies that have evaluated the Prolift, in
24 evaluating them, did you look to whether or not the

Joye K. Lowman, M.D., MPH

Page 202

1   people who performed the studies and wrote the
2   articles, whether they had financial relationships with
3   Ethicon?  Was that something you considered at all?
4        MR. ISMAIL:  Objection to form.
5        THE WITNESS:  No.
6        Q    (By Mr. Slater)  Let me ask you this:  On
7   page 24 of your report, you say that, "The fact that
8   studies selected the Prolift to be studied supports
9   that the Prolift is not just an acceptable procedure,
10  but it is arguably the procedure of choice, i.e., the
11  industry standard for trocar-guided mesh augmented
12  prolapse repair."  You made that statement, correct?
13       A    That's correct.
14       Q    Do you know of anybody that's ever published
15  in an article that's peer-reviewed that the Prolift was
16  considered to be the industry standard for these types
17  of repairs?
18       A    No.  That's my opinion.
19       Q    Okay.  Let me ask you this:  Do you know
20  whether or not doctors who were using the Prolift
21  continued to use it with the same frequency as the
22  years went on or whether or not the use of the Prolift
23  went down?  Do you have any idea?
24       MR. ISMAIL:  Objection to form.

Page 203

1        THE WITNESS:  No.
2        Q    (By Mr. Slater)  Do you know what
3   Dr. Lucente's -- let me ask you this:  Dr. Lucente is
4   somebody you have great respect for, correct?
5        A    Correct.
6        Q    Do you know what Dr. Lucente's opinion was as
7   between whether or not one should use the Prolift or
8   the Prolift+M based on safety considerations?
9        A    I don't.
10       Q    Do you know what Dr. Lucente's opinion was as
11  between the Prolift and Prolift+M in terms of what was
12  more compatible with a female's tissue?
13       A    I don't.
14       Q    Significance to you in forming your opinions
15  in this case?
16       MR. ISMAIL:  Restate, please.
17       MR. SLATER:  Sure.
18       Q    (By Mr. Slater)  Would Dr. Lucente's opinions
19  about the Prolift M versus the Prolift be of any
20  significance to you in forming your opinions in this
21  case?
22       MR. ISMAIL:  Objection to form.
23       THE WITNESS:  No.
24       Q    (By Mr. Slater)  Let me ask you this, Doctor.

Page 204

1   And I'm not really being facetious, but I want to
2   understand something.  It could save me a lot of
3   questions.  Is there anything I could tell you about
4   the Prolift or people who know about the Prolift that
5   would -- that would impact any of the opinions you've
6   given in this report?
7        MR. ISMAIL:  Objection to form.
8        THE WITNESS:  I -- that's a difficult
9   question for me to answer.  I don't think so.
10       Q    (By Mr. Slater)  Let me ask you this
11  question:  With Patricia Hammons, after the surgery, in
12  the postoperative period when she was -- in her acute
13  healing phase, she healed fine, right?
14       MR. ISMAIL:  Which operation?
15       MR. SLATER:  That's a good question,
16  actually.  Thank you.
17       MR. ISMAIL:  You're welcome.
18       Q    (By Mr. Slater)  After the Prolift was
19  implanted, Ms. Hammons' healing was uneventful, she
20  healed fine from that surgery, correct?
21       MR. ISMAIL:  Objection to form.
22       THE WITNESS:  Other than having some
23  scar tissue or some tenderness noted at the
24  vaginal cuff, yes.

Page 205

1        Q    (By Mr. Slater)  Well, let me ask you this:
2   The -- you said she had scar tissue or tenderness at
3   the vaginal cuff?
4        A    Uh-huh.
5        Q    When was that first noted, how long after the
6   surgery?
7        A    Eleven weeks.
8        Q    Okay.  Well, let me ask you this:  One can
9   have normal healing and have some discomfort at the
10  vaginal cuff after a Prolift surgery, correct?
11       A    What do you mean by "normal healing"?
12       Q    Healing without any complications.
13       MR. ISMAIL:  Restate, please.
14       MR. SLATER:  Sure.
15       Q    (By Mr. Slater)  Do you consider that the
16  discomfort and tenderness at the vaginal cuff --
17  rephrase.
18       Do you consider the scarring and the
19  tenderness at the vaginal cuff 11 weeks after the
20  Prolift to be due to any complication?
21       A    No.
22       Q    Okay.  Let me ask you this:  Did you see any
23  indication that Ms. Hammons did not heal normally after
24  the Prolift was implanted?

