# Exhibit D

Joye Lowman, M.D.

Page 1

1          IN THE COURT OF COMMON PLEAS
          PHILADELPHIA COUNTY, PENNSYLVANIA
2
                    -   -   -
3
     IN RE:
4    PELVIC MESH/GYNECARE  :  MAY TERM, 2013
     LITIGATION            :
5                          :
     PATRICIA L. HAMMONS,  :
6          Plaintiff,      :
           v.              :
7    ETHICON, INC., et al.,:
           Defendants.     :  NO. 003913
8

9                   -   -   -
               DECEMBER 13, 2015
10                  -   -   -

11           Videotape deposition of JOYE

12   LOWMAN, M.D., taken pursuant to notice,

13   was held at the law offices of Drinker

14   Biddle and Reath, LLP, One Logan Square,

15   18th and Cherry Streets, Suite 2000,

16   Philadelphia, Pennsylvania 19103,

17   commencing at 2:00 p.m., on the above

18   date, before Amanda Dee Maslynsky-Miller,

19   a Certified Realtime Reporter and Notary

20   Public in and for the Commonwealth of

21   Pennsylvania.

22                   -   -   -
               GOLKOW TECHNOLOGIES, INC.
23        877.370.3377 ph|917.591.5672 fax
                 deps@golkow.com
24

Joye Lowman, M.D.

Page 2

1  APPEARANCES:
2
3     MAZIE SLATER KATZ & FREEMAN, LLC
      BY: ADAM SLATER, ESQUIRE
4     103 Eisenhower Parkway
      2nd Floor
5     Roseland, New Jersey 07068
      (973) 228-9898
6     Aslater@mskf.net
      Representing the Plaintiff
7
8
9
10    KLINE SPECTER, P.C.
      BY:  SHANIN SPECTER, ESQUIRE
      BY:  KILA B. BALDWIN, JD, MBA, LLM
11    1525 Locust Street
      19th Floor
12    Philadelphia, Pennsylvania 19102
      (215) 772-1000
13    Shanin.Specter@KlineSpecter.com
      Kila.baldwin@klinespecter.com
14    Representing the Plaintiff
15
16
17    GOLDMAN ISMAIL TOMASELLI BRENNAN &
      BAUM LLP
18    BY:  TAREK ISMAIL, ESQUIRE
      564 West Randolph Street
19    Suite 400
      Chicago, Illinois 60661
20    (312) 681-6000
      Tismail@goldmanismail.com
21    Representing the Defendant
22
23
24

Page 3

1  APPEARANCES:  (Continued)
2
3
4     TUCKER ELLIS, LP
      BY:  MATTHEW P. MORIARTY, ESQUIRE
      950 Main Avenue
5     Suite 1100
      Cleveland, Ohio 44113
6     (216) 592-5000
      Matthew.moriarty@tuckerellis.com
7
8
9  ALSO PRESENT:  David Lane, Videographer
10                 - - -
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 4

1                 - - -
2            I N D E X
3                 - - -
4
   Testimony of:  JOYE LOWMAN
5
6    By Mr. Ismail          8, 343, 386
     By Mr. Slater           184, 369
7
8                 - - -
9         E X H I B I T S
10                - - -
11
     NO.      DESCRIPTION          PAGE
12
13   Lowman-1    September 2007 E-mail   197

14   Lowman-2    June 2009 E-mail       198

15   Lowman-3    2010 E-mail           204

16   Lowman-4    Chart                 204

17   Lowman-5    Expert Report of
                 J. Lowman, M.D.       214
18   Lowman-6    Excerpt of Testimony of
                 C. Owens              229
19
20   Lowman-7    Excerpt of Testimony of
                 P. Hinoul             243
21   Lowman-8    January 2005 E-mails   277
22   Lowman-9    Excerpt of Testimony of
                 Dr. Klinge            323
23
24   Lowman-10   Chart                 337

Page 5

1                 - - -
2        DEPOSITION SUPPORT INDEX
3                 - - -
4
5    Direction to Witness Not to Answer
6    Page Line     Page Line      Page Line
7    None
8
9
10   Request for Production of Documents
11   Page Line     Page Line      Page Line
12   None
13
14
15   Stipulations
16   Page Line     Page Line      Page Line
17   7     1
18
19
20   Question Marked
21   Page Line     Page Line      Page Line
22   None
23
24

2 (Pages 2 to 5)

Joye Lowman, M.D.

Page 6

1              - - -
2              (It is hereby stipulated and
3     agreed by and among counsel that
4     sealing, filing and certification
5     are waived; and that all
6     objections, except as to the form
7     of the question, will be reserved
8     until the time of trial.)
9              VIDEO TECHNICIAN:  We're now
10    on the record.  My name is David
11    Lane, videographer for Golkow
12    Technologies.  Today's date is
13    December 13th, 2015.  Our time is
14    2:17 p.m.  This deposition is
15    taking place in Philadelphia,
16    Pennsylvania, in the matter of
17    Patricia Hammons versus Ethicon,
18    Inc., et al.  Our deponent today
19    is Dr. Joye Lowman, M.D.
20             Counsel will be noted on the
21    stenographic record.  Our court
22    reporter today is Amanda Miller
23    and will now swear in the witness.

Page 7

1              - - -
2              JOYE LOWMAN, M.D., after
3     having been duly sworn, was
4     examined and testified as follows:
5              - - -
6              VIDEO TECHNICIAN:  Please
7     begin.
8              - - -
9              EXAMINATION
10             - - -
11    BY MR. ISMAIL:
12        Q.   Good afternoon, Dr. Lowman.
13        A.   Hi.
14        Q.   Could you please tell the
15    jury your name and what you do for a
16    living?
17        A.   My name is Joy Lowman, and
18    I'm a urodynamic gynecologist.
19        Q.   Where do you practice, Dr.
20    Lowman?
21        A.   I practice at Kaiser in
22    Atlanta, Georgia.
23        Q.   Now, are we here today on a
24    Sunday in the middle of the Hammons

Page 8

1     trial?
2         A.   We are.
3         Q.   And do you understand that
4     the testimony you're giving today will be
5     shown to the jury on Tuesday or Wednesday
6     of this week?
7         A.   I do.
8         Q.   Doctor, did you want to have
9     an opportunity to actually appear in
10    court and testify to the jury in the
11    Hammons case?
12        A.   I did.
13        Q.   In fact, are we here today
14    just a few blocks from the courthouse?
15        A.   Yes, we are.
16        Q.   Why is it, Doctor, that you
17    will be unable to appear in person on
18    Tuesday or Wednesday of this week?
19        A.   It's my understanding that
20    the case has moved along much more
21    quickly than was initially anticipated.
22    I was scheduled to testify on Friday, and
23    now it's anticipated that the case might
24    end on Tuesday or Wednesday.

Page 9

1              Unfortunately, I have
2     surgical cases scheduled, as well as
3     patient visits, office visits, scheduled
4     and I don't want to compromise the care
5     of those patients.
6         Q.   Okay.  So do I understand
7     it, correctly, Dr. Lowman, that you have
8     patients who have previously scheduled
9     appointments for the first part of this
10    week?
11        A.   That's correct.
12        Q.   Including patients who have
13    surgeries scheduled that you are
14    scheduled to perform for them?
15        A.   Yes.
16        Q.   In light of that, Doctor,
17    did you feel it was necessary that you
18    take care of and be present for your
19    patients in Atlanta?
20        A.   Absolutely.
21        Q.   Nevertheless, Doctor, did
22    you feel that it was important that you
23    have an opportunity to give your
24    opinions -- opinions and your findings to

Joye Lowman, M.D.

Page 10

1 the jury in the Hammons case?
2          MR. SLATER:  Objection.
3          THE WITNESS:  Yes, I do.
4 BY MR. ISMAIL:
5      Q.    And is that why we're here
6 today on a Sunday taking your testimony?
7          MR. SLATER:  Objection.
8          THE WITNESS:  Yes, it is.
9 BY MR. ISMAIL:
10      Q.    Doctor, have we -- have we
11 asked you to analyze certain topics and
12 to discuss your findings with the jury?
13      A.    You have.
14      Q.    Have we asked you to discuss
15 the disease of pelvic organ prolapse?
16      A.    You have.
17      Q.    And the treatment and the
18 various options that are -- that have
19 been used by surgeons to treat that
20 condition?
21      A.    Yes.
22      Q.    Have we also asked you to
23 analyze Patricia Hammons' medical
24 history, particularly as it relates to

Page 11

1 her use of PROLIFT® to treat pelvic organ
2 prolapse?
3      A.    Yes.
4      Q.    Doctor, before we get to the
5 substance of your opinions, I want the
6 jury to have a better understanding of
7 your professional education and training,
8 okay?
9      A.    Okay.
10      Q.    And have you helped us put
11 together some slides that will help
12 explain some of the concepts that we're
13 discussing with the jury?
14      A.    I have.
15      Q.    And we have up on the screen
16 the first slide.
17          Does that describe your
18 educational training and some of your
19 professional training?
20      A.    It does.
21      Q.    It says that you went to
22 college at Spelman College.
23          Where is that?
24      A.    It's in Atlanta.

Page 12

1      Q.    Now, Doctor, did you begin,
2 at an early point in your career, to have
3 an interest in scientific research?
4      A.    I did.
5      Q.    Can you give us an example
6 of that?
7      A.    Yes, certainly.  As a
8 student at Spelman College, I was a
9 member of the UMARC program, which stands
10 for Undergraduate Minority Access to
11 Research Careers.  It was a scholarship
12 program that provided money for us to be
13 able to do basic science research.
14      Q.    Did you continue your
15 educational training to attend University
16 of Pennsylvania here in Philadelphia?
17      A.    I did.
18      Q.    And what degree did you get
19 from the University of Pennsylvania?
20      A.    A Master's -- a medical
21 degree.
22      Q.    Did you continue, Doctor, on
23 to get a Master's Degree at Columbia in
24 New York City?

Page 13

1      A.    I did.
2      Q.    And why did you pursue that
3 career, or that additional training?
4      A.    I wanted to perform clinical
5 research and, unfortunately, the
6 University of Pennsylvania doesn't have a
7 clinical research track.
8      Q.    And so what degree did you
9 get from Columbia university?
10      A.    An MPH, which is a Master's
11 in Public Health.
12      Q.    Doctor, did you --
13 withdrawn.
14          Can you explain for the jury
15 what led you to your career path to end
16 up as a urogynecologist and pelvic floor
17 surgeon?
18      A.    Yes.  I've always had an
19 interest in women's health, and I learned
20 in residency that I loved surgery.  And
21 urogynecology, in my opinion, is the best
22 merge of those two things.
23      Q.    Did you do additional
24 education and professional training in

Joye Lowman, M.D.

Page 14

1  order to follow the career path you set
2  out for yourself?
3      A.   I did.  I went to fellowship
4  at Indiana University after my residency
5  program.
6      Q.    What was your residency
7  program?
8      A.    It was residency program
9  in female -- I'm sorry, residency was
10 general obstetrics and gynecology.
11     Q.   And where did you do that?
12     A.   At Abington.
13     Q.    And what type of training
14 did you get as part of your residency
15 program in obstetrics and gynecology?
16     A.    We trained in the evaluation
17 and treatment of general obstetrics and
18 gynecologic issues.
19     Q.    And then you were starting
20 to tell us that you did some additional
21 training.
22          Was that through a
23 fellowship?
24     A.    That was through a

Page 15

1  fellowship.
2      Q.    And what was your fellowship
3  training?
4      A.    It's -- my fellowship
5  training was at Indiana University in
6  female pelvic medicine and reconstructive
7  surgery.  Luckily, they are one of very
8  few locations that also have a CITE
9  training program, that stands for
10 clinical investigator training
11 enhancement program, sponsored by the
12 NIH, to, basically, train clinical
13 scientists.
14     Q.    Is that additional training
15 in clinical scientific methods and
16 research, is that a part of every
17 fellowship program that's out there?
18     A.   It's not.
19     Q.    Is that a unique aspect of
20 your professional training that --
21     A.   It is.
22     Q.   -- that is -- did you find
23 that to be beneficial in the opinions
24 that we asked you to investigate in this

Page 16

1  case?
2      A.    Very much so.
3      Q.    How long was your fellowship
4  at Indiana University?
5      A.    Three years.
6      Q.    And what types of training
7  did you engage in while in fellowship
8  there?
9      A.    We evaluated complex female
10 pelvic medicine and reconstructive
11 surgery issues.  It was a tertiary --
12 tertiary referral center, so anything
13 dealing with matters of female pelvic
14 floor dysfunction, which includes urinary
15 incontinence, pelvic organ prolapse,
16 fecal incontinence and pelvic pain.
17     Q.    Are you board certified,
18 Doctor?
19     A.   I am.
20     Q.    In what areas are you board
21 certified?
22     A.    General obstetrics and
23 gynecology and in female pelvic medicine
24 and reconstructive surgery.

Page 17

1      Q.    So you have both board
2  certifications?
3      A.   I do.
4      Q.    Doctor, have you conducted
5  clinical research in your career?
6      A.   I have.
7      Q.    Can you describe for the
8  members of the jury, just briefly, what
9  that clinical research -- some examples
10 of the work that you have done to
11 contribute to clinical science?
12     A.    Certainly.  I have performed
13 basic science, as I said, when I was an
14 undergraduate.  And then in terms of
15 peer-reviewed publications, I've studied
16 dyspareunia rates in particular after the
17 PROLIFT®, as well as risk factors for
18 mesh erosion after mesh augmented pelvic
19 organ prolapse repair.
20     Q.    So do I understand
21 correctly, Doctor, that you have actually
22 done clinical research in the areas of
23 mesh implantation?
24     A.    Yes, award-winning research.

Joye Lowman, M.D.

Page 18

1      Q.     Have you also done research
2  that looked at the PROLIFT® in
3  particular?
4      A.   I have.
5      Q.     Have you published research
6  in the peer-reviewed medical literature?
7      A.   I have.
8      Q.     And does that include some
9  of the research you've already described
10 for us in polypropylene meshes and
11 PROLIFT® in particular?
12     A.   Yes.
13     Q.     Doctor, have you, throughout
14 your career, had experience surgically
15 implanting mesh material?
16     A.   I have.
17     Q.   Polypropylene mesh?
18     A.   Yes.
19     Q.   Does that include experience
20 implanting the PROLIFT®?
21     A.   Yes.
22     Q.   Can you give us -- first of
23 all, Doctor, when did you first gain
24 experience implanting the PROLIFT®

Page 19

1  through the procedure that was developed
2  for that medical product?
3      A.   In my fellowship.
4      Q.     Was that at Indiana
5  University that you've described for us
6  already?
7      A.   Yes.
8      Q.     Do you have an estimate,
9  Doctor, as to how many PROLIFT®
10 procedures you have performed in your
11 career?
12     A.   Approximately 150.
13     Q.   Do you also have experience,
14 Doctor, implanting other types of mesh?
15     A.   I do.
16     Q.   Do you also have experience
17 treating complications from mesh surgery?
18     A.   I do.
19     Q.   Do you have experience
20 treating complications for non-mesh
21 surgery used to treat pelvic organ
22 prolapse?
23     A.   I do.
24     Q.   Doctor, what's your current

Page 20

1  position?
2      A.   I'm currently the module
3  lead for the urogynecology department at
4  Kaiser.
5      Q.     First of all, what is
6  Kaiser?
7      A.   Kaiser is a health
8  management organization where a health
9  plan or insurance company employs
10 physicians to care for the patients that
11 have that insurance.
12     Q.   And do you have privileges
13 at hospitals in Atlanta?
14     A.   I do.
15     Q.   Is that where you perform
16 surgery and see patients?
17     A.   Yes.
18     Q.     What does it mean to be a
19 module lead?  Or, basically, describe
20 what your duties are in the position you
21 currently hold.
22     A.   I, basically, oversee the
23 department.  The department is focused on
24 evaluating and treating female pelvic

Page 21

1  floor dysfunction, and I oversee that
2  process.  I have one partner or
3  colleague, another physician, that works
4  with me, and we have three nurses that
5  work with us.
6      Q.   And what types of conditions
7  do you treat in your clinical practice?
8      A.   We treat anything that deals
9  with the female pelvis, in particular as
10 it relates to female pelvic floor
11 dysfunction.  So, again, urinary
12 incontinence, pelvic organ prolapse,
13 fecal incontinence, pelvic pain
14 syndromes, and then lower urinary tract
15 problems as well, like urethral
16 diverticulum.
17     Q.   Do you do surgeries?
18     A.   I do.
19     Q.   Do you have experience,
20 Doctor, counseling women on their options
21 on treating pelvic organ prolapse?
22     A.   Yes.
23     Q.     Is that an important part of
24 your practice?

Joye Lowman, M.D.

Page 22

1      A.   It is.
2      Q.   Doctor, have you described
3  for us your background, training,
4  experience and research about pelvic
5  organ prolapse, vaginal mesh, vaginal
6  mesh procedures and pelvic surgery?
7      A.   Yes.
8           MR. ISMAIL:  At this time,
9      I'd like to offer Dr. Lowman as an
10     expert in urogynecology, including
11     pelvic reconstructive surgery,
12     vaginal mesh, vaginal mesh
13     procedures and the PROLIFT® in
14     particular.
15          MR. SLATER:  We'll reserve.
16  BY MR. ISMAIL:
17     Q.   Doctor, have you reached
18  opinions in this case about the use of
19  PROLIFT® to treat pelvic organ prolapse?
20     A.   I have.
21     Q.   Have you reached opinions in
22  this case related to Mrs. Hammons'
23  medical history, particularly as it
24  relates to her pelvic floor disease and

Page 23

1  her use of PROLIFT®?
2      A.   I have.
3      Q.   Doctor, will all the offers
4  you offer today be to a reasonable degree
5  of medical certainty?
6      A.   They will.
7      Q.   Before we get to the
8  substance of the opinions, Doctor, I want
9  the jury to understand the work that you
10  did that led to the opinions that you
11  will offer today, okay?
12     A.   Okay.
13     Q.   Did you review Mrs. Hammons'
14  relevant medical records?
15     A.   I did.
16     Q.   Did you review the testimony
17  of her and her treating physicians?
18     A.   I did.
19     Q.   Did you review the expert
20  reports of plaintiff's experts, Drs.
21  Weber, Zipper and Elliott?
22     A.   I did.
23     Q.   Did you review material that
24  was -- withdrawn.

Page 24

1           Did you review material such
2  as the patient brochures, the surgical
3  technique guide and the surgeon's
4  monograph?
5      A.   I did.
6      Q.   Did you consider, as part of
7  your work preparing your opinions in this
8  case, the relevant medical literature on
9  the issues you were asked to investigate?
10     A.   Yes.
11     Q.   Did you also, as part of
12  forming your opinions, consider your
13  experience, both as a clinical researcher
14  and as a clinician treating women with
15  this condition?
16     A.   I did.
17     Q.   Doctor, did you feel it was
18  important, as part of your work, to
19  review internal company e-mails?
20     A.   No.
21     Q.   Why not?
22     A.   Because that's not what I
23  base my clinical decisions on.  I
24  practice what is known as evidence-based

Page 25

1  medicine, meaning that I use evidence in
2  science, which is research studies, to
3  base my clinical opinions on.
4      Q.   Doctor, did you examine Mrs.
5  Hammons in this case?
6      A.   I didn't.
7      Q.   Do you, nevertheless, feel
8  that you are in a position to offer
9  opinions about her case, particularly as
10  it relates to her pelvic floor condition
11  and her use of PROLIFT®?
12     A.   I do.
13     Q.   And why do you believe that?
14     A.   Because I reviewed her
15  medical records, I've read her testimony,
16  as well as the testimony of her treating
17  physicians, and I think that gives me a
18  good gestalt of her condition.
19     Q.   And when you say a
20  "gestalt," does that mean an overall
21  impression of the symptoms she reported,
22  when she reported them and her disease
23  state?
24          MR. SLATER:  Objection.

Joye Lowman, M.D.

Page 26

1    THE WITNESS:  That's
2    correct.
3    BY MR. ISMAIL:
4        Q.    Doctor, have you charged for
5    the time that you have spent working on
6    this case?
7        A.    I have.
8        Q.    And at what hourly rate?
9        A.    $400 an hour.
10       Q.    And if I -- do you have an
11   estimate, Doctor, for the number of hours
12   that you have spent on Mrs. Hammons' case
13   in particular to arrive at the opinions
14   you'll offer today?
15       A.    I have been evaluating
16   multiple cases, so it's not an exact
17   estimate.  But if I had to guess, I would
18   guess around 100 hours.
19       Q.    Let me rephrase my question
20   and ask it this way -- new question.
21       Can you give me an estimate
22   just about the amount of time that you
23   spent on Mrs. Hammons' case, to date,
24   that brought you to the point to offer

Page 27

1    the opinions you're going to tell to the
2    jury?
3        A.    Approximately 100 hours.
4        Q.    Doctor, I want to start with
5    the condition that the jury has heard a
6    lot about and that is pelvic organ
7    prolapse, okay?
8        A.    Okay.
9        Q.    And at this point in the
10   trial, the jury has heard a lot about
11   pelvic organ prolapse.  So I don't want
12   to go over a description of the
13   disease -- withdrawn.
14       Doctor, I want to start with
15   discussing the public health impact of
16   pelvic organ prolapse as you've seen it
17   as a clinical researcher and as a
18   clinician in this field, okay?
19       A.    Okay.
20       Q.    Do you have statistics that
21   you use in your clinical research or as
22   you counsel patients as to the prevalence
23   of pelvic organ prolapse?
24       A.    I do.

Page 28

1        Q.    Can you give the jury a
2    sense of the -- how significant of a
3    public health issue pelvic organ prolapse
4    is?
5        A.    Certainly.  Pelvic organ
6    prolapse is a very significant issue in
7    this country and all over the world.  It
8    is the most common indication for
9    hysterectomy in this country, and over 60
10   percent of women who have had children
11   are affected.
12       Q.    What are some of the risk
13   factors that can lead to the development
14   of pelvic organ prolapse?
15       A.    The biggest risk factor is
16   childbirth.  That has been shown to
17   increase the risk of prolapse in a
18   dose-response relationship, which means
19   that the more babies you've had, the
20   greater your risk of developing prolapse.
21       Aging is the second biggest
22   risk factor.
23       Chronic heavy lifting or
24   straining, tobacco use, obesity; those

Page 29

1    are the main ones.
2        Q.    Doctor, do you see a range
3    of symptoms in patients you treat who
4    have pelvic organ prolapse?
5        A.    I do.
6        Q.    What are some of the
7    symptoms you've seen, clinically, in
8    patients who are presenting with this
9    disease?
10       A.    Most patients present with
11   the chief complaint of feeling or sensing
12   a vaginal bulge.  Many patients will
13   describe discomfort in particular with
14   intercourse from pelvic organ prolapse.
15   Some describe difficulty being able to
16   urinate.  Some describe difficulty being
17   able to have bowel movements.
18       Those are probably the main
19   ones.
20       MR. SLATER:  I just want to
21   say one thing for the record.  I'm
22   going to start to object every
23   time you use the word "disease."
24   I think it's mischaracterizes

8 (Pages 26 to 29)

Case 2:12-md-02327   Document 2061-4   Filed 04/21/16   Page 10 of 99 PageID #: 43881

Joye Lowman, M.D.

1    what's really happening.
2         MR. ISMAIL:  I appreciate
3    that.
4    BY MR. ISMAIL:
5         Q.   Doctor, do you -- new
6    question.
7         Doctor, do you believe that
8    surgical intervention is appropriate for
9    patients who have symptoms of pelvic
10   organ prolapse?
11        A.   Yes.
12        Q.   Is that a belief that is
13   supported, in your view, in the medical
14   community?
15        A.   Yes.
16        Q.   Doctor, the jury has heard
17   that watching and waiting is sometimes
18   appropriate for a woman who is presenting
19   with this condition.
20        Is that sometimes true?
21        A.   Yes.
22        Q.   What is to be expected if a
23   patient does not receive any treatment
24   for a prolapse with respect to the

1    condition itself?
2         A.   Most likely, it will
3    progress.
4         Q.   And so if a patient receives
5    no treatment for a prolapse, what would
6    be the expected course of that condition
7    over time?
8         A.   It most likely will worsen
9    over time.
10        Q.   Now, Doctor, the jury has
11   heard this term "recurrence."
12        What does "recurrence" mean
13   in the context of pelvic organ prolapse?
14        A.   Recurrence refers to the
15   fact that a patient may have had a
16   surgical repair for prolapse and then
17   re-present with prolapse subsequently.
18        Q.   Is recurrence a problem that
19   is faced with clinicians taking care of
20   women with this condition?
21        A.   Significantly, yes.
22        Q.   Do you have any statistics
23   that you use in your clinical research or
24   as you counsel women as to the -- how

1    common it is to have this problem of
2    recurrence of a prolapse?
3         A.   I do.
4         Q.   And can you tell the jury
5    some of that information?
6         A.   Certainly.  Over 50 percent
7    of patients that have repair, in
8    particular of the anterior compartment,
9    which means the bladder, or a cystocele,
10   will have recurrence of that prolapse
11   without the use of mesh.
12        Q.   Is there a particular
13   patient type that is most vulnerable to a
14   recurrence of a prolapse?
15        A.   Yes.
16        Q.   Can you tell the jury the
17   characteristics of a patient who is most
18   vulnerable for that?
19        A.   Yes.  So there are risk
20   factors for the development of prolapse
21   recurrence.  Many of those risk factors
22   overlap with development of prolapse in
23   the first place.
24        So childbirth, obviously, is

1    not going to be something that is going
2    to develop subsequently.  But aging,
3    chronic heavy lifting, smoking, obesity
4    and multicompartment prolapse; in
5    addition to the grade of prolapse or the
6    stage of prolapse are all -- all indicate
7    that the patient may have an increased
8    risk of recurrence.
9         Q.   So one of the things that
10   you said in your last answer was
11   multicompartment prolapse.  And I think
12   that term came up before.
13        But can you remind us what
14   you mean by multicompartment prolapse is?
15        A.   Right.  So the vagina is --
16   has a front vaginal wall, a back vaginal
17   wall and then there's the top of the
18   vagina.  If there's a uterus present,
19   it's at the top of the vagina.  You can
20   have prolapse in the anterior
21   compartment, which is the front; prolapse
22   in the posterior compartment, which is
23   the back; or prolapse at the top of the
24   vagina.

Joye Lowman, M.D.

Page 34

1        Q.    If a patient has multiple
2    organ prolapse but receives treatment for
3    only one of those prolapse conditions,
4    what is to be expected about the
5    compartment that did not receive
6    treatment?
7        A.    It most likely will
8    progress.
9        Q.    Now, Doctor, I want to talk
10   about the surgical options for prolapse,
11   particularly as it relates to 2009, which
12   is the time frame that Mrs. Hammons was
13   receiving her treatment for the
14   condition, okay?
15       A.    Okay.
16       Q.    Were you a practicing
17   surgeon in 2009?
18       A.    I was.
19       Q.    And was part of your
20   practice treating women like Mrs. Hammons
21   who had pelvic organ prolapse?
22       A.    Yes.
23       Q.    Doctor, what are -- are
24   there factors that influence what surgery

Page 35

1    a surgeon may recommend to a patient who
2    is experiencing prolapse?
3        A.    Yes.
4        Q.    And can you tell us what
5    those are?
6        A.    Yes.  So there are patient
7    factors, there are physician factors, and
8    then there are also factors that affect
9    sort of, you know, what devices you have
10   at your disposal.
11           So the patient may have risk
12   factors for recurrence that allow you --
13   that encourage you to use a more
14   aggressive therapy.  The patient may also
15   have risk factors for morbidity, which
16   means risk -- morbidity means sort of
17   negative outcomes after surgery.  You
18   have to take that into account as well.
19           The surgeon also has to
20   consider what they're able to do, what
21   they've been trained to do.  So while I
22   have been trained in one of the best
23   training programs in the country, I have
24   the complete armamentarium to treat

Page 36

1    patients with pelvic organ prolapse.  But
2    many of my GYN colleagues, many of my
3    urogyn colleagues are not trained to do
4    abdominal sacrocolpopexy, for example, so
5    that particular treatment is not an
6    option for every patient.
7        Q.    So have we put on the
8    screen, Doctor, a graph that you helped
9    us to put together to explain this
10   concept?
11       A.    Yes.
12       Q.    So when you talk about
13   patient factors, are those factors
14   specific to the patient who is
15   experiencing the condition?
16       A.    Yes.
17       Q.    And what were some of those
18   factors again?
19       A.    The patient's medical
20   condition.  We call it their
21   comorbidities, meaning, are they
22   diabetic?  Are they hypertensive?  Do
23   they -- are they obese?  Things that put
24   them at risk for surgical complications.

Page 37

1    We have to consider that.
2            The degree of their
3    prolapse.  How bad is their prolapse?
4    How aggressive do we think we have to be?
5            And then in terms of surgeon
6    factors, it's what I described.
7        Q.    So in terms of patient
8    factors, can the type of conditions the
9    patient has and the type of prolapse the
10   patient has dictate that one option may
11   be more appropriate an another?
12       A.    Yes.
13       Q.    And then you described
14   surgeon factors.
15            Does that, basically,
16   referred to what types of surgeries the
17   surgeon is comfortable doing?
18       A.    Right.
19       Q.    And then product factors.
20            What are you referring to
21   there?
22       A.    What are your options in
23   terms of products.  So what products are
24   available?  There -- you know, you may --

10 (Pages 34 to 37)

Joye Lowman, M.D.

Page 38

1  want to do a vaginal procedure for a
2  patient but if you don't have a vaginal
3  product that works well, that's not going
4  to be an option for you.  So it talks
5  about the fact of -- what I mean by that
6  is, you know, what products are available
7  and how well they work.
8        Q.    And do some of the surgeries
9  that you've described use polypropylene
10 mesh?
11       A.    Yes.
12       Q.    Is abdominal sacrocolpopexy
13 an example of a surgery that uses
14 polypropylene mesh?
15       A.    Yes.
16       Q.    Is the PROLIFT® an example
17 of transvaginal mesh?
18       A.    It is.
19       Q.    Are there other types of
20 surgeries that rely on the patient's own
21 native tissues?
22       A.    Yes.
23       Q.    Are there surgeries that use
24 different material that -- different

Page 39

1  biologic material that can be used to
2  repair a prolapse?
3        A.    Yes.
4        Q.    Can you give us an example
5  of those biologic materials?
6        A.    Yes.  So there are grafts
7  that we have available to repair pelvic
8  organ prolapse.  Most of them are taken
9  from other animals, those are called
10 xenografts; they come from either pig,
11 which is called porcine graft, or cow,
12 which is called a bovine graft.
13       Q.    Let me stop you there for a
14 minute, Doctor.
15       So you've described that
16 there's polypropylene mesh that can be
17 implanted transvaginally, correct?
18       A.    Right.
19       Q.    And you described native
20 tissue repair surgery, correct?
21       A.    Correct.
22       Q.    And you've described a
23 different type of surgical repair using
24 biologic tissue, for example, from an

Page 40

1  animal?
2        A.    Right.
3        Q.    Did Mrs. Hammons have all
4  three of those types of surgeries over
5  time?
6        A.    She did.
7        Q.    Now, Doctor, do you believe
8  that all surgical procedures carry
9  potential risks along with hope for
10 benefits?
11       A.    Yes.
12       Q.    Is that true in the field of
13 pelvic reconstructive surgery?
14       A.    Yes.
15       Q.    What are some of the
16 potential complications or drawbacks of a
17 surgical repair of a pelvic organ
18 prolapse?
19       A.    So some of the potential
20 complications with repair of pelvic organ
21 prolapse are general to all surgeries.
22 So risks of bleeding, risk of infection,
23 risk of damage to the organs that you're
24 working around.

Page 41

1        There are other potential
2  risks that are inherent to prolapse
3  surgeries, and mostly postop
4  complications, which is failure to cure
5  or recurrence of prolapse.  And if you're
6  using mesh augmentation, there's the risk
7  of mesh erosion or a mesh complication.
8        Q.    Are there -- what are the
9  benefits that a surgeon is trying to
10 accomplish when recommending a surgery
11 for pelvic organ prolapse?
12       A.    The goal of surgery for
13 pelvic organ prolapse is to restore
14 normal anatomy and function.
15       Q.    Now, let's talk about the
16 PROLIFT® in particular.
17       You told the jury already
18 that your experience included 150
19 surgeries implanting the PROLIFT®; is
20 that correct?
21       A.    That's correct.
22       Q.    When you recommended a
23 PROLIFT® for your patients, why did you
24 do so?

11 (Pages 38 to 41)

Joye Lowman, M.D.

Page 42

1      A.    Because I feel that it's a
2  safe and effective procedure.
3      Q.    When you recommended a
4  PROLIFT® for your patients, what goal
5  were you trying to accomplish for your
6  patient?
7      A.    I wanted to restore normal
8  anatomy and function.
9      Q.    And when you recommended the
10  PROLIFT®, did you believe that it was a
11  safe and effective procedure for your
12  patients?
13      A.    I do.  I did.
14      Q.    And in terms of the success
15  of treating a pelvic organ prolapse, has
16  the PROLIFT® been shown to be effective
17  in treating the condition?
18      A.    Yes.
19      Q.    Now, Doctor, you already
20  told the jury about the term
21  "evidence-based medicine."
22          Do you recall saying that
23  earlier in your testimony?
24      A.    I do.

Page 43

1      Q.    Explain to the jury what
2  evidence-based medicine is.
3      A.    Evidence-based medicine is
4  using science to make decisions about how
5  best to impart clinical care.
6      Q.    What is the role of
7  evidence-based medicine in assessing the
8  benefits and risks of surgical options?
9      A.    The role of evidence-based
10  medicine is to guide us, to guide
11  physicians in trying to make decisions
12  about what procedures, medications, et
13  cetera, we're going to offer to our
14  patients.
15          So there's a wealth of
16  literature in our community about the
17  success rates, failure rates,
18  complication rates of various treatment
19  options, whether they be surgical or
20  nonsurgical.
21          We have to have some guide
22  in trying to decide what -- which
23  evidence is strongest.
24      Q.    Is all scientific evidence

Page 44

1  treated equally in evidence-based
2  medicine?
3      A.    It should not be.  That's
4  not -- that's what evidence-based
5  medicine is, not -- figuring out which
6  evidence is strongest, meaning which
7  evidence is most reliable.
8      Q.    So is -- some types of
9  scientific evidence more reliable than
10  others?
11      A.    Yes.
12      Q.    Is there an accepted ranking
13  of reliability when it comes to reviewing
14  scientific evidence when you're trying to
15  answer important medical questions?
16      A.    Yes.
17      Q.    Doctor, we have on the
18  screen here a pyramid.
19          Can you just give the jury
20  an overview of what we're looking at
21  here?
22      A.    Yes.  So this pyramid
23  depicts what we refer to as levels of
24  evidence.  That means that evidence is

Page 45

1  graded in a hierarchal fashion so that at
2  the top of the grading scale are the
3  types of studies that provide us the most
4  reliable evidence, and at the bottom of
5  the scale, or at the bottom of the
6  pyramid, are the types of studies that
7  give us the least reliable evidence.
8      Q.    So if we were looking at
9  this pyramid here, under the principles
10  that you've described, as we go towards
11  the top, are those the more reliable
12  forms of evidence?
13      A.    Yes.
14      Q.    And as we go towards the
15  bottom, are those the less reliable forms
16  of evidence?
17      A.    That's correct.
18      Q.    So, for example, you have at
19  the top something referred to as
20  systematic reviews and meta-analysis?
21      A.    Right.
22      Q.    Can you just, in a few
23  sentences, tell us what that means?
24      A.    Yes.  So systematic reviews

Joye Lowman, M.D.

Page 46

1  and meta-analyses compile the data of
2  smaller studies and evaluate it in total.
3  And it gives you a stronger sense of how
4  the disease process or the intervention
5  is experienced in the population.
6      Q.   Why is that type of
7  scientific evidence more reliable than,
8  say, individual case reports or
9  individual anecdotal experience of
10 physicians?
11     A.   It minimizes bias.
12     Q.   When you were addressing the
13 issues that we asked you to investigate
14 in this case, did you use evidence-based
15 medicine in your analysis?
16     A.   I did.
17     Q.   Did you review the opinions
18 of Drs. Elliott, Weber and Zipper?
19     A.   I did.
20     Q.   Did you see any indication
21 that any of them used evidence-based
22 medicine in the opinions they offered the
23 jury?
24     A.   No, they didn't.

Page 47

1      Q.   Doctor, I want to now turn
2  to some of the specific opinions you have
3  on the PROLIFT® product, okay?
4      A.   Okay.
5      Q.   The first question I want to
6  address is the -- what does the
7  scientific evidence show on the
8  effectiveness of PROLIFT® to treat pelvic
9  organ prolapse, okay?
10     A.   Okay.
11     Q.   Doctor, did you form an
12 opinion, as part of your work in this
13 case, as to the effectiveness of the
14 PROLIFT® to treat pelvic organ prolapse?
15     A.   I did.
16     Q.   What did you consider to
17 form your opinions in this case?
18     A.   I considered the scientific
19 evidence and my clinical experience.
20     Q.   What is the opinion -- what
21 is your opinion, Doctor, as to what that
22 evidence shows about the effectiveness of
23 the PROLIFT® to treat prolapse?
24     A.   It's very effective.

Page 48

1      Q.   You indicated, Doctor, that
2  you, as part of your work in this case,
3  followed the pyramid of reliability, if I
4  can call it that?
5      A.   Yes.
6      Q.   Did you consider the highest
7  quality data in answering the question
8  that you've presented to the jury today?
9      A.   I did.
10     Q.   Now, what I have up on the
11 screen, Doctor, is this an example of
12 some of the data that you considered in
13 this case?
14     A.   This is.
15     Q.   Now, let's sort of orient
16 the jury to what we're looking at here.
17          It's called a Cochrane
18 review?
19     A.   That's correct.
20     Q.   What is a Cochrane review?
21     A.   So when we were looking at
22 the levels of evidence, at the very top
23 of the pyramid is a meta-analysis, or a
24 summary of well designed randomized

Page 49

1  control trials.
2          The Cochrane review of 2013
3  is exactly that.  It's an evaluation of
4  all of the randomized controlled trials,
5  up until that date, of pelvic organ
6  prolapse.
7      Q.   And this particular analysis
8  here is looking at the success of native
9  tissue versus mesh repair?
10     A.   That's correct.
11     Q.   And so does this look at
12 multiple polypropylene mesh products for
13 treatment of a bladder prolapse?
14     A.   It does.
15     Q.   And there's some medical
16 terminology in the middle there, anterior
17 colporrhaphy?
18     A.   Colporrhaphy.
19     Q.   Is that a native tissue
20 surgery?
21     A.   That's a native tissue
22 surgery.
23     Q.   And it says, versus, and
24 then it describes these transobturator

13 (Pages 46 to 49)

Joye Lowman, M.D.

