S. Abbas Shobeiri, M.D.

Page 1

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

---------------------------X

IN RE: ETHICON, INC., PELVIC    Master File No.
REPAIR SYSTEM PRODUCTS          2:12-MD-02327
LIABILITY LITIGATION            MDL 2327
---------------------------X
THIS DOCUMENT RELATES TO THE   JOSEPH R. GOODWIN
FOLLOWING CASES IN WAVE 1 OF   U.S. DISTRICT JUDGE
MDL 200:

Dorothy Baugher v. Ethicon, Inc., et al.
Civil Action No. 2:12-cv-01053

Denise Sacchetti v. Ethicon, Inc., et al.
Civil Action No. 2:12-cv-01148

Sheri Scholl, et al. v. Ethicon, Inc.
Civil Action No. 2:12-cv-00738

Lisa Thompson, et al. v. Ethicon, Inc., et al.
Civil Action No. 2:12-cv-01199

Roberta Warmack, et al. v. Ethicon, Inc., et al
Civil Action No. 2:12-cv-1150

Rebecca Wheeler, et al. v Ethicon, Inc., et al.
Civil Action No. 2:12-cv-01088

Thelma Wright v. Ethicon, Inc., et al.
Civil Action No. 2:12-cv-01090
---------------------------X

VIDEOTAPED DEPOSITION OF

S. ABBAS SHOBEIRI, M.D.

Fairfax, Virginia

February 27, 2016

Reported by:  Denise D. Vickery, CRR/RMR

Golkow Technologies, Inc. - 1.877.370.DEPS

S. Abbas Shobeiri, M.D.

Page 30

1 Devising retractors to help during
2 sacrocolpopexies, you know.
3     Q.  Okay.  But those have not been used?
4     A.  Quite honestly, those are the things
5 I devised and by the time that I decided it would
6 be a good time to patent them, they -- somebody
7 else beat them to the market.
8     Q.  Have you ever designed a
9 mid-urethral sling?
10     A.  Have I ever designed a mid-urethral
11 sling?  Well, we -- we create -- I created
12 ultrasound Phantoms, and we did cut like sling
13 tapes that we implanted into the Phantoms.
14     Q.  Okay.  Well, I'm going to get into
15 your ultrasound opinions here in a minute, but
16 right now I'm asking:  Did you ever design for
17 use in a patient a mid-urethral sling?
18     A.  Well, are you talking about a
19 synthetic sling?
20     Q.  Sure.
21     A.  No, I have not designed a synthetic
22 sling that has gone to the market.
23     Q.  Okay.  And have you ever designed a
24 device which has been implanted into a patient

Page 31

1 that has been approved or vetted by the FDA?
2     A.  No.
3     Q.  Are you an expert in FDA regulatory
4 matters?
5     A.  I know a lot about FDA regulatory
6 matters.
7     Q.  My question was:  Do you consider
8 yourself an expert in FDA regulatory issues?
9     A.  Could you define "expert"?
10     Q.  You -- you're the one that mentioned
11 it.  I'm just asking you if you consider yourself
12 to be an expert in FDA regulatory matters.
13     A.  I know more than a lot of other
14 people.
15     Q.  Okay.  Have you worked -- been hired
16 by the FDA to work on regulatory issues?
17     A.  No.
18     Q.  Have you ever worked with a device
19 manufacturer to gain FDA approval for a medical
20 device?
21     A.  Yes.
22     Q.  Okay.  Tell me about that.
23     A.  I'm not sure if I can because we
24 signed confidentiality agreement.

Page 32

1     Q.  Well, obviously I don't want you to
2 violate a confidentiality agreement.
3     A.  Uh-huh.
4     Q.  But you're going to have to give me
5 some idea for whom, when, what in general was
6 involved.
7     A.  Hmm.  AMS.
8     Q.  Okay.  Tell me about what you did
9 for AMS in general.
10     MS. THOMPSON:  Only to the extent
11   that you can under your agreement.
12     THE WITNESS:  Well, we trialed
13   the -- we trialed TOPAS.
14 BY MR. OTTAWAY:
15     Q.  Trialed?  I'm sorry.  Trialed TOPAS?
16     A.  Uh-huh.  T-O-P-A -- is it S or Z?  I
17 don't know.  I think that's it.
18     Q.  Okay.  And what is TOPAS?
19     A.  It's a fecal incontinence product.
20     Q.  And does it involve any kind of
21 synthetic mesh?
22     A.  Yes.
23     Q.  Okay.  What kind of mesh product is
24 used in TOPAS that you were involved with?

Page 33

1     A.  Well, we -- it was their -- their
2 version of polypropylene.
3     Q.  And how is it -- how does it differ
4 from a polypropylene used in TVT-O if you know?
5     A.  It's just the way it's woven is
6 probably different.
7     Q.  Okay.  And tell me how the way it is
8 woven is different than TVT.
9     A.  So, for example, TVT-O when you
10 implant it and it frays and the little pieces of
11 mesh come undone, you can actually see it on your
12 hand.  That is, when you pull the sheet out, the
13 sling rolls into sort of tubular structure and,
14 you know, just as it gets stretched, the -- the
15 holes in the mesh are not as the size that they
16 were designed.  So -- so it's just different.
17     Q.  Okay.  And, again, how is it
18 different?  I'm -- I'm -- is it --
19     A.  So the TVT-O when you insert it,
20 when you take the plastic sheet out, you know, it
21 frays.  The little piece of mesh can come on your
22 hand and then it can also roll, and also it
23 stretches where the holes that are there sort of
24 become smaller.

Golkow Technologies, Inc. - 1.877.370.DEPS

S. Abbas Shobeiri, M.D.

Page 34

1    Q.   Right.  You told me that, but I want
2  to know how the polypropylene used in TOPAS
3  differs from the polypropylene used in TVT-O.
4    A.   It's just different design.
5    Q.   Okay.  And how is the design
6  different?
7    A.   The -- the weave is different.
8    Q.   Okay.  Weave.
9    A.   Uh-huh.
10   Q.   Anything else?
11   A.   I think that's mostly what
12  differentiates them, and also the -- just the way
13  it designed.  It's not -- doesn't stretch like
14  TVT-O.
15   Q.   Okay.  So its application is
16  different?
17   A.   No.  It's just woven differently, so
18  it wouldn't be as stretchy.
19   Q.   Does it differ -- differ in chemical
20  property?
21       MS. THOMPSON:  Object to form.
22       THE WITNESS:  The chemical
23    property.  The polypropylene?  When you say
24    "chemical property," like is it like made

