# Exhibit H

Peggy Pence, Ph.D.

Page 1

1              IN THE DISTRICT COURT

2             438TH JUDICIAL DISTRICT

3              BEXAR COUNTY, TEXAS

4

5    JENNIFER RAMIREZ F/K/A      )
     JENNIFER GALINDO            )
6                               )
            Plaintiff,          ) Cause No.
7                               )
        vs.                     ) 2012-CI-18690
8                               )
     CESAR REYES, JOHNSON &      )
9    JOHNSON, INC., AND          )
     ETHICON, INC.              )
10                              )
            Defendants.         )
11   _____    )

12

13

14          THURSDAY, MARCH 24, 2016

15

16        Deposition of PEGGY PENCE, PH.D., held

17   at Lopez McHugh, LLP, 100 Bayview Circle,

18   Suite 5600, Newport Beach California,

19   commencing at 9:36 a.m., on the above date,

20   before Lisa Moskowitz, California Certified

21   Shorthand Reporter No. 10816, RPR, CLR.

22                  - - -

23          GOLKOW TECHNOLOGIES, INC.
         877.370.3377 ph | 917.591.5672 fax
24              Deps@golkow.com

25

Peggy Pence, Ph.D.

## Page 2

APPEARANCES:

FREESE & GOSS, PLLC
BY:  TIM K. GOSS, ESQ.
tim@freeseandgoss.com
YVETTE DIAZ, ESQ.
yvette@freeseandgoss.com
3031 Allen Street, Suite 200
Dallas, Texas 75204
(214) 761-6610

Counsel for Plaintiff

BUTLER SNOW, LLP
BY:  KARI L. SUTHERLAND, ESQ.
kari.sutherland@butlersnow.com
1200 Jefferson Avenue, Suite 205
Oxford, Mississippi 38655
(662) 513-8000

Counsel for Defendants Johnson &
Johnson and Ethicon, Inc.

SCOTT, CLAWATER & HOUSTON, LLP
BY:  CAROL Y. VERBEEK, ESQ. (By Telephone)
cverbeek@schlawyers.com
2727 Allen Parkway, Suite 500
Houston, Texas 77019
(713) 650-6600
Counsel for Defendant Cesar Reyes, M.D.

## Page 3

I N D E X
EXAMINATION OF                     PAGE
PEGGY PENCE, PH.D.
   By Ms. Sutherland          8
   By Mr. Goss              313

DEPOSITION EXHIBITS
NUMBER       DESCRIPTION       PAGE
1    Second Amended Notice          9
2    FDA Device Labeling Guidance   15
     G91-1
3    Expert Report of Peggy Pence,  19
     Ph.D., RAC, FRAPS
4    Peggy Pence, Ph.D., RAC,       20
     FRAPS, Expert Witness Report,
     First Supplemental
5    Second Supplemental Reliance   20
     List
6    Supplemental Report of Peggy   22
     Pence, Ph.D., RAC, FRAPS
7    Exhibit 1 to Supplemental      23
     Report
8    Deposition and Trial Testimony 45
     of Peggy Pence, Ph.D., RAC,
     FRAPS
9    Global Harmonization Task     144
     Force Final Document
10   Gynecare TVT Obturator System 146
     IFU

## Page 4

DEPOSITION EXHIBITS
NUMBER       DESCRIPTION       PAGE
11   FDA Public Health Notification 206
12   AdvaMed's 40th Anniversary     280
13   Guidance for Industry and FDA  286
     Staff
14   Curriculum Vitae               315
15   Deposition and Trial Testimony 350
     Reviewed
16   Safety Principle PowerPoint    354
17   Johnson & Johnson Credo        357
18   Exhibit 2 to Supplemental      364
     Report
19   Baptist Health System Surgery  367
     Implant/Prosthesis Record
20   Due Diligence Growth           370
     Opportunity Outline
21   Email Chain, dated 4/14/03     378
22   Email from Ronnie Toddywala,   385
     dated 6/24/03
23   Gynecare Sales Training Launch 389
     Meeting
24   GHTF Final Document, dated     395
     5/20/05
25   GHTF Final Document, dated     401
     May, 2007
26   Letter from Carol Holloway,    408
     dated 10/12/05
27   Email Chain, dated 2/27/04     411

## Page 5

DEPOSITION EXHIBITS
NUMBER       DESCRIPTION       PAGE
28   Email Chain, dated 3/2/04      417
29   Email Chain, dated 11/12/04    424
30   Translation of PD Doctor       424
     Eberhard's Letter of 18.10.04
31   LCM Project PowerPoint         429
32   Second Half Photo Presentation 429
33   Email from Gene Kammerer,      430
     dated 8/28/06
34   Email from Allison London      438
     Brown, dated 5/6/05
35   Clinical Expert Report         444
36   Email Chain, dated 6/12/06     450
37   Letter from Marty Weisberg,    453
     dated 11/18/03
38   Ethicon Product Pointer        455
39   Excerpt of Trial Proceedings   459
40   Transcript of Trial            460
     Proceedings
41   Memo from Allison London Brown 466
42   Email from Shalot Armstrong,   475
     dated 9/1/10
43   Email Chain, dated 7/5/10      477
44   Email Chain, dated 10/5/10     482
45   Email Chain, dated 8/24/10     485
46   ADM Module 2:  Compliance      488

Golkow Technologies, Inc. - 1.877.370.DEPS

Peggy Pence, Ph.D.

Page 6

1    QUESTIONS NOT ANSWERED
2        PAGE  LINE
3          58   12
            59   20
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

1        NEWPORT BEACH, CALIFORNIA
2    THURSDAY, MARCH 24, 2016, 9:36 A.M.
3
4        THE VIDEOGRAPHER:  We are now
5    on the record.  My name is Jim Lopez.
6    I'm a videographer for Golkow
7    Technologies.  Today's date is March 24,
8    2016, and the time is approximately
9    9:36 a.m.  This video deposition is
10   being held in Newport Beach, California
11   in the matter of Jennifer Ramirez aka
12   Jennifer Galindo versus Cesar Reyes,
13   Johnson & Johnson, Inc., and Ethicon,
14   Inc., Case Number 2012-CI-18690 for the
15   District Court, 438th Judicial District,
16   Bexar County, Texas.  The deponent is
17   Dr. Peggy Pence.
18       Counsel and all present, will
19   you please identify yourselves.
20       MR. GOSS:  Tim Goss for the
21   plaintiff.
22       MS. SUTHERLAND:  Kari
23   Sutherland for Ethicon and J&J.
24       THE VIDEOGRAPHER:  On the line?
25       MR. GOSS:  Did we lose you on

Page 8

1    the line?  Hello?  Do you have it muted?
2        THE VIDEOGRAPHER:  Counsel will
3    be noted on the stenographic record.
4    The court reporter is Lisa Moskowitz,
5    and she will now swear in the witness.
6
7        PEGGY PENCE, PH.D.,
8    after having been duly sworn, was examined
9        and testified as follows:
10           - - -
11       MS. VERBEEK:  This is Carol
12   Verbeek.  I'm sorry, I lost you.
13       MS. SUTHERLAND:  Okay.  We're
14   back.
15       MS. VERBEEK:  Okay.
16
17       EXAMINATION
18   BY MS. SUTHERLAND:
19   Q.  Good morning, Dr. Pence.
20   A.  Good morning.
21   Q.  Would you please tell me your full
22   name?
23   A.  Peggy Jo Clark Pence.
24   Q.  And your address?
25   A.  1533 Miramar Drive, Newport Beach,

Page 9

1    California 92661.
2    Q.  And Dr. Pence, do you still have a
3    company that you work under?
4    A.  Yes, I do.
5    Q.  And what is that company?
6    A.  Symbion, S-y-m-b-i-o-n, Research
7    International, Incorporated.
8    Q.  And is that the company through
9    which you're working essentially for your
10   opinions in this case?
11   A.  That's correct.
12   Q.  All right.  And you understand
13   we're here for the Jennifer Ramirez case?
14   A.  Yes, I do.
15   Q.  I'm going to hand you what I have
16   marked as Deposition Exhibit Number 1 which
17   is the notice.
18       (Exhibit Number 1 was
19       marked for identification.)
20   BY MS. SUTHERLAND:
21   Q.  And ask you if you have seen that
22   document before?
23   A.  I don't recall having seen this
24   before.
25   Q.  I'm going to bet you have seen a

3 (Pages 6 to 9)

Peggy Pence, Ph.D.

Page 10

1 document similar to this before.
2     A. Yes, I have.
3     Q. All right. Did you bring some
4 stuff with you today with respect to your
5 opinions in this case?
6     A. Yes.
7     Q. And what all have you brought with
8 you?
9     A. I brought my report from April,
10 2015, and a copy of my supplemental report,
11 dated -- I think it was March 2, 2016, and
12 some copies of Global Harmonization Task
13 Force guidances, and my deposition and trial
14 testimony history.
15     Q. Oh. Let me see the GHTF's
16 guidances that you brought.
17     A. My supplemental report is in there
18 as well.
19     Q. Okay. I may not mark these because
20 I think I got them previously.
21     A. And the one you have previously is
22 actually more comprehensive. It has some of
23 the older ones as well.
24     Q. In your great binder?
25     A. Yes. That I haven't gotten back

Page 11

1 yet.
2     Q. Golkow has?
3     A. Yes.
4     Q. All right. So what I'm looking at
5 you have a GHTF guidance document entitled
6 "Essential Principles of Safety and
7 Performance of Medical Devices," dated
8 November 2, 2012. And a GHTF final guidance
9 entitled "Principles of Conformity
10 Assessment For Medical Devices," dated
11 November 2, 2012. Correct?
12     A. Correct.
13     Q. While I'm looking at these dates,
14 I've got a question for you. Am I correct
15 that the GHTF changed to a different
16 organization in 2011?
17     A. I believe it was 2011 or 2012, yes.
18 The GHTF disbanded, and its work was
19 transferred to IMDRF.
20     Q. And tell me again what the IMDRF
21 stands for.
22     A. I know that. Medical Device
23 Regulators -- International Medical Devices
24 Regulators Forum. I believe, and I can just
25 double-check that.

Page 12

1     Q. Yeah. And I really could not
2 remember myself. I was not trying to put
3 you on the spot.
4         Do you want this back?
5     A. Yeah, just because I can
6 double-check to make sure I'm giving you the
7 right name for the acronym.
8     Q. Thank you.
9     A. I believe it is the International
10 Medical Device Regulators Forum, but I'll
11 check. Yes. International Medical Device
12 Regulators Forum.
13     Q. Okay. And when did they, I guess,
14 come into existence and the GHTF went out of
15 existence?
16     A. It was in the 2011 to 2012 time
17 frame.
18     Q. All right. Was it before the two
19 guidances that you brought with you were
20 promulgated?
21     A. These -- well, there are other
22 guidances in here as well. These were GHTF
23 guidances. They are on the IMDRF website as
24 current documents with the notation from
25 IMDRF that they are to be considered current

Page 13

1 documents and as time progresses, IMDRF will
2 reissue them as IMDRF documents. But for
3 the present time, they're GHTF documents.
4     Q. Okay. And those guidance
5 documents, the two that I called out, are
6 dated November, 2012?
7     A. They --
8     Q. And I know they're preceded by
9 others.
10     A. Yes, and they are GHTF documents,
11 though. They are not IMDRF. They were
12 documents that were produced through the
13 GHTF process.
14     Q. Were they finalized before the
15 GHTF, I guess, for lack of a better term,
16 went out of business?
17     A. I presume so since they were signed
18 off by GHTF. So they must have been a part
19 of finalizing their final work. The
20 transition was supposed to have been in
21 2012. In that 2011/2012 time frame. 2012
22 is what I have in my report.
23     Q. Okay. I think you said GHTRF.
24     A. I'm sorry. GHTF. Sorry.
25     Q. No worries. No worries. I just

Peggy Pence, Ph.D.

Page 14

1  want to make sure we're straight.
2      A.  It stands for Global Harmonization
3  Task Force.
4      Q.  Got it.
5          What else have you brought with you
6  today?
7      A.  I think I have one guidance
8  document, MDA guidance document, the device
9  label guidance number G91-1 Blue Book Memo.
10     Q.  Okay.  Do you mind if I take a peak
11 at that?
12     A.  Oh, sure.
13     Q.  Okay.  And that's obviously
14 referenced throughout your report on your
15 labeling opinions?
16     A.  Yes.
17     Q.  This is a different format for
18 printing than I have seen.
19     A.  I probably didn't do the PDF
20 version.
21     Q.  Did you just print this out
22 yesterday?
23     A.  Yes, last night.
24     Q.  All right.  I'm just going to mark
25 it.  I think it's the same thing, but I'm

Page 15

1  just going to mark it as Exhibit Number 2.
2          (Exhibit Number 2 was
3          marked for identification.)
4  BY MS. CAREY:
5      Q.  I'll hand that back to you.
6      A.  Thank you.
7      Q.  And then did you tell me this
8  binder is just your TVT-O report?
9      A.  Yes, with the exhibits and
10 appendices and a copy of a few references
11 that were footnoted in the -- in my report,
12 at the bottom of my report.
13     Q.  Okay.  Do you mind if I just take a
14 peak at that too?
15     A.  Not at all.
16     Q.  And it looks like your references
17 are deposition testimony that you pulled
18 out?
19     A.  And there's a publication as well.
20     Q.  Now, is there a particular reason
21 that you pulled out these references?
22     A.  Those were additional references
23 that were -- there was a report filed for
24 TVT-O in 2014.
25     Q.  Right.

Page 16

1      A.  And one in 2015.  And I asked my
2  staff to pull out any additional references
3  that I hadn't already pulled out in my 2014
4  report, and I believe that's what these are.
5      Q.  Okay.  So if I'm following
6  correctly, what you've got sort of marked
7  here beginning with reference 217 and
8  skipping some but going up through --
9  actually 545B are references that are in
10 your 2015 TVT-O supplemental report that
11 were not in your 2014 TVT-O report?
12     A.  Yes.  That's my understanding.
13 That's what I asked my staff to do.  I've
14 not verified it personally, but that's what
15 I understand that to be.
16     Q.  And are the references that you've
17 got marked here up at the top the footnote
18 numbers?
19     A.  Yes.
20     Q.  All right.  I'm just going to call
21 those out for the record so that I'll know
22 what they are and that way I don't think we
23 need to mark another binder of yours.
24     A.  Sounds good.
25     Q.  The first one is reference 217.

Page 17

1  The next one is 218.  219.  224A.  224B.
2  230.  231A.  231B.  232.  259.  313A.  And
3  545B.
4          And actually, what I may do to save
5  me even more work is I might get a copy of
6  this at a break just of your references.
7      A.  Okay.
8      Q.  At a break.  I will hand this back
9  to you.  And then what was the last binder
10 that's underneath there?
11     A.  Just a copy of my report.  This is
12 the exhibits and the appendices, and this is
13 a copy of my report.
14     Q.  Okay.  And then was this second
15 binder also just a copy of the report?
16     A.  That's the one you were looking at
17 that has the GHTF guidances in it that I
18 brought.
19     Q.  Right.
20     A.  And also my supplemental report.
21     Q.  Okay.  Can I see that for one more
22 minute?
23     A.  Sure.
24     Q.  Okay.  And then it looks like
25 there's another GHTF guidance in the back

Peggy Pence, Ph.D.

Page 18

1  entitled "Clinical Evaluation," dated
2  May 2007.
3     A. Yes. And then behind each of the
4  tabs in that binder after the supplemental
5  report are other GHTF guidances.
6     Q. Oh, okay. I see. I was getting my
7  reports mixed up. This is your -- what I
8  call your MDL supplemental report, but it's
9  your March, 2016, supplemental report?
10    A. That's correct. That's correct.
11    Q. With some guidances from GHTF
12 behind it. Which, in fairness, I think, I
13 already have from your previous deposition.
14    A. Yes.
15    Q. So I will hand that back to you.
16    A. Thank you.
17    Q. And then just because I know Madam
18 Court Reporter has been waiting on it, I'm
19 going to mark what I have as your 2014
20 report.
21    A. Okay.
22    Q. And let you just identify that for
23 me and make sure we're on the same page.
24 I've marked that as Exhibit 3.
25 ///

Page 19

1        (Exhibit Number 3 was
2     marked for identification.)
3        THE WITNESS: This says
4     Exhibit C on the cover sheet.
5  BY MS. CAREY:
6     Q. I marked it with the yellow as
7  Exhibit 3.
8     A. Okay.
9     Q. Is Exhibit C your 2014 TVT-O
10 report?
11    A. I just wanted to be clear on the
12 Exhibit C because there is an Exhibit C --
13 there is an Appendix C to my report. I just
14 wanted to be sure that it was the entirety
15 of the report and not just the exhibits.
16    Q. Just the Exhibit C?
17    A. Yeah. Yes, it appears -- it
18 appears --
19    Q. Kind of thick.
20    A. Yes, it's double-sided. I'm just
21 trying to make sure that all the exhibits
22 are there and the appendices. It looks like
23 to be complete, yes.
24    Q. And then do that same thing for me,
25 if you would, for your supplemental report

Page 20

1  in this case on TVT-O that I've marked as
2  number 4.
3        (Exhibit Number 4 was
4     marked for identification.)
5  BY MS. SUTHERLAND:
6     Q. And it has on the front that same
7  Exhibit 3 down at the bottom.
8     A. Right. So that Exhibit 3 is
9  overwritten by this sticker Exhibit 4; is
10 that correct?
11    Q. Yeah. For this deposition, that
12 supplemental TVT-O report is Exhibit 4.
13    A. Okay.
14    Q. The yellow sticker.
15    A. Without going through it page by
16 page, it appears to be the complete report.
17    Q. Okay. And now I'm going to hand
18 you what I've marked as Exhibit 5, which I
19 understand to be your second supplemental
20 reliance list. Take a look at that.
21        (Exhibit Number 5 was
22     marked for identification.)
23 BY MS. SUTHERLAND:
24    Q. And does that appear to be your
25 reliance list for your TVT-O opinions in the

Page 21

1  Ramirez case, other than what you've got,
2  like, footnoted in your report?
3     A. It's cumulative. I have other
4  references that are referenced in the
5  reliance list in the report as appendices.
6  So this is --
7     Q. In addition to that?
8     A. In addition, yes.
9     Q. All right. Do you have a reliance
10 list that's dated any later than this one,
11 March 17, 2016?
12    A. Not at this time, I don't.
13    Q. Okay. If I were to look at this
14 reliance list and the reports that we've
15 marked so far, including the appendices and
16 exhibits, would that include all of the
17 documents that you're basing your opinions
18 on?
19    A. To the best of my recollection, as
20 I sit here today, yes.
21    Q. And the report I'm about to mark,
22 which is your March, 2016, TVT-O
23 supplemental report?
24    A. Correct.
25    Q. So let me do that. I'm handing you

Peggy Pence, Ph.D.

Page 22

1  what I've marked as Exhibit 6.
2       (Exhibit Number 6 was
3    marked for identification.)
4        THE WITNESS:  I do reserve the
5    right to add to this.
6  BY MS. CAREY:
7    Q.  I'm going to ask you about that.
8       Now, is Exhibit Number 6 your TVT-O
9  supplemental report dated March 2, 2016?
10   A.  It is the body of the report, but
11 it is missing the exhibits.
12   Q.  Actually, in fairness, it's TVT and
13 TVT-O supplemental report from March, 2016?
14   A.  That's correct.
15   Q.  All right.  And you said that had
16 an exhibit to it?
17   A.  Two exhibits.
18   Q.  And I confess I evidently didn't
19 bring the second exhibit, but I've marked as
20 Exhibit Number 7 what had been marked as
21 Exhibit 1 to the TVT and TVT-O supplemental
22 report, which is applicable industry
23 standards; correct?
24   A.  That's correct.
25 ///

Page 23

1       (Exhibit Number 7 was
2    marked for identification.)
3  BY MS. CAREY:
4    Q.  All right.  And I don't know if you
5  remember, but what was Exhibit 2?
6    A.  Exhibit 2 is a tabular presentation
7  of the numbers of MDR reports through 2015
8  for a number of manufacturers and certain
9  products of those manufacturers.
10   Q.  That's right.  And do you have a
11 similar exhibit attached to your April,
12 2015, report?
13   A.  Yes.  I believe it's Exhibit 3, if
14 I recall correctly.  Yeah.
15   Q.  And you may not know because you
16 don't have it in front of you.  Is it the
17 same exhibit?
18   A.  No.  It's different.  The Exhibit 3
19 includes -- that you're looking at includes,
20 I believe, only stress urinary continence.
21   Q.  Correct.
22   A.  And the one that is included in the
23 supplemental report from March 2016 is
24 updated through 2015, and it also --
25   Q.  Has prolapse products?

Page 24

1    A.  It also has the pelvic organ
2  prolapse products.  I do believe I brought a
3  copy of that.  I have it here.
4    Q.  Okay.  So looking at what we've
5  marked as far as your reports and exhibits
6  to reports, do those encapsulate, first of
7  all, your opinions in this case?
8    A.  Yes.
9    Q.  All right.  Do those items that
10 I've marked, not the deposition notice but
11 otherwise up to Deposition Exhibit Number 7,
12 would those all encapsulate the bases or the
13 documents that you've relied on for your
14 opinions in this case?
15   A.  Yes.
16   Q.  Okay.  You mentioned something
17 about reserving the right to supplement your
18 numerous reports.  As you sit here today, do
19 you have an intention to supplement any of
20 your reports related to TVT-O?
21   A.  At the present time, I'm not
22 anticipating a supplement.  If new
23 information becomes available or after
24 reviewing reports of other experts, it's
25 appropriate for me to supplement my reports,

Page 25

1  then I reserve the right to do that.
2    Q.  Certainly.  But in fairness, as you
3  sit here today, you don't have any ideas in
4  your head of things you already want to
5  supplement?
6    A.  Not at this point in time.
7    Q.  Okay.  And obviously, if you did
8  that, you'd let your counsel know, and he'd
9  let us know.
10   A.  Of course.
11   Q.  As you sit here today, other than
12 I'm sure reviewing your reports, do you have
13 any other work that you intend to do in this
14 case?
15   A.  Can you clarify?
16   Q.  Yeah.  Do you have any other charts
17 you intend to put together for this case,
18 any other depositions you intend to review,
19 essentially any other work you intend to do
20 in this case other than obviously reviewing
21 your reports and preparing for testimony?
22   A.  If there are other reports of
23 experts or other reports that are applicable
24 to the case that I've not yet seen or
25 reviewed, I perhaps would review those.  If

Peggy Pence, Ph.D.

Page 26

1   there's anything new that's presented, I
2   would review that.
3       Q.  Have you asked for anything to
4   review in this case that you haven't already
5   been given?
6       A.  To the best of my recollection, as
7   I sit here today, no.
8       Q.  Did you review -- well, first of
9   all, the plaintiff in this case is Jennifer
10  Ramirez; right?
11      A.  Yes.
12      Q.  Have you reviewed her medical
13  records?
14      A.  I've reviewed not all of her
15  medical records in their entirety but an
16  overview of her medical records through
17  depositions that I've reviewed of her care.
18      Q.  Okay.  Let me make sure I -- well,
19  do you have a listing of items specific to
20  this case that you've reviewed?  You know
21  what I'm talking about?  The plaintiff
22  deposition?  In-plainor deposition?
23      A.  I would have to look at the
24  reliance list to see if those are included.
25      Q.  Do you mind?  Let's just take a

Page 27

1   minute.  I just want to be sure I know for
2   this particular case what you've looked at.
3       A.  Okay.
4       Q.  And I think I've got it on the very
5   last page of your March 17, 2015, reliance
6   list.  Is that what you're looking at?
7   That's what you're looking at.
8       A.  Yes.
9       Q.  All right.  Now --
10      A.  There is one addition.
11      Q.  Okay.  What's that?
12      A.  And that is Jennifer Ramirez most
13  recent, if I recall correctly, as I sit here
14  today, there was a third deposition, and I
15  did -- I don't recall the -- it post dated
16  the August 2014.
17      Q.  She's been deposed three times in
18  this case?
19      A.  I think so, yes.
20      Q.  And you reviewed that third
21  deposition?
22      A.  I did.
23      Q.  All right.  Anything else that
24  needs to be added to your case-specific
25  reliance list?

Page 28

1       A.  Not as I sit here today.
2       Q.  And when you say that you had
3   reviewed medical records, would those have
4   been the exhibits to the doctor's
5   deposition?
6       A.  That's correct.
7       Q.  All right.  Does your reliance list
8   that I marked as Exhibit Number 5 include
9   all of the medical literature that you've
10  reviewed, or is there a separate listing of
11  the literature?
12      A.  There is literature in here.
13  There's also literature in my prior reports
14  that's in my reliance list.
15      Q.  As an attachment to your report?
16      A.  Exhibit B in my reports includes
17  reliance list.  So there's medical and
18  scientific literature included there.
19      Q.  Okay.
20      A.  And literature is also footnoted
21  as -- referenced as footnotes throughout the
22  body of the report as well, and then there's
23  literature that is included in the March 17,
24  2016, reliance list as well.
25      Q.  All right.  Is there literature

Page 29

1   that you've reviewed that would be listed
2   elsewhere other than those places you just
3   told me about?
4       A.  The Appendix C to my report
5   includes summaries of certain literature.
6   In order to -- I would have to -- ideally,
7   everything that's in Exhibit -- I'm sorry,
8   Appendix C to my reports would be included
9   in my reliance list, but to verify that, I
10  would need to sit down and do a
11  double-check.
12          But if you look at Appendix C to my
13  reports, Appendix B to my reports, which is
14  the Appendix B being the reliance list and
15  the March 17, 2016, reliance list and the
16  references that are throughout my report
17  where literature is cited --
18      Q.  You think that might cover the
19  waterfront?
20      A.  I'm hoping so, yes.  It should,
21  yes.
22      Q.  The reason I'm asking is there a
23  file that you keep at home specific to
24  pelvic mesh that might include additional
25  items other than what we've got on all your

Peggy Pence, Ph.D.

Page 30

1  reliance lists and your appendices?
2        MR. GOSS:  Be careful.  This is
3  where Hilary Clinton got in trouble.
4        MS. SUTHERLAND:  Do you have an
5  email server for all the secret email of
6  plaintiff counsel -- strike that.
7        Read back my original question.
8        (Record read by the reporter as follows:
9  The reason I'm asking is there a file you keep at
10 home specific to pelvic mesh that might include
11 additional items other than what we've got on all
12 your reliance lists and appendices?")
13       THE WITNESS:  There are a large
14    number of publications that are cited in
15    the various documents that we've just
16    been -- or that are included in the
17    various documents that we just been
18    discussing.  There may be other
19    documents that I have reviewed more
20    recently that -- looking at certain
21    update -- you know, updated reports
22    coming out routinely that may not have
23    made it into the reliance list at this
24    point in time because I do my best to
25    stay current, but I'm becoming aware of

Page 31

1     new literature all the time.
2        So it may be that there are
3     publications that have not yet made it
4     into a reliance list that I do have in
5     my files at home.  I try to be as
6     comprehensive as possible, but as you
7     can see --
8  BY MS. SUTHERLAND:
9     Q.  It's extensive.
10    A.  -- it's extensive.
11    Q.  If there was new stuff, are you
12 talking about things that might have come
13 out within the past six months or so that
14 might just not have made it to the list yet?
15    A.  Yes.  Or even within the last year
16 that I just may not have had an opportunity
17 to review yet or am in the process of
18 reviewing.
19    Q.  With respect to TVT-O, is there any
20 piece of literature that's come out
21 within -- I'm going to limit it to six
22 months -- that was of significance to you
23 and your opinions in this case?
24       MR. GOSS:  I'm sorry.  Can you
25    say that --

Page 32

1        THE WITNESS:  Do you want me to
2     restate it?
3        MR. GOSS:  Yes.
4        MS. SUTHERLAND:  Yeah.
5  BY MS. SUTHERLAND:
6     Q.  Is there a piece of medical
7  literature, peer-reviewed publication,
8  that's come out in the past six months
9  specific to TVT-O that is of significance to
10 you in your opinions in this case?
11       MR. GOSS:  Objection.  Form.
12       THE WITNESS:  You're talking
13    about solely scientific literature?
14 BY MS. SUTHERLAND:
15    Q.  Yes, ma'am.
16    A.  There continues to be.  I can't
17 speak to the six months specifically without
18 looking back at literature and confirming
19 it's within the last six months.  There
20 continues to be literature published that
21 substantiates my opinions.
22    Q.  Okay.  Give me an example -- the
23 reason I'm asking is just to see if there's
24 something that has come out recently that
25 might not be on your reliance list that

Page 33

1  you're thinking of today.
2     A.  For example, I believe it's
3  Dr. Ross and the publication that's
4  five-year results of a study that she had
5  done with obturator versus -- if I recall
6  correctly, it wasn't the Ethicon product but
7  another obturator -- transobturator sling
8  versus the retropubic sling approach.  Her
9  publication.
10       That, I've just recently reviewed
11 in the last couple of weeks.  Things of that
12 nature.  But nothing that has changed my
13 opinions but provides further support for my
14 opinions.
15    Q.  And do you do, like, a weekly
16 PubMed search to find new literature?
17    A.  No.  I don't do it weekly.
18    Q.  How often do you do a literature
19 search to make sure you're getting the most
20 up-to-date literature that might address
21 pelvic mesh?
22    A.  Periodically.  I don't have a set
23 schedule but periodically.
24    Q.  When's the last time, for instance,
25 that you did a PubMed search?

9 (Pages 30 to 33)

Peggy Pence, Ph.D.

Page 34

1    A.  Probably within the last two
2  months.
3    Q.  And do you do something besides
4  PubMed?
5    A.  I do ask counsel if there's any new
6  literature that they're aware of as well
7  that would be important for me to review.
8  So that's -- I do look for, for example,
9  Cochran reviews, things of that nature.
10    Q.  Now, I had limited my question to
11  literature, and you had specifically asked
12  me about that.  Is there another document
13  that's come out recently specific to your
14  opinions on TVT-O that you were thinking of?
15    A.  The FDA -- and unfortunately, I
16  don't have the binder because it's one of
17  the ones that's with Golkow that I don't
18  have back, but there was an advisory
19  committee meeting in February of this year
20  to discuss and make recommendations whether
21  or not to reclassify the instruments that
22  are used in the insertion of the medical
23  devices in stress urinary incontinence
24  devices, for example, to reclassify those
25  from Class 1 to Class 2.

Page 35

1    Q.  And was that a panel meeting?
2    A.  Yes, it was.
3    Q.  And were there recommendations made
4  by the panel?
5    A.  Yes.  If I recall correctly, and I
6  wish I had that document with me, but if I
7  recall correctly, the recommendation was to
8  reclassify those insertion instruments,
9  those types of medical devices as Class 2.
10    Q.  All right.  Now, how would that, if
11  it would, impact the TVT-O and your opinions
12  on TVT-O?
13         MR. GOSS:  Objection.  Form.
14         THE WITNESS:  They were still
15  reviewed, the instruments for insertion
16  for TVT-O were included in the review of
17  the -- in the 510(k).  So they were
18  included in the 510(k), reviewed for
19  clearance of the TVT-O.
20         But the instruments by
21  themselves had previously been
22  classified as Class 1.  When they're
23  reviewed as a part of the 510(k), then
24  they're reviewed.  Obviously, they were
25  included in the 510(k) submission as a

Page 36

1  Class 2 device.  They were reviewed, I
2  should say, in the same framework as a
3  Class 2 device.
4  BY MS. SUTHERLAND:
5    Q.  Okay.  Let me make sure I'm on the
6  same page with you for that.
7         For the instruments that are within
8  the TVT-O kit --
9    A.  That's correct.
10    Q.  -- for insertion, were those
11  instruments already reviewed as Class 2
12  because they were part of the 510(k)
13  submission on TVT-O?
14    A.  Yes.  Yes.  But if they were -- if
15  they were to be manufactured separately
16  outside of a kit, they would no longer be
17  considered Class 1.  They would be
18  considered a Class 2 as part of the 510(k).
19    Q.  Well, actually, have they been
20  reclassified?
21    A.  No.  There's a recommendation.  As
22  we know, that takes -- that's a process.
23    Q.  Some time.
24    A.  It takes some time.  But if, in
25  fact, FDA makes a determination that they

Page 37

1  will reclassify those instruments and they
2  reclassify them as Class 2, then they
3  become, if I recall correctly, the
4  recommendation would be that they would
5  require a 510(k) submission.
6    Q.  Okay.  Does Ethicon sell the
7  instruments separately?  Do you know?
8    A.  As far as I know as regards to
9  TVT-O, they're sold in the kit.
10    Q.  In the kit.
11    A.  Yeah.
12    Q.  All right.  So just with respect to
13  the TVT-O, would I be correct that even if
14  those instruments were reclassified as
15  Class 2, would that impact TVT-O?
16    A.  I think the real point is that the
17  instruments-- if I recall correctly -- do
18  you have a copy of the 510(k)?
19    Q.  I don't.  He may.
20    A.  If I recall correctly, I'd have to
21  look specifically in the TVT-O 510(k), but
22  many times you will see in the 510(k) that
23  the instruments are discussed as Class 1
24  devices by the manufacturer.  They are
25  reviewed -- when it's -- when they are

Peggy Pence, Ph.D.

Page 38

1  submitted as a part of a kit, obviously, a
2  510(k) has been submitted.  The FDA is
3  looking at the instruments as a part of the
4  510(k).
5       So even though they may have been
6  on their own considered Class 1 devices, the
7  FDA is looking at them within the framework
8  of the context of a 510(k).  I think the
9  significance of the finding or the
10  recommendation, I should say, of the
11  advisory committee that the instruments
12  require more than general controls, if they
13  require special controls to provide a
14  reasonable assurance of safety and
15  effectiveness which is the criteria to
16  define a Class 2 device, that there are --
17  that the instruments themselves, safety and
18  effectiveness issues need to be addressed
19  for the instruments as well.
20      Q.  And so would Ethicon need to do
21  something different with the TVT-O if those
22  instruments got reclassified?
23      A.  At this point in time, all I've
24  seen that's been published that I've seen is
25  the recommendations from the advisory

Page 39

1  committee.  Since these were marketed as
2  part of the kit, I don't anticipate that,
3  but I don't know until we see what FDA does,
4  unless they were to be marketed separately
5  from the mesh, for example --
6      Q.  Okay.
7      A.  -- then they would require a
8  separate 510(k).  But until FDA makes a
9  determination --
10      Q.  We don't know yet.
11      A.  -- we don't know yet.  And it might
12  be that FDA might come back and say, "We'd
13  like to see more information about the
14  insertion tools."
15      Q.  Or they may not.
16      A.  Or they may not.  Exactly.  It's
17  too early to tell, but certainly that was an
18  important advisory committee meeting in the
19  context of the TVT-O and other devices such
20  as this.
21      Q.  Did you attend the advisory
22  committee meeting?
23      A.  No, I didn't.
24      Q.  I'm sorry.  You shook your head
25  yes, but you said no.

Page 40

1      A.  Oh, I'm sorry.
2      Q.  Were you asked by FDA to be on the
3  advisory panel?
4      A.  No.
5      Q.  Was there more than one advisory
6  panel or just one?
7      A.  There was -- for this, my
8  understanding it was the latter part of
9  February, and there was, to my knowledge, as
10  I sit here today, there was one.
11      Q.  Okay.  And do you know which panel
12  it was?  And I'm sorry I don't have the
13  document in front of me.  I just don't know
14  if you recall.
15      A.  Yes.  I believe it was -- had to do
16  with urology, but I would have to look it
17  up.  As I say, it's in the binder that I
18  still don't have back.
19      Q.  You keep throwing that out there.
20  Come on.  We'll get it back.
21       Let me ask you a follow-up on
22  something you just said.  As I understand
23  it, you said the instruments had been
24  Class 1, and Class 1 are devices for which
25  general controls are sufficient --

Page 41

1      A.  Yes.
2      Q.  -- to demonstrate safety and
3  efficacy.
4      A.  Correct.
5      Q.  All right.  And then Class 2
6  devices, such as the TVT-O, are devices
7  where you need not only the general
8  controls, but there are special controls in
9  order to demonstrate safety and efficacy;
10  correct?
11      A.  That's correct.
12      Q.  All right.  What are the special
13  controls applicable to, for instance, a
14  device like the TVT-O to demonstrate safety
15  and efficacy so that the FDA can clear it?
16      A.  It varies by device.  For example,
17  there can be a special guidance documents or
18  various -- various procedures that are
19  required.  There can be certain types of --
20  in some cases, certain types of labeling
21  requirements.  There are some types of
22  post-market surveillance, certain types of
23  special controls.  There is the guidance
24  document, as you know, for the surgical
25  meshes.

11 (Pages 38 to 41)

Peggy Pence, Ph.D.

Page 42

1    Q. I was going to ask, is that the '99
2  surgical mesh guidance that you're talking
3  about?
4    A. Yes. That would be one.
5    Q. That would be one example of a
6  special control applicable to TVT-O?
7    A. That's correct.
8    Q. All right. Are there others
9  applicable to TVT-O?
10    A. I would have to look at the
11  classification index, for example, certain
12  standards like the ISO standards, voluntary
13  consensus standards, those can be -- certain
14  types of consensus standards. I need to
15  look at the classification regulation and
16  refresh my memory on that as to whether or
17  not there are any of those cited. The key
18  one, as I recall, is the 1999 guidance
19  document.
20    Q. Okay. And I'll be candid with you.
21  I'm not aware of another special control,
22  but I didn't know if you might know one off
23  the top of your head.
24    A. Well, in the guidance, in the
25  March 1999 guidance, I don't have a copy

Page 43

1  here in front of me, but it discusses
2  biocompatibility, for example, and the ISO
3  standard. So by inference, some of the
4  standards such as ISO standards are
5  addressed by the guidance document.
6    Q. Okay. And the ISO standards that
7  are referenced in that surgical mesh
8  guidance, am I correct that those have been
9  specifically adopted by FDA?
10    A. I'm sorry. Say again.
11    Q. Sure. The ISO standards that
12  you're referencing from the '99 surgical
13  guidance on surgical mesh, have those been
14  specifically adopted by FDA?
15    A. FDA actually has its own guidance
16  document where it discusses the ISO
17  standards. So that is, to the best of my
18  recollection, those have been adopted, but
19  it has its own -- generally speaking, they
20  have been adopted, but FDA also has its own
21  guidance document that addresses the ISO
22  1099-3 standard for biocompatibility.
23    Q. Okay. And then I'm thinking of
24  another ISO standard for some reason. Is
25  there a 141 --

Page 44

1    A. 55.
2    Q. 55? I was thinking 77. Is it
3  14155? Which ISO standard is that?
4    A. That is the clinical
5  investigations. Which one are you --
6    Q. I was thinking of a different one.
7  We'll come to it. All right. I got off my
8  outline as I tend to do.
9    A. No worries.
10    Q. Which lawyers are you working for
11  in this case?
12    A. Mr. Goss.
13    Q. And have you worked for Mr. Goss
14  before?
15    A. I have.
16    Q. About how many cases have you
17  worked with him on?
18    A. For mesh?
19    Q. I'll start with for mesh.
20    A. To the best of my recollection --
21    Q. You have a list.
22    A. I have a list. I can actually
23  verify my memory. At this point in time, it
24  appears to be five.
25    Q. Okay. And I'm glad you pulled that

Page 45

1  out. I'm going to mark that actually as
2  Exhibit 8, and I'm marking as Exhibit 8 your
3  deposition and trial testimony; is that
4  correct?
5    A. Yes.
6        (Exhibit Number 8 was
7        marked for identification.)
8  BY MS. SUTHERLAND:
9    Q. All right. Now, does this list,
10  your deposition and trial testimony, it
11  looks like from October of 2009?
12    A. I'm sorry. What was that question
13  again?
14    Q. Does this list, your deposition and
15  trial testimony, Exhibit 8, as of October,
16  2009?
17    A. Yes. That was my first deposition
18  that I've ever given.
19    Q. And that's up through, it looks
20  like, December 2015?
21    A. Yes. For trial testimony. And
22  deposition testimony is there as well. So
23  my deposition from two weeks ago is not
24  included --
25    Q. Right.

12 (Pages 42 to 45)

Peggy Pence, Ph.D.

Page 46

1    A. -- yet.
2    Q. Are there -- so it looks like your
3  deposition testimony ends in November
4  of 2015 on Exhibit 8.
5    A. Yes.
6    Q. Is the deposition that I did of you
7  two weeks ago the only deposition that
8  you've given to date in 2016?
9    A. Can I just take a look at that?
10   Q. Oh, sure.
11   A. Time goes so quickly. I have to
12 stop and think.
13   Q. Yeah, I know. We're just in March.
14   A. I know. To the best of my
15 recollection, as I sit here today, that's
16 correct.
17   Q. Okay. Just the one I did two weeks
18 ago?
19   A. Yes, that's correct.
20   Q. You can keep that in front of you.
21 I'm going to ask you a few more questions
22 while we're on the topic.
23       In looking at Exhibit 8, are you
24 able to tell me how many times you've
25 testified at trial in a pelvic mesh case?

Page 47

1    A. I believe it's nine but just let me
2  check that. Yes, nine.
3    Q. Okay. Nine trials?
4    A. Nine trials.
5    Q. For pelvic mesh?
6    A. Yes.
7    Q. And how many mesh manufacturers has
8  that involved?
9    A. Three.
10   Q. And who are they?
11   A. Ethicon, Boston Scientific, and
12 Bard.
13   Q. All right.
14   A. CR Bard.
15   Q. And which products have you
16 testified at trial for?
17   A. That would include for Bard, the
18 Align. Discussion about Avaulta came up,
19 but it was principally Align.
20   Q. Is Align a sling or a prolapse?
21   A. It's a sling.
22   Q. Okay.
23   A. And for Ethicon, it's included
24 Prolift, Prosima, TVT Abbrevo, TVT-O.
25   Q. What trial was that?

Page 48

1    A. TVT-O?
2    Q. TVT-O.
3    A. Batiste. Batiste. I think
4  that's -- those are the products for
5  Ethicon, and then for Boston Scientific, it
6  would have been Obtryx.
7    Q. Is that a sling?
8    A. Yes. And Pinnacle.
9    Q. Is Pinnacle a sling?
10   A. No.
11   Q. It's a prolapse?
12   A. It's a pelvic organ prolapse
13 device.
14   Q. All right. So for sling cases
15 where you've testified at trial, am I right
16 that it's the Align, the TVT-O, Obtryx, and
17 the Abbrevo?
18   A. Yes. And also for Boston
19 Scientific and the Scherer trial, it also
20 included the Solyx.
21   Q. Is that a sling?
22   A. Yes. It's a single-incision sling.
23   Q. Okay. And that was a trial?
24   A. Yes.
25   Q. Now, have you given deposition

Page 49

1  testimony in cases involving additional
2  products for pelvic mesh?
3    A. Yes.
4    Q. Can you tell me what those are?
5    A. Yes. For Boston Scientific, that
6  would have included the Uphold, which is a
7  pelvic organ prolapse device, and the
8  Prefix, which is a sling.
9       And for Ethicon, we already
10 addressed Prolift and Prosima. So those are
11 the two pelvic organ prolapse devices. I
12 think the only other sling about which I
13 have given deposition testimony is TVT from
14 Ethicon.
15   Q. Okay.
16   A. And then we've already addressed
17 Bard.
18   Q. Okay. So no additional products in
19 deposition testimony for Bard?
20   A. No. As I mentioned, I had an
21 Avaulta report which was the focus of the --
22 the focus of the deposition was Align, but
23 their Avaulta was also discussed, and my
24 report for Avaulta was also incorporated in
25 that deposition as an exhibit.

13 (Pages 46 to 49)

Peggy Pence, Ph.D.

Page 50

1    Q.  And is Avaulta a sling?
2    A.  No.  It's an pelvic organ prolapse
3  device.
4    Q.  Okay.  I'm just trying to make sure
5  I've got all the sling devices where you've
6  offered deposition or trial testimony, and
7  let me see if I've got them.
8    A.  Okay.
9    Q.  I have Align, TVT-O, Obtryx, TVT
10  Abbrevo, Solyx, Prefix, and TVT.
11    A.  Yes.
12    Q.  Okay.  And those are from three
13  different manufacturers?
14    A.  That's correct.
15    Q.  All right.  Does AMS also make a
16  sling product or they did?
17    A.  Yes.
18    Q.  All right.  Other than -- have you
19  offered any opinions in any AMS case?
20    A.  No, I have not.
21    Q.  Okay.  Is there another mesh
22  manufacturer that makes a sling?
23    A.  There are other manufacturers, yes,
24  that make slings.  Those --
25    Q.  Have you reviewed any of those

Page 51

1  manufacturers' documents?
2    A.  No, I have not.
3    Q.  All right.
4    A.  Other than in the context of doing
5  my report for the products that we've
6  discussed, I do research and go online
7  and look at 510(k) summaries of safety and
8  effectiveness for certain devices.
9       I've obviously looked at MDR
10  reports, which are included in a number of
11  my reports.  So publicly available
12  information or information that might be in
13  some of the records that have been produced
14  during discovery for the various cases.
15       I may have reviewed information
16  about some of the slings or press releases
17  or information that's publicly available,
18  but in terms of have I worked on other
19  manufacturers' sling products in the context
20  of reviewing confidential documents to --
21  and arrive at opinions, no, I have not done
22  that.
23    Q.  Have you reviewed that you can
24  recall any IFUs for slings other than the
25  seven that you and I have talked about?

Page 52

1    A.  No.
2    Q.  Okay.  I'm not meaning that to be a
3  trick question.  For instance, like if a
4  sling was a predicate for one of these other
5  products, typically that IFU is within the
6  510(k); right?
7    A.  Yes.  If you're talking about that,
8  yes.  In reviewing the 510(k)s.  I'm sorry.
9  I understood your question to be separately.
10    Q.  Yeah, and I'm not trying to, you
11  know, trick you on that.  But as you sit
12  here today, for instance, in addition to
13  these seven, would you have reviewed the
14  ProteGen IFU as it's the predicate for TVT?
15    A.  I don't recall.  I would have to
16  look back at the 510(k) to see if the
17  ProteGen IFU was included.
18    Q.  Okay.  I think it was, but as you
19  sit here today, you don't recall?
20    A.  I would have reviewed it if it was,
21  yes.
22    Q.  Do you recall any other IFUs that
23  might have been within the 510(k)s of these
24  seven other products that you might have
25  reviewed?

Page 53

1    A.  The predicate -- the predicate
2  devices for those products.
3    Q.  Okay.  I mean, do you recall what
4  they were?
5    A.  Well, certainly, TVT-O's predicates
6  were the TVT, the TVT device.
7    Q.  Yeah.  But you reviewed that
8  because that's one of your products; right?
9    A.  Exactly.  And then similarly -- let
10  me just take a moment.  So --
11    Q.  Can I tell you why I'm asking that?
12    A.  Sure.  Sure.
13    Q.  I'm just asking if there's one that
14  stands out to you that you know you reviewed
15  that's not one of these seven sling products
16  that you and I have already talked about.
17    A.  No.  Many of them, as you know,
18  they all go back -- they go back ultimately
19  to the ProteGen.
20    Q.  Right.
21    A.  Ultimately in the hierarchy and the
22  substantial equivalence decision tree, is
23  they typically all go back to the ProteGen
24  because then TVT relied on the ProteGen for
25  its clearance, and then some of these later

14 (Pages 50 to 53)

Peggy Pence, Ph.D.

Page 54

1  devices reference -- including TVT-O
2  references the TVT.
3          And the advantage I would have --
4  for example, the Advantage meshes, I would
5  have reviewed their -- for Boston
6  Scientific, I would have reviewed their
7  IFUs.
8      Q.  Is Advantage a sling?
9      A.  Yes.  Advantage and Advantage Fit.
10  I would have reviewed those.
11      Q.  All right.  And Advantage Fit?
12      A.  Yes.
13      Q.  Any others that kind of pop in your
14  mind?
15      A.  Without checking back, I can't
16  recall for sure.  I may have -- I may have
17  looked at Monarc or --
18      Q.  SPARC?
19      A.  Pardon me?
20      Q.  SPARC?
21      A.  SPARC possibly.  MiniArc.  Without
22  checking back, I can't confirm, but I may
23  have looked at those.
24      Q.  Okay.  All right.  And so now as we
25  sit here today, we've got one, two, three,

Page 55

1  four, five, six, seven, eight, nine slings
2  where you think you've reviewed the IFU for
3  those slings?
4      A.  Yes.
5      Q.  All right.  Now, out of those nine,
6  did you ever determine that the IFU was
7  adequate?
8      A.  No.  I found them all to be
9  inadequate.
10      Q.  All right.  Is there any IFU for a
11  sling product today that you believe is
12  adequate?
13      A.  There are some that are improved
14  over what they were, but they're still --
15  for example, in the --
16      Q.  Can I get a yes or no to the
17  question first?  Are there any IFUs for a
18  sling product today that you believe are
19  adequate?
20      A.  Well, as we already mentioned, I
21  have not reviewed all sling IFUs.
22      Q.  The ones you have.
23      A.  So I can only speak to the ones
24  that I have reviewed.
25      Q.  Right.

Page 56

1      A.  The ones that I have reviewed, and
2  I have not -- for some of these products
3  where I have not done an updated report, if
4  there have been changes since I last opined
5  about it, I may not have seen any updates to
6  labeling to the IFUs.
7          For those that I have seen, for
8  example, the TVT-O, there are improvements,
9  and some of the information that I, in fact,
10  included in my reports going back to even,
11  if I recall correctly, 2013, information
12  that I documented then that should have been
13  included in the IFU has since been included.
14      Q.  Is it adequate?
15      A.  No.  And as I stated in my
16  supplemental report, which we've marked as
17  Exhibit 6, there are still -- there is still
18  missing information as regards safety and
19  risk even in the updated 2015 IFU for TVT-O.
20      Q.  Okay.  So to get a clean question
21  and answer, if I could, is there any IFU
22  that you've reviewed, even up to the present
23  day, that you consider adequate?
24      A.  No.
25      Q.  Okay.  And I don't know if I -- I

Page 57

1  was talking about sling IFUs.  You knew
2  that; right?
3      A.  Yes.  Yes.
4      Q.  All right.  What is your hourly
5  rate for work?
6      A.  $500 an hour.
7      Q.  Is that for deposition and review
8  of documents?
9      A.  Yes.
10      Q.  All right.  Are you charging 500 an
11  hour today?
12      A.  Yes.
13      Q.  Do you have a -- if you're here all
14  day, do you have an amount that you charge
15  for the entire day that's different than
16  your hourly rate?
17      A.  No.
18      Q.  Did you meet with plaintiff counsel
19  before today in order to prepare for your
20  deposition?
21      A.  Yes.
22      Q.  All right.  What did you do when
23  you met with him?
24          MR. GOSS:  Are you asking her
25      what we talked about?

15 (Pages 54 to 57)

Peggy Pence, Ph.D.

Page 58

BY MS. SUTHERLAND:
1
2       Q.  What did you review?
3           MR. GOSS:  What did you review?
4       Okay.
5           THE WITNESS:  We talked about
6       GHTF.
7           MR. GOSS:  Wait a minute.
8           THE WITNESS:  Oh, sorry.
9       BY MS. SUTHERLAND:
10      Q.  Keep going, though.
11          No, what documents did you review?
12          MR. GOSS:  Listen, I'm going to
13      instruct you not to answer that
14      question.  There's an agreement, as I
15      understand it, that we're not getting
16      into each other's discussions with
17      experts beforehand and what we showed
18      experts beforehand.  That's my
19      understanding.  If you want to --
20          MS. SUTHERLAND:  I'll check at
21      a break because I don't know.
22          MR. GOSS:  At a break, maybe if
23      you want to check but --
24          MS. SUTHERLAND:  Right now
25      you're instructing her?

Page 59

1           MR. GOSS:  Right now I'm
2       instructing her not to answer because I
3       certainly know there's agreements about,
4       you know, drafts reports and things like
5       that.
6           MS. SUTHERLAND:  I'm not asking
7       about draft reports.  I was asking her
8       what she looked at to prepare for her
9       deposition today, and if you're
10      instructing her not to answer that --
11          MR. GOSS:  I'm instructing her
12      not to answer.  I object to foundation
13      and --
14          MS. SUTHERLAND:  -- then I'll
15      ensure that we're on the same page.
16          MR. GOSS:  -- I'm instructing
17      her not to answer.
18      BY MS. SUTHERLAND:
19      Q.  Well, did you review any documents
20      to prepare for your deposition today?
21          MR. GOSS:  Same objection.
22          MS. SUTHERLAND:  Are you
23      instructing her not to answer that?
24          MR. GOSS:  Instructing Ms.
25      Pence not to answer.

Page 60

BY MS. SUTHERLAND:
1
2       Q.  How many times did you meet with
3       counsel to prepare for your deposition
4       today?
5       A.  Just once.
6       Q.  And when was that?
7       A.  Yesterday afternoon.
8       Q.  And how long did you all meet?
9       A.  Two-and-a-half to three hours.
10      Q.  And where did you meet?
11      A.  Here.
12      Q.  How much time have you put into the
13      Jennifer Ramirez case?
14      A.  In anticipation of your asking me
15      that, I attempted to evaluate that last
16      night.  As you know, there's a lot of
17      crossover between the reports and what's
18      relevant to her case as well.  Specific to
19      her case and, as you know, also this case
20      has been continued a couple of times and, in
21      fact, preparing for deposition on another
22      occasion and it ended up being canceled
23      towards the time that it was supposed to
24      occur, if I'm recalling correctly as I sit
25      here today.

Page 61

1           So I went back and looked at that
2       time, and to the best I'm able to estimate
3       it at this point in time, it was
4       approximately 107 hours specific for this
5       case.
6       Q.  Okay.  Now, would that include, for
7       instance, time spent on your supplemental
8       TVT-O report from March, 2016?
9       A.  No.
10      Q.  All right.  So that would be --
11      since this is now part of your opinions in
12      this case, would that be additional time?
13      A.  Yes.
14      Q.  Do you know how much that would be?
15      A.  I think at the last deposition that
16      I included the preparation for this in
17      the -- in a total of time that I gave you
18      because I put two supplemental reports
19      together in close proximity, and I didn't
20      separate out how much time for this report
21      specifically.  I haven't billed for that
22      yet; so I can't give you a specific answer.
23      Q.  Have you submitted any invoices for
24      the Jennifer Ramirez case?
25      A.  No.

16 (Pages 58 to 61)

Peggy Pence, Ph.D.

Page 62

1    Q.  Are you hoarding them up to give
2  them one painful invoice at the end?
3    A.  I often -- I often wait until a
4  case is finished or a project is finished
5  and bill at the end.  That's one way that I
6  frequently bill.
7    Q.  And you keep up with your hours
8  how?  Since this case has been going on for
9  so long, how do you keep up with your hours
10  on it?
11    A.  They get recorded -- ultimately,
12  they get recorded from -- I document my
13  hours, and then they get put into
14  QuickBooks.
15    Q.  Okay.  And have other people at
16  Symbion billed on the Jennifer Ramirez case?
17    A.  Yes.
18    Q.  And are you including their time in
19  your time when you tell me about 107 hours?
20    A.  No.  That's my time.
21    Q.  All right.  Do you know how much
22  time -- first of all, let me ask you this:
23  How many other people have worked on the
24  Jennifer Ramirez case for you?
25    A.  Again, because this has been

Page 63

1  ongoing for probably a couple of years, if I
2  recall correctly, I would need to go back
3  and just double-check, but I would
4  anticipate that or I would believe that at
5  least -- at least three to four other people
6  have worked on this case at one point in
7  time or another.
8    Q.  Okay.  You don't know, like, a
9  ballpark their hours?
10    A.  No.  I didn't look at that.
11    Q.  Okay.  Is that something you could
12  look at?
13    A.  Yes.
14    Q.  Do you know overall how many hours
15  you've put in to the pelvic mesh litigation
16  against Ethicon and J&J?
17    A.  No.
18         MR. GOSS:  Objection.  Form.
19         THE WITNESS:  Not without going
20    back and tallying it.
21  BY MS. SUTHERLAND:
22    Q.  Okay.  Do you know how much money
23  you've billed for in the pelvic mesh
24  litigation against Ethicon and J&J?
25    A.  Again, not without going back and

Page 64

1  actually totalling it.
2    Q.  Do you know if it's more than
3  a million?
4         MR. GOSS:  Objection.  Form.
5         THE WITNESS:  Not without going
6    back and tallying it.  I don't think
7    it's more than a million, but I wouldn't
8    want to rely on that with great fact in
9    doing my calculations.
10  BY MS. SUTHERLAND:
11    Q.  Okay.  Do you have that information
12  available in your QuickBooks?
13    A.  Yes.
14    Q.  All right.  And so that's -- would
15  it be an undue burden to find that out for
16  me?
17    A.  Sure.  I can find that out.
18    Q.  Mean it would not be an undue
19  burden?
20    A.  No.  I'm sorry.
21    Q.  No worries.
22         And when I talk about the pelvic
23  mesh litigation against Ethicon and J&J, you
24  know I'm talking about both your work on the
25  prolapse products as well as the sling

Page 65

1  products?
2    A.  Yes.  Yes.
3    Q.  Okay.  Do you know how many
4  documents you've reviewed in the pelvic mesh
5  litigation for Ethicon and J&J?
6    A.  Thousands.
7    Q.  Okay.  Do you know how many
8  documents Ethicon and J&J have produced in
9  the pelvic mesh litigation?
10    A.  I'm sure it's millions.  As you can
11  see from the size of the Appendices B and
12  the reliance list that we've just discussed
13  today, over the period of time, I'm sure
14  I've reviewed over the period of since 2012
15  working on Ethicon mesh litigation, when I
16  say thousands, I'm not talking about a
17  couple of thousand.  Huge numbers of
18  documents and huge numbers of pages.
19    Q.  If Ethicon and J&J have produced
20  nearly 25 million pages of documents in this
21  litigation, do you know, just ballpark, what
22  your number of pages would compare with
23  that?
24         MR. GOSS:  Objection.  Form.
25         THE WITNESS:  I don't know what

Peggy Pence, Ph.D.

Page 66

1    percentage.  I know -- you can see from
2    the volume the size of the -- I'll just
3    reiterate what I said a few moments ago,
4    you can see from the volume of the
5    reliance list the numbers of documents
6    that have been reviewed.
7    BY MS. SUTHERLAND:
8        Q.  Do you think it's been a million
9    pages?
10       A.  It may be.  I just don't have a
11   number to give you.  I can only say it's
12   been a very large volume of documents, and I
13   have cabinets full of binders as well as
14   what I have archived electronically.
15       I have multiple cabinets full of
16   binders of TVT and TVT-O and Prolift and
17   Prosima and TVT Abbrevo.
18       Q.  And those multiple binders you're
19   talking about would be on the exhibit lists,
20   the reliance lists that we've marked today?
21       A.  Yes.  Yes.  Because I'm still old
22   school enough that I like to use hard copy
23   as well as electronic copies.
24       Q.  Do you know that you have not
25   reviewed all of the documents produced by

Page 67

1    Ethicon and J&J in this litigation?
2            MR. GOSS:  Objection.  Form.
3            THE WITNESS:  It's my
4    understanding that I wouldn't have
5    reviewed all of the documents that have
6    been produced.
7    BY MS. SUTHERLAND:
8        Q.  Okay.
9        A.  But the ones that are relevant to
10   my opinions, I have reviewed.
11       Q.  Do you know what percentage of your
12   income has come from expert consulting work
13   in the past five years?
14       A.  I haven't averaged it over the last
15   five years.  I have provided testimony on
16   that before in previous -- in previous
17   depositions and at trial, if I recall
18   correctly.  Certainly in depositions.
19       When I first began product
20   liability litigation work, I was first
21   contacted the latter part of 2008 and really
22   began doing work in 2009 to any great
23   extent.  And it's progressed from -- to the
24   best of my recollection as I sit here today,
25   I think what I've indicated is it may have

Page 68

1    been around 5 percent or less in 2008, and
2    then over the period of time, it moved to
3    maybe 20 percent.  And because, as we were
4    discussing earlier, the mesh litigation is
5    so large, and there's been -- it's at a
6    point in time when there are so many cases
7    going to trial and so much happening in the
8    litigation that my time involved in
9    litigation work has certainly increased over
10   the last -- over the last couple of years.
11       I think my testimony -- I may have
12   said maybe greater than 50 percent, and it
13   depends really on the -- what's going on,
14   what's happening at any particular time.
15   Sometimes it's higher than that.  Sometimes
16   it may be less than that.
17       I'm teaching, and I'm getting ready
18   to start class again.  When I'm teaching,
19   that takes up a large part of my time, and I
20   work on other projects as well.  So it
21   really depends on what's happening.
22       Sometimes it -- in certain weeks,
23   it may be all encompassing.  Almost.  Not
24   entirely.  But in other weeks, I'll be
25   focused on teaching and not do anything on

Page 69

1    the litigation side.
2        Q.  Do you think it was over 50 percent
3    last year?
4        A.  Yes.  I think that's fair.
5        Q.  All right.  So far this year, has
6    it been over 50 percent?
7        A.  So far this year, yes.
8        Q.  Okay.  Do you know by how much over
9    50 percent?
10       A.  No.  I haven't done a calculation.
11       Q.  And has your work been for
12   plaintiffs?
13       A.  Yes.
14       Q.  Consistently since you started
15   consulting in 2008?
16       A.  No.
17       Q.  All right.  When did it become
18   consistent for plaintiffs?
19       A.  Without checking back the dates, I
20   can't give you an exact date.  The point is
21   I evaluate each case.  If what you're asking
22   is do I only work for plaintiffs, I evaluate
23   each case, and I take -- I don't take every
24   case that I'm asked about.
25       So I evaluate to see if whether or

Peggy Pence, Ph.D.

Page 70

1  not the opinions that I would be -- are the
2  allegations that are being made based on
3  what I can review are something that I
4  believe that I could support, that my
5  opinions based on what I review would be
6  consistent with what counsel -- counsel's
7  claims are.
8      If they're not, I don't take the
9  case.  I don't --
10     Q.  In the -- I'm sorry.  Were you
11 done?
12     A.  I was just going to say I'm very --
13 I will not testify or take any case if my
14 opinions are not 100 percent consistent with
15 the claims that are being made.
16     If I review those, and I think that
17 there's an issue, I don't take the case.  I
18 have to believe and stand behind my
19 opinions.
20     Q.  Okay.  In the past five years, have
21 you taken a case for a defendant?
22     A.  Yes.
23     Q.  Okay.  Who was that?
24     A.  It was for -- it was a pain -- it
25 was a pain pump case, and it was --

Page 71

1      MR. GOSS:  Can we take a
2  bathroom break after this line of
3  questioning?
4      MS. SUTHERLAND:  Yeah, yeah.
5  Time flies.
6      MR. GOSS:  Too many Diet Cokes
7  this morning.
8      THE WITNESS:  It was a
9  contractual issue between one pain pump
10 manufacturer and DJO.
11 BY MS. SUTHERLAND:
12     Q.  Okay.  Let me change my question.
13     A.  Okay.
14     Q.  Because I'm really just interested
15 in product liability cases where a plaintiff
16 is alleging they got hurt.
17     Have you worked for a defendant in
18 a product liability case in the past five
19 years?
20     A.  No.
21     Q.  All right.  Have you turned down a
22 pelvic mesh case that you were asked to
23 review?
24     A.  Not a pelvic mesh case, no.
25     Q.  All right.  So every pelvic mesh

Page 72

1  case that you've been asked to opine about
2  you, in fact, have opined about.  Is that
3  fair?
4      A.  After reviewing the information and
5  seeing whether or not my opinions would be
6  consistent with the claims that -- yes.
7      Q.  Okay.  So the answer to my question
8  is yes?  Every pelvic mesh case you've been
9  asked about, to opine about you have, in
10 fact, opined about?  Is that fair to give me
11 a yes or no?
12     A.  To the best of my recollection as I
13 sit here today, yes.
14     Q.  Okay.
15     MS. SUTHERLAND:  Let's, yeah,
16 let's take a break.
17     THE VIDEOGRAPHER:  With the
18 approval of counsel, going off the
19 record.  The time is approximately
20 10:53 a.m.
21     (Recess taken from
22 10:53 a.m. to 11:01 a.m.)
23     THE VIDEOGRAPHER:  With the
24 approval of counsel, back on the record.
25 The time is approximately 11:01 a.m.

Page 73

1  BY MS. SUTHERLAND:
2      Q.  Dr. Pence, sooner or later, we're
3  going to get into your opinions in this
4  case.
5      Have you published any of your
6  opinions that you're intending to offer in
7  this case?
8      A.  No.
9      Q.  Have you ever spoken with any
10 scientist about the opinions you intend to
11 offer in this case?
12     A.  If you can clarify your question, I
13 am a scientist; so I'm not sure what the
14 question is.
15     Q.  Well, other than talking to
16 yourself, have you talked with any other
17 scientist about your opinions in this case?
18     A.  I've not talked with any other
19 scientists.  I've certainly read deposition
20 testimony.  I've read expert reports.  I've
21 read internal documents of Ethicon's own
22 scientist.
23     Q.  Have you talked -- and I'm talking
24 about talked.  I understand what you've read
25 and what's on your reliance list.  Have you

Peggy Pence, Ph.D.

Page 74

1  talked with any engineers about your
2  opinions in this case?
3      A.  No, I have not.
4      Q.  All right.  And then other than
5  physicians that are paid by plaintiffs to be
6  expert witnesses, have you talked with any
7  physicians about your opinions that you're
8  intending to give in this case?
9          MR. GOSS:  Objection.  Form.
10          THE WITNESS:  I haven't talked
11      with physicians about my opinions in
12      this case, including those, as you
13      noted, that are paid by plaintiffs for
14      this particular case.  My opinions are
15      based on my review of the deposition --
16      a number of depositions of both Ethicon
17      employees as well as the depositions
18      that are referenced in the reliance list
19      that we went through earlier, internal
20      documents, standards, and an integration
21      of all that information and analysis to
22      arrive at my opinions.
23  BY MS. SUTHERLAND:
24      Q.  Right.  My -- with all due respect,
25  I'm going to move to strike.

Page 75

1          But my question is:  Just did you
2  talk with any physicians about your opinions
3  in this case?
4      A.  No.
5      Q.  And, obviously, you've offered
6  opinions on the adequacy of IFUs in pelvic
7  mesh cases, including this one; correct?
8      A.  Yes, that is correct.
9      Q.  All right.  Now, as I understand
10  it, you have talked with plaintiff expert
11  physicians about pelvic mesh IFUs; is that
12  right?
13      A.  Can you clarify your question?
14      Q.  Yeah.  I thought you had testified
15  in one case earlier that you had talked with
16  Dr. Rosenzweig about an IFU in a pelvic mesh
17  case.
18          Do you recall talking to him about
19  an IFU?
20      A.  No.  I think, to the best of my
21  recollection as I sit here today, what you
22  may be referring to is I was asked whether I
23  had spoken to any physicians about pelvic
24  mesh issues, and I would have mentioned
25  Dr. Rosenzweig and Dr. Margolis.

Page 76

1      Q.  Yeah.
2      A.  But I didn't talk with them about
3  what should be in an IFU specifically, no.
4      Q.  Okay.  Let me ask it cleanly.
5          Have you talked with any physicians
6  about the opinions you have expressed in the
7  pelvic mesh litigation about IFUs?
8      A.  As I understand your question, no.
9      Q.  Okay.  All right.  Is it fair to
10  say that the opinions that you're going to
11  opine about in the Jennifer Ramirez case you
12  developed specifically for litigation?
13      A.  Let me answer that this way:  I was
14  asked to review the relevant documentation
15  and deposition testimony related to the
16  clearance and marketing of the TVT-O and
17  whether or not Ethicon met the standard of
18  care for not only preparation of the IFU but
19  for testing, its responsibilities for
20  post-market surveillance, and so forth.
21          As a part of being a regulatory
22  affairs professional, if you look at -- and
23  I'm a RAPS fellow, and the reason I bring
24  that up is because there is a level of
25  experience in order to achieve that level

Page 77

1  that one must meet, and a part of that is
2  being able to evaluate package inserts,
3  instructions for use, labeling, and know
4  what goes in labeling.  That's part of my
5  credentials.
6          So I evaluated all of the
7  information that I -- as I mentioned,
8  deposition testimony, internal documents,
9  what the company knew or didn't know,
10  scientific and medical -- what the company
11  knew or didn't know based on their own
12  internal documents, or what they should have
13  known, scientific literature, the publicly
14  available MAUDE database, not only for its
15  own products but for other products where
16  complications and other safety issues have
17  been reported.
18          I evaluated all of that in the
19  context of FDA regulations as well as global
20  industry standards and my experience and
21  knowledge, based on the level 4 experience
22  that I have as a regulatory affairs
23  professional and product development
24  scientist in the medical device world, and
25  that's how I arrived at my opinions as

Peggy Pence, Ph.D.

Page 78

1  regards what should have been in the
2  labeling and was missing from the labeling.
3      Q.  Okay.  And I'm not quite sure you
4  answered my question.  Let me ask it this
5  way:  The items that you just told me about
6  that you reviewed, you did that because
7  plaintiff's lawyers asked you to?
8      A.  They asked me to review the
9  documentation and arrive at opinions.
10     Q.  Right.
11     A.  I told them the kinds of
12 information that I needed to review, and I
13 did some of my own independent research as
14 well.
15     Q.  Okay.
16     A.  And then, of course, I know the
17 standards that are applicable.
18     Q.  Right.
19     A.  And it was based on that that I
20 arrived at my opinions, but I was asked to
21 let counsel know what my opinions would be.
22     Q.  And that whole process of this
23 review of pelvic mesh documents, et cetera,
24 began because plaintiff lawyers asked you
25 for your opinions; correct?

Page 79

1      A.  Yes.  Just as it would be the --
2  but it would be the same type of
3  methodology, the same type of process.
4      Q.  I'm just asking how the process got
5  started --
6          MR. GOSS:  Please let her
7      finish her answer.
8          THE WITNESS:  In a consulting
9      agreement with the client where I would
10     be helping them with developing their
11     labeling, I would undertake the same
12     type of evaluation and say, "No, this is
13     what we need to put in the labeling for
14     it to meet the standard of care for the
15     purpose of medical device labeling."
16 BY MS. SUTHERLAND:
17     Q.  Okay.  I think I'm going to move to
18 strike everything after "yes" because my
19 question really was you started this process
20 because plaintiff lawyers asked you to.
21 Isn't that fair?
22         MR. GOSS:  Objection.  Form.
23         THE WITNESS:  It's a fair
24     question, but I think it needs to be
25     characterized that the process that I

Page 80

1  followed is the very same methodology
2  and process that I follow for a
3  pharmaceutical or medical device client
4  where I'm assisting them with labeling.
5  BY MS. SUTHERLAND:
6      Q.  And I got that.  My question is:
7  Didn't that process start, in fairness,
8  Dr. Pence, because plaintiff lawyers asked
9  you to?
10         MR. GOSS:  Objection to form.
11 BY MS. SUTHERLAND:
12     Q.  Isn't that true?
13     A.  For the mesh products, that is
14 true.  That was -- that was what I was asked
15 to review the information, let them know
16 what my opinions would be.
17     Q.  FDA didn't ask you for your
18 opinions on pelvic mesh; correct?
19     A.  No, they did not.
20     Q.  And no mesh manufacturer asked you
21 for your opinions on pelvic mesh; right?
22     A.  No, they have not.
23     Q.  All right.  So the folks that have
24 asked you for your opinions on pelvic mesh
25 have been plaintiff lawyers?

Page 81

1      A.  Yes.  That said, the 2015 update to
2  the labeling for TVT and TVT-O reflects much
3  of what I -- a number of the -- all of the
4  safety information that I stated in my
5  report was missing and should have been
6  included, and that now has been included.
7          MS. SUTHERLAND:  Okay.  I'm
8      going to move to strike everything after
9      "yes."
10 BY MS. SUTHERLAND:
11     Q.  Are you intending to offer any
12 specific causation opinion in the Jennifer
13 Ramirez case?
14     A.  No.
15     Q.  All right.  Are you intending to
16 offer any general causation opinion in the
17 Jennifer Ramirez case?
18     A.  No.
19     Q.  All right.  Are you intending to
20 offer an opinion on manufacturing defect in
21 the Jennifer Ramirez case?
22         MR. GOSS:  I'm sorry.  Can you
23     repeat that?
24         THE WITNESS:  Do you want me to
25     rephrase it?

Peggy Pence, Ph.D.

Page 82

1          MR. GOSS:  Yes.
2  BY MS. SUTHERLAND:
3      Q.  Are you intending to offer a
4  manufacturing defect opinion in the Jennifer
5  Ramirez case?
6          MR. GOSS:  Objection.  Form.
7          THE WITNESS:  If you are asking
8      about -- and I recall a similar question
9      a couple of weeks ago, I believe.  If
10     you're asking about the manufacturing
11     process itself, maybe you can clarify,
12     or are you asking about whether or not
13     the product degrades, whether or not --
14  BY MS. SUTHERLAND:
15     Q.  Yeah.  It's the same thing I did
16  two weeks ago.  I'm not asking you about
17  defects like degradation, roping, curling,
18  et cetera, that other plaintiffs' experts
19  have opined about.
20         My question to you is for the lot
21  or batch that Mrs. Ramirez, this TVT-O came
22  out of, do you have any opinions that you
23  intend to offer about the manufacturing
24  processes for that batch?
25     A.  I intend to offer opinions, if

Page 83

1  asked, about the fact that that lot, that
2  there had been complaints about that lot for
3  mesh fraying.
4      Q.  And what opinions, if asked, are
5  you going to give on that particular topic?
6      A.  That there was no testing that was
7  ever done, that this was -- this batch, as
8  well as other batches, were known to fray
9  and have particle loss.  There were
10  complaints about particle loss.  Some of
11  Ethicon's own experts advised that they --
12  that some physicians, when they saw those
13  particles, would stop and use another sling
14  because they were concerned about those
15  particles, the migration of those products
16  potentially causing pain.
17         There were reports of those
18  particles migrating into the vaginal wall
19  and causing pain.  There's documentation
20  within Ethicon's own records that they did
21  not recommend the use of a product and that
22  this was -- in fact, there's deposition
23  testimony that says this -- on behalf of
24  Ethicon that says that the fraying was a
25  product defect.

Page 84

1      Q.  So, again, just getting back
2  specific to Mrs. Ramirez's batch --
3      A.  Yes.
4      Q.  -- is what you're going to offer
5  that there were reports or devices returned
6  from her same batch?
7      A.  There were at least two complaints
8  about the batch from which her sling was
9  made of fraying particle loss.
10     Q.  Okay.  Did Dr. -- who is the
11  implanter in this case?
12     A.  Cesar Reyes.  Dr. Cesar Reyes.
13     Q.  Okay.  Did Dr. Reyes in his
14  deposition -- did he mention anything about
15  noticing any fraying of the TVT-O before he
16  implanted it?
17     A.  To the best of my recollection, he
18  did.
19         MR. GOSS:  I'm sorry.  Can you
20     repeat that?
21         MS. SUTHERLAND:  Was that an
22     objection?
23         MS. VERBEEK:  Yes.
24         THE REPORTER:  Can you repeat
25     the objection?

Page 85

1          MS. VERBEEK:  I objected to the
2      form of the question.
3          THE REPORTER:  Thank you.
4          MR. GOSS:  I don't recall.  Do
5      we have an agreement that an objection
6      for one is good for all?
7          MS. SUTHERLAND:  I would assume
8      that'd be fine.  Instead of tag teaming
9      me, I'd be fine with that.
10         MR. GOSS:  There you go.
11  BY MS. SUTHERLAND:
12     Q.  Do you want me to restate my
13  question?
14     A.  Yes.  Thank you.
15     Q.  Did you review Dr. Reyes'
16  deposition?
17     A.  Yes, I did.
18     Q.  All right.  Do you recall whether
19  or not he testified about noticing any
20  fraying of the TVT-O tape before he
21  implanted it in Mrs. Ramirez?
22     A.  Yes.
23     Q.  What did he say?
24     A.  As I sit here today, what I recall
25  is that he did not notice any particle loss.

Peggy Pence, Ph.D.

Page 86

1    Q.  Okay.  I'm trying to think how to
2  phrase this one.  Are you intending to offer
3  an opinion that because there were reports
4  received within her same batch, that
5  Mrs. Ramirez's TVT-O must have frayed as
6  well?
7    A.  The potential was there.  It's
8  in -- the potential was there for fraying,
9  roping, curling, and a degradation of the
10  mesh structure with any type of stretching.
11    Q.  Okay.  I'm talking specifically,
12  though, because I think your report
13  mentioned those two other reports from the
14  batch.
15    A.  Yes.
16    Q.  And my question is -- I understand
17  all that, that the opinions on degradation,
18  roping, curling, fraying that are generic to
19  TVT and the Prolene.  My question is a
20  little more specific as to Mrs. Ramirez and
21  her specific batch, and my question is:  Are
22  you intending to offer an opinion that
23  because of these two other reports from the
24  batch about fraying, that her,
25  Mrs. Ramirez's TVT-O must also have frayed

Page 87

1  based on those two reports?
2    A.  A couple of points to be made.  We
3  know that there were other slings in that
4  batch, as you've just described, that did
5  fray, although Dr. Reyes testified that he
6  didn't see that.  He was not aware, based on
7  his testimony, that there was also a
8  laser-cut mesh.
9      Ethicon did not -- never did tell
10  doctors that had noticed this fraying about
11  the issues with fraying and roping and
12  curling.  So whether or not Dr. Reyes
13  actually looked for that, only Dr. Reyes can
14  know.  And as I sit here today to the best
15  of my recollection, I don't believe there
16  was a lot more discussion about whether or
17  not he saw any particle loss or fraying
18  other than that.
19      Whether or not he actually looked
20  in the packaging to see if there were any
21  particles, I don't know.  I only know what
22  he testified to.  My point being that also
23  on stretching, just the stretching that
24  occurs with implanting it, it could have
25  frayed.  We know it was, in that particular

Page 88

1  batch, that already there were other
2  complaints.
3      So if asked, I will testify that
4  that certainly was a -- you know, could have
5  happened.  And not only that, but there's
6  much documentation that says this was in --
7  the fraying and the particle loss was
8  inherent in the mesh, the mechanically cut
9  mesh, which was the whole impetus for the
10  development of the laser-cut mesh.  So it's
11  inherent, by Ethicon's own words, in the
12  mechanically cut mesh, and then for her
13  particular batch, for there to have been
14  other complaints, there certainly was a
15  potential that on implantation, even if
16  Dr. Reyes didn't notice fraying at the time
17  he took it out to implant it, that it could
18  have frayed, and there could have been
19  particle loss, and as I mentioned, there
20  have been complaints of particle loss -- the
21  particles that are lost migrating into the
22  vaginal wall causing pain and causing pain
23  on -- dyspareunia.
24    Q.  Let me try it this way:  Are you
25  going to say that Mrs. Ramirez's tape was

Page 89

1  frayed because of these other two reports?
2    A.  I can't say it was frayed because I
3  wasn't there.
4    Q.  Okay.
5    A.  But what I can say is the company
6  knew that this was a defect in the product.
7  The company knew that this happened often,
8  and for this particular batch, they had
9  specific complaints that showed it was an
10  issue with fraying from this batch.  So
11  there was certainly a potential for fraying
12  when it was implanted.
13    Q.  Okay.  I'm going to move to strike
14  everything after "I can't say it was
15  frayed."
16      Let me ask you -- changing gears.
17  Let me ask you this:  Obviously, you've got
18  a number of opinions in this case.
19    A.  Yes.
20    Q.  Have you conducted any studies to
21  support your opinions in this case?
22      MR. GOSS:  Objection.  Form.
23      THE WITNESS:  Can you clarify
24    what you mean?
25  BY MS. SUTHERLAND:

Peggy Pence, Ph.D.

Page 90

1    Q.  Sure.  Other than reviewing
2  documents and obviously applying your
3  expertise and your experience, have you
4  otherwise conducted any studies to
5  substantiate any of your opinions in this
6  case?
7            MR. GOSS:  Objection.  Form.
8            THE WITNESS:  If you're asking
9      if I've conducted animal studies or
10     clinical studies, no, I've not.
11  BY MS. SUTHERLAND:
12     Q.  Have you conducted any surveys of
13  physicians to substantiate any of your
14  opinions?
15            MR. GOSS:  Objection.  Form.
16            THE WITNESS:  Specific to this
17     case, no.
18  BY MS. SUTHERLAND:
19     Q.  All right.  Have you conducted any
20  surveys of women at all -- I'll leave it
21  broad like that.  Have you conducted any
22  surveys of women to substantiate your
23  opinions in this case?
24     A.  Can you be more specific?
25     Q.  I'll give you an example.  For

Page 91

1  instance -- and we'll get into it.  One of
2  your opinions, as I understand it, is that
3  the patient brochure is misleading.
4            For example, have you conducted a
5  survey of women who have read the patient
6  brochure to get their perceptions on that
7  patient brochure?
8     A.  The best answer I can give you on
9  that is no, I've not done the survey.
10  However, Meng Chen, Dr. Meng Chen, for
11  example, discussed patients with whom she
12  had spoken who had complaints who said that
13  based on what doctors were telling them and
14  based on the literature that was available,
15  that they were disappointed that neither
16  doctors nor Ethicon had been able to tell
17  them all the potential risks because they
18  did not feel that the potential -- that the
19  risk and the benefit were adequately
20  explained to them, and had they understood
21  the risk, they would have made a different
22  decision.
23            And that comes from complaints of
24  women made directly to Ethicon who did not
25  feel that they were getting the appropriate

Page 92

1  information, and Ethicon, as the
2  manufacturer, has a responsibility to
3  provide that manufacturer -- or that
4  information to the physicians as well as to
5  the patient in the context of patient
6  brochures, if they're going to use patient
7  brochures, but the doctor can only relay to
8  the patient what the doctor knows.
9            And if Ethicon doesn't follow
10  through on its responsibility to provide the
11  information to the doctor so that he -- he
12  or she understands all the risks, then, as
13  stated in my report, then the consenting
14  process is negatively affected because a
15  true, full informed consent can't be done
16  because all the risks aren't known.
17            MS. SUTHERLAND:  I'm going to
18      move to strike everything after "no, I
19      have not."
20  BY MS. SUTHERLAND:
21     Q.  So again, my question really was
22  only to you whether or not you have
23  performed any kind of survey or study to
24  gather what women's perceptions of the TVT-O
25  patient brochure are.

Page 93

1     A.  No.  As you've asked the question,
2  no.
3     Q.  Okay.  That wasn't so hard, was it?
4            Have you ever worked at FDA?
5     A.  No.  Worked, obviously, with FDA
6  and people at FDA but not as an employee at
7  FDA.
8     Q.  Right.  Have you ever talked with
9  the FDA about your opinions with respect to
10  pelvic mesh?
11     A.  No.  As you know, I'm bound by
12  confidentiality and have to sign
13  confidentiality agreements to receive the
14  documents.  So that would be, to me, a
15  conflict of interest.
16     Q.  Has FDA ever approached you to get
17  your opinions about pelvic mesh --
18     A.  No.
19     Q.  -- and you've had to tell them "No,
20  I can't talk to you because of
21  confidentiality"?
22     A.  No.
23     Q.  Has the FDA ever asked for your
24  opinion about labeling of pelvic mesh
25  products?

Peggy Pence, Ph.D.

Page 94

1    A.  No.
2    Q.  Has the FDA ever asked for your
3  opinion about instructions for use for
4  pelvic mesh products?
5    A.  No.
6    Q.  Has FDA ever asked for your opinion
7  about patient brochures of pelvic mesh
8  products?
9    A.  No.
10    Q.  Has FDA ever asked for your opinion
11  about anything regarding pelvic mesh?
12    A.  No.
13    Q.  Were you invited to be part of the
14  2011 AdCom concerning pelvic mesh?
15    A.  No.
16    Q.  Have you ever spoken to anybody at
17  the FDA concerning your opinions regarding
18  pre-market testing of pelvic mesh products?
19    A.  No.
20    Q.  And have you ever spoken to any
21  manufacturer outside the context of
22  litigation about pre-market testing for
23  pelvic mesh products?
24    A.  No, not for pelvic mesh products,
25  no.

Page 95

1    Q.  Okay.  Have you done that for mesh
2  products?
3    A.  Yes.  In the context of wound
4  healing.
5    Q.  Okay.  And what product are we
6  talking about?
7    A.  It was -- I can't really say
8  because I have confidentiality agreements
9  with clients, but it was a product for use
10  in wound healing.
11    Q.  Okay.  And was this the Class 2
12  product?
13    A.  This was actually -- I believe this
14  was a Class 3.
15    Q.  All right.  Have you talked with
16  any manufacturer of a Class 2 mesh device
17  concerning pre-market testing?
18    A.  Of a mesh device?  Not as I sit
19  here today, I don't recall that, no.
20    Q.  Okay.  Have you ever been invited
21  by the FDA to be on an advisory committee of
22  any type?
23    A.  No.
24    Q.  I'm sure you've been asked this
25  before so forgive me.  Prior to your

Page 96

1  involvement in litigation on pelvic mesh,
2  had you had any involvement whatsoever with
3  any pelvic mesh device?
4    A.  In women's health issues, yes, but
5  not a pelvic mesh device specifically, no.
6    Q.  Okay.  And the woman's health
7  device that you're talking about, what was
8  that?
9    A.  It's women's health, a variety of
10  health issues, both drugs and medical
11  devices.  And, again, I'm unable to disclose
12  what products specifically because of my
13  confidentiality agreements with the clients.
14    Q.  So would it be correct to say that
15  prior to your involvement in litigation, you
16  had not had any involvement whatsoever in
17  pelvic mesh devices?
18    A.  That's fair to say, yes.
19    Q.  Okay.  Are you intending to offer
20  any criticisms of FDA as part of your
21  opinions at trial?
22    A.  No.
23    Q.  Outside of litigation, have you
24  ever drafted a label for a pelvic mesh
25  device?

Page 97

1    A.  No.
2    Q.  Outside of litigation, have you
3  ever drafted a label for a mesh device?
4    A.  Not a mesh device, per se.  I was
5  involved in testing, but I'm trying to
6  recall back.  I don't recall working on the
7  labeling for that specific device.
8    Q.  Okay.  And you and I are on the
9  same page.  When I talk about labeling, you
10  understand I'm talking about the
11  instructions for use?
12    A.  Yes.  Yes.
13    Q.  Okay.  And I know that sometimes
14  that gets a little semantical, label versus
15  labeling versus IFU.  Please let me know if
16  you have confusion over the way I'm using a
17  certain term in my questioning.  I think
18  we've been on the same page.
19    A.  I think so too.  To the best of my
20  recollection, as I sit here today, I don't
21  recall working on the aspects of the
22  labeling because of the testing that I was
23  doing on that device, which would have gone
24  into the labeling but not the final
25  labeling, as I sit here today.

25 (Pages 94 to 97)

Peggy Pence, Ph.D.

Page 98

1    Q.  Okay.  Actually, let me break it
2   down a little bit more focused.  Outside of
3   litigation, have you ever worked on the
4   adverse events section of a mesh device?
5    A.  Not specifically, no.
6    Q.  Okay.  And obviously outside of
7   litigation, have you ever worked on the
8   adverse events section of a pelvic mesh IFU?
9    A.  No.
10    Q.  All right.  Outside of litigation,
11   have you ever worked on the warnings and
12   precautions section of an IFU for a mesh
13   device?
14    A.  No.
15    Q.  And then even more focused, outside
16   of litigation, have you ever worked on the
17   warnings and precautions section of an IFU
18   for a pelvic mesh device?
19    A.  No.
20    Q.  Okay.  Outside of litigation, have
21   you ever worked on a patient brochure for a
22   mesh device?
23    A.  Are you talking about polypropylene
24   mesh?
25    Q.  I'll start with that.  Do you want

Page 99

1   me to ask it more cleanly?
2    A.  Yes, please.
3    Q.  Outside of the context of
4   litigation, have you ever worked on a
5   patient brochure for a polypropylene mesh
6   device?
7    A.  No.
8    Q.  All right.  Outside the context of
9   litigation, have you ever worked on a
10   patient brochure for some other type of mesh
11   device?
12    A.  On a dermal graft that was used for
13   wound healing, I worked on not specifically
14   the brochure but on background information,
15   some of which would have been representative
16   of what would have gone into a brochure.
17    Q.  Okay.  Was that, obviously, for
18   some kind of mesh manufacturer?  I'm not
19   asking you who, but was that for a mesh
20   manufacturer?
21    A.  It was for a Class 3 type product
22   for wound healing.
23    Q.  Okay.  And did that company have a
24   team that they put together to work on the
25   patient brochure for that product?

Page 100

1    A.  Yes.
2    Q.  All right.  Were you on that team
3   to work on the patient brochure?
4    A.  Not on the patient brochure
5   specifically, no.  I worked on the clinical
6   information that would have gone into the
7   brochure.
8    Q.  Okay.  Would you have fed your
9   clinical information to a member on that
10   team --
11    A.  Yes.
12    Q.  -- for inclusion in the patient
13   brochure?
14    A.  Yes.
15    Q.  Do you know what was included in
16   the patient brochure?
17    A.  As I sit here today, I don't recall
18   specifically.
19    Q.  All right.
20    A.  It would have been the results of
21   the clinical -- well -- as I say, I put
22   together -- I actually -- you're talking
23   specifically about patient brochure.  The
24   information, I don't recall as I sit here
25   today, what would have gone into the patient

Page 101

1   brochure.  I know that the information that
2   I put together went to physicians.
3    Q.  Okay.  I had another question, and
4   I lost it.
5    Outside of litigation, have you
6   ever worked on a patient brochure for any
7   device?
8    A.  Oh --
9    MR. GOSS:  Objection.  Form.
10    THE WITNESS:  I've worked on a
11   lot -- a lot of information that's been
12   provided to patients.  The same types of
13   information that goes into a patient
14   brochure.  I've done a lot of that
15   especially on the pre-marketing side for
16   patients where information sheets, all
17   the information that's known as well as
18   putting together the prototype labeling
19   for the professional labeling as well as
20   all the information that goes to
21   patients, putting together informed
22   consents for patients as well.
23    As I mentioned, the information
24   sheets to tell the patient more about
25   the product so that they can make an

26 (Pages 98 to 101)

Peggy Pence, Ph.D.

Page 102

```
1    informed decision as to whether or not,
2    in the case of pre-marketing, in the
3    case of whether or not they actually
4    want to participate in a clinical trial
5    of a particular product.
6          And I've worked on -- let me
7    just think back a minute because it's
8    been over 40 years of experience.  I
9    certainly have worked on information
10   that was to be presented in patient
11   forums about particular -- particular
12   products and --
13   BY MS. SUTHERLAND:
14     Q.  I'm not sure I know what that
15   means.  What do you mean "patient forums"?
16     A.  On different seminars for patients
17   to learn more about a particular product, to
18   better inform them about particular
19   products.
20          Certainly put together the clinical
21   information that would have gone in to any
22   patient -- any patient brochures.  As I've
23   mentioned before, in the context of working
24   within companies -- same as at Ethicon --
25   they have a team.  And it's not any one
```

Page 103

```
1    particular person that actually puts a
2    brochure together, puts the labeling
3    together.  The different expertises
4    contribute their component, and then that's
5    pulled together typically finally by
6    regulatory for submission, but it's a team
7    that puts that together.  So certainly, I've
8    sat on those teams.
9      Q.  Okay.  Well, that's part of my
10   question.  For instance, at Ethicon, we know
11   it's a copy -- what's called a copy review
12   team --
13     A.  Yes.
14     Q.  -- that decides the final approval
15   of what goes into, for instance, a patient
16   brochure; correct?
17     A.  Right.
18     Q.  Is it your testimony that you have
19   sat on similar such copy review teams for
20   patient brochures for implantable devices?
21     A.  For implantable devices?
22     Q.  Yes, ma'am.
23     A.  For implantable devices, I have
24   done more on the pre-clinical side where
25   I've put together all of the patient
```

Page 104

```
1    information that was going to go to the
2    patients that were going to have a device
3    implanted.
4      Q.  And that's what you're talking
5    about, if I'm following you, is the consent
6    that you do for them to participate in,
7    like, a clinical trial?
8      A.  It's not just the consent.  It can
9    also be in we call them information sheets.
10     Q.  Right.  But it's for participation
11   in a clinical trial?  Is that the context
12   that you're talking about?
13     A.  Yes.  On the pre-clinical side,
14   yes.  I'm sorry.  The pre-marketing side.
15     Q.  Pre-marketing.  Not pre-clinical.
16     A.  Not pre-clinical.  Pre-marketing
17   side.
18     Q.  So to get to my question, have you
19   sat on a copy review team that worked on a
20   patient brochure for an implantable device
21   after it's been cleared or in the clearance
22   process?
23     A.  I may have.  I don't recall
24   specifically, as I sit here today.
25     Q.  Okay.  Have you sat on such a team
```

Page 105

```
1    for a patient brochure for an implantable
2    mesh device?
3      A.  No.
4      Q.  All right.  And I would assume,
5    then, you have not sat on such a team for a
6    patient brochure for a pelvic mesh device?
7      A.  That's correct.  I have not.
8      Q.  Okay.  Now, you told me that you
9    describe yourself as a scientist; correct?
10     A.  Yes.  I am a scientist.
11     Q.  Okay.  And briefly -- I don't have
12   your CV in front of me.  I know I've read it
13   multiple times.  Tell me why you describe
14   yourself as a scientist.
15     A.  I work -- well, first of all, let's
16   talk about educational background.
17     Q.  Yeah.  Let me start with that.
18     A.  My educational background is in
19   science.  I have an undergraduate degree in
20   microbiology with -- a major in microbiology
21   and minors in chemistry and zoology,
22   certainly all scientific fields.  My
23   doctorate, my Ph.D. is in toxicology with a
24   minor in pharmacology, again, all medical
25   sciences.
```

27 (Pages 102 to 105)

Peggy Pence, Ph.D.

Page 106

1  My work has involved science,
2  including product development science, both
3  pre-clinical testing, whether that's in
4  vitro or in vivo testing, as well as
5  clinical testing, all of which involve, of
6  course, science.
7  Work in manufacturing as well and
8  ensuring that products are manufactured
9  appropriately, according to standards.  As a
10  product manager, overseeing the start of a
11  project from discovery all the way through
12  to product launch and as a regulatory
13  scientist.
14  Q.  Do you describe yourself as a
15  pharmacotoxicologist, or is there a
16  particular science field that you use more
17  frequently than others to describe yourself?
18  Does that make sense?
19  A.  Well, I think I understand your
20  question.  Let me give it a try.
21  I describe myself as a product
22  development expert, product development
23  scientist, as well as a regulatory expert in
24  regulatory sciences.
25  Q.  Okay.  All right.  And --

Page 107

1  A.  Because my -- the scope of my
2  expertise involves, as I was noting, and
3  that's how I developed my career, from basic
4  research all the way through to product
5  launch and post marketing.
6  So my career has encompassed that
7  entire scope of all -- when I teach, for
8  example, I put it into different buckets, if
9  you will, for my students to help them to
10  understand that you have the manufacturing,
11  the quality system component.  You have the
12  pre-clinical testing, and you have the
13  clinical testing.
14  And then, of course, that all comes
15  together in the regulatory arena in order to
16  get a product cleared or approved, whichever
17  the case may be, providing that the data
18  show that it's safe and effective, and it's
19  a quality product and that there's a
20  favorable benefit/risk ratio, and then you
21  have the pre-marketing and the
22  post-marketing, which should be a continuum.
23  As long as the product is being
24  marketed, there's always testing and risk
25  analysis and feedback that has to happen,

Page 108

1  and it's that entire scope and that entire
2  spectrum of product development which I have
3  over 40 years of experience in and have
4  directed my career to being able to
5  understand and evaluate and guide products
6  through that entire development process.
7  Q.  Okay.  And keeping that answer in
8  mind, that entire development process, the
9  spectrum that you just described to me, has
10  any of your experience in that entire
11  spectrum ever concerned a pelvic mesh
12  product in your 40 years?
13  A.  Not pelvic mesh.
14  Q.  Okay.
15  A.  Other than in the context of
16  litigation.
17  Q.  Yeah.  Outside of litigation, the
18  spectrum of experience that you just talked
19  about on product development, that's never
20  included a pelvic mesh product?
21  A.  I have not, on the manufacturer's
22  side, been involved in the development of a
23  pelvic mesh product.  However, all of that
24  same level -- all of that scope, I should
25  say, and that spectrum of experience and my

Page 109

1  experience and knowledge of all of those
2  areas, I applied in the context of
3  evaluating all of the information, the
4  deposition testimony, internal documents,
5  standards, guidance, regulation, scientific
6  medical literature, I applied all of that
7  and integrated that knowledge together to
8  arrive at my opinions in this case in the
9  very same fashion that I would for advising
10  clients or if employed by a company, that I
11  would participate at the company as a part
12  of the product team, I apply the same type
13  of methodology.
14  Q.  Okay.  And my question, I guess,
15  was just that you have not applied that
16  methodology outside the context of
17  litigation for a pelvic mesh product.
18  A.  That's correct.
19  Q.  Right.  So a company has not asked
20  you to employ your expertise for a pelvic
21  mesh product; correct?
22  A.  Not for a pelvic mesh product.
23  That's correct.
24  Q.  The only folks that have asked you
25  to apply your expertise have been plaintiff

28 (Pages 106 to 109)

Peggy Pence, Ph.D.

Page 110

1  lawyers; correct?
2      A.  For pelvic mesh products, yes.
3      Q.  Okay.  Have you ever participated
4  in any cadaver study of polypropylene mesh?
5      A.  No.
6      Q.  Have you ever participated in any
7  animal study for polypropylene mesh?
8      A.  No.
9      Q.  Have you ever designed any clinical
10  trials regarding polypropylene mesh?
11      A.  I've not designed one specifically
12  for polypropylene mesh.  I've considered
13  designs, but I've not designed one.
14      Q.  All right.  And when you considered
15  designs, was that outside the context of
16  litigation?
17      A.  No.  It was in the context of
18  litigation.
19      Q.  All right.  Have you ever been
20  involved in any clinical research concerning
21  polypropylene mesh outside litigation?
22      A.  No.
23      Q.  Have you ever designed a pelvic
24  mesh?
25      A.  No.

Page 111

1      Q.  Have you ever done any lab work
2  regarding polypropylene mesh?
3      A.  No.
4      Q.  As I understand it, your company
5  Symbion, does that have a lab?
6      A.  No.
7      Q.  All right.  Do you own any lab
8  equipment?
9      A.  No.  We work with -- when we're
10  working with clients, and we're working in
11  pre-clinical research where a laboratory
12  environment is needed, we identify contract
13  laboratories to do that work, and we help to
14  design the testing.
15      We oversee and sometimes inspect
16  the facilities to make sure that they're
17  adequate, that can do what -- they can meet
18  the requirements for the testing,
19  particularly if it's good laboratory
20  practice standards.  I teach good laboratory
21  practice that they meet GLP requirements.
22  If it's a study, pre-clinical study that
23  requires GLP standards be met, must be done
24  under GLP.
25      Q.  Are you saying GOP or GLP?

Page 112

1      A.  Sorry.  GLP.  Good laboratory
2  practices.
3      Q.  I'm not going to talk politics with
4  you.
5      A.  Sorry.  So we could be here all
6  day; right?  We're teasing.
7      So I teach GLP, and I've done
8  inspections of facilities to be sure that
9  they meet the requirements for a GLP testing
10  facility and then help to design the
11  studies, oversee them, review the study
12  reports, go back and forth with the contract
13  laboratory with questions to ensure that we
14  get the final report that is accurate and
15  represents what actually was done in the
16  study.
17      Q.  Okay.  I'm going to respectfully
18  move to strike everything after "no" because
19  I think my question was does Symbion own any
20  lab equipment?
21      A.  No.
22      Q.  All right.  Have you ever done any
23  biomechanical testing of polypropylene mesh?
24      A.  No.
25      Q.  Ever done any testing of a mesh

Page 113

1  explant?
2      A.  No.
3      Q.  Have you ever looked at a mesh
4  explant under a microscope?
5      A.  I've looked at photos but not under
6  a microscope myself.
7      Q.  Okay.  And the photos that you're
8  talking about, would that have been in
9  medical literature that you looked at?
10      A.  Medical literature or in the
11  context of a trial.
12      Q.  Like a photo that one of the
13  experts took --
14      A.  That's correct.
15      Q.  -- of a mesh explant.  Okay.
16      Have you -- first of all, you know
17  what a DDSA is; correct?
18      A.  Yes.
19      Q.  And what is it?  A device design
20  safety analysis.
21      A.  Yes.
22      Q.  All right.  Have you ever done a
23  DDSA for a mesh product?
24      A.  There are different terms that are
25  used, DFMEA, that kind of thing, I've been

29 (Pages 110 to 113)

Peggy Pence, Ph.D.

Page 114

1 involved in those, yes, for mesh -- not
2 mesh. For other devices.
3     Q. Let me get a -- and I'm going to
4 ask you about DFMEA right after this one.
5 Let me get a clean question and answer.
6     Have you ever been involved in
7 performing a device design safety analysis
8 for a mesh product?
9     A. No.
10     Q. Have you ever reviewed a device
11 design safety analysis for a mesh product
12 outside the context of litigation?
13     A. No.
14     Q. Okay. Now I'll do the DFMEA.
15     A. Okay.
16     Q. Am I correct, Doctor, that an FMEA
17 is a failure mode evaluation analysis?
18     A. Failure mode effects analysis.
19     Q. And have you ever performed an
20 DFMEA for a mesh product?
21         MR. GOSS: Objection to form.
22         THE WITNESS: Not a mesh
23 product, no.
24 ///
25 BY MS. SUTHERLAND:

Page 115

1     Q. All right. Have you ever reviewed
2 an DFMEA for a mesh product outside the
3 context of litigation?
4     A. Not outside of the context of
5 litigation.
6     Q. All right. Do you consider
7 yourself an expert on how mesh performs in
8 vivo?
9     A. Can you clarify what you mean?
10     Q. Have you ever yourself studied how
11 mesh reacts in vivo clinically?
12     A. Have I done the clinical testing
13 myself?
14     Q. Right.
15     A. No. In fact, I've opined that the
16 clinical testing has been inadequate that
17 manufacturers have done.
18     Q. Okay. I'm going to move to strike
19 everything after "no."
20     Have you ever been involved in a
21 clinical trial -- let me strike that.
22     You understand when I talk about a
23 clinical trial, that I'm talking about
24 actual humans being involved; right?
25     A. Yes. I teach clinical trials at

Page 116

1 college.
2     Q. I know you do. I'm doing it for
3 the jury and for myself.
4     Have you ever been involved in a
5 clinical trial to evaluate the safety or
6 efficacy of a medical device where part of
7 that device was polypropylene mesh?
8     A. Not polypropylene, no.
9     Q. All right. Have you been involved
10 in a clinical trial to evaluate the safety
11 or efficacy of a medical device where part
12 of that device was something other -- a mesh
13 other than polypropylene mesh?
14     A. Yes.
15     Q. And is that the Allograft that you
16 talked about?
17     A. It was in -- it actually was a
18 different product, but it was a part of the
19 product that was being evaluated prior to
20 the final product.
21     Q. Okay. Like a prototype?
22     A. Yes.
23     Q. Okay. What size clinical trial was
24 that?
25     A. I don't recall, as I sit here

Page 117

1 today, the actual numbers of patients.
2     Q. Do you know if it was a hundred?
3     A. If I recall correctly, it probably
4 was more than that, as I sit here today
5 without checking back.
6     Q. Okay. Well, when was it?
7     A. That particular trial was, to the
8 best of my recollection as I sit here today,
9 mid to latter 1990s.
10     Q. Okay. Have you ever done any kind
11 of mechanical testing on the TVT-O?
12     A. No.
13     Q. Have you ever done any kind of
14 testing or measurements on the Prolene mesh?
15     A. No.
16     Q. I had asked you before about
17 whether or not you have looked at the new
18 drug application for Prolene sutures.
19     A. Yes.
20     Q. Have you now reviewed the entire
21 NDA for Prolene sutures?
22     A. No. I think I've testified before
23 I was not able to. I don't have a copy of
24 that to review.
25     Q. Okay. And I think I had asked you

30 (Pages 114 to 117)

Peggy Pence, Ph.D.

Page 118

1  before if you had asked for that from
2  counsel, and I thought you told me you had.
3      A.  To the best of my recollection, I
4  had, and it wasn't -- it wasn't available.
5      Q.  Provided?
6      A.  Yeah.
7      Q.  Okay.  All right.  Obviously,
8  you've never diagnosed stress urinary
9  incontinence.
10     A.  No.
11     Q.  Have you ever treated stress
12  urinary incontinence?
13     A.  No.
14     Q.  Have you ever made a recommendation
15  to a woman on the options available to her
16  to treat stress urinary incontinence?
17     A.  I have talked with women who --
18  about the options that are available.
19     Q.  And would this have been, like,
20  friends -- I don't want names or anything.
21     A.  Yes.  Yes.
22     Q.  About how many women have you
23  talked to about the options available to
24  treat stress urinary incontinence?
25     A.  Oh, it would be probably in the

Page 119

1  order of maybe five.
2      Q.  All right.  And do you recall what
3  options you talked with them about?
4      A.  Just told them about pessaries,
5  told them about bulking agents, told them
6  about Burch colposuspension, certainly the
7  topic of pelvic mesh -- well, the mesh came
8  up.  Clearly, I don't recommend that based
9  on everything that I've reviewed over the
10 last few years.  So when they ask, I give
11 them my opinion.
12     Q.  Have you recommended a Burch to a
13 woman?
14     A.  No.  I would never make a
15 recommendation.  And, you know, and I don't
16 discuss with people that -- I don't
17 volunteer that I'm working in litigation.
18 I'm very discreet about what I say, but if
19 anybody asks me because they know I'm in --
20 they know I'm a scientist, and clearly, you
21 know, there are some people, obviously, who
22 know that I've been at trial, that
23 information is available.
24         When I'm asked, you know, I talk to
25 them about the various options, but I would

Page 120

1  never make a recommendation.  That's
2  something that -- I'm not a clinician.  They
3  need to be evaluated appropriately.
4      Q.  By a doctor?
5      A.  By a doctor.
6      Q.  Medical doctor?
7      A.  By a medical doctor.  And based on
8  their own particular situation, what their
9  issues are, discuss with the doctor what the
10 options are.  It's just that if someone asks
11 me, you know, "Do you know what's available?
12 What do you think about this?"  As a
13 scientist, an educated scientist in this
14 area, I can give them my thoughts.
15         But I would never make -- I would
16 never tell them what to do.  That's a
17 decision -- and that goes to the consenting
18 process that we were talking about earlier.
19 They need to know all the information about
20 the products to make an appropriate decision
21 for themself.
22     Q.  For the women where you have just
23 talked about the options for treatment of
24 stress urinary incontinence, have you talked
25 with them about the risks that you're aware

Page 121

1  of with the Burch procedure?
2      A.  We really haven't gotten to that
3  level of detail with them.  It's very
4  cursory conversations.
5      Q.  Okay.  Have you ever been in the
6  operating room when a TVT-O was actually
7  implanted?
8      A.  I've seen videos, but I've not been
9  in the operating room, yeah.
10     Q.  Was it an Ethicon training video on
11 TVT-O that you've -- are referencing there?
12     A.  Yes.  As well -- yes.  And I've
13 looked at other videos of slings as well.
14 And there are even some that you can --
15 where certain doctors have posted various --
16     Q.  Their own surgeries?
17     A.  Their own, and I've looked at those
18 as well.
19     Q.  Have you watched a Burch surgery?
20     A.  To the best of my recollection as I
21 sit here today, I have looked at a video of
22 that.
23     Q.  All right.  Do you recall when you
24 did that?
25     A.  I don't.  Sometime within the last

31 (Pages 118 to 121)

Peggy Pence, Ph.D.

Page 122

1  couple of years --
2      Q.  Was that --
3      A.  -- but I don't recall specifically.
4      Q.  I'm sorry.  Was that just a video
5  that you found off of, like, YouTube --
6      A.  Yes.
7      Q.  -- or was that a professional
8  education video?
9      A.  To the best of my recollection, it
10  was something that I found on YouTube.
11      Q.  All right.
12      A.  And, of course, there are lots of
13  pictures, and even in the training
14  materials, you know, for Ethicon and other
15  places, there are pictures of procedures,
16  and it discusses those procedures.  So I've
17  certainly reviewed those.  Textbooks.
18      Q.  All right.  Let me ask you this:
19  See what I get.
20      A.  You're going fishing?
21      Q.  I'm going fishing.
22      Would you agree that there are
23  patients who have had a TVT-O implanted who
24  have had no complications?
25      A.  I can't answer that as asked yes or

Page 123

1  no because I don't know every patient that
2  has been implanted and whether or not what
3  complications they may or may not have had
4  as well.
5      It's also in the literature and
6  documented that patients may have --
7  particularly women who are not sexually
8  active may have erosions that they're not
9  aware of, and without an actual pelvic
10  examination, physical examination, that that
11  can't be -- that may not be detected.  So
12  for several patients, I'm unable to say yes
13  or no the way your question was asked.
14      Q.  Okay.  Let me ask a couple of
15  follow-ups.  It's correct, then, that a
16  woman can have an erosion and be completely
17  asymptomatic; correct?
18      A.  In the situation that I described
19  where she isn't sexually active, and it's --
20  it's small, it may not be bothering her, is
21  my understanding as I sit here today.  It
22  doesn't mean that it may not bother her long
23  term, and that also is an important point
24  because what we're seeing in the literature
25  is that just because a patient hasn't had a

Page 124

1  complication that has affected them a year
2  or even two years out, these are permanent
3  implants, and it's well known and, in fact,
4  Ethicon's own employees have testified that,
5  for example, erosions are a lifelong risk as
6  long as the implant is there.
7      And as I started to mention, in the
8  literature, it's showing that a number of
9  complications actually increase in a
10  percentage of patients who are
11  experiencing -- experience them over time,
12  which all the more supports why one needs to
13  study a permanent implant long term to see
14  what the complications may be.
15      And also because there is a chronic
16  foreign body reaction that is set up and
17  depending on what the mesh -- the
18  biomaterial may be, et cetera, and the
19  characteristics of the particular implant
20  may be, that long-term inflammation may also
21  ultimately cause complications.
22      So my point being that just because
23  a woman hasn't experienced a complaint that
24  has bothered her in a year doesn't mean that
25  five years from now she isn't going to have

Page 125

1  one.  The data supports that the data -- the
2  medium to long-term data on these products
3  is still, at this point in time, very
4  limited.
5      Q.  Okay.  I'm going to move to strike
6  everything after you finished your first
7  sentence, and I've forgotten what that was.
8      Let me ask it this way:  Do you
9  intend to offer an opinion that every woman
10  implanted with a TVT-O will have a
11  complication from that mesh?
12      MR. GOSS:  Objection to form.
13      THE WITNESS:  I can't say they
14  will.  What I can say is that there is a
15  potential for complication.  So they may
16  not.  They may not.
17  BY MS. SUTHERLAND:
18      Q.  All right.  You mentioned before
19  the need for long-term clinical data for
20  permanent implants.
21      A.  Yes.
22      Q.  And I know I've asked you this
23  before, and I don't think you gave me a
24  specific time frame a couple of weeks ago
25  when I asked this.  Do you have a specific

Peggy Pence, Ph.D.

Page 126

1  time frame in mind today that, in your
2  opinion, constitutes what you call long-term
3  for a permanent implant?
4        MR. GOSS:  Objection to form.
5        THE WITNESS:  In the
6     literature --
7  BY MS. SUTHERLAND:
8     Q.  Let me ask a better question
9  because that was so convoluted I lost it.
10    A.  Okay.
11    Q.  As I understand your opinion, it's
12  that for a permanent implant such as the
13  TVT-O, a manufacturer needs long-term data;
14  is that right?
15    A.  Yes.  Yes.
16    Q.  All right.  Now, do you have a
17  specific time frame that you're ascribing to
18  "long-term data"?
19    A.  A medium term is three to five
20  years.  Long-term would be ten years.
21    Q.  Okay.  And is it your opinion
22  that --
23    A.  Or longer than five years but at
24  least ten years would be helpful.
25    Q.  All right.

Page 127

1     A.  And that is also described in some
2  pieces of literature.
3     Q.  So is it five years, or is it ten
4  years?
5     A.  Three to five for mid, for medium.
6  Ten years would be long-term for a permanent
7  implant.
8     Q.  Okay.  And so for a permanent
9  implant like the TVT-O, are you going to
10  offer an opinion at trial that Ethicon
11  should have had ten years worth of data
12  before they marketed the TVT-O?
13    A.  No, because that becomes -- that --
14  there's a practicality aspect, obviously, as
15  well.  What they should have done, however,
16  is to continue a registry and have follow-on
17  data so that they're collecting that data.
18  But before you even get to that point, there
19  is a lot of testing that should have been
20  done pre-marketing that they didn't do that
21  they should have understood before these
22  products were implanted in women.
23    Q.  And I'm going to get to that
24  because that's one of your opinions in your
25  report.  I do promise I am going to get to

Page 128

1  your opinions.
2        Would you agree that there are
3  women where the TVT-O has been placed where
4  it's been effective to treat their stress
5  urinary incontinence?
6        MR. GOSS:  Objection.  Form.
7        THE WITNESS:  Based on my
8     understanding, that's correct.
9  BY MS. SUTHERLAND:
10    Q.  All right.  Would you agree that
11  there are a lot of doctors in the United
12  States who believe that the TVT-O is safe
13  and effective?
14       MR. GOSS:  Objection.  Form.
15       THE WITNESS:  Based on my
16    knowledge of the situation today, there
17    are doctors who, yes, believe it is safe
18    and effective.  There are others who are
19    changing their opinions.
20  BY MS. SUTHERLAND:
21    Q.  Okay.  Other than the Burch
22  procedure, are there other surgical
23  procedures that you're aware of for the
24  treatment of stress urinary incontinence
25  without the use of mesh?

Page 129

1     A.  Yes.
2     Q.  Okay.  And what are they?
3     A.  Well, the Burch can be done open or
4  laparoscopically.  There's the MMK, the
5  Marshall-Marchetti-Krantz.  Paravaginal
6  repairs, different types of suspensions and,
7  of course, then there are -- you said
8  surgical, though; right?
9     Q.  Yes, ma'am.
10    A.  So excluding bulking agents.
11    Q.  Yeah.  When you talk about
12  suspensions, are you talking about the use
13  of an autologous sling as well?
14    A.  Yes, definitely an autologous sling
15  or an Allograft as well.
16    Q.  Yeah.  By "Allograft," do you mean
17  either cadaver or some kind of animal?
18    A.  Well, that would be a xenograft,
19  but yeah.  So cadaver tissue.  There
20  are different options as well as the
21  autologous grafts.
22    Q.  All right.  Now, are you familiar
23  --
24    A.  Autologous sling, I should say.
25    Q.  I'm sorry.

33 (Pages 126 to 129)

Peggy Pence, Ph.D.

Page 130

1    A.  I'm sorry.
2    Q.  I don't mean to cut you off.
3       Are you familiar with the risks
4  associated with those different procedures
5  that you just mentioned?
6    A.  I think so, yes.
7    Q.  All right.  So with respect to the
8  Burch open procedure, can you tell me what
9  are the risks associated with that
10 procedure?
11   A.  Well, certainly you have --
12       MR. GOSS:  Objection.  Form.
13       THE WITNESS:  -- the same risk
14   of anesthesia that you do with any
15   surgical procedure.  There's the risk of
16   pain, pelvic pain, the risk of
17   dyspareunia, the risk of bleeding, the
18   risk of organ perforation, the risk of
19   voiding dysfunction.  Those are some of
20   the representative ones.
21 BY MS. SUTHERLAND:
22   Q.  And I had asked that specific to
23 Burch, but would those same risks be
24 applicable, for instance, to the Burch
25 performed laparoscopically?

Page 131

1    A.  Yes.
2    Q.  And would those same risks be
3  applicable to the MMK?
4    A.  That's my understanding.  That's
5  correct.
6       MR. GOSS:  Objection.  Form.
7  BY MS. SUTHERLAND:
8    Q.  Okay.  Do you know how many doctors
9  perform the MMK today?
10   A.  I don't know how many doctors.
11 It's my understanding that it's not
12 performed very often today.
13   Q.  Okay.  Do you know if it's even
14 taught in medical school anymore?
15       MR. GOSS:  Objection.  Form.
16       THE WITNESS:  I can't say for
17   every medical school whether or not it's
18   taught or not.  I haven't done that
19   evaluation.
20 BY MS. SUTHERLAND:
21   Q.  All right.  Would those same risks
22 that you mentioned be applicable to an
23 autologous sling?
24   A.  Yes.  I think what we're talking
25 about, if you're going -- if you're talking

Page 132

1  about a foreign body, there are -- there are
2  differences where there's -- where there's a
3  graft being placed.  Even with a biological
4  graft, you can get erosion that you
5  obviously don't have in the Burch
6  colposuspension.
7    Q.  And did you say can you have a
8  foreign body reaction when you use a foreign
9  body other than a mesh?
10   A.  Well, I'm speaking more there about
11 the polypropylene meshes.
12   Q.  Okay.  I'm excluding the meshes for
13 right now.
14   A.  Okay.
15   Q.  I'm just wanting to get your
16 understanding of the risks that are
17 attendant to, for instance, that you said an
18 autologous sling for the treatment of SUI.
19       MR. GOSS:  Objection.  Form.
20       THE WITNESS:  That's one's own
21   tissue.
22 BY MS. SUTHERLAND:
23   Q.  Right.  Can your own tissue erode?
24       MR. GOSS:  Objection.  Form.
25 BY MS. SUTHERLAND:

Page 133

1    Q.  Or do you know?
2       MR. GOSS:  Objection.  Form.
3       THE WITNESS:  I haven't
4   actually studied that.  I suspect that
5   it could, but I haven't actually studied
6   that.
7  BY MS. SUTHERLAND:
8    Q.  Can the sutures that are utilized
9  in these other surgical procedures for the
10 treatment of SUI erode?
11   A.  Yes.
12   Q.  And can you have a reaction to the
13 use of cadaver tissue?
14       MR. GOSS:  Objection.  Form.
15       THE WITNESS:  You could, yes.
16 BY MS. SUTHERLAND:
17   Q.  I mean, that's a risk associated
18 with surgical treatment of SUI where you use
19 cadaver tissue, isn't it?
20       MR. GOSS:  Objection.  Form.
21       THE WITNESS:  It's a potential
22   risk.
23 BY MS. SUTHERLAND:
24   Q.  All right.  Now, have you -- strike
25 that.

Golkow Technologies, Inc. - 1.877.370.DEPS

Peggy Pence, Ph.D.

Page 134

1      What, if anything, have you done to
2  determine whether doctors knew of these
3  risks for surgical treatment of SUI other
4  than with mesh?
5          MR. GOSS:  Objection.  Form.
6          THE WITNESS:  If I understand
7    your question correctly, review of the
8    literature, review of textbooks about
9    the procedure, review of deposition
10   testimony.  I think that's probably a
11   good summation.
12 BY MS. SUTHERLAND:
13   Q.  Okay.  Have you done any kind of
14 survey of physicians to understand their
15 state of knowledge with respect to the risks
16 you've listed for surgical options for the
17 treatment of SUI other than with mesh?
18         MR. GOSS:  Objection.  Form.
19         THE WITNESS:  I've not done a
20   survey, no.
21 BY MS. SUTHERLAND:
22   Q.  All right.  So if I'm understanding
23 you correctly -- let me ask you this:  Would
24 it be fair to say that you are aware of
25 these risks because of your review of the

Page 135

1  medical literature?
2    A.  Yes.
3          MR. GOSS:  Objection.  Form.
4  BY MS. SUTHERLAND:
5    Q.  All right.  Is it your opinion that
6  doctors are aware of these risks if they
7  have reviewed the medical literature?
8          MR. GOSS:  Objection.  Form.
9          THE WITNESS:  Yes.  And they
10   were also taught.
11 BY MS. SUTHERLAND:
12   Q.  In medical school?
13   A.  In medical school or more
14 specifically in their fellowships or --
15 internships and fellowships, residencies.
16   Q.  Now.  Is it your opinion that a
17 manufacturer of a mesh device for the
18 surgical treatment of stress urinary
19 incontinence has a duty to warn of risks
20 associated with the use of the device?
21   A.  Yes.
22   Q.  All right.  Now, in your definition
23 of risks associated with the use of the
24 device, are you including risks that also
25 are associated with general surgical

Page 136

1  treatment of SUI that does not use mesh?
2          MR. GOSS:  Objection.  Form.
3          THE WITNESS:  Yes.  And more
4    specifically, the labeling should
5    include information about frequency,
6    severity, chronicity of those particular
7    risks.
8  BY MS. SUTHERLAND:
9    Q.  Okay.  And I'm going to get to
10 that.  So I'm going to move to strike
11 everything after "yes" for right now.
12       Well, I'll go ask you this while
13 we're on that.  Is there any IFU that you've
14 seen for a pelvic mesh device that includes
15 rates of frequency for their adverse events?
16         MR. GOSS:  Objection.  Form.
17         THE WITNESS:  Not for a pelvic
18   mesh device of the ones that I have
19   reviewed that we discussed earlier.
20 BY MS. SUTHERLAND:
21   Q.  Of the ones you've reviewed, yeah.
22       What about any mesh device?  Does
23 any mesh device that you've reviewed, does
24 the IFU include frequency rates for their
25 adverse events?

Page 137

1          MR. GOSS:  Objection.  Form.
2          THE WITNESS:  If I recall
3    correctly as I sit here today, for
4    example, some of the Gor-Tex IFUs
5    include clinical data that shows the
6    frequency of particular adverse events
7    in the clinical testing.
8  BY MS. SUTHERLAND:
9    Q.  Okay.  And would that be a separate
10 section under clinical performance in that
11 IFU?
12   A.  To the best of my recollection,
13 yes, it's included there.  But it's present
14 in the IFU.
15   Q.  And, now, I'm assuming your
16 opinion -- well, let me just ask you:  Is
17 your opinion that in the IFU Ethicon, under
18 the adverse events section where it listed
19 adverse events, it should have listed
20 frequency rates for those adverse events?
21   A.  They should have -- let me go back
22 to the purpose of labeling, which is to
23 provide the information to the physician
24 that he can also discuss with the patient to
25 make an informed decision.  Like Dr. Reyes

Peggy Pence, Ph.D.

Page 138

1  said, you know, he wanted -- if I recall
2  correctly, he wanted to make an informed
3  decision, and information to make an
4  informed decision includes, because just as
5  you've mentioned there, some of the same
6  types of side effects, risks that occur with
7  the mesh products can occur with other types
8  of surgery as well.
9      So in order to make an informed
10  decision about what is the appropriate
11  alternative for this woman, take it in the case
12  of Ms. Ramirez, her case, a 28 years old,
13  whether or not you implant a mesh product or
14  use something else, understanding the
15  frequency, the severity, the permanency,
16  chronicity of these in contrast to other
17  procedures where there may be -- there's a
18  possibility or the potential for adverse
19  effects but that don't have the same level
20  of severity, or they don't occur as often,
21  and they don't last as -- they don't last
22  chronically for the lifetime of the patient.
23      And then, of course, you have the
24  specific mesh-related complications as well.
25  But yes, and if you look at the G91-1, the

Page 139

1  Blue Book Memo, it does address that you
2  should actually list the adverse events in
3  order of greatest clinical significance and
4  where appropriate, you have from clinical
5  information frequency that that should be
6  included as well.
7      MS. SUTHERLAND:  All right.
8  Would you read my question back.
9      (Record read by the
10      reporter as follows:
    Is it your opinion that in the IFU Ethicon under
11  the adverse events section where it listed adverse
12  events it should have listed frequency rates for
13  those adverse events?")
14  BY MS. SUTHERLAND:
15  Q.  And I'm -- if I missed your answer,
16  I apologize, but I do want an answer to that
17  question if I could get it.
18  A.  Yes, that's my opinion.
19  Q.  Okay.  Now --
20      MR. GOSS:  You missed that in
21  the last answer?
22      MS. SUTHERLAND:  I missed that
23  one.  You saw how long she had to scroll
24  for it.  Come on.
25      Guys, we're at 12:15.  When do

Page 140

1  you guys want to break for lunch?
2      MR. GOSS:  How about now?
3  Whenever you're at a stopping point.
4      MS. SUTHERLAND:  I mean, I
5  think I'm at a -- good enough now as
6  later.
7      MR. GOSS:  All right.
8      THE VIDEOGRAPHER:  All right.
9  With the approval of counsel, going off
10  the record.  The time is approximately
11  12:15 p.m.
12      (Lunch recess taken from
13  12:15 p.m. to 1:01 p.m.)
14      THE VIDEOGRAPHER:  With the
15  approval of counsel, back on the record.
16  The time is approximately 1:01 p.m.
17  BY MS. SUTHERLAND:
18  Q.  Dr. Pence, welcome back from lunch.
19  A.  Thank you.
20  Q.  I wanted to follow up on what we
21  had kind of been talking about before the
22  break, which was your opinion that there
23  needs to be frequency rates set out beside
24  adverse events in the IFU.
25  A.  Yes.

Page 141

1  Q.  All right.  And if I understood you
2  correctly, you were relying on the Blue Book
3  Memo for that opinion?
4  A.  Yes.
5  Q.  All right.  And I -- where did it
6  just go?  Oh.
7  A.  As well as experience.
8  Q.  Okay.  And in case I didn't ask
9  this before, is there any pelvic mesh IFU
10  that you have reviewed that lists frequency
11  rates outside adverse events?
12  A.  No.
13  Q.  Okay.  Now, in looking at the Blue
14  Book Memo, which I marked as Exhibit
15  Number 2 --
16  A.  I might also add that in addition
17  to the Blue Book Memo, there's also the GHTF
18  labeling document, which talks about all
19  residual risk, and we may have talked about
20  in the prior deposition that risk is a
21  combination of the probability of occurrence
22  and severity.
23  Q.  Well, the probability of occurrence
24  and severity is the definition of how you
25  define a risk in the GHTF document; correct?

Peggy Pence, Ph.D.

Page 142

1    A.  That's the definition of risk, yes.
2  It's a combination of those.
3    Q.  Now, the GHTF labeling guidance
4  does not set out anything about listing
5  frequency next to adverse events, does it?
6        MR. GOSS:  Objection.  Form.
7        THE WITNESS:  It talks about --
8  let me just refresh my recollection --
9        MS. SUTHERLAND:  Okay.
10        THE WITNESS:  -- but it says
11  that all residual risk, and risk by
12  definition includes a combination of
13  probability of occurrence and severity.
14  And some of these documents, you know,
15  various pieces of literature also
16  discuss, in addition to the guidances,
17  discuss severity as being important.
18  BY MS. SUTHERLAND:
19    Q.  And when you get to the document,
20  tell me what you're looking at, please.
21    A.  Okay.  This is the label
22  instructions for use in medical devices.
23    Q.  Okay.
24    A.  GHTF guidance.
25    Q.  Right.

Page 143

1    A.  Which states that "Residual risks,
2  which are required to be communicated to the
3  user and/or other person, should be included
4  as limitations, contraindications,
5  precautions, or warnings in the labeling."
6        MR. GOSS:  Let the record
7  reflect that the witness is reading from
8  page --
9        THE WITNESS:  Unfortunately, it
10  doesn't have a page number.
11        MR. GOSS:  Or section number.
12        THE WITNESS:  Section
13  number 5.0, General Principles, on the
14  beginning or two pages after that at the
15  top of the page, there's a bullet point.
16        MS. SUTHERLAND:  All right.
17        MR. GOSS:  Have you marked this
18  as an exhibit?
19        MS. SUTHERLAND:  Yeah.  We can.
20  I mean, we did last -- two weeks ago I
21  marked all of the --
22        MR. GOSS:  I was just going to
23  reference it as what exhibit number it
24  was.  I didn't know if you'd marked it
25  yet.

Page 144

1        MS. SUTHERLAND:  No, I haven't.
2  Certainly you're welcome to if you want
3  to as Exhibit 9.
4        If you don't mind sticking that
5  on there.  That means you've got to give
6  it up.
7        (Exhibit Number 9 was
8  marked for identification.)
9        MR. GOSS:  That's how you lost
10  your last one; right?
11        THE WITNESS:  Yes.  Exactly.
12        MS. SUTHERLAND:  This was his
13  idea.
14  BY MS. SUTHERLAND:
15    Q.  So if I'm right, are you relying on
16  the GHTF labeling guidance and the Blue Book
17  Memo for your opinion that frequency rates
18  need to be listed out beside adverse events
19  in a pelvic mesh IFU?
20    A.  Yes.  As well as I mentioned my own
21  experience and also the fact that, if I'm
22  recalling correctly as I sit here today,
23  that Ethicon's corporate designee testified,
24  regulatory corporate designee Susan Lin,
25  testified, again as I recall, if I recall

Page 145

1  correctly as I sit here today, that Ethicon
2  had adopted the G91-1 as its standard.
3    Q.  Okay.  Well, let's look at the Blue
4  Book Memo, which you're calling the G91-1
5  standard; correct?
6    A.  Right.
7    Q.  And if you'll turn to the adverse
8  event section in there, and I pulled down
9  the page, down at the bottom, do you see
10  where --
11    A.  Yes.
12    Q.  And I don't have a copy.  So I'm
13  kind of going by my notes.
14        MR. GOSS:  What do you need?
15  Blue Book?
16        MS. SUTHERLAND:  Blue Book
17  Memo.
18        MR. GOSS:  It may have my
19  writing on it, but if it does --
20        MS. SUTHERLAND:  I won't look
21  at your super secret notes unless
22  they're very helpful.
23        MR. GOSS:  Yeah.
24  BY MS. SUTHERLAND:
25    Q.  And if I am with you at the right

Peggy Pence, Ph.D.

Page 146

1  language, you're looking under adverse
2  reactions under Section 8 of the Blue Book
3  Memo?
4      A. Yes.
5      Q. And you're looking under the third
6  paragraph that begins "Adverse reactions
7  should be listed"?
8      A. Yes.
9      Q. All right. Is this what you're --
10 the standard that you're relying on when you
11 opine that "Adverse reactions should be
12 listed in descending order according to
13 their clinical significance as determined by
14 their severity and frequency"?
15     A. Correct.
16     Q. All right. And let me ask you --
17 I'm going to had you the TVT-O IFU that I'm
18 going to mark as Exhibit Number 10.
19         (Exhibit Number 10 was
20     marked for identification.)
21 BY MS. SUTHERLAND:
22     Q. And I have marked on mine --
23         MR. GOSS: Don't worry about
24     it. What is that?
25         MS. SUTHERLAND: It's just the

Page 147

1      IFU.
2  BY MS. SUTHERLAND:
3      Q. And I want you to turn with me,
4  Doctor, to the adverse reaction section.
5      A. Is this the IFU that was in use
6  with Ms. Ramirez?
7      Q. I pulled it from Dr. Reyes'
8  deposition; so I can represent to you that I
9  assume so.
10     A. Okay.
11         MR. GOSS: Let the record
12     reflect that on the first page, it says
13     2005. You might ask her if 2005 would
14     also be the same as the 2010.
15 BY MS. SUTHERLAND:
16     Q. Would that be the same as the 2010?
17     A. The adverse reactions during this
18 period. Even if it were a different --
19     Q. Yeah. The adverse reactions would
20 be the same?
21     A. The adverse reactions would stay
22 the same for this time period.
23     Q. Yeah. Yeah. So turn with me to
24 the adverse reaction section of the IFU.
25     A. Yes.

Page 148

1      Q. And now I understand and I'm going
2  to get to your opinion about listing
3  additional adverse reactions. Right now my
4  question to you is: The adverse reactions
5  that are listed there, is it your opinion
6  that they are not listed in descending order
7  according to their clinical significance?
8  Actually, strike that. Let me ask a
9  different question to begin with, and then
10 I'll come back to that.
11         MR. GOSS: As long as I haven't
12     marked on that Blue Book, you can mark
13     that as an exhibit if you want.
14         MS. SUTHERLAND: Well, I marked
15     hers as the Blue Book.
16         MR. GOSS: Okay.
17         MS. SUTHERLAND: Yeah.
18 BY MS. SUTHERLAND:
19     Q. You're not a medical doctor;
20 correct?
21     A. That's correct.
22     Q. And you don't implant mesh
23 obviously; correct?
24     A. Correct.
25     Q. And you don't treat complications

Page 149

1  associated with the use of mesh; correct?
2      A. That's correct.
3      Q. Or with surgical procedures to
4  treat stress urinary incontinence; correct?
5      A. That's correct.
6      Q. So do you consider yourself
7  qualified to opine as to the clinical
8  significance of different adverse reactions
9  associated with mesh?
10         MR. GOSS: Objection. Form --
11     (Simultaneous discussion
12     interrupted by the reporter.)
13         THE WITNESS: As to the adverse
14     events that should go into labeling,
15     yes.
16 BY MS. SUTHERLAND:
17     Q. Okay. But are you qualified, in
18 your opinion, to offer an opinion as to the
19 clinical significance between different
20 adverse events?
21         MR. GOSS: Objection. Form.
22         THE WITNESS: The way you've
23     asked that question, I can't really give
24     you a yes or no. So let me see if I can
25     explain it. The clinical significance

Golkow Technologies, Inc. - 1.877.370.DEPS

Peggy Pence, Ph.D.

Page 150

1 is determined, like within the project
2 team, with -- based on a clinical
3 evaluation which includes commercial
4 experience.  It includes what's in the
5 clinical literature and clinical
6 investigations.
7         And as a part of my career in
8 product development, yes, I have often
9 evaluated adverse reactions as regards
10 to clinical significance and working
11 with investigators to make that
12 determination.
13         But I've done evaluations of
14 adverse reactions for clinical
15 significance myself, but we incorporate
16 physicians as a part of that product
17 team.
18         But the labeling here, if you
19 read what this says, it says, "Provide
20 frequency data from adequate clinical
21 studies."  So it's from the clinical
22 evaluation, which I've participated in
23 many times, that you -- based on the
24 different types of clinical data, you
25 determine what's clinically significant.

Page 151

1 Does that help?
2 BY MS. SUTHERLAND:
3     Q.  Not really.  Right now my question
4 is just on are you -- do you consider
5 yourself qualified as a non-physician to
6 offer an opinion as to the clinical
7 significance of the different adverse
8 reactions that are set out in the TVT-O IFU?
9         MR. GOSS:  Objection.  Form.
10         THE WITNESS:  I think there are
11 two parts -- two answers -- two parts of
12 the answer to that question, I should
13 say.
14         If you're talking about in
15 terms of determining in an event that
16 occurs to a patient whether or not that
17 particular event is clinically
18 significant, in that case, I would work
19 with the doctor to make that
20 determination, which I've done many
21 times.
22         If you're talking about
23 clinical significance as to what goes in
24 the labeling, that is based on an
25 evaluation of, as I mentioned, what's

Page 152

1 known through commercial experience, the
2 scientific literature, clinical
3 investigations that are done.
4         And when you look at the
5 potential -- whether the -- where
6 there's a reasonable association of the
7 device with the occurrence of the event,
8 there doesn't have to be causation
9 proved.  Based on that analysis, you
10 determine what should go in the
11 labeling, which I did for my opinions,
12 and yes, I am qualified to do that.
13 BY MS. SUTHERLAND:
14     Q.  Okay.  And my question is not
15 asking you if you're qualified to opine as
16 to what ought to be in the labeling.  My
17 question is:  Are you qualified as a
18 non-physician to tell me of the adverse
19 events that are in the labeling, which are
20 more clinically significant than others as
21 far as the order that they ought to be
22 listed?
23         MR. GOSS:  Objection.  Form,
24 asked and answered.
25         THE WITNESS:  With severity and

Page 153

1 frequency, based on severity and
2 frequency, yes.  In terms of whether or
3 not a clinician thinks in terms of
4 managing a patient one is more important
5 than another, then for that, a physician
6 would be the appropriate person.  But in
7 terms of severity and frequency on
8 clinical significance, yes.
9 BY MS. SUTHERLAND:
10     Q.  Is that just because of your review
11 of the medical literature?
12     A.  No.  It's review of what's in the
13 clinical literature -- I mean, the clinical
14 studies that have been published as well as
15 the literature and commercial experience,
16 what's known within the company, the
17 input -- there's lots of documentation
18 within Ethicon that -- where they've had
19 meetings of their preceptors and meetings of
20 their experts who they consult with who have
21 discussed the importance of a number of
22 unmet medical needs, for example, with mesh
23 and what is important from a clinical
24 standpoint.
25     Q.  So if -- I'm not going to -- we may

39 (Pages 150 to 153)

Peggy Pence, Ph.D.

Page 154

1 agree to disagree on your qualifications on
2 that, but assuming you are allowed to opine
3 as to the clinical significance of adverse
4 reactions, in looking at the TVT-O IFU, are
5 those adverse reactions listed appropriately
6 in descending order according to their
7 clinical significance as determined by their
8 severity and frequency?
9        MR. GOSS: Objection. Form.
10       THE WITNESS: There are no
11   severities and frequencies listed here
12   to denote that aspect of whether or not
13   they're listed in order of clinical
14   significance.
15        As well, some of them are
16   wrong, like transitory foreign body
17   reaction may occur. It may be chronic.
18 BY MS. SUTHERLAND:
19   Q. Do you have an opinion that you
20 intend to give that the adverse reactions
21 that are listed in the TVT-O IFU are
22 incorrectly listed as far as being put in
23 descending order according to their clinical
24 significance as determined by their severity
25 and frequency?

Page 155

1        MR. GOSS: Objection. Form.
2        THE WITNESS: As regards to the
3    question as you've asked it and as I
4    understand it, that's not my intention
5    to opine about that specifically.
6 BY MS. SUTHERLAND:
7    Q. Okay. Then let me take you to the
8 next sentence on the Blue Book Memo, and it
9 talks about "Provide frequency data from
10 adequately reported clinical studies when
11 the data is not well known to the device
12 user and/or when needed in deciding between
13 the use of the device and an alternative
14 procedure or approach."
15       Are you with me?
16   A. Yes.
17   Q. All right. I want to break those
18 into two questions, if I could, first.
19       As I understand what the Blue Book
20 Memo says, it says you provide frequency
21 data from adequately reported clinical
22 studies when the data is not well known to
23 the device user. All right? Are you with
24 me?
25   A. Yes. Yes.

Page 156

1    Q. Do you with that?
2    A. Yes.
3    Q. All right. The device user for a
4 pelvic mesh product is someone who's been
5 trained in the surgical treatment of stress
6 urinary incontinence; correct?
7    A. In the treatment of stress -- well,
8 we hope so, yes.
9    Q. Well, the information -- I mean,
10 the IFU, in fact, sets out that that's who
11 ought to be using the TVT-O; correct?
12   A. Yes.
13   Q. Someone who's been trained in the
14 surgical treatment of stress urinary
15 incontinence?
16   A. That is correct.
17   Q. And, in fact, someone who's been
18 trained in the use of the TVT-O; right? I
19 mean, that's what the IFU says, isn't it?
20   A. Let me look at the specific
21 language.
22   Q. Okay. It's actually on page 2
23 under "Important."
24   A. Yes, it does. This one does say
25 and specifically in implanting the Gynecare

Page 157

1 TVT obturator device. That said --
2    Q. Well, now, you've answered my
3 question. So my next question is --
4        MR. GOSS: Let me see that.
5 BY MS. SUTHERLAND:
6    Q. Have you conducted a study of
7 surgeons who are trained in the surgical
8 use -- strike that.
9        Have you conducted a survey of
10 physicians who have been trained in the
11 surgical treatment of SUI and trained in the
12 use of TVT-O to determine whether or not
13 they were unaware of frequency data of any
14 adverse event?
15       MR. GOSS: Objection. Form.
16       MS. VERBEEK: Same objection.
17       THE WITNESS: I have not
18   conducted a survey, but I've certainly
19   reviewed deposition testimony where
20   there's information about adverse
21   reactions or potential adverse reactions
22   that doctors were not aware of.
23 ///
24 BY MS. SUTHERLAND:
25   Q. And how many depositions of

40 (Pages 154 to 157)

Peggy Pence, Ph.D.

Page 158

1  surgeons trained in the surgical treatment
2  of SUI and TVT-O have you reviewed?
3        MR. GOSS:  Objection.  Form.
4        THE WITNESS:  I don't have a
5    specific number that I recall as I sit
6    here today.
7  BY MS. SUTHERLAND:
8    Q.  I mean, it's less than five.
9  Wouldn't that be fair?
10    A.  It may be more than five.
11    Q.  Of surgeons trained for TVT-O?
12    A.  It may be more than five.
13    Q.  Is it going to be more than ten?
14        MR. GOSS:  Objection.  Form.
15        THE WITNESS:  Probably not.
16  BY MS. SUTHERLAND:
17    Q.  And do you know how many surgeons
18  in the United States are trained in the
19  surgical treatment of stress urinary
20  incontinence?
21        MR. GOSS:  Objection.  Form.
22        MS. VERBEEK:  Same objection.
23        THE WITNESS:  I can tell you
24    approximately how many urogynecologists,
25    gynecologists, and urologists there are

Page 159

1    in total.  How many have actually, you
2    know, practiced in the treatment of SUI,
3    I don't have a specific number, but
4    there are in the high 30 thousands, if I
5    recall correctly, of ones who are listed
6    as active.
7  BY MS. SUTHERLAND:
8    Q.  All right.
9    A.  And practice.
10    Q.  And if I'm understanding the basis
11  of your opinion that frequency data from
12  adequately reported clinical studies is not
13  well known to the user of the TVT-O, that
14  basis is your review of approximately ten or
15  less depositions?
16        MR. GOSS:  Objection.  Form.
17        THE WITNESS:  I'm saying that
18    there -- I'll take the counter argument,
19    so to speak, to your question that
20    you're asking how many surgeons there
21    are that may practice in SUI.
22        First of all, the labeling is
23    the cornerstone of risk management, and
24    the purpose is to provide all
25    information necessary for safe and

Page 160

1    effective use of the product, and if you
2    don't include information from clinical
3    studies for very adverse events that are
4    of high clinical significance in the
5    labeling, then you are assuming that
6    those 30 some-odd thousand physicians
7    who could potentially use the product
8    have all read all the literature that
9    expresses that important information.
10        And you're also assuming, then,
11    that all of those 30 some-odd thousand
12    doctors have gone to specific training
13    for TVT-O, and the TVT-O training is a
14    cadaver lab sometimes with a proctor
15    later as well working with a proctor.
16        But there's no credentialing
17    required for someone to be able to
18    implant a TVT-O; so they may or may not
19    have had specific training.
20        But you have to go back to the
21    point of the labeling.  The manufacturer
22    owns that document.  It is the key point
23    of communication, the IFU, with the
24    physician who's going to be using the
25    product.  And, therefore, all necessary

Page 161

1    important information must be in there.
2        For example, the groin and
3    thigh pain.  The percentage is as high
4    as in the 20 percents, 20 percent or
5    more for groin and thigh pain in some
6    clinical studies.  Doctors who are
7    implanting the TVT-O, if they've not
8    read the literature, they're not up to
9    date on the literature, would not know
10    that.
11        That's the reason that type of
12    information should be in the IFU.
13        MS. SUTHERLAND:  All right.
14    I'm going to move to strike that entire
15    answer.
16        Would you read my question
17    back?
18        (Record read by the
19    reporter as follows:
20  BY MS. SUTHERLAND:
21    Q.  Is that true?
22    A.  Not as you've asked the question.
23  No, that's not true.
24    Q.  Are you assuming that the 30,000 or
25    so surgeons, and it might be less, that are

41 (Pages 158 to 161)

Peggy Pence, Ph.D.

1  actually trained in the surgical treatment
2  of stress urinary incontinence do not know
3  frequency data of adverse events?
4       MR. GOSS:  Objection.  Form.
5  BY MS. SUTHERLAND:
6    Q.  Are you making that assumption?
7    A.  I'm not making an assumption.  I'm
8  stating that it's really irrelevant as to
9  what goes in the labeling.  There are
10  standards.  There are regulations, and
11  there's a global standard for what's
12  supposed to go into the labeling.
13      And going to the second point here,
14  information when needed and deciding between
15  the use of the device and an alternative
16  procedure or approach, having that
17  information is critical to understanding
18  what the risks are for one product versus
19  another, and without that information, the
20  labeling does not serve its purpose which is
21  to provide, again, all the information
22  necessary for safe and effective use of the
23  product.
24    Q.  And I appreciate that, but my
25  question is the Blue Book that you're

1  relying on for your opinion that frequency
2  data needs to be in the IFU says, "You
3  provide frequency data when that data is not
4  well known to the device user."  And I'm
5  trying to get what have you done to
6  determine that the frequency data is not
7  well known to the device users of TVT-O?
8       MR. GOSS:  Objection.  Form.
9  BY MS. SUTHERLAND:
10    Q.  And you haven't done a survey of
11  physicians; correct?
12    A.  No.  Nor did the company.
13    Q.  You've read approximately ten
14  depositions of surgeons for the TVT-O;
15  correct?
16    A.  Yes.
17    Q.  All right.  What have you done
18  otherwise, if anything, to be able to opine
19  that frequency data from adequately reported
20  clinical studies is not well known to the
21  TVT-O device user?
22    A.  I have looked up and evaluated the
23  total numbers of physicians that have the
24  potential credentials to implant this
25  device, and one has to -- Ethicon didn't --

1  I've not seen any evidence that Ethicon has
2  ever done this survey in order to exclude
3  incorporating that information.
4    Q.  I'm asking what you have done.
5    A.  I have not done a survey, but short
6  of Ethicon, who has a responsibility for the
7  labeling, never having done such a survey,
8  then the information needs to be included.
9       One would be making a large
10  assumption to think that every physician of
11  those 30-plus thousand has read all of the
12  literature that's available.
13    Q.  Aren't you making an assumption
14  that they haven't?
15    A.  But that's the point.  The
16  labeling --
17    Q.  Give me a yes or no, please.  Are
18  you making an assumption that they haven't
19  read the literature?
20       MR. GOSS:  No, no, no.  We're
21  not going to start interrupting her by
22  telling her what she's going to do and
23  what she's not going to do.  You can ask
24  your question.  She can answer the
25  question.  You can object nonresponsive.

1  But let's not interrupt each other.
2  BY MS. SUTHERLAND:
3    Q.  Aren't you making an assumption
4  that --
5       MR. GOSS:  Are you finished?
6  Were you finished with your answer?
7       THE WITNESS:  I don't remember
8  my point.
9  BY MS. SUTHERLAND:
10    Q.  I'll start over.  Aren't you making
11  an assumption that surgeons trained in the
12  surgical treatment of stress urinary
13  incontinence have not read the medical
14  literature and, therefore, are not versed in
15  frequency data?
16    A.  What I am saying I am not making
17  any assumption.  What I'm saying is that I'm
18  doing -- I'm recommending -- I'm opining
19  that one ensures that the information is
20  available, which is what a reasonably
21  prudent medical device manufacturer would do
22  to ensure that the information is available
23  because one cannot know if every surgeon who
24  might use this product has read the
25  literature.

Golkow Technologies, Inc. - 1.877.370.DEPS

Peggy Pence, Ph.D.

Page 166

1 Then the manufacturer who owns the
2 label must ensure that the necessary
3 information for safe and effective use of
4 the product is provided.
5 Q. All right. Let me ask it one more
6 time. What, if anything, have you done to
7 determine that surgeons trained in the
8 surgical treatment of stress urinary
9 incontinence do not know the frequency data
10 from adequately reported clinical studies?
11 MR. GOSS: Objection. Form.
12 THE WITNESS: I've already
13 indicated that I've read depositions of
14 different physicians. I've read
15 obviously lots of internal
16 documentation, scientific literature,
17 and I've evaluated, I've assessed the
18 total number of potential physicians in
19 this country who could be using this
20 product.
21 BY MS. SUTHERLAND:
22 Q. Okay.
23 A. And based on that -- and based on
24 what should be included in the label for
25 safe and effective use of the product, I

Page 167

1 arrived at my opinions.
2 Q. Is there an internal Ethicon
3 document that says that frequency data for a
4 particular adverse event is not well known
5 to device users?
6 MR. GOSS: Objection. Form.
7 THE WITNESS: Ask that question
8 again, please.
9 BY MS. SUTHERLAND:
10 Q. Sure. I thought you said as part
11 of your bases for your opinion that you're
12 relying on internal Ethicon documents.
13 A. Right.
14 Q. So is there such a document from
15 Ethicon that says for any adverse event that
16 the frequency data of that adverse event is
17 not well known to device users?
18 A. Well, for example, there's
19 information on roping, and -- there's
20 documentation in Ethicon's files, I should
21 say, on roping and fraying and that this
22 information and the -- that that information
23 was not made known to doctors.
24 Q. Let me limit it to actually to
25 adverse events.

Page 168

1 A. Well, adverse events can result
2 from that.
3 Q. Well, for instance, like erosion
4 could result from one or the other of the
5 things that you said. But I'm asking
6 specifically about an adverse event that you
7 think ought to be listed in the IFU with
8 frequency data.
9 Is there a particular Ethicon
10 document that you're thinking of that
11 supports your opinion that users of the
12 TVT-O device didn't know about the frequency
13 data from adequately reported clinical
14 studies?
15 MR. GOSS: Objection. Form.
16 THE WITNESS: As you've asked
17 the question, I can't think of a
18 specific document that says they don't
19 know the frequency of this, but I can
20 think of many documents that say
21 doctors -- that this information has not
22 been made available to doctors.
23 BY MS. SUTHERLAND:
24 Q. Okay. I'm going to move to strike
25 after your first sentence.

Page 169

1 Now, you can set aside that IFU and
2 pull out your report from this case, the
3 2015, and turn to pages 78 and 79, if you
4 would. I'll tell you where I'm going with
5 this.
6 I want to get from you exactly what
7 you intend to tell a jury ought to be listed
8 under the adverse reactions section of the
9 TVT-O IFU in 2010.
10 Does that make sense?
11 A. Yes, it does.
12 Q. All right. So I've read through
13 your report and saw the list on page 78 and
14 79, and I want to ask you is this listing on
15 these bullet points from 78 to 79 what you
16 intend to tell a jury in this case should
17 have been included in the adverse reactions
18 section of the TVT-O IFU?
19 A. Yes, that's correct.
20 Q. All right. Now, are there any
21 additional -- I want to be sure I've got the
22 whole list for the adverse reactions
23 section. Are there any additional adverse
24 reactions that you think should be listed
25 here? And I'll ask you about one because I

Peggy Pence, Ph.D.

Page 170

1  don't want to play any tricks on you.
2       Groin pain and leg pain is not
3  listed in those bullet points. Should it
4  be, according to your opinion?
5     A. Yes. And let's see. I do address
6  that on page 81.
7     Q. Yeah. And that's why --
8     A. And 82 and 83.
9     Q. -- I'm asking should those be
10 additional -- two additional bullet points
11 that we add to these bullet points on 78 and
12 79?
13    A. Yes. And that's indicated on
14 page 83 where I note that "By no later than
15 2007, Ethicon had the responsibility to
16 update the IFU to advise physicians that
17 leg, groin, inner thigh pain may be chronic,
18 may require analgesics for pain management
19 and may require mesh excision and complete
20 mesh removal, may be not be possible. As well,
21 leg movement may be affected and, moreover,
22 the likelihood of this complication is
23 significantly higher for TVT-O implantation
24 versus TVT."
25    Q. So let me be sure I've got a

Page 171

1  complete listing here. As I understand
2  it -- well, first of all, let me ask you.
3  On your first bullet point on page 78,
4  you've got there "Pain, including chronic
5  pain," and then you've got a parenthetical
6  with note.
7       Now, the parenthetical you're not
8  saying should be included in your adverse
9  reactions section for the IFU; correct?
10    A. No. My purpose, if I can explain
11 why I included that, I wanted to be thorough
12 so that you wouldn't look at the fact that
13 the IFU says, "Transient pain lasting 24 to
14 48 hours may occur" and then say, "Well, we
15 do say pain."
16    Q. Right.
17    A. So I'm addressing that I recognize
18 what the IFU says, but what the IFU says is
19 inadequate and incorrect actually.
20    Q. So would the parentheticals that
21 are listed here next to these bullet points,
22 obviously not be what you're saying should
23 be in the TVT-O IFU?
24    A. I'll just check each one.
25    Q. Yeah.

Page 172

1     A. Yes.
2     Q. Okay. And now tell me specifically
3  on the leg pain, groin pain issue what
4  exactly you would add to this list
5  language-wise?
6     A. "Leg, groin, inner thigh pain that
7  may be chronic may require analgesics for
8  pain management and may require mesh
9  excision --
10    Q. Okay.
11    A. -- and complete mesh removal may
12 not be possible and leg movement may be
13 affected."
14    Q. So that whole --
15    A. And that the complication -- this
16 goes back to what we were talking about
17 earlier about the frequency, that the
18 likelihood of this complication is
19 significantly higher for TVT-O versus TVT.
20    Q. And so that, what all you just
21 said, ought to be in one bullet point under
22 adverse reactions?
23    A. Some of it might be in the warnings
24 like the TVT -- this is -- the complication
25 rate is higher for TVT-O than for TVT, for

Page 173

1  example.
2     Q. Okay. Now --
3     A. Because the adverse reactions are
4  supposed to reference warnings. Those that
5  are serious should also reference "See
6  warnings for additional information which
7  may also include limitations of use as a
8  result of the potential for that adverse
9  reaction and what might be done, if
10 anything, to be able to mitigate that risk.
11    Q. Now, are there any other bullet
12 points that we need to add to pages 78 and
13 79 in order for me to have a complete
14 listing of your opinion in this case as far
15 as adverse reactions?
16    A. These are ones that are missing.
17 So obviously, you have the ones that are
18 already in the adverse reaction listing.
19    Q. Right.
20    A. As I sit here today, I think
21 it's -- but we do have the warnings as well.
22    Q. Yeah, I'm going to talk about
23 those.
24    A. Okay.
25    Q. Now, is the listing on page 78 and

Golkow Technologies, Inc. - 1.877.370.DEPS

Peggy Pence, Ph.D.

Page 174

1  79 in the order that you would place it
2  according to clinical significance based on
3  severity and frequency?
4      A. No.
5      Q. How would you order this list?
6      A. I haven't done that evaluation. I
7  would do -- I would go through the process
8  that I talked about earlier is looking at
9  doing an evaluation of the available data
10 through commercial experience, through what
11 the company knew at the time of launch of
12 the product, is documented in the
13 documentation from the company, through the
14 scientific medical literature, through
15 the -- the clinical -- any clinical
16 information that may be available for
17 similar products if not the company's own
18 product, looking at all of that and then
19 evaluating what the percentages of
20 occurrence are, what the range of occurrence
21 is because different studies will report
22 different ranges, look at the frequency,
23 look at the severity, look at the
24 permanency, the chronicity, and then as part
25 of the project team, evaluate that and

Page 175

1  determine what are the most important ones,
2  what clinicals, which ones should be
3  presented as most clinically significant for
4  this particular device and present them in
5  that way.
6      So it's an evaluation that needs to
7  be undertaken in that type of a framework.
8      Q. Okay. I'm going to move to strike
9  everything after "I have not done that
10 evaluation."
11     Would it be fair to say, though,
12 that at least as you sit here today, you're
13 not intending to tell a jury the order that
14 your bullet points ought to be listed in?
15     A. That's correct.
16     Q. Okay. Now -- oh, one more thing on
17 the bullet points. Is it your opinion, for
18 instance, that -- let's just assume, if you
19 will for now, that like the first three are
20 listed in the correct order according to the
21 Blue Book Memo. All right? Is it your
22 opinion that they also need to have some
23 sort of frequency rate or percentage out
24 beside them?
25     A. If that data is available through

Page 176

1  clinical studies, which there is data
2  available like the groin and thigh pain.
3  There are studies that report in the 20
4  percents ranges for groin and thigh pain in
5  certain studies.
6      Q. Okay.
7      A. And so for things of nature, again,
8  yes, because that then helps a clinician,
9  the surgeon in this case, to understand when
10 he's deciding what type -- what the
11 frequency of dyspareunia is, for example,
12 and whether or not it's short term or long
13 term.
14     That type of information is
15 critical for the surgeon to know as he works
16 with the patient to make a decision is what
17 the best treatment is for this patient.
18     Q. Okay. I'm going to move to strike
19 everything after "yes."
20     Actually, would you read my
21 question back?
22     (Record read by the
23 reporter as follows:
24 Is it your opinion, for instance, that -- let's
25 just assume, if you will for now, that like the
   first three are listed in the correct order

Page 177

1  according to the Blue Book Memo. All right? Is it
2  your opinion that they also need to have some sort
3  of frequency rate or percentage out beside them?")
4  BY MS. SUTHERLAND:
5      Q. Okay. And I think your answer to
6  that was yes; correct?
7      A. I think I also said that if that
8  information is available from clinical
9  studies.
10     Q. Okay. Is that information
11 available from clinical studies for all of
12 your bullet points on pages 78 to 79?
13     A. One would have to do -- there is
14 information on all of these in the
15 literature, yes, but that -- one would have
16 to do an assessment of the literature and
17 look at ranges that were reported and make
18 determinations so that you could say, you
19 know, ideally this information comes from
20 the company having done its own clinical
21 studies.
22     Q. Have you done the determination as
23 to what the frequency rates ought to be for
24 all of your bullet points?
25     A. I actually have in some of my

Peggy Pence, Ph.D.

Page 178

1  reports some that are indicated in some of
2  the systematic reviews that have been done.
3  I've not done and I have looked at that in
4  terms of looking at each one of these and
5  evaluating the entirety of the literature
6  and making a determination for each of these
7  as to what I would include or whether or not
8  it needs to be included for every one.
9      I have not done that determination,
10 but it certainly, for the more clinically
11 significant ones, that's appropriate to do.
12     Q.  Okay.  And tell me which ones are
13 the more clinically significant ones that
14 you're talking about there?
15     A.  Certainly the groin and leg, inner
16 thigh pain, the effect on walking, the
17 erosion, the rates of erosion, the
18 shrinkage, the urinary problems, the ones
19 that occur most frequently.
20     But, again, in order to do that and
21 give the right percentages, one would go
22 through the process that I have already
23 described.
24     Q.  Okay.  Now, let me turn -- well,
25 let me make sure.  Have you given me your

Page 179

1  opinions that you're going to offer to a
2  jury as to what ought to be under the
3  adverse reaction section of the TVT-O IFU?
4      A.  Yes, in terms of missing data, yes.
5      Q.  Right.  Okay.  Now, I'm going to
6  turn to your warnings and precautions.
7      A.  Missing adverse reactions, I should
8  say.
9      Q.  Yeah.  So let me turn to the
10 warnings, and am I correct that the warnings
11 information that you think should be in the
12 TVT-O IFU as of 2010, that is set out on
13 pages 79 and 80 and top of 81 and also
14 includes the leg and groin pain that you and
15 I already talked about?
16     A.  That's correct.
17     Q.  All right.  Is there anything else
18 that you intend to opine ought to be in the
19 warnings section of the TVT-O IFU as of
20 2010?
21     A.  There are -- there are two points
22 that I would add.
23     Q.  Okay.
24     A.  One is that factors that --
25 patient-related factors that may affect how

Page 180

1  they respond to implantation of mesh and the
2  Ethicon documentation reflects that there
3  are certain factors related to individual
4  patients' medical status that might impact
5  how well they would respond to implantation
6  of the device or whether or not it might
7  increase their risk for complications, in
8  other words.  So those factors would be
9  appropriately included in the warnings and
10 precautions section.
11     And then the other one is that
12 while the -- with regard to degradation and
13 that the mesh may degrade and that with
14 degradation, that that may impact the safety
15 and effectiveness, whereas I -- if I recall
16 correctly, the IFU states that the product
17 does not degrade.
18     Yes, it says under the action
19 section on the last page, "The material is
20 not absorbed nor is it subject to
21 degradation or weakening by the action of
22 tissue enzymes."
23     Q.  Okay.  Let me go back to your first
24 point on the patient factors.  What specific
25 patient factors are you talking about there

Page 181

1  for inclusion under warnings?
2      A.  For example, if there's any
3  potential scarring already there as a result
4  of prior surgeries, information of that
5  nature.
6      Q.  Okay.  Anything else under warnings
7  that you're going to opine about ought to be
8  in the TVT-O IFU as of 2010?
9      A.  With regard to the I think -- or I
10 should say with regard to "Chronic pain may
11 result from foreign body reaction and/or
12 scarring and contraction," the information
13 that's provided there, if asked, I would
14 also opine that that scarring and
15 contraction in addition to pain may also
16 result in vaginal tightening and distortion
17 of the vagina.
18     Q.  Okay.
19     A.  And as regards the dyspareunia,
20 occurring and being persistent --
21     Q.  I'm sorry.  Where are you?
22     A.  Also on top of page 80.
23     Q.  Oh, "De novo dyspareunia may occur
24 and be persistent"?
25     A.  Yes.  That -- that sexual function

Peggy Pence, Ph.D.

Page 182

1 may be affected for a lifetime.  There's the
2 potential that sexual dysfunction --
3     Q.  You're just adding length --
4     A.  Between that and the vaginal
5 tightening and narrowing, that between both
6 of those, that there's the potential that a
7 patient would not be able to have sexual
8 intercourse.
9     Q.  Okay.  Anything else?
10     A.  As I sit here today --
11     Q.  I know you're trying hard.  You've
12 got to come up with one more.  That's the
13 best you've got right now?
14     A.  Yes.
15     Q.  All right.  Let me switch gears on
16 you for a minute, and I want to talk to you
17 about sources of information other than the
18 IFU for doctors.  Okay?
19     A.  I understand.
20     Q.  Would you agree that professional
21 education could be a source of information
22 with respect to the risks associated with
23 the TVT-O?
24     A.  Yes.  It's not the primary source.
25 It is a source.

Page 183

1     Q.  Okay.  And while I'm on that, I did
2 not see any opinion of yours in your report
3 as to professional education.
4         Do you intend to offer any opinions
5 in the Jennifer Ramirez case about
6 professional education?
7     A.  If I understand your question,
8 you're separating professional education
9 separately from the professional labeling
10 which is addressed in my report.
11     Q.  Oh, yeah.  You and I have talked
12 about the IFU, and I am sure we will again.
13     A.  No, no, not that.  There's a
14 section in my report that also talks about
15 the promotional labeling.
16     Q.  Marketing pieces?
17     A.  Yes.
18     Q.  Yeah.  I'm not talking about that.
19 I'm talking about the actual training
20 sessions, actual professional education
21 where slide decks are shown and cadavers are
22 used.  I didn't see any opinions of yours on
23 what I'm calling Ethicon's professional
24 education.
25         Do you intend to offer any opinions

Page 184

1 on Ethicon's professional education, as I've
2 described that term to you?
3     A.  As I sit here today, no.
4     Q.  Okay.  Do you agree that doctors
5 can get information about surgical treatment
6 of SUI including the use of TVT-O from
7 medical school training?
8     A.  Yes.
9     Q.  All right.  Depending on --
10         MR. GOSS:  Objection.  Form.
11         MS. VERBEEK:  Objection.
12         THE WITNESS:  Depending on the
13     medical school and what the training
14     program is and how extensive their
15     involvement is.
16 BY MS. SUTHERLAND:
17     Q.  Do you know if the TVT-O procedure
18 is taught in medical school?
19     A.  I don't know that it would be
20 taught in medical school so much as it might
21 be taught in residencies.
22     Q.  Okay.
23     A.  But I haven't -- I can't say that
24 specifically.  I've not studied it.
25     Q.  Would medical literature be another

Page 185

1 source of information for doctors about
2 risks associated with surgical treatment of
3 SUI including TVT-O?
4     A.  Yes.
5     Q.  Would talking to colleagues be
6 another source of information for doctors?
7     A.  Yes, but it would be based on an
8 individual doctor's experience, not on --
9 those are all separate sources, but not the
10 primary sources.
11     Q.  Yeah.  And what I'm talking to you
12 about are just different sources where
13 doctors can get information about risks and
14 benefits of different surgical options for
15 the treatment of SUI including the option of
16 the TVT-O; right?
17     A.  Yes.
18     Q.  All right.  And, in fact, a
19 surgeon's own clinical experience can be a
20 source of information for him?
21     A.  Yes, although that's limited
22 experience, and, you know, there is
23 documentation now in the literature that
24 supports that doctors performing these
25 procedures with mesh may actually not even

47 (Pages 182 to 185)

Peggy Pence, Ph.D.

Page 186

1 know the complications with their own
2 patients because many times patients who
3 have complications don't return to the
4 doctor who did the implantation, such as in
5 the case with Ms. Ramirez.
6        She didn't return to Dr. Reyes to
7 do her revision. She went to other
8 physicians for her revisions. And so that
9 happens, and when that happens, doctors are
10 not aware that their patients have had
11 complications.
12        (Mr. Goss exits the proceeding.)
13        MS. SUTHERLAND: I'm going to
14 move to strike everything after "yes."
15 BY MS. SUTHERLAND:
16    Q. Do you agree that -- should I wait
17 for him to come back?
18    A. Probably.
19        MS. SUTHERLAND: Let's go off.
20        THE VIDEOGRAPHER: Going off
21 the record. The time is approximately
22 1:54 p.m.
23        (Recess taken from
24 1:54 p.m. to 1:54 p.m.)
25        THE VIDEOGRAPHER: Back on the

Page 187

1    record. The time is approximately
2    1:54 p.m.
3 BY MS. SUTHERLAND:
4    Q. All right. Dr. Pence, do you agree
5 that doctors who implanted the TVT-O may
6 have learned of the risks of that device
7 through means other than the IFU?
8        MR. GOSS: Objection. Form.
9        MS. VERBEEK: Same objection.
10        THE WITNESS: Some doctors may
11    have learned of some of the risks
12    through other means, but that, again,
13    would be an assumption. It's not the
14    primary means of communicating risks to
15    the doctor. The primary means is the
16    IFU. So one can't rely on a doctor
17    having learned about the risks on --
18    based on other sources.
19 BY MS. SUTHERLAND:
20    Q. Okay. I'll move to strike
21 everything after your first phrase.
22        Are you aware that some doctors
23 don't read the IFU before implanting
24 surgical mesh?
25        MR. GOSS: Objection. Form.

Page 188

1        THE WITNESS: Dr. Reyes did.
2 BY MS. SUTHERLAND:
3    Q. Are you aware that some doctors do
4 not read IFUs before implanting surgical
5 mesh?
6        MS. VERBEEK: Objection. Form.
7        MR. GOSS: Objection. Form.
8        THE WITNESS: There may be some
9    doctors who don't. But without asking
10    every doctor, I can't say that. And
11    irregardless, whether that happens or
12    not, it's the manufacturer's
13    responsibility to be sure that the IFU
14    is -- contains all the necessary
15    information for safe and effective use
16    of the product, and it's truthful and
17    accurate and not misleading.
18 BY MS. SUTHERLAND:
19    Q. Okay. I'm going to move to strike
20 everything after your first phrase and
21 response.
22        In your opinion, how often should a
23 doctor read a device IFU?
24        MR. GOSS: Objection. Form,
25    foundation.

Page 189

1        MS. VERBEEK: Same objection.
2 BY MS. SUTHERLAND:
3    Q. Or do you have an opinion on that?
4 You may not. I don't know.
5    A. Dr. Reyes testified he went back to
6    it many times and reviewed it. It
7    definitely should be reviewed any time
8    there's new information that is important to
9    the doctor.
10    Q. How would a doctor know there's new
11 information if he doesn't review it?
12        MR. GOSS: Objection. Form.
13        THE WITNESS: Well, if there's
14    an IFU in every mesh package, and if the
15    manufacturer wants to ensure that the
16    physician knows that there is an update
17    that's important for him or her to know,
18    then a red card, for example, there are
19    different means where that can be
20    attached with a new IFU that says,
21    "Please refer to section adverse
22    reactions and warnings when new
23    information has been added for the safe
24    and effective use of this product" or
25    some similar wording, or a Dear Doctor

48 (Pages 186 to 189)

Peggy Pence, Ph.D.

Page 190

1    letter can be sent out saying, "We've
2    updated the IFU. Here's a copy. This
3    is the information that's changed. We
4    feel it's important for you to know
5    that."
6  BY MS. SUTHERLAND:
7      Q. How many Dear Doctor letters have
8  you seen from pelvic mesh manufacturers?
9          MR. GOSS: Objection. Form.
10         THE WITNESS: I've seen at
11    least one. I don't recall how many
12    total I've seen but --
13  BY MS. SUTHERLAND:
14      Q. The one you're recalling, was that
15  in relation to updated labeling?
16      A. It was, if I'm recalling correctly,
17  in relation to this 2011 public -- the
18  advisory committee meeting, FDA advisory
19  committee meeting, and there may have been
20  one as well with regard to removing certain
21  meshes from the market.
22      Q. With respect to 2011 Ad Com
23  meeting, who sent out that Dear Doctor
24  letter?
25         MR. GOSS: Objection. Form.

Page 191

1  BY MS. SUTHERLAND:
2      Q. Which manufacturer?
3      A. As I sit here today, to the -- I
4  would need to check my memory.
5      Q. Okay. Do you know whether or not
6  it was Ethicon?
7      A. I think it may have been Ethicon,
8  but I would need to confirm my memory.
9      Q. Would you trust me if I said it
10  was?
11      A. Yes.
12         MR. GOSS: Doesn't sound like
13    them.
14         MS. SUTHERLAND: Move to
15    strike.
16         THE WITNESS: However, I think
17    if you have that, we can talk about it
18    as to whether or not the information in
19    there was exactly what should have been
20    included.
21  BY MS. SUTHERLAND:
22      Q. When was Ms. Ramirez implanted?
23      A. In -- if I recall correctly, it was
24  September of 2010.
25      Q. All right. Now, have you done any

Page 192

1    study of surgeons who conduct surgical
2    repair of SUI to determine what risks
3    they're aware of, not from reading the IFU,
4    but from their medical school or residency
5    training?
6      A. Have I conducted a survey?
7      Q. Right.
8      A. I've not conducted a survey, no.
9      Q. All right. Have you conducted a
10  survey of surgeons trained in the surgical
11  treatment of SUI to determine what risks of
12  a mesh device they understood, not from
13  reading the IFU, but from their professional
14  education training?
15      A. Can you just repeat the question,
16  please?
17      Q. Yeah, it's a long one.
18      A. Yes, I know.
19      Q. Have you conducted any study or
20  survey of surgeons trained in the surgical
21  treatment of SUI to determine what risks of
22  the TVT-O they understood, not from reading
23  the IFU, but from participating in
24  professional education?
25         MR. GOSS: Objection. Form.

Page 193

1          THE WITNESS: I've not. As
2    regards to a particular survey, I've not
3    conducted such a survey.
4  BY MS. SUTHERLAND:
5      Q. All right. Have you conducted any
6  study or survey of surgeons trained in
7  surgical treatment of SUI who implanted
8  TVT-O to determine what risks of the TVT-O
9  they understood from reading medical
10  literature as opposed to reading the IFU?
11         MR. GOSS: Objection. Form.
12         THE WITNESS: No, I haven't,
13    and it's not relevant to my opinion as
14    to what should go into the IFU. My
15    opinion would be the same regardless of
16    what the answer to any of those surveys
17    would be because, again, the IFU is the
18    primary communication between the doctor
19    and the surgeon -- I mean, between the
20    company and the surgeon.
21  BY MS. SUTHERLAND:
22      Q. And I move to strike everything
23  after "No, I haven't."
24      Last one on that. Have you
25  conducted any study or survey of surgeons

49 (Pages 190 to 193)

Peggy Pence, Ph.D.

Page 194

1  trained in the surgical treatment of SUI to
2  determine what risks of the TVT-O they
3  understood, not from reading the IFU, but
4  from their own clinical experience
5  implanting the TVT-O?
6        MR. GOSS:  Objection.  Form.
7        MS. VERBEEK:  Same objection.
8        THE WITNESS:  Again, the --
9  whether or not I -- the answer to any
10  such survey would not impact my opinion
11  as to what should be in the IFU, and
12  I've not conducted such a survey.  But
13  also to that point, their own clinical
14  experience may not be representative of
15  the risks of the points I mentioned a
16  little while ago that patients who
17  experience serious complications, and
18  it's reflected in the literature, do not
19  often return to the implanting
20  clinician.
21        So the implanting surgeon would
22  not know about those risks.  So their
23  experience may not be a very accurate
24  reflection of what the complication rate
25  is, and it would be foolhardy to rely on

Page 195

1  their experience only.
2  BY MS. SUTHERLAND:
3     Q.  All right.  I'm going to move to
4  strike.
5        Is the answer to my question that
6  you have not conducted any such survey or
7  study?
8        MR. GOSS:  Objection.  Form.
9        THE WITNESS:  Yes, for the
10  reasons I mentioned.
11  BY MS. SUTHERLAND:
12     Q.  Okay.  Talking about different
13  studies, do you agree that there are more
14  clinical studies evaluating safety and
15  efficacy of TVT than any other device used
16  to treat SUI?
17        MR. GOSS:  Objection.  Form.
18        THE WITNESS:  I think,
19  actually, that's from your report.
20  That's my understanding, yes.
21  BY MS. SUTHERLAND:
22     Q.  All right.  Do you have an
23  understanding that there are over 100 RCTs
24  or randomized control trials for TVT?
25     A.  That's my understanding.

Page 196

1        MR. GOSS:  Objection.  Form.
2  BY MS. SUTHERLAND:
3     Q.  All right.  And there are over 60
4  RCTs or randomized control trials for TVT-O?
5        MR. GOSS:  Objection.  Form.
6        THE WITNESS:  Yes, not
7  necessarily conducted by Ethicon.
8  BY MS. SUTHERLAND:
9     Q.  And is it your understanding that
10  there are over a thousand studies -- I'm not
11  saying RCTs but over a thousand studies on
12  TVT?
13        MR. GOSS:  Objection.  Form.
14        THE WITNESS:  I have seen that
15  number, yes.
16  BY MS. SUTHERLAND:
17     Q.  Okay.  Have you looked at the
18  patient brochure for the TVT-O in this case?
19     A.  My understanding that Ms. Ramirez,
20  if I'm recalling correctly, does not recall
21  having received a brochure, although I
22  believe, to the best of my recollection as I
23  sit here today, Dr. Reyes thought he would
24  have given her one, but she did not
25  recall -- if I'm recalling correctly, she

Page 197

1  did not recall having received one.
2     Q.  All right.  I thought I was done
3  with these questions.  A couple more.
4        Have you conducted a study or
5  survey to determine whether the inclusion,
6  for instance, of your bullet points for the
7  adverse reactions on pages 78 to 79 in the
8  TVT-O IFU would have changed any doctor's
9  decision to implant TVT-O?
10        MS. VERBEEK:  Objection to
11  form.
12        MR. GOSS:  Objection.  Form.
13        THE WITNESS:  You're speaking
14  about just the adverse reactions, or
15  you're talking about the warnings as
16  well?
17  ///
18  BY MS. SUTHERLAND:
19     Q.  Well, for now for my question,
20  let's look at just the adverse reactions
21  and -- let me ask it again to make sure I've
22  got it clean.
23        Have you done any kind of study or
24  survey of surgeons trained in the surgical
25  treatment of SUI to determine whether or not

50 (Pages 194 to 197)

Golkow Technologies, Inc. - 1.877.370.DEPS

Peggy Pence, Ph.D.

Page 198

1  the inclusion of your listed adverse
2  reactions on pages 78 to 79 of your report
3  would have changed their decision to implant
4  TVT-O?
5      MR. GOSS:  Objection.  Form.
6      THE WITNESS:  I've not done a
7   survey.
8      MS. VERBEEK:  Objection.
9  BY MS. SUTHERLAND:
10     Q.  Okay.  In your report, I think it's
11  on page 60, you list out what was listed in
12  the FDA's public health notice from 2008, if
13  you want to turn to that.
14     A.  Which page?
15     Q.  Page 60.
16     A.  Page 60.
17     Q.  And I'm actually just curious about
18  this.  Is it your opinion that the
19  complications that the FDA listed in its
20  2008 PHN --
21     A.  You're on page 60?
22     Q.  Yeah.  Are you not there?
23     A.  My page 60 is Section 7 "TVT
24  Classic and TVT Obturator:  Known/Knowable
25  Risks."

Page 199

1      Q.  Uh-huh.
2      A.  And you said something about the --
3      Q.  And then you've got -- yeah -- your
4  paragraph talks about --
5      A.  Oh, you're talking about -- I see.
6  I have a section on FDA.  I thought you
7  might be in that section.  I'm sorry.
8      Q.  No, no, no.  Let me make sure -- I
9  thought I had this right.  Are the bullet
10  points that you've listed there on pages 60
11  to 61 the adverse reactions listed by the
12  FDA in its PHN in 2008?
13     A.  Yes.
14     Q.  Okay.  Now, is it your opinion that
15  if an IFU in 2008 had included these bullet
16  points in its adverse reactions, that it
17  would have been adequate or inadequate?
18     MR. GOSS:  Objection.  Form.
19     THE WITNESS:  No.  It still
20  would have been inadequate.  At this
21  point in 2008, you know, what I've
22  stated here is that Ethicon knew about
23  all of the following complications
24  identified in the 2008 PHN, and I've
25  listed the ones that they testified they

Page 200

1  have known about.
2      But remember, the public health
3  notification was based on an evaluation
4  of the MAUDE database.  And so this was
5  information coming from one of the
6  sources of information that was
7  available for identifying potential
8  risks with the TVT-O and other sling --
9  polypropylene slings.
10  BY MS. SUTHERLAND:
11     Q.  They look at literature too; right?
12     A.  That was in 2011.  They did --
13  you're talking about now about the 2008
14  public health notification.
15     Q.  Yeah.  Are you saying FDA had not
16  reviewed literature for the risks associated
17  with pelvic mesh --
18     A.  The 2008 public health
19  notification --
20     (Simultaneous discussion
21      interrupted by the reporter.)
22     MR. GOSS:  She's going to have
23  a long enough day as it is.  Let's try
24  to not step on each other.
25     THE WITNESS:  I'm sorry.  The

Page 201

1  2008 public health notification, to the
2  best of my recollection, and I can just
3  verify that, was based on a review of
4  the MAUDE database.
5      It was in 2011 that the FDA
6  conducted an evaluation of the
7  scientific and medical literature from
8  1996 through 2011.  So what I'm saying
9  is that the 2008 public health
10  notification was based only on one
11  source of information, whereas Ethicon
12  had available to it not only its own
13  internal documentation where a number of
14  different ones of its senior staff have
15  testified that all of these risks were
16  known about at the time of launch, but
17  also they had available to their own
18  internal complaints, and there are, in
19  their own internal complaints, their
20  issue reports, a number of issues that,
21  in my opinion, a number of adverse
22  reactions, in my opinion, that should
23  have been submitted as MDR reports but
24  that were not.
25     FDA didn't have access to

Peggy Pence, Ph.D.

Page 202

1 those.  The company did as well as the
2 scientific and medical literature as
3 well as the information from the experts
4 and with their summit meetings, with the
5 experts that they met with.
6 They had -- that's why the
7 manufacturer is the greatest repository
8 of the information related to their own
9 product.  So this information definitely
10 should have been in there, but there was
11 more beyond that that should have be
12 included.
13 BY MS. SUTHERLAND:
14 Q.  I'm going to respectfully move to
15 strike that answer and the previous answer
16 after "No, it was not adequate" because I
17 think my question to you was:  Was this
18 listing by FDA in 2008 of adverse reactions
19 adequate had it been in an IFU for a pelvic
20 mesh device in 2008?
21 A.  No, for the reasons I explained.
22 Q.  All right.  Was mesh erosion a
23 well-known complication in 2008?
24 A.  Yes.
25 Q.  All right.  Was infection a

Page 203

1 well-known complication in 2008?
2 A.  Yes.
3 Q.  Was pain a well-known complication
4 in 2008?
5 A.  Yes.  You're talking about well
6 known to the company?
7 Q.  No.  I'm talking about well known
8 to users of the device such as a TVT
9 meaning --
10 A.  I'm talking about well known to the
11 company.
12 Q.  Was mesh erosion well known to
13 users of surgical -- of mesh devices, pelvic
14 mesh devices, in 2008, or do you know?
15 MR. GOSS:  I'm going object to
16 the form of the question.
17 MS. VERBEEK:  Objection.  Form.
18 MR. GOSS:  You're unclear as to
19 well known to who?
20 BY MS. SUTHERLAND:
21 Q.  Now do you know I'm talking about
22 surgeons that are trained in the surgical
23 treatment of SUI?
24 A.  I can't tell you --
25 MR. GOSS:  Objection to form.

Page 204

1 MS. VERBEEK:  Form.
2 THE WITNESS:  -- what every
3 surgeon -- what was well known to every
4 surgeon.  That's the reason the
5 information -- I keep going back to the
6 purpose of the IFU and the reason that
7 information has to be in the IFU.  The
8 company was well aware of these, as is
9 noted here in my report.
10 There are a number of senior
11 employees, senior executives at Ethicon
12 that have testified that all of these --
13 all of this information was known to
14 Ethicon at the time of launch.  And in
15 my own analysis, which I presented in my
16 report, I did the analysis as to what
17 was known at time of launch based on
18 MAUDE database, based on internal
19 documentation, deposition testimony,
20 based on the scientific literature, and
21 I was able to make that analysis of
22 everything that should have been in the
23 IFU at time of launch back in, 2000 --
24 end of 2003, 2004 and was missing.
25 BY MS. SUTHERLAND:

Page 205

1 Q.  I'm going to move to strike
2 everything after "No, I can't tell you what
3 was known by surgeons."
4 Is it your opinion that the adverse
5 reactions that were listed in the FDA's 2008
6 PHN were listed according to the descending
7 order as set out in the Blue Book Memo?
8 MR. GOSS:  Objection.  Form.
9 THE WITNESS:  Do you have a
10 copy of the 2008 public health
11 notification with you?
12 BY MS. SUTHERLAND:
13 Q.  I do not.  Tim might.
14 MR. GOSS:  I might.  Give me
15 one second and I can get it for you.
16 It's next door.
17 MS. SUTHERLAND:  Actually,
18 let's take a break.
19 THE VIDEOGRAPHER:  With the
20 approval of counsel.  Going off the
21 record.  The time is approximately
22 2:14 p.m.
23 (Recess taken from
24 2:14 p.m. to 2:27 p.m.)
25 THE VIDEOGRAPHER:  With the

Peggy Pence, Ph.D.

Page 206

1    approval of counsel, back on the record.
2       The time is approximately 2:27 p.m.
3    BY MS. SUTHERLAND:
4       Q. Dr. Pence, I had marked the 2008
5    PHN as Exhibit Number 11.
6       Do you have that in front of you?
7       A. I do.
8          (Exhibit Number 11 was
9       marked for identification.)
10   BY MS. SUTHERLAND:
11      Q. All right. And now, am I correct
12   that that PHN sets out certain complications
13   associated with pelvic mesh?
14      Do you see that?
15      A. Yes, I do.
16      Q. All right. And now, is it your
17   understanding or is it your opinion that the
18   complications that are listed in that
19   paragraph starting "The most frequent" are
20   actually listed in the appropriate order
21   under the Blue Book Memo?
22          MR. GOSS: Objection. Form.
23          THE WITNESS: Yes. And I was
24      just going to make that point that you
25      can see that FDA lists the most frequent

Page 207

1    complications, and that's what they
2    relied on, and I wanted to just verify
3    that in the 2008 PHN, it did note that
4    those were the most frequent.
5          It's also reflected -- if you
6       look in my report on page -- let me find
7       it again. On page 117, I have a tabular
8       presentation of the number percent of
9       adverse events for SUI reported to MAUDE
10      from 2008 to 2010, which was the data
11      that was reflected in the 2000 -- FDA's
12      2011 safety communication.
13          And you can see there that the
14      numbers of reports of pain, erosion, and
15      so forth and you can see the order of
16      frequency. And the total number of --
17      the total number of reports included for
18      SUI in that MAUDE evaluation was 1371.
19      So you can see the percent of those 1371
20      reports that included pain. It was
21      34.9 percent.
22          So for the 2008 to 2010 data,
23      you can see that the listing of the most
24      frequent complications is very similar
25      to the listing in the 2000/2008, which

Page 208

1    was based on data from 2005 to 2007, if
2    I recall correctly.
3    BY MS. SUTHERLAND:
4       Q. And while we're on that, let me ask
5    you something else on page 117 of
6    your report. Were you able to duplicate a
7    search of the MAUDE database and come up
8    with the 1371 total number of MDRs like the
9    FDA did?
10      A. I didn't look at all nine
11   manufacturers. I have shown and I show on
12   my report for TVT and TVT-O what the numbers
13   of reports of these particular events are
14   and how they are representative in the order
15   of frequency of the adverse reactions for
16   those two devices are representative of the
17   nine manufacturers' events that were -- I
18   believe it was nine manufacturers, if I
19   recall correctly as I sit here today, that
20   were included in FDA's assessment.
21      Q. Okay. I don't think you answered
22   my question.
23      A. I think I understand your question.
24   I think I did. I think I said I haven't
25   looked at all nine manufacturers.

Page 209

1       Q. So you have not attempted to
2    duplicate FDA's search to come up with the
3    1371 that FDA came up with that's listed in
4    the PHN; correct?
5       A. No, not that specifically. I
6    relied on FDA's evaluation for that. But
7    what I did do as relevant to my report is
8    look into TVT and TVT-O to see how the data
9    for TVT and TVT-O compared to FDA's data
10   across the multiple manufacturers. And to
11   that point, in one of the reports, FDA noted
12   that the -- there did not seem to be a
13   difference across the types of events that
14   were reported across manufacturers.
15      Q. Okay. Let me ask it again. Did
16   you try to duplicate FDA's search that they
17   listed actually in their 2011 safety update
18   where they listed a total number of SUI
19   reports being 1,371?
20      A. No. I specifically looked at
21   certain manufacturers and certain products
22   for those manufacturers.
23      Q. When you're looking at your
24   Table 9.1 on page 117 --
25      A. Yes.

Golkow Technologies, Inc. - 1.877.370.DEPS

Peggy Pence, Ph.D.

Page 210

1  Q. -- and you have there pain, 479
2  number of reports of pain.
3  Do you see where I am?
4  A. Yes.
5  Q. And then you say that's
6  34.9 percent.
7  Do you see where I am there?
8  A. Yes.
9  Q. You are saying that 479 number of
10 reports of pain is 34.9 percent of the 1371?
11 A. Yes.
12 Q. All right. But let me ask you
13 this. Did FDA find 479 reports of pain out
14 of their 1,371?
15 A. I believe this information came
16 directly from their report, yes. That was
17 their finding.
18 Q. From the 2011 safety update?
19 A. Yes. Based on their review of the
20 MAUDE database from 2008 to 2010, to the
21 best of my recollection as I sit here today.
22 Let me just take a look and confirm.
23 Q. I didn't recall the 2011 safety
24 update setting out the number of reports of
25 pain, the number of reports of erosion.

Page 211

1  A. You have to look at the executive
2  summary and the information behind that that
3  FDA --
4  Q. Is that where the numbers are
5  coming from?
6  A. To the best of my recollection,
7  that's correct. I probably have it
8  footnoted. Let me -- to the best of my
9  recollection as I sit here today, that's
10 where that -- those are FDA's numbers, not
11 mine.
12 Q. Okay. And then, if I'm
13 understanding you correctly, if you turn to
14 page 123 of your report --
15 A. Yes.
16 Q. -- are you saying that, for
17 instance, on the row of pain going across
18 there --
19 A. Yes.
20 Q. -- that TVT, TVT-O reports are 228
21 of those reports out of those 479?
22 A. That's correct.
23 Q. All right. Did you do a search and
24 find 479 reports of pain out of which you
25 culled the TVT/TVT-O reports of 228?

Page 212

1  A. No. I took -- I took FDA's numbers
2  that they presented, which, again, if I
3  recall, and I believe it's in my report, but
4  if I recall correctly as I sit here today,
5  this was across nine manufacturers, and I
6  can look it up and verify that as well.
7  But I looked at TVT and TVT-O for
8  that same time period, 2008 to 2010 --
9  Q. Yeah.
10 A. -- and found for TVT and TVT-O, 228
11 reports of pain. And as you see in this
12 table, I've shown that that was 47.6 percent
13 of the total number of reports of pain,
14 according to FDA's numbers.
15 Q. Right. But my question to you is:
16 What search did you run to find pain in the
17 TVT/TVT-O reports, and how does that search
18 compare to what FDA ran to find 479 reports
19 of pain in order to make your percentage
20 valid?
21 A. I downloaded the MAUDE --
22 MR. GOSS: Objection. Form.
23 THE WITNESS: We downloaded the
24 MAUDE database and pulled from the MAUDE
25 database and got -- in one of the

Page 213

1  exhibits, it describes the methodology
2  that we used to download the MAUDE
3  database. And from the MAUDE database,
4  there -- in all the MDR reports, there's
5  an event description, and we went
6  through each individual event
7  description and pulled out every one
8  after removing duplicates --
9  BY MS. SUTHERLAND:
10 Q. I'm going to ask you about that.
11 A. Removing duplicates, pulled out the
12 numbers of reports of pain. And, for
13 example, and I think it's important to note,
14 if there was more than -- if more than one
15 type of pain was reported for a particular
16 patient, for this number, only -- the
17 patient was only recorded once as a patient
18 having pain.
19 So we're not saying that this is --
20 this is 228 patients is the point I'm trying
21 to make who experienced one or more types of
22 pain. And we -- FDA analyzed their own
23 MAUDE database and looking at their own
24 database, they came up with 479 reports
25 across the nine manufacturers that they

Peggy Pence, Ph.D.

Page 214

1 looked at, and from analyzing the very same
2 database for TVT and TVT-O only, we found
3 228 reports.
4     Q. Yeah. And I follow that. But my
5 question is: Did you do any kind of quality
6 check with the searches you were running to
7 find the TVT and TVT-O reports of pain to
8 ensure that you would have also found only
9 479 reports of pain like the FDA found?
10    A. If I understand your question as
11 you've asked it, the evaluation that we did
12 is accurate. We didn't then try to validate
13 that FDA evaluated their own database
14 accurately.
15    Q. Or even ran the same search that
16 you did to try to find the same number of
17 reports. Fair?
18    A. Well, we downloaded TVT and TVT-O
19 and any terms that were -- any like TVT
20 obturator, TVT-O, TVTO, we looked at
21 everything that was TVT, TVT-O. There are
22 different ways that something may be
23 represented. You know, the reports may
24 represent, for example, TVT-O in a different
25 way. TVT may be TVT or TVT classic or TVT

Page 215

1 retropubic.
2     There are various ways in which the
3 information may be, by product, recorded,
4 but it's all TVT or all TVT-O. We
5 downloaded all of those that were TVT and
6 all that were TVT-O.
7     Q. I got that part.
8     A. I understand.
9     Q. My question is: How are you
10 validly comparing it to FDA's number of 479
11 total complaints of pain without knowing
12 what terms and how FDA did that search to
13 see if you'd come up with the same number of
14 total complaints of pain that FDA did?
15    A. Well, FDA did this across nine
16 manufacturers. I did not try and duplicate
17 FDA's data, but FDA said that this is what
18 they found in their own MAUDE database, and
19 I looked at the same information for the
20 same time period for TVT and TVT-O. So if
21 FDA's numbers were wrong, then --
22    Q. Or just different because they ran
23 a different type of search than you did.
24 Isn't that possible?
25    A. If you're downloading all nine

Page 216

1 manufacturers, then they're trying to be
2 comprehensive. Then it may be more. I
3 mean, there are more than nine
4 manufacturers; so they looked at nine
5 manufacturers.
6     Q. And if I'm understanding this chart
7 that you have on 123, you are assuming in
8 order to reach your percentage of all SUI
9 mesh reports, that last column?
10    A. Yes.
11    Q. You are assuming that your number
12 of reports for your TVT-O column came out of
13 the very same number of all mesh product
14 reports that FDA found?
15    A. State that last sentence again.
16    Q. Sure. For instance, in order to
17 reach your number here on your chart on the
18 first column that the percentage of TVT and
19 TVT-O reports of pain for all SUI mesh
20 reports is 47.6 percent, you are assuming
21 that this number of TVT and TVT-O reports of
22 228 came out of this number, 479.
23     Aren't you making that assumption?
24 A. Not exactly.
25     MR. GOSS: Objection. Form.

Page 217

1     THE WITNESS: I don't use the
2 word "assume," and I'm not using it for
3 that basis. I'm saying that of 479
4 reports that FDA reported and with
5 Ethicon and TVT and TVT-O being one of
6 the major manufacturers, that if you
7 look at that number and you look at what
8 we were able to download for TVT-O,
9 using that number, those numbers alone
10 standalone, but I wanted to compare what
11 percentage based on the total that FDA
12 had found, and if you look at the total
13 that FDA reported, I'm not assuming how
14 they did except that they said across
15 nine manufacturers, and one they based a
16 public health notification on this
17 information.
18     I didn't try and duplicate that
19 data, if that's what you're asking. But
20 I didn't -- I looked at this based on
21 479 reports that they said they found
22 across the manufacturers that they
23 looked at that I found this many
24 reports. And that would be 47.6 percent
25 as the total.

55 (Pages 214 to 217)

Peggy Pence, Ph.D.

Page 218

BY MS. SUTHERLAND:
1
2    Q. Yeah. And my question just is: I
3  mean, aren't I correct that in order to get
4  your 47.6 percent of pain, that you're
5  taking that 228 number of TVT/TVT-O reports
6  and doing some sort of division with this
7  479 number from FDA?
8    A. Yes, that's correct.
9    Q. All right. And am I also correct
10 that you didn't do some sort of quality
11 check to ensure that you would have found
12 the same number of reports, meaning 479,
13 with your search terms that you used to find
14 the TVT and TVT-O reports of pain?
15       MR. GOSS: Objection. Form.
16       THE WITNESS: Let me check one
17   thing here quickly. It was in the
18   2000 -- I just wanted to double-check my
19   figure of nine. It was in the 2008 FDA
20   public health notification that they
21   noted that the reports of complications
22   were from nine surgical mesh
23   manufacturers of surgical mesh devices
24   used to repair pelvic organ prolapse and
25   stress urinary incontinence. That's

Page 219

1   where the nine. I just wanted to verify
2   the nine manufacturers.
3       Now to your specific question,
4   I did not verify FDA's numbers, but I
5   think maybe there's a disconnect in
6   understanding that we pulled everything
7   for TVT and TVT-O that we could find.
8  BY MS. SUTHERLAND:
9    Q. No, I got that.
10    A. And FDA pulled the information that
11 it found for manufacturers that made SUI
12 mesh products.
13    Q. And I got that.
14    A. And I didn't verify that FDA did
15 their analysis correctly. I think that's
16 what you're asking to do my percentage.
17    Q. No. I'm not asking whether or not
18 FDA did it correctly. What I'm asking is
19 whether or not you ran a similar search for
20 pain as FDA did for pain when you were
21 finding your TVT and TVT-O reports.
22       MR. GOSS: Objection. Form.
23       THE WITNESS: Yes, I did for
24   TVT and TVT-O.
25  BY MS. SUTHERLAND:

Page 220

1    Q. Did you run -- well, tell me what
2  search you ran for TVT and TVT-O to allow
3  you to come up with 228 reports of pain.
4    A. It's in the exhibit -- it's in the
5  Exhibit 1, I believe, to my report that
6  gives you -- that shows you the methodology,
7  and it also provides a tabular presentation
8  for TVT and TVO by year of the numbers of
9  reports.
10    Q. Yeah, and maybe I can cut to the
11 chase. Did you do a term search for "pain"
12 to come up with the 228 MDRs?
13    A. What you have to do in that -- when
14 you're doing a manual download, you have to
15 read through every event description, and we
16 downloaded the information into an Excel
17 database, and then you have to read through
18 every event description to pull out the
19 adverse events that are reported, and then
20 we tabulated those in Access and did an
21 assessment of total number of pain.
22    Q. Okay. And so how are you able to
23 tell me that the way that you did your
24 analysis to pull out the 228 reports of pain
25 for TVT and TVT-O would have gotten you the

Page 221

1  same number that FDA got had you done it for
2  all nine mesh manufacturers, the same number
3  being 479?
4    A. Well, the information, whether I'm
5  reviewing it or FDA is reviewing it, the
6  information that is in the event description
7  doesn't change, and that's where the
8  information is located.
9    Q. I guess what I'm getting at is do
10 you know if a report listed pain, erosion,
11 and infection, did FDA put that report in
12 each separate row there for pain, erosion,
13 and infection? Or did it pick one and say,
14 you know what? For this report, I'm going
15 to put it just in erosion?
16       MR. GOSS: Objection. Form.
17       THE WITNESS: Ethicon picked
18   one.
19  BY MS. SUTHERLAND:
20    Q. Well, I'm asking do you know how
21 FDA did it so that you can say that your
22 percentage in this last column is valid
23 based on you and FDA performing the same
24 search to reach the same numbers?
25       MR. GOSS: Objection. Form.

Peggy Pence, Ph.D.

Page 222

1    THE WITNESS:  Do you have the
2 executive summary?  With -- my
3 recollection is this is the total number
4 of patients in which they found pain,
5 and they would have counted those
6 appropriately.  They would have
7 accounted those separately.  I don't
8 recall, as I sit here today, without
9 going back and looking at the
10 information.  I don't recall exactly
11 how -- what they described as their
12 methodology, but having done many
13 adverse event assessments over the
14 course of my career, if you -- if a
15 patient has pain and erosion and
16 infection, you don't just choose one of
17 them.  You report every one.
18 BY MS. SUTHERLAND:
19    Q.  And do you know if that's what FDA
20 did in order to reach their numbers in that
21 first column on page 123?
22    A.  To the best of my recollection as I
23 sit here today, that is correct, but I would
24 need to go back and review that.  If you
25 have it, I'd be happy to take a look at it.

Page 223

1 I just -- I can't recall specifically that
2 without looking back at the document.
3    Q.  Did you make an attempt to perform
4 your search and inclusion of reports in the
5 same manner that FDA had as set out in what
6 you're telling me is in the executive
7 summary?
8    MR. GOSS:  Objection.  Form.
9    THE WITNESS:  I did the most
10 comprehensive assessment we could do,
11 which was to pull all the MDR reports
12 for any description of TVT, any
13 description of TVT-O, remove duplicates,
14 and read through the event description,
15 and every adverse event that was noted
16 was recorded, and then our tabulations
17 were done based on that.
18    With the point also that I was
19 making that if the patient had several
20 different types of pain reported, we
21 didn't report that patient twice.  We
22 reported, and you'll see in the exhibit
23 that you can see the total numbers of
24 reports of pain versus the total numbers
25 of patients with pain.

Page 224

1    For this number, the numbers of
2 patients with pain was exactly that.
3 The number of patients with pain, not
4 the number of episodes of pain.  As I
5 note here, the total number of reports
6 is greater than the number of MDRs
7 because most MDRs reported more than one
8 adverse event.
9 BY MS. SUTHERLAND:
10    Q.  Okay.  I think I'm going to move to
11 strike that answer.
12    Would you read my question back.
13    (Record read by the
14 reporter as follows:
15    THE WITNESS:  I think I
16 answered that.  I think I told you --
17    MR. GOSS:  Wait, wait.  The
18 ball is in her court.
19    THE WITNESS:  Sorry.
20 BY MS. SUTHERLAND:
21    Q.  Can you answer that question?
22    MR. GOSS:  That's what you get.
23    THE WITNESS:  Sorry.  I think
24 I -- I answered that.  I said that --
25 I've answered that in the last couple of

Page 225

1 questions.  If you have the document
2 that describes FDA, what FDA did, I can
3 go back and just verify my recollection.
4 Without that document, I'm giving you
5 the best information I can with regard
6 to my recollection --
7 BY MS. SUTHERLAND:
8    Q.  Okay.
9    A.  -- as to how FDA -- what FDA did.
10 What we did, you can't be more comprehensive
11 than what we did --
12    Q.  I know you're comprehensive.
13    A.  -- for looking at TVT and TVT-O,
14 and it was a very laborious process to go
15 through each of these, and we were as
16 conservative as possible, like removing
17 duplicates, and clearly, and that's the
18 appropriate way to report adverse events.
19    You don't -- you know, if you're
20 looking at total number of patients with
21 pain, you don't count a patient twice if
22 they had two different types of pain.  So I
23 followed the same methodology that I've
24 employed in the course of my consulting
25 career for medical device pharmaceutical

Peggy Pence, Ph.D.

Page 226

1  companies.
2      Q.  Let me just close the loop on this
3  just to be sure I have it in my head.  Let
4  me pick another column here.  Let's say
5  bleeding.  In order to reach this
6  39.8 percent in the last column, what you're
7  saying, as I understand it, that is the
8  total percent of reports attributed to TVT
9  and TVT-O out of all SUI reports from 2008
10 to 2010?
11     A.  According to FDA's number of the
12 number of patients that -- the number of MDR
13 reports, I should say, which should be
14 individual patients, had bleeding.  There
15 were 103.
16     Q.  Right.  And let me stop you there
17 because, as I understand it, you did not do
18 the same search that FDA did to come up and
19 verify that you also would find 103 reports?
20         MR. GOSS:  Objection.  Form.
21         THE WITNESS:  Yes.  I did not
22     look at all the other manufacturers.
23     That's correct.
24 BY MS. SUTHERLAND:
25     Q.  Okay.  So you're assuming in order

Page 227

1  to reach this 39.8 percent that your number
2  of 41 reports comes out of this number, 103
3  reports?
4          MR. GOSS:  Objection.  Form.
5          THE WITNESS:  Based on the
6      number of bleeding reports that FDA
7      reported, we took a percentage of that
8      to arrive at what percentage of that
9      number was TVT and TVT-O.
10 BY MS. SUTHERLAND:
11     Q.  Okay.  I'm going to change gears.
12     A.  Okay.
13     Q.  And get back on my outline.
14         Has the FDA ever said that the
15 TVT-O IFU up to the time of implant in this
16 case was inadequate?
17         MR. GOSS:  Objection.  Form.
18         THE WITNESS:  I'm not -- there
19     may be internal communication to which
20     I've not seen, but based on what I've
21     seen, the answer to that is, no.
22 BY MS. SUTHERLAND:
23     Q.  All right.  Let me ask it cleanly.
24 As far as documents that you have seen --
25 and we've talked about the number of

Page 228

1  documents that you've seen, and you claimed
2  it's a lot, from that number of documents
3  you've reviewed, has FDA ever said that the
4  IFU for the TVT-O up to the time of implant
5  was inadequate?
6      A.  You know, the way I'm going to
7  answer that is I have not seen -- while I
8  have not seen any specific communications
9  directed to Ethicon, the 2008 public health
10 notification includes information that --
11 and recommendations that indicate what a
12 manufacturer should do and recommendations
13 for what physicians need to know.
14     Q.  Where are the recommendations that
15 the FDA said a manufacturer ought to do with
16 respect to its IFU in the 2008 PHN?
17     A.  The IFU is a communication, as
18 we've discussed before, the primary
19 communication between the manufacturer.
20     Q.  Now, I want you to answer my
21 question.
22     A.  I am.  But it has a basis, and the
23 basis is that it is the manufacturer's
24 communication with the physician, and these
25 recommendations say that the physician

Page 229

1  should be vigilant for potential adverse
2  events, especially erosion and infection,
3  watch for complications associated with the
4  tools, inform patients that implantation of
5  surgical mesh is permanent, that some
6  complications associated with the implanted
7  mesh may require additional surgery that may
8  or may not correct the complication, inform
9  patients about the potential for serious
10 complications and their affect on quality of
11 life, including pain during sexual
12 intercourse, scarring and narrowing of the
13 vaginal wall, noted there in POP repair, and
14 provide patients with a copy of the patient
15 labeling from the surgical mesh
16 manufacturer.
17         There is testimony by Ethicon, and
18 if I recall correctly as I sit here today,
19 specifically from Dr. Hinoul testifying that
20 all of the information in the 2008 public
21 health notification was included in the TVT
22 and TVT-O IFU, and it was not.
23         But that information -- and I think
24 it maybe even -- that publicly, if I'm
25 recalling correctly as I sit here today -- I

Peggy Pence, Ph.D.

Page 230

1 can actually verify that.
2    Q.  I've got to say you're not
3 answering my question.
4    A.  Oh, I am answering your question
5 because the fact that physicians should do
6 these things, it's up to the manufacturer to
7 communicate this information to the
8 physicians through the IFU.
9       So while this is a public health
10 notification, and the FDA is telling the
11 physicians what the manufacturer should have
12 told the physicians.
13    Q.  Is there a document where the FDA
14 ever told Ethicon your TVT-O IFU is
15 inadequate up to the date of implant?
16       MR. GOSS:  Objection.  Form.
17       THE WITNESS:  I believe I've
18    answered that.
19 BY MS. SUTHERLAND:
20    Q.  You're pointing to the PHN?
21    A.  I'm pointing to the PHN.
22    Q.  Is there anything besides the PHN
23 that you can point me to where you're saying
24 FDA told Ethicon the TVT-O IFU is
25 inadequate?

Page 231

1    A.  If you read the 2008 public health
2 communication and you compare --
3    Q.  I said other than --
4    A.  I know, but if you compare that --
5 I can't tell you about a specific document
6 from FDA to Ethicon, but if you compare
7 what's supposed to be notified to physicians
8 and the IFU, they're vastly different.
9    Q.  All right.  Is the word or the
10 letters "IFU" anywhere in the 2008 PHN?
11       MR. GOSS:  Take your time and
12    review it.
13       MS. SUTHERLAND:  And it's a
14    page and a half.
15       MR. GOSS:  We can take
16    30 minutes.
17 BY MS. SUTHERLAND:
18    Q.  That's a yes or no.
19    A.  There is no mention of the IFU
20 specifically in this document.
21    Q.  All right.  Is the word "Ethicon"
22 anywhere in this document, the 2008 PHN?
23    A.  No, but it addresses reports from
24 nine surgical mesh manufacturers which were
25 the basis for this, and so Ethicon was

Page 232

1 included.
2    Q.  Move to strike everything after
3 "no."
4       Is the TVT-O mentioned anywhere in
5 the 2008 PHN by name?
6    A.  Not by name.
7    Q.  All right.  Has FDA ever issued a
8 warning letter to Ethicon about the TVT-O?
9    A.  No, not that I -- not that I've
10 seen, and I have looked, yes.
11    Q.  I bet you looked.
12       We're at 30 minutes.  Do you want
13 to go off and check?
14    A.  Yes, please.  Thank you.
15       THE VIDEOGRAPHER:  With the
16    approval of counsel, going off the
17    record.  The time is approximately 3:00
18    p.m.
19       (Recess taken from
20    3:00 p.m. to 3:09 p.m.)
21       THE VIDEOGRAPHER:  With the
22    approval of counsel, back on the record.
23    The time is approximately 3:09 p.m.
24 BY MS. SUTHERLAND:
25    Q.  Dr. Pence, have you ever seen a

Page 233

1 document where FDA determined that the TVT-O
2 device was misbranded?
3       MR. GOSS:  Objection.  Form.
4       THE WITNESS:  No.
5 BY MS. SUTHERLAND:
6    Q.  All right.  In fact, as far as you
7 know, FDA has never determined TVT-O to be
8 misbranded; correct?
9       MR. GOSS:  Objection.  Form.
10       THE WITNESS:  I've never seen
11    any documentation stating that.
12 BY MS. SUTHERLAND:
13    Q.  Stating that it is misbranded?
14    A.  Correct.
15    Q.  All right.  Have you ever seen any
16 documentation from FDA stating that TVT-O is
17 adulterated?
18       MR. GOSS:  Objection.  Form.
19       THE WITNESS:  No, I have not.
20 BY MS. SUTHERLAND:
21    Q.  Has FDA ever requested
22 the TVT-O to be withdrawn from the market?
23       MR. GOSS:  Objection.  Form.
24       THE WITNESS:  No.
25 BY MS. SUTHERLAND:

59 (Pages 230 to 233)

Peggy Pence, Ph.D.

Page 234

1    Q.  Has FDA ever recalled the TVT-O?
2    A.  Not to my knowledge, as I sit here
3  today.
4    Q.  All right.  Have you ever spoken --
5  have you ever spoken with a woman who had
6  the TVT-O implanted in her?
7       MR. GOSS:  Objection.  Form.
8  Foundation.
9       THE WITNESS:  Yes.
10  BY MS. SUTHERLAND:
11    Q.  Would that be a plaintiff?
12    A.  Yes.
13    Q.  All right.  Which plaintiff?
14    A.  That would have been Ms. Batiste.
15    Q.  Okay.  You haven't talked to
16  Ms. Ramirez?
17    A.  No, I have not.
18    Q.  All right.  Have you ever done any
19  kind of survey to determine what women
20  perceived from the patient brochure for the
21  TVT-O?
22    A.  No.  I have not done such a survey.
23  And just to clarify, Ms. Batiste, I spoke to
24  her in the context of being courteous when I
25  was at trial, but I didn't discuss any

Page 235

1  specifics obviously with her.
2    Q.  Yeah.
3       For the Class 2 device TVT-O, is
4  there a requirement that Ethicon have a
5  patient brochure?
6    A.  There isn't a requirement unless
7  the FDA requests it.
8    Q.  Okay.  Did the FDA request one for
9  the TVT-O?
10    A.  Do you have the 510(k)?  I'd have
11  to go back --
12    Q.  I don't have the 510(k).
13    A.  -- and look.  They did -- they
14  had --
15       MR. GOSS:  I can probably let
16  you see one.
17       MS. SUTHERLAND:  I don't want
18  to take the time.
19       Do you recall, as you sit here
20  today, whether or not FDA requested a
21  patient brochure for TVT-O?
22       THE WITNESS:  My recollection
23  is they did not.
24  BY MS. SUTHERLAND:
25    Q.  Yeah, because it was a special

Page 236

1  510(k); right?
2    A.  It was.  My recollection also is,
3  though, that Ethicon had brochures for the
4  TVT family of product at the time of that
5  submission, and, to the best of my
6  recollection as I sit here today, and I can
7  look it up, did not include the patient
8  labeling in the 510(k), and what is intended
9  to be included in a 510(k) would also
10  include patient labeling if a company is
11  going to be using it.  Let me just take a
12  moment here to check something.
13       Yes, as stated on page 92 of my
14  report, the patient brochure was not
15  included for FDA's review in the proposed
16  labeling section of the 510(k) pre-market
17  notification for the TVT-O, although a
18  patient brochure had been available since
19  2001 for the TVT system, and noting also
20  that the information that is intended to be
21  used required in a pre-market notification,
22  submission includes proposed labeling and
23  advertisement sufficient to describe the
24  device's intended use and its directions for
25  its use -- and the directions for its use.

Page 237

1    Q.  Now, at the time of the submission
2  of the TVT-O 510(k), was there in existence
3  a TVT-O brochure?
4    A.  The --
5       MR. GOSS:  Objection.  Form.
6       THE WITNESS:  There was -- if
7  you look at my report on page 92, in the
8  documents that were available for my
9  review, there were 16 patient brochures
10  final copy relevant to the TVT-O product
11  with the following dates, and one of
12  those was dated 2004.
13       The submission went in in 2003,
14  the 510(k) submission went in in 2003,
15  but as I noted, many of these are the
16  TVT family of products and contain very
17  similar information, and my opinion
18  would be that they certainly could have
19  included one in the 510(k) submission.
20  They had TVT ones since 2001 at least.
21  BY MS. SUTHERLAND:
22    Q.  Let me get an answer to my
23  question, though, because I think my
24  question was, was there in existence at the
25  time of the submission of the TVT-O 510(k) a

Peggy Pence, Ph.D.

Page 238

1 TVT-O brochure?  That answer is no, isn't
2 it?
3     A.  The ones that were made available
4 to me began in 2004, which was the same time
5 period they marketed the product.
6     Q.  All right.  I'm still not hearing
7 an answer to my question.  Was there in
8 existence at the time of the submission of
9 the TVT-O 510(k) a TVT-O brochure?
10    A.  Not one specific to the TVT-O, but
11 there were TVT ones, and as I noted, many of
12 these brochures are not specific to TVT or
13 TVT-O.  They are for the TVT family of
14 products.
15    Q.  I'm going to move to strike
16 everything after "Not one specific to the
17 TVT-O."
18         For those brochures that you're
19 talking about that were for the TVT family
20 of products, they didn't include TVT-O until
21 after TVT-O was cleared by FDA, now, did
22 they?
23         MR. GOSS:  Objection.  Form.
24         THE WITNESS:  No, but they
25 could just as the IFU for TVT-O was

Page 239

1     included in the 510(k), because there
2     were brochures that were existing for
3     TVT since very shortly thereafter and
4     for launch, there was a -- there was one
5     that included TVT-O to comply with
6     the -- what should be included in the
7     510(k), Ethicon could readily have used
8     what it had and made any additions for
9     TVT-O and submitted it in the 510(k) but
10    did not.
11 BY MS. SUTHERLAND:
12    Q.  I want to move to strike everything
13 after "no."
14         Based on what was in existence with
15 respect to a TVT-O brochure, are you opining
16 that Ethicon breached some standard or
17 regulation by not creating a TVT-O brochure
18 to include with its 510(k) submission?
19         MR. GOSS:  Objection.  Form.
20         THE WITNESS:  Well, as I note
21    in the information and referencing the
22    guidance on medical device patient
23    labeling, which was a 2001 guidance, the
24    information that's required in a
25    pre-market notification submission

Page 240

1     includes proposed labels, labeling and
2     advertisement sufficient to describe the
3     device, its intended use and directions
4     for its use.
5          So if -- since Ethicon
6     obviously intended to include patient
7     labeling and make that available, it
8     would have been appropriate for them to
9     include patient labeling in their 510(k)
10    submission.
11 BY MS. SUTHERLAND:
12    Q.  Now, did you see documents that
13 reference an intent by Ethicon to have a
14 patient brochure for TVT-O before clearance
15 of TVT-O?
16         MR. GOSS:  Objection.  Form.
17         THE WITNESS:  I don't -- I
18    don't recall specifically, as I sit here
19    today, except to say that they had had
20    TVT patient labeling in existence since
21    2001.
22 BY MS. SUTHERLAND:
23    Q.  Okay.  Do you intend to offer an
24 opinion as to a safer alternative design for
25 the TVT-O?

Page 241

1     A.  If asked, I would offer that
2 opinion.
3     Q.  I mean, do you have that in your
4 report?
5     A.  I talk about mesh fraying, and I
6 talk about the laser-cut mesh versus the
7 mechanically cut mesh and various issues
8 with the mechanically cut mesh.
9     Q.  Would it be your opinion that
10 laser-cut mesh is safer than mechanically
11 cut mesh?
12    A.  The testing wasn't done on the
13 laser -- they both have issues.  They both
14 have different issues, and the testing was
15 never done to -- clinically to determine
16 head to head how they compare.
17    Q.  So do you intend to after an
18 opinion that laser-cut mesh is safer than
19 mechanically cut mesh in this trial?
20         MR. GOSS:  Objection.  Form.
21         THE WITNESS:  No.  I'm saying
22    that there were issues with mechanically
23    cut mesh.  There were also issues with
24    the laser-cut mesh, and the testing was
25    never done to assess whether or not,

Golkow Technologies, Inc. - 1.877.370.DEPS

Peggy Pence, Ph.D.

Page 242

1    with either one, the implications of the
2    issues -- with both what the
3    implications were for the patient.
4    BY MS. SUTHERLAND:
5        Q.  Move to strike everything after
6    "no."
7            Are you aware -- let me ask it this
8    way:  In 2010 at the time of implant, was
9    there available a mesh sling that, in your
10   opinion, was safer than the TVT-O?
11           MR. GOSS:  Objection.  Form.
12   Foundation.
13           THE WITNESS:  Based on -- there
14   were meshes available --
15   BY MS. SUTHERLAND:
16       Q.  Answer my question now.
17       A.  -- that were considered safer than
18   the heavy weight mesh that is in the TVT-O,
19   and Ethicon had such meshes.
20       Q.  I'm going to move to strike.
21           Would you read back my question,
22   please?
23           (Record read by the
24   reporter as follows:
25   Let me ask it this way:  In 2010 at the time of
     implant, was there available a mesh sling that, in

Page 243

1    your opinion, was safer than the TVT-O?")
2            THE WITNESS:  I've not done an
3        evaluation of all mesh slings that were
4        available; so I can't -- I can't answer
5        that question.
6    BY MS. SUTHERLAND:
7        Q.  Okay.  So you aren't intending to
8    offer an opinion that there was some mesh
9    sling that was available in 2010 that was
10   safer than TVT-O; correct?
11           MR. GOSS:  Objection.  Form.
12           THE WITNESS:  As you've asked
13       the question, that is correct.  If
14       asked, I will opine that there were
15       meshes available by Ethicon's own
16       documentation and testimony that
17       would -- that they believed would be
18       safer than the heavy weight mesh used in
19       TVT-O.
20   BY MS. SUTHERLAND:
21       Q.  And are you talking about Ultrapro?
22       A.  BiPro, there are other meshes that
23   were available that were lighter weight in
24   2004.
25       Q.  Now, have you seen any medical

Page 244

1    literature using those meshes in the
2    surgical treatment of stress urinary
3    incontinence?
4        A.  Those particular meshes?
5        Q.  Correct.
6        A.  Not that I've seen at this point
7    today for Ethicon.
8        Q.  Because there's not any.
9        A.  I know.
10       Q.  Right?
11       A.  That's correct.
12       Q.  All right.
13       A.  Because they didn't develop it for
14   SUI.  They didn't take it to that step where
15   they had meshes that could have -- they
16   believed could have been safer but never
17   developed the sling with such meshes.
18       Q.  I'm going to move to strike.
19           Let's change gears and talk about
20   adverse events.  If you'll flip to page 125
21   of your report, are you with me?
22       A.  Yes.
23       Q.  Okay.  Now, in reading your report,
24   as I understand it, you have -- I'm going to
25   talk about these in different buckets.

Page 245

1        A.  Okay.
2        Q.  So in my first bucket, I'm going to
3    talk about the reports that you're claiming
4    were reportable but were not given to FDA.
5    Okay?
6        A.  Yes.  These are examples.
7        Q.  Examples.  Now, you list 29
8    examples; correct?
9        A.  Yes.
10       Q.  And that is somewhere in your
11   report, and then the full section of the 29
12   is in Exhibit 4 to your report; correct?
13       A.  Yes.
14       Q.  All right.  The first thing I want
15   to ask you is:  Are you intending to specify
16   any other issue reports other than the 29
17   that you specifically delineated that should
18   have been reported to FDA but were not?
19       A.  As I sit here today --
20           MR. GOSS:  I'm sorry I didn't
21       hear the last part of that.  Would you
22       ask that again?
23           MS. SUTHERLAND:  I don't know
24       if I can ask it the same way.
25           MR. GOSS:  Can you read it

Peggy Pence, Ph.D.

1    back?
2        (Record read by the
3    reporter as follows:
The first thing I want to ask you is are you
4    intending to specify any other issue reports other
5    than the 29 that you specifically delineated that
6    should have been reported to FDA but were not?")
7        THE WITNESS:  As I sit here
8    today, no.
9    BY MS. SUTHERLAND:
10    Q.  Okay.
11    A.  If there are some that are
12    presented to me, and I'm asked about them, I
13    would opine about them.
14    Q.  Tell me how you found those 29.
15    What was your methodology to pull out those
16    29?
17    A.  If you look at page -- at the
18    bottom of page 124, I note that an issue
19    report -- what an issue report is and that
20    there were 862 TVT issue reports from 1999
21    to 2012 and 901 TVT-O issue reports from
22    2004 to 2012 that I received and reviewed
23    for the preparation of my TVT and TVT-O
24    reports.
25        And I was able by matching up

1    the -- what was in the MAUDE database to the
2    issue reports, I was able to determine that
3    Ethicon submitted 70 percent as MDR reports
4    to FDA for TVT, and I determined then that
5    29.9 percent or 258 were determined to be
6    not reportable by Ethicon.  And then one was
7    undetermined.
8        For TVT-O, 444 or 49.3 percent were
9    submitted as MDR reports to FDA and 457 or
10    just over 50 percent, 50.7 percent, were
11    determined by Ethicon to be not reportable.
12        So I reviewed the issue reports
13    that Ethicon determined to be not
14    reportable, and they showed that -- my
15    review showed that a number of them met the
16    requirements for MDR reporting and should
17    have been submitted to FDA, in my opinion.
18    And I took examples of those that Ethicon
19    determined were not reportable and included
20    those in my report.
21    Q.  All right.  Now, are you intending
22    to offer an opinion that some number more
23    than 29 should have been reported to FDA?
24    A.  I don't have a specific number, if
25    I understand your question correctly.  I

1    don't have a specific number that I'm going
2    to say should have been reported but were
3    not reported but that there were a number
4    that were not reported that should have been
5    reported.
6        And because of the importance of
7    reporting so that, for example, the 2008
8    public health notification, if companies are
9    not fulfilling their responsibilities for
10    reporting MDRs according to the requirements
11    for reporting, then that information doesn't
12    populate the database, and FDA doesn't
13    become aware, nor do other people who may
14    be, like physicians, who -- we talked about
15    different sources of information -- who may
16    access the MDR database or patients to
17    see -- because it is a publicly available
18    database to see what information exists.
19    That information is not there.
20        So it's not a true picture, and we
21    talk about there's a lot of underreporting,
22    and this is one of the reasons there's
23    underreporting.  There are other reasons for
24    underreporting to the MAUDE database as
25    well, but FDA, if they get the information

1    sooner, then that 2008 public health
2    notification may have come out sooner than
3    it did if all manufacturers were fulfilling
4    their responsibilities for reporting.
5    Q.  All right.  I'm going to move to
6    strike everything after your first sentence
7    where, I think, you said you were going to
8    say a number had not been reported to FDA.
9        My question is:  Are you going to
10    offer an opinion that more than 29 issue
11    reports should have been reported to FDA?
12    A.  I might offer that opinion.
13    Q.  And what is that opinion based on?
14    I mean, do you have those?
15    A.  Yes.
16    Q.  Do you have those issue reports
17    other than the 29 that you can tell me that
18    you say ought to be -- ought to have been
19    reported?
20    A.  I can't tell you, as I sit here
21    today.  I have them available if I -- there
22    are others if I wanted -- these are not the
23    only 29.  There are others.
24    Q.  Okay.  Where are those others?  You
25    say you have them available.  I want to see

Golkow Technologies, Inc. - 1.877.370.DEPS

Peggy Pence, Ph.D.

1  them.
2      A.  In my records.
3      Q.  Did you create an Excel workbook on
4  your MAUDE database review?
5      A.  Well, this is separate.  These are
6  issue reports.
7      Q.  Then I'll ask that separately.
8          Where -- so if I want to -- I mean,
9  I'm entitled to know, you know, what your
10  opinions are, and I've got your 29 issue
11  reports that you say were not appropriately
12  reported to FDA.
13         If you're going to say some number
14  more than that 29 should have been reported
15  to FDA, I need you to tell me, number one,
16  what that number is, and number two, which
17  specific issue reports those are.
18      A.  I understand what you're asking.  I
19  think where our disconnect may be, you asked
20  if I was going to say more than 29 should
21  have been reported.  I don't intend, as I
22  sit here today, unless asked by counsel, to
23  tally the total number.
24         I don't anticipate being asked how
25  many should be reported -- should have been

1  reported that were not of the issue reports,
2  but if there were more than 29, these are
3  examples.
4          So as I understood your question,
5  you said are you going to say there were
6  more than 29, and I could say there were
7  more than 29 without giving an actual
8  number.  There were also the malfunctions.
9      Q.  Well, and I'll get to malfunctions.
10  But if you have an opinion that more than 29
11  issue reports ought to have been reported to
12  FDA, and as I understand your testimony, you
13  know which issue reports those are --
14      A.  I would have to go --
15      Q.  -- I would ask counsel that he let
16  me know which ones they are so that we
17  aren't ambushed at trial.  I'm entitled to
18  know --
19      A.  I understand.
20      Q.  -- which issue reports you think
21  should have been reported.
22          MR. GOSS:  Is there a question
23      in there somewhere?
24  BY MS. SUTHERLAND:
25      Q.  Does that sound fair?

1      A.  Yes.  And if I'm asked -- if that's
2  going to be asked --
3          MR. GOSS:  I'm sure she'll ask
4      me.
5          THE WITNESS:  I can certainly
6      do that.
7  BY MS. SUTHERLAND:
8      Q.  I've got a letter drafted in my
9  head already.
10         Okay.  Now, those 29 examples that
11  you pulled out are all on TVT; correct?
12      A.  Yes.
13      Q.  All right.  Did you perform a
14  review of the issue reports for TVT-O that
15  were not submitted to FDA?
16      A.  Yes, I did.  I don't recall, as I
17  sit here today, if I went through all of the
18  457 that Ethicon determined to be not
19  reportable, but I certainly went through a
20  number of them.
21      Q.  Okay.  Are you going to offer any
22  opinion that any of the TVT-O issue reports
23  were not appropriately submitted to FDA?
24      A.  If asked, if asked that, yes.  I
25  might not give a specific number, but I

1  would say, yes, if asked that, I would
2  respond that there were reports that were
3  not appropriately reported.
4          And the idea here is not so much a
5  specific number, but the real underlying
6  point is that Ethicon was down playing the
7  adverse events that occurred using
8  rationales for not reporting that were
9  inappropriate, and as a result, not
10  fulfilling its obligations that is required,
11  both by FDA regulations and the global
12  standard of care.
13         And as a result of that, then that
14  compromises the ability of the FDA and
15  others to see what the true safety profile,
16  and it -- true safety profile of these
17  products are -- or is.  And the other aspect
18  of that is this all goes to the central
19  principles of safety and performance.
20      Q.  You've gone way past my question
21  now.
22      A.  But it's all relevant.  It's all
23  relevant.
24          MS. SUTHERLAND:  Would you read
25      my question back, please?

Peggy Pence, Ph.D.

Page 254

1          (Record read by the
2     reporter as follows:
3   Are you going to offer any opinion that any of the
4   TVT-O issue reports were not appropriately
5   submitted to FDA?")
6   BY MS. SUTHERLAND:
7       Q.  All right.  And I think you told me
8   yes, you are.
9       A.  If asked.
10      Q.  Now, which issue reports for TVT-O
11  were not appropriately reported to FDA?
12      A.  I don't have them with me today.
13      Q.  Do you have that somewhere?
14      A.  Yes.
15      Q.  All right.  And I'm going to ask
16  counsel to get me those.
17          Do you know what number you're
18  going to say -- or strike that.
19          Do you know what number you found
20  of the TVT issue reports were not
21  appropriately reported to FDA?
22      A.  I don't recall the number, as I sit
23  here today.
24      Q.  All right.  Do you know what the
25  reports were in those issue reports that

Page 255

1   you're saying were not appropriately
2   reported to FDA, meaning erosion, extrusion,
3   pain?
4       A.  There were a variety of different
5   adverse events.
6       Q.  All right.  What were they?
7       A.  Difficulty walking, pain, urinary
8   issues, for example.
9       Q.  Okay.  Now, did you look at what
10  was reported to FDA with respect to TVT-O's
11  issue reports?
12      A.  Yes.
13      Q.  All right.  Did they report reports
14  of pain to FDA?
15      A.  Yes, and we know that because we
16  just went through the tabular presentation.
17      Q.  You answered.  You said yes.
18          Did they report reports of urinary
19  dysfunction to FDA?
20      A.  Yes, but that's not the issue
21  whether they reported some.  It's whether or
22  not they reported all that should have been
23  reported.
24      Q.  Did they report -- I think you said
25  that there was some reports of leg pain that

Page 256

1   had not been appropriately reported to FDA
2   for TVT-O?
3       A.  Yes.
4       Q.  Did they report to FDA some reports
5   of leg pain?
6       A.  To the best of my recollection -- I
7   would have to look back.  Yes.
8   Neuromuscular problems.  I'd have to look
9   back at exactly what the reports were.
10      Q.  Okay.  Now, how many --
11      A.  Oh, I can do that actually.
12      Q.  You answered my question.
13      A.  There's difficulty walking.  It's
14  in my Exhibit 1.
15      Q.  How many reports of leg pain for
16  TVT-O were not appropriately reported to
17  FDA, in your opinion, from what you
18  reviewed?
19      A.  I can't give you a number, as I sit
20  here today, and I also only received a
21  certain number of issue reports.  It's my
22  understanding, drawing from the recesses of
23  my memory from having done this a year or
24  two ago, I didn't receive all issue reports.
25  The issue reports I received I went through,

Page 257

1   and I've given you the numbers of those
2   which were reported as MDRs, which were not,
3   and I can't tell you exactly, as I sit here
4   today, how many should have been reported
5   but that were not of the issue reports that
6   I was given to review and had access to.
7       Q.  And as I understand it, you also
8   listed ten malfunctions as examples of issue
9   reports that were not reported to FDA and
10  should have been?
11      A.  Yes.
12      Q.  All right.  Now, that's all for
13  TVT; correct?
14      A.  Yes.
15      Q.  Do you have a number that you
16  determined over ten that should have been
17  reported to FDA?
18      A.  I don't recall the specific number.
19  Again, these are examples.
20      Q.  Yeah.  My question is:  Do you have
21  more than ten that you found that you
22  thought should have been reported to FDA?
23      A.  I would have to go back and tally
24  the number.
25      Q.  Okay.  Did you look for

65 (Pages 254 to 257)

Peggy Pence, Ph.D.

Page 258

1  malfunctions in TVT-O issue reports and
2  determine that any should have been reported
3  to FDA but were not?
4      A. To the best of my recollection as I
5  sit here today, yes.
6      Q. And how many?
7      A. I can't give you a number without
8  going back and checking.
9      Q. And do you know what type of
10  malfunction?
11     A. I don't recall specifically, as I
12  sit here today.
13     Q. Okay. But you have all of that
14  information somewhere back at your office,
15  if I'm correct?
16     A. Yes.
17     Q. Okay. Now, you also listed some
18  late reports that -- meaning Ethicon got
19  them and waited longer than 30 days to
20  report them to FDA?
21     A. Yes.
22     Q. Now, as I understand it -- well,
23  let's look on page 124. What you found
24  specific to TVT-O were 36 late reports; is
25  that right?

Page 259

1      A. Yes.
2      Q. All right. And as I understand it,
3  they were late from 1 day to 19 days; is
4  that right?
5      A. Yes.
6      Q. All right. Now, are you saying
7  that that delay of 36 reports from 1 day to
8  19 days is of some sort of significance?
9      A. Yes. It's out of regulatory
10  compliance.
11     Q. Is it --
12     A. It's a violation of the
13  regulations.
14     Q. Is it of significance in the
15  evaluation of the risk of TVT-O?
16     A. For that time frame, I would think
17  that particular time frame didn't make a
18  difference in terms of FDA's evaluation.
19     Q. I wouldn't think so either.
20     A. However, the requirements are set
21  for a reason, and they are supposed to be
22  followed, and it is a violation of their
23  requirements, FDA requirements, not to
24  submit within 30 days.
25     Q. Have you seen FDA -- well, first of

Page 260

1  all, did FDA take any compliance action
2  against Ethicon for these 36 reports that
3  were late anywhere from 1 to 19 days?
4      A. No. But I have seen, to answer
5  where I think you're going with your
6  question, FDA does --
7      Q. I think you answered my question.
8      A. -- does note in warning letters if
9  something has not been reported or in a 483
10  report, but also to your question you asked
11  me about compliance, and FDA did issue a 483
12  related to compliance.
13     Q. That was a 483 observation in 2005;
14  right?
15     A. Uh-huh.
16     Q. And then that was responded to by
17  Ethicon; correct?
18     A. To the best of my recollection,
19  yes. If not, that would be an issue.
20     Q. And no further action was taken by
21  FDA, was it?
22     A. To the best of my knowledge, that's
23  correct.
24     Q. All right. And no -- certainly no
25  compliance action was taken as a result of

Page 261

1  that 483 observation; right?
2      A. Yes, but understanding that when
3  FDA performs an inspection, it's based on
4  something very limited, and FDA has not had
5  access to all of the information that I have
6  had access to.
7      Q. Move to strike everything after
8  "yes."
9          All right. The issue reports that
10  were reviewed for TVT and TVT-O, did you
11  actually review them?
12     A. Yes.
13     Q. Did you have help reviewing them?
14     A. Yes, I did.
15     Q. And who was that?
16     A. It would have been several
17  different people over time.
18     Q. Who all?
19     A. Dr. Miriam Erberich would have been
20  one of them, potentially Dr. Kathryn Kimmel,
21  Wren Cherney, Andrea Friedman.
22         To the best of my recollection as I
23  sit here today, those would be the staff who
24  would have assisted me with looking at
25  those. But any that I determined, any that

Peggy Pence, Ph.D.

Page 262

1  were determined and that I've discussed as
2  being they should have been reported but
3  were not, that was all my evaluation.
4      Q.  Okay.  So we know for the 29 that
5  are listed, you reviewed those.
6      A.  Yes.
7      Q.  And we know for the 10 malfunctions
8  that were listed, you reviewed those.
9      A.  Absolutely.
10     Q.  And if I'm understanding your
11 testimony, you reviewed others that you're
12 not able to tell me about today that you
13 claim should have been reported to FDA.
14     A.  Yes.  I just can't recall the
15 specifics of those, and where people would
16 have helped me would have been to, for
17 example, to determine which ones were
18 actually reported to FDA of the issue
19 reports because we had to match that
20 information up with the MAUDE database and
21 verify that the ones that were not
22 reportable we could not find MDR reports
23 that were associated with those.  So that's
24 where they would have helped me.
25         Then the other aspect that I asked

Page 263

1  them to help me with was to go through the
2  different issue reports and read through
3  them and categorize them according to what
4  the adverse reaction was.  Was it difficulty
5  walking?  Was it a urinary problem?  Was it
6  erosion?  What was it so that I'd have those
7  in the categories, and then I could go
8  through and individually review them as to
9  what was reportable or whether it was a
10 malfunction function and whether it was
11 reportable or not.
12     Q.  How were duplicates culled out?
13     A.  The -- in two ways:  We look at the
14 -- to see if -- sometimes you'll have the
15 same report number.  It will appear more
16 than once in your download, and we get rid
17 of anything of that nature.
18         Also -- and I think I have a
19 description in here as well, but also we
20 would read through -- as I mentioned, we
21 read through the event descriptions, and if
22 it looks like everything is the same, and we
23 can verify that everything appears to be the
24 same in the reports, then we would not
25 report it twice.

Page 264

1      Q.  Okay.  Did you look at how many of
2  the reports were based on filed lawsuits?
3      A.  I did take a look at that more
4  recently, not so much in the number that I
5  recall to speak about but the percentage.
6  At various times -- and I would have to go
7  back and look at the information to verify
8  my memory whether it was 2012 -- I think it
9  was 2012 to 2014 that we looked at.  It
10 could have been 2013 to 2015.  I would have
11 to go back and just double-check the years,
12 but based on an assessment of the event
13 description, if attorney reported was
14 mentioned, in one of the years, it was
15 35 percent.
16         One year -- on one of the years, it
17 was -- I looked at TVT and TVT-O, and they
18 were both very similar.  It was around
19 35 percent, and then one year it was 80 to
20 81 percent, and then in the subsequent year,
21 it was about 50 percent.
22     Q.  Okay.  What year was it 80 to
23 81 percent?
24     A.  That's what I'm trying to remember
25 if we looked at 2012 to 2014 or 2013 to

Page 265

1  2015, and I have to go back and look at my
2  records.  I just can't -- I don't want to
3  confirm without double checking my memory.
4      Q.  Okay.  There was a reference -- if
5  you turn to your Exhibit 1 of your report,
6  which was the MAUDE database in your
7  report --
8      A.  Okay.
9      Q.  -- and on the second page, middle
10 of the page --
11     A.  The table.
12     Q.  I'm sorry.  First page.
13     A.  Oh, I'm sorry.
14     Q.  There's a reference there, fourth
15 paragraph down, "All such MDRs were reviewed
16 and an Excel workbook was created to record
17 the information provided by the adverse
18 events."
19         Do you see that?
20     A.  Yes.
21     Q.  Do you have that Excel workbook?
22     A.  It should be in our archives.
23     Q.  Okay.
24     A.  We did change servers.
25     Q.  Here we go, Hilary.

67 (Pages 262 to 265)

Peggy Pence, Ph.D.

Page 266

1    A.  It's the truth.  We did.  It should
2  be there.
3    Q.  All right.  I'm going to send a
4  request for that.  You won't have any
5  heartburn turning that over to me, would
6  you?
7        MR. GOSS:  Send it to me.  Send
8    the request to me.
9        MS. SUTHERLAND:  I'll send it
10    to you.
11  ///
12  BY MS. SUTHERLAND:
13    Q.  Did you rely on that for some of
14  the opinions in your report?
15    A.  Yes.  We downloaded the information
16  into the Excel workbook.
17    Q.  Yeah.  And then you used that Excel
18  workbook when you were formulating some of
19  your opinions; right?
20    A.  Yes.  We --
21        MR. GOSS:  Objection.  Form.
22  BY MS. SUTHERLAND:
23    Q.  And some of the charts that you've
24  had in your report?
25    A.  Yes.  Exactly.

Page 267

1    Q.  All right.  Do the MDR reports set
2  out pre-existing conditions?  Let me ask it
3  as an example.  For instance, I know some of
4  your charts show reports of dyspareunia.
5    A.  Right.
6    Q.  Do you know how many of those women
7  reporting dyspareunia actually had it before
8  any kind of mesh device was implanted?
9        MR. GOSS:  Objection.  Form.
10        THE WITNESS:  No, not
11    without -- not without going back and
12    reading one.
13  BY MS. SUTHERLAND:
14    Q.  And sometimes it wouldn't be in
15  there anyways; right?
16    A.  No, and that's why the manufacturer
17  has responsibility to investigate.
18    Q.  And from your review, how often did
19  Ethicon attempt to follow up for reports?
20    A.  My -- I'm checking my memory -- let
21  me just double check.  If you look on
22  page 124 of the main report, I note that the
23  majority of reports were initial reports
24  rather than follow-up reports.
25    Q.  Okay.  Does that tell you how many

Page 268

1  times Ethicon tried to follow up but yet got
2  no more information?
3    A.  That alone does not.  My own review
4  of the information, I found a number of
5  instances where the investigation was very
6  limited.
7    Q.  Can you give me an example of a
8  particular issue report?
9    A.  I can't without going back and
10  looking at my records.
11    Q.  Okay.
12    A.  But hold on just a minute.  Let me
13  see if I can locate anything that would help
14  to address your question.
15    Q.  I've forgotten what my question
16  was.
17        Would you read it back?
18        (Record read by the
19    reporter as follows:
      Can you give me an example of a particular issue
20  report?")
21  BY MS. SUTHERLAND:
22    Q.  I know you said no to that.
23        Are you looking for an average of
24  attempts at follow up that might be in your
25  report somewhere?

Page 269

1    A.  No.  That wouldn't be there, but I
2  was going to -- I was looking to see if I
3  might be able to give you a specific
4  example, which I thought was your question;
5  right?
6    Q.  Well, it was, and I thought you
7  said you couldn't come up with one, as you
8  sit here.
9    A.  Right.  Then I decided to look at
10  my report.
11        For example, on page 26, this is
12  one of the issue reports that was determined
13  by Ethicon not to be reportable.
14    Q.  Did you say 26 or 126?
15    A.  126.  Sorry.
16    Q.  Got it.
17    A.  And, for example, it says,
18  "Notably, it was speculation and my
19  professional opinion for the medical
20  reviewer to conclude that the erosion would
21  not worsen and/or require treatment, and I
22  reviewed no evidence of follow up by Ethicon
23  to determine outcome of the erosion.  The
24  status was indicated as closed within
25  approximately two months of the alert date."

Golkow Technologies, Inc. - 1.877.370.DEPS

Peggy Pence, Ph.D.

Page 270

1    So that's an example of where they
2 should have followed up to see if there were
3 any consequences to really understand the
4 safety profile of the product and feed that
5 risk information back into the risk
6 analysis, which should always be ongoing
7 during the development -- during the
8 marketing of a product, post-marketing as
9 well as pre-marketing, to assure that
10 there's a favorable benefit to risk ratio.
11    Q. As far as attempts at follow up,
12 did you come up with any sort of average of
13 the number of times that Ethicon attempts to
14 follow up to get information?
15    A. As I sit here today, I don't recall
16 having come up with a particular number
17 because the point, again, is not --
18    Q. Well, I think you answered my
19 question.
20    A. -- not the number. It's the fact
21 that they have an obligation to follow these
22 up to understand the safety profile of their
23 product and report as appropriate.
24    Q. I'm going to move to strike
25 everything after you didn't come up with a

Page 271

1 specific number.
2    Going back to MDR reports, are
3 there certain requirements that have to be
4 present in order for a reported event to be
5 reportable to FDA?
6    A. Yes.
7    Q. Okay. And what are those?
8    A. It has to be a serious or
9 life-threatening event where there is a
10 reasonable association with the device, and
11 as well for malfunctions, if that
12 malfunction were to recur, that a serious or
13 life-threatening event could result.
14    Q. Okay. Is there also a similar
15 requirement for devices like there is for
16 drugs that a reporter has to be identified,
17 an event, a patient, and a product?
18    A. I'm not sure exactly what you're
19 asking because a report from any source --
20 obviously, there has to be --
21    Q. There's got to be a reporter.
22    A. There's got to be a reporter.
23    Q. Right.
24    A. And information that you can follow
25 up to determine whether or not -- to get the

Page 272

1 information necessary to make that
2 determination.
3    Q. Yeah. My question is: In order to
4 be a reportable event to FDA, do you, number
5 one, have to have a product identified?
6    MR. GOSS: Objection. Form.
7    THE WITNESS: Generally
8 speaking, I would say, yes.
9 BY MS. SUTHERLAND:
10    Q. I was going to say --
11    A. But -- well, no. But I'm
12 hesitating because it's not a black and
13 white necessarily question because you can
14 get a report that says, "We used an Ethicon
15 product, and we implanted this device, and
16 the woman in whom we implanted it is
17 continuing to have chronic infection and
18 erosion," and they may not state what the
19 device is.
20    So you have to follow that up. You
21 need to make sure it's your product and
22 through investigation, try and -- you have
23 to make a due diligence effort, a valid due
24 diligence effort, and Ethicon has its own
25 standard operating procedures.

Page 273

1    They know what they must do to
2 follow it up to determine what product it is
3 and to find out more about the information
4 to determine whether it's reportable,
5 whether there's a follow-up report required,
6 et cetera.
7    And the whole basis of that, again,
8 is to always substantiate that a product is
9 meeting the essential principles of safety
10 and performance. If it's not Ethicon's
11 product, and they get a report for some
12 other manufacturer's mesh, they don't have
13 to submit an MDR report, but they are
14 supposed to send a letter to the FDA letting
15 the FDA know about it so that that
16 information doesn't get lost.
17    Again, all in the interest of
18 patient safety. But, generally speaking,
19 they need to -- you know, they could also
20 make a report that says this -- there should
21 always be a tendency in the global standard.
22 There should always be a tendency in doubt,
23 when you're in doubt, to report rather than
24 not to report.
25    So if they're unable to determine

Golkow Technologies, Inc. - 1.877.370.DEPS

Peggy Pence, Ph.D.

Page 274

1  which particular product it was, but it's
2  fairly substantiated that it was an Ethicon
3  product, and it was a sling, but they can't
4  determine if it was a TVT or a TVT-O, they
5  could still report that to the FDA and say
6  unable to determine which sling but
7  information confirms that it's an Ethicon
8  sling.
9      Q.  And did you, in fact, see where
10  Ethicon did that very thing?
11      A.  I don't recall a specific example
12  of that, as I sit here today.
13      Q.  Are you saying it didn't happen, or
14  you just don't recall?
15          MR. GOSS:  Objection.  Form.
16          THE WITNESS:  No.  I just don't
17  recall, as I sit here today.
18  BY MS. SUTHERLAND:
19      Q.  All right.  Did you look at the
20  reported events to see whether or not
21  Ethicon took even a more conservative
22  approach and reported something that you
23  wouldn't have reported?
24          MR. GOSS:  Objection.  Form.
25  BY MS. SUTHERLAND:

Page 275

1      Q.  Did you perform that review?
2      A.  As you've asked the question, as I
3  understand it, I didn't perform that review.
4      Q.  Okay.
5      A.  As I mentioned, there should always
6  be a tendency, if there's any question, to
7  report rather than not to report.
8      Q.  Okay.  Move to strike everything
9  after "I did not perform that review."
10      Is there a requirement for some
11  sort of identifier of a patient in order for
12  an adverse event to be reportable, meaning
13  the gender of the patient, the age,
14  something like that?
15      A.  The age, no.  The gender, not
16  necessarily.  If it's a device that can be
17  used in both sexes, you provide -- again,
18  that's why you investigate.  You try and
19  obtain as much information as necessary, and
20  then you make an appropriate judgment as to
21  whether or not it needs to be reported.
22      Q.  All right.  Let's switch gears
23  again, and I'm going to walk you through
24  some particular aspects of your report that
25  we haven't already covered, part of which

Page 276

1  I'm going to start with the Global
2  Harmonization Task Force issues.
3      A.  Okay.
4      Q.  Now, am I correct that the Global
5  Harmonization Task Force was sort of formed
6  in 1992?
7      A.  Yes.
8      Q.  All right.  And as I understand it,
9  there were members from different countries,
10  approximately five --
11      A.  Yes.
12      Q.  -- for sort of the task force.
13      A.  Countries or regions.
14      Q.  All right.  And would that be the
15  European Union?
16      A.  Yes.
17      Q.  The U.S.?
18      A.  Yes.
19      Q.  Canada?
20      A.  Yes.
21      Q.  Japan?
22      A.  Yes.
23      Q.  And France?
24      A.  Oh, I think it was Australia.
25      Q.  Oh, they met -- yeah, I think

Page 277

1  you're right.  Australia.
2      Was the purpose of the GHTF to come
3  up with some documents that harmonized
4  regulatory processes across the countries?
5      A.  Yes.  To provide a global model --
6      Q.  All right.
7      A.  -- for development of medical
8  devices with the intent of patient safety
9  and being able to bring important new
10  technologies to the market in a safe, cost
11  effective, efficient manner.
12      Q.  And in that effort to reach that
13  goal, am I correct that certain guidances
14  were promulgated by the GHTF?
15      A.  Yes, that's correct.
16      Q.  All right.  Was the intent then
17  that those guidances would then be adopted
18  by the regulatory agencies of those
19  different countries or regions?
20      A.  Yes.  And even beyond those
21  countries and regions but would even be more
22  global and other countries that didn't have
23  as well -- the countries and regions that
24  were involved had more established
25  regulatory framework for medical devices,

Golkow Technologies, Inc. - 1.877.370.DEPS

Peggy Pence, Ph.D.

Page 278

1  and so for countries and regions that didn't
2  have as well developed regulatory framework,
3  this would also -- the GHTF guidance
4  documents would also help those countries to
5  be able to have a framework for development
6  of safe and effective medical devices.
7      Q.  And all of this was for the
8  regulatory processes in the different
9  countries to be harmonized so that, for
10  instance, a manufacturer in one country knew
11  what was required for clearance in another
12  country across the globe.
13      A.  It was more than that.  It
14  certainly was for that purpose, but it was
15  also to establish the standards for testing,
16  for labeling, the guidances for risk
17  management, quality system for manufacturers
18  because the Global Harmonization Task Force
19  was a partnership between the industry and
20  regulators so that there was equal
21  representation across industry and
22  regulators for GHTF for its approximately
23  20-year history.
24      Q.  Now, study groups were created
25  under the umbrella of the GHTF; correct?

Page 279

1      A.  That's correct.
2      Q.  And there were five of them?
3      A.  That's correct.
4      Q.  And those leaders of those study
5  groups were all regulators, weren't they?
6      A.  I don't know specifically if the
7  leaders were all regulators.  The study
8  groups were compromised of both regulators
9  and -- both regulators and industry
10  representatives.
11      Q.  All right.  I'm going to hand you
12  what I've marked as Exhibit Number 12.
13          (Exhibit Number 12 was
14      marked for identification.)
15  BY MS. SUTHERLAND:
16      Q.  This is a printout of AdvaMed's
17  40th anniversary discussing the GHTF.
18          Now, have you ever seen this
19  document before?
20      A.  I don't recall, as I sit here
21  today, having seen this particular one.
22      Q.  All right.  What is AdvaMed?
23      A.  It's an industry organization that
24  represents medical device companies.
25      Q.  Okay.  Is it the largest medical

Page 280

1  device industry group in the United States?
2      A.  I would say, yes.
3      Q.  All right.
4      A.  That's my understanding.
5      Q.  Now, under this first section
6  there, Global Harmonization Task Force of
7  1992, it sets out sort of what we've already
8  talked about that in September 1992, senior
9  regulate officials and industry reps from
10  those different areas met in France;
11  correct?
12      A.  Right.
13      Q.  And that was for the purpose of
14  exploring "the formation of a global
15  partnership chartered to harmonize medical
16  device regulatory practices worldwide"; is
17  that right?
18      A.  That's what this says, yes.
19      Q.  Is that not right?
20      A.  No.  I said that was right, but, I
21  think, it also provides documentation for
22  how to develop a medical device to guide
23  manufacturers and how the appropriate
24  methods -- the appropriate types of testing,
25  labeling requirements, risk assessment,

Page 281

1  quality system, it sets out the standards
2  for medical device companies to follow in
3  being able to bring safe, effective, quality
4  products to market.
5      Q.  Now, those guidances were based on
6  regulations already in place in the
7  different countries that were members of
8  GHTF, weren't they?
9      A.  They utilized those, yes.  But,
10  again, it's a representation of medical
11  device industry, AdvaMed participated.  If I
12  recall correctly, AdvaMed was on the
13  steering committee, and AdvaMed
14  participated, representatives from companies
15  that were part of AdvaMed participated, and
16  then the regulators.
17      Q.  Now, the third paragraph in there
18  said that "The mission of GHTF was to
19  encourage the convergence in regulatory
20  practices related to ensuring the safety,
21  effectiveness, and quality of medical
22  devices."
23          Do you agree with that statement?
24      A.  Yes, as well as the rest, which is
25  promoting technological innovation which has

Peggy Pence, Ph.D.

Page 282

1  to do with companies --
2      Q.  Right.
3      A.  -- and facilitating international
4  trade.
5      Q.  Correct.  And then it goes on and
6  says, "This important task was accomplished
7  through the development and dissemination of
8  harmonized guidance documents on regulatory
9  practices."
10         Do you agree with that statement?
11     A.  Yes, but it's more than regulatory
12 practices because there are documents that
13 talk about clinical evaluation, what
14 clinical evidence means, all of the same
15 kind of -- it's not just for regulators.
16         This information is intended to be
17 used by companies developing products in
18 order to take the appropriate steps and have
19 a model to follow to produce safe and
20 effective and high-quality products, quality
21 product, to bring to the market in their
22 various regions or countries.
23     Q.  It goes on to say, "These critical
24 documents" -- meaning these guidances --
25 "which were developed by the five different

Page 283

1  study groups were then to be implemented by
2  member national regulatory authorities to
3  further the goal of harmonization."
4         Now, was that -- is that your
5  understanding of what was to be accomplished
6  through the GHTF?
7      A.  Yes.
8      Q.  Okay.
9      A.  Yes.
10     Q.  Which GHTF guidances were adopted
11 by FDA?
12     A.  There are -- there are a number of
13 those like, for example, the auditing one.
14 FDA is currently using a GHTF auditing
15 guidance in cooperation with, I believe,
16 it's Japan and maybe Canada -- I'd have to
17 check back to refresh my memory -- to look
18 at an auditing model to audit medical device
19 companies so that they don't have to be
20 audited by multiple countries and that by
21 working together through GHTF, the GHTF
22 model for auditing, that they all accept
23 that whatever the audit is, that they will
24 accept the -- it's a pilot program
25 currently.

Page 284

1      Q.  And that pilot program that you're
2  talking about, is that set out in some sort
3  of FDA document?
4      A.  Yes.  It's on the -- you can find
5  it on the FDA website.
6      Q.  All right.  Other than that pilot
7  program that you're talking about on
8  auditing, did FDA adopt any other guidance
9  put out by GHTF?
10     A.  If you'll -- Tim Ulatowski, who is
11 your expert in these cases, actually, back
12 around --
13     Q.  Well, you note something from him
14 from 2009 in your report.
15     A.  I said they were becoming -- that
16 companies should be aware of them, that they
17 were becoming the standard.  And --
18     Q.  And my question is a little bit
19 different.
20         MR. GOSS:  Wait, wait, wait,
21     wait.  Slow down a little bit.
22 BY MS. SUTHERLAND:
23     Q.  My question was specifically on
24 whether you can tell me which, if any,
25 guidance put out by GHTF has been adopted by

Page 285

1  FDA.
2      A.  I would have to check the status of
3  it.  I know that there was also a pilot
4  program where the FDA was encouraging the
5  use of the STED document for submission of
6  medical device applications.  I would have
7  to check the status of that, at this point
8  in time.
9         Many of the GHTF documents are very
10 reflective already of the FDA regulations
11 because obviously FDA was a major
12 participant.
13     Q.  Now, is this the pilot program on
14 the STED that you're talking about?
15         Let me mark that as 13.
16         (Exhibit Number 13 was
17     marked for identification.)
18         THE WITNESS:  Yes.
19 BY MS. SUTHERLAND:
20     Q.  Okay.  Now, I'm not aware of that
21 actually being implemented past 2005.  Are
22 you?
23     A.  Not without checking, I don't
24 recall.
25     Q.  All right.  So now other than the

72 (Pages 282 to 285)

Peggy Pence, Ph.D.

Page 286

1  two pilot programs that you've mentioned to
2  me, are you aware of any guidance from GHTF
3  that FDA has adopted?
4      A. As I sit here today, I don't recall
5  without going back and looking at all of
6  them --
7      Q. Okay.
8      A. -- and checking. What I can tell
9  you in answer to your question is that the
10 reason for -- I was able to find some
11 further documentation. The reason for
12 disbanding GHTF and transitioning GHTF's
13 work to IMDRF was specifically for that
14 purpose. That incorporation of these
15 guidance documents into the regulatory
16 framework to the regulations had been slower
17 than had been hoped and so --
18     Q. In fact, not at all; right?
19     A. Well, in some places, I don't think
20 that's true. They are in the U.S.
21     Q. In the U.S., not at all; right?
22     A. In the U.S., but in other places,
23 they were being incorporated, but the
24 incorporation was slower than anticipated,
25 and so the regulators decided that they

Page 287

1  could make that happen after the 20 years of
2  GHTF and with the global framework that had
3  been developed, that now if the regulators
4  were to take the ball, if you will, that
5  they could work more effectively to get the
6  GHTF guidance documents and any new
7  documents that IMDRF would develop
8  incorporated into the regulations of their
9  respective areas.
10     Q. All right. And IMDRF doesn't have
11 industry representatives right?
12     A. No. It's all regulators.
13     Q. All regulators. Okay.
14         MS. SUTHERLAND: How much time
15 do we have?
16         THE VIDEOGRAPHER: About --
17 you're at 5 hours 24 minutes.
18         MS. SUTHERLAND: Let's keep
19 going.
20 BY MS. SUTHERLAND:
21     Q. Flip over to page 42.
22     A. Of my report?
23     Q. Of your report, yes, ma'am.
24     A. 42?
25     Q. Yes, ma'am.

Page 288

1      And I just had a quick question.
2  You note there about the Medscand payments
3  of 400,000 --
4      A. Yes.
5      Q. -- and that -- are you offering an
6  opinion that that financial information
7  should have been disclosed in the TVT
8  510(k)?
9      A. Yes.
10     Q. All right. And am I correct,
11 though, that the regulation requiring that
12 type of disclosure actually wasn't finalized
13 until after the submission of the TVT
14 510(k)?
15     A. That is correct.
16     Q. All right. Let's move on to
17 page 54. And as I review your report, at
18 least for this specific one, I understood
19 you to be saying that there were two
20 cytotoxicity tests that should have been
21 provided to FDA?
22     A. Yes.
23     Q. All right. Now --
24     A. Or should have -- and should have
25 been also followed up further to understand

Page 289

1  why they were getting positive cytotoxicity
2  tests.
3      Q. Okay. I got you.
4      But what I'm going for here is what
5  are you going to tell a jury that Ethicon
6  should have given to FDA but didn't, and I
7  know you and I have talked about the MDRs.
8  We've now talked about these two
9  cytotoxicity tests.
10     A. Right.
11     Q. Now, is there other specific
12 documentation that you're going to say
13 Ethicon should have given to FDA but didn't
14 with respect to the TVT-O?
15         MR. GOSS: Objection. Form.
16         THE WITNESS: For example, the
17 issues with fraying and particle loss of
18 the mesh, the mechanically cut mesh, the
19 roping, the curling.
20 BY MS. SUTHERLAND:
21     Q. Yeah. I'm asking about can you
22 name for me a specific document that you're
23 talking about that you say Ethicon should
24 have give to FDA but didn't?
25     A. Well, there are a number of

Golkow Technologies, Inc. - 1.877.370.DEPS

Peggy Pence, Ph.D.

Page 290

1  documents related to the fraying, the
2  particle loss.
3      Q.  Can you tell -- I mean, I need to
4  know if you're going to say, "Ethicon should
5  have given this document to FDA," I want to
6  know what this document is.
7      A.  Well, for example, if I'm recalling
8  correctly, Gene Kammerer's, the engineer,
9  lead engineer, Gene Kammerer -- there's a --
10  I believe it's a PowerPoint presentation
11  where they're actually pictures of the mesh
12  and the particle loss and how the structure
13  is lost, the mesh structure is lost, and the
14  word "degradation" was used separate from
15  degradation once implanted, but degradation
16  of the structure of the mesh and the
17  particle loss and the fact that there was no
18  testing to determine whether or not those
19  particles might have any impact for safety
20  and effectiveness.
21      The narrowing -- the narrowing and
22  the roping and the curling of the mesh, the
23  fact that that was considered, and it's been
24  testified to by Ethicon employees that that
25  was a product defect.

Page 291

1      Q.  Okay.  Now, you told me about a
2  PowerPoint --
3      A.  I believe it was a PowerPoint.
4      Q.  -- by Mr. Kammerer.
5      A.  Yes.
6      Q.  All right.  What other document are
7  you going to say should have been given to
8  FDA but wasn't?
9      A.  At that point in time --
10      Q.  And what point in time are we
11  talking about?
12      A.  Submission of 510(k).
13      Q.  Okay.
14      A.  Some of the documents I have
15  referenced, I don't have years indicated in
16  my reference.  So without checking back the
17  document, I can't say whether it had the
18  information available at the time of
19  submission or not, but I do know, for
20  example, that by November, 2003, that they
21  had -- Ethicon had at least had received a
22  total of 58 complaints of fraying, and they
23  also had information from their preceptors
24  about denaturing and linting being a
25  concern, leaving particles in patients.

Page 292

1      Q.  Those 58 reports of fraying, were
2  they reported to FDA's MDRs?
3      A.  To the best of my recollection,
4  there may have been some but not all.  I'd
5  have to go back and check my records.
6  That's to the best of my recollection.
7      Q.  Okay.
8      A.  And let's see -- yes.  I know for
9  sure that in the discussion of malfunctions
10  in the back of my report.  Definitely
11  there -- there, for example, eight reports
12  of the mesh fraying, unraveling, and on
13  fragments falling off, the tape becoming
14  particles.  So there were definitely reports
15  that were not submitted to FDA.
16      Q.  Okay.  But there were actually some
17  reports of fraying that were reported to FDA
18  by Ethicon; right?
19      A.  I'd have to go back and double
20  check.
21      Q.  You don't know that sitting here
22  today?
23      A.  There are many MDR reports.  To the
24  best of my recollection as I sit here today,
25  there were some, but I'd have to just verify

Page 293

1  my memory.
2      Q.  Okay.
3      A.  And that's very important because
4  that goes not only to determining safety and
5  effectiveness, that's an important
6  consideration for FDA's determination of
7  substantial equivalence, and that
8  information was known to Ethicon and not
9  provided to the FDA.
10      Q.  Move to strike everything after
11  your first clause where, I think, you said
12  that you thought some were reported to FDA,
13  but you'd have to confirm.
14      Let me get you to move to page 107
15  of your report.
16      A.  Okay.
17      Q.  And if we're flipping through
18  there, by my count, you pull out five pieces
19  of promotional material on pages 107 to 114.
20  Is that right?
21      A.  I'll double check.  Yes.
22      Q.  All right.  Now, are those five
23  pieces of promotional materials what you're
24  relying on to support your opinion number 4?
25      A.  Yes.

74 (Pages 290 to 293)

Peggy Pence, Ph.D.

Page 294

1    Q.  Now, let's go back and look at --
2  on page 107, the first piece that you have
3  there.
4    A.  Okay.
5    Q.  All right.  First of all, that
6  one's entitled "Only Gynecare TVT Has
7  Long-Term Results You Can See -- blah, blah,
8  blah -- "and Believe."
9    A.  Right.
10   Q.  All right.  Now, do you have any
11 information that the implanter in the
12 Jennifer Ramirez case, Dr. Reyes, saw that
13 piece?
14           MR. GOSS:  Objection.  Form.
15           MS. VERBEEK:  Same objection.
16           THE WITNESS:  I don't recall
17   that he testified about this --
18 BY MS. SUTHERLAND:
19   Q.  Okay.
20   A.  -- as I sit here today.
21   Q.  All right.  Have you done any kind
22 of survey of surgeons to determine what
23 their perception is of this particular
24 piece, number 1, on your report, page 107?
25   A.  No.  My evaluation was based on

Page 295

1  what the requirements are for promotional
2  labeling.
3    Q.  Now, you discuss there in that
4  paragraph that the financial conflicts of
5  Professor Ulmsten and Professor Nilsson were
6  not disclosed; correct?
7    A.  That's correct.
8    Q.  All right.  Now, are you opining
9  that Professor Ulmsten or Professor Nilsson
10 manipulated their data to make it
11 inaccurate?
12   A.  I'm not opining that.  What I'm
13 opining is that there is -- any time there
14 is a financial arrangement that could impact
15 one's assessment of data and particularly
16 where positive data is required in order for
17 a payment to be made, there is the potential
18 for bias, and that information should be
19 disclosed so that the reader of -- in this
20 case, the promotional labeling, understands
21 that there was financial incentive for the
22 authors of that data.
23      I'm not saying that they did.  I'm
24 saying that presents a potential for bias,
25 and that's the reason it should be

Page 296

1  disclosed.
2    Q.  And then move to page 110 of your
3  report, and there's your second marketing
4  piece.
5    A.  Yes.
6    Q.  All right.  Now, do you have any
7  information that Dr. Reyes saw this
8  particular marketing piece?
9           MS. VERBEEK:  Object to form.
10          MR. GOSS:  Objection.  Form.
11          THE WITNESS:  To the best of my
12   recollection as I sit here today, I
13   don't recall that he testified as to
14   having seen this particular piece.
15 BY MS. SUTHERLAND:
16   Q.  All right.  Now, did you perform
17 any kind of survey to determine how
18 physicians perceived this particular
19 marketing piece?
20          MR. GOSS:  Objection.  Form.
21          MS. VERBEEK:  Objection.  Form.
22          THE WITNESS:  My assessment was
23   based on the requirements for what is
24   supposed to be in promotional labeling.
25   I did not perform a survey.

Page 297

1  BY MS. SUTHERLAND:
2    Q.  And with respect to -- you note,
3  again, the financial conflict of Professor
4  Ulmsten and Nilsson; right?
5    A.  Yes.
6    Q.  And then you also pull in Professor
7  de Leval; correct?  Do you see that last
8  sentence there on the first paragraph?
9    A.  Yes, I do.
10   Q.  Okay.  Now, are you opining that
11 Professor de Leval manipulated his data to
12 make it inaccurate?
13   A.  No.  I'm, again, opining that
14 there's a potential for bias and because of
15 that potential for bias, it is the standard,
16 it's a requirement from a regulatory
17 standpoint at this point in time, in fact,
18 by the time of the TVT-O but no clinical
19 data was included in the special 510(k) for
20 TVT-O.
21      It's a regulatory requirement, but
22 it's also the standard of -- the standard
23 for publications that that type of
24 information be disclosed.
25   Q.  Okay.  Move to strike everything

Golkow Technologies, Inc. - 1.877.370.DEPS

Peggy Pence, Ph.D.

Page 298

1  after "no."
2      If you turn to page 112 of your
3  report, and that gets us to your third
4  marketing piece?
5      A. Yes.
6      Q. And this one is dated 2010?
7      A. Yes.
8      Q. All right. Now, do you have any
9  information that Dr. Reyes saw this
10  marketing piece?
11      MR. GOSS: Objection. Form.
12      THE WITNESS: I don't recall.
13      MS. VERBEEK: Objection. Form.
14      THE WITNESS: I don't recall
15  having seen testimony that as regards
16  his having seen this piece.
17  BY MS. SUTHERLAND:
18      Q. Okay. Did you perform any kind of
19  survey to determine physicians perceptions
20  of this particular marketing piece on
21  page 112?
22      MR. GOSS: Objection. Form.
23      MS. VERBEEK: Object to form.
24      THE WITNESS: With the same
25  comment as I made for the prior two, no,

Page 299

1  I did not.
2  BY MS. SUTHERLAND:
3      Q. Okay. Turn to page 114. And up at
4  the top, we have your fourth marketing
5  piece.
6      A. Yes.
7      Q. And, again, do you have any
8  information that Dr. Reyes saw this
9  particular marketing piece?
10      MS. VERBEEK: Object to form.
11      THE WITNESS: I do not recall
12  his having testified that he had seen
13  this, as I sit here today.
14  BY MS. SUTHERLAND:
15      Q. Okay. Did you perform any kind of
16  survey to determine physicians perception of
17  this particular piece?
18      MR. GOSS: Objection. Form.
19      MS. VERBEEK: Object to form.
20      THE WITNESS: My assessment and
21  my opinion is based on a review of --
22  based on a review of the piece as
23  regards the requirement for promotional
24  labeling must meet, just as for the
25  other pieces, and I did not perform a

Page 300

1  survey.
2  BY MS. SUTHERLAND:
3      Q. All right. And for the last piece
4  on page 5, did you perform any kind of
5  survey to determine physicians perception of
6  that fifth marketing piece?
7      MS. VERBEEK: Object to form.
8      THE WITNESS: With the same
9  comments as for the prior promotional
10  labeling pieces, no.
11  BY MS. SUTHERLAND:
12      Q. All right. And do you have any
13  information that Dr. Reyes saw this
14  particular piece?
15      A. I don't recall any specific
16  information in his testimony as regards to
17  this piece, as I sit here today.
18      Q. Under your opinion there, the
19  second sentence you note, "Labelling can be
20  deemed by FDA to be misleading and in
21  violation of FDA requirements if it proves
22  deceptive to the customer by creating or
23  leading to a false impression in the mind of
24  the reader."
25      Did I read that correctly?

Page 301

1      A. Yes, you did.
2      Q. All right. Now, number one, has
3  FDA ever issued any kind of documentation
4  for these five pieces saying that they were
5  misleading or in violation of any FDA
6  requirement?
7      A. Not that I've seen, but they were
8  not just submitted to FDA, as far as I know.
9  So they weren't provided to FDA for comment.
10      Q. Move to strike everything after
11  "Not that I've seen."
12      And with respect to determining if
13  the piece proved deceptive to the customer
14  by creating or leading to a false impression
15  in the mind of the reader, would the reader
16  be intended to be obviously a physician;
17  correct?
18      A. Yes. For these pieces, yes.
19      Q. All right. Did you talk to any
20  physician who actually saw any of these
21  pieces?
22      A. No, I did not. And I've given my
23  rationale for each of these pieces as to why
24  it was false and misleading.
25      Q. And we already know that you didn't

Golkow Technologies, Inc. - 1.877.370.DEPS

Peggy Pence, Ph.D.

Page 302

1  do any kind of survey to determine if any
2  physician got a false impression in their
3  mind after reading any of these five pieces;
4  correct?
5         MR. GOSS:  Objection.  Form.
6         THE WITNESS:  Based on my
7  experience --
8  BY MS. SUTHERLAND:
9     Q.  Is that a yes or a no?
10    A.  I can't give you just a yes or no.
11    Q.  Well, you didn't do a survey;
12  right?
13    A.  I have, based on years of
14  experience and knowledge and reviewing, a
15  number of warning letters about what should
16  be in promotional labeling and what should
17  not as well as correspondence between
18  companies who have submitted labeling of
19  this type and FDA correspondence and based
20  on what the requirements are for what's
21  supposed to be included, I made my
22  assessment based on that and not a survey
23  because there's a certain standard that must
24  be met, and I made my assessment, and I've
25  given the rationale for each piece as to

Page 303

1  where it was false and misleading.
2         And I made my assessment based on
3  what the requirements are for this type of
4  labeling.
5     Q.  All right.  So in order to reach
6  this opinion -- essentially, we have your
7  opinion that under the FDA regs, it would
8  create or lead to a false impression in the
9  mind of a physician; correct?
10    A.  My opinion based on many years of
11  experience.
12    Q.  What we don't have is you even
13  talking to a single physician to confirm
14  your opinion; correct?
15         MR. GOSS:  Objection.  Form.
16         MS. VERBEEK:  Object to form.
17         THE WITNESS:  I have not talked
18  to a single physician.  I based it on
19  the requirements for this type of
20  labeling and given the rationale for it,
21  for my opinions.
22  BY MS. SUTHERLAND:
23    Q.  Do you intend to opine that Prolene
24  mesh is carcinogenic?
25    A.  I don't intend to opine that it's

Page 304

1  carcinogenic.  If I'm asked about that, I
2  would opine that there have been cases now
3  that have been reported where polypropylene
4  as well as other polyester meshes and TVTs
5  have been found in association with tumors
6  and that the authors of those reports have
7  not concluded that the mesh was the cause of
8  the tumor but that it may have been a
9  contributing factor.
10    Q.  And are those case reports, the, I
11  think, four or five that are set out in your
12  report?
13    A.  Yes.
14    Q.  Are there any other pieces of
15  medical literature that you've looked at
16  addressing whether or not mesh is
17  carcinogenic?
18         MR. GOSS:  Objection.  Form.
19         THE WITNESS:  There is, as
20  discussed in my report, in one of the
21  points I said should have been in the
22  warnings that there were rat sarcomas
23  that were identified in the material
24  safety data sheet with implantation.
25  BY MS. SUTHERLAND:

Page 305

1     Q.  I should have specified.  I'm
2  asking about medical literature.  Did you
3  look at any other medical literature that
4  addresses an issue of whether or not mesh is
5  associated with cancer other than what
6  you've got in your report?
7     A.  I certainly have -- I can't give
8  you a specific -- I know I have looked at
9  solid state tumors and mesh and various --
10  I've looked into that.  I can't give you a
11  specific document.  I have done some
12  research on it.  I can't give you a specific
13  document that I recall, as I sit here today.
14    Q.  All right.
15    A.  Those case reports are important
16  because of the information that they
17  present, and it needs to be considered and
18  for long-term implants, testing for -- and
19  that goes into the testing for long-term
20  inflammation, long-term infection.
21         These are -- this is one of the
22  reasons, for example, for doing further
23  testing, for having a registry.  Without
24  having the appropriate follow up of these
25  patients, making such an association is

77 (Pages 302 to 305)

Peggy Pence, Ph.D.

Page 306

1  difficult.  It cannot be done actually.
2      Q.  All right.  I'm going to move to
3  strike everything after your first clause.
4          Would you agree with me that
5  TVT-O -- the mesh in TVT-O is Prolene mesh.
6      A.  Yes.
7      Q.  All right.  And would you agree
8  with me that Prolene mesh has been used in
9  the body since the 1970s?
10         MR. GOSS:  Objection.  Form.
11  BY MS. SUTHERLAND:
12     Q.  You know it was a preeminent
13  device; right?
14         THE WITNESS:  Yes, I do.
15         MR. GOSS:  Objection.  Form.
16         THE WITNESS:  Yes, I agree with
17     that, but there's more to be considered
18     than just that fact.
19  BY MS. SUTHERLAND:
20     Q.  Okay.  Well, my question is do you
21  know, or do you not know that Prolene mesh
22  has been used in the body since the 1970s?
23         MR. GOSS:  Objection.  Form.
24         THE WITNESS:  Yes, I know that.
25  BY MS. SUTHERLAND:

Page 307

1      Q.  Okay.  Now, in the in 40 some-odd
2  years that Prolene mesh has been used in the
3  body, is there a single case report where a
4  doctor attributed cancer to Prolene mesh?
5          MR. GOSS:  Objection.  Form.
6          THE WITNESS:  Well, the TVT is
7      Prolene mesh.
8  BY MS. SUTHERLAND:
9      Q.  Well, that doctor didn't attribute
10  the issue to TVT, did he?
11     A.  In one case, the authors concluded
12  that the bowel cancer in both cases is
13  unlikely to be caused by the mesh, but
14  chronic irritation by the mesh may be a
15  contributing factor and further cautioned --
16  this is the key point -- that it is
17  important to keep in mind that mesh surgery,
18  especially for prolapse procedures, has been
19  used for a relatively short duration of
20  time, and there may still be unknown
21  long-term complications associated with
22  their usage.
23     Q.  Does Ms. Reyes have cancer?  I'm
24  sorry.  Ms. Ramirez.
25         MR. GOSS:  Objection.  Form.

Page 308

1          THE WITNESS:  If she does, I
2      have not seen any information with
3      regard to that.
4  BY MS. SUTHERLAND:
5      Q.  Okay.  All right.
6      A.  I hope she doesn't.
7      Q.  I hope she doesn't either.
8          MS. SUTHERLAND:  Let's go off for a
9  few minutes.  I think I've got maybe ten
10  minutes.  Let me make sure I've covered
11  everything.
12         MR. GOSS:  Are you going to
13     leave your co-defendant any time in the
14     six hours?
15         MS. SUTHERLAND:  I didn't know
16  I needed to.
17         MS. VERBEEK:  You probably
18  don't.  You've worn me out.
19         MS. SUTHERLAND:  I've worn
20  myself out.
21         THE VIDEOGRAPHER:  Going off?
22         MS. SUTHERLAND:  Yes.
23         THE VIDEOGRAPHER:  With the
24  approval of counsel, going off the
25  record.  The time is approximately

Page 309

1  4:37 p.m.
2          (Recess taken from
3  4:37 p.m. to 4:43 p.m.)
4          THE VIDEOGRAPHER:  With the
5  approval of counsel, back on the record.
6  The time is approximately 4:43 p.m.
7  BY MS. SUTHERLAND:
8      Q.  Doctor, let me get you to turn back
9  to page 59 of your report, if I could, and
10  this actually sets out your first opinion in
11  your report; right?
12     A.  Yes.
13     Q.  Now, as I understand it, you've got
14  an opinion that Ethicon failed to conduct
15  appropriate pre-market testing of the TVT-O?
16     A.  That's correct.
17     Q.  All right.  Are you intending to
18  opine as to the specific protocol of trials
19  that Ethicon should have done pre-market
20  that it did not do for TVT-O?
21         MR. GOSS:  Objection.  Form.
22         THE WITNESS:  Let me make two
23     points.  One is that they didn't do the
24     appropriate testing pre-market but also
25     as new information was obtained and, for

Peggy Pence, Ph.D.

1    example, marketing of the laser-cut
2    mesh, post-marketing, they didn't --
3    they didn't do appropriate testing
4    either.
5          If I were to be asked what type
6    of study should have been done, I will
7    respond to that.  I don't know if I'm
8    going to be asked that kind of question.
9    I could certainly opine about what types
10   of testing should have been done, but
11   the testing was inadequate.
12   BY MS. SUTHERLAND:
13       Q.  Okay.  Let me ask it this way:  Do
14   you intend to opine that Ethicon should have
15   done clinical testing of TVT-O before
16   marketing the TVT-O?
17       A.  Yes.
18       Q.  All right.  Are you intending to
19   opine as to a specific number of women that
20   should have been enrolled in a clinical
21   trial pre-market?
22       A.  I don't intend to offer a specific
23   number of women because, as you and I have
24   discussed previously, in order to arrive at a
25   specific number of women -- I could give

1    potentially a range that would have been
2    appropriate, but in order to arrive at a
3    specific number, one has to design the
4    study.
5          What the endpoints are.  If it's a
6    comparative study, what the differences one
7    expects to see or no differences between
8    a -- one product and another depending on
9    what type of trial it is.  Then one then
10   needs to give that information to a
11   statistician who does his calculations to
12   let you know how many patients you need to
13   include considering the possibility for
14   dropouts in order to be able to end up with
15   the right number of patients to be able to
16   answer the questions you're intending to ask
17   by your protocol.
18       Q.  One is the loneliest number.
19       A.  One meaning a person.
20       Q.  So as you sit here today, have you,
21   in fact, designed a protocol that you intend
22   to opine about with respect to TVT-O --
23   strike that.
24          As you sit here today, have you put
25   together a protocol that you intend to opine

1    about during this particular trial?
2        A.  No.  As I sit here today, no.
3            MS. SUTHERLAND:  All right.
4    I'm going to hand it to co-counsel for
5    any questions and maybe save three
6    minutes for my follow-up questions.
7            MS. VERBEEK:  I'll reserve.
8            MS. SUTHERLAND:  How much time
9    do we have?
10           THE VIDEOGRAPHER:  Nine
11   minutes.
12           MS. SUTHERLAND:  All right.
13   Let's go off.  We'll switch.
14           THE VIDEOGRAPHER:  With the
15   approval of counsel, going off the
16   record.  The time is approximately
17   4:47 p.m.
18           (Recess taken from
19   4:47 p.m. to 5:06 p.m.)
20           THE VIDEOGRAPHER:  With the
21   approval of counsel, back on the record.
22   The time is approximately 5:06 p.m.
23
24           EXAMINATION
25   BY MR. GOSS:

1        Q.  Good almost evening, Dr. Pence.
2        A.  Good evening.
3        Q.  For the record, we met before.  I'm
4    Tim Goss.  You know I represent Jennifer
5    Ramirez.
6        A.  Yes.
7        Q.  And I retain -- my firm retained
8    you as an expert for her case.
9        A.  Yes.
10       Q.  And we are in Newport Beach,
11   California, and you are giving your
12   deposition in that case today; is that
13   right?
14       A.  Yes, I am.
15       Q.  And you've given your deposition
16   before?
17       A.  I have.
18       Q.  You understand that this case may
19   go to trial in San Antonio, Texas?
20       A.  Yes, I do.
21       Q.  And do you understand that your
22   testimony today is as if you are sitting in
23   that courtroom talking to that jury?
24       A.  Yes, I do.
25       Q.  Okay.  And you've testified before

Peggy Pence, Ph.D.

1   juries before?
2       A.  Yes, I have.
3       Q.  Okay.  Where do you currently
4   reside?
5       A.  Newport Beach, California.
6       Q.  And where did you reside before
7   that?
8       A.  Newberry Park, California.
9       Q.  You just recently moved to Newport?
10      A.  That's correct.
11      Q.  Why did you move to Newport?
12      A.  My son and his family, including my
13  three grandchildren, live in Newport Beach.
14      Q.  Where did you grow up?
15      A.  I grew up in the south in Texas.
16      Q.  Where in Texas?
17      A.  I of New Braunfels and Wichita
18  Falls, Texas.
19      Q.  So you're a little familiar with
20  San Antonio, Texas?
21      A.  Yes, I am.
22      Q.  Okay.  Let me mark your CV.  I'm
23  going to hand you what's been marked as
24  Pence Exhibit 14.
25      A.  Thank you.

1          (Exhibit Number 14 was
2          marked for identification.)
3   BY MS. SUTHERLAND:
4       Q.  And is that your personal CV?
5       A.  Yes, it is.
6       Q.  Okay.  I'm going to walk through a
7   little bit of this, and I'm not going to
8   spend a lot of time on it, but I do want the
9   jury to get a flavor of your education, your
10  employment, and why you're an expert in this
11  case.  Okay?
12          Where did you go to college?
13      A.  I did my undergraduate work at
14  Louisiana Tech, Louisiana Polytechnic
15  University, usually known as Louisiana Tech.
16      Q.  Were you born in Louisiana?
17      A.  No.  I was actually born in
18  Georgia.
19      Q.  Okay.  Did you get a degree at
20  Louisiana Polytech?
21      A.  Yes, I did.
22      Q.  And what did you get that degree
23  in?
24      A.  My major was microbiology with
25  minors in chemistry and zoology.

1       Q.  And what type of degree was your
2   major?
3       A.  Bachelor of science.
4       Q.  Okay.  Why did you get it in
5   science?
6       A.  From the time I was a little girl,
7   as far back as I can remember, I was always
8   interested in the medical field and in
9   science and doing something to contribute
10  and help people to feel better, to be
11  better, better quality of life.
12      Q.  After you obtained your degree,
13  your bachelor of science in microbiology,
14  did you do further studies?
15      A.  Eventually I did, yes.
16      Q.  And did you get another degree?
17      A.  Yes, I did.
18      Q.  What did you get?
19      A.  A got a doctor of philosophy or a
20  Ph.D. degree with a major in toxicology, a
21  minor in pharmacology.
22      Q.  Where was that?
23      A.  That was at Indiana University
24  Medical School.
25      Q.  And that's why we call you doctor.

1       A.  Yes.
2       Q.  You're not a medical doctor?
3       A.  No, I'm not.
4       Q.  Why don't you explain to the jury
5   what toxicology is?
6       A.  Toxicology is the study of poisons
7   in the context of medical device and
8   pharmaceutical product development.  It
9   focuses on the study of the potential
10  adverse effects of medical devices or
11  pharmaceutical type drugs on the human body
12  or on animals predicting what may happen in
13  humans.
14      Q.  And you got your Ph.D. in
15  toxicology?
16      A.  Yes, I did.
17      Q.  Tell the jury a little bit about
18  what getting your Ph.D. entails.
19      A.  It requires, of course, a lot of
20  didactic training, a large amount of
21  coursework, and then for a Ph.D., it
22  requires independent research and presenting
23  that research to a committee, writing up
24  your results, and getting those --
25  submitting those results to the university,

Golkow Technologies, Inc. - 1.877.370.DEPS

Peggy Pence, Ph.D.

Page 318

1  being examined on those results by your
2  committee, and they're assuring that you
3  meet the qualifications to receive your
4  receive your Ph.D. degree.
5      Q.  You got a minor in pharmacology.
6  Explain to us what pharmacology is.
7      A.  Pharmacology -- toxicology is a
8  subset of pharmacology.  Pharmacology is the
9  study of both the adverse effects as well as
10  the -- more principally the effects of drugs
11  that are positive, how -- the beneficial
12  effects of drugs, how they act on the body,
13  how the body responds to them.
14      Q.  So the study of toxicology and
15  pharmacology would include the study of the
16  benefits and risks of drugs?
17      A.  That's correct.
18      Q.  Okay.  How long does it generally
19  take for someone to get a Ph.D. in
20  toxicology?
21      A.  It generally takes four to five
22  years after -- once one enters the program.
23  In my case, it took, if I recall correctly,
24  a little over seven years because I was also
25  working full-time for a large part of that

Page 319

1  time and raising a couple of children.
2      Q.  Right.  Are you currently employed?
3      A.  Yes, I am.
4      Q.  And how are you currently employed?
5      A.  I am employed by Symbion Research
6  International.
7      Q.  Okay.  What is Symbion?
8      A.  Symbion is a consulting company and
9  contract research organization.  We work
10  with companies like medical device
11  companies, pharmaceutical companies,
12  companies developing biological therapeutics
13  to assist them with understanding what the
14  requirements are, what they need to do to
15  bring their products to the market, assuming
16  that the products turn out to be safe and
17  effective through all the appropriate
18  testing, and we work with them to help get
19  their products through the FDA process prior
20  to marketing and post-marketing.
21      Q.  That's how you're currently
22  employed.  Now I'm going to back you way up.
23      When you got out of school, where
24  did you go to work?
25      A.  My first job after school was Eli

Page 320

1  Lilly and Company.
2      Q.  Is Eli Lilly and Company similar to
3  Johnson & Johnson and Ethicon?
4          MS. SUTHERLAND:  Objection.
5          THE WITNESS:  Yes.  It's a
6  large pharmaceutical company.
7  BY MR. GOSS:
8      Q.  Okay.  And what did you do for Eli
9  Lilly?
10      A.  I started out working in a basic
11  research laboratory developing various types
12  of assays and doing animal research in
13  the -- in immunology.
14      Q.  What year was that?
15      A.  1970.
16      Q.  1970?
17      A.  1970.
18      Q.  So for almost 40 years, have you
19  been either working with the industry or for
20  a pharmaceutical company?
21      A.  This is my 47th year of work, I
22  think, when I calculated it recently.
23      Q.  And has that all been encompassed
24  with either being employed by pharmaceutical
25  companies or advising pharmaceutical

Page 321

1  companies or manufacturers?
2      A.  Yes.  And one part of that period,
3  there was a three-year period where I was
4  still employed by Eli Lilly and Company but
5  worked in developing cosmetics.  There are
6  correlations between -- cosmetics are also
7  regulated by the FDA.
8      Q.  I saw you also worked for Serono.
9  Is that how you say it?
10      A.  Yes, it is.
11      Q.  What kind of company is that?
12      A.  Serono Laboratories is also a
13  pharmaceutical company.
14      Q.  You worked for Triton?
15      A.  Yes, I did.
16      Q.  What is Triton?
17      A.  Triton was a pharmaceutical
18  company, a biotechnology company.  It was,
19  at the time, a wholly owned subsidiary of
20  Shell Oil Company, and ultimately Shell --
21  it was acquired by Berlex.
22      Q.  And you worked for Amgen?
23      A.  Yes, I did.
24      Q.  What's Amgen?
25      A.  Amgen is probably the major

Peggy Pence, Ph.D.

Page 322

1  independent biotechnology company in the
2  country.
3      Q.  After Amgen, then you went to work
4  with Symbion?
5      A.  Yes.  For a three-year period prior
6  to incorporating at Symbion, I operated as
7  an independent consultant and then
8  incorporated Symbion Research International,
9  founded the company in 1995.
10     Q.  Okay.  I'm going to ask you just an
11  overview of some things that you did for
12  these companies while you were working for
13  them.
14         Did you design clinical trials?
15     A.  I did.  Many.
16     Q.  What's a clinical trial?
17     A.  A clinical trial is a research
18  study in humans, and a clinical trial
19  specifically is one where patients are
20  randomly -- are assigned prospectively, I
21  should say, to one or more treatments.
22     Q.  Did you do laboratory work?
23     A.  Yes.
24     Q.  Did you deal with clinical affairs?
25     A.  Yes.

Page 323

1      Q.  What's clinical affairs?
2      A.  Clinical affairs is the group
3  within companies that deals with the human
4  phase of testing of products.
5      Q.  Did you -- were you responsible for
6  collecting data?
7      A.  Yes, I was.  Many times.
8      Q.  Okay.  What types of data?
9      A.  A variety of types of data.  All
10  the types of data that are collected in
11  clinical -- in a clinical trial or any type
12  of clinical study where one is looking -- is
13  administering one or more types of treatment
14  to a patient, different patients, human
15  subjects, and evaluating the outcome, both
16  safety and effectiveness data.
17         So it would include data to
18  determine whether or not the product is
19  working for its intended use.  It would
20  include adverse reaction information and
21  clinical laboratory information, a whole
22  scope of information including patient
23  demographics.
24     Q.  Part of what you've done in this
25  case is look at the product development for

Page 324

1  the TVT-O; is that right?
2         MS. SUTHERLAND:  Objection.
3         THE WITNESS:  That is correct.
4  BY MR. GOSS:
5      Q.  Did you have any experience in
6  product development in your early
7  employment?
8      A.  Yes.  My whole career has been
9  involved in one aspect or another of product
10  development.  In particular at Triton, I was
11  a project manager where I was responsible
12  for oversight of product development from
13  basic research all the way through in
14  preparation for market launch.
15  BY MR. GOSS:
16     Q.  At any of these companies, did you
17  hold responsibility for making sure the
18  companies were complying with industry
19  standards?
20         MS. SUTHERLAND:  Objection.
21         THE WITNESS:  Always, yes.
22  Especially once we got into the
23  regulatory and clinical development
24  area, and that was particularly in 1997.
25  I'm sorry.  1977.

Page 325

1  BY MR. GOSS:
2      Q.  What was that in connection with?
3      A.  I transferred at Eli Lilly and
4  Company into the clinical and regulatory
5  area.
6      Q.  And so you were in the clinical and
7  regulatory area at Eli Lilly?
8      A.  Yes.  As a medical information --
9  and my title was medical information
10  administrator.
11     Q.  What did that entail?
12     A.  A variety of -- a variety of roles,
13  if you will.  I was responsible for working
14  pre-marketing and with data pre-marketing
15  and post-marketing.  In some aspects, I
16  actually monitored clinical trials, meaning
17  that I would go out to the investigative
18  sites where the studies were being conducted
19  to make sure that the physicians and the
20  physician staff were conducting the study
21  according to the protocol, which is the
22  document that describes how a study should
23  be conducted and according to regulations as
24  well.
25         And I was responsible for

82 (Pages 322 to 325)

Peggy Pence, Ph.D.

Page 326

1  collect -- to evaluating data and tabulating
2  data, both pre-marketing and post-marketing,
3  in particular adverse event data.
4      For example, I worked on the very
5  first recombinant DNA product ever to be
6  marketed, which was human insulin, and one
7  of my roles at Eli Lilly was involvement in
8  the collection of data once the product went
9  on the market, safety data in particular, to
10 present to FDA.
11     There are certain requirements,
12 regularly reporting of adverse event data
13 post-marketing of a new drug such as that.
14   Q.  What experience have you obtained
15 over your 40-something years in the industry
16 with respect to labeling of product, drugs,
17 and devices?
18   A.  Again, a variety of experience.  In
19 terms of clinical trials, there's a document
20 called the Investigator's Brochure.  It's
21 also been termed proto labeling.  It's
22 basically for products prior to their
23 marketing, it is the document that provides
24 the same type of information that's included
25 in a package insert for a drug or in the

Page 327

1  context of a medical device and instructions
2  for use or directions for use, which we
3  refer to as an IFU or a DFU.
4      The purpose of that is to give the
5  physician the information that he or she
6  needs to be able to use the product safely
7  and effectively based on the known
8  information.
9      So I've prepared a number of those
10 Investigator's Brochures over my career,
11 written them in their entirety, and then
12 I've also been involved in the review and/or
13 development of IFUs, for example, for
14 medical devices.
15   Q.  Have you been involved in safety
16 surveillance?
17   A.  Yes.
18   Q.  What is safety surveillance?
19   A.  Safety surveillance -- are you
20 talking about post-marketing safety
21 surveillance in particular?
22   Q.  Sure.
23   A.  It is evaluating the safety data
24 that is available once a product goes on the
25 market through post-marketing clinical

Page 328

1  trials, through reports of complaints,
2  adverse events that are reported to the
3  company once the product is on the market as
4  well as in reviewing the medical and
5  scientific literature for reports of adverse
6  events.
7      So I've done that post-marketing,
8  and on the pre-marketing side in terms of
9  clinical trials, as I may have mentioned
10 earlier, constantly evaluating adverse
11 events that are being -- that are occurring
12 during clinical trials, assessing those,
13 very serious ones that are unexpected that
14 meet certain criteria, reporting those to
15 the FDA in a required time frame and
16 submitting them to doctors as well.
17   Q.  Have you consulted with companies
18 with respect to regulatory matters?
19   A.  Yes, frequently.
20   Q.  Is that mostly with Symbion?
21   A.  It's not only with Symbion.  Prior
22 to that, while my roles were in clinical and
23 project management, within companies such as
24 Eli Lilly, Amgen, work is done -- all the
25 companies where I've worked, work is done as

Page 329

1  a part of a project team, and I've been
2  involved in preparing many submissions to
3  the FDA, presenting -- prior to being at
4  Symbion, starting at Symbion, I've presented
5  to FDA on many occasions the proposed plan
6  for the studies that we were going to
7  conduct.
8      I've been involved in an advisory
9  committee meeting as well preparing the
10 information for that post-marketing.
11   Q.  How many pharmaceutical and/or
12 device companies have you advised over your
13 40-plus years in the industry?
14   A.  Over 80.
15   Q.  Involving how many drugs or
16 devices?
17   A.  Over 90.
18   Q.  Do you have experience with
19 Class 1, Class 2, and Class 3 medical
20 devices?
21   A.  Yes, I do.
22   Q.  How did you obtain that experience?
23   A.  The majority of that experience was
24 obtained after I started my own consulting
25 practice beginning in 1992 and then through

83 (Pages 326 to 329)

Peggy Pence, Ph.D.

Page 330

1  Symbion as well.
2      Q.  Have you advised manufacturers with
3  respect to the adequacy of their medical
4  device labeling?
5      A.  Yes, I have.
6      Q.  Have you advised manufacturers with
7  respect to whether or not they should
8  perform clinical studies?
9      A.  Yes, I have.
10      Q.  And what types of studies to
11  perform?
12      A.  Absolutely.  I've designed the
13  clinical studies on many occasions.
14      Q.  Did you, during this time period,
15  gain expertise in the review and analyzing
16  of medical literature?
17      A.  Yes.
18          MS. SUTHERLAND:  Objection.
19  BY MR. GOSS:
20      Q.  When I use the term "medical
21  literature," why don't you tell the jury
22  what that means.
23      A.  Talking about publications that are
24  in typically peer-reviewed journals where
25  scientists, clinicians publish results of

Page 331

1  their research, both pre-clinical research,
2  meaning testing that's not in humans, maybe
3  laboratory research in in vitro, which is
4  test tube, Petri-dish-type testing, benchtop
5  testing, as well as testing in animals and
6  also testing in humans.
7          For a peer review, a draft
8  publication is submitted to a journal, and a
9  group of peers, if you will, who are
10  experienced in the field that is covered by
11  the specific publication, review the
12  publication, typically will critique it and
13  often will request revisions and decide
14  whether or not that the publication -- that
15  the data in the publication in the paper is
16  worthy of publication.
17      Q.  Okay.  Let's shift gears a little
18  bit.  I want you to -- I want to talk a
19  little bit about your boards and
20  memberships.
21          Are there certain boards that you
22  belong to?
23      A.  Yes, either now or in the past.
24      Q.  Right.  What are those?
25      A.  I'm currently on the board of the

Page 332

1  Compassion -- of CompassioNow.
2      Q.  What is that?
3      A.  CompassioNow is a nonprofit
4  organization.  We have our 10th anniversary
5  this year.  It was started with the vision
6  of providing medical care to the world's
7  least served.  We've been working in
8  Sub-Saharan Africa, South Africa, Tazania,
9  Zambia, for example, to provide support for
10  nurses and doctors and help to educate local
11  people so that they can help to run
12  community clinics, providing medical
13  supplies, both drugs and various equipment.
14          There are people in these areas
15  that have -- they don't even have Band-Aids.
16      Q.  I can tell you're proud of that
17  work.
18      A.  I am.  It's important.  We have
19  served a lot of people, and it's made a
20  difference.
21      Q.  Do you now or have you served on
22  the clinical trials certificate program
23  advisory board?
24      A.  Yes.  I did in the past.
25      Q.  What is that?

Page 333

1      A.  The intent of that advisory
2  board -- it was run through the California
3  State University system -- was to develop a
4  certification program for people that were
5  both students, usually graduate level
6  students, or people already working in a
7  related field that were interested in
8  furthering their career and getting into
9  clinical development.
10          And it was intended to be a
11  certification program to train them about
12  how to do clinical trials.
13      Q.  You spoke a little bit about RAPS,
14  which as I understand it, Regulatory Affairs
15  Professional Society.
16      A.  Yes.
17      Q.  And you were a RAPS fellow; is that
18  right?
19      A.  Yes.
20      Q.  What is a RAPS fellow?
21      A.  I'm very honored to be a RAPS
22  fellow.  Pardon me.  A RAPS fellow is a
23  peer-reviewed credential.  RAPS fellows were
24  first designated in 2008.  A committee of
25  peers who are senior level professionals who

84 (Pages 330 to 333)

Peggy Pence, Ph.D.

Page 334

1  have met the highest level of regulatory
2  achievement review one's credentials, and
3  one must have a minimum of 15 years of
4  regulatory experience and then based on
5  one's management and leadership experience
6  and their contributions to the field of
7  regulatory affairs, the committee, which
8  I've actually served on also for several
9  years since becoming a RAPS fellow, makes a
10 determination as to whether or not one
11 qualifies to be a RAPS fellow.
12     There are, at this point in time as
13 of December 2015, 98.
14     Q.  When did you become a RAPS fellow?
15     A.  2009.
16     Q.  How many were there in 2009,
17 roughly?
18     A.  20 to 30 or fewer than 20.  I don't
19 recall the specific number.
20     Q.  And that's a Regulatory Affairs
21 Professional Society?
22     A.  A fellow, yes.
23     Q.  And that's for people that have a
24 particular expertise and have been
25 recognized for their abilities in regulatory

Page 335

1  affairs?
2         MS. SUTHERLAND:  Objection.
3  Leading.
4         THE WITNESS:  That's correct.
5  That's correct.  One must have achieved
6  the highest level of achievement.
7  BY MR. GOSS:
8     Q.  Let's talk a little bit about your
9  teaching experience.
10     First of all, do you have any
11 teaching experience?
12     A.  I do.
13     Q.  And what is your teaching
14 experience?
15     A.  I've taught clinical trials and
16 project management in the clinical trial
17 certificate program that we talked about a
18 short while ago.  I've also -- I also was
19 asked to develop and teach.  So I'm
20 part-time faculty at the California State
21 University on the Channel Islands campus
22 teaching master's students who are getting
23 their master's degree in biotechnology, a
24 course entitled "Clinical Trials and Quality
25 Assurance."

Page 336

1     Q.  What's the regulatory training
2  course faculty?
3     A.  That, if I understand your
4  question, that, through the Drug Information
5  Association, in the past, I have taught in
6  that program.
7     Q.  What is -- I see that you're RAC
8  certified.  What is that?
9     A.  That's regulatory affairs
10 certification.  That is a certification that
11 is offered through the Regulatory Affairs
12 Professional Society.  It is the -- again,
13 is a credential that -- this one in
14 particular is not a peer-reviewed
15 credential.
16     It's achieved by taking a test
17 that's been designed to test one's level of
18 regulatory expertise, and through the
19 testing, if you pass the test, you can
20 become regulatory affairs certified.  And
21 once you become regulatory affairs
22 certified, every three years you're required
23 to submit continuing education and
24 leadership information to show that you're
25 active and still working in the top of your

Page 337

1  field, if you will.
2     Q.  Do you consider yourself a
3  regulatory affairs expert?
4     A.  Yes, I do.
5     Q.  Okay.  In addition to all that, you
6  also work on cases like this?
7     A.  Yes.
8     Q.  Okay.  Do you accept every case
9  that's presented to you?
10     A.  No, I don't.
11     Q.  Do you charge for your time just
12 like anybody else would?
13     A.  I do.
14     Q.  Charge for your time just like when
15 you consult with a manufacturer?
16     A.  Correct.
17     Q.  Have you testified before in a mesh
18 case?
19     A.  Yes, I have.
20     Q.  Have you been accepted by courts in
21 Texas as an expert in a mesh case?
22         MS. SUTHERLAND:  Objection.
23         THE WITNESS:  Yes, I have.
24 BY MR. GOSS:
25     Q.  Okay.  Let's move on to another

85 (Pages 334 to 337)

Peggy Pence, Ph.D.

Page 338

1  area.  I want to talk with you -- I kind of
2  want to get some definitions down so that
3  the jury kind of understands where we're
4  going with some things.
5        What is J&J?  J&J is a term that
6  the jury is going to hear.  What is J&J?
7      A.  Johnson & Johnson.
8      Q.  Okay.  What does Johnson & Johnson
9  do?
10     A.  Johnson & Johnson is a company that
11  develops a variety of products.  Amongst
12  those products are medical devices as well
13  as pharmaceutical products through various
14  divisions of Johnson & Johnson.
15     Q.  What is Ethicon?
16     A.  Ethicon is a division of Johnson &
17  Johnson.  In this case that we're talking
18  about today, it is the division or the part
19  of Johnson & Johnson, if you will, that
20  manufactures and markets the pelvic mesh
21  products.
22        MS. SUTHERLAND:  I'm going to
23     object to foundation just on the
24     response on J&J as to what they do.
25  BY MR. GOSS:

Page 339

1      Q.  What is the FDA?
2      A.  The United States Food and Drug
3  Administration.  It is the agency within the
4  federal government that is responsible for
5  oversight of the public health in particular
6  with regard to a number of different
7  products.  A large number of products that
8  we all deal with on a daily basis, including
9  not only medical devices and drugs, but
10  certain types of foods, cosmetics, tobacco,
11  veterinary products.
12     Q.  The jury's heard about transvaginal
13  synthetic mesh slings.
14     A.  Yes.
15     Q.  Or mesh slings or slings.
16        What is that?
17     A.  The transvaginal mesh sling, what
18  we're talking about here today, those slings
19  are made of a plastic, which is
20  polypropylene, for the treatment of stress
21  urinary incontinence.
22     Q.  When we talk about polypropylene,
23  we're talking about plastic.
24     A.  Yes.
25        MS. SUTHERLAND:  Objection.

Page 340

1  BY MR. GOSS:
2      Q.  What's stress urinary incontinence?
3      A.  Stress urinary incontinence, you'll
4  probably hear me refer to it for short as
5  SUI, is involuntary leakage of urine with
6  coughing, for example, jumping, types of
7  exercise that cause intraabdominal pressure.
8      Q.  Is stress urinary incontinence a
9  life-threatening condition?
10     A.  No, it is not.
11     Q.  We're going to talk today about the
12  TVT obturator system.  What's the TVT
13  obturator system?
14     A.  It's the tension-free vaginal mesh
15  that is a sling for the treatment of SUI,
16  and it -- tension-free vaginal tape,
17  sometimes the T is -- sometimes is referred
18  to as a tape instead of a sling.
19        And this particular, the obturator
20  means that it is -- that refers to the
21  insertion technique.
22     Q.  Okay.  Let's back up a little bit
23  on that.  The jury is going to hear about
24  the TVT retropubic --
25     A.  Yes.

Page 341

1      Q.  -- and the TVT obturator.
2      A.  Yes.
3      Q.  Also known as the TVT-O.
4      A.  Yes.
5      Q.  What's the difference?
6      A.  Okay.  The tension-free vaginal
7  tape, TVT retropubic, it's the insertion
8  method.  And the insertion method is
9  through -- well, it can be inserted two
10  ways.
11        The insertion begins in the vagina,
12  in the female vagina, and then it exits in
13  the lower abdomen.  It can also be inserted
14  suprapubicly so that the insertion begins in
15  the abdomen and then comes through the
16  vagina.  So it fits under the urethra, if
17  you will, and the urethra is the tube that
18  leads from the bladder to the exit through
19  which one urinates.
20     Q.  What's the TVT-O obturator or the
21  TVT-O?
22     A.  The insertion route is -- it's an
23  inside-out technique.  It starts in the
24  vagina, and instead of going up and the
25  exiting through the abdomen, lower abdomen,

86 (Pages 338 to 341)

Peggy Pence, Ph.D.

Page 342

1  it exits in the thigh or the groin area
2  going through the obturator -- the obturator
3  membrane and the obturator muscle area.
4      Q.  Which product was developed first
5  by Ethicon?
6      A.  The TVT.  The retropubic.
7      Q.  And then did Ethicon develop the
8  TVT-O?
9      A.  Yes.
10     Q.  What's the IFU?
11     A.  The IFU is short for instructions
12 for use.  It is what we call professional
13 labeling.  It is the cornerstone of risk
14 management because it is the document, the
15 primary communication between the
16 manufacturer of the product, in this case,
17 the TVT-O sling, and the surgeon who's going
18 to be using that product.
19         And it is intended to provide all
20 of the necessary information to enable the
21 physician to use that product safely and
22 effectively, to consult and advise the
23 patient with regard to the risk, potential
24 risk as well as the potential benefit of the
25 product so that together the patient and

Page 343

1  the -- the physician and the patient can
2  make a determination as to whether or not
3  this is the right product to be used for the
4  patient's treatment of SUI or should an
5  alternative procedure or treatment be used.
6      Q.  What does IFU stand for?
7      A.  Instructions for use.
8      Q.  Okay.  And does that come packaged
9  with the product?
10     A.  Yes, it does.
11     Q.  We'll be talking a little about the
12 concept of informed consent.
13         What is informed consent?
14     A.  Informed consent has -- its --
15 current day, informed consent really has its
16 origins in the Nuremberg Code following the
17 second world war.  The Nuremberg Code was
18 developed as a means of evaluating the
19 scientists and physicians who had
20 participated in experimentation on patients
21 in the -- in Germany during the second world
22 war, and that was the code that was then the
23 beginning of other codes which have been
24 developed.
25         And the key, the very first point

Page 344

1  of that code, is that human subjects must
2  be -- must be informed about any treatment
3  or any procedure that is going to be done to
4  them and consent.  Certainly, that's true in
5  the context of research.  It's also true in
6  the context of practice.
7      In fact, there's a position
8  statement from the American College of
9  Obstetrics and Gynecologists that talks
10 about the concept of respect for persons
11 which is essentially what informed consent
12 does.  It's respect for persons in that the
13 individual is informed of all the potential
14 risks and benefits so that they have a right
15 to self-determination for their medical
16 care.
17         MS. SUTHERLAND:  Objection.
18     Nonresponsive.
19 BY MR. GOSS:
20     Q.  What role does the IFU play in the
21 concept of informed consent?
22     A.  The IFU is the document that
23 provides the information about the product
24 including risks, potential risks, as well as
25 potential benefits, to the surgeon or the --

Page 345

1  in this case, and that information in
2  consenting a patient as to whether or not,
3  in this case the TVT-O, would be used on a
4  particular patient.
5      That document provides the
6  information for the doctor to share that
7  with the patient, what the risks may be and
8  whether or not the patient makes a decision,
9  self-determination, as to whether or not
10 this is a procedure considering the risks
11 that she wants to undertake.
12     It also is intended to provide the
13 information that enables the physician, as I
14 mentioned earlier, to make a decision as to
15 whether or not -- because there are
16 alternative treatments available -- whether
17 or not this is the right treatment for a
18 particular patient.
19     Q.  If the IFU is inadequate, what
20 effect does that have on informed consent?
21         MS. SUTHERLAND:  Objection.
22     Speculative.
23         THE WITNESS:  If it is
24     inadequate, then full -- particularly
25     with regard to complications and risks,

87 (Pages 342 to 345)

Peggy Pence, Ph.D.

Page 346

1    then the patient cannot be truly --
2    cannot provide true informed consent
3    because information about risks is
4    missing.
5    BY MR. GOSS:
6       Q.  Does that have an effect on public
7    safety?
8            MS. SUTHERLAND:  Objection.
9            THE WITNESS:  Yes, it does.
10   ///
11   BY MR. GOSS:
12      Q.  Okay.  Let me move on to another
13   topic.
14           When you were retained in this
15   case, did you conduct an investigation into
16   Ethicon's practices?
17      A.  Yes, I did.
18      Q.  And what did you do to conduct that
19   investigation?
20      A.  I reviewed a large volume of
21   materials, which included deposition
22   testimony of a large number of Ethicon
23   employees.  I also evaluated documentation
24   that's been produced in this litigation.  I
25   reviewed scientific and medical literature.

Page 347

1    I also evaluated the -- what's called the
2    MAUDE, a manufacturing user facility device
3    experience database, which is a publicly
4    available database of what are called
5    medical device reports, serious adverse
6    events, and malfunctions that could result
7    in serious adverse events that FDA
8    maintained.
9            I reviewed guidances and
10   regulations that are applicable to the
11   product.  That is an overview.  Website --
12   various websites that are relevant.
13      Q.  Were some of the internal documents
14   that you reviewed of Ethicon's, were some of
15   those confidential documents?
16           MS. SUTHERLAND:  Objection.
17           THE WITNESS:  Yes.
18   BY MR. GOSS:
19      Q.  Were they marked confidential?
20           MS. SUTHERLAND:  Objection.
21           THE WITNESS:  Yes.
22   BY MR. GOSS:
23      Q.  How many documents do you think you
24   reviewed?
25      A.  Many thousands.

Page 348

1       Q.  Okay.  In the hundreds of
2    thousands?
3            MS. SUTHERLAND:  Objection.
4    Leading.
5            THE WITNESS:  Very well may be.
6    BY MR. GOSS:
7       Q.  Okay.  Did you review testimony of
8    Ethicon witnesses?
9       A.  Yes.
10      Q.  Did you review trial testimony?
11      A.  Yes, I did.
12      Q.  Did you review deposition
13   testimony?
14      A.  Yes.
15      Q.  Testimony like you're giving today?
16      A.  That's correct.
17      Q.  What areas of Ethicon were -- these
18   employees that were giving their deposition,
19   what areas were they in?
20      A.  A variety of areas.  I mentioned
21   earlier that companies like Ethicon have a
22   product project team, and there are
23   different groups that have different
24   expertises that contribute to the
25   development of a project.

Page 349

1            So I have -- the various expertises
2    that would contribute to the development of
3    a project, I've reviewed depositions from
4    people in those different areas which
5    include clinical and medical affairs,
6    pre-clinical, engineers, regulatory as well,
7    senior executives.  It would also include
8    quality assurance.  Quality.
9       Q.  I'll hand you what's been marked as
10   Exhibit 15.
11           (Exhibit Number 15 was
12   marked for identification.)
13   BY MR. GOSS:
14      Q.  This is a slide that I prepared
15   based upon your report and information that
16   you provided to me.
17           Is this a summary -- first of all,
18   have you seen this slide before?
19      A.  Yes, or one similar, yes.
20      Q.  Okay.  And will this assist you in
21   your testimony in explaining to the jury the
22   types of depositions and trial testimony
23   you've reviewed?
24      A.  Yes.
25      Q.  Okay.  And is this a list of some

Golkow Technologies, Inc. - 1.877.370.DEPS

Peggy Pence, Ph.D.

1  of the witnesses whose trial testimony and
2  deposition you have reviewed?
3      A.  Yes, it is.
4      Q.  Does that refresh some of your
5  recollection as to what areas some of them
6  are in?
7      A.  Yes.  There are people in
8  pre-clinical research, as I mentioned, as
9  well as quality and medical affairs and
10  regulatory affairs and marketing.  I think I
11  had not mentioned before.  Medical
12  directors.  I've also reviewed professional
13  education.
14      Q.  Let me ask you this --
15      A.  Oh.  People reporting adverse
16  events and reviewing adverse events.
17      Q.  Did you also review medical
18  literature?
19      A.  Yes.
20      Q.  Okay.  What types of medical
21  literature were available to you?
22      A.  The scope of medical literature
23  that's available publicly.
24      Q.  Okay.  And did you review
25  peer-reviewed medical literature?

1      A.  Yes.
2      Q.  And explain to the jury what
3  peer-reviewed medical literature is.
4      A.  Peer-reviewed is the process that
5  means that a publication prior to being
6  accepted for publication is -- someone
7  wishing to publish a paper submits it to an
8  appropriate journal that publishes the type
9  of data that the research that's in that --
10  that's in a particular paper addresses, and
11  the journal has people who are experienced
12  in that field who review the paper and look
13  at it and critique it and provide feedback
14  to the authors of the publication.
15      And many times they'll ask
16  questions and have revisions made to the
17  paper prior to its publication, or sometimes
18  if they don't feel that the information in
19  the proposed publication meets the
20  qualifications of the journal or deserves to
21  be published, they'll deny publication.
22      Q.  Did I retain you -- did my firm
23  retain you on behalf of Ms. Ramirez to look
24  at the conduct of Ethicon and determine
25  whether or not that conduct complied with

1  industry standards with respect to the
2  development and marketing of the TVT-O?
3      A.  Yes.
4          MS. SUTHERLAND:  Objection.
5  BY MR. GOSS:
6      Q.  And did you endeavor to do that
7  review?
8      A.  Yes, I did.
9      Q.  How many hours do you think that
10  you spent conducting your investigation?
11      A.  Hundreds of hours if you include
12  not just specific for Ms. Ramirez's case but
13  overall for the development of TVT and
14  TVT-O.  Hundreds of hours.
15      Q.  In your review of that information
16  and the information that we've talked about
17  so far, did you apply the same methodology
18  in the review of that information that you
19  applied in your everyday work in consulting
20  with other manufacturers and advising them?
21      A.  Yes.  In this case, I actually had
22  more information in the context of
23  deposition testimony.  When I'm working with
24  companies, I interview the people that I'm
25  working with, but in this context, I had

1  enough numerous depositions that I could
2  review that also provided insight to what
3  happened.
4      Q.  You've talked a little bit about
5  some standards in the industry.  You spoke
6  this morning about the GHTF principles.
7      What's GHTF?
8      A.  Global Harmonization Task Force.
9      Q.  We'll talk a little bit about that
10  later.
11      You spoke about the Blue Book?
12      A.  Yes.
13      Q.  What is that?
14      A.  If I understand your question, the
15  specific Blue Book memorandum that you're
16  talking about is a particular FDA guidance
17  document that -- for medical device labeling
18  that sets the standards for medical device
19  labeling.
20      Q.  In your review and in forming your
21  opinions, did you apply some of those
22  standards to the things that your
23  investigation uncovered?
24      A.  Absolutely.
25      Q.  Okay.  Let me shift gears a little

89 (Pages 350 to 353)

Peggy Pence, Ph.D.

Page 354

1  bit more.  I want to talk to you about
2  safety principles.  I'm going to hand you
3  some slides.  I'm going to hand you what I
4  have marked as Exhibit 16.
5      (Exhibit Number 16 was
6      marked for identification.)
7  BY MR. GOSS:
8      Q.  Are these some slides that you
9  assisted me in preparing?
10     A.  Yes.
11     Q.  And do you recognize those slides?
12     A.  Yes, I do.
13     Q.  Okay.  Let's talk about the first
14 safety principle.  When we say "safety
15 principle," what do we mean?
16         MS. SUTHERLAND:  Objection.
17         THE WITNESS:  That a product is
18     safe for use, that there's a favorable
19     benefit-to-risk ratio.
20 BY MR. GOSS:
21     Q.  Well, is a safety principle
22 something that a manufacturer should seek to
23 comply with?
24         MS. SUTHERLAND:  Objection.
25         THE WITNESS:  Absolutely.

Page 355

1  BY MR. GOSS:
2      Q.  Let's talk about the first safety
3  principle.  "A corporation is required to
4  make sure its products are reasonably safe."
5      Is that a standard in the industry?
6      A.  Yes, it is.
7      Q.  Okay.  And is that a standard in
8  the industry that is set forth in the Global
9  Harmonization Task Force documents?
10     A.  Yes, it is.
11     Q.  Okay.  The second safety principle,
12 "A corporation must investigate warning
13 signs that its products may be dangerous and
14 make sure that any problems with the product
15 are fixed in a safe manner."
16     Is that a safety principle that
17 also has support in the Global Harmonization
18 Task Force documents?
19     A.  Yes, that's correct.
20         MS. SUTHERLAND:  Objection.
21 BY MR. GOSS:
22     Q.  Let's talk about the third safety
23 principle.  "If a corporation has two
24 products that treat the same condition, and
25 one is safer for patients, the corporation

Page 356

1  must choose the safest product."
2      Is that a principle that is
3  supported by the Global Harmonization Task
4  Force standards?
5          MS. SUTHERLAND:  Objection.
6          THE WITNESS:  All other things
7      considered equal, yes.
8  BY MR. GOSS:
9      Q.  And the fourth safety principle.
10 "Safety of patients has to be the number one
11 priority, not corporate profits."
12     Is that a safety principle
13 supported by the Global Harmonization Task
14 Force?
15         MS. SUTHERLAND:  Objection.
16         THE WITNESS:  Yes.  Patient
17     safety is always number one.
18 BY MR. GOSS:
19     Q.  Is that a principle that is -- also
20 one that is supported by the credo of J&J
21 and Ethicon?
22     A.  Yes, that is correct.
23     Q.  When you investigated Ethicon --
24 when you investigated Ethicon, did you find
25 a document that was a Johnson & Johnson

Page 357

1  credo?
2      A.  Yes, I did.
3          This was attached to the back of
4  these.  Was it intended to be?
5      Q.  I'm handing you what's been marked
6  as Exhibit 17.
7          (Exhibit Number 17 was
8      marked for identification.)
9  BY MR. GOSS:
10     Q.  And what is this document?
11     A.  This is the Johnson & Johnson
12 credo.
13     Q.  And are you familiar with this
14 document?
15     A.  Yes, I am.
16     Q.  Let's talk a little bit about it.
17 First of all, do you support this credo?
18     A.  Yes, I do.
19     Q.  Think it's a good idea?
20     A.  It is a good credo.
21     Q.  It says, at the beginning, "We
22 believe our first responsibility is to the
23 doctors, nurses, and patients, to mothers
24 and fathers and all others who use our
25 products and services."

Peggy Pence, Ph.D.

Page 358

1    Is that consistent with the safety
2 principles we just discussed?
3         MS. SUTHERLAND: Objection.
4         THE WITNESS: Yes, it is.
5 BY MR. GOSS:
6    Q. In your investigation, did you find
7 that Johnson & Johnson lived up or Ethicon
8 lived up to this credo?
9         MS. SUTHERLAND: Objection.
10        THE WITNESS: I found that they
11 did not live up to this credo.
12 BY MR. GOSS:
13   Q. With respect to their development
14 in marketing of the TVT-O?
15        MS. SUTHERLAND: Objection.
16        THE WITNESS: That is correct.
17 BY MR. GOSS:
18   Q. Okay. You've talked a little bit
19 about the label. Who is responsible for
20 making sure that the label is accurate?
21   A. The primary responsibility is that
22 of the manufacturer.
23   Q. And I've heard the concept called
24 "owning the label." What's that mean?
25   A. That the manufacturer -- it is

Page 359

1 their product. The manufacturer owns the
2 label. It is a component of the product, in
3 this case, the TVT-O. And owning the TVT-O,
4 the company, Ethicon, also owns the label,
5 meaning that it is responsible for making
6 sure that that professional labeling is --
7 any type of labeling that is associated with
8 its product is truthful and accurate and
9 complete and not misleading.
10   Q. The buck stops with the
11 manufacturer?
12        MS. SUTHERLAND: Objection.
13        THE WITNESS: That's correct.
14 BY MR. GOSS:
15   Q. The safety principles that we've
16 talked about, are those safety principles
17 part of the standard of care for a
18 manufacturer?
19        MS. SUTHERLAND: Objection.
20        THE WITNESS: Yes, they are.
21 BY MR. GOSS:
22   Q. Would you consider the credo that
23 putting patients first, first responsibility
24 to patients, the credo adopted by this
25 company, would you consider that the

Page 360

1 standard of care?
2   A. Yes.
3         MS. SUTHERLAND: Objection.
4 BY MR. GOSS:
5   Q. In your investigation of Ethicon's
6 files in review of discovery in this case
7 and all the things that we've just discussed
8 that you reviewed in applying the standard
9 of care and the documents reflecting the
10 standard of care, did you reach an opinion
11 regarding whether Ethicon violated the
12 standard of care in its marketing of the
13 MCM, TVT obturator system?
14        MS. SUTHERLAND: Objection.
15        THE WITNESS: Yes, I did.
16 BY MR. GOSS:
17   Q. And what is that opinion?
18   A. They violated the standard of care
19 in several ways.
20   Q. Did you reach an opinion whether
21 Ethicon violated the standard of care by
22 failing to conduct appropriate testing to
23 support the safe and effective use of the
24 TVT obturator system?
25        MS. SUTHERLAND: Objection.

Page 361

1         THE WITNESS: Yes.
2 BY MR. GOSS:
3   Q. What is that opinion?
4         MS. SUTHERLAND: Same
5 objection.
6         THE WITNESS: They failed to
7 act according to the standard of care.
8 BY MR. GOSS:
9   Q. Did you reach an opinion whether
10 the labeling for the TVT obturator system
11 was inadequate?
12   A. Yes, I did.
13   Q. Due to failure to warn?
14   A. Yes.
15   Q. What's that opinion?
16        MS. SUTHERLAND: Objection.
17        THE WITNESS: The labeling was
18 inadequate.
19 BY MR. GOSS:
20   Q. Did you reach an opinion as to
21 whether the label was false or misleading?
22   A. Yes, I did.
23   Q. What is that opinion?
24        MS. SUTHERLAND: Objection.
25        THE WITNESS: The labeling was

91 (Pages 358 to 361)

Peggy Pence, Ph.D.

Page 362

1     false and misleading.
2  BY MR. GOSS:
3     Q. Did you reach an opinion as to
4  whether Ethicon failed to meet the
5  post-market vigilant standard of care in
6  management of risk?
7     A. Yes, I did.
8     Q. What is that opinion?
9        MS. SUTHERLAND: Objection.
10       THE WITNESS: They failed to
11  meet the post-market vigilant standard
12  of care and manage risk appropriately.
13  BY MR. GOSS:
14    Q. You have prepared a report in this
15  case?
16    A. Yes.
17    Q. Did you prepare a supplemental
18  report as well?
19    A. Yes, I did.
20       MR. GOSS: Did we mark those
21  already?
22       MS. SUTHERLAND: Yeah.
23       THE WITNESS: I'm not sure
24  Exhibit 2 to the March supplemental
25  report was marked.

Page 363

1  BY MR. GOSS:
2     Q. Is Exhibit 4 the supplemental
3  report that you prepared in this case?
4  Pence Exhibit 4.
5     A. Yes.
6     Q. And did that Pence Exhibit 4
7  supplement Pence Exhibit 3?
8     A. Yes.
9     Q. And is Exhibit 6 also a part of
10  your report, a supplemental report?
11    A. Yes. It's March of this year. A
12  supplemental report. And Exhibit 6 is just
13  the body of the report without the exhibits.
14    Q. And what is Exhibit 7?
15    A. Exhibit 7 is Exhibit 1, applicable
16  industry standards, to the March, 2016,
17  supplemental report which was Exhibit 6.
18  There is an Exhibit 2, which we have not
19  marked.
20    Q. Okay. I'm going to hand you what's
21  been marked as Exhibit 21.
22       Is this the Exhibit 2 that you just
23  referenced?
24    A. Yes.
25    Q. Okay.

Page 364

1        THE REPORTER: Excuse me. Did
2  you say Exhibit 21?
3        MR. GOSS: You know what? I'm
4  sorry. I grabbed the wrong one. I'm
5  going to re-mark Exhibit 21 as
6  Exhibit 18.
7        (Exhibit Number 18 was
8  marked for identification.)
9  BY MR. GOSS:
10    Q. Again, is Exhibit 18 the Exhibit 2
11  you just referenced?
12    A. Yes, it is.
13    Q. Okay. All the opinions that you've
14  given today and that you are going to give
15  today, have they all been held to a
16  reasonable degree of scientific or
17  professional certainty?
18    A. Yes, they have.
19    Q. We've talked a little bit about the
20  TVT-O. What was it designed to treat?
21    A. Stress urinary incontinence.
22    Q. When did it come on the market?
23    A. The very end of 2003, early 2004.
24    Q. And was the TVT retropubic already
25  on the market?

Page 365

1     A. Yes.
2     Q. Do you recall how long it had been
3  on the market?
4     A. Since 1998.
5     Q. What type of mesh is used in the
6  TVT-O?
7     A. Polypropylene mesh.
8     Q. There's going to be some discussion
9  today about MCM-cut mesh.
10       By the way, is Prolene mesh in the
11  TVT-O?
12    A. Yes. It's Prolene polypropylene
13  mesh.
14    Q. Okay. And there's going to be --
15  there's been some discussion, and we're
16  going to have some more discussion about the
17  manner in which the Prolene mesh was cut by
18  Ethicon, and we'll discuss what's called
19  MCM.
20       Do you know what that is?
21    A. Yes, I do.
22    Q. What is that?
23    A. Mechanically cut mesh.
24    Q. Okay. And then there's going to be
25  a discussion of LCM.

Peggy Pence, Ph.D.

Page 366

1      Do you know what that is?
2      A.  Yes.
3      Q.  What is that?
4      A.  Laser-cut mesh.
5      Q.  Are they two different methods of
6  cutting?
7      A.  Yes.
8      Q.  Okay.  Do you know what type of
9  TVT-O mesh was implanted in Jennifer Ramirez
10  on September 17, 2010?
11      A.  Yes, I do.
12      Q.  What was it?
13      A.  A mechanically cut mesh.
14      Q.  And it was a TVT-O?
15      A.  That's correct.
16      Q.  Okay.  I'm going to hand you what's
17  been marked as Exhibit 19.
18          (Exhibit Number 19 was
19      marked for identification.)
20  BY MR. GOSS:
21      Q.  What is that document?
22      A.  This is a document that has a
23  sticker from the TVT-O device that was
24  implanted in Ms. Ramirez.  The document is a
25  Baptist Health System document dated 9/17/10

Page 367

1  showing the surgeon's name, Dr. C. Reyes --
2  or C. Reyes, implant location, vagina.
3      Q.  Is this one of the documents you
4  relied upon in determining whether or not
5  she was implanted with a mechanically cut
6  mesh?
7      A.  Yes.
8      Q.  And how can you tell by looking at
9  this document that it was mechanically cut?
10      A.  The number that's on the sticker
11  from the mesh that was implanted, 810081,
12  does not have an L at the end, and when it's
13  laser-cut mesh, an L is included at the end
14  of that series of numbers.
15      Q.  How did you learn that?
16      A.  Through review of the Ethicon
17  documentation.
18      Q.  In conducting your investigation
19  into Ethicon's internal documents, were you
20  able to determine the reason Ethicon
21  developed the TVT-O?
22          MS. SUTHERLAND:  Objection.
23          THE WITNESS:  The TVT-O?
24  BY MR. GOSS:
25      Q.  Yes.

Page 368

1      A.  Yes.
2      Q.  And what was that reason?
3          MS. SUTHERLAND:  Objection.
4          THE WITNESS:  The idea was to
5      reduce the numbers of bladder
6      perforations that were occurring.
7  BY MR. GOSS:
8      Q.  What was happening in the market?
9          MS. SUTHERLAND:  Objection.
10          THE WITNESS:  What was
11      happening in the market with the TVT-O
12      was Ethicon had enjoyed about five years
13      of the market for stress urinary
14      incontinence slings, and competitors
15      were coming on the market, and in
16      particular, a couple of other companies
17      had marketed devices with an obturator
18      approach, and that was hoped that it
19      would be safer than the retropubic
20      approach because of the numbers of
21      bladder perforations in particular that
22      can occur and have occurred with the
23      retropubic approach.
24          And so in order to retain and
25      not lose market share, the company

Page 369

1      decided that they needed to enter the
2      competitive market space with an
3      obturator approach.
4  BY MR. GOSS:
5      Q.  Okay.  Let's back it up a little
6      bit and let me get some clarification.  You
7      said that they had been a market leader for
8      five years.
9          With respect to what product?
10      A.  The TVT retropubic.
11      Q.  Not the O?
12      A.  That's correct.
13      Q.  Okay.  And were competitors
14  entering the market?
15      A.  Yes.
16      Q.  Did you see any documents that
17  reflected that Ethicon was concerned about
18  the competitors entering the market?
19      A.  Yes, I did.
20          MS. SUTHERLAND:  Objection.
21  BY MR. GOSS:
22      Q.  I'm handing you what's been marked
23  as Exhibit 20.
24          (Exhibit Number 20 was
25      marked for identification.)

93 (Pages 366 to 369)

Peggy Pence, Ph.D.

Page 370

BY MR. GOSS:
Q. Is that a document that you discovered in Ethicon's files?
MS. SUTHERLAND: Objection.
THE WITNESS: Yes.
BY MR. GOSS:
Q. And is this a document that you relied upon in forming your opinions in this case?
A. Yes.
Q. And what's the date of this document?
A. 14 February, 2003.
Q. And the document's regarding Project Mulberry.
What is that?
A. Project Mulberry was the project name given to the development of TVT-O.
Q. And let's just start with the executive summary and the strategic rationale. Is there anything under strategic rationale with respect to this document that you found important in your opinions today?
A. Yes.

Page 371

Q. What's that?
A. The rationale that we were just discussing for development of the TVT-O being competitive pressure.
Q. It says, "The rationale for Project Mulberry is to drive and defend Gynecare sales of TVT, hereafter referred to as TVT."
And, again, Project Mulberry is the TVT-O?
A. That's correct.
Q. And it goes on to say, "TVT is under competitive pressure, as evidenced by a decline in category share of revenue of 15 percent in Europe and the U.S., over the last two years. The competition comes from "me-too" versions of TVT."
Did you find that important?
A. Yes.
Q. Why?
MS. SUTHERLAND: Objection.
THE WITNESS: That was a key rationale to the development of the TVT-O. It was to preserve market share.
BY MR. GOSS:
Q. Okay. Is there anything that

Page 372

you've seen in this document where it reflects their concern was trying to develop a better product for their patients?
MS. SUTHERLAND: Objection.
MR. GOSS: Let me re-ask that.
BY MR. GOSS:
Q. Under this strategic rationale, does it discuss how much they thought they would lose if they -- if things continued as they were with the TVT franchise?
MS. SUTHERLAND: Objection.
THE WITNESS: Yes, it does.
BY MR. GOSS:
Q. What was that?
A. It was $8 million, if I recall correctly, yes.
Q. Under the financial summary, does it reflect how much they thought they could profit if they launched a product like the TVT-O?
MS. SUTHERLAND: Objection.
THE WITNESS: Yes, it does.
BY MR. GOSS:
Q. What did they project as year of sales of TVT-O?

Page 373

MS. SUTHERLAND: Objection.
THE WITNESS: I'm sorry?
BY MR. GOSS:
Q. By 2010, were they projecting sales?
A. Yes.
Q. Of how much?
A. Peak year sales of the transobturator products exceeding $34 million, of which 60 percent would be incremental over the current TVT sales projections.
Q. Okay. So to summarize this, is it fair to summarize this first page of this document to be that Ethicon reflects it was concerned about losing market share?
A. Yes.
MS. SUTHERLAND: Objection.
BY MR. GOSS:
Q. It was concerned that it was going to have lost profit of $8 million?
MS. SUTHERLAND: Objection.
THE WITNESS: Correct.
BY MR. GOSS:
Q. But if they could develop a TVT-O,

Page 374

1  they could have products sales exceeding
2  34 million by 2010?
3         MS. SUTHERLAND:  Objection.
4         THE WITNESS:  Correct.
5  BY MR. GOSS:
6     Q.  Okay.  Let's go to the second page.
7  I'm going to ask you about the first line of
8  that second page.  It says, "The assumptions
9  used to make product sales forecasts are as
10 follows:  U.S. assumes introduction of
11 Mulberry in quarter 1 2005 after six months
12 of clinical data is available."
13        What does that mean?
14        MS. SUTHERLAND:  Objection.
15        THE WITNESS:  That means at the
16 time this document was prepared in
17 February of 2003, that the company
18 intended to introduce TVT-O once they
19 had six months of clinical testing data
20 available.
21 BY MR. GOSS:
22    Q.  Is that a good thing?
23        MS. SUTHERLAND:  Objection.
24        THE WITNESS:  That's a good
25 thing, yes.

Page 375

1  BY MR. GOSS:
2     Q.  Is that what you would expect a
3  company -- I'm sorry.
4        Is that what you would expect a
5  design -- a device company -- let me start
6  over.
7        Is that what you would expect a
8  device manufacturer to do?
9     A.  Absolutely.
10    Q.  To conduct six months clinical
11 data?
12    A.  Minimally six months.
13    Q.  Okay.  We'll get to this a little
14 bit later.  Did they do that?
15    A.  No, they did not.  Not beyond what
16 the inventor of the product had already done
17 with the prototype.
18    Q.  Let's go to the Bates number on
19 that exhibit that is -- it's page 7.  Bates
20 number ends at 53.
21        Do you see "Risk Assessment"?
22    A.  Yes.
23    Q.  Under "Clinical," what does it have
24 as risk assessments?
25        MS. SUTHERLAND:  Objection.

Page 376

1     The document speaks for itself.
2         THE WITNESS:  Three things.
3  That it's a new procedure.  Secondly,
4  the obturator bundle because, again, if
5  I might explain that, the insertion
6  route is a different route, and in the
7  obturator bundle, they're the obturator
8  nerve and obturator vessels which, if
9  those are perforated, could cause
10 issues, safety issues, for the patient,
11 present potential risks.
12        And the third is future, as
13 they term it, radical developments, for
14 example, needle-less TVT and growth
15 factors.
16 BY MR. GOSS:
17    Q.  So in 2003, just so I'm clear, is
18 Ethicon evaluating already under risk
19 assessment, clinical issues and risks with
20 the obturator bundle?
21        MS. SUTHERLAND:  Objection.
22        THE WITNESS:  Yes.
23 BY MR. GOSS:
24    Q.  Do you find that important?
25    A.  Yes.

Page 377

1     Q.  Why?
2     A.  Because those risks in order -- it
3  goes back to what I may have talked about
4  already today that before marketing a
5  product, one needs to do a benefit/risk
6  assessment to assure that there's a
7  favorable benefit/risk ratio, and that
8  includes an assessment of potential risks,
9  and the way you assess that risk is through
10 clinical testing.
11    Q.  Did -- in your investigation of the
12 files of Ethicon, did you see anywhere where
13 they -- where it upset -- where it assessed
14 the risk of obturator bundle injury prior to
15 launching this product?
16    A.  No.  Certainly not in clinical
17 testing.
18    Q.  Would a reasonable and prudent
19 manufacturer have done that assessment?
20        MS. SUTHERLAND:  Objection.
21        THE WITNESS:  Yes.
22        (Exhibit Number 21 was
23 marked for identification.)
24 BY MR. GOSS:
25    Q.  I'm going to hand you what's been

95 (Pages 374 to 377)

Peggy Pence, Ph.D.

Page 378

1  marked as Pence Exhibit 21.  And is this a
2  document that you reviewed -- first of all,
3  did you find this in Ethicon's files?
4        MS. SUTHERLAND:  Objection.
5        THE WITNESS:  Yes.
6  BY MR. GOSS:
7     Q.  Is this a document that you
8  reviewed and relied upon in coming up with
9  your opinions in this case?
10    A.  Yes, it is.
11    Q.  Is this document dated April 14,
12  2003?
13    A.  Yes, it is.
14    Q.  Is this an Ethicon document?
15    A.  Yes.
16    Q.  Came out of their files?
17        MS. SUTHERLAND:  Objection.
18        THE WITNESS:  That's correct.
19  BY MR. GOSS:
20    Q.  Is Brian -- I believe Brian
21  Luscombe, is he the U.S. products director?
22    A.  Yes.  To the best of my
23  recollection, that is correct.
24    Q.  And he's on this email string.
25  This is a long email string; right?

Page 379

1     A.  Yes, it is.
2     Q.  As I understand, the way that you
3  read these documents out of their files that
4  are email strings is you start from the back
5  and work your way forward; is that correct?
6     A.  Correct.
7     Q.  So let's do that.  So start at the
8  bottom of the second page that has Bates
9  number 94 at the end.
10        Do you know where I am?
11    A.  I am there too.
12    Q.  Okay.  And this is an email from
13  Brian Luscombe to Cheryl Bogardus.  I
14  believe -- do you recognize she is worldwide
15  marketing director?
16    A.  Yes.  That's my recollection as
17  well.
18    Q.  And Brian Luscombe, I believe, he
19  was U.S. product director; is that right?
20    A.  Yes.  To the best of my
21  recollection, that's correct.
22    Q.  It says, "Cheryl, I understand that
23  the Gynecare board made the decision that
24  clinicals will not be required for
25  Mulberry."

Page 380

1        Again, what's Mulberry?
2     A.  That's the project name for the
3  TVT-O.
4     Q.  "Can you please clarify whether or
5  not post-market introduction studies are
6  acceptable or not?  If we only have ex-U.S.
7  data, won't this limit us?  Brian."
8        Was this document -- was that email
9  important for your opinions?
10        MS. SUTHERLAND:  Objection.
11    The document speaks for itself.
12        THE WITNESS:  Yes.
13  BY MR. GOSS:
14    Q.  Why?
15    A.  Because as the risk assessment
16  noted in the document we just reviewed,
17  Exhibit 20, the -- there are risks with a
18  new procedure, risks with the obturator
19  approach, particularly with regard to the
20  obturator bundle, and clinical testing in
21  February of 2003 was intended to be done.
22        And in this document, we learn two
23  months later, almost two months later to the
24  date, that the Gynecare board had made the
25  decisions -- the decision that clinicals

Page 381

1  would not be done, which means that these
2  risks would not be assessed in human testing
3  prior to marketing.
4     Q.  Is that decision by the Gynecare
5  board in violation of standards in the
6  industry?
7        MS. SUTHERLAND:  Objection.
8        THE WITNESS:  Yes.
9  BY MR. GOSS:
10    Q.  Why is that?
11    A.  Once again, one has to ensure the
12  safety and effectiveness of one's product,
13  and in order to do that, one has to do a
14  clinical evaluation of data that's available
15  and based on the data that's available, make
16  a determination as to whether or not there's
17  a favorable benefit to risk for use of this
18  device.
19        And if one does not have that data,
20  then that's a violation of we refer to as
21  the essential principles of safety as well
22  as performance, and in order to get the type
23  of information necessary, they needed to do
24  clinical testing.
25    Q.  Okay.  Let's talk about the email

Peggy Pence, Ph.D.

Page 382

1  right following this one.
2      A.  Okay.
3      Q.  Okay.  So to set the stage -- to
4  set the stage, we know two months ago there
5  was a projection that there would be a six
6  months of clinicals done before launch.
7          MS. SUTHERLAND:  Objection.
8          THE WITNESS:  That's correct.
9  BY MR. GOSS:
10     Q.  And then we have an email here
11 where we learn and you learn in your
12 investigation that the Gynecare board made
13 the decision that they weren't going to do
14 the clinical testing.
15         MS. SUTHERLAND:  Objection.
16         THE WITNESS:  That's correct.
17 BY MR. GOSS:
18     Q.  Okay.  So let's get to the next
19 email.  Cheryl Bogardus, I assume she was
20 the same Cheryl from below; right?
21     A.  Yes.
22     Q.  Writing back to Brian Luscombe,
23 responding to the previous email, she
24 says -- let's get to the second sentence in
25 the second paragraph.  "To protect our

Page 383

1  market share, we need to be ready to launch.
2  So the development process should not
3  require clinicals."
4          Do you find that sentence
5  important?
6          MS. SUTHERLAND:  Objection.
7          THE WITNESS:  Yes, I do.
8  BY MR. GOSS:
9      Q.  Why is that important?
10     A.  Because the key factors we
11 discussed earlier with regard to safety
12 principles is patient safety and ensuring
13 that the product is safe.  The first point
14 of care of a company is not protecting
15 market share.  While that's important, the
16 first point is to make sure that the product
17 is safe.  You don't market a product without
18 knowing and justifying that it's safe and
19 effective.
20     Q.  Should a company ever forego
21 recommended clinical testing so that it
22 could protect its market share?
23         MS. SUTHERLAND:  Objection.
24         THE WITNESS:  No.
25 BY MR. GOSS:

Page 384

1      Q.  Should a company ever put market
2  share and profits over safety?
3          MS. SUTHERLAND:  Objection.
4          THE WITNESS:  Never.
5  BY MR. GOSS:
6      Q.  Is that a violation of the industry
7  standards?
8          MS. SUTHERLAND:  Objection.
9          THE WITNESS:  Yes, it is.
10 ///
11 BY MR. GOSS:
12     Q.  Would that be a violation of
13 Ethicon's own credo?
14         MS. SUTHERLAND:  Objection.
15         THE WITNESS:  Yes, it is.
16 BY MR. GOSS:
17     Q.  Would that be a violation of the
18 Global Harmonization Task Force?
19         MS. SUTHERLAND:  Objection.
20         THE WITNESS:  Yes, it would.
21         (Exhibit Number 22 was
22     marked for identification.)
23 BY MR. GOSS:
24     Q.  I'll hand you what's been marked as
25 Pence Exhibit 22.

Page 385

1          Is that a document that you found
2  in Ethicon's files?
3          MS. SUTHERLAND:  Objection.
4          THE WITNESS:  Yes, it is.
5  BY MR. GOSS:
6      Q.  Is this an Ethicon document?
7      A.  Yes, it is.
8      Q.  Is this a document that you
9  reviewed in connection with forming your
10 opinions?
11     A.  Yes, it is.
12     Q.  Is it a document you relied upon in
13 forming your opinions?
14     A.  Yes, it is.
15     Q.  This document is dated June 24,
16 2003, from a Ronnie Toddywala.  I believe
17 he's vice president of Gynecare.
18         Is that what you understand?
19     A.  Yes.  Gynecare research and
20 development.
21     Q.  It says so on the bottom of the
22 document.
23     A.  Yes.
24     Q.  I'm trying to figure out who some
25 of these other people are.  Is Cheryl

Golkow Technologies, Inc. - 1.877.370.DEPS

Peggy Pence, Ph.D.

Page 386

1 Bogardus, we just spoke about her. Is she
2 the worldwide marketing director?
3     A. Yes. That's my understanding, yes.
4     Q. What about Axel Arnaud? I see he
5 is cc'd. Who's that?
6     A. He was actually -- for the TVT-O,
7 he was actually the person who identified
8 the -- Dr. De Leval who is the inventor of
9 the in-out procedure that is the TVT-O
10 procedure.
11     Q. Was he the head of medical affairs?
12     A. In Europe, yes.
13     Q. Okay. This document says, "Dear
14 All, as you know, Project Mulberry" --
15 again, is that the TVT-O?
16     A. Yes.
17     Q. -- "is critical to Gynecare's
18 success in the incontinence marketplace.
19 This team has been charged with the
20 breakthrough goal of completing this project
21 within nine months. We must make this
22 project happen in a short period of time.
23 You play a critical role in bringing this
24 endeavor."
25         First of all, do you find that

Page 387

1 important --
2         MS. SUTHERLAND: Objection.
3     The document speaks for itself.
4 BY MR. GOSS:
5     Q. -- in forming your opinion?
6         MS. SUTHERLAND: Speaks for
7     itself.
8         THE WITNESS: Yes.
9 BY MR. GOSS:
10     Q. Why are those statements important
11 to you in forming your opinions?
12     A. Notably, the breakthrough goal is
13 to complete the project within nine months,
14 and this project was initially, if I recall
15 correctly, this project was intended to have
16 24 months.
17         And part of that time, of course,
18 would have been doing the clinical testing
19 that we've talked about. So now for
20 competitive reasons, the decision has been
21 made that they must launch the product
22 within nine months.
23     Q. Again, would a reasonable and
24 prudent manufacturer decrease its launch
25 time by cutting clinical studies that relate

Page 388

1 to safety?
2         MS. SUTHERLAND: Objection.
3         THE WITNESS: No.
4 BY MR. GOSS:
5     Q. Did you ever see any documents that
6 reflected how much the French market was
7 estimated to lose as a result of the
8 competitors entering the market in the TVT?
9     A. Yes.
10     Q. What percentage of the market were
11 they anticipating losing?
12     A. If I recall correctly, it was
13 30 percent.
14     Q. Is that substantial for a
15 manufacturer?
16         MS. SUTHERLAND: Objection.
17         THE WITNESS: Yes.
18         MR. GOSS: I'm sorry. I only
19     have one copy, but I think you've seen
20     it.
21         MS. SUTHERLAND: It's not like
22     I have a whole lot of time when you get
23     done to ask questions about it.
24         MR. GOSS: Yeah.
25 BY MR. GOSS:

Page 389

1     Q. I'm going to hand you what's been
2 marked as Exhibit 23.
3         (Exhibit Number 23 was
4     marked for identification.)
5         MR. GOSS: Do you want to look
6     at it first.
7         MS. SUTHERLAND: Just to see.
8         MR. GOSS: I'm only using this
9     one to liven you up a little bit.
10         MS. SUTHERLAND: I'm engrossed.
11     Can you not tell? Am I not objecting
12     enough?
13 BY MR. GOSS:
14     Q. Okay. Is this a document that you
15 reviewed that came from Ethicon's files?
16     A. Yes.
17     Q. And it says it's a sales training
18 launch meeting, January 22 through 23, 2004,
19 Bridgewater, New Jersey.
20         What's a sales training launch
21 meeting? What is that?
22     A. This is a presentation to the sales
23 representatives that will be detailing
24 physicians, telling them about this product
25 with the intent of the physicians buying

Peggy Pence, Ph.D.

Page 390

1  this product.
2      Q.  Okay.  And is the product on the
3  market yet?
4      A.  It was launched in this period of
5  time.  It was cleared to go to the market in
6  December of 2003.  So this is -- this is
7  the --
8      Q.  The TVT-O?
9      A.  The TVT-O.  This is the sales
10 training right after the product was cleared
11 so that it could be sold in the U.S.
12     Q.  Okay.  And is this a PowerPoint?
13     A.  Yes.
14     Q.  Okay.  And, again, they're using
15 this to train their sales team?
16     A.  Yes.
17     Q.  Okay.  Let's turn to -- the pages
18 aren't numbered, but can you find the top
19 ten reasons to pursue the TVT obturator
20 approach.
21     A.  Sorry.  Some of them are upside
22 down.  I'm trying to find them.
23     Q.  Let me find it for you.
24     By the way, did you review this
25 document in preparation for your opinions?

Page 391

1      A.  I did.
2          MS. SUTHERLAND:  I'll object
3  that the document speaks for itself.
4          MR. GOSS:  I'll let you have
5  that objection for every document.
6          MS. SUTHERLAND:  May I have a
7  continuing objection for every Ethicon
8  document that you use?
9          MR. GOSS:  Sure.
10         I do agree with your statement
11 about the document earlier.
12         MS. SUTHERLAND:  What did I
13 say?
14         MR. GOSS:  That it's gross.
15 Strike that conversation.
16 BY MR. GOSS:
17     Q.  Okay.  Here you go.
18     All right.  Now, this sales
19 document where they're teaching -- where
20 Ethicon is teaching its salespeople about
21 the TVT obturator and that approach in
22 anticipation of going out and selling the
23 product, they have a top ten reasons to
24 pursue Gynecare TVT obturator approach.  And
25 we'll go through a few of these.

Page 392

1      Number 9, for example, says, "Since
2  the needles don't enter the retropubic
3  space, bladder perforation should be
4  reduced."
5      That's what you said earlier?
6      A.  That's correct.
7      Q.  It's a good scientific reason?
8      A.  Yes, it is.
9      Q.  Says one of the inventors, number
10 4, "Doesn't like the obturator approach."
11     That's a competitor doesn't like
12 it; right?
13     A.  Yes.
14     Q.  Number 5, it says, "The hammock
15 shape of the sling may result in less
16 obstructive symptoms since it's hard to
17 over-compress the urethra with the obturator
18 sling."
19     Scientific reason?
20     A.  Yes.  Medical reason, yes.
21     Q.  And what did they give as the
22 number one reason as to why they should
23 pursue the TVT obturator approach?
24         MS. SUTHERLAND:  Objection.
25         THE WITNESS:  "Mama needs a new

Page 393

1  pair of shoes."
2  BY MR. GOSS:
3      Q.  In other words, for profit?
4          MS. SUTHERLAND:  Objection.
5          THE WITNESS:  That's correct.
6  BY MR. GOSS:
7      Q.  Should a company ever encourage --
8  strike that.
9      Would a reasonable and prudent
10 manufacturer ever encourage its employees to
11 sell its product solely for profit over
12 safety?
13         MS. SUTHERLAND:  Objection.
14         THE WITNESS:  No.
15         MS. SUTHERLAND:  If you're
16 switching, can I run down the hall real
17 quick?
18         MR. GOSS:  Sure.  Let's take a
19 five-minute break.
20         MS. SUTHERLAND:  Yeah.
21         THE VIDEOGRAPHER:  With the
22 approval of counsel, going off the
23 record.  The time is approximately
24 6:29 p.m.
25         (Recess taken from

99 (Pages 390 to 393)

Peggy Pence, Ph.D.

Page 394

1    6:29 p.m. to 6:36 p.m.)
2        THE VIDEOGRAPHER:  With the
3    approval of counsel, back on the record.
4    The time is approximately 6:36 p.m.
5    BY MR. GOSS:
6    Q.  Dr. Pence, I should have done this
7    early on.  I'll go ahead and do it now.  We
8    keep talking about the Global Harmonization
9    Task Force, and we spent a lot of time on
10   that this morning, and I'm not sure if this
11   has been marked, but I'm going to mark
12   another one just in case.
13       I've marked Pence Exhibit 24.
14       (Exhibit Number 24 was
15   marked for identification.)
16   BY MR. GOSS:
17   Q.  So I've handed you what has been
18   marked as Pence Exhibit 24.  And when we've
19   talked about the Global Harmonization Task
20   Force, is this one of the documents we
21   talked about?
22   A.  Yes, it is.
23   Q.  Its title is "Essential Principles
24   of Safety and Performance of Medical
25   Devices," endorsed by the Global

Page 395

1    Harmonization Task Force dated May 20, 2005.
2    A.  That's correct.
3    Q.  And this is one of the documents
4    that you discussed previously that provides
5    the standard of care with respect to device
6    manufacturers?
7    A.  Yes.  It is an international
8    standard of care.
9    Q.  Okay.  And this is something that
10   you applied in giving your opinions?
11   A.  Yes.
12   Q.  Okay.  Let's go to page 8 of that
13   document.  Go to page 8 of that document and
14   talking about under a section called
15   "Essential Principles of Safety and
16   Performance of Medical Devices."  It says,
17   "General Requirements.  Medical devices
18   should be designed and manufactured in such
19   a way that, when used under the conditions
20   and for the purposes intended, and where
21   applicable, by virtue of the technical
22   knowledge, experience, education or training
23   of intended users, they will not compromise
24   the clinical condition or the safety of
25   patients or the safety and health of users

Page 396

1    or, where applicable, other persons provided
2    that any risks which may be associated with
3    their use constitute acceptable risks when
4    weighed against the benefits of the patient
5    and are compatible with a high level of
6    protection of health and safety."
7        That's a long way of saying --
8    isn't it? -- that manufacturers should
9    market safe products?
10       MS. SUTHERLAND:  Objection.
11       THE WITNESS:  Safe, and as I
12   mentioned before, that have a favorable
13   benefit-to-risk ratio.
14   BY MR. GOSS:
15   Q.  Okay.  I got on objection.  Let me
16   try to fix this.
17       What are they saying there in
18   Section 5.1?
19   A.  They're saying that for the
20   intended use of a medical device, that they
21   should be designed and produced in such a
22   way that for their intended use, they don't
23   compromise -- they don't cause undue risk to
24   the patient or users of the device either
25   and that, again, as I've specified before,

Page 397

1    that one has to always look at the potential
2    risks versus the potential benefits and
3    assure that there's a favorable
4    benefit-to-risk ratio.
5        In other words, that the benefits
6    exceed the potential risks and any risks are
7    acceptable.
8    Q.  We talked about safety principles
9    earlier in Exhibit 16.
10   A.  Yes.
11   Q.  Does that support your safety
12   principle number 1?
13       MS. SUTHERLAND:  Objection.
14       THE WITNESS:  Yes.
15   BY MR. GOSS:
16   Q.  Like the first line, "A corporation
17   is required to make sure its products are
18   reasonably safe"?
19   A.  Yes.
20       MS. SUTHERLAND:  Objection.
21   BY MR. GOSS:
22   Q.  Does it also support "Safety of
23   patients has to be the number one priority,
24   not corporate profits"?
25   A.  Yes, it does.

100 (Pages 394 to 397)

Peggy Pence, Ph.D.

1          MS. SUTHERLAND:  Objection.
2     BY MR. GOSS:
3          Q.   Let me ask you -- let's go down
4     that document some more.
5          MS. SUTHERLAND:  Can I have a
6     continuing objection, again, to just
7     reading the GHTF documents as well as
8     you already gave me the one on the
9     Ethicon documents.
10         MR. GOSS:  Sure.
11         How am I supposed to use it if
12     I can't read it?  Am I supposed to --
13     mental telepathy to the --
14         MS. SUTHERLAND:  You're
15     supposed to ask her what it means if it
16     needs explanation by an expert.
17    BY MR. GOSS:
18         Q.   Let talk about Section 5.2 of the
19    general requirements, and I'll ask the court
20    to let us publish 5.2 to the jury.
21         Tell me what 5.2 means.
22         A.   The essence of this is that a
23    medical device manufacturer must do a risk
24    assessment of its product to, again, make
25    sure that the risks are acceptable for

1     the -- how the product is designed and how
2     it's manufactured, and to do that, they have
3     to identify known or foreseeable potential
4     risks, estimate those risks, eliminate them
5     as far as they can, reduce any remaining
6     risks by taking adequate protection measures
7     and very importantly, according to what
8     we've been discussing with regard to
9     labeling, the key there is inform users of
10    any residual risks.
11         Q.   Does that support the second page
12    of your safety principles in Exhibit 16 that
13    a corporation must investigate warning signs
14    that its products may be dangerous and make
15    sure that any problems with the product are
16    fixed in a safe manner?
17         MS. SUTHERLAND:  Objection.
18         THE WITNESS:  Yes, it does.
19    BY MR. GOSS:
20         Q.   Okay.  Now I'd like for you to look
21    at page 9 of 15 on that exhibit, which is
22    Exhibit 24.  In particular, where it says
23    that "They should eliminate risks as far as
24    reasonably practicable through inherently
25    safe design and manufacture."

1          A.   Yes.
2          Q.   What does that mean?
3          A.   That means in the design of the
4     device and how it's actually produced, that
5     they do a risk assessment and anything that
6     they can do to control risks in how the
7     device is designed and manufactured, they
8     are supposed to do.
9          Q.   Does that support, back to
10    Exhibit 16, safety principles, the safety
11    principle on page 3 of Exhibit 16, "If a
12    corporation has two products that treat the
13    same condition, and one is safer for the
14    patients, the corporation must choose the
15    safest product"?
16         MS. SUTHERLAND:  Objection.
17         THE WITNESS:  Yes.  That would
18    be consistent with what we just read.
19    BY MR. GOSS:
20         Q.   Okay.  I'm going to hand you what's
21    been marked as Exhibit 25.
22         (Exhibit Number 25 was
23    marked for identification.)
24         MS. SUTHERLAND:  I've seen it.
25    BY MR. GOSS:

1          Q.   Is this, again, another Global
2     Harmonization Task Force document?
3          A.   Yes.
4          Q.   Titled "Clinical Evaluation"?
5          A.   That's correct.
6          Q.   Dated May, 2007?
7          A.   That's correct.
8          Q.   Is this one of the documents that
9     you relied upon for the standard of care?
10         A.   Yes.
11         Q.   Let me turn you to -- direct you to
12    page 4 of 28.  And you talked a little bit
13    earlier about clinical evaluation.
14         A.   Yes.
15         Q.   And what does this tell us in that
16    third section, third paragraph there about
17    clinical evaluation as far as the standard
18    of care is described in this document?
19         MS. SUTHERLAND:  Objection.
20         THE WITNESS:  Are you talking
21    about the first paragraph after "Why is
22    clinical evaluation important?"
23    BY MR. GOSS:
24         Q.   Right.
25         A.   Clinical evaluation is one of the

Peggy Pence, Ph.D.

Page 402

1  methods by which one assures that a device
2  satisfies the essential principles of safety
3  and performance.  Basically, it's through
4  clinical testing that you determine whether
5  the product is safe and whether it's
6  effective in humans.
7      Q.  Okay.  And does it talk about
8  minimizing adverse events?
9      A.  Yes, it does.  And clinical
10  evaluation, in this context, includes
11  clinical data from different sources.
12  Clinical testing as well as commercial
13  experience and also the scientific and
14  medical literature, the peer-reviewed
15  publications that we talked about.
16      Q.  Okay.  Let's shift gears.  Let's go
17  to -- I want to talk with you briefly about
18  the 510(k) process.
19      What are the two processes by which
20  a medical device can come to market?
21      A.  The 510(k) process, if an
22  application is required to be submitted to
23  the FDA, either a -- what's called a 510(k),
24  a pre-market notification, or a pre-market
25  approval application, which is referred to

Page 403

1  as a PMA.
2      Q.  What's the difference between a
3  510(k) pre-market notification or clearance
4  and pre-market approval?
5      A.  There are a number of differences
6  between the two.  Probably the key one is
7  that a 510(k) pre-market notification is
8  submitted to FDA to get a clearance of the
9  product to market based on substantial
10  equivalence to what is termed a predicate
11  product, a product that's already legally on
12  the market that is similar to the device
13  that is the subject device that the company
14  intends to market.
15      Where the pre-market approval
16  application is submitted to the FDA and
17  includes a much larger volume of data, and
18  the data submitted is reviewed by FDA in
19  such a way that it is an independent
20  demonstration -- there must be an
21  independent demonstration of safety and
22  effectiveness, and a PMA product, if FDA
23  accepts it for -- authorizes it to be
24  marketed is approved versus cleared.
25      Q.  Can a manufacturer that has

Page 404

1  received 510(k) clearance represent that its
2  product has received approval?
3      A.  No.
4      Q.  Why is that?
5      A.  There's a specific regulation that
6  specifies that one cannot give -- infer that
7  a 510(k) clearance constitutes an approval
8  by FDA.
9      Q.  What type of studies are typically
10  done with PMA approval?
11      A.  Almost all PMAs require clinical
12  human testing.
13      Q.  Okay.  But a product -- a device
14  that's gone through 510(k) clearance have
15  done any clinical testing?
16          MS. SUTHERLAND:  Objection.
17          THE WITNESS:  Only about 10 to
18  15 percent require clinical testing.
19  BY MR. GOSS:
20      Q.  If a manufacturer wanted to do
21  clinical testing before seeking 510(k)
22  clearance, could it?
23      A.  Absolutely.
24      Q.  Okay.  How long does it take to get
25  pre-market approval versus clearance?

Page 405

1          MS. SUTHERLAND:  Objection.
2          THE WITNESS:  The average --
3  the -- typically -- well, it depends on
4  the type of submission.  In the case of
5  TVT-O, it's what we call a special
6  510(k), and it was approved in
7  approximately a month, just under a
8  month.  The overall average, depending
9  on which year you look at, is around 90
10  to 140 days.
11      The pre-market approval review
12  at FDA can require upwards of 300,
13  350 days, and generally speaking, it's
14  anywhere from two-and-a-half to
15  three-and-a-half or four times the
16  amount of time that FDA spends reviewing
17  a PMA by contrast to a traditional
18  510(k), and the TVT-O was not a
19  traditional.  It was a special which
20  means less information, less time.
21  BY MR. GOSS:
22      Q.  Just so it's clear for the jury,
23  was there ever an independent determination
24  by the FDA that the TVT-O was safe or it was
25  efficacious?

Peggy Pence, Ph.D.

Page 406

1          MS. SUTHERLAND:  Objection.
2          THE WITNESS:  No.
3   BY MR. GOSS:
4      Q.  Is there any room for debate about
5   that?
6      A.  No.
7          MS. SUTHERLAND:  Objection.
8   BY MR. GOSS:
9      Q.  Let's talk a little bit about the
10  TVT-O.  And you talked a little bit this
11  morning with defense counsel about Prolene
12  mesh, and there was some discussion about
13  fraying.
14        Do you recall that?
15     A.  Yes, I do.
16     Q.  In your investigations of -- in
17  your investigation of Ethicon's files, did
18  you uncover any documents that discussed any
19  complaints about the Prolene mesh product
20  fraying?
21     A.  Yes, I did.
22     Q.  Did you uncover any documents that
23  discussed particle loss with respect to
24  Prolene mesh?
25     A.  Yes.

Page 407

1      Q.  Did you review any documents that
2   discussed the difference between MCM and LCM
3   with respect to fraying and particle loss?
4      A.  Yes, I did.
5      Q.  Did those documents form a basis of
6   your opinions that you're giving today?
7      A.  Yes, they did.
8      Q.  I'm going to hand you what's been
9   marked as Pence Exhibit 26.
10  ///
11        (Exhibit Number 26 was
12     marked for identification.)
13  BY MR. GOSS:
14     Q.  Is that a document that you
15  reviewed from Ethicon's files?
16     A.  Yes, it is.
17     Q.  And is this a document relating to
18  a TVT device?
19     A.  Yes, it is.
20     Q.  What's the date of this document?
21     A.  October 12, 2005.
22     Q.  And who is Carol Holloway?
23     A.  She's a product complaint analyst
24  in worldwide customer quality.
25     Q.  By the way, when we talk about TVT

Page 408

1   and TVT-O, do they use the same mesh?
2      A.  Yes, they do.
3      Q.  Okay.  So what is this document,
4   and why was it important to you?
5          MS. SUTHERLAND:  Objection.
6          THE WITNESS:  This is a
7   document about a customer's experience
8   with a TVT device where there's
9   unravelling.  It's a complaint where
10  unravelling of the tape occurred, and
11  the tape became particles, and after
12  implantation of the TVT device, the
13  staff found remaining particles that had
14  been lost from the mesh in the box.
15  BY MR. GOSS:
16     Q.  And Carol -- this is a letter from
17  Carol Holloway.  She is a product complaint
18  analyst worldwide customer quality for
19  Gynecare.
20        Is Gynecare a part of J&J and
21  Ethicon?
22     A.  Yes.
23          MS. SUTHERLAND:  Objection.
24  BY MR. GOSS:
25     Q.  I believe it's a women's division

Page 409

1   or something?
2      A.  That's correct.
3      Q.  And one of the sentences -- explain
4   to the jury this sentence:  "Fraying is
5   inherent in the product" -- this is
6   Ms. Holloway for the Gynecare talking.
7   "Fraying is inherent in the product based
8   upon the mesh construction."
9          What does that mean, "Fraying is
10  inherent in the product"?
11         MS. SUTHERLAND:  Objection.
12         THE WITNESS:  The way the
13  product is designed and with the
14  mechanical cutting, what occurs is that
15  there is -- the term that has been used
16  by Ethicon is a degradation of the mesh
17  structure so that the structure
18  particularly when they -- there's
19  particle loss even without stretching
20  but when -- particularly when the
21  product is stretched, that the structure
22  along the edges of the mesh is lost, and
23  the product can rope and curl and
24  particles fall off.
25  BY MR. GOSS:

103 (Pages 406 to 409)

Peggy Pence, Ph.D.

Page 410

1    Q.  Under the re line there, it has a
2  lot number.  Can you tell from that lot
3  number whether this lot -- whether this
4  product that's being discussed in this
5  exhibit is mechanical cut?
6    A.  Yes.
7    Q.  And what is it?
8    A.  It's mechanically cut.
9    Q.  And how do you know that?
10    A.  There's no L for laser cut as well
11  as in October, 2005, the laser cut was not
12  yet available.
13    Q.  So what should a reasonable,
14  prudent manufacturer do when it receives a
15  letter like this?
16        MS. SUTHERLAND:  Objection.
17        THE WITNESS:  There's a number
18    of different things it should do.  It
19    should do further investigation.  It
20    should open up corrective and preventive
21    action, determine what the cause of this
22    is, and then look at what it can do to
23    mitigate risks.
24        And it should investigate, like
25    this loss of particles and the

Page 411

1    stretching that occurs, whether or
2    not -- how that -- I should say how that
3    impacts the safety and effectiveness of
4    the tape when implanted.
5  BY MR. GOSS:
6    Q.  Let me hand you what's been marked
7  as Exhibit 27 to your deposition.
8        (Exhibit Number 27 was
9    marked for identification.)
10  ///
11  BY MR. GOSS:
12    Q.  Is that a document that you
13  reviewed from Ethicon's files?
14    A.  Yes, it is.
15    Q.  And is this a document that you
16  relied upon in forming your opinions today?
17    A.  Yes, it is.
18    Q.  And this document is from Dan
19  Smith.
20        Do you know who Dan Smith is?
21    A.  Yes, I do.
22    Q.  Who is he?
23    A.  He is a lead engineer.  If I recall
24  correctly, he was a project lead on the
25  TVT-O and been with the company

Page 412

1  approximately 36 years.  Engineering fellow
2  at this point, I believe.
3    Q.  So, and he's writing to Janice
4  Burns.  I believe she's with -- @ethgb means
5  Ethicon Great Britain; is that right?
6    A.  Yes, that's my understanding.
7    Q.  And, again, with these emails, we
8  start from the back, which should be the
9  second page; right?
10    A.  Yes.
11    Q.  And that appears to be, on the
12  second page, an email from Bernhard Fischer,
13  who appears to be from marketing Gynecare
14  and Breast Care in Vienna.
15    A.  Correct.
16    Q.  And he is writing Janice Burns in
17  Great Britain regarding TVT complaints; is
18  that right?
19    A.  Yes.
20    Q.  And is this email something that
21  you relied upon in forming your opinions?
22    A.  Yes, it is.
23    Q.  And is this time period a time
24  period before there was laser-cut mesh?
25    A.  Yes, it is.

Page 413

1    Q.  So the mesh we're talking about
2  here would be mechanically cut mesh?
3    A.  Yes.
4    Q.  Okay.  And what's Janice Burns --
5  what is Bernhard Fischer explaining to
6  Janice Burns in this email?
7        MS. SUTHERLAND:  Objection.
8        THE WITNESS:  It's about two
9    TVT complaints, both dealing with the
10    same issue.  One with the retropubic --
11    the TVT retropubic, and one with the TVT
12    obturator, the TVT-O, and it has to do
13    with a small blue particles.  The mesh
14    was blue, falling off the mesh, and they
15    term it as if the mesh was brittle.  It
16    has to do with the particle loss and
17    fraying that we were just discussing.
18  BY MR. GOSS:
19    Q.  Okay.  Let's go back to the front
20  page now and look at the end of the email
21  where Dan Smith is writing to Janice Burns.
22  He's responding to this situation; is that
23  right?
24    A.  Yes.
25    Q.  And he writes, "This is not new,

Peggy Pence, Ph.D.

Page 414

1  and was exactly the original issue that
2  stopped TVT blue for months.  The fix, I'm
3  not sure how complete, is to cut the mesh
4  using ultrasonics, but it has not been
5  validated.  I'm not sure where it sits on
6  the operations priority list."
7      What does that mean?
8          MS. SUTHERLAND:  Objection.
9          THE WITNESS:  It means that the
10     company has identified a way to fix the
11     fraying, but they've not implemented it.
12  BY MR. GOSS:
13     Q.  Okay.  In the company documents, do
14  they sometimes use ultrasonic and LCM
15  interchangeably?
16     A.  They're different, but they've used
17  ultrasonic cutting to test material that
18  they -- that they've -- where they've later
19  marketed laser-cut mesh.  They've done the
20  testing with ultrasonically cut mesh.
21     Q.  Okay.  So go down to the third -- I
22  guess the fourth paragraph there.  "This is
23  not going away any time soon, and
24  competition will have a field day.  Major
25  damage control offensive needs to start to

Page 415

1  educate the reps and the surgeons upfront
2  that they will see blue shit, and it is
3  okay.  This is why I wanted to launch TVT-O
4  in clear."
5      Is there anything in that sentence
6  that's important to your opinions?
7          MS. SUTHERLAND:  Objection.
8          THE WITNESS:  Yes.
9  BY MR. GOSS:
10     Q.  What's that?
11     A.  They've identified this shedding of
12  particles as an issue, and yet their concern
13  is more about it not being noticeable to
14  surgeons than actually doing an evaluation
15  and the appropriate testing to determine
16  whether or not this is a safety risk or an
17  effectiveness risk as well for the patients
18  in whom this faulty product is implanted.
19     Q.  Is that a violation of the safety
20  principles we've discussed today?
21          MS. SUTHERLAND:  Objection.
22          THE WITNESS:  Yes, it is.
23  BY MR. GOSS:
24     Q.  Should a -- Dan Smith is saying
25  here that he wanted the TVT-O to be clear.

Page 416

1  Should a manufacturer ever manufacture a
2  product so that a defect could not be
3  apparent to the user?
4          MS. SUTHERLAND:  Objection.
5          THE WITNESS:  No.
6  BY MR. GOSS:
7      Q.  Would that be a violation of
8  standards in the industry?
9          MS. SUTHERLAND:  Objection.
10          THE WITNESS:  Absolutely.
11  BY MR. GOSS:
12     Q.  I'm handing you what's been marked
13  as Exhibit 28.
14          (Exhibit Number 28 was
15     marked for identification.)
16  BY MR. GOSS:
17     Q.  Is that a document that you
18  reviewed from Ethicon's files?
19     A.  Yes, it is.
20     Q.  Is this a document that you relied
21  upon in forming your opinions that you're
22  giving today?
23     A.  Yes, it is.
24     Q.  And this is another one of those
25  two-page emails.  It appears to be -- it

Page 417

1  appears to involve, at the bottom, Dan
2  Smith, who we just talked about; right?
3     A.  Yes.
4     Q.  Janice Burns, who we just talked
5  about as well?
6     A.  Yes.
7     Q.  Charlotte Owens, who appears to be
8  the worldwide medical director --
9     A.  Yes.
10     Q.  -- for Gynecare, a division of
11  Ethicon?
12     A.  That's correct.
13     Q.  Is that a high position?
14     A.  Yes.
15          MS. SUTHERLAND:  Objection.
16  BY MR. GOSS:
17     Q.  And it attaches a letter in the
18  back or an email, I guess, from Steve Bell.
19      Do you see that?
20     A.  I do.
21     Q.  And it says, "Dear All, As more and
22  more customers now move to TVT Blue and
23  TVT-O with blue mesh, you may sometimes hear
24  'I can see small blue pieces come off the
25  mesh!  What's wrong?'"

Peggy Pence, Ph.D.

Page 418

1      Do you see that?
2      A.  I do.
3      Q.  And I want to focus on the third
4  sentence there, the third element there.  It
5  says, "Reassure your doctors" -- and, by the
6  way, Steve Bell is director of marketing;
7  right?
8      A.  Yes, for Europe.
9      Q.  And he's saying, "Reassure your
10  doctors that this is part of the success of
11  TVT.  The way we have cut the mesh makes the
12  edges softer, and we feel that this has been
13  a crucial success factor in TVT.  Reassure
14  them that Prolene has proven to be inert,
15  and there are hundreds of papers going back
16  25 years to reinforce this point.  These
17  particles will not cause any problem."
18      What I want to focus on is the
19  statement "Reassure them that Prolene has
20  proven to be inert, and there are hundreds
21  of papers going back 25 years to reinforce
22  this point."
23      Is that statement -- you've
24  reviewed the literature in that regard, have
25  you not?

Page 419

1      A.  Yes, I have.
2          MS. SUTHERLAND:  Objection.
3  BY MR. GOSS:
4      Q.  Is that statement true?
5          MS. SUTHERLAND:  Objection.
6          THE WITNESS:  No, it is not.
7  BY MR. GOSS:
8      Q.  Is it even close to true?
9      A.  No.
10          MS. SUTHERLAND:  Objection.
11          THE WITNESS:  There are
12  certainly papers, but the fact that it's
13  inert, that is definitely not true.
14  BY MR. GOSS:
15      Q.  Let me ask you, the Global
16  Harmonization Task Force says -- let me
17  refer you to the clinical evaluation.
18      A.  Yes.
19      Q.  Let me refer you to page 4 of 28.
20      A.  Yes.
21      Q.  And, again, just to back up a
22  little bit for the jury, the Global
23  Harmonization Task Force document are
24  documents that you say provide the standard
25  of care for this industry.

Page 420

1          MS. SUTHERLAND:  Objection.
2          THE WITNESS:  They're the
3  international globally accepted standard
4  of care, yes.
5  BY MR. GOSS:
6      Q.  Okay.  Is there any debate about
7  that?
8          MS. SUTHERLAND:  Objection.
9          THE WITNESS:  No.
10  ///
11  BY MR. GOSS:
12      Q.  Okay.  Let me -- under "Why is
13  Clinical Evaluation Important," it says, the
14  last sentence of the first paragraph there's,
15  "That any claims made about the device's
16  performance and safety should be supported
17  by suitable evidence."
18      Do you see that?
19      A.  Yes.
20      Q.  The statement that Steve bell is
21  telling his marketing people to say to
22  doctors, does that violate that provision of
23  the Global Harmonization Task Force?
24          MS. SUTHERLAND:  Objection.
25          THE WITNESS:  It certainly

Page 421

1  does.
2  BY MR. GOSS:
3      Q.  Is it supported by suitable
4  evidence?
5      A.  No, it is not.
6          MS. SUTHERLAND:  Objection.
7  BY MR. GOSS:
8      Q.  Okay.  And is that a violation of
9  the standard of care?
10      A.  Yes, it is.
11          MS. SUTHERLAND:  Objection.
12  BY MR. GOSS:
13      Q.  Okay.  And then just to close up on
14  this, the email on the first page, Dan
15  Smith, again, is telling Charlotte Owens in
16  the last sentence there, "There's been some
17  customer questions raised about the blue
18  particles again, the same as when it was
19  released in the States."
20      Is that important in forming your
21  opinion?
22      A.  Yes, it is.
23      Q.  Why is that?
24      A.  This is an ongoing problem, and, in
25  fact, there is other documentation as well

106 (Pages 418 to 421)

Peggy Pence, Ph.D.

Page 422

1   and testimony that says this is a product
2   defect, and the company is aware it's
3   ongoing but yet has not addressed it.
4       Q.  As of the 2004 time period here,
5   the time period of these emails, have you
6   seen anything in Ethicon's files where it's
7   done a clinical test on particle loss?
8       A.  No.  None.
9       Q.  And whether or not it's safe?
10          MS. SUTHERLAND:  Objection.
11          THE WITNESS:  That's correct.
12      No testing.
13  BY MR. GOSS:
14      Q.  Okay.  Would a reasonable, prudent
15  manufacturer at this time have begun
16  clinical testing, at least by this time, to
17  determine whether or not this particle loss
18  was an issue?
19      A.  If they were going to maintain this
20  on the market, absolutely.
21          THE VIDEOGRAPHER:  Can we go
22      off for 10 seconds?
23          MR. GOSS:  Sure.
24          THE VIDEOGRAPHER:  With the
25      approval of counsel, I'm going off the

Page 423

1       record.  The time is approximately
2       7:08 p.m.
3           (Recess taken from
4       7:08 p.m. to 7:10 p.m.)
5           THE VIDEOGRAPHER:  With the
6       approval of counsel, back on the record.
7       The time is approximately 7:10 p.m.
8   BY MR. GOSS:
9       Q.  I'm going to hand you two documents
10  that I believe go together marked as
11  Exhibits 29 and 30.
12          (Exhibit Numbers 29 and 30
13      were marked for identification.)
14  BY MR. GOSS:
15      Q.  Have you seen those documents
16  before?
17      A.  Yes, I certainly have.
18      Q.  Are those documents that came out
19  of Ethicon's files?
20      A.  Yes.
21      Q.  Are these documents that you
22  reviewed and relied upon in forming your
23  opinions?
24      A.  Yes, they are.
25      Q.  And this appears to be an email

Page 424

1   string involving, among others, David
2   Menneret who is a complaint investigator and
3   regulatory contact for Ethicon; is that
4   right?
5       A.  That's correct.
6       Q.  It also involves -- if you look at
7   the front page, Dan Smith is involved.
8           Does this look like the TVT people?
9       A.  Yes.
10      Q.  Okay.  And the first document,
11  Exhibit 29, essentially encloses the
12  exhibit -- the letter that's marked as
13  Exhibit 30; is that right?
14      A.  I'm sorry.  Could you reask that?
15      Q.  The first document, Exhibit 29, is
16  really enclosing and transferring the letter
17  marked as Exhibit 30; right?
18      A.  Yes, that's correct.
19      Q.  And what is Exhibit 30?
20      A.  Exhibit 30 is a letter from a Dr.
21  Eberhard who has been a major user, actually
22  an important customer in Switzerland,
23  important user of Ethicon's products -- mesh
24  products.
25      Q.  I believe on the second page of

Page 425

1   Exhibit 29, they describe him as an opinion
2   leader?
3       A.  Yes.
4       Q.  It says, on Exhibit 29, "He knows
5   everything about tape, and if we lost him,
6   we lost all."
7           Do you see that?
8       A.  Yes.
9       Q.  By the way, what's an opinion
10  leader?
11      A.  An opinion leader is, in this case,
12  a doctor who is very well recognized in his
13  field of practice as an authority.
14      Q.  Okay.  And so this opinion leader
15  who they describe in the email as someone
16  who knows everything about tape and if we
17  lost him, we lost all, and his letter on
18  Exhibit 30, he states, "Dear Emilie, Please
19  find attached a TVT tape which was used as a
20  demo unit for patients before they have
21  their operation.
22          "Already at the operation, it is
23  embarrassing to see how the tape is
24  crumbling, but it gets worse if there is a
25  stretch on the tape.  It is urgent that

Peggy Pence, Ph.D.

Page 426

1  Johnson & Johnson quickly produce a tape
2  that is solid and weaved.  If not, I have
3  the convenience that the doctors will change
4  the tape and will get others.  I can't
5  understand that no one will solve that
6  problem for such a long time.
7      "At the latest, as the tape has
8  become blue, everyone has realized the
9  quality of the tape is terrible."  Then he
10  attaches some pictures.  And it says the
11  tape needs to be weaved; so it doesn't
12  crumble.
13      Why is a document like this -- why
14  do you find something like this, if you do,
15  important in their files?
16      MS. SUTHERLAND:  Object to the
17  reading of the document.
18      THE WITNESS:  It's critically
19  important.  It's another complaint.  The
20  company has gotten now multiple
21  complaints about the fraying of its
22  product from the doctors who are using
23  it.  And companies have a responsibility
24  to investigate complaints, to implement
25  corrective and preventive actions as

Page 427

1  appropriate to change the issue, to
2  address the issue, I mean to say, and
3  correct it and study if it's causing
4  safety and efficacy risks.
5  BY MS. SUTHERLAND:
6      Q.  After this receipt of this letter
7  from this person they've described as one of
8  their opinion leaders, as someone who knows
9  everything about tape in November of 2004,
10  did you see any evidence in the files where
11  the company endeavored to start conducting
12  any clinical trials to see what's going on
13  with this problem?
14      A.  No.
15      MS. SUTHERLAND:  Objection.
16  BY MS. SUTHERLAND:
17      Q.  Would a reasonable, prudent
18  manufacturer have done that?
19      MS. SUTHERLAND:  Objection.
20      THE WITNESS:  If they were
21  going to maintain this on the market,
22  absolutely.
23  BY MS. SUTHERLAND:
24      Q.  Continuing to market this product
25  without conducting those tests, is that a

Page 428

1  violation of the standards in the industry
2  as set forth in the documents that we've
3  looked at?
4      MS. SUTHERLAND:  Objection.
5      THE WITNESS:  Yes, it is.
6  BY MS. SUTHERLAND:
7      Q.  You talked earlier today about a --
8  some slides or a PowerPoint that Gene
9  Kammerer did.
10      Do you recall that?
11      A.  Yes, I do.
12      Q.  Where he had done some comparisons
13  of mechanically cut mesh and laser-cut mesh?
14      A.  Yes.
15      Q.  I'm going to hand you what's been
16  marked as Exhibits 31 and 32 and ask you if
17  those were the slides that you were talking
18  about.
19      (Exhibit Numbers 31 and 32
20  were marked for identification.)
21      THE WITNESS:  Yes, they are.
22  BY MR. GOSS:
23      Q.  And were those slides -- did you
24  find those -- were those in Ethicon's files?
25      A.  Yes.

Page 429

1      Q.  And was there an email accompanying
2  this that demonstrated that they were done
3  by Gene Kammerer?
4      A.  Yes.
5      Q.  And was he an engineer?
6      A.  Yes.
7      Q.  Okay.  Is this -- by the way, that
8  email -- we might as well just so we can get
9  a time frame -- just so we get a time frame,
10  I'll hand you what's been marked as Exhibit
11  33.
12      (Exhibit Number 33 was
13  marked for identification.)
14  BY MR. GOSS:
15      Q.  Just so we get a time frame of when
16  this is being done, is that the email that
17  you found in Ethicon's files where these
18  slides were being shown to people?
19      A.  Yes.
20      Q.  Okay.  Again, Gene Kammerer is an
21  engineer?
22      A.  He's an engineering fellow at
23  Ethicon research and development.
24      Q.  What's the date of that email?
25      A.  August 28, 2006.

Golkow Technologies, Inc. - 1.877.370.DEPS

Peggy Pence, Ph.D.

Page 430

1      Q.  And he's sending these to a number
2  of Ethicon people; is that right?
3      A.  Yes, he is.
4      Q.  Now, prior to August 28 of 2006,
5  did you uncover any documents in your
6  investigation where something like this
7  comparison had been done prior to 2006?
8          MS. SUTHERLAND:  Objection.
9          THE WITNESS:  No.  I don't
10     recall having seen anything earlier than
11     this of this type of comparison.
12  BY MR. GOSS:
13     Q.  Okay.  So and what is -- now let's
14  move to the slides.
15     A.  Okay.
16     Q.  Okay.  What is it that he's doing
17  in Exhibits 31 and 32, just generally?
18     A.  He's taken pictures of laser-cut
19  mesh versus mechanically cut mesh,
20  particularly on stretching.
21     Q.  Okay.  Let's look at Exhibit 31.
22  That's the first one; right?
23     A.  Yes.
24     Q.  And does he describe his results
25  there?

Page 431

1      A.  Yes, he does.
2      Q.  And generally, what is he saying
3  about the results of this comparison that
4  he's done, this engineering fellow has done
5  who works for Ethicon?
6          MS. SUTHERLAND:  Objection.
7          THE WITNESS:  He's stretched
8      the samples of both the laser-cut and
9      the mechanically cut mesh to 50 percent
10     elongation then let them relax.  And the
11     mechanically cut mesh shows, as I was
12     talking about earlier, the degradation
13     of the structure of the mesh in certain
14     areas because of particle loss, whereas
15     the laser-cut mesh does not show that
16     same degradation of the structure of the
17     mesh, and no particles -- or nearly no
18     particles haven been lost, as he terms
19     it.
20  BY MR. GOSS:
21     Q.  In that third paragraph, he
22  discusses roping.  Tell the jury what roping
23  is.
24     A.  It's a stretching and narrowing of
25  the mesh so that it loses its structure and

Page 432

1  it ropes, and it can rope underneath -- you
2  know, the idea of the sling, the tape is
3  that it fits under the urethra to support
4  the urethra to prevent stress urinary
5  incontinence, and that roping can affect
6  effectiveness as well as safety.
7      Q.  And what does he conclude with
8  respect to mechanically cut mesh versus
9  laser-cut mesh as to roping?
10     A.  That the mechanically cut mesh
11  ropes, and the roping does not occur with
12  the laser-cut mesh.
13     Q.  And what did he -- what did he
14  conclude about particle loss with respect to
15  mechanically cut mesh versus laser-cut mesh?
16     A.  There's significant particle loss
17  with the mechanically cut mesh where, by
18  contrast, the laser-cut mesh, there's either
19  no particle lost or almost no particles
20  lost.
21     Q.  And let's go to the third page of
22  that first exhibit where it's a side-by-side
23  slide.
24         Do you see that?
25     A.  Yes, I do.

Page 433

1      Q.  And tell me what's going on here.
2      A.  This is a picture that shows what
3  he described.  It's a picture of the
4  mechanically cut mesh that's been relaxed
5  after it's been pulled 50 percent
6  elongation, and the same pictures of the
7  laser-cut mesh after it's been treated in
8  the same way.
9          And one can see on the edges of the
10  mechanically cut mesh how the weave that has
11  been -- the structure has been lost.  You
12  can see the particles that have been lost in
13  the photographic field, and you can see the
14  narrowing.
15         And by contrast, you can see on the
16  laser-cut mesh, you don't see the particles
17  in the photographic field because there
18  weren't the particles lost, and you can see,
19  although there may be some narrowing from
20  the stretching, certainly not as significant
21  and that the mesh structure has remained
22  intact.
23     Q.  And then the next page of that
24  slide he discusses a -- it's entitled
25  "Description of Side-By-Side Views."

Peggy Pence, Ph.D.

Page 434

1    A. Yes.
2    Q. And what does he conclude?
3         MS. SUTHERLAND: Objection.
4         THE WITNESS: What I was just
5    describing that no particles can be
6    lost in the laser-cut mesh and that the
7    structure of the laser-cut mesh remains
8    intact so that the integrity of the mesh
9    across the full width of the sample
10   still holds in contrast to the
11   mechanically cut mesh where the
12   integrity of that mesh, the structure
13   has been lost, and there's a degradation
14   of the outer wale of the knit.
15   BY MR. GOSS:
16   Q. Let's go to the next exhibit, the
17   second part of the mesh.
18       And what's that exhibit number?
19   A. 32.
20   Q. Let's go to Exhibit 32. And just
21   go to the end. First of all, on Exhibit 32,
22   does he continue to conduct elongation
23   testing and some things you've described?
24   A. Yes.
25   Q. And then what is his summary there

Page 435

1    at the back page of Exhibit 32?
2         MS. SUTHERLAND: Objection.
3    BY MR. GOSS:
4    Q. What does he conclude?
5    A. He concludes "That the laser-cut
6    mesh resists degradation of the knit
7    construction, resists particle loss and
8    permanent narrowing better than the
9    mechanically cut mesh," and although there's
10   some variation in the results and some of
11   the mechanically cut mesh held up better
12   than others, overall, the finding holds true
13   across all the tested articles that their
14   laser-cut mesh provides more consistent test
15   results, good results.
16   Q. Is roping an adverse risk?
17   A. Yes.
18       MS. SUTHERLAND: Objection.
19   BY MR. GOSS:
20   Q. Okay. And we've talked about the
21   standards?
22   A. Yes.
23   Q. Global Harmonization Task Force
24   standards?
25   A. Yes.

Page 436

1    Q. And about reducing risk.
2    A. Yes.
3    Q. Based upon those standards and
4    based upon the documents that you've seen in
5    Ethicon's files, what would a reasonable,
6    prudent manufacturer have done?
7         MS. SUTHERLAND: Objection.
8         THE WITNESS: They would have
9    done the appropriate testing to -- first
10   of all, they would, as I have mentioned,
11   on the mechanically cut mesh, they
12   should have implemented corrective and
13   preventive action. Looking at laser-cut
14   mesh could be one of those techniques,
15   methods that they use to do that.
16       But then, although they showed
17   here that the laser-cut mesh resisted
18   the same degradation, then they would
19   also need to evaluate the potential
20   impact on safety and effectiveness of
21   the laser-cut mesh as well before they
22   would implement it.
23   BY MR. GOSS:
24   Q. Okay. So here we are again August
25   of 2006. Have you seen any documents in the

Page 437

1    company's files where they have even
2    suggested that they should even implement
3    any clinical testing?
4         MS. SUTHERLAND: Objection.
5         THE WITNESS: No.
6    BY MR. GOSS:
7    Q. Would a reasonable and prudent
8    manufacturer at that time -- at least at
9    that time have conducted clinical tests?
10        MS. SUTHERLAND: Objection.
11        THE WITNESS: Yes.
12   BY MR. GOSS:
13   Q. Okay. Let's go to -- I'll hand you
14   what's been marked as Exhibit 34.
15       (Exhibit Number 34 was
16   marked for identification.)
17   BY MR. GOSS:
18   Q. And ask you is that a document from
19   Ethicon's files that you reviewed?
20   A. Yes, it is.
21   Q. Is it a document that you relied
22   upon in forming your opinions?
23   A. Yes, it is.
24   Q. And it appears to be another one of
25   these -- this email from Alison London

Golkow Technologies, Inc. - 1.877.370.DEPS

Peggy Pence, Ph.D.

Page 438

1   Brown, who the document describes is a
2   product director, incontinence and pelvic
3   floor repair, Gynecare worldwide division of
4   Ethicon.
5         Are you familiar with who Alison
6   London Brown is?
7       A.  Yes, I am.
8       Q.  And it's -- appears to be a to a
9   number of marketing people.  Isn't Kevin
10  Mahar in marketing?
11      A.  To the best of my recollection,
12  yes.
13      Q.  All right.  And so what I really
14  want to ask you about is the second
15  paragraph there.  I want you to explain to
16  the jury that second paragraph and if it's
17  important.
18        MS. SUTHERLAND:  Objection.
19  BY MR. GOSS:
20      Q.  "The basic story here is that the
21  current mesh, MCM" -- is that mechanically
22  cut mesh?
23      A.  Yes.
24      Q.  "Is perceived by some physicians as
25  inferior, and we do get a high number of

Page 439

1   complaints on linting and roping" -- roping
2   is what we just talked about; right?
3       A.  Yes.
4       Q.  And they're getting a high number
5   of complaints?
6       A.  That's correct.
7       Q.  "Mesh particles falling off and the
8   material stretching to the point of being a
9   string.  The new material would dramatically
10  reduce the incident of linting and should
11  all but eliminate the roping as it stays
12  nice it flat."
13        And they're talking about laser-cut
14  mesh; is that right?
15      A.  Yes.
16      Q.  Okay.  So tell us the importance of
17  that --
18        MS. SUTHERLAND:  Objection.
19  BY MR. GOSS:
20      Q.  -- if any.
21      A.  Just that part?
22      Q.  Yeah, what we just read.
23      A.  Basically, she's saying that --
24  reiterating their knowledge of the numbers
25  of complaints that they have gotten because

Page 440

1   of the issues with the mechanically cut mesh
2   losing particles and stretching to the point
3   of even being a string so that it ropes, and
4   the laser-cut material doesn't have those
5   same issues.
6       Q.  Do you remember when we talked
7   about the Global Harmonization Task Force
8   standards?
9       A.  Yes.
10      Q.  Where we talked about minimizing
11  risk, if possible?
12      A.  Yes.
13        MS. SUTHERLAND:  Objection.
14  BY MR. GOSS:
15      Q.  Applying that standard -- applying
16  that standard to this information, what
17  would a reasonable and prudent manufacturer
18  do?
19        MS. SUTHERLAND:  Objection.
20        THE WITNESS:  They would do the
21  appropriate testing.  They would do the
22  appropriate testing to -- of the
23  laser-cut mesh to substantiate that the
24  laser-cut mesh, by the way it's cut,
25  even though it doesn't lose the

Page 441

1   structural integrity as the mechanically
2   cut mesh does, they would move towards
3   implementing that but also they need to
4   do the benefit-risk assessment for the
5   laser-cut mesh and the appropriate
6   testing to ensure that the changes in
7   its characteristics as a result of
8   cutting with the laser don't affect
9   safety and performance.
10  ///
11  BY MR. GOSS:
12      Q.  And let's get our timing back in
13  our heads here.  Jennifer Ramirez had her
14  surgery in September of 2010 --
15      A.  That's correct.
16      Q.  -- right?
17        And she got mechanically cut mesh;
18  is that right?
19      A.  Yes, she did.
20      Q.  And at the time of that surgery,
21  was laser-cut mesh available for her?
22      A.  Yes, it was available.  It became
23  available in fourth quarter of 2006.
24      Q.  And mechanically cut mesh was still
25  on the market?

111 (Pages 438 to 441)

Peggy Pence, Ph.D.

Page 442

1    A.  Yes, it was.
2    Q.  And had Ethicon received a number
3  of similar complaints to the ones that you
4  just discussed, these last couple that we
5  just discussed?
6         MS. SUTHERLAND:  Objection.
7         THE WITNESS:  Absolutely, yes.
8  BY MR. GOSS:
9    Q.  And when Jennifer got her
10  mechanically cut mesh in September of 2010,
11  even by that time, had the company done any
12  clinical testing to determine whether there
13  was a difference in mechanically cut mesh
14  versus laser-cut mesh?
15         MS. SUTHERLAND:  Objection.
16         THE WITNESS:  No.  No testing
17    for that, and no testing to determine if
18    the linting and the fraying and the
19    roping affected safety and performance,
20    although they maintained the
21    mechanically cut mesh on the market.
22  BY MR. GOSS:
23    Q.  And some of the complaints are
24  complaints that the material was stretching
25  to the point of being a string?

Page 443

1         MS. SUTHERLAND:  Objection.
2         THE WITNESS:  Yes.
3  BY MR. GOSS:
4    Q.  Have you ever heard of the term
5  "bow stringing"?
6    A.  Yes.
7         MS. SUTHERLAND:  Objection.
8  BY MR. GOSS:
9    Q.  Have you ever heard that in
10  connection with the problems that Jennifer
11  Ramirez has?
12    A.  Yes, I have.
13    Q.  And was Ethicon receiving
14  complaints about that type of problem back
15  as early as May of 2005?
16    A.  Yes.
17    Q.  Okay.  I'm going to hand you what's
18  been marked as Exhibit 35.
19    A.  Thank you.
20         (Exhibit Number 35 was
21    marked for identification.)
22  BY MR. GOSS:
23    Q.  And this document is entitled
24  "Clinical Expert Report."
25         Is that a document that came from

Page 444

1  Ethicon's files that you reviewed?
2    A.  Yes, it is.
3    Q.  Is it a document that formed the
4  basis of your opinions in this case?
5    A.  Yes, it is.
6    Q.  Who is Martin Weisberg?
7    A.  He's the senior medical director --
8  at this time, he was senior medical director
9  at Ethicon.
10    Q.  And this document is dated
11  April 18, 2006?
12    A.  That's correct.
13    Q.  What's a clinical expert report?
14    A.  It's essentially -- we talked
15  earlier -- we referred to the GHTF document
16  on clinical evaluation, and it's basically a
17  clinical evaluation that's been undertaken
18  by Dr. Martin Weisberg, who we just talked
19  about, and also a Dr. David Robinson, who is
20  a medical director at Ethicon, to assess
21  clinically the laser-cut mesh.
22    Q.  So this document, is this sometimes
23  referred to as a CER?
24    A.  Yes.
25    Q.  Certified expert report?

Page 445

1    A.  Yes.
2    Q.  So the CER was intended to assess
3  laser-cut mesh?
4         MS. SUTHERLAND:  Objection.
5         THE WITNESS:  Yes.
6  BY MR. GOSS:
7    Q.  Okay.  Well, did they endeavor to
8  assess laser-cut mesh?
9    A.  The only testing that was done to
10  assess the laser-cut mesh was benchtop
11  testing, and it was not done with laser-cut
12  mesh.  It was done with ultrasonically --
13  let's see.  Some of the testing was done
14  with ultrasonically-cut mesh, but there was
15  no testing in animals, no testing in humans.
16    Q.  What do you mean by "benchtop
17  testing"?
18    A.  Like the pictures we -- for
19  example, like the pictures we were just
20  looking at where there was -- it was a
21  tensile strength test to look at the
22  elongation of the mesh.  That would be a
23  type of benchtop testing, burst strength,
24  measurement of pore size, measurement of
25  various characteristics of the mesh on a

112 (Pages 442 to 445)

Peggy Pence, Ph.D.

Page 446

1    benchtop laboratory setting.
2        Q.  It has nothing to do with animal
3    testing?
4        A.  No.
5        Q.  Has nothing to do with human
6    testing?
7        A.  Not this type of testing, no.
8        Q.  At this time -- let's talk about
9    the background section there.  Does it
10   describe for us the reason they're doing
11   this testing?
12       A.  Yes.
13       Q.  Explain to the jury why they're
14   doing -- why they purport to be doing the
15   testing.
16           MS. SUTHERLAND:  Objection.
17           THE WITNESS:  Their rationale
18       for doing this is to switch from
19       mechanically cut as a response to, as
20       they term it, customer needs, that
21       customers expressed a desire for a mesh
22       with smoother edges rather than edges
23       with the ends of individual fibers
24       exposed, which is a reference to the
25       fraying, and also they note that

Page 447

1        customer feedback has indicated there
2        was some dissatisfaction with potential
3        fraying of the mechanically cut mesh.
4    BY MR. GOSS:
5        Q.  Okay.  And going to page 4, what
6    was the results of their testing with
7    respect to particle loss?
8        A.  That, on average, the mechanically
9    cut mesh lost approximately twice the number
10   of particles as the laser-cut mesh.
11       Q.  Did they ever, at this time or any
12   time after, do any clinical testing to
13   determine whether losing particle loss --
14   more particle loss was significant?
15       A.  No.
16       Q.  Would a reasonable and prudent
17   manufacturer have done that?
18           MS. SUTHERLAND:  Objection.
19           THE WITNESS:  Absolutely.
20   BY MR. GOSS:
21       Q.  They note that this study was
22   performed -- this is on page 4 -- that this
23   study was performed on ultrasonic-cut mesh
24   and not laser-cut mesh; is that right?
25       A.  That's what this document states,

Page 448

1    yes.
2        Q.  Why would a company, if you know,
3    why would they test ultrasound mesh instead
4    of laser-cut mesh if they're trying to
5    determine that the scope -- as they say on
6    the front page, "The project scope applies
7    to Prolene mesh laser cutting," and yet they
8    don't test laser cutting.
9            MS. SUTHERLAND:  Objection.
10   ///
11   BY MR. GOSS:
12       Q.  Do you know any plausible reason
13   why they did that that you've uncovered in
14   their files?
15       A.  No.  There was -- this was
16   inappropriate.
17       Q.  Did you find anything in their
18   files that said, "Hey, we're out of
19   laser-cut mesh.  Let's use some ultrasonic
20   mesh"?
21       A.  No.
22       Q.  Based upon your 40-plus years of
23   experience and your 40-plus years of
24   experience where you've designed testing,
25   clinical testing, benchmark testing, and

Page 449

1    advised companies on the appropriate testing
2    to do for a product, would that in any way
3    be appropriate testing for this product?
4            MS. SUTHERLAND:  Objection.
5            THE WITNESS:  Absolutely not.
6    BY MR. GOSS:
7        Q.  And to rely on testing like that,
8    would it be a violation of the standard of
9    care?
10           MS. SUTHERLAND:  Objection.
11           THE WITNESS:  Yes, it would.
12   BY MR. GOSS:
13       Q.  Okay.  I'm handing you what's been
14   marked as Exhibit 36.
15           (Exhibit Number 36 was
16       marked for identification.)
17   BY MR. GOSS:
18       Q.  Is that a document that you found
19   in Ethicon's files?
20       A.  Yes, it is.
21       Q.  Is it a document that you reviewed?
22       A.  Yes, it is.
23       Q.  Is it a document you relied upon in
24   forming your opinions in this case?
25       A.  Yes, it is.

113 (Pages 446 to 449)

Peggy Pence, Ph.D.

Page 450

1    Q.  And is it an Ethicon document?
2    A.  Yes.
3    Q.  And it's another one of these
4  string emails, is it not?
5    A.  Yes.
6    Q.  Actually, I guess, it's just --
7    A.  It's a couple.
8    Q.  Just a couple.  And it involves
9  Gene Kammerer.  We've talked about him?
10   A.  Yes.
11   Q.  He's an engineering fellow?
12   A.  Correct.
13   Q.  He's the one that did the slides we
14  were talking about?
15   A.  That's correct.
16   Q.  And then it also has Sunny Rha,
17  who's -- this identifies as operations
18  integrations, Ethicon, a Johnson & Johnson
19  Company; is that right?
20   A.  Yes.
21   Q.  I don't want to spend a lot of time
22  on this, but I simply want to ask:  What are
23  they talking about here at the beginning of
24  this about the French standards of particle
25  loss?  Explain to the jury what this

Page 451

1  discussion entailed.
2        MS. SUTHERLAND:  Objection.
3        THE WITNESS:  That there's a
4    new French standard test method for
5    determining particle loss, and the
6    difference between the TVT and the
7    competitors in that test is significant,
8    particularly almost tenfold more for TVT
9    particle loss with 8 percent of the mesh
10   falling off.
11 BY MR. GOSS:
12   Q.  Is that mechanically cut mesh?
13   A.  Yes.
14   Q.  Okay.  And the year of that is
15  June, 2006; is that right?
16   A.  Yes.
17   Q.  Why is that document important, if
18  at all, in your opinion?
19       MS. SUTHERLAND:  Objection.
20       THE WITNESS:  It documents that
21   8 percent of the mesh falls off, and
22   that's -- so you have 8 percent of
23   particles that potentially are loose,
24   either in the package or in the patient,
25   with no testing to determine that with 8

Page 452

1    percent of the mesh lost and the
2    structural integrity of that mesh
3    affected by the particle loss, how that
4    impacts both safety and effectiveness
5    when implanted.
6  BY MR. GOSS:
7    Q.  I'm going to hand you what's been
8  marked as Exhibit 37.
9    A.  Thank you.
10 ///
11       (Exhibit Number 37 was
12   marked for identification.)
13 BY MR. GOSS:
14   Q.  Is that a document that came from
15  Ethicon's files that you reviewed?
16   A.  Yes, it is.
17   Q.  Is it a document that you relied
18  upon in forming your opinions in this case?
19   A.  Yes, it is.
20   Q.  And it's dated November 18 of 2003?
21   A.  Yes.
22   Q.  Again, this is a document cc'ing
23  Gene Kammerer.  We talked about him?
24   A.  Right.
25   Q.  We talked about Brian Luscombe.

Page 453

1    A.  Yes.
2    Q.  It's from Marty Weisberg, and he is
3  the senior medical director of Gynecare?
4    A.  That's correct.
5    Q.  I just want you to focus on the
6  first paragraph of that document and tell me
7  whether or not this is a document that was
8  important to your opinions and, if so, why?
9        MS. SUTHERLAND:  Objection.
10       THE WITNESS:  Yes.  This
11   document is important to my opinions.
12   It documents that as far back as 2003,
13   November, 2003, actually prior to the
14   marketing of the TVT-O, that the company
15   had received a recorded total of 58
16   complaints of fraying, and it also
17   states that the fraying is inherent in
18   the design and construction of the
19   product and that any tension applied
20   exacerbates, makes that loss of
21   integrity and fraying worse, and that
22   when the fraying happens, just as we've
23   been talking about, several things
24   occur.
25         The mesh elongates in places

Golkow Technologies, Inc. - 1.877.370.DEPS

Peggy Pence, Ph.D.

Page 454

1    and narrows in places, and the small
2    particles may break off.
3  BY MR. GOSS:
4    Q.  Again, is that important to you
5  because it put the company on notice as to
6  problems?
7        MS. SUTHERLAND:  Objection.
8        THE WITNESS:  Absolutely.
9  BY MR. GOSS:
10    Q.  Does that put the company on notice
11  as to any problems?
12    A.  Absolutely, it does.
13        MS. SUTHERLAND:  Quit fixing
14    your questions.
15  BY MR. GOSS:
16    Q.  Okay.  Let me hand you what's been
17  marked as Exhibit 38.
18        (Exhibit Number 38 was
19    marked for identification.)
20  BY MR. GOSS:
21    Q.  Do you recognize this document?
22    A.  Yes, I do.
23    Q.  Is this a document that came out of
24  Ethicon's files?
25    A.  Yes, it is.

Page 455

1    Q.  Is it a document that you relied
2  upon in forming your opinions in this case?
3    A.  Yes, it is.
4    Q.  It appears to be a product pointer.
5  Is it something that seems to be a marketing
6  document?
7    A.  Yes.
8    Q.  Dated June 26, 2006?
9    A.  That's correct.
10    Q.  And I don't want to spend a long
11  time on this, but let's just -- is this
12  something that's directed to the sales
13  force?
14    A.  Yes.
15    Q.  And what's going on here?
16    A.  The company is going to market the
17  laser-cut mesh, but they are also going to
18  continue to have the mechanically cut mesh
19  on the market as well.
20        And so they're advising -- they're
21  advising with regard to that and providing
22  the rationale for why they're going to
23  maintain both the mechanically cut and the
24  laser-cut meshes on the market.
25    Q.  What did they say about particle

Page 456

1  loss and potential for mesh fraying?
2        MS. SUTHERLAND:  Objection.
3  BY MR. GOSS:
4    Q.  About third paragraph down in bold.
5    A.  Oh, that part.  Sorry.  I wasn't
6  sure which part you were referencing.
7        That the laser-cut mesh will be
8  available for customers who are concerned
9  about particle loss and fraying with the
10  mechanically cut mesh.
11    Q.  It states, "We decided to explore
12  the impact of cutting our present TVT
13  products on the laser cutter.  We found by
14  doing so, we reduced particulate loss as
15  well as the potential for mesh fraying."
16        Is that important?
17        MS. SUTHERLAND:  Objection.
18        THE WITNESS:  Yes.
19  BY MR. GOSS:
20    Q.  Why is that important?
21    A.  Again, and this is just another
22  document that discusses what the other
23  documents that we've been reviewing
24  addresses that the company is aware that
25  they have a methodology to reduce that

Page 457

1  particle loss and reduce fraying.
2    Q.  As of June 26, 2006, have they
3  still not conducted any clinical tests?
4    A.  They still have not.
5    Q.  In fact, I think on the -- they
6  say, "As a result of the laser-cutting
7  process, the edges of the mesh will appear
8  and may feel slightly different upon
9  stretching.  We have conducted several bench
10  tests."
11        Are those the tests we've been
12  talking about?
13    A.  Yes.
14    Q.  Again, what's the difference
15  between bench test and clinical test?
16    A.  Well, bench testing is done in a
17  laboratory setting on a benchtop.  It's
18  things like stretching the mesh and the
19  elongation tests that we talked about.
20  Tests of the physical properties, the
21  mechanical properties of the mesh.
22    Q.  Never been tested -- they weren't
23  testing it in a woman's pelvis, were they?
24    A.  No, they were not.
25    Q.  And the products on the market at

Golkow Technologies, Inc. - 1.877.370.DEPS

Peggy Pence, Ph.D.

Page 458

1  that time, 2006, never been tested in a
2  woman's pelvis; is that right?
3          MS. SUTHERLAND:  Objection.
4          THE WITNESS:  That's correct.
5  BY MR. GOSS:
6      Q.  Laser-cut mesh, at this point,
7  before it's been launched, has it been
8  tested in a woman's pelvis?
9      A.  Can you repeat your prior question?
10 That's what I understood it to be.
11     Q.  They're about to launch laser-cut
12 mesh.
13     A.  Yes.
14     Q.  At that point, has it even been
15 tested in a woman's pelvis?
16     A.  No.  No.
17     Q.  Okay.  And I believe when I showed
18 you early on some of the testimony that you
19 had reviewed, Piet Hinoul was somebody that
20 you had reviewed their testimony?
21     A.  Yes.
22         (Exhibit Number 39 was
23         marked for identification.)
24 BY MR. GOSS:
25     Q.  I'm handing you what's been marked

Page 459

1  as Exhibit 39 entitled "Trial Proceedings."
2         And this, on the front page,
3  identified -- is identified as trial
4  proceedings from the Linda Batiste trial in
5  Dallas, Texas.
6         Are you familiar with that trial?
7      A.  I am.
8      Q.  Did you testify at that trial?
9      A.  Yes, I did.
10     Q.  And it's dated March 27, 2014.
11         Do you recognize this as the
12 testimony of Piet Hinoul?
13     A.  Yes, I do.
14     Q.  In fact, let me -- I'm just going
15 to go ahead -- I'm not going to use it, but
16 I want to put it in the record.
17         (Exhibit Number 40 was
18         marked for identification.)
19 BY MR. GOSS:
20     Q.  I'm going to hand you Exhibit 40,
21 and I'll represent to you that Exhibit 40 is
22 the trial testimony of Piet Hinoul, and what
23 Exhibit 39 is, if you want to assure
24 yourself of it, is some excerpts taken from
25 that trial testimony.

Page 460

1          Do you want me to help you?
2      A.  I was just looking for the start of
3  his testimony.  Do you know what page number
4  it starts?  Based on my prior review, it
5  looks to be the same, but I will verify.
6      Q.  On page 65, there is the total
7  transcript, and you will see the excerpt
8  that I've handed you is an excerpt from
9  there.
10     A.  Yes.
11     Q.  So reading from page 65 of that
12 transcript, and I'd like for you to read to
13 yourself page 65, lines 12, through page 66,
14 line 12, and let me know if that's testimony
15 that you reviewed in forming your opinions
16 in this case and whether it's something you
17 relied upon.
18     A.  Yes, I did.
19     Q.  Okay.  And this is March -- this
20 testimony is March 27, 2014?
21     A.  Correct.
22     Q.  Question -- this is Piet Hinoul.
23 He's medical director; right?
24     A.  Yes.
25     Q.  Worldwide medical director?

Page 461

1      A.  Yes, he was.
2      Q.  For Ethicon.
3      A.  Yes.
4      Q.  Pretty high up.
5      A.  Very much so.
6      Q.  "And that was the story that was
7  told to doctors, correct, that they're
8  identical, essentially" -- that they're
9  identical, essentially; right?"
10         Talking about mechanically cut
11 versus laser cut; right?
12     A.  Yes.
13     Q.  "And you told doctors that one
14 won't cause any more medical problems than
15 the other; right?
16         "ANSWER:  And that's what we still
17 say today, yes.
18         "And there's never been a study,
19 even in the literature, there has never been
20 a study that specifically looked at the
21 mechanically cut mesh versus the laser-cut
22 mesh to determine whether or not one is more
23 dangerous than the others; correct?
24         "ANSWER:  Correct?
25         "Of all those thousands of doctors

Peggy Pence, Ph.D.

Page 462

1  that you're paying, many of which you're
2  paying to do studies, never any of them, you
3  never asked any of them to do that study;
4  correct?
5       "ANSWER: You say a lot of the
6  things in your sentence here.
7       "QUESTION: Have you ever asked any
8  doctor, any paid consultant that you're
9  asking to do studies, to do a study
10 specifically looking whether or not there is
11 more injuries to women with mechanically cut
12 mesh versus laser-cut mesh? Have you ever
13 asked anybody to do that?
14      "We have not."
15      Did you rely upon that testimony in
16 forming your opinions?
17 A.  Yes, I did.
18      MS. SUTHERLAND: Objection.
19 BY MR. GOSS:
20 Q.  And what's your opinion about that
21 testimony?
22      MS. SUTHERLAND: Well,
23 objection.
24      THE WITNESS: There was never
25 any testing done. That's a violation of

Page 463

1       the standard of care. Testing should
2       have been long done long before this.
3  BY MR. GOSS:
4  Q.  As of March 2014, still hadn't done
5  any testing?
6  A.  Still hadn't done any. Should have
7  been done prior to -- prior to launch.
8  Q.  What should have been done prior to
9  launch?
10 A.  Clinical testing should have been
11 done prior to launch of the laser-cut mesh,
12 but when they first became aware of the
13 problems with the mechanically cut mesh,
14 they should also have done clinical testing.
15      To determine if they were going to
16 maintain that on the market, they should
17 have done clinical testing to determine the
18 impact on safety and effectiveness.
19 Q.  Okay. So we've analyzed these
20 documents where is it safe to say -- is it
21 fair to say that we've analyzed some
22 documents that have put the company on
23 notice or at least advised the company that
24 there may be more particle loss and more
25 fraying with mechanically cut mesh than

Page 464

1  laser-cut mesh?
2       MS. SUTHERLAND: Objection.
3       THE WITNESS: Definitely, yes.
4  BY MR. GOSS:
5  Q.  Okay. Did your review and
6  investigation of Ethicon's files, did you
7  find any documents or any PowerPoints or
8  anything or any emails that reflected why
9  Ethicon kept mechanically cut mesh on the
10 market instead of just selling laser-cut
11 mesh?
12      MS. SUTHERLAND: Objection.
13      THE WITNESS: Yes, I did.
14 BY MR. GOSS:
15 Q.  And what did those documents
16 reflect?
17 A.  The TVT was the first polypropylene
18 sling kit that was on the market and had
19 been on the market since 1998. The company
20 had clinical data from the inventor and
21 associates of the inventor dating back to
22 1996 to 1998 on the product.
23      Compared to other meshes that were
24 on the market, they had what they considered
25 a competitive advantage because they could

Page 465

1  claim having clinical data on the TVT
2  retropubic product dating back to the late
3  1990s, and they didn't want to lose the
4  advantage of that competitive -- that
5  competitive clinical data. Or that clinical
6  data that they felt was a clinical
7  advantage.
8  Q.  Clinical history?
9  A.  Yes. Clinical edge.
10 ///
11      (Exhibit Number 41 was
12      marked for identification.)
13 BY MR. GOSS:
14 Q.  Okay. I'm going to hand you what's
15 been marked as Exhibit 41.
16 A.  Thank you.
17 Q.  Is this a document that came from
18 Ethicon's files that you reviewed?
19 A.  Yes, it is.
20 Q.  Is it a document you relied upon in
21 forming your opinions in this case?
22 A.  Yes.
23 Q.  And it's from Allison London Brown.
24 Who is Allison London Brown? I believe
25 she's a product director?

117 (Pages 462 to 465)

Peggy Pence, Ph.D.

Page 466

1    A.  Yes.
2    Q.  To Dan Smith, who we talked about
3  is an engineer.
4    A.  Correct.
5    Q.  Was he project lead?
6    A.  Yes.
7    Q.  And it's "Mechanical-Cut Versus
8  Laser-Cut Mesh Rationale."  That's what we
9  were just talking about, wasn't it, what was
10 the reasoning, what was the rationale?
11   A.  That's correct.
12   Q.  Okay.  And let's go about halfway
13 down that document.  Do you see where it
14 says, "Additionally," and this is Allison
15 London Brown giving the rationale.
16   A.  Yes.
17   Q.  "Additionally, the mechanically cut
18 TVT mesh can be stretched to deformation,
19 creating a rope if not placed properly."
20     We've seen other documents about
21 roping?
22   A.  Yes, we have.
23   Q.  Okay.  "Some physicians perceived
24 could irritate/damage the urethra, as
25 competition honed in, this aspect of the

Page 467

1  Gynecare TVT product."
2      It says, "In order to alleviate
3  concerns/meet customers needs, the team
4  identified two corrections."
5      One talks about the sheath.  But
6  the second one says, "The use of laser
7  cutting for processing which minimized
8  particulate loss as the material was
9  somewhat melted as it was cut, thus keeping
10 mostly cut loops intact."
11     Is that consistent with the other
12 documents you've seen?
13       MS. SUTHERLAND:  Objection.
14       THE WITNESS:  Yes, it is.
15 BY MR. GOSS:
16   Q.  And why is that important?
17       MS. SUTHERLAND:  Objection.
18       THE WITNESS:  That, again, is a
19   document -- another document that
20   substantiates that they knew that there
21   was an issue with mechanically cut mesh.
22   They knew that laser cutting mesh
23   minimized the particle loss and that
24   that would alleviate the concerns of
25   some customers who were concerned about

Page 468

1  fraying and roping.
2  BY MR. GOSS:
3    Q.  If a manufacturer believed that
4  mechanically cut mesh -- if they believed
5  that it caused roping, and that manufacturer
6  believed that laser-cut mesh eliminated
7  roping, what do the safety principles say
8  they should do?
9        MS. SUTHERLAND:  Objection.
10       THE WITNESS:  They should
11   validate through clinical testing the
12   laser-cut mesh to assure that the
13   difference in characteristics in the
14   laser-cut mesh versus the mechanically
15   cut mesh didn't create safety and
16   effectiveness issue and move to market.
17       Assuming safety and
18   effectiveness was demonstrated, moved
19   towards marketing the laser cut and
20   discontinuing the mechanically cut.
21 BY MR. GOSS:
22   Q.  Okay.  Then under the second point
23 there, I believe, this relates to what you
24 were testifying about, the clinical data and
25 preserving the clinical data.  They say, "In

Page 469

1  order to continue to claim" -- Allison
2  London Brown says, "In order to continue to
3  claim the use of seven-year data in all
4  clinical studies, the MCM and LCM needed to
5  show similar properties with physical
6  properties being used as a proxy for the
7  clinical needs."
8      What does that mean?
9        MS. SUTHERLAND:  Objection.
10       THE WITNESS:  It means that
11   they made the determination -- they
12   wanted to continue to use the clinical
13   data that they had dating back to the
14   late 1990s on the mechanically cut mesh,
15   which was used in the initial TVT
16   product, and in order to do that, they
17   made the determination that they would
18   assess physical properties, and if they
19   were similar enough based on Ethicon's
20   determination of what similar meant,
21   then they would use that instead of
22   doing clinical testing.
23 BY MR. GOSS:
24   Q.  If Ethicon admitted that laser-cut
25 mesh was superior to mechanically cut mesh

Golkow Technologies, Inc. - 1.877.370.DEPS

Peggy Pence, Ph.D.

Page 470

1  and offered only laser-cut mesh, is this
2  saying that they would not be able to rely
3  upon that seven-year data that they had
4  collected?
5      MS. SUTHERLAND:  Objection.
6      THE WITNESS:  Yes.
7  BY MR. GOSS:
8      Q.  And if they were unable to rely on
9  the seven-year data that they have
10 collected, what would be the effect of that?
11     MS. SUTHERLAND:  Objection.
12     THE WITNESS:  Well, their
13 concern is if they can't show similarity
14 for the laser-cut mesh, similar enough
15 that they can maintain the use of that
16 seven-year data, that they lose that
17 competitive advantage because other
18 polypropylene mesh slings that were on
19 the market by this time didn't have that
20 old data.
21     So if you look at some of the
22 documents we discussed earlier today,
23 both patient labeling, promotional
24 labeling, as I recall as I sit here
25 today, they discuss the long-term data.

Page 471

1      They reference the data that goes back
2      to the late 1990s, and so the company
3      relied on that as a competitive
4      advantage.
5  BY MR. GOSS:
6      Q.  If they admitted that laser-cut
7  mesh was different and better than
8  mechanically cut mesh, could they continue
9  to rely on that data?
10     MS. SUTHERLAND:  Objection.
11     THE WITNESS:  No.  They would
12 have to do some kind of testing to
13 assess whether or not they could rely on
14 that data.  It would not be the same.
15 BY MR. GOSS:
16     Q.  And would that cost money?
17     A.  Yes.
18     Q.  Would that cost time?
19     A.  Yes.
20     Q.  Would that cost profits?
21     MS. SUTHERLAND:  Objection.
22     THE WITNESS:  Yes.
23 BY MR. GOSS:
24     Q.  Would that allow their competitors
25 to gain a competitive edge over them?

Page 472

1      MS. SUTHERLAND:  Objection.
2      THE WITNESS:  Yes.  That was
3  their concern.
4  BY MR. GOSS:
5      Q.  Should a company ever -- strike
6  that.
7      Should a device manufacturer ever
8  put profits over safety?
9      MS. SUTHERLAND:  Objection.
10     THE WITNESS:  Never.
11 BY MR. GOSS:
12     Q.  Is that a violation of the standard
13 of care?
14     THE WITNESS:  Definitely.
15     MS. SUTHERLAND:  Objection.
16 BY MR. GOSS:
17     Q.  Is that a violation of the safety
18 principles that we discussed today?
19     MS. SUTHERLAND:  Objection.
20     THE WITNESS:  Yes, it is.
21     MR. GOSS:  Let me go for about
22 another ten minutes and that will be a
23 good stopping point.  Okay?  Not forever
24 but just a break.  But we've made good
25 time, and I'm going to cut a lot out of

Page 473

1  this.
2      MS. SUTHERLAND:  Obviously, I
3  can't leave.
4      MR. GOSS:  I'm going to ask the
5  court reporter.  You doing fine?  You
6  need a break here in about ten minutes?
7      THE REPORTER:  Yeah, about ten
8  minutes.
9      MR. GOSS:  Can you hold out ten
10 more minutes?
11 BY MR. GOSS:
12     Q.  Let me shift gears a little bit.
13 We've discussed this problem that existed --
14 well, there were some discussions internally
15 that we've identified about particle loss;
16 right?
17     A.  Yes.
18     Q.  And particle loss with mechanically
19 cut mesh; right?
20     A.  Correct.
21     Q.  Gene Kammerer compared particle
22 loss with mechanically cut mesh and
23 laser-cut mesh?
24     A.  That's correct.
25     MS. SUTHERLAND:  Objection.

119 (Pages 470 to 473)

Peggy Pence, Ph.D.

Page 474

1  BY MR. GOSS:
2    Q.  Now, over and above that particle
3  loss issue that was being discussed within
4  the company, was there an additional issue
5  relating to particle loss with respect to
6  the specific lot of mesh that Jennifer
7  Ramirez received?
8    A.  Yes, there was.
9    Q.  What was that issue?
10   A.  The company received two complaints
11 on that specific lot of particle loss.
12        (Exhibit Number 42 was
13       marked for identification.)
14 BY MR. GOSS:
15   Q.  Okay.  Let me hand you what's been
16 marked as Exhibit 42.
17        Is this a document that came from
18 Ethicon's files?
19   A.  Yes, it is.
20   Q.  Is this a document that you
21 reviewed with respect to your opinions?
22   A.  Yes, it is.
23   Q.  Is it a document that you relied
24 upon with respect to your opinions?
25   A.  Yes, it is.

Page 475

1    Q.  And this document is entitled
2  "Particles in TVT-O Blisters"?
3    A.  Yes.
4    Q.  The second page of Exhibit 42 is
5  "TVT-O Complaints"?
6    A.  Yes.
7    Q.  It says, "Since July, 2010, six
8  complaints have been recorded for the
9  following issue:  Foreign matter in TVT-O
10 blisters."
11       And then it lists the complaints;
12 right?
13   A.  Yes.
14   Q.  And it lists the product code;
15 right?
16   A.  Yes.
17   Q.  And is that 810081, is that the
18 same product code that was on the sticker
19 that we discussed earlier today for
20 Jennifer's lot?
21   A.  Yes.
22   Q.  Okay.  So she -- just so I'm clear,
23 they were receiving -- this document says
24 they were receiving complaints about a
25 specific batch; is that right?

Page 476

1        MS. SUTHERLAND:  Objection.
2  BY MR. GOSS:
3    Q.  Specific product code?
4    A.  For a specific product code, yes.
5    Q.  And that included Jennifer's?
6        MS. SUTHERLAND:  Objection.
7  BY MR. GOSS:
8    Q.  Or did that include Jennifer's?
9    A.  For the product code.  This was the
10 product code for mechanically cut mesh.
11   Q.  Go to page 3.  And this is a
12 PowerPoint we're looking at, is it not?
13   A.  Yes.
14   Q.  And it says, on the second sentence
15 there on page 3, "The presence of Prolene
16 particles in the blister is common for a
17 manual compared to laser code."
18       Why is that important?
19       MS. SUTHERLAND:  Objection.
20       THE WITNESS:  That is stating
21   what we've been discussing that the
22   manually-cut mesh has particle loss and
23   structural integrity degradation where
24   the laser code does not have those
25   same -- the laser-cut product does not

Page 477

1  have those same issues.
2  BY MR. GOSS:
3    Q.  Okay.  Let me hand you what's been
4  marked as Exhibit 43.
5        (Exhibit Number 43 was
6       marked for identification.)
7  BY MR. GOSS:
8    Q.  And this is another one of those
9  string emails; right?
10   A.  Yes.
11   Q.  And this is an email from -- let's
12 just start in the back, Kathie Chen, who
13 appears to be from J&J in Medical Taiwan; is
14 that right?
15   A.  Yes.
16   Q.  And she is writing an email to
17 Darlene Kyle; right?
18   A.  Yes.
19   Q.  This is dated July 1, 2010?
20   A.  Yes.
21   Q.  Now, Jennifer got her implant
22 September of 2010; right?
23   A.  That's correct.
24   Q.  And this is July 1 of 2010; right?
25   A.  July 5, yes.

120 (Pages 474 to 477)

Peggy Pence, Ph.D.

Page 478

1    Q.  I'm sorry.  July 5.
2    A.  Well, there are different dates on
3  here.  There's July 1 to July 5.
4    Q.  Couple months before Jennifer's
5  implant?
6    A.  Yes.
7    Q.  And it says, "Dear Darlene.  Good
8  day.  I've had some quality queries about
9  the product TVT obturator system.  Could you
10  please answer it for me.  Today our customer
11  found some tiny mesh pieces (about
12  2 millimeters) in the unopened tyvek box.
13  So they refused to accept the product TVT-O.
14  Could you please let me know why these" --
15  "why did these tiny mesh pieces fall within
16  the sterile package?  Is this product with
17  tiny mesh pieces safe to be used?"
18      And then the response is -- well,
19  she then writes again -- does she not? -- on
20  the first page following up this email
21  string?
22      MS. SUTHERLAND:  Objection.
23      THE WITNESS:  Yes.
24  BY MR. GOSS:
25    Q.  She's again saying, "We received

Page 479

1  another three cases, same as yesterday"?
2      MS. SUTHERLAND:  Objection.
3      THE WITNESS:  Yes.
4  BY MR. GOSS:
5    Q.  Okay.  Then Darlene who she was
6  writing to, and Darlene is, as I understand
7  it, she's an analyst, worldwide consumer
8  customer quality.  Does that seem right to
9  you?  It's not on here, but I think there's
10  some emails we're about to see.
11    A.  That would sound right then.  I
12  don't recall specifically.
13    Q.  This is a customer quality or
14  product quality issue?
15    A.  Yes, it is a product quality issue.
16    Q.  And so Darlene Kyle writes back to
17  Kathie and she says with respect to these
18  particle losses showing up in the unopened
19  package, "No, this is not normal nor do we
20  recommend using the product."
21      Is that important?
22      MS. SUTHERLAND:  Objection.
23      THE WITNESS:  Yes, it is.
24  BY MR. GOSS:
25    Q.  Why is that important to your

Page 480

1  opinion?
2    A.  It's stating -- essentially it's
3  saying this is a product defect, and the
4  product shouldn't be used.
5    Q.  Did you see anywhere where Ethicon
6  sent any Dear Doctor letter or any Dear
7  Healthcare Provider letter or told anybody
8  on the outside that this is not normal in
9  that product and that the product should not
10  be used?
11      MS. SUTHERLAND:  Objection.
12      THE WITNESS:  No.
13  BY MR. GOSS:
14    Q.  Do you see where they did any
15  voluntary recall or even thought about doing
16  a voluntary recall?
17      MS. SUTHERLAND:  Objection.
18      THE WITNESS:  No.
19  BY MR. GOSS:
20    Q.  Any discussion of voluntary recall?
21    A.  Nothing that I've ever seen.
22    Q.  Any discussion that you saw in
23  their files of advising doctors or
24  healthcare providers that there may be a
25  problem with one of these lots?

Page 481

1      MS. SUTHERLAND:  Objection.
2      THE WITNESS:  No.
3  BY MR. GOSS:
4    Q.  And, again, this particle loss,
5  what we're talking about here is separate
6  from the particle loss issue that we've been
7  discussing, is it not?
8      MS. SUTHERLAND:  Objection.
9  BY MR. GOSS:
10    Q.  I mean, this is about a specific
11  batch now; right?
12    A.  They only use the product code, but
13  they are talking, as best I can tell, they
14  are -- let me just take a moment to look at
15  this.  They're talking about the product
16  code for manually-cut mesh, and it appears
17  because it's coming from four cases and one
18  complaint coming from the same hospital.  I
19  don't see that it actually gives the --
20    Q.  Well, on the second page, it says
21  code 810081 within the --
22    A.  Right.  That's the code for TVT-O.
23    Q.  Okay.  Let's move on.  Anyway, so
24  they received these complaints; right?
25    A.  Yes.

121 (Pages 478 to 481)

Peggy Pence, Ph.D.

Page 482

1        MS. SUTHERLAND:  Objection.
2  BY MR. GOSS:
3      Q.  I'm going to hand you what's been
4  marked as Exhibit 44.
5          (Exhibit Number 44 was
6      marked for identification.)
7  BY MR. GOSS:
8      Q.  Do you recognize that document?
9      A.  Yes, I do.
10     Q.  And is that a document that came
11 from Ethicon's files?
12     A.  Yes, it is.
13     Q.  Is it a document that you relied
14 upon?
15     A.  Yes, it is.
16     Q.  And who's Meng Chen?
17     A.  She is an associate medical
18 director.
19     Q.  And Carolyn Brennan, who appears to
20 be a manager of women's health and urology,
21 worldwide customer quality?
22     A.  Correct.
23     Q.  This, again, is addressing this
24 particle loss issue?
25     A.  Yes, it is.

Page 483

1        MS. SUTHERLAND:  Objection.
2  BY MR. GOSS:
3      Q.  And Meng Chen, isn't she an
4  associate medical director?
5      A.  Yes, she is.
6      Q.  And Meng Chen responds -- with
7  addressing this issue responds to Cary
8  Brennan there in the middle of the page.
9  She says, "After careful review of the
10 available information in the files and
11 information provided by the manufacturing
12 site, the business unit medical director and
13 I feel that the possibility for the tiny
14 tape fragments observed in these five cases
15 to cause adverse consequences in a patient,
16 a device administrator or others should be
17 considered remote.  The presence of tiny
18 tape fragments in the product package is not
19 expected to change the product safety
20 profile."
21     Does it -- first of all, did you
22 see anywhere where they did any testing, or
23 there was any analysis done at all to
24 determine that it was remote?
25        MS. SUTHERLAND:  Objection.

Page 484

1        THE WITNESS:  No.  I did not
2      see any testing.
3  BY MR. GOSS:
4      Q.  Did you find anything like that in
5  their files?
6      A.  No, I did not.
7      Q.  If there was no such analysis in
8  their files, there was not any such analysis
9  done, to make a statement that it was
10 remote, would that be a violation of the
11 standard in the industry?
12        MS. SUTHERLAND:  Objection.
13        THE WITNESS:  Yes, it would.
14 BY MR. GOSS:
15     Q.  Okay.  I have two more, and then we
16 can break.  I'm handing you what's been
17 marked as Exhibit 45.
18     A.  Thank you.
19         (Exhibit Number 45 was
20     marked for identification.)
21 BY MR. GOSS:
22     Q.  This is another one of those email
23 chains.
24     A.  Yes.
25     Q.  So we start from the back.  First

Page 485

1  of all, let's identify some of these people
2  in this document.  First of all, is this a
3  document that came from Ethicon's files?
4      A.  Yes, it is.
5      Q.  Is it a document that you reviewed
6  with respect to your opinions?
7      A.  Yes, it is.
8      Q.  Is it a document that you relied
9  upon in forming your opinions?
10     A.  Yes, it is.
11     Q.  And looks like this is another
12 document involving Darlene Kyle.  Remember I
13 said earlier, she was an analyst, worldwide
14 customer quality.
15     Do you see that on the last page?
16     A.  Yes, I do.  Thank you.
17     Q.  And also I see Meng Chen's also
18 copied on these emails.  We just talked
19 about her.
20     A.  Correct.
21     Q.  And Shalot Armstrong.  She's a
22 manager -- it appears manager -- I think
23 she's a manager in quality systems and
24 compliance.
25     Do you think that's true?

Peggy Pence, Ph.D.

Page 486

1    A.  That sounds right, to the best of
2  my recollection.
3    Q.  Okay.  And they're talking about --
4  if you go to the bottom of page 1, and they
5  ask -- Darlene's asking Carlos Lugo-Ponce --
6  they're discussing this issue about whether
7  or not it's safe despite small pieces of
8  mesh that are being found in the packaging.
9    Do you see that?
10    A.  Yes, I do.
11    Q.  And what I want to ask you about is
12  Carlos Lugo-Ponce's response at the top
13  there is "Darlene, First, I recommend a
14  meeting rather than an email chain."  And
15  then he talks about at the bottom still
16  needing "a detailed understanding of how
17  this happens in the manufacturing level,
18  what defect classification this is, and how
19  frequent this is."
20    He's talking about -- is he talking
21  about the product?
22    MS. SUTHERLAND:  Objection.
23    THE WITNESS:  Yes, he is.
24  BY MR. GOSS:
25    Q.  Is he talking about a

Page 487

1  product-related issue?
2    A.  Yes.
3    MS. SUTHERLAND:  Objection.
4  BY MR. GOSS:
5    Q.  And product performance issue?
6    A.  Yes.  Product quality issue.
7    Q.  Okay.  And his first sentence there
8  is "First, I recommend a meeting rather than
9  an email chain."
10    Do you see that?
11    A.  Yes.
12    Q.  Now, after this email -- now we
13  just talked about how we didn't see much
14  going on with respect to where Meng Chen
15  came up with her determination that it was
16  remote.
17    A.  Yes.
18    MS. SUTHERLAND:  Objection.
19  BY MR. GOSS:
20    Q.  After this email that we're talking
21  about, which is Exhibit 45, where Carlos
22  says let's do meetings, not an email chain,
23  you didn't see much more after that, or did
24  you?
25    MS. SUTHERLAND:  Objection.

Page 488

1    THE WITNESS:  No, I have not.
2  BY MR. GOSS:
3    Q.  Okay.  Well, let me -- did the
4  company have a corporate policy regarding
5  careful communications?
6    MS. SUTHERLAND:  Objection.
7    THE WITNESS:  Yes, it did.
8    (Exhibit Number 46 was
9  marked for identification.)
10  ///
11  BY MR. GOSS:
12    Q.  I'm handing you what's been marked
13  as Exhibit 46.  And is this a document that
14  you reviewed in -- is this a document from
15  Ethicon's files?
16    A.  Yes, it is.
17    Q.  Is this a document that you
18  reviewed in connection with forming your
19  opinions in this case?
20    A.  Yes, it is.
21    Q.  And it's entitled "Introduction to
22  HCC:  Key Takeaways and Contacts."  And it's
23  talking about mission statement for HCC.  By
24  the way, do you know what HCC is?
25    A.  Yes.  It stands for healthcare

Page 489

1  compliance.
2    Q.  Okay.  And we just talked about the
3  email where they were talking about the
4  product and product performance, and Carlos
5  Lugo said let's not do this in writing?
6    A.  Yes.
7    MS. SUTHERLAND:  Objection.
8  BY MR. GOSS:
9    Q.  Let's have meetings?
10    MS. SUTHERLAND:  Objection.
11    THE WITNESS:  Yes.
12  BY MR. GOSS:
13    Q.  And let me turn you to the Bates
14  stamp 465 at the bottom, the last three
15  numbers are 465.
16    A.  Yes, I have it.
17    Q.  And the careful communications.
18    Do you see that?
19    A.  Yes, I do.
20    Q.  And it says at the bottom talking
21  about "With regards to electronic
22  communications."
23    Do you see that?
24    A.  Yes.
25    Q.  "Including email and text

Peggy Pence, Ph.D.

Page 490

1   message" -- let me start over.
2        "With regards to electronic
3   communications, including email and text
4   messaging, it is important to note no
5   product claims should ever be communicated
6   via email or text messaging."
7        Do you see that?
8   A.  Yes.
9   Q.  And was what they were talking
10  about in those last emails, were they
11  product claims?
12       MS. SUTHERLAND:  Objection.
13       THE WITNESS:  It relates to
14   product claims, yes.
15  BY MR. GOSS:
16  Q.  Okay.  And the company's policy is
17  this:  "Be very cognizant of what you're
18  communicating electronically as any and all
19  forms of communications can be discoverable
20  in a court of law."
21       Did I read that right?
22  A.  Yes.
23       MS. SUTHERLAND:  Objection.
24  BY MR. GOSS:
25  Q.  Is that this company's careful

Page 491

1   communication policy?
2   A.  Yes.  It's a part of it, yes.
3   Q.  I mean, should a reasonable and
4   prudent manufacturer be concerned about its
5   claims, its product claims and complaints by
6   customers, when handling those complaints,
7   should they be concerned about what's going
8   to be discovered in a court of law?
9        MS. SUTHERLAND:  Objection.
10       THE WITNESS:  The concern
11   should be about addressing the claims
12   and taking the appropriate corrective
13   and preventive actions.
14  BY MR. GOSS:
15  Q.  And does it appear to you based
16  upon your review of the file and -- that the
17  people in that email chain that they heeded
18  Carlos Lugo's instructions about no more
19  emails?
20       MS. SUTHERLAND:  Objection.
21   Calls for speculation.
22  BY MR. GOSS:
23  Q.  Did you see any further emails
24  where they were explaining, for example, how
25  they made the determination that it was

Page 492

1   remote?
2        MS. SUTHERLAND:  Objection.
3        THE WITNESS:  No.
4        MR. GOSS:  Okay.  Let's take a
5   break.
6        THE VIDEOGRAPHER:  With the
7   approval of counsel, going off the
8   record.  The time is approximately
9   8:18 p.m.
10       (Recess taken from
11   8:18 p.m. to 8:30 p.m.)
12       MR. GOSS:  Let's go on the
13   record.
14       It's been a long day.  I've
15  looked at my notes.  I think I probably
16  have time left of almost three hours.  I
17  think I would probably, from the
18  looks of my notes, get close to using
19  all that.  It's now -- is it 8:30 our
20  time?  8:30 California time, 10:30
21  Dallas time.
22       The court reporter has told me
23  she doesn't have three hours left in
24  her.  I think I believe her.  And I've
25  talked with the witness.

Page 493

1        Peggy, you can be made
2   available next Thursday or Friday for
3   two-and-a-half hours.
4        THE WITNESS:  That's correct.
5        MR. GOSS:  Okay.  I'm
6   available.  I understand the doctor's
7   lawyer will make somebody available, and
8   I understand from you, Kari, that you
9   have a firm retreat, but you will try to
10   find coverage.
11       MS. SUTHERLAND:  I will do
12   whatever I can to find coverage.  Would
13   you object if, worst-case scenario, we
14   had to have somebody cover it by phone
15   instead of being here?
16       MR. GOSS:  I don't care.
17   That's fine.  That's fine.  Truthfully,
18   I would do it by phone if I didn't have
19   to hand exhibits.
20       MS. SUTHERLAND:  And as I
21   understand it, you are taking the
22   position that defense counsel is limited
23   to the time that I had left from my six
24   hours, which I think the videographer
25   told me is eight minutes; is that

124 (Pages 490 to 493)

Peggy Pence, Ph.D.

Page 494

1   correct?
2          MR. GOSS:  Right.
3          MS. SUTHERLAND:  All right.
4   And I would just note an objection to
5   that, that plaintiffs did not
6   cross-notice this deposition.  I had no
7   notice that this was going to be a trial
8   deposition.  I certainly didn't prepare
9   for a trial cross-exam, and so I would
10  preserve whatever objection might
11  possibly be available to me under Texas
12  law to come back and do a thorough
13  cross-exam of the witness, either me or
14  somebody from the trial team.
15         MR. GOSS:  I note your
16  objection.  I don't agree with it under
17  Texas law.  We didn't have to
18  cross-notice it.  Anyway, we don't have
19  to argue about that.  I got your
20  objection.
21         MS. SUTHERLAND:  Yeah.  It is
22  what it is.  I had my marching orders to
23  get that on the record, and I have.
24         MR. GOSS:  You've got to tell
25  your local -- anyway, we don't need to

Page 495

1   get into that.  It's been a long day.
2   Thanks, everybody.  I think we all
3   cooperated, and obviously, I'm not
4   passing the witness.  We're adjourned.
5          MS. SUTHERLAND:  Right.  And as
6   soon as I know which day will work for
7   coverage, I will let everybody know.
8          MR. GOSS:  Okay.  Yeah.  And
9   just so we're all clear, I don't
10  think -- I'm certain that I'm not going
11  to convince anybody to come take my
12  place.
13         MS. SUTHERLAND:  That's my
14  fear.
15         MR. GOSS:  Obviously, I don't
16  have any problem with switching out
17  lawyers and all that.  I understand.
18  Okay.  All right.  Thank you.
19         (Whereupon the deposition
20  adjourned at 8:33 p.m.)
21
22
23
24
25

Page 496

1          REPORTER'S CERTIFICATE
2
3          The undersigned Certified Shorthand
4   Reporter licensed in the State of California
5   does hereby certify:
6          That the foregoing deposition was
7   taken before me at the time and place
8   therein set forth, at which time the witness
9   was duly sworn by me;
10         That the testimony of the witness
11  and all objections made at the time of the
12  examination were recorded stenographically
13  by me and were thereafter transcribed, said
14  transcript being a true copy of my shorthand
15  notes thereof.
16         I further declare that I have no
17  interest in the outcome of the action.
18         In witness whereof, I have
18  subscribed my name this 30th day of March,
19  2016.
20
21         _____
22              LISA MOSKOWITZ
23         CSR 10816, RPR, CRR, CLR
24         NCRA Realtime Systems Administrator
25

Page 497

1          LAWYER'S NOTES
2   PAGE    LINE
3   _____   _____  _____
4   _____   _____  _____
5   _____   _____  _____
6   _____   _____  _____
7   _____   _____  _____
8   _____   _____  _____
9   _____   _____  _____
10  _____   _____  _____
11  _____   _____  _____
12  _____   _____  _____
13  _____   _____  _____
14  _____   _____  _____
15  _____   _____  _____
16  _____   _____  _____
17  _____   _____  _____
18  _____   _____  _____
19  _____   _____  _____
20  _____   _____  _____
21  _____   _____  _____
22  _____   _____  _____
23  _____   _____  _____
24  _____   _____  _____
25  _____   _____  _____

125 (Pages 494 to 497)