# Exhibit C

Debra L. Fromer, M.D.

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF WEST VIRGINIA AT CHARLESTON

---------------------------------------------------------

IN RE:  ETHICON, INC., PELVIC      Master File No.

REPAIR SYSTEM PRODUCTS             2:12-MD-02327

LITIGATION                            MDL 2327

                                   U.S. DISTRICT JUDGE

                                   JOSEPH R. GOODWIN

---------------------------------------------------------



          GENERAL DEPOSITION of DEBRA L. FROMER, M.D.,

pursuant to Notice, on the 29th day of March 2016, at

RIKER, DANZIG, SHERER, HYLAND, PERRETTI, LLP, 500 Fifth

Avenue, New York, New York, commencing at 9:00 a.m.;

before DANA N. SREBRENICK, a Certified Court Reporter, a

Registered Realtime Reporter and Notary Public within

and for the State of New York.

Debra L. Fromer, M.D.

Page 2

1    APPEARANCES:
2         On behalf of Plaintiff:
3         MOTLEY RICE LLC
4         321 South Main Street
5         Providence, Rhode Island  02903
6         (401) 457-7728
7         BY:  FIDELMA L. FITZPATRICK, ESQ.
8         Ffitzpatrick@motleyrice.com
9
10        On behalf of Defendant:
11        RIKER DANZIG SCHERER HYLAND &
12        PERRETTI, LLP
13        Headquarters Plaza
14        One Speedwell Avenue
15        Morristown, New Jersey  07962
16        973.451.8472
17        BY:  MAHA M. KABBASH, ESQ.
18        Mkabbash@riker.com
19
20        RUPRECHT HART WEEKS RICCIARDULLI LLP
21        BY LINDSAY B. BEAUMONTH, ESQ.
22        53 Cardinal Drive, Suite 1
23        Westfield, New Jersey  07090
24        (908) 232-4800
25        Lbeaumont@rhwlawfirm.com

Page 3

1              - - -
2            I N D E X
3              - - -
4
5    Testimony of:
6         DEBRA L. FROMER, M.D.
7    BY MS. FITZPATRICK...................... 7
8    BY MS. KABBASH........................... 181
9
10             - - -
11          E X H I B I T S
12             - - -
13   FROMER
14   NO.       DESCRIPTION        PAGE
15   Exhibit 1    Notice to Take Deposition
16       of Debra L. Fromer M.D..... 6
17   Exhibit 2    TVT-O General Report, ..... 6
18   Exhibit 3    Prolift Expert Report of
19       Debra L. Fromer, M.D....... 6
20   Exhibit 4    Curriculum Vitae of Debra
21       L. Fromer, M.D.'s, ........ 6
22   Exhibit 5    February 2016 Reliance
23       List...................... 6
24
25

Page 4

1              - - -
2    E X H I B I T S (Continued.)
3              - - -
4    FROMER
5    NO.       DESCRIPTION        PAGE
6    Exhibit 6    Exhibit B to General
7        Expert Report of Debra L.
8        Fromer, M.D., ............. 6
9    Exhibit 7    February 3, 2016 and
10       March 3, 2016 invoices..... 34
11   Exhibit 8    List of articles........... 43
12   Exhibit 9    Document dated 3/29/2012,
13       re:  Master Consulting
14       Agreement.................. 83
15   Exhibit 10   Reclassification of
16       Urogynecological Surgical
17       Mesh Instruction FDA
18       Executive Summary dated
19       February 26, 2016.......... 88
20   Exhibit 11   Reclassification of
21       Urogynecological Surgical
22       Mesh Instrumentation
23       dated February 26, 2016.... 88
24
25

Page 5

1              - - -
2    E X H I B I T S (Continued.)
3              - - -
4    FROMER
5    NO.       DESCRIPTION        PAGE
6    Exhibit 12   Article titled Surgeon
7        for Street Urinary
8        Incontinence in Women:  A
9        systematic review and
10       meta-analysis, ............114
11   Exhibit 13   Retropubic Tension-Free
12       Vaginal Tape and
13       Inside-Out Transobturator
14       Tape:  A long-term
15       randomized trial...........125
16   Exhibit 14   Gynecare TVT Instructions
17       for Use....................139
18   Exhibit 15   Gynecare TVT Obturator
19       System....................139
20
21
22
23
24
25

2 (Pages 2 to 5)

Debra L. Fromer, M.D.

1    MS. FITZPATRICK:  We'll mark as 1, the depo
2  notice.
3    (Exhibit Fromer 1, Notice to Take Deposition
4  of Debra L. Fromer M.D., marked for identification.)
5    MS. FITZPATRICK:  We can mark as 2 the TVT-O
6  general report.
7    (Exhibit Fromer 2, TVT-O General Report,
8  marked for identification.)
9    MS. FITZPATRICK:  The Prolift report will be
10  number 3.
11    (Exhibit Fromer 3, Prolift Expert Report of
12  Debra L. Fromer, M.D., marked for identification.)
13    (Exhibit Fromer 4, Curriculum Vitae of Debra
14  L. Fromer, M.D.'s, marked for identification.)
15    MS. FITZPATRICK:  Let me mark the February
16  2016 reliance list as 5.
17    (Exhibit Fromer 5, February 2016 Reliance
18  List, marked for identification.)
19    MS. FITZPATRICK:  This is 6.
20    (Exhibit Fromer 6, Exhibit B to General Expert
21  Report of Debra L. Fromer, M.D., marked for
22  identification.)
23    DEBRA L. FROMER, M.D., doing business at 360
24  Essex Street, Hackensack, New Jersey 07601, having first
25  been duly sworn by the Certified Court Reporter of the

1  State of New Jersey was examined and testified as
2  follows:
3    - - -
4    EXAMINATION BY MS. FITZPATRICK:
5    - - -
6    Q   Good morning, Dr. Fromer.  My name is Fidelma
7  Fitzpatrick.  Have you been deposed before?
8    A   Yes.
9    Q   So we'll go through a series of questions.
10  We're going to try to get through it as quickly as
11  possible today.  If at any point you need a break, you
12  need to stretch your legs, just let me know and I'll be
13  happy to take a break.  Otherwise, we'll just plow right
14  through until we get to the end.
15    And if you at any point in time don't
16  understand something that I've asked or don't understand
17  something that I've said, please let me know.
18  Otherwise, I'll just assume that you understood the
19  question and we can move on.
20    Today -- actually, last night your counsel
21  provided me with a new copy of your CV.  Do you have
22  that in front of you?  It's marked as Exhibit 4.
23    A   It might be here.
24    Q   Okay.
25    A   You can mark off the original.

1    Q   And we had previously been provided with a
2  copy of your CV with the expert report that you
3  generated in this case.  And can you tell me what the
4  difference is between your old CV that was provided with
5  your report, and the CV that I was provided last night?
6    A   I believe there's only one updated item and
7  that is under presentations.  So, the first presentation
8  listed occurred, I'll say November, late November.
9    Q   Okay.
10    A   This was a lecture given to the department of
11  OB/GYN.
12    Q   And that was a lecture give at Hackensack
13  University Medical Center?
14    A   Correct.
15    Q   And is that the only addition or change
16  between the original CV that was provided to us in
17  connection with your expert report and the CV that I was
18  provided last night?
19    A   Do you have the old -- the older CV, and I'll
20  just double check and make sure that there --
21    Q   I sure do.
22    A   -- are no additional publications?
23    Yes, that's the only addition.
24    Q   Great, thank you.
25    Now, you attended the University of

1  Pennsylvania for your undergraduate, correct?
2    A   Correct.
3    Q   And Tufts University for medical school?
4    A   Correct.
5    Q   And you did your internship and residency at
6  New York-Presbyterian Hospital?
7    A   Correct.
8    Q   Have you done a fellowship?
9    A   No.
10    Q   And what are your board certifications?
11    A   I was certified in general urology in 2005.
12  And then the year that the subspecialty certification
13  for FPMRS came out, I sat for that board and passed.
14  And so I became subspecialty certified in 2015.
15    Q   And what you're talking about is female pelvic
16  medicine and reconstructive surgery, correct?
17    A   Correct.
18    Q   And that was 2013 that you became certified in
19  that?
20    A   That's correct.
21    Q   And you're not a gynecologist, correct?
22    A   That is correct.
23    Q   And you're not a urogynecologist, correct?
24    A   That is correct.
25    Q   Now, you're currently affiliated with

3 (Pages 6 to 9)

Debra L. Fromer, M.D.

Page 10

1   Hackensack University Medical Center?
2       A   Correct.
3       Q   As well as the New York-Presbyterian
4   Hospital/Weill Cornell Medical Center, correct?
5       A   That is correct.
6       Q   In your work, have you come across Dr. Jerry
7   Blaivas?
8       A   I have talked to him at meetings.
9       Q   Okay.
10      A   We have had conversations by phone regarding
11  mutual patients.
12      Q   Okay.  And in connection with your work with
13  the Cornell Medical Center, have you had any
14  professional involvement with him beyond discussing
15  patients?
16      A   No.
17      Q   And how many patients have you had with
18  Dr. Blaivas?
19      A   Mutual patients?
20      Q   Mutual patients, yeah.
21      A   I can only think of one in recent years and
22  another one many years ago, maybe five or ten years ago.
23      Q   Okay.  Now, you're a member of the Society For
24  Urodynamics in Female Urology, correct?
25      A   That's correct.

Page 11

1       Q   The American Urological Association?
2       A   Correct.
3       Q   The New York section of the American
4   Urological Association?
5       A   Correct.
6       Q   The Kidney and Urology Foundation of America?
7       A   Yes.
8       Q   The International Continence Society?
9       A   Correct.
10      Q   The Society of Women in Urology?
11      A   Yes.
12      Q   And you're a reviewer for urology and
13  urodynamics?
14      A   Correct.
15      Q   And on the editorial board of Canadian Journal
16  of Urogynecology, correct?
17      A   Correct.
18      Q   Now, you have never written a peer-reviewed
19  article or journal on polypropylene mesh, correct?
20      A   That's correct.
21      Q   And you've never written a peer-reviewed
22  journal article on the Burch procedure, correct?
23      A   Can you go back to the previous question you
24  asked?
25      Q   Uh-huh.

Page 12

1       A   I did publish an article in the Canadian
2   Journal of Urology.
3       Q   Okay.  And which article is that?
4       A   If you look at our publications.  So number 2,
5   Techniques to Avoid Complications in Transvaginal Mesh
6   Surgery.
7       Q   Okay.  And that was published in 2015?
8       A   Correct.
9       Q   Okay.  And apart from that, is there any other
10  peer-reviewed journal article that you have published on
11  polypropylene mesh?
12      A   No.
13      Q   And you've never written about the Burch
14  procedure, have you?
15      A   No.
16      Q   And you've never written about pubovaginal
17  slings, have you?
18      A   No.
19      Q   And you're not an academic physician; you're a
20  physician in private practice, correct?
21      A   That's not correct.
22      Q   Okay.  You'll agree with me that you're not an
23  expert in chemical engineering, are you?
24      A   What do you mean by that?
25      Q   Do you know what the field of chemical

Page 13

1   engineering deals with?
2       A   Well, polypropylene mesh is probably one thing
3   that chemical engineering may evaluate.  However, I'm
4   not a chemical engineer.  I was not trained in chemical
5   engineering, but I am very familiar with the usage of
6   some things that chemical engineers may be looking at.
7       Q   Okay.  What type of polypropylene is used in
8   the Prolift?
9       A   What -- for example?  What do you mean?
10      Q   Do you know that there are different types of
11  polypropylene?
12      A   Well, the general -- the polypropylene that we
13  use is monofilament large pore mesh that -- are you --
14  is there -- then I'm not familiar with the different --
15      Q   Okay.  You understand that meshes are made
16  from polypropylene, correct?
17      A   That is correct.
18      Q   And that polypropylene is spun or woven or
19  knit into the various meshes that are used for pelvic
20  organ prolapse and stress urinary incontinence, correct?
21      A   That's correct.
22      Q   And so the basic polypropylene, before you get
23  it to a mesh, do you know the different types of
24  polypropylene that exist?
25      A   No.

4 (Pages 10 to 13)

Debra L. Fromer, M.D.

Page 14

1    Q    Do you know anything about the antioxidants
2    that are added to polypropylene as they're used in the
3    Ethicon products?
4        A    I have read about it in company documents.
5        Q    What antioxidants are used in the Prolene
6    products?
7        A    I can't recall.
8        Q    Have you had any training in that beyond
9    reading company documents?
10       A    No.
11       Q    And you agree with me that you're not a
12   chemical engineer by training?
13       A    Correct.
14       Q    And you're not an expert in pathology,
15   correct?
16       A    I'm not a pathologist.  However, I grossly
17   inspect polypropylene mesh after explantation or on
18   reoperation.
19       Q    Okay.
20       A    And I have spent some time in the pathology
21   lab looking at pathologic specimens.
22       Q    Okay.  Have you spent time in the pathology
23   lab microscopically looking at explanted polypropylene
24   meshes?
25       A    No.

Page 15

1    Q    Have you ever seen an explanted polypropylene
2    mesh microscopically?
3        A    Yes, I've seen images.
4        Q    And are those images of patients that you
5    removed it from?
6        A    No.  I've seen images in the literature.
7        Q    Okay.
8        A    And in lectures.
9        Q    Now, you've actually removed polypropylene
10   mesh from patients, correct?
11       A    Correct.
12       Q    Do you send that to a pathologist --
13       A    Yes.
14       Q    -- for examination?
15       A    Yes.
16       Q    And what do you look for in that examination?
17   What do you request from the pathologist when you do
18   that?
19       A    I am not requesting anything specific.  And
20   generally, the pathologic reports are generally similar.
21       Q    What do you mean by that?
22       A    The typical findings that we might see in
23   postsurgical specimens which might include scar tissue,
24   inflammatory response.
25       Q    Have you ever requested that the explanted

Page 16

1    mesh that you've reviewed be examined for degradation?
2        A    No.
3        Q    Beyond scar tissue and inflammatory response,
4    what else do you feel are typical of the findings that
5    you see in the pathology reviews of explanted mesh that
6    you've removed?
7        And that was probably the most confusing
8    question ever.  So let me start that -- let me start
9    that one all over again.
10       You testified that there were typical findings
11   in explanted meshes that you had removed, correct?
12       A    Correct.  That are consistent with other
13   postoperative specimens, not necessarily related to
14   polypropylene mesh.
15       Q    But they're present in the polypropylene mesh
16   samples that you've removed, correct?
17       A    Correct.
18       Q    And you have seen their scar tissue and
19   inflammatory response; that's what you had indicated,
20   correct?
21       A    Correct.
22       Q    Is there anything else that you believe is
23   typical for you to see in the pathology specimens that
24   you -- from polypropylene mesh that you have removed?
25       A    No.  Usually they state that the polypropylene

Page 17

1    mesh is intact, grossly intact, and under the microscope
2    intact.
3        Q    Anything else?
4        A    No.  And also -- I mean, just as an aside
5    going back to this question, one of the reasons why we
6    do send the explanted meshes is -- is mostly for
7    documentation that the mesh was, in fact, excised.
8        Q    So, when you send it, you want to make sure
9    that you got the mesh out, correct?  That's what's in
10   the specimen?
11       A    Well, I know that the mesh is there.
12       Q    Yes.
13       A    But I want it documented for future purposes
14   that the mesh was excised.
15       Q    And you're not looking, at that point, at
16   whatever particular disease processes or reactions that
17   the body had to the mesh, correct?
18       A    Correct.
19       Q    And you're not looking to see what reaction
20   the mesh had to the body, correct?
21       A    What reaction the mesh had to the body?
22       Q    You're not looking to see whether it degraded?
23       A    Well, degraded the body?  What do you mean?
24       Q    The mesh degraded, sorry.
25       When you send it to pathology, you're not

5  (Pages 14 to 17)

Debra L. Fromer, M.D.

Page 18

1   looking to see whether the mesh degraded in the body,
2   correct?
3       A   That is correct because I don't believe it to
4   be significant.
5       Q   That's because you don't believe it to be
6   significant, but you never actually looked for that
7   pathology, correct?
8           UNIDENTIFIED SPEAKER:  Objection.
9       A   That's correct.
10  BY MS. FITZPATRICK:
11      Q   All right.  And --
12      A   However -- however, like I said, they usually
13  do mention that the mesh is intact.
14      Q   Okay.  And you believe that mentioning it
15  intact means it has not microscopically degraded in any
16  level?
17      A   That the mesh is there, physically present.
18      Q   Okay.  But you're not trained in pathology,
19  correct?
20      A   I did not do a fellowship training in
21  pathology.
22      Q   Okay.  Now, talking about your clinical
23  practice, how many slides have you microscopically
24  examined of patients from whom you have removed mesh?
25      A   How many slides have I examined in patients?

Page 19

1       Q   Uh-huh.
2       A   None.
3       Q   Okay.
4       A   And I also don't -- I remove mesh maybe once,
5   twice a year, so it's not a very frequent occurrence.
6       Q   How often have you removed mesh total in your
7   career?
8       A   This is an estimate?
9       Q   Yes.
10      A   I would say between 10 and 20 cases in my
11  career.
12      Q   And have you sent all of those 10 to 20 cases
13  to a pathologist for review?
14      A   Yes.
15      Q   You agree with me that you're not a trained
16  expert in polymer chemistry, are you?
17      A   I'm not a trained expert in polymer chemistry.
18      Q   And you've never done bench research on
19  polypropylene, have you?
20      A   No.
21      Q   And you've never done any lab research on
22  polypropylene, have you?
23      A   No.
24      Q   You agree with me that you're not a
25  biomaterials specialist?

Page 20

1       A   I'm not a biomaterials expert.  However, as
2   I've said before, having implanted over a thousand women
3   with polypropylene mesh, I have a lot -- a great amount
4   of experience in the usage of polypropylene mesh in the
5   clinical setting.
6       Q   Okay.  But I just want to make sure, for the
7   purposes of this deposition, that I'm deposing you on
8   what you're an expert in.
9           We're here to talk about the clinical
10  implications of using polypropylene mesh, correct?
11      A   That's correct.
12      Q   And you're not here to talk about the
13  properties of the polypropylene mesh itself outside of
14  the body?
15      A   You're saying invitro?
16      Q   Outside of the body.
17      A   Correct.
18      Q   And you're not here to talk about the
19  biomaterial property of the polypropylene that is used
20  in Prolene mesh in any way, are you?
21      A   I'm not, not in the extent of my handling it
22  for surgical purposes.
23      Q   Okay.  And you're not here to talk about the
24  effect of antioxidants on the polypropylene that is used
25  in the Prolift and the TVT-O, correct?

Page 21

1       A   Not to the extent that it affects my clinical
2   usage of it.
3       Q   Do you believe that polypropylene creates a
4   foreign body reaction when implanted?
5       A   I believe that polypropylene creates a
6   reaction that is typical of any implant in the human
7   body, which is -- and also occurs in any surgical
8   procedure that we do on patients, which is basically an
9   acute inflammatory response that then settles down to a
10  clinical physiologic response.
11      Q   Do you believe that polypropylene can create a
12  chronic foreign body reaction when implanted into the
13  pelvis?
14      A   Again, I believe the mesh incorporates into
15  the body.  I believe it is a foreign body.  I believe
16  that we all react to foreign bodies in a very similar
17  and reproducible way, and that settles into a chronic,
18  but clinically not pathologic, reaction.
19      Q   You're not an expert on warnings, are you?
20          MS. KABBASH:  Objection.
21      A   I have great experience in reading warnings,
22  in reviewing warnings, in reviewing the medical
23  literature as it relates to the warnings in -- in --
24  particularly with respect to this litigation, in
25  reviewing the surgeon's monograph, in reviewing the

6  (Pages 18 to 21)

Debra L. Fromer, M.D.

Page 22

1   IFUs. I've had experience in developing warnings for
2   pharmaceuticals. So though I may not be an expert in
3   dealing with the FDA on a direct basis, I do have a lot
4   of experience with warnings.
5   BY MS. FITZPATRICK:
6       Q   What IFUs have you written?
7       A   I have not written any IFUs. However, I was
8   involved in developing warnings for a drug called Toviaz
9   made by Pfizer.
10      Q   And what does Toviaz do?
11      A   Toviaz. It's T-O-V-I-A-Z. It's an
12  anticholinergic in the treatment of overactive bladder.
13      Q   And when you said you were involved in the
14  development of warnings for that drug, can you tell me
15  exactly what it was that you did?
16      A   Sure. I was invited to participate in a
17  consultation group in the development of a package to be
18  given to patients as samples for the drug, and included
19  in that was warnings and side effects.
20      Q   Okay. So you were asked by Pfizer to get
21  involved in this consultation group, correct?
22      A   That's correct.
23      Q   And am I correct that Pfizer was interested in
24  your clinical experience in using this particular drug?
25      A   No. So the drug was not available at that

Page 23

1   time. The drug was in development, and they were
2   developing the packaging for the samples.
3       Q   What did you contribute to the warnings on
4   that packaging?
5       A   It was a while ago, so I can't specifically
6   remember what I said or what my recommendation was.
7   However, side effects and warnings were part of the
8   conversation.
9       Q   At the time that you did this, did you know
10  what the side effects of the drug were?
11      A   Well, we know what the side effects of all
12  anticholinergics are, and we were presented with data
13  from the company.
14      Q   Yeah. So at that time, you didn't have any
15  clinical experience on your own in using that drug,
16  correct?
17      A   That's correct.
18      Q   And so you were relying on the information
19  that Pfizer gave you about the potential side effects
20  from that particular drug, correct?
21          MS. KABBASH: Objection.
22      A   The studies that were performed before the
23  launching of the drug.
24  BY MS. FITZPATRICK:
25      Q   Okay. And those were studies that were funded

Page 24

1   by Pfizer?
2       A   I'm not sure.
3          MS. KABBASH: Objection.
4   BY MS. FITZPATRICK:
5       Q   And I want to know what involvement you
6   specifically had in developing the warnings for Toviaz.
7       A   Honestly, I don't remember the details of the
8   conversation with regards to warnings or even with
9   regards to the development of the materials that were
10  given to the patient. It was eight to ten years ago, I
11  would say.
12      Q   And did this consultation group have anything
13  to do with drafting the actual instructions for use that
14  would go to physicians?
15      A   I don't remember.
16      Q   So, apart from that experience you had eight
17  to ten years ago, what other experience have you had in
18  actually writing or drafting warnings for use with
19  either a medical device or a pharmaceutical?
20      A   That was it.
21      Q   Do you read the IFUs that come with the
22  products and drugs that you're using with your patients?
23      A   Yes.
24      Q   Do you consider them an important part of the
25  information that you, as a physician, have to understand

Page 25

1   the risks and benefits of a particular medical device?
2       A   No.
3       Q   Not important to you at all?
4       A   As I said, I read them. I've read them once,
5   generally, prior to using any new product.
6          However, there's nothing in there that I don't
7   already know. There's nothing novel that most surgeons,
8   who are doing these surgeries regularly, are not already
9   trained on and don't already know.
10      Q   But you would agree with me that an
11  instruction for use should be complete and accurate,
12  correct?
13      A   Again, I mean, I believe that surgeons should
14  not be relying on an IFU to know what the risks,
15  benefits, and how to use the products are. I believe
16  that they should have hands-on training and not learn
17  from a piece of paper how to do a surgery and what the
18  complications and risks are.
19      Q   And in addition to that, I mean there's a
20  reason that there's an IFU that goes along with a
21  medical device, correct?
22      A   You know --
23          MS. KABBASH: Objection.
24      A   -- I mean, I've always understood that to be
25  something that the FDA has required. I've understood it

7 (Pages 22 to 25)

Debra L. Fromer, M.D.

Page 26

1  to be something that is key in litigation. However, in
2  reality, in clinical practice, I -- I just don't think
3  it's as relevant as training and reading the literature
4  and attending conferences.
5  BY MS. FITZPATRICK:
6      Q  So let me take you back though.
7          Understanding that you believe that training
8  and reading the literature and attending conferences are
9  an important part of a physician's job; so we've
10 established that.
11         But I want to go back to this question about
12 the IFU. You understand, don't you, that the IFU
13 accompanies a medical -- there's a reason that a medical
14 device has an IFU with it, correct?
15         MS. KABBASH:  Objection.
16     A  Again, the -- there may be a reason, but I do
17 not, in my personal opinion, believe that the reason is
18 to train doctors on how to do the surgery and to know
19 the complications.
20 BY MS. FITZPATRICK:
21     Q  Okay. Then that's fine, but there's a reason
22 for it regardless of whether it's to train, correct?
23     A  Well, I can assume so, but I'm not -- you
24 know, I -- again, the reason may not make complete sense
25 to me.

