Confidential - Attorneys' Eyes Only

Page 322

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION
ATLANTIC COUNTY
CASE NO. 291 CT
MASTER CASE NO. L-6341-10

- - -

IN RE:
PELVIC MESH/GYNECARE
LITIGATION

- - -

CONFIDENTIAL - ATTORNEYS' EYES ONLY
VOLUME II
Friday, November 16, 2012

- - -

Continued oral deposition of DANIEL STEVEN ELLIOTT, M.D., held at MAZIE SLATER KATZ & FREEMAN, L.L.C., 103 Eisenhower Parkway, Roseland, New Jersey, commencing at approximately 8:25 a.m., before Rosemary Locklear, a Registered Professional Reporter, Certified Realtime Reporter, Certified Court Reporter (NJ License No. 30XI00171000), and Notary Public.

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph | 971.591.5672 Fax
deps@golkow.com

Confidential - Attorneys' Eyes Only

Page 323

```
1   APPEARANCES:
2
3       ANDERSON LAW OFFICES, L.L.C.
         BY:  BENJAMIN H. ANDERSON, ESQUIRE
4        ben@andersonlawoffices.net
         1360 West 9th Street, Suite 215
5        Cleveland, Ohio 44113
         (216) 589-0256
6        Appearing on behalf of the Plaintiffs
7
8        BUTLER SNOW O'MARA STEVENS & CANNADA, P.L.L.C.
         BY:  NILS B. (BURT) SNELL, ESQUIRE
9        burt.snell@butlersnow.com
         500 Office Center Drive, Suite 400
10       Fort Washington, Pennsylvania 19034
         (267) 513-1885
11       Appearing on behalf of the Defendants Johnson &
         Johnson and Ethicon
12
13
         SILLS CUMMIS EPSTEIN & GROSS, P.C.
14       BY:  WILLIAM R. STUART, III., ESQUIRE
         wstuart@sillscummmis.com
15       The Legal Center, One Riverfront Plaza
         Newark, New Jersey 07102
16       (973) 643-7000
         Appearing on behalf of the Defendant Caldero
17       Medical, Inc.
18
19                     - - -
20
21
22
23
24
25
```

Confidential - Attorneys' Eyes Only

Page 324

1  I N D E X
2
3  WITNESS                                            PAGE
4
5  DANIEL STEVEN ELLIOTT, M.D.
6
7       By Mr. Snell                                  328
8
9                      - - -
10
11                 EXHIBIT INDEX
12                                                    MAR
   Elliott
13  9     11-page copy of article dated 8/10          410
          entitled "Vaginal Mesh for Prolapse"
14
    10    9-page copy of article dated 2/11           420
15        entitled "Trocar-Guided Mesh Compared
          With Conventional Vaginal Repair in
16        Recurrent Prolapse"
17
    (Exhibits retained by the court reporter and
18  attached to transcript.)
19
                       - - -
20
21
22
23
24

Confidential - Attorneys' Eyes Only

Page 387

```
 1            I believe you testified
 2   yesterday that you've never used or
 3   implanted Prolift®; correct?
 4        A.   Correct.
 5        Q.   Have you ever used or implanted
 6   Apogee®?
 7        A.   No.
 8        Q.   Have you ever used or implanted
 9   Perigee®?
10        A.   No.
11        Q.   You never underwent or
12   participated in any of the professional
13   education programs for Prolift®; correct?
14        A.   Correct.  I did not.
15        Q.   You never did any cadaver
16   training with respect to Prolift®; correct?
17        A.   I did not.
18        Q.   And you never underwent cadaver
19   training with respect to the use of any mesh
20   products for prolapse repair; correct?
21        A.   No.  I'm just trying to remember.
22   In fellowship we may have had cadaver labs
23   on the sacrocolpopexy because our staff was
24   involved in AUA as far as the individual to
25   come in for learning and I may have been
```

Confidential - Attorneys' Eyes Only

Page 403

1   about, the patient-specific issues.
2       Q.   So it's correct, then, that if
3   you can do a transvaginal mesh rescission,
4   you prefer to do so over the transabdominal
5   mesh excision; correct?
6       A.   If it can be safely and
7   successfully accomplished transvaginally,
8   that is, no question, my preferred route.
9       Q.   And that's because transabdominal
10  surgery is a major and morbid surgery;
11  correct?
12      A.   That is fair to say, yes.
13      Q.   Before becoming involved in this
14  litigation, had you ever looked at mesh that
15  had been removed from a patient under a
16  microscope?
17      A.   No.
18      Q.   Have you done that since becoming
19  involved in this litigation?
20      A.   Not of my own patients.  I've
21  seen photographs and microscopies and
22  papers.
23      Q.   Prior to being engaged as an
24  expert witness in this matter, had you ever
25  performed any examination of the porosity of

