Exhibit E

```
 1              UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2                  CHARLESTON DIVISION
 3
     IN RE: ETHICON, INC., PELVIC REPAIR      Master File No.
 4   SYSTEM PRODUCTS LIABILITY LITIGATION     2:12-MD-02327
 5   THIS DOCUMENT RELATES TO THE FOLLOWING
     CASES IN THE WAVE 1 OF MDL 200:
 6   -------------------------------------
 7
 8   WENDY HAGANS,
 9          Plaintiff,
10   v.                       Case No: 2:12-cv-00783
11   ETHICON, INC., ET AL.,
12          Defendant(s).
     _____/
13
14                   DEPOSITION OF
                  BRIAN SCHWARTZ, M.D.
15
16         Taken in re: TVT-O Litigation
17
18        DATE TAKEN:     March 25, 2016
          TIME:           9:15 a.m.
19        PLACE:          5237 Summerlin Commons Blvd.
                          Fort Myers, Florida
20
21
22      Examination of the witness taken before:
23          Elizabeth M. Brooks, RPR, FPR
              2650 Airport Road South
24              Naples, FL  34112
25
```

Brian Schwartz, M.D.

```
 1                      APPEARANCES

 2

 3   For the Plaintiff(s):     P. LEIGH O'DELL, ESQ.

                               Beasley, Allen, Crow,

 4                             Methvin, Portis & Miles, PC

                               218 Commerce Street

 5                             P.O. Box 4160

                               Montgomery, AL  36104

 6                             leigh.odell@beasleyallen.com

 7

 8

 9   For the Defendant(s):    BARRY J. KOOPMANN, ESQ.

                               Bowman and Brooke, LLP

10                             150 S. 5th Street

                               Suite 3000

11                             Minneapolis, MN  55402

                               barry.koopmann@bowmanandbrooke.com

12

13

14                      * * * * * * *

15

16

17

18

19

20

21

22

23

24

25
```

Brian Schwartz, M.D.

```
 1                          INDEX

 2   WITNESS                                      PAGE

 3   BRIAN SCHWARTZ, M.D.

 4      Direct Examination by Ms. O'Dell            7

 5      Cross Examination by Mr. Koopmann          92

 6      Redirect Examination by Ms. O'Dell        127

 7      Recross Examination by Mr. Koopmann       133

 8      Further Redirect Examination by Ms. O'Dell   134

 9      Further Recross Examination by Mr. Koopmann  135

10      Further Redirect Examination by Ms. O'Dell   135

11      Further Recross Examination by Mr. Koopmann  136

12                     * * * * * * *

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Brian Schwartz, M.D.

```
 1                          EXHIBITS
 2   DESCRIPTION                                      PAGE
 3   Exhibit 1     Notice of Deposition                7
 4   Exhibit 2     Report for Gynecare TVT-O           8
 5   Exhibit 3     Curriculum Vitae of Brian           9
                   Schwartz, M.D.
 6
     Exhibit 4     Brian Schwartz, Reliance List       9
 7                 in Addition to Materials
                   Referenced In Report, MDL Wave
 8                 1
 9   Exhibit 5     Binder Labeled TVT-O Company       12
                   Documents
10
     Exhibit 6     Letter Dated 9/1/15 To Schwartz    16
11                 from Koopmann and Attachments
12   Exhibit 7     Article Entitled Sling Surgery     31
                   for Stress Urinary Incontinence
13
     Exhibit 8     The Safety and Efficacy of the     49
14                 Inside-Out Trans-Obturator TVT
                   by Groutz, et al
15
     Exhibit 10    AUGS Paper Entitled Dyspareunia    56
16                 Associated with Paraurethral
                   Banding In the Transobturator
17                 Sling
18   Exhibit 12    Article Entitled Randomized        58
                   Trial of Tension-free Vaginal
19                 Tape and Tension-free Vaginal
                   Tape-obturator for Urodynami
20                 Stree Incontinence In Women
21   Exhibit 13    Article Entitled Retropubic        62
                   Tension-free Vaginal Tape and
22                 Inside-out Transobturator Tape
23   Exhibit 14    Document entitled Ethicon          71
                   Expert Meeting, Meshes for
24                 Pelvic Floor Repair, 1/2/06
25
```

Brian Schwartz, M.D.

```
 1

                         EXHIBITS
 2                      (continued)
 3   DESCRIPTION                                      PAGE
 4   Exhibit 14B    Document entitled IR Microscopy    82
                    of Explanted Prolene, 9/30/87
 5
     Exhibit 15     IFU for Gynecare TVT Opturator     85
 6                  System
 7   Exhibit 17     Article entitled midurethral      103
                    Sling Operations for Stress
 8                  Urinary Incontinence in Women
                    (Review) by Ford, AA
 9
     Exhibit 18     Article entitled Primary and      104
10                  Repeat Surgical Treatment for
                    Female Pelvic Organ Prolapse
11                  and Incontinence in Parous
                    Women in the UK, by Mohamed
12                  Abdel-fattah, et al
13   Exhibit 19     Article entitled Sling            104
                    Revision/Removal for Mesh
14                  Erosion and Urinary Retention,
                    by Michele Jonsson Funk, et al
15
     Exhibit 20     AUA article entitled Guideline    105
16                  for the Surgical Management of
                    Female Stress Urinary
17                  Incontinence: 2009 Update
18   Exhibit 21     Article entitled Medium-term      107
                    and Long-term Outcomes
19                  Following Placement of
                    Midurethral Slings for Stress
20                  Urinary Incontinence by Giovanni
                    A. Tommaselli, et al
21
     Exhibit 22     Article entitled Indications      109
22                  and Risk Factors for
                    Midurethral Sling Revision
23
     Exhibit 23     Article entitled Removal or       111
24                  Revision of Vaginal Mesh Used
                    for the Treatment of Stress
25                  Urinary Incontinence by Blayne
```

Brian Schwartz, M.D.

```
 1                      EXHIBITS
                       (continued)
 2   DESCRIPTION                                    PAGE

 3   Exhibit 24     Binder labeled Dr. Brian        113
                    Schwartz, TVT-O General Report
 4
     Exhibit 25     Binder entitled TVT-O           134
 5                  Literature and Document Starter
                    Set
 6
     Exhibit 26     Binder labeled TVT Literature   134
 7                  and Document Set
 8   Exhibit 27     Document Entitled Device         135
                    Labeling Guidance #G91-1
 9

10

11           (The following exhibits were not marked:  9,
12           11, 16)
13
14                     * * * * * * * *
15

16

17

18

19

20

21

22

23

24

25
```

Brian Schwartz, M.D.

```
 1   WHEREUPON,

 2                      BRIAN SCHWARTZ, M.D.,

 3   having been duly sworn to tell the truth, testified upon

 4   his oath as follows:

 5                      DIRECT EXAMINATION

 6   BY MS. O'DELL:

 7        Q    Good morning, Dr. Schwartz.

 8        A    Good morning.

 9        Q    My name is Leigh O'Dell.  We met a few minutes

10   ago off the record.  I'm here to ask you some questions

11   about your TVT-O general report for the Ethicon Wave

12   cases.  And so you provided a number of notebooks to me

13   today, and I'm assuming that is in response to the

14   notice of deposition.

15             Let me show it to you.  Exhibit 1.

16             (Exhibit 1 marked for identification.)

17   BY MS. O'DELL:

18        Q    Have you seen that document before?

19        A    Yes.

20        Q    And if you'll turn, Dr. Schwartz, to Exhibit A

21   of the notice.

22        A    Okay.

23        Q    Is there anything in your possession that

24   relates to your work in this case that you have not

25   brought with you to the deposition?
```

Brian Schwartz, M.D.

```
1        A    No.

2        Q    Okay.  And is there anything that you have in

3    your possession that your lawyer has instructed you not

4    to bring?

5        A    No.

6        Q    You brought a number of notebooks, and let me

7    just ask for a general understanding of how you prepared

8    your opinions in this case.

9             Did you primarily review printed materials or

10   did you review materials electronically as well?

11       A    I've reviewed both.

12       Q    In other words, did you review the materials

13   electronically and then Ethicon counsel provided you

14   with hard copies, or were you provided hard copies

15   initially and you reviewed them upon receipt?

16       A    Both.  Actually, both ways.  Some I received

17   hard copies and reviewed them, and some I received

18   electronically and reviewed them and then got the hard

19   copies.

20       Q    Let me do a few more housekeeping matters and

21   I'll return to that.

22            Let me show you what I've marked as Exhibit 2

23   and ask you to identify that for the record.

24            (Exhibit 2 marked for identification.)

25            THE WITNESS:  This appears to be my general
```

Brian Schwartz, M.D.

```
 1      report for TVT-O.

 2           (Exhibit 3 marked for identification.)

 3  BY MS. O'DELL:

 4      Q    And would you identify Exhibit 3, please?

 5      A    This is my up-to-date CV.

 6      Q    I'm handing you Exhibit 4, and please identify

 7  that for the record.

 8           (Exhibit 4 marked for identification.)

 9           THE WITNESS:  I believe this is the reliance

10      list that was provided to me.

11  BY MS. O'DELL:

12      Q    Did you review all of the materials that are

13  listed on Exhibit 4?

14      A    I have reviewed most, at least in a cursory

15  fashion.

16      Q    If you'll turn to Page 2, you'll see that that

17  starts a very lengthy list of medical literature.

18           Who identified these publications --

19      A    Page 2?

20      Q    -- for you to consider in rendering your

21  opinion?

22      A    My attorney, Mr. Koopmann.

23      Q    Are there any articles that you identified

24  independently of Ethicon counsel and asked that they be

25  added to this list?
```

Brian Schwartz, M.D.

1    A    I did forward some articles to Mr. Koopmann.

2    I don't know if they have been added to the list or not.

3    Q    Do you recall either the name or the first

4    author of the articles?

5    A    I do not.

6    Q    What product did they relate to?

7    A    They related to generalized female

8    incontinence surgery.

9    Q    Were they recently published articles or

10   were --

11   A    Recently published articles.

12   Q    Okay.  And in regard to their content, did

13   they address a specific type of product?

14   A    No, they did not.

15   Q    And what were -- what was the subject of the

16   articles?

17   A    The effectiveness of various female

18   incontinence surgeries.

19   Q    Did they include efficacy rates of the TVT-O?

20   A    No.

21   Q    Did any of those articles address the efficacy

22   of the TVT-Secur or another mini-sling?

23   A    No.

24   Q    Approximately how many articles did you

25   forward to your attorney?

Brian Schwartz, M.D.

```
 1      A    Two or three.

 2      Q    Did you perform any PubMed searches or any

 3  other type of searches for literature?

 4      A    I did not do any generalized searches, no.

 5      Q    If you'll turn to what appears to be about the

 6  last five or six pages of your reliance list, Exhibit 4,

 7  you'll see a list of production materials.  I think you

 8  may have gone too far in the exhibit.  The title at the

 9  top is Production Materials.

10      A    Yes.

11      Q    Are those materials or does this begin a list

12  of materials that you were provided by Ethicon counsel

13  of internal documents?

14      A    Not all.

15      Q    Did you add any of those items to your list or

16  were they all added by Ethicon counsel?

17      A    They were all added by Ethicon counsel.

18      Q    Okay.  Are those materials printed in one of

19  these binders?

20      A    Some of those materials will be in the

21  binders.  Should be labeled Company Documents.

22      Q    I see this.  I think the index is entitled TVT

23  Company Documents.

24      A    Yes.

25      Q    I'm going to mark the notebook as Exhibit 5.
```

Brian Schwartz, M.D.

```
 1              MR. KOOPMANN:  Just for the record, the index

 2       is labeled TVT-O Company Documents.

 3              (Exhibit 5 marked for identification.)

 4  BY MS. O'DELL:

 5       Q    All right.  I'm going to mark the binder as

 6  Exhibit 5, and it is various TVT-O company documents.

 7              Who prepared this notebook?

 8       A    Ethicon counsel.

 9       Q    Did you review these materials?

10       A    Yes, I did.

11       Q    Did you review any company documents, with the

12  exception of the IFUs, which I see here in another

13  binder, for the TVT-O?  Did you review any company

14  documents electronically?

15       A    Not that I recall.

16       Q    So would it be fair to say that outside of the

17  documents that are marked in Exhibit 5 and the IFUs that

18  are in another binder, but I won't mark, to take pity on

19  our court reporter since we all have copies of those,

20  but other than those documents within the binders, is

21  that the whole universe of company documents that you

22  relied on in rendering your opinions in relation to the

23  TVT-O?

24       A    Yes.

25       Q    And so, to the degree there are other company
```

Brian Schwartz, M.D.

1   documents that are listed in the Materials Reviewed list

2   marked as Exhibit 4, those are not documents that you've

3   relied on in rendering your opinions, correct?

4              MR. KOOPMANN:  Objection.  Form.

5              Go ahead.

6              THE WITNESS:  Correct.

7   BY MS. O'DELL:

8      Q    Who hired you to be involved in the Ethicon

9   litigation?

10     A    I was contacted towards the end of last year

11  by Mr. Koopmann.

12     Q    And did you know Mr. Koopmann prior to him

13  contacting you?

14     A    No.

15     Q    How did he identify you as a potential expert?

16             MR. KOOPMANN:  Objection.  Foundation.

17             THE WITNESS:  Apparently my name was in a list

18     of names that was forwarded to him of TVT users.

19  BY MS. O'DELL:

20     Q    You mean TVT-O users?

21     A    Yes.  The Ethicon product users.

22     Q    Okay.  And so is it your understanding that it

23  was an Ethicon employee that forwarded a list to Ethicon

24  counsel of TVT-O users?

25             MR. KOOPMANN:  Objection.  Form.

Brian Schwartz, M.D.

```
 1              THE WITNESS:  I honestly do not have an answer
 2       to that.
 3  BY MS. O'DELL:
 4       Q    Prior to your involvement in the Ethicon
 5  transvaginal mesh litigation, have you been an expert
 6  witness in other cases?
 7       A    Never.
 8       Q    And would that be true of product liability
 9  cases as well as med mal cases, or any other type cases?
10       A    Correct.
11       Q    Have you done any expert consulting for
12  litigation, other than providing testimony?
13       A    Never.
14       Q    Have you been deposed before?
15       A    Yes.
16       Q    How many times, if you recall?
17       A    For any reason?
18       Q    For any purpose, yes.
19       A    Half a dozen.
20       Q    And in those particular circumstances, were
21  those involved -- involving your professional work as a
22  physician?
23       A    Yes.  They were involving -- most of them.  I
24  think one was for an auto accident my wife had.  The
25  rest were for patients who were involved in some type of
```

Brian Schwartz, M.D.

```
 1   litigation.  And there were some that just involved me.

 2        Q    Okay.  And were those that involved you

 3   directly cases involving medical malpractice claims?

 4        A    Yes.

 5        Q    And how many cases involved medical

 6   malpractice?

 7        A    Three.

 8        Q    Okay.  And if you'll start, just go through

 9   the list of three, if you don't mind, sir.

10             What were the -- very short summary of the

11   allegations and then what was the outcome of the case.

12        A    The first was when I was a surgery intern in

13   1990.  The allegation was misdiagnosis of appendicitis.

14   That was settled by the hospital.

15             The second was in the late nineties.  I was

16   covering for one of my partners, provided a patient with

17   some antianxiety medication.  The next day he was found

18   in respiratory arrest, and that's number two, and that

19   case was settled.

20             And the third is a high-risk patient of mine

21   who, while in the hospital postoperatively, appeared to

22   have cardiac arrest, and that was settled as well.

23        Q    I'm going to mark a group of papers that

24   Ethicon counsel has provided to me that appear to be

25   your engagement letter in these cases, as well as
```

Brian Schwartz, M.D.

```
 1    invoices.

 2              (Exhibit 6 marked for identification.)

 3    BY MS. O'DELL:

 4         Q    Let me just show you this and see if I've

 5    identified those correctly.

 6         A    Yes.

 7         Q    Okay.  And since we only have one copy, if we

 8    can share.  I'll ask you a few questions.  If you need

 9    to see these, please just ask me.

10         A    Sure.

11         Q    It appears based on Page 1 of Exhibit 6 that

12    you were engaged to serve as an expert in these cases on

13    September the 1st?

14         A    Yes.

15         Q    And the first bill or invoice documenting work

16    that I see has an entry for 12/4, or December 4.

17              Did you perform any work or do any preparation

18    of your opinions between September 1st and December the

19    4th?

20         A    Not that I recall.

21         Q    And I have, you know, three general bills, one

22    for December, one for January, one for February, that

23    have all been made a part of this exhibit.  And there is

24    no delineation of whether the work was for a general

25    report you prepared, individual case report.  So let me
```

Brian Schwartz, M.D.

1    just ask you.

2          Are all of these invoices related to your

3    TVT-O work?

4      A    They are all related to any of the Ethicon

5    work, so that would include the TVT-O, the TVT-Secur and

6    the case work.

7      Q    Okay.  And you are serving as a case-specific

8    expert in the Hagans case, and I'm aware of one other

9    case, that I cannot recall the name of the case.

10         Are there any other cases besides those two

11   that you are serving as a case-specific expert?

12     A    No.

13     Q    And, totaling these bills, Dr. Schwartz, it

14   appears that you have spent approximately 67.5 hours, if

15   my math is correct, on your work in these matters up

16   until February the 28th.

17         What percentage of those hours, approximately,

18   would be spent on the TVT-O general opinions?

19     A    70 percent.

20     Q    Okay.

21     A    As an estimate.

22     Q    Fair enough.

23         And then how many hours, approximately, or

24   what percentage of the hours would have been spent in

25   preparing your TVT-Secur report?

Brian Schwartz, M.D.

1      A     The other 30.

2      Q     Okay.  And that is 100 percent.

3            So what portion of your time was devoted to

4      rendering your opinions in the case, the case specific?

5      A     About -- I would estimate about 30 percent of

6      each, so 30 percent of the 70 percent for the TVT-O, and

7      30 percent of the TVT-Secur for the case specific.

8      Q     Okay.  How many hours have you spent since

9      February 28th on your work in relation to the overall

10     Ethicon litigation?

11     A     I would estimate around between 25 and 30

12     additional hours.

13     Q     And what did you do during those 30 hours?

14     A     I'm going to need you to be more specific.

15     Q     Okay.  Well, you wrote your report and you

16     ostensibly -- let me start again.

17           From December to February the 28th, I'm

18     assuming, you reviewed materials, you met with your

19     lawyer, you wrote reports, and so that's up until

20     February the 28th.

21           Since that time have you written any

22     supplemental reports?

23     A     No.

24     Q     Have you reviewed new materials?  In other

25     words, how have you -- what did you do in the 25 to 30

Brian Schwartz, M.D.

