# EXHIBIT C

```
 1      IN THE UNITED STATES DISTRICT COURT
       FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2
     IN RE:  ETHICON,    :  Master File No.
 3   INC. PELVIC         :  2:12-MD-02347
     REPAIR SYSTEM       :  MDL No. 2327
 4   PRODUCTS            :
     LIABILITY           :
 5   LITIGATION          :
     ----------------    :
 6   ROSE GOMEZ, et al   :  Joseph R. Goodwin
     Case No.            :  U.S. District Judge
 7   2:12-cv-00344       :
 8
 9
10
                   - - -
11
         Thursday, March 31, 2016
12
                   - - -
13
14      Oral deposition of JULIE DROLET, M.D.,
15   taken pursuant to notice, at the Courtyard
16   by Marriott York, 2799 Concord Road, York,
17   Pennsylvania, commencing on the above date
18   at or about 10:05 a.m., before Eileen P.
19   Barth, C.S.R., N.P.
20
21                 - - -
22
23        GOLKOW TECHNOLOGIES, INC.
     877.370.3377 ph  |  917.591.5672 fax
24          deps@golkow.com
```

Page 2

1  APPEARANCES:
2      ZONIES LAW LLC
    BY: JOSEPH ZONIES, ESQUIRE
3      GREG BENTLEY, ESQUIRE
    1900 Wazee Street
4   Suite 203
    Denver, CO 80202
5   Jzonies@zonieslaw.com
    Gbentley@zonieslaw.com
6   Attorneys for the Plaintiff
7
    DRINKER BIDDLE & REATH, LLP
8   BY: MELISSA A. GRAFF, ESQUIRE
    One Logan Square
9   Suite 2000
    Philadelphia, PA 19103-6996
10  Melissa.Graff@dbr.com
    Attorneys for the Defendants
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 4

1          INDEX
2
    WITNESS                    PAGE
3
4   JULIE DROLET, M.D.
5     By Mr. Zonies           5
6
7
8          EXHIBITS
9   EXHIBIT    DESCRIPTION       PAGE
10
    Exhibit 1    Binder 1 of 1      48
11
    Exhibit 2    Binder 2 of 2      48
12
    Exhibit 3*   Thumb Drive        48
13
    Exhibit 1-A  Drolet Case Specific   58
14      Gomez Report
15  Exhibit 4    Julie Drolet Reliance   62
    List in Addition to
16      Material Reference in
    Report, Rose Gomez
17
18  (*Thumb Drive Retained by Mr. Bentley)
19
20
21
22
23
24

Page 3

1      DEPOSITION SUPPORT INDEX
2
    DIRECTIONS NOT TO ANSWER
3   PAGES: None
4   REQUESTS FOR DOCUMENTS OR INFORMATION
    PAGES: None
5
    STIPULATIONS AND/OR STATEMENTS:
6   PAGES: None
7   MARKED QUESTIONS:
    PAGES: None
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 5

1          JULIE DROLET, M.D., having
2      been duly sworn, was examined and
3      testified as follows:
4   BY MR. ZONIES:
5      Q.   Good morning, Doctor. Would
6   you please state your full name for the
7   record?
8      A.   Julie Drolet.
9      Q.   And how do you spell your
10  last name?
11     A.   D as in doctor, R as in Rio,
12  O as in omega, L as in lima, E, T as in
13  Texas.
14     Q.   Doctor, you understand that
15  you're here today as an expert witness in
16  the Ethicon transvaginal mesh litigation;
17  correct?
18     A.   That is correct.
19     Q.   What's your understanding of
20  what your role is today as an expert
21  witness?
22     A.   To give deposition today
23  about Prolift+M and TVT-O.
24     Q.   And we're going to start the

Julie Drolet, M.D.

Page 6

1  morning with the Prolift+M device.  Is
2  that okay?
3      A.   Sure.
4      Q.   Doctor, have you given a
5  deposition before?
6      A.   Yes, I have.
7      Q.   How many times?
8      A.   Total?  Three.
9      Q.   And you gave a deposition in
10  a case entitled Hammons; is that right?
11      A.   Yes.  That would have been
12  my first deposition for an expert.
13      Q.   And that's H-A-M-M-O-N-S?
14      A.   As best I can recall.
15      Q.   I don't want to go over the
16  territory in the Hammons deposition again
17  if I can help it, so I'll try to preface
18  most of my questions with since the
19  Hammon deposition or Hammons and ask you
20  the questions.  Is that okay?  Do you
21  understand what I mean by that?
22      A.   I do.
23      Q.   So for example since the
24  Hammons deposition, have you given any

Page 7

1  other depositions?
2      A.   No, I have not.
3      Q.   And do you have a
4  recollection of when the Hammons
5  deposition was?
6      A.   Friday, November 13th, 2015.
7      Q.   You have a recollection.
8  That's for sure.  Good.
9           Did you ultimately testify
10  in trial at the Hammons case?
11      A.   I did not.
12      Q.   Do you know why not?
13      MS. GRAFF:  Objection.
14      THE WITNESS:  I do not.
15  BY MR. ZONIES:
16      Q.   Do you understand that it
17  did go to trial?
18      A.   I do.
19      Q.   And what do you understand
20  the outcome of that case to be?
21      A.   I think the verdict went to
22  the plaintiff.
23      Q.   Doctor, when did you begin
24  using synthetic meshes to treat prolapse?

Page 8

1      A.   As a resident probably in
2  the late '80s.
3      Q.   And when did you first use a
4  kit?  Do you know what I mean when I say
5  a kit?
6      A.   Commercially available
7  device, mesh, and application device?
8      Q.   Correct.
9      A.   Yes.  Did that probably
10  sometime in May 2005.
11      Q.   And what was the first mesh
12  kit that you used?
13      A.   For pelvic organ prolapse?
14      Q.   Yes.
15      A.   Prolift.
16      Q.   Have you used -- well, when
17  do you think the last time was that you
18  used a pelvic organ prolapse mesh kit?
19      A.   That included the
20  application devices?  Probably 2010,
21  2011.
22      Q.   And then since that time in
23  2010 or 2011 you've continued to use
24  synthetic meshes for treatment of

Page 9

1  prolapse?
2      A.   I have.
3      Q.   And are you -- what type
4  of -- what are you using in that
5  application if not a kit?
6      A.   At this time I'm using
7  Restorelle vaginal mesh.  For
8  sacrocolpopexies I have done various Y
9  meshes, Y-shaped meshes from different
10  companies.
11      Q.   Can you name the companies'
12  meshes?
13      A.   I've used different
14  configuration of the Bard mesh, the
15  Restorelle mesh, we're looking at now
16  Boston Scientific, I've used Gynemesh in
17  different configurations as well.
18      Q.   When you switched from using
19  commercially-available kits to using
20  Restorelle, you testified that that was
21  in about 2010, 2011?  Is that right?
22      A.   That would be about right.
23      Q.   When you made that switch,
24  did you -- since the switch, have you had

Julie Drolet, M.D.

1 success in your operations?
2       A.   I have.
3       Q.   Have you had success that's
4 been about equal to what you feel you had
5 with the commercially-available mesh
6 kits?
7       A.   It depends on your
8 definition of success.
9       Q.   Cure of the prolapse.
10      A.   In the treated compartment?
11      Q.   Yes.
12      A.   I don't have the exact
13 figures, but I would say about the same
14 or a little less.
15      Q.   A little less success?
16      A.   Now, yes.  I've had mesh
17 disinserted from the sacrospinous
18 ligaments.
19      Q.   Can you explain what you
20 mean by that?
21      A.   That there was a good
22 suspension for a few weeks, months, and
23 suddenly without a recurrence of the true
24 cystocele and/or rectocele the apex fell

1 in my vaginal meshes, and that is only
2 for vaginal mesh.  Not sacrocolpopexies.
3 Those successes has been the same
4 throughout the years.
5       Q.   Why did you choose to stop
6 using commercially-available mesh kits?
7           MS. GRAFF:  Object to form.
8       You can answer.
9           THE WITNESS:  After the FDA
10      of 2008 and closer to 2010, 2011
11      where literature was coming out
12      about different kinds of mesh that
13      were now available without kits,
14      the hospital had already a
15      contract with Coloplast which
16      bought Restorelle and it was kind
17      of a joint decision for me to try
18      this and that's how it happened;
19      and eventually Gynecare stopped
20      producing their kits, so it was a
21      no brainer around that time.
22 BY MR. ZONIES:
23      Q.   But originally the decision,
24 were you happy with your decision to stop

1 using the commercial kits?
2           MS. GRAFF:  Object to form.
3           THE WITNESS:  I don't know
4       if I could call it happy to stop
5       the commercial kits, no.  It was a
6       question of what else is there out
7       there, hospital purchasing
8       decisions, combined.
9 BY MR. ZONIES:
10      Q.   Did you voice any
11 disagreement with the hospital about
12 their purchasing decisions to stop
13 purchasing commercially-available kits
14 such as the Prolift?
15      A.   I don't recall.
16      Q.   How would you describe your
17 success with after -- strike that.
18           How would you describe your
19 post-commercial kit success rates in the
20 non-treated compartments?
21      A.   As good as with the kits.
22      Q.   How would you describe the
23 complications and adverse events that
24 your patients experienced --

1           MS. GRAFF:  Object to form.
2 BY MR. ZONIES:
3       Q.   -- between the commercial
4 kits and your time after your last use of
5 a commercial kit?
6       A.   It depends on the kit you're
7 talking about.  Are we talking about just
8 Prolift+M?  Are we talking about --
9       Q.   Let's begin with the
10 Prolift+M and then we can expand if you
11 think that that would be helpful.
12      A.   I don't think I can put a
13 special number on it, but about the same.
14      Q.   Do you keep a log of the
15 surgeries you've performed and the
16 devices you've used in those surgeries?
17      A.   I don't keep a log of the
18 exact devices, but we do have a log of
19 all of the patients that went to surgery
20 since 2005.
21      Q.   You started to keep that log
22 in 2005?
23      A.   At least that's the last we
24 can find.

Julie Drolet, M.D.

