# EXHIBIT D

Julie Drolet, M.D.

1      IN THE UNITED STATES DISTRICT COURT
      FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
2
3   IN RE:  ETHICON,    :  Master File No.
      INC. PELVIC        :  2:12-MD-02347
4   REPAIR SYSTEM        :  MDL No. 2327
      PRODUCTS           :
5   LIABILITY            :  Joseph R. Goodwin
      LITIGATION         :  U.S. District Judge
6   ----------------    :
      ROSE GOMEZ, et al  :
7   Case no.             :
      2:12-CV-00344       :
8
9
                        - - -
10
          Thursday, March 31, 2016
11
                        - - -
12
13      Oral deposition of JULIE DROLET, M.D.,
14   taken pursuant to notice, at the Courtyard
15   by Marriott York, 2799 Concord Road, York,
16   Pennsylvania, commencing on the above date
17   at or about 1:28 p.m., before Eileen P.
18   Barth, C.S.R., N.P.
19
20                      - - -
22      GOLKOW TECHNOLOGIES, INC.
      877.370.3377 ph │  917.591.5672 fax
23          deps@golkow.com
24

Julie Drolet, M.D.

Page 2

```
1    APPEARANCES:
2        ZONIES LAW LLC
         BY:  JOSEPH ZONIES, ESQUIRE
3            GREG BENTLEY, ESQUIRE
         1900 Wazee Street
4        Suite 203
         Denver, CO  80202
5        Jzonies@zonieslaw.com
         Gbentley@zonieslaw.com
6        Attorneys for the Plaintiff
7
         DRINKER BIDDLE & REATH, LLP
8        BY:  MELISSA A. GRAFF, ESQUIRE
         One Logan Square
9        Suite 2000
         Philadelphia, PA  19103-6996
10       Melissa.Graff@dbr.com
         Attorneys for the Defendants
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 3

```
1        DEPOSITION SUPPORT INDEX
2
     DIRECTIONS NOT TO ANSWER
3    PAGES:  None
4    REQUESTS FOR DOCUMENTS OR INFORMATION
     PAGES:  None
5
     STIPULATIONS AND/OR STATEMENTS:
6    PAGES:  None
7    MARKED QUESTIONS:
     PAGES:  None
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
1                INDEX
2
     WITNESS                  PAGE
3
4    JULIE DROLET, M.D.
5      By Mr. Zonies            5
6
7
8             EXHIBITS
9    EXHIBIT    DESCRIPTION       PAGE
10
     Exhibit 1   TVT-Obturator Brochure   74
11
     Exhibit 1A   Dr. Drolet Report     111
12
     Exhibit 2   IFU              92
13               EHT.MESH.02340902-908
14   Exhibit 3   Redacted Curriculum   113
                 Vitae
15
     Exhibit 4   Reliance Materials    112
16
     Exhibit 5   Curriculum Vitae     113
17
     Exhibit 6   Black Binder 1 of 2   115
18
     Exhibit 7   Black Binder 2 of 2   115
19
     Exhibit 8   IFU              141
20               ETH.MESH.00860239-245
21
22
23
24
```

Page 5

```
1        JULIE DROLET, M.D., having
2    been duly sworn, was examined and
3    testified as follows:
4    BY MR. ZONIES:
5    Q.    Good afternoon, Doctor
6    Drolet.  How are you?
7    A.    I'm fine.  Thank you.
8    Q.    We just finished up the
9    deposition the Prolift+M; is that right?
10   A.    That is correct.
11   Q.    And to the extent that our
12   conversations about the reliance
13   materials and Exhibits 1 and 2 and 3 and
14   the thumb drive that you brought with you
15   today, to the extent that we discuss
16   those things, I'll incorporate those into
17   this deposition so we don't have to do it
18   again.  Is that okay with you?
19   A.    For the most part I guess.
20   Q.    Is there some part that
21   isn't?
22   A.    I don't know.  It depends on
23   your questions.  I reserve the right to
24   change or to add.
```

Julie Drolet, M.D.

Page 6

1    Q.   And is there anything over
2  the lunch hour that you would like to
3  change or add from our discussions this
4  morning?
5    A.   I didn't think about this
6  case over the lunch hour.
7    Q.   So as you sit here right
8  now, the answer is no, there's nothing to
9  change or add?
10   A.   At this point in time.
11   Q.   Thank you.
12       Doctor, this deposition is
13  about the TVT-O device.  Do you have that
14  understanding?
15   A.   I do.
16   Q.   And you issued an expert
17  report about the TVT-O device; correct?
18   A.   I issued an expert report on
19  the Gomez case that included my opinion
20  on the TVT-O device.
21   Q.   Doctor, when did you first
22  use a synthetic sling device for
23  treatment of stress urinary incontinence?
24   A.   2002.

Page 7

1    Q.   And what device did you use
2  in 2002?
3    A.   It was the Gynecare TVT.
4    Q.   Is that also known as the
5  TVT Retropubic?
6    A.   Yes, it is.
7    Q.   And that's a retropubic
8  package to implant the mesh; correct?
9    A.   That it is.
10   Q.   How long did you use the TVT
11  Retropubic device?
12   A.   For a few years.  I am still
13  doing retropubic approaches but now doing
14  transobturator approaches as well.
15   Q.   And after starting with the
16  TVT Retropubic, what was the next sling
17  that you used?
18   A.   I don't recall specifically.
19   Q.   Have you ever done any
20  nonsynthetic sling procedures?
21   A.   Yes.
22   Q.   For treatment of stress
23  urinary incontinence?
24   A.   For treatment of stress

Page 8

1  urinary incontinence, yes.
2    Q.   What procedures?
3    A.   Those were transvaginal
4  using the vaginal mucosa as a sling with
5  sutures, polypropylene sutures, sorry,
6  prolene sutures.
7    Q.   And what are those?  Is
8  there a name for these surgeries?
9    A.   They're considered part of
10  the bladder neck sling group or
11  pubovaginal sling group.
12   Q.   And when did you perform
13  those?
14   A.   Before 2002.
15   Q.   Did you stop doing
16  pubovaginal slings when you started to
17  use the TVT Retropubic?
18   A.   Yes, I had.
19   Q.   Have you done any since
20  2002?
21   A.   Not that I can recall.
22   Q.   Have you ever done a Burch
23  procedure?
24   A.   Yes.

Page 9

1    Q.   How many times?
2    A.   Hundreds.
3    Q.   When was the last time you
4  did a Burch?
5    A.   A few months ago.
6    Q.   You continue to do Burch
7  procedures at this point in your career?
8    A.   Yes.  Not as frequently.
9    Q.   I'm sorry?
10   A.   Not as frequently since the
11  slings have appeared.  The midurethral
12  slings.  Pardon me.
13   Q.   From 2002 when you first
14  started to use synthetic slings until
15  today in 2016, have you continuously also
16  done Burch procedures during that period
17  of time?
18   A.   Yes.
19   Q.   Any other procedures that
20  you have used for the treatment of stress
21  urinary incontinence?
22   A.   For the treatment of stress
23  incontinence?  No, not for the treatment.
24   Q.   Have you ever used bulking

Julie Drolet, M.D.

Page 10

1  agents?
2      A.   I was trained on them, but
3  no.
4      Q.   Why not?
5      A.   At the hospital where I
6  practice, there's a territorial issue
7  between the urologists and I as a female
8  urogynecologist and so it was something
9  that I decided that politically I would
10  pick my battles, so I don't have
11  experience with bulking agents.
12      Q.   You said at some point you
13  did do them in your training was it?
14      A.   Yes.  I went to a training
15  session for bulking agents.
16      Q.   When was that?
17      A.   2010 or 2011.  I can't
18  remember exactly.
19      Q.   Did you find during that
20  training session that the bulking agents
21  were effective for the treatment of
22  stress urinary incontinence?
23      A.   This was a training session
24  with pelvic models and cadavers, so I

Page 11

1  couldn't establish the effectiveness
2  since pelvic models and cadavers don't
3  leak.
4      Q.   Who sponsored that training
5  session?
6      A.   I think it was Coloplast.
7  They make Durasphere.
8      Q.   If you didn't have these
9  political concerns that you discussed,
10  are bulking agents something that you
11  would consider bringing into your
12  armament to fight stress urinary
13  incontinence for your patients?
14      A.   At this point in my career,
15  possibly not.
16      Q.   Why not?
17      A.   Because I have a new great
18  urologist co-worker who does a lot and we
19  compliment each other.  He doesn't do
20  laparoscopy, doesn't do laparoscopic
21  Burch, I do, and so we have a very good
22  working relationship.
23      Q.   So if you believe and a
24  patient agrees that a bulking agent might

Page 12

1  be an appropriate treatment, you would
2  refer that patient to this other
3  physician?
4      A.   Absolutely.
5      Q.   And what is his or her name?
6      A.   Doctor Sisbarro.
7      Q.   How do you spell that?
8      A.   S-I-S-B-A-R-R-O.
9      Q.   And do you have a financial
10  arrangement with Doctor Sisbarro?
11      A.   Absolutely not.
12      Q.   And is it your understanding
13  that when Doctor Sisbarro has a patient
14  where he believes it might be appropriate
15  that that patient have a surgical
16  procedure aside from bulking agents to
17  treat stress urinary incontinence he
18  would refer that patient to you?
19      A.   I don't know if that's
20  happened for stress urinary incontinence.
21      Q.   For other laparoscopic
22  surgeries however it happens?
23      A.   He has sent me patients who
24  were in need of prolapse, pelvic organ

Page 13

1  prolapse care, and so he has referred
2  them to me.  I've referred more to him
3  than he to me.
4      Q.   It always works that way.
5      A.   It's fine.  It's all good.
6      Q.   Do you find the Burch -- you
7  do the Burch procedure laparoscopically?
8      A.   Most of them, yes.
9      Q.   You've done some laparotomy
10  however?
11      A.   Open, yes.
12      Q.   Do you find that to be a
13  safe and effective procedure?
14      A.   I do.
15      Q.   The Burch has been described
16  historically as a gold standard
17  treatment.  Do you agree that it is
18  indeed a gold standard treatment?
19      A.   I agree that it has been
20  described as a gold standard treatment.
21      Q.   And in 2002 you started to
22  use a TVT Retropubic.  When do you think
23  you introduced another synthetic sling
24  into your practice?

Julie Drolet, M.D.

Page 14

1      A.   I can't recall exactly.
2      Q.   Today in your practice do
3  you continue to use synthetic slings?
4      A.   I do.
5      Q.   Which slings do you use
6  today?
7      A.   Today I use the Coloplast
8  T-Sling, retropubic and transobturator.
9      Q.   Is that the only one you use
10  now?
11      A.   Today, yes.
12      Q.   When did you start using the
13  Coloplast T-Sling?
14      A.   Oh, many years ago.
15  Whenever the Coloplast mesh we used was
16  bought out by Coloplast, so many years
17  ago.
18      Q.   Was that about the same time
19  that you switched over to using
20  Coloplast's pelvic floor mesh as well?
21  Restorelle?
22      A.   I'm trying to think.  I
23  think I was using the T-Sling before.
24  Yeah, a few years before.

Page 15

1      Q.   Before you started to use
2  Restorelle?
3      A.   Yes.  I think so.
4      Q.   Does it help at all to say
5  that may have been around 2010 or '11?
6      A.   The Restorelle was around
7  2010, 2011.  The T-Sling was probably
8  before that.  It might have been called
9  Caldera.  So different.
10      Q.   Different manufacturer?
11      A.   Yes.
12      Q.   But the same product?
13      A.   From what was reported to
14  me.
15      Q.   Understood.  When you
16  started to use the T-Sling, did you stop
17  using the TVT Retropubic?
18      A.   Yes.  The Gynecare
19  Retropubic.
20      Q.   Yes.  And to be clear, I
21  understand that sometimes TVT is like
22  Frisbee.  It's a generic term for a
23  device.  But when I use the phrase TVT,
24  I'm talking about Ethicon's TVT products.

Page 16

1  Okay?
2      A.   Retropubic.
3      Q.   Yes.
4      A.   Down up and not top down.
5      Q.   Correct.
6      A.   Okay.
7      Q.   All right?  So what's
8  sometimes known in our circles as the TVT
9  classic, the original TVT device designed
10  by --
11      A.   Ulmsten.
12      Q.   Correct.  So the Ulmsten
13  device, the TVT Retropubic, you would
14  have stopped using that device at about
15  the time that you started to use either
16  the Caldera or Coloplast T-Sling; is that
17  right?
18      A.   That sounds about right.
19      Q.   And it sounds like that may
20  have been around or earlier than 2010; is
21  that fair?
22      A.   It's possible, but I cannot
23  give you an exact date without getting
24  all hospital records and going back to

Page 17

1  all patients.
2      Q.   So at one point earlier when
3  we were discussing the Prolift+M, you
4  said that you had one of your office
5  workers go through and do sort of an
6  analysis of how many Prolifts and
7  Prolift+Ms you had implanted in the
8  timeframe from 2005 I think it was to
9  2015.  Do you recall saying that?
10      MS. GRAFF:  Object to form.
11      THE WITNESS:  I recall
12      talking about that, yes.
13  BY MR. ZONIES:
14      Q.   Roughly?  Did you also at
15  that time look at which slings you had
16  implanted and how many?
17      A.   How many?  Yes.  The type of
18  sling and the root of approach was not
19  specified.
20      Q.   So first can you tell me how
21  many slings you believe you have used for
22  the treatment of stress urinary
23  incontinence in women?
24      A.   As far as midurethral

Julie Drolet, M.D.

Page 18

1 slings, up until October of 2015 I think
2 the count was 350, 351. Since that time
3 maybe 15, 20 more, 15, more. That makes
4 sense.
5     Q. I'm sorry. Could you just
6 repeat those numbers so I can write them
7 down? You said from --
8     A. From --
9     Q. Is this from 2002 or do you
10 think this is also from 2005?
11     A. 2005.
12     Q. 2005?
13     A. 2005, pardon me, because our
14 records don't go back that far.
15     Q. So from 2005 until when you
16 had the count done in October of 2015 it
17 was approximately how many slings?
18     A. 351 or 357. I can't
19 remember.
20     Q. And then from that October
21 2015 until today in March?
22     A. Another 15 would
23 statistically make sense as well.
24     Q. What do you mean by

Page 19

1 "statistically make sense"?
2     A. If I do an average of 30 or
3 31, 32 a year for ten years between 2005,
4 2015, from October to March, that's six
5 months, makes sense. That's why I added
6 roughly 15 to the count.
7     Q. That's about the pace at
8 which you feel that -- that's about the
9 pace at which your data showed that you
10 used these was roughly 30 per year?
