# EXHIBIT E

1           IN THE COURT OF COMMON PLEAS
        OF PHILADELPHIA COUNTY, PENNSYLVANIA
2              TRIAL DIVISION - CIVIL
3          IN RE:  PELVIC MESH LITIGATION
4

    PATRICIA L. HAMMONS,    : MAY TERM, 2013
5   Plaintiff               :
                            :
6            vs.            :
                            :
7   ETHICON, INC. et al.,   :
    Defendants              : NO. 003913
8

                    - - -
9

            Friday, November 13, 2015
10

                    - - -
11

12              Videotaped deposition of
    JULIE DROLET, M.D. taken at the Courtyard
13   by Marriott, 2799 Concord Road, York,
    Pennsylvania, on the above date,
14   commencing at 9:54 a.m. before Lauren A.
    Moore, Registered Merit Reporter and
15   Certified Realtime Reporter and Angelo
    Del Monte, Videographer.
16

17

18

19

20

21

22          GOLKOW TECHNOLOGIES, INC.
23      877.370.3377 ph|917.591.5672 fax
24            deps@golkow.com

Page 2

```
1   APPEARANCES:
2       KLINE & SPECTER
        By: KILA B. BALDWIN, ESQUIRE
3          LISA DAGOSTINO, M.D., J.D.
        1525 Locust Street, 19th Floor
4       Philadelphia, PA  19102
        215-772-1000
5       kila.baldwin@klinespecter.com
        lisa.dagostino@klinespecter.com
6       -- For the Plaintiff
7       TUCKER ELLIS, LLP
        By: MATTHEW P. MORIARTY, ESQUIRE
8       950 Main Avenue, Suite 1100
        Cleveland, OH  44113-7213
9       216-696-2276
        matthew.moriarty@tuckerellis.com
10      -- For the Defendants
11
12      ALSO PRESENT:
13      Angelo Del Monte, Videographer
14
15
16
17
18
19
20
21
22
23
24      GOLKOW TECHNOLOGIES, INC. - 877.370.3377
```

Page 3

```
1           INDEX TO WITNESSES
2
    WITNESS                        PAGE
3
    JULIE DROLET, M.D.
4
5     By Ms. Baldwin          7
6     By Mr. Moriarty          341
7
8           INDEX TO EXHIBITS
9                             PAGE
    EXHIBIT   DESCRIPTION          MARKED
10
11  Drolet-1  8/17/15 Letter
        10/5/15 Letter
12      11/2/15 Letter          19
13  Drolet-2  Curriculum Vitae of
        Julie Drolet, M.D.          24
14  Drolet-3  Master Consulting Agreement
        Bates Stamp ETH.MESH.03612200
15      through ETH.MESH.03612209   59
16  Drolet-4  9/14/10 E-mail
        Bates Stamp
17      ETH.MESH.01145221          65
18  Drolet-5  6/20/11 E-mail
        Bates Stamp
19      ETH.MESH.11534575          70
20  Drolet-6  9/28/07 E-mail Chain
        Bates Stamp ETH.MESH.02111966
21      through ETH.MESH.02111968  72
22  Drolet-7  Spreadsheet          76
23  Drolet-8  1/7/11 E-mail Chain
        Bates Stamp
24      ETH.MESH.07981349          78
```

Page 4

```
1
2           INDEX TO EXHIBITS
3                             PAGE
    EXHIBIT   DESCRIPTION          MARKED
4
5   Drolet-9  3/1/11 E-mail
        Bates Stamp
6       ETH.MESH.08382746          80
7   Drolet-10 Julie Drolet - Medical
        Literature          111
8   Drolet-11 8/10/15 Expert Report of
        Julie Drolet, M.D.          221
9
10  Drolet-12 Gynecare Prolift Pelvic Floor
        Repair System
        Surgical Technique
11      Bates Stamp ETH.MESH.00419571
        through ETH.MESH.00419600   259
12
13  Drolet-13 Gynecare Prolift
        Surgeon's Resource Monograph
        Bates Stamp DX10140.1
14      through DX10140.39          261
15  Drolet-14 6/10/09 Progress Notes
        Heartland OB/GYN          288
16
17  Drolet-15 9/8/15 Exam Notes Women's
        Institute for Gynecology &
        Minimally Invasive
18      Surgery, LLC          304
19  Drolet-16 Diagram          305
20  Drolet-17 Addendum to Expert Report
        Following IME of
21      Mrs. Hammons          328
22
23
24
```

Page 5

```
1           DEPOSITION SUPPORT INDEX
2   Directions to Witness Not to Answer
3   PAGE          LINE
4
5   Request For Production of Documents
6   PAGE          LINE
7
8
    Stipulations
9
    PAGE          LINE
10
11
12  Questions Marked
13  PAGE          LINE
14
15
16
17
18
19
20
21
22
23
24
```

Julie Drolet, M.D.

Page 6

1        (It is stipulated by and
2   between counsel for the respective
3   parties that all objections except
4   as to the form of the question are
5   reserved until the time of trial.)
6
7        THE VIDEOGRAPHER:  We are
8   now on the record.  My name is
9   Angelo Del Monte.  I am the
10  videographer for Golkow
11  Technologies.  Today's date is
12  November 13th, 2015.  The time on
13  the camera now reads 9:54 a.m.
14       This video deposition is
15  being held in York, Pennsylvania
16  in the matter of Patricia L.
17  Hammons versus Ethicon Women's
18  Health and Urology et al., for the
19  Philadelphia County Court of
20  Common Pleas, trial division,
21  civil.
22       The deponent is Julie
23  Drolet, M.D.  Counsel will be
24  noted on the stenographer's

Page 7

1   record.  The court reporter is
2   Lauren Moore, and she will now
3   swear in the witness, after which
4   you may proceed.
5            *  *  *
6        JULIE DROLET, M.D., after
7   having been duly sworn or
8   affirmed, was examined and
9   testified as follows:
10           *  *  *
11       EXAMINATION
12  BY MS. BALDWIN:
13       Q.   Good morning, Dr. Drolet.
14       A.   Good morning.
15       Q.   My name is Kila Baldwin.
16  I'm the attorney for Patricia Hammons.
17  We're here today to take your deposition
18  in this case.  Do you understand that?
19       A.   Yes.
20       Q.   Have you had your deposition
21  taken before?
22       A.   Yes.
23       Q.   How many times?
24       A.   Twice.

Page 8

1        Q.   In what context?
2        A.   Medical malpractice lawsuit.
3        Q.   Okay.  Were you a party to
4   those lawsuits?
5        A.   I was.
6        Q.   In both instances?
7        A.   Yes, I was.
8        Q.   Okay.  Were you a defendant?
9        A.   Yes, I was.
10       Q.   Can you tell me what the
11  circumstances were surrounding each of
12  those cases?
13       A.   The first case occurred in
14  January of 1998.  It was a VBAC case in
15  which I had left specific instructions to
16  call me at a particular time.  The nurses
17  and the residents did not, actually told
18  the patient that doctors don't know
19  everything.  The uterus ended up
20  rupturing and the baby died.
21       Q.   Was any money paid on your
22  behalf in that lawsuit?
23       A.   No.
24       Q.   Okay.  And what was the

Page 9

1   second case?
2        A.   The second case occurred in
3   January of 2000 was a bladed trocar
4   injury, great vessel injury and colon.
5   The outcome was excellent.  The patient
6   left the hospital within five days with
7   only five transfusions.  The hospital and
8   residents settled.  I went to court, and
9   the jury returned a favorable verdict for
10  me.
11       Q.   It was a defense verdict?
12       A.   It was a defense verdict,
13  yes.
14       Q.   Okay.  Do you know the name
15  of the patient or the party who sued you
16  in that litigation?
17       A.   Cassandra Liggins.
18       Q.   Spell the last name.
19       A.   L-I-G-G-I-N-S.  But she
20  might have gotten married before or
21  after.  It was Logan and then Liggins or
22  Liggins versus Logan.  I can't remember
23  exactly.
24       Q.   And what court was that in

Julie Drolet, M.D.

Page 10

1 where you went to court?
2     A.   That was at York.
3     Q.   Okay.  The courthouse in
4 York?
5     A.   The courthouse -- the old
6 courthouse in York.  And the case was
7 tried in 2004, I think, but I'm not quite
8 sure.
9     Q.   Thank you for that
10 information.
11         Going back to your
12 deposition experience, have you ever
13 given a deposition as an expert before?
14     A.   Never.
15     Q.   Okay.  Did you testify in
16 court in both of those two lawsuits that
17 we discussed?
18     A.   I never went to court on the
19 first one.  The hospital and the
20 residents settled, and I was dropped.
21     Q.   Okay.  So in the second one
22 involving the bladed trocar injury, did
23 you testify in both deposition and court?
24     A.   Yes, I did.

Page 11

1     Q.   Okay.  Have you ever given
2 testimony in court as an expert witness
3 before?
4     A.   No, I have not.
5     Q.   Okay.  Just so we're on the
6 same page as far as depositions go, I'd
7 like to go through some ground rules.
8     A.   Yes.
9     Q.   Obviously, there's a court
10 reporter here who's taking everything
11 down.  I tend admittedly to start get
12 going very fast.  Please let me finish my
13 question before you give your answer, and
14 I'll wait for you to finish your answer
15 before I ask the next question, but that
16 makes it easier for the court reporter.
17 Okay?
18     A.   Yes.
19     Q.   If we're reading a document,
20 and I'm saying this more as a reminder to
21 myself, make sure you read slowly for the
22 ease of the court reporter's fingers.
23 Okay?  She's got to type it all down.
24     A.   All right.

Page 12

1     Q.   If you need a break at any
2 time, please let us know.  It will just
3 take a minute to shut off the video.
4 That's fine, too.  I just ask that you
5 answer any pending questions that are on
6 the floor before we go to break.  Okay?
7     A.   Yes.
8     Q.   Okay.  I don't want you to
9 guess at any questions, so if you don't
10 know, I don't know is a perfectly
11 acceptable answer.  Do you understand
12 that?
13     A.   Yes.
14     Q.   And do you understand that
15 you took an oath and it's the same oath
16 to tell the truth as if we were in a
17 court of law here today?
18     A.   Yes, I do.
19     Q.   Okay.  And the other thing
20 that's not always good for the court
21 reporter's sake is please give clear yes
22 or noes.  Once we get a little tired we
23 start to do uh-huhs or head nods or
24 gesturing sometimes, and the court

Page 13

1 reporter can't get that down on the
2 stenographic record.  So just be sure you
3 give clear verbal answers that she can
4 type down.  Okay?
5     A.   I will try.
6     Q.   All right.  Thank you.
7         Doctor, have you ever done
8 any work as an expert witness aside from
9 the work done in connection with the
10 Hammons case?
11     A.   No, I have not.
12     Q.   Okay.  Have you ever been
13 asked by anyone to review cases as an
14 expert outside of the context of the
15 Hammons case?
16     A.   Yes, I have.
17     Q.   How many times?
18     A.   Twice.
19     Q.   And did you decline to
20 review those cases?
21     A.   No, I did not.
22     Q.   Okay.  No, you did not
23 decline to review them?
24     A.   That would be correct.

Page 14

1    Q.   Okay.  Did you review them?
2    A.   Yes, I did.
3    Q.   Okay.  So you have been
4  retained as an expert at least twice
5  outside of the context of Hammons?
6    A.   I guess I have, yes.
7    Q.   Okay.  All right.  And can
8  you tell me -- sorry.  It gets a little
9  confusing.
10    A.   Yeah.  Not -- it never went
11  to deposition.  I was just asked to
12  review charts.
13    Q.   Okay.  What types of cases
14  were those?
15    A.   One was a surgical injury,
16  and the other one was a postpartum
17  stroke.
18    Q.   When you say surgical
19  injury, what type of surgery?
20    A.   It was robotic.
21    Q.   And what was the type of
22  injury?
23    A.   Bowel injury.
24    Q.   And what type of robotic

Page 15

1  surgery?
2    A.   It was a laparoscopic
3  oophorectomy, and I can't remember
4  which -- which side.
5    Q.   Okay.  And am I correct that
6  your role in that case was just to review
7  the medical charts?
8    A.   And admit an opinion.
9    Q.   Did you do that in written
10  form?
11    A.   Yes, I did.
12    Q.   And what was the name of the
13  case?
14    A.   I can't recall.
15    Q.   Okay.  Do you still have a
16  copy of that report?
17    A.   I'm not sure.
18    Q.   How long ago was that?
19    A.   About nine months ago.
20    Q.   Okay.  And were you retained
21  to work on behalf of the plaintiff or the
22  defendant?
23    A.   The defendant.
24    Q.   And what was the name of the

Page 16

1  law firm that retained you?
2    A.   I can't recall.
3    Q.   And the second case, it
4  involved a postpartum stroke?
5    A.   Yes.
6    Q.   Did you review the charts in
7  that case?
8    A.   Yes.
9    Q.   Okay.  And did you have to
10  write an expert report in that case?
11    A.   No, I did not.
12    Q.   And why is that?
13    A.   Because they -- I think it
14  was to get a certificate of merit, so all
15  I had to do is to review the chart and
16  give my impressions to the attorney.
17    Q.   Again, were you retained on
18  behalf of the defense attorney in that
19  case?
20    A.   No.  I think that would be
21  plaintiff.
22    Q.   Okay.  Do you know if a
23  complaint was ever filed?
24    A.   No, I do not.

Page 17

1    Q.   You don't know?
2    A.   I don't know.
3    Q.   How long ago was that?
4    A.   About a month ago.
5    Q.   And what's the name of the
6  firm who hired you?
7       MR. MORIARTY:  Objection.
8  I'm going to instruct/advise her
9  not to answer just because we
10  don't know -- I mean, it might be
11  as a consulting expert not
12  revealed and so it may not be
13  discoverable in that case, and I
14  don't want it to -- we just need
15  to protect the record on that.
16  BY MS. BALDWIN:
17    Q.   Do you know if you were
18  hired simply as a consulting expert?
19    A.   I may have.  I'm not quite
20  sure that -- of those legal definitions.
21    Q.   Did they tell you that
22  they'd like you to author an expert
23  report in the case eventually?
24    A.   No, they did not.

Page 18

1    Q.   Do you know the name of the
2  person who's bringing suit?
3         MR. MORIARTY:  Well,
4    objection.  I advise you not to
5    answer that because that's getting
6    at the same information.
7    Q.   Where did the alleged
8  malpractice take place?
9    A.   In a hospital in Harrisburg.
10   Q.   Which hospital?
11   A.   One of the Pinnacle Health
12  Systems Hospital.
13   Q.   How much did you charge to
14  review charts in that matter?
15   A.   $250 an hour.
16   Q.   And if we look at the first
17  case that you reviewed involving the
18  robotic surgery that was about nine
19  months ago, how much did you charge per
20  hour?
21   A.   I think it was 350.
22   Q.   Why the difference?
23   A.   Because in the second case I
24  was not asked to produce a report.  I was

Page 19

1  asked to review charts.
2    Q.   But in the first case you
3  charged 350 for your review of the
4  charts?
5    A.   And the report.
6    Q.   Okay.  So it was 350 an hour
7  for the work there, 250 in the second
8  one?
9    A.   That is correct.
10   Q.   Okay.  And just looking at
11  the invoices you produced in this case, I
12  guess we'll go ahead and mark these
13  collectively as Drolet-1.
14        (Whereupon, a document was
15        marked for identification as
16        Drolet Exhibit No. 1.)
17  BY MS. BALDWIN:
18   Q.   I'll pass those in front of
19  you.  Doctor, your counsel provided me
20  with those when we came in.
21        Are those a copy of your
22  invoices for work performed in connection
23  with the Hammons litigation?
24   A.   So far, yes.

Page 20

1    Q.   Okay.
2    A.   Up 'til October 31st, 2015.
3    Q.   Okay.  And if we go to the
4  very -- first one is August 17th, 2015,
5  and on there it looks like you were
6  billing at a rate of $450 an hour.  Is
7  that correct?
8    A.   That is correct.
9    Q.   So that's $100 an hour
10  higher than the rate you charged in the
11  robotic injury case?
12   A.   That would be correct.
13   Q.   And that's $200 an hour more
14  than you charged in the case that you
15  reviewed for the postpartum stroke only a
16  month ago?
17   A.   That would be correct.
18   Q.   Okay.  And it looks like,
19  according to this invoice, between April
20  1st, 2015 and August 13th, 2015 you spent
21  82.5 hours working on this matter?
22   A.   That would be correct.
23   Q.   And that included two
24  appointments in your office?

Page 21

1    A.   Yes.
2    Q.   Okay.  What were those two
3  appointments?
4    A.   Those were appointments with
5  Attorney Paul Rosenblatt and Burt Snell.
6    Q.   And, Doctor, have you ever
7  other -- outside of the context of this
8  litigation done a defense medical exam?
9    A.   No, I have not.
10   Q.   Have you ever done what's
11  called an independent medical exam?
12   A.   This was my first one.
13   Q.   Okay.  And so in this first
14  invoice, it looks like you requested
15  payment in the amount of $37,125?
16   A.   That's what is on the paper,
17  yes.
18   Q.   And have you been paid that
19  amount?
20   A.   Yes, I have.
21   Q.   Okay.  And then if we go to
22  the next invoice, it's dated October 5th,
23  2015, and here it says between August
24  14th and September 30th of this year you

Julie Drolet, M.D.

Page 22

1  spent an additional 28.4 hours at the
2  agreed rate of $450 an hour.  Is that
3  correct?
4      A.   That is correct.
5      Q.   So you were requesting
6  payment in the amount of that time of
7  $12,780.  Is that correct?
8      A.   That would be correct.
9      Q.   Have you been paid that
10 amount?
11     A.   I think so.
12     Q.   Okay.  And going to the
13 third invoice dated November 2nd, 2015,
14 it's a letter to Mr. Rosenblatt that
15 between October 1st and October 31st of
16 this year you spent an additional 64
17 hours on this case at 450 an hour
18 requesting payment in the amount of
19 $28,800.  Is that correct?
20     A.   That is correct.
21     Q.   And you may not -- have you
22 been paid yet?
23     A.   No, I have not.
24     Q.   Has any argument been

Page 23

1  raised -- do you have any understanding
2  that they don't intend to pay that
3  amount?
4      A.   No, I have -- I don't have
5  any reason to doubt that they would.
6      Q.   Right.  And just looking at
7  these, all of the --
8      A.   I wouldn't.
9      Q.   Right.  All of them ask to
10 make the check payable to Women's
11 Institute for Gynecology.  What is that?
12     A.   That is my office.
13     Q.   Okay.  Is that the name of
14 your medical practice?
15     A.   No.  It's actually Women's
16 Institute for Gynecology & Minimally
17 Invasive Surgery.
18     Q.   So is the Women's Institute
19 for Gynecology that we have here
20 something different than your medical
21 practice?
22     A.   No.  It's just shorter on
23 the check.
24     Q.   Okay.  Understood.

Page 24

1      (Whereupon, a document was
2      marked for identification as
3      Drolet Exhibit No. 2.)
4  BY MS. BALDWIN:
5      Q.   I'll mark as Drolet-2 a copy
6  of your CV.  I'll go ahead and staple it
7  so we don't lose any pieces.  Here we go,
8  Doctor.
9          And, Doctor, that was given
10 to me by your counsel this morning.  Is
11 it your understanding this is an updated
12 copy of your CV?
13     A.   Yes.
14     Q.   Okay.  And I'd like to
15 start, I guess, on the second page with
16 your education.
17     A.   Yes.
18     Q.   I see that you went to the
19 University of Montreal?
20     A.   Yes.
21     Q.   Are you a Canadian citizen?
22     A.   Yes, I am.
23     Q.   Okay.  Do you have a U.S.
24 citizenship?

Page 25

1      A.   No, I do not.
2      Q.   What year did you graduate
3  from the University of Montreal?
4      A.   Which one?  Residency,
5  medical school or...?
6      Q.   I'm sorry.  I was looking,
7  and I didn't even notice.  Where did you
8  get your undergraduate education?
9      A.   At University of Montreal.
10     Q.   Okay.  What year did you
11 graduate?
12     A.   1983.
13     Q.   Okay.  What year did you
14 start?
15     A.   1982.  It's different in
16 Canada.
17     Q.   I was going to ask, can you
18 explain that difference for me?
19     A.   After high school there is
20 a -- what you would consider the
21 undergrad here called CEGEP, C-E-G-E-P.
22 And in order to get into medical school
23 there are three pathways.
24         You can do two years of

Julie Drolet, M.D.

Page 26

1  CEGEP and then get admitted to medical
2  school.  Then there's two years of CEGEP,
3  one year in university and then you can
4  get admitted into medical school.  The
5  third pathway is that you do your two
6  years of CEGEP.  Then you do your three
7  years of university completed undergrad
8  and then you can get admitted to medical
9  school.
10      The amount -- the spots are
11  very limited for graduate right out of
12  CEGEP or CEGEP plus one year compared to
13  the spots available for everybody else
14  who has a complete undergrad.  So I did
15  two years of CEGEP, one year in biology
16  called minor and then I went to medical
17  school.
18      Q.   Understood.  And you got
19  your medical degree from University of
20  Montreal as well?
21      A.   Yes, I did.
22      Q.   And is that an M.D. degree?
23      A.   It is.
24      Q.   Okay.  And you graduated

Page 27

1  from there in 1988?
2      A.   That is correct.
3      Q.   Okay.  And did you go on and
4  do a residency?
5      A.   Yes, I did.
6      Q.   And where did you do your
7  residency?
8      A.   At University of Montreal.
9  Contrary to in the United States, there's
10 not just one hospital affiliated.  We
11 rotate through five hospitals in the
12 French system.
13      Q.   Okay.  And which hospitals
14 did you rotate through?
15      A.   I rotated through Sainte
16 Justine Hospital, Notre-Dame Hospital,
17 Saint Luc Hospital, De L'Hotel Dieu.
18 Maisonneuve-Rosemont was the first one.
19      Q.   You may have to spell that
20 for the court reporter.
21      A.   Shall I write it down?
22      Q.   Yeah.  We can do that at a
23 break then.
24      A.   Okay.

Page 28

1      Q.   Your French pronunciation is
2  probably better than everyone in the
3  room.
4           Am I correct that that was a
5  residency in obstetrics and gynecology?
6      A.   Yes, it was.
7      Q.   Okay.  And then following
8  that you did a fellowship?
9      A.   Yes.
10      Q.   Okay.  Did you immediately
11 go from your residency to your
12 fellowship?
13      A.   Yes, I did.
14      Q.   And what was your fellowship
15 in?
16      A.   Minimally invasive surgery,
17 laparoscopic and hysteroscopic.
18      Q.   Okay.  And just in layman's
19 terms, tell me what that means?
20      A.   It is to operate using
21 minimally invasive techniques, and at the
22 time laparoscopic surgery was
23 revolutionizing cancer, gynecological
24 cancer in women, the way hysterectomies

Page 29

1  were performed and pelvic floor surgeries
2  were performed.
3      Q.   Okay.  So the focus there
4  was all laparoscopic surgeries, not open
5  procedures?
6      A.   Correct.
7      Q.   Did you do any open
8  procedures in your fellowship?
9      A.   Two.
10      Q.   Okay.  And which two did you
11 do?
12      A.   One was a hysterectomy for a
13 22-week size uterus, and the other one
14 was for endometrial cancer in a woman
15 whose uterus was too large to pass
16 through the vaginal canal and thus there
17 would have been risk of contamination.
18      Q.   Okay.  Did you do any mesh
19 procedures in your fellowship?
20      A.   Yes.
21      Q.   Which types?
22      A.   Sacrocolpopexies and
23 hysteropexies.  They called them
24 promontofixation.

Julie Drolet, M.D.

Page 30

1    Q.   I'm sorry.  I got
2  sacrocolpopexy.  And what was the second
3  one?
4    A.   Hysteropexy.
5    Q.   Okay.
6    A.   H-Y-S-T --
7    Q.   Got it.
8    A.   She might need it.
9    Q.   Doctor, when you began
10  treating in the United States did you
11  have to repeat a residency here?
12    A.   No, I did not.
13    Q.   Okay.  You were qualified by
14  virtue of your training in Canada?
15    A.   Yes, and I had passed my
16  American Board certification as well.
17    Q.   When did you take your
18  American Board certification?
19    A.   I took my written exam in
20  June of 1994 and my oral exam in November
21  of 1996.
22    Q.   And when did you start
23  practicing in the United States?
24    A.   Officially, August 18th of

Page 31

1  1997.
2    Q.   Did you pass both your
3  written and oral boards the first time?
4    A.   Yes.
5    Q.   And that Board
6  certification, is that in obstetrics and
7  gynecology?
8    A.   Yes.
9    Q.   Okay.  And just for the
10  record, where did you do your fellowship?
11    A.   In France in
12  Clermont-Ferrand.
13    Q.   Is there a reason why you
14  chose to go to France for your fellowship
15  as opposed to stay in Canada?
16    A.   Yes.  Clermont-Ferrand was
17  known as the birthplace of advanced
18  laparoscopic surgery.  And in my
19  residency we had started to do
20  laparoscopic hysterectomies in 1991, and
21  my professors had learned through going
22  through conferences.  I wanted to learn
23  more and learn it from the best.
24    Q.   So you had a particular

Page 32

1  interest in laparoscopic surgeries?
2    A.   And pelvic surgeries, yes.
3    Q.   Did you do any mesh
4  surgeries in your residency?
5    A.   Yes.
6    Q.   Which types?
7    A.   Sacrocolpopexies, open,
8  abdominal.
9    Q.   In your fellowship when you
10  did sacrocolpopexies, were those done
11  laparoscopically?
12    A.   Yes.
13    Q.   Okay.  And the hyster --
14    A.   Hysteropexies?
15    Q.   Yes.  Were those done
16  laparoscopically?
17    A.   They were done
18  laparoscopically.
19    Q.   And, I'm sorry, I just asked
20  you, but I didn't make a note.  What type
21  of -- the mesh procedures that you did in
22  your residency was sacrocolpopexies and
23  that's it?
24    A.   Yes.  Open.

Page 33

1    Q.   Following your fellowship in
2  France, where did you go?
3    A.   I practiced at Notre-Dame
4  Hospital in Montreal.
5    Q.   And what type of practice
6  were you in?
7    A.   This was general obstetrics
8  and gynecology.  Mostly minimally
9  invasive, though.
10    Q.   Laparoscopic?
11    A.   Laparoscopic and
12  hysteroscopic.
13    Q.   Were you in a private
14  practice or were you an employee of the
15  hospital?
16    A.   It's socialized medicine in
17  Canada, so we're employed by the
18  government.
19    Q.   Okay.
20    A.   I did have an agreement with
21  the hospital, but everything else is
22  controlled by the government.
23    Q.   Understood.  When you were
24  at Notre-Dame Hospital were you doing any

Julie Drolet, M.D.

Page 34

1  mesh surgeries?
2      A.   Laparoscopic
3  sacrocolpopexies and hysteropexies.
4      Q.   What years were you at
5  Notre-Dame Hospital?
6      A.   From 1994 until August of
7  2007 -- pardon me, August of 1997.
8      Q.   And what happened in August
9  of 1997?
10      A.   I moved to York.
11      Q.   Okay.  How is it you came to
12  York, Pennsylvania?
13      A.   Through a recruiter.
14  Through a recruiting company.
15      Q.   Were you looking to come to
16  the United States?
17      A.   Yes.
18      Q.   Okay.  Is there a reason why
19  you wanted to leave Canada?
20      A.   At the time with the way
21  socialized medicine was organized, I was
22  only given one half day three times a
23  month of surgical time in the OR.  We
24  were three obstetrician-gynecologists to

Page 35

1  deliver about 1500 patients a year in the
2  last few months with no residents, no
3  midwives.  We were in-house.
4          And the climate in the
5  university teaching hospitals wasn't very
6  good, so I wanted another experience and
7  go somewhere where they would allow me to
8  operate at full capacity.  So I contacted
9  a recruiter through one of our journals
10  and ended up in York.
11      Q.   So am I correct then that
12  you left the Canadian medical system in
13  part because you weren't happy with the
14  amount of operating time you were
15  getting?
16      A.   Yeah, and my patients were
17  getting canceled.  And if I have a
18  patient who is on a waiting list for a
19  month for uterine cancer and the head
20  nurse in the OR says, Dr. Drolet, you're
21  not going to be done your cases by 3
22  o'clock or 3:30, so I'm going to have you
23  go up and cancel your last case and to
24  tell that woman that, I'm sorry, the OR

Page 36

1  just won't allow me, I found that very
2  difficult.
3      Q.   You just weren't getting
4  enough time in the OR with your patients?
5      A.   Correct.  And other -- there
6  were other issues.
7      Q.   Okay.  The recruiter brought
8  you here to York, Pennsylvania.  I
9  believe that there was another physician
10  in the practice when you came?
11      A.   Yes.  His name was Dr. Henry
12  Sagel.
13      Q.   And what was the name of the
14  practice then?
15      A.   Memorial Gynecological and
16  Obstetrical, P.C., something like that.
17      Q.   Okay.  And were you made a
18  partner in the practice when you came?
19      A.   No.  I was an employee.
20      Q.   Okay.  And what did the
21  practice consist of when you came?
22      A.   General obstetrics and
23  gynecology.
24      Q.   And you came in '97.  Did I

Page 37

1  get that right?
2      A.   Yes.  I arrived August 10th
3  in the country and officially started to
4  work on the 18th.
5      Q.   Okay.
6      A.   '97.
7      Q.   And my understanding, I
8  think it was in your report or your CV,
9  perhaps, is that Dr. Sagel passed away
10  after a year?
11      A.   Yeah.  He died in a plane
12  crash September 20th or 21st of 1998.
13      Q.   Okay.  And then you took
14  over the practice?
15      A.   Not really.
16      Q.   Okay.  What happened?
17      A.   I continued to practice.
18  The lawyers for the estate were the
19  managing partners, and in July of 1998 on
20  a Friday afternoon they closed down the
21  practice.
22      Q.   Did they give you a reason
23  for why they closed the practice?
24      A.   No.  I -- they just closed

Julie Drolet, M.D.

Page 38

1  it.  They arrived at my office at a
2  quarter to 4:00 and said take your
3  personal belongings.  We're closing down
4  the practice.
5      Q.   Okay.  From the time you
6  worked at that practice up until it was
7  closed, can you give me a breakdown of
8  what your work was like, what percentage
9  obstetrical versus gynecological --
10  gynecologic?
11      A.   I think it might have been
12  50/50 at the time.  I'm not quite sure.
13  I don't have any details.
14      Q.   Okay.  But, approximately,
15  50 percent obstetrical, 50 percent gyne
16  work?
17      A.   In that first year when he
18  was still alive, yes.
19      Q.   Okay.  Did that change after
20  he passed away before the practice
21  closed?
22      A.   I had more and more GYN
23  patients come to see me.
24      Q.   Is there a reason for that

Page 39

1  that you know of?
2      A.   I can't know for sure.  I
3  have some idea.
4      Q.   And what's that idea?
5      A.   He was a 56-year-old
6  gentleman and I was a younger woman, and
7  with questions of sex, pain, female
8  issues, some women felt more comfortable
9  talking to a woman, but I can't be sure.
10      Q.   So it's your understanding
11  just as a gynecologist that at times
12  women find it awkward to raise sexual or
13  pain issues with male physicians?
14      A.   I wouldn't say that.  I just
15  think, you know, there are some women who
16  are more comfortable with a woman.
17      Q.   And that's my question.  You
18  understand that some women may be more
19  comfortable with a female physician?
20      A.   Yes.  Yes.  Sorry.  Yes.
21      Q.   That's okay.  In that
22  context of sexual issues or pelvic
23  issues?
24      A.   That's possible.  Yes.

Page 40

1      Q.   Have you ever done a
2  urogynecology fellowship?
3      A.   No, I have not.
4      Q.   After the practice closed,
5  did you continue to practice medicine in
6  the United States?
7      A.   Yes.
8      Q.   And what practice did you go
9  to?
10      A.   I rented the space next door
11  that night and formed Woman Care
12  Obstetrics and Gynecology, P.C., I think.
13  I don't know.
14      Q.   Okay.  And that name, Women
15  Care Obstetrics and Gynecology, is that
16  now the practice that's known as the
17  Women's Institute for Gynecology?
18      A.   I had to close that one down
19  and...
20      Q.   Okay.
21      A.   But yes.
22      Q.   Okay.  So let's focus on
23  Women Care then.  What years did the
24  Women Care practice exist?

Page 41

1      A.   It's Woman Care.
2      Q.   Woman Care.  Sorry.
3      A.   W-O-M-A-N.  Sorry.  Just for
4  the court reporter.
5      Q.   Thank you.
6      A.   I don't want to get my dates
7  wrong, but I think it was July 16th or
8  19th of 1999 up until some time in the
9  spring of -- or fall of 2008.
10      Q.   The Woman Care practice,
11  were you the sole physician in that
12  practice?
13      A.   Yes, I was.
14      Q.   Was that an obstetrical and
15  gynecological practice?
16      A.   Yes.
17      Q.   Okay.  What percentage split
18  was obstetrics versus gyne work?
19      A.   It depends.
20      Q.   On what?
21      A.   What do you -- you calculate
22  hours or numbers of patients?
23      Q.   Let's do percentages of your
24  time?

Julie Drolet, M.B.

Page 42

1   A.   I would say probably 75
2  percent obstetrics in time because I was
3  solo practice and mostly at the hospital
4  for all those nighttime deliveries, but
5  patient-wise and patient load, I still
6  carried a full load of GYN surgeries, and
7  I operated approximately five
8  days -- five full days a month of GYN
9  surgery, five to six days a month of GYN
10  surgeries.
11   Q.   So at least one day a week
12  you were doing gyne surgeries?
13   A.   Yeah.  1.25.  I had every
14  Tuesday morning.  Actually, no.  It was
15  more than that.  So 1.5 days a week so
16  six days a month.
17   Q.   What kind of surgeries did
18  you do in that practice for the treatment
19  of pelvic organ prolapse?
20   A.   Cystocele repair, rectocele
21  repairs, vaginal hysterectomies with
22  uterosacral ligament suspension,
23  sacrospinous fixations, laparoscopic
24  sacrocolpopexies.  I might have done a

Page 43

1  couple of hysteropexies.  Up until 2008 I
2  also did pelvic floor mesh, slings.  I
3  did a few open sacrocolpopexies that I
4  can think of offhand.
5   Q.   Okay.  Just because your
6  initial part of that question was that
7  you did cystocele and rectocele.  Are
8  there any surgeries that come to mind
9  other than the ones that you listed out
10  after that?
11   A.   Vaginal hysterectomies,
12  apical vault prolapses, cystoscopies,
13  perineoplasties, enterocele repairs.  I
14  would have to -- for a full list, I would
15  have to be able to pull all of these
16  operative reports from all of these
17  years.
18   Q.   Sure.  You said that you did
19  pelvic floor mesh and slings up until
20  2008.  What products were you using?
21   A.   Just to be clear, 'til 2008
22  in Woman Care.
23   Q.   Okay.
24   A.   That's what you asked me,

Page 44

1  while I was in that Woman Care practice.
2   Q.   Right.
3   A.   Okay.  Can you repeat your
4  question?  I'm sorry.
5   Q.   Sure.  What products were
6  you using?
7   A.   For pelvic floor repair,
8  Gynemesh PS.  I did Prolift.  I am not
9  quite sure if I did Apogee or Perigee or
10  Avaulta.  I'm not quite sure.
11   Q.   The majority of mesh repairs
12  you were doing at that time were using
13  the Ethicon products?
14   A.   Yes, they were.  Oh, I also
15  did porcine dermis mesh Permacol and
16  Surgisis.  I think that is it.  Again,
17  we'd have to go back to the operative
18  reports to get a complete detailed list
19  for pelvic floor prolapse.
20   Q.   Right.  Understanding it's
21  for the treatment of stress urinary
22  incontinence, were you also doing
23  transvaginal tape procedures?
24   A.   Transvaginal slings, yes.

