# EXHIBIT E

Stanton Shoemaker, M.D.

```
 1            IN THE UNITED STATES DISTRICT COURT

          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

 2                    CHARLESTON DIVISION

 3

     IN RE: ETHICON, INC.,      Master File No. 2:12-MD-02327

 4   PELVIC REPAIR SYSTEM                MDL 2327

     PRODUCTS LIABILITY

 5   LITIGATION

 6   _____         JOSEPH R. GOODWIN

                                 U.S. DISTRICT JUDGE

 7   THIS DOCUMENT RELATES

     TO:

 8

     Jane Doe

 9   Case No. 2:12-cv-00000

10

11

12

            ORAL DEPOSITION OF STANTON SHOEMAKER, M.D.

13                    APRIL 5, 2016

14

15        ORAL DEPOSITION OF STANTON SHOEMAKER, M.D., produced

16   as a witness at the instance of the Plaintiffs and duly

17   sworn, was taken in the above styled and numbered cause on

18   Tuesday, April 5, 2016, from 9:11 a.m. to 2:14 p.m.,

19   before RENE WHITE MOAREFI, CSR, CRR, RPR in and for the

20   State of Texas, reported by computerized stenotype

21   machine, at the offices of Sico, Hoelscher, Harris &

22   Braugh, 802 N. Carancahua, Suite 900, Corpus Christi,

23   Texas, pursuant to the Federal Rules of Civil Procedure

24   and any provisions stated on the record herein.
```

Stanton Shoemaker, M.D.

---

**Page 2**

1 A P P E A R A N C E S
2
FOR THE PLAINTIFFS:
3 DOUGLAS C. MONSOUR, ESQ.
 KATY KROTTINGER, ESQ.
4 THE MONSOUR LAW FIRM
 404 North Green Street
5 Longview, Texas 75601
 903.758.5757
6 doug@monsourlawfirm.com
7
FOR THE DEFENDANTS:
8 N. KAREN "KAY" DEMING, ESQ.
 TROUTMAN SANDERS, LLP
9 600 Peachtree Street, N.E., Suite 5200
 Atlanta, Georgia 30308
10 404.885.3124
 karen.deming@troutmansanders.com
11
12 FOR THE PLAINTIFF DONNA LOUSTAUNAU:
 P. ANN GAYLE, ESQ.
13 AYLSTOCK, WITKIN, KRIES & OVERHOLTZ, PLLC
 17 E. Main Street, Suite 200
14 Pensacola, Florida 32502
 850.202.1010
15 agayle@awkolaw.com
16
FOR THE PLAINTIFF ANA RUEBEL:
17 SHARON BECK, ESQ. - VIA TELEPHONE
 FLEMING NOLEN JEZ, LLP
18 2800 Post Oak Boulevard, Suite 4000
 Houston, Texas 77056
19 866.977.6671
 sharon_beck@fleming-law.com
20
21 ATTORNEY FOR PLAINTIFFS DONNA AMSDEN AND KAREN BOLLINGER:
 SHEILA M. BOSSIER, ESQ. - VIA TELEPHONE
22 FREESE & GOSS
 1520 North State Street
23 Jackson, Mississippi 39202
 601.961.4050
24 SBossier@freeseandgoss.com

---

**Page 3**

1 I N D E X
2
    PAGE
3
4 APPEARANCES........................... 2
5 STANTON SHOEMAKER, M.D.
6 EXAMINATION
 By Mr. Monsour....................... 5
7 By Ms. Deming....................... 154
8 REPORTER'S CERTIFICATION.............. 158
9
10

11 E X H I B I T S

NO. DESCRIPTION  PAGE
12 Exhibit 1 Notice to Take Deposition
 of Dr. Stanton Shoemaker
13 (no Bates - 9 pages) 8
Exhibit 2 Defendants' Objections and
14 Responses to Plaintiffs'
 "Notice to Take Deposition
15 of Dr. Stanton Shoemaker"
 (no Bates - 11 pages) 11
16 Exhibit 3 Handwritten notes
 (no Bates - 4 pages) 101
17 Exhibit 4 E. Stanton Shoemaker
 Reliance List in Addition
18 to Materials Referenced in
 Report, MDL Wave 1
19 (no Bates - 20 pages) 110
Exhibit 5 Handwritten notes
20 (no Bates - 6 pages) 116
Exhibit 6 General Report of E.
21 Stanton (Stan) Shoemaker,
 M.D., Regarding the TVT
22 and TVT-O Mid-Urethral
 Slings (no Bates - 33
23 pages) 154
24

---

**Page 4**

1 EXHIBITS (cont'd.)
2 NO. DESCRIPTION  PAGE
 Exhibit 7 General Report of E.
3 Stanton (Stan) Shoemaker,
 M.D., Regarding Gynemesh
4 PS, PROLIFT, PROLIFT +M
 AND PROSIMA
5 (no Bates - 38 pages) 154
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

---

**Page 5**

1 STANTON SHOEMAKER, M.D.,
2 having been duly sworn, testified as follows:
3 EXAMINATION
4 BY MR. MONSOUR:
5 Q. Would you please state your name.
6 A. Edward Stanton Shoemaker.
7 Q. Do you go by Stan Shoemaker?
8 A. Yes.
9 Q. Okay.  What do you do for a living, sir?
10 A. I'm a physician.
11 Q. Okay.  And what kind?
12 A. I practice OB/GYN.
13 Q. Okay.  Do you deliver babies?
14 A. Yes.
15 Q. Still do?
16 A. Unfortunately.
17 Q. Okay.  Why do you say unfortunately?
18 A. Well, normally by my age everybody's just doing
19 gynecology, but that's changed a lot.  And so -- actually,
20 I quit doing OB about -- for about a year and my practice
21 aged about 20 years in about two months.
22 So I decided, well, you know, I'd like to
23 have a little more diversity in terms of demographics and,
24 so I went back to doing some -- so I do OB light.

Stanton Shoemaker, M.D.

Page 6

1  MS. BECK: Can you have Dr. Shoemaker speak
2  up? I can't hear him.
3     MR. MONSOUR: Oh, they're saying they can't
4  hear you. I'm going to push this a little closer to
5  Dr. Shoemaker.
6     MS. DEMING: In fact, he delivered twins
7  this morning.
8     Q. (BY MR. MONSOUR) Delivered twins this morning?
9  Okay.
10    A. Well, I -- yeah, about 11:00 o'clock last night
11 so . . .
12    Q. Okay.
13    A. Yeah.
14    Q. All right. I was going to say, because I would
15 think doing OB, that's that -- that's got to be one of the
16 happiest parts of medicine, right?
17    A. It usually is.
18    Q. Yeah.
19    A. Yes.
20    Q. I mean, 95 percent of the time unless there's --
21 something bad happens, right?
22    A. Yes.
23    Q. Let me ask you a little bit about your -- your
24 practice. So you -- in this practice or in this

Page 7

1  litigation, we have gynecologists, we have urologists, we
2  have urogynecologists. Would you classify yourself by
3  your practice as a urogynecologist or gynecologist?
4     A. I'd say gynecologist.
5     Q. Okay.
6     A. Yes.
7     Q. Now, you have been practicing medicine -- I mean,
8  just give me the run-through of your -- of your education
9  and all that kind of stuff.
10    A. I'm from -- I grew up in Houston --
11    Q. Okay.
12    A. -- and went to college at UCLA out in California
13 and came back in the -- in 1969 and started med school at
14 Galveston. And I was there from 1969 to '73 and then went
15 from Galveston to UT Dallas at Southwestern from '73 to
16 '77 doing a residency in OB/GYN.
17    Q. Okay.
18    A. And then moved from there to Corpus in seventy --
19 the late '77 and have been there ever since.
20    Q. I looked on your Web site. It said -- and I'll
21 probably get this wrong, but you'll know where I'm going.
22 It said you opened the first OB/GYN practice in South
23 Texas?
24    A. I opened the first group practice.

Page 8

1     Q. What -- what's the difference there?
2     A. Well, there were several doctors that actually
3  came together and shared patients instead of having solo
4  practices that just had a call arrangement.
5     Q. Okay.
6     A. So we started that in Corpus --
7     Q. Okay.
8     A. -- in the late Seventies.
9     Q. Okay. So there were a lot of OB/GYNs in South
10 Texas. This was just the first time y'all got together as
11 a group?
12    A. Correct.
13    Q. Okay. And it looks like -- are you board
14 certified?
15    A. Yes.
16    Q. And what are you board certified in?
17    A. In OB/GYN.
18    Q. Okay. Okay. So I want to go through a couple of
19 things, if I could.
20    MR. MONSOUR: Do we have the notice for the
21 deposition?
22    Q. (BY MR. MONSOUR) So let me hand you,
23 Dr. Shoemaker --
24    (Exhibit 1 marked.)

Page 9

1     Q. (BY MR. MONSOUR) Here's Exhibit 1. And this is
2  the notice for your deposition.
3     I take it you at least were able to glance
4  at that before you got here; is that correct?
5     A. Yes. Well, I've seen it before. I can't
6  remember when.
7     Q. And it -- if you look kind of on -- starting on
8  page 7, it's got a list of things that you were supposed
9  to bring with you today. Do you see that?
10    A. Yes.
11    Q. And did you bring all that --
12    A. Yes.
13    Q. -- stuff that's requested?
14    A. Yes.
15    MS. DEMING: I think there were some
16 objections filed to some of them, and subject to those
17 objections, we've brought everything responsive that he
18 has.
19    MR. MONSOUR: Okay. And, Kay, you had
20 mentioned that you're going to be providing us with a
21 thumb drive later today. It's not --
22    MS. DEMING: I brought them --
23    MR. MONSOUR: Okay.
24    MS. DEMING: -- just so that we are abiding

Stanton Shoemaker, M.D.

Page 10

1  by the law. We don't want to run afoul a Texas judge, or
2  even Judge Goodwin.
3          So I brought the thumb drives that were sent
4  to him, okay, and these include the case-specific ones.
5  Later today -- apparently, FedEx does not deliver for
6  early delivery to a hotel here in Corpus Christi. So I
7  should have by lunchtime.
8          MR. MONSOUR: Okay.
9          MS. DEMING: If y'all need it, I can go over
10 to the hotel or have it couriered over. The thumb drives
11 that don't have -- that don't -- they'll have a password,
12 they're password protected because they have confidential
13 stuff, but it's the one that they give to the plaintiffs.
14         MR. MONSOUR: Okay.
15         MS. DEMING: So it's one that you've used
16 before. And I don't know what it is, but they'll tell
17 you.
18         MR. MONSOUR: And then the only other
19 question I have is could you tell me which objections,
20 which numbers they had objections lodged to?
21         MS. DEMING: I did not bring the -- let me
22 see if I've got the notice.
23         MR. MONSOUR: Or if you've got a copy of
24 your objections, I'll just attach --

Page 11

1          MS. DEMING: I don't have a copy of them,
2  but --
3          MR. MONSOUR: Ann does. Okay. So let me
4  look.
5          MS. DEMING: But if -- shoot, I left it at
6  the hotel.
7          MR. MONSOUR: What I'll do --
8          MS. DEMING: It's just some that are toward
9  the end that -- one is just very, very overly broad about
10 e-mails and -- because it's really not very specific, and
11 then the tax -- I know the tax ones they've -- they
12 objected to, so we're not providing tax documents. But
13 everything else either he didn't have anything, I believe,
14 or we brought what he has.
15         MR. MONSOUR: Okay. And I've got -- Ann
16 Gayle just handed me a copy of it. So I'm going to mark
17 it as Exhibit 2 for completeness purposes.
18         (Exhibit 2 marked.)
19         MS. DEMING: Okay. This meaning the
20 objection?
21         MR. MONSOUR: Yeah, the objections --
22         MS. DEMING: Oh, good, I did --
23         MR. MONSOUR: -- that's Exhibit 2.
24         MS. DEMING: No. 12 and No. 16 will stand on

Page 12

1  the objection for sure and then -- yeah, 12 and 16, I
2  believe.
3          MR. MONSOUR: 12 and 16.
4          MS. DEMING: And whichever one asks for tax
5  information. Yeah, 11 -- 11, 12, and 16.
6          And then we've been through the list with
7  him one by one and he -- he has brought what he has, and
8  I'm sure you'll go through it and see what he doesn't
9  have, because there are several of these he just didn't
10 have anything that were responsive.
11         MR. MONSOUR: All right. Fair enough.
12         Q. (BY MR. MONSOUR) Now, Dr. Shoemaker, generally
13 speaking, what is your role for Ethicon in this
14 litigation? What do you view it as?
15         A. They have asked me to serve as an expert
16 regarding pelvic mesh products and as case reviews for
17 some of the mesh litigations that are going on, and so I
18 agreed to review some cases. And then they asked me to do
19 a general report, give my opinion about the product
20 itself, and so I've done that.
21         MS. BECK: I cannot hear Dr. Shoemaker at
22 all.
23         THE REPORTER: I'm having trouble, too.
24         THE WITNESS: You are?

Page 13

1          (Discussion off the record.)
2          Q. (BY MR. MONSOUR) So one of the things -- have
3  you ever given a deposition before?
4          A. I have.
5          Q. Okay. And I'll tell you -- and you probably know
6  this -- they're very conversational. So you and I are
7  going to just talk back and forth. And so sometimes
8  you --
9          A. Right.
10         Q. Just remember to keep your voice up so they can
11 hear you on the phone.
12         A. All right.
13         Q. All right. So let's go back in. Now,
14 Dr. Shoemaker, what is -- you said you were asked by
15 Ethicon to basically testify with regard to pelvic mesh
16 and I guess to look at some individual plaintiffs,
17 correct?
18         A. Correct.
19         Q. And you're providing case-specific reports for
20 those people?
21         A. Correct.
22         Q. Did you do actual physical exams on those women?
23         A. Not all of them.
24         Q. Okay. Do you know why some you did exams on and

Stanton Shoemaker, M.D.

Page 14

1 some you didn't?

2 　A. Not exactly. I think it had to do with whatever

3 the negotiation was between the attorney groups, which

4 ones they wanted me to do.

5 　Q. Okay. But I guess what I'm getting at is you

6 were told in the individual cases you need to do a

7 physical exam on this one and you'll just review medical

8 records on that one?

9 　A. Well -- and some of the medical records I

10 reviewed we haven't done the physical exam yet, but it's

11 in -- it's planned.

12 　Q. Okay. But I guess what I'm saying is, is the

13 determination as to whether or not a physical exam is done

14 on a patient, that decision is made by someone other than

15 you?

16 　A. That's correct.

17 　　MS. DEMING: In his cases? You're just

18 talking about in the matters he's working on?

19 　　MR. MONSOUR: Yes.

20 　　MS. DEMING: Okay.

21 　A. Yes.

22 　Q. (BY MR. MONSOUR) Okay. For your individual --

23 when you perform an individual exam with regard to a

24 plaintiff in a transvaginal mesh case, how long does a

Page 15

1 physical exam take and what do you typically do?

2 　A. Probably overall an hour or maybe a little bit

3 more, but it involves some history and involves some idea

4 about what their life is like, what it was like before

5 they had their procedure done, what their relationship

6 with their physician who was the -- did the implanting and

7 what -- and what has happened to them after that, et

8 cetera.

9 　　So there's a lot of -- a good part of that

10 is sitting down with them and talking to them about their

11 life and what's going on with -- with -- and their

12 complaint. And then -- and so I'd say the majority of

13 that hour and a half or so is probably in history and

14 visiting and then the exam part itself probably takes

15 maybe 15 to 20 minutes.

16 　Q. Okay. Do -- when you're talking to the women

17 that you're examining on behalf of Ethicon, generally

18 speaking, do you find them to be honest?

19 　　MS. DEMING: Object to the form.

20 　A. Well, I assume they are. I mean, I don't have

21 any -- I mean, I don't have anything to tell me that

22 they're not.

23 　Q. (BY MR. MONSOUR) Okay.

24 　A. I mean --

Page 16

1 　Q. Have you ever -- have you ever thought when you

2 were talking to them and performing exams on them that

3 they were faking?

4 　　MS. DEMING: Object to the form.

5 　A. Well, sometimes, you know, like you talk to

6 anybody, you can get an idea -- and they talk to you about

7 one thing and then -- and then they have another

8 explanation later on in the -- in the communication that

9 doesn't fit with what they'd said before and so -- but in

10 term -- in terms of how their body language is, sometimes

11 they can be very -- it's very simple and straightforward

12 and then sometimes it can be somewhat difficult.

13 　　But there's not any real -- I don't know,

14 there's not any real way for me to -- because I don't know

15 them very -- you know, I've only met them for a very short

16 period of time, so, you know, I have to make some

17 assumptions --

18 　Q. (BY MR. MONSOUR) Okay.

19 　A. -- about that.

20 　Q. I guess what I'm -- how many of these

21 case-specific exams have you done thus far for Ethicon?

22 　A. I've done three.

23 　Q. You've done three.

24 　　And of those three women that you've done

Page 17

1 thus far, did you believe that those women were telling

2 you the truth when they said they're having problems with

3 their transvaginal mesh implants?

4 　A. I believe that they -- I mean, I certainly

5 believe that in their mind that they were -- that that's

6 what they believed.

7 　Q. Okay. Now, let me ask you this: Do you believe

8 that there are women out there that suffer injuries from

9 transvaginal mesh implants?

10 　A. Yes.

11 　Q. And what are some of those injuries that -- that

12 you have seen in your practice?

13 　A. Well --

14 　　MS. DEMING: Object to the form.

15 　A. -- I think that the most common complaints with

16 regard to mesh has been erosion or extrusion or -- and --

17 or exposure, those -- that's another term we use depending

18 on what the circumstances are. So that's one thing that's

19 unique to mesh.

20 　Q. (BY MR. MONSOUR) Okay. Let me interrupt you

21 real quick. Do you use the term "erosion," "extrusion,"

22 and "exposure" interchangeably?

23 　A. Not exactly.

24 　Q. Okay. Can you explain the difference for me?

Stanton Shoemaker, M.D.

Page 18

1    A. Yeah. I think exposure in my opinion is -- is
2  where the mesh is exposed into the vaginal canal,
3  typically at the incision site, and usually within the
4  first few months of -- of the implant.
5        Extrusion can sometimes -- you see an
6  exposure of the mesh beyond or somewhere outside maybe the
7  incision line from the implanter.
8        And erosion is where the mesh actually
9  erodes into what we call a viscus, either into the bladder
10  or into the rectum.
11        MS. DEMING: Did someone just join the call?
12  Okay.
13        MR. MONSOUR: This is Doug Monsour talking
14  to the people on the phone. We just heard a blip on the
15  phone. Did somebody join us?
16        MS. DEMING: Did somebody leave? I guess
17  they're not going to answer if they left.
18        THE WITNESS: Maybe they couldn't hear me
19  I'm sorry.
20        MS. DEMING: Who's still on the phone,
21  please?
22        MS. BOSSIER: Somebody might have hung up.
23  This is Sheila Bossier. I'm still on the phone.
24        MS. DEMING: Sharon, are you still on the

Page 19

1  phone? Sharon? I guess not.
2        MR. MONSOUR: She was the one saying she
3  couldn't hear, so she probably just hung up.
4        Q. (BY MR. MONSOUR) Okay. So is there -- is there
5  any way to determine -- let me start again.
6        How can issues of erosion, extrusion, or
7  exposure, how can those cause problems for women?
8        A. Most commonly, they present with some discharge,
9  maybe some bloody discharge, and often -- but oftentimes
10  they have no symptoms. It just is discovered at the time
11  you do an exam. And then sometimes they can -- they can
12  have some discomfort when they have sex.
13        Q. And why would it cause discomfort when they have
14  sex?
15        A. Well --
16        Q. Can you explain that?
17        A. Well, often it's the husband who is the initial
18  complainer, and so the husband complains to her, "I think
19  I feel something." And, you know, sometimes she may not
20  feel it and sometimes she might feel. It depends.
21        Q. Okay. What about the issues of -- what about the
22  issue -- what other issues can be caused by transvaginal
23  mesh implants that can cause a woman problems other than
24  erosion, extrusion, and exposure?