Joye K. Lowman, M.D., MPH

Page 206

1    A    No.
2    Q    So let me ask you this:  So even though
3 Ms. Hammons was a smoker at the time of the Prolift,
4 her healing after the Prolift surgery was not impacted
5 by that, correct?
6    A    Not by anything that we could see on exam,
7 no.
8    Q    All right.  Let me ask you something else.
9 In your report, you indicate that Ms. Hammons had a
10 Stage 4 prolapse.  You say that, right?
11    A    Yeah.
12    Q    Okay.  She never had a validated measure done
13 of her prolapse before Dr. Baker operated on her and
14 placed the Prolift, correct?
15        MR. ISMAIL:  Objection to form.
16        THE WITNESS:  I'm not sure what you mean
17    by that.
18    Q    (By Mr. Slater)  Let me ask you this:  Did
19 Dr. Baker calculate POP-Q measurements before he placed
20 the Prolift?
21    A    No.
22    Q    Okay.  What measurement criteria did
23 Dr. Baker utilize, what validated measurement criteria
24 did he utilize preoperatively to measure the prolapse

Page 207

1 before the Prolift was implanted?
2    A    I don't know.  No one ever asked him that,
3 from my review of his deposition.
4    Q    Okay.  Dr. Baker's comments on the -- on the
5 prolapse that Ms. Hammons exhibited, one could
6 interpret that to be anywhere from a Stage 2 to a
7 Stage 3 and you call it a Stage 4, right?
8        MR. ISMAIL:  Objection to form.
9        THE WITNESS:  I disagree.
10        MR. SLATER:  Okay.
11    Q    (By Mr. Slater)  Well, let me ask you this
12 question:  Why do you call it a Stage 4 prolapse
13 preoperatively?  What is it about Dr. Baker's exam that
14 tells you it's a Stage 4?
15    A    Because he called it a Stage 4, and I would
16 assume that somebody that operates on patients that
17 have pelvic organ prolapse understand what Stage 4
18 prolapse is, regardless of whether or not they can
19 assess POP-Q measurements.
20    Q    All right.  Let me ask you:  Is a Stage 4
21 where the bladder would be completely out of the
22 vagina?
23    A    A Stage 4 -- you want me to just -- there's
24 specific definitions for ICS grading and for Baden and

Page 208

1 Walker staging.  It's not necessarily as simple as the
2 bladder being completely outside of the vagina.
3 There's specific criteria for that.
4    Q    Okay, fine.  Let me ask you this:  Did
5 Dr. Baker reference any criteria, such as POP-Q, ICS,
6 or Baden-Walker, in justifying his description of the
7 prolapse in terms of staging?
8    A    When practitioners are using the Baden and
9 Walker system, it's just graded.  There are no numbers
10 that are documented.  It's Grade 1, Grade 2, Grade 3,
11 or Grade 4.  He assessed her prolapse as Grade 4.  I
12 would assume he was using the Baden-Walker system.
13    Q    Let me ask you this:  What is it about
14 Dr. Baker's -- well, let me ask you this:  In saying
15 it's a Stage 4 prolapse, are you applying the
16 Baden-Walker system?
17    A    Yes.
18    Q    And what is the criteria for a Stage 4
19 prolapse under Baden-Walker?
20    A    Greater than halfway outside of the hymen.
21 So Grade 1 is halfway to the hymen, Grade 2 is at the
22 hymen, Grade 3 is halfway beyond, and I'm talking about
23 vaginal length, and Grade 4 is greater than halfway
24 beyond.  So that's all in reference to the hymen and

Page 209

1 the vaginal length.
2    Q    Well, let me ask you this:  When you say
3 "greater than halfway beyond the hymen," what is
4 greater than halfway beyond the hymen?
5    A    Total vaginal length.
6    Q    Are we talking about the location of the
7 bladder?
8    A    No, that's what I'm saying, it's not that
9 simple.  It's not just about the location of the
10 bladder.
11    Q    Well, let me ask you this:  For a Stage 4
12 prolapse under Baden-Walker, where would the bladder
13 need to be to reach Stage 4 --
14    A    It doesn't consider bladder --
15    Q    -- for a cystocele?
16    A    -- location.  The Baden-Walker system doesn't
17 describe the bladder location.  It's describing the
18 amount or length of vagina that is outside -- or in
19 relation to the hymen.
20    Q    Ah.  So it's describing the amount of the
21 vaginal length that is everted outside the hymen; is
22 that what you're saying?
23    A    That's correct.
24    Q    Okay.  And did Dr. Baker actually make a

53 (Pages 206 to 209)

Joye K. Lowman, M.D., MPH

Page 210

1 finding of a particular amount of the vaginal length
2 that was actually everted outside the hymen? Did he
3 actually document that in his records?
4     A   He did by calling it a Grade 4 prolapse.
5 That's what he's documenting.
6     Q   Conclusion, but there is no clinical
7 documentation from which you can evaluate the basis for
8 his conclusion it's a -- it's a Grade 4, correct?
9         MR. ISMAIL:  Restate, please.
10        MR. SLATER:  Sure.
11    Q   (By Mr. Slater)  Dr. Baker did not document
12 data regarding his examination of the vagina such that
13 you could corroborate whether or not it really is a
14 Stage 4 or a Grade 4 under Baden-Walker, he just gave
15 the conclusion, correct?
16        MR. ISMAIL:  Objection to form.
17        THE WITNESS:  When you use the Baden and
18    Walker system, that grade is the objective
19    documentation.
20    Q   (By Mr. Slater)  Well, let me ask you this:
21 If you wanted to document in a chart a Grade 4 prolapse
22 under Baden-Walker and you wanted another doctor to be
23 able to evaluate the basis for your conclusion, you
24 could document your specific findings on examination