Page 50

1    polypropylene mesh kits; is that correct?
2         A.    That's correct.
3         Q.    And so would PROLIFT® be an
4    example of one of those mesh kits?
5         A.    Yes.
6         Q.    So let's look at what the
7    data is that you considered.
8              So can you tell the jury,
9    sort of orient us as to what we're
10   looking at here and how that was
11   significant, if at all, to the opinions
12   you offer to the jury?
13        A.    Yes.  So what this depicts
14   is that the analysis revealed that the
15   risk ratio of success is much higher with
16   mesh augmentation than it is if you
17   perform the procedure using native
18   tissue.
19             So a risk ratio is how much
20   more likely is the outcome, the outcome
21   being success.  So a risk ratio of 3.83
22   shows you that it's almost four times
23   more likely to achieve success with mesh
24   than without mesh.  And this study

Page 51

1    included 56 randomized control trials and
2    over 6,000 patients.
3         Q.    When you say -- withdrawn.
4              The jury has heard about
5    this concept of statistical significance
6    through another witness.
7              Was this finding that you're
8    reporting here or that you relied upon
9    statistically significant?
10        A.    Overwhelmingly, yes.
11        Q.    And so the jury has heard
12   about different ways that researchers can
13   measure success with a surgical repair of
14   prolapse.
15        A.    Okay.
16        Q.    We've heard about anatomic
17   measures and symptomatic measures.
18        A.    Right.
19        Q.    Are you familiar with those
20   concepts as well?
21        A.    I am.
22        Q.    Can you remind us, Doctor,
23   what is an anatomical measure of success
24   following surgery?

Page 52

1         A.    So an anatomical measure of
2    success is when I do my physical
3    examination of the patient, do they still
4    have prolapse or not?
5              Now, you can quantify that
6    with the pelvic organ prolapse
7    quantification exam or with the BARD
8    system, but it basically is that.
9              Subjective evaluation is,
10   does the patient feel that they're
11   improved?
12        Q.    And the success measure that
13   you're reporting here, the four times
14   greater success with mesh compared to
15   native tissue, what success measure are
16   you using with this data?
17        A.    Anatomic success.
18        Q.    Do you believe that is an
19   appropriate way to assess the success of
20   surgeries?
21        A.    I do.
22        Q.    And why is that?
23        A.    Because the goal of surgery
24   is to restore normal anatomy and

Page 53

1    function.  The only way to objectively
2    evaluate whether or not you restore
3    normal anatomy is with the POP-Q or the
4    BARD halfway system.
5         Q.    The data that you relied
6    upon to arrive at your opinion about the
7    effectiveness of PROLIFT®, the ones that
8    we're showing the jury now on the screen,
9    do those -- does that data actually
10   include studies on the PROLIFT®?
11        A.    Yes, it does.
12        Q.    You mentioned that there was
13   an alternative measure of success, the
14   symptomatic outcomes; is that correct?
15        A.    That's correct.
16        Q.    Has the PROLIFT® been
17   studied in clinical trials to assess
18   whether the PROLIFT® improved symptomatic
19   outcomes as well?
20        A.    It does -- or it has been.
21        Q.    And can you tell the jury
22   what the results of that research is?
23        A.    It improves symptomatic
24   success as well.

14 (Pages 50 to 53)

Joye Lowman, M.D.

Page 54

1      Q.    So, Doctor, based on the
2   information that you have reviewed with
3   the jury -- by the way, the studies that
4   you've described, do you find them
5   reliable?
6      A.    Yes.
7      Q.    And do you find them
8   authoritative?
9      A.    Absolutely.
10     Q.    Based on the information you
11  reviewed with the jury and your own
12  clinical experience, do you have an
13  opinion as to whether or not the PROLIFT®
14  is effective in improving patient's
15  quality of life?
16     A.    It is.
17     Q.    And as to the question of
18  whether a PROLIFT®, how it compares to
19  native tissue surgery, do you have an
20  opinion as to how effective PROLIFT® is
21  in treating the prolapse itself compared
22  to a native tissue surgery?
23     A.    It's significantly more
24  effective.

Page 55

1      Q.    And is that for the reasons
2   you've discussed with the jury already
3   today?
4      A.    Yes.
5      Q.    Have there been data that
6   have examined the issue of dyspareunia
7   following surgery for pelvic organ
8   prolapse?
9      A.    There has been.
10     Q.    Now, Doctor, dyspareunia,
11  first of all, remind everyone,
12  dyspareunia, does that mean painful
13  sexual intercourse?
14     A.    It does.
15     Q.    Is dyspareunia a potential
16  complication of any surgery to treat
17  pelvic organ prolapse?
18     A.    It is.
19     Q.    And why is that?
20     A.    One reason is that the
21  incidence of dyspareunia in the patient
22  population that we're treating is high to
23  begin with, before they ever have
24  surgery.

Page 56

1               Secondly, we're operating in
2   the vaginal compartment, which is the
3   female sexual organ.  Whenever you make
4   an incision on any part of the body,
5   there's a risk that the patient may
6   develop pain in the area of that
7   incision.
8      Q.    So is that true with
9   surgeries that use mesh?
10     A.    Yes, it is.
11     Q.    Is that true with surgeries
12  that don't use mesh?
13     A.    Yes, it is.
14     Q.    Have there been studies that
15  have compared the risk of dyspareunia
16  with the PROLIFT® to procedures that
17  don't use mesh?
18     A.    There are.
19     Q.    Did you consider that
20  research in forming your opinions that
21  you're going to offer to the jury in this
22  case?
23     A.    Yes.
24     Q.    And as part of your work in

Page 57

1   this case, Doctor, have you formed an
2   opinion as to how PROLIFT® compares to,
3   say, native tissue surgery on this
4   question of the risk of dyspareunia?
5      A.    I have.
6      Q.    And what is your opinion?
7      A.    They're no different.
8      Q.    What do you base that
9   opinion on?
10     A.    The study that we just
11  talked about, the Cochrane review, is the
12  strongest level of evidence; but there
13  are several studies that show that.
14     Q.    And so, again, as to the
15  methodology you followed in this case,
16  did you use the principles of
17  evidence-based medicine that you've
18  described for the jury already?
19     A.    I have.
20     Q.    Okay.  Doctor, do we have up
21  on the screen some of the evidence you
22  considered on this question of the risk
23  of dyspareunia with PROLIFT® compared to
24  native tissue surgery?

15 (Pages 54 to 57)

Joye Lowman, M.D.

Page 58

```
1        A.   It does.
2        Q.   You mentioned, for example,
3   the Cochrane review.
4             Is that this study that I
5   have highlighted here on the screen?
6        A.   It is.
7        Q.   Now, what does the data
8   show, Doctor, in terms of the risk of
9   developing painful sexual intercourse
10  following a PROLIFT® compared to native
11  tissue surgery?
12       A.   That it's not significantly
13  different.
14       Q.   Okay.  So let's -- by the
15  way, all these studies that are
16  referenced here, did you review them?
17       A.   I did.
18       Q.   Do you find them reliable?
19       A.   I do.  They are randomized
20  control trials.
21       Q.   Did you find them
22  authoritative on to this question, as to
23  this question?
24       A.   Yes, yes.
```

Page 59

```
1        Q.   Now, there's this term here
2   we have up at the top, de novo
3   dyspareunia.
4        A.   Yes.
5        Q.   Can you tell us what that
6   means?
7        A.   That means new onset
8   dyspareunia, meaning that they didn't
9   have pain or they didn't have dyspareunia
10  before surgery.
11       MR. SLATER:  Do you have
12       copies of what you're using that
13       you can give to us?  All the
14       different slides you've used so
15       far.
16       MR. ISMAIL:  Yes.  My
17       apologies.  One moment, Doctor.
18  BY MR. ISMAIL:
19       Q.   Now, Doctor, why is it
20  important to consider new onset
21  dyspareunia when doing studies on this
22  patient population?
23       A.   Because you're trying to
24  assess whether or not the procedure
```

Page 60

```
1   itself caused the dyspareunia.
2        Q.   You mentioned that one of
3   the things that's part of this patient
4   population is that there's just a high
5   incidence in general of dyspareunia?
6        A.   That's correct.
7        Q.   What do you mean by that?
8        A.   What I mean is that the
9   patient population that we are treating
10  consists of women that have female pelvic
11  floor dysfunction.  And many of those
12  women are in the menopausal age group.
13  That age group is a high-risk group or a
14  high-incidence group, high prevalence is
15  the appropriate word, in terms of
16  dyspareunia.  There's a lot of
17  dyspareunia in that group of patients.
18       Q.   Are there a lot of different
19  factors that can lead a woman to have
20  problems with painful sexual activity?
21       A.   Yes.
22       Q.   Are those conditions common
23  in the patient population who also have
24  pelvic organ prolapse?
```

Page 61

```
1        A.   Yes.
2        Q.   Doctor, based on the
3   scientific data that you have reviewed
4   and have presented to the jury, do you
5   have an opinion as to how PROLIFT®
6   compares to native tissue surgery as to
7   the risk of developing dyspareunia
8   following the surgery?
9        A.   They are not significantly
10  different.
11       Q.   And is that reflected here
12  in this chart that we're showing to the
13  jury now?
14       A.   Yes.
15       Q.   And so we have on this
16  column, do we put in the various
17  percentages of de novo dyspareunia or at
18  least postoperative dyspareunia with the
19  various studies that are reflected here?
20       A.   Yes.
21       Q.   And there may be some
22  numerical differences between the two
23  groups?
24       A.   Yes.
```

16 (Pages 58 to 61)

Joye Lowman, M.D.

Page 62

1      Q.    Do researchers have a way to
2  assess whether those differences are
3  likely real or just potentially due to
4  chance?
5      A.    Yes.
6      Q.    And what is, just in
7  general, that concept in clinical
8  research called?
9      A.    It's called power.
10      Q.    And do you use those
11  concepts to determine whether a
12  difference is statistically significant?
13      A.    Yes.
14      Q.    And have you marked here on
15  this chart whether the observations in
16  any of these studies show any significant
17  difference between PROLIFT® mesh and
18  native tissue surgery?
19      A.    There's -- yes, there's no
20  difference.
21      Q.    Now, Doctor, have you,
22  yourself, done research in this
23  particular area?
24      A.    I have.

Page 63

1      Q.    And can you generally
2  describe, in a few sentences, the study
3  that you did that contributed to this
4  research?
5      A.    I performed a study, when I
6  was a fellow, evaluating the rate of de
7  novo dyspareunia after PROLIFT®
8  procedures.
9         One of the main goals was to
10  come up with an incidence for de novo
11  dyspareunia, but also we really wanted to
12  evaluate, in more detail, the type of
13  dyspareunia that was being experienced by
14  this group of patients, how mild it was,
15  whether it was severe, whether it was
16  moderate, where they were experiencing
17  the dyspareunia.
18         And then I also wanted to
19  know, is the dyspareunia so significant
20  that you would not have had this
21  procedure done.
22      Q.    Did you publish your data?
23      A.    I did.
24      Q.    In the peer-reviewed

Page 64

1  literature?
2      A.    Yes, I did.
3      Q.    Did you also present your
4  data at a medical conference?
5      A.    I did.
6      Q.    Dr. Weber was here last
7  week, I believe, and told the jury that
8  your study showed a rate of dyspareunia
9  with the PROLIFT® in excess of 30
10  percent.
11         Is Dr. Weber correct?
12      A.    She's not.
13      Q.    Why not?
14      A.    Because the -- my study
15  showed a rate of de novo dyspareunia of
16  16.7 percent.
17      Q.    You said that you also, as
18  part of your study, examined the question
19  of whether patients ultimately were
20  satisfied with their procedure even if
21  they developed dyspareunia?
22      A.    That's correct.
23      Q.    And what did your research
24  show as to that question?

Page 65

1      A.    It showed that they were
2  very satisfied, as indexed by the answer
3  to the question, would you have this
4  procedure performed again, over 85
5  percent of the patients with de novo
6  dyspareunia answered yes.  Over 90 -- I
7  think it was 96 or 97 percent of the
8  group overall answered yes.
9      Q.    And what does that tell you,
10  Doctor, as a clinical researcher, as to
11  the risks and benefits of a PROLIFT®
12  procedure to treat a woman's pelvic organ
13  prolapse?
14      A.    The risks are overall low
15  and the benefits are overall high.
16      Q.    Doctor, based on the
17  high-quality scientific data you
18  reviewed, your personal experience
19  implanting a PROLIFT®, do you have an
20  opinion as to whether the PROLIFT® was a
21  safe and effective option to treat Mrs.
22  Hammons' PROLIFT® -- prolapse in May of
23  2009?
24      A.    I do.

17 (Pages 62 to 65)

Joye Lowman, M.D.

Page 66

1    Q.    And can you tell the members
2  of the jury what your opinion is?
3    A.    My opinion is that the
4  PROLIFT® was a safe and effective
5  procedure to offer Mrs. Hammons.
6    Q.    And do you -- new question.
7        Can you tell the members of
8  the jury what you are relying upon for
9  that opinion?
10    A.    I am relying on the highest
11  levels of evidence and my clinical
12  experience.
13    Q.    In your opinion, Doctor, did
14  the benefits of the PROLIFT® procedure
15  outweigh its potential risks to a patient
16  such as Mrs. Hammons?
17    A.    Yes.
18    Q.    In your opinion, was the
19  PROLIFT® a defective product in any way?
20    A.    No.
21    Q.    Doctor, I want to switch
22  gears here.
23        MR. SLATER:  Counsel, just
24  for the record, we object to this

Page 67

1        document, since there's absolutely
2        no evidence in the record that Dr.
3        Baker saw it.  Moreover, it was
4        not even available to be given to
5        him during his training because
6        it's approved in 2007.  He was
7        trained in 2006.  So without any
8        testimony -- any evidence
9        whatsoever that he would have seen
10        it, we believe it to be irrelevant
11        and potentially confusing and
12        misleading.
13  BY MR. ISMAIL:
14    Q.    Doctor, we've handed you
15  Exhibit -- Defense Exhibit-24240.
16        Are you familiar with this
17  document?
18    A.    I am.
19    Q.    Can you tell us what it is?
20    A.    It's the surgeon's resource
21  monograph dealing with the PROLIFT®.
22    Q.    And just in general terms,
23  what is a surgeon's resource monograph?
24    A.    It's basically a resource

Page 68

1  for physicians that allows them to review
2  information that Gynecare provides to
3  them about this procedure.
4    Q.    Can these documents, these
5  resource monographs, an example of which
6  looking at now, be a source of
7  information for physicians about the
8  risks and benefits of a product?
9    A.    Yes.
10    Q.    Does the resource monograph
11  here for the PROLIFT® include information
12  about the surgical technique?
13    A.    It does.
14    Q.    Does it include information
15  about the potential risks and
16  complications of the procedure?
17    A.    It does.
18    Q.    Do all surgical products
19  have a monograph like the one we're
20  showing right now?
21    A.    Not that I'm aware of.
22    Q.    Is a device manufacturer the
23  only source of information for surgeons
24  who are using that medical device?

Page 69

1    A.    No.
2    Q.    What else does a surgeon, in
3  your experience, look to, to understand
4  the risks and benefits of a surgical
5  procedure they are performing?
6    A.    First of all, we should be
7  evaluating the medical literature
8  primarily; our clinical experience; our
9  training.
10        We often go to what's called
11  continuing medical education courses.  So
12  when we go to national meetings, there
13  are lectures and such that teach us about
14  products like these.
15    Q.    Doctor, I'm going to ask
16  that you turn to Page 7 of the monograph.
17  Actually, it's Page 6 of the monograph.
18        Let me know when you're
19  there.
20    A.    I'm there.
21    Q.    There's a section called,
22  Concomitant Procedures.
23        Do you see where I am?
24    A.    I do.

Joye Lowman, M.D.

Page 70

1        Q.    And I want to review some of
2  this information that is reflected here.
3        A.    Okay.
4        Q.    First of all, the word
5  "concomitant," what does that mean?
6        A.    That means at the same time.
7        Q.    And then let's review this
8  first sentence.
9              Can you read to the jury
10  what I'm highlighting on the screen now?
11        A.    It is unclear what
12  percentage of Gynecare PROLIFT® system
13  procedures involve both compartments, but
14  it is common to utilize Gynecare PROLIFT®
15  system in the most at-risk compartment
16  and treat the other side with a
17  traditional repair or leave it untreated
18  in the absence of prolapse.
19        Q.    So there's a lot there.
20  Let's go over it so we can discuss to the
21  jury what's being communicated here.
22        A.    Okay.
23        Q.    So when the surgeon's
24  monograph talks about there are -- that

Page 71

1  it's common to use the PROLIFT® system in
2  the most at-risk compartment --
3              MR. SLATER:  By the way, we
4        have an objection to this document
5        also as a hearsay document.
6              MR. ISMAIL:  Start over.
7  BY MR. ISMAIL:
8        Q.    When the surgeon's monograph
9  communicates that the PROLIFT® system
10  is most commonly used at the most at-risk
11  compartment, what does that mean?
12        A.    It means that when we are
13  trying to decide how to treat each
14  compartment, we're considering the
15  prognosis, if you will.  Prognosis means
16  how likely is this compartment to fail.
17              So if a patient is
18  presenting with an advanced stage of
19  prolapse in one compartment and a minor
20  stage of prolapse in the other
21  compartment, those compartments are at
22  risks that are differential.  So we often
23  will use more aggressive treatment to
24  treat the most at-risk compartment and

Page 72

1  less aggressive a treatment in the lesser
2  compartment.
3        Q.    So -- and, again, in your
4  answer here when you're saying -- using
5  the word "compartment," are you
6  describing, basically, different organ
7  prolapse?
8        A.    I'm describing the front
9  vaginal wall versus the back vaginal wall
10  versus the top of the vagina.
11        Q.    And so when the monograph
12  describes using a PROLIFT® in the most
13  at-risk compartment and the surgeon can
14  decide whether to treat any other
15  prolapse the patient is presenting with a
16  different type of repair or leave it
17  untreated, does the monograph go on to
18  describe some things that the surgeon
19  should consider in making that decision?
20        A.    It does.
21        Q.    And is that provided in the
22  very next sentence?
23        A.    It is.
24        Q.    So does the next sentence

Page 73

1  read, The advantage of this approach is
2  to reduce the mesh load and to avoid over
3  treatment?
4        A.    It does.
5        Q.    And then does it go on to
6  say, The disadvantage is that it's
7  estimated that 30 percent of all
8  recurrences are actually uncovering of
9  occult defects in the side untreated with
10  mesh may be prone to failure as it takes
11  a greater percentage of the Valsalva
12  forces over time?
13        A.    That's correct.
14        Q.    There's a lot of new terms
15  in there, so let's take it one at a time.
16        A.    Okay.
17        Q.    First of all, Valsalva
18  forces.
19              What are those?
20        A.    Valsalva is the act of
21  bearing down.  So we consider Valsalva to
22  be, you know, pushing down like in the
23  process of having a bowel movement,
24  coughing.  That's what that describes.

Joye Lowman, M.D.

Page 74

1    Q.   And then the monograph
2 describes uncovering of occult defects.
3        What does that mean?
4    A.   That means that there are
5 defects that relate to pelvic floor
6 dysfunction that may not have manifested
7 at the time that you're evaluating and
8 treating the patient.
9        So it's describing the fact
10 that whatever has led the patient to have
11 the prolapse that is large is also
12 affecting the other compartments and may
13 eventually lead to those compartments
14 developing prolapse as well.
15    Q.   So, overall, what is this
16 information telling surgeons to consider
17 when faced with a patient who has
18 prolapse of multiple organs?
19    A.   What they are saying is that
20 you should consider treating less
21 aggressively compartments that are less
22 severely affected by prolapse. However,
23 you have to also recognize that there's a
24 risk of developing prolapse in those

Page 75

1 compartments if you leave them untreated.
2    Q.   In that example that you
3 provided there, is the PROLIFT® causing a
4 prolapse in the untreated compartment?
5    A.   No.  That whole scenario
6 would hold true regardless of whether or
7 not you're treating the anterior
8 compartment with or without mesh.
9    Q.   What do you mean by that?
10    A.   What I mean is that this --
11 what they're describing is the scenario
12 regardless of whether or not you use mesh
13 to treat -- in treatment or not.
14        So if I were planning on
15 taking a patient to the operating room
16 for native tissue repair and I opt to
17 support her apex, or the top of the
18 vagina, because that is the most
19 prominent prolapse and to not address her
20 front vaginal wall or her back vaginal
21 wall, she's at risk for failure in her
22 front vaginal wall and back vaginal wall
23 because I opted not to treat them.
24    Q.   And if that patient

Page 76

1 subsequently developed a prolapse of the
2 front or back vaginal wall, did the
3 native tissue surgery cause that
4 prolapse?
5    A.   No.
6    Q.   In the example of a
7 PROLIFT®, where the surgeon opts to treat
8 only one part or one compartment and the
9 patient develops a prolapse in another
10 compartment, did the prolapse -- PROLIFT®
11 cause the subsequent prolapse?
12    A.   No.
13    Q.   Doctor, you indicated that
14 the surgeon's monograph provides some
15 information on potential complications
16 with the PROLIFT® procedure; is that
17 correct?
18    A.   Yes.
19    Q.   So if we go forward to Page
20 7, is there a list of potential
21 complications that is reflected here?
22    A.   Yes.
23    Q.   And does -- in the pages
24 that follow, the surgeon's monograph

Page 77

1 provide more information on various of
2 these topics?
3    A.   Yes.
4    Q.   Let's go ahead and show some
5 of that for the ladies and gentlemen of
6 the jury.
7        On the next page, is there a
8 section that's entitled, Mesh
9 Complications, Erosion, Exposure and
10 Extrusion?
11    A.   That's correct.
12    Q.   Now, the jury has heard
13 these terms in the past.
14        Are erosion, exposure and
15 extrusion known complications of any mesh
16 procedure?
17        MR. SLATER:  Objection.
18        THE WITNESS:  Yes.
19 BY MR. ISMAIL:
20    Q.   What is mesh erosion?
21    A.   Well, that definition has
22 changed over time.  When we first started
23 discussing mesh complications, mesh
24 erosion meant an exposure of the mesh in

Joye Lowman, M.D.

Page 78

1  the vagina.
2          There has been some -- we've
3  had debate in our community about how to
4  define mesh complications.  And now mesh
5  erosion is often considered a migration
6  of the mesh into a visceral organ.
7          Q.    Such as the bladder?
8          A.    Such as the bladder.
9          Q.    And then an exposure and an
10 extrusion?
11         A.    An exposure now means what
12 we used to call mesh erosion, which is an
13 exposure of the mesh in the vagina.
14         And extrusion is a large
15 exposure of the mesh in the vagina or a
16 wound dehiscence.
17         Q.    Do you have -- when you say
18 "wound dehiscence," what does that mean?
19         A.    That means that it appears
20 that the incision failed to heal.
21         Q.    Do you have an opinion,
22 Doctor, as to whether the potential
23 complications of mesh erosion, exposure,
24 and extrusion are well known in the

Page 79

1  surgical community that operates on a
2  pelvic organ prolapse?
3          A.    They are very well known.
4          Q.    And what do you base that
5  on?
6          A.    Our meetings, the
7  literature.  I mean, it's constantly
8  discussed.
9          Q.    Have you reviewed this
10 information here in this page and the
11 page that follows that Ethicon provided
12 on these potential complications of mesh
13 erosion, exposure, and extrusion?
14         A.    Yes.
15         Q.    And have you formed an
16 opinion, Doctor, as to whether this
17 information adequately describes these
18 potential complications for surgeons
19 using the product?
20         A.    Yes.
21         Q.    And what is your opinion?
22         A.    I feel that it was
23 comprehensive and representative.
24         Q.    Going forward, Doctor, there

Page 80

1  is a section on dyspareunia and vaginal
2  pain.
3          And if we actually go
4  forward, that information continues on
5  the next page; is that correct?
6          A.    Yes.
7          Q.    Now, do you have an opinion,
8  Doctor, as to whether, even without the
9  surgeon's monograph, whether the risk of
10 painful sexual intercourse following a
11 PROLIFT® procedure was well known in the
12 community of surgeons who are doing
13 pelvic reconstructive surgery?
14         A.    It's well known.
15         Q.    And what do you base that
16 on?
17         A.    I base that on my clinical
18 experience.  The literature constantly
19 talks about -- or consistently talks
20 about that being a potential risk with
21 any surgery.
22         Q.    Have you reviewed the
23 information that Ethicon included in this
24 monograph as to the potential

Page 81

1  complication of dyspareunia and vaginal
2  pain?
3          MR. SLATER:  I just want to
4          make it clear, we renew the
5          objection to the testimony of a
6          document that Dr. Baker never saw,
7          as far as the record exists, and
8          generalized testimony about what
9          other doctors may or may not have
10         seen or known where, as what's
11         relevant, most relevant here is
12         whether Dr. Baker knew these
13         things.
14         MR. ISMAIL:  I'll re-ask my
15         question.
16         THE WITNESS:  Okay.
17 BY MR. ISMAIL:
18         Q.    Have you reviewed the
19 information that Ethicon included in this
20 monograph as to the potential
21 complication of dyspareunia and vaginal
22 pain?
23         A.    Yes.
24         Q.    Have you formed an opinion

21 (Pages 78 to 81)

Joye Lowman, M.D.

Page 82

1   as to whether this information adequately
2   describes this potential complication of
3   dyspareunia to surgeons using the
4   PROLIFT®?
5        A.   Yes, I did.
6        Q.   And what is your opinion?
7        A.   My opinion is that it's
8   comprehensive and reliable.
9        Q.   Is the information that
10  Ethicon provided here consistent with how
11  the potential complication of dyspareunia
12  is described in the medical literature?
13       A.   It is.
14       Q.   So, Doctor, we've just
15  walked through one example of the type of
16  information that was available to
17  surgeons in this time frame about the
18  potential complications of the PROLIFT®;
19  is that correct?
20       A.   Yes.
21       Q.   And I think you indicated
22  that pelvic floor surgeons have access to
23  other information --
24       A.   Certainly.

Page 83

1        Q.   -- that can provide data or
2   descriptions of potential complications?
3        A.   Yes.
4        Q.   So when we consider the
5   group of physicians who would be
6   implanting the PROLIFT®, do you have an
7   opinion, Doctor, as to whether the
8   information provided by Ethicon overall
9   adequately described the potential
10  complications of the procedure?
11       A.   It did.
12       Q.   And just for the benefit of
13  the record, I think I asked you whether
14  you had an opinion as to whether or not
15  the information provided by Ethicon
16  overall adequately described the
17  potential complications of the procedure.
18       Do you have an opinion on
19  that issue?
20       A.   Yes, I do.
21       Q.   And can you tell the members
22  of the jury what your opinion is?
23       A.   My opinion is that Ethicon's
24  educational materials adequately

Page 84

1   describes the potential risks associated
2   with the PROLIFT®.
3        Q.   Dr. Lowman, I now want to
4   turn to Mrs. Hammons in particular, okay?
5        MR. SLATER:  One second. I
6   just want to make one thing clear.
7   Form objections you wanted me to
8   make.  Other objections are
9   preserved?
10       MR. ISMAIL:  Such as?
11       MR. SLATER:  Other
12  objections, relevancy, whether or
13  not it fits the case.
14       MR. ISMAIL:  You have been.
15       MR. SLATER:  We have been,
16  right.
17       MR. ISMAIL:  So you have
18  been making them.
19       MR. SLATER:  Well, I've made
20  a few because I wanted you to have
21  the benefit of knowing what I was
22  going to object to on other
23  things. I have other objections.
24  For example, we don't think Dr.

Page 85

1   Lowman is qualified to give
2   warnings opinions, and we believe
3   her opinions are not opinions
4   based on deposition testimony.
5        MR. ISMAIL:  I appreciate
6   that.
7        MR. SLATER:  Also, just for
8   the record, her answers are
9   overbroad and ambiguous as to what
10  she's actually talking about.  You
11  have her generalizing about
12  whether they gave information.  We
13  don't think that's adequate, and
14  we think that should be precluded
15  at trial.
16       MR. ISMAIL:  Are you ready
17  to proceed, Doctor?
18       THE WITNESS:  Yes.
19  BY MR. ISMAIL:
20       Q.   So to address Mr. Slater's
21  concerns, let's return to the topic we
22  were just discussing.
23       A.   Okay.
24       Q.   Dr. Lowman, have you been

22 (Pages 82 to 85)

Joye Lowman, M.D.

Page 86

1  part of the surgical community that has
2  treated women with pelvic organ prolapse
3  for over a decade?
4        A.   I have.
5        Q.   Have you attended scientific
6  conferences with other surgeons who treat
7  women with pelvic organ prolapse?
8        A.   I have.
9        Q.   Have you gone to scientific
10 meetings and discussed with colleagues
11 the surgical options to treat pelvic
12 organ prolapse?
13       A.   I have.
14       Q.   Have you engaged in clinical
15 research that has caused you to interact
16 with other surgeons on the surgical
17 options to treat prolapse?
18       A.   Yes.
19       Q.   Have you reviewed the
20 scientific literature that discusses the
21 information that's out there in the
22 community on the risks and benefits of
23 surgeries to treat prolapse?
24       A.   Yes.

Page 87

1        Q.   Through your exposure that
2  you've just described for the jury, do
3  you have an understanding of the type of
4  information that is available to surgeons
5  overall to inform them about the risks
6  and benefits of surgical procedures?
7        A.   Yes.
8        Q.   Have you considered the
9  information put out by Ethicon at various
10 points in time about the PROLIFT® device
11 in particular?
12       A.   I have.
13       Q.   Does that include the
14 surgeon's monograph that we looked at?
15       A.   Yes.
16       Q.   Did you look at the
17 instructions for use?
18       A.   Yes.
19       Q.   Did you look at the patient
20 brochure?
21       A.   Yes.
22       Q.   Based on your clinical
23 experience and your activity as a
24 clinician and researcher in this field,

Page 88

1  do you have a basis, Doctor, to testify
2  to what the information that was
3  available to surgeons overall on the
4  risks and benefits of the PROLIFT®?
5              MR. SLATER:  Same objection
6        as before.  And form of the
7        question.
8              THE WITNESS:  You're asking
9        me about my expertise and am I
10       qualified to give opinions in this
11       case?
12 BY MR. ISMAIL:
13       Q.   Let me rephrase.
14            Doctor, based on the
15 activities you've described for the
16 members of the jury that you've engaged
17 in, both as a clinical researcher and
18 surgeon, have you formed opinions as to
19 the type of information that was
20 available to surgeons who were operating
21 on women with pelvic organ prolapse?
22       A.   Yes.
23       Q.   Did you, as part of your
24 work in this case, consider whether the

Page 89

1  information put forth by Ethicon, given
2  the target audience of physicians who
3  would be using this product, whether that
4  information adequately described the
5  potential complications of the procedure?
6              MR. SLATER:  Same objection.
7              THE WITNESS:  Yes.
8  BY MR. ISMAIL:
9        Q.   What -- and can you tell the
10 members of the jury what your opinion is
11 on that issue?
12       A.   My opinion is that Ethicon
13 provided adequate educational materials
14 in discussing the potential risks and
15 benefits of their -- of the PROLIFT®.
16       Q.   Now, let's turn to Mrs.
17 Hammons in particular, okay?
18       A.   Okay.
19       Q.   Did you review Mrs. Hammons'
20 medical records to arrive at your
21 opinions in this case?
22       A.   I did.
23       Q.   And did you consider the
24 sworn testimony of both her and her

23 (Pages 86 to 89)

Joye Lowman, M.D.

Page 90

1  doctors?
2     A.   Yes.
3     Q.   Now, I want to start with
4  this question of whether the PROLIFT® was
5  an appropriate surgical option for Mrs.
6  Hammons when she saw Dr. Baker in May of
7  2009, okay?
8     A.   Okay.
9     Q.   Dr. Lowman, have you formed
10  an opinion as to whether Mrs. Hammons was
11  an appropriate candidate for surgery --
12  surgical repair of her prolapse in 2009?
13     A.   I have.
14     Q.   And what was your opinion?
15     A.   I feel that she was an
16  appropriate candidate for treatment of
17  her prolapse with the PROLIFT®.
18     Q.   Why do you -- why did you
19  arrive at that opinion?
20     A.   Because the PROLIFT® -- the
21  PROLIFT® has been shown to be
22  significantly more successful than
23  traditional repair, in particular in the
24  anterior compartment, which is where her

Page 91

1  stage IV prolapse was.
2        Number two, she's at
3  significant risk for recurrence of her
4  prolapse because of her young age,
5  because of her multicompartment prolapse,
6  because of her significant exposures, in
7  terms of the fact that she -- her job
8  required lifting, the fact that she was a
9  two- to three-pack-per-day smoker.  She
10  had multiple risk factors for recurrence.
11        And so she was a high-risk
12  patient and the PROLIFT® is indicated in
13  treating high risk patients.
14     Q.   Prior to May of 2009, did
15  Mrs. Hammons try more conservative
16  treatments of her prolapse?
17     A.   She did.
18     Q.   And what was that more
19  conservative treatment she described?
20     A.   She used a pessary.
21     Q.   And what was Mrs. Hammons'
22  experience with the pessary that she
23  attempted before 2009?
24     A.   It was so uncomfortable for

Page 92

1  her that she ended up in the emergency
2  room to have it removed.
3     Q.   And you described that one
4  of the reasons why a surgical repair of
5  the prolapse -- the prolapse was
6  appropriate in Mrs. Hammons' case, did
7  that include the severity of the
8  condition that she presented with?
9     A.   Yes.
10     Q.   Dr. Lowman, I'm handing you
11  what has been marked as Defense Exhibit
12  10003.56.
13        Are you familiar with this
14  medical record?
15     A.   I am.
16     Q.   Can you tell the jury what
17  this is?
18     A.   This is the operative report
19  from Dr. Baker's procedure.
20     Q.   Let's take a look at what's
21  reflected here.
22     A.   Okay.
23     Q.   First of all, the -- the
24  date is what?

Page 93

1     A.   May 5th, 2009.
2     Q.   And what was Dr. Baker's
3  postoperative diagnosis on this date?
4     A.   Uterine prolapse and
5  cystocele.
6     Q.   When you described earlier
7  that Mrs. Hammons -- one of the reasons
8  why you thought surgery was appropriate
9  was because she had multicompartment
10  failure; is that correct?
11     A.   Yes.  Multicompartment
12  prolapse.
13     Q.   Multicompartment prolapse.
14        Is that documented in Dr.
15  Baker's operative note?
16     A.   Yes.
17     Q.   And what were the various
18  compartments that were noted as being in
19  prolapse at this point?
20     A.   Her apical compartment,
21  which is the top of the vagina; and the
22  anterior compartment, which is the front,
23  if that makes sense.
24     Q.   Did Dr. Baker, as part of

Joye Lowman, M.D.

Page 94

1  his operative findings, note any
2  additional evidence of prolapse in Mrs.
3  Hammons' case?
4      A.   He did.
5      Q.   And can you tell, direct me
6  to where that's reflected here?
7      A.   When he dictates his
8  findings, he dictates that the vaginal --
9  vagina had a grade 4 cystocele and a
10  minimal rectocele.
11      Q.   Would that be yet another
12  prolapse that Mrs. Hammons presented with
13  on this date?
14      A.   Yes.
15      Q.   Now, you told us a moment
16  ago that Mrs. Hammons had a grade 4
17  cystocele; is that correct?
18      A.   That's correct.
19      Q.   Where does a grade 4 fall on
20  the grading scale of severity of a
21  bladder prolapse like Mrs. Hammons had?
22      A.   It's the most severe.
23      Q.   Are you aware that Dr.
24  Zipper told the jury that Mrs. Hammons,

Page 95

1  in fact, had a Grade 2 prolapse on this
2  date?
3      A.   I am.
4      Q.   Is Dr. Zipper correct?
5      A.   No.
6      Q.   Why not?
7      A.   Firstly, I think that the
8  most reliable assessment in this case, in
9  considering all of this evidence, is --
10  are the assessments that are made
11  actually by her treating physicians.
12          If he determined that she
13  had a grade 4 cystocele, that is most
14  likely to be the most correct assessment.
15          Secondly, currently, she has
16  been diagnosed with stage III prolapse by
17  both Dr. Zipper and Dr. Jolet.
18  Currently, she is asymptomatic.  So if
19  she was symptomatic when she presented to
20  Dr. Baker and she's asymptomatic now, it
21  is most likely that she had worse
22  prolapse when she presented to Dr. Baker.
23      Q.   Did you see Mrs. Hammons'
24  testimony as to whether or not, in May of

Page 96

1  2009, whether her bladder prolapse was
2  visible to her?
3      A.   Yes, I did.
4      Q.   And what do you recall Mrs.
5  Hammons' testimony being in that regard?
6      A.   She testified that it was
7  visible to her.
8      Q.   Now as is reflected on this
9  operative note, the PROLIFT® was
10  implanted in Mrs. Hammons on May 5, 2009,
11  correct?
12      A.   Correct.
13      Q.   Now, the jury is aware that
14  in December of 2012, Dr. Heit removed
15  portions of Mrs. Hammons' PROLIFT®.
16          Have you reviewed those
17  records as well?
18      A.   I have.
19      Q.   Have you reviewed Dr. Heit's
20  sworn testimony also?
21      A.   I have.
22      Q.   How did Dr. Heit describe
23  the presentation of -- withdrawn.
24          Before we get there, between

Page 97

1  May of 2009 and the summer of 2012, did
2  any of Mrs. Hammons' physicians document
3  any mesh erosion in her case?
4      A.   No.
5      Q.   So now turning to this
6  question of Dr. Heit's care and treatment
7  of Mrs. Hammons.
8          How did Dr. Heit describe
9  the presentation of Mrs. Hammons' mesh
10  when he saw her in August of 2012?
11      A.   He described that the mesh
12  was rolled and bunched at the bladder
13  neck.
14      Q.   Do you recall whether Dr.
15  Heit gave sworn testimony as to his
16  assessment of how the PROLIFT® mesh
17  became rolled and bunched under Mrs.
18  Hammons' bladder?
19      A.   I do.
20      Q.   Can you tell the jury what
21  your understanding of Dr. Heit's
22  findings, as part of his care and
23  treatment of Mrs. Hammons?
24      A.   Yes.  So he -- his

25 (Pages 94 to 97)

Joye Lowman, M.D.