Page 35

1    differently or --
2  BY MR. OTTAWAY:
3    Q.   Yes.
4    A.   -- what do you mean?
5       So, no, it's polypropylene and it's
6  just woven differently.
7    Q.   All right.  Is TOPAS on the market?
8    A.   It -- well, it has gone through its
9  FDA trial, and I believe it just got a hearing
10  recently.
11   Q.   Okay.  What exactly was your role in
12  the trial for TOPAS mesh?
13   A.   I studied the anatomical course of
14  the sling, both in cadavers and in live patients,
15  with ultrasound, and we did the trials.
16   Q.   Okay.  Were you involved in
17  preparing any written materials that were to
18  accompany or are to accompany TOPAS if it's
19  released to the market?
20   A.   Could you repeat that question?
21       MR. OTTAWAY:  Can you read that
22    back to him again?  I'm not sure I can ask
23    it any better.
24       (The reporter read the record on

Page 36

1    page 35 lines 16-19.)
2       THE WITNESS:  I haven't looked at
3    their final material but, I mean, we did
4    their anatomical studies.
5  BY MR. OTTAWAY:
6    Q.   Okay.  So is the answer to my
7  question you have or have not prepared written
8  materials that will go with the product if it is
9  released to the market?
10   A.   I gave them reports.  So what they
11  are using, it is their prerogative.
12   Q.   Okay.  Well, for example, have you
13  ever prepared a warning or IFU that would
14  accompany a device --
15   A.   No.
16   Q.   -- on the market?  No?
17   A.   No.
18   Q.   Okay.  Did you do that for or were
19  you asked to do that by AMS for TOPAS?
20       MS. THOMPSON:  Object to form.
21       THE WITNESS:  No.
22       Thanks.
23  BY MR. OTTAWAY:
24   Q.   Have you ever written a warning for

Page 37

1  any product?
2       MS. THOMPSON:  Object to form.
3       THE WITNESS:  Have I ever written
4    a warning for any products?  No.
5  BY MR. OTTAWAY:
6    Q.   Have you ever had any special
7  education about warnings and how they should be
8  written?
9       MS. THOMPSON:  Object to form.
10       THE WITNESS:  Well, I have read a
11    lot of IFUs and in medical school we, you
12    know, we learn about these things.
13  BY MR. OTTAWAY:
14   Q.   Well, other than your medical school
15  training and reading IFUs, have you had any
16  specialized training in the preparation or
17  dissemination of warnings?
18   A.   Could you expand on that?
19   Q.   Not really.
20   A.   Uh-huh.
21       MR. OTTAWAY:  You want to ask it?
22    Read the question again.
23       (The reporter read the record on
24    page 37 lines 14-17.)

10 (Pages 34 to 37)

S. Abbas Shobeiri, M.D.

Page 38

```
 1        MS. THOMPSON:  Object to form.
 2        THE WITNESS:  So like have I gone
 3     to law school or --
 4    BY MR. OTTAWAY:
 5        Q.   I know you haven't been to law
 6    school because I've read your resumé.
 7        A.   Uh-huh.
 8        Q.   My question stands as asked.  Can
 9    you answer it?
10        A.   Besides the training I have had, I
11    have not had any other training.
12        Q.   So confined to what you learned in
13    medical school and in reading IFUs?
14        MS. THOMPSON:  Object to form.
15        THE WITNESS:  Yes.  I'm not a
16     lawyer.
17    BY MR. OTTAWAY:
18        Q.   Are you a member of the -- what I'll
19    refer to as -- AUGS?  If I say "AUGS," do you
20    know what I mean?
21        A.   Yes.
22        Q.   Okay.  What -- what, for the ladies
23    and gentlemen of the jury, is AUGS?
24        A.   The American Urogyne Society.
```

Page 39

```
 1        Q.   How long have you been a member of
 2    that organization?
 3        A.   Probably close to 20 years.
 4        Q.   Have you reviewed abstracts for that
 5    organization and prepared programs for that
 6    organization?
 7        A.   Yes.
 8        Q.   Are you a member of the American
 9    College of Surgeons?
10        A.   Yes.
11        Q.   Gynecological surgeons.
12           What I will refer to as ACOG?
13        A.   They're different.  College of
14    Surgeons and ACOG are different.
15        Q.   And are you a member of both?
16        A.   Yes.
17        Q.   And when you say "ACOG," can you
18    tell the jury what you're referring to?
19        A.   American College of Obstetricians
20    and Gynecologists.
21        Q.   How long have you been a member of
22    ACOG?
23        A.   Probably 25 years.
24        Q.   Do you agree with me that stress
```

Page 40

```
 1    urinary incontinence can and does adversely
 2    affect the quality of life for women?
 3        A.   I agree with you.
 4        Q.   Do you agree with me that
 5    mid-urethral slings are the standard of care for
 6    the treatment of stress urinary incontinence?
 7        MS. THOMPSON:  Object to form.
 8        THE WITNESS:  The surgical
 9     standard of care, yeah.
10    BY MR. OTTAWAY:
11        Q.   Okay.  Is that position shared by
12    the organizations we just mentioned of which you
13    are a member, AUGS and ACOG?
14        A.   I think those are the standard of
15    care, yeah.
16        Q.   And would you agree with me that
17    TVT-O is a type of mid-urethral sling?
18        A.   That's debatable whether it ends up
19    in mid-urethral or not.
20        Q.   Do you believe it's a mid-urethral
21    sling or not?
22        A.   I believe it's not placed
23    mid-urethral.
24        Q.   Okay.  Have either AUGS or ACOG
```

Page 41

```
 1    taken a position that TVT-O is not a mid-urethral
 2    sling?
 3        A.   Let me correct myself.
 4           In the TVT-O IFU, where they say to
 5    make the incision does not facilitate putting the
 6    sling in mid-urethral.  ACOG and AUGS support
 7    mid-urethral slings.
 8        Q.   Have ACOG or AUGS taken a position,
 9    to your knowledge, indicating that TVT-O is not
10    within the category of mid-urethral slings?
11        A.   I believe they have not delineated
12    that.
13        Q.   All right.  We've been going about
14    45 minutes, Doctor.  Let's take a break.
15           And anytime you need to take a
16    break, by the way, if you'll just answer the
17    question on the table and tell me you need to
18    take a break, we'll do it at your convenience as
19    well.
20           Fair enough?
21        A.   That's great.
22        MR. OTTAWAY:  Okay.
23        THE VIDEOGRAPHER:  Time now is
24     10:49.  We are going off the record.
```

11 (Pages 38 to 41)

S. Abbas Shobeiri, M.D.

Page 46

1    A.   True.
2    Q.   So today are we on the $750 an hour
3  or the $6,000 a day plus expenses?
4    A.   6,000 divided by half because we'll
5  be utilizing half a day.
6    Q.   So $3,000 for half a day?
7    A.   Yes.
8    Q.   And did you prepare this report
9  yourself?
10    A.   Yes.
11    Q.   Okay.  It's got an Appendix B
12  associated with it, which is a list of reliance
13  materials.
14    A.   Hmm?
15    Q.   A list of reliance materials.
16    A.   Okay.
17    Q.   Did you assemble those yourself?
18    A.   The references?  Yes.
19    Q.   Okay.  Now, part of those references
20  are what I have marked as 2.
21       (Document marked, for
22    identification purposes, as Defendant's
23    Exhibit No. 2.)
24    BY MR. OTTAWAY:

Page 47

1    Q.   And for your benefit, Doctor, I will
2  tell you those are documents that have been
3  produced by Ethicon in this litigation.
4    A.   I'm just going over them.
5    Q.   Of course.  Take your time.
6    A.   (Reviewing document).  Yes.
7    Q.   How did you get those documents?
8    A.   It was sent to me.
9    Q.   By?
10    A.   Motley Rice.
11    Q.   Do you know how many documents have
12  been produced in this litigation by Ethicon?
13    A.   How many what?
14    Q.   Documents have been produced by
15  Ethicon in this litigation?
16    A.   Not really.
17    Q.   Did you go through additional
18  documents and cull those out, or were those the
19  documents that were provided to you?
20    A.   I went through all the documents
21  that was provided to me.  I went over this
22  because making sure that I had seen this before.
23    Q.   Okay.  And other than those
24  documents in front of you, have you reviewed any

Page 48

1  other documents produced by Ethicon in this
2  litigation?
3    A.   Not that I recall.
4    Q.   So as I understand it, those in
5  front of you are the ones you've reviewed and
6  you've reviewed no others?
7    A.   Unless I quoted them in my report.
8    Q.   Okay.  Those are the ones I think
9  you mention in your report.
10    A.   Then that's what it is.
11    Q.   Okay.  Now, you made no independent
12  effort to go through other documents produced by
13  Ethicon in this litigation?
14    A.   No.
15    Q.   Some of those documents were
16  originally in French.  I don't know whether you
17  speak French.  Do you?
18    A.   No.
19    Q.   Okay.  Who provided the translations
20  of those documents for you?
21    A.   I haven't skimmed over those.
22    Q.   Please, you're free to look at them
23  anytime you want.
24    A.   Hmm.  So this document you're

Page 49

1  talking about is on which page?  Are you talking
2  about this one?
3    Q.   There are two that are translated
4  from French into English in whole and part.
5    A.   Uh-huh.
6    Q.   I just wanted to know whether you
7  did the translations or who did them.
8    A.   That's how they came.
9    Q.   Okay.  And the literature portion of
10  Exhibit B, did you assemble that yourself?
11    A.   The ones that I have quoted?
12    Q.   Yes.
13    A.   Yes.
14    Q.   Okay.  When we talk about
15  literature, Doctor, is there a hierarchy of
16  literature that physicians rely upon, some more
17  reliable than others?
18    A.   Could you refine it?
19    Q.   Yeah, that was a terrible question.
20  You're right to ask me to repeat it.
21       If you as a physician review
22  literature, do you in your own mind differentiate
23  between, say, peer-reviewed random controlled
24  trials and individual case studies?

13 (Pages 46 to 49)

S. Abbas Shobeiri, M.D.

Page 78

1    Q.  I think we've covered this before,
2   but I just want to make sure.
3        Exhibit 2 there.  Are those the only
4   Ethicon documents upon which you rely to support
5   the opinion at page 19 of your report?
6    A.  Go ahead.
7    Q.  It starts out "I reviewed Ethicon
8   documents."
9        Are those the only Ethicon documents
10  you reviewed to support that part of your
11  opinion?
12   A.  I believe so.
13   Q.  All right.  When you say "mesh
14  contraction," what do you mean?
15   A.  Mesh being smaller than it was
16  implanted.
17   Q.  Okay.  And when does the literature
18  first discuss that as a potential with
19  polypropylene mesh?
20   A.  Probably somewhere in 1950s, '60s
21  with mesh for hernia repair.
22   Q.  And mesh has been used --
23  polypropylene mesh has been used for years in
24  surgical situations, whether it's sutures or

Page 79

1   woven mesh or medical devices such as
2   mid-urethral slings?  Is that a true statement?
3    A.  It has been used for hernia repair
4   and has had complications, and people have tried
5   to move away from it into other type of products.
6    Q.  But that's been known, this
7   contraction issue you discuss, for many years in
8   the medical community to people who practice in
9   the profession that you do?
10       MS. THOMPSON:  Object to form.
11       THE WITNESS:  So do people know
12     that mesh contracts?
13  BY MR. OTTAWAY:
14   Q.  Yes.
15   A.  I think they are told that it
16  doesn't, and it depends on how much of the
17  literature they are reading and how critically
18  they are looking at the literature.
19   Q.  Okay.  Someone who looks at the
20  literature would be able to find support for that
21  proposition?
22   A.  That mesh contracts?
23   Q.  Yes.
24   A.  Yes.

Page 80

1    Q.  Okay.  If you go to page 5 of your
2   report, Doctor.
3    A.  Go ahead.
4        MR. OTTAWAY:  We're going to get
5    into some of your opinions.
6        How long have we been going,
7    Ms. Reporter?
8        THE VIDEOGRAPHER:  43 minutes.
9        MR. OTTAWAY:  43.  Let's go ahead
10  and take another break.  I told you we'd
11  break about every 45 minutes, and this is a
12  good time to do so.
13       THE WITNESS:  Okay.  Has it been
14  45 minutes?
15       MR. OTTAWAY:  It has.  Have you
16  been having fun and time flies when you're
17  having fun?
18       THE WITNESS:  Yeah, it's just --
19  that's fine.  We can take like five
20  minutes; right?
21       THE VIDEOGRAPHER:  Time now is
22  11:49.  We are going off the record.
23       (Recess - 11:49 a.m..
24        - 12:03 p.m.)

Page 81

1        THE VIDEOGRAPHER:  Time now is
2   12:03.  We are back on the record.  This is
3   the beginning of disk No. 2.
4   BY MR. OTTAWAY:
5    Q.  Dr. Shobeiri, I had referred you
6   when we broke to page 5 of your report, which is
7   titled "Summary of Opinions."
8    A.  Yes, sir.
9    Q.  Have you had a chance to review that
10  while we were on break?
11   A.  No.  I was actually looking at IFU.
12   Q.  Okay.  Well, I take it you're
13  familiar with these opinions?
14   A.  Yes.
15   Q.  And I want to ask you about them --
16   A.  Uh-huh.
17   Q.  -- one at a time.
18   A.  Sure.
19   Q.  Tell me about opinion number 1.
20  What is your opinion and upon what do you base
21  it?
22   A.  Mesh complications are unlike those
23  seen with the other pelvic surgery in terms of
24  onset, frequency, severity, character,

21 (Pages 78 to 81)

S. Abbas Shobeiri, M.D.

Page 98

1    Q.   Anything else you need to tell me
2  about opinion number 6?
3    A.   Well, the last sentence that it says
4  results in significant morbidity for the patient.
5  Once you have scarring around the nerve causing
6  the pain, a lot of times even if when you go and
7  remove the sling, the scarring is still there and
8  the pain may not be reduced, depending on when
9  the original sling was placed.
10    Q.   And do you reference specific
11  literature to support that opinion?
12         MS. THOMPSON:  Object to form.
13         THE WITNESS:  Am I citing a
14    specific reference for relating to that?  I
15    think it is in my references.  We can look
16    it up.
17   BY MR. OTTAWAY:
18    Q.   We'll do that at the next break,
19  Doctor, and you can tell me.  I don't want to
20  take your time here.
21         But if you do reference a specific
22  piece of literature to support number 6, I would
23  appreciate you finding it for me on the next
24  break, okay?