Page 27

1      Q  Well, let me ask you it in a different way.
2          You'll agree with me that the IFU is one way
3  that a medical device manufacturer can communicate what
4  it knows about the risks and benefits of its products to
5  a physician, correct?
6      A  Sure.
7      Q  And you'll agree with me that even if you've
8  read the literature and even if you've gone to training
9  and even if you've gone to conferences, that a medical
10 device manufacturer also, separate and apart from that,
11 has an obligation to tell you, as a physician, what it
12 knows about the risks and benefits of its products,
13 correct?
14     A  Correct.
15     Q  And so even though you may not rely on it
16 exclusively, it is a source of information and the way
17 that a medical device manufacturer directly communicates
18 with the physician, correct?
19     A  Correct.
20     Q  And in doing so and having that communication,
21 you'll agree with me that a medical device manufacturer
22 has the obligation to be truthful and honest about the
23 risks and benefits associated with its products,
24 correct?
25     A  An obligation to whom?

Page 28

1      Q  The physicians.
2      A  I don't necessarily believe that. Again,
3  first of all, it's my --
4      Q  You don't think they have to be truthful and
5  honest?
6      A  Well, I didn't say they have to be dishonest.
7  I don't believe that they have to include everything
8  that a physician needs to know to operate on a patient.
9      Q  That wasn't my question though.
10         So I'm not asking you whether they have to
11 include everything that a physician needs to know to
12 operate on a patient. All I'm asking you is: In this
13 method of communication between a medical device
14 manufacturer and a physician, such as yourself, you
15 believe that a medical device manufacturer has an
16 obligation to be truthful and honest about the risks and
17 benefits associated with its product in the IFU,
18 correct?
19     A  Some of the risks and benefits, yes.
20     Q  What risks and benefits don't they have to
21 tell you?
22         Well, let me ask you this: What risks and
23 benefits don't they have to be truthful about?
24         MS. KABBASH:  Objection.
25     A  I don't believe -- I'm not sitting here saying

Page 29

1  that a company should be lying to physicians or doctors.
2  BY MS. FITZPATRICK:
3      Q  So we can agree that they shouldn't be lying
4  to --
5      A  They should always be honest, correct. We're
6  onboard with that.
7      Q  All right. That's all I was getting to.
8          And if a medical device company knows of a
9  risk inherent or specific to its medical device, you
10 believe they have an obligation to tell the medical
11 community about that, correct?
12     A  If it is inherent to the device, correct.
13     Q  Now, you've never designed a medical device,
14 have you?
15     A  I've been involved in the development of a
16 medical device.
17     Q  Have you ever designed a medical device?
18         MS. KABBASH:  Objection.
19     A  In terms of patenting it myself? Can you be
20 more specific?
21 BY MS. FITZPATRICK:
22     Q  Well, let me go back and ask you this: You
23 have -- let me get your exact language here because I
24 don't want to misstate you.
25         What has your involvement been in the

8 (Pages 26 to 29)

Debra L. Fromer, M.D.

Page 30

1  development of a medical device?
2      A  I consulted with AMS regarding the development
3  of their Elevate product.
4      Q  And when was that?
5      A  Well, probably about five years ago.
6      Q  And what was your role?
7      A  I used one of their novel devices that was not
8  yet launched on a cadaver to assess its use and give my
9  opinion on how it can be improved or whether it needed
10  to be improved.
11      Q  And was that the product that eventually
12  became the Elevate --
13      A  Yes.
14      Q  -- for the pelvic organ prolapse?
15      A  Yes.
16      Q  And what advice did you give AMS on how the
17  Elevate product could be improved?
18      A  I can't remember. I'm sure I had an opinion
19  on the shape of the trocars and the mesh itself, but I
20  can't recall specific details.
21      Q  And when did AMS approach you about this?
22      A  That was in the months prior to my visit.
23      Q  When would that have been?
24      A  I'm sorry. Prior to my -- I'm sorry.
25      Q  Okay.

Page 31

1      A  Let me go back.
2      Q  I thought I missed something.
3      A  I -- I -- my visit to AMS was however -- you
4  know, prior to the launch of Elevate. And I'm
5  estimating five, six years ago. And they contacted me
6  to make that visit in the months prior to my actual
7  visit. So I just don't remember the dates of it.
8      Q  And how much time did you spend giving AMS
9  feedback on the Elevate product before it was launched?
10      A  Three or four hours.
11      Q  Were you paid for your time?
12      A  Yes.
13      Q  And why did AMS select you?
14      MS. KABBASH: Objection.
15      A  I can't answer for them, but I suspect because
16  they knew that I had a high volume of patients with
17  prolapse and pelvic floor disorders.
18  BY MS. FITZPATRICK:
19      Q  And had you been using AMS products at the
20  time?
21      A  Yes. I think I was using some of their
22  products.
23      Q  And which products were you using?
24      A  At that time, Apogee and Perigee were
25  available. They had slings. However, I wasn't using

Page 32

1  them as much as the Gynecare products.
2      Q  Okay. When did you stop using AMS products?
3      A  I haven't.
4      Q  Which products do you currently use?
5      A  Anterior Elevate and MiniArc.
6      Q  Do you use any other manufacturer's products
7  besides AMS?
8      A  Yeah, I use the Gynecare products of slings.
9      Q  Sorry. I was taking that for granted since
10  that's what we're here about that. Anything besides
11  Gynecare and AMS?
12      A  I, on occasion, use the Capio, which is a
13  Boston Scientific product for native tissue repairs.
14      Q  Anything else?
15      A  That's it.
16      Q  Let's talk about your reports in this case.
17          You prepared actually four reports, correct?
18  You prepared the report on the Prolift that is marked as
19  Exhibit 3, correct?
20      A  Yes. I provided you a general report on
21  Prolift.
22      Q  Okay. And you also provided a general report
23  on the TVT-O, correct?
24      A  Correct.
25      Q  And did you also provide a general report on

Page 33

1  the TVT retropubic?
2      MS. KABBASH: Not in the MDL Wave 1.
3      MS. FITZPATRICK: Not in the MDL Wave 1?
4      MS. KABBASH: Right.
5  BY MS. FITZPATRICK:
6      Q  But you have provided a report on the TVT
7  retropubic before, correct?
8      A  Correct.
9      Q  And you've been deposed on that particular
10  product?
11      A  Correct.
12      Q  And that was in connection with the New Jersey
13  Ethicon litigation, correct?
14      A  Correct.
15      Q  And then in addition to that, you provided one
16  case-specific report in Mrs. Sacchetti's case that we'll
17  discuss later, correct?
18      A  Correct.
19      Q  So those are the only reports that you have
20  generated for Ethicon to date in any litigation?
21      A  That's correct.
22      Q  Okay. How much time did you spend reviewing
23  materials in order to write your Prolift report?
24      A  I have a little note I prepared for that
25  question. So the counsel has all the numbers up until

9 (Pages 30 to 33)

Debra L. Fromer, M.D.

1  March --
2      Q   Okay.
3      A   -- that they can provide you with a breakdown.
4          MS. KABBASH:  I have invoices for the time she
5  spent in Wave 1.
6          MS. FITZPATRICK:  Okay.  Super.  Let's start
7  with that one.  I'll get those marked.
8          MS. KABBASH:  These are three copies each.
9  There's a payment in February and a payment in March.
10         MS. FITZPATRICK:  Okay.  Great, okay.
11         So let's go ahead and mark these as Exhibit 7?
12         MS. KABBASH:  Yes.
13         MS. FITZPATRICK:  Yeah, 7.
14         MS. KABBASH:  I think they're collated by
15  three copies, so --
16         MS. FITZPATRICK:  Okay.
17         MS. KABBASH:  -- there's three.  You know, I
18  should take one for myself.
19         MS. FITZPATRICK:  Yeah, I got three.  You can
20  have one.  I'll keep one.
21         So why don't we mark the February 3, 2016, and
22  the March 3, 2016, invoices as 7.
23         (Exhibit Fromer 7, February 3, 2016 and March
24  3, 2016 invoices, marked for identification.)
25  BY MS. FITZPATRICK:

1      Q   So what I've put in front of you, as Exhibit
2  7, are a series of invoices.  The first one dated March
3  3rd, 2016, and that looks like that involves primarily
4  the preparation of your TVT-O report; is that correct?
5      A   These are for dates in January, for work in
6  January.
7      Q   Just looking through the description of
8  services, all relate to the TVT-O, correct?
9      A   Correct.
10     Q   And then you've got a second invoice that
11  looks like the work that you did in February?
12     A   Correct.
13     Q   And if I'm just quickly reviewing this, it
14  looks like this is work on the Prolift general report,
15  the TVT-O general report, and Mrs. Sacchetti's
16  case-specific report, correct?
17     A   That's correct.
18     Q   And are these two invoices an accurate
19  reflection of the work that you have spent on the Wave 1
20  cases through the end of February?
21     A   Yes.
22     Q   So I'm not going to do it now, but I could go
23  through and add up the hours that you spent on the
24  Prolift general report and that'd be pretty accurate for
25  preparation?

1      A   Yes.
2      Q   Since you've submitted these invoices, have
3  you done additional work for Ethicon?
4      A   Yes.
5      Q   And that would be starting in March?
6      A   Correct.
7      Q   Can you tell me what work you have done for
8  Ethicon in March?
9      A   Sure.  So, for work on the Sacchetti report,
10  it was 9.2 hours.
11     Q   Uh-huh.
12     A   For deposition preparation, it was nine and a
13  half hours plus a full day of prep with counsel and then
14  today's full day.
15     Q   And today's, okay.
16         So the 9.25 hours, is that spent on actually
17  drafting the report in Mrs. Sacchetti's case?
18     A   Yes.  Drafting the report, possibly
19  re-reviewing medical records, editing the report,
20  revising the report, finalizing the report.
21     Q   Okay.  And then you said that you spent 9.5
22  hours on depo prep.  Can you tell me what you did to
23  prepare for your deposition?
24     A   Sure.  I reread key medical records.  I reread
25  some of the pertinent articles.  I reread my reports.

1  And then for the full day of dep prep, I was with
2  counsel.
3      Q   Okay.  And who did you meet with?
4      A   Maha.
5      Q   And when was that?
6      A   Sunday.
7          (Whereupon, a brief discussion is held off the
8  record.)
9  BY MS. FITZPATRICK:
10     Q   So, about how many hours did you spend on
11  Easter Sunday preparing for the deposition?
12     A   So with Maha, we were working from around 9:00
13  in the morning until around 4:30 in the afternoon, and
14  then I continued my work into -- later into the evening.
15     Q   Did you do anything else to prepare for your
16  deposition besides reviewing the medical records, the
17  articles, the reports, and then spend time with counsel
18  preparing?
19     A   Yeah.  So I think that you were provided with
20  a couple of updated articles.  You got an updated list
21  of articles that were reviewed.  And in reading the
22  case-specific reports, I did do a little more literature
23  search.
24     Q   Okay.  So let me go there.
25         So we have marked --

10 (Pages 34 to 37)

Debra L. Fromer, M.D.

Page 38

1    MS. KABBASH:  Before you do, I just want to
2  add one thing to make sure you don't have inaccurate
3  information on the transcript.  You asked her before:
4  Are these all the reports you've ever done?  I think it
5  was a broad question.  I just want to make sure you're
6  also aware, last year she did reports in two New Jersey
7  case-specific matters called Cannon and Nemcek.
8    MS. FITZPATRICK:  Okay.
9    MS. KABBASH:  She ultimately was not deposed
10  on them because the cases were dropped out of the trial
11  selection and so she was not deposed on them.
12    MS. FITZPATRICK:  Okay.  Thank you.
13    MS. KABBASH:  I just didn't want that to
14  result in an incorrect transcript.
15    MS. FITZPATRICK:  Are those case-specific
16  reports only?
17    MS. KABBASH:  Yes.
18    MS. FITZPATRICK:  The general portion of that?
19    MS. KABBASH:  Well, she had the general TVT
20  report in New Jersey which she told you about.
21    MS. FITZPATRICK:  Okay.
22    MS. KABBASH:  In addition to that, they were
23  case-specific in those two cases which were TVT
24  retropubic cases.
25    MS. FITZPATRICK:  That's Cannon, and what was

Page 39

1  the other one?
2    MS. KABBASH:  Nemcek, N-E-M-C-E-K.
3    MS. FITZPATRICK:  Okay.  Thank you.  I
4  appreciate your clarifying that.
5    THE WITNESS:  Bad memory.
6    MS. KABBASH:  Sometimes they don't mind if we
7  testify if it's short circuit things.
8    MS. FITZPATRICK:  Yeah.  We can spend a half
9  an hour trying to figure that out and getting to the
10  bottom of it.
11  BY MS. FITZPATRICK:
12    Q   So let me take a look at some things here.  So
13  we have a list of materials that were updated on March
14  28th, 2016, and I just received that last night.  And
15  previous to that, I have a list of materials reviewed
16  from February 2016.  So can you help me out because I
17  haven't had time before this deposition to compare?
18    A   Sure.
19    Q   Can you tell me what's on your March 28th that
20  wasn't on your February 2016?
21    A   Sure.  Can you hand me the old one that you
22  have, and I can --
23    Q   Sure.
24    MS. FITZPATRICK:  We should have them marked
25  as 5 and 6.

Page 40

1    A   If you give me a pen, that might help as well.
2    MS. FITZPATRICK:  Do you mind if I just take a
3  very quick break?
4    MS. KABBASH:  Yes.  Go for it.
5    (Whereupon, a brief recess is taken.)
6    A   See it looks -- I found five articles that
7  were not on the old list that are on the new list that I
8  can easily identify.  However, I'd have to really go
9  through the list to identify the new ones, the other new
10  ones.
11  BY MS. FITZPATRICK:
12    Q   Okay.  So it looks like if I -- let me make
13  sure that I've got the right thing.
14    So it looks like the medical literature in
15  your initial -- well, let me ask you this:  Did you take
16  anything off of your reliance list?
17    A   No.
18    Q   So you had 318 articles on your February
19  reliance list and you have 336 that are on your current?
20    A   Correct.
21    Q   So we've added 18.  Eighteen articles have
22  been added to the medical literature; is that right?
23    A   Right.
24    Q   And who picked those articles?
25    A   The five that I have, I did.

Page 41

1    Q   Okay.
2    A   The other ones, I'm still trying to search
3  where they are.  And I can't remember which ones they
4  are, specifically, off the top of my head.  So, what I'm
5  doing is I'm going line by line to see where they're
6  off, to see where they were added.
7    Q   So you have in front of it, it looks like a
8  piece of paper in front of you with some notes on it?
9    A   Yes.
10    Q   Can you tell me what that is?
11    A   Sure.  These are a list of articles reflecting
12  patients who have had hysterectomy for pelvic pain and
13  dyspareunia, and what their outcomes were afterwards and
14  whether their deep dyspareunia and pelvic pain continued
15  after their hysterectomy done for endometriosis, for
16  example.  Some of them comment on persistent
17  endometriosis or de novo endometriosis after
18  hysterectomy.
19    Q   Okay.  And of these are articles that you
20  found yourself, that you've added to the reliance list.
21  Now, who actually generated this reliance list?  Did you
22  generate it or did counsel generate it for you?
23    A   Counsel did.
24    Q   So did you provide these five articles to
25  counsel for inclusion in this list?

Debra L. Fromer, M.D.

Page 42

1      A   Yes.
2          MS. FITZPATRICK:  Could we go ahead and -- I
3   don't know if you want to keep the original and we'll
4   get a copy of it or we can just mark the original.
5   Whatever you want to do.
6          MS. KABBASH:  I thought you might ask for
7   that.  Not to volunteer, but she has other notes she
8   might --
9          MS. FITZPATRICK:  Great.  Can we just --
10         MS. KABBASH:  Okay.
11         MS. FITZPATRICK:  I'm going to ask for them.
12         THE WITNESS:  Do you want all of them?
13         MS. KABBASH:  You're going to ask for them?
14         MS. FITZPATRICK:  Do you have a copy?
15         MS. KABBASH:  I have copies.  You keep what
16  you want.
17         THE WITNESS:  In the meantime, I'm doing it.
18         MS. FITZPATRICK:  No.  These are notes related
19  to the general report, correct, as opposed to --
20         MS. KABBASH:  That's a good question.
21         MS. FITZPATRICK:  Are these related to
22  Mrs. Sacchetti at all?
23         THE WITNESS:  Okay.  So here's another one.
24         MS. KABBASH:  Let me see if there's anything
25  outwardly -- it's all medical literature.  There may be

Page 43

1   some medical literature in here that's more pertinent
2   to -- may be pertinent to Sacchetti because of her --
3          MS. FITZPATRICK:  Okay.  So, for example, the
4   endometriosis.
5          THE WITNESS:  And also, I just found a
6   duplicate.  It looks like somebody repeatedly added the
7   da Silveira article, so that adds another one.
8          It's just in the new one, it looks like it was
9   already one that was already in my reliance list.  It's
10  duplicated.
11         MS. FITZPATRICK:  Okay.
12         THE WITNESS:  So it makes it look like there's
13  an extra article in there, but there's not.
14         MS. FITZPATRICK:  Okay.  Let me go ahead and
15  let me mark these notes as Exhibit 8.
16         (Exhibit Fromer 8, List of articles, marked
17  for identification.)
18  BY MS. FITZPATRICK:
19      Q   Let me put that in front of you and ask you if
20  you can just identify what those are for the record.
21      A   Okay.
22      Q   And can you identify and tell the court
23  reporter what those documents I've just handed you are?
24      A   Okay.  So the first page is the page I just
25  described to you.  The patient -- the list of articles,

Page 44

1   my notes on these articles, talking about women with
2   endometriosis who had undergone hysterectomy and
3   patients who had persistent pain after hysterectomy.
4          The next page are a list of articles regarding
5   TVT-O and neurovascular or leg pain.
6          The next page is a list of articles for TVT-O,
7   randomized controlled trials, and metaanalysis.
8          The next page is my notes on the
9   Maher/Cochrane review on prolapse repair from 2016.
10         The next page are my notes on articles where
11  symptomatic mesh retraction was discussed.
12         The next page is on de novo dyspareunia in
13  patients after mesh repairs for prolapse.  And there's a
14  little note on the back of that page reflecting one more
15  article.
16         And the next page is exposure and erosion
17  data.  This is for Pro -- this is for Prolift and other
18  transvaginal mesh for prolapse repair.  The back of that
19  page it continues, and then I have notes on just general
20  complications.
21      Q   Okay.
22      A   And the last page is the March breakdown, that
23  we earlier discussed, for the invoice.
24      Q   Thank you.
25         So I think you were correcting me that there's

Page 45

1   probably actually 17 articles that were added to this
2   list.  You didn't bring a copy of those articles with
3   you today, did you?
4      A   I didn't, but I think counsel is supposed to
5   have it on a flash disk, but I think the wrong one came.
6   I'm sure you were alerted to that.
7          MS. FITZPATRICK:  I don't know if I'm going to
8   ever need to do this, but until I have a chance to look
9   at what those 17 articles are and look through them, I'm
10  obviously not going to be able to ask her any questions
11  on it.  So I'm going to reserve a little bit of time.
12  If we do come back, I'm going to do it by phone.
13         But I need to do that since I haven't had an
14  opportunity to take a look through those articles to
15  question her today.
16         MS. KABBASH:  I'll object to that request on
17  the record, but we can save that for another time.
18         MS. FITZPATRICK:  Sure.
19  BY MS. FITZPATRICK:
20      Q   In addition to the additional medical articles
21  that you added, are there any other materials that
22  you've added to your reliance list between February 2016
23  and March 28th, 2016?
24      A   I don't believe so.  I think that covers it.
25      Q   Did you add any additional Ethicon documents

12  (Pages 42 to 45)

Debra L. Fromer, M.D.

Page 46

```
1    to the list?
2        A   I don't believe so.
3        Q   Okay.  Any additional medical records or
4    deposition transcripts to the list?
5        A   No.
6        Q   Okay.
7        A   So if you want me to -- I found a few of the
8    articles for you.  Do you want me to --
9        Q   Sure.  If you could --
10       A   -- stop that or just keep --
11       Q   No.
12       A   -- doing what I'm doing?
13       Q   I would love it if you can tell me what those
14   are, and you can identify them by number for me --
15       A   Okay.
16       Q   -- but I don't want to use too much of your
17   time.  You have limited time.  I don't --
18       A   Okay.  Hopefully it won't take too long.
19           (Reviewing documents.)
20       Q   How much longer do you think it will take you?
21       A   Right now, I'm on 199.
22       Q   You know what --
23       A   Do you want me to stop?
24       Q   I do.  If you can tell me right off the bat
25   which ones you know.
```

Page 47

```
1        A   Okay.  So I'll go through the ones that I have
2    so far.
3            Number 62.  Like I said, number 71 and 72 are
4    duplicates.
5        Q   Okay.
6        A   Number 93, number 104, number 115, number 118,
7    number 122, number 129, number 135, number 137, number
8    147, number 148, number 186, number 190, number 198.
9        Q   Okay.
10       A   That's what I got up to.
11       Q   Thank you.
12       A   Oh, and I have a couple more.
13       Q   Oh?
14       A   Sorry.  Number 259.
15       Q   Uh-huh.
16       A   Number 296, number 306.
17       Q   Who chose the medical articles that are
18   included, the three hundred and -- I guess, 335 medical
19   articles that are included on your reliance list?
20       A   Who chose all of them?
21       Q   Uh-huh.
22       A   I chose the majority of them.  Some of them
23   were provided to me by counsel, many of which I already
24   knew about before starting this process.  And the
25   majority of them were identified using the literature
```

Page 48

```
1    search.
2        Q   Did you perform the literature search for this
3    case specifically?
4            MS. KABBASH:  You mean Sacchetti or --
5    BY MS. FITZPATRICK:
6        Q   No.  The general reports that you issued.
7        A   Yes.  Although I frequently run literature
8    reports to answer my own questions anyway.
9        Q   Did you run, specifically, the literature
10   search for documents for your Prolift report?
11       A   Yes.
12       Q   And did you run a literature search for your
13   documents for your TVT-O report?
14       A   Yes.
15       Q   And you testified that you have added some
16   documents.  Why did you add documents to your reliance
17   list between February and March?
18       A   So some of the documents came about because I
19   was reviewing plaintiff's reports and plaintiff's
20   depositions, and they were citing articles that I was
21   not familiar with so I wanted to read those.  Some of
22   them came about as part of my review of my general
23   report and -- I'm sorry.  As review of my -- the
24   Sacchetti report.
25           And I realized that some of the statements
```

Page 49

```
1    that I was making in the Sacchetti report was not
2    necessarily backed up by the medical literature in my
3    Prolift or my TVT report.  So that resulted in my doing
4    a literature search regarding some of my opinions in the
5    Sacchetti report.
6        Q   And was that the endometriosis articles that
7    we were discussing?
8        A   Yes.
9        Q   Anything else that you did an independent
10   literature search of between February and March besides
11   the endometriosis?
12       A   Not that I can recall.
13       Q   And the articles on endometriosis, I think you
14   said there were five of them.  Were those all of the
15   articles that your literature search pulled up on those
16   particular topics or just the ones that you're relying
17   on in support of your opinions?
18       A   These are just the ones that I took notes on,
19   that I thought were the most substantial.
20       Q   And do you remember what actual search you
21   plugged in to get those articles?  I assume you did a
22   PubMed search for this?
23       A   Yes, that's correct.
24       Q   And do you remember what search terms you were
25   using?
```

13 (Pages 46 to 49)

Debra L. Fromer, M.D.

Page 50

1    A  I was probably using "endometriosis" and
2   "pelvic pain," "hysterectomy."  Oftentimes, it brings up
3   one or two articles, and then you can find -- once you
4   read those articles, you can -- they often cite other
5   articles that they are relying on and that resulted in
6   some of the documents that I pulled.
7    Q  And how long did it take you to do that PubMed
8   search and to find and review the articles on
9   endometriosis that you've added?
10   A  If I had to guess, maybe four hours.
11   Q  Did you write your Prolift report yourself?
12   A  Yes.
13   Q  Every word of it?
14   A  Yes.
15   Q  And did you write your TVT-O report yourself?
16   A  Yes.
17   Q  Do you keep drafts of any of your reports?
18   A  Yes.
19   Q  And where are those drafts housed?
20   A  In my computer.
21   Q  Did you receive feedback on your reports or
22  drafts of your reports from Ethicon's lawyers?
23   A  Yes.  They had comments, some of which I
24  incorporated to some extent, others which I did not.
25   Q  Is it fair to say that they were involved in

Page 51

1   the drafting process of those reports?
2    A  To some extent, yes.
3    Q  Okay.  Do you know Dr. Vincent Lucente?
4    A  Yes.  I -- he trained me on Prolift.  I've
5   seen him lecture, and I've seen him and talked to him at
6   meetings.
7    Q  When did he train you on Prolift?
8    A  I can't remember the year.  It was actually, I
9   think that this came up in the last deposition, so I
10  know that there was documentation on it, but I can't
11  recall the exact year.
12   Q  And how did Dr. Lucente train you on Prolift?
13   A  I went to St. Luke's Hospital in Allentown.
14  There was a didactic session and then a hands-on session
15  where we were in the OR with him.
16   Q  Have you spoken with Dr. Lucente at all about
17  this litigation?
18   A  No.
19   Q  Have you ever discussed your Prolift report
20  with Dr. Lucente?
21   A  No.
22   Q  Your TVT-O report with Dr. Lucente?
23   A  No.
24   Q  Any of the case-specific reports, have you
25  discussed those with Dr. Lucente?