Confidential - Attorneys' Eyes Only

Page 404

1  meshes?
2      A.    No.
3      Q.    You don't hold yourself out to be
4  a polymer chemist; correct?
5      A.    That is correct.
6      Q.    If you were counseling a patient
7  on the sacrospinous ligament fixation
8  surgery, what risk would you identify to her
9  with that procedure?
10     A.    Well, I wouldn't have that
11 counsel, consultation because I would send
12 them to my urogynecology colleagues.
13     Q.    Because you don't do sacrospinous
14 ligament fixation procedures; correct?
15     A.    That is correct.
16     Q.    Can you tell me what independent
17 research you did in connection with your
18 role as an expert in this litigation, other
19 than reviewing the materials that
20 plaintiffs' counsel provided to you?
21     A.    Well, I reviewed, as you
22 mentioned, the internal documents, I
23 reviewed roughly, what, 200 manuscripts,
24 scientific journal manuscripts, and then the
25 depositions, which would be the -- from the

Confidential - Attorneys' Eyes Only

Page 405

1  litigation.
2      Q.   The internal documents were
3  documents that Mr. Anderson or the other
4  plaintiffs' lawyers gave you; correct?
5      A.   Correct.
6      Q.   Before becoming involved in this
7  litigation, had you ever reviewed any other
8  company's internal documents?
9      A.   Only pertaining to that patent
10 infringement case.
11     Q.   The deposition transcripts, those
12 were given to you by Mr. Anderson or
13 plaintiffs' counsel; correct?
14     A.   Correct.  Yes.
15     Q.   The medical literature, the
16 manuscripts that you reviewed, were those
17 given to you by plaintiffs' counsel as well?
18     A.   They gave me a few.  So roughly
19 we're looking at 200 or so manuscripts in my
20 report and supplemental report.  When this
21 all started, I believe Mr. Anderson gave me
22 20, maybe 30.  So everything else is from
23 me.
24     Q.   So the independent research you
25 did besides reviewing the materials that

Confidential - Attorneys' Eyes Only

Page 406

```
 1   plaintiffs' counsel sent to you was you
 2   reviewed some of the medical literature and
 3   manuscripts.
 4       A.   Yeah.  It's fair to say that
 5   except for what I received from Mr. Anderson
 6   and colleagues, everything would be journal
 7   reviews.
 8       Q.   Do you know any of the study
 9   investigators involved in clinical studies
10   concerning Gynemesh® PS?
11       A.   No, I -- I don't know any of
12   those.
13       Q.   Do you know Doug Hale?
14       A.   I don't recognize the name.
15       Q.   Do you know anyone involved in
16   the Prolift® clinical studies?
17       A.   Not that I know of, no.
18       Q.   Now, you've never been employed
19   by the FDA; correct?
20       A.   No.
21       Q.   I'm not correct?
22       A.   No.  You are correct.  I have
23   never been employed --
24            MR. ANDERSON:  Your bad
25   question.
```

Confidential - Attorneys' Eyes Only

Page 407

```
 1         THE WITNESS:  -- or never
 2   anticipate being employed by the FDA.
 3   BY MR. SNELL:
 4       Q.   Have you ever been a consultant
 5   to the FDA?
 6       A.   No.  The closest would be through
 7   that Public Citizen, Ralph Nader's group,
 8   where I had comments read at the FDA.  But I
 9   wouldn't think I would be a consultant for.
10       Q.   Has the FDA ever paid you to be a
11   consultant to provide information to them?
12       A.   No.
13       Q.   Have you ever served on an FDA
14   advisory committee board?
15       A.   No.
16       Q.   Have you ever testified at any
17   government institution, setting aside, you
18   know, the patent case and any other
19   depositions or trial testimony you've given?
20       A.   No.
21       Q.   Have you ever testified at an FDA
22   advisory committee?
23       A.   No.  Again, other than that
24   Public Citizen comments.  But I was not
25   personally there.
```

Confidential - Attorneys' Eyes Only

Page 408

1    Q.    Have you reviewed the federal
2  regulations that pertain to medical devices?
3    A.    No.
4    Q.    Have you ever reviewed any FDA
5  regulations pertaining to devices before
6  becoming engaged as an expert witness in
7  this case?
8    A.    No.
9          MR. ANDERSON:  Off the record.
10         (Discussion off the record.)
11  BY MR. SNELL:
12   Q.    Have you ever been involved in
13  the clinical trial designed to evaluate the
14  safety and efficacy of a medical device?
15  When I say clinical trial, I mean in humans.
16   A.    Yes.
17   Q.    What was that?
18   A.    1998 to '99, it was a new design
19  of an artificial urinary sphincter for men,
20  and I was involved in the original dog
21  studies and then it went into human trials,
22  which my name was on.  However, I was not
23  involved because I went down to my
24  fellowship.  But my name would be attached
25  to it.