```
 1   hours that you've spent since February 28th?  I'm just

 2   asking you, what kind of work did you do?

 3        A    Re-reviewing the materials.

 4        Q    How many hours did you spend -- let me back

 5   up.

 6             Did you meet with counsel prior to your

 7   deposition?

 8        A    Yes.

 9        Q    When?

10        A    This morning and last evening.

11        Q    How many hours did you spend meeting with

12   Mr. Koopmann?

13        A    Three and a half.

14        Q    Did you have any telephone conferences?

15        A    We did.

16        Q    And when approximately did that conference

17   occur?

18        A    Last evening.

19        Q    Okay.  So you talked to him by phone

20   yesterday, or did you meet with him as well?

21        A    We had a telephone conference with a third

22   party by phone.

23        Q    Okay.  Who was the third party?

24        A    I don't -- Helen Catherine.

25        Q    Okay.
```

Brian Schwartz, M.D.

```
 1        A     That's all I know.

 2        Q     That's enough.  I know of a Helen Catherine.

 3              And I presume you talked about the Hagans

 4   case?

 5              MR. KOOPMANN:  Objection.  I mean, you can't

 6        inquire into the communications between counsel and

 7        the witness unless it relates to information we

 8        provided him or compensation.

 9              MS. O'DELL:  I can ask.  You are free to

10        object.

11              MR. KOOPMANN:  Objection.

12              And I'm going to instruct you not to answer,

13        regarding the substance of our conversation, that

14        question.

15   BY MS. O'DELL:

16        Q     Let me ask this question.

17              Dr. Schwartz, in rendering your opinions in

18   regard to Ethicon's TVT-O product, were you asked to

19   make any assumptions in reaching your opinions?  In

20   other words, were you given facts or data to assume and

21   base your opinions on those?

22        A     If I understand the question correctly, I was

23   asked to make my own assumptions based on the facts and

24   data that were provided.

25        Q     Okay.  Let me ask you some questions about
```

Brian Schwartz, M.D.

1   your clinical practice.

2          What percentage of your current patient

3   population is female?

4       A    30 percent.

5       Q    And of those, the 30 percent, how many of

6   those patients approximately would you be treating for

7   stress urinary incontinence?

8       A    My estimate would be 20 percent of that 30

9   percent.

10      Q    I read in your report where you have performed

11  approximately 600 sling procedures of some type or

12  another?

13      A    At least.

14      Q    In your current practice how often on a

15  monthly basis would you perform surgery for the

16  treatment of SUI?

17      A    Currently?

18      Q    Yes.

19      A    How many surgeries do I perform?

20      Q    No.  I asked you how many surgeries you would

21  perform in females for the treatment of SUI on a monthly

22  basis.

23      A    Six.  There has been a significant decline

24  over the last couple of years.

25      Q    In what?

Brian Schwartz, M.D.

```
 1        A    In my population of incontinence patients.

 2   One of the reasons had to do with our -- my practice

 3   voting to limit our practice to one hospital.

 4   Unfortunately that hospital does not include

 5   gynecologists, so referral patterns changed

 6   dramatically.

 7             And, secondly, with all of the incontinence

 8   litigation, there has just been a dramatic change.

 9        Q    Are you currently using transvaginal mesh in

10   the treatment of stress urinary incontinence?

11        A    I am.

12        Q    And what product are you using presently?

13        A    I utilize the TVT-O and the TVT-Abbrevo.

14        Q    You write in your report -- I'm looking on

15   Page 2.  Just a quick question.

16             You state that you performed Burch procedures

17   in your residency?

18        A    And in practice.

19        Q    Do you presently perform the Burch procedure?

20        A    I would perform the Burch procedure if there

21   was an appropriate situation, but I have not performed a

22   Burch procedure in several years.

23        Q    Are you trained to perform Burch procedures

24   laparoscopically?  And it's not a trick question.  I'm

25   just asking, when you were trained, were you trained to
```

Brian Schwartz, M.D.

1    do them through an open abdominal incision?

2        A    In my residency we did not.  But as a

3    practicing urologist I did help assist my partners with

4    those procedures.  So yes, I did perform them as a

5    practicing urologist.

6        Q    And those procedures were performed with an

7    abdominal incision, correct?

8        A    The laparoscopic Burch procedure?  Yes.

9    Through small abdominal incisions.

10       Q    I think I misunderstood what you are saying.

11            You are saying you had performed laparoscopic

12   Burches with your partners?

13       A    Correct.

14       Q    But you have not -- you didn't go through

15   resident training using the laparoscopic approach to a

16   Burch?

17       A    Correct.

18       Q    You state you have performed 600 sling

19   procedures and several hundred TVT-Os, I've read in your

20   TVT-O general report.  In your TVT-Secur general report

21   it says several hundred.

22            Would you give me a very big sort of estimate,

23   of those 600 procedures, what percentage would be TVT-O?

24       A    My comments in terms of the number were 300

25   TVT-O, 300 TVT-Secur, and I did not include the other

Brian Schwartz, M.D.

```
 1   types of slings that I have done in my career.

 2   Pubovaginal slings, Monarc sling.

 3        Q    Right.  You write on Page 2, "These include

 4   retropubic TVT, transobturator TVT-O, transobturator

 5   slings using the out-to-in method" -- which I'm assuming

 6   is the Monarc -- "the TVT-Abbrevo and mini-slings,

 7   including the TVT-Secur."  I'm reading from Page 2 of

 8   Exhibit 2.

 9             "I have performed over 600 of those

10   procedures."

11             And so, of all of those types of sling

12   procedures, is the total that you performed 600?

13        A    That is the minimum, yes.  I have performed

14   more than 600.

15        Q    Okay.

16        A    I just rounded down to the closest number.

17        Q    And if I understand your testimony, you've

18   performed 300 TVT-O, 300 TVT-Securs, so that's 600?

19        A    Yes.

20        Q    Approximately how many TVT procedures have you

21   performed?

22        A    Ten.

23        Q    And how many Abbrevo?

24        A    Thirty.

25        Q    How many Monarc?
```

Brian Schwartz, M.D.

1        A    I'm relying on more than 15 years ago, so I'm

2    giving you my best estimates.

3             I would say, for Monarc, 30.

4        Q    If you'll turn to Page 6 of your report,

5    Dr. Schwartz, middle of the page, you write, "All

6    continence surgeries have similar risk, including

7    bleeding, infection, persistent or recurrent SUI,

8    voiding dysfunction, including overactive bladder

9    symptoms and urinary retention, chronic pain,

10   dyspareunia, injury to the vagina, urethra, bladder," et

11   cetera.

12            What's your basis for that statement?

13       A    A combination of my experience, texts, and the

14   medical literature.

15       Q    Do you keep a log of the surgical procedures

16   that you perform?

17       A    I used to.

18       Q    When did you stop?

19       A    Probably ten years ago.

20       Q    So you presently do not keep a log of the

21   patients and the type of procedures that you perform?

22       A    I do not keep a log.

23       Q    Have you performed a surgical revision or

24   excision of an SUI sling?

25       A    Yes.

Brian Schwartz, M.D.

```
 1       Q    Approximately how many?

 2       A    Thirty.

 3       Q    Have you revised a TVT-O sling?

 4            MR. KOOPMANN:  Objection.  Form.

 5            MS. O'DELL:  What's the objection?

 6            MR. KOOPMANN:  Just, I think it's vague,

 7       "revised."  That can mean a lot of things.

 8            MS. O'DELL:  I'm happy to restate that.  Let

 9       me be more clear.

10  BY MS. O'DELL:

11       Q    Have you done a surgical procedure to remove

12  mesh from a TVT-O sling?

13       A    Of those, that estimated group of 30, I cannot

14  recall which -- how many of each different types of

15  slings, because a majority of those patients were not

16  implanted by myself, but I am fairly confident that

17  included in that group is a TVT-O patient.

18       Q    Have you removed mesh from a patient in whom

19  you've implanted the sling?

20       A    I have.

21       Q    And how many times, approximately?

22       A    My estimate would be ten.

23       Q    In any of those cases, did they involve a

24  transobturator device?

25       A    I cannot recall.  I would assume, because most
```

Brian Schwartz, M.D.

```
 1    of my sling procedures utilized one of the TV types of

 2    devices, that that would be included in that group.

 3         Q    Did you or have you performed a removal

 4    procedure in a patient for the treatment of pain?

 5         A    No.

 6         Q    Have you removed mesh to address dyspareunia?

 7         A    No.

 8         Q    Have you removed mesh from patients for the

 9    treatment of retention?

10         A    Yes.

11         Q    Okay.  And of the 30 that you've removed,

12    Dr. Schwartz, what -- if you could give me a general

13    idea of whether the indication for removal was

14    retention, erosion or some other indication.

15         A    The majority were for erosion.

16         Q    In any of those instances where you removed

17    mesh, have you reviewed the explanted material

18    microscopically?

19         A    No.

20         Q    Have you asked a pathologist to review the

21    material that you've removed microscopically?

22         A    I have sent the material to the pathologist

23    for them to assess.

24         Q    Okay.  And are you aware of any pathology that

25    has been examined microscopically of those explants that
```

Brian Schwartz, M.D.

```
1   you've performed?

2        A    I am not aware of any.

3        Q    Would it be the general practice at your

4   hospital only to review explanted mesh under gross

5   examination?

6        A    Yes.

7        Q    And so you've not requested that they do

8   anything other than the normal procedure at your

9   hospital, correct?

10       A    I have done nothing more than request that

11  they assess it like any other pathology specimen I would

12  send.

13            MS. O'DELL:  May we go off the record?

14            (Off the record at 9:59 a.m.)

15            (A recess was taken.)

16            (Back on the record at 10:02 a.m.)

17  BY MS. O'DELL:

18       Q    Dr. Schwartz, have you had any patients who

19  have reported new-onset dyspareunia after the

20  implantation of the TVT-O?

21       A    Not of patients that I've implanted.

22       Q    Have you treated patients who have developed

23  dyspareunia after the TVT-O?

24       A    I recall one or two patients that did have

25  that as part of their grouping of problems after a sling
```

Brian Schwartz, M.D.

```
 1    procedure.

 2         Q    And how did you treat those patients?  What

 3    was your -- what's your typical method for treating a

 4    patient who develops dyspareunia after a transobturator

 5    sling?

 6         A    It depends on the particular patient and what

 7    the clinical scenario is, obviously making sure there is

 8    nothing I feel is surgically correctable.  And, if they

 9    are postmenopausal patients, which many of mine are, if

10    they are not on some form of estrogen, I will prescribe

11    that.  And I'll typically work with a gynecologist to

12    see if they have any additional treatment suggestions.

13         Q    Have you performed any surgeries on patients

14    who developed dyspareunia after the TVT-O, such as

15    cutting the sling or removing the mesh, in order to

16    address their dyspareunia?

17         A    I have not had to operate on any patients for

18    the complaint of dyspareunia.

19         Q    Now, you acknowledge, I'm sure, that pain and

20    dyspareunia is reported in the literature as a

21    complication of the TVT-O?

22         A    At a very low occurrence rate, along with a

23    whole host of other complications.

24         Q    And what complications are you referring to

25    when you say a host of complications?
```

Brian Schwartz, M.D.

1     A     That are stated, actually, in the paragraph

2  that you read.  I think that's a really good example.

3     Q     And this was the paragraph that I read on

4  Page, I believe, 6 of your report?

5     A     Yes.

6     Q     And it's your opinion that those are, the

7  risks that are presented on Page 6, are similar in

8  midurethral slings, whether they are TVT, TVT-O or

9  mini-sling, true?

10          MR. KOOPMANN:  Object to form.

11          THE WITNESS:  To different degrees.

12  BY MS. O'DELL:

13     Q     Would you agree with me, Dr. Schwartz, that

14  groin pain is reported in the literature as a

15  complication of TVT-O slings?

16     A     Groin pain is reported as a complication of

17  every type of surgical treatment for stress urinary

18  incontinence, yes.

19     Q     Would you agree with me that groin pain is

20  reported at a more than fivefold increase in TVT-O

21  slings versus other types of incontinence procedures?

22     A     I think you would have to be more specific as

23  to "other types of incontinence procedures."

24     Q     So is it your opinion, Dr. Schwartz, that

25  groin pain, leg pain and dyspareunia does not occur in

Brian Schwartz, M.D.

```
 1    greater frequency in patients who have a TVT-O or

 2    transobturator sling as compared to other surgical

 3    treatments for SUI?

 4         A    That's a complicated question.  Could you

 5    repeat it?

 6              MS. O'DELL:  I'm going to ask Lynn if she

 7         could read it.

 8              (The record was read back.)

 9              MR. KOOPMANN:  Object to form.

10              THE WITNESS:  The occurrence of transient

11         groin and hip pain is reportedly increased in

12         patients who have had a transobturator procedure.

13    BY MS. O'DELL:

14         Q    What do you mean by "transient"?

15         A    Typically resolving within a matter of days to

16    weeks.

17         Q    And what do you rely on in making that

18    statement?

19         A    There is a -- there are many high-quality

20    published studies that have shown that to be the case.

21         Q    Let me show you what I'm marking as Exhibit 7.

22              (Exhibit 7 marked for identification.)

23    BY MS. O'DELL:

24         Q    This is an article you are familiar with.  The

25    first author named is Schimpf, S-C-H-I-M-P-F, published
```

Brian Schwartz, M.D.

1    in the American Journal of Obstetrics and Gynecology in

2    2014.

3            If you'll turn, Doctor, to Page -- it's 71.e9.

4            Do you see that, Table 3?

5    A    Yes.

6    Q    And in the review that was performed of all of

7    the literature regarding transobturator, retropubic,

8    Burch, mini-sling and pubovaginal slings, this study

9    group created an analysis.  And if you'll look under

10   Groin Pain, isn't it true that in obturator slings groin

11   pain occurred in 6.5 percent of the patients, and in

12   every other treatment modality it was 1.5 percent or

13   less, true?

14   A    True.

15   Q    Okay.  And if you will look in terms of leg

16   pain, leg pain was reported in 16 percent of patients

17   who received an obturator sling and reported in 1.6

18   percent or less in retropubic or mini-sling, true?

19           MR. KOOPMANN:  Object to form.

20   BY MS. O'DELL:

21   Q    True?

22   A    The findings of groin pain and leg pain are

23   increased, but, once again, the majority, if not all of

24   those instances, I believe are reported to be transient.

25   Q    And what do you base -- and you made that

Brian Schwartz, M.D.

1   statement -- I've spent a good amount of time with this

2   Schimpf article.

3           What did you rely on to reach the conclusion

4   that those reported adverse events are transient?

5       A   I'm relying on a host of other studies that

6   have specifically commented on the occurrence of leg and

7   groin pain, as well as outlining the specific amounts of

8   time to resolution and the treatments necessary to

9   address the pain.

10      Q   And there is nothing in this Schimpf

11  systematic review that refers to these complications of

12  groin pain and leg pain as transient, true?

13      A   There is -- there is no description.  There is

14  no specific description beyond what we're seeing here in

15  the chart, yes.

16      Q   So you've made an assumption that these

17  outcomes were transient, but there is no data in this

18  publication to support that, true?

19      A   I'm relying on multiple other studies that

20  have specifically addressed that breakdown.  This study

21  has not done that.

22      Q   Is it your opinion that one of the benefits of

23  the TVT-O is the lower percentage of patients who have

24  to return to the operating room following a first

25  procedure?

Brian Schwartz, M.D.

1      A     Benefits compared to what in particular?

2      Q     As compared to another SUI surgical procedure.

3      A     Can you restate the question for me?

4      Q     Happy to.

5            As you have evaluated the safety and efficacy

6   of the TVT-O, did you consider the reoperation rate?

7      A     With any procedure I do, I would consider the

8   potential reoperation rate.

9      Q     In your opinion, is the reoperation of the

10  TVT-O, the reoperation rate of the TVT-O, one of the

11  characteristics that make it, in your mind, an

12  advantageous procedure?

13     A     The reoperation rate for the sling procedures

14  that I do are all exceptionally low, so I would not rely

15  on that particular factor to make a decision on what

16  procedure to use.

17     Q     Are you basing that statement on your personal

18  experience?

19     A     I'm basing that statement on a combination of

20  my personal experience and the complication rates that

21  are quoted in the literature.

22     Q     Would you agree with me, Dr. Schwartz, that

23  Burch procedures, either open or laparoscopic, have a

24  lower rate of return to the operating room for

25  retention, erosion, overactive bladder and groin pain?

Brian Schwartz, M.D.

```
 1              MR. KOOPMANN:  Object to the form.

 2              THE WITNESS:  The Burch procedure, in my

 3         experience, has far more potential problems,

 4         potential problems than midurethral sling surgery.

 5              In terms of your question, which is, Do

 6         patients have a higher rate of returning to the

 7         operating room for Burch procedure, I don't believe

 8         they do.