Page 14

1    Q.   You've specifically looked
2  for that?
3    A.   Yes, I have.
4    Q.   When did you look for that?
5    A.   Probably in October of 2015.
6    Q.   When you were preparing for
7  your Hammons deposition?
8    A.   That would be correct.
9    Q.   And can you explain to me
10 what it was that you ultimately found?
11 What does the information and data look
12 like?
13   A.   I had my surgery scheduler
14 go through all of the surgical logs for
15 every case I operated since 2005 and go
16 through the dates and just tabulate how
17 many vaginal mesh prolapse surgery I had
18 done and how many slings, midurethral
19 slings.
20   Q.   And was that compiled into a
21 spreadsheet of sorts?
22   A.   No spreadsheet.  Just kind
23 of numbers.
24   Q.   And how was that provided to

Page 15

1  you?
2    A.   On a piece of paper.
3    Q.   Do you still have that piece
4  of paper?
5    A.   Don't think so.
6  Handwritten.
7    Q.   And did you update that at
8  all since the Hammons deposition?
9    A.   I have not.
10   Q.   Do you recollect what the
11 numbers were from 2005 forward for you
12 for the number of prolapse surgeries
13 using vaginal mesh?
14   A.   160 patients received
15 transvaginal mesh for prolapse and 350
16 something for midurethral sling from 2005
17 until 2015 at that time.
18   Q.   And when you had that
19 tabulated, did you ask or see information
20 about which types of vaginal mesh
21 prolapse kits you had used over that
22 timeframe?
23   A.   I did not.
24   Q.   Is that information

Page 16

1  available do you think?
2    A.   No, it wouldn't be in the
3  surgery book.  I have some recollection
4  of what product I have used, but not
5  precise numbers.
6    Q.   So I'd just like to get a
7  sense of what products you used from 2005
8  through 2010-2011 timeframe when you
9  stopped using commercially-available
10 kits.  Do you understand that?
11   A.   Yes.
12   Q.   So starting in 2005, I think
13 you testified that Prolift was the first
14 commercially-available kit that you used;
15 is that right?
16   A.   That would be correct.
17   Q.   And you were trained on that
18 Prolift by whom?
19   A.   By Doctor Vince Lucente.
20   Q.   When you created that
21 tabulation of how many surgeries you had
22 performed between 2005 and 2015, did you
23 have that information roughly by year?
24   A.   No, I did not.  I knew that

Page 17

1  after 2011 the number of surgeries using
2  vaginal mesh, transvaginal mesh had
3  decreased significantly.
4    Q.   So if we start in say May of
5  2005 when you first started to use the
6  Prolift, what was the next commercially
7  available prolapse kit that you used?
8    A.   Prolift+M.
9    Q.   And when did you start to
10 use Prolift+M?
11   A.   I don't recall.  I don't
12 remember when the switch was.
13   Q.   When you started to use
14 Prolift+M, did you stop using Prolift?
15   A.   Yes.
16   Q.   So if we assume in 2005 --
17 or I don't want to assume anything, so
18 let me start over.
19       Starting in 2005 you began
20 using the Prolift kit; correct?
21   A.   That is correct.
22   Q.   And then subsequently the
23 next kit that you used was the Prolift+M;
24 correct?

Page 18

1    A.   That would be correct.
2    Q.   After the Prolift+M, have
3  you -- did you use any other
4  commercially-available kits for treatment
5  of prolapse?
6    A.   For vaginal prolapse? Yes.
7  I can't recall the exact company. I
8  think it was either a Bard product, it
9  had porcine collagen on it and I used two
10 of those and did not use those again, and
11 then I think I went -- I might have used
12 an Elevate, I'm not quite sure, and then
13 went to the Restorelle mesh.
14   Q.   So you began using
15 commercially-available prolapse kits in
16 2005 with the Prolift, subsequently you
17 stopped using the Prolift and started to
18 use exclusively Prolift+M?
19   A.   That would be correct to the
20 best of my recollection.
21   Q.   And then at some point you
22 tried the Bard, what you recollect as the
23 Bard Avaulta, but a kit that used a
24 porcine collagen in the mesh; is that

Page 19

1  correct?
2    A.   That would be correct. It
3  was coated.
4    Q.   And you only used two of
5  those and then stopped?
6    A.   Yes.
7    Q.   And then you moved on to
8  perhaps the Elevate?
9    A.   I'm not sure if I moved on
10 or I went back to Prolift+M and then
11 eventually moved to the Restorelle, but
12 Prolift and Prolift+M have -- I've
13 probably done about 150 or something like
14 that of the Prolift series using Ethicon
15 products.
16   Q.   So of the 160 total that you
17 had your assistant count up, your belief
18 is that about 150 of those were either
19 Prolift or Prolift+M?
20   A.   That's to the best of my
21 recollection, yes.
22   Q.   So the vast majority of your
23 kits?
24   A.   That would be correct.

Page 20

1    Q.   And do you know of that 150
2  how many roughly would have been Prolift
3  as compared to Prolift+M?
4    A.   I do not.
5    Q.   Do you have a sense of in --
6  I know there was sort of a break period
7  in your career where you stopped doing
8  obstetrics; is that right?
9    A.   That would be correct.
10   Q.   In roughly 2008?
11   A.   November 21st, 2008.
12   Q.   You're very good with dates.
13   A.   Certain ones.
14   Q.   So from May of 2005 through
15 that November of 2008, so essentially
16 through all of 2008, do you have a sense
17 of how many of the 150, 160 kits would
18 have been -- you would have used in that
19 timeframe? So roughly three and a half
20 years?
21   A.   Yeah, I don't think it has
22 anything to do with me stopping
23 obstetrics or not. It has to do with the
24 overall I think worldwide decline of

Page 21

1  pelvic floor mesh utilization, patients
2  coming in and saying I don't want that
3  mesh on TV or things like that. So I
4  don't think the numbers really have been
5  affected by me stopping obstetrics. I
6  think it's kind of coincidental and other
7  external factors. So, it was probably
8  consistent throughout and then had I
9  stopped obstetrics in 2006 or 2014, the
10 rate at which I used the mesh would
11 probably have remained the same.
12   Q.   I understand. So I was just
13 trying to give you a point in time where
14 it may have made an impact.
15   A.   No.
16   Q.   It doesn't?
17   A.   I don't think it would have.
18   Q.   I want to try to get the
19 scope of the timeframe when you were
20 using commercial kits for prolapse. It
21 would be roughly May of 2005 through
22 somewhere around the end of 2010? Is
23 that fair?
24   A.   2010, 2011. I can't recall

Page 22

1 exactly.
2    Q.   So that would be roughly
3 five and a half to six years that you
4 were using commercial prolapse kits.  Is
5 that fair?
6    A.   Yes, that calculation would
7 be fair.
8    Q.   And it's your belief that of
9 the 150 Prolift or Prolift+M kits that
10 you used, those would roughly have been
11 used by you at a fairly continuous rate
12 over that period of time?
13       Let me re-ask that.  That
14 was terrible.
15       If we make the assumption
16 that it was about a five-year period,
17 five-and-a-half-year period that you used
18 the commercially-available prolapse kits
19 and you did approximately 160 over that
20 period of time, it seems like that math
21 tells us that you did roughly 30 to 40
22 kits per year.  Is that fair?
23    A.   That would be a calculation,
24 but I don't know in real numbers if that

Page 23

1 happened.  I have a solo practice and so
2 there may be some years where I did it a
3 little bit more and then obviously years
4 I did a little bit less.
5    Q.   But there isn't a particular
6 year where you did 75 kits in one year
7 and another year where you only did 25
8 for example?
9    A.   I don't recall.  I don't
10 have those numbers for you.
11    Q.   Why did you only use two of
12 the Bard Avaultas?
13    A.   Because both patients
14 presented to me two weeks later with a
15 complete dehiscence of their anterior
16 incision and I had used the exact same
17 sutures, the exact same methods to close
18 my vaginal vault.  So I brought those
19 patients back, re-closed the vaginal
20 wall, they did fine, but I never wanted
21 to use that product again.
22    Q.   That's actually something
23 you experienced with slings as well,
24 correct, with the TVT Secur?

Page 24

1    A.   No.
2    Q.   We'll talk about that this
3 afternoon.
4       MS. GRAFF:  Objection.
5 BY MR. ZONIES:
6    Q.   Why did you initially try
7 the Bard Avaulta?
8    A.   As reports came out in the
9 literature and we looked at more and more
10 experiences, there were concerns with
11 vaginal mesh erosion, and I'm not sure
12 again, you call it Avaulta, I'm not sure
13 if that's that company, so whatever mesh
14 that I used that had a collagen overlay
15 was promoted to me as possibly more
16 biocompatible, something like that, and
17 so I agreed to try it instead of what I
18 was using in a standard fashion and those
19 two patients had those dehiscence, and
20 although there weren't any long-term
21 sequela, I decided that I would not use
22 those in my practice.  That was my
23 experience.
24    Q.   And that was prior to using

Page 25

1 whatever that device was -- well, let me
2 ask this.  How did you find out about
3 that device?
4    A.   I think a sales rep came to
5 my office.
6    Q.   And that was a fairly normal
7 way for you to find out information about
8 commercially-available prolapse kits.  Is
9 that fair to say?
10       MS. GRAFF:  Object to form.
11 You can answer.
12       THE WITNESS:  No, not
13 really.  I get a lot of my
14 information from the literature
15 that I review and obviously those
16 companies are named in those
17 studies.  So I obviously knew of
18 different -- the existence of
19 different meshes out there and
20 different mesh companies.  So
21 that's not how I get my
22 information.  I don't get all my
23 information from sales reps as you
24 suggested.