11     A. Yes.
12     Q. So we've talked about the
13 TVT Retropubic, the Ulmsten device and
14 we've talked about the T-Sling. Were
15 there any other midurethral slings that
16 you've used in your practice?
17     A. Yes. I have tried two mini
18 slings.
19     Q. Which two?
20     A. I think one was called the
21 Bard Ajust, I have done the TVT-O, I have
22 done -- one of the hospitals in town uses
23 Obtryx, I have tried two TVT Securs.
24     Q. Is that included in the two

Page 20

1 mini slings that you've tried? The Bard
2 and TVT-S?
3     A. Yes.
4     Q. Yes?
5     A. Yes. The two types of mini
6 slings are, I think it's called Bard,
7 it's Ajust, and the other one was a TVT
8 Secur that I tried when mini slings
9 became more popular and I'm still using
10 the T-Sling for now.
11     Q. So when do you believe you
12 first used or tried the TVT Obturator by
13 Ethicon?
14     A. I can't recall exactly.
15     Q. And when you began to use
16 the T-Sling by Caldera or Coloplast, you
17 said earlier that you stopped using the
18 TVT Retropubic from Ethicon; correct?
19     A. That would be correct.
20     Q. And because the T-Sling has
21 either approach, obturator or retropubic,
22 when you started to use the T-Sling, did
23 you also stop using the TVT Obturator
24 from Ethicon?

Page 21

1     A. Yes.
2     Q. So if we can determine when
3 you started to use the T-Sling, we know
4 that that's the cutoff, that's the last
5 time you had used a TVT Retropubic, a TVT
6 Obturator and you've only used the TVT
7 Secur for two surgeries? Is that a fair
8 assessment of your TVT sling use?
9     A. Not exactly because I can't
10 coincide a hundred percent going from
11 retropubic, Gynecare products to another
12 product, two those, TVT and TVT-O versus
13 the Caldera or Coloplast product, that
14 may not have been a complete cut. I'm
15 not quite sure which one happened first,
16 did they both coincide. I'm not quite
17 sure.
18     Q. But that overlap would be --
19 in other words, if you stopped using the
20 TVT Retropubic the day you started to use
21 the T-Sling, you may have continued to
22 use the TVT Obturator for a few weeks or
23 a few months after starting to use the
24 T-Sling?

Julie Drolet, M.D.

Page 22

1    A.    That is entirely possible,
2  but I cannot recall exactly the dates or
3  the timeframe.
4    Q.    And regardless we know that
5  of all the products you did approximately
6  statistically an average of 30 of these
7  midurethral sling procedures per year?
8    A.    That's what I counted, yes.
9    Q.    And then how many Burchs do
10 you believe you've done from 2005 to the
11 present day?
12   A.    Those were not counted.  I
13 would imagine that I did very few of
14 them.  The ones that I did would have
15 been associated with a sacrocolpopexy or
16 for other indications.
17   Q.    And how about for
18 pubovaginal slings?  Did you do
19 pubovaginal slings during this period of
20 time?
21   A.    No.
22   Q.    Did you do any sling repairs
23 using native tissue?
24   A.    That would be a pubovaginal

Page 23

1  sling.  The answer is no.
2    Q.    Why not?
3    A.    Because the midurethral
4  slings offered good efficacy, good
5  safety, surgical time was greatly
6  reduced, other benefits, complications,
7  you know.
8    Q.    But you didn't learn that
9  from your own personal experience because
10 you've never used a pubovaginal native
11 tissue repair; correct?
12   A.    Correct I think.  Could you
13 repeat that question?
14   Q.    Sure.  Have you ever used a
15 pubovaginal sling?
16   A.    Not in my practice.
17   Q.    Just in training?
18   A.    Yes.
19   Q.    And that was the one time
20 years ago that we discussed; right?
21   A.    Now, you'd have to go back
22 and ask me that again.
23   Q.    When was that?
24   A.    Many years ago.

Page 24

1    Q.    Before you were in private
2  practice here in the United States?
3    A.    In the United States,
4  correct.
5    Q.    And you started your
6  practice here in the United States I
7  think in 1997?
8    A.    I arrived here in '97, yes.
9    Q.    So you haven't done a
10 pubovaginal sling since before 1997?
11   A.    That is correct.
12   Q.    Aside from the Burch and the
13 slings, the midurethral slings that we
14 had discussed and the bulking agents, are
15 there any other surgical treatments for
16 stress urinary incontinence in women that
17 you have utilized?
18   A.    Yes.  You asked me that and
19 I said using the vaginal mucosa as a
20 sling.
21   Q.    And when did you do that?
22   A.    Before I went for training
23 on the TVT which was in 2002, so sometime
24 before 2002.

Page 25

1    Q.    And since 2002 you haven't
2  had the opportunity to use that
3  procedure?
4    A.    I haven't done any.
5    Q.    And how many did you do?
6    A.    I can't recall.
7    Q.    What was your experience
8  with the TVT Secur?
9    A.    In my hands and at training,
10 I felt that it wasn't a procedure that I
11 can easily teach the residents and I
12 didn't have as much control over, so it
13 wasn't something that I would incorporate
14 in my practice at the teaching hospital
15 or where I do most of my surgical
16 procedures.
17   Q.    And you said in your hands
18 at training.  What training did you have
19 for the TVT-S?
20   A.    I went to I think it was in
21 Allentown but I can't be for sure.  Vince
22 Lucente was the trainer and that's as
23 much as I can tell you.
24   Q.    And was this an

Julie Drolet, M.D.

Page 26

1 Ethicon-sponsored training that you went
2 to where Doctor Lucente was the trainer?
3     A.   I would imagine, but I can't
4 guarantee that a hundred percent that it
5 was.
6     Q.   Do you recall were there
7 other doctors there as well as you?
8     A.   For the TVT Secur I can't
9 recall.
10     Q.   Do you have a sense of when
11 that would have been?
12     A.   No.
13     Q.   Did you have difficulty
14 using the TVT Secur during the training
15 sessions?
16     A.   Not that I -- I wouldn't
17 call it difficulty.  To me it was more
18 the fine adjustment when we have to
19 position compared to a traditionally long
20 sling, full length sling, didn't have the
21 ease of adjusting compared to the
22 transobturator or retropubic approach.
23     Q.   And by adjusting do you mean
24 adjusting the tensioning on the tape?

Page 27

1     A.   Or the lack thereof, but
2 adjusting it to where we think it would
3 correct the incontinence and it would
4 rest underneath the midurethra.  It's my
5 personal opinion, my personal preference,
6 I would rather do full length slings.
7     Q.   How would you describe the
8 tension or lack thereof that you believe
9 is the correct way to perform a
10 midurethral sling?
11         MS. GRAFF:  Can I hear that
12     question again?  I'm sorry.
13         MR. ZONIES:  Sure.
14 BY MR. ZONIES:
15     Q.   Can you describe in your own
16 words, Doctor, what tensioning you
17 believe a TVT Obturator should
18 appropriately have?
19     A.   Every physician whether it's
20 for retropubic, transobturator, out to
21 in, in to out has their own way and it
22 comes with experience, feeling, some
23 people do a Crede's maneuver, some people
24 have women cough, some people do it by

Page 28

1 feel, some people do it visually.
2 Everybody has got their own -- just like
3 pubovaginal slings or Burch.  We have to
4 lift the urethral vesicle junction at a
5 certain level on a Burch but it can't be
6 under too much tension.  So it's a
7 question of experience and teaching.
8 Everybody does it different.
9     Q.   There's no uniform way to
10 describe it?
11     A.   We don't have a protractor,
12 an angle measurement or any specific sign
13 that is the guarantee of the perfect
14 positioning and/or tensioning.  Just like
15 a lot of surgeries, it goes on
16 experience, training, and every patient
17 is different.
18     Q.   I've heard it described as a
19 Goldilocks principle.  Do you know what I
20 mean by that?
21     A.   Yes, I do.
22     Q.   Do you think that that's an
23 accurate description, not too tight, not
24 too loose, just right?

Page 29

1     A.   Well, I wouldn't use the
2 word Goldilocks in its literal
3 application, but it is something that
4 there's no precise, not too tight and not
5 too loose.
6     Q.   It's certainly not
7 tension-free; is that correct?
8     A.   I don't know how the initial
9 -- or Professor Ulmsten intended the word
10 tension-free to be and if his definition
11 of tension would be to anchor it via
12 sutures, bone anchors, staples to a
13 particular object to lift the urethra up
14 as we do with pubovaginal slings or
15 Burchs, then this would be tension-free
16 because we're not using those anchors.
17 There's always tension.
18     Q.   Yeah, and I suppose --
19     A.   It would fall apart on the
20 floor if there wasn't any tension.
21     Q.   I suppose my question is
22 there is tension required for a TVT
23 Obturator to work appropriately?
24     A.   The mesh whether it's from

Julie Drolet, M.B.

Page 30

¹ retropubic, transobturator, out to in, in
² to out or TOT, TVT-O has to have some
³ substance to it in order to be a,
⁴ quote/unquote, backstop to the abdominal
⁵ pressure when a patient has coughing,
⁶ sneezing, laughing.  That's what we think
⁷ is the midurethral continence mechanism
⁸ associated with these types of slings.
⁹     Q.    And to obtain that with a
¹⁰ TVT Obturator, it necessarily requires
¹¹ some tension; correct?
¹²         MS. GRAFF:  Object to the
¹³     form.  You can answer.
¹⁴         THE WITNESS:  It has to stay
¹⁵     in place.  If it doesn't, then at
¹⁶     the first cough then the whole
¹⁷     thing would again fall out, so we
¹⁸     have to place it in a certain area
¹⁹     but not pull or put tension on the
²⁰     urethra, so the tension-free maybe
²¹     applicable to the midurethra and
²²     not the material itself.
²³ BY MR. ZONIES:
²⁴     Q.    So tension-free might mean

Page 31

¹ tension-free on the urethra but the tape
² itself could have some and require some
³ tension?
⁴         MS. GRAFF:  Object to form.
⁵         THE WITNESS:  The tape
⁶     itself has to stay in place.
⁷ BY MR. ZONIES:
⁸     Q.    And does that require
⁹ tension?
¹⁰     A.    I don't know how to answer
¹¹ your question because it rests there.
¹² It's like Velcro.  So if that's what you
¹³ define as tension, tension to the
¹⁴ retropubic periosteum, if it's a
¹⁵ retropubic or to the periurethral fascia
¹⁶ obturator, at that point it has to stay
¹⁷ in place.  So if that for you is tension
¹⁸ and your definition of tension, it has to
¹⁹ stay in place.
²⁰     Q.    When you left the TVT Secur
²¹ training, did you feel that you were
²² trained well enough to be able to perform
²³ the TVT-S surgical procedure?
²⁴         MS. GRAFF:  Objection to

Page 32

¹ form.  Now we're back to the TVT
² Secur?
³         MR. ZONIES:  Yes.
⁴         THE WITNESS:  I answer that?
⁵         MS. GRAFF:  If you can.
⁶         THE WITNESS:  Yes, at that
⁷     time.
⁸ BY MR. ZONIES:
⁹     Q.    Did you receive a
¹⁰ certificate saying that you had completed
¹¹ the training?
¹²     A.    I don't recall.
¹³     Q.    Did you ever, in the
¹⁴ training, did you perform any procedures
¹⁵ on women?  Patients?
¹⁶     A.    I don't recall specifically.
¹⁷     Q.    Do you recall was it a
¹⁸ cadaver lab?
¹⁹     A.    I don't recall specifically.
²⁰     Q.    When you came back to your
²¹ practice after the TVT Secur training,
²² did you actually perform TVT Secur
²³ operations?
²⁴     A.    Yes.

Page 33

¹     Q.    And that's the two
² operations you discussed?
³     A.    Yes.
⁴     Q.    How did those go?  Did you
⁵ have any complications from those
⁶ surgeries?
⁷     A.    No complications.
⁸     Q.    Why did you stop using it
⁹ after those two operations?
¹⁰     A.    The first case I was not --
¹¹ it took me much longer to get the fine
¹² adjustment that I was looking for and
¹³ that was significantly for me if my hands
¹⁴ length of time compared to a traditional
¹⁵ transobturator.
¹⁶         The second case I had
¹⁷ difficulty releasing the device in place
¹⁸ and that basically created an area where
¹⁹ there wasn't enough resistance for the
²⁰ TVT Secur to stay in place so I removed
²¹ the device and put a traditional T-Sling.
²² The patient had no complication.
²³     Q.    So in other words, in the
²⁴ second one you were describing you

Julie Drolet, M.D.

1  attempted to use the TVT Secur and felt
2  that it had failed and so you used a
3  different sling to actually treat the
4  patient?
5      A.    I don't know if the device
6  itself failed or my application of the
7  device.  The net result would have been a
8  suboptimal result for the patient and I
9  couldn't chance it, so I took it out and
10  put a transobturator sling.
11     Q.    Do you have a sense of how
12  many times you have used the Ethicon TVT
13  obturator?
14     A.    I can't recall.
15     Q.    Do you have a preference for
16  an inside out or an outside in technique
17  for the obturator?
18     A.    At this time, outside in is
19  what I have been the most accustomed to.
20  I became comfortable with the outside in
21  when I did Prolift and so outside in just
22  came easier for me.  When I teach the
23  residents, you know, I can grip onto the
24  handle with the handle we have.  And so

1  it's easier for me, my preference.  My
2  residents learn TVT-O from other
3  physicians, so for me it's my preference.
4      Q.    Have you ever taught the
5  TVT-O?
6      A.    I'm sure I did.
7      Q.    You don't have a
8  recollection though as you sit here?
9      A.    There are two hospitals
10  where the TVT-O would have been used and
11  at Apple Hill which is an outpatient
12  facility they don't send residents and
13  they had the TVT-O for many years and
14  Memorial had it and I had the residents
15  there, so I must have.
16     Q.    And what was that timeframe?
17     A.    Again, that would have been
18  before I went to the T-Sling.
19     Q.    Do you think that you've
20  performed fewer than 30 TVT obturators
21  using the Ethicon TVT-O device?
22     A.    I can't tell you exactly.
23     Q.    It may be fewer than 30?
24     A.    It may be fewer; it may be

1  more.
2      Q.    Can you describe the TVT
3  Obturator inside out approach for me
4  please?  How you perform it?
5      A.    As best as I can recall, the
6  patient is under anesthesia, she's
7  prepped and draped in the usual fashion.