Page 45

1   Q.   Okay.  Which products were
2  you using?
3   A.   I used the Ethicon products,
4  the TVTs.  I did some TVTOs.  I did two
5  TVT Securs.  The majority are now Colo --
6  'til 2008 I think Coloplast which was
7  called -- they were -- I can't remember
8  what they were called before.
9   Q.   Okay.  In 2008 you had to
10  shut down that practice, the Woman Care
11  practice?
12   A.   Right.
13   Q.   Okay.  Why did you have to
14  shut it down?
15   A.   Because my ex-husband was
16  coming after my practice.
17   Q.   What year were you divorced?
18   A.   I can't remember when he
19  actually -- when the judge actually made
20  it official.  2008 or 2009.
21   Q.   Okay.  At that point did you
22  then open a new practice?
23   A.   Yes.
24   Q.   Okay.  And which practice

Julie Drolet, M.D.

1 was that?
2     A.   That would be the Women's
3 Institute for Gynecology & Minimally
4 Invasive Surgery.
5     Q.   And is that -- when you
6 opened it, is that at the same location
7 it's at now?
8     A.   Yes, it is.
9     Q.   And that's 1600 Sixth Avenue
10 in York?
11     A.   That is.
12     Q.   Suite 117?
13     A.   Yes.
14     Q.   Okay.  And are you the only
15 physician in that practice?
16     A.   Yes, I am.
17     Q.   So from 2008 to the present
18 time, you've been the only physician in
19 that practice?
20     A.   No.  I had another -- I
21 recruited another physician I think
22 around 2010, and she left September of
23 2012.  Her husband was transferred to
24 Atlanta and -- in a position he couldn't

1 refuse.
2     Q.   What was her name?
3     A.   Her name was Rama Rao,
4 R-A-O.
5     Q.   The practice as it is now,
6 the Women's Institute, if I say that,
7 will you understand what we're talking
8 about?
9     A.   Uh-huh.
10     Q.   The Women's Institute, can
11 you break down the percentage of your
12 time that's spent on -- you still
13 practice obstetrics in that practice?
14     A.   No, I do not.
15     Q.   So when you re-opened the
16 practice, you stopped doing obstetrics?
17     A.   I think it coincided with
18 it, yes.
19     Q.   Okay.  Do you ever remember
20 doing any obstetrics at the Women's
21 Institute?
22     A.   And that's -- it crossed
23 over so I -- the last delivery from my
24 practice in the United States was

1 November 21st of 2008 at York Hospital.
2     Q.   Why did you stop practicing
3 obstetrics?
4     A.   Because as a solo
5 practitioner I was working 90 to 130
6 hours a week, on call 24 hours a day,
7 seven days a week the last nine months
8 without one day off.
9     Q.   Too much work?
10     A.   At one point.  I love to do
11 gyne surgery, and I decided this was the
12 time.
13     Q.   Okay.  At the Women's
14 Institute can you give me a breakdown of
15 what your patients are?
16     A.   Well, the patients of the
17 practice because I have two nurse
18 practitioners --
19     Q.   Okay.
20     A.   -- with me, so they will see
21 most of the annuals.  I still have some
22 diehard patients that just want to see
23 me, but they will do -- one of them will
24 do the preliminary workup of women who

1 are incontinent and then order the
2 appropriate testing and then they will
3 come to me.  My nurse practitioners will
4 see every woman for just about every GYN
5 problem.
6     Q.   And what patients are you
7 seeing?
8     A.   I am seeing the more complex
9 cases, pelvic pain, prolapse, follow-ups
10 of incontinence.  I still do
11 hysterectomies for bleeding or management
12 of bleeding and/or endometriosis, pelvic
13 pain.
14     Q.   Are you still doing
15 surgeries?
16     A.   Oh, yes.
17     Q.   How many days a week?
18     A.   About two days a week.
19     Q.   Are you still doing mesh
20 surgeries?
21     A.   Yes.
22     Q.   Which types are you doing
23 now?
24     A.   Sacrocolpopexies and some

Julie Drolet, M.B.

Page 50

1 vaginal mesh and slings.
2     Q.    When you say you're doing
3 some vaginal mesh, what type of vaginal
4 mesh are you doing now?
5     A.    I use the Restorelle mesh.
6     Q.    Any others?
7     A.    For vaginal mesh for pelvic
8 prolapse, this is the one that is
9 available at our institution.
10    Q.    Do you know what year you
11 stopped using the Prolift?
12    A.    Not exactly.  Probably 2010,
13 2011.
14    Q.    And why did you stop using
15 it?
16    A.    I remember having many sales
17 reps coming in for us to try different
18 types of mesh.  I -- the hospital was
19 willing to try Restorelle, and we were
20 already using their T-sling from
21 Coloplast, so that's how I think it
22 happened.
23    Q.    So it was a marketing
24 decision?

Page 51

1     A.    I think between whoever was
2 at the hospital and myself as well.
3     Q.    Okay.  Did you work with the
4 hospital to decide what products they
5 would keep in stock, which mesh products
6 they would keep in stock?
7     A.    Not at Memorial Hospital.
8     Q.    Did you do that at other
9 hospitals?
10    A.    I tried.
11    Q.    Which hospitals?
12    A.    York Hospital or WellSpan
13 now.
14    Q.    In your practice in its
15 current form, Women's Institute, which
16 hospitals are you doing surgeries in?
17    A.    Most of my surgeries at this
18 time are done at Memorial Hospital.
19    Q.    Okay.  And then when you
20 were at Woman Care, which hospitals were
21 you doing surgeries in?
22    A.    Mostly at Memorial Hospital.
23    Q.    Okay.  Have you done some
24 hospitals -- some surgeries at York

Page 52

1 Hospital?
2     A.    Yes, I have.
3     Q.    Okay.  When was that?
4     A.    All throughout.
5     Q.    Okay.  Why both hospitals?
6     A.    Because some patients have
7 patient preference.  Some patients have
8 an insurance that is in-house, the South
9 Central Preferred product, now Aetna, if
10 you're a hospital employee, you have a
11 higher co-pay if you go to another
12 hospital.  So depending on their
13 insurance and patient preference, I would
14 go to one or the other hospital.
15    Q.    Okay.  When you say you
16 tried at York Hospital with regards to
17 the choice of what mesh products to use
18 in the hospital, tell me what you mean by
19 that?
20    A.    I remembered wanting to do
21 prolapse surgery using mesh at York
22 Hospital, and I had to send all of my
23 case lists from Memorial Hospital over to
24 York, WellSpan, and they wouldn't get the

Page 53

1 product for me at the time.  Same thing
2 with InterStim.
3     Q.    I'm sorry.  Where?
4     A.    InterStim is a procedure we
5 do for refractory urge incontinence.
6 It's a neuro -- implantable
7 neurostimulator in the sacrum, and for
8 quite a few years they didn't want to get
9 the product for me.
10    Q.    Okay.  At a certain point
11 did that change at York Hospital?  Did
12 they then begin getting the mesh products
13 for you?
14    A.    For me, I don't know.
15    Q.    Okay.
16    A.    But for others, yes.
17    Q.    Okay.  What do you mean you
18 don't know if they started getting it for
19 you?
20    A.    Well, I never got a
21 response, an affirmative response, but I
22 heard through the grapevine that other
23 surgeons had been trained, WellSpan
24 surgeons, to perform these surgeries, and

Julie Drolet, M.D.

Page 54

1 they were performing mesh surgeries.  And
2 if they weren't performing them at
3 Memorial because they didn't have the
4 privileges at Memorial, they were
5 performing them at York, so that's how I
6 found that out.
7     Q.   Are you licensed to practice
8 medicine?
9     A.   Yes.
10    Q.   Okay.  Where?
11    A.   Here in the United States
12 and in Canada.
13    Q.   Okay.  I just wanted to make
14 sure.  You're Board certified in what
15 areas?
16    A.   General obstetrics and
17 gynecology and female pelvic medicine and
18 reconstructive surgeries.
19    Q.   The female pelvic medicine
20 and reconstructive surgeries, am I
21 correct you got that certification in
22 2013?
23    A.   Yes.  You are correct.
24    Q.   And is that an oral and

Page 55

1 written exam?
2     A.   It's a written exam.
3     Q.   Did you pass on your first
4 attempt?
5     A.   Yes, I did.
6     Q.   Have your hospital
7 privileges from any of the hospitals
8 you've practiced at ever been suspended
9 or revoked?
10    A.   No.  I've had to -- for
11 Memorial, I've had to just let them know
12 that I was stopping practicing
13 obstetrics, and they had to have me sign
14 a paper for that when I quit doing
15 obstetrics, but for York they didn't have
16 me do that.
17    Q.   Has your license to practice
18 medicine ever been suspended or revoked?
19    A.   No, it has not.
20    Q.   On your updated CV I believe
21 there's just two publications?
22    A.   Yes.  That is correct.
23    Q.   One was Guidelines For the
24 Laparoscopic Management of Adnexal Masses

Page 56

1 in September of '98?
2     A.   Yes.
3     Q.   And the other one was
4 Laparoscopic Treatment of Symptomatic
5 Endometriosis --
6     A.   Yes.
7     Q.   -- in 1995?
8     A.   Yes.
9     Q.   No other publications?
10    A.   Not that I know of.
11    Q.   Were those both
12 peer-reviewed publications?
13    A.   Yes.
14    Q.   What is a peer-reviewed
15 publication?
16    A.   I think it's journals that
17 have been reviewed by colleagues and are
18 published within the medical community
19 and accepted as peer reviewed.
20    Q.   Okay.  What's the
21 significance of a journal -- an article
22 being peer reviewed?
23    A.   I am just guessing at this
24 point.  I'm not quite sure, but I think

Page 57

1 it has some criteria of -- or a
2 guideline -- not guidelines, but it has
3 to meet certain criteria, I would think,
4 to be admitted into those journals.  They
5 have reviewers and editors.
6     Q.   My question is a little bit
7 different.  What's the significance to
8 you as a medical professional of a
9 peer-reviewed journal article?
10    A.   Well, I would tend to read
11 more of the peer reviewed than nonpeer
12 reviewed if somebody just posted
13 something on the Internet.  I think
14 there's increased quality hopefully in
15 the reporting and accuracy of the
16 reporting, but that doesn't mean that the
17 studies are perfect.
18    Q.   And you can understand that
19 even in peer-reviewed studies, the
20 studies reported may have problems with
21 them inherently?
22    A.   Yeah.  That can happen.
23    Q.   Doctor, I don't see on your
24 CV any consulting work.  Am I correct

Page 58

1  that you did some consulting work for
2  Ethicon other than what you've done in
3  connection with the Hammons case?
4      A.  I don't recall consulting
5  work.  I would -- I was a proctor to Dr.
6  Rao for Prolift.
7      Q.  Were you paid for that?
8      A.  Yes, I was.
9      Q.  How much?
10     A.  $2,000.
11     Q.  Any other consulting work
12 that you recall off the top of your head
13 for Ethicon?
14     A.  No.
15     Q.  Okay.
16     A.  Not that I recall.
17     Q.  Doctor, do you recall
18 signing a contract for consulting in 2010
19 with Ethicon?
20     A.  I saw -- I didn't recall it
21 at the time, but I saw that paper, yes.
22     Q.  Okay.  Well, let's just go
23 ahead and mark that.
24     A.  But I felt that was for me

Page 59

1  to be proctor -- to be Dr. Rao's proctor
2  in 2010.
3      Q.  Right.
4          MS. BALDWIN:  So let's mark
5      this as Drolet-3 and this is a
6      copy of that consulting agreement.
7          (Whereupon, a document was
8      marked for identification as
9      Drolet Exhibit No. 3.)
10         MS. BALDWIN:  I should have
11     an extra copy, but I don't appear
12     to have one here.
13         MR. MORIARTY:  Just mark it,
14     give it to her, and we'll worry
15     about extras at a break.
16         MS. BALDWIN:  I think I've
17     got it, Matt.  Sorry.  I just want
18     to make sure I got you a copy.
19 BY MS. BALDWIN:
20     Q.  And, Doctor, do you see the
21 date at the top right hand, it says
22 August 20th of 2010?
23     A.  I see that.
24     Q.  And that's your name, Julie

Page 60

1  Drolet?
2      A.  Yes, it is.
3      Q.  And that's the correct
4  address for you?
5      A.  Yes, it is.
6      Q.  And the re line there is
7  master consulting agreement, correct?
8      A.  Yes.
9      Q.  Okay.  And then if we turn
10 back, if you look at the numbers at the
11 bottom page -- of the page, bottom
12 right-hand corner, it's
13 ETH.MESH.03612205.
14     A.  Yes.
15     Q.  Is that your signature?
16     A.  Yes.  That is.
17     Q.  And the date there is August
18 4th, 2010?
19     A.  Yes, it is.
20     Q.  And it's also signed by
21 Ethicon?
22     A.  It appears to be.
23     Q.  Okay.  And if we look at
24 this on the first page -- go back to the

Page 61

1  first page, please, paragraph 3.
2  Paragraph 2 talks about from time to
3  time, company will request in writing the
4  provision of specific consulting
5  services, explaining in detail the
6  services to be provided, the date, time
7  and location at which consulting services
8  need to be provided.
9          Do you see where I'm reading
10 from?
11     A.  Yes, I do.
12     Q.  Right.  And then paragraph 3
13 says:  In consideration for your
14 provision of consulting services, you
15 shall pay the amount set forth in
16 Exhibit-A.  Did I read that correctly?
17     A.  Company shall pay you the
18 amount set forth -- yes.
19     Q.  Right.  So Ethicon would be
20 paying you for consulting services?
21     A.  Correct.
22     Q.  And then if we go to
23 Exhibit-A, which is -- the last numbers
24 are 2206 attached there.  This is

Page 62

1 services and fees, Exhibit-A. Do you see
2 that?
3     A.   Yes.
4     Q.   And under
5 preceptorship/surgical training, it says:
6 Consultant shall allow visiting surgeons
7 and visiting company sales
8 representatives to observe surgical
9 procedures involving the practice of
10 pelvic floor repair and stress urinary
11 incontinence.
12         Did I read that correctly?
13 Paragraph 4.
14     A.   Yes.
15     Q.   See where I am?
16     A.   Yes, I do.
17     Q.   And it says:  The clinical
18 uses of pelvic floor repair and stress
19 urinary incontinence family of products.
20 And then it goes on to say:  And to
21 consult with consultant regarding such
22 procedures applicable to patient
23 confidentiality and consent requirements.
24         In particular, consultant

Page 63

1 agrees he or she shall secure appropriate
2 patient consent to the presence of any
3 third party during surgical training
4 programs as necessary.  Consultant shall
5 allow such visits on up to seven
6 occasions and company shall pay
7 consultant $2,000 for each such session
8 per eight-hour day.
9         Did I read that correctly?
10     A.   Yes. I think you did.
11     Q.   Okay. And if you flip to
12 the next page, paragraph 8, other, the
13 box checked yes.  Do you see that?
14     A.   Yes, I do.
15     Q.   That says:  Consultant shall
16 perform such other services designated
17 below, and it said the rate would vary
18 per hour?
19     A.   Yes.  It looks like it does,
20 yes.
21     Q.   And then it says:  Faculty
22 training meetings and educational summits
23 or forums.  Negotiated rate to be no more
24 than the maximum of 250 rate per hour?

Page 64

1     A.   I see that.
2     Q.   And then it says:  The
3 parties agree that the compensation paid
4 to consultant shall not exceed $16,000
5 per contract term, except as may be
6 mutually agreed in writing by the
7 parties.
8     A.   I see that on there.
9     Q.   Okay.  So you had a
10 consulting agreement then with Ethicon to
11 provide services, correct?
12     A.   I had this contract, yes.
13     Q.   Right.  And that didn't just
14 specify that you were providing
15 proctorship for Dr. Rao for the Prolift,
16 correct?
17     A.   Not in this contract.
18     Q.   Right.  And, in fact, when
19 you provided proctorships for your
20 partner or -- was she a partner or an
21 employee?
22     A.   She was an employee.
23     Q.   You did that for free for
24 the company.  Isn't that correct?

Page 65

1     A.   I remember receiving a check
2 for $2,000.
3     Q.   Okay.
4     A.   That's all.
5     Q.   Okay.
6         (Whereupon, a document was
7         marked for identification as
8         Drolet Exhibit No. 4.)
9 BY MS. BALDWIN:
10     Q.   And then let's look at
11 Drolet-4.  And this is a document.  It's
12 an e-mail from Ariba administrator,
13 jjariba@corus.jnj.com.
14         Do you see that at the top?
15     A.   Yes, I do.
16     Q.   And it's to a Caro-Rosado,
17 Lissette at ETHUS.  Do you see that?
18     A.   Yes.
19     Q.   And then under action
20 required, right below that, it says 2010
21 professional education, Julie Drolet,
22 M.D. That's you, correct?
23     A.   Yes.  That is.
24     Q.   And then it says below that,

Julie Drolet, M.D.

Page 66

1  U.S. incontinence, annual, approval
2  request.
3        Did I read that correctly
4  just in the subject line?
5     A.   Yes.  Yes.
6        MR. MORIARTY:  Kila, do you
7  have a copy of that?
8        MS. BALDWIN:  Yes.  I'm
9  sorry, Matt.
10 BY MS. BALDWIN:
11    Q.   And if we go down there, and
12 we look at the actual body of the e-mail,
13 it says professional -- top of form and
14 then below that in bold it says,
15 professional education, Julie Drolet,
16 M.D., U.S. incontinence, annual requires
17 your approval.
18       Did I read that correctly?
19    A.   I'm sorry.  Where...
20    Q.   The bold section here.  I
21 can point it to you.
22    A.   Bold.
23    Q.   Bold right there.
24    A.   Okay.  Yes.  Okay.  Yes.

Page 67

1     Q.   And the requester is a --
2  I'm not sure what's the first name.
3  Rosado Lissette Caro?
4     A.   I don't know who she is.
5     Q.   Okay.  Well, this document
6  seems to be created, if you follow along
7  that line, on Monday, September 13th,
8  2010, correct?
9     A.   This was sent on Tuesday,
10 the 14th.
11    Q.   Okay.
12    A.   Oh, yes.  I see that.
13 September 13th, yes.
14    Q.   Okay.  And then below that,
15 there's some line items, and it says
16 supplier and description?
17    A.   Yes.
18    Q.   Line item one identifies
19 you, Julie Drolet, correct?
20    A.   That is correct.
21    Q.   And it gives a contract ID
22 number, and it says consulting fee?
23    A.   I see that.
24    Q.   It says:  HCC-approved

Page 68

1  consultant shall perform
2  preceptorship/surgical training in pelvic
3  floor repair and stress urinary
4  incontinence procedures and demonstrate
5  the clinical uses of the company's PFR
6  and SUI products.
7        Consultant will also engage
8  in other services such as faculty
9  training meetings and educational summits
10 and forums and that you shall be
11 compensated at $2,000 per eight-hour day,
12 250 per hour.
13       Did I read that correctly?
14    A.   Yes, you did.
15    Q.   And then the price is 15,200
16 over to the right?
17    A.   I see that on this paper,
18 yes.
19    Q.   And the next line is meals
20 and out-of-pocket expenses, and the price
21 for that is $800?
22    A.   That's what it says.
23    Q.   And then the total cost is
24 $16,000?

Page 69

1     A.   That is correct.
2     Q.   Okay.  Do you know if you
3  got a check in connection with these
4  consulting services?
5     A.   I do know that I did not get
6  a check except for $2,000.
7     Q.   Okay.  But you're not sure
8  what that $2,000 was for?
9     A.   Yes, I do.
10    Q.   You think that was for
11 proctoring Dr. Rao?
12    A.   I think so.  That's my
13 understanding.
14    Q.   Okay.  Do you know who David
15 Pursel is?
16    A.   Yes.
17    Q.   Who is he?
18    A.   He's an -- or was.  I don't
19 know if he still is, a rep for Ethicon.
20    Q.   Okay.  A sales rep?
21    A.   Sales rep, I would think.
22    Q.   And is he someone who
23 detailed your office?
24    A.   Yes.

Julie Drolet, M.B.

Page 70

1    Q.   Okay.  How often would you
2 see him?
3    A.   I can't recall exactly.  I
4 haven't seen him in a while.
5    Q.   Okay.
6         MS. BALDWIN:  So we'll mark
7 this as Drolet-5.  Here you go,
8 Matt.
9         (Whereupon, a document was
10   marked for identification as
11   Drolet Exhibit No. 5.)
12 BY MS. BALDWIN:
13    Q.   And this is an e-mail dated
14 June 20th, 2011 from David Pursel to a
15 Melissa Doyle.  Do you see that?
16    A.   I see that.
17    Q.   Do you know who Melissa
18 Doyle is?
19    A.   No idea.
20    Q.   Okay.  If you go down to the
21 e-mail, the second, I guess, paragraph
22 there, it says:  Drolet still doing
23 Prolift and has been trying some empathy
24 mesh kits, also.  Has been proctoring her

Page 71

1 partner on Prolift for free since we have
2 no budget left.
3         Did I read that correctly?
4    A.   Yep.
5    Q.   Okay.  And at the very
6 bottom of the e-mail -- it's kind of a
7 chain, so the first e-mail at the bottom
8 is from this Melissa Doyle to David
9 Pursel dated June 17th, 2011.
10         Do you see that e-mail?
11    A.   Yes, I do.
12    Q.   And it says:  I'll try
13 again.  What's going on with her in terms
14 of faculty?  Did she adopt Prosima?
15         Do you know what that
16 reference is as far as in terms of
17 faculty?
18    A.   No.
19    Q.   Were you ever paid to be
20 faculty for Ethicon at any meetings?
21    A.   No.  I don't think so.
22    Q.   Did you ever serve as a key
23 opinion leader for Ethicon?
24         MR. MORIARTY:  Objection.

Page 72

1 Go ahead.
2    A.   Not that I recall.
3    Q.   Okay.  Do you know if you
4 were considered a high-volume practice by
5 Ethicon?
6    A.   I do not.
7    Q.   Okay.  Do you know if
8 Ethicon was targeting physicians who used
9 a high volume of their products?
10    A.   I don't have any idea about
11 that.
12    Q.   Did Ethicon ever send
13 patients to you?
14         MR. MORIARTY:  Objection.
15 Go ahead.
16    A.   Not that I know of.
17    Q.   Okay.
18         MS. BALDWIN:  I'll mark this
19 as Drolet-6.
20         (Whereupon, a document was
21   marked for identification as
22   Drolet Exhibit No. 6.)
23 BY MS. BALDWIN:
24    Q.   And, Doctor, this is an

Page 73

1 e-mail at the very top.  It looks like
2 it's an e-mail from Chad Lauer to David
3 Pursel.
4         Do you know who Chad Lauer
5 is?
6    A.   No, I do not.
7    Q.   Okay.
8         MR. MORIARTY:  Do you have
9 an extra?
10         MS. BALDWIN:  Yeah.  I'm
11 sorry, Matt.
12 BY MS. BALDWIN:
13    Q.   If we go all the way to the
14 very back, the last page, I think that's
15 where the e-mail chain starts.  So the
16 bottom of the page before that you'll see
17 it's an e-mail from Chad Lauer to Matt
18 Henderson.
19         And he says:  Matt, could
20 you tell me of a Gynecare friendly
21 surgeon in York, PA, or at least turn me
22 on to your rep in that area?  I have an
23 aunt who needs someone.  Thank you.
24         Did I read that correctly?

Julie Drolet, M.D.

Page 74

1   A.   You read that piece of paper
2 correctly.
3   Q.   And that's from Chad Lauer,
4 identifies himself as the field marketing
5 manager west of Ethicon?
6   A.   Yes.
7   Q.   Okay.  And then if we go
8 through the e-mails in order then, Matt
9 Henderson tells Chad Lauer to check with
10 Dave Pursel?  The bottom of 967.
11   A.   Yes.
12   Q.   Do you see where I am?
13   A.   Can you help me out?
14   Q.   Right.  Below that, the
15 e-mail before that --
16   A.   Okay.
17   Q.   -- Matt tells Chad to check
18 with Dave Pursel?
19   A.   Correct.  Yes.
20   Q.   And then Chad forwards the
21 e-mail to Dave Pursel asking for help,
22 correct?
23   A.   It says can you help me out,
24 yes.

Page 75

1   Q.   Right.  And then above that,
2 Dave makes some recommendations.  One is
3 a John Lawrence and one is a Detlef
4 Gerlach.  Did you see that?
5   A.   Uh-huh.
6   Q.   And then if we flip to the
7 first page, Chad asks if he's heard of
8 anyone doing the Prolift, and David
9 Pursel at Ethicon recommends you.  He
10 says Dr. Julie Drolet, a good surgeon as
11 well, correct?
12   A.   Where are we in all of this?
13     MR. MORIARTY:  Front page.
14   Q.   On the first page.
15   A.   Yes.  Okay.  I see that.
16   Q.   So you were recommended,
17 correct?
18   A.   It appears to be on this
19 page.
20   Q.   Okay.  Did Ethicon ever tell
21 you that they were referring patients to
22 you?
23     MR. MORIARTY:  Objection.
24   A.   No.

Page 76

1     MR. MORIARTY:  Go ahead.
2   A.   Not that I recall.
3   Q.   Okay.  Did David Pursel ever
4 tell you that he was referring patients
5 to you?
6     MR. MORIARTY:  Objection.
7   A.   Not that I recall.
8   Q.   Did David Pursel ever tell
9 you that he was recommending you to
10 others at Ethicon who were looking for
11 surgeons in the York area?
12   A.   Not that I recall.
13   Q.   Did you ever serve as
14 faculty for Ethicon at any events?
15     MR. MORIARTY:  Objection.
16   Asked and answered.
17   A.   Do I have to answer this
18 one?
19   Q.   Yes.
20   A.   Okay.  Not that I recall.
21   Q.   Okay.
22     (Whereupon, a document was
23   marked for identification as
24   Drolet Exhibit No. 7.)

Page 77

1 BY MS. BALDWIN:
2   Q.   So I'll hand you a
3 spreadsheet marked as No. 7, I think it
4 is or -- yeah.  And if you look at this
5 spreadsheet, about three quarters of the
6 way down the first page there's your
7 name, Julie Drolet, M.D., gynecologist,
8 correct?
9   A.   That is correct.
10   Q.   And if you look at the very
11 top of the page, it's identifying
12 faculty.  You see it says faculty last
13 name, faculty first name and their
14 specialty, correct?
15   A.   That's what it says on this
16 paper.
17   Q.   Okay.  Do you have any
18 recollection of being an educator for
19 TVTO, TVT Abbrevo or TVT Exact?
20   A.   I do not.
21   Q.   Do you know why your name
22 would appear on a list of faculty who was
23 teaching those products?
24   A.   I do not have any idea.

Julie Drolet, M.D.

1  Q.  Were you ever given free
2  products from Ethicon?
3  A.  You mean by the sales reps?
4  Q.  Yeah.  Free products to use
5  for your patients?
6  A.  Not that I know of other
7  than pens or pencils and -- but no.
8  MS. BALDWIN:  I'm sorry.
9  Wait.  I didn't mark that one.
10  Pass that back for just a second.
11  I'm sorry.  We'll mark that as
12  Exhibit-8.
13  (Whereupon, a document was
14  marked for identification as
15  Drolet Exhibit No. 8.)
16  BY MS. BALDWIN:
17  Q.  And, Doctor, this is an
18  e-mail, if you look at the top, from
19  David Pursel to a Phil Schmidt.  Do you
20  see that?
21  A.  Yes, I do.
22  Q.  Do you know Phil Schmidt?
23  A.  He used to work at Memorial,
24  yes.

1  Q.  Okay.  What was his role
2  there?
3  A.  I think he was in materials
4  management at the time.
5  Q.  Okay.
6  A.  I'm not sure.
7  Q.  Okay.  If you go, there's a
8  first e-mail and the one just below that,
9  it's the e-mail from David Pursel to Phil
10  Schmidt.
11  A.  I see that.
12  Q.  8:25 p.m. on January 26th
13  2011.
14  A.  I see that.
15  Q.  It says:  Phil, I brought in
16  one anterior and one posterior kit for
17  her last two cases at no charge.  In the
18  past I have always tried to provide free
19  samples as much as possible.
20  Do you dispute that David
21  Pursel was giving you free products?
22  MR. MORIARTY:  Objection.
23  Go ahead.
24  A.  I had no idea.  This is

1  between Phil Schmidt who is an employee
2  of the hospital.  So I have no say in
3  what the hospital purchases or gets
4  freebies from which rep from whatever
5  products.  I have no idea.
6  Q.  Okay.  So the hospital may
7  have been getting free products from
8  Ethicon for surgeries you were
9  performing?
10  A.  That's a possibility.
11  Q.  But you don't know anything
12  about that?
13  A.  But I don't know anything
14  about that.
15  Q.  Okay.  And then, Doctor, you
16  actually signed another contract with
17  Ethicon beyond the one we already looked
18  at.  Is that correct?
19  A.  I don't recall.
20  Q.  Okay.  I'll show you another
21  e-mail.
22  MS. BALDWIN:  We'll mark
23  this one as Drolet-9.
24  (Whereupon, a document was

1  marked for identification as
2  Drolet Exhibit No. 9.)
3  BY MS. BALDWIN:
4  Q.  And this is another e-mail
5  from the Ariba administrator to Paul
6  Parisi.  Did I read that correctly?
7  A.  That is correct.
8  Q.  Do you know who Paul Parisi
9  is?
10  A.  I do not.
11  Q.  Okay.  And here, if we go
12  down to the actual line items, again,
13  number one is your name, Julie Drolet,
14  correct?
15  A.  That is correct.
16  Q.  Again, it's a consulting
17  fee?
18  A.  It looks like it.
19  Q.  And at the bottom of that
20  line item it says:  Consultant shall be
21  compensated for these services at $30,000
22  per year, $2,000 per eight-hour day, $250
23  per hour.
24  Did I read that correctly?

Page 82

1    A.    Yes, you did.
2    Q.    And if you go over to the
3  price there, it's $28,500.  Did I read
4  that correctly?
5    A.    You read that correctly.
6    Q.    And then below that there's
7  meals and out-of-pocket expenses in the
8  amount of $1500.  Did I read that
9  correctly?
10    A.    You read that correctly.
11    Q.    And the total cost is
12  $30,000?
13    A.    You read that correctly.
14    Q.    Were you ever paid any
15  amount from this $30,000?
16    A.    Not that I recall.
17    Q.    Okay.  So you signed
18  contracts with Ethicon for $30,000 and
19  $16,000, but you were never paid?
20    A.    I got some fees reimbursed
21  when I went to some training, but except
22  for that $2,000 check that we received, I
23  didn't see any of that money.
24    Q.    What was the purpose in

Page 83

1  signing contracts with Ethicon?
2    A.    I guess if they needed me in
3  some capacity, these things would be in
4  place, but I'm not quite sure.
5    Q.    Did you ask them what needs
6  they might have for you?
7    A.    I don't recall.
8    Q.    Okay.  Did you have a
9  discussion with them about why you needed
10  to sign a consulting agreement with them?
11    A.    I thought it was in order
12  for me to proctor Dr. Rao, and the
13  hospital had to approve the proctor.  I
14  thought these had to be done, so I did
15  it.
16    Q.    What procedures did you
17  proctor Dr. Rao on?
18    A.    For the Prolift, I did
19  anterior and posterior.
20    Q.    Anything else?
21    A.    I proctored her on a lot of
22  things.  Hysteroscopies,
23  sacrocolpopexies.  She came in with me on
24  a lot of cases, InterStims.  None of

Page 84

1  these were paid.
2    Q.    What trainings did you go to
3  for Ethicon?
4    A.    I went to a TVT training
5  around 2002.  I went to the Prolift
6  training in April of 2005.  I remember
7  doing Prosima one-day training; I can't
8  recall the exact year, and then TVT, I
9  think it was Secur as well, but I can't
10  remember the exact dates.
11    Q.    Where were those trainings
12  held?
13    A.    The Prolift training was in
14  Allentown.  The other trainings may have
15  been in Maryland.  I'm not quite sure.
16    Q.    Did Ethicon pay for your
17  travel?
18    A.    I think it did.
19    Q.    Did they pay for your meals?
20    A.    I think they provided the
21  meals.  I would say yes.
22    Q.    How long were each of those
23  trainings?
24    A.    The Prolift was the entire

Page 85

1  day, and Prosima, I think, was close to
2  an entire day.
3    Q.    And the TVT?
4    A.    That, I can't remember.  I
5  can't recall.
6    Q.    Were they more than one-day
7  trainings or were they just one-day
8  trainings?
9    A.    I think they were one-day
10  trainings, I think.
11    Q.    How is it that you got
12  invited to go to these trainings?
13    A.    I'm not quite sure.
14    Q.    Did the sales rep bring them
15  up to you?
16    A.    It's possible.  I mean, I
17  don't recall.
18    Q.    Do you know if you asked
19  someone to go to the trainings?
20    A.    I can't recall.
21    Q.    Do you know how Ethicon
22  would let doctors generally know about
23  its trainings?
24    A.    I don't have any idea of how

Julie Drolet, M.D.

Page 86

1 that happened.
2    Q.   When you went to Prolift,
3 how many people were there?
4    A.   There were three other
5 doctors, I think. Maybe four, but
6 between three and four other doctors.
7    Q.   Who led the training?
8    A.   Dr. Vince Lucente.
9    Q.   And what was the forum like?
10 What did the day consist of?
11    A.   Early morning we had some
12 didactics video and then he had four
13 cases in the OR for which all of us got
14 to scrub. Afterwards, there was a kind
15 of debriefing videos and conversations.
16    Q.   How is it when you did the
17 proctorship for Dr. Rao that Ethicon got
18 involved to give you a consulting
19 contract? Did someone tell you you had
20 to sign that?
21    A.   I don't recall.
22    Q.   Did you ask someone whether
23 you had to sign one as opposed to just
24 bringing her into the surgery as your

Page 87

1 employee?
2    A.   I think there was some
3 issues with how the hospital would have
4 credentialed Dr. Rao to be able to do
5 those procedures, so I don't know how it
6 got -- it brought -- how it got brought
7 up, but the solution that was acceptable
8 to all parties was for me to become a
9 proctor so that I could proctor her and
10 then she could be able to do those
11 procedures.
12    Q.   Were there any other doctors
13 who were in those proctorships other than
14 you and Dr. Rao that you led?
15    A.   I didn't -- I don't recall
16 having anybody else but me proctoring Dr.
17 Rao.
18    Q.   Was there a sales rep
19 present?
20    A.   I -- I don't remember.
21    Q.   When you went to your
22 Prolift training with Dr. Vince Lucente,
23 was there a sales rep present?
24    A.   Yes, there was.

Page 88

1    Q.   How many?
2    A.   I can't recall.
3    Q.   More than one?
4    A.   There could have been.
5 There was one for -- that was a local rep
6 and then there was the rep that brought
7 me there.
8    Q.   Which rep brought you there?
9    A.   I can't recall for sure.
10    Q.   And when you say that rep
11 brought you there, what do you mean by
12 that?
13    A.   I had a cast. I couldn't
14 drive.
15    Q.   So he drove you?
16    A.   Yeah.
17    Q.   And am I right that Dr.
18 Lucente also led your TVT training?
19    A.   I don't specifically recall.
20    Q.   Okay. But if I told you
21 that, you'd have no reason to dispute it?
22    A.   I would not.
23    Q.   Doctor, at some point in
24 your -- I think it was in your report

Page 89

1 there was a statement that you've been
2 teaching obstetricians and gynecologists
3 since 1994. Is that correct?
4    A.   Residents --
5    Q.   Okay.
6    A.   -- in obstetrics and
7 gynecology.
8    Q.   Okay. And what school are
9 they coming from?
10    A.   Over at Memorial Hospital it
11 is PCOM and LECOM, Lehigh Valley, and at
12 York it's -- I think it's University of
13 Pennsylvania.
14    Q.   And so you're instructing
15 the residents in general obstetrics and
16 gynecology?
17    A.   Now only in gynecology since
18 2008.
19    Q.   Okay. And then I saw
20 something on your CV about you being an
21 adjunct clinical assistant professor at
22 the Lake Erie College of Osteopathic
23 Medicine?
24    A.   That's LECOM.