Page 20

1        MS. DEMING: Object to the form.
2        A. Well, in some cases, you have patients who
3  will -- they'll have -- they'll complain of some urinary
4  dysfunction. They may think it's related to the mesh, but
5  there are a lot of other factors that can be a part of
6  that complaint as well. And there may be -- those seem to
7  be the main ones. I would say the -- the issue of
8  exposure and subsequent vaginal discharge, that's --
9  that's uncomfortable.
10        Now, if they have an erosion into the
11  bladder or the rectum, then that can cause some difficulty
12  as well, including bleeding. It includes -- and in the
13  bladder, it can include hypermobility of the bladder,
14  overactive bladder and stone formation and chronic
15  infections, urinary tract infections.
16        Q. (BY MR. MONSOUR) Do you ever perform
17  transvaginal mesh revision surgeries on women that are
18  having problems with their mesh implants?
19        A. Yes.
20        Q. And about how many of those have you done over
21  the years?
22        A. Probably a dozen or so, dozen to maybe --
23  maybe -- between, I'd say, 12 and 20.
24        Q. And are those women that had the implant put in

Page 21

1  by you or by other doctors?
2        A. Other doctors.
3        Q. Have you ever done a revision surgery on a
4  transvaginal mesh implant that you put in?
5        A. Yes.
6        Q. And how many of those have you done?
7        A. Maybe one.
8        Q. Would that be within the 12 to 20?
9        A. Uh-huh.
10        Q. Okay. That's a "yes"?
11        A. Yes, yes.
12        Q. Okay.
13        A. I'm sorry.
14        Q. Sometimes you'll say "uh-huh" or --
15        A. Yeah.
16        Q. -- "huh-uh" --
17        A. Right.
18        Q. -- and she can't get that.
19        A. I'm sorry.
20        Q. That's okay.
21        So you've only operated or had to perform a
22  revision surgery on one transvaginal mesh implant that you
23  put in one of your patients?
24        A. Yes. Including -- I assume that you're including

Stanton Shoemaker, M.D.

Page 22

1  slings -- sling mesh procedures as well as vaginal mesh --
2  Q. Yes.
3  A. -- right?
4      Yes. Okay.
5  Q. I was speaking more generally.
6  A. Right, yeah, got it.
7  Q. And the one product that you had to go perform a
8  revision surgery on, do you know what the product was?
9  A. It was a sling. It was a -- I can't remember if
10 it was a transobturator or a retropubic, but it was one of
11 my -- it was a -- are you talking about the one that I put
12 in?
13 Q. Yes.
14 A. Yeah.
15 Q. Would it have been a TVT or a TVT-O?
16 A. Yes. It was probably a TVT. It was early in my
17 career.
18 Q. What happened on that one -- I guess what went
19 wrong where it required there to be a revision surgery?
20     MS. DEMING: Objection, form.
21 A. She began -- she was having some voiding
22 difficulties shortly after the procedure, and I think I
23 removed it within probably two weeks of the implant. She
24 was having difficulty with retention.

Page 23

1  Q. (BY MR. MONSOUR) And does that -- when you have
2  difficulty with retention, does that mean that you as a
3  physician likely put it in too tight?
4  A. Yes.
5      MS. BECK: Dr. Shoemaker has to speak up. I
6  really cannot understand what he's saying.
7      MR. MONSOUR: He's trying. I've got --
8  we've got the mike in -- we've got the speaker right in
9  front of him. I'm sorry. We're doing all we can.
10     MS. BECK: Okay.
11     THE WITNESS: Can you hear -- can you hear
12 Mr. Monsour plainly?
13     MS. BECK: Yes, I can hear Mr. Monsour
14 pretty clearly, but Dr. Shoemaker evidently speaks very
15 softly --
16     MS. DEMING: Not really.
17     MS. BECK: -- and it doesn't carry to the
18 speaker -- or the mike.
19     THE WITNESS: I'll try to do better.
20 Q. (BY MR. MONSOUR) So you've done approximately 12
21 to 20 revision surgeries. You've done one on one that you
22 put on. The remainders that you've done revisions on,
23 were those split amongst both slings and pelvic organ
24 prolapse implants?

Page 24

1  A. Yes.
2  Q. Okay. More one versus the other?
3  A. Probably more pelvic organ prolapse materials.
4  Q. Okay. And do you know -- of the ones that you
5  revised, did you determine what the products were that
6  were originally implanted by the other physicians?
7  A. Yes.
8  Q. And how did you do that?
9  A. Asked -- I reviewed the operative reports from
10 the implanters.
11 Q. Okay. And do you remember to this day what those
12 were?
13 A. Almost all of them were the products from AMS,
14 Apogee and Perigee and Monarch slings.
15 Q. Do you have any opinions as to why the group that
16 ended up with you being the revising doctor mainly tended
17 to be AMS products?
18 A. First of all, in Corpus, there's no
19 urogynecologists and -- and the -- all of the vaginal
20 floor and pelvic organ prolapse cases are typically done
21 by gynecologists. And the urinary incontinence procedures
22 are typically split between the urologists and the
23 gynecologists.
24     So the majority of pelvic organ prolapse and

Page 25

1  urinary incontinence cases in our -- in this community are
2  done by gynecologists. And I have -- you know, I know all
3  my colleagues, especially, you know, who have been
4  involved with the pelvic organ prolapse repair. We know
5  each other. And I think some of my colleagues and friends
6  and -- who have been mesh users over the last 15 years or
7  so, I think they for some reason were attracted to the AMS
8  products and that was what they typically used.
9      And I think -- but why there were more
10 from -- more complications with those cases, I'm not sure.
11 Q. Okay. When I read your report, there's a section
12 in there where you're kind of talking about -- and most of
13 the products were made by people other than Ethicon that
14 you looked at.
15     Do you mean to imply -- I just want to
16 clarify this. But do you mean to imply that the products
17 made by AMS are of a lesser quality than the products made
18 by Ethicon?
19     MS. DEMING: Object to the form.
20 A. I don't know, quite frankly. I never -- I mean,
21 I saw the Apogee/Perigee products and -- but I never
22 really utilized them. And I was always -- typically if I
23 get involved with a particular product that I like that
24 I'm having good results with, I don't like to switch and

Stanton Shoemaker, M.D.

Page 26

1 change back and forth to other things that may -- that I'm
2 told may be better than what I'm currently using, unless I
3 have a particular problem and I'm looking myself to make a
4 change.
5     Q. (BY MR. MONSOUR) Okay. Of the -- now, you've
6 already told me that you have done a revision surgery on,
7 you believe, a TVT product, correct?
8     A. Yes.
9     Q. That was the one that you put in, and that would
10 be manufactured by Ethicon, correct?
11     A. Yes.
12     Q. Have you ever done a revision surgery on a
13 Prolift?
14         MS. DEMING: That he put in?
15         MR. MONSOUR: (Moving head side to side.)
16         MS. DEMING: Okay. Thank you.
17     A. Yes.
18     Q. (BY MR. MONSOUR) Okay. And when did you -- how
19 many of those have you done?
20     A. Out of that 12 to 20, maybe 3. These are
21 guesstimates now.
22     Q. And how were you able to confirm that they were
23 Prolifts that you were operating on?
24     A. Again, from the operative report --

Page 27

1     Q. Okay.
2     A. -- of the implanter.
3     Q. And other than the one TVT that you've mentioned
4 that you put in, have you operated on any other --
5 performed any revision surgeries of any -- on any other
6 TVT or TVT-O or any other type of TVT product made by
7 Ethicon?
8     A. Some of the slings that I may have had to revise
9 or remove could have been a TVT or TVT-O sling.
10     Q. Okay. And one of the things in depositions I --
11 "could have been" doesn't really help me. I need to know
12 for sure if you know.
13         MS. DEMING: Object to form.
14     Q. (BY MR. MONSOUR) Can you say for sure you've
15 operated on a TVT or a TVT-O --
16     A. I would say, yes, at least one or two.
17     Q. So if I were to -- if I were to summarize it, you
18 said you've operated on maybe three Prolifts and one or
19 two TVTs and then the other TVT that you mentioned. Is it
20 a fair statement to say that you've probably done revision
21 surgeries on around six Ethicon products?
22     A. I don't know. I mean, maybe.
23     Q. Okay.
24     A. I don't know whether that helps you or not. I --

Page 28

1 I don't really know the answer to that for sure.
2     Q. I'm just trying to get a ballpark. If I were to
3 tell the jury you've operated on about six, if I'm off, I
4 wouldn't be off by very much, would I?
5     A. No.
6         MS. DEMING: Object to the form.
7     A. No. And -- and remember, since we don't --
8 I'm -- by default, I get a lot of these pelvic floor
9 problem cases that are in the community. They end up in
10 my office and -- so I get referred a lot of those cases.
11         Sometimes the problem may not be a
12 complication, but may be a -- or they may be a failure, in
13 other words, a recurrence of their prolapse, so I see
14 those cases as well. But that's not included in the 20 or
15 so mesh revision cases.
16     Q. (BY MR. MONSOUR) Right, right. With regard to
17 the TVT products, do you still use them today?
18     A. Yes.
19     Q. And let's say a patient came to see you today and
20 had stress urinary incontinence. What would you do to
21 treat her?
22         MS. DEMING: Object to the form.
23     A. First of all, I would do a complete workup and
24 probably urodynamic studies, determine whether or not --

Page 29

1 and, of course, do an exam to see whether there was any
2 pelvic organ prolapse in addition to her stress
3 incontinence.
4         Urodynamic studies would help give me an
5 idea of whether her urethral closure pressure or vesicle
6 leak point pressures were -- what they were to try to rule
7 out intrinsic sphincter deficiency, which is something
8 that I need to know because it does make a difference in
9 the way I approach any surgery we might do.
10         We talk about nonsurgical methods to improve
11 their incontinence, sometimes Kegel exercises, that kind
12 of thing. There's a lot of prolapse associated with it.
13 Then we talk about the use of a pessary, as it may be a
14 first line, depending on the age of the patient and what
15 their sexual activity is.
16         We try to rule out urgency incontinence as
17 opposed to stress incontinence or whether they have mixed
18 incontinence, which is a combination of both those
19 conditions.
20     Q. (BY MR. MONSOUR) Okay.
21     A. And then after all of that, if we decide that
22 surgery is going to be the best approach, then I may make
23 a decision about, as a first line, what kind of sling I'm
24 going to put in. And sometimes it's a TB -- it's a

Stanton Shoemaker, M.D.

Page 30

1  retropubic and sometimes it's a transobturator.
2      Q.  But in either case, it will be an Ethicon either
3  TVT or TVT-O, correct?
4      A.  That's correct.
5      Q.  As we -- as we sit here today --
6      A.  Or let me -- let me back up.
7      Q.  Go ahead.
8      A.  As -- in the last couple of years as a
9  transobturator sling, I used -- have been using the TVT
10  Abbrevo product instead of the TVT-O.
11      Q.  Okay.  So if a woman came to see you today -- let
12  me clarify this --
13      A.  Okay.
14      Q.  -- and you were going to do -- you were going to
15  surgically manage her stress urinary incontinence, you
16  would either use the TVT retropubic --
17      A.  Correct.
18      Q.  -- or the TVT Abbrevo?
19      A.  Correct.
20      Q.  You would not use today a TVT-O, correct?
21      A.  I had to use one recently because the hospital
22  was out of the Abbrevo and they happened to have a TVT-O
23  available, but my preference would be the Abbrevo.
24      Q.  Okay.  Why do you like the Abbrevo over the

Page 31

1  TVT-O?
2      A.  The -- I'm not sure when the Abbrevo product came
3  out, but only because the -- the -- the typical complaint
4  about TVT-O often had to do with transient leg pain after
5  it was applied.  And -- and even though I had an
6  occasional patient complain about some groin pain or leg
7  pain, it was always temporary.  I never had any with a
8  chronic problem that lasted forever.
9          The Abbrevo came out to try to eliminate
10  that.  I don't know whether you're familiar with that
11  product or not and what it looks like.  But the -- it's --
12  the design of the Abbrevo is that the polypropylene mesh,
13  which I think is identical to the TVT-O mesh, is only 12
14  millimeter -- 12 centimeters in length.  So it actually
15  can penetrate the obturator muscles and obturator membrane
16  on each side.
17          The way it's designed, you can -- as long as
18  you adjust it so that the midline is right in the midline,
19  then you get an equal amount of mesh on the obturator
20  muscle on each side, and, therefore, there's no mesh that
21  extends into the muscles on the inside of the leg; the
22  idea being that there won't be any -- they use the little
23  polypropylene suture material and then -- so that the
24  patient is left without any kind of -- anything going

Page 32

1  beyond the obturator muscles on each side.  So you still
2  get the same support in the mid portion of the urethra,
3  but it doesn't extend beyond the pelvis.
4      Q.  Okay.  When did you switch over to preferring the
5  Abbrevo versus the TVT-O?
6      A.  This is 2016.  Probably -- I'm -- quite frankly,
7  when -- I'm not sure what year it was introduced.  You may
8  have that information.  But it may have been -- I want to
9  say two thousand -- maybe '12 or '13, somewhere in that
10  range.
11      Q.  Okay.  Now, I was looking on your Web site.
12  Don't you have some other type of procedure you can do for
13  stress urinary incontinence?
14      A.  Well, there may be -- I do -- there is a
15  treatment that I do a lot of for urgency incontinence
16  called sacral nerve stimulation, InterStim.
17      Q.  That's what it was.
18      A.  Yeah, yeah.  That's not a procedure for stress
19  incontinence.  That's a procedure for urgency.
20      Q.  How many -- give me an idea about how many
21  slings, either TVT or TVT-O, when you have to -- or TVT
22  Abbrevos, about how many of those would you say you're
23  putting in in a given month these days?
24      A.  Maybe eight.

Page 33

1      Q.  Is that --
2      A.  Eight to ten, something like that.
3      Q.  Is that pretty consistent?
4      A.  Uh-huh.
5      Q.  Yes?
6      A.  Yes.
7      Q.  Okay.
8      A.  Yes.  I'm sorry.  Can you hear me?
9      Q.  Now, let's -- let's move from stress urinary
10  incontinence.  Let's talk about pelvic organ prolapse.  Is
11  it -- is it a fair statement to say that you have stopped
12  using pelvic organ prolapse kits to treat pelvic organ
13  prolapse?
14      A.  Synthetic kit, yes.
15      Q.  And when did you stop using the pelvic organ
16  prolapse kits to treat pelvic organ prolapse?
17      A.  Probably 2012 when Ethicon quit manufacturing the
18  Prolift products.
19      Q.  And why did you decide to quit using those kits?
20      A.  Well, there's -- the main reason was because
21  the -- as I tell people, sometimes there's not enough
22  trees in South Texas to get the -- to get -- to put the
23  informed consent in front of a patient to use
24  polypropylene mesh anymore since all this litigation

Stanton Shoemaker, M.D.

Page 34

1  began.

2      Q.  Okay.

3      A.  And I didn't have enough paper that I could find

4  to -- so, you know, we were sit -- and the hospital quit

5  buying them.  When the litigation began, the hospital

6  wouldn't allow the kits to be even brought into the --

7  into central supply.

8          So, anyway, that affected everybody that was

9  using any kind of synthetic meshes, so that's when we

10  quit.

11      Q.  Okay.  So if I was going to boil it down to the

12  reason you quit using pelvic organ prolapse kits to treat

13  pelvic organ prolapse, it would be, No. 1, the informed

14  consent process got to be too, too much and, No. 2, the

15  hospitals weren't allowing them anymore?

16      A.  Correct.

17          MS. DEMING:  Object to the form.

18      Q.  (BY MR. MONSOUR)  Any other reasons?

19      A.  Not really.

20      Q.  Okay.  Did you ever use any other pelvic organ

21  prolapse kits other than Prolift?

22      A.  Yes.

23      Q.  And which did you use?

24      A.  I used a Prosima.

Page 35

1      Q.  And who made Prosima?

2      A.  That's an Ethicon product.

3      Q.  Okay.  And why did you use Prosima?

4      A.  Prosima was a new generation that did not have

5  the little straps on the polypropylene -- the body of the

6  mesh, and it was -- had a totally different design so that

7  the -- you wouldn't use any trocars to implant the mesh.

8  So it was a totally different design.

9          Are you familiar with it?  I don't -- what

10  we do is we do a dissection and then the way the material

11  was placed was with a special instrument that came in the

12  kits.  So you could actually put the wings out toward the

13  ischial spines on each side, whether it was an anterior or

14  posterior kit, and that would allow the mesh to lay

15  perfectly nice and flat under the bladder or over the

16  rectum that -- and so -- without any straps and without

17  any necessity to put any -- to suture it in place, which

18  was an attractive mechanism for -- for implanting it and

19  made it simpler and easier.

20          And then on top of that, then you -- what

21  kept the device in place was a -- called a vaginal support

22  device, a VSD, which is a little device you put into the

23  vagina and sutured it in temporarily for about three weeks

24  and then you took it out in the office.

Page 36

1      Q.  What year did you start using pelvic organ

2  prolapse kits to treat pelvic organ prolapse?

3      A.  Probably two thousand -- I want to say maybe late

4  2006, maybe early 2007 was the Prolift.

5      Q.  And then you stopped in 2012?

6      A.  And then -- yes.

7          And then I was using some +M kits, which

8  were identical in terms of the way they were applied and

9  implanted, and I think that was base -- maybe 2009.

10          And then the Prosima kits were designed for

11  patients with minimal prolapse.  They weren't really

12  designed for patients with severe prolapse.  And so that

13  was another tool that we had available.  And I think

14  that -- that must have been 2010 when -- I'm going to

15  guess, two thousand -- late 2009, 2010 when Prosima became

16  available.  And so I only used it for a short --

17  relatively short period of time.

18      Q.  Can you give me an idea of how many of these kits

19  you implanted between 2006 to 2012 when you were using

20  them?

21      A.  I'm going to probably -- probably well over 100.

22      Q.  Can you narrow it down any more than that?

23      A.  Well, let me think.  2006 to 2012, over a

24  six-year period, that's actually about 200.  I'm going to

Page 37

1  say -- because I was thinking about 40 a year, so that's

2  about right.  I would say 200, in that -- between 200 -- a

3  little over 200, 200 to 240.  That's about 40 a year for

4  six years.

5      Q.  Okay.  As far as slings, polypropylene slings

6  that you've implanted, whether it's the TVT, the TVT-O, or

7  the Abbrevo, how many of those have you implanted over the

8  years, would you say?

9      A.  I would say probably 100, at least 100 a year,

10  100 to 150 a year, so that's a lot, maybe -- and I think

11  we started using slings maybe 2002, 2003, something like

12  that.

13      Q.  It's good you anticipated my next question.

14          MS. DEMING:  Don't do that.  Let him ask the

15  question.

16          THE WITNESS:  I knew it was coming.

17          MS. DEMING:  No, you don't.

18          (Phone ringing.)

19          MS. DEMING:  Sorry.

20      A.  And I think that it's been a while since I've

21  thought about these numbers.

22      Q.  (BY MR. MONSOUR)  So -- and just -- just so I can

23  get an idea, if I do those numbers in my head, you've

24  probably safely put in well over a thousand polypropylene

Stanton Shoemaker, M.D.

Page 38

1  slings in your career?
2         MS. DEMING: Object to the form.
3  A. Yes.
4  Q. (BY MR. MONSOUR) Okay. And it might be as high
5  as 1,500 or more?
6  A. Yes.
7  Q. Have you ever heard from any other doctors that,
8  hey, just wanted to you know one of your clients or one of
9  your patients has come in and I'm having to operate on her
10 sling or her mesh implant that was placed by you in her?
11 A. No.
12 Q. As far as -- as far as your patients that you've
13 implanted transvaginal mesh devices in, whether it be a
14 pelvic organ prolapse kit or a sling, a polypropylene
15 sling, how many are you aware are having problems with
16 those products?
17 A. I have one patient that -- no, that was a
18 different -- that was different. That was since 2012.
19        I don't know of any. I don't know of any --
20 I do not have an awareness of any patient who is having a
21 product -- who is having a problem with any implanted
22 sling or mesh that I'm aware of.
23 Q. Does that help shape some of the opinions that
24 you might have about using these products?