Page 211

1 that form the basis for your conclusion, you could do
2 that, correct?
3     A   You could.
4     Q   Dr. Baker did not do that, correct?
5     A   If you're asking if he documented vaginal
6 length and how much vaginal length was outside of the
7 vagina, no, he didn't.
8     Q   Testimony from Dr. Baker explaining that he
9 understood and applied the Baden-Walker system and
10 actually that's how he came to his finding of a
11 Grade 4?  Did he testify to that?
12    A   I missed -- I missed the first part of that
13 question.  I'm sorry.
14    Q   Sure.  Sure.  Do you have any information
15 from a medical record or a deposition indicating that
16 Dr. Baker actually applied the Baden-Walker system,
17 evaluated the amount of vaginal length that was
18 outside -- beyond the hymen, and utilized that
19 information in coming to a conclusion of a Grade 4
20 prolapse?
21    A   That's what using that term is an indication
22 of, and you don't have to physically measure the
23 length.  You can eyeball it, if you will.
24    Q   So the bottom line is -- the bottom line here

Page 212

1 is you're just accepting Dr. Baker calling it a Stage 4
2 or a Grade 4; you don't need to see any corroborating
3 medical information to support that, right?
4         MR. ISMAIL:  Objection to form.
5         THE WITNESS:  There is corroborating
6     medical information to support that, in my
7     opinion.
8     Q   (By Mr. Slater)  What's that?
9     A   Dr. Drolet and Dr. Zipper currently assess
10 Mrs. Hammons' prolapse as a -- I can't remember if they
11 used POP-Q or Baden-Walker, but they say Stage 3.  And
12 currently she's asymptomatic.  When she presented to
13 Dr. Baker, she was symptomatic.  So I would assume that
14 the prolapse that she had when she presented to
15 Dr. Baker is larger than it was when she presented and
16 was evaluated by Dr. Zipper and Drolet.
17    Q   Okay.  Let me ask you this:  What symptoms
18 was Ms. Hammons experiencing due to prolapse before the
19 Prolift was put in her body?
20    A   From what I remember, she reported that it
21 was bothersome with coughing, lifting, and with sexual
22 intercourse, her bulge.
23    Q   Meaning that she was aware of it, she could
24 feel it?

Page 213

1     A   She was -- she was aware of it, right.
2     Q   She had no pain reported, correct?
3     A   She did not report --
4     Q   She reported no pain, correct?
5     A   She did not report pain.
6     Q   She didn't report dyspareunia either,
7 correct?
8     A   She did not.
9     Q   Let me ask you this question:  If -- and I'm
10 asking you to draw an assumption -- if the evidence
11 were to establish that she actually had a Stage 3 or
12 early -- rephrase.
13        If the evidence were to establish that
14 Ms. Hammons actually had a Stage 2 or early Stage 3
15 prolapse, would that have any impact on any of your
16 opinions in this case?  And I'm talking about
17 pre-Prolift.
18    A   No.
19    Q   Let me ask you something, Doctor.  You talk
20 in your article [sic] on page 31 about the "Time to
21 Rethink" article, right?
22    A   Yes.
23        MR. ISMAIL:  You said your article.  Do
24    you mean the report, Mr. Slater?

54 (Pages 210 to 213)

Joye K. Lowman, M.D., MPH

Page 214

1      MR. SLATER:  In her -- in her report on
2  page 31, there's a discussion of the "Time to
3  Rethink" editorial.
4      THE WITNESS:  Yes.
5  Q   (By Mr. Slater)  Okay.  You know that's not a
6  peer-reviewed article, right?
7      A   I know that, yeah.
8  Q   You say that, "The Pelvic Surgeons Network,
9  consisting of over 600 pelvic surgeons, including
10  myself, conducted an analysis of available data,
11  including efficacy and potential complications with
12  regard to transvaginal mesh placement for prolapse
13  treatment."  That's what you wrote, right?
14     A   That's correct.
15  Q   Have you read -- well, let me ask you this:
16  Do you know where the name Pelvic Surgeons Network came
17  from?
18     A   I don't.
19  Q   The 600 surgeons conducted an analysis of
20  available data, are you saying you participated in some
21  sort of a scientific study of data?
22     MR. ISMAIL:  Restate, please.
23  Q   (By Mr. Slater)  Are you saying -- when you
24  say that 600 pelvic surgeons, including yourself,

Page 215

1  conducted an analysis of available data, are you saying
2  an actual scientific analysis was undertaken?
3      A   I'm not sure what you mean by that.  Did we
4  generate a scientific paper, is that the question or --
5  I'm --
6      Q   Yeah, let's start with that question.
7      A   We did not generate a scientific paper, but
8  we did analyze current data.
9      Q   When you say -- let me ask you this:  When
10  you say "we," did you participate in writing that
11  editorial?
12     A   No.
13  Q   All that happened was it was circulated to a
14  bunch of doctors and they signed the petition at the
15  end, right?
16     A   Yes, after reviewing, giving feedback, yes.
17  Q   Let me ask you:  You gave feedback on the
18  article?
19     A   Yes.
20  Q   Did that impact the writing of the article?
21  Did the language change based on your feedback?
22     A   No.
23  Q   Do you know if anybody else gave feedback
24  besides you?