Page 98

1 conclusion was that the appearance of the
2 mesh was consistent with improper
3 placement.
4         MR. ISMAIL:  Counsel.
5 BY MR. ISMAIL:
6     Q.   And Dr. Lowman, I'm handing
7 you a copy of Dr. Heit's deposition
8 transcript and his sworn testimony.
9         Is this information that you
10 reviewed in this case?
11     A.   Yes.
12     Q.   Did you rely upon this
13 information in understanding what
14 symptoms Mrs. Hammons had and when?
15     A.   Yes.
16     Q.   I would ask, Doctor, that
17 you turn to Page 220, and ask whether
18 there's information there that you relied
19 upon to understand how Dr. Heit assessed
20 why the mesh was rolled and bunched
21 underneath Mrs. Hammons' bladder in 2012.
22         Are you there?
23     A.   I don't think I'm here, but
24 I can follow you on there.

Page 99

1     Q.   If it's easier to follow on
2 the screen.
3     A.   I'll do that.
4     Q.   Is this Page 220 of the
5 transcript?
6     A.   There's different page
7 numbers.  You're talking about this one
8 in the corner?
9     Q.   Yes.
10     A.   Let me go to that.  Thank
11 you.
12     Q.   Was Dr. Heit, was he asked
13 in his deposition:  The bunching, as I
14 think you said earlier, was due to what?
15         Answer:  Well, my hypothesis
16 is related to improper placement.
17         And then was he asked:  And
18 that's to a reasonable degree of medical
19 certainty?
20         And Dr. Heit answers:  Yes.
21         Is this testimony that you
22 looked to, to understand how Dr. Heit
23 assessed Mrs. Hammons' --
24     A.   Yes.

Page 100

1     Q.    -- condition?
2         Now, Dr. Lowman, are you
3 aware that Dr. Zipper, on behalf of the
4 plaintiff in this case, has advanced an
5 alternative explanation for how the mesh
6 became rolled and bunched?
7     A.   I am.
8     Q.   What do you understand Dr.
9 Zipper's opinion to be?
10     A.   Dr. Zipper's opinion is that
11 the mesh is rolled -- or was rolled or
12 bunched due to mesh contraction.
13     Q.   So on the one hand, you have
14 Dr. Heit's explanation; and on the other
15 hand, we have Dr. Zipper's explanation?
16     A.   Right.
17     Q.   Did we ask you to analyze
18 those two competing explanations and form
19 an opinion as to which you believe is
20 correct?
21     A.   You did.
22         MR. SLATER:  Objection.
23 This is beyond the scope of the
24 report of the deposition.  We were

Page 101

1 never given notice of this issue
2 and a comparison of their two
3 opinions.  I don't believe it's in
4 the report.  I think it's a new
5 opinion.
6 BY MR. ISMAIL:
7     Q.   Did -- withdrawn.
8         Did we ask you to consider
9 whether there was any defect in the mesh
10 that led to the condition of the mesh as
11 Dr. Heit found it in 2012?
12     A.   Yes.
13         MR. SLATER:  Objection.
14 This is beyond the scope of the
15 report as well.  This was not
16 analyzed.
17 BY MR. ISMAIL:
18     Q.   Are you familiar with the
19 opinion advanced by Dr. Zipper in this
20 case?
21     A.   Yes.
22     Q.   And are you familiar with
23 the diagnosis made by Dr. Heit as part of
24 his care and treatment?

Golkow Technologies, Inc. - 1.877.370.DEPS

Joye Lowman, M.D.

Page 102

1    A.    Yes.
2    Q.    And did you consider those
3  two explanations for what happened to
4  Mrs. Hammons with respect to her
5  PROLIFT®?
6    A.    I did.
7    Q.    Did you form an opinion,
8  Doctor, as to what you think happened to
9  Mrs. Hammons' PROLIFT® at the time she
10  presented to Dr. Heit in 2012?
11    A.    I did.
12    Q.    Did you consider Mrs.
13  Hammons' medical records when doing that
14  investigation?
15    A.    I did.
16    Q.    Did you consider the sworn
17  testimony of her doctors?
18    A.    I did.
19    Q.    Did you consider your own
20  clinical experience?
21    A.    Yes.
22    Q.    Did you consider the medical
23  literature on this issue?
24    A.    Yes.

Page 103

1    Q.    All right.  Let's discuss
2  the issue of mesh contraction as opined
3  by Dr. Zipper, okay?
4    A.    Okay.
5    Q.    First of all, Dr. Lowman,
6  did you see any indication in the medical
7  records that any of Mrs. Hammons' own
8  doctors diagnosed mesh contraction in
9  this case?
10    A.    No.
11    Q.    Are you familiar with the
12  concept of mesh contraction?
13    A.    I am.
14    Q.    Is that potential
15  complication described in the literature?
16    A.    It is.
17    Q.    Does the description that
18  Dr. Heit gave of how the mesh appeared to
19  him match a description of mesh
20  contraction in a clinical context?
21    A.    No.
22    Q.    And why do you say that?
23    A.    There are -- there is a
24  specific diagnosis of mesh contraction.

Page 104

1  It's a little bit confusing in the
2  literature because we use that word to
3  mean two different things.
4    On the one hand, the actual
5  mesh or the mesh vaginal complex can
6  undergo shrinkage.  That's called the
7  biomaterial contraction.
8    On the other hand, there is
9  a clinical syndrome of contraction, as
10  defined by Feiner and Maher in their
11  article on contraction.  The clinical
12  syndrome is a patient who presents with
13  severe pelvic pain that's exacerbated by
14  movement, who has reproduction of that
15  pain with palpation of the mesh, and who
16  complains of severe dyspareunia.  It's a
17  very specific diagnosis as defined in the
18  literature.
19    Q.    Did Mrs. Hammons present
20  with all three of those criteria?
21    A.    She did not.
22    Q.    Did Mrs. Hammons have any
23  reports of pelvic pain?
24    A.    She did not.

Page 105

1    MR. SLATER:  I just want to
2  state on objection for the record.
3  That opinion and that criteria was
4  not put in the report.  This is a
5  new opinion.  We object to it and
6  we move to strike it.
7  BY MR. ISMAIL:
8    Q.    Now, the description that --
9  withdrawn.
10    Dr. Zipper told the jury
11  that one of the reasons he thinks the
12  mesh contracted was because the mesh no
13  longer was providing bladder support by
14  August of 2012.
15    Are you aware of that
16  testimony?
17    A.    I am.
18    Q.    Is Dr. Zipper correct?
19    A.    He's not.
20    Q.    Why do you say that?
21    MR. SLATER:  Objection,
22  again, to this evaluation of Dr.
23  Zipper's opinions.  That was not
24  in the report.  We weren't given

27 (Pages 102 to 105)

Joye Lowman, M.D.

Page 106

1    notice of this.
2  BY MR. ISMAIL:
3      Q.   Why do you believe --
4  withdrawn.
5      Do you believe that in
6  August of 2012 the PROLIFT® was still
7  providing Mrs. Hammons adequate support
8  to her bladder?
9      A.   It was.
10     Q.   And why do you say that?
11     A.   Because Dr. Heit testified
12 that he did not feel that she had a
13 significant cystocele.  She had several
14 evaluations by Dr. Lackey and Dr. Heit
15 after the placement of her PROLIFT®, and
16 no one suggested that she had a
17 significant cystocele.
18     Q.   Did you see any indication
19 in Dr. Heit's medical records that he
20 recommended some treatment for a
21 recurrence of bladder prolapse?
22     A.   He did not.
23     Q.   Did you see any indication,
24 from any other physician treating Mrs.

Page 107

1  Hammons, following the PROLIFT®, that she
2  needed some treatment for a recurrence?
3      A.   No.
4      Q.   If you have Dr. Heit's
5  deposition testimony still there, on Page
6  146, you referenced Dr. Heit gave an
7  assessment of Mrs. Hammons' PROLIFT® and
8  whether or not it was providing support
9  in August of 2012.
10     And do you see, at Page 146,
11 Dr. Heit was asked:  During your
12 examination, I take it you did not find
13 that she had a bladder prolapse; is that
14 correct?
15     And what was his answer?
16     A.   His answer is:  Yes, ma'am.
17     Q.   Is that consistent or
18 inconsistent with Dr. Heit's medical
19 records on this question?
20     A.   It's consistent.
21     Q.   Was Dr. Heit further asked:
22 To your knowledge, was the PROLIFT®
23 providing proper anatomical support of
24 Mrs. Hammons' bladder on August 30th,

Page 108

1  2012?
2      A.   Yes.
3      Q.   What was his answer?
4      A.   Yes, ma'am.
5      Q.   Do you have an opinion as to
6  whether or not you agree with Dr. Heit's
7  assessment of the effectiveness of the
8  PROLIFT® in Mrs. Hammons' case, in terms
9  of supporting her bladder in this time
10 frame?
11     A.   Yes.  It seemed to be
12 working well at supporting her bladder
13 prolapse, as indicated by the fact that
14 none of the treating physicians, after
15 the PROLIFT® was placed, diagnosed her
16 with a significant bladder prolapse,
17 although they did diagnose her with
18 significant prolapse in other
19 compartments.
20     Q.   Now, finally, Dr. Zipper
21 pointed to the pathology report as a
22 basis to conclude that the mesh had
23 contracted.
24     Did you examine that record

Page 109

1  as well?
2      A.   I did.
3      MR. SLATER:  Objection.
4  There's no discussion of this in
5  her -- in Dr. Lowman's report.
6  She's never testified about the
7  pathology report.  She's never
8  offered opinions about it.  This
9  would be beyond the scope of the
10 report, and we move to preclude
11 this testimony.
12 BY MR. ISMAIL:
13     Q.   Dr. Lowman, I've not
14 actually done anything yet.
15     New question.
16     Dr. Lowman, I'm handing you
17 Defense Exhibit-10020.5.
18     Are you familiar with this
19 document?
20     A.   I am.
21     Q.   Is this a copy of the
22 pathology report that was prepared based
23 on the mesh that Dr. Heit removed from
24 Mrs. Hammons?

28 (Pages 106 to 109)

Joye Lowman, M.D.

Page 110

1      A.   It is.
2      Q.   Did you review this
3  document?
4      A.   I did.
5      Q.   Are you familiar with it?
6      A.   Yes.
7      Q.   Have you reviewed pathology
8  reports before?
9      A.   I have.
10     Q.   This pathology report, Dr.
11 Lowman, in your opinion, does it provide
12 any indication that Mrs. Hammons' mesh
13 had contracted and that's why it needed
14 to be removed in August -- or in 2012?
15     A.   No.
16     Q.   And why do you say that?
17     A.   This pathology report is a
18 gross description of what was sent to the
19 pathologist for evaluation.  Usually,
20 pathologists just describe the fact that
21 they have vaginal mesh there, maybe they
22 have suture there.
23          They are describing it
24 grossly.  They are not looking at --

Page 111

1  looking at it under a microscope, per se.
2      Q.   So when the pathologist
3  describes a gross description of -- a lot
4  of us use the word "gross" to mean
5  something else in a different contexts.
6          When you're talking about a
7  pathology review, what is a gross
8  description?
9      A.   That means they're
10 eyeballing it, they're just looking at
11 it, feeling it and then describing it.
12     Q.   Does the pathologist
13 describe contracted mesh in this report?
14 Is that terminology used?
15     A.   She does not, or he.
16     Q.   Based on everything you
17 reviewed, Dr. Lowman, including what
18 you've testified to, was the complication
19 of Mrs. Hammons' PROLIFT® mesh caused by
20 mesh contraction?
21     A.   No.
22     Q.   Did you also consider the
23 explanation offered by Dr. Heit that the
24 reason why the mesh became rolled and

Page 112

1  bunched was because of surgical
2  technique?
3      A.   Yes.
4      Q.   Did you review Dr. Baker's
5  medical records and his deposition to
6  understand how he implanted the PROLIFT®?
7      A.   I did.
8      Q.   Now, did Dr. Baker describe
9  in his operative note that he implanted
10 the PROLIFT®, quote, per protocol?
11     A.   He did.
12     Q.   Does that answer the
13 question that you were asked to
14 investigate?
15     A.   Not completely, no.
16     Q.   Did you do further analysis
17 to determine what Dr. Baker did or did
18 not do when he implanted the PROLIFT® in
19 Mrs. Hammons?
20     A.   The only thing I have to go
21 on, on what he did was his operative
22 report.  He was not specific in his
23 description of his actual implantation of
24 the PROLIFT®, other than the fact that he

Page 113

1  described that he sutured the PROLIFT® at
2  the apex.
3      Q.   So you indicated that Dr.
4  Baker sutured the PROLIFT® to the apex.
5      A.   Right.
6      Q.   Now, do you have an opinion,
7  Dr. Lowman, as to what caused Mrs.
8  Hammons' mesh to become rolled and
9  bunched to the point that Dr. Heit
10 removed it in 2012?
11     A.   Yes, I do.
12     Q.   Can you tell the members of
13 the jury what your opinion is?
14          MR. SLATER:  Objection.
15 Beyond the scope.
16          You can answer.
17          THE WITNESS:  I believe that
18 Mrs. Hammons' mesh became rolled
19 or bunched because the mesh was
20 secured to the apex, which is the
21 top of her vagina, and her top --
22 the top of her vagina was actually
23 prolapsing at the time.  And the
24 prolapse of the top of the vagina

Joye Lowman, M.D.

Page 114

1    caused the mesh to sort of fall in
2    this direction and roll or bunch
3    underneath the bladder neck.
4  BY MR. ISMAIL:
5        Q.   And, Dr. Lowman, have you
6  helped us put together some slides to
7  explain this concept to the members of
8  the jury?
9        A.   I have.
10       Q.   Okay, Doctor, I have up on
11 the screen the first slide.
12            And you used a lot of terms
13 in your last answer here, and I thought
14 we could use this to orient the members
15 of the jury to your -- the opinion you
16 are giving in this case --
17       A.   Okay.
18       Q.   -- and your basis for it,
19 okay?
20       A.   Okay.
21       Q.   So just real basic.
22       A.   Okay.
23       Q.   We're looking at several of
24 the organs that we've talked a lot about

Page 115

1  in this trial.  And let's orient where we
2  are.
3            Where is the front of the
4  woman here?
5        A.   The front of the woman is at
6  the -- on the left side.
7        Q.   And if we're going from left
8  to right, first of all, what is this
9  organ here?
10       A.   That's the bladder.
11       Q.   What is this organ here?
12       A.   That's the vagina.
13       Q.   And what is this organ here?
14       A.   That's the rectum.
15       Q.   So as we're going left to
16 right, is all the way to the right the
17 posterior --
18       A.   Simple terms.  The back.
19       Q.   The back.
20            And then the left is the
21 front; is that correct?
22       A.   That's correct.
23       Q.   And is what we depicted
24 here, does this drawing depict a woman

Page 116

1  with a uterus or no?
2        A.   It does not.
3        Q.   So in terms of Mrs. Hammons,
4  did Dr. Baker do a vaginal hysterectomy
5  before he did the PROLIFT® procedure?
6        A.   He did.
7        Q.   Okay.  So now that we're
8  sort of oriented here.
9            You indicated -- you used
10 the term -- you used a couple of terms in
11 your last answer a moment ago, one of
12 which was vaginal cuff, and one of which
13 was the apex.  And I'd like to explain
14 that now if we could.
15       A.   Okay.
16       Q.   Generally speaking, what is
17 the apex, when we're talking about this
18 area of the body?
19       A.   So the apex is the top of
20 the vagina, where those three black lines
21 are located.  That whole sort of
22 curvature is considered the apex.
23       Q.   Okay.  So let's see if we
24 can do it this way.

Page 117

1            When you say the
2  "curvature," tell me if I've done it
3  right.  Is this, generally speaking, the
4  apex?
5        A.   Right.
6        Q.   You also indicated the term
7  vaginal cuff.
8        A.   Right.
9        Q.   What is the vaginal cuff?
10       A.   The vaginal cuff is the
11 area, the suture line where we have
12 amputated or removed the uterus and
13 cervix.  So where those black lines are
14 is where the uterus would normally sit.
15            In order for us to perform a
16 hysterectomy, we have to cut the uterus
17 out from that area.  And those black
18 lines indicate the suture where we've
19 sutured the two ends of the vagina back
20 together.
21       Q.   So in a woman who has had
22 her uterus removed, are the apex and the
23 cuff essentially the same thing?
24       A.   Yes.

30 (Pages 114 to 117)

Joye Lowman, M.D.

Page 118

1     Q.   And you said this was a hole
2  that the -- that Dr. Baker had to make
3  to, basically -- I think the word you
4  used, was amputate the uterus?
5     A.   Right.
6     Q.   And did he have to close
7  that hole back up?
8     A.   Right.
9     Q.   And is that called the cuff?
10    A.   Right.
11    Q.   So what is this blue strip
12 here meant to represent?
13    A.   That's meant to represent
14 the -- where the anterior PROLIFT® would
15 lie.
16    Q.   And is it placed here
17 ordinarily when you're trying to support
18 the bladder?
19    A.   Yes.
20    Q.   Now, you indicated, in one
21 of your last answers, that Dr. Baker
22 sutured the PROLIFT® to the apex.
23    A.   Right.
24    Q.   Can that be done as part of

Page 119

1  the PROLIFT® procedure?
2     A.   Yes, it's commonly done.
3     Q.   But what did Dr. Baker do in
4  this case that you believe led to the
5  problems later on?
6        MR. SLATER:  Objection.
7        THE WITNESS:  He failed to
8     support --
9        MR. SLATER:  Same objection
10    as before.
11 BY MR. ISMAIL:
12    Q.   Please begin again.
13    A.   He failed to support the
14 apex at the time of this procedure.
15    Q.   Why do you believe it is
16 significant that Dr. Baker failed to
17 support the apex when he implanted the
18 PROLIFT®?
19    A.   For two reasons.  Number
20 one, he attached the mesh to the apex, so
21 failure to support that area is going to
22 put the top of the mesh at risk for
23 falling, if you will.
24        Secondly, the apex or the

Page 120

1  top of the vagina, is what we consider
2  the cornerstone of pelvic organ
3  prolapse -- the cornerstone of pelvic
4  organ support.  So if the apex is not
5  well supported, it puts the anterior and
6  posterior compartments at risk for
7  failure.
8     Q.   Okay.  Can a patient develop
9  an apical prolapse?
10    A.   Yes.  She had that.
11    Q.   So when you say "she had
12 that" are you referring to --
13    A.   Mrs. Hammons.
14    Q.   So prior to the time that
15 Dr. Baker implanted the PROLIFT®, had
16 Mrs. Hammons presented with an apical
17 PROLIFT® --
18    A.   She did, yes.
19    Q.   -- prolapse?  Sorry.
20    A.   She did.
21    Q.   Did Dr. Baker do any
22 surgical repair that totally fixed the
23 apical prolapse?
24    A.   He did not.

Page 121

1     Q.   Now, is an anterior PROLIFT®
2  designed to support an apical prolapse?
3     A.   It's not.
4     Q.   But I thought you indicated,
5  Doctor, that Dr. Baker sewed the PROLIFT®
6  to the apex or the cuff.
7        Doesn't that provide
8  support?
9     A.   No, it doesn't.
10    Q.   In addition to the PROLIFT®,
11 did Dr. Baker, I think you indicated did
12 a vaginal hysterectomy on this day; is
13 that right?
14    A.   He did.
15    Q.   Does a vaginal hysterectomy
16 totally fix an apical prolapse?
17    A.   No, it doesn't.  The uterus
18 is an innocent bystander, if you will.
19        The primary problem with
20 pelvic organ prolapse is the vagina
21 itself.  The organs that are involved are
22 innocent bystanders.  The bladder is
23 resting, as you can see in this picture,
24 on the front wall of the vagina.  The

Joye Lowman, M.D.

Page 122

1  rectum rests behind the back wall.  The
2  uterus and cervix, if it was in the
3  picture, would be resting at the top.
4        It's the vaginal walls that
5  are dropping and falling in the pelvic
6  organ prolapse.  It's not a problem with
7  the bladder or the rectum or the uterus.
8        Q.   Did Mrs. Hammons, after the
9  implantation of the PROLIFT®, develop a
10  worsening apical prolapse?
11       A.   She did.
12       Q.   What effect did that have on
13  the PROLIFT®, which Dr. Baker sewed to
14  it?
15       A.   It didn't allow it to lie
16  flat in that compartment.
17       Q.   And have you helped us
18  prepare some slides to represent that
19  phenomenon?
20       A.   I have.
21       Q.   This first slide here,
22  orient the jury, if you could, to what's
23  happening in comparison to the slide we
24  just looked at?

Page 123

1        MR. SLATER:  I just want to
2     state again, I object to this
3     testimony.  I don't believe this
4     was spelled out in the report.
5  BY MR. ISMAIL:
6        Q.   Go ahead, ma'am.
7        A.   So this picture is
8  representing apical prolapse or the
9  descent of the top of her vagina after
10  the mesh has been inserted.
11       As the vagina is dropping --
12  so if this is the mesh and it's been
13  placed in the vagina here and they're
14  secured to one another, as the anterior
15  vagina and the apex of the vagina falls,
16  it's going to pull that mesh forward.
17  That's what that picture is representing.
18       Q.   So in this diagram here, do
19  we have an example of an advancing apical
20  prolapse?
21       A.   Yes.
22       Q.   And is that what was
23  happening in Mrs. Hammons' case after May
24  of 2009?

Page 124

1        A.   Yes.
2        Q.   What effect did that have on
3  the mesh that was sewn to it?
4        A.   It caused it to pull forward
5  or to roll or bunch.
6        Q.   Did that process continue to
7  the time that Mrs. Hammons found her way
8  to Dr. Heit in 2012?
9        A.   Most likely.
10       MR. SLATER:  Counsel, just
11    one other thing.  We've never seen
12    these diagrams.  They were never
13    suggested by the report, they were
14    never provided.  We never had any
15    ability to meet this in our case.
16    I'm putting that on the record as
17    well.  Along with our objection
18    that these opinions are new
19    opinions.
20       MR. ISMAIL:  I'm not sure if
21    you got spoken over, Doctor, so
22    let me re-ask the question.
23  BY MR. ISMAIL:
24       Q.   Did the process of Mrs.

Page 125

1  Hammons' apical prolapse continue to the
2  time that she was ultimately referred to
3  Dr. Heit in 2012?
4        A.   It did.
5        Q.   So if we continue the
6  process forward, in this next slide, do
7  you further depict an apical prolapse to
8  the degree that Mrs. Hammons had when she
9  saw Dr. Heit?
10       MR. SLATER:  Same objection.
11       THE WITNESS:  Right.  Yes.
12    This shows that that prolapse has
13    progressed.
14       I believe that her prolapse
15    was even more severe than this
16    picture predicts.  But, yes.  Or
17    depicts is what I meant to say.
18  BY MR. ISMAIL:
19       Q.   So between Dr. Baker in may
20  of 2009 and Dr. Heit in August of 2012,
21  at any time did any physician provide
22  support for Mrs. Hammons' apex?
23       A.   No.
24       Q.   Did her apical prolapse

32 (Pages 122 to 125)

Joye Lowman, M.D.

Page 126

1 continue to develop over time during that
2 entire time period?
3      A.   Yes.
4      Q.   And is what you're showing
5 here, that blue line that's sort of
6 rolled and bunched, is that how you
7 understand Mrs. Hammons' mesh was
8 presenting to Dr. Heit in 2012?
9      A.   Yes.
10      Q.   When was the first time that
11 a doctor provided any surgical repair of
12 Mrs. Hammons' apical prolapse?
13      A.   When Dr. Heit operated on
14 her.
15      Q.   Now, do you believe the
16 failure to support the apex, of Dr. Baker
17 in May of 2009, was that a mistake?
18      A.   Yes.
19      Q.   Do you believe that the
20 failure to support the apex in the
21 subsequent apical prolapse, did that have
22 any contribution to how the mesh became
23 rolled and bunched in 2012?
24           MR. SLATER:  Objection to

Page 127

1      this.  Again, there's no opinion
2      that it was a mistake.  It was not
3      phrased this way.  We object to
4      this line.
5           MR. ISMAIL:  I'll rephrase.
6           MR. SLATER:  And, again,
7      object to this question again,
8      because I just went through the
9      report, these opinions are not
10      there.
11           MR. ISMAIL:  Let me
12      rephrase.
13 BY MR. ISMAIL:
14      Q.   Do you believe that the
15 presentation of rolled and bunched mesh,
16 do you believe that is a function of
17 surgical implant technique?
18      A.   Yes.
19      Q.   The surgical -- and whose
20 surgical implant technique are you
21 referring to?
22      A.   Dr. Baker's.
23      Q.   What was the surgical
24 implant technique issue that you believe

Page 128

1 led to the rolled and bunched mesh?
2      A.   The lack of supporting the
3 apex that he sutured the mesh to.
4      Q.   And have you described for
5 the jury why you believe that that
6 surgical technique decision of Dr.
7 Baker's led to the mesh being in the
8 condition it was in 2012?
9      A.   Yes.
10      Q.   Now, let's talk about the
11 turn about of the consequences of that
12 rolled and bunched mesh in 2012, okay?
13      A.   Okay.
14      Q.   In the summer of 2012, did
15 Mrs. Hammons develop urinary incontinence
16 symptoms?
17      A.   She did.
18      Q.   Doctor, in your clinical
19 experience, do you treat patients with
20 urinary incontinence?
21      A.   I do.
22      Q.   Just briefly, are there
23 different types of incontinence
24 conditions that a patient can develop?

Page 129

1      A.   There are.
2      Q.   Can you describe some of
3 those, briefly, for the jury?
4      A.   Sure.  The most common
5 reasons to have urinary incontinence in
6 the female pelvic -- female patient
7 population is overactive bladder, where
8 the patient experiences incontinence
9 because of not being able to make it to
10 the bathroom in time; stress
11 incontinence, where the patient
12 experiences urinary incontinence with
13 coughing, sneezing and laughing; overflow
14 incontinence, where the patient
15 experiences incontinence with difficulty
16 voiding.
17      Q.   Prior to receiving the
18 PROLIFT®, did Mrs. Hammons have
19 indications in her medical record of
20 having incontinence symptoms?
21      A.   I don't believe so.  She may
22 have had mild stress incontinence.
23      Q.   Did -- was that documented
24 in the records of her primary care

33 (Pages 126 to 129)

Joye Lowman, M.D.

Page 130

1    physician, Dr. Royer?
2        A.    I believe so.
3        Q.    What type of incontinence
4    did Dr. Heit diagnose Mrs. Hammons as
5    having in 2012?
6        A.    Insensible urine loss.
7        Q.    Is that a condition you're
8    familiar with?
9        A.    It is.
10       Q.    What is insensible urine
11   loss?
12       A.    That means that the patient
13   is experiencing incontinence without
14   sensation.
15       Q.    Now, Doctor, do you agree
16   with Dr. Heit that the rolled and bunched
17   mesh may have been contributing to Mrs.
18   Hammons insensible urine loss?
19       A.    Yes, it may have.
20       Q.    Have you described for the
21   jury what you believe happened as to how
22   the rolled -- the mesh became rolled and
23   bunched in 2012?
24       A.    I have.

Page 131

1        Q.    Is that in reference to the
2    apical prolapse you've described already?
3        A.    Yes.
4        Q.    Now, Dr. Heit, did he do a
5    procedure to remove the mesh from the
6    bladder neck?
7        A.    Yes, he did.
8        Q.    Do you agree with Dr. Heit's
9    decision to do that?
10       A.    Yes, I do.
11       Q.    What happened in particular
12   to Mrs. Hammons' complaints of
13   incontinence after Dr. Heit did his
14   procedures in the end of 2012 and early
15   2013?
16       A.    They resolved.
17       Q.    Have you seen any indication
18   in the medical records, since early 2013,
19   that Mrs. Hammons has had any complaints
20   of incontinence the likes of which she
21   had before she saw Dr. Heit?
22       A.    No.
23       Q.    Have you reviewed Mrs.
24   Hammons' sworn testimony on the issue of

Page 132

1    whether she has any complaints of
2    incontinence since Dr. Heit's care and
3    treatment of her?
4        A.    I have.
5        Q.    And does she have any
6    complaints that she's testified to on the
7    issue of incontinence?
8        A.    No.
9        Q.    Did Dr. Heit, as part of his
10   assessment of Mrs. Hammons, assess her
11   bladder capacity?
12       A.    He did.
13       Q.    Did he do so both before and
14   after the procedures he did -- offered
15   her to treat her incontinence symptoms?
16       A.    He did.
17       Q.    Dr. Lowman, I'm going to
18   provide you a copy of Defense
19   Exhibit-10043.22 and ask that you confirm
20   that this is a medical record that you
21   reviewed in this case?
22       A.    Yes, it is.
23       Q.    Can you tell the members of
24   the jury what this is?

Page 133

1        A.    This is a consultation note
2    from Dr. Heit.
3        Q.    And to whom is it sent?
4        A.    It was sent to Dr. Lackey.
5        Q.    And does -- what's the date
6    of it?
7        A.    January of 2013.
8        Q.    Does Dr. Heit inform Dr.
9    Lackey here of some of the testing that
10   he's done on his patient, Patricia
11   Hammons?
12       A.    He does.
13       Q.    Does that include an
14   assessment of bladder capacity?
15       A.    It does.
16       Q.    And is that under the first
17   paragraph?
18       A.    Yes.
19       Q.    And towards the end of that
20   paragraph, what does Dr. Heit say is Mrs.
21   Hammons bladder capacity?
22       A.    He says that her capacity is
23   normal.
24       Q.    Have you seen any indication

34 (Pages 130 to 133)

Joye Lowman, M.D.

Page 134

1  from any of her treating physicians,
2  after January of 2013, to suggest any
3  change in Mrs. Hammons' bladder capacity?
4      A.   No.
5      Q.   What does this tell you, as
6  a specialist in this field, as to whether
7  or not Mrs. Hammons has low bladder
8  compliance?
9      A.   That she didn't have it.
10     Q.   Have you seen any indication
11  in the medical records that any of Mrs.
12  Hammons' treating physicians have
13  diagnosed her with low bladder
14  compliance?
15     A.   No.
16     Q.   Now, to the extent Mrs.
17  Hammons has reports today of feelings of
18  urgency, that she has to use the restroom
19  more frequently, what's that called in
20  urogynecology?
21     A.   Overactive bladder.
22     Q.   Are there various factors
23  that can lead a patient to develop
24  overactive bladder?

Page 135

1      A.   There are.
2      Q.   What are some of those?
3      A.   The most common is irritant
4  exposure; so exposure to things that
5  irritate the bladder and cause it to be
6  overly contractive.  That would include
7  coffee, tea, sodas, alcohol, carbonated
8  beverages, tobacco.
9          Having pelvic organ prolapse
10  in particular, a cystocele, is associated
11  with irrelevant -- we call it irritated
12  voiding symptoms or overactive bladder as
13  well.
14     Q.   Are there medications that
15  can be offered to a patient to help treat
16  these symptoms of having to go more
17  frequently?
18     A.   Yes, there are.
19     Q.   Have you seen any indication
20  in the medical records, following Dr.
21  Heit's treatment of Mrs. Hammons, that
22  she's been offered or has taken any of
23  these medications to treat this
24  overactive bladder symptom you've

Page 136

1  described?
2      A.   I haven't.
3      Q.   Dr. Zipper opined that Mrs.
4  Hammons is at risk for future kidney
5  injury.
6          Are you familiar with that
7  testimony?
8      A.   I am.
9      Q.   And have you formed a view
10  as to whether Dr. Zipper is correct or
11  not?
12     A.   Yes.
13         MR. SLATER:  One second,
14     objection.  Not expressed in the
15     report.
16  BY MR. ISMAIL:
17     Q.   Dr. Lowman, can you please
18  tell us what your opinion is as to Dr.
19  Zipper's suggestion that Mrs. Hammons is
20  at risk for future kidney problems?
21     A.   I think that's ridiculous.
22     Q.   Why do you say that?
23     A.   Because impaired compliance
24  of the bladder has got to be very severe

Page 137

1  in order for it to lead to kidney
2  failure, so severe that the treating
3  physicians often consider diversion, is
4  what we call it, but, basically, moving
5  urine that goes to the bladder to urine
6  that goes to the bowel.
7      Q.   Have you seen any
8  indication, Dr. Lowman, that any
9  physician has diagnosed Patricia Hammons
10  with the severe bladder compliance
11  condition that you've just described?
12     A.   No.
13     Q.   Does Mrs. Hammons, today,
14  have any compromised renal function?
15     A.   No.
16     Q.   In terms of the most recent
17  testing done, how is her kidney function?
18     A.   It's normal.
19     Q.   Doctor, we talked before
20  about that a patient can present with
21  multiple organ prolapse.
22         Do you recall that
23  discussion?
24     A.   Uh-huh.

35 (Pages 134 to 137)

Joye Lowman, M.D.

Page 138

1    Q.    Yes?
2    A.    Yes.
3    Q.    Are patients who developed
4  prolapse in one -- with one organ at an
5  increased risk for developing it in other
6  organs?
7    A.    Yes.
8    Q.    If a patient has prolapse
9  in -- with multiple organs, do you try to
10 treat all those prolapses when you're a
11 treating physician?
12   A.    Yes.
13   Q.    Why?
14   A.    Because it makes sense to
15 treat everything that's broken at the
16 time that you're treating pelvic organ
17 prolapse.
18          But, furthermore, it -- if
19 you don't treat it, it's likely to
20 progress.
21   Q.    So what are the consequences
22 of leaving a particular prolapse
23 untreated in a patient?
24   A.    It kind of -- you know, it

Page 139

1  depends on the compartment that you're
2  talking about.
3          If you're talking about the
4  apex, you put that patient at risk for
5  developing prolapse in alternative
6  compartments, because apical prolapse, or
7  not supporting the apex, makes it very
8  difficult to support whatever compartment
9  you're trying to support, either the
10 anterior compartment or the posterior
11 compartment.
12          If it's, say, just the
13 posterior compartment, the major risk is
14 that that compartment might progress; if
15 there's a mild prolapse there, it might
16 get worse.
17          If you don't treat the
18 apical part, and you're -- say you're --
19 let me start over.
20   Q.    Let me start with a new
21 question.  I'll withdraw the prior
22 question and start with a new question.
23   A.    Okay.
24   Q.    What are the consequences of

Page 140

1  failing to treat a prolapse that is
2  presenting to a physician?
3    A.    It may progress.
4    Q.    Now, we already looked at a
5  record, and I'll put it back up on the
6  screen, that Dr. Baker, before the
7  PROLIFT®, assessed that Mrs. Hammons had
8  multiorgan prolapse; is that correct?
9    A.    That's correct.
10   Q.    One of which was the bladder
11 prolapse; is that right?
12   A.    Yes, that's right.
13   Q.    And was the PROLIFT® the
14 procedure he did to support that?
15   A.    Yes.
16   Q.    And you already indicated
17 that she had a uterine prolapse or an
18 apical prolapse?
19   A.    Yes.
20   Q.    Was there any treatment
21 offered to Mrs. Hammons at this point to
22 treat that prolapse?
23   A.    There was not.
24   Q.    You also indicated that she

Page 141

1  had a rectocele in May of 2009.
2          Was there any surgical
3  repair offered of that prolapse?
4    A.    No.
5    Q.    Now, subsequent to Dr.
6  Baker's procedure, did Mrs. Hammons
7  present to another physician with a
8  prolapse of a different organ?
9    A.    Could you repeat the
10 question for me?
11   Q.    Sure.
12          Subsequent to Dr. Baker's
13 procedure, did Mrs. Hammons see a
14 different physician because she developed
15 prolapse in a different organ?
16   A.    She did.
17   Q.    And who was that physician?
18   A.    Dr. Lackey.
19   Q.    What type of prolapse did
20 Dr. Lackey diagnose?
21   A.    A rectocele.
22   Q.    Did Dr. Lackey do a surgical
23 procedure to repair the rectocele?
24   A.    He did.

36 (Pages 138 to 141)

Joye Lowman, M.D.

Page 142

1      Q.    What type of procedure did
2  he do?
3      A.    He did a traditional repair
4  called a posterior colporrhaphy.
5      Q.    Is that the native tissue
6  surgery that the jury's heard about?
7      A.    Yes, it is.
8      Q.    At that same time, did Dr.
9  Lackey find yet another prolapse in
10 connection with the surgery he did on
11 Mrs. Hammons?
12     A.    He did.
13     Q.    What is that?
14     A.    An enterocele.
15     Q.    What kind of organ prolapse
16 is that?
17     A.    It's bowel prolapse.
18     Q.    Did Dr. Lackey repair that
19 prolapse in the same procedure?
20     A.    He did.
21     Q.    Now, Dr. Lowman, did Mrs.
22 Hammons' use or implantation of a
23 PROLIFT® cause her to develop a
24 rectocele?

Page 143

1      A.    No, it did not.
2      Q.    Why do you say that?
3      A.    She had a rectocele at the
4  time of the PROLIFT® procedure.
5      Q.    Did the PROLIFT® cause the
6  rectocele to get worse?
7      A.    No, it didn't.
8      Q.    Why do you say that?
9      A.    Because fixing one
10 compartment doesn't cause or worsen
11 prolapse in other compartments.
12     Q.    Did the PROLIFT® cause Mrs.
13 Hammons to develop the bowel prolapse?
14     A.    No, it didn't.
15     Q.    Is that for the same reasons
16 you've just described?
17     A.    Right.
18     Q.    Did you see any indication
19 in the medical records that any of Mrs.
20 Hammons' treating physicians assessed
21 that the PROLIFT® was the cause of either
22 the bowel prolapse or the rectocele?
23     A.    No.
24     Q.    What does it tell you

Page 144

1  instead -- withdrawn.
2      Q.    What does it tell you, that
3  Mrs. Hammons has developed prolapse in
4  multiple organs, the bladder, the rectum,
5  the bowel and the apex?
6      A.    It's just an indication of
7  the severity of her pelvic floor
8  dysfunction.
9      Q.    And when you say it's "an
10 indication of the severity of her pelvic
11 floor dysfunction," what do you mean by
12 that?
13     A.    I mean that she has so many
14 risk factors for developing pelvic organ
15 prolapse.  Part of that is pelvic floor
16 dysfunction, sort of the fact that her
17 connective tissues aren't working
18 appropriately to hold her organs up.
19 That affects the pelvis globally.  Even
20 though it's just manifesting in the
21 anterior compartment initially, the other
22 compartments are also at risk.
23     Q.    Now, did Dr. Heit, I think
24 you indicated he did a procedure, as

Page 145

1  well, to provide surgical repair of one
2  of the prolapses Mrs. Hammons had?
3      A.    Yes.
4      Q.    So I think we started this
5  discussion a while ago mentioning the
6  fact that Mrs. Hammons has had three
7  different types of prolapse procedures;
8  is that correct?
9      A.    That's correct.
10     Q.    One of which was the
11 PROLIFT®?
12     A.    Right.
13     Q.    One of which was the native
14 tissue surgery?
15     A.    Right.
16     Q.    And another of which was
17 using a graft from a pig to support her
18 organs; is that correct?
19     A.    That's correct.
20     Q.    Of the three surgeries that
21 Mrs. Hammons had, did any of them fail?
22     A.    Yes.
23     Q.    Which ones?
24     A.    All except the PROLIFT®.