Page 99

1    A.   Do I have any of the papers with me?
2         Oh, no, I need the papers.  So those
3  are just the references.
4         Maybe, maybe not.  I have to look at
5  them.
6    Q.   Okay.  And if you find one, will you
7  advise --
8    A.   Sure.
9    Q.   -- Counsel here so she can advise
10  us?
11    A.   Sure.
12    Q.   Okay.  Number 7.  TVT-O is
13  associated with an unacceptably high rate of
14  chronic pain.
15         Tell me about that.  What do you
16  rely on to support that opinion?
17    A.   Sure.  So, again, you get to the
18  fact that you're operating in a space that causes
19  the kind of pain that is hard to get rid of --
20    Q.   Okay.
21    A.   -- and that's unacceptable.
22    Q.   Okay.  Now, are we talking about a
23  particular kind of pain here?
24    A.   We are talking about groin pain and

Page 100

1  the leg pain that the patients experience.
2    Q.   So it's groin and leg pain.
3         And do you have in your mind what an
4  acceptable rate of pain would be?
5         MS. THOMPSON:  Object to form.
6   BY MR. OTTAWAY:
7    Q.   You say this is "unacceptably high."
8         Do you have an opinion about what
9  would be acceptable, in your opinion?
10    A.   Acceptable rate --
11         MS. THOMPSON:  Object to form.
12         THE WITNESS:  -- of chronic pain
13    for me would be none.
14   BY MR. OTTAWAY:
15    Q.   Okay.  So anything above zero is an
16  unacceptably high rate of chronic pain to you?
17         MS. THOMPSON:  Object to form.
18         THE WITNESS:  I don't want my
19    patients to have any chronic pain.
20   BY MR. OTTAWAY:
21    Q.   Okay.  I'm just asking what your
22  opinion is here, Doctor.
23         Was my statement correct?
24    A.   My opinion is that if the patient

Page 101

1  walked into your office without chronic pain and
2  they're to take care -- they're to have their
3  urinary incontinence taken care of, they should
4  not walk away with chronic debilitating pain.
5    Q.   Is --
6    A.   So it's unacceptable.
7    Q.   Okay.  Any level?  Anything above
8  zero percent?
9    A.   If my patient walked into my office
10  and they had that surgery done, and they came to
11  me and they said they are having this pain, I --
12  I would take it very seriously.
13         And likely I would remove that sling
14  very quickly before the scarring sets in and she
15  has chronic pain.
16    Q.   Okay.  Number 9.
17         By the way, I'll tell you.  We
18  looked at your reference material.  We didn't see
19  the paper listed by Denson.
20    A.   Pardon me?
21    Q.   We didn't list -- see a paper listed
22  by the author you referenced.
23    A.   Oh, okay.  Well, you can -- it's
24  probably -- I'll find it for you.  That's fine.

26 (Pages 98 to 101)

S. Abbas Shobeiri, M.D.

Page 102

1  Q.  Okay.  9 and 10 kind of are related
2  to each other.  Tell me about those.
3  A.  So this is the same sort of thing
4  that we talked about.
5  If a patient walks into my office,
6  not having had this pain but purely for treatment
7  of urinary incontinence, and then they wake up
8  after the procedure, they have pain that
9  persists, given what I told you about the course
10  of unpredictive -- unpredictable course of the
11  slings that has been shown both in the literature
12  and can also be -- be seen by ultrasound, it's
13  safe to conclude that they're having a
14  device-related complication.
15  Q.  Again, Doctor, I'm going to ask you
16  if you're referencing there any specific
17  literature upon which you rely to support your
18  opinion.
19  A.  The -- I believe we have the
20  references in the list of references, I believe.
21  Q.  Okay.  So everything I would find in
22  your list of reliance materials in Exhibit B to
23  your report?
24  A.  Pardon me?

Page 103

1  Q.  Everything you rely on is contained
2  in Exhibit B to your report, which is your
3  reliance materials?
4  MS. THOMPSON:  Do you have
5  Exhibit B that he could --
6  MS. FISCHER:  Go off the record,
7  please.
8  MS. THOMPSON:  You don't have to
9  go off the record to mark an exhibit.
10  MS. FISCHER:  Are you refusing my
11  request to go off the record?
12  MS. THOMPSON:  Well, we're taking
13  a lot of breaks.
14  MS. FISCHER:  Two.  We've taken
15  two.  Are you refusing my request to go off
16  the record?
17  MS. THOMPSON:  No, I'm not
18  refusing.  I'm just suggesting if you're
19  going to do something that takes 10
20  seconds, it's probably more efficient to
21  stay on the record.
22  MS. FISCHER:  Are we off the
23  record or not?
24  MS. THOMPSON:  Yeah.  Go off the

Page 104

1  record.
2  THE VIDEOGRAPHER:  Time now is
3  12:32.  We are going off the record.
4  (Recess - 12:32 p.m.
5  - 12:32 p.m.)
6  THE VIDEOGRAPHER:  Time now is
7  12:32.  We are back on the record.
8  (Document marked, for
9  identification purposes, as Defendant's
10  Exhibit No. 3.)
11  BY MR. OTTAWAY:
12  Q.  Doctor, we are back on the record
13  and you've been handed an exhibit here, which is
14  a part of your report labeled "Reliance
15  Materials."
16  Can you go through there and
17  reference, if you can, the specific support for
18  the opinions we just discussed.
19  MS. THOMPSON:  Object to form.
20  Well, answer that question
21  however you want.
22  THE WITNESS:  So -- so what you a
23  handed me is a list of publications, you
24  know, that we have coded and it's just a

Page 105

1  list of it.  So what I require right now is
2  the actual articles for me to go through
3  and tell you where they are.
4  BY MR. OTTAWAY:
5  Q.  Doctor, they didn't give them to us
6  and, I mean, I guess they're available.
7  But do you have anything in your
8  mind right now, any specific article you're
9  referencing?
10  MS. THOMPSON:  And -- and you
11  also have to which opinion you're referring
12  to.
13  MR. OTTAWAY:  The same one we
14  were just discussing, counsel.  I haven't
15  moved on.
16  MS. THOMPSON:  Okay.  Which one
17  are we on?
18  MR. OTTAWAY:  I'm sorry.  Let's
19  go back.  I think it was 8 and 9.
20  THE WITNESS:  9 and 10.
21  MR. OTTAWAY:  9 and 10.  See, I
22  was pretty close.  The doctor knew all the
23  time.
24  MS. THOMPSON:  Okay.  Numbers 9