Page 52

1    A  No.
2    Q  Do you consider Dr. Lucente to be a colleague?
3    A  How do you define "colleague"?
4    Q  Well, I thought it was a fairly -- well, I can
5   look up the dictionary definition.  Someone that you
6   work with.
7    A  I don't work directly with him, no.
8    Q  Does he work in the same field as you do?
9    A  Yes.
10   Q  Do you respect the research that he has done
11  in the field of pelvic surgery, particularly with
12  respect to the Prolift?
13   A  We'd have to go by that detail by detail.  I
14  feel like that's a very broad question.
15   Q  Are you familiar with the research that
16  Dr. Lucente does?
17   A  Yes.  We -- I know that he was involved in the
18  initial development of the product, but, again, the
19  details of the study, we would have to look at directly.
20   Q  And in the training sessions for the Prolift,
21  Dr. Lucente discussed his research and his work on the
22  Prolift, correct?
23   A  He must have.  I mean, I can't -- it was a
24  long time ago, and I can't recall.  And I'm sure that he
25  presented data because that was part of what I reviewed

Page 53

1   for the ProfEd from Ethicon.
2    Q  Okay.  And you have some research and
3   publications by Dr. Lucente on your materials-reviewed
4   list, correct?
5    A  Yeah, I'm sure.
6    Q  Okay.  Have you ever heard anywhere that there
7   were questions about the validity of the data that
8   Dr. Lucente reported in his studies?
9        MS. KABBASH:  Objection.
10   A  Can you be more specific?
11  BY MS. FITZPATRICK:
12   Q  Yeah.  Has anybody ever indicated to you that
13  there have been any questions about the validity of the
14  data reported by Dr. Lucente in any of his studies?
15       MS. KABBASH:  Objection.
16   A  I'm not familiar with that, but a lot of
17  studies you can look at, and you can invalidate them for
18  a number of different reasons depending upon how you
19  look at them.
20  BY MS. FITZPATRICK:
21   Q  Has anyone ever indicated to you that Ethicon
22  questioned the validity of the data that Dr. Lucente
23  used in some of his studies?
24       MS. KABBASH:  Objection.
25   A  Can you be specific?

14 (Pages 50 to 53)

Debra L. Fromer, M.D.

**Page 54**

1  BY MS. FITZPATRICK:
2      Q   I'm just asking if you've ever heard that.
3  Either you have or you haven't.
4      A   I mean, not off the top of my head, but...
5      Q   And you don't remember seeing that in any of
6  the Ethicon documents that the Ethicon lawyers gave you
7  to review in this case?
8      A   I reviewed a lot of Ethicon documents, so...
9      Q   Do you remember seeing that in any of the
10 Ethicon documents that they gave you to review in this
11 case?
12     A   Not off the top of my head, no.
13     Q   Okay.  And you've relied on some of the
14 findings and publications by Dr. Lucente, particularly
15 for your Prolift opinions, correct, as opposed to your
16 TVT opinions?
17     A   Not necessarily.  So this is a list of all the
18 things that I've reviewed.  I haven't necessarily -- I
19 mean, we can look at my report to see if I've cited
20 Lucente in any of my statements or my opinions.
21     Q   So let's figure this out then.
22         So this is a list -- this Exhibit B is a list
23 of everything that you reviewed, correct?
24     A   Correct.
25     Q   And within your report itself -- let me pull

**Page 55**

1  that out.  Hang on one second.
2         Within your reports and the Prolift and the
3  TVT itself, you have cited specifically to some of the
4  articles that are on your reliance list, correct?
5      A   Correct.
6      Q   So is it fair to say that the articles that
7  you have footnoted are the ones that you primarily rely
8  on for your opinions; whereas, the list of materials you
9  reviewed is a broader list that includes lots of things
10 that you reviewed but maybe don't primarily rely on for
11 specific opinions that are contained in your expert
12 report?
13     A   Yeah, that's accurate.
14     Q   Okay.  How many TVT-Rs have you implanted?
15     A   TVT-Rs?
16     Q   Yeah.
17     A   I mean, I'm estimating here again.  If I had
18 to guesstimate, I'd say somewhere between 30 to 40.
19     Q   Total over the course of your career?
20     A   Yeah.
21     Q   Do you use the TVT EXACT?
22     A   Yes.
23     Q   And how many of those have you implanted?
24     A   If I had to guess, probably around 10.
25     Q   How many TVT-Os have you implanted?

**Page 56**

1      A   Hundreds, a lot.
2      Q   Is it safe to say that that's your preferred
3  polypropylene midurethra sling to use, the obturator
4  slings?
5      A   I have no preferred sling in the sense of do I
6  prefer TVT, retropubic, or EXACT versus TVT-O versus a
7  mini-sling.  There's risks and benefits of each
8  procedure.  So these are presented to the patients.  And
9  then, with the help of the patients, we decide what the
10 ideal sling for that patient is.  So I have no preferred
11 sling per se.
12     Q   How come you've implanted hundreds of TVT-Os
13 but only 30 to 40 TVT-Rs?
14     A   But many of my patients don't want to have the
15 risk of potential bladder injury, and they don't want to
16 potentially have a catheter for a few days after the
17 surgery.  So they have in the past opted for the
18 transobturator approach.
19     Q   Is that the one you generally recommend?
20     A   Again, I don't generally recommend anything.
21 There are options, and we discuss the options.  And what
22 I -- you're also leaving out the many mini-slings that I
23 do since the mini-slings have accrued more data.  So I
24 don't want -- I don't want to lead you down the wrong
25 path.

**Page 57**

1      Q   So let me get to that.
2         So you don't recommend it, but the majority of
3  your patients choose the obturator procedure over the
4  retropubic procedure; is that correct?
5      A   Can we back up a little bit just so that we --
6  again, I don't want to go down the wrong path.
7      Q   Sure.
8      A   So the way I present this to patients, is
9  there are three slings that we can choose from:  a
10 retropubic sling, an obturator sling, or a mini-sling.
11 And over the last several years, many more patients have
12 been opting for the mini-sling.
13         So if we had to break down the numbers over
14 the last -- so, there's been an evolution, okay, of --
15 of our numbers in terms of which slings are we doing
16 more commonly.
17     Q   Okay.
18     A   Not necessarily which slings is the preferred
19 method by me.  That's -- I can't answer that question.
20 That's not what drives me to do surgery on patients.  We
21 have to make a decision collaboratively what the patient
22 would opt for.
23     Q   Okay.  Well, let me then start with a more
24 basic question just to get the record clear.
25         You agree with me that there are three types

15 (Pages 54 to 57)

Golkow Technologies, Inc. - 1.877.370.DEPS

Debra L. Fromer, M.D.

Page 58

1   of polypropylene midurethral slings that can be used to
2   surgically correct stress urinary incontinence, correct?
3       A   Well, it depends --
4           MS. KABBASH: Objection.
5       A   -- on how you label them, okay.  There are
6   obturator slings, there are retropubic slings, and there
7   are mini-slings, and there are different approaches for
8   each of them in terms of the technique.
9   BY MS. FITZPATRICK:
10      Q   Okay.
11      A   Okay.
12      Q   But let's start with just -- I want to make
13  sure I've got the general bucket.
14          It is within the standard of care to use a
15  retropubic midurethral sling for the treatment of stress
16  urinary incontinence, correct?
17      A   Correct.
18      Q   And it's within the standard of care to use
19  the obturator sling, midurethral sling, as a surgical
20  intervention for stress urinary incontinence, correct?
21      A   Correct.
22      Q   And it's within the standard of care to use a
23  mini-sling for the treatment of stress urinary
24  incontinence, surgical correction of stress urinary
25  incontinence, correct?

Page 59

1       A   Correct.
2       Q   And in addition to those polypropylene slings,
3   it's also within the standard of care to use autologous
4   fascial sling to treat stress urinary incontinence,
5   correct?
6       A   That's correct.
7       Q   And do you offer that procedure to your
8   patients?
9       A   It's discussed.  It's often not -- rarely, if
10  ever, selected.
11      Q   Okay.  And it's also within the standard of
12  care to use a Burch procedure for surgical intervention
13  for treatment of stress urinary incontinence, correct?
14      A   Sure.
15      Q   All right.  And do you offer Burch procedure
16  to your patients?
17      A   No.
18      Q   So that's not offered.  So if a patient is
19  coming in to see you for the treatment of stress urinary
20  incontinence, the four options that you would discuss
21  with that patient are the retropubic sling, the
22  obturator sling, the mini-sling, and the autologous
23  fascial sling, correct?
24      A   Yes, that is true.  However, much more time is
25  spent discussing the midurethral sling because that is,

Page 60

1   by far, in my opinion, the -- has the best outcomes with
2   the least complication rates.
3       Q   Okay.  And we'll get to that, but at least
4   those are the four options that are discussed that one
5   of your patients has available to them?
6       A   That's correct.
7       Q   Okay.  And your preference as a physician is
8   to use one of the polypropylene slings as opposed to the
9   autologous fascial sling?
10      A   Yes.  Unless a patient comes here saying I
11  don't want mesh, so mesh is off the table.
12      Q   Okay.  And so you'll agree with me that
13  there's a risk -- different risks, risk/benefit profile
14  associated with each of those four surgical
15  interventions, correct?
16      A   That's correct.
17      Q   And so there are risks and benefits to the
18  retropubic sling that are different than the risks and
19  benefits associated with the obturator sling, correct?
20      A   Correct.
21      Q   And the risks and benefits of the mini-sling
22  are then different still?
23      A   Correct.
24      Q   And the risks and benefits of the autologous
25  fascial sling are different again?

Page 61

1       A   Correct.
2       Q   And so when a patient comes in and is looking
3   for a surgical intervention for stress urinary
4   incontinence, your job as a physician is to discuss each
5   of these four surgical options with that patient,
6   correct?
7       A   Correct.
8       Q   And your job as a physician is to present all
9   of the information on the different risk/benefit
10  profiles for each of these particular procedures,
11  correct?
12      A   Correct.
13      Q   And then it's up to the patient to decide
14  which profile best suits her, correct?
15      A   Yes and no.  It's collaborative.  So there's
16  information that we sometimes incorporate from
17  urodynamic data.  There's information from physical
18  examination.  So it's not simply about patient
19  preference; although, that is one component of the
20  decision-making process.
21      Q   All else being equal though, you don't
22  recommend one particular type of sling over the other,
23  do you?
24      A   So, for example, when you say "all else being
25  equal" -- I'll give you an example.  So what I call

16  (Pages 58 to 61)

Debra L. Fromer, M.D.

Page 62

1    the -- okay.
2         So, for a typical patient that would come in
3    as being a good candidate for a midurethral sling, okay,
4    someone has hypermobility, someone that is young,
5    someone that does not have atrophic epithelium, this is
6    somebody that, in my opinion, is very likely to do well
7    with any midurethral sling, okay, in terms of efficacy.
8         Q    Okay.
9         A    So then it comes down to -- and also adding to
10   that, someone whose urodynamic profile also fits this.
11   So then it comes down to, okay. We've got three sling
12   options for you. We've got one that has the longest
13   term data, but you run the risk of having a bladder
14   injury.
15        Okay. We've got one that also has long-term
16   data, but not as much long-term data. We can avoid the
17   risk of a bladder injury, but we are operating through
18   the groin. So there is a potential to have leg pain for
19   24 to 48 hours after the procedure. And you will have
20   little incisions in the groin.
21        Or we have a third procedure that does not
22   have as much long-term data as the other two, but we can
23   avoid the bladder and avoid going through the groin,
24   thereby minimizing the postoperative leg pain.
25        Q    And what you just ran through, is that kind of

Page 63

1    in a nutshell what you would tell your patients who are
2    looking for surgical intervention for stress urinary
3    incontinence?
4         A    Only those patients that can be -- or that
5    would have good outcomes with any of those three slings.
6         Q    And do you tell any of your patients about the
7    potential for chronic pain?
8         A    Yes.
9         Q    And what do you tell them about chronic pain
10   associated with retropubic?
11        A    I tell them, as with all surgery, chronic pain
12   can be something that can happen. And in this case, in
13   rare circumstances, it can be chronic pelvic pain and it
14   can be dyspareunia in a small subset of patients.
15        Q    And what do you tell your TVT-O patients about
16   the potential for chronic pain?
17        A    That's across the board for all three of them.
18        Q    Do you tell your TVT-O patients that there's
19   an increased incidence of chronic leg or groin pain for
20   TVT-O patients over retropubic patients?
21        A    Yes. Although I do say that the chronic pain
22   is very low and, over time, dissipates.
23        Q    And what do you tell your mini-sling patients
24   about the potential for chronic pain?
25        A    Again, with all -- this is a conversation

Page 64

1    that, for chronic pain, that I have with any patient
2    that I'm operating on.
3         Q    So you don't differentiate chronic pain
4    between the retropubic and the TVT-O and the mini-sling
5    procedures?
6         A    No.
7         Q    Okay.
8         A    Just for all three of them, chronic pain is
9    very unusual.
10        Q    Is that in your experience or do you believe
11   that's supported by the literature?
12        A    Both.
13        Q    In what's reported in the literature
14   comes in -- well, you'll agree with me that there's no
15   literature that has primarily looked at safety as an end
16   point for any of these devices, correct?
17        MS. KABBASH:  Objection.
18        A    Actually, that's not true. I just read an
19   article that did -- you know, I always wondered about
20   this because I would assume that there were very few
21   articles that did look at safety as an endpoint for a
22   number of different reasons, but I did come across an
23   article in my review recently, that did look at safety
24   and complications as an endpoint, as a primary endpoint.
25   BY MS. FITZPATRICK:

Page 65

1         Q    What was that?
2         A    Do you want me to look it up?
3         Q    Yes, that would be great.
4         A    Let's see if I can do it. I would have to
5    pull the article to look at it.
6         THE WITNESS:  Do you have our list?  Do we
7    have articles here that --
8         MS. KABBASH:  Would you be able to identify
9    the article, what it is?
10        THE WITNESS:  Can you pull Zhang, Z-H-A-N-G.
11        MS. KABBASH:  If you want, we can do that at
12   the break.
13        MS. FITZPATRICK:  Yeah. Why don't we do that
14   at a break.
15        THE WITNESS:  Okay. Do you want me to look
16   for this now or we'll do it on break?
17   BY MS. FITZPATRICK:
18        Q    So you've identified as Zhang, which I think
19   is on your third page under TVT-O, correct?
20        A    Right. But, again, I'm not sure. I have to
21   look at the article because I didn't notate it. And I'm
22   just trying to go off memory here.
23        Q    Why don't we pull that at a break.
24        But was it your recollection that that was a
25   randomized control trial?

17 (Pages 62 to 65)

Debra L. Fromer, M.D.

Page 66

1    A   Yes.
2    Q   Okay.  And it looks like here that there were
3  140 patients involved?
4    A   Correct.
5    Q   And do you believe a randomized control trial
6  with 140 patients enrolled is sufficiently powered to
7  look at safety data as a valid endpoint?
8    A   Well, it depends on what you have to compare
9  it to, right.  We're doing a literature search to answer
10  our questions.  We have to do the best that we can.
11       I would love to have a randomized control
12  trial with 3,000 patients, but that doesn't exist, at
13  least in this particular case.
14    Q   But do you believe that 140 patients is
15  adequately powered to look at safety as an endpoint for
16  the TVT-O device?
17    A   I think it can be.  If it's all we have, it's
18  what we have to go on.  It is a randomized control trial
19  which has benefits in and of itself.  There are other
20  ways to look at safety besides randomized control
21  trials, but we consider the randomized control trials to
22  be one of the gold standards.
23    Q   So you believe that the Zhang article -- and
24  we can pull a copy of that at a break -- is a randomized
25  control trial that has safety as an endpoint?

Page 67

1    A   I'm not sure.  I don't want to say that.  I'm
2  not going to pontificate about that until I see the
3  article.
4    Q   Let's pull the article and we'll come back to
5  that.  I don't want you to have to guess as to what it
6  says.
7       Let me go back to just some basic questions
8  before we get into all this.  How many Prolifts have you
9  implanted?
10    A   Hundreds.
11    Q   And do you use the Prolift+M?
12    A   Well, I don't use Prolift+M anymore, but I did
13  at one point when it was available.
14    Q   Did you switch from the traditional Prolift or
15  Prolift+M when it was available?
16    A   Yes.
17    Q   Why'd you switch?
18    A   The idea of it sounded better to me,
19  theoretically.  I didn't see the harm in switching.  I
20  only saw a potential benefit in switching; although, my
21  outcomes weren't particularly dissimilar between the
22  two.
23    Q   And what were the potential benefits that you
24  saw when you switched?
25    A   Less polypropylene and more absorbable

Page 68

1  material.
2    Q   And you'll agree with me that, at least in
3  theory, the least amount of the foreign body, the
4  polypropylene that you leave behind in a woman's pelvis,
5  the better the outcome for the woman?
6    A   Not necessarily.
7    Q   In what circumstance do you think that more
8  polypropylene is a better option for women?
9    A   Well, you don't want to leave one strip of
10  polypropylene because then it won't be as supportive.
11  So you need the minimum amount to be supportive.
12    Q   Fair enough.  But you agree with me that you
13  want to use the minimum amount of polypropylene
14  necessary to effectuate a repair?
15    A   A good outcome, yes, both with safety and with
16  efficacy.
17    Q   And how many Prolift+M's did you implant?
18    A   Okay.  So when you asked me how many Prolifts,
19  I was including +M in that.  So I really can't make the
20  discrimination between the original Prolift and the
21  Prolift+M because I'm not sure when my hospital switched
22  to the +M.
23    Q   Did you make the decision to switch or did
24  your institution make the decision to switch?
25    A   I think it happened automatically, and when I

Page 69

1  checked on it, I was happy that it happened.
2    Q   Okay.  How many TVT ABBREVOs have you
3  implanted?
4    A   One.
5    Q   Well, I think we talked about the EXACT.  How
6  many TVT SECURs have you implanted?
7    A   One.
8    Q   What mini-sling do you use?
9    A   MiniArc.
10    Q   Why do you use the MiniArc?
11    A   It has the same weave as the Gynecare
12  products.  It felt very similar on a clinical basis to
13  the Gynecare product that I previously used.  And the
14  transient postoperative leg pain is virtually eliminated
15  with it.  The outcomes are about the same as the longer
16  slings.
17    Q   Do you believe the mini-slings have the same
18  efficacy in curing stress urinary incontinence as the
19  obturator slings?
20    A   We don't have long-term data on that, but the
21  data that we do have on it appears to be similar so far.
22    Q   Okay.  And do you believe that the mini-sling
23  is as efficacious as a retropubic sling?
24    A   Again, it's the same answer.  So in the
25  midterm, the five-year data, it looks about the same,

18 (Pages 66 to 69)

Debra L. Fromer, M.D.

Page 70

1  but we don't have the long-term data that we have with
2  the retropubic slings.
3       Q    Why did you implant only one TVT SECUR?
4       A    I didn't like the delivery method.
5       Q    Okay.  And what didn't you like about the
6  delivery method?
7       A    I thought there was a blade used to implant
8  it.  I felt like it was wider than it -- wider than I
9  would have liked it to have been.  I liked the idea
10 behind a mini-sling so I tried it, but there was some
11 blood loss when I used it, and I just preferred -- if I
12 was going to do that at that time, it was going to be
13 TVT-O.  And then the MiniArc came out and that seemed to
14 be a better option for a mini-sling.
15      Q    And why did you only implant one TVT EXACT?
16      MS. KABBASH:  You mean ABBREVO?
17      A    TVT ABBREVO.
18 BY MS. FITZPATRICK:
19      Q    Oh, sorry.  ABBREVO, yes.
20      A    You know, at the time, I didn't -- I hadn't
21 seen any data on the TVT ABBREVO.  It just so happens
22 that it was in the operating room, and I think that they
23 had run out of TVT-Os.  So the next best option was a
24 TVT ABBREVO.  So we used the TVT ABBREVO, but I never
25 stuck with it because I felt like I'm still going

Page 71

1  through the transobturator and I would rather use what I
2  had longer-term data on, if I'm going to go through the
3  transobturator canal.
4       Q    And I think you told me before, but I can't
5  remember, that you've done about 10 explants, is that
6  right, 10 to 20?
7       A    Yeah, that's about right.
8       Q    And what products have you removed -- well,
9  let me ask you this:  How many of those were pelvic
10 organ prolapse products?
11      A    Now I'm really guessing.  So I would have to
12 say a little more than half would be pelvic organ
13 prolapse products, polypropylene.
14      Q    So maybe like a 60/40; does that sound about
15 right?
16      A    If I had to guess, sure.
17      Q    Now, when you said that you had had a couple
18 of patients that you shared with Dr. Blaivas, was he
19 performing mesh-removal surgery on those patients?
20      A    So the first patient that I recall was a
21 patient with prolapse not related to mesh, but she had a
22 very complicated condition where she had a fistula as a
23 result of having chronic prolapse.  So her bladder
24 fistulized into the vagina and she was just leaking
25 urine.  She was an elderly patient, and she was very

Page 72

1  uncomfortable with what -- with her -- with everything
2  that was going on.  Her bladder was kind of eroding out
3  through the opening.  Somewhat of a disastrous outcome
4  from just managing prolapse with observation.
5       But anyway, this was a patient that was very
6  complicated and so, therefore, I sent her to somebody
7  with a little more gray hair, which is Dr. Blaivas.
8       Q    He does have a little more gray hair than you.
9       A    Yeah.
10      Q    Have you ever sent any patients to him for
11 mesh-removal surgery?
12      A    There was a mutual patient that we had, and
13 I'm not sure if he removed the mesh or I removed the
14 mesh.  And she may have been going to him for an
15 autologous fascial sling after I removed a sling.  That
16 might be the case.  I don't recall sending anybody to
17 him for removal of mesh.
18      Q    Okay.  So if a woman comes to you and needs
19 mesh removal, are you the one who performs that surgery
20 or do you refer those out to other physicians?
21      A    I mean, it depends.  You know, most cases that
22 I believe -- there have been patients that have come to
23 me that have been fine and they wanted their mesh
24 removed for no reason.  So I won't do that.  If you want
25 your mesh removed, you have to go elsewhere, especially

Page 73

1  if there's nothing wrong.  Everything is going well.
2  You're happy.  You just want the mesh removed because
3  you're nervous about the commercials you're seeing on
4  TV.  So that is one circumstance where I would refer.
5       If a patient had a symptomatic exposure, for
6  example, that's something that I can very easily manage.
7       Q    Have you referred patients to other physicians
8  for mesh removal associated with symptom complications?
9       A    I may have sent patients for second opinions,
10 just complicated patients that may need second opinions
11 to make sure that we're doing the right thing, but...
12      Q    Okay.
13      MS. KABBASH:  Fidelma, can we plan on a break?
14      MS. FITZPATRICK:  Yes.  I was just going to
15 suggest that.
16      (Whereupon, a brief recess is taken.)
17 BY MS. FITZPATRICK:
18      Q    Now, in your experience in removing mesh
19 products, have you been able to remove all of the mesh
20 from the patient?
21      A    I don't necessarily need to.  For most of the
22 indications, it was simple exposure.
23      Q    And would you agree with me that particularly
24 with the obturator sling, it's not possible, absent very
25 extensive dissection, to remove a sling from the

19 (Pages 70 to 73)

Debra L. Fromer, M.D.

Page 74

1    obturator space?
2         MS. KABBASH:  Objection.
3         A    Okay.  It might be difficult to do.  However,
4    I think it's rarely necessary to do, if ever.
5    BY MS. FITZPATRICK:
6         Q    But putting aside the necessity of it, if for
7    some reason a woman should have that mesh removed,
8    that's an extremely difficult and extensive surgery,
9    correct?
10        A    Difficult, but not impossible.
11        Q    And are you aware of any other surgeries,
12   besides the placement of the transobturator sling, where
13   surgeons utilized the transobturator space?
14        A    Well, for pelvic --
15        Q    Anything.
16        A    For pelvic floor repair.  We're frequently in
17   that space when we do a prostatectomy, and when you're
18   doing a node section, where there are nodes in the
19   obturator space.  So we're not infrequently in that
20   area, and we frequently dissect right over the obturator
21   nerve.  Although, I don't do those surgeries anymore.  I
22   did in training.
23        Q    So it's testimony that surgeons are not
24   infrequently in the obturator space for surgical
25   procedure?