Confidential - Attorneys' Eyes Only

Page 409

1  Q.  So it's correct that you were not
2  involved in the human clinical trials with
3  regard to this artificial urinary sphincter;
4  correct?
5  A.  I was not involved in the
6  implantation. I was involved heavily as far
7  as the write-up, the documentation. And
8  then timing, I was sent down to my
9  fellowship so I left. I did the work but
10 didn't get to do the surgery.
11 Q.  You've never been involved in a
12 clinical trial designed to evaluate the
13 safety and efficacy of a prolapse device;
14 correct?
15 A.  Correct.
16 Q.  You've never been involved in a
17 clinical trial designed to evaluate the
18 safety and efficacy of a stress urinary
19 incontinence synthetic sling; correct?
20 A.  Correct. I have not.
21         MR. SNELL: Why don't we take a
22 break.
23         (Recess, 11:15-11:52 a.m.)
24 BY MR. SNELL:
25 Q.  Doctor, you've never been

Confidential - Attorneys' Eyes Only

Page 410

1  involved in a clinical trial designed to
2  assess the safety and efficacy of a stress
3  urinary incontinence device; correct?
4      A.   Correct.
5      Q.   Prior to becoming involved in
6  this litigation, you had never reviewed a
7  device design safety assessment; correct?
8      A.   From an industry, I guess I don't
9  know -- I just want to make sure I'm clear
10 in understanding your question.
11     Q.   Yes.
12     A.   Would this be an industry --
13     Q.   From a manufacturer, yes.
14     A.   No, I have not.
15     Q.   You're not an FDA regulatory
16 expert, are you?
17     A.   No, I'm not.
18     Q.   Yesterday, Doctor, you mentioned
19 the Iglesia study?
20     A.   Yes.
21          MR. SNELL:  Can we mark it as
22 the next exhibit.
23          (Exhibit Elliott-9 was marked
24 for identification.)
25 BY MR. SNELL:

Confidential - Attorneys' Eyes Only

Page 431

1  residents, you have to look and feel for the
2  mesh.  And many times, it's so encased in
3  scar that you have to go by feel, then you
4  can feel the poking sensation of it.  It's
5  sharp.
6      Q.   And in the Prolift® mesh that you
7  have examined, you don't recall it being
8  barbed wire; correct?
9      A.   No.  I cannot recall.  I did not
10 keep records if it was specifically
11 Prolift®.  I do know specifically TVT® but
12 not Prolift®.
13     Q.   Can you tell me any clinical
14 human studies in TVT® that reported a
15 barbed-wire effect with the mesh?
16     A.   I don't recall off the top of my
17 head, no.  Barbed wire is a descriptive
18 term, not a scientific term.
19          MR. SNELL:  Okay.  Let's have
20 some lunch.
21          (Luncheon recess,
22 12:29-1:15 p.m.)
23          AFTERNOON SESSION
24 BY MR. SNELL:
25     Q.   Am I correct that you never

Confidential - Attorneys' Eyes Only

Page 432

1    looked at any FDA guidance documents before
2    becoming involved in this litigation?
3       A.   I'm not familiar what guidance
4    documents are.
5       Q.   As you sit here today, do you
6    know what FDA guidance documents are?
7       A.   No, I do not.
8       Q.   Do you know whether the mesh that
9    was used in sacrocolpopexies by surgeons
10   between the 1970s and the 1990s, whether
11   that use was cleared by the FDA for use in
12   prolapse?
13      A.   I do not know that.
14      Q.   The FDA has never begun, to your
15   knowledge, any type of enforcement
16   proceedings against Ethicon for the
17   Prolift®; correct?
18      A.   I don't know. Proceedings,
19   again, that falls under regulation
20   territory. I'm a clinician. I know of the
21   only -- the event in I believe 2008 where
22   letters were sent, from what I reviewed in
23   depositions, about not having 510
24   clearance. But I'm not a regulatory
25   individual.

Confidential - Attorneys' Eyes Only

Page 433

1  Q. You're not a regulatory expert on
2  510(k) clearance.
3  A. By no means.
4  Q. And you're not a lawyer; correct?
5  A. No.
6  Q. You don't have any legal
7  specialization in what is illegal versus
8  legal conduct; correct?
9  A. Correct.
10 Q. I'd like to ask you a couple of
11 questions, Doctor, about Exhibit Number 2.
12 A. Yes.
13 Q. And this is your November 7th,
14 2012, supplemental report; correct?
15 A. Yes, it is.
16      MR. SNELL: And, again, for the
17 record, we have filed a Motion to strike
18 this report and identified the bases for
19 that. And I'm not waiving any arguments or
20 rights by questioning the doctor on this
21 report.
22 BY MR. SNELL:
23 Q. Doctor, in your November 7th,
24 2012, report, this is the first time that
25 you identified any opinions with regard to