 9  BY MS. O'DELL:

10      Q    Okay.  If you'll turn to e11 of the Schimpf

11  publication that we've marked as Exhibit 7 and look at

12  Table 4.

13              Following the schematic review that was

14  performed by the authors, they concluded that Burch

15  procedures may result in lower rates of return to the

16  operating room for retention, erosion, overactive

17  bladder symptoms and groin pain.

18              Do you see that?

19      A    I do.

20      Q    Do you disagree with that statement?

21      A    I comment that they are not discussing the

22  overall, all complications of the Burch procedures, just

23  the ones that are listed there.

24      Q    What is your basis for -- well, let me just

25  ask this.
```

Brian Schwartz, M.D.

1           Are you saying that statement is incorrect?

2      A    No, I'm not.  I agree with that statement but

3    that statement is, is including return to the operating

4    room for those four distinct issues.

5      Q    And reoperation rate and the return to the OR

6    is a significant adverse event, true?

7      A    True.

8      Q    I mean, the whole idea is, you have the sling

9    implanted and you are not going to have to ever have to

10   go back to the operating room, be placed under general

11   anesthesia and undergo another procedure with all of the

12   inherent risk of a surgical procedure, true?

13     A    Surgery is a combination of science, skill and

14   the art of medicine.  And, with any surgical procedure,

15   as you are probably aware, there are going to be

16   instances where return to the operating room is

17   warranted.

18          My job as a continence surgeon is to provide

19   patients with information regarding complications and

20   how those complications are addressed.

21          The rate of erosion --

22     Q    Sir, I want to let you finish, but that's

23   really not my question.  So let me just refocus the

24   discussion.

25     A    Okay.

Brian Schwartz, M.D.

1        Q    If a procedure -- let me ask you this.

2             What is an unacceptable rate of reoperation

3    after a procedure before you would think that procedure

4    is not safe?

5        A    I don't believe that that question can be

6    answered in generalities.

7        Q    If you had a rate of reoperation of greater

8    than 10 percent of a procedure that is intended to be a

9    permanent treatment, would you consider that rate to be

10   too high?

11       A    Once again, I think that's -- I cannot comment

12   on generalities.  When I do a complicated cancer

13   surgery, there are rates that are clearly higher than 10

14   percent.  And patients are aware of that, for

15   reoperation for major complications.  And that is

16   something that a patient has to decide.  It's my job to

17   provide them the information to make a good decision.

18       Q    What rate of reoperation do you give to your

19   patients in whom you are going to implant the TVT-O?

20       A    In my hands, less than 5 percent.

21       Q    Do your patients always return to you for

22   treatment of complications?  Do you track patients and

23   their complications?

24            MR. KOOPMANN:  Objection to form.

25            THE WITNESS:  We do track patients, patients

Brian Schwartz, M.D.

```
1        insomuch as if they do not return for their

2        postoperative visits, we contact them, all

3        patients, for all reasons, and will document why

4        the patient hasn't followed up.

5   BY MS. O'DELL:

6        Q    What is your normal postoperative follow-up

7   schedule?

8        A    For what procedure?

9        Q    For a TVT-O.

10        A    I will -- my typical follow-up schedule, if a

11   patient is having no postoperative problems, is to see

12   them in two weeks.

13        Q    Do you see them again after that?

14        A    Yes, I do.  If they are having no issues

15   whatsoever, I will see them again in three months.  If

16   they are having issues, I may see them a week later, two

17   weeks later.  It all depends on what their concerns are.

18        Q    Is it your opinion that the reoperation rate

19   for the TVT-O is 5 percent?

20             MR. KOOPMANN:  Objection.  Form.

21             MS. O'DELL:  What's wrong with the question?

22             MR. KOOPMANN:  Well, I think it could be

23        vague, because I don't know what reoperation rate

24        you are talking about, if it's overall or specific.

25             MS. O'DELL:  He just testified a few minutes
```

Brian Schwartz, M.D.

1        ago that his reoperation rate was 5 percent.

2    BY MS. O'DELL:

3        Q    Is that what you said?

4             And my question to you, is that based on your

5    personal experience?

6        A    It's based on my personal experience.

7        Q    But you do not keep a log of your procedures

8    for the TVT-O, true?

9        A    True.

10       Q    And you do not have a systematic follow-up for

11   your patients beyond the follow-up that you just

12   outlined, true?

13       A    I follow up on my patients longer term, if

14   that's what you are asking.

15       Q    Do you call them a year out, Dr. Schwartz, or

16   18 months out, and ask them if they are doing okay?

17       A    I see -- if my patient is having no issue

18   after their three-month visit, I see them in six months

19   for follow-up.  If the patient is having no issues after

20   six months, I see them in one year.  If in one year they

21   are doing -- they are having no issues, then I

22   specifically tell them that they are discharged and if

23   they should have any problems to please contact me.

24       Q    Is that your follow-up protocol for every

25   patient who has a surgery for stress incontinence?

Brian Schwartz, M.D.

```
 1       A     Every patient, yes.

 2       Q     Every patient.

 3             Okay.  Beyond the one-year mark, is there any

 4   attempt to follow them?

 5       A     Yes.  So if we're talking typically, two

 6   weeks, three months, then six months, then one year

 7   later, that gets me to, oh, about a year and three

 8   quarters.

 9       Q     Do you keep a registry of any complaints

10   lodged by your patients in regard to a particular

11   medical device implanted?

12       A     I do not.

13       Q     Would you agree with me that a device that has

14   been reported in the literature to have a reoperation of

15   greater than 15 percent is unsafe?

16             MR. KOOPMANN:  Objection to form.

17             THE WITNESS:  I could not make that comment.

18   BY MS. O'DELL:

19       Q     In terms of your appreciation of the risk and

20   benefits, would that evaluation -- strike that.  I'll

21   start again.

22             Turn to Page 17 of the Schimpf article, e17,

23   Dr. Schwartz.

24             You'll see in the middle column, the first

25   paragraph, "Rate of reoperation for SUI at three years
```

Brian Schwartz, M.D.

1    of follow-up favored retropubic in this population.

2    18.3 percent of women in the obturator group required

3    reoperation versus 1.2 percent in the retropubic group

4    on intention-to-treat analysis."

5            In your opinion, is an 18.3 percent

6    reoperation rate an acceptable rate of reoperation in

7    terms of safety?

8        A    I'm assuming that they are including patients

9    who are being reoperated on for recurrent or persistent

10   incontinence.

11       Q    My question is, Is an 18.3 percent reoperation

12   rate an acceptable rate for a medical device in terms of

13   safety?

14       A    I don't believe that 18 percent is reflecting

15   the safety issues of the sling.

16       Q    I disagree with you.  We're going to disagree

17   a lot today.  But assuming it is -- strike that.

18           Taking a person back to the operating room has

19   significant risk, true?

20       A    No.  Not necessarily.

21       Q    It's a serious adverse event to have to go

22   back to the operating room, true?

23       A    That must be qualified with the fact that

24   incontinence procedure has a very clear success rate,

25   subjective and objective, and there are patients who

Brian Schwartz, M.D.

```
 1    will decide to return to the operating room if they have

 2    a leakage episode after bungee jumping, and there are

 3    some patients who are perfectly happy going from six

 4    pads to two pads and feel that they have had a wonderful

 5    success.

 6            So I don't believe you can characterize return

 7    to the operating room in terms of, simply in terms of

 8    complications.

 9       Q    So you don't think return to the operating

10    room is a serious adverse event?

11            MR. KOOPMANN:  Object to form.

12            THE WITNESS:  Return to the operating room --

13    BY MS. O'DELL:

14       Q    Yes or no.  So if it's a no, that's fine.

15       A    No.

16       Q    Fair enough.

17            And you believe that that 18 percent is

18    composed of women who experience infrequent episodes of

19    SUIs?  Is that your opinion?

20       A    No.  That potentially includes patients who

21    have not achieved their desired level of continence.

22       Q    And what do you rely on in making that

23    statement?

24       A    I would have to review the whole paper to give

25    you a specific answer.
```

Brian Schwartz, M.D.

1     Q    But you are making an assumption by saying

2  that at this point, true?

3     A    I am.  I am making an assumption.

4     Q    When the TVT came on the market, were you an

5  early adopter?

6     A    An early adopter of the TVT?

7     Q    Excuse me.  Were you an early adopter of the

8  TVT-O?

9     A    Yes.

10     Q    And were you provided samples of the TVT-O to

11  use in your practice prior to it being marketed?

12     A    I'm not sure I understand the question.

13     Q    Were you provided samples of the TVT-O device

14  right at the time or prior to it becoming available to

15  the general population of surgeons?

16     A    That was provided to me at the time that it

17  became, was -- yes.  At the time it became available.

18     Q    At that time was there any clinical data to

19  support the efficacy and safety of the TVT-O?

20     A    Yes.  There was clinical data to support that.

21     Q    What was it?

22     A    I would have to review my loose-leaves here to

23  answer that for you.

24     Q    And in your view, is a one-month study of less

25  than 100 or 107 patients sufficient clinical data to

Brian Schwartz, M.D.

1    perform a procedure?

2         A    Based on the fact that I was familiar with the

3    mesh and am familiar with pelvic anatomy and felt that

4    that would be beneficial to patients as compared to what

5    was available, yes.  I had already been performing

6    outside, in slings, with the Monarc device, so I was

7    very familiar with the procedure, with the anatomy, with

8    potential problems that could arise and how I had to

9    inform patients.

10        Q    Do you agree with the statement that a

11   procedure involving a medical device needs to be

12   subjected to thorough clinical testing before it should

13   be placed on the market?

14        A    Not necessarily.

15        Q    And in your opinion, there was adequate

16   clinical data at the time that you started using the

17   TVT-O?

18        A    Yes.

19        Q    Were you aware that Ethicon made a decision

20   that clinical data would not be required prior to

21   launching the product?

22             MR. KOOPMANN:  Object to form.

23   BY MS. O'DELL:

24        Q    And by "product" I mean the TVT-O.

25        A    I cannot recall reading anything to that

Brian Schwartz, M.D.

1    effect.

2        Q    Do you think it's important that a medical

3    device manufacturer have data prior to placing a device

4    on the market that is going to be implanted in patients

5    permanently?

6        A    That absolutely depends on what types of

7    devices are already available for use, as well as the

8    similarities, the differences.  Is it a similar

9    material?  Is it the same type of mesh?  There are many

10   factors that should go into that answer.

11       Q    Would you agree with me it would be wrong for

12   a company to place a device on the market that utilizes

13   a different method for implanting the device in the

14   absence of clinical data?

15       A    Once again, it would depend on what devices

16   and materials are already available from that company

17   and from other companies.

18       Q    When the TVT-O was placed on the market, were

19   there any other transobturator slings -- there were no

20   other transobturator slings that used the inside-out

21   method, correct?

22       A    Correct.

23       Q    And that was a new method for implanting a

24   midurethral sling, true?

25       A    That was a variation on an already established

Brian Schwartz, M.D.

```
 1   method.

 2        Q    It was a new way to implant the sling, true?

 3             MR. KOOPMANN:  Object to form.

 4             THE WITNESS:  Once again, it was the same

 5        procedure.

 6   BY MS. O'DELL:

 7        Q    Performed differently?

 8        A    Performed with a variation, yes.

 9        Q    So it's not the same as the Monarc, true?

10             MR. KOOPMANN:  Object to form --

11   BY MS. O'DELL:

12        Q    -- in terms of the manner in which it was

13   implanted?

14        A    Correct.

15        Q    True?

16        A    Correct.

17        Q    I mean --

18        A    Yes.  True.

19        Q    And there was no data on the TVT-O at the time

20   of launch, true?

21        A    There was data on the -- on the TVT-O when it

22   was launched.

23        Q    Okay.  Let me ask you this question and move

24   to a new topic.  There wasn't, but we'll move on.

25             Starting on Page 16 of your report, if you
```

Brian Schwartz, M.D.

```
 1    will turn back to that, you go through a series of

 2    articles, starting with Dr. de Leval and colleagues.

 3              Did you write this portion of your report?

 4              MR. KOOPMANN:  Object to form.

 5              Don't provide information regarding your

 6         drafting of the report.  That's privileged

 7         information, the preparation of the reports.

 8    BY MS. O'DELL:

 9         Q    Did you select the studies that you have

10    focused on beginning on Page 16 of your report?

11         A    I was -- I had integral involvement in the

12    studies in the whole report.

13         Q    How were they selected?

14         A    Well, the initial study by de Leval is --

15         Q    No, sir.  I'm asking you how you selected

16    these, the studies that you have summarized in your

17    report.  I'm asking you --

18         A    Relevance.

19         Q    Okay.  Turning to Page 17, Dr. Schwartz, you

20    mention a study by Angioli.  On Page 18.  Excuse me.

21              You state that there were no reports of

22    chronic pelvic pain in the Angioli study.

23              Have you reviewed that study, sir?

24         A    Yes.

25         Q    And was chronic pelvic pain an end point of
```

Brian Schwartz, M.D.

1    that study?

2        A    I would have to review the study.

3        Q    Do you know?

4        A    I cannot answer that without reviewing the

5    study.  Would you like me to review it?

6        Q    Well, if you need to review it, we'll go off

7    the record and I'll be happy to have you do that.

8            MR. KOOPMANN:  We need to stay on the record.

9        If you want to ask specific questions about the

10       literature, then that's part of the deposition.

11           MS. O'DELL:  I'm just asking him a specific

12       question.

13           MR. KOOPMANN:  If he's going to review it, I

14       think time spent reviewing articles that you want

15       him to ask him a specific question about --

16           MS. O'DELL:  I disagree with that.

17   BY MS. O'DELL:

18       Q    If you want to read the study, sir, I'm happy

19   to hand it to you.

20       A    There is a big one with "TVT."

21           MS. O'DELL:  We should go off the record.

22           MR. KOOPMANN:  I think we should stay on the

23       record, or I'm objecting to going off the record to

24       answer questions that you are asking about a

25       specific article.

Brian Schwartz, M.D.

```
 1              MS. O'DELL:  We should go off the record.

 2              (Discussion off the record at 10:43 a.m.)

 3              (Back on the record at 10:44 a.m.)

 4              MS. O'DELL:  Back on.

 5              All right.  Lynn, would you please re-ask the

 6         question.

 7              (The record was read back.)

 8              THE WITNESS:  Not according to the objective.

 9    BY MS. O'DELL:

10         Q    Let me show you what I'm going to mark as

11    Exhibit 8.

12              (Exhibit 8 marked for identification.)

13              MS. O'DELL:  Sorry, Barry.  I don't have

14         another copy.

15    BY MS. O'DELL:

16         Q    You note in Groutz the cure rates.

17              And, Dr. Schwartz, in considering Groutz, did

18    you -- why didn't you consider or note that in elderly

19    patients there was a 19 percent increase in -- or

20    occurrence -- excuse me -- of de novo OAB in patients

21    who were elderly?

22         A    Well, it was -- I summarized, and there was

23    one paragraph with several sentences.

24         Q    Did you consider, in evaluating Groutz, that

25    11 percent of the patients who were younger had thigh
```

Brian Schwartz, M.D.

1    pain that lasted one to three months?

2        A    I'm not sure I understand the question.

3        Q    Do you consider an occurrence, 11 percent

4    occurrence of thigh and leg pain after a procedure to be

5    a significant frequency in terms of an adverse event?

6        A    All adverse events have to be discussed with

7    patients, and if this procedure provided less overall

8    complications, and equal or better outcomes, then prior

9    procedures that I've done -- then I would consider

10   transient leg or thigh pain, which is what I consider

11   this to be, acceptable, and especially when it's

12   discussed with the patient.

13       Q    At what point would you consider leg and thigh

14   pain not to be transient?  If you consider three months

15   transient, at what point does it become a chronic

16   condition?

17       A    When, despite various basic treatment options,

18   it doesn't resolve or if it doesn't resolve

19   spontaneously with time.  And I qualify that because

20   surgical incisions hurt, and they can most certainly

21   hurt for three months or even six months.  But it's

22   clear to me that nearly all of them resolve with time

23   and will resolve spontaneously.

24       Q    What literature do you base your opinion on

25   that three months is considered to be transient?  Do you

Brian Schwartz, M.D.

```
 1    have a reference that you rely on in making that

 2    statement?

 3         A    I do not, no.  I'm basing that on my own

 4    clinical experience.

 5         Q    And you would agree with me, wouldn't you,

 6    Dr. Schwartz, that there is literature that notes any

 7    condition that continues consistently to 9 weeks, it

 8    would be considered a chronic condition, true?

 9         A    I don't necessarily agree with that.

10         Q    And in outlining your opinions regarding the

11    Groutz article, you failed to note the incidence of OAB,

12    thigh pain, urge and UTIs, true?

13         A    They were not included.

14         Q    You write on Page 20 of your report that

15    "high-quality evidence has shown complication rates with

16    midurethral slings such as the TVT-O to be low."

17              What percentage of a complication rate do you

18    consider to be low?  In other words, what percentage do

19    you have to reach before, in your mind, it tips over to

20    be not a low rate of complications but an unacceptable

21    rate?

22         A    That's completely dependent upon the procedure

23    and what is being defined as "a complication rate."

24    Some people would define persistent incontinence a

25    complication and assign that a complication rate, while,
```

Brian Schwartz, M.D.

1    in actuality, that's not a complication rate.

2        Q    That's a failure, true?

3        A    Correct.

4        Q    And do you find that a de novo overactive

5    bladder at a rate of 24 percent in the first year, the

6    the first year following the implant of an TVT-O, to be

7    an acceptable rate in terms of the safety of a TVT-O

8    sling?

9        A    If a patient considers their outcome to be

10   more beneficial than their occurrence of OAB symptoms,

11   yes.

12       Q    What if they don't?  What if they would rather

13   leak than have frequency and urge 24/7?

14       A    Well, my experience is when that is the case

15   that I can address their de novo OAB symptoms fairly

16   easily.

17       Q    You've told us about your experience.  Is

18   there any reference in the literature that you've cited

19   that supports that conclusion?

20       A    There are -- there are mounds of literature to

21   discuss the effectiveness of antimuscarinic and

22   anticholinergic medication in addressing OAB symptoms.

23       Q    Is that literature that you've read and relied

24   on and listed in your materials in this case?

25       A    No.

Brian Schwartz, M.D.