Page 26

BY MR. ZONIES:
Q.   Right, and I don't mean to suggest that you got all of the information that way, but certainly in your practice you interacted with sales reps from various medical device companies; correct?
A.   From time to time.
Q.   And in this case that we're talking about, this mesh that has a collagen component, you testified that you learned about this mesh through a sales rep that came to your office; is that correct?
A.   That's as best as I can recall.
Q.   And when you performed those two surgeries, was it a sales rep in the room with you?
A.   I can't recall.
Q.   Would you sometimes perform surgeries with the company representative in the room with you?
A.   Yes, it happened.  Still

Page 27

happens today.
Q.   And by that what you mean is you'll perform a surgery and a company's sales representative will be in the operating room with you and the patient; correct?
MS. GRAFF:  Object to form.
THE WITNESS:  The sales representative would be in the room, yes.
BY MR. ZONIES:
Q.   And what is the role of the sales representative when you're doing such a surgery?
A.   It depends.
Q.   What do you mean?
A.   Well, right now the rep that comes in from Medtronic, when I do InterStim neuromodulator implants, the rep has a role as I'm sterilely gowned, gloved, and we need to test the leads, I pass an extender cord to the sales rep to make sure that those leads and all the electrodes on the leads are within normal

Page 28

parameters so then I can continue implanting a functional lead and not a defective one.  So that would be the role of that particular rep.
The DaVinci robot rep is sometimes in the room as I'm performing surgery.  Sometimes I don't know that she's there or not or she came and went.  So they come and go and they don't have an active part to play in the surgery.  The rep that has the active part would be the rep from the InterStim company.
Q.   And what about when you were doing Prolift and Prolift+M?  Ethicon had a sales rep that would attend your surgeries; correct?
A.   Some of the times.  Probably in the beginning, yes.
Q.   Do you recall the name I think it's Dave Purcell?
A.   Yes.
Q.   Would Mr. Purcell sometimes attend your surgeries?
A.   Yes, he would.

Page 29

Q.   And when he attended a surgery, would he actually scrub in and be gowned as well?
A.   Absolutely not.
Q.   Not?
A.   Not.
Q.   What was his role during those surgeries?
A.   I think at the beginning he would instruct the nurses how to put the cannula through the guide properly.  The steps where I needed the mesh, he was able to see where I was in the surgery and assist the nurses and that's it.
Q.   And one of the ways that you described that he would assist the nurses would be to help them I think you said position the cannula?  Is that right?
A.   No.  When the kit comes, there are the guides which have the handle and the curved metal portion of the guide and then the cannulas, what I call the soft plastic trocars are separate and they need to be threaded or

Julie Drolet, M.D.

1  inserted passing through the cannula.
2  But they're not showing them how to
3  insert the cannula.  I insert the cannula
4  in the patient.
5      Q.   Understood.
6      A.   And the guide.
7      Q.   So can you describe for me
8  what Mr. Purcell would -- how Mr. Purcell
9  would help your nurses?
10      A.   Well, he was behind my back
11  because the table and the nurses were
12  behind, but I can hear him, you know,
13  open up the package or give the package
14  to the nurse, the box to the nurse so
15  that the nurse could open the box and
16  then peel the package making sure that
17  they would lift both the mesh and the kit
18  which is still in plastic in a safe
19  sterile manner.
20           So he directed what was
21  going on on the table.  And if this was a
22  nurse that had never seen Prolift in the
23  first few months or cases that I had
24  done, then he would instruct the nurse

1  how to correctly thread the soft cannula
2  over the guide.
3      Q.   And aside from that, as the
4  operation went further into it, did he
5  have any role in that room?
6      A.   Not that I can recall or I'm
7  aware of, no.
8      Q.   Why did you make the switch
9  from Prolift to Prolift+M?
10      A.   I don't recall.
11      Q.   Do you recall how you found
12  out about the Prolift+M?
13      A.   I don't have a specific
14  recollection, no.
15      Q.   Did you receive any training
16  specific to the Prolift+M?
17      A.   No, I did not.
18      Q.   How would you compare your
19  results from your memory between the use
20  of Prolift and Prolift+M?
21      A.   I don't think I can track
22  specific results and specific patients.
23  Certainly no worse.  Maybe better.  I
24  don't know.

1      Q.   And that's in part because
2  you don't, as you said, you don't have a
3  log of specific patients, the specific
4  device you used in that patient and the
5  specific outcome of whether it be safety
6  or efficacy for that patient with that
7  device.  Is that fair?
8           MS. GRAFF:  Object to form.
9           THE WITNESS:  It would be
10      fair to say that I don't have a
11      specific log for each individual
12      patient.  That would be correct.
13  BY MR. ZONIES:
14      Q.   You've never undertaken an
15  analysis of how many patients and which
16  patients you've implanted a certain
17  device on and what the success and safety
18  outcomes were for each of those patients;
19  is that correct?
20      A.   I've not performed a
21  prospective or retrospective cohort
22  study, but I do see all of my patients
23  postop at two weeks, six weeks, six
24  months and a year, and so it's been my

1  experience with my patients and reviewing
2  the literature that things are going
3  pretty well.
4      Q.   And when you say that you
5  have the follow-up with your patients up
6  to one year, that's for patients who
7  continue to see you; is that correct?
8      A.   Most of them still do.
9      Q.   But you have some, if this
10  were a study, you would have loss to
11  follow-up for example?
12      A.   I would expect that.
13      Q.   I may have asked this and
14  I'm sorry if I did, but did you receive
15  any specific training on the +M?
16      A.   No, I did not.
17      Q.   Did you watch any training
18  videos that were specific to the +M prior
19  to using it or while using it in your
20  practice?
21      A.   Not that I can recall.
22      Q.   Did you receive any
23  Prolift+M specific instructions for use
24  or IFUs?

Julie Drolet, M.D.

Page 34

1    A.   Well, the IFU came with the
2  Prolift+M and all the training and
3  insertion of the mesh was given to me
4  when I went for the Prolift, and so the
5  only thing that changed in the actual kit
6  was the type of mesh, but the cannulas,
7  the retrieval device and the guide were
8  all the same.
9    Q.   Did you find that the meshes
10  themselves between the Prolift and the
11  Prolift+M were in any way different?
12    A.   When they come out of the
13  box, I did not notice a huge difference
14  and that's probably because of the
15  Monocryl filament, but the overall weight
16  of the mesh is a little less with
17  Prolift+M than Prolift.
18    Q.   Out of the box?
19    A.   So out of the box don't feel
20  much difference, but after the patient
21  has had the Monocryl portion of the mesh
22  resorbed, then the overall amount of
23  polypropylene is less with Prolift+M than
24  with Prolift.  So I don't know how it

Page 35

1  would feel if I were to, you know, touch
2  a Prolift minus M out of the box.
3    Q.   When you were using the
4  Prolift+M as compared to the Prolift, did
5  you find that it was easier to work with
6  when you were implanting it than with the
7  Prolift?
8    A.   I don't recall a specific
9  difference.
10    Q.   And do you know how long it
11  takes for the resorption to occur?
12    A.   I think most resorption is
13  done, completed, around 84 days, 90 days.
14    Q.   And when you would follow-up
15  with a Prolift+M patient of yours, would
16  you notice a difference in your exam of
17  that patient at 90 days as compared to
18  the Prolift?
19    A.   I wouldn't because I saw
20  patients at two weeks, six weeks,
21  hopefully six months and hopefully a
22  year, so I did not make a specific
23  appointment for them to see me at the
24  three-month mark.

Page 36

1    Q.   How about at the six-month
2  mark?  Did you notice a difference in
3  your examination of the patient between
4  those patients for whom you used Prolift
5  and then as compared to those where you
6  used Prolift+M?
7    A.   Not anything that was
8  significant that I can recall.
9    Q.   Have you ever seen a --
10  strike that.
11         Have you ever received any
12  training -- strike that too.
13         Have you ever seen any
14  Prolift+M specific videos?
15         MS. GRAFF:  At any time?
16  BY MR. ZONIES:
17    Q.   At any time.
18    A.   As I sit here, I'm not sure
19  if it was a specific video for Prolift or
20  Prolift+M.
21    Q.   So as you sit here, you're
22  not certain whether you've ever seen a
23  Prolift+M specific training video
24  produced by Ethicon for example?

Page 37

1    A.   Not at the time.  I think
2  recently I've watched so many videos that
3  were provided for me for this particular
4  case that that might have been part of
5  it, but I don't have the serial number
6  that goes with it off the top of my head.
7    Q.   In your preparation for
8  today's deposition or the Hammons
9  deposition, did you review some training
10  videos produced by Ethicon?
11    A.   I reviewed training videos
12  produced by Ethicon, yes.
13    Q.   Do you have a recollection
14  of whether any of those were specifically
15  Prolift+M training videos?
16    A.   With the Hammons case it
17  wouldn't have been.  It was a Prolift
18  case.  And for this case, I can't
19  specifically recall if what I watched was
20  a Prolift or Prolift+M.
21    Q.   I'd like to talk about what
22  you've done and the work you've done
23  since the Hammons deposition and between
24  today.  Okay?  So just focusing on your

Julie Drolet, M.D.

Page 38

1  work as an expert witness between
2  November of 2015 and today.  Is that --
3      A.  That's correct.  Okay.
4      Q.  Okay?  So subsequent to your
5  deposition in the Hammons case, have you
6  produced any expert reports other than
7  your expert report in this case?
8      A.  I have not.
9      Q.  Can you tell me what you did
10  to prepare for today's deposition?
11      A.  I met with Attorney Graff
12  yesterday, I read my expert report.
13      Q.  Anything else?
14      A.  I mean since the Hammons
15  case I've read articles of literature,
16  background material that was sent to me
17  by Ethicon, did a pub med literature
18  search looking for different articles.
19      Q.  Anything else?
20      A.  Not that I recall.
21      Q.  How long did you meet with
22  Ms. Graff yesterday?
23      A.  About 9:00 to 5:00.
24      Q.  And other than -- was anyone

Page 39

1  else in attendance at that meeting?
2      A.  No.
3      Q.  Was anyone on the phone?
4      A.  No.
5      Q.  Had you ever met Ms. Graff
6  before yesterday?
7      A.  Never.
8      Q.  Did you meet with or have
9  telephone calls with any other attorneys
10  about your expert work in this case?
11      A.  Yes.
12      Q.  Tell me about that.
13      A.  I had contacts with Attorney
14  Paul Rosenblatt.
15      Q.  And when was that?
16      A.  We met I think the last week
17  of January of 2016.
18      Q.  Where was that meeting?
19      A.  That was here in York.
20      Q.  And who was in attendance?
21      A.  Just he and I.
22      Q.  Is that when you were first
23  asked to work on the Prolift+M case?
24      A.  No.