8  Her bladder is catheterized via Foley.  I
9  evaluate the UV junction and figure out
10  where the midurethral area is, take two
11  long Alice clamps, grasp the area just
12  above and just below and cephalocaudal to
13  the midurethral, inject that area with a
14  solution of Marcaine diluted with
15  epinephrine, inject towards the inferior
16  pubic rami on both sides, make a 1.2, 1.4
17  centimeter incision at the level of the
18  midurethra, use a pair of Metzenbaum
19  scissors, open up that periurethral
20  areolar and fascial tissue, what people
21  call fascia, introduce the wing guide at
22  a 45-degree angle, perforate the
23  obturator membrane, take the correct
24  ipsilateral handle depending which way

1  you want to start, right or left, pass it
2  through the wing guide, along the wing
3  guide, and once the tip has reached the
4  obturator membrane, the wing guide goes
5  out, then it's a movement where the hand
6  goes down and rotate and you externalize.
7          I don't make my incisions
8  before I see the tip of my needle because
9  I'll make my incision when the tip of the
10  needle comes out.  Then I take a Kocher
11  or Alice clamp, grab the tip, undo the
12  motion so that the actual helical passer
13  can come out, leave the mesh there,
14  perform the same exact procedure on the
15  contralateral side.
16         Once the plastic sheath has
17  been brought out and the mesh is sitting
18  underneath the midurethral but very
19  loose, then I take my Foley catheter out,
20  introduce a 30-degree lens cystoscope for
21  the TOT and TVT-Os.  I use a 30-degree
22  lens and explore the urethra, bladder,
23  making sure everything is okay, urethral
24  orifices, leave approximately 200 to 300

Julie Drolet, M.D.

1 ML in the patient's bladder depending on
2 what she could hold before with a cough
3 test and stress incontinence. My
4 patients are usually asleep so I do a
5 Crede maneuver for them, make them leak,
6 and then I adjust the tape, and then we
7 cut, pull the plastic sheaths, leave the
8 tape in place.
9          During that time I place a
10 curved Kelly just underneath the
11 midurethra and secure that. Usually my
12 residents are the ones pulling the
13 plastic sheaths.
14          And then I close the
15 incision of course, put the -- pardon me.
16 Once the cysto is done and the cough test
17 is done and put the Foley in, then I put
18 my Kelly, then the plastic sheaths are
19 pulled off, then close incision and then
20 I put a tampon in there in the vagina.
21     Q.   So do you have a sense of
22 how soon after the TVT-O came to market
23 that you started to use it?
24     A.   I'm not quite sure.

1     Q.   Do you have a preference for
2 the retropubic or obturator approach?
3     A.   I have no personal
4 preference. It depends on the patient.
5 It depends on her indications,
6 contraindications, what her pathology is,
7 does she have intrinsic sphincter
8 deficiency, you know, what else is going
9 on and what has she had done previously,
10 if I'm seeing her for a previously
11 failed, you know, incontinence procedure.
12 So everything will be tailored to the
13 patient.
14     Q.   If you have a woman who has
15 intrinsic sphincter deficiency, do you
16 lean towards retropubic or obturator?
17     A.   I would lean to retropubic,
18 yes.
19     Q.   When you began using the TVT
20 Retropubic, did you have any
21 complications with any of your patients
22 during the surgical procedure?
23     A.   Yes. I buttonholed the
24 vaginal mucosa, I think it was my first

1 or my second case, but I have never had a
2 surgical complication during either --
3 during any midurethral sling.
4     Q.   Do you have a sense of how
5 -- is there a difference in efficacy in
6 your mind between a TVT Retropubic and a
7 TVT Obturator?
8     A.   As far as objective, there
9 is about the same, maybe the retropubic
10 TVT would be more efficacious in
11 intrinsic sphincter deficiency patients,
12 but if we look at all of the studies,
13 it's about the same objective and
14 subjective outcome.
15     Q.   How about in your personal
16 experience?
17     A.   Same.
18     Q.   And then how about in
19 complications or adverse effects? Do you
20 find in your experience that there's a
21 difference between your patients who get
22 a TVT or who got a TVT Retropubic and a
23 TVT Obturator?
24     A.   So those are two questions.

1     Q.   Uh-huh.
2     A.   If we look at overall
3 complication rates, no difference. Are
4 there subtleties? Yes, because the
5 retropubic TVT passes in Retzius, there's
6 complications specifically associated
7 with Retzius space and intraabdominal
8 complication. There are vascular
9 complications in both but the vessels can
10 be different just because we're not
11 entering through the same space. The
12 area of pain and discomfort will be
13 different just because suprapubic versus
14 between the inner thighs, so those things
15 specifically will be different, but
16 overall success/failure, about the same.
17     Q.   And again, is that based on
18 your experience or based on your
19 literature review or both?
20     A.   Both.
21     Q.   When you were using the TVT
22 Obturator, were you using mechanically
23 cut mesh or laser cut mesh?
24     A.   At the time it is

Julie Drolet, M.D.

Page 42

1 mechanically cut. I think it is
2 mechanically cut.
3    Q.   Did you ever use a TVT
4 Retropubic or a TVT Obturator that was
5 made with laser cut mesh?
6    A.   I don't recall.
7    Q.   Have you ever had to remove
8 a midurethral sling that you had
9 implanted?
10    A.   Yes.
11    Q.   Tell me about that. How
12 many times?
13    A.   And let me be more -- or ask
14 a more precise -- are we talking about
15 the entire sling?
16    Q.   Okay.
17    A.   Or are we just talking about
18 adjustment cut? I think that's a fair
19 question.
20    Q.   Let's break it down. Have
21 you ever had to remove an entire TVT
22 Retropubic or a TVT Obturator sling?
23    A.   So for the TVT Retropubic
24 that I have personally put in, yes.

Page 43

1 Once.
2    Q.   And what led to that?
3    A.   The patient was convinced
4 her fatty liver was caused by the TVT
5 sling even though she had absolutely no
6 problems. She claimed other ailments and
7 just absolutely wanted it out. I sent
8 her to a gastroenterologist, a
9 rheumatologist, her internal medicine
10 person, this patient was also on some
11 antidepressant and other medication,
12 morbidly obese, and at one point had to
13 acquiesce and removed it.
14    Q.   And that was a TVT
15 Retropubic?
16    A.   That was a TVT Retropubic.
17    Q.   And about when did that
18 occur?
19    A.   Early on. Basically between
20 2002 and 2005. Something like that.
21    Q.   Other than that one time
22 when you removed an entire TVT
23 Retropubic, have you removed any other
24 TVT Retropubics? The entire sling?

Page 44

1    A.   Not the entire sling, no.
2    Q.   How about a TVT Obturator?
3 Have you ever removed an entire TVT
4 Obturator sling?
5    A.   The entire? Going into the
6 adductus muscles and obturator, no, I
7 have not.
8    Q.   Would that be difficult to
9 do? Is that why you say it that way?
10 That going in through the adductor
11 muscles would be a much more invasive and
12 difficult procedure to remove the mesh?
13    A.   No. I'm just saying it to
14 make sure that I'm as precise as you are.
15 When you say entire removal, it means
16 entire removal.
17    Q.   And you've never done that?
18    A.   I've never had to do that.
19    Q.   Do you know if any of your
20 patients, any of the patients that you
21 implanted have ever had to have their
22 entire TVT Retropubic or TVT Obturator
23 removed by another physician?
24    A.   Not to my knowledge.

Page 45

1    Q.   Have you ever had to remove
2 part of a TVT Obturator sling?
3    A.   I can't recall if it was --
4 TVT Obturator? Yes.
5    Q.   Tell me about that.
6    A.   That I put in?
7    Q.   Yes.
8    A.   Oh! I don't think it was a
9 TVT Obturator. It was a TOT. An out to
10 in.
11    Q.   Is the T-Sling an out to in
12 sling?
13    A.   It's an out to in.
14    Q.   And what about a TVT
15 Retropubic? Have you ever had to --
16    A.   Remove part of it? Yes.
17 That I put in, no.
18        MS. GRAFF:  Doctor, please
19    let him finish his question before
20    you answer.
21        THE WITNESS: Sorry.
22 BY MR. ZONIES:
23    Q.   You haven't had to remove
24 any TVT -- it sounds like your testimony

Julie Drolet, M.D.

Page 46

1 is that you haven't had to remove any TVT
2 Retropubics or TVT Obturator even in part
3 that you put in in the first instance;
4 correct?
5     A.   I'm trying to think here.
6 Not that I can recall.
7     Q.   Have you ever treated any of
8 the patients for whom you've put in a TVT
9 or TVT-O sling, have you ever treated
10 them for an erosion?
11     A.   Not a TVT-O.  An out to in,
12 yes, vaginal, but not --
13     Q.   Vaginal erosion for a --
14     A.   Out to in, but not
15 specifically the TVT-O.
16     Q.   Okay.  You treat women who
17 have had complications from mesh that was
18 implanted by other physicians; correct?
19     A.   I do.
20     Q.   Is that a significant part
21 of your practice?
22     A.   Not more than 51 percent if
23 that's what you calculate, no.
24     Q.   What percentage of your

Page 47

1 practice is treating mesh complications?
2     A.   Less than ten percent.
3     Q.   Less than ten percent?
4     A.   Less than ten percent.
5     Q.   Have you ever treated a
6 patient for an erosion who had a TVT
7 Obturator device?
8     A.   I may have.  I can't recall.
9     Q.   Have you ever removed a TVT
10 Obturator device?
11     A.   Partially?
12     Q.   Yes.
13     A.   In somebody that I didn't
14 put in, yes.
15     Q.   And how often have you done
16 that?
17     A.   Ten times maybe.
18     Q.   How do you know it was a TVT
19 Obturator?
20     A.   Because I get the operative
21 reports.
22     Q.   Do you do that for all of
23 the patients for whom you're treating for
24 a mesh complication?

Page 48

1     A.   All of the patients that I
2 didn't put it in I get the operative
3 report because I would have the operative
4 report if they were mine.
5     Q.   And why is that important
6 for you to get the operative report?
7     A.   I want to know exactly what
8 mesh I'm dealing with, where they said
9 they implanted it, what other risks,
10 complications happened during the case.
11 It just helps me see ahead of time if
12 there are any additional risks or any
13 other additional factors that I would be
14 dealing with before I bring a patient to
15 the OR.
16     Q.   And in those patients where
17 you've excised some of a TVT Obturator
18 device, what were the indications for
19 removing the mesh?
20     A.   Pain, erosion.  Erosion into
21 the vagina and pelvic pain.
22     Q.   So in your practice for at
23 least these ten times you felt it was an
24 appropriate scientific and medical

Page 49

1 procedure to remove a portion of a TVT-O
2 sling when the complaints were of pelvic
3 pain; correct?
4     A.   You say scientific.
5     Q.   And I meant medical.
6     A.   After thorough evaluation,
7 after conservative measures, after pelvic
8 floor therapy, if I feel that there was a
9 significant amount of pain that was
10 located at the insertion of the mesh
11 material into the pelvic floor and that
12 set off a trigger point and conservative
13 measures didn't work, then at that point
14 it's a discussion with the patient
15 knowing that the risk of recurrence of
16 incontinence, you know, is 25 to 30
17 percent, sometimes even more.
18     Q.   And you've done that for
19 patients who have presented with pelvic
20 pain; correct?
21     A.   What do you mean "done
22 that"?
23     Q.   Sorry.  You have removed a
24 TVT Obturator sling or part of a TVT

Julie Drolet, M.D.

Page 50

1   Obturator sling for patients who have
2   presented to you with pelvic pain after
3   doing a thorough analysis that it was a
4   medically necessary and correct
5   procedure?
6       A.   Correct.
7       Q.   You've also done that
8   separately for patients who have had a
9   TVT Obturator, you have removed some of
10  the TVT Obturator mesh when those
11  patients have presented to you with an
12  erosion because you felt it was a
13  medically necessary and reasonable
14  surgery; correct?
15      A.   Correct.
16      Q.   In those cases where you've
17  done that, was there relief from the pain
18  in those cases?
19      A.   Most, yes.
20      Q.   And you discussed that prior
21  to taking the surgical step of removing
22  the mesh you would also attempt other
23  noninvasive methods to help the patients
24  with the pain; is that right?

Page 51

1       A.   That is correct.  I just
2   want to make sure that we're separating
3   here the need to correct an erosion of a
4   mesh from a patient presenting with
5   pelvic floor pain or pelvic pain that
6   also happens to have a transobturator
7   sling mesh.  Those are two separate
8   pathology, etiology, management, and two
9   different types of intervention.
10      Q.   Understood.  So if you have
11  a patient presenting with pelvic pain who
12  has a TVT Obturator, your first steps
13  would be to try to conservatively manage
14  that pain?
15      A.   The first step would be to
16  evaluate where the pain is coming from.
17  Plenty of women have pelvic pain and
18  pelvic floor dysfunction and a lot of
19  conditions that produce pain and have
20  never had any mesh or sling procedures.
21  So one doesn't preclude the other, and
22  it's not because somebody comes in and
23  had a previous sling that her pain is
24  consequently due to the sling.

Page 52

1       Q.   I understand, but in these
2   ten patients for example where ultimately
3   you surgically had to remove --
4       A.   Yes.
5       Q.   -- part of the mesh, in
6   those patients when you finally got to
7   that point of needing to do a surgical
8   intervention, prior to that surgical
9   intervention you would have tried more
10  conservative measures to manage their
11  pain that obviously did not work.  Is
12  that fair?
13      A.   That is correct, unless
14  they've already had the conservative
15  measures done elsewhere.
16      Q.   Understood.  And so it
17  sounds to me like that's some number of
18  months of trying to manage the pain prior
19  to the surgical procedure.  Is that fair?
20          MS. GRAFF:  Object to form.
21          THE WITNESS:  I wouldn't say
22      months.  It just depends on when
23      they come to my doorstep and what
24      I think the appropriate course of

Page 53

1   action is.
2   BY MR. ZONIES:
3       Q.   Have you had the experience
4   of a case where you've removed part of
5   the mesh and it did not resolve the pain?
6       A.   Yes.
7       Q.   In those cases, what is your
8   next step?  Do you take a step to remove
9   more of the mesh?
10      A.   It depends.  Last case that
11  came to mind -- that comes to mind is a
12  patient who had severe pelvic floor
13  dysfunction and we're not quite sure if
14  it was caused by the mesh or not.  There
15  was not a hundred percent relief.  And I
16  have somebody that I refer to that can do
17  neurolysis and specific pudendal nerve
18  releases, so she's at that point.
19      Q.   Continued attempts to
20  resolve the pain despite having the mesh
21  partially excised?
22      A.   Correct.  And the entire
23  left side was removed, and she had no
24  stress incontinence after the removal.  I

Julie Drolet, M.D.

Page 54

1  did not put the mesh in. And so she's a
2  complex case of pelvic pain and we're not
3  quite sure what hit first, so ...
4          And may I add one more thing
5  in that particular patient? Her left arm
6  of whatever the mesh that was put in was
7  into the levator ani muscle group. It
8  was asymmetrically positioned in her.