Julie Drolet, M.D.

Page 90

1    Q.   Okay.  And do you have any
2  technical title with PCOM or the
3  University of Pennsylvania?
4    A.   No.  I don't think so.
5    Q.   So that title with LECOM, is
6  that just by virtue of you instructing
7  their residents that rotate through the
8  hospital?
9    A.   I would think so.
10   Q.   Okay.  Do you teach any
11 actual classes physically at the college?
12   A.   No, I do not.
13   Q.   Okay.  Are you teaching
14 gynecological surgeries to the residents?
15   A.   Yes.
16   Q.   Other than York and
17 Memorial, do you have privileges at any
18 other facilities?
19   A.   Outpatient facilities at
20 Apple Hill Surgical Center and the
21 Surgical Center of York which is right
22 beside Memorial Hospital.
23   Q.   In your report it said that
24 you have a special interest in

Page 91

1  urogynecology with a focus on pelvic
2  pain, pelvic prolapse and incontinence.
3          What percentage of your
4  patient population are suffering from
5  these disorders?
6    A.   About 50 percent right now.
7  Sorry.  Pardon me.  About 50 percent.
8    Q.   Are you still doing open
9  procedures for the treatment of pelvic
10 organ prolapse?
11   A.   Very rarely.
12   Q.   And what do you mean by very
13 rarely?
14   A.   I think the last time I had
15 to do a laparotomy was two years ago in
16 the United States.
17   Q.   Do you have experience in
18 treating women who have suffered from
19 mesh complications?
20   A.   I do.
21   Q.   Okay.  And define for me
22 what kind of mesh complications you've
23 seen?
24   A.   I've seen pain.  I've seen

Page 92

1  mesh erosion.  Granulomas.
2    Q.   Doctor, do you know what the
3  rates of the patient where you've
4  implanted mesh for the treatment of
5  pelvic organ prolapse, what your
6  complication rates are?
7    A.   I can guesstimate.
8    Q.   Okay.
9    A.   All right.
10       MR. MORIARTY:  I'm sorry.
11 Did you say on patients for whom
12 she's operated?
13       MS. BALDWIN:  Yes.
14       MR. MORIARTY:  Okay.
15       MS. BALDWIN:  What her
16 complication rates are.  Go ahead.
17       THE WITNESS:  Which one
18 would you like me -- which one do
19 you want?
20 BY MS. BALDWIN:
21   Q.   Let's start with pain.
22   A.   Percentage-wise...
23       MR. MORIARTY:  I'm sorry to
24 interrupt.  Are we just talking

Page 93

1  about POP?
2        MS. BALDWIN:  Yes.
3        MR. MORIARTY:  Okay.
4        THE WITNESS:  Okay.  No
5  slings?
6        MS. BALDWIN:  Right.  Yep.
7  Just for treatment of pelvic organ
8  prolapse as I said.
9        THE WITNESS:  Okay.  To the
10 best of my recollection,
11 spontaneous pain unprovoked, zero.
12 BY MS. BALDWIN:
13   Q.   And would that include pain
14 with intercourse?
15   A.   No.
16   Q.   Okay.  What about pain with
17 intercourse?
18   A.   Again, to my recollection,
19 probably less than 5 percent.
20   Q.   What about erosion?
21   A.   Depending on the mesh, less
22 than 5 percent.
23   Q.   Have you seen more erosion
24 in patients with certain products versus

Julie Drolet, M.D.

Page 94

1 others?
2    A.   Yes.
3    Q.   And can you explain?
4    A.   I tried -- and I can't
5 remember which company.  It wasn't
6 Prolift.  It was an Ethicon product, but
7 it was mesh with collagen, and I had two
8 anterior repairs, and the entire incision
9 dehisced.  So I brought them back to the
10 OR, closed it.  They did fine, but those
11 two patients, I've continued to see them,
12 but I didn't want to use that product
13 again.
14    Q.   So you've only had two
15 patients ever who have had erosion?
16    A.   No.
17    Q.   Okay.
18    A.   So other than those --
19 depending on the type of mesh, other than
20 those two patients who were a hundred
21 percent, the rest were less than 5
22 percent.
23    Q.   Okay.  Do you mean that less
24 than 5 percent of your other patients

Page 95

1 have suffered some form of erosion?
2    A.   Yes.
3    Q.   Yes.  Okay.
4    A.   That's what I think.
5    Q.   Okay.  And this is with your
6 patients?
7    A.   My patients, yes.
8    Q.   Have you had patients come
9 to you who have been implanted by a
10 different physician who are experiencing
11 complications from their mesh implant
12 seeking treatment?
13    A.   Yes.
14    Q.   Okay.  And have those
15 patients come to you for problems like
16 pain, pain with intercourse and erosion?
17    A.   Yes.
18    Q.   Okay.  And do you, in turn,
19 call their implanting physician to let
20 that physician know that there was a
21 complication from their implant surgery?
22    A.   I don't call them, but I do
23 have the patients sign records release
24 and the reason for the records release.

Page 96

1    Q.   Okay.  Do you automatically
2 send the records to the implanting
3 physician?
4    A.   I send a records release
5 signed by the patient to the implanting
6 physician because I want to know exactly
7 what type of mesh, how it was put in.  I
8 want to read the operative report.
9    Q.   Okay.  So you try to get
10 information from the implanting physician
11 about the type of mesh and what happened
12 with the patient?
13    A.   Correct.
14    Q.   You don't necessarily
15 provide information to the implanting
16 physician about your treatment of that
17 patient?
18    A.   Sometimes I do at patient's
19 request.
20    Q.   But not always?
21    A.   Not always.
22    Q.   So it's not your normal
23 protocol, every patient who comes in with
24 a mesh complication, if it wasn't

Page 97

1 implanted by you, either in writing or
2 phone call to somehow contact an
3 implanter to explain the nature of the
4 complication and what your treatment is?
5    MR. MORIARTY:  Objection.
6    Go ahead.
7    A.   It's not my usual habit.
8    Q.   So you may be treating
9 patients who are mesh complication and
10 their implanter does not know that
11 they're suffering from that complication?
12    A.   That is a possibility.
13    Q.   And, likewise, it's also a
14 possibility that some of your patients
15 may have left your practice after you
16 implanted them with a mesh product and
17 are suffering complications that you
18 don't know about?
19    A.   Yes, but I see the records
20 release forms.
21    Q.   Right.  You see the records
22 release, but you don't necessarily get
23 all their records from subsequent
24 physicians, correct?

Julie Drolet, M.D.

Page 98

1    A.   No, but if I have a
2  patient --
3         MR. MORIARTY:  Objection.
4    A.   -- who is at another
5  doctor's office and she sends a records
6  release, I get to see those.
7    Q.   Right.
8    A.   And I pull if -- when we
9  were in paper chart at the time, I'm the
10 one that has access to our chart room.
11   Q.   Right.  So you pull your
12 chart on that patient and look at it?
13   A.   Correct.
14   Q.   You don't pull the other
15 doctor's chart because you don't have the
16 other doctor's chart, correct?
17   A.   I think we're -- are we
18 asking about the -- are we talking about
19 the same thing?
20   Q.   I think you're
21 misunderstanding me.  You understand that
22 patients leave your practice, correct?
23   A.   Yes.
24   Q.   And they may go to other

Page 99

1  doctors that you don't know about at
2  times, correct?
3    A.   That could be correct, yes.
4    Q.   If those doctors don't send
5  you a release, you have no way of knowing
6  what doctors those are, correct?
7    A.   Correct.
8    Q.   And if those patients choose
9  not to let their doctor know, you have no
10 way of knowing if that patient has
11 experienced complications, correct?
12   A.   That could be correct, yes.
13   Q.   So am I correct that as a
14 physician, you don't follow all of your
15 patients in perpetuity for the rest of
16 their lives to see if they're
17 experiencing complications?
18   A.   We try to.  We have recalls
19 and we send them notices, and we have
20 people going through our chart list and
21 calling them periodically.
22   Q.   But you can't say that you
23 followed all of your patients forever?
24   A.   I absolutely -- that would

Page 100

1  be a correct statement.
2    Q.   Right.  No doctor can?
3    A.   That would be a correct
4  statement that I think.
5         MS. BALDWIN:  I think we're
6    short on video time, so we might
7    as well take a break here because
8    he's got to change tapes.
9         THE VIDEOGRAPHER:  The time
10   is now 11:25, and this concludes
11   DVD number 1.
12        (A short break was taken.)
13        THE VIDEOGRAPHER:  The time
14   is now 11:39, and this is the
15   beginning of DVD number 2.
16 BY MS. BALDWIN:
17   Q.   Doctor, other than the
18 proctorship that we talked about with
19 Ethicon and the contract that we looked
20 at, have you had any other financial
21 agreements with any other medical device
22 manufacturers in your career?
23   A.   Not that I recall.
24   Q.   Have you ever been paid by a

Page 101

1  medical device manufacturer or
2  pharmaceutical company other than what
3  you've been paid by Ethicon that we
4  looked at?
5    A.   Not that I recall.
6    Q.   Okay.  Am I correct then
7  that you don't hold yourself out as an
8  expert in the design of medical devices?
9         MR. MORIARTY:  Objection.
10   Go ahead.
11   A.   Well, as a surgeon, there's
12 certain things that I'm interested in,
13 and as a pelvic floor surgeon I would
14 want to use my knowledge to see if a
15 product makes sense or not, but do I
16 design them?  No.  I do not design them.
17   Q.   Right.  You've never
18 designed a medical device?
19   A.   That would be correct.
20   Q.   And you've never worked with
21 a medical device manufacturer in
22 designing a medical device?
23   A.   That would be correct.  I've
24 spoken to design teams, but that's it.

Julie Drolet, M.D.

Page 102

1    Q.   What design teams have you
2 spoken to?
3    A.   The Coloplast group.
4    Q.   Did you have a financial
5 agreement with them?
6    A.   No.
7    Q.   Okay.  And what -- when did
8 this happen?
9    A.   I'm not quite sure.  Between
10 2009 and 2011, '12.  I'm not quite sure.
11    Q.   And what was the nature of
12 your communications?  You said you spoke
13 with them.  What did you speak with them
14 about?
15    A.   It was in conjunction with a
16 conference, and they said they had their
17 techs there, and we talked about mesh.  I
18 thought that their design didn't
19 do -- didn't provide enough support.
20    Q.   Okay.  So you were giving
21 them your critiques as a surgeon?
22    A.   Correct.
23    Q.   Right.  You weren't involved
24 in the actual design?

Page 103

1    A.   That is correct.
2    Q.   And you weren't involved in
3 any redesign that may have happened?
4    A.   That is correct.
5    Q.   You just told them what your
6 critiques were from a surgical
7 standpoint?
8    A.   That would be correct.
9    Q.   Because you're a trained
10 surgeon?
11    A.   Yes.  That would be correct.
12    Q.   Okay.  You've never worked
13 with any pharmaceutical device
14 manufacturers in their -- strike that.
15         Have you ever worked with
16 any pharmaceutical device manufacturers
17 to assist them in their communications
18 with the FDA?
19    A.   No, I have not.
20    Q.   Do you have any expertise in
21 the area of FDA regulation of pharma --
22 medical devices?
23    A.   No, I do not.
24    Q.   Okay.  Do you hold yourself

Page 104

1 out as an expert generally in medical
2 device industry practice?
3    A.   That's a very broad
4 question.  I use devices, so I've
5 developed an expertise.
6    Q.   Your expertise is based on
7 your use of the devices, correct?
8    A.   Partly, yes.
9    Q.   And not on the regulation of
10 those devices?
11    A.   Yes.  I would agree with
12 that statement.
13    Q.   Right.  You're not an expert
14 in the FDA regulation of medical devices?
15    A.   That would be correct.
16    Q.   Okay.  And you're not an
17 expert in the standards for the labels of
18 medical devices?
19    A.   What do you mean by labels?
20    Q.   The warning labels or the
21 product labels or the packaging that
22 comes with a medical device?
23         MR. MORIARTY:  Objection.
24    Go ahead.

Page 105

1    A.   As a surgeon, I read those
2 labels.  I am familiar with what they
3 usually contain, but am I an expert in
4 the regulations of what gets put into
5 those inserts?
6    Q.   Yes.
7    A.   Legally, no.  I'm not.
8    Q.   So you're not familiar with
9 what the FDA regulations are for the
10 standards of what must be conveyed in a
11 medical device's warning label?
12         MR. MORIARTY:  Objection.
13    Go ahead.
14    A.   Repeat the question again.
15 Sorry.
16    Q.   Why don't I just rephrase
17 it.  I think it got kind of long.
18    A.   Okay.
19    Q.   Are you familiar with the
20 FDA regulations for what information is
21 required to be in a medical device label?
22    A.   Not what is required to be.
23    Q.   Right.  Are you familiar at
24 all with what Ethicon's internal

Julie Drolet, M.D.

1  standards were for the information that
2  should be conveyed in the Prolift's
3  label?
4      A.   I don't think I am, no.
5      Q.   Do you have any information
6  about what Ethicon's regulatory affairs
7  department believed should be in the
8  label for the Prolift device?
9      A.   I do not think so.
10     Q.   You don't intend to offer
11 any opinions in this case as to whether
12 Ethicon met its own internal standards
13 for labeling?
14     A.   That is correct.
15     Q.   Because you don't know what
16 those standards are?
17     A.   I'm not familiar with what
18 they are in their entirety.
19     Q.   Am I correct that you're not
20 an expert in clinical study design?
21     A.   That is correct.  I am not a
22 statistician, but I am familiar with what
23 we read in journals and, generally
24 speaking, different types of studies.

1      Q.   You're familiar with what
2  clinical studies are?
3      A.   I have some familiarity,
4  yes.
5      Q.   How do you define clinical
6  study?
7      A.   Patients -- patient involved
8  studies.
9      Q.   How do you define
10 preclinical study?
11     A.   I don't.
12     Q.   Do you know what a
13 preclinical study is?
14     A.   I'm not quite sure.
15     Q.   Okay.  Do you have any
16 expertise in correlating preclinical
17 studies on medical devices to how a
18 device would perform in the human body?
19     A.   No, I do not.
20     Q.   Doctor, do you know
21 approximately how many patients you've
22 implanted a Prolift in?
23     A.   Over 150 to 160.
24     Q.   And how many pelvic floor

1  repair surgeries are you doing a week?
2          MR. MORIARTY:  You mean now,
3      Kila?
4          MS. BALDWIN:  Now.
5          THE WITNESS:  Okay.  Now,
6      about two.  It depends on the
7      week.  I'm in solo practice, so
8      I'm not in --
9  BY MS. BALDWIN:
10     Q.   Let's just do it maybe per
11 month now on average?
12     A.   Okay.  Okay.  It depends.  I
13 would say, on average, eight a month
14 excluding slings.
15     Q.   Right.
16     A.   Okay.
17     Q.   If we included slings, how
18 many?
19     A.   Probably -- some of them
20 will have both, so an extra maybe three
21 or four.  Like I said, some of them will
22 have both, pelvic floor and slings.
23     Q.   So some are between 8 to 11
24 pelvic floor repair surgeries per month

1  now?
2      A.   I think so.
3      Q.   Has that number changed over
4  time?
5      A.   Yes, it has.
6      Q.   Okay.  How so?
7      A.   As I dropped obstetrics, my
8  patient population also changed and
9  reputation, I'm doing more now.
10     Q.   Okay.  Back when you were
11 trained on the Prolift, and I think you
12 told me you were trained in 2005.  Am I
13 right on that?
14     A.   Yes.
15     Q.   How many pelvic floor repair
16 surgeries were you doing per month then
17 of any type?
18     A.   Probably half that number.
19     Q.   So maybe four to five per
20 month?
21     A.   Yes.  That is possible.
22     Q.   Do you know what Ethicon's
23 standards were for the physicians who
24 should be invited to attend the Prolift

Page 110

1  training?
2      A.   No, I do not.
3      Q.   Okay.  Has anyone talked
4  with you about whether Ethicon had any
5  standards for the type of physicians that
6  were appropriate for the use of the
7  Prolift implant?
8      A.   No.  Nobody's talked to me
9  about that.
10     Q.   Okay.
11     A.   That I can recall.
12     Q.   Did you see any documents in
13 that regard?
14     A.   Not for that.
15     Q.   Okay.  You paused there.  Is
16 there something else that you did see
17 that's relevant?
18     A.   I saw a pathway physician
19 who had done mesh surgery and then that
20 would be kind of -- what kind of training
21 they would need to go to versus surgeons
22 who had not used pelvic mesh before, so I
23 recall seeing that in the documents that
24 were forwarded to me recently.

Page 111

1      Q.   Okay.  So you saw something
2  about a pathway about physicians who had
3  done mesh before and the training they
4  would need versus physicians who hadn't
5  done mesh implants before?
6      A.   Yes.
7      Q.   But you haven't seen
8  anything about the internal standards
9  that Ethicon had --
10     A.   Not that I recall.
11     Q.   Let me just finish the
12 question.
13     A.   I'm sorry.
14     Q.   You haven't seen anything
15 about the internal standards Ethicon had
16 for which physicians were appropriate for
17 Prolift training whatsoever?
18     A.   That would be correct.
19     Q.   Okay.  While we're here, why
20 don't we just go over your reliance list.
21 I think I already gave this to Matt.
22     MS. BALDWIN:  We'll mark
23     this as Exhibit-10.
24     (Whereupon, a document was

Page 112

1  marked for identification as
2  Drolet Exhibit No. 10.)
3  BY MS. BALDWIN:
4      Q.   And, Doctor, this is all the
5  materials that you reviewed in connection
6  with this litigation?
7      A.   No.
8      MR. MORIARTY:  Objection.
9      A.   No.
10     MR. MORIARTY:  Go ahead.
11     Q.   I'm sorry.  Are there other
12 materials that aren't listed here that
13 you've reviewed?
14     A.   Yes.
15     Q.   And what are those?
16     A.   There was a list, wasn't it,
17 e-mailed, an attachment yesterday --
18     Q.   Okay.
19     A.   -- of articles that was
20 e-mailed.  I got a copy of it.
21     Q.   Okay.  So that e-mail list,
22 those articles that were on that list?
23     A.   Yes.
24     Q.   Okay.

Page 113

1      A.   They're not included in this
2  that I can see.
3      Q.   Okay.
4      MR. MORIARTY:  We can put
5      those in the list and substitute
6      for Exhibit-10 later if you
7      prefer.
8      MS. BALDWIN:  It doesn't
9      matter.  You gave them to me, and
10     I thought I had them printed out,
11     but I just had the cover letter,
12     but that was just that list of
13     articles that you e-mailed me
14     yesterday.  It's not included in
15     this version?
16     MR. MORIARTY:  Correct.
17     They were in her report.
18     MS. BALDWIN:  Right.
19     MR. MORIARTY:  They just
20     weren't in the reliance list.
21     MS. BALDWIN:  Okay.
22 BY MS. BALDWIN:
23     Q.   So that was just that list
24 of articles is the only thing that is

Julie Drolet, M.D.

Page 114

1 missing from this reliance list, correct?
2     A.   From what I can tell, yes.
3     Q.   Okay.  So going through
4 this, understanding that there's a list
5 of articles in addition to the stuff
6 that's listed here --
7     A.   Yes.
8     Q.   -- that would be the world
9 of materials that you've reviewed in
10 connection with this case, correct?
11     A.   That would be correct.
12     Q.   Okay.  I'm just trying to
13 get an understanding of all the documents
14 you reviewed, so it would be this list
15 and the e-mail that was sent, correct?
16     A.   Correct.
17     Q.   Okay.  And looking at this
18 list, the first one, two, three pages are
19 the medical literature you reviewed,
20 correct?
21     A.   Yes.
22     Q.   Okay.  Do you know if you
23 reviewed all of the medical literature
24 that was reviewed by Dr. Ann Weber?

Page 115

1     A.   No.  I did not make a
2 cross-reference.
3     Q.   Okay.  Do you know if you
4 reviewed all of the literature that was
5 read by Dr. Ralph Zipper?
6     A.   No.  I did not make that
7 cross-reference.
8     Q.   Did you make a
9 cross-reference between your literature
10 references and the references of the
11 other defense experts identified in this
12 case?
13     A.   No, I did not.
14     Q.   Okay.  Going to page 4, it
15 says production materials?
16     A.   Which four?
17     Q.   The fourth page in here it
18 starts.
19     A.   Yes.
20     Q.   Okay.  And these are all, I
21 guess, presumably the Ethicon documents
22 that you were provided?
23     A.   Yes.  Some of them are
24 repeats.

Page 116

1     Q.   Okay.  So some of these
2 things here are duplicates?
3     A.   I would assume.  I did not
4 see all of those.  I read the peer
5 reviewed.  Some of these videos came to
6 me via e-mail, so there were four that
7 were -- four videos via e-mail that were
8 provided to me.  One of them would not
9 open at all.
10     Q.   So you don't know that you
11 reviewed word-for-word everything that
12 was on here or every single video that
13 was listed on here?
14     A.   I did not review the dozens
15 of these videos and if any of them are
16 repeats, so there's no way for me to
17 tell.
18     Q.   Okay.  Well, let's look
19 at -- the first page has a bunch of
20 anatomy videos, but let's go to the next
21 page, the second page of production
22 materials where it lists patient
23 brochures?
24     A.   Yes.

Page 117

1     Q.   And there's one, two, three,
2 four, five patient brochures.  Did you
3 review five copies of the patient
4 brochure?
5     A.   I thought there were only
6 four.
7     Q.   Okay.
8     A.   So I don't know in these
9 numbers here where it says F, dash, mesh,
10 dash, and all of these numbers, if these
11 are duplicates or not.  I reviewed the
12 materials that were provided to me by
13 Ethicon.
14     Q.   Okay.  Can you tell me what
15 years the patient brochures you actually
16 recall reviewing?
17     A.   Some of them were early
18 2005, 2006.  Some were 2000, I think,
19 eight or 2009.  I don't recall off the
20 top of my head.
21     Q.   Okay.  When you reviewed
22 those patient brochures, were you given
23 information about when those patient
24 brochures were actually distributed into

Julie Drolet, M.D.

Page 118

1  the market?
2      A.   No, but I had -- our sales
3  rep would come into the office, David
4  Pursel, and change these brochures and
5  update them, I would guess.
6      Q.   Okay.  So did you keep track
7  of when they changed the brochures so you
8  could look in the context of this
9  litigation as to when the brochures went
10  onto the market?
11      A.   Well, back in 2005 or 2008 I
12  wasn't involved in litigation.  So
13  whenever they came out with a new
14  brochure, the rep would come in and
15  change the brochure, I would assume.
16      Q.   Right.
17      A.   In a timely fashion.
18      Q.   Right.  So my question is,
19  in this case you've offered some opinions
20  about the labeling of the Prolift
21  product.  And what I want to know is, the
22  brochures that you reviewed in connection
23  with this case, were you given any actual
24  concrete information about when those

Page 119

1  were released into the marketplace?
2      A.   No.  I just looked at the
3  dates --
4      Q.   Okay.
5      A.   -- on the brochures.
6      Q.   Right.  And that's it.  You
7  don't know when they were actually
8  released into the market?
9      A.   I couldn't tell for sure.
10      Q.   Okay.  And then let's go
11  down on this list.  There's a list of
12  Prolift+M professional education slide
13  decks and videos.  Did you review all of
14  those?
15      A.   No.  I -- like I said, I
16  don't know if there are duplicates in
17  here.  They did provide me with what --
18  the Prolift+M education slide deck, a
19  copy of that, but -- and I reviewed that.
20      Q.   But you don't know that you
21  reviewed all of these that are listed
22  here?
23      A.   I do not know exactly which
24  one corresponded with the copy they sent

Page 120

1  me.
2      Q.   Okay.  What device did Mrs.
3  Hammons have implanted?
4      A.   She had a Prolift, an
5  anterior Prolift.
6      Q.   So not a Prolift+M, correct?
7      A.   That would be correct.
8      Q.   Okay.  Going down on this
9  list then, there's the Prolift IFU and
10  there's one, two, three, four, five, six,
11  seven, seven listed with no dates and
12  then two more listed for the Prolift IFU
13  for 2004 and 2009.
14          Did you review all of those
15  different IFUs?
16      A.   The first that have no
17  dates, I don't know which one they
18  correspond to, but the 2004 and 2009 I
19  did for sure.  The other ones I don't
20  know what they correspond to.
21      Q.   Okay.  The Prolift IFU dated
22  2004, do you know what date that was
23  released on the market?
24      A.   No, I do not.

Page 121

1      Q.   The Prolift IFU dated 2009,
2  do you know what date that was released
3  on the market?
4      A.   No, I do not exactly.
5      Q.   Okay.  And then there's
6  Prolift professional educational videos,
7  and there's a whole series of those
8  listed.  Did you review all of those
9  videos?
10      A.   Not all of those.  As I
11  said, I reviewed three videos that were
12  sent to me.  I had a USB port drive that
13  I couldn't open, and it wouldn't open.
14  So they e-mailed me four videos, one in
15  one e-mail and three as e-mail attachment
16  and another e-mail.  I could not open the
17  first one, but I could open the other
18  three.
19      Q.   Okay.  Did you see any
20  e-mails to or from anyone at Ethicon
21  medical affairs about the design of the
22  Prolift device?
23      A.   I can't recall if I did or
24  not.

Julie Drolet, M.D.

Page 122

1  Q.   Okay.  Did you see any
2  e-mails to or from anyone at Ethicon's
3  regulatory department about the Prolift?
4     A.   I think some e-mails were
5  contained, but I don't recall from whom,
6  to whom and about what subject exactly.
7     Q.   Okay.  Looking at your list,
8  I don't see any e-mails listed.  Do you
9  have any recollection of any e-mails you
10  read?
11     A.   I remember that there were
12  e-mails or copies of or they may have
13  been copies of letters, but I didn't use
14  this for my opinion, so there may not be
15  included in here.
16     Q.   The e-mails that you saw
17  might not be included on this list.  Is
18  that what you're telling me?
19     A.   Well, I don't -- do you
20  see -- they might be in here.
21     Q.   Let me ask you this
22  question:  How was this document created
23  that's your reliance list?
24        MR. MORIARTY:  Objection.

Page 123

1  Go ahead.
2     A.   Ethicon.  Ethicon did.
3     Q.   Okay.  And you've already
4  told me you don't believe you've seen
5  every single document that's listed on
6  here?
7     A.   I have not seen all of the
8  videos and education slide decks, and I
9  may have, but I don't have a number to
10  compare what all of these are.  So if
11  they're all the same version but numbered
12  differently, then yes.  I would have seen
13  them, but if there were subtleties, I do
14  not have any way to know which is which.
15     Q.   And then, Doctor, a moment
16  ago we were talking about e-mails.  Do
17  you recall seeing any e-mails from anyone
18  at Ethicon internally about the design of
19  the Prolift?
20     A.   No.
21     Q.   Do you recall any e-mails
22  whatsoever from anyone at Ethicon
23  internally about the warnings on the
24  Prolift?

Page 124

1     A.   Not that I recall.
2     Q.   Do you recall any e-mails
3  whatsoever about anyone at Ethicon about
4  the labeling of the Prolift?
5     A.   No.  I don't recall.
6     Q.   Okay.  Did you see any
7  e-mails referring or relating at all to
8  the French surgeons who created the
9  Prolift?
10     A.   I don't know if it was
11  e-mail or not.  I don't think so.
12     Q.   Doctor, if we go to the next
13  page here, under publicly available?
14     A.   Yes.
15     Q.   Who found these publicly
16  available sources?
17     A.   Ethicon did.
18     Q.   Okay.  And did they send
19  them to you?
20     A.   Yes, they did.
21     Q.   So it's not research you did
22  on your own?
23     A.   Some of them I would have
24  seen in the course of my practice.

Page 125

1     Q.   But outside the course of
2  your practice, did you go out and
3  research to find these things yourself?
4     A.   Not in the last two months.
5     Q.   What about before the last
6  two months?
7     A.   Well, in 2011 when the FDA
8  health notification came out, I know I
9  went to my computer and read it.
10     Q.   In the context of this
11  litigation, I'm asking?
12     A.   Right.
13     Q.   Did you go out and do any
14  research yourself in the context of this
15  litigation for the opinions you
16  offered in connection with this case?
17     A.   No, I did not.
18     Q.   You relied on the documents
19  that were provided to you by Ethicon?
20     A.   Actually, yes, I did.  I saw
21  a couple of articles, and I mentioned it
22  to them that were -- that were coming
23  out, and some of them are probably in
24  here.

Julie Drolet, M.D.

Page 126

1    Q.   You mentioned -- when you
2  say mentioned to them, who's "them"?  Is
3  that an attorney?
4    A.   An attorney.
5    Q.   Is that someone at Ethicon?
6       And you told them that there
7  were articles that were coming out that
8  you'd like to incorporate?
9    A.   Yes.
10   Q.   Okay.  And did you indeed
11 incorporate those into your opinion?
12   A.   I'm not quite sure how to
13 answer that specifically.  I think it's
14 the body of the entire literature.
15   Q.   That's listed here?
16   A.   That's listed here.
17   Q.   And that's in that e-mail?
18   A.   And that's in that e-mail,
19 yes.
20   Q.   Did you do any MEDLINE or
21 PubMed searches when preparing your
22 report?
23   A.   No, I did not.
24   Q.   Other than the couple of

Page 127

1  articles I think you said that you found
2  yourself, did you rely on the literature
3  that was provided to you by Ethicon?
4    A.   I relied on this list, yes.
5    Q.   That Ethicon created?
6    A.   Yes.
7    Q.   And then the literature
8  that's on here is the literature that
9  Ethicon sent to you?
10   A.   Yes.
11   Q.   Okay.  And then if we go to
12 the next page of the list, it's Patricia
13 Hammons case specific, and it's all of
14 her medical records, correct?
15   A.   All of the medical records
16 that were provided to us.
17   Q.   Okay.  When did you
18 get -- start -- let me ask you this
19 question:  When were you retained to
20 start working on this case?
21   A.   I signed a, if you want to
22 call it, contract with Butler Snow May
23 26th of 2015.
24   Q.   And at that time did you

Page 128

1  start receiving medical records?
2    A.   No.
3    Q.   When did you start receiving
4  medical records?
5    A.   July of 2015.
6    Q.   Did you ever ask to see the
7  medical records before then?
8       MR. MORIARTY:  Objection.
9    Go ahead.
10   A.   No, because even though we
11 signed this agreement, I didn't know
12 when -- if or when they would actually
13 want me to be involved in a case.  That
14 only occurred at the end of June of 2015,
15 like June 28th or June 29th, something
16 like that.
17   Q.   Okay.  That's when you were
18 told you would actually be involved --
19   A.   Yes.
20   Q.   -- in this case?
21   A.   I was told I was going to be
22 involved in a case, and eventually I
23 started to receive documents.
24   Q.   Okay.  When you received the

Page 129

1  documents in connection with this case,
2  was it your understanding you were going
3  to be asked to do a medical exam of the
4  plaintiff?
5    A.   No.
6    Q.   Okay.  When did you first
7  learn that you were going to be asked to
8  do a medical exam of this woman?
9    A.   Some time in August, early
10 August.
11   Q.   At that point in early
12 August, did you have all these medical
13 records available to you?
14   A.   I can't recall exactly in
15 what order they were sent, but I think I
16 had most of the medical records by then.
17   Q.   And then if we go to the
18 next page, it lists out depositions, and
19 there's a list of people who were deposed
20 specifically in connection with Ms.
21 Hammons' case.  Do you see that?
22   A.   Yes, I do.
23   Q.   Were all of those
24 depositions, in fact, provided to you?

Julie Drolet, M.D.

Page 130

1      MR. MORIARTY:  We missed
2  one.
3      THE WITNESS:  Yeah.
4      MR. MORIARTY:  Oh, no.
5  There it is.
6      THE WITNESS:  It looks like
7  it is the deposition of Dr. Zipper
8  didn't arrive until later.
9  BY MS. BALDWIN:
10     Q.   Okay.  Are those the dates
11 there, do you believe those are the dates
12 you received the depositions?
13     A.   No.
14     Q.   Okay.  What date did you
15 receive the depositions?
16     A.   They were sent in packages
17 and boxes starting in July and August.
18     Q.   Did you get the deposition
19 of Patricia Hammons before you knew you
20 would have to do a medical examination of
21 her?
22     A.   I think I did.  Yes, I think
23 I did.  Yes.
24     Q.   Okay.  Did you read all of

Page 131

1  these depositions?
2      A.   Yes, I did.
3      Q.   Okay.  I notice missing from
4  that list were the depositions of the
5  Ethicon company witnesses.  Did you read
6  any of the depositions of any of
7  Ethicon's employees?
8      A.   There was one they sent me.
9  It's in one of those suitcases.  It was
10 the rep that was associated with Dr.
11 Baker.
12     Q.   So would that be the
13 deposition of Brian Heckman?
14     A.   That could have been.  I
15 just don't recall the name.
16     Q.   If I tell you that Brian
17 David Heckman was the sales rep who
18 detailed Dr. Baker that was deposed in
19 connection with this case, do you have
20 any reason to disagree with that?
21     A.   No, I do not.
22     Q.   Okay.  Other than reading
23 the deposition of Brian Heckman, did you
24 read the depositions of any other Ethicon

Page 132

1  employees?
2      A.   No.
3      Q.   Okay.  Did you know that
4  Axel Arnaud was deposed in the, I guess,
5  pelvic mesh litigation?
6      A.   No.
7      Q.   Do you know who Axel Arnaud
8  is?
9      A.   I've heard -- or I've read
10 his name in some documents but...
11     Q.   Okay.  Do you know that he
12 was the scientific director of Gynecare
13 Europe when Prolift was being designed?
14     A.   I recall reading that.
15     Q.   Okay.  Would you like to
16 know what he said about the design of the
17 Prolift?
18     MR. MORIARTY:  Objection.
19     Q.   Do you want to read it?
20     Q.   Well, I'm asking you, do you
21 think that would be important when you
22 developed your opinions?
23     A.   It would be an element, so I
24 would want to know.

Page 133

1      Q.   Right.  And you didn't have
2  that, correct?
3      A.   Not that I specifically can
4  recall.
5      Q.   Do you know who Scott
6  Ciarroca is?
7      A.   No, I do not.
8      Q.   Okay.  He was a principal
9  engineer at Gynecare within Ethicon's
10 research and development department that
11 led the exploratory program that led to
12 the development of Prolift.
13         Would you have liked to have
14 known what he said about the development
15 of the Prolift?
16     MR. MORIARTY:  Objection.
17 Go ahead.
18     A.   Along with all of this, yes.
19     Q.   But you couldn't do that
20 because you weren't provided it, correct?
21     A.   Not that I can specifically
22 recall.  I was provided with two
23 suitcases and a box of documentations to
24 read before August 10th, before my report

Julie Drolet, M.D.

Page 134

1 was due, and so there may be some
2 documents in there that I can't
3 specifically recall.
4    Q.    You got the documents in
5 kind of a quick time frame?
6    A.    That would be correct.
7    Q.    And you had to read them
8 rather quickly to get ready for the exam?
9    A.    For what exam?
10    Q.    The medical exam you
11 performed --
12    A.    Oh, yes.
13    Q.    -- in connection with this
14 case?
15    A.    I had to read them quickly
16 in order to produce my report.
17    Q.    Right.
18    A.    Right.
19    Q.    And then you shortly
20 thereafter had to do a medical exam?
21    A.    Then I did, yes.
22    Q.    Right.  So you had a quick
23 turnaround time that you had to go
24 through these documents?