Page 39

1  A. I'm sorry. I don't understand.
2  Q. I believe -- you use TVT and TVT Abbrevo and
3  occasionally TVT-O because you think those are good
4  products, I'm assuming?
5  A. Yes.
6  Q. If you found out that more of your patients were
7  having problems with them, could that alter your opinion
8  of that?
9  A. If I had -- yes, if I had patients who were
10 having big problems with any type of surgery that I was
11 doing, then that would -- it would make my opinion about
12 the type of surgery I'm doing somewhat different, yes.
13 Q. Okay. As far as the surgeries that you've
14 done -- and you explained to me about 12 to 20 revision
15 surgeries that you've done -- can you walk me through some
16 of the complaints that the women were having with their
17 implants that required you to go in and surgically operate
18 on them?
19 A. Probably the most common complaint was erosion or
20 discharge or they'd already been diagnosed with erosion by
21 another physician and was being referred to me for
22 management and -- and then a lot of -- and then probably
23 another more common reason would be the patients' husbands
24 or their sexual partner complaining that they could feel

Page 40

1  it.
2  Q. When someone comes to see you and they're saying,
3  hey, my husband says he feels something when we have sex,
4  what type of surgery do you do to fix that problem?
5  A. Well, it depends on what the problem is. If I do
6  a very thorough exam and I feel like -- you're talking
7  about a patient that has mesh or --
8  Q. Yes, sir.
9  A. Obviously if there's a mesh erosion and he's
10 feeling it, then there's not really -- let me back up.
11       If it's a recent procedure and there is a
12 small erosion, oftentimes, I will attempt to manage that
13 with estrogen therapy.
14 Q. Okay.
15 A. And -- and then if it doesn't improve, then we go
16 to the operating room and remove that section or segment
17 of the mesh.
18 Q. Now, when you remove a portion of the mesh to
19 treat a condition like that, that is obviously removing a
20 portion of the mesh that was providing support in the
21 patient's vaginal area, correct?
22 A. Correct.
23 Q. How does that allow the product to still serve
24 its initial purpose if you're having to cut part of it

Page 41

1  out?
2  A. That's a good question. The -- you would think
3  that prolapse would be imminent if you remove a portion of
4  the mesh that was designed to support the pelvic floor.
5  Sometimes that happens. And I warn patients that that may
6  happen and then sometimes it doesn't. You remove a piece
7  of it, you correct the vaginal tissue over the defect that
8  you've created from the removal of the mesh, and sometimes
9  they don't lose support.
10       I think it depends on where the -- where
11 it's located and the volume of mesh that you have to
12 remove.
13 Q. Okay. Now, let's go back to kind of the same
14 line of questioning I asked you about stress urinary
15 incontinence. A woman walks into your office today and
16 has pelvic organ prolapse. You're not going to use, as we
17 sit here today, a pelvic organ prolapse transvaginal mesh
18 polypropylene kit today, correct?
19 A. Correct.
20 Q. What are you going to offer her if she needs a
21 surgical option?
22 A. Since 2012, I've been doing basically native
23 tissue repair and -- and have been -- as an adjunct to the
24 native tissue repair, I've been using a biologic material

Stanton Shoemaker, M.D.

Page 42

1  called MatriStem, which is a noncross-linked extra
2  cellular matrix product to help improve the efficacy and
3  the efficiency of the repair.
4        And then it depends on what the defects are
5  in terms of how I manage.  If they have an apical defect,
6  they need to have that supported in some way, so it may be
7  a sacrospinous fixation or it may be -- or if it's a
8  pretty significant prolapse, I may resort to a
9  sacrocolpopexy, which, by the way, is -- does involve a
10  polypropylene mesh product put in robotically with the --
11  but abdominally.
12     Q.  You actually have one of those on your Web site.
13     A.  (Moving head up and down.)
14     Q.  Correct?
15     A.  What -- which --
16     Q.  A sacrocolpopexy surgery.
17     A.  Yes.
18     Q.  I watched it.
19     A.  Oh, you did?  That's right.  I do have that on
20  the video.
21        MS. DEMING:  Did you like it?
22        MR. MONSOUR:  Did I like it?
23        MS. DEMING:  Did you enjoy it?
24        MR. MONSOUR:  That's not one of those things

Page 43

1  you like or dislike.  I watched it.  But -- okay.  So I
2  would -- yeah, I'll just --
3        MS. DEMING:  I didn't mean that quite the
4  way it sounded, but it's a very good -- I've seen it, too,
5  and he does a very nice job.
6     Q.  (BY MR. MONSOUR)  But if we can go through it,
7  you've got -- on your Web site, you've got a
8  sacrocolpopexy procedure --
9     A.  Correct.
10     Q.  -- where you are doing the surgery robotically,
11  correct?
12     A.  Correct, that is right.
13     Q.  And if we watch the procedure, we can see you,
14  like, tying knots using the robotic hands, correctly?
15     A.  Correct.
16     Q.  And how do you do that with the robotic hands?
17  Do you have something that hooks onto your hands and
18  allows them to mimic your fingers or how does that work?
19     A.  The -- that's a whole different technology.  But
20  you -- it's a laparoscopic procedure.  So the patient has
21  ports that are placed through which these instruments that
22  will do the -- that do the dissection and instruments that
23  do the knot tying, et cetera, and then that's attached to
24  a robotic machine that actually controls the instruments.

Page 44

1        Then I control the machine sitting at a
2  totally different location through a -- it's kind of a
3  station where it's kind of like playing a video game and
4  you have little finger devices that -- that you use to
5  manipulate the arms of the robot.
6     Q.  Okay.  How far away are you from the patient
7  physically?
8     A.  Probably 10 to 15 feet.
9     Q.  Okay.
10     A.  It's in the same -- but the operating room is set
11  up so you could actually do it in another room, I mean, if
12  you had to.  So it's --
13     Q.  You could do it from India if you had to, I
14  guess, if they had the technology, right?
15     A.  Yes.
16     Q.  Are there nurses that are next to the patient as
17  you're doing the procedure to do what nurses do in
18  surgery?
19     A.  Yes.
20     Q.  Okay.
21     A.  There's an assistant.  I usually have two
22  assistants.  And then usually -- and, of course,
23  anesthesia's there.
24     Q.  And why are you doing these robotic surgeries

Page 45

1  instead of doing it the old-fashioned way?
2     A.  Well, robotically, the patients have a much
3  faster, shorter recovery.  Instead of having a large
4  incision, they only have five small 1-centimeter
5  incisions.  So they're often -- we can actually discharge
6  them within 24 hours of their hospitalization.
7     Q.  Now, in watching your sacrocolpopexy surgery on
8  your Web site, you do use a polypropylene mesh?
9     A.  Yes.
10     Q.  And what type of polypropylene mesh do you use?
11     A.  It also is an Ethicon product called ARTISYN.
12     Q.  A-r-t-i-s-a-n?
13     A.  I think it's A-R-T-I-S-Y-N, ARTISYN.
14     Q.  And why do you use that product in your
15  sacrocolpopexy surgeries?
16     A.  Well --
17        MS. DEMING:  Object to the form.
18     A.  The -- it's a Y mesh that's already been designed
19  so you don't have to craft it.  And there are some
20  features about that mesh, one of which it's a +M.  It's a
21  +M or ULTRAPRO mesh so that the -- so that it does have a
22  Monocryl component that does dissolve.
23        So the mesh ultimately is very -- after
24  about 90 days is very lightweight and has a big pore size.

Stanton Shoemaker, M.D.

Page 46

1 It's a good -- it's identical to the +M product that we
2 were using vaginally. And as a result, it also has -- the
3 way it's designed, it has little measurement lines on it
4 that are centimeters -- that it's a centimeter apart so
5 you know exactly what the length of the mesh is that
6 you're applying at the time you put it in.
7        So when you craft it or want to shorten it
8 or leave length to it, it's easy to manage, and when you
9 do it -- when it's in the pelvis and you're looking at it
10 robotically from the console that you're sitting in, it's
11 real easy to see where you are --
12     Q. Okay.
13     A. -- keep yourself oriented.
14     Q. Okay. And you use a Gore-Tex stitch, correct?
15     A. Yes.
16     Q. Why do you use Gore-Tex instead of polypropylene?
17     A. Well, Gore-Tex is a permanent -- that's what --
18 the reason I use Gore-Tex is because in the conventional
19 sacrocolpopexy procedures that were done prior to a
20 robotic surgery being available, that was the technique
21 and the design that they -- that was utilized.
22     Q. A Gore-Tex stitch?
23     A. A Gore-Tex stitch.
24        So I wanted to try to keep it as close to

Page 47

1 the identical procedure that was originally described in
2 terms of the manner in which the product -- the
3 polypropylene was put in. But I've also done them -- I've
4 also done them with some -- some absorbable sutures, too.
5        It -- it varies depending on where I am,
6 whether the patient has had previous surgeries before,
7 whether they've still got a cervix or not, whether
8 they've -- whether there's a -- a lot of different things
9 that make the decision about what type of suture material
10 is used.
11     Q. Now, you had mentioned earlier that one of the
12 treatments that you offer some of your patients for pelvic
13 organ prolapse is -- is a -- is a biologic?
14     A. Yes.
15     Q. And what's it called, again?
16     A. It's -- the company that makes it is called
17 ACell, A-C-e-l-l. And the product is called MatriStem.
18 It's a -- it's a xenograft that's -- that's designed from
19 urinary bladder matrix. It's an extracellular matrix
20 product.
21     Q. And how do you implant that?
22     A. It's implanted vaginally as well. And I do
23 craft -- it comes in sheets and it does -- what it does
24 that's different as a typical biologic, it is not the

Page 48

1 product that's designed to be the support in the pelvic
2 organ prolapse. It actually -- it's a graft and it
3 actually disappears in about 90 days itself.
4        But in the process, it -- and it's
5 decellularized so that the collagen matrix that makes up
6 this graft actually directs the immune cells that come to
7 the healing process to remodel into the identical tissue
8 it happens to be sitting on.
9     Q. Okay. Now, the mesh that is being used for
10 pelvic organ prolapse by you, the two implants that you
11 use, one is the MatriStem, the other one would be the
12 ARTISYN, correct?
13        MS. DEMING: Object to the form.
14     A. Well, yes. One is designed for sacrocolpopexy
15 and one is designed to put in vaginally.
16     Q. (BY MR. MONSOUR) How do you put in the one --
17 the MatriStem which is designed to be put in vaginally?
18     A. I put it in very similar to the way I put in I
19 want to say Prolift except it doesn't have any arms or
20 trocars or anything, but you make the same type of
21 incision and dissect between the bladder and the vagina
22 and -- or if you're doing it posteriorly, between the
23 rectum and the vagina, and you create a space all the way
24 out to the -- it's a full thickness dissection.

Page 49

1        And then I do a native tissue repair just
2 like you ordinarily would with -- like an anterior or
3 posterior colporrhaphy, and then I lay -- so that I create
4 as much connective tissue in that space as I can lay in
5 that space, and then this graft is then placed over that
6 and then the vagina is closed over the graft.
7        So the graft is laying up against the
8 bladder wall or have this connective visceral -- we call
9 it visceral connective tissue that's in that space, or
10 over the rectal wall and that connective tissue, and then
11 that's -- that's what directs -- the graft then directs
12 the remodeling of the tissue to simulate that connective
13 tissue that's in that space.
14     Q. And for that procedure, why --
15        MS. DEMING: Speak up, please.
16     Q. (BY MR. MONSOUR) Why do you elect to use the
17 MatriStem instead of a polypropylene mesh?
18     A. The -- first of all, the hospital has no
19 polypropylene mesh to be applied vaginally. And when I
20 was -- when I was still using Prolift or Prosima before
21 they were removed from the market, I would use this
22 MatriStem to lay over the polypropylene graft in a
23 small -- not in a big -- in a -- in a small dimension area
24 to try to improve the thickness of the vaginal wall over

Stanton Shoemaker, M.D.

**Page 50**

1 the -- right at the suture line. That would help -- the
2 whole idea was to try to improve erosion risk -- or I'm
3 sorry, exposure risk.
4     Q. (BY MR. MONSOUR) Okay.
5     A. So I already had some experience with that
6 material from that standpoint. But I only had been using
7 it for about a year during 2011. So I had that experience
8 with that particular material, and then I was very --
9 knowing that -- going back to native tissue repair, we
10 already had some data that showed up to 30 to 40 percent
11 failure in a lot of these anterior and posterior
12 colporrhaphies.
13     So the notion was, in my opinion, to do a
14 native tissue, and then if we could improve that by adding
15 the -- this MatriStem graft to help improve the connective
16 tissue that was in the support, that it might improve
17 the -- that outcome so that instead of a 30 to 40 percent
18 failure rate, it would be reduced to some degree.
19     Q. Has it worked?
20     A. So far. It seems to be -- it seems to be working
21 fairly well. I've been using it since 2012, so it's about
22 three years now, a little over three years. And I've had,
23 you know, a couple of failures, but not anywhere close to
24 the 30 or 40 percent failure rate.

**Page 51**

1     Q. Okay. So you had mentioned before, the hospital
2 that you practice at does not allow polypropylene mesh to
3 be implanted transvaginally anymore, correct?
4     A. Well, they don't purchase it, so it's not
5 available.
6     Q. Okay. But there are abdominal polypropylene
7 meshes at the hospital, correct?
8         MS. DEMING: Object to the form.
9     A. I think there -- I don't -- quite frankly, I'm
10 not sure. I would -- I think they are. I'm not sure
11 what -- since I really don't do abdominal hernia surgery,
12 I don't know what my surgery -- surgeon colleagues are
13 utilizing, so . . .
14     Q. (BY MR. MONSOUR) Is -- are you familiar with
15 how -- how Ethicon's transvaginal polypropylene meshes
16 compare to their abdominal polypropylene meshes?
17     A. Do I know how they compare?
18     Q. Yes.
19         MS. DEMING: Object to form.
20     A. No, I do not.
21     Q. (BY MR. MONSOUR) Do you know what the
22 differences are between the vaginal and the abdominal
23 meshes that they make?
24     A. No, I do not.

**Page 52**

1     Q. If the meshes were identical, would -- would you
2 utilize information about the abdominal meshes in
3 determining whether or not -- well, let me ask -- that's a
4 crummy question. Let me -- let me start again.
5         MS. DEMING: He knew I was going to object.
6     Q. (BY MR. MONSOUR) Do you think -- if the
7 abdominal -- if the abdominal and transvaginal meshes,
8 polypropylene meshes by Ethicon, were identical, would you
9 or could you use information about the physical
10 characteristics of the abdominal placement to give you an
11 idea of how the product might work vaginally?
12         MS. DEMING: Object to the form.
13     A. There's two different locations, and there are
14 different -- there are different mechanisms in which
15 you're trying -- you know, a hernia repair in the abdomen
16 is a lot different than the hernia in the pelvic floor
17 that's allowed a prolapse of the bladder and rectum, et
18 cetera. So -- and the vagina is a different arena, you
19 know, in any kind of surgery.
20     So I don't -- I don't think that because
21 there were certain characteristics about anything that's
22 used in the abdominal hernia arena necessarily would
23 automatically apply positively to repairs in the vagina.
24     Q. (BY MR. MONSOUR) You mentioned they're very

**Page 53**

1 different, the abdomen -- the surgery in the abdomen
2 versus surgery in the vagina, correct?
3         MS. DEMING: Object to the form.
4     A. Yes.
5     Q. (BY MR. MONSOUR) Could you tell me why they're
6 so different?
7     A. Well, the vagina is a different organ. You know,
8 it's a different organ and it functions differently. And
9 so it's -- it's like, you know, what might be an
10 appropriate application in operating on the stomach,
11 you're trying to -- to see if that would apply to
12 open-heart surgery. It's -- it's not the same and it
13 functions differently.
14     The vagina functions different -- it's not
15 just -- the abdominal wall just is designed to hold the
16 abdominal contents in the right location, and the vagina
17 does a lot more things than just hold up the pelvic floor
18 organs.
19     Q. Right. Okay. We've been going for about an
20 hour. Why don't we take a break.
21         (Short recess.)
22     Q. (BY MR. MONSOUR) Dr. Shoemaker, we've had a
23 short break. Are you ready to proceed?
24     A. Yes.

Stanton Shoemaker, M.D.

Page 54

1    Q. Okay. We were talking about different types of
2    meshes at the end, abdominal versus transvaginal. Do you
3    remember that?
4    A. Yes.
5    Q. One of the questions I'd like to ask you is your
6    knowledge -- some of the things that you talk about in
7    your expert report reference basically your experience
8    implanting and explanting or implanting and revising
9    transvaginal mesh products, correct?
10   A. Yes.
11   Q. Now, when you were performing the revisions that
12   we've already talked about, the 12 to 20 revision
13   surgeries that you've done, did you look at the mesh that
14   you were revising?
15        MS. DEMING: Object to form.
16   A. You mean after it was removed?
17   Q. (BY MR. MONSOUR) Yes, sir.
18   A. Yeah.
19   Q. And did you perform any testing of it?
20   A. No.
21   Q. Did you just look at it visually?
22   A. Yes.
23   Q. And can you tell us what you would see when you
24   looked at it?

Page 55

1        MS. DEMING: Object to the form.
2    A. Well, you would -- you would see -- you could
3    identify the mesh, you could see that it was -- you know,
4    it was a mesh like a -- like a matrix, in other words, it
5    was -- you could see the fibers, and then you could see --
6    you know, you never could -- typically, it was several
7    months to a year -- years after the implantations. And so
8    there would be a lot of scar tissue around -- around it
9    that we were having to dissect through in order to get the
10   products out, uh-huh. And it would be various lengths.
11   Q. (BY MR. MONSOUR) The -- some of the things that
12   you talk about in your expert report are pore size,
13   correct?
14   A. Yes.
15   Q. Before this -- before you were retained as an
16   expert by Ethicon, did you ever talk about pore size?
17        MS. DEMING: Object to the form.
18   A. You mean -- I'm not sure I understand what --
19   talk to who about pore size?
20   Q. (BY MR. MONSOUR) Did you ever -- did you ever --
21   did you ever talk with any other doctors about pore size
22   or anything like that? Is that a topic that would come
23   up?
24   A. If we were in meetings and things and we were

Page 56

1    talking about different types of products and you were
2    listening to lectures about pelvic floor reconstruction
3    and pelvic floor meshes, we would absolutely talk about
4    pore size.
5    Q. Why is that important?
6    A. Well, the whole concept of using a synthetic mesh
7    in order to improve pelvic organ prolapse repair is that
8    you want to have the mesh integrated into the patient's
9    body and not allow -- and not -- you don't -- what you
10   don't want is to have a product that gets encapsulated and
11   scarred. But you'd prefer to have a product that -- and
12   so pore size was important.
13        The -- in order for the body to put in the
14   vasculature and the collagen to integrate that product or
15   that particular scaffold to help in the support, you
16   wanted to make sure that the pore size -- if it was too
17   big, there is such a -- if the pore size was too big, then
18   you didn't have any support, and if it was too small, then
19   it typically would not integrate.
20   Q. Are you going to be an expert and try and give
21   opinions about pore sizes?
22   A. If I'm asked what I know about pore sizes and why
23   I think that's important, yes.
24   Q. Do you think you're an expert in pore sizes?

Page 57

1    A. An -- what do you mean by that?
2    Q. I mean, do you think you're qualified to give
3    opinions about pore sizes and how tissues integrate into
4    those pores?
5    A. In terms of the --
6        MS. DEMING: Object to the form.
7    A. In terms of the -- the pore size related to
8    pelvic mesh and its integration into the type of surgery
9    that I do in terms of pelvic organ prolapse, absolutely, I
10   feel very good about that, being able to talk about that.
11   Q. (BY MR. MONSOUR) How -- how big are the pores
12   on -- in TVT mesh?
13   A. I think in terms of microns, it's probably in
14   the -- I want to say 1,300. I can't -- we had that the
15   other day, 1,300 microns, something like that. It's --
16   it's almost -- it's 2 millimeters.
17   Q. What -- for -- for integration within the pelvic
18   floor, what size of pore is too small and what size is too
19   big?
20   A. I think that's been defined -- I think the
21   definition is 75 is the -- sort of the magic number. If
22   it was less than 75 microns, it was considered smaller
23   pores or microporous, and if it's larger than 75 microns,
24   it's considered macroporous.

Stanton Shoemaker, M.D.

Page 58

1    Q. I guess my definition -- I mean, my question is a
2 little simpler than that.  You're talking about the Amid
3 article, correct?
4    A. Correct.
5    Q. A-m-i-d, I think?
6        MS. DEMING:  You have to answer verbally.
7 Was that a "yes"?
8    A. Yes.
9        MS. DEMING:  Okay.
10    Q. (BY MR. MONSOUR) But I guess -- are -- are you
11 saying -- is it your opinion that a pore -- I think the
12 Amid article says 75 microns is -- bigger than that is
13 macroporous, correct?
14    A. Yes.
15    Q. So would it be your opinion that if something
16 was, like, 79 microns, that would be an adequate pore size
17 for a mesh?
18    A. I'm not sure what "adequate" means.
19    Q. To allow for tissue end growth to get good
20 response.
21    A. I don't have any experience with -- really with
22 any mesh that is smaller than what the Ethicon mesh is.
23 So --
24    Q. So --

Page 59

1    A. -- I would -- without that -- so I don't know.  I
2 know that when pore size is discussed and we know what
3 the -- what we would like to see happen with integration,
4 the bigger the better to a certain degree, and then
5 obviously it's sort of just common knowledge if you get
6 too big, then you don't -- then you don't have any
7 support.
8    Q. But here's -- here's -- this is the basis of my
9 question.  This is why I'm asking you, because I don't
10 know exactly what Ms. Deming will ask you on the stand.  I
11 have an idea, but I don't know everything and I don't know
12 what answer you're going to give.  And so some of the
13 questions I have to ask you are what are you going to talk
14 about.
15        And one of the things that I need to find
16 out is, you know, how much do you really know about pore
17 size and its role in integration with tissue?
18        MS. DEMING:  Object to the form, asked and
19 answered.
20    Q. (BY MR. MONSOUR) And is it -- you know, what
21 size of pore is too small and what size of pore is too big
22 to effectively work in the pelvic floor?  I guess that's
23 what I'm getting at.
24    A. Prior to using some of the Prolift products, I

Page 60

1 did have some experience with a -- some biologics that
2 were cross-linked biologics that really had small pore
3 sizes, and I abandoned their use because they oftentimes
4 would encapsulate -- they never would get integrated in
5 the tissue and then they would ultimately fail.
6        So I do have some personal experience with
7 products that are tiny in terms of pore size.  I have no
8 idea whether they were 75 microns or whether they were
9 74 microns.  My -- I can tell you from my discussion with
10 my peers at meetings and things that the Amid article at
11 75 seemed to be the goal -- the standard by which these
12 pore sizes were measured.
13        And I know that the Prolift products and the
14 TVT-O products were exceed -- certainly would be
15 classified as macroporous and that they seemed to work
16 extremely well in terms of being able to integrate into
17 the tissue when placed properly.
18    Q. So the -- the smaller pore products that you
19 worked with were not polypropylene products, they were
20 biologics?
21    A. That's right.
22    Q. One of the things we have to do is we have to
23 figure the basis for your knowledge.  Is the basis for
24 your knowledge on pore size pretty much the Amid article?