Page 216

1      A   I don't know.
2      Q   Did the authors of the article, who happen to
3  be Lucente and Murphy, write back to you when you gave
4  your feedback?  Did they respond?
5      A   I don't remember.
6      Q   Did you send it to them by email?
7      A   I believe so.
8      Q   Do you still have that email?
9      A   Probably not.
10  Q   Do you have the email you received from them
11  with the article and the -- and the petition attached
12  to it?
13     A   Probably not, no.
14     MR. SLATER:  All right.  Well, we'll ask
15  for production of those items, the email with
16  regard to "Time to Rethink" and any email
17  from Dr. Lowman back to Lucente and Murphy,
18  if she has it.
19     MR. ISMAIL:  We'll take it under
20  advisement.
21  Q   (By Mr. Slater)  Would you have used your
22  work -- Dr. Lowman --
23     A   Yes.
24  Q   -- what computer were you using at the time?

Page 217

1      A   2012?  I don't know.
2      Q   You were in Atlanta at your current practice,
3  right?
4      A   I was, uh-huh.
5      Q   Has the computer system in your office been
6  changed since that time?
7      A   My office has changed since that time.
8  Before I got a partner, before we hired Dr. Saguan, I
9  was floating throughout the region, so I was using
10  different computers.  It wasn't until either late 2012
11  or 2013, I believe, that I had a stationary office or I
12  was in one location most of the time.
13  Q   Well, you had an email account, right, for
14  your -- for your practice?  Is that what you would have
15  used for these emails?
16     A   That's correct.  Either that or my personal
17  account.  I don't know which one it was.
18  Q   Do you have the same email accounts, your
19  professional and private ones, are they still the same?
20     A   They are.
21  Q   You'd be able to go look into your old emails
22  and see if you still have those, right?
23     MR. ISMAIL:  Objection to form.
24     THE WITNESS:  I can look.

55 (Pages 214 to 217)

Joye K. Lowman, M.D., MPH

Page 218

1    MR. SLATER:  Okay.
2    Q    (By Mr. Slater)  By the way, one other
3  question.  The "Time to Rethink" article was not
4  limited to discussing the Prolift, was it?
5    A    No, it wasn't.
6    Q    "Think" article is talking about mesh surgery
7  in general, right?
8    A    That's correct.
9    Q    And let me ask you this:  The ultimate
10  conclusion of that article was don't ban mesh because
11  there are some doctors who are skilled enough to use it
12  in some patients who it would be appropriate to use the
13  mesh with if you have the right doctor; fair statement?
14    A    No.  There was never --
15    Q    Okay.
16    A    -- no ban of mesh.
17    Q    Well, wasn't one of the concerns in the
18  article that mesh was on the verge of -- people were
19  talking about banning it and that's why this article
20  was written?
21    A    No.
22    Q    Do you know that the FDA was considering
23  banning mesh kits like the Prolift?
24    MR. ISMAIL:  Objection to form.

Page 219

1    THE WITNESS:  I did -- I was not aware
2    of that.
3    Q    (By Mr. Slater)  Are you aware up till the
4  present whether the FDA was considering -- well, let me
5  ask you this:  You don't know anything about the
6  interaction between the FDA and Ethicon about the
7  Prolift, correct?
8    A    Correct.
9    Q    Let me ask you to -- let me just get to this.
10  Okay, if you could, turn to page 33 of your report,
11  please.
12    A    Okay.  I'm here.
13    Q    Okay.  On page 33, towards the bottom, about
14  five lines up, your report says, "It is my opinion that
15  Ms. Hammons' dyspareunia was multifactorial and was due
16  to a combination of a shortened vagina, scarring or
17  narrowing from a posterior repair, vaginal atrophy, and
18  rolled or bunched mesh and/or mesh that had been placed
19  on excessive tension."  Do you see that?
20    A    I do.
21    Q    And you stand by that opinion today?
22    A    I do.
23    Q    When you say that the dyspareunia was
24  multifactorial, are you saying that there were multiple

Page 220

1  causes that contributed to this?
2    A    Yes.
3    Q    Let me ask you this question:  You refer to
4  mesh that had been placed on excessive tension.  When
5  mesh is on excessive tension, are you aware that that
6  can increase the risk of scar plating and contraction?
7    A    I'm aware that that can cause pain.  I'm not
8  aware that it can cause scar plating.
9    Q    Well, let me ask you this:  Do you have an
10  understanding of what happens to the pores in the
11  Prolift when it's placed on excessive tension?
12    A    I don't.
13    Q    Let me ask you this question:  When
14  Dr. Zipper examined Ms. Hammons, he found that she was
15  having -- she had tenderness on the exam and he
16  attributed that to the Prolift, correct?
17    A    Yes.
18    Q    Okay.  That's consistent with the findings by
19  Dr. Heit, correct?
20    MR. ISMAIL:  Objection to form.
21    THE WITNESS:  He -- Dr. Heit, my
22    impression of Dr. Heit's exam was that he
23    felt that she had pain at the site of rolled
24    and bunched mesh.