Joye Lowman, M.D.

Page 146

1      Q.   The native tissue surgery
2  that Dr. Lackey did, did that result in a
3  recurrence?
4      A.   It did.
5      Q.   The pig graft procedure that
6  Dr. Heit did, did that ultimately fail,
7  too?
8      A.   It did.
9      Q.   Up until the time that Dr.
10 Heit removed the PROLIFT®, had the
11 PROLIFT® failed?
12     A.   No.
13     Q.   Is it surprising to you that
14 Dr. Lackey's native tissue surgery
15 failed?
16     A.   It's not, no.
17     Q.   Why?
18     A.   For the reasons that I just
19 discussed.  The fact that she has so many
20 risk factors for recurrence.
21     Q.   Is it surprising to you that
22 even the biologic graft that Dr. Heit did
23 failed?
24     A.   It's not.

Page 147

1      Q.   Dr. Lowman, I want to now
2  turn to the question of dyspareunia.
3      A.   Okay.
4      Q.   In your patients, do you see
5  complaints related to pain with
6  intercourse?
7      A.   I do.
8      Q.   What are some of the factors
9  that can lead a woman to develop pain
10 with intercourse?
11     A.   Vaginal atrophy, levator
12 myalgia, interstitial cystitis, prior
13 surgeries.
14     Q.   Can a prolapse itself lead
15 to painful sexual intercourse?
16     A.   It can.
17     Q.   Did Mrs. Hammons have some
18 of those very risk factors that you just
19 described?
20     A.   She did.
21     Q.   Did you see any indication
22 in the medical records that Mrs. Hammons
23 had vaginal atrophy?
24     A.   Yes.

Page 148

1      Q.   Is vaginal atrophy
2  associated with menopause and the loss of
3  estrogen?
4      A.   It is.
5      Q.   Did Mrs. Hammons, over time,
6  have multiple vaginal surgeries?
7      A.   She did.
8      Q.   The vaginal hysterectomy
9  that Mrs. Hammons had, is that associated
10 with dyspareunia?
11     A.   It can be.
12     Q.   The native tissue surgery
13 that Dr. Lackey did, is that associated
14 with dyspareunia?
15     A.   It is.
16     Q.   The surgery that Dr. Heit
17 did, is that associated with dyspareunia?
18     A.   It is.
19     Q.   And you've already described
20 for us that you have looked at this
21 question yourself as to whether
22 dyspareunia is associated with the
23 PROLIFT®, correct?
24     A.   Right.

Page 149

1      Q.   Now, when did Mrs. Hammons
2  first report dyspareunia to one of her
3  physicians?
4      A.   She first reported
5  dyspareunia to Dr. Baker at her postop
6  follow-up 11 weeks after her PROLIFT®
7  surgery.
8      Q.   Okay.  So I'm now providing
9  you Defense Exhibit-10016.10, and ask if
10 you can confirm this is a medical record
11 you reviewed.
12          And tell the members of the
13 jury what it is.
14     A.   This is a medical record
15 that I reviewed.  This is a physical
16 examination note, or a progress note, by
17 Dr. Baker.
18     Q.   Does this relate at all to
19 this question of when Mrs. Hammons first
20 reported dyspareunia?
21     A.   It does.  This is the first
22 instance of they are -- or at least it
23 being documented that she was reporting
24 dyspareunia.

38 (Pages 146 to 149)

Joye Lowman, M.D.

Page 150

1    Q.    Okay.  So the date is July
2  20th, 2009; is that correct?
3    A.    That's correct.
4    Q.    And does Dr. Baker document
5  Mrs. Hammons' complaints and his findings
6  on that date?
7    A.    He does.
8    Q.    Did Dr. Baker do a vaginal
9  exam on this day?
10    A.    He did.
11    Q.    Dr. Lowman, when you're
12  examining a patient who has reported
13  pain, do you sometimes attempt to
14  reproduce the pain?
15    A.    Yes, we do.
16    Q.    Why do you do that?
17    A.    It gives us an indication of
18  the cause of the pain.
19    Q.    Did Dr. Baker do that in
20  this case?
21    A.    He did.
22    Q.    Does the particular spot or
23  location that leads to pain, does it help
24  tell you, as a doctor, what's going on

Page 151

1  with that patient?
2    A.    It does.
3    Q.    Did Dr. Baker document in
4  this record where he was able to
5  reproduce Mrs. Hammons' pain?
6    A.    He did.
7    Q.    And can you tell the jury
8  where that was?
9    A.    He said that the pain is on
10  the back cuff.
11    Q.    Is that what I've
12  highlighted here in this record?
13    A.    It is.
14    Q.    When we've talked about the
15  back cuff, is that -- is that the vaginal
16  cuff you told the jury about?
17    A.    Right.
18    Q.    Okay.  Is this finding of
19  Dr. Baker significant to you in
20  understanding what was causing Mrs.
21  Hammons' pain on that day?
22    A.    It is.
23    Q.    What do you believe, Doctor,
24  was the most likely explanation for why

Page 152

1  Mrs. Hammons was experiencing painful
2  sexual intercourse in July of 2009?
3    A.    I think the most likely --
4  the most likely reason that she was
5  experiencing pain at that time was from
6  her vaginal cuff incision --
7    Q.    And --
8    A.    -- from the hysterectomy.
9    Q.    So the vaginal cuff
10  incision.
11        Which of the surgical
12  procedures that Dr. Baker did required
13  the vaginal cuff incision?
14    A.    The vaginal hysterectomy.
15    Q.    And why do you say it most
16  likely is related to that procedure
17  rather than the PROLIFT®?
18    A.    Because he reports that the
19  pain is on the back, which is in the
20  opposite compartment where the PROLIFT®
21  was placed.  And he reports that it's at
22  the cuff.
23    Q.    So is the -- I think we
24  looked earlier at that anatomical

Page 153

1  drawing.
2    A.    Uh-huh.
3    Q.    If we look back at this
4  drawing here, the PROLIFT® is placed at
5  the front?
6    A.    That's right.
7    Q.    And where is the back cuff
8  in this drawing?
9    A.    Right there.  Right where
10  you're indicating it.
11    Q.    So to the right of where the
12  stitches are located?
13    A.    Right.  Or it can even be a
14  little further, that whole curve is
15  considered the back cuff.
16    Q.    Okay.  And is that location
17  of pain consistent with the incision done
18  for the hysterectomy?
19    A.    It is.
20    Q.    Is it at all surprising to
21  you to have a patient who attempted
22  intercourse six weeks after a vaginal
23  hysterectomy reporting pain?
24    A.    That's not surprising.

39 (Pages 150 to 153)

Joye Lowman, M.D.

Page 154

1    Q.    When did Mrs. Hammons next
2 report pain with sexual activity?
3    A.    She next reported pain when
4 she presented to Dr. Lackey.
5    Q.    Was that at the end of 2009?
6    A.    Yes.
7    Q.    I'm now handing you what
8 we've marked as Defense Exhibit-10043.4.
9        Dr. Lowman, is this a record
10 you reviewed and considered in this case?
11    A.    It is.
12    Q.    Can you tell the jury what
13 it is?
14    A.    This is a progress note by
15 Dr. Lackey.
16    Q.    And the date of it?
17    A.    November 30th, 2009.
18    Q.    Did Mrs. Hammons report to
19 Dr. Lackey pain with sexual activity on
20 this -- at this visit?
21    A.    She did.
22    Q.    Now, did Mrs. Hammons tell
23 Dr. Lackey about her prior surgery with
24 Dr. Baker?

Page 155

1    A.    She did.
2    Q.    And is that documented here?
3    A.    It is.
4    Q.    Can you direct us to where
5 that is?
6    A.    In the beginning of his
7 assessment, he says that she had a
8 hysterectomy and bladder repair in May of
9 this year.  The uterus was coming out and
10 the bladder was dropped.  She thinks they
11 used mesh and those symptoms are better.
12    Q.    Did Dr. Lackey do an
13 examination on that date as to this
14 question of whether the mesh was
15 adequately supporting Mrs. Hammons'
16 bladder?
17    A.    He did.
18    Q.    And what did he assess on
19 that date?
20    A.    He said that her bladder is
21 well supported.
22    Q.    Did Dr. Lackey also assess
23 what he believed was causing Mrs.
24 Hammons' pain with sexual activity?

Page 156

1    A.    He did.
2    Q.    Now, did you review Dr.
3 Lackey's deposition?
4    A.    I did.
5    Q.    Was Dr. Lackey asked, and
6 provided sworn testimony on this issue?
7    A.    He did.
8    Q.    Do you recall what Dr.
9 Lackey testified to was -- what was his
10 belief as to what was causing Mrs.
11 Hammons' pain, towards the ends of 2009,
12 with sexual activity?
13    A.    It was his opinion that her
14 pain was being caused by the prolapse.
15    Q.    Did Dr. Lackey also mention
16 that atrophy may be -- vaginal atrophy
17 may be contributing to her pain?
18    A.    Yes, he did.
19    Q.    Dr. Lowman, do you see any
20 reason to disagree with Dr. Lackey's
21 conclusion about his own patient and what
22 was causing her pain with sexual
23 activity?
24    A.    No.

Page 157

1    Q.    Can vaginal atrophy lead to
2 pain?
3    A.    Yes.
4    Q.    Can a severe rectocele, the
5 likes of which Mrs. Hammons had, lead to
6 pain with sexual activity?
7    A.    Yes.
8    Q.    And you've already described
9 for the jury that Dr. Lackey did a
10 surgery to help correct the prolapse that
11 Mrs. Hammons had developed in other
12 organs outside of the bladder, correct?
13    A.    Yes.
14    Q.    In 2010, did Mrs. Hammons
15 report to any of her healthcare providers
16 any complaints of dyspareunia?
17    A.    Not that I'm aware of.
18    Q.    In 2011, did Mrs. Hammons
19 report to any of her healthcare providers
20 any complaints of dyspareunia?
21    A.    No.
22    Q.    Now, we already discussed
23 with the jury Dr. Heit's treatment of
24 Mrs. Hammons, beginning in the summer of

Golkow Technologies, Inc. - 1.877.370.DEPS

Joye Lowman, M.D.

Page 158

1  2012.
2          Do you recall that?
3     A.   Yes.
4     Q.   To the extent that Mrs.
5  Hammons was sexually active in that
6  period of time, what do you believe would
7  be the factors that would cause her to
8  have pain with sexual activity?
9          And, again, we're talking
10 about the period of time around Dr.
11 Heit's treatment, when he found the mesh
12 rolled and bunched.
13    A.   I think her painful
14 intercourse was most likely, at that
15 time, multifactorial, for all of the
16 reasons that we just talked about.  So
17 she demonstrated vaginal atrophy at the
18 time that she presented to Dr. Heit.
19         She demonstrated stage III
20 prolapse at the time that she presented
21 to Dr. Heit.  He also described her
22 having a foreshortened vagina.  All of
23 those things can contribute to
24 dyspareunia.

Page 159

1          And he did palpate her mesh
2  and reproduce pain there, so I do think
3  that was likely contributing to her
4  dyspareunia as well.
5          MR. ISMAIL:  We need to
6     change the tape.
7          VIDEO TECHNICIAN:  Going off
8     the record at 4:20 p.m.
9                - - -
10         (Whereupon, a brief recess
11    was taken.)
12               - - -
13         VIDEO TECHNICIAN:  We're
14    back on the record at 4:28 p.m.
15 BY MR. ISMAIL:
16    Q.   Dr. Lowman, did -- I want to
17 turn now to the period of time after Dr.
18 Heit did his procedures, the end of 2012,
19 early 2013, okay?
20    A.   Okay.
21    Q.   I'm going to hand you what
22 we marked as Defense Exhibit 10039.3.
23         Is this a medical record you
24 reviewed in this case?

Page 160

1     A.   It is.
2     Q.   Can you tell the jury what
3  this is?
4     A.   This is Dr. Heit's postop
5  assessment in April of 2013.
6     Q.   When you say postop, that's
7  after the operations he performed?
8     A.   After the operations he
9  performed, yes.
10    Q.   Was this Dr. Heit's last
11 visit with Mrs. Hammons?
12    A.   It is.
13    Q.   Now, so we have at the top
14 April 22nd, 2013; is that correct?
15    A.   That's correct.
16    Q.   Did Dr. Heit do a physical
17 examination on this date?
18    A.   He did.
19    Q.   And what did he note?
20    A.   He noted a normal vagina,
21 other than atrophy.  No tenderness on
22 examination.
23    Q.   And is that significant to
24 you?

Page 161

1     A.   It is.
2     Q.   Tell us why.
3     A.   Because she initially
4  presented with tenderness on examination
5  and now is not, after having excised the
6  mesh.
7          She also has vaginal
8  atrophy.
9     Q.   Is vaginal atrophy that
10 condition that you've described as being
11 associated with painful sex?
12    A.   It is.
13    Q.   Did Dr. Heit, in this visit,
14 give any advice to Mrs. Hammons as to
15 whether or not he believed she could
16 resume sexual activity?
17    A.   Yes, he did.
18    Q.   And what did he document
19 here?
20    A.   Okay to proceed with coitus.
21    Q.   Is that -- what does that
22 mean in non --
23    A.   Coitus is sexual activity.
24    Q.   And is that finding or is

Joye Lowman, M.D.

Page 162

1   that recommendation significant to you in
2   any way?
3       A.   It is.
4       Q.   Tell us why.
5       A.   I think that Dr. Heit is
6   basically saying, you know, the problems
7   that you presented to me with are now
8   resolved, it's fine for you to
9   continue -- or to resume your usual
10  activities.
11      Q.   Since early 2013, Dr.
12  Lowman, have you seen any indication
13  that -- withdrawn.
14           In this record that we're
15  looking at here, did Dr. Heit document
16  any concern that Mrs. Hammons --
17  withdrawn.
18           Do you have an opinion, Dr.
19  Lowman, as to whether or not mesh was
20  causing Mrs. Hammons any pain with
21  intercourse after her care and treatment
22  by Dr. Heit?
23      A.   That would be unlikely, no.
24      Q.   And what do you base that

Page 163

1   on?
2       A.   My clinical experience, the
3   evaluation of mesh complications in the
4   literature, and Dr. Heit's assessment.
5       Q.   Now, as of April of 2013,
6   had Dr. Heit done procedures to remove
7   the mesh from the vagina?
8       A.   He did.
9       Q.   And is that significant to
10  you in considering whether or not, after
11  his care and treatment, Mrs. Hammons'
12  prior use of a PROLIFT® had any relation
13  to complaints of painful sexual activity?
14      A.   Current complaints?
15      Q.   Correct.
16      A.   You're asking -- no.
17      Q.   Tell us -- tell us why that
18  is significant.
19      A.   It's significant because Dr.
20  Heit's assessment was that he felt that
21  the rolled and bunched mesh was
22  contributing to her pain.  After he
23  excised the mesh, he's communicating in
24  this note, in my opinion, that he does

Page 164

1   not feel like that condition currently
2   exists.
3            So if she does have pain
4   with intercourse at this time, it is most
5   likely not related to the mesh.
6       Q.   If Mrs. Hammons is sexually
7   active since her treatment with Dr. Heit
8   and is reporting pain, what do you
9   believe to be the most likely explanation
10  for that pain?
11      A.   All of the other potential
12  things that we talked about, which would
13  include vaginal atrophy, the fact that
14  she may or may not have a shortened
15  vaginal length, and the multiple
16  surgeries that she has been exposed to.
17           Dr. Jolet, in her
18  evaluation, also documented the condition
19  of levator myalgia, which is where the
20  muscles around the vagina spasm, and that
21  can cause pain with intercourse as well.
22      Q.   How about going forward, Dr.
23  Lowman, is there any reason to believe
24  that Mrs. Hammons' implantation with a

Page 165

1   PROLIFT® in 2009 would cause her painful
2   intercourse in the future?
3            MR. SLATER:  One second,
4        counsel.  I just want to move
5        and -- object and move to strike
6        the last answer.  Reference to Dr.
7        Jolet's exam by this witness is
8        inappropriate, since that is a
9        defense expert who is not
10       testifying in trial.
11           MR. ISMAIL:  Let me re-ask a
12       prior question.
13  BY MR. ISMAIL:
14      Q.   Dr. Lowman, I guess the
15  judge will decide whether the first
16  answer is acceptable or not.  But let me
17  re-ask it and ask that you not make
18  reference to Dr. Jolet, okay?
19      A.   Okay.
20      Q.   If Mrs. Hammons is sexually
21  active since her treatment with Dr. Heit
22  and is reporting pain, what do you
23  believe the most likely explanation for
24  that pain to be?

42 (Pages 162 to 165)

Golkow Technologies, Inc. - 1.877.370.DEPS

Joye Lowman, M.D.

Page 166

1      A.    The potential conditions
2  that she currently has, or at least did
3  have at that time, that may lead to her
4  having dyspareunia are vaginal atrophy, a
5  foreshortened vagina, and Dr. Zipper
6  testified that she had pain with
7  palpation of the anterior vaginal wall on
8  his exam.
9           That, coupled with urgency
10 and frequency, is also consistent with
11 interstitial cystitis, which is a
12 condition that can cause painful
13 intercourse.
14      Q.    Now, does --
15          MR. SLATER:  Move to strike
16      that answer also.  The
17      interstitial cystitis opinion,
18      which has absolutely no basis
19      whatsoever.  That's never been
20      found by any doctor.
21 BY MR. ISMAIL:
22      Q.    Doctor, do you believe that
23 since Mrs. Hammons' treatment with Dr.
24 Heit, has there been documentation of her

Page 167

1  having vaginal atrophy?
2      A.    Since the treatment of Dr.
3  Heit?  Yes.
4      Q.    Does -- do you believe that
5  Mrs. Hammons' vaginal atrophy to be
6  contributing to her reports of pain with
7  any sexual activity that she's engaged in
8  since Dr. Heit's treatment?
9      A.    Yes.
10      Q.    Do you believe that the
11 procedures, the surgical procedures he's
12 undertaken, specifically the vaginal
13 hysterectomy and the native tissue
14 surgery of Dr. Lackey, to be contributing
15 to any pain that Mrs. Hammons may be
16 experiencing since her treatment with Dr.
17 Heit?
18      A.    Could you ask that question
19 again?
20      Q.    Yes.
21          Let me ask it this way:
22 Since January of 2013, has any doctor
23 ever found, on examination, that he or
24 she could feel mesh in Mrs. Hammons?

Page 168

1      A.    No.
2      Q.    Does that include Dr.
3  Zipper?
4      A.    Yes.
5      Q.    Since January of 2013, has
6  any doctor ever noted that mesh was
7  visible in Mrs. Hammons' case?
8      A.    No.
9      Q.    Does that include Dr.
10 Zipper?
11      A.    Yes.
12      Q.    Are those findings
13 significant to you in answering the
14 question of whether mesh is playing any
15 role in any symptoms that Mrs. Hammons is
16 reporting currently?
17      A.    Yes.
18      Q.    Tell us why.
19      A.    Because if the presence of
20 mesh is causing dyspareunia, removing the
21 mesh usually resolves the dyspareunia.
22      Q.    And the fact that there's no
23 mesh palpable or visible in Mrs. Hammons
24 since 2013, is that a significant

Page 169

1  finding?
2      A.    It is.
3      Q.    Does that help answer this
4  question of whether or not the mesh is
5  causing Mrs. Hammons any symptoms since
6  early 2013?
7      A.    It does.
8      Q.    Now, the jury has seen
9  reference to these straps or arms of an
10 anterior PROLIFT®.
11          You're obviously familiar
12 with what the PROLIFT® looks like,
13 correct?
14      A.    Yes.
15          MR. SLATER:  Objection.
16      There's no discussion of any
17      issues with the arms in the
18      report.
19 BY MR. ISMAIL:
20      Q.    The jury has seen a surgical
21 video, at least a portion of it, of
22 implantation of a PROLIFT®.
23          You're obviously familiar
24 with the PROLIFT® procedure?

43 (Pages 166 to 169)

Joye Lowman, M.D.

1      A.   I am.
2      Q.   Now, the straps that are
3  part of the PROLIFT® as it comes out of
4  the box, is that entire strap still in
5  Mrs. Hammons?
6      A.   No.
7      Q.   Why is do you say that?
8      A.   Because a significant
9  portion of the strap is cut at the time
10  of surgery.
11      Q.   So if the jury saw a video
12  in which the arms are pulled through
13  these plastic tubes called a cannula --
14      A.   Right.
15      Q.   -- what happens next in the
16  surgery?
17      A.   Once the mesh is
18  appropriately positioned, the cannulas
19  are removed and the mesh is cut at the
20  level of the patient's skin.
21      Q.   So if, during Dr. Zipper's
22  examination, the PROLIFT® out of the box
23  was held up to the jury and it was
24  suggested that the strap, or the entire

1  arm of the mesh is still in Mrs. Hammons,
2  is that accurate?
3      A.   That's misleading --
4          MR. SLATER:  Objection.
5      Mischaracterizes and foundation.
6          THE WITNESS:  That would be
7      inaccurate.
8  BY MR. ISMAIL:
9      Q.   Now, is the strap that -- is
10  there a portion of that arm or strap
11  that's still in Mrs. Hammons,
12  potentially?
13      A.   Yes.
14      Q.   Is that in contact with the
15  vagina?
16      A.   Not according to Dr. Heit's
17  testimony or his operative report.
18      Q.   Is there any reason to
19  expect that that small portion of the
20  strap would cause Mrs. Hammons any
21  problems going forward?
22      A.   No.
23      Q.   Why do you say that?
24      A.   In the studies that evaluate

1  mesh contraction and mesh complications,
2  it is documented that the majority of the
3  pain that is caused in that situation is
4  from tension across the mesh body from
5  the mesh arms.
6          So if you relieve the
7  connection or relieve that tension across
8  the mesh, then you are likely to relieve
9  the patient's symptoms.
10          MR. SLATER:  Objection.
11      Move to strike.  Improper use of
12      medical literature.
13          THE WITNESS:  That's been my
14      clinical experience as well.
15  BY MR. ISMAIL:
16      Q.   Dr. Lowman, in your clinical
17  practice, have you had experience
18  treating women and providing relief for
19  pain of dyspareunia?
20      A.   I have.
21      Q.   Do you see any indication,
22  since Dr. Heit's treatment with Mrs.
23  Hammons, that she's ever been offered
24  treatment for dyspareunia?

1      A.   No.
2      Q.   What types of treatments are
3  you familiar with in women who have
4  reported pain with sexual activity?
5      A.   Oh, there are several.  It
6  depends on the diagnosis.  If a patient
7  presents with interstitial cystitis,
8  which is definitely a real condition, the
9  jury can Google it, but it's there --
10      Q.   Let's start over.  That's
11  going to cause the judge to be upset.  So
12  let's start over.
13      A.   It's real.
14      Q.   I know.
15      A.   He said I'm making it up.
16      Q.   We're not inviting the jury
17  to Google anything.  So we'll start over
18  with a new question, okay?
19      A.   Fine.
20      Q.   What types of treatments are
21  available for women who have reports of
22  dyspareunia?
23      A.   There are several
24  treatments.  It depends on the diagnosis

Golkow Technologies, Inc. - 1.877.370.DEPS

Joye Lowman, M.D.

Page 174

1  causing the dyspareunia. In the case of
2  interstitial cystitis, we use several
3  different medications.
4         You can perform cystoscopy
5  with hydrodistention. I mean, there are
6  a number of different treatment options.
7         In the case of levator
8  myalgia, the usual therapies include
9  physical therapy. We can inject sort of
10  numbing medication, what we call trigger
11  point injections, to help relieve pain in
12  that situation. We can actually inject
13  Botox into the muscles themselves to
14  relieve the spasm that's causing the
15  pain.
16         So it just depends on what
17  the cause is.
18     Q.   Have you had success in
19  treating women who have reports of
20  dyspareunia?
21     A.   Yes.
22     Q.   I want to turn now to this
23  discussion of vaginal length. You
24  mentioned that in one of your answers a

Page 175

1  moment ago, okay?
2     A.   Okay.
3     Q.   Was there a measure of total
4  vaginal length in Mrs. Hammons before Dr.
5  Baker's surgery in May of 2009?
6     A.   Not that I'm aware of, no.
7     Q.   When was the first time any
8  physician recorded a measure of total
9  vaginal length for Mrs. Hammons?
10     A.   Dr. Heit's evaluation.
11     Q.   And do you recall what Dr.
12  Heit measured?
13     A.   He said it was 7
14  centimeters.
15     Q.   Now, did Mrs. Hammons, prior
16  to seeing Dr. Heit, undergo certain
17  surgeries that would be expected to
18  reduce her total vaginal length?
19     A.   She did.
20     Q.   What were those surgeries?
21     A.   Namely, the vaginal
22  hysterectomy that she had, as well as the
23  enterocele repair without supporting the
24  apex.

Page 176

1     Q.   The -- you mentioned that
2  there was no measure of total vaginal
3  length before Dr. Baker's surgeries,
4  correct?
5     A.   That's correct.
6     Q.   If we were to assume that
7  Mrs. Hammons had a 10 centimeter vaginal
8  length, would the vaginal hysterectomy
9  and the native tissue surgery alone be
10  sufficient to explain her current vaginal
11  length?
12         MR. SLATER: Objection.
13         THE WITNESS: They would.
14  BY MR. ISMAIL:
15     Q.   And what do you base that
16  upon?
17     A.   Upon the literature and my
18  clinical experience.
19     Q.   Now, just a few more
20  questions, Dr. Lowman.
21         You've discussed with the
22  jury several opinions that you've offered
23  today, both about the PROLIFT® device and
24  procedure and Mrs. Hammons in particular.

Page 177

1  And I'd like to review those now, if we
2  could.
3     A.   Okay.
4     Q.   Dr. Lowman, based on all the
5  work that you have done, your clinical
6  experience, the literature, your work as
7  a researcher, was the PROLIFT® a safe and
8  effective option to treat Mrs. Hammons'
9  pelvic organ prolapse in May of 2009?
10     A.   Yes.
11     Q.   Based on all the work you've
12  done, your clinical experience and the
13  medical literature, did the PROLIFT®
14  cause Mrs. Hammons to develop a prolapse
15  in other organs?
16     A.   No.
17     Q.   Did Mrs. Hammons' initial
18  reports of painful sexual intercourse in
19  2009 have anything to do with the
20  PROLIFT®?
21     A.   No.
22     Q.   Is that for the reasons
23  you've described for the jury so far
24  today?

45 (Pages 174 to 177)

Joye Lowman, M.D.

Page 178

1      A.   Yes.
2      Q.   Did mesh contraction cause
3   Mrs. Hammons' mesh to roll and bunch
4   under the bladder neck, as found by Dr.
5   Heit?
6      A.   No.
7      Q.   What did?
8      A.   Not supporting the vaginal
9   apex at the time that the mesh was
10  secured to the vaginal apex.
11     Q.   Since the removal of mesh
12  has, the PROLIFT® caused Mrs. Hammons any
13  complications, in your view?
14     A.   Not that the medical records
15  demonstrate, no.
16     Q.   Does Mrs. Hammons have any
17  ongoing complications that you believe is
18  due to her PROLIFT®?
19     A.   No.
20     Q.   Have any of Mrs. Hammons'
21  doctors diagnosed any complications from
22  Mrs. Hammons' PROLIFT® since January of
23  2013?
24     A.   Not that I'm aware of.

Page 179

1      Q.   Have any of Mrs. Hammons'
2   doctors diagnosed -- withdrawn.
3           Have any of Mrs. Hammons'
4   doctors assessed her to be at risk for
5   future complications because of her
6   PROLIFT® procedure?
7      A.   No.
8      Q.   Do you believe that Mrs.
9   Hammons is at risk for any future
10  complications from her PROLIFT®
11  procedure?
12     A.   No.
13     Q.   Dr. Lowman, I have up on the
14  chart -- up on the screen a chart that we
15  started with Dr. Zipper, and I'd like to
16  go through it with you now, if I could.
17     A.   Okay.
18     Q.   As to the first question,
19  did Mrs. Hammons have a grade 4 bladder
20  prolapse, did you review for the jury
21  today how Mrs. Hammons' physician, Dr.
22  Baker, answered that question?
23     A.   I did.
24     Q.   And did he say she did?

Page 180

1      A.   He did.
2      Q.   Do you agree with Dr.
3   Baker's diagnosis?
4      A.   I do.
5      Q.   As to this question of
6   whether the rectocele and atrophy caused
7   the dyspareunia in 2009, did Dr. Lackey,
8   in his sworn testimony, answer that
9   question?
10     A.   He did.
11     Q.   And what was Dr. Lackey's
12  assessment?
13     A.   Yes.
14     Q.   Do you agree with Dr.
15  Lackey?
16     A.   I do.
17     Q.   As to whether surgical
18  implant technique, as you've more fully
19  described for the jury today, led to the
20  rolling and bunching of the mesh in 2012,
21  did Dr. Heit answer that question?
22     A.   He did.
23     Q.   And what was his assessment,
24  as you understand the record?

Page 181

1      A.   That was his opinion.
2      Q.   Do you agree with Dr. Heit?
3      A.   I do.
4      Q.   As to this question of
5   whether the PROLIFT® was adequately
6   supporting Mrs. Hammons' bladder in
7   August of 2012, did Mrs. Hammons' own
8   physician, Dr. Heit, answer that
9   question?
10     A.   He did.
11     Q.   What is your understanding
12  of the record as to what Dr. Heit, Mrs.
13  Hammons' own doctor, said about that
14  issue?
15     A.   He doesn't indicate any
16  concern for that.
17     Q.   Do you agree with Dr. Heit?
18     A.   I do.
19     Q.   As to the question of
20  whether there are any future
21  complications due to the PROLIFT®, have
22  you seen any indications from any of the
23  records of Mrs. Hammons' doctors that
24  they believe Mrs. Hammons is at risk of

46 (Pages 178 to 181)

Joye Lowman, M.D.

Page 182

1  future complications from her PROLIFT®?
2      A.   No.
3      Q.   Do you agree with Mrs.
4  Hammons' doctors on that issue?
5      A.   I do.
6          MR. ISMAIL:  Dr. Lowman, I
7  want to thank you for your time,
8  and I appreciate you providing
9  your opinions to the jury.
10         THE WITNESS:  Thank you.
11         MR. SLATER:  Let's go off
12  the record.
13         VIDEO TECHNICIAN:  Off
14  record at 4:46 p.m.
15              - - -
16         (Whereupon, a brief recess
17  was taken.)
18              - - -
19         VIDEO TECHNICIAN:  We're
20  back on the record at 5:02 p.m.
21              - - -
22         EXAMINATION
23              - - -
24  BY MR. SLATER:

Page 183

1      Q.   Good afternoon, Dr. Lowman.
2      A.   Good evening.
3      Q.   Good evening, you're right.
4  It's the evening now.
5          Doctor, I want to go over a
6  little bit about your preparation for
7  this deposition, this trial testimony.
8          Did you have time to prepare
9  for this?
10     A.   I did have time to prepare
11  for this.
12     Q.   How much time did you spend
13  preparing for this testimony?
14     A.   I've been spending the past
15  several weeks preparing to testify.  I
16  was made aware, maybe -- I have to -- I'm
17  guessing, but I think it was about two
18  weeks ago of the likely date of the
19  testimony.
20         It was a last-minute
21  decision to -- not to do that on Friday
22  and to do that today.  But I have been
23  preparing over the last several weeks.
24     Q.   How much time would you say

Page 184

1  you've spent in the past several weeks
2  preparing for this?
3      A.   A significant amount of
4  time.  If I had to guess, maybe 40 hours.
5      Q.   Okay.  Counsel asked you
6  some questions about your billing rate
7  and the time you've spent.  I'd just like
8  to go over that a little bit with you.
9      A.   Okay.
10     Q.   You said that your rate is
11  $400 per hour?
12     A.   Yes.
13     Q.   Actually, your rate is $400
14  per hour for preparation of your report
15  and review of materials.
16         But for when you testify, as
17  you're testifying now, we're in a
18  deposition, it's $600 an hour; isn't that
19  true?
20     A.   That's correct.
21     Q.   And you told counsel that
22  you thought you had spent about 100 hours
23  in this case?
24     A.   Yes.

Page 185

1      Q.   When we met, remember we met
2  about a month ago, November 13th, and I
3  was able to ask you some questions?
4      A.   Yes.
5      Q.   At that time, you told us
6  that you had actually had two prior
7  invoices before that time, one for
8  $32,400 and one for $19,600, which was
9  your billing up through October 15th in
10  this matter and maybe one other matter.
11     A.   Yes, that's correct.
12     Q.   And then you told us that --
13  so let me ask you this:  So some portion
14  of that $50,000 was for this case, right?
15     A.   Yes.
16     Q.   What portion?
17     A.   I don't remember.  I started
18  evaluating this case first, and then I
19  was asked to evaluate a different case,
20  and then I came back to -- then was asked
21  again to go back to this case.  So it's
22  hard for me to say that.
23         But my best guesstimate of
24  the time that I've spent on this case

Joye Lowman, M.D.

1   overall is about 100 hours.
2        Q.   Okay.  What I'm asking is
3   this:  The $50,000 you had billed for
4   time up through October 15th, you can't
5   give us any idea of how much of that
6   $50,000 was for this case?
7        A.   Not any more than what I
8   just said, no.
9        Q.   Certainly, it would have
10  been at least half or more than half of
11  that, right?
12       A.   No, not necessarily.  A
13  great proportion of what I have been
14  reviewing has been the literature.  So
15  that's been a significant amount of time,
16  and that relates to all of the cases that
17  I review.
18       Q.   So a significant part of the
19  $50,000 was for reviewing literature?
20       A.   Yes.
21       Q.   Which you've testified about
22  today?
23       A.   Yes.
24       Q.   You told me, when I took

1   your deposition in November, that since
2   October 15th, you had spent over 100
3   hours in this case at $400 per hour up
4   till the day of the deposition.
5        Do you remember telling me
6   that?
7        A.   I don't remember that
8   specifically.  But that sounds about
9   right.
10       Q.   So as of November 13th, you
11  had spent over -- well, let me take it
12  back.
13       You had spent some portion
14  of that $50,000 on this case before
15  October 15, right?
16       A.   Yes.
17       Q.   And then after October 15
18  and up to the day of the deposition,
19  November 13, you had spent over 100 hours
20  more, right?
21       A.   Of the total time.
22       Q.   Well, you told me in the
23  deposition, and I'll have to hand you
24  your transcript here.

1        A.   Okay.
2        Q.   Here you go.
3        If you go to Page 235 of
4   your deposition.
5        And on Page 235, Line 19, I
6   asked you:  Since October 15, do you know
7   how many hours you've spent up through
8   today or, can you estimate, on this case,
9   on Hammons?
10       And you said:  It's been
11  over 100.  I don't know exactly.
12       And the question:  Over 100
13  hours reviewing materials, preparing for
14  the deposition, that sort of thing?
15       Right.
16       And then I asked you:  And
17  that wouldn't include today?
18       And you said:  That would
19  not include today.
20       That was the deposition.
21       And then you were asked, on
22  236, Line 5:  So over 100 hours at $400
23  an hour on Hammons that you haven't
24  billed for yet?

1        And you said:  That's
2   correct.
3        Right?
4        A.   That's correct.
5        Q.   So as of November 13th,
6   there was over 100 hours at $400 an hour
7   you had not billed for yet through the
8   day before that deposition, right?
9        A.   Right.
10       Q.   And then you did the
11  deposition in November 13th, which was
12  $600 an hour, right?
13       A.   Right.
14       Q.   And then since November 13th
15  and up until today, you've spent at least
16  40 or more hours?  You just told us you
17  prepared for 40 or more hours for this
18  deposition, right?
19       A.   Right.
20       Q.   So that gets us to 100 or
21  so, 140 plus today and the other day of
22  the deposition at $600 an hour, that's
23  all encompassed there, right?
24       A.   Yes.

Joye Lowman, M.D.

Page 190

1    Q.   Plus whatever was the
2 portion of the first $50,000, right?
3    A.   Right.
4         Again, in the beginning of
5 this, I talk about the fact that much of
6 that, before this, was spent on two cases
7 so it was hard for me to be specific.
8         But in an effort to try to
9 give you a number, that's what I did.
10 And I think that that's fairly accurate.
11    Q.   That was for before October
12 15th --
13    A.   Yes.
14    Q.   -- when you said you could
15 not tell?
16    A.   Yes.
17    Q.   Right.  So you haven't just
18 spent about 100 hours on this case,
19 you've actually spent at least 140 hours,
20 plus the time today and the time in the
21 deposition in November, plus whatever
22 portion of the first $50,000 is for this
23 case, right?
24    A.   That's correct.

Page 191

1    Q.   Now, let's talk a little
2 about your background.
3         You have no current teaching
4 appointments, right?
5    A.   Right.
6    Q.   You're not a peer reviewer
7 for any medical journal, correct?
8    A.   Correct.
9    Q.   Your publications that you
10 talked about, they were -- they were
11 written when you were still studying as a
12 fellow, correct?
13    A.   That's correct.
14    Q.   And what happened was, you
15 were working under a doctor named
16 Douglass Hale, and he had ideas for some
17 studies he wanted to do and articles he
18 wanted to write, and he would involve his
19 fellows in those projects, right?
20    A.   No.  Those studies that I
21 talked about are studies that were my
22 ideas.
23    Q.   The dyspareunia article was
24 your idea?

Page 192

1    A.   That was my idea.
2    Q.   Okay.  And the article that
3 we'll talk about, maybe in a few minutes,
4 on the MRI, that was your idea?
5    A.   That was Dr. Hale's idea.
6 It was our idea together, we kind of
7 talked about it together.  But the way
8 that the -- the way that study developed
9 over time was more his idea.
10    Q.   And Dr. Hale was an Ethicon
11 consultant for many years and was an
12 Ethicon consultant when you were training
13 with him, correct?
14         MR. ISMAIL:  Objection to
15 foundation.
16         THE WITNESS:  I don't know.
17 BY MR. SLATER:
18    Q.   You don't know whether he
19 was an Ethicon consultant or was being
20 paid for work?
21    A.   No.
22    Q.   He never told you that?
23    A.   No.  Most program directors
24 don't discuss that with their fellows.

Page 193

1    Q.   Now, Dr. Hale, and I'll just
2 show you something we marked as an
3 exhibit, P-1666, that's an abstract
4 presentation of the GYNEMESH®® PS study.
5         Do you see that?
6    A.   I do.
7    Q.   And do you see who the
8 authors are?  It's Dr. Lucente and Dr.
9 Hale, and a couple of other people?
10    A.   Yes.
11    Q.   And were you aware that Dr.
12 Hale was one of the investigators for
13 Ethicon on the GYNEMESH®® PS study?
14    A.   I didn't -- I wasn't aware,
15 no.
16    Q.   Now, let's go and talk about
17 Dr. Lucente a little bit.  We've heard
18 his name during the trial.
19         You know Dr. Lucente, right?
20    A.   I do.
21    Q.   In fact, your residency you
22 did with him?
23    A.   Yes.
24    Q.   Meaning, he was a doctor at

Joye Lowman, M.D.