27 (Pages 102 to 105)

S. Abbas Shobeiri, M.D.

Page 106

```
 1      and 10.
 2              THE WITNESS:  So there are a lot
 3      of articles supporting this.  I have to see
 4      the actual articles to put it out for you.
 5      BY MR. OTTAWAY:
 6          Q.   Okay.  So you're not able to tell me
 7      just looking at the --
 8          A.   Yeah.  They --
 9          Q.   -- exhibit I handed you?
10          A.   They are a lot of articles and there
11      are a lot of them that each of them looks at a
12      different point, and I'll be happy to give you
13      that information if I have the actual papers.
14          Q.   Okay.  Just keep going there,
15      Doctor, and I want to take all the other opinions
16      and ask you the same kind of thing.
17              Do you have any particular support
18      you're relying on for them, or is this just,
19      again, contained somewhere in your reliance
20      materials?
21          A.   For the what question?
22          Q.   The rest of them, 10 on.
23          A.   Yeah, I think they're all in the
24      references that we have given you.
```

Page 107

```
 1          Q.   Okay.  You have an opinion, Doctor,
 2      that the TVT-O is defective in design.
 3              Exactly what defects in design do
 4      you reference?
 5          A.   Well, one thing we had talked about
 6      earlier is just the weave of the mesh, where the
 7      opening surgeon in the removal of the sheet, the
 8      sling frays and so cords and so that would change
 9      the properties of the mesh.
10          Q.   Okay.  Is that a -- is that a
11      function of it being made out of polypropylene?
12          A.   It's a function of design.
13          Q.   Okay.  Tell me the design function
14      that it results from.  Tell me what specifically
15      about the design you're critical of.
16          A.   Well, the fact that it's coils.
17      It's ropes.  It doesn't stay flat.  The way the
18      fact that it has edges that fray, you know.
19      Those are the design flaws.
20          Q.   Okay.  Does the -- is this a common
21      characteristic of all transobturator slings, both
22      inside-out and outside-in?
23              MS. THOMPSON:  Object to form.
24              THE WITNESS:  So you're asking if
```

Page 108

```
 1      all of them do that?
 2      BY MR. OTTAWAY:
 3          Q.   Yes.
 4          A.   No.  I mean, we have seen slings
 5      that don't do that.
 6          Q.   Okay.  Tell me who manufactured
 7      those slings.
 8          A.   Who manufactures the slings that
 9      don't roll?
10          Q.   Yes.
11          A.   Well, for example, the -- most of
12      the TVT type slings that we look at, they don't
13      roll.  They sit straight.
14          Q.   Well, no.  My question was
15      specifically limited to transobturator slings.
16          A.   Well, the TVT-Os we have looked at,
17      they roll and they cause problems.  And I told
18      you we don't use TOTs anymore.
19          Q.   Okay.  Well, have you done a study,
20      though, of TOTs in the same way that you have
21      looked at TVT-Os to determine whether they roll,
22      fray, curl?
23          A.   Uh-huh.
24          Q.   Tell me what you found.
```

Page 109

```
 1          A.   Well, the -- I think that both TOTs
 2      and TVT-Os can behave the same to some degree.
 3      The -- the ones that I have looked at have been
 4      the TVT-O and the Bard product, and I know those
 5      ones roll and cause issues.
 6          Q.   Okay.  Any others that you've looked
 7      at?
 8          A.   There are some others, but off the
 9      top of my head, I would say that we have looked
10      at some Boston Scientific products that also do
11      the same thing.  Their transobturators.  So those
12      are the three I can think of.
13          Q.   So TVT-O is not unique in that
14      regard?
15              MS. THOMPSON:  Object to form.
16              THE WITNESS:  The TVT-O probably
17      is not unique in that regard, and but we
18      are not using TOTs or TVT-Os.
19      BY MR. OTTAWAY:
20          Q.   Doctor, if you can go to page 26 of
21      your report.  Middle paragraph starts "There
22      are."  Are you with me?
23          A.   Sure.
24          Q.   Okay.  Tell me what in your opinion
```

28 (Pages 106 to 109)

S. Abbas Shobeiri, M.D.

Page 110

1    would have provided a safer alternative.
2        A.   Well, in our practice, we are
3    basically using the retropubic devices.  We're
4    using the TVT type devices.
5        Q.   TVT devices manufactured by Ethicon?
6        A.   Ethicon, Boston Scientific.  You
7    know, depends on what the hospital is providing
8    us.
9        Q.   So when you say "safer alternative,"
10   you mean retropubic TVT devices?
11       A.   Yeah, that's the --
12           MS. THOMPSON:  Object to form.
13           THE WITNESS:  Those are the safer
14       things.
15           MR. OTTAWAY:  You have to let her
16       get her objection out, Doctor.
17           Do you have an objection,
18       counsel?
19           MS. THOMPSON:  Object.  Yeah, I
20       object to form.
21           MR. OTTAWAY:  Thank you.
22   BY MR. OTTAWAY:
23       Q.   You may answer, Doctor.  I'm sorry.
24   If you can remember the question?

Page 111

1        A.   Yeah.  So we have -- we have moved
2    to the more retropubic slings.
3        Q.   Okay.
4        A.   And we don't have TVT-Os on the
5    shelf.
6        Q.   Okay.  And those include TVT devices
7    made by Ethicon?
8        A.   TVT devices by -- made by Ethicon.
9        Q.   Okay.  And when you say "safer
10   alternative," that's what you mean?
11           MS. THOMPSON:  Object to form.
12           THE WITNESS:  That's what we are
13       using now.
14   BY MR. OTTAWAY:
15       Q.   Okay.  Well, no.  I'm asking you if
16   that is the safer alternative you're referencing
17   at page 26 of your report?
18       A.   Yes.  We are avoiding transobturator
19   space and going to retropubic in appropriate
20   patients.
21       Q.   Okay.  Is there medical literature,
22   Doctor, of what you're aware in peer-reviewed
23   journals which suggests that TVT devices and
24   TVT-O devices are equivalent --

Page 112

1           MS. THOMPSON:  Object to form.
2    BY MR. OTTAWAY:
3        Q.   -- when it comes to safety and
4    efficacy?
5        A.   I'm aware of literature that say
6    they are not equivalent.
7        Q.   That wasn't my question again,
8    Doctor.
9           If you can answer my question.  I
10   appreciate your answer, but can you answer my
11   question?
12       A.   Yes, there is literature saying that
13   depending on the end point that they were looking
14   at, those end points are equivalent.
15       Q.   Okay.  Thank you.
16           I noticed here at the last page of
17   your report that you've already told us that
18   you've stopped using TVT-O; correct?
19       A.   Uh-huh.  True.
20       Q.   Are you aware of any academic center
21   currently using TVT-O?
22       A.   No, but that doesn't mean somebody
23   out there is not using it.
24       Q.   Have you made any effort to search