Page 75

1         A    Transabdominally or robotically.
2         Q    And that's a different approach than is used
3    with either the Prolift or the TVT-O, correct?
4         A    Correct.  But it's not an unfamiliar space.
5         Q    Do you know of any other product that is
6    permanently implanted into the obturator space?
7         A    No.
8         Q    What surgical --
9         A    Well, I'm sorry.  To go back on that, there
10   are people who leave nonabsorbable sutures in that space
11   as part of their pelvic organ prolapse repair.
12        Q    And well, let's -- I'm going to actually get
13   to procedures to treat pelvic organ prolapse.
14             What surgical procedures do you currently use
15   to treat pelvic organ prolapse?
16        A    Native tissue repairs.
17        Q    Uh-huh.
18        A    Transvaginal repairs with mesh augmentation.
19        Q    Uh-huh.
20        A    Robotic sacrocolpopexy that I do with a
21   robotic surgeon.
22        Q    Uh-huh.
23        A    That's it.
24        Q    And I think we talked about the product that
25   you use for the mesh repair is the Elevate; is that

Page 76

1    right?
2         A    That's correct.
3         Q    Do you use any other product?
4         A    I used to use Prolift but not anymore,
5    obviously.
6         Q    And with the robotic sacrocolpopexy, do you
7    use mesh?
8         A    It's called Y-Mesh.  It's an AMS product.
9         Q    And that's an AMS product that you use for --
10   and are those abdominally done; is that correct?
11        A    Yes.
12        Q    And do you use anterior colporrhaphies?
13        A    I would consider that as part of the native
14   tissue repair.
15        Q    If the Prolift was still on the market, would
16   you continue to use it?
17        A    Yes.
18        Q    Would you continue to use it in absence of the
19   522 studies and data that the FDA requested on Prolift?
20        A    Well, that's a very hypothetical question.  So
21   they -- they never did the 522 studies, correct?  They
22   just withdrew the -- the mesh.  So if they hadn't done
23   the 522s, would I be using it?  Yes, I probably would as
24   I am with Elevate.
25        Q    But you know that there's 522 studies underway

Page 77

1    for Elevate, correct?
2         A    Correct, but if Prolift were still on the
3    market, they would have been underway for Prolift if
4    they decided to put the money into it, so...
5         Q    Do you think that Ethicon should have
6    performed clinical trials, as required by the FDA, to
7    establish the safety and efficacy of the Prolift and,
8    therefore, keep it on the market for women today?
9             MS. KABBASH:  Objection.
10        A    As far as I know, that was a company decision
11   based on a financial decision, not on a safety and
12   efficacy decision.  If you asked me personally, do I
13   wish that Prolift was still on the market, the answer
14   was yes, but...
15   BY MS. FITZPATRICK:
16        Q    Do you wish Ethicon had done those studies so
17   Prolift was still on the market?
18             MS. KABBASH:  Objection.
19        A    Yes.
20   BY MS. FITZPATRICK:
21        Q    Do you think that Ethicon's decision to
22   withdraw the Prolift from the market instead of doing
23   the clinical studies did a disservice to women?
24             MS. KABBASH:  Objection.
25        A    It didn't do a disservice.  There are other

Debra L. Fromer, M.D.

Page 78

1    products that can be used.  So its coming off the
2    market, it did not result in a major hole in the ability
3    to treat patients.  It just -- we can still do
4    transvaginal procedures in a similar way, fashioning
5    things like we did with Prolift.
6    BY MS. FITZPATRICK:
7        Q   What do you mean by that?
8        A   So, for example, we were able to use a total
9    Prolift, which was one piece of mesh that was placed in
10   patients who had either concomitant hysterectomy or
11   previous hysterectomy.  There is no product that is like
12   that that is available now.
13           So if you wanted one piece of mesh to wrap
14   around the apex of the vagina, you have to fashion it
15   out of either an anterior -- right now, an anterior or
16   posterior Elevate.  You have to sew it together so that
17   you don't have a gap between the two pieces of mesh.
18           So even though that product doesn't exist
19   anymore, we can make something similar to it, albeit a
20   different delivery system, but in terms of the anatomy
21   of the mesh.
22       Q   And it's with a different manufacturer, right?
23       A   Correct.
24       Q   Now, when you're doing a surgical intervention
25   for the treatment of POP, do you take the POP -- you

Page 79

1    consider the POP-Q score of the patient, correct?
2        A   I don't use POP-Q.  I use the Baden-Walker
3    System.  It's easier to explain to the patient.
4        Q   How do you explain that to a patient?
5        A   So I tell them that we scale prolapse on a
6    scale of up to four, and I go through the scaling of it.
7    And I tell them what they are.  And I tell them,
8    patients are usually not symptomatic until they're a
9    three, until the bulge is at the enteritis or just at
10   the enteritis.  And that some patients are referred with
11   grade 2 prolapse even though they're asymptomatic.  So
12   it's helpful to say, Yes.  You do have grade 2 prolapse,
13   but so does everybody else walking around out there
14   that's had a couple of vagina deliveries.  It doesn't
15   mean we have to do anything about it.
16       Q   Which leads me to my next question.
17          You have to take into account the clinical
18   symptoms of the patient before recommending a surgical
19   intervention for pelvic organ prolapse, correct?
20       A   Correct.
21       Q   And it's important to consider how the pelvic
22   organ prolapse is affecting the patient's quality of
23   life, correct?
24       A   Yes.
25       Q   And so when you're looking at evaluating the

Page 80

1    outcomes of your pelvic organ prolapse repair surgery,
2    do you agree with me that the functional outcomes are
3    the most important measure of success?
4        A   What do you mean "the function outcomes"?
5        Q   The clinical symptoms, the resolution of
6    clinical symptoms for women.
7        A   I think that's very important.
8        Q   And you agree with me that there are certain
9    women who can still have some degree of prolapse, but
10   the surgery controls or corrects the clinical symptoms
11   that she was having and that would be a successful
12   surgery, correct?
13       A   At that moment in time.  However, there's no
14   way to predict whether an anatomic outcome that was
15   suboptimal, could ultimately result in a clinical
16   suboptimal outcome.
17       Q   And there's also no way to predict that a
18   woman coming out of surgery who had what would appear to
19   be a better anatomic outcome, there's no way to predict
20   what her clinical symptoms or clinical problems are
21   going be later in life, correct?
22          MS. KABBASH:  Objection.
23       A   We don't -- I don't believe we have any data
24   to support that.
25   BY MS. FITZPATRICK:

Page 81

1        Q   And you agree with me, obviously, that the
2    native tissue repairs and the colporrhaphies that we
3    discussed are within the standard of care for treatment
4    for pelvic organ prolapse?
5        A   Yes.
6        Q   And I think we discussed an anterior
7    colporrhaphy.  Do you offer native tissue repairs in the
8    posterior compartment as well?
9        A   Yes.
10       Q   And do you offer native tissue repairs in the
11   apical compartment as well?
12       A   Yes.
13       Q   And what percentage of the surgeries that you
14   do currently for POP would be the native tissue repairs?
15       A   I would say around 40 percent.
16       Q   Okay.  And what percentage of the surgeries
17   that you do for pelvic organ prolapse, would be the
18   vaginal placement of the Elevate system?
19       A   I would say about 50 percent.
20       Q   And what percentage of the pelvic organ
21   prolapse surgeries that you do are done with the robotic
22   sacrocolpopexy?
23       A   The remainder 10 percent.
24       Q   So I'm going to ask you the same series of
25   questions that I asked you about the slings.  Each of

21 (Pages 78 to 81)

Debra L. Fromer, M.D.

Page 82

1  these surgical interventions has a different
2  risk/benefit profile, correct?
3      A   Correct.
4      Q   And when you sit down with a patient, it's
5  your job to tell her the potential risks and benefits of
6  each of these separate surgeries, correct?
7      A   Correct.
8      Q   And to maybe make recommendations, what might
9  be best in her personal circumstance, but allow her to
10  make her own decision about which risks and benefits she
11  is willing to accept, correct?
12      A   Correct.
13      Q   Now, you've worked as a preceptor for Ethicon,
14  correct?
15      A   Yes.
16      Q   And that goes back to about 2003, correct?
17          MS. KABBASH:  Objection.
18      A   I'm not sure.
19  BY MS. FITZPATRICK:
20      Q   What's your recollection of when you started
21  to work with Ethicon as a preceptor?
22      A   I think it was after that.  I don't think it
23  was quite that early, but, again, I don't recall.
24      Q   Since they didn't come in the handy little
25  folders they were supposed to come in, it just came in a

Page 83

1  stack, it might take me a little bit longer to find this
2  stuff than I wanted it to.
3          MS. FITZPATRICK:  Can we mark this as an
4  exhibit?
5          (Exhibit Fromer 9, Document dated 3/29/2012,
6  re:  Master Consulting Agreement, marked for
7  identification.)
8  BY MS. FITZPATRICK:
9      Q   Let me show you what's been marked as
10  Exhibit 9.  Do you recognize the document that I've just
11  handed you?
12      A   This looks like a contract.
13      Q   And it's a contract between you and Ethicon,
14  correct?
15      A   Correct.
16      Q   And do you recall when you entered into that
17  contract?
18      A   I don't recall it, but it says here that the
19  agreement shall commence on March 29th, 2012.
20      Q   And you recall, though, that you worked for
21  Ethicon long before 2012 and before you became an expert
22  witness in litigation, correct?
23          MS. KABBASH:  Objection.
24      A   I don't think I ever worked for Ethicon.  I
25  wouldn't say that.  I think in my whole life, I haven't

Page 84

1  made more than a few thousand dollars from Ethicon.
2  BY MS. FITZPATRICK:
3      Q   Well, would you consider preceptoring for
4  Ethicon to be working for Ethicon?
5      A   Again, this is not -- you phrased it initially
6  as I work for Ethicon.  I don't work for Ethicon.  I was
7  hired by Ethicon, in my recollection, to run a training
8  lab for them and participate in training other surgeons
9  on how to use the products.
10      Q   And you have been hired by Ethicon to do that
11  in connection with the TVT device, correct?
12      A   It could have been one of a few of the
13  devices.  I don't recall.
14      Q   And you recall that you did preceptoring for
15  the TVT-O device, too, correct?
16      A   I think so.  It might have been TVT EXACT.  I
17  don't know if it was the original retropubic or the TVT
18  EXACT.
19      Q   But you recall that it was either the TVT-O or
20  the TVT EXACT?
21      A   Correct, or TVT-O.
22      Q   Well, and you preceptored for the TVT-O,
23  correct?
24      A   Yes, possibly.
25      Q   And you've also preceptored for the Prolift,

Page 85

1  correct?
2      A   Yes.
3      Q   And you've also attended cadaver labs
4  sponsored by Ethicon, correct?
5      A   I have preceptored.  Are you talking about
6  teaching or attending?
7      Q   You both attended one and got trained at one,
8  and you taught them, correct?
9      A   Okay.  I don't -- I don't remember the
10  training lab, but it's very possible that I did one.
11      Q   Okay.  And did you ever get trained by Ethicon
12  on TVT-S?
13      A   I don't remember.
14      Q   Okay.  You don't remember.
15      A   Do you mean in a cadaver lab, a formal
16  training in a cadaver lab?
17      Q   Yes.
18      A   I may have.  I mean, I may have used it in one
19  of the cadaver labs.  I don't recall.
20      Q   And you've also attended educational dinners
21  that were sponsored by Ethicon over the years, correct?
22          MS. KABBASH:  Objection.
23      A   Educational dinners?  For example, what do you
24  mean?
25  BY MS. FITZPATRICK:

22 (Pages 82 to 85)

Debra L. Fromer, M.D.

Page 86

1    Q   Dinners that were sponsored by Ethicon
2  concerning their products.
3    A   I do remember a dinner that was sponsored by
4  Ethicon.  However, it was more of a roundtable
5  discussion for OB/GYNs that -- where there was no formal
6  teaching about their products.  It was more a
7  conversation about incontinence and prolapse and broad
8  discussion.
9    Q   And you've also arranged with Ethicon to
10 sponsor a women's health seminar at Hackensack
11 University; do you recall that?
12   A   Well, we've done a few seminars for patient
13 outreach for a variety of different female urology
14 issues.  We had one that was sponsored by AMS.  We may
15 have had one that was sponsored by Gynecare.  I don't
16 know if it ever got off the ground because it might have
17 been -- it might have -- I remember there being multiple
18 ones that were going on simultaneously from -- that were
19 sponsored by different companies.
20   Q   Okay.  But you do recall Ethicon being there,
21 correct?
22   A   No.  I don't actually recall the Ethicon
23 outreach program actually happening.  I recall an AMS
24 outreach program to women actually happening, but I
25 don't recall the Ethicon.

Page 87

1    Q   And do you recall conducting a cadaver lab
2  with Dr. Vincent Lucente in 2012?
3    A   No, he was not there.  Vincent Lucente was not
4  there, but we did have a cadaver lab.  I don't think he
5  was one of the people proctoring it.
6    Q   You don't think he was there or you know that
7  he wasn't there?
8    A   He wasn't there.
9    Q   And if documents suggested otherwise, those
10 documents would be incorrect?
11   A   That's correct.
12   Q   Now, is this the only contract that you've
13 entered into with Ethicon, the one that's dated March
14 29th, 2012?
15   A   I don't remember.
16   Q   In preparation for your deposition today, did
17 you go back and look for any agreements or contracts
18 that you had with Ethicon?
19   A   No.  But I did -- I did see this document at
20 the TVT -- at my previous TVT deposition, I think I saw
21 this document.
22   Q   But you don't recall whether you have any
23 other contracts with Ethicon or Ethicon has paid you for
24 any other services beyond or after the date of this
25 contract; is that right?

Page 88

1    A   It may have happened, but I don't -- I just
2  don't recall it.
3    Q   Now, you know that the FDA has recently sought
4  to reclassify the trocars that are used in the
5  TVT-O/TVT-R procedures as class 2 medical devices?
6        MS. KABBASH:  Objection.
7    A   I do recall a recent reclassification by the
8  FDA.
9  BY MS. FITZPATRICK:
10   Q   And what was your understanding of that
11 reclassification?
12   A   That it was -- I don't really understand the
13 significance of the reclassification.  It certainly
14 hasn't affected the use of my product, but I do know
15 that it was reclassified.
16       MS. FITZPATRICK:  So let's go ahead and mark
17 this as Exhibit 10 and this is Exhibit 11.
18       (Exhibit Fromer 10, Reclassification of
19 Urogynecological Surgical Mesh Instruction FDA Executive
20 Summary dated February 26, 2016, marked for
21 identification.)
22       (Exhibit Fromer 11, Reclassification of
23 Urogynecological Surgical Mesh Instrumentation dated
24 February 26, 2016, marked for identification.)
25       THE WITNESS:  This one is the short one?

Page 89

1        MS. FITZPATRICK:  Yes, the abbreviated
2  version.
3  BY MS. FITZPATRICK:
4    Q   Now, have you seen this before?
5    A   No.
6    Q   And so, if you look at page 5 of the
7  abbreviated investigation.
8    A   So pages 1 through 4 are not here.
9    Q   It's in the larger version, if you want to
10 take a look at pages 1 through 4.
11   A   I don't like to see things out of context.
12   Q   Sure.
13   A   Do you want me to go to something or do you
14 want me to read this document?
15   Q   Sure.  Why don't you start with page 4.
16   A   Okay.
17   Q   And in page 4, it indicates that the FDA
18 believes that intraoperative and perioperative adverse
19 events such as organ injury, perforation, and
20 hemorrhage, and bleeding, and nerve injury and pain can
21 be reasonably attributed to the urogynecological
22 surgical mesh instrumentation and not the surgical mesh.
23       Now, is it your understanding that the
24 urogynecological surgical mesh instrumentation are the
25 trocars; is that correct?

23 (Pages 86 to 89)

Debra L. Fromer, M.D.

Page 90

1     A   I suppose it could be the trocars.  It could
2  be the Capios.  There's a picture of a Capio here, so...
3     Q   Yup, you're correct, but in the -- in the --
4     A   I assume, yeah, I assume it's the delivery
5  system.
6     Q   Right, but the Ethicon products don't use a
7  Capio, correct?
8     A   That's true.
9     Q   And it uses, instead, the trocar-based system,
10  correct?
11     A   Yeah.
12     Q   Okay.  And the trocar for the TVT-R is
13  different than the trocar that's used for the TVT-O?
14     A   Correct.
15     Q   And if you turn to page 5 -- well, let me ask
16  you this:  Do you agree with the FDA that intraoperative
17  and perioperative adverse events such as organ injury
18  and perforation, hemorrhage and bleeding, and nerve
19  injury and pain can be reasonably attributed to the
20  urogynecological surgical mesh instrumentation and not
21  surgical mesh?
22     A   Yes.  Although, I think those risks are rare
23  in the case of TVT and TVT-O and Prolift.
24     Q   Okay.  And if you turn to page 5, you'll see
25  that the FDA did a literature search of all MDRs

Page 91

1  reported from January 1st, 2008, to December 22nd, 2015,
2  to find those associated specifically with the surgical
3  mesh instrumentation; do you see that?
4     A   The first paragraph?
5     Q   It's in the second paragraph, the FDA searched
6  all MDRs.
7         MS. KABBASH:  I see that language in the first
8  paragraph.  You mean the first one under A?
9         THE WITNESS:  I'm reading from each year.
10         MS. FITZPATRICK:  No, second paragraph.  The
11  FDA searched all MDRs.
12         MS. KABBASH:  Okay.
13     A   Okay.
14  BY MS. FITZPATRICK:
15     Q   And according to this report, the FDA
16  identified a total of 463 MDRs using the search methods
17  that they described above.
18     A   Between 2008 and 2015?
19     Q   That's correct.
20     A   In the absence of knowing what the denominator
21  is?
22     Q   Uh-huh.
23     A   Okay.
24     Q   And that actually leads me to something.
25         You can't solely use the MAUDE database to

Page 92

1  determine what the incidence of adverse events from a
2  particular product are, correct?
3     A   Yes.
4     Q   And one of the reasons is because you don't
5  know what the denominator is, correct?
6     A   That's correct.
7     Q   And the other reason is because there's
8  oftentimes underreporting of those adverse events to the
9  FDA, correct?
10     A   That's true.  And sometimes the adverse events
11  are not necessarily related to what -- whoever's
12  reporting it is related to.
13     Q   So you believe that looking at published
14  literature is required as well?
15     A   Correct.
16     Q   Now, if you take a look at page 6 to 7,
17  there's a chart that has manufacturer and brand name; do
18  you see that?
19     A   The one on top?  The one on the bottom, okay.
20     Q   The one on the bottom, that's right.
21         And so Boston Scientific Corporation had 316
22  MDRs associated, correct?
23     A   Okay.
24     Q   Do you see that?
25     A   Yes.

Page 93

1     Q   And are you familiar with the Pinnacle Pelvic
2  Floor Repair Kit and the Uphold Vaginal Support System?
3     A   I know them, yes.
4     Q   And those don't use trocars; those use a
5  Capio, correct?
6     A   I mean, I see these -- I don't really -- I
7  don't know that I would call -- make a differentiation
8  between that.  I mean, the Capio is a device that
9  implants sutures, and you use it -- it's a long tool to
10  get to where your fingers can't get to, which is the
11  same thing that a trocar is.  So if you're talking about
12  definitions of trocar versus a Capio -- what is -- what
13  is the question?
14     Q   Do you think that the -- well, let's go back
15  to the phrase.  The urogynecological surgical mesh
16  instrumentation use of the Pinnacle and Uphold vaginal
17  support systems are the same as the urogynecological
18  surgical mesh instrumentation that's used to implant the
19  Ethicon devices?
20     A   They are all different.
21     Q   Okay.  And Ethicon doesn't use a Capio,
22  correct?
23     A   That's correct.
24     Q   All right.  And Boston Scientific does?
25     A   That's correct.

Debra L. Fromer, M.D.

Page 94

1    Q   So if you turn to the next page --
2    A   Although, just to -- you know, you're talking
3    about Pinnacle and Uphold.  Those are pelvic floor
4    repair kits, right?
5    Q   Uh-huh.
6    A   Whereas, TVT-O and retropubic TVT, those are
7    stress incontinence procedures.
8    Q   Okay.  And what's used for the Prolift?
9    A   So the Prolift is a delivery system.
10   Q   What type of delivery system is used?
11   A   It's a trocar.
12   Q   So we can agree that the pelvic floor or the
13   pelvic organ prolapse kits that are made by Ethicon use
14   a trocar-based system as opposed to the Capio-based
15   system that Boston Scientific --
16   A   Correct.
17   Q   So if you turn to the next page, you'll see
18   Ethicon, correct?
19   A   Uh-huh.
20   Q   And you'll see that there are 65 MDRs for the
21   Ethicon -- the Gynecare TVT system, correct?
22   A   Correct.
23   Q   And there are 14 for the tension-free vaginal
24   tape, correct?
25   A   Well, I don't -- I'm not sure I understand the

Page 95

1    difference between the two of them.
2    Q   And in fact, those two terms are often used
3    interchangeably, correct?
4    A   Yes.
5    Q   So just looking at this, would you agree with
6    me that the highest number of MDRs associated with a
7    trocar system, as opposed to a Capio system, are
8    associated with the use of the Ethicon products?
9        MS. KABBASH:  Objection.
10   A   I don't see the relevance of that.
11   BY MS. FITZPATRICK:
12   Q   Okay.  Well --
13   A   And also --
14   Q   -- we may disagree on --
15   A   -- Prolift is not listed here -- listed here.
16   I mean, we're comparing apples and oranges here.
17   Q   Whether you agree with me or not, here's the
18   basic question:  Would you agree with me that the
19   greatest number of MDRs associated with a trocar-based
20   system are with the Ethicon products?
21       MS. KABBASH:  Objection.
22   A   Well, that may be true.  However, odds are,
23   the greatest number of products that were being used at
24   the time were the Ethicon products, so...
25   Q   And they caused the greatest number of MDRs

Page 96

1    that we know of here.
2    A   That's probably as a result of the
3    denominator.
4        MS. KABBASH:  Give her half a second.  Just a
5    half a second.
6        I just want to state an objection to the last
7    question.
8        MS. FITZPATRICK:  Okay.
9    BY MS. FITZPATRICK:
10   Q   You don't know what the denominator is?
11   A   That's correct.
12   Q   And nobody knows what the denominator is,
13   correct?
14   A   That's not published anywhere that we can
15   find.
16   Q   So when you say that Ethicon probably had the
17   highest number because it has the highest denominator,
18   you're guessing there?  You have no data to support that
19   guess, correct?
20   A   That's probably true.
21   Q   So the FDA also performed a literature review
22   and it's in the -- I think it's the next -- okay.
23       So on page 30 -- starting at page 30 of that
24   document, there's a discussion of the review of
25   published literature conducted by the FDA.  And if you

Page 97

1    look at page 31, it outlines the methods that were used;
2    do you see that?
3        If you could read through that and tell me if
4    you think that looks like a reasonable methodology to
5    perform a literature review.
6    A   Is this a literature review for --
7    Q   That goes along with the reclassification,
8    correct.
9    A   For all prolapse and incontinence products?
10   Q   Uh-huh.
11   A   And only associated with devices, not native
12   tissue repairs?  This is only associated with devices --
13   Q   Correct.
14   A   -- correct?
15       And did they include randomized control trials
16   where things were compared, where native tissue might
17   have been compared?
18   Q   I guess what I'm just asking you is about the
19   methodology.  Does that look reasonable to you?
20   A   Yes.  Assuming that they incorporated all the
21   studies that are available to review that may -- may
22   result in comparisons between devices and non-devices
23   for the same procedure.  It's hard to know whether or
24   not those were included.
25   Q   Is there any indication on this slide that

25 (Pages 94 to 97)

Debra L. Fromer, M.D.