```
 1      Q    Is there any literature that you've relied on

 2   in rendering your opinions specifically related to the

 3   TVT-O that would support your statement that a 24.3

 4   percent rate of overactive bladder following the implant

 5   of a TVT-O is an acceptable complication rate?

 6      A    My opinions -- my opinions and stated facts

 7   are based on an entire career of accumulation, and there

 8   is no way that that can be excluded from comments I have

 9   dealing with the TVT-O, nor can I include all of the

10   medical literature regarding all of the facts to get to

11   this level here in this room.  It would be onerous and

12   unreasonable.

13      Q    And so I appreciate your comment, but, to be

14   fair, you are basing what you are saying on your

15   personal experience, true?

16      A    I don't agree with that.

17      Q    I mean, I just heard you say that you are

18   basing it on your personal experience in your individual

19   practice, true?

20      A    No, no.  The data that looks at the

21   effectiveness of overactive bladder with anticholinergic

22   or antimuscarinic oral therapy shows that it is

23   exceptionally effective in addressing those issues.

24      Q    Well, and, Dr. Schwartz, to be clear, I didn't

25   ask you about the effectiveness of those therapies.
```

Brian Schwartz, M.D.

```
 1   What I asked you was whether it was your opinion that a

 2   24.3 percent rate of de novo OAB following the

 3   implantation of a TVT-O was an acceptable complication

 4   rate, and you said, "Yes, based on my experience."

 5              Did I understand that correctly?

 6              MR. KOOPMANN:  Object to form.

 7              THE WITNESS:  No.  I commented very

 8         specifically that it is an acceptable result if

 9         patients find their procedure to be successful.

10   BY MS. O'DELL:

11      Q    What if they don't find their procedure to be

12   successful; is that an acceptable rate of OAB, de novo

13   OAB?

14              MR. KOOPMANN:  Object to form.

15              THE WITNESS:  I don't necessarily consider

16         that to be excessive or problematic and is

17         certainly treatable nonsurgically.

18   BY MS. O'DELL:

19      Q    Yes or no.

20              MR. KOOPMANN:  Object to form.

21              THE WITNESS:  Could be.  I can't apply a yes

22         or no to that question.

23   BY MS. O'DELL:

24      Q    Do you tell your patients when you discuss

25   with them a TVT-O that they have a 24 -- one-in-four --
```

Brian Schwartz, M.D.

```
 1    let me put it this way:  One in four, approximately,

 2    patients will have de novo overactive bladder?

 3              MR. KOOPMANN:  Object to form.

 4              THE WITNESS:  What I discuss with my patients

 5         regarding overactive bladder is that 60, 60 to 70

 6         percent of them who have overactive bladder

 7         symptoms will derive significant benefit from their

 8         continence surgery, and that, if they do not have

 9         those symptoms, that they can develop after the

10         procedure.

11    BY MS. O'DELL:

12         Q    Do you tell your patients who do not have OAB

13    prior to the implantation of a TVT-O device that they

14    have a one-in-four chance of having OAB following the

15    procedure?  Yes or no.

16         A    No.

17         Q    Do you tell your patients -- let me back up

18    and ask it this way.

19              Is an outcome following the implantation of a

20    TVT-O of one in four women having de novo dyspareunia an

21    acceptable outcome, in your opinion?

22         A    The literature has extensively looked at the

23    rates of dyspareunia following that procedure, and

24    various high-quality, large studies have shown that rate

25    to be exceedingly low.
```

Brian Schwartz, M.D.

1      Q    What studies are you referring to?

2      A    There are -- there is the AUA 2009 study that

3   came out in 2012.  And there is -- several of the --

4   there is the large Cochrane analysis.

5      Q    Did you consider, in rendering your opinions,

6   studies that showed a high rate of dyspareunia in cases

7   where a patient was implanted with a transobturator

8   sling?

9      A    I reviewed many, many studies that discussed

10  dyspareunia.

11     Q    That's really not my question.

12          Did you review studies involving a

13  transobturator device that reported rates of dyspareunia

14  at 24 percent in rendering your opinions in this case?

15     A    I may have.

16     Q    Did you or do you recall that?

17     A    I do not recall -- I cannot recall the

18  specific percentage.

19     Q    Can you recall any studies that you reviewed

20  that showed an increase in dyspareunia in patients who

21  had a transobturator sling of greater than 10 percent?

22     A    I cannot state that specifically.

23     Q    Let me show you what I'm marking as Exhibit

24  10.

25          (Exhibit 10 marked for identification.)

Brian Schwartz, M.D.

```
 1   BY MS. O'DELL:

 2        Q    Have you seen this study before?

 3        A    I don't think I have.

 4        Q    And so it's fair to say, if you haven't seen

 5   it, you didn't consider it in rendering your opinions,

 6   true?

 7        A    True.

 8        Q    And if you'll look in the abstract,

 9   Dr. Schwartz, on the right side, it says, "De novo

10   internal dyspareunia was reported in 4 out of 17, or 24

11   percent, of the transobturator group and none in the

12   retropubic group."

13             Do you see that?

14        A    Yes, I do.

15        Q    And that was not information you took into

16   account in rendering your opinions, true?

17        A    True.  This is a rather small study.

18        Q    Is a study with 127 women a study with an

19   acceptable size?

20        A    Well, it's more than 25 transobturator

21   patients in this study.

22        Q    What methodology do you utilize in determining

23   if a study has sufficient size for you to consider it?

24        A    Part will be the statistical relevance.

25        Q    How many patients, in your mind, is a
```

Brian Schwartz, M.D.

```
 1   sufficient number in order for a study to be worth your

 2   consideration?

 3        A    Any study is easy to review.  I don't know

 4   that I'd necessarily not review a study based on the

 5   number of patients, but I do consider that a statistical

 6   significance, when comparing outcomes, when comparing

 7   complications, is important.

 8             (Exhibit 12 marked for identification.)

 9   BY MS. O'DELL:

10        Q    Let me show you what I'm marking as Exhibit

11   Number 12.

12             Did you consider this study in rendering your

13   opinions in this case?

14        A    I don't recall.

15        Q    And this is a study comparing the TVT to the

16   TVT-O.  It involves 127 patients.  Do you see that in

17   the abstract under Results?

18        A    Yes.

19        Q    Following that, it says, "The study was

20   stopped early due to excess leg pain and tension-free

21   vaginal tape obturator group."  It goes to know to say,

22   "More women complained of leg pain after receiving a

23   tension-free vaginal tape obturator, TVT-O, in 26.4

24   percent versus 1.4 percent in the retropubic group."

25             Do you see that?
```

Brian Schwartz, M.D.

1      A    I do, and I'm well aware that the

2  transobturator procedure does have an increased risk of

3  leg pain.  And I use that with many other factors in

4  deciding what is the safest and most effective procedure

5  for a patient.

6      Q    And so you would agree with me that in

7  patients who develop leg pain following the TVT-O that

8  the TVT-O is a reasonable explanation for the cause of

9  their leg pain?

10     A    The procedure is likely the cause of their leg

11 pain.

12     Q    That's not really what I asked you, but let me

13 ask you this way.

14          Would you agree with me that the implantation

15 of a TVT-O in the presence of the TVT-O device in a

16 patient is a reasonable explanation for leg pain

17 following the implantation?

18     A    I'm not sure I understood the question.

19     Q    Would you agree with me that the implantation

20 of a TVT-O in the presence of a TVT device in a patient

21 is a reasonable explanation for leg pain following the

22 procedure?

23     A    I'm sorry.  It's still an ambiguous question

24 to me.

25     Q    What's ambiguous about it?

Brian Schwartz, M.D.

1       A    That I've stated that the procedure is likely

2    what contributes to the leg pain.

3       Q    In your opinion does the presence of a mesh

4    through the obturator foramen contribute to the

5    development of leg or groin pain?

6       A    Unlikely.  It's the procedure itself.  It's

7    the going through the muscles, going through the fascial

8    tissues, having some trauma to those tissues, some

9    degree of hematoma there, all contributes, not to

10   mention being in stirrups with your hips flexed to 90

11   degrees.

12      Q    Well, the procedure itself is dictated by the

13   instructions for use that's generated by Ethicon, true?

14      A    A technical description of the procedure is in

15   the IFU.

16      Q    That describes a pathway of the mesh through

17   the obturator foramen, true?

18      A    True.

19      Q    And you would criticize a physician who

20   departed from the instructions for use in implanting,

21   the procedure, true?

22           MR. KOOPMANN:  Object to the form.

23           THE WITNESS:  Not necessarily.  I mean, every

24      patient, every single patient has slightly

25      different anatomy.  Every procedure has to be

Brian Schwartz, M.D.

```
 1         typically adapted in some way to address that

 2         particular patient.

 3    BY MS. O'DELL:

 4         Q    You write in your report that one of the

 5    benefits of a TVT-O procedure is that it's reproducible

 6    each time.

 7              Is that different than what you are saying

 8    now, that a surgeon should feel free to vary the

 9    procedure in any way that they deem appropriate?

10         A    Those comments are not mutually exclusive.

11              MS. O'DELL:  Move to strike as nonresponsive.

12    BY MS. O'DELL:

13         Q    In your opinion, Dr. Schwartz, is groin pain

14    at a rate of 16 percent an acceptable outcome following

15    the implantation of a TVT-O?

16         A    Yes.

17         Q    Sir, what is the exhibit number on the study?

18         A    Twelve.

19         Q    In your opinion, over what time after the

20    implantation of a TVT-O would you expect to see erosion?

21         A    My experience has been that episodes of

22    erosion will be identified prior to six months.

23         Q    Is that opinion you've just stated, is that

24    published in the literature?

25         A    Well, you asked me for my opinion.
```

Brian Schwartz, M.D.

```
 1       Q    I did.

 2       A    I gave it to you.

 3       Q    Okay.  And here is my job today.  When you

 4  give an opinion, whether you express it here in your

 5  deposition or in your report, I have the job to ask you

 6  what you are relying on in rendering your opinion, and

 7  this is my opportunity to learn that.  And if there is

 8  something you are relying on that's not reflected in

 9  these materials or it's specific, I would like to know

10  it, and I think I'm entitled to know that.

11            So if you say that there is going to be

12  erosion following a TVT-O, that it's going to be six

13  months, then I would like to know what you are relying

14  on.  If it's your personal experience only, then you

15  just tell me that.

16       A    And I am not only relying on my personal

17  experience.  The vast majority of studies that identify

18  erosion identify them as early complications.

19            MS. O'DELL:  How long have we been going?

20            THE COURT REPORTER:  Two hours and 15.

21            MS. O'DELL:  So we have 45 minutes left.

22            (Exhibit 13 marked for identification.)

23  BY MS. O'DELL:

24       Q    Let me show you what I'm marking as Exhibit

25  13, Dr. Schwartz.
```

Brian Schwartz, M.D.

1          Have you seen this publication?

2     A    I don't believe so.

3     Q    Okay.  And this article, first author, Zhang,

4  published in 2016, followed 120 patients that were

5  randomized in either TVT or TVT-O.  And you'll see in --

6  the tape exposure was possible up to seven years after

7  the TVT-O.

8          Do you see that?

9     A    Yes.

10    Q    And that's not something that you considered

11 in rendering your opinions in this case, true?

12    A    No.  That's -- no, that's not true.  It's not

13 something that I consider typical, even despite the low

14 rate of erosion.

15    Q    You had not considered this study when you

16 rendered your opinions in this case, true?

17    A    Correct.  Correct.

18    Q    And would you consider an objective cure rate

19 of 69.35 percent to be acceptable following the

20 implantation of a TVT-O?

21    A    It depends on the study selection and who was

22 included.  In some scenarios that would be perfectly

23 acceptable.

24    Q    For a index patient under the AUA guidelines,

25 is that an acceptable cure rate?

Brian Schwartz, M.D.

```
 1        A    Because I haven't had the chance to look at

 2   this, if these are patients who were undergoing

 3   secondary procedures, yes, that's -- if this study

 4   includes patients undergoing -- also undergoing

 5   secondary procedures, then that would be an acceptable

 6   cure rate.

 7        Q    If it's initial procedures, which I think that

 8   to be the case, but, if it's initial procedures, is a

 9   69.3 percent cure rate acceptable in your mind?

10        A    Not being consistent with most of the

11   literature in terms of acceptable rates, I don't find

12   that to be dramatically different than the typical

13   literature, which has much better results.

14        Q    So you would discount this study and the

15   outcomes or the -- yes, the outcomes of the study?

16        A    I can't discount any study until I have had an

17   opportunity to fully review and scrutinize the

18   specifics.

19        Q    And that's not one that Ethicon counsel made

20   available to you, correct?

21        A    Not that I recall.

22             MR. KOOPMANN:  Object to form.

23   BY MS. O'DELL:

24        Q    Turning to Page 28 of your report,

25   Dr. Schwartz, you write, "I have used mechanically cut
```

Brian Schwartz, M.D.

1    TVT-O slings and I have used laser-cut TVT-O Abbrevo and

2    TVT-Secur slings, and I have found there to be a" --

3    excuse me -- "I have not found there to be a clinically

4    significant difference in the way mesh itself performs."

5           We've already discussed you don't keep a

6    registry nor a log of your surgical procedures, true?

7       A    True.

8       Q    Do you keep a register or log of the patients

9    in whom you implant a mechanical cut mesh versus

10   laser-cut mesh?

11      A    No.

12      Q    Have you done any study or review of your

13   patients to determine if there is a clinically

14   significant difference in how the meshes perform?  In

15   other words, have you reviewed their charts?  Have you

16   done anything to inform yourself as to whether there is

17   a clinically significant difference between how

18   laser-cut versus mechanical put mesh is performed in

19   your patients?

20      A    I simply rely on my clinical experience.

21      Q    Is that a no?

22      A    I do not -- I have not performed a study

23   identifying who has laser-cut and mechanical cut mesh.

24      Q    You write, In my patients in whom I've

25   implanted mechanically cut TVT-O sling, I have not seen

Brian Schwartz, M.D.

```
 1   fraying, roping or curling as plaintiffs' experts have

 2   suggested."

 3           Have you examined the mesh that you've removed

 4   from patients to determine if it is fraying, curling,

 5   roping?

 6       A   I've examined it grossly, yes.

 7       Q   Have you documented those findings in any way?

 8       A   In an operative report?

 9       Q   Yes.

10       A   No.

11       Q   Have you made any other notation of your gross

12   examination of explanted mesh?

13       A   No.

14       Q   Do you perform ultrasounds, vaginal

15   ultrasounds of your patients in order to evaluate

16   implanted mesh?

17       A   No.

18       Q   Have you done a literature search to find

19   studies that have evaluated the way mesh changes, frays,

20   ropes or curls in vivo?

21       A   I have read several studies that have

22   discussed mesh issues, and I believe that was included.

23       Q   Have you done any review or search yourself to

24   seek out studies that describe the fraying, roping or

25   curling of the mesh in vivo?
```

Brian Schwartz, M.D.

 1      A    I have not done a specific literature search

 2  on those issues.

 3      Q    And so you are relying on the literature that

 4  Ethicon counsel has provided to you, correct?

 5          MR. KOOPMANN:  Object to form.

 6          THE WITNESS:  Yes.

 7  BY MS. O'DELL:

 8      Q    Dr. Schwartz, have you ever designed a mesh?

 9      A    No.

10      Q    Do you have any training as a medical device

11  engineer?

12      A    No.

13      Q    Do you have any training in materials in terms

14  of the properties of polypropylene or how it reacts to

15  agents within the body?

16      A    Insomuch as I've used polypropylene for 25

17  years in many different forms.

18      Q    Have you performed any scientific studies?

19      A    No, I have not.

20      Q    Have you performed any experiments on

21  polypropylene to evaluate how it reacts to agents found

22  within the human body?

23      A    No experiment.

24      Q    You go on to say, "The strong efficacy in

25  safety exhibited in public literature on MUS predating

Brian Schwartz, M.D.

```
1    the ability of laser-cut mesh slings is consistent with

2    a strong efficacy and safety exhibited in the published

3    literature since laser-cut mesh has been available."

4         Did I read that correctly?

5    A    I think so.

6    Q    I tried to.  I'm not sure I did, but I've

7    tried to give it my best shot.  Here is the question.

8         Are you aware of any published clinical

9    literature that identifies whether a TVT-O device was

10   laser-cut or mechanical cut?

11   A    Please repeat that.

12   Q    My point is, you say, "The strong efficacy

13   exhibited in the published literature on MUS predating

14   the availability of laser-cut," and you go on to talk

15   about mechanical cut.  The bottom line is this.  Are you

16   aware of any studies involving patients that include

17   information as to whether the mesh is laser-cut or

18   mechanical cut?

19   A    Well, one can extrapolate if a study included

20   only mechanically cut mesh based on the date because it

21   was before the laser-cut mesh was available.

22   Q    My question is, Are you aware of any clinical

23   trials that specifically delineate whether the TVT-O

24   that was implanted was mechanical cut or laser-cut?