Page 40

1      Q.  When were you first asked to
2  work on Prolift+M?
3      A.  I was given the charts for a
4  specific patient case sometime in
5  December of 2015.  I met with him prior
6  to giving my -- or preparing my expert
7  case specific report.
8      Q.  And that's in the --
9      A.  That was February 29th,
10  2016.
11      Q.  That's in the Gomez case?
12      A.  That is in the Gomez case.
13      Q.  So in December of 2015, you
14  were first approached to work on a case
15  specific expert report for the Gomez
16  case?
17      A.  That is correct.
18      Q.  At that time in December of
19  2015 did you receive materials that were
20  about Prolift+M as well or was it just
21  the medical and case specific files for
22  Ms. Gomez?
23      A.  I don't recall exactly when
24  those thumb drives started to arrive, but

Page 41

1  I think it was in 2016.  The end of 2015
2  were more patient specific.  At one point
3  they did start sending material on the
4  Prolift+M and videos and drawings on
5  TVT-O as well and that came through those
6  little thumb drives.
7      Q.  And those came in January of
8  2016?
9      A.  I think so, but I can't be a
10  hundred percent sure if some came at the
11  end of the year or not.
12      Q.  And when did you issue your
13  expert report on Prolift+M and TVT-O?
14      A.  I never issued an expert
15  report specifically for Prolift+M or
16  TVT-O.  I issued a case report for the
17  Gomez case February 29th of 2016.
18      Q.  And what do you mean by that
19  distinction that you just made that you
20  -- so is it your testimony that you've
21  never issued a general causation expert
22  report for Prolift+M?
23      A.  You'd have to tell me what
24  your definition is of expert report for

Julie Drolet, M.D.

1  Prolift+M and TVT-O.  Since Mrs. Gomez
2  has had both, those are generally
3  included in my expert report, but you
4  didn't ask me about the Gomez report.
5      Q.   Do you have any other
6  reports other than the Hammons report and
7  the Gomez report?
8      A.   I do not.
9      Q.   So you don't have an expert
10  report that discusses Prolift+M in
11  general?
12     A.   I don't have an exclusive
13  report that only talks about Prolift+M.
14     Q.   The portions of your report
15  in the Gomez case that talk about
16  Prolift+M, do you consider those to be a
17  complete opinion about the safety and
18  efficacy of the Prolift+M?
19     A.   As complete as I can give at
20  this point in time.
21     Q.   And what do you mean by
22  that?
23     A.   That there are probably 500
24  articles, maybe more, in the literature

1  on prolapse and use of mesh.  The
2  literature gets added onto just about
3  every day, and so at this point in time
4  that's my best opinion on Prolift+M.
5      Q.   Would you consider the
6  opinions that you provided in the Gomez
7  case concerning Prolift+M, would you
8  consider that you've had sufficient time
9  to do a thorough study of the Prolift+M?
10         MS. GRAFF:  Object to form.
11         THE WITNESS:  With my
12     experience and what I've read over
13     the years plus what I have read
14     over the last few months, I think
15     yes.
16  BY MR. ZONIES:
17     Q.   Would you -- are you
18  confident that you have reviewed all of
19  the information that you need to have
20  reviewed to express your opinion to a
21  reasonable degree of medical certainty
22  about the safety and efficacy of the
23  Prolift+M device?
24     A.   I do.

1      Q.   When you said that it's as
2  complete an opinion as you can give at
3  this time, do you mean by that that at
4  this time because new literature is still
5  coming out that you haven't had a chance
6  to review it yet because it hasn't been
7  published?
8      A.   That's a possibility.
9      Q.   What else did you mean by
10  "at this time"?
11     A.   I think given more time
12  there may be other articles that are not
13  cited, but the major articles published
14  in the literature I've based my opinion
15  on plus my experience, so I would have to
16  agree it would have to come out in
17  unpublished literature not published yet.
18     Q.   Are your opinions about the
19  Prolift+M as set forth in your Gomez
20  report, are those opinions applicable to
21  other patients other than Ms. Gomez as
22  far as the safety and efficacy of the
23  Prolift+M?
24     A.   As far as the reported

1  safety and efficacy, yes.
2      Q.   Those opinions are not
3  specific to Ms. Gomez' case?
4      A.   The general opinions that
5  are cited in my expert report concerning
6  Prolift+M and my review of literature are
7  specific to Prolift+M to a reasonable
8  degree of medical certainty.
9      Q.   And what does that mean to
10  you, "reasonable degree of medical
11  certainty"?
12     A.   It means more likely than
13  not.
14     Q.   Did you bring any materials
15  or documents with you today other than
16  the thumb drive you provided?
17     A.   I did not bring the thumb
18  drive, Melissa Graff did, and I have this
19  box here of materials that were delivered
20  to me last Thursday.
21         Should I give them to him?
22         MS. GRAFF:  Yeah.  That's
23  fine.
24         Just for the record, what's

Julie Drolet, M.D.

Page 46

1  in those binders is what's on the
2  thumb drive.
3      THE WITNESS:  That was
4  delivered to me Thursday of last
5  week.  Thursday afternoon.
6      MR. ZONIES:  I don't know
7  what we're going to do about
8  marking them.
9      MS. GRAFF:  So again,
10 everything in here is what's on
11 the thumb drive and she doesn't
12 have any notes, so you can flip
13 through it if you want to, but
14 they're the same.
15 BY MR. ZONIES:
16     Q.   So it's your understanding,
17 Doctor, that what's in these two binders
18 is also what is on that thumb drive.  Is
19 that fair to say?
20     A.   Not quite.
21     Q.   Go ahead and tell me your
22 understanding.
23     A.   I went through all of those
24 over the weekend and there are some

Page 47

1  articles there that although have a title
2  are not the correct articles.  This was
3  prepared by Butler Snow, it arrived from
4  Butler Snow, and what they took were my
5  references and plugged in the articles,
6  except there are three or four articles
7  in there that have nothing to do with
8  pelvic floor, wrong author, one of them
9  is on laparoscopic adrenalectomy, the
10 other one is on ovarian reserve after
11 laparoscopic salpingectomy, so I have,
12 good luck with that, I have informed Mrs.
13 Graff of this yesterday but I've also
14 informed Attorney Rosenblatt Sunday night
15 wee hours of Monday morning, I think it
16 was 12:04 when my email was sent to him
17 about the corrections that needed to be
18 made to this.
19     Q.   And when you say "this",
20 you're pointing to the binder?
21     A.   I am pointing to the binder.
22         Subsequently, yesterday
23 Attorney Graff was able to get the
24 correct articles from Butler Snow and put

Page 48

1  them on the thumb drive.  That will be
2  the difference.
3      MR. ZONIES:  So why don't we
4  go ahead mark these as Exhibits 1
5  and 2 and the thumb drive as
6  Number 3.
7      (Whereupon, the court
8  reporter marked Exhibits 1, 2 and
9  3 for identification as of this
10 date.)
11     THE WITNESS:  Some of these
12 --
13     MS. GRAFF:  Just a minute.
14 BY MR. ZONIES:
15     Q.   So you were saying, Doctor?
16 Go ahead.
17     A.   Some of them have the
18 correct author, but that same author
19 published different articles in the same
20 year, and so there are one or two of them
21 that are not the correct articles cited
22 in my reference although it is the same
23 author and the same year.  Just
24 different.

Page 49

1      Q.   Understood.  So the two
2  binders that we've marked as Exhibits 1
3  and 2 are entitled Materials Referenced
4  in Drolet Report; is that right?
5      A.   Correct.
6      Q.   And are these -- did you
7  direct that these materials be gathered?
8      A.   I did not direct it, no.
9      Q.   Are these materials that are
10 cited in the body of your report?
11     A.   Most of them, yes.  Some of
12 them, no.  These are -- there's an expert
13 report here from Doctor Garely specific
14 to the Hammons case, depositions of
15 Doctor Albrecht.  So some of them are in
16 my report, but there's a few here that
17 are not in my report, but these are the
18 binders that were sent to me and what I
19 was told to bring today.
20     Q.   And who told you to bring
21 them today?
22     A.   Attorney Graff.
23     Q.   I'm now holding Exhibit 2,
24 Materials Referenced in Drolet Report

Page 50

1 Binder 2 of 2 and one of the tabs is
2 called Depos and CER; is that right?
3     A.   That's what it says.
4     Q.   And behind those tabs,
5 behind that tab are the 2015 Margolis CER
6 4/24/15. Is that what that tab says?
7     A.   With my glasses from here,
8 yes, it absolutely looks like that.  Yes.
9     Q.   And can you tell me what is
10 that behind that tab?
11     A.   It's the expert report of
12 Michael Thomas Margolis.
13     Q.   In what case?
14     A.   This is Ramirez Galindo,
15 Plaintiff.
16     Q.   And have you ever read that
17 expert report?
18     A.   That was sent to me.
19     Q.   When?
20     A.   Sometime this winter, so
21 between January 1st, 2016 up until
22 probably beginning of March.  Sometime
23 like that.  I'm not sure.
24     Q.   Do you think it was sent to

Page 51

1 you prior to your issuing your expert
2 report in the Gomez case?
3     A.   That one I'm not sure.
4     Q.   Okay.  What about the next
5 one?  What is the title on the next tab?
6     A.   The next tab is 2016
7 Albrecht -- A-L-B-R-E-C-H-T --
8 2016-02-08.  That I received before my
9 report.
10         Ostergard, Donald, expert
11 report.
12     Q.   And you're looking at a tab
13 now that's -- what's the case name on the
14 top of that document?
15     A.   Is that -- is this here?
16     Q.   Yes.
17     A.   This is Kari Smith v.
18 Ethicon.
19     Q.   When do you think you
20 received that report from Doctor
21 Ostergard?
22     A.   I think I got this last
23 Thursday.
24     Q.   For the first time?