9      Q.   And was that a TVT
10 Obturator?
11     A.   TVT Obturator.
12     Q.   This risk of pelvic pain
13 associated with a TVT Obturator, is that
14 something that you inform your patients
15 about prior to -- or informed your
16 patients about prior to using a TVT
17 Obturator device on them?
18     A.   The risk of pelvic pain
19 is -- I inform my patients of the risk of
20 pelvic pain while doing any surgery to
21 the pelvic floor. So whether it's a TVT,
22 TOT, TVT-O, hysterectomy, pelvic
23 reconstruction, you touch the pelvic
24 floor, there can be pain.

Page 55

1      Q.   But specifically with a
2  TVT-O or a midurethral sling like the
3  TVT-O, do you say to your patients, look,
4  I've had an experience where after
5  implanting a TVT-O a patient -- or strike
6  that.
7          Specifically with regard to
8  TVT-O, do you have discussions with your
9  patients saying I've had experiences
10 where a patient has had a TVT-O inserted
11 and they've experienced severe pelvic
12 pain and I remove a portion of that mesh
13 and it can relieve the pain?
14     MS. GRAFF:  Object to form.
15 BY MR. ZONIES:
16     Q.   Have you ever had that
17 discussion with a patient?
18     MS. GRAFF:  Objection.
19     THE WITNESS:  Well, I
20 wouldn't have had that specific
21 discussion because I have had not
22 experience with TVT-O that caused
23 pelvic pain that I needed to
24 remove part of the mesh. So I

Page 56

1  wouldn't have had that type of
2  discussion.
3          But when we go through
4  options to manage urinary stress
5  incontinence and we've gone from
6  the nonsurgical to the surgical,
7  once we get to the surgical,
8  whatever procedure there is
9  described in the literature can
10 and is associated with pelvic pain
11 in some patients to a certain
12 degree.
13          So no matter what,
14 anesthesia is associated with the
15 risk of death, so when I do and
16 talk about, listen, we're at a
17 point where you may need surgery,
18 the considerations are and include
19 bladder perforation, urethral
20 damage, pain, chronic pain,
21 dyspareunia, heart attack, stroke,
22 laparotomy. So all of these are
23 discussed with the patient ahead
24 of time.

Page 57

1  BY MR. ZONIES:
2      Q.   And then when you have a
3  patient present like one of these ten
4  TVT-O patients you discussed with a
5  complication of pelvic pain, at that
6  point you have an informed consent
7  discussion with that patient as well;
8  correct?
9      A.   Absolutely.
10     Q.   And during that informed
11 content conversation with a patient who's
12 presenting with pelvic pain from a TVT-O,
13 you inform that patient that you've had
14 success removing some of the TVT-O mesh
15 to alleviate the pain. Is that right?
16     MS. GRAFF:  Object to form.
17     THE WITNESS:  Yes, that is
18 correct.
19 BY MR. ZONIES:
20     Q.   And when you're having that
21 informed consent discussion with that
22 patient, you say to do this procedure of
23 removing the mesh there are risks?
24     A.   That is correct.

Julie Drolet, M.D.

Page 58

1  Q.  And you go through the list
2  of risks very similar to the ones you
3  just named for me saying because this is
4  a surgical procedure there's a risk when
5  I remove this mesh of bleeding.  You tell
6  the patient that; right?
7  A.  Yes.
8  Q.  There's a risk of de novo
9  pelvic pain associated with removing a
10  mesh; is that true?
11  A.  Right, but if they're
12  already coming to me for pain and I'm
13  going to remove the mesh, the word de
14  novo doesn't apply.
15  Q.  I meant to say worsening
16  pelvic pain.
17  A.  Yes.  And may I add one
18  thing?
19  Q.  Sure.
20  A.  Mesh erosion, I forgot to
21  mention it and the risk of me placing a
22  mesh sling, that would have gone into
23  your previous question.
24  Q.  That's one of the -- what

Page 59

1  you're trying to say is is that in
2  addition to what I'll call creative
3  horribles of outcomes, you would also
4  have erosion in there as one of your
5  consenting risks?
6  A.  I would have mesh erosion as
7  one of my original consent risks.
8  Q.  And you would also have
9  erosion as one of your consent risks for
10  a patient for whom you're about to remove
11  some of the mesh, correct, because
12  there's a chance of erosion associated
13  with removing a portion of the mesh?
14  A.  It would be associated with
15  the portion that has not been removed,
16  yes.
17  Q.  And you would also -- so if
18  a patient has a TVT-O implanted and
19  presents to you with pelvic pain, in your
20  discussion with that patient about the
21  risks of a now second surgery that would
22  be to remove a portion of the mesh, you
23  would go through the same risks because
24  all those risks as in your original

Page 60

1  consenting of a patient exist again for
2  this surgical operation on the pelvic
3  floor; correct?
4  MS. GRAFF:  Object to form.
5  THE WITNESS:  It depends on
6  the patient, and I'll just do a
7  caveat.  The risk of erosion
8  depends on how much is left and
9  where it's left.  So, if we go and
10  dissect to the obturator internus
11  and we remove that mesh, well,
12  whatever is left on that pelvic
13  side wall cannot erode therefore
14  in the vagina.  What is left of
15  the mesh depending on where it is
16  can if there's still mesh in that
17  general area.
18  BY MR. ZONIES:
19  Q.  In patients when you are
20  removing a portion of a TVT-O sling, do
21  you use general anesthesia usually?
22  A.  Yes.
23  Q.  So those patients have the
24  risks, all of the risks associated with

Page 61

1  general anesthesia when you're doing a
2  removal of the mesh; correct?
3  A.  Let me caveat that.  Not all
4  of them are under general anesthesia.
5  The ones that are on general anesthesia
6  are the ones that I remove for pelvic
7  pain.
8  Q.  Some of them may be however?
9  A.  Some?
10  Q.  Yeah.
11  A.  If I have a simple vaginal
12  erosion, I may do that in the office
13  local anesthesia, you know; but if I feel
14  that there is a portion of the mesh that
15  is placed through the levator ani muscle,
16  then that patient is going to be under
17  general anesthesia for her patient
18  comfort.
19  Q.  So there are some of the
20  patients whom you've treated for mesh
21  complications such as pelvic pain where
22  you're removing a portion of a TVT
23  Obturator sling for whom you've had to
24  use general anesthesia; correct?

Julie Drolet, M.D.

1   A.   That would be correct.
2   Q.   And those patients who are
3   having this re-operation to remove a
4   portion of the mesh have all of the risks
5   associated with going under general
6   anesthesia including, for example, death;
7   correct?
8   A.   Yes, although pretty darn
9   rare.  Good anesthesia nowadays, but yes.
10  Q.   And those patients would
11  have the risk of bleeding from the
12  surgical procedure to remove the mesh;
13  correct?
14  A.   Yes.
15  Q.   They would also have the
16  risk of dyspareunia associated with any
17  pelvic floor surgery; correct?
18  A.   Right, but if I'm removing
19  it for pain, most of these women have
20  dyspareunia if they're sexually active.
21  Q.   That's a good point.  To you
22  it sounds like pelvic pain includes
23  within it dyspareunia?
24  A.   No.  They can be mutually

1   inclusive or not.
2   Q.   So my question is have you
3   ever removed a TVT-O mesh where the
4   indication was dyspareunia?
5   A.   Along with pelvic pain, yes.
6   MR. ZONIES:  Let's take a
7   break.
8   (Whereupon, a brief recess
9   was held from 2:42 to 2:51 p.m.)
10  BY MR. ZONIES:
11  Q.   Doctor, before we broke we
12  were discussing your medical treatment of
13  some women who had had complications
14  associated with their TVT-O sling.  Do
15  you recall those conversations?
16  A.   Yes.
17  Q.   And your treatment of those
18  women, for some of them you had to
19  perform a second surgical procedure to
20  remove part of the TVT-O mesh; is that
21  right?
22  A.   That would be correct.
23  Q.   Do you think it would be
24  appropriate and necessary for a medical

1   device company who was making such a mesh
2   to inform physicians and patients that
3   removal of the mesh may be necessary to
4   relieve pelvic pain?
5   MS. GRAFF:  Object to form.
6   THE WITNESS:  Specifically
7   talking about TVT-O?  Is that what
8   you're asking?
9   BY MR. ZONIES:
10  Q.   Yes.  Do you think it would
11  be appropriate and necessary for a
12  medical device manufacturer to include in
13  the instructions for use and the patient
14  brochure the fact that there's a risk
15  that the TVT-O mesh may need to be
16  removed in a second surgical procedure?
17  A.   I think that -- let me
18  rephrase this.  It's my opinion that
19  urinary stress incontinence surgery can
20  always carry a risk of needing to have
21  sutures removed, mesh removed whether
22  it's a pubovaginal sling or a midurethral
23  sling for many years.  So every surgeon
24  that puts in a foreign body has to know

1   that there's a risk that part of it may
2   need to be removed for any reason.
3   So is it necessary to inform
4   each doctor specifically that the TVT-O
5   needs to have this information?  I think
6   with our training, with our experience,
7   with any of the literature it would not
8   be necessary or it should not be
9   necessary.
10  Q.   You don't know what's in
11  every other physician's head; correct?
12  A.   Correct.  I am not a mind
13  reader.
14  Q.   Right.  And so for a
15  physician who is just starting to use
16  midurethral slings such as the TVT-O,
17  don't you think it would be appropriate
18  to include in the instructions for use,
19  hey, you should know that in some
20  instances it's been reported that women
21  who have had a TVT-O implanted have
22  experienced pelvic pain and dyspareunia
23  and despite conservative measures to
24  treat that pelvic pain and dyspareunia it

Julie Drolet, M.D.

Page 66

1  did not resolve which necessitated
2  removal of some or all of the sling?
3  Wouldn't that be appropriate?
4      A.   What is more appropriate I
5  would think is that if a physician is
6  just starting now to do midurethral sling
7  with the amount of body of literature
8  that's out there that that person would,
9  one, read what's out there or part of it,
10  make themselves aware of at least the
11  latest Cochrane Reviews on midurethral
12  sling, get appropriate training and that
13  would include risks and complications.
14      Q.   And you're speaking about a
15  physician who would start today, but what
16  about when you started to do slings?
17  When you first started to do slings, did
18  you know that in 2002, 2003, 2005, did
19  you have an appreciation that there was a
20  risk of pelvic pain and dyspareunia
21  associated with the use of a TVT device
22  and that the only way to get relief if
23  possible would be removal of the device?
24      MS. GRAFF:  Object to form.

Page 67

1      THE WITNESS:  Can you repeat
2      that?  I'm sorry.
3  BY MR. ZONIES:
4      Q.   Sure.  When you first
5  started to use TVT slings and the TVT-O
6  in 2002 through say 2005 timeframe, did
7  you understand that there was a risk of
8  severe pelvic pain and dyspareunia with
9  the use of a TVT-O and that conservative
10  measures of treating that pain might not
11  work such that you would recommend and
12  perform a surgical procedure to remove
13  the mesh in a patient?
14      MS. GRAFF:  Object to form.
15  BY MR. ZONIES:
16      Q.   Did you know that?
17      MS. GRAFF:  Same objection.
18      THE WITNESS:  I think I did.
19  BY MR. ZONIES:
20      Q.   And from where did you learn
21  that?
22      A.   Experience, previous
23  knowledge of putting burst sutures that,
24  you know, would have to be removed.  I

Page 68

1  didn't expect that there could be no
2  association with pain by placing a
3  polypropylene mesh underneath the
4  midurethra.  We would have risks just
5  like a sacrocolpopexy has risks of pain.
6      Q.   And is that something that
7  in that timeframe in the early 2000s
8  through mid 2000s, is that something that
9  you believe patients should also have
10  been informed of?
11      A.   I think it's part of the
12  informed consent and to have to redo
13  surgery is part of the informed consent
14  that things may not last, so I believe
15  that there's enough out there that it's
16  not an absolute necessity to have it
17  spelled out on an IFU.
18      Q.   What about in a brochure
19  that's advertising the product?
20  Shouldn't you put the risk of resurgery
21  in that brochure?
22      MS. GRAFF:  Objection.
23      THE WITNESS:  It depends on
24      what the brochure is intended to

Page 69

1  do.  I think if you put every
2  possible risk that could occur on
3  a brochure, since those risks are
4  not more likelier than not to
5  occur, then it defies the purpose
6  of the brochure.  I think the
7  brochure in general for patients
8  is intended for general use, that
9  the broad risks are explained and
10  that a secondary surgery could be
11  necessary.
12  BY MR. ZONIES:
13      Q.   And that's certainly
14  something that a patient should be
15  informed of, that a secondary surgery
16  could be necessary; correct?
17      MS. GRAFF:  Objection.
18  Mischaracterizes.
19      THE WITNESS:  For any reason
20  for any surgeon.
21  BY MR. ZONIES:
22      Q.   Including for a TVT-O?
23      A.   Including for TVT-O.
24      Q.   And a patient should be

Julie Drolet, M.D.

Page 70

1  informed and consented that implantation
2  of a TVT-O could lead to severe pelvic
3  pain that is not resolvable absent
4  another surgery removing the mesh;
5  correct?
6          MS. GRAFF:  Are you talking
7      about the brochure or are you
8      talking about the consent that she
9      has with her patient?
10         MR. ZONIES:  Thank you.
11  BY MR. ZONIES:
12      Q.   Either through the brochure
13  or through the physician's discussion
14  with the patient, a patient should be
15  informed when getting a TVT-O device that
16  there is a risk that the patient will
17  experience severe pelvic pain from the
18  TVT-O device that can only be relieved by
19  removing the device; correct?
20         MS. GRAFF:  Objection to the
21      form, to the word "should".
22         You can answer if you can.
23         THE WITNESS:  It is my
24      experience that chronic pelvic

Page 71

1      pain is a known risk associated
2      with any pelvic and/or urological
3      procedure and that should be part
4      of the informed consent.
5  BY MR. ZONIES:
6      Q.   Right.  A patient should be
7  informed of that; correct?
8      A.   Should be informed of the
9  risk of chronic pelvic pain.
10     Q.   Should also be informed that
11  there is a risk with the insertion of a
12  TVT Obturator device of chronic permanent
13  dyspareunia; correct?
14         MS. GRAFF:  Object to form.
15         THE WITNESS:  Part of the
16      chronic pain syndrome, I inform my
17      patients about chronic pelvic pain
18      on every procedure.  Scarring even
19      normal can lead to pain.
20  BY MR. ZONIES:
21      Q.   And in particular you inform
22  them that there is a risk of permanent
23  debilitating dyspareunia with the use of
24  a TVT-O device?

Page 72

1          MS. GRAFF:  Object to form.
2  BY MR. ZONIES:
3      Q.   You inform your patients of
4  that; correct?