Page 135

1    A.    That would be correct.
2    Q.    All right.  You also didn't
3 get the deposition of James Hart?
4    A.    I don't -- I don't think so.
5    Q.    He was the vice president of
6 medical operations at Ethicon when the
7 Prolift was marketed.  Would you have
8 liked to have known what he said about
9 the Prolift?
10        MR. MORIARTY:  Objection.
11    A.    Again, I would have liked to
12 see it in this context.
13    Q.    Okay.  Now, you offered a
14 lot of opinions about the warnings of the
15 Prolift product in your report?
16    A.    I offered some opinions,
17 yes.
18    Q.    Are you aware of what
19 Ethicon knew at the time they put Prolift
20 on the market the complications actually
21 were?
22        MR. MORIARTY:  Objection.
23    Go ahead.
24    A.    At the time or now?

Page 136

1    Q.    At the time when they put
2 Prolift on the market, were you aware of
3 what complications Ethicon knew about?
4    A.    None other than what my
5 surgical experience and the use of
6 Gynemesh PS that I had used a few times.
7    Q.    Well, your surgical
8 experience certainly couldn't get you
9 inside the brains of the medical affairs
10 department at Ethicon, correct?
11    A.    That would be correct.
12    Q.    And your surgical experience
13 certainly couldn't get you inside the
14 brains of the design team at Ethicon,
15 correct?
16    A.    That is correct.
17    Q.    And your surgical experience
18 certainly couldn't get you inside the
19 brains of the folks who wrote the
20 labeling for the Prolift, correct?
21    A.    That would be correct.
22    Q.    And your experience with the
23 Gynemesh certainly couldn't give you any
24 of those things either, correct?

Page 137

1    A.    Give me an idea, but
2 correct.  I would not be in those brains.
3    Q.    Right.  You would not know
4 what Ethicon knew about the complications
5 of the Prolift when it was put on the
6 market?
7    A.    That would be correct.
8    Q.    And you were not provided
9 the depositions that you can recall of
10 the company witnesses --
11    A.    Correct.
12    Q.    -- like the vice president
13 of medical operations, James Hart?
14    A.    That would be correct.
15    Q.    Okay.  Would it affect your
16 opinion that James Hart was aware that
17 the medical affairs department at Ethicon
18 knew that with the Prolift some women
19 would have life-changing complications
20 like pain, dyspareunia and erosions that
21 were not easily resolved and may be
22 completely untreatable?
23        MR. MORIARTY:  Objection.
24    Go ahead.

Julie Drolet, M.B.

Page 138

1      A.    Would I have wanted to know?
2      Q.    Yeah.  That Ethicon knew
3  this at the time it put the Prolift on
4  the market?
5      A.    I think I would -- I think I
6  would have wanted to know if they knew
7  something that was clinically relevant,
8  yes.
9      Q.    Because it should have been
10 included in the labeling.
11          MR. MORIARTY:  Objection.
12     Go ahead.
13     A.    I don't know what is -- by
14 regulation, what should go into a
15 labeling.
16     Q.    Because you're not a
17 labeling expert, correct?
18     A.    I don't write the rules that
19 says what needs to be put on labels.
20 That would be correct.
21     Q.    So you're not familiar with
22 the standards for labeling, correct?
23          MR. MORIARTY:  Objection.
24     Go ahead.

Page 139

1      A.    I don't have the list of
2  what is standard or not.  That would be
3  correct.
4      Q.    Let me just ask this
5  question.  Is it your belief that a
6  company should put the complications it's
7  aware of in its labeling?
8          MR. MORIARTY:  Objection.
9     Go ahead.
10     A.    I think a company should put
11 in what is specifically and clinically
12 relevant to their product; but as a
13 surgeon that is going to implant that
14 product, there are inherent risks of
15 surgeries that I don't need a company to
16 remind us of all of those risks as well.
17     Q.    Right.  There's inherent
18 risks of any surgery.  You know that as a
19 surgeon, correct?
20     A.    Yes, I do.
21     Q.    If a company, however, is
22 aware of novel morbidities or novel
23 complications with its product that are
24 specific and clinically relevant to its

Page 140

1  product, those should be included in the
2  labeling, correct?
3      A.    One would want to, yes.
4      Q.    As a surgeon, you would want
5  a medical device manufacturer to do that?
6      A.    If it is clinically relevant
7  and important, yes.
8      Q.    You didn't get the
9  deposition of Piet Hinoul?
10     A.    No.  I don't think I did.
11     Q.    You didn't get the
12 deposition of Jorge Holste?
13     A.    I did not.
14     Q.    While we're on him, he
15 conducted some histopathological
16 evaluations for Ethicon very early on.
17          Were you aware that Ethicon
18 was looking at other meshes beyond the
19 Prolene mesh that the Prolift is made of?
20          MR. MORIARTY:  Objection.
21     Go ahead.
22     A.    Not at the time, no.
23     Q.    Okay.  Were you aware that
24 there were some internally at Ethicon

Page 141

1  felt that there were better options other
2  than the mesh that the Prolift is made
3  of?
4          MR. MORIARTY:  Objection.
5     Go ahead.
6      A.    No.  Not at the time, no.
7      Q.    Okay.  Are you aware now?
8      A.    Well, I read about Vipro,
9  that they were -- somebody was looking at
10 that in the French group, and they
11 decided against it.  And there is another
12 mesh, and I can't recall the name this
13 second, that I had never heard of until I
14 read it in those documents.
15     Q.    The ones you got very
16 recently?
17     A.    Correct.
18     Q.    And you got those after you
19 authored report?
20     A.    After I altered my report?
21     Q.    Authored, wrote your report?
22     A.    No.  Most of these documents
23 I got before I wrote my report.
24     Q.    Okay.  I'm sorry.  I thought

Julie Drolet, M.D.

Page 142

1 you told me there were some company
2 documents you got after you wrote your
3 report. Maybe I misunderstood.
4     A.   I have gotten other records
5 afterwards and depositions afterwards,
6 but most of the company Ethicon Prolift
7 materials I received before I authored my
8 report in August of 2015.
9     Q.   Okay. Did you get any of
10 the histopathological evaluations that
11 Jorge Holste did?
12     A.   I don't specifically recall.
13     Q.   Okay. Do you know who Dr.
14 Klinge is?
15     A.   No, I do not.
16     Q.   Did you read his expert
17 report?
18     A.   K-L --
19     Q.   K-L-I-N-G-E?
20     A.   Yes.
21     Q.   Okay. Did you read his
22 report?
23     A.   Yes, I did.
24     Q.   Did you read any of the

Page 143

1 research that he did for Ethicon about
2 its meshes?
3     A.   Did I read his research?
4 No.
5     Q.   Okay. Did you watch the
6 video of his deposition?
7     A.   No. I did not see any
8 deposition videos.
9     Q.   Were you provided with a
10 transcript of his deposition?
11     A.   No. I was provided with, I
12 think it was an expert report.
13     Q.   Okay. Do you know who
14 Kimberly Hunsicker is?
15     A.   I do not.
16     Q.   Do you know who Scott Jones
17 is?
18     A.   No. I do not.
19     Q.   Do you know who Gene
20 Kammerer is?
21     A.   No, I do not.
22     Q.   Okay. Do you have any
23 knowledge about the French surgical group
24 who designed the Prolift about what their

Page 144

1 concerns with were about the design of
2 the Prolift before it went onto market?
3     A.   Not at the time.
4     Q.   Not at what time?
5     A.   Not in 2004 or 2005.
6     Q.   Would it surprise you to
7 learn that they were concerned about the
8 shrinkage of the mesh and its ability to
9 lead to pain and permanent dyspareunia?
10     MR. MORIARTY: Objection.
11 Go ahead.
12     A.   I don't know if that would
13 surprise me or not because of experiences
14 with Gynemesh and other biological meshes
15 in the pelvic floor, there's pain and
16 dyspareunia, you know, associated with
17 any surgery in the pelvic floor.
18     Q.   Right, but if Ethicon felt
19 that the type of pain and dyspareunia it
20 saw with the Prolift with the contraction
21 of the mesh was novel or something
22 different because by definition they
23 thought this was a revolutionary surgical
24 procedure, would it surprise you to know

Page 145

1 they thought that?
2     MR. MORIARTY: Objection.
3 Go ahead.
4     A.   I would have been
5 interested. Would it surprise? I don't
6 know what you mean by surprise, you know.
7     Q.   Were you ever provided
8 information that Ethicon knew that there
9 were novel morbidities associated with
10 the Prolift different from other pelvic
11 floor repair surgeries?
12     A.   Not at the time.
13     Q.   What time?
14     A.   Well, 2005 when I started to
15 do that.
16     Q.   Right. Do you know it now?
17     A.   Do I know what now?
18     Q.   Do you know now that they
19 knew in 2005 that there were novel
20 morbidities associated with the Prolift
21 different from other pelvic floor repair
22 surgeries?
23     MR. MORIARTY: Objection.
24     A.   Not in that wording, but I

Julie Drolet, M.D.

Page 146

1 read the French study, and I read the
2 documents that Ethicon provided.
3     Q.   So you read the French
4 clinical study?
5     A.   Yes.
6     Q.   The one that didn't meet its
7 end point?
8     A.   I've read the French TVM
9 study, yes.
10     Q.   The one that didn't meet its
11 end point, are you aware of that?
12     A.   I am aware of what the
13 conclusions are, yes.
14     Q.   Did you read the United
15 States one?
16     A.   I did.
17     Q.   Okay.  Do you know what the
18 conclusions are?
19     A.   Not off the top of my head,
20 but...
21     Q.   Do you know what mesh
22 contraction rate Ethicon was aware of in
23 2005?
24     A.   No, I did not.

Page 147

1     Q.   Okay.  Do you have any idea
2 what an acceptable contraction rate would
3 be for pelvic mesh?
4     A.   I don't know of a standard
5 of what is an acceptable contraction
6 rate.
7     Q.   As a surgeon who implants
8 pelvic floor mesh or has done in the
9 past, do you have a rate in your head
10 that would be an acceptable contraction
11 rate for the safety and health of your
12 patients?
13     A.   It would have to be
14 clinically relevant.  It depends on the
15 symptoms.
16     Q.   Explain that.
17     A.   Well, if I have a mesh that
18 contracts by 50 percent and all of the
19 patients are doing well, is it clinically
20 relevant?  No.  Does the mesh contract by
21 50 percent?  Yes.  But if there's no
22 problem associated with it, the number or
23 the percentage of shrinkage may not
24 really matter.

Page 148

1     Q.   If the mesh shrinks 30 to 50
2 percent and women are experiencing severe
3 complications with that, is that
4 clinically significant to you?
5         MR. MORIARTY:  Objection.
6 Go ahead.
7     A.   If that was the case, then
8 that would be a relevant -- clinically
9 relevant fact, yes.
10     Q.   If Ethicon had knowledge
11 that its mesh was shrinking -- shrinking
12 leading to clinically -- strike that.
13 Let me start over.
14         If Ethicon had knowledge
15 that the mesh used in the Prolift was
16 shrinking causing severe consequences to
17 women, is that something it should have
18 shared in its labeling with the surgeons
19 who were going to implant its mesh?
20         MR. MORIARTY:  Objection.
21 Go ahead.
22     A.   It depends.
23     Q.   On what?
24     A.   On the severity and the

Page 149

1 frequency.
2     Q.   Okay.  So severity and
3 frequency are very important for a doctor
4 in understanding the risks of a product?
5     A.   They are important in the
6 grand scheme of things, yes.
7     Q.   Right.  A doctor would want
8 to know how severe the complications can
9 be?
10     A.   Yes.
11     Q.   And a doctor would like to
12 know how frequently those complications
13 can arise?
14     A.   Yes, but it also depends on
15 the patient as well.
16     Q.   Because when a doctor has a
17 discussion with a patient recommending a
18 surgical option, they have to discuss
19 things like severity and frequency of the
20 complications, correct?
21     A.   Yes.  That should be
22 correct.
23     Q.   And also important to that
24 discussion would be the ability to treat

Julie Drolet, M.D.

Page 150

1  the complications, correct?
2      A.   Are you asking me
3  hypothetically what should doctors do?
4      Q.   I'm asking you when you
5  counsel patients or make recommendations
6  for surgery, do you counsel your patients
7  if, boy, these are the side effects but
8  they are treatable versus these are the
9  side effects and they're not treatable?
10     A.   Yes.  I do have that type of
11 discussion.
12     Q.   As a surgeon, that's
13 important to you to have that discussion
14 with your patients, correct?
15     A.   That is important to me,
16 yes.
17     Q.   Right.  So the severity, the
18 frequency and the ability to treat
19 complications is important to know for
20 you as a surgeon when making
21 recommendations for surgery to your
22 patients?
23     A.   Correct.
24     Q.   And I think you'd hope as a

Page 151

1  surgeon that all surgeons would think
2  it's important to know the severity,
3  frequency and treatability of
4  complications when making recommendations
5  to their patients, correct?
6      A.   The range, yes.
7      Q.   Do you intend to offer any
8  standard of care opinions in this case
9  about the surgery performed by Dr. Baker?
10         MR. MORIARTY:  Objection.
11     Form and otherwise.  Go ahead.
12     A.   No.  Not standard of care.
13 I intend to comment and give an opinion
14 as to what he did.
15     Q.   Right.  As to what he did,
16 but you don't intend to offer an opinion
17 that he deviated from the accepted
18 standards of medical care?
19     A.   No.  I'm not going to say
20 that.  I don't think so.
21     Q.   Do you believe that he
22 deviated from the accepted standards of
23 medical care?
24     A.   No.  No.

Page 152

1          MR. MORIARTY:  When it's
2  convenient, we ought to just put
3  in the call for that.
4          MS. BALDWIN:  Why don't we
5  take a quick break because Lisa is
6  getting me water and doesn't want
7  to be on the video.
8          THE VIDEOGRAPHER:  The time
9  is now 12:26, and we are going off
10 camera.
11         (A short break was taken.)
12         THE VIDEOGRAPHER:  The time
13 is now 12:33, and we are back on
14 camera.
15 BY MS. BALDWIN:
16     Q.   Hi, Doctor.  I neglected to
17 ask you this earlier so kind of off topic
18 of where we were.  What did -- what did
19 you do to prepare for today's deposition?
20     A.   Read materials, everything
21 that was provided.  I spoke with Attorney
22 Moriarty.  I had a meeting last week with
23 Attorney Tarek Ismail and as well, a few
24 weeks prior to that, with Attorney Molly

Page 153

1  Flynn.
2      Q.   Was your meeting with Mr.
3  Ismail different than your meeting with
4  Ms. Flynn?  Were these those two separate
5  meetings?
6      A.   They were in conjunction
7  with Attorney Moriarty.  He was present
8  at both of those meetings.
9      Q.   Okay.
10     A.   And they were in different
11 dates.
12     Q.   Okay.
13     A.   Attorney Flynn was there
14 first and Attorney Ismail was there last
15 week.
16     Q.   Okay.  The meeting that
17 happened last week with Attorney Ismail,
18 how long did that meeting last?
19     A.   Well, for Attorney Moriarty
20 and I, it lasted a little bit longer
21 because he had a flight to catch, so I
22 was there from 11:30 to about 6:00 last
23 week.
24     Q.   And the meeting with Ms.

Julie Drolet, M.D.

Page 154

1 Flynn where Mr. Moriarty was there?
2     A.   Where Mr.
3 Moriarty -- Attorney Moriarty was there.
4 That was October 1st and that was, I
5 think, an all-day thing.
6     Q.   So more than six or seven
7 hours?
8     A.   Probably about that time
9 because Attorney Moriarty had to drive
10 back home and it's a long drive, so we
11 finished about 5:00.
12     Q.   Did you look at any
13 documents with the attorneys in those
14 meetings?
15     A.   Yes.
16     Q.   Which documents did you
17 review?
18     A.   I brought Patricia Hammons'
19 medical records and other records.
20     Q.   When you say other records,
21 medical records?
22     A.   I was sent records in
23 different binders, so that would be Dr.
24 Heit's records, Dr. Rohrer's records, Dr.

Page 155

1 Baker's records.
2     Q.   Okay.  So all the different
3 medical records?
4     A.   Correct.  Correct.
5     Q.   Did you review any company
6 documents?
7     A.   I don't recall at that time
8 that we reviewed company documents, no.
9     Q.   Okay.  And then just because
10 I didn't finish going through this.  Were
11 you ever given the deposition of Bryan
12 Lisa?
13     A.   Not -- no.
14     Q.   And he was in Ethicon
15 regulatory affairs?
16     A.   I did not see that.
17     Q.   Okay.  Were you ever -- did
18 you know that Vince Lucente was deposed
19 in connection with this case?
20     MR. MORIARTY:  Objection.
21     A.   I imagine he would have
22 since he was a proctor.
23     Q.   Did you get a copy of his
24 deposition transcript?

Page 156

1     A.   No, I did not.
2     Q.   Are you aware of the amount
3 of money that he was paid by Ethicon to
4 work for them?
5     A.   No, I am not.
6     Q.   Are you aware of the scope
7 of his work for them?
8     A.   He was there since the
9 beginning, so I imagine it was a very
10 large scope compared to me which is
11 nothing.
12     Q.   Other than serving as an
13 expert in connection with this case?
14     A.   Correct, and the proctorship
15 of Dr. Rao.
16     Q.   Right.  And the consulting
17 agreements that you signed?
18     A.   Right, for which I did not
19 get any of that money.
20     Q.   Right, but you signed a
21 consulting agreement?
22     A.   Correct.
23     Q.   At least two consulting
24 agreements?

Page 157

1     A.   Those are -- that is
2 correct.
3     Q.   And you went to training for
4 various Ethicon products, correct?
5     A.   I did go to training, yes.
6     Q.   And then you sent letters to
7 York Hospital trying to get Ethicon
8 products in the hospital, correct?
9     A.   I did.
10     Q.   Yeah.  Do you think Vince
11 Lucente did more than those things?
12     A.   I don't know if he was
13 involved in the development of it.  I
14 don't know, but he's a national speaker.
15     Q.   Do you know if he had any
16 role or influence on publications that
17 came out from ACOG about pelvic mesh?
18     MR. MORIARTY:  Objection.
19     A.   Well, let's -- I think he
20 published a lot.  Did it come out in the
21 Green Journal or the Gray Journal, I'm
22 not quite sure.
23     Q.   Do you know if he did any
24 behind-the-scenes work on the editing or

Julie Drolet, M.D.

Page 158

1  revisions to things that came out in the
2  ACOG journal that were unfavorable about
3  pelvic mesh?
4       MR. MORIARTY: Objection.
5       A.   I don't have any knowledge
6  of that.
7       Q.   Okay.  Do you know if he had
8  any role in working with the sales and
9  marketing people at Ethicon?
10      A.   I don't know what his role
11 was in that respect.
12      Q.   Would you liked to have
13 known that since he proctored you if he
14 was working for the company with their
15 sales and marketing teams as well?
16      MR. MORIARTY: Objection.
17 Go ahead.
18      A.   Well, I kind of figured he
19 would be, so I just wanted -- I just went
20 for training.
21      Q.   When he did the training
22 with you, did he give you -- did he give
23 you -- I'm sorry.  I'm going fast.  Did
24 he give you the complication rates he saw

Page 159

1  with his own patients?
2       A.   What we saw was a slide
3  presentation, and I don't know if it was
4  his particular patients or if it
5  was -- the complications rate came from
6  somewhere else.
7       Q.   Okay.  So you saw what was
8  in the Ethicon slide decks?
9       A.   That would be correct.
10      Q.   Right.  And then after you
11 left, you weren't given that slide deck
12 to take home or anything like that?
13      A.   I don't particularly recall.
14      Q.   Okay.  You don't recall
15 getting it or you don't know one way or
16 the other?
17      A.   I don't know one way or the
18 other.  I don't remember if they gave it
19 to me or not.
20      Q.   Okay.  And you were trained,
21 I think, in 2005?  I'm sorry.  I forget.
22      A.   In the end of April of 2005.
23      Q.   Is when you were trained on
24 Prolift?

Page 160

1       A.   That would be correct.
2       Q.   After you were trained at
3  end of April 2005, as new versions of the
4  Prolift slide deck came out, were they
5  sent to you by Ethicon?
6       A.   The rep brought things in,
7  but I can't remember exactly what he
8  brought in when and what it was called,
9  if it was called Prolift slide deck or
10 not, so I can't recall.
11      Q.   So just, for instance, there
12 were different versions of the Prolift
13 slide deck; I'll represent that to you.
14 I think you reviewed some of them, and
15 there was a 2005 version and a 2009
16 version.
17          Do you understand that there
18 were different versions of the Prolift
19 slide decks released?
20      A.   I see different versions
21 with dates here, 2004, 2009 and Prolift+M
22 professional education slide deck, but
23 in -- I have professional education
24 videos.

Page 161

1       Q.   Are you aware that for the
2  Prolift that there were different
3  professional education slide decks that
4  were released at different points in
5  time?
6       A.   Not for the Prolift itself.
7       Q.   Okay.  If there were
8  different Prolift slide decks, you as a
9  physician, just based on your own
10 experience, you're not certain whether
11 you saw all of them as a practicing
12 physician who implanted the Prolift?
13      A.   I can't be sure of what I
14 saw when.
15      Q.   Right.
16      A.   Right.
17      Q.   So you can't be sure that
18 you saw all the different versions of the
19 Prolift professional education slide
20 deck?
21      A.   At the time, that would be a
22 correct assessment.
23      Q.   Right.  You're not sure
24 which documents were given to you and

Julie Drolet, M.D.

Page 162

1 which weren't?
2      A.    For the slide deck.
3      Q.    And I'm asking now not as an
4 expert but as --
5      A.    As a physician.
6      Q.    Right.
7      A.    When the rep came in with
8 new information and updated patient
9 material, then whatever I saw, I saw, but
10 I can't be exactly sure of what I saw at
11 what date.
12      Q.    When you -- was the sales
13 rep your source of information for
14 materials from Ethicon about its Prolift
15 product?
16      A.    Other than the Green
17 Journal, the Gray Journal and the other
18 literature, yes.
19      Q.    I'm saying putting aside --
20      A.    Okay.
21      Q.    -- public literature or
22 research you could have done, was your
23 source of information from the company
24 about its product the information that

Page 163

1 was provided to you by the sales rep?
2      A.    Yes.  Partially, yes.
3      Q.    And what's the other?
4      A.    I had encountered Dr.
5 Lucente at conferences and other meetings
6 and he still remembered me and so we
7 might have had some discussion at the
8 time.
9      Q.    He might have talked to you
10 about the Prolift product?
11      A.    Correct.
12      Q.    Okay.  And when you say
13 conferences and things, were those
14 Ethicon sponsored conferences?
15      A.    No.  That would have been,
16 like, ACOG, AAGL.
17      Q.    Okay.  So outside of Ethicon
18 sponsored conferences, ACOG or AGL --
19      A.    AAGL.
20      Q.    -- AAGL, you may have ran
21 into Dr. Lucente?
22      A.    Outside of that, no.
23      Q.    Okay.
24      A.    At those conferences.

Page 164

1      Q.    That's what I'm saying.
2      A.    Yes.
3      Q.    Outside of Ethicon sponsored
4 conferences?
5      A.    Yes.
6      Q.    So at non-Ethicon
7 conferences you may run into Dr. Lucente?
8      A.    Yes.
9      Q.    And at those conferences, he
10 may have spoken to you about the Prolift
11 product?
12      A.    That is correct.
13      Q.    Because you knew that he may
14 have been involved in the sales and
15 marketing of Prolift?
16      A.    Well, once I've gotten the
17 training and I knew him and I saw him at
18 conferences, then yes.
19      Q.    Right.  He would talk to you
20 about the Prolift product?
21      A.    Yes.
22      Q.    Okay.
23      A.    Amongst other things.
24      Q.    Okay.  Then if we keep going

Page 165

1 in my handy dandy list here, do you know
2 who Cheryl McCoy is?
3      A.    No, I do not.
4      Q.    Okay.  Do you know who Sean
5 O'Brien is?
6      A.    No, I do not.
7      Q.    Were you ever shown the
8 depositions of Cheryl McCoy or Sean
9 O'Brien?
10      A.    No, I was not.
11      Q.    Do you know who Charlotte
12 Owens is?
13      A.    No, I do not.
14      Q.    Did you ever look at the
15 clinical report for the Prolift?
16      A.    The clinical report for the
17 Prolift?
18      Q.    Yes.
19      A.    I...
20      Q.    Do you know what a clinic
21 report is?
22      A.    I don't know what specific
23 clinical report you mean.
24      Q.    Okay.  So if you don't know,

Julie Drolet, M.D.

1 that's fine.
2     A.   Okay.
3     Q.   But I'm asking you, do you
4 know what a clinical report is?
5     A.   Maybe not with your
6 definition.
7     Q.   Okay.  Do you know what a
8 clinical report that has to be given to
9 the FDA verifying the safety and efficacy
10 of a medical device is?
11     A.   No, I do not.
12     Q.   Okay.
13     A.   Okay.  So --
14     Q.   Are you familiar with those
15 documents at all?
16     A.   No, I am not.
17     Q.   Okay.  Did you look at the
18 clinical report for the Prolift?
19     A.   I do not recall.
20     Q.   Okay.  Did you look at the
21 clinical report for Gynemesh PS?
22     A.   I do not recall, no.
23     Q.   Okay.  When Ethicon
24 filed -- or prepared a clinical report

1 about the safety and efficacy of the
2 Prolift, would you expect that they would
3 put in there all of the known
4 complications with the Prolift?
5         MR. MORIARTY:  Objection.
6     Go ahead.
7     A.   Would I expect it or would I
8 wish or would I want?
9     Q.   Would you expect?
10     A.   If it was clinically
11 relevant and specific to the Prolift
12 itself, I would want to.
13     Q.   Right.  You would want them
14 to include that in clinical reports they
15 prepared about the safety and efficacy of
16 the product?
17     A.   In general, yes.
18     Q.   Yes, because it's relevant
19 if women are suffering severe -- severe
20 injuries that are clinically significant?
21     A.   That are attributable or
22 unique to the material itself.
23     Q.   Right.  Let me ask you this
24 question:  As a gynecologist who does

1 pelvic floor repair surgeries?
2     A.   Yes.
3     Q.   When evaluating the safety
4 and efficacy of a product for use in your
5 own patients, do you want to know all of
6 the clinically significant risks that the
7 manufacturer has seen in patients?
8         MR. MORIARTY:  Objection.
9     Go ahead.
10     A.   I think I would want to know
11 what they -- what is clinically relevant,
12 yes.
13     Q.   You'd want to know what the
14 manufacturer knew as far as clinically
15 relevant risks?
16     A.   Yes.
17     Q.   Because that information
18 would be important to you when counseling
19 your patients?
20     A.   It would be -- it would be
21 part of my counseling, yes.
22     Q.   Right.  And it would be
23 important to you in your own decision as
24 to whether or not to recommend products

1 for use with your patients?
2     A.   Depending on the risks and
3 complications, that would be accurate.
4     Q.   Right.  So you'd need to
5 know all the information the company knew
6 about clinically significant risks in
7 order to be able to make a decision
8 yourself about whether or not to
9 recommend it to a patient?
10         MR. MORIARTY:  Objection.
11     A.   Yes, if it was attributable
12 to that product.
13     Q.   Right.  If the company knew
14 about clinically significant risks that
15 it believed were novel or new risks that
16 were associated with the use of that
17 product like the Prolift, you as a
18 surgeon would want to know that so you
19 could, one, use it in your decision about
20 whether to recommend it to patients, and,
21 two, use it in your counseling of
22 patients, correct?
23     A.   Yes.
24     Q.   Do you know who Paul Parisi

Julie Drolet, M.B.

Page 170

1  is?
2      A.   I don't think so.
3      Q.   Okay.  Do you know who David
4  Robinson is?
5      A.   No, I do not.
6      Q.   Would it ever be appropriate
7  for Ethicon to not put certain
8  information in its labeling of its
9  products just because a previous version
10  had already been printed to save some
11  money?
12         MR. MORIARTY:  Objection.
13     A.   Would it ever be
14  appropriate?
15     Q.   If Ethicon had clinically
16  significant information about the Prolift
17  product that it did not put in its
18  labeling because it had already printed
19  the labeling, would that be appropriate
20  to market the product without that
21  information?
22         MR. MORIARTY:  Objection.
23     A.   If the information was
24  critical, then I don't think that would

Page 171

1  be appropriate.
2      Q.   How do you define critical?
3  Does that mean clinically significant?
4      A.   Clinically significant.
5      Q.   So if Ethicon had clinically
6  significant information about its
7  products but didn't put it in the
8  labeling because it had already printed
9  the labeling and wanted to save the
10  money, that would be inappropriate?
11         MR. MORIARTY:  Objection.
12     Go ahead.
13     A.   Yeah.  I would want to know.
14     Q.   As a gynecologist and a
15  pelvic floor surgeon, one of your primary
16  interests is the health and safety of
17  your patients?
18     A.   Yes, it is.
19     Q.   And you would hope -- would
20  you expect that medical device
21  manufacturers would also value the health
22  and safety of the patients who are using
23  the medical devices they put on the
24  market?

Page 172

1      A.   I would expect that, yes.
2      Q.   And would you expect that
3  they were putting the health and safety
4  of those patients above their own
5  profits?
6         MR. MORIARTY:  Objection.
7      A.   I think health and safety is
8  a very important aspect.  Ahead of
9  profit, well, if they go bankrupt, then
10  there's no product, so it just depends on
11  the degree of...
12     Q.   So are you saying that in
13  some instances their profit is more
14  important than the health and safety of
15  patients?
16     A.   No, I am not.
17     Q.   Okay.  What are you saying?
18     A.   I'm saying that if it's
19  clinically relevant information, that is
20  important.
21     Q.   And a medical device
22  manufacturer should share that with the
23  user -- with the doctors who are going to
24  use those devices?

Page 173

1      A.   I would agree with that
2  statement.
3      Q.   Okay.  And you would expect
4  that in your standpoint as a
5  gynecological surgeon?
6      A.   Yes, I would.
7      Q.   And you would expect as a
8  gynecologic surgeon who used Prolift that
9  Ethicon would share all of the clinically
10  significant information it had about its
11  product in the labeling of the Prolift
12  product?
13         MR. MORIARTY:  Objection.
14     Go ahead.
15     A.   I would want to, yes.
16     Q.   You would expect that they
17  would do that?
18     A.   Yes.
19     Q.   And you would want that as a
20  surgeon?
21     A.   Yes.
22     Q.   Because of the safety and
23  health of your patients?
24     A.   Yes.

Julie Drolet, M.D.

Page 174

1    Q.   Do you know who Price St.
2  Hilaire is?
3    A.   No, I do not.
4    Q.   Do you know who Clifford
5  Volpe is?
6    A.   No, I do not.
7    Q.   Do you know who Marty
8  Weisberg is?
9    A.   No, I do not.
10   Q.   Okay.  Would you expect that
11 inside Ethicon, if the medical affairs
12 team was aware of severe complications,
13 that that would be shared outside of the
14 medical affairs department to the leaders
15 at Ethicon?
16        MR. MORIARTY:  Objection.
17   A.   I would hope it would be.
18   Q.   Would it be upsetting for
19 you to know that the worldwide president
20 of Ethicon Women's Health and Urology was
21 not aware of any severe complications
22 with the Prolift?
23        MR. MORIARTY:  Objection.
24   A.   Would it upset me?

Page 175

1    Q.   Does it upset you?
2    A.   Yeah.  Yes.  It would upset
3  me.
4    Q.   If Renee Selman, the
5  worldwide president of Ethicon's Women's
6  Health and Urology, testified she was not
7  aware of severe complications with
8  Prolift, does that fact upset you?
9        MR. MORIARTY:  Objection.
10   A.   Yes.  I would want a
11 president to know what's going on, or is
12 it possible that she didn't know?  Yes.
13   Q.   What's dyspareunia?
14   A.   It's defined as pain with
15 intercourse or painful intercourse.
16   Q.   You understand that one of
17 the risks of the Prolift device is
18 dyspareunia?
19        MR. MORIARTY:  Objection.
20   A.   Including any pelvic
21 surgery, yes.
22   Q.   Okay.  Would it surprise you
23 to know that Cheryl McCoy, who is the
24 vice chairman of Johnson & Johnson, was

Page 176

1  never informed that there was concern
2  about complications like dyspareunia in
3  women who got the Prolift implant?
4        MR. MORIARTY:  Objection.
5    A.   Is she a surgeon?
6    Q.   She's the vice chairman of
7  Johnson & Johnson and the head of
8  surgical care there.
9    A.   Okay.  So are we talking
10 about painful intercourse after pelvic
11 surgery -- just pelvic surgery?
12   Q.   Prolift?
13   A.   One would assume that there
14 would be pain with intercourse after any
15 pelvic floor surgery with or without
16 mesh.
17   Q.   Putting that aside, she was
18 never told about any specific
19 complications associated with the
20 Prolift.  Does that upset you as a
21 surgeon?
22        MR. MORIARTY:  Objection.
23   A.   I did not know that.
24   Q.   That the head of surgical

Page 177

1  care for the defendants didn't know that
2  there were serious complications
3  associated with the Prolift?
4        MR. MORIARTY:  Objection.
5    A.   I didn't know that.
6    Q.   Do you know that she doesn't
7  know what the term "dyspareunia" means?
8    A.   I did not know that.
9    Q.   Is that alarming to you that
10 the head of surgical care for the
11 defendants doesn't even know what the
12 term "dyspareunia" means?
13        MR. MORIARTY:  Objection.
14   A.   Yes, but it's a medical
15 term, so pain with intercourse...
16   Q.   Right.  So the head of
17 surgical care at Ethicon you think is not
18 expected to know medical terms like
19 dyspareunia even though one of their
20 products has a known risk of dyspareunia?
21        MR. MORIARTY:  Objection.
22   A.   Can you repeat that
23 question, please?
24   Q.   Well, you said it's a

Julie Drolet, M.D.

Page 178

1  medical term?
2      A.   It's a medical term, so if a
3  particular person in a business suit who
4  is not a doctor doesn't know a particular
5  term but knows the synonym, you know...
6      Q.   Right.  So the head of
7  surgical care doesn't have to know what
8  dyspareunia is.  You're saying that's
9  okay at Ethicon?
10     A.   No.  I'm not saying it's
11 okay.  Am I surprised by it?  No.
12     Q.   Are you surprised that she
13 didn't know that women were suffering
14 from severe complications with the
15 Prolift?
16         MR. MORIARTY:  Objection.
17     A.   Am I surprised?  You know,
18 in a big organization, you know, yes.  I
19 guess it -- she should have been aware.
20     Q.   And this goes back, I guess,
21 really, Doctor, to your qualifications.
22 You've never worked for a medical device
23 manufacturer, correct?
24     A.   Correct.

Page 179

1      Q.   Right.  And you don't have
2  any experience in the design of medical
3  devices, correct?
4      A.   I have no experience in
5  designing those devices.  You are
6  correct.
7      Q.   And you have no experience
8  whatsoever in writing the labeling for
9  medical devices, correct?
10         MR. MORIARTY:  Objection.
11         Asked and answered.  Go ahead.
12     A.   I have never written a
13 labeling so...
14     Q.   And outside of this case
15 here, the Patricia Hammons case --
16     A.   Yes.
17     Q.   -- you've never been hired
18 any by medical device manufacturer as an
19 employee or a consultant to any type of
20 critique of the adequacy of their
21 labeling, correct?
22     A.   That would be correct.
23     Q.   So this case, Hammons, is
24 the very first time you've ever looked at

Page 180

1  a label to determine its adequacy,
2  correct --
3          MR. MORIARTY:  Objection.
4      Q.   -- for a device
5  manufacturer?
6          MR. MORIARTY:  Objection.
7      A.   To determine adequacy in a
8  medical litigation case, yes.
9      Q.   Right.  No.  I'm saying
10 determining adequacy for the purposes of
11 a medical device manufacturer, correct?
12     A.   Correct.
13     Q.   Right.  You've never done
14 that other than this case, Patricia
15 Hammons?
16     A.   Correct.
17     Q.   Where you were paid -- I
18 don't know where the documents went to.
19 Where you were paid to do so at 450 an
20 hour, correct?
21     A.   That would be correct.
22     Q.   All right.  And have you
23 ever worked for Butler Snow in any
24 context outside of this litigation?