Page 61

1    A. And my experience --
2    Q. Okay.
3    A. -- and what the -- and the -- you know, the
4 studies and things that I've reviewed in my, you know,
5 participation in some of these conferences, et cetera.
6    Q. Okay.  So the Amid article I can pull up and I
7 can look at.  I can't really pull up your experience and
8 look at it, but I can -- I can ask you about it.
9        As far as your experience, what is it about
10 your experience that you believe would allow you to be an
11 expert on pore size?  And -- and here's -- and I'll be a
12 little more specific.
13        Is your experience, Hey, I've worked with
14 some of these Ethicon products, I put them in, the pore
15 seems to be good, so, therefore, I know about pores, or do
16 you actually really know something about differences in
17 pore size and those types of things?
18        MS. DEMING:  Object to the form.
19    A. Well, you can certainly look at it and see, you
20 know -- I can certainly look at the mesh every time I
21 utilize it.  And -- and, you know, none of the -- none of
22 the -- any study that you read about certain types of
23 meshes that were being introduced back in the early 2000s,
24 sometimes there would be conferences that we would --

Stanton Shoemaker, M.D.

Page 62

1  there would be discussions about why certain meshes work
2  better than others and a lot of times the concept of pore
3  size would come up.
4          So the fact that the pore size and the Amid
5  article indicates that the 75 micrograms was picked, that
6  anything over than was macroporous, most people have had
7  in their experience and what they wrote about in terms of
8  their -- what they would utilize in some of these clinical
9  trials, they would typically want to use a macroporous
10 product.  And the clinical trials that we saw, the results
11 seemed to be good and it was consistent with what I was
12 seeing in my patients.  I wasn't seeing patients come back
13 with big-time failures.
14         And, like I said, the time -- the couple of
15 times that I used products that were really tiny porous
16 materials, I quit using them quite early on.
17 Q.  (BY MR. MONSOUR)  But back -- that's kind of
18 where I'm getting at.  The -- if the Amid article talks
19 about 75 microns and you had said before you think the
20 pores in TVT are about 1,300 microns --
21 A.  I think that's right.
22 Q.  The number that's sticking in my head is, like,
23 1,379 or something like that.
24 A.  Okay.

Page 63

1          MR. MONSOUR:  Do you know off the top of
2  your head?
3          MS. DEMING:  (Moving head side to side.)
4          MR. MONSOUR:  Okay.
5  Q.  (BY MR. MONSOUR)  I think you're right.  I think
6  it's in the 1,300s, but if it's in the 1,300s, that's
7  roughly 14 times the size of 75 microns, correct?
8          MS. DEMING:  Object to form.
9  Q.  (BY MR. MONSOUR)  Right?
10 A.  Yes.
11 Q.  And I guess that's what I'm getting at.  That's
12 not slightly bigger than 75 microns, that's roughly 14
13 times bigger, if my math is correct, right?
14 A.  Yes.
15 Q.  And so I guess that's where we -- that's what I'm
16 trying to figure out is obviously Ethicon didn't say,
17 okay, bigger than 75 works, so we're going to make it 78.
18 For some reason, they have picked the size that they
19 picked, which is -- we'll say is ballpark of
20 1,300 microns.
21         My question to you is:  Why is 1,300 -- why
22 is that a good number or size for a pore?  That's kind of
23 what I'm getting at.
24 A.  I'm not -- I'm not sure.  It just simply means

Page 64

1  that it's -- it's -- it falls into the category of being
2  macroporous, and when investigators sit around and talk
3  about various products and which ones work, seem to be the
4  best, then they -- they use the words "macroporous" versus
5  "microporous," and that's been set up as the criteria of
6  what's macroporous and what's not.
7  Q.  The meshes -- the mesh that you use now for
8  sacrocolpopexy, the ARTISYN, how -- what are the size of
9  the pores in that?
10 A.  It's about -- it's -- it's a plus -- it's the
11 Prolift +M mesh, so whatever that pore size is.  I think
12 it may be -- it starts out at 1,300, but it increase --
13 or, yeah, in that -- but the -- since the big part of the
14 fibers are absorbable Monocryl fibers at the pore size,
15 once in 90 days is even larger.
16 Q.  Do you know after 90 days how large the pores
17 get?
18 A.  I want to say 2,400, 2,500, something like that.
19 Q.  So when it goes in, it has about the same pore
20 size when you factor in the Monocryl as the TVT, and then
21 once the Monocryl dissolves or absorbs, it has a much
22 larger pore?
23         MS. DEMING:  Object to the form.
24 A.  Yes.

Page 65

1  Q.  (BY MR. MONSOUR)  If I look in your reports, it
2  appears that one of the things you're talking about is the
3  physician that implants the product can have a significant
4  role as to whether or not the product -- the transvaginal
5  mesh product functions well inside the woman; is that
6  true?
7  A.  Yes.
8  Q.  Do you believe that in most cases where a woman
9  is having problems with her transvaginal mesh implant,
10 that in most cases it's more of an issue of physician
11 problems versus product problems?
12         MS. DEMING:  Object to the form.
13 A.  It may not -- it's a little more complex than
14 that.  The physician does play a big role, but there can
15 be other complications that can occur in the surgery
16 that's just part of surgery that can influence whether or
17 not the product is adequate or has complication with it as
18 well.
19 Q.  (BY MR. MONSOUR)  Give me -- give me an example
20 of some of the things that can take place in surgery that
21 can affect how -- what the outcome is.
22 A.  You can have hematomas form.  It breaks down the
23 wound.  Anything that has to do with the -- with -- that
24 can influence the way the vagina heals can influence some

Stanton Shoemaker, M.D.

**Page 66**

1  of the complications with the mesh. Some of that has to
2  do with the vascularity to the tissue that you're trying
3  to repair over the mesh when you're pulling, the position
4  of the mesh in the tissue, whether or not a hematoma
5  develops as a result that doesn't even -- you may not even
6  see it until after the patient has gone to recovery or may
7  not even see it for several days after she's home that can
8  break down the wound, the vaginal wound that's been
9  repaired.
10      Q. What's a hematoma?
11      A. That's a -- that is a mass -- a mass of a blood
12  clot that occurs at the operative site where blood vessels
13  have been disrupted and the blood collects there and it
14  forms almost a mass like a tumor. That's why the -- the
15  suffix "oma" is applied. So it's a -- it's a hemorrhage
16  that occurs at the operative site.
17      Q. Okay. How -- how often do patients suffer from
18  hematomas when they're having transvaginal mesh products
19  implanted in them?
20      A. A lot of the study -- you know, if you read some
21  of the studies, they'll often talk about blood loss, but
22  you don't necessarily see them defined as hematomas. But
23  I think they -- I don't know what the number is, but I can
24  tell you that I've had maybe two hematomas occur in

**Page 67**

1  vaginal mesh surgery that ended up disrupting the suture
2  line where the vagina comes together.
3      Q. Okay. And to put that in context, if we add up
4  the number of slings that you've implanted and the number
5  of pelvic organ prolapse kits you've implanted, the
6  number's well over a thousand, correct?
7          MS. DEMING: Object to the form.
8      A. Yes.
9      Q. (BY MR. MONSOUR) So if you've only had two out
10  of well over a thousand, it's a fraction of a percent
11  where we see issues of hematomas affecting the -- the --
12  how well the implant performs?
13          MS. DEMING: Objection, form.
14      A. Well, the hematoma is a -- influences the healing
15  process of the vagina that's been overlaying the implant,
16  and that can make a difference in some complication with
17  the implant.
18      Q. (BY MR. MONSOUR) Right.
19      A. But -- but just because I've only had two doesn't
20  mean that that -- the rest of the world -- there may be
21  more than that.
22      Q. Okay.
23      A. That's a pretty low number.
24      Q. So -- but I guess what I'm getting at is, you

**Page 68**

1  know, I'm trying to figure out, you know, if -- what I'm
2  trying to figure out is there's a lot of women who have
3  lawsuits involving transvaginal mesh products. You're
4  aware of that, correct?
5          MS. DEMING: Object to the form.
6      A. Yes.
7      Q. (BY MR. MONSOUR) Several thousand -- tens of
8  thousands, correct?
9          MS. DEMING: Object to the form.
10      A. I don't know the number.
11      Q. (BY MR. MONSOUR) Okay. I'll represent to you --
12  and I'm not lying -- it's tens of thousands of women,
13  okay?
14          MS. DEMING: Object to the form.
15      Q. (BY MR. MONSOUR) If that's the case, and there's
16  all these complaints out there, what I'm trying to figure
17  out is, is what's causing the problem in your opinion.
18  Why are so many women having problems? That's literally
19  all I'm trying to figure out. And what I'm trying to
20  figure out is, is the product, is it the doctor, is it
21  something else?
22          MS. DEMING: Object to the form.
23      Q. (BY MR. MONSOUR) And so what I want to do is I
24  just want to kind of walk through those. Do you think --

**Page 69**

1  do you think the products themselves, the transvaginal
2  mesh products, are the reason that so many women are
3  having issues with transvaginal mesh implants?
4          MS. DEMING: Object to the form.
5      A. Well, it depends on what their particular
6  complaint is. I think that if -- I don't think you can
7  just say automatically that it's -- it's related to
8  something about the mesh. I think there is a much, much
9  bigger influence in terms of the way the mesh was applied,
10  the way the mesh was inserted, certain things that happen
11  to the mesh when it's inserted improperly, and then
12  there's a -- several -- several other problems that can
13  occur in the healing process.
14          Anything that happens that doesn't allow the
15  mesh to be integrated into the tissue in which it's
16  implanted can influence a complication with the mesh or a
17  failure of the mesh.
18      Q. (BY MR. MONSOUR) Okay. All right. So this is
19  why I'm asking you the question, because you -- when you
20  say, well, one of the things that can -- one of the things
21  that can contribute to these women's complaints is you
22  said the way it is applied or inserted, those are your
23  words, correct?
24          MS. DEMING: Object to the form.

Stanton Shoemaker, M.D.

Page 70

1   A.   Yes.
2   Q.   (BY MR. MONSOUR)  To me, that implies potentially
3   operator error, in other words, the doctor might not have
4   done a great job putting it in.  That's what I hear when
5   you tell me that.
6   A.   (Moving head up and down.)
7   Q.   Am I close?
8   A.   Yeah, I think that plays a big role.
9   Q.   Okay.  So the doctors can play a big role in the
10  women having poor outcomes.  You agree with that?
11  A.   Yes.
12  Q.   You've also mentioned the healing process can
13  play a big role in how the women respond to the implants,
14  correct?
15  A.   Yes.
16  Q.   What about the healing process other than
17  hematomas, which you've already explained, can cause the
18  women to have problems?
19  A.   Anything that disturbs the vascularity of the
20  area and the site in which the surgery's done and the
21  implant is placed, anything -- vascularity of that area is
22  really very, very important.  So hematoma's disrupted.
23  Infection, if they get an infection in that area where
24  the -- and I'm talking about the incision line in the

Page 71

1   vagina which has been opened up into the -- into the -- to
2   create the space in which the implant is placed.
3        So anything that disrupts the blood supply
4   to that area.  Could be the vaginal tissue is already
5   anemic, in other words, it's very atrophic or it's very
6   thin, and there's not much blood supply that can increase
7   the risk of the -- of the incision line breaking down.
8        A infection that occurs at the time of
9   the -- acute infection that occurs at the time of surgery
10  can influence the breakdown of the tissue.  If the implant
11  is placed too superficial and it's not really in the
12  correct location, between the organ, the bladder, and the
13  vagina, can make a huge difference in terms of whether
14  there's a good vascularity into the vaginal healing
15  process.
16        The suture material used to close the vagina
17  can make a difference in whether there's a -- and how --
18  and how tight the -- and the way the suture material is
19  placed can influence the vascularity of that area.
20        If the mesh is inadvertently manipulated by
21  the surgeon in a way to shrink or to reduce the pore size
22  can make an influence -- can influence the way the graft
23  itself is placed and can influence the way it's
24  integrated, so there's a lot of factors.  If the graft is

Page 72

1   placed correctly and it's in the right place and there's
2   good vascularity and there's not a hematoma, those
3   patients typically do great.
4        Q.   So let's -- let's take a -- let's take a
5   situation where -- I'm going to go out on a limb and I'm
6   going to say that you think you're a pretty good doctor.
7   Is that a fair statement?
8        MS. DEMING:  Object to the form.
9        A.   Okay.  I don't have any idea what all this means.
10  But, yes, I do.
11        Q.   (BY MR. MONSOUR)  Okay.
12        MS. DEMING:  I just have to make objections
13  for the record, Doctor.
14        THE WITNESS:  That's fine.
15        Q.   (BY MR. MONSOUR)  And I just want it to be noted
16  that your own lawyer objected to that.
17        MS. DEMING:  The objection was based on his
18  telling you what he feels about things.  That doesn't have
19  anything to -- you don't know that, so that's where the
20  objection -- he is a fine doctor, let me state on the
21  record.
22        Q.   (BY MR. MONSOUR)  So we're going to go with that.
23  Your lawyer says you're a fine doctor.  And we'll -- we'll
24  say -- let's assume that that's correct.

Page 73

1        Let's say you've got a surgery -- you're a
2   fine doctor.  You've been doing this for decades.  And you
3   put in one of these mesh implants.  You don't have any
4   issues with infection, atrophic tissue, there's no
5   infections that take place during the surgery, there's no
6   superficial placement, you've put it in right, the suture
7   material, the suturing is all done right, you don't
8   inadvertently manipulate the implant in a way that affects
9   the pore size.
10        If you as a good surgeon put it in and you
11  don't have any of those factors, yet the client -- the
12  patient still has problems down the road from the implant,
13  would that indicate to you that the problem's probably
14  more to do with the implant?
15        MS. DEMING:  Object to the form.
16        A.   It would depend completely on what the problem
17  is.
18        Q.   (BY MR. MONSOUR)  But I guess --
19        A.   I mean -- I mean -- I mean, I don't -- I don't
20  understand what the -- I mean, before I could answer that,
21  I'd have to know what the particular problem is.
22        Q.   Let's assume that the woman down the road is
23  suffering from pain, pain in the area of the implant.
24  Would you assume that that problem would be more related

Stanton Shoemaker, M.D.

Page 74

1  to the implant than to the doctor that put it in?
2         MS. DEMING:  Object to the form.
3      A.  There are tons of reasons why women may have
4  chronic pain or pain, and I would not just assume that
5  it's related to the implant.
6      Q.  (BY MR. MONSOUR)  Okay.  Have you seen
7  circumstances where women have had chronic pain that you
8  have associated with their implant?
9         MS. DEMING:  Object to the form.
10     A.  Are you talking about -- just pain in general and
11  not necessarily with intercourse, they're just standing
12  around and they're hurting all the time?
13     Q.  (BY MR. MONSOUR)  Let's start with pain in
14  general first.
15     A.  Okay.
16     Q.  Have you seen that situation?
17     A.  I have not.
18     Q.  Okay.  Have you seen a situation where a woman
19  has pain with intercourse that is long-term, chronic,
20  associated with her transvaginal mesh implant?
21     A.  I have heard of that -- of patients complaining
22  of that, and I have examined patients complaining of that,
23  and most -- I would say almost all of the time I can feel
24  something that doesn't -- about the way the implant was

Page 75

1  placed.  So I can't tell you that I've got --
2  automatically that if she's complaining of painful
3  intercourse, that it automatically is related to the mesh
4  when all of those other criteria have been met.
5      Q.  Okay.  So in situations where you've examined
6  women that have chronic complaints of dyspareunia
7  associated with their implant, you've been able to feel
8  something about the implant that leads you to believe it
9  was placed improperly?
10        MS. DEMING:  Object to the form.
11     Q.  (BY MR. MONSOUR)  Is that accurate?
12     A.  Well, if they -- if the patient comes in and
13  that's their main complaint and then -- and I do an
14  examination, you sort of have to rule out all the other
15  reasons that they may have pain with intercourse and how
16  many other surgery -- there can be lots and lots and lots
17  of different things that influence that.
18        If -- if they -- if I see -- on the
19  examination, I can see an addition to their pain
20  complaint, they have an erosion or they can palpate the
21  mesh underneath the vaginal wall or it's -- and it's --
22  and they have point tenderness right over that spot,
23  then -- then I can make the assumption that it may be mesh
24  related, and it most like -- it is most invariably the way

Page 76

1  it was -- the way it was implanted.
2      Q.  Okay.  You probably will anticipate this
3  question, so I'm going to ask it.  How can you tell simply
4  by touching it?
5         MS. DEMING:  In the instance he's
6  describing?
7         MR. MONSOUR:  Yes.
8      A.  Well, you can -- when you do the exam and you
9  feel that everything in the vagina's soft and pliable and
10  mobile and not tender and then you reach a spot where
11  it's -- it feels hard and firm and they move 10 feet off
12  the table when you touch it, that's a pretty good
13  indicator that that's where they're hurting.
14     Q.  (BY MR. MONSOUR)  That makes sense to me.
15        But here's my question:  How can you tell by
16  simply touching it and they jump 10 feet off the table and
17  it's hard and firm, how can you tell by doing that that it
18  was probably put in wrong by the doctor that put it in?
19     A.  Well, I've gone in --
20        MS. DEMING:  Object to form.
21     A.  -- cases to remove those areas that are
22  exquisitely tender and thinking that it might have been
23  the mesh that has been implanted and discovered that
24  there's not even any mesh there, that the scarring was

Page 77

1  just -- maybe they'd had previous attempts at removing
2  mesh because of exposure and then the vagina's repaired in
3  that area and it scars down and there's no mesh around
4  there.  Or they even have intraperitoneally some adhesion
5  of their colon or small bowel that's stuck to the apex of
6  the vagina right where that point tender spot is.
7         So you might think it's mesh related because
8  of the temporality of the complaint when the mesh was put
9  in, but then you discover it really isn't mesh at all, it
10  may be something else.  Sometimes you can tell -- listen,
11  when the implantation occurs, if everything is -- if -- if
12  there's a -- it may not even be intentional.  If there's
13  an overtensioning, especially with -- if there were arms
14  involved with regard to the Prolift device and it
15  wasn't -- and the arms were not all the way to the pelvic
16  side wall but were actually kinked or pulled or twisted or
17  taut right under the vaginal wall more closer to the
18  midline, those are -- those are places where there --
19  extra scarring can take place, and then you go in and you
20  remove that scar that you palpate and there may be mesh
21  there.  But you can't always assume it's always related to
22  the mesh.
23     Q.  (BY MR. MONSOUR)  My question was more simple
24  than that.  My question is:  On you performing your

Stanton Shoemaker, M.D.