Page 221

1    Q    (By Mr. Slater)  I want to understand one
2  thing.  You seem to suggest that if -- that the rolling
3  or -- well, let me ask you this:  You say rolling or
4  bunching of the mesh.  Am I correct that what you're
5  saying is you're basically talking about the same
6  thing, whether it was rolled or bunched, you're saying
7  that's -- it's the same thing to you?
8    A    Not exactly, but I don't think distinguishing
9  them is important in terms of the pathology.
10    Q    Okay.  The important thing is whether the
11  mesh is laying flat or whether it's bunched up or
12  folded or clumped together, that's a bad thing, right?
13    A    That's correct.
14    Q    When the mesh is bunched up, for example,
15  that can increase the risk for complications, correct?
16    A    That's correct.
17    Q    And a doctor can follow the Prolift
18  technique, follow the technique in the IFU and the
19  surgical guide, and the mesh can still end up bunched,
20  that can happen, correct?
21    MR. ISMAIL:  Objection to form.
22    THE WITNESS:  I don't think so.
23    Q    (By Mr. Slater)  Do you think that
24  Dr. Jacquetin and Velemir knew how to do the Prolift

56 (Pages 218 to 221)

Joye K. Lowman, M.D., MPH

Page 222

1  procedure?
2      A   Yes.
3      Q   You read the Velemir article.  You cited it
4  in your report, right?
5      A   Yes.
6      Q   Did you see the findings that 89 percent of
7  the anterior Prolifts had either moderate or severe
8  contraction?
9      MR. ISMAIL:  Objection to form.
10     THE WITNESS:  I don't remember that
11     finding, no.
12     Q   (By Mr. Slater)  Did you look in the Velemir
13  article at the ultrasound images showing that the mesh
14  was bunched up and in an irregular shape?
15     A   I don't remember them describing that, that
16  it was bunched and irregular.
17     Q   Seeing those pictures of the ultrasounds in
18  the article?
19     MR. ISMAIL:  Restate, please.
20     Q   (By Mr. Slater)  Do you remember seeing the
21  pictures of the mesh on ultrasound in the Velemir
22  article?
23     A   I don't remember the pictures specifically.
24     Q   You say here that Dr. Baker, from your

Page 223

1  perspective, was an appropriate surgeon and fully
2  qualified and skilled to perform the Prolift procedure,
3  correct?
4      A   Yes.
5      Q   You also say -- rephrase.
6          You say in your report that the rolling or
7  bunching of mesh after the Prolift in this case was
8  most likely due to improper technique and implantation.
9  You say that in your report, right?
10     A   That's part of it, yes.
11     Q   It's also possible that Dr. Baker did do the
12  procedure correctly and the mesh ended up bunched just
13  because of the nature of the Prolift and the fact that
14  in some women, the mesh bunches up just because of the
15  way the procedure is performed in all patients, that
16  can happen, are you aware of that?
17     A   No.
18     Q   Okay.  If Ethicon thinks that a doctor can
19  follow the procedure, do everything correctly, and the
20  mesh can still be bunched up, would you defer to
21  Ethicon, the people who developed and sell the device,
22  or would you say, "No, I disagree with Ethicon"?
23     MR. ISMAIL:  Objection to form.
24     THE WITNESS:  I would say that has not

Page 224

1  been my experience in clinical practice.
2      Q   (By Mr. Slater)  Your experience is 150
3  Prolift procedures, right?
4      A   That's correct.
5      Q   Okay.  Ethicon, you would agree with me,
6  probably has a lot more information than you do about
7  what happens with the Prolift in the human body,
8  correct?
9      MR. ISMAIL:  Objection to form.
10     THE WITNESS:  I would say that I
11     think -- it depends on who you're talking
12     about at Ethicon.
13     Q   (By Mr. Slater)  How about the medical
14  affairs directors?  How about the medical affairs
15  directors?
16     MR. ISMAIL:  Objection to form.
17     THE WITNESS:  The medical affairs
18     directors?
19     Q   (By Mr. Slater)  Do you know what a medical
20  affairs director is?
21     A   I think I have a good idea.  I don't think
22  that administrators would have a better idea of what
23  goes on with the Prolift than surgeons.  I do believe
24  that Ethicon works --

Page 225

1      Q   Okay.
2      A   -- closely with surgeons.  I think those
3  surgeons might have more information than me.
4      Q   Is it -- is it your -- okay.  Is it your
5  understanding that the medical affairs directors at
6  Ethicon, even though you're not sure who they are, that
7  they're administrators?  Is that what you said?
8      A   Okay.
9      Q   Their backgrounds or qualifications, right?
10     A   I'm sorry, could you repeat that?
11     Q   You don't know the background or -- sure.
12  You don't know the background or qualifications of any
13  of the medical affairs directors at Ethicon, right?
14     A   I don't.
15     Q   Let me ask you a couple questions about the
16  warnings.  You read Dr. Baker's deposition, correct?
17     A   Yes.
18     Q   And you saw there were some things that he
19  said he was not aware of when he was using the Prolift?
20     A   Yes.
21     MR. ISMAIL:  Objection to form.
22     Q   (By Mr. Slater)  Okay.  Well, let me ask you:
23  The things he said he did not know, were those things
24  that you knew?