Page 194

1  the hospital where you were doing your
2  residency?
3       A.   Yes, that's correct.
4       Q.   And he was one of the people
5  that trained you?
6       A.   Yes.
7       Q.   Dr. Lucente, you considered
8  to be a friend, right?
9       A.   I do.
10      Q.   And a colleague, right?
11      A.   Yes.
12      Q.   In fact, you actually called
13  and spoke with Dr. Lucente about this
14  case, didn't you?
15      A.   I did.
16      Q.   And I think what you told us
17  is that when you called Dr. Lucente, you
18  wanted to know, why is it that Dr.
19  Zipper, who had used mesh in the past, is
20  now so against its use; that's what you
21  wanted to talk to Dr. Lucente about,
22  right?
23      A.   Right.
24      Q.   Now, have you seen Dr.

Page 195

1  Zipper's testimony from the trial?
2       A.   I've seen portions of it.
3       Q.   Portions?
4       A.   Uh-huh.
5       Q.   Do you know that Dr. Zipper
6  said the reason he stopped using the mesh
7  is because of the damage he was seeing to
8  patients and the horrible complications
9  they were suffering?
10      A.   Yes.
11           MR. ISMAIL:  Objection.
12  BY MR. SLATER:
13      Q.   And you know, of course,
14  there are patients with PROLIFTs® that
15  have suffered very serious, very
16  life-changing complications; you know
17  that, right?
18      A.   There have been patients
19  that have had serious complications, yes.
20           MR. SLATER:  I'm going to
21      need some stickers.
22           You didn't use any?  I'm
23      going to mark them with these when
24      they haven't been marked already.

Page 196

1       Is that okay?
2            MR. ISMAIL:  That's fine.
3            - - -
4            (Whereupon, Exhibit
5       Lowman-1, September 2007 E-mail,
6       was marked for identification.)
7            - - -
8  BY MR. SLATER:
9       Q.   Doctor, I'm going to hand
10  you what we marked as Exhibit Lowman-1.
11  And that's an e-mail from September of
12  2007.
13           Do you see that?
14      A.   I do.
15      Q.   And, in fact, you can see
16  that Vince Lucente, on September 11,
17  2007, is writing to somebody, and he's
18  talking about you.
19           Do you see that?
20      A.   I do.
21      Q.   And he's telling Bart
22  Pattyson, who was a professional
23  education manager at Ethicon, that Dr.
24  Hale's senior fellow, you, was a resident

Page 197

1  of his and that your loyalty to him was a
2  friction point with Dr. Hale.
3            Do you see him talking about
4  that?
5       A.   I do.
6       Q.   And is he correct that you
7  have a great deal of loyalty to Dr.
8  Lucente?
9            MR. ISMAIL:  Objection to
10      form.
11           THE WITNESS:  I don't have
12      loyalty to Dr. Lucente.  I respect
13      Dr. Lucente.
14           - - -
15           (Whereupon, Exhibit
16      Lowman-2, June 2009 E-mail, was
17      marked for identification.)
18           - - -
19  BY MR. SLATER:
20      Q.   I'm now going to hand you
21  what we've marked as Exhibit-2.  And
22  that's an e-mail in June of 2009.
23           Do you see that?
24      A.   Yes, I do.

50 (Pages 194 to 197)

Joye Lowman, M.D.

Page 198

1    Q.   And it's written by somebody
2 at Ethicon named Scott Finley, who is a
3 division manager, a sales division
4 manager.
5         Do you see that?
6    A.   I do.
7    Q.   And he's writing to some
8 people about a program to give
9 professional education to other doctors,
10 and he talks, in the middle, about a
11 proctorship where you and Dr. Lucente
12 would perform a procedure on the
13 PROLIFT®, and other doctors would watch
14 and learn about it.
15        Do you see that?
16   A.   Yes.
17        MR. ISMAIL:  Objection.
18 Lack of foundation.  Give me a
19 minute, Dr. Lowman, to get the
20 objection in.
21        THE WITNESS:  Sorry.
22 BY MR. SLATER:
23   Q.   You see that that's what's
24 being discussed in the document, correct?

Page 199

1        MR. ISMAIL:  Objection.
2 Lack of foundation.
3        THE WITNESS:  Yes.
4 BY MR. SLATER:
5    Q.   And you see at the end of
6 the letter, the e-mail that this Scott
7 Finley says that -- they're talking about
8 the targets, people they want to target
9 in connection with this event.
10        Do you see that?
11   A.   Yes, I do.
12   Q.   And targets, do you know
13 that's language that marketers use at
14 Ethicon when they want to target a doctor
15 to use their products?
16   A.   I do now.  I didn't before
17 this trial.
18   Q.   And they're talking about
19 the doctors they want to bring in, and
20 they say, You all need to discuss this
21 program with every mesh doctor in
22 Atlanta, seize the moment and let's
23 conquer.
24        That's what they were

Page 200

1 talking about, about this proposed
2 proctorship with you and Dr. Lucente?
3        MR. ISMAIL:  Objection.
4 Lack of foundation.
5        THE WITNESS:  I see that.
6 BY MR. SLATER:
7    Q.   Now, let's talk about your
8 own background with surgery, okay?
9    A.   Okay.
10   Q.   Tell me if I have my numbers
11 correct.
12   A.   Okay.
13   Q.   You've done about 2,700
14 total operative procedures for the pelvic
15 floor.
16        Do I have that right?
17   A.   That's right.
18   Q.   And in those 2,700, you have
19 used mesh in about 1,200 of them?
20   A.   That's correct.
21   Q.   And that includes your
22 fellowship, when you were training in
23 Indiana, and your private practice since
24 then when you finished that in 2008?

Page 201

1    A.   That's correct.
2    Q.   So 1,500 of your operations,
3 more than half, no mesh, correct?
4    A.   That's correct.
5    Q.   And that's for treating
6 pelvic floor?
7    A.   Pelvic floor disorders, yes.
8    Q.   Okay.  And now, let's talk
9 about the 1,200 mesh procedures that you
10 have done, including your fellowship and
11 your private practice.
12        That takes us back to about
13 2005, right?
14   A.   Right.
15   Q.   So in about ten years?
16   A.   Right.
17   Q.   1,200 mesh procedures; 150
18 of them were PROLIFT®, right?
19   A.   Right.
20   Q.   So more than 1,000 of those
21 operations you did something other than
22 the PROLIFT® to treat the person's
23 condition, right?
24   A.   That's correct.

Joye Lowman, M.D.

Page 202

1    Q.    And, again, 80 of those were
2  in your fellowship, right?
3    A.    Yes.
4    Q.    So since 2008, after 2008,
5  you only did about 70 PROLIFTs®, right?
6    A.    That's right.
7    Q.    You were using other
8  procedures and other methods to treat
9  prolapse in the other procedures, right?
10   A.    Right.
11   Q.    And for every patient that
12  you treated --
13   A.    Well, all of those
14  procedures weren't prolapse.  But for
15  prolapse, I was using other procedures,
16  yes.
17   Q.    When you were doing a
18  prolapse surgery, most of the time you
19  weren't doing a PROLIFT®, you were doing
20  something else, right?
21   A.    Right.
22   Q.    And when you treated a
23  patient and you make recommendations, you
24  try to do a risk/benefit and try to make

Page 203

1  the best recommendation for the safest,
2  most effective surgery for that patient,
3  right?
4    A.    That's correct.
5            - - -
6        (Whereupon, Exhibit
7  Lowman-3, 2010 E-mail, was marked
8  for identification.)
9            - - -
10  BY MR. SLATER:
11   Q.    Doctor, I've handed you what
12  we've marked as Exhibit-3.  This is an
13  e-mail that goes back to 2010.
14       Do you see that?
15   A.    Yes, I do.
16   Q.    And I'm actually going to
17  also hand you now Exhibit-4, which is the
18  chart that was accompanying that e-mail
19  when it was sent around within Ethicon.
20           - - -
21       (Whereupon, Exhibit
22  Lowman-4, Chart, was marked for
23  identification.)
24           - - -

Page 204

1        MR. SLATER:  They go
2    together.
3  BY MR. SLATER:
4    Q.    And if you look at that,
5  you'll see that in the middle of the
6  page -- well, actually, on the second
7  page of this e-mail chain, in February of
8  2010, someone named Scott Jones, who the
9  jury has met, who is a marketing
10  executive, writes this e-mail.  And he's
11  talking about apical support.
12       Do you see that?
13        MR. ISMAIL:  Objection.
14    Lack of foundation.
15        THE WITNESS:  Yes, I do.
16  BY MR. SLATER:
17    Q.    Okay.  And apical support,
18  that's where there was a recurrence of
19  prolapse with Ms. Hammons, right, at the
20  apex?
21    A.    Yes.
22    Q.    And here, Scott Jones is
23  writing to several people within Ethicon,
24  and says to these people, We need your

Page 205

1  help to quantify the number of customers
2  that we have lost to a competitive
3  procedure focused on apical support.  Our
4  customers continue to tell us they want
5  to see PROLIFT®+M introduced with an
6  anterior apical product code.
7        And he talks about wanting
8  to present the business case.  And he
9  says, a little further down, In the last
10  year we have lost blank number of
11  doctors, which accounted for X
12  procedures.  And he wants to be able to
13  talk about the business lost to the
14  company because doctors are telling them
15  we're going to do other things because of
16  lack of apical support.
17       Do you see that?
18    A.    Right.
19        MR. ISMAIL:  Objection.
20    Lack of foundation.
21  BY MR. SLATER:
22    Q.    And if you go to the front
23  page of this e-mail, right in the middle
24  of the page, a guy named Robert Zipfel at

Joye Lowman, M.D.

Page 206

1  Ethicon says that, This is a worthwhile
2  effort.  Last week at the summit it was
3  clear that our physicians want anterior
4  apical support modification to the
5  PROLIFT®.
6         Do you see that?
7         MR. ISMAIL:  Objection.
8  Lack of foundation.
9         THE WITNESS:  I do.
10 BY MR. SLATER:
11     Q.   The attachment to the
12 document, they list doctors and they talk
13 about what product they've converted to.
14        Do you see that?
15     A.   Uh-huh.
16     Q.   And in the context of
17 doctors stopping using the PROLIFT®
18 because they want to do something else
19 that gives better apical support.  They
20 actually list you on that list.
21        Do you see that?
22        MR. ISMAIL:  Objection.
23 Lack of foundation.
24        THE WITNESS:  I see my name

Page 207

1        on that list, yes.
2  BY MR. SLATER:
3      Q.   And they say the product
4  here in 2010 is sacrocolpopexy.
5         Do you see that?
6      A.   I do.
7      Q.   Sacrocolpopexy is a
8  procedure to treat the apex of the
9  vagina, correct?
10     A.   Yes.
11     Q.   To give apical support,
12 right?
13     A.   Yes.
14     Q.   And, in fact, that's your
15 go-to procedure for apical support, you
16 feel that that's a terrific procedure and
17 very safe and effective, right?
18     A.   It's -- yes.
19     Q.   And do you agree or dispute
20 that you stopped using the PROLIFT®,
21 whether at this point or another point,
22 and converted primarily to sacrocolpopexy
23 on procedures where you may have
24 considered the PROLIFT®?

Page 208

1         MR. ISMAIL:  Objection to
2  that question.  Violates motion
3  limine and agreement of the
4  parties.
5         THE WITNESS:  I disagree
6  with that assessment.
7  BY MR. SLATER:
8      Q.   So the document is incorrect
9  from --
10     A.   The document is incorrect.
11 Sacrocolpopexy is Dr. Hale's bread and
12 butter.  That's what we were trained to
13 do more than anything else.  So
14 sacrocolpopexy has always been my go-to.
15     Q.   Sacrocolpopexy was -- has
16 always been your go-to in your private
17 practice, right?
18     A.   It has.
19     Q.   The PROLIFT® was never your
20 go-to, right?
21     A.   When you say "go-to," the
22 most commonly performed procedure, if
23 that's what you mean, yes, that's
24 correct.

Page 209

1      Q.   Let's just talk about when
2  you stopped using the PROLIFT® so we're
3  oriented.
4         You told me in the
5  deposition you weren't sure about when,
6  but it would be at least three years,
7  three and-a-half years ago, right?
8         MR. ISMAIL:  Objection.
9  Violates motion limine.
10        THE WITNESS:  Approximately
11 three years ago, yes.
12 BY MR. SLATER:
13     Q.   You haven't done a PROLIFT®
14 in over three years, so that's 70
15 PROLIFTs® in maybe five years, right?
16        MR. ISMAIL:  Objection.
17 Violates motion limine and
18 agreement.
19        THE WITNESS:  I think that's
20 right.
21 BY MR. SLATER:
22     Q.   I'd like to talk a little
23 bit with you about your role as an
24 expert, if we could.

53 (Pages 206 to 209)

Joye Lowman, M.D.

Page 210

1    A.   Okay.
2    Q.   And as an expert, you're
3  essentially brought in, and you're
4  supposed to be objective and look at the
5  important evidence and render opinions,
6  right?
7    A.   That's correct.
8    Q.   And it's very important, in
9  order to do a full investigation and give
10  a valid opinion to know the important
11  evidence, right?
12    A.   Right.
13    Q.   One of the things you want
14  to do as an expert, or should want to do,
15  is see the important evidence, right?
16    A.   Yes.
17    Q.   You want to have the most
18  complete information possible, correct?
19    A.   The relevant information,
20  yes.
21    Q.   For example, you would want
22  to at least know and consider the
23  information the jury has been presented
24  and that the jury may feel is important;

Page 211

1  you'd want to at least take that into
2  account, right?
3      MR. ISMAIL:  Objection.
4      THE WITNESS:  Would I, as an
5    expert, want to know what the jury
6    has taken into account?  Not --
7    no.  I don't think that's relevant
8    to the -- evaluating the case,
9    what the jury knows.
10  BY MR. SLATER:
11    Q.   Your opinions are based on
12  the information you have available to
13  you, right?
14    A.   Yes.
15    Q.   If there's information the
16  jury thinks is important, they've seen
17  the case now for a few weeks, and you
18  haven't considered that information, the
19  jury would be within its rights to reject
20  your opinions because you're not
21  considering factual information they
22  think is important, correct?
23      MR. ISMAIL:  Objection.
24      THE WITNESS:  No.  I'm

Page 212

1  giving opinions about the case,
2    not about what's being presented
3    to the jury.
4  BY MR. SLATER:
5    Q.   Is it important that you
6  understand the PROLIFT®?
7    A.   Yes.
8    Q.   Is it important that you
9  understand and know the complications
10  caused by the PROLIFT®?
11    A.   Yes.
12    Q.   Now, you wrote a report
13  which is about 58 pages long, right?
14    A.   I did.
15    Q.   And I think you told me
16  before, that had all the important
17  information and facts in it, right?
18    A.   I said it had most of the
19  important information and facts, yes.
20    Q.   You seem like a careful
21  person.
22      Did you carefully write the
23  report?
24    A.   I did.

Page 213

1    Q.   Did you proofread it, make
2  sure it said exactly what you wanted it
3  to say?
4    A.   I did.
5    Q.   And if you could, turn to
6  Page 17 of the report.
7      MR. ISMAIL:  You'll have to
8    give it to her.
9      MR. SLATER:  Oh, I'm sorry.
10      Sorry about that.
11  BY MR. SLATER:
12    Q.   Okay, Doctor, this is your
13  report in front of you, correct?
14    A.   Yes, it is.
15    Q.   And, you know what, maybe
16  what I should do is put a sticker on it.
17        - - -
18      (Whereupon, Exhibit
19    Lowman-5, Expert Report of  J.
20    Lowman, M.D., was marked for
21    identification.)
22        - - -
23  BY MR. SLATER:
24    Q.   I'm sorry, every piece of

54 (Pages 210 to 213)

Joye Lowman, M.D.

Page 214

1  paper gets a sticker.  Sorry about that.
2  Let's start again.
3          Exhibit-5 that I've just
4  given you, is that a copy of your report
5  in this case?
6      A.   Yes.
7      Q.   And that's the report you
8  just told us you carefully wrote and
9  carefully proofread so it said exactly
10  what you wanted it to say?
11      A.   Yes.
12      Q.   If you look at Page 17,
13  you're talking about your personal
14  experience with the PROLIFT® and that
15  started during your fellowship?
16      A.   Yes.
17      Q.   And if you go about halfway
18  or more down that paragraph, you talk
19  about it looks very intricate and complex
20  at first.
21          Do you see that sentence?
22      A.   I do.
23      Q.   The large mesh with eight
24  arms laid out on the slides looked

Page 215

1  ominous, right?
2      A.   Right.
3      Q.   And you stand by that
4  statement, right?
5      A.   Well, it's six arms.
6      Q.   Okay.  So when you wrote
7  this report, you said it was eight arms
8  on the PROLIFT® when it's really only six
9  arms, right?
10      A.   That's correct.  I made an
11  error.  I am human.
12      Q.   Now, Doctor, have you had
13  the opportunity to know what testimony
14  has been given during this trial?
15          You said you knew a little
16  bit about Dr. Zipper.  Is that it?
17      A.   That's pretty much it, yes.
18      Q.   Okay.  Now, I want to ask
19  you another question about the PROLIFT®.
20  And I want to understand what you know
21  about what the mesh does in the human
22  body, if we could for a few minutes,
23  okay?
24      A.   Okay.

Page 216

1      Q.   Do you agree with me that
2  the PROLIFT® causes a chronic
3  inflammatory reaction?
4      A.   It does cause some -- any
5  foreign body is going to cause an
6  inflammatory reaction.  Whether or not
7  it's chronic or not, I can't testify to
8  that.
9      Q.   Is it because you don't
10  know?
11      A.   It's not that I don't know,
12  I just haven't seen that documented in
13  the literature as it relates to the
14  PROLIFT®.
15      Q.   Are you aware that there can
16  be a chronic inflammatory reaction to the
17  PROLIFT® mesh that can be, in some women,
18  severe?
19      A.   I'm aware that there is
20  inflammation associated with the mesh, as
21  it is with any foreign body.  I haven't
22  read any evidence that suggests that that
23  inflammation is what causes difficulty or
24  complications with the mesh.

Page 217

1      Q.   We're going to come back to
2  that in a couple of minutes.
3          I want to go through a
4  little bit of your background, in terms
5  of what materials you reviewed in this
6  case, okay?
7      A.   Okay.
8      Q.   And then we'll come back to
9  that question in a little bit.
10      A.   Okay.
11      Q.   Did you assume that if there
12  was something important, either an
13  Ethicon document or testimony by an
14  Ethicon witness, that the lawyers that
15  represent Ethicon would have given that
16  to you to consider?
17      A.   Testimony by whom?  Could
18  you repeat the question?
19      Q.   If there was important
20  evidence, either in a document or in a
21  deposition from people who work at
22  Ethicon, who worked with the PROLIFT® and
23  know a lot about it, would you assume
24  that if there was important information

55 (Pages 214 to 217)

Joye Lowman, M.D.

Page 218

1  from those types of people, that the
2  lawyers representing Ethicon would have
3  given that to you?
4      A.   Not necessarily.
5      Q.   Did you have interest in
6  knowing what the people who actually
7  developed and were responsible for the
8  safety of the PROLIFT® had to say about
9  it?
10     A.   I was interested in reading
11 the -- about the development by the
12 Jacquetin and Cosson, who helped to
13 develop the product, yes.
14         So as it relates to what's
15 published in the scientific literature, I
16 was very interested in that.
17         In terms of what employees
18 at Ethicon thought about it, that's less
19 relevant.
20     Q.   Let's talk about some
21 people, and I want to ask you a few
22 questions.
23     A.   Okay.
24     Q.   Do you know who Charlotte

Page 219

1  Owens is?
2      A.   I don't.
3      Q.   Do you know who David
4  Robinson is?
5      A.   That name sounds familiar,
6  but I can't say specifically who he is.
7      Q.   Do you know who Piet Hinoul
8  is?
9      A.   No.
10     Q.   Do you know who Scott
11 Ciarrocca is?
12     A.   No.
13     Q.   Do you know who Paul Parisi
14 is?
15     A.   No.
16     Q.   Do you know who Price Saint
17 Pallere is?
18     A.   No.
19     Q.   Do you know who Axalar Noh
20 is?
21     A.   I've seen his name mentioned
22 a lot in the depositions, but I don't
23 know who he is.
24     Q.   You don't know anything

Page 220

1  about what he does or anything like that,
2  right?
3      A.   I don't.
4      Q.   Do you know who Dr. Jim Hart
5  is?
6      A.   No.
7      Q.   Do you know who Scott Jones
8  is?
9      A.   No.
10     Q.   We did just go through his
11 e-mail.  In fairness, he's a marketing
12 executive.
13         But you didn't know that
14 until I showed you that?
15     A.   Right.
16     Q.   Am I correct that you still
17 don't even know who those people are now,
18 including Scott Ciarrocca, who testified
19 in court before this jury?
20         MR. ISMAIL:  Objection.
21         THE WITNESS:  That's
22 correct.
23 BY MR. SLATER:
24     Q.   You haven't had the chance

Page 221

1  to see the testimony he gave?  You have
2  no knowledge about that?
3      A.   I haven't tried to look at
4  the testimony he gave.
5      Q.   Whatever he said in court is
6  irrelevant to you, fair?
7      A.   That's fair.
8      Q.   There's nothing that Scott
9  Ciarrocca could have said that would have
10 any impact on your opinions, right?
11         MR. ISMAIL:  Objection.
12         THE WITNESS:  That's
13 correct.
14 BY MR. SLATER:
15     Q.   In fact, there's nothing
16 that I could show you that any of those
17 people I just listed said that could have
18 any impact on your opinions, correct?
19     A.   That's correct.
20     Q.   In fact, you didn't read the
21 deposition of any witness employed by
22 Ethicon at all; is that true?
23     A.   That would be true.
24     Q.   Let's go through a little

56 (Pages 218 to 221)

Joye Lowman, M.D.

Page 222

1   more information.
2        Do you know what Ethicon
3   medical affairs is?  Do you know what
4   that department is?
5        A.   I don't.
6        Q.   Do you know the background
7   or the qualifications of any of the
8   medical affairs directors?
9        A.   No.
10       Q.   Do you know whether their
11  surgeons, who are urogynecologist in
12  private practice before they joined
13  Ethicon?
14       A.   I don't know that.
15       Q.   Do you know if some of them
16  were investigators and did clinical
17  studies on the PROLIFT®?
18       A.   I did not know that.
19       Q.   You mentioned a few moments
20  ago Dr. Jacquetin and Dr. Cosson.
21       Their literature is
22  important information, right?
23       A.   Yes.
24       Q.   The things that they know

Page 223

1   about the PROLIFT® and the PROLIFT® mesh,
2   that's important to you because they
3   developed this procedure, right?
4        A.   Yes.  And because they've
5   published in peer-reviewed literature.
6        Q.   You don't know what
7   Professor Jacquetin and Dr. Cosson were
8   telling Ethicon about the mesh privately,
9   do you?
10       A.   I don't.
11       Q.   So you know what they
12  published, but you don't know what they
13  were saying privately?
14       A.   That's correct.
15       Q.   Is it of any significance to
16  you to know what Jacquetin and Cosson
17  were telling Ethicon privately, for
18  example, in e-mails and conversations?
19       MR. ISMAIL:  Objection.
20       THE WITNESS:  No.
21  BY MR. SLATER:
22       Q.   If the jury has seen
23  evidence and heard evidence that
24  Jacquetin and Cosson were asking Ethicon

Page 224

1   for a new, safer mesh to be used in the
2   PROLIFT®, would that have any
3   significance to you at all?
4        MR. ISMAIL:  Objection.
5        THE WITNESS:  No, not in
6   formulating these opinions.  No.
7   BY MR. SLATER:
8        Q.   Do you know what Ethicon did
9   to evaluate the safety of the PROLIFT®
10  before they put it on the market to be
11  put in women's bodies all over the United
12  States and the world?
13       A.   I don't know what Ethicon
14  did, but --
15       Q.   That's what I'm asking.
16       A.   No.
17       Q.   Do you know what Ethicon did
18  to evaluate the safety of the PROLIFT®
19  once it was on the market?
20       A.   I know that they were
21  involved in funding some of the research
22  that was done.
23       Q.   Do you know who at Ethicon
24  was evaluating the research that was

Page 225

1   being done?
2        A.   I don't.
3        Q.   Do you know if there were
4   people at Ethicon that would read reports
5   of people being harmed by the PROLIFT®
6   and consider that?  Do you know if that
7   would go on?
8        MR. ISMAIL:  Objection.
9        Calls for speculation.
10       THE WITNESS:  I don't.
11  BY MR. SLATER:
12       Q.   Is it fair to say that
13  whether or not Ethicon was evaluating the
14  safety of the PROLIFT® or not or how they
15  did it is really not of any interest to
16  you?
17       MR. ISMAIL:  Objection.
18       THE WITNESS:  That's
19  correct.
20  BY MR. SLATER:
21       Q.   Did you make any effort to
22  learn what information Ethicon had
23  compiled internally regarding the safety
24  or efficacy of the PROLIFT®?

57 (Pages 222 to 225)

Joye Lowman, M.D.

Page 226

1    A.   No, I did not.
2    Q.   That wouldn't have been
3  any -- of any significance to you, right?
4    A.   No.
5    Q.   Let's go through a few more
6  terms, just to kind of clear off my
7  checklist if we could.
8         Do you know what design
9  control is?
10    A.   No.
11    Q.   Do you know what a design
12  requirements matrix is?
13    A.   No.
14    Q.   Do you know what an FMEA is?
15    A.   No.
16    Q.   Do you know what a DDSA is?
17    A.   No.
18    Q.   Do you know what an Ethicon
19  clinical expert report is?
20    A.   No.
21    Q.   And all these things I've
22  asked you about that you say you're not
23  familiar with, to be fair, that's -- you
24  didn't consider any of those things in

Page 227

1  forming your opinions, right?
2    A.   That's correct.
3    Q.   Do you know anything about
4  what criteria or standards Ethicon
5  applied when deciding to put the PROLIFT®
6  on the market?
7    A.   No.
8    Q.   That would not be of any
9  significance to you, right?
10         MR. ISMAIL:  Objection to
11    form.
12  BY MR. SLATER:
13    Q.   Is that correct?
14    A.   That's correct.
15    Q.   Other than what's published
16  in the literature, you don't know what
17  Ethicon knew about the risk/benefit
18  profile for the PROLIFT®, correct?
19    A.   That's correct.
20    Q.   And what Ethicon internally
21  knew about the risk/benefit profile of
22  the PROLIFT® is not of any importance at
23  all to you, correct?
24         MR. ISMAIL:  Objection.

Page 228

1         THE WITNESS:  No.
2  BY MR. SLATER:
3    Q.   Meaning --
4    A.   Yes, you're correct.
5    Q.   That's okay.
6         Now, coming back to my
7  question about the inflammatory response,
8  I'm going to show you something that
9  we're going to mark as Exhibit-6, which
10  is the testimony of Charlotte Owens that
11  was submitted to the jury.  This is a
12  transcript of that.
13         - - -
14         (Whereupon, Exhibit
15    Lowman-6, Excerpt of Testimony of
16    C. Owens, was marked for
17    identification.)
18         - - -
19         THE WITNESS:  Okay.
20  BY MR. SLATER:
21    Q.   And if you look, there's
22  what we call numbered clips.  And if you
23  go to clip 36, there's some questions and
24  answers of Charlotte Owens, who you told

Page 229

1  us you don't know who she is.  But let's
2  look at what she said.
3    A.   Where do I find the clip
4  numbers?
5    Q.   It's Page 8.  The bottom
6  right --
7    A.   Oh, Page 8.
8    Q.   -- there's page numbers.
9  Sorry about that.
10    A.   Uh-huh.
11         Okay.
12    Q.   And you can look at that and
13  you can read it to yourself so I don't
14  have to read it out loud, and then I'll
15  just ask you a question about it real
16  quick.
17         Actually, to save time, let
18  me read it.  She was asked, on Page 273,
19  Line 25:  You also understood that there
20  were some women that would generate a
21  more severe inflammatory reaction that
22  would not be minimum or slight and which
23  would not be transient but would be
24  chronic, correct?

Joye Lowman, M.D.

Page 230

1        And she then testifies:
2   This statement is about what we saw in
3   our animal studies, but what you state is
4   also a possibility.  But this statement
5   is about what we demonstrated in our
6   animal studies.
7        And then she was asked:
8   What I stated just a moment ago, you
9   understood that that would occur in some
10  women, correct?
11       And she says:  That can
12  occur in some women.
13       Do you see that?
14       A.    I see that.
15       Q.    Now, I'll just let you know,
16  Charlotte Owens is the medical director
17  who signed off to let the PROLIFT® go on
18  the market.
19       You didn't know that before
20  I just told you that?
21       A.    No.
22       Q.    And she testified that the
23  inflammatory reaction is chronic and can
24  be severe.

Page 231

1        You see that, right?
2        A.    Yes.
3        Q.    Does that have any impact on
4   your opinions in this case?
5        A.    No.
6        Q.    Because, again, I think you
7   told me there's really nothing that I
8   could show you that would change your
9   opinions, correct?
10       MR. ISMAIL:  Objection.
11  Asked and answered.
12       THE WITNESS:  Do I answer it
13  or not?
14       MR. ISMAIL:  Yes.
15       THE WITNESS:  That's
16  correct.  Because, as I said
17  before, I focus my clinical
18  decision-making on peer-reviewed
19  literature.
20  BY MR. SLATER:
21       Q.    When you say you focus your
22  clinical decision-making, you're talking
23  about what you do in your practice and
24  what you did in your practice, right?

Page 232

1        A.    That's correct.
2        Q.    And when you've --
3        A.    And my opinions in general.
4        Q.    Right.  But when you're
5   talking here as an expert, you're basing
6   that on your own experience and the
7   medical literature, right?
8        A.    That's correct.
9        Q.    And you're basing it, when
10  you're talking about your experience, on
11  what you do in your practice and what
12  you've done in your practice, right?
13       A.    That's right.
14       Q.    Let's talk a little bit now
15  about some medical literature, because
16  you just talked about that a bit.
17       A.    Okay.
18       Q.    I'm going to hand you an
19  article that was marked as PLT 352.
20       And this is an abstract, on
21  the right-hand side, that was published
22  in the Journal of Pelvic Medicine and
23  Surgery, in March and April 2006.
24       Do you see that?

Page 233

1        A.    Uh-huh.
2        Q.    And you see who the authors
3   are, it includes Vince Lucente and Miles
4   Murphy, and the doctors he works with at
5   his practice?
6        A.    Yes.
7        Q.    And is this the type of
8   literature you did rely on in forming
9   your opinions?
10       A.    No.  I relied on the highest
11  levels of evidence.  Smaller studies were
12  considered; I mean, I did review them and
13  read them.  But what I relied on was the
14  highest levels of evidence that we
15  described a few moments ago.
16       Q.    When you say "the highest
17  levels of evidence," are you saying you
18  only relied on randomized control trials?
19       A.    No.  What I'm saying is I
20  rely most heavily on those -- on those
21  studies, because they have -- the
22  strength is better of those studies.
23       Q.    Well, this article, for
24  example, and I think you told me in your

Joye Lowman, M.D.

Page 234

1 deposition, one of the things you relied
2 on, in forming your opinions, was Dr.
3 Lucente's literature; is that true?
4     A.   All of the literature, yes.
5     Q.   So this is one part of his
6 literature, correct?
7     A.   This is.
8     Q.   And you see it was 89
9 patients, right?
10     A.   Yes.
11     Q.   And then if you go down into
12 the results section, about halfway down,
13 they say that, Of the 89 patients, there
14 was one mesh -- erosion of mesh into the
15 bladder and this was the only erosion.
16         Do you see that?
17     A.   I don't see that yet.
18     Q.   Go down about two-thirds of
19 the way.
20     A.   Two-thirds of the way.
21         Okay.
22     Q.   There was an erosion of mesh
23 into the bladder, and this was the only
24 erosion, one out of 89 patients.

Page 235

1         Do you see that?
2     A.   Are you on the first page?
3     Q.   Yes.
4     A.   I don't see it yet.
5     Q.   If you go down the results
6 section, about halfway down.
7     A.   Yes.
8     Q.   Now, let me give you another
9 article that we marked as PLT 485.
10         This is an article about the
11 PROLIFT® written by Dr. Lucente's group
12 again.
13         Do you see this?
14     A.   Yes.
15     Q.   Published in the American
16 Journal of Obstetrics and Gynecology in
17 2008?
18     A.   Yes.
19     Q.   And if you turn to the
20 second page of the article, it's Page E2,
21 in the results section, there's a
22 paragraph that goes over to the third
23 column.
24         And at the very bottom of

Page 236

1 that column, it says, No mesh exposures
2 or erosions were detected.
3         Do you see that?
4     A.   I see that.
5     Q.   And if you look just to the
6 left of that, in the results section, it
7 says that, There were 97 patients that
8 came back for their one-year visit.
9         Do you see that?
10     A.   Yes.
11     Q.   So this is 97 patients
12 they're reporting on, no exposures or
13 erosions.  Vince Lucente and his group,
14 right?
15     A.   Yes.
16     Q.   And, again, this is the type
17 of article that you took into account in
18 forming your opinions, right?
19     A.   Yes.
20     Q.   And when Vince Lucente --
21 let's get to the next one, actually.
22 I'll give you a third article, it's
23 P-1500.
24         And this is a manuscript

Page 237

1 written by Dr. Lucente and his group
2 regarding results of the PROLIFT® with
3 349 patients.
4         Do you see that?
5     A.   Yes.
6     Q.   And if you go to the second
7 page, there's an abstract.  And at the
8 very end of the results section of the
9 abstract, on the second page it says,
10 Mesh exposure was seen in four, 1.1
11 percent of the patients.
12         So four out of 349.
13         Do you see that?
14         MR. ISMAIL:  Objection.
15     Lack of foundation.
16         THE WITNESS:  I see that.
17 BY MR. SLATER:
18     Q.   So this literature, again,
19 is Dr. Lucente.  And this was, again, the
20 type of thing you relied on, correct?
21     A.   This is the type of study
22 that I would rely on, yes.
23     Q.   And you're comfortable with
24 Dr. Lucente and his group reporting in

Joye Lowman, M.D.

Page 238

1    one study of 89 patients, one erosion
2    into the bladder; 97 patients with no
3    erosions; and then 349 patients where
4    there was only a 1 percent exposure rate?
5    You're comfortable with that data?
6           A.   Yes, I'm comfortable with
7    that.
8           Q.   You believe that?
9           A.   I have no reason not to
10   believe it.
11          Q.   Do you know what Ethicon
12   thinks about that?
13               MR. ISMAIL:  Objection.
14               THE WITNESS:  No.
15   BY MR. SLATER:
16          Q.   Is it your testimony for
17   this jury that those erosion rates are
18   credible and believable?
19          A.   Yes.
20          Q.   Doctor, I'm going to hand
21   you now what we've marked as PLT 0302.
22               And that's the article you
23   told the jury about that you were one of
24   the authors of?

Page 239

1           A.   Yes.
2           Q.   And the question is, Does
3    the PROLIFT® System Cause Dyspareunia?
4    That's the question at the top of the
5    article?
6           A.   Right.
7           Q.   The answer to that question
8    is yes, right?
9           A.   No.
10          Q.   You're saying the PROLIFT®
11   doesn't cause dyspareunia?
12          A.   No, it doesn't.  It's
13   associated with a risk of de novo
14   dyspareunia in the same way that all of
15   the procedures are.
16          Q.   Is it your testimony that
17   the PROLIFT system and the PROLIFT® mesh
18   doesn't cause dyspareunia in any women?
19          A.   It -- that's not my
20   testimony.  My testimony is that the
21   dyspareunia can be associated with that
22   surgery, in the same way that it's
23   associated with any procedure that we do.
24               And I described why patients

Page 240

1    who have surgery then have dyspareunia
2    afterwards.  It's not just using the
3    product, but it's also the fact that
4    we've made an incision at the time of
5    surgery and everything else that I've
6    previously discussed.
7               So I think to say that the
8    PROLIFT® causes dyspareunia is an
9    overstatement.
10          Q.   You're not testifying to
11   this jury that every woman who has
12   surgery for pelvic organ prolapse,
13   whatever the procedure is, ends up with
14   dyspareunia, are you?
15          A.   I'm not, no.
16          Q.   Women will have some
17   discomfort when they're healing from the
18   surgery, that's true across the board,
19   right, because they have an incision in
20   the vagina that has to heal, right?
21          A.   Right.
22          Q.   And for most women, that
23   heals up and they're okay after that,
24   right?

Page 241

1           A.   Right.
2           Q.   For some women, they have a
3    PROLIFT® and due to the PROLIFT®, the
4    mesh and the impact of the PROLIFT® mesh
5    on their body, they get dyspareunia; that
6    happens to some women, right?
7           A.   I think that that's a
8    misstatement.  Just as we've talked
9    about, women that don't have mesh and
10   don't have PROLIFTs® also end up with
11   dyspareunia after surgery.
12               Dyspareunia after surgery is
13   multifactorial.  So I think it's a
14   misstatement to say that the PROLIFT®
15   causes dyspareunia.
16          Q.   In some women, you would
17   agree the PROLIFT® causes dyspareunia,
18   right?
19          A.   No, I don't think that we
20   can say that, for the reasons that I have
21   just discussed.
22          Q.   The jury has heard
23   testimony, and let me just give it to you
24   to be fair.

61 (Pages 238 to 241)

Joye Lowman, M.D.

1           - - -
2           (Whereupon, Exhibit
3     Lowman-7, Excerpt of Testimony of
4     P. Hinoul, was marked for
5     identification.)
6           - - -
7     BY MR. SLATER:
8       Q.   We marked this as Exhibit 7.
9     This is the testimony the jury heard from
10    Piet Hinoul.
11          You said you don't know who
12    he is, right?
13      A.   Right.
14      Q.   Just in fairness, Piet
15    Hinoul is the worldwide medical director
16    at Ethicon.  He's a urogynecologist who
17    was trained by Professor Cosson on how to
18    do the PROLIFT®.
19      A.   Okay.
20      Q.   And works at Ethicon as
21    their designated corporate representative
22    for medical affairs.
23      A.   Okay.
24      Q.   Just so you know who he is.