Page 113

1    and find out that information?
2        A.   The people I have talked to and the
3    people who are within my communication space are
4    not using it, but it doesn't mean somebody out
5    there is not.
6        Q.   Okay.  Even in an academic center?
7        A.   True.
8           MR. OTTAWAY:  How are we doing on
9       time, Mr. Videographer?
10           THE VIDEOGRAPHER:  Nine minutes
11       to go.
12           MR. OTTAWAY:  All right.  Good.
13       We'll finish out the nine minutes then.
14   BY MR. OTTAWAY:
15       Q.   You have reviewed the IFU for TVT-O,
16   Doctor?
17       A.   Yes, I did.
18       Q.   When you were performing TVT-O
19   surgeries, had you reviewed it prior to doing
20   them?
21       A.   Yes.
22       Q.   Did you also conduct your own review
23   of literature to determine how other people were
24   doing with the TVT-O or TOT device?

29 (Pages 110 to 113)

S. Abbas Shobeiri, M.D.

Page 114

1    A.   I believe when we started using
2  either of them, you know, we reviewed the
3  available literature and we read the IFU.
4    Q.   And that's why you say you practice
5  evidence-based medicine; correct?  Because that's
6  something you do, review the literature before
7  you start using a product?
8         MS. THOMPSON:  Object to form.
9         THE WITNESS:  We review the
10     literature and read the IFU before we use
11     the product.
12   BY MR. OTTAWAY:
13    Q.   But you don't do one to the
14  exclusion of the other; correct?
15    A.   True.
16    Q.   And you would expect other doctors
17  sharing your specialty to do the same.  True?
18         MS. THOMPSON:  Object to form.
19         THE WITNESS:  True.
20   BY MR. OTTAWAY:
21    Q.   Now, you talk about adverse
22  reactions that are listed in the IFU.
23    A.   What page?
24    Q.   I'm not trying to fool you here,

Page 115

1  Doctor.  It's page 24 of your report if you want
2  to go to it.
3    A.   Okay.
4    Q.   What adverse reactions are listed in
5  the IFU?
6    A.   So you want me to pull out the IFU?
7    Q.   You're free to refer to it, Doctor.
8  If you can't tell me without referring to it, of
9  course you can.
10    A.   Okay.  (Reviewing document).
11         So we have the warning and
12  precautions and the adverse reactions section.
13  What's your question about it?
14    Q.   For example, is nerve pain
15  mentioned?
16    A.   Yes.
17    Q.   We discussed scarring previously.
18         As a physician, did you know
19  scarring was a potential?
20    A.   Yes.
21    Q.   Did you know inflammatory or foreign
22  body reaction was a potential?
23    A.   With the TVT-O insertion?
24    Q.   Yes.

Page 116

1    A.   Well, the IFU says transitory local
2  irritation and transitory foreign body response,
3  which is what you expect the body to do when it's
4  healing.  So I really think that Ethicon
5  minimized the extent of the problems that was
6  occurring in the body.
7    Q.   And were those problems noted in the
8  literature to which you've referred?
9    A.   So the question is?
10    Q.   Well, you've talked about the IFU,
11  and I know you disagree with the way it's worded.
12    A.   Uh-huh.
13    Q.   But regardless of how it's worded,
14  was that information available in the
15  peer-reviewed literature that you've referenced?
16         You've said you've looked at
17  peer-reviewed literature and the IFU.
18         MS. THOMPSON:  Object to form of
19     the question.
20         THE WITNESS:  In terms of TVT-O?
21   BY MR. OTTAWAY:
22    Q.   Yes.
23         MS. THOMPSON:  I'm sorry.  And
24     misstates his previous testimony.

Page 117

1   BY MR. OTTAWAY:
2    Q.   She has to get it all out, Doctor,
3  and she's entitled to.
4    A.   Yeah, in terms of the TVT-O being a
5  new device, we went with the literature and IFU.
6    Q.   Okay.  Now, you talk about some of
7  the adverse reactions on page 25 of your report?
8    A.   Sure.
9    Q.   Chronic pain.  Is there a difference
10  between chronic pain and chronic pain syndromes?
11    A.   Yes.
12    Q.   Okay.  Tell me the difference.
13    A.   Chronic pain is -- can be localized.
14  Chronic pain syndrome can be a constellation of
15  different systems.
16    Q.   And which are you referring to here
17  when you say "adverse reactions"?
18    A.   Could be both.
19    Q.   Okay.  So it could be both.
20         And are both noted and contained in
21  the peer-reviewed literature?  Supported by the
22  peer-reviewed literature?
23    A.   In terms of?
24    Q.   TVT-O.

30 (Pages 114 to 117)

S. Abbas Shobeiri, M.D.

Page 130

1    But at the same time, depending on
2 how, whether it's a TVT or a mesh that is device
3 inserted, you know, if there is any obstruction
4 to the -- to the bladder also, you can get UTI.
5 So they can melt into each other.
6    Q.   Okay.  What I'm hearing you saying
7 is infection -- bladder infections can be present
8 with all forms of mesh in addition to TVT-O.
9    Is that a correct statement?  Is my
10 statement correct?
11    A.   Well, theoretically, you should not
12 have it as much with mesh --
13    Q.   Okay.
14    A.   -- itself but more with the TVT-O.
15    Q.   Okay.  So that's a question of
16 frequency, I guess?
17    A.   Uh-huh.  True.
18    Q.   Both can do it, but in your
19 judgment, TVT-O or TOT devices do it more often?
20    A.   Repeat that question.  Sorry about
21 that.  Do you want to?
22    Q.   Well, yeah, it's all right.
23    A.   Just make sure.
24    Q.   I want to make sure we communicate

Page 131

1 so that you know that when you've answered my
2 question, you've answered it with your opinion.
3 Fair enough?
4    A.   Well, I just want to make sure you
5 understand what I said.
6    Q.   Yes.  Yeah.  What I'm understanding
7 you to say is:  Infection can result from any
8 mesh.  Vaginal infection can result from any
9 mesh.
10    A.   Uh-huh.
11    Q.   But in your opinion, urinary tract
12 infections or bladder infections would be more
13 common with TVT-O than with TVT mesh?
14    A.   Yeah.  The thing is that their
15 mechanisms can be different, too.
16    Q.   Okay.  And that's --
17    A.   That's what I was trying to stress.
18    Q.   Yeah.  Tell me about how their
19 mechanisms can be different.
20    A.   Well, what I was saying is that with
21 the vaginal meshes that are placed, you know, if
22 they're coming through and they're causing
23 vaginal discharge, that would be the contributing
24 factor.  And that's true for TVT-O as well, but