Page 98

1  those were excluded?
2       MS. KABBASH:  Objection.
3       A   Again, they don't specifically state whether
4  it is or it isn't, so...
5  BY MS. FITZPATRICK:
6       Q   Well, there's some limitations on the searchs
7  that were done that are included in this method slide,
8  correct?
9       A   When you say "limitations," you mean the human
10  subjects, written in English, published between 1967 and
11  2015?
12       Q   Correct.
13       A   Then there's exclusions.
14       Q   Correct.
15       A   But they only searched for devices,
16  manufacturers.  So hopefully, that would come up in
17  their search, the randomized control trials that were
18  done, correct.
19       Q   So let's take a look at the next slide which
20  is on page 32.  So it had 207 references that were
21  reviewed and 74 of those were related to the retropubic,
22  correct?
23       A   207?  Were there more?
24       Q   Resulted in 207 at the bottom of page 31.
25       MS. KABBASH:  Oh, I think you're on the wrong

Page 99

1  page.
2       THE WITNESS:  Am I on the wrong page?
3       MS. KABBASH:  Yes.
4       THE WITNESS:  Oh.
5  BY MS. FITZPATRICK:
6       Q   So there were 207 references that were
7  reviewed?
8       A   Okay.
9       Q   And then the next slide on page 32 breaks down
10  those references, those 207 references by procedure.
11  And there were 74 of those that were retropubic,
12  correct?
13       A   Okay.
14       Q   64 which were transobturator and 32 that were
15  mini-sling for the SUI?
16       A   Correct.
17       Q   For the pelvic organ prolapse, transvaginal
18  repair was related to 33 references and the abdominal
19  repair was by three, correct?
20       A   Okay.
21       Q   All right.  So what I want you to do is to
22  look at page 34 of this for me.  And this shows the
23  results of the literature search for organ perforation
24  and injury; do you see that?
25       A   Yes.

Page 100

1       Q   And the retropubic number found a rate of 0.3
2  to 23.8 of those references.
3       A   This includes bladder injury.
4       Q   Uh-huh.
5       A   Okay.
6       Q   It includes organ perforation, organ injury,
7  urethral injury, urethral injury twice, bladder injury,
8  bladder perforation, rectal injury, cystostomy, and
9  enterotomy; did I say that right?
10       A   Enterotomy.  Yes.  Which is the same thing as
11  bladder injury, an enterotomy.  And they don't break it
12  down according to the severity of the injury.
13       Q   Correct.
14       A   So certainly, you would agree that a bowel
15  perforation would be much more of an issue than a
16  bladder injury.
17       Q   Sure.  For purposes of -- since I don't have
18  to agree with your questions today, we're doing it the
19  opposite way.  You do good at our job.
20       A   Sorry.  I mean, you're rubbing off on me.
21       Q   0.3 to 23 percent -- to 23.8 percent of organ
22  perforation and injury, that's the rate, correct?
23       A   Correct.
24       Q   And you would agree with me that the studies
25  that are going up to 23.8 percent of organ perforation

Page 101

1  and injury as defined here, that's not a rare
2  complication, correct?
3       MS. KABBASH:  Objection.
4       A   Well, I mean, you'd have to break it down by
5  injury.  If you look specifically at bladder injury,
6  it's -- you know, it can range between 15 and 20 --
7  probably up to 23 percent.  And that's something that
8  patients are counseled on with regard to any retropubic
9  sling or any retropubic procedure regardless of whether
10  they're using mesh, trocars or sutures.
11       Q   So before I get to this next line of
12  questioning, let me ask you this:  It's important to
13  know the frequency of a complication or how often it can
14  be expected to occur, correct?
15       MS. KABBASH:  Objection.
16       A   Yes.
17  BY MS. FITZPATRICK:
18       Q   And it's also important to know the severity
19  of the complication, correct?
20       A   That's correct.
21       MS. KABBASH:  Objection.
22  BY MS. FITZPATRICK:
23       Q   And it's also important to understand the
24  permanence of the complication, correct?
25       MS. KABBASH:  Objection.

26 (Pages 98 to 101)

Debra L. Fromer, M.D.

Page 102

1    A   Correct.
2    BY MS. FITZPATRICK:
3        Q   And you have to take all three of those, the
4    frequency, the severity, and the permanence of the
5    complication into consideration when you're counseling a
6    patient on a potential risk of a product, correct?
7        A   And also, the reality of the complication,
8    right. So again, going back to my original discussion
9    of a retropubic versus a transobturator sling, the
10   patient goes in knowing there's a potential for a
11   bladder organ injury during that procedure. And if they
12   do not want to have a catheter because, in their eyes, a
13   catheter is the worst thing in the world, even if it's
14   just for three days, that's going to steer us away from
15   a retropubic sling.
16       Q   So I'm going to call that kind of the
17   real-world consequences --
18       A   Right.
19       Q   -- correct? Okay. So let's put all four of
20   those.
21           So it's important for a physician to counsel
22   on the frequency, the severity, the permanence and kind
23   of the real-world consequences of these decisions,
24   correct?
25           MS. KABBASH: Objection.

Page 103

1        A   Can you repeat the question?
2    BY MS. FITZPATRICK:
3        Q   Sure. It's important for a physician to
4    counsel the patient on the frequency of the
5    complication, the severity of a complication, the
6    permanence of a complication and this -- we'll call it
7    the real-world implications of a complication?
8        A   Yes, how a potential complication could affect
9    their lives.
10       Q   So the rate of a complication, as it's
11   reflected here, is one of the measures and one of the
12   things to counsel a patient on for a physician to be
13   aware of, correct?
14       A   That's true.
15           MS. KABBASH: Objection.
16       A   Although, again, if you're specifically
17   speaking about this rate of organ perforation up to 24
18   percent, I would not counsel a patient that you have up
19   to a 24 percent chance of bowel injury.
20   BY MS. FITZPATRICK:
21       Q   But we're looking at overall organ perforation
22   injury the way that it's defined by the FDA here?
23       A   That's fine, but that's not just reality, the
24   way we talk to patients about it.
25       Q   Fair enough. But this is the way that it's

Page 104

1    reported in the literature.
2            So here's what my point is --
3        A   Actually, to correct you, it's not how it's
4    reported in the literature. The literature usually
5    pieces it apart because that is important.
6        Q   Here's all I'm trying to get to: The
7    transobturator, the rate is 0.2 to 5.8 percent, correct?
8        A   Yes.
9        Q   So there's a significantly lower rate of organ
10   perforation and injury reported with the transobturator
11   sling than the retropubic sling based on this literature
12   review, correct?
13       A   That is most likely because you're avoiding
14   bladder injury.
15       Q   And that is something that you would expect to
16   see, a difference between the rates in the
17   transobturator procedure and the retropubic procedure,
18   because of the bladder injury that you've mentioned,
19   correct?
20       A   Correct.
21       Q   All right. And with mini-sling, the rate is
22   again lower. And is that something that you would
23   expect to see and is consistent with your understanding,
24   of the frequency of this organ perforation and injury as
25   a class with a mini-sling?

Page 105

1        A   Correct.
2        Q   And for the pelvic organ prolapse procedures,
3    there's a rate of organ perforation and injury between
4    0.7 to 13.1 percent, correct?
5        A   That's what this says, yes.
6        Q   Do you consider 13.1 percent to be a rare
7    complication?
8            MS. KABBASH: Objection.
9        A   I wouldn't call it rare. However, I would
10   need to look at the study that shows 13.1 percent chance
11   of organ perforation. That seems to be an outlier in
12   terms of all the data that we have, and that I have
13   accrued and written about in my report.
14   BY MS. FITZPATRICK:
15       Q   But putting aside whether you agree with this
16   statistic or what it's based on, 13.1 percent is not a
17   rare complication?
18           MS. KABBASH: Objection.
19       A   I would not call it rare.
20   BY MS. FITZPATRICK:
21       Q   So if we turn the page then, to the vascular
22   injury and bleeding. Now, this includes: hemorrhage,
23   vascular injury, hematoma, and blood transfusion. So,
24   again, these complications have been grouped under the
25   heading: A vascular injury and bleeding.

27 (Pages 102 to 105)

Debra L. Fromer, M.D.

Page 106

1     For the retropubic, the rate is 0.4 to 29.4
2   percent.  And for the transobturator, it's 0.2 to 11.9
3   percent; do you see that?
4     A   Yes, I see it.
5     Q   And is that consistent with your experience in
6   the difference between the retropubic and the
7   transobturator with the risks associated with the
8   retropubic and transobturator procedures?
9     A   My experience is not within -- is not near
10   this range of up to 29 or 11.9 percent, nor is that the
11   experience that I've seen in reviewing the literature.
12     Q   Okay.
13     A   So again, I would say that these high numbers
14   are outliers.  And even though they presented it as a
15   range, this is not reality or close to it.
16     Q   Okay.  So there's a range of a low to a high,
17   correct?
18     A   That's correct.
19     Q   And is it your opinion that the reality of it
20   lies somewhere in between?
21     A   No.  I think the reality of it is it relies on
22   the very low side, and I have a lot of literature that
23   can also support that.
24     Q   So, when you're looking at this, you believe,
25   although there's a range of 0.4 to 29.4 percent, it's

Page 107

1   more likely to be closer to the 0.4 percent?
2     A   Again, they are stating this rate.  I don't
3   know -- you're not showing me the study that shows a
4   rate of 29 percent vascular injury and bleeding, and I
5   would be interested to see that study.
6     Q   Okay.
7     A   Same thing for the 12 percent transobturator
8   and the 20 percent mini-sling.
9     MS. KABBASH:  Can I just state and seek a
10   standing objection because I understand why retropubic
11   would be -- could be part of questioning, but a lot of
12   the questioning that has happened in the past 20, 30
13   minutes has been very heavily on retropubic as
14   specifically relating to surgical instrumentation and
15   trocar use.  And I'd just like to reiterate that
16   Dr. Fromer is not being put up for a deposition on
17   retropubic right now.  Some of it may relate to her
18   current opinions, but this is specifically on trocar use
19   and surgical instrumentation, which I think is kind of
20   outside the realm of what she's been put up for now.  So
21   I'll just state that standing objection.
22   BY MS. FITZPATRICK:
23     Q   Okay.  Would you agree that vascular injury
24   and bleeding are more common with the retropubic over
25   the transobturator sling?

Page 108

1     A   I have to look at some of the data.  There
2   might be varying -- there might be varying results on
3   that throughout the data.
4     In my personal experience, I don't see -- I --
5   the hundreds of cases I've done, I've transfused one
6   patient and we've identified that she had a bleeding
7   disorder after the surgery.
8     Q   Okay.  There's -- what's -- let me --
9     A   The data also supports that.
10     Q   Let me separate out.
11     There's your clinical experience in treating
12   women, correct?
13     A   Correct.
14     Q   And you've implanted hundreds of women with
15   some kind of polypropylene mesh for the treatment of
16   stress urinary incontinence, correct?
17     A   Correct.
18     Q   And you've implanted hundreds of women with
19   transvaginal mesh for the treatment of pelvic organ
20   prolapse, correct?
21     A   Correct.
22     Q   But you haven't conducted any clinical studies
23   on those women, correct?
24     A   Not true.  We reported on them in the Canadian
25   Journal of Urology last year.

Page 109

1     Q   How many?
2     A   We can look at the numbers.  I have to pull up
3   the article.  I don't know.
4     Q   Can you tell me off the top of your head how
5   many?
6     A   Probably over a hundred.  I don't remember.
7     Q   So a fraction of them were reported, correct?
8     A   That's true.
9     Q   All right.  And for the rest of those women,
10   you don't follow them and you don't address their
11   injuries in the same way that you -- or track their
12   injuries in the same way that you did for the article
13   that you published, correct?
14     MS. KABBASH:  Objection.  Lack of foundation.
15     A   Not true.  So, for example, blood transfusion,
16   this is something that I do know because I have been
17   tracking this.  And there's only one patient that
18   required a blood transfusion, and that was in the
19   setting of a -- of a hemorrhagic disorder that she had.
20   BY MS. FITZPATRICK:
21     Q   Where do you keep that data on your patients
22   that I could take a look at?
23     A   The one patient that I had, I can probably get
24   her record.
25     MS. KABBASH:  Objection.  No, no, no, no.

28 (Pages 106 to 109)

Debra L. Fromer, M.D.

Page 110

1    Hang on. I'm going to state an objection to the extent
2    that you are seeking private patient information of Dr.
3    Fromer. I don't know where you're going with this, but
4    I'll just put it on the record.
5         MS. FITZPATRICK: Okay.
6         MS. KABBASH: And you're not going to
7    volunteer any information about your patients that has
8    not been reported in the medical literature.
9         You can speak generally about your experience,
10   but we're certainly not going to disclose any private
11   information of patients who have not filed lawsuits and
12   waived their privileges.
13   BY MS. FITZPATRICK:
14       Q    There's a group of patients that you followed
15   for the article that you published in 2015, correct?
16       A    That's correct.
17       Q    And there was a methodology that you used for
18   qualifying those patients for the study that you were
19   doing, correct?
20       A    Correct.
21       Q    And there was a methodology that you used for
22   tracking the outcomes for those patients, correct?
23       A    Correct.
24       Q    And there was a methodology that you used to
25   do the statistical analysis to look at what the outcomes

Page 111

1    of those patients were, correct?
2        A    Correct.
3        Q    You don't do that for the rest of your patient
4    population, correct?
5        A    Correct, but I don't need to tell you how many
6    transfusions in all the patients I've done have been.
7        Q    I'm not focusing just on transfusions. I want
8    to get an idea of what you do across the hundreds of
9    women that you've implanted.
10       And so, apart from those who have been
11   reported in the Canadian Urology Journal, you don't
12   follow the methodology for selection for tracking and
13   for statistical analysis across your clinical
14   population, correct?
15       A    Not in the past. However, this is not -- this
16   is not a -- these are not long-term complications. This
17   is an intraoperative complication. Are we just talking
18   generally?
19       Q    I'm just talking generally.
20       A    Okay.
21       Q    I want to understand what you have and what
22   you don't have. And if you've done a statistical
23   analysis of your clinical population in the same way
24   that you did for the Canadian Urology Journal, I want to
25   know what it is and how you did it. And if you didn't

Page 112

1    do it, then I know you didn't do it and I can move on.
2    So that's what I'm trying to figure out here.
3        So, it's not in connection with your vascular
4    injury or hemorrhage?
5        A    I didn't do it.
6        Q    So let me step back.
7        We've already discussed that there was a
8    particular way that you undertook the methodology for
9    the Canadian Urology Journal. You don't employ that
10   same methodology for considering, including, tracking,
11   and analyzing your clinical outcomes in your typical
12   clinical patient who comes in, correct?
13       A    That's correct.
14       Q    That doesn't exist. So what does exist is the
15   study that you did that was published?
16       A    Correct.
17       Q    And that's the only place that I could get the
18   statistical analyses that would look at these different
19   rates of complications across your clinical population?
20       A    Correct.
21       Q    Okay. And so then, in addition to that, there
22   is the clinical literature. And you'll agree with me
23   that the clinical literature is -- there's a significant
24   amount of clinical literature that has reported on
25   safety observations that were secondary to efficacy

Page 113

1    observations, correct?
2        A    Safety observation -- I'm just repeating what
3    you just said. Safety observations that were secondary?
4        Q    Right. Secondary end point to the studies.
5        A    They may have been the secondary end point,
6    but that doesn't make the value of the information
7    achieved from them any less.
8        Q    I'm not suggesting that. I'm just asking you
9    a simple question.
10       The literature that's out there safety --
11   apart from perhaps the Zhang study that we'll look at,
12   safety is the secondary outcome and efficacy is the
13   primary outcome of those studies. You'll agree with me
14   on that, correct?
15       A    Yes.
16       Q    And then, in addition to those studies, there
17   are metaanalyses that have been done that have looked at
18   a collection of these studies and run their own
19   statistical analyses to look at some of the rates of
20   adverse events and complications that are associated
21   with the various procedures, correct?
22       A    That is correct.
23       Q    All right. So all I'm trying to -- and slide
24   35, I'm just trying to ask you a simple question.
25       Is it consistent with your understanding that

29 (Pages 110 to 113)

Debra L. Fromer, M.D.

Page 114

1    there's a higher rate of vascular injury and bleeding
2    associated with the retropubic device than the
3    transobturator device?
4        A   Well, why don't we just look at one of the
5    articles quickly that I've relied upon.  I'm pulling out
6    the Schimpf study.
7        Q   Perfect.  I'm going there.  Great.
8        MS. FITZPATRICK:  Can we mark this as the next
9    one?
10       (Exhibit Fromer 12, Article titled Surgeon for
11   Street Urinary Incontinence in Women:  A systematic
12   review and metaanalysis, marked for identification.)
13       A   So I'm looking at the summary estimate of
14   incidence.
15   BY MS. FITZPATRICK:
16       Q   I'm sorry.  What page are you on?
17       A   I'm sorry.  Page 1.E7.
18       Q   Okay.
19       A   It's table 3, rates of adverse events by sling
20   type from randomized control trials and included adverse
21   event studies.
22       Q   Okay.
23       A   So here you can see for TVT or for
24   transobturator techniques, a .22 percent chance of blood
25   loss greater than 200 cc's.  And for retropubic, 1.5

Page 115

1    percent.  If we move to transfusion, transobturator,
2    0.17 percent, retropubic 0.4 percent.
3        Q   So based on Schimpf, it's your testimony that
4    there is no difference between the vascular injury and
5    bleeding associated with the retropubic transobturator
6    and mini-sling?
7        A   Well, there's a difference.  As you said, it
8    is slightly higher for the retropubic sling, but it's
9    still less than one percent for a transfusion rate.
10   Which I would not be telling a patient choosing between
11   an obturator and a retropubic, you have a .17 percent
12   chance with an obturator and a .4 percent chance with a
13   retropubic.  I'd be saying the chance is less than one
14   percent.
15       All right.  I'll start over again.  Where did
16   I leave off?  Sorry.  Okay.  So --
17       MS. KABBASH:  You said you would not tell a
18   patient --
19       THE WITNESS:  Right.  I would not tell a
20   patient that they have a .17 percent estimate of
21   requiring a transfusion for a transobturator sling and a
22   .4 percent chance of requiring a transfusion for a
23   retropubic sling.  I would say, in reality, the odds of
24   your having a transfusion is less than one percent.
25   BY MS. FITZPATRICK:

Page 116

1        Q   Okay.  I feel like we're talking past each
2    other because you don't want to talk about what I'm
3    talking about, but we will move along.
4        MS. KABBASH:  Objection.
5        A   Just to clarify that, honestly, I pulled this
6    article out because I wanted to make certain what I was
7    telling you was my accurate opinion.
8    BY MS. FITZPATRICK:
9        Q   Then maybe you can tell me your opinion
10   because I've asked it two different ways, and you
11   haven't agreed with either way.  So let me figure out
12   what's going on here.
13       Do you believe that there is a difference in
14   the rates of vascular injury and bleeding between the
15   retropubic and transobturator slings?
16       A   There may be a slight increased risk with
17   retropubic, but I think that they are both so low as to
18   be insignificant -- an insignificant difference.
19       Q   Do you believe that there's a difference in
20   the vascular injury and bleeding between the
21   transobturator and the mini-sling?
22       A   My answer is the same.  It's still less than
23   one percent in most of the studies that we've looked at.
24       Q   Okay.  If you turn to the next page, nerve
25   injury and pain.  And keep Schimpf out, too, because

Page 117

1    this will be --
2        A   Okay.
3        Q   This includes nerve injury, nerve damage, leg
4    pain, thigh pain, buttocks pain, and neurological
5    symptoms, okay?
6        A   Uh-huh.
7        Q   Retropubic has a rate of 0.1 to 5.3 and
8    transobturator has a rate of 0.8 to 30.8 percent.  Do
9    you believe that there's a significantly higher rate of
10   nerve pain and injury associated with the transobturator
11   sling over the retropubic sling?
12       A   Did you say leg pain in your statement or did
13   you say nerve damage?
14       Q   Nerve pain, nerve injury, leg pain, thigh
15   pain, buttocks pain, and neurological symptoms all
16   defined at the top of that page for you.
17       A   Sure.  There's definitely a higher risk of
18   transient leg pain with the transobturator sling than
19   the retropubic sling.
20       Q   Is there a greater rate of chronic leg pain
21   associated with transobturator slings over retropubic?
22       A   I think that this -- there may be a slight
23   increase from transobturator to retropubic in chronic
24   leg pain, but it is still a very low number.
25       Q   And mini-slings, do you believe that there's a

30 (Pages 114 to 117)

Debra L. Fromer, M.D.

Page 118

1   greater incidence of nerve injury and pain associated
2   with the transobturator over the mini-sling?
3      A   Again, the same answer.  The transient leg
4   pain is definitely an increased risk associated with the
5   transobturator technique.
6      Q   Now, taking a look at nerve injury and pain
7   associated with the transvaginal repair, that's 6.0 to
8   39.1 percent as analyzed by the FDA using their
9   literature review.  Is that something that's consistent
10  with your understanding of the incidence of nerve injury
11  and pain associated with transvaginal mesh repairs using
12  trocars?
13     A   This doesn't say "transvaginal mesh repair."
14  This just says "transvaginal repair."
15     Q   But you realize that this whole thing deals
16  with transvaginal mesh, correct?  It's the placement of
17  either --
18     A   Okay.
19     Q   It's the placement of either mesh or SUI or
20  for pelvic organ prolapse.
21     A   Okay.  Because I was -- again, it goes back to
22  the search and what they were including.  But I
23  understand you're telling me that these are all mesh,
24  including the abdominal repair being a mesh
25  sacrocolpopexy, correct?

Page 119

1      Q   Right.
2      A   Okay.
3      Q   So all I'm asking you is:  They report out 6.0
4   to 39.1 percent rate of nerve injury and pain associated
5   with a transvaginal repair.  Is that consistent with
6   your understanding?
7      A   Again, it's a very wild range that's listed
8   here.  And I'm sure if you look at certain studies, you
9   can see higher rates than lower rates.  But if you're
10  looking at the global picture, the number is probably
11  closer to the 6 and possibly lower than the 39.
12     Q   Okay.  And that's based on the literature that
13  you have cited here, correct?  That's the basis for your
14  opinion on that?
15     A   Yes.
16     Q   71.E9 of Schimpf or Exhibit 12.  Groin pain,
17  if you look about halfway down.  Dr. Schimpf and her
18  colleagues looked at the incidence of groin pain
19  associated with the mini-sling, the retropubic sling,
20  and the obturator sling, along with some other native
21  tissue procedures or, I should say, the autologous
22  fascial sling and the Burch procedure, correct?
23     A   Correct.
24     Q   And what Dr. Schimpf and her colleagues
25  concluded was that the summary estimate of incidence of

Page 120

1   groin pain with the obturator was 6.5 percent over the
2   retropubic of 1.5 percent, correct?
3      A   Correct.
4      Q   And that was both higher than the incidence
5   with the mini-sling which is 0.62 percent, correct?
6      A   Correct.  Although, we would have to look into
7   more detail about whether that 6.5 percent is transient
8   or how long-term that is because that's important when
9   you're looking at the complications.
10     Q   But Dr. Schimpf, in this article, hasn't done
11  that analysis, correct?
12     A   No.  Although, I have a list of some studies
13  that looked at that.
14     Q   Have you done a metaanalysis to assess the
15  incidence of chronic groin pain with the obturator,
16  retropubic, and mini-sling?
17     A   No.  I was referring to my list of -- other
18  list of articles that look at this in terms of
19  long-term, short-term.
20     Q   But are those metaanalyses or are those
21  individual --
22     A   I'm not sure.
23     Q   Either randomized control trials or
24  prospective studies?
25     A   I think it was a randomized control trial.

Page 121

1      Q   And so one of the benefits of this type of
2   metaanalysis done by Dr. Schimpf, is she was able to
3   pull all of that stuff together, sort out the apples and
4   oranges, and do a statistical analysis.  And you haven't
5   actually done that, correct?
6      A   That's true.
7         MS. KABBASH:  Objection.
8   BY MS. FITZPATRICK:
9      Q   So what she's reporting here is, and would you
10  agree, that there's a significantly higher chance of
11  groin pain with the obturator sling over either the
12  retropubic or the mini-sling?
13     A   Yes, that is correct.
14     Q   And 6.5 percent is not rare, correct?
15        MS. KABBASH:  Objection.
16     A   I would call that 6.5 percent.  Whether it's
17  rare, uncommon, common, prevalent, I don't think there's
18  any definition for that.
19  BY MS. FITZPATRICK:
20     Q   Well, I'd like to know what the definition is
21  because you've used the term "uncommon" or "rare" many
22  times in your deposition today, in your opinions,
23  concerning the incidence of certain adverse events
24  associated with the polypropylene midurethral slings.
25  And I'd like to know what you mean by "rare" and

31 (Pages 118 to 121)

Debra L. Fromer, M.D.