25   A    Are you asking me have there been studies
```

Brian Schwartz, M.D.

1    comparing the two?

2        Q    I'm asking you, in the published literature,

3    is there any study involving a TVT-O that identifies the

4    specifics as to whether the mesh was laser-cut or

5    mechanical cut?  Yes or no.

6        A    Not that I know of.

7        Q    You say, "Nor have I seen any clinically

8    significant contraction in the TVT-O mesh slings that I

9    have used.  In my experience tissue ingrowth occurs as

10   expected following the implantation of the sling, and

11   while the scar tissue can be expected to contract to an

12   extent, I have not seen a contraction of the tissue that

13   leads to problems."

14           What have you done to evaluate whether mesh

15   contracts?

16       A    Clinical examination.

17       Q    What do you mean by that?

18       A    Examining patients after their procedures have

19   been performed to assess for any palpable mesh, any

20   erosions, any other local issues.

21       Q    And you are talking about performing a pelvic

22   exam and attempting to palpate the mesh, true?

23       A    I'm talking about after patients have their

24   procedure, examining them to confirm whether I can

25   identify any problems.

Brian Schwartz, M.D.

1    Q    Do you, in those pelvic exams, make any effort

2    to measure the change in the mesh in terms of surface

3    area from the time of implant to the time that you

4    evaluate it?

5    A    I can tell you that I can almost never feel

6    the mesh after implantation.

7    Q    That's not my question.

8         Do you make any effort to measure the

9    difference in the surface area from the date of implant

10   to the date of your examination?

11   A    But that's an impossible question.

12   Q    Yes or no.  Do you or do you not?

13   A    No.

14   Q    Have you reviewed literature that evaluates

15   contracture of mesh?

16   A    I have reviewed some studies that discuss in

17   vivo mesh changes.

18   Q    Would you agree with me, if the surface area

19   of mesh is reduced by 36 percent, that could result in a

20   patient experiencing pain?

21   A    I don't believe it's the surface area of the

22   mesh that's reduced.  I believe it to be the ingrowth of

23   fibroblast and other tissues and part of wound healing

24   that result in the change that you are mentioning.

25   Q    And what do you base that opinion on?

Brian Schwartz, M.D.

1      A    I base that opinion on my knowledge of Prolene

2   and my clinical experience.

3      Q    If experts that Ethicon sought out disagreed

4   with your opinion, would you defer to those experts?

5      A    It would depend on their opinion.

6      Q    Let me show you what I'm marking as Exhibit

7   Number 14.

8           (Exhibit 14 marked for identification.)

9   BY MS. O'DELL:

10     Q    Dr. Schwartz, have you seen this document

11  before?

12     A    I don't believe so.

13     Q    I'll represent to you that this is a document

14  that memorializes the discussion that took place on June

15  the 2nd, 2006.  It was a meeting posted by Ethicon, and

16  it had participants that were Ethicon employees, as well

17  as academic physicians and experts that Ethicon invited

18  to come together to discuss mesh properties.

19          And if you'll turn to Page 2 and you look at

20  the bottom of the page, you'll see two line items that

21  deal with shrinkage.

22          Do you see that?

23     A    Yes.

24     Q    And the discussion is that shrinkage of 20

25  percent means a reduction of mesh area, surface area, to

Brian Schwartz, M.D.

1    64 percent.  In other words a 36 percent reduction in

2    the surface area of the mesh.

3            Is that information that Ethicon ever provided

4    to you?

5            MR. KOOPMANN:  Object to form.

6            THE WITNESS:  Not that I recall.

7    BY MS. O'DELL:

8        Q    And would you agree with me that a 36 percent

9    reduction in the surface area of mesh more likely than

10   not will have clinical significance?

11       A    I disagree.

12       Q    Okay.  And in disagreeing with that, is there

13   any literature that you are relying on in making that

14   statement?

15       A    I'm relying on the multitude of high quality

16   literature that attests to the effectiveness of the

17   procedure and, as such, the mesh up to 15-plus years.

18   So I maintain that the clinical relevance is directly

19   related to those results.

20       Q    And you are talking about the Nilsson series

21   of studies that focus on efficacy.  Is that what you are

22   referring to?

23           MR. KOOPMANN:  Object to form.

24           THE WITNESS:  One of them.

25   BY MS. O'DELL:

Brian Schwartz, M.D.

```
 1        Q    Any others?

 2        A    There are.  I would have to --

 3        Q    Would you --

 4        A    -- go through.

 5        Q    Excuse me.  Sorry.

 6             Would you agree with the general principle

 7   that contraction of 36 percent of the surface area of

 8   mesh increases the risk of pain?

 9        A    No.

10        Q    And did you evaluate any studies that focus on

11   the clinical significance of mesh contracture in

12   patients who have been implanted with a midurethral

13   sling?

14        A    I recall a study that looked at explanted

15   mesh.

16        Q    Do you recall the name of it?

17        A    I do not.

18        Q    And do you remember the first author?

19        A    I do not.

20        Q    And do you recall the outcome of the study

21   generally?  I'm not talking about specifics, but what

22   brought it to your mind.  Obviously, you are thinking of

23   something.

24        A    Yes.  No.  I recall that the, that that was a

25   fairly unique report that looked at a subset of patients
```

Brian Schwartz, M.D.

1    who had mesh explanted.

2         Q    And what was the conclusion, as you recall?

3         A    I didn't find the conclusion very clinically

4    useful.

5         Q    What was it?

6         A    That they were talking -- discussing different

7    characteristics that were found after further examining

8    explanted mesh.

9         Q    And what was their conclusion?

10        A    I can't exactly recall the conclusions.

11        Q    Was the conclusion that contracture of the

12   mesh contributed to adverse events associated with the

13   mesh product?

14        A    I can't recall if that was the case, but I

15   would disagree with that anyway.

16        Q    Okay.  What's your method for disagreeing with

17   it?  How did you discount that?

18        A    Based on a combination of the medical

19   literature and my experience, the contraction that

20   occurs with fibroblast ingrowth certainly occurs but

21   does not result in clinical significance.  And that's

22   supported by the high degree of effectiveness, even

23   longer term, with this material.

24        Q    Well, in terms of contracture, its implication

25   is not on effectiveness, is it, Doctor, but rather on

Brian Schwartz, M.D.

1    the safety of the product, true?

2        A    Can you repeat that for me?

3        Q    In terms of contracture, the implication is

4    not on the effectiveness of the mesh but rather on the

5    safety, true?

6        A    I don't know that I agree with that.

7        Q    Okay.   Let me ask you one other question,

8    just to make sure I've rounded that out.

9             Have you ever performed any studies,

10   independent of your own -- strike that.

11            Have you ever performed any studies to measure

12   contracture in transvaginal mesh?

13       A    No.

14       Q    Have you ever published on it?

15       A    No.

16       Q    You go on to say on Page 29 that "Plaintiff's

17   experts have offered the opinion that the mesh and the

18   TVT family of products is cytotoxic and degrades.   I

19   disagree."

20            What do you mean by "cytotoxic"?

21       A    Destructive to human tissue.

22       Q    Are you referring to chronic inflammation when

23   you say "cytotoxicity"?

24       A    No.

25       Q    And in terms of -- did you say destruction of

Brian Schwartz, M.D.

```
 1   human tissue?  Is that your definition of cytotoxicity?

 2        A    Yes.  Cells and human tissue.

 3        Q    And on what basis do you conclude that mesh is

 4   not, to use your word, cytotoxic?

 5        A    Once again, based on my experience with

 6   implant, explant, examining patients and the millions

 7   and millions of women who have had successful mesh

 8   implants provides me with a large amount of information

 9   that mitigates against the mesh being cytotoxic.

10        Q    Have you reviewed mesh -- are you a

11   pathologist?

12        A    Sorry?

13        Q    Are you a pathologist?

14        A    No.

15        Q    Are you a materials expert?

16             MR. KOOPMANN:  Object to form.

17             THE WITNESS:  Just insofar as I have used

18        certain materials for decades.

19   BY MS. O'DELL:

20        Q    But you don't study them in the same way that

21   a materials science or a polymer scientist would, true?

22        A    True.

23        Q    And you have put them in for decades, but

24   you've never gone into a laboratory for purposes of

25   evaluating microscopically a mesh product, true?
```

Brian Schwartz, M.D.

1      A     True.

2      Q     And in the women who have come to you for

3   treatment and you have removed mesh, have you examined

4   that mesh for purposes of determining if it has

5   degraded?

6      A     Just gross inspection only.

7      Q     And so if degradation is not possible to

8   appreciate grossly, then you have never reviewed mesh

9   for purposes of determining that it has degraded, true?

10     A     I have never microscopically examined

11  explanted mesh.

12     Q     And on what basis do you say, Dr. Schwartz,

13  that TVT-O mesh does not degrade?

14     A     Once again, based on my clinical experience

15  implanting and explanting the mesh and the long-term

16  studies that look at the effectiveness.  If the mesh

17  degraded, the procedure efficacy would be dramatically

18  different.  And when I explant mesh, it looks very

19  similar to when I implant the mesh, but I'm talking

20  grossly.

21     Q     You are stating that the mesh, when you

22  explant it, looks similar to pristine mesh when you

23  remove it?

24     A     No.  It has fibroblast ingrowth and --

25     Q     It looks remarkably different, true?  In fact,

Brian Schwartz, M.D.

1    you can barely see the mesh due to, you know, tissue,

2    blood, et cetera?

3              MR. KOOPMANN:  Object to form.

4              THE WITNESS:  I can always see the mesh.

5    BY MS. O'DELL:

6       Q    The mesh fiber is covered in tissue and I'm

7    assuming blood from the procedure in many instances,

8    true?

9       A    True.  But I can always identify the blue

10   mesh.  I believe I've only implanted blue-colored mesh.

11      Q    Well, fair enough.  You can see the color

12   blue, but in terms of examining the mesh fibers, the

13   mesh is covered in material that would prevent you, on

14   gross examination, from determining if there has been

15   degradation or breakdown in the actual fiber, true?

16      A    I can only assess it grossly.  I have not

17   assessed it microscopically.

18      Q    So is that true?

19      A    You would have to repeat the question.

20      Q    Yes.

21           Okay.  And has Ethicon ever shared with you

22   the information they have about the fact that Prolene

23   degrades in vivo?

24              MR. KOOPMANN:  Object to form.

25              THE WITNESS:  Not that I know of.

Brian Schwartz, M.D.

```
 1   BY MS. O'DELL:

 2       Q    Have you reviewed -- let me say this, to save

 3   time.

 4            If Ethicon internally has known that Prolene

 5   degrades in vivo since 1987, that would be news to you,

 6   correct?

 7            MR. KOOPMANN:  Object to form.

 8            THE WITNESS:  Yes.  I'm not aware of that

 9       information.

10   BY MS. O'DELL:

11       Q    Would you want to see that information in

12   order to consider your opinions in this case that mesh

13   does not degrade?

14       A    I don't think that that would affect my choice

15   of procedures.

16       Q    That's not my question.

17            You have opined specifically that mesh does

18   not degrade.  If Ethicon has information that

19   categorically states that Prolene degrades, is that

20   information you would want to have in rendering your

21   opinions in this case?

22       A    The clinical significance of mesh degradation,

23   if it occurs to any significant degree, has no signs,

24   that I have found, affecting outcome of the procedures.

25       Q    All right.  Is it no longer your opinion that
```

Brian Schwartz, M.D.

```
 1   mesh does not degrade?

 2           MR. KOOPMANN:  Object to form.

 3   BY MS. O'DELL:

 4       Q    Because what I hear you saying now is it may

 5   degrade, but, if it degrades, it's not clinically

 6   significant.  So here is the question.

 7           Does it degrade?  Is it your opinion it does

 8   not degrade?

 9       A    In my experience --

10       Q    No, sir.

11       A    But in my experience there is no clinically

12   significant mesh degradation.

13       Q    Now.  Okay.  So, as I read your report, it

14   says, "Plaintiff's experts have offered the opinion that

15   the mesh in the TVT family of products is cytotoxic and

16   degrades.  I disagree."

17           It should be you are not disagreeing that it

18   degrades, you are just saying it's not clinically

19   significant in your view; is that your opinion?

20       A    From my -- from my research all I can say is,

21   from a materials science standpoint, I have not read any

22   material that convinces me that there is any significant

23   degree of mesh degradation.

24       Q    Let me just -- is it your opinion that mesh

25   does not degrade?
```

Brian Schwartz, M.D.

```
 1        A    It is.  It is my opinion that there is, based

 2   on my experience with Prolene, I don't believe that

 3   there is any significant degree of mesh degradation.

 4        Q    So when it says, "I disagree," in regard to

 5   degradation, you are changing your opinion to say, I

 6   don't think it's significant, I don't think it degrades

 7   significantly?

 8        A    I'm not changing my opinion.

 9        Q    You are not changing it.

10             So when you say you disagree, what are you

11   relying on?

12             MR. KOOPMANN:  Object to form.

13             THE WITNESS:  I'm relying on, once again, my

14        clinical experience with Prolene, with the mesh and

15        the long-term efficacy studies.  That's what I'm

16        basing my opinion on.

17   BY MS. O'DELL:

18        Q    And so in your mind efficacy is a matter of --

19   degradation is a matter of efficacy and not safety,

20   fair?

21        A    I feel that safety would certainly be an issue

22   as well.  I've -- I -- my research has not suggested

23   that there are safety issues arising from a causal

24   relationship with mesh changes.

25        Q    Let me show you Exhibit 14.
```

Brian Schwartz, M.D.

```
 1              (Exhibit 14B marked for identification.)

 2    BY MS. O'DELL:

 3         Q     Have you seen this document before?

 4         A     I have not.

 5         Q     You'll see it's dated September 30th, 1987,

 6    and the title is IR Microscopy of Prolene, Received from

 7    Professor R. Guidoin.  I don't know how to pronounce

 8    that.

 9              Do you see that?

10         A     I do.

11         Q     If you'll turn to Page 2, sir.

12              Under Conclusion, No. 3, it says, "The IR

13    spectra of this scraped material is clearly

14    polypropylene but it appears to be degraded in an

15    oxidative fashion."

16              Do you see that?

17         A     I do.

18         Q     No. 4, "The degraded portion of the 8-year

19    explant makes up only a minor portion of the suture."

20    But clearly there is a finding of degradation.

21              Do you see that?

22         A     Yes, I do.

23         Q     And that's not information that was provided

24    to you by Ethicon, true?

25         A     I have not seen this report.
```

Brian Schwartz, M.D.

```
1        Q    And have you considered literature -- in what

2   literature have you considered and relied on in regard

3   to your opinion that mesh does not degrade?

4        A    Once again, it's a result of my long-term

5   experience with Prolene and the long-term efficacy

6   studies.

7        Q    Okay.  If you'll turn over to Page 30, you say

8   at the top of the page, "Plaintiffs' experts have also

9   offered the opinion that larger pore or lighter weight

10  meshes would have been safer to use in the TVT-O sling.

11  I disagree."

12            We've established you have not designed a mesh

13  product.  Have you published in the area of pore size or

14  mesh density?

15       A    No.

16       Q    Have you performed any research in that area?

17       A    No.

18            MR. KOOPMANN:  Object to form.

19  BY MS. O'DELL:

20       Q    Have you taught any students about the issue

21  of pore size in mesh density and what those should be in

22  a medical device?

23       A    I discussed this issue with --

24       Q    Have you taught a course on it?

25       A    No, I have not.
```

Brian Schwartz, M.D.

```
 1        Q    Do you know the size of the -- strike that.

 2             What's the pore size of the mesh?

 3        A    About 1300 microns.

 4        Q    What is the density?

 5        A    The weight is about 100 grams per meter

 6   squared.

 7        Q    How do you know that?

 8        A    From my research.

 9        Q    Your research in rendering your opinions in

10   this case?

11        A    Yes.

12        Q    You say that the pore size and weight are

13   optimal.  Is there a specific material that you rely on

14   in order to say that it's optimal?

15        A    My research, basically reading of the

16   material, has suggested that that is an optimal pore

17   size.

18        Q    Have you done an independent research

19   review -- excuse me -- research to determine what has

20   been written regarding pore size and density, outside

21   the materials given to you by Ethicon?

22        A    No, I have not.

23        Q    Sir, what is the last exhibit number that I

24   used?

25        A    Fourteen.
```

Brian Schwartz, M.D.

```
 1      Q    Okay.

 2           (Exhibit 15 marked for identification.)

 3  BY MS. O'DELL:

 4      Q    Let me show you what I'm marking as Exhibit

 5  15.  This is an IFU for the TVT.

 6           I'm assuming you are familiar with this?

 7           MR. KOOPMANN:  Leigh, I think you gave me your

 8      copy.

 9  BY MS. O'DELL:

10      Q    If you'll turn, sir, to Page -- I believe it's

11  Page 6 or 5 of the exhibit.

12           Earlier, sir, you testified that, in your

13  mind, transient leg pain was up to three months.  Do you

14  recall that?

15      A    Yes.

16      Q    And would you agree with me, under the

17  Warnings and Precautions section, that the transient leg

18  pain that Ethicon defines is 24 to 48 hours?

19      A    I'm sorry.  Repeat the question, please.

20      Q    Are you -- what page are you on, sir?

21      A    Six.

22      Q    Okay.  Great.

23           If you'll look down in the Warnings and

24  Precautions section, as it proceeds on to Page 6 of

25  Exhibit 15, you'll see the third bullet point says,
```

Brian Schwartz, M.D.

1    "Transient leg pain lasting 24 to 48 hours may occur and

2    usually can be managed with mild analgesics."

3        A    Yes.  I see that.

4        Q    And is it fair to say your opinion of

5    transient leg pain being three months is very different

6    from what is described here in the IFU, true?

7            MR. KOOPMANN:  Object to form.

8            THE WITNESS:  Leg pain is leg pain.

9    BY MS. O'DELL:

10       Q    Okay.  Ethicon in the IFU defines "transient"

11   as 24 to 48 hours.  Do you see that?

12           MR. KOOPMANN:  Object to form.

13           THE WITNESS:  It's not clear to me that they

14       define it that way.

15   BY MS. O'DELL:

16       Q    They don't say three months, do they, sir?

17       A    They say "may occur."

18       Q    Twenty-four to 48 hours of leg pain is a very

19   different complication following a procedure than

20   consistent leg pain of three months.  Would you agree

21   with that?

22       A    I comment that the majority of my patients

23   have leg pain lasting up to 48 hours.  There are -- I

24   have had patients with some degree of leg pain that does

25   not resolve for up to three months.

Brian Schwartz, M.D.