Page 52

1     A.   Yes.  I don't recall seeing
2 this at all.  I don't remember Kari
3 Smith.  So this was put in my binder that
4 was sent to me and I did not read this.
5     Q.   You don't think you read
6 that in preparation for this deposition?
7     A.   I'm convinced.  I'm certain
8 I did not read this.
9     Q.   Okay.  Now that you've seen
10 that, if you look back at the Margolis
11 expert report we were just looking at,
12 that tab in Binder Number 2 is 2015
13 Margolis CER 4-24-15 for a case caption
14 that is Ramirez.  Do you think that you
15 read that prior to your doing your report
16 in this case?
17     A.   I don't think I have.  That
18 I'm -- this one I'm not quite sure.
19     Q.   Okay.  May I?
20     A.   Oh, absolutely.
21     Q.   Thank you.
22         And then the last tab in
23 this second binder that's marked as
24 Exhibit 2 is the tab says Prolift -

Page 53

1 Garely -- G-A-R-E-L-Y -- and I'm going to
2 hand that to you and ask you if you've
3 read that prior to doing your report in
4 this case.
5     A.   I'll have to read it all to
6 remind myself just to be sure, but I do
7 recall a general report and a Doctor
8 Garely.  Is it the same physician?  I'm
9 not sure because I don't recall seeing
10 pictures, so I don't think I've read
11 this.
12     Q.   Okay.  May I have that
13 binder back, Doctor?
14     A.   Yes, you certainly may.
15     Q.   Thank you.
16         MS. GRAFF:  We've been going
17 for about an hour, Counsel.  Is
18 there a time when we can take a
19 break?
20         MR. ZONIES:  Any time.  Why
21 don't we go ahead and take a
22 break?
23         (Whereupon, a brief recess
24 was held from 11:10 a.m. to 11:18

Page 54

1    a.m.)
2    BY MR. ZONIES:
3        Q.   Doctor, after a break, are
4    you ready to go?
5        A.   I am.
6        Q.   Did you bring with you today
7    any invoices for the work you've done on
8    this expert report?
9        A.   I did not.
10       MS. GRAFF:  I think it's on
11   the thumb drive.
12       THE WITNESS:  It's on the
13   thumb drive.
14       MR. BENTLEY:  Maybe.
15   BY MR. ZONIES:
16       Q.   In addition to the invoices
17   and copies of some of the documents in
18   Binders 1 and 2 and the corrected studies
19   for what you intended to be in Binders 1
20   and 2, is there anything else on that
21   thumb drive?
22       A.   I would not know.  I've not
23   seen the thumb drive.  I wasn't privy to
24   it.  I think -- I don't know when my

Page 55

1    attorney received it.  I have no idea.
2        Q.   Right.
3        MS. GRAFF:  I received it
4        yesterday after I met with her, so
5        she has not seen it.
6    BY MR. ZONIES:
7        Q.   You said that you went
8    through these binders when you received
9    them on Thursday; correct?
10       A.   I said I received them on
11   Thursday and I went through them over the
12   weekend.
13       Q.   And while going through the
14   binders you identified some errors in the
15   scientific articles that were included in
16   these binders as compared to what you
17   intended to be included in the binders.
18   Is that fair?
19       A.   They were not the correctly
20   cited articles.  I did not read through
21   those incorrect articles.
22       Q.   Have you had a chance to
23   review the thumb drive to ensure that the
24   corrected versions of those articles are

Page 56

1    on the thumb drive?
2        A.   I have not seen the thumb
3    drive.  It arrived to Attorney Graff, in
4    Attorney Graff's possession after we had
5    met.
6        Q.   So the answer is, no, you
7    don't know that the thumb drive actually
8    contains the correct materials either?
9        A.   The corrected materials were
10   added on this morning by Attorney Graff
11   and I did see that she did add on those
12   articles.
13       Q.   And this morning did you
14   notice if was anything deleted off of the
15   thumb drive or were the incorrect ones
16   also left on there?
17       A.   I don't exactly have any
18   confirmation of that one way or the
19   other.
20       Q.   And in making those
21   corrections to the materials that were in
22   these binders, did you focus only on the
23   scientific studies?
24       A.   I mostly did, yes.

Page 57

1        Q.   So we were just looking at,
2    for example, a number of expert reports
3    from Plaintiff's experts that appear they
4    also may be incorrect but you didn't
5    review those to notice that they were
6    incorrect; correct?
7        A.   I don't know if I would
8    characterize them as incorrect, but those
9    are materials that I may not or would not
10   have viewed in order to prepare my expert
11   report.
12       Q.   Understood.  So I have what
13   I believe to be a copy of your expert
14   report.  Did you bring a copy of your
15   expert report with you today?
16       A.   I did not, but it's in the
17   binder.
18       Q.   Great.  Thank you.
19       So in the Exhibit 1 entitled
20   Materials Referenced in Drolet Report
21   Binder 1 of 2, you have in the first tab
22   the Drolet Case Specific Gomez is what it
23   states.  Would this be your expert report
24   in this case?

Julie Drolet, M.D.

1      A.   That would be.
2      Q.   This would be your expert
3   report about the safety and efficacy of
4   Prolift+M; is that correct?
5      A.   That would be included in
6   the Gomez report because she had
7   Prolift+M along with TVT-O.
8      Q.   Doctor, I'm going to go
9   ahead and we'll replace this first tab
10  into the binder after we finish, but I'll
11  go ahead and mark as Exhibit 4 the first
12  tab from Exhibit 1.
13         MR. ZONIES:  Should we call
14      it 1-A?  What would you prefer?
15      Why don't we call this 1-A
16      then?  I'll correct that on the
17      record.
18         (Whereupon, the court
19      reporter marked Exhibit 1-A for
20      identification as of this date.)
21         MR. ZONIES:  I misspoke.
22      What we've marked as Exhibit 1-A
23      is the first tab in Binder 1 which
24      is Exhibit 1.

1   BY MR. ZONIES:
2      Q.   Is this your expert report
3   on Prolift+M?
4      A.   It is my expert report in
5   the case of the Rose Gomez case.
6      Q.   And that includes your
7   opinions on the safety and efficacy of
8   Prolift+M; correct?
9      A.   That would be correct.
10     Q.   You issued a reliance list
11  with your report.  Do you have a copy of
12  that reliance list with you today?
13     A.   I do not.
14     Q.   Doctor, can you look at that
15  report on the last page?  I believe you
16  signed it on the last page.  Is that
17  right?
18     A.   That is correct.
19     Q.   And what is the date of your
20  signature?
21     A.   That date is March 1st,
22  2016.
23     Q.   And is that when you
24  actually signed that document?

1      A.   Yes.  It was after midnight.
2      Q.   After midnight of?
3      A.   Well, from the February
4   29th --
5      Q.   Yes.
6      A.   -- to March 1st.
7      Q.   So you signed it on March
8   1st, but it was in the early hours of
9   March 1st.  Is that fair?
10     A.   Kind of sort of.
11     Q.   What do you mean?
12     A.   The whole report was
13  finished on February 29th of 2016 before
14  midnight, but I did not have the
15  capability of scanning a signed
16  signature.  So the whole report was sent
17  and then Butler Snow had it in their
18  possession and the next morning they said
19  scan it when you get to the office with
20  your signature and we'll add to it.
21     Q.   Understood.
22     A.   That's why the dates are
23  different.  I didn't put this date.  They
24  did.

1      Q.   So you had completed the
2   report and sent it to the attorneys at
3   Butler Snow unsigned?
4      A.   That would be correct
5   because I don't have the capacity to sign
6   on my computer.
7      Q.   And then you subsequently
8   executed the signature page with the
9   March date on it and scanned and emailed
10  that to Butler Snow?
11     A.   That would be correct.
12     Q.   When you signed it and
13  emailed it on March 1st, did you just
14  review that single page or did you review
15  the entire report one more time?
16     A.   Only the back of the last
17  page.  That back page was sent like this.
18     Q.   Okay.  So you didn't have a
19  chance to review the entire report prior
20  to sending your signature?
21     A.   It wasn't sent back to me,
22  no.
23     Q.   Doctor, I'm going to hand
24  you -- have marked and hand you Exhibit

Page 62

1 Number 4.
2        (Whereupon, the court
3    reporter marked Exhibit 4 for
4    identification as of this date.)
5 BY MR. ZONIES:
6    Q.   Doctor, do you have Exhibit
7 Number 4 in front of you?
8    A.   Yes, I do.
9    Q.   And what is Exhibit Number
10 4?
11    A.   It says Reliance List in
12 Addition to Materials Referenced in
13 Report, Rose Gomez.
14    Q.   And have you seen this
15 document before?
16    A.   I've seen a document like
17 this yesterday afternoon while meeting
18 with Attorney Graff.
19    Q.   And was that the first time
20 you saw this document?
21    A.   Yes, it was.
22    Q.   You didn't actually prepare
23 this document?
24    A.   I did not type this

Page 63

1 document.  That is correct.
2    Q.   And yesterday when you went
3 through this document, did you find any
4 concerns or mistakes in this document?
5    A.   I did have some things that
6 I wasn't quite sure I had read.
7    Q.   Okay.  Such as?
8    A.   Well, I'd have to go through
9 it, or referenced, and I don't know if
10 this is the same copy of what I saw
11 yesterday.
12    Q.   Understood.
13    A.   When did you receive this?
14    Q.   If you see up at the top, it
15 says 2/29/2016.  Do you see that?
16    A.   Yes, I see that.
17    Q.   That's when.  It was issued
18 with your report.
19    A.   Okay.  So I did not know if
20 that's when you --
21    Q.   So would it be fair to say,
22 Doctor, that certainly as of 2/29/2016,
23 the date on the top of this and when your
24 report was issued you had not seen this

Page 64

1 document?  Correct?
2    A.   That would be correct.  The
3 typed form of this document.  Right.
4    Q.   And as you can see, the
5 first 14 pages of this document is
6 entitled Medical Literature; is that
7 correct?
8    A.   That would be correct,
9 excluding the first page, the title page.
10    Q.   And as we're sitting here
11 today, do you have any way of knowing
12 which of these studies you actually
13 reviewed prior to creating your expert
14 report?  Strike that.
15        As we're sitting here today,
16 Doctor, do you any way of knowing absent
17 going through each piece of literature
18 one by one which of these you actually
19 reviewed and relied upon in the
20 preparation of your expert report in this
21 case?
22        MS. GRAFF:  Object to form.
23    You can answer.
24        THE WITNESS:  I would say

Page 65

1 the vast majority.
2 BY MR. ZONIES:
3    Q.   The vast majority of what?
4    A.   Of all of these articles.
5    Q.   So for example, there's an
6 article by Waltregny in this reliance
7 list.  Do you think you read that
8 article?
9    A.   I haven't gone through it
10 yet.
11        MS. GRAFF:  There's actually
12    two.
13        THE WITNESS:  There are two
14    on there.  I'm not quite sure
15    which one of those.
16 BY MR. ZONIES:
17    Q.   Do you think you reviewed
18 either of those?
19    A.   I can't recall at a hundred
20 percent that I have for the preparation
21 of this case.
22    Q.   Understood.  Well, those
23 are, for example, those are Waltregny
24 documents --

Julie Drolet, M.D.