5          MS. GRAFF:  Same objection.
6          THE WITNESS:  I tell them
7      that there is a risk that they can
8      have chronic pain.
9  BY MR. ZONIES:
10     Q.   Do you tell them that
11  there's a risk that they can have
12  permanent pain?
13     A.   Yes.
14     Q.   Do you tell them that
15  there's a risk that they can have pain
16  that will lead to a second surgery to
17  remove the TVT-O device and even that
18  surgery may not correct the pain?
19         MS. GRAFF:  Objection.
20         THE WITNESS:  Any patient
21      after any surgery, mesh, non-mesh,
22      synthetic sling or not,
23      pubovaginal sling, Burch procedure
24      has a risk of permanent pain, has

Page 73

1      a risk of needing a secondary
2      procedure for any reason that is
3      medically necessary that may or
4      may not correct the problem.
5  BY MR. ZONIES:
6      Q.   And that is something that
7  you believe you have an obligation to
8  inform your patients of prior to
9  implanting a TVT-O device; correct?
10     A.   Prior to implanting any
11  device I would inform them that they have
12  a risk of chronic pelvic pain and
13  dyspareunia.
14     Q.   And resurgery?
15     A.   And they may need a
16  secondary surgery, yes, for a medically
17  necessary reason.  Yes.
18     Q.   And for example, in those
19  ten women where you removed part of the
20  TVT Obturator, it was a medically
21  necessary operation?
22     A.   Correct.
23     Q.   Doctor, I'm going to hand
24  you what's going to be marked Exhibit 1

Page 74

1  to this deposition?
2         (Whereupon, the court
3     reporter marked Exhibit 1 for
4     identification as of this date.)
5  BY MR. ZONIES:
6     Q.   And Doctor, this is the TVT
7  Obturator Instructions for Use.  Do you
8  recognize it as such?
9     A.   Yes.
10    Q.   And I'll have you turn
11 please to the Page 7 entitled Adverse
12 Reactions.  Do you see that section?
13    A.   Yes.
14    Q.   So Doctor, under Adverse
15 Reactions, do you believe that it was
16 appropriate and necessary to include in
17 the IFU the adverse reaction of punctures
18 or lacerations of vessels, nerves,
19 structures or organs including the
20 bladder, urethra or bowel may occur and
21 may require surgical repair?
22        MS. GRAFF:  Objection.  Was
23    it necessary?  Was that your
24    question.

Page 75

1         MR. ZONIES:  Yes.
2  BY MR. ZONIES:
3     Q.   Was it reasonable and
4  necessary to include that risk?
5     A.   I think it's very
6  reasonable.  Was it necessary?  I don't
7  know what is necessary in the formulation
8  of an IFU or what is required, but this
9  is certainly very reasonable.
10    Q.   And same question with
11 respect to the second adverse reaction in
12 the IFU, "transitory local irritation at
13 the wound site may occur".
14        That's reasonable and
15 necessary to include in the IFU; correct?
16        MS. GRAFF:  Objection.
17        THE WITNESS:  I think it is,
18    in my opinion, it is very
19    reasonable; and again, is it
20    necessary for a surgeon to know
21    that once you make an incision and
22    there's a wound that there's a
23    transitory local irritation?  I
24    think most surgeons who have

Page 76

1  handled a scalpel would know that
2  there is a transitory local
3  irritation at the site of the
4  wound.  Is it necessary?  I don't
5  know what the FDA required for
6  this IFU.
7  BY MR. ZONIES:
8     Q.   But again you don't know
9  what is in surgeons' heads about the
10 risks that they do or don't know about;
11 correct?
12    A.   I, again, am not going to
13 pretend to know what's in every surgeon,
14 but I would expect that surgeons would
15 know that if they make an incision that
16 there will be inflammation in order for
17 this incision to heal.  It's part of the
18 normal healing process.
19    Q.   The third bullet down for
20 adverse reactions is "as with any
21 implant, a foreign body response may
22 occur".
23        You agree that with the
24 implantation of a TVT-O device in every

Page 77

1  instance a foreign body response occurs;
2  correct?
3     A.   With the implantation of any
4  foreign body, a foreign body response
5  will occur.
6     Q.   Will occur; correct?
7     A.   Will.
8     Q.   Not may as the IFU says;
9  correct?
10    A.   Correct.
11    Q.   And it goes on to say this
12 response could result in extrusion,
13 erosion, exposure, fistula formulation
14 and/or inflammation.  You agree with that
15 as well; correct?
16    A.   I agree that a foreign body
17 response can result in all of these, yes.
18    Q.   And the next bullet point
19 down says mesh extrusion, exposure or
20 erosion into the vagina or other
21 structures or organs.
22        You agree that that is a
23 potential adverse reaction associated
24 with the use of a TVT-O device; correct?

Page 78

1     A.   I believe it is associated
2  with the TVT-O or any other mesh, yes.
3     Q.   And so it's appropriate for
4  that to be in the IFU; correct?
5     A.   I think it was appropriate
6  to be in the IFU.
7     Q.   Is that necessary to be in
8  the IFU?
9        MS. GRAFF:  Object to form.
10       THE WITNESS:  I don't know
11    what the FDA again requires as
12    necessary, but it was appropriate
13    to be placed here.
14 BY MR. ZONIES:
15    Q.   If Ethicon knew of that risk
16 and decided not to put that in the IFU,
17 would that be inappropriate?
18       MS. GRAFF:  Object to form.
19       THE WITNESS:  Again, I don't
20    know what is necessary by FDA
21    standards in the formulation of an
22    IFU, but surgeons who use prolene
23    or polypropylene mesh would know
24    that there's a risk of mesh

Page 79

1     extrusion, exposure, erosion into
2     the vagina or other structures or
3     organs; even with sacrocolpopexies
4     this will occur.
5  BY MR. ZONIES:
6     Q.   Did you administer
7  prophylactic antibiotics when you
8  implanted TVT-O?
9     A.   Yes.
10    Q.   In every case?
11    A.   Every case.
12    Q.   Do you believe that's the
13 medically correct way to handle a TVT-O
14 implantation?
15    A.   In my experience, I
16 administer antibiotic prophylaxis for any
17 vaginal surgery that requires an incision
18 of the vaginal mucosa.
19    Q.   Have you ever experienced a
20 midurethral sling becoming infected --
21    A.   No.
22    Q.   -- and necessitating removal
23 of the sling?
24    A.   No.

Page 80

1     Q.   You've never had a TVT
2  Retropubic sling that became severely
3  infected?
4     A.   No.
5     Q.   You've never referred a
6  patient of yours with a TVT sling to an
7  infectious disease doctor to deal with
8  the infection?
9     A.   No, not for that.  I
10 referred the previously mentioned patient
11 to an infectious disease specialist to
12 confirm that there was no infection for
13 the patient's satisfaction and no
14 infection was found at the removal of her
15 entire TVT site.
16    Q.   Her TVT was eventually
17 removed?
18    A.   Yes, as previously
19 discussed.
20    Q.   And who removed that TVT?
21    A.   I did.  It was sent to
22 pathology.
23    Q.   Do you send all of the
24 meshes that you have removed to

Page 81

1  pathology?
2     A.   I do.
3     Q.   And do you review those
4  pathology reports?
5     A.   I do.
6     Q.   Have you ever seen a
7  pathology report discuss degradation of
8  mesh?
9     A.   No.
10       MR. ZONIES:  Could we go off
11    the record a second?
12       (Whereupon, a discussion was
13    held off the record from 3:14 p.m.
14    to 3:16 p.m.)
15 BY MR. ZONIES:
16    Q.   Do you have that IFU still
17 in front of you, Doctor?
18    A.   Yes.
19    Q.   Doctor, we were reviewing
20 Exhibit 1, the IFU for the TVT-O and a
21 few bullets down from where we just were
22 there's a line that says an adverse
23 reaction is acute and/or chronic pain.
24 Do you see that?

Julie Drolet, M.D.

Page 82

1    A.   I do see that.
2    Q.   And you would agree that
3  that's a risk with a TVT-O; correct?
4    A.   As with any surgery, yes.
5    Q.   But it is a risk with a
6  TVT-O; correct?
7    A.   It is.
8    Q.   So it's appropriate for that
9  to be in the IFU in your opinion;
10 correct?
11   A.   It is appropriate.
12   Q.   And then voiding dysfunction
13 is the next one.  That's also appropriate
14 to be in the IFU; correct?
15   A.   It is appropriate to be in
16 the IFU.
17   Q.   The next one, pain with
18 intercourse which in some patients may
19 not resolve, that's appropriate to be in
20 the IFU and to inform physicians of;
21 correct?
22   A.   It is appropriate to be in
23 the IFU and it's there.
24   Q.   Neuromuscular problems

Page 83

1  including acute and/or chronic pain in
2  the groin, thigh, leg, pelvic and/or
3  abdominal area may occur, you agree that
4  that's a risk with a TVT-O device;
5  correct?
6    A.   It is.
7    Q.   And you agree that it's
8  appropriate to put that in the IFU;
9  correct?
10   A.   As stated, yes.
11   Q.   The next one is recurrence
12 of incontinence.  That is a risk with a
13 TVT-O device; correct?
14   A.   As with any antiincontinence
15 surgery as well.
16   Q.   So recurrence of
17 incontinence is a risk with the TVT-O
18 device; correct?
19   A.   Yes, it is.
20   Q.   And you think it's
21 appropriate that that be in the IFU;
22 correct?
23   A.   It is appropriate.
24   Q.   Bleeding including

Page 84

1  hemorrhage or hematoma, that is a risk
2  associated with the TVT-O device;
3  correct?
4    A.   As with any other surgery.
5    Q.   So bleeding including
6  hemorrhage or hematoma is a risk of the
7  TVT-O device; correct?
8    A.   It is.
9    Q.   And so it's appropriate that
10 that be in the IFU; correct?
11   A.   It is appropriate that it is
12 in the IFU.
13   Q.   Next one is one or more
14 revision surgeries may be necessary to
15 treat these adverse reactions.  You agree
16 that that is a risk with a TVT-O;
17 correct?
18   A.   I agree that it is a risk,
19 yes.
20   Q.   And you agree that it's
21 appropriate for that to be in the TVT-O
22 IFU; correct?
23   A.   It is appropriate to be in
24 the IFU.

Page 85

1    Q.   The next one is proline mesh
2  is a permanent implant that integrates
3  into the tissue.  You agree with that;
4  correct?
5    A.   Yes.
6    Q.   And it goes on to say in
7  cases in which the proline mesh needs to
8  be removed in part or whole significant
9  dissection may be required.  You agree
10 that that is a risk of the TVT-O device;
11 correct?
12   A.   Yes.
13   Q.   And you agree that that's
14 appropriate that physicians be told that
15 in the IFU; correct?
16   A.   As mentioned here in the
17 IFU, they mentioned it.  It's appropriate
18 for it to be here in this IFU.
19   Q.   Would you think it's
20 inappropriate to not have that in the
21 IFU?
22       MS. GRAFF:  Object to form.
23       THE WITNESS:  Two negatives
24 so ...

Julie Drolet, M.D.

Page 86

BY MR. ZONIES:
Q.   If that were not in the IFU,
is that inappropriate?
        MS. GRAFF:  Same objection.
        THE WITNESS:  I would think
        that the physician who puts in a
        TVT-O going through the anatomy
        through which it goes through,
        removing it would require
        significant dissection or may
        require significant dissection
        depending on the extent that needs
        to be removed, the timing and the
        circumstances.
BY MR. ZONIES:
Q.   If a company knows that a
potential adverse reaction associated
with the use of their medical device is
that it may need to be removed in whole
or part requiring significant dissection,
that's something that should be included
in an IFU; correct?
        MS. GRAFF:  Object to form.
        THE WITNESS:  I think it's

Page 87

very appropriate that it is
included in this IFU.
BY MR. ZONIES:
Q.   Are the warnings that we've
just gone through in the IFU sufficient
and adequate based on your experience?
A.   Yes, they are.
Q.   Under the next section is
Other Adverse Reactions.  Do you see
that?
A.   Yes, I do.
Q.   And there it lists seroma,
urge incontinence, urinary frequency,
urinary retention, adhesion formation,
atypical vaginal discharge, exposed mesh
may cause pain or discomfort to the
patient's partner during intercourse and
death.  Did I read those correctly?
A.   You read those correctly.
Q.   And those are appropriate
adverse reactions to include in the IFU;
correct?
A.   They are appropriate to be
included in this IFU.

Page 88

Q.   If a company knew that these
risks existed, the company should include
these risks in the IFU; correct?
        MS. GRAFF:  Object to form.
        THE WITNESS:  "Should" I
        don't know, but they did, so it is
        very appropriate that they placed
        them here.
BY MR. ZONIES:
Q.   If the company knew that
these risks existed with the use of their
device, would it be inappropriate for the
company to refuse to put these risks in
the IFU?
        MS. GRAFF:  Object to form.
        THE WITNESS:  It depends.
BY MR. ZONIES:
Q.   On?
A.   Severity, relevance,
clinical relevance, frequency.  It
depends.  We can't list every
complication known to mankind on an IFU;
and so what is -- the complications that
are mentioned here are very appropriate

Page 89

to be in this IFU.
Q.   They're appropriate to be in
the IFU because it informs physicians of
the potential risks of using the device;
correct?
A.   These inform the surgeon of
these potential risks and they're
appropriately placed in this IFU.
Q.   And they in turn would help
a physician have an informed consent
conversation with his or her patient
about the risks as well; correct?
A.   As you said, I can't be in
every surgeon's head, but one would by
looking at these ahead of surgery knowing
this procedure, they would be more
enlightened if they had not been at all
and before they performed their first
TVT-O that this would be an aid to their
general body of knowledge and experience
in order to appropriately inform the
patient of the risk benefit of a
particular surgery.
Q.   Having these adverse

Julie Drolet, M.D.

Page 90

1 reactions and risks listed certainly
2 could only benefit the physician in
3 understanding the risks and benefit the
4 physician's patient to understand the
5 risks; correct?
6           MS. GRAFF:  Object to form.
7           THE WITNESS:  As an
8      addition.
9 BY MR. ZONIES:
10     Q.   As additional information
11 for that physician to use when making the
12 determination of whether or not to
13 perform the surgery and having a
14 discussion with their patient about
15 performing the surgery; correct?
16           MS. GRAFF:  Objection.
17           THE WITNESS:  As stated in
18      this particular brochure for this
19      particular procedure, yes.
20 BY MR. ZONIES:
21     Q.   In preparation of your
22 report, Doctor, did you review the TVT-O
23 instructions for use?