Page 181

1      A.   No.
2      Q.   Okay.  What about Tucker
3  Ellis law firm?
4      A.   No.
5      Q.   What about Drinker, Biddle &
6  Reath?
7      A.   I do not know --
8      Q.   Okay.
9      A.   -- who they are.
10     Q.   What about Thomas, Combs &
11 Spann?
12     A.   I don't know who they are.
13     Q.   What about the Goldman
14 Ismail firm?  Outside of this litigation,
15 have you ever worked with them?
16     A.   I worked with Tarek Ismail,
17 so if he's the partner, then yes.
18     Q.   Right.  That's not my
19 question.  I'm asking outside of this
20 litigation?
21     A.   Outside, no.
22     Q.   Right.  Have you had, that
23 you know of, any direct communications
24 with anyone in professional education at

Julie Drolet, M.D.

Page 182

1  Ethicon?
2      A.   Not that I know of.
3      Q.   Did you see any of the
4  exhibits that were marked at the
5  depositions of any of the company folks
6  that I listed out?  Do you know if you
7  got any of the exhibits that were marked
8  at their depositions?
9      A.   Some, yes.
10     Q.   Okay.  And how do you know
11  that you saw those if you didn't see the
12  depositions?
13     A.   Oh, I saw the depositions of
14  Ann Weber --
15     Q.   Okay.  I'm talking about
16  this list here I went through with all of
17  the company folks who you weren't
18  familiar with?
19     A.   No.  I have not seen any of
20  those exhibits.
21     Q.   Doctor, were you able to
22  read the deposition of Patricia Hammons
23  before you did the medical examination of
24  her?

Page 183

1          MR. MORIARTY:  I'm sorry.
2  Could you repeat that question?
3      Q.   Were you able to read the
4  deposition of Patricia Hammons before you
5  did the medical examination of her?
6      A.   I think I did.
7      Q.   Okay.  It had physically
8  been provided to you?
9      A.   I think it was.
10     Q.   Okay.  So you think it was
11  available to you.  You could have read
12  it.  Whether you did it or not, you
13  physically had it in your possession?
14     A.   In relationship to the date
15  in which I performed the exam, yes.
16     Q.   Okay.
17     A.   So yes, I did.
18     Q.   Okay.
19     A.   Okay.
20     Q.   Okay.
21     A.   Yes.  Time-wise, yes,
22  because my exam was in September.
23     Q.   And then looking at the
24  expert reports here on your reliance

Page 184

1  list, I think it's the last two pages.
2  It looks like you looked at the
3  plaintiff's reports of Daniel Elliott,
4  Uwe Klinge, Peggy Pence, Ann Weber and
5  Ralph Zipper.  Did I read that correctly?
6      A.   Yes.  You read that
7  correctly.
8      Q.   Did you read any of the
9  defense expert reports in this case?
10     A.   I don't think I read
11  anything other than what's on this list.
12     Q.   Okay.  Do you know who Dr.
13  Lowman is?
14     A.   Oh, yes.  Yes.
15     Q.   Okay.
16     A.   I read her report.  It was
17  provided to me.
18     Q.   All right.  Did you read any
19  of the other reports?  Let's see.  Did
20  you read the report of Shelby Thames or
21  Thames, T-H-A-M-E-S?
22     A.   I don't think so.
23     Q.   How about the report of
24  Timothy Ulatowski?

Page 185

1      A.   I don't recall that name.
2      Q.   And how about the report of
3  David Weber?
4      A.   No.  I would remember Ann
5  Weber but not a David Weber.
6      Q.   Okay.  Am I correct you
7  don't hold yourself out as an expert in
8  polymer science?
9      A.   That would be correct.
10     Q.   You don't hold yourself out
11  as an expert in material science?
12     A.   Not in material science, no.
13     Q.   You don't hold yourself out
14  as a regulatory expert?
15     A.   I am not a regulatory
16  expert.  That is correct.
17     Q.   You don't hold yourself out
18  as an expert epidemiologist?
19     A.   That would also be correct.
20     Q.   Okay.  Doctor, if a medical
21  device has a permanent risk that cannot
22  be treated, is that important to you as a
23  surgeon when making a decision whether to
24  recommend that product to a patient?

Julie Drolet, M.D.

Page 186

1    A.   Depending on the risk, the
2  intensity, the severity and the
3  percentage of recurrence or the frequency
4  of recurrence, yes.
5    Q.   Right.  So you'd want to
6  know all of those things?
7    A.   As best that can be
8  reported, yes.
9    Q.   Did you ever stop using the
10  Prolift product?
11    A.   Yes, I did.
12    Q.   When was that,
13  approximately?
14    A.   Somewhere between 2010 and
15  2011, I think.  I'm not sure.
16    Q.   And why is it that you
17  stopped using the Prolift product?
18      MR. MORIARTY:  Objection.
19  Asked and answered.
20    A.   As I stated previously,
21  there were other reps coming into my
22  office.  I looked at another mesh where
23  the hospital already had an agreement
24  with Coloplast and Restorelle and tried

Page 187

1  it.  And then the FDA came out with its
2  warning, and Prolift -- I think they
3  stopped production or providing Prolift.
4    Q.   Do you know that the Prolift
5  is no longer on the market?
6    A.   Yes, I do.
7    Q.   Do you know why it is no
8  longer on the market?
9    A.   No, I do not.
10    Q.   Were you provided any of the
11  correspondence between Ethicon and the
12  FDA about studies that needed to be done
13  on the Prolift?
14      MR. MORIARTY:  Objection.
15    A.   Not that I can recall, no.
16    Q.   Were you provided any
17  documents internally about Ethicon's
18  decision to pull Prolift from the market?
19      MR. MORIARTY:  Objection.
20  Go ahead.
21    A.   Not that I can remember.
22    Q.   Okay.  Doctor, in your
23  report you talked about a host of other
24  procedures other than the Prolift implant

Page 188

1  that Mrs. Hammons could have undergone,
2  correct?
3    A.   Yes.
4    Q.   For her pelvic organ
5  prolapse, correct?
6    A.   I discussed other options,
7  yes, that are available.
8    Q.   Right.  And those other
9  options all have risks associated with
10  them, correct?
11    A.   That would be correct.
12    Q.   But you can't sit here
13  today, you're not clairvoyant, and say
14  had she gotten an alternative procedure,
15  a different surgery, she definitively
16  would have had this specific thing happen
17  to her, correct?
18      MR. MORIARTY:  Objection.
19  Form.  Go ahead.
20    A.   It depends on what you're
21  talking about, but yes.
22    Q.   Let me just give you an
23  example.
24    A.   Yes.

Page 189

1    Q.   One of the alternative
2  surgeries you listed was a sacrospinous
3  ligament fixation.  Am I saying that
4  correctly?
5    A.   That be would correct.
6    Q.   And that's an alternative
7  procedure Mrs. Hammons could have
8  undergone, correct?
9    A.   For apical vault prolapse,
10  yes.
11    Q.   Okay.  And one of the
12  surgeries you talked about was a vaginal
13  paravaginal repair, correct?
14    A.   That would be correct.
15    Q.   Right.  And those surgeries
16  have risks associated with them, correct?
17    A.   Yes, they do.
18    Q.   What are the risks
19  associated with surgeries like that?
20    A.   Bleeding, infection, pain,
21  dyspareunia, scarring, urinary
22  incontinence, nerve damage, muscle
23  damage, heart attack, stroke, suture
24  erosion.

Page 190

1    Q.   Sitting here today, you're
2  not able to say had, in 2009, Ms. Hammons
3  gone to Dr. Baker and he recommended one
4  of those alternative procedures and she
5  elected to have it, that she would have
6  suffered a heart attack, which is one of
7  the risks you listed, correct?
8        MR. MORIARTY:  Objection to
9    form.  Go ahead.
10   A.   Correct.
11   Q.   You could not sit here and
12 say, had she undergone one of those
13 alternative procedures, she would have
14 definitely suffered nerve damage,
15 correct?
16       MR. MORIARTY:  Objection.
17   A.   I would agree with that.
18   Q.   Right.  You can't predict
19 what her course would have been had she
20 undergone one of those procedures.  You
21 only know that they are risks associated
22 with those procedures, correct?
23       MR. MORIARTY:  Objection.
24   Form.  Go ahead.

Page 191

1    A.   Not to a hundred percent
2  degree of medical certainty, but yes.  I
3  do agree.  There are risks associated
4  with any and every procedure.
5    Q.   Right.  It would be
6  impossible for you to say to a reasonable
7  degree of medical certainty what risks
8  she absolutely would have suffered had
9  she undergone a different surgical
10 procedure, correct?
11       MR. MORIARTY:  Objection.
12   Form.
13   A.   That would be correct up to
14 a hundred percent of medical certainty.
15   Q.   Right.  No one could do
16 that, correct?
17   A.   Correct.
18   Q.   Unless they were somehow
19 clairvoyant, correct?
20   A.   Correct.
21   Q.   Right.  Ms. Hammons had an
22 anterior Prolift, correct?
23   A.   Yes, she did.
24   Q.   By Dr. Baker?

Page 192

1    A.   By Dr. Baker.
2    Q.   And Dr. Baker did not treat
3  her posterior compartment, correct?
4    A.   Neither did he treat her
5  apical compartment.
6    Q.   Correct.  And do you
7  understand that with the Prolift there's
8  a shifting of the pressures in the pelvic
9  floor?
10   A.   There can be.
11   Q.   Right.  So one of the risks
12 with the Prolift is the shifting of the
13 pressures and that the pelvic organ
14 prolapse will reappear in a different
15 compartment, correct?
16   A.   There's an increased risk,
17 yes.
18   Q.   Right.  So that's an
19 increased risk of the procedure?
20   A.   Yes, but she already had the
21 apical prolapse.
22   Q.   Right.  She already had the
23 apical prolapse, and he did an anterior
24 repair?

Page 193

1    A.   Correct.
2    Q.   And then when she went to
3  see Dr. Lackey, she had a posterior
4  prolapse, correct?
5    A.   Of what Dr. Lackey noted,
6  yes.
7    Q.   Do you disagree that she had
8  a posterior prolapse?
9    A.   No, I do not.
10   Q.   Okay.  So you agree she had
11 a posterior prolapse, and you know that
12 one of the risks of getting an anterior
13 Prolift is the shifting of the pressures
14 and an increased risk of a posterior
15 prolapse, correct?
16       MR. MORIARTY:  Objection.
17   Form.  Go ahead.
18   A.   I agree that prolapse in the
19 untreated compartment, but she still had
20 her apical prolapse which was not
21 treated.
22   Q.   Right.  Correct.  And we're
23 not talking about the apical prolapse.
24 We're talking about the posterior

Julie Drolet, M.D.

Page 194

1 prolapse.
2      A.    Okay.
3      Q.    Right.  That was an
4 untreated compartment as of 2009 when Dr.
5 Baker did the anterior Prolift, correct?
6      A.    In May of 2009, yes.
7      Q.    And he had -- did an
8 anterior Prolift procedure, correct?
9      A.    Yes, he did.
10      Q.    And the posterior then was
11 untreated after he did the anterior
12 Prolift, correct?
13      A.    That would be correct.
14      Q.    So one of the risks of doing
15 that anterior Prolift was that there
16 would then be a pelvic organ prolapse in
17 the posterior untreated compartment,
18 correct?
19      A.    As well as the apex, yes.
20      Q.    Correct.  And then by the
21 time she got to see Dr. Lackey, who we
22 know did a posterior repair, she, in
23 fact, had posterior pelvic organ
24 prolapse, correct?

Page 195

1      A.    Amongst other things, yes.
2      Q.    Yes.  Have you ever done
3 hernia surgeries with the use of graft
4 materials?
5      A.    Abdominal hernias?
6      Q.    Yes.
7      A.    Umbilical, yes.
8      Q.    Okay.  How many?
9      A.    A handful.
10      Q.    When did you do those?
11      A.    In conjunction with
12 laparoscopic hysterectomies and one
13 C-section or two back in the day.
14      Q.    Okay.  And do you know what
15 mesh products you used?
16      A.    Absolutely not.
17      Q.    No idea?
18      A.    I can't recall.
19      Q.    So you can't say if it was
20 the same type of mesh that's used in the
21 Prolift product?
22      A.    I -- from what I can recall,
23 these were little disks that had -- that
24 were much more rigid that had a -- they

Page 196

1 were meant to be intraperitoneal, so they
2 were not Gynemesh or Gynemesh PS or
3 Prolift.
4      Q.    So they had a different
5 consistency in that they were more rigid
6 than the Gynemesh?
7      A.    Yes.
8      Q.    And that they were a much
9 smaller disk.  There was much less mesh?
10      A.    Well, for the meshes for the
11 umbilical hernias that I used, yes, they
12 were appropriately sized.
13      Q.    Right.  So you believe it
14 was a different material?
15      A.    Or it was a combination of
16 different materials.
17      Q.    Right.  You're not an expert
18 in comparing medical devices from a
19 material standpoint the similarities
20 between them, correct?
21      A.    It just depends on what
22 you're talking about.  Hernia mesh versus
23 Prolift?
24      Q.    Right.

Page 197

1      A.    I can say it's different,
2 and, you know, I don't have to be an
3 expert in hernia repair to know that
4 there's a difference.
5      Q.    Right.  And you say they're
6 different, and would that be the extent
7 of your opinions about them being
8 different?  Could you explain that
9 further than you already have?
10      A.    No.  Not very well.
11      Q.    Right.  And, likewise, could
12 you describe similarities between them
13 other than saying that they're both mesh?
14      A.    If I had the characteristics
15 of each, I might be a little bit more
16 eloquent but...
17      Q.    Do you intend to offer any
18 opinions about the similarities between
19 them at trial?
20      A.    I do not.
21      Q.    Okay.  Do you intend to
22 offer any opinions whatsoever about the
23 use of mesh in hernia repairs at trial?
24          MR. MORIARTY:  Objection.

Julie Drolet, M.B.

Page 198

1    A.   I don't think so.
2        MR. MORIARTY:  Form.
3    Q.   Well, now is my chance to
4  find out so if you're going to, I'd like
5  to know.
6    A.   I don't think so, no.
7        MR. MORIARTY:  She's going
8        to answer whatever questions we
9        pose to her.
10   Q.   Well, Doctor, you're limited
11 to your report and what you say here in
12 this deposition.  So do you have any
13 opinions you intend to offer about hernia
14 meshes at the time of trial?
15   A.   Other than the hernia mesh
16 that I used were different than Prolift,
17 no.
18   Q.   Okay.  And we talked a
19 little bit about the size and you said
20 that they were smaller, correct?
21   A.   Correct, because the hernia
22 was small.
23   Q.   Correct.  Do you understand
24 what the term "mesh load" means?

Page 199

1    A.   Broadly, yes.
2    Q.   Okay.  Tell me what your
3  understanding is?
4    A.   From the -- I think it is a
5  surface measurement, bidimensional.
6    Q.   Do you understand that when
7  you implant mesh in a person's body, a
8  patient's body, that there will be a
9  natural inflammatory reaction to the
10 foreign body?
11   A.   Yes, I do.
12   Q.   Okay.  Do you understand
13 that if there's more foreign body or more
14 mesh implanted, there will be more of an
15 inflammatory response, correct?
16   A.   Proportional to the size of
17 the mesh, yes.
18   Q.   So if you implant something
19 larger than a small disk, there will be
20 an inflammatory response larger
21 proportional to the amount of mesh you
22 implant in a person's body, correct?
23   A.   That assumption is correct.
24   Q.   The mesh load would be

Page 200

1  greater on the patient's body, correct?
2    A.   That would be correct.  The
3  total amount of mesh implanted would be
4  larger in a larger mesh than in a smaller
5  mesh, yes.
6    Q.   Okay.  Have you looked at
7  any of the information about what Ethicon
8  knew about the mesh load of the Prolift
9  in a woman's body?
10   A.   I don't recall what they
11 knew.
12   Q.   Okay.  Do you know what
13 Ethicon knew about the inflammatory
14 reaction caused by the implantation of
15 Prolift in a woman's body?
16   A.   I remember reading that
17 there was an inflammatory response, and
18 it happened with Gynemesh, and it
19 happened with other types of mesh as
20 well.
21   Q.   Do you know any -- have any
22 information about the severity of that
23 inflammatory response?
24   A.   I don't have a particular

Page 201

1  number when you say severity, but every
2  woman is different.  So there will be
3  inflammatory response in every woman, but
4  the amount will vary, and I don't know if
5  we -- I don't think we can predict and
6  have an exact number of how much
7  inflammation a particular woman will have
8  related to a particular product.
9    Q.   Understanding that all women
10 are different, do you know that Ethicon
11 knew that the inflammatory reaction could
12 be chronic in women after the
13 implantation of the Prolift?
14       MR. MORIARTY:  Objection.
15   A.   Sorry.  Did I know at the
16 time in 2005 or 2006?
17   Q.   Yeah.
18   A.   No, I did not.
19   Q.   As a surgeon, would you have
20 liked to have known that they knew the
21 implantation of the Prolift could cause a
22 chronic inflammatory reaction in your
23 patients?
24       MR. MORIARTY:  Objection.

Julie Drolet, M.D.

Page 202

1    A.   I would have wanted to know.
2    Q.   Right.  And if that chronic
3 inflammatory reaction could have led to
4 rigid scar tissue formation, would you
5 have wanted to know that?
6         MR. MORIARTY:  Objection.
7    A.   Depending on severity and
8 clinical consequences, yes.
9    Q.   If Ethicon -- if the French
10 surgeons who designed Prolift for Ethicon
11 had concerns about this rigid scar tissue
12 as a severe complication in women, would
13 you have wanted to know that as a surgeon
14 before you started implanting the Prolift
15 device in your patients?
16         MR. MORIARTY:  Objection.
17   A.   Yes.  Depending on the
18 percentage, yes.
19   Q.   Right.  Because it's
20 something you would have wanted to have
21 in your mind when deciding whether or not
22 to use the Prolift?
23   A.   That would have been a
24 factor, yes.

Page 203

1    Q.   And it's something you would
2 have had in your mind when counseling
3 patients about their choice as to whether
4 or not to get a Prolift implanted?
5    A.   Yes.  It would have been
6 part of my discussion.
7    Q.   One of the things you said
8 in your report is that Gynemesh is not
9 defective, your words, because a small
10 percentage of patients experience mesh
11 exposures or other well-known and
12 acceptable complications.
13        Can you define for me what
14 you meant by defective?
15   A.   Relating to Mrs. Patricia
16 Hammons?
17   Q.   It's your words.  I'm
18 reading your sentence.  You said Gynemesh
19 is not defective, and I want to know what
20 you meant by defective?
21   A.   I meant that it is not a bad
22 product, that its intended use for pelvic
23 floor repair has value, and this Gyne --
24 Gynecare product or Prolift or -- what

Page 204

1 did I say?  Gyne --
2    Q.   You said Gynemesh is not
3 defective.
4    A.   Gynemesh.  The intended use
5 for Gynemesh in pelvic floor repair, it
6 performed according to what it was
7 intended to do.  It's not going to break
8 down.  It's not going to explode.  It's
9 not -- so that's what I meant by
10 defective.  It will have risks as in any
11 foreign body would, but I don't think
12 that the Gynemesh is, in itself,
13 inherently defective.
14   Q.   Do you believe the Prolift
15 system as marketed was defective?
16        MR. MORIARTY:  Objection.
17 Go ahead.
18   A.   In general, no.
19   Q.   Do you have some caveat?
20 What do you mean by in general?
21   A.   Well, this is quite a broad
22 statement.  You said -- can we repeat
23 what your statement was?
24   Q.   Sure.  The Prolift system as

Page 205

1 marketed?
2    A.   As marketed.  Okay.
3    Q.   So the Prolift device that
4 came in a box with the trocars --
5    A.   Right.
6    Q.   -- and the instructions for
7 use, do you believe the Prolift system,
8 that's what I'm referring to when you
9 would pull one off the shelf --
10   A.   Right.
11   Q.   -- was defective?
12   A.   No.  I do not believe it was
13 defective.
14   Q.   Okay.
15        MS. BALDWIN:  Why don't we
16 take a break.  We have to change
17 the tape in two minutes, so we
18 might as well switch tapes.
19        THE VIDEOGRAPHER:  The time
20 is now 1:19, and this concludes
21 DVD number 2.
22        (A lunch break was taken.)
23        THE VIDEOGRAPHER:  The time
24 is now 1:47, and this is the

Julie Drolet, M.D.

Page 206

1    beginning of DVD number 3.
2    BY MS. BALDWIN:
3        Q.   Dr. Drolet, at the break I
4    was looking through the invoices for
5    payment that you gave me at the very
6    beginning of the deposition, and I
7    noticed that they go up to work performed
8    as of October 31st, 2015.
9            The prep sessions you did
10   for today's deposition, were those after
11   October 31st, 2015?
12       A.   The one for yesterday was.
13   Last week would have been still November,
14   so that would have been after.
15       Q.   So you haven't billed for
16   that time yet?
17       A.   I have not.
18       Q.   And will you be billing at
19   the same rate for the dep prep sessions?
20       A.   I think we have an
21   agreement.  I'd have to talk to Attorney
22   Rosenblatt because nothing is in writing.
23       Q.   Okay.
24       A.   Because there are blocks of

Page 207

1    time where it's a fee.
2        Q.   A fee for, like, say, dep
3    prep?
4        A.   Correct.
5        Q.   What is your fee for giving
6    a deposition?
7        A.   I'd have to call Attorney
8    Rosenblatt, but I think -- I know trial
9    would be for the whole day and that would
10   be 5,000.
11       Q.   You're just not sure about
12   how much here for the deposition?
13       A.   Correct.  He didn't send
14   anything in writing.
15       Q.   Other than the deposition
16   prep sessions you've had and the
17   deposition that we're here at today, have
18   you done other work in the case in
19   November that hasn't been billed for yet?
20       A.   Well, I've read or re-read
21   articles and read my report, read
22   documents.
23       Q.   Okay.  So will you be
24   billing for that time?

Page 208

1        A.   Some of it, yes.  Some of
2    it, no.
3        Q.   Okay.  Why would you not
4    bill for all of it?
5        A.   Because some of it, I think,
6    is just to reassure me at bedtime, so my
7    bedtime reading.
8        Q.   Gotcha.
9        A.   And I don't think that's
10   fair.
11       Q.   Gotcha.  We were talking
12   just before the break about whether you
13   believe the Prolift device is defective,
14   and I think I called it the Prolift
15   system.  And you said in general, no.
16   What did you mean by that?
17           MR. MORIARTY:  Objection.
18       Asked and answered.
19       Q.   You can go ahead.
20       A.   I mean that the benefits
21   outweigh the risks, and there are risks
22   with any product, so no.  It is not a
23   defective product.
24       Q.   Okay.  And you're saying the

Page 209

1    benefits outweigh the risks as far as the
2    risks that you're aware of?
3        A.   Yes.
4        Q.   Okay.  And that would
5    include the severity, frequency and
6    treatability of risks that you're aware
7    of?
8        A.   And that have been written
9    in the literature.
10       Q.   The literature that was
11   provided to you by Ethicon?
12       A.   And through the years the
13   literature that I have read as a surgeon.
14       Q.   What literature have you
15   read that you intend to rely on?
16       A.   What I have read over the
17   years, I can't begin to count.  My
18   general experience as a surgeon and with
19   talking to colleagues and with
20   discussions and with reading of different
21   articles overall.  My surgical
22   experience, my patient experience, the
23   referrals I get, all of that.
24       Q.   Okay.  I understand your

Page 210

1  answer, but today's my chance to find out
2  what you intend to testify to at
3  deposition, so are there any --
4      A.   At deposition?
5      Q.   Or at trial.
6      A.   Okay.
7      Q.   I'm sorry.  Thank you.  At
8  trial.
9          So at trial are there any
10 articles that aren't on your reliance
11 list or in that e-mail that was sent that
12 you intend to rely on?
13     A.   Not that I know as of now.
14     Q.   Okay.  You can't think of
15 any offhand?
16     A.   I cannot think of any
17 offhand as of this minute.
18     Q.   Okay.  And one of the things
19 you told me before the break is that
20 Gynemesh was not defective because it
21 wouldn't break down or explode.  Do you
22 recall that testimony?
23     A.   I do, yes.
24     Q.   Okay.  Do you know what the

Page 211

1  degradation rates are of the Gynemesh
2  that's used in the Prolift device?
3          MR. MORIARTY:  Objection.
4  Go ahead.
5      A.   In clinical situation, I do
6  not.
7      Q.   Okay.  Do you know what
8  rates Ethicon was aware of when it put
9  Prolift on the market for degradation?
10         MR. MORIARTY:  Objection.
11         MS. BALDWIN:  I'm not sure I
12 said that right.  Let me just
13 re-ask it because I think the
14 words got mixed up in my head.
15 BY MS. BALDWIN:
16     Q.   Are you aware of what rates
17 of degradation Ethicon was aware of when
18 it put Prolift on the market for the
19 product?
20     A.   I was not aware --
21         MR. MORIARTY:  Objection.
22     A.   -- of what rates of
23 degradation they were aware of before
24 they put it on the market.

Page 212

1      Q.   Okay.  Are you aware that
2  there is a risk of degradation with the
3  Prolift?
4          MR. MORIARTY:  Objection.
5  Go ahead.
6      A.   Is there a theoretical risk?
7  Yes.
8      Q.   Okay.  Are you aware that --
9  I'm sorry.  I cut you off.
10     A.   I am aware that they --
11 somewhere in those boxes of documents
12 they mention it.  Is it clinically
13 significant relevant?  So far, not in my
14 experience as a surgeon.
15     Q.   Right.  Based on the
16 documents that were given to you by
17 Ethicon?
18     A.   That would be correct.
19     Q.   Right.  So when you -- when
20 we're using the term "degradation," how
21 do you define that?
22     A.   That the mesh would lose its
23 supportive properties or be absorbed
24 which it is not absorbed.

Page 213

1      Q.   So by loss of its supportive
2  properties, you mean it would break down
3  from its intended use?
4      A.   That is a definition of
5  degradation.  I don't know if it's the
6  degradation that Ethicon used.
7      Q.   Is that your understanding
8  of what it means to degrade?
9      A.   Part of it, yes.
10     Q.   Okay.  What's the other
11 part?
12     A.   That it would fragment.
13 That could be another way that a
14 particular product theoretically could
15 degrade.
16     Q.   Do you know that there's a
17 risk of Prolift mesh fragmenting?
18         MR. MORIARTY:  Objection.
19     A.   I do not.
20     Q.   If Ethicon has knowledge
21 that there are clinically significant
22 risks of fragmenting with its Prolift
23 mesh, should it have warned of those
24 risks?

Julie Drolet, M.D.

Page 214

1    MR. MORIARTY: Objection.
2    A.   If those risks were
3 clinically significant or relevant, I
4 would have wanted to know. What they're
5 obliged to reveal or not at the corporate
6 level, I don't know.
7    Q.   I think we --
8    A.   I want to know, but...
9    Q.   Right. I think we
10 understand you can't say at the corporate
11 level what they're required to do. You
12 don't have that expertise?
13   A.   That would be correct.
14   Q.   You're sitting here
15 testifying today as a pelvic floor
16 surgeon with years of experience,
17 correct?
18   A.   That would be correct.
19   Q.   About information you would
20 have wanted to know, correct?
21   A.   Yes.
22   Q.   So for all the risks that
23 we've talked about, if there's a
24 clinically significant risk --

Page 215

1    A.   Yes.
2    Q.   -- for the Prolift, as a
3 surgeon, you would have wanted that to be
4 in the labeling for the Prolift?
5    A.   If it was clinically
6 relevant, yes.
7    Q.   And it would be reasonable
8 for a manufacturer to include clinically
9 significant risks in its labeling,
10 correct?
11   MR. MORIARTY: Objection.
12   Go ahead.
13   A.   What I want as a surgeon and
14 what they need to put in in their
15 labeling may be two different things. I
16 don't know.
17   Q.   One would hope they'd be
18 similar, correct?
19   A.   In an ideal world, yes.
20   Q.   One would hope that the
21 required label would be what a surgeon
22 would want to see, correct?
23   MR. MORIARTY: Objection.
24   A.   We would have to ask every

Page 216

1 surgeon on the planet, but yes.
2    Q.   Do you believe there's
3 surgeons out there who don't want to know
4 the clinically significant risks of a
5 product?
6    A.   I believe that most surgeons
7 would want, yes, clinically relevant.
8    Q.   Clinically significant?
9    A.   Clinically significant as
10 well.
11   Q.   Would it be unreasonable if
12 Ethicon had knowledge of clinically
13 significant risks that it did not include
14 in its labeling for the Prolift?
15   MR. MORIARTY: Objection.
16   A.   Did you say would it be
17 reasonable or unreasonable.
18   Q.   Unreasonable?
19   A.   Okay. So would it be
20 unreasonable -- can you repeat the rest
21 of the question, please?
22   Q.   Sure. Sorry. I do this. I
23 start to talk quickly.
24   Would it be unreasonable if

Page 217

1 Ethicon had knowledge of clinically
2 significant risks with the Prolift to not
3 include them in the labeling?
4    MR. MORIARTY: Objection.
5    A.   Would it be unreasonable for
6 them not to include it?
7    Q.   Yes.
8    A.   I can't answer that question
9 because I can't understand the double
10 negatives.
11   Q.   If Ethicon had clinically
12 significant information --
13   A.   Yes.
14   Q.   -- about the risks of the
15 Prolift product --
16   A.   Yes.
17   Q.   -- and it failed to include
18 those in its labelings, is that
19 unreasonable?
20   MR. MORIARTY: Objection.
21   A.   It wouldn't be good,
22 correct.
23   Q.   What do you mean by it
24 wouldn't be good?

Julie Drolet, M.B.

Page 218

1    A.   I don't know what you mean
2   by unreasonable.
3       Q.   Okay.
4       A.   So I would want to know the
5   clinically relevant risks or
6   complications.
7       Q.   When we talk about labelings
8   of a product, a label should include the
9   clinically significant risks of a
10  product, correct?
11      A.   Yes.
12      Q.   When we talk about the
13  adequacy of a labeling, a term of art
14  that's often used is whether a label is
15  reasonable.  Have you ever heard that
16  term before?
17      A.   I've heard the term
18  "reasonable," but I don't know your
19  definition of reasonable.
20      Q.   Okay.  From your
21  expertise --
22      A.   Yes.
23      Q.   -- as a gynecologic
24  surgeon --

Page 219

1       A.   Yes.
2       Q.   -- in order for a label of a
3   medical device to be adequate, should it
4   contain all of the manufacturer's
5   knowledge about clinically significant
6   risks?
7           MR. MORIARTY:  Objection.
8       A.   I would want to know, that
9   are specific to that particular product.
10      Q.   Correct.  If Ethicon had
11  knowledge of clinically significant risks
12  specific to the Prolift that it believed
13  were novel to the Prolift, would you have
14  wanted those to be included in the
15  labeling?
16          MR. MORIARTY:  Objection.
17  Asked and answered.  Go ahead.
18      A.   I would have wanted to know.
19  In an ideal world, yes.
20      Q.   Would it be dangerous for
21  Ethicon to market the Prolift if they had
22  knowledge of clinically significant
23  consequences that it wasn't warning
24  physicians about?

Page 220

1           MR. MORIARTY:  Objection.
2       A.   What do you mean by
3   dangerous?
4       Q.   Presenting a danger to human
5   beings?
6       A.   I would have wanted them to
7   mention those risks.
8       Q.   Why?
9       A.   Because if these risks were
10  very different, unpredictable and
11  occurring in a high percentage of women,
12  it depends on the frequency, severity.  I
13  would have wanted to know.
14      Q.   Why would you have wanted to
15  know?
16      A.   That would have influenced
17  my decision to use a particular product
18  in a particular patient for a particular
19  reason.
20      Q.   One of the things that you
21  discussed in your report was that pelvic
22  floor surgeons know the risks by virtue
23  of their basic medical education and
24  training, and I think you're referring to

Page 221

1   the risks of the Prolift.  Is that
2   correct?
3       A.   No.  If I could have my --
4       Q.   Sure.
5       A.   -- a copy of my report just
6   to put it back in context, please.
7       Q.   No.  Absolutely.
8           MS. BALDWIN:  Matt, do you
9   need a copy of this?  I have one
10  if you want the paper?
11          MR. MORIARTY:  No thanks.
12          (Whereupon, a document was
13  marked for identification as
14  Drolet Exhibit No. 11.)
15          MR. MORIARTY:  What are we
16  up to?  Ten?
17          MS. BALDWIN:  I think that's
18  11?
19          THE WITNESS:  This is 11.
20  BY MS. BALDWIN:
21      Q.   Let me see if I can turn to
22  the page.  Hang on a second.
23          I have this sentence in
24  here.  Try education and training.

Julie Drolet, M.B.

1 Virtue might be my word.
2          Here we go.  At the bottom
3 of page 6, very last paragraph, so we're
4 at the paragraph that starts "the Prolift
5 IFU."  Do you see where I am?
6     A.    Yes.
7     Q.    Okay.  The very last
8 sentence, and it starts "pelvic floor."
9 It's the very end of page 6.  Do you see
10 that?
11    A.    Yes.
12    Q.    Pelvic floor, and then the
13 next page, surgeons would know of the
14 risks of pain and dyspareunia by way of
15 their basic medical education and
16 training and would also know that pain
17 and dyspareunia are potential risks from
18 infection, inflammation, adhesion
19 formation, fistula formation, erosion,
20 extrusion and scarring that results in
21 implant contraction and that all of these
22 potential complications may need
23 reparative surgery.
24          Did I read that correctly?

1     A.    Yes, you did.
2     Q.    Okay.  So my question for
3 you was: Do you believe that pelvic
4 floor surgeons would know of the risks of
5 pain and dyspareunia based on their
6 education and training about all pelvic
7 floor surgeries?
8     A.    All pelvic floor surgeries
9 that they were trained on, yes.
10    Q.    Okay.  So for any particular
11 doctor, they should know generally that
12 pain and dyspareunia is a risk of pelvic
13 floor surgery, correct?
14    A.    That statement would be
15 correct.
16    Q.    If Ethicon had information
17 that the risks of pain and dyspareunia
18 that were specific to the Prolift were
19 different in severity or frequency than
20 the general risk, would you have liked to
21 have known that as a surgeon?
22          MR. MORIARTY:  Objection.
23 Go ahead.
24    A.    If it was very different,

1 yes.
2     Q.    And if they had knowledge
3 that the risks of pain and dyspareunia
4 were somehow new, novel, different than
5 what was being seen from the general
6 risks of other pelvic floor surgeries,
7 should they have shared that in their
8 labeling?
9          MR. MORIARTY:  Objection.
10    A.    Well, pain and dyspareunia
11 would not be novel, would not be new to
12 Prolift.  Erosions were seen with
13 Gynecare -- Gynemesh, pardon me, and so
14 with our training and experience, we're
15 able to put those things together.
16    Q.    My question is a little
17 different, though.
18    A.    Okay.
19    Q.    Let's focus on this.  Piet
20 Hinoul who worked at Ethicon was
21 important in the development of the
22 Prolift device.  Did you read his
23 deposition?
24    A.    No, I did not.  I didn't

1 have it.
2     Q.    Okay.  Reading from his
3 deposition, they marked an exhibit and
4 then asked him about it.  It was an
5 e-mail, and they asked him:  You say the
6 introduction of these new biomaterials in
7 pelvic reconstructive surgery, however,
8 has introduced a new kind of morbidity
9 related to the materials used.
10          Do you see that?  And he
11 answered: Yes.
12          MR. MORIARTY:  Objection.
13 What page are you talking about?
14          MS. BALDWIN:  I'm sorry.
15 Page 457.
16          MR. MORIARTY:  This is of
17 Hinoul?
18          MS. BALDWIN:  Hinoul.
19          MR. MORIARTY:  Do you know
20 what date?
21          MS. BALDWIN:  I don't -- oh,
22 yes, I do.  June 27th, 2013.
23 BY MS. BALDWIN:
24    Q.    So going back to that.