Page 78

1 exam -- as I understood it, you said, I can go in there
2 and I can feel and I can feel something about how the
3 implant was placed when there's the problem.
4        What I'm asking you is: How can you as a
5 doctor simply reach inside or examine a woman's vagina and
6 by touching it figure out, hey, that was -- there's
7 something about how that product was placed that is
8 causing that problem? That's what I'm asking.
9        MS. DEMING: Object to the form, asked and
10 answered.
11       A. If I can feel the -- if I can actually feel the
12 mesh under my finger when I'm doing the examination in a
13 particular area, then the mesh has been placed
14 superficially.
15       Q. (BY MR. MONSOUR) Okay. Now, one of the issues
16 that is present in this litigation involves shrinkage of
17 the mesh. Are you familiar with this topic?
18       A. Yes.
19       Q. Do you believe that mesh when it is implanted
20 transvaginally can shrink?
21       A. I don't think so.
22       Q. Okay. Let me ask it another way. Do you believe
23 that mesh when it is implanted transvaginally, as there is
24 scar tissue ingrowth, that scar tissue ingrowth can cause

Page 79

1 the mesh to shrink or contract?
2        A. I believe that the -- the collagen that's laid
3 down in between the -- the pores of the mesh that
4 integrate the mesh, they may have some minimally
5 contractual characteristics.
6        The typical problem with contraction from
7 what I've seen has been when the mesh has -- is overly
8 tightened and there's a -- it encapsulate the scar
9 tissue -- not the scar tissue that grows into the pores of
10 the fabric, but the scar tissue around the outside
11 encapsulates and then that scar contracts, that creates a
12 much bigger problem.
13       Q. Do you think you would be an appropriate person
14 to try to give expert opinions on shrinkage or
15 contraction?
16       A. I think so. I mean, from my experience and --
17       Q. Okay.
18       A. Uh-huh.
19       MS. DEMING: Speak up.
20       A. Okay.
21       Q. (BY MR. MONSOUR) Let me ask you this: What
22 would be an acceptable amount for a transvaginal mesh
23 implant of shrinkage or contraction so it wouldn't cause a
24 woman problems?

Page 80

1        MS. DEMING: Object to the form.
2        A. I'm not sure I know exactly -- you're saying what
3 percentage?
4        Q. (BY MR. MONSOUR) Yes.
5        A. I don't know the answer to that.
6        Q. Let me ask -- let me ask it another way. Is
7 there an amount of shrinkage or contraction that if it
8 took place, it would concern you as someone who implants
9 these types of products?
10       A. The only time it's going to create a clinical
11 problem is if there's -- if maybe the -- one of the things
12 we always did when we put in vaginal Prolift, as an
13 example, was you didn't want to trim any excess vaginal
14 tissue. You wanted to use a suture material that was
15 delayed absorbable, and you didn't want to do anything
16 that would contract or constrict the blood vessels and
17 reduce blood supply.
18       And if you did -- followed -- and if you did
19 that, you didn't -- if it contracted some, then -- I mean,
20 I don't even know how we would measure that except for the
21 fact that the patient wouldn't be complaining of any
22 particular problem and you could -- you felt pretty
23 comfortable that they were -- you've got good integration
24 of the mesh into the tissue and you did not get an

Page 81

1 encapsulation.
2        So I don't know -- I do not know how you
3 would -- you know, what's -- what if you -- if you
4 measured something like a -- I don't even know how to
5 measure what the contraction is and if it contracts
6 10 percent. I -- or whether it contracts 50 percent just
7 on the basis of contraction alone that that's going to be
8 an issue.
9        Q. I think they look at the size of the mesh implant
10 before it goes in and then I think they try and look at it
11 afterward to determine how much it contracts.
12       A. You mean --
13       MS. DEMING: Object to the form.
14       A. You mean you measure the amount of the size of
15 the mesh you put in and then when you take it out, you
16 measure that size and then you try to come up with an idea
17 that if -- if it was 10 centimeters long and now it's
18 8 centimeters long, it contracted 2 centimeters?
19       Q. (BY MR. MONSOUR) Yeah, basically.
20       A. I've -- well, you have some mesh --
21       MS. DEMING: Is there a question pending?
22 I'm sorry.
23       Q. (BY MR. MONSOUR) Yeah, we're trying to get on
24 the same page.

Stanton Shoemaker, M.D.

Page 82

1      MS. DEMING: Well, I don't think there's a
2  question pending, so until -- he told you what he thinks
3  it is, you've now asked him about that. I don't think
4  there's a question pending.
5      A. Okay.
6      Q. (BY MR. MONSOUR) Here's my question: Would you
7  keep talking about what you were just talking about about
8  that?
9      MS. DEMING: Object to the form.
10     Q. (BY MR. MONSOUR) So I can ask my follow-up.
11     A. Okay. Just ask it and I'll --
12     Q. Well, my -- I mean, that's -- what you and I were
13  talking about is contraction, correct?
14     A. Yes.
15     Q. And you understand that if you put in a piece
16  that's, like you said, 10 centimeters and when they look
17  at it afterwards, after it's been implanted, it's down to
18  8 centimeters, there are people that have looked at those
19  types of things before and they might conclude, well,
20  that's shrunk 20 percent because it's contracted
21  2 centimeters, correct?
22     MS. DEMING: Object to the form.
23     A. I don't think the word "correct" is the right
24  question. I think the word is do I -- do I think that's

Page 83

1  an adequate way to measure that, and I would say
2  absolutely not.
3      Q. (BY MR. MONSOUR) Okay.
4      A. And the -- go ahead.
5      Q. So you tell me. How would you adequately measure
6  contraction or shrinkage?
7      A. Well, a lot of times mesh gets trimmed up before
8  it ever gets put in to fit the space. And I never
9  measure -- I never measure, and I don't know any surgeon
10  that actually measures the exact length of what's put in.
11  And then when it's removed, I don't know of any surgeon
12  that measures what's removed and knows that they removed
13  all the mesh that was there.
14     Q. Assume with me that there are people that have
15  measured before and do measure after, okay? If they are
16  doing that, what amount of contraction would concern you?
17     MS. DEMING: Object to the form.
18     A. I don't have any -- I have no experience with
19  that, but I would be very suspect in the mechanism that
20  was used to make that conclusion. I'd have to look at the
21  specific case and see exactly what was talking -- what
22  they were talking about.
23     Q. (BY MR. MONSOUR) Have you ever looked at any
24  studies that have talked about shrinkage or contraction of

Page 84

1  mesh?
2      A. Not from a clinical standpoint.
3      Q. Have you ever looked at any internal Ethicon
4  documents that talked about shrinkage or contraction of
5  mesh?
6      A. No.
7      Q. If there were Ethicon documents that indicated
8  that shrinkage or contraction of mesh took place, would
9  you like to see those types of documents?
10     MS. DEMING: Object to the form.
11     A. Would I like to see them?
12     Q. (BY MR. MONSOUR) Yes.
13     A. I mean, like when, like now?
14     Q. At any point in time. If you're going to -- if
15  you're going to talk about shrinkage or contraction as an
16  expert, wouldn't you like to know what Ethicon has
17  internally with regard to whether or not their products
18  shrink?
19     MS. DEMING: Object to the form.
20     A. Well, it depends on how it is applied clinically.
21  I mean, I'm not sure it would -- that would make any
22  difference in terms of my utilization of the product. I'd
23  have to know a lot more about what the circumstances were
24  and what they were talking about and what the

Page 85

1  specifications are and how it was measured and what it was
2  measured in and what it was measured on and was it
3  measured in a -- on a bench lab or was it measured in a
4  human being or what.
5      Q. (BY MR. MONSOUR) Well, I think you're quibbling
6  with me on specifics. Just generally --
7      MS. DEMING: Objection, form.
8      Q. (BY MR. MONSOUR) -- speaking, if Ethicon has
9  looked at the issue of contraction or shrinkage and has
10  internal documents about it, as an expert that might talk
11  about that, wouldn't you like to see that information?
12     MS. DEMING: Objection, form.
13     A. It depends on what the information is.
14     Q. (BY MR. MONSOUR) What if it's information that
15  talks about how their product shrinks or contracts --
16     MS. DEMING: Objection, form.
17     Q. (BY MR. MONSOUR) -- and how much it shrinks or
18  contracts --
19     MS. DEMING: Objection, form.
20     Q. (BY MR. MONSOUR) -- and explains exactly how
21  they measure it, wouldn't you like to see that?
22     A. Only if it --
23     MS. DEMING: Object to the form.
24     A. I would like to see it only how it applied from a

Stanton Shoemaker, M.D.

Page 86

1 clinical standpoint in humans.
2     Q. (BY MR. MONSOUR) Okay. Why would you like to
3 see contraction and shrinkage information as to how it
4 applies to humans? Why?
5     A. Well, if there was really -- if it really made a
6 difference clinically, if it did make a difference
7 clinically, and there was some kind of study that showed
8 that, that in human beings that the -- that -- who had
9 increased mesh problems because of the -- because it was
10 anticipated or thought that it was related to shrinkage,
11 yes. But -- but I don't -- there is no data like that.
12     Q. How could shrinkage or contraction make a
13 difference clinically?
14         MS. DEMING: Object to the form.
15     A. I'm not sure except that if it's -- if it's
16 like -- if the contraction is caused by -- if a
17 contraction is caused from an encapsulation of -- of
18 material such that the material is then blocked, pulled,
19 or tightened, sometimes that increased scarring under the
20 vagina can cause some point tenderness and it might be the
21 case. Again, this has to do with the concept of the mesh
22 becoming encapsulated rather than integrated.
23     Q. (BY MR. MONSOUR) Okay.
24     A. And as I said before, there's a lot of different

Page 87

1 reasons that that can happen.
2     Q. Do you agree with me that if -- if the mesh is
3 implanted in a woman and if the -- it contracts enough, it
4 can potentially cause point tenderness?
5         MS. DEMING: Object to the form.
6     A. It can potentially cause point tenderness? I'm
7 not sure. Maybe. I'd have to put a big -- there's a --
8 because there may be other things that are involved in
9 that particular spot that could cause point tenderness.
10     Q. (BY MR. MONSOUR) Have you ever looked at studies
11 on slings that have talked about how slings will contract
12 or shrink once they're implanted?
13     A. No, not -- not that they contract or shrink, but
14 sometimes the position of the patient can make a
15 difference in how much tension there is. We always like
16 to put the -- you know, they're -- it's why they call them
17 TV -- tension-free vaginal tape, because you want to make
18 sure they're applied without tension.
19         Whether or not once they're implanted and
20 integrated in the tissue, whether or not there's a
21 contraction or it actually shrinks, I'm not quite sure.
22 Part of the problem -- go ahead.
23         MS. DEMING: No. Finish your answer. If
24 you were finished, that's fine.

Page 88

1     A. I was finished.
2     Q. (BY MR. MONSOUR) Like you were saying, these
3 devices are supposed to be implanted tension-free,
4 correct?
5     A. Yes.
6     Q. If a device is implanted tension-free, truly
7 tension-free, and later on when someone examines the
8 patient notes that there is tension on the product, would
9 that indicate to you that there has been some sort of
10 contraction?
11         MS. DEMING: Object to the form.
12     A. No, it would probably indicate that the -- it's
13 maybe not as tension-free as what was described at the
14 beginning.
15     Q. (BY MR. MONSOUR) So it would be a situation
16 where the doctor might have put it in too tight?
17     A. Correct.
18     Q. Have you ever heard of the term "banding"?
19     A. Yes.
20     Q. What is that?
21     A. It typically applies to -- more to slings or at
22 least the arms that were on Prolift. When they're
23 tensioned, if -- you have a -- if you had one here, I
24 could show you.

Page 89

1         But if you -- you know, the TVT and TVT-O
2 tape is a flat piece of material, right?
3     Q. Right.
4     A. And it has some stretch. And if you really
5 overstretch it, it -- instead of being flat, it becomes --
6 the width narrows and it becomes more like a -- like this
7 (indicating).
8     Q. Let me see if I can describe it and see if you
9 agree with me. As you pull on a flat piece of TVT,
10 whether it's the -- just the mesh, whether it's TVT or
11 TVT-O, if you pull on it, the ends will kind of curl up?
12         MS. DEMING: Object to the form.
13     Q. (BY MR. MONSOUR) Is that what you're saying?
14     A. The form -- yeah, instead of a nice, flat piece
15 of material, it becomes more like that --
16     Q. Okay.
17     A. -- a round circular or cord like this.
18     Q. And what you're doing, just so I can describe for
19 the record, is you're holding the cord to the
20 speakerphone, correct?
21     A. Yes.
22     Q. And that's just a standard cord --
23     A. Yes.
24     Q. -- right?

Stanton Shoemaker, M.D.

## Page 90

1    And you think that that phenomenon takes
2 place because when the surgeon was putting the product in,
3 they pulled too tightly on the mesh itself?
4    A. Yes.
5    Q. Have you ever heard of a situation where that
6 phenomenon occurs, but the surgeon did not place any
7 excess tension on it?
8    A. No.
9    Q. So, in your opinion, when you see something like
10 the banding taking place, that's an issue of operator
11 error, not an issue where the product is poorly designed,
12 correct?
13      MS. DEMING: Object to the form.
14    A. Yes.
15    Q. (BY MR. MONSOUR) And another way that they talk
16 about it is, is they call it periurethral banding?
17      MS. DEMING: I'm sorry. What did you say?
18      MR. MONSOUR: Periurethral banding.
19      MS. DEMING: Object to the form.
20    A. What do -- you mean that -- that phenomenon --
21    Q. (BY MR. MONSOUR) Yeah.
22    A. -- where --
23    Q. Do you just call it banding or do you call it
24 periurethral banding?

## Page 91

1    A. If it's around the urethra, it's periurethral.
2    Q. Okay.
3    A. That's the definition of periurethral.
4    Q. Okay. Have you ever read any studies about
5 banding or anything like that?
6    A. No.
7    Q. I want to ask you a hypothetical situation. A
8 doctor places a TVT-O appropriately with no tension.
9 Years later, the patient is examined and a doctor notes
10 banding. Can you explain how something like that could
11 occur if the doctor put in the TVT properly?
12      MS. DEMING: Object to form.
13    A. Well, you're making a big assumption that he put
14 it in properly, and you're probably having to base that on
15 the operative report that it was placed.
16      I don't -- I don't know the answer to that.
17 I know I've put in jillions of them and we haven't seen
18 that. I do have -- I've created a band before.
19    Q. (BY MR. MONSOUR) How?
20    A. Well, when we place -- do you want me to tell you
21 how the -- has to do with the technique when you put in a
22 sling?
23    Q. Sure.
24    A. I would always use -- I always use a spacer at

## Page 92

1 the time we're making our adjustments on the tension. A
2 spacer is the device that you put in between the urethra
3 and the mesh material, and then as you tension it, you
4 tension it up on the spacer so it can't tension up on the
5 base of the urethra.
6    Q. Okay.
7    A. Okay. And then -- and the ends of the sling are
8 coming out through the skin, okay --
9    Q. Okay.
10    A. -- through needles. You've already looked in the
11 bladder, you know there's no bladder injury, et cetera.
12      So at this point, you clip the trocars off
13 of the cellophane and the material, and then you have your
14 assistant -- when you finally get it up next to this
15 spacer, your assistant pulls the cellophane off of the
16 ends of the mesh and then you can slip out your spacer and
17 it allows the mesh to lay perfectly flat and tension-free.
18    Q. Okay.
19    A. Okay. Now, in a situation where my spacer --
20 when I was -- when my assistants pulled at the same time
21 the cellophane, the spacer accidentally pulled out the
22 tension that was placed on the mesh created this.
23    Q. Okay.
24    A. Okay. So it was -- I had to -- I had to cut it

## Page 93

1 out right then. I mean, I was able to get it out and
2 replace it.
3    Q. Okay. Fair enough.
4      And one of the -- what you were talking
5 about -- what you were describing is you put the spacer in
6 between the sling and the urethra and you pull off the --
7 the sheaths or whatever?
8    A. Correct, the cellophane sheaths --
9    Q. Okay.
10    A. -- that allows the -- the sling material, the
11 mesh, to be in contact with tissue.
12    Q. Right. And that -- and part of the reason they
13 have the sheaths on there is so they're not stretching the
14 mesh as they're pulling it through the tissue?
15      MS. DEMING: Objection, form.
16    A. Well, that's one reason, but the main -- the
17 other reason is you can't -- once the sheath is removed,
18 it's very difficult to move that tissue at all.
19    Q. (BY MR. MONSOUR) Okay.
20    A. It gets fixed in place. And so the sheath being
21 smooth, you can make your adjustments that you need to
22 make to put it in the right position.
23    Q. All right. Now, let me ask you a question.
24 Let's assume that -- let me start -- let me start again.

Stanton Shoemaker, M.D.

Page 94

1    In the situation -- the one situation you
2 had where you had the phenomenon of banding, you
3 immediately removed the sling right then and there?
4    A. Yes.
5    Q. And you -- did you then put in another sling
6 immediately?
7    A. Yes.
8    Q. Okay. So you didn't wait and let that heal and
9 then come back several weeks later. You said, okay, let's
10 take this one out and let's immediately put one back in?
11    A. Yes.
12    Q. Okay. If a different doctor did that, not you,
13 but put in the first sling and banding happens and that
14 doctor says, close enough, sews the patient -- closes her
15 up, how soon do you think the patient would start feeling
16 the effects of the banding? Would it be pretty
17 immediately?
18        MS. DEMING: Object to the form.
19    A. I don't -- I don't know the answer. Maybe. It's
20 possible it could be pretty immediately. It's possible
21 that it could get encapsulated over the months and then
22 create some problem with pain.
23    Q. (BY MR. MONSOUR) Because what I think you're
24 explaining to me is as it's pulled and as there's banding

Page 95

1 as you described with the edges kind of curling up, that's
2 as a result of tension, right?
3    A. Yes.
4        MS. DEMING: Object to the form.
5    Q. (BY MR. MONSOUR) And so if it is tensioned too
6 much from the get-go, the patient very likely could feel
7 that very soon after surgery, wouldn't you think?
8    A. It's possible. It is very possible.
9        MS. DEMING: Object to the form.
10        Give me a moment to make my objection before
11 you start answering.
12        THE WITNESS: Okay. All right.
13    Q. (BY MR. MONSOUR) Have you ever operated on a
14 woman where she's had the banding where it was implanted
15 by somebody else and you were called in to fix it?
16    A. At the -- at the time it was implanted?
17    Q. No, I'm talking about -- I'm talking about one of
18 these situations where -- you know, we talked about your
19 revisions and you said you did -- you've done 12 to 20
20 revisions and one of them was for yours and you said the
21 other ones other doctors put in?
22    A. Isn't that amazing?
23        Yes, I understand what you're saying.
24    Q. So my question is: Of any of those 12 to 19 that

Page 96

1 you've looked at that -- that were from somebody else, did
2 any of those have the banding phenomenon?
3        MS. DEMING: Object to the form.
4    A. I think, yes, maybe one of the slings I removed.
5    Q. (BY MR. MONSOUR) Okay.
6    A. And it could have been -- but I don't recall
7 what -- the timing related to the implant. And also with
8 regard to one of the -- an arm of -- an arm of one of
9 the -- of a pro -- not necessarily a Prolift, but one of
10 the arms that was in one of the other Apogee/Perigee
11 design, you know, they were similar.
12    Q. Okay.
13    A. And, so, yes. Go ahead.
14    Q. So my question would be: You believe you have
15 operated twice to repair situations where banding has
16 taken place?
17    A. Yes, where -- well, yes, there -- in other words,
18 the band -- bands have been removed, pieces of -- like
19 this instead of having a nice, flat piece of material.
20    Q. And just to be clear for people that are reading
21 this, when you say "pieces like this," you just grabbed
22 the cord --
23    A. Yes.
24    Q. -- that goes to the speakerphone?

Page 97

1    A. Yes.
2    Q. And the situations where that took place, where
3 you found the banding and you operated to fix the banding
4 that had occurred, that was other surgeons had put it in,
5 not you, correct?
6    A. Yes.
7    Q. And one of them was a sling, a midurethral sling,
8 and the other one, you believe, was an arm from a POP kit,
9 correct?
10    A. Yes.
11    Q. Can you tell me if you can remember the -- those
12 two women -- it was two separate women, I'm assuming; is
13 that fair?
14    A. Yes.
15    Q. Do you know whether those two women that you
16 operated on for banding, whether or not their problems
17 took place or they started having problems immediately
18 after the original implants were put in or was it some
19 time later?
20    A. I don't remember. I don't -- I don't -- I don't
21 think it was within months of the -- I think it was longer
22 than months after the original implant.
23    Q. So there would have been time for tissue
24 integration into the mesh?

Stanton Shoemaker, M.D.

Page 98

1    A. Well, I think one of the problems with banding,
2  when it becomes this type of rope, you can't get
3  integration.
4    Q. Okay.
5    A. That's part of the problem.
6    Q. Okay.
7    A. But I -- go ahead.
8        MS. DEMING: Finish your answer.
9    A. I'm finished. I finished. I was going to -- I'm
10 through.
11   Q. (BY MR. MONSOUR) I'll usually let you talk. If
12 you want to say something, I'll let you do it. I'm
13 usually not one of the ones that yells at people, "that's
14 not my question."
15       MS. DEMING: Are there people that do that?
16       MR. MONSOUR: Yeah, you think?
17       MS. KROTTINGER: Never.
18   Q. (BY MR. MONSOUR) I think you've acknowledged
19 this already, but I just want to clarify it. Or you've at
20 least touched on it.
21       There is a term that you've used, and I've
22 heard other people use, palpable mesh. That means you can
23 feel the mesh once it's been implanted, correctly --
24 correct?