57 (Pages 222 to 225)

Joye K. Lowman, M.D., MPH

Page 226

1    MR. ISMAIL:  Objection to form.
2        THE WITNESS:  Could you be more
3    specific?
4    Q    (By Mr. Slater)  All right, let me ask you
5    this question:  Is it your understanding that when the
6    Prolift is in the body, that it creates a chronic
7    inflammatory reaction that in some women can be severe?
8    Do you -- do you believe that to be true?
9    A    I've not seen any evidence of that, no.
10    Q    Do you -- so you feel that doesn't happen
11    based on your experience, correct?
12    A    Correct.
13    Q    And that's your assumption in forming your
14    opinions, correct?
15        MR. ISMAIL:  Objection to form.
16        THE WITNESS:  That's correct.
17    Q    (By Mr. Slater)  Let me ask you about
18    something.  On the bottom of page 56, you say, "The
19    professional education authored by Ethicon has been
20    more than adequate, but exceptional, in my opinion."
21    You say that in your report, correct?
22    A    That's correct.
23    Q    You never attended the professional education
24    authored by Ethicon, we established that earlier, or if

Page 227

1    you did, you can't remember doing so, right?
2        MR. ISMAIL:  Objection to form.
3        THE WITNESS:  I don't remember attending
4        proctorships or dinners where we did
5        surgeries or cadaver labs afterwards.  But
6        what I'm referencing is their educational
7        literature.
8    Q    (By Mr. Slater)  The educational -- rephrase.
9        You're referring there to the educational
10    literature that you saw after you were retained as an
11    expert and they sent some of that stuff to you,
12    correct?
13    A    Yes, that's part of it.
14    Q    Okay.  Did you go through the PowerPoints for
15    professional education that they sent you to determine
16    whether the information in there was accurate and
17    truthful?
18    A    I went through those documents, yes.
19    Q    And you were comfortable that all the data
20    cited in the professional education decks was accurate?
21        MR. ISMAIL:  Objection to form.
22        THE WITNESS:  That's my position, yes.
23    Q    (By Mr. Slater)  You've never looked at the
24    underlying data for any of the prototype studies on

Page 228

1    Gynemesh PS or the Prolift, you've never looked at
2    them, right?
3    A    That's correct.
4    Q    You've never looked at the protocols for the
5    Gynemesh PS or the TVM studies, right?
6        MR. ISMAIL:  Objection to form.
7        THE WITNESS:  That's correct.
8        MR. SLATER:  All right, I think we're at
9        one minute on this tape, so let's change the
10        tape and I'm going to -- Jonathan, if we
11        could, maybe if you could just give me a call
12        on my -- on the cell or I can call you.  I
13        just want to ask you a question and then I'm
14        getting towards the end, guys.
15        (Discussion off the written record.)
16        THE VIDEOGRAPHER:  We are now going off
17        the video record.  The time is -- hang on.
18        We are now going off the video record.  The
19        time is currently 4:38 p.m.
20        (Recess taken.)
21        THE VIDEOGRAPHER:  We are now back on
22        the video record with Tape No. 5.  The time
23        is currently 4:53 p.m.
24    Q    (By Mr. Slater)  Doctor, in front of you is

Page 229

1    Exhibit 8, and it looks like you had sent an email --
2    rephrase.
3        Exhibit 8 looks like it's a cover sheet from
4    your office to Ethicon making a medical information
5    request.  Do you see that?
6    A    I do.
7    Q    And I don't know, is that your handwriting on
8    it or is it someone from your office?
9    A    That's my handwriting.
10    Q    And could you just read for the record,
11    because I'm not sure if I can read all the words, what
12    you asked for on April 15, 2013?
13    A    Yes.  No. 1 says, "Prolift, list of all
14    research" -- yes, "list of all" -- sometimes I have a
15    hard time reading my own handwriting.  "List of all
16    research papers done on Prolift and a summary of the
17    findings if you have it."  And, two, "Gynemesh used in
18    sacrocolpopexy, list of all research papers done on it
19    and a summary of the findings."
20    Q    Okay.  Why is it you sent that request to
21    Ethicon?
22    A    I was in the process of wanting to do a
23    outcomes assessment on the patients that -- my
24    patients.  And I wanted to try to circumvent having to

58 (Pages 226 to 229)

Joye K. Lowman, M.D., MPH

Page 230

1  do an exhaustive literature search and try to get this
2  information more directly.
3      Q    And then Exhibit 9, if you could look at
4  Exhibit 9, they show the document that you had faxed in
5  coming in by -- I guess they call it an e-fax, and then
6  you see the emails above where they sent your fax
7  around.  And at the top, you have Pete Hinoul saying,
8  "I am not sure that we owe the doctor this kind of
9  response.  We are not a library service.  I wonder
10 whether I can reach out and ask what his specific
11 question is."  Do you see that?
12     A    I see that.
13     Q    Now, this -- the emails are in 2014 after you
14 originally sent your request in in 2013, it looks like,
15 correct?
16     A    That's what it looks like.
17     Q    Do you know whether or not there's some
18 error; or do you know, was it 2013 when you sent it in?
19     MR. ISMAIL:  Objection to form.
20     THE WITNESS:  I -- it looks like from
21 the fax that it was 2013.
22     MR. SLATER:  Okay.
23     Q    (By Mr. Slater)  Did you ever get a response
24 from Ethicon?