1           And if you could turn in
2     this exhibit to the third -- to the
3     fourth page, please.
4           And he's talking there about
5     some of the risks --
6       A.   It says -- it's numbered 1,
7     2, 3 and then 1 again.
8       Q.   Don't -- if you just go to
9     the fourth page, the fourth page is
10    actually a new Page 1 because that's
11    testimony from an April 6th, 2012,
12    deposition.  You see at the top, that
13    date.
14      A.   Yes, okay.
15      Q.   No problem.
16          So here Dr. Hinoul, who is
17    the worldwide medical director for
18    Ethicon, is asked:  You knew that
19    significant retraction would occur --
20    could occur?
21          He says:  Right.
22          Do you see that?
23          MR. ISMAIL:  Objection.
24    Lack of foundation.

1           THE WITNESS:  I see that,
2     yes.
3     BY MR. SLATER:
4       Q.   And if you go a little
5     further down -- let me start over.  I'm
6     going to start over.
7           Dr. Hinoul here is
8     testifying about the PROLIFT®.  And do
9     you see on Line 22, Page 382, Line 22,
10    he's talking about the PROLIFT® and he's
11    asked:  You knew it could lead to
12    dyspareunia?
13          And his answer is:  Yes.
14          Do you see that?
15          MR. ISMAIL:  Objection.
16    Lack of foundation.
17          THE WITNESS:  Yes.
18    BY MR. SLATER:
19      Q.   And this is testimony the
20    jury has already seen, in fairness.  You
21    don't know that.  You're seeing this for
22    the first time?
23          MR. ISMAIL:  Objection.
24    Lack of foundation.

1           THE WITNESS:  I'm seeing
2     this for the first time.
3     BY MR. SLATER:
4       Q.   Do you disagree with Piet
5     Hinoul, who is a urogynecologist, who was
6     trained by the inventor of the PROLIFT®
7     and was in charge of overseeing the
8     PROLIFT® for years at Ethicon?  Do you
9     disagree with his testimony to the jury?
10      A.   I think that's an
11    overstatement, yes.
12      Q.   So you disagree with Piet
13    Hinoul?
14          MR. ISMAIL:  Objection.
15          THE WITNESS:  Yes.
16    BY MR. SLATER:
17      Q.   And if we were to show you
18    internal documents where Ethicon
19    acknowledged that the PROLIFT® could
20    cause dyspareunia, you would disagree
21    with every one of those documents, right?
22          MR. ISMAIL:  Objection.
23          THE WITNESS:  I would
24    disagree with that assessment,

Joye Lowman, M.D.

Page 246

1    yes.
2  BY MR. SLATER:
3      Q.    Now, in your article, which
4  we have here, PLT 0302, there was a 16 --
5  actually, you called it a 17 percent de
6  novo dyspareunia rate.
7          That's what you reported in
8  this article, correct?
9      A.    That's correct.
10     Q.    De novo dyspareunia means
11  the person didn't have any discomfort
12  with sexual relations before the surgery,
13  after the surgery the woman has
14  discomfort with sexual relations, right?
15     A.    That's right.
16     Q.    And 17 percent of those
17  women that had no discomfort to begin
18  with ended up with it after, that's what
19  you've documented, right?
20     A.    17 percent of the patients
21  that were currently sexually active, yes.
22     Q.    Now, you had previously
23  submitted an abstract of this study where
24  you had quoted a 24 percent de novo

Page 247

1  dyspareunia rate, correct?
2      A.    Yes, I believe so.  Do you
3  have that for me?
4      Q.    Sure.  PLT 1096.
5      A.    Thank you.
6      Q.    That's the abstract for the
7  same article where you previously, in
8  March and April of 2008, reported 24
9  percent new dyspareunia for patients with
10  the PROLIFT®, right?
11     A.    Yes, that's right.
12     Q.    Now, whether the rate is 16
13  or 17 percent or 24 percent, those are
14  high rates of dyspareunia, correct?
15     A.    Correct.
16     Q.    Now, if you look at your
17  article, and you turn into the article
18  several pages, you actually have a
19  calculation or the numbers of patients
20  that were counted for this study, right?
21  To determine that 17 percent, right?
22     A.    Where are you talking about?
23     Q.    In your article.
24     A.    Right.  But where in the

Page 248

1  article?
2      Q.    I think it's on Page E3 or
3  E4.  Let's turn to that.  Here we go.
4  It's actually Page E2 into E3.
5          What you're talking about
6  there is you sent questionnaires out to
7  these patients, validated questionnaires,
8  right?
9      A.    That's right.  One of them
10  was validated, one was not.
11     Q.    A validated questionnaire is
12  something that the urogynecology
13  community of doctors has said, okay,
14  these questions are valid to find out if
15  somebody has dyspareunia in this case,
16  right?
17     A.    No.  It's a validation of
18  sexual -- in this case, it would be a
19  validation of whether or not that
20  questionnaire accurately captures or
21  assesses sexual function.
22          It's not -- PISQ -- the PISQ
23  12 is not specific for dyspareunia, which
24  is why we included that non-validated

Page 249

1  questionnaire, because that was specific
2  for dyspareunia.
3      Q.    You created your own
4  questionnaire to accompany the validated
5  one so you would get really good
6  questionnaire data, right?
7      A.    That's right.  More
8  comprehensive data about dyspareunia.
9      Q.    Now, if you take the number
10  of people that answered the
11  questionnaires, and we go through it,
12  this is on Page E2 in the right-hand
13  column, it says that 56 patients agreed
14  to answer the questionnaires and 41 of
15  them actually answered it, right?
16          Right-hand column, under the
17  results, first full -- second paragraph.
18     A.    Yes.
19     Q.    So we have -- so we have 41
20  women that we're now studying through the
21  questionnaires because that's how many
22  answered it?
23     A.    Right.
24     Q.    And so we have 41 total.

Joye Lowman, M.D.

Page 250

1    And then if you go down
2 through it, they talk about -- or you
3 talk about, on the next page -- let me
4 just find it -- it's right there
5 underneath.  Sorry.  Let's start over.
6    Right underneath the 41
7 patients, it says, 20 of the 41 sexually
8 active patients who responded to the
9 questionnaires described themselves as
10 pain free.
11    Right?
12    A.   Right.
13    Q.   So 20 are okay, and that
14 leaves 21 with dyspareunia, correct?
15    A.   I think that's correct.
16    Q.   Okay.  Then if you go to the
17 next page, the top of the left-hand
18 column, the first full paragraph, Page
19 E3, it says, 8 of the women reported
20 having dyspareunia at baseline.
21    Eight of the 41, right?
22    A.   Yes.
23    Q.   So you would want to
24 subtract those both out of the numerator

Page 251

1 and denominator, because you're not going
2 to find out if someone has new
3 dyspareunia if they had it to begin with,
4 correct?
5    A.   That's correct.
6    Q.   So right now we have 21
7 women who ended up with dyspareunia after
8 the surgery out of a total of 41, so we
9 have to subtract those eight women from
10 both sides so it's appropriate, right?
11    A.   Let me think about that.
12    Q.   You have 21 women with
13 dyspareunia after the surgery, you want
14 to take out the eight that had it before?
15    A.   Well, this is retrospective
16 self-report.
17    Q.   I understand that.  We're
18 just doing math.
19    A.   So we don't have -- we don't
20 have a denominator on the number of
21 patients that were sexually active total.
22 This is just by retrospective
23 self-report.
24    So the only thing that I can

Page 252

1 say is that 13 were saying that they had
2 de novo dyspareunia, meaning that they
3 answered the first question, which was,
4 do you have pain with intercourse, as a
5 yes; and answered the second question,
6 did you have pain with intercourse before
7 surgery, as a no.
8    I don't know the total
9 denominator.  I just have to use those
10 numbers objectively.
11    Q.   I'm using the numbers in
12 your article.
13    A.   Okay.
14    Q.   And the numbers in your
15 article are, you have 21 women with
16 dyspareunia after the surgery, right?
17    Remember, we went through,
18 and it says 20 of the women said they
19 were okay, they didn't have dyspareunia.
20    So it leaves 21 women with
21 dyspareunia, right?
22    A.   Okay.
23    Q.   So we have 21 women with
24 dyspareunia.

Page 253

1    If you subtract the eight
2 that had it to begin, with that leaves
3 you 13, right?
4    A.   Right.
5    Q.   If you subtract them from
6 the numerator, the top, you also subtract
7 it from the denominator, right?
8    MR. ISMAIL:  Objections.
9    THE WITNESS:  No, what I'm
10 saying is, there's no denominator.
11 BY MR. SLATER:
12    Q.   I'm asking --
13    A.   No, that's not right.
14    Q.   Well, we're using 41, that's
15 the entire group of women that answered
16 the questionnaires, right?
17    A.   Right.
18    Q.   So let's just stick with the
19 41 women that we actually have data on
20 here, questionnaires.
21    If you subtract the eight
22 women from the 21, because they had it to
23 begin with, you also subtract them from
24 the total of 41, right?

64 (Pages 250 to 253)

Joye Lowman, M.D.

Page 254

1          MR. ISMAIL:  Objection.
2   BY MR. SLATER:
3          Q.    So that the calculation will
4   be accurate?
5          MR. ISMAIL:  Objection.
6      Asked and answered.
7          THE WITNESS:  I don't think
8      that's right.
9   BY MR. SLATER:
10         Q.    Well, let's do this.  You
11  have eight women that had dyspareunia to
12  begin with, right?
13         A.    Yes, by retrospective
14  self-report.  Yes.
15         Q.    So you're not going to want
16  to evaluate them for whether they had
17  dyspareunia or not after because we know
18  they already had it, and you're looking
19  to find new dyspareunia, right?
20         A.    Right.
21         Q.    So if we subtract them out
22  of the 41 total, that goes to a total of
23  33 women that didn't have dyspareunia to
24  begin with, right?

Page 255

1          MR. ISMAIL:  Objection.
2          THE WITNESS:  No.  Because
3      the eight women aren't in the same
4      group as the 41 women.  There's a
5      total of -- there's a total of --
6      how many patients answered this?
7      56 patients answered --
8   BY MR. SLATER:
9          Q.    There's actually 41.
10         A.    So 41 patients answered the
11  questionnaire.  Right.  Okay.  Forty-one
12  patients answered the questionnaire.  Out
13  of those 41 patients, eight said that
14  they had de novo dyspareunia.  So eight
15  said that they had dyspareunia --
16         Q.    No, eight said they had
17  dyspareunia at baseline in the beginning.
18  That's what you said right here.
19         A.    Okay.  Eight said that
20  they --
21         Q.    Do you see that at the top
22  of the left column on Page E3.
23         Eight reported dyspareunia
24  as baseline, leaving 13 with de novo

Page 256

1   dyspareunia --
2          A.    Where are you?
3          Q.    -- by retrospective self
4   report?
5          First full paragraph on E3,
6   first sentence.
7          A.    I'm on E3.  Eight
8   respondents reported dyspareunia at
9   baseline, leaving 13 with de novo
10  dyspareunia by retrospective report.
11         Right.
12         So the baseline, the 13 is,
13  I believe, the number of patients that
14  had dyspareunia, and out of those 13,
15  eight of them described it as de novo.
16         Q.    That's not what you say
17  there.  You say, eight respondents
18  reported dyspareunia at baseline, leaving
19  13 with de novo dyspareunia.
20         So it's 21 minus eight
21  equals 13, right?
22         A.    Right.
23         Q.    So that's how you get the
24  number of women out of the 41 that had

Page 257

1   dyspareunia only after the PROLIFT®,
2   right?
3          A.    Right.  By retrospective
4   self-report.
5          Q.    Right.
6          A.    So it's a proportion of that
7   41 patients.  It's not -- the denominator
8   is not 41.  When you're looking at --
9   this -- I don't -- we can go on about
10  this.
11         But what I'm trying to say
12  is that when you look at the
13  questionnaires, the only thing that I can
14  say is what proportion of those patients
15  have dyspareunia.  It's not whether or
16  not they developed de novo dyspareunia
17  from baseline, because I don't have that
18  baseline data.  These were anonymous
19  questionnaires.
20         The only way that I can --
21  that I can estimate or calculate a de
22  novo dyspareunia rate objectively from
23  all of the patients that were sexually
24  active is to know who was answering the

65 (Pages 254 to 257)

Joye Lowman, M.D.

Page 258

1  questions.
2       So what I'm reporting is a
3  proportion of patients who are reporting
4  that they felt de novo dyspareunia.
5       I don't know how else to say
6  it.  But it's different from what you're
7  saying.
8       MR. SLATER:  Move to strike
9  as nonresponsive.
10 BY MR. SLATER:
11      Q.    Doctor, in your abstract
12 where you reported 24 percent, you base
13 that on the questionnaires plus talking
14 to the people on the phone, right?
15      A.    Right.
16      Q.    And then when you did your
17 article, you had 41 women who responded
18 to the questionnaires, correct?
19      A.    Correct.
20      Q.    Of those, 21 had dyspareunia
21 after the PROLIFT®, right?
22      A.    Of those that responded to
23 the questionnaires?
24      Q.    Yes.

Page 259

1       A.    Ask the question again.
2       Q.    Of the women who responded
3  to the questionnaires, we only have 41
4  women, that's the number you can study,
5  right, based on --
6       A.    Right.
7       Q.    -- the questionnaires,
8  because that's what you have, right?
9       A.    Right.
10      Q.    So you have, of the 41, 20
11 were okay and 21 had dyspareunia after
12 the surgery, right?
13      A.    Right.
14      Q.    So that's 21 out of 41,
15 right?
16      A.    Right.
17      Q.    But eight of those 21 women
18 had dyspareunia, according to their
19 questionnaire results, before the
20 PROLIFT®, right?
21      A.    Right.
22      Q.    Since you're studying women
23 who have new dyspareunia, you don't want
24 to count them because it's not new in

Page 260

1  their case, right?
2       A.    Right.
3       Q.    So you subtract them out of
4  the calculation, if you just want to find
5  the percentage of the 41 that had new
6  dyspareunia, correct?
7       A.    Right.
8       Q.    And that would leave you 13
9  women with new dyspareunia out of 33,
10 which was the total that didn't have it
11 before, correct?
12      A.    No.
13      Q.    There were 41 women total
14 who answered?
15      A.    This is the thing --
16      Q.    Doctor --
17      A.    -- we didn't calculate --
18      Q.    Doctor --
19      A.    -- the rate of de novo
20 dyspareunia based on the questionnaires.
21 We calculated the rate of de novo
22 dyspareunia based on chart review and
23 telephone interview.
24      The questionnaires was

Page 261

1  simply an effort to try to get more
2  information about dyspareunia and how
3  they were experiencing it, whether or not
4  it was mild, moderate or severe; when
5  they were experiencing it, with deep
6  penetration, et cetera.
7       We did not use the
8  questionnaires, nor were the
9  questionnaires designed to assess a rate
10 of de novo dyspareunia.  You can't do
11 that, if you don't know who is answering
12 the questionnaires.  Because I don't know
13 what their baseline incidence of
14 dyspareunia was.
15      The only reason we asked the
16 questions on the questionnaire was to
17 then be able to relate their answers on
18 the questionnaire to whether or not they,
19 by self-report, had de novo dyspareunia.
20      So the objective assessment
21 of dyspareunia is different from a
22 patient's self-recollection of
23 dyspareunia.  Are the numbers different?
24 If you want to say that, that's fine.

66 (Pages 258 to 261)

Joye Lowman, M.D.

Page 262

1  But we're assessing two different things
2  with those two different evaluations.
3            MR. SLATER:  Move to strike.
4  BY MR. SLATER:
5       Q.    Dr. Lowman, what I want to
6  do is just go through a little bit of the
7  calculation, and we went through this at
8  your deposition, remember?
9       A.    Right.
10      Q.    All I'm trying to do is
11  figure out the percentage of those 41
12  women that reported de novo dyspareunia,
13  okay?
14      A.    Okay.
15      Q.    It's all I want to do right
16  now.
17      A.    Okay.
18      Q.    So if we go through it very
19  simply, 41 women answered the
20  questionnaires, right?
21            We've established that?  41
22  women answered the questionnaires?
23      A.    41 women answered the
24  questionnaires.

Page 263

1       Q.    21 said they had dyspareunia
2  after the PROLIFT® surgery, right?
3       A.    Yes.
4       Q.    So 21 out of 41, correct?
5       A.    21 out of 41, yes.
6       Q.    Eight of those 21 women had
7  it to begin with, before the surgery; so
8  you can't study them for new dyspareunia
9  because they already had it, right?
10      A.    You can't study any of these
11  respondents for de novo dyspareunia.
12            MR. SLATER:  Move to strike.
13            THE WITNESS:  That's what
14  I'm trying to tell you.  I don't
15  know what their baseline
16  dyspareunia rate was, objectively.
17  When you're studying something, an
18  objective outcome, you have to
19  study that objectively.
20            That's -- I can't tell who
21  had de novo dyspareunia or not,
22  based on a retrospective
23  questionnaire that's anonymous.
24            MR. SLATER:  Move to strike.

Page 264

1  BY MR. SLATER:
2       Q.    Doctor, I just want to go
3  through what the information is that you
4  reported here in --
5       A.    I'm trying to get through
6  that.
7       Q.    We'll get to what you want
8  to talk about, we both want to talk
9  about.
10      A.    We're talking about what you
11  want to talk about.
12      Q.    We're not.  I just want to
13  do a calculation.
14      A.    Okay.
15      Q.    I just want to do is math.
16      A.    Okay.
17      Q.    All I want to do is math.
18      A.    Okay.
19      Q.    So let's start again, and
20  just try to go through the numbers.
21      A.    Okay.
22      Q.    Doctor, 41 --
23      A.    Can I have a pen to go
24  through the numbers with --

Page 265

1       Q.    Sure.
2       A.    And let me just read it
3  again.  Can I have a sheet of paper?
4       Q.    I have some paper for you,
5  Doctor.  Here is a piece of paper.
6       A.    Give me a minute to read it.
7       Q.    Doctor, in the interest of
8  time, what I'd like to do is go to the
9  transcript of your deposition, and we'll
10  just walk through the transcript, okay?
11      A.    To answer any more questions
12  about this, I need to read this again.
13  So if you could just give me a minute and
14  let me read it again.
15            Okay.
16      Q.    And, Doctor, what I'd like
17  to do, you have your deposition
18  transcript, I gave it to you before.
19  Let's go to Page 173 of your deposition
20  transcript.
21      A.    I can answer your question
22  now, without that, if you'd like.
23      Q.    This is what I'd like to do,
24  Doctor, in your article, you say that you

Joye Lowman, M.D.

Page 266

1  sent questionnaires out to 56 women and
2  41 responded, correct?
3      A.    That's correct.
4      Q.    And those questionnaires
5  were designed to determine how many
6  women, or what percentage of women were
7  reporting or had new dyspareunia after
8  the surgery, correct?
9      A.    No.  That's what I'm saying.
10  That's not what the questionnaires were
11  for.
12          The questionnaires were sent
13  out to get greater -- get greater
14  information about the quality of their
15  dyspareunia, how severe it was, where
16  they were experiencing it, and if the
17  dyspareunia was so bad that they wouldn't
18  have the procedure done again.
19      Q.    Doctor, when you reported
20  the results of this study in the abstract
21  I gave you as PLT 1096, you reported a 24
22  percent dyspareunia rate, new
23  dyspareunia, based on the questionnaires,
24  correct?

Page 267

1      A.    I have to look at that.
2          No, we didn't -- we didn't
3  assess the rate of de novo dyspareunia
4  based on the questionnaires.
5      Q.    That's what it says, though?
6      A.    Where does it say that?
7      Q.    Right in the results
8  section, 49 were currently sexually
9  active and were mailed questionnaires?
10      A.    Right.
11      Q.    33 patients responded; 7 of
12  the 33 who responded had dyspareunia
13  preoperatively; 8, 24 percent, developed
14  de novo dyspareunia.
15          And that's the figure you
16  reported.  The 8 -- 24 percent per the
17  questionnaires, that's what you reported,
18  correct?
19      A.    Right.
20      Q.    It's a simple yes or no.  I
21  just want to know --
22      A.    We reported --
23      Q.    Doctor, I just want to
24  know --

Page 268

1      A.    -- what we had at the time.
2          When we presented this data,
3  it was abstract.  That means the -- the
4  study is still ongoing.  An abstract is
5  what we submit to whatever body it is
6  that we're submitting it to, to present
7  our data, about what we currently have.
8  It's not final data.
9          There were several patients
10  in this cohort of patients who had just
11  had surgery and were not yet sexually
12  active.  We were still evaluating the
13  data.
14          Did we ask the question, do
15  you have de novo dyspareunia in the
16  questionnaires?  Yes.  Did we assess de
17  novo -- de novo dyspareunia rate by
18  questionnaire?  No.
19          MR SLATER:  Move to strike.
20  BY MR SLATER:
21      Q.    The data reported in the
22  Journal of Pelvic Medicine and Surgery in
23  March and April of 2008, the 24 percent
24  figure of new dyspareunia for PROLIFT®

Page 269

1  patients is based on the responses to the
2  questionnaires.
3          That's a true statement,
4  correct?
5      A.    It might be.  But we are
6  not -- we didn't evaluate -- that's not
7  what we used to characterize the de novo
8  dyspareunia -- de novo dyspareunia rate.
9          We assessed de novo
10  dyspareunia with the questionnaires by
11  asking, do you have pain with intercourse
12  now and did you have pain with
13  intercourse before surgery?  That data is
14  not what we used to calculate the de novo
15  dyspareunia rate for the cohort.
16          MR. SLATER:  Move to strike
17  after "it might be."
18  BY MR. SLATER:
19      Q.    When you published your
20  article, you decided not to base your
21  figure on the questionnaires, correct?
22  That's a true statement, correct?
23      A.    The de novo dyspareunia
24  rate?

68 (Pages 266 to 269)

Joye Lowman, M.D.

Page 270

1     Q.   Right.
2     A.   We never -- no, that's not
3  correct.  We had always planned to assess
4  de novo dyspareunia in the most objective
5  way, which is to evaluate what patients
6  reported at the beginning, when they
7  first came into our practice, on the
8  patient self-administered questionnaires
9  that they receive as a new patient in our
10 practice, where they are asked, are you
11 currently sexually active and are you
12 experiencing dyspareunia.
13          That is the most objective
14 assessment, because it allows the patient
15 to describe their condition at that time.
16          We then went back to the
17 charts to look at their six-month
18 follow-ups, where they are also given
19 those questionnaires, and asked then, are
20 you having pain with intercourse now and
21 do you have -- are you sexually active.
22 Asking the patients at the time what
23 they're experiencing now is more accurate
24 than asking them to recollect what they

Page 271

1  remember.
2          The only reason we asked
3  them that question in the questionnaire
4  was to be able to correlate the other
5  data in the questionnaire to whether or
6  not the patients were self-reporting de
7  novo dyspareunia.
8          MR. ISMAIL:  Doctor, if the
9      answer to the question is no and
10     he doesn't want an explanation you
11     don't have to give it.  So if he
12     asks, is this correct and if you
13     disagree, you can say no.  And if
14     he wants an explanation, he'll ask
15     for it.
16         MR. SLATER:  I move to
17     strike that response.
18 BY MR. SLATER:
19     Q.   Doctor, what I'd like to do
20 it go to Page 173 of your deposition,
21 please.
22     A.   Okay.
23     Q.   And what we're going to do
24 is walk through -- do you remember at the

Page 272

1  deposition, I walked through your article
2  and I walked through the calculation of
3  de novo dyspareunia based on the
4  questionnaires?  Do you remember we did
5  that on Page 173, 174 and 175?
6     A.   Yes.
7     Q.   I'm going to walk through it
8  with you, starting on Line 8 of Page 173.
9  I point out we're on Page E2, because
10 that's where it starts:  In the bottom
11 right-hand corner -- paragraph where it
12 says, 56 of the sexually active patients
13 agreed to answer questionnaires, the
14 response rate was 73 percent, meaning 41
15 responded.
16          Your answer was:  Uh-huh.
17          And the question:  So we
18 know we have a set of 41 that responded,
19 correct?
20     A.   Right.
21     Q.   Now, you were then asked, on
22 Line 18:  Then it says, 20 of the 41
23 sexually active patients who responded to
24 the questionnaires described themselves

Page 273

1  as pain free?
2     A.   Right.
3     Q.   So 20 out of 41 had no
4  dyspareunia?
5     A.   Right.
6     Q.   And that leaves 21 at the
7  bottom of the page right there who
8  reported dyspareunia?
9     A.   Right.
10    Q.   And you confirmed that and
11 said that was correct, right?
12    A.   Right.
13         MR. ISMAIL:  Improper use of
14     a deposition.
15         Please wait.
16 BY MR. SLATER:
17    Q.   The next question, now we're
18 on Page 174.
19         Question:  So 21 out of 41
20 reported dyspareunia on the
21 questionnaires, correct?
22         MR. ISMAIL:  Same.
23 BY MR. SLATER:
24    Q.   And what was your answer?

69 (Pages 270 to 273)

Joye Lowman, M.D.

Page 274

1         MR. ISMAIL:  Same objection.
2         THE WITNESS:  That's
3    correct.
4  BY MR. SLATER:
5       Q.   Then I asked you:  If you
6  want to then eliminate the women who had
7  dyspareunia at baseline because you're --
8  rephrase.  If you're trying to eliminate
9  the women who had dyspareunia at baseline
10 because you're trying to study de novo
11 dyspareunia, you would subtract those
12 eight women from both the numerator and
13 the denominator, right?
14         And what was your answer?
15      A.   That's incorrect.
16      Q.   I'm sorry, what did you say
17 under oath on November 13th, on Line 13?
18      A.   Where is it again?
19      Q.   Page 174, Line 13.
20         What was your answer to that
21 question?
22      A.   That's correct.
23      Q.   Then --
24      A.   But that's incorrect.

Page 275

1       Q.   Then the next question.
2         Right.  So it would be on
3  the numerator 21 minus eight would be 13
4  and 41 minus 8 would be 33, correct?
5         You answered.  You said:  18
6  and 33?
7         And I answered, I questioned
8  you:  13 and 33.  21 minus 8 equals 13
9  and 41 minus 8 equals 33, correct?
10        Your answer, what did you
11 say?
12        MR. ISMAIL:  Objection.
13    Improper use of a deposition.
14        THE WITNESS:  I said:  I
15    think that's correct.  Math is not
16    my strong point.
17 BY MR. SLATER:
18      Q.   It's not mine either, but
19 we'll do the best we can.
20      A.   Okay.
21      Q.   Then Page 175, Line 13.
22 Question:  13 -- rephrase.  33 --
23 rephrase.
24        13 divided by 33 -- let me

Page 276

1    start over.
2         Then on Page 175, Line 13, I
3  asked you:  13 divided by 33?  13 divided
4  by 33 is 39.4 percent.  Will you agree to
5  that percentage?
6         And what was your answer?
7         MR. ISMAIL:  Objection.
8    Same objection.
9         THE WITNESS:  My answer was
10   yes.
11 BY MR. SLATER:
12      Q.   Okay.  Let's move on.
13      A.   For the record, that's
14 incorrect.
15        MR. SLATER:  Move to strike.
16 BY MR. SLATER:
17      Q.   Now, I want to talk a little
18 bit about something that you wrote in a
19 document to Ethicon.  Let's mark this as
20 Exhibit-8.
21            - - -
22        (Whereupon, Exhibit
23    Lowman-8, January 2005 E-mails,
24    was marked for identification.)

Page 277

1            - - -
2  BY MR. SLATER:
3       Q.   Actually, we'll come back to
4  this.
5         MR. SLATER:  Let's take a
6    five-minute break.
7         VIDEO TECHNICIAN:  Going off
8    the record at 6:14 p.m.
9            - - -
10        (Whereupon, a brief recess
11    was taken.)
12            - - -
13        VIDEO TECHNICIAN:  Back on
14    the record at 6:21 p.m.
15 BY MR. SLATER:
16      Q.   Doctor, I want to hand you
17 an article that was previously marked in
18 this case as PLT 1095.  And I didn't see
19 this article listed on the reliance list
20 in your report.
21        It was not listed, right?
22      A.   I don't remember.  There's
23 several Withagen studies on the reliance
24 list.

Joye Lowman, M.D.

Page 278

1    Q.    What I want to do -- sorry?
2    Start over.
3          MR. SLATER:  Were you able
4    to hear?
5          VIDEO TECHNICIAN:  Yes.
6    BY MR. SLATER:
7    Q.    We'll start over with this
8    document.
9          Doctor, I've given you what
10   we marked as PLT 1095.  This is an
11   article by several people, including
12   Mariella Withagen, who is an Ethicon
13   consultant that studied the PROLIFT®.
14         You know that, right?
15   A.    Yes.
16   Q.    And she's evaluating here a
17   comparison of outcomes for various women
18   with mesh surgery, including PROLIFTs®,
19   correct?
20   A.    It looks like that, yes.
21   Q.    And what I want to do is
22   turn to a couple specific things in here.
23   One of them is on Page 1402.  1-4-0-2,
24   the numbers are in the top left.

Page 279

1    A.    Sorry.  Top left.
2    Q.    Doctor, in the interest of
3    time, I'm going to ask you a new
4    question.
5          Doctor, please look at the
6    conclusion at the end of the article.
7    A.    Okay.
8    Q.    And, let me just -- in case
9    you're not aware, this article was
10   identified by Dr. Elliott, one of the
11   experts who testified, as authoritative
12   and medically reliable.
13         Are you aware of that?
14         MR. ISMAIL:  Objection.
15   Lack of foundation.
16         THE WITNESS:  I don't
17   remember what he testified was
18   authoritative or reliable.
19   BY MR. SLATER:
20   Q.    I'm going to start over.
21         Doctor, I want to ask you a
22   question, and I want to make a statement
23   and see if you agree with it, okay?
24   A.    Okay.

Page 280

1    Q.    The increasing number of
2    inserted meshes for pelvic organ prolapse
3    raises concerns.  Mesh is successfully
4    used for repair of prolapse, but when
5    complications arise they may be severe in
6    nature and result in a decrease in
7    quality of life.  New meshes are
8    introduced into clinical practice despite
9    the lack of proper studies showing their
10   safety and effectiveness.  Moreover, the
11   use of easy-to-do mesh kits lowers the
12   threshold for inexperienced surgeons to
13   start operating with meshes.  This can
14   only lead to more complications which is
15   harmful for the patients.
16         Do you agree with that
17   statement?
18         MR. ISMAIL:  Objection.
19         THE WITNESS:  No.
20   BY MR. SLATER:
21   Q.    Doctor, I'd like to bring
22   your attention now to PLT 1095, which I
23   believe you have in front of you.
24   A.    This one?

Page 281

1    Q.    Yes.
2    A.    Okay.
3    Q.    And this is an article that
4    Dr. Elliott, who testified as an expert
5    in this case, identified as being an
6    authoritative article in the medical
7    literature.
8          I'd like to represent that
9    to you, okay?
10   A.    Okay.
11   Q.    And if you look at the last
12   page where the conclusion is?
13   A.    Okay.
14   Q.    The very bottom paragraph at
15   the bottom of the conclusion in the left
16   column, do you see, The increasing
17   number?  Do you see that phrase?
18         And if you read that over to
19   the next page, do you see the statement
20   that I just read to you?
21   A.    I do.
22   Q.    And do you disagree with at
23   that statement found in this article?
24   A.    Yes, I do.

Joye Lowman, M.D.

Page 282

1      Q.    And this is an article
2  written by Mariella Withagen and other
3  doctors with regard to the PROLIFT® and
4  other products, correct?
5      A.    That's correct.
6      Q.    And you know Mariella
7  Withagen is an investigator who has
8  studied the PROLIFT® extensively,
9  correct?
10     A.    That's correct.
11     Q.    In fact, she is one of the
12  authors of one of those randomized
13  control trials you relied on earlier,
14  correct?
15     A.    That's correct.
16     Q.    And you know that trial,
17  because in that trial she found a 17
18  percent exposure rate with PROLIFT®,
19  correct?
20     A.    That's correct.
21     Q.    And in the end of that
22  article, she actually concluded that the
23  PROLIFT® should only be used for, in most
24  cases, recurrent prolapse where someone

Page 283

1  already had a surgical procedure and it
2  happened again?  She said that, too, at
3  the end, correct?
4          MR. ISMAIL:  Objection.
5      Lack of foundation.
6          THE WITNESS:  I don't
7      remember what she concluded.
8  BY MR. SLATER:
9      Q.    Doctor, I'm going to hand
10  you now Exhibit-750.
11         This is a document produced
12  by Ethicon regarding a meeting regarding
13  a potential PROLIFT® randomized control
14  trial, February 2nd, 2006.
15         Do you see that?
16     A.    I see that.
17     Q.    And do you see the people who
18  attended included Dr. Lucente?
19     A.    Uh-huh.
20         MR. ISMAIL:  Objection.
21     Lack of foundation.
22         THE WITNESS:  Yes.
23  BY MR. SLATER:
24     Q.    And if we go to the next

Page 284

1  page -- now, certainly, this is not an
2  article -- this is not a document you've
3  ever seen, right?
4      A.    No.
5      Q.    Because you made it clear
6  you didn't rely on any Ethicon internal
7  documents, right?
8      A.    That's correct.
9      Q.    On Page 2 of this document,
10  there's a heading, Recent Problem With
11  PROLIFT®.
12         Do you see that?
13         MR. ISMAIL:  Objection.
14     Lack of foundation.
15         THE WITNESS:  Yes.
16  BY MR. SLATER:
17     Q.    And it says, VL -- that
18  would be Vince Lucente, right?
19     A.    I'm assuming so.
20         MR. ISMAIL:  Objection.
21     Lack of foundation.
22  BY MR. SLATER:
23     Q.    -- recently removed the
24  center of an anterior PROLIFT® from a

Page 285

1  Tennessee woman.  The device appeared to
2  have been placed too tightly.  Patient
3  was in constant pain and had been since
4  two weeks post surgery.  Returning for
5  surgery to deal with a bad PROLIFT® will
6  be a disaster.
7          Do you see that?
8          MR. ISMAIL:  Objection.
9      Lack of foundation.  Hearsay.
10         THE WITNESS:  I see that.
11  BY MR. SLATER:
12     Q.    Were you aware, when you
13  drew your opinions in this case, that
14  Vince Lucente told Ethicon that where you
15  have a patient suffering pain from a
16  PROLIFT® and you have to deal with that
17  PROLIFT®, that the removal surgery will
18  be a disaster?
19         MR. ISMAIL:  Objection.
20  BY MR. SLATER:
21     Q.    Were you aware of that?
22         MR. ISMAIL:  Objection.
23     Lack of foundation.  Hearsay.
24         THE WITNESS:  I was not

Joye Lowman, M.D.

Page 286

1    aware of that.
2        But removing or undoing any
3    procedure, whether or not there's
4    mesh there or not, is a difficult
5    thing to do.
6        MR. SLATER:  Move to strike
7    from "but" forward.
8    BY MR. SLATER:
9        Q.    I don't want to generalize.
10       A.    That's not a generalization,
11   that's a qualification.
12       Q.    I wasn't even asking you a
13   question.  I was just saying, I don't
14   want to generalize.  I'm trying to just
15   ask you about this document and the
16   language in this document, okay, Doctor?
17       A.    Okay.
18       Q.    This document says that,
19   Returning to surgery to deal with a bad
20   PROLIFT® will be a disaster.
21       That's what Vince Lucente
22   told Ethicon according to this document?
23   Do you see that?
24       MR. ISMAIL:  Objection.

Page 287

1    Lack of foundation.  Hearsay.
2        THE WITNESS:  Yes, I see
3    that.
4    BY MR. SLATER:
5        Q.    Does that have any impact on
6    any of your opinions in this case?
7        A.    No.
8        Q.    Doctor, I've handed you an
9    Ethicon document entitled Exhibit P-28.
10   That's an e-mail of February 19, 2009.
11       Do you see that?
12       A.    Yes.
13       Q.    And it's written from Fah
14   Che Leong to Scott Jones.
15       Do you see that?
16       A.    Yes.
17       Q.    And if you look in the
18   bottom part of the e-mail, you can see
19   that Scott Jones had written to Dr. Leong
20   and asked him about setting up a
21   professional education event about the
22   PROLIFT® at St. Louis University.
23       MR. ISMAIL:  Objection.
24   BY MR. SLATER:

Page 288

1        Q.    Do you see that?
2        MR. ISMAIL:  Objection.
3    Lack of foundation.
4        THE WITNESS:  Can you ask
5    the question again?
6    BY MR. SLATER:
7        Q.    Sure.
8        In this e-mail, you'll see
9    in the middle of the page, Scott Jones
10   wrote to Fah Che Leong regarding setting
11   up a professional education event at St.
12   Louis University to train doctors on the
13   PROLIFT®.
14       Do you see that?
15       MR. ISMAIL:  Objection.
16   Lack of foundation.
17       THE WITNESS:  Yes, I see
18   that.
19   BY MR. SLATER:
20       Q.    And Dr. Leong writes back to
21   Scott Jones, and let's read together at
22   the top.
23       He writes back to Scott
24   Jones and says, I am currently involved

Page 289

1    in getting a patient to the operating
2    room who had an anterior and posterior
3    PROLIFT® implanted by another physician.
4    She will likely lose any coital function,
5    as her vaginal length is now 3
6    centimeters and there is mesh extruding
7    literally everywhere.  Also, there is a
8    large stone in the bladder from a bladder
9    perforation with the anterior arm.
10       And then he goes on to say,
11   This patient will have a permanently
12   destroyed vagina, and I am only hoping to
13   get her out of this without more
14   morbidity.
15       My question is this:  First
16   of all, do you agree -- or did you know
17   that women can suffer complications this
18   severe from PROLIFT®?
19       A.    Yes.
20       Q.    And you agree with that,
21   right?  That women can suffer
22   complications as severe as stated here,
23   correct?
24       A.    That's correct.

Joye Lowman, M.D.

Page 290

1    Q.   That doesn't impact on your
2  opinions at all, seeing this document,
3  right?
4    A.   No.  Isolated case reports,
5  as I identified on -- when you're
6  evaluating levels of evidence, are less
7  reliable in formulating overall opinions
8  about how whatever it is that you're
9  evaluating performs in the population.
10    Q.   Do you know whether Ethicon,
11  the doctors who work in medical affairs,
12  whose business it is to evaluate these
13  types of reports, whether they think
14  these types of reports are valuable?
15    MR. ISMAIL:  Objection.
16    THE WITNESS:  I don't know
17    that.
18  BY MR. SLATER:
19    Q.   Doctor, I've handed you what
20  we marked as Exhibit P-596, and it's a
21  set of e-mails within the company.
22    And the one at the top is
23  from David Robinson, who I will tell you
24  is a medical affairs director, he was at

Page 291

1  Ethicon.
2    And this is in July of 2006,
3  okay?
4    A.   Okay.
5    Q.   And the subject is,
6  Australian PROLIFT® registry.
7    And if you look at the
8  e-mail, he writes to Jonathan Meek, who
9  is in marketing, and is responding to an
10  inquiry about a registry.
11    Do you see, it says, You
12  asked about legal risk.  I don't know
13  about legal risk, but we clearly have a
14  worldwide customer quality risk.  When
15  any adverse event is captured in a
16  registry, it has to be reported to
17  worldwide customer quality.
18  Consequently, if none of our competitors
19  are keeping registries, our complication
20  data may appear increasingly accurate but
21  with decreasing appeal.
22    Do you see that?
23    MR. ISMAIL:  Objection.
24    Lack of foundation.