Page 132

1 with the TVT-Os, if they're roping and rolling
2 and they're a tube type and they're causing
3 outflow problems to the bladder, they can also
4 contribute to the bladder infection.
5    Q.   Okay.  And this roping and rolling
6 you're discussing, is that, in your opinion,
7 unique to TVT-O or TOT devices?
8    A.   They are more often seen in those
9 conditions.
10    Q.   Okay.  So not unique but more
11 frequent.  Fair?
12    A.   The -- so we are talking about the
13 roping and curling of the tissue?
14    Q.   Yes.
15    A.   Yeah.  I mean, just because of the
16 anatomy going from side to side, you see that.
17    Q.   More frequently?  I mean, it's a
18 question of frequency?  Not that it doesn't rope
19 or roll in other meshes, it's just more frequent
20 in?
21    A.   Well, that's the condition that we
22 have seen it in.
23    Q.   Okay.
24    A.   So...

Page 133

1    Q.   I'm still not sure I got the answer
2 there.
3    Do you see roping and rolling in
4 other forms of mesh other than TVT-O and TOT?
5    A.   That's where we have seen it.  You
6 know, I mean, if somebody puts a TVT and they are
7 placed in a very tight manner, you know, I guess
8 they could do that, but we don't see that as
9 frequently versus with the TOT and TVT-O we do
10 see that.
11    Q.   So it is a question of frequency.
12 That's what I'm trying to get at.
13    A.   Yeah.
14    Q.   Okay.  De novo urinary symptoms.  Is
15 that something unique to TVT-O or TOT devices or
16 something that is present in as a potential in
17 vaginal surgery or mesh surgeries in general?
18    A.   De novo urinary symptoms could be
19 associated with both TVT-O and TVT type slings.
20    Q.   Okay.  Hyspareunia.  What do you
21 mean by hyspareunia, in quotes?
22    A.   Again, because of the anatomy and
23 the way that the sling would travel causing that
24 bridge or scarring.  As male tries to enter and

34 (Pages 130 to 133)

Golkow Technologies, Inc. - 1.877.370.DEPS

S. Abbas Shobeiri, M.D.

Page 134

1    have intercourse, they have pain.
2        Q.   And is that something unique to
3    TVT-O or TOT devices or can that be present with
4    any TVT or mesh device?
5        A.   The location would be different,
6    depending on where you have the problem.
7        Q.   Okay.  Other than location?
8        A.   So the presentation would be
9    different for TVT-O device versus something that
10   is placed deeper.
11       Q.   Okay.  Explain that to me, if you
12   will.  I want to understand.
13       A.   So if you have a mesh under the
14   bladder or over the rectum and it's working
15   through, so the male can enter, but they would go
16   halfway in, and they feel the mesh then and that
17   would hurt them versus with the TVT-O is very
18   much, you know, closer to the outside.  So they
19   would feel it.  They cannot get very far.
20       Q.   Okay.  So it would be a question of
21   location within the vagina then?
22       A.   Yes.
23       Q.   Thank you.  I think I understand.
24           Is there any difference in the

Page 135

1    chemical composition of the polypropylene used in
2    TVT-O and TVT mesh made by Ethicon that you're
3    aware of?
4            MS. THOMPSON:  Object to form.
5        The TVT-O compared to TVT or TVT-O and TVT
6        compared to other mesh?
7            MR. OTTAWAY:  I actually asked
8        the question TVT-O and TVT manufactured by
9        Ethicon, I believe.
10           THE WITNESS:  So comparing TVT-O
11       to --
12           MS. THOMPSON:  Object to the form
13       of the question.
14           THE WITNESS:  -- TVT?  They're
15       both polypropylene.
16    BY MR. OTTAWAY:
17       Q.   Okay.  Are you aware of any
18   differences in the chemical makeup of the two?
19       A.   I think they are both polypropylene.
20       Q.   Okay.  And do you hold yourself out
21   as an expert in biomaterials?
22       A.   I know as much as it pertains to my
23   work.
24       Q.   Again, that wasn't my question.

Page 136

1            I asked you:  Do you hold yourself
2    out as an expert in biomaterials?
3        A.   I'm not a biomaterial engineer.
4        Q.   All right.  Doctor, I'd like to ask
5    you a question.  If you want to refer to page 27,
6    but it's referred to in several pages in your
7    report.
8            What is your definition of a
9    "community doctor"?
10       A.   A community doctor?  Where do I --
11   ah, I see here.
12           Community doctors are physicians who
13   are working in the community.  Probably
14   physicians in nonacademic centers.
15       Q.   And would they be gynecologists,
16   urogynecologists?
17       A.   Or -- or physicians in a non- --
18   non-tertiary type health centers.
19       Q.   Would they be doctors who had access
20   to the same reference material that you refer to
21   in your Exhibit B to your report?
22       A.   They would have access to it, but
23   remember, for me I'm always reading articles
24   continuously where those physicians may have

Page 137

1    certain societies they belong to or they would --
2    they may read one or the other journal.
3        Q.   They can be doctors who are
4    specializing in your specialty?  Members of the
5    same societies you're members of?
6        A.   So are there community physicians
7    who are urogynecologists?  There are community
8    urogynecologists as well.
9        Q.   Now, the reason I ask that is
10   because if you'll go to page 22?
11       A.   Uh-huh.
12       Q.   The second sentence on that page.
13   That phrase "doctors in the community."  Not
14   community doctors, but "Doctors in the
15   community --
16       A.   Uh-huh.
17       Q.   -- are often unaware of the risks of
18   mesh."
19           You see that sentence?
20       A.   I see that.
21       Q.   Are you aware of any study that
22   supports that opinion?  It's not referenced to
23   anything.
24       A.   Well, I think we draw that from our

35 (Pages 134 to 137)

S. Abbas Shobeiri, M.D.

Page 138

1 studies where we were in Oklahoma at a tertiary
2 care center, and we did a study where we saw 75
3 percent of patients who came to us with mesh
4 complications with the sling complications.
5 　　　They -- when we asked them who
6 referred you to us, they said, you know, we -- I
7 came here based on the referral from a friend or
8 the church. And when we talked to the
9 physicians, they were like OB-GYNs, know this was
10 a problem. So it's actually documented in the
11 literature how -- how these mesh complications
12 may be seen, but most often they are told that
13 maybe just give the patient estrogen and it would
14 go away and it would end.
15 　　　Q. Is estrogen an accepted form of
16 therapy for some mesh complications?
17 　　　A. You know, to the -- this type of
18 mesh complications pertaining to TVT-O and such
19 was something that I think crept up on the
20 community, and a lot of times neither the
21 community physicians nor us knew how to deal with
22 them.
23 　　　I mean, they came about and we were
24 looking at ways to take care of the mesh problem,