Page 122

1    "uncommon" and at what point that stops.
2        A    Okay.  That's a good question.
3            When I'm talking to patients about this, which
4    is, I think, relevant to this conversation because, at
5    the end of the day, we're dealing with the women who are
6    having these surgeries.  I don't really use the word
7    "rare."  I use the numbers.  Okay.  So if I think
8    something is less than one percent, like bleeding,
9    transfusion, I will call it less than one percent.  If
10   something is less than 10 percent, I'll call it less
11   than 10 percent.  If we're talking about something like
12   bladder injury, I'll tell a patient there's a 15 to 20
13   percent chance you may go home with a catheter today.
14   And I don't use the words "common" or "uncommon"
15   because, at least with patients, because it results in
16   this kind of difficulty with understanding.
17           So when we talk about -- when I use that word,
18   you can -- I can bring up the numbers for you that I
19   have written down as reminders for myself.
20       Q    But you were the one that was using the words,
21   so I'm trying to understand what it was that you were
22   telling me in the course of the deposition.
23           What do you tell patients is the chance of
24   them leaving your operating room with groin pain
25   following an obturator sling?

Page 123

1        A    I prepare them for the fact that your legs are
2    going to hurt after the surgery.  It's probably going to
3    last for 24 to 48 hours.  You will get pain medication
4    for that.  And after that, it will dissipate and
5    eventually go away.
6        Q    You told me that the way you counsel patients,
7    is you tell them less than one percent, less than ten
8    percent.  What do you tell them with the groin pain
9    associated with the obturator sling?
10       A    I tell them they're going to have pain
11   afterwards.  I just assume it's going to happen.  I
12   prepare them for that because I don't want them to be
13   confused.  That is something that happens.  We're
14   operating on the groin, the site of making an incision
15   in the leg, so that's their site of pain.
16       Q    What do you tell them is the potential for
17   chronic groin or leg pain following the obturator
18   procedure?
19       A    Less than one percent.
20       Q    And what is that based on?
21       A    Studies that have been done in the literature
22   as well as my own review of my patients.
23       Q    Show me what you've got that's less than one
24   percent for chronic.
25       A    So Saradi 2013.

Page 124

1        Q    Do you have a copy of that with you?
2            MS. KABBASH:  I don't know if we do.  We can
3    look.  Do you want to take a break?
4            MS. FITZPATRICK:  If you've got it handy.  I
5    don't want to waste too much time, but if we're going to
6    talk about certain studies that you have, I'd like to
7    have them on something other than a thumb drive.
8            MS. KABBASH:  Well, if you want us to look for
9    Sorrotti, I can go look for Saradi.
10           MS. FITZPATRICK:  Okay.  That would be great.
11   BY MS. FITZPATRICK:
12       Q    What other ones are you going to?  Let's get
13   them all at the same time.
14       A    That's -- I mean, to be honest, that's the
15   best one because it went out to five years.
16       Q    And would you base what you tell your patients
17   on a single study?
18           MS. KABBASH:  Objection.
19       A    Very few of these studies have looked at groin
20   pain going out to five years, so that's why I've used
21   this particular study.
22   BY MS. FITZPATRICK:
23       Q    Is it the only one?
24       A    No.  There are other studies, and I'm sure we
25   can find other rates of groin pain.  There is the Zhang

Page 125

1    study that went out to a year and that was 3.8 percent,
2    which is on the higher end.
3        Q    Do you counsel your patients if there's a
4    possibility of up to 3.8 percent chance of chronic pain,
5    groin pain, and leg pain up to a year?
6        A    I don't use that number.  However, I will tell
7    you that we do discuss that being a possibility, and we
8    do have patients who are marathon runners, bodybuilders,
9    who opt not who have a TVT-O for that reason because
10   they don't want that even small chance of having that
11   problem.
12       Q    And is there anything else besides Saradi that
13   you rely on, for your advice to patients, that their
14   chance of having chronic leg or groin pain is less than
15   one percent?
16       A    My own personal experience with my patients,
17   having followed them in the long-term.
18           MS. FITZPATRICK:  If we can pull Saradi.
19   Maybe I'll take a quick look while we're doing that.
20   We'll take a break.
21           (Whereupon, a brief recess is taken.)
22           MS. FITZPATRICK:  Let me mark this as
23   Exhibit 13 and this is the article by Dr. Zhang that you
24   had discussed.
25           (Exhibit Fromer 13, Retropubic Tension-Free

32 (Pages 122 to 125)

Debra L. Fromer, M.D.

Page 126

1    Vaginal Tape and Inside-Out Transobturator Tape:  A
2    long-term randomized trial, marked for identification.)
3    BY MS. FITZPATRICK:
4        Q    Dr. Zhang's article was the one that you had
5    referenced as an RCT that had a primary end point of
6    safety.  Having looked at the article, is that still
7    your opinion concerning this article?
8        A    Well, they phrased it in a different way.  The
9    primary outcomes where the proportions of patients with
10   long-term postoperative complications, which is another
11   word for safety.
12       Q    Okay.  And this is the only RCT that you know
13   of that had that primary outcome of safety, correct?
14       A    It -- yes.  And for stress incontinence or
15   pelvic floor repair.
16       Q    So just looking at this article, this looked
17   at both the TVT and the retropubic group and an
18   obturator group, correct?
19       A    Correct.
20       Q    And it found that there were long-term
21   complications in 43.1 percent of patients who had the
22   TVT device, correct?
23       A    That was in the TVT, yes.
24       Q    That's not rare, is it?
25            MS. KABBASH:  Objection.

Page 127

1        A    I never said 43 percent was rare.
2    BY MS. FITZPATRICK:
3        Q    And do you tell your patients that they have
4    greater than 40 percent chance of having a long-term
5    complication associated with the TVT?
6        A    I do not because I don't necessarily believe
7    that the 43 percent is necessarily related to the TVT.
8    This is a long-term study, over 95 months, which, you
9    know, for example, de novo overactive bladder, that is
10   something that can happen as related to the sling, but
11   it's also something that can happen with the natural
12   history of overactive bladder and in an aging population
13   of women.
14       Q    Well, let me get this on the record.
15            The TVT-O, there was a long-term complication
16   rate of 27.4 percent, correct?
17       A    Correct.
18       Q    Do you counsel your TVT-O patients that they
19   have a greater than 25 percent chance of having a
20   long-term complication associated with the TVT-O?
21       A    No.  Because we break complications down.  So,
22   for example, voiding complaints after slings that
23   persist, in the long-term, is something that is
24   discussed because that, as you said, is not rare.  It is
25   less common than more common and can occur in up to 20

Page 128

1    percent in any anti-incontinence procedure.  So that is
2    discussed broadly in terms of having any kind of surgery
3    for incontinence.
4        Q    Okay.
5        A    The slings being included.
6        Q    So let me take a look at, if I'm reading this
7    correctly, on page 107 of this article, it looks like
8    what Dr. Zhang's group found is that 20.6 percent of the
9    TVT group had de novo voiding systems, that means new,
10   correct?
11       A    Correct.
12       Q    And it found that 11.29 percent of the TVT-O
13   group had de novo voiding symptoms following placement
14   of the TVT-O, correct?
15       A    Can you give me a second?  Which line --
16   you're looking at the chart, the table?
17       Q    Uh-huh.
18       A    And de novo voiding symptoms, 20.69 percent in
19   the TVT group; 11.29 in the TVT-O group; both within
20   range for what we would expect for the de novo voiding
21   since this would be for any anti-incontinence procedure.
22       Q    So you don't think that's got anything to do
23   with the TVT or the TVT-O?
24       A    Again, I think that any anti-incontinence
25   procedure carries a risk of de novo overactivity.  Do we

Page 129

1    know what causes it?  Not necessarily.  There are many
2    theories about that, but we don't know that it's the
3    actual sling.  We don't know that it's the proximity
4    that we operate to nerves in any of these
5    anti-incontinence procedures.
6            And this is -- again, this is a rate that all
7    surgeons know.  This is something that is a well-known
8    complication of any anti-incontinence procedure
9    including Burches and autologous fascial slings.
10       Q    So you think there is a 20 -- according to the
11   literature, there is a 20.69 percent chance, or
12   somewhere around that, of de novo voiding symptoms
13   following an autologous fascial sling procedure?
14       A    I'm sure we can find a study that goes up that
15   high, but we can look at other studies.  We can look at
16   the Schimpf to see what they found.
17       Q    Okay.  Let's look at -- let's do that.  Let's
18   look at Schimpf.
19            Now, would you rely on Dr. Schimpf's article
20   to give you the rates of adverse events for autologous
21   fascial slings?
22       A    That's a good question.  I would probably be
23   more likely to rely upon the AUA guidelines for the
24   treatment of stress incontinence that did a more
25   historical analysis.  Because, I think in recent years,

33 (Pages 126 to 129)

Debra L. Fromer, M.D.

Page 130

1 autologous fascial slings have fallen out of favor for
2 obvious reasons. So I don't know that they're -- you
3 know, this is -- that's not something that I was truly
4 looking at and relying upon for this, but, however, in
5 my report I believe I did cite the AUA guidelines on
6 stress incontinence for that.
7     Q   Does Dr. Schimpf, in her article, report
8 anywhere on the rates of adverse events associated with
9 the autologous fascial sling?
10     A   Well, she talks about pubovaginal slings.
11     Q   Is it your assumption that when she talks
12 about pubovaginal slings that she's talking about
13 autologous fascial slings?
14     A   It's my assumption it's included in there.
15     Q   So if we go back and look at table 1 on
16 page 71.E3, and you'll see about halfway down the page,
17 it says pubovaginal sling versus Burch.
18     A   Uh-huh.
19     Q   And you'll see an article by Dr. Culligan in
20 2003, and there she has considered a Gore-Tex sling as a
21 pubovaginal sling, correct?
22     A   Yes.
23     Q   And Gore-Tex is no longer used as a surgical
24 intervention to treat stress urinary incontinence,
25 correct?

Page 131

1     A   Yes, because of complications.
2     Q   Right. It's got a very high rate of
3 complications, correct?
4     A   Correct.
5     Q   And so if you're including a Gore-Tex study in
6 with autologous fascial slings, it's necessarily going
7 to skew the numbers because of the high rates of
8 complications associated with Gore-Tex, correct?
9     A   Yes, I would agree with you.
10     Q   And Dr. Culligan's article is footnote 20 in
11 Dr. Schimpf's article, correct?
12     A   Correct.
13     Q   And if you look then at table 3, and you look
14 at the randomized control trials and adverse event
15 studies, you see the footnotes up top? It's between
16 footnotes 9 and 57 --
17     A   Uh-huh.
18     Q   -- which includes 20, correct?
19     A   Uh-huh.
20     Q   Which includes Dr. Culligan's study, correct?
21     A   Okay.
22     Q   Do you agree with me?
23     A   Yes.
24     Q   So you wouldn't rely on these rates of adverse
25 events associated with a pubovaginal sling to accurately

Page 132

1 reflect the rate of those adverse events associated
2 specifically with an autologous fascial sling, correct?
3 They're not synonymous here?
4     A   No, I wouldn't. However, the flip side is
5 also skewing data in that they've included some TVT
6 SECUR in the midurethral sling; that is getting mixed
7 into the retropubic. So if you look -- continue on
8 table 1, you can see all the comparators, TVT SECUR
9 being included in the analysis.
10     Q   Now, show me where that is.
11     A   Table 1.
12     Q   Okay.
13     A   Page 71.E5. Mini-sling versus any other
14 sling.
15     Q   Okay. And that is studies that are looking at
16 the safety or efficacy of the mini-sling?
17     A   Right.
18     Q   Versus any other sling.
19     A   Right. She did not lump the mini-slings,
20 you're right. She did not lump the mini-slings with the
21 retropubic and obturator slings, so it was a separate
22 line that would bring down the mini-slings.
23     Q   Okay. So it's really -- here, it's the
24 pubovaginal, at least from what you can see here, the
25 pubovaginal adverse events here can't be correlated

Page 133

1 solely to an adverse event associated with an autologous
2 fascial sling, right?
3     A   Well, can we go back to that table? How many
4 patients were included in that Gore-Text trial? We're
5 looking at 17 patients out of a total of how many
6 patients who she's including pubovaginal sling. We can
7 calculate this, but we would have to see what percent to
8 see how skewed it would be. I would look at that.
9     Q   Right. But you would agree that the way to
10 calculate the complication or adverse event rate with an
11 autologous fascial sling, is to look at the autologous
12 fascial sling and not to include either the Gore-Text or
13 the dura mater, which is not a autologous fascial sling
14 too, correct?
15     A   Yes.
16     Q   And Dr. Schimpf hasn't done that?
17     A   No. Although, again, the significance of it
18 depends upon, you know, if it's .1 percent of the
19 patients, is that very significant? If it's 80 percent
20 of the patients, it's obviously significant.
21     Q   But you don't know?
22     A   No, but I can figure it out.
23     Q   But you haven't, right?
24     A   No. But I -- I didn't say that I was relying
25 on this. I said that I would rely on the AUA Guidelines

34 (Pages 130 to 133)

Golkow Technologies, Inc. - 1.877.370.DEPS

Debra L. Fromer, M.D.

Page 134

1  for pubovaginal sling.
2      Q   So I just wanted to establish you're on the
3  same page with Dr. Schimpf.
4          Now, going back to Dr. Zhang's article, there
5  is a rate here, table 2, of de novo dyspareunia, and
6  that means new onset dyspareunia, of 5.17 percent with
7  the TVT and 8.05 with the TVT-O, correct?
8      A   Correct.
9      Q   Do you counsel your patients on those
10  statistics?
11      A   I do counsel my patients on de novo
12  dyspareunia.
13      Q   And what rate do you tell them to expect?
14      A   So I usually tell them around five percent or
15  less.
16      Q   Tape exposure, now, that is an erosion or
17  extrusion, correct?
18      A   Well, it depends on the definition, but it
19  means that -- tape exposure means that you can visualize
20  the tape through the epithelial.
21      Q   And the epithelial would be the vaginal
22  epithelial, so the tape is coming through the vaginal
23  wall and exposed into the vagina, right?
24      A   It's the visualization of it, correct.
25      Q   So we've got a 3.45 percent with the TVT and

Page 135

1  an 8.05 percent with the TVT-O. What do you counsel
2  your patients on is the rate of tape exposure for the
3  TVT?
4      A   For the TVT itself?
5      Q   Uh-huh.
6          MS. KABBASH:  The retropubic?
7          MS. FITZPATRICK:  The retropubic, yeah.
8          THE WITNESS:  Yes. I --
9          MS. KABBASH:  I just want to continue my
10  standing objection. Go ahead.
11      A   Okay. I counsel my patients that it's less
12  than five percent.
13  BY MS. FITZPATRICK:
14      Q   And what do you do with the TVT-O?
15      A   The same.
16      Q   And that's inconsistent with this article,
17  correct?
18      A   That is.
19      Q   Okay.
20      A   But not inconsistent with the data that I've
21  looked at over the last year and a half and my overall
22  experience of operating on hundreds of patients, and
23  understanding that there is a technical component to
24  this, that it's operator-dependant.
25      Q   So let me just -- what seems to me is when

Page 136

1  you're faced with -- there's lots of --
2          Let me put it this way:  There's lots of
3  studies out with this different rates of complications
4  associated with each of these devices, correct?
5      A   Correct.
6      Q   And when you're counseling patients, you tend
7  towards the lower rate, the lower reported rate of
8  complications rather than the higher reported rate of
9  complications?
10          MS. KABBASH:  Objection.
11      A   Not true.
12  BY MS. FITZPATRICK:
13      Q   But you're not doing it in consistency with
14  the only randomized controlled trial that was looking at
15  long-term safety complications associated with these
16  devices, correct?
17          MS. KABBASH:  Objection.
18      A   Just because they -- this was the only study
19  that looked at safety as a primary outcome -- doesn't
20  debunk the large volume of data on safety and efficacy
21  in patients -- on thousands of patients in hundreds of
22  articles that I've cited.
23  BY MS. FITZPATRICK:
24      Q   So you think this one's an outlier?
25          MS. KABBASH:  Objection.

Page 137

1      A   No, I didn't say that.
2  BY MS. FITZPATRICK:
3      Q   Then I'm trying to understand what it is.
4  Because every time we look at statistics, you keep
5  telling me it's at the lower rate. It's at the lower.
6  It's at the lower rate. And you seem to be disregarding
7  the reported studies that have the higher rates of
8  complication. I'm trying to figure out why you do that.
9      A   No, I'm -- I'm not disregarding that. I'm
10  taking it into consideration. This study came up
11  because you had asked me if there was a study that
12  looked at safety as an end point. And so I said yes.
13  In fact, there is a study that looked at safety as an
14  end point. And this is how this article came about.
15  This is one of many articles that looks at TVT versus
16  TVT-O and there's obviously a range.
17      Q   Okay.
18      A   And then there's my own personal experience as
19  well.
20      Q   Let me ask you quickly with respect to
21  Dr. Schimpf's article again. If we can go to table 4.
22  And if you go about halfway down, it says retropubic
23  versus obturator midurethral slings, correct?
24      A   Correct.
25      Q   And it says that retropubic slings result in

35 (Pages 134 to 137)

Debra L. Fromer, M.D.

Page 138

1    lower rates of sling erosion, need to return to the
2    operating room for treatment of sling erosion, groin and
3    leg pain, and vaginal perforation; do you agree with
4    that?
5        A   I agree with the groin and leg pain.  I agree
6    with vaginal perforation.  And, as a result of vaginal
7    perforation, I agree with the rates of sling erosion and
8    need to come to -- need to return to the operating room.
9        Q   Okay.  So you agree with that?
10       A   Correct.
11       Q   Okay.  And with transobturator midurethral
12   slings result in shorter operative time, fewer
13   bladder/urethral perforations, less perioperative pain,
14   fewer urinary tract infections, and less overactive
15   bladder systems; do you agree with that?
16       A   Yes.
17       Q   And so this goes back to the discussion that
18   we were having that there are differences in the
19   risk/benefit profile of the TVT versus the TVT-O
20   procedures, correct?
21       A   Correct.
22       Q   Now, I want to go back to the instructions for
23   use.  And you've looked at the instructions for use
24   associated with both the TVT and the TVT-O systems,
25   correct?

Page 139

1        A   Yes.
2        Q   And you've offered some opinions on those
3    instructions for use, correct?
4        A   Correct.
5        MS. FITZPATRICK:  Can we mark the TVT
6    instructions for use -- and I apologize.  It's very
7    small print -- as 14, I believe, and the TVT-O as
8    Exhibit 15?
9        (Exhibit Fromer 14, Gynecare TVT Instructions
10   for Use, marked for identification.)
11       (Exhibit Fromer 15, Gynecare TVT Obturator
12   System, marked for identification.)
13   BY MS. FITZPATRICK:
14       Q   Now, you've seen both of these before,
15   correct?
16       A   Which year is this?
17       Q   These are the pre-2015.
18       A   Okay.  Yes.
19       Q   This TVT is 2009.  Do you see that right down
20   here?
21       A   Right.
22       Q   And then, I believe that the Gynecare was
23   2010.
24       A   This looks like --
25       Q   2008?

Page 140

1        MS. KABBASH:  Just to put on the record for
2    the benefit of both of you, don't lend any credence to
3    copyright dates.  The dates that they're in use would be
4    according to the chart that we have produced in the
5    litigation.  So that's what -- and I'm not doubting what
6    you're saying that it would be in effect in 2009, but
7    I'm just saying, don't go by copyright dates on
8    anything.  Our chart that has been produced in the
9    litigation is which governs any use dates.
10       MS. FITZPATRICK:  Okay.  Fair enough.
11   BY MS. FITZPATRICK:
12       Q   And you've looked at the TVT-R IFUs over time,
13   correct?
14       A   Uh-huh, yes.
15       Q   And you know that the changes to that TVT IFU
16   came in 2015, correct?
17       A   That's correct.
18       Q   So you've seen the pre-2015 and the post-2015,
19   correct?
20       A   Yes.
21       Q   And it's the same with the TVT-O, that there's
22   pre-2015 IFU and then the major changes were made in
23   2015, correct?
24       A   Yes.
25       Q   And you also understand that the cases at

Page 141

1    issue in Wave 1 of this litigation all involve pre-2015
2    implants?
3        A   Yes.
4        Q   Do you understand that?  Okay.
5        So we've already established, and you've
6    agreed with me, that there are different risk/benefit
7    profiles for the TVT and the TVT-O that are supported by
8    your experience and by the literature, correct?
9        A   Yes.
10       Q   And I'm wondering if, in looking at these
11   instructions for use, I'm a physician looking at these,
12   where I could see the difference between the risk
13   profile associated with the TVT versus the risk profile
14   associated with the TVT-O.
15       A   Why don't you know that already, Doctor?
16       Q   I'm asking you what Johnson & Johnson told
17   physicians.  I understand your position that the medical
18   device manufacturer is off the hook.  It's completely on
19   the medical community.  I'm just asking you, though,
20   putting that aside and looking at these, where could I,
21   as a physician, see the differences between the risk
22   profiles associated with the TVT and the TVT-O as
23   communicated to me by Ethicon?
24       MS. KABBASH:  Objection.  Mischaracterization.
25       A   Okay.  So we would look in the adverse events.

36 (Pages 138 to 141)

Debra L. Fromer, M.D.

Page 142

1  Do you have it turned to a specific page for me or do
2  you want me to find it?
3  BY MS. FITZPATRICK:
4      Q   I'm asking if you're aware of anywhere in
5  these IFUs that reflect a different risk profile for the
6  TVT versus the TVT-O.
7      A   So here we go.  On this page, you see a
8  picture of the implant going through the transobturator,
9  going through the obturator canal and coming out the
10 groin.  There I am, okay.  This patient is going to have
11 postoperative groin pain at the site where it's coming
12 out.  Okay.
13         I'm going to avoid having a bladder injury
14 because I know where the bladder is.  I know my pelvic
15 anatomy, and I'm going to avoid hitting the bladder.  So
16 I know that I'm not -- I'm very unlikely to have a
17 bladder injury through this technique looking at the
18 diagram.
19     Q   Maybe you're not understanding my question and
20 I don't want to -- I apologize if I made it unclear.
21        The IFUs contained contraindications and
22 warnings and precautions, right, including an adverse
23 event.  So let's, for example, start with the TVT-O.  I
24 think you mentioned in one of your answers that
25 sometimes athletes and marathon runners, et cetera,

Page 143

1  don't want to take the risk of the transobturator
2  procedure because of the increased potential for a
3  chronic leg or groin pain that could affect them,
4  correct, something along that line; did I get --
5      A   Yes, relative to -- I'm sorry.
6      Q   -- that sort --
7      A   Yes.  Relative to a retropubic TVT, for
8  example.
9      Q   Can I find that in here?  Is there somewhere
10 in here that tells me that?
11        MS. KABBASH:  Objection.
12     A   Well, again, I'm a doctor.  I'm not somebody
13 that's walking off the street.  I don't need somebody to
14 say --
15 BY MS. FITZPATRICK:
16     Q   I understand you and I are going to disagree
17 on the importance of IFU.  You got your record on that.
18 The IFU still exists.  So I'm not asking you your
19 opinions whether they're important or not.
20        I'm asking your opinions on what is contained
21 in them regardless of whether you think they matter or
22 not?
23        MS. KABBASH:  Objection.  Mischaracterization.
24 BY MS. FITZPATRICK:
25     Q   Is the TVT-O contraindicated or it's indicated

Page 144

1  anywhere in the contraindications or warnings or
2  precautions or adverse reactions, that there's a greater
3  risk of chronic leg and groin pain in what you've
4  observed with athletic or active women?
5      MS. KABBASH:  Objection.
6      A   I never said that.  I never said that it
7  was -- there was an increased risk of leg pain
8  specifically for active women.  I said that active --
9  and I don't mean active women.  I mean people who make a
10 living out of being physically active that have concerns
11 about having any kind of surgery on their legs.  So I
12 just want to clarify what I previously said.
13         Transient leg pain, lasting 24 to 48 hours,
14 may occur and can usually be managed with mild
15 analgesics.
16 BY MS. FITZPATRICK:
17     Q   Does that say "chronic"?
18     A   No.
19     Q   So where does it tell me about the chronic?
20     A   Punctures or lacerations, vessels, nerves may
21 occur during needle passage and may require surgical
22 repair.
23     Q   Do you think that's specific to the TVT-O?
24     A   No.
25     Q   So that's all I'm asking you about.