```
 1        Q    And that would -- according to the IFU, that
 2   would not be transient leg pain, true?
 3              MR. KOOPMANN:  Object to form.
 4              THE WITNESS:  I define transient leg pain as
 5        I've defined it, which is pain that resolves on its
 6        own.
 7   BY MS. O'DELL:
 8        Q    That's your definition of transient leg pain?
 9        A    Transient leg pain, yes, is that it resolves
10   spontaneously.
11        Q    Are you suggesting -- let me just cut to the
12   chase.
13              Does the IFU warn of chronic leg pain?
14        A    The IFU can't include every single --
15        Q    That's not my question.
16        A    I understand that.
17        Q    So here is my question.
18              Does the IFU include chronic leg pain?
19        A    They list transient leg pain, is how they
20   define it.
21        Q    Does it include a warning of leg pain that
22   lasts beyond 48 hours?
23        A    Not specifically.
24        Q    And you would agree with me, Dr. Schwartz,
25   that studies such as the Teo study that we looked at
```

Brian Schwartz, M.D.

1    earlier, Exhibit 12 reports leg pain of much longer than

2    48 hours in upwards of 26 percent of the patients in

3    that particular study.

4            Do you recall that?

5        A    I recall looking at that study, yes.

6        Q    And so it would be fair to say there was

7    information available of instances of leg pain that

8    lasted longer than 48 hours that were not included in

9    the IFU, true?

10       A    There is no way that the IFU can include all

11   potential issues that can arise from surgery.

12       Q    And so is the answer to my question yes,

13   that's true?

14           MR. KOOPMANN:  Object to form.

15           THE WITNESS:  I'm sorry.  You'll have to

16       repeat the question.

17   BY MS. O'DELL:

18       Q    The IFU does not warn of leg pain lasting

19   longer than 48 hours, does it, sir?

20       A    The IFU makes no specific reference to leg

21   pain lasting longer than that time.

22       Q    And the IFU does not warn of dyspareunia,

23   true?

24       A    I do not see dyspareunia listed here.

25       Q    And it does not include a warning of urge

Brian Schwartz, M.D.

```
 1   incontinence, urgency or frequency, true?

 2        A    Well, by the same token it doesn't comment

 3   that it will prompt improvement in the majority of women

 4   who have that problem.

 5        Q    We're talking about warnings and adverse

 6   reactions.  And let me ask you to turn to Page 32 of

 7   your report.

 8             You say, "There is no need for Ethicon to warn

 9   surgeons about risks inherent in any pelvic floor

10   surgery," and you include infection, inflammation,

11   bleeding, scarring, bladder damage, bowel damage, nerve

12   damage, urethral damage, pain, pelvic pain, dyspareunia,

13   groin pain, and you go on to list others.

14             Is it fair to say that, regardless of what the

15   known risks are, those adverse outcomes, they were not

16   included in the IFU of the TVT-O?

17        A    Once again, I don't feel that's the role of

18   the IFU.

19        Q    Have you ever written a warning for a medical

20   device or an IFU?

21        A    No, I have not.

22        Q    Have you been asked to consult with a medical

23   device manufacturer to assist in writing an IFU?

24        A    I have not been asked to assist in writing an

25   IFU.
```

Brian Schwartz, M.D.

```
 1        Q    And is it your opinion that you outline here

 2   on Page 32 what was not necessary to include in the IFU,

 3   based on your personal experience?

 4        A    And the experience of my colleagues as well.

 5        Q    What colleagues are you referring to?

 6        A    My surgical colleagues.

 7        Q    Your partners?

 8        A    Yes.

 9        Q    In your medical practice?

10        A    Yes.

11        Q    Anything else?

12        A    Basically surgeons in general.  Surgeons don't

13   rely on IFUs to provide them with complication

14   information.

15        Q    And what do you base that statement on?

16        A    That most --

17        Q    Sir, I'm asking for a reference.

18        A    Most procedures don't have an IFU available.

19        Q    I'm talking about a medical device, and all

20   medical devices have IFUs, and I'm asking, when you say

21   there is no need to put into an IFU known risks of a

22   procedure, you've stated that you base that on your

23   personal experience and talking with your colleagues.

24             Is there anything else you base that opinion

25   on?
```

Brian Schwartz, M.D.

```
 1        A    Not that I can think of currently.

 2        Q    In your view, Ethicon has no duty to provide

 3   information about risk of a product; is that fair?

 4             MR. KOOPMANN:  Object to form.

 5             THE WITNESS:  Is that stated here?

 6   BY MS. O'DELL:

 7        Q    I'm asking you the question, sir.

 8        A    I'm sorry.  What was the question?

 9        Q    The question is, In your view, does Ethicon

10   have a duty to provide information about known risks of

11   a product in an IFU?

12        A    No.  The surgeon is responsible for

13   understanding and learning about risks of procedures

14   from literature, peer-reviewed textbooks, peers,

15   meetings, et cetera.

16        Q    Does Ethicon have a duty to provide

17   information about known risks to patients in their

18   patient brochures?

19             MR. KOOPMANN:  Object to form.

20             THE WITNESS:  That's a duty that should fall

21        on the surgeon.

22   BY MS. O'DELL:

23        Q    So if Ethicon is printing a brochure for

24   distribution to patients who are going to ostensibly be

25   implanted with a TVT-O or another device in the TVT
```

Brian Schwartz, M.D.

1    family, do they have a duty to include known risks?

2              MR. KOOPMANN:  Object to form.

3              THE WITNESS:  No.  That's the job of the

4         surgeon.

5    BY MS. O'DELL:

6         Q    Are you going to opine, to a reasonable degree

7    of medical certainty, that Ethicon provided adequate

8    training to surgeons on the implantation of the TVT-O?

9         A    Ethicon provided me with adequate training and

10   I in turn provided other surgeons with adequate

11   training.

12        Q    Do you have any opinion as to the overall

13   training provided by Ethicon to surgeons who purchase

14   the TVT-O product?

15        A    I cannot attest to what their experience was.

16        Q    You can only attest to your own experience?

17        A    Correct.

18        Q    Okay.

19             MS. O'DELL:  I've got about five minutes left,

20        and I'll reserve it.

21             MR. KOOPMANN:  So I should ask my follow-up

22        questions now?

23             MS. O'DELL:  If you have any.

24                    CROSS EXAMINATION

25   BY MR. KOOPMANN:

Brian Schwartz, M.D.

```
 1       Q    Dr. Schwartz, counsel asked you some questions

 2   about the Schimpf article earlier.

 3            Do you still have that one in front of you?

 4   It's here.

 5            If you'll turn to Table 3.

 6       A    Yes.

 7       Q    In that article you will see the adverse event

 8   rates for various types of adverse events for various

 9   types of sling procedures and non-sling incontinence

10   procedures, correct?

11       A    Correct.

12       Q    And one of the rates referenced there is a

13   dyspareunia rate with obturator procedures of 0.16

14   percent; is that right?

15       A    Correct.

16       Q    And is this article an article that you relied

17   on in forming your opinions in these cases?

18       A    Yes.

19       Q    The rate of return to operating room for

20   erosion was 2.7 percent in the transobturator sling

21   patients, correct?

22            MS. O'DELL:  Object to form.

23            THE WITNESS:  Correct.

24   BY MR. KOOPMANN:

25       Q    And what was the rate of exposure for
```

Brian Schwartz, M.D.

1    transobturator sling patients?

2         A    2.2 percent.

3         Q    What was the rate of wound infection for

4    transobturator patients?

5         A    0.74 percent.

6         Q    And what was the rate for pubovaginal sling

7    patients?

8         A    2.6 percent.

9         Q    And what was the rate of wound infection for

10   Burch procedure patients?

11        A    7 percent.

12        Q    What was the rate of bowel injuries for

13   obturator patients?

14        A    Nonexistent.

15        Q    What was the rate of bowel injury for Burch

16   patients?

17        A    3.13 percent.

18        Q    Is bowel injury a significant adverse event?

19        A    It's a potentially life-threatening event.

20        Q    What was the rate of overactive bladder or

21   urgency in obturator patients, based on this study?

22        A    0.3 percent.

23        Q    And this study is a systematic review and

24   meta-analysis?

25        A    Yes.

Brian Schwartz, M.D.

```
 1        Q     Is that high quality scientific evidence?

 2              MS. O'DELL:  Object to form.

 3              THE WITNESS:  Yes.

 4   BY MR. KOOPMANN:

 5        Q     What was the rate of overactive bladder or

 6   urgency in the pubovaginal sling patients?

 7        A     8.6 percent.

 8        Q     And what was it in the Burch patients?

 9        A     4.3 percent.

10        Q     What was the rate of retention lasting longer

11   than six weeks in the obturator patients?

12        A     2.4 percent.

13        Q     And was that rate -- how did that rate compare

14   to the other rates studied?

15        A     It was the lowest of the group, including

16   obturator, retropubic, mini-sling, pubovaginal and

17   Burch.

18        Q     And one of the articles that counsel asked you

19   about was the Cholhan article.

20        A     Yes.

21        Q     If you'll turn to the second page of that

22   article, on the right-hand side they talk about, "More

23   than half of their patients, 28 out of 52, underwent

24   concurrent surgery for prolapse in addition to the

25   transobturator or retropubic sling."
```

Brian Schwartz, M.D.

```
 1                 Do you see that?

 2        A    I see that now.

 3        Q    And then they go on to note after that, that,

 4   "Of the four transobturator patients with de novo

 5   internal dyspareunia, two had supracervical hysterectomy

 6   with abdominal sacrocolpopexy and one had a posterior

 7   colporrhaphy, and one had a transobturator sling alone."

 8                 Is that right?

 9        A    Correct.

10        Q    You were also asked some questions about the

11   Teo study.  Do you recall that?

12        A    Yes.

13        Q    Okay.  And in the Teo study, if you'll turn to

14   the second to last page, there is a discussion of leg

15   and groin pain being experienced by 26.4 percent of the

16   women of the TVT-O group, which is what counsel asked

17   you about, right?

18        A    Yes.

19        Q    Further down, in the middle of that paragraph,

20   it says, "There was sufficient response to amitriptyline

21   and gabapentin, which obviated the need for tape removal

22   in those patients."

23                 Is that right?

24        A    Yes.

25        Q    And then it says, "In all other cases of leg
```

Brian Schwartz, M.D.

```
 1   pain in the TVT-O group the problem resolved

 2   spontaneously within three months."

 3          Is that right?

 4     A    Correct.

 5     Q    Another article you were asked about is the

 6   Zhang study.

 7     A    Yes.

 8     Q    And they note in the Zhang study, in the

 9   Results section of the long-term complication rates for

10   TVT and TVT-O were 43.1 percent and 27.4 percent

11   respectively; is that right?

12     A    Yes.

13     Q    And counsel asked you about tape exposure

14   being possible seven years after the TVT-O.  Do you

15   remember that?

16     A    Yes.

17     Q    Okay.  If you'll turn to the second to last

18   page you'll see the Conclusions section.

19     A    Yes.

20     Q    And at the end of that Conclusions section,

21   the authors of this Zhang study noted that, "Despite the

22   high incidence of long-term complications most

23   complications were not consequential and the patient's

24   QOL retained significant improvements in the long term."

25          Is that right?
```

Brian Schwartz, M.D.

```
 1      A    Correct.

 2           MS. O'DELL:  Object to the form.

 3  BY MR. KOOPMANN:

 4      Q    What is "QOL"?

 5      A    Quality of life.

 6      Q    And they also note that sexual function was

 7  unchanged by either procedure; is that right?

 8      A    Correct.

 9      Q    You were asked some questions a few minutes

10  ago about the instructions for use for the TVT

11  obturator.

12           In the Adverse Reaction section on Page 6 of

13  that document it notes that, "Punctures or lacerations

14  of vessels nerves, bladder, urethra or bowel may occur

15  during needle passage and may require surgical repair."

16           Is that right?

17      A    Yes.

18      Q    And as a urologic surgeon and pelvic floor

19  surgeon, is it obvious to you that pain could result

20  from punctures or lacerations of vessels, nerves,

21  bladder, urethra or bowel?

22           MS. O'DELL:  Object to form.

23           THE WITNESS:  Yes.

24  BY MR. KOOPMANN:

25      Q    And did you need an IFU to tell you that pain
```

Brian Schwartz, M.D.

```
 1   could result from adverse reactions like that?

 2       A    No.

 3       Q    As a urologic surgeon, do you know that pain

 4   could result after any surgery?

 5       A    Pain can result following any surgery.

 6       Q    Can it result after a Burch procedure?

 7            MS. O'DELL:  Object to form.

 8            THE WITNESS:  Yes.

 9   BY MR. KOOPMANN:

10       Q    Can it result after pubovaginal sling

11   procedures?

12       A    Yes.

13       Q    And can pain that results after any surgery be

14   temporary or permanent?

15       A    Yes.

16       Q    Handing you some of the articles that you've

17   got in file materials here today, and ask you some

18   questions about some of those.

19       A    Okay.

20            MS. O'DELL:  Do you have a copy for me?

21            MR. KOOPMANN:  I do.

22   BY MR. KOOPMANN:

23       Q    One of the articles you have there is the

24   Abdel-fattah study.  Do you see that one?

25       A    Yes.
```

Brian Schwartz, M.D.

1        Q    In that study the authors looked at a database

2   with 34,631 women; is that right?

3        A    Yes.

4        Q    And this is a study that you reviewed in the

5   course of forming your opinions in this case?

6        A    Yes.

7        Q    If you will look at Page 5 of the study, it

8   indicates in the left-hand column that, "Sixty-seven

9   women had at least one repeat urinary incontinence

10  surgery, giving a reoperation rate of 8.8 percent."

11            Is that right?

12            MS. O'DELL:  Can you show me where you are

13       reading, please?

14            MR. KOOPMANN:  Right here.

15            THE WITNESS:  Left side, second paragraph.

16            MR. KOOPMANN:  Yes.  Halfway through the

17       paragraph.  Page 5.

18            MS. O'DELL:  I gotcha.

19            THE WITNESS:  Yes.

20  BY MR. KOOPMANN:

21       Q    And then on the right-hand column at the top

22  it says, "The reoperation rate for urinary incontinence

23  was 3.2 percent in the midurethral sling group, 10.7 in

24  the abdominal retropubic surgery group."

25            Is that right?

Brian Schwartz, M.D.

```
 1       A    Yes.

 2            MS. O'DELL:  Object to the form.

 3   BY MR. KOOPMANN:

 4       Q    You also have a study there by Ford and

 5   others, the Cochrane review.

 6            Do you have that?

 7       A    Yes.

 8       Q    This is a study that you reviewed and relied

 9   on in forming your opinions in these cases?

10       A    Yes.

11       Q    And on the third page there they noted --

12   third page of the document, but it's labeled Page 2 at

13   the bottom?

14       A    Okay.

15       Q    It says Main Results at the top?

16       A    Yes.

17       Q    And in the fourth paragraph in that page it

18   notes that, "The overall rates of vaginal tape

19   erosion/exposure/extrusion was low in both groups: 24

20   out of 1,000 instances with the transobturator compared

21   with 21 out of 1,000 for the retropubic."

22            Is that what that indicates?

23       A    Yes.

24       Q    And do you have, as part of that document --

25   it's the last page, Page 30 and 31.  That's the last two
```

Brian Schwartz, M.D.

```
 1   pages.

 2        A    Yes.

 3             MR. KOOPMANN:  Do you have those, Leigh?

 4             MS. O'DELL:  Yes.

 5   BY MR. KOOPMANN:

 6        Q    And at the bottom of Page 30 the author has

 7   assessed sexual function, quality of life measures.

 8             Do you see that section?

 9        A    Yes.

10        Q    And the bottom paragraph in that column, it

11   says, "In all the trials there was significant

12   improvement in sexual function from baseline scores

13   during the follow-up period that spans 6 to 24 months."

14             Did I read that correctly?

15        A    Yes.

16        Q    And it says, "There were no significant

17   differences between the two groups at 24-month

18   follow-up.  Rates of superficial and deep dyspareunia

19   were low with no difference between the groups."

20             Is that right?

21             MS. O'DELL:  Object to the form.

22             THE WITNESS:  Yes.

23   BY MR. KOOPMANN:

24        Q    And if you go back to Page 2 that we looked at

25   a moment ago, this study looked at 55 trials with data
```

Brian Schwartz, M.D.

```
 1   contributed by 8,652 women, which compared the use of

 2   the transobturator route and retropubic route.

 3            Is that right?

 4       A    Yes.

 5       Q    Do you have an article there by Michele

 6   Jonsson Funk?

 7            MS. O'DELL:  Are you going to mark these for

 8       the record?

 9            MR. KOOPMANN:  Well, they are part of his file

10       materials.  Are you going to mark his file

11       materials?

12            MS. O'DELL:  I've marked all I'm going to

13       mark, but if you don't mark them, I'll mark them

14       when I go back on the record.  Otherwise it's not

15       going to make any sense.  I suggest you mark them,

16       but it's up to you.

17            MR. KOOPMANN:  I didn't know if you had marked

18       these, that particular stack.

19            All right.  I'll mark them.

20            (Exhibit 17 marked for identification.)