1    A.   Actually, I have -- let me
2  rephrase this.  I have definitely the one
3  with deLeval, the 2009, yes.
4    Q.   You think you have reviewed
5  that one?
6    A.   I have reviewed it.
7    Q.   That's not a journal that
8  you subscribe to I assume, "The
9  International Urogynecologic Journal"?
10    A.   I do not.  It's the
11  "International Urogynecological Journal
12  of Pelvic Floor Dysfunction", but part of
13  the pub med list of articles that I
14  periodically submitted to Butler Snow so
15  that they could send me the articles.
16    Q.   And do you know how the
17  articles were chosen to be put on this
18  medical literature reliance list?
19    A.   Some of these are probably
20  derived from my first reliance list for
21  the Hammons case.
22    Q.   Okay.
23    A.   And some of these articles,
24  a lot of them or a portion of them I have

1  asked for those articles from Butler Snow
2  and they said they would add them onto my
3  reliance list.  That's how Attorney
4  Rosenblatt said he would do it.
5    Q.   Okay.  And after the section
6  on medical literature, there's a section
7  called document description or it's
8  actually called Production Materials.  Do
9  you see that section?
10    A.   Yes.
11    Q.   What's your understanding of
12  what that means, Production Materials?
13    A.   Those are materials that
14  were produced by Ethicon, internal
15  documents, anatomy video.
16    Q.   In looking at this list here
17  as you're sitting here today, do you
18  believe that you've reviewed all of these
19  documents?
20    A.   Most of them, yes.  Some of
21  them I can't make the cross reference.
22  As an example, anatomy video Ethicon,
23  ETH-MESH-PM000006 versus the 000009,
24  those things were not included as far as

1  nomenclature in the thumb drives so
2  there's no way for me to currently as we
3  speak now be a hundred percent sure that
4  the cross reference was made.  I was not
5  sent anything in any type of order or
6  alphabetical order or numerical order,
7  and so this is the list that they have
8  given me.
9    Q.   And you said that you would
10  have received these items on a thumb
11  drive; is that right?
12    A.   That is correct.  The
13  experts' reports here that are on the
14  last few pages --
15    Q.   Yes.
16    A.   -- the Blaivas, Jerry,
17  Prolift report, TVT Abbrevo, Exact, all
18  these I've not seen.  I am not quite sure
19  if I have received the expert report from
20  Doctor Elliott either.
21    Q.   So you're looking on the --
22    A.   They're not numbered.  The
23  third to last page.
24    Q.   -- third to last page of

1  Exhibit 4, your reliance materials where
2  it lists at the top it says
3  depositions --
4    A.   Yes.
5    Q.   -- and then it says Expert
6  Reports; correct?
7    A.   Correct.
8    Q.   And under Expert Reports, it
9  says there are six expert reports listed
10  for Doctor Blaivas; correct?
11    A.   That's correct.  I don't
12  believe I've read any of those.
13    Q.   Okay.  And that includes his
14  Prolift report and his TVT-O report;
15  correct?
16    A.   That's correct.
17    Q.   You haven't read those;
18  correct?
19    A.   That would be correct.
20    Q.   And then there's four expert
21  reports from Doctor Elliott including a
22  Prolift and a TVT-O; correct?
23    A.   Correct.
24    Q.   And it's your recollection

Page 70

1 that you have not reviewed those either?
2    A.   Not the TVT, TVT-O and
3 TVT-S. I'm not quite about the Prolift
4 general, if that wasn't provided to me in
5 the previous case because it was a
6 Prolift case, that could have been
7 provided to me by the Hammons case, but
8 it's not something that I reviewed for
9 this case here, the Gomez case.
10    Q.   How about the Garely
11 Prolift+M general report?  Have you ever
12 reviewed that?
13    A.   I think that was sent to me
14 for this case, the Margolis report
15 possibly, the Ostergard report, yes.  The
16 Rosenzweig five reports on Prosima, TVT
17 and TVT-O I have not received those, did
18 not read.
19    Q.   So the Garely Prolift+M
20 general report that has a date next to it
21 of February 1st, 2016, it's your belief
22 that you may have reviewed that expert
23 report?
24    A.   I may have.  I'm just not a

Page 71

1 hundred percent sure.
2    Q.   And if we look in the
3 binders that you've brought with you
4 today, that report is not in the binders
5 that you provided in Exhibits 1 and 2?
6    A.   Somebody would have to check
7 to be sure.  Or is it?
8    Q.   Doctor, I'm going to go
9 ahead and hand you Exhibit 2 which is the
10 second binder of materials that you
11 brought with you today and the last tab
12 is actually an expert report from Doctor
13 Garely but it's entitled I think Prolift;
14 is that right?
15    A.   That's correct.
16    Q.   And that's not a Prolift+M
17 expert report from your quick review?
18    A.   From the title it says
19 Prolift.
20    Q.   So do you think that you
21 reviewed Doctor Garely's Prolift report
22 that you're looking at now?
23    A.   When was this issued?  Do we
24 have a date on this?  I have a

Page 72

1 Certificate of Service here of February
2 1st, 2016, so that may be.  It just
3 doesn't look familiar.  I'm sorry.
4    Q.   As you sit here, you don't
5 have any specific recollection of having
6 reviewed Doctor Garely's Prolift+M
7 report?
8    A.   Not looking at these
9 pictures.
10    Q.   Do you recall as you're
11 sitting here today, Doctor, having
12 reviewed any Plaintiff's expert report on
13 the Prolift+M?
14    A.   No, I don't have any
15 specific recollection.
16    Q.   On Exhibit 4, at the top of
17 the page we were just on on Exhibit 4,
18 the reliance list exhibit, do you have
19 that in front of you?
20    A.   I have the reliance list.
21    Q.   Good.  It says depositions.
22 Do you see that?
23    A.   Yes.
24    Q.   And there are three

Page 73

1 depositions listed there?
2    A.   Yes.
3    Q.   Do you recall reviewing any
4 -- do you recall reviewing those three
5 depositions first of all?
6    A.   I do.
7    Q.   Did you review any other
8 depositions in the preparation of this
9 report?
10    A.   In the preparation of this
11 report, no, not for this report.
12    Q.   Did you -- have you reviewed
13 any of the depositions of any of the
14 Plaintiff's experts related to the
15 Prosima+M or the TVT-O?
16    A.   No Prosima+M.
17    Q.   We can leave it at that.
18 I'll ask you about the TVT-O this
19 afternoon.
20    A.   Okay.
21    Q.   Since your deposition in the
22 Hammons case, have you published any
23 articles in any peer review papers?
24    A.   I have not.

Julie Drolet, M.D.

Page 74

1    Q.   How many -- how much -- I
2 don't think we've been able to crack that
3 thumb drive yet, but do you know how much
4 your total billing has been for the
5 creation of this report and the
6 preparation for your deposition today?
7    A.   I don't have a specific
8 number.
9    Q.   Do you have an estimate, or
10 no?
11    A.   Total number?
12       MS. GRAFF:  I'm sorry.  I
13    was talking to your colleague.
14    You're asking how many hours was
15    the question?
16       MR. ZONIES:  Yes.  How many
17    hours.
18       THE WITNESS:  Over 100
19    hours, 120 hours.
20 BY MR. ZONIES:
21    Q.   So between the time in
22 December of 2015 when you were approached
23 to work on this report and today, you've
24 spent over 120 hours?

Page 75

1    A.   Probably.
2    Q.   How much of that -- well, I
3 think we may have the invoices so I'll
4 try to get that on a break.
5       MR. ZONIES:  Why don't we go
6    ahead and take a break?  How is
7    that?  Why don't we find out
8    what's on there?
9       (Whereupon, a brief recess
10    was held from 11:45 a.m. to 11:50
11    a.m.)
12 BY MR. ZONIES:
13    Q.   Doctor, why did you make the
14 change from Prolift to Prolift+M?
15    A.   I don't specifically recall.
16    Q.   Did you believe that there
17 was some benefit with the Prolift+M over
18 and above the Prolift?
19    A.   I'm not quite sure.  Can't
20 answer you.
21    Q.   How would you describe the
22 difference between Prolift and Prolift+M?
23    A.   Prolift+M contains a weave
24 of Monocryl which resorbs into the body,

Page 76

1 so the overall polypropylene included in
2 the Prolift+M is less than in the
3 Prolift.  I believed it was an evolution
4 to go back to your previous question, an
5 evolution in the product and they came
6 out with Prolift+M and used it.
7    Q.   You didn't have any, or as
8 you sit here today you don't recall any
9 specific scientific or medical reason
10 that you felt that the Prolift+M would be
11 a better device to use than the Prolift?
12    A.   Specifically at the time,
13 no.
14    Q.   Did you believe that having
15 less mesh left in the pelvic floor due to
16 resorption would somehow be better?
17    A.   That's I think what was the
18 idea at the time, that we would try to
19 make better, thinner meshes, and if we
20 could decrease the load and have a
21 resorbable component to it would be
22 improving.
23    Q.   And you're saying that that
24 was the idea at the time?