24     A.   Yes.

Page 91

1     Q.   When?
2     A.   Before my report.
3     Q.   Sometime between January and
4 February 2016?
5     A.   That would be correct.
6     Q.   Do you know which version?
7 Did you review only one IFU?
8     A.   I was sent multiple
9 documents on PDFs, in PDF form, and I
10 cannot be sure if it was a variation of
11 -- if there was more than one produced.
12 This I see is the version from 2005.
13 Actually, there's a date of January 2015
14 here and then it says 2005, so I don't
15 know which version I read.
16     Q.   In rendering your opinions
17 in the Gomez case, do you know if you
18 read the IFU that would have been in
19 effect when Ms. Gomez had her TVT-O
20 implanted?
21     A.   I think I did.  I think that
22 was part of the documents that they
23 provided to me.
24           MR. ZONIES:  Can you go

Page 92

1 ahead and mark this as Exhibit 2
2 please?
3           (Whereupon, the court
4      reporter marked Exhibit 2 for
5      identification as of this date.)
6 BY MR. ZONIES:
7     Q.   Doctor, you've just been
8 handed Exhibit 2.  This is another TVT
9 Obturator IFU and this happens to be an
10 IFU that's listed in your reliance
11 materials.
12     A.   Okay.
13     Q.   Does this appear to be the
14 IFU that you reviewed in the preparation
15 of your report?
16     A.   If it's in my reliance
17 material, chances are it is.  I would
18 have to confirm that there's not another
19 IFU that was produced between 2005 and
20 2009.
21     Q.   And if you look at the
22 adverse reactions section in this IFU,
23 you'll see that it's significantly
24 shorter than the one we just went

Page 93

1 through; isn't it?
2           MS. GRAFF:  Object to form.
3           THE WITNESS:  What page are
4      you looking at here?  Okay.
5 BY MR. ZONIES:
6     Q.   Page 7.
7     A.   I agree that the paragraph
8 of adverse reaction in the 2005 version
9 of this IFU is different than the version
10 in 2015 which was Exhibit 1.
11     Q.   So in Exhibit 2, Doctor, if
12 you look at it, do you see any indication
13 in the adverse reaction section that
14 Ethicon is informing physicians of the
15 risk of seroma?
16     A.   The specific risk of seroma
17 in this paragraph of adverse reaction is
18 not specifically mentioned.
19     Q.   Is the risk of urge
20 incontinence mentioned?
21     A.   In this IFU, the risk is --
22 that particular risk is not mentioned.
23     Q.   Is urinary frequency
24 mentioned?

Page 94

1      A.    No, it is not mentioned.
2      Q.    Is urinary retention
3  mentioned?
4      A.    In specific words, no, but
5  it does say temporary or permanent lower
6  urinary tract obstruction, so that would
7  be clinically the same as retention.
8      Q.    Is adhesion formation
9  mentioned?
10      A.    The word adhesion formation
11  is not specifically written as stated,
12  but you have foreign body reaction could
13  result in extrusion, erosion, fistula
14  formation or inflammation. They're all
15  precursors of adhesions. This obviously
16  contains less words than what is in the
17  2015 version.
18      Q.    And atypical vaginal
19  discharge, is that mentioned?
20      A.    The atypical vaginal
21  discharge is not mentioned in this
22  particular IFU.
23          Wait a minute. Some of
24  these adverse reactions are located in

Page 95

1  warnings and precautions, so that as I'm
2  reading here, there is detrusor
3  instability, so there are risks of
4  voiding dysfunction in this brochure that
5  are maybe not stated verbatim but are the
6  equivalent.
7      Q.    It's more detailed warnings
8  in the 2015 IFU?
9      A.    Well, I'd have to see if the
10  word de novo detrusor instability is in
11  the 2015 IFU.
12      Q.    If you look just adverse
13  reactions four bullets up, it says as
14  with other incontinence procedures, de
15  novo detrusor and instability may occur?
16      A.    Right.
17      Q.    So there --
18      A.    And that would go with
19  voiding dysfunction. It's just a
20  different term. So the fact that the
21  term voiding dysfunction is not written
22  on the 2005 brochure, de nova detrusor
23  instability or urgency frequency, pardon
24  me, the urgency frequency is in the 2005

Page 96

1  maybe not explicitly but implied with
2  voiding dysfunction.
3      Q.    It's an implied warning?
4      A.    A surgeon should know that
5  detrusor instability would cause urgency
6  frequency and may cause even urge
7  incontinence, so that would be part of
8  the general body of knowledge of a
9  surgeon who would be implanting a TVT-O
10  reading this IFU.
11      Q.    That's your assumption that
12  physicians would know that?
13          MS. GRAFF: Object to form.
14  Mischaracterizes.
15          THE WITNESS: It's in the
16  general literature. As with any
17  antiincontinence procedure whether
18  it's pubovaginal sling, Burch,
19  midurethral slings, urgency
20  frequency will occur. Detrusor
21  instability may occur.
22  BY MR. ZONIES:
23      Q.    Does the 2005 brochure say
24  anything about exposed mesh may cause

Page 97

1  pain or discomfort to the patient's
2  partner during intercourse?
3      A.    Let me just make sure. In
4  this brochure it is not specifically
5  mentioned.
6      Q.    So you would agree with me,
7  Doctor, that when comparing Exhibits 1
8  and 2 that the Exhibit 1, 2015 brochure
9  certainly has more detail and lists
10  additional adverse reactions in it that
11  the company feels or felt at this time
12  that it should include in the IFU as
13  compared to Exhibit 2; correct?
14      A.    I don't know what the
15  company felt as far as feelings, but
16  there are more specified or more lists of
17  adverse reaction mentioned in the 2015
18  brochure than the 2005.
19      Q.    And certainly it seems like
20  your testimony today is is that all of
21  the risks in the 2015, those were all
22  known in 2005?
23          MS. GRAFF: Object to form.
24          THE WITNESS: I wouldn't

Julie Drolet, M.D.

Page 98

1  characterize it that way.  I think
2  most of the major risks associated
3  with this procedure as far as
4  midurethral slings, TVT-O, I think
5  most of the severe risks were
6  known in 2005.
7  BY MR. ZONIES:
8      Q.  And you agree that when we
9  went through the 2015 IFU, you agree that
10  these warnings and adverse reactions were
11  all reasonable to include in the IFU;
12  correct?
13      A.  I think it was reasonable
14  for a company to include these risks in
15  an IFU.
16      Q.  And are there some risks in
17  the 2015 IFU that you believe weren't
18  well-known in 2005?
19      A.  I'm not sure that any of
20  these risks weren't known in 2005.  There
21  are not too many studies that have
22  reported on partner dyspareunia
23  specifically and I can't recall if and
24  when those started to appear.  Permanent

Page 99

1  stitches in the vagina for any reason can
2  cause pain to the partner, so it's not a
3  long shot to think that a polypropylene
4  mesh could cause pain to the partner.  It
5  was known with sacrocolpopexy, so it's
6  not far reached that this could have been
7  known in 2005.
8      Q.  And they added that warning
9  in 2015; correct?
10      MS. GRAFF:  Objection.
11      Lacks foundation.
12  BY MR. ZONIES:
13      Q.  According to Exhibit 1?
14      MS. GRAFF:  Same objection.
15      THE WITNESS:  According to
16      Exhibit 1, these are the lists of
17      things that appear in the IFU and
18      it's different than 2005.
19  BY MR. ZONIES:
20      Q.  Is there anything on Exhibit
21  1 in the adverse reaction section that we
22  were just looking at that you think
23  shouldn't have been included in a patient
24  brochure?

Page 100

1      MS. GRAFF:  Object to form.
2      THE WITNESS:  Should not be
3  in a patient brochure?
4  BY MR. ZONIES:
5      Q.  Yes.
6      A.  There's nothing in here that
7  should not be in a patient brochure in
8  these adverse reactions.
9      MR. ZONIES:  Why don't we
10  take a break?
11      (Whereupon, a brief recess
12  was held from 3:42 to 3:50 p.m.
13  Mr. Bentley left the deposition.)
14  BY MR. ZONIES:
15      Q.  Doctor, before we broke we
16  were looking at Exhibit 1 which is the
17  2015 IFU and the adverse events that are
18  listed there in that IFU, would it be
19  appropriate to list those adverse events
20  in a patient brochure as well?
21      MS. GRAFF:  Object to form.
22      THE WITNESS:  I wouldn't
23      know what is appropriate or not in
24      the design of a patient brochure

Page 101

1  to inform a patient.
2  BY MR. ZONIES:
3      Q.  You don't have an opinion on
4  whether or not that should be included in
5  a patient brochure?
6      A.  And to what detail patient
7  brochures are informative, marketing and
8  do not substitute for informed consent
9  and a discussion with the doctor.  So
10  what is appropriate to be put in a
11  patient brochure just like the ads on TV
12  we see whether it's for drugs or any
13  product, there's always a disclaimer and
14  to talk to your doctor.  Patient
15  brochures are the same way.
16      Q.  So do you have an opinion on
17  whether or not the information in the
18  adverse reactions section of the 2015
19  IFU, whether or not that information
20  should have been included in a patient
21  brochure?
22      A.  Should have?
23      Q.  Yes.  Do you have an opinion
24  on that?

Julie Drolet, M.D.

Page 102

1    A.   I think it doesn't need to
2  in part or total modified so that the
3  patient can understand some of it, but
4  the brochure is to start a conversation
5  and/or to give a patient to think about
6  things and then come back and then
7  discuss it again.  From the patient
8  brochures, they can do research on the
9  Internet if they have a computer, talk to
10  friends, and then come back, but what a
11  patient understands to go to surgery
12  would more rely on the discussion that
13  they would have had with their surgeon
14  who is actually going to perform the
15  surgery.
16    Q.   But don't you think it would
17  be helpful for a patient to have those
18  adverse reactions in front of them and
19  say, doctor, can you tell me what is a
20  seroma and what's the risk of that and
21  what might the potential adverse outcome
22  be?
23         MS. GRAFF:  Object to form.
24         THE WITNESS:  It depends on

Page 103

1  the adverse event.  If we gave
2  adverse event for a bottle of
3  Tylenol, it may be that nobody
4  would ever take their Tylenol
5  medicine, nobody would ever take
6  their blood pressure medicine.
7  Although it saves lives, there are
8  some serious risks associated with
9  blood pressure medicine.
10       So it's a fine balance to be
11  informative and to start a
12  discussion with a patient
13  brochure, but again it doesn't
14  substitute for all of the risks
15  and conversations that need to be
16  had with the implanting physician.
17  BY MR. ZONIES:
18    Q.   Well, you know for example
19  on a bottle of Tylenol or blood pressure
20  medication the adverse effects and
21  warnings and contraindications are fairly
22  lengthy and detailed even for the
23  patients; right?
24         MS. GRAFF:  Objection to

Page 104

1  form.
2         THE WITNESS:  They're not on
3  the bottle, just like they're not
4  on television.
5  BY MR. ZONIES:
6    Q.   Well, you were talking about
7  on television where they list the adverse
8  events at the end of an advertisement;
9  right?
10    A.   It is an absolute small
11  blurb sometimes not even mentioned but it
12  says talk to your doctor, for more
13  information talk to your doctor.  So to
14  list certain complications on a patient
15  brochure I think is very appropriate
16  because it starts the discussion.
17       Do every potential risks
18  known to mankind for every procedure need
19  to be listed on a patient brochure?  Then
20  the answer is probably not.  It would
21  have a counter-effective negative impact
22  of that brochure.  It wouldn't start the
23  discussion.  Any surgical brochure needs
24  to look at risk versus benefits.  So

Page 105

1  these are the complications, but talk to
2  your doctor, it's permanent.
3    Q.   And I'm not talking about
4  every complication under the sun.  I'm
5  just talking about the ones that are
6  listed in Exhibit 1 and I believe you
7  testified earlier that having these
8  adverse reactions in a patient brochure
9  would be reasonable.  Correct?
10    A.   I'd have to have my
11  deposition re-read to that, but certain
12  risks and adverse reactions to be put in
13  in a patient brochure are reasonable.
14  Are they mandatory?  Are they necessary?
15  What does the government or the FDA
16  require?  That I can't tell you.
17    Q.   And you've said that a
18  number of times.  You don't know what the
19  requirements, if any, are that drive what
20  needs to be included in an IFU; correct?
21    A.   I don't know the specific
22  regulation of what is needed, but I've
23  seen many IFUs and that gives me
24  experience and knowledge and that's where

Julie Drolet, M.B.

Page 106

1  I draw my conclusions from.
2      Q.   And it's the same with
3  patient brochures.  You have no idea what
4  is or is not required in patient
5  brochures; correct?
6      A.   I don't know of any
7  regulation that regulates patient
8  brochures.
9      Q.   One of the adverse reactions
10 in Exhibit -- let me go ahead and -- one
11 of the adverse reactions in Exhibit 2
12 that you have in front of you, Doctor, is
13 transitory local irritation at the wound
14 site and a transitory foreign body
15 response.  Do you see that one?
16     A.   I do see that.
17     Q.   Would it have been -- strike
18 that.
19          In drafting your expert
20 report, Doctor, do you recall seeing any
21 internal Ethicon emails about that
22 language about a transitory foreign body
23 response?
24     A.   I remember seeing

Page 107

1  documentation pertaining to that.  I
2  cannot recall if they were in the form of
3  a letter, of an email or internal
4  research documentation that Ethicon would
5  have had at this time.
6      Q.   If one of Ethicon's
7  associate medical directors when
8  reviewing that language had informed her
9  superiors that in her experience in the
10 report she was receiving from women who
11 had had TVT device implanted the foreign
12 body response was not at all transitory,
13 is that something that you would have
14 wanted to know prior to drafting your
15 expert witness report?
16     MS. GRAFF:  Object to form.
17     THE WITNESS:  So you're
18 saying that this particular person
19 would have known from women that
20 their own -- that they had a
21 foreign body response?  How would
22 a particular woman know that she
23 has a foreign body response and
24 not anything else happening?

Page 108

1  BY MR. ZONIES:
2      Q.   So do you recall reviewing
3  any emails or documents from the
4  associate medical director at Ethicon by
5  the name of Meng Chen?
6      A.   I remember that name.  I
7  remember viewing some documents, yes.
8      Q.   And do you remember that
9  that associate medical director Doctor
10 Chen had informed her superiors that she
11 received numerous phone calls from women
12 who had had a TVT device implanted and
13 the problems they were describing were
14 not at all transitory problems?
15     MS. GRAFF:  Object to form.
16     THE WITNESS:  I don't recall
17 that specific information, but
18 what you're telling me is that
19 these women have a problem that is
20 not transient.  This talks about a
21 transitory foreign body response
22 which is an immune response or an
23 inflammatory response to the mesh
24 with giant foreign body cells and

Page 109

1  that is at the, you know, cellular
2  level, microscopical level.