Julie Drolet, M.D.

Page 226

1      A.   Are they talking about
2  Gynemesh or are they talking about
3  Prolift?
4      Q.   The Gynemesh that is used in
5  Prolift.
6      A.   Okay.
7      Q.   Okay.  So they asked him:
8  Has introduced a new kind of morbidity
9  related to materials used?  Answer:  Yes.
10         Mr. Hinoul knew they were
11 new kinds of morbidities.  If Ethicon had
12 this knowledge that there were new kinds
13 of morbidities, should it have included
14 information about those new morbidities
15 in its labeling?
16         MR. MORIARTY:  Objection.
17     A.   As a surgeon, if something
18 was new and clinically significant, I
19 would want to know.
20     Q.   Right.  So when they asked
21 him:  When you --
22         MS. BALDWIN:  Page 45 now,
23 Matt.
24     Q.   When you refer to a new kind

Page 227

1  of morbidity, you're talking about
2  morbidity that had not existed before
3  with this type of surgery, meaning the
4  Prolift implant, correct?
5      And he said:  That is
6  specific to the use of the mesh as
7  opposed to something if you don't use it,
8  you cannot have any related morbidity,
9  yes.
10         He's saying there's a new
11 morbidity.
12     A.   Okay.
13     Q.   And that's information you
14 would have liked to have known as a
15 surgeon, correct?
16         MR. MORIARTY:  Objection.
17     Go ahead.
18     A.   Yes.  As a surgeon, I would
19 have wanted to know.
20     Q.   As a pelvic floor surgeon
21 with experience in the Prolift device, if
22 Ethicon had information about new
23 morbidities associated with the Prolift
24 that it believed were clinically

Page 228

1  significant, were their warnings
2  inadequate because they did not include
3  that information?
4      MR. MORIARTY:  Objection.
5      Go ahead.
6      A.   I would have wanted to know.
7  As far as the inadequacy of warnings, I
8  can't answer that question.
9      Q.   So you can't say whether the
10 warning was adequate based on what the
11 company knew?
12         MR. MORIARTY:  Objection.
13     Go ahead.
14     A.   I would not have known at
15 that time.
16     Q.   As an expert, do you intend
17 to offer any opinions about the adequacy
18 of the labeling of the Prolift product?
19         MR. MORIARTY:  Objection.
20     That's in her report.
21     A.   I think -- I think there was
22 enough information clinically, and for me
23 as a surgeon, I can't judge what is
24 totally inadequate for that particular

Page 229

1  product labeling because it does warn of
2  multiple side effects coupled with what,
3  as a surgeon, I have with experience,
4  with my experience.  And the training I
5  went to with Dr. Lucente, I think -- I
6  think was adequate at the time with what
7  we knew.
8      Q.   Okay.  When you say "we,"
9  you're talking about you?
10     A.   Correct.
11     Q.   Specific to your training
12 and your experience, correct?
13     A.   Yes.
14     Q.   Correct.  But you cannot
15 speak to what Ethicon knew, correct?
16     A.   That would be correct.
17     Q.   Because you were not
18 provided those materials, correct?
19     A.   That would be correct.
20     Q.   So you cannot offer any
21 opinions about the adequacy of the
22 labeling with respect to what Ethicon
23 knew, correct?
24         MR. MORIARTY:  Objection.

Julie Drolet, M.D.

Page 230

1    Go ahead.
2    A.   With respect to what Ethicon
3  knew, that would have been correct.  That
4  would be correct.
5    Q.   And you cannot offer any
6  opinions about whether this labeling was
7  reasonable with respect to what Ethicon
8  knew because you have no idea what
9  Ethicon knew?
10       MR. MORIARTY:  Objection.
11  Go ahead.
12    A.   With respect to what Ethicon
13  knew and not, that would be correct.
14    Q.   You can't offer an opinion
15  as to the reasonableness of the label
16  with respect to what Ethicon knew?
17    A.   From Ethicon's point of
18  view, I am not qualified as an expert for
19  that.  As a surgeon, that's different.
20    Q.   Right.  As a surgeon, based
21  on your own training, you can speak to
22  that?
23    A.   That would be correct.
24    Q.   And I've asked you a hundred

Page 231

1  questions and I won't ask them a hundred
2  times more about what you would have
3  liked to have seen, correct?
4    A.   Yes.  That would be correct.
5    Q.   And if I asked you questions
6  again, the answers would be the same?
7    A.   Yes.  That would be, I would
8  hope so, correct.
9    Q.   I want to talk about the
10  surgeon's resource monograph.  It was a
11  document that you referenced in here.
12  Are you familiar with that?
13    A.   I have read it, yes.
14    Q.   Okay.  I don't want to put
15  it in front of you because I don't want
16  to go through the details of it.  I want
17  to know what your understanding is of how
18  it was distributed to physicians by
19  Ethicon?
20    A.   I don't know how Ethicon
21  distributed to their general physicians.
22    Q.   Okay.  Do you have any
23  knowledge of whether or not Dr. Baker
24  ever got the surgeon's resource

Page 232

1  monograph?
2       MR. MORIARTY:  Objection.
3    Go ahead.
4    A.   I don't have independent
5  knowledge of that.  I would have to refer
6  to his deposition and what he recalls.
7    Q.   Okay.  If he doesn't recall
8  ever seeing it, do you have a reason to
9  dispute that?
10    A.   No, I do not.
11    Q.   Okay.  And going back to
12  those Prolift professional education
13  slide decks.  We talked about them quite
14  a few hours ago.  There were different
15  versions of those, correct?
16    A.   Apparently.  I don't know.
17    Q.   Okay.  Do you have any
18  information of how Ethicon was getting
19  those slide decks in front of physicians?
20    A.   Via the sales rep.
21    Q.   Do you know if the sales
22  reps were required to give the updated
23  slide deck presentations to every
24  physician who was using the Prolift

Page 233

1  product?
2    A.   No.  I do not know that.
3    Q.   Okay.  If the slide decks
4  were the way that Ethicon was
5  communicating its warnings, did it have a
6  responsibility to provide the updated
7  slide decks to all the physicians who
8  were using its product when they issued
9  new ones?
10    A.   I don't know what their
11  guidelines were.  As a surgeon, I would
12  want to know the latest update if there
13  was a clinical significant modification.
14    Q.   If Dr. Baker testifies he
15  doesn't recall seeing particular slide
16  decks, do you have a reason to dispute
17  that?
18    A.   No, I do not.
19    Q.   Do you have any evidence
20  that he saw any of the professional
21  education slide decks?
22       MR. MORIARTY:  Objection.
23    A.   I don't have any evidence
24  one way or another.

Julie Drolet, M.D.

Page 234

1    Q.   Okay.  So in your report you
2  offered a bunch of opinions about the
3  information that was conveyed in those
4  slide decks.
5    A.   What do you consider a
6  bunch?
7    Q.   Well, on page 7 you say:
8  Also published and made available to
9  physicians are the 2005 and 2007 Prolift
10 pelvic floor repair system slides and the
11 2007 Prolift surgeon's resource
12 monograph.  And then you said:  Which
13 clearly demonstrate the proper placement
14 of the guiding cannulas, and you talk
15 about that they discuss the increased
16 risks and the complications, right?
17 That's an opinion you offered, correct?
18   A.   Yes.
19   Q.   So the conveyance of the
20 information that was in those documents
21 would only hold true if Ethicon actually
22 got those documents in the hands of
23 physicians, correct?
24   A.   Or the physicians asked for

Page 235

1  it, yes.
2    Q.   Correct.  But for a
3  physician to ask for it, they would have
4  to know it existed, correct?
5    A.   Or they would have to know
6  or ask for another piece of literature.
7    Q.   The physician would have to
8  take it on themselves to go to the sales
9  reps and say, have you guys updated your
10 warnings?  Are you aware of any more
11 serious warnings, and if so, can you give
12 me those documents?
13   A.   Or ask for, do you have any
14 literature on it, yes.
15   Q.   Is that the responsibility
16 of a doctor to ask the medical device
17 manufacturers who are selling them
18 products what the updated warnings are or
19 when they change?
20        MR. MORIARTY:  Objection.
21   Go ahead.
22   A.   One, I don't think Ethicon
23 sells the product directly to doctors.
24 And I think it's each physician's

Page 236

1  responsibility to keep themselves up to
2  date with the most current literature and
3  what is available.
4    Q.   So let's --
5    A.   And -- go ahead.
6    Q.   No.  I cut you off.  I'm
7  sorry.
8    A.   I lost my train of thought.
9    Q.   I apologize, Doctor.  I'm
10 sorry.  Let me just ask you some
11 follow-up questions.
12        You said you don't think
13 that they sell the Prolift directly to
14 doctors.  Am I correct that Ethicon was
15 selling the Prolift to the hospitals or
16 the facilities where it was being
17 implanted?
18   A.   That's what I think.
19   Q.   However, they were sending
20 sales reps to detail physicians to
21 encourage the use of the Prolift,
22 correct?
23   A.   To encourage the use, that's
24 how I was informed of where to go for

Page 237

1  training, but they did not push the use
2  of the product.
3    Q.   Do you know that the sales
4  reps were targeting physicians to sell
5  the Prolift to?
6    A.   I have --
7        MR. MORIARTY:  Objection.
8   Go ahead.
9    A.   I had no idea.
10   Q.   Do you know that the sales
11 team for the sales reps created
12 spreadsheets where they talked about
13 target physicians that they wanted to
14 start using the product for?
15   A.   No, I did not.
16   Q.   Did you know that they were
17 targeting physicians in different
18 physical vicinities of the country?
19   A.   No, I did not.
20   Q.   Did you know that they were
21 targeting physicians based on the type of
22 practice they had?
23   A.   I had no idea of their
24 business practice.

Page 238

1  Q.  Did you know that they were
2  targeting physicians based on volume of
3  sales that they could have by a physician
4  using the Prolift product?
5  A.  No, I did not.
6  Q.  If the Prolift sales reps
7  were targeting physicians who weren't
8  highly experienced pelvic floor repair
9  surgeons, is that a problem for Ethicon?
10  MR. MORIARTY:  Objection.
11  A.  I don't know what -- what
12  their policies are.
13  Q.  If Ethicon had an internal
14  standard that it thought the Prolift was
15  appropriate for highly skilled pelvic
16  floor repair surgeons who did a high
17  volume of pelvic floor repair surgery,
18  are those the doctors you would expect
19  its sales reps to target?
20  MR. MORIARTY:  Objection.
21  Go ahead.
22  A.  Initially -- initially, I
23  would think so, especially at the time of
24  its launch, yes.

Page 239

1  Q.  If the reps were then
2  targeting generalists who had low volume
3  of any type of surgery and were not
4  experienced pelvic floor repair surgeons,
5  was that bad of the company to do?
6  MR. MORIARTY:  Objection.
7  Go ahead.
8  A.  I think -- and, again, I
9  don't know what they were targeting
10  especially, but it's the responsibility
11  of the physician to realize if their
12  surgical skills are up to par; it's the
13  responsibility of the hospital for
14  credentialing.  So somebody can try and
15  tell me something, but if I am not an
16  expert in that particular field, it would
17  be up to me to say no.
18  Q.  Right.
19  A.  Right.
20  Q.  But if you were targeted and
21  told we'll train you and you were trained
22  on something, isn't it the responsibility
23  of the person who trained you to say,
24  hey, by the way, we're training you, but

Page 240

1  you're not our target doctor, and we
2  don't think you should be implanting this
3  because you have an increased risk of
4  complications in your patients?
5  MR. MORIARTY:  Objection.
6  A.  I think as a surgeon we all
7  evolve our skills, and we all want to
8  learn new techniques, new ideas.  We do
9  continuing medical education, but then it
10  has to fall back on us to decide to
11  implant or not those techniques.
12  Q.  So if I'm hearing you right,
13  you don't think it was the responsibility
14  of Ethicon to tell generalists that it
15  invited to its training and that it
16  targeted that they were not the intended
17  users of this product and that their
18  complication rates could be higher by
19  virtue of the fact that they were not
20  skilled pelvic floor repair surgeons?
21  MR. MORIARTY:  Objection.
22  A.  I then don't understand why
23  they would invite them for training.
24  Q.  Right.  That doesn't make

Page 241

1  any sense, does it?
2  MR. MORIARTY:  Objection.
3  A.  It wouldn't if Ethicon had
4  only decided to go to high pelvic volume
5  surgeons.
6  Q.  Right.  If Ethicon decided
7  it wanted to target the Prolift to
8  high-volume, skilled pelvic floor repair
9  surgeons --
10  A.  Forever.
11  Q.  -- forever, it wouldn't make
12  any sense for them to then invite
13  generalists to its training?
14  MR. MORIARTY:  Objection.
15  A.  I don't necessarily a
16  hundred percent agree with that.
17  Q.  Okay.  You think it makes
18  sense for them?
19  A.  No.  I mean, there may come
20  a point in somebody's career that they
21  would want to go from low volume to
22  higher volume, get trained, get more
23  experience, get proctored.  So I don't
24  know what the company internal rulings or

Julie Drolet, M.D.

Page 242

1  decisions were about this product.
2      Q.   If Ethicon had information
3  that physicians who are not highly
4  skilled pelvic floor repair surgeons had
5  a much higher complication rate in their
6  patients, should it have told doctors
7  that when they were training them if they
8  were not highly skilled pelvic floor
9  repair surgeons?
10         MR. MORIARTY:  Objection.
11     A.   I think they should make
12  people aware that if you're not a
13  high-volume surgeon, and any surgeon
14  who's not a high-volume surgeon is going
15  to have or may have complications that
16  are different than the high-volume
17  surgeon.
18     Q.   If Ethicon knew with the
19  Prolift that when nonskilled surgeons
20  were using it they saw much higher
21  complication rates, clinically
22  significant different rates, should it
23  have told those nonskilled surgeons if it
24  was targeting them for training?

Page 243

1         MR. MORIARTY:  Objection.
2      A.   I think it should have made
3  them aware.
4      Q.   That would have been the
5  responsible thing for Ethicon to do?
6         MR. MORIARTY:  Objection.
7      A.   I think it's something that
8  all physicians would have wanted to know.
9      Q.   Going to Patricia Hammons,
10  you reviewed all of her medical records,
11  correct?
12     A.   All of the medical records
13  that were provided.
14     Q.   And included in those were
15  some employment records as well?
16     A.   I saw some, yes.
17     Q.   Okay.  Did you review those?
18     A.   Most of them, yes.
19     Q.   Do you have any opinion that
20  Patricia Hammons went back to work too
21  soon after her Prolift surgery?
22     A.   If she went back at two
23  weeks, that would be much sooner than I
24  personally counsel my patients.

Page 244

1      Q.   Patricia Hammons testified
2  that she did not go back to work after
3  two weeks, so are you getting that number
4  from somewhere?
5      A.   Just the dates that are
6  there, but if she testified that she went
7  back not at two weeks, then I have
8  nothing to dispute.
9      Q.   Do you have any reason not
10  to believe her testimony that she waited
11  the time her doctor told her to wait?
12         MR. MORIARTY:  Objection.
13     A.   I don't have anything to
14  dispute that at this point in time.
15     Q.   Do you have any opinion that
16  she resumed intercourse too quickly after
17  her Prolift implant?
18     A.   I do not.
19     Q.   Do you have any opinion that
20  she was in any way a noncompliant
21  patient?
22     A.   No.  I do not have that
23  opinion in general except for smoking.
24     Q.   Well, there's nothing in the

Page 245

1  Prolift warnings that said it's not to be
2  used in smokers, correct?
3      A.   No. Correct.  Correct.  I'm
4  sorry.  Correct.
5      Q.   Right.
6      A.   Correct.
7      Q.   There's nothing there about
8  absolutely do not use this product in
9  smokers, correct?
10     A.   That would be correct.
11     Q.   And you were not trained
12  that, correct?
13     A.   No.
14     Q.   That is not the way the
15  product was marketed, correct?
16     A.   The product was not marketed
17  that way.
18     Q.   In fact, one of the things
19  you did was list out all of the risk
20  factors, I believe, in your report for
21  pelvic organ prolapse, correct?
22     A.   That would be correct.
23     Q.   And what are those?  I don't
24  have the page right in front of me, so

Julie Drolet, M.D.

Page 246

1 why don't you list them out for me?
2      A.   Genetics, family history,
3 vaginal delivery, heavy lifting, smoking,
4 chronic coughing, chronic constipation,
5 menopause, vaginal atrophy, age, race.
6      Q.   So Ethicon, when it marketed
7 the Prolift for the treatment of pelvic
8 organ prolapse, should have anticipated
9 that it would be used in women who were
10 smokers and did heavy lifting and had
11 vaginal deliveries and were heavyset,
12 correct?
13      A.   Yes.  Did I forget obesity?
14      Q.   We can add that to the list,
15 and I'll accept it.  The point is that
16 Ethicon should have been aware of the
17 risk factors for pelvic organ prolapse
18 when marketing the Prolift for the
19 treatment of pelvic organ prolapse,
20 correct?
21      A.   I don't have any reason that
22 Ethicon was not aware of those risks.
23      Q.   Right.
24      A.   Okay.

Page 247

1      Q.   And they certainly didn't
2 market the product saying the Prolift is
3 contraindicated for women that are
4 suffering from any of these symptoms,
5 correct, or have any of these risk
6 factors?
7      A.   Not contraindicated in women
8 with these risk factors.
9      Q.   It, in fact, knew that the
10 women who would get the Prolift would
11 likely have these risk factors?
12      A.   Have some of these risk
13 factors.
14      Q.   Right.  Correct.  So by Ms.
15 Hammons smoking, that's not outside of
16 the normal patient who might need a
17 Prolift, correct?
18      A.   No.  That is not.
19      Q.   Let me just get to the page.
20      MS. BALDWIN:  Why don't we
21 just go off the record for five
22 minutes.  It will be quicker if I
23 can find the pages.
24      THE VIDEOGRAPHER:  The time

Page 248

1 is now 2:28, and we are going off
2 camera.
3      (A short break was taken.)
4      THE VIDEOGRAPHER:  The time
5 is now 2:36, and we are back on
6 camera.
7 BY MS. BALDWIN:
8      Q.   Doctor, I want to turn now
9 to Ms. Hammons' actual Prolift implant
10 surgery that she had done by Dr. Baker in
11 May of 2009, I believe.  And in your
12 report you authored the opinion -- I'm
13 looking at page 17 of your report, first,
14 second, third, fourth paragraph down.
15 The first sentence is fine.
16      I'm talking about the second
17 sentence there; it starts the third line
18 down:  What is not standard is not
19 suspending the vaginal cuff prior to
20 closure.  The uterosacral ligament should
21 have been used to help secure the apical
22 portion of the vaginal cuff.
23      Did I read that correctly?
24      A.   Yes, you did.

Page 249

1      Q.   So if I'm looking at Dr.
2 Baker's note, and I'm just trying to
3 understand your opinion here.  When he
4 says the mesh was then placed and secured
5 at the cuff with 2-0 Vicryl and
6 anteriorly with 2-0 Vicryl and then the
7 vagina was closed with 2-0 Caprosyn,
8 that's something different than what
9 you're saying here, correct?
10      A.   That is correct.
11      Q.   You're saying that he should
12 have suspended the vaginal cuff to the
13 uterosacral ligament?
14      A.   That would be correct, in
15 order to perform an apical repair.
16      Q.   Right.  Am I correct,
17 though, that there's nothing in the
18 Prolift labeling that warns that if a
19 physician does not suspend the vaginal
20 cuff to the uterosacral ligament, it
21 presents a risk of bunched, rolled up
22 mesh like was found in Ms. Hammons?
23      MR. MORIARTY:  Objection.
24 Go ahead.

Page 250

1    A.   And you said what -- it does
2  not say rolled up, bunched up in the
3  Prolift documentation.
4    Q.   Right.  None of the Prolift
5  labeling warns of the risks of what could
6  happen if a doctor does not suspend the
7  vaginal cuff to the uterosacral ligament,
8  correct?
9    A.   The Prolift itself does not,
10 but the doctor should know that if the
11 uterus prolapses and you do not do an
12 apical repair, the anterior Prolift is
13 not designed to hold up that apex.
14   Q.   Right.  The anterior Prolift
15 is not indicated for apical repair,
16 correct?
17   A.   It is not indicated for
18 apical repair, and it is not indicated to
19 support the apex, either.
20   Q.   Right.  And that is
21 something that Ethicon needed to provide
22 to the physicians that it trained, that
23 information, correct?
24       MR. MORIARTY:  Objection.

Page 251

1    A.   I don't know if Ethicon was
2  obligated to provide that information.
3  It provided the information that the
4  anterior Prolift is designed for anterior
5  repair.  The surgeon who diagnosed an
6  anterior prolapse and a uterine prolapse
7  would or should have known that by not
8  suspending the apex, there would be no
9  support.  There would be increased risk
10 of further apical descent and posterior
11 prolapse.
12   Q.   Right.  So a surgeon based
13 on their general training, not anything
14 Ethicon taught them, should know that if
15 they didn't do an apical repair, there
16 could be further descent of the apex,
17 correct?
18   A.   That would be correct.
19   Q.   Right, but they would have
20 no way of knowing unless Ethicon told
21 them that if they didn't do that, you
22 could get bunching mesh, correct?
23       MR. MORIARTY:  Objection.
24   Go ahead.

Page 252

1    A.   They -- Ethicon made sure
2  that at our training that the mesh has to
3  lie flat and under no tension.  And if
4  you don't suspend the apex, just getting
5  up from bed, coughing after general
6  anesthesia will put pressure on that
7  apex, and there's nothing -- let me
8  rephrase this.  There's a much higher
9  risk that this mesh would not continue to
10 lie flat.
11   Q.   Okay.  So you're saying in
12 your training that you went to with Vince
13 Lucente, it was emphasized that the mesh
14 lay flat?
15   A.   Yes.
16   Q.   Okay.  And that it was put
17 in tension free, I think you said?
18   A.   Yes.
19   Q.   Or without tension?
20   A.   Without tension.
21   Q.   Okay.  Are you aware of the
22 studies that were done on this mesh that
23 no matter what you do, it's impossible to
24 implant mesh tension free because of

Page 253

1  the tools used for implantation?
2        MR. MORIARTY:  Objection.
3    A.   I was not aware that Ethicon
4  knew that it was impossible.
5    Q.   To implant the mesh tension
6  free?
7    A.   Correct.
8    Q.   Okay.  And one of the things
9  you talked about was that if the apex is
10 not secured, there's an increased risk of
11 problems because the mesh will not lay
12 flat if a woman gets out of bed or
13 participates in other activities like you
14 talked about, correct?
15   A.   Or right after surgery,
16 correct.
17   Q.   Right.  Where does that
18 appear in the labeling that that's going
19 to lead to bunched mesh?
20   A.   That -- that statement is
21 not on the labeling.
22   Q.   That's something you knew?
23   A.   Yes.
24   Q.   Right.  Based on your

Julie Drolet, M.D.

Page 254

1  experience as a gynecologic surgeon?
2      A.   That would be correct.
3      Q.   And your training as a
4  gynecologic surgeon?
5      A.   Yes.
6      Q.   And you consider yourself a
7  high-volume gynecological surgeon?
8      A.   Yes.
9      Q.   It's one of the interest
10  areas of your practice?
11      A.   That is correct.
12      Q.   In fact, you gave up
13  obstetrics so you could do more surgery?
14      A.   Yes.
15      Q.   And you left Canada to come
16  to the United States so you could do more
17  surgeries?
18      A.   That is one of the reasons.
19      Q.   Right.  And so based on all
20  of your skill and training and knowledge
21  through the years, you knew that fact,
22  correct?
23      A.   Yes.
24      Q.   You can't possibly speak

Page 255

1  what's in the mind of every surgeon or
2  every doctor, for that matter, who is
3  trained on the Prolift, though, can you?
4      MR. MORIARTY:  Objection.
5      A.   I cannot speak to what goes
6  on in other people's minds.
7      Q.   Right.  And
8  especially -- well, if generalists,
9  D.O.s, obstetrician-gynecologists who are
10  not high-volume surgeons were going to
11  training, you don't know what they knew
12  about apical suspension, do you?
13      A.   I do not know what is in the
14  minds of other surgeons who are not
15  high-volume surgeons, whether they're
16  M.D.s or D.O.s.
17      Q.   So if Ethicon was targeting
18  or inviting generalists to come to
19  Prolift training, it had a responsibility
20  to tell them, you need to support the
21  apex because if you don't, there's an
22  increased risk of a lot of problems to
23  and include this bunching, correct?
24      MR. MORIARTY:  Objection.

Page 256

1      A.   I don't know what the
2  responsibility for Ethicon would have
3  been in that particular situation.
4      Q.   As a surgeon, do you think
5  it would have been a good idea for the
6  manufacturer to share that information
7  with generalists it invited to do a
8  surgery?
9      MR. MORIARTY:  Objection.
10      A.   I don't know that it wasn't
11  discussed during the training.
12      Q.   If it wasn't, don't you
13  think it should have been?
14      A.   I think it's one of the
15  aspects of pelvic reconstructive surgery
16  that is gaining more and more attention
17  now.
18      Q.   If Ethicon knew that
19  information in 2006 and it didn't share
20  it with generalists that it invited to
21  its Prolift surgery, is that wrong?
22      MR. MORIARTY:  Objection.
23      A.   In 2006, wrong?  I think it
24  would have been good if they had known it

Page 257

1  and disseminated the information.
2      Q.   That's what a reasonable
3  medical device manufacturer should do?
4      A.   I don't know about their
5  regulatory system and if they can predict
6  every possible scenario, but they do put
7  in the 2007 surgeon's resource monograph
8  that if a hysterectomy is performed that
9  the uterosacral ligaments should be
10  retained and should be interposed.
11      Q.   Right.  It uses the word
12  "should," correct?
13      A.   Well, I'd have to look at
14  the document just to make sure that I'm
15  using the correct word.
16      Q.   Sure.  Which document do you
17  want?
18      A.   Both.
19      Q.   Which?
20      A.   The surgical technical guide
21  and the Prolift surgeon's research
22  monograph.
23      Q.   Well, how about we start
24  with the surgical technical guide.  Do

Julie Drolet, M.D.

Page 258

1 you know what date that was released on
2 into the -- was released to doctors?
3     A.   I do not know exactly.
4     Q.   Do you have any evidence
5 that Dr. Baker got this specific
6 document?
7         MR. MORIARTY:  Objection.
8     A.   Not personally.
9     Q.   Why don't you point me to
10 what you're talking about?
11     A.   Well, let's take a look.
12        MR. MORIARTY:  Did you mark
13     either of those?
14        MS. BALDWIN:  I marked one
15     of them, the surgical technique
16     guide.  I'm just trying to get an
17     extra copy for you.  Do you want
18     it?
19        MR. MORIARTY:  Just to use
20     during the depo.
21        MS. BALDWIN:  Sure.
22        MR. MORIARTY:  Is that 12?
23        THE WITNESS:  Yes.  That's
24     what you wrote.

Page 259

1        MS. BALDWIN:  Give me a
2     second, Matt.  I should have one.
3        (Whereupon, a document was
4     marked for identification as
5     Drolet Exhibit No. 12.)
6 BY MS. BALDWIN:
7     Q.   So I'm looking at page 5 of
8 this document.
9     A.   So am I.
10     Q.   Total repair with vaginal
11 hysterectomy?
12     A.   Yes.  That's one part, yes.
13     Q.   Okay.  Is there a point you
14 wanted to point me to that had the
15 language you're referring to?
16     A.   The language I was referring
17 to is:  A standard vaginal hysterectomy
18 is performed through a pericervical
19 incision.  It is recommended that users
20 identify and retain the uterosacral
21 ligaments or other elements of the
22 cardinal ligament complex.  Those
23 structures can later be interposed
24 between the implant and the vagina or

Page 260

1 attached to the edges of the total
2 implant.
3     Q.   So the language that you
4 read, it says:  These structures can
5 later be interposed, right?  C-A-N?
6     A.   Yes, but before that it
7 says:  It is recommended --
8     Q.   Right.
9     A.   -- that users identify and
10 retain the uterosacral ligaments.
11     Q.   Right.  It doesn't say they
12 must, they should or it's mandatory,
13 correct, retain the uterosacral
14 ligaments, correct?
15     A.   It doesn't say must, should.
16     Q.   And, again, when we go to
17 the sentence, these structures can later
18 be interposed between the implant and the
19 vagina, it doesn't say must or should,
20 correct?
21     A.   In those sentences, you are
22 correct.
23     Q.   And I'm right that there's
24 not any warning language in there that if

Page 261

1 this recommendation is not followed that
2 there will be complications for the
3 patient, correct?
4     A.   Not in that -- not as
5 stated.
6     Q.   Right.  Correct.
7        Doctor, I think I'd like to
8 go on to the next document.
9     A.   All right.
10     Q.   And this would be the
11 surgeon's resource monograph.
12        (Whereupon, a document was
13     marked for identification as
14     Drolet Exhibit No. 13.)
15        MR. MORIARTY:  I guess I'll
16     take one of those, too, if you're
17     passing them out.
18        MS. BALDWIN:  Yep.  Let me
19     just get my copy in front of me.
20     Too many documents.  Here we are.
21 BY MS. BALDWIN:
22     Q.   Doctor, I've marked as
23 Exhibit-13 the surgeon's resource
24 monograph, and for ease of reference,

Julie Drolet, M.D.

Page 262

1 while you were flipping, I was flipping,
2 so I'll turn you to the page. It's the
3 one Bates stamped DX 10140.18, and it's
4 total repair with vaginal hysterectomy.
5 Do you see that page in
6 front of you?
7 A. Yes. I see that page.
8 Q. Okay. And if we look
9 at -- that's a total repair? I'm sorry.
10 A. Yeah. That's why I was
11 hesitating.
12 Q. I'm sorry. Doctor, if you
13 flip through, if you can find the
14 anterior page quicker than I can, I
15 welcome you.
16 A. That will be after.
17 MR. MORIARTY: You know you
18 did the same thing with the tech
19 guide.
20 MS. BALDWIN: Did I? Okay.
21 Let me go back.
22 MR. MORIARTY: It says the
23 same thing at page 18 which is the
24 anterior repair, so you don't

Page 263

1 really need to. It's at page 29.
2 MS. BALDWIN: Thank you,
3 Matt.
4 BY MS. BALDWIN:
5 Q. So Matt apparently has --
6 Mr. Moriarty apparently has the surgeon's
7 resource monograph committed to memory,
8 but on page 29 is the anterior repair in
9 the absence of posterior defect and then
10 the anterior repair with hysterectomy?
11 A. Yes.
12 Q. Okay. And if we look at
13 that, at the bottom, the anterior repair
14 with hysterectomy, it's the same
15 language.
16 It is recommended that users
17 identify and retain the uterosacral
18 ligaments and then these structures can
19 later be interposed between the interior
20 implant and the vagina, correct?
21 A. That's what it says here.
22 Q. And it's not a must or a
23 should in either of those sentences,
24 correct?

Page 264

1 A. I agree with what you're
2 reading.
3 Q. Okay. And just while we're
4 on this surgeon's resource monograph, do
5 you know which date this was released to
6 physicians?
7 A. I don't have a date for that
8 that I can see right now.
9 Q. Okay. Do you have any
10 information whether or not Dr. Baker
11 actually saw this document?
12 MR. MORIARTY: Objection.
13 Asked and answered.
14 A. I don't know what was shown
15 to him or what he saw.
16 Q. Right. When I say shown, do
17 you have any information that Dr. Baker
18 received this information from Ethicon?
19 A. I do not have independent
20 information of that.
21 Q. Let's go back to 12, the
22 surgical technique guide, just to correct
23 the record, the one before that.
24 A. I beg your pardon?

Page 265

1 Q. Let's go back to Document
2 12, the surgical technique guide?
3 A. Yes.
4 Q. And just because I did the
5 same thing there. I had you looking at
6 the total repair with vaginal
7 hysterectomy, and if you turn to page 18,
8 that's the anterior repair with
9 hysterectomy, correct?
10 A. Page 18. I'm sorry.
11 Q. I'm sorry. I'm looking at
12 these numbers right here, page 18.
13 A. Page 18, anterior repair
14 with hysterectomy.
15 Q. And it's the same language
16 there. It is recommended that users
17 identify and these structures can later
18 be interposed, correct? It's the same
19 language there?
20 A. That is correct.
21 Q. I just didn't want you to
22 think I was tricking you. I want to make
23 sure we're on the anterior repair with
24 hysterectomy?

Julie Drolet, M.D.

Page 266

1    A.   Correct.
2    Q.   Okay.  We can put those
3 aside now.
4        Doctor, I'm looking at
5 the -- Dr. Baker's operative report.  You
6 presumably saw this, correct?
7    A.   Yes, I did.
8    Q.   Okay.  And looking at it, he
9 does say that he followed the Prolift
10 protocol, correct?
11    A.   That's what he said.
12    Q.   Correct.  So he doesn't put
13 anywhere in here that he deviated from
14 the Prolift protocol, correct?
15    A.   That's -- that -- he said he
16 followed the Prolift protocol, but he
17 dissected to the sacrospinous ligaments
18 which is not a protocol for anterior
19 Prolift.
20    Q.   Right.  So he dissected a
21 little further back, correct?
22    A.   He dissected -- it's not a
23 question of further.  It's a question of
24 dissecting in the wrong plane.

Page 267

1    Q.   Okay.  So you believe he
2 dissected in the wrong plane?
3    A.   Correct.
4    Q.   So you believe the implant
5 was placed in the wrong plane?
6    A.   Well, he doesn't say that he
7 dissected along the fascia -- fascia
8 pelvis, the AFTP, arcus tendineus fascia
9 pelvis, he said he dissected down towards
10 the sacrospinous ligaments and that's the
11 wrong place.
12        If he started with his most
13 superficial dissection close to the UV
14 junction and then instead of dissecting
15 along the arcus tendineus fascia pelvis,
16 he went back to the sacrospinous, that
17 would have further damaged the level one
18 support and displaced how the mesh would
19 have rested more posteriorly which is how
20 Dr. Heit found it when he dictated his
21 discharge summary.
22    Q.   Okay.  Understanding your
23 hypothetical, if he dissected, do you
24 have any evidence that he actually put

Page 268

1 the mesh in the wrong plane?
2    A.   Well, he dissected the wrong
3 plane.
4    Q.   Well, you're basing your
5 opinion on his dissection then or his
6 description of his dissection?
7    A.   Yes, because he does not
8 describe anything else.
9    Q.   Okay.  So the fact that he
10 describes following the Prolift protocol
11 you're disregarding because you don't
12 believe he did that.  You believe he did
13 something else?
14    A.   Well, if he had strictly
15 followed the protocol for Prolift, he
16 would not have been dissecting towards
17 the sacrospinous ligament.
18    Q.   Okay.  He says he followed
19 the Prolift protocol so you -- what I'm
20 asking you is:  Do you disagree with
21 that?  You think he was incorrect for
22 saying I followed the Prolift protocol?
23    A.   I have an incline that he
24 did not because he dictated that he went

Page 269

1 to the sacrospinous ligament.  If he had
2 said he dissected to the ischial spine,
3 if he dissected on the level of the arcus
4 tendineus fascia pelvis, that would have
5 been per protocol; but because he started
6 to dissect in the wrong place, I can't be
7 a hundred percent sure that he did follow
8 the protocol.
9    Q.   Understanding you can't be a
10 hundred percent sure, my question is:  Do
11 you have an opinion -- and let me
12 rephrase it.
13        Do you have an opinion to a
14 reasonable degree of medical certainty
15 that he placed this mesh in the wrong
16 plane?
17        MR. MORIARTY:  Objection.
18        Go ahead.
19    A.   Possibly, yes, because
20 that's how Dr. Heit found it.
21    Q.   Okay.  So you're saying
22 possibly.  You possibly have that
23 opinion.  You're not sure if you have
24 that opinion; you possibly have that

Julie Drolet, M.D.