Page 99

1    A. Are you talking about palpating or feeling the --
2  the mesh fabric underneath the tissue?
3    Q. Yes.
4    A. Yes.
5    Q. In a situation where there has been palpable --
6  you can feel palpable mesh, if you were -- if a woman came
7  to you and was having complaints about her implant and you
8  examined her and you found palpable mesh, would it be your
9  opinion that the mesh was implanted superficially?
10   A. Yes. Or -- or it may have been implanted in the
11 right space and the vagina became thinner.
12   Q. Okay.
13   A. And -- and if the vagina became -- because of
14 atrophy and age so that the -- so that the mesh that's
15 sitting on top was then -- it was easier to palpate
16 because the vagina was very thin.
17   Q. Fair enough.
18       If somebody came to you and they had -- and
19 you could feel palpable mesh and you thought -- you
20 thought their vaginal tissue was just thinning, what would
21 you do to help them with that condition?
22   A. Well, it would depend on what they were
23 complaining about.
24   Q. Okay.

Page 100

1    A. Most of the time in that situation when you
2  palpate, you can palpate mesh, it's in a patient who's
3  asymptomatic.
4    Q. Okay.
5    A. In other words, it's implanted maybe when they
6  were younger and it was in the right place, and then
7  they've gotten older and they didn't use any hormone
8  replacement and the vagina got thinner and you can feel it
9  on the examination, but it doesn't hurt and they're not
10 complaining of anything.
11   Q. If they had no complaints, would you just let it
12 go or would you give them an estrogen cream to try and
13 help thicken up the vaginal walls?
14   A. Well, that --
15       MS. DEMING: Object to the form.
16   A. That depends on a lot of things. If they're
17 complaining of dryness and have other vaginal complaints,
18 then, yes, we may use an estrogen cream or some type of
19 something. If they were -- if they could take estrogen.
20 Some patients -- you know, maybe they're breast cancer
21 patients that can't use estrogen. So, anyway, there's --
22 there's some other options for them, but it just depends
23 on the individual circumstances.
24   Q. (BY MR. MONSOUR) Okay. I guess I'll look at my

Page 101

1  outline.
2        MS. DEMING: You're like me. You do -- you
3  do a nice outline and then you never look at it except to
4  check things off to make sure you covered it.
5        We've been going about another hour.
6        MR. MONSOUR: Why don't we take a lunch
7  break.
8        (Lunch recess.)
9    Q. (BY MR. MONSOUR) All right. We are back after a
10 lunch break. Dr. Shoemaker, are you ready to continue?
11   A. Yes.
12   Q. Okay.
13       (Exhibit 3 marked.)
14   Q. (BY MR. MONSOUR) Let me hand you what I've
15 marked as Exhibit 3.
16   A. Okay.
17   Q. And is that a complete -- is that your complete
18 billing for your work as an expert for Ethicon in this
19 litigation except for what might have been done in the
20 past couple of days to get you ready for your deposition?
21   A. They're -- I believe this is the -- let me just
22 go back.
23       Yeah, this -- this invoice covers November
24 to December. There's a -- Butler & Snow is another law

Stanton Shoemaker, M.D.

Page 102

1  firm that originally contacted me --
2      Q.  Right.
3      A.  -- about a year ago.  And, quite frankly, I can't
4  remember whether or not there was any invoices prior to
5  starting counting hours in November.
6          MS. DEMING:  I will represent to you that I
7  checked with Butler Snow and these are the only three
8  invoices that they have.
9          MR. MONSOUR:  Okay.
10         THE WITNESS:  Okay.
11     Q.  (BY MR. MONSOUR)  All right.
12         MS. DEMING:  But as you can see, he's doing
13  them in, like, monthly or whatever, so -- any April time,
14  he has not billed us.
15         MR. MONSOUR:  Right, that's what I was --
16  today's April the 5th?
17         MS. DEMING:  Uh-huh.
18     Q.  (BY MR. MONSOUR)  So Exhibit 3 is your time
19  through March 31 --
20     A.  Right.
21     Q.  -- of 2016?
22     A.  Correct.
23     Q.  Okay.  And if I add it up, it looks to me like
24  it's about 40, 41,000, ballpark.  Does that sound about

Page 103

1  right?
2      A.  Yes, sir.
3      Q.  Okay.
4      A.  Yeah.
5      Q.  Now, for the work that was done -- do you know
6  when you completed these reports, your two reports in this
7  case?
8      A.  The end of February, I think.
9      Q.  What's that?
10     A.  The end of February.
11     Q.  End of February.
12     A.  I think that's right.  Maybe middle of February.
13  Somewhere in the month of February.
14     Q.  Okay.  So your reports -- well, you sent a bill
15  on February 25th of 2016.  So did you probably send the
16  bill around the time you were wrapping up your reports?
17     A.  Probably.
18     Q.  Okay.  So up through the time of your reports,
19  you've got 10 hours on the first bill, 22 on the second,
20  and 29.5 on the third bill.  Does that sound about right?
21     A.  Yes.
22     Q.  Okay.  Your reports -- did you write them?
23     A.  Yes.
24     Q.  Did you write them all by yourself?

Page 104

1      A.  Yes.  I mean --
2          MS. DEMING:  Object to the form.
3      A.  I wrote all the words, somebody else typed it,
4  but, yeah.
5      Q.  (BY MR. MONSOUR)  Did you dictate it or how did
6  it go?
7      A.  I usually wrote or I put it in a Word -- you
8  know, on the computer, tried to type something up, or I
9  handwrote it --
10     Q.  Okay.
11     A.  -- which is a little daunting.
12     Q.  Okay.  All right.  I want to switch topics.  I
13  want to ask you about the topic of degradation.  Your
14  report mentions that a little bit.
15         MS. DEMING:  Let me stop you for a minute.
16  For the record, we extended the deadline on a couple of
17  the cases that he's been doing because he had to do an IME
18  or two after the report deadline.  So I just wanted to
19  make you clear that there was other stuff being done after
20  this general report, for example, was completed.
21         MR. MONSOUR:  But that would be
22  case-specific stuff?
23         MS. DEMING:  It is, absolutely.
24         MR. MONSOUR:  Okay, yeah, that's okay.  I

Page 105

1  know that --
2          MS. DEMING:  I just wanted to be complete.
3          MR. MONSOUR:  I know there's some give and
4  take on specific cases, so I think -- I've done that and
5  y'all have done that with me on a few, so --
6          MS. DEMING:  Sure.
7          MR. MONSOUR:  -- that's understand --
8      Q.  (BY MR. MONSOUR)  But let me just clarify this.
9  As far as your work on general theories of liability and
10  the products themselves, that's all encompassed in the
11  billing that is in Exhibit 3?
12     A.  Yes.
13     Q.  And, actually, if I look at Exhibit 3, this also
14  does include some case-specific work you've done.  For
15  instance, on the third page it mentions -- looks like IMEs
16  for Dimock and Morrow.
17     A.  Right.
18     Q.  So now that we've got that clear, degradation,
19  are you familiar with that subject matter with regard to
20  the transvaginal mesh products?
21     A.  I've just heard that it's been -- it's been
22  mentioned as a potential complication with the material.
23     Q.  Okay.  Have you ever done any studies on -- have
24  you ever done any research on the topic of polypropylene

Stanton Shoemaker, M.D.

Page 106

1 mesh degradation?
2    A. I haven't -- I haven't -- only to the extent that
3 I've seen it written about with regard to this litigation.
4    Q. And -- and. Okay. So you've done no personal
5 research or scientific studies on the topic of
6 degradation?
7    A. On polypropylene?
8    Q. Yes.
9    A. No, I have not.
10    Q. Would you consider yourself an expert in the
11 field of polypropylene degradation?
12    A. In what respect?
13    Q. With regard to polypropylene transvaginal mesh
14 products.
15    A. Only to the extent that they're in -- whatever
16 clinical application might be appropriate.
17    Q. Okay. Well, let me ask this question: Do you
18 know whether or not polypropylene mesh, once it's
19 implanted in the vaginal area, if it degrades at all; do
20 you know?
21    A. I have -- I certainly have never seen that --
22 have I had an experience with that? I've never seen that
23 happen. I've never read any of the -- any of the studies
24 related to -- clinical studies comparing polypropylene to

Page 107

1 other native tissue repairs. I've never seen any comments
2 on any of those papers related to some issue that the --
3 that the mesh may be degrading or disappearing or going
4 away. I mean -- you know, we've -- I can't imagine.
5       I mean, as far as I know, all the
6 polypropylene sutures that we've used for, you know,
7 decades hasn't gone away. So I don't -- I -- I've never
8 seen that happen, nor have I ever read about that
9 happening. I've just seen it in some discussions related
10 to this litigation.
11    Q. Are you aware that there are some articles that
12 are published about polypropylene degradation that are out
13 in the scientific community?
14    A. You mean unrelated to the clinical aspect of
15 pelvic organ prolapse?
16    Q. Well, I'm just talking about where they actually
17 look at -- where they actually look at the polypropylene
18 and determine whether or not it degraded once it was
19 implanted.
20    A. I've -- I -- I have not seen that specifically.
21 Whether you're talking about like a -- a laboratory study
22 where they've seen the material go away or disappear, I've
23 never seen that. I certainly have never seen it in any
24 kind of application related to the surgical procedures

Page 108

1 that we do.
2    Q. Do you --
3    A. And I've -- and I've gone back in on surgical
4 cases in which Prolene has been there -- around for 20
5 plus years and it's still there.
6    Q. Have you ever looked at it microscopically?
7    A. No.
8    Q. And I think you'll agree with this. Sometimes a
9 microscope will give you a better view of something that's
10 small like mesh than your naked eye would, correct?
11    A. Oh, in what -- in what application? Because if
12 it doesn't make any -- I mean, if it's not a clinical
13 issue, what difference would it make whether
14 microscopically I could see that it had decreased in
15 diameter or whatever?
16    Q. Well, that's my question, though. My question is
17 more: Have you ever looked at it microscopically to
18 determine --
19    A. No.
20    Q. -- whether or not that's taken place?
21    A. No, I have not.
22    Q. Okay. And you've never read any studies about
23 whether or not degradation takes place in polypropylene
24 transvaginal mesh implants once it's -- once it's

Page 109

1 implanted, true?
2    A. No. And I've never -- and I've never seen -- no.
3 And I never thought that it mattered, because I've seen
4 polypropylene, you know, numbers of years later and it
5 was -- it looked the same.
6    Q. With regard to your expert reports, there's a
7 couple of things. You've got -- there's a reliance list
8 of things that you relied upon. Are you familiar with --
9    A. Yes.
10    Q. -- that document?
11       Who put together the documents on your
12 reliance list?
13    A. You mean put the -- this together?
14    Q. Yes.
15       MS. DEMING: The list together.
16    A. Yes. They put -- we put the list together. We
17 commented about it with the -- with Kay, and then her
18 staff actually grasped the documents or printed them and
19 put them in those folders.
20    Q. (BY MR. MONSOUR) Okay. Well, I guess my
21 question, though, is simpler than that. On your reliance
22 list, there's a list of, like, internal Ethicon documents
23 that you've looked at?
24    A. Internal Ethicon documents like what?

Stanton Shoemaker, M.D.

Page 110

1    Q. They're Bates stamped. Have you -- did you look
2  at any internal Ethicon documents?
3    A. Give me an example and I'll tell you.
4      MS. DEMING: I can state for the record the
5  list was -- it's a materials list that Butler Snow keeps
6  up with anything that has been sent to him.
7      MR. MONSOUR: Okay.
8      MS. DEMING: And then he looked at it to see
9  if he had add -- you know, if there were things that
10  needed to be added to it --
11      MR. MONSOUR: Okay.
12      MS. DEMING: -- that he had looked at
13  independently.
14      MR. MONSOUR: Right.
15      MS. DEMING: So it's a list, really, that
16  provides, you know, an accounting, if you will, of
17  everything that he's had and then he could choose to look
18  at whatever he wanted to.
19      (Exhibit 4 marked.)
20    Q. (BY MR. MONSOUR) So I've marked as Exhibit 4
21  your reliance list, correct?
22    A. Okay.
23    Q. And who -- who determined what you relied upon, I
24  guess, is my question?

Page 111

1    A. Well, a lot of it I relied -- you mean in terms
2  of record -- clinical trials and papers that have been
3  written?
4    Q. Yes.
5    A. I relied on some of that. Some of that they sent
6  to me. I sent some stuff to them they hadn't seen,
7  some --
8    Q. Well, like -- let me ask you this question:
9  There's a memo from Dan Smith to David Robinson, Re:
10  Elongation characteristics of laser cut Prolene mesh for
11  TVT.
12      How was it determined that you needed that
13  document? Did you request it, did somebody send it to you
14  and, say, hey, you might want to read this?
15    A. I may have requested that, because there was
16  some -- something I read about -- there was an issue about
17  laser cut versus a mechanical cut. So I might have asked
18  them if they had any data or any papers about that and
19  they may have sent that to me.
20    Q. Okay. But I guess they were the ones that were
21  determining what was sent to you?
22    A. Well, if I -- yeah, if I -- well, in some cases,
23  that's correct; in some cases, it was not.
24    Q. Okay. You might mention a subject and say, I

Page 112

1  would like some information on this subject and then they
2  would then determine what was sent to you on that subject.
3  Is that a fair summary?
4    A. Often that -- often that would happen and
5  sometimes I would have the information myself.
6    Q. Okay.
7      MS. DEMING: That is Exhibit 3, did you say?
8      MR. MONSOUR: Yeah, that's exhibit --
9  Exhibit 4. I'm sorry.
10    Q. (BY MR. MONSOUR) And then there's a bunch of
11  studies in here on your reliance list. Do you see those?
12      MS. DEMING: You mean the published
13  articles?
14      MR. MONSOUR: Yeah.
15      MS. DEMING: Okay.
16    A. Yes.
17    Q. (BY MR. MONSOUR) How -- how did the list of
18  published articles come up? Were they provided to you or
19  did you come up with them?
20    A. Some of them were provided to me if I was on a
21  particular subject, and then some I already had or I had
22  reviewed. I reviewed articles periodically and in --
23  in -- but since all this -- since the litigation started,
24  you know, everything's been focused on this, you know,

Page 113

1  pelvic floor and pelvic floor mesh and slings, et cetera.
2  So --
3      MS. DEMING: Speak up.
4    A. So, anyway . . .
5      MS. DEMING: Did our people ever dial back
6  in?
7      MR. MONSOUR: I don't know. That's not --
8      MS. DEMING: Not my problem.
9      MR. MONSOUR: -- my problem. Okay.
10    Q. (BY MR. MONSOUR) Could you tell me which
11  subjects you requested additional -- well, let -- let me
12  ask it this way. Let me start this.
13      Your report or your reliance list has two
14  sections on it, basically. One is medical literature and
15  the second one is documents, correct?
16      MS. DEMING: And for the record, there --
17  with each report, for example, in a case-specific report,
18  there will be added material that was specific to the
19  case.
20      MR. MONSOUR: Okay.
21    A. Some of these --
22      MS. DEMING: Like, medical records and
23  things like that.
24    A. And I think there may be some duplication if --

Stanton Shoemaker, M.D.

Page 114

1  anyway.
2      Q. (BY MR. MONSOUR) So here's my question -- am I
3  right, though?  Does it -- does your reliance list
4  basically have two sections, one that's medical records,
5  the other one looks like Ethicon documents?
6          MS. DEMING:  Object to the form.
7      A. I haven't seen this put together in these pages,
8  so . . .
9      Q. (BY MR. MONSOUR) That's why I'm letting you look
10 at it.
11         MS. DEMING:  He's referring to this area
12 back here.
13     Q. (BY MR. MONSOUR) It's broken down at the top.
14 See, if you look here, this -- your medical literature
15 seems to stop on this page and then you flip over and it
16 says, "Document Description" --
17     A. I gotcha.
18     Q. -- and then it's got the Bates numbers.
19         MS. DEMING:  And it's got Bates numbers and
20 individual things.
21     A. I see.
22     Q. (BY MR. MONSOUR) Does that appear to be how
23 the --
24     A. Yeah.

Page 115

1      Q. -- the list was broken down?
2      A. Yeah.  And this may be stuff that they sent to
3  me.  It doesn't necessarily mean -- and I perused some of
4  it, but some of it I may not have complete --
5      Q. Okay.  And that's what I was going to get at.
6  Some of it they sent to you probably at -- as their choice
7  just to say, here, in case you want this, and then
8  others -- topics you might have requested --
9      A. Correct.
10     Q. -- literature or documents on, correct?
11     A. Yes.  Uh-huh.
12     Q. Could you tell me which topics -- so we don't
13 have to go through each document, which topics did you
14 request that they send you information on?
15     A. Well, any topic that -- where I -- it was
16 mentioned as a complaint with regard to some litigation,
17 that was -- that would all be -- would be one.  And, for
18 instance, I made a list here.  In fact, if you want -- you
19 might want to copy it.  These are particular articles that
20 I've couched that apply to things like voiding problems
21 after -- these are all postsurgical --
22         THE REPORTER:  Postsurgical what?  Speak up.
23         THE WITNESS:  I'm sorry.  What now?
24         THE REPORTER:  Postsurgical and then I

Page 116

1  couldn't hear you.
2      A. These are postsurgical issues that are commonly
3  associated with some of the complaints that people have in
4  the litigation.  So failure of recurrence or failure of
5  their prolapse, exposure and erosion, chronic pelvic pain,
6  dyspareunia, voiding problems, and quality of life.
7      Q. (BY MR. MONSOUR) Can I see those?
8      A. Yeah.
9      Q. And so on these handwritten pages that you've
10 just handed me, this is your handwriting on these,
11 correct?
12     A. Yes.
13     Q. And so there -- it looks like there's -- you're
14 citing, it looks like, some medical articles, correct?
15     A. Yes.
16     Q. And is that research that you did on your own?
17     A. Yes.
18     Q. Okay.
19         MR. MONSOUR:  I'm going to mark this as
20 Exhibit 5.
21         (Exhibit 5 marked.)
22     Q. (BY MR. MONSOUR) Okay.  I'll mark this as
23 Exhibit 5.
24         So Exhibit 5 is basically a list of medical

Page 117

1  articles that you came up on various topics that you are
2  aware were complaints or issues -- medical complaints or
3  issues that have been brought up in the litigation?
4      A. Correct.
5      Q. Okay.
6      A. Yes.  And in my -- and in my own experience, I've
7  had patients that came in that had these kind of problems
8  as well.
9      Q. Okay.  And then if we go back to Exhibit 4, which
10 is your list, it appears that at least a significant
11 number of these documents that are attached would have
12 been documents that were sent to you by Ethicon's counsel
13 saying, here, you might want to read this?
14     A. A lot of that, yes.
15     Q. Okay.  And then are there any -- on the -- on the
16 list -- not on medical journals, because I think this kind
17 of covers that.  But as far as documents, Ethicon
18 documents, can you tell me specifically the topics where
19 you would have contacted their lawyers and said, hey, I
20 would like to see the documents or some documents about
21 issue X?  Can you tell me what issues those would have
22 been?
23         MS. DEMING:  If he did.  Object to the form.
24     A. I don't think I did.

Stanton Shoemaker, M.D.

Page 118

1    Q. (BY MR. MONSOUR)  You didn't?

2    A. I don't think I ever asked specifically for any

3  particular document related to anything.

4    Q. Okay.  All right.  So all of the documents that

5  are listed on Exhibit 4 were those that were hand-selected

6  by Ethicon's lawyers to send to you, the documents, not

7  the --

8    A. Yes.

9    Q. -- scientific articles, correct?

10    A. Yes, I would say that.

11    Q. Okay.  Did you read them?

12    A. Probably not.

13    Q. Okay.  All right.

14         MS. DEMING:  That's going to cut things

15  down.

16    Q. (BY MR. MONSOUR)  That's why I ask questions that

17  way.  Makes it a lot simpler.

18         Let's go back to the topic of degradation.

19  Do you know what reactive oxidative species are?

20    A. You mean like species like germs, bacteria?

21    Q. Yes.

22    A. Do I know what they --

23    Q. Do you know what they are?

24    A. No.

Page 119

1    Q. Okay.  Do you -- do you know what peroxides are?

2    A. Only to the extent I've read that in some of the

3  reports from some of the experts on the plaintiffs' side.

4    Q. Okay.

5    A. I've read those words.

6    Q. Okay.  But you're unfamiliar with those topics?

7    A. Correct.

8    Q. Okay.

9    A. Only -- yes, to the extent that I -- in my -- I

10  mean, I have not had any clinical significant experience

11  that may be related to that.