Page 231

1      A    No, I don't believe so.
2      Q    Okay.  Did you ever follow up with anybody
3  from Ethicon, whether it was a sales representative or
4  anybody, and ask if they were going to send you this
5  information?
6      A    I don't remember.
7      Q    Okay.  Now, if we could, can you go back to
8  your CV that's attached to the report, please.  I just
9  have a few questions on that.
10     A    Okay.  Okay.
11     Q    Okay.  Doctor, on the second page of your CV
12 is a list of current research activities.  Do you see
13 that?
14     A    I do.
15     Q    Okay.  Are those current research activities
16 as of today?
17     A    No.  The magnesium sulfate prophylaxis is not
18 a current research activity, nor is the long-term
19 success rate with the Prolift.
20     Q    The long-term success rate of the Prolift
21 procedure, that research activity, when did that stop?
22     A    I don't remember exactly.  I'll just have to
23 say I don't remember.
24     Q    Why did you cease that project?

Page 232

1      A    It was hard for me to try to get IRB
2  approval.  They kept denying it, and so I ultimately
3  gave up, and then it -- I was also guessing that it was
4  going to be hard for me to amass a large enough cohort
5  of patients to make it meaningful because the Prolift
6  was withdrawn from the market.
7      Q    You say you wanted to get IRB approval.  Are
8  you talking about you submitted a grant request to
9  Ethicon?
10     A    No.  Institution Review Board at Kaiser.
11     Q    Okay.  So you never got that far to even make
12 a request to Ethicon for funding or anything; you were
13 just trying to get IRB permission from your health
14 system?
15     A    Right.  I didn't need funding for it.
16     Q    Okay.  I'm just checking my notes really
17 quickly.  Give me a second.  I'm just checking my
18 notes, as I said.
19     A    Okay.
20     Q    Oh, I think you might have -- we might have
21 your invoices here, Dr. Lowman.  I'd like to mark those
22 and confirm how much money you've been paid in this
23 case to date.
24     A    Okay.

Page 233

1      (Discussion off the written record.)
2      (Exhibit 24 marked for identification.)
3      THE WITNESS:  Okay, I have them.
4      Q    (By Mr. Slater)  Okay.  All right, Doctor,
5  you told us just earlier your -- the hourly rates that
6  you're charging.  What amount have you billed for this
7  matter so far?
8      A    It is approximately 50,000 or so.
9      Q    Well, the invoices that you have there, when
10 are they dated?
11     A    One was sent on October 15th.
12     Q    What's that amount?
13     A    19,600.
14     Q    Okay.  What else do you have?
15     A    And the other one, the last dated hour
16 documentation was August 10th, and that amount was
17 32,400.
18     Q    Okay.
19     MR. ISMAIL:  And just so you know --
20     Q    (By Mr. Slater)  You said that --
21     MR. ISMAIL:  Just one comment.
22     MR. SLATER:  Yes.
23     MR. ISMAIL:  The invoices reflect -- are
24 not just Hammons specific, which maybe you

59 (Pages 230 to 233)

Joye K. Lowman, M.D., MPH

Page 234

1  would have gotten to and I preempted you, but
2  just so you're aware.
3       MR. SLATER:  No problem.  I was going to
4  ask that, actually.
5       Q   (By Mr. Slater)  The invoices that you just
6  read off, the one that's August 10th, that's for work
7  you did up through August 10th?
8       A   Yes.
9       Q   And what's the earliest date of that work?
10      A   For this particular invoice?  There's -- the
11  one -- the earliest date for the work on this invoice
12  was July 20th.  Oh, yeah, this would have been before
13  that one, so yeah.  That's the earliest date,
14  July 20th.
15      Q   2015 we're talking about, right?
16      A   Right, 2015.
17      Q   Okay.  And it's $32,400.  Is that for the
18  Hammons case or for anything else?
19      A   It's for all my work through that time
20  period.
21      Q   What other work are you doing --
22      A   It's not just the Hammons case.
23      Q   -- beside the Hammons?  What else is there?
24      A   There was another case that I was asked to

Page 235

1  review.
2       Q   What case was that?
3       THE WITNESS:  I'm able to say that?
4       MR. ISMAIL:  You're allowed, yes.
5       THE WITNESS:  Okay.  The Delacruz
6  case.
7       Q   (By Mr. Slater)  Okay.  Is there any way to
8  tell me of the $32,400 how much was for Hammons?
9       A   No.
10      Q   The next invoice dated October 15, is that
11  from your billing from August 10 forward to October 15?
12      A   That's correct.
13      Q   And that was 19,600.  Is that for Hammons
14  only or for more than one case?
15      A   What -- this is November.  That was for more
16  than one case, too, I believe.
17      Q   In addition to Hammons, what case?
18      A   The Delacruz case.
19      Q   Okay.  Since October 15, do you know how many
20  hours you've spent up through today or can you estimate
21  on this case, on Hammons?
22      A   It's been over a hundred.  I don't know
23  exactly.
24      Q   Over a hundred hours reviewing materials,