Page 292

1    THE WITNESS:  I see that.
2  BY MR. SLATER:
3    Q.   Did you know that in Ethicon
4  the medical affairs department and,
5  certainly David Robinson, in this e-mail,
6  decided they don't want to do a
7  registry -- and you know what a registry
8  is, right?
9    A.   I do.
10    Q.   That's where you try to
11  track all patients that get the product,
12  right?
13    A.   Right.
14    Q.   And he says, If we do that,
15  our complication data may be increasingly
16  accurate, but it's going to look worse
17  against our competitors because they're
18  not tracking all the cases --
19    MR. ISMAIL:  Objection.
20  BY MR. SLATER:
21    Q.   -- that's what he's talking
22  about there?
23    Do you see that?
24    MR. ISMAIL:  Objection.

Page 293

1    Lack of foundation.
2    THE WITNESS:  I see that.
3  BY MR. SLATER:
4    Q.   Is that a good thing for a
5  company like Ethicon, to not want to have
6  a registry to track complications
7  accurately because they're afraid it's
8  going to look bad compared to their
9  competitors?
10    MR. ISMAIL:  Objection.
11    Lack of foundation.  Beyond the
12    scope.
13    THE WITNESS:  I can't speak
14    to everything that they had to
15    consider in making that decision.
16  BY MR. SLATER:
17    Q.   Let's go to the next
18  document, P-2576.
19    This is an e-mail dated
20  October 14th, 2011, within the company.
21  Copied to multiple people, including Paul
22  Parisi and some others.
23    You don't know who Paul
24  Parisi and these other people are, right?

Joye Lowman, M.D.

Page 294

1      A.    No.
2      Q.    Well, what I'd like to do
3  show you this, there's a PowerPoint
4  attached, Pelvic Organ Prolapse Condition
5  Business Team Meeting, October 14, 2011.
6            Do you see that?
7      A.    I see that.
8      Q.    And now what I'd like to do
9  is turn to the page that is numbered 39.
10     A.    Okay.
11     Q.    And do you see at the top it
12  says, There are different patient needs
13  that must be considered before a surgical
14  procedure is recommended?
15           Do you see that?
16           MR. ISMAIL:  Lack of
17      foundation.
18           THE WITNESS:  Yes, I do.
19  BY MR. SLATER:
20     Q.    And if you go around, you'll
21  see that there's different types of
22  patients in these black circles.
23           And the one in the top left
24  says, Young patient, aged 30 to 55?

Page 295

1            Do you see that?
2      A.    Yes, I do.
3            MR. ISMAIL:  Lack of
4      foundation.
5  BY MR. SLATER:
6      Q.    And it says, Considerations,
7  maintain sexual function.
8            So that's a consideration
9  for a young women aged 30 to 55, right?
10           MR. ISMAIL:  Objection.
11      Lack of foundation.
12           THE WITNESS:  Yes.
13  BY MR. SLATER:
14     Q.    And if a woman is sexually
15  active and she's within the age range of
16  30 to 55, an important consideration is
17  maintaining sexual function, correct?
18           MR. ISMAIL:  Same objection.
19           THE WITNESS:  That's
20      correct.
21  BY MR. SLATER:
22     Q.    It says here in this Ethicon
23  document that for a woman like that, the
24  treatment, sacrocolpopexy or traditional

Page 296

1  repair?  That's what it says in this
2  Ethicon document, correct?
3            MR. ISMAIL:  Objection.
4      Lack of foundation.
5            THE WITNESS:  Yes.
6  BY MR. SLATER:
7      Q.    That is not something you
8  knew that Ethicon internally had a
9  document which said that?  You didn't
10  know that before right now, right?
11           MR. ISMAIL:  Objection.
12      Lack of foundation.
13           THE WITNESS:  I did not.
14  BY MR. SLATER:
15     Q.    Am I correct that has no
16  impact on any opinion in this case,
17  regardless of whether Ethicon thought it
18  or not?
19     A.    On my opinions, no.
20     Q.    Okay.  Now, I'll give you
21  Exhibit -- what we've marked as 8.
22           This is a series of e-mails
23  within Ethicon in January of 2005,
24  about -- under two months before the

Page 297

1  PROLIFT® went on the market.
2            You never have seen this,
3  right?
4      A.    No.
5      Q.    At the bottom of the first
6  page, there's an e-mail from Gene
7  Kammerer to Paul Parisi and some other
8  people.
9            Do you see that?  January
10  18, 2005?
11           MR. ISMAIL:  Objection.
12      Lack of foundation.
13           THE WITNESS:  Gene Kammerer
14      to Kelly Brown, is that what you
15      said?
16  BY MR. SLATER:
17     Q.    Exactly.  Exactly.
18     A.    Okay.
19     Q.    Do you know who Gene
20  Kammerer is?
21     A.    I don't.
22     Q.    Gene Kammerer writes to this
23  group of people and says he had spoken
24  with a professor named Mauro Cervigni, an

75 (Pages 294 to 297)

Joye Lowman, M.D.

Page 298

1  Italian gynecologist.
2          Do you see that?
3          MR. ISMAIL:  Objection.
4  Lack of foundation.  Hearsay.
5          THE WITNESS:  Yes.
6  BY MR. SLATER:
7      Q.    And he then says that there
8  were some important points made by Dr.
9  Cervigni, and he lists them and numbers
10  them.
11          And I want to focus on the
12  second box, or Number 2.  All right?  Are
13  you with me?
14          MR. ISMAIL:  Objection.
15  Lack of foundation.  Hearsay.
16          THE WITNESS:  I'm with you.
17  BY MR. SLATER:
18      Q.    All right.  Thanks.  It
19  says, Faster tissue repair would prevent
20  complications of erosion and dyspareunia,
21  the latter generally caused by scar
22  contraction.  Contraction pulls against
23  the side wall and causes pain.  It causes
24  a hard issue, which can be felt by

Page 299

1  patient and sexual partner.  It can lead
2  to a balling up of the mesh which is very
3  uncomfortable.
4          Are you reading along with
5  me, Doctor?
6          MR. ISMAIL:  Same
7  objections.
8          THE WITNESS:  I'm reading
9  along.
10  BY MR. SLATER:
11      Q.    First of all, do you agree
12  that when there's mesh contraction, the
13  mesh can ball up and can be very
14  uncomfortable for the woman who has that
15  inside her body?
16      A.    No.
17      Q.    If you look to the
18  continuation of this e-mail, on the next
19  page, Gene Kammerer actually suggests, in
20  the last section, on Number 5, the very
21  top of the page, He confirmed our
22  thoughts regarding the correlation
23  between inflammation, foreign body
24  response and scar formation.

Page 300

1          I want to stop there.
2          Do you have any idea what
3  Ethicon's thoughts were on that subject?
4      A.    On inflammation, foreign
5  body response and scar formation?  No.
6      Q.    Further down, Gene Kammerer
7  says that -- he's suggesting, As an
8  interim step to reduce erosion and
9  contraction, I am suggesting we market
10  this mesh -- and he named it as ULTRAPRO®
11  Mesh, just above there, for pelvic floor
12  repair.
13          Do you see that?
14          MR. ISMAIL:  Objection.
15  Lack of foundation.
16          THE WITNESS:  Yes.
17  BY MR. SLATER:
18      Q.    Did you know that within
19  Ethicon, just before the PROLIFT® went on
20  the market, that they were discussing the
21  possibility of marketing a different mesh
22  that would reduce erosion and
23  contraction?
24          MR. ISMAIL:  Objection.

Page 301

1  Lack of foundation.
2  BY MR. SLATER:
3      Q.    Did you know Ethicon was
4  talking about that?
5      A.    I didn't.
6      Q.    Is that of any significance
7  to you?
8      A.    No.
9      Q.    If you go to the top of the
10  exhibit on the front page, Kelly Brown
11  responds to that e-mail and says, at the
12  bottom of that, I am always pleased to
13  learn of the commonalities in surgeons'
14  observations.  Many of the points that
15  Professor Cervigni mentioned have been
16  voiced by other surgeons, which gives me
17  a degree of confidence in considering
18  these issues in our innovative efforts.
19          Does that have any impact on
20  your opinion that Ethicon internally was
21  getting this information from multiple
22  surgeons?
23          MR. ISMAIL:  Objection.
24  Lack of foundation.

76 (Pages 298 to 301)

Joye Lowman, M.D.

Page 302

1  BY MR. SLATER:
2      Q.   About the contraction and
3  the foreign body response?
4      A.   No.
5      Q.   Doctor, I want to ask you a
6  question about whether or not you agree
7  with a statement.  And assume the
8  statement is being made in about 2005 --
9  in 2005, okay?
10     A.   Okay.
11     Q.   We can only advise that
12  caution be exercised when carrying out
13  this new surgical procedure -- and I'm
14  talking about the PROLIFT® procedure.
15     A.   Okay.
16     Q.   -- in fact, experimental
17  studies and clinical trials seem
18  necessary in order to reduce the level of
19  exposure to less than 5 percent of cases.
20         Do you agree with that
21  statement?
22     A.   In order to expose -- repeat
23  that again.
24     Q.   In order to reduce the level

Page 303

1  of exposure to less than 5 percent of
2  cases.
3         Do you agree that the
4  PROLIFT® should have been, on an
5  experimental basis -- only used on an
6  experimental basis in clinical trials
7  until the overall exposure rate could be
8  brought under 5 percent?
9         MR. ISMAIL:  Objection.
10  Mischaracterizes the document that
11  you're reading from.
12         THE WITNESS:  The exposure
13     rate to the PROLIFT® procedure?
14  BY MR. SLATER:
15     Q.   Right.
16     A.   No.
17     Q.   Doctor, I want to hand you
18  what we marked as PLT 108.
19         Doctor, PLT 108 is an
20  article written by several authors,
21  including Dr. Cosson.
22         Do you see that?
23     A.   Yes.
24     Q.   It's dated in 2005, titled,

Page 304

1  Transvaginal Mesh Technique for Pelvic
2  Organ Prolapse, Mesh Exposure Management
3  and Risk Factors.
4         Do you see that?
5      A.   I see that.
6      Q.   And you know who Dr. Cosson
7  is?  He's one of the inventors of the
8  PROLIFT® and the TVM procedures, correct?
9      A.   Correct.
10     Q.   I'll represent to you this
11  article was found to be were
12  authoritative and medically reliable by
13  Dr. Elliott, our expert, and he testified
14  to that during our case, okay?
15     A.   Okay.
16     Q.   And if you look at the last
17  page, in the conclusion, the last
18  paragraph, it says, We can only advise
19  that caution be exercised when carrying
20  out this new surgical procedure.  In
21  fact, experimental studies and clinical
22  trials seem necessary in order to reduce
23  the level of exposure to less than 5
24  percent of cases.

Page 305

1         Having seen that now and
2  knowing it's Dr. Cosson that says it, do
3  you agree with that statement?
4      A.   I lost you.  I'm on the last
5  page, under -- in the section where it
6  says conclusion.  Are you in the first or
7  second paragraph?
8      Q.   The second paragraph.  The
9  beginning.  You can read it.
10     A.   Okay.
11         Oh, they're not talking
12  about exposure to the PROLIFT®.  They're
13  talking about mesh erosion.
14     Q.   He's talking -- if you want
15  to look at the article, he's not talking
16  about the TVM procedure that became the
17  PROLIFT®?
18     A.   It doesn't seem like it.
19  Because he says in the next sentence,
20  With this particular study, we show that
21  this level is below 1 percent when the
22  uterus is preserved.
23         MR. SLATER:  Move to strike.
24  BY MR. SLATER:

77 (Pages 302 to 305)

Joye Lowman, M.D.

Page 306

1    Q.    Doctor, if you want to look
2  through the article, you can see that
3  they're talking about the TVM procedure.
4    A.    So in the abstract it says,
5  Prosthetic reinforcement in the surgical
6  repair of pelvic prolapse by the vaginal
7  approach is not devoid of tolerability
8  related problems such as vaginal erosion.
9  The purposes of our study are to define
10  the risk factors for exposure of the mesh
11  material, to describe advances and to
12  recommend a therapeutic strategy.
13        So they're talking about
14  mesh erosion, not exposure to the
15  PROLIFT® procedure.
16    Q.    If you look through this,
17  you'll see they actually have diagrams
18  that show the TVM technique.  For
19  example, on the third page of the
20  article, it shows what a total PROLIFT®
21  looks like.
22        Do you see that?
23    A.    Yes.
24    Q.    This article is about the

Page 307

1  TVM technique, isn't it?
2    A.    Yes.
3    Q.    Just very simply, do you
4  agree or disagree with Dr. Cosson that as
5  of 2005, the procedure should have been
6  deemed experimental?
7        MR. ISMAIL:  Completely
8  mischaracterizes the document.
9        THE WITNESS:  No.
10  BY MR. SLATER:
11    Q.    One last question.
12        Do you know that article
13  that I just gave you, Doctor?  Are you
14  familiar with that article?
15    A.    I've read this article
16  before.
17    Q.    Doctor, as of 2006, with
18  regard to complications of erosion and
19  dyspareunia and the use of PROLENE® soft
20  mesh, which is the mesh in the TVM
21  procedure and the PROLIFT®, would you
22  agree with the following statement:
23  Proposed to improve these phenomenon --
24  meaning erosion and dyspareunia -- soft

Page 308

1  PROLENE® recently used by several authors
2  does not appear to fulfill expectations.
3        Do you agree with that
4  statement?
5    A.    No.  I don't even know what
6  the expectations were.
7    Q.    Would you agree that as of
8  2006, Dr. Cosson and others in his group
9  still had reservations about the
10  widespread use of synthetic meshes?
11        MR. ISMAIL:  Objection.
12  Lack of foundation.
13        THE WITNESS:  No.
14  BY MR. SLATER:
15    Q.    Doctor, I've handed you what
16  we marked as PLT 0139.  And I'll
17  represent to you this is an article that
18  Dr. Elliott testified earlier in the case
19  is an authoritative article, okay?
20    A.    Okay.
21    Q.    Have you seen this article
22  before?
23    A.    It's in French, so probably
24  not.

Page 309

1    Q.    If you turn to the second
2  page, you'll see there's an abstract and
3  a summary in English.
4    A.    Okay.
5    Q.    You've never seen this?
6        No?  You're just shaking
7  your head.  I'm sorry.  You have to --
8    A.    I'm sorry.  Say that again.
9    Q.    I'll start over.
10        Doctor, have you seen this
11  article before?
12    A.    I may have seen it.  I've
13  looked at over 200 articles.
14    Q.    You didn't mention it in
15  your report, did you?
16    A.    No.
17    Q.    Have you seen Dr. Elliott's
18  testimony, by the way, that was given to
19  the jury in this case?
20    A.    I have not.
21    Q.    If you would look in the
22  summary, about halfway down, and you can
23  read down with me, you'll see them
24  talking about erosion and dyspareunia.

Joye Lowman, M.D.

Page 310

1     A.    Okay.  When you say "halfway
2 down," the first paragraph?  Second
3 paragraph?
4     Q.    Halfway down the summary,
5 right in the middle.  As you go down to
6 the middle, you'll see them talking about
7 erosion and dyspareunia and the rates of
8 those complications.
9          Do you see that?
10    A.    Yes, I see that.
11    Q.    And do you see the sentence,
12 Proposed to improve these phenomenon,
13 soft PROLENE® recently used by several
14 authors does not appear to fulfill
15 expectations.
16          Do you see where I just
17 read?
18    A.    Yes, I see that.
19    Q.    Now, seeing that that was
20 written by Dr. Cosson, do you agree or
21 disagree with that statement?
22          MR. ISMAIL:  Objection.
23 Lack of foundation.
24          THE WITNESS:  Again, I don't

Page 311

1        know what he means by "does not
2        appear to fulfill expectations."
3 BY MR. SLATER:
4     Q.    Further down, just about
5 five lines from the bottom of the
6 summary, he says, We still have
7 reservations about widespread use of
8 synthetic meshes.
9          Seeing that in an article
10 authored by Dr. Cosson and others, that
11 he said that, is that something that you
12 agree or disagree with?
13          MR. ISMAIL:  Objection.
14 Lack of foundation.
15          THE WITNESS:  I disagree
16        with that.
17 BY MR. SLATER:
18    Q.    Would you agree with me that
19 Dr. Cosson probably has more extensive
20 experience with the mesh -- the soft
21 PROLENE® mesh that ended up in the
22 PROLIFT® and what they're talking about
23 there than you would have had in your
24 practice?

Page 312

1     A.    He probably has more
2 knowledge about GYNEMESH®® than I do,
3 yes.
4          MR. SLATER:  Let's go off
5 the video for a second.
6          VIDEO TECHNICIAN:  Going off
7 the record at 6:48 p.m.
8              - - -
9          (Whereupon, a brief recess
10 was taken.)
11             - - -
12          VIDEO TECHNICIAN:  We're
13 back on the record at 6:50 p.m.
14 BY MR. SLATER:
15    Q.    Doctor, you offered some
16 opinions earlier about some of the
17 documents Ethicon used to provide
18 information to doctors.
19          Do you remember that?
20    A.    Yes.
21    Q.    With regard to the
22 monograph, remember you were asked some
23 questions about that?
24    A.    Yes.

Page 313

1     Q.    Do you have any information
2 that shows that Dr. Baker saw the
3 monograph?
4     A.    No.
5     Q.    How about the different
6 patient brochures and IFUs, you're not
7 sure which he may have seen or which he
8 didn't, right?
9     A.    That's right.
10    Q.    Now, let's talk about some
11 of the standards that applied within
12 Ethicon to ensure that warnings in their
13 documents were adequate.
14          Do you know what any of
15 those standards are?
16    A.    No.
17    Q.    Do you know what any of the
18 medical directors or others in the
19 company said they were supposed to
20 communicate in a warning?
21    A.    No.
22    Q.    Do you know any of the
23 standards that apply in general to
24 medical devices, in terms of what

Joye Lowman, M.D.

Page 314

1 information should be included in
2 something like an IFU or a brochure?
3     A.    No.
4     Q.    Were you curious at all as
5 to what standards Ethicon thought it was
6 required to meet?  What its duty was in
7 deciding whether warnings and information
8 were adequate?
9         MR. ISMAIL:  Objection.
10        THE WITNESS:  No.
11 BY MR. SLATER:
12    Q.    That would have been of no
13 significance to you in forming the
14 opinions you offered here today?
15    A.    No.  What they think?  No.
16    Q.    In essence, tell me if I'm
17 right, your warning opinions are based on
18 your own evaluation of what information
19 you would need in your own medical
20 practice; is that correct?
21    A.    Me and my colleagues, not
22 just me, but physicians in general.
23    Q.    Let's look at your
24 deposition, Page 134; Page 134, Line 13.

Page 315

1         I asked you:  If I
2 understand correctly, with regard to the
3 warning opinions, those are based on your
4 own evaluation of what information you
5 would need in your practice; is that a
6 correct statement?
7         What answer did you give
8 under oath last month?
9     A.    That's correct.
10    Q.    So, again, your warning
11 opinions go to what you would personally
12 need in your own practice, correct?
13    A.    Not just my practice, but
14 the practice of my colleagues as well.
15    Q.    Please look at Page 133,
16 Line 22.
17        The question you were asked:
18 In offering your opinions with regard to
19 whether the information provided in the
20 patient brochure was adequate, were you
21 basing that upon your own evaluation of
22 what information you would personally
23 need in your practice?
24        And what answer did you

Page 316

1 give?
2     A.    Yes.
3     Q.    Coming back to the
4 monograph, which you were asked questions
5 about, do you even know whether the
6 monograph, which is dated, on the copy
7 you used, 2007, whether that was even
8 available when Dr. Baker was trained?
9     A.    I don't.
10    Q.    Do you know that Dr. Baker
11 was trained before 2007?
12    A.    I do.
13    Q.    And, again, you have no
14 information indicating Dr. Baker ever saw
15 that document, right?
16        MR. ISMAIL:  Asked and
17    answered.
18        THE WITNESS:  That's
19    correct.
20 BY MR. SLATER:
21    Q.    Do you have any information
22 as to which patient brochure Dr. Baker
23 said he saw?
24        MR. ISMAIL:  Asked and

Page 317

1    answered.
2        THE WITNESS:  I don't.
3 BY MR. SLATER:
4     Q.    You don't know what
5 professional education information Dr.
6 Baker would have seen, correct?
7     A.    I don't.
8     Q.    Would you at least agree
9 with me, regarding warnings, that Ethicon
10 needed to accurately warn about the risks
11 they knew?
12    A.    No.
13    Q.    They didn't need to
14 accurately warn about the risks they knew
15 existed with the PROLIFT®?
16    A.    When you're talking about
17 warning, there's a lot that goes into
18 deciding what to disclose and what not to
19 disclose.  So my answer to that is no.
20    Q.    If Ethicon knew something to
21 be true -- withdrawn.
22        You testified, regarding the
23 warnings, that doctors know certain risks
24 and understand certain things and that

Joye Lowman, M.D.

Page 318

1  you think the warnings are adequate.
2        You said that, right?
3        A.   Yes.
4        Q.   Did you see Dr. Baker's
5  testimony?
6        A.   I did.
7        Q.   Do you know the testimony
8  that was presented to the jury --
9        A.   When you're saying
10 "testimony," you're talking about
11 deposition?
12       Q.   Right.  That was played to
13 the jury in this case?
14       A.   I've read his deposition.
15       Q.   Did you see that Dr. Baker
16 said he didn't know all the risks and
17 didn't understand them, and when he
18 learned them he stopped using the
19 PROLIFT®?
20       MR. ISMAIL:  Objection.
21 Lack of foundation.
22       THE WITNESS:  That wasn't
23 what I got from his deposition.
24 BY MR. SLATER:

Page 319

1        Q.   Did you see where he said
2  that when he learned more about the pain
3  and the erosions and things like that, he
4  stopped using the PROLIFT®?
5        MR. ISMAIL:  Objection.
6        THE WITNESS:  I don't
7  remember that.
8  BY MR. SLATER:
9        Q.   Did you see that Dr. Baker
10 said he stopped using the PROLIFT®?
11       A.   I do remember that, yes.
12       Q.   Did you see that he said he
13 stopped using the PROLIFT® when he
14 learned about the complications, learned
15 more than he knew initially?
16       MR. ISMAIL:  Objection.
17       THE WITNESS:  I don't
18 remember that.
19 BY MR. SLATER:
20       Q.   Did you see in Dr. Baker's
21 testimony that he said he stopped using
22 the PROLIFT® because he determined, based
23 on the experience he was gathering, that
24 it was unsafe for his patients?

Page 320

1        MR. ISMAIL:  Objection.
2        THE WITNESS:  I don't
3  remember that.
4  BY MR. SLATER:
5        Q.   Do you know, as you sit here
6  now, why Dr. Baker stopped using the
7  PROLIFT®?
8        A.   I don't.
9        Q.   One of the things that you
10 told me previously is that you're
11 familiar with the literature of Dr.
12 Klinge?  Remember you told me that when
13 we met?
14       A.   Yes.
15       Q.   And Dr. Klinge, are you
16 aware, testified in this trial by video?
17       A.   I am, yes.
18       Q.   Have you seen that
19 testimony?
20       A.   I have.
21       Q.   When did you see that?
22       A.   Oh, I don't remember.  At
23 some point in reviewing these materials,
24 I have seen his -- his testimony in this

Page 321

1  trial you're saying?
2        Q.   Right.
3        A.   I think I did see that, yes.
4        Q.   His literature is certainly
5  important to you, right?
6        A.   Yes.
7        Q.   And in forming your
8  opinions, you relied, in part, on his
9  literature, correct?
10       A.   That's correct.
11       Q.   Do you know whether Dr.
12 Klinge offered the opinion as to whether
13 or not the PROLIFT® is safe or not?
14       A.   From what I remember from
15 his deposition, I think he did.
16       Q.   Do you remember what he said
17 in his deposition?
18       A.   He said that he felt like --
19 I don't remember if he said it was
20 unsafe.  I do remember him saying that he
21 thought that VIPRO® would be better
22 option.
23            - - -
24       (Whereupon, Exhibit

81 (Pages 318 to 321)

Joye Lowman, M.D.

Page 322

1    Lowman-9, Excerpt of Testimony of
2    Dr. Klinge, was marked for
3    identification.)
4              - - -
5         MR. SLATER:  I'm marking
6    this as Exhibit-9.
7    BY MR. SLATER:
8         Q.   Doctor, I've handed you the
9    testimony that we submitted at trial.
10        And if you can turn to Page
11   23, this is Dr. Klinge's testimony.
12        A.   Okay.
13        Q.   And Dr. Klinge, in clip 38,
14   it starts at Page 78, Line 6, was asked:
15   After your review of all the materials in
16   this case regarding Ethicon's meshes for
17   treating pelvic organ prolapse, all of
18   your work that you've done in the
19   scientific literature, conferences you've
20   spoken at around the world, the
21   conferences you've spoken as an invited
22   lecturer by Ethicon, and your work as a
23   hernia surgeon, both implanting and
24   explanting polypropylene meshes, your

Page 323

1    work in reviewing thousands of hernia
2    mesh explants from humans, your review of
3    looking at explants from the pelvic
4    floor -- from the pelvic floor of women,
5    do you have an opinion, to a reasonable
6    degree of medical and scientific
7    certainty, as to whether the PROLIFT® was
8    a safe design or an unsafe defective
9    design?
10        And you see he then says he
11   has such an opinion.
12        And then his opinion is
13   asked for on Page 79, Line 11, and he
14   answers:  The PROLIFT® carries
15   unnecessary risk and, therefore, it's
16   unsafe.
17        Had you -- you had read
18   this, is that your testimony?
19        MR. ISMAIL:  Objection.
20   BY MR. SLATER:
21        Q.   You had seen this before
22   today?
23        A.   No, I didn't.  It must have
24   been his report.

Page 324

1         Q.   Dr. Klinge's opinion that
2    the PROLIFT® is unsafe, that is
3    significant to you, based on his work in
4    this field, correct?
5         A.   No.
6         Q.   Look at Page 43 of your
7    deposition, please.  Actually, start at
8    Line 2.
9         I asked you at your
10   deposition:  So you're not aware of
11   whether Dr. Klinge has offered an opinion
12   directly about whether or not the mesh in
13   the PROLIFT® is safer for use to treat
14   prolapse through the PROLIFT® system?
15        Your answer was:  That's
16   correct.
17        Because at that time you
18   weren't aware of his opinion, correct?
19        A.   That's correct.
20        Q.   And then I asked you:  Based
21   on Dr. Klinge's work in this field, would
22   that opinion be significant to you?
23        And what did you say?
24        A.   It would be something that I

Page 325

1    would consider, yes.
2         Q.   Is it still something that
3    you would consider, now that I've showed
4    you that he has testified to this jury
5    that the PROLIFT® is unsafe?
6         A.   I -- his work in this field
7    has been significant.  What's been
8    published in the literature, I've
9    reviewed and considered that.
10        His opinion about whether or
11   not the PROLIFT® is safe is something
12   that I would consider.  It's not
13   something that I would consider in lieu
14   of the multiple randomized control
15   trials, the Cochrane review and all of
16   the hundreds of studies that have been
17   published about the PROLIFT® and its
18   safety and efficacy.
19        Q.   Dr. Klinge's opinion
20   certainly is an important piece of
21   information, right?
22        A.   Dr. Klinge's work is
23   important.  His opinion in the trial is
24   less important.

82 (Pages 322 to 325)

Joye Lowman, M.D.

Page 326

1      Q.   Are you aware that the
2  opinion he's offered in this trial is
3  consistent with his medical literature?
4      A.   No.
5      Q.   Do you know that he
6  testified that he published an article
7  where he tested the PROLIFT® mesh and
8  found that the pores collapse and that's
9  unsafe for people?
10         MR. ISMAIL:  Objection.
11 BY MR. SLATER:
12     Q.   And that he testified to
13 that at trial?
14     A.   I'm not aware of that.
15     Q.   Let's talk about Patricia
16 Hammons now.
17     A.   Okay.
18     Q.   One thing you wanted to do
19 was approach the evaluation of Patricia
20 Hammons like the evaluation of any
21 patient, right?
22     A.   Right.
23     Q.   And you would want to
24 evaluate her condition just like you

Page 327

1  would in your medical practice, right?
2      A.   Right.
3      Q.   And in your medical
4  practice, you examine your patients,
5  right?
6      A.   Right.
7      Q.   That's because an
8  examination is very critical to you
9  forming a solid opinion about what's
10 happening with the patient, right?
11     A.   Yes.  It gives you greater
12 information.
13     Q.   In fact, you would not, for
14 example, recommend a course of treatment
15 to one of your patients without examining
16 the patient; you'd want to examine her,
17 right?
18     A.   That's correct.
19     Q.   Here, you did not examine
20 Patricia Hammons, correct?
21     A.   That's correct.
22     Q.   And not having your own
23 examination of Patricia Hammons is a
24 piece of important information you just

Page 328

1  don't have because you haven't examined
2  her, correct?
3      A.   That's correct.
4      Q.   Did you speak to any of
5  Patricia Hammons' treating doctors?
6      A.   No.
7      Q.   Did you try to at any point?
8      A.   No.
9      Q.   Let's talk about a few
10 things first.
11         The stage of prolapse that
12 Patricia had when she first was seen by
13 Dr. Baker and went in for the surgery,
14 you said that Dr. Baker called it a grade
15 4, right?
16     A.   Right.
17     Q.   You don't know what criteria
18 he used, right?
19     A.   I'm assuming he used the
20 Baden and Walker system.  That's when
21 we -- when we say the word "grade,"
22 that's what that indicates.
23     Q.   That's your assumption, but
24 that's not documented anywhere?

Page 329

1      A.   Well, that is the
2  documentation.  When you say grade 4,
3  that means you're using the Baden and
4  Walker system.  If you're using the POP-Q
5  system, it's a stage.
6      Q.   Did Dr. Baker document the
7  findings on the exam in such a way that
8  he said, I found this and that's why I'm
9  calling it this grade?
10     A.   No.
11     Q.   And your basis for finding
12 that there was a grade 4 prolapse is just
13 because Dr. Baker called it a grade 4,
14 right?
15     A.   No.  That's -- like what I
16 testified to before, it's -- that is part
17 of the what I'm basing that opinion on,
18 but also the fact that she currently has
19 a stage III and is asymptomatic.
20     Q.   Can you look at Page 2073 of
21 your deposition, please?
22         On Page 207, at Line 12, you
23 were asked:  Why do you call it a stage
24 IV prolapse preoperatively?  What is it

Joye Lowman, M.D.

Page 330

1    about Dr. Baker's exam that tells you it
2    was a stage IV?
3           And what was your answer?
4       A.   I'm sorry, can you start
5    over?
6       Q.   Sure.
7       A.   Page 207?
8       Q.   Let's go to Page 207 of your
9    deposition.
10      A.   Okay.
11      Q.   And on Line 12 you were
12   asked:  Why do you call it a stage IV
13   prolapse preoperatively?  What is it
14   about Dr. Baker's exam that tell you it's
15   a stage IV?
16          And your answer:  Because he
17   called it a stage IV, and I would assume
18   that somebody that operates on patients
19   that have pelvic organ prolapse
20   understand what stage IV prolapse is,
21   regardless of whether or not they can
22   assess POP-Q measurements.
23          That was your answer under
24   oath, correct?

Page 331

1       A.   That's correct.
2       Q.   If, in fact, she was a stage
3    II, would that have any impact on your
4    opinions?
5       A.   No.
6       Q.   Now, most of the time --
7    well, let me take a step back.
8           When Dr. Baker assessed
9    Patricia Hammons, she had no pain,
10   correct, preoperatively?
11      A.   Correct.
12      Q.   Before the PROLIFT®, no
13   pain, right?
14      A.   That's correct.
15      Q.   No dyspareunia, correct?
16      A.   That's correct.
17      Q.   And no incontinence, right?
18      A.   That's correct.
19      Q.   Your procedure of choice for
20   a symptomatic cystocele -- or for a
21   cystocele like what you think Ms. Hammons
22   had is an abdominal sacrolcolpopexy,
23   correct?
24          MR. ISMAIL:  Objection to

Page 332

1           the form of that question.
2           THE WITNESS:  Can you re-ask
3    the question, please?
4    BY MR. SLATER:
5       Q.   Sure.  Let me ask it more
6    directly.
7           A reasonable treatment
8    option for Patricia Hammons, in May 2009,
9    would have been abdominal sacrolcolpopexy,
10   correct?
11      A.   That's correct.
12      Q.   You mentioned smoking
13   before.
14          In this case, Ms. Hammons
15   healed normally after the surgery,
16   correct?
17      A.   After which surgery?
18      Q.   Dr. Baker's surgery.
19      A.   She did.
20      Q.   Her healing was not impacted
21   in any way by her smoking that you can
22   see, right?
23      A.   That's correct.
24      Q.   Now, a couple of quick

Page 333

1    questions about a few things you
2    mentioned.
3           You mentioned IC,
4    interstitial cystitis.  Do you remember
5    you mentioned that?
6       A.   Yes.
7       Q.   And that's when somebody has
8    discomfort in their bladder?
9       A.   It's a clinical syndrome
10   that's defined by urgency, frequency and
11   bladder pain.
12      Q.   It's not characterized by
13   vaginal pain on intercourse, is it?
14      A.   Dyspareunia is one of the
15   symptoms of interstitial cystitis.
16      Q.   Did any doctor ever diagnose
17   that?
18      A.   No.
19      Q.   Did any doctor ever put it
20   in a differential of diagnosis of
21   potential causes?
22      A.   No.
23      Q.   Did any doctor ever suggest
24   it might be an issue with Patricia

84 (Pages 330 to 333)

Joye Lowman, M.D.

Page 334

1   Hammons?
2        A.   No.  No one other than me.
3        Q.   You talked about Dr. Lackey
4   and some of his findings about what was
5   causing Patricia Hammons' issues.
6             Do you remember that?
7        A.   Uh-huh.
8        Q.   Dr. Lackey didn't know
9   Patricia had a PROLIFT®, did he?
10       A.   I believe he testified that
11  he did not know that.  I think that's
12  correct.
13       Q.   If he didn't know there was
14  a PROLIFT®, he wouldn't be in a position
15  to make a full evaluation of what was
16  causing her issues, because he doesn't
17  know she has that system in her body,
18  right?
19       A.   I don't think that's true.
20       Q.   So you think Dr. Lackey can
21  form an opinion about what is causing
22  Patricia's issues without knowing that
23  she has the PROLIFT® in there and that
24  that might be a cause also?

Page 335

1        A.   He documented his physical
2   exam findings and what she was
3   complaining about and drew his opinions
4   based on that.
5        Q.   But he didn't know what was
6   going on inside her body because he
7   didn't know she had a PROLIFT®, right?
8             MR. ISMAIL:  Objection.
9             THE WITNESS:  He knew that
10       she had a mesh, because she told
11       him she that had -- that she
12       thought they used mesh.
13  BY MR. SLATER:
14       Q.   He thought it was a TVT,
15  right?
16       A.   I believe he commented that,
17  yes, in her subsequent evaluations.
18       Q.   That's a small strip of mesh
19  that goes underneath the urethra; much
20  smaller and much less mesh than a
21  PROLIFT®, right?
22       A.   Yes.
23       Q.   With your own patients, you
24  have seen your own patients where they

Page 336

1   have scarring of the mesh causing banding
2   of the mesh, tense areas of the mesh that
3   are tender or painful when touched,
4   right?  You've seen that with your own
5   patients, right?
6        A.   I have.
7        Q.   And Dr. Heit found this to
8   be present with Patricia Hammons,
9   correct?
10       A.   Correct.
11            - - -
12            (Whereupon, Exhibit
13       Lowman-10, Chart, was marked for
14       identification.)
15            - - -
16  BY MR. SLATER:
17       Q.   Doctor, I've provided you a
18  list and I'd like to go through it with
19  you and ask you to confirm, if you could,
20  that the medical records document the
21  things that we have set forth on this
22  list, okay?
23            Let me start over.  I've
24  marked as -- rephrase.

Page 337

1             I've marked for
2   identification Exhibit-10, is that
3   correct?
4        A.   Yes.
5        Q.   This document.
6             And you see in front of you
7   it's a list of dates and information
8   about each date?
9        A.   Yes.
10       Q.   Doctor, what I'd like to see
11  if you can confirm for me is whether the
12  medical records document each of the
13  findings that we've listed on this chart,
14  okay?
15       A.   Okay.
16       Q.   So August 30th, 2012,
17  patient's pain from anterior vaginal
18  mesh.
19            That is in the medical
20  record, correct?
21       A.   That's correct.
22       Q.   August 30, 2012, tense,
23  tender anterior vaginal wall after
24  vaginal mesh.

Joye Lowman, M.D.

Page 338

1    That's in the medical
2  record, correct?
3    A.   That's correct.
4    Q.   September 13, 2012,
5  dyspareunia secondary to anterior wall
6  mesh.
7    That's in the medical
8  record, correct?
9    A.   That's correct.
10    Q.   And "secondary" means caused
11  by, correct?
12    A.   That's correct.
13    Q.   November 8, 2012, pain and
14  dyspareunia from anterior vaginal wall
15  mesh, right?
16    A.   That's correct.
17    Q.   Urinary incontinence from
18  low bladder compliance, likely related to
19  mesh as well.
20    That is what's documented in
21  Dr. Heit's record, correct?
22    A.   That's correct.
23    Q.   Tense, tender anterior
24  vaginal wall after vaginal mesh.

Page 339

1    Again, documented in Dr.
2  Heit's medical record, correct?
3    A.   Correct.
4    Q.   And just to be clear, you,
5  as a doctor, and you, as an expert,
6  what's most important to you is what's in
7  the medical records, right?
8    A.   In determining my opinions
9  about her clinical course, yes.
10    Q.   November 26th, 2012, mesh
11  erosion, anterior wall.
12    That's in the record, right?
13    A.   That is.
14    Q.   Tense, tender anterior
15  vaginal wall after vaginal mesh.
16    Again, that's documented by
17  Dr. Heit, correct?
18    A.   That's correct.
19    Q.   November 28, 2012, pelvic
20  pain and dyspareunia secondary to mesh
21  exposure.
22    Documented by Dr. Heit,
23  correct?
24    A.   That's correct.