Page 139

1 take care of the sling erosion problem
2 nonsurgically. We did try estrogen and you may
3 find references in the literature that it was
4 advocated at one point, but it really fell out of
5 favor because it just didn't work.
6 　　　Q. Okay. There was an FDA paper you
7 reference in your report issued in 2008.
8 　　　A. Okay.
9 　　　Q. Are you aware of that?
10 　　　A. Yes.
11 　　　Q. Did that FDA paper warn of the risks
12 associated with mesh implantation?
13 　　　A. Okay.
14 　　　Q. Did it?
15 　　　A. So what's the question?
16 　　　Q. My question is: Did the FDA 2008
17 paper address the issue of --
18 　　　A. Yeah, that was the FDA warning,
19 warning of.
20 　　　Q. -- risks of mesh?
21 　　　A. They were -- they were alerting the
22 community of -- of complications associated with
23 the mesh and the sling that they were seeing.
24 　　　Q. Okay. And did that go to doctors in

Page 140

1 the community?
2 　　　A. It was pretty much a media blast.
3 So whoever followed that probably learned about
4 it quickly.
5 　　　Q. And so your statement,
6 "Unfortunately, doctors in the community are
7 often not aware of the risks of mesh" would
8 predate 2008?
9 　　　MS. THOMPSON: Object to form.
10 　　　THE WITNESS: Well, the study
11 　　that we did was after that time. So
12 　　doesn't seem like that filtrated into the
13 　　community.
14 BY MR. OTTAWAY:
15 　　　Q. And did you try to in your study --
16 and please refer me to the study you're
17 referencing if it's in your materials there.
18 　　　A. Sure.
19 　　　Q. I'd like to know which study it is.
20 　　　A. Uh-huh. It's the -- in the Oklahoma
21 Medical Journal. I don't know what year it was,
22 whether it's 2012 or '13. So...
23 　　　Q. Okay. Did you make an effort in
24 that study to determine whether this statement

Page 141

1 "Doctors in the community are not aware of the
2 risks of mesh" was post or pre-2008, the
3 implantation?
4 　　　A. The study was done in 2012, '13,
5 whenever it was published. So, I mean, you can
6 draw a conclusion. If the warning came in 2008
7 and the study is published a few years later
8 whether the physicians really got the message or
9 not. I think that the -- you know, they -- they
10 didn't refer us the patients and it doesn't seem
11 like they were aware of the mesh problems that
12 was going on. Whether -- yeah, go ahead.
13 　　　Q. No, go ahead. Finish your answer,
14 please.
15 　　　A. So the study basically said about 75
16 percent of people were self-referred but not
17 referred by the surgeon who did their surgery.
18 　　　Q. And it's from that study you
19 determined that "Doctors in the community are
20 often not aware of the risks of mesh"?
21 　　　A. That's -- that's the -- that's what
22 we have observed.
23 　　　Q. And did that study -- and again, you
24 know, I know the study you're referencing on that

36 (Pages 138 to 141)

S. Abbas Shobeiri, M.D.

Page 142

1    one.
2        A.    Uh-huh.
3        Q.    Did that make any effort to
4    determine whether the mesh was implanted pre or
5    post the FDA 2008 advisory?
6        A.    I see what you're asking.
7            So these are the patients who -- I
8    mean, they could have had their mesh implanted
9    before that as well.  We didn't look at the exact
10   date of implantation.
11       Q.    Okay.  Now, the last point I want to
12   discuss with you -- because we're running out of
13   time, and I want to take one very brief break for
14   about 10 minutes left to make sure I got
15   everything but -- is your opinion that TVT-O or
16   TOT devices are more difficult to remove than
17   other forms of TVT mesh.
18           Tell me about your opinion in that
19   regard.
20       A.    So it, again, goes to the matter of
21   the space utilized to put those slings in.  So if
22   we had a TVT mesh, if you want to remove the
23   whole thing, you could go retropubically,
24   transvaginally and you could be pretty sure that

Page 143

1    you could remove 100 percent of it.
2            With the transobturator tape or the
3    TVT-O, as we discussed, your arm of the sling
4    goes lateral and behind the bone and disappears.
5            So most skilled surgeons -- again,
6    has been a learning cycle for a lot of people who
7    were not used to this area -- that's as far as
8    they can go.  So there is inevitably some mesh
9    left in a patient where they can come back and
10   say, I still have a problem there.
11       Q.    Okay.  How about in your experience,
12   are you able to access and remove that mesh?
13       A.    I -- I try to remove as much as I
14   can, but I -- because you get into such a
15   difficult space, most often that's where we will
16   stop.  You know, because then the idea of having
17   to go through the groin to approach that space
18   is -- it's very challenging as well.
19       Q.    Now, having removed the mesh other
20   than the mesh you've just described, what
21   consequences would result from leaving just that
22   portion of the mesh in?
23       A.    Well, the patient is coming to you
24   for pain, mesh complications problems, especially

Page 144

1    if it's pain issue, groin pain issue, leg pain
2    that is radiating from the obturator territory.
3    You know, the -- if that was really the thing
4    that I was worried about, then, you know, I would
5    probably sit with the patient and tell them if
6    that's the issue, then I would have to make that
7    groin incision and approach it that way to make
8    sure we get everything.  But it's -- it's one of
9    those things that adds time to the surgery.
10       Q.    So in your case, you can get it.  It
11   just adds a little more time to the surgery?
12       A.    Not a little time --
13           MS. THOMPSON:  Object to the
14       form.
15   BY MR. OTTAWAY:
16       Q.    That's fine.  She got her right to
17   object.
18       A.    No.  It probably takes about an hour
19   on each side.
20       Q.    Okay.  It adds an hour more?
21       A.    On each side.
22       Q.    Per side?
23       A.    Yeah.
24       Q.    Anything else?

Page 145

1        A.    To remove that mesh?
2        Q.    Yes.
3        A.    Well, you may be left with the
4    consequences that despite you doing all that
5    surgery, the nerve is still scarred and the pain
6    wouldn't go away.
7        Q.    Have you done a study, Doctor, to
8    determine the percentage of patients or can you
9    refer to one in the literature that you rely upon
10   today --
11       A.    Uh-huh.
12       Q.    -- that discusses the percentage of
13   patients who will have that residual mesh or
14   suffer a consequence from it?
15           MS. THOMPSON:  Object to form.
16           THE WITNESS:  Pardon me?
17           MS. THOMPSON:  Object to form of
18       that question.
19           THE WITNESS:  Yeah.
20           MS. THOMPSON:  It's compound.
21           THE WITNESS:  Yeah, there are
22       studies -- again if you want me to name it,
23       I have to look at the whole article and
24       find it for you.  But there are studies

37 (Pages 142 to 145)