Page 145

1         Could a physician, by looking at the TVT-R and
2  the TVT-O instructions for use, discern the differences
3  in the risk profiles for these particular devices
4  through what Ethicon has said here?
5      A   Yes.  I do believe that, based on the diagrams
6  that are here and based on the expected knowledge of the
7  surgeon implanting these devices.
8      Q   I'm not asking you about the expected
9  knowledge, and I know you keep wanting to go there.  And
10 I think you keep wanting to there because you know this
11 stuff isn't in here.
12        MS. KABBASH:  Objection.
13 BY MS. FITZPATRICK:
14     Q   I'm asking you about the language in the IFUs.
15 If there's something in the language of these IFUs that
16 tells doctors that there are different risks associated
17 with the TVT versus the TVT-O, does it exist in these
18 IFUs?
19        MS. KABBASH:  Objection to editorial statement
20 of counsel.  Asked and answered.
21     A   So in the TVT IFU, it suggests that cystoscopy
22 should be performed to confirm bladder integrity or
23 recognize the bladder perforation which is a specific
24 complication associated with the TVT, more common in the
25 TVT than the TVT-O.

37 (Pages 142 to 145)

Debra L. Fromer, M.D.

Page 146

1    I do believe that -- before I say "I believe,"
2  it says, "Cystoscopy can be performed at the discretion
3  of the surgeon." So the company is saying it's optional
4  because the risk of bladder perforation is much less
5  than the risk of bladder perforation with the retropubic
6  TVT.
7    Q   Is that the best you got to defend the IFU?
8        MS. KABBASH: Objection. Argumentative.
9  BY MS. FITZPATRICK:
10   Q   Keep going.
11       MS. KABBASH: Hang on. Let me get my
12  objections on the record.
13       Argumentative. And I'm just -- argumentative.
14  Go ahead. She can answer.
15   A   Okay. So again, another difference in
16  technique associated -- in order to alert the physician
17  to the fact that bladder injury is a potential -- is
18  using the catheter guide, which is not employed in the
19  TVT-O; again, alluding to the higher risk of bladder
20  perforation with a retropubic TVT.
21       And again, the leg pain is here and not here.
22  Transient -- sorry.
23       MS. KABBASH: Can you be more specific for the
24  record?
25       THE WITNESS: The transient leg pain that's

Page 147

1  stated here is not stated -- the transient let pain that
2  is stated in the TVT-O IFU is not stated in the TVT IFU.
3        MS. KABBASH: Fidelma, I don't know what your
4  intentions on timing are, but it's almost 1 o'clock and
5  I want to feed my witness.
6        MS. FITZPATRICK: Okay.
7        MS. KABBASH: Including you.
8        MS. FITZPATRICK: Okay.
9  BY MS. FITZPATRICK:
10   Q   Does it say anywhere in the -- are there words
11  in the TVT IFUs that say there's an increased risk of
12  bladder perforation?
13   A   With the TVT relative to the TVT-O?
14   Q   Uh-huh.
15   A   No.
16   Q   Okay. Does it say in the TVT-O anywhere, that
17  there's an increased risk of chronic leg and groin pain
18  relative to the TVT?
19   A   The word "chronic" is not used in association
20  with leg pain.
21   Q   And you'll agree with me that the
22  contraindications, warnings, and precautions and adverse
23  reactions are largely the same between the TVT IFU and
24  the TVT-O IFU, correct?
25       MS. KABBASH: Objection.

Page 148

1    A   There are similarities, but still there are
2  differences.
3  BY MS. FITZPATRICK:
4    Q   They're more similar than different, don't you
5  think?
6        MS. KABBASH: Objection.
7    A   They are similar, but it's the same tape, just
8  a different delivery system.
9  BY MS. FITZPATRICK:
10   Q   Okay. And you agree with me that the
11  delivery system and the placement, as we've already
12  established, creates separate risks, correct?
13   A   Yes.
14   Q   And that's what you counsel your patients on,
15  correct?
16   A   Correct.
17   Q   And if I were looking for it in these two
18  IFUs, I can't find that information?
19       MS. KABBASH: Objection.
20  BY MS. FITZPATRICK:
21   Q   Right?
22   A   That's not correct. I can find that
23  information here.
24   Q   You can find that information? Okay. That's
25  interesting. We'll leave it at that.

Page 149

1        Do you want to stick with that answer?
2        MS. KABBASH: Objection. Don't answer that.
3  BY MS. FITZPATRICK:
4    Q   I want to know.
5        MS. KABBASH: All right. Answer it.
6    A   Okay. The information that I get from this
7  involves every page of this, not just the words that are
8  explicitly stated.
9  BY MS. FITZPATRICK:
10   Q   Okay.
11   A   Because I am not a layperson sitting here
12  reading this. I'm a surgeon who does pelvic floor
13  surgery.
14   Q   Okay. Do you know what the difference between
15  laser-cut and mechanically-cut mesh in the TVT and the
16  TVT-O are?
17   A   Yes.
18   Q   Tell me what those are.
19   A   I mechanically-cut mesh. It's cut by a
20  machine and laser-cut mesh is cut by a laser.
21   Q   What are the different risk profiles?
22   A   There are no different risk profiles that have
23  been written about in the literature, to my knowledge.
24  There's been no head-to-head study that I know of that
25  compares efficacy or safety.

38 (Pages 146 to 149)

Debra L. Fromer, M.D.

Page 150

1    Q   Are you aware of any internal Ethicon
2   documents which reflect on different risk profiles
3   between the laser-cut and the mechanically-cut mesh?
4    A   I read a lot of pontification with no data to
5   support it that was reliable.
6    Q   So you believe the internal Ethicon documents
7   concerning the differences in the risk profiles between
8   the mechanically-cut mesh and the laser-cut mesh are not
9   reliable; is that right?
10       MS. KABBASH: Objection.
11   A   The statements that I had read -- and I'll
12  tell you specifically what I'm talking about, I recall
13  an e-mail about fraying in the mechanically-cut mesh.
14  And in my opinion, there's no data to support that
15  there's any adverse outcome from fraying in
16  mechanically-cut mesh.  And that was pontification on
17  the part of surgeons as well as possibly whoever the
18  person in the company is that I read the e-mail.
19  BY MS. FITZPATRICK:
20   Q   Is there data to support your conclusion that
21  there is no difference between the risk profile of the
22  laser-cut mesh and the mechanically-cut mesh?
23   A   There is no data to support it or to not
24  support it.  It doesn't exist.  And largely, the
25  original TVT was laser-cut and the data that we have on

Page 151

1   that is long-term.
2    Q   Really?
3    A   I'm sorry.  That was a typo.
4    Q   Okay.
5       MS. KABBASH: Verbal typo?
6    A   The original TVT was mechanically-cut -- I
7   need lunch -- was mechanically-cut.  And, therefore, we
8   have -- we have a large body of data on mechanically-cut
9   mesh.
10  BY MS. FITZPATRICK:
11   Q   What data do you have to support your
12  hypothesis that the laser-cut mesh performs the same as
13  the mechanically-cut mesh?
14       MS. KABBASH: Objection.
15   A   There is no data to support that one is better
16  than the other.
17  BY MS. FITZPATRICK:
18   Q   Okay.
19   A   Or that one is worse than the other.
20   Q   What I wanted to know, though, what data do
21  you have to support your hypothesis that the laser-cut
22  mesh performs the same as the mechanically-cut mesh?
23       MS. KABBASH: Objection.
24   A   Over the years, we have -- our hospital has
25  switched from a mechanical-cut mesh to a laser-cut mesh.

Page 152

1   I have noticed no difference in outcomes with respect to
2   either one.
3   BY MS. FITZPATRICK:
4    Q   Okay.  Let me ask you the same question.
5       What data do you have to support your
6   hypothesis that the laser-cut mesh performs the same as
7   the mechanically-cut mesh?
8    A   There is no data to support one over the
9   other.
10   Q   And you can't just assume that the data on the
11  mechanically-cut mesh is transferable to the laser-cut
12  mesh, can you?
13       MS. KABBASH: Objection.
14   A   Most of the slings that are on the market
15  today, I believe, are laser-cut.  So if you look at
16  laser-cut mesh outside of Ethicon, you see the same
17  rates of complications in efficacy rates with other
18  polypropylene slings that are laser-cut.
19  BY MS. FITZPATRICK:
20   Q   Which ones do you think are laser-cut?
21   A   The Boston Scientific product is laser-cut.
22   Q   Are you sure?
23   A   Yeah.
24   Q   Could it be that the Boston Scientific is
25  laser-cut suburethrally and it's not laser-cut?  It's

Page 153

1   mechanically-cut?  And that the rest of the sling is
2   mechanically-cut?
3    A   That might be the case, but the relevance is
4   where it lies -- I assume that what you're getting at is
5   the relevance with respect to extrusion data.
6    Q   Are you aware of reports in the literature,
7   that the Boston Scientific Advantage Sling is two times
8   stiffer than the Ethicon TVT mechanically-cut?
9    A   I don't see how the stiffness of the mesh is
10  related to the cut of the mesh.
11   Q   You don't see how a laser-cut, where it melts
12  the edges of the sling, can lead to an increased
13  stiffness in the mesh over a mechanically-cut?
14   A   It was my understanding that the whole mesh
15  was not placed under a laser, that just the edges are
16  lased.  So I don't -- again, it doesn't make complete
17  sense to me.  That's not intuitive to me that cutting
18  the edges of the -- of the mesh is going to result in
19  stiffness.  It could be stiffer because it's stiffer.
20   Q   Well, let's say that.
21       So you wouldn't say that a mesh that is two
22  times stiffer than the Ethicon TVT, would necessarily
23  have the same risk profile, correct?
24   A   I don't know the answer.  I'd have to look at
25  clinical head-to-head trials to see.

39 (Pages 150 to 153)

Debra L. Fromer, M.D.

Page 154

1    Q  So you don't know? You don't have data to
2  support the opinion right now, correct?
3        MS. KABBASH:  Objection.
4    A  I haven't researched the Boston Scientific
5  sling nor do I use it.  So I can't talk to the safety
6  and efficacy especially in comparison to other slings.
7  BY MS. FITZPATRICK:
8    Q  Fair enough.  How do you know whether you're
9  using a mechanically-cut or a laser-cut TVT?
10    A  We look at the box.  In fact, I didn't know up
11  until yesterday when I looked at the box.
12    Q  Okay.  So prior to -- I don't know what today
13  is.  Prior to March 28, 2016, you didn't know when you
14  implanted a TVT into a woman, TVT or a TVT-O, whether
15  you were using a laser-cut or mechanically-cut, correct?
16    A  That's because I believe it's irrelevant.
17    Q  And that's not based on any data, though?
18        MS. KABBASH:  Objection.
19    A  There is no -- there is no data to support one
20  is better than the other.
21        MS. FITZPATRICK:  Okay.  Do you want to take a
22  quick -- if we can do a quick lunch break?
23        MS. KABBASH:  Yes.
24        MS. FITZPATRICK:  I'll get through the Prolift
25  pretty quickly, and then we can put on to

Page 155

1  Mrs. Sacchetti's case.
2        (Whereupon, a luncheon recess is taken.)
3  BY MS. FITZPATRICK:
4    Q  I'm just going to ask you a few questions
5  about the Prolift, and then we'll move on to Mrs.
6  Sacchetti's case.
7        Do you know what Ethicon did to evaluate the
8  safety of the Prolift before they put it on the market?
9    A  I believe that they had a TVM study, a group
10  of French surgeons, and an American arm that did some
11  preliminary safety and efficacy studies.
12    Q  And do you believe that what Ethicon knew
13  about the safety and efficacy of the Prolift, they
14  learned prelaunch, should have been conveyed to
15  physicians who were first implanting the Prolift into
16  women?
17        MS. KABBASH:  Objection.
18    A  I think whatever the company knew about the
19  data, when they were disseminating it to other
20  individuals, should have been disseminated.
21  BY MS. FITZPATRICK:
22    Q  Okay.  And that's so that those women who were
23  getting implanted with the Prolift could make a decision
24  on whether they wanted to accept those risks or not when
25  getting implanted with the device, correct?

Page 156

1    A  Sure.
2    Q  Do you know what Ethicon's internal criteria
3  was for whether a woman was a candidate for a Prolift?
4    A  In terms of the degree of prolapse?
5    Q  In terms of the degree of prolapse or just the
6  patient demographics.
7    A  I don't know.
8    Q  Okay.  And would what Ethicon knew about the
9  Prolift, prior to launch, be of any significance to you
10  in forming your opinions in this case?
11    A  Yes.  I think that that's important to some
12  degree, depending upon what it is.
13    Q  Did you ask the attorneys who retained you to
14  give you any information on what Ethicon knew or didn't
15  know about the Prolift device before it was launched?
16    A  I didn't ask for it, but they provided me with
17  a binder of materials.
18    Q  Okay.  And --
19    A  An electronic binder.
20    Q  And those included internal Ethicon documents,
21  correct?
22    A  Yes.
23    Q  And were those selected by the attorneys in
24  the case?
25    A  Yes.

Page 157

1    Q  Did you give them any criteria or tell them
2  the types of documents that you wanted?
3    A  No.
4    Q  When you looked through those documents, did
5  you ask them for any additional documents or any other
6  things that came to mind when you looked at them?
7    A  I don't think so.
8    Q  And what significance did you attach to the
9  internal Ethicon documents that you were provided at the
10  time that you prepared your report?
11    A  I think that there was some data that was
12  reported, that was eventually published, that was not
13  horribly inconsistent with any of the data that we
14  currently have.  There were a lot of e-mails and
15  communications back and forth that didn't hold much
16  significance to me.
17    Q  And why didn't they hold much significance to
18  you?
19    A  These were conversations between people and
20  they didn't -- it didn't have any scientific basis for
21  whatever.  I assume that that's the reason why I didn't
22  hold credence to it.  There was no -- nobody was backing
23  up anything about scientific data.
24    Q  Did you see any documents where physicians
25  were reporting complications or adverse events to

40 (Pages 154 to 157)

Debra L. Fromer, M.D.

Page 158

1    Ethicon associated with the Prolift?
2        A   I may have, though none of them come to mind.
3    I reviewed a lot of documents, so it's hard to keep it
4    straight.
5        Q   Do you think that what the physicians were
6    reporting to Ethicon, concerning the Prolift, would be
7    important for understanding how the device was actually
8    working in the real-world, is what I think you called
9    it?
10       A   What do you mean by -- what specific things
11   are you referring to?
12       Q   Anything that a physician would be reporting
13   to Ethicon concerning the safety or complications
14   associated with the product.  Is that significant to
15   you?
16       A   It depends on what they're reporting.
17       Q   And what do you mean by that?
18       A   So I mean, what comes to mind is the -- you
19   know, I'm thinking more of TVT-O because that's what
20   comes to mind when you talk about physicians reporting
21   things that are not necessarily clinically significant,
22   that some doctors didn't like the way that they saw when
23   they -- when the material was dyed blue that they saw
24   blue fraying.  And in my opinion, that's clinically
25   insignificant.  But people didn't like it because they

Page 159

1    didn't like the appearance; so that's an example of a
2    complaint that doesn't really hold credence.  So that's
3    why there are differences depending upon what the
4    complaint is.  Somebody can say, You know, I don't like
5    the way this feels.  That doesn't necessarily hold
6    credence to it.
7        Q   If physicians are reporting actual
8    complications and poor clinical outcomes for patients,
9    do you believe that's significant?
10       A   Again, it depends on the numbers.  It depends
11   on how they're reporting them.
12       Q   But you realize at the beginning, when Ethicon
13   first put the Prolift on the market, that much of the
14   information about complications would come from
15   anecdotal information from physicians or from case
16   studies, correct?
17       A   I don't know the answer to that question, but
18   that's possible.
19       Q   Do you know how much data -- when did you
20   start using the Prolift?
21       A   I want to say -- when did it -- when did it --
22   it came out in 2005?
23       Q   Uh-huh.
24       A   I want to say I started using it in 2006.  I
25   recall I did my training in 2006, and that's probably

Page 160

1    when I started using it, if I had to guess.
2        Q   What data did you rely on to satisfy yourself
3    that it was both safe and efficacious for your patients?
4        A   I was relying upon a lot of what was
5    didactically given at -- at the ProfEd.
6        Q   And that was the training course by Ethicon,
7    correct?
8        A   Yes.
9        Q   And so you would be relying on them to give
10   you complete and full information about all of the risks
11   associated with the device so you could make a decision
12   on whether to use that, correct?
13       A   Correct.
14       Q   And you believed that Ethicon had a duty to
15   you and to others, who it was training, to give full
16   information on the risk profiles, correct?
17           MS. KABBASH:  Objection.
18       A   I -- I believe them to give a -- give the
19   honest data on the outcomes.
20   BY MS. FITZPATRICK:
21       Q   What data was available at that time on the
22   outcomes?
23       A   I don't remember.  I don't know.
24       Q   So you're not sure what data, if any, you were
25   relying on?

Page 161

1            MS. KABBASH:  Objection.
2        A   It was a long time ago when I started using
3    it, so it's hard to know.
4    BY MS. FITZPATRICK:
5        Q   But you were one of the early adapters to the
6    Prolift.  Correct?
7        A   I don't know.  I mean, I -- I started adapting
8    it, what, a year after?  I don't know if you would
9    consider that early or not.
10       Q   And you don't know whether there was any data
11   available by way of clinical trial that would support
12   the safety or efficacy of the device at that time,
13   correct?
14       A   I make the assumption that there were.  I
15   wouldn't be operating on something without any clinical
16   data.
17       Q   And the same with the TVT-O.  Did you rely on
18   specific clinical data when you began to use that
19   product?
20       A   Again, I'm sure that there were -- there were
21   trials and there was data available; otherwise, I would
22   not have been using it.
23       Q   And when did you start to use the TVT-O?
24       A   TVT-O came out in '04.
25           THE WITNESS:  Yes?

41 (Pages 158 to 161)

Debra L. Fromer, M.D.

Page 162

1        MS. KABBASH:  Yes.  If you don't mind me
2    telling her.
3        MS. FITZPATRICK:  Yes.  I thought I'd have it
4    my head, too.
5        A    I mean, it was probably soon after it came
6    out.  '04 or '05 I would -- again, I would guess.
7        Q    And it's your recollection that you would not
8    have used that TVT-O device, absent any clinical data
9    that you could rely on for the clinical safety and
10   efficacy of the device, right?
11       A    That's correct.
12       Q    Now, in your report you say that the medical
13   literature on Prolift -- if you look at page 29 to 30 of
14   your report -- I don't want to put words in your
15   mouth -- that the medical literature on Prolift shows it
16   provides significant benefits to well-selected patients
17   with a reasonable risk profile, particularly when used
18   by surgeons who are experienced with the device.
19       So I want to -- do you see that?
20       A    Uh-huh.
21       Q    So I want to break that statement down.
22       What are the criteria for the well-selected
23   patients that you...
24       A    Good question.
25       So there are patients where other surgical

Page 163

1    procedures for prolapse may not be a good choice.  For
2    example, take a patient who has failed the native tissue
3    repair, a patient who has multiple abdominal surgeries,
4    may even have a bowel diversion for which you don't want
5    to do a transabdominal route and you don't want to
6    repeat another native tissue repair.  This would be a
7    patient that I -- that I would strongly consider for a
8    mesh repair.
9        Q    Would you consider a native tissue repair to
10   be kind of the first line in a pelvic organ prolapse
11   repair?
12       A    Not necessarily, no.
13       Q    So then there must being other well-selected
14   patients that you're referring to beyond patients who've
15   had a prior failed native tissue repair?
16       A    Right.  So patients who are concerned about
17   failure with a transvaginal procedure -- patients who
18   want a transvaginal procedure, and they are concerned
19   with failure both subjective and objective.
20       Q    Anything else?
21       A    No.  I mean, I think that pretty much limits
22   the pool of patients that opt to use transvaginal mesh
23   at this time.
24       Q    Okay.  What do you mean by "a reasonable risk
25   profile"?

Page 164

1        A    Comparable to other prolapse procedures.
2        Q    I don't understand that.
3        A    Comparable to -- so this has a -- my statement
4    here is that Prolift shows that it provides significant
5    benefit to well-selected patients with a reasonable risk
6    profile.  A reasonable risk profile is one that has a
7    similar -- not necessarily a similar risk profile, but
8    within the range of other procedures done to correct
9    prolapse.
10       Q    Okay.  So you believe that the Prolift has a
11   similar risk profile to a native tissue repair?
12       A    No.  There are different risks and different
13   benefits to each.  However, in terms of percentages,
14   that -- that I would consider to be acceptable or that a
15   patient might consider to be acceptable.
16       Q    Okay.  So do you believe that the risk profile
17   of the Prolift is within the range of the risk profile
18   for other native tissue repairs?
19       A    Yes.
20       Q    And you'll agree with me that erosion is a
21   unique risk to the mesh procedure, correct?
22       A    Yes and no.  So there -- there are reports and
23   incidents of exposure of biological tissue, exposure of
24   suture material that's used in native tissue repairs as
25   well, but exposure of mesh and erosion of mesh is a

Page 165

1    complication exclusive to mesh.
2        Q    Do you believe that a suture erosion from a
3    native tissue repair causes the same degree of a
4    complication as the erosion of a polypropylene mesh?
5        A    It can be.  It can be.  In terms of volume, it
6    can be just as small.  An exposure can be just -- from a
7    mesh product, can be just as small as a loop of suture
8    material dangling from the vaginal wall after a
9    sacrospinous fixation.
10       Q    So you see no difference in the relative risk
11   of erosion presented by the use of a Prolift versus a
12   suture in a native tissue repair?  It's the same thing?
13       MS. KABBASH:  Objection.
14       A    No, I didn't say that.
15       MS. FITZPATRICK:  Hold on.  Let her object.
16   Go ahead.
17       THE WITNESS:  I said it can be, and other
18   times it's not.  Other times, the mesh can pose -- can
19   pose more of a -- a morbidity associated with it than a
20   suture, but there's a range.  Exposure is not just
21   exposure.  There's small exposures.  There's larger
22   exposures.
23   BY MS. FITZPATRICK:
24       Q    And then, what happens to women whose surgeon
25   is not experienced with the device?

42 (Pages 162 to 165)

Debra L. Fromer, M.D.

Page 166

1      MS. KABBASH:  Objection.
2  BY MS. FITZPATRICK:
3      Q   I'm just looking at your page 30.
4      A   Yeah.
5      Q   When used by surgeons who are experienced with
6  the device.  What happens to surgeons who are not
7  experienced?
8      MS. KABBASH:  Objection.
9      A   So what I'm alluding to is certain studies
10 that support that higher surgical volume may lower
11 complication rates.  And I think that this is not
12 exclusive to Prolift.  This is -- this is something that
13 we see with any surgical procedure, including robotic
14 sacrocolpopexy, robotic prostatectomy.  There's always a
15 learning curve.  So outcomes are generally better when
16 you're at the top of the learning curve than when you're
17 at the bottom.
18 BY MS. FITZPATRICK:
19     Q   Do you believe Ethicon should only have made
20 its Prolift available to surgeons who are experienced in
21 the device?
22     A   I don't believe that it is Ethicon's
23 responsibility.  But I do believe that it, in many
24 circumstances, it's up to the hospital or even the
25 surgeon to decide whether or not they can use products

Page 167

1  for complex reconstructions.  I don't think that's up to
2  the company.
3      Q   Now, you got trained on this device in 2005 to
4  2006, correct?
5      A   Probably, yes.
6      Q   Okay.  And there came a point in time where
7  you had patient number 1, the first person that you
8  implanted a Prolift in, right?
9      A   Yes.
10     Q   And your experience now is very significantly
11 different than your experience was at the time?
12     A   Correct.
13     Q   Do you believe that you should not have been
14 using the Prolift at that time because you were not a
15 surgeon who is experienced with the implant of the
16 Prolift device?
17     A   No.
18     Q   Okay.  Then tell me how that works.
19     A   You tell the patient there's something new on
20 the market.  You'll be my first patient.  And these are
21 the risks associated in high-volume users and patient --
22 when I do something for the first time on anybody, they
23 know that they're the first person.
24     Q   Do you believe that physicians should be
25 telling patients that there are greater risks and

Page 168

1  complications for low-volume users over high volume
2  users?
3      A   I think that that's expected because, again, I
4  think that the learning curve is a well-known phenomenon
5  that occurs for any surgical procedure that we do.
6      Q   And you agree with me the only way you can get
7  to the top of the learning curve is by actually doing
8  the procedure, right?
9      A   That's correct.
10     Q   So anybody who is now well-experienced with
11 the device, at one point, had no experience with the
12 device or little experience with the device, right?
13     A   That's correct.
14     Q   And it's trial and error.  You keep doing it,
15 and the more times you replicate the procedure, the
16 better you, as the surgeon, get with it, correct?
17     MS. KABBASH:  Objection.
18     A   Well, I wouldn't use the words "trial and
19 error."  You learn things over time, not by error
20 necessarily, but by just learning that you can have
21 better outcomes with certain tech -- certain techniques.
22 And, again, this is why we have training programs now,
23 to train people.
24     Q   How long was the training program that you
25 went to?  Was it a one-day didactic and a one-day

Page 169

1  cadaver?
2      A   Things are different now than they were then.
3  Okay.  So now, it's my personal opinion that it's up to
4  the surgeon and up to the training physicians in
5  residency and fellowship programs, to adequately train
6  their residents to be able to do this in the real-world
7  and not have to go out there and learn it on their own
8  or learn it from -- or learn it from, you know, ProfEd.
9      Q   But when you started doing this in 2005 and
10 2006, you were learning it through an Ethicon procedure.
11 And did you learn from other surgeons that you were
12 working with at the time?
13     A   There were other surgeons that were doing
14 Prolift, I believe at Hackensack, that I was observing.
15 And I did go to cadaver courses, as many as I could, to
16 get further acquainted with the anatomy required to do
17 Prolift.  So I did -- I did more homework than just
18 going out and doing it.
19     Q   Now, one of the things that you talk about in
20 your report is this concept of tensioning, do you recall
21 that, of over-tensioning the device?
22     A   Okay.
23     Q   Do you recall saying that?
24     A   Well, I know it's in the surgeon's monograph
25 that over-tensioning can result in pain, contractions,

43 (Pages 166 to 169)

Debra L. Fromer, M.D.