21   BY MR. KOOPMANN:

22       Q    I'll mark for the record as Exhibit 17 a copy

23   of the Ford record article that was just discussed and

24   is in your file materials; is that correct?

25       A    Correct.
```

Brian Schwartz, M.D.

```
 1        Q    And then I'll mark as Exhibit 18 a copy of

 2   the --

 3             MS. O'DELL:  Abdel-fattah?

 4             THE WITNESS:  I have copies, two copies in my

 5        pile.  I just have to find it here.

 6             (Exhibit 18 marked for identification.)

 7   BY MR. KOOPMANN:

 8        Q    And then you've got a copy of the Jonsson Funk

 9   article from your file.  Let's mark that as Exhibit 19.

10             (Exhibit 19 marked for identification.)

11   BY MR. KOOPMANN:

12        Q    You haven't commented on that.  I'll ask you

13   some questions about this.

14             I've marked it as Exhibit 19; is that correct?

15        A    Yes.

16        Q    And this study looked at 188,454 eligible

17   women who underwent an index sling procedure?

18        A    Yes.

19        Q    And they found that, "The nine-year cumulative

20   risks of sling revision/removal was 3.7 percent."

21             Is that right?

22        A    Yes.

23        Q    You had mentioned earlier the 2009 AUA

24   guidelines regarding the surgical management of stress

25   incontinence --
```

Brian Schwartz, M.D.

```
1       A    Yes.

2       Q    -- that was updated in 2012.

3            Do you have a copy of that in your file?

4       A    Yes.

5       Q    We'll mark that.

6            (Exhibit 20 marked for identification.)

7            MS. O'DELL:  Is it Exhibit 20?

8            MR. KOOPMANN:  Yes.

9  BY MR. KOOPMANN:

10      Q    And if you'll turn to the second to last page,

11  you should see Appendix A16.

12           Do you see that page?

13      A    Yes.

14      Q    Okay.  And these are guidelines that you

15  reviewed and relied on in forming your opinions in this

16  case?

17      A    Yes.

18      Q    And in that Appendix A16, it lists

19  complication rates for synthetic slings at the

20  midurethra; is that right?

21      A    Yes.

22      Q    And it notes a rate of pain as a subjective

23  complication at a rate of 1 percent; is that correct?

24           MS. O'DELL:  Object to form.

25           Excuse me, Doctor.
```

Brian Schwartz, M.D.

```
1              Are you on Page A16, Synthetic -- are you on

2         the last page or the next to last page of this

3         exhibit?

4              MR. KOOPMANN:  It is the second to last page.

5              MS. O'DELL:  Okay.  All right.  Do you mind

6         repeating your question?

7              MR. KOOPMANN:  In the middle column, it says

8         Synthetic at Mid-Urethra.

9              Do you see that section?

10             MS. O'DELL:  Yes.

11   BY MR. KOOPMANN:

12        Q    Dr. Schwartz, the subjective complication of

13   pain was reported to occur in 1 percent of patients

14   studied, correct?

15        A    Yes.

16             MS. O'DELL:  Object to the form.

17   BY MR. KOOPMANN:

18        Q    Was what I said correct?

19        A    What you said was correct.

20        Q    And what was the rate of sexual dysfunction?

21        A    Zero.

22        Q    What was the rate of voiding dysfunction?

23        A    2 percent.

24        Q    Do you have a study by Giovanni Tommaselli in

25   your stack of materials there?
```

Brian Schwartz, M.D.

```
 1      A    Yes.

 2           (Exhibit 21 marked for identification.)

 3   BY MR. KOOPMANN:

 4      Q    Before I move on from the AUA guidelines, I've

 5   marked those as Exhibit 20; is that correct?

 6      A    Correct.

 7      Q    Would you please put that Exhibit 21 sticker

 8   on the Tommaselli article?

 9      A    (The witness complies.)

10      Q    This article by Dr. Tommaselli and colleagues

11   was written in 2015; is that correct?

12      A    Yes.  Accepted for publication 2015.

13      Q    And this was a systematic review and

14   meta-analysis, correct?

15           MS. O'DELL:  Object to the form.

16           THE WITNESS:  Yes.

17   BY MR. KOOPMANN:

18      Q    And if you'll turn to Page -- well, it's the

19   page with Table 3 on it.

20           Do you see that page?

21      A    Yes.

22      Q    That shows the number of total transobturator

23   sling patients that were studied in the article,

24   correct?

25      A    Yes.
```

Brian Schwartz, M.D.

```
 1      Q    And the total was what?

 2      A    The total transobturator, 1,500 -- no.  All

 3  studies, 2,432.

 4      Q    Okay.  And then if you'll turn to the next

 5  page, you'll see the paragraph that's got a header

 6  Tape-Related Long-Term Complications.

 7           Do you see that?

 8      A    Yes.

 9      Q    And what does it say there in the second

10  sentence in that paragraph?

11      A    Starting "persistent"?

12      Q    Yes.

13      A    "Persistent or severe voiding problems" --

14      Q    I think you've got the wrong one.  Second

15  sentence, not the third.

16      A    "Persistent or chronic pain, pain persisting

17  beyond the peri-operative period or reported at the last

18  follow-up visit, was reported by 13 patients for the

19  retropubic MUS and 30 patients for the transobturator

20  MUS."

21      Q    And if you do that calculation, 30 patients

22  divided by 2,432, it would be a 1.2 percent rate of

23  chronic or persistent pain with the transobturator

24  procedure, based on this study?

25           MS. O'DELL:  Object to the form.
```

Brian Schwartz, M.D.

```
 1              THE WITNESS:  Yes.

 2   BY MR. KOOPMANN:

 3        Q    And that's a study you reviewed and relied

 4   upon in forming your opinions in this case?

 5        A    Yes.

 6        Q    You have a study there by Cecile Unger and

 7   colleagues?

 8        A    Yes.

 9        Q    I'll mark that as Deposition Exhibit 22.

10              (Exhibit 22 marked for identification.)

11   BY MR. KOOPMANN:

12        Q    Is this a study that you reviewed in the

13   course of forming your opinions, relied on?

14        A    Yes.

15        Q    And this study involved an analysis of 3,307

16   women who underwent sling placement; is that right?

17        A    Yes.

18        Q    And 89 of those women, or 2.7 percent of the

19   3,307, underwent sling revisions for one or more of

20   various indications; is that right?

21              MS. O'DELL:  Object to the form.

22              THE WITNESS:  Yes.

23   BY MR. KOOPMANN:

24        Q    And of that 2.7 percent that underwent a sling

25   revision, 21.3 percent of those were for mesh erosion;
```

Brian Schwartz, M.D.

```
1    is that right?

2          A     Yes.

3          Q     So 21.3 percent of 2.7 percent?

4          A     Yes.  That's about 5 1/2 percent.

5                MS. O'DELL:  Object to the form.

6    BY MR. KOOPMANN:

7          Q     So 21.3 percent of 89 people, it would be 19

8    people; is that right?

9                MS. O'DELL:  Object to the form.

10               THE WITNESS:  Yes.

11   BY MR. KOOPMANN:

12         Q     And 19 people divided by 3,307 women would

13   yield a complication rate of 0.57 percent; is that

14   right?

15         A     Yes.

16         Q     And then vaginal pain and dyspareunia was the

17   indication for sling revisions in 7.9 percent of the 89

18   women; is that right?

19         A     Yes.

20         Q     Okay.  And 7.9 percent of 89 is seven people,

21   if you trust my math?

22         A     Yes.

23               MS. O'DELL:  Object to the form.

24   BY MR. KOOPMANN:

25         Q     And seven women out of 3,307 would be 0.21
```

Brian Schwartz, M.D.

```
 1   percent?

 2              MS. O'DELL:  Object to the form.

 3              THE WITNESS:  Yes.

 4   BY MR. KOOPMANN:

 5        Q    And then 3.4 percent of the 89 women had sling

 6   revision for groin pain; is that right?

 7        A    Correct.

 8        Q    Do you have a study in front of you there by a

 9   Dr. Welk and colleagues?

10        A    Yes.

11              MR. KOOPMANN:  Let's mark that as Deposition

12         Exhibit 23.

13              (Exhibit 23 marked for identification.)

14   BY MR. KOOPMANN:

15        Q    Is this a study that you reviewed and relied

16   upon in forming your opinions in this case?

17              MS. O'DELL:  Object to the form.

18              THE WITNESS:  Yes.

19   BY MR. KOOPMANN:

20        Q    This study looked at -- well, it was a

21   population-based retrospective cohort study that

22   included all adult women undergoing an incident

23   procedure for SUI for synthetic mesh in Ontario, Canada,

24   from April 1st, 2002, through December 31st, 2012.

25              Is that right?
```

Brian Schwartz, M.D.

```
 1       A    Yes.

 2       Q    And in the Results section it indicates there

 3   that, "Among the identified 59,887 women" -- strike

 4   that.

 5            It indicates that there were 59,887 women

 6   studied as part of this group, this article, correct?

 7       A    Yes.

 8       Q    And they note in the middle of the Results

 9   section there that, "Complications were treated in 1,307

10   women or 2.2 percent."

11            Is that right?

12       A    Yes.

13       Q    And they note that the ten-year cumulative

14   incidence rate was 3.29; is that right?

15       A    Yes.

16       Q    And then in the Conclusion Section they note

17   that, "Ten years after SUI mesh surgery 1 of every 30

18   women may require a second procedure for mesh removal or

19   revision."

20            Is that correct?

21       A    Yes.

22       Q    And that's a study that forms the basis or

23   part of the basis for your opinions in this case?

24            MS. O'DELL:  Object to the form.

25            THE WITNESS:  Yes.
```

Brian Schwartz, M.D.

```
 1   BY MR. KOOPMANN:

 2       Q    You were asked some questions earlier about

 3   the Angioli study.  Do you remember going through that?

 4            MS. O'DELL:  I didn't mark the study.

 5            MR. KOOPMANN:  You didn't?

 6            THE WITNESS:  It's here.  Do you want me to --

 7   BY MR. KOOPMANN:

 8       Q    You have it included in your TVT-O general

 9   report binder notebook that you brought?

10       A    Yes.

11       Q    Let's mark that notebook as Exhibit 24.

12            (Exhibit 24 marked for identification.)

13   BY MR. KOOPMANN:

14       Q    Counsel asked you some questions about what

15   the primary end point was for this study.

16            Do you recall that?

17       A    Yes.

18       Q    And the Measurements section, what does it say

19   was the primary end point of this study, Measurement

20   Section of the abstract -- let me start that over.

21       A    Okay.

22       Q    In the Measurements section of the abstract,

23   what do the authors indicate was the primary end point

24   of the study?

25       A    Long-term complications.
```

Brian Schwartz, M.D.

```
 1        Q    And this was a five-year study of the

 2   tension-free vaginal tape versus transobturator

 3   suburethral tape?

 4        A    Yes.

 5        Q    Specifically the TVT versus TVT-O slings,

 6   correct?

 7        A    Yes.

 8        Q    And the authors' conclusions were that both

 9   surgical techniques, meaning the TVT and TVT-O, were

10   safe with similar results and low complication rates; is

11   that correct?

12             MS. O'DELL:  Object to the form.

13             THE WITNESS:  Yes.

14   BY MR. KOOPMANN:

15        Q    On Page 673 of that study, in the right-hand

16   column there is a reference to dyspareunia.  And it

17   says, "Dyspareunia and incontinence during intercourse

18   occurred in 2, or 5.1 percent, and 4, or 10.2 percent,

19   respectively, of the 39 sexually active women who

20   completed follow-up."

21             Is that right?

22        A    Yes.

23        Q    In Table 4 they report long-term complications

24   that they saw in the TVT and TVT-O patients; is that

25   right?
```

Brian Schwartz, M.D.

```
 1       A    Yes.

 2       Q    How many cases of urinary retention did they

 3  see in the TVT-O patients?

 4       A    Zero.

 5       Q    How many cases of de novo urgency?

 6       A    Two.

 7       Q    How many cases of chronic pelvic pain in the

 8  TVT-O patients?

 9       A    Zero.

10       Q    How many cases of pain during intercourse in

11  the TVT-O patients?

12       A    One.

13       Q    How many cases of incontinence during

14  intercourse in the TVT-O patients?

15       A    Two.

16       Q    How many cases of vaginal erosions?

17       A    Two.

18       Q    And in the Discussion section, the right-hand

19  column on that same page, they indicate in the bottom

20  paragraph, "Our data confirmed that neither approach

21  constituted an invasive procedure so that the majority

22  of women, 51 patients, which was 85 percent, would

23  undergo the same procedure again if SUI recurred,

24  especially within the TVT-O group."

25            Is that correct?
```

Brian Schwartz, M.D.

```
 1      A    Yes.

 2           MS. O'DELL:  Object to the form.

 3   BY MR. KOOPMANN:

 4      Q    Is that consistent with what you've seen in

 5   your patient population with your TVT-Os?

 6      A    Correct.

 7      Q    Are your patients generally happy with the

 8   outcome of the procedure?

 9      A    Yes.

10      Q    Turn to Page 675 of the Angioli study.  In the

11   left-hand column, second full paragraph starting with

12   "development of"?

13      A    Uh-huh.

14      Q    There is a sentence there that says, "TVT-O

15   seems to be associated with a better impact on

16   sexuality, but there are insufficient data to allow the

17   comparison between retropubic and the transobturator

18   procedures with respect to sexual activity after

19   surgery."

20           Is that right?

21      A    Yes.

22      Q    And then on Page 676 of that article they

23   noted that out of the three vaginal erosions, that they

24   saw only one of the three was symptomatic while the

25   other two were found during a routine gynecologic exam;
```

Brian Schwartz, M.D.

1    is that right?

2         A    Yes.

3         Q    Do you have a study there from Dr. Serati in

4    your notebook in 2013?

5         A    Yes.

6         Q    And that's contained in the notebook we've

7    marked as Exhibit 24; is that right?

8         A    Yes.

9         Q    And that Serati study, this was a study with

10   five-year follow-up; is that right?

11        A    Yes.

12        Q    And they found that the five-year subjective

13   and objective cure rates with the TVT-O were 90.3

14   percent and 90.8 percent respectively, correct?

15        A    Yes.

16        Q    In the Discussion section at the top of page

17   876, the authors noted in the second sentence of that

18   section that they found the TVT-O to be a highly

19   effective and safe procedure; is that right?

20             MS. O'DELL:  Object to the form.

21             THE WITNESS:  Yes.

22   BY MR. KOOPMANN:

23        Q    Do you have a study in your notebook marked as

24   Exhibit 24 by Dr. Liapis?

25        A    Yes.

Brian Schwartz, M.D.

 1      Q     Okay.

 2      A     There is an '08 and a '10.

 3      Q     The 2010 I have a question about.

 4            This was an efficacy study of the inside-out

 5      transobturator vaginal tape, TVT-O, at four years'

 6      follow-up; is that right?

 7      A     Yes.

 8      Q     And in the Results section of the abstract

 9      there they say, "The objective cure rate based on the

10      pad test finding for the TVT-O only patients was 82.4

11      percent and the improvement rate was 6.8 percent."

12            Is that right?

13      A     Yes.

14      Q     And then they found that the objective cure

15      rate for the group undergoing TVT-O and anterior

16      colporrhaphy was 84.5 percent and the improvement rate

17      was 7.4."

18      A     Yes.

19      Q     In the Introduction section at the bottom of

20      that first paragraph they say, "The aim of this study

21      was to assess the efficacy and safety of the TVT-O

22      procedure with or without cystocele repair in the

23      treatment of USI in women at four years follow-up."

24            Is that right?

25      A     Yes.

Brian Schwartz, M.D.

```
 1      Q    The top of Page 201 they note, top of the left

 2   column, "Rejection of tape was found in one case on

 3   patients with the TVT-O procedure at three months

 4   postoperatively and in one case in patients with TVT-O

 5   and anterior colporrhaphy at five months

 6   postoperatively."

 7           Is that correct?

 8      A    Yes.

 9      Q    And is this one of the studies that you relied

10   on in forming your opinion that most instances of

11   erosion occur early on after the procedure?

12           MS. O'DELL:  Object to the form.

13           THE WITNESS:  Yes.

14   BY MR. KOOPMANN:

15      Q    The bottom of that left column on Page 201

16   they talk about postoperative pain in the last sentence.

17           Do you see that?

18      A    Yes.

19      Q    The authors have noted, "Postoperative pain

20   developed in 12.1 percent of patients with TVT-O and 9.7

21   percent of patients with TVT-O and anterior

22   colporrhaphy."

23           Is that right?

24      A    Yes.

25      Q    They then noted, "This pain was located in the
```

Brian Schwartz, M.D.

```
 1   thigh region, unilateral or bilateral, and lasted, in

 2   the great majority of cases, from one to two weeks but

 3   one woman complained of pain for up to four months."

 4          Did I read that correctly?

 5     A    Agree.

 6          MS. O'DELL:  For optimal completeness I

 7     request that you read the next three sentences as

 8     well.

 9   BY MR. KOOPMANN:

10     Q    They go to note, "The pain was managed with

11   non-steroidal anti-inflammatory analgesics effectively."

12          Is that correct?

13     A    Yes.

14          MS. O'DELL:  Keep going.

15          MR. KOOPMANN:  I'll let you cover that,

16     Counsel, if you would like to.

17          Oh, I see.

18          MS. O'DELL:  "An incidence of up to 16 percent

19     of postoperative pain has been reported and it

20     usually resolves within four weeks but in rare

21     cases persistent groin pain can be seen for up to

22     one year postoperatively."