Page 77

1    A.   Uh-huh.
2    Q.   By that do you mean that's
3 what Ethicon was saying at the time about
4 Prolift+M is that it would have a reduced
5 mesh load because of resorption?
6       MS. GRAFF:  Object to form.
7       THE WITNESS:  I don't know
8    if it was just Ethicon.  I think a
9    lot of companies were looking for
10    ways to improve products, their
11    own products, so that was a school
12    of thought.
13 BY MR. ZONIES:
14    Q.   And was that your belief at
15 the time that the Prolift+M because it
16 would have a lower mesh load due to the
17 resorption portion of the mesh, that that
18 would somehow have clinical benefit for
19 your patients?
20    A.   That was one I think reason.
21    Q.   Was it the primary reason?
22    A.   I'm not quite sure at the
23 time.
24    Q.   How about as you sit here

Julie Drolet, M.D.

Page 78

1  today?
2      A.   I think it's not just mesh
3  load or the weight of the mesh.  It's a
4  combination of multiple factors.
5      Q.   And what do you mean by "it"
6  is, "it's a combination of multiple
7  factors"?  What is?
8      A.   As far as being a, to use
9  your term, better product, better, slash,
10  different.
11      Q.   What do you understand the
12  differences to be between the Prolift kit
13  and the Prolift+M kit other than --
14  clearly one difference you've described
15  is the difference in the mesh itself with
16  a portion of it being resorbable;
17  correct?
18      A.   That would be correct.
19      Q.   Any other differences?
20      A.   I'm not sure if the shape of
21  the introducer had changed or not.  I
22  can't recall.
23      Q.   As you sit here today, do
24  you know if the shape of the introducer

Page 79

1  changed?
2      A.   I can't recall.
3      Q.   Was the procedure the same?
4      A.   It didn't seem any different
5  to me in my experience.  You still had to
6  put it along the arcus tendineus fasciae
7  pelvis for an anterior Prolift, you still
8  had to put it through the sacrospinous
9  ligament for a total or posterior
10  Prolift+M, so the procedure itself did
11  not change.
12      Q.   Do you know if the shape of
13  the mesh itself changed in any way?
14      A.   I did not notice a
15  significant change and I have not seen
16  them side to side to be able to take
17  precise measurements.
18      Q.   So you don't have a sense
19  that, for example, the shape of the arms
20  changed in any way?
21      A.   If they were less of an
22  acute or more of an acute angle in
23  relationship to the body of the mesh, it
24  didn't make any clinical difference in my

Page 80

1  opinion in my experience.
2      Q.   Were they at a more acute
3  angle?
4      A.   I can't tell.  You're asking
5  me.
6      Q.   So you don't know if they
7  were or were not?
8      A.   As we sit today, I don't
9  recall.
10      Q.   Do you know if the, prior to
11  the Prolift+M being sold, whether or not
12  a polypropylene Monocryl combined mesh
13  had ever been used in the pelvic floor?
14      A.   It was called ULTAPRO, but I
15  don't know if it was sold in another kit
16  or something.
17      Q.   The mesh itself that was
18  used in the Prolift+M was called
19  ULTRAPRO; is that right?
20      A.   Yes.
21      Q.   Do you believe that Ethicon
22  -- strike that.
23          Were you told by anyone at
24  Ethicon that there had been testing on

Page 81

1  the ULTRAPRO mesh in the pelvic floor
2  that showed that it had better outcomes
3  because of a reduced mesh load?
4      A.   I'm not sure if I had heard
5  that through Ethicon or not.
6      Q.   Was that your belief at the
7  time?
8      A.   Yes, I think it was.
9      Q.   Did you -- were you shown
10  any testing that would demonstrate that
11  to be true at the time?
12      A.   I don't recall.
13      Q.   Would you expect a
14  reasonable medical device company to have
15  testing that would demonstrate that the
16  Prolift+M was somehow a better product
17  than the Prolift?
18          MS. GRAFF:  Object to form.
19  BY MR. ZONIES:
20      Q.   Prior to selling it.
21          MS. GRAFF:  Same objection.
22          THE WITNESS:  Well, I don't
23  know what their rules are for
24  going from Prolift to Prolift+M,

Page 82

1  but I do believe it was cleared by
2  the FDA and so I did not have any
3  reason to disbelieve what they
4  would tell me.
5  BY MR. ZONIES:
6      Q.   And did you believe that
7  there was, when you first started to use
8  Prolift+M, did you believe that there was
9  scientific support for the notion that
10 having some resorbable mesh would somehow
11 improve outcomes for your patients?
12     A.   It depends.
13     Q.   What do you mean?
14     A.   Well, Vypro also has a
15 resorbable component to it and I remember
16 reading something that, I think it was
17 Professor Jacquetin didn't like the
18 Vypro, so it's not a question of a
19 general resorbable component.  It
20 depends.
21     Q.   What does it depend on?
22     A.   Well, there's a difference
23 between Vicryl and Monocryl.  Vicryl is a
24 multifilament braided, so it depends on

Page 83

1  multiple factors.  So it's not just
2  having something resorbable.  The mesh
3  that I used that had this collagen
4  overlay did not perform well and so that
5  collagen is absorbable.
6      Q.   So prior to using the
7  Prolift+M device, did you do any sort of
8  a risk benefit analysis of whether or not
9  you should switch to the Prolift+M from
10 Prolift?
11     A.   I did not conduct a risk
12 analysis study.
13     Q.   Did you just for your own
14 practice and your own discussions with
15 your patients, did you have some sort of
16 a risk benefit analysis of the
17 differences between the Prolift and the
18 Prolift+M?
19     A.   At the time, no, I did not.
20     Q.   Did you consent your
21 patients differently between the time
22 that you used Prolift and started to use
23 Prolift+M?
24     A.   Not in any significant

Page 84

1  difference.
2      Q.   Did you inform your patients
3  when you switched over to Prolift+M that
4  there was an absorbable component to
5  Prolift+M?
6      A.   I think I did.
7      Q.   And why would you tell them
8  that?
9      A.   I think I mentioned, or to
10 the best of my recollection I mentioned
11 it was mostly permanent but part it was
12 resorbable.
13     Q.   And did you describe that as
14 a benefit to the patient?
15     A.   I think -- or let me
16 rephrase this.  I think -- no.  When I
17 consent my patients, I tell them this is
18 what we're going to do, we're putting a
19 permanent mesh, part of it it will be
20 dissolvable, most of it stays permanent.
21 I did not distinguish risk benefits
22 versus something else that I wasn't using
23 at the time.
24     Q.   Would you have expected

Page 85

1  Ethicon to have done some clinical tests
2  using the Prolift+M prior to selling it
3  to you?
4      A.   It depends on what you say
5  tests.  What do you mean by testing?
6      Q.   Would you have expected
7  Ethicon to have performed a clinical
8  trial with the Prolift+M before they sold
9  it to you?
10         MS. GRAFF:  Object to form.
11         THE WITNESS:  It depends on
12     the type of clinical trial.
13 BY MR. ZONIES:
14     Q.   A clinical trial showing
15 even short-term outcomes associated with
16 the Prolift+M?
17         MS. GRAFF:  Same objection.
18         THE WITNESS:  I don't know
19     what I would have expected.  I
20     think Doctor Lucente was still --
21     was using it up in Allentown and
22     he had moved to it, so I used
23     Prolift+M.
24 BY MR. ZONIES:

Julie Drolet, M.B.

Page 86

1    Q.   So one of the things that
2  gave you comfort in moving to the
3  Prolift+M was that Doctor Lucente had
4  made the move from Prolift to Prolift+M?
5    A.   I think that's what I was
6  told.
7    Q.   By whom?
8    A.   I can't recall.
9    Q.   An Ethicon sales rep?
10    A.   I can't recall.
11    Q.   Would you have expected
12  Ethicon to have done some animal testing
13  with the Prolift+M mesh demonstrating
14  that it was in some way better than the
15  Prolift mesh?
16        MS. GRAFF:  Object to form.
17        THE WITNESS:  I did not know
18        or do not know what was required
19        at the time in order to go from
20        Prolift to Prolift+M, so I did not
21        have those expectations.
22  BY MR. ZONIES:
23    Q.   Have you reviewed any
24  internal Ethicon documents discussing

Page 87

1  whether or not Ethicon should perform
2  animal testing prior to selling the
3  Prolift+M?
4    A.   I don't recall specifically
5  reading that.
6    Q.   Have you reviewed any
7  internal Ethicon documents demonstrating
8  Ethicon's discussions about whether or
9  not to perform a clinical trial in women
10  using the Prolift+M prior to selling the
11  device?
12    A.   I don't recall reading
13  something specifically to that effect.
14    Q.   If you had seen internal
15  Ethicon documents describing Ethicon's
16  choices not to perform animal testing
17  prior to marketing the device, would that
18  have been helpful in formulating your
19  opinion about whether or not this was a
20  safe and effective device?
21        MS. GRAFF:  Object to form.
22        THE WITNESS:  It depends.
23  BY MR. ZONIES:
24    Q.   On what?

Page 88

1    A.   If women had been treated
2  with Prolift and now there were studies
3  on ULTRAPRO that showed that it had a
4  benefit over the Gynemesh in general and
5  the FDA cleared it to be part of Prolift
6  now called Prolift+M, then if the FDA
7  cleared it, then it was going to be safe.
8    Q.   Is it your understanding as
9  a practicing physician and as an expert
10  witness in this case that if the FDA
11  clears a device for marketing that the
12  FDA has determined that it is safe and
13  effective?
14        MS. GRAFF:  Object to form,
15        but you can answer.
16        THE WITNESS:  Can you repeat
17        that question verbatim please?
18  BY MR. ZONIES:
19    Q.   Sure. Is it your
20  understanding as a treating physician and
21  as an expert witness in this case that if
22  the FDA has cleared a medical device for
23  marketing under the 510(k) process that
24  the FDA has made a determination that

Page 89

1  that device is safe and effective for its
2  intended use?
3    A.   At the time that they
4  cleared it, I would say yes.
5    Q.   Do you know what a 522 study
6  is?
7    A.   It is my understanding that
8  it is a postmarket study after a product
9  has been cleared by a 510(k) process.
10    Q.   Do you have an opinion,
11  Doctor, whether or not there is more or
12  less contraction with the Prolift+M as
13  compared to the Prolift?
14    A.   At this time the studies are
15  not well comparable in a sense that
16  there's no randomized control study
17  comparing Prolift and Prolift+M with a
18  sufficient amount of power and long
19  enough follow-up, but there does seem
20  that there may be slightly less in
21  comparing the studies that have been
22  published looking at the first years of
23  Prolift versus looking at patients who
24  have been implanted more recently, but

Julie Drolet, M.B.