3          Now, what I read in this
4  brochure is you can have a
5  transitory foreign body response
6  may occur, period; this response
7  could result in extrusion,
8  erosion, fistula formation or
9  inflammation.  Those complications
10 of extrusion, erosion, fistula
11 formation or inflammation are
12 listed in these adverse reactions.
13     MS. GRAFF:  Just before you
14 go on, that's not a brochure; it's
15 an IFU.
16     THE WITNESS:  Pardon me.  In
17 this IFU.
18 BY MR. ZONIES:
19     Q.   And you would agree those
20 are not transitory outcomes; correct?
21     A.   Correct, and they're
22 separate than a foreign body response or
23 they may be separate than a foreign body
24 response.

Page 110

1    Q.   So if Ethicon's associate
2  medical director had described the report
3  she was receiving from women who had a
4  device as not transitory, you would agree
5  that that is -- that these outcomes are
6  not transitory outcomes; correct?
7        MS. GRAFF:  Object to form
8     when you say these outcomes.
9        THE WITNESS:  What outcomes?
10  BY MR. ZONIES:
11    Q.   The outcomes right in that
12  sentence that you described.
13        MS. GRAFF:  Same objection.
14        THE WITNESS:  The extrusion,
15     erosion, fistula formation or
16     inflammation if they occur will
17     continue to occur until treatment
18     is initiated and then will
19     retrospectively be transient
20     because they will stop occurring.
21  BY MR. ZONIES:
22    Q.   Once treatment is received;
23  correct?
24    A.   If a particular patient has

Page 111

1  an extrusion or an erosion, once the
2  extrusion or erosion has been resolved,
3  then that particular complication has an
4  end point to it and thus will be
5  considered transient.
6    Q.   You're saying that the
7  extrusion, exposure or fistula if
8  untreated it certainly is not transient;
9  correct?
10    A.   Usually not.
11    Q.   Doctor, in your last
12  deposition we marked your report as
13  Exhibit 1-A and so in this deposition I
14  would again like to mark the report as
15  Exhibit 1-A.  Okay?
16    A.   If you say so.
17        (Whereupon, the court
18     reporter marked Exhibit 1-A for
19     identification as of this date.)
20  BY MR. ZONIES:
21    Q.   And then in the last
22  deposition we marked as Exhibit 4 your
23  reliance materials for your report, so
24  again I'd like to mark the reliance

Page 112

1  materials as Exhibit 4.  Okay?  Okay?
2  Yes?
3    A.   Yes.
4        (Whereupon, the court
5     reporter marked Exhibit 4 for
6     identification as of this date.)
7  BY MR. ZONIES:
8    Q.   You brought with you today a
9  CV that is an updated CV; is that right?
10    A.   Updated from the version my
11  attorney had produced.
12    Q.   And what is updated in your
13  new CV?
14        MS. GRAFF:  Do you have one
15     that you can hand to her?  I can
16     hand mine to her, but I think you
17     have two.
18        MR. ZONIES:  Let me go ahead
19     and mark as Exhibit 5 the CV you
20     brought with you today.
21        (Whereupon, the court
22     reporter marked Exhibits 3 and 5
23     for identification as of this
24     date.)

Page 113

1  BY MR. ZONIES:
2    Q.   Doctor, we've had marked as
3  Exhibit 3 the CV that was provided to us
4  with your report and then marked as
5  Exhibit 5 is the CV that you brought with
6  you today.  So can you tell me the
7  difference between the two, if any?
8    A.   One has my entire address
9  blocked off by a black marker of some
10  sort.  The thing that is different is
11  some of the font and the fact that FPMRS
12  or Female Pelvic Medicine and
13  Reconstructive Surgery is added
14  underneath my name.
15    Q.   To Exhibit 5?
16    A.   To Exhibit 5 and it was not
17  on Exhibit 3.  The Exhibit 3 has the
18  address and phone number blocked off,
19  whatever it was.
20    Q.   So aside from what we call
21  the redaction of your address, the only
22  update to your CV as reflected in Exhibit
23  5 is the letters reflecting your
24  certification for female pelvic floor; is

Page 114

1  that right?
2      A.   As I'm continuing to just go
3  through it, that looks like it is a
4  correct statement.
5      Q.   Now, Doctor, you brought
6  with you today as Exhibits 1 and 2,
7  marked in the original deposition as
8  Exhibits 1 and 2 and now for this
9  deposition we'll mark them as Exhibits 6
10  and 7.
11         (Whereupon, the court
12      reporter marked Exhibits 6 and 7
13      for identification.)
14  BY MR. ZONIES:
15      Q.   I'm just write TVT-O under
16  those two new stickers.
17         MS. GRAFF:  Just for the
18      record, these are being marked and
19      I assume will go with the court
20      reporter today.  They're going to
21      need to come back to the Doctor
22      because they're hers.
23         MR. ZONIES:  I'll leave that
24      between you and you.

Page 115

1         (Whereupon, the court
2      reporter marked Exhibits 6 and 7
3      for identification as of this
4      date.)
5  BY MR. ZONIES:
6      Q.   These two binders reflect
7  materials that you brought with you today
8  that originally you understood were to be
9  the reference materials listed in your
10  reliance; is that correct?
11      A.   That was the understanding
12  and it was provided to me by Butler Snow
13  Thursday of last week which was a week
14  ago, seven days ago.
15      Q.   Do you have copies of most
16  of this scientific literature at your
17  office or at your home as well that you
18  used in writing your report?
19      A.   A lot of those came via
20  email and some of those I've researched
21  myself on the computer, so I don't know
22  if I have an integral copy of everything
23  that's in there.  Certainly what's in
24  there has some errors.  It was provided

Page 116

1  by Butler Snow.  Some of the articles
2  that are in here are different than the
3  USB port that you were given this
4  morning.  The wrong article was placed in
5  there in certain cases or it's the right
6  author but not the correct authored paper
7  for that particular reference, and at the
8  end there are some expert reports that I
9  don't think I have -- that were not part
10  of my reliance list.  Pardon me.  They're
11  included here but they're not part of my
12  reliance list.
13      Q.   And by that you mean in
14  Binder 2 which has been marked in this
15  deposition as Exhibit 7 there is what's
16  entitled on the tab 2015 Margolis CER
17  dated 4/24/15 which appears to be
18  entitled Expert Report of Michael Thomas
19  Margolis in the Rameriz Case; is that
20  right?
21      A.   That's the title of that
22  report.
23      Q.   And this is a report that
24  you actually did not receive and rely

Page 117

1  upon in drafting your expert report?
2      A.   I don't recall it.
3      Q.   And the same could be said
4  of the Prolift Garely report in your
5  binder; correct?  The one that has the
6  pictures in it?
7      A.   That one I'm not as sure.
8      Q.   Did you review any
9  Plaintiff's expert reports on the TVT-O?
10      A.   Not that I recall at this
11  moment.
12      Q.   Did you perform any
13  independent medical literature research
14  on the TVT-O?
15      A.   I was not part of a research
16  project, but I did run a pub med on it.
17      Q.   Tell me what that pub med
18  search was?
19      A.   I looked for TVT-O versus
20  transobturator or TOT approach, I looked
21  for the Cochrane Review on suburethral
22  sling, pubovaginal sling, Burch, so
23  looked at a lot of articles.
24      Q.   One of the articles that is

Julie Drolet, M.D.

Page 118

1  not on your reliance list that has to do
2  with the TVT-O is a study by Teo --
3  T-E-O. Do you recall reviewing that
4  study at all?
5      A.  That name sounds familiar,
6  yes.
7      Q.  It's a study where they
8  stopped the study early because of the
9  pain associated with the TVT-O procedure.
10  Do you recall that?
11      A.  I would have --
12          MS. GRAFF:  Object to form.
13          THE WITNESS:  -- to look at
14      that article. I vaguely remember,
15      but in order to refresh my mind
16      and comment on it, you'd have to
17      produce the article.
18  BY MR. ZONIES:
19      Q.  In fact, there are a couple
20  of studies that were stopped early, a
21  couple of studies -- strike that.
22          In fact, there were more
23  than one study on the TVT-O device that
24  was stopped early because the

Page 119

1  investigators felt that continuing to use
2  the TVT-O device was not appropriate
3  given the amount of pain that women were
4  experiencing in the study. Do you recall
5  any of the studies like that?
6          MS. GRAFF:  Object to form.
7          THE WITNESS:  I would have
8      to re-review what you're telling
9      me and why in order to make an
10      opinion, but if we look at the
11      thousands and thousands of TVT-Os,
12      transobturator approaches that
13      have been performed, that's not
14      what's in the body of the entire
15      medical review comparing in and
16      out TVT-O versus out to in TOT
17      versus retropubic. That is not
18      the experience of the body of
19      literature.
20  BY MR. ZONIES:
21      Q.  And you actually in the body
22  of your report, you don't discuss any of
23  the studies that were halted because the
24  investigators felt it was no longer

Page 120

1  appropriate to continue using TVT-O
2  devices. You don't discuss those in the
3  body of your report; correct?
4      A.  I don't discuss those in the
5  body of my report because those studies
6  never achieved statistical significance
7  and the definition of pain, there will be
8  pain associated with any procedure, so,
9  the definition of pain in some of these
10  articles was not clearly defined, was
11  that pain immediately, 24, 72 hours.
12  Most of the metaanalysis that included
13  the in to out or TVT-O do not report a
14  substantial amount of groin or inner
15  thigh pain going beyond the normal
16  postoperative period.
17      Q.  You did choose certain
18  studies to include in your report;
19  correct?
20      A.  I did.
21      Q.  And did you chose studies
22  that would support your opinion to
23  include in the body of your report?
24      A.  I included studies that I

Page 121

1  would rely on and the studies that -- the
2  Teo study that you have mentioned, I did
3  not include it because I didn't consider
4  it for my report. I didn't rely on it.
5      Q.  I noticed in your report
6  that you have a substantial amount of
7  Prolift literature in your expert report.
8  Is that right?
9          MS. GRAFF:  Object to the
10      form.
11          THE WITNESS:  I didn't
12      calculate the proportions of
13      Prolift versus Prolift+M, but yes.
14  BY MR. ZONIES:
15      Q.  When you were drafting this
16  report, did you start with your Hammons
17  report and make edits to the Hammons
18  report?
19      A.  I used part of the Hammons
20  report as a basis as this report is a
21  case specific report.
22      Q.  And what does that mean to
23  you that it's "a case specific report"?
24      A.  That I was asked to perform

Julie Drolet, M.B.

Page 122

1  an analysis of Mrs. Gomez' case.
2       Q.   We've been supplied with
3  three invoices for your work on the Gomez
4  case.  Does that sound accurate?
5       A.   There are three invoices
6  since mid December of 2015.
7       Q.   And do those invoices
8  reflect your work only on this expert
9  report that has been marked as Exhibit
10  1-A in this case?
11       A.   Not necessarily.  They have
12  sent some other documentation from
13  Ethicon, from the company, videos, live
14  surgery video.
15       Q.   And in those invoices, in
16  the last invoice, I believe it said that
17  you had approximately 82 hours of work on
18  this expert report in the month of
19  February.  Does that make sense?
20       A.   Well, if I could see the
21  report.
22          MS. GRAFF:  I can show it to
23  her on my iPad.
24          MR. ZONIES:  Would you do

Page 123

1  that?  That would be great.
2          MS. GRAFF:  February?
3          MR. ZONIES:  Yeah.  It's the
4  last one.  I think there was three
5  of them, so it was the last one
6  that was issued.
7  BY MR. ZONIES:
8       Q.   I don't have a hard copy,
9  Doctor, so Counsel has agreed to pull it
10  up on her iPad.
11          MS. GRAFF:  I have one dated
12  March 4.
13          THE WITNESS:  That would be
14  the one.
15  BY MR. ZONIES:
16       Q.   Do you have that invoice in
17  front of you, Doctor?
18       A.   I do.
19       Q.   And what does that invoice
20  reflect?
21       A.   That reflects the time I
22  spent reviewing documents from Ethicon or
23  sent by, pardon me, sent by Butler Snow
24  and also review of the literature in

Page 124

1  preparing my report.
2       Q.   And does that also include
3  the actual drafting of your report?
4       A.   That does.
5       Q.   How many hours did you spend
6  in February that you billed for?
7       A.   Total?
8       Q.   Yes.
9       A.   For everything?  It's
10  written up here.  It says 81.72 hours.
11       Q.   So were you also practicing
12  medicine in the month of February?
13       A.   Of course.
14       Q.   And how much time per week
15  do you spend in the office in a month
16  like February this year?
17       A.   Office and OR, about 60
18  hours a week now.
19       Q.   And is it your testimony
20  that in the month of February you spent
21  about 60 hours a week in the office and
22  OR?
23       A.   That sounds about right.
24  That's my average.

Page 125

1       Q.   And so in addition to that
2  time in February you spent an additional
3  80 hours working on this report?
4       A.   If that's what the record
5  shows.  I keep accurate records.  The
6  answer would be yes.
7       Q.   How do you keep those
8  records?
9       A.   Well, when I sit down to
10  read something that is provided by Butler
11  Snow as they have provided the documents,
12  I look at the clock, and if I stand up to
13  do something else, I look at my watch and
14  notice how much time I spent, and then if
15  I come back to it I re-note the time and
16  then I bundle it up for each day.
17       Q.   Could I see that iPad?
18       A.   Sure.
19       Q.   Thank you.
20          MR. ZONIES:  Is that okay?
21          MS. GRAFF:  Yes.
22  BY MR. ZONIES:
23       Q.   So your invoice for the
24  Gomez case from February 1st, 2016

Page 126

1  through February 29th, 2016 you say that
2  you spent a total of 81.72 hours working
3  on the Gomez matter. Is that accurate?
4      A.  On matters that are
5  generally with the Gomez case, yes.
6      Q.  And what do you mean by
7  that? You seem a little concerned that
8  it wasn't all for Gomez.
9      A.  There may be some materials
10 that I may be viewing -- I may have
11 viewed in February that may also be
12 useful for a further case down the road,
13 so those of kind of background matter.
14     Q.  Have you been asked to do
15 other cases down the road?
16     A.  No, not yet. It has been
17 suggested, but I have not received any
18 documentation.
19     Q.  And it says that you billed
20 at $450 per hour for those 81.72 hours
21 and so you're requesting payment of
22 $36,774 for your work in the month of
23 February on this case; correct? I
24     A.  If that's indicated there, I

Page 127

1  will trust that you read it right.
2      Q.  You break it down, your
3  work, by the day that you did the work
4  and then a description of what you did;
5  is that right?