Page 270

1 opinion?
2     A.   I'm going to say that that
3 opinion that he put it in the wrong plane
4 is more probable than not.
5     Q.   More probable than not?
6     A.   Yes.
7     Q.   And you're basing that on
8 you're disregarding -- where he dictated
9 that he followed the Prolift protocol,
10 you're disregarding that?
11     A.   I'm not disregarding it.
12 I'm putting all of the medical findings
13 of Dr. Heit and Dr. Baker put together.
14     Q.   So if he put this mesh in
15 the wrong plane, how is it that it was
16 able to heal nicely afterwards?
17     A.   The vagina healed nicely
18 afterwards, but the mesh was never flat.
19 It would have stayed flat.
20     Q.   Okay.  So you believe the
21 mesh was not put in flat from the time of
22 the surgery?
23     A.   I think that is a
24 possibility.

Page 271

1     Q.   Again, a possibility or an
2 opinion?
3     A.   It's my opinion that it was
4 not put in flat and did not stay flat
5 because it would have remained that way.
6 Mesh doesn't just roll up on its own or
7 bunch up on its own.
8     Q.   Is that opinion held to a
9 reasonable degree of professional --
10 medical certainty?
11     A.   Yes.
12     Q.   Okay.  Are you aware of
13 articles that have come out in the
14 literature that have found that women
15 have experienced bunching in their mesh,
16 and it can be seen on ultrasound with the
17 mesh contraction?
18         MR. MORIARTY:  Objection.
19 Go ahead.
20     A.   Mesh will contract -- or,
21 pardon me, the healing process will cause
22 contracture of the mesh and the tissues,
23 and it will contract in size in the same
24 dimensions or in the same plane that it

Page 272

1 was placed in.  It will not roll up or
2 bunch up after years of being in place.
3     Q.   Are you familiar with the
4 Velemir literature?
5     A.   If it is part of my reliance
6 list, then I have read it.
7     Q.   Well, it's not and that's
8 why I'm asking because there was
9 literature published in 2010 that showed
10 ultrasound images of the mesh bunching --
11 and, unfortunately, I only have a black
12 and white copy -- after it contracted
13 inside of women.  Are you aware of any
14 literature about that topic?
15         MR. MORIARTY:  Objection.
16 Go ahead.
17     A.   I would need to read that
18 article and have time to reflect on it
19 and what it means.
20     Q.   Right.  Right.  So my
21 question is, are you aware right now?
22 Understanding you haven't read this, are
23 you aware that this literature existed?
24     A.   No.  I don't know the title

Page 273

1 of that article.
2     Q.   Okay.
3         MR. MORIARTY:  Objection.
4 At least tell her what journal it
5 was from so she'd know if it's a
6 journal she reads.
7         MS. BALDWIN:  Sure.
8 BY MS. BALDWIN:
9     Q.   It's the Ultrasound
10 Obstetric Gynecology.
11     A.   The ultrasound?
12     Q.   I can show it to you here.
13     A.   Okay.
14     Q.   I'm sorry.  I'm reading the
15 title.  It's very small.
16     A.   Yes.  Well, it's not one of
17 the journals that I read.
18     Q.   Well, we don't have to go
19 through it now, Doctor.  Can I have the
20 copy back?
21         Ethicon didn't give you this
22 article, correct?
23     A.   That is correct.
24     Q.   Okay.  And it didn't give

Julie Drolet, M.D.

Page 274

1 you any articles about the propensity of
2 mesh to bunch, correct?
3        MR. MORIARTY:  Objection.
4    Go ahead.
5    A.   No, it did not.
6    Q.   If there's literature out
7 there about the mesh's propensity to
8 bunch as it contracts, would that
9 necessarily impact on your opinion that
10 Ms. Hammons' mesh was placed in the wrong
11 plane?
12        MR. MORIARTY:  Objection.
13    A.   One, I would have to read
14 that literature to make an opinion and to
15 see if that would influence my, but Dr.
16 Baker did not dissect along the arcus
17 tendineus fascia pelvis.  He did not
18 dissect or say he was in the obturator
19 internus muscle.  He did not say he went
20 to the ischial spine.  He said he went to
21 the sacrospinous ligament.
22    Q.   He didn't say that he didn't
23 do those things.  What he said is he
24 followed the Prolift protocol, correct?

Page 275

1        MR. MORIARTY:  Objection.
2    Asked and answered.
3    Q.   Correct?
4    A.   That's -- that's what he
5 stated, didn't describe it, and the one
6 thing he did describe is a dissection in
7 the wrong space.
8    Q.   And from what he dictated
9 here, you're inferring that it was placed
10 in the wrong plane, correct?
11    A.   I have no other reason to
12 believe that it was placed even in the
13 right plane.
14    Q.   But if there's literature
15 out there that discusses the propensity
16 of the mesh to bunch, assuming I'm
17 correct, then that's a possibility of
18 what could have happened as well,
19 correct?
20        MR. MORIARTY:  Objection.
21    Go ahead.
22    A.   I would have to read that
23 literature and how these studies were
24 performed and look at how they measured

Page 276

1 on ultrasounds, the mesh before and
2 after, before I can say that it would
3 influence my decision.
4    Q.   Right.  You'd need to look
5 at all the literature that was out there
6 on the subject, correct?
7    A.   I would need to look at the
8 most important papers defining what
9 you're saying is a phenomenon that can
10 happen.
11    Q.   You'd at least need
12 information about it to be provided to
13 you to give an educated opinion, correct?
14    A.   I would agree with that
15 statement.
16    Q.   So if there's literature out
17 there that you haven't seen, then you
18 can't say that your opinion is complete
19 because you haven't seen that literature,
20 correct?
21        MR. MORIARTY:  Objection.
22    Go ahead.
23    A.   I would say that there's a
24 possibility that it might or -- it's

Page 277

1 possible that it could influence my
2 opinion, but in all of the surgeries that
3 I have done, mesh did not end up curled
4 up or bunched up in one centimeter thick.
5    Q.   Right.  In the surgeries
6 that you've done?
7    A.   Correct.
8    Q.   But in the 70-plus thousand
9 dollars you were paid to serve as an
10 expert in this opinion, you didn't read
11 the articles about the propensity of the
12 mesh to bunch, correct?
13        MR. MORIARTY:  Objection.
14    A.   One, I wasn't paid $70,000,
15 and I have read as much articles as I
16 could and what was provided to me.
17    Q.   Well, you were paid $37,000
18 on August 17th or submitted an invoice
19 for that amount, correct?
20    A.   That was correct.
21    Q.   And then you were paid
22 12,000 and change on October 5th, 2015,
23 correct?
24    A.   That is correct.

Julie Drolet, M.D.

Page 278

1    Q.   And then you were paid --
2    A.   No, I wasn't.
3    Q.   I'm sorry.  You billed for
4  $28,000 and some change on November 2nd,
5  correct?
6    A.   That is correct.
7    Q.   So you have bills to Ethicon
8  totaling more than $70,000, correct?
9    A.   That is correct.
10   Q.   So like we discussed at the
11 very beginning, you expect to be paid
12 more than $70,000 for what you're saying
13 in connection with this case, correct?
14       MR. MORIARTY:  Objection.
15 Go ahead.
16   A.   I am hoping, yes.
17   Q.   Okay.  And then for all that
18 money that you're billing at 450 an hour,
19 they didn't give you any literature about
20 the propensity of mesh to bunch, correct?
21   A.   That is correct.
22   Q.   And they didn't show you any
23 internal documents about whether Ethicon
24 knew that there was a propensity of the

Page 279

1  mesh to bunch or roll up?
2        MR. MORIARTY:  Objection.
3  Go ahead.
4    A.   I now recall one phrase
5  where the mesh could roll up where the
6  arms of the mesh meet the actual body of
7  the mesh and that I remember reading.
8    Q.   Are you talking about
9  roping?
10   A.   Yes.
11   Q.   Okay.
12   A.   But that's not what we're
13 talking about here.
14   Q.   Right, because they didn't
15 give you any other documents, did they?
16   A.   No, they did not.  And in
17 the Green Journal, Gray Journal and
18 Female Pelvic Medicine, I have not come
19 across over the last few years on
20 articles that describe this phenomenon
21 that you say rolling and bunching as a
22 frequent complication of mesh.
23   Q.   If it was a known
24 complication of mesh and there are

Page 280

1  internal documents about it, would you
2  have liked to have considered those when
3  coming up with your expert opinion in
4  this case?
5    A.   Yes, I would have.
6        MR. MORIARTY:  Objection.
7    Q.   If there's literature out
8  there that specifically relates to this
9  phenomenon of the ability of the mesh to
10 bunch up, would you have liked to have
11 seen that when making your opinions in
12 this case?
13       MR. MORIARTY:  Objection.
14   A.   I would have liked to have
15 seen those articles.
16   Q.   It's your opinion that the
17 mesh was never laid flat, correct?
18   A.   It's my opinion that in its
19 final resting position, it probably was
20 not laid flat.
21   Q.   Well, probably or do you
22 have an opinion to a reasonable degree of
23 medical certainty?
24       MR. MORIARTY:  Well,

Page 281

1  objection.
2    A.   Reasonable degree of medical
3  certainty.
4        MR. MORIARTY:  That's what
5  she's telling you.
6    Q.   Well, probably isn't the
7  same as reasonable degree of medical
8  certainty, with all due respect to
9  counsel.  Do you understand that?
10       MR. MORIARTY:  Objection.
11 It is, but...
12       MS. BALDWIN:  Well, let's
13 not have the speaking objections.
14 BY MS. BALDWIN:
15   Q.   Why don't you just tell me
16 what you believe reasonable degree of
17 professional medical certainty is?
18   A.   More than 50 percent likely.
19   Q.   Doctor, you're aware that on
20 June 10th, 2009 Ms. Hammons had an exam
21 by Dr. Baker, and he said she was doing
22 well and healing great?
23   A.   Yes.
24   Q.   How is that possible if the

Julie Drolet, M.B.

Page 282

1 mesh was not laid flat?
2     A.   Because it's possible to
3 look at a vaginal incision and see that
4 there's no mesh erosion, that the vaginal
5 mucosa is healing well, but he did not
6 put a comment that he could feel the mesh
7 flat and it was doing well.  He just
8 looked at, repair doing great.  There's
9 no other --
10     Q.   So, again, you're inferring
11 something by what he didn't write here,
12 correct?
13     A.   No.  I'm just looking at
14 what he did write.
15     Q.   Right.  He put doing well,
16 healing great, correct?
17     A.   Right.
18     Q.   And then you're inferring
19 from that because he didn't put that
20 he felt the mesh laying flat that it
21 wasn't flat?
22         MR. MORIARTY:  Objection.
23     Go ahead.
24     A.   I'm saying here that your

Page 283

1 interpretation of healing great and --
2 may I see the exact language, please?
3     Q.   Sure.
4     A.   And do we have -- do we have
5 the exam in there?
6     Q.   Well, I'm just showing you
7 the note where he says it.
8     A.   Okay.  Doing well, healing
9 great, still see some suture.  So what he
10 is inferring to is what he can see.  He
11 can see the vaginal mucosa.  He can see
12 that she has irritation all on the
13 outside and advise Monistat or Vagisil.
14 So all he can see is the sutures.
15     Q.   Right.
16     A.   Okay.
17     Q.   And you're inferring from
18 that that there's a condition here that
19 he didn't document, correct?
20         MR. MORIARTY:  Objection.
21     A.   He might not have even
22 known.
23     Q.   So now you think he didn't
24 even know?

Page 284

1     A.   Well, I don't know if he
2 examined her, if he did a bimanual exam
3 or not, if he even put a speculum in or
4 not, but he could see vaginal sutures and
5 he could see that she has an irritation
6 on the outside for which he recommended
7 Monistat or Vagisil.
8     Q.   Did you read his deposition?
9     A.   I did.
10     Q.   What did he say about it?
11     A.   I don't recall by heart, but
12 I'd have to have the deposition in front
13 of me to quote him.
14     Q.   Had you been retained in
15 specific connection with this case when
16 he was deposed?
17     A.   If you could remind me the
18 date of the deposition?
19     Q.   May 13th, 2015?
20     A.   I was retained by Ethicon on
21 May 26th but did not learn about the case
22 until late June 28th or 29th and did not
23 receive any depositions or patient chart
24 records until July.

Page 285

1     Q.   So you weren't asked what
2 information you'd like to know from Dr.
3 Baker about what was done at each of
4 these exams?
5         MR. MORIARTY:  Objection.
6     A.   Can you repeat the question?
7     Q.   You weren't asked by the
8 attorneys what information you would like
9 to know about what occurred at each of
10 these exams?
11         MR. MORIARTY:  Objection.
12     She's told you she didn't have any
13     case material 'til the end of
14     June.
15         MS. BALDWIN:  Right.  And
16     that's my point.
17 BY MS. BALDWIN:
18     Q.   So you couldn't possibly
19 have told the attorneys, boy, this is
20 what I'd like to know when you talk to
21 Dr. Baker, correct?
22     A.   That would be a correct
23 statement since I didn't even know this
24 case existed until July.

Julie Drolet, M.D.

Page 286

1  Q.  Right.  So you couldn't say
2  to them, boy, I'm inferring from this
3  record that he didn't do a bimanual exam;
4  could you clear that up in the
5  deposition?  You didn't get that
6  opportunity, did you?
7     A.  That would be correct.
8     Q.  The attorneys didn't ask you
9  what information are you going to infer
10  from these records so that we can clear
11  it up with the doctor to make sure your
12  inferences are correct?
13     A.  That would be correct.
14     Q.  So if he doesn't talk one
15  way or the other about what happened on
16  this visit, June 10th, 2009, then you
17  have no way of knowing.  You're just
18  inferring based on what's in the note?
19     A.  I am basing my conclusion on
20  what he wrote in his note.
21     Q.  Right.  And you're drawing
22  inferences based on what you don't see
23  there, correct?
24     A.  The only inference I -- in

Page 287

1  conclusion I can come up with with this
2  note is to say that he saw a suture still
3  in the vagina and that she was irritated
4  on the outside.  She might have been
5  doing great where there's no pain.  I
6  don't know.  She might have been doing
7  great in other particular areas.  It's
8  not in there.
9     Q.  Right.  So you don't know?
10  You don't know what else happened other
11  than beyond what's in this note, correct?
12     A.  The only thing we can
13  conclude with this note is that he says
14  that the repair -- doing well, healing
15  great, still see some suture.  The
16  irritation is all on the outside.
17     Q.  Just so we don't get
18  confused later, I'm going to go ahead and
19  mark this as Drolet-14, this page, so you
20  have it in front of you.
21        But the only thing then that
22  we can conclude from this visit is
23  exactly what he has written, correct?
24     A.  That -- I agree with

Page 288

1  what -- yes.
2     Q.  And anything else that might
3  have happened at this visit would be an
4  assumption on your part?
5     A.  And anybody else who looks
6  at this record.
7     Q.  Right.
8        (Whereupon, a document was
9        marked for identification as
10        Drolet Exhibit No. 14.)
11  BY MS. BALDWIN:
12     Q.  And that would be the same
13  thing about the positioning of the
14  Prolift.  You're making an assumption
15  that it was not positioned at the level
16  of the arcus tendineus fascia pelvis
17  because it's not dictated in the report
18  one way or the other what level it was
19  implanted?
20     A.  Correct, but it's dictated
21  that he dissected posteriorly in the
22  wrong plane.
23     Q.  Right.  So you're making an
24  assumption?

Page 289

1        MR. MORIARTY:  Objection.
2  About what?
3     Q.  You're making an assumption
4  about where the Prolift was placed?
5     A.  You can say you do something
6  per protocol, but if the events leading
7  up to that are erroneous, then there's a
8  strong possibility that you didn't do it
9  quite per protocol.
10     Q.  You're making that
11  assumption?
12     A.  That's my conclusion.
13     Q.  Which is based on an
14  assumption.  It's not based on what he
15  actually dictated in the note?
16        MR. MORIARTY:  Objection.
17  This has been asked and answered
18  ten times.
19        MS. BALDWIN:  No, it hasn't,
20  Matt.
21        MR. MORIARTY:  Yes, it is.
22  She has told you what she's basing
23  it on.
24        MS. BALDWIN:  Was it an

Julie Drolet, M.D.

Page 290

1  assumption on your part?
2      MR. MORIARTY:  He said
3  two -- he said two --
4      MS. BALDWIN:  Thank you for
5  the speaking objection.  How about
6  you make your objection and we
7  keep going?
8      MR. MORIARTY:  Because it's
9  asked and answered repeatedly.
10  It's been established he said two
11  contrary things.  She draws an
12  inference from the specific one.
13  You want an inference from the
14  general one.
15      MS. BALDWIN:  Okay.  Matt,
16  thank you for your speaking
17  objection.
18      MR. MORIARTY:  We've covered
19  it.
20      MS. BALDWIN:  Let me
21  continue with my deposition.
22      MR. MORIARTY:  You're
23  welcome.  I'll do more of them if
24  you like them.

Page 291

1      MS. BALDWIN:  On your clock.
2  BY MS. BALDWIN:
3      Q.   Doctor, nowhere in the
4  operative note did Dr. Baker dictate that
5  he positioned the Prolift mesh at the
6  wrong level?
7      A.   Literally, that is correct.
8      Q.   Thank you.
9      A.   But I don't know of any
10  surgeon who would go into an OR report
11  and said, I put X, Y, Z in the wrong
12  place.
13      Q.   Let's talk about that.  He's
14  not a surgeon, really, is he?  He's a
15  generalist?
16      MR. MORIARTY:  Objection.
17      A.   He is a Board certified
18  obstetrician-gynecologist.
19      Q.   Who doesn't consider himself
20  a highly skilled pelvic floor repair
21  surgeon, correct?
22      A.   I do not know what he
23  considers himself.
24      Q.   Who doesn't consider himself

Page 292

1  someone who has high-volume pelvic floor
2  repair experience?
3      A.   I don't know what he
4  considers or not considers himself.
5      Q.   Did Ethicon have any
6  advanced trainings more than just the
7  one-day preceptorships for doctors that
8  weren't high-volume pelvic floor repair
9  surgeons?
10      A.   I don't know.
11      Q.   If Ethicon knew that doctors
12  who were not high-volume pelvic floor
13  repair surgeons were likely to have
14  higher complication rates, shouldn't they
15  have had more than just one-day
16  preceptorships for those surgeons?
17      MR. MORIARTY:  Objection.
18      A.   I don't know if the training
19  availability was there or not for that
20  opportunity.
21      Q.   So you can't speak to the
22  adequacy of the training?
23      MR. MORIARTY:  Objection.
24      A.   Yes, I can.

Page 293

1      Q.   Well, you just said you
2  don't know if it was there?
3      A.   I can speak to the adequacy
4  of training that I have experienced.  I
5  don't know if Dr. Baker asked for more
6  training, wanted more training, felt that
7  he needed more training or not.
8          He is a Board certified
9  obstetrician-gynecologist who had done
10  some Prolifts before.  He had gone
11  through training.  Ethicon provided
12  training.  The hospital granted him
13  privileges to do these procedures.
14      Q.   Okay.  You said he had done
15  Prolifts before.  Before what?
16      A.   Before Mrs. Hammons' case.
17      Q.   Do you know how many?
18      A.   I think he refers to about
19  30.
20      Q.   Total?
21      A.   I'm not sure.  We'd have to
22  go back to his deposition to find out
23  exactly what he said.
24      Q.   Right.  So if he said he

Julie Drolet, M.D.

Page 294

1 thinks he did about 30 of those total,
2 that doesn't mean he did 30 before he saw
3 Mrs. Hammons, right?
4     A.   That would be correct.  I'm
5 not sure exactly how many total he had
6 done or how many he had done before Mrs.
7 Hammons, but Mrs. Hammons' surgery was in
8 2009, and if I recall, his training, I
9 think, was in 2006.  I'd have to go back
10 to the deposition to look for that.
11     Q.   Right.  So let's talk about
12 the training.  We got off track here.  We
13 were talking about the adequacy of the
14 training, and you're speaking about the
15 adequacy of the training from your
16 standpoint, correct?
17     A.   Yes.
18     Q.   You believe your training
19 was adequate?
20     A.   I think it was.
21     Q.   Okay.  You can't speak to
22 the adequacy of the training received by
23 general OB-GYNs who are not high-volume
24 pelvic floor repair surgeons because you

Page 295

1 don't know what they were offered,
2 correct?
3         MR. MORIARTY:  Objection.
4     A.   I do not know the exact
5 training that Dr. Baker received.
6     Q.   So you can't speak to the
7 adequacy of that training because you
8 just don't know?
9         MR. MORIARTY:  Objection.
10     A.   I was not there at that
11 time, but I received good training.
12     Q.   You received good training?
13     A.   Correct.
14     Q.   Do you know if Dr. Baker
15 received the exact same training you did?
16     A.   Well, he couldn't have
17 received the exact same training because
18 it wasn't Vince Lucente, but it was still
19 a reputable surgeon.  And it wasn't in
20 Allentown, so it couldn't have been the
21 exact same, but I would hope that when
22 Ethicon provided training, they would
23 have a standard way or a standardized way
24 of providing these trainings.

Page 296

1     Q.   Right.  And you would hope
2 that if they were inviting general
3 OB-GYNs who are not high-volume pelvic
4 floor repair surgeons that they would
5 give them additional training that they
6 needed on the Prolift?
7     A.   If they needed additional
8 training, yes.
9     Q.   Because -- well, if Ethicon
10 believed that the Prolift was appropriate
11 only for high-volume pelvic floor repair
12 surgeons, then it had a responsibility to
13 provide additional training to folks who
14 didn't fit that category?
15         MR. MORIARTY:  Objection.
16     A.   I would hope that the
17 training would have been available if a
18 particular doctor felt that he or she
19 would want additional training.
20     Q.   You would hope also that
21 that training would be given by the
22 company that knew that doctors who didn't
23 fit its criteria might have higher
24 complication rates, right?

Page 297

1         MR. MORIARTY:  Objection.
2         Asked and answered.
3     A.   I would hope that it would
4 be provided by the company, yes.
5     Q.   Doctor, one of the opinions
6 I think you're offering in your report is
7 that you don't believe Ms. Hammons'
8 dyspareunia was caused by her anterior
9 Prolift, correct?
10     A.   To a reasonable medical
11 degree of certainty, yes.
12     Q.   You don't believe that her
13 anterior Prolift is causing her current
14 complaints of dyspareunia?
15     A.   That would be correct.
16     Q.   Okay.  And I think you're
17 basing that in large part on your medical
18 examination of Ms. Hammons, correct?
19         MR. MORIARTY:  Objection.
20     A.   I did this report before I
21 had the chance to examine her.
22     Q.   Right.  And in this report
23 you noted that the only places that pain
24 had been documented was at the back cuff

Page 298

1 in the posterior portion of the vagina,
2 correct?
3      A.   Yes.  That was the exam from
4 Dr. Baker when he saw her at 12 weeks.
5      Q.   Okay.  And based on that, in
6 part, you're saying that the dyspareunia
7 was not caused by the anterior Prolift,
8 correct?
9      A.   To a reasonable degree of
10 medical certainty, yes.
11      Q.   Okay.  After you authored
12 this report you had the chance to examine
13 Ms. Hammons, correct?
14      A.   Yes.
15      Q.   And she was in your office?
16      A.   Yes, she was.
17      Q.   And she submitted to a
18 physical exam.  You were able to examine
19 her vagina?
20      A.   Yes.  That is correct.
21      Q.   Okay.  And in that --
22      MS. BALDWIN:  You know what?
23 We might as well take the break
24 now then.  We're going to go off

Page 299

1 the video.  He has to change
2 tapes.
3      THE VIDEOGRAPHER:  The time
4 is now 3:27, and this concludes
5 DVD number 3.
6      (A short break was taken.)
7      THE VIDEOGRAPHER:  The time
8 now is 3:37, and this is the
9 beginning of DVD number 4.
10 BY MS. BALDWIN:
11      Q.   Doctor, I just want to
12 backtrack a little bit.  There was a
13 record produced that Ms. Hammons had a
14 pessary placed in 2007 and then had it
15 removed that same day in the emergency
16 room because it was painful.  Did you get
17 that record?
18      A.   Yes.  I got that way late
19 after -- after this report, I think, yes.
20      Q.   The fact that she had a
21 pessary placed in 2007 and had to have it
22 removed and had acute pain from that that
23 was not longstanding, does that in any
24 way change any of the opinions you

Page 300

1 authored in your report?
2      A.   No.  Not that I can think of
3 at this point.
4      Q.   Okay.  We were talking about
5 the defense medical exam before we went
6 off the tape.  I'm right that you
7 authored your --
8      A.   Can I amend that previous
9 report?
10      Q.   Sure.
11      A.   The fact that she had pain
12 with her pessary may indicate that she
13 could have been at higher risk for
14 dyspareunia or pelvic pain or levator ani
15 myalgia because the pessary has to rest
16 on the levator ani, so that may be a sign
17 or a symptom.
18      Q.   Are you suggesting that the
19 insertion of the pessary somehow injured
20 her levator ani?
21      A.   No, but when it comes to
22 rest on it, if you have a sensitivity, it
23 may become very uncomfortable as the day
24 wears on and the pessary pushes against

Page 301

1 it, so I'm not sure.
2      Q.   Okay.  If it's her
3 recollection -- this is a hypothetical.
4      If it's her recollection
5 that became uncomfortable when it became
6 partially dislodged, that's something
7 different than it being painful when it's
8 resting on the levator ani, correct?
9      A.   Well, I don't -- I don't
10 know what partially dislodged would mean
11 because the pessary, when it's about to
12 come out, you Valsalva and it falls out.
13      So dislodged, I don't know
14 what type of pessary, what size it was
15 put in and how was it dislodged when she
16 went to the emergency room.  So I can't
17 make a firm conclusion on that to a
18 reasonable degree of medical certainty.
19      Q.   So because of the
20 information you don't know about this
21 pessary, you can't draw any conclusions
22 from it?
23      A.   I can draw some hypotheses
24 but not a firm conclusion to a hundred

Julie Drolet, M.B.

Page 302

1  percent of medical certainty.
2      Q.   To a reasonable degree of
3  medical certainty, you cannot draw
4  conclusions?
5          MR. MORIARTY:  Well,
6      objection.  Go ahead.
7      A.   I would agree with that
8  statement.
9      Q.   Okay.  We were talking about
10  the defense medical exam, and sometimes
11  those are hyphenated DME.  If I use DME,
12  will you understand that term, that
13  acronym?
14      A.   Now I will.
15      Q.   Okay.  All right.  You
16  authored your report in this case.  I had
17  it in front of me.  Just give me a
18  moment.
19          You authored your full
20  report in this case -- of course, this
21  doesn't have a signature page on it --
22  before you did the DME, correct?
23      A.   That was correct.
24      Q.   Okay.  And if I look at this

Page 303

1  version, I know it's in here.  I took it
2  out of here.  All right.
3          And then after you authored
4  this report and authored the opinions in
5  this report, you had the opportunity to
6  do your examination of Ms. Hammons,
7  correct?
8      A.   That is correct.
9      Q.   Before you did your
10  examination of Ms. Hammons, you had never
11  done a medical examination in conjunction
12  with a lawsuit before, correct?
13      A.   Not in conjunction with a
14  lawsuit.
15      Q.   Were you given an
16  understanding of what the scope of your
17  exam was to be before it happened?
18      A.   Not really.
19      Q.   Okay.  Were you given an
20  explanation of what the discussion was
21  between counsel about the scope of the
22  exam?
23          MR. MORIARTY:  Objection.
24      A.   Between counsel?  Whose

Page 304

1  counsel?
2      Q.   Between the attorneys, so
3  between the attorneys for the defendants
4  who retained you and between the
5  attorneys for Ms. Hammons, my office.
6  Were you told about the discussions
7  between the attorneys about the scope of
8  the examination?
9          MR. MORIARTY:  Objection.
10      Go ahead.
11      A.   No.
12      Q.   Okay.  Are you familiar with
13  the Pennsylvania Rules of Civil Procedure
14  that cover defense medical examinations?
15      A.   No, I am not.
16      Q.   Okay.
17          MS. BALDWIN:  Doctor, I'll
18      put in front of you, we can mark
19      it while she's pointing something
20      out to me.
21          (Whereupon, a document was
22      marked for identification as
23      Drolet Exhibit No. 15.)
24  BY MS. BALDWIN:

Page 305

1      Q.   Fifteen, I believe, are the
2  notes of the exam.  Is that correct?
3      A.   That would be correct.
4          MS. BALDWIN:  Matt, I just
5      tossed one in your direction.
6      Q.   Okay.  And if we go to the
7  second page of the notes on your exam,
8  page 2?
9      A.   Yes.
10      Q.   Okay.  And if we go down
11  about halfway, it talks about your
12  bimanual midline exam, and you said there
13  she is nontender up to approximately 6 to
14  8 centimeters beyond the hymen.
15          Did I read that correctly?
16      A.   You read that correctly
17  above the hymen.  Beyond for me would be
18  above the hymen.
19      Q.   Right.  So if we -- I can --
20  let's just make it even clearer.
21          (Whereupon, a document was
22      marked for identification as
23      Drolet Exhibit No. 16.)
24  BY MS. BALDWIN:

Julie Drolet, M.D.

Page 306

1    Q.   Sixteen is a diagram of
2  normal pelvic anatomy.  Why don't you
3  circle for me the area that you mean?
4    A.   Well, she doesn't have a
5  uterus.
6    Q.   Oh, goodness.
7        MR. MORIARTY:  That was
8    what's known as a trick question.
9        MS. BALDWIN:  It is.  I
10    don't know that I have one without
11    a uterus.  Do I have one without a
12    uterus?
13 BY MS. BALDWIN:
14    Q.   Why don't you cross out the
15  uterus with a pen and then circle the
16  area you're talking about because I don't
17  know that I have one without a uterus.
18  You can use that red marker there.
19    A.   (Witness indicating.)
20        MR. MORIARTY:  Did you mark
21    that drawing an as exhibit?
22        MS. BALDWIN:  I did.
23    Sixteen.
24        THE WITNESS:  So up to 6 to

Page 307

1    8 centimeters, whatever six or
2    eight is on this drawing here.  So
3    6 to 8 centimeters, there's no
4    cervix, so it would have to be
5    over here.  So the area in red.
6  BY MS. BALDWIN:
7    Q.   Okay.  Is where she was
8  nontender?
9    A.   That is correct.
10    Q.   Was she tender at all beyond
11  8 centimeters?
12    A.   If I pushed hard enough,
13  yes.
14    Q.   Okay.  Did she visibly
15  display uncomfort during the entire exam?
16    A.   Not during the entire exam.
17    Q.   Did she visibly display
18  discomfort when you did this vaginal exam
19  of the area that you colored in red?
20    A.   Well, she had no discomfort
21  in the area in red.
22    Q.   Did she explain to you that
23  there was some discomfort but it was not
24  as bad as when she had first gotten the

Page 308

1  Prolift implanted?
2    A.   No, because I wasn't allowed
3  to have that question answered.
4    Q.   Okay.  Doctor, you're aware
5  that Dr. Dagostino from my office was
6  also physically present at the exam?
7    A.   Yes.
8    Q.   And she was listening to the
9  questions that were asked and the answers
10  that were given?
11        MR. MORIARTY:  Objection.
12    A.   If she was listening, I'm
13  sure.
14    Q.   Did you receive a copy of
15  the letter that Dr. Dagostino sent to Mr.
16  Moriarty about your exam after it
17  happened?
18    A.   Yes, I did.
19    Q.   Okay.  And did you take
20  issue with that letter?
21    A.   What do you mean by take
22  issue?
23    Q.   Well, she believes that Ms.
24  Hammons was visibly uncomfortable during

Page 309

1  the exam and that Ms. Hammons explained
2  to you that she had pain up front.  Do
3  you disagree that that happened?
4    A.   Yes, I do.
5    Q.   Ms. Hammons -- are you
6  saying you don't recall Ms. Hammons
7  explaining to you that she had pain up
8  front?
9    A.   She had pain down there.
10  She pointed to her lower pelvis, not her
11  privates, but when she said she had pain
12  down there, she pointed to her lower
13  abdomen.  And it happened maybe, if I
14  recall my notes, infrequently, lasts for
15  a few minutes.  I cannot say exactly and
16  knows it's less than 30 minutes because I
17  asked her, is it once in a while, once a
18  week, and she didn't know.  It goes away
19  on its own, and she can still continue to
20  work.
21    Q.   I'm not asking about her
22  description of the pain that she had
23  currently.
24    A.   Okay.

Julie Drolet, M.D.

Page 310

1     Q. I'm asking about the pain
2 that she described to you when you were
3 doing your bimanual exam?
4     A. Well, anteriorly?
5     Q. Yes.
6     A. There was no pain.
7     Q. Whatsoever?
8     A. I examined her, and the way
9 the exam room is configured, Dr.
10 Dagostino was on the back wall in a
11 chair. The patient, Mrs. Hammons, was at
12 times sitting with her back to Dr.
13 Dagostino. The only time where Dr.
14 Dagostino could see Mrs. Hammons' face
15 was when Mrs. Hammons turned around and
16 if she was waiting or wanted to get a
17 signal to either answer or not answer a
18 question.
19     Q. Are you suggesting that Mrs.
20 Hammons was getting signals from Dr.
21 Dagostino during the exam?
22     MR. MORIARTY: Objection.
23     A. I'm not saying she was
24 getting signals from her, no, but there

Page 311

1 came a point where I asked a question
2 after my exam which found no anterior
3 pelvic pain, and the way the patient is
4 draped on the table, if I'm the patient,
5 the patient is lying not quite on her
6 back but with an angle. We have stirrups
7 that hold the calf, not the heel.
8     Dr. Dagostino was sitting
9 behind, about four or five feet behind
10 her head. There is a paper drape lying
11 on her, covering her legs up to her
12 knees, and I'm down below.
13     So when I examined her at
14 that part of the exam, I said to -- or I
15 asked Mrs. Hammons, does it hurt here?
16 She said no. That was the periurethral
17 anterior wall area. Does it hurt here?
18 And she said no. And that was at the
19 level of the bladder neck trigone area.
20 Does it hurt here? No. And I went in as
21 deep as my fingers will allow, she said
22 no. Then I stood up and did it again,
23 and in those areas she said no.
24     I distinctly remember asking

Page 312

1 Mrs. Hammons, is there a reason why you
2 haven't tried to have intercourse since
3 Dr. Heit's surgery in 2012? I was
4 interrupted by Dr. Dagostino saying, what
5 do you mean in 2012? And I repeated -- I
6 thought I had made a mistake, so I said
7 okay. Let's forget the dates. The major
8 surgery by Dr. Heit and the cystoscopies.
9     I repeated the question, and
10 Mrs. Hammons smiled at me, turned around
11 to Dr. Dagostino, and Dr. Dagostino said
12 something to the effect, don't answer
13 that question.
14     Q. Did you read Ms. Hammons'
15 deposition in advance of your exam --
16     MR. MORIARTY: Objection.
17     Asked and answered three times.
18     MS. BALDWIN: I didn't
19     finish my question. Can I finish?
20     Thanks.
21     MR. MORIARTY: I thought you
22     were done.
23 BY MS. BALDWIN:
24     Q. Did you read Ms. Hammons'

Page 313

1 deposition before the medical exam where
2 she testified about the reasons why she
3 stopped having sex?
4     MR. MORIARTY: Objection.
5     A. I did.
6     Q. Did you have any
7 understanding that there was discussion
8 between counsel that pursuant to Rule
9 4010 of the Pennsylvania Rules of Civil
10 Procedure, she would only be permitted to
11 answer questions about her current
12 medical condition and not questions that
13 were already covered in her deposition?
14     MR. MORIARTY: Objection.
15     A. Well, since I did not know
16 what the Pennsylvania rule was, I didn't
17 know I wasn't supposed to ask.
18     Q. Do you deny the fact that
19 Ms. Hammons said there was pain up front
20 when you were doing the bimanual exam?
21     A. There were some areas of
22 pain but not in the specific areas that I
23 pointed to.
24     Q. Do you deny that Ms. Hammons

Julie Drolet, M.D.