12    Q. Okay.  Do you -- do you know if peroxides are

13  present in a woman's vagina?

14    A. Peroxides?

15    Q. Yes.

16    A. She may have put it there.

17    Q. Okay.

18    A. Are you talking about if they just occur

19  naturally there?

20    Q. Yes, if they occur naturally.

21    A. I don't know.

22    Q. All right.  Let me see.  You have given a

23  deposition before today, correct?

24    A. Not related to anything that has to do with this

Page 120

1  subject.

2    Q. Okay.  All right.  This is your first

3  transvaginal mesh depo ever?

4    A. Ever.

5    Q. Okay.  All right.  How long have you -- how long

6  have you worked -- or excuse me.

7         When were you retained by Ethicon to be an

8  expert for them in this litigation?

9    A. I was -- it was discussed -- probably it's been a

10  year ago, maybe eight -- late spring of last year.

11    Q. So 2015?

12    A. Yeah.

13    Q. Okay.  And -- but it seems like your work didn't

14  start until very, very recently?

15    A. Well, the end of 2015 because --

16    Q. End of 2015?

17    A. Yeah.

18    Q. And then this year some?

19    A. Yeah.

20    Q. What prompted you to be an expert for Ethicon?

21  Why did you do that?

22    A. You mean as a -- in this litigation, you mean?

23    Q. Yes, sir.

24    A. Well, I've had a relationship with Ethicon for a

Page 121

1  number of years as a -- as a preceptor/instructor going

2  back to the late '80s.

3    Q. And could you describe your relationship with

4  Ethicon, what you've done with them or for them over the

5  years?

6    A. Yeah, I was -- I was a preceptor for them in the

7  late '80s, their Ethicon endosurgery, which was their

8  laparoscopic division, about the time -- in fact, I was

9  involved -- one of the -- with their -- after they

10  developed their training center in Cincinnati for products

11  related to laparoscopic surgery.  And that was in the

12  late '80s.

13         And -- and so we were designing at that time

14  trocars and different types of substitutes for suture

15  materials, stapling devices and that kind of thing that I

16  was involved with.  So I would teach -- and physicians

17  would come down and -- I was a very -- had been an

18  advanced laparoscopic surgeon.  And so we did surgical

19  training, and I was involved in some of the surgical

20  training related to everything from laparoscopic

21  hysterectomy to laparoscopic gallbladder surgery.

22    Q. Okay.  As far as transvaginal mesh products, both

23  POP and SUI, when did your relationship with Ethicon

24  begin?

Stanton Shoemaker, M.D.

Page 122

1    A. Well, they began a division, Women's Health and
2  Urology, in the early 2000s. I'd already -- I had already
3  started doing TVT slings that -- when -- when that product
4  was actually produced by a company called Gynemesh. And I
5  think Ethicon bought Gynemesh and so -- and so it became
6  their product.
7        And so they were -- so I was asked at that
8  time to look at the product and -- and use it, and then
9  after a while, they were asking me to preceptor doctors
10  coming down and operating with them. So I began the
11  slings in the early 2000s and then with Prolift when it
12  was introduced in probably 2005 or '6, something like
13  that.
14    Q. And as a preceptor, that's -- a preceptor, that's
15  a situation where you're a doctor in an area that knows
16  how to do a certain procedure or use a certain device,
17  other doctors that might want to learn how to use that
18  procedure come see you and learn firsthand from you,
19  correct?
20    A. Yes.
21    Q. And the company pays you to teach them how to use
22  their product?
23    A. Yes. There's kind of a sequence that I would go
24  through in terms of that educational process for other

Page 123

1  doctors, but, anyway . . .
2    Q. Tell me the sequence.
3    A. The -- what I like to do is have the docs come --
4  well, oftentimes, we would end up meeting at a cadaver lab
5  that the company would provide to introduce something new
6  and to -- from a training standpoint, and then they would
7  allow -- then after that -- and I was involved in some of
8  those cadaver labs as well.
9        And then if the docs wanted more hands-on
10  type training, then they would come to Corpus Christi and
11  we would have some cases that I -- my cases. And so they
12  would be observers. And then I would talk to them a
13  little bit about what the procedure was, et cetera, and
14  how we -- how we utilized this particular product.
15        And then often -- and there was a
16  questionnaire that would have to be printed up, and then I
17  would have to put my signature of approval, whether I
18  thought this doc was adequately trained or not. But
19  before I would do that, oftentimes, I would go to where
20  his hospital was. This was at a time when you could
21  actually get hospital privileges a lot easier than you can
22  today.
23        But I would get privileges at his hospital
24  and actually assist him in some of his or her first cases,

Page 124

1  and then after that experience, then I felt comfortable in
2  deeming them qualified for doing a certain type of
3  procedure.
4    Q. Okay. When they were -- when they would first
5  come to see you --
6    A. Uh-huh.
7    Q. -- and on -- working on your patients, would they
8  scrub in?
9    A. Yes.
10    Q. Okay. And actually help with the procedure?
11    A. No, not -- well, that varied. That wasn't always
12  the case. Our hospital was pretty lenient in allow -- and
13  let me kind of control that. I mean, they weren't there
14  knowing that they were going to be able to be hands-on,
15  but I would often have them scrub in just so that --
16  because in vaginal surgery, if you're not scrubbed in, you
17  can't see.
18    Q. Okay.
19    A. It's just technically impossible to see the
20  anatomy and see what's going on if you have to be away
21  from the operative field.
22    Q. Just -- just from the physical construction of
23  where you're operating?
24    A. That's correct.

Page 125

1    Q. Okay.
2    A. In laparoscopic surgery where everything's on a
3  monitor, that's totally different. You know, everybody in
4  the room can look at a monitor and kind of see what the
5  procedure is.
6    Q. Have you ever voiced any criticisms to Ethicon
7  about any of their TVT products?
8    A. No.
9    Q. Have you ever voiced any criticisms to Ethicon
10  about any of their pelvic organ prolapse products?
11    A. Yes, yeah, the only one was -- would -- I would
12  say is Prosima. I was a key opinion leader when Prosima
13  was introduced, and that came through their division of
14  Women's Health and Urology.
15        And so they would have meetings, key opinion
16  leader meetings, and we would discuss different things.
17  And in the Prosima case, there might be 10 or 15 docs that
18  were from around the country that would get together for a
19  day or two and you, know, talk to them about our -- give
20  them some input about what our opinion was about certain
21  things.
22    Q. What were your criticisms of Prosima?
23    A. The biggest one was that I didn't like the -- the
24  little device that they provided in the kit to put -- to

Stanton Shoemaker, M.D.

Page 126

1 place the arms of the Prosima. It was a little awkward
2 and difficult to use.
3     So, you know, you'd have 15 people in the
4 room from all over the country and everybody would just
5 start talking about different things and people would have
6 different opinions. And so it gave the company an
7 opportunity to hear some issues from these people that
8 were using the product a lot and it gave us an opportunity
9 to learn maybe from somebody in Nebraska or something, you
10 know, say, oh, yeah, I had that problem, too. So it was a
11 good deal for all of us.
12     Q. Okay. Have you ever had -- you've worked with
13 various transvaginal mesh products made by other
14 manufacturers, true?
15     A. Very minimal experience.
16     Q. Okay.
17     A. But they would often call me and want to
18 introduce something, but it was -- you know, it's kind of
19 like, you know, you get into using a certain thing that
20 you like and, you know, you -- you -- because you do a lot
21 of certain types of cases, you're sort of a target for a
22 lot of people that want you to evaluate things.
23     But it was very -- so occasionally I would
24 use, maybe once or twice, something that was not an

Page 127

1 Ethicon product, but I was so happy with the Ethicon
2 products and the way they were working that it was -- I
3 never had -- I never saw any other product that was --
4 that made me say, well, you know, I really need to start
5 using something different because it's better for my
6 patient.
7     Q. Basically because -- as we were discussing
8 earlier in the depo, you've probably put in well over a
9 thousand transvaginal mesh products. That can make you a
10 target to salespeople from competitor products --
11     A. Yes.
12     Q. -- that want you to start using their product?
13     A. Yes, or -- yes, yes, that's correct.
14     Q. They probably call you every week to try and get
15 you to switch?
16         MS. DEMING: Object to form.
17     A. Over -- over a particular time period, yes, that
18 was correct.
19     Q. (BY MR. MONSOUR) Okay. Do you still -- other
20 than your expert work, do you still have a relationship
21 with Ethicon where you're a preceptor for them on
22 anything?
23     A. No.
24     Q. Is the -- is the da Vinci robot, do you teach --

Page 128

1 are you a preceptor for da Vinci?
2     A. I am.
3     Q. Okay. Are you a preceptor for any other
4 companies?
5     A. This company, ACell, that makes the MatriStem
6 product, the biologic, I do preceptorship with them.
7     Q. Okay. As far as your background, I know you've
8 worked on this litigation. Have you ever done any other
9 expert work in litigation before?
10     A. You know, yes, before Prop 12 in Texas where
11 there was a lot more malpractice litigation going on, I
12 was often called on to review cases, malpractice cases.
13     Q. For which side, plaintiff or defense?
14     A. Both. Probably more defense than plaintiff's
15 side, but I did -- I -- I did review cases for plaintiffs'
16 lawyers and sometimes I'd tell them that they did not want
17 me for a particular case, too.
18     Q. I've heard that story before.
19         Which plaintiffs' lawyers did you work with?
20     A. You know what, the last -- I couldn't -- I
21 couldn't tell you. The last case was probably in the mid
22 to early '80s, you know, with -- the only one I remember
23 vividly was -- it was -- the plaintiffs were -- the
24 plaintiff was in Oklahoma. It was -- it was a -- it was a

Page 129

1 medical malpractice case. It was an obstetrical
2 complication case. And I was a plaintiff's expert and --
3 and -- yeah, but both -- I guess both the defense -- yeah,
4 the -- the doctor was from Oklahoma, so I guess the
5 defense lawyers were from Oklahoma City, yeah.
6     Q. Did you do a lot of brain damage baby cases,
7 expert work?
8     A. Not really, not -- I mean, sometimes I'd review
9 records typically on the defense side.
10         This plaintiff's particular case that I
11 remember vividly was a maternal death case.
12     Q. Okay. Have you ever testified live at trial?
13     A. I have.
14     Q. When was that?
15     A. Probably that -- I'm going to say the mid -- mid
16 to late '90s. It was a case out of Kingsville, Texas,
17 which is a community close here -- close to here.
18     Q. Yeah.
19     A. And that was -- that was a defense case. And it
20 was a -- it was an obstetrically related malpractice case.
21 And you may know Darrell Barger.
22     Q. Yeah.
23     A. Darrell and I are very close friends. And he was
24 the defense lawyer in that case.

Stanton Shoemaker, M.D.

Page 130

1    Q.  Okay.  Have you ever worked to -- have you ever
2   worked with a company to help get a product through the
3   FDA 510(k) process?
4    A.  I have not.
5    Q.  Do you have any specific knowledge about the
6   510(k) process?
7    A.  No.
8    Q.  Have you ever worked with a company getting a
9   product approved through the PMA process?
10    A.  I never -- no, I haven't.  Is that the device
11   process?
12    Q.  Yes.
13    A.  I've never worked with a company to try to get a
14   product through.  I'm fairly familiar with some of that,
15   somewhat related to this, with regard to the FDA.
16    Q.  Okay.  Would you -- I guess what I'm getting at
17   is would you consider yourself an expert on the 510(k)
18   process or the PMA process?
19    A.  No.
20    Q.  Okay.  One of the things that you talk about in
21   your expert report are the instructions for use that
22   accompany a product?
23    A.  Uh-huh.
24    Q.  Why -- what is your understanding of the reason

Page 131

1   why they have instructions for use?
2    A.  Well, I think they're just sort of basic
3   instructions that apply specific -- that apply to how --
4   what may be unique about the device in terms of how it
5   relates to a particular surgical procedure.
6    Q.  Do you think that if the company is aware of
7   adverse -- adverse reactions or problems with their
8   product, it should be disclosed to doctors in the IFU?
9    A.  Well, if it's a -- if it's related to something
10   from a clinical standpoint that's important to -- yeah,
11   then I think it may be.
12    Q.  Okay.  But in -- in all fairness, if the company
13   knows about certain issues with regards to its products,
14   you believe that they should share that information with
15   doctors so the doctors can perform an appropriate risk
16   balance evaluation?
17        MS. DEMING:  Object to the form.
18    A.  I think it depends on the -- what the application
19   is.  I mean, you know, if it's -- the handle's too heavy
20   and it may hurt your foot if it hits the floor, I don't
21   care about knowing that kind of thing, I mean.  But --
22   so -- I mean, you can get to a point where you can add
23   hundreds and hundreds of possible complication and things
24   and then it becomes -- it becomes meaningless.  So I

Page 132

1   haven't really relied on the instructions for use in order
2   to make what you call the risk and benefit ratio to
3   determine that.
4    Q.  (BY MR. MONSOUR)  One of the things as a
5   preceptor --
6    A.  Yeah.
7    Q.  -- you've been through some of their training
8   programs --
9    A.  Yeah.
10    Q.  -- correct?
11        They do go through the instructions for use
12   at those?
13    A.  Yeah.
14    Q.  And all -- all aspects of the instructions for
15   use?
16    A.  Yeah.
17    Q.  And, I mean, at least that's what their corporate
18   people are telling me.
19    A.  Oh, yeah.
20    Q.  Okay.
21    A.  So, then -- what I mean is when I'm in a
22   preceptor situation or a training situation, certainly, I
23   review -- say, look, here's -- you know, this is some
24   things you need to be aware of when you handle this

Page 133

1   instrument and you handle this device.  But it's not the
2   company -- I guess the point I'm making is there's a lot
3   of things that happen to patients that's -- that are
4   adverse or a complication that may be related to the
5   surgery and not so much the product.  And so it's not -- I
6   don't think it's the company's responsibility to try to
7   teach doctors how to operate.
8        And let me tell you, what I -- when I
9   described to you sort of my critique on how I handle
10   doctor instructions and them coming and observing,
11   discussing, and then going and operating with them, I
12   learn a lot about the surgeon.  And not every surgeon is
13   equal.
14    Q.  I'd say that's a pretty reasonable statement.
15        With the understanding that not every
16   surgeon is equal, is it probably also fair to say that not
17   every surgeon stays abreast of current medical literature?
18        MS. DEMING:  Object to form.
19    Q.  (BY MR. MONSOUR)  Is that a fair statement?
20        MS. DEMING:  Object to the form.
21    A.  I -- well, I would probably -- I'd have to
22   probably say yes.
23    Q.  (BY MR. MONSOUR)  Okay.
24    A.  Knowing that there might be surgeons out there

Stanton Shoemaker, M.D.

Page 134

1 that don't stay as abreast of medicine as others, one way
2 that a company can ensure that they get up-to-date
3 information on the adverse issues with their product is to
4 include that in the instructions for use --
5      MS. DEMING: Object to the form.
6 Q. (BY MR. MONSOUR) -- true?
7      A. Well, it depends on what the instructions are. I
8 mean, if you're going to put in the instructions for use
9 that you might injure a blood vessel when you perform the
10 surgery, well --
11      Q. Duh.
12      A. I mean, right.
13      Q. Right.
14      A. I mean, in other words, you can add so many
15 things.
16      Q. What you think --
17      MS. DEMING: Let him finish.
18      Were you finished?
19      THE WITNESS: Yes, I was finished.
20      MS. DEMING: Okay.
21      Q. (BY MR. MONSOUR) Let me -- let me see if I
22 can -- in the instructions for use, you believe a company
23 is not obligated to teach the doctor how to practice
24 medicine or to teach them how to operate, true?

Page 135

1      A. True.
2      Q. However, do you believe that if there are issues
3 unique to the product, that that information should be
4 shared with the physicians?
5      MS. DEMING: Object to the form.
6      A. If that -- if that -- if that information about
7 the product is -- has clinical significance --
8      Q. (BY MR. MONSOUR) Okay.
9      A. -- then -- then -- then, yes, if it has clinical
10 significance in the form of its uniqueness to that
11 particular product.
12      Q. Okay. Fair enough.
13      A. And I'm happy to look at an individual bit of
14 information and discuss that with you if you want. But
15 just overall, that's my overall opinion.
16      Q. Okay. But it involves -- what you're saying is,
17 is the company needs to include in the instructions for
18 use issues that are unique to the product and that have
19 clinical significance?
20      MS. DEMING: Object to the form.
21      A. I would say if they have -- yes, if they have
22 clinical significance and -- and the clinical significance
23 is going to -- makes a difference in how the product is
24 used, yes.

Page 136

1      Q. (BY MR. MONSOUR) Okay. Do you consider yourself
2 an expert in -- in instructions for use as far as what is
3 required to be in them?
4      A. As long as it applies to -- it has clinical
5 significance, and as long as it applies to, you know, what
6 I'm -- what I do, you know, clinically and as long as it
7 takes a -- as long as it -- as long as it's relevant to
8 the realm of surgery that I'm doing.
9      Q. Okay. Let me ask it this way: Is it a fair
10 statement to say that as a surgeon, you use a lot of
11 different medical devices?
12      A. Yes.
13      Q. Is it fair to say that as a surgeon, you have
14 read a lot of instructions for use for medical devices
15 over the years?
16      A. Yes.
17      Q. Would you say your experience -- or your
18 expertise is derived from your working with and using so
19 many instructions for use over the years?
20      A. No.
21      Q. Okay. Explain it --
22      A. No.
23      Q. -- to me, then.
24      A. No, I mean, I read the instructions for use and I

Page 137

1 see what the specific things are that are -- but, you
2 know, my -- my -- the criteria I use on whether I'm going
3 to continue to use the product or not really has very
4 little to do with what the -- the IFUs as presented.
5      I mean, there's a lot more other things that
6 go into the use of that product that makes a decision --
7 where I make a decision about whether I'm going to
8 continue to use it far beyond what -- the instructions for
9 use.
10      Q. I asked an inartful question. Let me -- let
11 me -- let me -- let me -- let me reask the question.
12      Your knowledge on instructions for use is
13 based on the fact that as a surgeon, over the years,
14 you've read and utilized a lot of instructions for use?
15      A. I've read and utilized instructions for use --
16 just read it and then how much I've relied on it in terms
17 of whether I continue to use the product or not may not be
18 exactly the same. I mean --
19      Q. I guess what I'm getting at, though, is, is that
20 would -- your knowledge based on instructions for use is
21 based upon your experience as a surgeon, not with working
22 with the company to help draft them or working with the
23 FDA to see that requirements are met. Your experience
24 with instructions for use is -- is -- is that --

Stanton Shoemaker, M.D.

Page 138

1    A. Clinical.
2    Q. -- your experience clinically --
3    A. Yes.
4    Q. -- correct?
5    A. Yes.
6        MS. DEMING: Object to the form.
7    Q. (BY MR. MONSOUR) Have you ever participated in
8    designing a clinical study?
9    A. I've had a couple of papers published, but
10   they -- they were not really -- yeah, there was one that
11   was a clinical study back when I was a resident.
12   Q. Okay.
13   A. It was an obstetrically related study when I was
14   at Parkland.
15   Q. Would you consider yourself an expert in
16   designing clinical studies?
17   A. Only to the extent that I've done some myself,
18   but I can read studies and make a decision about whether
19   they're -- how -- how appropriate they are and how
20   credible they are.
21   Q. Okay.
22       MS. DEMING: Off the record.
23   Q. (BY MR. MONSOUR) Have you -- have you ever
24   designed a medical device?

Page 139

1    A. No, I have not.
2    Q. Would you consider yourself an expert on the
3    design of medical devices?
4    A. Again, only to the extent that -- how it's
5    applied in my surgical hands and whether it -- you know,
6    how functional it is from that perspective.
7    Q. So your design expertise would basically be more
8    of a -- it's already designed and you use it and you can
9    say, yeah, it seems to work or, no, it doesn't?
10   A. Yeah, exactly.
11   Q. Okay. It would be from a user's perspective, not
12   from a designer's perspective?
13   A. Correct.
14   Q. Okay. Do you know why they pulled the Prolift
15   from the market?
16       MS. DEMING: Object to the form.
17   A. The only thing I was told was that they were --
18   there was a -- after the FDA in 2011 basically said if
19   you're going to market these vaginal mesh devices, you're
20   going to have to come do -- produce some 522 study -- the
21   522 study thing, and this is what you're going to have to
22   do. And I think at that -- didn't they reclassify it as a
23   Level 3 product rather than a -- or that just recently
24   happened.