Page 236

1  preparing for the deposition, that sort of thing?
2       A   Right.
3       Q   And that wouldn't include today, or would it?
4       A   That would not include today.
5       Q   Okay.  So over a hundred hours at $400 an
6  hour on Hammons that you haven't billed for yet?
7       A   That's correct.
8       Q   Today, which is $600 an hour?
9       A   That's correct.
10      MR. SLATER:  I don't think I have any
11  other questions, guys.
12      MR. ISMAIL:  Okay.  No questions here
13  either.  We'll reserve reading and sign.
14  Thank you very much.
15      THE VIDEOGRAPHER:  We are now going off
16  the video record.
17      MR. SLATER:  Thank you very much.
18      THE WITNESS:  Thank you.
19      THE VIDEOGRAPHER:  We are now going off
20  the video record.  The time is currently
21  4:05 p.m.  This is the end of Tape No.
22  5 and the end of the deposition.
23      (Deposition concluded at 5:04 p.m.)
24

Page 237

1       C E R T I F I C A T E.
2
3  STATE OF GEORGIA
4  COUNTY OF COBB
5
6       I, MICHELLE M. BOUDREAUX, do hereby certify
7  that JOYE K. LOWMAN, M.D., MPH, the witness whose
8  deposition is hereinbefore set forth, was duly sworn by
9  me and that such deposition is a true record of the
10  testimony given by such witness.
11
12      I further certify that I am not related to
13  any of the parties to this action by blood or marriage
14  and that I am in no way interested in the outcome of
15  this matter.
16
17      IN WITNESS WHEREOF, I have hereunto set my
18  hand this 17th day of November 2015.
19
20  _____
21      MICHELLE M. BOUDREAUX, RPR
22
23
24

Joye K. Lowman, M.D., MPH

Page 238

1              INDEX
2
3          EXAMINATIONS
4   Examination by Mr. Slater ................... 5
5              - - -
6           EXHIBITS
7   Exhibit                          Page
8   Exhibit 1 ........................................ 9
        Expert Report of Joye K. Lowman, M.D., MPH
9
    Exhibit 2 ........................................ 149
10      SGS Papers, "Pelvic magnetic resonance imaging
        for assessment of the efficacy of the Prolift
11      system for pelvic organ prolapse"
        (Seshadri Kasturi, et al.)
12
    Exhibit 3 ........................................ 151
13      SGS Papers, "Does the Prolift system cause
        dyspareunia?" (Joye K. Lowman, et al.)
14
15  Exhibit 4 ........................................ 185
        Email chain (ETH.MESH.00006814)
16  Exhibit 5 ........................................ 188
        "Does the Prolift Procedure Cause Dyspareunia?"
17      (Joye K. Lowman, et al.)
18  Exhibit 7 ........................................ 49
        June 16, 2009 email (ETH.MESH.10213366)
19
    Exhibit 8 ........................................ 229
20      May 31, 2013 fax to Ethicon from Dr. Lowman's
        office (ETH.MESH.19114214...)
21
    Exhibit 9 ........................................ 230
22      Email chain (ETH.MESH.19114057...)
23  Exhibit 10 ...................................... 80
        Email chain (ETH.MESH.03966939...)
24

Page 239

1          INDEX (Cont'd)
2
3   Exhibit                          Page
4   Exhibit 11 ...................................... 82
        List (ETH.MESH.03966941)
5
    Exhibit 17 ...................................... 43
6       Email chain (ETH.MESH.01717117...)
7   Exhibit 18 ...................................... 47
        Email chain (ETH.MESH.07639968)
8
    Exhibit 22 ...................................... 138
9       Lowman, Joye Materials List - 11.12.15
10  Exhibit 23 ...................................... 159
        Journal of Pelvic Medicine & Surgery,
11      Volume 14, Number 2, March/April 2008
12  Exhibit 24 ...................................... 233
        Dr. Lowman case hours
13
14
15
16
17
18
19
20
21
22
23
24

Page 240

1        ERRATA SHEET FOR THE TRANSCRIPT OF:
2   Case Name:  Patricia Hammons vs. Ethicon, et al.
3   Deposition Date:  November 13, 2015
4   Deponent:  Joye K. Lowman, M.D.
5   Pg.  Ln.  Now Reads      Should Read    Reason
6   ____  ____  _____  _____  _____
7   ____  ____  _____  _____  _____
8   ____  ____  _____  _____  _____
9   ____  ____  _____  _____  _____
10  ____  ____  _____  _____  _____
11  ____  ____  _____  _____  _____
12  ____  ____  _____  _____  _____
13  ____  ____  _____  _____  _____
14  ____  ____  _____  _____  _____
15  ____  ____  _____  _____  _____
16  ____  ____  _____  _____  _____
17  ____  ____  _____  _____  _____
18
19        _____
          Signature of Deponent
20
21
    SUBSCRIBED AND SWORN BEFORE ME
22  THIS _____ DAY OF _____ 20___.
23  _____
    (SIGNATURE OF NOTARY PUBLIC)
24  MY COMMISSION EXPIRES:_____

Golkow Technologies, Inc. - 1.877.370.DEPS