Page 340

1    Q.   Again on November 28, 2012,
2  shards of mesh at base of bladder.
3    That's documented by Dr.
4  Heit, correct?
5    A.   I believe so.  After his
6  excision.  I think so.
7    Q.   There were -- there were
8  shards of mesh that he couldn't get out
9  of the bladder that he had to leave
10  inside the bladder, correct?
11    A.   No.  That was --
12    Q.   On the bladder wall?
13    A.   There was mesh left in
14  the -- incorporated into the bladder
15  during his repair, yes.
16    Q.   December 13, 2012, good
17  portion of anterior wall mesh was
18  adherent if not eroding through the
19  bladder.
20    That was documented by Dr.
21  Heit, correct?
22    A.   Yes.
23    Q.   January 4, 2013, good
24  portion of anterior wall mesh was

Page 341

1  adherent if not eroding through bladder.
2    He documents that again,
3  correct?
4    A.   That's correct.
5    Q.   January 24, 2013, pain from
6  anterior vaginal wall mesh placement for
7  cystocele.
8    Documented in the record by
9  Dr. Heit, correct?
10    A.   That's correct.
11    Q.   January 28, 2013, erosion of
12  vaginal mesh into bladder.
13    Documented by Dr. Heit in
14  the medical record, correct?
15    A.   That's correct.
16    Q.   Doctor, in forming your
17  opinions in this case, you accept Ms.
18  Hammons' reports to her physicians and
19  those who have examined her that she has
20  had pelvic pain and dyspareunia after the
21  PROLIFT® surgery and reporting when she
22  had it and what she felt?  You accept
23  that, correct?
24    A.   Correct.

86 (Pages 338 to 341)

Joye Lowman, M.D.

Page 342

1    MR. SLATER:  Let's go off.
2    VIDEO TECHNICIAN:  Going off
3 the record at 7:13 p.m.
4          - - -
5    (Whereupon, a brief recess
6 was taken.)
7          - - -
8    VIDEO TECHNICIAN:  We're
9 back on the record at 7:15 p.m.
10    MR. SLATER:  Doctor, thank
11 you very much.  I don't have any
12 other questions on
13 cross-examination.
14    THE WITNESS:  Thank you.
15          - - -
16        EXAMINATION
17          - - -
18 BY MR. ISMAIL:
19    Q.   Dr. Lowman, it's getting
20 late in the evening.  I don't intend to
21 be very long.  I appreciate your patience
22 today.
23        I'd like to begin where Mr.
24 Slater left off.  Do you still have in

Page 343

1 front of you Exhibit-10?
2    A.   I do.
3    Q.   So Dr. -- Mr. Slater began
4 this summary of medical records on August
5 30, 2012?
6    A.   Yes.
7    Q.   And does it end on January
8 28, 2013?
9    A.   Yes.
10    Q.   I want to focus on the end.
11        Have you seen any records
12 after January 28th from 2013, in any way
13 from Mrs. Hammons' treating physicians,
14 documenting problems with -- that mesh is
15 causing her problems?
16    A.   No.
17    Q.   So using Mr. Slater's own
18 chart, is there anything on Mr. Slater's
19 chart after January 28, 2013, that
20 documents that any of Mrs. Hammons'
21 treating physicians believe mesh was
22 causing her any problems?
23    A.   No.
24    Q.   Did you see anything in the

Page 344

1 testimony of any of her treating
2 physicians, after January 28th, 2013,
3 that any of them considered that mesh was
4 causing her any problems?
5    A.   No.
6    Q.   Going to the findings that
7 are reported here, did you, on direct
8 examination, go over Dr. Heit's findings
9 that are reflected on Exhibit-10?
10    A.   I did.
11    Q.   Did Dr. Heit explain what he
12 concluded, as part of his care and
13 treatment, was the reason why the mesh
14 was bunched and presenting the way it did
15 to him in 2012?
16    A.   He did.
17    Q.   What was Dr. Heit's
18 explanation for why the mesh was in the
19 condition it was in, in 2012?
20    A.   Improper placement.
21    Q.   Do you agree with Dr. Heit's
22 conclusion in that regard?
23    A.   I do.
24    Q.   Did Dr. Heit, anywhere in

Page 345

1 his records or in his testimony, conclude
2 that the mesh had contracted?
3    A.   No, he didn't.
4    Q.   Did Dr. Heit conclude,
5 anywhere in his records or in his
6 testimony, that there was something wrong
7 with the mesh that resulted in problems
8 for Mrs. Hammons?
9    MR. SLATER:  Just for the
10 record, this line of questioning
11 about the cause of the mesh,
12 that's beyond the scope of the
13 direct.  I didn't ask any
14 questions about that.  We move to
15 preclude the entire line of the
16 questioning -- that's what I
17 meant, beyond the scope of cross.
18    MR. ISMAIL:  You may answer.
19    THE WITNESS:  No.
20 BY MR. ISMAIL:
21    Q.   Now, turning to Dr. Lackey,
22 I don't know if you still have it there
23 with you, and I can pull it up on the
24 screen, but it's Exhibit D -- Defense

Joye Lowman, M.D.

1 Exhibit 100043.4. And I can put it up on
2 the record.
3      A.   Yeah, I think it will be
4 easier for me to just look there.
5      Q.   So counsel asked you --
6          MR. SLATER:  Just for the
7      record.  I object to this.  I
8      didn't go through medical records.
9      I object.
10         MR. ISMAIL:  Let me get my
11     question out, please.
12 BY MR. ISMAIL:
13     Q.   Did Mr. Slater ask you what
14 Dr. Lackey believed was the mesh that
15 Mrs. Hammons had in 2009?
16     A.   He did.
17     Q.   Is that conversation between
18 Ms. Hammons and Dr. Lackey documented in
19 this record?
20     A.   On that -- on this date, it
21 says that, She thinks they used mesh and
22 those symptoms are better.
23     Q.   Let's look at the
24 immediately prior sentence.  Her uterus

1 is coming out and bladder was dropped.
2          Correct?
3      A.   Correct.
4      Q.   It says, She thinks they
5 used mesh and those symptoms are better.
6          Is the TVT used to treat a
7 pelvic organ prolapse?
8      A.   It's not.
9      Q.   So in terms of the mesh that
10 was described to Dr. Lackey in November
11 of 2009 for the treatment of pelvic organ
12 prolapse, could that have been the TVT?
13     A.   No.
14     Q.   Now, with respect to the
15 abdominal sacrocolpopexy in 2009, is that
16 surgical treatment indicated for
17 treatment of a bladder prolapse, in 2009?
18     A.   It's indicated for the
19 treatment of apical prolapse.
20     Q.   Did Mrs. Hammons have an
21 apical prolapse?
22     A.   She did.
23     Q.   Did you review Dr. Baker's
24 testimony to see whether he was even

1 equipped to do an abdominal
2 sacrocolpopexy?
3      A.   I did.
4      Q.   And what do you recall was
5 his testimony?
6      A.   He was not.
7      Q.   So to the extent an
8 abdominal sacrocolpopexy would have been
9 appropriate for Mrs. Hammons in 2009,
10 would that have been for the apical
11 prolapse that she had?
12         MR. SLATER:  Objection.
13         THE WITNESS:  It would have
14     been an appropriate -- it would
15     have been an appropriate option
16     for treatment of her apical
17     prolapse.  However, it was not an
18     option for her because her
19     treating doctor was not able to
20     perform that procedure.
21 BY MR. ISMAIL:
22     Q.   Now, I want to turn to the
23 discussion of your study that you had
24 with Mr. Slater, okay?

1      A.   Okay.
2      Q.   Do you recall what exhibit
3 number that was?
4      A.   0302.
5      Q.   Okay.  Dr. Lowman, were you
6 one of the authors of this paper?
7      A.   Yes.
8      Q.   Was this paper submitted for
9 peer review?
10     A.   It was.
11     Q.   Was this paper -- explain to
12 the jury what the peer review process is.
13     A.   The peer review process is
14 when we submit abstracts for
15 consideration for presentation, our
16 peers, or colleagues, review the
17 abstracts and assess the quality of the
18 data, the content of the data and decide
19 whether or not they think it's something
20 worth presenting.
21     Q.   How about -- and I'm
22 actually looking at the published
23 article.
24     A.   Okay.

Joye Lowman, M.D.

Page 350

1    Q.   So with respect to peer
2  review of an article that ends up in a
3  journal, how does that process work?
4    A.   You submit your article for
5  presentation.  They evaluate the article
6  and decide whether or not it's publish
7  worthy.
8    Q.   And what journal was this
9  article published in?
10   A.   The American Journal of
11 Obstetrics and Gynecology.
12   Q.   And what is the significance
13 of that journal to the practitioners in
14 the field?
15   A.   It's one of the lead
16 journals in obstetrics and gynecology.
17   Q.   Did your article and your
18 description of the patients and the
19 methods you employed, was that accepted
20 by this journal for publication?
21   A.   It was.
22   Q.   Did the description of the
23 study and the methods you employed and
24 everything that you went through with Mr.

Page 351

1  Slater, did that go through peer review?
2    A.   It did.
3    Q.   Now, you were describing for
4  Mr. Slater what the purpose of this study
5  was.
6        Do you recall that
7  discussion?
8    A.   I do.
9    Q.   And there was a discussion
10 of whether you would use questionnaires
11 or some other method to assess whether
12 patients developed painful intercourse
13 after the PROLIFT®.
14       Do you recall that?
15   A.   I do.
16   Q.   For the design of this
17 study, what was the study -- the clinical
18 researchers' method for assessing the
19 development of painful intercourse
20 following surgery?
21   A.   The method was to evaluate
22 their charts to assess baseline
23 dyspareunia, because that's the most
24 objective assessment, and evaluate their

Page 352

1  charts to assess the development of de
2  novo dyspareunia or dyspareunia after the
3  indexed procedure.
4        If the chart was incomplete
5  on that data, then we called the patients
6  and asked them, do you have painful
7  intercourse?  Well, first we asked them,
8  are you sexually active?  And then, do
9  you have painful intercourse?
10   Q.   Did -- why did you believe
11 that doing the study in that manner --
12 withdrawn.
13       Do you believe that doing
14 the study in that manner resulted in the
15 most reliable data that you could share
16 with the medical community?
17       MR. SLATER:  Objection.
18   Leading.
19       THE WITNESS:  Yes.
20 BY MR. ISMAIL:
21   Q.   Why?
22   A.   Because you're assessing a
23 rate of the development of an outcome.
24 So in doing that, you have to know

Page 353

1  whether or not that outcome was present
2  at the baseline, which we did know
3  because patients answered questionnaires,
4  what we called intake questionnaires.
5        That means when they present
6  to our practice, they answer a
7  questionnaire about what they're
8  presenting with.  So any patient that
9  comes in for us -- to us -- or any
10 patient that came in to us for evaluation
11 was given one of those questionnaires to
12 fill out.
13       On that questionnaire, it
14 says, are you sexually active?  And, do
15 you have pain with intercourse?  Two
16 separate questions.  So it's a objective
17 assessment of what the patient is feeling
18 then.  That is the most accurate
19 assessment.
20       When we then looked at
21 whether or not they developed de novo
22 dyspareunia after surgery, they also fill
23 out that same questionnaire when they
24 come back to see us for a six-month

89 (Pages 350 to 353)

Joye Lowman, M.D.

Page 354

1  postop check, which is what I explain in
2  the paper.
3          So we have a preop
4  assessment that's subjective and asks
5  them about what they're feeling then.  We
6  have a six-month assessment that also
7  asks them about what they are feeling
8  then.
9          If we had not had
10  patients -- say we had performed a
11  PROLIFT® on a patient and they were three
12  months postop, then I picked up the phone
13  and called them and asked them, are you
14  sexually active?  Do you have painful
15  intercourse?  That's why that assessment
16  was done with chart review and telephone
17  assessment.
18          In the questionnaires, we
19  asked them, do you have painful
20  intercourse?  Did you have painful
21  intercourse before surgery?  That was not
22  to calculate de novo dyspareunia rate.
23  That was to classify the answers in the
24  questionnaire.

Page 355

1      Q.    So -- go ahead.  I didn't
2  mean to cut you off.
3      A.    The questionnaires that were
4  sent out, 41 were answered.  Of the 41
5  that answered the questionnaire, eight
6  reported dyspareunia at baseline,
7  therefore, 13 out of the 41 that answered
8  the questionnaire had de novo
9  dyspareunia.
10          The denominator is not the
11  number of patients that were sexually
12  active, it's the number of patients that
13  answered the questionnaire.
14      Q.    So in terms of the
15  calculation that Mr. Slater was trying to
16  do on his examination, do you believe
17  that that was an appropriate calculation
18  to undertake based on the design of the
19  study?
20      A.    Yes.  That is the most
21  appropriate way to evaluate that, that's
22  why this paper won a research award at
23  the Society of Gynecologic Surgeons.
24      Q.    I think I had a negative

Page 356

1  somewhere in my question, so let me
2  re-ask it.
3          First, let me ask it this
4  way:  Do you believe that your method of
5  examining de novo dyspareunia in this
6  paper was the appropriate method?
7      A.    Yes.
8      Q.    And why is that?
9      A.    Because of exactly what I
10  just said.  You can't -- if you have a
11  questionnaire that's an anonymous
12  questionnaire, there is no way for me to
13  tell whose answer belongs to who, you
14  can't assess a de novo dyspareunia rate
15  that way.
16      Q.    Was your paper recognized as
17  being of distinction in the medical
18  community?
19          MR. SLATER:  Objection.
20          THE WITNESS:  Yes, it was.
21  BY MR. ISMAIL:
22      Q.    Please tell us about that.
23      A.    So the Society of
24  Gynecologic Surgeons -- every medical

Page 357

1  conference that we have is a conference
2  about research.  So people present their
3  data, present their research.  And not
4  everyone is selected to do that.
5          The papers that are thought
6  to be most impactful are selected for
7  presentation, so that the peers that are
8  at the meeting can evaluate the paper,
9  criticize the paper, analyze the paper
10  and decide whether or not they think it's
11  something that's relevant.  So not even
12  every paper is selected for presentation,
13  number one.
14          But then also certain papers
15  are given awards, if they think that the
16  research is outstanding.  And my paper
17  was given one of those awards.
18      Q.    Was the critique that Mr.
19  Slater did of your paper, do you believe
20  that was valid?
21      A.    No.
22      Q.    This information that you've
23  published here, Doctor, was this out in
24  the scientific community as of what date?

Joye Lowman, M.D.

Page 358

1    A.   2008.
2    Q.   I want you to turn to Page
3  E4 of your paper and go to Table 4.
4         Now, in Table 4, do you
5  compare the rate of dyspareunia that you
6  detected in your study compared to
7  alternative options to treat pelvic organ
8  prolapse?
9         MR. SLATER:  Objection.
10        This is far beyond the scope of
11        what I asked her on
12        cross-examination.
13        THE WITNESS:  I did.
14  BY MR. ISMAIL:
15    Q.   What was the rate of de novo
16  dyspareunia that you reported?
17    A.   16.7 percent.
18    Q.   Is that anywhere near the
19  30-plus percent that Dr. Weber said was
20  in your paper?
21    A.   No.
22    Q.   Looking at Table 4, how does
23  the PROLIFT® compare to these other
24  treatment options that are reflected in

Page 359

1  this table on this question of de novo
2  dyspareunia?
3    A.   It compares favorably.
4    Q.   Doctor, on this question
5  of -- counsel talked to you about --
6  withdrawn.
7         I'm going to hand you what
8  has been marked as Defense Exhibit-31991.
9         And, Doctor, are you
10  familiar with this paper?
11    A.   I am.
12        MR. SLATER:  I object.  This
13        is beyond the scope.  The doctor
14        wasn't asked about this article at
15        all.
16        MR. ISMAIL:  It doesn't
17        matter.
18        MR. SLATER:  It doesn't?
19        MR. ISMAIL:  No.
20        MR. SLATER:  How is this
21        implicated by the scope of
22        cross-examination?
23        MR. ISMAIL:  Because you
24        covered risk/benefit.

Page 360

1         MR. SLATER:  Oh, come on.
2  BY MR. ISMAIL:
3    Q.   Doctor, is this an article
4  by de Landsheere?
5    A.   It is.
6    Q.   Is this one of the papers
7  you considered in this case?
8    A.   It is.
9    Q.   Is this paper authoritative?
10    A.   It is.
11    Q.   Is it reliable?
12    A.   Yes.
13    Q.   Is this -- what type of
14  study is this, that's being reported
15  here?
16    A.   This is a retrospective
17  single-center study including 524
18  patients who were followed for three
19  years -- a median of three years.
20        MR. SLATER:  I just want to
21        make it clear, I'm objecting.  Not
22        only is this beyond the scope, the
23        doctor was not asked about this
24        article.  There's a ton of

Page 361

1         articles on her reliance list.
2  Are you now going to go through
3  all of them?  Of course not.  And
4  it's hearsay.
5  BY MR. ISMAIL:
6    Q.   Doctor, I want to ask you to
7  turn to the last part of the article, if
8  I could.
9    A.   The last page?
10    Q.   Yes.  Of the article.
11    A.   Okay.
12    Q.   You indicated this was
13  three-year follow-up data; is that
14  correct?
15    A.   That's correct.
16    Q.   Approximately how long did
17  Mrs. Hammons have her PROLIFT® before Dr.
18  Heit surgically removed it?
19    A.   About three years.
20    Q.   And if you look to the right
21  column, the paragraph that begins, In
22  conclusion.
23    A.   Yes.
24    Q.   I want to direct you to the

Joye Lowman, M.D.

Page 362

1 bottom part of that.
2        Does this read, The three
3 years median follow-up result showed that
4 this procedure is safe and effective in
5 the median term?
6        Did I read that correctly?
7    A.   Yes.
8    Q.   And "this procedure," what
9 does it relate to that's being described
10 here?
11    A.   Complications.
12    Q.   What specific surgical
13 procedure?  Does this relate to the
14 PROLIFT®?  Let me ask it that way.
15    A.   Yes.
16    Q.   So the conclusion of this
17 paper, what does it say about whether the
18 PROLIFT® is a safe and effective
19 treatment for pelvic organ prolapse, at
20 least for the period of time in which
21 Mrs. Hammons had it?
22    A.   It's saying that it's safe
23 and effective.
24    Q.   Do you agree with these

Page 363

1 results?
2    A.   I do.
3    Q.   Counsel asked you a lot of
4 questions about internal e-mails and
5 policies that may or may not be a part of
6 Ethicon.
7        Do you recall all that?
8    A.   Yes.
9    Q.   Doctor, are you aware of any
10 scientific methodology that looks to
11 internal e-mails to answer a scientific
12 question?
13        MR. SLATER:  Objection.
14        THE WITNESS:  No.
15 BY MR. ISMAIL:
16    Q.   Is the use of individual
17 e-mails part of what you do as a clinical
18 researcher to answer scientific
19 questions?
20    A.   No.
21    Q.   Individual case reports, Mr.
22 Slater should showed you a case of a
23 single patient having a complication, or
24 another patient having a complication.

Page 364

1        Do you recall that?
2    A.   I recall that.
3    Q.   Where do individual case
4 reports like that fall on the levels of
5 reliability that researchers such as
6 yourself use when answering scientific
7 questions?
8        MR. SLATER:  Objection.
9        Again, beyond the scope.
10        THE WITNESS:  It's the
11 lowest level.
12 BY MR. ISMAIL:
13    Q.   When you were asked to
14 investigate the issues and to share your
15 findings with the jury, what approach to
16 answering scientific questions did you
17 bring to this case?
18    A.   As I described before, I
19 used evidence-based medicine, which means
20 that you specifically rely on the most
21 reliable science, the most reliable
22 evidence.
23        The de Landsheere study is
24 more reliable than many of the studies

Page 365

1 that we talked about, that Mr. Slater
2 talked, about because it's got a larger
3 group of patients.  Larger cohort studies
4 are more reliable than smaller cohort
5 studies.
6        In making my opinions, or in
7 coming to my conclusions, I used the
8 highest levels of evidence.
9        In medicine, in any
10 scientific field, there are
11 controversies.  Some people will think
12 one thing, other people will think
13 something else.  The way that those
14 controversies are settled is through the
15 literature, as long as everyone is
16 practicing evidence-based medicine.
17        If some people choose to
18 ignore the levels of evidence and rely on
19 unreliable or less reliable evidence,
20 then the controversy just persists.
21    Q.   Does -- counsel asked you
22 whether you would be interested in
23 learning about discussions that were
24 happening within Ethicon or e-mails that

Golkow Technologies, Inc. - 1.877.370.DEPS

Joye Lowman, M.D.

Page 366

1  were exchanged within Ethicon.
2        Does any of that meet the
3  criteria of reliability that a researcher
4  would use when using evidence-based
5  medicine to answer scientific questions?
6     A.  No, it's not.  We don't even
7  have access to that, nor should we.
8     Q.  Is that why, in this case,
9  when you did your investigation as a
10 researcher you didn't look to those
11 documents?
12    A.  That's correct.
13    Q.  Counsel asked you whether
14 abdominal sacrocolpopexy is a go-to
15 procedure, or some words to that effect.
16       Do you recall that question?
17    A.  I do.
18    Q.  What is the mesh that you
19 used in your abdominal sacrocolpopexy
20 procedure?
21    A.  GYNEMESH®.
22    Q.  What is the mesh that was
23 part of the PROLIFT® kit?
24    A.  GYNEMESH®.

Page 367

1     Q.  Lastly, Dr. Lowman, Mr.
2  Slater asked you questions about Dr.
3  Lucente and whether you respect him, or
4  words to that effect.
5        Do you recall that?
6     A.  I do.
7     Q.  Has Dr. Lucente, to your
8  knowledge, been recognized in the field
9  of urogynecology?
10       MR. SLATER:  Objection.
11       THE WITNESS:  He has.
12 BY MR. ISMAIL:
13    Q.  How recently?
14    A.  Just this year's AUGS
15 meeting.  He was given an award, I
16 believe it was the Raymond Lee
17 Lectureship Award, which is the
18 equivalent of a lifetime achievement
19 award from the American Urogynecologic
20 Society.
21    Q.  Is that an award of some
22 significance in your mind?
23    A.  Absolutely.
24       MR. SLATER:  Objection.

Page 368

1  Leading.
2        MR. ISMAIL:  Dr. Lowman,
3  that's all I have for you.  Thank
4  you very much.
5        THE WITNESS:  Thank you.
6           - - -
7        EXAMINATION
8           - - -
9  BY MR. SLATER:
10    Q.  Doctor, I'm just going to
11 follow up with a few questions.
12       Are you aware that Ethicon
13 is a member of AUGS?
14    A.  No.
15    Q.  Did AUGS see the internal
16 e-mails at Ethicon about Dr. Lucente when
17 they gave him that award?
18    A.  Probably not.
19    Q.  You were just asked a
20 question about your use of GYNEMESH® PS
21 for your abdominal sacrocolpopexies.
22       Do you remember that
23 question a few minutes ago?
24    A.  Yes.

Page 369

1     Q.  And you're aware, are you
2  not, that GYNEMESH® PS mesh is only
3  indicated by the manufacturer to be put
4  in abdominally?  You know that, right?
5     A.  I did not know that.
6        MR. SLATER:  Off the record
7  for a second.
8        VIDEO TECHNICIAN:  Off the
9  record.  7:37 p.m.
10          - - -
11       (Whereupon, a discussion off
12 the record was held.)
13          - - -
14       VIDEO TECHNICIAN:  Back on
15 the record at 7:38 p.m.
16          - - -
17       MR. ISMAIL:  Object to the
18 form of that question as violating
19 motion in limine.
20 BY MR. SLATER:
21    Q.  Doctor, you just testified
22 about your use of GYNEMESH®® PS a few
23 minutes ago when defense counsel asked
24 you some questions, correct?

93 (Pages 366 to 369)

Joye Lowman, M.D.

Page 370

1      A.   Yes.
2      Q.   And this is the IFU for
3   GYNEMESH®®® PS.
4          Do you see that?
5      A.   I see this, yes.
6          MR. ISMAIL:  Objection to
7   the form.  Violates motion in
8   limine.
9   BY MR. SLATER:
10     Q.   And if you look at the
11  indications, it talks about the use of
12  the GYNEMESH®®®, and it indicates -- it's
13  indicated for use as a bridging material
14  for apical vaginal and uterine prolapse.
15  For surgical treatment, laparotomy or
16  laparoscopic approach is warranted.
17         Do you see that?
18     A.   I see that.
19         MR. ISMAIL:  Objection.
20  BY MR. SLATER:
21     Q.   You weren't aware that
22  Ethicon had limited the indications of
23  GYNEMESH®®® PS only to be placed
24  abdominally through either a laparotomy

Page 371

1   or laparoscopic approach?
2      A.   It doesn't --
3          MR. ISMAIL:  Objection.
4   Sorry.  Dr. Lowman, before you
5   start your answer.
6          Objection.  Violates motion
7   in limine and stipulation.
8          THE WITNESS:  That's not
9   what it says.  It says it's
10  indicated for being a bridging
11  material in apical vaginal and
12  uterine prolapse.  It doesn't say
13  it's only indicated in abdominal
14  implantation.
15  BY MR. SLATER:
16     Q.   Is it your testimony,
17  Doctor, that GYNEMESH®®® PS is indicated
18  by Ethicon to be placed transvaginally
19  through the vagina now?
20         MR. ISMAIL:  Objection.
21  Violates motion in limine and
22  stipulation.
23         THE WITNESS:  I don't know
24  what they have said it's indicated

Page 372

1   for.  I'm interpreting the
2   sentence that you just had me look
3   at, and it doesn't say what you
4   just said it says.  It doesn't say
5   it's only indicated for
6   implantation in the abdomen.  It
7   doesn't say that.
8   BY MR. SLATER:
9      Q.   Doctor, you mentioned
10  earlier, you were talking about --
11     A.   And underneath there, it
12  says contraindications, and it doesn't
13  say that it should not be used in the
14  vagina.
15     Q.   Doctor, you talked earlier
16  about the PROLIFT® and you spoke in the
17  present tense, and you talked about use
18  of GYNEMESH®®® PS.
19         You're aware that the
20  PROLIFT® is no longer marketed, right?
21         MR. ISMAIL:  Objection.
22  Violates motion in limine and
23  stipulation.
24         THE WITNESS:  I'm aware of

Page 373

1      that, yes.
2   BY MR. SLATER:
3      Q.   You made an effort to find
4   out and the person you spoke to from
5   Ethicon didn't know the answer, right?
6          MR. ISMAIL:  Objection.
7   Violation motion in limine and
8   stipulation.
9          THE WITNESS:  To find out?
10  BY MR. SLATER:
11     Q.   Why Ethicon stopped selling
12  the PROLIFT®?
13     A.   Yes.
14         MR. ISMAIL:  Objection.
15  Also beyond the scope of redirect
16  examination.  And violates motions
17  in limine.
18  BY MR. SLATER:
19     Q.   And you made no further
20  effort, so you don't know, even as you
21  sit here now, why the PROLIFT® was
22  withdrawn from the market, correct?
23         MR. ISMAIL:  Same three
24  objections.

Joye Lowman, M.D.

Page 374

1    THE WITNESS:  No.
2  BY MR. SLATER:
3    Q.   And it wouldn't matter to
4  you what the reason is, that wouldn't
5  impact your opinions at all, right?
6    MR. ISMAIL:  Same three
7    objections.  Beyond the scope.
8    Violates court order and
9    stipulation.
10    THE WITNESS:  No.
11  BY MR. SLATER:
12    Q.   Doctor, you were asked about
13  whether or not there's documentation of
14  complaints of dyspareunia after 2013.
15    Do you remember that?
16    A.   Yes.
17    Q.   Is there any doctor who is
18  documenting that Ms. Hammons is -- no
19  longer has dyspareunia?  That it actually
20  says that?
21    A.   I don't remember any
22  documentation of dyspareunia.
23    Q.   Does any doctor, after 2013,
24  say that Ms. Hammons does not have

Page 375

1  dyspareunia?
2    A.   No.
3    Q.   You talked about Dr. Heit
4  saying that the mesh was improperly
5  placed; counsel asked you about that a
6  few minutes ago.
7    Do you recall that?
8    A.   I do.
9    Q.   Dr. Heit never said in the
10  medical records, anywhere, not once, that
11  the mesh was improperly placed, correct?
12    MR. ISMAIL:  Objection.
13    THE WITNESS:  Ask me that
14    question again.
15  BY MR. SLATER:
16    Q.   Dr. Heit does not write
17  anywhere, in any medical record, that the
18  mesh was improperly placed by Dr. Baker?
19  It doesn't say that anywhere, does it?
20    A.   Not in the medical record,
21  no.
22    Q.   It was only after this
23  litigation got going and Dr. Heit was in
24  a deposition that he said that for the

Page 376

1  first time, right?
2    A.   That's correct.
3    Q.   Are you aware of Dr. Heit's
4  history of acting as a consultant for
5  Ethicon and having been paid money by
6  Ethicon over the years?
7    MR. ISMAIL:  Objection.
8    Beyond the scope.  Lack of
9    foundation.  Assumes facts not in
10    evidence.
11    THE WITNESS:  No, I'm not.
12  BY MR. SLATER:
13    Q.   You talked about Dr. Lackey
14  and where -- remember counsel showed you
15  a part of a medical record?
16    A.   Yes.
17    Q.   And you basically said,
18  yeah, from that you could figure out it
19  would be a bladder suspension or
20  something like that, right?
21    A.   Yes.
22    Q.   But Dr. Lackey, in another
23  record, calls it a TVT; so he wasn't able
24  to figure that out, right?

Page 377

1    MR. ISMAIL:  Objection.
2    Compound.  Lack of foundation.
3    THE WITNESS:  Dr. Lackey, in
4    a subsequent progress report, said
5    that he could feel the tape and
6    something about suspecting that it
7    might be a TVT or something of
8    that sort.
9  BY MR. SLATER:
10    Q.   So from the records, he was
11  not familiar with these mesh devices and
12  didn't really know very much about them,
13  right?
14    MR. ISMAIL:  Objection.
15    Lack of foundation.
16    THE WITNESS:  That's one
17    potential explanation.  But as I
18    was explaining, when you're asking
19    somebody to recollect something,
20    that's less reliable than their
21    assessment at that time.  So it
22    could just be that he didn't
23    remember what she told him.
24    I think when she presented

95 (Pages 374 to 377)

Joye Lowman, M.D.

Page 378

1    it was three years later, wasn't
2    it?  Or two years later?
3            MR. SLATER:  Move to strike
4    from "but" forward.
5    BY MR. SLATER:
6        Q.   Dr. Baker, if he had known
7    all the risks of the PROLIFT®, as he said
8    in his testimony he didn't, he could have
9    referred Ms. Hammons to another doctor,
10   right?
11           MR. ISMAIL:  Objection.
12   Calls for speculation.
13           THE WITNESS:  Yes, he could
14   have.
15   BY MR. SLATER:
16       Q.   Dr. Baker could have
17   referred Ms. Hammons to another doctor if
18   she chose a procedure he didn't perform,
19   correct?
20           MR. ISMAIL:  Objection.
21   Calls for speculation.
22           THE WITNESS:  Yes.
23   BY MR. SLATER:
24       Q.   That happens all the time in

Page 379

1    the medical field, correct?
2            MR. ISMAIL:  Objection.
3    Lack of foundation.
4            THE WITNESS:  Assuming that
5    you have someone to refer to, yes.
6    BY MR. SLATER:
7        Q.   You went through your
8    calculations and peer review and all
9    those things on your article.
10           Do you remember that?
11       A.   Yes.
12       Q.   Just to be clear, in the
13   abstract, you talked about questionnaires
14   and said based on the questionnaires you
15   came to 24 percent, right?
16       A.   I'd have to look at it
17   again.  We talked about the assessment --
18       Q.   I'm asking you what you said
19   in the abstract?
20       A.   Possibly.
21       Q.   In the article, you then
22   decided, well, we don't want to do it
23   that way, we're going to do it by the
24   chart reviews and not consider the

Page 380

1    questionnaires, and that brought the
2    number down 7 percent from what you had
3    reported the abstract, correct?
4        A.   No.
5        Q.   The number didn't go down by
6    7 percent?
7        A.   No.  I have explained that
8    extensively what happened, why the
9    abstract numbers are different than the
10   final paper.
11           We weren't even done doing
12   the study when we submitted the abstract.
13   That's why the numbers are different.
14       Q.   Does it say anywhere in the
15   abstract that the method you're using to
16   calculate the numbers is different than
17   what was intended?
18           MR. ISMAIL:  Objection.
19   Vague.  I don't even know what
20   that means.
21           THE WITNESS:  The methods
22   that we used to calculate the
23   numbers were not different than
24   what was intended.  But in my

Page 381

1    abstract -- where is it?
2            I state, All cases of
3    PROLIFT® performed were evaluated.
4    Patients were contacted by phone
5    to assess sexual activity and
6    obtain informed consent.  Those
7    that were sexually active were
8    mailed a validated
9    condition-specific questionnaires
10   and a seven-items questionnaire.
11   The rate of dyspareunia was
12   calculated; type of dyspareunia,
13   degree of dyspareunia,
14   demographics, et cetera.
15           I say here that -- there's a
16   part in here, I believe, where I
17   explain the fact that there are
18   several sexually active
19   patients -- yes.  So in the
20   results, 128 PROLIFT® cases were
21   performed during the study period.
22   68 were not sexually active.  Of
23   the remaining 60 sexually active
24   patients, 11 had not yet resumed

96 (Pages 378 to 381)

Joye Lowman, M.D.

Page 382

1    sexual intercourse but have
2    enrolled in the study and will be
3    evaluated over the next several
4    months.
5         Indicating that this was not
6    complete data.
7         MR. SLATER:  Move to strike.
8    BY MR. SLATER:
9         Q.   I only have a couple more
10   questions.
11        A.   Okay.
12        Q.   This is conditional, in case
13   the de Landsheere article is permitted,
14   which we think is beyond the scope of the
15   cross.
16        Doctor, in the de Landsheere
17   article that you were asked about --
18        A.   Yes.
19        Q.   -- if you turn to Page E3.
20        A.   Yes.
21        Q.   They talk about the number
22   of mesh exposures and 13 out of the 14
23   mesh exposures required surgery, correct?
24        A.   Where are you reading that?

Page 383

1         Q.   In the left column.
2         The most frequent
3    complication was mesh exposure which
4    happened --
5         A.   What paragraph?
6         Q.   -- in 14 cases.
7         A.   Which one?
8         Q.   Right in the middle of the
9    column.  Third paragraph.
10        A.   Three patients had postop
11   severe blood loss over 400, that
12   paragraph?
13        Q.   No, it's the next paragraph.
14   Let me start over.
15        A.   Okay.
16        Q.   In the third paragraph, it
17   starts with, A total of 19 patients
18   required surgical intervention for mesh
19   related complication.
20        A.   Yes, 3.6 percent.
21        Q.   And the most frequent
22   complication was mesh exposure.  There
23   were 14 exposures.  And then it says, 13
24   to 14 had to have surgery, partial mesh

Page 384

1    excision.
2         Right?
3         A.   Right.
4         Q.   And then further down, if
5    you go through the complications, there
6    were two patients with severe symptomatic
7    mesh retraction, right?
8         A.   Yes.  Which was .4 percent
9    of those patients.
10        MR. SLATER:  Move to strike.
11        Didn't ask that.
12   BY MR. SLATER:
13        Q.   Doctor, you were asked
14   questions about e-mails and whether
15   that's scientific evidence.
16        Do you remember that?
17        A.   Yes.
18        Q.   Do you understand that in a
19   court of law, company documents like
20   e-mails and internal documents are
21   admissible and can be considered by the
22   jury in deciding whether the product was
23   defective and whether Ethicon acted
24   reasonably?

Page 385

1         MR. ISMAIL:  Objection.
2         Argumentative.
3         THE WITNESS:  I accept that.
4    BY MR. SLATER:
5         Q.   You didn't consider that
6    information in forming your opinions,
7    though, right?
8         A.   Right.
9         MR. SLATER:  Thank you very
10   much.
11        - - -
12        EXAMINATION
13        - - -
14   BY MR. ISMAIL:
15        Q.   Doctor, two questions.
16        On the de Landsheere
17   paper --
18        MR. SLATER:  I object to any
19   further redirect.
20        MR. ISMAIL:  Great.  Then
21   make it, and let me ask the
22   question.  Do you object?
23        MR. SLATER:  You can do
24   whatever you want.

Joye Lowman, M.D.

Page 386

1      MR. ISMAIL:  Thank you.
2      MR. SLATER:  Nobody jumped
3   over the table.
4   BY MR. ISMAIL:
5      Q.   Doctor, I want to go to the
6   section that Mr. Slater just read to you
7   about the de Landsheere paper.
8      A.   Yes.
9      Q.   He said two patients were
10  reported here as having retraction,
11  right?
12     A.   Yes.
13     MR. SLATER:  Objection.
14  Foundation.  Mischaracterizes.
15  Hearsay.
16  BY MR. ISMAIL:
17     Q.   The -- how many patients
18  were in this study?
19     A.   Over 500; 524.
20     Q.   So what was the complication
21  rate for the data that Mr. Slater
22  directed you on recross-examination?
23     MR. SLATER:  Same
24  objections.

Page 387

1      THE WITNESS:  For the two
2   patients it was .4 percent.
3      MR. ISMAIL:  Thank you.  Dr.
4   Lowman, you're done.
5      VIDEO TECHNICIAN:  This ends
6   today's deposition.  We're going
7   off the record at 7:50 p.m.
8         - - -
9      (Whereupon, the deposition
10  was concluded at 7:50 p.m.)
11        - - -
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 388

1            CERTIFICATE
2
3
4      I HEREBY CERTIFY that the
5   witness was duly sworn by me and that the
6   deposition is a true record of the
7   testimony given by the witness.
8
9
10
         Amanda Maslynsky-Miller
11       Certified Realtime Reporter
         Dated:  December 13, 2015
12
13
14
15
16
17      (The foregoing certification
18  of this transcript does not apply to any
19  reproduction of the same by any means,
20  unless under the direct control and/or
21  supervision of the certifying reporter.)
22
23
24

Page 389

1         LAWYER'S NOTES
2   PAGE   LINE
3   _____  _____  _____
4   _____  _____  _____
5   _____  _____  _____
6   _____  _____  _____
7   _____  _____  _____
8   _____  _____  _____
9   _____  _____  _____
10  _____  _____  _____
11  _____  _____  _____
12  _____  _____  _____
13  _____  _____  _____
14  _____  _____  _____
15  _____  _____  _____
16  _____  _____  _____
17  _____  _____  _____
18  _____  _____  _____
19  _____  _____  _____
20  _____  _____  _____
21  _____  _____  _____
22  _____  _____  _____
23  _____  _____  _____
24  _____  _____  _____

98 (Pages 386 to 389)