Page 170

1  bunching, so I may have put that in the report.
2      Q   How does a physician -- let me step back from
3  that.
4          Tensioning can differ -- tensioning the device
5  is an art rather than a science, correct?
6      MS. KABBASH:  Objection.
7  BY MS. FITZPATRICK:
8      Q   Meaning that you learn how to tension the
9  device in individual women through your experience in
10  implanting the device, correct?
11      A   Not necessarily.  So the way I was trained was
12  to make sure that there are two fingers in the fornices
13  of the vagina holding the mesh in place, while you're
14  tensioning so that you don't over-tension the device.
15  This is a means of preventing the mesh from getting too
16  tight under the bladder or too tight in the -- at the
17  obturator foramen.
18          Is that quantitative?  Is there -- is there a
19  way of quantitating that?  Not necessarily.
20      Q   Have you ever over-tensioned a device?
21      A   Inadvertently?
22      Q   Well, I'm assuming you didn't do it
23  intentionally if you did.
24      A   Correct.  Not that I recall.
25          However, I do train residents and so there --

Page 171

1  these things can happen, and these things are
2  identified.  So I -- I have seen the potential for that
3  in -- in my residents.
4      Q   And you don't believe that the mesh itself in
5  the Prolift, actually contracts invivo, do you?
6      A   Well, I believe that the tissue around the
7  mesh contracts and the mesh contracts with the tissue
8  because the tissue is integrated into the mesh.
9      Q   And you'd agree with whether it's the mesh
10  itself contracting or the scar tissue around it, mesh
11  contracting, that that can cause complications such as
12  pelvic pain and dyspareunia?
13      A   It's been cited.  I -- I have not found
14  anything that is showing causation, that retraction of
15  mesh directly causes pelvic pain and dyspareunia.
16      Q   People scar differently, don't they?
17      A   I don't know the answer to that question.
18      Q   Okay.
19      A   And I -- I -- I will also say that I don't --
20  I don't truly believe that people scar differently.  I
21  do know that some people form keloids, other people
22  don't.  So in that circumstance, yes, people can scar
23  differently, I suppose.
24          But in terms of the pelvic floor, it's
25  pretty -- any time I've gone back in from pathologic or

Page 172

1  nonpathologic reasons, it looks -- for the most part --
2  the same to the naked eye.
3      Q   But this rate of -- I'm going to call it
4  contraction, you can call it scar contraction, but that
5  phenomenon that you're talking about, you agree that
6  that can vary from patient to patient, right?
7          You don't know whether someone's scar is going
8  to retract the mesh 10 percent, three percent or thirty
9  percent, correct?
10      A   I think that there's been ranges reported in
11  the literature and there is a range.  And I think that
12  it can probably contract within that range.  How narrow
13  that range is, I'm not sure.  We'd have to go to the
14  literature.
15      Q   And you would rely on what's reported in the
16  literature as far as what the range of that can be,
17  correct?
18      A   I would rely on what we have.  Whether it's
19  reliable data is hard to know in the absence of physical
20  measurements.  So I know a lot of people are using
21  ultrasound.  There's reports of MRI.  But again, the way
22  to know is if you're physically measuring it.  And I
23  don't know that that has truly been done reliably.
24      Q   Have you seen any articles where that was
25  actually done though?

Page 173

1      A   How -- how they measured --
2      Q   That they measured how much contraction
3  occurred.
4      A   Possibly, but I can't recall, off the top of
5  my head.
6      Q   Have you seen any internal Ethicon documents
7  where they quantified the rate of or range of
8  contraction of mesh?
9      A   I may have seen it in the -- in the documents
10  as well.
11      Q   Do you recall what that was off the top of
12  your head?
13      A   No.
14      Q   Do you believe that contraction can lead to a
15  balling up of the mesh in the pelvis?
16      A   What do you mean by "balling up of the mesh in
17  the pelvis"?
18      Q   That it can contract the mesh into a ball.
19      A   A sphere, like this?
20      Q   Yes.
21      A   No, I don't believe that.
22      Q   And if Ethicon said that, you would disagree
23  with them, correct?
24      A   Yes.
25      Q   And if Ethicon said that the contraction of

44  (Pages 170 to 173)

Debra L. Fromer, M.D.

Page 174

1    mesh can cause it to fold over or wrinkle in the pelvis,
2    would you disagree with them?
3        A   Well, it depends on how they're making that
4    claim.
5        Q   So you're not sure whether that can happen or
6    not?
7        A   No, I'm not sure.  I know that the mesh can be
8    left folded if proper tensioning wasn't placed on it or
9    if the technique was not done correctly.  If the trocars
10   are not placed correctly, you can definitely have
11   bunching of the mesh that's iatrogenic or caused by the
12   surgeon, but not necessarily that it would just
13   magically form.
14       Q   So you think that if the mesh is folded, it
15   was caused by the surgeon and not through this
16   contraction process that we're talking about?
17       A   I didn't say that.  But I do -- what I said
18   was that the mesh can fold, and it can be -- as it -- it
19   can be placed folded.  That's one of the ideologies for
20   identifying folded mesh when you go back in for whatever
21   reason.
22       Q   Okay.  But I'm asking you a separate question.
23   I'm asking you whether this contraction process that
24   we've talked about can also lead to folded mesh?
25       A   That I'm not sure about.  I can't prove that.

Page 175

1        Q   Do you believe that this contraction process
2    that we've talked about can cause pain in women?
3        A   Again, I'm not convinced of that.  I have not
4    seen any data or any scientific evidence connecting the
5    ideology of dyspareunia and pelvic pain after these
6    procedures directly to retraction.
7        Q   Okay.  So if Ethicon had said that this
8    contraction can cause pain, you would disagree with
9    them?
10       A   It's not that I disagree with them.  It's just
11   that it hasn't been proven.  It does state that in the
12   surgeon's monograph.  I don't deny that they said that.
13           But I have a hard time seeing the evidence to
14   support that the two are connected because there are
15   many things that cause dyspareunia in these patients.
16       Q   But that's one of the things that can cause
17   dyspareunia?
18       A   I -- I agree with you.  It might be one of
19   them, but I just haven't seen the causation.
20       Q   All right.  And we'll get to this in a little
21   bit.
22           There's lot of things that can cause
23   dyspareunia, correct?
24       A   Right.
25       Q   But you agree with me that the Prolift device

Page 176

1    can cause dyspareunia, correct?
2        A   The device itself or the technique?
3        Q   The placement of the Prolift device can cause
4    dyspareunia in a woman?
5        A   Yes.  I believe that any pelvic floor surgery,
6    any surgery that is involving the obturator muscles, can
7    potentially cause dyspareunia.  I just -- I'm not
8    convinced that it's the actual mesh that is the sole
9    reason why women get dyspareunia or why there are
10   dyspareunia rates in these surgeries.
11       Q   But I'm not asking about a sole cause.  I'm
12   asking you about a cause, and you believe that
13   dyspareunia can be multifactorial, correct?
14       A   That's correct.
15       Q   And in women who have the Prolift, the Prolift
16   can be a cause of dyspareunia, correct?
17       A   That -- yes, that is correct.
18       Q   Okay.  And in women who have the TVT-O, the
19   TVT-O can be a cause of dyspareunia, correct?
20       A   Correct.  The placement of the surgery,
21   correct.
22       Q   And in women who have the TVT-R, that can be a
23   cause of the dyspareunia, correct?
24       A   Correct.
25       Q   You had said in your report, at page 47, that

Page 177

1    based on your experience with over 500 surgical
2    procedures to treat pelvic organ prolapse, it's your
3    opinion that "Prolift was not defectively designed.  In
4    fact, to this day, I treat patients whom I believe would
5    benefit from the product if it were still available."
6    Is that your opinion sitting here today?
7        A   Yes.
8        Q   And you're aware that the Prolift is no longer
9    available because Ethicon made the decision not to
10   perform the required 522 studies, correct?
11           MS. KABBASH:  Objection.
12       A   Yes.
13   BY MS. FITZPATRICK:
14       Q   And it was Ethicon's decision, and nobody
15   else, to discontinue the product, correct?
16       A   That's correct.
17       Q   And if Ethicon had wanted to spend the money
18   to perform the studies, the product may still be on the
19   market or may even have been improved, correct?
20           MS. KABBASH:  Objection.
21       A   Yes.
22   BY MS. FITZPATRICK:
23       Q   Do you know who Charlotte Owens is?
24       A   No.
25       Q   Do you know who David Robinson is?

45 (Pages 174 to 177)

Debra L. Fromer, M.D.

Page 178

1     A   No.
2     Q   Do you know who Pete Arnaul is?
3     A   I've never met him, but I read his name.
4     Q   Do you know who he is?
5     A   I believe he works at Ethicon.
6     Q   Do you know what his position was?
7     A   Medical director, I think.
8     Q   Do you know when it was?
9     A   No.
10    Q   Do you know who Paul Parisi is?
11    A   The name sounds familiar, so I may have come
12   across it.  Or maybe I saw it in an e-mail that you
13   showed me or in the document that you just sent me.
14    Q   Do you know who Aslar Kno is?
15    A   No.
16    Q   Do you know who Jim Hart is?
17    A   No.
18    Q   In preparing your report, did you read the
19   deposition transcripts of any witnesses employed by
20   Ethicon?
21    A   No.
22    Q   Why not?
23    A   They were not provided to me.
24    Q   Would you have been interested in reading the
25   deposition transcripts of the medical directors at

Page 179

1    Ethicon who worked with these pelvic organ prolapse
2    products?
3     A   It depends on what was said and the
4    significance of it.
5     Q   Do you believe that there's something that you
6    may have gained from knowing what Ethicon knew about the
7    pelvic organ prolapse mesh products?
8        MS. KABBASH:  Objection.
9     A   Again, you know, this goes back to the earlier
10   questioning.  But it depends on what you suspect might
11   be of issue here.  So I mean, it doesn't cut -- I'm more
12   interested in the published literature.
13   BY MS. FITZPATRICK:
14    Q   Okay.  Is there anything in the Ethicon
15   documents that could change your opinion concerning the
16   safety and efficacy of the TVT-O?
17    A   Now that --
18       MS. KABBASH:  Objection.
19    A   Now that we have all the data on TVT-O.
20   BY MS. FITZPATRICK:
21    Q   Yes.
22    A   No.  I think it's irrelevant because I think
23   we have by far more data now than we ever did.
24    Q   Is there any relevance on the Ethicon
25   documents to your opinions concerning the Prolift?

Page 180

1     A   The same answer holds true.
2     Q   Okay.  And is there anything in any Ethicon
3    deposition that would have any relevance to your
4    opinions about the TVT-O?
5        MS. KABBASH:  Objection.
6    BY MS. FITZPATRICK:
7     Q   I'm asking about depositions now instead of
8    the documents.
9     A   Okay.  Again, no, same answer.
10    Q   And is there anything in the Ethicon
11   depositions that you believe would have any relevance to
12   your opinions on the Prolift?
13    A   Again, no.  These products are now safe and
14   effective and documented in the literature.
15    Q   Okay.  And did you read the deposition
16   transcript of any deposition taken of Dr. Lucente in
17   preparation?
18    A   No.
19    Q   Was that offered to you by Ethicon?
20    A   No.
21    Q   Would there be any relevance of Dr. Lucente's
22   deposition to your opinions on the TVT-O?
23    A   I have no idea.  Again, it still has very
24   little relevance because we have such long-term data on
25   the TVT-O, and we have such a volume of literature on

Page 181

1    it.  So I don't see how that would be significant.
2     Q   And do you think there'd be any significance
3    in reading Dr. Lucente's deposition to your opinions
4    concerning the Prolift product?
5     A   No.
6        MS. FITZPATRICK:  That's all that I have on
7    the general.
8        MS. KABBASH:  Okay.  I might have a few, a
9    little bit of followup, so I think that probably makes
10   more sense to do that now and start with a clean slate
11   for Sacchetti.
12       MS. FITZPATRICK:  That's fine.
13       - - -
14       EXAMINATION BY MS. KABBASH:
15       - - -
16    Q   Dr. Fromer, I just have some follow-up
17   questions for you.
18       You were asked several questions today by
19   plaintiff's counsel about whether you had reviewed
20   studies where safety was the end point of the study.  Do
21   you recall that line of questioning?
22    A   Yes.
23    Q   And I think there was some questioning
24   regarding the Zhang study in that regard; do you recall
25   that?

46 (Pages 178 to 181)

Debra L. Fromer, M.D.

Page 182

1    A   Yes.
2    Q   Does a study have to have safety as its end
3  point in order to be informative to you on
4  safety-related information?
5    A   No.
6    Q   Why is that?
7    A   All -- all the randomized control trials that
8  we have available are not designed with the idea in mind
9  to evaluate safety and efficacy, that although it may
10  not be a primary end point, the data is still valuable
11  and informative on the incidence -- complications
12  associated with these procedures.
13    Q   And the monitoring of complications is, in
14  fact, part of the design of the study as is described in
15  the published literature?
16    A   Yes.
17    Q   In both forming your opinions on TVT-O and
18  Prolift, did you review randomized control trials?
19    A   Yes.
20    Q   And did you review meta-analyses studies?
21    A   Yes.
22    Q   And how do RCTs and meta-analyses fall within
23  the hierarchy of scientific evidence?
24    A   They're the highest level of evidence.
25    Q   And in those RCTs and meta-analyses that you

Page 183

1  reviewed, were complications monitored in all of those
2  studies?
3    A   Yes.
4    Q   You were asked a question about certain
5  articles that you had added to your Exhibit B, list of
6  materials reviewed.  And in particular, you were asked,
7  I believe in the context of your Prolift report, why you
8  had looked at certain articles.  And I'm paraphrasing
9  your response, but you indicated something to the effect
10  of you saw statements that were, quote, "not backed up,"
11  close quotes, by literature.  Do you remember making a
12  comment like that?
13    A   Yes.
14    Q   What did you mean when you said "not backed up
15  by literature"?
16    A   Some of my opinions that I had formed, I did
17  not cite them into my general report on either the TVT-O
18  or the Prolift.  It wouldn't be indicated to be in
19  there.  So I went and did a literature search so that I
20  can cite those opinions and -- and identify supporting
21  literature to my opinions.
22    Q   So when you went back and looked at your
23  Prolift opinions, did you believe that they were wrong
24  or inaccurate?
25    A   No.

Page 184

1    Q   Were you looking to add citations to the
2  opinions that were already in your report?
3    A   Yes, that's correct.  But that were in my
4  case-specific report.
5    Q   Okay.  So you wanted to find further citations
6  for the opinions in your Sacchetti report?
7    A   Yes.
8    Q   Okay.  Dr. Fromer, you were asked if the
9  Prolift were still available today, would you use it.
10  What was your response to that question?
11    A   Yes.
12    Q   What is your response to that question?
13    A   Yes, absolutely.  There are indications for it
14  to this day, as I've written in my report.  There are
15  patients for whom I think I miss the product and that I
16  wish it were still available.
17    Q   And why is that?  What did Prolift bring to
18  your practice in terms of a treatment method for your
19  patients?
20    A   So the total Prolift was really very well
21  designed for patients with severe apical prolapse or
22  total eversion of the vaginal vault, and it prevented
23  the need to have a robotic sacrocolpopexy.  I feel like
24  most of these patients are now forced down the road of
25  robotic sacrocolpopexy or reconstructing transvaginally

Page 185

1  by fashioning a Prolift out of an Elevate, as I
2  described earlier.
3    Q   So when you described earlier fashioning a
4  Prolift out of an Elevate for those certain group of
5  patients, you're trying to turn other materials into a
6  Prolift, aren't you?
7    A   Correct.
8    Q   Doctor, have you ever been paid more than
9  $5,000 by Ethicon for your work as a consultant or as a
10  preceptor?  And by consultant, I'm not including
11  litigation.
12    A   It's a long question.
13    Q   Sorry.
14    A   But I've never been paid more than 5,000.  I
15  think the 5,000 is a very conservative number.  I think
16  it's more in the order of 2- to $3,000.
17    Q   If you'll take a look at Exhibit 11.  If you
18  could turn to slide 34.
19    A   Is that a page?
20    Q   Yes, a page number.  And this was the slide
21  from Exhibit 11 on the FDA slide deck, and that slide is
22  titled Organ Perforation and Injury; do you see that?
23    A   Yes.
24    Q   And do you recall the line of questioning that
25  plaintiff's counsel asked you about the rates that are

47 (Pages 182 to 185)

Debra L. Fromer, M.D.

Page 186

1  reflected on the right side of this slide?
2      A   Correct.
3      Q   Does this slide deck -- is the information in
4  the slide deck limited to the TVT retropubic device?
5      A   No.  These are most likely all retropubic
6  transobturator and mini-slings.
7      Q   Well, let me restate.  It wasn't a very good
8  question.
9          And the line that is referring to retropubic;
10  do you see that?
11     A   Yes.
12     Q   Does that indicate that it is solely related
13  to the TVT retropubic device?
14     A   No.
15     Q   In the line on transobturator, is that
16  indicating that it's solely related to the TVT obturator
17  deviation?
18     A   No.
19     Q   In the transvaginal repair line, is that
20  indicating that it's solely related to Prolift?
21     A   No.
22     Q   And am I correct that, based on your review of
23  the slide, that the rates that are reflected on the
24  right-hand column include the rates of all of the
25  adverse events that are listed at the top of the slide

Page 187

1  which are organ perforation, organ injury, urethral
2  injury, ureteral injury, bladder injury, bladder
3  perforation, rectal injury, cystotomy, and enterotomy?
4      A   Yes.
5      Q   Can you look at Exhibit 13.  You were asked
6  about the Zhang article.  And do you recall being
7  questioned by plaintiff's counsel about this Exhibit 13,
8  the Zhang article?
9      A   Yes.
10     Q   I'd like to draw your attention to the
11  conclusion of that article on page 110 of the article
12  and it's about halfway down, the conclusion.  Am I
13  correct that part of the conclusion of Dr. Zhang and the
14  other authors is that, quote, "Despite the high
15  incidence of long-term complications, most complications
16  were not consequential and the patient's quality of life
17  retained significant improvements in the long-term.
18  Sexual function was unchanged by either procedure,"
19  close quote.
20         That was part of the conclusions made by
21  Dr. Zhang and the other co-authors in the study,
22  correct?
23     A   Yes.
24     Q   And is that conclusion consistent with your
25  opinion and your review of the other medical literature

Page 188

1  on TVT and TVT-O?
2      A   Yes.
3      Q   If you could pull out your general TVT-O
4  report, and turn to page 21.  Do you recall being asked
5  several questions by plaintiff's counsel regarding the
6  Schimpf article and whether certain amounts of patients
7  who were operated on with Gore-Text, skewed results of
8  de novo urge in the context of pubovaginal slings.  Do
9  you remember that line of questioning?
10         MS. FITZPATRICK:  Objection.  Misstates the
11  testimony -- the questioning.
12     A   Yes.
13  BY MS. KABBASH:
14     Q   In your report on page 21, the first full
15  paragraph at the top says, "Alvo, et al., performed a
16  multicenter randomized trial comparing outcomes in women
17  undergoing autologous rectal fascial pubovaginal slings
18  and Burch colposuspension.  Postoperative treatment for
19  urge incontinence was required in 27 percent of patients
20  in the Burch group and 20 percent of patients in the
21  autologous fascial sling group."
22         Are those outcomes, as reported in the Alvo
23  study -- first of all, is this Alvo study also
24  referenced as the sister trial?
25     A   Yes.

Page 189

1      Q   And are these outcomes that are reported here
2  in your report, do they form part of the basis for your
3  opinion regarding the relative risk of de novo urge
4  among different surgical options to treat stress urinary
5  incontinence?
6      A   Yes.
7      Q   The next sentence is, "Furthermore, in the AUA
8  guidelines, meta-analysis for the surgical management of
9  stress urinary incontinence, de novo urge incontinence
10  occurred in a median of eight percent of patients
11  undergoing the Burch procedure, nine percent of patients
12  undergoing autologous fascial slings without bone
13  anchors, twenty-eight percent of patients undergoing
14  cadaveric slings with bone anchors, and six percent of
15  patients undergoing synthetic midurethral slings twelve
16  to twenty-three months postoperatively"; do you see
17  that?
18         And was that important information to you in
19  assessing the relative risk of de novo urge from
20  different surgeries to treat stress urinary
21  incontinence?
22     A   Yes and yes.
23     Q   And why was this information relevant to your
24  opinion?
25     A   These are gold standard studies that we've

48 (Pages 186 to 189)

Debra L. Fromer, M.D.

Page 190

1 used over the years in using traditional surgeries for
2 stress incontinence. And so that's where the range of
3 up to 20 percent for de novo overactivity comes from and
4 applies to slings as well.
5 Q Was Dr. Jerry Blaivas, in fact, as a co-author
6 of these AUA guidelines?
7 A I think he was.
8 Q In your questioning by plaintiff's counsel,
9 she asked you whether Prolift TVT and TVT-O can be a
10 cause of dyspareunia, and I believe you said yes. Do
11 you recall that?
12 A Yes.
13 Q In what way do you believe Prolift TVT or
14 TVT-O can be a cause of dyspareunia?
15 A Well, just like any other anti-incontinence
16 surgery or pelvic floor surgery, there is a risk of
17 dyspareunia any time you're operating in the vagina near
18 the pelvic floor or even doing a hysterectomy. So --
19 and those rates with prolapse, with TVT-O, with
20 retropubic TVT, are all consistent with the same rates
21 in traditional surgeries for anti-incontinence or for
22 anti -- for traditional surgeries for incontinence as
23 well as for prolapse.
24 Q As part of your report in the formulation of
25 your opinions, did you review 8/20/15 Maher/Cochrane

Page 191

1 review on the treatment of prolapse?
2 A Yes.
3 Q And did the Maher/Cochrane review form a
4 conclusion as to the relative risk of dyspareunia in
5 vaginal mesh repairs as opposed to native tissue
6 repairs?
7 A Yeah, let me get that out so I can speak
8 without guessing.
9 So no difference in total vaginal length
10 between mesh repairs and non-mesh repairs. De novo
11 dyspareunia was no different between mesh repairs and
12 non-mesh repairs. There was no difference even amongst
13 the -- when they subcategorized it according to the
14 extent of the repair, there was no difference in the
15 sexual function questionnaire. There was no difference
16 in quality of life between the two groups.
17 Q And, Doctor, is it your opinion that
18 dyspareunia can occur following a Prolift TVT and TVT-O
19 because of the fact that you were doing surgery in the
20 pelvic space?
21 A That's correct.
22 Q And --
23 A That's one of the potential reasons.
24 Q And are you convinced that you can have
25 dyspareunia from Prolift TVT or TVT-O because of the

Page 192

1 device itself as opposed to the surgery to implant the
2 device?
3 A No.
4 MS. KABBASH: Okay. I don't think I have any
5 more questions.
6 (Time noted: 2:28 p.m.)

Page 193

1 CERTIFICATION
2
3
4 I, DANA N. SREBRENICK, a Notary Public for and
5 within the State of New York, do hereby certify:
6 That the witness whose testimony is herein set
7 forth, was duly sworn by me; and that the within
8 transcript is a true record of the testimony given by
9 said witness.
10 I further certify that I am not related to any
11 of the parties to this action by blood or marriage, and
12 that I am in no way interested in the outcome of this
13 matter.
14 IN WITNESS WHEREOF, I have hereunto set my
15 hand this 1st day of April 2016.
16
17 _____
18 DANA N. SREBRENICK, CLR, CRR
19
20 * * *
21
22
23
24
25

49 (Pages 190 to 193)