23   BY MR. KOOPMANN:

24     Q    Does it state that as well?

25     A    Yes.
```

Brian Schwartz, M.D.

1      Q    And the last paragraph of that page says, "In

2    the present study, TVT-O procedure alone or with

3    anterior colporrhaphy maintains a high cure and

4    improvement rate with very low complication rate at four

5    years follow-up and appears to be a promising technique,

6    but long-term results should be published for safer

7    conclusions to be made about its efficacy and

8    tolerability."

9           Is that what it says?

10     A    Yes.

11     Q    And this is a study that you relied on in

12   forming your opinions in this case?

13     A    Yes.

14     Q    Did you also review and rely on a study by a

15   Dr. Athanasiou, spelled A-T-H-A-N-A-S-I-O-U?

16     A    Yes, from 2014.

17     Q    Yes.  And you have that included in Exhibit

18   24?

19     A    Yes.

20     Q    And this is a seven-year TVT-O study; is that

21   right?

22     A    Yes.

23     Q    Is that a long-term study?

24     A    Yes.

25     Q    This study looked retrospectively at women who

Brian Schwartz, M.D.

1    underwent the TVT-O procedure?

2        A    Yes.

3        Q    And they identified in the Results section

4    that, "Overall objective and subjective cure rates were

5    81.5 percent and 83.5 percent, respectively."

6            Is that right?

7        A    Yes.

8        Q    And their conclusion was that "the TVT-O

9    procedure provides high objective and subjective

10   long-term efficacy, a clinically meaningful improvement

11   in patient quality of life and an excellent safety

12   profile."  Is that right?

13           MS. O'DELL:  Object to the form.

14           THE WITNESS:  Yes.

15   BY MR. KOOPMANN:

16       Q    Turn to Page 221, please, of that study.

17           Actually, go back to 220 for a moment.  In the

18   left-hand column, eight lines down, there is a sentence

19   that says, "Current evidence suggests that mid-urethral

20   sling, such as the retropubic tension-free vaginal tape

21   and the transvaginal, tension-free vaginal tape

22   obturator, or transobturator tape, TVT-O, TOT, have

23   become the treatment of choice and are considered the

24   gold standard."

25           Did I read that correctly?

Brian Schwartz, M.D.

```
 1              MS. O'DELL:  Object to the form.

 2              THE WITNESS:  Yes.

 3   BY MR. KOOPMANN:

 4        Q    Is that a statement that you agree with, that

 5   the TVT and TVT-O are the gold standard?

 6        A    Yes.

 7        Q    Now if you'll go to Page 221.  It indicates

 8   there that, in the right-hand column about two-thirds of

 9   the way down, there is a paragraph that says, "There

10   were no major perioperative complications, such as

11   bladder perforations, vessel injuries and obturator

12   hematomas.  One patient, 0.8 percent, reported

13   postoperative voiding difficulties that required tape

14   division three months after surgery."

15              Did I read that correctly?

16        A    Yes.

17        Q    It also says, "Another patient, 0.8 percent,

18   reported the presence of vaginal erosion diagnosed one

19   year after the procedure.  It was situated on the

20   midurethral midline, and a large part of the tape was

21   excised.  At the follow-up visit, no cases of vaginal

22   erosions were detected."

23              Is that correct?

24        A    Yes.

25        Q    They then go on to note, "Assessment of
```

Brian Schwartz, M.D.

```
 1   postoperative urgency symptoms revealed that 76.3

 2   percent of patients with preoperative urgency symptoms

 3   reported an improvement at the time of the visit."

 4        Did I read that correctly?

 5   A    Yes.

 6   Q    And is that one of the articles that supports

 7   your opinion that patients with preoperative urgency or

 8   overactive bladder symptoms improve after a TVT sling

 9   placement?

10   A    Yes.

11        MS. O'DELL:  Object to the form.

12   BY MR. KOOPMANN:

13   Q    On Page 223 in this study, in the right-hand

14   column, the authors note that, "Groin pain may occur

15   after transobturator procedures but mostly settles

16   within the first month following surgery."

17        Is that correct?

18   A    Yes.

19   Q    They then note, "Persistent groin pain can be

20   present in up to 3.8 percent of patients."

21        Is that correct?

22   A    Yes.

23   Q    And then they note, "At follow-up, no patient

24   reported persistent groin pain."

25        Is that right?
```

Brian Schwartz, M.D.

1      A    Yes.

2      Q    Have you been reviewing the literature

3   regarding the TVT-O sling long before you started

4   serving as an expert witness in this litigation?

5      A    Yes.

6      Q    You have been keeping up with the literature

7   regarding incontinence surgeries your entire career; is

8   that true?

9           MS. O'DELL:  Object to the form.  Leading.

10          THE WITNESS:  Yes.

11  BY MR. KOOPMANN:

12     Q    And your review of medical literature, both

13  specifically for purposes of this case and throughout

14  your career as a urologist and surgeon, has formed part

15  of the basis for your opinions that you've set forth in

16  your TVT-O general report; is that correct?

17          MS. O'DELL:  Object to the form.

18          THE WITNESS:  Correct.

19  BY MR. KOOPMANN:

20     Q    And has your experience in treating patients

21  with the TVT-O sling also formed part of the basis for

22  your opinions regarding the safety and efficacy of the

23  TVT-O sling?

24     A    Yes.

25     Q    And has your review of the medical literature

Brian Schwartz, M.D.

```
 1   and your experience regarding the treatment of patients

 2   with the TVT obturator sling also formed the basis for

 3   your opinions regarding the adequacy of the warnings

 4   contained in the instructions for use for the TVT

 5   obturator device?

 6            MS. O'DELL:  Object to the form.

 7            THE WITNESS:  Correct.

 8   BY MR. KOOPMANN:

 9      Q    Do you practice evidence-based medicine?

10      A    Yes.

11      Q    What does that mean?

12      A    That means I do everything possible to rely on

13   the literature to make decisions.

14      Q    And is some literature of greater significance

15   than other types of literature?

16            MS. O'DELL:  Object to the form.

17            THE WITNESS:  There is dramatic diversity in

18       terms of quality of medical literature.

19   BY MR. KOOPMANN:

20      Q    And is there sort of a hierarchy of the levels

21   of different scientific evidence?

22      A    Yes.  With Cochrane reviews and the

23   meta-analyses being at the top of that list.

24      Q    Are the complications that you've seen in your

25   practice after treating patients with the TVT obturator
```

Brian Schwartz, M.D.

```
 1    sling consistent with the warnings that you see in the

 2    Adverse Reaction section of the Instructions for Use?

 3              MS. O'DELL:  Object to the form.

 4              THE WITNESS:  Yes.

 5    BY MR. KOOPMANN:

 6       Q    Your report that's contained in Exhibit 24 for

 7    the TVT-O device, do you hold the opinions set forth in

 8    that report to a reasonable degree of medical and

 9    scientific certainty?

10       A    Yes, I do.

11       Q    Can you think of a single randomized control

12    trial or systematic review and meta-analysis that you've

13    read that talks about the TVT mesh and the TVT sling

14    degrading or being cytotoxic?

15              MS. O'DELL:  Object to the form.

16              THE WITNESS:  No.

17              MR. KOOPMANN:  I think those are all of the

18         questions I have.

19                    REDIRECT EXAMINATION

20    BY MS. O'DELL:

21       Q    Dr. Schwartz, you were asked about the

22    Abdel-fattah publication that was marked as Exhibit 18.

23    I think it's in the bottom of that stack, if I recognize

24    it correctly.  Okay.

25              This study, which is an epidemiological study
```

Brian Schwartz, M.D.

```
1    of the Aberdeen Maternity and Neonatal Database, a

2    Scottish database, evidently, is there any distinction

3    that's made between TVT and TVT-O or are all slings

4    lumped together?

5        A    I don't believe they separate it out.

6        Q    And is that also true of a study that your

7    counsel marked as Exhibit 19, the Jonsson Funk study on

8    sling revision/removal for erosion and urinary

9    retention, long-term risk and predictors?

10           You can look at mine, sir.

11       A    Thank you.  I'm sorry?

12       Q    Is there any distinction that is drawn between

13   retropubic and transobturator slings or are all

14   midurethral slings considered together?

15       A    I don't believe there was a distinction made

16   here.

17       Q    That's right.

18           And we would agree that the risk-benefit

19   analysis of a retropubic and transobturator sling is

20   different because of the different pathways for the

21   implantation of the sling, true?

22       A    True.

23       Q    And if you'll look at the AUA guidelines your

24   counsel asked about, and they were marked as Exhibit 20

25   and you were asked to look at the next to the last page
```

Brian Schwartz, M.D.

1    appendix, A16?

2        A    Yes.

3        Q    And synthetic midurethral slings are not

4    divided in this recitation of these numbers, are they?

5    They are considered in composite?

6        A    Correct.

7        Q    And, sir, you were asked some questions about

8    the Cochrane collaboration, Exhibit 17.  For the record,

9    it's 2015 Cochrane review.

10            I would ask you to turn to 28, Page 28.

11            Do you see that, under Pain?

12       A    Yes.

13       Q    "There was a significantly higher occurrence

14   of groin pain in women who underwent a TOR, or

15   transobturator procedure, than in women who underwent an

16   RPR procedure."

17            True?  Did I read that correctly?

18       A    Yes.

19       Q    You were also asked questions about the Welk

20   study, sir, the Canadian database review?

21       A    Yes.

22       Q    And that epidemiological study does not

23   separate out results between transobturator and

24   retropubic sling, true?

25       A    Correct.

Brian Schwartz, M.D.

1    Q    Similarly, counsel for Ethicon showed you the

2   Unger study and marked it as Exhibit 22.

3    A    Yes.

4    Q    In this study the authors do not distinguish

5   between implantation of a transobturator and retropubic

6   device, true?

7    A    Correct.

8    Q    You were asked about the Zhang article.  I had

9   marked that previously --

10   A    Yes.

11   Q    -- as Exhibit --

12   A    Thirteen.

13   Q    -- 13.

14        And if you'll turn to the last page of this

15  study, it's right before Conclusions.  Do you see on the

16  left-hand side about the middle of the way down the

17  page, there is a sentence beginning "Our data"?

18        Do you see that?

19   A    Middle of the way down the page?

20   Q    Yes.  It says, "Our data demonstrated that

21  14.49 percent of patients experienced a worsened

22  dyspareunia post-operatively."

23        Did I read that correctly?

24   A    Yes.

25   Q    And then, lastly, Dr. Schwartz, counsel for

Brian Schwartz, M.D.

1    Ethicon marked as Exhibit 21 the Tommaselli publication

2    from 2015.

3              And if you'll turn to Page -- I believe it's

4    Page 7 under Figure 2.  It's the same page you were

5    referred to earlier.  I think you are on it.

6              On the left-hand side, do you see where it

7    says, "Complications were more common with a

8    transobturator midurethral sling than with newer

9    minimally invasive tapes"?

10             Do you see that?

11   A    Yes.

12   Q    "This result was due exclusively to

13   pain-related complications which were common with

14   transobturator midurethral slings."

15             Did I read that correctly, sir?

16   A    Yes.

17   Q    Would you agree with me, Dr. Schwartz, that,

18   in light of the literature you relied on, that perhaps

19   increased rates of pain complications with

20   transobturator slings, that for patients who develop de

21   novo pain following the implant of a TVT-O sling, that

22   one of the contributing causes of their pain is the

23   sling itself?

24   A    I would not agree with that.

25   Q    How do you rule out the data that we have just

Brian Schwartz, M.D.

1  reviewed from studies that you rely on in reaching that

2  conclusion?

3      A    The postoperative pain symptoms are from the

4  procedure itself.

5      Q    And what basis do you have for stating that

6  it's only the procedure that contributes to pain, it is

7  not the device itself?

8      A    Because that variability is what accounts for

9  most patients not having that pain, the pain being very

10  transient, and --

11          (Cell phone interruption.)

12          THE WITNESS:  I lost my train of thought.  I'm

13      sorry.  Can you read me the answer?

14          (The record was read back.)

15          THE WITNESS:  Can you read me the question?

16          (The record was read back.)

17          THE WITNESS:  -- that -- a combination of

18      factors, that most patients do not experience any

19      discomfort, the fact -- also the fact that, when it

20      does occur, it typically resolves very quickly,

21      requires very little treatment, if any.

22          If it was the mesh that was accounting for it,

23      I'm convinced that it would not be transient and it

24      would be in a much higher percentage or potentially

25      all patients.

Brian Schwartz, M.D.

1   BY MS. O'DELL:

2       Q    What literature are you relying on to say

3   that, sir?

4       A    I'm relying on what I believe to be the case,

5   based on my clinical experience.

6       Q    Dr. Schwartz, the notebook that's in front of

7   you, are those the articles that you relied on in

8   rendering the opinions in your report?

9       A    Select ones, yes.

10          MS. O'DELL:  I don't have anything further.

11          MR. KOOPMANN:  Okay.

12                    RECROSS EXAMINATION

13  BY MR. KOOPMANN:

14      Q    Dr. Schwartz, you've brought a lot of

15  materials here today with you; is that right?

16      A    Yes.

17      Q    Okay.  And the materials you've brought with

18  you here today are all things that you've reviewed in

19  forming your opinions and relied on in forming your

20  opinions in this case?

21          MS. O'DELL:  Object to the form.

22  BY MR. KOOPMANN:

23      Q    And counsel hasn't marked all of those as

24  exhibits; is that right?

25      A    Yes.

Brian Schwartz, M.D.

```
 1      Q    Okay?

 2           MS. O'DELL:  I've got about two minutes left.

 3      I'll mark them, if that's an issue.

 4           I'm going to mark as exhibit -- what was the

 5      last one you left off?

 6           (Exhibit 25 marked for identification.)

 7           MS. O'DELL:  I'm marking that binder as 25.

 8               FURTHER REDIRECT EXAMINATION

 9  BY MS. O'DELL:

10      Q    What's that, Dr. Schwartz?

11      A    Which one is this?

12      Q    Twenty-five.  I've just marked it and handed

13  it to you.

14      A    What's it called?

15      Q    What is contained in it?

16      A    The TVT-O literature and document set.  It's

17  mostly IFUs and patient brochures.

18      Q    Okay.  And let me ask you to identify what

19  I've marked as Exhibit 26.

20           (Exhibit 26 marked for identification.)

21  BY MS. O'DELL:

22      Q    What's the title of that notebook, sir?

23      A    This is TVT Literature and Document Set.

24      Q    Okay.  And if you'll be so kind as to hand it

25  back to me?
```

Brian Schwartz, M.D.

```
 1              Is this binder I've marked as Exhibit 26 the

 2    TVT literature and document starter set?

 3         A    Yes.

 4         Q    And this was provided to you by Ethicon

 5    counsel?

 6         A    Yes.

 7              MS. O'DELL:  I don't have anything further.

 8                   FURTHER RECROSS EXAMINATION

 9    BY MR. KOOPMANN:

10         Q    Okay.  Doctor, there is an additional document

11    that was part of your file that counsel didn't mark.

12              Can you tell me what that document is labeled

13    as?

14         A    The Device Labeling Guide.

15         Q    Okay.

16         A    From the FDA.

17              MR. KOOPMANN:  Would you mark that as Exhibit

18         27?  We'll mark that as Deposition Exhibit 27.

19              (Exhibit 27 marked for identification.)

20                   FURTHER REDIRECT EXAMINATION

21    BY MS. O'DELL:

22         Q    Have you ever, sir, read that outside -- read

23    Exhibit 27 outside of the context of litigation?

24         A    No.

25         Q    Have you read it inside the context of
```

Brian Schwartz, M.D.

```
 1   litigation?

 2        A    I have reviewed it.

 3        Q    Is that a fancy way of saying you may have

 4   skimmed it?

 5        A    Yes.

 6        Q    Okay.

 7             MS. O'DELL:  I have nothing further.

 8                  FURTHER RECROSS EXAMINATION

 9   BY MR. KOOPMANN:

10        Q    Did you read the Warnings section and Adverse

11   Reaction section of Exhibit 27?

12        A    Yes.

13        Q    Is that one piece of information that you've

14   considered in forming your opinions about the adequacy

15   of the warnings in the TVT-O IFU?

16        A    Yes.

17             MS. O'DELL:  Object to the form.

18             MR. KOOPMANN:  Those are all of the questions

19        I have.

20             MS. O'DELL:  Nothing further.

21             (Deposition concluded at 1:17 p.m.)

22

23

24

25
```

Brian Schwartz, M.D.

1                    CERTIFICATE OF OATH

2

3    STATE OF FLORIDA    )

4    COUNTY OF COLLIER   )

5

6

7            I, Elizabeth M. Brooks, Notary Public, State

8    of Florida, do hereby certify that, BRIAN SCHWARTZ,

9    M.D., personally appeared before me on the 25th day of

10   March, 2016, and was duly sworn.

11

12           Signed this 29th day of March, 2016.

13

14

15                          _____

                            Elizabeth M. Brooks

16                          Notary Public

                            State of Florida

17                          My Commission No. FF 014169

                            Expires:  June 27, 2017

18

19

20

21

22

23

24

25

Brian Schwartz, M.D.

```
 1              CERTIFICATE OF REPORTER

 2   STATE OF FLORIDA

 3   COUNTY OF COLLIER

 4          I, Elizabeth M. Brooks, Registered

 5   Professional Reporter, Florida Professional Reporter, do

 6   hereby certify that I was authorized to and did

 7   stenographically report the deposition of BRIAN

 8   SCHWARTZ, M.D.; that a review of the transcript was not

 9   requested, and that the foregoing transcript is a true

10   record of my stenographic notes.

11          I FURTHER CERTIFY that I am not a relative,

12   employee or attorney, or counsel of any of the parties,

13   nor am I a relative or employee of any of the parties'

14   attorney or counsel connected with the action, nor am I

15   financially interested in the action.

16          DATED this 29th day of March, 2016, at Naples,

17   Collier County, Florida.

18

19                       _____

                         Elizabeth M. Brooks

20                       Registered Professional Reporter

                         Florida Professional Reporter

21

22

23

24

25
```