Page 90

1 there are other confounding factors that
2 may alter those results.
3     Q.   Would it have been helpful
4 to you as a treating physician when
5 making the decision to switch from
6 Prolift to Prolift+M to actually see
7 clinical trial data comparing the Prolift
8 and the Prolift+M?
9     A.   It depends.  In an ideal
10 world, you know, we'd love to wait for
11 all the studies to come out, but in
12 reality if we have something better,
13 maybe, possibly, or an improvement,
14 technological improvement and it has been
15 cleared by the FDA and it doesn't show
16 it's not an inferior product, then my
17 opinion is yes.
18     Q.   How would you know whether
19 or not it's an inferior product without
20 the testing prior to marketing?
21     A.   Studies on ULTRAPRO versus
22 Gynemesh did not show that ULTRAPRO was
23 an inferior product and had less mesh
24 load totally.

Page 91

1     Q.   Are you talking about in the
2 hernia application?
3     A.   In the hernia applications,
4 yes.  And we had safety and efficacy data
5 and study data on the Prolift, so now
6 we're improving on the actual mesh or
7 we're changing the mesh incorporating an
8 absorbable component.
9     Q.   And do you know if there are
10 any differences in the scarring
11 associated with the use of +M versus
12 Prolift?
13     A.   I don't think the studies
14 have specifically reported on scarring.
15     Q.   How about the same question
16 with regard to foreign body reaction,
17 whether or not it's more or less with the
18 +M versus the Prolift?
19     A.   I don't think there's any
20 study out there that have biopsied
21 women's vagina and mesh postoperatively
22 and make a comparative comparison.
23     Q.   Do you have any
24 understanding whether or not there's a

Page 92

1 difference in the inflammatory processes
2 associated with the +M mesh as compared
3 to the Prolift mesh?
4     A.   Again, in women's vaginas,
5 there's no study that has looked at the
6 evolution of the inflammatory process in
7 healthy women who have had this mesh
8 implanted by performing biopsy, serial
9 biopsies and analyzing them under the
10 microscope.
11     Q.   So the answer is, no, you
12 don't know if there's any difference?
13     A.   There is not anything
14 published out there about those
15 differences in specifically Prolift and
16 Prolift+M which are used in the pelvis.
17     Q.   Have you ever seen any of
18 the microscopic examinations of the mesh
19 used in Prolift or the +M?
20     A.   I have.
21     Q.   Do you know if there's any
22 difference in degradation of the mesh
23 between the Prolift+M and Prolift?
24     A.   Well, that would depend on

Page 93

1 your definition of degradation.
2     Q.   And how do you define that?
3     A.   It depends.
4     Q.   On what?
5     A.   You have to give me the
6 definition of what you think is a
7 degradation.  Does a product disintegrate
8 to form dust and become totally
9 insufficient?  Does it completely
10 disappear?  We know the absorbable
11 portion of the Prolift+M will degrade, it
12 will be reabsorbed and it will disappear,
13 so that's a normal function of the
14 Monocryl.
15     Q.   Okay.  Have you ever read
16 any of the depositions of Ethicon
17 employees?
18     A.   No, I have not.
19     Q.   So since your deposition in
20 Hammons for example you haven't read the
21 deposition of Axel Arnaud?
22     A.   I have not.
23     Q.   You haven't seen any emails
24 from Axel Arnaud saying that he thinks

Page 94

1 the company should not do a clinical
2 trial of the Prolift+M because it might
3 be risky?
4          MS. GRAFF: Objection.
5          THE WITNESS: None of that
6     if it exists was ever provided to
7     me, so I have not read it.
8 BY MR. ZONIES:
9     Q.   Ethicon never provided
10 documents like that to you; correct?
11          MS. GRAFF: Object to form.
12          THE WITNESS: Not to my
13     recollection.
14 BY MR. ZONIES:
15     Q.   Did you ask for any
16 documents like that?
17     A.   Not in the preparation of
18 this report.
19     Q.   How about after the Hammons
20 deposition? Did you ask for any
21 documents as a result of the deposition
22 in Hammons? Did you say, hey, we
23 discussed such and so, I'd like to see
24 that document or that study?

Page 95

1     A.   No.
2     Q.   Would it have been something
3 that would have informed your opinion in
4 this case if you had known that Axel
5 Arnaud, one of the medical directors at
6 Ethicon, was of the opinion that doing a
7 study of the Prolift+M mesh as compared
8 to the Prolift mesh prior to the sale of
9 Prolift+M may have been risky?
10          MS. GRAFF: Object to form.
11          THE WITNESS: Would I have
12     wanted to know?
13 BY MR. ZONIES:
14     Q.   Yeah.
15     A.   Retrospectively here? No.
16     Q.   That's not something you'd
17 want to have looked at?
18     A.   I've used the Prolift+M and
19 it would have to depend on the context of
20 that email.
21     Q.   But you've never seen it, so
22 you don't know what that context is;
23 correct?
24     A.   That would be correct.

Page 96

1     Q.   And I'm still a little
2 unclear. In your reliance materials you
3 have an expert report listed there from
4 Doctor Garely related to the Prolift+M
5 and I believe you said that you don't
6 know or you don't think you've reviewed
7 that expert report?
8     A.   As I sit here today, I don't
9 have a specific recollection if I have or
10 have not read it.
11     Q.   Assuming that Doctor Garely
12 had issued and Plaintiff's other experts
13 had issued expert reports on Prolift+M in
14 discussing their concerns with Prolift+M,
15 do you think having those reports and
16 reviewing those would have been helpful
17 in formulating your opinions in this
18 case?
19          MS. GRAFF: Object to form.
20          THE WITNESS: I've based my
21     opinions on medical literature, my
22     experience, what I've reviewed, so
23     I don't know if a work product or
24     a report for the opposite point of

Page 97

1     view expert report provided by
2     Plaintiffs would have had a
3     significant impact on my report.
4 BY MR. ZONIES:
5     Q.   If Doctor Garely had for
6 example literature in his report that he
7 discussed that was literature about the
8 Prolift+M that isn't listed in your
9 reliance materials, do you think it would
10 have been helpful for you to review the
11 literature he reviewed and opined on?
12          MS. GRAFF: Object to form.
13          THE WITNESS: It depends.
14 BY MR. ZONIES:
15     Q.   And did you review Doctor
16 Garely's reliance materials?
17     A.   I don't think that was --
18 I'm not sure if that was provided to me
19 or not.
20     Q.   If Doctor Garely had in his
21 reliance materials other internal Ethicon
22 documents discussing the testing or lack
23 of testing of the Prolift+M prior to its
24 marketing, is that something you would

Julie Drolet, M.D.

Page 98

1  have liked to have at least known about
2  in the preparation of your report?
3          MS. GRAFF:  Object to form.
4          THE WITNESS:  Would I have
5  wanted to know or needed to know?
6  It depends on what those articles
7  contained.  They may have no
8  bearing on my opinion, so it
9  depends.
10 BY MR. ZONIES:
11     Q.   But they may have a bearing,
12 you just don't know because you haven't
13 seen those materials, Ethicon hasn't
14 given them to you; correct?
15         MS. GRAFF:  Objection.
16         THE WITNESS:  I have not
17 seen the entire list of what
18 Doctor Garely relied on.  Some of
19 his articles might be the same as
20 mine.
21 BY MR. ZONIES:
22     Q.   But you don't know?
23     A.   As I sit here today, I don't
24 have his list, and since I only have

Page 99

1  received this yesterday afternoon, I
2  haven't made a comparative or been able
3  to make a comparative note of what he
4  relied on.
5          MR. ZONIES:  Go off the
6  record for a second.
7          (Whereupon, a brief recess
8  was held from 12:20 p.m. 12:26
9  p.m.)
10         MR. ZONIES:  Doctor Drolet,
11 we've reached our two-hour time
12 for the Prosima+M deposition so --
13         THE WITNESS:  No.
14         MS. GRAFF:  Prolift+M.
15         THE WITNESS:  Prolift+M.
16         MR. ZONIES:  What did I say?
17         THE WITNESS:  Prosima.
18         MR. ZONIES:  Doctor Drolet,
19 we've reached our two-hour time
20 limit for the Prolift+M
21 deposition, so I'm going to go and
22 stop now.  I would like the
23 opportunity to discuss it further
24 with you, but under our current

Page 100

1  orders I'm not permitted to do so,
2  so thank you for your time on the
3  Prolift+M.
4          THE WITNESS:  You're
5  welcome.
6          (Whereupon, the deposition
7  was concluded at approximately
8  1:27 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 101

1          CERTIFICATION
2
3
4     I, EILEEN P. BARTH, hereby certify
5  that the testimony and proceedings in the
6  aforegoing matter are contained fully and
7  accurately in the stenographic notes
8  taken by me and are a true and correct
9  transcript of the same.
10
11         _____
12         EILEEN P. BARTH
13         Certified Shorthand
14         Reporter
15
16
17     The foregoing certification of this
18 transcript does not apply to any
19 reproduction of the same by any means
20 unless under the direct control and/or
21 direction of the certifying shorthand
22 reporter.
23
24

Julie Drolet, M.D.

Page 102

```
 1        LAWYER'S NOTES
 2    PAGE   LINE   NOTATION
 3    ____   ____  _____
 4    ____   ____  _____
 5    ____   ____  _____
 6    ____   ____  _____
 7    ____   ____  _____
 8    ____   ____  _____
 9    ____   ____  _____
10    ____   ____  _____
11    ____   ____  _____
12    ____   ____  _____
13    ____   ____  _____
14    ____   ____  _____
15    ____   ____  _____
16    ____   ____  _____
17    ____   ____  _____
18    ____   ____  _____
19    ____   ____  _____
20    ____   ____  _____
21    ____   ____  _____
22    ____   ____  _____
23    ____   ____  _____
24
```