6      A.  They have asked me to do so.
7      Q.  And it says here that you
8  had a 34-minute phone call with Attorney
9  Rosenblatt on the 27th of February;
10 correct?
11     A.  If that's what it says and
12 that's what you're reading, I would agree
13 to it.
14     Q.  And then you had three
15 telephone calls, one of six minutes, one
16 of seven minutes and one of 14 minutes
17 with Mr. Rosenblatt on February 29th as
18 well?
19     A.  Yes, sir. That was very
20 late in the evening.
21     Q.  Did you feel crunched for
22 time when getting your report out?
23     A.  That wasn't it. It was a
24 computer -- trying to get my computer to

Page 128

1  edit certain things so that he could have
2  it and have to email the file to him so
3  he would have it on February 29th. And
4  so he is much more computer savvy than I
5  am. I'm a better doctor than a computer
6  technician. So this was at 11:00
7  something, 11:30 something and 11:50
8  something at night.
9      Q.  In your report, Doctor, you
10 say that mesh exposures typically appear
11 within the first few months to one or two
12 years postoperatively. Is that your
13 personal experience as well?
14     A.  That's my personal
15 experience and I have references in the
16 literature as well.
17     Q.  Have you ever treated an
18 exposure for TVT-O that occurred beyond
19 two years?
20     A.  Not that I can recall.
21         MR. ZONIES:  Why don't we go
22 ahead and take a break.
23         (Whereupon, a brief recess
24 was held from 4:26 p.m. to 4:32

Page 129

1  p.m.)
2  BY MR. ZONIES:
3      Q.  Doctor, earlier we were
4  talking about when you made the change
5  from using the TVT-O to the T-sling. Do
6  you recall that conversation?
7      A.  I recall, yes.
8      Q.  Can you tell me why you
9  stopped using the TVT-O?
10     A.  Part of it was a question of
11 price. Reusable needle that could be
12 re-sterilized was a cost conservative
13 measure for the hospital. The other part
14 was going out to in for me for my
15 preference and I'd been using the Prolift
16 at the time, and it was just a
17 continuation of what I experienced. So
18 it's a personal preference for that
19 particular and as well for me teaching
20 the residents, that made sense.
21     Q.  So it may be up to six years
22 since you've used a TVT-O?
23     A.  I wouldn't say that because
24 Apple Hill still continued to use TVT-O

Julie Drolet, M.D.

Page 130

1  and when I would bring patients, until
2  they went to the Obtryx sling and I
3  didn't know why they went and they
4  changed, but here you have to use what
5  the hospital buys, so I am, you know,
6  limited to their options.
7       Q.  Well, earlier you testified
8  that it may have been 2010, 2011 when you
9  switched over to the T-Sling; correct?
10      A.  No.  It was before that.
11      Q.  Okay.  So --
12      A.  That was when I switched
13  from Prolift+M to the Restorelle
14  transvaginal mesh.
15      Q.  That's right.  So prior to
16  2010, sometime prior to 2010 you switched
17  primarily to the T-Sling for your stress
18  urinary incontinence procedures?
19      A.  Correct.
20      Q.  And now in 2016, so six or
21  so years later, you're still using only
22  the T-Sling; correct?
23      A.  For now.
24      Q.  So over the past six years

Page 131

1  you haven't implanted a TVT-O?
2       A.  No, I wouldn't say that
3  because I practice at different centers
4  and Apple Hill still used TVT-Os up to a
5  certain point which was more recent.  So
6  while I was doing T-Sling, transobturator
7  and retropubic at Memorial Hospital,
8  Apple Hill had a different brand of sling
9  and it carried the TVT-O Gynecare for
10  sometime even after I started to do
11  T-Sling at Memorial Hospital, so I can't
12  tell you when they switched to Obtryx and
13  then I had to use what they had.
14      Q.  Well, is it fair to say that
15  in the past year you haven't implanted a
16  TVT-O?
17      A.  That would be safe to say.
18      Q.  How about would it be safe
19  to say in the past two years it's
20  unlikely that you've implanted a TVT-O?
21      A.  Two years, yes.
22      Q.  How about in the past three
23  years it's unlikely that you implanted a
24  TVT-O?

Page 132

1       A.  I can't tell you.
2       Q.  That's where it gets a
3  little fuzzy?
4       A.  As far as the actual device
5  used, yes.
6       Q.  Did you have a sort of
7  breakdown on how often you would use
8  retropubic or obturator?
9       A.  I am doing more retropubic
10  now than I was.  I would say that I'm
11  doing five to ten percent retropubic and
12  the rest transobturator.
13      Q.  That's now?  Is that what
14  you said?
15      A.  In the last year or so I've
16  done more retropubics, so I'm probably at
17  ten percent; but if you look at before,
18  it varies.  It varies.  I'm in solo
19  practice, and so depending on the
20  patient, her type of incontinence, her
21  prior surgery and all, I will evaluate
22  and decide which approach I use.
23      Q.  So the best information you
24  can give me on the last time you may have

Page 133

1  used a TVT-O is maybe sometime three
2  years ago?
3       A.  Yeah, three to four years
4  ago.  That would be an estimate.
5       Q.  Do you have any plans or
6  have you asked any of the hospitals to
7  stock TVT-O?
8       A.  To restock it?  Not yet; and
9  the reason I say that is there are many
10  sling companies that have decided not to
11  continue making their devices and that
12  includes the T-Sling.  So I am currently
13  looking at different companies and
14  different devices.
15      Q.  And when you're doing that
16  analysis, what are you looking at?  What
17  characteristics of the slings are you
18  looking at to make your decision?
19      A.  I am looking at a mesh that
20  would have sufficient pore size that
21  won't roll onto itself easily, I'm not
22  looking at mini slings quite yet, I'm
23  waiting for more data to come out, a mesh
24  that could be used retropubic and

Julie Drolet, M.D.

Page 134

1 transobturator, past performance of the
2 mesh, studies, so I'm looking at a lot of
3 things.
4　　Q.　Have you seen photographs of
5 the TVT mesh under stress that reflected
6 it deforming and fraying and roping and
7 curling?
8　　A.　I have seen those pictures,
9 yes, laboratory pictures where they have
10 stretched it, you know, beyond its normal
11 physiological use.
12　　Q.　And what do you think normal
13 physiological use is?
14　　A.　Less than what they show in
15 those pictures and it depends on the
16 reports.
17　　Q.　Do you have a sense of how
18 many newtons for example would be normal
19 load for a sling mesh?
20　　A.　The reports vary between
21 Ostergard and Ozod who has published his
22 doctoral thesis on it and it looks like
23 with the LaPlace law of tension there's
24 about ten times less the force truly

Page 135

1 applied to the hiatus than was previously
2 thought intraabdominal pressure by
3 Ostergard.
4　　Q.　Did you ever experience
5 difficulty removing the sheaths with a
6 TVT-O?
7　　A.　No, I have not.
8　　Q.　Were you provided with any
9 documents or information demonstrating
10 that Ethicon had received numerous
11 complaints of difficulty removing the
12 sheaths with a TVT-O?
13　　A.　I have.
14　　Q.　And you would agree that if
15 there's difficulty removing the sheath
16 that that can apply pressure to the mesh
17 that might collapse the pore size;
18 correct?
19　　A.　It just depends. If the
20 mesh gets hung on the tissue, on the
21 patient's tissue, then that may not
22 affect the mesh.
23　　Q.　And have you seen any
24 evidence or documents discussing

Page 136

1 collapsing of pore size or deformation of
2 mesh associated with difficult sheath
3 removal?
4　　MS. GRAFF: Object to form.
5　　THE WITNESS: I don't know
6　　if the pore size were measured
7　　after the difficulty of removing
8　　the sheaths or not. As far as
9　　numerous, numerous depends on the
10　　denominator. So ten cases out of
11　　12 is a high number; ten cases out
12　　of 12 million would not.
13 BY MR. ZONIES:
14　　Q.　And in your investigation of
15 this issue and in drafting your expert
16 report, do you have a sense of how often
17 those reports were coming in based on the
18 numerator and denominator?
19　　MS. GRAFF: Object to form.
20　　THE WITNESS: I did not have
21　　a denominator.
22 BY MR. ZONIES:
23　　Q.　In addition to the ten
24 TVT-Os that we had discussed that you

Page 137

1 partially removed, have you treated any
2 other complications with TVT-O meshes?
3　　A.　Not that I recall.
4　　Q.　You have, however, treated
5 an erosion or more than one erosion with
6 a TVT-O mesh?
7　　A.　Yes, and out to in, TOT as
8 well.
9　　Q.　Doctor, do you have a sense
10 of in these binders that you brought with
11 you today, do you have a sense of which
12 articles you independently found as
13 compared to the ones that were provided
14 to you?
15　　A.　Not at this minute, no.
16　　Q.　Do you rely for your expert
17 opinion on deLeval and Waltregny's early
18 first studies for TVT-O?
19　　A.　I'll have to take a look at
20 the reliance list here. I know that
21 those names are in my reliance list and
22 one is the deLeval that I have is a 2009,
23 the Waltregny is 2006. So how early do
24 you want me to go with TVT-O?

Page 138

1     Q.   Do you recall in reviewing
2 the materials for preparation of your
3 expert report reviewing a memorandum
4 written by a clinical investigator about
5 how deLuval was performing his
6 experiments with the TVT-O when it was
7 first being created?
8          MS. GRAFF:  Object to form.
9          THE WITNESS:  I do not know
10         how he performed as you say
11         experiments.
12 BY MR. ZONIES:
13    Q.   You never saw a memorandum
14 that was prepared for Ethicon discussing
15 how Doctor deLuval was potentially
16 illegally creating devices to test the
17 TVT-O methodology?
18         MS. GRAFF:  Object to form.
19         THE WITNESS:  I don't know
20         about any illegality and what's
21         legal in Liege versus, you know,
22         America and what's legal or not
23         legal for experiments and
24         experiments in whom and in what,

Page 139

1         so I have no recollection or was
2         not provided with that
3         information.
4 BY MR. ZONIES:
5    Q.   That information was not
6 provided to you in preparation for your
7 expert report?
8    A.   If it's buried in one of
9 those little USB ports, some of it I
10 didn't have time to open it.  I would
11 have logged in 200 hours.  So I read what
12 I read from the background materials that
13 they provided to me, but I don't have any
14 independent recollection of seeing
15 something that mentioned illegality.
16    Q.   And it sounds like there may
17 be documents that were provided to you
18 that may or may not be on your reliance
19 list that you may or may not have had the
20 opportunity to read.  Is that fair?
21    A.   That would be fair to say
22 and I obviously did not use them in order
23 to prepare this report if I didn't see
24 them.

Page 140

1     Q.   Do you know if they would
2 have shown up on your reliance even if
3 you didn't use them or read them?
4     A.   If these are documents --
5 I'd have to go through what they have
6 provided me, but this here is
7 ETH-MESH-00388485.  I do not know what
8 this corresponds to and on what has been
9 given to me has the word PDF dot a few
10 zeros and then some numbers, but it
11 doesn't look like this.
12    Q.   It sounds to me like a lot
13 of the materials were provided to you on
14 thumb drives; is that right?
15    A.   Yes.  That's what I mean by
16 USB port.  It's a thumb drive.
17    Q.   And do you still have all
18 those thumb drives?
19    A.   They are somewhere in my
20 house, yes.
21    Q.   So if I requested of your
22 counsel that we can get a copy of those,
23 that's something you can provide to us?
24    A.   If that's what Butler Snow

Page 141

1 and -- yes.  But I thought they were
2 sending you all of this.  They were
3 supposed to send you everything that they
4 sent to me.
5    Q.   I agree.
6    A.   So if I don't know --
7         MR. ZONIES:  I'm going to go
8         and mark as Exhibit 8.
9         (Whereupon, the court
10        reporter marked Exhibit 8 for
11        identification as of this date.)
12 BY MR. ZONIES:
13    Q.   Doctor, I've handed you
14 what's been marked as Exhibit 8 and the
15 ETH number on the bottom is 00860239 and
16 it's yet another Gynecare TVT Obturator
17 IFU.  Do you see that?
18    A.   Yes, I do see that.
19    Q.   And I could tell you,
20 Doctor, that it's been represented to me
21 at least that this is the IFU that would
22 have been in effect from 2005 through
23 2008.  Okay?
24    A.   And your Exhibit 2 that you

Page 142

1  represented to me was an IFU with a date
2  of Ethicon 2005?
3      Q.   If you look to the right on
4  that one, it's actually 2010.
5      A.   2010.  Okay.
6      Q.   Right.  And that's why I'm
7  handing you Exhibit 8 because this is
8  actually the 2005 to 2008 IFU, at least
9  that's my understanding.  Okay?
10     A.   I will agree that this is
11  stamped, here it says TVT with a bunch of
12  numbers and it says 3/7/2008 at 1:37:03
13  p.m. so is that the date that it was
14  published or is it a date that it was
15  faxed to somebody?  But the date on the
16  brochure here, it says 2005 trademark.
17     Q.   And if you turn to the last
18  page of Exhibit 8, you'll see that the
19  adverse reaction section is actually the
20  same as the one we were looking at in
21  Exhibit 2.  Is that right?
22     A.   Let me just verify.  That
23  would be correct.
24     Q.   And so as with Exhibit 2,

Page 143

1  this IFU which we have marked as Exhibit
2  8 also does not contain a substantial
3  number of adverse risks and warnings that
4  are included in the 2015 IFU; correct?
5      A.   I would agree that this
6  trademark 2005 but still Exhibit 8 is
7  different than the one that is marked
8  2015.
9      Q.   And it has fewer adverse
10  reactions listed in it than does the 2015
11  IFU; correct?
12     A.   That would be a correct
13  statement.
14         MR. ZONIES:  Thank you,
15  Doctor.  I have nothing further.
16  Appreciate your time today.
17         MS. GRAFF:  You're done.
18         (Whereupon, the deposition
19  was concluded at approximately
20  4:53 p.m.)
21
22
23
24

Page 144

1          CERTIFICATION
2
3
4      I, EILEEN P. BARTH, hereby certify
5  that the testimony and proceedings in the
6  aforegoing matter are contained fully and
7  accurately in the stenographic notes
8  taken by me and are a true and correct
9  transcript of the same.
10
11         _____
12         EILEEN P. BARTH
           Certified Shorthand
13         Reporter
14
15
16     The foregoing certification of this
17  transcript does not apply to any
18  reproduction of the same by any means
19  unless under the direct control and/or
20  direction of the certifying shorthand
21  reporter.
22
23
24

Page 145

1         LAWYER'S NOTES
2  PAGE   LINE   NOTATION
3  ____  ____  _____
4  ____  ____  _____
5  ____  ____  _____
6  ____  ____  _____
7  ____  ____  _____
8  ____  ____  _____
9  ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____