Page 314

1 said there was pain up front when you
2 were doing the bimanual exam?
3         MR. MORIARTY:  Objection.
4     Go ahead.
5     A.   I don't remember her saying
6 pain up front while I was doing a
7 bimanual exam because I asked yes and no
8 questions.  Does it hurt here, here,
9 here, and I did not mention the
10 anatomical site that I was examining when
11 I was asking the question.
12     Q.   Did Ms. Hammons or don't you
13 recall?
14     A.   Did Ms. Hammons what?
15     Q.   Mention pain up front or
16 don't you recall?
17     A.   I do not remember her saying
18 pain up front while I was doing the exam.
19     Q.   If you pushed hard enough in
20 a particular area, you would admit that
21 Ms. Hammons had pain?
22     A.    In other areas of the
23 pelvis, yes and not -- you know, when you
24 say hard enough, you know, when we do a

Page 315

1 pelvic exam, we don't want to be -- we
2 want to be respectful and we want to be,
3 you know -- as I would normally do.
4 Let's just say it that way.
5         I conducted this exam as I
6 would do any woman who would come to my
7 office complaining of pain with
8 intercourse.  I would want to know the
9 source of the pain and where it hurt in
10 order to better assist how to help treat,
11 and that's how I conducted this portion
12 of the pelvic exam.
13     Q.   So you're not in any way
14 suggesting that the bimanual exam you did
15 simulated the amount of force that might
16 be placed upon the vagina during sex?
17     A.   It can be more or less.  It
18 just depends.  I...
19     Q.   But you were able to get her
20 to say there was pain when you pressed
21 hard enough in certain areas?
22     A.   That would be correct.
23     Q.   So you do not deny the fact
24 that she may have pain during

Page 316

1 intercourse?
2     A.   Well, right now, she said
3 she hadn't had intercourse after Dr.
4 Heit's surgery.  That's what she told me.
5     Q.   You understand it was her
6 testimony that she stopped having sex
7 because it was excruciatingly painful,
8 correct?
9     A.   That is correct.  That's
10 what Dr. Lackey wrote in his report.  He
11 said -- or in his notes, they've pretty
12 much given up on it, but if you complain
13 of dyspareunia and you do surgery to try
14 and fix it -- let me rephrase that.
15         After a particular surgery
16 one would think you would want to retry
17 just in case it didn't hurt, and by
18 removing the Prolift, the area of
19 tenderness that Dr. Heit palpated was no
20 longer tender.  It was the posterior
21 direction of the vagina and the lateral
22 aspects in the levator ani muscles that
23 were tender, not where the Prolift was.
24     Q.   Do you intend to offer an

Page 317

1 opinion that Ms. Hammons does not suffer
2 from dyspareunia?
3         MR. MORIARTY:  Objection.
4     Go ahead.
5     A.   At this point in time.  If
6 she has had intercourse that caused pain,
7 I absolutely believe her.
8     Q.   You have no reason not to
9 believe her?
10     A.   But since she told me she
11 has not tried to have sex since 2012, I
12 don't know if she would still have pain
13 with intercourse.
14     Q.   Do you have any reason not
15 to believe the testimony she gave about
16 the pain she experienced the last time
17 she tried intercourse?
18     A.   In my office I absolutely
19 believe that when she told me she had
20 pain with intercourse, I do believe her.
21 But since Dr. Heit did his surgery, I
22 don't know if it would still be painful
23 or not.
24     Q.   Because she's too scared to

Page 318

1  try because it was so excruciatingly
2  painful the last time she tried, correct?
3       MR. MORIARTY:  Objection.
4    A.   Well, she couldn't tell me
5  why.
6    Q.   Right.  And we already went
7  over that.  You're not familiar with the
8  rules of Pennsylvania civil procedure or
9  what the scope of the exam was going into
10  it?
11    A.   I'm not familiar with the
12  Pennsylvania ruling, right.
13    Q.   Right. Right. Okay.  So
14  you had the deposition testimony and you
15  have no reason to disbelieve what she
16  testified to under oath?
17    A.   Well, at one point she
18  testified under oath she didn't know she
19  was having mesh put in, but in the
20  nurse's pre-op notes for Dr. Baker's
21  surgery, it says typed in, per patient,
22  patient -- patient understands her
23  surgery, and the two nurses wrote in
24  independently that she was having her

Page 319

1  bladder tucked with mesh so...
2    Q.   I'm just trying to get a
3  clear answer from you, and I need to know
4  the extent of your opinions.
5       So do you intend to get up
6  at trial and say that Ms. Hammons is a
7  liar and that she was not speaking
8  truthfully about her dyspareunia in her
9  deposition?
10       MR. MORIARTY:  Objection.
11  Go ahead.
12    A.   No.  I think you're
13  mischaracterizing.
14    Q.   Okay.  Do you intend to
15  testify that Ms. Hammons was not truthful
16  in her deposition?
17       MR. MORIARTY:  Objection.
18  She just answered your question.
19       MS. BALDWIN:  She said I
20  mischaracterized it, so I
21  rephrased it.  Go ahead.
22       THE WITNESS:  I would hope
23  that Mrs. Hammons was as truthful
24  as she could during her

Page 320

1  deposition, but we're talking
2  about dyspareunia which is pain
3  that only occurs during
4  intercourse.
5       So if she hasn't tried it
6  after Dr. Heit did his surgeries,
7  we can't find out where she hurts.
8  We don't know where she hurts, if
9  she hurts during intercourse.
10  BY MS. BALDWIN:
11    Q.   Doctor, do you know to what
12  extent the anterior Prolift caused Ms.
13  Hammons' vagina to shrink?
14       MR. MORIARTY:  Objection.
15  Form.  Go ahead.
16    A.   Well, one, we don't have a
17  measurement of Mrs. Hammons' vagina
18  beforehand, and then a vaginal
19  hysterectomy has been shown to decrease
20  vaginal length by about one and a half,
21  1.8 centimeters.
22    Q.   What's the average vaginal
23  length?
24    A.   Average, around 10

Page 321

1  centimeters, plus or minus 1.2
2  centimeters, something like that.
3    Q.   When you did your vaginal
4  exam, you measured her vagina to be
5  approximately 6 centimeters?
6    A.   Six to eight, actually.
7  That's mea culpa here.  It should have
8  been eight instead of six.
9    Q.   I'm sorry.  Which document
10  are you looking at?
11    A.   I am looking at the office
12  exam, the contemporaneous note.  First,
13  at the top the age is wrong because we
14  were not allowed to have her birthday,
15  and I had no documents as to her
16  birthday.  So eight months, one week
17  was -- they put today's date as her
18  birthday.
19    Q.   Can I just interrupt you
20  right there?  You had her deposition,
21  correct?
22    A.   Yes, but I did not have the
23  documents in my office.
24    Q.   Okay.  Okay.  But you had it

Julie Drolet, M.D.

Page 322

1  in your possession, correct?
2      A.   I had documents in my
3  possession but not that moment, that day,
4  that second that she came to the office.
5  And for me to be able to put anything on
6  EMR, we have to have a birth date.  So
7  since she didn't want to give hers and I
8  couldn't remember exactly, my front end
9  office staff put the date of the...
10     Q.   Right.
11     A.   Okay.
12     Q.   So for convenience, they put
13 a random date of 1/1/15 in there as a
14 placeholder because you had access to
15 that information.  You had her
16 deposition, correct?
17     A.   But I did not have it in the
18 office that Monday morning or Tuesday
19 morning when she came to the office.
20     Q.   Correct.  But you had it
21 somewhere that you could have, if you
22 wanted to, gone and got it?
23     A.   Not easily.  I would have
24 had to leave the office, drive home, go

Page 323

1  and look and come back.
2      Q.   The point is, they put a
3  placeholder date in there?
4      A.   They did.
5      Q.   Okay.  Going down.  Where is
6  the 6 centimeters?
7      A.   If we go to page 2 and we go
8  to the area where you had pointed to me
9  bimanual exam.
10     Q.   Yes.
11     A.   One, two, three, four lines
12 down, you have minus two, comma, AP,
13 minus two, GH, general hiatus, 3.5,
14 perineal body, 1.5.  TVL that should
15 have been 8.
16     Q.   We're at TVL 6 centimeters,
17 and you say that should be 8 centimeters?
18     A.   Correct.
19     Q.   What are you basing that on?
20 Your memory?
21          MR. MORIARTY:  Objection.
22     A.   No.  I had a graduated
23 measured speculum that measured it point
24 C where the scarring in the posterior

Page 324

1  vagina was at minus six in a posterior
2  direction toward the sacrospinous
3  ligaments.
4          And that is probably due to
5  the sacrospinous fixation using mesh that
6  Dr. Heit put in, plus the two enterocele
7  repairs, plus the two previous rectocele
8  repairs where you have vagina that is
9  very adherent and scarred posteriorly,
10 but in a direct angle where I put in the
11 speculum, that measured eight.
12     Q.   Correct.  I'm asking you,
13 that eight measurement, did you write
14 that down somewhere on some other
15 document or are you getting that from
16 your memory?
17          MR. MORIARTY:  Objection.
18 It's right in the report.
19          MS. BALDWIN:  Well, I'm
20 looking at the number, and it says
21 6 centimeters through.
22          THE WITNESS:  Yeah, but --
23          MS. BALDWIN:  So please stop
24 coaching the witness.  It says

Page 325

1  six, and now you're saying eight.
2          THE WITNESS:  It says
3  nontender up to 6 to 8
4  centimeters, so easily put in
5  something at 8 centimeters, that's
6  her vaginal length.
7          When I do a bimanual exam
8  with my fingers, I do not have a
9  ruler marked on my glove exactly.
10 That's why I put six to eight.
11 BY MS. BALDWIN:
12     Q.   Okay.  So bimanual midline,
13 you're using your fingers to approximate
14 which is where you put approximately 6 to
15 8 centimeters beyond the hymen?
16     A.   Correct.  Because --
17     Q.   That's based on your finger
18 approximation?
19     A.   Yes, ma'am.
20     Q.   Okay.  And then below where
21 you actually use the ruler, you put a
22 six?
23     A.   And that is a typo because
24 the total vaginal length is longer than

Julie Drolet, M.D.

Page 326

1 the actual point C.
2     Q.  And you're basing that on
3 your memory, not something that you have
4 written down.  You're basing that on your
5 memory of what happened?
6     A.  Yes.
7     Q.  Okay.  Because you didn't
8 record that measurement somewhere?
9     A.  Well, yes.  I said eight
10 here on bimanual exam.
11     Q.  Right.  You said
12 approximately six to eight when you used
13 your glove which was not marked?
14     A.  Where it wasn't tender until
15 approximately 6 to 8 centimeters.
16     Q.  Using your fingers inserted
17 in a glove which was not marked with the
18 centimeter measurements?
19     A.  Right, but my fingers are
20 longer than 6 centimeters.
21     Q.  Right.  But you didn't mark
22 on your glove somewhere exactly where it
23 was, did you?
24     A.  No, but it might have even

Page 327

1 been more than eight as far as
2 tenderness, but no.  That's why I put six
3 to eight.
4     Q.  That's why you put
5 approximately six to eight, right?
6     A.  That is correct.  That's
7 what I put in in the bimanual midline
8 exam.
9     Q.  Right.  And then when you
10 used the ruler, the number that you typed
11 in was 6 centimeters, correct?
12     A.  Yes.  And I just said this
13 is a typo here.
14     Q.  Did you type this at the
15 time you were doing the exam or just
16 after?
17     A.  I started right after under
18 the watchful eye of Dr. Dagostino while
19 Mrs. Hammons was getting dressed and
20 going to the bathroom.
21     Q.  And then if we go to the
22 typed report that you authored about the
23 exam, I can get you a copy of that.  Hang
24 on a minute.

Page 328

1     A.  Thank you.
2     Q.  Hang on a second.  I was
3 organized a few hours ago.
4         MS. BALDWIN:  So let's mark
5 this as Exhibit -- Exhibit-17.
6         (Whereupon, a document was
7 marked for identification as
8 Drolet Exhibit No. 17.)
9         MS. BALDWIN:  Matt, do you
10 want one to look at?
11         MR. MORIARTY:  Sure.
12 BY MS. BALDWIN:
13     Q.  So this is the typed report
14 that you did following the exam, correct?
15     A.  That is correct.
16     Q.  After you made these notes
17 on the previous exhibit?
18     A.  Yes.
19     Q.  Okay.  So if we go to this
20 one and we go to the very bottom
21 paragraph of the first page, we have
22 speculum insertion and bimanual
23 examination respecting the normal vaginal
24 axis along the --

Page 329

1     A.  Where are you?  I'm so
2 sorry.
3     Q.  That's okay.  Last
4 paragraph.
5         MR. MORIARTY:  Of the first
6 page?
7         MS. BALDWIN:  First page,
8 yes.
9         THE WITNESS:  Okay.
10 BY MS. BALDWIN:
11     Q.  Got there?
12     A.  Yes.  I...
13     Q.  Okay.  Speculum insertion
14 and bimanual examination respecting the
15 normal vaginal axis along the ATFP is
16 nontender up to approximately 8
17 centimeters above the hymen, parens,
18 deeper than the apex.
19         Did I read that correctly?
20     A.  Correct.
21     Q.  And that's your
22 approximation done with your glove
23 measurement, correct?
24     A.  Yes and no.  The speculum

Julie Drolet, M.D.

1  went in easily up to 8 centimeters.
2      Q.   Okay.  And then you said:
3  Her true apex is difficult to precisely
4  ascertain as there is a posterior
5  deviation of the upper posterior vaginal
6  wall, 6 centimeters above the hymen,
7  associated with scar tissue and pain to
8  the touch of that specific area.
9         Did I read that correctly?
10     A.   You read that correctly.
11     Q.   So she has pain to the touch
12 6 centimeters above the hymen?
13     A.   Posteriorly.
14     Q.   Okay.
15     A.   Yes.
16     Q.   And I think I asked you
17 this, but I think we got off topic.
18 Forgive me if I've already asked you, and
19 I don't recall.
20        Do you know how much the
21 hysterectomy actually shrunk Ms. Hammons'
22 vagina, if at all?
23     A.   We don't know because we
24 don't have a measurement of Mrs. Hammons'

1  vagina before, after Dr. Baker's surgery,
2  after -- before Dr. Lackey's surgery,
3  after Dr. Lackey's enterocele and
4  rectocele repair, and we don't have any
5  measurements, you know.
6      Q.   So, similarly, you can't
7  tell me how much specifically Dr.
8  Lackey's surgery, the posterior repair,
9  shrunk her vagina, if at all?
10     A.   I can't tell you
11 specifically.  You are correct.
12     Q.   Right.  So you also couldn't
13 say how much the anterior Prolift shrunk
14 her vagina?
15     A.   Well, now that it's removed,
16 it might not have shortened it at all.
17 The anterior Prolift has not been
18 described, from what I read from this
19 reliance list, that it causes significant
20 shortening of the vagina.
21     Q.   Do you know -- I just want
22 to clarify that.
23        Do you believe there's a
24 risk of vaginal shortening from the

1  anterior Prolift?
2      A.   From any surgery, yeah.
3  That's possible.
4      Q.   Okay.  So you can't give an
5  opinion to a reasonable degree of medical
6  certainty which of Ms. Hammons' pelvic
7  surgeries, if any, shortened her vagina?
8         MR. MORIARTY:  Objection.
9  Go ahead.
10     A.   I think in centimeters or
11 millimeters, that would be a correct
12 assumption.
13     Q.   By the way, there's nothing
14 in the Prolift labeling that warns of the
15 risk of a reduction in the size of a
16 vagina from a Prolift implant, correct?
17     A.   I'd have to relook, and I
18 don't specifically recall this second.
19     Q.   If Ethicon was aware that
20 the mesh contraction with the Prolift
21 could create an increased risk of a
22 shrunken vagina more so than the risks
23 faced by other pelvic surgeries, then
24 Ethicon had a duty to warn about that

1  risk, correct?
2         MR. MORIARTY:  Objection.
3      A.   I would have wanted Ethicon
4  to let us know if they were aware of
5  these clinical significant factors.
6      Q.   Right.
7      A.   If they were.
8      Q.   If Ethicon had knowledge of
9  clinically significant risk factors that
10 were different or greater than the
11 severity, frequency or treatability of
12 the known risks of other pelvic
13 surgeries, you would have wanted to know
14 that, correct?
15        MR. MORIARTY:  Objection.
16 Asked and answered many times.  Go
17 ahead.
18     A.   If they were clinically more
19 significant, yes.
20     Q.   Ms. Hammons never complained
21 of pain with intercourse prior to her
22 Prolift implant, correct?
23     A.   And her vaginal
24 hysterectomy, that is correct.  That we

Julie Drolet, M.D.

Page 334

1 know of.
2     Q.   She never complained of pain
3 associated with vaginal atrophy prior to
4 Dr. Baker's surgery in May of 2009?
5         MR. MORIARTY:  Objection.
6     A.   I don't know if she was
7 aware if she had vaginal atrophy.  So
8 pain with sex, she did not complain of
9 it.
10     Q.   Do you have any opinion that
11 Ms. Hammons' back pain or problems with
12 her back is somehow related to her
13 current pelvic complaints?
14     A.   Well, one, she doesn't have
15 general pelvic complaints.
16     Q.   Well, her dyspareunia?
17     A.   She has pain with
18 intercourse, yes.
19     Q.   Do you believe that's at all
20 related or do you intend to offer an
21 opinion that that's related to her back
22 pain?
23     A.   I think there is a -- there
24 may be an association with sacroiliac

Page 335

1 joint dysfunction and levator ani
2 myorrhaphy -- or, pardon me, levator ani
3 tenderness that can contribute to
4 dyspareunia, but, again, I would have to
5 be able to ask her where it hurt when she
6 and her partner would have intercourse in
7 order to figure out the etiology of the
8 pain.
9     Q.   She never had complaints of
10 dyspareunia before May of 2009, Dr.
11 Baker's surgery, but she did have known
12 problems with her back pain at that time,
13 correct?
14     A.   Yes.  She did have known
15 back pain at that time.
16     Q.   And no complaints of
17 dyspareunia at that time?
18     A.   Not at that time but things
19 evolve.
20     Q.   Do you intend to offer any
21 opinion that Ms. Hammons' current
22 complaints of dyspareunia are related to
23 her knee problems?
24     A.   Not directly.

Page 336

1     Q.   Do you intend to offer any
2 opinion that Ms. Hammons' problems with
3 her hip pain are related to her current
4 complaints of dyspareunia?
5     A.   Not directly related.
6     Q.   When you say not directly,
7 what do you mean by that?
8     A.   Well, when you throw off a
9 joint that affects your posture, she is
10 walking with a cane.  That can throw off
11 your pelvic floor ligaments and muscles
12 and cause levator ani muscle tenderness.
13 It's a very intricate relationship
14 between the back, the nerves, the pelvic
15 floor muscles and pain.
16     Q.   The back, the knees and the
17 hips were not causing her to suffer from
18 dyspareunia up until the time she had her
19 surgery by Dr. Baker in May of 2009,
20 correct?
21     A.   That is correct.  At that
22 time it didn't appear so.
23     Q.   If Ms. Hammons did not have
24 the anterior Prolift put in, she never

Page 337

1 would have had to have a removal of the
2 Prolift by Dr. Heit in 2012, correct?
3     A.   That is correct.  If she
4 didn't have it in, she didn't need to
5 have it out.
6     Q.   If Ms. Hammons had not had
7 the Prolift put in in May of 2009 by Dr.
8 Baker, Dr. Heit would not have put the
9 holes in her bladder in 2012 when he
10 removed the mesh, correct?
11     A.   If he had not...
12     Q.   If she never had the mesh?
13     A.   If she had never had the
14 mesh.
15     Q.   She never would have had the
16 holes in her bladder?
17     A.   By Dr. Heit, probably not.
18     Q.   Do you believe that Dr.
19 Baker put holes in her bladder?
20     A.   I don't think so.  He didn't
21 put a direct hole in it.
22     Q.   Do you believe that Dr.
23 Lackey put holes in her bladder?
24     A.   No.

Julie Drolet, M.D.

Page 338

1    MR. MORIARTY: When it's
2  convenient, I'd like to take a
3  couple minute break.
4    MS. BALDWIN: Sure. We can
5  do it now.
6    THE VIDEOGRAPHER: The time
7  is now 4:19, and we are going off
8  camera.
9    (A short break was taken.)
10    THE VIDEOGRAPHER: The time
11  is now 4:29, and we are back on
12  camera.
13    MR. MORIARTY: What time did
14  we go off?
15  BY MS. BALDWIN:
16    Q.  Doctor, did you rely on any
17  literature evidence about the safety of
18  or efficacy of TVT devices or other
19  stress urinary incontinence devices in
20  forming your opinions in this case?
21    A.  Not particularly.
22    Q.  Do you agree that randomized
23  controlled trials are the gold standard
24  for clinical studies?

Page 339

1    MR. MORIARTY: Objection.
2  Go ahead.
3    A.  I think for certain things,
4  medical treatments, randomized controlled
5  trials are the best but not for all.
6    Q.  What about for medical
7  devices?
8    A.  Since I am not a
9  statistician, I wouldn't be able to say
10  to a hundred percent medical certainty
11  that the random -- a randomized
12  controlled study would be a gold
13  standard.
14    Q.  Do you know that the Prolift
15  was released onto the market without any
16  randomized controlled trials?
17    A.  I do believe that it was a
18  cohort study.
19    Q.  Should Ethicon have done
20  randomized controlled trials on the
21  Prolift before launching it onto the
22  market?
23    MR. MORIARTY: Objection.
24  Go ahead.

Page 340

1    A.  I don't know what the FDA
2  requires or not before launching things
3  on the market so...
4    Q.  You don't have any opinion
5  in that regard about what studies should
6  have been done when it was released onto
7  the market?
8    A.  Would a randomized
9  controlled study -- would I wish that a
10  randomized controlled study had been
11  done? Yes.
12    MS. BALDWIN: Doctor, I
13  don't have any other questions for
14  you. Thank you.
15    MR. MORIARTY: I have a
16  couple.
17    MS. BALDWIN: Go ahead.
18    MR. MORIARTY: Can I have
19  the exhibit with the drawing,
20  because that's the only exhibit I
21  haven't seen.
22    MS. BALDWIN: I have an
23  extra copy if you need one.
24    MR. MORIARTY: Yeah, but she

Page 341

1  only drew on this one.
2    MS. BALDWIN: Okay.
3    MR. MORIARTY: And it's
4  going to copy very poorly, I can
5  tell.
6    * * *
7    EXAMINATION
8  BY MR. MORIARTY:
9    Q.  Doctor, I just have a couple
10  things. Within the last week did you
11  check the financial records of your
12  practice to see whether you ever got paid
13  for work done under any of the Ethicon
14  consulting contracts that Ms. Baldwin
15  asked you about?
16    A.  Yes.
17    Q.  And were there payments
18  beyond the $2,000 fee that you thought
19  was for one proctor in the facility?
20    A.  For consultant fee, no.
21    Q.  Okay. Anything other than
22  the proctor fee and small expense
23  reimbursements for going to Baltimore or
24  Allentown?

Julie Drolet, M.D.

Page 342

1    A.   Correct.
2    Q.   So there were no more?
3    A.   No more.
4    Q.   Okay.  Do you know anything
5  about what these company documents are
6  that reflect these higher amounts?
7    A.   No, I do not.
8    Q.   Ms. Baldwin asked you some
9  questions about severity, frequency,
10  treatability, things of that nature.  Do
11  you remember those questions?
12    A.   There were so many asked in
13  so many forms.
14    Q.   All right.  Do you as a
15  urogynecologist or obstetrician and
16  gynecologist typically get that kind of
17  information from the IFU or from the
18  periodic medical literature?
19        MS. BALDWIN:  Objection to
20    the form.
21    A.   Mostly from the medical
22  literature.
23    Q.   Do you know -- let me ask
24  that a different way.

Page 343

1        If the clinical reports for
2  either Gynemesh PS or Prolift were in the
3  materials that you reviewed that's in
4  these two brief -- or these suitcases and
5  the one box, are they likely in your
6  reliance list?
7    A.   If they were in that box, I
8  would hope they'd be in that reliance
9  list.
10    Q.   You just don't know if
11  sitting here today whether you reviewed
12  what were termed clinical reports?
13        MS. BALDWIN:  Objection to
14    the form.
15    A.   What the title of it was, I
16  agree.  I can't to a hundred percent
17  certainty.  There are two suitcases and a
18  box of documents there.
19    Q.   Have you -- do you perform
20  midurethral sling procedures?
21    A.   Yes, I do.
22    Q.   Do those come with IFUs?
23  Instructions for use?
24    A.   No, they do not.

Page 344

1    Q.   The midurethral slings, when
2  they come out of the box, don't have an
3  IFU?
4    A.   Not the box we have.
5    Q.   Okay.
6    A.   I've never seen --
7    Q.   Do you have experience in
8  putting in other medical devices besides,
9  like, Gynemesh PS, Restorelle, Prolift
10  and midurethral slings?
11    A.   Yes.
12    Q.   All right.  So have you had
13  experience in your career reading the
14  instructions for use that come with the
15  products?
16    A.   Yes, I have.
17    Q.   All right.  And do you have
18  experience in analyzing medical
19  literature about the procedures that are
20  associated with those medical devices?
21    A.   Yes.
22    Q.   And then do you draw from
23  your own experience what the risks,
24  possible risks, and complications of

Page 345

1  particular procedures are?
2    A.   From my own experience, plus
3  the literature, plus whatever information
4  I can gather, but it's a combination of
5  it all.
6    Q.   All right.  So do you
7  believe that you have some expertise in
8  evaluating whether an IFU adequately
9  conveys to you the clinical risks and
10  complications of a procedure done with a
11  medical device?
12        MS. BALDWIN:  Objection to
13    form.
14    A.   Yes.  I think that I would
15  be able to see if something was adequate.
16    Q.   I want to ask you about
17  apical repair.  Were you taught about
18  apical repair in your residency?
19    A.   Yes.
20    Q.   Do you believe, to the best
21  of your knowledge, that that is a typical
22  part of an obstetric and gynecologic
23  residency?
24        MS. BALDWIN:  Objection to

Julie Drolet, M.B.

Page 346

1    form. Time? When?
2    Q.   The early 2000s.
3    A.   Yes.
4    Q.   Or the 1990s?
5    A.   Well, 'til '94 for me.
6    Q.   So do you believe that the
7    roll of and need for apical repair was
8    well-known to the gynecologic community
9    before 2009?
10       MS. BALDWIN:  Objection to
11   form.
12   A.   Yes, I do.
13   Q.   Do you believe that by 2009,
14   reasonable, prudent gynecologic surgeons,
15   whether through their training, the
16   medical literature or continuing medical
17   education, would have been aware of the
18   need to repair an apex when a patient had
19   a uterine or vaginal vault prolapse?
20       MS. BALDWIN:  Objection to
21   form.
22   A.   Depending on the degree of
23   descent, yes.
24   Q.   Do you believe that

Page 347

1    reasonable, prudent gynecologic surgeons
2    like those I just described would need a
3    medical device company to explain the
4    need for apical repair to them for an IFU
5    or any other material?
6    A.   No.  I didn't -- wouldn't
7    expect that.
8    Q.   I'd like you to look at
9    Exhibit-13, please.
10       MS. BALDWIN:  Matt, could
11   you just tell me what that is?
12       MR. MORIARTY:  Yeah.  That's
13   the surgeon's resource monograph.
14       MS. BALDWIN:  Thank you.
15       THE WITNESS:  And may I turn
16   the air off, please?
17       MS. BALDWIN:  Sure.  Sure.
18   BY MR. MORIARTY:
19   Q.   Exhibit-13, do you have it?
20   A.   Yes, I do.
21   Q.   I'd like you to go to this
22   DX 10140.29, and I'd like you to go --
23       MR. MORIARTY:  Do you have
24   it, Kila?

Page 348

1        MS. BALDWIN:  Yeah.  I'm
2    sorry.  What page again?
3        MR. MORIARTY:  .29.
4        MS. BALDWIN:  Thank you.
5    BY MR. MORIARTY:
6    Q.   Do you see, Doctor, in the
7    total repair in the absence of a
8    posterior defect, anterior/apical repair,
9    do you see that section on that page?
10   A.   Yes.  Yes.
11   Q.   And then you have the next
12   section is called anterior repair with
13   hysterectomy.  Do you see that?
14   A.   Yes, I do.
15   Q.   Okay.  So go two little
16   paragraphs above anterior repair with
17   hysterectomy.  Does it say:  The
18   suspension of the uterus, in cases of
19   uterine preservation, or the vaginal
20   vault, in cases of concomitant or
21   previous hysterectomy, relies on the
22   posterior segment of the total implant.
23       Do you see that?
24       MS. BALDWIN:  Objection to

Page 349

1    form.
2    A.   Yes, I do.
3    Q.   Would a surgeon doing an
4    anterior Prolift only know that there is
5    no posterior segment involved?
6        MS. BALDWIN:  Objection to
7    form.
8    Q.   Posterior segment of an
9    implant involved?
10   A.   Can you repeat that
11   question, please?
12   Q.   Sure.  Would a surgeon
13   know -- would a surgeon who's only doing
14   an anterior Prolift know that there is no
15   posterior segment of the total implant?
16   A.   If only using an anterior
17   Prolift, there is no posterior implant
18   associated with an anterior Prolift.
19   Q.   Okay.  And would that mean
20   that the surgeon would have to do a
21   repair of the apex with some other device
22   or technique?
23   A.   If there was an apical vault
24   prolapse or uterine descent, yes.

Julie Drolet, M.D.

Page 350

1       MR. MORIARTY:  That's all I
2   have.  Oh, wait.  I'm sorry.
3   That's not all I have.
4       MS. BALDWIN:  Go ahead.
5   BY MR. MORIARTY:
6       Q.   This Exhibit-16, I know it's
7   the only drawing we had available, but
8   does this accurately depict the situation
9   that Dr. Baker was faced with on May
10  9 -- I'm sorry, May 5, 2009?
11      A.   Is that the day of the
12  surgery?
13      Q.   Yeah.
14      MS. BALDWIN:  Objection to
15  form.
16      A.   Before or after?
17      Q.   Either?
18      A.   None of it.
19      Q.   Okay.  Were you just doing
20  the best you could with the only drawing
21  we had available today?
22      A.   Yes, 'cause this says normal
23  pelvic anatomy.
24      Q.   Okay.

Page 351

1       A.   With a uterus.
2       MR. MORIARTY:  Thanks.
3   That's all.
4       MS. BALDWIN:  I don't have
5   any other questions for you,
6   Doctor.
7       My question that I did want
8   to do on the record is that Lisa
9   Dagostino went through your file
10  and saw some notes on things but
11  couldn't go through all of it.
12      MR. MORIARTY:  Time out.  We
13  can go off the video.
14      MS. BALDWIN:  We can go off
15  the video record for this.  Sure.
16      THE VIDEOGRAPHER:  The time
17  is now 4:43, and this concludes
18  DVD number 4 and the deposition.
19      MS. BALDWIN:  What I'd like
20  to do then for the stenographic
21  record is mark your entire file as
22  Exhibit-18, and what I'd ask you
23  to do is have someone copy her
24  entire file and have it shipped to

Page 352

1   us.  I'm happy to pay the costs
2   associated with that.
3       MR. MORIARTY:  Can we just
4   send you DVDs of what's in there?
5       MS. BALDWIN:  Yeah, but I
6   need her handwritten copies.  I
7   want to see her highlighted
8   handwritten copies.
9       MR. MORIARTY:  Do you want
10  just want copies on the things on
11  which there is handwriting?
12      MS. BALDWIN:  I'd like to
13  see it all to review because I
14  need to see what there's not and
15  what there is, if that makes
16  sense.
17      MR. MORIARTY:  It does.
18      MS. BALDWIN:  Again, it's
19  burdensome.
20      MR. MORIARTY:  I'll tell
21  you, I spent several hours going
22  through it yesterday.  There's a
23  substantial amount of material in
24  there on which there are no

Page 353

1   highlighting and no writing.  You
2   want it all?
3       MS. BALDWIN:  Yes.
4       MR. MORIARTY:  Okay.
5       MS. BALDWIN:  If you want to
6   have it scanned as opposed to hard
7   copying and send it on DVD
8   scanned, that's fine.
9       MR. MORIARTY:  I'm just
10  going to have to find a local
11  Kinkos and find out what the
12  project is going to entail, what
13  it's going to cost, and we'll get
14  you an estimate before we even do
15  it.
16      MS. BALDWIN:  Okay.
17      MS. DAGOSTINO:  Can we keep
18  her file sort of as in toto, and
19  if she gets anything else in the
20  course of this litigation that it
21  would be not added to this file
22  specifically.  It would be kind of
23  kept separate.
24      MR. MORIARTY:  I told you

Julie Drolet, M.D.

Page 354

1   what has been added, so we will
2   continue --
3          MS. DAGOSTINO:  But from
4   this point forward.
5          MR. MORIARTY:  Yeah.  That's
6   all fine.
7          MS. BALDWIN:  We can go off
8   the record.
9          (Deposition was concluded at
10   4:47 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 356

1          INSTRUCTIONS TO WITNESS
2
3          Please read your deposition
4   over carefully and make any necessary
5   corrections.  You should state the reason
6   in the appropriate space on the errata
7   sheet for any corrections that are made.
8          After doing so, please sign
9   the errata sheet and date it.  It will be
10   attached to your deposition.
11          It is imperative that you
12   return the original errata sheet to the
13   deposing attorney within thirty (30) days
14   of receipt of the deposition transcript
15   by you.  If you fail to do so, the
16   deposition transcript may be deemed to be
17   accurate and may be used in court.
18
19
20
21
22
23
24

Page 355

1          C E R T I F I C A T E
2
3          I do hereby certify that I
    am a Notary Public in good standing, that
    the aforesaid testimony was taken before
4   me, pursuant to notice, at the time and
    place indicated; that said deponent was
5   by me duly sworn to tell the truth, the
    whole truth, and nothing but the truth;
6   that the testimony of said deponent was
    correctly recorded in machine shorthand
7   by me and thereafter transcribed under my
    supervision with computer-aided
8   transcription; that the deposition is a
    true and correct record of the testimony
9   given by the witness; and that I am
    neither of counsel nor kin to any party
10   in said action, nor interested in the
    outcome thereof.
11
12
13
14          WITNESS my hand and official
    seal this 18th day of November, 2015.
15
16
17          _____
                LAUREN A. MOORE
18              Notary Public
19
20
21
22
23
24

Page 357

1          - - - - - -
            E R R A T A
2          - - - - - -
3   PAGE  LINE  CHANGE
4   ____  ____  _____
5     REASON: _____
6   ____  ____  _____
7     REASON: _____
8   ____  ____  _____
9     REASON: _____
10   ____  ____  _____
11     REASON: _____
12   ____  ____  _____
13     REASON: _____
14   ____  ____  _____
15     REASON: _____
16   ____  ____  _____
17     REASON: _____
18   ____  ____  _____
19     REASON: _____
20   ____  ____  _____
21     REASON: _____
22   ____  ____  _____
23     REASON: _____
24   ____  ____  _____

Julie Drolet, M.D.

Page 358

ACKNOWLEDGMENT OF DEPONENT

1
2
3       I,_____, do
    hereby certify that I have read the
    foregoing pages, and that the same
4   is a correct transcription of the answers
    given by me to the questions therein
5   propounded, except for the corrections or
    changes in form or substance, if any,
6   noted in the attached Errata Sheet.
7

_____
8   JULIE DROLET, M.D.        DATE
9
10
11
12
13
14

    Subscribed and sworn
15  to before me this
    _____ day of _____, 20____.
16
    My commission expires:_____
17
18
    _____
    Notary Public
19
20
21
22
23
24
25

Page 359

LAWYER'S NOTES

1
2   PAGE  LINE
3   ____  ____  _____
4   ____  ____  _____
5   ____  ____  _____
6   ____  ____  _____
7   ____  ____  _____
8   ____  ____  _____
9   ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____
25