Page 140

1    Q. (BY MR. MONSOUR) Yes.
2    A. But, anyway -- so I think the company decided
3    that instead of going through with the 522 study, that
4    they -- it was -- the cost-benefit ratio to them was not
5    there from a business standpoint.
6    Q. And you heard that from the company?
7    A. Yeah.
8    Q. Did that come from your sales rep with the
9    company or somebody higher up the food chain?
10   A. No, I think -- I can't remember his name anymore,
11   but there was somebody -- I think -- it may have been in
12   the -- December of 2011, I was at a conference in -- a
13   PAGS conference, pelvic anatomy and GYN surgery
14   conference, that was always held in December.
15       And at that meeting, the -- I'm trying to
16   think of -- it was the guy that was the director of -- for
17   Women's Health and Urology, that division of Ethicon,
18   indicated at that time to me that they were going to quit
19   making vaginal devices -- I mean, the vaginal products,
20   so -- but they were still going to make the slings, that
21   was not an issue, because that -- in the -- in the FDA
22   hearing in -- in August of 2011, the slings in -- that the
23   transobturator -- the traditional transobturator and
24   transvaginal slings were not required to do additional

Page 141

1    studies and they were allowed to stay on the market. The
2    only sling that was required to participate in the 522
3    study were the mini slings, the single-incision slings.
4        And then from the medical device -- from the
5    vaginal meshes that were being made, I think the
6    company -- Boston and AMS, Ethicon, Bard, they were going
7    to have to produce -- redo their -- or redo the -- the big
8    criticism was that there was not a control group with
9    their initial clinical trials. So they said you're going
10   to need to do -- that's what the 522 study was designed to
11   do.
12       So -- so, anyway, Ethicon at that point
13   decided from a business standpoint, that they didn't want
14   to participate because of the -- I know a little bit about
15   that, because ACell, the company that makes this biologic
16   graft that I currently use, is participating in the 522
17   studies. And it took until -- let me think about this.
18   It took -- those studies just began a year ago. So from
19   2011 until 2015, it took four years to put a study design
20   together where the urologic societies and ACOG and
21   everybody agreed to the design of the study. And then
22   it's going to take probably five more years before they
23   actually have data.
24   Q. Have you ever worked with any of the mini slings?

Stanton Shoemaker, M.D.

Page 142

1    A. I've put in maybe one or two.
2    Q. Did -- what did you think of the mini slings?
3    A. Well, the idea was intriguing, because I think
4  when they originally came out, the concept was that it
5  might be something that would be simple enough to do in an
6  office, you know, with local anesthesia.
7        So the idea was good, but I never could --
8  my -- my -- my problem with the mini sling was there was
9  not any objective way to control the tensioning. So you
10  didn't know how loose to make it or how snug to make it,
11  and that was a problem for me, so -- and I was happy with
12  the conventional products anyway.
13    Q. Oh, you mentioned in your report evidence-based
14  medicine that you -- I guess you try and follow
15  evidence-based medicine?
16    A. To a big degree, yeah.
17    Q. What does that mean? What's evidence-based
18  medicine?
19    A. Well, it's sort of like, you know, what -- what
20  kind of study or what kind of -- needs to be done or
21  what -- what is necessary. And there's different levels.
22  What -- what seems to be the best in terms of trying to
23  prove something causes something else to happen. So, for
24  instance, an anecdotal report on something is not very

Page 143

1  power in terms of influencing a causal relationship
2  compared to, say, a randomized controlled study, which
3  is -- you know, as you know, randomized controlled studies
4  are more of the standard by which a lot of these things
5  are done. You know, a lot of these decisions are made
6  about what works and what doesn't work and what's the
7  complications and what -- and . . .
8        So, you know, that and in conjunction with
9  my experience, you know, and my own personal things
10  going -- you know, in my practice are the things that
11  influence me the most.
12    Q. What is a monograph?
13    A. Monograph, it's like a report. Sometimes it's a
14  report written by somebody that has a -- they have an
15  opinion about it, about some -- some issue or some --
16    Q. You mention in your report the 2007 Prolift
17  surgeon monograph?
18    A. 2007?
19    Q. Yeah.
20    A. I'd have to see it.
21    MS. DEMING: Is there a question pending?
22    Q. (BY MR. MONSOUR) Yeah, why did you mention the
23  2007 Prolift surgeon monograph?
24    A. Well, I'd have to -- I'd have to look and see.

Page 144

1        MS. DEMING: Where are you reading?
2    Q. (BY MR. MONSOUR) It's on page 36 of your report
3  at the bottom.
4        MS. DEMING: On the Prolift or TVT or --
5  yeah, Prolift, I presume.
6        MR. MONSOUR: I presume it would be Prolift.
7        MS. DEMING: Yeah, what page?
8        MR. MONSOUR: Page 36 at the bottom. It's
9  near the end of the report.
10        MS. DEMING: Here it is. That's what he's
11  talking about.
12    Q. (BY MR. MONSOUR) And I'll read it to you.
13  It's -- just so the record's clear. On page 36 of your
14  Prolift report, it says, "The professional education
15  materials in 2007 Prolift surgeon monograph which
16  supplement the IFUs warn of complications like
17  contraction, erosion, pain, and dyspareunia and discuss
18  management of these complications."
19        Did I read that correctly?
20    A. Yes.
21    Q. And so why did you mention --
22        THE WITNESS: Did we put in --
23        MS. DEMING: No, that's not -- we didn't put
24  that in the -- I mean, we didn't -- these were articles,

Page 145

1  so . . .
2    Q. (BY MR. MONSOUR) So why did you refer to the
3  monograph?
4    A. The -- it must have come as an additional paper.
5    Q. So tell me --
6    A. It could have been -- and I think it was -- I
7  have to look at some of the materials that I had. We had
8  brochures and a variety of things. I'd have to pull that
9  out and see exactly. But it would talk -- it -- I'm sure
10  without -- I'd have to look at it to see exactly how it
11  was worded, but, you know, whenever you saw the certain
12  types of complications that discussed, you know, certain
13  ways to manage them.
14    Q. Where does the monograph come in to the surgeon's
15  process? Where do y'all use the monographs at?
16    A. Well, if the -- if, for instance, you had a
17  patient who had an erosion or who had some -- or pain
18  and -- then it would discuss, you know, how to manage that
19  with regard to what -- what -- what other options there
20  were, what other conditions there were that may have
21  caused the problem. And then if it was a surgical
22  problem, how the -- what technique would be used.
23    Q. How do you get the monograph? Does the company
24  send them to you?

Stanton Shoemaker, M.D.

Page 146

1    A.  The company provided that.
2    Q.  And is that -- is -- is the monograph -- is it
3  something you keep in your office or --
4    A.  It could have been.  I mean, it could have
5  been -- there were a lot of materials related to Prolift
6  and the -- and the instructions on how to place Prolift
7  and that kind of thing and how to place the trocars, et
8  cetera, and all that.  And then they would -- then they
9  would -- there may have been -- after the initial Prolift
10  launch, then they may -- as issues that came up that might
11  have been related to the Prolift, then they may have come
12  up with a monograph that came from the company.  Do you
13  need to --
14    Q.  How is an instruction for use different than a
15  monograph?
16    A.  It may have been a supplement to the -- in other
17  words, instead of reproducing another IFU, it might have
18  been an addition to the IFU.
19    Q.  Do you know or are you guessing?
20    A.  I'm -- I'm not 100 percent sure, but I need to
21  have that in front of me and then I could tell you.
22    Q.  Okay.
23      MR. MONSOUR:  Did you say it was attached?
24      MS. DEMING:  No, it's not.  We don't --

Page 147

1      MR. MONSOUR:  It's in there?
2      MS. DEMING:  No, it is not.
3      MS. KROTTINGER:  Is it on the thumb drive of
4  reliance materials?
5      MS. DEMING:  Yeah, absolutely, but I don't
6  think we brought one here that we can get it.
7      THE WITNESS:  I thought I had some patient
8  brochures -- maybe they're with those -- maybe they're
9  with the case-specific.
10      MS. DEMING:  Let me -- let me look.  Let me
11  look.
12    Q.  (BY MR. MONSOUR)  My -- I won't go into it too
13  much.  I'm just more generally asking questions.
14      Is -- when you would -- I know you did
15  preceptor work for Ethicon.  But did you also -- when they
16  would have meetings and have, like, a lecture portion and
17  then the cadaver lab following, would you ever be one of
18  the lecturers?
19    A.  Typically -- I may have been a lecturer on a
20  couple of occasions.  I was a lecturer with Prosima.  But
21  Prolift, I don't think so.  I think I was just a -- it may
22  have been a -- and with slings, I was more of a -- a
23  proctor in the cadaver lab.
24    Q.  Okay.

Page 148

1      MS. DEMING:  And, by the way, I did receive
2  the one for you, if you want it --
3      MR. MONSOUR:  Okay.
4      MS. DEMING:  -- that has the --
5      MR. MONSOUR:  Hand it to her.
6      MS. DEMING:  It's now yours.  And I think
7  when you try to open it, it will tell -- you should know
8  what the plaintiffs' password is.  I don't.  I mean, they
9  didn't tell me what it was, but it's what they do for
10  everybody.
11      MR. MONSOUR:  Okay.
12      MS. DEMING:  Whatever that is.  I can -- if
13  you have a problem, call me.
14      MS. KROTTINGER:  Okay.
15    Q.  (BY MR. MONSOUR)  When you go through either a
16  surgery with one of your patients and you're explaining
17  what the surgery is, you typically talk about the risks
18  and the benefits, I would assume?
19    A.  I do.
20    Q.  One of the things that I've seen in this
21  litigation is various pamphlets that Ethicon's made with
22  regard to either the TVT or to the Prolift.
23    A.  Yes.
24    Q.  Have you ever seen any of those?

Page 149

1    A.  Oh, yes.
2    Q.  Did -- did you ever use those in your practice
3  and -- to kind of help explain things --
4    A.  Yes.
5    Q.  -- or maybe give them to the patients when they
6  were leaving?
7    A.  Yes.
8    Q.  What is the purpose of those handouts?
9    A.  Well, they're typically written on maybe a -- you
10  know, on a level that most people can understand, because
11  trying to go through pelvic anatomy with a patient is not
12  easy.
13    Q.  Right.
14    A.  And so the diagrams that were in were very
15  simple, so it was very useful from that perspective.
16  And -- so -- so it was a -- it was a -- it was a really
17  nice educational tool.  I could say, you know, we're going
18  to be doing this repair and we're going to be using this
19  product and this is the way it looks and this is the way
20  it looks when we put it in your body and this is what it's
21  designed to do.
22    Q.  But the intention of those products is to, I
23  guess, provide the patient with a more understandable
24  version of the procedure and/or the product?

Stanton Shoemaker, M.D.

| Page 150 |
|---|
| 1    MS. DEMING:  Object to the form. |
| 2    A.  Well, yeah.  And the way I -- I never did just |
| 3   hand the -- say, listen, this is what we're going to do |
| 4   and go home. |
| 5    Q.  (BY MR. MONSOUR)  I didn't figure you would. |
| 6    A.  Because that was -- that was useless.  And I |
| 7   think I -- I don't think -- I didn't have the Ethicon |
| 8   brochure on my wall, but if you came to my office and you |
| 9   went in my exam rooms, I have diagrams all over the walls, |
| 10   so depending on what I needed to reference for patients |
| 11   and -- where the pictures were big.  So I use that, a |
| 12   lot of -- I'm a very visual person and I -- it's a lot |
| 13   easier to explain things in picture form than it is to try |
| 14   to explain it in any other way.  So that was my main way |
| 15   of using it. |
| 16    And then I would -- then I would -- after |
| 17   explaining it on there and maybe jotting a note or |
| 18   something, then I would hand it to the patient so they |
| 19   could keep that and refer to it.  And then oftentimes they |
| 20   would come back for their preop visit with questions |
| 21   related to the surgery that they -- that they -- that the |
| 22   question was derived from what -- when they read those |
| 23   brochures. |
| 24    Q.  Okay.  We've been going about an hour.  Let's |

| Page 151 |
|---|
| 1   take a break. |
| 2    (Short recess.) |
| 3    Q.  (BY MR. MONSOUR)  Let's go back on the record. |
| 4    We've had a short break.  Are you ready to |
| 5   continue? |
| 6    A.  Yes, uh-huh. |
| 7    Q.  A couple of things.  I just need to do some |
| 8   housekeeping.  With regard to your qualifications, you are |
| 9   not a -- a pathologist, correct? |
| 10    A.  I'm not a pathologist. |
| 11    Q.  You are not a polymer science expert, correct? |
| 12    A.  I -- from what perspective? |
| 13    Q.  As far as how polymers perform, are made, |
| 14   degrade, those types of things.  You are not a polymer |
| 15   science expert? |
| 16    A.  I'm not a polymer scientist. |
| 17    Q.  Okay.  All right.  You are -- you are not an FDA |
| 18   expert, correct? |
| 19    A.  I mean, in what -- I mean, how -- I don't know |
| 20   what you mean by "expert."  How do you become an FDA |
| 21   expert? |
| 22    Q.  Well, if you were one, you would probably know. |
| 23   So -- |
| 24    A.  Look -- look, how the -- how the FDA may -- and |

| Page 152 |
|---|
| 1   its -- and its regulation about these products and how I |
| 2   used them, yeah, I have some knowledge about that.  And |
| 3   how the FDA classifies devices, I have some knowledge |
| 4   about that.  So, I mean, from -- I don't know what the |
| 5   definition of an "expert" is, but -- |
| 6    Q.  Let me ask it this way.  I have some knowledge |
| 7   about automobiles, but you wouldn't want me fixing your |
| 8   car.  I own a car.  I own several cars.  I've owned many |
| 9   over the years.  I'm not a car expert at all.  And that's |
| 10   kind of what I'm getting at. |
| 11    I mean, it -- your expertise is limited to |
| 12   gynecology.  Is that a fair statement? |
| 13    MS. DEMING:  Object to the form. |
| 14    A.  Well, yes.  And anything that applies to |
| 15   gynecology that might be somewhere -- I mean -- I mean -- |
| 16   go ahead. |
| 17    Q.  (BY MR. MONSOUR)  But I'm trying to short-circuit |
| 18   this.  Your expertise is limited to gynecology and |
| 19   clinical aspects of gynecology.  Is that a fair statement? |
| 20    MS. DEMING:  Object to the form. |
| 21    A.  I wouldn't say it's limited to, but it certainly |
| 22   is inclusive of anything that has to do with gynecologic |
| 23   surgery and anything that's affecting gynecologic surgery, |
| 24   then I feel I have pretty good expertise about. |

| Page 153 |
|---|
| 1    Q.  (BY MR. MONSOUR)  Okay. |
| 2    MS. DEMING:  I can assure you he is not |
| 3   going to be offered as an expert to talk about 510(k) |
| 4   process and how it goes through the regulations for FDA |
| 5   requirements.  In that respect, he is not a regulatory |
| 6   expert.  If that helps you at all.  Nor is he going to be |
| 7   offered to take a regulation of the FDA and -- and talk to |
| 8   the jury about it, nor do I understand whether Judge |
| 9   Goodwin will even allow it. |
| 10    MR. MONSOUR:  These questions weren't my |
| 11   idea. |
| 12    MS. DEMING:  I understand.  I know exactly. |
| 13    MR. MONSOUR:  It's my two compadres here. |
| 14    MS. DEMING:  It's not the first. |
| 15    MS. KROTTINGER:  It's an expert deposition. |
| 16   We want to know what he's an expert in. |
| 17    MS. DEMING:  And you are entitled to.  I'm |
| 18   just trying to shortcut it to -- |
| 19    Q.  (BY MR. MONSOUR)  So I'm -- I'm going to ask it |
| 20   another broad way.  Other than gynecology -- other than |
| 21   gynecology, what are you an expert in? |
| 22    A.  Fly fishing. |
| 23    Q.  Okay.  Okay. |
| 24    A.  How's that? |

Stanton Shoemaker, M.D.

Page 154

1  Q. All right. Okay.
2        MS. DEMING: Are we through?
3        MS. KROTTINGER: Could you introduce these
4  as exhibits?
5        MR. MONSOUR: Let me mark this as Exhibit 6.
6        (Exhibit 6 marked.)
7  Q. (BY MR. MONSOUR) Exhibit 6, Dr. Shoemaker, is
8  your TVT midurethral sling expert report, correct?
9  A. Yes.
10        (Exhibit 7 marked.)
11  Q. (BY MR. MONSOUR) And Exhibit No. 7 is your
12  Prolift pelvic organ prolapse expert report, correct?
13  A. Yes.
14  Q. Anything in either one of those two expert
15  reports that you need to supplement or change, as we sit
16  here today?
17  A. No.
18        MS. DEMING: I just have a couple of
19  questions.
20        MR. MONSOUR: Okay. Nothing -- I'll pass
21  the witness.
22        EXAMINATION
23  BY MS. DEMING:
24  Q. With respect to Exhibits 6 and 7, do these

Page 155

1  incorporate the opinions that you've formed in connection
2  with this case --
3  A. Yes.
4  Q. Okay.
5        -- with this -- the general aspects of this
6  pelvic mesh litigation?
7  A. Yes.
8  Q. He asked you some questions about the brochure
9  and how you use the patient brochure. Do you --
10  A. Yes.
11  Q. -- remember those questions?
12  A. Yes.
13  Q. In -- in the way that you use the brochure, is
14  it -- do you -- in -- strike that.
15        Is the brochure ever intended to supplant
16  your discussions with the patients?
17  A. No.
18  Q. How is it to be used?
19  A. No. I use it in conjunction with my discussion
20  with the patient about what the surgery's going to be and
21  mainly use it to -- to demonstrate schematically, you
22  know, what the operation's going to entail and what
23  products would I be using to help supplant it, her
24  implant.

Page 156

1  Q. Mr. Monsour asked you some questions about the
2  IFU and the bases of your expertise in connection with the
3  IFU. What, if any, role does the teaching or the
4  preceptorships that you have participated in in -- with
5  respect to the pelvic mesh, what, if any, role does that
6  have or inform you about with -- insofar as your expertise
7  as a labeling person is?
8  A. You mean how have I used the IFU in terms of
9  teaching another doctor?
10  Q. No, what I'm asking about that -- when you
11  test -- or, rather, when you have given an opinion in your
12  report --
13  A. Right.
14  Q. -- about the adequacy of the IFU for one of these
15  mesh products, does your role in teaching and your
16  discussions with the physicians that you teach inform that
17  expertise?
18  A. Inform the expertise?
19  Q. Yes.
20  A. Yes.
21  Q. Does your assistance at meetings -- you mentioned
22  one, but the professional meetings and whatnot where you
23  have these discussions with doctors, does that inform your
24  expertise?

Page 157

1  A. Oh, absolutely, yes.
2  Q. That's all I have.
3        MR. MONSOUR: I have nothing further.
4        MS. DEMING: I thank you.
5        (Deposition concluded.)

Stanton Shoemaker, M.D.

Page 158

```
1        IN THE UNITED STATES DISTRICT COURT
      FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
2             CHARLESTON DIVISION
3
   IN RE: ETHICON, INC.,    Master File No. 2:12-MD-02327
4  PELVIC REPAIR SYSTEM         MDL 2327
   PRODUCTS LIABILITY
5  LITIGATION
6  _____    JOSEPH R. GOODWIN
                  U.S. DISTRICT JUDGE
7  THIS DOCUMENT RELATES
   TO:
8
   Jane Doe
9  Case No. 2:12-cv-00000
10
11        REPORTER'S CERTIFICATION
       DEPOSITION OF STANTON SHOEMAKER, M.D.
12          TAKEN APRIL 5, 2016
13     I, RENE WHITE MOAREFI, Certified Shorthand Reporter
14 and Notary Public in and for the State of Texas, hereby
15 certify to the following:
16     That the witness, STANTON SHOEMAKER, M.D., was duly
17 sworn by the officer and that the transcript of the oral
18 deposition is a true record of the testimony given by the
19 witness;
20     That the original deposition was delivered to DOUGLAS
21 C. MONSOUR, ESQ.;
22     That a copy of this certificate was served on all
23 parties and/or the witness shown herein on
24 _____.
```

Page 159

```
1      I further certify that pursuant to FRCP No. 30(f)(i)
2  that the signature of the deponent was not requested by
3  the deponent or a party before the completion of the
4  deposition.
5      I further certify that I am neither counsel for,
6  related to, nor employed by any of the parties in the
7  action in which this proceeding was taken, and further
8  that I am not financially or otherwise interested in the
9  outcome of the action.
10     Certified to by me this 15th day of April, 2016.
11
12
13     _____
       RENE WHITE MOAREFI, CSR, CRR, RPR
14     My notary commission expires 10-28-18
15
       Golkow Technologies
16     Firm Registration No. 690
       1650 Market Street, Suite 5150
17     Philadelphia, PA  19103
       877.370.3377
18
19
20
21
22
23
24
```